INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

WASHINGTON D.C.

In the arbitration proceeding between

ANTIN INFRASTRUCTURE SERVICES LUXEMBOURG S.à.r.l. and
ANTIN ENERGIA TERMOSOLAR B.V.

v.

THE KINGDOM OF SPAIN

ICSID CASE No. ARB/13/31

---

**Award**

---

Members of the Tribunal

Mr. J. Christopher Thomas QC, Arbitrator
Prof. Francisco Orrego Vicuña, Arbitrator
Dr. Eduardo Zuleta, President

Secretary of the Tribunal:

Natalí Sequeira

Date of dispatch to the Parties: 15 June 2018

## REPRESENTATION OF THE PARTIES

---

*Representing Antin Infrastructure Services*
*Luxembourg S.à.r.l. and*
*Antin Energia Termosolar B.V.:*

Ms. Judith Gill QC
Ms. Marie Stoyanov
Ms. Virginia Allan
Mr. Ignacio Madalena
Ms. Lauren Lindsay
Ms. Naomi Briercliffe
Mr. Tomasz Hara
Ms. Stephanie Hawes
Allen & Overy LLP
One Bishops Square
London E1 6AD
United Kingdom

Mr. Jeffrey Sullivan
Gibson Dunn & Crutcher LLP
2-4 Temple Ave
London EC4Y 0HB
United Kingdom

*Representing the Kingdom of Spain*:

Mr. Diego Santacruz Descartín
Mr. Antolín Fernández Antuña
Mr. Javier Torres Gella
Ms. Mónica Moraleda Saceda
Ms. Amaia Rivas Kortazar
Ms. Elena Oñoro Sainz
Mr. Roberto Fernández Castilla
Ms. Patricia Froehlingsdorf Nicolás
Mr. Yago Fernández Badía

Abogacía General del Estado
Ministry of Justice of the Government of Spain
Calle Ayala 5
28001, Madrid
Spain

## TABLE OF CONTENTS

I.      INTRODUCTION AND PARTIES ............................................................................... 1
II.     PROCEDURAL HISTORY ........................................................................................ 1
III.    THE NON-DISPUTING PARTY APPLICATIONS.................................................. 10
IV.     FACTUAL BACKGROUND.................................................................................... 11
V.      SUMMARY OF THE PARTIES' CLAIMS AND PRAYERS FOR RELIEF .......... 38
VI.     APPLICABLE LAW ................................................................................................ 40
VII.    JURISDICTION ...................................................................................................... 41
        A.      Whether the Tribunal lacks jurisdiction *ratione personae* ......................... 42
                1.      Respondent's Position ...................................................... 42
                2.      Claimants' Position .......................................................... 48
                3.      Tribunal's Analysis .......................................................... 55
        B.      Whether the Tribunal has jurisdiction over the claims submitted by the Claimants
                regarding the "Interests" identified as protected investments under the Treaty.............. 64
                1.      Respondent's Position ...................................................... 64
                2.      Claimants' Position .......................................................... 66
                3.      Tribunal's Analysis .......................................................... 69
        C.      Whether there is a lack of jurisdiction to hear alleged violations arising from the TVPEE
                ............................................................................................................... 75
                1.      Respondent's Position ...................................................... 75
                2.      Claimants' Position .......................................................... 78
                3.      Tribunal's Analysis .......................................................... 83
        D.      Whether the requirements of the cooling-off period were met ....................... 89
                1.      Respondent's Position ...................................................... 89
                2.      Claimants' Position .......................................................... 90
                3.      Tribunal's Analysis .......................................................... 93
VIII.   MERITS OF THE CLAIMS....................................................................................... 97
        A.      Claimants' Position ...................................................................................... 97
                1.      Spain's violation of the FET standard ................................ 98
                2.      Impairment of the Claimants' investments as a result of unreasonable measures118
                3.      Violation of the umbrella clause........................................ 118
        B.      Respondent's position .................................................................................. 119
                1.      Spain has respected the standard of FET of Article 10(1) of the ECT................ 119
                2.      Inexistence of an umbrella clause...................................... 135
        C.      Tribunal's Analysis ..................................................................................... 137
IX.     Reparation.............................................................................................................. 155

    A.    Claimants' position ...................................................................................... 155

        1.    Spain's international responsibility for violations of the ECT ........................ 155

        2.    Valuation methodology and valuation date ..................................................... 156

        3.    The Respondent's criticisms to the damages calculations submitted by the Claimants ......................................................................................................... 160

        4.    The Claimants' alternative damages calculation .............................................. 166

    B.    Respondent's position ................................................................................... 167

        1.    The alleged damages are totally and absolutely speculative ............................. 167

        2.    The DCF method is inappropriate in light of the circumstances, in accordance with the doctrine ................................................................................................ 168

        3.    The standard established for the Andasol Plants in Ministerial Order IET/1045/2014 covers the investment costs undertaken ....................................... 169

        4.    Serious flaws of the Brattle Quantum Report ................................................... 170

        5.    Subsidiary calculations using DCF render positive financial impacts for the Claimants ......................................................................................................... 170

        6.    The inappropriateness of the tax gross-up proposed by the Claimants ............... 171

    C.    Tribunal's Analysis ....................................................................................... 171

        1.    The applicable standard for compensation ........................................................ 178

        2.    The historical damages ..................................................................................... 179

        3.    The tax gross-up claim ..................................................................................... 180

        4.    Damages for loss of future cash flows ............................................................. 181

        5.    The DCF method .............................................................................................. 182

        6.    Operational life of the Andasol Plants .............................................................. 185

        7.    The claim for lost future cash flows .................................................................. 190

        8.    Other objections from the Respondent on the methodology presented by the Claimants ......................................................................................................... 192

        9.    Interest ............................................................................................................. 193

X.    Costs ...................................................................................................................... 194

    A.    Claimants' Position ........................................................................................ 194

    B.    Respondent's Position .................................................................................... 195

    C.    Tribunal's Analysis ....................................................................................... 196

XI.    Decision ................................................................................................................ 197

**DEFINED TERMS**

---

| | |
|---|---|
| 2001 Renewables Directive | Directive 2001/77/EC "on the Promotion of Electricity Produced from Renewable Energy Sources in the Internal Electricity Market." |
| 2005-2010 Plan | Plan for the Promotion of Renewable Energies in Spain 2005-2010. |
| 2009 EU Directive | Directive 2009/28/EC "on the promotion and use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC." |
| 2012 Judgements | Spanish Supreme Court judgements issued in 2012 establishing that the remuneration regime applicable to RE producers could be validly modified, in accordance with the principle of reasonable return. |
| ACS | Actividades de Construcción y Servicios, S.A. |
| Adjusted NPV | The adjusted net present value of the reasonably expected cash flows of the Andasol Plants. |
| Alatec | Alatec Ingenieros Consultores y Arquitectos. |
| Alatec Report | Report prepared by Alatec, titled "Technical Evaluation of the Solar Thermal Plants with Parabolic Trough Collectors, Property of ACS/Cobra in Spain", dated 15 March 2011. |
| Altermia | Altermia Asesores Técnicos, S.L. |
| Altermia Report | Report prepared by Altermia, titled "Independent Technical Analysis – Technical Due Diligence of Three Thermosolar Projects in Spain", dated 7 July 2011. |
| Andasol Companies | Andasol-1 Central Termosolar UNO S.A. and Andasol-2 Central Termosolar DOS S.A. |
| Andasol Plants | The Andasol-1 Plant and the Andasol-2 Plant. |
| Andasol-1 Plant | A 49.9 MW CSP plant in Granada owned by Andasol-1 SA. |
| Andasol-1 SA | Andasol-1 Central Termosolar UNO S.A. |
| Andasol-2 Plant | A 49.9 MW CSP plant in Granada owned by Andasol-2 SA. |
| Andasol-2 SA | Andasol-2 Central Termosolar DOS S.A. |
| Antin | Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energía Termosolar B.V. |
| Antin Fund 1 | Antin Infrastructure Partners (AIP) FPCI. |
| Antin IP | Antin Infrastructure Partners S.A.S. |
| Antin Luxembourg | Antin Infrastructure Services Luxembourg S.à. r.l. |

| Antin Termosolar | Antin Energia Termosolar B.V. |
|---|---|
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings. |
| Art./Arts. | Article/Articles. |
| Base NPV | Base Net Present Value. |
| BDO Quantum Report I | Expert Report of BDO, titled "Expert economic-financial report on ANTIN and solar power plants", dated 30 July 2015. |
| BDO Quantum Report II | Expert Report of BDO, titled Expert rejoinder report to Brattle's "Rebuttal Report: Financial Damages to ANTIN", dated 29 February 2016. |
| BDO Regulatory Report I | Expert Report of BDO, titled "Economic and financial analysis of incentives to the solar thermal energy sector", dated 30 July 2015. |
| BDO Regulatory Report II | Expert Report of BDO, titled "Rejoinder Expert Report in response to the Brattle report 'Rebuttal Report: Changes to the Regulation of Concentrated Solar Power Installations in Spain'", dated 29 February 2016. |
| Bolaña WS I | Witness Statement of Mr. Mauricio Bolaña of 28 November 2014. |
| Brattle | The Brattle Group. |
| Brattle Quantum Report I | Expert Report of Brattle, titled "Financial Damages to Antin", dated 28 November 2014. |
| Brattle Quantum Report II | Expert Report of Brattle, titled "Rebuttal Report: Financial Damages to Antin", dated 18 December 2015. |
| Brattle Regulatory Report I | Expert Report of Brattle, titled "Changes to the Regulation of Concentrated Solar Power Installations in Spain", dated 28 November 2014. |
| Brattle Regulatory Report II | Expert Report of Brattle, titled "Rebuttal Report: Changes to the Regulation of Concentrated Solar Power Installations in Spain", dated 18 December 2015. |
| Centre | International Centre for Settlement of Investment Disputes. |
| Charter | The European Energy Charter. |
| CJEU | Court of Justice of the European Union. |
| Claimants | Antin Infrastructure Services Luxembourg S.à. r.l. and Antin Energia Termosolar B.V. |
| Claimants' Memorial | Claimants' Memorial submitted on 28 November 2014. |
| Claimants' Rejoinder | Claimants' Rejoinder on Jurisdiction, submitted on 15 April 2016. |

| | |
|---|---|
| Claimants' Reply | Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction, submitted on 18 December 2015. |
| CNE | "*Comisión Nacional de Energía*", the Spanish National Energy Commission. |
| Commission | European Commission. |
| Commission's First Application | European Commission's Application for Leave to Intervene as a Non-Disputing Party, submitted on 14 November 2014. |
| Commission's Second Application | European Commission's Application for Leave to Intervene as a Non-Disputing Party, submitted on 9 December 2015. |
| Cooling-Off Period | The three-month negotiation period that must elapse before an investor can submit a claim to arbitration under Article 26 ECT. |
| CPI | Consumer Price Index. |
| CPI Formula | The mechanism set forth in Article 44(1) RD 661/2007 for updating the FIT pursuant to the CPI. |
| CPI-PI | The CPI at constant taxes excluding unprocessed foods and energy products. |
| CPI-PI Formula | The mechanism set forth in RDL 2/2013 for updating remunerations, rates and premiums for electricity sector activities in accordance with the CPI at constant taxes excluding unprocessed foods and energy products. |
| Crosbie WS I | Witness Statement of Mr. Mark Crosbie of 28 November 2014. |
| CSP | Concentrated solar power. |
| DCF | Discounted cash flow. |
| December 2009 Judgements | Spanish Supreme Court judgements of 3 December 2009, 9 December 2009 and 9 December 2009. |
| Disputed Measures | Jointly, Law 15/2012, RDL 2/2013, RDL 9/2013, Law 24/2013, RD 413/2014, Ministerial Order IET/1045/2014. |
| ECT | Energy Charter Treaty. |
| EEC | European Economic Community. |
| EU | European Union. |
| EUR | Euros. |
| FET | Fair and Equitable Treatment. |
| Final Equity Value | The Adjusted NPV minus the net present value of the debt held by the Andasol Companies. |
| FIT | Feed-in-tariff mechanism provided in RD 661/2007. |
| Fixed Tariff | Type of FIT offered under RD 661/2007 in the form of a regulated tariff. |

| | |
|---|---|
| Further Measures | Jointly, Law 24/2013, RD 413/2014, Ministerial Order IET/1045/2014 and Ministerial Order IET/1882/2014. |
| GBP | British Pound Sterling. |
| Hearing | Hearing on Jurisdiction and the Merits was held at Paris, France from 19 October 2016 to 25 October 2016. |
| Herbert Smith | Herbert Smith Freehills (Madrid). |
| HS Report | Due diligence report issued by Herbert Smith on 25 March 2011, analysing the regulatory framework for CSP plants in Spain. |
| HTF | Heat transfer fluid. |
| ICSID | International Centre for Settlement of Investment Disputes. |
| ICSID Convention | Convention on the Settlement of Investment Disputes between States and Nationals of Other States. |
| IDAE | *Instituto para la Diversificación y Ahorro de la Energía.* |
| ILC Articles | The International Commission's Articles on the Responsibility of States for Internationally Wrongful Acts. |
| Initial Measures | Jointly, Law 15/2012, RDL 2/2013 and RDL 9/2013. |
| Intra-EU dispute | Dispute between an investor from the EU and a Member State of the EU. |
| Intra-EU investment | Investment made by an investor from the EU in the territory of the EU. |
| July 2010 Agreement | An agreement entered into between the Ministry and the CSP and wind industry associations, contemplating amendments to the SES regulatory framework. |
| Law 24/2013 | Law 24 of 2013, enacted on 26 December 2013, regulating the Spanish electrical sector. |
| Law 54/1997 | Law 54 of 1997 of 27 November 1997, on the Electric Power Sector, published on 28 November 1997. |
| Limited Partners | The 35 Limited Partners that invested in Antin Fund 1. |
| Mancini Report | Expert Report of Dr. Thomas R. Mancini of TRMancini Solar Consulting, dated 18 December 2015. |
| May 2007 Press Release | Press release dated 25 May 2007, announcing RD 661/2007, establishing that "The Government prioritizes profitability and stability in the new Royal Decree on renewable energy and combined heat and power". |
| Ministerial Order IET/1045/2014 | Order IET/1045/2014 enacted on June 2014, establishing certain aspects of the economic regime applicable to the different RE installations. |

| Ministerial Order IET/1882/2014 | Order IET/1882/2014 enacted on October 2014, for calculating the power attributable to the use of fuels in establishing thermoelectric solar installations. |
|---|---|
| Ministry | Spanish Ministry of Industry, Tourism and Commerce. |
| NCMC | *Comisión Nacional de los Mercados y la Competencia*, the Spanish National Commission on Markets and Competition. |
| New Regime | The regulatory regime applicable to RE producers in Spain after the introduction of the Disputed Measures, comprised of RDL 9/2013, RD 413/2014 and Ministerial Order IET/1045/2014. |
| Ordinary Regime | The regulatory regime applicable to conventional sources of energy production in the Spanish Electrical System, by opposition to the Special Regime applicable to renewable energy generators. |
| Parties | Collectively, the Claimants and the Respondent. |
| Pöyry | Pöyry Management Consulting. |
| Pöyry's First Report | Report issued by Pöyry, titled "Current State and Future Trends of Solar Power in Spain: An ILEX Energy Report to RREEF Infrastructure" in March 2011. |
| Pöyry's Second Report | Report issued by Pöyry, titled "Spanish Electricity Tariff Deficit – A Note from Pöyry Management Consulting to RREEF", 11 May 2011. |
| Premium | A type of FIT provided under RD 661/2007 consisting of a fixed premium payment over and above the price received in the market, subject to caps and floors. |
| Pre-RD 661/2007 Judgements | Spanish Supreme Court Judgements of 15 December 2005, 25 October 2006, 20 March 2007 and 9 October 2007. |
| PV | Photovoltaic. |
| RAB | Regulatory Asset Base. |
| RAIPRE | "*Registro Administrativo de Instalaciones de Producción en Régimen Especial*", the Administrative Registry of Production Facilities under the Special Regime. |
| RD | Royal Decree. |
| RD 2818/1998 | Royal Decree 2818 of 1998, enacted on 23 December 1998. |
| RD 413/2014 | Roya Decree 413 of 2014, enacted on 6 June 2014, regulating the activity of electrical energy production from renewable energy, waste or co-generation sources. |
| RD 436/2004 | Royal Decree 436 of 2004, enacted on 12 March 2004. |
| RDL | Royal Decree Law. |

| | |
|---|---|
| RDL 9/2013 | Royal Decree Law 9/2013, enacted on 12 July 2013, by which urgent measures are adopted to guarantee the financial stability of the electricity system. |
| RE | Renewable energy. |
| REIO | Regional Economic Integration Organization |
| Request for Arbitration | Claimants' Request for Arbitration, dated 29 October 2013. |
| Request for Bifurcation | Respondent's Request for Bifurcation, submitted on 30 January 2015. |
| Respondent | The Kingdom of Spain. |
| Respondent's Counter-Memorial | Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction, submitted on 31 July 2015. |
| Respondent's Rejoinder | Respondent's Rejoinder on the Merits and Reply on Jurisdiction, submitted on 1 March 2016. NOTE: **the numbers of paragraphs between the Spanish (original) version of Respondent's Rejoinder and the English translation differ. For purposes of the English version of the Award, the Tribunal uses the paragraphs of the English (translation) of the Respondent's Rejoinder.** |
| RREEF | RREEF Infrastructure (G.P.) Limited. |
| Servert Report | Expert report of Servert Engineering: "Andasol 1 and 2 CSP plants. Lifetime analysis and gas use in CSP plants with storage", dated 28 February 2016, prepared by the Engineer Dr. Jorge Servert. |
| SES | Spanish Electrical System. |
| Spain | The Kingdom of Spain. |
| Special Payment | Payment granted to RE producers under the New Regime. |
| Special Regime | Regulatory regime applicable to electricity production facilities of less than 50 MW which generated electricity from non-consumable renewable energy resources. |
| Tariff Deficit | The shortfall of revenues arising in the SES when the income of the system is smaller than its costs. |
| TFEU | Treaty on the Functioning of the European Union. |
| Treaty | Energy Charter Treaty. |
| TVPEE | Tax on the value of the production of electrical energy, introduced by Law 15/2012. |
| USD | United States Dollars. |
| VCLT | Vienna Convention on the Law of Treaties of 23 May 1969. |

# CASES

_____

*ADC Affiliate Limited and ADC & ADMC Management Limited v. The Republic of Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006 ("*ADC v. Hungary* (Award)"), Legal Authority CL-0002.

*AES Summit Generation Limited and AES-Tisza Erömü Kft. v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010 ("*AES v. Hungary* (Award)"), Legal Authority RL-0032.

*AES Summit Generation Limited and AES-Tisza Erömü Kft. v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Decision on Annulment, 29 June 2012 ("*AES v. Hungary* (Decision on Annulment)")*, Legal Authority RL-0036.

*Alps Finance and Trade AG v. The Slovak Republic,* UNCITRAL, Award, 5 March 2011 ("*Alps Finance v. The Slovak Republic* (Award)"), Legal Authority CL-0094.

*Amco Asia Corporation and others v. Republic of Indonesia,* ICSID Case No. ARB/81/1, Award, 20 November 1984 ("*Amco v. Indonesia* (Award)"), Legal Authority CL-0129.

*Anatolie Stati, Gabriel Stati, Ascom Group SA and Terra Raf Trans Traiding Ltd v. The Republic of Kazakhstan.* SCC, Decision, 19 December 2013 ("*Stati et al. v. Kazakhstan* (Decision)"), Legal Authorities RL-0017 and CL-0005.

*Antoine Goetz and others v. The Republic of Burundi,* ICSID Case No. ARB/95/3, Award, 10 February 1999 ("*Goetz v. Burundi* (Award)"), Legal Authority CL-0092.

*Arbitration regarding the Iron Rhine ("Ijzeren Rijn") Railway (Belgium/Netherlands),* Award, 24 May 2005 ("*Iron Rhine*") Legal Authority CL-0195.

*Asian Agricultural Products Ltd. (AAPL) v. The Republic of Sri Lanka*, Award, ICSID Case No. ARB/87/3, 27 June 1990 ("*AAPL v. Sri Lanka* (Award)"), Legal Authority CL-0130.

*Attanasio Group v. Commune di Carbognano* Judgment of the European Court of Justice, 11 March 2010, Issue C-384, [2010] ECR-I-2055 ("*Attanasio Group v. Commune di Carbognano* (Judgment)") Exhibit R-0013.

*Azurix Corp. v. The Argentine Republic,* ICSID Case No. ARB/01/12, Decision on Jurisdiction of 8 December 2003 ("*Azurix v. Argentina* (Decision on Jurisdiction)"), Legal Authority CL-0095.

*Azurix Corp. v. The Argentine Republic,* ICSID Case No. ARB/01/12, Award, 14 July 2006 ("*Azurix v. Argentina* (Award)"), Legal Authority CL-0006.

*Azurix Corp. v. The Argentine Republic,* ICSID Case No. ARB/01/12, Decision of the Annulment Committee, 1 September 2009 ("*Azurix v. Argentina* (Annulment)", Legal Authority RL-0060.

*Biwater Gauff (Tanzania) Limited v. The United Republic of Tanzania,* ICSID Case No. ARB/05/22, Award, 24 July 2008 ("*Biwater Gauff v. Tanzania* (Award)"), Legal Authority CL-0097.

*Camuzzi International S.A. v. The Argentine Republic*, ICSD Case No. ARB/03/2, Decision on Jurisdiction, 11 May 2005 ("*Camuzzi v. Argentina* (Decision on Jurisdiction)"), Legal Authority CL-0134.

*Case Concerning the Factory at Chorzów*, PCIJ Rep, Series A, No. 17, Judgment, 13 September 1928 ("*Factory at Chorzów* (Judgment)"), Legal Authority CL-0010.

*Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain*, SCC 062/2012, Final Award, 21 January 2016 ("*Charanne v. Spain* (Final Award)"), Legal Authority RL-0055.

*CMS Gas Transmission Company v. The Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005 ("*CMS v. Argentina* (Award)"), Legal Authority CL-0016.

*CMS Gas Transmission Company v. The Argentine Republic*, ICSID Case No. ARB/01/8, Decision of the Ad Hoc Committee on the Application for Annulment of the Argentine Republic, 25 September 2007 ("*CMS v. Argentina* (Annulment)"), Legal Authority RL-0040.

*Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. The Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007 ("*Vivendi v. Argentina* (Award)"), Legal Authority CL-0018.

*Compañía del Desarrollo de Santa Elena S.A. v. Republic of Costa Rica,* ICSID Case No. ARB/96/1, Award, 17 February 2000 ("*Santa Elena v. Costa Rica* (Award)"), Legal Authority CL-0017.

*Daimler Financial Services AG v. The Argentine Republic*, ICSID Case No. ARB/05/1, Dissenting Opinion of Judge Charles N. Brower, 15 August 2012 ("*Daimler v. Argentina* (Dissenting Opinion)"), Legal Authority CL-0141.

*Daimler Financial Services AG v. The Argentine Republic*, ICSID Case No. ARB/05/1, Award, 22 August 2012 ("*Daimler v. Argentina* (Award)"), Legal Authority CL-0140.

*Eastern Sugar B.V. v. The Czech Republic,* SCC Case No. 088/2004, Partial Award, 27 March 2007 ("*Eastern Sugar v. The Czech Republic* (Partial Award)"), Legal Authority CL-0102.

*ECE Projektmanagement Internal GmbH and other v. The Czech Republic,* PCA Case No. 2010-5, Award, 19 September 2013 ("*ECE v. Czech Republic* (Award)"), Legal Authority RL-0031.

*EDF (Services) Limited v. Romania,* ICSID Case No. ARB/05/13, Award, 8 October 2009, ("*EDF v. Romania* (Award)"), Legal Authority RL-0034.

*Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, ("*Eiser v. Spain* (Award)"), Legal Authority CL-0201.

*Elcogás, S.A. v. Administración del Estado and Iberdrola, S.A.*, Case C-275/13, Official Journal of the European Union Series C 16, 19.1.2015 , 22 October 2014 ("*Elcogás*"), Exhibit R-0045.

*Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, ("*Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability)"), Legal Authority CL-0024.

*El Paso Energy International Company v. The Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011 ("*El Paso v. Argentina* (Award)"), Legal Authority CL-0022.

*Emilio Agustín Maffezini v. Kingdom of Spain,* ICSID Case No. ARB/97/7*,* Award, 13 November 2000 ("*Maffezini v. Spain* (Award)"), Legal Authority CL-0023.

*EnCana Corporation v. Republic of Ecuador,* LCIA Case No. UN 3481, Award, 3 February 2006 ("*EnCana v. Ecuador* (Award)"), Legal Authority RL-0022.

*Enron Corporation and Ponderosa Assets, L.P. v. The Argentine Republic*, ICSID Case No. ARB/01/3. Decision on Jurisdiction, 14 January 2004 ("*Enron v. Argentina* (Decision on Jurisdiction)"), Legal Authority CL-0194.

*Enron Corporation and Ponderosa Assets, L.P. v. The Argentine Republic,* ICSID Case No. ARB/01/3, Award, 22 May 2007 *("Enron v. Argentina* (Award)*"),* Legal Authority CL-0025.

*Ethyl Corporation v. The Government of Canada*, UNCITRAL, Award on Jurisdiction, 24 June 1998 ("*Ethyl Corporation v. Canada* (Award on Jurisdiction)"), Legal Authority CL-0105.

*Eureko B.V. v. The Slovak Republic*, PCA Case No. 2008-13, UNCITRAL, Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010 ("*Eureko v. The Slovak Republic* (Award on Jurisdiction, Arbitrability and Suspension)"), Legal Authority CL-0106.

*European American Investment Bank AG (EURAM) v. The Slovak Republic*, UNCITRAL, PCA Case No. 2010-17, Award on Jurisdiction, 22 October 2012 ("*EURAM v. The Slovak Republic* (Award on Jurisdiction)"), Legal Authority CL-0143.

*Guaracachi America, Inc. and Rurelec PLC v. The Plurinational State of Bolivia*, UNCITRAL, PCA Case No. 2011-17, Award, 31 January 2014 ("*Guaracachi v. Bolivia* (Award)"), Legal Authority RL-0007.

*Hussein Numan Soufraki v. United Arab Emirates*, ICSID Case No. ARB/02/7, Decision of the Ad Hoc Committee on Annulment, 5 June 2007 ("*Soufraki v. United Arab Emirates* (Annulment)"), Legal Authority RL-0062.

*Ioannis Kardassopoulos v. Georgia*, ICSID Case No. ARB/05/18, Decision on jurisdiction, 6 July 2007 ("*Kardassopoulos v. Georgia* (Decision on Jurisdiction)"), Legal Authority RL-0015.

*Ioan Micula, Viorel Micula and others v. Romania,* ICSID Case No. ARB/05/20, Award, 11 December 2013, ("*Micula v. Romania* (Award)"), Legal Authority CL-0029.

*Isolux Netherlands B.V. v. Kingdom of Spain* (SCC Case V2013/153), Award, 17 July 2016 ("*Isolux v. Spain* (Award)"), Legal Authority RL-0080.

*Jan Oostergetel and Theodora Laurentius v. The Slovak Republic*, UNCITRAL, Decision on Jurisdiction, 30 April 2010 ("*Jan Oostergetel v. The Slovak Republic* (Decision on Jurisdiction)"), Legal Authority CL-0110.

*Joseph C. Lemire v. Ukraine,* ICSID Case No. ARB/06/18, Award, 28 March 2011 ("*Lemire v. Ukraine* (Award)"), Legal Authority CL-0032.

*Joy Mining Machinery Limited v. The Arab Republic of Egypt*, ICSID Case No. ARB/03/11, Decision on Jurisdiction, 6 August 2004 ("*Joy Mining v. Egypt* (Decision on Jurisdiction)"), Legal Authority RL-0044.

*Khan Resources Inc., Khan Resources B.V., and Cauc Holding Company Ltd. v. The Government of Mongolia,* UNCITRAL, Award on Merits, 2 March 2015 ("*Khan Resources v. Mongolia* (Award on the Merits)"), Legal Authority CL-0146.

*Libananco Holdings Co. Limited v. Republic of Turkey*, ICSID Case No. ARB/06/8, Award, 2 September 2011 ("*Libananco v. Turkey* (Award)"), Legal Authority RL-0014.

*LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. The Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006 ("*LG&E v. Argentina* (Decision on Liability)"), Legal Authority CL-0033.

*Liman Caspian Oil B.V. & NCL Dutch Investment B.V. v. The Republic of Kazakhstan, I*CSID Case No. ARB/07/14, Award (excerpts only), 22 June 2010 *("Liman Caspian Oil v. Kazakhstan (Award)"),* Legal Authority CL-0035.

*Mamidoil Jetoil Greek Petroleum Products Societe Anonyme S.A. v. Republic of Albania*, ICSID Case No. ARB/11/24, Award, 30 March 2015 ("*Mamidoil v. Albania* (Award)"), Legal Authority RL-0033.

*Marvin Roy Feldman Karpa v. The United Mexican States*, ICSID Case No. ARB (AF)/99/1, Award, 16 December 2002 ("*Feldman v. Mexico* (Award)"), Legal Authority RL-0030.

*Mohammad Ammar Al-Bahloul v. the Republic of Tajikistan*, SCC Case No. V (064/2008), Partial Award on Jurisdiction and Liability, 2 September 2009 ("*Al-Bahloul v. Tajikistan* (Partial Award on Jurisdiction and Liability)"), Legal Authority RL-0016.

*Mohammad Ammar Al-Bahloul v. the Republic of Tajikistan*, SCC Case No. V (064/2008), Final Award of the 8 June 2010 ("*Al-Bahloul v. Tajikistan* (Final Award)"), Legal Authority CL-0147.

*Nations Energy Inc. and others v. Republic of Panama*, ICSID Case C No. ARB/06/19, Award, 24 November 2010 ("*Nations Energy v. Panama* (Award)"), Legal Authority RL-0072.

*Noble Ventures, Inc v. Romania,* ICSID Case No. ARB/01/11, Award, 12 October 2005 ("*Noble Ventures v. Romania* (Award)"), Legal Authority RL-0038.

*Nova Scotia Power Incorporated (Canada) v. The Bolivarian Republic of Venezuela*, UNCITRAL, Award on Jurisdiction, 22 April 2010 ("*Nova Scotia v. Venezuela* (Award on Jurisdiction)"), Legal Authority CL-0148.

*Occidental Exploration and Production Company v. The Republic of Ecuador*, LCIA Case No. UN 3467, Final Award, 1 July 2004 ("*Occidental v. Ecuador* (Final Award)"), Legal Authority CL-0042.

*Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Award, 5 December 2012, ("*Occidental v. Ecuador* (II) (Award)"), Legal Authority CL-0043.

*Opinion 1/91 on the Agreement on the Creation of an European Economic Area*, ECJ, 14 December 1991 ("*Opinion 1/91*"), Exhibit R-0014.

*Phoenix Action LTD v. The Czech Republic,* ICSID Case No. ARB/06/5, Award, 15 April 2009 ("*Phoenix v. The Czech Republic* (Award)"), Legal Authority CL-0149.

*Plama Consortium Limited v. The Republic of Bulgaria,* ICSID Case No. ARB/03/24, Award, 27 August 2008 ("*Plama v. Bulgaria* (Award)"), Legal Authority RL-0048.

*Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction 8 February 2005 ("*Plama v. Bulgaria* (Decision on Jurisdiction)"), Legal Authority RL-0013.

*Pope & Talbot Inc. v The Government of Canada*, UNCITRAL, Award, 7 August 2000 ("*Pope & Talbot v. Canada* (Award on Jurisdiction)"), Legal Authority CL-0150.

*Postová Banka, A.S. and Istrokapital SE v. Hellenic Republic*, ICSID Case No. ARB/13/8, Award, 9 April 2015 ("*Poštová v. Hellenic Republic* (Award)"), Legal Authority RL-0061.

*PSEG Global Inc. and Konya Ilgin Elektrik Üretim v Ticaret Limited Sirketi v. The Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007 ("*PSEG v. Turkey* (Award)"), Legal Authority CL-0045.

*Renta 4 S.V.S.A, Ahorro Corporación Emergentes F.I., Ahorro Corporación Eurofondo F.I., Rovime Inversiones SICAV S.A., Quasar de Valors SICAV S.A., Orgor de Valores SICAV S.A., GBI 9000 SICAV S.A. v. The Russian Federation*, SCC No. 24/2007, Award, 20 July 2012, ("*Renta 4 v. Russia* (Award)"), Legal Authority CL-0152.

*RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spai*n, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016 ("*RREEF v. Spain* (Decision on Jurisdiction)"), Legal Authority CL-0200.

*Saipem S.p.A. v. The People's Republic of Bangladesh*, ICSID Case No. ARB/05/07, Decision on Jurisdiction and *Recommendation* on Provisional Measures, 21 March 2007 ("*Saipem v. Bangladesh* (Decision on Jurisdiction and Recommendation on Provisional Measures)"), Legal Authority RL-0019.

*Saluka Investments B.V. v. The Czech Republic,* UNCITRAL, Partial Award on Jurisdiction and Merits, 17 March 2006, ¶ 307 ("*Saluka v. Czech Republic* (Partial Award)"), Legal Authority CL-0049.

*Sapphire International Petroleum Ltd. v. The National Iranian Oil Company* (1963) 35 ILR 136, Arbitral Award, 15 March 1963 ("*Sapphire International Petroleum Ltd. v. National Iranian Oil Co.* (Award)"), Legal Authority CL-0154.

*Sempra Energy International v. The Argentine Republic*, ICSID Case No. ARB/02/16, Award, 28 September 2007 ("*Sempra v. Argentina* (Award)"), Legal Authority CL-0052.

*Siemens A.G. v. The Argentine Republic*, ICSID Case No. ARB/02/8, Award, 6 February 2007 ("*Siemens v. Argentina* (Award)"), Legal Authority CL-0054.

*ST-AD GmbH v. Republic of Bulgaria*, UNCITRAL, PCA Case No. 2011-06, Award on Jurisdiction, 18 July 2013 ("*ST-AD v. Bulgaria* (Award on Jurisdiction)"), Legal Authority RL-0006.

*Suez, Sociedad General de Aguas de Barcelona S.A., and Vivendi Universal S.A. v. The Argentine Republic, ICSID Case No. ARB/03/19, and AWG Group Ltd v. The Argentine Republic, UNCITRAL, Decision on Liability, 30 July 2010 ("AWG v. Argentina* (Decision on Liability)"), Legal Authority CL-0159.

*Técnicas Medioambientales Tecmed S.A. v.* The United Mexican States, ICSID Case No. ARB (AF)/00/2, Award, 29 May 2003 ("*Tecmed v. Mexico (Award)"*), Legal Authority CL-0055.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v. The Argentine Republic*, ICSID Case No. ARB/09/1, Decision on Jurisdiction, 21 December 2012 ("*Teinver v. Argentina* (Decision on Jurisdiction)"), Legal Authority CL-0161.

*Total S.A. v. The Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Liability, 27 December 2010 ("*Total v. Argentina* (Decision on Liability)"), Legal Authority RL-0037.

*The PV Investors v. The Kingdom of Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, 13 October 2014 ("*PV Investors v. Spain* (Preliminary Award on Jurisdiction)"), Legal Authority CL-0164.

*Toto Costruzioni Generali S.p.A. v. Lebanese Republic,* ICSID Case No. ARB/07/12, Award, 7 June 2012 ("*Toto Costruzioni v. Lebanon* (Award)"), Legal Authority RL-0035.

*United States – Measures Affecting Imports of Woven Wool Shirts and Blouses from India, (India v. The United States of America)*, WTO Appellate Body (WT/DS33/AB/R), 23 May 1997 ("*US-Measures Affecting Imports of Woven Wool Shirts and Blouses*"), Legal Authority CL-0166.

*Venezuela Holdings B.V. and others v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/07/27, Award, 9 October 2014 ("*Mobil v. Venezuela* (Award)"), Legal Authority RL-0077.

*Wena Hotels Limited v. Arab Republic of Egypt,* ICSID Case No. ARB/98/4, Award, 8 December 2000 ("*Wena Hotels v. Egypt* (Award)"), Legal Authority CL-0058.

*White Industries Australia Limited v. The Republic of India*, UNCITRAL, Final Award, 30 November 2011 ("*White Industries v. India* (Final Award)"), Legal Authority RL-0029.

xv

*Yukos Universal Limited (Isle of Man) v.* The *Russian Federation*, PCA Case No. 227, Interim Award on Jurisdiction and Admissibility, 30 November 2009 ("*Yukos v. Russia* (Interim Award on Jurisdiction and Admissibility)"), Legal Authority CL-0121.

*Yukos Universal Limited (Isle of Man) v. Russian Federation*, PCA Case No. AA 227, Final Award, 18 July 2014 ("*Yukos v. Russia* (Final Award)"), Legal Authority CL-0168.

## I.    INTRODUCTION AND PARTIES

1.    This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") on the basis of the Energy Charter Treaty ("ECT" or "Treaty") which entered into force with respect to Spain, Luxembourg and the Netherlands on 16 April 1998, and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "ICSID Convention").

2.    The claimants are Antin Infrastructure Services Luxembourg S.à.r.l. ("Antin Luxembourg"), a company incorporated on 22 March 2011 under the laws of Luxembourg and Antin Energia Termosolar B.V. ("Antin Termosolar"), a company incorporated on 27 June 2011, under the laws of the Netherlands (together, the "Claimants"). Antin Termosolar is directly and wholly-owned by Antin Luxembourg. Antin Luxembourg and Antin Termosolar are the two entities used by Antin Infrastructure Partners (AIP) FPCI (the "Antin Fund 1"), a French professional private equity investment fund (*fonds professionnel de capital investissement*), to carry out investments in the Spanish renewable energy sector.[1]

3.    The Respondent is the Kingdom of Spain ("Spain" or the "Respondent").

4.    The Claimants and the Respondent are collectively referred to as the "Parties." The Parties' representatives and their addresses are listed above on page (i).

5.    The dispute relates to measures undertaken by the Respondent in the renewable energy sector and the alleged breaches of its obligations under the ECT and international law with respect to the Claimants and their investments.

## II.    PROCEDURAL HISTORY

6.    On 1 November 2013, ICSID received from the Claimants a Request for Arbitration dated 29 October 2013 (the "Request for Arbitration").

7.    On 22 November 2013, the Secretary-General of ICSID registered the Request for Arbitration in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the notice of registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with

---

[1]    Claimants' Memorial, ¶ 2.

Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

8.     In the absence of an agreement between the Parties on the method of constituting the Tribunal, the Tribunal was constituted in accordance with the procedure set forth in Article 37(2)(b) of the ICSID Convention.

9.     The Tribunal is composed of Professor Francisco Orrego Vicuña, a national of Chile, appointed by the Claimants on 14 February 2014; Mr. J. Christopher Thomas QC, a national of Canada, appointed by the Respondent on 26 February 2014, and Dr. Eduardo Zuleta Jaramillo, a national of Colombia, President of the Tribunal, appointed by the Chairman of the ICSID Administrative Council on 1 August 2014 in accordance with Article 38 of the ICSID Convention.

10.    On 7 August 2014, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "Arbitration Rules"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Ms. Natalí Sequeira, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

11.    In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 23 September 2014 at the World Bank offices in Paris.

12.    On 6 October 2014, the Tribunal issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters and the decisions of the Tribunal on disputed issues. Procedural Order No. 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in force as of 10 April 2006, that the procedural languages would be English and Spanish, and that the place of proceeding would be Washington D.C., United States of America. Procedural Order No. 1 also provided different procedural scenarios and agreed timetables as well as the number, sequence and dates of pleadings. These timetables were included in Annex A of Procedural Order No. 1.

13.    On 28 November 2014, the Claimants filed their Memorial ("Claimants' Memorial") with accompanying documentation.

14.    On 30 January 2015, the Respondent filed a Request for Bifurcation to address the objections to jurisdictions as a preliminary question ("Request for Bifurcation").

15.    On 16 February 2015, the Claimants filed their Observations to Respondent's Request for Bifurcation.

16. On 2 March 2015, the Tribunal rendered its "Decision on Respondent's Request for Bifurcation" rejecting Respondent's request to address the objections to jurisdiction as a preliminary question, joining the preliminary objections to the merits and confirming the procedural timetable.

17. On 31 July 2015, the Respondent filed its Counter-Memorial on the Merits and Memorial on Jurisdiction ("Respondent's Counter-Memorial"), with accompanying documentation. On the same date, the Parties informed the Tribunal of their agreement to amend the procedural timetable for the document production phase of the arbitration. The Parties agreed that the remaining dates of the procedural timetable would remain as scheduled. The Tribunal approved the amended timetable on 3 August 2017.

18. On 29 September 2015, in accordance with the agreed procedural timetable, the Parties submitted their respective document production requests to the Tribunal.

19. On 14 October 2015, the Tribunal issued Procedural Order No. 2, addressing the Parties' respective requests for document production and confirming the agreed procedural timetable for the following stages. In Section III of Procedural Order No. 2, the Tribunal requested the Respondent to provide the Tribunal with the documents corresponding to the Claimants' document production requests under Categories 29 and 30 and indicated that it would "decide on the production of such documents after receiving and reviewing the aforesaid documents in camera."

20. Pursuant to the Tribunal's instructions, on 28 October 2015, the Respondent provided the Tribunal with digital copies of the requested documents.

21. On 6 November 2014, the Tribunal issued Procedural Order No. 3, dealing with the Claimants' document production requests under Categories 29 and 30.

22. On 18 December 2015, the Claimants submitted their Reply on the Merits and Counter-Memorial on Jurisdiction ("Claimants' Reply") along with supporting documents.

23. On 21 December 2015, the Parties agreed an extension (until 1 March 2016) for the filing of the Respondent's Rejoinder on the Merits and Reply on Jurisdiction, as well as an extension (until 15 April 2015) for the filing of the Claimants' Rejoinder on Jurisdiction.

24. On 23 December 2015, the Respondent sought the Tribunal's authorization to adduce six exhibits submitted in the context of the present proceeding, in the arbitration *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain* (ICSID Case No. ARB/13/36) ("*Eiser v. Spain*").

25. On 7 January 2016, the Claimants objected to the Respondent's request on the grounds that five out of six of the requested exhibits were confidential and commercially sensitive in nature.

26. On 28 January 2016, the Tribunal issued Procedural Order No. 4 deciding on the Respondent's request and the Parties' submissions on confidentiality of the six exhibits. The Tribunal further requested the Claimants to inform the Tribunal on or before 2 February 2016 whether they had obtained consent to submit Exhibit C-0092 in this arbitration, and if not, the reasons therefore.

27. On 2 February 2016, Claimants confirmed that they had obtained the consent to submit the referred as Exhibit C-0092 in this arbitration and sought an order from the Tribunal declaring its confidentiality. In Procedural Order No. 5, dated 5 February 2016, the Tribunal declared the relevant document confidential.

28. On 1 March 2016, the Respondent filed its Rejoinder on the Merits and Reply on Jurisdiction ("Respondent's Rejoinder").

29. On 15 April 2016, the Claimants filed their Rejoinder on Jurisdiction ("Claimants' Rejoinder").

30. On 19 July 2016, the Claimants requested leave from the Tribunal to submit additional documents to the record in this arbitration, and to correct a document and some data that they had previously filed. On 26 July 2016, the Respondent replied to the Claimants' request and also sought authorization to submit additional documents. On 2 August 2016, the Claimants replied to the Respondent's request. On 8 August 2016, the Tribunal issued Procedural Order No. 6 deciding on both Parties' requests.

31. On 12 September 2016, the President and the Secretary of the Tribunal held a pre-hearing organizational telephone conference with the Parties.

32. On 15 September 2016, the Tribunal issued Procedural Order No. 7 reflecting the Parties' agreements and the Tribunal's decisions on procedural matters concerning the organization and logistical arrangements of the hearing.

33. The Hearing on Jurisdiction and the Merits was held at Paris, France from 19 October 2016 to 25 October 2016 ("Hearing").  The following persons were present at the Hearing:

| **Tribunal:** | |
|---|---|
| Dr. Eduardo Zuleta Jaramillo | President |
| Prof. Francisco Orrego Vicuña | Co-Arbitrator |
| Mr. J. Christopher Thomas QC | Co-Arbitrator |

| **ICSID Secretariat:** | |
|---|---|
| Ms. Natalí Sequeira | Secretary of the Tribunal |

| **For the Claimants:** | |
|---|---|
| *Counsel:* | |
| Ms. Judith Gill QC | Allen & Overy LLP |
| Mr. Jeffrey Sullivan | Allen & Overy LLP (Now Gibson Dunn & Crutcher LLP) |
| Ms. Marie Stoyanov | Allen & Overy LLP |
| Ms. Naomi Briercliffe | Allen & Overy LLP |
| Mr. Tomasz Hara | Allen & Overy LLP |
| Ms. Stephanie Hawes | Allen & Overy LLP |
| Mr. Jack Busby | Allen & Overy LLP |
| Ms. Karolina Latasz | Allen & Overy LLP |
| | |
| *Parties* | |
| Mr. Stéphane Ifker | Antin Infrastructure Partners |
| Mr. Ashkan Karimi | Antin Infrastructure Partners |
| | |
| *Witnesses* | |
| Mr. Mark Crosbie | Antin Infrastructure Partners |
| Mr. Mauricio Bolaña | Antin Infrastructure Partners |
| | |
| *Experts* | |
| Mr. Richard Caldwell | The Brattle Group |
| Mr. Carlos Lapuerta | The Brattle Group |
| Mr. José Antonio García | The Brattle Group |
| Mr. John (Jack) Stirzaker | The Brattle Group |
| Dr. Thomas R. Mancini | TRMancini Solar Consulting, LLC |

| **For the Respondent:** | |
|---|---|
| | |
| Mr. Diego Santacruz Descartin | Ministry of Justice of the Government of Spain |
| Mr. Javier Torres Gella | Ministry of Justice of the Government of Spain |

| | |
|---|---|
| Mr. Yago Fernández Badía | Ministry of Justice of the Government of Spain |
| Mr. Antolín Fernández Antuña | Ministry of Justice of the Government of Spain |
| Ms. Amaia Rivas Kortazar | Ministry of Justice of the Government of Spain |
| Ms. Elena Oñoro Sanz | Ministry of Justice of the Government of Spain |
| Mr. Arturo Fernández | IDAE |
| Mr. Alfonso Olivas | IDAE |
| Ms. Raquel Vázquez | IDAE |

*Witness:*

| | |
|---|---|
| Mr. Carlos Montoya | IDAE |

*Experts*

| | |
|---|---|
| Mr. Eduardo Pérez | BDO |
| Mr. Francisco Javier Espel | BDO |
| Mr. David Mitchell | BDO |
| Mr. Manuel A. Vargas | BDO |
| Ms. Susan Blower | BDO |
| Dr. Jorge Servert | BDO |

## Observer

| | |
|---|---|
| Ms. Emily Choo[2] | NUS Centre for International Law Practice Fellow |

## Court Reporters:

| | |
|---|---|
| Mr. Trevor McGowan | The Court Reporter |
| Mr. Leandro Iezzi | D-R Esteno |
| Ms. Luciana Sosa | D-R Esteno |

## Interpreters:

| | |
|---|---|
| Mr. Jesús Getan Bornn | Independent |
| Mr. Juan María Burdiel Perez | Independent |
| Ms. Amalia Thaler | Independent |

---

[2]  Ms. Choo's attendance as an observer was agreed by the Parties on 17 August 2016.

34. During the Hearing, the following persons were examined:

| | |
|---|---|
| Mr. Mark Crosbie | Antin Infrastructure Partners |
| Mr. Mauricio Bolaña | Antin Infrastructure Partners |
| Mr. Carlos Montoya | IDAE |
| Dr. Thomas R. Mancini | TR Mancini Solar Consulting, LLC |
| Mr. Richard Caldwell | The Brattle Group |
| Mr. Carlos Lapuerta | The Brattle Group |
| Mr. José Antonio García | The Brattle Group |
| Mr. David Mitchell | BDO |
| Mr. Eduardo Pérez | BDO |
| Mr. Francisco Javier Espel | BDO |

35. On 2 November 2016, the Tribunal issued Procedural Order No. 8 concerning post-hearing procedural matters.

36. On 24 November 2016, the Respondent submitted a letter dated 18 November 2016, seeking authorization to add an additional legal authority to the record (namely, the award in *Isolux Netherlands B.V. v. Kingdom of Spain* (SCC Case V2013/153) dated 17 July 2016 ("*Isolux v. Spain*"). On 25 November 2016 and 2 December 2016, the Claimants submitted observations on the Respondent's request. The Respondent submitted further observations on 29 November 2016 and 7 December 2016.

37. On 30 November 2016, the Parties submitted agreed corrections to the Hearing transcripts.

38. On 13 December 2016, the Tribunal issued Procedural Order No. 9 rejecting the Respondent's request of 24 November 2016 to introduce the award in *Isolux v. Spain* as an additional legal authority to the record.

39. The Parties filed post-Hearing briefs on 16 December 2016.  Pursuant to Procedural Order No. 1, the Centre transmitted the Parties' post-Hearing briefs simultaneously to the Tribunal and to the other Party.

40. The Claimants filed their Statement of Costs on 20 January 2017. On 24 January 2017, the Respondent requested an extension to file its Statement of Costs. By a communication of 28 January 2017, the Tribunal granted such extension. The Respondent's Statement of Costs was filed on 31 January 2017. Pursuant to Procedural Order No. 1, the Centre transmitted both Parties' Statement of Costs simultaneously to the Tribunal and to the other Party on 31 January 2017.

41.  By letter of 22 March 2017 the Claimants filed a letter informing the Tribunal and the Respondent that they had "recently entered into an agreement for the sale of their investments in the Andasol-1 and Andasol-2 CSP plants." The Claimants further indicated that "[t]he sale has not yet closed and is subject to certain conditions precedent, which are yet to be satisfied. As a result, the Claimants are presently unable to provide the Tribunal with the full details of the transaction. […]." The Claimants' letter further indicated that "[t]he transaction agreement expressly confirms that the Claimants' rights in respect of the arbitration are retained by them following the sale." The Claimants anticipated that all conditions would be satisfied, and the sale fully finalised, by the end of April or early May 2017 and indicated that they would update the Tribunal once the sale was fully finalised.

42.  On 9 May 2017, the Claimants requested leave to introduce the award issued by the arbitral tribunal in *Eiser v. Spain* on 4 May 2017.

43.  On 12 May 2017, the Respondent indicated that it did not object to the addition into the record of the award in *Eiser v. Spain*. On 15 May 2017, the Tribunal admitted the award into the record and invited the Parties to submit a brief of no more than three pages commenting exclusively on the relevance, if any, of such award. The Claimants submitted their comments on 19 May 2017 and the Respondent did likewise on 24 May 2017. Pursuant to Procedural Order No. 1, the Centre transmitted both Parties' observations simultaneously to the Tribunal and to the other Party on 24 May 2017.

44.  On 29 June 2017, the Respondent informed the Tribunal that the award in *Isolux v. Spain* had been released to the public domain, requested leave to add it to the record and submit comments. The Respondent further indicated that it wished to make further written submissions to the Tribunal concerning new relevant facts, in particular, recent developments concerning the electrical regulatory framework through "[p]ublic auctions."

45.  By communications of 5 and 21 July 2017 the Parties agreed on the introduction of the *Isolux v. Spain* award and other additional documents to the record. The Parties further agreed on making simultaneous written submission, addressing such award and all new documents by 26 July 2017. Pursuant to Procedural Order No. 1, the Centre transmitted both Parties' observations simultaneously to the Tribunal and to the other Party on 27 July 2017.

46.  By letter of 1 August 2017 the Claimants informed that "the Claimants' sale of their investments in the Andasol-1 and Andasol-2 CSP plants has now closed. The assets were sold to Cubico Sustainable Investments Limited following the auction process organised by Mediobanca and the proceeds to Antin were EUR 75.2 million (before locked-box interests)."

47.   On 9 August 2017, the Respondent submitted its comments regarding the Claimants' letter of 1 August 2017. The Respondent noted that all documents pertaining to the transaction should be provided by the Claimants for the Tribunal to be able to assess the statements made in the Claimants' letter.

48.   By letter of 15 August 2017 the Centre informed the Parties that Mrs. Mercedes Cordido-Freytes de Kurowski, ICSID Legal Counsel, would serve as Secretary of the Tribunal, replacing Mrs. Sequeira, a certain period of time.

49.   On 17 August 2017, the Claimants submitted an email concerning the Respondent's submission of 9 August. The Claimants rejected a specific assertion made by the Respondent and conveyed that they did not intend to make further submissions or provide further documents unless otherwise requested by the Tribunal.

50.   By email of 21 August 2017 the Tribunal informed that it did not intend to request any further submissions or documents at that time.

51.   On 23 November 2017, the Respondent requested leave from the Tribunal to file a decision from the European Commission (the "Commission") regarding the Spanish State Aid Framework for Renewable Sources.

52.   On 28 November 2017, the Claimants submitted their comments on the Respondent's request.

53.   By letter of 29 November 2017 the Tribunal denied the Respondent's request of 23 November 2017.

54.   By letter of 16 January 2018, the Centre informed the Parties that Mrs. Sequeira had resumed her functions as Secretary of the Tribunal.

55.   The proceeding was closed on 26 February 2018.

56.   By letter of 7 March 2018, the Respondent filed an application under ICSID Arbitration Rule 38(2) requesting that the proceeding be reopened for the Respondent to submit (i) the Final Judgment of the Court of Justice of the European Union ("CJEU") of 6 March 2018 in *Slowakische Republik v. Achmea BV* and (ii) the Commission's decision of 10 November 2017 regarding the Spanish State Aid Framework for Renewable Sources.

57.   On 12 March 2018, the Claimants submitted their comments on the Respondent's request.

58.   By Procedural Order No. 10 of 16 April 2018, the Tribunal denied the Respondent's request of 7 March 2018.

### III.   THE NON-DISPUTING PARTY APPLICATIONS

59.   On 14 November 2014, the European Commission filed an Application for Leave to Intervene as a Non-Disputing Party (the "Commission's First Application").

60.   On 5 December 2014, the Parties filed their observations on the Commission's First Application.

61.   On 15 December 2014, the Tribunal issued its "Decision on Application for Leave to Intervene as a Non-Disputing Party". The Tribunal found that the Commission's First Application was premature considering that the Respondent had not yet submitted its jurisdictional objections to the Tribunal and therefore dismissed the First Application without prejudice to the Commission's making a new request in due course.

62.   On 9 December 2015, the Commission submitted a Second Application for Leave to Intervene as a Non-Disputing Party pursuant to Arbitration Rule 37(2) (the "Commission's Second Application").

63.   On 21 December 2015, the Parties submitted their observations on the Commission's Second Application.

64.   On 5 February 2016, the Tribunal adopted its "Decision on the European Commission's Second Application for Leave to Intervene as a Non-Disputing Party". In its Decision, the Tribunal authorized the Commission to make a written submission by 1 March 2016, upon the submission of a written undertaking that it would comply with any decision on costs ordered by the Tribunal. The Decision further established that the written submission should be limited to 15 pages and be focused on the interpretation of European Union law regarding the issue of jurisdiction. The Tribunal denied the Commission access to the record of the arbitration, to the Parties' pleadings, and to any hearings. The Commission would have to bear its own costs for its participation as non-disputing party.

65.   On 5 February 2016, the Centre sent a communication to the Commission informing it of the contents of the operative section of the Tribunal's Decision.

66.   On 18 February 2016, the Commission submitted a request for the Tribunal to alter the above-referenced Decision on the point of the costs undertaking. The Commission informed that it was not in a position to submit the required written undertaking on costs and requested the Tribunal to "reconsider its Decision on that point, and to drop the condition set out in paragraph 44, under (f)."

67.   On 18 February 2016, the Tribunal invited the Parties to submit their comments on the Commission's reconsideration request. On 22 February 2016, both Parties filed their

observations. On 26 February 2016, the Tribunal rejected the Commission's request for reconsideration and maintained its earlier decision of 5 February 2016.

68. By letter of 29 February 2016, the Commission notified the Tribunal that it was not in a position to provide the costs undertaking and therefore informed the Tribunal that it would not file a written submission.

## IV.   FACTUAL BACKGROUND

69. This dispute relates to certain measures undertaken by the Respondent in the renewable energy ("RE") sector and the alleged breaches of its obligations under the ECT and international law with respect to the Claimants and their investments.

70. The investments made by the Claimants, as will be further addressed below, consisted of the acquisition of shareholding participations in Andasol-1 Plant and Andasol-2 Plant, two operational concentrated solar power ("CSP") plants located in Granada, southern Spain (together, the "Andasol Plants") in 2011.

71. CSP technology has been in use since the 1980's and exploits sunlight with minimal environmental impact. It is a form of solar thermal technology, where energy from the sun is captured onto a liquid carrier fluid which heats a thermo-oil heat transfer fluid ("HTF") inside absorber tubes. The HTF converts water into steam by using a steam generator, or, alternatively, the heat is transferred into a thermal storage system for later use. The steam generated then drives a turbine, which in turn is connected to a generator that produces electricity.[3]  The Andasol Plants use a parabolic-trough design, where solar radiation is concentrated on receptors by cylindrical-parabolic mirrors or collectors.

72. CSP plants may also use fossil fuels in order to boost their power-generation capacity. By using natural gas, CSP plants increase their solar-to-electric conversion efficiency and the reliability of their production. This was the case of the Andasol Plants, which were equipped with three heaters and a liquefied natural gas reservoir to allow them to use natural gas in their electricity production.[4]

73. Since the Spanish Constitution of 1978, Spain has adopted four laws which govern the Spanish Electrical System ("SES"), with the aim of maintaining a unified and integrated electrical system.[5] The SES is composed of the generation, transmission, distribution and

---

[3]   Claimants' Memorial, ¶ 55.

[4]   *See* Bolaña WS I, ¶ 22.

[5]   **Exhibit R-0041**, Law 49/1984, 26 December 1984; **Exhibit R-0044**, Law 40/1994, 31 December 1994; **Exhibit R-0042**, Law 54/1997, 27 November 1997 ("Law 54/1997"); and **Exhibit R-0043**, Law 24/2013, 26 December 2013.

supply of electricity, the consumers of electricity and the State's various regulating authorities.

74. On 27 November 1997, Spain enacted Law 54/1997, partially opening up the electricity sector to competition (with both regulated and liberalised activities) and putting an end to the previous State-controlled system. This law established the overall legal framework for the electricity sector in Spain, including its governing principles.[6] In its preamble, Law 54/1997 set out that it created

> "an energy policy based on the gradual liberalisation of the market compatible with the achievement of other objectives which also belong to it, such as the improvement of energy efficiency, reduced consumption and environmental protection. The special electricity generation regime, the demand management programmes and, above all, the promotion of renewable energy improve the way in which it fits into our legal system."

75. In order to encourage the production of energy from renewable sources, Law 54/1997 distinguished between an "Ordinary Regime" applicable to conventional sources of energy production (such as coal-fired power plants) and a "Special Regime" applicable to electricity production facilities of less than 50MW which generated electricity from non-consumable renewable energy sources. Pursuant to Article 27 of Law 54/1997:

> "1. Electrical energy production shall be approved for operation under the special regime in the following cases, and when said activity is carried out in power plants with an installed power capacity that does not exceed 50MW: […]
>
> b) When used as a primary energy source, any of the no-consumable renewable energy, biomass or any kind of biofuel, providing the owner does not operate electricity production activities under the ordinary regime. […]
>
> 2. Energy production under the special regime shall be governed by its specific guidelines and, in matters not covered by them, general applicable electrical production rules shall apply."[7]

76. Generation of energy, with the exception of the activity of generation under the Special Regime was specified to be a liberalised activity.[8]

---

[6]   **Exhibit C-0033**, Law 54/1997, Article 1; Claimants' Memorial, ¶ 83.

[7]   **Exhibit C-0033**, Law 54/1997, Article 27.

[8]   Respondent's Counter-Memorial, ¶ 291; Claimants' Memorial, ¶ 85 and footnote 106.

77.   Spain explains that the reason for this double regime rests on the need to encourage energy production from certain sources in which "the price that they can get in the competitive generation market is insufficient to cover its installation costs with a reasonable return on investment, so that additional emoluments are required to be profitable."[9] It seems undisputed that due to their high investment costs, CSP power-generation projects require government-backed incentives to be cost-competitive with conventional energy projects.[10]

78.   The application of the Special Regime was subjected to the fulfilment of a series of requirements.[11]

79.   Law 54/1997 also provided for a "*tasa de rentabilidad razonable*" (a "reasonable rate of return") to energy producers. To that regard, Article 30(4) of Law 54/1997 stated the following:

> "In order to establish premium quotas the following factors shall be considered: the tension level of delivery to the grid, the actual contribution to the improvement of the environment, to the saving on primary energy and energy efficiency as well as the costs incurred from investment, in order that reasonable rate of return may be established related to the cost in assets on the capital market."
> [Tribunal's Translation]

80.   The Parties disagree as to the meaning and legal consequences of the term "reasonable rate of return" in Law 54/1997 and as generally used in other regulations and policy statements, and by Spanish courts.[12]

81.   In development of Law 54/1997, Spain enacted Royal Decree ("RD") 2818/1998 on the production of electrical energy by facilities supported by renewable energy, wastes and cogeneration resources. RD 2818/1998 provided for the possibility for RE generators to sell electricity under either a regulated tariff (some technologies did not have this option) or a premium paid over its wholesale market price.[13] It also provided for the periodical updating and review of tariffs and premiums applicable to RE producers.[14]

---

[9]   Respondent's Counter-Memorial, ¶ 347, citing **Exhibit R-0048**, José Giménez Cervantes, The legal system of renewable energies in Spain, in Treaty on Electric Sector Regulation, Vol I (2009), p. 314.

[10]   *See* Claimants' Reply, ¶ 61; Brattle Regulatory Report I, ¶¶ 23-27.

[11]   *See* Respondent's Counter-Memorial, ¶ 349.

[12]   *See* Respondent's Counter-Memorial, ¶¶ 350-426; Claimants' Reply, ¶¶ 178-259.

[13]   **Exhibit C-0052**, RD 2818/1998, 23 December 1998 ("RD 2818/1998"), Articles 23-31; Claimants' Memorial, ¶ 89; Respondent's Counter-Memorial, ¶ 381.

[14]   **Exhibit C-0052**, RD 2818/1998, Articles 28 and 32; Claimants' Memorial, ¶ 89; Respondent's Counter-Memorial, ¶ 381.

82.    The promotion and development of RE had also come to be an important goal for the European Union ("EU"). EU targets and objectives have been set by reference to the global objectives agreed in the Kyoto Protocol. In turn, the Spanish regulatory regime for renewables "…must be understood within […] the policies of the European Union, both in the field of energy and the environment…"[15] Spain does not dispute that the Special Regime for RE producers was introduced and also maintained based on the United Nations Framework Convention on Climate Change and the Kyoto Protocol.

83.    On 27 September 2001, the EU adopted Directive 2001/77/EC "on the Promotion of Electricity Produced from Renewable Energy Sources in the Internal Electricity Market" (the "2001 Renewables Directive"). The 2001 Renewables Directive recognized the need for public support in favour of RE sources, including mechanisms such as green certificates, investment aid, tax exemptions or reductions, tax refunds and direct price support schemes.[16] It further required EU Member States to take appropriate measures to meet targets on the reduction of emission of greenhouse gasses, as well as to increase the proportion of electricity produced using renewable resources and to set national indicative targets consistent with the global indicative target of 12% of gross domestic energy consumption from renewable sources by 2010.[17]

84.    Moreover, the 2001 Renewables Directive required members to bring into force the laws, regulations and administrative provisions necessary to comply with the directive no later than 2003,[18] and to ensure that the charging of transmission and distribution fees did not discriminate against electricity from RE sources.[19] The targets set out in the 2001 Renewables Directive for RE production and consumption became a key driver behind the Respondent's actions to encourage investments in RE projects.[20] Spain's indicative target was to draw 29.4% of its electricity from renewable sources by 2010.[21]

85.    On 12 March 2004, the Respondent introduced RD 436/2004.[22] Spain intended to establish a lasting economic regime for RE facilities eligible under the Special Regime, through RD 436/2004 (and later through RD 661/2007).[23] RD 436/2004 sought to unify the existing regulation developing Law 54/1997, particularly regarding the economic regime applicable

---

[15]    Respondent's Counter-Memorial, ¶ 337.

[16]    **Exhibit C-0018**, Directive 2001/77/EC, European Parliament and European Council, 27 September 2001 ("2001 Renewables Directive"), Preamble (12) and (14).

[17]    **Exhibit C-0018**, 2001 Renewables Directive, Preamble (1), (5) and (7) and Article 3.

[18]    **Exhibit C-0018**, 2001 Renewables Directive, Article 9.

[19]    **Exhibit C-0018**, 2001 Renewables Directive, Article 7(6).

[20]    Claimants' Reply, ¶ 64; Respondent's Rejoinder, ¶ 267.

[21]    **Exhibit C-0018**, 2001 Renewables Directive, Annex.

[22]    **Exhibit C-0059**, RD 436/2004, 12 March 2004 ("RD 436/2004"), Article 1(b).

[23]    Respondent's Rejoinder, ¶ 269.

to Special Regime producers. It also sought to promote investment in RE production by offering security and stability in the calculation of the compensation offered to Special Regime producers.[24] RD 436/2004 established the possibility for Special Regime producers to sell the energy produced either (i) at a regulated fixed tariff, or (ii) at market price plus a premium payment per unit of electricity.[25] The exact value of both the fixed tariff and the premium would be tied to market fluctuations and subject to change on an annual basis.[26]

86. RD 436/2004 further established that the tariffs, premiums and incentives provided therein would be reviewed and modified periodically. Also, tariffs, premiums, incentives and complements resulting from any such revisions would be applicable only to facilities commencing operations after the date of entry into force of the corresponding modifications.[27]

87. The Claimants explain that RD 436/2004 did not provide for a fixed level of remuneration; rather, "the regulated tariff and premium it provided were calculated as a percentage of the yearly average tariff paid by all electricity consumers, which was itself set by reference to market prices".[28]

88. The *Instituto para la Diversificación y Ahorro de la Energía* ("IDAE", for its acronym in Spanish), an advisory body to the Spanish Ministry of Industry, Tourism and Commerce (the "Ministry"), set out a series of recommendations to assist in further increasing investment in the RE sector in Spain through the Plan for the Promotion of Renewable Energies in Spain 2005-2010 (the "2005-2010 Plan").[29] The 2005-2010 Plan states that RD 436/2004 set out an economic framework sufficiently favourable for the development of the thermosolar electricity sector.[30] However, it limits the conditions for retribution by setting up a maximum of 200MW. It also expressly acknowledged that due to the technologies' low profitability, higher premiums were necessary to secure the sustainability to the project. It identified a series of economic, technological and normative

---

[24] **Exhibit C-0059**, RD 436/2004, Preamble ("The aim with this Royal Decree is that by the year 2010, close to one third of electricity demand will be covered by high energy efficient technologies and by renewable energies without any increase in the production cost of the electricity system compared to the forecasts used to set the tariff methodology in 2002. With this contribution of the special regime, it will be possible to reach the goal set out in the 1997 Electricity Act, i.e. to ensure that by the year 2010 renewable energy sources cover at least 12% of total energy demand in Spain.").

[25] **Exhibit C-0059**, RD 436/2004, Article 22.

[26] **Exhibit C-0059**, RD 436/2004, Articles 23 and 24.

[27] **Exhibit C-0059**, RD 436/2004, Article 40.

[28] Claimants' Memorial, ¶ 110.

[29] **Exhibit C-0039**, Plan for the Promotion of Renewable Energies in Spain 2005-2010, August 2005 (the "2005-2010 Plan"); **Exhibit C-0054**, Ministry of Industry, Tourism and Commerce & IDAE, "Summary of the Spanish Renewable Energy Plan 2005-2010", August 2005.

[30] **Exhibit C-0039**, 2005-2010 Plan, Section 3.4.2.1.

barriers to developing thermoelectric projects, including the need for investment assistance or subsidies for early projects, little regulation for thermoelectric plants, and limitations on current premiums and tariff for plants within the 200MW threshold.[31]

89.    On 23 June 2006, the Respondent introduced Royal Decree Law ("RDL") 7/2006, on the adoption of urgent measures for the energy sector. RDL 7/2006 provided that any revisions made by the Government to the medium tariff paid would not be applicable to the prices, premiums, incentives and tariffs granted to RE producers subject to the Special Regime, until the provisions of RDL 7/2006 were further regulated.[32] Additionally, RDL 7/2006 amended Article 30 of Law 54/1997, in order to provide "priority access to transport and distribution networks" to the energy produced by producers subject to the Special Regime.[33] However, this priority of access was subject to the "maintenance and safety of such networks."[34]

90.    Although the growth experienced as a result of the Special Regime had been considerable, the objectives sought were still far from being reached.[35] Specifically, there was a need to modify the compensation regime available to Special Regime producers to take into consideration certain variables that had not been considered by RD 436/2004, and de-link such compensation from the reference tariff used to date, as well as to regulate certain technical aspects and thus contribute to the growth of RE technologies.[36]

91.    As a result, on 25 May 2007, RD 436/2004 was repealed and replaced by RD 661/2007. RD 661/2007 sought to develop the principles in Law 54/1997, "guaranteeing the owners of [Special Regime] facilities…  a reasonable return on their investments, and the consumers of electricity an assignment of the costs attributable to the electricity system which is also reasonable."[37] Hence, RD 661/2007 sought to grant RE producers stability in time, allowing them to do medium and long-term planning while obtaining a sufficient and reasonable return.[38] Moreover, by the adoption of RD 661/2007, the Respondent sought to achieve its national target set by the 2001 Renewables Directive.[39] In accordance with the Ministry's press release announcing RD 661/2007:

---

[31]    **Exhibit C-0039**, 2005-2010 Plan, Section 3.4.2.7.

[32]    **Exhibit C-0063**, RDL 7/2006, 23 June 2006 ("RDL 7/2006"), Second Transitory Disposition.

[33]    **Exhibit C-0063**, RDL 7/2006, Article 1, paragraph Twelve.

[34]    Ibid.

[35]    **Exhibit C-0020**, RD 661/2007, 25 May 2007 ("RD 661/2007"), Preamble.

[36]    **Exhibit C-0020**, RD 661/2007, Preamble.

[37]    Ibid.

[38]    **Exhibit C-0171**, Press release announcing RD 661/2007, "The Government prioritises profitability and stability in new Royal Decree-Law on renewables and combined heat and power", 25 May 2007.

[39]    **Exhibit C-0020**, RD 661/2007, Preamble.

"The aim of this Royal Decree is to increase remuneration for facilities using newer technologies, such as biomass and solar-thermal, in order to comply with targets outlined under the [2005-2010 Plan] and those agreed upon between Spain and the European Union. As these renewable energy technologies are developed, renewable energy shall cover 12% of Spain's energy needs by 2010. […] With regard to technologies in need of a boost in view of their limited development, such as biogas or solar-thermoelectric, profitability shall rise to 8% for facilities that choose to supply distributors and between 7% and 11% return for those participating in the wholesale market. Tariffs shall be reviewed every 4 years, taking into account compliance with the established targets. Such a revision shall allow for adjustments to be made to the tariff in virtue of new costs and the level of compliance with the targets. Future tariff revisions shall not be applied to existing facilities. This guarantees legal certainty for the electricity producer and stability for the sector, thereby favouring development. […] "[40]

92. Article 2 of RD 661/2007 provided that the Special Regime would be applicable to "facilities which employ any non-consumable renewable energies, biomass, or any type of biofuels, as their primary energy, upon condition that the owner does not carry out any production activity under the ordinary regime."[41]

93. RD 661/2007 established a fixed tariff or premium system where Special Regime producers could sell electricity, subject to certain floors and caps, either a) selling electricity to the system through the transportation or distribution grid, receiving in exchange a regulated tariff, fixed for all the programming periods, expressed in Euro cents per kilowatt/hour ("Fixed Tariff"), or b) selling the electricity in the electric energy production market, in which case, the sale price of the electricity would be the price obtained in the organized market or the price freely negotiated by the owner or representative of the facility, supplemented, where applicable, by a premium in Euro cents per kilowatt/hour ("Premium").[42] The choice between these two options of feed-in-tariff mechanisms provided in RD 661/2007 ("FIT") applied for a one-year term. For technologies such as CSP, the Premium option was subject to lower and upper thresholds. According to the Claimants, generators were incentivised to opt for the Premium option, since the Fixed Tariff had been set close to the floor level of the Premium.[43]

94. Additionally, RD 661/2007 offered the following features:

---

[40]  **Exhibit C-0171**, Press release announcing RD 661/2007, "The Government prioritises profitability and stability in new Royal Decree-Law on renewables and combined heat and power", 25 May 2007.

[41]  **Exhibit C-0020**, RD 661/2007, Article 2.1(b).

[42]  **Exhibit C-0020**, RD 661/2007, Article 24.1.

[43]  Claimants' Memorial, ¶¶ 126 and 138.

(a)   Article 14 provided that definitive registration with the Administrative Registry of Production Facilities under the Special Regime (the "<u>RAIPRE</u>" for its acronym in Spanish), administered by the Ministry, was a necessary condition for a facility to be subject to the Special Regime benefits under RD 661/2007;

(b)   Article 17(e) granted priority of access and priority of dispatch to the electric grid to RE producers over conventional energy producers, under the terms set forth in Annex XI of RD 661/2007;

(c)   Article 2(1)(b) allowed RE production facilities subject to the Special Regime to use fuels for generation of electricity, insofar as the electricity produced by such fuels did not exceed 12% of the total production, if the facility sold energy through the Fixed Tariff option, or 15%, if the facility sold energy through the Premium option;

(d)   Article 22 provided that the tariffs and premiums established in RD 661/2007 could be revised if Spain reached certain volumes of RE installed capacity, but such revision would not be applicable to those facilities already registered with the RAIPRE prior to such date;

(e)   Article 36 established fixed tariffs and premiums that would be applicable for the entire operational lifetime of each facility;

(f)   Article 44(1) provided that tariffs and premiums and the upper and lower limits would be adjusted by reference to fuel price indexes and to the Consumer Price Index ("<u>CPI</u>");[44]

95.   According to Article 44(3):

> "<u>During the year 2010, on sight of the results of the</u> monitoring reports on the degree of fulfilment of the Renewable Energies Plan (PER) 2005-2010, and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new tar-gets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, premiums, supplements and lower and upper limits defined in this Royal <u>Decree with regard to the costs associated</u> <u>with each of these technologies, the degree of participation of the</u> <u>special regime in covering the demand and its impact upon the</u> <u>technical and economic management of the system, and a reasonable</u> <u>rate of profitability shall always be guaranteed with reference to the</u> <u>cost of money in the capital markets. Subsequently a further re- view</u> <u>shall be performed every four years, maintaining the same criteria as</u> <u>previously.</u> The revisions to the regulated tariff and the upper and

---

[44]   Claimants' Memorial, ¶ 139.

lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed."[45]

96.    The Parties disagree as to the interpretation of Article 44(3) of RD 661/2007.

97.    After RD 661/2007 entered into force, the EU approved the 2009/28/EC Directive "on the promotion and use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC" on 23 April 2009 (the "2009 EU Directive"). After reaffirming the EU's commitment to the promotion of RE, this Directive established the objective that by 2020 the EU would seek to obtain 20% of its total energy consumption requirements from RE sources.

98.    Meanwhile, between 2007 and 2009 Spain prepared and displayed several promotional materials, including brochures and presentations, where it touched upon the stability of its investment framework and the incentives provided by RD 661/2007.[46]

99.    Spain explains that costs of the SES and the electricity bill for Spanish consumers have grown exponentially since 2003.[47] Spain further argues that despite raising tolls and charges permanently over the years, a growing tariff deficit has arisen from the difference between the regulated tariffs set by the Government and paid by consumers and the real costs associated with said tariffs (the "Tariff Deficit").[48] Thus, in the midst of the global financial crisis, which severely affected Spain's finances, the Respondent enacted RDL 6/2009, intended to address such Tariff Deficit.[49] RDL 6/2009 established maximum tariff deficit limits for the years 2009, 2010, 2011, and 2012, and provided that the Tariff Deficit should be eliminated by 2013.[50]

100.    Additionally, in order to limit the number of facilities that would benefit from the Special Regime and to thus have a greater control over the costs borne by the SES, RDL 6/2009 also introduced a pre-assignment process, requiring all RE facilities to register with the Pre-Assignment Register before registering with the RAIPRE. This was a mandatory requisite for facilities to be eligible for receiving the benefits granted under the Special Regime.[51] After having obtained the Pre-Assignment Register, the plant had a deadline of

---

[45]    **Exhibit C-0020**, RD 661/2007, Article 44(3) [Tribunal's own translation].

[46]    Claimants' Reply, ¶ 72; Respondent's Rejoinder, ¶¶ 278; Claimants' Memorial, ¶¶ 151-153; **Exhibit C-0022**, M. García, "Opportunities in Renewable Energy in Spain", PowerPoint presentation published by the Spanish Ministry for Industry, Tourism and Commerce and InvestInSpain, November 2008.

[47]    Respondent's Counter-Memorial, ¶¶ 307-314.

[48]    **Exhibit C-0070**, RDL 6/2009, 30 April 2009 ("RDL 6/2009"), Preamble; Claimants' Memorial, ¶ 157.

[49]    *See* **Exhibit C-0088**, RDL 14/2010, 24 December 2010 ("RDL14/2010"), Recital 1.

[50]    **Exhibit C-0070**, RDL 6/2009, Article 1.

[51]    **Exhibit C-0070**, RDL 6/2009, Preamble and Article 4.

36 months to be finally registered with the RAIPRE in order to benefit from the RD 661/2007 economic regime.

101.   As of 7 May 2009, date on which RDL 6/2009 was introduced, CSP facilities registered with the RAIPRE had a total installed capacity of 81 MW.[52] However, this was far from the 500 MW target set forth in RDL 661/2007.[53] Later, by 19 November 2009, 104 registration requests representing 4.499 MW from CSP technology had been filed pursuant to RDL 6/2009, seeking to qualify under the Special Regime pursuant to RD 661/2007.[54] Accepting such requests would result in a total installed capacity exceeding the objectives set forth in RD 661/2007 for the year 2010. The Government thus analysed the technical and economic impact that the entry into operation of an installed capacity significantly exceeding the established goal would have.[55] On 19 November 2009 the Government approved the progressive registration of all such new facilities with the Pre-Assignment Registry and with the RAIPRE, as well as their progressive entry into operation, until 1 January 2014.[56]

102.   CSP and wind RE associations entered into discussions with the Ministry regarding future modifications to be made to the remuneration framework applicable to them. On July 2010, the Ministry issued a press release announcing that the parties had reached an agreement, including "short-term measures, which will allow the impact of the price of electricity from these technologies to be reduced, as well as long-term measures, which will guarantee future stability for both sectors."[57] This agreement (the "July 2010 Agreement") covered the following issues:

(a)   The CSP plants waived access to the Premium option during their first year of operations.

(b)   Qualifying CSP plants accepted the delaying of the date of commencing operations.

---

[52]   **Exhibit C-0073**, Resolution of the Secretary of State for Energy, dated 19 November 2009, publishing the Agreement of the Council of Ministers, ordering the projects and installations presented to the Pre-Assignment Register for electricity generation installations set forth in Royal Decree Law 6/2009 (published on 24 November 2009) ("19 November 2009 Resolution of the Secretary of State for Energy"), Section II.

[53]   **Exhibit C-0020**, RDL 661/2007, Article 37.

[54]   **Exhibit C-0073**, 19 November 2009 Resolution of the Secretary of State for Energy, Section III.

[55]   **Exhibit C-0073**, 19 November 2009 Resolution of the Secretary of State for Energy, Section III.

[56]   **Exhibit C-0073**, 19 November 2009 Resolution of the Secretary of State for Energy, Section V.

[57]   **Exhibit C-0074**, Government of Spain, Ministry of Industry, Tourism and Commerce, Press Release: "The Ministry of Industry, Tourism and Commerce Reaches an Agreement with the Solar Thermal and Wind Power Sectors to Revise their Rate Structures", 2 July 2010 ("2 July 2010 Press Release").

(c)    The number of hours with a right to compensation above market prices would be limited, in accordance with the provisions of the 2005-2010 Plan regarding calculation of the facilities' profitability.

103.    The press release asserted that the measures agreed did not jeopardize the profitability of existing facilities and guaranteed that RE generation above the expected amount would benefit consumers and not compromise the system's economic sustainability. Likewise, it provided that the agreement reached entailed "the reinforcement of the visibility and stability of the regulation of these technologies in the future, guaranteeing the current incentives and rates of RD 661/2007 for the facilities in operation (and for those included in the [Pre-Assignment Registry]) starting in 2013."[58]

104.    On 19 November 2010, the Respondent introduced RD 1565/2010, which regulated and modified certain aspects related to electrical production under the Special Regime. RD 1565/2010 limited to 25 the number of years during which photovoltaic ("PV") installations would be subject to the regulated tariffs set forth in the RD 661/2007 regime.[59] Importantly, RD 1565/2010 was only applicable to PV producers and did not refer to CSP or wind producers.

105.    Spain then enacted RD 1614/2010 on 7 December 2010, regulating and modifying certain issues related to the production of energy from CSP and wind sources. RD 1614/2010 was intended to "resolve certain inefficiencies in the application of… RDL 6/2009,"[60] in line with the July 2010 Agreement. Specifically, RD 1614/2010 limited the number of hours per year during which installations were entitled to payment under the FIT pursuant to RD 661/2010.[61] It further provided that CSP facilities would not be eligible for selling electricity under the Premium option during their first year of operation or during the first 12 months after the entry into force of RD 1614/2010, if the plant had already obtained its final commissioning certificate.[62] However, during this first year, CSP installations were allowed to increase the percentage of electricity generated from secondary fuel, including gas, up to 15%, and still benefit from the Fixed Tariff for their entire electricity output.[63] Article 4 of RD 1614/2010 expressly provided the following:

"For solar thermoelectric technology facilities that fall under RD 661/2007 […] revisions of tariffs, premiums and upper and lower limits referred to by article 44.3 of the aforementioned Royal Decree,

---

[58]    **Exhibit C-0074**, 2 July 2010 Press Release.

[59]    **Exhibit R-0067**, RD 1565/2010, 19 November 2010 ("RD 1565/2010"), Article 1.10.

[60]    **Exhibit C-0023**, RDL 1614/2010, 7 December 2010 ("RDL 1614/2010"), Preamble.

[61]    **Exhibit C-0023**, RDL 1614/2010, Article 2.

[62]    **Exhibit C-0023**, RDL 1614/2010, Article 3.

[63]    **Exhibit C-0023**, RDL 1614/2010, Article 3.3.

shall not affect facilities registered definitively in the [RAIPRE] as of 7 May 2009, nor those that were to have been registered in the [Pre-Assignment Registry] under the fourth transitional provision of RDL 6/2009 […], and that meet the obligation envisaged in its article 4.8, extended until 31 December 2013 for those facilities associated to phase 4 envisaged in the Agreement of the Council of Ministers of 13 November 2009."

106. On 23 December 2010, Spain enacted RDL 14/2010 implementing measures which sought to address the Tariff Deficit and ensure the economic sustainability of the SES.[64] RDL 14/2010 introduced cuts to the number of hours for which PV facilities would benefit from the tariffs of the RD 661/2007 Special Regime,[65] and created access tolls to be paid by producers (both from the Ordinary Regime and the Special Regime) and consumers for the use of the transportation and distribution grids.[66] A few days later, on 29 December 2010, Ministerial Order No. ITC /3353/2010 was passed which, *inter alia*, increased the lower and upper caps under the Premium option for CSP plants.[67]

107. RDL 14/2010 was understood by PV producers as being a retroactive modification of the remuneration regime to which they were entitled. As a consequence, claims were filed before the Spanish Supreme Court, questioning the validity of RD 1565/2010 and RDL 14/2010.[68] The Supreme Court issued a series of judgments rejecting such claims, establishing that the remuneration regime applicable to RE producers could  be validly modified, in accordance with the principle of reasonable return (the "2012 Judgments").[69] The Respondent considers these judgments to be a reiteration of the Supreme Court's jurisprudence on the limits and scope of the principle of reasonable return, which should have been taken into account by the Claimants when analysing the legal framework of their investment.[70] The Claimants argue that the 2012 Judgments are irrelevant to the CSP sector, and that the outcome of these judgments is irrelevant to assess the Claimants' expectations, since they made their investments in the Andasol Plants in June 2011.

108. The Parties generally disagree as to the relevance or the application of the Supreme Court's case law in connection with the claims submitted in this arbitration. The Respondent alleges that such case law is a fact that must be taken into account by the Tribunal as a

---

[64] **Exhibit C-0088**, RDL 14/2010, 23 December 2010 ("RDL 14/2010").

[65] **Exhibit C-0088**, RDL 14/2010, First Additional Provision.

[66] **Exhibit C-0088**, RDL 14/2010, Article 1.

[67] **Exhibit C-0076**, Ministerial Order ITC/3353/2010, 28 December 2010.

[68] *See* Claimants' Reply, ¶ 239.

[69] **Exhibit R-0068**, Judgments from the Third Chamber of the Supreme Court concerning various appeals brought between 20 December 2011 and 26 November 2012; **Exhibit R-0069**, Judgment of the Supreme Court of 12 April 2012, EDJ 2012/65328; **Exhibit R-0070**, Judgment of the Supreme Court of 19 June 2012, EDJ 2012/124000 (together, the "2012 Judgments"); *See* Respondent's Counter-Memorial, ¶¶ 408-414.

[70] Respondent's Counter-Memorial, ¶ 408.

fundamental element in determining the specific extent of investors' rights and obligations under Spanish law.[71] Consequently, it is an element that has to be considered in determining any legitimate expectations that the Claimants might have had. The Claimants argue to the contrary that the Supreme Court's case law cannot have been understood to override the clear and unambiguous statements made by Spain concerning the meaning of RD 661/2007 and RD 1614/2010.[72] They also assert that the fact that measures might be considered valid as a matter of Spanish law does not render the measures legal under international law and that, in any event, the Supreme Court judgments on which Spain relies do not support its arguments.[73]

109.    The Claimants first became aware of the Spanish conglomerate Actividades de Construcción y Servicios, S.A.'s ("ACS") intention to sell a large part of its RE generation assets in the autumn of 2010.[74] Later, in February 2011, Antin was approached by RREEF Infrastructure (G.P.) Limited ("RREEF"), a company in the Deutsche Bank group, to consider a possible investment in certain assets owned by ACS.[75] The specific assets concerned were shares owned by ACS in the Spanish companies Andasol-1 Central Termosolar UNO S.A. and Andasol-2 Central Termosolar DOS S.A. (jointly, the "Andasol Companies"), each one of which owns and operates each of the Andasol-1 Plant and the Andasol-2 Plant.[76]

110.    Construction of the Andasol Plants, located in the province of Granada, southern Spain, were finished in 2008 and 2009. The Andasol-1 Plant received its final commissioning certificate on 25 November 2008 and registered with the RAIPRE on 24 April 2009, while the Andasol-2 Plant received its commissioning certificate on 5 June 2009 and registered with the RAIPRE on 22 December 2009.[77] The Andasol-2 Plant also registered with the Pre-Assignment Registry and started selling energy within the 36 months following the date of notification of said registration.[78] The Andasol-1 Plant, however, did not have to register with the Pre-Assignment Registry, since it was already in operation by the time RDL 6/2009 came into force. Spain does not dispute that, as a consequence, both Andasol

---

[71]    Respondent's Rejoinder, ¶¶ 311-317.

[72]    Claimants' Reply, ¶ 209.

[73]    Claimants' Reply, ¶¶ 210-214.

[74]    Crosbie WS I, ¶ 35; Bolaña WS I, ¶ 20; **Exhibit C-0077**, Mediobanca Banca di Credito Finanziario S.p.A., "Project Greco – Datapack", November 2010.

[75]    Crosbie WS I, ¶ 37; Bolaña WS I, ¶ 20.

[76]    **Exhibit C-0078**, Antin Infrastructure Partners, internal PowerPoint presentation on "Project Green Giant – CSP opportunity", 9 March 2011, p. 3; **Exhibit C-0090**, Antin Infrastructure Partners, internal PowerPoint presentation on "Project Greco – CSP Opportunity", 23 and 27 June 2011.

[77]    **Exhibit C-0008**, RAIPRE Certificates for the Andasol-1 Plant and the Andasol-2 Plant.

[78]    **Exhibit C-0072**, Pre-Assignment Registry Certificate for the Andasol-2 Plant.

Plants were qualified to receive Special Regime benefits under RD 661/2007 and RD 1614/2010.

111. Between March and June 2011, Antin and RREEF carried out a due diligence process regarding a potential investment in the Andasol Companies. In March 2011, the Antin Investment Committee discussed the investment opportunity and authorized a preliminary due diligence.[79] The Antin project team received contractual and financing documents, as well as due diligence reports provided by ACS, authored by Clifford Chance LLP, Deloitte S.L. and Alatec Ingenieros Consultores y Arquitectos ("Alatec").[80]

112. The 9 March 2011 Antin Investment Committee meeting minutes note that:

> "CSP technology was discussed. A more detailed presentation will be made in subsequent IC. The technology emerged commercially in the 1980s in California but few plants were built post 1990s. This was because there is a high investment cost which requires state support in the form of subsidies or tax breaks. In the 1990s, as a result of low gas prices, there was a focus on building CCGTs to satisfy electricity demands. CSP development has restarted in Spain and the US as a result of government support schemes.
>
> Spanish regulation for renewables has recently changed, in particular affecting solar PV. The CSP sector is dominated by large Spanish contractors and their association has negotiated changes to regulation which did not have a significant negative impact on the projects (i.e. fixed tariff for 2011 and limitation of hours of production). Spain is a world leader in CSP and Spanish contractors are involved in exporting their technology to many countries abroad. Therefore it is expected that CSP will be more sheltered from regulatory change."[81]

113. An Antin PowerPoint presentation also dated 9 March 2011 described the thermosolar regulation in Spain, and in regard to RD1614/2010, stated that "in order to contribute to the economic sustainability of the system, the Government introduced temporary modifications to the remuneration framework" and that the "new Royal Decree 1614/2010 prevents plants from choosing the market option during their first year of operation," "[t]hey are forced to choose the regulated tariff option" and "[t]hose facilities with COD

---

[79] **Exhibit C-0094**, Antin Infrastructure Partners, Project Greco – Minutes of Investment Committee Meeting, 9 March 2011; **Exhibit C-0153**, Antin Infrastructure Partners, Project Greco – Minutes of Investment Committee meeting, 17 March 2011.

[80] **Exhibit C-0078**, Antin Infrastructure Partners, internal Powerpoint presentation on "Project Green Giant – CSP Opportunity", 9 March 2011.

[81] **Exhibit C-0094**, Antin Infrastructure Partners, Project Greco – Minutes of Investment Committee Meeting, 9 March 2011.

prior to December 9, 2010 will move on to the tariff option from January 1, 2011 until December 31, 2011."[82]

114. Later, in a 17 March 2011 Antin Investment Committee meeting, a due diligence budget was approved with the intention to "carry out a limited amount of market, technical and legal due diligence over a period of 2 weeks to provide ACS with a firmed up indicative offer subject to confirmatory due diligence."[83] The Antin Investment Committee thus approved the formation of a consortium with RREEF to potentially bid for the ACS' CSP plants, subject to discussion with RREEF.

115. The due diligence process carried out by Antin involved legal counsel (Herbert Smith Freehills in Madrid ("Herbert Smith"), market analyst (Pöyry Management Consulting ("Pöyry"), financial advisors (Deutsche Bank and Lazard Limited) and technical experts (Altermia Asesores Técnicos, S.L. ("Altermia").[84] It was focused on the following: "Review of VDD (technical, legal, accounting & tax). Herbert Smith review of project contracts (EPC and P&M) and finance agreements. Altermia review of solar resource and production."[85]

116. Pöyry submitted three reports: an "off the shelf" report in March of 2011 ("Pöyry's First Report"), a market analysis focusing on Spain's Tariff Deficit in May 2011 ("Pöyry's Second Report"), and a "capture price analysis" report for purposes of determining projections of market prices[86] Pöyry's First Report analysed the differences between the PV and CSP sectors in Spain and the Tariff Deficit. Regarding RD 1614/2010, it concluded that "[t]he CSP industry has essentially remained unaffected, apart from the first year of operation with no real damage inflicted on its project economics", and that "[t]he major concern from the CSP industry is the absence of a regulatory framework beyond 2014, although given the lobbying power of the companies involved we feel that the industry is in a far safer position than PV."[87]

---

[82]   **Exhibit C-0078**, Antin Infrastructure Partners, internal PowerPoint presentation on "Project Green Giant – CSP Opportunity", 9 March 2011.

[83]   **Exhibit C-0153**, Antin Infrastructure Partners, Project Greco – Minutes of Investment Committee meeting, 17 March 2011.

[84]   **Exhibit C-0085**, Antin Infrastructure Partners, Project Greco – Minutes of Investment Committee Meeting, 13 April 2011. *See* Claimants' Memorial, ¶ 188.

[85]   **Exhibit C-0085**, Antin Infrastructure Partners, Project Greco – Minutes of Investment Committee Meeting, 13 April 2011.

[86]   **Exhibit C-0091**, Pöyry Management Consulting, "Current State and Future Trends of Solar Power in Spain: an ILEX Energy Report to RREEF Infrastructure", March 2011 ("Pöyry March 2011 Report"); **Exhibit C-0092**, Pöyry Management Consulting, "Spanish Electricity Tariff Deficit – A Note from Pöyry Management Consulting to RREEF", 11 May 2011 ("Pöyry May 2011 Report"); **Exhibit C-0093,** Pöyry Management Consulting, "Capture Price Analysis for Andasol 1, Andasol 2 and Extresol 1 CSP Plants", May 2011.

[87]   **Exhibit C-0091**, Pöyry March 2011 Report, pp. 108-109.

117. Also, according to Pöyry's First Report, considering the increase in Brent prices at the time, the political will to mitigate the impact of rising electricity costs to end-users would increase, potentially leading the Government to avoid introducing the required increases in third party access charges (these represent the tariff to access the electricity network, and form part of the electricity bill). The zero-tariff deficit would thus be unlikely to be met by 2012, while in a realistic scenario such target would be met by 2014-2015 through yearly 10% tariff to access increases.[88] Pöyry then concluded that:

> "If the zero tariff deficit target by end of 2012 is postponed, it will open up the opportunity to more deficit generation. Considering the Government behaviour, it is likely that future changes might be implemented if considered needed. RDL 14/2010 is aimed at tackling the lack of funds in the electricity system, reducing the revenue of renewable generators as well as introducing additional revenue sources (i.e., grid tolls). We feel that the Government is in a position to continue with the same energy policy, if considered a requirement, including implementation of further reductions in remuneration to renewables and non-renewable technologies."[89]

118. Two months later, in Pöyry's Second Report, it added that the trend was for subsidies in the electricity system to be reduced or disappear. For Pöyry, the risk was being driven by the interaction of factors inherent to the SES and the power of different lobbying groups, noting that "[i]n this regard, CSP is quite a safe market place as major Spanish construction companies are involved in this business, which certainly implies a smaller risk exposure than other RES technologies."[90]

119. Altermia's technical due diligence report of July 2011 states that the design criteria for the type of plants considered allowed for an average working lifespan of 30 years, providing preventative, predictive and corrective maintenance procedures were followed, in compliance with good engineering practice.[91] Altermia also covered the plants' thermal storage system and their use of natural gas.[92]

120. Antin instructed Herbert Smith to analyse the regulatory regime for CSP plants. In its due diligence report dated 25 March 2011 (the " HS Report"), Herbert Smith stated that Article 44(3) of RD 661/2007 provides that "reviews to the tariff and the caps and floors would only affect installations placed into operation after 1 January of the second year after the review", and that this provisions sets out the "untouchability of the regulated tariff and the

[88] **Exhibit C-0091**, Pöyry March 2011 Report.
[89] **Exhibit C-0091**, Pöyry March 2011 Report, p. 135.
[90] **Exhibit C-0092**, Pöyry 11 May 2011 Report, p. 8.
[91] **Exhibit C-0036**, Altermia Asesores Técnicos, S.L., "Independent Technical Consultancy – Technical Due Diligence Report on Three (3) Solar Thermal Energy Plant Projects", 7 July 2011 ("Altermia July 2011 Report").
[92] **Exhibit C-0036**, Altermia July 2011 Report.

caps and floors."[93] It noted, however, that this provision mentions only the tariff and the caps and floors, not the premium. The Ministry of Industry has therefore interpreted RD 661/2007 in meaning that it does not protect the premiums enjoyed by installations, and that future legislation could alter and reduce premiums without altering the tariff or the caps and floors.[94] In contrast, according to Herbert Smith, RD 1614/2010, "guarantees that the current premiums, tariffs and the floors and caps will not be modified" for installations that have either achieved definitive registration in the RAIPRE by 7 May 2009 or been registered in the RAIPRE.

121.  The HS Report added that "the Supreme Court has, in three judgments […] expressly acknowledged the possibility of retroactively changing the remunerative regime applicable to electricity generation installations subject to the special regime, provided that this remains within the limits established by the LSE, i.e. provided that an investor is able to obtain a reasonable return on its investments, which would therefore not be in violation of legitimate confidence and legal protection […]."[95]

122.  However, according to the HS Report, "all the Supreme Court's case law in this regard has related to the wording of RD 661/2007, without taking into account the new elements introduced by RD 1614/2010. In effect, this more recent Royal Decree introduced substantial new elements, and for the first time acknowledges that the current premiums, tariffs and the upper and lower limits will not be modified for installations (i) that have achieved definitive registration in the [RAIPRE] by 7 May 2009, and (ii) registered in the [Pre-Assignment Registry]."[96]

123.  The HS Report concluded that "the Government could (although highly improbable) in the future approve a new provision having the same (Royal Decree) or a higher rank (Act) to modify the protection currently afforded in RD 1614/2010. Nevertheless, precisely due to the explicit and strong protection contained in RD 1614/2010, in the unlikely event that the Government were to change the regulation to the detriment of the aforementioned installations, the owner of the installation would have a very strong case before the Courts."[97]

---

[93]  **Exhibit C-0096**, Herbert Smith LLP Madrid, "Project Greco – Memorandum on the Legislative Changes in Spain Governing the Generation of Energy under the Special Regime, Particularly in Connection with Installations that use Thermal Processes to Transform Solar Energy into Electricity (Solar Thermal)", 25 March 2011 ("HS Report"), p. 3.
[94]  **Exhibit C-0096**, HS Report, p. 4.
[95]  **Exhibit C-0096**, HS Report, p. 10.
[96]  **Exhibit C-0096**, HS Report, p. 11.
[97]  **Exhibit C-0096**, HS Report, p. 12.

124. Spain takes issue with certain aspects of the HS Report, including its analysis of the effects and applicability of Supreme Court judgments.[98]

125. At the 13 April 2011 Antin Investment Committee meeting, Antin discussed the due diligence carried out thus far, and pointed to the following as some of the key investment considerations: the CSP plants were best in class and developed by the world leader in the sector; their storage capacity enabled the plants to be the only renewable producers able to provide dispatchable electricity;[99] the "[a]ttractive regulatory regime has been sheltered from any significant changes and benefits from the support and lobby power of major Spanish corporates," and there were "[s]table and predictable cash flows underpinned by floor and cap of market premium over pool electricity prices."[100] The transaction then under consideration concerned the sale of up to 100% of seven CSP plants, of which Antin would acquire two or three. At the time, the plants were "valued at a 15% IRR resulting in a 1.7x-2.0x MoM" and an "[a]verage yield in the low-to mid-teens"[101]. It was further stated that:

> "Spain has a tariff deficit as a result of regulated electricity prices not reflecting the actual cost of producing electricity. This deficit has been accumulating over the past few years. The government has a plan to reduce the tariff deficit to zero by 2013. The regulatory changes in renewables last year were in part motivated by this desire to reduce the tariff deficit. The project team will carry out a more in depth analysis of the tariff deficit and its potential impact on CSP plants during the next phase of the process.
>
> The CSP sector has not been significantly affected by recent regulatory changes (see slides 14 and 15). A key reason for this is the involvement of large Spanish corporates in the sector and their lobby power with the government. Additionally, Spain is a world leader in CSP and it has become a very relevant export industry.
>
> Further comfort on the future stability of regulation would be obtained from the involvement of major Spanish utilities. Today the Spanish CSP market is dominated by large contractors, although

---

[98]  *See* Respondent's Counter-Memorial, ¶ 695.

[99]  **Exhibit C-0085**, Antin Infrastructure Partners, Project Greco – Minutes of Investment Committee Meeting, 13 April 2011, p. 2. *See* **Exhibit C-0084**, Antin Infrastructure Partners, internal PowerPoint presentation on "Project Greco – CSP Opportunity", 13 April 2011, p. 9 ("CSP technology presents certain advantages over other renewable energies which make this technology more attractive to investors and more useful for the electricity system. – Energy storage allows CSP plants to be dispatchable and provide electricity during demand peaks (receiving therefore higher prices). – The steam turbine can produce electricity using gas, allowing the plants to provide electricity during demand peaks, cloudy days or during the night." [footnote omitted].

[100]  **Exhibit C-0085**, Antin Infrastructure Partners, Project Greco – Minutes of Investment Committee Meeting, 13 April 2011, p. 2.

[101]  **Exhibit C-0085**, Antin Infrastructure Partners, Project Greco – Minutes of Investment Committee Meeting, 13 April 2011, p. 3.

some like Acciona could be considered a utility. Iberdrola owns an operational plant and one that is pre-registered. The project team will find out if they have further projects in the pipeline, underpinning their support to the sector."[102]

126.   An Antin PowerPoint presentation also dated 13 April 2011 described the recent changes to the Spanish regulatory framework in RDL 1614/2010 stating that the "regulatory framework is now more robust against retroactive changes" and the "[l]imited impact of recent changes over thermo solar industry in Spain which clearly show the commitment and support of this technology by the Government (contrary to the PV sector)."[103]

127.   The Claimants met with certain Government officers as part of their due diligence process. On 20 May 2011 Mauricio Bolaña, an Antin partner, together with Mr. Francisco Cabeza (on behalf of RREEF), Herbert Smith and Lazard representatives, met with Mr. Miguel Vizcaíno, head of the legal department at the Ministry. The Parties disagree as to the content and consequences of said meeting. The Claimants allege, based upon Mr. Bolaña's witness statement and an email prepared by him, that during the meeting Mr. Vizcaíno confirmed that RD 1614/2010 provided a long-term, stable regulatory framework for CSP producers, specifically mentioning that any future changes would not affect the existing facilities, such as the Andasol Plants.[104]   According to Mr. Bolaña's Statement, Mr. Vizcaíno also affirmed that the Tariff Deficit was a manageable issue, and explained that the CSP and PV sectors were different since the former produces more electricity using less subsidies than the latter, which explained the retroactive changes affecting PV facilities.[105]

128.   An email sent by Mr. Cabeza after the meeting on 20 May 2010 included the following remarks: "[c]onfirmation that the current decree provides a long term, stable regulatory framework for Termo Solar ("TS"). Obviously, this has to be taken with some caution ("nothing is written in marble") but any changes/adjustments in the future would not be to the detriment of current investors."[106]

129.   The email included, according to the Claimants, the following language that provided comfort: (i) Article 4 of RD 1614/2010, where "[a]lthough one can argue that the article could be changed by a new government in the future, […] this would be very difficult from

---

[102]   **Exhibit C-0085**, Antin Infrastructure Partners, Project Greco – Minutes of Investment Committee Meeting, 13 April 2011, pp. 3-4.

[103]   **Exhibit C-0084**, Antin Infrastructure Partners, internal PowerPoint presentation on "Project Greco – CSP Opportunity", 13 April 2011, p. 21.

[104]   Claimants' Memorial, ¶ 213.

[105]   Bolaña WS I, ¶¶ 49-51.

[106]   **Exhibit C-0099**, Email chain between Antin, RREEF, Lazard and Deutsche Bank Madrid, 20 May 2011; Claimants' Memorial, ¶ 214. Mr. Bolaña explains that this email was drafted both by him and Mr. Cabeza immediately after the meeting. Bolaña WS I, ¶ 51.

a legal/litigation and reputational standpoint. The protection given under article 4 is unique in Spanish regulatory history, and TS is the only technology that has this kind of support"[107]; (ii) the focus of the Ministry at the time was the PV sector, which is subject to regulatory changes in the short term; and (iii) other work-streams of the Ministry at the time included gas and transmission regulation, and there were no works on a future solar thermal decree.[108] The email (in its original English version) also mentions the Supreme Court doctrine on "reasonable return" and notes that the capital basis for a returns calculation is unclear, but Spanish courts recognize a legal protection for investors in regulated assets, which cannot be breached by the Government.[109]

130.  The Respondent does not deny that the meeting took place. However; Spain argues that there is no evidence as to its contents, except for an email with subjective and ambiguous conclusions drawn by a meeting attendant.[110] Moreover, the Respondent points out that, even as per said email, Mr. Vizcaíno explained that the Supreme Court had established the doctrine of reasonable return on investments, and that it could not be breached.[111] In any event, according to the Respondent, no commitments to petrify the legal system in the sense alleged by the Claimants could come from a public official, and no legitimate expectations could arise from an individual lacking the capacity or competence to fulfil them.[112]

131.  According to the Claimants, Mr. Bolaña also met with the General Secretary, the Chief Legal Advisor and the Assistant Director for Special Regimes of the Spanish National Energy Commission ("CNE", for its acronym in Spanish), on behalf of Antin on 25 May 2011. According to the Claimants, the CNE confirmed during the meeting the information that had been previously provided by the Ministry, *i.e.* that the CSP sector was subject to a stable regulatory regime.[113] The Respondent alleges that there is no evidence on the content of such meeting and that, in any event, the opinions allegedly expressed therein by the CNE's officers were contrary to the official opinion expressed by the CNE in its report of 7 March 2012.[114]

132.  At Antin Investment Committee meetings in June 2011, presentations made considered that there was strong Government support for the CSP sector, as evidenced from the recent regulatory changes and as communicated in meetings with the Ministry and the CNE. It

---

[107]  **Exhibit C-0099**, Email chain between Antin, RREEF, Lazard and Deutsche Bank Madrid, 20 May 2011.

[108]  **Exhibit C-0099**, Email chain between Antin, RREEF, Lazard and Deutsche Bank Madrid, 20 May 2011.

[109]  **Exhibit C-0099**, Email chain between Antin, RREEF, Lazard and Deutsche Bank Madrid, 20 May 2011.

[110]  Respondent's Counter-Memorial, ¶ 697.

[111]  Respondent's Counter-Memorial, ¶ 701.

[112]  Respondent's Counter-Memorial, ¶¶ 703-708.

[113]  Claimants' Memorial, ¶¶ 211-217; Bolaña WS I, ¶ 52.

[114]  Respondent's Counter-Memorial, ¶ 683; Respondent's Rejoinder, ¶¶ 572-574.

was acknowledged that "[w]hilst changes to regulation can never be ruled out, the representatives met considered the CSP regulation review closed" and that changes to Article 54 of RD 1614/2010 for CSP would be very difficult from a legal, litigation or reputational standpoint, since the protection given under Article 4 is unique in Spanish regulatory history.[115] The PowerPoint presentation also mentioned that in the May 2011 meetings with the Ministry and the CNE it was discussed that there were significant differences between the PV and CSP sectors: PV plants were owned by thousands of small operators with no lobby power; the PV sector was involved in widespread fraud; and while in 2010 CSP plants generated 0.8% of electricity and received 3% of Special Regime subsidies, PV plants generated 7% of the electricity and received 37% of the Special Regime subsidies.[116] On RDL 1614/2010, it was noted that for the first time in Spanish RE regulation, the fixed tariff, premium, cap and floor could not be modified for CSP and wind, and therefore, a retroactive change was hard to implement as operators would have a much stronger case in court than before.[117]

133. Additionally, the presentation noted that even though the Tariff Deficit existed prior to the widespread deployment of renewables, such tariff has grown significantly over the past few years in part due to the increasing contribution of Special Regime generators, and mainly the PV sector.[118] In order to reduce the Tariff Deficit, the Spanish government had announced temporary modifications to the Special Regime (mainly for the PV sector). However, alternatives which might be considered to deal with the Tariff Deficit included increasing third-party access charges (but there was a political reluctance to significantly increase electricity bills), reducing special regime subsidies, imposing a windfall profit tax on nuclear or hydroelectric energy producers or increasing the amount of tariff deficit to be securitised.[119]

134. Antin asserts that, based upon the findings of its due diligence process, it decided to proceed with the investment in the Andasol Companies. Thus, on 27 June 2011 Antin Termosolar was incorporated and on 30 June 2011 a share purchase agreement was concluded, by which Antin Termosolar would acquire 45% of the issued share capital of the Andasol Companies.[120] The acquisition became effective on 31 August 2011 once the

---

[115] Exhibit C-0090.

[116] Exhibit C-0090, p. 8.

[117] Exhibit C-0090, p. 10.

[118] Exhibit C-0090, p. 104

[119] Exhibit C-0090, p. 15.

[120] **Exhibit C-0100**, Notarised Agreement for the Sale and Purchase of 90% of the issued share capital of Andasol-1 Central Termosolar Uno, S.A. and Andasol-2 Central Termosolar Dos, S.A. and the partial assignment of subordinated shareholder loans between Proto Primo, B.V.; Antin Energia Termosolar, B.V.; Cobra Sistemas y Redes, S.A., Cobra Solar Del Sur, S.L.; and Cobra Gestión de Infraestructuras, S.A., 30 June 2011. *See* Claimants' Memorial, ¶¶ 222-223.

conditions precedent in the share purchase agreement were met.[121] Antin Termosolar and REEFF also agreed to take on a proportionate share in the existing shareholders' loans and to an earn-out mechanism in favour of ACS, should the Andasol Plants sustain certain performance levels.[122]

135. The Claimants explain that by 2010 and 2011 Spain was broadly in line with the target of sourcing 22.1% of its electricity from renewable sources, and by 2012 with a total of 1,950 MW, with about 2,300 MW in 2013, Spain had more CSP capacity than any other country in the world.[123]

136. On 27 January 2012, a few months after the Claimants had completed their investment in the Andasol Companies, Spain enacted RDL 1/2012. This RDL suppressed the application of the economic incentives granted by the RD 661/2007 Special Regime (*i.e.* regulated tariffs, premiums and upper and lower limits) for RE production facilities that had not been registered with the Pre-Assignment Registry as of the date of entry into force of RDL 1/2012.[124] Additionally, RDL 1/2012 suspended registration of new facilities with the Pre-Assignment Registry.[125] However, the provisions of RDL 1/2012 were not made applicable to Special Regime facilities that had already completed registration with the RAIPRE, as was the case for the Andasol Plants.

137. On 27 January 2012, the Secretary of State for Energy wrote to the President of the CNE requesting that the CNE prepare a report on proposing regulatory measures to address the Tariff Deficit.[126] Some of the measures eventually proposed by the CNE included the "harmonisation" of the premium of solar thermoelectric energy, by way of reducing the premium of pre-registered CSP plants by 12%. In accordance with the report issued by the CNE in 2012, correcting the Premium in such a way that it maintains the principle of a reasonable return provided by law.[127]

138. The Tariff Deficit was also addressed in the National Reform Programme of 27 April 2012, which sets out a broad economic strategy to address the economic and financial crisis in Spain and the growing public debt.[128] Regarding the SES, the 2012 National Reform Programme noted that there was an imbalance between the costs and the revenues of the

---

[121] *See* Claimants' Memorial, ¶ 223.

[122] *See* Claimants' Memorial, ¶ 223.

[123] Claimants' Memorial, ¶¶ 226-228.

[124] **Exhibit R-0079**, RDL 1/2012, 27 January 2012 ("RDL 1/2012"), Articles 2 and 3.

[125] **Exhibit R-0079**, RDL 1/2012, Article 4.

[126] **Exhibit R-0081**, Copy of the letter from the Secretary of State for Energy, Ministry of Industry, Energy and Tourism, to the President of CNE, 27 January 2012.

[127] **Exhibit R-0083**, CNE, "Report on the Spanish energy sector. Introduction and Executive Summary," p. 23.

[128] **Exhibit R-0087**, National Reform Programme, Kingdom of Spain, 27 April 2012 ("2012 National Reform Programme").

SES, the Government was committed to eliminating the tariff deficit by equally distributing amongst consumers and the public and private sectors the costs of the cost-reduction measures, and the Special Regime Premiums was identified as one of the most significant costs of the SES.[129] Such an energy reform was briefly mentioned in other documents or reports issued by the Government in 2012.[130]

139. On 28 December 2012, Spain enacted Law 15/2012, introducing certain changes to the Special Regime applicable to CSP producers. Particularly, it added a new numeral to Article 30 of Law 54/1997, which provided the following:

> "The electricity that is attributable to the use of a fuel in a generation facility that uses as its primary energy any non-consumable renewable energies shall not be subject to the premium economic regime, other than in the case of hybrid facilities which use non-consumable and consumable sources of renewable energy, in which case the electricity attributable to the use of the consumable source of renewable energy is subject to the bonified economic regime."[131]

140. The above provision eliminated the application of the RD 661/2007 economic regime (and particularly the right to receive a FIT) to the electricity produced using fossil fuels (such as natural gas, in the Andasol Plants), starting as of 1 January 2013.[132] According to Claimants, this lead to a substantial reduction of the amount of electricity produced and a consequential reduction in the revenues of the Andasol Plants.[133]

141. Law 15/2012 also created a tax on the value of the production of electrical energy (the "TVPEE"), imposed on the total revenue coming from the production and feeding of electricity into the national grid. The TVPEE, which amounts to 7% of such revenue, was made applicable to all energy producers, both conventional and renewable, including those subject to the Special Regime.[134] The Parties disagree as to the nature of the TVPEE: while the Respondent considers that it is a tax of general application under both Spanish law and international law,[135] the Claimants contend that, in practice, the TVPEE amounts to a

---

[129] **Exhibit R-0087**, 2012 National Reform Programme, p. 208.

[130] *See* **Exhibit R-0128**, Ministry of the Presidency, Secretariat of State for Communication "Six Months of Government: Reform and Growth", 9 July 2012, p. 30; **Exhibit R-0129**, Ministry of the Presidency, Secretariat of State for Communication, "The Reforms of the Spanish Government: determination against the crisis", September 2012, p. 18.

[131] **Exhibit C-0024**, Law 15/2012, 27 December 2012 ("Law 15/2012"), First Final Provision.

[132] Claimants' Memorial, ¶ 236.

[133] Claimants' Memorial, ¶ 238.

[134] **Exhibit C-0024**, Law 15/2012, Articles 1-8.

[135] Respondent's Counter-Memorial, ¶¶ 178, 179, 192-194.

disguised tariff cut for RE installations and cannot be considered a *bona fide* taxation measure of general application.[136]

142. A month later, on 1 February 2013, Spain introduced RDL 2/2013, in order to reduce the costs of the Special Regime and hence avoid an increase in the access tolls paid by consumers.[137] For such purpose, through RDL 2/2013, Spain introduced several measures that are contested by the Claimants in these proceedings.

143. First, in accordance with its Article 1, with effect as of 1 January 2013, all compensations, tariffs and premiums of the electrical system that were previously updated in accordance with the CPI —including those applicable to producers under the Special Regime— would now be updated in accordance with a CPI at constant tax rates, excluding unprocessed foods and energy products.[138]

144. Second, under Article 2 of RDL 2/2013, where Special Regime producers chose the market price plus Premium remuneration scheme, such Premium would be reduced to the amount of EUR 0.0 cent/kWh, for both existing and future facilities. The Claimants argue that, in practice, the Premium option for Special Regime producers was effectively eliminated.[139] Those Special Regime facilities that up until that moment had opted to sell their energy under the Premium option would be deemed subject to the Fixed Tariff option as of 2 February 2013 with effect from 1 January 2013, unless they notified the Government that they desired to opt for the Premium option, in which case such decision would be definitive and they would not be allowed to opt for the Fixed Tariff option subsequently.[140] Antin

---

[136] Claimants' Memorial, ¶ 241.

[137] **Exhibit C-0025**, RDL 2/2013, 1 February 2013 ("RDL 2/2013"), Preamble ("In recent years, the growing evolution of the cost elements of the electricity system has given rise to the appearance of imbalances between said costs and the revenue obtained from regulated prices. In order to correct these imbalances, a series of urgent measures during 2012 were adopted which affected both elements. […]Data made public by the National Energy Commission in its report 35/2012, of 20 December, concerning the proposal which established access fees as of 1 January 2013 and tariffs and premiums for special regime facilities, made manifest the appearance of new deviations in the cost and revenue estimates caused by different factors, both for the closure of 2012 and for 2013 which, in the current economic context, would make it almost unfeasible to fund such costs with the electricity fees and the elements expected to derive from the General State Budget. To a great extent these deviations are due to a greater increase in the cost of the special regime on account of an increase in operating hours which was greater than expected, to an increase in remuneration values due to their being indexed to the Brent price, and to a decrease in revenue from fees due to a very marked fall in demand which was consolidated during this tax year. The alternative that was raised would be a new increase in the access fees paid by consumers of electricity. This measure would directly affect household economies and company competitiveness, both in a delicate situation given the current economic situation. Faced with this scenario and in order to palliate this problem, the Government has considered adopting certain urgent cost-reduction measures which avoid consumers having to bear a new burden, thereby contributing to their being able to also collaborate in the economic recovery through consumption and investment. […]").

[138] **Exhibit C-0025**, RDL 2/2013, Article 1.

[139] Claimants' Memorial, ¶ 244.

[140] **Exhibit C-0025**, RDL 2/2013, Articles 2 and 3.

alleges that under such circumstances, no installation (including the Claimants') had any interest in opting for the Premium option.[141]

145.  According to the Respondent, this measure was introduced in order to avoid an over-remuneration of Special Regime producers while guaranteeing them a reasonable rate of return, and preventing consumers from having to bear a new increase in the tariffs.[142] In any event, the Respondent argues, the effects of this measure disappeared with the adoption, a couple of months later, of the new subsidies model introduced by the global reform of the SES, initiated with Law 24/2013.[143] To the contrary, the Claimants argue that Spain's claim of over-remuneration is baseless, and constituted an abrupt and unprecedented departure from the RD 661/2007 basic legal framework.[144]

146.  On 26 April 2013, the Claimants sent a letter to the President of the Spanish Government, Mr. Mariano Rajoy, making reference to the changes to the legal regime applicable to CSP plants. Said measures included RDL 12/2012, Law 15/2012, Law 16/2012 and RDL 2/2013. In that letter, the Claimants requested negotiations with the Spanish Government and reserved their right to submit their claims to international arbitration.[145] In response, on 7 May 2013, the Spanish Government requested the Claimants to submit their request for negotiations in Spanish.[146] On 15 May 2013, the Claimants complied with the Respondent's request.[147]

147.  On 12 July 2013, Spain introduced RDL 9/2013 amending Law 54/1997. Claimants consider RDL 9/2013 a complete overhaul of the regulatory framework for the RE sector and to have "wiped out" the entire RD 661/2007 economic regime.[148] Specifically, Article 1 of RDL 9/2013 amended Article 30(4) of RD 661/2007 in the following terms:

> "4. Additionally, subject to the terms that the Council of Ministers might adopt pursuant to Royal Decrees, in relation to the remuneration for the generation of electricity calculated according to market price, installations may receive a specific remuneration [the Special Payment] composed of an amount per unit of installed capacity. Such amount shall cover, as appropriate, the investment costs of a standard installation that cannot be recovered through the

---

[141]  Claimants' Memorial, ¶ 246.

[142]  **Exhibit C-0025**, RDL 2/2013, Preamble; Respondent's Counter-Memorial, ¶ 523.

[143]  Respondent's Counter-Memorial, ¶ 526.

[144]  Claimants' Memorial, ¶¶ 248-249; Claimants' Reply, ¶¶ 320-323.

[145]  **Exhibit C-0010**, Letter from Allen & Overy LLP to President of the Spanish Government Mariano Rajoy Brey on behalf of the Claimants.

[146]  **Exhibit C-0011**, Letter from the Ministry of Industry, Energy and Tourism to Allen & Overy LLP.

[147]  **Exhibit C-0012**, Letter from Allen & Overy LLP to the Ministry of Industry, Energy and Tourism on behalf of the Claimants.

[148]  Claimants' Memorial, ¶¶ 253-254.

sale of energy, as well as an amount for the operation of the installation to cover, as the case may be, the difference between exploitation costs and the revenues obtained from the participation of such a standard installation in the market.

For the calculation of that specific remuneration, the following elements shall be considered, based on the installation's regulatory useful life and by reference to the activities carried out by an efficient and well administered business:

a)  The standard revenues for the sale of the generated energy valued at market price of production;

b)  The standard exploitation costs; .

c)  The standard value of the initial investment. […]

This remuneration regime shall not exceed the minimum required level  to cover the costs that are necessary for installations to compete on an equal footing with the rest of the technologies in the market in order to allow those installations to obtain a reasonable return, by reference to the standard installation […]

Such reasonable return will be based on, before taxes, the average returns in the secondary market of the State's ten-year bonds plus the adequate differential.

The parameters of the remuneration regime can be revised every six years."[149]

148. Under amended Article 30(4), facilities under the Special Regime could only enjoy a payment additional to the market value of electricity (the "Special Payment"), rather than choosing between the Fixed Tariff and Premium options, which were eliminated. Moreover, the Special Payment (i) would be calculated by reference to the costs of a standard facility, as determined by the Government, and by reference to the activity carried out by an efficient and well managed business, and (ii) would in no case surpass the minimum level required for facilities to obtain a reasonable rate of return, based on the return on State bonds in the secondary market. Furthermore, the entire remuneration regime may be reviewed every six years.

149. Since RDL 9/2013 applies to both existing and new facilities, according to Antin, it modifies considerably the Special Regime to which CSP facilities, including the Andasol Plants, were subject prior to its entry into force. Its adoption gave rise to further protests by the Claimants, which on 30 July 2013 sent a letter to the President of the Spanish

---

[149] **Exhibit C-0029**, RDL 9/2013, 13 July 2013 ("RDL 9/2013"), Article 1.

Government asserting that RDL 9/2013 modified the regulatory framework applicable to Antin's investments and foreseen that such modifications would cause serious additional damages thereto.[150] Claimants thus reiterated their request to hold a meeting with the Government in order to discuss the dispute between the Parties.[151]

150. Spain continued to adopt further amendments to the regulation of the electricity sector. On 26 December 2013, the Respondent adopted Law 24/2013 which superseded Law 54/1997 and formally eliminated the distinction between the Ordinary Regime and the Special Regime.[152] Thus, under the regime created by Law 24/2013, conventional and RE generators were now subject to equal conditions, being the latter entitled exclusively to the Special Payment created by RDL 9/2013.[153] It also eliminated RE installations' right of priority of grid access and priority of dispatch.[154] By the time both RDL 9/2013 and Law 24/2013 were adopted, Spain had not yet adopted a comprehensive regime on the legal and economic regime of RE installations.[155] For the following months, the Fixed Tariff continued to apply (but not the Premium, which had been removed by RDL 2/2013), and the payments received during such time would be discounted from any Special Payment to be received once such Special Payments were defined at some later date.[156]

151. The Respondent began the implementation of Law 24/2013 on 6 June 2014 by introducing RD 413/2014, which regulated the production of electricity from renewable sources of energy, cogeneration and waste. RD 413/2014, however, did not set out the parameters of compensation for Standard Installations. Later, Ministerial Order IET/1045/2014, enacted on 20 June 2014 as the second measure implementing Law 24/2013, set out the remuneration parameters applicable to RE producers under the Law 24/2013 regime. Under Ministerial Order IET/1045/2014 the reasonable rate of return applicable to facilities existing prior to the entry into force of RDL 9/2013 was set at 7.398%.[157]

---

[150] **Exhibit C-0013**, Letter from Allen & Overy LLP to President of the Spanish Government Mariano Rajoy Brey on behalf of the Claimants.

[151] **Exhibit C-0013**, Letter from Allen & Overy LLP to President of the Spanish Government Mariano Rajoy Brey on behalf of the Claimants.

[152] **Exhibit C-0030**, Law 24/2013, 26 December 2013 ("Law 24/2013"), Article 6.

[153] **Exhibit C-0030**, Law 24/2013, Preamble.

[154] **Exhibit C-0030**, Law 24/2013, Article 26(1). *See* **Exhibit C-0031**, RD 413/2014, 6 June 2014 ("RD 413/2014"), Article 6.

[155] **Exhibit C-0030**, Law 24/2013, Third Final Provision ("on the proposal of the Ministry of Industry, Energy and Tourism, the government approved a royal decree regulating the legal and economic scheme for electricity production installations using renewable energy sources, cogeneration and waste-to-energy that had been recognized as being entitled to receive priority remuneration at the time of the coming into force of said Royal Decree Law").

[156] *See* Claimants' Memorial, ¶¶ 260-261.

[157] **Exhibit C-0032**, Ministerial Order IET/1045/2014, 20 June 2014 ("Ministerial Order IET/1045/2014"), Annex III, Article 1.3.

152. Finally, on 14 October 2014, the Respondent introduced Ministerial Order IET/1882/2014, for calculating the electricity produced by solar installations attributable to the use of fossil fuels. As previously mentioned, pursuant to Law 15/2012, such electricity would not be subject to the Special Payment applicable to RE. Order IET/1882/2014 provided that it would apply to electricity produced from 1 January 2013, date of entry into force of Law 15/2012, and thus any payments received as premiums or tariffs since that date for electricity produced by using fossil fuels would have to be returned.[158]

153. According to the Claimants, under the new regime applicable to RE facilities, which includes the Andasol Plants, RE producers are entitled to obtain a Special Payment in addition to the market price of the electricity produced by them, rather than being able to choose between the Fixed Tariff and Premium options. CSP facilities are entitled to the Special Payment only during a regulatory useful life of 25 years, rather than for the entire operational life of the installations. Moreover, the Special Payment is calculated by reference to a standard facility, without considering the specific circumstances of each particular facility nor taking into account the costs incurred or investments made as a consequence of local laws or regulations. Finally, the Special Payment is intended to be no more than the minimum necessary to allow RE producers to obtain a reasonable rate of return, calculated at 7.398% for existing facilities.

154. As a consequence of the above, Claimants claim that the regulatory regime applicable to the Andasol Plants has changed considerably since the moment when Antin made its investment in the Andasol Companies. According to the Claimants, these changes have had significant harmful effects on the Andasol Companies, and thus on their investments.[159] In particular, according to the expert report submitted by the Claimants, Premium payments expected under RD 661/2007 considerably exceeded the Special Payments provided to RE producers under the new regime.[160] Additionally, according to the Claimants, their free cash flows and their equity cash flows were also sensibly reduced.[161] Thus, the Claimants intend to recover in this arbitration the damages they allege to have suffered as a consequence of the regulatory changes introduced by the Respondent.

## V.    SUMMARY OF THE PARTIES' CLAIMS AND PRAYERS FOR RELIEF

155. The Claimants' request for relief as stated in the Claimants' Memorial (and reiterated in the Claimants' Reply) is as follows:

---

[158]  **Exhibit C-0105**, Ministerial Order IET/1882/2014, 14 October 2014, First Transitory Provision.
[159]  Claimants' Memorial, ¶ 291.
[160]  Brattle Regulatory Report I, ¶ 135; Claimants' Memorial, ¶ 292.
[161]  Brattle Quantum Report I, ¶ 73; Claimants' Memorial, ¶ 293.

"537. For all of the foregoing reasons, the Claimants respectfully request that the Tribunal enter an award in their favour and against the Kingdom of Spain as follows:

(a) DECLARING that Spain has breached Article 10(1) of the ECT; and

(b) ORDERING that Spain:

(i) provide full restitution to the Claimants by re-establishing the situation which existed prior to Spain's breaches of the ECT, together with compensation for all losses suffered before restitution; or

(ii) pay the Claimants compensation for all losses suffered as a result of Spain's breaches of the ECT; and

in any event:

(iii) pay the Claimants pre-award interest at a rate of 2.07% compounded monthly; and

(iv) pay post-award interest, compounded monthly at a rate to be determined by the Tribunal on the amounts awarded until full payment thereof; and

(v) pay the Claimants the costs of this arbitration on a full-indemnity basis, including all expenses that the Claimants have incurred or will incur in respect of the fees and expenses of the arbitrators, ICSID, legal counsel, experts and consultants; and

(vi) any such other and further relief that the Tribunal shall deem just and proper."[162]

156. Additionally, the Claimants request the Tribunal to dismiss the Respondent's jurisdictional and admissibility objections and order that the Respondent bear the cost of bringing said objections.[163]

157. In turn, in its Rejoinder, the Respondent requests the Tribunal to:

"a) Declare its lacks of jurisdiction to hear the claims of the Claimants, or if applicable their inadmissibility, in accordance with what is set forth in section III of this Document, referring to Jurisdictional Objections;

---

[162] Claimants' Memorial, ¶ 537; Claimants' Reply, ¶ 891.
[163] Claimants' Rejoinder, ¶ 143.

b) Secondarily, for the case that the Arbitral Tribunal decides that it has jurisdiction to hear this dispute, that it dismiss all the claims of the Claimants on the merits because the Kingdom of Spain has not breached in any way the ECT, in accordance with what is stated in paragraphs (A) and (B) of section IV of this Document, on the substance of the matter;

c) Secondarily, that all rescionary claims of the Claimants are dismissed inasmuch as the latter are not entitled to compensation in accordance with what is set forth in paragraph (C) of section IV of this document; and

d) Sentence the Claimants to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees, and the fees of the legal representatives of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred and the date of their actual payment."[164]

## VI.  APPLICABLE LAW

158.  Claimants consider that the relevant provisions to determine the law that applies to the merits of this dispute are Article 42(1) of the ICSID Convention and Article 26(6) of the ECT, and that therefore the Tribunal shall decide the dispute in accordance with the rules of law agreed upon by the parties and, in the absence of such agreement, the Tribunal shall apply "the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable" (Article 42(1) of the ICSID Convention).[165]

159.  Claimants add that under Article 26(6) of the ECT, the parties have agreed the rules of law applicable to the merits of the dispute, and therefore the Tribunal shall decide the issues in dispute in accordance with the ECT and applicable rules and principles of international law. Therefore, the ECT is the primary source of law and where the ECT is silent, the Tribunal should apply customary international law and general principles of international law.[166]

160.  Respondent does not seem to contest that the Tribunal shall decide based on the ECT and that the applicable law to the merits of the dispute is the one provided for under Article 26(6) thereof. According to the Respondent, EU law, including the treaties creating the

---

[164] Respondent's Rejoinder, ¶ 992.
[165] Claimants' Memorial, ¶¶ 339-340.
[166] Claimants' Memorial, ¶ 342.

European Economic Community ("EEC") and the EU and allocating competences among European institutions and their member countries, EU's internal legislation, and decisions of the CJEU, constitute "applicable rules and principles of international law" for purposes of Article 26(6).[167] The Tribunal refers to this contention in paragraph 223 *et seq.* of this Award. As to Spanish law, even though the Respondent invokes a series of domestic provisions and decisions of Spanish courts, it does so in the context of facts that the Claimants should have considered when making the investment and facts that the Tribunal should consider in making its decision, particularly as regards to the alleged legitimate expectations of the Claimants.

## VII. JURISDICTION

161. The Respondent submitted the following objections to jurisdiction:

(a) The Tribunal lacks jurisdiction *ratione personae*: since the Claimants are nationals of EU Member States and the Respondent is a EU Member State, the Claimants are not investors "of another Contracting Party" under Article 26(1) of the ECT. Additionally, Luxembourg and the Netherlands, as well as Spain, were already members of the EU at the time they ratified the ECT; therefore, they could not "contract between them obligations within the internal Energy Market, harmonised by the EU."[168]

(b) The Tribunal lacks jurisdiction *ratione materiae* since the Claimants do not own or control, directly or indirectly, the assets identified by them as their investment, and therefore the only protected investment under ECT Article 1(6) is the shareholding that Antin Termosolar owns in the Andasol Companies and the loans granted by it to the Andasol Companies.

(c) The Tribunal lacks jurisdiction *ratione materiae* to hear any claims related to the TVPEE, given that Spain did not grant its consent to arbitrate disputes regarding alleged violations of ECT Article 10(1) arising from tax measures.

(d) The Tribunal lacks jurisdiction to hear any claims related to Law 24/2013, RD 413/2014 and Ministerial Order IET/1045/2014, since the Claimants did not comply with the cooling-off period set forth in ECT Article 26.

162. In their Reply and in their Rejoinder, the Claimants submitted their arguments for rejecting these objections.

---

[167] *See* Respondent's Counter-Memorial, ¶¶ 66-75.
[168] Respondent's Counter-Memorial, ¶ 44.

A.    WHETHER THE TRIBUNAL LACKS JURISDICTION *RATIONE PERSONAE*

1.    *Respondent's Position*

163.   Spain argues that the Claimants are not investors "of another Contracting Party", as required by Article 26(1) of the ECT.[169]

164.   According to Article 26(1) of the ECT, the dispute submitted to arbitration must arise between "a Contracting Party" and an "investor of another Contracting Party." The Respondent argues that the ECT does not apply to a dispute between an investor from the EU and a Member State of the EU ("intra-EU dispute"), in relation to an investment made in the territory of the EU ("intra-EU investment"). For purposes of the ECT, intra-EU investments cannot be considered foreign investments; this would be contrary to the context, object and purpose of the ECT and to EU law. In this case, Luxembourg and the Netherlands (countries of nationality of the Claimants), and the Respondent are Member States of the EU and also Contracting Parties to the ECT.[170]

165.   Furthermore, the Respondent claims that since Luxembourg, the Netherlands and Spain were Member States of the EU before ratifying the ECT, they could not acquire obligations related to the internal energy market amongst themselves, specifically those set out in Part III of the ECT.[171]

166.   According to the Respondent, the Claimants' investment within the internal electricity market of the EU grants the Claimants a specific and preferential protection over that conceded by the ECT. EU law is thus to be applied in preference to or prevailing over any other law —including the law of the ECT— and displacing other national or international provisions. Preferential application of EU law does not require proving that such other treaty is more or less favourable.[172] Spain further notes that there is no incompatibility between the ECT and EU law.[173]

167.   Spain alleges that the EU is an area of economic integration that includes in its rules relating to the internal market an integral system for the promotion and protection of intra-EU investments.[174] Energy policy forms part of the EU policies since before signing the

---

[169]  Respondent's Counter-Memorial, ¶¶ 41-44. *See* Request for Bifurcation, § III.A.

[170]  Respondent's Counter-Memorial, ¶¶ 42-43.

[171]  Respondent's Rejoinder, ¶ 64.

[172]  *See* Respondent's Rejoinder, ¶ 62 ("EU Law is given preference over any other [system] that deals with regulating internal EU relations.").

[173]  Respondent's Rejoinder, ¶ 86.

[174]  Respondent's Counter-Memorial, ¶ 49. *See* **Exhibit R-0001**, "Consolidated versions of the Treaty on European Union and the Treaty on the Functioning of the European Union and the Charter of Fundamental Rights of the European Union, published in the Official Journal of the European Union 2012/C326/01-02), 26 October 2012

ECT.[175] Spain's promotion of investment in renewable energy is embedded within its obligations as an EU Member State, assumed so as to reach the objectives established by the EU Directives, including the protection of investors.[176] These Directives allowed Spain to encourage investments through the concession of public aids allowed by the EU, subject to certain limitations. The standard of EU protection forbids any type of regulation that dissuades an EU investor from establishing itself in a specific Member State.[177] Of note, the text of the ECT itself recognizes the EU's process of superior economic integration in its Article 25(2) and in the corresponding Declaration incorporated by the European Communities and their Member States in the ECT.[178]

168. Furthermore, compliance by States with the EU legal system is guaranteed by the EU jurisdictional system, which has a monopoly on the final interpretation of EU law and which offers an appropriate forum for investors' claims whose rights are breached.[179] This investment promotion and protection system makes no distinction within the EU between EU investors from Member States, but only between EU investors and investors from other States.[180] The Claimants' statement that EU law does not grant investors a complete system of investment promotion and protection is foolhardy. Spain notes that the Claimants have not argued how the protection that investors receive through the EU judicial system could be less favourable for them or for their investments than the protection they would receive through arbitration.[181] It cannot be alleged that the rights granted to investors under the ECT are in addition to those granted to them by EU law.[182]

---

("Treaty on the Functioning of the European Union"), Article 26 (defining "Internal Market" as an "area without internal frontiers in which the free movement of goods, persons, services and capital is ensured in accordance with the provisions of the Treaties").

[175] Respondent's Counter-Memorial, ¶ 51.

[176] Respondent's Counter-Memorial, ¶ 52.

[177] Respondent's Counter-Memorial, ¶ 57. *See* **Exhibit R-0013**, *Attanasio Group v. Commune di Carbognano* (Judgement) ¶ 43; **Exhibit R-0001**, Treaty on the Functioning of the European Union, Article 54.

[178] Respondent's Rejoinder, ¶¶ 82, 121-124. *See* **Legal Authority RL-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Final Act of the European Energy Charter Conference, Declaration VI.5. ("[…] The European Communities and their Member States further recall that: […] the application of Article 25 of the Energy Charter Treaty will allow only those derogations necessary to safeguard the preferential treatment resulting from the wider process of economic integration resulting from the Treaties establishing the European Communities.").

[179] Respondent's Counter-Memorial, ¶ 54.

[180] Respondent's Counter-Memorial, ¶¶ 55-56; Respondent's Rejoinder, ¶¶ 129-131. *See* Respondent's Rejoinder, ¶ 130. Spain argues that "[i]f the Claimants understand as 'foreign investments' under EU Law as those that come from outside the borders of the EU, they may be right (although not so much after the Treaty of Lisbon of 2007 went into effect)."

[181] Respondent's Rejoinder, ¶ 92.

[182] Respondent's Rejoinder, ¶¶ 125-127.

169. Spain argues that, pursuant to the principle of primacy, the preferential application of the EU's protection system is reflected in the literality, context and purposes of the ECT.[183]

170. The EU is a member of the ECT and the EU is the only Regional Economic Integration Organization ("REIO") which is a party to the ECT.[184] The ECT thus recognized the special nature of the EU as an international organization and that certain matters governed by the ECT should be negotiated by the EU since its Member States do not have the competence to do so. This is reaffirmed by Article 36(7) on voting rights, since the EU and its Member States may not vote simultaneously, and each will vote within the scope of their own competences.[185] The Respondent explains that Article 25 of the ECT prevents the application of the intra-EU investment protection system to non-EU parties of the ECT via the most favoured nation clause.[186] This further supports the argument that the EU system is to be preferentially applied.

171. Moreover, pursuant to Article 26(6) of the ECT, EU law must be taken into account as applicable international law in disputes arising under the ECT. It is Spain's position that Article 26(6) of the ECT prevents an intra-EU investor from initiating arbitration proceedings against an EU Member State, since such possibility would go against EU law. Particularly, this would be contrary to Article 344 of the Treaty on the Functioning of the European Union ("TFEU"), which prevents EU Member States from submitting controversies related to the interpretation or application of the EU treaties to dispute resolution procedures other than those foreseen therein.[187] According to the Respondent, "[a]dmitting the arbitration would mean that the Arbitral Tribunal would have to decide on the rights of the European investor in the Internal Market,"[188] while the CJEU has flatly rejected such an interference in *Opinion 1/91*.[189]

172. The Respondent alleges that, at the moment of signing the ECT, EU (then European Community) Member States could not undertake obligations between themselves surrounding the internal market, an area over which they had turned over their sovereignty to the European Community. The EU is a contracting party to the ECT precisely for this

---

[183] Respondent's Counter-Memorial, ¶ 58; Respondent's Rejoinder, ¶ 62.

[184] Respondent's Counter-Memorial, ¶¶ 59-60. *See* **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Article 1(3) (defining REIO as "an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters"), and Article 1(10) (defining the "Area" of a REIO).

[185] Respondent's Rejoinder, ¶ 114.

[186] Respondent's Counter-Memorial, ¶¶ 61-63.

[187] Respondent's Counter-Memorial, ¶¶ 66-67. **Exhibit R-0001**, Treaty on the Functioning of the European Union, Article 344 ("Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.").

[188] Respondent's Counter-Memorial, ¶ 68.

[189] Respondent's Counter-Memorial, ¶¶ 69-72, making reference to *Opinion 1/91*.

reason. Therefore EU Member States such as Spain, the Netherlands and Luxembourg could not bind themselves under Part III of the ECT, which includes Article 26 on settlement of disputes.[190] Hence, Article 26 of the ECT does not create obligations between EU Member States, and the only arbitration possible under the ECT, in a harmonious interpretation with EU law —as stated by the tribunal in *Electrabel v. Hungary*— is that between a non-EU investor and an EU Member State or between an EU investor and a non-EU Member State.[191]

173. According to the Respondent, the object and purpose of the ECT confirms its interpretation on the impossibility of having an arbitration between an intra-EU investor and an EU Member State.[192]

174. Also, "[u]nderstanding that the intra EU controversies are included in the area of protection of the ECT […] would assume that the EU and its Member States, as determining actors, promoted the creation and conclusion of the ECT to cover an area, that of intra EU investments, that was being covered since many years, exhaustively and in a widely superior manner, through EU Law." Based on Articles 1 and 2 of the ECT, its preface, and Article 2 of the European Energy Charter, Spain argues that the fundamental purpose of the ECT was to create conditions throughout Europe that guarantee the principle of non-discrimination and market-oriented price formation.[193] The ECT intended to promote cooperation between Eastern Europe and the European Community following the fall of the Berlin Wall, without giving away Commission or CJEU competences.[194] The Treaties Constituting the European Communities, —signed 43 years (in the case of the Treaty Constituting the European Coal and Steel Community) and 37 years (in the case of the Treaties Constituting the European Economic Community and EURATOM) before the ECT—aimed at creating, within their respective scopes, a common market based on the principles of non-discrimination and market-oriented price formation, and thus, surpassed the aims of the ECT.[195] The Respondent argues that, if one is to compare the object and purpose of the ECT with the object and purpose of the EU Treaties —especially the Treaty

---

[190] Respondent's Counter-Memorial, ¶ 73. Respondent's Rejoinder, ¶¶ 109-111.

[191] Respondent's Counter-Memorial, ¶ 74. Respondent cites *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability).

[192] Respondent's Counter-Memorial, ¶ 79.

[193] Respondent's Counter-Memorial, ¶¶ 76-79.

[194] Respondent's Counter-Memorial, ¶¶ 76-80; Respondent's Rejoinder, ¶ 735.

[195] Respondent refers to **Legal Authority RL-0052**, ECSC Treaty, Paris (1951) ("1951 Treaty of Paris"), Article 2 ("to contribute, through the common market for coal and steel, to economic expansion, growth of employment and a rising standard of living."); **Legal Authority RL-0053**, EEC Treaty, Rome ("1957 Treaty of Rome") Article 2, (regarding the objective of the European Economic Community, "The Community shall have as its task, by establishing a common market and progressively approximating the economic policies of member states, to promote throughout the community a harmonious development of economic activities, a continuous and balanced expansion, an increase in stability, an accelerated raising of the standard of living and closer relations between the states belonging to it.").

of Lisbon— and applied Articles 30 and 59 of the Vienna Convention on the Law of Treaties ("<u>VCLT</u>"), the EU Treaties would prevail.[196] However, it notes that this exercise is proposed for dialectical purposes and to counter the Claimants' allegations. In Spain's position, there is no incompatibility between the ECT and EU Law.[197]

175. Spain further alleges that the Commission, guardian of the EU Treaties and promoter of the negotiation of the ECT, further supports Spain's position. In the Commission's view, the ECT does not create obligations among EU Member States, but only between the EU and its Member States, on the one hand, and each of the other Contracting Parties, on the other.[198] Spain notes that the tribunal in *Electrabel v. Hungary* recognized the important role of the Commission regarding this subject matter[199]. Furthermore, the position of Spain and the Commission on the preferential application of EU law is confirmed by doctrine.[200]

176. According to the Respondent, the Claimants have made a dialectical effort to deviate from EU law and claim the exclusive application of the ECT. However, the Claimants' argument is contradictory since "if we are to adhere exclusively to the ECT, the Claimants would not receive the protection that they claim pursuant to [the ECT]."[201] The ECT has not achieved its maximum objective of non-discrimination as regards the "making of Investments," as deduced from the first four sections of Article 10 of the ECT. After having made the investment, while the investor is guaranteed national treatment and most favoured nation treatment, an important exception applies. Article 10(8) of the ECT does not extend national treatment regarding aids or subsidies granted by the State to foreign investors, as they shall be reserved for the supplementary treaty described in Article 10(4), which has not yet been signed.[202] The amount claimed by the Claimants in this arbitration is a subsidy, whose classification as State aid is beyond dispute since the Judgement of the CJEU in *Elcogás*.[203]

177. Spain responds to the Claimants' arguments regarding Article 26 of the ECT specifically noting that none of the articles of the ECT cited by the Respondent deprive the Tribunal of jurisdiction. According to Spain, Article 26 introduces a model of consent to restricted arbitration.[204] The dispute resolution mechanisms introduced by Article 26 of the ECT only

---

[196] Respondent's Rejoinder, ¶ 85.
[197] Respondent's Rejoinder, ¶ 86.
[198] Respondent's Counter-Memorial, ¶¶ 81-84.
[199] Respondent's Counter-Memorial, ¶ 86, making reference to *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability).
[200] Respondent's Counter-Memorial, ¶¶ 89-94, especially ¶ 93.
[201] Respondent's Rejoinder, ¶ 98.
[202] Respondent's Rejoinder, ¶ 102.
[203] Respondent's Counter-Memorial, ¶ 630.
[204] Respondent's Rejoinder, ¶ 108.

refer to disputes regarding the alleged breach of obligations in Part III of the ECT. Neither Spain, Luxembourg nor the Netherlands could acquire obligations under Part III of the ECT at the moment of signing the Treaty because at the time they did not have the competence to do so. Spain argues that this competence had been ceded to the European Communities and that not a single BIT was signed by EU Member States after entering the EU.[205] If EU Member States could not acquire any obligations amongst themselves under Part III of the ECT, consequently, the dispute resolution mechanisms therein do not apply to intra-community disputes.[206] Furthermore, Article 26 of the ECT does not provide that arbitration is the only available dispute resolution mechanism, nor does it establish an order of preference between them – for instance, stating that arbitration is more favourable to an investor.[207]

178. Also, regarding the "[p]reliminary observations on the relevance of previous awards and other legal precedents" as argued by the Claimants, Spain claims that the awards cited by the Claimants do not resolve the issues before the Tribunal in the present case. Not all awards are "subject to being extrapolated to the ECT," since "the ECT is a multilateral and mixed treaty, promoted by the former European Communities (now the EU) and signed by the EU as one more Contracting Party."[208] Also, regarding the Decision on Jurisdiction, Applicable Law and Liability in *Electrabel v. Hungary*, the Respondent states that Hungary signed the ECT before having joined the EU. Therefore, Hungary, unlike Spain, Luxembourg and the Netherlands, was able to contract obligations under Part III of the ECT. Also, regarding the awards in *PV Investors v. Spain* and *Charanne v. Spain*, Spain claims that they both fail to consider the principle of primacy of EU law, which is the essential element of this jurisdictional objection.[209] Finally, regarding the Claimants' argument that there were matters resolved by awards in which the respondent State did not invoke the intra-community objection, Spain counters that in none of those cases the respondent State involved was already a member of the EU when signing the corresponding investment treaty.[210]

179. In responding to the Claimants' argument that "it follows, on Spain's case, that the Claimants in this arbitration are deprived from protection under the ECT,"[211] Spain notes that the Claimants do not need the protection offered by the ECT as they have a comprehensive system to protect their investment which is guaranteed by EU law.[212] While

---

[205] Respondent's Rejoinder, ¶ 109.
[206] *See* Respondent's Rejoinder, ¶ 64.
[207] Respondent's Rejoinder, ¶ 133.
[208] Respondent's Rejoinder, ¶ 69.
[209] Respondent's Rejoinder, ¶ 87.
[210] Respondent's Rejoinder, ¶ 88.
[211] Claimants' Reply, ¶ 522.
[212] Respondent's Rejoinder, ¶ 135.

a Japanese or Russian investor within the EU would be protected by the ECT in a case such as this, they would not be entitled to national treatment, to which the Claimants are entitled under EU law.[213]

180. Finally, Spain clarifies that it does not claim that an explicit or implicit disconnection clause exists.[214]

181. In conclusion, the Respondent alleges that the Claimants fail to comply with the requirement set out in ECT Article 26(1), since the dispute does not arise between a Contracting Party and investors from different Contracting Parties.

### 2. *Claimants' Position*

182. The Claimants argue that each of the requirements in Article 26 of the ECT has been satisfied in the present case, since Spain is a "Contracting Party" to the ECT, and each of the Claimants is an "Investor of another Contracting Party." Spain signed the ECT on 17 December 1994 and it entered into force with respect to Spain on 16 April 1998.[215] Also, pursuant to Article 1(7)(a)(ii) of the ECT an "Investor" of a Contracting Party is "a company or other organization organized in accordance with the law applicable in that Contracting Party." The Claimants are companies incorporated under the laws of Luxembourg and the Netherlands, each of which is a "Contracting Party" to the ECT.[216]

183. The Claimants first respond to the Respondent's objection noting that every arbitral tribunal and national court that has considered the intra-EU objection, including where there have been submissions under the ECT, has rejected it.[217] Notably, three tribunals constituted under Article 26 of the ECT have rejected said objection in cases against Spain, concluding that intra-EU disputes are not excluded from their jurisdiction: *PV Investors v. Spain*, *Charanne v. Spain*, and *RREEF v. Spain* (Decision on Jurisdiction).[218] The tribunal in *PV Investors v. Spain*, for instance, concluded that intra-EU disputes are not excluded from the jurisdiction of an arbitral tribunal constituted under Article 26 of the ECT.[219] Two of the most recent decisions on the intra-EU issue involved the ECT and were brought against Spain, and both *Electrabel v. Hungary* and *EDF v. Hungary*, cases cited by Spain,

---

[213] Respondent's Rejoinder, ¶ 136.
[214] Respondent's Rejoinder, ¶¶ 142-143.
[215] Request for Arbitration, ¶ 104.
[216] Request for Arbitration, ¶¶ 105-106.
[217] Claimants' Rejoinder, ¶ 14.
[218] Claimants' Rejoinder, ¶ 14.
[219] Claimants' Reply, ¶ 483.

were brought pursuant to the ECT.[220] There have been numerous ECT cases involving disputes between Member States and EU investors where no intra-EU objection was even raised by the respondent State, and not a single arbitral tribunal has found that it lacked jurisdiction due to the intra-EU nature of the dispute.[221]

184. Contrary to Spain's allegation, the Claimants maintain that the energy sector is not an area where EU Member States have given over their sovereignty to the EU. Regulation of the energy sector is a shared competence under EU law.[222] Also, the Claimants note that the Disputed Measures are clearly national measures taken by Spain, and not at the insistence of or mandate of the EU.

185. Even if it is assumed that the two treaty regimes (the EU and the ECT) have the same subject matter, the ECT would take precedence over any conflicting provision of the EU founding treaties, based on Article 16 of the ECT and Articles 30 and 59 of the VCLT.[223] Spain's argument entails that Article 26 of the ECT applies to an intra-EU dispute so long as either the home State of the claimant-investor or the respondent-host State was not a Member State at the time the ECT was signed and/or ratified, but that it does not apply to intra-EU disputes if both of the relevant States were Member States at the time the ECT was signed. The Claimants maintain that this position is absurd and that it would amount to impermissible discrimination.[224]

186. Additionally, the ordinary meaning of the ECT demonstrates Spain's unconditional consent to arbitrate disputes with investors from Luxembourg and the Netherlands. First, Article 26(1) of the ECT conveys a clear meaning, and it cannot be construed in such a way as to deprive EU investors of the right to bring a claim against EU Member States under the ECT.[225] "In this arbitration, the First Claimant [Antin Luxembourg] is a company incorporated in Luxembourg and the Second Claimant [Antin Termosolar] is a company organised in accordance with the law applicable in the Netherlands. The First and Second Claimants have made investments in Spain. Both Luxembourg and the Netherlands are Contracting Parties to the ECT, as is Spain. The present dispute is therefore a dispute between a Contracting Party (Spain), and two investors, each from another Contracting Party (Luxembourg (the First Claimant) and the Netherlands (the Second Claimant))."[226]

---

[220] Claimants' Rejoinder, ¶ 16. *See* **Exhibit C-0160**, L E Peterson, "Intra-EU Treaty Claims Controversy: New Decisions and Developments in Claims Brought by EU Investors vs. Spain and Hungary", 24 December 2014.

[221] Claimants' Reply, ¶¶ 487-489; Claimants' Rejoinder, ¶ 14.

[222] Claimants' Reply, ¶¶ 489-490.

[223] Claimants' Reply, ¶ 492.

[224] Claimants' Reply, ¶ 493.

[225] Claimants' Reply, ¶¶ 498-501.

[226] Claimants' Reply, ¶ 500.

187.  The Claimants allege that it is difficult to see how the fact that Article 26 of the ECT provides for different dispute resolution mechanisms would assist Spain's case.[227] Article 26 of the ECT leaves the choice between different dispute resolution mechanisms to the investor, but it also provides that each Contracting Party unconditionally consents to arbitration. [228]

188.  Furthermore, the object and purpose of the ECT does not confirm Spain's interpretation of Article 26 of the ECT. Spain argues that permitting intra-EU arbitration would assume that the EU and its Member States promoted the creation of the ECT to cover an area (intra-EU investments) that had been covered for many years exhaustively and in a widely superior manner through EU law.

189.  The Claimants first indicate that "the fundamental objective of the ECT is to facilitate transactions and investments in the energy sector by reducing political and regulatory risks."[229] However, Spain unjustifiably adopts a narrower interpretation, claiming that the object of the ECT as being the promotion of East-West energy cooperation and the economic recovery of Eastern Europe, which would lead to sustaining the impossibility of intra-EU arbitrations.[230] The fact that the ECT initially promoted an East-West trade gateway does not alter the ordinary meaning of Article 26 of the ECT, and that as stated in the introduction of the treaty, the ECT is a "legally-binding multilateral instrument, the only one of its kind dealing specifically with inter-governmental cooperation in the energy sector."[231] Spain also attaches significant interpretative weight to the European Commission's view of Article 26 of the ECT. The Claimants nonetheless allege that what matters is the intentions of the parties as expressed in the text, and the intention of one party to a treaty, on its own, is irrelevant to determining its proper interpretation.[232] Moreover, various tribunals have found that most EU Member States do not support the European Commission's position.[233] Spain's intra-EU objection is premised on the false assumption that the tribunal must resort to supplementary means of interpretation of the ECT. Since the ordinary meaning of Article 26 of the ECT is clear and unambiguous, there is nothing that would justify resorting to such supplementary means.[234]

---

[227] Claimants' Rejoinder, ¶ 34. *See* Respondent's Rejoinder, ¶ 65.

[228] Claimants' Rejoinder, ¶ 34.

[229] Claimants' Reply, ¶ 505. *See* Claimants' Memorial, §11.2.

[230] Claimants' Reply, ¶¶ 503-506.

[231] Claimants' Reply, ¶ 506; **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, p. 13.

[232] Claimants' Reply, ¶¶ 507-509.

[233] Claimants' Reply, ¶¶ 510-511. Claimants cite *Jan Oostergetel v. The Slovak Republic* (Decision on Jurisdiction), ¶¶ 107-108; *Eureko v. The Slovak Republic*, (Award on Jurisdiction, Arbitrability and Suspension) ¶ 161.

[234] Claimants' Reply, ¶¶ 512-513.

190.    The Claimants also argue that even if it were permissible to interpret Article 26 of the ECT by looking into the intentions of the European Commission and certain Member States regarding EU law, there is nothing within the provisions of EU law that could be understood to override the rights granted in Article 26 of the ECT. The provisions of the ECT do not contradict EU law nor are the investor protections contained in the EU's Internal Market superior to those under the ECT.[235] The Claimants maintain that the EU system does not provide for a widely superior system to that of the ECT, as claimed by the Respondent. EU treaties cover a different subject matter, since investment protection under EU law is primarily focused on ensuring access to the market of other Member States, rather than providing a comprehensive system of promotion and protection of investments, as the ECT does.[236] The EU system does not provide recourse to investor-State resolution, nor does it allow an investor to bring claims for illegal governmental action against a foreign investment in an international arbitration (a neutral and independent forum).

191.    Since the ECT grants EU investors rights that are different from and additional to those provided by EU law (and particularly the right of action through arbitration), rather than contradicting them, there is no inconsistency between the two systems. This has been recognized by certain tribunals, including the tribunals in *Electrabel v. Hungary* and *Eastern Sugar v. Czech Republic*.[237] Even if there were a contradiction, Article 26 of the ECT should be held to prevail due to the application of the principle of *lex posterior*[238] and of Article 16 of the ECT.[239] To this regard, the fact that Article 26 of the ECT provides for other possible dispute resolution mechanisms is irrelevant, since it does not deprive an investor of its right to international arbitration.[240]

192.    According to the Claimants, EU law does not deprive the Tribunal of jurisdiction under the ECT. The protection of foreign investments is not part of the CJEU's competences and the pursuit of protection of investor rights as is sought in this arbitration is not an option under

---

[235]  Claimants' Reply, ¶ 514.

[236]  Claimants' Reply, ¶¶ 515-516.

[237]  Claimants' Reply, ¶ 517. Claimants cite *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶ 4.166; *Eastern Sugar v. The Czech Republic* (Partial Award), ¶ 165.

[238]  **Legal Authority CL-0090**, Vienna Convention on the Law of Treaties, 1155 United Nations Treaty Series 331, 23 May 1969 (entry into force 27 January 1980), Articles 30 and 59.

[239]  Claimants' Rejoinder, ¶¶ 43-46. **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Article 16 ("Relation to Other Agreements. Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty, (1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and (2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty, where any such provision is more favourable to the Investor or Investment.").

[240]  Claimants' Rejoinder, ¶ 34.

EU law. The CJEU itself has acknowledged that an international dispute settlement mechanism established by an international treaty to which the EU is a party is compatible with EU law, and decisions arising therefrom are binding on the CJEU.[241] It is only decisions on the distribution of competencies between the EU and its Member States, or on the legality of acts of European institutions, that are considered by the CJEU as falling within its exclusive jurisdiction.[242]

193. Furthermore, Article 26(6) of the ECT, which provides that ECT disputes be decided in accordance with the ECT and "applicable rules and principles of international law", does not prevent an EU investor from bringing a claim against another EU Member State under the ECT. The Respondent relied on the tribunal on *Electrabel v. Hungary*, which stated that notwithstanding harmonization efforts, if the ECT and EU law remained incompatible, "EU law would prevail over the ECT's substantive protections and that the ECT could not apply inconsistently with EU law to such a national's claim against an EU Member State." However, the Claimants note that the findings of the tribunal in *Electrabel v. Hungary* on this regard were in respect of the law applicable to the merits, and not a matter of jurisdiction. The tribunal found that it had jurisdiction and dismissed the intra-EU objection.[243] The Claimants' position is that the fact that EU law is part of international law bears no relevance to the question of jurisdiction.[244] In any event, Article 16 of the ECT makes clear that to the extent that the ECT and EU law are in conflict, the ECT prevails.

194. Spain maintains that Article 26 introduces a model of consent to restricted arbitration, limited by certain provisions of the ECT, namely Articles 1(2), 1(3), 16, 25 and 36(7). The Claimants respond arguing that the fact that the EU is a party recognized as a REIO under the ECT does not deprive investors of their rights under Article 26 nor does it imply that the EU system be preferentially applied. According to the Claimants, Articles 1(2), 1(3) and 1(10) of the ECT simply recognise the existence of REIOs amongst the ECT's Contracting Parties and identify the Area of the REIO that is a Contracting Party as meaning the Areas of the member states of such REIO.[245] It only ensures that claims can be brought against such REIO regarding disputes arising out of an investment made in the corresponding area.[246] In accordance with Articles 26(6) and 1(10) of the ECT, the relevant Area is that of the Contracting Party that is a party to the dispute, in this case, Spain. For instance, the tribunal in *PV Investors v. Spain* found that the relevant area, as is the case in

---

[241] The Claimants rely on *Opinion 1/91*.
[242] Claimants' Reply, ¶¶ 518-519.
[243] Claimants' Reply, ¶ 522.
[244] Claimants' Rejoinder, ¶ 35.
[245] Claimants' Reply, ¶ 526.
[246] Claimants' Reply, ¶¶ 523-527.

the present dispute, is not the EU but the territory of Spain.[247] If the EU itself were the respondent, the relevant Area would be the entire EU Area. Also, the Claimants maintain that the simple reference to the existence of a regional organization that is also a party to the same multilateral treaty, as in the ECT, does not establish that the multilateral treaty does not apply within the regional organisation absent a disconnection clause.[248]

195.  In addition, Articles 16, 25 and 36(7) of the ECT in no way support Spain's argument that the EU system must be preferentially applied to the ECT, therefore depriving investors of the possibility of bringing claims under Article 26 of the ECT.[249]

196.  The ordinary meaning of Article 16 of the ECT provides that in the event of a conflict between the ECT and either a prior or subsequent international agreement, the provision more favourable to the investor shall apply. Article 26 of the ECT reflects a more favourable treatment since the ECT confers to investors a right of action, through arbitration, against the offending State.[250] The Claimants explain that they have brought their claims under the ECT because it depoliticises the dispute by removing it from the purview of Spain's national courts.

197.  Regarding Article 25 of the ECT, the Claimants note that it indeed provides that the obligation to accord most-favoured nation treatment does not require a Contracting Party from an Economic Integration Area (EIA) to accord investors from outside the EIA the preferential treatment that may be applicable inside the EIA. Most-favoured-nation treatment does not oblige Member States to extend the rights of the Internal Market to investors from outside the EU.[251] Regarding the EU, Article 25 of the ECT protects against any claim that EU law advantages should be extended to non-EU investors. However, Article 25 of the ECT does not state that EU Investors cannot bring claims against Member States under Article 26 of the ECT, nor recognize the primacy of EU law.[252]

198.  Article 36(7) of the ECT is a procedural provision that purely relates to the voting procedure of ECT Contracting Parties in reference to the Energy Charter Conference, and in no way does the recognition of voting rights of a REIO support Spain's view that the EU system applies preferentially over the protection afforded by Article 26 of the ECT.[253]

---

[247]  Claimants' Rejoinder, ¶¶ 25-26.

[248]  Claimants' Reply, ¶ 526.

[249]  Claimants' Reply, ¶ 528.

[250]  Claimants' Rejoinder, ¶¶ 20, 28-29.

[251]  Claimants' Reply, ¶ 529.

[252]  Claimants' Rejoinder, ¶ 30.

[253]  Claimants' Reply, ¶ 531. **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Article 36(7) ("[A REIO] shall, when voting, have a number of votes equal to the number of its member states which are Contracting

Article 36(7) does not concern the dispute-resolution procedure in Part V of the ECT. It merely provides, as Spain has accepted, that the EU and its Member States may not vote simultaneously.[254]

199.    There is no indication in the text of the ECT that the Contracting Parties have limited their consent to arbitration on the basis that some of the Contracting Parties belong to the same REIO, such as the EU.[255] On the contrary, Annexes ID and IA of the ECT, which provide certain specific exceptions to the consent of contracting parties to arbitration under Article 26, include no provisions regarding such issue.[256] Hence, "a good faith interpretation of the ordinary meaning of Article 26 leads to the conclusion that there is no intra-EU exception to the Contracting Parties' 'unconditional consent' to arbitration."[257]

200.    The Claimants further argue that Article 344 of the TFEU is irrelevant to the present case since it does not prevent EU Member States from submitting disputes that are not related to EU law to other fora, nor does it prohibit the submission of disputes between other actors to a different method of settlement not contemplated in the EU treaties.[258] The Claimants maintain that Spain's argument confuses the concepts of substantive protections offered under EU law, applicable to the merits of a dispute under EU law, and the question of jurisdiction of the Tribunal.[259] Moreover, since there is no provision in any of the EU Treaties dealing with investor-State arbitration, Article 344 of the TFEU does not affect the operation of Article 26 of the ECT nor does it modify the States' consent under said article.

201.    The Claimants note that this has been confirmed by investment tribunals, such as *Eureko v. The Slovak Republic*, *EURAM v. The Slovak Republic*, *Electrabel v. Hungary* and *Charanne v. Spain*.[260] Furthermore, the Claimants maintain that Spain's argument that intra-EU investor-State arbitration is contrary to EU law is not contradicted by *Opinion 1/91* of the CJEU. The Claimants admit that the CJEU concluded that the creation of a European Economic Area court would violate the monopoly of the CJEU as it concerned judgments on the interpretation of EU treaties and the validity of decisions of EU organs

---

Parties to this Treaty; provided that such an Organization shall not exercise its right to vote if its member states exercise theirs, and vice versa.").

[254]  Claimants' Rejoinder, ¶ 32.

[255]  Claimants' Rejoinder, ¶¶ 30-32.

[256]  Claimants' Reply, ¶ 532.

[257]  Claimants' Reply, ¶ 532.

[258]  Claimants' Reply, ¶ 535; Claimants' Rejoinder, ¶ 37.

[259]  Claimants' Reply, ¶ 533.

[260]  Claimants' Reply, ¶ 536; Claimants' Rejoinder, ¶¶ 37-38; *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶ 4.151; *Eureko v. The Slovak Republic* (Award on Jurisdiction, Arbitrability and Suspension), ¶¶ 134, 282; *EURAM v. The Slovak Republic* (Award on Jurisdiction), ¶ 255; *Charanne v. Spain* (Final Award), ¶¶ 443-445.

and institutions. However, *Opinion 1/91* did not deal with the interpretation of the rights of investors under the ECT. The Claimants also argue that their position is supported by the fact that arbitration is permissible even between EU Member States, as is shown by the *Iron Rhine* arbitration where the tribunal noted that although it had to consider EU law, this did not deprive it from its jurisdiction.[261]

202. Article 344 of the TFEU, agreed in the 2009 Lisbon Treaty, cannot be considered a relevant instrument for interpreting Article 26 of the ECT according to Article 31(3)(a) of the VCLT, since it is not an agreement regarding the interpretation of the ECT, or the application of its provisions.[262] Article 344 cannot serve as subsequent practice under Article 31(3)(b) of the VCLT as "it is not the practice followed 'in the application' of the ECT, nor does it establish the consent of all the Contracting Parties to the ECT regarding its interpretation."[263]

203. Finally, the Claimants argue that the ECT contains no implicit or explicit disconnection clause concerning intra-EU disputes. This can be affirmed since (i) prior to the conclusion of the ECT, the EU had used disconnection clauses where they were intended to apply, (ii) the ECT contains disconnection clauses where they are intended to apply, as is the case regarding the Svalbard Treaty,[264] and (iii) given the ordinary meaning of Article 26 of the ECT, if such a clause had been intended, its inclusion would have been eminently necessary.[265] As Spain clarified its position in its Rejoinder, in that it does not hold to the existence of an express or implied disconnection clause, this is a point on which the Parties are in agreement.[266]

### 3.    *Tribunal's Analysis*

204. Respondent's objection to jurisdiction is based on Article 26 of the ECT, and specifically on the text related to disputes between "a Contracting Party and an Investor of another Contracting Party."

205. Article 26 provides as follows:

> "(1) Disputes between a Contracting Party and an Investor of another
> Contracting Party relating to an Investment of the latter in the Area

---

[261] Claimants' Rejoinder, ¶ 41.

[262] Claimants' Rejoinder, ¶ 39.

[263] Claimants' Rejoinder, ¶ 39.

[264] **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Annex 2 to the Final Act of the European Energy Charter Conference, "*Decisions with respect to the Energy Charter Treaty*", Item 1.

[265] Claimants' Reply, ¶¶ 540-549.

[266] Claimants' Rejoinder, ¶ 48.

of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

(a) to the courts or administrative tribunals of the Contracting Party to the dispute;

(b) in accordance with any applicable, previously agreed dispute settlement procedure; or

(c) in accordance with the following paragraphs of this Article.

(3) (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article. […]"

206. The aforesaid article must be interpreted in accordance with the rules of the VCLT and particularly Articles 31 and 32 thereof which provide:

"Article 31. General Rule of Interpretation

1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

2. The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

(a) Any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;

(b) Any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3. There shall be taken into account, together with the context:

(a) Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

(b) Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

(c) Any relevant rules of international law applicable in the relations between the parties.

[...]

Article 32. Supplementary Means of Interpretation

Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:

(a) Leaves the meaning ambiguous or obscure; or

(b) Leads to a result which is manifestly absurd or unreasonable."

207. The rule of Article 31 VCLT is an integral single rule, i.e., the Tribunal should not analyse the text, context, object and purpose as separate elements of interpretation, but rather start with the ordinary meaning of the words of Article 26 in their context and considering the object and purpose of the Treaty. In addition, Article 32 is a subsidiary rule, applying to confirm an interpretation reached under Article 31 or where the interpretation according to Article 31 (a) leaves the meaning ambiguous or obscure; or (b) leads to a result which is manifestly absurd or unreasonable.

208. ECT Article 1(2) defines "Contracting Party" as "a state or Regional Economic Integration Organization which has consented to be bound by this Treaty and for which the Treaty is in force."[267] In turn, Article 1(7)(a)(ii) of the ECT defines "Investor" with respect to a Contracting Party as "a company or other organization organized in accordance with the law applicable in that Contracting Party."[268]

209. Spain signed the ECT on 17 December 1994, ratified it on 11 December 1997,[269] and the ECT entered into force with respect to Spain on 16 April 1998. The ECT entered into force with respect to each of Luxembourg and the Netherlands on 16 April 1998, after Luxembourg signed the ECT on 17 December 1994 and ratified it on 7 February 1997, and the Netherlands signed the ECT on 17 December 1994 and ratified it on 11 December 1997.

---

[267] **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Article 1(2).

[268] **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Article 1(7)(a)(ii).

[269] **Exhibit C-0009**, Instrument of Spain's Ratification of the Energy Charter Treaty and the Energy Charter Protocol on Energy Efficiency and Related Environmental Aspects, published in the Spanish Official Gazette, 17 March 1998.

210.  Spain is therefore a Contracting Party and both Luxembourg and the Netherlands, the States of nationality of the Claimants, satisfy the definition of Article 1(2) and are therefore Contracting Parties under the ECT. The Claimants are companies or organizations organized in accordance with the laws of the Netherlands and of Luxembourg and thus are investors of a Contracting Party under Article 1(7)(a)(ii).

211.  The ECT's Article 10 imposes substantial obligations on each Contracting Party with respect to "Investors of other Contracting Parties" and their Investments and Article 13 adds that "Investments of Investors of a Contracting Party in the Area of any other Contracting Party" shall not be nationalized or expropriated, unless certain requirements are met.[270] ECT Article 26 provides for the consent of the parties to arbitration of "[d]isputes between a Contracting Party and an Investor of another Contracting Party […]."[271]

212.  The ordinary meaning of the above texts, in their context, provide the Tribunal with jurisdiction to entertain claims against Spain (a Contracting Party) by investors of Luxembourg and the Netherlands (both a Contracting Party) related to "Investments" made by the Claimants in the Spanish RE sector.

213.  However, the Respondent objects to the jurisdiction of this Tribunal arguing that an interpretation of the aforesaid Article 26 in the context of the ECT results in a limitation that would bar any claim by "Investors" of EU Member States against another EU Member State that is party to the ECT. In other words, the Respondent considers that the context of the ECT results in the exclusion of intra-EU investor-State disputes based on the ECT.

214.  The Tribunal notes that this objection has already been presented by the Respondent and rejected by arbitral tribunals in three cases that the Parties included as legal authorities in this arbitration: *Charanne v. Spain;*[272] *Isolux v. Spain;*[273] and *Eiser v. Spain*.[274]

215.  The ECT does not include a limitation that provides for a wide exclusion such as the one alleged by the Respondent. Such an exclusion would have to be express and clear and the Tribunal is not persuaded that it results from an interpretation such as the one submitted by the Respondent. The Tribunal agrees with the *Eiser v. Spain* award in that:

---

[270] **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Article 2, 10, and 13.

[271] **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Article 26.

[272] *See Charanne v. Spain* (Final Award), ¶¶ 424-438.

[273] See *Isolux v. Spain* (Award), ¶¶ 424-450.

[274] See *Eiser v. Spain* (Award), ¶¶ 179-207.

"It is a fundamental rule of international law that treaties are to be interpreted in good faith. As a corollary, treaty makers should be understood to carry out their function in good faith, and not to lay traps for the unwary with hidden meanings and sweeping implied exclusions. In this regard, the *RREEF* tribunal, in a case much like the present, concluded that international law would require some form of express warning to make such a broad exclusion evident:

'84. [...] [W]hen the very essence of a treaty to which the EU is a party is at issue, such as it would be for the ECT if the interpretation proposed by the Respondent were correct, then precisely because the EU is a party to the treaty a formal warning that EU law would prevail over the treaty, such as that contained in a disconnection clause, would have been required under international law.

85. This follows from the basic public international law principle of *pacta sunt servanda*. If one or more parties to a treaty wish to exclude the application of that treaty in certain respects or circumstances, they must either make a reservation (excluded in the present case by Article 46 of the ECT) or include an unequivocal disconnection clause in the treaty itself. [...]'."[275]

216. The ECT's purpose does not support the Respondent's interpretation. Article 2, captioned "Purpose of the Treaty," declares that "[t]his Treaty establishes a legal framework in order to promote long-term co-operation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter."[276] Nothing in this wording suggests the exclusion of claims by investors who are nationals of an EU Member State who is also a party to the ECT against another EU Member State. Moreover, such context does not call into question the ordinary meaning of Article 26.

217. As regards to the specific provisions of the ECT invoked by Spain to support its objection, the Tribunal is not persuaded that such provisions lead to the result of excluding a significant group of investors from the jurisdictional provisions of the ECT:

(a)     It is true that the definition of a REIO in Article 1(3)[277] implies that a REIO's member can transfer competence over some matters to the organization. However, there is nothing in such provision that may be construed as the transfer of all competence by

---

[275] *Eiser v. Spain* (Award), ¶ 186, quoting *RREEF v. Spain* (Decision on Jurisdiction), ¶¶ 84-85.

[276] **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Article 2.

[277] **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Article 1(3). ("'Regional Economic Integration Organization' means an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters.")

EEC member countries over energy investments to the EEC when the ECT was signed in 1994, and there is nothing that suggests that this position was communicated to or accepted by other ECT Contracting Parties.

(b)    It is also true that Article 36(7)[278] could be said to recognize the possibility of divided competence by giving a REIO votes equivalent to the number of its member States when voting on matters over which it has competence. But this does not provide for the particular allocation of competence that, according to the Respondent, existed at the time of the ECT's conclusion, nor does it incorporate into the Treaty an exception such as the one claimed by Spain or otherwise contradict the clear language of the ECT.

(c)    Article 25 indeed contains provisions that eliminate or prohibit discriminatory treatment among members of an "Economic Integration Agreement" from the ECT's most-favoured nation obligations. But such provisions do not support the Respondent's interpretation. The possibility that the parties have to agree on a regime limiting discrimination among themselves does not prevent such parties from agreeing to other obligations under a different treaty regime.

218.    Moreover, the Tribunal considers that the fact that the EU is also a Contracting Party and a "Regional Economic International Organization" as defined in Articles 1(2) and 1(3) of the ECT does not bar the Tribunal's jurisdiction. Neither does the use of the terms "relating to an Investment of the latter in the Area of the former" in Article 26 of the ECT, nor the definition of "Area" in Article 1(10) of the Treaty. The ordinary meaning of Articles 1(2), 1(3) and 1(10) recognize the existence of REIOs as possible Contracting Parties and identify that the "Area" of a REIO, such as the EU, to mean the "Areas of the member states of such [REIO]."[279] Under the terms of the ECT, a claim could thus be brought against a REIO, regarding a dispute arising out of an "Investment" made by an "Investor" in that REIO's defined "Area."

219.    The simultaneous existence of Spain, the Netherlands and Luxembourg as Contracting Parties to the ECT, together with the EU, where each would have obligations under the Treaty, results from their separate ratifications of the Treaty. The act by which the EU

---

[278]    **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Article 36(7). ("A Regional Economic Integration Organization shall, when voting, have a number of votes equal to the number of its member states which are Contracting Parties to this Treaty; provided that such an Organization shall not exercise its right to vote if its member states exercise theirs, and vice versa.")

[279]    **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Article 1(10). Furthermore, Article 36(7) of the ECT on the voting procedure of ECT Contracting Parties does not imply that EU law or the EU system applies in preference to the protection afforded by Article 26 of the ECT.

"gives its unconditional consent" to arbitration does not supersede or eliminate the specific consent granted by each sovereign EU Member State that is also a Contracting Party to the ECT.

220. The same applies to the understanding of the "Area" in which an "Investment" is made and relating to which a dispute arises. The Tribunal agrees with the following analysis articulated by the tribunal in *PV Investors v. Spain*:

> "The phrase 'in the Area of the former [Contracting Party] in Article 26(1) of the ECT refers to the particular dispute initiated by the investor. If the investor commences arbitration against a member state of the EU (rather than against the EU itself), then 'Area' means 'with respect to a state that is a Contracting Party' the territory of that particular member state, in accordance with the first sentence of Article 1(10). In other words, the relevant area is that of the Contracting Party *that is party to the dispute*. In this case, the relevant Area is the territory of Spain (not of the EU), and thus the diversity of area requirement is complied with where the investors are of a Contracting Party other than Spain and the investment has been carried out in the territory of Spain. The situation may be different where the EU itself is a Respondent. In that case, 'with respect to a [REIO]' (Article 1(10), second sentence), the relevant Area would be the entire EU Area and the diversity of area requirement would have to be satisfied with respect to that territory. This is, however, not the scenario before the Tribunal."[280]

221. Therefore, the recognition that a REIO may have standing as a respondent under the terms of the ECT does not alter the entitlement of an "Investor" from Luxembourg (such as Antin Luxembourg) and/or an "Investor" from the Netherlands (such as Antin Termosolar), to bring claims against Spain regarding "Investments" made in the "Area" of Spain.

222. In connection with the Respondent's claim that the Claimants cannot invoke arbitration under the ECT Article 26 because both the Claimants and the Respondent are located within the geographical territory of the EU, which is itself party to the ECT and thus Claimants are not from the territory of another Contracting Party,[281] the Tribunal disagrees and recalls, as did the *Charanne* and *Eiser* tribunals, that:

> "[…] while the EU is a Contracting Party to the ECT, so too are its Member States. '[A]lthough the EU is a party to the ECT, EU Member States also remain contracting parties to the ECT. Both the EU and [its] Member States can have legal standing as respondents in a claim under the ECT.' Investors organized in accordance with

---

[280] *PV Investors v. Spain* (Preliminary Award on Jurisdiction), ¶¶ 179-180.
[281] *See* Respondent's Counter-Memorial, ¶¶ 66-75.

the law of any Contracting Party satisfy Article 1(7)(a)(ii)'s literal requirement to be an 'Investor' of a 'Contracting Party.' And, a dispute involving such an Investor and another Contracting Party regarding an Investment in that Contracting Party's 'Area' satisfies the literal requirements for compulsory dispute settlement under ECT Article 26(1) and (2).

Respondent's analysis, however, imposes an unstated limitation upon any Investor hailing from an EU Member State. For Respondent, such an Investor loses its national character and becomes predominantly an Investor of the EU, because its home country is also an EU Member State and subject to EU law. Accordingly, the Investor and the putative respondent State are found in the same "Area" – the area of the EU – so that the diversity required by Article 26(1) and (2) does not exist.

A difficulty with this analysis is that it is not evident how there can be an 'Investor of the EU' satisfying Article 1(7)(a)(ii) definition. There is no trans-national body of European law regulating the organization of business units, a matter that remains subject to member countries' domestic law. Thus, within the framework of the definition, there can be no 'EU Investors.' Investors exist only as 'Investors' of a 'Contracting Party.'[282]

223. ECT Article 26(6), which defines the law to be applied in disputes between "Investors" and ECT Contracting Parties, provides that tribunals "shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."[283] According to the Respondent, EU law, including the treaties creating the EEC and the EU and allocating competences among European institutions and their member countries, EU's internal legislation, and decisions of the CJEU, constitute applicable rules and principles of international law for purposes of Article 26(6).[284] Further, pursuant to Article 344 of the TFEU and mandatory principles of European law defined by the CJEU, only European courts, in particular, the CJEU, are competent to pass upon the meaning and content of European law. Therefore, according to the Respondent, the relevant principles of international law referred to in Article 26(6) do not allow this Tribunal to address the Claimants' claims, because EU law does not permit the existence of a mechanism for dispute resolution between EU investors and EU Member States other than that provided for under EU treaties.[285]

---

[282] *Eiser v. Spain* (Award), ¶¶ 194-196 (footnotes omitted), referring to *Charanne v. Spain* (Final Award), ¶ 429.

[283] **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Article 26(6).

[284] *See* Respondent's Counter-Memorial, ¶¶ 66-75.

[285] Respondent's Counter-Memorial, ¶ 67.

224.  The Tribunal disagrees. First, the jurisdiction of this Tribunal derives from the express terms of a treaty —the ECT— that is binding under international law on the State parties thereof and on the EU. Second, the ECT is a multilateral treaty to which the EU itself is a party.[286] Third, the EU and each EU Member State granted its consent to submit to arbitration any claim against it. Fourth, nothing in the text, context, purpose and object of the ECT suggests that the inclusion of the reference to "rules and principles of international law" in the applicable law clause was intended to mean that the treaties creating the EEC and the EU and allocating competences among European institutions and their Member States, the EU's internal legislation, as subsequently interpreted by the CJEU, could be interpreted in a manner such that a development in the EU's *acquis* could be employed to undermine the prior consents to submit to arbitration under the ECT given by each of the EU Member States and the EU itself. The alleged problem of incompatibility between EU law and the ECT, if there is one, is to be sorted out by the EU and the EU States counterparties to the ECT.

225.  Under Article 32 of the VCLT treaties are to be interpreted in good faith, and as mentioned by the *Eiser* tribunal "treaty makers should be understood to carry out their function in good faith, and not to lay traps for the unwary with hidden meanings and sweeping implied exclusions."[287] If the arbitration clause, which is at the very heart of the Treaty to which the EU consented, were to exclude the variety of treaties and legislation mentioned by Spain, then the EU, which the Tribunal must assume acted in good faith when it negotiated and signed the ECT, would have, under international law, provided a formal warning, or an express exclusion or a reserve.

226.  In sum, the Tribunal does not find anything within the provisions of EU law, as invoked and pleaded by Spain, that overrides the rights granted in Article 26 of the ECT regarding the settlement of disputes.

227.  Central to Spain's argument is also Article 344 of the TFEU:

> "Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein."

228.  Relying on *Opinion 1/91*, Spain further argues that Article 344 of the TFEU would be infringed if intra-EU disputes were to be allowed. The Tribunal agrees with the Claimants in that the different concepts of substantive protections under EU law, which would apply

---

[286] The EU signed the Treaty on 17 December 1994, ratified it on 16 December 1997 and the ECT entered into force with respect to the EU on 16 April 1998.

[287] *Eiser v. Spain* (Award), ¶ 186.

to the merits of a dispute brought under EU law, should not be confused with the jurisdiction of the Tribunal.

229. Finally, the Tribunal finds it relevant that *Opinion 1/91* does not deal with the analysis of "Investors'" rights under the ECT, and that the present case, unlike *Opinion 1/91*, does not concern the validity of decisions of EU organs and institutions.

230. In conclusion, Spain made a standing offer to "Investors" of other "Contracting Parties" to settle disputes through international arbitration. The Claimants in this case, as "Investor[s] of another Contracting Party" accepted such an offer, and submitted their consent to arbitration, by filing their Request for Arbitration. The Tribunal thus rejects Spain's jurisdictional objection.

**B.    WHETHER THE TRIBUNAL HAS JURISDICTION OVER THE CLAIMS SUBMITTED BY THE CLAIMANTS REGARDING THE "INTERESTS" IDENTIFIED AS PROTECTED INVESTMENTS UNDER THE TREATY**

### 1.    *Respondent's Position*

231. The Respondent claims that certain of the assets invoked by the Claimants as "Investments" should be excluded from this arbitration since they are not investments to the effect of Article 1(6) of the ECT.

232. Spain argues that the Claimants neither own nor control, directly or indirectly, certain assets identified as investments in their Memorial. Article 1(6) of the ECT requires that the asset which constitutes the investment be either owned or controlled, directly or indirectly, by an investor. According to the Respondent, when the ECT alludes to the term indirect ownership, it refers to the real and ultimate possession of the asset.[288]

233. In the case at hand, the Claimants argue that their investment consists of direct and indirect shareholding and debt interests in the Andasol Companies that own and operate the Andasol Plants, as well as interests in the said plants and claims to money, returns and rights conferred by RD 661/2007 and RD 1614/2010.[289] However, according to the Respondent, the only assets that qualify as investments under Article 1(6) of the ECT are Antin Termosolar's shareholdings in the Andasol Companies and the loans granted by Antin Termosolar to the Andasol Companies.[290]

---

[288] Respondent's Counter-Memorial, ¶ 99.
[289] Respondent's Counter-Memorial, ¶¶ 100, 103.
[290] Respondent's Counter-Memorial, ¶¶ 101-102.

234. First, none of the other assets invoked are controlled by the Claimants, which are simple vehicle entities. Said control corresponds to Antin Fund 1 or Antin IP, none of which has brought a claim against the Respondent.[291]

235. Second, Antin Luxembourg does not directly own the shares in the social capital of the Andasol Companies and the loans granted to the Andasol Companies, since possession of these assets is channelled indirectly through Antin Termosolar, while the rest of the assets are channelled through Antin Termosolar and the Andasol Companies.[292]

236. Third, Antin Termosolar directly owns the shares in the Andasol Companies as well as the loans granted to these companies, but it does not have direct ownership over the interests in the plants and claims to money, returns and rights conferred by law, since said assets are owned by the Andasol Companies themselves.[293]

237. Spain explains that the Claimants argue for the existence of an indirect ownership over many of the assets identified by them as their investment.[294] However, the existence of indirect ownership under the ECT can only be alleged by the real and ultimate owner, *i.e.*, the final beneficiary. This interpretation is consistent with previous decisions of tribunals regarding the denial of benefits clause contained in Article 17 of the ECT, since such decisions have accepted that "ownership" refers to the final beneficiary of the ownership chain.[295] Likewise, different tribunals have found that indirect ownership of assets under Article 1(6) of the ECT should be interpreted as referring to the final beneficiary.[296] Considering the preparatory work of the ECT, signatory States to the ECT accepted the idea that indirect ownership referred to "actual ownership of assets, held through a chain of entities", which is clearly a reference to the final link in each chain of ownership.[297]

238. The Respondent maintains that the indirect ownership of the assets identified by the Claimants as their investment belongs not to them but to the Limited Partners, the final beneficiaries.[298] Since Antin Luxembourg does not own either directly or indirectly any such assets, it does not have an "investment" under Article 1(6) of the ECT. The same conclusion applies to Antin Termosolar regarding the assets whose direct ownership

---

[291] Respondent's Counter-Memorial, ¶¶ 103-104.

[292] Respondent's Counter-Memorial, ¶¶ 106-108.

[293] Respondent's Counter-Memorial, ¶¶ 106-110.

[294] Respondent's Counter-Memorial, ¶¶ 106-111.

[295] Respondent's Counter-Memorial, ¶¶ 115-118. Respondent cites *Plama v. Bulgaria* (Decision on Jurisdiction), ¶ 170; and *Libananco v. Turkey* (Award), ¶ 556.

[296] Respondent's Counter-Memorial, ¶¶ 119-121. Respondent cites *Kardassopoulos v. Georgia* (Decision on Jurisdiction); *Al-Bahloul v. Tajikistan* (Partial Award on Jurisdiction and Liability); *Stati et al. v. Kazakhstan* (Decision).

[297] Respondent's Rejoinder, ¶¶ 164-169.

[298] Respondent's Counter-Memorial, ¶ 122; Respondent's Rejoinder, ¶ 147.

corresponds to the Andasol Companies. Previous tribunals have held that shareholders of a company can claim for alleged damages caused to the value of their shares in a company, but not for damages caused to the assets of a company in which it has a shareholding.[299] Therefore, this Tribunal only has jurisdiction to decide on the claims regarding the shareholding that Antin Termosolar owns in the Andasol Companies, and receivables from loans granted to the Andasol Companies by Antin Termosolar.[300]

### 2. *Claimants' Position*

239. The Claimants submit they hold numerous direct and indirect interests that qualify as "Investments" under the ECT.

240. The Respondent argues that, regarding ownership, it is the Limited Partners making up the Fund that are the ultimate beneficial owners; and regarding control, it is Antin Fund 1 or Antin IP that control the Interests: consequently, the Claimants cannot bring forth such claims.[301]

241. According to the Claimants, Spain's interpretation of indirect ownership under Article 1(6) ECT, pursuant to which intermediate companies such as the Claimants can never bring a claim under the ECT, goes beyond the ordinary meaning of the ECT and finds no support in the treaty's language.

242. First, the Claimants argue that they satisfy Article 1(6) by directly and indirectly owning the Interests.

243. Regarding both Antin Luxembourg and Antin Termosolar, it is clear that a shareholder's interest in a company comprises an interest in the assets of that company, including its rights under law, claims to money or economic performance. This is particularly true under Article 1(6)(b) of the ECT, which covers "*every kind of asset*", including those "*owned or controlled directly or indirectly by an Investor*", and including not only shares but also a company or business enterprise, returns and any right conferred by law. Therefore, according to the ordinary meaning of the ECT, Claimants' qualifying Investments under the ECT include both the indirect shareholding in the Andasol Companies and the share in the entire underlying business units, including the returns that the Andasol Companies were entitled to receive under the RD 661/2007 economic regime.[302]

---

[299] Respondent's Rejoinder, ¶¶ 155-162. Respondent cites *Azurix v. Argentina* (Annulment), ¶ 109; *ST-AD v. Bulgaria* (Award on Jurisdiction), ¶¶ 278 and 282; *Poštová v. Hellenic Republic* (Award), ¶¶ 229, 230 and 245.

[300] Respondent's Counter-Memorial, ¶¶ 122-125. *See* Request for Bifurcation, ¶¶ 46-47.

[301] Claimants' Reply, ¶ 554.

[302] Claimants' Reply, ¶¶ 561-563; Claimants' Rejoinder, ¶¶ 58-60.

244. Previous tribunals have confirmed this interpretation, in making no distinction between direct ownership rights of the shareholders and shareholders' indirect rights in the assets of the local company suffering the host-State measures, and also recognizing that a shareholder can have indirect investments in the underlying assets of a company.[303] Neither of the cases cited by Spain[304] contradict this position. To the contrary, the tribunal in *ST-AD v. Bulgaria* expressly admitted that a foreign shareholder has standing to bring a treaty claim regarding measures which, although directed at the local company in which the shareholder holds shares, violate the relevant treaty and cause damage to the shareholder.[305] The tribunal in *Poštová v. Hellenic Republic* indicated that the claimant had no right to the assets of its subsidiary that qualified for protection under the BIT because it had based its claim solely on the government bond interests held by said subsidiary, rather than in its shareholding in it, situation that is clearly different from the case at hand.[306]

245. The Claimants argue that Antin Luxembourg indirectly owns the Interests. Spain's suggestion that the indirect possessory link between Antin Luxembourg and the Interests somehow distorts the ownership chain and deprives it from the ability to claim in respect of the Interests makes no sense, since there is nothing in the wording of the ECT to suggest that ownership hinges on any "possessory" requirement, as Spain claims. In addition, Spain's suggestion that the existence of intermediary companies in the corporate chain deprives Antin Luxembourg of protection —unless it is the beneficial owner— is without merit and unsupported by the wording of the ECT.[307] Antin Luxembourg, the first Claimant, owns a 100% stake in Antin Termosolar, second Claimant, which in turn owns a 45% stake in the Andasol Companies (together with RREEF and ACS). The Andasol Companies own the Interests. It is therefore unclear to the Claimants in what way they have failed to establish the necessary "link" of ownership, as suggested by the Respondent.

246. The Claimants further argue that Antin Termosolar indirectly owns the Interests. According to Spain, Antin Termosolar can claim only regarding its shareholding in the Andasol Companies and the loans granted to them. However, the definition of investment under the ECT includes *every* kind of asset directly or indirectly owned or controlled, including returns and any rights conferred by law. Antin Termosolar does indirectly own

---

[303] Claimants' Reply, ¶ 564; Claimants' Rejoinder, ¶ 61. Claimants cite *Azurix v Argentina* (Decision on Jurisdiction), ¶¶ 42-43; *CMS v. Argentina* (Annulment); *Camuzzi v. Argentina* (Decision on Jurisdiction); and *Teinver v. Argentina* (Decision on Jurisdiction).

[304] ST-AD v. Bulgaria (Award on Jurisdiction); Poštová v. Hellenic Republic (Award).

[305] Claimants' Rejoinder, ¶¶ 64-66.

[306] Claimants' Rejoinder, ¶¶ 67-70.

[307] Claimants' Reply, ¶¶ 567-571.

a stake in the Interests, and the presence of the Andasol Companies between it and the Interests does not affect the establishment of ownership for the purposes of the ECT.[308]

247. There is nothing in the text of the ECT to support Spain's interpretation that the only relevant indirect owner who can qualify as an Investor under the ECT is the final beneficiary or the "last or actual holder". In Spain's argument, an investor must be a direct owner (here, the Andasol Companies) or an indirect owner, being the last link in the corporate chain (the Limited Partners).

248. However, Article 1(6) of the ECT expressly acknowledges that a qualifying investment can be either direct or indirect, with no mention of any ultimate owner requirement. Spain seeks to import words into the ECT. None of the five legal authorities cited by Spain in this regard support this view, and the fact that any indirect owner, regardless of its position in the chain of ownership, may qualify as an investor under the ECT, is uncontroversial.[309] If Spain's argument were accepted, a corporate entity that indirectly owns an investment could never qualify as an investor under the ECT, since a natural person or a State will always be the ultimate beneficial owner.[310] Article 17(1) of the ECT further supports this position, since it contemplates the possibility that a claimant entity may not be the ultimate beneficial owner, limiting the protections offered by the ECT in those circumstances only to entities that are owned or controlled by an entity from a non-Contracting Party.[311]

249. In any event, the Limited Partners could not be the proper claimants in this arbitration. Under French Law, Antin Fund 1 is a *fonds commun de placement* with no legal personality, but which is the legal owner of Antin's 45% stake in the Andasol companies, and thus the ultimate owner of the assets of the Andasol Companies. The Limited Partners are characterized under French Law as "unit-holders", and do not have ownership rights over the assets of Antin Fund 1. Since Antin Fund 1 has no legal personality, it is represented by Antin IP, a management company, which can defend the rights and interests of its unit-holders. Therefore, even though the Limited Partners have subscribed the units issued by the Fund, they do not have direct ownership rights nor control over the assets of Antin Fund 1. Also, if one were to adopt Spain' position, the chain of ownership would not stop at the Limited Partners; it would be necessary to peel all layers of ownership until the natural person or State at the top.[312]

---

[308] Claimants' Reply, ¶¶ 572-575.

[309] Claimants' Reply, ¶¶ 580-584; Claimants' Rejoinder, ¶ 78. Claimants cite *Yukos v. Russia* (Interim Award on Jurisdiction and Admissibility), ¶¶ 41-44 and Appendix.

[310] Claimants' Reply, ¶ 587.

[311] Claimants' Reply, ¶¶ 588-591.

[312] Claimants' Reply, ¶¶ 592-598.

250. Second, the Claimants allege that they control the Interests.

251. The Claimants assert that they exercise control over the Interests, and in any event, Antin Fund 1 and Antin IP are not the proper claimants in this arbitration, as Spain implies. Moreover, the Claimants in this arbitration are bringing the claims on their behalf, and not on behalf of the Fund.

252. The Claimants maintain that the relevant test for control is the broad test set out in Understanding No. 3 of the Final Act of the European Energy Charter Conference, which is a question of fact to be determined on a case-by-case basis. The list of factors set out in Understanding 3 is not exhaustive, the demonstration of the capacity to control is sufficient to meet the test, and the Claimants meet such a test.[313]

253. The Claimants have both the capacity to control and actually control the Interests, rather than being simple vehicle entities: both Claimants exercise influence over the management and operation of the Andasol Plants and make their own investment decisions taking into account the best corporate interests of each.[314] Moreover, Antin Fund 1, which Spain argues exercises control over the Interests, cannot bring a claim since it is not a separate legal person. Antin IP, its managing company, does exercise control over the "Interests", but this does not prevent other entities in the Antin structure from bringing a claim.[315]

   3.   *Tribunal's Analysis*

254. According to the Claimants, Antin Luxembourg and Antin Termosolar directly and indirectly own and control the "Interests", and therefore, the Tribunal has jurisdiction *ratione materiae*. Such "Interests" comprise: (a) direct and indirect shareholdings and debt interests in the Andasol Companies that own and operate the Andasol Plants (Article 1(6)(b) of the ECT); (b) interests in the Andasol Plants (Article 1(6)(b) of the ECT); (c) claims to money (Article 1(6)(c) of the ECT); (d) returns (Article 1(6)(e) of the ECT); and (e) rights conferred by law, including those conferred by RD 661/2007 and RD 1614/2010 (Article 1(6)(f) of the ECT).[316]

255. Spain has taken issue with the link between the Claimants and the "Interests" they have identified as being protected investments under the Treaty. The Respondent argues that the only investments for purposes of Article 1(6) of the ECT, and therefore, the only investments on which the Tribunal holds jurisdiction, consist of the shares on the Andasol

---

[313] Claimants' Reply, ¶ 604.
[314] Claimants' Reply, ¶¶ 602-609.
[315] Claimants' Reply, ¶¶ 610-613.
[316] Claimants' Memorial, ¶ 320.

Companies owned by Antin Termosolar and the receivables from loans granted to the Andasol Companies by Antin Termosolar.[317]

256. Spain does not dispute:

(a) that Antin Termosolar may bring a claim for any deterioration in the value of its shares as a result of the Disputed Measures or for the loss of value of the receivables from loans granted by Antin Termosolar to the Andasol Companies;

(b) that the Interests for which the Claimants advance their claims in this arbitration fall under the non-exhaustive categories of assets listed in Article 1(6) of the ECT, or that these qualify as investments under Article 25 of the ICSID Convention; and

(c) that the investment is "associated with an Economic Activity in the Energy Sector."[318]

257. Article 1(6) of the ECT provides:

"(6) "Investment" means every kind of asset, owned or controlled directly or indirectly by an Investor and includes:

(a) tangible and intangible, and movable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;

(b) a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;

(c) claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment;

(d) Intellectual Property;

(e) Returns;

(f) any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector."

258. Article 26(1) of the ECT on the settlement of disputes between an Investor and a Contracting Party also requires that such a dispute be "relating to an Investment of the

---

[317] Respondent's Counter-Memorial, ¶¶ 122-125. *See* Request for Bifurcation, ¶¶ 46-47; Respondent's Rejoinder, ¶¶ 146, 152.

[318] *See* **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Articles 1(4), 1(5) and 1(6).

latter in the Area of the former, which concern an alleged breach of an obligation of the [Contracting Party] under Part III."[319]

259. The Tribunal recalls that, according to Article 31 of the VCLT, a treaty is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose.

260. Based on the terms of Article 1(6) of the ECT, the Investment must be either: (i) owned by the Investor, directly or indirectly; or (ii) controlled by the Investor, directly or indirectly.[320]

261. It is common ground between the Parties that Antin Luxembourg owns 100% of the shares in Antin Termosolar, Antin Termosolar in turn owns 45% of the shares in each of the two Andasol Companies —the remainder of the shareholdings of the Andasol Companies are owned by RREEF (45%) and ACS (10%)—, and the Andasol Companies own and operate RE power-generation facilities in Spain.[321] Since Antin Termosolar directly owns 45% of the shares in the Andasol Companies, Antin Luxembourg —owner of 100% of the shares of Antin Termosolar— owns or controls such shares in the Andasol Companies indirectly.[322] The same analysis applies to Antin Termosolar's debt interests for loans granted to the Andasol Companies: these are directly owned by Antin Termosolar, and indirectly by Antin Luxembourg.[323]

---

[319] **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Article 26(1).

[320] *See* Respondent's Counter-Memorial, ¶ 98.

[321] **Exhibit C-0100**, Notarised *Agreement* for the Sale and Purchase of 90% of the issued share capital of Andasol-1 Central Termosolar Uno, S.A. and Andasol-2 Central Termosolar Dos, S.A. and the partial assignment of subordinated shareholder loans between Proto Primo, B.VV.; Antin Energia Termosolar, B.V.; Cobra Sistemas y Redes, S.A., Cobra Solar Del Sur, S.L.; and Cobra Gestión de Infraestructuras, S.A., 31 August 2011; **Exhibit C-0204**, Register of Shareholders in Antin Energia Termosolar B.V., 27 June 2011; **Exhibit C-0206**, Register of Shareholders in Andasol-1 S.A., 31 August 2011; **Exhibit C-0207**, Register of Shareholders in Andasol-2 SA, 31 August 2011. *See* **Exhibit C-0259**, Updated corporate structure pertaining to Claimants' investments, 27 November 2015. *See also* Claimants' Memorial, ¶ 223 ("Antin's investments in the Andasol Companies were formalised by a share purchase agreement, executed on 30 June 2011, with Antin BV and RREEF each acquiring 45% of the issued share capital of the Andasol Companies (the SPA). Both investors also agreed to take a proportionate share in the existing shareholders' loans. Finally, RREEF and Antin agreed to an earn-out mechanism in favour of ACS, should the Andasol Plants sustain certain performance levels. This acquisition became effective on 31 August 2011, once the conditions precedent set out in the SPA were completed.").

[322] *See Al-Bahloul v. Tajikistan* (Partial Award on Jurisdiction and Liability), ¶¶ 141-146.

[323] *See* **Exhibit C-0100**, Notarised *Agreement* for the Sale and Purchase of 90% of the issued share capital of Andasol-1 Central Termosolar Uno, S.A. and Andasol-2 Central Termosolar Dos, S.A. and the partial assignment of subordinated shareholder loans between Proto Primo, B.VV; Antin Energia Termosolar, B.V.; Cobra Sistemas y Redes, S.A., Cobra Solar Del Sur, S.L.; and Cobra Gestión de Infraestructuras, S.A., 31 August 2011; **Exhibit C-0204**, Register of Shareholders in Antin Energia Termosolar B.V., 27 June 2011 and **Exhibit C-0210**, Resolutions of the Board of Directors of Antin Infrastructure Services Luxembourg, 30 March 2012.

262. There is nothing in the text or context of the ECT that supports Spain's position. Article 6(1) refers to direct or indirect control or ownership, but nowhere in its text or in the context of the ECT is there a requirement that only the real and ultimate owner or beneficiary may submit claims to arbitration.

263. Spain's seeks support for its proposed concept of "indirect ownership" in the preparatory works of the ECT, and particularly in the preparatory work of a Sub-Group of the ECT.[324] The Tribunal is not persuaded by Spain's allegations.

264. First, the preparatory works, under Article 32 of the VCLT, constitute a subsidiary means of interpretation that serves to confirm the meaning resulting from the application of Article 31 or to determine the meaning when the interpretation according to Article 31 (a) leaves the meaning ambiguous or obscure; or (b) leads to a result which is manifestly absurd or unreasonable. There is nothing resulting from the application of VCLT Article 31 to the interpretation of Article 6(1) of the Treaty that suggests that only the ultimate shareholder can claim in respect of the investment, much less obscurity or ambiguity in Article 6(1) that requires resorting to the subsidiary means of interpretation of VCLT Article 32.

265. Second, the Contracting States, contrary to the suggestion of the ECT Sub-Group,[325] decided that it was not necessary to include a definition of indirect ownership. Thus, even if the preparatory works were to be considered for the purposes of the interpretative exercise as Spain proposes, they suggest that the Contracting States considered the definition of Investor, and the concept of indirect ownership or control, as finally reflected in the ECT, to be sufficiently clear.

266. Therefore, there is nothing in the ECT that requires the Tribunal to perform an analysis of "indirect possession" up until the last "possessory stage," to find such "real and ultimate owner."[326] Furthermore, nothing in the ECT suggests that the presence of intermediary companies in the corporate chain between Antin Luxembourg and the Andasol Companies deprives Antin Luxembourg of protection.

267. Spain has further argued that the Claimants may not bring claims in this arbitration for alleged damages caused to the assets of a company (*i.e.*, interests in the Andasol Plants, claims to money, returns and rights allegedly conferred by RD 661/2007 and RD 1614/2010).[327] According to Spain there is a "lack of jurisdiction *ratione materiae* of the Arbitral Tribunal to hear the Claimants' claim for alleged damages to the renewable

---

[324] *See* Respondent's Rejoinder, ¶ 168.
[325] Respondent's Rejoinder, ¶ 168.
[326] *See* Respondent's Counter-Memorial, ¶ 115.
[327] Respondent's Rejoinder, ¶¶ 153-156.

energy production plants, given that the legitimation for such claim corresponds exclusively to the Spanish companies that own these production plants [...]."[328]

268.  According to Spain, the Tribunal's jurisdiction is limited to the direct ownership of shares and loans by Antin Termosolar in the Andasol Companies and therefore the assets of the Andasol Companies should be excluded from this arbitration because they are not investments protected by the ECT.

269.  The Tribunal recalls that the definition of "Investment" under ECT Article 1(6)(b) covers "every kind of asset owned or controlled directly or indirectly by an Investor," and includes "shares;" "a company" or "business enterprise;" "Returns," and "any right conferred by law."

270.  Spain does not seem to dispute that Antin Luxembourg indirectly owns shares in the Andasol Companies and that Antin Termosolar directly owns shares and loans in the Andasol Companies.[329] Therefore, under the ordinary meaning of the ECT, Antin Luxembourg has an investment consisting of an indirect shareholding in the Andasol Companies and Antin Termosolar has an investment consisting of a direct shareholding in the Andasol Companies and a direct interest in the loans to the Andasol Companies. It is by reason of such shareholding (direct and indirect) that Claimants are claiming an Interest in the Andasol Companies,[330] in other words, the Claimants are claiming "damages caused to the value of their shareholding interests in the Andasol Companies."[331]

271.  Spain does not contest the decisions of different arbitral tribunals invoked by the Claimants and that support their position, but relies instead on the decisions of the tribunals in *ST-AD v. Bulgaria and Poštová v. Hellenic Republic* to support its allegation that claims for the so called "reflective losses" by shareholders are not permitted under investment treaties. The Tribunal disagrees. In the *ST-AD* case the tribunal held that although the rights of a subsidiary are not the same as the rights of the parent company, the latter is entitled to bring claims under the treaty for actions directed at the subsidiary and affecting the assets of the subsidiary that cause loss to the value of the shares held by the claimant parent company.[332] Ultimately, the *ST-AD* tribunal found that it lacked jurisdiction *ratione temporis* and jurisdiction *ratione voluntatis*,[333] not jurisdiction *ratione materiae*. In the *Poštová* case the tribunal declared that an investor had not made an investment because the investor based its claim not on its shareholding in the corresponding company, but rather on an alleged

---

[328]  Respondent's Rejoinder, § III.B.
[329]  *See* Respondent's Counter-Memorial, ¶¶ 106 and 109.
[330]  Claimants' Memorial, ¶¶ 477-478; Brattle Quantum Report I, ¶ 12.
[331]  Claimants' Rejoinder, ¶ 8.
[332]  *ST-AD v. Bulgaria* (Award on Jurisdiction), ¶¶ 282, 312.
[333]  *ST-AD v. Bulgaria* (Award on Jurisdiction), ¶¶ 312 and 431.

direct interest on the asset itself.[334] The facts of the two cases are thus substantially different from the case before this Tribunal and do not support Spain's objection.

272. Finally, the Respondent claims that Article 17(1) of the ECT on the denial of benefits supports its view that only an "Investor" that is the last link in the possessory chain qualifies for protection under the ECT.

273. Article 17(1) provides that the benefits of the ECT are to be denied to a legal entity if that entity is owned or controlled by nationals of a "third state." Therefore, Article 17(1), on the one hand, confirms that a claimant entity need not be the ultimate beneficial owner, and on the other hand, denies the protection to claimant entities that are owned or controlled by an entity from a non-Contracting Party. The provision contains no limitation on claims brought by intermediary companies that are owned or controlled by "Investors" of Contracting Parties.

274. The Claimants have sought restitution of the legal and regulatory regime under which they made their investments. In the alternative, the Claimants seek damages "for the lost fair market value of their investments, comprised of lost historical and future cash flows":[335] first, compensation in the form of Antin's share of the extra cash flows Antin's CSP plants would have generated up until 20 June 2014;[336] second, looking forward from 20 June 2014, compensation on the reduction of the fair market value of Antin's investments in

---

[334] Poštová v. Hellenic Republic (Award), ¶ 246.

[335] Claimants' Memorial, ¶ 477.

[336] Claimants' Memorial, ¶¶ 504, 506 ("This first step uses the full benefit of hindsight. Starting at 20 June 2014, Brattle looks back to the commencement of the Disputed Measures in December 2012, and calculates the cash flows accruing to the Claimants under both the But For and the Actual scenarios. […] Applying the above assumptions to Brattle's financial model quantifies the difference in the total lost cash flows to the Andasol Plants as EUR 25 million. Antin's portion of those lost cash flows is EUR 11 million (based on Antin's percentage shareholding in the Andasol Companies."); Brattle Quantum Report I, ¶¶ 14-15 ("Step 1 uses full hindsight and, looking back from June 2014, compares But For and Actual cash flows from the inception of the Disputed Measures in December 2012, cumulating the differences over time. […] The analysis relies on historical operating and financial data for each of Antin's CSP assets, and then computes the extra cash flow the plants would have enjoyed assuming a continuation of the Original Regulatory Regime, including continued electricity production with gas. In the absence of the Disputed Measures, Antin's CSP plants would have generated additional cash flows of EUR 25 million between December 2012 and June 2014. Antin's share of the extra cash flow would have amounted to EUR 11 million.").

CSP assets;[337] and third, pre-award and post-award interest on amounts due.[338] While the matters of liability and any damages for breach will be dealt with below, with respect to the foregoing jurisdictional objections to the application of the ECT, the Tribunal concludes that the Claimants have standing under the Treaty to bring claims in respect of Spain's measures which, although directed at the Andasol Companies and its assets, allegedly caused losses to the Claimants.

275. The Tribunal thus rejects Spain's objections.

## C.  WHETHER THERE IS A LACK OF JURISDICTION TO HEAR ALLEGED VIOLATIONS ARISING FROM THE TVPEE

### 1.  *Respondent's Position*

276. Spain submits an objection to the Tribunal's jurisdiction on the Claimants claims in respect of the TVPEE. The Claimants argue that the adoption of the TVPEE amounts to a breach of Article 10(1) of the ECT. However, Article 21(1) of the ECT establishes that "nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties" (the "taxation carve-out") and provides an exhaustive list of exceptions to this general principle that does not include Article 10(1) of the ECT. Consequently, according to the Respondent, Article 10(1) of the ECT imposes no obligations to Contracting Parties regarding taxation measures.[339]

277. Spain further argues that, under Article 26 of the ECT, it has only consented to submit disputes to arbitration related to alleged breaches of Part III of the Treaty. While Article 10 is included in of Part III of the Treaty, no obligations arise under Article 10(1) regarding taxation measures, and therefore there is no obligation which would have allegedly been

---

[337] Claimants' Memorial, ¶ 507 ("In this second step, Brattle forecasts the 'reasonably expected cash flows of each of Antin's CSP assets. There are four main components or sub-steps to Brattle's DCF model. For each component, Brattle calculates a value for (a) the But For scenario; (b) the Actual scenario; and (c) the difference between the But For and the Actual scenarios. The last figure represents the impact of the Disputed Measures on Antin's investments."); Brattle Quantum Report I, ¶¶ 16, 21 ("Step 2 looks forward from June 2014 to estimate the fair market value of Antin's investments. We develop a financial model that forecasts the reasonably expected cash flows of Antin's CSP assets under the But For and Actual scenarios. The But For scenario assumes the continued application of the Original Regulatory Regime under RD 661/2007. The Actual scenario reflects the "mid-stream switch" described in the Regulatory Report, introduced by RDL 9/2013, RD 413/2014 and the Ministerial Order of June 20, 2014. [...] We conclude that in the Actual world the alleged violations reduced the fair market value of Antin's financial interests in CSP assets by a further EUR 155 million as at June 2014, relative to their value under the But For scenario and the continued application of the Original Regulatory Regime.").

[338] Claimants' Memorial, ¶ 528; Brattle Quantum Report I, ¶ 22 ("Step 3 recognises that Antin would not receive payment for damages until sometime after June 2014. The analysis accounts for the delay in compensation by adding pre-award interest to our June 2014 damages estimates [...].").

[339] Respondent's Counter-Memorial, ¶¶ 146-154.

breached by Spain through the introduction of any taxation measures, and particularly the TVPEE. Consequently, Spain has not granted its consent to arbitration in respect of any dispute related to the alleged breach of Article 10(1) of the ECT arising from the introduction of the TVPEE.[340]

278.  Taxation measures are defined in Article 21(7)(a) of the ECT as including any provisions relating to taxes of the domestic law of the Contracting Party. According to Spain, whether a provision relates to taxes should be determined in accordance with the national law of the corresponding Contracting Party, as may be derived from the wording of Article 21(7)(a)(1) of the ECT. Certain terms of international treaties may be defined in accordance with national law, as it has been recognized by previous tribunals[341] and doctrine, as well as by double taxation agreements concluded by Spain with the Netherlands and Luxembourg, which can be used to interpret the ECT in accordance with Article 31(3)(c) of the VCLT.[342] Also, it could be argued that a determination on the nature of a taxation measure should be adopted in accordance with international law, pursuant to Article 26(6) of the ECT. Although Spain believes the first approach to be correct (taking into account Spanish domestic law), both lead to the conclusion that the TVPEE is a tax measure, since (i) Law 15/2012 is part of the national legislation of Spain and (ii) the provisions of Law 15/2012 regarding the TVPEE are provisions on taxes.[343] The latter is true both according to national law and to international law.[344]

279.  Under domestic law, there is no doubt that the TVPEE is a direct tax over the production and incorporation of electrical energy in the SES.[345] This has been ratified by the Spanish Constitutional Court and is clearly established in Article 1 ("*Nature*") of Law 15/2012.[346] The Institute of Accounting and Account Audits has also recognized the taxable nature of the TVPEE, explaining that it is an expense fiscally deductible from the Corporations Tax, which has been confirmed by the Spanish General Directorate of Taxes.[347] The relevance of these statements is undisputable, as stated by the *ad hoc* committee in *Soufraki v. United Arab Emirates* (Annulment).[348]

280.  Likewise, according to Spain, there is no doubt that the TVPEE is a tax from the perspective of international law. This is a question of the legal operation of the measure,

---

[340]  Respondent's Counter-Memorial, ¶¶ 229-233.
[341]  Citing *Saipem v. Bangladesh* (Decision on Jurisdiction and Recommendation on Provisional Measures), ¶ 82.
[342]  Respondent's Counter-Memorial, ¶¶ 159-168.
[343]  Respondent's Counter-Memorial, ¶¶ 169-172.
[344]  Respondent's Counter-Memorial, ¶¶ 176-177; Respondent's Rejoinder, ¶ 178.
[345]  Hearing Tr., Day 1, 8:11-9:5.
[346]  Respondent's Counter-Memorial, ¶¶ 178-179, 187-191.
[347]  Respondent's Rejoinder, ¶¶ 182-187.
[348]  Soufraki v. United Arab Emirates (Annulment), ¶ 97.

rather than its economic effect. Other tribunals have set out the characteristics of a tax as follows: (i) it is established by law, (ii) said law imposes an obligation on a category of people, and (iii) this obligation entails payment of money to the State for public purposes.[349] These elements are all present in the case of the TVPEE.[350] Additionally, the European Commission has ratified the taxable nature of the TVPEE and its conformity with EU law.[351]

281. Spain further argues that it is not appropriate to carry out any additional examination on the TVPEE, as sought by the Claimants. First, the good faith analysis carried out by the tribunal in *Yukos v. Russia* (Award)[352] is not applicable in this case. Such analysis was carried out due to extraordinary circumstances not present in the case at hand, namely that the alleged taxation measures pursued a purpose entirely unrelated to obtaining revenue for the State, such as the destruction of a company or the elimination of a political opponent.[353] According to the Respondent, as opposed to the *Yukos* arbitration, in this case, the Parties' dispute concerns a law of general application and not specific actions for tax collection and inspection —freezing and liquidation of assets— carried out by the Russian tax administration in respect of one specific taxpayer.[354]

282. Second, the analysis proposed by the Claimants entails an examination of the economic effects of the tax rather than its legal operation, which was discarded by the tribunal in *EnCana v. Ecuador*.[355]

283. In any event, even if such an analysis were to be carried out, the TVPEE is a *bona fide* taxation measure.[356] First, it applies to all energy producers, both conventional and renewable, without any distinction, and it cannot be argued that it is not a *bona fide* measure because it grants equal treatment to all without including tax benefits for renewable producers.[357] In this sense, the Spanish Constitutional Court stated that the Spanish Constitution does not grant a right to unequal regulatory treatment and that the generalized application of the TVPEE corresponds to a valid choice made by the legislator, which has a wide margin for establishing and configuring the tax.[358] Besides, the fact that TVPEE is

---

[349] Respondent's Counter-Memorial, ¶¶ 198-201; Hearing Tr., Day 1, 12:11-13:15.

[350] Respondent's Counter-Memorial, ¶¶ 202-216.

[351] Respondent's Counter-Memorial, ¶¶ 217-227; Respondent's Rejoinder, ¶¶ 189-195; Hearing Tr., Day 1, 9:6-11:20.

[352] *Yukos v. Russia* (Final Award), ¶ 1407.

[353] Hearing, Day 1, Tr. 15:1-10. Spain further argues that 83% of the revenue going into the Andasol plants actually come from subsidies granted by the Spanish State.

[354] Hearing, Day 1, Tr. 14:14-23.

[355] Respondent's Rejoinder, ¶¶ 198-203: Hearing, Day 1, Tr. 15:11-18. *See EnCana v. Ecuador* (Award), ¶ 142.

[356] Hearing, Day 1, Tr. 14:2 *et seq*.

[357] Hearing, Day 1, Tr. 15:23-16:6.

[358] Respondent's Rejoinder, ¶¶ 207-216.

established for all electric power generation facilities, regardless of the technology used, is linked to the environmental nature of the tax, as laid down in the preamble to Law 15/2012.[359]

284.  Second, the TVPEE does not discriminate against RE producers.[360] Law 15/2012 grants the same treatment to all TVPEE taxpayers, whether they are renewable or conventional energy producers.[361] Since the TPVEE is one of the costs remunerated to renewable producers through the regulated regime applicable to them, the economic effect of the TVPEE on said producers is neutralized.[362] The specific remuneration set for renewable producers allows them to recover certain costs that, unlike conventional producers, they cannot recover in the market, including the TVPEE.[363]

285.  Third, the objective of the TVPEE is to raise revenue for the Spanish State for public purposes. Said revenue is integrated into the General Budgets of the State and an amount equivalent to the estimated annual revenue arising from the taxes included in Law 15/2012, included the TVPEE, is allocated to financing the costs of the electricity system concerning the promotion of renewable energy.[364] Law 15/2012 also created other taxes, for instance, on nuclear energy producers. An amount equivalent to that levy is also assigned to finance the costs of the RE system. However, the Claimants are not arguing that those taxes on nuclear energy producers are not *bona fide*.[365]

### 2.    *Claimants' Position*

286.  The Claimants allege that the taxation carve-out set out in Article 21 of the ECT does not apply if the challenged measure is not a *bona fide* tax. Therefore, the Tribunal must determine whether the TVPEE contained in Law 15/2012 is a *bona fide* tax or whether it is a measure implemented under the guise of taxation. This assessment requires a factual enquiry.[366]

287.  According to the Claimants, Spain implemented the TVPEE as part of a series of measures designed to strip away and dismantle the incentive regime upon which the Claimants were induced to invest. It was a backdoor tariff cut labelled as a tax to scale back even further the incentives provided for under RD 661/2007, in breach of Spain's obligations under the

---

[359] Respondent's Rejoinder, ¶¶ 217-219.
[360] Respondent's Rejoinder, ¶¶ 221-223.
[361] Respondent's Rejoinder, ¶¶ 224-227; Hearing, Day 1, Tr. 16:7-13.
[362] Hearing, Day 1, Tr. 17:1-18.
[363] Respondent's Rejoinder, ¶¶ 228-234.
[364] Respondent's Rejoinder, ¶¶ 235-240 and footnote 92.
[365] Hearing, Day 1, Tr. 19:16-23.
[366] Claimants' Reply, ¶ 614.

ECT, and has had an unfair direct economic impact on installations that qualified under the RD 661/2007 economic regime.[367]

288. The requirement that taxation measures be *bona fide* follows from the principle of good faith, reflected in Article 26 of the VCLT. It follows from this principle that Spain cannot avoid liability by framing a measure as a tax and then pointing to the literal wording of the carve-out in a manner that amounts to an abuse of rights, calculated to frustrate the object and purpose of the Treaty.[368] One of the objects and purpose of the ECT is to ensure that qualifying foreign investors are accorded FET. Hence, Spain must not use its tax powers to frustrate the rights of the Claimants to FET by stripping away their rights in a way calculated to fall within the taxation carve-out of the ECT.[369] It was not the object or purpose of Article 21 of the ECT to enable States to frame their conducts under the guise of taxation measures in order to achieve an unlawful end with impunity.[370] As a consequence, the taxation carve-out only applies concerning *bona fide* taxation measures.

289. Good faith obliges States not to violate the requirement of consistency, linked to the principle of *estoppel*, and therefore, when seeking to avail itself of an exemption in an international investment agreement, a State must not act in a way that is manifestly inconsistent nor flout the principle of estoppel. Likewise, a State cannot implement a measure with a declared purpose that is in fact *mala fide* in nature. As applied to the present case, this principle entails that Spain cannot benefit from its own inconsistencies by making specific commitments to investors and then implementing a disguised tariff cut to avoid honouring those commitments and investor protections under the ECT.[371]

290. Determining whether a taxation measure is *bona fide* must be inferred from the conduct of the State and determined on the balance of probabilities. Therefore, it is necessary to look behind the State's labelling of a measure as a tax, as determined in the *Yukos v. Russia* case.[372] Here, the Claimants argue that they are not making factual comparisons between the specific conduct of Russia, as referenced in the *Yukos* arbitration; rather, the Claimants' case is that the *Yukos v. Russia* tribunal analysis of the taxation carve-out under the ECT and its finding that a tax must be *bona fide* applies generally.[373] The Tribunal must determine whether the implementation of the TVPEE is "*more consistent with*" the

---

[367] Claimants' Reply, ¶ 616.

[368] Claimants' Reply, ¶¶ 619-623.

[369] Claimants' Reply, ¶ 625.

[370] Claimants' Reply, ¶¶ 624-629. Claimants cite *Yukos v. Russia* (Final Award), ¶ 1407.

[371] Claimants' Reply, ¶¶ 630-636. Claimants cite *Saluka v. Czech Republic* (Partial Award), ¶ 307; *Nova Scotia v. Venezuela* (Award on Jurisdiction), ¶ 141; *Phoenix v. The Czech Republic* (Award), ¶ 107, citing Hersch Lauterpacht, *Development of International Law by the International Court*, London, 1958, p. 164; *Daimler v. Argentina* (Dissenting Opinion), ¶ 7; and *Daimler v. Argentina* (Award), ¶ 173 and footnote 317.

[372] *Yukos v. Russia* (Final Award), ¶ 514.

[373] Claimants' Rejoinder, ¶ 93.

conclusion that it forms part of a scheme to deprive the Claimants of the rights they were granted under RD 661/2007 and RD 1614/2010, despite the stabilization provisions included therein. Moreover, where, as in this case, there is *prima facie* evidence that the TVPEE is arbitrary or wherever Spain's explanation for the measure is inconsistent or contradictory, the Tribunal may draw inferences in favour of the Claimants, and the burden of proof switches to the respondent State to provide rational explanation for its conduct.[374]

291.   In the present case, it is apparent from Spain's conduct that the TVPEE is not a *bona fide* tax, but a measure designed to strip away the rights of the Claimants' installations under the RD 661/2007 regulatory regime.[375]

292.   First, the Government's conduct reveals that the TVPEE was intended as a tariff cut. By applying the so-called "*tax*" to all revenues generated by the plants, the measure would be equivalent to a tariff cut or a reduction in the amount of incentives RE installations were entitled to, since (i) RE generators operate in a regulated environment where most of the revenues were fixed by the Government, and therefore they had no chance but to absorb the decrease in those revenues as a result of the levy, since they cannot pass it on to consumers as conventional producers can,[376] and (ii) in all cases, the taxable basis would be higher for RE installations, requiring them to pay a higher cost per MWh produced compared to ordinary installations. Therefore, the TVPEE has a discriminatory effect on RE producers when compared to conventional producers.[377]

293.   It is not true, as Spain argues, that the economic effect of the TVPEE on renewable producers is neutralized because the TVPEE is one of the operating costs taken into account in calculating the specific remuneration for such renewable producers under the New Regime. The Claimants have suffered extensive losses as a result of both the TVPEE and the New Regime, and the fact that the damages caused by the TVPEE alone are now subsumed within the greater damage caused by the New Regime does not mean the Claimants did not suffer losses as a result of the former.[378]

294.   These concerns were raised several times by the Claimants to the Government,[379] which through several comments acknowledged that the TVPEE was designed as a means to cut the incentives it had committed to provide under RD 661/2007 and 1614/2010, since it was

---

[374] Claimants' Reply, ¶¶ 637-643. Claimants cite Feldman v. Mexico (Award), ¶¶ 177 and 178; US – Measures Affecting Imports of Woven Wool Shirts and Blouses, p. 14; AAPL v. Sri Lanka (Award), ¶ 56.
[375] Claimants' Reply, ¶ 644.
[376] Claimants' Rejoinder, ¶¶ 98-102.
[377] Claimants' Reply, ¶¶ 647-649.
[378] Claimants' Rejoinder, ¶¶ 103-104.
[379] Claimants' Reply, ¶¶ 650, 652.

conscious the same result could be achieved by cutting the applicable tariffs.[380] Moreover, the measure was implemented at a time in which Spain was already facing several claims under the ECT arising from its retroactive cuts to RD 661/2007 and concerning RDL 14/2010.[381] Therefore, Spain was on notice that further changes affecting international investors were likely to provoke additional ECT claims. In this context, it may be inferred that the TVPEE was framed as a tax with the purpose of avoiding liability for breaching investors' rights under the ECT and does not constitute a *bona fide* taxation measure. Consequently, Spain cannot avail itself of the taxation exemption at Article 21 of the ECT.[382]

295. Second, the *mala fide* nature of the TVPEE is further evident for two reasons. On the one hand, it goes against its proffered aim, i.e., to harmonize the tax system with a more efficient and respectful use of energy resources with the environment and stability, as it disproportionately impacts RE installations by its design, intending to cut the FIT specifically designed to increase investment in the RE sector in Spain. This is evidenced by the fact that (i) Spain considered no other alternative for achieving the alleged purpose, (ii) Spain did not even consider the potential negative effects of the measure over RE installations, (iii) the set tax rate was arbitrary and unsupported, and (iv) the TVPEE was intended to be predominantly financed by RE installations, even though these installations produce less than half of the electricity generated and sold to the market by the Ordinary Regime. This shows that the TVPEE targeted the premiums and incentives that the Government had committed to pay to RE installations. This discrimination is in direct contradiction to Government commitments that induced foreign investors to invest, a situation that the ECT tax carve-out was not intended to permit.[383]

296. Spain alleges that the objective of the TVPEE is to raise revenue for the State, included in the General Budgets of the State, for public purposes. However, this fact on its own does not mean it qualifies as a *bona fide* measure.[384] The money raised by the TVPEE is directed to reduce the costs of RE incentives in the electricity system and increase the income of said electricity system rather than to encourage the development of RE, and thus it achieves the same result as a tariff cut.[385] The fact that Law 15/2012 also introduced two other taxes on nuclear fuel and radioactive waste is irrelevant to this regard.[386]

---

[380] Claimants' Reply, ¶¶ 653-655.

[381] Claimants' Reply, ¶ 656. Claimants cite *PV Investors v. Spain* (Preliminary Award on Jurisdiction); *Charanne v. Spain* (Final Award).

[382] Claimants' Reply, ¶¶ 657-660.

[383] Claimants' Reply, ¶¶ 662-674.

[384] Claimants' Rejoinder, ¶¶ 105-106.

[385] Claimants' Reply, ¶¶ 675-677; Claimants' Rejoinder, ¶¶ 107-109.

[386] Claimants' Reply, ¶¶ 678-680.

297.  Third, the TVPEE is not an isolated measure, but part of a chain of connected legislative measures that deprived the Claimants of the rights to which the Andasol Plants were entitled under RD 661/2007. These included the deprivation to the Andasol Companies of their right to receive a FIT for the electricity produced using natural gas, the elimination of the Premium and the change in inflation adjustments established under RD 661/2007, the dismantling of the entire RD 661/2007 regime and an 11-month transitory period of uncertainty before the establishment of the economic parameters under the New Regime in June 2014.[387] All of these measures were adopted despite repeated assurances by Spain that the Andasol Plants would be entitled to the benefit of the RD 661/2007 tariffs for their operational lifetime.[388] This factual context must be considered in analysing whether a tax measure amounts to a breach of a treaty obligation, as clarified by previous tribunals.[389]

298.  Finally, it is necessary to clarify that a State's labelling of a measure as a tax under its domestic law or in accordance with international law, is not determinative as to whether Article 21 of the ECT is applicable, as stated by previous tribunals.[390] Compliance with domestic law is also irrelevant to this regard, since a State cannot rely on its own law to evade international liability. Therefore, the ruling of the Spanish Constitutional Court, on which Spain seeks to rely, and that determined that the TVPEE does not discriminate RE producers, is irrelevant. So is the annulment decision in *Soufraki v. United Arab Emirates*.[391] There, the *ad hoc* committee analysed whether the nationality of the claimant was determined on the basis of national, rather than international law, which is a completely different context from the one in the case at hand.[392]

299.  Likewise, the characterisation of a measure as a tax in accordance with international law is in no way determinative as to whether the taxation carve-out is applicable.[393] The European Commission decision relied on by Spain is also irrelevant, since said decision did not examine the nature of the TVPEE as a tax nor ratified its conformity with EU law.[394] Consequently, the Claimants' claim regarding the TVPEE falls within the Tribunal's jurisdiction.

---

[387]  Claimants' Reply, ¶¶ 681-684.

[388]  Claimants' Rejoinder, ¶ 94.

[389]  *Renta 4 v. Russia* (Award), ¶ 181.

[390]  Claimants' Reply, ¶¶ 687-692. Claimants cite *Yukos v. Russia* (Final Award), ¶ 1433; *Renta 4 v. Russia* (Award), ¶ 179.

[391]  Soufraki v. United Arab Emirates (Annulment), ¶ 97.

[392]  Claimants' Rejoinder, ¶¶ 86-87.

[393]  Claimants' Reply, ¶¶ 695-696; Claimants' Rejoinder, ¶¶ 88-89.

[394]  Claimants' Rejoinder, ¶¶ 90-91.

3. _Tribunal's Analysis_

300. Spain has advanced an objection to the Tribunal's jurisdiction to decide the Claimants' claims in respect of the TVPEE. According to the Respondent, given the taxation carve-out in Article 21 of the ECT, Article 10(1) of the ECT does not apply to taxation measures.

301. The Claimants allege that Spain breached its obligation to accord FET to their investments under Article 10(1) of the ECT, in part, by adopting the TVPEE introduced by Law 15/2012. According to the Claimants, the ECT indeed gives rise to obligations concerning non-_bona fide_ taxation measures; the taxation carve-out in the Treaty does not apply if the challenged measure is not a _bona fide_ tax.

302. Law 15/2012, which applies from 1 January 2013, imposed a 7% levy on the income of all electricity produced and fed into the national grid during a calendar year.[395]

303. The Claimants consider that this is a back-door tariff cut to the RD 661/2007 economic regime because the levy applies on all revenues of the Andasol Plants, which come from the FIT, rather than on their profits. Therefore, by taxing all revenues, "the Government simply cut the tariff."[396] According to the Claimants, the measure is more akin to Spain unilaterally imposing a royalty on gross income. The purpose of the TVPEE was to obtain additional resources from generators in order to "balance the budget" of the Electricity System.[397] The Claimants argue that the Minister of Industry, Energy and Tourism expressly acknowledged that Spain could have reached the same result through a direct cut to FITs, but chose instead to do so by means of the levy.[398] The Government's conduct would thus reveal that the TVPEE was intended as a tariff cut, notwithstanding the fact that it was labelled and presented as a tax.

304. The Claimants also allege that the TVPEE is not a _bona fide_ taxation measure, and that it is part of a chain of connected legislative measures that deprived the Claimants of the rights to which the Andasol Plants were entitled under RD 661/2007.[399] The TVPEE achieves the opposite of its official aim —"harmoni[sing] [the] tax system with a more efficient and respectful use of energy resources with the environment and sustainability.—"[400] Instead, it unfairly targets and has a disproportionally impact on RE installations.[401] Contrary to

---

[395] **Exhibit C-0024**, Law 15/2012, Articles 6-8.

[396] Claimants' Memorial, ¶ 242.

[397] Claimants' Memorial, ¶ 241(c). _See_ **Exhibit C-0024**, Law 15/2012, Preamble, Part II.

[398] Claimants' Observations on the _Eiser_ Award, ¶ 12. _See_ **Exhibit C-0106**, Patricia Carmona & Javier Mesones, Interview with the Minister of Industry, Energy and Tourism, _La Gaceta_, 14 October 2012.

[399] _See_ Claimants' Reply, ¶¶ 683-686.

[400] **Exhibit C-0217**, Regulatory Dossier of Law 17/2012, _Memoria_, 14 September 2012, p.1.

[401] The Claimants argue that the 7% Levy was intended to be predominantly financed by RE installations, even though these produce less than half of the electricity that is generated and sold to be market by the Ordinary

what has been argued by Spain, the effect of the TVPEE is not neutralised:[402] "[t]he fact that the damages suffered by the [TVPEE] alone are now subsumed within the greater damage caused by the New Regime (as one of the costs that is covered by the Special Payment) does not mean that the Claimants did not suffer losses as a result of the [TVPEE]."[403] According to the Claimants, the measure constitutes a cut to the FIT, which was an incentive especially designed to increase investment in the RE sector in Spain and which, according to the Claimants, the government had committed not to modify for the lifetime of the investments.[404] The funds from the TVPEE pay for the cost of RE incentives. The Claimants argue that a measure that does the opposite of what it claims to achieve is not only arbitrary, but *mala fide*.[405]

305. Central to Spain's jurisdictional objection are Articles 21 and 10 of the ECT. In accordance with Article 21(1) of the Treaty:

> "TAXATION
>
> (1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency."

306. Although the term "Taxation Measures" is not comprehensively defined in the Treaty, paragraph (7)(a) of Article 21 notes that "Taxation Measures" "include":

> "(i) any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and (ii) any provision relating to taxes of any convention for the avoidance of double taxation or of any other

---

Regime. Also, Special Regime installations, such as the Andasol Plants, cannot pass on part of the 7% Levy to consumers since their revenues are fixed by the Government. Ordinary Regime installations may raise the price at which electricity is sold to the market, thereby increasing revenues. *See* Claimants' Rejoinder, ¶¶ 98-100. *See also* **Exhibit R-0144,** Documentation relating to pilot proceedings 5526-13-TAXU conducted by the European Commission regarding the TVPEE, Report submitted by the Spanish Ministry of Finance, and Public Administration, 17 February 2014, p. 32 ("Renewable energy generators cannot pass through the [7% Levy] to the market, because they may not determine the price they receive in exchange for the energy produced and incorporated into the grid, but a premium which is regulated." [Claimants' translation]).

[402] Respondent's Rejoinder, ¶¶ 228-233. Spain argues that the 7% Levy is one of the RE producers' operating costs, that are taken into account in calculating their specific remuneration.

[403] Claimants' Rejoinder, ¶ 104.

[404] *See* Claimants' Reply, ¶¶ 666, 668.

[405] Claimants' Reply, ¶ 668.

international agreement or arrangement by which the Contracting Party is bound."[406]

307. Spain argues that, by virtue of Article 26 of the ECT, it has only consented to submit disputes to arbitration related to alleged breaches of obligations derived from Part III of the Treaty. According to the Respondent, Article 10(1) of the ECT —although included in Part III of the Treaty— does not generate obligations regarding "Taxation Measures" of the Contracting Parties, and only paragraphs (2) and (7) of Article 10 would apply to such measures. Spain goes on to conclude that no obligation arises from Article 10(1) in respect of taxation measures, particularly through the introduction of the 7% Levy; and that therefore, Spain has not given its consent to refer the dispute regarding the 7% Levy to arbitration.[407]

308. The Claimants maintain that Spain's position that "it is 'not possible' to have breached Article 10(1) through the implementation of the [TVPEE] because it has 'not given it[s] consent to submit this controversy to arbitration'" is incorrect and no issue of consent arises.[408]

309. Whether or not it is characterized as an issue of consent, the Claimants concede that if the measure meets the *bona fides* requirement for which they contend, it will qualify as a "Taxation Measure" under Article 21 of the ECT and will fall outside of the scope of application of the ECT. As noted by the tribunal in *Plama v. Bulgaria*, and quoted by Spain in its Counter-Memorial:

> "[…] Article 21 of the ECT specifically excludes from the scope of the ECT's protections taxation measures of a Contracting State, with certain exceptions […]."[409]

310. In this arbitration, the Claimants allege that Spain has breached the FET treatment protection, included in Article 10(1) of the ECT. The Claimants have not submitted claims under Articles 10(2) and 10(7), or 13 of the ECT. This is of importance, since Article 21

---

[406] **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Article 21(7)(a).

[407] Respondent's Counter-Memorial, ¶¶ 229-233.

[408] Claimants' Reply, ¶ 615. *See* Respondent's Counter-Memorial, ¶ 127.

[409] *Plama v. Bulgaria* (Award), ¶ 266. *See* **Legal Authority RL-0018**, The Energy Charter Treaty: A Reader's Guide, Energy Charter Secretariat, p. 39 ("Article 21 excludes taxation matters, in principle, from the scope of application of the agreement.").

of the Treaty is a "multi-layered exceptions mechanism"[410] which provides for certain claw-backs to the taxation carve-out.[411]

311. The Tribunal must therefore determine whether the TVPEE is a taxation measure which falls under the carve-out to the ECT provided for in Article 21(1) of the Treaty.

312. There is no doubt that the TVPEE is a tax under Spanish Law. Law 15/2012, which introduced the TVPEE, is a domestic law adopted by the Congress of Spain.[412] Article 1 of Law 15/2012 expressly states that "[t]he tax on the value of the production of electricity is a levy of a direct and real nature […]" which applies throughout Spain.[413] Even, the Claimants concede that the TVPEE falls within the "literal" definition of the word "tax."[414] However, they argue that "Spain's labelling of a measure as a 'tax' cannot deprive investors of protection under the ECT" and that "[i]f it were otherwise, then *any* taxation measure by a State —no matter how egregiously abusive in nature— would be exempt under the ECT."[415] The Tribunal concludes that the fact that the TVPEE is a tax under Spanish law (and not merely the labelling of any type of State measure) is confirmed by the manner in which the 7% Levy is accrued, declared and paid, and by statements of the General Directorate of Taxes and the Institute of Accounting and Account Audits.[416]

313. The Claimants also accept that the TVPEE meets the three-prong test advanced by Spain regarding the characteristics of a tax under international law: (i) that the tax be laid-down by law; (ii) that such law imposes an obligation on a class of people; and (iii) that such obligation involves paying money to the State for public purposes.[417] It is the Claimants' argument that this is not sufficient for the purposes of this dispute.

314. In this respect, the Claimants contend that the TVPEE, which bears the characteristics of a tax at international law, is nevertheless not a *bona fide* taxation measure. The Tribunal considers that if a measure bears the hallmarks of a tax under the applicable domestic law and under the general approach taken by international law, it is very likely that the measure

---

[410] **Legal Authority CL-0188**, U. E. Özgür, Taxation of Foreign Investments under International Law: Article 21 of the Energy Charter Treaty in Context, (Energy Charter Secretariat, 2015), 1 June 2015, p. 52.

[411] **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Article 21 (2), (3), (4) and (5).

[412] *See* **Exhibit R-0020**, Spanish Constitution, Articles 66 and 133.

[413] **Exhibit C-0024**, Law 15/2012 of 27 December 2012, Articles 1 and 2 [translation submitted by the Claimants]. *See* **Exhibit R-0021**, Law 58/2003, General Taxation, 17 December 2003, Article 2 (defining the concept, the purposes and classification of taxes).

[414] Claimants' Rejoinder, ¶ 83.

[415] Claimants' Rejoinder, ¶ 89(c).

[416] **Exhibit R-0031,** Response of the General Directorate of Taxes to Consultation V3371-14, 23 December 2014. **Exhibit R-0028**, Consultation No. 1 of BOICAC 94, June 2013. *See* Respondent's Counter-Memorial, ¶¶ 181-186.

[417] Claimants' Rejoinder, ¶ 89.

will be excluded by operation of ECT Article 21. However, in exceptional circumstances a measure that bears such hallmarks could not benefit from the taxation exclusion if a claimant is able to demonstrate a lack of good faith on the part of the respondent.

315. While Spain considers that it is not appropriate to carry out the additional examination on the TVPEE as alleged by the Claimants,[418] it argues further that even if the Tribunal did so, the Tribunal would be bound to find that the TVPEE is a *bona fide* taxation measure.

316. As accepted by Spain at the Hearing —specifically in the context of this jurisdictional objection—, "Article 26(6) of the ECT makes it compulsory upon arbitral tribunals to hear cases not just under the ECT but taking into account also the rest of international law."[419] As such, in application of the general principle of good faith, parties are not allowed to abuse their rights. The Tribunal recalls the words of Hersch Lauterpacht, quoted in *Phoenix v. The Czech Republic*:

> "There is no right, however well established, which could not, in some circumstances, be refused recognition on the ground that it has been abused."[420]

317. It is well established in international law that at an abuse of right claim is subjected to a high threshold of proof. The Tribunal must therefore determine if the TVPEE was adopted by Spain with the precise aim of abusing its rights under the ECT, by strategically creating the TVPEE to curtail the investors' alleged rights under the Treaty, in a manner that abusively sought to employ the taxation exclusion. Here, the Tribunal finds that the Claimants' evidence is lacking.

318. The Claimants point especially to the explanatory statements to a 2012 draft bill introducing the levy,[421] to communications sent by RE generators and investors to the Spanish government and to certain statements made by Mr. José Manuel Soria, the Spanish Minister of Industry, Energy and Commerce, as government conduct revealing that the TVPEE is not a *bona fide* measure.

319. The Tribunal, however, does not find it to be even a close call that, on the totality of the evidence before it, the TVPEE forms part of a "scheme" to deprive the Claimants of their rights while precluding the Tribunal from examining the measure by way of Article 21 of the ECT. Minister Soria's interview to *La Gaceta* shows that the Spanish government considered adopting a series of general measures to the energy sector, and that it opted to

---

[418] Respondent's Rejoinder, ¶¶ 199-200, 203.

[419] Hearing Tr. Day 1, 11:24-12:2.

[420] **Legal Authority CL-0149**, *Phoenix v. The Czech Republic* (Award), ¶ 107, quoting Hersch Lauterpacht, Development of International Law by the International Court, London, 1958, p. 164.

[421] **Exhibit C-0218**, Draft bill on tax measures for sustainable Energy, 28 September 2012.

first introduce taxation measures to address the deficit in the Electric System, and then it would introduce certain regulatory changes.[422] These statements by Minister Soria are not evidence that "Spain was intent on stripping away the rights afforded under the Original Regime and implementing a tariff cut," as argued by the Claimants.[423]

320. The Tribunal considers that Law 15/2012 and the TVPEE specifically is not merely a measure *labelled* as a taxation measure, but rather plainly it is a tax of general application to all companies in the RE and conventional energy sector, in the pursuit of a public purpose identified and pursued by the Respondent. As set out by the Secretariat of the ECT:

> "The issue of taxation has great significance both for the private economic agents in the energy sector and the involved states. While foreign companies have a keen interest that they are not fiscally discriminated, <u>host countries may wish to retain some discretion concerning their tax treatment</u>."[424] [Emphasis added]

321. For the TVPEE, Spain has deemed it appropriate to apply as tax base the amount due by the tax payer for the production of electricity and its incorporation into the electricity system, measured at power station bus bars. As explained by Spain at the Hearing, the TVPEE taxes "the income of the conventional and renewable producers for producing energy and feeding it into the system."[425] It is not uncommon for a State to tax income received for carrying out an economic activity. And, as is the case with any income tax, the greater the income, the greater the levy.

322. The Tribunal finds it appropriate to contrast the facts of the present case with the "extraordinary circumstances" found by the tribunal in *Yukos v. Russia*, where "the State apparatus decided to take advantage of [the investors'] vulnerability […] by launching a full assault on Yukos and its beneficial owners in order to bankrupt Yukos and appropriate its assets while, at the same time, removing Mr. Khodorkovsky from the political arena."[426] In contrast to the *Yukos* tribunal's findings on the facts before it, there is evidence on the record of this arbitration showing that Law 15/2012 and the taxation measures it introduced were designed with a general public purpose, rather than with the aim of employing a tax for the entirely unrelated purpose of destroying the Claimants' investments.[427] The strong

---

[422] *See* **Exhibit C-0106**, P. Carmona. & J. Mesones, Interview with the Minister of Industry, Energy and Tourism, *La Gaceta*, 12 October 2012.

[423] Claimants' Reply, ¶ 654.

[424] **Legal Authority RL-0018**, The Energy Charter Treaty: A Reader's Guide, Energy Charter Secretariat (Energy Charter Secretariat, 2002), p. 38.

[425] Hearing, Day 1, Tr. 18:3-6.

[426] *Yukos v. Russia*, (Final Award) ¶¶ 1404, 1407.

[427] To quote the claimants' contention expressly accepted by the tribunal in *Yukos v. Russia*, (Final Award) ¶ 1431: "[…] actions that are taken only 'under the guise' of taxation, but in reality aim to achieve an entirely unrelated

contrast with the facts before the *Yukos* tribunal which led it to reject that respondent's invocation of ECT Article 21 serves to show that there is simply nothing on the record of the present case that provides any evidence of abuse of right.

323. Based on the reasons set forth above, the Tribunal accepts Spain's jurisdictional objection regarding the Claimants' claims based on the TVPEE.

### D.    WHETHER THE REQUIREMENTS OF THE COOLING-OFF PERIOD WERE MET

#### 1.    *Respondent's Position*

324. According to the Respondent, the Claimants failed to request an amicable solution from Spain or to observe the three-month cooling-off period, as required by Article 26 of the ECT, in relation with Law 24/2013, RD 413/2014, Ministerial Order IET/1045/2014 and Ministerial Order IET/1882/2014.[428] Therefore, the Tribunal lacks jurisdiction to hear any claims regarding these measures.[429]

325. Article 26(1) of the ECT requires investors to attempt to settle any dispute amicably for a period of three months, starting from the date of request of amicable settlement, before submitting such dispute to arbitration. Thus, under the ECT, Contracting States have only consented to resort to arbitration once amicable resolution has been requested and after the three-months period has elapsed without reaching a resolution to the dispute. Failing to meet these circumstances excludes jurisdiction of the Tribunal to hear the dispute.[430] According to Spain, this issue is a matter of jurisdiction, and not a matter of admissibility.[431]

326. The Claimants sent letters to the President of the Spanish Government on 26 April 2013 and 30 July 2013, requesting a friendly solution regarding potential disputes arising out of

---

purpose (such as the destruction of a company or the elimination of a political opponent)" are not shielded by ECT Article 21.

[428] Respondent's Rejoinder, ¶¶ 243, 257. Spain argues that it had not previously mentioned the Tribunal's lack of jurisdiction regarding Ministerial Order IET/1882/2014 in Respondent's Counter-Memorial because the Claimants had not listed it as a disputed measure in the Claimants' Memorial. Respondent's Rejoinder, ¶ 253 ("It is in their Reply on Jurisdiction that the Claimants extended the dispute to include Ministerial Order IET/1882/2014. Therefore, this is the first procedure step available for the Kingdom of Spain to extend its arguments regarding the lack of communication of the dispute and observance of the cooling off period to include Ministerial Order IET/1882/2014.").

[429] Respondent's Counter-Memorial, ¶¶ 235-236.

[430] Respondent's Counter-Memorial, ¶¶ 237-240. Respondent refers to *Enron v. Argentina* (Decision on Jurisdiction), ¶ 88; *Guaracachi v. Bolivia* (Award), ¶¶ 388-391; *Goetz v. Burundi* (Award), as referenced in *The Oxford Handbook of International Investment Law,* Muchlinski, Ortino and Schreuer, Oxford University Press, pp. 845 - 846.

[431] Respondent's Rejoinder, ¶¶ 254-256.

Law 15/2012 and RDL 2/2013, and RDL 9/2013, respectively. However, Law 24/2013, RD 413/2014 and Ministerial Order IET/1045/2014 (jointly, the "Further Measures") were all enacted after the remission of such letters, and no request of amicable settlement was ever submitted to the Government regarding these measures.[432] Consequently, Spain has not granted its consent to arbitration over disputes related to said measures, and the Tribunal lacks jurisdiction to hear any claims related thereto.

327.   Spain alleges that the Further Measures "cannot be considered to be part of a single dispute between the parties"[433] According to Spain, Law 24/2013 is a law of the same hierarchy as RDL 9/2013, its purpose is much broader than that of RDL 9/2013, and the Claimants' allegation that Law 24/2013 was issued to develop and confirm RDL 9/2013 is incorrect.[434] RD 413/2014 is a regulation issued by the executive branch, developing Law 24/2013, and Ministerial Order IET/1045/2014, also a regulation issued by the executive branch, complements RD 413/2014.[435] The Claimants' reading of Article 26 of the ECT makes it "useless" because it leaves the subject matter of the arbitration indefinitely open regarding any regulation issued after RD 661/2007.[436]

328.   Spain argues, in the alternative, that such claims are inadmissible.[437] Furthermore, Article 26 of the ECT requires the communication of the dispute and the observance of the cooling-off period regardless of the belief of its usefulness.[438]

### 2.   *Claimants' Position*

329.   The Claimants allege that they complied with the three-month negotiating period under ECT Article 26(1) before exercising their right to pursue remedies through arbitration by serving their Request for Arbitration on 29 October 2013.[439]

330.   According to the Claimants, Spain's preliminary objection has no merit for three reasons.

331.   First, the Claimants have complied with the cooling-off period because all the Disputed Measures, including the Further Measures, are part of a single ongoing dispute between the Parties regarding Spain's failure to honour its commitments to the Claimants in relation

---

[432]   Respondent's Counter-Memorial, ¶¶ 244-257.
[433]   Respondent's Rejoinder, ¶ 246.
[434]   Respondent's Rejoinder, ¶¶ 247-248.
[435]   Respondent's Rejoinder, ¶¶ 249-250.
[436]   Respondent's Rejoinder, ¶ 251.
[437]   Respondent's Rejoinder, ¶ 258.
[438]   Respondent's Rejoinder, ¶ 255.
[439]   Request for Arbitration, ¶ 116.

to RD 661/2007 and RD 1614/2010. This single on-going dispute has already been notified to Spain, and the cooling-off period has expired without settlement.

332. Spain adopted a series of measures (Law 15/2012, RDL 2/2013 and RDL 9/2013) between December 2012 and July 2013 (the "Initial Measures"). The Claimants put Spain on notice of the present dispute by letters dated 26 April 2013 and 30 July 2013 and filed their Request for Arbitration on 29 October 2013.[440]

333. Although RDL 9/2013 completely withdrew the RD 661/2007 regime, it only established a transitory regime and did not set out the specific economic parameters that would be applied to the Claimants' investments going forward.[441] The further legislation that set such parameters, *i.e.*, Law 24/2013, RD 413/2014, Ministerial Order IET/1045/2014 and Ministerial Order IET/1882/2014—the Further Measures— were adopted after the Claimants put Spain on notice of the present dispute and after they had filed the Request for Arbitration. Both the Initial Measures and the Further Measures constitute a series of related measures that rolled back and eventually withdrew the economic incentives of the RD 661/2007 regime, and the fact that Spain issued further legislation defining the parameters of the New Regime after the dispute was notified does not create a jurisdictional (or even admissibility) hurdle that would shield Spain from responsibility for its illegal acts.[442]

334. According to the Claimants, it cannot be disputed that the Further Measures are supplemental to RDL 9/2013. Both RDL 9/2013 and Law 24/2013 required implementing legislation and the Further Measures fulfilled those requirements, as recognized by Spain itself.[443] In fact, Ministerial Order IET/1045/2014, which completed the New Regime, refers explicitly to RDL 9/2013 and the Government's task of establishing a new legal and economic framework, clarifying that this new framework would apply retroactively to the date of RDL 9/2013.[444] Moreover, the Claimants clearly stated in both letters sent to the Government and in their Request for Arbitration that they would include in this arbitration any additional measures implemented against the CSP sector concerned with overhauling the regime laid down by RD 661/2007.[445] There are further several other references in each of the Further Measures that demonstrate how these measures are clearly inter-linked between them and related to RDL 9/2013.[446]

---

[440] Claimants' Reply, ¶¶ 699-700.
[441] Claimants' Rejoinder, ¶ 117.
[442] Claimants' Reply, ¶¶ 700-701.
[443] Claimants' Reply, ¶¶ 702-703.
[444] Claimants' Rejoinder, ¶ 113.
[445] Claimants' Reply, ¶¶ 704-706.
[446] Claimants' Rejoinder, ¶¶ 118-124.

335. The Claimants further argue that their approach does not result in an open-ended arbitration which would leave Spain defenceless against new claims. This dispute concerns exclusively measures adopted by Spain as part of its decision to scale back and withdraw the RD 661/2007 regime, which were already announced in RDL 9/2013. That the Disputed Measures have been implemented over a long period of time is of Spain's own doing, and this cannot be a relevant criterion in determining the admissibility of the claims. Spain's argument is thus tantamount to saying that it would prefer the Claimants to commence a new arbitration for each new measure, which is absurd.[447]

336. Numerous previous tribunals have held that where measures introduced by a host State after the investor has requested arbitration are within the scope of the dispute outlined in the request for arbitration, compliance with cooling-off periods is rendered moot.[448] In those cases, further measures adopted by the respondent States after the request of arbitration was submitted were considered to be new elements of a same ongoing dispute.[449] That is exactly the case at hand.

337. In any event, even if the Tribunal considers that the Claimants should have complied with an additional cooling-off period, Spain's objection would still fail, since the negotiations would be futile. As stated by tribunals in previous arbitrations, non-compliance with a cooling-off period would not justify refusing to hear the dispute, since such periods should not be misused to obstruct arbitration proceedings.[450]

338. In the case at hand, Spain has provided no indication that it is even willing to engage in amicable settlement discussions with the Claimants. On the contrary, since the Claimants filed their Request for Arbitration, Spain has continued to adopt further harmful measures against the Claimants, causing additional losses to their investments. Hence, the futility of any negotiations is self-evident. In any event, even if the Tribunal were to take the filing of the Memorial as the relevant date for the first notification of a dispute regarding the Further Measures, the cooling-off period has long expired and there is no reason to dismiss any claims on that basis.[451]

339. In addition, the Claimants maintain that even if the Tribunal does not agree with the previous arguments, it should nonetheless accept jurisdiction, since the cooling-off period objection goes to the admissibility of claims relating to the Further Measures rather than

---

[447] Claimants' Rejoinder, ¶¶ 128-133.

[448] Claimants refer to *Ethyl Corporation v. Canada* (Award on Jurisdiction); *Pope & Talbot v. Canada* (Award on Jurisdiction); *Enron v. Argentina* (Decision on Jurisdiction).

[449] Claimants' Reply, ¶¶ 709-712; Claimants' Rejoinder, ¶ 127.

[450] Claimants' Reply, ¶¶ 713-716, referring to *Biwater Gauff v. Tanzania* (Award), ¶ 343; *Alps Finance v. The Slovak Republic* (Award), ¶¶ 201-204, citing Muchlinski, Ortino and Schreuer, *The Oxford Handbook of International Investment Law* (Oxford University Press, 2008), pp. 845-846.

[451] Claimants' Reply, ¶ 718.

to the Tribunal's jurisdiction or competence to rule on those claims. This is supported by (i) the ordinary meaning of Article 25 of the ICSID Convention, (ii) several investment-treaty decisions, and (iii) the rationale of cooling-off periods, which is to facilitate settlements, not obstruct arbitrations.[452]

340. Spain's position that compliance with a cooling-off period is a precondition to consent which failure precludes jurisdiction is not the prevailing view.[453] The three authorities relied on by Spain to support such position do not advance its case, since they concern specific factual situations that cannot be generalized and do not represent the current state of investment-treaty jurisprudence.[454] Moreover, Spain's interpretation is not supported by Article 26(3) of the ECT, which makes it clear that consent to arbitration is not predicated on compliance with the cooling-off period.[455] Therefore, failure to comply with this period is not a jurisdictional hurdle.

### 3. *Tribunal's Analysis*

341. Spain's preliminary objection deals with the requirement set out in Article 26 of the ECT that an investor and the Contracting Party to the Treaty attempt to reach a settlement of the dispute amicably for a period of three months, prior to having the dispute submitted to arbitration.

342. According to Article 26 of the ECT:

> "(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.
>
> (2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:
>
> (a) to the courts or administrative tribunals of the Contracting Party to the dispute;
>
> (b) in accordance with any applicable, previously agreed dispute settlement procedure; or

---

[452] Claimants' Reply, ¶ 720.
[453] Claimants' Reply, ¶¶ 721-723.
[454] Claimants' Reply, ¶¶ 724-725.
[455] Claimants' Rejoinder, ¶ 138.

(c) in accordance with the following paragraphs of this Article.

(3) (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article. […]"[456]

343. The Parties do not dispute that the Claimants sent two communications to Spain, dated 26 April 2013 and 30 July 2013, requesting negotiations with an aim of reaching an amicable settlement, nor that such letters refer to the Initial Measures.

344. Indeed, in their 26 April 2013 letter, the Claimants stated that their investments "were made in accordance with, and in reliance on, [RD 661/2007]."[457] The Claimants alleged that the Spanish Government had made numerous changes to the legal regime for CSP plants, including, but not limited to RDL 12/2012, Law 15/2012, Law 16/2012 and RDL 2/2013, and that "[t]hese and other measures taken by Spain substantially alter the legal framework for the investments that Antin has made in the Spanish CSP sector."[458] Such actions, according to the Claimants, are not in compliance with the ECT.[459]

345. In the Claimants' letter dated 30 July 2013, they referred to RDL 9/2013 issued on 14 July 2013, describing it as a further measure which results in greater uncertainty, and which constitutes an additional breach of the ECT, aggravates the dispute, and is expected to cause further material harm to the Claimants' investments.[460] Both the April and July 2013 letters expressly requested that negotiations be carried out with a view to reaching an amicable resolution to the dispute.

346. Of note, the Claimants' allegation that Spain has not responded to their request to commence negotiations has not been challenged by the Respondent. Indeed, the Claimants' 30 July 2013 letter informs that as of that date, the Claimants had not received any response

---

[456] **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Article 26.

[457] **Exhibit C-0010**, Letter from Allen & Overy LLP to President of the Spanish Government Mariano Rajoy Brey on behalf of the Claimants, 26 April 2013, p. 1.

[458] **Exhibit C-0010**, Letter from Allen & Overy LLP to President of the Spanish Government Mariano Rajoy Brey on behalf of the Claimants, 26 April 2013, p. 1.

[459] **Exhibit C-0010**, Letter from Allen & Overy LLP to President of the Spanish Government Mariano Rajoy Brey on behalf of the Claimants, 26 April 2013, pp. 1-2.

[460] **Exhibit C-0013**, Letter from Allen & Overy LLP to President of the Spanish Government Mariano Rajoy Brey on behalf of the Claimants, 30 July 2013, p. 1.

to their previous letter.[461] Spain only replied to the 26 April 2013 letter requesting that the Claimants submit the letter in Spanish.[462]

347. Spain objects to the Tribunal's jurisdiction —or to the admissibility of the claims, in the alternative— arguing that the following measures —the Further Measures— were not submitted for negotiation by the Claimants:

(a) Law 24/2013, adopted on 26 December 2013, and published in the BOE on 27 December 2013;

(b) RD 413/2014, adopted on 6 June 2014, and published in the BOE on 10 June 2014;

(c) Ministerial Order IET/1045/2014, adopted on 16 June 2014, and published in the BOE on 20 June 2014; and

(d) Ministerial Order IET/1882/2014, adopted on 14 October 2014, and published in the BOE on 16 October 2014.

348. Spain also argues that requesting the amicable settlement and waiting for the expiry of the term of the cooling-off period is a precondition for consent. In the alternative, it requests that the Tribunal decide that the claims regarding the Further Measures be declared inadmissible.

349. The Claimants respond by stating that: (i) they have complied with the cooling-off period, since the Further Measures are part of a series of measures implemented by Spain and which form part of one single dispute; (ii) further attempts to settle would be futile, and in such circumstances, compliance with the cooling-off period would be unnecessary; and (iii) in any event, the non-compliance with the cooling-off period does not prevent the Tribunal from exercising jurisdiction of a dispute, as this is a procedural and not a jurisdictional requirement.

350. The Tribunal finds that the Claimants' 26 April 2013 and 30 July 2013 letters calling for negotiations describe the dispute between the Parties as one concerning Spain's alleged breach of its obligations under the ECT, where after the Claimants made their investments in accordance with, and in reliance on, RD 661/2007, Spain made numerous changes to the legal regime for CSP plants, substantially altering the legal framework for their investments. These measures, according to the Claimants, have caused serious and

---

[461] **Exhibit C-0013,** Letter from Allen & Overy LLP to President of the Spanish Government Mariano Rajoy Brey on behalf of the Claimants, 30 July 2013, p. 1.

[462] **Exhibit C-0011** Letter from the Ministry of Industry, Energy and Tourism to Allen & Overy LLP. *See* **Exhibit C-0013,** Letter from Allen & Overy LLP to President of the Spanish Government Mariano Rajoy Brey on behalf of the Claimants, 30 July 2013.

substantial harm to their investments. The Tribunal's reading of the Claimants' description of the dispute in their 26 April 2013 and 30 July 2013 letters is in line with the Claimants' characterization of the dispute in the arbitration: "Spain's failure to honour its commitments under RD 661/2007 and RD 1614/2010 that constitutes a breach of the ECT."[463]

351. The Tribunal is thus tasked with determining whether the dispute, as communicated to Spain, and for which the Claimants sought an amicable settlement, could be seen to include both the Initial Measures and the Further Measures. The Claimants maintain in this respect that the Initial Measures and the Further Measures constitute a series of related measures that rolled back and ultimately withdrew the economic incentives upon which the investments were made, specifically RD 661/2007.

352. The Claimants state that they invested in Spain in reliance of the regime established in RD 661/2007, which was strengthened by RD 1614/2010. The Initial Measures which, according to the Claimants, scaled-back and ultimately withdrew such an economic regime consist on Law 15/2012 (which would include limitations to the RD 661/2007 regime in the form of a tariff deficit), RDL 2/2013 (which would scale back the FITs in the RD 661/2007 regime even further), and RDL 9/2013 (applying "urgent measures […] to guarantee the financial stability of the electricity system," and which would have overhauled completely the RD 661/2007 economic regime for present and future installations).[464] Notably, RDL 9/2013 repealed RD 661/2007 in its entirety and directed the Government, through the Ministry to adopt a new legal and economic regulation for renewable energy production facilities.[465] This new regime for renewables was soon to come, and RD 661/2007 continued to apply in a transitory manner until such new regulation was approved. The Claimants indeed pointed out in their Request for Arbitration that "[t]he New Regime under RDL 9/2013 is to be implemented" and that "[t]hese implementing measures are currently the subject of legislative debate."[466]

353. The Tribunal considers that this objection by the Respondent must be rejected.

354. First, the Respondent itself acknowledges the inseparable relationship between the Initial Measures and the Further Measures. It is undisputed that Law 24/2013 further developed the principles set out in RDL 9/2013. It is true that Law 24/2013 is much broader than RDL 9/2013, but Law 24/2013 repealed and replaced sections of RDL 9/2013. In turn, RD 413/2014 developed Law 24/2013[467] and Ministerial Order IET/1045/2014 itself

---

[463] Claimants' Reply, ¶ 701.

[464] Claimants' Reply, ¶ 700.

[465] **Exhibit R-0091**, RDL 9/2013, Single Repealing Provision, and First Final Provision, p. 52127.

[466] Request for Arbitration, ¶ 93.

[467] Respondent's Rejoinder, ¶ 249.

complements RD 413/2014.[468] None of these measures could thus be considered as separate, much less as unrelated to the others.

355. Second, the dispute submitted by the Claimants for purposes of exhausting the cooling off period refer to "Spain's failure to honour its commitments under RD 661/2007 and RD 1614/2010 that constitutes a breach of the ECT."[469] The Further Measures introduced additional changes to the RD 661/2007 and RD 1614/2010 regime and therefore, are clearly related to the dispute submitted by the Claimants.

356. Third, Spain did not respond to the letters filed by the Claimants (except to request that the letters be submitted in Spanish, which the Claimants did), and therefore the Respondent could not claim that a cooling off period should have been exhausted with each measure, when its lack of response suggests that such exhaustion would have been futile.

357. The Tribunal thus finds that the Initial Measures and the Further Measures are part of a single, on-going dispute between the Parties, as communicated by the Claimants in their 26 April 2013 and 30 July 2013 letters. The Request for Arbitration was submitted well after the negotiation period provided for in the Treaty had expired. Consequently, the Tribunal does not find it necessary to address in its decision the remainder of the arguments raised by the Parties, including whether the cooling-off period is a jurisdictional or a procedural requirement.

358. In conclusion, the Claimants complied with the requirements set out in Article 26 of the ECT in respect of requesting the initiation of negotiations regarding the dispute, and the expiry of the three-month cooling-off period prior to commencing the arbitration.

## VIII. MERITS OF THE CLAIMS

### A. CLAIMANTS' POSITION

359. The Claimants allege that they invested approximately EUR 139.5 million in the Spanish RE sector, based on the expectation that their CSP plants would generate regular and sustainable income that would allow the Claimants to service their debt and obtain a return on their investment. However, contrary to these expectations, Spain adopted various wrongful measures that have caused substantial losses to the Claimants' investments in

---

[468] Respondent's Rejoinder, ¶ 250.
[469] Claimants' Reply, ¶ 701.

Spain, due to the fundamental alteration of the applicable legal and regulatory framework in reliance upon which said investments were made.[470]

360. Consequently, according to the Claimants, Spain's measures violate Article 10(1) of the ECT, namely (i) the obligation to accord FET to the Claimants' investments, (ii) the obligation not to impair by unreasonable or discriminatory measures the management, maintenance, use, enjoyment or disposal of the Claimants' investments, and (iii) the obligation to observe obligations it had entered into with the Claimants or their investments.[471]

### 1. *Spain's violation of the FET standard*

361. The FET standard in the ECT is an independent and autonomous standard, which is additional to the international minimum standard under customary international law.[472] When interpreted in accordance with the ordinary meaning of its terms, in their context and in light of the object and purpose of the treaty, it may be concluded that the FET standard is an absolute standard and, in its analysis, the Tribunal should consider whether Spain's conduct was conducive to the provision of a stable, transparent legal framework for foreign investments in the energy sector. Because of the specific long-term nature of energy investments, this article imposes a high level of protection.[473] This interpretative approach is well established in arbitral practice.[474]

362. Regarding the application of the FET standard, the preferred method in arbitral practice has been the evaluation of the State's conduct against non-cumulative criteria including (i) whether the host State breached the investor's reasonable and legitimate expectations when the investment was made; (ii) whether the State failed to provide a stable and predictable legal and business framework in relation to the investment; (iii) whether the State's conduct was transparent; (iv) whether the State acted in an arbitrary and unreasonable manner; and (v) whether the actions of the State were disproportionate.[475] Bad faith from the host State is not required in order to find a breach of the FET standard, and good faith on the State's part does not excuse such breach.[476]

---

[470] Claimants' Memorial, ¶¶ 376-378.

[471] Claimants' Memorial, ¶ 379.

[472] Claimants' Memorial, ¶¶ 383-384; Claimants cite *Liman Caspian Oil v Kazakhstan* (Award), ¶ 263.

[473] Claimants' Memorial, ¶¶ 385-388.

[474] Claimants' Memorial, ¶¶ 389-391. Claimants cite *Tecmed v. Mexico* (Award), ¶ 156; *MTD v. Chile*, ¶ 113; *Saluka v. Czech Republic* (Partial Award), ¶ 286; *Azurix v. Argentina* (Decision on Jurisdiction), ¶ 360; *Siemens v. Argentina* (Award), ¶ 290; *Kardassopoulos v. Georgia* (Decision on Jurisdiction), ¶¶ 430-433.

[475] Claimants' Memorial, ¶ 392.

[476] Claimants' Memorial, ¶ 393.

### a.     Breach of Antin's legitimate expectations

### (i)     Antin's legitimate expectations under the ECT

363.    Spain breached Antin's legitimate expectations on the application and stability of the RD 661/2007 regime. The protection of such legitimate expectations, and particularly the obligation to provide for the stability of the legal and business framework on which an investor reasonably relied upon making its investment, is a central feature of the FET obligation.[477] This is particularly true in the energy sector where, as in the present case, a substantial amount of capital is usually committed at the outset so as to generate a long-term return.[478]

364.    Hence, Spain cannot alter the regulatory framework applicable to the Claimants' investments in ways that would be unfair, unreasonable and inequitable, including by undermining Antin's legitimate expectations, based on the legal framework at the time of the investment and on any undertakings made implicitly or explicitly by the host State. Particularly, Spain cannot dispense with the entire legal framework it has put in place in order to attract investments into its renewable sector and is instead required to honour its commitments with respect to foreign investors.[479]

365.    The State's conduct, which may contribute to the creation of a reasonable expectation and upon which an investor is entitled to rely, may take the form of the legal framework in relation to, or surrounding, the investment.[480] In the case at hand, Antin's expectations were twofold. First, at the time it made its investments, Antin expected that the Andasol plants would be subject to the FIT regime for their entire operational life, since they complied with all applicable registration requirements.[481] Spain's undertakings to this regard were sufficiently specific to generate legitimate expectations, since (i) it provided stabilization commitments in Article 4 of RD 1614/2010 for CSP plants and (ii) repeatedly confirmed (including specific representations addressed to Antin in face-to-face meetings) that its intention was for the FIT to apply for the lifetime of the plants without any retroactive changes.[482]

366.    Second, Antin expected that any future changes to RD 661/2007 would only apply to new installations, while existing installations would remain unaffected. Spain had expressly

---

[477] Claimants' Memorial, ¶¶ 395-396; 398-400. Claimants cite *CMS v. Argentina* (Award), ¶ 274; *Occidental v. Ecuador* (Final Award), ¶ 183; *LG&E v. Argentina* (Decision on Liability), ¶ 131; *PSEG v. Turkey* (Award)*, ¶ 250.

[478] Claimants' Memorial, ¶ 401. Claimants cite *Plama v. Bulgaria* (Award), ¶ 173.

[479] Claimants' Memorial, ¶¶ 395-397. Claimants cite *ADC v. Hungary* (Award), ¶¶ 423-424.

[480] Claimants' Memorial, ¶¶ 402-403.

[481] Claimants' Memorial, ¶¶ 404-405.

[482] Claimants' Reply, ¶ 81.

made such stability commitment in Article 44(3) of RD 661/2007 and later confirmed this interpretation by issuing RD 1578/2008, which introduced reductions of tariffs payable to PV installations, but only to those that did not qualify for FITs under RD 661/2007.[483] Article 4 of RD 1614/2010 further reinforced these stability commitments, and the Claimants' expectations were enhanced by specific assurances by Spain's public officials that the economic regime would not be changed to the detriment of existing CSP installations.[484]

367. Legitimate expectations are to be assessed at the time of the investment, rather than based on *ex-post* interpretations.[485] Spain was aware that the stability and predictability of the regulatory regime was essential to attract the investments it needed in order to develop its RE sector, and the Ministry had made clear that "stability" meant that new legislation should not be applied retroactively.[486] Spain did not make any warning to investors that they could face future tariff cuts if the Government changed its mind regarding what it considered to be "reasonable profitability."[487] In this sense, Article 44(3) of RD 661/2007 clearly provided for the non-modification of the FIT regime for facilities that had already obtained their start-up certificate as of the date of any future reforms.[488]

368. Moreover, Article 4 of RD 1614/2010 specifically established that no tariff reviews would apply to CSP facilities that had obtained definitive registration with the RAIPRE on or before 7 May 2009, nor to any facilities that at the time of entry into force of RDL 6/2009 met the requirements for registration with the Pre-Assignment Registry and were effectively registered in the RAIPRE on or before 31 December 2013. The Andasol Plants met such requirements, since they were both registered with the RAIPRE by 22 December 2009.[489]

369. RD 1614/2010 was the direct result of an agreement between the CSP sector and the Ministry (the July 2010 Agreement), as expressly confirmed by the Government, and was thus seen by many investors, including the Claimants, as strengthening the stability of the regime for CSP plants. This was especially important given the important retroactive regulatory changes that had been adopted by Spain affecting PV facilities.[490] Moreover, RD 1614/2010 offered stronger stabilization commitments than RD 661/2007, as expressly recognized by the Ministry by extending such stabilization commitments to the Premium

---

[483] Claimants' Reply, ¶¶ 83-84.
[484] Claimants' Memorial, ¶¶ 406-409.
[485] Claimants' Reply, ¶ 79.
[486] Claimants' Reply, ¶ 87, 267.
[487] Claimants' Reply, ¶ 88.
[488] Claimants' Reply, ¶¶ 89-90.
[489] Claimants' Reply, ¶ 93.
[490] Claimants' Memorial, ¶¶ 18; 161-163; Claimants' Reply, ¶¶ 94-97.

option.[491] Therefore, the Claimants legitimately expected that the FIT would apply for the entire operational life of the Andasol Plants.[492]

370. Spain alleges that there was no stabilization clause under Spanish law. However, Spain provides no logical alternative interpretation to Article 4 of RD 1614/2010. Spain also contends that the Claimants could not have legitimately expected the freezing of the regulatory regime. However, the Claimants recognize that Spain had the possibility to amend the regulatory regime, but honouring the commitments made to existing investors.[493]

371. However, the Claimants' expectations were not limited to the applicability of the FIT. The Claimants also expected (i) to be allowed to use natural gas in combination with solar energy; (ii) that the FIT would be updated annually in accordance with a CPI adjustment; and (iii) that the Andasol Plants would enjoy priority of dispatch for the electricity produced.[494]

372. *First*, regarding the use of natural gas in combination with solar energy, it is clear that, contrary to Spain's allegations, Article 2 of RD 661/2007 allowed the production of electricity under the Special Regime through natural gas. EU law context, including the definition of "electricity produced from renewable energy sources" under the 2001 Renewables Directive, does not serve to exclude the existence of legitimate expectations on the use of gas as expressly set out in RD 661/2007.[495] Likewise, contrary to Spain's allegations, RD 661/2007 does not contain any limitations regarding the circumstances on which CSP plants could burn natural gas,[496] and there was no indication at the time that the incentive allowing for the use of natural gas while enjoying the FIT would be limited in time. Had there been such a limitation, the Claimants would have acquired differently-equipped plants.[497]

373. Spain alleges that, as a result of their due diligence analysis, the Claimants' knew that the right to use natural gas could be withdrawn. However, none of the arguments set forth by Spain demonstrate that Spain had any expectation different than that some gas usage, around the percentages set out in the regulation applicable at the time, would always be permitted for existing plants.[498] Moreover, Spain's position regarding the Claimants'

---

[491] Claimants' Reply, ¶¶ 99-100.
[492] Claimants' Reply, ¶ 102.
[493] Claimants' Reply, ¶¶ 280-283.
[494] Claimants' Reply, ¶ 103.
[495] Claimants' Reply, ¶¶ 105-106.
[496] Claimants' Reply, ¶ 108.
[497] Claimants' Reply, ¶ 110.
[498] Claimants' Reply, ¶¶ 111-113.

legitimate expectation on the use of natural gas is entirely inconsistent with the Government's public statements, which make clear that this was one of the strong incentives that the RD 661/2007 regime provided.[499]

374. *Second*, Article 44(1) of RD 661/2007 established a mechanism to update the FIT pursuant to the CPI (the "CPI Formula"). This mechanism applied to all facilities, regardless of the date on which they started operations.[500] Spain suggests that the Claimants should have known that there could be a change to the CPI Formula, based upon a Supreme Court decision from 2015, which therefore could not have been the basis for the Claimants' expectations at the time the investments were made. In any event, Spain's arguments are irrelevant since Spain's measures changing the CPI Formula only affected the remuneration that the Andasol Plants received before Spain approved RDL 9/2013; under the New Regime, remuneration is not subject to update in accordance with any CPI-related formula.[501]

375. *Third*, the Andasol Companies enjoyed priority of access to the transmission and distribution network, pursuant to RDL 7/2006, as well as priority of dispatch, pursuant to RD 661/2007. Spain admits that the right to priority of dispatch was part of the original regime under which the Claimants made their investments, but it is uncertain whether the Andasol Plants would continue to enjoy such priority under the New Regime.[502]

376. Antin specifically relied upon the abovementioned guarantees and representations provided for in the legislation, together with the additional assurances made by Spanish public officials. In this sense, prior to investing in the Andasol Plants, the Claimants rigorously analysed the associated risks by means of a thorough due diligence process.[503] This process included an analysis of the legal, technical and market issues surrounding the investment.[504]

377. *First*, the legal analysis included an assessment carried out by Herbert Smith and the meetings held directly by Antin with Government representatives. As concerns Herbert Smith, its assessment concluded with a legal memorandum which, although not creating the Claimants' expectations regarding the regulatory regime applicable to CSP generation, did demonstrate the reasonableness of such expectations.[505] This memorandum did not

---

[499] Claimants' Reply, ¶ 115.
[500] Claimants' Memorial, ¶ 139.
[501] Claimants' Reply, ¶¶ 117-118.
[502] Claimants' Reply, ¶ 119.
[503] Claimants' Reply, ¶¶ 122-127.
[504] Claimants' Memorial, ¶ 189.
[505] Claimants' Reply, ¶¶ 130-133.

overlook the importance of the principle of reasonable return, but rather adequately understood the unprecedented level of protection offered by Article 4 of RD 1614/2010.[506]

378. Regarding the meetings held directly by Antin with Government representatives, Spain made direct representations to Antin reinforcing its legitimate expectations during two meetings: one with Miguel Vizcaíno, head of the legal department at the Ministry on 20 May 2011, and one with the General Secretary, the Chief Legal Advisor and the Assistant Director for Special Regimes of the CNE, on 25 May 2011.[507]

379. During the first of such meetings, Mr. Vizcaíno confirmed that RD 1614/2010 provided a long-term, stable regulatory framework for CSP, specifically mentioning that any future changes would not affect existing facilities, such as the Andasol Plants. He also mentioned that CSP facilities produced more electricity than the PV sector while using less subsidies, which explained the retroactive changes affecting PV installations.[508]

380. The discussions held in this meeting are reflected in an email that clearly recorded the representations made therein, and there has been no misrepresentation by the Claimants as to what they were told there (*i.e.*, that the regulatory regime applicable to CSP plants was stable). Further, it is clear that legitimate expectations may arise therefrom, since the meeting was formal, the assurances given were definitive and unambiguous and they confirmed the representations included in RD 661/2007 and RD 1614/2010.[509] Even if Mr. Vizcaíno was not authorized under Spanish law to make binding representations, this does not allow for the denial of the Claimants' legitimate expectations.[510] The Claimants do not allege that Mr. Vizcaíno committed to "petrification" of the Spanish legal system, but rather that he expressly reassured the Claimants that any changes to the CSP regulatory regime would not be retroactive.[511]

381. In the second meeting held with Government representatives, the CNE confirmed what Mr. Vizcaíno had said, *i.e.* that there was a stable regulatory regime in place for the CSP sector.[512] It is undisputed that this meeting took place, and it is absurd to suggest that the Claimants cannot derive any legitimate expectations from what was said in that meeting

---

[506] Claimants' Reply, ¶¶ 134-137.
[507] Claimants' Memorial, ¶ 211; Claimants' Reply, ¶ 143.
[508] Claimants' Memorial, ¶ 213.
[509] Claimants' Memorial, ¶ 214; Claimants' Reply, ¶¶ 146-153.
[510] Claimants' Reply, ¶¶ 159-161.
[511] Claimants' Reply, ¶ 163.
[512] Claimants' Memorial, ¶ 216.

because it contradicted the CNE report of 7 March 2012, since the investment decision was made in June 2011.[513]

382.  *Second*, Antin's market analysis was conducted by Pöyry.[514] The reports issued by Pöyry concluded, among others, that (i) the CSP industry was in a far safer position than the PV industry; and (ii) the Spanish Tariff Deficit was not the result of the development of the RE sector in Spain, since it already existed in 2007, and it could be managed without the need to make retroactive changes to the RD 661/2007 economic regime for existing facilities. Thus, such reports concluded that CSP was quite a safe market place to invest in.[515] They did not, however, suggest (and Claimants do not argue) that Spain could not change the regulatory regime applicable to CSP, but rather that it would not change such regime for existing facilities.[516]

383.  And *Third*, Antin's technical analysis was conducted by Altermia, with the help of the University of Seville and the *Centro Nacional de Energías Renovables* (CENER). Thanks to this analysis, Antin gained confidence in the CSP technology and in the Andasol Plants, concluding that they would be running efficiently. Antin was particularly interested in (i) the thermal storage system that allowed the Andasol Plants to produce dispatchable electricity, and (ii) the possibility of supplementing electricity production by using natural gas.[517]

384.  Thus, as a result of its due diligence process, Antin obtained certain guarantees and representation in which absence it would not have invested in the Spanish CSP sector. Antin's expectations on the continued application of the RD 661/2007 economic regime were perfectly legitimate for several reasons:[518]

   (a)   The FIT which Antin relied on had been offered under a royal decree that provided the specific applicable tariffs.

   (b)   The RD 661/2007 regime was part of a wider international and domestic policy that sought to develop RE power-generation infrastructure, under which Spain had actively encouraged investment in RE projects.

---

[513] Claimants' Reply, ¶¶ 164-167.
[514] Claimants' Memorial, ¶ 193.
[515] Claimants' Memorial, ¶¶ 194-196.
[516] Claimants' Reply, ¶¶ 138-142.
[517] Claimants' Memorial, ¶¶ 190-192.
[518] Claimants' Memorial, ¶¶ 410-412.

(c)    Antin conducted a thorough due diligence process that confirmed that its investments would be subject to the RD 661/2007 economic regime for the entire operational lifetime of the facilities.

(d)    The FIT was sufficiently attractive to encourage the necessary investments in RE projects, which would not have been possible without it.

(e)    RE power-generation projects raise debt project financing to fund part of their investments, and the RD 661/2007 regime encouraged such debts, since lenders could rely on the fact that the underlying assets would generate sufficiently high, predictable and stable revenue streams.

(f)    Spain continued to encourage investments in CSP during 2008 and 2009, confirming that its expectations on the application and stability of the RD 661/2007 regime were consistent with those of Antin.

(g)    At a time when the PV sector was being hit by tariff cuts, RD 1614/2010 was adopted, guaranteeing the CSP sector would not be affected.

(h)    At the time Antin was finalizing its investments, Spain gave specific oral commitments to it that the RD 661/2007 regime would not be altered.[519]

385.    Additionally, contrary to Spain's allegations, the Claimants' investment in the Andasol Plants is by no means speculative: the price paid was not unusually high, the level of returns expected by Antin was not out of the ordinary, the lead-time for the investment was determined by the provisions of the Antin Fund 1 bylaws and the project did not have an unusually high-risk level.

386.    Finally, Spain submits that it has made no specific commitments favouring the Claimants, and that the regulatory framework could not create a legitimate expectation on the future immutability of the regime. However, Spain did make specific undertakings regarding the application of the FIT for the lifetime of the plants without any retroactive changes, in both RD 661/2007 and RD 1614/2010, and repeatedly confirmed these intentions. Spain deliberately offered a favourable, long-term economic regime that enabled capital-intensive investments where the upfront capital costs are significant and can only be recovered in the long-term, and its withdrawal is inconsistent with the object and purpose of the ECT.[520] In this sense, several tribunals have determined that legitimate expectations

---

[519]  Claimants' Memorial, ¶¶ 410-412; Claimants' Reply, ¶ 121.
[520]  Claimants' Reply, ¶¶ 284-288.

may arise from the legal and regulatory framework, as was the case at hand, even if there is no direct and specific undertaking in a contract between the State and the investor.[521]

    (ii)    The principle of reasonable return does not support Spain's case

387. Spain's defence is built upon the concept of "reasonable return", arguing that the Claimants ought to have been aware that the Government could change and entirely withdraw the RD 661/2007 regime as long as a reasonable return was guaranteed. However, the majority of Spain's arguments are an *ex post* and novel interpretation of the key statutory provisions and core elements of the Spanish regulatory framework, developed solely for the purposes of evading international responsibility.[522]

388. Spain's position on this regard is based on a misinterpretation of Article 30(4) of Law 54/1997 and the regulation that implemented it. This article did not define the concept of reasonable return nor did it limit an RE producer's entitlement to a reasonable return, but rather served as a basis for the Government to set out the specific remuneration that would provide a reasonable return through further regulation, which it did through RD 436/2004 and RD 661/2007.[523] The RD 661/2007 regime guaranteed a particular FIT, which the New Regime did not respect, rather than a reasonable return on a fixed cost target,[524] and the Claimants could hardly have relied on anything other than the precise FIT set in the applicable regulation in order to understand the concept of "reasonable return."[525]

389. In this sense, both RD 661/2007 and RD 1614/2010 set out a fixed remuneration and not a percentage return based on a balance between incentives and consumer protection. The preamble of RD 661/2007 expressly confirmed that the remuneration offered to qualifying installations represented what Spain believed to be a reasonable return and would impose an assignment of those costs attributable to the electricity system that was also reasonable, therefore confirming there were no potential imbalances under the RD 661/2007 economic regime.[526] Even if the 2011-2020 Renewable Energy Plan provided the possibility that the Government might make changes to prevent compensation imbalances, and Spain was obviously at liberty to change the regime for new facilities, it had expressly promised it would not do so for existing ones.[527]

---

[521] Claimants' Memorial, ¶ 395; Claimants' Reply, ¶¶ 291-292. Claimants cite *Tecmed v. Mexico* (Award); *Enron v. Argentina* (Award), ¶¶ 264-266; *LG&E v. Argentina* (Decision on Liability), ¶¶ 130 and 133.

[522] Claimants' Reply, ¶ 52.

[523] Claimants' Reply, ¶¶ 187-188.

[524] Claimants' Reply, ¶ 189.

[525] Claimants' Reply, ¶ 53.

[526] Claimants' Reply, ¶¶ 251-253.

[527] Claimants' Reply, ¶¶ 254-256.

390. Spain further contends that the principle of reasonable return (i) imposes a balance between the costs of the incentives and the return generated; (ii) has a dynamic character; (iii) represents a guarantee for the investor; (iv) has a referenced character; and (v) imposes on the regulator an obligation of result. However, these allegations do not support Spain's case, as follows. [528]

391. First, the existence of a balance between costs and returns implies that (i) the Government has unfettered discretion to change the FIT whenever it considers that returns are unreasonable; (ii) returns can change over time; and (iii) the investor should take the blame for the Government not dealing with the Tariff Deficit. All of this is inconsistent with Spain's stability commitments and with the nature of RE projects.[529]

392. Second, Spain argues that the dynamic character of the principle of reasonable return entails that the Original Regime would be adjusted as investment costs are reduced. The Claimants recognize that costs have come down and therefore subsidies may legitimately be scaled back, but only for new facilities, since investments already made do not benefit from the decrease in costs. This is the approach the Claimants legitimately expected Spain to adopt, which makes economic sense and is consistent with the spirit of creating a "level playing field" for investments made in the energy sector, as referred to in the ECT. Spain argues that the Claimants ought to have known that the Special Regime was flexible, but the preamble to Law 24/2013 asserts that such law was introduced precisely because the remuneration system set forth in Law 54/1997 lacked the flexibility desired by Spain.[530]

393. Third, Spain argues that the principle of reasonable return operates as a guarantee for the investor, reducing the risk faced by him. However, Spain ignores the significant risks incurred by investors like Antin, which the Original Regime (not the principle of reasonable return) reduced to a minimum.[531]

394. Fourth, Spain suggests that, under Law 54/1997, the reasonable return is necessarily referenced to the cost of money in the capital market. However, the cost of money is only one of the numerous factors to be taken into account in defining the remuneration of qualifying facilities.[532]

395. And fifth, Spain argues that the principle of reasonable return must be taken into account when putting in place a level of remuneration, therefore imposing an obligation of result. However, Spain turns this into an unfettered discretion to introduce retrospective changes

---

[528] Claimants' Reply, ¶ 194.
[529] Claimants' Reply, ¶¶ 195-196.
[530] Claimants' Reply, ¶¶ 197-203.
[531] Claimants' Reply, ¶¶ 204-205.
[532] Claimants' Reply, ¶ 206.

without regard to the fact that expected returns are determined at the time the investments are made.[533]

396.   Additionally, Supreme Court decisions on the principle of reasonable return relied on by Spain to support its position, cannot reasonably have been understood to override the close and unambiguous statements made by Spain concerning the real meaning of RD 661/2007 and RD 1614/2010, since they either do not concern the Original Regime, refer to a different sector or were rendered after Claimants' investments were made.[534] In any event, whether the Disputed Measures are legal as a matter of Spanish law is irrelevant, since domestic law is not a valid defence to international law claims.[535]

397.   Spain relies on three categories of Supreme Court judgements: judgements issued prior to the introduction of RD 661/2007, judgements issued on December 2009, and judgements issued on 2012.[536] *Firstly*, the judgements issued prior to the introduction of RD 661/2007 do not address the Original Regime at all and could not have been understood to derogate from the numerous express assurances given by Spain concerning the continued application of the Original Regime. Spain decided to make those stabilization commitments notwithstanding such previous judgements, intending to protect investors from the governmental regulatory discretion described in those judgements. In any event, those judgements did not address the issue of whether a complete withdrawal of a regulatory regime, such as the one resulting from RDL 9/2013, is in conformity with Spanish law.[537]

398.   *Secondly*, the judgements issued on December 2009 pre-date RD 1614/2010, through which the Government introduced express and binding stabilization commitments notwithstanding previous Supreme Court decisions regarding the Government's discretion. Moreover, at the same time when those judgements were issued, Spain made a statement explicitly ensuring that future revisions of the RD 661/2007 tariffs would not affect existing installations.[538] Spain's position is based on the premise that the judgements issued on December 2009 are relevant because they dealt with detrimental changes introduced by RD 661/2007 to the RD 436/2004 regime. However, RD 661/2007 actually improved the conditions for CSP technology and most RE technologies, only marginally affecting the wind sector, which in any event benefitted from appropriate transitory provisions that contrast with the immediate effects of the Disputed Measures.[539] These were the changes

---

[533]  Claimants' Reply, ¶ 207.
[534]  Claimants' Reply, ¶¶ 208-209.
[535]  Claimants' Reply, ¶¶ 212-213.
[536]  Claimants' Reply, ¶ 215.
[537]  Claimants' Reply, ¶¶ 216-222.
[538]  Claimants' Reply, ¶¶ 224-228.
[539]  Claimants' Reply, ¶¶ 223-236.

accepted by the Supreme Court, which are fundamentally different from the immediate and complete withdrawal of the RD 661/2007 economic regime carried out through RDL 9/2013.[540]

399.   *Thirdly*, the judgements issued in 2012 are completely irrelevant to the CSP sector, since none of them dealt with the stabilization commitments of Article 4 of RD 1614/2010. Additionally, the outcome of these judgements is irrelevant for assessing the Claimants' expectations, since they were rendered after the investments were made.[541]

400.   Spain further alleges that the Claimants were aware that a reasonable return was provided only regarding funds used for the construction of facilities, and not for funds used for the acquisition of existing assets.[542] However, there is no indication in RD 661/2007 or RD 1614/2010 that the FIT would be limited in such way, and this distinction between investors does not make sense from a regulatory and economic point of view and is contrary to the position of the EC on the matter.[543]

401.   In the alternative, even if all the Claimants could reasonably expect was a "reasonable return", such return should not be lower than what Spain promised under the Original Regime. As expressly recognized by the CNE, the rate of return Spain considered at the time it approved RD 661/2007 was only indicative, and producers could obtain higher returns.[544]

402.   Further, Spain's argument that royal decrees are subject to change while laws are stable is irrelevant and false. The key issue is whether the subject-matter of the regulatory changes can be applied retroactively to pre-existing situations, when those changes are in breach of Spain's international obligations. The replacement of the Original Regime for the New Regime could perfectly have been done by royal decree, and there was no need for the Government to resort to a royal decree-law, such as RDL 9/2013.[545]

   (iii)   Spain's measures frustrated Antin's reasonable and legitimate expectations

403.   Spain's measures frustrated Antin's reasonable and legitimate expectations dismantling the existing legal and business framework after its policy goals regarding investment in CSP facilities had been met.

---

[540]  Claimants' Reply, ¶¶ 237-238.
[541]  Claimants' Reply, ¶¶ 239-240.
[542]  Claimants' Reply, ¶ 242.
[543]  Claimants' Reply, ¶¶ 246-249.
[544]  Claimants' Reply, ¶¶ 258-259.
[545]  Claimants' Reply, ¶¶ 260-263.

404.  *First*, the withdrawal under Law 15/2012 of the FIT for electricity production using natural gas frustrated Antin's expectations that the Andasol Companies would be entitled to payment under the FIT for all the electricity produced. Moreover, through Ministerial Order IET/1882/2014, the Government capped the use of natural gas only for essential technical purposes, thus obliging CSP plants that used more natural gas than implied by the formula under said Ministerial Order to reimburse the associated financial incentives received between January and July 2013.[546]

405.  Contrary to Spain's allegations, the fact that the cost of purchasing gas and the investment costs incurred in building installations capable of operating using natural gas are taken into account in the costs of a standard installation under the New Regime is not equivalent to saying that electricity produced using a limited percentage of gas will be subject to the FIT. Had the Claimants known that Spain was going to withdraw the economic incentives for electricity produced using natural gas, they would likely have not invested in the Andasol Plants at the same price.[547]

406.  *Second*, the introduction of the TVPEE constitutes a disguised and unjustified cut of the FIT, frustrating Antin's expectations on the level of FIT the Andasol Companies would be entitled to.[548] Spain argues that the impact of the TVPEE has been neutralized since this levy is one of the costs covered by the Special Payment under the New Regime. However, even if the TVPEE is subsumed within the overall damage caused by the New Regime, the Claimants have still suffered damages as a result of this measure.[549]

407.  *Third*, the elimination of the Premium through RDL 2/2013 frustrates Antin's expectations to choose between selling at a fixed tariff or at the market prices plus Premium. Spain's decision to eliminate the Premium was abrupt and unprecedented, which contrasts with the transitory adjustments introduced by RD 661/2007 to the Premium applicable to existing wind parks under RD 436/2004.[550]

408.  *Fourth*, the replacement of the CPI-linked updating mechanism for the FIT by a lower index, adopted by RDL 2/2013, frustrates Antin's expectations that the FIT would be updated to reflect variations of CPI.[551] Contrary to Spain's allegations, there is no evidence that the Claimants are better-off under the new formula, under which the FIT would now be updated in accordance with a CPI at constant tax rates, excluding unprocessed foods and energy products, than under the CPI Formula. Moreover, the new formula only applies

---

[546]  Claimants' Memorial, ¶ 414; Claimants' Reply, ¶¶ 310-312.
[547]  Claimants' Reply, ¶¶ 315-317.
[548]  Claimants' Memorial, ¶ 414.
[549]  Claimants' Reply, ¶ 307.
[550]  Claimants' Memorial, ¶ 414; Claimants' Reply, ¶¶ 319-323.
[551]  Claimants' Memorial, ¶ 414.

to remuneration of the Andasol Plants between January and July 2013, not under the New Regime, and therefore it is irrelevant that the adjusted CPI happened to be higher than the general CPI for some months in 2014 and 2015. It is also irrelevant whether the new formula is in line with price index calculation standards, since Spain's legislative commitment was to adjust the FIT in accordance with CPI. Depriving the Claimants from a remuneration updated in accordance with the CPI Formula makes their investments subject to greater instability and unpredictability, since they now have to bear the inflation risk.[552]

409. And *fifth*, by eliminating the RD 661/2007 economic regime entirely through RDL 9/2013 and introducing a substantially less favourable regime without FIT, Spain violated the basic foundations upon which Antin made its investments, namely stable and predictable revenue streams at levels that sufficed for servicing the debt acquired, providing a return on their investments and justifying the significant risks they incurred.[553]

410. In the New Regime, the concept of reasonable return has also been changed and the framework provided under Article 30(4) of Law 54/1997 has been withdrawn. In fact, (i) the Special Payment under the New Regime is exceptional in nature, in contrast with the FIT under the Original Regime; (ii) Spain has used hindsight to set the Special Payment, set by reference to the investment costs of a standard installation, thus comparatively penalizing efficient investors; (iii) Article 30(4), as amended by RDL 9/2013, introduced a cap on the return of a standard facility based on what the Government considers "reasonable" for the regulatory life of the plant, thus taking into account the returns obtained by the facility during the time the Original Regime was in place and clawing back what investors earned then; (iv) the Special Payment is calculated based on *ex post* determinations of what investment and operation costs should have been; and (v) under RDL 9/2013, contrary to the Original Regime, the Government can revise every six years the reasonable rate of return that a plant is entitled to receive.[554] The New Regime has been so controversial that Spain currently faces several domestic and international challenges against it, including 27 arbitrations under the ECT.[555]

411. In this sense, the tribunal in *Micula v. Romania* confirmed that the termination of an FIT regime may result in a breach of the FET standard,[556] and such is the case at hand. Spain eviscerated all the key characteristics of the RD 661/2007 regime after having made

---

[552] Claimants' Reply, ¶¶ 326-330.
[553] Claimants' Memorial, ¶ 414; Claimants' Reply, ¶¶ 331-333, 340.
[554] Claimants' Reply, ¶ 338.
[555] Claimants' Reply, ¶ 334.
[556] *Micula v. Romania* (Award), ¶ 687.

specific compromises to the Claimants, thereby frustrating their legitimate expectations and breaching its obligation to provide FET.[557]

412. Furthermore, even on Spain's case, the New Regime does not provide a reasonable return. Spain claims that the New Regime offers a mean annual benefit of 7.398% on the investment taken. However, there is no indication as to whether this rate of return will continue to apply in the future, and the concept of reasonable return is in itself subject to change under the New Regime.[558] Moreover, this is a pre-tax return, which is equivalent to an after-tax return of only 5.2%, significantly lower than the return to which producers were entitled under the Original Regime and only marginally above return on Government bonds.[559] Spain considers that efficient investors will achieve higher returns; however, the costs considered for such standard calculation are determined by reference to data compiled from 2011, thus being significantly lower than those originally faced by the Andasol Companies and hence unfavourable for investors such as the Claimants, who invested in plants with higher investment and operating costs in return for a higher production capacity.[560]

413. Finally, contrary to Spain's allegations, retroactivity for the purposes of this arbitration means that changes in regulations affect installations already in operation, which is clearly the case for the Disputed Measures. This was the position evidenced in Spain's statements prior to the adoption of said measures.[561] Further, the Disputed Measures are also retroactive insofar as they claw back monies already paid by offsetting those revenues against future revenues.[562]

      *b.    Spain has failed to provide a stable and predictable regulatory regime*

414. Spain's obligation to provide a stable legal environment is an essential element of FET, particularly in the ECT context. However, stability cannot exist in a situation of continuous and endless change of the legal regime regulating an investment, and therefore such a situation will entail a breach of the FET standard.[563] In the case at hand, Spain, after having expressly committed to maintain the full RD 661/2007 regime in place in order to attract investors like Antin, wrongfully subjected the Claimants to constant and drastic changes

---

[557] Claimants' Memorial, ¶¶ 415-416.
[558] Claimants' Reply, ¶¶ 341, 348, 351.
[559] Claimants' Reply, ¶¶ 342-343.
[560] Claimants' Reply, ¶¶ 344-350.
[561] Claimants' Reply, ¶¶ 300-303.
[562] Claimants' Reply, ¶ 304.
[563] Claimants' Memorial, ¶¶ 417-418.

in the applicable legal and regulatory framework. As stated by the Commission,[564] such changes alter the legitimate expectations of business and discourage investment, which cannot be considered conducive to the provision of a stable, transparent legal framework for foreign investments, as sought by the ECT.[565] Spain is permitted to change its regime under the ECT, but those changes must be predictable and in line with the investors' expectations.[566]

415.   In line with the above, the stabilization guarantees under Article 44(3) of RD 661/2007 and Article 4 of RD 1614/2010 have to be assessed in the light of Spain's stability obligations under the ECT.[567] Any changes made to the applicable regulation must be consistent with such guarantees, as well as with the specific promises and representations made by Spain that it would not change the Original Regime to the Claimants' detriment. Even on Spain's own case, Spain has not respected the stability and predictability of the legal framework by respecting the principle of reasonable return. Moreover, the ongoing uncertainty means that the full scale of the negative impact of Spain's measures on the Claimants' investments is not yet apparent.[568]

### c.    Spain's conduct was not transparent

416.   The FET standard requires States' conduct towards investors and the applicable legal environment to be transparent, *i.e.* free from ambiguity and uncertainty.[569] In the case at hand, Spain dismantled the RD 661/2007 regime in a manner that was not transparent.

417.   *First*, RDL 9/2013 was followed by a transitory regime lasting more than 11 months, during which the Government gave no indication regarding the precise remuneration that any qualifying facilities, including the Andasol Plants, would be entitled to. This constituted a major departure from the stability and predictability provided by the previous regime. Although RDL 9/2013 provided that during this transitory period the Original Regime would continue to apply, the New Regime takes into account payments received

---

[564]   **Exhibit C-0220,** European Commission's report to the European Parliament, the Council, the European Economic and Social Committee and the Committee of the Regions, Renewable energy progress report, COM (2013) 175 final, 27 March 2013, p. 9

[565]   Claimants' Memorial, ¶¶ 419-420; Claimants' Reply, ¶¶ 353-354.

[566]   Claimants' Reply, ¶ 356.

[567]   Claimants' Memorial, ¶ 421.

[568]   Claimants' Memorial, ¶¶ 421-422; Claimants' Reply, ¶¶ 359-365.

[569]   Claimants' Memorial, ¶¶ 423-425. Claimants cite *Tecmed v. Mexico* (Award*)*, ¶ 154; *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶ 7.79; *Plama v. Bulgaria* (Award), ¶ 178.

during this period and deducts them from future amounts due under the New Regime, which produces greater uncertainty.[570] This uncertainty was even criticized by the EC.[571]

418. *Second*, neither RD 413/2014 nor Ministerial Order IET/1045/2014 provided any transparent analysis explaining the underlying criteria behind the Special Payment or whether there will be any future updates. Particularly, the Government, despite being requested to do so, refused to disclose the reports prepared by Roland Berger and Boston Consulting Group for preparing the standard assumptions applicable to the New Regime, making clear that it had relied on its own calculations and analysis. Further, it appears that both companies were retained to give recommendations that were compliant with the thesis of the Government.[572]

419. *Third*, the fact that the Special Payment is calculated by reference to a standard facility which parameters may be discretionally altered by the Government, every three or six years, creates further uncertainties.[573]

420. *Fourth*, this is aggravated by the fact that the Government also retains the right to review the Special Payment in order to make sure that the prevailing yield on ten-year Spanish bonds plus a spread continues to apply, but has not established any methodology for such adjustments.[574]

421. *Finally*, the New Regime does not provide any clear indication as to the timeframe during which the remuneration for installed capacity (one of the two elements of the Special Regime, together with a remuneration per MWh of electricity produced) will apply.[575]

422. Spain contends that a public consultation opened in February 2012 regarding the measures that would affect existing facilities, but this was unsatisfactory for investors like Antin which, given the size of their investment, should have had the opportunity to provide its views directly to the officials in charge of implementing the regulatory changes.[576] Moreover, as acknowledged by the CNE, due to the urgency with which the consultation was made, the effective participation of the different players involved could not be guaranteed, and the CNE reports issued in February and March 2012 referred to by Spain

---

[570] Claimants' Reply, ¶¶ 370-373.

[571] Claimants' Reply, ¶ 374. Claimants cite **Exhibit C-0242**, European Commission, "Macroeconomic imbalances: Country Report – Spain 2015", European Economy Occasional Papers 216, June 2015, p. 63.

[572] Claimants' Reply, ¶¶ 376-380.

[573] Claimants' Memorial, ¶ 426.

[574] Claimants' Memorial, ¶ 426.

[575] Claimants' Memorial, ¶ 426.

[576] Claimants' Reply, ¶ 367.

did not provide any visibility as to the scope of the changes that would be adopted and did not satisfy any transparency requirements.[577]

### d.   Spain's measures were unreasonable

423.   For a State's conduct to be reasonable it must be related to a rational policy, and the State's acts of implementation of that policy must have been appropriately tailored to pursue such policy with due regard for the consequences imposed on investors.[578] Spain does not satisfy this test. Its justifications for the Disputed Measures were (i) the overcapacity of RE infrastructure; (ii) the Tariff Deficit; (iii) ensuring consumer protection; (iv) dealing with the economic crisis; and (v) complying with EU State aid rules. However, these are either problems resulting from Spain's own regulatory decisions, and the burden of fixing them cannot be attributed to foreign investors in violation of their legitimate expectations, or issues that do not justify dismantling the Original Regime.[579]

424.   Regarding the first alleged justification, such overcapacity is the consequence of Spain's own failure to locate sole central control over access to the economic benefits of RD 661/2007. This control was instead granted to the Autonomous Communities which, in a context of crisis, were willing to accept all qualifying applications. Spain acknowledged this regulatory misjudgement when enacting RDL 6/2009.[580]

425.   Concerning the second alleged justification, which appears to be the primary purpose of the Disputed Measures, addressing the Tariff Deficit is not a valid excuse for implementing such measures. *First*, the measures are not reasonably correlated to a rational policy goal. The Tariff Deficit existed long before the development of CSP in Spain due to the failure by Spain to raise regulated tariffs (network access tolls) to the level necessary to cover the costs of the system, despite being obliged to do so by its own laws, particularly Law 54/1997, RDL 6/2009 and Supreme Court decisions.[581]

426.   Spain's own documents acknowledge that, as of 2011, the tolls had remained unchanged and would continue to be at those levels notwithstanding the costs of the regulated activities. The CNE warned the Government that the insufficiency of fees was endangering the economic financial sustainability of the electrical system.[582] When Antin specifically inquired with the government and the CNE about the Tariff Deficit, concerned that this

---

[577] Claimants' Reply, ¶¶ 368, 383.
[578] Claimants' Memorial, ¶ 428. Claimants cite *Micula v. Romania* (Award), ¶ 525.
[579] Claimants' Memorial, ¶ 429; Claimants' Reply, ¶ 434.
[580] Claimants' Memorial, ¶¶ 430-432.
[581] Claimants' Memorial, ¶¶ 432-434; Claimants' Reply, ¶¶ 435-436.
[582] Claimants' Reply, ¶ 401.

could entail retroactive changes to the economic regime applicable to CSP plants, it was expressly told that the issue was not a problem.[583]

427. Moreover, Spain subsequently reduced the charges, one of the elements of the regulated system revenues, in breach of Law 24/2013 and contributing to broadening the Tariff Deficit.[584] The contribution of CSP to the Tariff Deficit is very limited, and there were other available measures that were less harmful for the Claimants' investments, such as introducing a tax on $CO_2$ emissions or raising electricity tariffs.[585]

428. *Second*, a unilateral withdrawal by the State of the undertakings and assurances given in good faith to the Claimants as an inducement for them to make an investment, including an entire repeal of the RD 661/2007 regime, is by definition unreasonable and a breach of the ECT.

429. *Third*, since the root cause for the Tariff Deficit was not the RD 661/2007 regime but Spain's failure to set regulated tariffs (network access tolls) at a level necessary for covering the costs, the removal of said regime is not a reasonable response to addressing the Tariff Deficit. In any event, since the contribution of CSP to the Tariff Deficit is very limited, the measures cannot be said to be reasonably correlated to addressing Spain's stated policy goal, or to have been enacted with due regard for the consequences imposed on foreign investors such as the Claimants.[586]

430. Concerning the third alleged justification, Spain contends that it changed the regulatory regime applicable to CSP projects to protect consumers' interests by avoiding further rises in the cost of electricity and reducing the excessive burden they had to bear as a result of the incentives granted by the Original Regime. To this regard, Spain argues that the Claimants were receiving excessive or windfall profits. However, the Claimants were not enjoying any profits beyond the reasonable rewards provided by the Original Regime.[587] Moreover, the stated object and purpose of the Disputed Measures was not to protect consumers but to address the Tariff Deficit, for which purpose a modest increase in the network access tolls would have sufficed.[588]

431. Spain's claim is further not credible since it has imposed a high burden on consumers through taxation on the consumption of electricity which is used to increase the funds of

---

[583] Claimants' Reply, ¶ 402.
[584] Claimants' Reply, ¶ 404.
[585] Claimants' Memorial, ¶¶ 432-434; Claimants' Reply, ¶¶ 385-399, 406.
[586] Claimants' Memorial, ¶ 435-437; Claimants' Reply, ¶ 437.
[587] Claimants' Reply, ¶¶ 411-412.
[588] Claimants' Reply, ¶ 413.

the Spanish State.[589] In any event, Spain's desire to protect consumers by preventing a remuneration higher than the reasonable is not a valid justification under the ECT or international law. Spain intended to maintain artificially-low electricity costs by reneging on its commitments to RE investors, for political purposes.[590]

432. Concerning the fourth alleged justification, Spain alleges that the disputed measures were justified due to the economic crisis scenario, without raising a state of necessity defence. However, Spain does not substantiate this claim nor explains precisely how any unspecified economic difficulties justify the disputed measures. Spain is unreasonably arguing that the Original Regime would only apply in times of economic prosperity, which is not indicated anywhere in the legislation and is not what the Claimants relied upon.[591]

433. Finally, concerning the fifth alleged justification, the disputed measures were neither adopted as a response to EU law nor required by it. First, EU law did not require Spain to withdraw the RD 661/2007 regime, particularly with respect to facilities that were already operating under that regime, since it is an established principle of European State aid law that beneficiaries of an existing support scheme should be allowed to continue to rely upon a stable legal framework.[592] Second, there is no indication whatsoever that the New Regime was being put in place for this purpose.[593] And third, Spain's failure to notify the Original Regime to the EC, as it did with the New Regime, suggests that it believed such regime to be in compliance with EU State aid rules. This is further supported by the fact that the European Commission never saw fit to investigate or even criticize the Original Regime for State aid, while criticizing Spain for the introduction of the Disputed Measures.[594]

*e.    Spain's measures were disproportionate*

434. For a measure to be proportionate there must be a reasonable relationship between the burden imposed on the foreign investor and the aim sought by the measure. This test is not satisfied in the present case.[595]

435. First, since the contribution of CSP to the Tariff Deficit is limited, eliminating the RD 661/2007 economic regime is not a suitable or proportionate solution to the problem. Given the harmful effect of the measures on Antin's investments, Spain's actions are entirely disproportionate.[596] Second, a State's measure is not proportionate unless it is

---

[589] Claimants' Reply, ¶¶ 415-418.
[590] Claimants' Reply, ¶¶ 420-422.
[591] Claimants' Reply, ¶¶ 407-410.
[592] Claimants' Reply, ¶¶ 423-427.
[593] Claimants' Reply, ¶ 428.
[594] Claimants' Reply, ¶¶ 429-432.
[595] Claimants' Memorial, ¶ 438.
[596] Claimants' Memorial, ¶¶ 439-440.

necessary to achieve the goals pursued, as upheld by the tribunal in *AWG v. Argentina*.[597] Spain's own organs recognized there were many other alternatives available that were less harmful to investors. Therefore, Spain's measures are not proportionate and breach the FET standard.[598]

436. Spain alleges that the disputed measures are reasonable and proportionate since they (i) guarantee a reasonable rate of return, and (ii) guarantee reimbursement for all the operational costs and that no losses are incurred. However, the Disputed Measures do not guarantee a reasonable rate of return, as explained above and, due to the high risks incurred by the Claimants under the expectation that they would obtain reward, it is not enough for them to simply recover operational costs.[599]

2. *Impairment of the Claimants' investments as a result of unreasonable measures*

437. Article 10(1) of the ECT prohibits Spain from impairing investments by unreasonable or discriminatory measures. As with FET, the standard of reasonableness requires Spain to show that its measures were taken in pursuance of a rational policy goal and were carefully tailored to achieve that goal. As explained above, the Disputed Measures do not fulfil these conditions. Moreover, they have caused damages to the Claimants' investments in the amount of EUR 148 million. Therefore, in addition to a violation of the FET standard under the ECT, Spain's actions violate the obligation under Article 10(1) of the ECT to refrain from impairing Antin's investments through unreasonable measures.[600]

3. *Violation of the umbrella clause*

438. Article 10(1) of the ECT establishes an umbrella clause by providing that "each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party." The obligations encompassed under this broad provision may include contractual obligations, unilateral obligations, legislation and government acts, and any host State laws or regulations relating to the investor's investment, as provided in the decisions of several previous tribunals.[601] Even the legal authorities cited by Spain either confirm that umbrella clauses are not limited to

---

[597] Claimants cite *AWG v. Argentina* (Decision on Liability), ¶ 235.
[598] Claimants' Memorial, ¶¶ 441-444; Claimants' Reply, ¶¶ 438-439.
[599] Claimants' Reply, ¶ 440.
[600] Claimants' Memorial, ¶¶ 445-448; Claimants' Reply, ¶ 442.
[601] Claimants' Memorial, ¶¶ 449-456; Claimants' Reply, ¶¶ 443-444. Claimants cite *LG&E v. Argentina* (Decision on Liability), ¶¶ 165, 169, 175; *Enron v. Argentina* (Award), ¶¶ 274-277; *Sempra v. Argentina* (Award), ¶¶ 312-314.

contractual obligations or refer to different discussions, such as the distinction between contract claims and treaty claims, which is not relevant in the case at hand.[602]

439. Spain expressly recognized the application of the FIT to the Andasol Companies for all the electricity produced by the Andasol Plants and for the entire operational lifetime of the installations pursuant to RD 661/2007 (particularly Article 44(3)) and RD 1614/2010 (particularly Article 4), and further confirmed its regulatory undertakings in direct discussions with Antin. These clear and specific commitments are binding obligations on Spain towards the Claimants, which Spain must honour. However, Spain breached said obligations by introducing legislation departing from those commitments, and thus breached the umbrella clause in Article 10(1) of the ECT.[603]

## B. RESPONDENT'S POSITION

### 1. *Spain has respected the standard of FET of Article 10(1) of the ECT*

440. The Claimants' legitimate expectations under the ECT do not include the freezing or impossibility to modify the RD 661/2007 regime. There is no stabilization clause in this sense in Spanish law, and specifically in Article 44(3) of RD 661/2007.[604] As stated by the tribunal in *Charanne v. Spain*,[605] this provision contains no specific commitment to stability, and the registration of the Andasol Plants in the RAIPRE cannot create any expectations towards the stability of the Original Regime.[606] Article 4 of RD 1614/2010 does not confirm the immutability of RD 661/2007, since its literal wording demonstrates that it simply extends the provisions of Article 44(3) of RD 661/2007 to plants not covered by the latter.[607] Further, RD 1614/2010 itself entailed a reduction of profitability of CSP plants in order to ensure the economic sustainability of the SES and the principle of reasonable return, and Spain adopted measures resulting in a reduction in the profitability of CSP facilities after the entry into force of RD 1614/2010 but before Claimants' investments.[608]

441. The SES only guarantees the right to obtain a "reasonable rate of return" to certain electricity generation plants, and the Claimants themselves admitted from the beginning

---

[602] Claimants' Reply, ¶¶ 445-447, 450-452.

[603] Claimants' Memorial, ¶¶ 457-462; Claimants' Reply, ¶¶ 449, 453-454.

[604] Respondent's Rejoinder, ¶ 786.

[605] Respondent cites *Charanne v. Spain* (Final Award), ¶¶ 503, 510, 511.

[606] Respondent's Rejoinder, ¶¶ 789-793. Respondent cites *Plama v. Bulgaria* (Award), ¶ 219; *AES Summit v. Hungary* (Award), ¶ 9.3.34.

[607] Respondent's Rejoinder, ¶¶ 542-544.

[608] Respondent's Rejoinder, ¶¶ 545-549.

the possibility that the RD 661/2007 economic regime could be modified.[609] Spanish legislation has always maintained a clear support to Special Regime energy production, but what must be analysed under the FET standard is whether the "right to a reasonable return" principle has been respected, as it in fact has.[610] For this purpose, RD 661/2007 and RD 1614/2010 cannot be analysed, as Claimants intend, as an independent regulatory framework, but must rather be interpreted in the context of the entire regulatory framework of the SES, particularly the principle of economic sustainability, and in the light of Supreme Court precedent, which complements such framework.[611]

442. Moreover, under Spanish law, the principle of hierarchy of rules provides that regulations issued in development of a law cannot contradict the provisions of such law. Such is the case with the SES: RD 661/2007 and RD 1614/2010 cannot contradict or nullify the provisions of Law 54/1997, and therefore the provisions of this law must be taken into account when interpreting such two decrees.[612] Particularly, RD 661/2007 and RD 1614/2010 cannot be understood to be contrary to (i) the obligation to set out reasonable rates of return with reference to the cost of money on the capital market, and (ii) the principle of sustainability of the SES, set out in Law 54/1997.[613]

### a. Object and purpose of the ECT

443. Article 10(1) of the ECT obliges States to grant investors only the minimum standard of protection guaranteed by international law. The maximum aspiration a foreign investor can thus have under the ECT is to receive national treatment, in case that treatment is more favourable than said minimum standard of protection. This is so because the main objective of the ECT is to achieve non-discrimination.[614] However, there is no obligation under the ECT for States to grant national treatment to foreign investors regarding programs that provide grants or other financial assistance.[615]

444. The fact that the ECT limits regulatory risks does not entail that the State's regulatory powers regarding macroeconomic control are blocked.[616] Moreover, contrary to the Claimants' position, the ECT does not establish that the way to achieve its objectives is requiring Contracting Parties to maintain a stable, predictable and transparent legal and regulatory framework for investments. It is not true that the latitude of regulatory action

---

[609] Respondent's Counter-Memorial, ¶¶ 642-650.
[610] Respondent's Counter-Memorial, ¶¶ 651-653.
[611] Respondent's Rejoinder, ¶¶ 261-266, 312.
[612] Respondent's Rejoinder, ¶¶ 282-288.
[613] Respondent's Rejoinder, ¶ 292.
[614] Respondent's Rejoinder, ¶¶ 742-745.
[615] Respondent's Rejoinder, ¶¶ 747-749.
[616] Respondent's Rejoinder, ¶¶ 729-730.

accorded to the States under the ECT is extremely limited, and the ECT does not prevent the adoption by States of macroeconomic control measures, even if this entails loss of profits by investors.[617] The ECT sets no more limits on the regulatory power of States than the minimum standard of international law, and this standard has not been breached by Spain.[618]

> *b.    No legitimate expectation of the Claimants has been violated.*

445.    To establish whether there has been a violation of the FET standard, the expectations the Claimants had at the moment of making their investments regarding the treatment of said investments must be considered. Such expectations must be reasonable and legitimate in light of the existing regulatory framework. In this sense, previous tribunals[619] have stated that, at the moment of undertaking an investment, an investor must know and understand the applicable existing regulatory framework, including the potential risks. In the case at hand, the Claimants had total knowledge of several issues that will be explained below.[620]

446.    Therefore, in order for legitimate expectations under the ECT to exist regarding the immutability of the regulatory framework, (i) specific commitments must have been made to an investor that the regulation in force is going to remain immutable; (ii) the investor's expectations must be reasonable and justified in relation to any changes in the laws of the host country; (iii) a comprehensive analysis of the applicable regulatory framework must have been completed; and (iv) the investor must consider the due diligence exercised and the circumstances surrounding its investment, and structure the investment so as to adapt to potential changes of the legal framework that may be anticipated.[621] For this purpose, contrary to the Claimants' allegations, Spanish law may not be ignored, since it is a fundamental fact in order to determine the creation and scope of the rights invoked by the Claimants and the expectations that may have arisen after making their investment. Supreme Court case-law is highly relevant for this purpose.[622]

447.    In addition to the Spanish regulatory framework, the circumstances surrounding the investment should also be considered to determine whether an investor could or should have reasonably anticipated that the applicable regulatory framework could change.[623]

---

[617] Respondent's Rejoinder, ¶¶ 753-760.

[618] Respondent's Rejoinder, ¶¶ 761-763.

[619] Respondent cites *MTD v. Chile* (Decision on Annulment), ¶ 67; *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶¶ 7.77-7.78.

[620] Respondent's Counter-Memorial, ¶¶ 664-669.

[621] Respondent's Rejoinder, ¶ 772.

[622] Respondent's Rejoinder, ¶¶ 774-778. Respondent cites *Charanne v. Spain* (Final Award), ¶ 504.

[623] Respondent's Rejoinder, ¶ 783.

448.  As will be explained below, Spain has made no promises or specific commitments favouring the Claimants or any investors, and therefore the existing regulatory framework could not create a legitimate expectation for the Claimants on the future immutability of the remuneration system established under RD 661/2007.[624] This position has been adopted by several tribunals which have nuanced and corrected the strict position established by the tribunal in *Tecmed v. Mexico*, recognizing the existence of certain circumstances that require States to justifiably adopt legislative measures.[625]

      (i)    Reasonable return is the cornerstone of the remuneration system for the production of energy from renewable sources

449.  As mentioned above, the applicable regulatory framework is not limited to RD 661/2007 and RD 1614/2010. To the contrary, these regulations are only a part of the broader regulatory framework of the SES, which includes Law 54/1997, all regulations issued under this law and Supreme Court jurisprudence regarding thereto. To this regard, it must be taken into account that the SES is an interconnected legal, economic and technical system for the generation, transmission, distribution and sale of electricity, created to ensure that a power supply will be maintained under conditions that are affordable for consumers and that supply is sustainable in the long term.[626]

450.  The principle of economic sustainability of the SES involves the technical, environmental and financial viability of the SES. Pursuant to Law 54/1997, RE producers, as part of the SES, are also subject to this general principle, and the subsidies granted within the Special Regime are a cost of the SES.[627] Hence, these subsidies required detailed planning, which is developed through renewable energy plans where a reasonable level of profitability is determined based upon a specific scenario of foreseeable electricity demand.

451.  RD 661/2007 was issued based upon the economic scenario set-forth in the 2005-2010 Plan. Therefore, if-as happened in Spain between 2009 and 2013, a major alteration occurred regarding such economic scenario, no investor could have held the expectation that the subsidies established in RD 661/2007, which constituted costs of the SES, would remain petrified.[628] This was expressly recognized by the Supreme Court, which jurisprudence plays an essential role as precedent, complementing the Spanish legal system

---

[624] Respondent's Counter-Memorial, ¶¶ 655-660.

[625] Respondent's Counter-Memorial, ¶¶ 661-663. Respondent cites *MTD v. Chile (Decision on Annulment)*, ¶ 67.

[626] Respondent's Rejoinder, ¶¶ 293-294.

[627] Respondent's Rejoinder, ¶¶ 296-298.

[628] Respondent's Rejoinder, ¶¶ 300-305.

and therefore should be taken into account as a fact by the Tribunal in determining the existence of any legitimate expectations held by investors.[629]

452. Considering the above, pursuant to Law 54/1997 and repeated Supreme Court jurisprudence, the only legitimate expectation the Claimants could have, was to obtain a reasonable return, since this principle is the cornerstone of the remuneration system for RE producers within the general framework of the SES.[630]

453. This principle entails that (i) Special Regime producers have the right to obtain profitability, that is, recover the amounts invested and the operating costs and obtain an industrial profit; (ii) such industrial profit must be reasonable, *i.e.* not disproportionate or irrational; and (iii) reasonableness must be assessed with reference to the cost of money on the capital market.[631] Rather than establishing a specific figure as reasonable return, Law 54/1997 established two limits for Special Regime remuneration: (i) that receiving the market price plus a subsidy allowed producers to obtain a reasonable return, and (ii) that such subsidies were contingent upon the economic sustainability of the SES.[632]

454. Due to its dynamic nature, reasonable return is an end that can be achieved in various ways. Therefore, the Special Regime does not guarantee a determined level of profits or revenues, nor the invariability of the formulas used to set the premiums.[633] The dynamic nature of the principle of reasonable return is imposed by the wording of Article 30(4) of Law 54/1997, which establishes the cost of money on the capital market as the benchmark for determining the reasonability of a determined profit level,[634] and it has been further confirmed by Supreme Court decisions and acknowledged by the tribunal in *Charanne v. Spain*.[635]

455. This is in line with the expectations of Spanish companies, and particularly Iberdrola which, contrary to the Claimants' assertions, understood that the only legitimate expectation of investors in the RE sector was to a reasonable return.[636] Such was also the case with Protermosolar, an association of the Spanish solar thermal industry, which knew and expressly invoked the principle of reasonable return while RD 661/2007 was still in force.[637] Moreover, the reports issued by Pöyry further informed the Claimants that the

---

[629] Respondents' Rejoinder, ¶¶ 306, 312-317.

[630] Respondent's Counter-Memorial, ¶ 357; Respondent's Rejoinder, ¶¶ 322-323.

[631] Respondent's Rejoinder, ¶ 332.

[632] Respondent's Counter-Memorial, ¶ 367; Respondent's Rejoinder, ¶¶ 333-334.

[633] Respondent's Counter-Memorial, ¶¶ 371-373; Respondent's Rejoinder, ¶¶ 337-340, 348-349.

[634] Respondent's Counter Memorial, ¶¶ 376-377; Respondent's Rejoinder, ¶¶ 350-354.

[635] Respondent's Rejoinder, ¶¶ 355-358. Respondent cites *Charanne v. Spain* (Final Award), ¶ 507.

[636] Respondent's Rejoinder, ¶¶ 359-363.

[637] Respondent's Rejoinder, ¶¶ 366-370.

Government could potentially adopt regulatory amendments that could affect them in order to tackle the Tariff Deficit, and the Claimants themselves admitted that the reduction of Special Regime subsidies was one of the measures the Government could adopt in order to tackle the Tariff Deficit. [638]

456. As explained above, the 2005-2010 Plan is essential to understanding the setting of the reasonable return established in RD 661/2007, as required by Law 54/1997 and further confirmed by the fact that RD 661/2007 itself links its content to the 2005-2010 Plan.[639] The 2005-2010 Plan establishes a profitability target by reference to a standardized facility, established for CSP projects at approximately 7%, to which the premiums granted should be subject. This rate is set according to the standard costs of a standardized facility and its operating and maintenance costs, rather than based upon the individual costs of each investor.[640] It is in accordance with this system that the profitability target to which the subsidies deriving from RD 661/2007 aimed was set, therefore guaranteeing, contrary to the Claimants' allegations, a reasonable return on a fixed cost target rather than a particular FIT.[641]

> (ii)    The Claimants knew that the legal principle of "reasonable return" admits changes both in the way of setting support subsidies for renewable energies and in the amounts of such subsidies

457. During their due diligence process, Claimants had been warned and were fully aware of the possibility of future regulatory changes affecting their investments, including the reduction of Special Regime subsidies.[642] The Claimants' Investment Committee itself classified the possibility of a regulatory change in Spain as "medium" during its June 2011 meeting.[643] This assessment, however, was mitigated because of two circumstances: first, the belief that the permanence of ACS as a shareholder in the Andasol Companies would provide regulatory insurance due to its lobby power and, second, a wrong legal evaluation of the Spanish regulatory framework.[644]

458. Regarding the first issue, the Claimants could not have any legitimate expectations that ACS's lobby power could help maintain an unbalanced situation caused by the generous subsidies granted to renewable energy producers in detriment of Spanish consumers, and

---

[638] Respondent's Rejoinder, ¶¶ 377-382.
[639] Respondent's Rejoinder, ¶¶ 383-386.
[640] Respondent's Rejoinder, ¶¶ 393-395.
[641] Respondent's Rejoinder, ¶¶ 397-403.
[642] Respondent's Counter-Memorial, ¶¶ 670-673.
[643] Respondent's Counter-Memorial, ¶¶ 674-675; Respondent's Rejoinder, ¶ 503.
[644] Respondent's Counter-Memorial, ¶ 676.

of the SES in general. In that sense, despite said lobby power, the Government adopted the measures it considered necessary to protect the SES and the Spanish consumers.[645]

459.   Concerning the second issue, the Claimants' legal evaluation of the Spanish regulatory framework came from two sources: the legal report prepared by Herbert Smith and certain ambiguous subjective conclusions obtained by representatives of the Claimants during informal meetings held at the Ministry. No expectations can be derived from these two sources. The Claimants allege that Herbert Smith's memorandum states, regarding Article 4 of RD 1614/2010, that "[t]his is the first time that Spanish legislation on renewable energy has established a provision affording this level of protection." However, such statement is not justified in the memorandum and does not correspond to the truth, since every regulatory norm developing the principle of reasonable return enacted since 2004 has introduced similar provisions.[646]

460.   Moreover, this statement does not correspond with the literal wording or with the purpose of Article 4 of RD 1614/2010, which simply extended the provisions of Article 44(3) of RD 661/2007 to plants not covered by it.[647] This, since RDL 6/2009 provided for a gradual initiation of operation of CSP plants until 2013, and a literal interpretation of Article 44(3) of RD 661/2007 led to the possibility that plants entering into operation after 1 January 2011 could be affected by the revision of the applicable regime to take place in 2010. Therefore, the purpose of Article 4 of RD 1614/2010 was not to give broader protection to plants, but to correct unintended inefficiencies in the application of RDL 6/2009.[648]

461.   Additionally, the Claimants were aware of the jurisprudence of the Supreme Court regarding the scope and content of the principle of reasonable return, which clearly evidences the mistake committed by Herbert Smith's report when asserting "the untouchability of the regulated tariff and the caps and floors."[649] Supreme Court case-law is a key component of the RE regulatory framework and no investor in Spain can expect to have any expectations on an interpretation that disagrees with the one previously established by the Supreme Court in a consolidated manner.[650]

462.   The Claimants further rely on "specific guarantees given by Spanish public workers" to justify their legitimate expectations on the immutability of the RD 661/2007 regime. However, their only source for such expectations is an email with subjective conclusions proposed by an attendant to a meeting with a State attorney of the Ministry, from which no

---

[645]  Respondent's Counter-Memorial, ¶¶ 677-680.

[646]  Respondent's Counter-Memorial, ¶¶ 681-689; Respondent's Rejoinder, ¶¶ 526-528.

[647]  Respondent's Counter-Memorial, ¶ 690.

[648]  Respondent's Counter-Memorial, ¶¶ 691-694.

[649]  Respondent's Counter-Memorial, ¶ 695.

[650]  Respondent's Rejoinder, ¶¶ 314-317. Respondent cites *Charanne v. Spain* (Final Award), ¶¶ 504, 507, and 508.

legitimate expectation can be derived.[651] The email's content is so ambiguous that extracting a conclusion from it would be naïve. Even if the statements of the public worker do correspond to the content of the email, such workers are not formal representatives of the Government and their opinions cannot be considered as guarantees made by the State. In any event, the public worker allegedly explained that the Government can modify the received remuneration as long as such change does not prevent the investor from obtaining a reasonable return on the investment.[652]

463.    A commitment to petrify the legal system in the sense alleged by the Claimants would require a review of the legal principle of reasonable return, which could only be undertaken by means of a law. Since a legitimate expectation cannot be generated by individuals lacking the capacity to comply with their statements,[653] a State attorney cannot create legitimate expectations regarding the Ministry's goals or other regulatory functions corresponding to the Ministry, and specifically regarding the petrification of remuneration under RD 661/2007.[654] Moreover, statements contradicting the legal system of the State receiving the investment cannot be granted any value. Such is the case for statements that directly contradict the principle of reasonable return and the jurisprudence of the Supreme Court.[655]

(iii)    The Claimants knew that the principle of reasonable return requires the maintenance of a necessary balance between remunerations to be received by producers and the sacrifice they imply to consumers

464.    The Claimants were familiar with the functioning and objectives of the SES. Hence, they must have been aware that there must be a balance between the return they can expect, which must be reasonable, and the cost this entails for consumers, as set forth in the preambles of RD 436/2004 and RD 661/2007 and confirmed by the 2005-2010 Plan. Therefore, the Claimants should have foreseen that the Government could not shelter situations of economic imbalance in the system and would therefore maintain continued scrutiny over the applicable economic regime. [656]

465.    The Claimants were aware that the Government had already adopted measures to eliminate the imbalance created by other technologies, such as the PV sector, in order to ensure a reasonable return for the facilities. These measures were backed by the Supreme Court. Despite these warnings, the Claimants designed and undertook a speculative investment

---

[651] Respondent's Counter-Memorial, ¶¶ 696-697. Respondent cites *White Industries v. India* (Final Award), ¶ 10.3.7.

[652] Respondent's Counter-Memorial, ¶¶ 698-701.

[653] Respondent's Counter-Memorial, ¶¶ 703-704; Respondent's Rejoinder, ¶¶ 764-766. Respondent cites *ECE v. Czech Republic* (Award), ¶ 4.771.

[654] Respondent's Counter-Memorial, ¶¶ 705-706.

[655] Respondent's Counter-Memorial, ¶¶ 707-708. Respondent cites *Feldman v. Mexico* (Award), ¶ 149.

[656] Respondent's Counter-Memorial, ¶¶ 709-715; Respondent's Rejoinder, ¶¶ 341-347.

based exclusively on the generosity of the existing subsidies, as revealed by the return predictions set out by the Claimants.[657]

466. Moreover, the Claimants were fully aware of the imbalance created by the subsidies and knew the regulator would act when this situation was discovered, but erroneously assumed they would be protected by the lobby power of certain companies in Spain. Therefore, the Claimants could not expect their purely speculative investment model to be perpetuated by a regulated system based on the principle of reasonable return.[658]

467. In response to the existing imbalance in the solar thermal energy sector, Spain first adopted measures under the existing subvention model and then established a New Regime that solved the problem. The regulatory changes adopted by Spain regarding the Special Regime responded to either situations of over-remuneration that needed to be corrected or to strong alterations of the economic data that served as the basis for the initial determination of the amount of the Premium, in accordance with the 2005-2010 Plan, as explained above.[659] However, all measures respected the only legitimate expectation the Claimants could have: maintaining a reasonable rate of return on their investments.[660]

468. *On the one hand*, two measures were first adopted under the existing subvention model. First, through RDL 2/2013, remunerations, fees and premiums from the electrical sector that were linked to the CPI were subsequently linked to the CPI at constant taxes without considering non-elaborated food or energy products.[661] As acknowledged by the Supreme Court, price indexes used in the regulation of the energy sector do not have to remain inalterable through time, and the use of consumer price indexes subjacent to constant taxes is widely accepted in the global economic doctrine. The methodological change introduced by RDL 2/2013 responds, in general, to the usual consumption price indexes calculation standards in the global economy, and its purpose is to avoid distortions in the consumption price index that are unrelated to the bases of the economy. Moreover, the measure has even been beneficial for plants in certain periods in which the adjusted CPI has surpassed the CPI.[662]

469. The adoption of adjusted CPI was further justified by the distortion caused to CPI as a consequence of the introduction of important tax increases through RDL 20/2012,[663] and

---

[657] Respondent's Counter-Memorial, ¶¶ 716-724; Respondent's Rejoinder, ¶¶ 499-502.
[658] Respondent's Counter-Memorial, ¶¶ 725-726.
[659] Respondent's Rejoinder, ¶ 780.
[660] Respondent's Counter-Memorial, ¶¶ 729-730.
[661] Respondent's Counter-Memorial, ¶¶ 731-734.
[662] Respondent's Counter-Memorial, ¶¶ 735-739.
[663] Respondent's Counter-Memorial, ¶¶ 744-745.

it had been previously proposed by the CNE.[664] Moreover, since only an insignificant part of the products included in the CPI are related with the costs of the electric sector, it makes no sense for the remaining products to determine tariffs in this sector.[665] The adoption of the adjusted CPI instead of the CPI is a predictable measure for any investor in the energy sector in Spain, and it is proportional to the goals it intends to achieve.[666]

470.  Second, by means of RDL 2/2013, the sum of the premium available in the Premium option existing under the RD 661/2007 regime was reduced to a value of EUR 0. The object of this measure was to guarantee a reasonable rate of return for facilities and at the same time avoid an over remuneration that would revert on the rest of the system, taking into account the evolution of the economic scenario under which the Premium option had been introduced. The Premium option had already been criticized by the CNE in its report of 7 March 2012, alleging it should be reduced.[667]

471.  The adoption of this measure did not affect the Claimants' expectations of obtaining a reasonable rate of return for their investment, since all of their financial studies were developed based on the option of the regulated tariff, rather than on the Premium option.[668] Moreover, before RDL 2/2012 was enacted, not all renewable technologies had access to the Premium option, and RD 1614/2010 had temporarily suspended this option for solar thermal technology itself.[669]

472.  *On the other hand*, after the adoption in 2012 of the two partial measures described above, a new remuneration model had to be adopted to comply with European regulations, particularly with the prohibition to grant State aid imposed by the TFEU.[670] Additionally, the new model had to be adapted to comply also with the internal Spanish legal system, and particularly with the principle of reasonable return.[671]

473.  In this sense, under the New Regime the receiving of a reasonable return is based, like in the previous model, in two remunerative elements: the income resulting from participation in the market and, if necessary, an additional subsidy covering the investments and operating costs that an efficient and well-managed company cannot recover in the market.[672]

---

[664] Respondent's Counter-Memorial, ¶ 747; Respondent's Rejoinder, ¶¶ 441-444.
[665] Respondent's Counter-Memorial, ¶¶ 748-751.
[666] Respondent's Counter-Memorial, ¶¶ 752-753.
[667] Respondent's Counter-Memorial, ¶¶ 755-758.
[668] Respondent's Counter-Memorial, ¶ 759.
[669] Respondent's Counter-Memorial, ¶ 760.
[670] Respondent's Rejoinder, ¶¶ 421-427.
[671] Respondent's Counter-Memorial, ¶¶ 761-764.
[672] Respondent's Counter-Memorial, ¶ 765.

474. This reform was based on the criterion that had historically motivated the different regulatory changes in Spain: costs incurred by investors. However, its novelty is the limitation of the costs that will be recoverable through the subsidy, through the concept of an "efficient and well-managed company", to prevent consumers from paying the high costs borne by an inefficient company.[673] Since 83% of the Claimants' income would come from direct contributions from Spanish consumers, it is in accordance with any investor's expectations that efficiency and good management are required from him. With such purpose, the investment and operation costs of an efficient and well-managed company were determined, resulting in the assignment of a reasonable return at a rate of 7,398% on the totality of the project per facility type. The remuneration obtained will therefore depend on the efficiency of the investor.[674]

475. Likewise, the plant's regulatory lifetime is established to avoid the granting of subventions for a period that exceeds the plant's useful life. This measure does not prevent the investor from recovering its investment and obtaining a return of 7.398% or higher during said regulatory lifetime.[675]

476. In conclusion, the New Regime has not affected any expectations, since the provision of a reasonable return based on investment costs continues to be a fundamental element. The fact that the costs and investments on which the New Regime is based are those of an efficient and well-managed company cannot be deemed to harm any expectation.[676]

(iv) The Claimants knew that the "reasonable return" extends exclusively to the investment undertaken in the plants

477. The Claimants knew that a reasonable return was granted exclusively to funds used in the construction of plants, while funds used for the acquisition of existing assets in the form of premiums have never been covered by said principle.[677] Such exclusions arise both from the regulatory framework and from the funding agreement concluded between Andasol-2 Central Termosolar Dos, S.A. and certain credit entities from the year 2006. Therefore, the Claimants were aware that the "reasonable return" guaranteed did not extend to the premiums paid by them to the companies selling the plants, nor to the capital gains that Antin intended to obtain through the operation. [678]

---

[673] Respondent's Counter-Memorial, ¶¶ 766-769.
[674] Respondent's Counter-Memorial, ¶¶ 771-773.
[675] Respondent's Counter-Memorial, ¶¶ 774-776.
[676] Respondent's Counter-Memorial, ¶ 777.
[677] Respondent's Counter-Memorial, ¶ 778; Respondent's Rejoinder, ¶ 408.
[678] Respondent's Counter-Memorial, ¶¶ 779-782.

478.  The decision to build the Andasol Plants was adopted before the entrance into force of RD 661/2007 and their funding was obtained under the validity of RD 436/2004, which allowed for the recovery of the sums invested in the development of the project and of the operation costs of the plants, while also allowing the investor to obtain a reasonable return. However, RD 436/2004 did not allow for the recovery of premiums paid for the acquisition of already existing plants. The Claimants were aware of this, and they nevertheless require in this arbitration the reimbursement of 100% of the funding contribution paid to ACS and its subsidiaries for the acquisition of the assets.[679]

> (v)    The Claimants knew that there could be changes in the application of the subsidized regime to energy production with gas

479.  At the time of undertaking their investment, the Claimants knew that there could be changes in the application of the subsidized regime to energy produced with gas in solar thermal plants, as evidenced by several documents.[680] This assessment stems from a correct understanding of the legal regime applicable at the time. In fact, the use of gas in the production of renewable energy under the Special Regime, a possibility that was introduced by RD 436/2004, has always been limited to those cases meeting two circumstances: that it is necessary to compensate the lack of solar radiation and that the lack of gas usage might affect the foreseen energy delivery. Such limitations exist under the RD 661/2007 regime.[681]

480.  This regulation was introduced at a time when the implementation of solar thermal technology facilities was beginning, and their promotion and development advised promoting the use of this technology in optimum conditions.[682] However, in 2012, in light of the need of a comprehensive reform to the energy sector, the CNE pointed out the problem of incentivizing the production of energy from fossil fuels under the protection of renewable energies, when the ultimate purpose was promoting energy supply security, reducing dependence from fossil fuels and guaranteeing the protection of the environment.[683] This purpose was enshrined in the  preamble of Law 15/2012 and is consistent with EU guidelines on the issue, under which only the electricity produced from RE sources shall be taken into account for calculating the RE implementation targets created by EU law. The Claimants could not have any expectations to the contrary.[684]

---

[679]  Respondent's Counter-Memorial, ¶¶ 783-789.

[680]  Respondent's Counter-Memorial, ¶¶ 790-793; Respondent's Rejoinder, ¶¶ 617-620.

[681]  Respondent's Counter-Memorial, ¶¶ 794-799; Respondent's Rejoinder, ¶¶ 613-614.

[682]  Respondent's Counter-Memorial, ¶ 800.

[683]  Respondent's Counter-Memorial, ¶¶ 802-803.

[684]  Respondent's Counter-Memorial, ¶¶ 804-806; Respondent's Rejoinder, ¶¶ 267, 621-623.

481.  Law 24/2013 also followed this path. However, the lack of any premium remuneration of renewable energies produced with the use of gas does not mean that the use of this fuel in the process of energy generation does not receive any economic compensation.[685] Such use of gas has been considered in the estimation of costs of each facility type under the New Regime, as developed in Ministerial Order IET/1045/2014. Likewise, the larger investment costs incurred by an investor to allow the use of gas in a facility have been considered in establishing the investment cost of the corresponding facility type.[686]

> c.  *Spain has complied with the commitment to establish a stable and predictable regulatory regime*

482.  The Claimants confuse the stability of the economic regime with the unaltered maintenance of the specific tariffs set forth under the RD 661/2007 regime. However, the guarantee of stable conditions under the FET standard does not entail a right to the freezing of States' legislation nor is it equivalent to a stability clause, and regulatory amendments that are reasonable in light of the circumstances or respect the investment's economic balance, guaranteeing a reasonable rate of return, do not result in a violation of this standard. Previous tribunals have supported this position.[687]

483.  Contrary to the Claimants' allegations, the relevant regulatory framework cannot be limited to two specific regulations, and the assessment of the adopted measures must be made in accordance with the entire regulatory framework. This includes Law 54/1997, which stated the principle of reasonable return, and case law interpreting this principle.[688] Therefore, any analysis regarding this issue must consider that, throughout Spanish regulatory history, the cornerstone of the system has been the principle of reasonable return on investments, which must be respected by the specific remuneration regimes established. Since all changes in the Spanish legal system have sought precisely to underpin and apply this same principle, no instability can be alleged. Consequently, the subvention regime to renewable energies has always kept its essence: guaranteeing the investor a reasonable return on investment costs.[689]

484.  Moreover, no retroactive measures have been adopted. For a regulation to be retroactive it must affect acquired rights, and the Claimants never had an acquired right regarding a future fixed and unchanging FIT that was not subject to potential macroeconomic control

---

[685]  Respondent's Counter-Memorial, ¶¶ 807-809.

[686]  Respondent's Counter-Memorial, ¶¶ 810-814.

[687]  Respondent's Counter-Memorial, ¶¶ 813-820; Respondent's Rejoinder, ¶¶ 809-810. Respondent cites *AES Summit v. Hungary* (Award), ¶ 9.3.29; *Mamidoil v. Albania* (Award), ¶¶ 617-618; *EDF v. Romania* (Award), ¶ 217; *Toto Costruzioni v. Lebanon* (Award), ¶¶ 159-160.

[688]  Respondent's Rejoinder, ¶ 815.

[689]  Respondent's Counter-Memorial, ¶¶ 821-826; Respondent's Rejoinder, ¶¶ 816-819.

measures or reforms of the SES.[690] Rather than retroactively affecting rights already acquired, RDL 9/2013 applies only to future events, and hence it cannot be considered a retroactive measure.[691] Both international[692] and Spanish precedent confirm this view.[693]

### d. The conduct of Spain has been transparent

485. The Claimants allege that Spain has not acted in a transparent manner since (i) it dismantled the RD 661/2007 regime in a manner that was not transparent, and (ii) it has not offered any guidelines on many key aspects of the New Regime and has denied access to the reports issued by Roland Berger and Boston Consulting Group regarding remuneration parameters. This is false. The need for a reform to the Spanish electrical sector was announced and publicly explained several years before its implementation, as have been the announcements of a new law for such purpose and the general features of said reform, basically intended to correct and eliminate the Tariff Deficit and its causes.[694]

486. The development of legal regulations has also been transparent. Even if the enactment of RD 413/2014 and Ministerial Order IET/1045/2014 has extended in time due to requirements set forth in Spanish law, this process has been transparent and open to opinions from all interested parties.[695] Drafts were circulated before their enactment, and the Claimants were already familiar with them four months after the publication of RDL 9/2013.[696]

487. Regarding the reports issued by Boston Consulting Group and Roland Berger, the first one was never received given that the corresponding contract was terminated by Spain due to performance failures, and the second one was received by the Government after the enactment of both RD 413/2014 and Ministerial Order IET/1045/2014. Thus, it was not requested before the development of the parameters included in Ministerial Order IET/1045/2014.[697]

488. The Claimants claim that the New Regime is unstable due to the existence of different regulatory periods. However, since these periods are perfectly delimited, they constitute an element of security for the investor, especially given that Law 24/2013 establishes that neither the investment value nor the regulatory useful life of a plant can be modified. Such

---

[690] Respondent's Rejoinder, ¶ 822.

[691] Respondent's Rejoinder, ¶¶ 825-828.

[692] Respondent cites *Nations Energy v. Panama* (Award), ¶¶ 642, 644, 646; *Charanne v. Spain* (Final Award), ¶¶ 546 and 548.

[693] Respondent's Rejoinder, ¶¶ 831-835.

[694] Respondent's Counter-Memorial, ¶¶ 827-830; Respondent's Rejoinder, ¶¶ 839-841.

[695] Respondent's Counter-Memorial, ¶¶ 831-832.

[696] Respondent's Rejoinder, ¶¶ 837-838.

[697] Respondent's Counter-Memorial, ¶¶ 834-835.

periods include updating parameters to maintain a reasonable return for investors and they do not necessarily entail a decrease in the parameters currently set. Contrary to the Claimants' allegations, both Law 24/2013 and RD 413/2014 include specific and concrete measures determining the methodology used for determining the applicable parameters.[698] The remuneration period system guarantees the attainment of a reasonable return for investors, and the standards included therein enable determining when such reasonable return has been obtained.[699]

489. Finally, the Claimants argue that there has been uncertainty regarding the reception of income during the time elapsed before the approval of the applicable regulation, namely RD 413/2014 and Ministerial Order IET 1045/2014. However, the system has never stopped fulfilling its obligations, and RDL 9/2013 clearly established remuneration regulations. Afterwards, the Government has progressively paid the sums corresponding to facilities benefitted by the New Regime, and those who received funds in excess have returned such excess. The Claimants have not proven any damages suffered due to this procedure nor claimed any sums regarding remuneration received for energy produced prior to 14 July 2013.[700]

### e. The measures of Spain have been reasonable

490. Spain has complied with the international standards set forth by the Claimants, since the disputed measures respond to a public policy rationale and are proportionate.[701]

491. *First*, Spain complied with the test set forth in *EDF v. Romania*[702] regarding the arbitrariness or discriminatory nature of its actions, since (i) the measures served a legitimate purpose, since they intended to prevent Spanish consumers from paying unjustified charges corresponding to an investor return higher than the "reasonable" one guaranteed by law; (ii) the reform has fully respected existing legal regulations and the jurisprudence of the Supreme Court, underpinning the principle of reasonable return, and is not discriminatory regarding any investors; (iii) the reasons for the adoption of the reform were clearly exposed by the President since 2011; and (iv) Spain has fully complied with the formally applicable procedures.[703] This test is especially relevant since the main

---

[698] Respondent's Counter-Memorial, ¶¶ 836-840.
[699] Respondent's Counter-Memorial, ¶¶ 841-842.
[700] Respondent's Counter-Memorial, ¶¶ 843-846.
[701] Respondent's Counter-Memorial, ¶¶ 847-850.
[702] *EDF v. Romania* (Award), ¶ 303.
[703] Respondent's Counter-Memorial, ¶¶ 851-857.

objective of the ECT is to ensure the principle of national treatment or non-discrimination.[704]

492. *Second*, Spain complied with the test set forth in *AES SUMMIT v. Hungary*[705] for determining whether a measure is reasonable and in compliance with the FET standard set forth in the ECT. According to this test, for a measure to be reasonable (i) it must respond to a rational policy, *i.e.*, it must have been adopted with the aim of addressing a public interest matter, and (ii) it must be reasonable, which means there must be an appropriate correlation between the State's public policy objective and the measure adopted to achieve it.[706]

493. Regarding the first element, Spain intended to correct the imbalance that existed due to an excessive remuneration of investors which, besides creating an excessive charge for Spanish consumers, was contributing to the generation of Tariff Deficit, in the context of an acute economic crisis that affected the economy as a whole.[707] This is a valid rational public policy according to the criteria established in *AES Summit v. Hungary*.[708] Absent a regulatory reform, the increase in costs for the SES arising from the CSP sector would have been exponential in 2014. This increase was the one the disputed measures intended to prevent, and therefore the Claimants' figures regarding 2012 costs, when the CSP sector had phased its entry into operation, are not relevant.[709] Moreover, the existence of an economic crisis and the difficulty of obtaining international financing also forced Spain to adopt several macroeconomic control measures in different sectors, including energy.[710]

494. In this context, the rational policy was to amend the regulatory framework to protect consumers, rather than raising rates for consumers, which would have led to less energy consumption and further aggravation of the Tariff Deficit. Likewise, raising taxes on fuels as proposed by the Claimants is a measure that has no support and would not be feasible in the circumstances.[711]

495. Regarding the second element, the reform had an impact on all persons integrating the SES, seeking to raise income and reduce SES costs to cope with the Tariff Deficit. From the perspective of producers, the measures are equally proportionate, since they can still obtain

---

[704] Respondent's Rejoinder, ¶¶ 845-846.
[705] *AES Summit v. Hungary* (Award), ¶¶ 10.3.7-10.3.9.
[706] Respondent's Counter-Memorial, ¶ 860.
[707] Respondent's Counter-Memorial, ¶¶ 861-863.
[708] Respondent's Counter-Memorial, ¶¶ 864-866. Respondent cites *AES Summit v. Hungary* (Award), ¶¶ 10.3.31 and 10.3.34; *AES Summit v. Hungary (Decision on Annulment)*, ¶ 78.
[709] Respondent's Rejoinder, ¶¶ 850-851.
[710] Respondent's Rejoinder, ¶¶ 852-853.
[711] Respondent's Rejoinder, ¶¶ 855-858.

a reasonable return of 7.398% on their investment while the existing imbalance is corrected.[712]

496. *Third*, Spain complied with the test established in *Total v. Argentina*[713] regarding respect towards the economic balance of the investment. The tribunal in that case established that, for sectors requiring long-term investments that involve large sums of capital, any modification by the State to the corresponding legal framework must be done in a way that allows the investor to recover its operational costs, amortize its investment and obtain a reasonable rate of return during such period of time.[714] The tribunal in this test ruled on the basis of the minimum standard of protection guaranteed by international law, the same one granted by the ECT, and therefore this case is relevant for the present analysis.[715]

497. The New Regime allows for investors to recover their operation costs, amortize their investments and obtain a reasonable return over time. The costs necessary for the electrical generation activity to be performed in an efficient and well-managed manner, which are listed (in a non-exhaustive manner) in the preamble of Ministerial Order IET/1045/2014, are remunerated; in case revenue from energy sales does not cover operation costs, these are complemented with a compensation to the operation, so that the result of income minus expenses is at least equal to zero every year. This guarantees remuneration to the investment that allows recovering such investment during the regulatory useful lifetime of the plant.[716]

498. Additionally, this system also guarantees a reasonable return of 7.398% on the undertaken investment from the commissioning of the facility and until the end of its regulatory useful lifetime. This return rate is reasonable, determined objectively and not modifiable until six years after the coming into force of RDL 9/2013.[717]

499. Because of the above, the disputed measures do not breach the FET standard established in the ECT.

2. *Inexistence of an umbrella clause*

500. The Claimants misinterpret the content and purpose of the last subparagraph of Article 10(1) of the ECT. This subparagraph refers to obligations that the State has "entered into" with an investor or an investment, which clearly refer to concrete, specific, bilateral

---

[712] Respondent's Counter-Memorial, ¶ 867; Respondent's Rejoinder, ¶¶ 860-861.
[713] *Total v. Argentina* (Decision on Liability), ¶ 122.
[714] Respondent's Counter-Memorial, ¶ 869.
[715] Respondent's Rejoinder, ¶ 864.
[716] Respondent's Counter-Memorial, ¶¶ 871-878; Respondent's Rejoinder, ¶¶ 862-878.
[717] Respondent's Counter-Memorial, ¶¶ 879-890.

obligations assumed by the State regarding an investor through an express, concluding, unequivocal and individualized commitment that cannot normally be thought of except by signing a contract. This leaves outside the scope of said subparagraph cases in which States assume binding obligations through unilateral acts.[718] This interpretation is further confirmed by the Reader's Guide of the ECT,[719] which in explaining the last subparagraph of Article 10(1) of the ECT refers specifically to "contracts".[720]

501. However, the Claimants interpret the words "any obligation" as including within its scope not only contractual obligations, but also legislative or regulatory commitments. Thus, the Claimants intend to include the *erga omnes* provisions of a Royal Decree as specific commitments adopted towards them.[721] This interpretation ignores the essence of the umbrella clause itself and would mean that States would renounce to their legislative powers, which was not the intention of the ECT signatory States.[722]

502. In all the *LG&E v. Argentina*, *Enron v. Argentina* and *Sempra v. Argentina* cases quoted by the Claimants there was a previous contractual link between the claimants and the State, and therefore the State's obligations arose from such contracts rather than from the law. Regulatory changes were only analysed in those cases to determine the extent to which previously assumed contracted obligations had been breached by the State.[723]

503. Therefore, for a claimant to invoke the application of an umbrella clause, it must demonstrate the essential prerequisite for the application of such clauses: a consensual relationship through which the State has assumed a specific obligation, which it must legally respect, regarding that specific investor. Regulations, due to their nature, do not create such *vis-à-vis* relationships.[724] Neither does the press release of the Government dated 2 July 2010 nor the conversations held by Antin with the representatives of the Ministry and the CNE.[725] Therefore, the Claimants cannot validly invoke the umbrella clause on their behalf.

504. Additionally, umbrella clauses do not alter the nature or the content of the invoked obligation. Therefore, demonstrating the existence of a legal obligation is not enough to invoke such a clause; it is also necessary to demonstrate which is the applicable domestic

---

[718] Respondent's Counter-Memorial, ¶¶ 884-887, 889-892. Respondent cites *Noble Ventures v. Romania* (Award), ¶ 51; *S.G.S. v. Pakistan* (Decision on Objections to Jurisdiction), ¶ 166; *CMS v. Argentina* (Annulment), ¶ 95.

[719] **Legal Authority RL-0018,** The Energy Charter Treaty: A Reader's Guide, June 2002, p. 26.

[720] Respondent's Counter-Memorial, ¶ 894.

[721] Respondent's Counter-Memorial, ¶ 888.

[722] Respondent's Counter-Memorial, ¶¶ 895-897.

[723] Respondent's Counter-Memorial, ¶¶ 901-904.

[724] Respondent's Counter-Memorial, ¶¶ 907-908.

[725] Respondent's Counter-Memorial, ¶ 909.

law and, additionally, whether there has been any failure to comply with such an obligation that is attributable to the State according to such national law. However, the Claimants do not make any allegations regarding these issues.[726]

505. To this regard, the Supreme Court has stated that no statutory provision can establish the intangibility of a certain level of specific benefits nor the indefinite permanence of the formulas used for such purpose. Therefore, the obligation that the Claimants want to raise to the international field by virtue of the umbrella clause does not even exist in Spanish law.[727]

506. *In arguendo,* even in the event Spain had assumed any specific compromises with the Andasol Plants, that commitment would be limited to applying the existing legal regime in its entirety rather than applying two single articles of two specific regulations. In this regard, the only obligation Spanish law has created in favour of RE producers is to obtain a reasonable return for their investment at all times, and this is guaranteed by the New Regime.[728] Therefore, an umbrella clause in Article 10(1) of the ECT would still have been respected by Spain.[729]

507. Finally, not any breach of any obligation entails a violation of an umbrella clause. A breach of a contractual obligation would only entail a violation of an investment treaty if such a breach implied a violation of the substantive standards of the treaty. In the case at hand, the FET standard has been fully respected by Spain, and therefore an umbrella clause has not been breached.[730]

## C.    TRIBUNAL'S ANALYSIS

508. The Claimants assert that the FET standard in the ECT is an independent and autonomous standard, whose specific legal meaning must be ascertained in accordance with Articles 31 and 32 of the VCLT.[731] In interpreting the FET standard in the light of the object and purpose of the ECT, the Tribunal should —according to the Claimants— consider whether Spain's conduct was conducive to the provision of a stable, transparent legal framework for foreign investments in the energy sector.[732] This is particularly important in the RE

---

[726] Respondent's Counter-Memorial, ¶¶ 911-912.

[727] Respondent's Counter-Memorial, ¶¶ 913-916.

[728] Respondent's Rejoinder, ¶¶ 906-910.

[729] Respondent's Rejoinder, ¶ 912.

[730] Respondent's Counter-Memorial, ¶¶ 918-919. The Respondent cites *Joy Mining v. Egypt* (Decision on Jurisdiction), ¶ 81.

[731] Claimants' Memorial, ¶¶ 383-385.

[732] Claimants' Memorial, ¶ 388.

sector where a substantial amount of capital is typically committed at the outset in order to produce a long-term return.[733]

509.   The Claimants claim that they invested in Spain in reliance of the regulatory framework set forth under RD 661/2007 —as reinforced by RD 1614/2010—, which was purposely designed to attract foreign investment in Spain's RE sector.[734] Specifically, the Claimants expected that because the Andasol Plants complied with all the registration requirements, they would be subject to the FIT regime for their entire operational life.[735] Relying on Article 44(3) of RD 661/2007, the Claimants further expected that any future changes to RD 661/2007 would apply only to new installations, while existing installations —such as the Andasol Plants— would remain unaffected.[736]

510.   The Claimants further claim that their expectations regarding the stability of the RD 661/2007 economic regime —and specifically of the FIT— were legitimate, as they were based on an offer made by the Spanish Government under a "royal decree" (RD 661/2007) which sought to encourage investments in the capital-intensive RE sector by providing the necessary incentives to attract investors.[737] The Claimants' own due diligence process, Respondent's campaign to promote investments in the Spanish RE sector, the adoption of RD 1614/2010 implementing the July 2010 Agreement and specific assurances made by Spain's public officials that the RD 661/2007 would not be materially altered, all confirm that the Claimants' expectations were legitimate.[738]

511.   It is the Claimants' case that notwithstanding these specific compromises, Respondent eviscerated all the key features of the RD 661/2007 regime thereby frustrating the Claimants' legitimate expectations and breaching its obligation to provide FET under the ECT.[739] In particular, Spain (i) withdrew the FIT for electricity production using natural gas under Law 15/2012 and then capped the use of natural gas for essential technical purposes though Ministerial Order IET/1882/2014;[740] (ii) introduced the TVPEE which constitutes a disguised and unjustified cut of the FIT;[741] (iii) eliminated the Premium through RDL 2/2013;[742] (iv) replaced the CPI-linked updating mechanism for the FIT by a lower index also through RDL 2/2013;[743] and finally, (v) eliminated the RD 661/2007

---

[733]   Claimants' Memorial, ¶ 401.

[734]   *See* Claimants' Memorial, ¶¶ 22-25 and 32-33.

[735]   Claimants' Memorial, ¶ 405.

[736]   Claimants' Memorial, ¶¶ 406-407.

[737]   Claimants' Memorial, ¶ 412.

[738]   Claimants' Memorial, ¶ 412.

[739]   Claimants' Memorial, ¶¶ 415-416.

[740]   Claimants' Memorial, ¶ 414; Claimants' Reply, ¶¶ 310-312.

[741]   Claimants' Memorial, ¶ 414.

[742]   Claimants' Memorial, ¶ 414; Claimants' Reply, ¶¶ 319-323.

[743]   Claimants' Memorial, ¶ 414.

economic regime in its entirety through RDL 9/2013 and introduced a substantially less favourable regime without FIT.[744]

512.    The Respondent contends that it has not breached the FET standard under Article 10(1) of the ECT. While agreeing that the ECT must be interpreted in accordance with Article 31 of the VCLT[745] and recognizing that it provides a level of protection that limits the regulatory power of the signatory States,[746] the Respondent submits that the ECT neither cancels nor extremely curtails the State's regulatory power.[747] According to Spain, the ECT sets no more limits on the regulatory power of States than the minimum standard of international law, and this standard has not been breached by Spain.[748]

513.    Regarding the Claimants' allegation that Spain frustrated their legitimate expectations, the Respondent submits that the Claimants' expectations were neither legitimate nor protected by the ECT. The Respondent argues that the Claimants could not reasonably expect that the RD 661/2007 regime remained frozen or unmodified. There is no stabilisation clause in this sense in Spanish law, and specifically in Article 44(3) of RD 661/2007,[749] and Spain did not make any promises or commitments to the Claimants as to the immutability of the regime.[750]

514.    Moreover, the Respondent asserts that when the Claimants made their investment in Spain, they were fully aware of the possibility of future regulatory changes affecting their investments.[751] It also states that the Claimants could not derive any expectations from the HS Report, which was superficial and flawed,[752] or from unverifiable representations allegedly made by public officials lacking authority to bind Spain.[753]

515.    According to the Respondent, the Claimants were only entitled to a reasonable return. Thus, what must be analysed under the FET standard is whether the "right to a reasonable return" principle has been respected.[754] The Respondent affirms that the New Regime does

---

[744]  Claimants' Memorial, ¶ 414; Claimants' Reply, ¶¶ 331-333, 340.
[745]  Respondent's Rejoinder, ¶¶ 729-730.
[746]  Respondent's Rejoinder, ¶ 737.
[747]  Respondent's Rejoinder, ¶¶ 730 and 737.
[748]  Respondent's Rejoinder, ¶¶ 761-763.
[749]  Respondent's Rejoinder, ¶ 786.
[750]  Respondent's Counter-Memorial, ¶¶ 655-660.
[751]  Respondent's Counter-Memorial, ¶¶ 670-673.
[752]  *See* Respondent's Counter-Memorial, ¶¶ 681-689; Respondent's Rejoinder, ¶¶ 526-528.
[753]  Respondent's Counter-Memorial, ¶¶ 696-701.
[754]  Respondent's Counter-Memorial, ¶¶ 651-653.

not breach any legitimate expectations, as it "keeps having [the] reasonable return as a main piece."[755]

516. The issues before this Tribunal concern the alleged breach of Article 10(1) of the ECT. In its relevant part, this provision reads as follows:

> "Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. […]"

517. The Parties agree that Article 10(1) of the ECT must be interpreted in accordance with Article 31 of the VCLT, which contains the general rule of customary international law for the interpretation of treaties. The Tribunal has already set the criteria for the application of Article 31 of the VCLT in paragraph 207 *supra*.

518. The ordinary meaning of the words "fair" and "equitable" is commonly found in the dictionary. According to the Oxford English Dictionary "fair" means "just, unbiased, equitable, impartial, legitimate."[756] In turn, "equitable" is defined as "characterised by equity or fairness", where "equity" means "fairness; impartiality; even-handed dealing."[757] In Spanish, another official language of the ECT and the language of the Respondent, the dictionary of the Spanish language of the *Real Academia Española* defines "fair" as "in accordance with justice and reason"[758] and "equitable" as "having equity", i.e., "equality of disposition", and, more specifically, "disposition that moves to give each one what he deserves."[759] These terms, however, cannot be interpreted in separation from the treaty's context, object and purpose.

519. Pursuant to Article 2 of the ECT, the purpose of the Treaty is to:

> "[establish] a legal framework in order to promote long-term co-operation in the energy field, based on complementarities and mutual

---

[755] Respondent's Counter-Memorial, ¶ 777.

[756] **Legal Authority CL-0088,** Oxford Dictionaries, Oxford English Dictionary (6th ed, Oxford University Press, 2007), p. 920.

[757] **Legal Authority CL-0088,** Oxford Dictionaries, Oxford English Dictionary (6th ed, Oxford University Press, 2007), p. 856.

[758] Meaning of the word "justo", Real Academia Española, Dictionary of the Spanish language, electronic version (twenty-third edition October 2014), available at: http://dle.rae.es/?id=MfO65xY ("*Justo: arreglado a justicia y razón*".)

[759] Meaning of the word "equitativo", Real Academia Española, Dictionary of the Spanish language electronic version (twenty-third edition October 2014), available at: http://dle.rae.es/?w=equitativo ("*Equitativo: que tiene equidad*". "*Equidad; 1. igualdad de ánimo*. [...] *5. Disposición del ánimo que mueve a dar a cada uno lo que merece*.")

> benefits, in accordance with the objectives and principles of the [European Energy] Charter."

520. As noted by the tribunal in *Eiser v. Spain*, the ECT's stated purpose emphasises the Treaty's role in providing a legal framework that promotes long-term cooperation, suggesting that the ECT is conceived as enhancing the stability required for such cooperation.[760]

521. This is further confirmed by the objectives and principles of the European Energy Charter (the "Charter"), a political declaration that formed the basis of the ECT and to which Article 2 of the ECT expressly refers.

522. Title I of the Charter, labelled "objectives", provides that the signatories will engage, *inter alia*, in cooperation in the energy field, which entails the "formulation of stable and transparent legal frameworks creating conditions for the development of energy resources."[761] Similarly, Title II.4 of the Charter, which specifically deals with the implementation of the Charter's objectives regarding the promotion and protection of investments, provides as follows:

> "In order to promote the international flow of investments, the signatories will at national level provide for a stable, transparent legal framework for foreign investments, in conformity with the relevant international laws and rules on investment and trade.
>
> They affirm that it is important for the signatory States to negotiate and ratify legally binding agreements on promotion and protection of investments which ensure a high level of legal security and enable the use of investment risk guarantee schemes."[762]

523. These provisions of the Charter thus confirm that the legal framework referred to in Article 2 of the ECT is one that is stable, transparent, and compliant with international legal standards. The Tribunal shall therefore observe the objectives of legal stability and transparency in interpreting the FET standard under the ECT.

524. The stability of the legal regime is reinforced in the first sentence of Article 10(1) of the ECT which requires that the Contracting Parties "encourage and create stable, equitable,

---

[760] *Eiser v. Spain* (Award), ¶ 378.

[761] **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Concluding Document of The Hague Conference on the European Energy Charter, Title I (Objectives), p. 215.

[762] **Exhibit C-0001**, Energy Charter Secretariat, "The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation", September 2004, Concluding Document of the Hague Conference on the European Energy Charter, Title II.4 (Promotion and Protection of investments), p. 218.

favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area."

525. The Tribunal notes that the language of Article 10(1) of the ECT is not merely a suggestion or a recommendation for the Contracting Parties. It provides that each Contracting Party "shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area" (emphasis added). The modal verb "shall" expresses an instruction, command or obligation[763] and therefore, compliance with the ECT requires that each Contracting State shall not only encourage but also create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area.

526. The Tribunal further notes that, as mentioned in the preceding paragraphs, the stability of the conditions for Investors of other Contracting Parties to make Investments in another Contracting Party's Area is a *leitmotiv* in the text of the ECT and is clearly reinforced in the Charter.

527. The Parties disagree as to the scope and extent of the obligation contained in the ECT to encourage and create stable conditions. The Claimants suggest that stability implies that the regime contained in RD 661/2007 should have been maintained for the entire life of operation of those plants that were already registered. The Respondent holds that stability does not mean freezing the legal regime and that even though the ECT limits the regulatory power of the signatory States, it neither cancels nor extremely curtails the State's regulatory power.[764] According to the Respondent, if it maintains a "reasonable rate of return", the obligation of stability is complied with.

528. As already indicated, and as the Parties agree, the ECT must be interpreted in accordance with Article 31 of the VCLT. As regards the text, the term "stable" means "[n]ot likely to change or fail; firmly established."[765] In Spanish, "stable" is "something that is maintained with no peril of changing, falling or disappearing."[766] Stable, therefore, neither means something close to immutable or something unlikely to change at any time.

---

[763] Oxford University Press, Oxford Dictionaries, Oxford English Dictionary, electronic version, available at: https://en.oxforddictionaries.com/definition/shall. For Spanish, *see*: Meaning of the word "deber", Real Academia Española, Dictionary of the Spanish language, electronic version (twenty-third edition October 2014), available at: http://dle.rae.es/?id=Bu2rLyz

[764] Respondent's Rejoinder, ¶¶ 730 and 737.

[765] Oxford University Press, Oxford Dictionaries, Oxford English Dictionary, electronic version, available at:: https://en.oxforddictionaries.com/definition/stable.

[766] Meaning of the word "estable", Real Academia Española, Dictionary of the Spanish language electronic version (twenty-third edition October 2014), available at: http://dle.rae.es/?id=GikXRGw ("*Estable: Que se mantiene sin peligro de cambiar, caer o desaparecer*".)

529. Referring to the context, other arbitral tribunals interpreting Article 10(1) of the ECT have concluded that stability is part of or is related to the FET standard under the Treaty. For instance, the tribunal in *Plama v. Bulgaria* observed that "stable and equitable conditions are clearly part of the fair and equitable treatment standard under the ECT."[767] Similarly, the tribunal in *Electrabel v. Hungary* asserted that "[f]air and equitable treatment is connected in the ECT to the encouragement to provide stable, equitable, favourable and transparent conditions for investors."[768] Recent decisions in investment arbitration cases under the ECT involving Spain endorse the same conclusion.[769]

530. Based on the text and context of the ECT, the Tribunal agrees with the Respondent in that the ECT limits the regulatory power of the signatory States, but does not cancel or "extremely limit" the State's regulatory power.[770] However, the Tribunal does not agree with Spain in that the ECT sets no more limits on the regulatory power of States than the minimum standard of international law. The ECT provides for specific obligations to the Contracting States regarding stability, and the FET standard of the ECT, as in the quote provided by Respondent:

> "requires a balancing process. Investment treaties as international law disciplines interfere in domestic regulatory and administrative sovereignty; that is their very purpose. They are meant to do so in order to upgrade the quality of governance. But they must also not be operated in order to become an excessively interventionist instrument."[771]

531. As anticipated by the tribunal in *Charanne v. Spain* and reaffirmed by the tribunal in *Eiser v. Spain,* the specific obligation of stability of the conditions for investors under the ECT does not eliminate or strictly limit the regulatory powers of States nor does it prevent Contracting States from amending existing regulations, provided that the given State does not "suddenly and unexpectedly eliminate the essential features of the regulatory framework in place."[772]

532. In sum, considering the context, object and purpose of the ECT, the Tribunal concludes that the obligation under Article 10(1) of the ECT to provide FET to protected investments comprises an obligation to afford fundamental stability in the essential characteristics of

---

[767] *Plama v. Bulgaria* (Award), ¶ 173.

[768] *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶ 7.73.

[769] *Isolux v. Spain* (Award), ¶ 765; *Eiser v. Spain* (Award), ¶¶ 381-382.

[770] Respondent's Rejoinder, ¶¶ 730 and 737.

[771] Respondent's Rejoinder, ¶¶ 758 citing T W Wälde, "*Arbitration in the Oil, Gas and Energy Field: Emerging Energy Charter Treaty Practice*" (2004) 1 Transnational Dispute Management 2, **Legal Authority RL-0057**.

[772] *Charanne v. Spain* (Final Award), ¶¶ 513-514; 517.

the legal regime relied upon by the investors in making long-term investments.[773] This does not mean that the legal framework cannot evolve or that a State Party to the ECT is precluded from exercising its regulatory powers to adapt the regime to the changing circumstances in the public interest.[774] It rather means that a regulatory regime specifically created to induce investments in the energy sector cannot be radically altered —i.e., stripped of its key features— as applied to existing investments in ways that affect investors who invested in reliance on those regimes.

533. The Tribunal deems it important to emphasize that the content and scope of the FET standard must be assessed within the context of the Treaty in which it is found. Reference to decisions on the stability of a regime based on treaties whose text is substantially different and where no specific obligation of stability is contained may be of no assistance in the interpretation of this specific feature of the ECT. Not only does the ECT expressly state that its purpose is to provide a legal framework to promote long-term cooperation in the energy field in accordance with the objectives and principles of the Charter —which stresses the need for a stable and transparent legal framework,— it also contains a specific obligation —as opposed to a mere declaration in the preamble, and with language that suggests and imperative and not merely a recommendation— to encourage and create stable conditions for investments. Regardless of how the relationship between stability of the legal framework and the obligation to accord FET is conceived, it seems clear that, in the context of the ECT, the concepts are associated in a manner that merits their joined assessment.[775] In fact, it seems undisputed that the ECT's FET standard includes the obligation to provide a stable and predictable legal framework for investments.[776]

534. In the present case, the Claimants argue that the Respondent breached the FET standard under the ECT, *inter alia*, because it adopted measures that frustrated their legitimate

---

[773] *See Eiser v. Spain* (Award), ¶ 382; *Charanne v. Spain* (Final Award), ¶ 517.

[774] *See Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶ 7.77. ("While the investor is promised protection against unfair changes, it is well established that the host State is entitled to maintain a reasonable degree of regulatory flexibility to respond to changing circumstances in the public interest. Consequently, the requirement of fairness must not be understood as the immutability of the legal framework, but as implying that subsequent changes should be made fairly, consistently and predictably, taking into account the circumstances of the investment.")

[775] Several tribunals interpreting the ECT have referred to the relationship between stability of the legal framework and the FET standard under the Treaty. *See Plama v. Bulgaria* (Award), ¶ 173 ("In addition, the conditions are dependent on their accordance with the other standards. For instance, stable and equitable conditions are clearly part of the fair and equitable treatment standard under the ECT."); *Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶7.73 ("The first part of Article 10(1) ECT refers to the encouragement and creation of 'stable, equitable, favourable and transparent conditions for investors', which is said to include a commitment to accord at all times fair and equitable treatment to investments. Fair and equitable treatment is connected in the ECT to the encouragement to provide stable, equitable, favourable and transparent conditions for investors.") *Charanne v. Spain* (Final Award), ¶ 477 ("From Article 10(1) it can be inferred that the duty to provide fair and equitable treatment is included within the broader obligation to create stable, equitable, favourable and transparent conditions.")

[776] *See* Claimants' Reply, ¶ 355.

expectations as to the continued application of the Original Regime.[777] The Claimants' allegations in this regard are thus closely related to their claims about the stability of the legal framework.

535. The Parties concur that the protection of the legitimate expectations held by an investor forms part of the FET standard under the ECT. However, they disagree over the content of the Claimants' expectations and whether those expectations were breached in the present case. The Parties have invoked various decisions from international arbitration tribunals in support of their respective positions. The Tribunal agrees with some of these decisions to the extent explained below.

536. First, the expectations of the investor cannot be analysed in the abstract nor can they be based on the investor's subjective beliefs. On the contrary, the finding that there has been a violation of the investor's legitimate expectations must be based on an objective standard, which must be assessed on a case-by-case basis.[778]

537. Second, the investor's expectations must be assessed at the time of the investment's making.[779] Accordingly, the Tribunal must consider when the investment was made, what the circumstances were at that time and the information that the investor had or should reasonably have had, had it acted with the requisite degree of diligence (considering its expertise). In carrying out this assessment, tribunals must attempt to place themselves at the time of the investment and consider the information and conditions available at such time, and to refrain from appraising the investor's expectations with the benefit of hindsight.

538. Third, the expectations of the investor need to originate from some affirmative action of the State, either in the form of specific commitments made by the host State to the investor —as several international investment tribunals have recognized—[780] or in the form of representations made by the host State, for example, with respect to certain features of a regulation aimed at encouraging investments in a specific sector. In other words, legitimate expectations cannot arise from subjective considerations of the investor absent an affirmative action of the State which, objectively determined, evidences that the State intended to describe a particular treatment or regime on which the investor could rely when making its investment.

539. Accordingly, the Tribunal will assess the legitimacy of the Claimants' expectations against the existing conditions at the time of the investment, the background of information that

---

[777] *See* Claimants' Reply, ¶ 299.
[778] *See Charanne v. Spain* (Final Award), ¶ 495.
[779] *See EDF v. Romania* (Award), ¶ 219.
[780] See *AES Summit v. Hungary* (Award), ¶ 9.3.31

the Claimants had or should reasonably have had at the time of the investment and of Spain's conduct prior to, and at the time of, the investment. This examination is based on the facts of this case, as pleaded by the Parties and evidenced in the record of this arbitration.

540. It is undisputed that investments in the capital-intensive RE sector —including CSP power-generation projects— require economic incentives from the State because such technologies at least initially cost more than conventional power generating facilities.[781] The purpose of subsidization in this context is to allow the technologies to be developed in the hope that over time the costs associated therewith will decline, thus making RE technologies more competitive. It is undisputed in the present case that through the compensation system offered in RD 661/2007, Spain sought to encourage further investments in its RE sector to meet the targeted growth in certain technologies, including CSP systems.[782] Over all, the Respondent emphasized the stability of the legal and economic regime established in RD 661/2007 in order to attract investment in the sector.

541. The CNE report No. 3/2007 of 14 February 2007 —issued a couple of months before RD 661/2007 was approved— reads:

> "**5.3. On the criteria that inform regulation of the special regime.**
>
> [...]
>
> **(b) Minimise regulatory uncertainty**. The [CNE] understands that transparency and predictability in the future of economic incentives reduces regulatory uncertainty, incentivising investments in new capacity and minimizing the cost of financing projects, thus reducing the final cost to the consumer. The regulation must offer <u>sufficient guarantees to ensure that the economic incentives are stable and predictable throughout the service life of the facility</u>...".[783] [Emphasis added].

542. Similarly, a press release from the Ministry dated 25 May 2007 stressed that the recently approved RD 661/2007 was "aimed at establishing a stable subsidy system that guarantees attractive profitability for electricity production under the special scheme [...]."[784]

---

[781] Claimants' Memorial, ¶ 14; Respondent's Counter-Memorial, ¶ 366.

[782] *See* **Exhibit C-0020**, RD 661/2007, Preamble.

[783] **Exhibit BRR-0006**, CNE, "NEC Report 3/2007 regarding the proposed Royal Decree regulating electricity generation in the Special Regime and specific technological facilities equivalent to the Ordinary Regime", 14 February 2007, pp. 15-16.

[784] **Exhibit C-0171**, Press Release announcing RD 661/2007, "The Government prioritises profitability and stability in new Royal Decree-Law on renewables and combined heat and power", 25 May 2007, p. 1.

543. Beyond Spain's statements regarding the need for regulatory stability and predictability in reports, press releases and presentations, the Tribunal observes that the Respondent expressly referred to these principles in royal decrees concerning the RE sector.

544. For instance, the preamble of RD 661/2007 states that:

> "[…] [I]n order to safeguard the security and quality of the supply of electricity in the system, and in order to minimise the restrictions on production in those technologies which are today considered not manageable, certain reference installed power targets are established which coincide with the targets of the Renewable Energy Plan 2005-2010 and the Strategy for Energy Saving and Efficiency in Spain (E4), for which the compensation system set out in this Royal Decree shall be applicable."[785]

545. The 2005-2010 Plan analysed barriers to the development of CSP capacity in Spain and provided recommendations for increasing investment in the Spanish RE sector that had been thus far insufficient. Notably, the 2005-2010 Plan recognized that investments in RE installations require large sums of upfront capital which are typically obtained through third-party financing. To encourage investments in the Spanish RE sector, the 2005-2010 Plan recommended, *inter alia*, that regulated remuneration for RE installations be retained.[786] The 2005-2010 Plan thus recognised that, to meet its policy goals regarding the CSP sector, Spain needed to provide incentives that would ensure long-term and stable cash flows. It is undisputed by the Parties that the incentives provided for in RD 661/2007 fulfilled those requirements.

546. Similarly, the preamble of RD 1614/2010, recognizes that:

> "This growth [in electricity from renewable sources] has arisen thanks to the existence of a <u>solid, stable and predictable economic and legal support</u> regime, and the contribution of all players involved therein: Public Administration Bodies, the system's technical and economic operators and companies.
>
> Worth special mention is the growth in wind, solar thermoelectric and photovoltaic technologies, the objectives for 2010 for installed power having been equalled and indeed exceeded.
>
> Therefore the support regime, as set forth in the formulation thereof, <u>must adapt, while ensuring the legal security of investments and the principle of fair return</u>, to the dynamic reality of the learning curves of the different technologies and to the technical constraints that arise

---

[785] **Exhibit C-0020**, RD 661/2007, Preamble.
[786] **Exhibit C-0039**, 2005-2010 Plan, August 2005, pp. 144-145.

due to the increased penetration of such technologies in the generation "mix", to thus maintain a necessary and adequate support that is consistent with market conditions and with the strategic objectives in the area of energy and to contribute to the transfer to society of the profit from the suitable development of these technologies."[787] [Emphasis added]

547. The preamble of RD 1614/2010 thus recognises that the stability and predictability of the regime were key to attaining Spain's policy goals regarding RE technologies and further provides that any changes to the regime must ensure the legal security of the investments. From its preamble, RD 1614/2010 iterates Spain's representations regarding the stability and predictability of the regulatory regime applicable to RE installations.

548. The requirement that acts of the State be reasoned is common to most legal systems and, in any event, exists under Spanish law. The reasoning of an administrative act —as reflected in its preamble— exposes the motives for the State's actions. In the present case, the preamble of the royal decrees enacted by the Spanish Government —specifically RD 661/2007 and RD 1614/2010— reflect the Respondent's intention to provide for and guarantee the stability of the legal and economic regime applicable to RE projects. Previous and subsequent acts by State entities, including reports from the CNE, press releases from the Ministry and advertising material prepared together with InvestInSpain, all emphasise the stability of the regulatory regime set forth under RD 661/2207.[788] The stability of the regulatory regime for investments in the RE sector was thus the *leitmotiv* of Spain's acts at the time of the Claimants' investment.

549. In addition to the above-noted statements, Article 44(3) of RD 661/2007 provided that:

"The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed."[789]

550. In connection therewith, Article 4 of RD 1614/2010 specified that:

---

[787] **Exhibit C-0023**, RDL 1614/2010, Preamble.

[788] *See* **Exhibit C-0171**, Press Release announcing RD 661/2007, "The Government prioritises profitability and stability in the new Royal Decree on renewable energy and combined heat and power", 25 May 2007; **Exhibit C-0174**, InvestInSpain PowerPoint presentation, "Opportunities in Renewable Energy in Spain", 16 November 2007; **Exhibit C-0178**, CNE presentation, "Legal and Regulatory Framework for the Renewable Energy Sector", 29 October 2008; **Exhibit C-0022**, M. Garcia, "Opportunities in Renewable Energy in Spain", PowerPoint Presentation published by the Spanish Ministry for Industry, Tourism and Commerce & InvestInSpain, November 2008.

[789] **Exhibit C-0020**, RD 661/2007, Article 44(3).

> "For solar thermoelectric technology facilities that fall under Royal Decree 661/2007 of 25 May, revisions of tariffs, premiums and upper and lower limits referred to in article 44.3 of the aforementioned Royal Decree, shall not affect facilities registered definitively in the Administrative Registry of production facilities entitled to the special regime that is maintained by the Directorate-General for Energy and Mining Policy as of 7 May 2009, nor those that were to have been registered in the Remuneration Pre-assignment Registry under the fourth transitional provision of Royal Decree-Law 6/2009 of 30 April, and that meet the obligation envisaged in its article 4.8, extended until 31 December 2013 for those facilities associated to phase 4 envisaged in the Agreement of the Council of Ministers of 13 November 2009."[790]

551. The Claimants claim that Article 44(3) of RD 661/2007 and Article 4 of RD 1614/2010 clearly guarantee that any future changes to the FIT regime would not affect existing installations that had satisfied the registration requirements referred to therein.[791] Invoking the award in *Charanne v. Spain*, the Respondent contends that "registration in the RAIPRE was simply an administrative requirement to be able to sell energy, and did not imply that the facilities registered had an acquired right to a particular remuneration."[792]

552. The Tribunal is not persuaded that registration in the RAIPRE is simply an administrative requirement to sell energy without any further legal consequences. The Respondent's explanation is not only inconsistent with the wording of the provisions reproduced above, but it is also at odds with Spain's contemporary representations that "[f]uture tariff revisions shall not be applied to already functioning facilities"[793] Given the precision and detail exhibited in the royal decrees, particularly the contemplation that the treatment would be accorded for a defined period of time, the Tribunal has no difficulty in concluding that this falls squarely into the type of State conduct that was intended to, and did, give rise to legitimate expectations of the Claimants.

553. In the Tribunal's view, even if Articles 44(3) of RD 661/2007 and 4 of RD 1614/2010, *per se*, could not give rise to a legitimate expectation that compensation applicable to the

---

[790] **Exhibit C-0023**, RD 1614/2010, 8 December 2010, Article 4.

[791] Claimants' Memorial, ¶ 18.

[792] Respondent's Rejoinder, ¶ 792, citing *Charanne v. Spain* (Final Award), ¶ 510.

[793] **Exhibit C-0171**, Press Release announcing RD 661/2007, "The Government prioritises profitability and stability in new Royal Decree-Law on renewables and combined heat and power", 25 May 2007. *See also* **Exhibit C-0190**, CNE, "Report on the proposed RD regulating and modifying certain aspects of the Special Regime", 14 September 2010, p. 24. ("Art. 44.3 should not be amended where it includes one of the most important criteria of the current regulations of the special regime in relation to legal certainty and stability of the economic system."); **Exhibit C-0192**, Ministry of Industry Commerce and Tourism, "Report on the Draft RD 1614/2010", 26 October 2010, pp. 10-11 ("[…] Article 4 of the draft also guarantees to thermoelectric facilities under Royal Decree 661/2007 that future quadrennial reviews of tariffs, premiums, and upper and lower limits for this technology, provided under Article 44.3 thereof, shall not be applicable to them. […]").

Andasol Plants would remain completely unchanged, said provisions did reflect Spain's commitment to ensuring the stability and predictability of the existing economic regime.

554. To summarize, the Tribunal finds that at the time of the Claimants' investment in the Andasol Plants, Spain (i) recognised that RE projects required high upfront capital investments; (ii) understood that to foster investments in that sector, in line with its policy goals, it needed to create more appropriate incentives; (iii) issued RD 661/2007 providing incentives to encourage investments in certain RE technologies, including CSP projects, and (iv) represented, through its acts and regulations, that the economic regime applicable to RE projects would remain stable and predictable.

555. Relying on *Charanne v. Spain*, the Respondent argues that the Claimants could not have had the legitimate expectation that the regulatory framework established by RD 661/2007 would remain unchanged throughout the useful life of its plants, as admitting the existence of such an expectation would amount to the freezing of the regulatory framework.[794] The Tribunal agrees with this contention. The requirement of stability under the Treaty does not equate to the immutability of the legal framework. The State is certainly entitled to exercise its sovereign power to amend its regulations to respond to changing circumstances in the public interest.[795] However, any such changes must be consistent with the assurances on stability of the regulatory framework provided by the State and required by the ECT.

556. The Tribunal's opinion regarding the legitimate expectations of the investor is consistent with *Charanne v. Spain* in that such expectations may be defeated if the host State eliminates the essential features of the regulatory framework relied upon by the investor in making a long-term investment. In this regard, the tribunal in *Charanne v. Spain* reasoned as follows:

> "In their Memorial on the Merits, the Claimants submit in this regard that 'the investor's legitimate expectations [...] are defeated, even in the absence of specific commitments, when the host State carries out actions that are incompatible with a criterion of economic reasonableness, with the public interest, or with the proportionality principle.'
>
> As a matter of principle, the Arbitration Tribunal accepts this approach. Indeed, an investor has the legitimate expectation that, when the State modifies the regulation under which the investor

---

[794] Respondent's Rejoinder, ¶ 532, quoting *Charanne v. Spain* (Final Award), ¶ 503. Respondent itself recognizes that Claimants do not claim that the regulatory framework should remain unchanged or "frozen". (*See* Respondent's Rejoinder, footnote 324, referring to Claimants' Reply, ¶¶ 282 and 358).

[795] *See Electrabel v. Hungary* (Decision on Jurisdiction, Applicable Law and Liability), ¶ 7.77.

made the investment, it will not do so unreasonably, contrary to the public interest, or in a disproportionate manner.

[…]

The Arbitration Tribunal considers that the proportionality requirement is fulfilled as long as the modifications are not random or unnecessary, and that <u>they do not suddenly and unexpectedly eliminate the essential features of the regulatory framework in place</u>."[796] (Emphasis added)

557. The tribunal in *Charanne v. Spain* concluded that the claimants in the said arbitration had not proved that the Respondent violated its obligation to grant FET due to the modifications to the regulatory regime undertaken in 2010. In summarizing its findings, the tribunal observed:

> "In sum, the Tribunal considers that the 2010 regulations cannot be considered to be in violation of the ECT. <u>Indeed, said rules introduce modifications that are restricted to the regulatory framework applicable at the time of the investment, **without eliminating its essential features**, and in particular, the existence of a tariff guaranteed during the entire lifespan of the facilities.</u> The Claimants have not proved that the 2010 regulations defeated their legitimate expectations under the ECT due to being unreasonable, arbitrary, contrary to the public interest or disproportionate. Neither is there any proof whatsoever that such provisions were unfair or inconsistent. Finally, the Claimants have not proved that the 2010 regulations were adopted in violation of the due process requirements under Spanish law."[797] (Emphasis added)

558. It warrants noting that the *Charanne* tribunal's analysis was restricted to the 2010 regulations and did not extend to RDL 9/2013, or any other provision issued in 2013 or afterwards.[798] Within such limited scope, the tribunal found that it "[could not] draw the conclusion that Spain breached its obligation to provide regulatory stability."[799] By contrast, the disputed measures in the present case include RDL 9/2013, Law 24/2013 and Ministerial Order IET/1045/2014.[800] Therefore, the Tribunal must determine whether the

---

[796] *Charanne v. Spain* (Final Award), ¶¶ 513-514; 517 [Emphasis added].

[797] *Charanne v. Spain* (Final Award), ¶ 539 [Footnotes omitted].

[798] *See Charanne v. Spain* (Final Award), ¶ 481. ("However, the Arbitration Tribunal cannot, without exceeding its powers, examine whether the 2013 provisions have helped to create a lack of stability or clarity in the regulatory framework that could be considered to be contrary to the ECT. Indeed, the Claimants themselves have excluded from the scope of this arbitration the 2013 regulations. In this regard, the Claimants submit, in a very straightforward manner, that 'they do not request the Tribunal to decide on RDL 9/2013 and its implementing provisions.'") [Footnotes omitted]

[799] *Charanne v. Spain* (Final Award), ¶ 484.

[800] *See* Claimants' Memorial, ¶ 377.

amendments to the regulatory regime applicable at the time of the investment introduced by Spain through the Disputed Measures eliminated the essential features of such regime, thus defeating the Claimants' legitimate expectations regarding the stability of the regulatory framework.

559.  Pursuant to RD 661/2007, energy producers under the Special Regime had a right to obtain a fixed tariff or a premium over market price, at their choice, for their electricity production.[801] This royal decree specified the amounts of both the fixed tariff and the premium in euros per kilowatt hour that would be payable in respect of each hour of production, subject to a cap and a floor. RD 661/2007 further provided qualifying installations with priority of access and priority of dispatch to the transmission and distribution networks.

560.  According to the tribunal in *Charanne v. Spain*, the essential features of the regime set forth under RD 661/2007 were the offering of a guaranteed tariff and the granting of privileged access to the electricity transmission and distribution grid.[802] In this case, it is undisputed that through RDL 9/2013 and Law 24/2013, Spain (a) replaced the FIT system by a remuneration system that allowed certain RE installations to obtain a special payment by reference to a standard installation[803] and (b) withdrew the right of priority of grid access and priority of dispatch for RE installations.[804] Moreover, RDL 9/2013, Law 24/2013 and Ministerial Order IET/1045/2014 dismantled all the regime and therefore all the features of the regime provided for under RD 661/2007. Thus, whether the Tribunal were to adopt the opinion of the *Charanne* tribunal regarding the essential features of the RD 661/2007 regime, or whether it was to consider that only the FIT system was the key feature of the regime, it would necessarily conclude that Spain breached its obligations under Article 10(1) of the ECT by eliminating those features through RDL 9/2013 and Law 24/2013.

561.  However, the Respondent contends that, as a matter of Spanish law,[805] the Claimants were only entitled to a reasonable return on their investment and could not reasonably have held other expectations.[806] The Parties disagree on whether the New Regime complies with the principle of reasonable return.[807]

---

[801]  **Exhibit C-0020**, RD 661/2007, Article 17(c) and Article 24.1.

[802]  *Charanne v. Spain* (Final Award), ¶ 518 and ¶ 539.

[803]  **Exhibit C-0029**, Royal Decree 9/2013, 13 July 2013.

[804]  **Exhibit C-0031**, RD 413/2014, 10 June 2014.

[805]  According to Spain, the principle of "reasonable return" is "the core principle on which the legal regime of remuneration to the Claimants is built". (Respondent's Counter-Memorial, ¶ 20).

[806]  Respondent's Counter-Memorial, ¶ 730.

[807]  *See* Claimants' Reply, § II. 2.5, Respondent's Rejoinder, ¶¶ 689-696.

562. In the Tribunal's view, considering the Parties' respective contentions and the terms of the ECT as explained above,[808] the issue at hand is not whether the New Regime provides a "reasonable return", but rather how such "reasonable return" is determined. To comply with the stability and predictability requirements under the ECT, the methodology for determining the payment due to CSP installations must be based on identifiable criteria.

563. Based on the Parties' submissions and the evidence submitted in this arbitration, the Tribunal is not persuaded that the methodology for determining the "reasonable return" under the New Regime complies with the requirements of the ECT and is sufficiently aligned to the representations previously made by Spain regarding the stability of the legal and economic regime applicable to RE projects in order to induce investments in the CSP sector.

564. First, the New Regime fixes the "applicable rate for reasonable return" at 7.398% before taxes. Such rate is based on the average yield in the secondary market of 10-year Spanish government bonds, plus a differential of 3%.[809] The evidence in the record does not point to an identifiable basis for determining such adjustment. On the contrary, during cross-examination, Mr. Montoya —manager of the solar department at IDAE— conveyed that the 3% adjustment is simply what he considered to be an appropriate spread.[810]

565. Second, the Special Payment is calculated considering the costs of a standard installation. According to Mr. Montoya, "each standard installation represents a group of installations that share the same technical characteristics and that share the same year of commissioning."[811] The determination of whether the plants are sufficiently similar was undertaken by the IDAE, according to their calculations.[812] Mr. Montoya claims that his calculation "covers practically all installations that have been put into service, including operating costs and other costs."[813] However, the Respondent has offered no further evidence in this arbitration to show the parameters used by the IDAE to determine the features of a standard installation. There is no evidence on the record as to which parameters were considered in determining what is a standard installation. Other than the testimony of Mr. Montoya, the Respondent provided no evidence as to which studies —

---

[808] *See* ¶¶ 517-533 *supra*.

[809] **Exhibit C-0029**, Royal Decree 9/2013, 12 July 2013, Article 1(2).

[810] Hearing, Day 3, Tr. 36:14-37:2. ("Q. What was the basis, Mr Montoya, for determining the adjustment of 300 basis points? A. Well, I was calculating for the standard installations and the remuneration. So those data are scenarios for me. On a regulated market, normally the spread is 200 basi points. So if you get 50% more in the spread, it is taking into account the risks, which may be higher in this kind of operation. So I think it is the standard spread that is used for that kind of regulated activity. Q. So you decided that that was the appropriate spread to apply in order to determine the reasonable return in this case? A. Yes.")

[811] Hearing, Day 3, Tr. 24:25-25:3.

[812] Hearing, Day 3, Tr. 25:6-12.

[813] Hearing, Day 3, Tr. 25:9-11.

technical, financial or otherwise— were made or considered to determine the criteria for grouping the installations and to determine which installations shared the same technical characteristics and the same year of commissioning.

566. Third, the "reasonable rate of return" is subject to a mandatory revision every three years and a possible revision every six years.[814] At the three-year point, the forecast of the market price is adjusted to the actual market price, which could go up or down.[815] After six years, Spain could revise the figure for the "reasonable return" and apply a different adjustment.[816] When asked about these possible revisions, Mr. Montoya acknowledged that the Government was entitled to either increase or decrease the spread, but failed to explain the criteria under which an adjustment would be made.[817] There is thus no evidence in the record that shows that the Government has established an identifiable set of criteria for the revision of the remuneration for RE installations.

567. Fourth, determination of the special payment under the New Regime is subject to the 7.398% rate.[818] As explained by Mr. Montoya, the Government considers the revenues obtained by a group of installations under the same standard installation and, on that basis, it estimates "how many subsidies they need to achieve a reasonable rate of return, which is 7.398%."[819] As a result, the already reduced "reasonable rate return" may be lowered considering previous payments to the relevant installation. Moreover, if the revenues obtained by a group of installations under the same standard installation exceeds the 7.398% rate of return, future compensation under the New Regime will be reduced accordingly so that the rate of return does not exceed the aforesaid 7.398%.[820] This means that the rate of return under the New Regime may apply to periods preceding the establishment of the New Regime.

568. Based on the evidence on the record of this arbitration, the Tribunal concludes that the methodology for determining the "reasonable rate of return" under the New Regime is not based on any identifiable criteria. On the contrary, what Spain labels a "reasonable rate of return" seemingly depends on governmental discretion. This is in plain contrast with the relative precision of the Original Regime —in force when the Claimants made their investment— which provided for objective and identifiable criteria for determining the

---

[814] Hearing, Day 3, Tr. 37:13-18; 47:12-22.

[815] *See* Hearing, Day 3, Tr. 34:2-20.

[816] *See* Hearing, Day 3, Tr. 48:17-23.

[817] Hearing, Day 3, Tr. 48:17-23 ("Q. That spread then, if in today's scenario, 1.1% of the Spanish bond yield over ten years, would it be possible for the government, considering the circumstances, to increase that to 600 basis points? A. Yes, of course. That is an option. As I said earlier, it could go one way, it could go the other. That is a possibility.) [Emphasis added]

[818] Hearing, Day 3, Tr. 25:20-26:14.

[819] Hearing, Day 3, Tr. 26:12-14.

[820] *See* Hearing, Day 3, 27:7-23.

remuneration due to CSP plants, which were expressly specified in the regulation and were dependent on the market.[821]

569. Finally, Spain contends that the disputed measures were adopted to address the Tariff Deficit and preserve the sustainability of the electricity system.[822] Indeed, the record indicates that the main purpose of these measures was to address the said deficit.[823]

570. It is undisputed that the Tariff Deficit poses a legitimate public policy problem for Spain. However, the experts of both Parties agree that the Tariff Deficit originated before Spain had any significant RE capacity.[824] The Respondent's suggestion that the incentives offered under the Original Regime caused the deficit is therefore unattainable.

571. Moreover, Brattle showed that, "Spain provided cumulative financial support of €0.6 billion to CSP from 2000 to 2011, which was less than 0.6% of €118 billion in cumulative costs of regulated activities other than generation."[825] Accordingly, the Tribunal is not persuaded that the FIT for CSP plants played a significant role in the accumulation of the Tariff Deficit.

572. Under these circumstances, the Tribunal cannot agree that the Tariff Deficit justified the elimination of the key features of the RD 661/2007 regime and its replacement by a wholly new regime, not based on any identifiable criteria.

573. For the reasons stated above and based on the facts credited in the record of this arbitration, the Tribunal cannot conclude that Spain complied with its obligation under Article 10(1) of the ECT.

## IX.  REPARATION

### A.  CLAIMANTS' POSITION

#### 1.  *Spain's international responsibility for violations of the ECT*

574. Since Spain has breached its obligations under Article 10 of the ECT, the Claimants are entitled to full reparation in accordance with principles of customary international law, as

---

[821] *See*, e.g., ¶¶ 559 *et seq. supra*.

[822] Respondent's Counter-Memorial, ¶¶ 442 and 443.

[823] *See* **Exhibit R-0081**, Copy of the letter from the Secretary of State for Energy, Ministry of Industry, Energy and Tourism, to the President of the National Energy Commission of 27 January 2012.

[824] Brattle Regulatory Report I, ¶ 14; and Brattle Regulatory Report II, ¶ 37; BDO Regulatory Report I, ¶ 121; Hearing, Day 5, 81:2-7.

[825] Brattle Regulatory Report I, ¶ 84.

codified in the International Law Commission's Articles on the Responsibility of States for Internationally Wrongful Acts ("<u>ILC Articles</u>").[826] Thus, Spain is under an obligation to make restitution to or, alternatively, compensate the Claimants for its internationally wrongful acts. Accordingly, Spain must, as far as possible, put the Claimants in the position they would have been in but for Spain's wrongdoing.[827]

575. Spain is obliged to effect restitution by withdrawing all the harmful laws and regulations disputed by the Claimants (namely the relevant articles of Law 15/2012, RDL 2/2013, RDL 9/2013, Law 24/2013, Order IET/1045/2014 and Order IET/1882/2014), while also compensating the Claimants for all losses suffered prior to the reinstatement of the original regulatory regime. In the alternative, if the Tribunal were to believe that restitution is either materially impossible or wholly disproportionate, the Respondent must pay the Claimants compensation for any financially assessable damage including loss of profits insofar as this is caused by the Disputed Measures.[828]

576. The ECT does not provide for a measure of damages for a breach of Article 10. Thus, the standard of damages applicable to a breach of Article 10 is the fair market value standard, specifically the difference in the fair market value of the investments with and without the Disputed Measures.[829] The fair market value is the standard applicable under Article 13 of the ECT in the event of a lawful expropriation and has been held by previous tribunals as the appropriate standard for compensation for a breach of the FET clause in the Argentina-U.S. BIT which, like the ECT, has no standard of compensation applicable to the FET clause but establishes that lawful expropriations must be compensated through the fair market value standard.[830] Likewise, the tribunal in *Anatolie Statie v. Kazakhstan*[831] held that the standard of damages for a breach of Article 10(1) of the ECT should not be lower than the fair market value standard prescribed by Article 13 of the ECT.[832]

### 2. *Valuation methodology and valuation date*

577. The removal of the FIT has significantly affected the Claimants' investments. It threatened the Claimants' ability to operate the Andasol Plants in accordance with their loan obligations and exposes Andasol-2 SA to a possibility of default on its debt. The Disputed Measures have also created significant regulatory risk in the Spanish RE market, which

---

[826] Claimants' Memorial, ¶¶ 465-466.

[827] Claimants' Memorial, ¶¶ 467-469.

[828] Claimants' Memorial, ¶¶ 470-471.

[829] Claimants' Memorial, ¶¶ 472-473.

[830] Claimants' Memorial, ¶¶ 474-475. Claimants cite *CMS v. Argentina* (Award), ¶¶ 409-410; *Enron v. Argentina* (Award), ¶¶ 361-363; *Sempra v. Argentina* (Award), ¶¶ 403-404; *Azurix v. Argentina* (Award), ¶ 424.

[831] *Stati et al. v. Kazakhstan* (Decision), ¶¶ 1460-1461.

[832] Claimants' Memorial, ¶ 476.

has had a negative impact on Antin's investments, and thus Spain must compensate the Claimants for the lost fair market value of their investments, comprised of lost historical and future cash flows.[833]

578. Brattle values the fair market value of Antin's investments in the Andasol Plants using a discounted cash flow ("DCF") analysis. Brattle compares two scenarios: the "But For" scenario, in which the Disputed Measures were never implemented, and the "Actual" scenario, which takes into account the full effect of the Disputed Measures. This comprises lost cash flows, both historical and future. The amount of damages due to the Claimants is the difference in the net present value between the Claimants' cash flows with and without the Disputed Measures.[834]

579. A DCF approach, which involves looking forward from the valuation date and projecting the most likely revenues and expenses of the going concern, is the approach that most accurately captures the Claimants' lost future cash flows, since it recognises that future cash flows have less value than current cash flows due to market risk and the time value of money. The DCF method is considered to be theoretically the strongest of the valuation methods frequently chosen by tribunals.[835]

580. In the present case, a DCF analysis is appropriate since (i) it can be used to explore the impact of different scenarios on the Claimants' cash flows and enables regulatory risk to be properly accounted for; (ii) it is particularly appropriate for the valuation of power stations and has come to dominate such valuations, and (iii) CSP projects have a relatively simple business model whose demand and long-run value can be analysed and modelled in detail based on readily available data.[836]

581. As a general principle, damages resulting from a breach are valued as at the date of harm. In cases of breach of an FET clause where the State has implemented multiple measures, tribunals have drawn on the test applied in cases of indirect expropriation. In such cases, there is growing recognition that the appropriate date for determining liability and valuing damages should be the date of culmination of all the events, *i.e.*, the point of irreversible deprivation of the property, rather than the date of the first event.[837]

582. This test has been adapted for breaches other than expropriation, including the obligation to provide FET.[838] In the case at hand, the Tribunal should thus consider when the

---

[833] Claimants' Memorial, ¶ 477.
[834] Claimants' Memorial, ¶¶ 478-480.
[835] Claimants' Memorial, ¶¶ 486-487.
[836] Claimants' Memorial, ¶ 488.
[837] Claimants' Memorial, ¶¶ 490-493.
[838] Claimants cite *Azurix v. Argentina* (Award), ¶¶ 417-418; *Enron v. Argentina* (Award), ¶ 405.

Claimants suffered harm by reference to the irreversible deprivation test, taking into account when the most serious damage was caused to the Claimants. For such purpose, the relevant date is 20 June 2014, on which Ministerial Order IET/1045/2014, the final act of the Spanish measures, was published.[839]

583.    To this regard, there are seven potential dates for valuation, corresponding to the different dates on which the Disputed Measures were adopted. Two of these dates may be considered to be the relevant date for valuation purposes. First, 12 July 2013, date on which Spain introduced RDL 9/2013, which was a complete overhaul of the RD 661/2007 economic regime. And second, 20 June 2014, date on which the Government published Ministerial Order IET/1045/2014, which set out the precise parameters for calculating the Special Payment under the New Regime. It is 20 June 2014 the date that is the most appropriate valuation date since (i) it was only then that Spain defined the parameters of the New Regime, confirming the total departure from the RD 661/2007 regime and thus, prior to that date, irreversible deprivation had not taken place; (ii) taking a valuation prior to 20 June 2014 is artificial and would require using hindsight, since from 12 July 2013 until that date the Claimants were unable to assess the extent of the impact of the New Regime and could not value their investments and (iii) 20 June 2014 represents the ultimate act of a two-year legislative backlash against RE, and on that date over 71% of the value of the Claimants' investments was wiped out.[840]

584.    By applying certain assumptions, Brattle calculated the difference in the total lost historical cash flows in the Andasol Plants to be EUR 25 million. Pursuant to its percentage shareholding in the Andasol Companies, Claimants' portion of those lost cash flows is EUR 11 million.[841]

585.    Regarding the lost future cash flows, Brattle calculates the Base Net Present Value ("Base NPV") of the reasonably-expected cash flows of the Andasol Plants. In the But For scenario, the Base NPV of the two CSP projects is EUR 935 million, while in the Actual scenario the Base NPV is EUR 498 million. Thus, the Disputed Measures have decreased the Base NPV of the CSP projects by EUR 437 million, which represents the lost net present value of the equity held in the CSP projects. Brattle then adjusts the Base NPV in both scenarios to take into account the positive "financing side-effects" of holding debt ("Adjusted NPV"). In the But For scenario, these effects amount to EUR 34 million and the Adjusted NPV is EUR 970 million, while in the Actual scenario they amount to EUR

---

[839] Claimants' Memorial, ¶¶ 494-498.
[840] Claimants' Memorial, ¶¶ 499-502.
[841] Claimants' Memorial, ¶¶ 504-506.

43 million, corresponding to an Adjusted NPV of EUR 541 million. Thus, the impact of the Disputed Measures is reduced by EUR 8 million to EUR 429 million.[842]

586. Brattle then subtracts from each scenario the net present value of the debt held by the Andasol Companies, obtaining the "Final Equity Value". In the But For scenario, the net present value of the debt is EUR 376 million, resulting in a Final Equity Value of EUR 593 million, while in the Actual scenario the present value of the debt is EUR 366 million, resulting in a Final Equity Value of EUR 175 million. Hence, the Disputed Measures have reduced the Final Equity Value by EUR 419 million. Brattle then assigns a percentage of the Final Equity Value to the Claimants, in proportion to the Claimants' 45% shareholding in the Andasol Companies, and subsequently applies an illiquidity discount of 18%, since the Claimants' CSP assets are difficult to trade. This results in lost future cash flows to the Claimants, as of 20 June 2014, amounting to EUR 155 million.[843] Together with the lost historical cash flows, Antin's damages amount to EUR 166 million, excluding interest and tax gross-up. After taking into account scheduled maintenance at the Andasol Plants and the lifetime of the storage and non-storage components of the plants, the Claimants' lost cash flows amount to EUR 148 million.[844]

587. The Claimants request that the Tribunal award both pre-award and post-award interest on the amounts due. In this regard, Article 13 of the ECT provides that interest will be calculated at a commercial rate established on a market basis from the date of expropriation until the date of payment. Although this article is only applicable to expropriation, this is also the appropriate benchmark for the assessment of damages arising out of breaches of the ECT other than expropriation.[845]

588. Interest intends to achieve full reparation, as required by Article 38 of the ILC Articles, and to re-establish the situation that would have existed if the illegal acts had not been committed. Thus, interest is an integral part of any award of compensation.[846] Since pre-award and post-award interests serve different purposes, the Tribunal may and should adopt different rates for each.[847]

589. As regards to pre-award interest, a rate that affords full reparation and is a commercial rate established on a market basis within the meaning of the ECT, is Spain's borrowing rate (based on the yield on Spanish 10-year bonds) which for the relevant period is 2.07%, compounded monthly. Awarding compound interest reflects the commercial reality of the

---

[842] Claimants' Memorial, ¶ 507.
[843] Claimants' Memorial, ¶¶ 507-508.
[844] Claimants' Reply, ¶¶ 727, 749-750.
[845] Claimants' Memorial, ¶ 528.
[846] Claimants' Memorial, ¶ 530.
[847] Claimants' Memorial, ¶ 531.

situation and is consistent with the most recent practice of investment treaty tribunals.[848] Concerning post-award interest, they serve the dual purpose of ensuring prompt compliance and preventing unjust enrichment. The Tribunal should order post-award interest at a rate higher than 2.07%, also compounded on a monthly basis.[849]

590.   Finally, to achieve full reparation, damages should be subject to a tax gross-up, since they are calculated to place the Claimants in the same position they would have been in, net of tax. Any amounts received by the Claimants will be subject to a corporate tax at a rate of 29.22%, the Luxembourg corporate tax rate, and the Tribunal should therefore order a compensation including a tax gross-up of 29.22%.[850]

591.   Contrary to the Respondent's allegations, the Brattle Quantum Reports do not lack transparency. They provided the underlying detail for all of the adopted assumptions, and thus BDO had all the information it needed to construct its own model of damages or, alternatively, if it disagreed with Brattle's assumptions, to adopt its own and devise a different damages calculation.[851]

   3.   *The Respondent's criticisms to the damages calculations submitted by the Claimants*

   a.   *The Claimants' damages are not speculative*

592.   Even if the Tribunal were to find, as requested by the Respondent, that the Claimants' legitimate expectations were limited to obtaining a "*reasonable return*" (which is denied) the Claimants have not received and will not receive a reasonable return under the New Regime. The New Regime has reduced the rate of return that was implicit in RD 661/2007 and thus Spain still incurs liability and the Claimants have suffered losses for which they must be compensated.[852]

593.   Moreover, Spain assumes that a decision of the Spanish Supreme Court which allegedly takes issue with the DCF method is relevant to this arbitration. However, the internal law of the host State has limited relevance to the wrongfulness of an act attributable to that State under an international instrument such as the ECT. Thus, the appropriate method for

---

[848] Claimants' Memorial, ¶¶ 532-534. Claimants cite *Santa Elena v. Costa Rica* (Award), ¶ 106; *Maffezini v. Spain* (Award), ¶ 96; *Wena Hotels v. Egypt* (Award), ¶¶ 128-130; *Micula v. Romania* (Award), ¶¶ 1266-1267; *Occidental v. Ecuador* (II) (Award), ¶ 848; *El Paso v. Argentina* (Award), ¶ 746; *Lemire v. Ukraine* (Award), ¶¶ 360-361.
[849] Claimants' Memorial, ¶ 535.
[850] Claimants' Memorial, ¶ 536.
[851] Claimants' Reply, ¶¶ 735-738
[852] Claimants' Reply, ¶ 742.

reparation is a question to be determined solely by reference to public international law and the ECT standard of fair market value.[853]

### b.   The DCF method is appropriate

594. Spain asserts that the DCF method should be rejected in this case. However, Spain has itself adopted the DCF method in this same context in order to (i) develop cash flow forecasts for attracting investors in its RE sector in 2005, (ii) design the tariff regime applicable under RD 661/2007, and (iii) design the New Regime.[854] Moreover, whether or not a DCF method is appropriate reduces to the single consideration of the certainty of future cash flows, and hence issues of duration (of both the existing track record and the projection) and financial viability, to the extent they are relevant at all, all go to the question of whether the future cash flows determined by the expert are likely to eventuate.[855]

595. The DCF method is almost universally used and accepted by both the business and academic community in valuing income-producing assets, and it has been confirmed by numerous tribunals to be the standard approach for calculating the fair market value of an investment for purposes of compensation of breaches of international law.[856] Tribunals adopting the DCF approach expressly acknowledge that projecting future cash flows requires a degree of conjecture, but minimize speculative elements by carefully analysing the underlying assumptions and parameters. Moreover, DCF discounts more distant cash flows more severely than near-term cash flows, assigning distant cash flows lower value to reflect the way that uncertainty compounds over time.[857]

596. Even though there are certain circumstances in which the DCF method is not appropriate due to uncertainties regarding future cash flows, that is clearly not the case at hand.[858] As of the valuation date, the Andasol Plants were well-established and had been operating and producing electricity for the national grid since 2009. In addition, the projects were fully financed and, without the Disputed Measures in place, the Andasol Companies would not have had trouble servicing their loans. Moreover, the DCF method has come to dominate the valuation of power stations, and it was used by all the relevant parties who have valued the Spanish CSP assets, including the Claimants, the lenders providing project finance and Spain itself.[859]

---

[853] Claimants' Reply, ¶ 745.

[854] Claimants' Reply, ¶ 752.

[855] Claimants' Reply, ¶ 755.

[856] Claimants' Reply, ¶ 757. Claimants cite *Occidental v. Ecuador* (II) (Award), ¶ 708; *Enron v. Argentina* (Award), ¶ 385; *CMS v. Argentina* (Award), ¶ 416; *Sempra v. Argentina* (Award), ¶ 416.

[857] Claimants' Reply, ¶¶ 758-760.

[858] Claimants' Reply, ¶¶ 761-762. Claimants cite *Khan Resources v. Mongolia* (Award on the Merits), ¶ 390.

[859] Claimants' Reply, ¶¶ 763-765.

597. Spain argues that there is too much uncertainty regarding the future cash flows due to the Claimants and that the DCF method is therefore unreliable. This is contradictory with Spain's own argument that under the New Regime investors are still obtaining a reasonable return of approximately 7.4% pre-tax, implying that their investments are at low risk. In any event, the future cash flows have been estimated with sufficient certainty by Brattle to warrant the use of a DCF calculation.[860]

598. *First*, concerning the standard of proof for the certainty of cash flows, the general tendency in investment-treaty jurisprudence has been to assess said standard as being akin to the balance of probabilities, that is, the claimant only needs to provide a basis upon which the tribunal can, with reasonable confidence, estimate the extent of the loss.[861] A smaller number of tribunals, to the contrary, consider that a claimant must meet a rather high standard when demonstrating that projected cash flows are likely to be realized. Whatever the standard adopted by the Tribunal, the Claimants easily meet their burden of proof, since Brattle's DCF calculation is based on mostly objective data. That is the case, firstly, for the Base NPV, which is based on predominantly objective inputs, including data regarding production, electricity prices, natural gas prices, inflation, financial support, operations and maintenance costs, lifetime of the plants, the regulatory risk and the discount rate used.[862]

599. As concerns Adjusted NPV, Brattle's accounting for financing side-effects, including the discount rate applied, is based on objective or actual data. Likewise, the Final Equity Value of the debt is calculated based on objective third-party data.[863]

600. *Second*, contrary to Spain's allegations, the Andasol Companies have sufficient operating history to warrant the adoption of a DCF methodology. Even though certain tribunals have considered the duration of an investment's operating history in this context, not all tribunals adopt that approach. Some do not consider operational history to be a particularly persuasive factor, and others award damages with regards to assets with a very short or no operational history.[864] Even those tribunals that have ultimately rejected the DCF method on the facts of the case have expressly recognized the possibility of adopting such method notwithstanding a short operating history.[865] This is so given that even without any history of performance, future cash flows can be estimated using other evidence such as business

---

[860] Claimants' Reply, ¶¶ 766-768.

[861] Claimants' Reply, ¶ 770. Claimants cite *Lemire v. Ukraine* (Award)*,* ¶ 246.

[862] Claimants' Reply, ¶¶ 773-780.

[863] Claimants' Reply, ¶¶ 782-783.

[864] Claimants' Reply, ¶¶ 784-788. Claimants cite Enron v. Argentina (Award), ¶ 369; Amco v. Indonesia (Award), ¶ 274; Sapphire International Petroleum Ltd. v. National Iranian Oil Co. (Award), p. 189.

[865] Claimants' Reply, ¶¶ 789-790. Claimants cite *Vivendi v. Argentina* (Award)*,* ¶ 8.3.4; *Al-Bahloul v. Tajikistan* (Final Award), ¶ 74.

plans, feasibility studies or analyst reports that contain analyses of projected costs and revenues, validated with market indicators and industry forecasts.[866]

601. The relevance of a history of operational performance will depend on other factors, such as the volatility of cash flows; in circumstances where the revenues are stable, such as the case at hand, the duration of such history is less important.[867] However, even if the Tribunal were to consider the length of operating history as a relevant factor, there is sufficient historical evidence to support a DCF method: the Claimants acquired their stake in the Andasol Plants in August 2011 and thus Brattle had almost four years of data on which to base its future estimated cash flows.[868]

602. *Third*, Spain argues the lack of financial viability of the Andasol Companies, allegedly a consequence of their own financial choices, in order to suggest that a DCF method is inappropriate. However, this is not true: if the Andasol Companies, particularly Andasol-2 SA, suffer any financial difficulties, it is due to the reduction of cash flows stemming from the Disputed Measures. In fact, the Andasol Companies had conservative debt: equity ratios as compared to other similar projects in the RE sector. In this regard, Spain acknowledged that a large percentage of RE investment would require leverage. Additionally, the Andasol Companies were making windfall profits, which suggests their viability is not in question.[869]

603. In any event, very few tribunals have considered the financial state of a claimant as being relevant to assessing the future prospect of the investment. Where this has been an issue, it is because such financial state has undermined the ability for the investment to be profitable in the future.[870]

604. *Fourth*, Spain argues that the volatility of pool prices renders the use of the DCF method inappropriate due to its uncertainty. However, such volatility is precisely one of the reasons for implementing a FIT regime, and thus under RD 661/2007 the pool price has only minimal impact on the remuneration received by CSP facilities, further limited by the established caps and floors.[871]

605. *Fifth*, Spain objects to how the long-term predictions are forecasted, to 37 years. However, standard practice is to forecast cash flows far out into the future. Moreover, contrary to

---

[866] Claimants' Reply, ¶ 786.
[867] Claimants' Reply, ¶ 791.
[868] Claimants' Reply, ¶ 792.
[869] Claimants' Reply, ¶¶ 793-796.
[870] Claimants' Reply, ¶¶ 797-800. Claimants cite *Wena Hotels v. Egypt* (Award), ¶ 124; *CMS v. Argentina* (Award), ¶¶ 413, 417, 424-427.
[871] Claimants' Reply, ¶¶ 803-804.

Spain's allegations, the useful lifetime assumptions of the Andasol Plants made by Brattle are reasonable.[872]

606.  *Sixth*, Spain argues that the DCF approach is inappropriate since the solar thermal industry is in evolutionary phase and lacks the necessary maturity. However, the uncertainty surrounding investments in RE in Spain are of the Respondent's own doing. Likewise, any technology risks that may have existed at the time the Claimants invested have since largely been resolved and do not affect Brattle's ability to forecast future cash flows. Power stations have a relatively simple business, and future revenues and cash flows for CSP power stations are well-defined.[873]

607.  *Finally*, Brattle's assumptions are not inherently subjective nor produce speculative damages, as alleged by Spain. To the contrary, Brattle's DCF calculation is conservative and consistent with recent market transactions.[874]

608.  In addition to the above, the argument raised by Spain that there is a disparity between the amount that Antin invested and the amount it claims in damages is irrelevant. However, in neither of the cases (*Wena Hotels v. Egypt* and *Tecmed v. Mexico*) cited by the authors in which Spain bases its allegations was the "*disparity*" factor a relevant consideration for rejecting the DCF method. In those cases, the tribunal's primary concern was the certainty of future cash flows, which is not in doubt in the case at hand. Moreover, the disparity between the amount claimed and the amount invested in both cases was significant and much greater than the difference in the present case, although it was not in itself a sufficient reason for rejecting the DCF method.[875]

c.    *The investment-based method is inappropriate*

609.  Spain alleges that Antin should only be entitled to the recovery of its investment costs (the "regulatory asset base" or "RAB") together with a reasonable return on those costs. However, contrary to Spain's allegations, the investment-based approach is inappropriate. First, it is not less speculative and easier than an income-based approach like the DCF method, since the assumptions underlying Brattle's calculation are mostly objective and simplicity cannot be assessed when BDO has not calculated the Claimants' damages based on the investment-based method.[876] Second, the investments were not acquired near the valuation date, but nearly three years before, and in any event Spain cites no authority for how the temporal proximity of an investment with the valuation supports the adoption of

---

[872] Claimants' Reply, ¶¶ 806-809.
[873] Claimants' Reply, ¶¶ 810-813.
[874] Claimants' Reply, ¶¶ 814-817.
[875] Claimants' Reply, ¶¶ 818-826.
[876] Claimants' Reply, ¶¶ 833-835.

the investment-based method. And third, Spain alleges that the Claimants' investments are a capital-intensive business with an important asset base, with no intangible assets to assess; however, it is unclear what the basis of this assertion is, and thus it may not be addressed in detail.[877]

610. In addition to the above, the Claimants are not aware of a single ECT award where the tribunal has opted for an investment-based method to assess the fair market value under Article 10 or Article 13. Moreover, the specific kind of investment-based method suggested by BDO, the RAB method, is not an appropriate measure of fair market value in the circumstances. First, BDO's reliance on this approach is highly unusual and without support from investment-treaty jurisprudence. In fact, the RAB is not used to value the fair market value of assets, the value of a company can differ from its RAB and this method is only used in the context of distribution monopolies.[878] Second, the RAB is not a *bona fide* alternative to assessing the fair market value of the Claimants' investments since it does not account for the regime change that took place, but simply assumes that a different regime was in place at the time Antin made its investment.[879]

611. The Respondent further argues that the Andasol Plants will obtain a better return than the corresponding standard facility. This argument is irrelevant to the Claimants' damages and it appears to be a further manifestation of Spain's submissions concerning the reasonable return, questioning its liability. In any event, BDO has used the wrong capital expenditure figures for the Andasol Plants, understating the actual cost outlay incurred, and it has overlooked production at the Andasol Plants, which is approximately 10% lower than production assumed for the comparable standard installation, which leads to a lower operating incentive. Thus, it is incorrect to conclude that the Andasol Plants would earn more than the reasonable return set by the New Regime.[880]

### d.  Spain's prejudicial allegations

612. *First*, Spain alleges inconsistencies regarding asset impairments. As Brattle explains, there is no such inconsistency, and, on any view, asset impairments are irrelevant to damages since they are based on fundamentally different considerations.[881]

613. *Second*, BDO opines that the Claimants were speculators. Such commentary does not fall within the scope of an expert report on damages and, in any event, it does not withstand scrutiny. Firstly, the price the Claimants' paid for their investment, their contemplated exit

---

[877] Claimants' Reply, ¶¶ 836-837.
[878] Claimants' Reply, ¶¶ 839-842.
[879] Claimants' Reply, ¶¶ 843-844.
[880] Claimants' Reply, ¶¶ 846-850.
[881] Claimants' Reply, ¶¶ 853-859.

in 2017 and the construction costs incurred in the Andasol Plants have no bearing on the fair market value of the Claimants' investment with and without the Disputed Measures. Secondly, BDO's speculation claim comparing the price paid by the Claimants to the price of ACS Cobra's equity investment is flawed. Thirdly, BDO fails to address the relevance of the Claimants' cash flow expectations or its possible exit at a higher price than it originally invested; in any event, the Claimants' expectations were not unreasonable or consistent with a speculative investment. Fourthly, BDO's interpretation of the medium risk of regulatory change does not assist BDO's argument regarding speculation and, in any event, regulatory risk has been taken into account by Brattle in its report. Finally, BDO's assertion that the Claimants are speculators is contrary to the evidence on the record in this arbitration, including the Fund's investment strategy and its decision-making process.[882]

### 4. *The Claimants' alternative damages calculation*

614. Even if the Tribunal were to find that the Claimants' legitimate expectations were limited by a reasonable return, the Claimants have still suffered damages. In this alternative hypothetical scenario, the Claimants would only be entitled to earn the reasonable return that was implicit in the FIT originally offered by the Original Regime. Three principles underpin this alternative scenario. *First,* the retroactivity of the New Regime is removed. For such purpose, Brattle assumes that (i) the Andasol Plants were entitled to earn what Spain considered reasonable at the time (9.5% after-tax for the premium option under RD 661/2007); (ii) all CSP plants would be entitled to the same levels of financial support regardless of their past gains; and (iii) Spain is prevented from retroactively imposing lower cost and efficiency targets on plants that turned out to be cheaper and/or perform better.[883]

615. *Second*, the reasonable return that allegedly underpinned RD 661/2007 was not expressly identified at the time. Based upon contemporaneous documents, Brattle has determined that a 9.5% after-tax return is a reasonable target. And *third*, Spain never published the cost target underpinning RD 661/2007. Brattle has used the marginal plant concept and assessed the Claimants damages under three possible interpretations of the marginal plant, highlighting that in the most logical scenario levelised costs are EUR 500/MWh with a 9.5% after-tax return, in contrast to approximately EUR 350/MWh with a 7.4% pre-tax return, representing a loss of EUR 150 for each MWh of production.[884]

---

[882] Claimants' Reply, ¶¶ 860-866.
[883] Claimants' Reply, ¶¶ 867-872.
[884] Claimants' Reply, ¶¶ 873-882.

616. With these principles in mind, Brattle adopts the DCF method to assess the Claimants' damages under the alternative scenario, taking the difference between the fair market value of the Claimants' investments under the But For and Actual scenarios as at June 2014 to estimate the Claimants' damages. Brattle applies a series of assumptions to each of the three levelised cost targets identified and calculates the Claimants' damages as follows: (i) in scenario 1, which considers the most expensive tower system as the marginal plant, the Claimants' damages are EUR 196 million; (ii) in scenario 2, which considers the most expensive parabolic trough scenario as the marginal plant, the Claimants' losses amount to EUR 105 million; (iii) in scenario 3, which computes the Claimants' damages by reference to the actual construction costs at the Andasol Plants, the Claimants' damages amount to EUR 100 million, all such amounts net of interest and tax.[885]

## B.   RESPONDENT'S POSITION

617. The Claimants have no right to compensation, since (i) the legal regime has always, since 1997, granted a reasonable return, and thus the Claimants have not suffered any deprivation or damages, and (ii) Spain has not violated any ECT provisions. Notwithstanding the above, in an ancillary manner, (i) the alleged damages are totally and absolutely speculative, (ii) the DCF method is inappropriate in light of the circumstances, (iii) the standard established for the Andasol Plants in Order IET/1045/2014 covers the investment costs undertaken, and (iv) the Brattle Report has serious flaws.[886]

### 1.   *The alleged damages are totally and absolutely speculative*

618. The distinction made by Brattle between historical cash flows and future cash flows must be rejected since it ignores the concept of useful regulatory life, as well as the joint consideration of past flows and future flows, which are relevant in order to guarantee the reasonable return of investments undertaken. The parameters used by the Claimants in their Actual and But For scenarios, including the time frame used and the assumption that the actual retribution system will remain petrified in the next decades, are hypothetical and illusory and ignore the fact that the guiding principle of the system is the guarantee of a reasonable return, which is a dynamic concept. Such a reasoning has been repeatedly rejected by the Spanish Supreme Court in decisions regarding modifications to the remuneration regime applicable to RE, where it has established that forecasts for long periods into the future, such as the one used by Brattle, lack rigor and security. Thus, the

---

[885]  Claimants' Reply, ¶¶ 883-890.
[886]  Respondent's Counter-Memorial, ¶¶ 927-933.

calculation of damages undertaken is speculative and such damages have not even been minimally proven.[887]

### 2. *The DCF method is inappropriate in light of the circumstances, in accordance with the doctrine*

619.  Arbitral doctrine and case law are clear in banning the application of the DCF method when its application is excessively speculative. In such cases, greater credibility has been granted to more reliable methods, such as those based on assets.[888] DCF will oftentimes result in an overvaluation of the impacts suffered by the Claimants, and in the case at hand it is unfair and impossible to apply such method since (i) there is not sufficient financial record sustaining a minimally solid future forecast on cash flows; (ii) almost all of the costs are investment costs in tangible infrastructures recently completed, and there are no significant intangible assets to be assessed; (iii) the solar thermal industry is in an evolutionary phase, and lacks the necessary maturity; (iv) there is a high dependence on cash flows stemming from volatile and unpredictable exogenous sources, such as pool prices; (v) the agreed project finance structures are financially weak and the plants are excessively leveraged, compromising and conditioning their viability; (vi) the long term predictions are calculated up to 37 years; (vii) there is a contradiction between such time horizon and the Andasol Plants' official useful life, as registered in their official accountability, i.e., between 15 and 20 years; (viii) there is an evident disproportion between the historical track record (less than five years) and the forecast time frame (37 years); and (ix) there is a disproportion between the alleged investment (and the alleged assumed risk) and the sum claimed.[889]

620.  In particular, it must be underscored that the useful life of the Andasol Plants would be, as a maximum, 25 years, and not 40 years as considered by Brattle. In fact, Claimants never expected the Andasol Plants to have a useful life exceeding 25 years. As mentioned before, the official useful life, as registered in the official accountability of the Andasol Companies, varied between 15 and 20 years. Likewise, both the Draft Law Report for RD 661/2007 and the 2005-2010 Plan estimated a useful life of 25 years. This conclusion has been supported by both the expert report prepared by Dr. Thomas R. Mancini (the "Mancini Report") and the expert report prepared by Dr. Jorge Servert (the "Servert Report), which show that the Andasol Plants will have a useful life of 25 years or less.[890]

---

[887]  Respondent's Counter-Memorial, ¶¶ 934-941; Respondent's Rejoinder, ¶¶ 921-924.
[888]  Respondent's Counter-Memorial, ¶¶ 945-946.
[889]  Respondent's Counter-Memorial, ¶¶ 948-950.
[890]  Respondent's Rejoinder, ¶¶ 935-943.

621. Moreover, the calculations made by the Claimants have not taken into account the necessary renovations that, according to said reports, will have to be made, nor did they consider that the storage system will probably be inoperative before 25 years, leading to a substantial reduction in the number of operating hours. This could entail that the Disputed Measures actually had a favourable impact on the Andasol Plants. Moreover, Brattle has not considered that a substantial modification of the components of the Andasol Plants would entail a new date of entrance into service under Article 4.3 of RD 661/2007, which would in turn cause RD 661/2007 to be inapplicable.[891]

622. In this sense, the DCF method has been rejected by tribunals on several grounds, including lack of sufficiently long performance record, failure to establish future profitability of the investment, lack of sufficient funds to complete and operate the investment and large disparity between the amount actually invested and the amount claimed. Hence, due to the unfairness of DCF, tribunals have often used methods based on the costs of assets in order to assess damages, analysing whether such assets have been recovered and whether a reasonable return has been obtained on them. These methods are less speculative and easier to apply and are particularly appropriate when the date of acquisition of the assets is close to the date of valuation, since on that date the price paid for the asset normally represents its market value. A valuation based on DCF should thus be discarded in the present case.[892]

    3.   *The standard established for the Andasol Plants in Ministerial Order IET/1045/2014 covers the investment costs undertaken*

623. The standard established for the Andasol Plants in Ministerial Order IET/1045/2014 covers the investment costs undertaken by the Claimants. In fact, said Order established a standard investment cost applicable to facilities with the characteristics of the Andasol Plants that is between 12% and 14% greater than the investment actually declared by the Andasol Companies. Hence, the specific return received by the Andasol Plants pursuant to Ministerial Order IET/1045/2014 will be much higher than the reference return set forth therein.[893]

---

[891] Respondent's Rejoinder, ¶¶ 944-947.
[892] Respondent's Counter-Memorial, ¶¶ 950-955; Respondent's Rejoinder, ¶¶ 926-933.
[893] Respondent's Counter-Memorial, ¶¶ 957-958.

4.    *Serious flaws of the Brattle Quantum Report*

624.    The Brattle Quantum Report has serious flaws that totally and absolutely invalidate its conclusions. Particularly, the report is opaque and does not provide the information used, and hence it cannot be checked or verified.[894]

5.    *Subsidiary calculations using DCF render positive financial impacts for the Claimants*

625.    In the alternative, BDO has calculated the financial impact of the Disputed Measures in accordance with the DCF method, adopting two different alternatives for the But-For scenario: first, by a But-For scenario calculated by reference to the provisions of RD 36/2004, which was in force at the time the greenfield investment was made in the Andasol Plants; and second, a But-For scenario calculated in accordance with RD 661/2007. Under the first scenario, the Disputed Measures, as compared with RD 436/2004, render a positive financial impact of EUR 11 million for the Claimants. Under the second scenario, BDO calculates a negative impact of only EUR 18 million for the Claimants, 88% less than the impact calculated by Brattle.[895]

626.    Such a difference arises from the different DCF models used and the different parameters considered: BDO, contrary to Brattle, has considered a useful life of the plants of 25 years, and it has taken into account that the conditions of the But-For scenario would entail a greater risk and greater uncertainty than those existing under the Actual scenario. Moreover, BDO carried out a sensitivity analysis of the financial impacts before the changes in the level of indebtedness or leverage, considering that the decision on the degree of indebtedness of a company is an individual decision freely adopted by each economic agent. Such analysis shows that the financial impact is very sensitive to the degree of leverage: even in the second scenario, reducing the debt ratio to 50% reduces the financial impact to less than half, and further reducing it to 25% would eliminate the negative financial impact of the measures.[896]

627.    Moreover, all of these calculations were made by applying the models used by Brattle, which were flawed since they did not take into account different issues related to the useful life of the technical components of the Andasol Plants. Considering such issues would affect the cash flows and further reduce the impact claimed by the Claimants. Likewise, any pre-award interest to be granted between the valuation date and the date of the Award

---

[894]  Respondent's Counter-Memorial, ¶¶ 959-961.
[895]  Respondent's Rejoinder, ¶¶ 951-957.
[896]  Respondent's Rejoinder, ¶¶ 958-962.

should not be calculated based on the interest rate adopted by Brattle (10-year bond), but on a rate that has a temporal correlation with the time gap between the valuation date and the estimated date of the award (2-year bond). Thus, even when using the speculative DCF method proposed by the Claimants, the hypothetical financial impact of the Disputed Measures is either positive or quantitatively negligible in relative terms.[897]

6. *The inappropriateness of the tax gross-up proposed by the Claimants*

628. The Claimants request the Tribunal to include within the amount granted as compensation a tax gross-up, in order to compensate the hypothetical tax payable by the Claimants in Luxembourg over such amount. However, this request is inadmissible. First, the tax gross-up proposed by the Claimants is vetoed by Article 21 of the ECT which establishes a tax gross-up carve out, by providing that nothing in the ECT shall create rights or impose obligations with respect to taxation measures of the Contracting Parties to the ECT. This carve out applies to taxation measures adopted by both the host country and the home country, since both are Contracting Parties. Moreover, the second sentence of Article 21 provides that said article will prevail in the event of any inconsistency with any other provisions of the ECT, including Articles 10, 13 or 26. Thus, under the ECT no taxation measures of the State of Luxembourg could create any obligations for Spain.[898]

629. Second, any hypothetical compensation granted in the Award would be exempt from taxation in Luxembourg, under both the domestic fiscal regulation of Luxembourg and the international tax regulation applicable.[899] And third, even if this were not the case, there are certain circumstances that would qualify the claim for a tax gross-up due to tax regulations in the home country as inappropriate, since it is essentially speculative, contingent and uncertain. Such was the rationale exposed by the tribunal in *Mobil v. Venezuela*, when it dismissed as speculative and uncertain a claim for the recognition of further damages that could arise from other jurisdictions imposing taxes on the sum awarded.[900]

C. **TRIBUNAL'S ANALYSIS**

630. The Tribunal has found that the Respondent breached its obligation under Article 10(1) of the ECT to accord the Claimants FET. Accordingly, the Tribunal must consider the appropriate standard of reparation.

---

[897] Respondent's Rejoinder, ¶¶ 963-965.
[898] Respondent's Rejoinder, ¶¶ 972-980.
[899] Respondent's Rejoinder, ¶¶ 982-986.
[900] Respondent's Rejoinder, ¶¶ 987-991. Respondent cites *Mobil v. Venezuela* (Award), ¶ 388.

631. In their prayer for relief, the Claimants requested that the Tribunal enter an award ordering the Respondent to:

> "(i) provide full restitution to the Claimants by re-establishing the situation which existed prior to Spain's breaches of the ECT, together with compensation for all losses suffered before restitution; or

> "(ii) pay the Claimants compensation for all losses suffered as a result of Spain's breaches of the ECT;"[901]

632. Regarding their request under (i) above, the Claimants assert that "Spain is obliged to effect restitution by withdrawing all the harmful laws and regulations complained of in this Memorial (namely the relevant articles of Law 12/2012, RDL 2/2013, RDL 9/2013, Law 24/2013, RD 413/2014 and the June 2014 Order) and placing Claimants under the same legal and regulatory framework that existed at the time they made the investments."[902]

633. In response to the Claimants' request for reparation, the Respondent contends that "the legal and regulating regime, since 1997 until today, has always granted the same, a reasonable return. Therefore, there is no reason to claim what we have never been deprived from, not to talk about any type of damage."[903]

634. The Tribunal observes that neither Party engaged with the Claimants' rather summary request that the Respondent provide reparation in the form of restitution of the legal and regulatory regime in force when the Claimants made their investment in Spain. While the Claimants merely devoted two paragraphs of their Memorial to their claim for restitution,[904] the Respondent did not offer a response to such claim beyond the statement from its Counter-Memorial quoted above. Neither was this claim fully discussed in the Parties' subsequent pleadings or in the Hearing.

635. However, to the extent that the Claimants maintained such request for restitution in their prayer for relief, the Tribunal must render a decision on the matter. In the present case and based on the Parties' pleadings and in consistency with the Tribunal's own findings, the Tribunal will not grant the Claimants' request that the Respondent be ordered to "[re-

---

[901] Claimants' Memorial, ¶ 537(b). *See* Claimants' Reply, ¶ 891.

[902] Claimants' Memorial, ¶ 470.

[903] Respondent's Counter-Memorial, ¶ 928.

[904] *See* Claimants' Memorial, ¶ 470-471. Claimants cite the decision in *Factory at Chorzów* for the proposition that restitution is the primary remedy for a State's wrongful act under international law. Additionally, they invoke Commentary (7) to the ILC Articles in support of their assertion that the Tribunal must order compensation for any financial assessable damage if "[it] were to believe that restitution is either materially impossible or wholly disproportionate."

establish] the situation which existed prior to Spain's breaches of the ECT"[905] in the terms set forth in their Memorial.

636.    Based on Article 35 of the ILC Articles, the Claimants submit that the Tribunal shall order restitution, unless it "believe[s] that restitution is either materially impossible or wholly disproportionate."[906] In the circumstances of this case, the Tribunal deems the order sought by the Claimants disproportional to its interference with the sovereignty of the State compared to monetary compensation.

637.    As previously mentioned, the Respondent is entitled to exercise its sovereign power to amend its regulations to respond to changing circumstances in the public interest to the extent that any such amendments are consistent with the assurances on the stability of the regulatory framework provided by the State and required by the ECT.[907] Failure to adhere to these commitments triggers the Respondent's obligation under the ECT to pay compensation for damages ensued. The Tribunal's finding in this regard is consistent with the decision in *Eiser v. Spain*.[908]

638.    In view of the above, the Tribunal turns to the Claimants' alternative claim that the Tribunal order Spain to pay monetary damages resulting from its breaches of the ECT.

639.    Having found that the Respondent breached its obligation under Article 10(1) of the ECT to accord the Claimants FET, the Tribunal must now decide (i) the appropriate standard for determining any compensation due for that breach; (ii) whether the Claimants suffered damages and are entitled to compensation as a result of the aforesaid violation, and (iii) if so, the amount of any such compensation.

640.    At the time of the Hearing, the Claimants retained a shareholding interest in two solar power generation plants (Andasol I and Andasol II).[909] The Claimants contend that even

---

[905] Claimants' Memorial, ¶ 537(b)(i).

[906] Claimants' Memorial, ¶ 468(d) and 471. *See* **Legal Authority CL-0086**, ILC Articles, Article 35 ("A State responsible for an internationally wrongful act is under an obligation to make restitution, that is, to re-establish the situation which existed before the wrongful act was committed, provided and to the extent that restitution: (a) Is not materially impossible; (b) Does not involve a burden out of all proportion to the benefit deriving from restitution instead of compensation.")

[907] *See* ¶ 532 *supra.*

[908] The tribunal in *Eiser v. Spain* reasoned as follows: "In their Memorial and Reply, Claimants sought 'restitution of the legal and regulatory regime under which they made their investments or, in the alternative, damages.' The Tribunal does not regard restitution in the form of restoring the RD 661/2007 regulatory regime as an appropriate remedy in this situation. As indicated earlier, the Tribunal does not question Respondent's sovereign right to take appropriate regulatory measures to meet public needs, potentially including revision of the RD 661/2007 regime. However, it must do so within the international legal framework it accepted when it adhered to the ECT, including the obligation to provide compensation for any breach of its commitments under the Treaty." *Eiser v. Spain* (Award), ¶ 425 [footnotes omitted]).

[909] A 45% shareholding in Andasol , and a 45% shareholding in Andasol II. Antin holds both its Andasol I and II shareholdings via a 100% owned subsidiary Guadisol B.V.

though the plants continue producing cash flows, it is far less than what they expected on the basis of the regime contemplated under RD 661/2007. The Claimants have calculated their damages based on the reduction in past and future cash flows said to result from the Disputed Measures. The Claimants claim the amount of EUR 148 million for lost and future cash flows resulting from the comparison between the But For and Actual scenarios, i.e. the comparison between the cash flows that the Claimants would have obtained absent the Disputed Measures and the ones they would obtain under the New Regime (excluding interest and a tax gross-up).[910]

641. Brattle, the Claimants' valuation experts, start from the premise that alleged violations commenced on 27 December 2012, when Law 15/2012 withdrew support for the MWh generated by natural gas and imposed a 7% levy on electricity production by CSP, wind and other types of power stations,[911] that RDL 9/2013 and Law 24/2013 fundamentally changed the regulatory regime for CSP, and that Spain left several parameters of the new regime unspecified until June 2014 when it issued RD 413/2014 and Ministerial Order IET/1045/2014.[912]

642. Based on the above premises, Brattle calculates, as a first step, the so-called "historical cash flows" corresponding to the difference between the actual cash flows from December 2012 up until June 2014 and the estimated during this same period had the RD 661/2007 regime remained fully in force.[913] The second step in Brattle's valuation is to estimate the fair market value of the Claimants' investments. In doing so, Brattle forecasts the reasonably expected cash flows of the Andasol Plants under the But For and Actual scenarios.[914] In this second step the But For scenario assumes the continued application of the RD 661/2007 regime and the Actual scenario reflects the cash flows resulting from the introduction of RDL 9/2013, RD 413/2014 and Ministerial Order IET/1045/2014.[915]

643. For purposes of the forecast mentioned in paragraph 642 above, the Claimants' expert valuators forecast production levels with reference to historical performance and contemporaneous forecasts prepared by the Claimants; assume that annual average pool prices grow with inflation over the long-run from a base of EUR 48 per MWh in 2015/16, and assume that Spanish gas prices move similarly. Brattle forecasts inflation with reference to the traded prices of Spanish inflation swaps and projects future O&M costs by

---

[910]  Claimants' Reply, ¶ 727.
[911]  Brattle Quantum Report I, ¶ 9.
[912]  Brattle Quantum Report I, ¶ 10.
[913]  Brattle Quantum Report I, ¶ 14.
[914]  Brattle Quantum Report I, ¶ 16.
[915]  Brattle Quantum Report I, ¶ 16.

174

reference to the contractual arrangements with O&M suppliers existing on the date of Brattle's Quantum Report I.[916]

644. Brattle applies a DCF approach that discounts the projection of future cash flows in the But For and Actual scenarios. In such approach, Brattle discounts the future cash flows to reflect risk and for purposes thereof considers "discount rates and techniques for the relatively low-risk But For scenario, as compared to the higher risk Actual scenario."[917]

645. To assess the risk for purposes of the calculation, Brattle examines a sample of publicly traded renewables companies to estimate a discount rate reflecting market risk and adds a further discount to reflect the presence of regulatory risk in Spain. Brattle quantifies the regulatory risk by reference to the performance of securitised debt linked to the Spanish Tariff Deficit. Brattle considers that the performance of these securities provides the basis for additional regulatory risk discounts in both the But For and Actual scenarios.[918] The June 2014 valuations performed by Brattle also consider the financial structure of the Claimants' investments, and particularly the fact that the Claimants hold shares and shareholder loans in the Andasol Companies which themselves have borrowed substantial sums.[919] Brattle first estimates the value of the relevant Andasol Companies as a whole, and then deduces the value of the outstanding liabilities of the Andasol Companies to derive the value of the Claimants' investments interests. Finally, Brattle reduces the value of the Claimants' investment interests "by a further 18% to account for their relatively illiquid nature."[920]

646. As a third and last step, Brattle calculates the amount of pre-award interest and the tax gross-up resulting from the requirement to pay Dutch income tax on any damages awarded by the Tribunal.[921]

647. The Respondent denied its liability for violation of the ECT and in its Counter-Memorial alleged that the damages claimed by the Claimants are "totally and absolutely speculative"; that the DCF method is inappropriate in the light of the circumstances; that the standard established for the Andasol Plants in Ministerial Order IET/1045/2014 covers the investment costs undertaken; and "other serious defects of the Brattle Report."[922]

---

[916] Brattle Quantum Report I, ¶ 17.
[917] Brattle Quantum Report I, ¶ 18.
[918] Brattle Quantum Report I, ¶ 19.
[919] Brattle Quantum Report I, ¶ 20.
[920] Brattle Quantum Report I, ¶ 20.
[921] Brattle Quantum Report I, ¶ 22.
[922] Respondent's Counter-Memorial, ¶ 933.

648. Even though Spain submitted with its Counter-Memorial expert reports prepared by BDO, in BDO Quantum Report I, the Respondent's experts did not respond to the calculations made by Brattle, and it was only in their second report that the Respondent's experts addressed all the calculations made by Brattle and proposed an alternative calculation method.

649. In their second quantum report, BDO expanded upon their prior objections and presented their own calculations of the value of the Claimants' investment. Even though, considering the timing of the presentation of these new valuations, the Claimants did not have an opportunity to respond in the written phase, at the Hearing and in their post-Hearing briefs the Parties debated their respective valuations.

650. The Respondent's objections to the calculation of damages presented by the Claimants are, therefore, fundamentally the same submitted by BDO particularly in BDO Quantum Report II.

651. The Respondent claims that the distinction between historical and future cash flows should be rejected, on the one hand because the date of 20 June 2014 is a date arbitrarily chosen by the Claimants, and on the other because it ignores "the essential concept of regulatory useful life as well as the joint consideration of past flows and future flows, in order to guarantee the reasonable return of investments undertaken".[923]

652. The Respondent also takes issue with the DCF method used by Brattle. First, because in Spain's view generally the use of the DCF method is speculative and, in addition, even if acceptable generally, it has been banned by case law and the doctrine in circumstances such as the ones prevailing in this arbitration.[924]

653. Specifically, the Respondent considers that the DCF method cannot be applied in the calculation of the alleged damages suffered by the Claimants because:

(a) The lack of sufficient financial record (less than five years) sustaining a minimally solid future forecast on cash flows and the evident time disproportion between the said financial track record and the predictions (37 years).

(b) The long-term predictions in the forecast (37 years) and the contradiction of such time horizon and the plants' official useful life declared in the official accountability of the plants (between 15 and 20 years).

---

[923] Respondent's Counter-Memorial, ¶¶ 935-936.
[924] Respondent's Counter-Memorial, ¶¶ 942-948.

(c)     The fact that it is a capital-intensive business, with an important asset base. Almost all its costs are investment costs in tangible infrastructure performed recently (plants finished in 2008-2009). There are no significant intangibles to be assessed.

(d)     The nature of the thermosolar industry itself: it is in an evolutionary phase, lacks the necessary maturity and has a high dependence on cash flows of volatile and unpredictable exogenous elements, such as the pool prices, amongst others.

(e)     The financial weakness of agreed project finance structures without recourse, which excessively leveraged thermosolar plants, compromising and conditioning their viability.

(f)     The disproportion between the alleged investment (and the pretended assumed risk) and the claimed sum.[925]

654.    The Respondent concludes that the appropriate method applicable in this case, according to the case law and the doctrine, is the asset-based method and that the DCF method should be discarded by the Tribunal.[926]

655.    The Respondent also argues that the standard provided for under Ministerial Order IET/1045/2014 results in a return that is higher than the one provided under the Original Regime and that Brattle Quantum Report I is opaque, as it does not reveal nor provide the information used and therefore it cannot be checked or verified. Quoting the BDO Quantum Report II, the Respondent asserts that Brattle has not provided with their financial impact report a breakdown of the calculations used and this has made it extremely difficult to analyse the report, and to determine whether the data are arithmetically accurate or not, and whether it is consistent with the assumptions on which it is based.[927]

656.    The Tribunal further notes that BDO in both quantum reports submits that the investment made by the Claimants is speculative. Particularly in BDO Quantum Report II, the experts argue that the speculative nature of the purchase made by Antin Termosolar results from the striking scenario where it paid almost 3 times the investment made by the initial investor and provided for a hypothetical sale of its stake six years after its acquisition for 2.02 times the amount paid.[928] This argument was not developed by Spain in its Counter-Memorial.

---

[925]  Respondent's Counter-Memorial, ¶ 949.
[926]  Respondent's Counter-Memorial, ¶ 951.
[927]  Respondent's Counter-Memorial, ¶¶ 959-961.
[928]  BDO Quantum Report I, ¶¶ 41, 140, 155; BDO Quantum Report II, ¶¶ 219-225

657. Finally, the Tribunal notes that in paragraphs 634 and following of its Counter-Memorial and in paragraphs 421 and following of its Rejoinder, the Respondent briefly addressed the limitations on the granting of State aid and the alleged illegality of the remuneration provided for under the Disputed Measures in light of EU regulations. The Respondent asserted that it was "obliged, under the provisions of Articles 107 and 108 TFEU, to notify the European Commission of the existence of support measures for renewable energy and cogeneration in Spain, through Order IET/1045/2014. To this effect, the Commission has opened proceedings No. SA.40348 2014/N." [929]

658. In principle, the issue of whether an investor in an EU Member State that provides state aid to RE investors should, when making the investment, consider that the State's RE subsidy programme is governed not only by the applicable national regime, but also by EU state aid rules which are legally binding on Member States under EU law, could be relevant to determine the legitimate expectations of the investor. In the instant case, however, the Respondent did not analyse the impact, if any, of the alleged illegality of the Disputed Measures on the legitimate expectations of the investor at the time of the investment; nor the impact of such alleged illegality under EU law in the protection granted by the ECT; nor did it explain the effects of the alleged illegality under EU law of measures that Spain considered legal at the time of issuance; nor did it seek to estimate the impact of an alleged illegality resulting from EU state aid rules on any potential award of damages.

### 1. *The applicable standard for compensation*

659. Article 10 of the ECT does not provide for a standard of compensation for breaches of its obligations. No other provision of the ECT establishes a standard for compensation in case of violation of the obligation to provide FET.

660. As regards expropriation, Article 13 of the ECT provides that State Parties may not expropriate except, inter alia, when expropriation is accompanied by prompt, adequate and effective compensation reflecting the fair market value of the expropriated property.

661. It is undisputed that, as a general rule, the violation of a treaty obligation causing damage grants the injured party the right to receive compensation for the damage sustained.

662. The Tribunal agrees with the Claimants in that the appropriate standard for compensation should be based on international law. In the well-known decision in the *Chorzów* Case, the Permanent Court of International Justice indicated that

---

[929] Respondent's Rejoinder, ¶ 425.

> "The essential principle contained in the actual notion of an illegal act […] is that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it – such are the principles which should serve to determine the amount of compensation due for an act contrary to international law."[930]

663. In turn, Article 31 of the ILC Articles provides that in case of a treaty breach or other internationally wrongful act (a) the responsible State is under an obligation to make full reparation for the injury caused by the internationally wrongful act, and (b) injury includes any damage, whether material or moral, caused by the internationally wrongful act of a State.[931]

664. The Tribunal considers the above as reflecting the international law rules that are to be applied here and therefore, the Claimants under international law are entitled to full reparation for damages caused by the breach by the Respondent of its obligation to accord FET under ECT Article 10(1), so as to remove the consequences of the wrongful act.

665. Before addressing the valuation submitted by the Claimants' experts and the criticisms presented by the Respondent and its experts, the Tribunal will address two issues submitted by Spain that have an impact on the damages valuation: the so-called historical damages and the tax gross-up.

### 2.  *The historical damages*

666. As discussed in paragraph 642 *supra*, the historic losses claimed by the Claimants correspond to the difference between the actual cash flows from December 2012 up until June 2014 and the estimated cash flows during this same period had the RD 661/2007 regime remained fully in force.

667. The Tribunal has already decided that the Respondent's violation of the ECT results from the entire elimination and replacement of the Original Regime and not from the elimination or modification of certain features of the Original Regime. Given that the violation

---

[930] **Legal Authority CL-0010**, *Factory at Chorzów*, p. 47.
[931] **Legal Authority CL-0086**, ILC Articles, Article 31.

occurred when the Original Regime was eliminated in June 2014, Claimants' damages for the so called "historic losses" occurring prior to June 2014 must fail.

668. Considering that the historical losses are not included in the calculation of damages, the issue of whether the Tribunal has jurisdiction regarding the claims involving the tax on energy production as regards this portion of the claim becomes moot, as it does not affect the calculation of the Claimants' damages.

###### 3.   *The tax gross-up claim*

669. The Claimants consider that to achieve full reparation, the damages should be subject to a tax gross-up since damages are calculated to place the Claimants in the same position they would have been net of tax. Considering that any amounts received by the Claimants will be subject to corporate tax at a rate of 29.22%, the Tribunal should include in the compensation a tax gross-up of 29.22%, reflecting the income tax rate in Luxembourg (assuming all damages are paid to Antin Luxembourg). The Claimants add that if they obtain an award for compensation (including interest due) in October 2016, the tax gross-up amounts to around EUR 72 million, reflecting the Luxembourg corporate tax rate.[932]

670. In its Counter-Memorial, Spain indicated that it reserved its rights to challenge the tax gross-up, but did not indicate on which basis nor discussed the merits of such claim.[933]

671. In the Rejoinder, Spain engaged with the analysis of the tax gross-up and submitted two expert opinions, attached as exhibits to BDO Quantum Report II, to question the viability of the Claimants' claim in this regard. The Respondent's objection to the tax gross-up is threefold. First, the tax gross-up is impermissible given Article 21 of the ECT. This provision applies both to the taxation measures of the host country and to the taxation measures of the investor's home country, since both are Contracting Parties of the ECT. Moreover, no taxation measure of Luxembourg could create any obligation for Spain based on the ECT.[934] Second, the compensation would include an income that is exempt from taxation in Luxembourg. The compensation for income that was not received would fall within what is known as the "participation exemption" in the scope of the EU, established by Community Directive. The participation exemption provides for the exemption of the "profit distributions" between parent companies and subsidiaries of different Member States of the EU and aims to eliminate double taxation. This is clear from the analysis of both the "Luxembourg Income Tax Law", as well as the so-called Parent-Subsidiary

---

[932] Claimants' Memorial, ¶ 536.
[933] Respondent's Counter-Memorial, ¶ 932.
[934] Respondent's Rejoinder, ¶¶ 972-981.

Directive.[935] Third, any claim for tax gross-up is speculative, contingent and uncertain. The Respondent contends that there are several issues that have not been discussed or put forward by the Claimants and that would affect taxation to the Claimants such as whether the Claimants benefit from a tax ruling in Luxembourg, or whether the Claimants would neutralise the compensation with other negative income that they may have now or in the future in Luxembourg; or whether the Claimants benefit from any special tax regime.[936]

672. At the Hearing, the Claimants' counsel briefly referred to the matter in the opening statement,[937] as did the Respondent's counsel.[938] During his cross-examination, Mr. Caldwell, the Claimants' expert, admitted that he was not an expert in international taxation nor in Luxembourg taxes and that the corresponding figures had been included based on the opinion of the Claimants' counsel.[939] In turn, Mr. Perez, the Respondent's expert, indicated that the tax gross-up calculated by Brattle was not properly supported or evidenced.[940]

673. The Tribunal considers that it is for the Claimants to prove whether or in what amount any tax on compensation determined by a future award may be due. There is no evidence on the record to prove the type and amount of tax that may be due on an award of compensation and whether such tax would be affected by the regime to which the Claimants as taxpayers are subjected in the given jurisdiction(s). Under these circumstances, the Tribunal is not in a position to determine whether there would be a specific tax impact that requires a tax gross-up like the one claimed by the Claimants. Therefore, this portion of the Claimants' damages claim must fail.

### 4.    *Damages for loss of future cash flows*

674. The Tribunal will now deal with the claim that constitutes the most representative amount of the claim for damages submitted by the Claimants, namely the loss of cash flows resulting from the Disputed Measures and the resulting reduction of the fair market value of the Claimants' investment. For the reasons already discussed in paragraph 667 *supra*, the Tribunal will not consider the so-called historic cash flows but only the cash flows that were allegedly lost after June 2014.

---

[935] Respondent's Rejoinder, ¶¶ 982-986.
[936] Respondent's Counter-Memorial, ¶¶ 987-991.
[937] Hearing Tr., Day 1, 217:20-218:22.
[938] Hearing Tr., Day 2, 103:12-106:22.
[939] Hearing Tr., Day 4, 107:4-108:24.
[940] Hearing Tr., Day 4, 211:12-18.

675. The Tribunal concurs with the Claimants in that the proper approach for determining the amount of reparation in this case is to assess the reduction of the fair market value of the Claimants' investment by determining the present value of cash flows claimed to have been lost as a result of the Disputed Measures.

676. As discussed in paragraph 653 *supra,* the Respondent and its experts disputed the calculation of damages submitted by the Claimants and its experts. The Tribunal will now refer to each of the issues submitted by the Respondent and disputed between the Parties.

### 5.   *The DCF method*

677. The Respondent takes issue with the DCF method used by Brattle in general, as it considers such method to be speculative and not applicable in the circumstances of this case.[941] Specifically, and as a first circumstance that bans the application of this method, the Respondent considers that the Andasol Plants lack a sufficient financial record (less than five years) to allow for a solid future forecast on cash flows.[942]

678. BDO, the Respondent's valuation expert, considers that valuation methods, in addition to the information used in any valuation, should be appropriate to the circumstances and context of the valuation and that the valuation should consider aspects such as the reasons for the valuation, the nature of the company, the business or asset to be valued, the environmental characteristics, the company's specific situation, the expectations of management or shareholders, the financial information available and the management information available. BDO adds that there are no right or wrong valuation methods, but methods of varying appropriateness, depending on the specific circumstances.[943]

679. BDO admits that the DCF method is, along with others, one of the most commonly used to value businesses and companies, but with certain qualifications including the fact that, in BDO's opinion, the main weaknesses of the DCF method are the high level of uncertainty and subjectivity of the assumptions and parameters on which the method relies, which assumptions and parameters can be unreliable and hard to verify, in many cases. This is due to the fact that the assumptions and parameters on which the analysis is based refer to expectations of a business' future, which are generally uncertain and volatile in nature and subject to a high level of subjectivity.[944]

---

[941] Respondent's Rejoinder, ¶¶ 919-923.
[942] Respondent's Rejoinder, ¶¶ 919-923.
[943] BDO Quantum Report I, ¶¶ 251-252.
[944] BDO Quantum Report I, ¶¶ 253-255.

680. BDO considers that the Brattle Quantum Report is based on assumptions that are highly subjective and that forecasts for periods exceeding 5-7 years involve a high degree of uncertainty and subjectivity and, therefore, mean that the reliability of the DCF method is limited. BDO adds that the approach adopted by Brattle of DCF in its Adjusted Present Value form, presents significant inaccuracies and inconsistencies, such as the failure to include bankruptcy costs in the valuation, and the lack of consistency in the cost of capital adopted in the actual scenario, wherein the cost of debt is greater than the cost of equity.[945]

681. In the opinion of BDO, given that the Spanish State guarantees a reasonable rate of return which will be revised and updated periodically, methods based on the cost of an efficient investment would be better suited than the DCF method.[946]

682. BDO proposed as the most suitable method for damage valuation, in the circumstances of this case, the asset-based method and particularly the Regulatory Asset Base ("RAB") and listed the advantages that such method would have in the valuation in this particular case.[947]

683. In BDO Quantum Report II, the Respondent's experts assert that

> "[…] there is no sense in projecting the variables which comprise the cash flows for far-off periods, as the results would be less accurate. Instead, we consider it more logical to perform forecasts for the stated variables for up to a maximum of 5-7 years and for the remainder of the useful lives of the plants, to annually increase the resulting cash flows on the basis of growth and profit assumptions taking into account the fact that as the useful life of the plants progresses, the desired yield of the assets should approach the yield required by the market (reflected in the discount rate), in accordance with the foreseeable growth of the long-term yield (due to the loss of competitive advantage) especially in regulated sectors."[948]

684. During his opening presentation at the Hearing, Mr. Eduardo Perez of BDO disputed again the DCF method as highly speculative and indicated that:

> "The scenario is conceived in market circumstances which are not regulated. It is a very complex situation, a very difficult situation, in an economy which is having a very severe crisis and in a sector where there is over-remuneration. So, in such circumstances, the DCF

---

[945] BDO Quantum Report I, ¶¶ 257-261.
[946] BDO Quantum Report I, ¶ 262.
[947] BDO Quantum Report I, ¶¶ 263-272 and ¶¶ 280-285.
[948] BDO Quantum Report II, ¶ 131.

method is very difficult to apply, and there are some specific difficulties to apply it."[949]

685. Also, in his opening presentation, Mr. Perez stressed regarding the proper methodology: "Let's see now the valuation methods used by us, by BDO. First of all, what is our basic approach? And second, some theoretical calculations. First of all, as I have said already, the valuation is made in a specific context and circumstances, and the investor knows it. They know it beforehand. And of course the main principle is reasonable return".[950]

686. Mr. Perez added that "the basis of the regime is reasonable return. Before and after the disputed measures, the value depends on the value of the investment: it could be a bit higher, much higher or less higher; it depends on the efficiency of the performance, it depends on the performance. But values are similar, and so there is no impact."[951]

687. When cross-examined in the Hearing by the Claimants' counsel, Mr. Perez admitted that for purposes of the calculation of damages his first assumption was that the Claimants were not entitled to a fixed FIT, but they should expect the plants' remuneration to vary with reasonable return. He also admitted that the assumptions that BDO made in its RAB analysis did not actually answer the Claimants' case, and finally that if the Tribunal were to disagree with Spain and accept the Claimants' claim that there had been a change in the regulatory regime, there was no analysis in BDO's reports on the impact that the change would have on the RAB multiples.[952]

688. The Tribunal agrees with the Respondent's expert in that there are no right or wrong valuation methods, but different methods that are appropriate depending on the specific circumstances of the case. The Tribunal also agrees that the DCF method is one of the most commonly used methods to value businesses and companies. However, the Tribunal is not persuaded by the objections to the use of the DCF method submitted by the Respondent and based on BDO's expert reports.

689. First, it is true that the DFC method may be inappropriate for the valuation of business concerns that are not in operation or at very early stages of operation and therefore lack a suitable track record of their performance. It may also be inappropriate for business concerns having a short performance record and subject to several variables that are difficult to forecast. However, this is not the case here. It is undisputed that the Andasol Plants have five years of operation and that they are not complex businesses. As stated in Brattle Quantum Report I —a point that the Tribunal finds convincing— "[p]ower stations

---

[949] Hearing Tr., Day 4, 202:1-8.
[950] Hearing Tr., Day 4, 207:19-25.
[951] Hearing Tr., Day 4, 208:14-20.
[952] Hearing Tr., Day 5, 91:12-25; 92:1-25; 93:1-10.

(both conventional and renewables) have a relatively simple business, producing electricity, whose demand and long-run value can be analysed and modelled in detail based on readily available data."[953]

690. Second, it is also true that the DCF forecast, as with any other forecast, has many variables and some of them (for example inflation or interest rates) may be difficult to predict for a long term. However, in this particular case, the alleged unpredictability of the DCF method submitted by BDO is fundamentally tied, on the one hand, to the unpredictability of the changes in the Spanish legal regime, and on the other, on the theory that all that the Respondent needs to guarantee is a reasonable return. Therefore, if the Tribunal were to find, as it did, that the Claimants are not only entitled to a reasonable return, and that the Original Regime could not be wiped out without violating the ECT, then BDO's case on damages, specifically as to the inapplicability of the DFC method, would fail. As admitted by BDO's Mr. Perez, if the Tribunal were to find in favour of the Claimants, the RAB analysis would not be appropriate. In other words, the BDO analysis on the DCF method was substantially based on, and highly dependent on, the Claimants' merits case failing. Since the Claimants succeeded in establishing liability on the basis of an expectation as to the continued operation of the RD 661/2007 regime, BDO's analysis on the inapplicability of the DCF method fails.

691. Therefore, the Tribunal considers the DCF approach adopted by the Claimants and their experts to be appropriate and considers that a track record of five years in this particular business does not prevent calculations for periods of time exceeding the five or seven years alleged by BDO. A different issue, which the Tribunal will proceed to analyse, is whether the calculation should be made based on an assumed operational life of the plants of 25 years or less, as claimed by the Respondent, or 40 years, as submitted by the Claimants.

### 6.  *Operational life of the Andasol Plants*

692. Based on the testimony of Mr. Mark Crosbie, the Brattle Quantum Report assumes that "Antin's CSP plants could continue operating for 40 years without the need for significant investment."[954] Brattle also clarifies that "Antin's original analysis conservatively projected that the plants would operate for 30 years. Antin now believes that an operational lifetime of 40 years is likely. We assume that Andasol I and II would continue operating until 2049."[955]

---

[953] Brattle Quantum Report I, ¶ 38.
[954] Brattle Quantum Report I, ¶ 65.
[955] Brattle Quantum Report I, ¶ 65, footnote 53.

693. In his first witness testimony, Mr. Crosbie indicated that "[w]e also looked into the main performance criteria for the Andasol Plants taking into consideration that they had a projected operational life of at least thirty years (and possibly up to forty years we believe today), and would be able to supplement production using natural gas, while attracting the same pool price plus Premiums."[956] He further clarified that thirty years was a conservative assessment at the time, but that some of the CSP plants in the United States of America have now been in operation for about thirty years and are still operating.[957]

694. Along with their Memorial, the Claimants submitted a due diligence report dated 7 July 2011 prepared by Altermia ("Altermia Report") which reviewed the Andasol Plants prior to the investment.[958] According to such report, the average useful life of the plants is 30 years, provided that adequate criteria are considered for the preventive, predictive and corrective maintenance according to good engineering practices and the recommendations of the contractors and the suppliers of the equipment.[959]

695. Also with their Memorial, the Claimants submitted the report prepared by Alatec dated 15 March 2011 (the "Alatec Report"). Like the Altermia Report, the Alatec Report was prepared for the due diligence conducted prior to the investment's acquisition. The main conclusion of the Alatec Report —partially disputed by Dr. Servert— is that the equipment can be divided into two groups according to its useful life: 20 to 25 years for less expensive equipment and approximately 35 years for core equipment, such as the turbine, mirrors, and receptor tubes.[960]

696. The Alatec Report adds that thermoelectric plants using parabolic trough collectors have an estimated useful life of 30 to 35 years, depending on the durability of the more expensive equipment, and after 35 years, if a significant decrease in efficiency is observed, maintaining the plant in operation would require a replacement of core equipment and a partial replacement of secondary equipment if it is in its second cycle.[961]

697. The Claimants also submitted the Mancini Report, an expert report prepared by Dr. Thomas R. Mancini, who evaluated the expected lifetime of the Andasol Plants and concluded that "[i]t is reasonable to assume that, excluding the thermal energy storage

---

[956] Crosbie WS I, ¶ 46.

[957] Crosbie WS I, ¶ 46, footnote 28.

[958] *See* **Exhibit C-0036**, Altermia Asesores Técnicos, S.L., "Independent Technical Consultancy – Technical Due Diligence Report on Three (3) Solar Thermal Energy Plant Projects", 7 July 2011 ("Altermia Report").

[959] **Exhibit C-0036**, Altermia Report, p. 7.

[960] **Exhibit C-0035**, Alatec Ingenieros Consultores y Arquitectos, "Technical Evaluation of the Solar Thermal Plants with Parabolic Trough Collectors, Property of ACS/Cobra in Spain", 15 March 2011 ("Alatec Report"), pp. 14-15.

[961] **Exhibit C-0035**, Alatec Report, p. 15.

system, the Andasol projects, Andasol 1 and Andasol 2, will each have an operational lifetime of 40 years."[962]

698. The Respondent disputes the lifetime of the Andasol Plants, as submitted by the Claimants and their experts and witnesses on several grounds.

699. First, according to Spain, the Claimants never had an estimated life expectancy of the Andasol Plants of more than 25 years. The useful life declared in official accounts of the holding companies of the Andasol Plants is 15 years in the annual accounts for the financial years 2009 and 2010, and 20 years in the annual accounts for the financial years 2011 to 2013.[963] Second, the base bank case for project finance of the Andasol Plants considered cash flows during a maximum of 25 years.[964] Third and last, both the draft law report of RD 661/2007, as well as the 2005-2010 Plan, estimated a useful life of 25 years.[965] Therefore, the higher lifetime expectancy of the plants should be 25 years.[966]

700. Together with its Rejoinder, the Respondent submitted the Severt Report, an expert report prepared by Dr. Jorge Servert on the lifetime of the Andasol Plants. In his report, Dr. Servert concluded that

> "[…] if properly operated, Andasol 1 and Andasol 2 CSP power plants will have in the best case an operational live of 25 years. For molten salt hot tank might be shorter as stated by Dr. Mancini, thus, further analysis is needed. If the hot tank has corrosion problems as Dr. Mancini states, this will be a major hazard that has to be solved, leading to the CSP plant to work without heat storage way before 25 years."[967]

701. In response to Dr. Mancini's report, Dr. Servert presents a chart with a summary of his analysis of the lifetime of the different components of the Andasol Plants.[968] According to such chart, the expected lifetime of the overall plant is 20-25 years and an expected lifetime of less than 25 years applies to the following components of the Andasol Plants: condenser; cooling tower; thermal receiver; steam generator; salt hot tank and system; and molten salt/HTF heat exchangers.[969]

---

[962] Expert Report of Dr. Thomas R. Mancini of TR Mancini Solar Consulting, dated 17 December 2015 ("Mancini Report"), ¶ 14 and p. 30.
[963] Respondent's Rejoinder, ¶ 936; Documents BQR-54, BQR-55 and BFR-5.
[964] Respondent's Rejoinder, ¶ 938; Documents BQR-63 and BQR-64.
[965] Respondent's Rejoinder, ¶ 939.
[966] Respondent's Rejoinder, ¶ 940.
[967] Servert Report, p. 21.
[968] Servert Report, pp. 21 and 22.
[969] Servert Report, pp. 21 and 22.

702. According to the Respondent, Brattle's calculations on the lifetime of the plants did not consider the necessary renovations that, in view of the reports from the engineers, should be performed;[970] that the storage system (SAT) will probably be inoperative before 25 years;[971] and that "a substantial modification of the components of the Plant would provoke, even according to RD 661/2007, a 'new date to put into service' for the purposes of not applying the subsidy of RD 661/2007."[972]

703. During cross examination, Dr. Mancini admitted that the Andasol Plants are the first to have thermal energy storage[973] and acknowledged that lack of performance data at medium- or long-term are potential risks for any commercial plants using this type of technology for the first time, but clarified that this conclusion only applies to thermal energy storage.[974] Dr. Mancini also declared that his analysis was limited to the likely lifetime of the plant, and did not consider the reinvestment costs necessary to keep the plant operational.[975]

704. A key issue in the cross-examination related to the comparison between coal and CSP plants, which, according to Dr. Servert, are not comparable. Dr. Mancini accepted that one of the main differences between them is that the former work more than twice the number of hours per year than CSP plants, and that CSP plants start and stop continuously[976] and this is likely to have an impact on the design of a turbine for CSP plants.[977] Dr. Mancini conveyed that, in his opinion, it is more technically accurate to refer to coal power plant data from the United States of America than to the Altermia and Alatec reports.[978]

705. In response to a question from the Respondent's counsel, Dr. Mancini indicated that he estimated the lifetime of the cold part of the storage system to be 25 years[979] and asserted that if the cold part fails, the whole circuit would stop functioning.[980] Dr. Mancini further admitted that he had not seen that the duration of the O&M contracts was 19 years.[981]

706. Finally, in their post-Hearing brief, the Claimants stressed that Article 36 of RD 661/2007, which refers to the applicable tariffs, contemplated a differential between the first 25 years

---

[970] Respondent's Rejoinder, ¶ 944.
[971] Respondent's Rejoinder, ¶ 945.
[972] Respondent's Rejoinder ¶ 946.
[973] Hearing Tr., Day 3, 66:8-9.
[974] Hearing Tr., Day 3, 67:23-68:2.
[975] Hearing Tr., Day 3, 68:13-18.
[976] Hearing Tr., Day 3, 69:24-70:4.
[977] *See* Hearing Tr., Day 3, 69:8-23.
[978] Hearing Tr., Day 3, 73:9-20.
[979] Hearing Tr., Day 3, 83:18-23.
[980] Hearing Tr., Day 3, 83:24-84:3.
[981] Hearing Tr., Day 3, 90:4-12.

of operation and thereafter which, in the Claimants' opinion, confirms that Spain contemplated a lifetime exceeding 25 years.[982]

707. The Tribunal considers that it is for the Claimants to prove the facts that support their case on damages and in this specific case, that Brattle's assumption of a 40-year lifetime for the plants is correct. In the Tribunal's view, the balance of the evidence in the record does not support the Claimants' case.

708. First, the documentary evidence in the record is inconsistent. The Altermia Report contemplates a useful life of 30 years, subject to proper maintenance. The Alatec Report considers that the useful life is 20 to 25 years for less expensive equipment and approximately 35 years for core equipment. The Claimants' own documentation suggests that for purpose of the annual accounts for the financial years 2009 to 2013, as well as for the financing, they estimated a useful life between 20 and 25 years. The Claimants' witness, Mr. Crosbie, admitted that the Claimants had projected an operational life of 30 years, but that today they believed it could possibly be 40 years.

709. Second, the record in this arbitration does not contain contemporaneous design specifications or contracts that could shed light on the estimated duration of the plants and there are no witnesses with direct and first-hand knowledge of these issues.

710. Third, the testimony presented by the Claimants' expert, Dr. Mancini, is not conclusive. Based on several hypotheses, including the submission that coal and CSP plants are comparable —which submission he attenuated during cross-examination— Dr. Mancini proposes a mere reasonable assumption that the useful life of the plants is 40 years. Moreover, during cross-examination, Dr. Mancini admitted that certain elements of the plants might fail after 25 years and be subject to full repair, and that such failure may affect the entire operation of the plant.

711. The conclusions of Dr. Servert, both in his expert report and in cross-examination, are not only categorical, as opposed to reasonable assumptions, but coincide with the lifetime that the Claimants had estimated in their own contemporaneous financial documents.

712. Finally, even though the Claimants are correct in that RD 661/2007 (Article 36) provides for timelines exceeding 25 years, the Parties' experts coincide in that substantial repairs to the plants must be made after 25 years, and according to Article 4.3 of the RD 661/2007 substantial modifications would affect the subsidy provided for thereunder.

---

[982] Claimants' post-Hearing brief, ¶ 178.

713. Considering the above, on balance, including the lack of contemporaneous documents or other contemporaneous evidence showing that the plants were designed to have a 40-year service life, this portion of the Claimants' damages claim fails.

714. Based on the evidence on the record, the Tribunal deems that, for purposes of the calculation of damages, the useful life of the Andasol Plants is 25 years.

### 7.   *The claim for lost future cash flows*

715. The Tribunal has already decided that the DCF method is the appropriate method to calculate the Claimants' compensation, that the Claimants are not entitled to the so-called historical losses, and that the useful life of the Andasol Plants for purposes of the calculation of damages is of 25 years. On these bases, the Tribunal will now proceed to decide the largest portion of the Claimants' claim corresponding to lost future cash flows for the period after June 2014.

716. In BDO Quantum Report II, the Respondents experts submitted an alternative calculation based on the DCF method.[983] The Tribunal finds such alternative calculation unpersuasive.

717. The calculation proposes two alternatives for the But For scenario (i.e., prior to the Disputed Measures): the first alternative is to apply the tariff and aspects set out in RD 436/2004, in force at the time of the developers' investment and construction of the Andasol Plants. The second alternative is to consider a But For scenario, taking into account the specifications of RD 661/2007, in force at the time of the investment by the Claimants.

718. The claim before this Tribunal refers to the effects of the Disputed Measures on the Claimants' investment, not the developers' investment and therefore only the second alternative would apply. However, the second alternative presents fundamental problems that make it unreliable.

719. First, BDO chose a discount rate of 7.43% in the Actual scenario (i.e., the scenario after the Disputed Measures) and 11.3% in the But For scenario[984] decreasing the claim by approximately EUR 41 million. BDO describes the But For scenario under RD 661/2007 as a fictitious high-risk scenario characterized by a context of high tariff deficit and a significant financial imbalance of the electricity system.[985] When cross-examined on the point during the Hearing, Mr. Perez admitted that BDO's argument is that the Actual

---

[983]  BDO Quantum Report II, § 5, ¶ 240 *et seq.*
[984]  BDO Quantum Report II, ¶ 288.
[985]  BDO Quantum Report II, ¶ 285.

scenario has a lower risk than the But For scenario because the Disputed Measures made the system sustainable, and under the But For scenario the risks would have been high because the system was unsustainable.[986]

720. Also in cross-examination, Mr. Perez admitted that BDO was, on the one hand, attributing the Eurozone crisis to the But For scenario and, on the other, considering that the But For scenario was an unbalanced and over-remunerated system that could not be compared to a properly regulated sector.[987] In his view, the country risk of Spain prior to the Disputed Measures was reflecting a situation of serious financial unbalance, while after the Disputed Measures Spain had a more normalised situation.[988]

721. The Tribunal did not find this to be convincing and his explanation at the Hearing would mean that by wiping out the Original Regime, the Respondent became less risky and therefore a discount rate reflecting such situation would have to apply to the Claimants' damage calculation. The result of this conclusion would be that the discount rate that BDO applies to the Claimants is a discount rate resulting from a violation of the ECT. Considering the findings of the Tribunal in this Award, this result is untenable.

722. Second, the Claimants are correct in that the treatment of leverage in BDO's DCF alternative model is inappropriate.[989] During his presentation (direct testimony) Mr. Caldwell of Brattle convincingly explained that BDO is mistaken in building its DCF model assuming a constant debt/equity ratio for project finance, where it is clear that this ratio changes constantly as project finance is repaid.[990] His explanation was not questioned or disputed. The result of this approach proposed by BDO would be to reduce the Claimants' claim in approximately EUR 30 million.

723. In sum, even though BDO objected to the use of the DCF method for purposes of the valuation, BDO's quantum reports are more focused on building Spain's case based on Spain's legal theories presented in this arbitration than in responding directly to the DCF valuation presented by the Claimants. For the reasons explained elsewhere in this Award, the RAB valuation method proposed by BDO as well as the alternative analysis proposed by the Claimants and its response by Spain, as well as the DCF analysis submitted by the Respondent have basically the same fundamental problem: they are based on the Respondent's legal theory and therefore cannot stand, given the Tribunal's determination

---

[986] Hearing Tr., Day 5, 112:5-19.
[987] Hearing Tr., Day 5, 113:6-18.
[988] Hearing Tr., Day 5, 112:1-25; 113:1-25; 114:1-4.
[989] Claimants' post-Hearing brief, ¶ 176.
[990] Hearing Tr., Day 4, 26:15-27:5.

on the violation of ECT Article 10. Therefore, the Tribunal was not presented by a convincing critique of Brattle's valuation of lost future cash flows.

724. On the other hand, Brattle's quantum reports and their explanation by Brattle's experts during direct and cross-examination on future cash flows were sound, solid and convincing, and the Respondent and its experts did not question the concrete assumptions and calculations contained in Brattle's reports in a concrete and persuasive manner, to question then or create doubts in the Tribunal on the fundamental conclusions reached. The Tribunal considers therefore that Brattle's reports provide a well-reasoned and convincing calculation of the losses incurred by the Claimants, which has not been effectively questioned by BDO.

725. The value of the future cash flows presented by the Claimants is EUR 148 million to which the Tribunal must deduct the amount of EUR 36 million corresponding to the difference between the estimate of 35 to 40-year service of the plants, which the Tribunal considered unsupported, and the 25-year lifetime that the Tribunal considered acceptable.[991] This results in a balance of EUR 112 million that the Tribunal finds to be a fair measure of the Claimants' damages. Therefore, the Claimants are entitled to an award of compensation in the amount of EUR 112 million.

> 8.   *Other objections from the Respondent on the methodology presented by the Claimants*

726. The Respondent and BDO complained that Brattle's quantum reports were not transparent, were unclear and lacked sufficient explanation.[992] The Tribunal also finds this contention unconvincing. Brattle's quantum reports explain the assumptions and the sources of data clearly and in detail. As to BDO's complaint that they did not have access to the resulting calculations, BDO accepted that it did not ask Brattle to provide its calculations, as frequently occurs in relations between valuation experts appointed by parties in adversarial proceedings.

727. The Respondent's experts also complain about an alleged financial weakness of project finance structures and a supposedly excessive leverage that condition the viability of the plants, but again this reasoning seems more destined to support Spain's legal theory on reasonable return and BDO's argument on the advantages of the RAB methodology than to question the DCF model presented by the Claimants.

---

[991] Brattle Quantum Report II, XII, Appendix A, Table 14.
[992] *See* BDO Quantum Report I, ¶ 244.

728. BDO also considers that there is a disproportion between the alleged investment (and the supposedly assumed risk) and the claimed sum.[993] Moreover, BDO claims that the investment is speculative because of the price paid and the plans to sale the investment in 2017 (which sale effectively took place).[994] However, these arguments were not developed by the Respondent and, particularly, there is no support as to why the structure is speculative and what is the impact of such a structure in the nature of the investment and on the rights of the investor and the protection of the investment under the ECT.

729. The Tribunal finds the above-referenced contentions unpersuasive and unsupported and therefore concludes that they do not lead the Tribunal to adjust its decision on quantum.

   9.   *Interest*

730. The Claimants request that the Tribunal award both pre-award and post-award interest on the amounts due.[995] The Claimants argue that the Tribunal may, in its discretion, and indeed should in the circumstances, adopt different rates for pre-award and post-award interest since they serve different purposes. According to the Claimants, this distinction arises for public policy reasons. While pre-award interest is solely concerned with achieving full reparation, post-award interest is generally awarded to achieve wider policy-based goals.[996]

731. According to the Claimants, in the present case, pre-award interest should follow the concept of full reparation and a rate that affords full reparation and that is a "commercial rate established on a market basis" within the meaning of the ECT is Spain's borrowing rate (based on the yield on Spanish 10-year bonds), which for the relevant period is 2.07%, compounded monthly.[997] For post-award interest, the Claimants consider that since it serves the dual purpose of ensuring prompt compliance and preventing unjust enrichment, the Tribunal should order post-award interest at a rate higher than 2.07%, which should also be compounded on a monthly basis.[998]

732. In BDO's Quantum Report II, the Respondent's experts agree that the interest rate on Spanish government bonds is the rate that should be used to calculate interest prior to the Award.[999] However, BDO considers that it is not appropriate to use the yield of 10-year Spanish government bonds (2.07%) to calculate the aforementioned interest rate, given the

---

[993] Respondent's Counter-Memorial, ¶ 949.
[994] *See* BDO Quantum Report I, ¶¶ 136-155.
[995] Claimants' Memorial, ¶ 528.
[996] Claimants' Memorial, ¶ 531.
[997] Claimants' Memorial, ¶ 534.
[998] Claimants' Memorial, ¶ 535.
[999] BDO Quantum Report II, ¶¶304-305.

estimated day for the decision, but a rate equal to the 2-year yield on Spanish bonds should be used, which as of 20 June 2014 was 0.60%.[1000]

733.  Taking account of the positions of the Parties, the Tribunal agrees with the Claimants that a "commercial rate established on a market basis" within the meaning of the ECT is Spain's borrowing rate (based on the yield on Spanish 10-year bonds), which for the relevant period is 2.07%, compounded monthly. However, the Tribunal does not agree that it should order post-award interest at a rate higher than 2.07% in the present case. The Respondent has an international obligation to comply with this Award in a timely manner. Imposing a higher post-award interest rate to ensure prompt compliance with the Award would imply that there are reasons to believe that the State will not fulfil its international obligation to comply promptly. In the absence of such reasons, the Tribunal believes that a higher post-award interest rate is not justified.

734.  The Tribunal therefore awards interest from 20 June 2014 to the date of this Award at the rate of 2.07%, compounded monthly and considers that the same rate of 2.07% compounded monthly should be sufficient to incentivise payment of the Award in the present case. Therefore, the Tribunal awards interest from the date of the Award to the date of payment at the rate of 2.07%, compounded monthly.

## X.    COSTS

### A.    CLAIMANTS' POSITION

735.  The Claimants request that the Tribunal order the Respondent to bear the costs of this arbitration, as well as the Claimants' cost for legal representation, in the amount of GBP 4.364.062,46.[1001] Further, the Claimants argue that they should not be liable for any of the Respondent's arbitration or representation costs.[1002]

736.  The Claimants submit that the Tribunal has broad discretion with respect to the allocation of costs and that it should exercise such discretion to make an award on costs in their favour, considering that (i) the Respondent committed several breaches of its obligations under the ECT in relation to the Claimants' investment, and (ii) the Respondent's jurisdictional challenges lacked merit.[1003]

---

[1000] BDO Quantum Report II, ¶¶ 306-307.
[1001] Claimants' Statement of Costs, ¶ 24.
[1002] Claimants' Statement of Costs, ¶ 25.
[1003] Claimants' Statement of Costs, ¶¶ 20-23.

737. Accordingly, the Claimants claim that, if they ultimately prevail in this arbitration, they are entitled to their costs on a full indemnity basis, as such compensation is necessary to reinstate the Claimants to the position they would have been in but for the Respondent's breaches of the ECT.[1004]

738. The Claimants seek to recover the following costs that, in their opinion, were reasonably incurred considering the circumstances of the case and the arbitration's procedural history:[1005]

| CONCEPT | AMOUNT IN GBP |
| --- | --- |
| Legal costs and related disbursements | 3,569,077.50 |
| Expert fees and related disbursements | 498,011.07 |
| Other disbursements incurred by the Claimants | 11,259.11 |
| Claimants' payments to ICSID | 285,714.78 |
| Total | 4,364,062.46 |

**B.    RESPONDENT'S POSITION**

739. The Respondent requests that the Tribunal "[o]rder the Claimant[s] to pay all the costs and expenses that arise from the present arbitration, including the administrative expenses incurred by ICSID, the fees of the arbitrators and the fees of the legal representation of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense incurred, all that including a reasonable interest rate from the date on which said cost were incurred until the date of its effective payment"[1006] for the following costs incurred by the Respondent because of this arbitration:

| CONCEPT | AMOUNT IN EUR |
| --- | --- |
| Advance on costs paid to ICSID | 438,279.03 |
| Expert Report | 560,773.13 |
| Translations | 22,683.69 |
| Editing Services | 6,569.85 |
| Courier | 4,668.45 |
| Travelling Expenses | 46,749.85 |
| Legal fees | 1,321,700.00 |
| Other costs | 26,142.21 |
| Total | 2,427,566.21 |

---

[1004] Claimants' Statement of Costs, ¶ 23.

[1005] Claimants' Statement of Costs, Appendix I. The Claimants' Statement of Costs covers costs up to and including 20 January 2017.

[1006] Respondent's Statement of Costs, ¶ 10. *See* Respondent's Counter-Memorial, ¶ 962(d) and Respondent's Rejoinder, ¶ 992(d).

C.    TRIBUNAL'S ANALYSIS

740. Article 61(2) of the ICSID Convention provides as follows:

> "In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award."

741. The Tribunal considers —and the Parties do not seem to dispute— that this provision gives the Tribunal discretion to allocate all costs of the arbitration, including attorney's fees and other costs, between the Parties as it deems appropriate. These costs include (i) the costs of the proceedings (fees and expenses of the Tribunal, and the Centre's administrative fees and direct expenses); and (ii) the legal representation costs and other expenses incurred by the Parties in connection with the arbitration.

742. The costs of the proceedings, including fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount to USD 1,059,052.84, disaggregated as follows:

| CONCEPT | AMOUNT IN USD |
|---|---|
| Fees and expenses of the Tribunal | 703,362.51 |
| ICSID's administrative fees | 138,000 |
| Direct expenses | 217,690.33 |
| Total | 1,059,052.84 |

743. The above costs have been paid out of the advances made by the Parties in equal parts.

744. In exercising the discretion described in paragraph 741 above, the Tribunal considers that the distribution of costs should be made considering the relative success of the claims and defences of each of the Parties, together with the circumstances of the case and the conduct of the Parties in the proceedings.

745. The Respondent submitted four jurisdictional objections, three of which were rejected by the Tribunal. Accordingly, the Claimants largely prevailed on jurisdiction. Similarly, the Claimants established a breach of the FET standard under the ECT and proved that they had suffered damages as a result thereof. However, the Tribunal did not accept all elements of the Claimants' claims and awarded a lesser amount in compensation than that claimed.

746. The Tribunal deems that the costs incurred by the Parties in connection with the arbitration were reasonable considering the circumstances of the case and the features of the proceedings.

747. In view of the above, the Tribunal concludes that the Respondent shall bear its own legal representation costs and expenses. The Respondent shall also pay 60% of the costs of the proceedings (that is, USD 635,431.70 out of USD 1,059,052.84) and 60% of the Claimants' legal representation costs and expenses, which include the Claimants' legal costs and related disbuserments; the Claimants' expert fees and related disbursements, and other disbursements incurred by the Claimants (that is, GBP 2,447,008.61 out of GBP 4,078,347.68).[1007]

## XI.    DECISION

748. For the reasons set forth in this Award, the Tribunal unanimously decides as follows:

(a)    The Tribunal has jurisdiction under the ECT and the ICSID Convention over the Claimants' claims, except with respect to the alleged violations of the ECT arising from the TVPEE;

(b)    The Respondent has breached Article 10(1) of the ECT by failing to accord fair and equitable treatment to the Claimants' investments;

(c)    On account of the Respondent's breach of the ECT, the Claimants are awarded, and the Respondent shall pay, EUR 112 million as compensation;

(d)    The Respondent shall pay interest on the sum awarded in (c) above from 20 June 2014 to the date of this Award at the rate of 2.07%, compounded monthly, and interest from the date of the Award to the date of payment at the rate of 2.07%, compounded monthly.

(e)    The Respondent shall pay the Claimants USD 635,431.70 as a contribution to the payment of their share of the costs of the proceedings and GBP 2,447,008.61 as a contribution to the payment of their legal representation costs and expenses.

(f)    Any claim, request or defence of the Parties that has not been expressly accepted in this Section XI, is hereby rejected.

---

[1007] *See* ¶ 738 *supra*. The Claimants' legal representation costs and expenses were expressed in GBP in Claimants' Statement of Costs, and are therefore expressed in such currency in this Award.

Mr. J. Christopher Thomas QC
Arbitrator

Mr. Francisco Orrego Vicuña
Arbitrator

Date:        **24 MAY 2018**

Date:        **9 MAY 2018**

Dr. Eduardo Zuleta
President of the Tribunal

Date:        **25 MAY 2018**

198