

**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

P.O. Box 16050, 103 21 Stockholm

Phone: +46 8-555 100 50, Fax: +46 8-566 316 50

www.sccinstitute.se

**FINAL ARBITRAL AWARD**

**Made in Stockholm, Sweden on 15 February 2018**

**Seat of arbitration is Stockholm, Sweden**

**SCC Arbitration (2015/063)**

**Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR**

**v.**

**The Kingdom of Spain**

**Claimant:**               Novenergia II - Energy & Environment (SCA), SICAR

                            Reg.no. B124550

                            21, Rue Philippe II, L-2340, Luxembourg


**Claimant's counsel:**     Mr. Fernando Mantilla-Serrano, Mr. Antonio Morales, Mr. John
                            Adam, Ms Rosa Espin, Ms Aija Lejniece, Ms Nora Fredstie

                            Latham & Watkins LLP

                            45 Rue Saint-Dominique

                            75007 Paris, France

                             and

                             María de Molina 6

                             28006 Madrid

                             Spain


**Respondent:**             The Kingdom of Spain

**Respondent's counsel:**   Mr. Diego Santacruz Descartin, Fco. Javier Torres Gella, Ms
                            Monica Moraleda Saceda, Ms Elena Oñoro Sainz, Ms Amaia
                            Rivas Kortazar, Mr. Antolin Fernandez Antuña, Mr. Alvaro Navas
                            Lopez and Ms Ana Maria Rodriguez Esquivas.

                            Abogacía General del Estado-Dirección del Servicio Jurídico del
                            Estado (Government Attorney's Office)

                            Calle Ayala, 5

                            28001 Madrid, Spain


**Arbitral Tribunal:**      Mr. Johan Sidklev, *Chairperson*

                            Roschier Attorneys Ltd.

                            Brunkebergstorg 2

111 51, Stockholm, Sweden

Professor Antonio Crivellaro, *Co-Arbitrator*

Bonelli Erede

Via Barozzi 1

20122, Milano, Italy

Judge Juez Bernardo Sepúlveda-Amor, *Co-Arbitrator*

Campos Elíseos 67-801

Polanco, Rincón del Bosque

CP 11580

Mexico

**Administrative Secretary:**  Ms. Shirin Saif

Roschier Attorneys Ltd.

Brunkebergstorg 2

111 51, Stockholm, Sweden

## Contents

I.      THE PARTIES AND THEIR COUNSEL ................................................................. 1

1.      The Claimant ................................................................................................. 1

2.      The Respondent ............................................................................................ 2

II.     SUMMARY OF THE PROCEDURAL HISTORY .................................................... 3

III.    THE ARBITRATION AGREEMENT AND SUBSTANTIVE LAW ........................... 11

IV.     SUMMARY OF THE FACTS ........................................................................... 13

3.      The Initial Regulatory Framework ................................................................ 13

        3.1     Law 54/1997 ..................................................................................... 13
        3.2     Royal Decree 2818/1998 and Royal Decree 436/2004 ........................ 14
        3.3     Royal Decree 661/2007 ..................................................................... 16
        3.4     The Renewable Energy Plan 2005–2010 ............................................ 18
        3.5     NEC Reports ..................................................................................... 19
        3.6     "The Sun Can Be All Yours" and Other Prospectuses ......................... 21

4.      Regulations Adopted after 2010 .................................................................. 23

        4.1     Royal Decree 1565/2010 ................................................................... 23
        4.2     Royal Decree-Law 14/2010 ............................................................... 23

5.      Regulations Adopted after 2012 .................................................................. 25

        5.1     Law 15/2012 ..................................................................................... 25
        5.2     Royal Decree-Law 2/2013 ................................................................. 26
        5.3     Royal Decree-Law 9/2013 ................................................................. 26
        5.4     Law 24/2013 ..................................................................................... 28
        5.5     Royal Decree 413/2014 and Order IET/1045/2014 ............................. 29

V.      SUMMARY OF THE CLAIMANT'S FACTUAL CASE .......................................... 31

6.      Introduction ................................................................................................ 31

7.      RD 661/2007 Was Clear on Its Face ............................................................ 32

8.      The Reasonable Rate of Return Was a Vague Starting Point ......................... 32

9.      The Claimant Invested in the PV Plants in September 2007 .......................... 33

10.     When It Invested, the Claimant Legitimately Expected a Fixed Long-Term FIT and
        There Were No Warning Signs That the Respondent Would Undermine and
        Thereafter Abolish the Special Regime ......................................................... 34

        10.1    The Claimant Expected a Fixed Long-Term FIT .................................. 34
        10.2    There Were No Warning Signs That the Respondent Would Undermine and
                Abolish the Special Regime ............................................................... 35

11.     The Special Regime Was Undermined and Thereafter Abolished .................. 38

12.     The Specific Regime Is Unreasonable and Disproportionate ........................ 40

        12.1    The Specific Regime Is Volatile and Removed Regulatory Certainty .......... 40
        12.2    The Changes Are Neither Reasonable nor Proportionate ..................... 40
        12.3    The Measures Were Not Proportional and Transparent, nor the Result of Any
                Meaningful Engagement With the Stakeholders ................................. 41

**VI.**  **SUMMARY OF THE RESPONDENT'S FACTUAL CASE** ................................................. **42**

**13.**  **Introduction** ................................................................................................. **42**

**14.**  **The Spanish Regulatory Framework** ........................................................... **43**

**15.**  **The Principle of Hierarchy in the Spanish Regulatory Framework** ............... **45**

**16.**  **The Special Regime Is Not an Island in the SES** ........................................... **47**

**17.**  **The Spanish Regulatory Framework in 2007 and 2008** ................................. **51**

17.1  Law 54/1997, Applied by the Government and Known by the RE Sector ............ 51
    17.1.1  Law 54/1997, Articles 16 and 30 ............................................. 51

    17.1.2  The Reasonable Return Can Be Achieved in Various Ways .................... 53

    17.1.3  The Reasonable Return Must Be Subject to Possible Changes .............. 54

17.2  RD 2818/1998 ......................................................................................... 55
17.3  RD 436/2004 ........................................................................................... 55
    17.3.1  Distortions Created by RD 436/2004 Remuneration Formula: RDL 7/2006 ................................................................................... 56

    17.3.2  The Modification of RD 436/2004 Was Harshly Criticised by the Sector ..................................................................................... 57

17.4  REP 2005 – 2010 Does Not Contain an Overall Increase in Return for RE ........... 59
17.5  RD 661/2007 ............................................................................................ 59
    17.5.1  The Aim and the Literal Wording of RD 661/2007 ................................. 59

    17.5.2  The Relevance of the Case Law as a Fact to Understand the Regulatory Framework .............................................................. 60

    17.5.3  Admissibility of Possible Future Changes by NEC Due to the Case Law ........................................................................................ 62

    17.5.4  Critics to RD 661/2007 by RE Sector and Awareness of the Limits for Future Possible Regulatory Measures ....................................... 65

    17.5.5  The Claimant's Awareness of Possible Prospective Regulatory Measures .................................................................................. 67

**18.**  **Basis of the Regulatory Measures Taken During 2009 and 2010** ................... **75**

18.1  RDL 6/2009 ............................................................................................. 75
18.2  National Action Plan for Renewable Energy in Spain 2011-2020 ...................... 77
18.3  RD 1614/2010 .......................................................................................... 78

**19.**  **The Challenged Measures Introduced by the Respondent** ............................ **79**

19.1  The Challenged Measures Were Adopted Due to a Proved Public Policy ............. 79
    19.1.1  Regulatory Measures Passed in 2010 ...................................... 79

    19.1.2  The Challenged Measures Enacted After the Collapse of the Spanish Financial Market in 2012 .......................................................... 80

19.2  The Challenged Measures Maintain the Essential Characteristics of the Remuneration System of LSE 1997, Are Reasonable and Proportionate ............. 81
    19.2.1  The New Remuneration Formula Maintains the Support to RE Producers Within a Sustainable Framework ........................................... 82

|  | 19.2.2 | The New Remunerative Formula Maintains the Priority of Access and Feed-In.............................................................................. 84 |
|  | 19.2.3 | The New Remuneration System Maintains the Objective of Providing the Investor With a Reasonable Rate of Return on a Standard Facility ...................................................................... 84 |
|  | 19.2.4 | Both Models Respond to the Same Concept of Efficiency...................... 85 |
|  | 19.2.5 | Both Models Set the Subsidies Based on the Standards Contained for Various Standard Facilities ............................................ 86 |
|  | 19.2.6 | The Remuneration Formula Allows the PV Plants to Achieve a Reasonable Return ...................................................... 87 |
|  | 19.2.7 | The Challenged Measures Maintain the Essential Characteristics Test stated by the Charanne Award and the Limits to Regulatory Measures Stated by the Isolux Award.................................... 90 |

**VII.    RELIEF SOUGHT** ................................................................................. **91**

**20.    The Claimant's Prayers for Relief** ....................................................... **91**

**21.    The Respondent's Prayers for Relief**.................................................... **92**

**VIII.    JURISDICTION** ................................................................................. **93**

**22.    Does the Tribunal Have Jurisdiction Over Intra-EU Disputes (Preliminary Objection A)?**................................................................................................... **93**

| 22.1 | Introduction ....................................................................................... 93 |
| 22.2 | The Respondent's Position ................................................................. 93 |
|  | 22.2.1 | Introduction ................................................................. 93 |
|  | 22.2.2 | The Claimant Ignores the Principle of the Primacy of EU Law in Intra-EU Relations ....................................................... 94 |
|  | 22.2.3 | Issues Pending Before the CJEU and Recent Decisions of the European Commission ..................................................... 97 |
|  | 22.2.4 | Conclusion ................................................................... 99 |
| 22.3 | The Claimant's Position ...................................................................... 100 |
|  | 22.3.1 | The Tribunal Has Ratione Personae Jurisdiction Over the Present Dispute ........................................................................ 100 |
|  | 22.3.2 | The Tribunal Has Jurisdiction Over Intra-EU Disputes ......................... 101 |
|  | 22.3.3 | The Tribunal's Jurisdiction Is Determined by the ECT, Not EU Law ...... 102 |
|  | 22.3.4 | There Is No Incompatibility Between the ECT and EU law.................... 103 |
| 22.4 | The Tribunal's Reasons ...................................................................... 106 |

**23.    Does the Taxation Carve-out in Article 21 of the ECT Apply to Law 15/2012 (Preliminary Objection B)?**..................................................................................... **109**

| 23.1 | Introduction...................................................................................... 109 |
| 23.2 | The Respondent's Position ................................................................. 110 |
|  | 23.2.1 | The Provisions Relating to the Tax Are a Taxation Measure, in Accordance With the Definition of Taxation Measure of Article 21(7)(a)(i) of the ECT .......................................... 111 |

23.2.2    In Any Event, It Must Be Concluded That the Tax Is a Bona Fide Taxation Measure...............................................................112

23.2.3    The Tax Applies to All Energy Producers, Both Renewable and Conventional .........................................................................113

23.2.4    The General Application of the Tax Is a Legitimate Option of the State Legislator, as Recognised by the Spanish Constitutional Court, and Is Linked to the Environmental Nature of the Tax ........................114

23.2.5    The Tax Does Not Discriminate Against Renewable Producers in Terms of Repercussion .........................................................115

23.2.6    The Objective of the Tax Is to Raise Revenue for the Spanish State for Public Purposes .............................................................116

23.3    The Claimant's Position ..............................................................116
23.3.1    Article 21 ECT Only Applies to Bona Fide Taxation Measures .............116
23.3.2    The Respondent Adopted Law 15/2012 Mala Fide..............................117

23.4    The Tribunal's Reasons ..............................................................118

IX.    **MERITS** ...............................................................................................**120**

24.    **When Was the Claimant's Investment Made?** ........................................**120**
24.1    Introduction ...............................................................................120
24.2    The Claimant's Position ...............................................................120
24.3    The Respondent's Position ...........................................................120
24.4    The Tribunal's Reasons ...............................................................120

25.    **Has the Respondent Failed to Accord at All Times to the Claimant and its Investment Fair and Equitable Treatment?** .............................................**122**
25.1    Introduction ...............................................................................122
25.2    The Claimant's Position ...............................................................123
25.2.1    The Fair and Equitable Treatment Standard under the ECT ................123
25.2.2    The Respondent Failed to Conform to the Fair and Equitable Treatment Standard ...............................................................124
25.2.3    The Stability and Transparency Obligation in the ECT .......................127

25.3    The Respondent's Position ...........................................................129
25.3.1    The Principle of Fair and Equitable Treatment Under ECT Article 10(1) ......................................................................................129

25.3.2    Reasonable and Objective Expectations of the Claimant ...................131

25.3.3    The Expectations of the Claimant Are Not Objective............................134

25.3.4    Fair and Equitable Treatment Standard Under ECT: Stable Conditions ...............................................................................138

25.3.5    Transparent Conditions.................................................................143

25.4    The Tribunal's Reasons ..............................................................146
25.4.1    Is the Stability and Transparency Obligation Part of the Fair and Equitable Treatment Standard in Article 10(1) of the ECT?................146

25.4.2    The Scope and Applicability of the Fair and Equitable Treatment Standard .................................................................147

|  |  | 25.4.3 | Were the Claimant's Expectations Legitimate and Reasonable?.......... 151 |
|  |  | 25.4.4 | Did the Legislation Introduced by the Respondent After 2007 Constitute a Violation of the Fair and Equitable Treatment Standard in Article 10(1) of the ECT?................................................................ 156 |
|  |  | 25.4.5 | The Claimant's Further Alleged Breaches of Article 10(1) of the ECT ..................................................................................................... 160 |

**26. Has the Respondent Breached Article 13 of the ECT?................................ 165**

26.1 Introduction ............................................................................... 165
26.2 The Claimant's Position ............................................................. 165
    26.2.1 The Claimant's Investment Is Protected by Article 13 of the ECT......... 165
    26.2.2 The Respondent's Measures Resulted in the Expropriation of the Claimant's Investment................................................................... 166
    26.2.3 The Challenged Measures Cannot Be Justified by the Police Powers Doctrine.......................................................................... 167
26.3 The Respondent's Position ........................................................ 169
    26.3.1 Introduction ........................................................................... 169
    26.3.2 The Case Law Applicable to the Challenged Measures........................ 170
26.4 The Tribunal's Reasons ............................................................. 172

**27. Damages............................................................................................. 173**

27.1 Introduction ............................................................................... 173
27.2 The Claimant's Position ............................................................. 174
27.3 The Respondent's Position ........................................................ 178
27.4 The Tribunal's Reasons ............................................................. 183
    27.4.1 The Standard of Compensation................................................. 183
    27.4.2 The Damages Payable by the Respondent............................... 184
    27.4.3 The Interest Payable by the Respondent ............................... 190

**X. COSTS ................................................................................................ 191**

**28. The Claimant's Costs ......................................................................... 191**

**29. The Respondent's Costs...................................................................... 192**

**30. The Tribunal's Findings on Costs ....................................................... 192**

**XI. DECISION ........................................................................................... 192**

## I.    THE PARTIES AND THEIR COUNSEL

## 1.    The Claimant

1.    The Claimant in this arbitration is Novenergia, a *Société d'investissement en capital à risque* (SICAR) ("**Novenergia**" or the "**Claimant**") (list of definitions can be found in **Annex 1**) incorporated in the Grand Duchy of Luxembourg on 1 February 2007, with legal address at 28, Boulevard Royal, L-2449, Luxembourg, and with registration number B124550 in the Luxembourgish Commercial and Corporate Registry.

2.    The investment in the eight photovoltaic ("**PV**") plants (the "**PV Plants**") was structured through Novenergia II Energy & Environment España, S.L. ("**Novenergia Spain**"). The Claimant acquired its interest in Novenergia Spain on 3 July 2007. At this time, Novenergia Spain was wholly- and directly-owned by the Claimant.

3.    The eight PV Plants were each built and organised under the auspices of seven corporations which each bear the same name as a respective PV Plant (except Fuente Alamo Norte and Fuente Alamo Sur, which were built and are administered by the same corporation). All seven corporations have at all times been held by Novenergia Spain. The Claimant held the following indirect ownership in these seven companies:

- 100% in Novenergia-Solarsaor, S.L. ("**Solarsaor**");

- 100% in Novenergia-Bonete, S.L., formerly called Paracel Investment, S.L. ("**Bonete**");

- 100% in Novenergia-Almansa, S.L., formerly called Las Cabezuelas Fotoparque, S.L. ("**Almansa**");

- 100% in Novenergia-Villares del Saz, S.L., formerly called Terrapower, S.L. ("**Villares**");

- 90% in Energy Engineering I Mora la Nova, S.L. ("**Mora**");

- 50% in Fuente Alamo Fotoparque, S.L. ("**Alamo**"); and

- 70% in Novenergia-Lobon, S.L., formerly called Morcone Invest, S.L. ("**Lobon**").

4.      The corporate structure after November 2015 is depicted in the chart below:



5.      Under this corporate structure, the Claimant holds a 60.27% indirect interest in Novenergia Spain. Similarly, the Claimant's interest in the seven corporations is:

- 60.27% in Solarsaor;

- 60.27% in Bonete;

- 60.27% in Almansa;

- 60.27% in Villares;

- 57.26% in Mora;

- 30.14% in Alamo; and

- 71.47% in Lobon.

6.      The Claimant is represented by Mr. Fernando Mantilla-Serrano, Mr. Antonio Morales, Mr. John Adam, Ms Rosa Espin, Ms Aija Lejniece, Ms Nora Fredstie, all of whom are from the law firm Latham and Watkins LLP.

## 2.      The Respondent

7.      The Respondent in this arbitration is the Kingdom of Spain (hereinafter together with the Claimant referred to as the "**Parties**").

8.      The Respondent is represented by Mr. Diego Santacruz Descartin, Fco. Javier Torres Gella, Ms Monica Moraleda Saceda, Ms Elena Oñoro Sainz, Ms Amaia

Rivas Kortazar, Mr. Antolin Fernandez Antuña, Mr. Alvaro Navas Lopez and Ms Ana Maria Rodriguez Esquivas, all of whom are from the Minister of Justice.

## II.    SUMMARY OF THE PROCEDURAL HISTORY

9.    On 8 May 2015, the Claimant submitted its Request for Arbitration. In accordance with Article 13(3) of the 2010 Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce (the "**SCC Rules**"), the Claimant appointed Professor Antonio Crivellaro as arbitrator. Since the Parties had not agreed on the seat of the arbitration, the Claimant proposed and requested that the seat of arbitration be fixed in a non-EU member state, in order to guarantee the normal, serene and impartial conduct of the arbitration and to protect the arbitral proceedings from any undue influence by EU member state court and EU institutions. The Claimant submitted that Switzerland (Geneva) or the United States (New York or Washington DC) were appropriate venues as the seat of the arbitration.

10.    On 11 May 2015, the Arbitration Institute of the Stockholm Chamber of Commerce (the "**SCC**") confirmed receipt of the Claimant's request for arbitration and payment of the registration fee. The SCC further asked the Claimant to provide the SCC with a preliminary estimate of the value of its claims by 18 May 2015.

11.    On 18 May 2015, the Claimant submitted a letter to the SCC stating that it was not currently in the position to provide the SCC with the requested estimate.

12.    On 19 May 2015, the SCC again requested that the Claimant provide an estimated value of its claim, in order to calculate the advance on costs. On 22 May 2015, the Claimant, without prejudice to its right to adapt its quantification, provisionally estimated its claims at not less than EUR 30,000,000.

13.    On 1 June 2015, the Respondent submitted its Answer to the Request for Arbitration. In the Answer to the Request for Arbitration, the Respondent stated that it considered Madrid to be a suitable seat for the arbitration and referred to the UNCITRAL Rules in this respect. The Respondent also suggested that the SCC invite the Claimant to comply with Article 2(v) of the SCC Rules and submit its position on the number of arbitrators in the proceedings. The Respondent also requested a 21-day extension of the deadline for appointing an arbitrator until 22 June 2015.

14.    After being provided the opportunity by the SCC, the Claimant, on 10 June 2015, submitted comments on the Answer to the Request for Arbitration. The Claimant reiterated that the seat of the arbitration should be in a "truly neutral venue", *i.e.* neither in Spain, nor in the European Union (the "**EU**"). The Claimant further stated that it is evident that the Claimant considers that this arbitration should be adjudicated by a three-member arbitral tribunal.

15.    On 12 June 2015, the SCC granted the Respondent an extension of time for the appointment of an arbitrator until 22 June 2015. The advance on costs was determined to EUR 455,000. The Claimant was ordered to pay EUR 225,500 and the Respondent EUR 227,500.

16.    On 22 June 2015, the Respondent requested a two-day extension to appoint its arbitrator. On 23 June 2015, the SCC granted the Respondent an extension of time for the appointment of an arbitrator until 24 June 2015.

17.    On 24 June 2015, the Respondent appointed Judge Bernardo Sepúlveda Amor as co-arbitrator in accordance with Article 13(3) of the SCC Rules.

18.    On 29 July 2015, the SCC appointed Mr. Johan Sidklev as chairperson and decided that the seat of the arbitration shall be Stockholm. On the same date, the Respondent wrote to the SCC to state that the Parties were still engaged in negotiations on the method of the appointment of the chairperson in order to reach an agreement. The Respondent further requested clarification on the procedure followed for the appointment of the chairperson.

19.    On 30 July 2015, the SCC wrote to the Parties and stated that since the Parties appointed their co-arbitrators under Article 13(3) of the SCC Rules, the chairperson shall be appointed by the SCC Board. The Claimant was asked to confirm the Respondent's statement that the Parties were engaged in discussions under Article 13(1) of the SCC Rules.

20.    On 3 August 2015, the Claimant wrote to the SCC stating that the Parties had not agreed on a procedure for the appointment of the tribunal different from the one provided for under the SCC Rules and that the Parties had merely evoked the possibility of identifying a suitable common candidate for chairperson. Accordingly, the Claimant considered that the designation of Johan Sidklev had been made in full compliance with the SCC Rules.

21.    On 6 August 2015, the SCC wrote to the Parties stating that there is no agreement between the Parties for a different appointment procedure under Article 13(1) of the SCC Rules and that the SCC had appointed the chairperson in accordance with Article 13(3) of the SCC Rules.

22.    On 7 August 2015, the SCC wrote to the tribunal (the "**Tribunal**") stating that the Parties had paid the advance on costs and that the case was therefore referred to the Tribunal. The SCC decided that the final award (the "**Final Award**") was to be rendered by 8 February 2016.

23.    On 3 September 2015, the Parties and the Tribunal held a case management conference to discuss the draft Procedural Order No. 1.

24.    On 10 September 2015, the Respondent wrote to the Tribunal stating that both Spanish and English should be the language of the proceedings and that briefs

should be submitted in one procedural language provided that a translation of such document to the other procedural language is submitted within 15 days thereafter.

25.    On 24 September 2015, the Tribunal issued Procedural Order No. 1 which included provisions regarding the language of the proceedings, the seat of the arbitration, the provisional timetable and written submissions, the transmission of submissions, notifications and communications, witnesses and experts, document production, the hearing etc. It was *inter alia* recorded that the seat of the arbitration is Stockholm. Appended to Procedural Order No. 1 were a provisional timetable, a contact list and a Redfern Schedule.

26.    On 24 September 2015, the Tribunal requested that the time for making the Final Award should be extended. On 25 September 2015, the SCC decided that the Final Award shall be rendered by 30 October 2017.

27.    On 21 December 2015, the Claimant submitted its Statement of Claim together with the first expert report from KPMG ("**First KPMG Report**"), the first expert report from Compass Lexecon ("**First Compass Lexecon Report**"), a witness statement of Mr. Henri Baguenier as well as factual and legal exhibits.

28.    On 11 March 2016, the Tribunal granted the Respondent's request for extension of time until 12 May 2016 for filing of the Statement of Defense and Jurisdictional Objections, as well as the Claimant's request for amendments of the filing dates of the document production phase (Procedural Order No. 2). Further to this decision, the Tribunal decided to amend the provisional timetable.

29.    On 29 April 2016, the Respondent submitted its Statement of Defense and Jurisdictional Objections together with the first expert report by Accuracy ("**First Accuracy Report**"), a witness statement by Mr. Carlos Montoya as well as legal and factual exhibits.

30.    On 29 June 2016, the Tribunal ruled on the Claimant's and the Respondent's requests for production of documents (Procedural Order No. 3).

31.    On 16 July 2016, the Respondent addressed the Tribunal, requesting it to "*reconsider its decision rendered in P.O. no 3, granting the production of the 'Technical and Legal Due Diligence ordered or used by the Claimant' regarding its investment in the Spanish PV Plants subject to the present Case (Respondent's Document request number 17) in order to protect the Respondent's rights of Defense and the Due Process*" (the "**Request for Reconsideration**"). The Request for Reconsideration was made outside the scope of the existing provisional timetable which had been agreed by the Parties to govern these arbitral proceedings.

32.    On 18 July 2016, the Tribunal provided the Claimant an opportunity to comment on the Request for Reconsideration.

33.    On 22 July 2016, the Claimant filed a response in which it requested the Tribunal to deny the Respondent's Request for Reconsideration.

34.    The Tribunal denied the Request for Reconsideration on 3 August 2016 (Procedural Order No. 4). In its decision, the Tribunal noted that pursuant to Procedural Order No. 1 of 24 September 2015, document production was to be carried out in accordance with the provisional timetable. The provisional timetable was negotiated and agreed by the Parties and subsequently confirmed by the Tribunal. Under the agreed provisional timetable, the Respondent was granted two opportunities to argue its document production request no. 17 before the Tribunal. First, in its Request for Document Production, and second, in its Reply to the Claimant's Objections. The Tribunal also noted that the Respondent availed itself of these opportunities. The Tribunal was therefore confident that the Respondent's rights of due process had been fully respected.

35.    In preserving the integrity and timeliness of the proceedings, the Tribunal emphasised the importance of the Parties adhering to the mutually agreed provisional timetable.

36.    In a letter dated 1 August 2016, the Claimant addressed the Tribunal, raising concerns about the Respondent's adherence to certain of the document production orders issued by the Tribunal. The Claimant's concerns related to the Respondent's failure produce the ordered documents, its failure to fully comply with the Respondent's voluntary document production it had agreed to undertake, its production of documents that were non-responsive and out of scope in relation to Claimant's requests and its failure to distinguish or allocate the documents produced to the Claimant's requests.

37.    As a consequence of these concerns, the Claimant in its letter of 1 August 2016 made a series of requests for the production of certain documents. On 30 August 2016, the Tribunal ordered the Respondent to abide by the Tribunal's previous document production rulings and to produce certain specified documents which had not yet been produced (Procedural Order No. 5).

38.    On 8 September 2016, the Claimant once more raised concerns about the Respondent's adherence to certain of the document production orders issued by the Tribunal as well as the Respondent's belated and incomplete production of the requested documents. The Claimant noted that the Respondent on 8 September 2016 had produced voluminous and potentially important documents that were, according to the original time schedule, due to be produced on 18 July 2016. Considering the volume, complexity and potential importance of the documents produced by the Respondent, the Claimant argued that it is an insurmountable task to review and analyse the produced documents within the time available before the Claimant's Statement of Reply and Answer to Jurisdictional Objections was due. Consequently, the Claimant requested an extension of time for filing its Reply and Answer to Jurisdictional Objections until

17 October 2016. The Claimant also requested the Tribunal to order the Respondent to comply forthwith and as a matter of urgency with its extant document production obligations.

39.   On 8 September 2016, the Tribunal provided the Respondent an opportunity to submit comments to the Claimant's requests. The Respondent chose not to avail itself of the opportunity to provide comments. On 12 September 2016, the Tribunal granted the Claimant's request for extension of time until 17 October 2016 to file its Statement of Reply and Answer to Jurisdictional Objections and ordered the Respondent to comply with previous procedural orders on the production of documents (Procedural Order No. 6).

40.   On 17 October 2016, the Claimant submitted its Statement of Reply and Answer to Jurisdictional Objections together with the reply expert report of KPMG ("**Second KPMG Report**"), the reply expert report of Compass Lexecon ("**Second Compass Lexecon Report**") as well as additional legal and factual exhibits.

41.   On 20 February 2017, the Respondent submitted its Statement of Rejoinder and Reply to Jurisdictional Objections together with the second expert report of Accuracy ("**Second Accuracy Report**"), a second witness statement of Mr. Carlos Montoya as well as additional legal and factual exhibits.

42.   On 1 March 2017, the Parties jointly requested that the Tribunal extend the deadline to submit the English version of the Respondent's Statement of Rejoinder on the Merits and Reply on Jurisdiction until 10 March 2017 and the deadline to submit the Claimant's Statement of Rejoinder on Jurisdiction until 16 May 2017. On 2 March 2017, the Tribunal granted the Parties' joint request and issued an amended provisional timetable (Procedural Order No. 7).

43.   On 3 March 2017, European Commission submitted an Application for Leave to Intervene as a Non-Disputing Party (the "**EC Application**"). On 8 March 2017, the Tribunal invited the Parties to submit comments on the EC Application no later than 21 March 2017. On 21 March 2017, the Claimant submitted its comments on the EC Application. On 22 March 2017, the Respondent submitted its comments on the EC Application.

44.   On 24 March 2017, the Tribunal issued a decision in which it allowed the European Commission to submit one (1) written submission confined to the issue of jurisdiction by 2 May 2017 with a page limit of thirty (30) pages (Procedural Order No. 8). The Parties were provided an opportunity to comment on the European Commission's submission at the Hearing. All other requests by the European Commission were denied.

45.   On 2 May 2017, the European Commission submitted its Amicus Curiae Brief together with a number of supporting annexes.

46.     On 8 May 2017, the Parties submitted a joint proposed hearing schedule, which outlined the agreements and disagreements between the Parties on different issues relating to the Hearing. On 9 May 2017, the Parties and the chairperson held a pre-hearing conference call during which counsel for the Parties developed the Parties' respective positions regarding the issues raised in the joint proposed draft hearing schedule.

47.     On 12 May 2017, the Tribunal issued an order concerning the deadline for demonstrative exhibits, the length of the opening statements, the length of warm-up examination-in-chief, sequestration of fact witnesses, the length of expert presentations, physical witness/expert examination binders, and the agreement according to which there should be no closing arguments during the Hearing (Procedural Order No. 9). Any issues that the Tribunal considered to be of particular relevance for inclusion in the post-hearing briefs could instead be raised by the Tribunal during the last day of the Hearing. Alternatively, the Tribunal could determine such issues following its preliminary deliberations subsequent to the Hearing and thereafter inform the Parties in writing. A Hearing Schedule was attached to the decision.

48.     On 16 May 2017, the Claimant submitted its Statement of Rejoinder on Jurisdictional Objections.

49.     On 26 May 2017, the Respondent submitted a request in which it sought the approval of the Tribunal to have a number of new documents added to the record of the proceedings. The Respondent based its request on the Claimant's submission of the *Eiser* award into the record (filed together with the Statement of Rejoinder on Jurisdictional Objections).

50.     On 29 May 2017, the Parties submitted their skeleton arguments.

51.     On 31 May 2017, the Claimant objected to the Respondent's request dated 26 May 2017, on the basis that the Respondent should not be allowed to reargue the *Eiser* case before the present Tribunal and that the *Eiser* award is nothing more than a legal authority and, secondly that the Respondent seeks to introduce the relevant documents at a late stage.

52.     On 2 June 2017, the Tribunal rendered a decision to the effect that the Respondent was granted the opportunity to submit into the record of the arbitration the documents in question (Procedural Order No. 10). However, the Respondent was not allowed to submit the documents together with any further written pleadings or comments. Both Parties were given the opportunity to provide comments on the documents at the Hearing.

53.     On 6 June 2017, the Respondent made a request to reallocate its allotted time during the opening statement from jurisdiction to merits (but not to extend the total time beyond the 4 hours agreed upon). On 7 June 2017, the Claimant objected to this request.

54.     On 7 June 2017, the Tribunal rendered a decision to the effect that, revising para. 2 of Procedural Order No. 9, each party was provided an equal amount of time for its opening statement (Procedural Order No. 11). Such time should not in total exceed four hours. Each party was allowed to freely allocate the time allotted to it as between opening statement on jurisdiction and opening statement on the merits.

55.     On 12 June until 16 June 2017, a hearing on jurisdiction and merits (the "**Hearing**") took place in Stockholm. The following persons were examined during the Hearing:

        On behalf of Claimant:

                (a)  Mr. Henri Baguenier

                (b)  Mr. Carlos Solé Martin

                (c)  Dr. Manuel Abdala


        On behalf of the Respondent:

                (a)  Mr. Carlos Montoya

                (b)  Mr. Eduard Saura


56.     On 29 June 2017, the Tribunal issued a procedural order in which it listed three questions from the Tribunal and asked the Parties to submit no later than 4 July 2017 an agreed proposed deadline for Post-Hearing Briefs (Procedural Order No. 12). The Parties were also given the opportunity to submit corrections to the transcripts from the Hearing by 7 July 2017.

57.     On 3 July 2017, the Respondent requested clarifications with respect to the questions posed by the Tribunal on 29 June 2017. In the same email, the Respondent, with reference to the Tribunal's questions, requested that it be allowed to submit, together with the Post-Hearing Brief, a complementary expert report in order to calculate the financial impact of certain measures implemented by the Respondent. Further correspondence on this issue was exchanged by the Claimant and the Respondent on 4–5 July 2017. In the Parties' emails of 4 July and 5 July 2017, the Parties agreed on a page-limit of 50 pages for the Post-Hearing Briefs. The Parties failed to agree on a proposed deadline for the Post-Hearing Briefs. In its first email of 4 July 2017 the Claimant objected to the submission of additional expert reports.

58.     On 6 July 2017, the Tribunal provided the requested clarifications in the form of a procedural order (Procedural Order No. 13). The Tribunal rejected the Respondent's request to submit a complementary expert report together with its Post-Hearing Brief. The Tribunal also considered both Parties' arguments with

respect to the deadline for the Post-Hearing Briefs and concluded that 25 August 2017 would be an appropriate compromise between the Parties' positions. Considering the deadline for Post-Hearing Briefs, the Parties were ordered to simultaneously file their cost submissions no later than 1 September 2017. The Parties were also provided an opportunity to comment on each other's cost submissions no later than 8 September 2017.

59.   On 7 July 2017, the Parties mutually requested extension of time to revert with the Parties' agreed corrections of the transcripts, as well as points of disagreement by 12 July 2017. On the same date, the Tribunal confirmed the extension of time until 12 July 2017 as agreed between the Parties.

60.   On 12 July 2017, the Parties mutually requested the Tribunal's leave to submit comments on the corrections directly to Briault Reporting, copying the Tribunal. On 13 July 2017, the Parties submitted the corrections to Briault Reporting.

61.   On 25 August 2017, the Parties submitted their respective Post-Hearing Briefs.

62.   On 1 September 2017, the Parties submitted their respective cost submissions.

63.   In an email dated 23 November 2017, the Respondent made a request to add a decision from the European Commission (the "**EC Decision**") into the record and to allow the Parties to file additional short submissions regarding the implications of such decision. According to the Respondent, the EC Decision concerned the Spanish state aid framework for renewable sources and was, according to the Respondent, relevant for the case, both as regards jurisdiction and the merits.

64.   In a letter dated 27 November 2017, the Claimant requested the Tribunal to deny the Respondent's request to be allowed to introduce the EC Decision into the record. The Claimant argued that the EC Decision is manifestly irrelevant to the case and that its introduction into the record would be disruptive and potentially lead to a further postponement of the rendering of the Final Award.

65.   In Procedural Order No. 14 dated 30 November 2017, the Tribunal granted the Respondent's request on the basis that, despite the lateness of the Respondent's request, it was important that the Parties and the Tribunal were provided a reasonable opportunity to review, assess and comment on the potential relevance of the EC Decision prior to the Final Award being rendered. The Tribunal invited the Respondent to submit a brief submission on the content and relevance of the EC Decision by 11 December 2017 and invited the Claimant to file a short reply submission by 21 December 2017.

66.   The decisions in Procedural Order No. 14 were made subject to the Tribunal being granted extension of time until 16 February 2018 for rendering of the Final Award. A request to this effect was submitted by the Tribunal to the SCC on 30 November 2017.

67.    On 11 December 2017, the SCC granted the Tribunal's request for extension of time for rendering of the Final Award until 16 February 2018.

68.    On 11 December 2017, the Respondent filed its submission relating to the EC Decision and on 21 December 2017, the Claimant filed its response hereto.

69.    Being satisfied that the Parties have had a reasonable opportunity to present their cases, the Tribunal in Procedural Order No. 15 on 19 January 2018 declared the proceedings closed as per Article 34 of the SCC Rules.

70.    On 2 February 2018, the SCC determined the costs of the arbitration.

71.    On 5 February 2018, the Respondent requested that the Tribunal (i) reopen the case; (ii) allow the filing of the final award in *Wirtgen v. Czech Republic*, dated 11 October 2017 into the record of the arbitration and; (iii) allow the Parties to make short additional submissions in respect of such award. In Procedural Order No. 16, the Tribunal rejected the Respondent's request, based on, *inter alia*, the Tribunal being satisfied that both Parties have had reasonable opportunity to present their cases.

72.    On 9 February 2018, the SCC provided the Tribunal with a corrected determination of the costs of the arbitration.

## III.    THE ARBITRATION AGREEMENT AND SUBSTANTIVE LAW

73.    The Respondent is a Contracting Party to the Energy Charter Treaty adopted on 17 December 1994 (the "**ECT**"). Article 26 of the ECT provides as follows:

"SETTLEMENT OF DISPUTES BETWEEN AN INVESTOR AND A CONTRACTING PARTY

1.    Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

2.    If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

(a) to the courts or administrative tribunals of the Contracting Party to the dispute;

(b) in accordance with any applicable, previously agreed dispute settlement    procedure; or

(c) in accordance with the following paragraphs of this Article.

3.    (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

(b)(i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).

[…]

4.    In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

[…]

(c) an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce.[…]

5.    An arbitral tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.

[…]

8.    The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute. An award of arbitration concerning a measure of a subnational government or authority of the disputing Contracting Party shall provide that the Contracting Party may pay monetary damages in lieu of any other remedy granted. Each Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards.

74.    On 18 December 2014, the Claimant communicated a notice of dispute to the Respondent pursuant to Article 26 of the ECT. The Claimant sent another notice on 6 March 2015.

75.    On 8 May 2015, the Claimant submitted its Request for Arbitration with the SCC.

76.    Article 26(6) of the ECT provides that "[a] *tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law*".

77.     Moreover, Article 22 of the SCC Rules states that the Tribunal "*shall decide the merits of the dispute on the basis of the law(s) or rules of law agreed upon by the parties*".

## IV.     SUMMARY OF THE FACTS

## 3.     The Initial Regulatory Framework

### 3.1     Law 54/1997

78.     Law 54/1997 of 27 November, on the Electric Sector ("**Law 54/1997**") created an energy policy centred on liberalising the energy market in Spain. One of its goals was to have 12% of the national energy demand supplied by renewable energy by 2010.[1] In subsequent amendments, Law 54/1997 stated that: "[t]*he Government shall modify the Renewable Energy Promotion Plan to adapt it to the targets set in this regard by the European Union of 20% by 2020, maintaining the commitment that this plan established of 12% for 2010. These targets will be taken into account when setting premiums for these kinds of facilities*".[2]

79.     The law introduced a special regime (the "**Special Regime**") that was to apply to authorised energy production facilities registered in the Administrative Registry for Electrical Power Generating Units ("**RAIPRE**"). Facilities that were admitted to the Special Regime would be entitled "[t]*o incorporate their surplus energy into the system*", and the "*Government* [could] *authorise facilities under the special regime that use renewable energy as primary energy to incorporate all the energy produced by them into the system*".[3]

80.     Law 54/1997 constituted the framework for remuneration under the Special Regime, but did not specify in concrete terms what the remuneration as such would consist of. Facilities qualifying under the Special Regime would be entitled to the general, market-based remuneration applicable by default to all facilities (irrespective of whether or not they were Special Regime facilities).[4]

81.     Article 16.7 stipulated: "*The remuneration for electricity generated, as measured at the power station busbars, by generators under the special regime, shall be the remuneration corresponding to the generation of electric power,* [...] *and, where applicable, a premium that will be determined by the Government after seeking the views of the Autonomous Regions, as set out in article 30.4.*"[5]

---

[1] Law 54/1997, **Exhibits C-11, R-23**.

[2] The Kingdom of Spain's Skeleton Arguments, para. 30 and Act 17/2007 of 4 July, **Exhibit R-20**.

[3] Law 54/1997, Art. 30(2)(a), **Exhibit C-11** (see also **Exhibit R-23**).

[4] Law 54/1997, Art. 16(1)(a) and 30(3)(a), **Exhibits C-11, R-23**.

[5] Law 54/1997, Art. 16(7), **Exhibit R-23** (see also **Exhibit C-11**).

82.    Such facilities would receive a premium, "*to be set by the Government*", "*to obtain reasonable rates of return based on the cost of money in capital markets*".[6]

83.    Article 30(4) stipulated that:

> "The remuneration arrangements for electric power generation installations operating under the special regime shall be supplemented by the payment of a premium under statutory terms set out in regulations and in the following cases:
>
> […]
>
> To work out the premiums, the voltage level on delivery of the power to the network, the effective contribution to environmental improvement, to primary energy saving and energy efficiency, the generation of economically justifiable useful heat and the investment costs incurred shall all be taken into account so as to achieve reasonable profitability rates with reference to the cost of money on capital markets."[7]

## 3.2    Royal Decree 2818/1998 and Royal Decree 436/2004

84.    Royal Decree 2818/1998 on Production of Electric Energy by Facilities Fuelled by Resources or Sources from Renewable Energy, Waste, or Cogeneration ("**RD 2818/1998**") was enacted on 23 December 1998.

85.    RD 2818/1998 was adopted for the purpose of reducing greenhouse gas emissions. The goal was that, by 2010, 12% of the total energy demand in Spain would be covered by renewable energy sources.[8] It developed and gave substance to the Special Regime outlined in Law 54/1997. RD 2818/1998 targeted certain types of facilities with a power capacity not exceeding 50 MW, including "[f]*acilities that solely employ solar energy as primary energy*".[9]

86.    In accordance with RD 2818/1998, facilities registered with the RAIPRE were entitled to a premium for the electric energy incorporated into the grid.[10] PV Plants that qualified were permitted to incorporate all electric energy produced into the grid.[11]

---

[6] Law 54/1997, Art. 30(4), **Exhibit C-11** (see also **Exhibit R-23**).

[7] Law 54/1997, Art. 30(4), **Exhibit R-23** (see also **Exhibit C-11**).

[8] RD 2818/1998, Preamble, **Exhibits C-88, R-68**.

[9] RD 2818/1998, Art. 2(b)(1), **Exhibit C-88** (see also **Exhibit R-68**).

[10] RD 2818/1998, Arts. 9 and 23, **Exhibits C-88, R-68**.

[11] RD 2818/1998, Art. 21(1), **Exhibits C-88, R-68**.

87.   Where the primary energy of a facility was non-consumable renewable energy, biomass or any type of biofuel, such facility could choose "*a total price*" "*at all hours*".[12]

88.   Royal Decree 436/2004, Establishing the Methodology for Updating and Systematising the Legal and Economic Regime of Electric Energy Production in the Special Regime ("**RD 436/2004**"), was adopted on 12 March. RD 436/2004 repealed RD 2818/1998.

89.   RD 436/2004 expanded the Special Regime by "*provid*[ing] *those who have decided or will decide in the near future to opt for the special regime with a durable, objective, and transparent framework*" and further stated that *"there is no doubt that the security and stability offered by this new method for calculating the special regime remuneration should help it foster investment in this kind of facilities, with the full achievement, by 2011, of the installed power targets set out in the Renewable Energies Development Plan.*"[13]

90.   Moreover, it was stated in RD 436/2004 that it would provide for a "*durable economic regime* […] *based on an objective, transparent methodology to calculate the remuneration*".[14]

91.   This Special Regime was available for *inter alia* "*Sub-Group b.1.1 Facilities that solely use photovoltaic solar energy as primary energy*".[15] PV plants were entitled to "*incorporate into the grid all of the electric energy produced*"[16] and could receive either a feed in tariff ("**FIT**") or a premium.[17]

92.   The FIT would be calculated as a certain percentage of each year's average or reference electric tariff.[18] Article 33 stated the following for PV plants:

"Photovoltaic solar energy facilities in Sub-Group b.1.1 of no greater than 100 kW with installed power:

Tariff: 575 percent during the first 25 years from their start-up and 460 percent thereafter.

All other photovoltaic energy facilities in Sub-Group b.1.1:

      Tariff: 300 percent during the first 25 years from their start-up and 240 percent thereafter.

---

[12] RD 2818/1998, Art. 28(3), **Exhibit C-88** (see also **Exhibit R-68**).

[13] RD 436/2004, Preamble, **Exhibit C-89** (see also **Exhibit R-70**).

[14] RD 436/2004, Art. 1(b), **Exhibit C-89** (see also **Exhibit R-70**).

[15] RD 436/2004, Art. 2(1), **Exhibit C-89** (see also **Exhibit R-70**).

[16] RD 436/2004, Art. 20, **Exhibit C-89** (see also **Exhibit R-70**).

[17] RD 436/2004, Art. 22(1), **Exhibits C-89, R-70**.

[18] RD 436/2004, Art. 23, **Exhibits C-89, R-70**.

Premium: 250 percent during the first 25 years from their start-up and 200 percent thereafter.

Incentive: 10 percent."[19]

93. The FIT would be payable for the lifespan of the PV plants. Revision of the FIT could not affect facilities that had already commenced operation:

"**Article 40.** *Revision of tariffs, premiums, incentives and supplements for new facilities*. [...] 3. The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the plants that commence operating subsequent to the date of the entry into force referred to the paragraph above and shall not have a backdated effect on any previous tariffs and premiums."[20] (Emphasis in Exhibit C-89.)

94. The only condition for obtaining the remuneration under RD 436/2004 was registration with the RAIPRE.[21]

## 3.3    Royal Decree 661/2007

95. Royal Decree 661/2007 of 25 May 2007, Regulating Electricity Production Under the Special Regime ("**RD 661/2007**"), updated the Special Regime in RD 436/2004, which was repealed.

96. RD 661/2007 concerned renewable energy, namely the following renewable technologies: PV technology; cogeneration; thermal technology; solar energy; wind technology; geothermal, wave, tidal and ocean-thermal technology; hydroelectric technology; biomass, biofuels or biogas technologies; and waste technology.[22]

97. The Kingdom of Spain modified the Special Regime through RD 661/2007, with the purpose of contributing to growth in the sector:

"The modification of the economic and legal framework that regulates the existing special regime has become necessary for various reasons. First, the growth of the special regime in recent years, together with the experience accumulated during the application of [RD 2818/1998], and [RD 436/2004], have brought to light the need to regulate certain technical aspects in order to contribute to the growth of those technologies..."[23]

---

[19] RD 436/2004, Art. 33, **Exhibit C-89** (see also **Exhibit R-70**).

[20] RD 436/2004, Art. 40(3), **Exhibit C-89** (see also **Exhibit R-70**).

[21] RD 436/2004, Arts. 9 and 15, **Exhibits C-89, R-70**.

[22] RD 661/2007, Art. 2, **Exhibit C-3** (see also **Exhibit R-72**).

[23] RD 661/2007, Preamble, **Exhibit C-3** (see also **Exhibit R-72**).

98.     In the Preamble, it was also stated that:

>       "Spanish society [...] is increasingly demanding the employment of
>       renewable sources of energy and efficiency in the generation of electricity
>       as basic principles in the achievement of sustainable development from an
>       economic, social, [and] environmental point of view.
>
>       [...]
>
>       This new system protects the promoter when the revenues..."[24]

99.     The purpose of RD 661/2007 was set out in Article 1:

>       "The purpose of this Royal Decree is:
>
>       a) To establish a legal and economic framework for the production of
>       electric energy under the special regime, in replacement of Royal Decree
>       436/2004 of 12 March [...]".[25]

100.    The compensation for investing in renewable energy sources was a fixed
        remuneration. Under RD 661/2007, the owners of production facilities had to
        choose between two remuneration regimes: payment of either a FIT or a
        different premium. Article 24 stated:

>       "1. In order to sell the totality or a part of their net production of electric
>       energy, the owners of facilities to which this Royal Decree applies shall
>       elect one of the following options:
>
>       a) To sell the electricity to the system through the transportation or
>       distribution grid, receiving a feed in tariff, which shall be the same for all
>       scheduling periods, expressed in Euro cents per kilowatt/hour.
>
>       b) To sell the electricity in the electric energy production market. In this
>       case, the sale price of the electricity shall be either the price obtained on
>       the organised market or the price freely negotiated by the owner or the
>       representative of the facility, supplemented where applicable by a
>       premium, in Euro cents per kilowatt/hour."[26]

101.    The FIT would be paid with respect to the total net energy produced by the plants
        and for the entire lifespan of the plants.

102.    Article 44(1) stated, in part:

---

[24] RD 661/2007, Preamble, **Exhibit R-72** (see also **Exhibit C-3**).

[25] RD 661/2007, Art. 1, **Exhibit C-3** (see also **Exhibit R-72**).

[26] RD 661/2007, Art. 24, **Exhibit C-3** (see also **Exhibit R-72**).

> "The values of the tariffs, premiums, supplements, and lower and upper limits to the hourly price of the market as defined in this Royal Decree, for Category b) and Sub-Group a.1.3, shall be updated on an annual basis using as a reference the increase in the CPI minus the value set out in Additional Provision One of the present Royal Decree."[27]

103.  Article 44(3) stated, in part:

> "3. During the year 2010, given the results of the monitoring reports on the degree of enforcement of the Renewable Energies Plan (PER) 2005–2010 and of the Strategy for Energy Efficiency and Savings in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies, the degree of participation of the special regime in covering the demand and its impact upon the technical and economic management of the system, and reasonable rates of return shall always be guaranteed with reference to the cost of money in capital markets. Further reviews shall be performed every four years, maintaining the same criteria as previously."[28]

### 3.4    The Renewable Energy Plan 2005–2010

104.  The Renewable Energy Plan 2005-2010 ("**REP 2005-2010**") was approved by the Kingdom of Spain in 2005. The REP 2005-2010 set out the Kingdom of Spain's energy sector policy at the time and aimed to achieve "*29.4% of the electricity generation from renewable resources*"[29] and the installation of 3,000 MW of PV energy by 2010.

105.  With regard to the Special Regime, the REP 2005-2010 stated that:

▪  "*the proper functioning of these mechanisms must be guaranteed* […] *to maintain investor's confidence*"; and

▪  the Special Regime should maintain "*investor's confidence* […] *through a stable and predictable support scheme*".[30]

106.  The REP 2005-2010 added that:

> "Taking the proposed energy objectives as a starting point, financing requirements were determined for each technology on the basis of their

---

[27] RD 661/2007, Art. 44(1), **Exhibit C-3** (see also **Exhibit R-72**).

[28] RD 661/2007, Art. 44(3), **Exhibit C-3** (see also **Exhibit R-72**).

[29] REP 2005-2010, p. 1, **Exhibit C-69**.

[30] REP 2005-2010, pp. 17-18, **Exhibit C-69**.

financial performance, defining several **standard projects** for the calculation of model.

These standard projects have been characterized by technical parameters relative to their size, equivalent operating hours, unit costs, implementation periods, service life, operation costs and maintenance and sales costs for the final energy unit. Likewise, some assumptions for funding have been applied, as well as a series of measures and financial aid, designed according to the requirements of each technology.

The technical sheets for each standard project, determined for the various technology sectors, whose data was used for the economic-financial calculation for the Plan for the 2005-2010 period, are found below."[31] (Emphasis in Exhibit R-66.)

107.    As regards returns for standard projects, the REP 2005-2010 provided that:

"Return on Project Type: calculated on the basis of maintaining an Internal Rate of Return (IRR), measured in legal tender and for each standard project, around 7%, on equity (before any financing) and after taxes."[32]

### 3.5    NEC Reports

108.    The National Energy Commission ("**NEC**")—the Spanish electrical system regulator—has issued several reports regarding the implementation of the Special Regime.

109.    In its report 3/2007 of 14 February 2007, the NEC stated:

"Economic incentives are fundamental for the development of the different technologies, if they are sufficient to create investments. In certain cases, different incentives leading to higher returns are justified in order to reach the established targets. Said economic incentives, in a liberalised regulatory framework such as the one corresponding to electric energy production, represent an important tool of energy and environmental policy."[33]

"The NEC is of the understanding that transparency and predictability of the future of economic incentives reduces regulatory uncertainty which encourages investments in new capacity and minimises the cost of financing projects, reducing the end cost for consumers. The regulations must provide sufficient guarantees so as to achieve stable and predictable economic incentives throughout the lifespan of the facility, setting, as the

---

[31] REP 2005-2010, p. 280, **Exhibit R-66**.

[32] REP 2005-2010, p. 280, **Exhibit R-66**.

[33] NEC Report 3/2007 of 14 February 2007, p. 16, **Exhibit C-73** (see also **Exhibit R-78**).

case may be, both transparent annual update mechanisms based on solid indicators (the average or reference tariff, the CPI, 10-year bonds, etc.) as well as periodic reviews, for instance every four years which will only affect new facilities, and in terms of investment costs may also affect existing facilities."[34]

110.   With reference to RD 661/2007, in its report 30/2008 of 30 July 2008, the NEC commented as follows:

> **"Criteria to minimize regulatory uncertainty.**
>
> The production facilities under the special regime are often capital-intensive with long recovery periods. The regulation of production facilities under the special regime, established by Royal Decree 661/2007, has tried to minimize the regulatory risk of this group, providing security and predictability to the economic incentives during the facilities' lifespan, establishing transparent mechanisms for annual updates..."[35] (Emphasis in Exhibit C-77.)
>
> **"Legal certainty and the protection of legitimate expectations.** The stability and predictability of economic incentives (tariffs and premiums) reduce regulatory uncertainty, which encourages investments in new capacity to tackle their projects, while minimizing financing cost, and reducing the final cost to the consumer. The current regulation has established annual updates of economic incentives based on robust indicators (such as CPI, ten-year bonds, etc.) and also periodic reviews every four years, which can only affect new facilities."[36] (Emphasis in Exhibit C-77.)

111.   In a further report of 22 April 2009 in which it also addressed RD 661/2007, the NEC stated:

> "The **technical and economic regulation** of the special regime is developed mainly in Royal Decree 661/2007 of 25 May, as well as in Royal Decree 616/2007 of 11 May, for high-efficiency cogeneration, and in [RD 1578/2008] of 26 September, for photovoltaic facilities.
>
> This regulation is based on the following basic criteria, contained in the methodology developed by the NEC:
>
> **a. Achieving planned targets**: Financial incentives are justified by the planned targets. These incentives are a tool of environmental and energy

---

[34] NEC Report 3/2007 of 14 February 2007, p. 16, **Exhibit C-73** (see also **Exhibit R-78**).

[35] NEC Report 30/2008 of 30 July 2008, p. 20, **Exhibit C-77** (see also **Exhibit R-254**).

[36] NEC Report 30/2008 of 30 July 2008, p. 3, **Exhibit C-77** (see also **Exhibit R-254**).

policy. They should be adequate for investors to obtain a reasonable return, or greater if the targets are far from being achieved.

**b. Regulatory stability and non-retroactivity.** The predictability and security of the financial incentives during the facilities' lifespan is essential to encourage agents to invest in these new technologies, and also to minimise regulatory risk and the financial cost of bank loans.

[...]

Tariffs and premiums under the special regime must be sufficient and stable to incentivise agents in order to achieve the planned targets."[37] (Emphasis in Exhibit C-79.)

### 3.6    "The Sun Can Be All Yours" and Other Prospectuses

112.    On 24 May 2005, the Institute for Diversification and Saving of Energy ("**IDAE**"), an organ affiliated with the Ministry, published the first of a series of documents under the slogan "The Sun Can Be All Yours".

113.    In this document, the question was asked: "*Why is it good to invest in a solar photovoltaic facility?*" One of the answers provided was that "[t]*he return on the investment is reasonable and can sometimes reach up to 15%*", and that there can be "*significant financing of the investment*".[38]

114.    In June 2007 the IDAE published a new prospectus in the "The Sun Can Be All Yours" series. The new prospectus explained that the objective of any investment in the PV sector was to "o*btain[ ] a* [maximum] *return on the investment*" throughout the lifespan of the facility.[39] Heading Four ("Is there any aid?") stated that the support system was:

"**Aid for operation** is provided to photovoltaic facilities **connected to the grid** by means of the **feed in tariff** in **Royal Decree 661/2007** published in the **Official State Gazette (BOE) No. 126**, of 26 May of 2007."[40] (Emphasis in Exhibit C-74.)

---

[37] NEC Report of 22 April 2009, p. 3 and 9, **Exhibit C-79**.

[38] IDEA, The Sun Can Be All Yours, Reply to all the Key Questions, 24 May 2005, p. 43, **Exhibit C-68**.

[39] IDEA, The Sun Can Be All Yours, Reply to all the Key Questions, June 2007, p. 25, **Exhibit C-74**.

[40] IDEA, The Sun Can Be All Yours, Reply to all the Key Questions, June 2007, p. 18, **Exhibit C-74**.

115.   Heading Four ("Is there any aid?") sets out the specific revenues that investors could expect to achieve, and for how long:[41]



116.   The FIT would be subject to an annual review based on the Consumer Price Index ("**CPI**") published by the Spanish National Statistics Institute.

117.   The IDAE issued a new version of the prospectus "The Sun Can be All Yours" in November 2008. In its "Renewables Made in Spain" prospectus, a document drawn up in March 2010, the IDAE identified as the key "*to understanding the Spanish renewables success story*" the fact that it had been "*driven by a regulatory framework that has promoted development through stability*" and "*the support system that was selected*".[42] The same document states under its heading "Feed in tariff" that:

> "Based on experience, it can be concluded that choosing the right economic support model is critical to successfully developing a renewable electricity generation system. Spain chose to support the sales price of renewable electricity by establishing either a fixed tariff (which differs from one technology to the next) or a premium paid on top of the market price for installations that opt to sell their electricity on the market. The scheme, commonly known as a feed-in tariff, is basically the same as that

---

[41] IDEA, The Sun Can Be All Yours, Reply to all the Key Questions, June 2007, p. 19, **Exhibit C-74**.

[42] IDEA, Renewables Made in Spain, March 2010, p. 7, **Exhibit C-81**.

> used in countries such as Germany or Denmark, which, along with Spain, have also successfully rolled out renewable energies."[43]

118. The prospectus "Renewables Made in Spain" further explained as follows:

> "Shortly after the second international oil crisis, Law 82/1980 on energy conservation was enacted, representing the start of the development of renewable energies in our country. Since then, comprehensive legislation has given rise to a sustained support framework for these sources of energy, which has boosted investor confidence and enabled developers and equipment manufacturers to procure the financing required to make significant investments and position "Renewables Made in Spain" at the top of the world league."[44]

## 4.    Regulations Adopted after 2010

### 4.1    Royal Decree 1565/2010

119. On 19 November 2010, the Respondent enacted Royal Decree 1565/2010, Regulating and Modifying Specific Aspects Related to Energy Production in the Special Regime ("**RD 1565/2010**").

120. Article 1(10) of RD 1565/2010 stated that:

> "In Table 3 of Article 36, the values for the feed in tariffs indicated for Sub-Group b.1.1 facilities from the twenty-sixth year are deleted."[45]

121. Put differently, RD 1565/2010 limited the application of the FIT to the first 25 years of a plant's operation. RD 1565/2010 retroactively limited the rights of PV plants registered under RD 661/2007, in that it applied to all plants, including those plants which had been registered with the RAIPRE prior to the enactment of RD 1565/2010.

### 4.2    Royal Decree-Law 14/2010

122. The Respondent subsequently enacted Royal Decree-Law 14/2010 of 23 December, Establishing Urgent Measures for the Correction of the Tariff Deficit of the Electric Sector ("**RDL 14/2010**").

123. The Preamble to RDL 14/2010 mentioned the tariff deficit, which it defined as "*the difference between the income generated by the tolls on the access to the*

---

[43] IDEA, Renewables Made in Spain, March 2010, p. 7, **Exhibit C-81**.

[44] IDEA, Renewables Made in Spain, March 2010, p. 6, **Exhibit C-81**.

[45] RD 1565/2010, p. 8, **Exhibit C-5** (see also **Exhibit R-75**).

*electric energy transportation and distribution grids and the costs of regulated activities from the electric sector that said tolls are intended to cover*".[46]

124. RDL 14/2010 was aimed at "*eliminating the emergence of a new deficit in the electrical system from 2013*" by "*distribut*[ing] *efforts to reduce the tariff deficit between all the agents of the electric sector*".[47]

125. RDL 14/2010 capped the number of yearly production hours that would be entitled to receive the FIT. RDL 14/2010's Additional Provision One limited PV plants' right to receive the FIT by capping the number of "*equivalent reference hours*" eligible to the remuneration regime.[48] It defined the notion of "*number of equivalent reference hours*" by "*climatic zone*" as follows:

> "The reference equivalent hours for these facilities, which depend on the climate zone where the solar facility is located, according to the classification of climatic zones based on the average solar radiation in Spain, established by Royal Decree 314/2006 of 17 March, Approving the Technical Building Code, will be:

| Technology | Equivalent reference hours /year | | | | |
| --- | --- | --- | --- | --- | --- |
| | Zone I | Zone II | Zone III | Zone IV | Zone V |
| Fixed facility. . . . . . . . . . . . . . . . . . . . . . | 1.232 | 1.362 | 1.492 | 1.632 | 1.753 |
| Facility with 1 axis tracking . . . . ….…... . | 1.602 | 1.770 | 1.940 | 2.122 | 2.279 |
| Facility with 2 axis tracking. . . . . . .…..... | 1.664 | 1.838 | 2.015 | 2.204 | 2.367 |

> For this purpose, the number of the equivalent hours of operation of a facility for the production of electric energy is defined as the ratio of net annual production in kWh and the nominal power of the facility in kW."[49]

126. RDL 14/2010's Transitory Provision Two imposed a single and temporary number of equivalent hours of reference for plants registered under RD 661/2007, which would be applicable until 31 December 2013:[50]

---

[46] RDL 14/2010, Preamble, **Exhibit C-7** (see also **Exhibit R-59**).

[47] Minutes of the Parliamentary Session No. 219, 26 January 2011, p. 47, **Exhibit C-94** (see also **Exhibit R-246**).

[48] RDL 14/2010, p. 6, **Exhibit C-7** (see also **Exhibit R-59**).

[49] RDL 14/2010, Additional Provision One (2), **Exhibit C-7** (see also **Exhibit R-59**).

[50] RDL 14/2010, Transitory Provision Two, **Exhibit C-7** (see also **Exhibit R-59**).

| Technology | Equivalent reference hours / year |
|---|---|
| Fixed Facility………………………………… | 1.250 |
| Facility with 1-axis tracking……………………… | 1.644 |
| Facility with 2-axis tracking……………………… | 1.707 |

## 5.    Regulations Adopted after 2012

### 5.1    Law 15/2012

127.   The Respondent further enacted Law 15/2012 of 27 December, on Tax Measures for Energy Sustainability ("**Law 15/2012**").

128.   Law 15/2012 created a new tax on the production of electric energy within the Spanish territory, consisting of 7% of taxable income (the "**Tax**"), defined as follows:

> "The tax base shall consist of the total amount to be received by the taxpayer for the production and incorporation into the electric energy system, measured at plant busbar cost, for each facility, in the tax period.
>
> For these purposes, in the calculation of the total amount, the remuneration provided in all economic regimes coming under provisions of Law 54/1997 of 27 November, on the Electric Sector, during the corresponding accounting period as well as the remuneration provided in the specific economic system in the case of production and incorporation activities into the electric energy system in non-mainland territories, will be considered."[51]

129.   The Tax applies to the production of electric energy, regardless of the sources employed (*e.g.* renewable v. fossil-based), the applicable regime (whether ordinary or special), the quantity or quality of the electric energy at issue, and the category of the producer.

130.   In the Preamble of Law 15/2012 it is stated that the new Tax on the need to "*harmonise our tax system with a more efficient and environmentally friendly and sustainable use*",[52] "*and to also promote a balanced budget*".[53] It was further stated that:

> "The core foundation of this Act resides in Article 45 of the Constitution, a provision in which the protection of our environment stands as one of the guiding principles of social and economic policies. Therefore, one of the focuses of this tax reform will be the internalisation of environmental costs

---

[51] Law 15/2012, Art. 6(1), **Exhibit C-8** (see also **Exhibit R-28**).

[52] Law 15/2012, Preamble I, **Exhibit C-8** (see also **Exhibit R-28**).

[53] Law 15/2012, Preamble II, **Exhibit C-8** (see also **Exhibit R-28**).

arising from the production of electric energy and the storage of spent nuclear fuel or radioactive waste. Thus, the Act must serve as a stimulus to improve our levels of energy efficiency while enabling a better management of natural resources and to move forward with the new model for sustainable development, both economically and socially as well as environmentally."[54]

## 5.2    Royal Decree-Law 2/2013

131.    In 2013, the Respondent enacted Royal Decree-Law 2/2013 of 1 February, Concerning Urgent Measures in the Electric System and Financial Sector ("**RDL 2/2013**").

132.    Article 1 of RDL 2/2013 altered the mechanism for updating the FIT, which up until then, had been indexed on the CPI:

"Article 1. Updates to the remunerations for activities in the electric system linked to the Consumer Price Index ("CPI").

In force from 1 January 2013, this index will be replaced by the Consumer Price Index at constant taxes, excluding unprocessed food and energy products, in all methodologies that, linked to the Consumer Price Index, govern the update of the remuneration, tariffs, and premiums that the participants in the electric system receive from the sectorial regulation."[55]

133.    The "*Consumer Price Index at constant taxes, excluding unprocessed food and energy products*" was created by RDL 2/2013.[56]

## 5.3    Royal Decree-Law 9/2013

134.    On 13 July 2013, the Respondent enacted Royal Decree-Law 9/2013, Adopting Urgent Measures to Ensure the Financial Stability of the Electric System ("**RDL 9/2013**").

135.    The second final provision of RDL 9/2013 stated that:

"The Government, at the proposal of the Minister of Industry, Energy, and Tourism, shall approve a Royal Decree regulating the legal and economic regimes for the facilities for the production of electric energy from renewable energy sources, cogeneration, and waste with premium remuneration that shall modify the remuneration model of existing facilities.

---

[54] Law 15/2012, Preamble I, **Exhibit C-8** (see also **Exhibit R-28**).

[55] RDL 2/2013, Art 1, **Exhibit C-9** (see also **Exhibit R-63**).

[56] RDL 2/2013, Art 1, **Exhibit C-9** (see also **Exhibit R-63**).

> This new model shall comply with the criteria laid down in Article 30 of Law 54/1997 of 27 November, on the Electric Sector, introduced by the present Royal Decree-Law and shall be applicable from the entry into force of the present Royal Decree-Law."[57]

136.   RDL 9/2013 established a new framework for the remuneration of PV plants, which came to be known as the Specific Regime (the "**Specific Regime**").

137.   RDL 9/2013 repealed the Special Regime and substituted it with a new "*legal and economic regime*" applicable to electric energy production plants using renewable energy.[58]

138.   Article 1(2) of RDL 9/2013 revised the wording of Article 30(4) of Law 54/1997, to the following:

> "4. Additionally, and in the terms legally determined by Royal Decree of the Council of Ministers, for the remuneration for the sale of generated energy valued at market price, the facilities may receive specific remuneration that consists in a term for each installed capacity unit, covering, where applicable, the investment costs of a model facility that cannot be recovered by the sale of energy and a term for operation covering, where appropriate, the difference between operation costs and the revenue for the market share of said model facility.
>
> To calculate said specific remuneration for a model facility, during its regulatory lifespan, and in reference to the activity carried out by an efficient and well-managed company, the following shall be considered:
>
> a) The standard revenue from the sale of generated energy valued at the market price of production.
>
> b) The standard operation costs.
>
> c) The standard value of the initial investment.
>
> For this purpose, under no circumstance shall the costs or investments that are determined by regulation or administrative acts that are not applicable throughout the Spanish territory be taken into account. Similarly, only the costs and investments that respond exclusively to electric energy production shall be taken into account.

---

[57] RDL 9/2013, Final Provision Two, **Exhibit C-10** (see also **Exhibit R-64**).

[58] RDL 9/2013, Preamble II, **Exhibit C-10** (see also **Exhibit R-64**).

> As a consequence of the unique characteristics of the insular and non-mainland electric systems, facilities may be exceptionally defined as specific model facilities for each one of them."[59]

139.   The Specific Regime defined the "reasonable rate of return", set it as a cap and allowed for a revision every six years:

> "This remuneration regime shall not exceed the minimum necessary level to cover the costs that allow the facilities to compete on an equal footing with the rest of technologies and to enable obtaining a reasonable return by reference to the model facility applicable in each case. […]

> This reasonable return shall turn, before taxes, on the average yield of ten-year Government bonds on the secondary market, applying the adequate differential.

> The parameters of the remuneration regime may be revised every six years."[60]

140.   The new Specific Regime was based on the investment costs of "*model facilities*" defined by reference to "*an efficient and well-managed company*".

141.   Pursuant to the new Article 30(4) of Law 54/1997, a plant's specific remuneration was calculated on the basis of:

- the standard income for the sale, at market price, of the energy produced;

- standard costs of operation; and

- the standard initial investment.

142.   The model facilities, the standard costs of operation and initial investment were not defined in RDL 9/2013 but were left for future regulation.

143.   The Specific Regime applied to all PV plants already in operation at the date of entry into force of RDL 9/2013 (13 July 2013). As such, the new regime established under RDL 9/2013 was retroactively applicable to the entire lifespan of PV Plants, in other words, it covered all periods prior to its publication.[61]

## 5.4     Law 24/2013

144.   In December 2013, the Respondent enacted Law 24/2013 of 26 December, on the Electric Sector ("**Law 24/2013**").

---

[59] RDL 9/2013, Art. 1(2), **Exhibit C-10** (see also **Exhibit R-64**).

[60] RDL 9/2013, Art. 1(2), **Exhibit C-10** (see also **Exhibit R-64**).

[61] RDL 9/2013, Art. 1, **Exhibits C-10, R-64**; Law 24/2013, Final Provisions 2-3, **Exhibits C-12, R-55**.

145.  Law 24/2013 abandoned the distinction between the ordinary and the special regimes:

> "The high penetration of production from renewable energy resources, cogeneration, and waste, included in the so-called special regime for electric energy production, has caused its unique regulation associated with power and its technology to lack purpose […] so the difference between the ordinary and special regime is abandoned."[62]

146.  Law 24/2013 confirmed the reforms brought about by RDL 9/2013 as regards the PV sector.

## 5.5    Royal Decree 413/2014 and Order IET/1045/2014

147.  In 2014, the Respondent enacted Royal Decree 413/2014 of 6 June, on the Regulation of the Electric Energy Production Activity from Renewable Energy, Cogeneration and Waste ("**RD 413/2014**") and Order IET/1045/2014 of 16 June, Approving the Remuneration Parameters, for Model Facilities, Applicable to Certain Facilities of Electric Energy Production Using Renewable Energy Resources, Cogeneration, and Waste ("**Order 1045/2014**").

148.  Pursuant to RD 413/2014, each model facility was assigned a number of remuneration parameters calculated in light of the activity carried out by an "efficient and well-managed company". In accordance with Article 13(2) of RD 413/2014, the most relevant remuneration parameters necessary for the implementation of the specific remuneration regime were the following:

(a)  "Remuneration for investing";

(b)  "Remuneration for operating"; ("**Ro**")

(c)  "Investment incentive by reducing the generation cost";

(d)  "Regulatory lifespan";

(e)  "Minimum number of operating hours";

(f)  "Operating threshold";

(g)  "Maximum number of operating hours for the purposes of receiving the remuneration for operating, if any";

(h)  "Upper and lower limits of the annual market price"; and

(i)  "Average annual price of the daily and intraday market".[63]

---

[62] Law 24/2013, Preamble II, **Exhibit C-12** (see also **Exhibit R-55**).

[63] RD 413/2014, Art. 13, **Exhibit C-91** (see also **Exhibit R-81**).

149. Article 13(2) of RD 413/2014 also includes the necessary parameters to calculate the aforementioned parameters:

    (a)  "Standard value of the initial investment for the model facility";

    (b)  "Estimated price of the daily and intraday market";

    (c)  "Number of operation hours of the model facility";

    (d)  "Estimated future income for the participation in the production market";

    (e)  "Other operating income";

    (f)  "Estimated future operating costs";

    (g)  "Update rate for which the value is that of the reasonable return";

    (h)  "Adjustment coefficient of the model facility"; and

    (i)  "Net asset value".[64]

150. Order 1045/2014 defined the above-mentioned parameters in detail.

151. RD 413/2014 stated that the Specific Remuneration can be amended every "*regulatory period*". Article 15 of RD 413/2014 defined "*regulatory periods*" as periods of six years, divided into two "*regulatory half-periods*" of three years.[65]

152. Article 20 of RD 413/2014 described amendments that can be made to the Specific Remuneration:

"1. Without prejudice to the provisions of Article 19, the remaining remuneration parameters may be reviewed at the end of each regulatory period by order of the Minister of Industry, Energy, and Tourism, with the prior agreement of the Executive Government Commission for Economic Affairs.

In said review, all the values of the remuneration parameters may be modified in accordance with the provisions of Article 14.4 of Law 24/2013 of 26 December.

Notwithstanding the foregoing, neither the regulatory lifespan nor the standard value of the initial investment of the model facility may be revised.

2. After each regulatory semi-period, the estimates of model facilities' standard incomes from the sale of energy valued at market price as well as the remuneration parameters directly linked thereto may be reviewed by

---

[64] RD 413/2014, Art. 13, **Exhibit C-91** (see also **Exhibit R-81**).

[65] RD 413/2014, Art. 15, **Exhibit C-91** (see also **Exhibit R-81**).

order of the Minister of Industry, Energy, and Tourism, with the prior agreement of the Executive Government Commission for Economic Affairs.

As a result of this review, new model facilities to which remuneration for operating is applicable may be removed or added.

3. In accordance with the methodology established by regulation, the remuneration for operating for the model facilities to which it is applicable and for which the operating costs depend essentially on the price of fuel shall be reviewed at least annually.

As a result of this annual review, new model facilities to which this remuneration for operating is applicable shall not be removed or added."[66]

## V.    SUMMARY OF THE CLAIMANT'S FACTUAL CASE

## 6.    Introduction

153.    According to the Claimant, this is not a complex case. The basic theory and allegations are straightforward: the Kingdom of Spain offered and guaranteed certain conditions to investors. Companies invested in reliance of said guarantee. Thus, the Kingdom of Spain is required as a matter of international law to honour those conditions for those investors.[67]

154.    Novenergia invested on 13 September 2007. It did so relying on the Kingdom of Spain's explicit offer in RD 661/2007 of a fixed long-term FIT, on the condition that Novenergia registered its PV Plants with the RAIPRE by September 2008. In light of the Kingdom of Spain's undertakings, marketing, and past conduct, Novenergia expected the Kingdom of Spain to make good on its promises. There were no warning signs that it would not. Nonetheless, the Kingdom of Spain decided actively to undermine and abolish the entire regulatory framework. It did so in complete disregard of its offer, and of the principles of reasonableness, proportionality, regulatory certainty, and transparency. Novenergia has, as a result, suffered significant harm.

155.    Contrary to what the Respondent argues, Novenergia never expected a petrification of the Spanish electric regulatory framework. It only expected the Kingdom of Spain to maintain, as per its undertakings, a fixed long-term FIT for it and others investing alongside it in 2007.[68]

---

[66] RD 413/2014, **Exhibit C-91**.

[67] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 222.

[68] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras, 218-221.

## 7.    RD 661/2007 Was Clear on Its Face

156.    RD 661/2007 could not have been clearer. To PV plants that registered with the RAIPRE by 28 September 2008, it guaranteed:

- the right to incorporate all energy production into the grid;

- a fixed FIT for the lifespan of the PV plants; and

- that there would be no changes to the FIT except for updates in accordance with the CPI.[69]

157.    These favourable conditions were attached to a requirement to invest, construct, and register PV plants within one year. This, to entice investors to make enormous investments rapidly. The Kingdom of Spain needed large-scale investments in renewable energy to meet its goals and commitments. It needed these swiftly.[70] Only a limited, defined, and identifiable group was able to register with the RAIPRE under RD 661/2007. This group was promised the benefits of RD 661/2007.[71]

158.    Given the explicit nature of the undertakings in RD 661/2007 and its limitation on modifications, had the Kingdom of Spain intended to reserve the right to renege on these promises, it should have stated so expressly. It did not do so. Anything else would have been misleading to investors.[72]

## 8.    The Reasonable Rate of Return Was a Vague Starting Point

159.    RD 661/2007 implemented and fleshed out the Special Regime established by Law 54/1997. The latter only contained a skeletal regime. It stipulated that certain renewable energy producers, under any royal decree developing the Special Regime, were "*to obtain reasonable rates of return based on the cost of money in capital markets*". It provided no more guidance on the content of "*reasonable rates of return*".[73]

160.    "Reasonable rates of return" was the starting point, and accordingly the income floor. This was also the Kingdom of Spain's contemporary understanding of the term.[74]

---

[69] Novenergia's Statement of Claim, Section III.B; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 223, 227-240; RD 661/, Arts. 2(1), 9, 14, 17, 18, 20, 22, 24, 30(1), 36, 37, 44, Additional Provision One, **Exhibit C-3**.

[70] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 252-258.

[71] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 259-263.

[72] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 241-251; Second KPMG Report, paras. 23-24, 55-60.

[73] Novenergia's Statement of Claim, paras. 104-106; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 280; Law 54/1997, Art. 30(4), **Exhibit C-11**.

[74] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 281-282.

161.  Based on a dictionary definition of "reasonable" as "appropriate, in accordance with reason, proportionate or not exaggerated", the Kingdom of Spain has alleged that "reasonable" must be dynamic.[75] Since it is dynamic, it "must"— according to the Kingdom of Spain—be open to radical change. According to the Claimant, this argument is unbelievable. The requirement that something be "reasonable" does not entail that it is subject to outright repeal.[76]

162.  In 2013, the phrase "reasonable rates of return" was defined and given a specific content via an amendment of Law 54/1997. The Respondent attempts to argue that the 2013 wording applied in 1997. It did not. The definition upon which the Kingdom of Spain now relies only came into existence fifteen years after Law 54/1997 was adopted and six years after Novenergia invested. The Kingdom of Spain's arguments concerning the phrase are contingent on retroactively applying the new definition to the prior undefined term.[77] This position is obviously artificial and should be rejected by the Tribunal.

## 9.    The Claimant Invested in the PV Plants in September 2007

163.  The Claimant's investment is comprised of its shareholding in Novenergia Spain and the returns associated with that investment.[78]

164.  On 3 July 2007, the Claimant established Novenergia Spain to hold the Claimant's investment in the PV Plants. In order to incorporate Novenergia Spain, nominal funds were transferred on the same day.[79]

165.  On 13 September 2007, Novenergia acquired a 100% interest in the PV Plant Solarsaor.[80] This was the day the Claimant acquired its interest in the first of the PV Plants, and accordingly irreversibly committed to investing in the Spanish PV sector. Starting with this purchase, significant funds were expended for the development of Solarsaor and the six other PV Plants. This funding was continuous and uninterrupted. All PV Plants, as a result, achieved registration under the Special Regime by September 2008.[81]

166.  Therefore, 13 September 2007 is the date of the investment.[82]

---

[75] The Kingdom of Spain's Rejoinder Statement and Jurisdictional Objections, fn. 154.

[76] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 390-392.

[77] Novenergia's Statement of Claim, paras. 252-271; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 283-284; RDL 9/2013, Art. 1(2), **Exhibit C-10.**

[78] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 296-300.

[79] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para 301; Novenergia II – Energy & Environment (SCA), SICAR Financial Statements 2009, p. 18, CLEX-14.

[80] Deed of Shares Transfer, 13 September 2007, cl. 11, p. 8, D7792778, **Exhibit C-114**; Solarsaor S.L.'s Partners Register Book, 1 September 2007, p. 1, **Exhibit C-25.**

[81] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 301-348.

[82] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 304.

167.    The Kingdom of Spain has relied on the dates of the project finance agreements to project the date of Novenergia's investment into 2010. However, by 2010, all plants had been registered, were operating, and had been receiving the FIT for two years.

168.    The late dates of the project finance agreements are easily explained. Given the short timeframe for registration, Novenergia had to act quickly. Although financial negotiations commenced in 2007, Novenergia invested prior to obtaining project finance for each plant. It entered into a bridge agreement with BPI for all the PV Plants in early 2008. Due to the global financial crisis, BPI could not live up to its commitment, forcing Novenergia to seek and negotiate new project finance agreements. This created a situation where the project finance agreements post-dated the investment.[83]

## 10.    When It Invested, the Claimant Legitimately Expected a Fixed Long-Term FIT and There Were No Warning Signs That the Respondent Would Undermine and Thereafter Abolish the Special Regime

169.    When Novenergia invested in September 2007, it expected a fixed long-term FIT. At that time, there were no warning signs that the Respondent would undermine and abolish the entire Special Regime.

### 10.1    The Claimant Expected a Fixed Long-Term FIT

170.    Novenergia invested heavily in the PV sector based on the guarantees contained in RD 661/2007. Its objective, legitimate expectation was to obtain what RD 661/2007 explicitly promised: a fixed long-term FIT with limited updates based on the CPI.[84]

171.    This expectation – which was comforted by the State's regulatory regime – was solidified by the Kingdom of Spain's public relations efforts. Through policy literature, public statements, and advertisement prospectuses, the Kingdom of Spain signalled that companies could invest in Spain with confidence and without fear of radical change to the Special Regime.[85] The Kingdom of Spain's marketing

---

[83] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 287-294; Bridge Loan Agreement between Novenergia II & Environment España, S.L., Novenergia II Energy & Environment (SCA) SICAR and Banco BPI, S.A., 19 March 2008, **Exhibit C-144**.

[84] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras.350-351.

[85] Novenergia's Statement of Claim, Section III.C; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 351; Witness Statement of Henri Baguenier, paras. 22-26; REP 2005-2010, **Exhibit C-69**; Ministry of the Environment, Spanish Climate Change and Clean Energy Strategy for the Horizon 2007-2012-2020, **Exhibit C-72**; NEC Report of 26 January 2006, **Exhibit C-71**; See "Clos corrects Montilla and says that he will not reduce the premiums for the renewables", ABC, 27 October 2006, **Exhibit C-100**; "Clos highlights the importance of renewable energies during his visit to the Almería Solar Platform", EuropaPress, 9 November 2006, **Exhibit C-101**; NEC Report 3/2007 of 14 February 2007, p. 16, **Exhibit C-73**; NEC Report 30/2008 of 30 July 2008, p. 20, **Exhibit C-77**; IDEA, The Sun Can Be All Yours, Reply to all the Key Questions, 24 May 2005, pp. 42-43, **Exhibit C-68**; IDEA, The Sun Can Be All Yours, Reply to all the Key Questions, June 2007, **Exhibit C-74**; IDAE, The Sun Can Be All Yours. Reply to all the Key Questions on Solar Photovoltaic Energy, November 2008, p. 45, **Exhibit C-78**; IDAE, ICO-IDAE Financing Agreement for the promotion of investments in renewable energies and energy efficiency in 2005, 16 May 2005, **Exhibit C-67**; IDAE, ICO-IDAE Financing Line for

campaign appeared credible in light of the State's track-record of good regulatory practice combined with promotion and protection of renewable energy.[86]

172. The regulatory framework, including royal decrees, can and did generate obligations and expectations. The Respondent readily admits that Law 54/1997 gives rise to undertakings (and attendant expectations). However, it objects to RD 661/2007 being able to do the same. There is no reason why the former, but not the latter, can create obligations and expectations. RD 661/2007 is clearer than Law 54/1997, and the Kingdom of Spain has the power to change both. But merely because the Kingdom of Spain has the power to bring about a modification does not imply that such modification is foreseeable or reasonable and proportional.[87]

## 10.2 There Were No Warning Signs That the Respondent Would Undermine and Abolish the Special Regime

173. With the same firmness that it once promoted the profitability, stability, and predictability of the Special Regime to investors, the Kingdom of Spain now in this case denies that very same stability and predictability. The Kingdom of Spain is asserting that investors should have known that RD 661/2007 was not worth the paper on which it was written.

174. Novenergia could only be aware of the circumstances that existed at the time of its investment. This would exclude most of the evidence relied upon by the Kingdom of Spain to challenge Novenergia's legitimate expectations, leaving only a handful of facts, information, and circumstances.[88]

175. The Kingdom of Spain relies on seven alleged facts, principles, and circumstances to argue that Novenergia was warned and had foreseen, or ought to have foreseen, the abolition of the Special Regime: (i) the project finance agreements; (ii) "*economic sustainability*"; (iii) "*reasonable rate of return*"; (iv) REP 2005-2010; (v) RD 661/2007; (vi) RD 436/2004; and (vii) Spanish Supreme Court judgments.

176. *First,* the Respondent uses the language of the project finance agreements to allege that Novenergia could foresee the destruction of the regime. However, all of the agreements post-date the investment and only a few pre-date the construction of the PV Plants and their registration with the RAIPRE. And, at any

---

Renewable Energies and Energy Efficiency Projects 2004, 1 March 2004, **Exhibit C-66**; IDAE, New ICO-IDAE Financial Line for the Conditioned Positive Photovoltaic Projects, 22 December 2005, **Exhibit C-70**.

[86] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 424-425; Second KPMG Report, paras. 25, 27 62-72, 76-77, 79, 94-96.

[87] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 267-278.

[88] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras.358-360, Annex A.

rate, these project finance agreements only refer to a risk of failing to register within the deadline.[89]

177. *Second*, the Kingdom of Spain alleges that the principle of "economic sustainability" should have warned Novenergia that the Respondent intended to renege on its undertakings. This argument is fictitious. Neither Law 54/1997 nor any other document included "economic sustainability" as a governing principle. Indeed, the Kingdom of Spain knowingly permitted the growth of a tariff deficit since 2000 by decoupling regulated costs and regulated revenues – behaviour that is diametrically opposed to any notion of "economic sustainability".[90]

178. The principle of "economic sustainability" was first introduced together with the Specific Regime. Unlike Law 54/1997 and RD 661/2007, RDL 9/2013 and Law 24/2013 explicitly state that remuneration would be compatible with economic sustainability.[91]

179. *Third*, the Kingdom of Spain relies on the notion of "reasonable rates of return" to artificially conjure up a warning to investors. Its interpretation is incorrect. A vague and undefined principle could not have constituted a warning. The definition given to the said notion fifteen years later is irrelevant. That definition was enacted six years after Novenergia invested, and at the same time as the Special Regime was abolished.[92]

180. *Fourth*, the Respondent also attempts to repackage REP 2005-2010 as a warning to investors. Even a cursory reading of this REP demonstrates that it did not put investors on notice that the Kingdom of Spain would deny them the FIT.

181. REP 2005-2010 used several assumptions to calculate the funding of each technology. The Respondent has latched on to <u>one</u> of these, namely an Internal Rate of Return of 7% after taxes, arguing that a reasonable rate of return meant a return of 7%. The Kingdom of Spain here confuses an assumption used in calculating the remuneration with a condition/goal of the remuneration. Importantly, the methodology used to calculate incentives is not a warning that the Special Regime was contingent on the vagaries of the economic climate after the incentives had been calculated.[93]

182. If anything, REP 2005-2010 strengthened investors' expectations. The purpose of publishing this REP was to ensure that the Kingdom of Spain could cover at least 12% of its energy demand with renewable energy by 2010. It noted that Spain must continue to push for increasing growth of renewable energy by reducing

---

[89] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 295.

[90] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras.367-376, 381-386; Second KPMG Report, paras. 27(i), 64-65.

[91] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 377-381; Second KPMG Report, paras. 13, 27, 65.

[92] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 387-392.

[93] Novenergia's Statement of Reply and Answer to Jurisdictional Objections paras. 402-404; Second KPMG Report, paras. 68(i), 113; REP 2005-2010, pp. 170, 273-274, **Exhibit C-69**.

economic barriers to the development of the PV sector and increasing premiums.[94]

183.    *Fifth*, RD 661/2007 was purpose-built to attract investors. It contained no warning that its promises would be undermined or abolished, and, as discussed *supra*, it was clear on its face and contained no governing principle of "economic sustainability". Further, there is no basis for the Kingdom of Spain's argument that it was solely a means to achieve "reasonable rate of return". Nowhere in RD 661/2007 does it say so, and the Respondent has furnished no other evidence for its proposition.[95]

184.    *Sixth*, RD 661/2007 was introduced as an improvement of RD 436/2004. Indeed, several laws and regulations have preceded RD 661/2007. Each time there was a regulatory modification of the Special Regime, the Kingdom of Spain had actively avoided negatively affecting investments already in operation. The main tool for effecting this was "grandfathering". Grandfather clauses are provisions that preserve the benefits of a previous regulatory regime for investments already in existence at the time of that regulatory regime.[96]

185.    Remarkably, the draft of RD 661/2007 did not initially include grandfather provisions for the facilities operating under RD 436/2004. This was remedied in the final draft as soon as the NEC detected its absence while reviewing the draft of RD 661/2007:

> "Royal Decree 436/2004 is meant to be a permanent law (guaranteeing a highly convenient regulatory certainty), which is not necessarily a "petrification" of the law.
>
> […]
>
> [The] NEC [is] of the opinion that the need to make the Draft for Royal Decree retroactive has not been sufficiently justified, the transition period from passing from the current remuneration system to the one established in the Draft for Royal Decree is not adequate and, last of all, investors are not sufficiently compensated for the lower remuneration.
>
> […]
>
> [T]he Draft for Royal Decree analysed and reported on herein shall not apply to facilities that are already in operation as of 1 January 2008."[97]

186.    The Special Regime was constantly improved upon, but investors were given the option to continue relying on previous iterations of the regulatory regime should

---

[94] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 394-396.

[95] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 405-415.

[96] Second KPMG Report, paras. 88-95; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 416-424.

[97] NEC Report 3/2007 of 14 February 2007, pp. 18-20, **Exhibit C-73**.

they so choose. The NEC would review draft royal decrees to ensure that this was not overlooked. None of this could have served as a warning to Novenergia that the Kingdom of Spain would undermine or abolish the Special Regime. If anything, it would have increased Novenergia's expectation of a stable and predictable regime.

187. *Seventh*, almost all of the Spanish Supreme Court judgments relied upon by the Kingdom of Spain to allege that Novenergia ought to have known that dramatic change could come at any given point are irrelevant for the purposes of legitimate expectations. They post-date the investment. Regardless, the Kingdom of Spain stresses that the Supreme Court judgments underline the Respondent's power to change royal decrees and legislation. This misses the point. Of course, it is perfectly possible for the Kingdom of Spain to change these as a matter of domestic law. The real question for the purpose of this arbitration is not whether the Kingdom of Spain <u>could</u> act as it did under Spanish law, but rather whether it could reasonably be expected that it <u>would</u>, and if by acting as it did, whether the Kingdom of Spain violated its obligations towards the Claimant under international law and the ECT. Aware that it had the power to overhaul its legal framework, the Kingdom of Spain made sure investors trusted it would not exercise this power.[98]

188. Moreover, the three Supreme Court judgments relied upon by the Kingdom of Spain which pre-date the investment concern a different sector, a different royal decree, and a different type of remuneration. None of the judgments concern substantial changes to the system. They only concern minor adjustments to the system. They therefore bear no comparison to the present arbitration, which concerns a radical regulatory overhaul. These judgments provided no warning to investors.[99]

## 11.  The Special Regime Was Undermined and Thereafter Abolished

189. The Respondent slowly emptied the Special Regime of content through four principal laws and regulations:

- RD 1565/2010: introduced a cap on the number of years for which the FIT was available;[100]

- RDL 14/2010: introduced a cap of the number of yearly production hours entitled to the FIT;[101]

---

[98] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras.426-432, 439-441.

[99] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 434-438.

[100] Novenergia's Statement of Claim, Section III.D.1(i); Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 453-457; RD 1565/2010, Art 1(10), **Exhibit C-5**.

[101] Novenergia's Statement of Claim, Section III.D.1(ii); Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 458-465; RDL 14/2010, Preamble, Additional Provision One, Transitory Provision Two, **Exhibit C-7**.

- Law 15/2012: introduced a 7% tax on energy production with a dramatic effect on remuneration (though its effects were somewhat mitigated by the Specific Regime);[102] and

- RDL 2/2013: modified the mechanism for updating the FIT. From being indexed to the CPI, updates of the FIT became indexed to a significantly less beneficial *ad hoc* CPI.[103]

190.  The Respondent, finally, completely abolished the Special Regime by means of four laws and regulations:

- RDL 9/2013 and Law 24/2013: repealed the Special Regime and modified Law 54/1997, including defining the concept of "reasonable rate of return" as a cap on returns. A <u>Specific</u> (rather than a "Special") Regime was introduced with a remuneration based on the investment costs of "model facilities" defined with reference to "an efficient and well-managed company", but provided no content to these concepts. The new Specific Regime applied retrospectively to the entire lifespan of PV plants. It affected those plants that had already begun operation and had already registered with the RAIPRE. This regime could be revised, without limitation, every six years.[104]

- RD 413/2014 and Order 1045/2014: provided the details for the operation of the Specific Regime. Remuneration became contingent on a litany of criteria that were wholly different from those in the Special Regime – criteria that investors were unaware of when investing in their PV plants and registering them with the RAIPRE under RD 661/2007. Further, said criteria could (and the expectation was that they would) easily be extensively reviewed, changed, and amended going forward.[105]

191.  The assault on the Special Regime was slow and piecemeal. It was also systematic, concerted, and designed to deprive PV investors of their returns on their investments. These actions by the Kingdom of Spain were unprecedented. Never before in the history of the Spanish electric sector had a system been subject to such an onslaught.

---

[102] Novenergia's Statement of Claim, Section III.D.1(iii); Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 466-469; Law 15/2012, Preamble I II, Art. 6.1, **Exhibit C-8**.

[103] Novenergia's Statement of Claim, Section III.D.1(iv); Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 470-472; RDL 2/2013, Preamble, Art. 1, **Exhibit C-9**.

[104] Novenergia's Statement of Claim, Section III.D.2(i)-(ii); Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 477-479; RDL 9/2013, Preamble II, Art. 1, Final Provision Two, Transitory Provision Three, **Exhibit C-10**; Law 24/2013, Preamble II, Arts. 14(5)(a), 14(7), Final Provisions 2-3, **Exhibit C-12**; RD 413/2014, Preamble III, Arts. 11(4), 13(2), 15(1), 20, **Exhibit C-91**; Order 1045/2014, Arts. 1(1), 5, **Exhibit C-13**.

[105] Novenergia's Statement of Claim, Section III.D.2(iv); Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 476, 478-480.

## 12.    The Specific Regime Is Unreasonable and Disproportionate

192.    The Specific Regime is volatile and has removed regulatory certainty. The changes passed by the Kingdom of Spain are neither reasonable nor proportionate, and the measures were not proportionate and transparent, nor the result of any meaningful engagement with the stakeholders.

## 12.1    The Specific Regime Is Volatile and Removed Regulatory Certainty

193.    The Specific Regime introduced a regulatory period of six years, at the end of which all remuneration parameters could be amended. These short regulatory periods dealt a fatal blow to the income visibility of the now abolished Special Regime.[106]

194.    This was not the only aspect that destroyed regulatory certainty. The introduction of the Specific Regime itself did so. Investors were never warned that their remuneration would be judged against an arbitrary standard of "*an efficient and well-managed company*" nor that it would be capped at 7.398% – which the Kingdom of Spain decided in 2014, for the first time, would be the "reasonable rate of return". These conditions were applied to the entire, *i.e.,* past and future, life span of the PV plants. Hence, the investments' revenue-generating capabilities were altered *ab initio* but the costs remained the same. The Respondent was fully aware of the consequences of its measures.[107]

## 12.2    The Changes Are Neither Reasonable nor Proportionate

195.    Given the harsh and permanent negative effect of the measures undertaken by the Kingdom of Spain, the changes should have been reasonable and proportionate. They were not. As explained by KPMG, the changes were contrary to good regulatory practice since they did not provide: (i) stability and predictability; (ii) proportionality; (iii) transparency; (iv) effectiveness; and (v) efficiency.[108] In a vain attempt to defend its actions, the Kingdom of Spain has stated that these were reasonable and proportionate. However, its assertion fails for at least three reasons.

196.    *First*, the Kingdom of Spain has not produced any evidence of a prior, independent assessment balancing the impact of the measures. As explained by NEC, the reports attached to the draft law were simplistic and did not fully analyse or justify the changes implemented by RDL 9/2013. This includes the Respondent's BCG report, which only reviewed certain aspects and was limited

---

[106] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 499-500; RD 413/2014, Art. 20, **Exhibit C-91**.

[107] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 489-498; First KPMG Report, pp. 9, 56; Second KPMG Report, paras. 117-122, 175-176, 179; First Compass Lexecon Report, table II, p. 10.

[108] Novenergia's Statement of Claim, Section III.D.4(ii); First KPMG Report, pp. 7-8, 10-12, 84, 90-126.

to publicly available information rather than actual expenses, costs and revenues.[109]

197.  *Second*, the Respondent fails to show that the measures were selected based on an objective consideration of viable alternatives. Indeed, KPMG has outlined several better alternatives, which the Respondent failed seriously to consider.[110]

198.  *Third*, the Kingdom of Spain fails to justify its measures based on internationally recognised good governance principles, EU-level guidance on state aid and renewable energy schemes, or Law 54/1997. It has instead focused all its attention on arguing that it complied with a principle it mischaracterises, namely that of the "*reasonable rate of return*".[111]

## 12.3   The Measures Were Not Proportional and Transparent, nor the Result of Any Meaningful Engagement With the Stakeholders

199.  The Specific Regime was enacted without proper widespread public consultation and without any meaningful engagement with stakeholders. This demonstrates a clear failure to adhere to the principles of transparency and predictability.

200.  No hearings took place with respect to RDL 9/2013. *I.e.*, the Kingdom of Spain did not see it fit to convene any hearings prior to imposing the Specific Regime and its general framework. Hearings were organised only for subsequent orders and regulations which set out the details of the Specific Regime. When submissions were invited for these subsequent orders, they were invited for very preliminary texts, that ultimately bore no relationship to the final product.[112]

201.  In an attempt to justify proportionality, the Respondent relies heavily on proposals made by a single renewable energy association, the Spanish Renewable Energies Association ("**APPA**"). However, the Kingdom of Spain misrepresents that proposal by cherry-picking a few lines, leaving out that APPA emphasised that any new regulation should not apply to already existing PV plants. Further, while the APPA bill includes methods for calculating

---

[109] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 509-522; Second KPMG Report, paras. 172-173; Boston Consulting Group, Final Report on the Analysis of the Standards for Electricity Production Projects Under the Special Regime, 30 July 2014, p. 3, **Exhibit C-179**; Boston Consulting Group, "Collection of Results of Solar Photovoltaic", Annex 1 to the Final Report on the Analysis of the Standards for Electricity Production Projects Under the Special Regime, 30 July 2014, slides 3-6, **Exhibit C-180**; NEC Report 18/2013 of 4 September, pp. 4-5, **Exhibit 50** of First KPMG Report.

[110] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 523-531; First KPMG Report, Section 7; Second KPMG Report, Section 8; National Energy Commission Report, 7 March 2012, **Exhibit R-102**.

[111] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 532-536; First KPMG Report, pp. 11, 13-14, 62-67; Second KPMG Report, paras. 45-46, 156-158; European Commission Guidance for the Design of Renewable Support Schemes, Commission Staff Working Document, Reference SWD (2013) 439 final, 5 November 2013, pp. 4-5, **Exhibit R-11**.

[112] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 545 -555; First KPMG Report, p. 81; Second KPMG Report, paras. 22, 47.

remuneration based on the investment costs of the technology, it does not include the concept of an "efficiently managed company".[113]

# VI.    SUMMARY OF THE RESPONDENT'S FACTUAL CASE

## 13.    Introduction

202. According to the Respondent, the Claimant has omitted numerous factual elements that are relevant to assess the numerous violations asserted by the Claimant. The Claimant has limited itself to expounding a few applicable rules of a regulatory framework as dense as that of an energy sector, and it has limited itself to expounding its own expectations and specific documents to try to substantiate the promises allegedly made by the Kingdom of Spain.

203. The Claimant claims that its expectations have been violated, expectations that it considers reasonable and objective during the timing of its investment. Regarding this timing, the Claimant tries to bring this date of the investment forward to 13 September 2007.

204. However, the Claimant continued carrying out investment activities in Spain after the acquisition of the shares in Novenergia Spain, as it has assumed economic obligations and risks inherent to the execution of the seven PV Plants in which it holds an indirect shareholding:

1.    The Claimant assumed obligations and granted express warranties to a financial entity when it signed a bridge loan with BPI on <u>19 March 2008</u> for a sum of EUR 35 million.[114] These obligations that the Claimant assumed must also be considered part of the investment activity of the Claimant.

2.    The Claimant assumed the role of guarantor in other project finance *vis-à-vis* other lending banks. Through these contracts, the Claimant assumed new obligations as guarantor during the months of <u>June and July 2008</u>.[115]

3.    The construction of all the PV Plants did not end until <u>November 2008</u>. Their construction implied an evident risk of delays. The investment committee minutes of 6 October 2008 shows that Alamo had not yet been concluded.[116] The investment committee minutes of 11 and 24

---

[113] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 539-544; APPA-Greenpeace, Draft Bill on the Promotion of Renewable Energies, 21 May 2009, Art. 23(4), **Exhibit R-157**.

[114] Bridge Loan Agreement between Novenergia II & Environment España, S.L., Novenergia II Energy & Environment (SCA) SICAR and Banco BPI, S.A., 19 March 2008, **Exhibit C-144**.

[115] Solarsaor definitions agreement of June 2008, **Exhibit R-179**; Almansa of June 2008, **Exhibit R-180**; Lobón, July 2008, **Exhibit R-181**.

[116] Minutes of the Meeting of the managers of Novenergia, 6th and 7th October 2008, p. 3, **Exhibit C-176**.

November 2008 are the minutes that reveal that the construction of all the PV Plants had ended and that they are connected to the grid.[117]

4.    Even the Claimant itself had to lend money to the company Novenergia Spain given that the economic and regulatory uncertainty was making it hard to obtain external financing for the PV Plants. The Claimant granted 23 loans to Novenergia Spain from 13 July 2007 until <u>31 January 2009</u>.[118]

205.    The Claimant bases its expectations on advertising leaflets, paragraphs from NEC reports and a national energy plan to substantiate the alleged promises to maintain a fixed FIT in perpetuity in favour of registered renewable energy ("**RE**") plants. The Claimant has omitted warnings given to operators in the RE sector (i) since 2006 by the government, (ii) since 2005 through case law and (iii) since 2007 by the NEC reports. These warnings have been consistent with respect to (1) the will to provide a reasonable rate of return on investments in RE plants, (2) the dynamic nature of said return, and (3) the intervention of the government in cases of distortion of the energy market or the discovery of over-remuneration.

206.    Every diligent investor is aware of or should have been aware of these warnings. The Claimant has not submitted one single regulatory or legal due diligence report that would have clarified these important issues. Additionally, the Claimant maintains an inexcusable silence or distorts facts, to suit its own ends, which are essential to ascertain the actual Spanish regulatory framework in which the Claimant invested.

207.    It is impossible to sustain that as from September 2007 the Claimant did not make any investments in the RE plants that are the subject of this arbitration. From the documentation that has been submitted, one can deduce that the Claimant (i) guaranteed the bridge loan of EUR 35 million on the condition that it obtained project finance for all the PV Plants in which the Claimant had a shareholding in March 2008 and (ii) assumed costs and risks with the construction of the PV plants. Consequently, the accredited facts in this case are that the investment by the Claimant extended from July 2007[119] to, at least, the end of the construction of the plants in November 2008.

## 14.    The Spanish Regulatory Framework

208.    The regulation of the Spanish electricity system (hereinafter "**SES**") in general, and RE in particular (as part of this system), is performed by means of regulations of a different nature. These regulations comply with the general outline of sources of the law in the Spanish legal system.

---

[117] Minutes of the Meeting of the managers of Novenergia, 11 and 24 November 2008, p. 3, **Exhibit C-177**.

[118] 23 Loans granted by the Claimant to the Respondent for a total sum of 109 million Euros, **Exhibit R-182**.

[119] Novenergia's Statement of Claim, para. 28.

209.    These are as follows:

    (a)    _The Spanish Constitution of 1978_: The supreme law of the Spanish legal system that configures the organisation of public authorities, its institutional and territorial structure, and regulates the essential aspects of the rights and duties of citizens.

    (b)    _The law_: A written rule issued by the legislative power. There are two classes of Laws:

    -    _Organic laws_: Reserved for regulating certain subjects envisaged in the Constitution (fundamental rights and public freedoms, general electoral regime, among others). An absolute majority of the congress of deputies is required for its approval.

    -    _Ordinary laws_: Regulate matters not reserved by the Constitution for an organic law. For approval, a simple majority of the congress of deputies will suffice.

    (c)    _Royal decree-law_: This is a rule with the force of law that the constitution authorises the government to approve in extraordinary situations of necessity or urgency. The adoption of a royal decree law is subject to strict conditions, controls and limits and its subsequent validation by parliament.

    (d)    _Royal decree_: a royal decree is a statutory rule that emanates from the government. It complements or develops laws and is hierarchically inferior to them. It can regulate within the authorisations that granted by law and cannot violate it.

    (e)    _Ministerial order_: This is a statutory regulation that emanates from one or several ministerial departments. In the field of energy, the most common is the ministerial order that emanates from the Minister of Industry, Energy and Tourism.

    (f)    _Resolutions_: These are acts with a lower rank than the ministerial order that emanate from the competent bodies of the administration, with a technical content.

210.    The regulations referred to above are arranged in accordance with the principle of regulatory hierarchy. The principle of regulatory hierarchy means that regulations are arranged in a hierarchical manner. This, in turn, leads to important practical consequences: (1) no regulatory provision may be contrary to the act that it develops, but is null and void and tribunals should not apply it, (2) all regulatory provisions should be interpreted and implemented in harmony with the law that they develop (3) no regulatory provision can prevent the adoption of policy measures aimed at complying with legal provisions.

211.    In addition, EU law has been part of the Spanish legal system since Spain joined the EU in 1986.

212. Within the EU law, together with the treaties (Treaty of the European Union and the Treaty on the functioning of the European Union ("**TFEU**")), there are also different legal acts of European institutions (Article 288 of the TFEU):

213. An EU regulation has a general scope and is binding in its entirety and directly applicable in each Member State.

      (a) *A directive* obliges the recipient member state regarding the result to be achieved, but allows national authorities to choose the form and methods.

      (b) *A decision* is compulsory for the recipient member state in all its elements.

      (c) *Recommendations* and *opinions* are not binding.

214. Finally, in the Spanish legal system, the relevance of the jurisprudence of the Supreme Court must be taken into consideration. Pursuant to Article 1.6 of the Civil Code:

      "Case law shall complement the legal system by means of the doctrine repeatedly upheld by the Supreme Court in its interpretation and application of statutes, customs and general legal principles."[120]

## 15.   The Principle of Hierarchy in the Spanish Regulatory Framework

215. The Claimant ignores or disregards the value of the different regulations that govern the SES and the principle of hierarchy that articulates how the different regulations of the Spanish regulatory framework actually work.

216. This principle of hierarchy implies that the regulations cannot contradict the provisions of a higher law. In Spanish law, when a regulation infringes on the provisions of a rule with the status of law, it causes said regulation to be null and void.[121] Moreover, the courts have the obligation not to apply the regulations that are contrary to law.[122]

217. Law 54/1997 is based on the principle of economic sustainability of the SES.[123] The Claimant now denies the existence of said principle. However:

      ▪ Said principle appears in Law 54/1997 preamble: "[T]*he basic purpose of this Act is to regulate the electricity sector with the traditional, three-fold goal of*

---

[120] Royal Decree of 24 July 1889 approving the Spanish Civil Code, Official State Gazette No. 206, of 25 July 1889. Art. 1.6, **Exhibit R-19**.

[121] Act 30/1992 of 26 November, Art. 62.2, **Exhibit R-21**.

[122] Organic Act 6/1985, of 1 July, on the Judiciary, Art. 6, **Exhibit R-168**.

[123] The Kingdom of Spain's Statement of Defense and Jurisdictional Objections, paras. 284, 313.

> *guaranteeing the supply of electric power, its quality and the provision of such supply at the lowest possible cost.* [...]"[124]

- Said principle was acknowledged by associations of energy producers. In 2006, during the processing of RD 661/2007, the Spanish Electricity Association ("**UNESA**") called for the need to: "*have a stable regulation in time. It has to be capable of providing the necessary legal security to carry out Capital-intensive investments and, in those respects,* [...] *continue the development of the electric system in a path of sustainability.*"[125]

- Said principle is mentioned in RD 661/2007 preamble, which the Claimant omits: "*Spanish society* [...] *is increasingly demanding the employment of renewable sources of energy and efficiency in the generation of electricity as basic principles in the achievement of sustainable development from an economic, social,* [and] *environmental point of view.*"[126]

- The Spanish Wind Energy Association (the "**AEE**") also invoked this principle as a guiding principle for public subsidies: "*As regards wind energy, Royal Decree 661/2007 characterizes itself, in general terms, by the idea of economic sustainability and control over costs*".[127]

- Said principle was invoked by the General Secretary of Energy in October 2008, prior to the introduction of the subsequent Royal Decree 1578/2008, of 26 September, on Remuneration for the Activity of Electricity Production Using Solar Photovoltaic Technology for Facilities after the Deadline for the Maintenance of the Remuneration Fixed under Royal Decree 661/2007 ("**RD 1578/2008**"): "*I received a number of foreign investors who told me that if the premiums were maintained up to the next year, they would invest billions of euros in Spain* [...] *We want to obtain investments that generate wealth, not just ones that absorb the resources of the consumers.* [..] *we must be aware of the economic sustainability of the cost of the energy* [...] *and that it is important for the families and for the productive sector*".[128]

218. Therefore, diligent investors knew or should have known that RD 661/2007 would not *freeze* remunerations indefinitely, along 3 or 4 decades, as this could infringe the principle of sustainability of the SES.[129] Subsidies received by Special Regime producers are a SES cost[130] that affects its sustainability. Similarly, no investor can expect the *freezing* of a regulatory provision maintaining non reasonable returns, *e.g.* for being *far higher* by reference to the capital markets. Such an interpretation would breach Law 54/1997, which sets a <u>limit</u> on the

---

[124] Law 54/1997, Preamble, **Exhibit R-23**.

[125] UNESA´s Submissions to the Draft of RD 661/2007, 20 December 2006, **Exhibit R-185**.

[126] RD 661/2007, Preamble, **Exhibit R-72**.

[127] AEE. 2008 Wind Power YEARBOOK, p. 13, **Exhibit R-184**.

[128] The Kingdom of Spain's Skeleton Arguments, para. 23(e) and Appearance of the Secretary General of Energy before the Spanish Senate on 16 October 2008, **Exhibit R-261.**

[129] Law 54/1997, Art. 29, **Exhibit R-23**.

[130] Law 54/1997, Art. 16(6), **Exhibit R-23**.

subsidised regime when stating that the *market price + premium* should *provide a <u>reasonable</u> rate of return pursuant to the capital m*arket.[131]

219.    No diligent investor could expect that, once a situation of over-remuneration was identified, said situation would not be corrected to apply Law 54/1997. In fact, the government indeed intervened in 2006 and in 2007, with respect to wind plants. Claimant was not ignorant of this.

220.    The Supreme Court made clear this situation in its judgment of October 2006: "*However, the payment regime* [...] *does not guarantee to special regime electricity producers that a certain level of profits or revenues will be unchanged relative to those obtained in previous years, or that the formulas for fixing the premiums will stay unchanged.*"[132]

221.    The *Isolux* award refers to this manifestation of the principle of hierarchy saying: "*the regulatory framework had already been modified several times. The proper RDs 6611/2007* [sic!] *and 1565/2008 were no more than amendments to RD 436/2004*. [...] *All of these regulations issued for the implementation of Law 54/1997, of 27 November 1997, regarding the Electrical Sector (LSE), showed a very unstable character of a regulatory framework that the government has the power and the duty to adapt to the economic and technical needs of the moment, within the LSE framework*."[133]

222.    This principle of hierarchy leaves most of the Claimant's theory without substance.

## 16.    The Special Regime Is Not an Island in the SES

223.    The Claimant equally disregards the integration of the activity of generation from RE in the SES as a cost thereof and, therefore, subject to its sustainability. The Claimant seeks to present PV technologies to the Tribunal as an "island" outside the SES. It is an interconnected legal, economic and technical system for the *generation, transmission, distribution and sale of electricity*. It is, therefore, a system created to ensure the power supply (1) at the lower possible cost for consumers[134] and (2) sustainable in the long term.

224.    The production of electricity from the Special Regime is a part of the SES according to Law 54/1997. That is, the subsidies comprising the Special Regime producers' economic regime are a cost of the SES: "*supply diversification and security costs*".[135] The close link between premiums (cost of the SES paid by the consumers) and the economic sustainability of the SES require the rollout of

---

[131] Law 54/1997, Art. 30(4), **Exhibit R-23**.

[132] Judgment of the Supreme Court dated 25 October 2006, **Exhibit R-132**.

[133] Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain, SCC V2013/153, Award, 12 July 2016, para. 788, **Exhibit RL-72**.

[134] Law 54/1997, Preamble, **Exhibit R-23**.

[135] Law 54/1997, Art. 16(6), **Exhibit R-23**.

renewable technologies and their economic impact to be planned. Law 54/1997 stated: "*The Government shall modify the Renewable Energy Promotion Plan to adapt it to the targets set in this regard by the European Union of 20% by 2020, maintaining the commitment that this plan established of 12% for 2010. These targets will be taken into account when setting premiums for these kinds of facilities*".[136]

225.     The planning described is developed in renewable energy plans ("**REP**"). Specifically, the determination of the premiums laid-down by RD 661/2007 is linked to the provisions of the REP 2005-2010.[137] In said plan, the costs to the SES that the deployment of RE involves are assessed in terms of the return that it is foreseen will be granted as *reasonable*.[138] In addition, it analyses whether such costs are sustainable for the SES.

226.     The methodology used to determine this cost, as did the REP of 1989, the REP 2000-2010 and the economic report of RD 436/2004,[139] was explained as follows:

>     "Using the proposed energy targets as the baseline, the financing needs for each technology have been determined according to their return, therefore defining some standard projects for the calculation model.
>
>     These standard projects have been characterised by technical parameters relating to their size, equivalent hours of operation, unit costs, periods of implementation, lifespan, operational and maintenance costs and sale prices per final unit of energy. Similarly, some financing assumptions have been applied, as well as a series of measures or financial aid designed according to the requirements of each technology."

227.     Specifically, according to the state of the technology at that time, four standard facilities were established for the PV sector.[140] In all cases, the REP set the different parameters required for each standard facility to reach a return on the project and with equity close to 7%[141] throughout its lifetime:

>     "*Return on Project Type*: calculated on the basis of maintaining an Internal Rate of Return (IRR), measured in legal tender and for each standard project, around 7% on equity (before any financing) and after taxes."[142] (Emphasis in Exhibit R-66.)

---

[136] The Kingdom of Spain's Skeleton Arguments, para. 30 and Act 17/2007 of 4 July, **Exhibit R-20**.

[137] REP 2005-2010. pp. 270-313, **Exhibit R-66**.

[138] REP 2005-2010, pp. 276-279, **Exhibit R-66**.

[139] NEC Report 4/2004 of 22 January, pp. 8-9, **Exhibit R-71**; NEC Draft of the report 3/2007 of 25 January 2007, p. 14, **Exhibit R-78**.

[140] REP 2005-2010, pp. 294-298, **Exhibit R-66**.

[141] REP 2005-2010, p. 274, **Exhibit R-66**.

[142] REP 2005-2010, p. 274, **Exhibit R-66.**

228. It should be noted that, as far as PV projects are concerned, the 2005-2010 REP was based on a cost opportunity on own resources of 5%.[143]

229. Consistent with the above, RD 661/2007 set the corresponding subsidies. The regulator does not calculate the return taking into account the specific costs of each investor. The premiums established by RD 661/2007 are set with the aim of providing a standard facility a return of about 7% according to the standards set in the REP 2005-2010 itself: the CAPEX of a standard facility, the OPEX of a standard facility, equivalent operating hours, unit costs, implementation periods, useful life and selling prices of the final energy unit.

230. The Claimant overlooks the methodology used by the Spanish regulator to set the premiums. This methodology was set forth in diverse regulatory instruments prior to and contemporary with the time of their investment. Evidently, the Claimant omits the Minister of Industry's declaration in the senate of the Kingdom of Spain, given on 26 October 2006:

> "It is important for all operators to receive this message and to be aware that our road map entails adapting to this framework as quickly as possible, which involves generating more market that we hope will be efficient, because it is not always so, and obviously, the tariffs are not going to pay for anyone's party. Tariffs, by law can only take into account energy costs, and shareholder ventures are not energy costs. This is also a very important message for the [RE] sector [...] there shall be no further criteria other than objective energy costs and, obviously, the market price is not included; the stock market is a mixture of future remuneration expectations, etc. [...], however the tariff framework will be strictly bound to what the regulations state, that is to say, only the costs shall be taken into account, and this shall be our principle of action."[144]

231. It is also essential to understand that the reasonable return was attributed to the investment in the plants. Consequently, the guarantee of reasonable return established in Law 54/1997 applies only to the capital employed directly in the economic activity that allows the formation of the assets to be used in electricity generation. In any case the concept of reasonable return could be attributable to other costs, such as premiums of a financial nature paid to acquire a PV plant. In fact, preamble of RD 661/2007 refers to promoters: "*This new system protects the promoter when the revenues....*"[145] This issue has not been objected to by the Claimant.

232. On the other hand, the REP 2005-2010 is framed within the context of a given scenario of expected electricity demand. The international financial crisis that started in 2009 had an extraordinary impact on the economic database on which

---

[143] REP 2005-2010, p. 168, **Exhibit R-66**.

[144] Appearance of the Industry Ministry in the Senate, Commission of Industry, 26 October 2006, **Exhibit R-257**.

[145] RD 661/2007, Preamble, **Exhibit R-72**.

RD 661/2007 premiums were projected.[146] The demand for electricity fell in an exceptional manner in 2009. The RE associations were aware of (i) this fall and (ii) the need to adopt measures to cope with this fall in demand.[147] REP 2005-2010 designed the deployment of subsidies to the renewable energies based on a foreseeable evolution of the electricity demand that was completely different to what actually occurred in 2009.[148]

233.  Claimant tries to limit the relevance of REP 2005-2010 and its value in the regulatory framework,[149] but the RE sector was aware that the returns were linked to the REP objectives. The Claimant attempts to put over to the Tribunal the erroneous idea that the activity of RE production is an island within the SES. An island outside the principles on which the SES are built; particularly, from the principle of its economic sustainability.

234.  Notwithstanding, the investors on PV plants were aware that EU law on state aid to RE is designed to achieve a *level playing field*, and that situations of over-remuneration that distort the market or that give rise to non-sustainability were not allowed:

> "[I]t is worth underlining that the last communication by the European Commission on the subject, dated last 10 November 2010, states in its section 2 that:
>
> '*The development of renewable energies shall depend on such aid regimes as may be determined over time. The Commission must perform its role in guaranteeing that these are sustainable, in consonance with technological progress and with not hindering innovation or competition.*'"[150]

235.  Importantly, the investors on PV Plants were aware that neither the legislation of the EU nor that of the European Commission would intervene to face situations of non-sustainability in national Electricity systems or situations of market distortions due to over-remunerations.

---

[146] Second Accuracy Expert Report, para. 232.

[147] AEE's pleadings to the NEC on August 2010, p.2, **Exhibit R-186**.

[148] Evolution of Peninsular demand 2006-2015 REE. Available public information at:
http://www.ree.es/sites/default/files/downloadable/the_spanish_electricity_system_2015.pdf, p.14.

[149] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 364, 393-404.

[150] The Kingdom of Spain's Skeleton Arguments, para. 40 and Claim filed by the PV Plants before the Supreme Court on 28 March 2011, p. 54, **Exhibit R-183**.

## 17.    The Spanish Regulatory Framework in 2007 and 2008

## 17.1    Law 54/1997, Applied by the Government and Known by the RE Sector

### 17.1.1  Law 54/1997, Articles 16 and 30

236.    The structure and limits of the remuneration regime for RE producers under the Special Regime are laid-down by Articles 16.7, 30.3 and 30.4 of Law 54/1997.[151] Article 16.7, omitted by the Claimants, stipulates:

> "The remuneration for electricity generated, as measured at the power station busbars, by generators under the special regime, shall be the remuneration corresponding to the generation of electric power, [...] and, where applicable, a premium that will be determined by the Government after seeking the views of the Autonomous Regions as set out in article 30.4."[152]

237.    It is deduced from this Article that producers under the Special Regime are entitled to receive the market price and a _premium_ for their net power production. Article 30(4) stipulates that:

> "The remuneration arrangements for electric power generation installations operating under the special regime shall be supplemented by the payment of a premium under statutory terms set out in regulations and in the following cases:
>
> […]
>
> To work out the premiums, the voltage level on delivery of the power to the network, the effective contribution to environmental improvement, to primary energy saving and energy efficiency, the generation of economically justifiable useful heat and the investment costs incurred shall all be taken into account so as to achieve reasonable profitability rates with reference to the cost of money on capital markets".[153]

238.    A literal interpretation of Article 30.4, last paragraph, leaves no room for doubt. The pool price + premium allows RE technologies to compete with conventional energy to reach a level playing field. Article 30.4 imposes a clear pairing that seeks an aim which can be expressed in the following formula: Market price + subsidy = achieve _reasonable return in accordance with the cost of money on the capital market:_

---

[151] Law 54/1997, **Exhibit R-23**.

[152] Law 54/1997, **Exhibit R-23**.

[153] Law 54/1997, **Exhibit R-23**.

(a) Firstly, Special Regime producers have the right to obtain a "return", allowing them to recover both the amounts invested (CAPEX) as well as the operating costs for such assets (OPEX) and, moreover, obtain an industrial profit;

(b) Secondly, this means that the industrial profit guaranteed to the producers must be "reasonable". Thus, this profit cannot be disproportionate or "irrational".

(c) Thirdly, the assessment of reasonableness must be made based on an element that is objective and variable: "with reference to the cost of money on the capital market".

239. The Claimant's theory is that reasonable return is merely one criterion to determine the premiums. Said theory is also breached by doctrinal publications that examined the Spanish regulatory framework. In 2010 the manual "Powering the Green Economy" – the FIT handbook points out: "*Different names have been used to describe this tariff calculation approach based on actual costs and profitability for producers.* [...] *the Spanish support mechanism speaks of a 'reasonable rate of return'* [...] *the Spanish legislator calculated the tariffs based on 7 per cent returns on investment under the fixed tariff option, and 5–9 per cent under the premium FIT option.*"[154]

240. The award in the *Isolux* case, after examining the regulatory framework that existed in 2008 and 2009 has reached the same conclusion when it analysed article 30.4 of Law 54/1997: "*This text does not include the concepts 'floor' or 'ceiling'. The only guarantee that it contains for the investor is to receive, with regard to certain parameters, a reasonable rate of return with reference to the cost on money in the capital market. That is to say, that the regulator guarantees a minimum profitability, but does not guarantee that the investor will obtain a rate greater than the minimum guaranteed*."[155]

241. The Claimant did not object that the rollout of renewables in Spain is subject to the guidelines arising from EU regulations. However, the Claimant forgets to mention that all subsidy or aid regime implemented by a Member state is subject to EU rules on state aid.[156] That is, it is subject to the principle of proportionality. The term "reasonable" of Article 30.4 means that it must be reasonable for investors, but also reasonable for the consumers who pay it.[157] Furthermore, it cannot breach EU regulations on state aid, stated in Article 107.1 of the TFEU: "*Save as otherwise provided in the Treaties, any aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain*

---

[154] Powering the Green Economy. The feed in tariff handbook, p. 19, 42, **Exhibit RL-59**.

[155] Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain, SCC V2013/153, Award, 12 July 2016, para. 807, **Exhibit RL-72**.

[156] The Kingdom of Spain's Statement of Defense and Jurisdictional Objections, paras. 317, 320; The Kingdom of Spain's Rejoinder Statement and Jurisdictional Objections, paras. 375-379.

[157] RD 661/2007, Preamble, **Exhibit R-72**.

*goods shall, in so far as it affects trade between Member States, be incompatible with the internal market*".[158]

242. The Claimant could not be unaware of this regulation and its binding nature if, in the future, the remuneration provided by RD 661/2007 became excessive, distorting the energy market.

### 17.1.2 The Reasonable Return Can Be Achieved in Various Ways

243. Law 54/1997 did not define the specific mechanism through which the Special Regime subsidy system should be articulated. The act did not even require the government to establish a "*feed in tariff*" system to articulate the Special Regime remuneration formula. The act was confined to establishing the limits and the objective so that the government could set it. In compliance with this legal mandate, since 1997, the regulator has established different mechanisms to achieve the objectives set by the act.

244. Changes from one mechanism to another were challenged by RE investors before the courts since 2004. The Supreme Court consistently held in 2005, 2006, 2007, 2009, 2011, and 2012 that the remuneration system pivots around *the principle of reasonable return*. In 2006 the case law clearly stated that: "[T]*he payment regime* [...] *does not guarantee to special regime electricity producers that a certain level of profits or revenues will be unchanged relative to those obtained in previous years, or that the formulas for fixing the premiums will stay unchanged.*"[159]

245. Thus, no investor who had a rational understanding of the Spanish regulatory framework could have had the reasonable and objective expectation of a specific formula or mechanism for remuneration in force indefinitely, *i.e.* a petrification. Especially, when the Kingdom of Spain never promised this regulatory petrification to the Claimant or any other investor.

246. The *Isolux* award denies that the government had undertaken to the investor that it would maintain a specific *formula of remuneration or a fixed tariff*: "*It is precisely to settle this dispute based on the ECT and on international law, that the Arbitral Tribunal must determine whether the Claimant was aware that there were no obstacles under Spanish law to modify the regulatory framework including with regard to the modalities of investor's remuneration. The existence or inexistence of these obstacles in Spanish law is a fact, and the Supreme Court's ruling are part of this fact.*"[160]

---

[158] TFEU, Art. 107, **Exhibit RL-1**.

[159] Judgment of the Supreme Court of 25 October 2006, **Exhibit R-132**.

[160] Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain, SCC V2013/153, Award, 12 July 2016, para. 793, **Exhibit RL-72**.

### 17.1.3 The Reasonable Return Must Be Subject to Possible Changes

247.   The Claimant denies the dynamic nature of the principle of reasonable return. The support models for renewables must be dynamic enough to correct situations of over- or under-remuneration that distort the market. Proof of this is that RD 661/2007 itself and earlier RDL 7/2006, of 23 June, Establishing Urgent Measures in the Energy Sector and Approves the Social Tariff ("**RDL 7/2006**") were passed in order to correct situations of over-remuneration for the wind plants. Indeed, Law 54/1997 does not use the terms "fixed" or "unchangeable". It uses "reasonable with reference to the cost of money on the capital market" which, by nature, is dynamic.

248.   Consequently, without altering the essential characteristics of the Spanish regulatory framework set forth (necessarily) in Law 54/1997, amendments can be made to the regulations as required to comply with the act. The manner in which said dynamism was expressed was through regulatory amendments implementing the necessary means for complying with Law 54/1997.

249.   This dynamic nature was accepted by the RE investors as Iberdrola,[161] Sener[162] (and other thermosolar players as Abengoa, FCC, Sacyr, Elecnor and Samca,[163] and EON[164]). This dynamic nature was also accepted by the main RE associations.[165]

250.   Importantly, in a claim filed before the Supreme Court, the Claimant's RE plants recognise *the dynamic nature* of the premiums which remunerates the RE plants, citing case law of 2006, 2007 and 2009:

> "[T]he aforementioned Sentence rejects the unmodifiability of the remuneration system: [...] the prescriptive content of Law 54/1997, of 27th November, on the Electricity Sector, does not envisage the petrification or freezing of the remunerative system for owners of electricity facilities under the special regime, nor any recognition of the right of producers under the special regime nor the unmodifiability of said system, [...]
>
> The Sentence determines that, apart from the fact that there is no damage, the Government may modify, in the exercising of its regulatory powers, a

---

[161] Expansión.com, "Iberdrola advises Government: "collection" measures will cut investment and damage revenues", 25 July 2012, **Exhibits R-229,** Libremercado.es, "Iberdrola demands a halt in premium for renewable energy producers", 23 February 2012, **Exhibit R-231,** Iberdrola PowerPoint Presentation, Renewable energy targets in Spain, **Exhibit R-238.**

[162] Press article, "Tariff deficit, retroactivity and reasonable return", **Exhibit R-187**; News item published by Helionoticias, the Solar Thermal Energy News Portal, **Exhibit R-188.**

[163] News item published by Helionoticias, the Solar Thermal Energy News Portal, **Exhibit R-188.**

[164] Journal ABC, Interview with the CEO of E.ON España, Mr. Antoñanzas. 28 November 2010, **Exhibit R-275.**

[165] APPA: **Exhibits R-164, R-190, R-198, R-201, R-227, R-239, R-248, R-249, R-268**; AEE Association (Wind): **Exhibits R-186, R-193, R-208, R-236, R-250**; ASIF Association (PV): **Exhibits R-199, R-216, R-243**; Protermosolar (thermosolar technology): **Exhibit R-242.**

specific remuneration system, but providing this falls within the provisions of the Electricity Sector Act."[166] (Emphasis omitted.)

251.  Claimant could not be deprived of the knowledge of its own PV Plants, even more when the managers of these PV Plants (Mr. Albert Mitja Sarvise and Mr. Alvaro Gonçalves Martins) were members of the manager team of Novenergía.

252.  Under Law 54/1997 there were successive regulations which stated different formulas in order to provide the reasonable return for RE investments. An investor who proposed to make an investment in REs in Spain since 2007 should have known that the system for calculating the remuneration of REs had experienced various changes. Said investors could have easily checked that RD 661/2007 was a consequence of RDL 7/2006, which substantially amended RD 436/2004 and that the latter had previously amended RD 2818/1998.

## 17.2   RD 2818/1998

253.  The first implementing regulation of Article 30.4 of Law 54/1997 was RD 2818/1998. This regulation emphasised the development of Special Regime facilities by creating a remuneration framework based on a subsidy (premium) that contemplated the market price and a complement for reactive energy.[167] The deficiency of this formula was its volatility. Being referenced only to the pool, the expectation of income of an investor in REs floated on the pool.

## 17.3   RD 436/2004

254.  In order to eradicate the volatility of the first calculation formula for the remuneration of REs, RD 436/2004 established a different remuneration system. An operator who operated a facility under the Special Regime would have the right to receive a premium that was equal to a multiple of the mean benchmark tariff (hereinafter, "**TMR** "). A PV investor would perceive a tariff which would be 575% of the TMR until year 25 (460% as from then) for facilities of less than 100 kW. The tariff would be 300% for 25 years (240% as from then) for facilities of over 100 kW, or, optionally for facilities of over 100 kW, a premium of 250% for 25 years and 200% as from then. Thus, it stated two different formulas to set up the subsidies.[168]

255.  Additionally, RD 436/2004 stated a quadrennial revision system in Article 40.3:[169]

> "**Article 40.** *Revision of tariffs, premiums,* [incentives] *and supplements for new plants*. [...] 3. The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply

---

[166] Claim filled by the claimant's PV Plants before the Supreme Court on March 2011, p. 73, **Exhibit R-183**.

[167] RD 2818/1998, Art. 28, **Exhibit R-68**.

[168] NEC Report 4/2004 of 22 January, pp. 17-22, **Exhibit R-71**.

[169] RD 436/2004. Art. 40(3), **Exhibit R-70**.

solely to the plants that commence operating subsequent to the date referred of the entry into force referred to in the paragraph [above] and shall not have a backdated effect on any previous tariffs and premiums."

256. Notwithstanding this Article, RD 436/2004 remuneration formula was modified for registered PV plants only two years later through RDL 7/2006 and later substituted by another through RD 661/2007.

### 17.3.1 Distortions Created by RD 436/2004 Remuneration Formula: RDL 7/2006

257. The link between the subsidies for renewable energies and the TMR created a potential risk to the economic sustainability of the SES. This was because the TMR was calculated based on the costs of the SES themselves, including subsidies to the Special Regime. Therefore, a loop arose in the mechanism for setting premiums; the premium was a percentage of the TMR which, in turn, was calculated taking into account the increase in the amount of the premiums. This constant feedback meant a disproportionate increase in the costs of the SES.

258. By 2006, the weight of REs (especially wind) in the SES already represented 17% of the total production.[170] The problem of cost overrun was compounded in light of the planning targets established in the REP 2005-2010, which would have meant a greater participation of the Special Regime in electricity generation.

259. As a result, the government intervened and enacted RDL 7/2006, of 23 June. It should be noted that Royal Decree-Acts are rules with the force of an act that the government may issue in cases of extraordinary and urgent need. This RD-Acts are to be confirmed by the parliament within 1 month to acquire the binding nature of an act. RDL 7/2006, in its preamble, highlighted the inefficiency of the current remuneration formula. Therefore, its 2nd Transitory Provision froze all the Special Regime subsidies until a new remuneration formula were implemented.

260. These changes included the untying of premiums from the TMR. Therefore, the applicable update of the TMR from 1 July 2006, was not applicable to the RE premiums and Special Regime tariffs of the existing Plants. RD 436/2004 generated "windfall profits" for the wind farms that it was necessary to eradicate. These windfall profits also pushed upwards the tariff deficit existing at the time.

261. The Claimant was aware that, due to a situation of over-remuneration, the government acted to correct that over-remuneration. This is what the PV Plants investors stated in the claim they lodged before the Supreme Court:

> "[T]hrough the analysing of previous justification of retroactive measures in relation to [RD 661/2007], 25 of May with respect to [RD 436/2004]. [...]

---

[170] Renewable Energy Promotion Plan 2000-2010, p. 18, **Exhibit R-65**.

> said Royal Decree applied a retroactive measure to premiums of the wind sector and at the time, this was justified by the distortion of the market price. Initially, when [RD 436/2004] was passed, the price was low (36c€/nNh) and later it went up to 50/60 c€/KWh. This fact led to an exaggerated increase in the remuneration and the moving of the wind parks to the remuneration system of the market price. Faced with this distortion, and in the name of general interest as a result of the deviation of a free market price when this was variable, a retroactive measure was applied."[171]

262. Surprisingly, such intervention, known by the Claimant in 2011, has been continuously hidden by it to the Tribunal from 2015 onwards.

263. It must be recalled that due to these wind fall profits, the Ministry of Industry warned the RE sector on 26 October 2006 about the market efficiency and the limit nature of the premiums:

> "It is important for all operators to receive this message and to be aware that our road map entails adapting to this framework as quickly as possible, which involves generating more market that we hope will be efficient, because it is not always so, and obviously, the tariffs are not going to pay for anyone's party. Tariffs by law can only take into account energy costs, and shareholder ventures are not energy costs. This is also a very important message for the [RE] Sector [...] there shall be no further criteria other than objective energy costs and, obviously, the market price is not included".[172]

264. Warnings for the RE sector were repeated on November 2006 by the Secretary General for Energy:

> "The regulation of wind power in 2004 was rather unfortunate. [...] This remuneration has an IRR of around 20 percent. I believe in renewable energies as much as anyone, but I also believe that we have to do things reasonably. **Technologies**, that is my opinion, whose **investment** is guaranteed through a **premium** [...] cannot have returns of 20 per cent; nobody has those. Some speculators do have them. We must be reasonable".[173] (Emphasis added to Exhibit R-260.)

## 17.3.2 The Modification of RD 436/2004 Was Harshly Criticised by the Sector

265. The Claimant's theory on the aim of RD 661/2007 to entice investors contrasts with the opinion held by the RE sector in the period in which the regulatory

---

[171] Claim submitted by the PV Plants belonging to Novenergía before the Supreme Court on 28 March 2011, Appeal 35/2011, p. 60. **Exhibit R-183**.

[172] Appearance of the Ministry of Industry before the Senate, 26 October 2006, **Exhibit R-257**.

[173] Appearance of the Secretary General for Energy before the Congress of Deputies, **Exhibit R-260**.

change took place. The leading associations of the renewables sector, APPA, AEE and ASIF, sent a joint letter to the Minister of Industry on 26 July 2006 in relation to RDL 7/2006 and the reform of the Special Regime remuneration formula which said RD-Act announced. They requested the "*immediate cessation of the ongoing regulatory process*":[174]

- "*the appearing associations can only state their rejection, their most profound discontent and their most serious concern about how and why the process is being carried out*".

- "[RDL 7/2006] *substantially ruptures the regulation of renewable energies established in the Energy Sector Act (Law 54/1997)*".

- "[RDL 7/2006] *eliminates the objective parameters that established minimum remuneration for the different renewable energies included in said Act. These minimums were the guarantee of stability, predictability and durability that attracted investment to the sector (....)*"

- "*This situation, already compromising and disconcerting, is further compounded when we acknowledge that the planned revision of RD 436/2004 is being transformed into the introduction of a new regulatory framework*."

266.  In December 2006, APPA continued to harshly criticise this RDL 7/2006:

- "*RD 436/2004 [...] is therefore conditioned by the elements of retroactivity and legal uncertainty introduced in the sector by said* [RDL 7/2006]."

- "*Last June,* [RDL 7/2006] *was approved, which contains a frontal attack against the national policy of promoting renewables: it eliminates the 80-90% band and the retributive stability mechanisms* [of RD 436/2004]*, without also contemplating the guarantees and timeframes established. The legislation, which tears up the rules half way through play, introduces retroactivity and seriously destroys legitimate investor confidence.*"[175]

267.  Therefore, the measures introduced by RDL 7/2006 and RD 661/2007 in the period in which they took place, was criticised by RE sector. At that time, as at present, certain parties used expressions such as the following to define the changes: "*substantial destruction of the system*", "*frontal attack against the national policy of promoting renewables*", "*breaking the rules of the game halfway through the match*", *etc*. This notwithstanding, the Claimant requested neither in 2007 nor in 2008 one single regulatory due diligence report.

---

[174] The Kingdom of Spain's Skeleton Arguments, para. 71.

[175] The Kingdom of Spain's Skeleton Arguments, para. 72.

### 17.4    REP 2005 – 2010 Does Not Contain an Overall Increase in Return for RE

268.    The REP 2005-2010 is the key instrument passed by the Council of Ministers in August 26, 2005[176] for setting the subsidies in RD 661/2007. This governmental planning to increase the RE costs did not mention any rise in PV subsidies. In fact, the REP 2005-2010 maintained, in general, the subsidies established by Renewable Energy Promotion Plan 2000-2010, which were reflected in RD 436/2004.

269.    Both the Renewable Energy Promotion Plan 2000-2010 and the REP 2005-2010 established, in general, for all technologies, return for standard projects amounting to close to "*7 % with own resources, before financing and after tax*".[177] Indeed, REP 2005-2010 expressly stated that the PV targets forecast can be achieved by maintaining the remuneration level.[178]

270.    The Respondent has proved the Awareness by ASIF (PV), APPA, *Isolux*, Abengoa, KPMG, Deloitte and Pöyry of (i) the link between REP 2005-2010 with RD 661/2007 and (ii) the will of the government to provide a reasonable return close to 7% IRR to the RE plants projects.[179] Furthermore, the PV Plants were aware that, in line with the provisions of the 2005-2010 REP, the government aimed to grant a remuneration "of around 7%" on the investment and exploitation costs of RE plants:

> "[T]he profitability foreseen by the [NEC] was between 7.6% and 8% annually, slightly higher than that proposed by the Ministry of Industry, Tourism and Commerce for the regulated tariffs which was 7.1%. The [NEC] determined the *internal rate of return of free cash flows and after taxes* (IRR) based on the regulated tariff of the Royal Decree proposal and the real costs of the facilities commissioned since the year 2004."[180] (Emphasis in Exhibit R-183.)

271.    The Claimant could also not be unaware of the relevant information stemming from its own PV Plants.

### 17.5    RD 661/2007

#### 17.5.1    The Aim and the Literal Wording of RD 661/2007

272.    RD 661/2007 stated a new remuneration formula according to the purposes of REP 2005-2010: "*The regulated tariff has been calculated for*

---

[176] Agreement of the Council of Ministers of 13 November 2009, p. 2, **Exhibit R-198**.

[177] The Kingdom of Spain's Skeleton Arguments, para. 75.

[178] Renewable Energy Promotion Plan 2000-2010, p. 176, **Exhibit R-65**.

[179] The Kingdom of Spain's Rejoinder Statement and Jurisdictional Objections, paras. 360-374.

[180] Claim filed by the PV Plants before the Supreme Court on 28 March 2011, p. 35, **Exhibit R-183**.

*the purpose of guaranteeing a return of between 7% and 8% depending on the technology. Premiums have been calculated following the same criteria as in RD 436/2004…*"[181] Importantly, RD 661/2007 eliminated the pool plus premium option for existing PV plants. The Claimant could not be unaware of this radical abolition of a remuneration formula for existing PV plants, from publication of RD 661/2007 onwards without Transitory Provisions.

273.  Even more, it is proved that, RD 661/2007 did not establish a better economic regime than RD 436/2004.[182] The witness statement of Mr. Montoya includes a comparative table of the highest regulated tariff (RT) contemplated in RD 436/2004 and RD 661/2007. Marked in red are the values that would have corresponded to each Royal Decree if RD 436/2004 would have not been modified in 2006. Marked in blue are the estimated mean reference tariff (TMR) for 2007:

| | | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 (-julio) | 2006 (≥julio) | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TMR | €/MWh | - | - | - | - | - | 7,0853 | 7,2072 | 7,3304 | 7,6588 | 7,7644 | 8,2193 |
| Δ TMR | % | - | - | - | - | - | - | 1,72% | 1,71% | 4,48% | 1,38% | 5,86% |
| TR RD 2818/1998 | c€/kWh | 39,6668 | 39,6668 | 39,6668 | 39,6668 | 39,6668 | 39,6668 | 39,6668 | | | | |
| TR RD 436/2004 | c€/kWh | | | | | | | 41,4414 | 42,1498 | 44,0381 | 44,0381 | 44,0381 |
| | | | | | | | | | | | 44,6453 | 47,2610 |
| TR RD 661/2007 | c€/kWh | | | | | | | | | | | 44,0381 |
| Potencia | MW | 1,48 | 1,53 | 2,04 | 3,81 | 7,22 | 11,40 | 22,76 | 47,35 | 145,67 | | 690,46 |

274.  On the other hand, the wording of Article 44(3) of RD 661/2007 was more limited than Article 40(3) of RD 436/2004. Article 44(3) refers literally to the Quadrennial "*revisions indicated in this paragraph*". That is, periodic and regular reviews. This article did not prevent other revisions motivated by justified reasons, such as the economic sustainability of the SES or to cut off over-remunerations. Critically, previous Article 40(3) of RD 436/2004 was not an obstacle to regulatory adjustments, due to these reasons, made visible through RDL 7/2006 and RD 661/2007.

275.  RD 661/2007 is a general rule applicable to national or foreign investor, with no distinction at all. This regulation could not create different expectations to the Claimants than to other stakeholders of the RE sector, as RD 661/2007 was directed neither to the Claimant specifically nor to its PV Plants.

## 17.5.2 The Relevance of the Case Law as a Fact to Understand the Regulatory Framework

276.  The Claimant has voluntarily omitted to take into consideration the relevance of the case law of the Supreme Court of the Kingdom of Spain, as the ultimate

---

[181] The Kingdom of Spain's Skeleton Arguments, para. 78 and Regulatory Impact Report of RD 661/2007, p. 13, **Exhibit R-77**.

[182] First Witness statement of Mr. Carlos Montoya, paras. 19-28.

interpreter of Spanish law.[183] By doing so, it is endeavouring to hide the fact that the extension and limits of the rights of any investor in RE plants were stated by said case law prior to its investments of 2007 and 2008. Therefore, the Kingdom of Spain describes the case law of the Supreme Court as a relevant fact (together with the Spanish internal laws) that should be taken into account by any RE investor in Spain.

277.    In the Spanish regulatory framework, the source of expectations comes from the rational and comprehensive "*understanding*" of the rights and obligations arising from such regulatory framework. This "*understanding*" certainly must include the case law of the Supreme Court. Ignoring such case law means ignoring a key component of the regulatory framework in which an investor invests. The Respondent has proved[184] that since 2005 this case law has continuously stated that:

■    The RE plant's owners do not have a "*right*" to the economic regime remaining unaltered;

■    Unless Article 30(4) of Law 54/1997 is amended, the <u>*limit*</u> for the government in regulatory modifications is to provide Special Regime Plants a reasonable rate of *return with reference* to the *cost of money* on the capital market.

■    The integration of the Special Regime Plants into the SES implies that the companies have to assume a *regulatory risk*.

278.    The Supreme Court made crystal clear this case law on its judgment of October 2006, which confirmed the previous ruling of December 2005:[185]

"Until it is replaced by another, the above outlined legal regulation (Article 30 of the Electricity Law) allows the respective companies to expect that the fixing of the premiums can be included as a factor relevant to their obtaining "reasonable rates of return with reference the cost of money in the capital market" or, to put it again in the words of the preamble to [RD 436/2004], 'reasonable compensation for their investments.' However the payment regime under examination does not guarantee to special regime electricity producers that a certain level of profits or revenues will be unchanged relative to those obtained in previous years, or that the formulas for fixing the premiums will stay unchanged."[186]

---

[183] The Kingdom of Spain's Statement of Defense and Jurisdictional Objections, paras. 363-364.

[184] The Kingdom of Spain's Statement of Defense and Jurisdictional Objections, paras. 362-392.

[185] Judgment of the Supreme Court of 15 December 2005, **Exhibit R-131**.

[186] Judgment of the Supreme Court of 25 October 2006, **Exhibit R-132**.

279. This case law was newly confirmed by judgments of October 2006,[187] March 2007[188] and October 2007.[189] No investor in 2007 or 2008 could be unaware of such case law and the limits stated for the government regarding possible future regulatory changes.

### 17.5.3 Admissibility of Possible Future Changes by NEC Due to the Case Law

280. The NEC, as the advisory body in energy matters, stated its disagreement with the amendments introduced in RD 661/2007, due to the review system stated in art. 40 of RD 436/2004. However, the NEC knew that Supreme Court case law on remuneration of the Special Regime was binding on it. As a consequence, the NEC considered that the measures introduced by RD 661/2007 were adequate and possibly in accordance with Spanish law:

> "To such purpose, the recent Judgment by the Supreme Court dated 25 October 2006 […] is highly illustrative. This Judgment analyzes in particular a regulatory change provided in said Royal Decree in regard to the calculation procedure for premiums offered to encourage the electrical power production activity under the special regime. In said Judgment, the Supreme Court concludes that such regulatory modification did neither violate the principle of legal certainty nor the principle of protection of legitimate expectation".[190]

281. NEC highlighted the arguments of the judgment of the Spanish Supreme Court, dated 25 October 2006, that it considered essential for justifying its position:

> "As long as not replaced by another one, the abovementioned legal regulation (article 30 of the Electricity Sector Act) enables the relevant companies to pursue that premiums include as a significant factor when being established, the achievement of 'reasonable return rates in reference to the cost of money in capital markets' or, to express it once again in words of the preamble of [RD 436/2004], 'a reasonable remuneration for their investments'. The regime for remunerations being analyzed does not assure, on the contrary, owners of facilities operating under the special regime an intangible nature of certain level of profit or income in comparison to that obtained in previous years as it neither assures indefinite application of formulae used for establishment of premiums. In the same way as based on economic policy drivers of a widely varying sign (…) premiums and incentives for production of electrical power under the special regime may increase from one year to the following but also decrease whenever made advisable by those same

---

[187] Judgment of the Supreme Court of 25 October 2006, **Exhibit R-132**.

[188] Judgment of the Supreme Court of 20 March 2007, **Exhibit R-133**.

[189] Judgment of the Supreme Court of 9 October 2007, **Exhibit R-134**.

[190] NEC Draft of the report 3/2007 of 25 January 2007, p. 20, **Exhibit R-78**.

consideration. Provided that, we insist, variations are kept within the legal limits [...].

Companies that decide to get established on free will in a market such as the electrical power generation under the special regime, while knowing beforehand that this market is highly dependent on the establishment of incentives by public authorities, are or must be aware that such incentives may be modified, within legal guidelines, by said authorities. One of the 'regulatory risks' facing these companies -and which must necessarily be taken into account- is precisely the change in parameters for calculation of premiums or incentives, which is mitigated by the Electrical Sector Act in this regard, but not excluded altogether."[191] (Emphasis omitted.)

282.  As it can be seen, the NEC considered the Supreme Court case law prior to 2007 to be fully applicable and warned for this possibility in its final Report 3/2007:

> "**LEGAL CONSIDERATIONS IN REGARD TO THE RETROACTIVE NATURE OF THE ROYAL DECREE PROPOSED**. [...] "As both scientific research and case law have shown, [...] the principle of legal security [...] does not mean that the legal framework is reformproof.
>
> In this regard, said principles do not prevent a dynamic innovation in the legal framework. It does neither prevent new provisions from being applied in the future to already existing situations that remain upon the entry into force of the new regulations" […]
>
> "Application in the future of the new economic regime for production of electrical energy in the special regime to all facilities -including existing ones that already enjoyed the benefits of the previous regime for tariffs, premiums, incentives and complements... • Does not involve the suppression of acquired or patrimonialized entitlements."[192] (Emphasis in Exhibit R-78.)

283.  Importantly, the explanation of RD 661/2007 to Novenergia was made by an engineer and politician, Mr Albert Mitjá. This manager of the Claimant briefly explained on 4 June 2007:[193]

> (A)  **Spain**
>
>    (i)  *General Information*
>
>    AMS informed that the new law on renewables (Real Decreto 661/2007) is very favourable to the market players and above all consolidates the financial and regulatory stability of the activity in Spain.

---

[191] NEC Draft of the report 3/2007 of 25 January 2007, pp. 21-22, **Exhibit R-78**.

[192] NEC Draft of the report 3/2007 of 25 January 2007, pp. 16-18, **Exhibit R-78**.

[193] Minutes of the Meeting of the managers of Novenergia, held the 4th June 2007, p. 2, **Exhibit C-109**.

284. No more reference exist on the record of an assessment by the Claimant or by a Claimant's regulatory advisor regarding RD 661/2007. Notwithstanding, during the investments of Novenergia, NEC also warned in July 2008 of possible future changes on regulation:

> "[T]hese principles do not prevent the dynamic innovation of the regulatory frameworks, nor of new normative provisions which can be applied pro-future to situations initiated before it comes into force."[194]

285. There is no record regarding a Claimant request of any legal due diligence to clarify the warnings raised by the NEC, especially given the Fifth Additional Provision of RD 1578/2008. Importantly, this provision did not distinguish if it could be applied to existing PV plants:

> "Modification of the compensation for generation by photovoltaic technology. During the year 2012, based on the technological evolution of the sector and the market, and the functioning of the compensatory regime, compensation for the generation of electric power by photovoltaic solar technology may be modified."[195]

286. Even more, the General Secretary of Energy warned about the costs of the Special Regime subsidies and necessary sustainability of the SES: "*we must be aware of the economic sustainability* of the cost of the energy [...] *and that it is important for the families and for the productive sector.*"[196]

287. No request for clarification of any type appears, either because the Claimant was already aware of the possibility of future modifications or because it was not diligent in its exhaustive examination of the Spanish regulatory framework in 2007 or in 2008. If the Claimant had requested a due diligence from a regulatory advisor such as Pöyry after RD 661/2007 was passed, the Claimant would have been aware of possible future changes in the remuneration formulas for the RE sector:[197]

> Although Pöyry now considers the appearance of a market-based mechanism (i.e. Green Certificates) to replace the tariff system very unlikely, the Government could, in the year 2010, and depending on the rate of success of the latest REP, change to a market-based system. In any case, in the event of a change from the current feed-in tariff mechanism to a market mechanism (possibly at the end of 2010), we would expect to see a transitory period essentially extending the feed-in tariff mechanism applicable to operating wind farms for a number of years.

288. Without one single due diligence report, Novenergia could not *reasonably* expect the petrification of RD 661/2007 regime during 2 or 3 decades.

---

[194] NEC Report 30/2008 of 30 July 2008, p. 10, **Exhibit R-254**.

[195] The Kingdom of Spain's Skeleton Arguments, para. 92.

[196] Appearance of the Secretary General of Energy before the Spanish Senate on 16 October 2008, **Exhibit R-261**.

[197] ILEX-Pöyry Report "Current and Future State of Wind Energy in Spain", July 2007, p. 64, **Exhibit R-256**.

### 17.5.4 Critics to RD 661/2007 by RE Sector and Awareness of the Limits for Future Possible Regulatory Measures

289.   RD 661/2007 modified the remuneration formulas without following the review system stablished in Article 40.3 of RD 436/2004. Therefore, it was harshly criticised by the RE sector. APPA, the main Spanish RE association, which involves all the RE technologies including PV plants, stated in its submission against the final draft of RD 661/2007:

>   "**Breach of this principle of legal certainty and legitimate expectations: changing the economic regime retroactively.**
>
>   In the opinion of the APPA, the provision in the Draft, which completely ignores the stable regime undertaken in [RD 436/2004], is unlawful since it breaches the principles of legal certainty, the non-retroactivity of laws and legitimate expectations. […]
>
>   In this sense, the message that the Government is transmitting to the [RE] sector in this respect, if it approves the Draft exactly as it has been put forward, is disastrous and devastating for the future investments. [...]
>
>   If the Government fails to do so [pass the RD project], it will no longer be credible in the future: any rational investor, [...] must bear in mind not only the costs and the foreseeable remuneration, but it also must consider the risk that such remuneration could be lowered".[198]

290.   APPA was fully aware of the regulatory risk which involved passing RD 661/2007 and the only limit of the government to adopt regulatory measures: RE plants of Special Regime could only aspire to reach "*reasonable rates of return with regard to the cost of money in capital markets*". APPA expressly recognised that this reasonable return was dynamic and could involve different formulas. In this sense, APPA published a legal report before any of the measures breached in the present Case was passed. APPA's conclusion is crystal clear:

>   "The case law of the Supreme Court is conclusive: it justifies openly and resoundingly the retroactivity of the regulations that regulate or could regulate the economic system of the special regime, while the principles established in the Act are met, leading back in the final analysis to the so-called 'reasonable rates of return with reference to the cost of money in the capital market' [...] at least it guarantees certain profit levels that allow 'reasonable rates of return with reference to the cost of money in the capital market', by remaining within the letter of the law [Law 54/1997]. 'Reasonable rates of return' that the Supreme Court has set, as indicated by the IDAE, in an Internal Rate of Return of 7 percent.

---

[198] The Kingdom of Spain's Skeleton Arguments, para. 92.

[it is desirable] to reject any optimism [...], a certain modification of the premiums [...] below that 7 percent [...] could be perfectly 'validated' by the Court simply by maintaining that the 'reasonable character' of the rates of return in 2006 or 2007 might be the cited 7 percent, but that they do not have to coincide with that figure at the time the modification is made, so the other line of attack against the legal adjustment of retroactively modifying the tariffs and premiums would be frustrated."[199]

291.    ASIF (PV) tried to enhance the revision system proposing to be applied to "any" revision of that section, including premiums and tariffs with "*no retroactivity regarding previous tariffs and premiums*".[200] Such proposal was dismissed and the wording of Article 44.3 was limited to the "revisions of this paragraph", with no reference to *premiums* or *retroactivity*.

292.    The second most important Spanish RE Association, AEE (wind is the Spanish most relevant RE technology from 2006 onwards) was also aware of the regulatory risk which derived from the amendment by RD 661/2007 of RD 436/2004:

"For AEE, today the important thing is to ensure the door is not left open to changes in remuneration parameters at the halfway point, as is the case with the current wording of the decree. The "stable" nature of the twenty-year period proposed by the new Royal Decree for the allocation of remuneration is fictional if the premium amendments are retroactive as is contradictorily regulated now."[201]

293.    In 2008, the AEE's 2007 Yearbook, stated that RD 661/2007 nullified the non-retroactivity of the revisions in the future:

"The new Decree removes the incentive to participate in the electricity market and annuls the non-retroactivity of this revision and of future revisions concerning premiums and remuneration supplements, thereby applying universally to all facilities regardless of when they are commissioned. The proposal also entails a high level of uncertainty with regard to the indices for the annual updating of all parameters".[202]

294.    AEE was fully aware of the limits of the government in 2007 when adopting possible regulatory measures. AEE recognised these limits before any of the breached measures were passed:

"It is true that the Supreme Court has declared, in relation to this type of retroactive modification, that it is not an "unchangeable right" that the

---

[199] The Kingdom of Spain's Skeleton Arguments, para. 96 and APPA Report, 30 April 2010, pp. 6/14, 7/14, **Exhibit R-268**.

[200] The Kingdom of Spain's Skeleton Arguments, para. 97 and ASIF Association´s Submissions to the preliminary text of RD 661/2007, December 2006, p. 9, **Exhibit R-199**.

[201] AEE press release on RD 661/2007, 9 May 2007, **Exhibit R-236**.

[202] The Kingdom of Spain's Skeleton Arguments, para. 99.

economic regime remains unaltered [...] the jurisprudence has established limits [...] with regard to the retroactive modification of this remuneration framework, in particular "that the requirements of the Law on the Electrical Sector are observed with regard to the reasonable return of investments".[203] (Emphasis and footnotes omitted.)

295. The RE associations continuously published their opinion during 2004, 2006, 2007, 2008, 2009 and 2010 (i) against the regulatory risk due to the successive measures enacted by the government and (ii) recognizing the limits of the government when applying regulatory measures. Additionally, the main RE investors stated publicly the limit of the government when applying possible new regulatory measures: to provide a reasonable return on RE plants investments. Spain has proved this knowledge by *Iberdrola*, *Abengoa*, *Isolux*, *Sener*, *Sacyr*, *Elecnor*, *Samca*, *FCC* or *EON*.[204] Even more, Spain has proved the knowledge of regulatory advisors as Pöyry, Deliotte, KPMG and RE international doctrine such as Miguel Mendonça, David Jacobs and Benjamin Socacool.[205]

296. These expectations of (i) the RE associations, (ii) the main RE investors, (iii) the regulatory advisors and (iv) the RE international doctrine proves that the alleged expectations of Novenergia regarding the petrification of RD 661/2007 regime during 2 or 3 decades are not only *unreasonable*, but also not objective at all. Even more so when not one single due diligence report has been provided by Novenergia.

297. All the RE sector was fully aware that the government could implement prospectively measures for existing plants, with the only limit to respect Law 54/1997 requirements providing a *reasonable return* to the investment costs of the RE plants.

### 17.5.5 The Claimant's Awareness of Possible Prospective Regulatory Measures

### 17.5.5.1 The PV Plants' Knowledge of the Case Law, Hidden by the Claimant

298. Importantly, the investors on the PV plants in which the Claimant invested were fully aware of the relevance of the case law to understand the regulatory framework. The Claimant could not be unaware of the factual information relating to its own PV Plants:

---

[203] AEE submission before the NEC against the draft of RD 1565/2010, of 30 August 2010, p. 6, **Exhibit R-240**.

[204] The Kingdom of Spain's Rejoinder Statement and Jurisdictional Objections, paras. 573-580; Expansión.com, "Iberdrola advises Government: "collection" measures will cut investment and damage revenues", 25 July 2012, **Exhibits R-229**; Libremercado.es, "Iberdrola demands a halt in premium for renewable energy producers", 23 February 2012, **Exhibit R-231**; Press article, "Tariff deficit, retroactivity and reasonable return", **Exhibit R-187**; News item published by Helionoticias, the Solar Thermal Energy News Portal, **Exhibit R-188**; Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain, SCC V2013/153, Award, 12 July 2016, para. 788, **Exhibit RL-72**.

[205] The Kingdom of Spain's Rejoinder Statement and Jurisdictional Objections, paras. 581-587; Deloitte Expert Report, page 57/177, **Exhibit R-192**; ILEX-Pöyry Report "Current and Future State of Wind Energy in Spain", July 2007, **Exhibit R-256**; The risk in the retroactive modification of the tariff of solar photovoltaic installations (RD 1578/2008), **Exhibit R-273**; Powering the Green Economy. The feed in tariff handbook, p. 19, 42, **Exhibit RL-59**.

1.   The PV Plants knew that the RE plants remuneration system would be modified for reasons of public interest. However, the PV Plants argued in their claim that RD 1565/2010 was not adopted due to reasons of general interest: "*RD 661/2007 [...] applied a retroactive measure to premiums for the wind sector and at the time, this was justified by the distortion of the market price. [...] Faced with this distortion, and in the name of general interest as a result of the deviation of a free market price when this was variable, a retroactive measure was applied.*"[206]

2.   The PV Plants did not really know whether a regulatory measure would be admissible in the event of extraordinary or unforeseen situations: "*This party does not know, nor is the subject of this Appeal whether or not the regulatory power can amend current legislation regarding the establishing of regulated tariffs that affects third party rights in relation to facilities already built. [...] However, this is definitely not the case that we have here, where it is not possible, under any circumstances, to admit the existence of any unforeseeable or extraordinary factor.*"[207] The proved exceptional fall of demand in 2009 was not considered by them as an extraordinary factor.[208]

3.   The PV Plants knew the doctrine of the Constitutional Court applied by the Supreme Court when ruling on the possible modification of the remuneration systems of RE plants from 2005 to 2017: "*With respect to the retroactivity of the regulations, Sentence 182/1997 of the Constitutional Court, of 28 October, in its Eleventh Legal Basis, is key to understanding its dimension, assumptions and limitations: improper medium retroactivity* [prospective]"[209]

299.  Importantly, the Claimant's RE plants clearly admit the existence of the case law that applies to the "*remuneration regime of the owners of special regime electric energy facilities*". The PV Plants attempt to separate the tariffs from the premiums saying that the Supreme Court has always referred to the "premiums":

"[W]e need to bring up the fact that various Sentences of the High Court have been passed in relation to retroactivity and its possible admissibility, but it is worth pointing out that the existing ones, to date, have always been in relation to cases of the retroactivity of premiums, never in relation to regulated tariffs as in this case."[210] (Emphasis omitted.)

300.  Contradictorily, the PV Plants transcribe in the following page the judgment of the Supreme Court of 25 October 2006, which (i) rules in a general way to

---

[206] Claim filed by the PV Plants before the Supreme Court on March 2011, p. 60, **Exhibit R-183**.

[207] Claim filed by the PV Plants before the Supreme Court on March 2011, p. 38, **Exhibit R-183**.

[208] Claim filed by the PV Plants before the Supreme Court on March 2011, p. 38, **Exhibit R-183**.

[209] The Kingdom of Spain's Skeleton Arguments, para. 104(c).

[210] Claim filed by the PV Plants before the Supreme Court on March 2011, p. 69, **Exhibit R-183**.

"premiums and incentives", not only to "premiums" and, (ii) admits modifications not only to "revenues" but also to the "formulas for fixing the premiums":

> "[D]epending on very varied factors of economic policy [...], the premiums and incentives for the production of electrical energy under the special regime may increase from one year to the next and may also decrease when these same considerations should so advise."[211] (Emphasis omitted.)

301.    This argument by the PV Plants by which they endeavour to demarcate the *premiums* from the tariffs was totally rejected by the Supreme Court, as Articles 16.7 and 30.3 and 30.4 of Law 54/1997 did not make, since 1997, any distinction between "tariffs" and "premiums". This act only refers to "premiums", and the case law refers to such *premiums* when stated the limits of the act.

302.    Indeed, the PV Plants knew perfectly well that the case law of 2006 was reiterated in 2007 and 2009. The judgments from 2006 until 2009 are examined by the PV Plants throughout pages 69 to 73 of Exhibit R-183. Said judgments refer generically to the "remuneration regime" and the PV Plants also refer generically to the "remuneration regime", not to the premiums remunerative formula. The conclusion of the PV Plants is relevant for this Case:

> "The Sentence determines that, apart from the fact that there is no damage, the Government may modify, in the exercising of its regulatory powers, a specific remuneration system, but providing this falls within the provisions of the Electricity Sector Act."[212]

303.    The PV Plants recognise that they do not have a right to a specific remuneration system (through tariffs) providing that the regulatory powers respect the provisions of Law 54/1997 granting a reasonable return by reference to the cost of the money in the capital markets.

304.    The claim lodged by the PV Plants in 2011 demonstrates the knowledge that the Claimant had of the numerous facts which are relevant for this case and that have been presented by the Claimant to the Tribunal in a totally different way. The Claimant reasonably knew or should have known these relevant facts.

305.    Importantly, an express declaration of the Kingdom of Spain was given to the PV Plants. The Supreme Court judgment rendered on April 2012 maintained the consistent case law existing since 2005 and applied it to the PV Plants. A legal organ of the State made an express interpretation with respect to that the Plants

---

[211] Claim filed by the PV Plants before the Supreme Court on March 2011, p. 70, **Exhibit R-183**.

[212] Claim filed by the PV Plants before the Supreme Court on March 2011, p. 73, **Exhibit R-183**.

were claiming against RD 1565/2010 and this resolution became *res judicata* for the PV Plants.[213]

306.  This express declaration by the State to the PV Plants of the Claimant is also a relevant fact which has been inexplicably hidden from the Tribunal by the Claimant. This judgment is relevant to demonstrate the non-existence of objective expectations with the Claimant, as it has been proved that (i) the reduction of the tariffs was foreseeable for any *diligent* investor and for the majority of the RE sector and (ii) this judgment confirmed to its PV Plants such circumstances.

307.  The Claimant has maintained contradictory positions in two of its pleadings. In its Statement of Claim the case law of the Supreme Court for the Special Regime is hidden. Later, in its Statement of Reply, the Claimant admits its existence, yet it sustains that said case law is irrelevant when configuring the legitimate expectations of the Claimant.[214] This theory is denied by Spanish bodies as NEC, the main RE associations, RE investors and the *PV Plants* which knew the 2006 government's intervention "*for the sake of the general interest*" and the 2006 case law statements.

308.  Said judgment links the economic baseline data of the planning to the dynamic nature of the reasonable return and reveals its foreseeability for operators in the RE sector. That corresponds with the declarations of the RE associations proved by the Respondent and omitted by the Claimant:

> "Private operators or agents who 'renounce' the market, […] were aware or should have been aware that said public regulatory framework, approved at a given time, in the same way as it was consistent with the conditions of the economic scenario in force at that time and with the electricity demand forecasts made at that time, could not subsequently be immune to any relevant modifications to basic economic data in the light of which it is logical for the public authorities to keep in step with the new circumstances. […] And this is all the more so in the event of situations involving a widespread economic crisis and, in the case of electrical energy, in view of the growth in the tariff deficit…"[215] (Emphasis omitted.)

309.  This judgment considers that any diligent market operator should have quality legal advice:

> "The established economic administrative regime [...] relies on a series of implied assumptions, of which any diligent market operator - or any operator seeking high quality consultancy in advance - could not have failed to be aware. One of those implicit conditioning factors is that the

---

[213] Judgment of the Third Chamber of the Supreme Court of 12 June 2012, Appeal 35/2011, **Exhibit R-144**.

[214] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 426-441.

[215] Judgment of the Supreme Court of 20 December 2011, Appeal 16/2011, **Exhibit R-144**.

> measures for promotion (...) cannot be considered to be "perpetual" or unlimited over time. It is not reasonable to think that RD 661/2007 would guarantee the receipt of a regulated tariff for an unlimited period, in other words, without any time limit whatsoever."[216]

310.     The judgment reminds the RE plants that the reduction of the regulated tariff was foreseeable for most of the RE sector:

> "The limitation of the regulated tariff or, in general terms, that of the remuneration regime [...] was foreseeable in the light of the course of later circumstances, especially the economic and technical circumstances, that ensued after 2007".[217]

### 17.5.5.2 The Claimant's PV Plants Contracts Foresee Future Changes of Law

311.     The Claimant's O&M contracts were signed by managers of the Claimant such as Mr. Albert Mitja Sarvise. Said manager also acted in his role as Joint Administrator of the companies that managed the PV Plants. These contracts include the existence of a regulatory risk as they establish as an exclusion clause the possible future legislative changes:

> "The contract does not include the provision of the Services, when the cases detailed below arise [...] Suspension of the operation of the Plant [...] due to a legislative change."[218]

312.     The parties to the contract accepted that a legislative change was possible, which would render the PV Plant unprofitable. In such a case, both contracting parties (the Executive of the Claimant and the supplier of the Services) agree that the supplier shall not have to continue to provide O&M services.

313.     This clause was agreed by the Executive of the Claimant Mr. Alvaro Gonçalves Martins in the O&M contracts signed in 2008:

- O&M contract for the PV Solar Farm "Fuente Alamo", signed on 13 February 2008.[219]

- O&M contract for the PV Solar Farm "Lobón", signed on 7 April 2008.[220]

314.     This clause was also agreed in the contracts signed in 2009 by Mr. Albert Mitja:

---

[216] The Kingdom of Spain's Skeleton Arguments, para. 115.

[217] The Kingdom of Spain's Skeleton Arguments, para. 116.

[218] The Kingdom of Spain's Skeleton Arguments, para. 117.

[219] O&M contract for the PV Solar Farm Fuente Alamo, of 13 February 2008, p. 39 PDF, **Exhibit CLEX-51**.

[220] O&M contract for the PV Solar Farm Lobón, signed on 7 April 2008, p. 55 PDF, **Exhibit CLEX-51**.

- O&M contract for the PV Solar Farm "Villares", signed on 19 May 2009.[221]

- O&M contract for the PV Solar Farm "Mora la Nova", signed on 19 May 2009.[222]

- O&M contract for the PV Solar Farm "Almansa", signed on 31 May 2009.[223]

315.    The contracting parties did not establish any time limit when they signed these contracts in 2008 and 2009. It is obvious that they admit that this regulatory change is possible, although they do not know when it might happen.

### 17.5.5.3 Internal Documentation Proves the Existence of a Hidden Due Diligence

316.    In this procedure, the Claimant has not provided one single due diligence report that it might have carried out before or during its investments between 2007 and 2008. What is more, the Claimant strongly refused to provide it after the Respondent had requested it during the document production phase. Notwithstanding, the Claimant has provided some documents which prove the existence of these due diligence reports which were not voluntarily provided.

317.    Attached to an email dated 29 February 2008, sent to Mr. Alvaro Martins, is a proposal for a legal due diligence by Uria Menendez (U&M):

> "We also send herewith the following due diligence offers for your appreciation: - **Legal consultancy offer by Uría Menéndez**".[224] (Emphasis added to Exhibit R-181.)

318.    This offer was accepted on May 2008, although it was stated that the due diligence would not be complete:

> "After analysing the offers, Novenergia accepts them for Insurance DDs (Costa Duarte), **Legal (U&M)** and, for technical DD, Alatec's offer to carry it out in 4 weeks. […] As to the legal DD, U&M must be warned of the non-existence of direct agreements and other construction contracts – see items (vi) and (iii), respectively, paragraphs (a) and (b) of no. 2 of the offer [neither provided]."[225] (Emphasis added to Exhibit R-182.)

319.    The internal Document even prove that the Claimant had a meeting with the legal advisors Uría Menéndez on 8 May 2008:

---

[221] O&M contract for Villares Photovoltaic Plant, 19 May 2009, p. 7, **Exhibit R-202**.

[222] O&M contract for Mora La Nova Photovoltaic Plant, 19 May 2009, p. 7, **Exhibit R-203**.

[223] O&M contract for Almansa Photovoltaic Plant, 31 May 2009, p. 7, **Exhibit R-204**.

[224] E-mail sent from BPI to Novenergia on 29 February 2008, p. 1, **Exhibit C-181**.

[225] E-mail sent from Novenergia to BPI on 5 March 2008, p. 1, **Exhibit C-182**.

> "I also stress that in the first meeting to discuss contract minutes, at the time for the Barrax project, occurred on 8th May (for over 2 months) at the BPI premises, in the presence of Uría Menéndez (lawyers of the Banks), the NovEnergia representatives, including Dr. Armando Nunes…"[226]

320.   There are, furthermore, other in-house documents that demonstrate that legal advice was received, that has been hidden from the Tribunal. In the Claimant's Minutes of 3 September 2007[227] it says:

> **(ii)   Barrax (photovoltaic – 1.5 MW)**
>
> AMM informed that the negotiation for the purchase of this project is approaching its closing. The technical and legal due diligence were satisfactory and the negotiation is now focused on the commercial and contractual details.

321.   Equally, in the Claimant's Minutes of 8 and 9 November 2007:[228]

> **(iv)   Terrapower (photovoltaic 3.45 MW)**
>
> AMM and AMS informed that the results of the due diligence are satisfactory.

322.   It should be highlighted that the burden of proof as to the reasonable and objective expectations of the Claimant falls on it. It is evident that it has hidden relevant information so that the Tribunal might appreciate in its totality "*the background of information that the investor knew and should reasonably have known at the time of the investment*".[229]

323.   This intentional hiding of data cannot benefit the evidence of the Claimant's objective expectations, given that it has not presented even one single proof from an independent legal expert that might corroborate its alleged *reasonable* and *objective* expectations when it made its investments. That, without prejudice to the fact that other evidence submitted by the Claimant proves that Novenergia assumed a regulatory risk of the framework in which it decided to carry out its investment.

## 17.5.5.4 Registration in the RAIPRE Does Not Grant an Acquired Right to RD 661/2007.

324.   The Claimant maintains that the Kingdom of Spain assumed a specific commitment to the Claimant through the registration of the PV Plants in the RAIPRE. Registration in the RAIPRE[230] is an administrative requirement (Articles 6 et seq. of RD 661/2007) that the facilities that wish to form part of the Special Regime must fulfil. Registration is a formal requirement for producing energy. It

---

[226] E-mails between Novenergia and BPI, 14-21 July 2008, p. 3, **Exhibit C-183**.

[227] Minutes of the Meeting of managers of mail, 3 September 2007, **Exhibit C-113**.

[228] Minutes of the Meeting of managers of Novenergia, 8 and 9 November 2007, **Exhibit C-119**.

[229] Electrabel S.A. v. Hungary, ICSID No. ARB/07/19, Award of 25 November 2015, para. 7.78, **Exhibit RL-45**.

[230] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 252-263.

has nothing to do with the fact that the facilities acquire an "acquired right" to receive future yield, indefinitely.

325. The Tribunal's attention is called to the fact that in the Administrative Registry, all the facilities, both ordinary and Special Regime, were registered. The RAIPRE is a mere "Section Two" of the Administrative Register of the electricity production facilities referred to in Article 21.4 of Law 54/1997.[231]

326. The Claimant wants to hide from the Tribunal an evident fact: RD 2818/1998 provided that all the Special Regime production facilities should be registered in an Administrative Register. This registry did not prevent the adoption of RD 436/2004 and that this regulation affected all the registered plants. Furthermore, the registration of the plants in said Administrative Registry during enforcement of RD 436/2004 was not an obstacle for RD 661/2007 to be also applied to all the Plants already registered in said register.

327. The NEC has never recognised the existence of a "acquired right to future profits" due to the simple fact of being registered in the corresponding Administrative Registry. In its report 4/2004, it expressly stated the lack of these acquired rights:

"The production facilities included in the special regime have the right to receive a certain remuneration for energy sold, but logically they only have the acquired right to receive said remuneration with respect to the energy already sold, but not regarding the energy they forecast selling in the future, which only constitutes an expectation."[232]

328. In the RAIPRE there are tens of thousands of registered owners (more than 44,600) and tens of thousands of registered facilities (more than 64,400).[233] To these numbers we must add the changes of owners who could also claim damages. Over 5,200 changes of ownership have been recorded in the register.[234] And this does not take into account changes of ownership due to share transfers, which are not mentioned. This would be the case of the Claimant, whose ownership does not appear in any entry.

329. It is not rational to deduce that the tens of thousands of registered owners, not to mention those that have changed, have reached *vis-a-vis* agreements with the Kingdom of Spain. The Claimant has not submitted even one legal due diligence that might sustain this theory.

330. Notably, the RE Associations themselves are fully aware that the registration in the Administrative Registry does not grant an acquired right to the relevant regime. That is shown by the submission filed by APPA, concerning the draft of

[231] RD 661/2007, Art. 9, **Exhibit R-72**.

[232] The Kingdom of Spain's Skeleton Arguments, para. 132 and NEC Report 4/2004 of 22 January, pp. 17-22, **Exhibit R-71**.

[233] Report of 26 April 2016 on the number of owners registered in Section 2 of the RAIPEE, **Exhibit R-244**.

[234] Report of 26 April 2016 on the number of changes in owners registered, **Exhibit R-245**.

the Electricity Sector Law of 2013, whose article 27 also refers to the Administrative Register:

> "In the precept, there is confusion between what in general theory of law is known as declaratory acts and constituent acts, repeating the same mistake made when the Pre-allocation Remuneration Registry was set up. What should provide entitlement to the Specific Remuneration Regime is the producers' fulfilment of the requirements established by Law to enjoy it, not being registered in the registry whose only role is not to provide producers with rights (to enjoy the specific remuneration regime), but to give publicity to those who have achieved it (precisely by fulfilling the legal requisites)."[235]

331. Consequently, registration in this Administrative Register was not a government commitment to indefinitely and unalterably maintain the future and immutable return of the facilities registered therein, but rather a way to control and know those involved in the SES.

## 18.    Basis of the Regulatory Measures Taken During 2009 and 2010

### 18.1    RDL 6/2009

332. In 2009, due to the exceptional fall of demand due to the economic crisis, it was extremely urgent and necessary to try to rebalance the sustainability of the SES. Moreover, RDL 6/2009 created the so-called "social bond" in order to protect the most vulnerable consumers, who could not cope with the increasingly high cost of electricity bills.

333. The RDL 6/2009 noted that the REs would not be outside the regulatory measures necessary to adopt: "*The trend of these technologies may put at risk the sustainability of the system in the short term, both from the economic point of view and its impact on the electricity tariff, as well as from the technical point of view*..." Therefore, the RD-Act noted that without prejudice to other immediate measures that could be taken, it was necessary to set "*the foundations to establish new economic schemes which afford fulfilment of the intended objectives*..."[236]

334. In this way, for the purpose of achieving the objective sought, RDL 6/2009 introduced major modifications to RD 661/2007: a) it created the Pre-assignment register and b) gave the government the power to scale the entry into operation of preregistered facilities whenever the economic or technical sustainability of the SES so required. This power was made effective by means of the Council of

---

[235] APPA´s submissions to preliminary draft of LSE, of 26 July 2013, p. 7, **Exhibit R-227**.

[236] RDL 6/2009, 30 April 2009, Preamble, **Exhibit R-58**.

Ministers' Agreement of 13 November 2009, scaling the entry into operation of preregistered facilities.[237]

335. The RDL 6/2009 is described by the Claimant to the Tribunal in a biased manner, as a policy instrument aimed at "*further stimulate investment*" on RE sources and ensure the proper functioning of RD 661/2007.[238] However, this positive outlook contrasts with the sector's strong criticism of RDL 6/2009. In May 2009, APPA, ran a strong editorial against the Minister of Industry making him responsible for the publication of RDL 6/2009. When analysing the RD-Act said editorial stated:

> "[The Minister] has never met with or considered the sector regarding the regulatory changes […] adopting diverse measures to reduce the tariff deficit and to increase the administrative obstacles for clean energies.
>
> The measures under the RDL, [...] will make the sector's development even more difficult, while, as in other sectors, it suffers from funding issues arising from the crisis".[239]

336. The previous editorial was accompanied by a joint letter signed by various associations from the renewable sector against R-DL 6/2009. The title of the memorandum read "The RD-Act 6/2009, new imposed decree against renewables".[240] This letter was published by APPA in its Partner Journal:

> "APPA, ADAP, APREAN, EolicCat, GiWatt and the Cluster of Energy of Extremadura <u>strongly criticize</u> the decree and call on the government to develop its contents in the future Renewable Energy Law." (Emphasis added to Exhibit R-239.)

337. Through this joint letter, the various signatory associations strongly criticised this rule, referring to its similarity to the previous RD 1578/2008, of 26 September,[241] issued in the PV sector months before:

> "A clear and disastrous example can be seen in Royal Decree 1578, which regulates activity relating to solar photovoltaic technology and has caused the sector to grind to a halt, leading to factory closures and investment relocation. The new RDL may have the same impact on other renewable technologies and even affect wind energy, the most developed."[242]

338. It is evident that the RE sector did not appreciate RDL 6/2009 as a regulatory instrument aimed at providing "further stimulation to investment" in RE sources, and guaranteeing the grandfathering of RD 661/2007. It is evident that the

---

[237] Spanish Cabinet Meeting Decision of 13 November 2009, **Exhibit R-194**.

[238] Novenergia's Statement of Claim, paras. 192, 196.

[239] APPA info, "Europe, new policy, Spain, new imposed decree", May 2009, Editorial, **Exhibit R-239**.

[240] APPA info, "Europe, new policy, Spain, new imposed decree", May 2009, pp. 12-13, **Exhibit R-239**.

[241] RD 1578/2008 of 26 September, **Exhibit R-73**.

[242] APPA info, "Europe, new policy, Spain, new imposed decree", May 2009, pp. 12-13, **Exhibit R-239**.

Claimant intends to provide the Tribunal with a distorted view of the development of RE prior to the contested measures.

339. Given the warning of possible new measures for RE producers, the RE sector on 20 May 2009 proposed a new remuneration formula.[243] APPA and Greenpeace, with the legal advisor Cuatrecasas, proposed to the government the specification by the act of the reasonable return guaranteed to the RE through reference to the 10-year Spanish bonds, plus a spread of 300 base points:

> "The government will establish the amount of the regulated tariffs, premiums and complements, therefore assessing, in all cases, the operating and maintenance costs and the investments costs incurred by the owners of a facility in order to obtain reasonable rates of return in reference to the cost of money in capital market. As a fee for the remuneration of capital, an annual percentage equal to the mean of the preceding year for the remuneration of 10-years Treasury bonds will be used, increased by 300 basis points."[244]

340. The APPA also proposed in 2009 that the estimation of the investment costs be performed through standard facilities:

> "For the preceding purposes, the government will estimate the investment costs associated with the various classes of facilities, differentiated by technology and size, such that they reflect the usual values that said investments actually reach."[245]

341. The similarity between the proposal from the RE sector of May 2009 and the measures enacted by the Kingdom of Spain in 2013 is evident. The Claimant has, once again, hidden this proposal.

## 18.2   National Action Plan for Renewable Energy in Spain 2011-2020

342. The Claimant also remains silent on what is stated in Spain's National Renewable Energy Action Plan ("**PANER**") because it is clearly in opposition with the thesis it is attempting to hold before the Tribunal. The PANER notes when describing the legal framework of the subsidies for electricity generation through REs that the system of tariffs and premiums for special regime facilities "*provide for electricity generation remuneration levels that afford a reasonable rate of return on investment. In determining those levels, account is taken of the specific technical and economic aspects of each technology, installed capacity and the date*

---

[243] The Kingdom of Spain's Rejoinder Statement and Jurisdictional Objections, Section IV.E.8, paras. 518-530.

[244] Draft Act presented by APPA-Greenpeace in May 2009, Art. 23 (4), **Exhibit R-157**.

[245] Draft Act presented by APPA-Greenpeace in May 2009, Art. 23 (5), **Exhibit R-157**.

*operation commenced, in all cases using criteria of system economic sustainability and efficiency.*"[246]

343.    Moreover, when addressing the future evolution of the remuneration system for RE, according to the methodology followed to date, the PANER relies on a premise:

> "Technical parameters and investment costs incurred will be considered in determining remuneration with a view to providing a reasonable rate of return referenced to the cost of money on the capital market in accordance with the provisions of the Electricity Sector Act."[247]

## 18.3    RD 1614/2010

344.    Royal Decree 1614/2010, of 7 December, Regulating and Modifying Certain Aspects Related to Electric Energy Production Using Thermoelectric Solar and Wind Power Technologies ("**RD 1614/2010**") was adopted by the government of Spain in light of the need to reform the RE remuneration costs. In RD 1614/2010, cut measures were introduced to the remuneration received by wind facilities.[248] In the same vein, AEE was aware of the need to take measures because of "*the exceptional fall in electricity demand*".[249] Therefore, the RE sector knew that the approval of RD 1614/2010 responded to this basic purpose.

345.    Furthermore, the AEE expressly recognised before the NEC the existence and binding nature of the consolidated case law:

> "It is true that the Supreme Court has declared, in relation to this type of retroactive modification, that it is not an 'unchangeable right' that the economic regime remains unaltered and that 'of the prescriptive content of [Law 54/1997], […] the petrification or freezing of the remuneration regime of the owners of electricity installations under the special regime or the unchangeability of this regime is not apparent', thus recognising a relatively broad margin to the 'ius variandi' of the Administration in a regulated sector involving general interests [provided that it respects] the reasonable return of investments".[250] (Emphasis and footnotes omitted.)

346.    In its arguments, the AEE reveals perfect knowledge of the Spanish legal system, citing the Supreme Court Rulings of 25 October 2006, 3 December 2009 and 9 December 2009. The AEE does not claim the freezing of the remuneration regime

---

[246] Spain's National Renewable Energy Action Plan (PANER) 2011-2020, p. 112, **Exhibit R-67**.

[247] Spain's National Renewable Energy Action Plan (PANER) 2011-2020, p. 123, **Exhibit R-67**.

[248] The Kingdom of Spain's Rejoinder Statement and Jurisdictional Objections, paras. 565-580.

[249] AEE submission before the NEC, 30 August 2010, p. 2, **Exhibit R-186**.

[250] AEE submission before the NEC, 30 August 2010, p. 6, **Exhibit R-186**.

contained in RD 661/2007. All it claims is the respect of the principle of reasonable return stated in Law 54/1997.

## 19.    The Challenged Measures Introduced by the Respondent

347.    The measures that are the subject of this arbitration from 2010 until 2014 are: (1) RD 1565/2010, of 19 November; (2) RDL 14/2010, of 23 December; (3) the introduction of the Tax on the value of the production of electric energy (IVPEE); (4) the updating of the remunerations, tariffs and premiums for electricity sector activities to the Consumer Price Index at constant tax rates, without raw foodstuffs nor energy commodities; (5) reduction of the premium to zero euros in the electric energy sales option at production market price plus a premium and; (6) the new regulatory framework.

## 19.1    The Challenged Measures Were Adopted Due to a Proved Public Policy

348.    The measures challenged in this arbitration were adopted in a context of international economic crisis that produced severe effects on both the demand for electricity and capital market yields. The aforementioned international economic crisis substantially altered the economic parameters which were the basis for the subsidies to energy production from renewable sources, through REP 2005-2010.

### 19.1.1 Regulatory Measures Passed in 2010

349.    In 2010 the government passed RD 1565/2010 and RDL 14/2010. With the enactment of RD 1565/2010, a maximum number of years were established in which plants would be entitled to receive a subsidy. The useful regulatory life determines when the investor has reached the "level playing field". If the PV plants would have been receiving subsidies beyond its useful regulatory life, this would have been contrary to EU recommendations. Once the level playing field has been achieved, there should be no payment of additional subsidies in order to avoid over-remunerations and market distortions. Even more, obtaining tariffs *indefinitely* would also go against the essential characteristics of the feed-in tariff system.

350.    The following RDL 14/2010 was targeted at correcting situations of excess remuneration in the number of production hours subsidised. In this regard, the government stated its aim to cut off over remunerations:

> "The compensation values of [RD 661/2007] were calculated in order to obtain reasonable profitability rates and using as hypothetical starting point the average operating hours for facilities in these three technologies. These operating hours can be found in the [REP 2005-2010] for all technologies.

> Subsequently, in the actual operation of the system, it has been shown that there are more operating hours at the facilities than initially planned in some cases. There are diverse reasons for this – technical improvement, over-installations, etc. In any case, this means that for these facilities the compensation obtained is more than reasonable."[251]

351.    In consequence, the limitations introduced by RDL 14/2010 have their reason for being in the methodology used by the REP 2005-2010. The equivalent operating hours established in RDL 14/2010 are exactly the equivalent operating hours which, as standard, were used in the standard facilities contained in REP 2005-2010 to determine the *tariff*. In any case, this limitation refers to the *hours with tariff*, not to the operation of the facility, which may in any case (i) receive the market price for the excess of hours and (ii) also enjoy priority access and priority feed-in.

### 19.1.2 The Challenged Measures Enacted After the Collapse of the Spanish Financial Market in 2012

352.    In this macroeconomic context, the main part of the challenged measures were enacted after the Memorandum of Understanding of 12 July 2012, which is an international agreement signed by the Kingdom of Spain and the EU and its Member States (including the Claimants' State). This MoU introduced, among other commitments, the duty of adopting *macroeconomic control measures* upon the Kingdom of Spain in order to comprehensively deal with the tariff deficit.[252] Any measures that could be adopted by the Kingdom of Spain should take into account necessarily these commitments.

353.    In addition, the analysis conducted at that time revealed the existence of renewable remunerations that, either due to deficiency or to excess, did not maintain the principle of reasonable return laid down for the remunerations of the so-called Special Regime, in special for the thermosolar technology.[253] The changes in the Spanish legal system have been addressed, precisely, at underpinning and making sustainable the principle of reasonable return in the long term.

354.    *Firstly*, the Tax is a tax levied on the performance of the activities of production and incorporation of electrical energy into the SES. The Tax is a measure that applies to both conventional and renewable electrical energy producers and is a Spanish state income included in the General State Budgets.[254] Thus, the Tax,

---

[251] Regulatory impact report of draft RDL 14/2010 of 23 December, establishing urgent measures to correct the tariff deficit in the electricity industry, pp. 13-15, **Exhibit R-196**.

[252] MoU on Financial-Sector Policy Conditionality, 20 July 2012, **Exhibit RL-67**.

[253] NEC Report of 7 March 2012, **Exhibit R-102**.

[254] General Spanish State Budget, **Exhibits R-44** (2013), **R-45** (2014), **R-46** (2015), **R-43** (2016).

together with other state revenues, contributes to form the state's resources with which public expenditures are financed.

355.   *Secondly*, the revision of remunerations in line with the Consumer Price Index at constant tax rates (excluding unprocessed foods and energy products)[255] did not eliminate the updating of RE remunerations. This measure, introduced by RDL 2/2013, replaced one updating index with another that is more in keeping with the normal calculation standards of the consumer price indices in the international economy. This was made in order to avoid distortions in the consumer price index and during the time in which the new measure was in force. It is proven that this measure did not cause any adverse effect for the Claimants.[256]

356.   *Finally*, the Claimant has argued that the new remuneration model enacted in 2013 involved a complete review of the previous remunerative framework. However, this statement derives from a deliberately distortion of the remunerative framework in which the Claimant made its investments. The essential characteristics of the new remuneration formula were already contained in Law 54/1997. The current remuneration formula is contained in RDL 9/2013[257] and Law 24/2013.[258] These acts were developed by RD 413/2014[259] and by Order 1045/2014.[260] The measures adopted have affected all sectors of the SES and have allowed the economic sustainability of the SES. That is, the efficiency of the Spanish energy market.

## 19.2   The Challenged Measures Maintain the Essential Characteristics of the Remuneration System of LSE 1997, Are Reasonable and Proportionate

357.   The challenged measures have maintained the essential characteristics of the Spanish remuneration models in place since 1997.[261] Specifically the contested measures have maintained:

- ▪   The subsidies for RE as a cost of the SES and therefore related to its *economic sustainability.*

- ▪   The priority of access and dispatch for RE.

---

[255] The Kingdom of Spain's Statement of Defense and Jurisdictional Objections, paras. 616-622.

[256] The Kingdom of Spain's Statement of Defense and Jurisdictional Objections, para. 618.

[257] RDL 9/2013, First Additional Provision, **Exhibit R-64**.

[258] Law 24/2013, **Exhibit R-55**.

[259] RD 413/2014, **Exhibit R-81**.

[260] Ministry Order IET 1045/2014, **Exhibit R-84**.

[261] The Kingdom of Spain's Statement of Defense and Jurisdictional Objections, paras. 603-741; the Kingdom of Spain's Rejoinder Statement and Jurisdictional Objections, paras. 702-831.

- The characteristics of a reasonable return: its *proportionality and dynamism*, and continues to be assessed by reference to the *price of money on the capital market*.

- The concept of *efficiency* pursued by the SES since 1997, which involves supplying electricity to the Spanish consumer at the lowest possible cost.

- The *methodology* always used by the SES to determine the reasonable return (defining *Standard Facilities and Common Standards*) has been maintained and improved.

- The *guarantee* of a reasonable return for RE plants to be obtained. The return provided by the Spanish remuneration model is better than the discount rate (opportunity cost) of the sector and, specifically, better than the discount rate (opportunity cost) of the Claimants.

358. The basic structure of Law 54/1997 remuneration model, allowing RE plants to achieve a reasonable return by the combination of the market price (pool) + premium.

### 19.2.1 The New Remuneration Formula Maintains the Support to RE Producers Within a Sustainable Framework

359. The challenged measures have re-established the efficiency of the SES by eliminating situations which produced over-remunerations such as the indexation of all the components of the subsidy according to the CPI or the imbalances caused by the pool plus premium option.

360. Moreover, the new remuneration model continues to guarantee the support of the Kingdom of Spain for the investments that have been made in renewable assets. Thus, the SES is going to channel, in favour of facilities that were previously referred to as under the special regime since 2014 and until the end of their regulatory life, the amount of EUR 150.565 billion. Of this, 62.234 billion is to be earmarked for promoting PV technology. This enormous amount of public subsidies will be charged to subsidies paid for by Spanish consumers.[262]

---

[262] Report on the Analysis of the Regulatory Impact Draft Order IET/1045/2014, p. 100, **Exhibit R-122**.

| TECHNOLOGY | Estimated premiums received 1998-2013 (millions of €) | Estimated premiums yet to be received from 2014 to the end of the useful life (millions of €) | Estimated total premiums received throughout the useful life (millions of €) |
|---|---|---|---|
| CO-GENERATION | 12,917 | 19,504 | 32,421 |
| PHOTOVOLTAIC | 14,617 | 64,234 | 78,851 |
| THERMAL SOLAR | 2,640 | 32,464 | 35,104 |
| HYDRAULIC | 4,263 | 1,250 | 5,513 |
| WIND | 15,400 | 20,500 | 35,900 |
| BIOMASS AND BIOGAS | 2,003 | 6,685 | 8,688 |
| TREATMENT OF WASTE | 2,626 | 4,220 | 6,846 |
| COMBUSTION OF WASTE AND BLACK LIQUOR | 1,827 | 1,708 | 3,535 |
| TOTAL RENEWABLES, CO-GENERATION AND | 56,294 | 150,565 | 206.859 |

361.    The PV Plants that are the subject of this arbitration are no exception. These plants, with the new remuneration model, continue to enjoy a *high level of subsidies* that complement the income derived from their ordinary economic activity; producing and selling energy. An activity that they continue to develop without any limitation. An activity that is protected by priority rights of access and feed-in. In the following graph, it is showed the weight of the public subsidies received by the PV Plants in the total amount of their income, taking account of the actual revenues of the plants in 2015:[263]

362.



| Market | 2.007.694 |
|---|---|
| Subsidies | 13.993.693 |
| **TOTAL** | **16.001.387** |

*FUENTE: Elaboración propia a partir de Orden IET/1045/2014, Datos CNMC plantas de la Demandante W-0433_SP, y W-0461_SP*

**FIGURE 8.** TOTAL income of the plants of NOVENERGÍA

363.    In any event, as it was indicated by the European Commission when assessing the public aid schemes to the deployment of renewable energies within the framework of the European Union, there is "no right to State aid".[264] It is therefore a non-existent right that is being claimed in this arbitration. On this point, it must be recalled that what the Claimant is claiming in this arbitration is that a higher level of public subsidies should be kept frozen and non-modifiable over time.

---

[263] Second Statement of Carlos Montoya, para. 88.

[264] Decision EC(2016) 7827 final of 28 November 2016, Czech Republic, para. 142, **Exhibit RL-73**.

### 19.2.2 The New Remunerative Formula Maintains the Priority of Access and Feed-In

364.     The regulation maintains the principles of priority of access and feed-in of electricity generated by installations that use sources of RE and highly efficient cogeneration. The new regulation extends such priority even further than what was set out in the EU standards[265] in article 26 of Law 24/2013.[266]

365.     The priority (i) of feed-in and (ii) of access and connection to the grid are stated as rights that producers of energy from renewable sources maintain. This right may only be limited on the grounds of maintaining reliability and safety of the SES. Furthermore, unlike what was established in the previous regime, said priority feed-in also applies with regard to high-efficiency cogeneration installations.

### 19.2.3 The New Remuneration System Maintains the Objective of Providing the Investor With a Reasonable Rate of Return on a Standard Facility

366.     The new system of remuneration is configured for the purpose of providing investors with a reasonable rate of return on their investments. With regard to this point, the main new item has been that of setting the reasonable rate of return in a specific way through legal regulations. This has endowed the system with greater stability and security.

367.     In line with the provisions set out in Law 54/1997, with the methodology pursued in the REPs and relevant case law, the system of remuneration is based on a reasonable rate of return for a standard project.

368.     As a consequence, the new model, the same as the previous one, is constructed for the purpose of enabling any investor in renewable energies to recover their investment cost within specific period of time, as well as their operation costs and also to obtain a reasonable return. The same as in Law 54/1997, the reasonableness of the return must be determined in accordance with the cost of money in the money markets.

369.     In the Spanish SES there are several references to the Spanish bond at 10 years as the criterion set for the remuneration of regulated activities since 2006:

   ▪     The <u>production and the power guarantee</u> for ordinary production plants of the mainland and island electricity systems. A regulation of 2006 set the remuneration of this regulated activity at the Spanish bond at 10

---

[265] Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC, Art. 16(2) (c), **Exhibit RL-14**.

[266] Law 24/2013, Art. 26(2), **Exhibit R-55**.

years plus 300 base points. RDL 20/2012 lowered the spread to 200 base points.[267]

- <u>Transport activity</u>. A regulation from 2008[268] set the remuneration of this regulated activity at the Spanish bond at 10 years plus 375 base points. RDL 9/2013 lowered the spread to 200 base points.

- <u>Distribution activity</u>. RDL 9/2013[269] set the remuneration of this regulated activity at the Spanish bond at 10 years plus 200 basis points.

370. It must be recalled that in 2009 APPA quantified the return required from renewable energies as that of the Spanish bond at 10 years plus 300 base points. In 2010 such remuneration formula was discussed as applicable to the existing RE plants and in 2012 UNESA, an Energy Producers' Association (whose partners are, among others *Iberdrola*, *EON* or *Endesa*) publicly sought: "*These* [ER] *energies must receive what is indicated by law, a 'reasonable rate of return', which, in his opinion should mean that <u>all regulated activities</u> receive a <u>similar remuneration</u>*."[270] (Emphasis added to Exhibit R-221.)

### 19.2.4 Both Models Respond to the Same Concept of Efficiency

371. The current remuneration system responds to the same efficiency model on which the previous one was constructed. The Spanish regulatory framework has always maintained a requirement of efficiency when it supports the rollout of renewable energies. Law 54/1997 established that the purpose of the SES, like the new regulatory framework, was:

> "[T]he basic purpose of this Act is to regulate the electricity sector with the traditional, three-fold goal of guaranteeing the supply of electric power, its quality and the provision of such supply at the lowest possible cost."[271]

372. Therefore, the aid or subsidies for renewable energies, as a cost of the SES, could not be unconnected with this purpose. This concept of efficiency was also contained in the REP 2005-2010 when it stated that:

> "The analysis tries to balance the application of resources so that ROI levels make it attractive relative to other alternatives in an equivalent sector, in terms of profitability, risk and liquidity, and always attempting to optimise available public resources".[272]

---

[267] RD-Act 20/2012 of 13 July, **Exhibit R-62**.

[268] RD 325/2008 of 29 February, **Exhibit R-208**.

[269] RDL 9/2013, **Exhibit R-64**.

[270] El Economista news report, "UNESA calls for cuts to renewable energy premiums", **Exhibit R-221**.

[271] Law 54/1997, Preamble, Art. 10, **Exhibit R-23**.

[272] REP 2005-2010, p. 273, **Exhibit R-66**.

373.    It is proven that the previous remuneration formulas, like the new one, were also based on the concept of *efficiency*.[273]

### 19.2.5 Both Models Set the Subsidies Based on the Standards Contained for Various Standard Facilities

374.    The subsidies derived from RD 661/2007 were not established in contemplation of the individual plants of each investor. The purpose of these subsidies was to achieve a specific return on fixed investment costs in standard facilities.

375.    As required by Law 54/1997, the subsidies set in RD 661/2007 were based on the corresponding REP.[274] Specifically, in the REP 2005-2010. This REP provided details of the methodology used to determine the return at approximately 7%.[275]

376.    As a result, within the concept of standard facilities, standards and parameters are not a new feature introduced by the current regulatory framework. These concepts already existed as a basic element for setting the subsidies in the previous model. Thus, the only thing that the new remuneration model does is that instead of referring to a REP for setting the subsidies, it includes the concept expressly in the act. Once the concept has been set in the act, these parameters and standards are introduced into a regulation[276] and a Ministerial Order.[277]

377.    The Claimant ignores the fact that in the previous remuneration model the subsidies were based on the REP 2005-2010. In this REP 2005-2010, as in the Renewable Energy Promotion Plan 2000-2010, the subsidies had their origin in a specific methodology:

   (a)    Recognising and reconstructing a financial operating structure, therefore includes identifying the standard investment costs (CAPEX) and the operating and maintenance costs (OPEX), in accordance with the actions of a "diligent investor". Standard facilities;

   (b)    Set a balanced and appropriate return target in terms of reasonable rate of return on a standard facility.

378.    Consequently, if the plants adjusted or improved the standards set for a standard facility (investment costs, operating costs, etc.) they would manage to achieve or exceed the return considered reasonable. In this respect, the Economic Report of RD 436/2004 stated:

   "Parameter A [the investment, operating and maintenance costs of each technology] has a significant weighting in establishing the amount of the

---

[273] RDL 9/2013, Art. 1(2), **Exhibit R-64**.

[274] Law 54/1997, Additional provision 25, **Exhibit R-23**.

[275] REP 2005-2010, pp. 273, 274, 280, **Exhibit R-66**.

[276] RD 413/2014, **Exhibit R-81**.

[277] Order IET/1045/2014, of 16 June, **Exhibit R-84**.

regulated tariff for sale to distributors. This way, any plant in Spain in the regime, provided it is equal to or better than the standard (the standardised plant) for its group, will obtain reasonable return".[278]

379.   The Claimant states that the standards for the investment costs used in the Standard Facilities of Order 1045/2015 are not in line with the real investment costs. This statement completely lacks foundation. It was easy for the Claimant to demonstrate to the Tribunal that the costs of the Standard Facilities where its plants were included do not correspond to its actual costs, both investment and operating. However, the Claimant did not dedicate even a single paragraph to this question.

380.   The Tribunal is invited to compare (i) the actual cost of the *PV Plants* of this arbitration and (ii) the *investment cost standards* set for the Standard Facilities where the Claimant's plants are located. The comparison leads us to the following result:

   ▪   The Claimant <u>invested EUR 159.5 million</u> in the construction of the plants.[279]

   ▪   These PV Plants will recover a standard investment cost of EUR 173.4 million.[280]

381.   This proves that the investment costs contained in Order 1045/2015 were not set retroactively. They are not only linked to the costs, but are also 13.9 million higher than the actual costs incurred for construction of the PV Plants. This means that, throughout the regulatory life of these plants, the Claimant is going to have returned to it all the amounts that were invested in the construction of the plants, as well as an <u>additional EUR 14.6 million</u>.

### 19.2.6 The Remuneration Formula Allows the PV Plants to Achieve a Reasonable Return

382.   In the previous remuneration formula the reasonable rate of return should have been the result of the sum of two elements: the *market price* and a *premium*.[281] At present, the new model maintains the same structure. The reasonable rate of return should be achieved by adding two components together: the *market price* and a subsidy that is broken down into two elements, the *Return on Investment* (Ri) and the Return on operation (Ro).

383.   The difference lies in the fact that the previous formula incorporated into a single concept (*regulated tariff or pool plus premium*) the three elements that had to

---

[278] Economic Report of RD 436/2004, **Exhibit R-189**.

[279] Second Accuracy Report, para. 78.

[280] Second Accuracy Report, para. 79.

[281] Law 54/1997, Arts. 16, 30(4), **Exhibit R-23**.

be remunerated: (i) the investment cost; (ii) the operation cost; and (iii) a reasonable return. Once these three elements had been considered, the subsidy paid per unit of energy produced was obtained. The current formula, as with the previous one, sets out the aim of remunerating the three aforementioned elements. Similarly, in the new model the same means are used to remunerate these elements: the market price and the subsidy in order to achieve the level *playing field*.

384.   However, payment of the subsidies is carried out in a disaggregated way. One part with regard to the installed power and another part with regard to the energy produced. In general, the market revenue and the return on operation (Ro) remunerate the operating costs. In addition, any surplus revenue from the market, once the operating costs have been covered, if any, together with the return on investment (Ri) remunerate the investment cost and enable the securing of a fair return of 7.398%.

385.   On this point it must be recalled that Law 54/1997 never set in stone a specific formula or mechanisms through which the reasonable return could be obtained. Moreover, Law 54/1997 did not tie the payment of "*subsidies to the energy produced*". Since 2006, the Supreme Court has interpreted article 30.4 of Law 54/1997 stating that:

> "[T]he payment regime under examination does not guarantee [...] that the formulas for fixing the premiums will stay unchanged."[282]

386.   The current remuneration formula includes the regulated and possible updating of the Ro and the Returns, as explained in the Respondent's pleadings.[283] These regulated and limited revisions, as with the previous model, must be set duly respecting two essential elements: *the economic sustainability of the SES* and *the guarantee of a fair return for investors*.

387.   The subsidies of RD 661/2007 were set, in PV technology, to achieve a return, after tax during the useful life of the facility and on a standard facility, of 7% as a regulated price option.[284] These figures also correspond to the return objectives set out in the REP 2005-2010 for PV technology in standard facilities.[285]

388.   In the current remuneration formula the Claimant's plants achieve a pre-tax return of 7%. This means a post-tax return of 6.6%.[286] Once the return on the plants has been calculated, it has to be determined whether it is reasonable. In fact, as stated by Accuracy:

---

[282] Judgment of the Supreme Court of 25 October 2006, **Exhibit R-132**.

[283] The Kingdom of Spain's Statement of Defense, paras. 685-694; the Kingdom of Spain's Rejoinder Statement and Jurisdictional Objections, paras. 778-804.

[284] Regulatory Impact Report of RD 661/2007, **Exhibit R-224**.

[285] REP 2005-2010, p. 274, **Exhibit R-66**.

[286] Second Accuracy Report, paras. 26-30.

"A 7% pre-tax project return (or 6.6% post-tax) based on the Actual scenario is reasonable because:

a) It is in line with benchmark regulated returns of 7% post-tax as provided in [REP 2005-2010] and in the RD 661/2007 economic report. In fact, the figure is actually higher, due to a drop in interest rates since the publication of [REP 2005-2010] and RD 661/2007, which means that this 7% is equivalent to 5.74% and 5.10% respectively in 2013 (when RDL 9/2013 was published)."[287]

389.   In addition, the 6.6% post-tax return is higher than the Claimant's capital cost calculated by its own experts, which came to 6.24% in June 2014 and 4.94% in September 2016.[288]

390.   It is also higher than the discount rates used by comparable companies in their impairment tests, which range from 4.9% to 6.1%.[289] Similarly, it is higher than the discount rate used by Novenergia Spain[290] in recent years:

**Table 5 – Novenergía España's impairment tests discount rates**

|  | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| Average discount rate | 8% | 6.23% | 6.28% - 6.23% | 5.88% - 6.28% | 5.52% - 6.45% | 5.15% - 6.10% |

*Source: Novenergía España's Consolidated Annual Accounts. Exhibit CLEX-015.*

391.   The Claimant has failed to prove that the returns received by its PV Plants are not reasonable. Therefore, the changes carried out due to the challenged measures have precisely allowed (1) to maintain the principle of reasonable rate of return to the PV Plants; (2) to resolve situations of imbalance of the SES which threatened its economic sustainability and (3) to strengthen the stability of the regulatory framework through the elevation of some aspects regulated previously by a regulation, to a law with the strength of an "act".

392.   Even more, once these measures have begun to produce their effects, they have been recognised as reasonable macroeconomic control measures, necessary and stabilising for the SES by: a) International Institutions; b) Rating Agencies; and c) both domestic and international investors. Even more, international institutions such as the IMF described in its 2016 Report[291] the Spanish economic measures as *impressive* in order to recover the Economic sustainability.

---

[287] Second Accuracy Report, para. 31.

[288] Second Accuracy Report, para. 31.

[289] Second Accuracy Report, para. 31.

[290] Second Accuracy Report, para. 31.

[291] IMF, "Spain: Staff Concluding Statement of the 2016 Article IV Mission, December 13, 2016", **Exhibit R-219**.

### 19.2.7 The Challenged Measures Maintain the Essential Characteristics Test stated by the Charanne Award and the Limits to Regulatory Measures Stated by the Isolux Award

393.    The *Charanne* award examined the Spanish regulatory framework existing in 2008 and 2009. It did not admit that the regulatory framework could be only constituted by successive regulations. The essential characteristics arose necessarily from a higher law, not from the lower regulations. In this sense, the *Charanne* award concludes:

> "The Arbitration Tribunal understands that RD 661/2007 and RD 1578/2008 establish specific rules whose **essential characteristics** are **offering a guaranteed tariff** (or a premium, where appropriate) as well as **privileged access** to the electricity transmission and distribution grid, to each energy producer that fulfils the established requirements. Within the framework of the LSE, said principles **make it possible to guarantee to renewable energy producers the reasonable returns** to which Article 30.4 LSE refers."[292] (Emphasis added to Exhibit RL-46.)

394.    Therefore, the Essential Characteristics of the Spanish regulatory framework in 2008 and 2009, according to the *Charanne* award, are the following:

- ▪ Offer a *guaranteed tariff* or a premium where appropriate (*i.e.* Subsidies)

- ▪ *Privileged access* to the electricity transmission and distribution grid

- ▪ Guarantee to RE producers a *reasonable return*

395.    These essential characteristics are consistent with the key elements of any FIT regime. As stated by NREL: "*Successful feed-in tariff policies typically include three **key provisions**: (1) guaranteed access to the grid; (2) stable, long-term purchase agreements (typically, 15-20 years); and (3) payment levels based on the costs of RE generation*".[293] (Emphasis added to Exhibit R-272.)

396.    In the present case, the remuneration framework established by the challenged measures also (i) offers a guaranteed premium, (ii) maintain *privileged access* to the electricity transmission and distribution grid, in order to (iii) guarantee obtaining a reasonable return on the investment cost of the RE plants to every foreign or national investor.

397.    On the other hand, the *Isolux* award (i) examined the actual Spanish *regulatory framework*, including as a relevant fact the case law; (ii) concluded the actual of

---

[292] Charanne and Construction Investments v. Spain, SCC Case No. 062/2012, Final Award, 21 January 2016, paras. 517-518, **Exhibit RL-46**.

[293] NREL, A Policymaker's Guide to Feed-in Tariff Policy Design, July 2010, p. 22, **Exhibit R-272**.

the government to adopt regulatory measures and (iii) examined the knowledge of the Claimant about such limit:

> "[T]he Claimant had special knowledges that could not have created the legitimate expectation that the long-term FIT system enshrined in RDs 661/2007 and 1565/2008 would have lasted the entire lifetime of the plants. **The only legitimate expectation** of the Claimant **was to receive a reasonable return** for its investment.
>
> [...]
>
> According to that indicated by the Supreme Court, [...], **the only limit** to the power of the Government to modify its regulatory framework is the guarantee given by the LSE of a reasonable **return for the investors**...
>
> [...]
>
> [I]t is established that the Claimant was perfectly aware of the Spanish Supreme Court's jurisprudence..."[294] (Emphasis added to Exhibit RL-72)

398.    In the present case, it is also established that the Claimant was **perfectly aware** of the Spanish Supreme Court's case law because of the assertions made by its PV Plants in their claim, regarding (i) the awareness of a governmental intervention in 2006 due to a public policy and (ii) the awareness of the RE remuneration case law applicable from 2006 onwards. Due to the lack of proof of the Claimant regarding its objective and reasonable expectations and the evidence provided by the Respondent, the Tribunal must rely on these awards in order to dismiss the unfounded Claimant's claim.

## VII.    RELIEF SOUGHT

## 20.    The Claimant's Prayers for Relief

399.    The Claimant respectfully requests the Tribunal to:

DECLARE that the Respondent has breached its obligations under Article 10 ECT:

> to encourage and create stable, equitable, favourable and transparent conditions for the Claimant to invest in Spain;
>
> to accord at all times to the Claimant and its investment fair and equitable treatment;

---

[294] Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain, SCC V2013/153, Award, 12 July 2016, paras. 787, 792, 795, **Exhibit RL-72**.

to ensure that the Claimant's investment in Spain enjoys the most constant protection and security;

not to impair by unreasonable or discriminatory measures the management, maintenance, use, enjoyment or disposal of the Claimant's investment in Spain; and

to observe any obligations it has entered into with the Claimant or its investment in Spain;

DECLARE that the Respondent has breached its obligation under Article 13 ECT not to adopt any measures tantamount to expropriation *vis-à-vis* the Claimant in respect of its investment without the payment of prompt, effective and adequate compensation;

ORDER the Respondent to pay the Claimant EUR 61.3 million for the loss and damage incurred by the Claimant as a result of its breaches of the ECT;

ORDER the Respondent to pay the costs of this arbitration and all professional, legal and experts fees and disbursements made by the Claimant in connection with the same;

ORDER the Respondent to pay pre- and post-award compound interest on all compensation ordered by the Tribunal; and

ORDER any further relief that may be deemed appropriate by the Tribunal.

## 21.    The Respondent's Prayers for Relief

400.    In view of the arguments put forward in these arbitral proceedings, the Kingdom of Spain respectfully requests the Tribunal to:

1.    Declare that its lacks of jurisdiction to hear the claims of the Claimants, or if applicable their inadmissibility, in accordance with what is set forth in section III of the Statement of Rejoinder and Reply to Jurisdictional Objections, referring to Jurisdictional Objections;

2.    Secondarily, in case that the Tribunal decides that it has jurisdiction to hear this dispute, that it dismiss all the claims of the Claimants on the merits because the Kingdom of Spain has not breached in any way the ECT, in accordance with what is stated in paragraphs (A) and (B) of section IV of the Statement of Rejoinder and Reply to Jurisdictional Objections, on the substance of the matter;

3.    Secondarily, to dismiss all the Claimants' claims for damages as said claims are not entitled to compensation, in accordance with section V of the Statement of Rejoinder and Reply to Jurisdictional Objections; and

4.    Sentence the Claimants to pay all costs and expenses derived from this arbitration, including ICSID[295] administrative expenses, arbitrators' fees, and the fees of the legal representatives of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred and the date of their actual payment.

# VIII.   JURISDICTION

# 22.   Does the Tribunal Have Jurisdiction Over Intra-EU Disputes (Preliminary Objection A)?

## 22.1   Introduction

401.    The Claimant's position with respect to Preliminary Objection A has been outlined in, *inter alia*, Sections II.A and B of the Statement of Reply and Answer to Jurisdictional Objections, Section II of the Statement of Rejoinder on Jurisdictional Objections and Section II.A of the Claimant's Skeleton Arguments.

402.    The Respondent's position with respect to the issue of Preliminary Objection A has been outlined in, *inter alia*, Section III.A of the Statement of Defense and Jurisdictional Objections, Section III.A of the Statement of Rejoinder and Reply to Jurisdictional Objections, and Section II of the Respondent's Skeleton Arguments.

403.    For the avoidance of doubt, the below Sections are merely a summary of the Claimant's and the Respondent's respective positions in this respect. The Tribunal's reasons and final decision are based on the entirety of the Parties' arguments, both in their submissions and during the Hearing. Insofar as particular arguments are not explicitly discussed here, the Tribunal has nevertheless considered them.

## 22.2   The Respondent's Position

### 22.2.1 Introduction

404.    The Respondent objects that the Tribunal lacks jurisdiction to hear the intra-EU dispute that is the subject of this arbitration initiated by a company from Luxembourg against the Kingdom of Spain.

405.    Luxembourg and Spain are Member States of the EU; as a result, the requisite envisaged in Article 26(1) of the ECT, which states that to be able to resort to arbitration, the dispute must be between a Contracting Party and investors from a different Contracting Party, is not met.

---

[295] The Tribunal interprets the Respondent's request as actually pertaining to the SCC.

406.    The Claimant rejects the arguments of the Kingdom of Spain in that regard. However, the reasons that it puts forward do not, in the Respondent's views, undermine the objection to the jurisdiction of the Tribunal formulated by the Kingdom of Spain.

407.    Moreover, it must be borne in mind that there are two pending cases before the Court of Justice of the EU regarding the compatibility between bilateral investment treaties ("**BIT**") and EU law.[296] While the Court of Justice of the European Union ("**CJEU**") does not rule on these issues (and also on the compatibility between the arbitration of the ECT for intra-EU relations and EU law) the Respondent shall maintain this jurisdictional objection by virtue of the principle of institutional loyalty that derives from Article 4 of the EU Treaty,[297] particularly taking into account the recent decision of the European Commission in the state aid dossier of the Czech Republic.[298]

## 22.2.2 The Claimant Ignores the Principle of the Primacy of EU Law in Intra-EU Relations

408.    According to the Respondent, the Claimant ignores the essential principles of EU law and that of the ECT itself. Fundamentally, it has forgotten the essential principle on which the objection to the jurisdiction of the Tribunal brought by the Kingdom of Spain pivots: the principle of the primacy of EU law.

409.    The CJEU established the principle of primacy in the Costa v. ENEL judgment of 15 July 1964.[299] In it, the CJEU protected the rights of an investor in the common electricity market, opposed to the nationalisation practised by Italy. According to the CJEU, "[b]*y contrast with ordinary international treaties, the EEC Treaty has created its own legal system which, on the entry into force of the Treaty, became an integral part of the legal systems of the Member States and which their courts are bound to apply. By creating a Community of unlimited duration, having its own institutions, its own personality, its own legal capacity and capacity of representation on the international plane and, more particularly, real powers stemming from a limitation of sovereignty or a transfer of powers from the States to the Community, the Member States have limited their sovereign rights, albeit within limited fields, and have thus created a body of law which binds both their nationals and themselves*."[300]

410.    The principle of primacy means, thus, that EU law is applied to intra-community relations with preference to or prevailing over any other law, displacing any

---

[296] Prejudicial Question C-284/16 (Achmea Case) on the compatibility between the BIT signed in 1991 by the Netherlands and Slovakia (EC-13) and Case T-624/15 relating to the application for annulment of the European Commission decision of 30 March 2015 in case SA 38517 (Arbitral Award of Micula v. Romania Case, 11 December 2013).

[297] Treaty on European Union, **Exhibit RL-1**.

[298] Decision EC(2016) 7827 final of 28 November 2016, Czech Republic, para. 142, **Exhibit RL-73**.

[299] CJEU Judgment of 15 July 1964, in case 6/64, Flaiminio Costa v. ENEL, **Exhibit R-271**.

[300] CJEU Judgment of 15 July 1964, in case 6/64, Flaiminio Costa v. ENEL, on the interpretation of Art. 102 of the EEC Treaty, **Exhibit R-271**.

other domestic or international provision. The preference given to community law does not admit comparisons with other laws. Simply put, EU law is given preference over any other law regulating internal EU relations.

411. The principle of primacy of EU law in intra-EU relations has an explicit recognition in the ECT, as stated in Article 25 that:

> (1) "The provisions of this Treaty shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement (hereinafter referred to as "EIA") to extend, by means of most favoured nation treatment, to another Contracting Party which is not a party to that EIA, any preferential treatment applicable between the parties to that EIA as a result of their being parties thereto.

> (2) For the purposes of paragraph (1), "EIA" means an agreement substantially liberalizing, inter alia, trade and investment, by providing for the absence or elimination of substantially all discrimination between or among parties thereto through the elimination of existing discriminatory measures and/or the prohibition of new or more discriminatory measures, either at the entry into force of that agreement or on the basis of a reasonable time frame."[301] (Emphasis added to Exhibit RL-3.)

412. That Article 25 of the ECT refers to EU law is not questionable. In fact, the only Declaration contained in the ECT concerning this section is the one that the European communities and their member states made when they said:

> "[T]he application of Article 25 of the Energy Charter Treaty will allow only those derogations necessary to safeguard the preferential treatment resulting from the wider process of economic integration resulting from the Treaties establishing the European Communities".[302] (Emphasis added to Exhibit RL-3.)

413. As well as consecrating the principle of the primacy of EU law, the judgment of the CJEU dated 15 July 1964, handed down in the *Costa v. ENEL* case, ruled on questions of EU law that are also of importance when resolving this procedure, which, without any doubt, affects community law. In this respect, it must be recalled that what the Claimant is requesting this Tribunal to do, is to guarantee that the companies that produce renewable energies in Spain and in which it invested, should receive, throughout their entire respective useful life, a specific unmodifiable amount of state aid, even if that distorts competition in the Common Electricity Market. Following the judgment handed down by the CJEU in the *ELCOGÁS* case, there can no longer be any doubt that "*amounts that are financed by end-users of electricity as a whole and who are established in the*

---

[301] Energy Charter Treaty, Art. 25, **Exhibit RL-3**.

[302] Energy Charter Treaty, Art. 25, **Exhibit RL-3**.

*national territory, and that are distributed to companies in the electricity sector by a public body in line with predetermined legal criteria",* constitute state aid.[303]

414.    In this regard, the judgment by the CJEU in the *Costa v. ENEL* case already pointed that the European Commission had to be informed promptly of any plans to grant or alter aid.[304] In this case, the aid received by companies producing RE, although initially allowed by the EU, should be granted by the states taking into account the Guidelines on state aid for environmental protection and energy 2014-2020, approved by European Commission Communication 2014/C 200/01, as well as those repealed by these (European Commission Communication 2008/C 82/01).[305] The purpose of this aid is to ensure that RE producers are placed in a *level playing field*. Granting these producers aid which distorts competition in the market in their favour would, therefore, be contrary to EU law. Any determination made in relation with the right of producers of renewable energies who are the subject of this arbitration to receive this specific amount of aid, will affect, as stated, an essential pillar of the EU: the competition law.

415.    RE companies in Spain have invoked the EU law and not the ECT to protect their interests in light of the regulatory measures adopted by the government of Spain. The claims made by the AEE, which were filed during the processing of RD 1614/2010 with regard to the proposal to introduce a provision in the regulation that would restrict the "changes of ownership and the right transmission (Eighth additional provision)",[306] should be highlighted in this regard.

416.    The AEE considered that proposal unacceptable for being contrary to Directive 2009/28/EC because:

> "[…] It restricts the free circulation of capital laid down in Article 63 (formerly Article 56) of the current Treaty on the Functioning of the European Union (TFEU). […] [The CJEU has] declared that capital movements are, in particular, the so-called 'direct' investments, namely, investments in the form of shares in a company through the ownership of shares which grant the option to participate effectively in its management and control, and, the so-called 'portfolio' investments, namely, investments in the form of the purchase of securities in the capital market made with the sole intention of making an investment, without the intention of influencing the management and control of the business (see

---

[303] Order of the Court of Justice of the European Union laid down regarding the preliminary ruling C- 275/13, ELCOGAS, on 22 October 2014. (English version), **Exhibit RL-16**.

[304] CJEU Judgment of 15 July 1964, in case 6/64, Flaiminio Costa v. ENEL, on the interpretation of Art. 93 of the EEC Treaty, **Exhibit R-271**.

[305] Guidelines on State Aid for environmental protection and energy 2014-2020, approved by European Commission Communication 2014/C 200/01, **Exhibit R-3**; Guidelines on State Aid for environmental protection and energy approved by European Commission Communication 2008/C 82/01, **Exhibit R-1**.

[306] Submissions from the AEE concerning the proposal of RD 1614/2010, **Exhibit R-166**.

Judgment Commission/Netherlands, afore-mentioned, section 19 and the mentioned case-law."[307] (Emphasis omitted.)

417. In short, under the principle of primacy, it is the law of the EU and not the ECT which must be applied to resolve this dispute. The Claimant, which is from Luxembourg, to whom the ECT does not guarantee national treatment insofar as state aid is concerned, does enjoy the comprehensive protection of EU law both at the time of the investment and in its subsequent management. In fact, the Claimant has made all its investment under the umbrella and the protection of the rules of EU law and resorted to the ECT and to international arbitration as it is aware that the claim made herein would be rejected by the courts of justice of the EU.

418. This dispute also affects essential elements of EU law (state aid, free movement of capital and freedom of establishment), which affect the basic pillars of the EU, which prevents the Tribunal ruling on it, insofar as this power is reserved to the EU's own judicial system and, ultimately, to the CJEU. The latter emphasised this in its Opinion 1/91.[308]

### 22.2.3 Issues Pending Before the CJEU and Recent Decisions of the European Commission

419. The Kingdom of Spain is not unaware of the awards that have been handed down by other arbitral tribunals concerning the so-called intra-community objection and in which said jurisdictional objection has been rejected.

420. Without prejudice to the above, the question addressed in this objection is by no means a non-contentious issue.

421. One should remember that two issues are pending before the CJEU on the compatibility between the BITs and EU law. Specifically, the first one is the prejudicial question concerning the *Achmea* case on the compatibility between the BIT signed in 1991 by the Netherlands and Slovakia.[309] The second, is the case concerning the request to repeal the decision of the European Commission of 30 March 2015 in case SA 38517 (Arbitral award in the *Micula v. Romania* case of 11 December 2013).[310]

422. While the CJEU does not rule on these issues (and also on the compatibility between the arbitration of the ECT for intra-EU relations and EU law) the

---

[307] AEE submission before the NEC against the draft of RD 1565/2010, of 30 August 2010, p. 11, **Exhibit R-240**.

[308] Opinion 1/91 on 14 December 1991 issued by the Court of Justice of the European Union regarding the "Agreement to Create a European Economic Area" (EEA) (original version in Spanish), **Exhibit R-162**.

[309] Prejudicial Question C-284/16 (Achmea Case) on the compatibility between the BIT signed in 1991 by the Netherlands and Slovakia (EC-13).

[310] Case T-624/15 relating to the application for annulment of the European Commission decision of 30 March 2015 in case SA 38517 (Arbitral Award of Micula v. Romania Case, 11 December 2013).

Respondent shall maintain this jurisdictional objection by virtue of the principle of institutional loyalty that derives from Article 4 of the EU Treaty.[311]

423.  One must likewise take into account the decision of the European Commission, of 28 November 2016, handed down in the case of state aid of the Czech Republic, regarding the "Promotion of electricity production from RE sources". In said decision, the European Commission makes an interpretation as to the application of the ECT with respect to intra-EU conflicts that is particularly relevant:

> "(147) In the case of the Energy Charter Treaty, it is also clear from the wording, the objective and the context of the treaty that it does not apply in an intra-EU situation in any event. In general, when negotiating – as in the case of the Energy Charter Treaty – multilateral agreements as a "block", the Union and its Member States only intend to create international obligations vis-à-vis third countries, but not *inter se*. That has been particularly clear in case of the Energy Charter Treaty, which had been initiated by the Union in order to promote investment flows from the then European Communities to the East, and energy flows in the opposite direction, as part of the external action of the European Communities. It is also borne out by the wording of Articles 1(3) and 1(10) of the Energy Charter Treaty, which defines the area of a regional economic integration organisation as the area of that organisation. The lack of competence of Member States to conclude *inter se* investment agreements and the multiple violations of Union law set out above in recitals (143) to (145) also constitute relevant context for the interpretation of the Energy Charter Treaty in harmony with Union law, so as to avoid treaty conflict.

> (148) For those reasons, the ten investors cannot rely on the Energy Charter Treaty or the German-Czech BIT.

> (149) In any event, there is also on substance no violation of the fair and equitable treatment provisions. First, as explained above, the Czech Republic has not violated the principles of legitimate expectation and equal treatment, neither under its domestic law nor under Union law. As both under the Energy Charter Treaty and the German-Czech BIT Union law is part of the applicable law, the principle of legitimate expectation under the fair and equitable treatment provision has to be interpreted in line with the content of that principle under Union law. Second, in case of the Energy Charter Treaty, it has been expressly recognized by Arbitral Tribunals that the provisions of the Energy Charter Treaty have to be interpreted in line with Union law, and that in case of conflict, Union law prevails. It is settled case-law that a measure that does not violate

---

[311] Treaty on European Union, Art. 4(3), **Exhibit RL-1**.

domestic provisions on legitimate expectation generally does not violate the fair and equitable treatment provision.

(150) Finally, the Commission recalls that any remuneration which the Arbitral Tribunals were to grant would constitute in and of itself State aid. However, the Arbitral Tribunals are not competent to authorize the granting of State aid. That is an exclusive competence of the Commission. If they were to award remuneration, they would violate Article 108(3) TFEU, and any such award would not be enforceable, as that provision is part of the public order".[312] (Emphasis in Exhibit R-73. Footnote omitted.)

424.    More recently, on 11 December 2017, the Respondent reiterated its jurisdictional objection basing it also on the EC Decision dated 10 November 2017 which addresses the compatibility between Spain's Support for Electricity Generation from Renewable Energy Sources and EU rules on State aid.[313] The Kingdom of Spain draws the Tribunal's attention to the fact that the EC Decision restates that: (i) the jurisdictional conflict between EU judicial institutions and ECT arbitral tribunals on intra-EU investment disputes should be solved on the basis of the principle of primacy in favour of EU law; and (ii) any compensation granted by ECT tribunals to investors based on the Kingdom of Spain's changes in legislation on renewable energy would constitute a state aid that arbitral tribunals are not competent to authorise as this belongs to the exclusive competence of the EU Commission. Accordingly, the Respondent underlines that the EC Decision, which is binding upon the Kingdom of Spain, provides further support to its objection that this Tribunal lacks jurisdiction over the Claimant's claims.

425.    Finally, Article 26(6) of the ECT requires the Tribunal to settle issues under litigation in accordance with the ECT itself and "*with the applicable rules and principles of international Law*".[314] EU law is applicable international law that cannot therefore be ignored.

### 22.2.4 Conclusion

426.    In view of the above, the Respondent reiterates the request to the Tribunal that it should declare that it lacks the jurisdiction to hear the present intra-EU dispute brought by an investor from Luxembourg against the Kingdom of Spain. Luxembourg and Spain were Member States of the EU when the ECT came into force. Hence, the Claimant fails to comply with the requirement foreseen in Article 26(1) of the ECT which states that to be able to access arbitration the

---

[312] Decision EC(2016) 7827 final of 28 November 2016, Czech Republic, para. 142, **Exhibit RL-73**.

[313] On the admission into the file of the present proceedings of the EC Decision of 10 November 2017, seethe above procedural history at §§ 63 through 68.

[314] Energy Charter Treaty, Art. 26(6), **Exhibit RL-3**.

dispute must be between a Contracting Party and an investor from a different Contracting Party.

## 22.3    The Claimant's Position

### 22.3.1 The Tribunal Has Ratione Personae Jurisdiction Over the Present Dispute

427.    The Respondent argues that the Tribunal lacks *ratione personae* jurisdiction under Article 26(1) ECT because the Claimant is allegedly not from the "Area" of "another Contracting Party", as both Luxembourg and the Kingdom of Spain are Member States of the European Union.[315] The Respondent's interpretation is baseless and adds non-existent requirements to Article 26(1) ECT.[316]

428.    Article 26(1) ECT provides that "[d]*isputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III*"[317] may be submitted to arbitration. Based on an interpretation of Article 26(1) ECT in accordance with the Vienna Convention on the Law of Treaties ("**VCLT**"),[318] it is clear that Article 26(1) does not contain any requirements other than that the investor be a national of an ECT Contracting State other than the host State.[319] Nothing in the ECT supports the Respondent's proposition that an investor is not a national of an ECT Contracting Party to the extent that such contracting party is also a member of the same regional economic integration organisation ("**REIO**") as the host State. The Claimant's position has been consistently confirmed by arbitral tribunals in cases where the Kingdom of Spain has attempted to advance this argument.[320]

429.    In addition, the ECT does not – as originally posited by the Kingdom of Spain[321] – contain a disconnection clause that would allow EU Member States to not apply the ECT *inter se*.[322] Based on the unambiguous language of the ECT, it is clear that a disconnection clause is not included in any of its provisions.[323] The absence of such a clause in the ECT has likewise been confirmed by the arbitral tribunals in

---

[315] The Kingdom of Spain's Statement of Defense and Jurisdictional Objections, Section III.A; the Kingdom of Spain's Rejoinder Statement and Jurisdictional Objections, paras. 76-77.

[316] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, Section II.B; Novenergia's Statement of Rejoinder on Jurisdictional Objections, paras. 10-14, 25.

[317] Energy Charter Treaty, Art. 26(1), **Exhibit RL-3**.

[318] Vienna Convention on the Law of Treaties (1969), Art. 31.

[319] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 36-40.

[320] Charanne and Construction Investments v. Spain, SCC Case No. 062/2012, Final Award, 21 January 2016, paras. 429-431, **Exhibit RL-46**; RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. The Kingdom of Spain, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, **Exhibit CL-128**; Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain, SCC V2013/153, Award, 12 July 2016, **Exhibit RL-72**; Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, paras. 193-196, **Exhibit CL-162**.

[321] The Kingdom of Spain's Statement of Defense and Jurisdictional Objections, paras. 72-74.

[322] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, Section II.B.1.iii.

[323] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, Section II.B.1.iii., paras. 90-95.

*Charanne v. The Kingdom of Spain, RREEF v. The Kingdom of Spain, Isolux v. The Kingdom of Spain, and Eiser Infrastructure v. The Kingdom of Spain.*[324]

430.  The Tribunal should therefore reject the Respondent's *ratione personae* objection.

## 22.3.2 The Tribunal Has Jurisdiction Over Intra-EU Disputes

431.  In addition to the *ratione personae* objection, the Respondent has made a variety of other intra-EU arguments with respect to the Tribunal's jurisdiction. According to the Claimant, all of these arguments should be dismissed, as the present dispute does not relate to EU law, the Tribunal's jurisdiction is determined based on the ECT, not EU law, there is no incompatibility between the ECT and EU law, and even if any incompatibility existed, the ECT would prevail.

### 22.3.2.1 The Present Dispute Does Not Relate to EU Law

432.  As a first preliminary point, the Claimant reiterates that the present dispute does not relate to EU law. Novenergia is seeking compensation based on the Kingdom of Spain's violation of its obligations under the ECT. At no point has the Claimant submitted to the present Tribunal claims based on EU law. At the heart of this dispute is the Kingdom of Spain's abolition of the Special Regime in violation of its international law obligations. Further, the Claimant is not challenging any measures adopted by or at the direction of the EU. The Respondent's actions were of its own volition. Indeed, the Kingdom of Spain has repeatedly asserted that the eradication of the Special Regime was motivated by the Kingdom of Spain's need to address the so-called tariff deficit.[325]

433.  On 21 December 2017, the Claimant provided its comments on the EC Decision issued on 10 November 2017.[326] The Claimant vigorously refuted all contrary arguments put forward by the Kingdom of Spain. In particular, the Claimant underlined the total irrelevance of the EC Decision for the purposes of the present arbitration. Indeed, the EC Decision only concerns EU law on EU state aid, whereas the present dispute concerns the Claimant's right to have its investment protected in conformity with the ECT provisions and international law standards, and in accordance with the Respondent's obligation to accord those protections to the Claimant's investment.

---

[324] Charanne and Construction Investments v. Spain, SCC Case No. 062/2012, Final Award, 21 January 2016, paras. 436-438, **Exhibit RL-46**; RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. The Kingdom of Spain, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, Section IV(2), especially paras. 81-86, **Exhibit CL-128**; Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain, SCC V2013/153, Award, 12 July 2016, paras. 638-639, **Exhibit RL-72**; Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 207, **Exhibit CL-162**.

[325] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 84-87, 684, 836; Novenergia's Statement of Rejoinder on Jurisdictional Objections, paras. 69-72. See also the Kingdom of Spain's Statement of Defense and Jurisdictional Objections, paras. 975-978.

[326] Claimant's Comments on the EC Decision, 21 December 2017.

434.    In addition, for what concerns jurisdiction, the Claimant observed that the 10 November 2017 decision "adds nothing" to the EU Commission's traditional "hostility" against the intra-EU investment arbitration. The Claimant further emphasised that the long-standing EU Commission position is now "debunked" and "disavowed" in clear words by the opinion rendered on 19 September 2017 by the Advocate General to the ECJ in the *Slovak Republic v. Achmea BV* case, according to which the right to arbitrate under an investment treaty, including the ECT, on reliance of the procedural and substantive provisions set forth in the treaty is not incompatible with, nor precluded by, any rule of EU law. This *per se* suffices, the Claimant asserts, to dismantle all of the Respondent's and the European Commission's jurisdictional objections grounded on the alleged prevalence of the EU law in deciding intra-EU investment disputes.

### 22.3.3 The Tribunal's Jurisdiction Is Determined by the ECT, Not EU Law

435.    As a second preliminary point, the jurisdiction of the present Tribunal is to be determined based on the "*framework applicable to the legal instrument from which the Tribunal derives its prima facie jurisdiction [and] […] the legal order within which consent [to arbitrate] originated*".[327] As underlined by the *Eiser Infrastructure v. The Kingdom of Spain* tribunal:

> "The Tribunal's jurisdiction is derived from the express terms of the ECT, a binding treaty under international law. The Tribunal is not an institution of the European legal order, and it is not subject to the requirements of this legal order."[328]

436.    The *RREEF v. The Kingdom of Spain* tribunal underscored – in a case identical to the present one – that the ECT is the "'constitution' *of the Tribunal*" and that it has to ensure "*the full application of its 'constitutional' instrument, upon which its jurisdiction is founded*."[329] *The Electrabel v. Hungary* tribunal likewise held that international investment treaty tribunals are "*required to apply the ECT and 'applicable rules and principles of international law.'*"[330]

437.    The present Tribunal has been constituted under the ECT, and operates in the realm of public international law, not EU law. It is therefore bound to determine its jurisdiction over the present dispute in accordance with the terms of its constitution – the ECT. As discussed above, the jurisdictional requirements in Article 26(1) ECT are fulfilled in the present case.

---

[327] Achmea B.V. (formerly Eureko B.V.) v. Slovak Republic [I], PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010, paras. 228-229, **Exhibit CL-116**.

[328] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 199, **Exhibit CL-162**.

[329] RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. The Kingdom of Spain, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, Section IV(2), especially paras. 74-75, **Exhibit CL-128**. See also Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 87, **Exhibit CL-162**.

[330] Electrabel S.A. v. Hungary, ICSID No. ARB/07/19, Award of 25 November 2015, para. 4.112, **Exhibit RL-45**.

### 22.3.4 There Is No Incompatibility Between the ECT and EU law

438.     Throughout its submissions, the Kingdom of Spain ignores the self-evident truth that there is no incompatibility between the ECT and EU law, which would require the present Tribunal to resolve a conflict between the two.[331]

439.     *First*, as has been held by multiple investment treaty tribunals, the ECT and EU law do not regulate the same subject matter.[332] Arbitral tribunals have repeatedly held that "[*a*]*s regards the substantive protections in* […] *the ECT*, […] *the ECT and EU law* [do not] *share the same subject-matter*",[333] and that "*the EU Treaties and the EU law rooted in, and flowing from them do not relate to the same subject matter as BITs or multilateral treaties for the protection of foreign investment*".[334]

440.     *Second*, there is no incompatibility between the dispute resolution mechanism in Article 26 ECT and EU law.[335] In the words of the *Charanne v. The Kingdom of Spain* tribunal, "*there is no rule of EU law preventing EU Member States from resolving through arbitration their disputes with investors of other Member States [,] [n]either is there any rule of EU law preventing an arbitration tribunal from applying EU law to resolve such a dispute*".[336]

441.     Article 344 TFEU is not applicable to ECT disputes, as it refers to disputes between EU Member States themselves, not disputes between EU Member States and private parties such as investors.[337] This conclusion is clearly supported by the wording of Article 344 TFEU,[338] EU legal documents,[339] as well as investment treaty tribunals.[340]

---

[331] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, Section II.B.1; Novenergia's Statement of Rejoinder on Jurisdictional Objections, Section II.B.2.

 Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 61-62.

[332] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 61-62.

[333] Electrabel S.A. v. Hungary, ICSID No. ARB/07/19, Award of 25 November 2015, para. 4.176, **Exhibit RL-45**.

[334] European American Investment Bank AG v. The Slovak Republic, UNCITRAL, PCA Case No. 2010-17, Award on Jurisdiction, 22 October 2012, para. 184, **Exhibit CL-120**.

[335] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 57-60, 63-83.

[336] Charanne and Construction Investments v. Spain, SCC Case No. 062/2012, Final Award, 21 January 2016, para. 438, **Exhibit RL-46**.

[337] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 65-76.

[338] Consolidated version of the TFEU, Official Journal of the European Union C 115, Vol. 5, 9 May 2008, Art. 344, **Exhibit CL-51**; Consolidated version of the TFEU, Official Journal of the European Union C 115, Vol. 5, 9 May 2008, Art. 2(1), **Exhibit CL-51**; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 81.

[339] Consolidated version of the TFEU, Official Journal of the European Union C 115, Vol. 5, 9 May 2008, Art. 1(2), **Exhibit CL-51**; Legal Opinion 1/91 of the Court of Justice of the European Union regarding the "Agreement to Create a European Economic Area" (EEA), paras. 1, 6, 30, 34, **Exhibit CL-76**; Legal Opinion No. 2/13 of the ECJ, 18 December 2014, paras. 205, 212, **Exhibit CL-79**; Commission v. Ireland, Case C-459/03, [2006] ECJ, para. 132, **Exhibit CL-103**.

[340] Electrabel S.A. v. Republic of Hungary, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, paras. 4.151-4.152, 4.154-4.156, **Exhibit CL-31**; Achmea B.V. (formerly Eureko B.V.) v. Slovak Republic [I], PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010, paras. 274, 282-283, **Exhibit CL-116**; Jan Oostergetel and Theodora Laurentius v. The Slovak Republic, UNCITRAL, Decision on Jurisdiction, 30 April 2010, paras. 72, 98, **Exhibit CL-114**; Eastern Sugar B.V. (Netherlands) v. The Czech Republic, UNCITRAL, SCC Case No. 088/ 2014, Partial Award, 27 March 2007, paras. 172, 175, **Exhibit CL-106**; Charanne and Construction Investments v. Spain, SCC Case No. 062/2012, Final Award, 21 January 2016, paras. 443-444, **Exhibit RL-46**.

442.    There is no incompatibility between the provisions of the ECT and EU law.

## 22.3.4.1 Even if an Incompatibility Existed, the ECT Would Prevail

443.    *First*, any incompatibility between the ECT and EU law – which does not, for the avoidance of doubt, exist in the present case – must be resolved based on the ECT and public international law. As demonstrated above, the present Tribunal is a creature of public international law. Should any incompatibility be deemed to exist, it has to be resolved by the Tribunal based on the terms of the ECT and public international law.[341]

444.    *Second*, the ECT contains a provision that determines the "hierarchy" between the ECT and other international agreements should a conflict arise. Article 16 ECT expressly stipulates that "[w]*here two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the same subject matter of Part III or V of* [the ECT]," the more favourable provisions shall apply.[342] Therefore, even if it were considered that the ECT and EU law relate to the same subject-matter (*quod non*), the ECT would still apply between EU Member States when the provisions of the ECT are "*more favourable to the Investor or the Investment*".

445.    Depriving ECT-protected investors of their substantive and procedural rights under Parts III and V of the ECT would have a negative effect on these investors and their investments. Even though the EU may have an "internal market", as asserted by the Respondent,[343] any argument that EU law provides investors greater protection than the ECT is unsustainable.[344] It is obvious that the ECT is more favourable, as it grants investors substantive and procedural rights that are neither covered nor regulated by EU law. Most notably, EU law does not grant investors a right of direct action to protect their interests against host States that have violated those interests. Investment treaty tribunals have consistently affirmed that pursuant to Article 16 ECT, the ECT prevails over EU law, as its protections, especially the right to arbitration, are more favourable to investors.[345]

---

[341] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 110-125; Novenergia's Statement of Rejoinder on Jurisdictional Objections, paras. 29, 37.

[342] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 111-113; Novenergia's Statement of Rejoinder on Jurisdictional Objections, paras. 39 43.

[343] The Kingdom of Spain's Statement of Defense and Jurisdictional Objections, paras. 47, 52, 56.

[344] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 114-125.

[345] RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. The Kingdom of Spain, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, para. 75, **Exhibit CL-128**; Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 202, **Exhibit CL-162**; Plama Consortium Limited v. Republic of Bulgaria, ICSID Case No. ARB/03/24, Decision on Jurisdiction, 8 February 2005, para. 141, **Exhibit RL-22**; Achmea B.V. (formerly Eureko B.V.) v. Slovak Republic [I], PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010, paras. 245, 264, **Exhibit CL-116**; Eastern Sugar B.V. (Netherlands) v. The Czech Republic, SCC Case No. 088/2004, Partial Award, 27 March 2007, para. 165, **Exhibit CL-106**. See also Emilio Agustin Maffezini v. Kingdom of Spain, ICSID Case No. ARB/97/7, Decision on Objections to Jurisdiction, 25 January 2000, para. 54, **Exhibit CL-87**; Gas Natural SDG, S.A. v. Argentine Republic, ICSID Case No. ARB/03/10, Decision of the Tribunal on Preliminary Questions on Jurisdiction, 17 June 2005,

446. *Third*, the Tribunal must reject the Kingdom of Spain's argument that EU law would (somehow) automatically prevail over the ECT in relations between EU Member States who are also Contracting Parties to the ECT due to the so-called "primacy" of EU.[346] This argument does not find support in the law,[347] and has consistently and uniformly been rejected by arbitral tribunals.[348] In the words of the *RREEF v. The Kingdom of Spain* tribunal:

> "[I]n case of any contradiction between the ECT and EU law, the Tribunal would have to insure the full application of its "constitutional" instrument, upon which its jurisdiction is founded."[349]

> "[S]hould it ever be determined that there existed an inconsistency between the ECT and EU law [...] and absent any possibility to reconcile both rules through interpretation, the unqualified obligation in public international law of any arbitration tribunal constituted under the ECT would be to apply the former. This would be the case even were this to be the source of possible detriment to EU law."[350]

447. *Finally*, an analysis based on Articles 59 and 30 of the VCLT would lead to the same result.[351] Arbitral tribunals have consistently rejected jurisdictional challenges on the basis of Articles 59 and 30 of the VCLT in intra-EU disputes.[352]

448. Based on the above, even if an incompatibility between the ECT and EU law were deemed to exist, it would be resolved in favour of the ECT. The Respondent's intra-EU jurisdictional objection should thus be rejected.

---

para. 31, **Exhibit CL-101**; Suez, Sociedad General de Aguas de Barcelona S.A., and InterAguas Servicios Integrales del Agua S.A. v. Argentine Republic, ICSID Case No. ARB/03/17, Decision on Jurisdiction, 16 May 2006, paras. 37, 57, **Exhibit CL-105**.

[346] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, Section II.B.3.

[347] Novenergia's Statement of Rejoinder on Jurisdictional Objections, Section II.B.1, 3, 4.

[348] Electrabel S.A. v. Republic of Hungary, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, paras. 4.130-4.166**, Exhibit CL-31**; RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. The Kingdom of Spain, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, paras. 71-89, **Exhibit CL-128**; Achmea B.V. (formerly Eureko B.V.) v. Slovak Republic [I], PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010, paras. 274, 282-283, **Exhibit CL-116**; Eastern Sugar B.V.(Netherlands) v. The Czech Republic, UNCITRAL, SCC Case No. 088/ 2004, Partial Award, 27 March 2007, paras. 172, 175, **Exhibit CL-106**. See also Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, **Exhibit CL-162**.

[349] Novenergia's Skeleton Arguments, para. 25.

[350] RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. The Kingdom of Spain, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, para. 87, **Exhibit CL-128**.

[351] Novenergia's Statement of Rejoinder on Jurisdictional Objections, paras. 45-54.

[352] Eastern Sugar B.V. (Netherlands) v. The Czech Republic, SCC Case No. 088/2004, Partial Award, 27 March 2007, paras. 159-180, **Exhibit CL-106**; Achmea B.V. (formerly Eureko B.V.) v. Slovak Republic [I], PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010, paras. 239-277, **Exhibit CL-116**; European American Investment Bank AG v. The Slovak Republic, UNCITRAL, PCA Case No. 2010-17, Award on Jurisdiction, 22 October 2012, para. 280, **Exhibit CL-120**; WNC Factoring Ltd v. Czech Republic, PCA Case No. 2014-34, Award, 22 February 2017, paras. 298-310, **Exhibit CL-159**; Anglia Auto Accessories Limited v. Czech Republic, SCC Case V 2014/181, Final Award, 10 March 2017, paras. 115-128, **Exhibit CL-160**; I.P. Busta v. Czech Republic, SCC Case V 2015/014, Final Award, 10 March 2017, paras. 115-128, **Exhibit CL-161**.

### 22.4 The Tribunal's Reasons

449. The Respondent contends that the Tribunal should declare that it lacks jurisdiction to hear this intra-EU dispute brought by an investor registered in Luxembourg against the Respondent. The Respondent bases this argument on the contention that the Claimant fails to comply with the requirement foreseen in Article 26(1) of the ECT which states that in order to be able to access arbitration, the dispute must be between a Contracting Party and an investor from a different Contracting Party. In other words, the Tribunal understands the Respondent to argue that the Claimant is not from an "Area" of "another Contracting Party", as set out in Article 26(1) of the ECT, since both Luxembourg and the Respondent are Member States of the EU.

450. This argument is in line with the views expressed by the European Commission in its *Amicus Curiae* Brief on 2 May 2017 (as relied upon by the Respondent) that investors of EU Member States requesting the settlement of a dispute with another EU Member State cannot be considered investors of another Contracting Party to the ECT within the realms of Article 26(1) of the ECT. According to the *Amicus Curiae* Brief, this is so because the EU itself is a Contracting party to the ECT and investors of Member States of the EU are for these purposes considered to be investors of the EU. The Respondent therefore seems to argue that pursuant to a correct interpretation of the ECT, an investor is not a national of an ECT Contracting Party to the extent that such Contracting Party is also a member of the same REIO (*i.e.* the EU) as the host State.

451. Pursuant to the plain reading of Article 26 of the ECT, disputes between a Contracting Party and an investor of another Contracting Party relating to an investment in the territory of the former may be submitted to arbitration. From this follows that the parties must be of different nationalities. The Claimant is a legal person incorporated in the Grand Duchy of Luxembourg, which is a signatory state of the ECT, and as such there is a diversity of territories and nationalities between the Claimant and the Respondent.

452. The question in dispute is rather if the Claimant, for the purposes of the ECT, should be considered an investor of the EU rather than Luxembourg and therefore, as the Respondent is also a member of the EU, if the Claimant's investment is made by an investor of the EU in the territory of the EU.

453. However, in making this argument, the Respondent fails to recognise the fact that, even though the EU itself is a Contracting Party of the ECT, this does not eliminate the EU Member States' individual standing as respondents under the ECT. The Tribunal is convinced that with a correct application of Article 26(1) of the ECT, interpreted in light of the VCLT, there is no basis for any requirements other than that the investor shall be a national of an ECT Contracting State other than the host State. Put differently, the Tribunal cannot deduce from Article 26(1) of the ECT a limitation to the effect that an investor is not a national of an

ECT Contracting Party to the extent that such a Contracting Party is also a member of the same REIO (*i.e.* the EU) as the host State. The Tribunal therefore rejects the Respondent's argument that the Tribunal lacks jurisdiction on the basis of Article 26(1) of the ECT.[353]

454. The Tribunal further notes that the Respondent at least initially in this arbitration argued that the ECT should be interpreted so as to include a disconnection clause, which would bar EU Member States from applying the ECT *inter se*.[354] To the Tribunal, this issue is a matter of interpretation of the ECT. Since it is plain from the text of the ECT that it does not contain an explicit disconnection clause, the Tribunal has understood the Respondent to argue that the intention of the Contracting Parties was to include an implicit disconnection clause in the ECT. The Tribunal here notes that, in accordance with the VCLT, the ECT should be interpreted in good faith according to the ordinary meaning of the terms of the treaty in their context and taking into account the object and purpose of the treaty.[355] On this issue the Tribunal can be brief. The terms of the ECT are clear and the Tribunal finds no basis or evidence to suggest that the Contracting Parties had any intention to include an implicit disconnection clause in the ECT that should apply to intra-EU disputes. Consequently, the objection is dismissed.

455. In addition to the jurisdictional objection relating to the Respondent's *ratione personae*, which has been dealt with above, the Respondent has raised a variety of further jurisdictional objections which will be considered in the following.

456. The gist of the Respondent's jurisdictional argument relating to the primacy of EU law in intra-EU relations is that (i) EU law should apply to any intra-EU relations and (ii) such EU law provisions prevail over and displace any other law, including international law provisions (*inter alia* the ECT). In other words, the Respondent argues that EU law should be given preference over any other law that regulates internal EU relations. The Respondent basis its primacy of EU law objection on Article 25 of the ECT. The Respondent also refers to Article 26(6) of the ECT pursuant to which disputes under the ECT shall be decided in accordance with the ECT itself "*and applicable rules and principles of international law.*" Since also EU law is an applicable set of international law rules, the Tribunal should, according to the Respondent, take it into account when resolving this dispute.

457. The Respondent further contends that this dispute affects EU law, *inter alia*, since the Tribunal is requested to rule upon state aid to renewable energies in

---

[353] This finding is in line with the conclusions reached by other tribunals seized with the same argument; cf. Charanne and Construction Investments v. Spain, SCC Case No. 062/2012, Final Award, 21 January 2016, paras. 429-431; RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. The Kingdom of Spain, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016; Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain, SCC V2013/153, Award, 12 July 2016, **Exhibit RL-72**; Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, paras. 193-196, **Exhibit CL-162**.

[354] The Kingdom of Spain's Statement of Defense, paras. 72-74.

[355] VCLT, Art. 31.

Spain, something that has the effect of distorting the competition in the common electricity market.

458. The Respondent's objection in this respect is also based on the argument that the Claimant has in fact made all of its investment under the protection of EU law and that the Claimant has only resorted to international arbitration under the ECT since it has been aware that its claims would otherwise be rejected by the CJEU.

459. *First*, the Tribunal considers that the Respondent's argument relating to Article 26(6) of the ECT to be correct would require an explicit inclusion in the text of the ECT of a clear exception as purported by Respondent. However, no such exception was introduced and the Tribunal concludes that the text of the treaty does not support such an interpretation and is further unconvinced that such an exception was intended to be included by the drafters of the ECT.

460. *Second*, the Tribunal must note that the Claimant has not submitted any of its claims based on EU law. Instead, it is clear that the claims in this arbitration are all submitted solely on the basis of the provisions contained in the ECT. The facts invoked by the Claimant in support of its claims further substantiate this conclusion. It is equally clear that the Claimant is not relying on or challenging any measures adopted or directed by the EU or any of its organs. Rather, it is clear to the Tribunal that the Claimant is exclusively relying on the adoption of measures that were of the Respondent's own volition.

461. *Third*, this Tribunal's jurisdiction is based exclusively on the explicit terms of the ECT. As is evident, the Tribunal is not constituted on the basis of the European legal order and it is not subject to any requirements of such legal order.[356]

462. *Fourth*, and in any event, with respect to the Respondent's argument of potential incompatibility between the ECT and EU law, the Tribunal does not need to determine the alleged effects hereof as it is clear that no such clash between the two legal regimes has proven to exist. This situation is similar to the one in *Charanne*, in which that tribunal correctly concluded: "*this case does not entail any assessment with regards to the validity of community acts or decisions adopted by European Union organs. Additionally, it does not concern in any way allegations by the European Union that EU law has been violated, nor claims against such organization. In this arbitration there is not an argument according to which the content of the disputed provisions [...] is contrary to EU law.*"[357]

463. Based on the findings above, *i.e.* that its jurisdiction exclusively derives from the ECT and that no conflict between EU law and the ECT has proven to exist, the

---

[356] Cf. Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 199, **Exhibit CL-162**.

[357] This is also true with respect to the issues under consideration by the tribunals in *Eiser* and *Isolux*. Cf. Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 199, **Exhibit CL-162**.

Tribunal needs not to determine the hierarchy between the ECT and EU law as this issue becomes redundant.

464. The ECT tribunals in other previous similar cases against the Respondent, namely *Charanne*, *Isolux*, *RREEF*, and *Eiser*, all followed the same approach and dismissed the jurisdictional objection of the Respondent on the same above grounds. This Tribunal finds no reason to depart from such a stable case law in resolving the present dispute, which involves similar, if not identical, legal issues.

465. In reaching the above conclusions, the Tribunal finds additional support in the recent EC Decision dated 10 November 2017. In its own words, the EC Decision affirms that the Decision "*is part of the Union law, and as such also binding on Arbitration Tribunals, where they apply Union law*" (Emphasis added.). As seen above, this Tribunal is not applying Union law. This *per se* makes the EC Decision entirely irrelevant to the determinations pertaining to this Tribunal. Moreover, the EC Decision was adopted in order to regulate certain State aid issues under EU law, whereas the present dispute does not concern matters which are governed by EU law. It rather concerns certain alleged breaches of the ECT by the Kingdom of Spain, particularly the breach of the duty to accord the fair and equitable treatment ("**FET**") to foreign investors in the meaning of the ECT and of public international law, a legal notion which does not even exist, as such, in the EU legal order. Thus, the analysis of the EC Decision provides comfort to the Tribunal that a foreign investor who initiates an ECT arbitration towards a host State invoking protection under the FET standard does not abuse its rights nor incorrectly bypasses EU law. This is because EU law does not recognise, nor prohibit, a similar right. Simply said, the two legal orders do not share the same subject matter, but may easily coexist to the extent that they do not interfere with each other.

466. Consequently, the Respondent's jurisdictional objection relating to intra-EU disputes (Preliminary Objection A) is dismissed.

## 23. Does the Taxation Carve-out in Article 21 of the ECT Apply to Law 15/2012 (Preliminary Objection B)?

### 23.1 Introduction

467. The Claimant's position with respect to Preliminary Objection B has been outlined in, *inter alia*, Sections II.C.1 of the Statement of Reply and Answer to Jurisdictional Objections, Section III of the Statement of Rejoinder on Jurisdictional Objections and Section II.B of the Claimant's Skeleton Arguments.

468. The Respondent's position with respect to the issue of Preliminary Objection B has been outlined in, *inter alia*, Section III.B of the Statement of Defense and Jurisdictional Objections, Section III.B of the Statement of Rejoinder and Reply to Jurisdictional Objections, and Section II of the Respondent's Skeleton Arguments.

469. For the avoidance of doubt, the below Sections are merely a summary of the Claimant's and Respondent's respective positions in this respect. The Tribunal's reasons and final decision are based on the entirety of the Parties' arguments, both in their submissions and during the Hearing. Insofar as particular arguments are not explicitly discussed here, the Tribunal has nevertheless considered them.

## 23.2  The Respondent's Position

470. As Preliminary Objection B, the Kingdom of Spain asserts the lack of jurisdiction of the Tribunal to hear the claim on an alleged breach by the Kingdom of Spain of section (1) of Article 10 of the ECT through the introduction of the Tax in Law 15/2012. Such lack of jurisdiction is due to the absence of consent from the Kingdom of Spain to submit that issue to arbitration given that, pursuant to Article 21 of the ECT, section (1) of Article 10 of the ECT does not generate obligations regarding taxation measures of the Contracting Parties.

471. Specifically, the main arguments on which the Kingdom of Spain relies are, in summary, the following:

- In accordance with Article 26 of the ECT, the Kingdom of Spain has only provided its consent to submit to arbitration disputes related to alleged breaches of obligations derived from Part III of the ECT.

- In accordance with Article 21 of the ECT, section (1) of Article 10 of the ECT, invoked by the Claimant, although located in Part III of the ECT, does not generate obligations with respect to taxation measures of the Contracting Parties.

- Pursuant to Article 21 of the ECT on taxation, taxation measures are excluded from the scope of application of the ECT (taxation carve-out) with certain exceptions (claw-backs) stated in the said Article 21. Section (1) of Article 10 of the ECT is not found among those exceptions.

- The provisions relating to the Tax of Law 15/2012 are a taxation measure for the purposes of the ECT. According to Article 21(7) of the ECT, for the purposes of said Article 21, the term "taxation measure" includes any provision relating to taxes of the domestic law of the Contracting Party. In this case we are dealing with provisions relating to a tax – the Tax – of the domestic law of the Kingdom of Spain; Law 15/2012.

- The Claimant tries to avoid the taxation carve-out stated in Article 21 of the ECT with respect to section (1) of Article 10 of the ECT by trying to argue that the Tax is allegedly not a taxation measure for the purposes of the ECT. To do so, the Claimant tries to sustain that the Tax is not allegedly a *bona fide* taxation measure.

472.    In light of the above, the fundamental question is thus to determine whether the provisions relating to the Tax of Law 15/2012 are a taxation measure for the purposes of the ECT, because, if they are, they are excluded from the scope of application of section (1) of Article 10 of the ECT invoked by the Claimant.

### 23.2.1 The Provisions Relating to the Tax Are a Taxation Measure, in Accordance With the Definition of Taxation Measure of Article 21(7)(a)(i) of the ECT

473.    As the Kingdom of Spain stated in its Statement of Defense and Jurisdictional Objections, Article 21 of the ECT itself makes reference to what should be understood as a "taxation measure" for the purposes of said Article 21. In this regard, section (7)(a)(i) of Article 21 of the ECT provides that the term "taxation measure" includes any provisions relating to taxes of domestic law of the Contracting Party:

> "7. For the purposes of this Article:
>
> a) The term "Taxation Measure" includes:
>
> (i)    <u>any provision relating to taxes of the domestic law of the Contracting Party</u> or of a political subdivision thereof or a local authority therein; and;
>
> (ii)    any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound."[358] (Emphasis added to Exhibit RL-3.)

474.    As was also stated in the Statement of Defense and Jurisdictional Objections, of the Kingdom of Spain, there is no doubt that the provisions on the Tax are provisions relating to a tax of the domestic law of a Contracting Party for the following reasons:

475.    <u>Law 15/2012 is part of the domestic law of the Kingdom of Spain</u>. Law 15/2012 is a national law of the Kingdom of Spain, which was approved by the Spanish Parliament (formed by the Congress of Deputies and the Senate) in accordance with the ordinary legislative procedure under Spanish law. Law 15/2012 was passed in exercise of the legislative authority and primary power to impose taxes through legislation that the Spanish Constitution grants the Spanish State; and

476.    <u>The provisions on the Tax of Law 15/2012 are provisions relating to a tax</u>. There is no doubt that the Tax is a tax, both from the perspective of Spanish law and from the perspective of international law. The Kingdom of Spain hereby refers to

---

[358] Energy Charter Treaty, Art. 21(7)(a), **Exhibit RL-3**.

what was expounded in this regard in the Statement of Defense and Jurisdictional Objections.[359]

477.    Therefore, there is no doubt that the provisions relating to the Tax of Law 15/2012 are a taxation measure according to the definition of taxation measure contained in Article 21(7)(a)(i) of the ECT.

### 23.2.2 In Any Event, It Must Be Concluded That the Tax Is a Bona Fide Taxation Measure

478.    According to the Kingdom of Spain, it is clear that the provisions relating to the Tax of Law 15/2012 are a taxation measure for the purposes of ECT according to Article 21(7)(a)(i) of the ECT.

479.    Nevertheless, the Claimant considers that, in order to determine that we are dealing with taxation measures for the purposes of the ECT, the above is not sufficient and it is necessary to carry out an additional analysis of the Tax, which implies to a certain extent examining the economic effects of this tax.

480.    However, in order to determine that we are dealing with taxation measures for the purposes of the ECT, that additional analysis of the Tax wished by the Claimant does not need to be undertaken.

481.    Firstly, the Claimant resorts to the *Yukos v. the Russian Federation* award to analyse the good faith of this taxation measure. Such award has been recently quashed. In any case, the good faith analysis of the taxation measures conducted in the *Yukos v. the Russian Federation* case is not applicable in the present case. The arbitral tribunal in the *Yukos v. the Russian Federation* case made it clear that there were "extraordinary circumstances" in that case which do not concur in the present case. In this regard, the *Yukos* tribunal considered as extraordinary circumstances that the Russian taxation measures pursued a purpose that was "entirely unrelated" to the purpose of raising revenue for the State, such as the destruction of a company or the elimination of a political opponent:

> "Secondly, the Tribunal finds that, in any event, the carve-out of Article 21.1 can apply only to <u>bona fide taxation actions, i.e., actions that are motivated by the purpose of raising general revenue for the State</u>. By contrast, actions that are taken only under the guise of taxation, but in reality aim to achieve an <u>entirely unrelated purpose (such as the destruction of a company or the elimination of a political opponent)</u> cannot qualify for exemption from the protection standards of the ECT under the taxation carve-out in Article 21(1). As a consequence, the Tribunal finds that it does indeed have 'direct' jurisdiction over claims

---

[359] The Kingdom of Spain's Statement of Defense and Jurisdictional Objections, paras. 140-192.

under Article 13 (as well as Article 10) <u>in the extraordinary circumstances of this case</u>."[360] (Emphasis added to Exhibit RL-24.)

482.    Furthermore, the good faith analysis of the Tax that the Claimant proposes implies examining the economic effects of said tax. In this respect, the Respondent refers to what the arbitral tribunal of the *EnCana v. Ecuador* case stated:

> "<u>The question whether something is a tax measure is primarily a question of its legal operation, not its economic effect</u>. [...] The economic impacts or effects of tax measures may be unclear and debatable; nonetheless, a measure is a taxation measure if it is part of the regime for the imposition of a tax."[361] (Emphasis added to Exhibit RL-24.)

483.    There is no doubt that in the present case we are dealing with a taxation measure in view of its legal operation. Therefore, in order to determine that we are dealing with a taxation measure for the purposes of the ECT, it is not appropriate to examine the economic effect of the Tax, as intended by the Claimant.

484.    In any case, even in the hypothetical event that the Tribunal considered that in order to determine that we are dealing with a taxation measure for the purposes of the ECT, an additional analysis of the Tax is necessary, as the Claimant proposes, it must be concluded that the Tax is, in any event, a *bona fide* taxation measure. The Claimant has the burden to prove the alleged bad faith and it has not proven it at all.

485.    According to the Claimant,[362] the Tax is allegedly not a *bona fide* taxation measure basically for the following reasons: i) the Tax is aimed at all energy generators, both conventional and renewable, with no distinction between both technologies; ii) the Tax allegedly discriminates against renewable producers in favour of conventional producers given that the first cannot pass on at least part of the cost of the tax to the consumers; and iii) the Tax allegedly constitutes a disguised tariff cut for RE facilities.

486.    The arguments raised by the Claimant lack any merit.

### 23.2.3 The Tax Applies to All Energy Producers, Both Renewable and Conventional

487.    As has already been stated, the Tax is a tax of general application. That is, it applies to all energy production facilities, both renewable and conventional.

---

[360] Yukos Universal Limited (Isle of Man) v. Russian Federation, PCA Case No. AA 227, Final Award of 18 July 2014, para. 1407, **Exhibit RL-71**.

[361] EnCana Corporation v. Republic of Ecuador, LCIA Case No. UN 3481, Award of 3 February 2006, para. 142, **Exhibit RL-24**.

[362] Novenergia's Statement of Claim, paras. 220-236; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, part II.C.1, paras. 236, 130-150.

488.    In addition, Law 15/2012 grants exactly the same treatment to all taxpayers, whether they are renewable or conventional producers.

489.    One of the arguments that the Claimant uses to try to sustain that the Tax is not allegedly a *bona fide* taxation measure is that it does not contemplate distinctions between RE producers and conventional producers.[363] In other words, it appears that the Claimant attacks the good faith of the measure because renewable producers have not been granted a different treatment in the Tax through for example tax exemptions, reductions or deductions.

490.    The fact that the Tax applies to all producers, both renewable and conventional, and the fact that Law 15/2012 grants the same treatment to all of them cannot be construed in any way as a reason for considering that the Tax is not a *bona fide* taxation measure.

491.    Importantly, the arbitral tribunal in the case *Isolux Infrastructure Netherlands BV v. the Kingdom of Spain* agreed with the Kingdom of Spain as it has declared its lack of jurisdiction to hear the dispute on an alleged breach of obligations derived from section (1) of Article 10 of the ECT through the introduction of the Tax by Law 15/2012. The Claimant's arguments on the Tax in the *Isolux* case were coincident with those of the Claimant in the present case.

### 23.2.4 The General Application of the Tax Is a Legitimate Option of the State Legislator, as Recognised by the Spanish Constitutional Court, and Is Linked to the Environmental Nature of the Tax

492.    Respondent underlines that the Spanish Constitution grants the State the sovereign power to establish taxes: "*The primary power to raise taxes is vested exclusively in the State by means of law.*"[364]

493.    It cannot be argued in any way that the Tax is not a *bona fide* taxation measure because Law 15/2012 grants the same treatment to all those obliged to pay the tax, without including tax benefits for renewable producers.

494.    This has been stated by the Spanish Constitutional Court, the supreme interpreter of the Spanish Constitution, in its ruling of 6 November 2014 which dismissed the unconstitutionality appeal brought by the Andalusia government against various provisions of Law 15/2012.

495.    In addition, the fact that Law 15/2012 establishes the Tax for all electric energy production facilities, whatever the technology used, is linked to the environmental nature of the tax.

---

[363] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 146.

[364] Spanish Constitution of 1978, Art. 133(1), **Exhibit R-15**.

496.  In short, the fact that Law 15/2012 configures the Tax as a tax of general application, applicable to both conventional and renewable producers, granting the same treatment to all of those taxpayers without including tax benefits for renewable producers, cannot in any way be construed as a reason to deny the *bona fide* nature of this taxation measure.

### 23.2.5 The Tax Does Not Discriminate Against Renewable Producers in Terms of Repercussion

497.  The repercussion of a tax can be defined as the transfer of the amount of the tax in question by the taxpayer to another person.

498.  In general, the repercussion of a tax can be of two types: legal repercussion and economic repercussion.

499.  *Firstly*, there is no discrimination against renewable producers from the perspective of legal repercussion.

500.  This is because Law 15/2012 grants the same treatment to all taxpayers, whether they are renewable or conventional producers. Such equal treatment is also granted regarding repercussion.

501.  The Tax is a direct tax, levied on a direct manifestation of the economic capacity of those obliged to pay it as is the obtention of income.

502.  Given the nature of the direct tax of the Tax, and being typical of direct taxes the absence of legal repercussion of their amount as we have seen, Law 15/2012 does not establish the repercussion of the amount of the Tax by any of the Tax taxpayers – whether they are conventional producers or renewable producers – to other persons.

503.  *Secondly*, there is no discrimination against renewable producers from the perspective of economic repercussion either.

504.  The Tax is one of the costs that are remunerated to the renewable producers to whom the regulated regime applies, such as the producers which are parties to this arbitration. Thus, the economic effect of the Tax on these renewable producers is neutralised.

505.  That is, the specific remuneration received by renewable producers allows them to recover certain costs which, unlike conventional technologies, they cannot recover on the market, and also to obtain a reasonable return. The Tax is precisely one of those costs that are remunerated.

### 23.2.6 The Objective of the Tax Is to Raise Revenue for the Spanish State for Public Purposes

506.    As have already been mentioned, when analysing why the Tax meets the definition of tax under international law, previous arbitral tribunals have recognised that the purpose of the Tax is to raise revenue for the Spanish State for public purposes.

507.    In short, the Tax does not seek to perform a disguised cut of the tariffs for RE producers. The allegation of the Claimant that the Tax was designed to carry out such a disguised cut lacks any founding, bearing also in mind that, the economic effect of the Tax on renewable producers such as those involved in this arbitration, has been neutralised. The aim of the Tax is to raise revenue for the Spanish State for public purposes.

## 23.3    The Claimant's Position

508.    The Respondent argues that the present Tribunal lacks jurisdiction over the Claimant's Article 10(1) ECT claims based on Law 15/2012 because the carve-out in Article 21 ECT exempts taxation measures from the scope of the protections provided for in Article 10(1) ECT.[365] According to the Claimant, the Respondent's objection should be rejected, as Article 21 ECT only applies to taxes adopted *bona fide*. The 7% tax imposed on the Claimant pursuant to Law 15/2012 was not a *bona fide* tax, and therefore falls outside the scope of the carve-out in Article 21 ECT.

### 23.3.1 Article 21 ECT Only Applies to Bona Fide Taxation Measures

509.    Article 21 ECT includes a requirement that a tax be adopted *bona fide* in order to fall within the taxation measures carve-out.[366] This is supported by investment treaty tribunals, and by doctrine.

510.    The arbitral tribunals in *RosinvestCo v. Russian Federation, Renta 4 v. Russian Federation* and *Yukos v. Russian Federation* have consistently held that the mere labelling of a measure as a "tax" does not automatically fulfil the requirements of a tax carve-out in an investment protection agreement, and that in order to do so, a tax must be a *bona fide* taxation measure.[367] Furthermore, as underlined by Sir Hersch Lauterpacht: "[*t*]*here is no right, however well established, which*

---

[365] The Kingdom of Spain's Statement of Defense and Jurisdictional Objections, III. B; the Kingdom of Spain's Rejoinder Statement and Jurisdictional Objections, III.B.

[366] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, Section II.C.1; Novenergia's Statement of Rejoinder on Jurisdictional Objections, Section III.A.

[367] Yukos Universal Limited (Isle of Man) v. Russian Federation / Hulley Enterprises Limited (Cyprus) v. Russian Federation / Veteran Petroleum Limited (Cyprus) v. Russian Federation, PCA Case No. AA 228, Final Award, 18 July 2014, para. 1407, **Exhibit CL-126**; RosinvestCo Ltd. v. Russian Federation, SCC Case No. V079/2005, Final Award, 12 September 2010, para. 628, **Exhibit CL-115**; Renta 4 S.V.S.A., Ahorro Corporación Emergentes F.I., Ahorro Corporación Eurofondo F.I., Rovime Inversiones SICAV S.A., Orgor de Valores SICAV S.A., GBI 9000 SICAV S.A. v. Russian Federation, SCC Case No. 24/2007, Award, 20 July 2012, para. 179, **Exhibit CL-119**.

*could not, in some circumstances, be refused recognition on the ground that it has been abused*".[368] This principle likewise applies to Article 21 ECT.

511.   Consequently, a tax that has been adopted *mala fide* does not fall within the carve-out of Article 21 ECT.[369]

### 23.3.2 The Respondent Adopted Law 15/2012 Mala Fide

512.   A tax is adopted *bona fide* if the state's intention was only to raise revenues in accordance with the stated purpose of that tax; any motivation other than the public purpose of collecting taxes has to be considered *mala fide*.[370]

513.   The Respondent's stated purpose for the imposition of the 7% tax on electricity production through Law 15/2012 was to "*stimul[ate] [...] sustainable development, both economically and socially as well as environmentally*" and focused on the "*internalisation of environmental costs arising from the production of electric energy*".[371]  However, the actual aim of Law 15/2012 had nothing to do with these purported objectives. Its real purpose was to function as a backdoor tariff aimed at further reducing the income the Respondent had guaranteed to PV investors.[372]

514.   *First,* Law 15/2012 applied indiscriminately to both renewable and non-renewable energy producers, contradicting the "polluter pays" principle.[373] *Second,* Law 15/2012 did not take into consideration the higher cost of RE production compared to traditional energy. *Third,* Law 15/2012 likewise did not take into account the fact that RE producers could not pass on the tax burden to final consumers, as they received a regulated tariff.[374] *Finally,* the Respondent knowingly chose to adopt a tax that disadvantaged RE producers,[375] even though the measures for guaranteeing the stability of the electricity system proposed in the NEC's 2012 Report did not include the taxation of RE producers.[376]

---

[368] H. Lauterpacht, Development of International Law by the International Court, 1958, p. 164, **Exhibit CL-163**. See also A. Gildemeister, "Investment Law and Taxation", in M. Bungenberg, J. Griebel et al (eds.), International Investment Law, 2015, paras. 32-33, **Exhibit CL-164**.

[369] Novenergia's Statement of Rejoinder on Jurisdictional Objections, Section III.B, paras. 108-109.

[370] Novenergia's Statement of Claim, paras. 220-236; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 130-150.

[371] Law 15/2012, Preamble I, **Exhibit C-8**.

[372] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 144-145, 149; Novenergia's Statement of Rejoinder on Jurisdictional Objections, para. 97, 108.

[373] First KPMG Report, p. 13.

[374] First Compass Lexecon Report, para. 4.

[375] See Spanish Parliamentary debates: Minutes of the Parliamentary Session, No. 69, 30 October 2012, pp. 38, 41, 46-47, **Exhibit C-95**.

[376] Novenergia's Statement of Rejoinder on Jurisdictional Objections, para. 106; Report Regarding the Spanish Energy Sector Part I. Measurements in order to guarantee the financial sustainability of the electric system, National Energy Commission, 7 March 2012, p. 58, **Exhibit C-194**.

515.   For the reasons enumerated above, Law 15/2012 was not adopted *bona fide*, and it therefore does not fall within the carve-out of Article 21 ECT.

### 23.4   The Tribunal's Reasons

516.   Law 15/2012 introduced a new tax on the value of the electricity produced in Spain. Law 15/2012 is one of the challenged measures which the Claimant argues constitute a breach of the Respondent's obligations under the ECT.

517.   On the basis of Article 21(1) of the ECT, the Respondent argues that the Tribunal lacks jurisdiction to hear any claims based on alleged breaches of Article 10(1) of the ECT by virtue of implementation of Law 15/2012. The basis for the Respondent's objection is that Article 21(1) of the ECT is a "carve-out" provision which exempts tax measures from the scope of the ECT. Relevant parts of Article 21(1) stipulates:

> "Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties."[377]

518.   The Claimant argues that the Respondent's objection should be rejected as Article 21 of the ECT only applies to taxes adopted *bona fide.* The Tax imposed on the Claimant pursuant to Law 15/2012 would not be a *bona fide* tax, and therefore would fall outside the scope of the carve-out in Article 21 of the ECT.

519.   For the Tribunal there is no doubt that the provisions of Law 15/2012 are provisions relating to a tax of the domestic law of a Contracting Party as set out by Article 21, section (7)(a)(i) of the ECT. Consequently, the Tribunal is convinced that Law 15/2012 is indeed a taxation measure in its nature, which on its face is subject to the carve-out from the protection of the ECT.

520.   The question then is whether Law 15/2012 is a taxation measure enacted *bona fide*. This needs to be assessed because in deciding whether a tax measure is covered by the carve-out of Article 21(1) of the ECT, it is necessary to review whether its objective is truly taxation, *i.e.* whether Law 15/2012 was enacted in good faith. The *bona fide* criterion has been considered and confirmed by several arbitral tribunals.[378] For instance, the arbitral tribunal in the *Yukos* case took the following view:

> "[I]n any event, the carve-out of Article 21(1) can apply only to bona fide taxation actions, i.e. actions that are motivated by the purpose of raising general revenue for the State. By contrast, actions that are taken only under the guise of taxation, but in reality aim to achieve an entirely

---

[377] Energy Charter Treaty, **Exhibit CL-1**.

[378] RosInvestCo Uk Ltd v. the Russian Federation, SCC Case No. V079/2005, Award, 12 September 2010, para. 628, **Exhibit CL-115**; Renta 4 S.V.S.A., Ahorro Corporación Emergentes F.I., Ahorro Corporación Eurofondo F.I., Rovime Inversiones SICAV S.A., Orgor de Valores SICAV S.A., GBI 9000 SICAV S.A. v. Russian Federation, SCC Case No. 24/2007, Award, 20 July 2012, para. 179, **Exhibit CL-119.**

> unrelated purpose (such as the destruction of a company or the elimination of a political opponent) cannot qualify for exemption from the protection standards of the ECT under the taxation carve-out of Article 21(1)."[379]

521.    The Tribunal agrees that for the taxation carve-out to apply, the taxation measure in question needs to have been adopted in good faith. However, the starting point, or the assumption, should always be that the taxation measure was in fact adopted in good faith.[380] The consequence of this assumption is that the Claimant bears the burden of proving to the Tribunal that Law 15/2012 was not enacted for the purpose of raising general revenue for the state, but for a different purpose, *i.e.* that the measure therefore was enacted *mala fide*.

522.    In this respect, the Tribunal notes that the evidentiary threshold incumbent on the Claimant is high since "[s]*tates have a wide latitude in imposing and enforcing taxation law, even if resulting in substantial deprivation*."[381] This is supported by the fact that the arbitral tribunals in the *Yukos* and *RosInvestCo* cases contrasted the *bona fide* measures with measures taken for the purposes of destroying a party or political adversary.[382]

523.    The gist of the Claimant's argument is that a tax is adopted *bona fide* only if the state's intention was to raise revenues in accordance with the stated purpose of that tax. According to the Claimant, the stated purpose of Law 15/2012 had nothing to do with its real objective, which was to function as a backdoor tariff aimed at further reducing the income the Respondent had guaranteed to PV investors. The Tax was, therefore, adopted *mala fide*.

524.    The Tribunal has reviewed and assessed the basis and the evidence put forth by the Claimant for the purposes of establishing that Law 15/2012 was a *mala fide* taxation but is not convinced. It is not easy to overthrow the presumption that a tax measure introduced by a state is enacted *bona fide* and the Tribunal notes that the actions relied upon by the Claimant in this respect fall short of the extreme actions that according to other arbitral tribunals constitute viable *mala fide* grounds.

525.    According to its above findings, the Tribunal does not have jurisdiction to rule on the claims presented by the Claimant regarding the alleged breach by the Respondent of its obligations under Article 10(1) of the ECT by the enactment of

---

[379] Yukos Universal Limited (Isle of Man) v. Russian Federation, PCA Case No. AA 227, Final Award of 18 July 2014, para. 1407, **Exhibit RL-71.**

[380] Renta 4 S.V.S.A., Ahorro Corporación Emergentes F.I., Ahorro Corporación Eurofondo F.I., Rovime Inversiones SICAV S.A., Orgor de Valores SICAV S.A., GBI 9000 SICAV S.A. v. Russian Federation, SCC Case No. 24/2007, Award, 20 July 2012, para. 181, **Exhibit CL -119.**

[381] RosInvestCo Uk Ltd v. the Russian Federation, SCC Case No. V079/2005, Award, 12 September 2010, para. 580, **Exhibit CL-115.**

[382] Yukos Universal Limited (Isle of Man) v. Russian Federation, PCA Case No. AA 227, Final Award of 18 July 2014, para. 1407, **Exhibit RL-71**; RosInvestCo Uk Ltd v. the Russian Federation, SCC Case No. V079/2005, Award, 12 September 2010, **Exhibit CL-115.**

Law 15/2012. Consequently, the Claimant's claims in this respect shall be dismissed for lack of jurisdiction.

## IX.    MERITS

## 24.    When Was the Claimant's Investment Made?

### 24.1    Introduction

526.    The Claimant's position with respect to the issue of the timing of its investment has been outlined in, *inter alia*, Section II.A.1 of the Statement of Claim, Section III.D of the Statement of Reply and Answer on Jurisdictional Objections, Section III.C of the Claimant's Skeleton Arguments and Section II and III.B of the Claimant's Post-Hearing Brief and Appendix B thereto.

527.    The Respondent's position with respect to the issue of the timing of Claimant's investment has been outlined in, *inter alia*, Section IV.E.6 of the Statement of Defense and Jurisdictional Objections, Section IV.A.1 of Statement of Rejoinder and Reply to Jurisdictional Objections and Section I.C.1.2 of the Respondent's Post-Hearing Brief.

528.    For the avoidance of doubt, the below Sections are merely a summary of the Claimant's and Respondent's respective positions in this respect. The Tribunal's reasons and final decision are based on the entirety of the Parties' arguments, both in their submissions and during the Hearing. Insofar as particular arguments are not explicitly discussed here, the Tribunal has nevertheless considered them.

### 24.2    The Claimant's Position

529.    The Claimant's position in this respect has been set out in Section V.9 above and reference is made thereto.

### 24.3    The Respondent's Position

530.    The Respondent's position in this respect has been set out in Section VI.13 above and reference is made thereto.

### 24.4    The Tribunal's Reasons

531.    The date of the Claimant's investment is of relevance in this case, *inter alia*, because it lays the foundation in terms of timing for the assessment of the Claimant's legitimate expectations.

532.    The legitimate expectations of an investor has generally been considered to be grounded in the legal order of the host State as it stands at the time the investor acquires or makes the investment. Arbitral tribunals seized with the task of determining the relevant timing of the legitimate expectations of an investor

have stressed that the legal framework of the host State as it existed at the time of making the investment is decisive for any legitimate expectations. In the words of the *National Grid v. Argentina* tribunal:

> "[T]his standard protects the reasonable expectations of the investor at the time it made the investment and which were based on representations, commitments or specific conditions offered by the State concerned. Thus, treatment by the State should 'not affect the basic expectations that were taken into account by the foreign investor to make the investment'."[383]

533. In another case, *SD Myers v Canada*, the arbitral tribunal made the same point when it stated that the parties acted on the basis of the law as it appeared to exist at the time of the investments.[384] There are further examples where arbitral tribunals have rejected the investor's claim based on the fact that the disputed regulations were already in existence at all times relevant to the investor so that no *de jure* change had been made.[385]

534. As is clear from the above references, while the FET standard has an objective core, its application will depend on the expectations that were cultivated and fostered by local laws and regulations as they were, specifically at the time of the investment.

535. The timing of when the legitimate expectations under Article 10 of the ECT shall be assessed is no different from what has been accounted for above. Consequently, and as will be expounded upon in Section 25 below, the Claimant's legitimate expectations shall be assessed at the time it made its investment in the Respondent's territory.

536. The Respondent argues that the Claimant's investment extended from July 2007 to, at least, the end of the construction of the PV Plants in November 2008. But the Respondent also refers to the dates of the project finance agreements to project the date of the Claimant's investment into 2010.

537. The Claimant on the other hand argues that it made its investment on 13 September 2007 when the Claimant acquired a 100% interest in Solarsaor, the first of the PV Plants.

538. Based on the above, the Tribunal is of the view that the relevant time for making the assessment of the Claimant's legitimate expectations is at the time when the investment was made. The more difficult issue is to determine in an actual case when such investment was in fact made. It is of course not unusual in larger projects that the investment phase transcends through various stages;

---

[383] National Grid v. Argentina, Award 3 November 2008, para. 173 (footnote omitted), **Exhibit CL-26**.

[384] SD Myers v. Canada, Second Partial Award, 21 October 2002.

[385] Feldman v. Mexico, Award, 16 December 2002, para. 128; Mondev v. United States, Award, 12 October 2002, para. 156.

negotiations, due diligence, internal corporate decisions, external contractual commitments, financing, acquisition, construction, registration, start-up and the first generation of revenues. In addition, the investment is sometimes structured to be executed in consecutive stages even if there are binding commitments predating such subsequent stages.

539.    The Tribunal is of the view that the timing of the investor's *decision* to invest sets a backstop date for the evaluation of legitimate expectations. In the present case it is evidenced that the Claimant made its investment on 13 September 2007 when it acquired a 100% interest in the PV Plant Solarsaor. As from that date the Claimant had irreversibly committed to investing in the Spanish PV sector, which commitments were subsequently fulfilled as the Claimant expended further funds for the development of the other PV Plants relevant for this arbitration. Consequently, the Tribunal finds that the Claimant made its investment no later than 13 September 2007.

540.    The Tribunal takes further note of the fact that by September 2008 all the PV Plants were in any event registered under the Special Regime and had commenced operations.

541.    In relation to the Respondent's reference to the 2010 project finance agreements, the Tribunal accepts the Claimant's explanation that the reason that these agreements post-date the investment is that they are re-financing agreements of an earlier concluded bridge agreement that related to all the PV Plants.

## 25.    Has the Respondent Failed to Accord at All Times to the Claimant and its Investment Fair and Equitable Treatment?

### 25.1    Introduction

542.    The Claimant's position with respect to the issue of FET has been outlined in, *inter alia*, Section IV.A.2 of the Statement of Claim, Section IV.A.2 of the Statement of Reply and Answer on Jurisdictional Objections, and Section IV.B of the Claimant's Skeleton Arguments.

543.    The Respondent's position with respect to the issue of FET has been outlined in, *inter alia*, Section IV.J.1 and 2 of the Statement of Defense and Jurisdictional Objections, Section IV.B.2–4 of Statement of Rejoinder and Reply to Jurisdictional Objections and Section IV.1–3 of the Respondent's Skeleton Arguments.

544.    For the avoidance of doubt, the below Sections are merely a summary of the Claimant's and Respondent's respective positions in this respect. The Tribunal's reasons and final decision are based on the entirety of the Parties' arguments,

both in their submissions and during the Hearing. Insofar as particular arguments are not explicitly discussed here, the Tribunal has nevertheless considered them.

## 25.2   The Claimant's Position

### 25.2.1 The Fair and Equitable Treatment Standard under the ECT

545.   The FET standard under the ECT is a broad obligation that encompasses good faith, due process, non-discrimination, proportionality, and the obligation to create and maintain stable and transparent conditions for investors and their investments, and is informed by the stability and transparency standard in the first sentence of Article 10(1).[386] It likewise protects the investor's legitimate expectations, which arise from undertakings and explicit or implicit assurances made by or on behalf of the host State, and which can take the form of conduct or statements of the host State, including its laws and regulations.[387]

546.   Legitimate expectations arise naturally from undertakings and assurances made by, or on behalf of, the state. These need not be specific. In *Electrabel v. Hungary*, the arbitral tribunal explained that *"[w]hile specific assurances given by the host State may reinforce the investor's expectations, such an assurance is not always indispensable"*.[388] These undertakings or assurances can be explicit or implicit.[389]

547.   Further, undertakings or assurances can take the form of conduct or statements by the host State. Intent is not needed. Rather, the question is whether the statement or conduct is objectively sufficient to create legitimate expectations in the recipient.[390] Such conduct or statements can take the form of laws or regulations.

548.   An investor can have a legitimate expectation that a regulatory framework will be stable. Such a legitimate expectation arises from prospective laws as well as laws which aim at attracting foreign investors. If the regulatory framework in question was designed to attract investors, such investors will have a legitimate expectation that the regulatory framework will be stable. The arbitral tribunal in *Total v. Argentina* explained that it is irrelevant if a regulation is general, so long as it is prospective. *I.e.*, "*aimed at providing a defined framework for future operations*".[391]

---

[386] Novenergia's Statement of Claim, paras. 334-340; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 562, 565.

[387] Novenergia's Statement of Claim, paras. 341-346; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 604-605, 609.

[388] Electrabel S.A. v. Hungary, ICSID No. ARB/07/19, Award of 25 November 2015, para. 7.78, **Exhibit RL-45**.

[389] Total S.A. v. Argentine Republic, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010, para. 119-120, **Exhibit CL-30**; Ioan Micula, Viorel Micula, S.C. European Food S.A., S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania, ICSID Case No. ARB/05/20, Award, 11 December 2013, para. 669, **Exhibit CL-32**.

[390] Ioan Micula, Viorel Micula, S.C. European Food S.A., S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania, ICSID Case No. ARB/05/20, Award, 11 December 2013, para. 669, **Exhibit CL-32**.

[391] Total S.A. v. Argentine Republic, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010, para. 122, **Exhibit CL-30**.

549.    In addition, an expectation that the regulatory framework will be stable can arise from, or be strengthened by, state conduct or statements. Intent is not needed. Rather, the question is whether the statement or conduct is objectively sufficient to create legitimate expectations in the recipient. This was succinctly explained by the arbitral tribunal in *Micula v. Romania*.[392]

550.    The FET standard requires a state to act transparently. This approach has been adopted by arbitral tribunals deciding cases arising from the ECT.[393] The arbitral tribunal in *Electrabel v. Hungary* explained that "*the obligation to provide fair and equitable treatment comprises […] an obligation to act transparently*".[394] If the state does not, it will have failed to observe its obligation under Article 10(1) ECT.

### 25.2.2 The Respondent Failed to Conform to the Fair and Equitable Treatment Standard

551.    In the present case, the Kingdom of Spain induced PV investments under RD 661/2007 by offering guaranteed tariffs to RE producers for the lifetime of the PV plants under the Special Regime.[395] The Kingdom of Spain then retroactively repealed the Special Regime.[396] This truncated the Claimant's legitimate expectations that were created through the Kingdom of Spain's assurances and undertakings.

552.    It is indisputable that Novenergia's expectations were legitimate and reasonable in light of the conditions offered by the Kingdom of Spain at the time the Claimant invested.

553.    *First*, the Claimant's expectations were established through the Kingdom of Spain's assurances and undertakings. From 1997, the Kingdom of Spain began creating an attractive framework for RE investors. RD 661/2007 encouraged investment in the RE sector and was meant to "*provide sufficient guarantees so as to achieve stable and predictable economic incentives throughout the lifespan of the [renewable energy production] facility*".[397] Plants that qualified and registered under RD 661/2007, would be paid a FIT with respect to the total net energy produced by the plants and for their entire lifespan.[398] The Claimant

---

[392] Ioan Micula, Viorel Micula, S.C. European Food S.A., S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania, ICSID Case No. ARB/05/20, Award, 11 December 2013, para. 669, **Exhibit CL-32**.

[393] Mohammad Ammar Al-Bahloul v. Republic of Tajikistan, SCC Case No. V (064/2008), Partial Award on Jurisdiction and Liability, 2 September 2009, paras. 182-183, **Exhibit CL-27**; Electrabel S.A. v. Hungary, ICSID No. ARB/07/19, Award of 25 November 2015, **Exhibit RL-45**.

[394] Electrabel S.A. v. Hungary, ICSID No. ARB/07/19, Award of 25 November 2015, para. 7.74, **Exhibit RL-45**.

[395] Novenergia's Skeleton Argument, section III.A; Statement of Claim, Section III.B; Statement of Reply and Answer to Jurisdictional Objections, Section III.B.

[396] Statement of Claim, Section III.D; Statement of Reply and Answer to Jurisdictional Objections, Section III.F.

[397] NEC Report 3/2007 of 14 February 2007, p. 19, **Exhibit C-73**.

[398] RD 661/2007, Arts. 17, 36, **Exhibit C-3**, see also Arts. 20, 24.

invested under RD 661/2007 and expected to receive a fixed FIT for the lifespan of its PV Plants.

554.   *Second*, the Claimant's expectations were legitimate and reasonable,[399] as they arose out of a stable legal framework that was tailored to attract PV investments in the RE sector by offering income visibility through a guaranteed FIT for the lifetime of such investments.[400] According to the *Electrabel v. Hungary* tribunal, *"[f]airness and consistency must be assessed against the background of information that the investor knew and should reasonably have known at the time of the investment".*[401] A reasonable investor could not have anticipated that the Kingdom of Spain would retroactively dismantle the legal regime considering the particular circumstances. The Claimant's expectations were thus legitimate.[402]

555.   *Third*, the Claimant's expectations were reasonable in light of all the circumstances surrounding Novenergia's investment.[403] An investor may have a legitimate expectation that the regulatory framework will be stable on the basis of general legislation and the host State's representations.[404] The arbitral tribunal in *Total v. Argentina*[405] noted that the scope of legitimate expectations is based on whether the host State authorities "*announced officially their intent to pursue a certain conduct in the future, on which, in turn, the investor relied in making investments or incurring costs*":[406]

   "Where a host State which seeks foreign investment acts intentionally, so as to create expectations in potential investors with respect to particular treatment or comportment, the host state should, we suggest, be bound by the commitments and the investor is entitled to rely upon them in instances of decision."

556.   The Kingdom of Spain actively promoted the perception of its legal framework as stable, transparent, and welcoming to RE investors through its REP, NEC Reports, "The Sun Can Be All Yours" and other prospectuses.[407] The Claimant

---

[399] Novenergia's Statement of Claim, paras. 341-352; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 614-615, 624-625, 660-670.

[400] Novenergia's Statement of Claim, paras. 361-377; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 624-625.

[401] Electrabel S.A. v. Hungary, ICSID No. ARB/07/19, Award of 25 November 2015, para. 7.78, **Exhibit RL-45**.

[402] Novenergia's Statement of Claim, paras. 361-377.

[403] Novenergia's Statement of Claim, Section III.A & D, paras. 361-377; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 658-670.

[404] Novenergia's Statement of Claim, paras. 349-352; Total S.A. v. Argentine Republic, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010, paras. 122, 333, **Exhibit CL-30**; Ioan Micula, Viorel Micula, S.C. European Food S.A., S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania, ICSID Case No. ARB/05/20, Award, 11 December 2013, para. 669, **Exhibit CL-32**.

[405] Total S.A. v. Argentine Republic, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010, para. 118, **Exhibit CL-30**.

[406] Total S.A. v. Argentine Republic, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010, para. 119, **Exhibit CL-30**, citing M. Reisman, M.H. Arsanjani, the Question of Unilateral Governmental Statements as Applicable Law in Investment Disputes, 2004 ICSID Review 328, Vol. 19, p. 342.

[407] Novenergia's Statement of Claim, Section III.C; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 660.

relied on these assurances when it made its investment and adjusted its economic conduct accordingly.[408] Investors may expect that the host State will "*implement*[] *its policies bona fide by conduct that* [...] *does not manifestly violate the requirements of consistency, transparency, even-handedness and non-discrimination*",[409] and that "[e]*xpectations based on* [principles of economic rationality, public interest, reasonableness and proportionality] are *reasonable and hence legitimate*".[410] It was therefore reasonable for the Claimant to expect that the Kingdom of Spain would fulfil the promises it had made under RD 661/2007.[411]

557.    The Kingdom of Spain did not merely enact minor changes in the legislative framework in which Novenergia invested: it obliterated that framework. These radical changes violated the Claimant's legitimate expectations and breached the Kingdom of Spain's FET obligation to create and maintain stable and transparent conditions for the Claimant's investment.[412] The impugned measures were not foreseeable and failed to meet the threshold of transparency to which the Respondent committed pursuant to the ECT. As concluded by the Claimant's regulatory expert,[413] there were no warnings that could have allowed a reasonable investor to foresee that the Special Regime would be overhauled and replaced with a completely different remuneration regime.[414]

558.    In the words of the *Eiser Infrastructure v. The Kingdom of Spain*:[415]

> "Claimants could not reasonably expect that there would be no change whatsoever in the RD 661/2007 regime over three or four decades. As with any regulated investment, some changes had to be expected over time. However, Article 10(1) of the ECT entitled them to expect that Spain would not drastically and abruptly revise the regime, on which their investment depended, in a way that destroyed its value. But this was the result of RDL 9/2013, Law 24/2013, RD 413/2014 and implementation of the new regime through Ministry implementing Order IET/1045/2014. As it was put in *Parkerings*: "any businessman or investor knows that laws will evolve over time. What is prohibited however is for a State to act unfairly,

---

[408] Novenergia's Statement of Claim, paras. 359, 361-376.

[409] Saluka Investments BV (the Netherlands) v. the Czech Republic, UNCITRAL, Partial Award, 17 March 2006, para. 307, **Exhibit CL-18**.

[410] Total S.A. v. Argentine Republic, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010, para. 333, **Exhibit CL-30**.

[411] Técnicas Medioambientales Tecmed, S.A. v. the United Mexican States, ICSID Case No. ARB (AF)/00/2, Award, 29 May 2003, para. 154, **Exhibit CL-14**; CME Czech Republic B.V. (the Netherlands) v. the Czech Republic, UNCITRAL, Partial Award, 13 September 2001, para. 155, **Exhibit CL-13**; Waste Management, Inc. v. United Mexican States ("Number 2"), ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004, para. 98, **Exhibit CL-97**.

[412] Novenergia's Statement of Claim, paras. 353-357; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 565, 594-602, 671-674.

[413] Second KPMG Report, para. 99; Novenergia's Statement of Claim, paras. 296-303; First KPMG Report, p. 58.

[414] Novenergia's Skeleton Argument, section III.D.

[415] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 387, **Exhibit CL-162**.

unreasonably or inequitably in the exercise of its legislative power."
(Emphasis added by the Claimant.)

559.    The measures adopted by the Kingdom of Spain were not a "*normal exercise of [its] regulatory power*s".[416] The radical, fundamental and unforeseeable dismantling of the Special Regime fell "o*utside the acceptable range of legislative and regulatory behaviour*"[417]and violated the Kingdom of Spain's obligations under Article 10(1) ECT.

560.    For the foregoing reasons, the Kingdom of Spain breached the FET standard under Article 10(1) ECT.[418]

### 25.2.3 The Stability and Transparency Obligation in the ECT

561.    The ECT contains a reinforced obligation to create and maintain stable and transparent investment conditions by virtue of the first sentence of Article 10(1) ECT. The stability and transparency obligation in the ECT requires that the Kingdom of Spain be transparent and not impose marked, substantial, or unexpected changes to the conditions offered to investors, as well as take positive steps to ensure that its legal system is stable and transparent.[419]

562.    This is not only a distinct, fully fledged stability and transparency standard, but is also an overarching standard that informs the interpretation of the remaining commitments set out in Article 10(1), particularly the FET standard that in and of itself already incorporates a commitment of stability and transparency.[420] As was held in the recent award in the *Eiser Infrastructure v. The Kingdom of Spain* arbitration, "[t]*he ECT's stated purpose thus emphasizes the treaty's role in providing a legal framework promoting long-term cooperation, suggesting that the treaty is conceived as enhancing the stability required for such cooperation*"[421] and "[the ECT provisions] *show that, in interpreting ECT's obligation to accord fair and equitable treatment, interpreters must be mindful of the agreed objectives of legal stability and transparency*".[422]

563.    *Eiser Infrastructure v. The Kingdom of Spain* fully endorsed Novenergia's argument, holding that:

---

[416] Saluka Investments BV (the Netherlands) v. the Czech Republic, UNCITRAL, Partial Award, 17 March 2006, para. 255, **Exhibit CL-18**.

[417] AES Summit Generation Limited and AES-Tisza Erömü Kft v. Republic of Hungary, ICSID Case No. ARB/07/22, Award, 23 September 2010, para. 9.3.73, **Exhibit RL-36**.

[418] Novenergia's Statement of Claim, para. 395; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 675.

[419] Novenergia's Statement of Claim, paras. 320-326, 331-333.

[420] Novenergia's Statement of Claim, paras. 320-333; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 671-674.

[421] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 378, **Exhibit CL-162**.

[422] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 379, **Exhibit CL-162**.

"An important element of Article 10(1) – again, part of the context for purposes of interpreting the fair and equitable treatment obligation – reinforces this emphasis on stability of the legal regime affecting investments. The first sentence of Article 10(1) directs that '[e]ach Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area.'"[423]

564. The Kingdom of Spain breached this stability and transparency standard by failing to create and maintain stable conditions for Novenergia's investment. The *Eiser Infrastructure v. The Kingdom of Spain* tribunal underlined that a host State is under an obligation to refrain from fundamentally changing the regulatory regime.[424] This does not mean, and the Claimant has never argued, that the regulatory regime has to remain frozen,[425] or that the Kingdom of Spain is prohibited from adopting new legislation. That is obviously not the case. Article 10(1) ECT obliges the Kingdom of Spain to create and maintain transparent conditions for Novenergia's investment and to refrain from adopting fundamental and radical changes to the regulatory framework upon which investors, such as the Claimant, legitimately relied when making their investment.[426] Nevertheless, that is exactly what the Kingdom of Spain did.[427]

565. At the time that Novenergia's investment was made, everything in the applicable legal framework pointed to a highly stable regime with regulatory certainty and very limited and defined circumstances under which the framework could be modified.[428] The Kingdom of Spain radically changed and destabilised the legal framework of the investment by dismantling the Special Regime and enacting retroactive measures.[429]

566. The Kingdom of Spain thus violated the stability and transparency standard in Article 10(1) ECT.

---

[423] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 380, **Exhibit CL-162**.

[424] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, paras. 363, 382, **Exhibit CL-162**.

[425] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 619-622; Eiser Infrastructure Limited and Energía Solar Luxembourg S.r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 382, **Exhibit CL-162**.

[426] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 567-582.

[427] Novenergia's Skeleton Arguments, Section III.E; Novenergia's Statement of Claim, Section III.D; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, Section III.F.

[428] Novenergia's Statement of Claim, Section III.C, paras. 154–160; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, Section III.E.2.

[429] Novenergia's Skeleton Arguments, Section III.E; Novenergia's Statement of Claim, Section III.D; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, Section III.F.

## 25.3    The Respondent's Position

### 25.3.1 The Principle of Fair and Equitable Treatment Under ECT Article 10(1)

567.    The Claimant states that the measures adopted by the Kingdom of Spain are in violation of ECT Article 10(1). The Claimant breaks down its arguments into five alleged violations: (a) violation of providing a stable and transparent regulatory scheme; (b) frustration of their legitimate expectations, which it considers to be the principle of FET; (c) violation of the duty of granting full protection and security (d) violation of the duty of not adopting abusive and disproportionate measures; and (e) compliance with the obligations that were entered into with the Claimant or its investments (the protection clause).

568.    The precedents that apply the ECT incorporate the guarantee of granting stable and transparent conditions as well as the duty of full security and protection within the principle of FET.[430] The Claimant considers that they should be examined independently, citing the *Electrabel* precedent to contend that they are different principles. However, this award, like the *Plama* award, considers that the principle of FET comprises various elements that encompass scenarios cited in ECT Article 10(1).

569.    In this respect, the *Electrabel* award invoked by the Claimant states:

> "The first part of Article 10(1) ECT refers to the encouragement and creation of 'stable, equitable, favourable and transparent conditions for investors', which is said to include a commitment to accord at all times fair and equitable treatment to investments. Fair and equitable treatment is connected in the ECT to the encouragement to provide stable, equitable, favourable and transparent conditions for investors.
>
> The Tribunal shares the well-established scholarly opinions (...); and decisions cited by Electrabel (...) that the obligation to provide fair and equitable treatment comprises several elements, including an obligation to act transparently and with due process; and to refrain from taking arbitrary or discriminatory measures or from frustrating the investor's reasonable expectations with respect to the legal framework adversely affecting its investment."[431]

570.    The criterion established in *Plama* was also adopted by the arbitral tribunal in the *Charanne* case:

---

[430] Plama Consortium Limited v. Republic of Bulgaria, ICSID Case No. ARB/03/24, Award, 27 August 2008, para. 173, **Exhibit RL-31**.

[431] Electrabel S.A. v. Hungary, ICSID No. ARB/07/19, Award of 25 November 2015, para. 7.73-7.74, **Exhibit RL-45**.

> "From Article 10(1) it can be inferred that the duty to provide fair and equitable treatment is included within the broader obligation to create stable, equitable, favourable and transparent conditions."[432]

571.    The same decision was reached in the *Isolux* case:

> "[T]he Arbitral Tribunal did not find, in Article [10(1) ECT], an autonomous obligation for the Contracting Parties to promote and create stable and transparent conditions for the performance of investments in its territory, and whose violation would generate rights in favour of the investors of other Contracting Party [...].
>
> [The obligation to create stable conditions] is nothing more than an illustration of the obligation to respect the legitimate expectations of the investor. In fact, the Claimant does not offer any type of convincing jurisprudence or case law to support its allegations. To the contrary, the Tribunal, in the <u>Plama</u> case, adopted a similar position to that of the present [...]. In fact, the Claimant implicitly recognizes this in indicating that, under such standard, the reasonability and proportionality of the measures must be considered in light of the legitimate expectations of the investor, [...]
>
> As a result, the Arbitral Tribunal shall not examine the alleged violation of the Kingdom of Spain of an obligation to create stable and transparent conditions for investments in its territory as a separate matter."[433] (Emphasis in Exhibit RL-72. Footnote omitted.)

572.    The *Isolux* award included an examination of the protection and safety standards, among the examinations of FET as provided by the Kingdom of Spain:

> "The standard of protection and safety cannot intervene to protect the investor against modifications of the legal framework in cases that do not justify such protection as a result of the obligation to ensure the FET. The Tribunal shares the tribunal's position in the <u>AES Summit vs. Hungary</u> Case regarding this issue…"[434] (Emphasis in Exhibit RL-72.)

573.    Likewise, the *Isolux* award includes the examination of the obligation to not cause any damages through exorbitant or disproportionate measures in the examination of FET standards. Assuming the similarity with the *Saluka* Case:

---

[432] Charanne and Construction Investments v. Spain, SCC Case No. 062/2012, Final Award, 21 January 2016, para. 477, **Exhibit RL-46**.

[433] Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain, SCC V2013/153, Award, 12 July 2016, paras. 764-766, **Exhibit RL-72**.

[434] Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain, SCC V2013/153, Award, 12 July 2016, para. 817, **Exhibit RL-72**.

> "The standard of 'reasonableness' has no different meaning in this context than in the context of the 'fair and equitable treatment" standard with which it is associated."[435]

574. Consequently, the Respondent understands that it is unreasonable to separate the FET standard of the ECT from the duty to grant stable and transparent conditions, protection and complete security and the non-adoption of irrational and disproportionate measures that are prejudicial to the investor.

575. However, the Respondent refers separately to each of the alleged violations by the Claimant, beginning with the FET's primary constituting element: the legitimate expectations of the Claimant. As indicated in the award in the *Electrabel* case:

> "It is widely accepted that the most important function of the fair and equitable treatment standard is the protection of the investor's reasonable and legitimate expectations."[436]

### 25.3.2 Reasonable and Objective Expectations of the Claimant

### 25.3.2.1 Burden of Proof

576. The Claimant could not have reasonable and objective expectations to: (i) the maintenance or improvement of the RD 661/2007 regime by means of a grandfathering clause during 2 or 3 decades, nor (ii) the maintenance of a fixed FIT indefinitely during all the PV Plants' lifetime. Claimant has the burden of proving such expectations and has failed in this respect. Not one single due diligence report supports the Claimant's theory.

577. As Article 2.a of the ECT makes reference to the European Energy Charter, it makes one of its objectives "*to promote the development of an efficient energy market*".[437] That is to say, the ECT does not aim (i) to protect situations of unsustainability of the electricity markets or (ii) to protect expectations of petrification of over-remuneration for indefinite periods against the formation of market prices since they are public subsidies. Therefore, the Claimant could not expect, pursuant to the ECT, that its interests would be protected unconditionally, even distorting the free market and harming the interests of the SES consumers.

578. The awards of the *Charanne* and *Isolux* cases follow the principle set out by the majority of awards which have applied the FET standard concerning the burden of proof of the alleged breaches of the Treaty's obligations:

---

[435] Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain, SCC V2013/153, Award, 12 July 2016, para. 822, **Exhibit RL-72**.

[436] Electrabel S.A. v. Hungary, ICSID No. ARB/07/19, Award of 25 November 2015, para. 7.75, **Exhibit RL-45**.

[437] Energy Charter Treaty, Title I – Objectives, **Exhibit RL-3**.

"The burden of proof concerning the arbitrary or irrational nature of the disputed measures is on the Claimants."[438]

579.   The *Eiser* award also refers to the burden of proof, which is applied to both parties.[439]

580.   This principle is relevant in the present case as Novenergia has failed to prove relevant facts like the following:

(a)   The assessment and examination of the Spanish regulatory framework conducted by its board of directors prior to its investments, in order to achieve the expectations maintained in this arbitration. The Claimant's proof is limited to a single phrase said by one *engineer and politician*, Mr. Mitjá, in one board of directors meeting.[440] No other document has been submitted by the Claimant.

Furthermore, it must be highlighted that the Claimant's witness, Mr. Baguenier, Novenergia's President, <u>did not know anything</u> regarding relevant standards for the development of the RE Sector like RD 436/2004 and [RDL 7/2006].[441]

It must also be pointed out that not one single member of the Novenergia's board of directors had legal expertise. This is a highly relevant issue in the present case, which demonstrates the lack of evidence provided by the Claimant regarding its assessment of the regulatory framework. Moreover, when the subsidiaries of Novenergia filed their appeal before the Spanish Supreme Court, the regulations and the applicable case law were perfectly known by them and by their manager, Mr. Mitjá.[442]

(b)   The due diligence performed by legal advisers which support the Claimant's theory. It must be recalled that the Claimant expressly denied disclosure of such reports in the documents production phase.[443]

An investor who claims millions of euros against a state under the ECT, based on alleged expectations generated by the state's regulatory framework, <u>must be serious</u> when proving the due diligence performed by legal experts about that regulatory framework. The ECT does not *unconditionally* protect investors independently of whether or not they have developed a serious due diligence that allows them to be aware of the limits of the regulatory power of the state. Legitimate expectations must be *reasonable and objective*.

---

[438] Charanne and Construction Investments v. Spain, SCC Case No. 062/2012, Final Award, 21 January 2016, para. 536, **Exhibit RL-46**.

[439] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, paras. 345, 451, **Exhibit CL-162**.

[440] Minutes of the Meeting of the managers of Novenergia, held the 4th June 2007, p. 2, **Exhibit C-109**.

[441] Transcript of Hearing, 12 June, p. 33, (lines 4-6); Regarding RDL 7/2006, Mr. Baguenier neither remember which Act was nor was aware of the public complains of the RE against such RD-Act, Transcript of Hearing, 13 June, pp. 40 (line 19) – 45 (line 15): "*I do not remember if anyone made specific analysis of this 2004 Decree.*"

[442] Claim filed by the PV Plants before the Supreme Court on March 2011, pp. 60, 69-73, **Exhibit R-183**.

[443] Procedural Order No 3, Appendix 2, Respondent´s Documents request 9 to 17.

(c)     The knowledge of all the RE sector in 2006 and 2007 in comparison to the understanding of the Claimant. The Novenergia chairman, Mr. Baguenier, mentioned that they had contacts with the RE sector,[444] but they have provided not one single document which could prove such assertion. On the contrary, the Respondent has provided dozens of documents of all the RE sectors which contradict the understanding of the regulatory framework explained by Mr. Baguenier.

Notwithstanding, the Claimant maintains that its expectations are "*objective* and *reasonable*".[445] According to this assertion, the Tribunal must assess all the evidence provided by both parties in order to analyse the objectivity and reasonableness of the Claimant's expectations. Those expectations, to be *objective* and *reasonable*, should be consistent with the expectations of the RE Sector. An arbitral tribunal cannot protect *unconditionally* the *subjective* expectations of ill-informed investors, especially when there is no evidence that supports these subjective expectations.

(d)     The Claimant fails to prove the existence of alternative measures more reasonable than the challenged measures that could be enacted within the context of collapse of the Spanish financial sector in June of 2012. The KPMG Report has omitted any assessment of the (i) legal, (ii) budgetary and (iii) economic sustainability and admissibility of the measures it proposes.

It seems evident that an alternative should be *legal,* according to the domestic law and the applicable EU law. KPMG has voluntarily omitted such assessment[446] which is essential in order to assess the lawfulness and efficiency of the alternative measures. The same can be said regarding the budgetary and economic requirements in 2012.

In any case, the alternatives showed by the Claimant's expert do not imply the unreasonableness of the measures enacted by the Kingdom of Spain. This reasoning was expressly made to the KPMG alternatives by *Isolux* Award:

> "[T]he measures adopted by the Kingdom of Spain may be criticised, in consideration of others available, proposed by the NEC, which would have been preferable and more favourable to the Claimant. If this were true, it would not be sufficient to conclude that the measures adopted were, in fact "*exorbitant*" or that they were unreasonable under the terms of the

---

[444] Transcript of Hearing, 13 June, p. 67, lines 18-20: "*Of course we listen to all opinion*[s] *but we did not take our decision mainly based on this kind of information.*"

[445] Novenergía's expectations are reasonable and objective in light of the conditions offered by the Kingdom of Spain to prospective investors, Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 615.

[446] Indeed, no one single Legal expertise was in the KPMG Team: Transcript of Hearing, 13 June, p. 227 (line 25) – 231 (line 14): "[...] Mr. Santacruz: *Mr Solé, I think the question is very straightforward. In your team, is there anybody who is or could be considered to be a legal expert witness: yes or no?* Mr. Martin: *No.*"

ECT. The behaviour of the State was a rational political action that was, like it or not, taken to protect the consumer."[447] (Emphasis in Exhibit RL-72.)

581. The Tribunal should assess the lack of proof by the Claimant regarding such relevant matters in comparison with the amount of documents provided by the Respondent concerning the knowledge of (i) RE producers, (ii) different legal advisors, including KPMG, and (iii) authorities, which accredit the objective and reasonable expectations that any diligent investor should have had prior to making its investment within the Spanish RE sector.

582. On the other hand, the Respondent has proved that the Claimant was aware or should have been aware of the *dynamic* nature of the reasonable rate of return and the limits of the government in possible regulatory measures, as this was the understanding of (1) the RE sector; (2) the main RE investors; (3) relevant advisers and authorities; (4) the Claimant's PV Plants and (5) executives of the Claimant which signed contracts for the PV Plants.

### 25.3.3 The Expectations of the Claimant Are Not Objective

583. The Kingdom of Spain has submitted proof of numerous circumstances that occurred at the time of the Claimant's investment. The *Invesmart BV* precedent[448] listed the circumstances that, in the opinion of the arbitral tribunal, would give rise to the assessment of the Claimant's expectations.

584. The Kingdom of Spain has proven the applicable regulatory framework and the interpretation or understanding of said framework by the supreme interpreter thereof. These statements do not promise that plants in operation will not be affected by "any" future review of the tariffs. This has already been stated in the *Charanne* award.

585. Furthermore, the Kingdom of Spain has proven the real expectations of:

   (a) The Renewable Energy Associations: APPA, AEE, ASIF, the Spanish Solar Thermal Industry ("**Protermosolar**").

   (b) Relevant RE Investors, such as Iberdrola, Sener, Samca, Abengoa.

   (c) Relevant regulatory advisers, such as Pöyry, KPMG and Deloitte.

   (d) Doctrinal authorities who examined the Spanish regulatory framework while RD 661/2007 was in effect, such as Miguel Mendonça, David Jacobs and Benjamin K. Sovacool.

586. In addition, the Kingdom of Spain has proven:

---

[447] Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain, SCC V2013/153, Award, 12 July 2016, para. 823, **Exhibit RL-72**.

[448] Investmart BV v. Czech Rep. Award, 26 June 2009, paras. 250-258, **Exhibit RL-75**.

(e) Statements made by the Kingdom of Spain (government, Supreme Court and NEC) on the need for sustainability in the SES and the dynamic nature of reasonable return, from 2006 until 2012.

(f) Two Relevant Arbitration precedents, such as *Charanne BV v. Kingdom of Spain* and *Isolux INBV v. Kingdom of Spain*, which reject similar claims from the Claimants.

587. Moreover, the Kingdom of Spain has proven that the Claimant was fully aware of the necessary sustainability of the SES and the dynamic nature of the reasonable rate of return, accrediting these facts from:

(g) The claim lodged by the Claimant's PV Plants, which substantiates that the Claimant knew about the government's intervention in 2006 for reasons of general interest, affecting functioning RE plants. In this sense, the *Isolux* award took into account the knowledge gathered from the claim also lodged by the *Isolux* group in May 2011 before the Supreme Court.[449]

(h) The Supreme Court judgment handed down and about which there has been nothing but deafening silence. This award is a clear interpretation from the Kingdom of Spain made in relation to the PV Plants of the Claimant about the Spanish regulatory framework.

(i) Contracts signed by Claimant's executives as PV Plant managers, in which they assume the existence of a regulatory risk.

(j) Internal documentation from the Claimant that substantiates the existence of legal due diligence reports known to the Claimant and intentionally concealed from the Tribunal.

588. Objective expectations must be in line with the expectations of the associations in the RE sector, of other relevant investors, of regulatory consultants and of authors who examine the Spanish regulatory framework.

589. The Kingdom of Spain has also proved that it adopted since 2006 measures to correct imbalances of the SES and for reasons of general interest, without breaking the objective and reasonable expectations of the Claimant. Furthermore, not one single arbitral tribunal has ruled to the present day that a RE investor could have a *reasonable and objective expectation* that the RD 661/2007 regime would be maintained or improved indefinitely. Such expectations are not credible, according to the RE sector statements from 2006 onwards, including the Claimant's PV Plants statements.

590. The Claimant bases its expectations on a hypothetical commitment not to modify RD 661/2007 for operational facilities. However the Claimant could have checked and known between 2006 and 2008:

---

[449] Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain, SCC V2013/153, Award, 12 July 2016, para. 796, **Exhibit R-72**.

(a) The reasons why RDL 7/2006 was passed, which prospectively modified the remuneration system of RD 436/2004 to avoid over-remuneration.

(b) The warnings by the government, the NEC and the Supreme Court as to the remuneration of a reasonable rate of return, with a dynamic nature between the years 2006 and 2008.

(c) The complaints of the RE sector in 2007 with regard to the draft of RD 661/2007 concerning the remuneration of a reasonable rate of return, with a dynamic nature, which would permit a reduction of the remunerations established in RD 661/2007.

(d) The publication of RD 1578/2008, of 26 September, the Fifth Additional Provision of which pointed out:

"*Modification of the compensation for generation by photovoltaic technology*.

During the year 2012, based on the technological evolution of the sector and the market, and the functioning of the compensatory regime, compensation for the generation of electric power by photovoltaic solar technology may be modified."[450] (Emphasis in Exhibit R-73.)

591. In short, the Claimant maintains, without proof, that the Kingdom of Spain made a commitment not to make future reforms that could affect the PV Plants that are operational or under their control. In practice, the Claimant is claiming the *freezing* of RD 661/2007 in its favour, *sine die*, while contradictorily affirming that it does not claim any freeze.

## 25.3.3.1 The Expectations of the Claimant Are Not Reasonable

592. The Claimant's expectations are not reasonable. According to the proven facts outlined in this case there was no specific commitment by the Kingdom of Spain in favour of the Claimant.

593. In particular, the Respondent has substantiated the facts of the true regulatory framework which is not limited to RD 661/2007 as the Claimant claims. Likewise, the facts substantiate that RD 661/2007 does not contain a guarantee or promise (i) to freeze the regime in favour of the Claimant or of their investors, nor (ii) that successive measures will improve or maintain the regime established in the same (grandfathering).

594. As a result, no diligently informed investor could have expected a perpetually fixed FIT in favour of the registered RE plants by virtue of fulfilling regulatory requirements to obtain subsidies, such as registration in a mandatory

---

[450] RD 1578/2008, **Exhibit R-73**.

administrative register. Nor could it expect that these conditions would be maintained indefinitely or improved for it at any rate, as no commitment exists in this regard.

595.   The Claimant has not submitted one single regulatory due diligence report that would have clarified all these important questions. Furthermore, when the construction of the PV Plants had ended, it had not even approved a due diligence protocol to carry out its investments. In the last investment committee minutes that have been submitted, from November 2008, a draft memorandum of information for the projects of the Claimant was presented:[451]

> CP presented the first draft of a document named "Memorandum on Required Information" which contains the main procedures to be adopted for the (i) Project control and (ii) the Financial control, which should be followed by each Country Subsidiary.
>
> [...]
>
> regarding projects not yet approved. On the projects side, the data sheet will be very comprehensive, including all technical, legal, contractual and financial information required for an adequate appraisal of each project.

596.   Furthermore, the Claimant has neither submitted a single regulatory or legal due diligence report that might conclude the existence of a commitment not to modify RD 661/2007 nor the existence of a "grandfathering" clause that it now conjures up to the Tribunal as a generator of objective legitimate expectations.

597.   The Claimant affirms that its expectations are based on an alleged promise to totally stabilise RD 661/2007 during the entire operational life of all its RE plants: "*The Kingdom of Spain had no discretion to modify the FIT. It deliberately bound its own hands to ensure stability and predictability.* […] *The commitments made by the Kingdom of Spain in RD 661/2007 were crystal clear.*"[452]

598.   In this way, the Claimant constructs its Statement of Claim endeavouring to put across to the Tribunal the mistaken idea that the only regulations of the Spanish regulatory framework that any investment should take into account were only the wording of one article of RD 661/2007[453] and some informative leaflets entitled "The sun can be yours".

599.   The Claimant, however, has hidden from the Tribunal (i) the true understanding of the system during the years 2006 to 2008 by the RE business associations and (b) the warnings given by the government, the Supreme Court and the NEC during the years 2006 to 2008.

---

[451] Minutes of the Meeting of the managers of Novenergia, 11 and 24 November 2008, p. 1, **Exhibit C-177**.

[452] Novenergia's Statement of Claim, paras. 160-161.

[453] Claim filed by the PV Plants before the Supreme Court on March 2011, p. 38, **Exhibit R-183**.

600.   Furthermore, the Claimant never bothered to request a due diligence that would clarify the possibility of measures being adopted that would reduce remuneration in the event of extraordinary situations. The PV Plants, in an appeal brought before the Supreme Court, admit that in 2011 they did not know whether in the event of extraordinary situations the regulatory framework could be modified for operational facilities:

> "This party does not know, nor is the subject of this Appeal whether or not the regulatory power can amend current legislation regarding the establishing of regulated tariffs that affects third party rights in relation to facilities already built."[454]

601.   It is clear that the regulatory risk existed for the Claimant and that they knew or should have known it, as it was clearly known by (1) the doctrine that examined the Spanish regulatory framework[455] and (2) the RE sector associations such as APPA, ASIF, AEE and Protermosolar.

602.   Therefore, the Tribunal cannot accept the expectations claimed by the Claimant as reasonable. There are grounds to reject that the Claimant could objectively and reasonably have legitimate expectations to maintain a frozen FIT, *sine die*, in favour of their RE plants registered in the RAIPRE.

### 25.3.4 Fair and Equitable Treatment Standard Under ECT: Stable Conditions

### 25.3.4.1 Introduction

603.   In relation to the alleged violation of the duty to create stable conditions, the main part of the precedents that have applied the ECT have allowed the adoption of reasonable and proportionate macroeconomic control measures due to a proven public policy, as to avoid excessive burdens to the consumers. The Respondent has proved that the challenged measures have maintained the essential characteristics of the different remuneration formulas in place since 1997.

604.   In accordance with the literal wording of the ECT and the precedents that have applied this treaty, the Respondent denies that the ECT standard of providing stable conditions obliges the signatory countries to establish and maintain a "predictable" regulatory framework. The actual wording of Article 10.1 ECT does not include this term.

605.   The Claimant knew or should have known (i) the essential characteristics of the Special Regime remuneration system since 2006 and (ii) the limits to possible future changes under Article 30(4) of Law 54/1997: granting in any case a

---

[454] Claim filed by the PV Plants before the Supreme Court on March 2011, p. 38, **Exhibit R-183**.

[455] Miguel Mendonça, David Jacobs and Benjamin Socacool, "Powering the Green Economy. The feed in tariff handbook", Editorial. Earthscan, 2010, **Exhibit RL-59**.

reasonable return on the RE plants investment costs by reference to the cost of money in the capital markets.

606.   Additionally, it has been proved that the challenged measures did not affect the Claimant's acquired rights as the challenged measures are applied only to ongoing situations. Therefore, the challenged measures are not retroactive, according to the international standards of FET, stated in several precedents.

607.   Another precedent that applied the ECT, the *Electrabel v. Hungary* award, set out a basic principle for application of the ECT FET standard:

> "The host State is not required to elevate unconditionally the interests of the foreign investor above all other considerations in every circumstance. As was decided by the tribunals in Saluka v. the Czech Republic and Arif v. Moldova, a FET standard may legitimately involve a balancing or weighing exercise by the host State."[456]

608.   The *AES Summit v. Hungary* Case also clearly sets out the aims and objectives of the ECT:

> "The <u>stable conditions</u> that the ECT mentions relate to the framework within which the investment takes place. Nevertheless, <u>it is not a stability clause</u>. A legal framework is by definition <u>subject to change as it adapts to new circumstances</u> day by day and a state has the sovereign right to exercise its powers which include legislative acts."[457] (Emphasis added to Exhibit RL-36.)

609.   The arbitral tribunal in the *Mamidoil v. Albania[458]* case follows this criterion.

610.   Regarding this standard on stable conditions, the Claimant relies on awards which do not apply the ECT in order to claim the predictability of all the ECT signatory states' regulatory framework. The predictability of the regulatory frameworks is neither in the text of the ECT, nor an objective of the ECT, nor have the precedents applying the ECT required it.

611.   In any case, the reasons that have justified these measures are the same as those which motivated the regulatory changes since RDL 7/2006: the economic sustainability of the system and the correction of over-remuneration situations. It is proven that these motives were known by the Claimant and its PV Plants. Critically, the Respondent has acted under the limits stated from 1997 by the regulatory framework as continues to provide to the Claimant's PV Plants a reasonable return on the investment costs of the PV Plants: a pre-tax return of

[456]Electrabel S.A. v. Hungary, ICSID No. ARB/07/19, Award of 25 November 2015, para. 165, **Exhibit RL-45**.

[457] AES Summit Generation Limited and AES-Tisza Erömü Kft v. Republic of Hungary, ICSID Case No. ARB/07/22, Award 23 September 2010, para. 9.3.29, **Exhibit RL-36**.

[458] Mamidoil Jetoil Greek Petroleum Products Societe Anonyme S.A. v. The Republic of Albania, ICSID Case No. ARB/11/24, Award 30 March 2015, paras. 617-618, **Exhibit RL-43**.

7% or a post-tax return of 6.6%. Its investments maintain a level of profits and have not been destroyed at all.

612.    The Kingdom of Spain has substantiated[459] that the concept of reasonable returns did have content for the RE sector at the time of the Claimant's investment. REP 2005-2010 established a desired return in its planning for standard projects:

> "Returns on standard projects: calculated on the basis of maintaining an Internal Rate of Return (IRR), measured in standard currency and for each standard project, of approximately 7%, with proprietary resources (before funding) and after tax."[460] (Emphasis omitted.)

613.    This return through subsidies "*of approximately 7%*" was known to (i) the RE associations, (ii) regulatory consultants such as Pöyry, KPMG and Deloitte, and (iii) the international doctrine that examined the Spanish regulatory framework.

614.    In addition, the *Charanne*, *Isolux* and *Eiser* awards consider that the stable conditions of the FET standard of the ECT do not prevent the state from adopting measures to adapt the regulatory framework to the changes on economic and technical circumstances.

## 25.3.4.2 The Charanne Award

615.    The *Charanne* award concluded that stable conditions under FET standard admitted reasonable and proportional amendments to the regulatory framework:

> "The Arbitration Tribunal considers that the proportionality requirement is fulfilled as long as the modifications are not random or unnecessary, and that they do not suddenly and unexpectedly eliminate the essential features of the regulatory framework in place.
>
> The Arbitration Tribunal understands that RD 661/2007 and RD 1578/2008 establish specific rules whose essential characteristics are offering a guaranteed tariff (or a premium, where appropriate) as well as privileged access to the electricity transmission and distribution grid, to each energy producer that fulfils the established requirements. Within the framework of the LSE, said principles make it possible to guarantee to [RE] producers the reasonable returns to which Article 30.4 LSE refers."[461] (Emphasis added to Exhibit RL-49.)

---

[459] The Kingdom of Spain's Statement of Defense and Jurisdictional Objections, para. 422-425 and the Kingdom of Spain's Statement of Rejoinder and Reply to Jurisdictional Objections, Sections A.4 and A.5.

[460] The Kingdom of Spain's Statement of Rejoinder and Reply to Jurisdictional Objections, para. 959.

[461] Charanne B.V. and other v. Kingdom of Spain, Award, 21 January 2016, paras. 517-518, **Exhibit RL-46**.

616. It is proved in the present case that the PV Plants continue (i) maintaining priority of dispatch; (ii) maintaining priority access to the grid (iii) maintaining a privileged access to the electricity transmission (iv) receiving for the energy produced the market price (activity of energy production that can be developed without any limitation regarding the amount of energy that can be poured into the grid an bought by the market); (v) receiving a subsidy until the producer obtains a reasonable return on the investment costs of the Claimant's RE plants. In this sense, the challenged measures guarantee that Novenergia will obtain the return of 100% of the capital invested in the plants and obtain a return of 6.6% IRR on its investment after taxes.

617. It shall also be highlighted that the Claimant has not discussed whether a rate of return of 7.398% fixed for the first regulatory period is a fair and a reasonable return. This rate of return is coherent with different benchmarks used during this arbitration: (i) the Sector WACC (ii) the 2005 publication of ASIF, a PV Association (R-2017), (iii) the 2006 submissions of APPA for RD 661/2007 draft (R-278, page 23), (iv) the 2007 report of Arthur de little for APPA and PV associations ASIF (R-216) and (v) the 2007 press release of AEE Eolic association regarding RD 661/2007 (R-236); (vi) the return set for other regulated activities with similar level of risk as distribution or transportation.[462]

618. The essential characteristics of the framework which the Claimant knew or should have known during their investments (from 2001 until 2012) derived from Law 54/1997 and have been respected by the Kingdom of Spain.

### 25.3.4.3 The Eiser Award

619. The *Eiser* award also concluded that *stable conditions* under ECT's FET standard did not imply a stabilisation clause:

> "…Article 10(1)'s obligation to accord fair and equitable treatment necessarily embraces an obligation to provide fundamental <u>stability in the *essential characteristics*</u> of the legal regime relied upon by investors in making long-term investments. [...] [This] means that <u>regulatory regimes cannot be radically altered</u> as applied to existing investments <u>in ways that deprive investors who invested in reliance on those regimes of their investment's value</u>."[463] (Emphasis added to Exhibit C-162.)

620. The *Eiser* award assumes the *Charanne* award's assertions regarding the limits to the exercise of regulatory powers in maintaining the essential characteristics of the regulatory framework, but the *Eiser* award did not take into account such essential characteristics stated by the *Charanne* award.[464] This notwithstanding,

---

[462] RDL 9/2013, Art. 6, **Exhibit R-95**.

[463] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 382, **Exhibit CL-162**.

[464] Charanne B.V. and other v. Kingdom of Spain, Award, 21 January 2016, para. 370, **Exhibit RL-46**.

the *Eiser* award established a clear limit to any regulatory change: it cannot be a radical change adopted "*in ways that deprive investors* [...] *of their investment's value*".[465] Indeed, the *Eiser* award always links the measures taken with their economic effect on the particular investment of *Eiser*. According the *Eiser* tribunal, the challenged measures destroyed the value of the Claimant's investment.[466]

621.   The Claimant's own experts in this case consider that the effect of the challenged measures determines a reduction of 28% of the total revenues of the Claimants.[467] This decrease on revenues has not been considered by the *Eiser* award as enough in order to determine the destruction of the value of an investment. The *Eiser* award sets that the measures prior to RDL 9/2013, which supposed a reduction of 30%[468] of the plants revenues, did not "cross the line".[469]

622.   Moreover, in this case it has never been demonstrated that the value of the Claimant's investment has been destroyed. On the contrary, it has been established that the Claimant's plants recover after the measures their investment costs, their operation and maintenance costs and obtain a reasonable return of 6.6% after tax as we will see below. This figure does not have anything to do with the figures assessed by the *Eiser* tribunal, that talks about a "*Respondent's Experts rough estimate of the pre-tax return was on the order of 5%, while Claimants' expert estimated the pre-tax return on the project to be about 3.7%*".[470] (Footnote omitted.)

### 25.3.4.4 The Isolux Award

623.   The *Isolux* award considered that the limit to any regulatory change was the reasonable return for the investment as a dynamic concept:

> "(...) The only legitimate expectation of the Claimant was to receive a reasonable return for its investment.
>
> [...] According to that indicated by the Supreme Court, in its ruling of 9 December 2009, the only limit to the power of the Government to modify

---

[465] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 382, **Exhibit CL-162**.

[466] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, paras. (among others) 387, 365, 413, 418, **Exhibit CL-162**.

[467] First Compass Lexecon Report, para. 4.

[468] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 413, **Exhibit CL-162**.

[469] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 458, **Exhibit CL-162**.

[470] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 396, **Exhibit CL-162**.

its regulatory framework is the guarantee given by the LSE of a reasonable return for the investors…"[471]

624. The Kingdom of Spain has maintained the subsidies (i) during the reforms of 2004, 2006, 2007, 2009 and (ii) during the challenged measures. These subsidies have allowed and continue to allow RE investments to recover: (i) investment costs, (ii) operating costs and additionally, (iii) obtain reasonable return in accordance with the cost of money in the capital market.

625. Furthermore, it is not possible to talk about the violation of stable conditions since the returns RE producers can hope to achieve was determined by law following RDL 9/2013. This had been largely proposed and requested by the sector's associations.

626. Moreover, the Claimant has failed to prove that the contested measures are in breach of international law, as they are applied going forward without affecting acquired rights. The Claimant actually seeks to indefinitely freeze the legal regime of RD 661/2007 towards the future by invoking an alleged retroactivity. This forms no part of the ECT standard nor does it comply with the aims and objectives thereof, due to the absence of any commitment from the Kingdom of Spain to freeze the subsidies in the Claimant's favour.

627. To conclude, it cannot be stated that the creation of "stable conditions" referred to by Article 10(1) ECT has been violated when the challenged measures (1) <u>have resolved</u> a situation of imbalance that endangered the economic sustainability of the SES, (2) <u>have maintained</u> the principle of reasonable return for the investors and (3) <u>have avoided</u> the economic imbalance that existed to be weighed entirely upon consumers.

### 25.3.5 Transparent Conditions

628. In relation to the obligation to create transparent conditions contained in Article 10(1) of the ECT, the Kingdom of Spain has proved that (i) the RE associations and hundreds of stakeholders participated in the process making allegations, and (ii) many allegations were admitted. Their allegations were accepted into the final definition of the standard facilities and standards, which forced the regulatory procedure to commence anew.

629. Furthermore, the measures adopted in 2010, 2013 and 2014 are coherent with the previous acts of the government since 2006 as to the need to intervene in the event of market distortions and in cases of over-remuneration. The announcements of a structural reform were made more than one year prior to the adoption of the measures that were taken in 2013 and 2014. These measures were adopted by maintaining the essential characteristics of the Spanish

---

[471] Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain, SCC V2013/153, Award, 12 July 2016, paras. 787-792, 795, **Exhibit RL-72**.

remuneration systems and according to the interpretation thereof that the Supreme Court of the Kingdom of Spain had been implementing since 2005.

630. The Kingdom of Spain has already substantiated that (i) from 2006 it warned the energy sector operators that it would take action in situations of over-compensation or unsustainability of the SES and (ii) from 2008 it has alerted the need for introducing modifications to eliminate the tariff deficit.

631. In <u>2006</u>: (1) RDL 7/2006, which froze the TMR referred to in RD 436/2004 for reasons of general interest related to market distortion (this was known to the Claimant), (2) the Minister for Energy warned the operators that "*the tariffs are not going to pay for anyone's party*".[472] (3) The warning was repeated by the Secretary General of Energy, who explained in 2006 the government's actions against over-compensation to RE producers.[473] (4) Furthermore, the Supreme Court already created applicable case law when it confirmed in 2006 the 2005 judgment that had interpreted the dynamic nature of the compensation regime for RE.

632. In <u>2007</u>, (1) the preamble to RD 661/2007 reiterated the economic sustainability of the RE development aid system and the necessary tariff balance, both for investors and for consumers. This regulation does not protect investors unconditionally over consumers.[474] (2) Furthermore, another two judgments published by the Supreme Court confirm the previous case law on the dynamic nature of the compensation regime for RE.

633. In <u>2008</u>, the necessary reasonability and sustainability of the tariffs was reiterated by the Secretary General for Energy before congress.

634. In <u>2009</u>, the preamble to RDL 6/2009 warned of the necessary adoption of measures to tackle the tariff deficit.[475] This has been acknowledged by the Claimant. Furthermore, the Supreme Court issued three further rulings reinforcing the existing case law. All these rulings are clear interpretations of the regulatory framework applicable to the special regime in Spain that was fully understood by the RE associations.

635. In <u>2010</u>, the preamble to RDL 14/2010, subsequent to RD 1614/2010, alerted to the need to adopt measures to face the tariff deficit.[476] That was also known to the Claimant. [477]

---

[472] Appearance of the Minister of Industry, Energy and Tourism before the Senate on 26 October 2006, **Exhibit R-257**.

[473] Appearance of the General Secretary for Energy before the Congress of Deputies, **Exhibit R-260**.

[474] RD 661/2007, Preamble, **Exhibit R-72**.

[475] RDL 6/2009, 30 April 2009, Preamble, **Exhibit R-58**.

[476] RDL 14/2010, Preamble, **Exhibit R-59**.

[477] Claim filed by the PV Plants before the Supreme Court on March 2011, p. 71, **Exhibit R-183**.

636. In <u>2011</u>, there were numerous statements along the same line. The Sustainable Economy Act of March 2011 is important.[478] In January <u>2011</u>, Minister Sebastián expressly mentioned the possible need to adopt additional measures following the measures of 2009 and 2010 due to unbalance of the SES. The Claimant invested over 25 million euros in December 2011. Furthermore, in December 2011 the Prime Minister, Mr Mariano Rajoy Brey, expressly referred to the need for structural reforms within the energy sector, due to the economic situation of the tariff deficit.[479]

637. In <u>2012</u>, there were numerous statements about an essential structural reform of the SES.[480] Those of particular note include the express statements made in another Act, RD-Act 13/2012, of 30 March, which expressly refers to the need for structural reforms that would affect all of the system costs.[481]

638. Furthermore, the government published several documents concerning the elimination of the tariff deficit and the future reform of the SES: (i) in March 2012, it published the "National Reform Programme 2012",[482] restating its commitment to eliminating the tariff deficit;[483] (ii) in September, it published "*Reforms of the Government of Spain: Determination in the face of the crisis*",[484] which included the "Energy Sector Reform"; and (iii) also in September, it approved the "*Spanish Strategy for Economic Policy: Balance and structural reforms for the next six months*".[485] This Strategy announced the adoption of structural measures to remedy the tariff deficit and the drafting of a new Electricity Sector Act.

639. Also of note is the Memorandum of Understanding of 12 July 2012, which imposed, as an international treaty, the adoption of macroeconomic control measures to tackle the deficit on a global level.[486]

640. The announcements on the inadmissibility of over-compensation and the necessary sustainability of the SES were transparent, constant and, in addition, consistent with commitments undertaken at the international level to adopt macroeconomic control measures.

---

[478] Sustainable Economy Act 2/2011 of 4 March, Art. 79(4)(a) and (d), **Exhibit R-74**.

[479] Speech by Prime Minister Rajoy, 19 December 2011, **Exhibit R-96**.

[480] The Kingdom of Spain's Statement of Defense and Jurisdictional Objections, paras. 624 et seq.

[481] RD-Act 13/2012, 30 March, p. 8, **Exhibit R-61**.

[482] National Reform Programme 2012, Government of Spain, **Exhibit R-104**.

[483] National Reform Programme 2012, Government of Spain, **Exhibit R-104**.

[484] Secretariat of State for Communication, Ministry of the Presidency, The Reforms of the Spanish Government: Determination in the face of the crisis, September 2012, p. 18, ch. III, **Exhibit R-106**.

[485] Spanish Economic Policy Strategy: Assessment and structural reforms over the next six months, Government of Spain, 27 September 2012. Section C.8, p. 70, **Exhibit R-198**.

[486] MoU on Financial-Sector Policy Conditionality, 20 July 2012, **Exhibit RL-67**.

## 25.4    The Tribunal's Reasons

### 25.4.1 Is the Stability and Transparency Obligation Part of the Fair and Equitable Treatment Standard in Article 10(1) of the ECT?

641.    Article 10(1) of the ECT reads as follows:

> "Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create, stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party."[487]

642.    The first issue that the Tribunal has to examine is whether the stability and transparency obligation in the ECT is a standalone obligation and should be assessed separately or whether it is, as the Respondent maintains, included in the FET standard in Article 10(1) of the ECT. The Respondent also asserts that the other grounds on which the Claimant argues that the Respondent has breached Article 10(1) of the ECT are, in fact, part of the same FET standard. The Tribunal will get back to this point in Section 25.4.5 below.

643.    As regards the stability and transparency obligation, the Tribunal shares the position taken by the arbitral tribunal in *Isolux*, as highlighted by the Respondent:

> "[T]he Arbitral Tribunal did not find, in [Article 10(1) of the ECT], an autonomous obligation for the Contracting Parties to promote and create stable and transparent conditions for the performance of investments in its territory, and whose violation would generate rights in favour of investors of the other Contracting Party, *per se*. [...]
>
> [the obligation to create stable conditions] is nothing more than an illustration of the obligation to respect the legitimate expectations of the investor. In fact, the Claimant does not offer any type of convincing jurisprudence or case law to support its allegations. To the contrary, the Tribunal in the <u>Plama</u> case, adopted a similar position to that of the present [...]. In fact, the Claimant implicitly recognizes this in indicating that, under

---

[487] Energy Charter Treaty, **Exhibit CL-1**.

such standard, the reasonability and proportionality of the measures must be considered in light of the legitimate expectations of the investor, [...]

As a result, the Arbitral Tribunal shall not examine the alleged violation of the Kingdom of Spain of an obligation to create stable and transparent conditions for investment in its territory as a separate matter."[488] (Emphasis in Exhibit RL-72. Footnote omitted.)

644.  As mentioned in *Isolux* and referenced by the Respondent, the arbitral tribunal in *Plama* also established that "*stable and equitable conditions are clearly part of the fair and equitable standard under the ECT*".[489]

645.  Moreover, after considering the ECT's object and purpose, the arbitral tribunal in *Eiser* concluded that: "*Article 10(1)'s obligation to accord fair and equitable treatment necessarily embraces an obligation to provide fundamental stability in the essential characteristics of the legal regime relied upon by investors in making long-term investments.*"[490]

646.  Put differently, the Tribunal agrees with the arbitral tribunals' findings in *Isolux, Plama* and *Eiser* that the stability and transparency obligation is simply an illustration of the obligation to respect the investor's legitimate expectations through the FET standard, rather than a separate or independent obligation. Accordingly, the Tribunal will not assess the stability and transparency obligation separately, but as part of the FET standard.

## 25.4.2 The Scope and Applicability of the Fair and Equitable Treatment Standard

647.  The Tribunal will now move on to determining the outer limits of the FET standard.

648.  First and foremost, the Tribunal agrees with the Respondent that the FET's primary element is the legitimate and reasonable expectations of the Claimant. The Respondent cites the arbitral tribunal's observation in the *Electrabel* award, according to which:

"It is widely accepted that the most important function of the fair and equitable treatment standard is the protection of the investor's reasonable and legitimate expectations."[491]

---

[488] Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain, SCC V2013/153, Award, 12 July 2016, paras. 764-766, **Exhibit RL-72**.

[489] Plama Consortium Limited v. Republic of Bulgaria, ICSID Case No. ARB/03/24, Award, 27 August 2008, **Exhibit RL-31**.

[490] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 382, **Exhibit CL-162**.

[491] Electrabel S.A. v. Hungary, ICSID No. ARB/07/19, Award of 25 November 2015, para. 7.75, **Exhibit RL-45**.

649.    The Tribunal considers the interpretation of the FET standard as outlined by the *Micula* tribunal to be of particular relevance:

> "Cases supporting the doctrine of legitimate expectations are numerous. As noted by Dolzer and Schreuer, the protection of legitimate expectations is by now 'firmly rooted in arbitral practice.' Although the question of whether these legitimate expectations were breached is a factual one, an overwhelming majority of cases supports the contention that, where the investor has acquired rights, or where the state has acted in such a way so as to generate a legitimate expectation in the investor and that investor has relied on that expectation to make its investment, action by the state that reverses or destroys those legitimate expectations will be in breach of the fair and equitable treatment standard and thus give rise to compensation."[492] (Footnote omitted.)

650.    The Claimant has argued that legitimate expectations arise naturally from undertakings and assurances made by, or on behalf of, the state and that such undertakings and assurances need not be specific. The arbitral tribunal in *Electrabel*, acknowledged that "[w]*hile specific assurances given by the host State may reinforce the investor's expectations, such an assurance is not always indispensable*".[493] The Tribunal agrees. A multitude of arbitral tribunals have established that undertakings or assurances can be explicit or implicit.[494] In *Micula* the arbitral tribunal observed that:

> "There must be a promise, assurance or representation attributable to a competent organ or representative of the state, which may be explicit or implicit."[495]

651.    Additionally, the Tribunal agrees with the Claimant's statements that an expectation that the regulatory framework will be stable can arise from, or be strengthened by, state conduct or statements.[496]

652.    The standard to which the Tribunal must measure the actions of the Respondent is thus, whether the Respondent by virtue of its statements and conduct (including through RD 661/2007 itself) has given rise to a legitimate and reasonable expectation on the Claimant's part that the regulation implemented through RD 661/2007 would be stable. As pointed out by the Claimant, intent is

---

[492] Ioan Micula, Viorel Micula, S.C. European Food S.A., S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania, ICSID Case No. ARB/05/20, Award, 11 December 2013, para. 667, **Exhibit CL-32**.

[493] Electrabel S.A. v. Hungary, ICSID No. ARB/07/19, Award of 25 November 2015, para. 7.78, **Exhibit RL-45**.

[494] Total S.A. v. Argentine Republic, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010, paras. 119-120; Ioan Micula, Viorel Micula, S.C. European Food S.A., S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania, ICSID Case No. ARB/05/20, Award, 11 December 2013, para. 669, **Exhibit CL-32**.

[495] Ioan Micula, Viorel Micula, S.C. European Food S.A., S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania, ICSID Case No. ARB/05/20, Award, 11 December 2013, para. 669, **Exhibit CL-32**.

[496] Ioan Micula, Viorel Micula, S.C. European Food S.A., S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania, ICSID Case No. ARB/05/20, Award, 11 December 2013, para. 669, **Exhibit CL-32**.

not needed. The relevant question is rather whether the statement or conduct *objectively* suffices to create legitimate expectations in the recipient.[497]

653.    Several arbitral tribunals have assessed what falls within the stability and transparency obligation and to what extent an investor can expect that a particular regulatory framework can remain stable.

654.    As expressed in *Micula v. Romania*, "*the fair and equitable treatment standard does not give a right to regulatory stability per se*", rather, a state has a right to regulate and investors must expect that legislation may and will change.[498] The FET standard does, nevertheless, protect investors from a radical or fundamental change to legislation or other relevant assurances by a state that do not adequately consider the interests of existing investments already made on the basis of such legislation.[499] As provided by the arbitral tribunal in *Eiser*:

>    "[T]he Tribunal concludes that Article 10(1)'s obligation to accord fair and equitable treatment necessarily embraces an obligation to provide fundamental stability in the essential characteristics of the legal regime relied upon by investors in making long-term investments. This does not mean that regulatory regimes cannot evolve. Surely they can." [500]

655.    The arbitral tribunal in *AES Summit* stated that, while regulatory regimes may evolve, a state's measures cannot fall outside of the acceptable range of legislative and regulatory behaviour without breaching the FET standard:

>    "In summary, [the Respondent's measures], while sub-optional, did not fall outside the acceptable range of legislative and regulatory behavior. That being the case, it cannot be defined as unfair and inequitable."[501]

656.    The Tribunal will, thus, have to assess whether the Claimant's expectations on the basis of RD 661/2007 and preceding legislation and conduct by the Respondent were legitimate and reasonable and if subsequent legislation by the Respondent *radically* altered the essential characteristics of the legislation in a manner that violates the FET standard.

657.    The Tribunal agrees with the Respondent that an assessment of the Respondent's actions under the FET standard allows for a *balancing exercise*. As

---

[497] Ioan Micula, Viorel Micula, S.C. European Food S.A., S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania, ICSID Case No. ARB/05/20, Award, 11 December 2013, para. 669, **Exhibit CL-32**.

[498] Ioan Micula, Viorel Micula, S.C. European Food S.A., S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania, ICSID Case No. ARB/05/20, Award, 11 December 2013, para. 666, **Exhibit CL-32**.

[499] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 363, **Exhibit CL-162**.

[500] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 382, **Exhibit CL-162**.

[501] AES Summit Generation Limited and AES-Tisza Erömü Kft v. Republic of Hungary, ICSID Case No. ARB/07/22, Award, 23 September 2010, para. 9.3.73, **Exhibit RL-36**.

quoted by the Respondent, the arbitral tribunal in *Electrabel*, set out a basic principle for application of the ECT FET standard in this respect:

> "[T]he Tribunal considers that the application of the ECT's FET standard allows for a balancing exercise by the host State in appropriate circumstances. The host State is not required to elevate unconditionally the interests of the foreign investor above all other considerations in every circumstance. As was decided by the tribunals in *Saluka v Czech Republic* and *Arif v Moldova*, [a] FET standard may legitimately involve a balancing or weighing exercise by the host State."

> "That requires a balancing or weighing exercise so as to ensure that the effects of the intended measure remain proportionate in regard to the affected rights and interests. Provided that there is an appropriate correlation between the policy sought by the State and the measure, the decision by a State may be reasonable under the ECT's FET standard even if others can disagree with that decision. A State can thus be mistaken without being unreasonable."[502] (Emphasis in Exhibit RL-45 and footnotes omitted.)

658.    In *Saluka*, the arbitral tribunal also applied the balancing exercise:

> "[T]he scope of the Treaty's protection of foreign investment against unfair and inequitable treatment cannot exclusively be determined by foreign investors' subjective motivations and considerations. Their expectations, in order for them to be protected, must rise to the level of legitimacy and reasonableness in light of the circumstances.

> [...]

> No investor may reasonably expect that the circumstances prevailing at the time the investment is made remain totally unchanged. In order to determine whether frustration of the foreign investor's expectations was justified and reasonable, the host State's legitimate right subsequently to regulate domestic matters in the public interest must be taken into consideration as well.

> [...]

> The determination of a breach of [the FET standard] by the Czech Republic therefore requires a weighing of the Claimant's legitimate and reasonable expectations on the one hand and the Respondent's legitimate regulatory interests on the other."[503]

---

[502] Electrabel S.A. v. Hungary, ICSID No. ARB/07/19, Award of 25 November 2015, para. 165 and 180, **Exhibit RL-45**.

[503] Saluka Investments BV (the Netherlands) v. the Czech Republic, UNCITRAL, Partial Award, 17 March 2006, paras. 304–306, **Exhibit CL-18**.

659.   With respect to the element of transparency, and in line with the tribunal in *Plama*, the Tribunal considers this condition to be a significant element for "*the protection of both the legitimate expectations of the Investor and the stability of the legal framework.*"[504]

660.   Finally, and as rightly pointed out by the Respondent, the Claimant bears the burden of proving its case under the FET standard.

661.   In view of the foregoing, the Tribunal will now proceed with determining whether the Claimant's expectations that the Special Regime devised through RD 661/2007 could be considered legitimate and reasonable.

### 25.4.3 Were the Claimant's Expectations Legitimate and Reasonable?

662.   As mentioned in Section 24.4 above, an investor's legitimate expectations are based on the host State's legal framework and on any representations or undertakings by the host State at the time the investor makes the investment. Consequently, and as stated by the arbitral tribunal in *National Grid v. Argentina*: "[T]*reatment by the State should 'not affect the basic expectations that were taken into account by the foreign investor to make the investment'.*"[505] The Tribunal has concluded above that in the present case the investment was made on 13 September 2007. This is the relevant time at which the reasonability and legitimacy of the Claimant's measures must be assessed.

663.   The Tribunal will begin by addressing the Claimant's claims with respect to the nature of Law 54/1997 and RD 661/2007. The Claimant argues that the Kingdom of Spain induced investments in the PV sector through RD 661/2007 by offering a guaranteed FIT to RE producers for the lifetime of the PV plants under the Special Regime (as originally implemented through Law 54/1997). Additionally, the Kingdom of Spain made further statements designed to attract investors, namely the NEC reports, the REP and prospectuses such as "The Sun Can Be All Yours". The Kingdom of Spain then proceeded to retroactively repeal the Special Regime and replace it with the Specific Regime. According to the Claimant, this curtailed the legitimate expectations that the Kingdom of Spain had created through its assurances and undertakings.

664.   The Respondent counters by stating that RD 661/2007 did not contain a guarantee or promise to (i) freeze the Special Regime in favour of the Claimant or of their investors (*i.e.* a perpetually fixed FIT), nor (ii) that successive measures would improve or maintain the Special Regime established in RD 661/2007 (*i.e.* "grandfathering"). The Respondent asserts that "[n]*o diligently informed investor*

---

[504] Plama Consortium Limited v. Republic of Bulgaria, ICSID Case No. ARB/03/24, Award, 27 August 2008, para. 178, **Exhibit RL-31**.

[505] National Grid v. Argentina, Award 3 November 2008, para. 173 (footnote omitted), **Exhibit CL-26**.

*could expect* [a] *freezing* [of the system] *in their favour simply because they met regulatory requirements to obtain the subsidies*".[506]

665.    The Tribunal considers that Law 54/1997 and RD 661/2007 were clearly enacted with the objective of ensuring that the Kingdom of Spain achieved its emissions and RE targets.[507] In order to achieve that objective the Kingdom of Spain created a very favourable investment climate for RE investors, and the nucleus of such investment climate was the Special Regime. The requirements placed on the PV plants to qualify for the Special Regime were limited to registration with the RAIPRE, a requirement which all of the PV Plants had met within the prescribed cut-off date.

666.    In the Tribunal's view, a number of relevant statements or assurances were made by the Respondent with respect to the Special Regime, as initially introduced through Law 54/1997 and further developed by RD 661/2007 and legislation in-between:

(e)    In Law 54/1997, it was stated that RE facilities admitted to the Special Regime would be authorized to incorporate "*all the energy produced by them into the system*" and would "*obtain reasonable rates of return*" as set by the government.[508]

(f)    RD 436/2004 was enacted as expressly aiming at "*provid*[ing] *those who have decided or will decide in the near future to opt for the special regime with a durable, objective, and transparent framework*".[509]

(g)    Under RD 436/2004, PV plants were entitled to incorporate into the grid all of the electric energy produced in exchange for a FIT or premium for the lifespan of the PV plants.[510]

(h)    Under RD 661/2007, which replaced RD 436/2004, PV plants enrolled in the RAIPRE before the cut-off date would be entitled to (i) incorporate all of their net production into the grid; (ii) a FIT that would only be updated in accordance with the national CPI, and (iii) receive a fixed FIT for the lifespan of the PV plants.[511]

667.    These were the legal sources in force in the Kingdom of Spain when the Claimant made its investment and the Tribunal agrees with the Claimant that the above statements and assurances were indeed aimed at incentivising companies to invest heavily in the Spanish electricity sector and that the Claimant made its investment in reliance of the terms provided in RD 661/2007. The commitment

---

[506] The Kingdom of Spain's Statement of Defense, para. 864.

[507] Novenergia's Post-Hearing Brief, para. 45.

[508] Law 54/1997, Arts. 30(2) and (4), **Exhibits C-11, R-23**.

[509] RD 436/2004, Preamble, **Exhibit C-89** (see also **Exhibit R-70**).

[510] RD 436/2004, Arts. 20, 22(1), 33 of, **Exhibit C-89** (see also **Exhibit R-70**).

[511] RD 661/2007, Arts. 9, 14, 17, 18 (c), 20, 24, 36, **Exhibit C-3** (see also **Exhibit R-72**).

from the Kingdom of Spain could not have been clearer. A considerable number of RE companies also invested in reliance on these statements and assurances.

668.  Moreover, the investors were provided with the following information:

(a)  In the prospectus "The Sun Can Be All Yours", the IDAE, an organ of the Kingdom of Spain, wrote with respect to investments in the PV sector that "[t]*he return on the investment is reasonable and can sometimes reach up to 15%"* and offered "*significant financing of the investment*".[512]

(b)  In REP 2005–2010, with respect to the Special Regime, the Kingdom of Spain declared that "*the proper functioning of these mechanisms must be guaranteed* […] *to maintain investor's confidence*" and that it should maintain "*investor's confidence* […] *through a stable and predictable support scheme*".[513]

(c)  In a new prospectus in the "The Sun Can Be All Yours" series in June 2007, the IDAE wrote that investors in the PV sector would "*obtain*[] *a maximum return on the investment*" throughout the lifespan of the facility, namely through the FIT in RD 661/2007.[514]

669.  In the Tribunal's view, the above statements were also aimed at incentivising companies to invest heavily in the Spanish electricity sector and formed part of the basis for the Claimant's investment.

670.  The Claimant's witness Mr. Henri Baguenier expressed the Claimant's reliance on RD 661/2007 and the other sources mentioned above during the Hearing:

"I repeat that in 2006, in our global analysis, we reached a conclusion that the regime was stable and, as you are insisting here, if we had considered the assumption that such radical retroactive measures may be taken, we probably would not have invested. That is all I can say."[515]

671.  Nevertheless, the Respondent has drawn the Tribunal's attention to a number of warning signs that should have alerted the Claimant to the fact that the Special Regime would not remain intact over the course of the lifetime of the PV Plants. However, the vast majority of the sources referred to by the Kingdom of Spain post-date the Claimant's investment date, which the Tribunal has found to be 13 September 2007. The authorities that post-date the Claimant's investment have

---

[512] IDEA, The Sun Can Be All Yours, Reply to all the Key Questions, 24 May 2005, **Exhibit C-68**.

[513] REP 2005-2010, **Exhibit C-69**.

[514] IDEA, The Sun Can Be All Yours, Reply to all the Key Questions, June 2007, **Exhibit C-74**.

[515] Transcript of Hearing, 13 June, p. 65, line 21–25 and p. 66, line 1–2 (Mr. Baguenier).

been listed in Appendix A of the Statement of Reply and in Appendix B to the Claimant's Post-Hearing Brief.

672.    With respect to the sources cited by the Respondent prior to its Statement of Rejoinder, the Tribunal notes that only very few of them pre-date the Claimant's investment. These sources include the REP 2005-2010, the text of RD 661/2007 itself, RD 436/2004 and three Spanish Supreme Court cases as well as statements made in relation to the principles of "economic sustainability" and "reasonable rate of return".[516]

673.    As regards statements in relation to "economic sustainability" and "reasonable rate of return" the Tribunal finds the Respondent's arguments unconvincing, since these principles were still generally vague and insufficiently defined at the time of the Claimant's investment.[517] Precise content was given to these principles through the introduction of Law 15/2012 and RDL 9/2013, which were enacted long after the Claimant had already made its investment. Accordingly, they cannot be considered apposite for the assessment of the reasonability of the Claimant's expectations at the time of the investment, as the Respondent suggests.

674.    The above conclusion deals with the majority of the Respondent's statements with respect to REP 2005-2010, the text of RD 661/2007 itself, RD 436/2004 and the three Spanish Supreme Court cases. As regards these sources, the Tribunal is unpersuaded by the Respondent's arguments. Neither one of the documents could have given the Claimant the expectation that a "reasonable rate of return" would be limited to 7%, that stability and predictability could not be expected in the SES, that the Special Regime could be abolished, or any of the other arguments that the Respondent appears to make. In fact, the sources referenced by the Respondent includes wording that gives investors the impression that the Spanish regulator was eager to incentivise investors to invest heavily in the RE sector and that it was committed to creating a stable and predictable framework for investors to attain such investment. The overwhelming impression created by these sources is rather the exact opposite of that claimed by the Respondent; they constitute a bait rather than a deterrent.

675.    As the Claimant has set out in its Post-Hearing Brief only 18 of the sources cited in the Respondent's Statement of Rejoinder and at the Hearing pre-date the investment date of 13 September 2007 and none of these documents could be construed as a warning to investors of potential drastic changes to the Special Regime.

676.    The three categories of documents to which the Respondent makes reference in this respect are statements by (i) "Business RE Associations", (ii) "Relevant

---

[516] See e.g. Novenergia's Statement of Reply and Answer to Jurisdictional Objections, Section III.E.2.

[517] See e.g. Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 367-392 and Novenergia's Post-Hearing Brief, paras. 77-82.

investors" and (iii) "Omitted Spanish Declarations".[518] As regards the first category of documents, none of the documents originate from the Respondent or any Spanish state entity, but from private associations. With respect to the statements regarding drafts of RD 661/2007, it appears clear to the Tribunal that the criticism levelled against early drafts was later addressed in the final version of RD 661/2007 and could not have served as any sort of warning to the Claimant.[519] As far as the statements regarding the 19 March 2007 draft are concerned, the Tribunal does not consider them to be major issues and certainly not rising to the level of a red flag to the Claimant.[520]

677.   The Respondent has also highlighted several APPA publications from May/July 2006, which criticise RDL 7/2006. In respect of these documents, the Tribunal considers the Respondent's point slightly stronger since the documents could be construed as showing a tendency on the Spanish legislator's part towards implementing retroactive changes of some importance in the SES. However, taken on the whole, the Tribunal agrees with the Claimant that RDL 7/2006 merely acted as a "temporary stepping stone" towards RD 661/2007 and that the Kingdom of Spain's commitment therein was crystal clear. In any event, the statements with respect to RDL 7/2006 could not have acted as a warning sign to the Claimant that the Kingdom of Spain was likely to implement *radical* and *fundamental* changes to legislation already implemented in the SES, namely to the Special Regime.

678.   With respect to the Respondent's arguments concerning the second and third categories of documents and statements, namely statements by "relevant investors" and "Omitted Spanish Declarations", the Tribunal does not consider these to constitute warning signs to the Claimant that the Kingdom of Spain was likely to implement *radical* and *fundamental* changes to legislation already implemented in the SES, namely to the Special Regime.

679.   The Respondent has also submitted that the Claimant did not perform an adequate due diligence prior to making its investment. The Tribunal disagrees. The Tribunal finds it sufficiently established from the statements of Mr. Baguenier during the Hearing that the Claimant did carry out a reasonable analysis of the Spanish regulatory framework prior to its investment, also because RD 661/2007 was so adamantly clear that its understanding by common readers did not require a particularly sophisticated analysis.[521] In any event, the Tribunal remains unconvinced that the type of legal due diligence into the stability of the Spanish renewables regime called for by the Respondent would

---

[518] Novenergia's Post-Hearing Brief, para. 57.

[519] Novenergia's Post-Hearing Brief, paras. 60-65.

[520] Novenergia's Post-Hearing Brief, paras. 66-71.

[521] Transcript of Hearing, 13 June 2017, p. 9 (line 12) – p. 10 (line 7), p. 43 (line 24) – p. 44 (line 23) – p. 48 (line 4), p. 50 (lines 9-17), p. 69 (lines 3-9 and 14-25) (Mr. Baguenier).

have revealed the kind of changes which were later implemented by the Respondent through its introduction of the Specific Regime.

680.    The Tribunal has considered all other arguments made by the Respondent against the Claimant's assertion in this respect (even those not expressly mentioned in these reasons) but is not persuaded by them.

681.    Consequently, the Claimant has convincingly established that its initial expectations were legitimate since there was nothing to contradict the guaranteed FIT in RD 661/2007 and the surrounding statements made by the Kingdom of Spain in e.g. "The Sun Can Be All Yours". In other words, the Tribunal concludes that the Claimant had a legitimate and reasonable expectation that there would not be any radical or fundamental changes to the Special Regime as set out in RD 661/2007.

### 25.4.4 Did the Legislation Introduced by the Respondent After 2007 Constitute a Violation of the Fair and Equitable Treatment Standard in Article 10(1) of the ECT?

682.    The next issue for the Tribunal to determine is whether the legislation introduced by the Respondent has, in fact, constituted a radical change that reaches the threshold of amounting to a violation of the FET standard pursuant to Article 10(1) of the ECT.

683.    Before the Tribunal addresses the challenged measures enacted by the Kingdom of Spain subsequent to RD 661/2007, the Tribunal will address the findings in three cases that have also dealt with some of the issues at hand in the present arbitration.

684.    The Parties have extensively described the similarities and differences between the present arbitration and the *Charanne*, *Isolux* and *Eiser* cases in their Post-Hearing Briefs. The Tribunal is mindful of both similarities and differences and wishes to highlight the following as relevant for the purposes of its decision regarding the Respondent's alleged breach of the FET standard.

685.    In the *Charanne* case, as the Claimant rightly points out,[522] the arbitral tribunal was only confronted with the legislation enacted by the Kingdom of Spain until 2010 (namely RD 1565/2010 and RDL 14/2010) and not the regulations implemented through RDL 9/2013 and subsequent measures. The arbitral tribunal in *Charanne* found that RD 1565/2010 and RDL 14/2010 did not violate the FET standard. The Tribunal agrees with this assessment, which it will address in further detail below.

---

[522] See e.g. Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 630; Novenergia's Post-Hearing Brief, para. 166.

686.  In *Isolux*, again, as the Claimant rightly points out,[523] the arbitral tribunal was faced with an investor that had made investments in October of 2012, *i.e.* at a stage when it must have been clear to the investor that changes were being made to the Special Regime. Even if such changes may not have reached the level of a breach of the FET standard, they certainly must have been an indication to the investor in *Isolux* that significant changes were being made to the Special Regime as set out in RD 661/2007.

687.  In *Eiser*, the factual circumstances and legal issues were very similar to the ones in the present arbitration, *inter alia*, in *Eiser* the investment had also been made in 2007. One relevant distinction is the extent of the harm incurred by the investor in *Eiser*, which appears to have been much graver than the harm which the Claimant submits it has suffered. The Tribunal will get back to the relevance of the impact that the challenged measures have had on the Claimant's investment for purposes of assessing a breach of the FET.

688.  The Tribunal will begin by assessing the measures enacted by the Respondent in 2010, *i.e.* RD 1565/2010 and RDL 14/2010, against the FET standard. RD 1565/2010 limited the number of years for which the FIT was available and RDL 14/2010 limited the number of hours for which the FIT was available per year.[524] The Tribunal does not consider the measures enacted by the Kingdom of Spain in 2010 to reach the level of an FET breach. The Claimant could not have reasonably expected that there would be no changes at all to the regulatory regime that would lower the value of its investment. Moreover, throughout this arbitration, the Kingdom of Spain has repeatedly asserted that the changes to the Special Regime were motivated by the Kingdom of Spain's need to address the so-called tariff deficit. The Tribunal understands the Kingdom of Spain's motivations in this respect and accepts that there was not only a need to address the tariff deficit, but also that the Kingdom of Spain had a regulatory right to do so, albeit not an unfettered right. The measures enacted in 2010 did not, in the Tribunal's view, "*fall outside the acceptable range of legislative and regulatory behaviour*".[525] Put differently, those measures cannot be considered as having "*entirely transform*[ed] *and alter*[ed] *the legal and business environment under which the investment was decided and made*".[526] Moreover, the 2010 measures had limited impact on the Claimant.[527] The Tribunal further notes that the harm inflicted on the Claimant and the resulting damages stemming from the 2010

---

[523] See e.g. Novenergia's Post-Hearing Brief, para. 169.

[524] Novenergia's Statement of Claim, paras. 204-206, 210-216, Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 6, 239, 474.

[525] AES Summit Generation Limited and AES-Tisza Erömü Kft v. Republic of Hungary, ICSID Case No. ARB/07/22, Award, 23 September 2010, para. 9.3.73, **Exhibit RL-36**.

[526] CMS Gas Transmission Company v. The Argentine Republic, ICSID Case No. ARB/01/8, Award 12 May 2005, para. 275.

[527] See Novenergia's Post-Hearing Brief, p. ix, table II.

measures is also lower than that claimed by the claimants in *Charanne*, where the arbitral tribunal did not find a breach of Article 10(1) of the ECT.[528]

689. For the same reasons, the Tribunal does not consider the measures adopted through RD 2/2013 (*ad hoc* CPI) to constitute a breach of the FET standard. The Claimant itself acknowledges that the measures introduced through RD 2/2013 where not of the egregious kind as the subsequent legislation pursuant to which the Special Regime was effectively abolished.[529] RD 2/2013 did not entirely transform or fundamentally change the framework the Claimant relied on when it made its investment in 2007.

690. The Tribunal has found in Section 23 above that it does not have jurisdiction over Law 15/2012 and will, accordingly, not consider it in making its assessment on the merits.

691. That leaves the Tribunal with the assessment of the measures starting with RDL 9/2013. In accordance with the Specific Regime introduced in RDL 9/2013, the remuneration to PV plants would be based on the investment costs of "model facilities". Such model facilities would be equated with "*an efficient and well-managed company*".[530] RD 413/2014 and Order 1045/2014 introduced additional criteria for compensation under the Specific Regime.[531] Law 24/2013 eliminated the distinction between the ordinary and special regimes and confirmed the reforms introduced through RDL 9/2013, including that RDL 9/2013 applied retrospectively to PV plants which had originally benefited from the Special Regime under RD 661/2007.

692. The Respondent has during the arbitration to a large extent focused on the impact that the challenged measures have had on the Claimant's investment. In the Respondent's view, this impact is negligible since the Claimant is still making a healthy profit off its investment. The Respondent argues that it has acted under the limits as provided by Law 54/1997 since it continues to provide to the PV Plants a reasonable return on the investment costs of the PV Plants: a pre-tax return of 7% or a post-tax return of 6.6%. Thus, the Claimant's investments maintain a level of profit and have not been completely destroyed. The Respondent especially stresses this contention when drawing parallels to the *Eiser* case.

693. The Respondent asserts that the arbitral tribunal in *Eiser* established a clear limit to any regulatory change, namely that it cannot be a radical change adopted "*in*

---

[528] Novenergia's Post-Hearing Brief, para. 176.

[529] Novenergia's Skeleton Argument, paras. 72-73.

[530] Novenergia's Statement of Claim, Section III.D.2(i)-(ii); Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 477-479.

[531] Novenergia's Statement of Claim, Section III.D.2(iv), Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 476, 478-480.

*ways that deprive investors* […] *of their investment's value*".[532] The Respondent appears to claim that pursuant to the *Eiser* award, the Tribunal would always have to assess the measures against their economic effect on the particular investment. The standard set by *Eiser* in the Respondent's contention, is that the challenged measures must have destroyed the value of the Claimant's investment.[533]

694.    Contrary to what the Respondent suggests, the actions of the Respondent need not have obliterated the Claimant's investment entirely in order for the Tribunal to consider that the Respondent has breached the FET. The Tribunal disagrees with the approach adopted by the arbitral tribunal in *Eiser*, if it is indeed to be interpreted in the manner suggested by the Respondent. In the Tribunal's view, the assessment of whether the FET standard has been breached is a *balancing* exercise, where the state's regulatory interests are weighed against the investors' legitimate expectations and reliance. It is not simply sufficient to look at the economic effect that the challenged measures have had. Destruction of the value of the investment is clearly determinative in the assessment of whether a state has breached Article 13 of the ECT, but it is but one of several factors to consider when determining whether a state has breached Article 10(1) of the ECT. Nevertheless, in the Tribunal's opinion, the economic effect on a claimant's investment is  an important factor in the balancing exercise pursuant to Article 10(1) as well, as it can go towards showing a change in the *essential characteristics* of the legal regime relied upon by investors in making long-term investments.[534]

695.    Taking into account the Kingdom of Spain's statements and assurances prior to and in connection with the implementation of RD 661/2007, the legitimate expectations of the Claimant, and the changes introduced through RDL 9/2013, the Tribunal considers these challenged measures as radical and unexpected. The manner in which the Kingdom of Spain adopted the measures included and subsequent to RDL 9/2013 fell "*outside the acceptable range of legislative and regulatory behaviour*"[535] and "*entirely transform*[ed] *and alter*[ed] *the legal and business environment under which the investment was decided and made*".[536] Moreover, the challenged measures adopted in 2013 and 2014 had a significant damaging economic effect on the Claimant's investments as evidenced by the Claimant's invoked expert reports and the Claimant's opening statement during

---

[532] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 382, **Exhibit CL-162**.

[533] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, paras. 387, 365, 413, 418, **Exhibit CL-162**.

[534] Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain, ICSID Case No. ARB/13/36, Final Award, 4 May 2017, para. 382, **Exhibit CL-162** and Saluka Investments BV (the Netherlands) v. the Czech Republic, UNCITRAL, Partial Award, 17 March 2006, para. 304–306, **Exhibit CL-18**.

[535] AES Summit Generation Limited and AES-Tisza Erömü Kft v. Republic of Hungary, ICSID Case No. ARB/07/22, Award, 23 September 2010, **Exhibit RL-36**.

[536] CMS Gas Transmission Company v. The Argentine Republic, ICSID Case No. ARB/01/8, Award 12 May 2005, para. 275.

the Hearing. The Claimant's demonstratives, displayed during the Hearing, showed lower revenues on all of the PV Plants, the majority of which showed a decrease between 24 and 32% between 2013 and 2016. In the Tribunal's view, the measures implemented in 2013 and 2014 by the Respondent certainly constitute a substantial deprivation of the Claimant's investment. Consequently, the Tribunal considers the Kingdom of Spain's actions as drastic and unexpected in a manner that is contrary to the Kingdom of Spain's obligation to provide FET to investors.

696.    The Tribunal has considered all other arguments made by the Respondent against the Claimant's assertion in this respect (even those not expressly mentioned in these reasons) but is not persuaded by them.

697.    Consequently, the Tribunal finds that the radical changes enacted by the Kingdom of Spain in 2013 and 2014 have definitely abolished the fixed long-term FIT and have done so retroactively. The Tribunal concludes that the legislation introduced through RDL 9/2013, Law 24/2013, RD 413/2014 and Order 1045/2014 amount to a breach by the Kingdom of Spain of its obligation to accord to the investor FET as set out in Article 10(1) of the ECT and entitles the Claimant to compensation.

### 25.4.5  The Claimant's Further Alleged Breaches of Article 10(1) of the ECT

### 25.4.5.1 Introduction

698.    The Tribunal has concluded that the Kingdom of Spain has failed to honour its obligation towards the Claimant to at all times accord FET to the Claimant and its investment. The Tribunal has also concluded that the stability and transparency obligation is embedded in the concept of FET. The Claimant has however advanced three further distinct breaches of Article 10(1) of the ECT as grounds for its claims in this arbitration:

1.    The Respondent's failure to ensure that the Claimant's investment enjoys the most constant protection and security (Article 10(1) of the ECT);

2.    The Respondent's impairment by unreasonable or discriminatory measures the Claimant's management, maintenance, use, enjoyment or disposal of its investment (Article 10(1) of the ECT); and

3.    The Respondent's failure to observe the obligations entered into with the Claimant's investment (Article 10(1) of the ECT).

699.    While the assessment of the damages flowing from the alleged breaches 1–3 is identical to the assessment of the damages flowing from the Respondent's breach of the standard of fair and equitable treatment (as will be further addressed in Section 27.4 on damages below), the Tribunal notes that the alleged

expropriation breach pursuant to Article 13 of the ECT calls for a different assessment of damages.

700.    The Claimant's position with respect to the alleged breaches in 1–3 above has been outlined in, *inter alia*, Sections IV.A.3, IV.A.4 and IV.A.5 of the Statement of Claim, Sections IV.A.3, IV.A.4 and IV.A.5 of the Statement of Reply and Answer on Jurisdictional Objections, and Sections IV.C, IV.D and IV.E of the Claimant's Skeleton Arguments.

701.    The Respondent's position with respect to the alleged breaches in 1–3 above has been outlined in, *inter alia*, Sections IV.J.3, IV.J.4 and IV.J.5 of the Statement of Defense and Jurisdictional Objections and Sections IV.B.5, IV.B.6 and IV.B.7 of Statement of Rejoinder and Reply to Jurisdictional Objections, and Sections IV.4 and IV.5 of the Respondent's Skeleton Arguments.

702.    For the avoidance of doubt, the below Sections are merely a summary of the Claimant's and Respondent's respective positions in this respect. The Tribunal's reasons and final decision are based on the entirety of the Parties' arguments, both in their submissions and during the Hearing. Insofar as particular arguments are not explicitly discussed here, the Tribunal has nevertheless considered them.

## 25.4.5.2 The Claimant's Position

703.    Article 10(1) ECT provides that an "*Investments shall also enjoy the most constant protection and security…*"[537] This standard encompasses not only the physical protection of an investment but also the legal and economic protection and security of the investment.[538] The host State assumes an obligation to actively create a framework that grants security.[539] Not only did the Respondent not create a stable and secure legal framework, it actively removed all legal certainty and foreseeability. The *National Grid v. Argentina* tribunal found that the respondent had breached the protection and security standard because it had introduced changes in the regulatory framework that effectively dismantled it.[540] This is precisely what the Kingdom of Spain did in the present case.

704.    Moreover, pursuant to Article 10(1) ECT, "*no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal*". This so-called "non-impairment standard" is twofold, it imposes an obligation on the host State to act in a reasonable and measured manner, and provides that the standard can be breached by either unreasonable or discriminatory measures.

---

[537] Energy Charter Treaty, **Exhibit CL-1**.

[538] Novenergia's Statement of Claim, paras. 397-410.

[539] C. Schreuer, "Part I – Fair and Equitable Treatment (FET): Interactions with other standards", in G. Coop, C. Ribeiro (eds.), Investment Protection and the Energy Charter Treaty, 2008, **Exhibit CL-43**, pp. 68-69.  See also Frontier Petroleum Services Ltd. v. the Czech Republic, UNCITRAL, Final Award, 12 November 2010, para. 261, **Exhibit CL-29**.

[540] *National Grid P.L.C. v. Argentine Republic*, UNCITRAL, Award, 3 November 2008, para. 189, **Exhibit CL-26**.

705.    As held by the tribunal in *BG Group v. Argentina*, measures are considered "unreasonable and breach of the treaty" when a State modifies the legal framework that had originally motivated the investment. The Kingdom of Spain's measures did not relate to a rational public policy[541] and were disproportionately burdensome on investors who had invested in the renewable energy sector under RD 661/2007. The measures were furthermore unreasonable and disproportionate in light of the strong commitments acquired by the Kingdom of Spain in RD 661/2007.

706.    Finally, the Kingdom of Spain's failure to maintain the guaranteed tariffs under RD 661/2007 for the lifetime of the Claimant's investment is also tantamount to a breach of the umbrella clause in Article 10 ECT, which obliges the Kingdom of Spain to observe all obligations entered into with the Claimant's investment.[542]

707.    By adopting and promoting RD 661/2007, the Kingdom of Spain expressly undertook to pay a fixed FIT for all electricity produced by registered PV plants for their lifespan. Any modification of the FIT was to be effected only in carefully defined circumstances.[543] Furthermore, and in any event, the Kingdom of Spain made *specific commitments* to the Claimant and its investment. RD 661/2007 was not a general *erga omnes* commitment, but a specific commitment towards a defined group of investors – a discrete and identifiable group of PV plants that registered with the RAIPRE before the prescribed cut-off date,[544] which included the PV Plants in which the Claimant invested.  Moreover, the registration of the PV plants under the Special Regime was based on a process of offer and acceptance – a *quid pro quo* – defined and controlled by the Kingdom of Spain.

### 25.4.5.3 The Respondent's Position

708.    As regards the standard of full protection and security, the Claimant has expressly accepted the standard for reasonability established by the *AES Summit* tribunal:

> "The Respondent also cites *AES v. Hungary*, which held that the full protection and security standard "*does not protect against a state's right* […] *to legislate or regulate* […], *provided that the state acts reasonably in the circumstances*". This *AES v. Hungary* reference likewise demonstrates

---

[541] *National Grid P.L.C. v. Argentine Republic*, UNCITRAL, Award, 3 November 2008, paras. 684, 706-718, **Exhibit CL-26**.

[542] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 743-777. See Noble Ventures, Inc v Romania, ICSID Case No. ARB/01/11, Award, 12 October 2005, para. 46, **Exhibit RL-23**; Société Général de Surveillance S.A. v. The Philippines, ICSID Case No. ARB/02/6, Decision of the Tribunal on Objections to Jurisdiction, 29 January 2004, para. 92(d), **Exhibit CL-96**; Khan Resources Inc., Khan Resources B.V., CAUC Holding Co. Ltd. v. the Government of Mongolia, MonAtom LLC, PCA Case No. 2011-09, Award on the Merits, 2 March 2015, para. 295 citing to the Decision on Jurisdiction in the same matter, **Exhibit CL-35**; Eureko B.V. v. Republic of Poland, BIT, Partial Award, 19 August 2005, para. 246, **Exhibit CL-17**; Enron Corp., Ponderosa Assets, L.P. v. Argentine Republic, ICSID Case No. ARB/01/3, Award, 22 May 2007, para. 274, **Exhibit CL-22**; CMS Gas Transmission Company v. Argentine Republic, ICSID Case No. ARB/01/8, Annulment ad hoc Committee Decision, 25 September 2007, para. 95(a), **Exhibit RL-28**.

[543] Novenergia's Statement of Claim, paras. 154–160; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 412, 659.

[544] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, Section III.B.

that unreasonable measures will engage liability under this standard. The Claimant has never argued otherwise."[545] (Emphasis in the original. Footnote omitted.)

709.   The Claimant submits supposedly alternative measures that could have been reasonable and concludes that the Kingdom of Spain is the Party upon which it will be incumbent to show that the measures adopted are the most reasonable in relation to other possibilities. The Claimant has the burden of proof for its claim. If the Claimant does not establish the irrationality of the disputed measures or their adoption for an unjustified purpose, then the alleged violation shall be dismissed.

710.   With regard to the alleged adoption of abusive or disproportionate measures by the Kingdom of Spain, the measures challenged are consistent with the different tests applied in arbitration case law to evaluate whether this standard has or has not been infringed. The application of these tests to the challenged measures reveals that these: (1) are not discriminatory; (2) respect the FET standard laid down in the ECT; and (3) fulfil the minimum FET standard in international law by respecting the economic equilibrium of the investment. Therefore, the Kingdom of Spain has not breached the minimum standard of FET stated under international law, applicable to the case herein in accordance with the ECT.

711.   The Claimant also alleges that the Kingdom of Spain has infringed the umbrella clause included in the last subsection of Article 10(1) of the ECT. However, the Kingdom of Spain has not concluded any *specific agreements* or *commitments* with the Claimant or its investment. There is no *contract*, *concession* or *license* that generates obligations between the Kingdom of Spain and the Claimant or its investment:

1.   The Regulation cited by the Claimant (RD 661/2007) is a general rule issued *erga omnes*, (i) not expressly designed to seek foreign investment; (ii) nor addressed to the Claimant or its investment, as the *Isolux* award[546] has declared.

2.   Registration in the RAIPRE administrative registry is a mandatory administrative requirement for participating in the SES. It is a mechanism to control the tens of thousands of owners and RE facilities operating in the SES, whose technical sustainability must be guaranteed by the state, as the *Charanne* award[547] has concluded.

[545] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 682-683.

[546] Isolux Infrastructure Netherlands, B.V. v. the Kingdom of Spain, SCC V2013/153, Award, 12 July 2016, para. 772, **Exhibit RL-72**.

[547] Charanne and Construction Investments v. Spain, SCC Case No. 062/2012, Final Award, 21 January 2016, paras. 509-510, **Exhibit RL-46**.

712.    Therefore, the application of the umbrella clause should not be encouraged according to the arbitral doctrine that has applied to the ECT.

### 25.4.5.4 The Tribunal's Reasons

713.    Under the rationale of procedural economy it is generally accepted that an arbitral tribunal does not need to address claims and issues that are already implied in those that are essential to its decision. This has been the view adopted by other arbitral tribunals seized with the task of resolving claims of multiple breaches of applicable investment treaties.[548] Nevertheless, the Claimant's prayers for relief are phrased in a manner that obliges a tribunal seated in Stockholm, Sweden to rule on each request. Mindful of the decision on the Respondent's breach of the FET standard above and of procedural economy, the Tribunal's reasons as regards the Claimant's remaining grounds for breach under Article 10(1) of the ECT will be brief.

714.    Out of the three breaches listed by the Claimant, the first two are a further illustration of the FET standard. Having already decided that the Kingdom of Spain has breached this standard, the Tribunal does not need to expand further, except observing that the additional specific breaches complained of by the Claimant will not modify the compensation that the Tribunal will award to the Claimant for breach of the FET standard.

715.    The allegation of breach number 3 points to the alleged failure by the Respondent to observe the obligations it entered into with the Claimant. Article 10(1) of the ECT does indeed provide for a duty of each Contracting Party to "*observe any obligations it has entered into with an Investor*", a provision that recalls the "umbrella clause" contained in several investment treaties. However, the application of the umbrella clauses requires that the host State either concluded with the investor a specific contract or made to the investor a specific personal promise. On the contrary, in the instant case the Claimant made no contract with the Kingdom of Spain and the rights that the Claimant invoke are founded in general regulatory acts enacted by the Kingdom of Spain for a generality of investors in the field of renewable energy. They cannot therefore be equated with the kind of *ad personam* commitments that traditionally fall under the coverage of an umbrella clause. This request is therefore dismissed, however with no impact on the compensation to be awarded.

716.    Concluding on this point, the Tribunal observes that the additional requests put forward by the Claimant and discussed in the present section do not alter the conclusions already reached by the Tribunal in the previous section in connection with the breach of the FET standard by the Kingdom of Spain.

---

[548] SGS Société Générale de Surveillance S.A. v. Republic of Paraguay, ICSID Case No. ARB/07/29, Award, 10 February 2012, para. 161; Ioan Micula, Viorel Micula, S.C. European Food S.A., S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania, ICSID Case No. ARB/05/20, Award, 11 December 2013, para. 874, **Exhibit CL-32**.

## 26.    Has the Respondent Breached Article 13 of the ECT?

### 26.1    Introduction

717.    The Claimant's position with respect to the issue of expropriation has been outlined in, *inter alia*, Section IV.B of the Statement of Claim, Section IV.B of the Statement of Reply and Answer on Jurisdictional Objections and Section IV.F of the Claimant's Skeleton Arguments.

718.    The Respondent's position with respect to the issue of expropriation has been outlined in, *inter alia*, Section IV.K of the Statement of Defense and Jurisdictional Objections, Section IV.B.8 of Statement of Rejoinder and Reply to Jurisdictional Objections and Section IV.6 of the Respondent's Skeleton Arguments.

719.    For the avoidance of doubt, the below Sections are merely a summary of the Claimant's and Respondent's respective positions in this respect. The Tribunal's reasons and final decision are based on the entirety of the Parties' arguments, both in their submissions and during the Hearing. Insofar as particular arguments are not explicitly discussed here, the Tribunal has nevertheless considered them.

### 26.2    The Claimant's Position

720.    According to the Claimant, the Kingdom of Spain's measures at issue in this arbitration – the complete elimination of the Special Regime and the imposition of a tax on renewable energy producers – had an effect tantamount to the expropriation of Novenergia's investment. The Claimant's investment is protected under Article 13 of the ECT, and the Respondent's unreasonable and disproportionate measures resulted in the expropriation of said investment. Furthermore, the Respondent's invocation of the police powers doctrine as an excuse for said expropriation is irrelevant and should be dismissed.

### 26.2.1 The Claimant's Investment Is Protected by Article 13 of the ECT

721.    Article 13(1) of the ECT explicitly protects investments against illegal expropriation, whether direct or indirect.[549] The Claimant's investment clearly falls within the broad category of investments protected under Article 13 of the ECT.

722.    *First*, Novenergia's investment falls within the meaning of the term "Investment" as defined in Article 1(6) of the ECT, and it is therefore protected by Article 13 of the ECT. The Claimant's investment consists of its majority shareholding in Novenergia Spain and the returns associated with its controlling interest. Article 1(6) of the ECT specifically includes "Returns" in the definition of "Investment",

---

[549] Novenergia's Statement of Claim, paras. 429-432; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 785-816.

and neither Article 1(6) nor Article 13 of the ECT limits or qualifies the term "Returns" in any way.[550]

723.  *Second*, the claim for expropriation arises out of the substantial loss of value of the Claimant's investment due to the measures adopted by the Respondent in violation of the ECT. RD 661/2007 clearly and unambiguously formulated the Claimant's entitlement to the FIT-once duly registered, each PV plant would be paid the guaranteed tariffs for the lifetime of its operation. The grant of the tariffs for the production of each unity of electricity was not discretionary, and was created with the intention of applying to the entire lifespan of the investment. Once this right was registered, it existed under Spanish law.[551]

724.  By abolishing the Special Regime the Respondent expropriated the Claimant's rights, and thus, breached Article 13 of the ECT.

## 26.2.2 The Respondent's Measures Resulted in the Expropriation of the Claimant's Investment

725.  The Respondent, reneging on all of its promises, progressively eroded the Special Regime: *first*, it capped the number of hours that could benefit from the Special Regime; *second*, it limited the duration of the Special Regime; *third*, it modified the revision mechanism of the FIT; and *fourth*, it imposed a tax on electric energy production. Eventually, the Respondent abolished the Special Regime altogether and replaced it with a much less favourable remuneration system. The Respondent's unreasonable and disproportionate measures dramatically decreased the value of the Claimant's investment, and thus substantially deprived the Claimant of its investment. The measures therefore constitute an indirect expropriation, which must be compensated.[552]

726.  *First*, the Respondent's measures caused a substantial deprivation of the Claimant's investment. By progressively eroding, and eventually repealing the Special Regime, the Respondent severely affected the value of the Claimant's investment, amounting to a loss of EUR 61.3 million.[553]

727.  It is uncontroversial in international arbitration that a State measure resulting in a "substantial deprivation" of an investment – that is, when the measure substantially interferes with the control or the economic value of the investment – constitutes an expropriation.[554] The loss incurred by the Claimant's investment

---

[550] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 788-794.

[551] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 810–815.

[552] Novenergia's Statement of Claim, Section IV.B; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, Section IV.B.

[553] As of 15 September 2016: see Second Compass Lexecon Report, para. 3; Novenergia's Statement of Claim, paras. 441-445; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 858.

[554] Novenergia's Statement of Claim, paras. 435-440; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 852-857; Electrabel S.A. v. Republic of Hungary, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, **Exhibit CL-31**; AES Summit Generation Ltd., AES-Tisza Erömü Kft. v. the Republic of Hungary, ICSID Case No.

is both substantial and permanent, and results from the challenged measures that interfered with the Claimant's right to utilise its PV Plants in accordance with the guarantees set out in the Special Regime. The Claimant has been denied the reasonably expected economic benefit of the investment, which formed the very basis of its decision to enter into the Spanish electricity market.[555]

728. *Second*, the Respondent has not complied with the legality requirements set out by Article 13 of the ECT. Article 13(1) of the ECT provides that any expropriation must be carried out "in the public interest".[556] This condition imposes a high threshold on the Respondent that cannot be satisfied by merely stating a complacent and broad purpose in an attempt to justify its actions.

729. The impugned measures were supposedly adopted by the Respondent to target the tariff deficit.[557] However, the choice to permanently burden the renewable energies producers was by no means the Respondent's only option to address the tariff deficit and was contrary to good regulatory practice.[558] In fact, the Respondent chose the only option that had not been recommended by the NEC and disregarded the more reasonable alternatives that would not have been as burdensome for the Claimant, and investors alongside the Claimant, and would have entailed higher savings for the state.[559] Furthermore, the Respondent has failed to show that it engaged in an assessment balancing the impact of the measures, or that it objectively considered other alternatives.[560]

730. Finally, the Respondent's measures were not "accompanied by the payment of prompt, adequate and effective compensation".

731. In short, the Respondent's measures had an effect tantamount to expropriation within the meaning of Article 13 of the ECT and did not meet the requirements of legality. The Respondent is therefore liable to compensate the Claimant for the substantial and irreversible deprivation of the value of its investment.

### 26.2.3 The Challenged Measures Cannot Be Justified by the Police Powers Doctrine

732. The police powers doctrine, invoked by the Respondent, is not applicable to Article 13 of the ECT and, in any event, the challenged measures do not fulfil the

---

ARB/07/22, Award, 23 September 2010, E**xhibit CL-28**; Mamidoil Jetoil Greek Petroleum Products Societe Anonyme S.A. v. The Republic of Albania, ICSID Case No. ARB/11/24, Award 30 March 2015, **Exhibit RL-43**.

[555] Novenergia's Statement of Claim, paras. 380-383; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 856 and Section III.E.1.

[556] Novenergia's Statement of Claim, paras. 449-450.

[557] The Kingdom of Spain's Statement of Defense, paras. 480-483, 562, 585-600, 684, 757, 805, 905; Novenergia's Statement of Rejoinder on Jurisdictional Objections, paras. 148, 423-433, 594, 612, 990.

[558] Novenergia's Statement of Claim, Section III.D.4; First KPMG Report, pp. 7-8, 10-11, 84, 90-126; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, Section III.G.

[559] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 684, 838, 842; First KPMG Report, Section 7.

[560] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 523-531.

requirements of the standard the Respondent posits since the measures are demonstrably disproportionate and unreasonable.

733. *First*, Article 13(1) of the ECT itself defines measures that constitute an illegal expropriation. The specific wording of Article 13(1) of the ECT thus impedes the application of the police powers doctrine, which is a customary international law concept of general application.[561]

734. *Second*, Article 13(1) contains four cumulative legality requirements, the first being that the measure be adopted "for a purpose which is in the public interest". Under the ECT the adoption of a measure in the public interest is a requirement for the legality of an expropriation, and not a basis for a finding that no expropriation has occurred.  The police powers doctrine is merely a general rule of international law allowing States to regulate as they wish unless a rule that specifically proscribes such action, such as Article 13(1) of the ECT, exists.[562] Thus, the *lex specialis* of the ECT clearly contradicts and trumps the general police powers and rule.[563]

735. *Third*, assuming, *arguendo*, that the application of the police powers doctrine were applicable in the ECT context, the challenged measures would still qualify as expropriatory and compensable measures. The public purpose of the challenged measures is questionable because the measures were not proportionate and alternatives were available.[564] The Respondent's own policies caused the tariff deficit, and the measures it adopted were neither reasonable, nor effective.  The Respondent has failed to meet the high threshold of demonstrating the rational public policy and proportionality of its measures.  The Respondent ignored the alternative measures that would have been more efficient in addressing the tariff deficit, while not violating the Respondent's international obligations, and chose to expropriate the Claimant's investment.[565]

736. Based on the above, the police powers doctrine cannot be applied to determine whether the challenged measures are expropriatory.  However, even on the basis of the police powers doctrine, the Respondent fails to meet the threshold of a reasonable and proportionate exercise of the host State's regulatory powers.

737. The Respondent must therefore be held liable for the breach of Article 13 of the ECT.[566]

---

[561] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 818-822.

[562] Mostafa, "The Sole Effects Doctrine, Police Powers and Indirect Expropriation under International Law", 2008 Australian International Law Journal 267, Vol. 15, p. 279, **Exhibit CL-137**.

[563] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 821-833.

[564] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 837, 838.

[565] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 834-845.

[566] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 845.

## 26.3   The Respondent's Position

### 26.3.1 Introduction

738.   The Statement of Claim stated that the measures adopted by the Kingdom of Spain, the object of this arbitration, constitute an indirect expropriation of the Claimant's alleged investment in our country, based on the provisions of Article 13(1) of the ECT.

739.   In this sense, the Statement of Claim affirms that the measures had caused the effect proscribed in the cited international case law of "destroying" 50% of the economic interest of the Claimant's investment.[567]

740.   In its Statement of Rejoinder and Reply to Jurisdictional Objections, the Kingdom of Spain proved that the premises required in order to conclude the existence of a measure equivalent to an expropriation do not exist.

741.   To this end, it underscored the fact that the Statement of Claim had deliberately failed to include the complete transcription of Article 13 of the ECT, Section 2 of which refers to the legislation of a Contracting Party alleged to have carried out an expropriation, and Section 3 of which specifies that "[e]*xpropriation shall include situations where a Contracting Party expropriates the assets of a company or enterprise in its Area in which an Investor of any other Contracting Party has an Investment, including through the ownership of shares.*"[568]

742.   It also argued that the Claimant had failed to show that it has ownership over the allegedly expropriated asset or the existence of a causal link between the measures adopted by the state and the effect of this on the ownership of the asset in question.

743.   In fact, it argued that any investment susceptible to being expropriated must consist of a right or asset that is duly constituted, defined, formed and recognised under the laws of the host State, which grants protection under the corresponding investment treaty.[569]   That is because international law on expropriations only regulates substantive protection of property rights or other economic interests, but not the process of creating said rights.[570] According to the definition of investment in Article 1(6) of the ECT, the Claimant neither "owns nor controls, directly or indirectly" the returns they expected to receive in the future via tariff by virtue of the Spanish legislative framework. Neither is this alleged "security" subject to expropriation under Spanish law, as cited by the

---

[567] Novenergia's Statement of Claim, para. 443.

[568] Energy Charter Treaty, Art. 13(3), **Exhibit RL-3**.

[569] UNCTAD Series on Issues in International Investment Agreements, Expropriation, United Nations Series, New York and Geneva, 2012, page 22, **Exhibit RL-62**.

[570] UNCTAD Series on Issues in International Investment Agreements, Expropriation, United Nations Series, New York and Geneva, 2012, page 22, **Exhibit RL-62**.

ECT, or under international jurisprudence as cited in the Statement of Defense and Jurisdictional Objections.

### 26.3.2 The Case Law Applicable to the Challenged Measures

744.    The measures adopted by the Kingdom of Spain had not represented an indirect expropriation of the investment according to the test applicable according to international case law, as: they had not represented the taking of control by Spain of the investment, nor had they prevented the investment from continuing, nor had they destroyed the value of the investment forever.

745.    The award of the *Charanne* case expressly confirms this doctrine:

> "The Claimants therefore invested in shares (Article 1(6)(b) ECT).
>
> However, the Claimants contend that they have invested in returns (Article 1(6)(e) ECT) [...] According to the Claimants, the 2010 measures would have expropriated the returns on the plants by reducing such returns. The Arbitration Tribunal does not share this view. The subject of the investment were not the returns, but rather the company T-Solar. [...] [A]n investment protected under Article 1(6) must be owned or controlled by the investor, and that the Claimants neither own nor control the future returns on the plants, which do not constitute vested rights. Therefore, the Tribunal considers that the Claimants invested in shares (Article 1(6)(b) ECT), and not in returns."[571] (Footnotes omitted.)

746.    The Claimant denies that the arguments in the *Charanne* case are correct. However, the Claimant accepts the application of the established arguments in the *Electrabel*, *AES Summit* and *Mamidoil* cases. The Claimant accepts the test established by the AES Summit case, but the Claimant denies that in the present case they "*continued to receive substantial revenues despite the changes*":

> "[T]he tribunal analyses whether the measures had the *effect* of depriving a significant part of the *value* of the investment. The tribunal answered this question in the negative since the claimants continued to receive '*substantial revenues'* despite the changes. However, in the present case, the revenues of the PV Plants have contracted severely, and the present earnings from the investment cannot be considered substantial when compared to the guaranteed rate of income under RD 661/2007".[572] (Emphasis in the original. Footnotes omitted.)

---

[571] Charanne and Construction Investments v. Spain, SCC Case No. 062/2012, Final Award, 21 January 2016, paras. 458-459, **Exhibit RL-46**.

[572] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 853.

747.    In the present case, the experts from Accuracy have substantiated that the returns from the Claimant's Plants following the challenged measures reached 7% pre-tax during the regulatory life cycle and 6.6% post-tax.

748.    In no case may it be concluded that a reduction in returns from 8.4% IIR to 6.6% IIR (1.2%) is a "*substantial, radical, severe, devastating or fundamental deprivation of its rights or the virtual annihilation, effective neutralisation or factual destruction of its investment, its value or enjoyment*".

749.    On the contrary, these returns in the current economic situation mean that the Claimant's RE plants are still receiving "*substantial revenues*" after the measures. It is important to note that this return of 6.6% is greater than the WACC for the Sector, which is 4.9 post-tax.

750.    The experts from Accuracy have highlighted the value of these returns:

> "A 7% pre-tax project return (or 6.6% post-tax) based on the Actual scenario is reasonable because:
>
> a) It is in line with benchmark regulated returns of 7% post-tax as provided in [REP 2005-2010] and in the RD 661/2007 economic report. In fact, the figure is higher, due to a drop in interest rates since the publication of [REP 2005-2010] and RD 661/2007, which means that this 7% is equivalent to 5.74% and 5.1% respectively, in 2013 (when RDL 9/2013 was published).
>
> b) It is higher than the Claimant's cost of capital as calculated by Compass Lexecon, which was 6.24% post-tax in June 2014 and 4.94% post-tax in September 2016.
>
> c) It is higher than other benchmarks, such as the discount rates used by other comparable companies in their impairment tests (4.9% - 6.1%) and Novenergía itself".[573] (Footnotes and pictures omitted.)

751.    In light of the above, it is substantiated that the Claimant will recover the costs of investment and will obtain returns greater than that of the capital cost itself and of the capital cost for the RE Sector. Therefore, there can be no valid argument on expropriation of their investment.

752.    In short, the stability guaranteed by the challenged measures in no case lead to a "*substantial, radical, severe, devastating or fundamental deprivation of* [the Claimant's] *rights or the virtual annihilation, effective neutralisation or factual destruction of its investment*".

753.    Finally, it should be highlighted that there are no expropriatory effects from the IVPEE. As indicated in the section on Preliminary Objections, the Tribunal will be

---

[573] Second Accuracy Report, para. 31.

able to examine the question relating to the alleged expropriatory nature of the Tax (a nature which the Respondent firmly denies, in any case) given that the competent tax authorities will have been given the opportunity to state their opinion within a period of six months, as established by article 21(5)(b) of the ECT.

754.    Basically, as the Respondent has shown, the Tax, which applies with a tax rate of just 7%, is one of the costs that are repaid to RE producers, such as PV, through the specific compensation that they receive, so it neutralises the effect of the Tax on those producers.

755.    As the Respondent has shown, the Tax is also a tax-deductible expense for the corporate income tax for tax payers of the Tax, as stated by the Tax Department of the Spanish Ministry of the Treasury and Public Administration.

756.    Therefore, the Claimant's arguments on the alleged expropriatory nature of the Tax lack any support.

757.    The Kingdom of Spain has proved that the returns to be obtained by the PV Plants during their regulatory useful life is 7% before taxes or 6.6% after taxes. The Claimant will recover the costs of investment and will obtain returns greater than that of (i) its own capital cost and of (ii) the capital cost for the RE sector.

758.    Therefore, the stability guaranteed by the challenged measures in no case leads to a "*substantial, radical, severe, devastating or fundamental deprivation of* [the Claimant's] *rights or the virtual annihilation, effective neutralization or factual destruction of its investment*" as required by the tribunal in *AES Summit* in order to constitute a breach of Article 13 of the ECT. In conclusion, a claim for direct or indirect expropriation of the investment should be dismissed.

## 26.4    The Tribunal's Reasons

759.    With respect to expropriation, the Tribunal notes that the requested compensation in connection with this claim would be *lower* than the compensation requested by the Claimant in relation to the other breaches and was indeed brought as an *alternative*.[574] Nevertheless, the Claimant's prayers for relief are phrased in a manner that obliges a tribunal seated in Stockholm, Sweden to rule on each request.

760.    The Tribunal is not persuaded that the Claimant's claim based on alleged expropriation under Article 13 of the ECT is as well-founded as the Claimant's claim for breach of the FET obligation set forth under Article 10(1), which the Tribunal has accepted.

---

[574] Novenergia's Statement of Claim, para. 478; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, fn. 926; Novenergia's Skeleton Argument, fn. 165.

761. In the Tribunal's view, and having regard to the Respondent's objections in relation to the present claim, none of the Spanish regulatory acts that were enacted to regulate PV Plants or RE in general had an expropriatory intent or effect. This also applies to the 2013 and 2014 regulatory acts that the Tribunal has deemed to amount to an infringement of the FET duty under Article 10(1) of the ECT. Although the said acts had the effect of seriously affecting the Claimant's investment and of entitling the Claimant to proper compensation, they have nevertheless left unaffected the Claimant's proprietary rights.

762. In fact, the Claimant's assets that could be possibly expropriated were its industrial properties (plants and related facilities) and the shares of the companies involved in the investment that the Claimant directly or indirectly owns and controls. However, the Claimant is still the "untouched" owner of its plants and is still the holder (direct or indirect) of the companies' shares and relevant capital. While the value of these assets diminished as an effect of the state measures which proved to be incompatible with the FET obligation, the assets as such were not expropriated nor affected by measures having an effect equivalent to an expropriation. In other words, the Tribunal sees in the challenged measures no "taking" by the Kingdom of Spain, even less an illicit taking.

763. In conclusion, the expropriation claim is dismissed. Consequently, the Tribunal does not need to assess the compensation which the Claimant would otherwise be entitled to. The only compensation which the Claimant is entitled to concerns the damages that the Claimant is claiming based on the Respondent's violation of the FET obligation.

## 27. Damages

### 27.1 Introduction

764. The Claimant's position with respect to the issue of alleged damages has been outlined in, *inter alia*, Section V of the Statement of Claim, Section V of the Statement of Reply and Answer on Jurisdictional Objections and Section V of the Claimant's Skeleton Arguments.

765. The Respondent's position with respect to the issue of alleged damages has been outlined in, *inter alia*, Section V of the Statement of Defense and Jurisdictional Objections, Section V of Statement of Rejoinder and Reply to Jurisdictional Objections and Section V of the Respondent's Skeleton Arguments.

766. For the avoidance of doubt, the below Sections are merely a summary of the Claimant's and Respondent's respective positions in this respect. The Tribunal's reasons and final decision are based on the entirety of the Parties' arguments, both in their submissions and during the Hearing. Insofar as particular arguments are not explicitly discussed here, the Tribunal has nevertheless considered them.

## 27.2   The Claimant's Position

767.   According to the Claimant, the Kingdom of Spain must place the Claimant in the situation in which it would have been had the Respondent not breached its international obligations. In respect of expropriation, the Claimant is entitled to the fair market value of its investment immediately before the expropriation occurred.[575]

768.   The damages sought in this arbitration are:

- The Article 13 Claim: an *ex-ante* discounted cash flow ("**DCF**") valuation as of 23 November 2010 resulted in a EUR 33.2 million loss. Dr. Abdala further added pre-award interest, but only up to the date of the second report (15 September 2016). Novenergia's total harm as of 15 September 2016 was therefore EUR 51.4 million.[576]

- The Article 10 Claims: an *ex-post* DCF valuation as of 15 September 2016 resulted in a total loss of EUR 61.3 million.[577]

769.   The Tribunal must also add pre-award compounded interest to the above sums, from 15 September 2016 up until the date of the award. The pre-award interest rate is meant to cover the cost of equity,[578] 7.03% for the *ex-post* valuation[579] and 7.77% for the ex-ante valuation.[580]

770.   Further, should the Kingdom of Spain fail to pay the award, the Claimant's harm will continue to aggregate. The Tribunal must therefore add post-award interest, on the same basis, equivalent to the cost of equity.

771.   The Respondent disputes Compass Lexecon's valuation methodology and conclusions, according to which: (i) the damages are speculative; (ii) the DCF method is inappropriate; (iii) the Specific Regime adequately remunerates

---

[575] Novenergia's Statement of Claim, Section V.A; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 871; Energy Charter Treaty, 17 December 1994, Art. 13(1), **Exhibit CL-1**; Permanent Court of International Justice, Case concerning the Factory at Chorzów, Judgment, 13 September 1928, p. 47, **Exhibit CL-11**; Draft Articles, Arts. 31, 36, **Exhibit CL-40**.

[576] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 874; Second Compass Lexecon Report, tables I and IV.

[577] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, para. 874; Second Compass Lexecon Report, tables I and III. It should be noted that, as explained in Novenergia's Statement of Claim (para. 478) and Statement of Reply and Answer to Jurisdictional Objections (fn. 926) and in the Transcript of the Hearing, 14 June 2017, p. 151, line 17 – p. 152, line 19 (Dr. Abdala), the Novenergia is not seeking double recovery. Therefore, should the Tribunal find that there is exclusively an expropriation, then the Claimant will be awarded EUR 51.4 million (plus pre and post-award interest). Should the Tribunal find that there is a breach of Article 10 ECT (whether in addition to an expropriation claim or not) the Claimant will be entitled to EUR 61.3 million (plus pre and post-award interest).

[578] Second Compass Lexecon Report, Section IV.1.6.

[579] Second Compass Lexecon Report, para. 17, fn. 10, Section IV.1.6.

[580] Second Compass Lexecon Report, para. 17; First Compass Lexecon Report, paras. 8, 119, table VII. The reason for the different cost of equity is the date at which they were calculated. In 2010, *i.e.*, the ex-ante approach, the cost of equity was 7.77%. While this dropped to 7.03% by September 2016, the ex-ante approach will only account for what is known in 2010. However, for the ex-post approach, the 7.03% cost of equity is used. This is one of the many reasons for why an ex-post approach is more accurate.

Novenergia; and (iv) Novenergia is better off under the Specific Regime. It then presents its own DCF method.

772.  *First*, the damages caused are not speculative. The Claimant sustained harm caused by the Respondent's breaches of the ECT. Compass Lexecon's rigorous calculation includes a comparison of (i) the actual scenario, taking into account the replacement of the Special Regime with the Specific Regime, and (ii) a "but-for scenario" in which the challenged measures had not been enacted. This "but-for scenario" is grounded in the realisation of the Claimant's legitimate expectations. *I.e.*, on the expectation to receive the fixed long-term FIT under RD 661/2007. The damages are calculated based on the failure to receive this FIT. As such, they are projected based on years of historic data, including several years under the Special Regime and several years under the Specific Regime.[581]

773.  The Respondent further relied on its Supreme Court's statements, in unrelated cases, on the subject of speculative harm. The Spanish Supreme Court's view on what types of calculations are speculative is irrelevant. It does not adjudicate matters of international law, but of Spanish domestic law. Nor does it have any relevance *vis-à-vis* Compass Lexecon's calculations, since said calculations are specific to the present arbitration.[582]

774.  *Second*, the DCF method is an orthodox valuation method used by countless arbitral tribunals.[583] It is particularly pertinent on these facts for several reasons,[584] including:

- "[t]*he value of Claimant's investments in Spain stems from the cash flow generation capabilities of the PV Plants, which have sound history of eight years of operations (2008-2016)*";[585] (Footnote omitted.)

- "[t]*he DCF approach is particularly suited to value companies whose revenues are defined by law or regulation, such as the FiT regime or the new regime based on an annuity return on assets, as the resulting cash flows are more predictable than unregulated businesses that might be subject to or more exposed to market volatility*";[586] (Footnote omitted.)

- "[l]*eading financial authors support the use of the DCF as their preferred approach for income-producing assets like those of Novenergia's*

---

[581] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 879-882.

[582] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 883-885.

[583] See for example, Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. The Argentine Republic, ICSID Case No. ARB/97/3, Award, 20 August 2007, para. 8.3.3, **Exhibit CL-23**; Walter Bau AG (In Liquidation) v. The Kingdom of Thailand, UNCITRAL, Award, 1 July 2009, para. 14.12, **Exhibit CL-111**.

[584] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 887-890.

[585] Second Compass Lexecon Report, para. 29a.

[586] Second Compass Lexecon Report, para. 29d.

> *investments in Spain and its use is widely supported in the financial literature*";[587](Footnote omitted.) and

- "[t]*he DCF is the most generally accepted technique in valuation analysis and it is widely accepted as a tool for the calculation of damages in disputes*".[588] (Footnote omitted.)

775. The Kingdom of Spain has instead advocated for an asset-based approach. This is an approach routinely rejected by arbitral tribunals.[589] Moreover, even the sources upon which the Kingdom of Spain relies on indicate a clear preference for the DCF method.[590] Only in limited situations do they express a preference for an asset-based method, namely when the business has not yet become operational (or just after it becomes operational). This is very different from the case at hand, in which the PV Plants have been operating for over eight years.[591]

776. *Third*, the Specific Regime does not adequately remunerate Novenergia. The Respondent's belief is rooted in an incomplete calculation comparing only Novenergia's actual investment costs with the standard investment costs under the Specific Regime. That comparison is only partial. Standard investment costs is but one of the elements the Kingdom of Spain uses to determine the new Specific Remuneration. It also relies on standard operating costs and standard production hours, elements that the Respondent has conveniently left out. In fact, Novenergia's actual operating hours are higher while production hours are lower than the assumed "standards" in the Specific Regime's calculation, resulting in a lower remuneration.[592]

777. *Fourth*, a related allegation is that Novenergia's returns under the Specific Regime is higher than under the Special Regime and therefore the Specific Regime is more beneficial. This argument lacks credibility.[593] The Respondent confuses Novenergia's internal rates of return with its lower discount rates. As explained by Compass Lexecon, these concepts are different. One deals with returns, the other with impairment tests for accounting purposes:

---

[587] Second Compass Lexecon Report, para. 29b.

[588] Second Compass Lexecon Report, para. 29c.

[589] Amoco International Finance v. Iran, Iran U.S. Claims Tribunal, Case No. 56 (Award 310-56-3), Partial Award, 1987, 1988 International Legal Materials 1314, Vol. 27, paras. 231, 255, **Exhibit CL-83**; Enron v. The Republic of Argentina, ICSID Case No. ARB/01/3, Award, 22 May 2007, para. 382, **Exhibit CL-22**; Amco. v. Indonesia II, ICSID Case No. ARB/81/1, Award, 31 May 1990, 1992 International Law Reports 368, Vol. 89, paras. 191-193, **Exhibit CL-84**; Tidewater Investment SRL and Tidewater Caribe, C.A. v. The Bolivarian Republic of Venezuela, ICSID Case No. ARB/10/5, Award, 13 March 2015, para. 165, **Exhibit CL-127**.

[590] S. Ripinsky, K. Williams, Damages in International Investment Law, 2008, pp. 200-227, **Exhibit CL-44**.

[591] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 895-901; B. Sabahi, Compensation and Restitution in Investor-State Arbitration – Principles and Practice, 2011, pp. 132-133, **Exhibit RL-56** referring to: Metalclad Corporation v. The United Mexican States, ICSID Case No. ARB (AF)/97/1, Award, 30 August 2000, para. 121, **Exhibit CL-12**; Wena Hotels Limited v. Arab Republic of Egypt, ICSID Case No. ARB/98/4, Award, 8 December 2000, para. 124, **Exhibit CL-89**.

[592] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 902-904; Second Compass Lexecon Report, fn 115; RDL 9/2013, Art. 1(2), **Exhibit C-10**; RD 413/2014, Art. 13(2), **Exhibit C-91**.

[593] Second Compass Lexecon Report, para. 117.

> [T]he discount rates used by Novenergia Spain on impairment tests for accounting purposes do not reflect the expectations of returns of Claimant at the time of the investment. […] Whereas the expected IRR (internal rate of return) as of 2008, the time of investment, would have reflected Claimant's threshold return that it was expecting to obtain to commit for its investments in the projects, the discount rates used for impairment tests reflect the accounting choices made by the Novenergia group to decide on annual corrections to their book value of assets.[594]

778.    In addition, in its comparison of Novenergia's discount rate and the standard remuneration of 7.398%, the Kingdom of Spain forgets that the latter is pre-tax while the former is post-tax, and thus naturally lower.[595]

779.    The Kingdom of Spain's comparison falsely assumes that Novenergia actually receives a return of 7.398%. However, the 7.398% is not Novenergia's actual return; it is the standard return for a standard company matching the Kingdom of Spain's assumptions for a model company as introduced in 2013. Novenergia is not such a company. The PV Plants were constructed to meet the requirements in place under the Special Regime in 2007, not those in place under the Specific Regime in 2013.[596]

780.    *Finally*, in its polemic against Compass Lexecon's DCF calculation, easily dismissed as demonstrated *supra*, the Respondent presents its own DCF calculation performed by Accuracy. Accuracy's methodology is unsound. Accuracy recommends an asset-based valuation method. In Accuracy's opinion, the PV Plants' track-record is allegedly insufficient, thereby rendering a DCF valuation speculative. This allegation is incorrect. Although there is no justification for using the unorthodox asset-based valuation, it is also the case that a correctly applied asset-based valuation would yield a similar result to the DCF valuation.

781.    While Accuracy's report is littered with errors, three errors, addressed infra, contribute to 80% of the disparity between Accuracy and Compass Lexecon's calculations:[597]

   ▪ Accuracy wrongly includes a regulatory risk premium in the discount rate which is much higher in the "but-for scenario" than in the actual scenario. It

---

[594] Second Compass Lexecon Report, para. 109.

[595] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 908-909; Second Compass Lexecon Report, paras. 110-111; RD 413/2014, Art. 19, Additional Provision One, **Exhibit C-4**.

[596] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 908-909; Second Compass Lexecon Report, paras. 110-111; RD 413/2014Art. 19, Additional Provision One, **Exhibit C-4**.

[597] Novenergia's Statement of Reply and Answer to Jurisdictional Objections, paras. 912-917; Second Compass Lexecon Report, paras. 53-55.

incorrectly assumes that investors would pay less for a plant operating under the FIT regime than under the current regime;[598]

- Accuracy improperly includes an asymmetric illiquidity discount that reduces the value in the "but-for scenario" as compared to the actual scenario. This is erroneous, since the exit costs in the industry are at most very moderate, and both revenues and profits in the "but-for scenario" are higher than in the actual scenario, *ipso facto* having lower barriers to exit;[599] and

- Accuracy makes another fundamental mistake in its alternative DCF valuation by duplicating the value of operating costs in the "but-for scenario" and ignoring the cost reductions from 2010 to date.[600]

782. The three major errors in Accuracy's DCF calculation have been outlined above. In addition, several aspects of the Accuracy reports are misleading: (i) Accuracy's incorrect reliance on the Euribor for the purposes of reducing what rate of return is "reasonable"; and (ii) the selective quoting of documents from energy producers for the purpose of making it seem that the measures had a positive effect on market participants.

783. Compass Lexecon's calculation is rigorous and orthodox, based on several years of data, both under the old Special Regime and under the new Specific Regime. The Tribunal should dismiss the Respondent's disingenuous argument that the Claimant has not suffered any harm and is better off under the Specific Regime.

## 27.3   The Respondent's Position

784. In relation to the damages that the Claimant is claiming, the Respondent submits that the Claimant has no right to the requested relief. The Respondent's position on damages is presented secondarily, for the case that, in the first place, the Tribunal were to accept that it has jurisdiction over this dispute and that, secondly, the Tribunal were to accept that there is an infringement on the part of the Kingdom of Spain of any provision of the ECT. Furthermore, the Respondent's position on damages is complemented by the First and Second Accuracy Report, in which certain aspects thereof are developed.

785. The alleged estimated damages in the Compass Lexecon reports are not compensable, as they are totally and absolutely speculative. In this respect, as does the Supreme Court of the Kingdom of Spain in similar cases, the Respondent contends that the alleged damages have not been proven, not even minimally. This reasoning has been clearly laid down in almost one hundred judgments in which the Supreme Court has become aware of modifications to the RE

---

[598] Second Compass Lexecon Report, para. 52b, Section IV.1.2.

[599] Second Compass Lexecon Report, para. 52c, Section IV.1.3.

[600] Second Compass Lexecon Report, para. 52, Section IV.1.1.

remuneration regimen. From among these, emphasis should be placed on the judgment of 24 September 2012, which states the following:

> "[W]ith regard to the expert's report provided with the statement of claims to quantify the impact of the application of [RD 1565/2010], of 19 November, [...] its conclusions cannot be accepted from the moment when its extrapolations were based on a future of thirty years of magnitude, the calculation of which lacks the necessary rigour and security. A 'time horizon' of limitation to 30 years for the right to receive the regulated tariff, the loss of 'equity value' of the photovoltaic plants affirmed in said reports is not proven."[601] (Emphasis omitted from Exhibit R-12.)

786. The Supreme Court ruled that extrapolations into the future lack the necessary rigor and security. And the Claimant has not proven a loss of value of the PV Plants. In other words, the Claimant's calculations are mere speculation and, as a result, do not in any way meet the standard of proof demanded.

787. In that regard, two clarifications: *firstly*, the magnitudes that the Supreme Court deems essential or "*lacking the necessary rigor or security*" are the same ones that the experts from Compass Lexecon had to predict; and, secondly, the statements made by the Supreme Court do not constitute any legal interpretation of Spanish law in the area of energy, rather they are merely an appraisal of the proven *facts*; it is a simple assessment of evidence in accordance with the principle of fair judgment.

788. Concerning the burden of proof, it must be recalled  what was stated in the award in the case *Gemplus v. Mexico*:

> "*Burden of Proof*: Under international law and the BITs, the Claimants bear the overall burden of proving the loss founding their claims for compensation. If that loss is found to be too uncertain or speculative or otherwise unproven, the Tribunal must reject these claims, even if liability is established against the Respondent."[602] (Emphasis in Exhibit RL-76.)

789. With regard to the inappropriateness of the DCF methodology, both the Kingdom of Spain and the Claimant themselves have made reference to scientific doctrine and to arbitral precedents which, under certain circumstances, consider the DCF to be inappropriate as a valuation methodology, given that it is excessively speculative. Therefore, both parties coincide in that the DCF is not an appropriate methodology in every case. In fact, as the award in the case *Rusoro v. Venezuela* establishes:

> "DCF is not a friar's balm which cures all ailments. […] Small adjustments in the estimation can yield significant divergences in the results. For this

---

[601] Judgment of the Supreme Court of 24 September 2012, **Exhibit R-12**.

[602] Gemplus, S.A. et al v. United Mexican States Award, paras. 12-56, **Exhibit RL-76**.

reason, valuations made through a DCF analysis must in any case be subjected to a "sanity check" against other valuation methodologies".[603]

790.  This "sanity check" of the DCF employing other valuation methodologies has not been carried out by the Claimant. In that respect, Accuracy's experts have dedicated Section VII of their Rejoinder Report to point out the incongruities inherent in the approach taken by Compass Lexecon:

> "144. In this section, we will show why the reality check carried out by Compass Lexecon should be disregarded. Specifically, we will show that:
>
> a) The value calculated by Compass Lexecon in the Actual scenario in its First Report is inconsistent with market benchmarks (section VII.1.1)
>
> b) Compass Lexecon has calculated an incorrect value of the investment that is yet to be recovered by the Claimant as of the valuation date (section VII.1.2).
>
> c) International regulatory standards do not systematically nor generally include a premium over the cost of capital (section VII.1.3)
>
> 145. As an alternative, we provide a series of data and market information that demonstrate that multiple sources (analysts, institutions, agencies, [RE] leaders) take a positive view of the impact of the Measures on the [RE] sector in Spain. (section VII.2)"[604]

791.  In other words, not only does Accuracy demonstrate that the DCF of Compass Lexecon contains no reality check, but it also brings to light a series of data and information that shows that the market values in a positive way the impact of the Measures in dispute on the value of the Claimant's investment. That is perfectly coherent with the results of the valuations made by Accuracy, both of its ABV and its subsidiary DCF.

792.  We should also highlight that *Rusoro v. Venezuela* basically underlines the same requirements and features as to whether or not a DCF would be appropriate, which the Respondent has already analysed when commenting on the *Rypinski & Williams and Marboe* manuals.

793.  In this sense, it is the arbitral tribunal who will, as the case may be, determine if the predictions that have to be carried out in a horizon of several decades, on external factors such as for example the energy demand of a country or the pool price (also determined by the evolution of the price of crude oil), are reliable or speculative. Likewise, the arbitral tribunal shall have to decide whether the calculations offered by the Compass Lexecon experts are reliable or speculative.

---

[603] Rusoro Mining Ltd v. Venezuela Award, para. 760, **Exhibit RL-68**.

[604] Second Accuracy Report, Section VII, para. 144 et seq.

794. Besides, in the Statement of Defense and Jurisdictional Objections, the Respondent has demonstrated with figures how the return demanded by Novenergia Spain in the four financial years prior to 2014 (including this latter year), turned out to be less than the return guaranteed by the remuneration regime resulting from the measures (7.398%). In their second report, Accuracy ratifies the initial conclusions and adds the following:

> "– The return that the Claimant receives after the Measures (6.6% post-tax) exceeds any other objective reference for a reasonable return: cost of capital (4.94%), returns from [REP 2005-2010] as well as the Economic Report under RD 661/2007 adjusted to the implementation date of the Measures (5.74% and 5.10%, respectively) and market returns for the sector (4.9%).

> – However, the Claimant's return based on its But For scenario (8.4% post-tax), demonstrates that the claim contemplates windfall profits that, according to the Claimant, were owed to them through the previous renumeration system".[605] (Footnotes omitted.)

795. In other words, the Claimant is seeking to obtain, after the challenged measures, returns in excess even of reference returns. In this respect, Accuracy concludes that "[W]*hat is not open for discussion is that the reasonable return offered after the Measures (7.398%) is superior to the rates demanded from the photovoltaic market in Spain*".

796. Taking the above into consideration, it is clear that the Claimant's claim is speculative and that no damage exists whatsoever. Indeed, the result obtained by the subsidiary DCF models of Accuracy is that the measures in dispute have produced a favourable financial impact on the value of the investment, and that that is so whether an ex-ante or an ex-post approach is taken insofar as the date of valuation is concerned. In other words, the value of the investment of the Claimant has increased following the measures.

797. To simplify the comparisons, and given that the object of the DCF subsidiary calculations involve proving the volatility of the method in this case, and the mistaken calculation of Compass Lexecon, Accuracy has based itself -to the extent possible- on the Claimants' Experts method. In their first report, Accuracy already presented a subsidiary DCF model with a date of 20 June 2014. The results obtained were diametrically opposed to the Claimant's definition, alleging damages. Pursuant to Accuracy's DCF calculations, the Claimant could have obtained an increase in the value of its investment of up to EUR 0.4 million as a consequence of modifications to legislation.

798. In the Respondent's Statement of Rejoinder, to complete the spectrum, Accuracy also offers an *ex ante* assessment, as Compass Lexecon does, using an

---

[605] Second Accuracy Report, para. 10

assessment date of 23 November 2010. However, the results are the same: an increase in the value of the Claimant's investment. In this case, EUR 4.7 million, as shown in the chart below:[606]

**Table 11 – Subsidiary quantification of the impact of the Measures: *ex-ante* approach (23 November 2010)**

| €m | | But-For | Actual | Impact |
|---|---|---|---|---|
| Enterprise value of Novenergía España | [a] | 122.2 | 128.6 | |
| Net financial position of Novenergía España | [b] | (86.8) | (90.0) | |
| Value of the investments in Novenergía España (shares and loans) | [c]=[a]+[b] | 35.4 | 38.7 | |
| *Participation of NOVENERGÍA* | *[d]* | *100.0%* | *100.0%* | |
| **Gross market value for the Claimant as at 23 November 2010** | **[e]=[c]*[d]** | **35.4** | **38.7** | |
| *Illiquidity discount* | *[f]* | *17.0 %* | *11.8 %* | |
| **Net market value for the Claimant as at 23 November 2010** | **[g]=[e]*(1-[f])** | **29.4** | **34.1** | |
| **Measures impact for the Claimant as at 23 November 2010** | **[h]** | | | **(4.7)** |
| Pre-award interests: OAT 6 years (4.387%) | [i] | | | - |
| **Measures impact for the Claimant as at 15 September 2016** | **[j]=[h]+[i]** | | | **(4.7)** |

*Source: Corrected Compass Lexecon ex-ante model. Exhibit ACQ-0030. Note: a negative value implies an absence of damages to the Claimant.*

799. Discrepancies between the different DCF (by Accuracy and Compass Lexecon) derive from the different parameters that are considered. Among other factors, Accuracy has considered that but-for scenario conditions would obviously entail a greater risk and greater levels of uncertainty than the current scenario. Income would be subject to a greater risk in the but-for scenario. In fact, the framework that we encounter in the actual scenario under current legislation is stable, more predictable and lowers risk. This is very clearly accredited by the appraisal of market agents and the numerous transactions that have occurred since the approval of the challenged measures. It is logical that these considerations will have repercussions on the different discount rates to be considered, and on the different illiquidity discounts to be applied.

800. As regards Compass Lexecon's reference to the discrepancy in operating costs, it should be noted that the second DCF calculation made by Accuracy, was limited to the management fees, as indicated by Compass Lexecon.[607] However, as shown, even considering this point, the increase in the value of the investment is still greater in this second DCF calculation with an *ex ante* focus.

---

[606] Second Accuracy Report, para. 136, table 11.

[607] Second Accuracy Report, Section V.2, para. 98 et seq.

801. Notwithstanding, even if the speculative methods of DCF are used, it has been proven that the hypothetical impact is neutral or favourable to the Claimant, but in no case is it negative.

802. Finally, Claimant's request for interest should be dismissed. The interest cannot be the cost of capital claimed, since this lacks economic sense, as such interest seek to remunerate risks which the Claimant has not incurred.

## 27.4   The Tribunal's Reasons

### 27.4.1 The Standard of Compensation

803. The Tribunal has concluded that the Kingdom of Spain has violated its obligation contained in Article 10(1) of the ECT to accord FET to the Claimant's investment. Following such breach of international law, the Tribunal needs to assess whether this implicates any right to compensation in favour of the Claimant and, if so, the appropriate quantum of such compensation.

804. The ECT sets out in Article 13(1) a compensation formula which applies in relation to expropriation. The gist of this standard is that the compensation shall amount to the fair market value of the expropriated investment immediately before the expropriation took place. The compensation shall also include interest at a commercial rate established on a market basis from the date of the expropriation until the date of payment. Although this standard has at times served as guidance for relevant compensation in relation to breaches of the ECT other than unlawful expropriation, this Tribunal finds that a more nuanced assessment is called for, which is *inter alia* consistent with the Tribunal's dismissal of the claim for expropriation based on Article 13.

805. Since the ECT does not embody a provision which regulates the applicable compensation standard for a state's violation of the obligation to accord fair and equitable treatment, the Tribunal finds it appropriate to apply general principles of customary international law to determine the relevant compensation standard.

806. Pursuant to Article 31 of the Draft Articles on Responsibility of States for Internationally Wrongful Acts (the "**Draft Articles**"):[608]

> "1. The Responsible State is under an obligation to make full reparation for the injury caused by the internationally wrongful act.
>
> 2. Injury includes any damage, whether material or moral, caused by the internationally wrongful act of a State."

---

[608] Draft Articles, **Exhibit CL-40**.

807.  The compensation standard codified in the Draft Articles is based on the best practice set out by many arbitral tribunals over a significant period of time, but stems primarily from the 1928 principal case from the Permanent Court of International Justice ("**PCIJ**") referred to as *Factory at Chorzów*. In its decision on merits the PCIJ laid down that:

> "The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it – such are the principles which should serve to determine the amount of compensation due for an act contrary to international law."[609]

808.  The principle of full reparation under customary international law therefore dictates that the aggrieved investor shall through monetary compensation be placed in the same situation it would have been but for the breaches of the state's international law obligations. The compensation includes the loss already sustained as well as loss of profits.[610] The application of the full reparation principle in relation to investors when assessing the consequences a host State's breaches of its investment protection obligations is well in line with the findings of several other arbitral tribunals.[611]

809.  The Tribunal therefore finds that pursuant to customary international law the Respondent is obliged to make full reparation to the Claimant for the damages caused by the Respondent's failure to accord FET to the Claimant's investment pursuant to Article 10(1) of the ECT. The reparation must as far as possible wipe out all the consequences of the Respondent's breach of the ECT, which includes as far as possible compensation for the Claimant's lost profits.

### 27.4.2  The Damages Payable by the Respondent

810.  The Claimant has sought damages in this arbitration under Article 13 of the ECT relating to the Respondent's alleged unlawful expropriation of the Claimant's investment in the amount of EUR 51.4 million (plus pre-award interest). According to the Claimant, the damage corresponds to the fair market value of its investment immediately prior to the expropriation occurred. However, since

---

[609] PCIJ, Case Concerning the Factory at Chorzów, Judgment, 13 September 1928, p. 47. **Exhibit CL-11.**

[610] Pursuant to the Article 36(2) of the Draft Articles "*The Compensation shall cover any financially assessable damage including loss of profit insofar as it is established.*" **Exhibit CL-40**.

[611] See for instance CME Czech Republic B.V. (the Netherlands) v. the Czech Republic, UNCITRAL Partial Award, 13 September 2001, paras. 616-618, **Exhibit CL-13**; Siemens AG v. the Argentine Republic, ICSID Case no. ARB/02/8, Award 6 February 2007, para. 353, **Exhibit CL-21**.

the Tribunal has concluded (see Section 26.4 above) that the Respondent has not violated its obligations under Article 13 of the ECT and consequently dismissed the Claimant's claims in this respect, no further assessment of the damage relating to the investment's fair market value needs to be undertaken.

811.    In respect of the Claimant's claim that the Respondent has breached its obligations under Article 10(1) of the ECT, the Claimant has argued that it should be placed in the same financial situation it would have been but for the Respondent's breach of Article 10(1) of the ECT. The Claimant argues that the loss suffered as a consequence of the Respondent's violations of Article 10(1) of the ECT amounts to EUR 61.3 million.

812.    The Tribunal takes note of the Claimant's confirmation that it is not seeking double recovery and of its position that, should the Tribunal find that there was exclusively an expropriation, then the Claimant shall be awarded EUR 51.4 million. Otherwise, the Claimant shall be entitled to EUR 61.3 million.[612]

813.    In order to support its damages claim, the Claimant has relied on two expert reports from Compass Lexecon and oral testimony by Dr. Abdala. In relation to the evaluation of damages, the Respondent has relied on two expert reports from Accuracy and oral testimony by Mr. Saura.

814.    In relation to the Respondent's breach of Article 10(1) of the ECT, Compass Lexecon has arrived at a damage sustained by the Claimant in the amount of EUR 61.3 million by deploying an ex-post DCF valuation (as of 15 September 2016). This sum consists of (i) EUR 22.9 million in historical damages up to 15 September 2016, and (ii) a loss of EUR 38.4 million in the fair market value of the investment as of 15 September 2016.

815.    The amount of historical damages is based on the estimated foregone cash flow to the Claimant in the period from January 2011 to September 2016. The fair market value is based on Novenergia Spain's estimated value to its shareholders as of 15 September 2016. On both counts, Compass Lexecon has compared the forgone cash flow and the fair market value in a but-for scenario with the actual scenario and the damages result from the delta of those scenarios.[613]

816.    The Respondent has raised a number of objections to the Compass Lexecon analysis, which will be dealt with in the following.

817.    The Respondent has argued that the DCF-method is generally an inappropriate method for valuation. Accuracy further criticises the DCF-method as being ill-suited for calculating the economic impact in this case as the historical period is very short compared to the period which Claimant is trying to model. Accuracy

---

[612] Novenergia's Statement of Claim, para. 478; Novenergia's Statement of Reply and Answer to Jurisdictional Objections, fn. 926; Novenergia's Skeleton Argument, fn. 165.

[613] Second Compass Lexecon Report, para. 16, table III.

refers to certain academic studies and World Bank guidelines in support of the inappropriateness of the DCF-method in this case.[614]

818.   However, the DCF-valuation is based on fundamental principles of economic and finance and is regarded by many as the preferred method for valuation of income-earning assets. The DCF-method is widely supported in professional literature, but more importantly, the method has been broadly accepted by numerous arbitral tribunals as "*the only method which can accurately track value through time*" and "*the preferred method of calculating damages in cases involving the appropriation of or fundamental impairment of going concerns*". In the words of the *CMS v. Argentina* tribunal:

> "DCF techniques have been universally adopted, including by numerous arbitral tribunals, as an appropriate method for valuing business assets".[615]

819.   The Tribunal has also taken note of the Respondent's reliance on the Spanish Supreme Court judgments on the subject of speculative damages, but finds them irrelevant and of no assistance to the evaluation of damages in this case. Notably, this Tribunal applies international law and needs to analyse the alleged damages from a case specific point of view.

820.   In summary, the Tribunal does not consider the DCF-method ill-suited or speculative, especially considering the fact that the cash flow capabilities of the PV Plants have a track record of eight (8) years (2008-2016), and that the DCF-method is considered particularly suitable for valuating income-streams that are regulated (as opposed to unregulated business that is more exposed to market fluctuations).[616]

821.   Consequently, the Tribunal considers that the Claimant's approach to the damages calculation by the use of a DCF-method is generally an appropriate starting point. However, the Respondent has also advanced criticism against the DCF-method deployed by the Claimant in this specific case. This will be analysed in the following paragraphs.

822.   The Respondent argues that the Specific Regime adequately remunerates the Claimant and that the Claimant is in fact in a better position under the Specific Regime compared with the Special Regime.

823.   The Tribunal understands the Respondent to base this contention on the fact that the Claimant's standard investment costs are lower than the standard investment costs set by the Specific Regime, and, as a consequence, the

---

[614] First Accuracy Report, para. 112.

[615] CMS Gas Transmission Company v. The Argentine Republic, ICSID Case No. ARB/01/8, Award 12 May 2005, para. 416.

[616] Second Compass Lexecon Report, para. 29d.

Claimant's rate of return on its investment must be higher than the 7.398% standard rate of return for model PV Plants.[617]

824.    However, as explained by Compass Lexecon, the standard remuneration is also affected by standard operation costs and standard production hours. Since the Claimant's plants have higher operating costs and lower production hours compared with a standard plant, the Claimant's remuneration is lower than the standard remuneration.[618] Therefore, it cannot be correct that the Claimant's rate of return is higher than the standard rate of 7.398% as contended by the Respondent.

825.    On the argument that the Claimant would be in a better position under the Specific Regime compared with the Special Regime, the Tribunal has considered the discussion between the valuation experts regarding the use of internal rates of return and discount rates.

826.    The Tribunal understands that the internal rates of return is a relevant measurement for what the Claimant was expecting to get from its investment in the Kingdom of Spain at the time of making the investment. The discount rates however, as referred to and used by the Respondent and its evaluation expert, cannot reasonably be taken as a threshold of what the Claimant expected the PV Plants to generate. This is so because, as noted by Compass Lexecon, the discount rates serve a different purpose, namely one for impairment tests in order to correct the internal book value of the investment assets in the Novenergia group.[619] Further, the Tribunal accepts the additional explanation provided by Compass Lexecon that while the standard rate of 7.398% is calculated pre-tax, the Claimant's discount rate is applied post-tax, and as such it is lower.[620]

827.    Furthermore, as already noted by the Tribunal in paragraph 822 above, the PV Plants are not standard plants that meet the requirements of the Specific Regime, and as such, their rate of return under this regime is not 7.398%, but lower. Compass Lexecon has summarised this as follows:

>    "In sum, the PV Plants' effective rate of return after the Measures is 5.0% (post-tax) according to Accuracy's own DCF model (not 6.5-6.9% as Accuracy claim), and it is 4.3% (post-tax) once it incorporates the information on the likely outcome of the 2019 tariff review. A return at a 4.3% or 5.0% level is not only lower than the opportunity cost, but more importantly, is lower than the expected rate of return that Spain promised under the original regulatory framework in order to promote investments

---

[617] The Kingdom of Spain's Statement of Defense, paras. 1021-1022.

[618] Second Compass Lexecon Report, fn. 115.

[619] Second Compass Lexecon Report, fn. 115.

[620] Second Compass Lexecon Report, para. 110.

for a (fast) deployment of new capacity from renewables."[621] (Footnote omitted.)

828.    In summary, the Tribunal is convinced that the Claimant is not in a better position under the Specific Regime compared with the Special Regime.

829.    Accuracy has in its first expert report presented an alternative DCF calculation of the possible financial impact of the challenged measures. In its alternative calculation, Accuracy has applied the same methodology as Compass Lexecon, but corrected the calculation on certain parameters.[622] Pursuant to Accuracy's corrected DCF valuation, the impact on the Claimant of the challenged measures is actually slightly positive (EUR 0.4 million in its favour), meaning that the Claimant could have obtained an increase in the value of its investment as a consequence of the modifications to the legislation.[623]

830.    The Tribunal has analysed the two DCF calculations presented to it and makes the following observations.

831.    Three of Accuracy's corrections in its alternative DCF-calculation seem to represent approximately 80% of the difference between the two expert reports. The corrections concern (i) the discount rates; (ii) an illiquidity discount; and (iii) the operating costs.

832.    *First*, in respect of the discount rates, Accuracy has included a risk premium in the but-for scenario that is higher than in the actual scenario (2.2% in the former compared with 0.5% in the latter). However, it cannot be correct to assume a higher risk in a scenario where the regulatory framework of the RE sector would have remained stable and RD 661/2007 would have continued to remain in force as originally implemented. The facts of the case show that under the Special Regime, the Respondent managed to attract numerous investors to the tune of billions of euros, indicating that the risk was considered low. Conversely, under the Specific Regime, it is not reasonable to conclude that the risk is lower, especially considering that the current remuneration system is subject to periodic reviews and the turmoil that they have caused.

833.    *Second*, with regard to the illiquidity discount included by Accuracy in its alternative DCF-calculation, this has served to reduce the but-for scenario with 17% and the actual scenario with 11.8%. The rationale behind the inclusion of such discount seems to be to reflect that the Claimant's stake in the PV Plants was not traded and thus more difficult to sell, and also on the assumption that investors value the possibility to divest quickly.

---

[621] Second Compass Lexecon Report, para. 117.

[622] First Accuracy Report, paras. 600-619.

[623] The Kingdom of Spain's Statement of Defense, para. 1031.

834. The Tribunal has analysed Accuracy's arguments, but finds them unconvincing and not sufficiently substantiated, especially in light of the counterarguments and evidence presented by Compass Lexecon on this issue.[624] In summary, the Tribunal is not convinced that an otherwise healthy business operating under a regulated and stable environment would be more difficult to divest, something which is also confirmed by statistics on RE transactions in Spain showing entirely normal exit times.[625]

835. Third, Accuracy has considered the operating costs of the PV Plants in the but-for scenario to be more than double the actual operating costs. In its model, Accuracy departs from the actual operating costs of the PV Plants in 2010 (EUR 5.4 million) and projects this into the future. This is done, irrespective of the evidence presented by the Claimant showing that the PV Plants in the actual scenario have substantially reduced the operating costs during the following years (EUR 2.5 million in 2014).[626] The higher assumed operating costs have had a significant negative impact on the value of the PV Plants in the but-for scenario.

836. The basis for Accuracy's approach of not taking into account the actual reduction of costs of the PV Plants in the but-for scenario must be that those reductions came about because of the challenged measures. However, the Tribunal is not convinced. Compass Lexecon has identified, and already taken into account, three operating cost items whose reduction came about as a consequence of the challenged measures (operation and maintenance service contracts, insurance costs and the land fee of Alamo).[627] Other than those costs, the Tribunal finds itself at a loss as to why the actual operating costs of the PV Plants should not constitute the correct evaluation element in the but-for scenario.

837. The Tribunal concludes that it considers the DCF-model presented by Compass Lexecon to be conventional, robust and sufficiently substantiated to form the basis of the damages evaluation in this case. The Tribunal has noted and considered all of differences of opinions regarding the DCF-model presented by Accuracy (the major three have been addressed in the foregoing). The criticism presented by Accuracy of the Compass Lexecon evaluation model has not persuaded the Tribunal.

838. The total loss suffered by the Claimant as a consequence of the Respondent's breach of Article 10(1) of the ECT, calculated as of 15 September 2016, amounts to EUR 61.3 million. However, as the Tribunal has dismissed the Claimant's claims relating to Law 15/2012 for lack of jurisdiction, the damage corresponding to such measure needs to be deducted.

---

[624] Second Compass Lexecon Report, paras. 74-83.

[625] Second Compass Lexecon Report, para. 79 with references.

[626] Second Compass Lexecon Report, para. 56.

[627] First Compass Lexecon Report, paras. 88-93.

839. Furthermore, since the Tribunal has concluded that it was only by the Respondent's abolishment of the Special Regime and the introduction of the Specific Regime that the Respondent "crossed the line" and breached its obligation to accord fair and equitable treatment, the losses suffered by any of the measures pre-dating the abolishment of the Special Regime on 12 July 2013 (by RDL 9/2013) also need to be deducted.

840. These measures, and their effect on the Claimant's total loss,[628] are (i) RD 1565/2010 (limited years for FIT) - no effect on claimed loss; (ii) RDL 14/2010 (limited hours for FIT) - EUR 6.8 million effect on claimed loss; (iii) Law 15/2012 (7% tax until July 2013) - EUR 0.8 million effect on claimed loss; and (iv) RDL 2/2013 (new *ad hoc* CPI) - EUR 0.4 million effect on claimed loss.

841. The remaining loss claimed by the Claimant (*i.e.* EUR 61.3 million *minus* EUR 6.8 million *minus* EUR 0.8 million *minus* EUR 0.4 million) thus amounts to EUR 53.3 million and represents the damage caused by the Respondent's breach of the standard of FET set forth in Article 10(1) of the ECT.

842. The Tribunal notes that the Claimant itself has quantified the loss suffered as a consequence of the Specific Regime in isolation (defined as Law 15/2012, RDL 9/2013, Law 24/13, RD 413/2014 and Order 1045/2014) to EUR 53.3 million.[629]

843. In summary, the Tribunal concludes that, on the evidence presented to it, the Claimant is entitled to an award of compensation in the amount of EUR 53.3 million. To such an amount interest shall be added.

### 27.4.3 The Interest Payable by the Respondent

844. The Tribunal has concluded that the Respondent has violated its obligations under Article 10(1) of the ECT. However, as noted above, this provision does not regulate the principles of compensation and, moreover, is silent with respect to the interest rate that should apply. However, by way of analogy, Article 13(1) (which defines the compensation payable in respect of expropriation) states that: "[c]*ompensation shall also include interest at a commercial rate established on a market basis from the date of the Expropriation until the date of payment.*"

845. The Claimant has requested pre-award compounded interest (from the evaluation date 15 September 2016 until the award), and post-award compounded interest (from the award until payment is made) at a rate of 7.03%, which according to the Claimant equals the cost of equity. The Respondent has argued that the cost of equity is not a suitable measurement, and if interest shall

---

[628] Novenergia's Post Hearing Brief, p. ix, table II.

[629] It should be noted that the Tax (*i.e.* Law 15/2012) is included also in the Specific Regime. However, the Parties are in agreement that once the Specific Regime was introduced, the Tax formed an integral part of the Specific Regime and its separate effect was essentially neutralised through an increased remuneration. The historical damage of the Tax therefore only applies to the first half of 2013, *i.e.*, before the enactment of the Specific Regime. See Claimant's Post Hearing brief, paras. 159-161 and the Kingdom of Spain's Statement of Defense, paragraph 614.

be awarded, it should correspond to a short-term, risk-free rate both in respect of pre- and post-award interest.[630]

846.    The Tribunal considers that a relevant interest rate for this purpose shall correspond to a commercial and risk-free yield interest rate in the Kingdom of Spain during a relevant time-period. The Tribunal finds that the 10-year Spanish yield bond best corresponds to these parameters.[631] At the time of the award, the interest rate of this instrument is approximately 1.5%[632] and shall be awarded on a compounded monthly basis. The Tribunal notes that the compounded basis on the interest is in conformity with international law and practice in investment arbitration.

847.    Taking the Parties' respective positions into account, the Tribunal decides to award interest from 15 September 2016 to the date of this Award at the rate of 1.5% compounded monthly. From the date of this Award, the Tribunal decides to award interest at the same rate, *i.e.* 1.5% compounded monthly, until payment has been made.

## X.    COSTS

## 28.    The Claimant's Costs

848.    The Claimant submitted the following summary of the costs incurred in the arbitration up to 1 September 2017:

(a)    Latham & Watkins LLP (fees and expenses): EUR 1,631,988.63

(b)    External Translation Costs (fees and expenses): EUR 44,799.40

(c)    Experts (fees and expenses): EUR 1,118,288.15

(d)    Novenergia In-House Costs: EUR 4,164.17; SEK 109,087.00

(e)    Hearing Costs: SEK 188,776.00; GBP 7,194.55; EUR 14,027.23

(f)    Advance on costs to the SCC: EUR 277,150.00

849.    The Claimant's total costs amount to:

**(a)    GBP 7,194.55**

**(b)    EUR 3,090,417.58**

**(c)    SEK 297,863.00**

---

[630] Second Accuracy Report, para. 143.

[631] Apparently, this is not "short-term" and the Tribunal has taken note of the discussions between the Parties regarding different relevant bench-marks. However, the Tribunal considers that the Spanish short-term bonds are depressed for reasons unrelated to the commercial reality of the Claimant and that the interest rate of the 10-year bond better reflects this reality.

[632] https://www.bloomberg.com/quote/GSPG10YR:IND

## 29.    The Respondent's Costs

850.    The Respondent submitted the following summary of the costs incurred in the arbitration up to 1 September 2017:

    (a)  Advance on costs to the SCC: EUR 277,150.00

    (b)  Experts: EUR 496,100.00

    (c)  Translations: EUR 28,020.28

    (d)  Editing services: EUR 7,978.35

    (e)  Courier services: EUR 2,579.75

    (f)  Travelling expenses: EUR 30,204.17

    (g)  Hearing expenses: EUR 39,592.97

    (h)  Legal fees: EUR 306,500.00

851.    The Respondent's total costs amount to **EUR 1,188,125.52**.

## 30.    The Tribunal's Findings on Costs

852.    Pursuant to Article 43 of the SCC Rules, the costs of the arbitration consist of (i) the fees and expenses of the arbitral tribunal, and (ii) the administrative fee and expenses of the SCC. Unless otherwise agreed by the parties, the arbitral tribunal shall, at the request of a party, apportion the costs of the arbitration between the parties, having regard to the outcome of the case and other relevant circumstances. The parties are jointly and severally liable to the arbitrators and to the SCC for the costs of the arbitration.

853.    On 9 February 2018 the Board of the SCC set the costs of the arbitration as follows:

    (a)  The fees and expenses for the chairperson of the Tribunal, Mr. Johan Sidklev, amount to EUR 225,000 (fees), EUR 1,148.36 (expenses), and SEK 4,551 (expenses).

    (b)  The fees and expenses for co-arbitrator, Professor Antonio Crivellaro, amount to EUR 135,000 (fees), EUR 6,272.09 (expenses), and SEK 2,316 (expenses).

    (c)  The fees and expenses for co-arbitrator, Judge Bernardo Sepúlveda Amor, amount to EUR 135,000 (fees), and EUR 9,199 (expenses).

    (d)  The expenses for the administrative secretary, Ms Shirin Saif, amount to EUR 615.51.

(e)  The administrative fee of the SCC amounts to EUR 50,686.

854.  Value Added Tax must be added to the above amounts where applicable.

855.  In addition, and in accordance with Article 44 of the SCC Rules, the arbitral tribunal may in the final award upon the request of a party, order one party to pay any reasonable costs incurred by another party, including costs for legal representation, having regard to the outcome of the case and other relevant circumstances.

856.  The Parties have not agreed on the apportionment of the costs of the arbitration and have instead left this determination to the Tribunal.

857.  As regards the Parties' submissions on costs, the Tribunal finds as follows. The Respondent has lost its primary jurisdictional objection and on the merits and should therefore bear its own costs and refund the Claimant's costs pursuant to Articles 43 and 44 of the SCC Rules. However, the Tribunal finds the Claimant's claim for more than EUR 3 million inadequately justified. The Tribunal must also take into consideration that the Claimant lost on Preliminary Objection B and has eventually received a compensation lower than claimed.

858.  Due to these reasons, the Tribunal finds appropriate to award to the Claimant EUR 2.6 million. The Tribunal therefore orders the Kingdom of Spain to reimburse to the Claimant EUR 2.6 million in total (which includes the full costs of the arbitration as determined by the SCC to be EUR 562,920.96 and SEK 6,867 (adding VAT where applicable)).

859.  The Tribunal finds it appropriate to apply the same interest rate, with respect to costs, as the one applied to the damages in Section 27.4.3 above, *i.e.* 1.5%, compounded monthly.

## XI.   DECISION

860.  For the reasons stated above, the Tribunal makes the following decisions:

(a)  The Tribunal has jurisdiction under the ECT and the SCC Rules over the Claimant's claims, barring Respondent's Preliminary Objection B that the Tribunal lacks jurisdiction over the Tax.

(b)  The Respondent has violated Article 10(1) of the ECT.

(c)  On the basis of the Tribunal's decision in (b), the Respondent shall pay to the Claimant, EUR 53.3 million as damages.

(d)  The Respondent shall, in accordance with Article 43 and 44 of the SCC Rules, pay to the Claimant the cost of the arbitration and the reasonable costs incurred by the Claimant in the amount of EUR 2.6 million. Value Added Tax must be added pursuant to Article 43 of the SCC Rules if applicable.

(e)  The Respondent shall pay interest on the sum awarded in (c) from 15 September 2016 at the rate of 1.5%, compounded monthly, until full payment has been made, and interest on the sums awarded in (d) from the date of the award at the rate of 1.5%, compounded monthly, until full payment has been made.

(f)  All other claims are dismissed.

------------------

A party may bring an action against the award regarding the decision on the fee(s) of the arbitrator(s) within three months from the date when the party received the award. This action should be brought before the Stockholm District Court.

## ANNEX 1

## List of Definitions

| | |
|---|---|
| **Alamo** | Fuente Alamo Fotoparque, S.L. |
| **Almansa** | Novenergia-Almansa, S.L., formerly called Las Cabezuelas Fotoparque, S.L. |
| **AEE** | The Spanish Wind Energy Association |
| **APPA** | The Spanish Renewable Energies Association |
| **ASIF** | The Photovoltaic Industry Association. |
| **BIT** | Bilateral investment treaties |
| **Bonete** | Novenergia-Bonete, S.L., formerly called Paracel Investment, S.L. |
| **CJEU** | Court of Justice of the European Union |
| **CPI** | Consumer Price Index |
| **DCF** | Discounted cash flow |
| **Draft Articles** | Draft Articles on Responsibility of States for Internationally Wrongful Acts |
| **EC Application** | The European Commission's Application for Leave to Intervene as a Non-Disputing Party dated 3 March 2017 |
| **EC Decision** | Decision from the European Commission Decision concerning the Spanish State Aid Framework for Renewable Sources |
| **ECT** | The Energy Charter Treaty adopted on 17 December 1994 |
| **EU** | The European Union |
| **FET** | Fair and equitable treatment |
| **First Accuracy Report** | The first expert report by Accuracy submitted on 29 April 2016 |

| | |
|---|---|
| **First Compass Lexecon Report** | The first expert report from Compass Lexecon submitted on 21 December 2015 |
| **First KPMG Report** | The first expert report from KPMG submitted on 21 December 2015 |
| **FIT** | Feed in Tariff |
| **Hearing** | The hearing on jurisdiction and merits held on 12–15 June 2017 in Stockholm |
| **IDAE** | Institute for Diversification and Saving of Energy |
| **Law 54/1997** | Law 54/1997, on the Electric Sector enacted on 27 November 1997 and subsequent amendments |
| **Law 15/2012** | Law 15/2012, on Tax Measures for Energy Sustainability enacted on 27 December 2012 |
| **Law 24/2013** | Law 24/2013, on the Electric Sector enacted on 26 December 2013 |
| **Lobon** | Novenergia-Lobon, S.L., formerly called Morcone Invest, S.L. |
| **Mora** | Energy Engineering I Mora la Nova, S.L. |
| **NEC** | National Energy Commission |
| **Novenergia** | Novenergia, a *Société d'investissement en capital à risque* (SICAR) |
| **Novenergia Spain** | Novenergia II Energy & Environment España, S.L. |
| **Order 1045/2014** | Order IET/1045/2014, Approving the Remuneration Parameters, for Model Facilities, Applicable to Certain Facilities of Electric Energy Production Using Renewable Energy Resources, Cogeneration, and Waste, enacted on 16 June 2014 |
| **PANER** | Spain's National Renewable Energy Action Plan |
| **PCIJ** | Permanent Court of International Justice |
| **Protermosolar** | The Spanish Solar Thermal Industry |
| **Provisional Timetable** | Timetable agreed by the Parties in Procedural Order No. 1 |

| | |
|---|---|
| **PV** | Photovoltaic |
| **PV Plants** | The Claimant's eight photovoltaic plants |
| **RAIPRE** | Administrative Registry for Electrical Power Generating Units |
| **RD 2818/1998** | Royal Decree 2818/1998 on Production of Electric Energy by Facilities Fuelled by Resources or Sources from Renewable Energy, Waste, or Cogeneration enacted on 23 December 1998 |
| **RD 436/2004** | Royal Decree 436/2004, Establishing the Methodology for Updating and Systematising the Legal and Economic Regime of Electric Energy Production in the Special Regime enacted on 12 March 2004 |
| **RD 661/2007** | Royal Decree 661/2007 of 25 May, Regulating Electricity Production Under the Special Regime enacted on 25 May 2007 |
| **RD 1578/2008** | Royal Decree 1578/2008, on Remuneration for the Activity of Electricity Production Using Solar Photovoltaic Technology for Facilities after the Deadline for the Maintenance of the Remuneration Fixed under Royal Decree 661/2007, enacted 26 September 2008 |
| **RD 1565/2010** | Royal Decree 1565/2010, Regulating and Modifying Specific Aspects Related to Energy Production in the Special Regime enacted 19 November 2010 |
| **RDL 7/2006** | Royal Decree-Law 7/2006, Establishing Urgent Measures in the Energy Sector and Approves the Social Tariff enacted on 23 June 2006 |
| **RDL 14/2010** | Royal Decree-Law 14/2010, Establishing Urgent Measures for the Correction of the Tariff Deficit of the Electric Sector enacted on 23 December 2010 |
| **RD 1614/2010** | Royal Decree 1614/2010, Regulating and Modifying Certain Aspects Related to Electric Energy Production Using Thermoelectric Solar and Wind Power Technologies enacted 7 December 2010 |

| | |
|---|---|
| **RDL 2/2013** | Royal Decree-Law 2/2013, Concerning Urgent Measures in the Electric System and Financial Sector enacted on 1 February 2013 |
| **RDL 9/2013** | Royal Decree-Law 9/2013, Adopting Urgent Measures to Ensure the Financial Stability of the Electric System enacted on 13 July 2013 |
| **RD 413/2014** | Royal Decree 413/2014, on the Regulation of the Electric Energy Production Activity from Renewable Energy, Cogeneration and Waste enacted on 6 June 2014 |
| **RE** | Renewable energy |
| **REIO** | Regional economic integration organization |
| **REP** | Renewable Energy Plan |
| **REP 2005-2010** | The Renewable Energy Plan 2005-2010 |
| **Request for Reconsideration** | The Respondent's request on 16 July 2016 for the Tribunal to reconsider its decision in Procedural Order No. 3 |
| **Ro** | Remuneration for operating |
| **SCC** | The Arbitration Institute of the Stockholm Chamber of Commerce |
| **SCC Rules** | 2010 Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce |
| **Second Accuracy Report** | The second expert report of Accuracy submitted on 20 February 2017 |
| **Second Compass Lexecon Report** | The reply expert report of Compass Lexecon submitted on 17 October 2016 |
| **Second KPMG Report** | Reply expert report of KPMG submitted on 17 October 2016 |
| **SES** | Spanish electricity system |
| **Solarsaor** | Novenergia-Solarsaor, S.L. |
| **Special Regime** | The special regime devised in Law 54/1997 |

| | |
|---|---|
| **Specific Regime** | The framework for the remuneration of PV plan introduced in RDL 9/2013 |
| **TFEU** | Treaty on the Functioning of the European Union |
| **The Claimant** | Novenergia, a *Société d'investissement en capital à risque* (SICAR) |
| **The Parties** | The Claimant and the Respondent. |
| **The Respondent** | The Kingdom of Spain |
| **The SCC Rules** | 2010 Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce |
| **The Tax** | The new tax on the production of electric energy within the Spanish territory, consisting of 7% of taxable income introduced through Law 15/2012 |
| **The Tribunal** | The arbitral tribunal including the Chairperson Mr. Johan Sidklev and party-appointed arbitrators Professor Antonio Crivellaro and Judge Bernardo Sepúlveda Amor |
| **TMR** | Mean benchmark tariff |
| **UNESA** | The Spanish Electricity Association |
| **VCLT** | Vienna convention on the law of treaties |
| **Villares** | Novenergia-Villares del Saz, S.L., formerly called Terrapower, S.L. |

Seat of the Arbitration: Stockholm, Sweden

Date: 15 February 2018


Professor Antonio Crivellaro

Arbitrator

Judge Bernardo Sepúlveda Amor

Arbitrator


Mr. Johan Sidklev

Chairperson

DocNum