Every effort has been made to ensure the accuracy of the contents of this translation. However, Mena Chambers does not assume any responsibility for any actual or perceived inaccuracies.

To report any errors, omissions or to suggest an alternative translation, please e-mail info@menachambers.com

Draft 1, 03 March 2016

# FINAL AWARD

Issued on 21 January 2016

Based on the Energy Charter Treaty adopted on 17 December 1994

Seat of Arbitration: Madrid, Spain

**Arbitration No.: 062/2012**

| | |
|---|---|
| **Claimants:** | **Charanne B.V.** |
| | **Construction Investments S.A.R.L.** |
| **Represented by:** | Hermenegildo Altozano, Coral Yánez, Paloma Belascoain, *Bird & Bird*, Madrid, Spain. |
| | Fernando Mantilla Serrano, John Adam, *Latham Watkins*, Paris, France. |
| **Respondent:** | **The Kingdom of Spain** |
| **Represented by:** | José Luis Gomara, Fernando Irurzun, José Ramón Mourenza, *Lawyers for the State* |
| | Eduardo Soler Tappa, Christian Leathley, Florencia Villaggi, Beverly Timmins, Pilar Colomes, *Herbert Smith Freehills*, Madrid, Spain. |
| **Arbitral Tribunal:** | Alexis Mourre, President |
| | Guido Santiago Tawil, Arbitrator |
| | Claus von Wobeser, Arbitrator |
| **Administrative Secretary:** | Bingen Amezaga |

# TABLE OF CONTENTS

I.   THE PARTIES ...................................................................................................8
   A.   The Claimants .........................................................................................8
   B.   The Respondent .......................................................................................9
II.   CONSENT TO ARBITRATION.........................................................................9
III.   APPLICABLE LAW ..........................................................................................11
IV.   PROCEDURAL HISTORY ................................................................................11
V.   SUMMARY OF THE FACTS ...........................................................................18
   A.   Introduction ............................................................................................18
   B.   The initial regulatory framework ...........................................................19
      1.   The Electricity Sector Law ............................................................19
      2.   Royal Decree 436/2004..................................................................21
      3.   Presentation *"The sun can be yours"* of 2005 ..............................21
      4.   The 2005-2010 Renewable Energy Plan.........................................22
      5.   Presentation "*The sun can be yours*" of 2007 ..............................23
      6.   Report 3/2007 of the National Energy Commission................................23
      7.   Memorandum of the Minetur..........................................................24
      8.   Royal Decree 661/2007...................................................................25
      9.   Report 30/2008 of the National Energy Commission.....................29
      10.    Royal Decree 1578/2008..........................................................30
   C.   The Claimants' investment .....................................................................32
   D.   Regulations in the photovoltaic industry after 2010 ...............................33
      1.   Royal Decree 1565/2010................................................................33
          a)   Elimination of regulated tariffs from the twenty-sixth year ................33
          b)   Requirement of additional technical requirements ...........................34
      2.   Royal Decree 1614/2010................................................................34
      3.   Royal Decree-Law 14/2010 ...........................................................34
          a)   Limit on the operating hours.......................................................35
          b)   Charges for access to transport networks.....................................37
      4.   Legal challenge to RD 1565/2010 and RDL 14/2010 .....................38
          a)   Proceedings brought by the Autonomous Communities against RDL 14/2010 ..38
          b)   Administrative proceedings before the Supreme Court....................39
          c)   Proceedings before the ECHR .....................................................39
   E.   Rules subsequently adopted by Spain .....................................................39
      1.   Law 2/2011 on Sustainable Economy.............................................39
      2.   Royal Decree-Law 1/2012 .............................................................40
      3.   Royal Decree-Law 9/2013 .............................................................40
      4.   Law 24/2013 ..................................................................................42
      5.   Order IET/1045/2014.....................................................................42
VI.   The PARTIES' POSITIONS ON JURISDICTION ..........................................42
   A.   The Respondent's position ......................................................................42
      1.   Lack subject matter jurisdiction......................................................43
      2.   The Claimants have activated the '*fork in the road*' provision of the ECT............44
          a)   Identity of the Parties .................................................................45
          b)   Identity of the subject matter ......................................................46
          c)   Identification of the cause of action.............................................46
      3.   It is an intra-European dispute not subject to the ECT....................47
      4.   The Claimants are not investors in accordance with Article 1(7) of the ECT.........51
   B.   The Claimants' position .........................................................................52

1. Argument concerning lack of subject matter jurisdiction should be rejected..........52
2. The Claimants did not exercise the "*fork in the road*" provision of the ECT .........53
   a) Absence of identity between the parties ........................................................53
   b) Absence of identity as to the subject matter .........................................................54
   c) Absence of identity as to the legal basis .........................................................54
3. The ECT is applicable to this dispute and does not undermine EU Law ...............55
4. Claimants are investors of another ECT Contracting Party....................................59

VII. PARTIES' POSITIONS ON MERITS ..........................................................................61
  A. The Claimants ...........................................................................................................61
    1. Regulatory changes ..................................................................................................61
      a) Limited term for regulated tariffs .............................................................61
      b) Imposition of limits on equivalent production hours...........................................62
      c) Obligation to fulfil technical requirement against voltage dips..........................62
      d) Obligation to pay a charge for grid access................................................62
    2. Breaches of the ECT .................................................................................................63
      a) Expropriation in breach of Article 13 of the ECT ..............................................63
      b) Breach of fair and equitable treatment contrary to Article 10(1) of the ECT......66
      c) Breach of duty to provide effective means for the assertion of claims and the enforcement of rights with respect to investments contrary to Article 10(12) of the ECT 70
    3. Damages....................................................................................................................71
      a) Damages for breach of Article 13 of the ECT – Expropriation..........................71
      b) Damages for breach of Article 10(1) of the ECT – Fair and equitable treatment72
      c) Damages for breach of Article 10(12) of the ECT – Effective means for exercising rights ......................................................................................................72
      d) The focus of the Claimants' expert is correct .....................................................73
      e) Spain cannot benefit from the uncertainty caused by its own actions to limit compensation ............................................................................................................73
      f) RDL 9/2013 has no impact on the damages suffered by the Claimants .............74
      g) Interest..................................................................................................................75
  B. The Respondent .........................................................................................................75
    1. The Respondent did not expropriate the investments of the Claimants...................75
    2. The Respondent Did Not Violate the Standard of Fair and Equitable Treatment under Article 10(1) of the ECT ......................................................................................77
      a) The applicable standard .......................................................................................78
      b) The measures taken by the Kingdom of Spain were reasonable and predictable 78
      c) Regarding the Claimants' alleged legitimate expectations..................................79
      d) Regarding the alleged retroactive application of the norms ................................82
    3. Spain did not breach Article 10(12) of the ECT .....................................................83
    4. On the damages claimed ..........................................................................................84
      a) The claim for damages has become without subject matter ................................84
      b) The 2010-2013 period cannot be considered in isolation ...................................84
      c) Claimants did not prove damage nor quantum ...................................................85

VIII. RELIEF SOUGHT...........................................................................................................87
  A. The Claimants ...........................................................................................................87
  B. The Respondent .........................................................................................................88

IX. ANALYSIS BY THE TRIBUNAL .................................................................................88
  A. Jurisdiction................................................................................................................88
    1. *Fork in the Road* provision: ...................................................................................90
    2. Claimants are not investors in accordance with Article 1(7) of the ECT ...............93

a) The actual Claimants are Spanish nationals.........................................................93

b) On the alleged breach of the Spanish Constitution that the decision of this Tribunal would cause ...........................................................................................95

3. The Dispute is an intra-EU dispute which is subject to the regulatory regime of the EU 96

a) On the inexistence of diversity of territories.......................................................96

b) The alleged implicit disconnection clause ..........................................................98

c) On the compatibility of the dispute resolution mechanism of the ECT with EU Law 100

(i) Application of Article 344 TFEU to arbitration between investors and EU Member States ......................................................................................................100

(ii) Whether the present dispute concerns the interpretation or application of the European treaties within the meaning of Article 344 ...........................................102

(iii) Whether there are any rules of European public order prohibiting the Resolution of the present dispute through arbitration...........................................102

B. Merits ...............................................................................................................103

1. Regarding inadmissibility for lack of subject matter .............................................103

2. Article 13 of the ECT (Expropriation)....................................................................104

3. Article 10(12) of the ECT (effective means for the assertion of claims)...............108

4. Article 10(1) of the ECT (fair and equitable treatment) .......................................109

a) Alteration of the regulatory framework and infringement of the legitimate expectations of the investor ......................................................................................110

b) Retroactivity.....................................................................................................123

5. Arbitration costs.....................................................................................................125

a) Costs of arbitration (Article 43 of the Rules)...................................................125

b) Reasonable Costs of the Parties (Article 44 of the Rules) ..............................125

c) Decision of the Arbitral Tribunal on Costs......................................................126

X. DECISION...............................................................................................................128

## GLOSSARY OF TERMS AND ABBREVIATIONS

***Amicus EC***: *Amicus curiae* brief submitted by the European Commission on 19 January 2015.

**Charanne:** Charanne B.V. (one of the Claimants).

**EC:** European Commission.

**CNE:** National Energy Commission.

**Construction:** Construction Investment S.à.r.l. (one of the Claimants).

**Arbitration Court of Madrid:** Court of Arbitration of the Chamber of Commerce, Industry and Services of Madrid.

**VCLT:** Vienna Convention on the Law of Treaties concluded on 23 May 1969.

**Directive 2001/77/EC:** Directive 2001/77/EC of the European Parliament and of the Council of 27 September 2001 on the promotion of electricity produced from renewable energy sources in the internal electricity market.

**Member State:** A member state of the European Union.

**FIT:** *Feed in tariff.*

**ICO:** Instituto de Crédito Oficial.

**IDAE:** Institute for Diversification and Energy Saving.

**Report 3/2007:** Report of the CNE of 14 February 2007 concerning a proposal for a Royal Decree on regulation of the electricity production under a special regime and for determined facilities of similar technologies under the ordinary regime.

**Report 30/2008:** Report of the CNE of 29 July 2008 concerning a proposal for a Royal Decree regarding compensation for electricity production through photovoltaic technology for facilities subsequent to the deadline regarding the maintenance of the payment scheme of RD 661/2007.

**Institute:** Arbitration Institute of the Stockholm Chamber of Commerce.

**2010 Regulations:** collective referral to RD 1565/2010 and RDL 14/2010.

**Law 2/2011:** Law 2/2011 of 4 March, on Sustainable Economy.

**LSE:** Law 54/1997 of 27 November, on the Electricity Sector.

**New LSE:** Law 24/2013 of 26 December, on the Electricity Sector.

**Minetur:** Ministry of Industry, Energy and Tourism of the Kingdom of Spain.

**MWp:** Megawatt peak.

**Order IET/1045/2014:** Ministerial Order IET/1045/2014 of 16 June concerning approval of applicable remuneration criteria for certain facilities of electricity production by means of renewable energy.

**REIO:** Regional Economic Integration Organization according to Article 1(3) of the ECT.

**Contracting Party:** Contracting Parties to the Energy Charter Treaty adopted on 17 December 1994.

**PER 2005-2010:** Renewable Energy Plan 2005-2010 approved by the Council of Ministers of the Kingdom of Spain on 26 August 2005.

**RAIPRE:** Administrative Register for Production Facilities under the Special Regime.

**RD:** Royal Decree.

**RDL:** Royal Decree-Law.

**RD 436/2004:** Royal Decree 436/2004 of 12 March establishing the methodology for updating and organising the legal and economic regime for electricity production under a special regime.

**RD 661/2007:** Royal Decree 661/2007 of 25 May establishing the special regime for electricity production.

**RD 1578/2008:** Royal Decree 1578/2008 of 26 September on remuneration for electricity production by photovoltaic technology for facilities established after the scheme established by Royal Decree 661/2007.

**RD 1565/2010:** Royal Decree 1565/2010 of 19 November amending certain aspects of the special regime for electricity production.

**RD 1614/2010:** Royal Decree 1614/2010 of 7 December amending certain aspects of the regulation for electricity production from solar, thermal and wind technologies.

**RDL 14/2010:** Royal Decree-Law 14/2010 of 23 December introducing urgent measures to correct the tariff deficit in the electricity sector.

**RDL 1/2012:** Royal Decree-Law 1/2012 of 27 January suspending pre-allocation payment procedures and abolishing economic incentives for new electricity production facilities by means of co-generation, renewable energy and waste.

**RDL 2/2013:** Royal Decree-Law 2/2013 of 1 February concerning urgent measures in the electricity and financial sectors.

**RDL 9/2013:** Royal Decree-Law 9/2013 of 12 July adopting urgent measures to ensure financial stability of the electricity sector.

**Special Regime:** Refers to production of electricity from sustainable sources.

**Rules:** Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce.

**RPR:** Remuneration Pre-Allocation Register.

**ECT:** Energy Charter Treaty adopted on 17 December 1994.

**ECHR:** European Court of Human Rights.

**TFEU:** Treaty on the Functioning of the European Union.

**T-SOLAR:** Grupo T-Solar Global S.A.

**CJEU:** Court of Justice of the European Union (formerly Court of Justice of the European Communities or CJEC).

**Transcripts 2014:** Transcripts of the hearings held on 17, 18 and 19 November 2014.

**Transcript 2015:** Transcript of the hearing held on 29 July 2015.

**EU:** European Union.

# I. THE PARTIES

## A. The Claimants

1.      Charanne B.V. ("**Charanne**") is a Dutch company, with headquarters in Luna Arena, Herikerberbergweg 238, Amsterdam Zuidoost, Netherlands, registered under registration number (K.v.K.) No. 20.114.560, with tax identification number 810474347.[1]

2.      Construction Investment S.à.r.l. ("**Construction**") is a Luxembourg company, with registered offices at 13-15 Avenue de la Liberté, L-1931 Luxembourg, registered under registration number (R.C.S.) B 87.926, with tax identification number 20022408845.[2]

3.      Charanne and Construction are jointly referred to as the "**Claimants**".

4.      The Claimants are shareholders of Grupo T-Solar Global S.A. ("**T-Solar**"), a limited liability company established in 2007 and formerly known as Tuin Zonne S.A.  The activity of T-Solar consists, among other things, in generation and sale of electricity produced by photovoltaic solar plants.[3]

5.      At the time of the notification of dispute, T-Solar owned, via certain companies, 34 production facilities generating electricity by means of solar photovoltaic technology under the special regime.[4]

6.      At the date of entry into force of RD 1565/2010 and RDL 14/2010, Charanne and Construction held 18,6583% and 2,8876% of shares in T-Solar, respectively.[5]

7.      On 30 June 2011, T-Solar merged with Grupo GTS de Sociedades Solares, S.A.U.,[6] maintaining the name of T-Solar.

8.      On 28 December 2012, Charanne and Construction transferred their shares in T-Solar to Grupo Isolux Corsán Concesiones S.L., as contribution in kind to the capital as well as to acquire a stake in the company and its parent company, Grupo Isolux Corsán S.A.[7]

---

[1] C-102.
[2] C-103.
[3] C-31, Article 2.
[4] PHB1 Claimants, footnote p. 130; Claim, paras. 6-8.
[5] Reply, para. 378, C-40 and C-41.
[6] C-30.
[7] C-108; C-2.

9.   Currently, Charanne and Construction maintain interest in T-Solar through their shares in Grupo Isolux Corsán S.A. (2,43% and 52,02%, respectively) and Grupo Isolux Corsán Concesiones S.A. (1,756% and 0,44765%, respectively).[8]

## B.  The Respondent

10.  The respondent in this arbitration is the Kingdom of Spain ("**Spain**" or the "**Respondent**").

(The Tribunal refers to the Claimants and the Respondent jointly as the "**Parties**").

# II.  CONSENT TO ARBITRATION

11.  Spain is a Contracting Party to the Energy Charter Treaty adopted on 17 December 1994 ("**ECT**").

12.  Article 26 of the ECT provides:

*"SETTLEMENT OF DISPUTES BETWEEN AN INVESTOR AND A CONTRACTING PARTY*

*(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.*

*(2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:*

*(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;*

*(b) in accordance with any applicable, previously agreed dispute settlement procedure; or*

*(c) in accordance with the following paragraphs of this Article.*

*(3) (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to*

---

[8] See diagram at C-104.

*international arbitration or conciliation in accordance with the provisions of this Article.*

*(b) (i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).[9]*

*[…]*

*(4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:*

*[…]*

*(c) an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce.*

*[…]*

*(6) A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.*

*[…]*

*(8) The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute. An award of arbitration concerning a measure of a sub-national government or authority of the disputing Contracting Party shall provide that the Contracting Party may pay monetary damages in lieu of any other remedy granted. Each Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards."*

13.   On 28 April 2011, the Claimants communicated a notice of dispute to the Respondent to initiate the negotiations period provided for in Article 26 of the ECT (the "**Notice**").

14.   The Claimants filed a request for arbitration ("**Request for Arbitration**")[10] with the Arbitration Institute of the Stockholm Chamber of Commerce (the "**Institute**") on 07 May 2012.

---

[9] Spain is one of the Contracting Parties listed in Annex ID of the ECT.
[10] Original *Request for Arbitration* is in the English language.

## III.  APPLICABLE LAW

15.     Article 26(6) of the ECT provides that "*[a] tribunal [...] shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.*"

16.     Article 22 of the Arbitration Rules of the Arbitration Institute of the Stockholm Chamber of Commerce in force as of 01 January 2010 ("**Rules**") provides that the Tribunal "*shall decide the merits of the dispute on the basis of the law(s) or rules of law agreed upon by the parties.*"

## IV.  PROCEDURAL HISTORY

17.     On 28 April 2011, the Claimants submitted the Notice of dispute to the Kingdom of Spain, initiating the three-month period for negotiations as provided for in Article 26 of the ECT.[11]

18.     On 7 May 2012, the Claimants filed the Request for Arbitration with the Institute in accordance with Article 2 of the Rules.

19.     On 26 September 2012, the Arbitral Tribunal was constituted with Mr Guido Tawil, appointed by the Claimants; Mr Claus Von Wobeser, appointed by the Respondent; and Mr Alexis Mourre, appointed jointly by the Parties in consultation with the co-arbitrators.

20.     On 11 October 2012, the Arbitral Tribunal communicated to the Parties a draft procedural order No. 1, and requested them to provide the Tribunal with comments on the procedural calendar.

21.     On 26 October 2012, during a discussion concerning procedural order No. 1, the Respondent raised a possibility of bifurcation of proceedings to deal with the jurisdictional objections separately.  On the same day, the Tribunal requested the Parties to communicate their positions on bifurcation of proceedings no later than 5 November 2012 for the Respondent, and 12 November 2012 for the Claimants' answer.

---

[11] Claim, paras. 5, 171 and 241; Defence, para. 306.

22. On 5 November 2012, the Respondent filed its submission explaining the reasons for the need to bifurcate the proceedings, but did not expressly request such bifurcation.

23. On 12 November 2012, the Claimants filed their response to the Respondent's submission on the bifurcation of proceedings.

24. On the same day, 12 November 2012, the Arbitral Tribunal, having considered the Parties' submissions, noted that the Respondent did not file a formal request for bifurcation and decided to postpone its ruling in relation to the latter.

25. On 23 November 2012, the Tribunal held a meeting with the Parties in Madrid, during which the final text of Procedural Order No. 1 was adopted, setting out the rules for these arbitration proceedings. The Parties also discussed the establishment of a provisional procedural timetable.

26. On 27 November 2012, the Arbitral Tribunal issued Procedural Order No. 2, containing the provisional procedural timetable agreed upon by the Parties, and establishing a template based on the Redfern schedule for submission of requests for production of documents in due course.

27. On 15 March 2013, the Claimants filed the Statement of Claim ("**Claim**") as well as factual exhibits C-1 to C-25, legal exhibits CL-1 to CL-54, and the expert report of Mr Javier Acevedo Jiménez de Castro and Mr Jesús Mota Robledo of Deloitte company ("**CT-1**").

28. On 20 March 2013, the Arbitral Tribunal, upon agreement with the Parties, requested the Institute to extend the deadline to render the Final Award until 31 December 2013 in accordance with Article 37 of the Rules. The Institute granted the requested extension on 21 March 2013.

29. On 26 March 2013, the Claimants submitted a document referenced as "C-15". When asked by the Tribunal regarding the duplicate reference to exhibit C-15, the Claimants clarified that the submitted document was the originally intended exhibit C-15 referred by the Claimants in footnote 3 of the Claim, whereas footnote 44 on page 64 should have referred to Exhibit C-16.

30. On 15 April 2013, the Respondent filed a written request for bifurcation (the "**Request to Bifurcate**") along with factual exhibit R-l and legal exhibits RL-1 to RL-9.

31. On 30 April 2013, the Claimants filed their response to the Respondent's Request to Bifurcate enclosed with factual exhibits C-26 to C-28 and legal exhibits CL-55

to CL-64. On the same day, the Claimants informed the Arbitral Tribunal that Shearman & Sterling LLP will assist Bird & Bird LLP as counsel for the Claimants in these proceedings.

32.     On 16 May 2013, the Arbitral Tribunal, upon consideration of the Parties' submissions, decided not to bifurcate the proceedings.

33.     On 27 May 2013, the Arbitral Tribunal held a conference call with the Parties to establish a provisional procedural timetable in view of the Arbitral Tribunal's decision not to bifurcate the proceedings.

34.     On 15 October 2013, the Respondent filed its Statement of Defence (the "**Defence**") including factual exhibit R-1, legal exhibits RL-10 to RL-290 (clarifying that exhibits RL-35, RL-88, RL-106, RL-122, RL-128, RL-131, RL-139, RL-175, RL-203, RL-273, RL-274, RL-275, RL-283, RL-287, RL-288 and RL-289 were left intentionally blank) and expert report of Mr Grant Greatex, Mr Carlos Montojo González, Mr Javier García-Verdugo de Sales and Mr João Magalhães of Altran and Mac Group companies ("**RT-1**"), accompanied by 7 volumes of exhibits numbered EX.1 to EX.79.

35.     On 8 November 2013, the Claimants and the Respondent submitted separate Written requests for production of documents in the form of Redfern Schedules; each request was forwarded to the other Party simultaneously in accordance with the provisions of Procedural Order No. 2 and the Procedural Timetable of 28 May 2013.

36.     On 22 November 2013, each Party submitted to the Tribunal its objections to the request for production of documents. The Respondent also submitted exhibits RL-291 to RL-293. On the same day, the documents were transmitted by the Tribunal to the parties as provided in Procedural Order No. 2.

37.     On 4 December 2013, the Arbitral Tribunal issued Procedural Order No. 3, containing exhibits A and B, in which it decided on the requests for production of documents.

38.     On 5 December 2013, the Arbitral Tribunal, upon agreement with the Parties, requested the Institute to extend the time limit to render the Final Award until 31 December 2014 in accordance with Article 37 of Rules.

39.     On 9 December 2013, the Arbitral Tribunal informed the Parties that it would not be possible to hold the hearing at the scheduled time – during the week

commencing on 7 July 2014, and suggested to the Parties an alternative week commenting on 17 November 2014.

40.     On 10 December 2013, the Parties agreed to hold the hearing at the time suggested by the Tribunal.

41.     On 17 December 2013, the Institute extended the time limit for rendering the Final Award until 30 December 2014.

42.     On 20 December 2013, each Party confirmed to the Arbitral Tribunal its compliance with document production orders as set out in Procedural Order No. 3. The Claimants submitted exhibits C-29 to C-76, and the Respondent submitted exhibits RL-294, RL-296 and RL-297.

43.     On 05 February 2014, the Parties proposed to modify the procedural timetable as follows: submission of the reply on 9 May 2014, the rejoinder on 26 September 2014, the lists of witnesses to be cross-examined at the hearing on 3 November 2014, and a conference call prior to the hearing on 11 November 2014.

44.     On 6 February 2014, the Arbitral Tribunal confirmed the procedural timetable as amended by the Parties.

45.     On 2 May 2014, Mr Fernando Mantilla Serano, counsel for the Claimants, informed the Tribunal and the Respondent that Shearman & Sterling LLP no longer represent the Claimants, and will be replaced by Latham & Watkins acting in with Bird & Bird LLP.

46.     On 9 May 2014, the Claimants filed their reply (the "**Reply**") including factual exhibits C-77 to C-293, legal exhibits CL-65 to CL-140, and a supplementary expert report by Mr Javier Acevedo Jiménez de Castro and Mr Jesús Mota Robledo of Deloitte company ("**CT-2**").

47.     On 26 September 2014, the Respondent filed its rejoinder (the "**Rejoinder**") including factual exhibits R-2 to R-15, legal exhibits RL-298 to RL-402 (clarifying that documents RL-299, RL 330, RL-336, RL-339, RL-358, RL-372, RL-377, RL-386 were left intentionally blank) and a supplementary expert report by Messrs Grant Greatex and Carlos Montojo González of Altran and Mac Group companies ("**RT-2**"), accompanied by exhibits EX.1 to EX.19.

48.     On 7 October 2014, the Arbitral Tribunal confirmed that the conference call with the Parties will be held on 11 November 2014. The Tribunal also requested the Parties to agree on logistical aspects of the hearing and other relevant procedural aspects to be considered during the conference call.

49.     On 3 November 2014, the European Commission ("**EC**") filed an application to participate as *amicus curiae* in these proceedings.  The Arbitral Tribunal informed the Parties of the application and invited them to submit their comments on the European Commission's application no later than 09 November 2014.

50.     On 4 November 2014, the Respondent submitted a written request for dismissal of the claim for lack of subject matter and termination of the proceedings.  The Tribunal granted the Claimants until 9 November 2014 to submit a reply to the Respondent's request.

51.     On 9 November 2014, each Party submitted to the Tribunal its comments on the EC's request to participate as *amicus curiae* in these proceedings.  On the same day, 9 November 2014, the Claimants submitted their reply to the Respondent's written request for dismissal of the claim for lack of subject matter and termination of the proceedings.

52.     On 11 November 2014, the Arbitral Tribunal held a conference call with the Parties, during which it discussed the request filed by the Respondent on 4 November 2014, the application submitted by the EC, and hearing logistics.  In this regard, the Tribunal decided that the scope of this arbitration, the application of the EC, other logistics and duration of the hearings would be discussed during the first day of the hearing.

53.     The hearing was held on 17, 18 and 19 November 2014 at the premises of the Court of Arbitration of the official Chamber of Commerce, Industry and Services of Madrid ("**Arbitration Court of Madrid**").  The following individuals were in attendance:

-   For the Claimants: Hermenegildo Altozano, Coral Yáñez, Fernando Mantilla-Serrano, John Adam, Natalia Cabeza, Jaime Zarzalejos, Paloma Belascoain, Laura Benedicto, Alfonso Bayona Giménez, Esther Sebastián de Diego, Rosa Espín Martí, Leticia Sitges Cavero.

-   For the Respondent: Eduardo Soler-Tappa, Christian Leathley, Florencia Villaggi, Pilar Colomes, Jaime de San Martín, Beverly Timmins, José Ramón Mourenza, José Luis Gomara, Diego Santacruz, Elena Oñoro, Antolín Fernández, Irene Martínez.

-   The Arbitral Tribunal: Alexis Mourre, Guido Santiago Tawil, Claus von Wobeser.

-   The Administrative Secretary of the Tribunal: Bingen Amezaga.

54. During the hearing, the EC's application to participate and the Respondent's request to consider the proceedings terminated for lack of subject matter have been discussed. The Parties presented their oral arguments on jurisdiction and merits of the dispute. On 19 November 2014, the Arbitral Tribunal, after a discussion with the Parties, decided to postpone the examination of experts on damages.

55. Transcripts of the hearing have been communicated to the Parties for verification. The Administrative Secretary of the Tribunal sent the final transcripts of the hearing to the Parties on 06 March 2015 ("**Transcripts 2014**").

56. On 20 November 2014, the Arbitral Tribunal sent a letter to the Parties confirming its decision to allow the European Commission to submit an *amicus curiae* brief, but denying the EC the possibility of access the case file and participation in the hearings.

57. On 26 November 2014, the Arbitral Tribunal sent a letter to the European Commission informing that the EC is allowed to submit an *amicus curiae* brief by 5 January 2015, but is not allowed to access the case file or participate in the hearings due to the confidentiality of the arbitration as provided by Article 46 of the Rules.

58. On 12 December 2014, the Parties communicated to the Arbitral Tribunal the agreed procedural timetable for submission of post-hearing briefs.

59. On 18 December 2014, the EC requested an extension of time to file its *amicus curiae* brief. After a discussion with the Parties, the Tribunal decided to grant the EC the extension of time to submit its brief until 19 January 2015.

60. On 19 January 2015, the EC submitted to the Arbitral Tribunal its *amicus curiae* brief ("***Amicus EC***"), which was forwarded to the Parties.

61. On 12 March 2015, the Claimants filed their first post-hearing submission ("**PHB1 Claimants**"), enclosed with a supplementary expert report of Messrs Javier Acevedo Jiménez de Castro and Jesús Mota Robledo of Deloitte company ("**CT-3**").

62. On 12 May 2015, the Respondent filed its first post-hearing brief ("**PHB1 Respondent**"), enclosed with a supplementary expert report prepared by Mac Group – Altran ("**RT-3**").

63. On 20 June 2015, the Claimants filed their second post-hearing brief ("**PHB2 Claimants**"), enclosed with a final expert report prepared by Deloitte ("**CT-4**").

64.     On 20 July 2015, the Respondent filed its second post-hearing brief ("**PHB2 Respondent**"), enclosed with a final expert report prepared by Mac Group – Altran ("**RT-4**").

65.     On 23 July 2015, the Arbitral Tribunal held a conference call with the Parties during which it discussed the order of the Parties' presentations and other logistical preparations for the evidentiary hearing.

66.     On 29 July 2015, the evidentiary hearing to examine expert evidence was held at the headquarters of the Arbitration Court of Madrid.  Individual in attendance were:

- For the Claimants: Hermenegildo Altozano, Coral Yáñez, Fernando Mantilla-Serrano, John Adam, Natalia Cabeza, Jaime Zarzalejos, Paloma Belascoain, Laura Benedicto, Alfonso Bayona Giménez, Esther Sebastián de Diego, Rosa Espín Martí, Leticia Sitges Cavero.

- For the Respondent: Eduardo Soler-Tappa, Christian Leathley, Florencia Villaggi, Pilar Colomes, Jaime de San Martin, Beverly Timmins, José Ramón Mourenza, José Luis Gomara, Diego Santacruz, Elena Oñoro, Antolín Fernández, Irene Martínez.

- The Claimants' experts: Jesús Mota Robledo and Javier Acevedo.

- The Respondent's experts: Grant Greatrex, Carlos Montojo and Jesús Fernández Salguero.

- The Arbitral Tribunal: Alexis Mourre, Guido Santiago Tawil, Claus von Wobeser.

- The Administrative Secretary of the Tribunal: Bingen Amezaga.

67.     The Parties confirmed absence of any objections to the way the Arbitral Tribunal conducted the proceedings.  The hearing was transcribed and the transcripts have been communicated to the Parties for verification.

68.     At the end of the hearing, the Tribunal asked the Parties to agree on a date for delivery to the Tribunal of their respective submissions on costs and the finalised transcripts of the hearing.  On 18 August 2015, the Parties communicated to the Tribunal the agreed corrected version of the transcript ("**Transcript 2015**").

69.     On 10 September 2015, the Institute extended the time limit for rendering the Final Award until 29 February 2016.

70.     On 15 September 2015, each Party sent to the Tribunal its submission on costs.

71.     On 16 September 2015, the Claimants filed a supplementary submission on costs.

72.  On 22 September 2015, the Claimants communicated to the Tribunal their comments on the Respondent's submission on costs.

73.  On 28 September 2015, within the time allowed by the Tribunal, the Respondent submitted its response to the Claimants' comments.

74.  On 29 October 2015, the Claimants sent the Tribunal a letter with further comments in relation to the Respondent's costs of arbitration. Consequently, the Tribunal allowed the Respondent to submit its comments as soon as possible.

75.  On 2 December 2015, the Respondent submitted its comments on the Claimants' letter of 29 October 2015, enclosed with two documents.

76.  On 9 December 2015, the Respondent submitted additional evidence to substantiate its costs incurred in relation to the hearings.

77.  On 22 December 2015, the Arbitral Tribunal closed the proceedings in accordance with Article 34 of the Rules.

## V.  SUMMARY OF THE FACTS

### A.  Introduction

78.  The present dispute concerns the regulatory framework of the Kingdom of Spain regarding generation systems based on photovoltaic solar electricity. Electricity production through photovoltaic solar energy consists of a system based on renewable energy which is regulated by a special regime that provide for incentives and subsidies.[12]

79.  Spain, has established, among other things, a system of premiums and regulated tariffs to remunerate electricity production originating from photovoltaics.[13]

80.  In summary, the Claimants claim that after attracting their investments in the photovoltaic generation sector, the Respondent has unlawfully amended the special regime regulating the industry, causing various losses.

81.  In the following sections, (**B**) a summary of the regulatory framework in force at the time of investment; then (**C**) a description of the Claimant's investment; and (**D**) the regulatory changes in 2010 on which the Claimants' claims are based will

---

[12]  In application of Directive 2001/77/EC, which includes "support systems", involving direct payments to producers of electricity from renewable energy sources.
[13]  Defence, paras. 38-39.

be presented. Finally, (**E**) will briefly outline the subsequent changes in the regulatory framework.

## B. The initial regulatory framework

1. The Electricity Sector Law

82. The liberalisation of the electricity sector in Spain has been implemented by Law 54/1997, of 27 November, "*Law regulating the electricity sector*" (the "**LSE**"), which established the general regulatory framework for the sector.

83. Article 15 of the LSE provides: "*Activities for the supply of electricity will be economically subsidised in the manner provided in this Law, with payment of rates, charges and prices. For the determination of rates or charges and prices that consumers must meet, regulations for subsidies of such activities will be established with objective, transparent and non-discriminatory criteria that encourage an improvement in management effectiveness, economic and technical efficiency of these activities and quality of the power supply.*"

84. The LSE makes a distinction between an ordinary regime of energy production and a "*special*" regime. Chapter II of the LSE refers to the "*special regime of electricity production*" and Article 27 defines the production under the special regime as follows:

"*1. The electricity production activity will be considered as falling within the special regime in the following cases, when performed through facilities with a working capacity not exceeding 50 MW:*

*[...] (b) When any of the non-consumed renewable energy is used as primary energy, as well as biomass or any type of biofuel, as long as the owner does not carry out production activities under the ordinary regime.*

*2. Production under the special regime is governed by specific provisions, and in matters not covered by them, by the applicable general provisions on electricity production.*

*Provided production facilities falling under the special regime will be granted approval by the relevant organs of the competent Autonomous Communities.*"

85. The special regime, comparing to the ordinary regime, favours promotion of energy production from renewable sources.

86.     Article 30 of the LSE refers to the obligations and rights of producers under the special regime. The obligations are set out in Article 30.1 and include the obligations to adopt safety standards and technical regulations for production and transportation, proper maintenance of the facilities, as well as obligations to facilitate information necessary for public administration and relating to performance of environmental protection requirements.

87.     Article 30.2 provides for the following rights:

"*a) To incorporate the net production of energy to the system, hereby receiving compensation as determined in accordance with the dispositions of this Law.*

*For these purposes, the net production shall be considered as the total energy production of facilities less consumption used by the power generation facility. When conditions regarding the supply of energy render it necessary, the Government, informed by the Autonomous Communities, will limit for a fixed period of time the quantity of energy that can be incorporated into the system by the producers under the Special Regime.*

*b) Priority access to the network of transportation and distribution of the generated energy, in accordance with the maintenance of reliability and security of the grids.*

*c) Parallel connection of the facilities to the network of the company in charge of distribution or transportation.*

*d) Use, in conjunction or alternatively, of the energy acquired through other actors.*

*e) To receive from the distribution company the electric energy supply required by the conditions determined by the regulations.*

88.     Article 30.4 states that the remunerative scheme of the special regime is accompanied with payment of premiums and notes that the amount of premiums is determined as follows:

"*it must take into account the voltage level of the power delivery network, the effective contribution to the improvement of the environment, the saving of primary energy and energy effectiveness, the production of heat economically useful and costs incurred by the investment, with the objective to reach reasonable profitability rates with reference to the cost of currencies in the capital market.*"

89.    The LSE has been further developed and supplemented by various regulations which, when relevant to the present dispute, are discussed below.

90.    It should be recalled, as it is a basis for some of the Parties' arguments, that in the Spanish legal system, Laws and Royal Decree-Laws have the force of law and are superior to Royal Decrees.  Royal Decrees, having a regulatory status and being subordinate to Laws, are implemented and supplemented by Ministerial Orders and Resolutions, which are at a lower rank to Royal Decrees.[14]

91.    One of the distinctions between a Royal Decree and a Royal Decree-Law is that the former involves a mandatory hearing procedure for those affected by the regulation,[15] this procedure does not apply to Royal Decree-Laws.  Another distinction is that Royal Decrees may be subject to challenge and review by organs of administrative jurisdiction,[16] whereas Royal Decree-Laws may not.

   2.   Royal Decree 436/2004

92.    Royal Decree 436/2004 was introduced on 12 March 2004 and "*establishes the methodology for the update and systematisation of the legal and economic regime of the electric energy production under a Special Regime".*  ("**RD 436/2004**")

93.    As stated in the preamble and in Article 1, RD 436/2004 is intended to harmonize the LSE rules, particularly, in relation to the special regime of electricity production.

94.    It is not in dispute between the Parties that RD 436/2004 is not applicable to the facilities owned by T-Solar, as those facilities have been realised and registered after RD 661/2007 was repealed.

   3.   Presentation *"The sun can be yours"* of 2005

95.    On 24 May 2005, the Ministry of Industry, Energy and Tourism of Spain ("**Minetur**") published a promotional presentation entitled "*The Sun can be yours. Answering all the Essential Questions"* ("***The sun can be yours 2005***"),[17] paragraph 8 of which provides reasons to invest in photovoltaic installations: "*The profitability of your investment is reasonable, and could reach up to 15%"* and "*With IDEA-ICO line, there is substantial financing for the investment.*"

---

[14] Claim, para. 45; Defence, para. 55.
[15] Claim, para. 48, citing Article 24 of the Governmental Law.
[16] Article 26.3 of the LSE.
[17] C-86.

4. The 2005-2010 Renewable Energy Plan

96.    On 26 August 2005, the Spanish government approved the 2005-2010 Renewable Energy Plan by signing the agreement of the Council of Ministers ("**PER 2005-2010**"),[18] which contains the government's policy in regards to the renewable energy sector's compliance with EU targets set out in Directive 2001/77 of 27 September 2001 ("**Directive 2001/77/EC**").

97.    In particular, PER 2005-2010 provides that "*implementation of photovoltaic solar energy will help initialise a future of technological development, which will give to the sector of electricity generation increasingly competitive terms in comparison with other generating proceedings.*"[19]

98.    PER 2005-2010 states that favourable factors for the development of the photovoltaic industry are the "*existence of a suitable and stable legal framework and implementation of a series of economic measures enabling the increase of the objective from 2010 onwards*".[20]  Noting that "*a regulatory framework aimed at the development of this type of energy must generate a consolidated trust of the developers, which brings them to invest in the photovoltaic sector in their legitimate confidence that this tendency will be maintained for the long term.*"[21]

99.    The PER also addresses certain barriers to the development of renewable energy: "*the insufficient profitability of the installations – as it needs an high premium – and the absence of incentives for the development of innovative facilities of photovoltaic energy generation*"; on the regulatory aspect, among other reasons, "*the lack of regulatory harmonization at regional levels, the limitations of conditions for payment once power capacity limits have been reached and the lack of a norms regarding the connection to the grid of high voltage facilities.*"[22]

100.    Table 11 of the PER 2005-2010 contains a summary of types of photovoltaic facilities, based on which the generation cost per KW/h is calculated.  According to this document:  "*generation costs are based on a 100% private investment, excluding subsidies and tax exemptions, considering for one out of five cases a compensation of 5% of the private investment.  The lifespan and the period of*

---

[18] C-9.
[19] C-9.
[20] C-9.
[21] C-9.
[22] C-9; Claim, paras. 39-42; Reply, paras. 25-26.

*repayment of the investment is considered to be 25 years. In Type II cases of this table, which refers to facilities with a fixed connection to the network and power less than 100 kWp, the assumption is that they will effectively function 1250 hours per year.*"[23]

101. According to PER 2005-2010, Spain's objective was to increase the working capacity in the photovoltaic sector to 363 MWp in the 2005-2010 period.[24]

5. Presentation "*The sun can be yours*" of 2007

102. In June 2007, the Minetur published another presentation entitled "*The Sun can be yours*" ("***The sun can be yours 2007***") that contains examples of photovoltaic facilities with lifespans of 25 years operating between 1250 and 1664 hours per annum and with ART yields between 7,11% and 9,58%.[25]

103. The presentation states that "*subsidies for the use of grid-connected photovoltaic installations are provided through the regulated tariff established by Royal Decree 661/2007 of 25 May, published in the B.O.E. 126 of 26 May 2007. No support is provided for investments in that type of facilities.*"[26]

104. Finally, the presentation refers to the technical construction code and five climatic zones in Spain according to the annual solar radiation on a horizontal surface.[27]

6. Report 3/2007 of the National Energy Commission

105. On 14 February 2007, the National Energy Commission ("**CNE**") issued report 3/2007 "*concerning a proposed Royal Decree on regulation of the electric energy production activity under a special regime and certain technology facilities regulated under the ordinary regime*" ("**Report 3/2007**").[28]

106. Section 5.3 of Report 3/2007 in paragraph (b) sets out the criteria that should direct the regulation of the special regime: "*minimising regulatory uncertainty. The CNE understands that transparency and predictability in the future of economic incentives reduce regulatory uncertainty, which encourages investment in new capacities and minimises the cost of project funding, consequently reducing the final cost for the consumer. The regulation must offer sufficient guarantees to*

---

[23] C-9, p. 168.
[24] C-9, p. 177.
[25] C-87, pp. 14-17.
[26] C-87, p. 18.
[27] C-87, p. 46.
[28] C-14.

*ensure that economic incentives are stable and predictable throughout the life of the facility, ascertaining both transparent mechanisms for annual updating associated with the evolution of strong rates (such as the average tariff of reference, the CPI, ten year bonds, etc.) as well as periodic reviews, for example, every four years that only concern new facilities in terms of investment costs which might affect the reduction of operative costs for existing facilities".*

107.  More precisely, paragraph (b) in section 7.2 entitled "*On the criteria to minimise regulatory uncertainty*" states that "*production facilities under the special regime are demanding in terms of capital and have long repayment periods. Royal Decree 436/2004 minimises the regulatory risk by providing stability and predictability of economic incentives for the lifespan of the facilities upon the establishment of a transparent mechanism for their yearly update, associated with the evolution of a strong rate as is the Average Reference Tariff (ART) and the exemption of existing facilities from the quadrennial review, considering that the new incentives only apply to new facilities".*

   7.  Memorandum of the Minetur

108.  On 21 March 2007, the Minetur published a Memorandum on the draft Decree on regulation of energy production under the special regime and certain similar technology facilities under the ordinary regime ("**Report on RD 661/2007**").[29]

109.  Section 3.2.1 of the Memorandum states that:

   "*Remuneration for photovoltaic solar sector is laid out in Table 3, subgroup b.1.1.*

   *For installations up to 10 MW, values for the regulated tariff provide for a proportion of an ART of 25 years at approximately 7%.*

   *Within the range of power greater than 10 MW, an ART of less than 7% is applied. Photovoltaic facilities of such a size are unusual and, if realised, do not exclusively meet the profitability criteria.*

   *These determined power objectives are extended up to 371 MW as an established objective of working capacity with the right for photovoltaic facilities remuneration.*"[30]

---

[29] RL-95.
[30] RL-95.

8. Royal Decree 661/2007

110. Royal Decree 661/2007, enacted on 25 May 2007, "*regulates the energy activities under the special regime*" ("**RD 661/2007**"). Paragraph seven of the preamble states that RD 661/2007 replaces RD 436/2004 and that the new regulatory framework for the electricity production under the special regime is introduced, while maintaining the basic structure of the previous regulation.

111. Paragraph eight of the preamble in RD 661/2007 provides that the Decree develops principles proclaimed in the LSE, "*guarantee the facility owners operating under the special regime reasonable compensation for their investment and guarantee electricity consumers a reasonable allocation of attributable costs of the electricity system. Accordingly, an incentive for market participation is that* [this Decree] *requires a lesser administrative intervention in fixing the electricity prices as well as a better and more efficient attribution of the costs of the system, especially in reference to management of budget deviations and supply of additional services*".

112. Among other objectives, in Article 1 of RD 661/2007, it is provided that the establishment of judicial and economic regimes of electricity production under the special regime, replacing the one in RD 436/2004, envisages a transitory period for facilities operating under the previous regime of RD 436/2004.

113. The scope of the application of RD 661/2007 is set out in Article 2.1 which states that the electricity production facilities in Article 27.1 of the LSE fall within its scope. Furthermore, classification of such facilities is established for various categories. In particular, category **b** refers to "*facilities that use as primary energy any of the renewable energies, biomass or any type of biofuel, as long as its beneficiary does not carry out production activities under the ordinary regime*", and within this category subgroup **b.1.1** refers to "*facilities that solely use solar radiation as primary energy by means of photovoltaic technology*".

114. RD 661/2007 provides for procedure of inclusion of electricity production facilities under the special regime; the requirements are listed in Article 6:

"*1. The requirements for the production facility to be included under the special regime will be granted by the competent Administration upon prior registration in the Administrative Register of production facilities under the special regime. The facilities' owners or operators that applying to be included to this regime*

*must request the competent administration for their inclusion in one of the categories, group or, if applicable, subgroup referred in Article 2".*

115.     Article 9 refers to the registration requirement, and provides that in order to monitor activities under the special regime, in particular, management and control of the remuneration of regulated tariffs, premiums and other supplements, the facilities must be registered with the Administrative Register of Production Facilities under the Special Regime ("**RAIPRE**").

116.     Article 14 outlines effects of the registration in the RAIPRE and states:

"*1. The final registration of the facility with the* [RAIPRE] *is necessary for the application of the economic regime provided for in this Royal Decree, which takes effect on the first day of the month following the beginning of the facility's activity.  In any event and where appropriate, supplements and costs under this regime will be applicable from this first day."*

117.     The requirement for final registration with the RAIPRE is also stated in the second paragraph of Article 17(c): "*the right to receive the regulated tariff, or, where appropriate, the premium, shall be subjected to final registration of the facility with the* [RAIPRE] *prior to the deadline established in Article 22.*"

118.     The rights of producers under the special regime are established in Article 17 which provides that, subject to Article 30.2 of the LSE, such producers shall have the rights to:

"*a) Parallel connection of its generation group or groups to the network of the transport or distribution electricity company.*

*b) Transfer to the system through the transport or distribution electricity company of the net production of electricity or sold energy, provided that absorption of this electricity by the grid is possible.*

*c) Compensation of the economic regime provided by this Royal Decree, originating from the total or partial sale of its net electric energy in any option provided by Article 24.1.  The right to receive the regulated tariff or, when applicable, bonus, subject to the facility registration with the RAIPRE before the deadline set out in Article 22.*

*d) Sell all or part of its net electricity production through direct means.*

*e) Have priority access and connection to the electricity grid according to the terms set out in Annex XI of this Royal Decree or in the regulations replacing it.*"

119. Article 24 contains a remuneration mechanisms for electricity produced under the special regime; the article provides for two options:

"*a) Transfer the electricity to the system through the transport or distribution grid with reception through it of a regulated tariff, uniform for all the program periods expressed in Euro cents per kilowatt-hour.*

*b) Sell the electricity on the electric energy production market. In this case, the sale price of the electricity will be the price resulting from the organised market or the price freely negotiated by the owner or representative of the facility, supplemented, where appropriate, with a premium in Euro cents per kilowatt-hour.*

120. The regulated tariff is described in Article 25 as "*a uniform fixed amount, which is determined depending on the category, group or subgroup in which the facility belongs as well as its working capacity, and, where appropriate, the amount of time passed after the date of commissioning as determined in Articles 35 to 42 of this Royal Decree.*"

121. The regulated tariff for the electricity produced by means of solar photovoltaic energy (subgroup b.1.1) is set out in Table 3 of Article 36:

a) For facilities with an output equal or exceeding 100 KW: 44,0381 Euro cents per kilowatt-hour ("**cent € x KW/h**") for the first 25 years. Thereafter: 35,2305 cents € x KW/h.

b) For facilities with an output of between 100 KW and 10 MW: 41,7500 cents € x KW/h for the first 25 years. Thereafter: 33,4000 cents € x KW/h.

c) Facilities over 10 MW to 50 MW: 22,9764 cents € x KW/h for the first 25 years. Thereafter: 18,3811 cents € x KW/h.

122. Therefore, RD 661/2007 establishes three categories of tariffs according to the working capacity of a plant (lesser the working capacity – higher the compensation). Within this category, there are two fixed regulated tariffs: a higher applicable rate for the first 25 years of the lifespan of the facility, and a lower applicable rate starting from the 26th year.

123. Article 44 of RD 661/2007 provides for revision of tariffs, premiums and supplements, in particular regarding tariff updates, the first paragraph states:

"*1. [...] The value of tariffs, premiums, and other supplements and lower and higher applicable rates of the market hourly price defined in this Royal Decree for category b) […] are updated on an annual basis taking as a reference the*

*increase of the CPI less the value established in the first additional provision of this Royal Decree.*"

124.    The first additional provision stipulates that the reference value for the decrease of the CPI for updates will consist of 25 basis points until 31 December 2012 and 50 basis points thereafter.

125.    The third paragraph of Article 44 provides for revision of tariffs:

"*3. During 2010, in view of the outcome of the monitoring reports on the compliance degree with the Renewable Energy Plan (PER) 2005-2010 Strategy for Energy Saving and Efficiency in Spain (E4), as well as new objectives in the following Renewable Energy Plan for 2011-2020, a revision will be undertaken regarding tariffs, premiums, and supplements, as well as lower and higher applicable rate limits defined in this Royal Decree, taking into account costs associated with each of these technologies, the level of involvement of the special regime in the coverage of the demand and its impact on the technical and economic management of the system, always guaranteeing rates of reasonable return with reference to the cost of currency in the capital market. Every four years thereafter, a new review will be carried out in accordance with the above criteria.*

*The revisions to which this section refers regarding the regulated tariff and the higher and lower limits do not affect facilities whose commissioning certificate has been granted before 1 January of the second year after the year in which there has been a revision.*"

126.    However, RD 661/2007 determined a limit up until which the facilities are entitled to benefit under the economic regime provided for in the regulation.  Article 22 entitled '*Time limit for maintaining regulated tariffs and premiums*' stipulates that:

"*Once 85 of 100 of the power objective has been reached by a group or subgroup established in the Articles 35 to 43 of this Royal Decree, it will be established through a Resolution of the Secretary General for Energy a maximum time limit during which these registered facilities operating under the special regime have the right to premiums or, where appropriate, the regulated tariff as established in this Royal Decree for the group or subgroup; this time limit shall not be less than twelve months.*"

127.    Moreover, with regard to administrative procedures for the inclusion of facilities under the special regime, Article 4.3 of RD 661/2007 provides: "*What is intended*

*by substantial modification of a pre-existing facility is the replacement of essential equipment such as boilers, motors, hydraulic turbines, or turbines in relation to steam, wind or gas, alternators and transformers, when it is established that the investment in the partial or full modification consists in more than 50 percent of the total investment in the plant, valued with a replacement criteria. The substantial modification shall give rise to a new commissioning date for the purposes of Chapter IV.*"

128.    On 27 September 2007, the Secretary General for Energy enacted a Resolution in accordance with Article 22 of RD 661/2007;[31] the Resolution affirmed that from 31 August 2007 "*the percentage reached in respect of the working capacity target for solar photovoltaic technology is 91 percent, and that 100 percent of the target will be achieved in October 2007.*"[32] In light of this circumstance and taking into account the fact that the timeframe for execution of a PV facility is ten months, the Secretary General for Energy decided to set a twelve-month implementation period for the Resolution in order for the photovoltaic power generation facilities to register in the RAIPRE in accordance with Article 22 of RD 661/2007.

9.    Report 30/2008 of the National Energy Commission

129.    Under Article 22 of RD 661/2007 and Resolution CNE of 27 September 2007, the facilities registered after 29 September 2008 could no longer benefit from the regime established in RD 661/2007. Therefore, it has been decided to enact a Royal Decree to establish a new regime for such facilities.

130.    On 29 July 2008, the CNE published Report 30/2008 "*in relation to the proposed Royal Decree for compensation for electricity production using solar photovoltaic technology for facilities after to the deadline for remuneration under Royal Decree 661/2007 of 25 May, and for such technology, of 29 July 2008*" ("**Report 30/2008**").[33]

131.    In particular, in its Report 30/2008, the CNE affirmed the following:

"*4.2.b) Legal certainty and protection of legitimate expectations. The stability and predictability of economic incentives (tariffs and premiums) reduce*

---

[31] CL-5.
[32] According to the communication provided by the Administrative Board of the National Energy Commission in its session of 27 September 2007.
[33] C-25.

*regulatory uncertainty, which encourages investments in new capacities to undertake projects, while minimising the cost of financing, reducing at the same time the final cost for the consumer. The current regulation has established annual updates of economic incentives based on solid rates (such as the CPI, ten year bonds, etc.). Moreover, periodic reviews every four years have been planned solely for newly established facilities.*

*Indeed, the principles of legal certainty and protection of legitimate expectations (art. 9.3 CE) are not insurmountable obstacles to modification of the judicial framework, nor can they be used as freezing the judicial framework at one point in time. In this sense, these principles neither restrict the dynamic evolution of regulatory frameworks, nor can they restrict new normative provisions to be applied in the future to situations initiated before their entry into force. However, such principles require that regulatory innovation – especially if it is abrupt, unpredictable and unexpected – must be carried out with certain guarantees and caution (transitory periods to adapt to new regimes, in some cases compensation measures, etc.) which soften, moderate or minimize as much as possible the disappointment of possible expectations generated by the previous legislation."*

132. And also:

"*5.2 On the criterion to minimise regulatory uncertainty. The production facilities under the special regime used to be intensive in capital and have long term recovery timeframes. The regulation of generation facilities under the special regime established in the Royal Decree 661/2007 attempted to minimize the regulatory risk of this altogether, granting security and predictability to economic incentives for the lifespan of the facilities by establishing transparent mechanisms consisting of annual updates of such mechanisms and with the exemption of the four-year revision for such facilities, considering that the new incentives will only affect new facilities.*"

### 10. Royal Decree 1578/2008

133. Royal Decree 1578/2008 was promulgated on 26 September 2008 '*Remuneration for the production of electricity using solar photovoltaic technology for facilities*

*established after the deadline for maintenance of the compensation scheme of the Royal Decree 661/2007 for such technology"* ("**RD 1578/2008**").[34]

134. The preamble of RD 1578/2008 states: "*the growth of the working capacity experienced by solar photovoltaic technology is being much higher than expected [...] in May 2008, it had already reached the 1,000 MW of working capacity.*" It also noted that the framework provided by RD 661/2007 has to be adapted to ensure its efficiency, affirming that: "*similarly to the fact that an inadequate payment would make investments non viable, an excessive payment could have significant consequences regarding costs to the electricity system and will discourage commitment to research and development, thus, lowering the excellent perspectives of this technology in middle and long terms. It is considered necessary to rationalise the payment and, through it, to approve the Royal Decree that brings the economic regime downwards following the hoped technological evolution and, thus, with a long term perspective.*"

135. Therefore, the aim of RD 1578/2008 is to maintain the system of promotion of energy production through the photovoltaic source for facilities that could not benefit from RD 661/2007, but reducing the incentive regime provided for in RD 661/2007.

136. With regard to implementation, Article 2 stipulates that RD 1578/2008 shall apply to installations of group b.1.1 of Article 2 of RD 661/2007 (photovoltaic power facilities), with the registration date in the RAIPRE after 29 September 2008.

137. RD 1578/2008 also stipulates that the facilities shall be registered to be able to benefit from the economic regime established by the Decree; and Article 4 provides for the establishment of a subsection of the RAIPRE – Retribution Pre-allocation Register ("**RPR**") – in which photovoltaic energy facilities should be registered.

138. Article 8.1 states that in order to benefit from the system provided for in RD 1578/2008, facilities shall register with the RPR and within 16 months obtain a final registration with the RAIPRE and start selling electricity.

139. Unlike the system of compensation established by RD 661/2007, which provides for a fixed compensation, the system in RD 1578/2008 provides for quarterly tenders by quotas so that there is a fixed rate for a quota of MW. If the quota is not reached, the rate could increase for another quota. The regulated tariff would not

---

[34] CL-4.

be fixed for the facility and would depend on the tender to which it will be assigned. Whether the tariff will be lower or higher will depend on the specific tender.[35]

140.     Article 11 establishes a regulated tariff for the first tender (32 cent € x KW/h), and the second paragraph of that article provides a mathematical formula to determine the successive tariffs, which would be reduced to the extent that the tenders are filled.

141.     Article 11.5 stipulates that the regulated tariff applicable to a facility in accordance with RD 1578/2008 will be maintained for a maximum period of twenty-five years from the latest commissioning date of the facility or the date of registration with the RPR.

142.     Finally, Article 12 states that the regulated rates for subgroup b.1.1 are subject to updates provided for in Article 44.1 of RD 661/2007 from 1 January of the second year following the tender in which it was assigned.

## C. The Claimants' investment

143.     As indicated above,[36] the Claimants claim to have an investment in Spain through the T-Solar company, which is dedicated to generation and sale of electricity produced by means of photovoltaic solar power plants. Charanne and Construction acquired stakes in T-Solar in February 2009[37] and December 2009, respectively.[38]

144.     T-Solar was established as a limited company (originally under the name of Tuin Zone) in 2007,[39] and currently owns through T-Solar Global Operating Assets, S.L. and Tuin Zonne Origen, S.L.U. all or most of the capital in several Spanish companies, which in turn own photovoltaic power plants.[40]

145.     The Spanish companies that own photovoltaic power plants, contracted for various leases in respect of the plots of land on which the facilities are located, with an average duration of less than 30 years.[41]

---

[35] Reply, para. 76.
[36] See above, paras. 4-9.
[37] Reply, para. 378; C-40. Charanne acquired 3.960.091 shares in T-Solar on 19 February 2009, and subsequently, through various agreements, Charanne increased its stake in the share capital of T-Solar and became the owner of 8.593.094 shares.
[38] Reply, para 378; C-40. Construction acquired 617.317 shares of T-Solar on 21 December 2009, and subsequently, through various agreements, Construction increased its stake in the share capital of T-Solar and became the owner of 1.308.674 shares.
[39] Claim, para. 4; Reply, para. 378; C-33. Tuin Zone was renamed "Grupo T- Solar Global" on 27 June 2008.
[40] Claim, paras. 4-5; Reply, paras. 390 et seq.; C-140; C-119 to C-227.
[41] Claim, para. 192; Report CT-1, p. 50.

146.   According to the Claimants, the vast majority of T-Solar photovoltaic facilities have been registered with the RAIPRE before 29 September 2008 and, therefore, concern the regime established under RD 661/2007,[42] the rest have been registered after this date with the RAIPRE and the RPR and, thus, concern the regime established under RD 1578/2008.[43]

147.   The Claimants assert that all T-Solar photovoltaic plants are registered with the RAIPRE and that such registration remains valid.[44]

## D. Regulations in the photovoltaic industry after 2010

### 1. Royal Decree 1565/2010

148.   Royal Decree 1565/2010 was promulgated on 19 November 2010 and "*Regulates and modifies certain aspects relating to the electricity production under the special regime*" ("**RD 1565/2010**").[45]

149.   The Claimants base their claims on two specific aspects of RD 1565/2010, which will be described below, (**a**) elimination of regulated tariffs from the twenty-sixth year for solar photovoltaic facilities, and (**b**) introduction of a series of additional technical requirements.

### a)   *Elimination of regulated tariffs from the twenty-sixth year*

150.   Article 1.10 of RD 1565/2010 provides that "*in Table 3 of Article 36* [of RD 661/2007] *rates for regulated facilities indicated for facilities of group b.1.1 are abolished from the twenty-sixth year.*" Accordingly, the facilities would maintain regulated tariffs provided for by RD/2007 for the first 25 years of their commissioning, but, thereafter, they would lose the right to the lower regulated tariff from that moment until the end of the life of the installation.

---

[42] PHB1 Claimants, footnote 130: "*The facilities Alcolea Lancha, Almodóvar, Archidona, Arnedo, Castillo Alcolea, El Carpio Buenavista, El Carpio Quintanilla, Elduayen, Espejo, Fuentes Valdepero, La Choza, La Poza, La Puente La Pledra, La Seca, Les Trencades, Madrigal, Medina de las Torres, Machuelos, Mogan-Bacol, Morila, Pozal de Gallinas, Pozocañada, Pozohondo, Sigüenza, Son Falconer, Talayuela, Tarifilla, and Viguilla pertain to the regime established under RD 661/2007.*"

[43] PHB1 Claimants, footnote 130: "*The facilities Cubierta T-Solar, Cubierta UAM, Saelices, Veguilla 2, Almodóvar 2 and the Carpio 2 pertain to RD 157/2008.*"

[44] Reply, para. 58; C-42 and C-75.

[45] CL-6.

151.    The term of validity of the regulated tariffs was initially limited to 25 years, but was later extended to 28 years through RDL 14/2010,[46] and up to 30 years in Law 2/2011 on Sustainable Economy.[47]

*b)  Requirement of additional technical requirements*

152.    Article 1.5 of RD 1565/2010 amended paragraph (e) of Article 18 of RD 661/2007 to require facilities or groups of photovoltaic facilities exceeding 2 MW to comply with requirements determined to overcome voltage dips in such facilities, which were approved by Resolution of the Secretary General for Energy on 04 October 2006.  Thus, it is required that facilities introduce response mechanisms to protect the electric system in the event of power failure in the network.

153.    Also, paragraph (e) of Article 18 of RD 661/2007 provides that compliance with facilities' response mechanism requirement to counter voltage dips is a necessary condition to receive the regulated tariff and failure to comply would "*result in the imposition of the market price instead of the regulated tariff.*"

2.  Royal Decree 1614/2010

154.    Royal Decree 1614/2010 was promulgated on 07 December 2010 and "*regulates and modifies certain aspects relating to electricity production from solar, thermal and wind technologies*" ("**RD 1614/2010**").[48]

155.    As indicated by its title, RD 1614/2010 is aimed to regulate activities of facilities based on solar, thermal and wind technologies and, therefore, does not affect the Claimants' facilities based on photovoltaic technology.  RD 1614/2010 introduces, *inter alia*, a limit on operating hours with a right to receive premiums or premium equivalents.

3.  Royal Decree-Law 14/2010

156.    On 23 December 2010, Royal Decree-Law 14/2010 on "*Establishment of urgent measures to amend the tariff deficit in the electricity sector*" was promulgated ("**RDL 14/2010**").  As indicated in its title, the objective of RDL 14/2010 is to amend the tariff deficit in the electricity sector and establish a set of measures "*so*

---

[46] See below, para. 165.
[47] See below, para. 175.
[48] CL-15.

*that all stakeholders in the sector contribute an additional and shared effort to the reduction of the deficit in the electricity system*".

157.　The preamble particularly states: "*it appears reasonable that producers under the special regime also make a contribution to mitigate additional costs. Such contribution should be proportional to the characteristics of each technology, to the degree of participation in the generation of these additional costs and to the existing margin in the compensation scheme for which reasonable profitability remains guaranteed in any event.*"

158.　The Claimants' claims relate specifically to two aspects of RDL 14/2010, (**a**) the limit on operating hours of photovoltaic facilities and, (**b**) the establishment of an obligation to pay charges for the use of the transportation and distribution network.

### a)　*Limit on the operating hours*

159.　Preamble of the Royal Decree-Law provides: "*in general the possibility to limit the equivalent operating hours is established with the recognised right to a priority economic regime. In this manner, amounts of reference will be established in accordance with amounts used for the calculation of the compensation established in the Renewable Energy Plan 2005-2010 and those reflected in the Royal Decree 661/2007 of 25 May by which the electricity production activity will be regulated taking into account the climate solar zone where the facility is located, in accordance with the classification of climate zones according to the average solar radiation in Spain established in Royal Decree 314/2006 of 17 March (RCL 2006, 655) in which the Technical Construction Code is approved.*"

160.　Such a limitation of equivalent operating hours is set out in the First Additional Provision of Royal Decree-Law 14/2010, which provides:

"*1. The photovoltaic solar technology facilities will have the right, where appropriate, to receive each year the economic regime that had been bestowed upon them, until they reach the number of equivalent hours of reference, taking as a starting point zero hours of the first January of every year.*

*2. The equivalent hours of reference for these facilities, depending on the climate zone where the installation site is located and determined according to the classification of climatic zones based on the average solar radiation in Spain established in Royal Decree 314/2006 of 17 March and in which the Technical Construction Code is approved, will be the following:*

| Technology | Equivalent hours of reference / year | | | | |
|---|---|---|---|---|---|
| | Zone I | Zone II | Zone III | Zone IV | Zone V |
| Fixed facility | 1.232 | 1.362 | 1.492 | 1.632 | 1.753 |
| Facility with 1-axis mobility | 1.602 | 1.770 | 1.940 | 2.122 | 2.279 |
| Facility with 2-axis mobility | 1.664 | 1.838 | 2.015 | 2.204 | 2.367 |

*Accordingly, the number of equivalent operating hours of an electricity production facility is defined as the ratio between the net annual production expressed in kWh and the nominal power of the facility expressed in kW.*

*3. The National Energy Commission will apply the limit on hours laid down in this provision to settlement of premiums for the appropriate facilities of photovoltaic solar technology. Similarly, it will also apply the limit established in the second transitional provision regarding settlement of premiums for photovoltaic solar facilities attached to the economic regime established in the Royal Decree 661/2007 of 25 May. For both cases, it will be able to collect the information necessary from the owners of the facilities and the competent organs for the authorisation for such facilities.*"

161.     Thus, the maximum annual quota of production hours paid through the regulated tariff is established depending on the solar zone where the photovoltaic facility is located.

162.     On the other hand, the second Transitional Provision of RDL 14/2010 states:

"*Notwithstanding the first additional provision, until 31 December 2013 equivalent hours of reference for photovoltaic solar technology facilities covered by the economic regime established by Royal Decree 661/2007 of 25 May, by which the activity of electricity production under the special regime is regulated, shall as follows:*

| Technology | Equivalent hours of reference / year |
|---|---|
| Fixed facility | 1.250 |
| Facility with 1-axis mobility | 1.644 |
| Facility with 2-axis mobility | 1.707 |

163.    The second transitory provision sets out the maximum production quota for the regulated tariff applicable to facilities operating under the regime of RD 661/2007 such quota is applicable until 31 December 2013. Thereafter, these facilities will also be subject to the limits set out in the first additional provision.

164.    Therefore, RDL 14/2010 anticipated two limits for compensated electricity production with the annually regulated tariff: the first transitory limit valid until 31 December 2013 applicable only to the facilities operating under RD 661/2007 and the second permanent limit applicable to the facilities operating under RD 1578/2008, and from 1 January 2014 onwards to the facilities operating under RD 661/2007, in other words after the transitory limit is no longer applicable.

165.    If the annual electricity production exceeds the maximum quota in a specific year, the facilities may sell the remaining production at market price, but not at the regulated tariff.

166.    However, and as determined earlier,[49] the first Final Provision of RDL 14/2010 increased the period from 25 to 28 years, during which photovoltaic facilities operating under the regime of RD 661/2007 are entitled to the regulated tariff.

### b) *Charges for access to transport networks*

167.    RDL 14/2010 also required payment of a charge of 0.5 euro/MW for access to transport and distribution networks. In this regards, the preamble provides: "*since the generation facilities, especially those operating under the special regime, have experienced a significant increase, an increase of investment in the transport and distribution networks of electricity has occurred in order to evacuate the facilities' spilling energy. In the current context of crisis and tariff deficiency, it remains justified that the generators contribute to the costs attributable to the investments through the payment of charges, as regulatory charges are not developing, to satisfy electricity producers, transporters and distributors an access charge of 0,5 EUR/MWh will be applied with reference to the framework established by the valid regulations of the European Union.*"

168.    The obligation to pay charges is established in the first Transitory Provision, which provides: "*from 1 January 2011 onwards, and as long as regulatory charges are not developed that would satisfy electricity producers, transporters and*

---

[49] See above, para. 150.

*distributers shall apply to producers that are connected to their grid an access charge of 0,5 EUR/MWh to be transferred to their grids or values established by the Ministry of Industry, Tourism and Commerce within the limits established by the normative framework of the European Union.*"

4. Legal challenge to RD 1565/2010 and RDL 14/2010

169. Approval of RD 1565 and RDL 14/2010 resulted in (**a**) proceedings brought before the Spanish Constitutional Court by the Autonomous Communities of Extremadura, Murcia and Valencia; (**b**) administrative proceedings brought before the Spanish Supreme Court by T-Solar and other companies that own photovoltaic plants; and (**c**) proceedings before the European Court of Human Rights brought by T-Solar and companies that own the plants.

### a) *Proceedings brought by the Autonomous Communities against RDL 14/2010*

170. In 2011, the Autonomous Communities of Extremadura, Murcia and Valencia brought claims challenging constitutionality of RDL 14/2010.[50] The challenge by the Autonomous Community of Murcia has referred to the first Additional Provision, the second Transitional Provision and the first Final Provision of RDL 14/2010, which were admitted on 29 March 2011.[51] The challenge of Generality of Valencia was admitted on 12 April 2011.[52] The challenge of Junta of Extremadura against the second transitional provision was admitted on 18 October 2011.[53]

171. The Spanish Constitutional Court dismissed the challenges brought by the Autonomous Communities of Murcia and Valencia for lack of subject matter on 12 June 2014[54] and 26 June 2014,[55] respectively, as will be discussed below,[56] due to the challenged provisions not being in force at the time. The challenge by the Junta of Extremadura was declared inadmissible on 22 July 2014 for the same reasons.[57]

---

[50] Claim, paras. 224-225; Reply, para. 187.
[51] CL-26.
[52] CL-27.
[53] CL-28.
[54] RL-347.
[55] RL-348.
[56] See below para. 178.
[57] PHB2 Claimants, para. 335.

### b) *Administrative proceedings before the Supreme Court*

172.    In July 2011, company Isolux Corsán together with the Spanish companies that own plants, filed an administrative appeal No. 60/2011 before the Spanish Supreme Court challenging RD 1565/2010, and on 4 July 2011, T-Solar together with its subsidiaries that own the photovoltaic generation plants brought a direct administrative appeal No. 64/2011 challenging RD 1565/2010 before the Spanish Supreme Court.[58]

173.    Appeal 60/2011 was dismissed by the Supreme Court in its judgment of 24 September 2012,[59] and appeal 64/2011 was dismissed by the Supreme Court in its judgment of 15 October 2012.[60]   In both cases the Court concluded that RD 1565/2010 was consistent with the law and did not violate investors' legitimate expectations in accordance with the Spanish law.[61]

### c) *Proceedings before the ECHR*

174.    On 4 July 2011, various subsidiaries of T-Solar filed a claim against Spain before the ECHR, seeking a declaration that RDL 14/2010 was in violation of Article I of the Additional Protocol, and Articles 6 and 13 of the Convention for the Protection of Human Rights and Fundamental Freedoms.[62]

175.    On 12 December 2013, the ECHR announced its final decision not to admit the claim, stating that it did not meet the admissibility criteria set out in Articles 34 and 35 of the Convention.[63]

## E.  Rules subsequently adopted by Spain

### 1.  Law 2/2011 on Sustainable Economy

176.    The Law 2/2011 '*Sustainable Economy*' was adopted on 4 March 2011 ("**Law 2/2011**"),[64] which amends the time limit during which a photovoltaic plant can be operating and be entitled to receive the regulated tariff.  This limit, which has been previously increased to 28 years by RDL 14/2010[65] is increased to 30 years.

---

[58] R-3.
[59] RL-236.
[60] RL-250.
[61] RL-236; RL-250.
[62] Defence, paras. 419(d)-420; Reply, para. 430.
[63] C-76.
[64] CL-20.
[65] See above, para. 165.

177.   This increase of the operating time limit with entitlement to the regulated tariff concerns, similar to RDL 14/2010, only the facilities covered by the previous regime established under RD 661/2007.[66]

### 2. Royal Decree-Law 1/2012

178.   Royal Decree-Law 1/2012 was promulgated on 27 January 2012 ("**RDL 1/2012**"), which suspends pre-allocation remuneration procedures and removes economic incentives for new photovoltaic facilities that have not been registered with the RPR as provided for in Article 4.1 of RD 1578/2008.

### 3. Royal Decree-Law 9/2013

179.   Royal Decree-Law 9/2013 was promulgated on 12 July 2013 "*by which urgent measures are taken to ensure the financial stability of the electrical system*" ("**RDL 9/2013**").[67]   In its sole Repealing Provision, this norm derogated from RD 661/2007 and RD 1578/2008, although it provided for their temporary application until the implementation of RDL 9/2013 is finalised.[68]

180.   Article 1.2 of RDL 9/2013 amended Article 30.4 of the LSE, which now read as follows:

> "*Additionally, and in the terms of regulations by Royal Decree of the Council of Ministers, compensation for the sale of energy generated will be determined and valued at the market price, facilities should receive a specific compensation composed by a term per unit of installed power that covers the costs of investment in a facility that cannot be reclaimed through the sale of energy and a term of the operation which covers, where appropriate the difference between the costs of exploitation and the resources of the participation in the market of this type of facility.*
>
> *In order to calculate the specific remuneration for a facility, it will be taken into account, apart from the regulatory lifespan of the facility and in reference with the activity realised by an efficient and well managed company:*
>
> *a) The standard income from the sale of generated energy valued at the market price.*

---

[66] It is based on the previous increase made and the First Final Provision of RDL 14/2010, in which reference was made only to the facilities pertaining to RD 661/2007.
[67] RL-279.
[68] RDL 9/2013, Third Transitory Provision.

*b) Standard operating costs.*

*c) The standard value of the initial investment.*

*For this purpose, in no case will it be taken into account costs or investments that would be determined by norms or administrative acts and that are not applicable in the entirety of Spanish territory. In the same vein, it will only be taken into account of the costs and investments that relate exclusively to the activity of electricity production.*

*[...]*

*This remuneration system will not exceed the required minimum level to cover costs that allow these facilities to experience competition on an equal footing with the rest of technologies on the market and that have the possibility to obtain a reasonable profit by reference to the type of facility. Nevertheless, the emoluments may exceptionally also take into account an incentive for the investment and the execution in a determined timeframe when the facility supposes a significant reduction of the costs in the island and extraterritorial systems.*

*Such a reasonable profitability will focus, prior to taxes, on the average profitability of the secondary market of State Obligations for ten years in applying the appropriate differential.*

*The parameters of the compensation regime may be revised every six years.*"

181.   The First Additional Provision of RDL 9/2013 provided: *"In accordance with the penultimate paragraph of Article 30.4 of the* [LSE] *for facilities that were entitled to the priority economic regime at the date of the entry into force of this Royal Decree, reasonable profitability will focus, before taxes, on the average profitability of the secondary market of State Obligations for ten years increased by 300 basic points. Such focus shall be performed without prejudice to the revision provided for in the last paragraph of this article.*"

182.   The Second Final Provision stipulates that "*the Government, upon proposal of* [Minetur]*, will adopt a royal decree regulating the legal and economic framework for electricity production facilities from renewable energy sources, co-generation and waste with the grant of a retribution to amend the compensation model of existing facilities. This new model should comply with the criteria set out in Article 30 of the* [LSE] *introduced by this royal decree-law and will apply from the entry into force of this royal decree-law.*"

183.    RDL 9/2013 applies from the date of its entry into force, 14 July 2013, but provides that until the approval of the decrees establishing the specific remuneration, operators registered under RD 661/2007 and RD 1578/2008 will continue receiving compensation in the form of payment on account in accordance with scheme applicable under the new methodology.[69]

### 4. Law 24/2013

184.    Law 24/2013 "*the Electricity Sector*" was enacted on 26 December 2013 ("**New LSE**").

185.    The New LSE establishes the principle of '*economic and financial sustainability of the electricity system*'.  In this regard, the preamble states: "*The principle of economic and financial sustainability of the electricity system will be a guiding principle for the actions of Public Administrations and other subjects within the scope of this Law.  Moreover, any regulatory action in relation to the sector which presumes an increase in costs for the electricity system or a reduction in income shall incorporate an equivalent reduction in other cost items or an equivalent increase in revenue in order to ensure the balance of the system.  Accordingly, the possibility of accumulation of new deficits as it happened in the past will be ruled out.*"

### 5. Order IET/1045/2014

186.    Order IET/1045/2014 adopting '*the remuneration parameters for certain power generation facilities from renewable energy sources*' ("**Order IET/1045/2014**") was issued on 16 June 2014 and entered into force on 21 June 2014.

## VI.  THE PARTIES' POSITIONS ON JURISDICTION

### A. The Respondent's position

187.    The Kingdom of Spain has raised objections to the jurisdiction of the Arbitral Tribunal on the following grounds: (**1**) lack of subject matter jurisdiction; (**2**) the "*fork in the road*" provision has been activated; (**3**) the dispute and the Parties are subject to the rules governing the internal market of the European Union and the

---

[69] RDL 9/2013, Third Transitory Provision; Reply, para. 205.

dispute should be settled according to the judicial system of the EU; (**4**) the Claimants are not investors in accordance with Article 1(7) ECT.

1. <u>Lack subject matter jurisdiction</u>

188.   According to the Respondent, RDL 9/2013 expressly repealed RD 661/2007, RD 1578/2008 and Article 4 of RDL 6/2009, and it must be considered to have repealed RD 1565/2010 and RDL 14/2010, that is to say, all the rules on which the Claimants have based their claim in this arbitration against Spain.[70]

189.   RDL 9/2013 has established a new compensation system different from the previous one, which is determined in a new regulatory framework comprised of RDL 9/2013, the New LSE, RD 413/2014, and Order IET/1045/2014 of 16 June 2014.[71]   Moreover, the new regulations entirely absorb any previous adaptation or regulatory measure, as they calculate a reasonable profitability with respect to the whole lifespan of the plant, therefore including in the calculation the first years of operation, so it is not possible to consider previous regulations separately.[72]

190.   The Respondent affirms that the Claimants' claim and their calculation of damages are based on regulations that have been repealed and, therefore, have no merit.[73]

191.   The Claimants did not make specific claims under RDL 9/2013 and subsequent regulations, and could not do so as they are bringing a claim based on them before another arbitral tribunal and if they also did so in these arbitral proceedings they would benefit from illicit enrichment.   Now the Claimants are lodging a claim on these regulations before another arbitral tribunal and if they would be doing so in this arbitration, the Claimants would be unjustly enriched.[74]   According to the Respondent, company Isolux Corsán Infrastructure Netherlands B.V., which is the same company through which the Claimants' investments are structured, on 3 October 2013 brought an arbitration claim against Spain based on alleged breaches of the ECT, and the only difference between the mentioned proceeding and the present claim is that the former is based also on the new regulations that are in force.[75]

---

[70] Rejoinder, paras. 1179-1181.
[71] Rejoinder, para. 1183.
[72] PHB1 Respondent, paras. 375, 382, 387-388; PHB2 Respondent, para. 176.
[73] Rejoinder, paras. 1185-1188.
[74] Rejoinder, paras. 1190, 1197.
[75] Rejoinder, paras. 1191-1196.

192. The Respondent sustains that if the Tribunal considered the Claimants' pleas on the basis of the new regulations that are not the object of these proceedings and over which Spain is not exercising its right of defence, that would constitute an abuse of due process.[76]

193. Finally, the Respondent argues that Spain has not approved the new legislation to circumvent this arbitration as the Claimants argue. On the contrary, the supervening lack of subject matter has been created by the Claimants themselves who chose not to file claims related to the new regulations before this Tribunal, but before another arbitral tribunal.[77]

### 2. The Claimants have activated the '*fork in the road*' provision of the ECT

194. The Respondent refers to the fork in the road provision contained in Article 26(3)(b)(i) of the ECT, which is aimed at preventing an investor from unjustly resorting to parallel dispute resolution mechanisms (one at the national level and another at the international level).[78]

195. The Respondent sustains that the activation of the fork in the road provision has occurred, on one hand, as a consequence of filing before the Supreme Court by T-Solar and all of the investment special purpose vehicles owners of photovoltaic plants, as well as by Isolux Corsán, of the administrative claims No. 64/2011 and No. 60/2011, respectively, in relation to RD 1565/2010; on the other hand, due to the presentation brought by several companies of T-Solar of a claim before the European Court of Human Rights.[79]

196. With regard to the claim filed before the ECHR seeking a declaration that RDL 14/2010 is contrary to Community law and requesting compensation, this claim alone would have already activated the fork in the road provision as it constitutes an abuse of right to use two parallel proceedings for the same claim to maximise possibilities to be heard.[80] Whilst the Claimants did not present claims in the Spanish courts, they did resort to "*a previously agreed dispute settlement procedure*", as provided in subparagraph (b) of paragraph 2 of Article 26 of the ECT.

---

[76] Rejoinder, para. 1190.
[77] PHB1 Respondent, paras. 7, 390-392.
[78] Rejoinder, para. 358.
[79] Rejoinder, paras. 354-355.
[80] Rejoinder, paras. 392-394.

197. Finally, it is irrelevant that the claim before the ECHR has not been admitted, since the fork in the road provision was activated at the time of submission of the claim, and such a clause only provides for its non-application when the investor renounces other dispute settlement procedures, in the present case the claim did not continue before the ECHR as it was not admitted; but the investors did not withdraw their claim.[81]

198. In relation to the proceedings before the Spanish courts, the Respondent denies the Claimants' arguments concerning alleged breach of the triple identity test, claiming that a strict and limited application of these requirements would in practice prevent the application of the provision.[82] According to the Respondent the conditions of the triple identity test have been met.

### a) Identity of the Parties

199. The Respondent affirms that the identities of the special purpose vehicle companies that together with T-Solar initiated proceedings before the Spanish court are the same as those forming the Claimants' investments in this arbitration, which is shaped by direct and indirect participation of Charanne and Construction in T-Solar.[83]

200. According to the Respondent, should proceedings 64/2011 continue, it would result in an identical claim as the one in the present arbitration with regard to RD 1565/2010.[84]

201. In this regard, the Respondent argues that international law supports the Respondent's position that the economic unity of the claiming entities and the economic effects of each case should be taken into account when analysing the identity of the parties.[85]

---

[81] Rejoinder, paras. 395-396.
[82] Rejoinder, para. 359, citing *Pantechniki S.A. Contractors & Engineers v. Albania*, ICSID Case No. ARB/07/21, Award, 30 July 2009 ("**Pantechniki v. Albania**") (RL-322), paras. 60-64, and *H&H Enterprises Investments, Inc. v. Egypt* ("**H&H Enterprises v. Egypt**"), Award not publicly available according to *I.A. Reporter* of 19 May 2014 (RL-323). PHB1 Respondent, paras. 400-403, quoting the Annulment Decision of the Committee in the case of *Compañia de Aguas del Aconquija SA and Vivendi Universal (previously Compagnie Générale des Eaux) v. Republic of Argentina*, ICSID Case No. ARB/97/3, Decision on Annulment, 03 July 2002 ("**Vivendi v. Argentina II – Annulment**").
[83] Rejoinder, para. 362.
[84] Rejoinder, para. 366.
[85] Rejoinder, para. 367; Campbell McLachlan, Laurence Shore and Matthew Weiniger, "*International Investment Arbitration: Substantive Principles*" (Oxford International Arbitration Series, 2007), para. 4.141.

202.    Moreover, the Respondent affirms that, had it been ruled, the Supreme Court's judgment of inadmissibility would have had an *erga omnes* effect independent of whom the claimants are.    According to Spanish law, judgments declaring inadmissibility of general character have a declarative effect *erga omnes* and *ex tunc*.[86]

### b)  Identity of the subject matter

203.    Concerning the subject matter, the actors in the proceedings before the Spanish courts in essence made the same claims that the Claimants in the present arbitration, although adapted to the particularities of these proceedings.[87]    Contrary to the arguments of the Claimants, not only a judgment declaring annulment of RD 1565/2010 was requested in the administrative proceedings, but also compensation for damages in the same way as it has been done in these proceedings.[88]

204.    Furthermore, the Respondent contends that the claims before the Spanish Supreme Court also referred to RDL 14/2010 and, in its decision, the court also ruled with respect to this norm.[89]    In any event, a ruling *erga omnes* regarding RD 1565/2010 would have affected the system of legislative adaptations as a whole, as its justification is similar.[90]

### c)  Identification of the cause of action

205.    Finally, the Respondent contends that it is normal for each proceeding to be based on specific norms of each system, domestic or international, and that what is relevant is the analysis of the existence of an essential genuine identity between the causes of action and not an absolute identity.[91]

206.    In this regard, the request in this arbitration to declare that the enactments carried out by Spain infringe the ECT and the request compensation for losses is equivalent to the request of ANULACION of RD 1565/2010 before the Spanish Supreme Court and the corresponding claim for compensation for losses.[92]   The Respondent

---

[86] Rejoinder, paras. 368-369.
[87] Rejoinder, para. 371.
[88] Rejoinder, paras. 372 et seq.; R-3.
[89] Rejoinder, para. 379; R-3, pp. 14, 15, 91, 132; RL-401.
[90] Rejoinder, para. 380.
[91] Rejoinder, paras. 383-386, quoting Campbell McLachlan, Laurence Shore and Matthew Weiniger, *Op. Cit.* para. 4.76 (RL-325).
[92] Rejoinder, para. 387.

finally argues that the Spanish Supreme Court also declared the absence of any infringement of the ECT in its decisions in appeals 60/2011 and 64/2011.[93]

### 3. It is an intra-European dispute not subject to the ECT

207.    The Respondent submits that countries which the Claimants claim to be nationals of, Luxembourg and the Netherlands, as well as Spain itself, have been members of the European Union ("**EU**") before they negotiated and ratified the ECT which means that the dispute brought is an intra-EU dispute.[94]

208.    The intra-European investment relations are subject to the specific regulatory framework of the EU, which thoroughly deals with all matters governed by investment treaties, including those covered by the ECT.[95]  Therefore, the ECT is not applicable to investments made within the EU by nationals of EU Member States ("**Member States**"), and does not confer any right to such nationals, including in particular the right to resolve disputes through arbitration.[96]

209.    According to the Respondent, the resolution of intra-European disputes is governed in a restrictive manner by the judicial system established under EU law, according to which each judge of a Member State acts as a judge of the EU and directly applies its laws.  If any conflict arises regarding its application, the resolution of disputes are submitted to the Court of Justice of the EU ("**CJEU**"), which is also the court of last resort, in order to ensure the system's integrity and coherence.[97]  In addition, investors may directly lodge a complaint before the European Commission  to initiate proceedings against the infringing State under Article 258 of the Treaty on the Functioning of the European Union ("**TFEU**").[98]

210.    Regarding the Claimants' allegation that Article 258 TFEU refers to disputes between States,[99] the Respondent asserts that this claim is unfounded and that most of the proceedings initiated by the EC against Member States under Article 258 have been initiated at the request of private parties.[100]

---

[93] PHB1 Respondent, paras. 434 and 438 (c).
[94] Defence, paras. 215 et seq.; Rejoinder, para. 401.
[95] Defence, paras. 222-225.
[96] Defence, paras. 237-238.
[97] Defence, paras. 226-229, 278-282; Rejoinder, para. 424.
[98] Rejoinder, para. 424.
[99] Reply, para. 295.
[100] Rejoinder, para. 426; RL-298.

211.	The Respondent asserts that, apart from the case of Eastern European States that subsequently joined the EU, bilateral investment treaties between EU Member States never existed as that the very objective of the EU was to create an internal market that included free circulation of capital and to establish all the necessary guarantees.[101]

212.	According to the Respondent, both the literal good faith interpretation of the wording of the ECT, systematic interpretation and other supplementary means of interpretation in accordance with Articles 31 and 32 of the Vienna Convention on the Law of Treaties ("**VCLT**") support its position.[102]

213.	Article 26 of the ECT requires diversity, in that the investor that brings a claim against a contracting party of the ECT ("**Contracting Party**") must be an investor of a State other than the Respondent Contracting Party, and the investment must be made in the territory of a Contracting Party other than the one from which the investor comes from.

214.	For the purposes of the ECT, an investor of a Member State of the EU is both an investor of that State and of the EU, and in accordance with Article 1(10) of the ECT the EU is a Regional Economic Integration Organisation ("**REIO**"), which covers the territory of Spain, as well as Luxembourg and the Netherlands, thus the diversity criteria between the territory of an investor and territory of the other Contracting Party receiving the investment is absent.[103]    According to the Respondent, the definition of territory of States in paragraphs (a) and (b) in Article 1(10) of the ECT only applies to States that are not members of the REIO.[104]

215.	As for its object and purpose, the Respondent contends that the ECT was designed to establish a regime of protection of investments in the countries of the former communist bloc without changing the intra-community regime.  The purpose and intent of the ECT can only be to establish a special regime for protection of energy investments outside the borders of the EU.[105]

216.	The Respondent also argues that interpretation of Article 26 of the ECT in the context of other articles of the treaty confirms Spain's position.  Thus, in the event of disputes between EU Member States, arbitration clause provided in Article 27

---

[101] Defence, para. 250; Rejoinder, paras. 475-478; R-2.
[102] Rejoinder, paras. 409-411.
[103] Defence, paras. 253 et seq.
[104] PHB1, para. 464.
[105] Defence, paras. 264-266; Rejoinder, paras. 434, 435.

of the ECT does not allow arbitration between Member States but provides that such disputes would be subjected to the exclusive competence of the EU jurisdictional mechanisms.[106]

217.  According to Spain, the prohibition of investor-State arbitration between Member States derives from jurisprudence of the CJEU, and, in particular, with the decision in the *Mox Plant* case,[107] in which it was established that in accordance with Article 344 TFEU[108] disputes that involve Member States and refer to EU law must be resolved in accordance with the procedures provided by the TFEU.  In this sense, "mixed" international treaties, that is treaties ratified by both States and the EU, are considered to be an integral part of EU law.[109]

218.  The Respondent asserts that acts subsequent to the signature of the ECT also confirm its interpretation.  The Respondent refers to the positions expressed by various EU institutions,[110] particularly by the European Commission,[111] the executive body of the EU that signed the ECT on behalf of the EU.[112]

219.  The Respondent also points out that instruments enacted by the EU with the objective of compliance with the ECT do not contain any reference to intra-EU disputes which demonstrates that it has not been considered that the ECT could apply to the resolution of such disputes.[113]

---

[106] Rejoinder, paras. 443-448.

[107] Rejoinder, paras. 450 et seq.; RL-84. Judgment of the CJEU in the case *Commission of the European Communities v. Ireland*, 30 May 2006, matter C-459/03 ("*Mox Plant*") (RL-84).

[108] The CJEU referred to Article 292 of the TEU, which is now Article 344 of the TFEU.

[109] Rejoinder, paras. 457 et seq. referring to the *Mox Plant* decision, paras. 82-85.

[110] Rejoinder, paras. 436-464 et seq; *Regulation Proposal of the European Parliament and the Council to establish a framework to manage the financial liability in regard to the dispute settlement by tribunals between an investor and an entity established by international agreements and which is a party to the EU; EU Regulation No. 1219/2012, of the European Parliament and the Council, of 12 December 2012, establishing transitional arrangements for bilateral investment agreements between Member States and third countries; Parliamentary Questions, 17 April 2013: "1. The Member States of the European Union have concluded among them 190 bilateral investment treaties. These treaties have discriminatory effects considering that the rules on the protection of investment vary from one treaty to another and as they violate Article 18 of the Treaty of the European Union. Moreover, they pose a conflict with the exclusive jurisdiction of the European Court of Justice regarding EU law as it gives rise to a parallel jurisprudence via arbitration proceedings.  According to the Commission, these Treaties are incompatible with the laws of the European Union and should be given no effect."* (RL-271), RL-388.

[111] Position of the European Commission in the cases of *Eureko B.V. v. Republic of Slovakia*, UNCITRAL, PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010 ("*Eureko v. Slovakia*") (RL-3), according to which the ECT provision on dispute settlement should be inapplicable as it is an "intra-community" dispute; and *Electrabel v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award on Jurisdiction, Applicable Law and Liability, 30 November 2012, ("*Electrabel v. Hungary*") (CL-32), Part V, pp. 9-11. More information on the website of IA Reporter, article "*Investigation: In recent briefs, European Commission casts doubts on application of Energy Charter Treaty to any intra-EU dispute*" of 8 September 2014 (RL-388).

[112] Rejoinder, paras. 470-474.

[113] Rejoinder, paras. 479 et seq., referring in particular to the "Declaration of the European Commission to the Energy Charter Secretariat in relation to its policies, practices and conditions regarding disputes between investors

---

220.    In relation to the Claimants' allegations referring to the decisions in the cases of *Eastern Sugar v. Czech Republic*,[114] *Eureko v. Slovakia*[115] and *Electrabel v. Hungary*,[116] the Respondent contends that they do not constitute relevant precedents for this Tribunal as they refer to a completely different situation considering that in these cases the States involved had signed a BIT or the ECT before acceding to the EU, whereas it is different in the case of Spain.[117] As a matter of fact, today there are no BITs between States that were members of the EU before becoming parties to the ECT.[118]

221.    Spain stressed the importance of ensuring systemic integration, consistency, harmony and certainty of the Rule of Law, and in this regard exclusive competence of the CJEU within the EU should be preserved to achieve predictability and certainty and avoid inconsistent decisions.[119]

222.    The Respondent also contends that Article 16 of the ECT is not applicable as there is no incompatibility between EU law and the ECT, and that in the event of a conflict between them, Article 351 of the TFEU of EU law prevails over any subsequent treaty to the admission of the State to the EU.[120]

223.    In its post-hearing briefs, the Respondent restated as an argument the position expressed by the European Commission in its *Amicus EC*,[121] in the sense that there is an implicit disconnection clause in the ECT regarding intra-EU relations.[122]

224.    The Respondent finally argues that the submission of this dispute to the ECT rather than to the dispute resolution mechanisms of the EU would constitute a violation of public policy under Spanish law,[123] and if the Arbitral Tribunal renders an award there would be a risk of unenforceability or annulment of such award.[124]

---

and Member States and their submission to arbitration or international conciliation." (RL-303), and the Decision of the Council and the Commission on 23 September 1997, whereby the ECT was approved (RL-311).

[114] *Eastern Sugar BV v. Czech Republic*, SCC Case No. 088/2004, Partial Award, 27 March 2007 (**"Eastern Sugar v. Czech Republic"**) (CL-57).

[115] *Eureko v. Slovakia.*

[116] *Electrabel v. Hungary.*

[117] Rejoinder, paras. 523 et seq.

[118] Rejoinder, paras. 475-476.

[119] Rejoinder, paras. 490 et seq.

[120] Rejoinder, paras. 542-545, citing cases 10/61 *Commission v. Italy* [1962] ECR 1, 10 (RL-318) and C-147/03, *Commission v. Austria* [2005] ECR 1-5969, 1-6011 (RL-319), para. 58, referring to case C-473/93, *Commission v. Luxembourg* [1996] ECR 1-3207, para. 40; PHB1 Respondent, para. 527 (c).

[121] *Amicus EC*, para. 13.

[122] PHB1 Respondent, paras. 466-490; PHB2 Respondent, Exhibit 7, paras. 8-11.

[123] Defence, para. 297; Rejoinder, para 402.

[124] Rejoinder, para. 501. In its PHB2 (para. 98), the Respondent refers in particular to the fact that on 13 February 2015, the EC decided to initiate a preliminary examination of State aid, which after the EC's initiatives extended to the regime of compensation for renewable energy, including RD 661/2007 and RD 1578/2008.

4. <u>The Claimants are not investors in accordance with Article 1(7) of the ECT</u>

225. The Respondent claims that behind the corporate veil of Charanne and Construction, the actual claimants in this arbitration are two natural persons of Spanish nationality, Messrs José Gomis Cañete and Mr Luis Antonio Delso Heras.[125]

226. According to the Respondent, the legal entity making the investment is not protected by the ECT, regardless of its place of incorporation, if it is controlled by national investors of the same State where the investment has been made.[126] This is because Article 26(1) of the ECT requires diversity of nationalities to bring an arbitration claim.[127]

227. The Respondent contends that although there is a formal line of interpretation in arbitration in respect of the nationality of a claimant legal entity,[128] there is a more appropriate line of interpretation that requires effective nationality of the legal entity,[129] because investment treaties were created to encourage foreign investment and not investment of own nationals.

228. According to the latter line of interpretation, the 'foreign' feature is not only a formal requirement but also an objective condition, which allows tribunals to pierce the corporate veil to give light to the actual controllers of the companies, and to deny jurisdiction when it becomes clear that the actual controllers are nationals of the respondent State.[130]

229. According to Spain, the reasoning in the decision it uses as support its position is perfectly valid, regardless of whether decisions have been made within the framework of ICSID arbitrations and not the ECT, as in any event it relates to instruments intended to establish mechanisms to resolve problems that arise in the context of commercial relations between States and nationals of other States.[131]

---

[125] Defence, paras. 304-305; Rejoinder, para. 554.

[126] Defence, para. 310; Articles 17(1) and 26(7) of the ECT.

[127] Rejoinder, paras. 557 et seq.

[128] Defence, para. 319, quoting *Tokio Tekelés v. Ukraine*, ICSID Case No. ARB/02/18, Award on Jurisdiction, 26 July 2007 ("***Tokio Tekelés***") (RL-320); *The Rompetrol Group N.V. v. Romania*, ICSID Case No. ARB/06/3, Award on the Respondent's Preliminary Objections on Jurisdiction and Admissibility, 18 April 2008, ("***Rompetrol***") (RL-109), para. 88.

[129] Defence, para. 319, citing *Vacuum Salt Products v. Republic of Ghana*, ICSID Case No. ARB/92/1, Award, 16 February 1994 *("**Vacuum Salt Products**")* (RL-34)

[130] Defence, para. 320, citing the Dissenting Opinion of Prof. Prosper Weil in *Tokio Tokelés* and the decision in the case of *Thales Spectrum de Argentina v. Republic of Argentina*, ICSID Case No. ARB/05/5, Decision on Jurisdiction, 19 December 2008 ("***TSA v. Argentina***") (RL-117), paras, 160-162.

[131] PHB1 Respondent, paras. 546-548.

230. Respondent further argues that, in these circumstances, in the event that jurisdiction is found and the arbitral tribunal renders an award, it would violate the public policy of Spain, seat of the arbitration, to recognise a different jurisdictional treatment that would rely on the form of investment vehicle chosen, as opposed to Spanish citizens in the same situation.[132]

## B. The Claimants' position

231. The Claimants reject the Respondent's arguments concerning (**1**) lack of subject matter; (**2**) the "*fork in the road*" provision. Also, (**3**) they contend that the claim under the ECT is compatible with EU law; and (**4**) assert that the Claimants are legitimate investors under the ECT.

### 1. Argument concerning lack of subject matter jurisdiction should be rejected

232. The Claimants argue that the adoption of RD 1565/2010 and RDL 14/2010 have reduced the economic value of their shares and returns in T-Solar, regardless of whether these regulations have been repealed or subsequently absorbed by RDL 9/2013, as it is unquestionable that damage has been caused.[133]

233. The measures under consideration in this arbitration are RD 1565/2010 and RDL 14/2010 only, nevertheless, the Claimants assert that such measures have been merely the first steps undertaken by Spain to carry out the complete dismantling of the special regime provided for in RD 661/2007 and RD 1578/2008.[134] The new regime introduced by RDL 9/2013 did not remedy the conduct of Spain, but has aggravated the situation created by the measures under consideration in this arbitration.[135]

234. Spain cannot take advantage of its own conduct, which has also further exacerbated the situation of the Claimants, to avoid responsibility under the ECT.[136]

235. The Claimants deny that RDL 9/2013 affects the subject matter of this arbitration, but even if it does, the measures under consideration in this arbitration, RD 1565/2010 and RDL 14/2010, remained in force for a period of nearly three years

---

[132] Defence, paras. 331-333; Rejoinder, paras. 575-579.
[133] PHB2 Claimants, para. 89.
[134] PHB1 Claimants, paras. 417-418.
[135] PHB1 Claimants, paras. 420-421.
[136] PHB1 Claimants, paras. 422-423.

until RDL 9/2013 entered into force, fully implementing and deploying effects of the measures.[137]

## 2. The Claimants did not exercise the "*fork in the road*" provision of the ECT

236. The Claimants recognise that Article 26(3) of the ECT contains a "*fork in the road*" provision, which provides that arbitration and recourse to ordinary courts of a Contracting Party are alternative and exclusive paths.  However, the Respondent's argument should be rejected because the universally recognized test[138] of the triple identity that requires that proceedings before domestic courts and proceedings before an arbitral tribunal share (**a**) the same parties, (**b**) the same subject matter, and (**c**) the same legal basis, has not been met.[139]

### a) *Absence of identity between the parties*

237. There is no identity of the parties as Charanne and Construction are not parties to any proceedings before the Spanish courts, since it was the companies that own the plants that initiated legal proceedings in Spain.  These companies do not fall within the scope of the ECT.[140]

238. The ECT expressly provides that it must be the investor who choses to resort to domestic courts and not its shareholders or subsidiaries.  The fact that the Claimants have corporate links with the companies Grupo T-Solar and Grupo lsolux Corsán does not allow to ignore the legal personality of the Claimants.[141]

239. The Respondent's argument that the Claimants would benefit from the potential strike down requested in the proceedings before the Supreme Court as it has *erga omnes* effect is irrelevant with regard to the "*fork in the road*" provision since such analysis would lead to an absurd result of not admitting arbitration claims brought by third parties that could benefit from a general decision.[142]

---

[137] PHB2 Claimants, paras. 95-98.
[138] Reply, para. 425; *Total S.A. v. Republic of Argentina*, ICSID Case No, ARB/04/10, Award, 27 December 2010 ("***Total v. Argentina***") (CL-43), para. 443; *Toto Construzioni Generali S.p.A. v. Republic of Lebanon*, ICSID Case No. ARB/07/12, Decision on Jurisdiction, 11 September 2009 ("***Toto Construzioni***") (CL-95), paras. 211-212.
[139] Reply, paras. 425-426.
[140] Reply, para. 427(i).
[141] PHB1 Claimants, para. 26.
[142] PHB1 Claimants, para. 27.

### b) *Absence of identity as to the subject matter*

240.    There is no identity as to the subject matter.  In administrative-contentious proceedings before the Supreme Court, the requesting parties sought to strike down RD 1565/2010 as violating Spanish law,[143] whereas in the present arbitration the Claimants request the Arbitral Tribunal to declare the incompatibility of RD 1565/2010 and RDL 14/2010 with the provisions of the ECT, and consequently order the Kingdom of Spain to pay compensation the damage suffered as a result of the adoption and entry into force of these regulations.[144]

241.    Although in the claims brought before the Supreme Court damages have also been requested, the Claimants submit that there cannot be an identity as to the subject matter between a claim based on Spanish law seeking to strike down of a regulation, and an international claim requesting compensation for damage caused due to the violation of international obligations of the State.[145]

### c) *Absence of identity as to the legal basis*

242.    There is also no identity as to the legal basis.  The actions before the Spanish courts are based on the violations of the Spanish legal system, in particular Articles 9.3 and 14 of the Spanish Constitution and Article 30.4 of the LSE, whereas the present claim is based on the ECT and international law.[146]

243.    The Claimants contend that the purpose of the "*fork in the road*" provision is precisely to prevent a party from submitting the same claim before multiple fora in respect of a violation of an obligation arising under Part III of the ECT and relating to an investment.[147]  The provision would also have been triggered if the Claimants would have requested the application of the ECT before Spanish courts, but this has not happened.[148]

244.    Regarding the claim filed by several companies of the T-Solar group before the ECHR, the "*fork in the road*" provision is irrelevant since it only concerns proceedings before "courts or administrative tribunals" of Spain as provided by Article 26(2)(a), and concerns neither proceedings before an international tribunal,

---

[143] Reply, para. 427 (i).
[144] Claim, paras. 139-140.
[145] PHB1 Claimants, para. 31.
[146] Reply, para. 427(iii).
[147] PHB1 Claimants, para. 37.
[148] PHB1 Claimants, para. 38.

nor proceedings "previously agreed" between the Parties as provided in Article 26(2)(b).[149]   In any case, the mentioned claim does meet the triple identity test as there is no identity of the parties, the subject matter or the legal basis.[150]   Finally, the abovementioned claim has not been admitted by the ECHR and, therefore, proceedings may be considered as have not been initiated.[151]

3.   The ECT is applicable to this dispute and does not undermine EU Law

245.   According to the Claimants, the TFEU and the ECT are different instruments with different scopes of application.  While the TFEU regulates the functioning of the EU and establishes freedoms for the community of EU citizens, the ECT focuses on investments in the energy sector, and establishes a legal framework open to any State to foster long-term cooperation in the field of energy.[152]

246.   The rights and specific protection of investments provided for in the ECT are broader or simply absent in EU law which generally regulates the economic and legal aspects of energy circulation in the EU.[153]   The Claimants refer to decisions of various arbitral tribunals that, in analysing the relationship between EU law and investment treaties, have concluded that both have different fields of application and that investment treaties are applicable to intra-EU disputes.[154]

247.   Compatibility between the ECT and EU law has been recognized by various arbitral tribunals[155] as well as national judges of EU Member States.[156]   In any case, Article 16 of the ECT would resolve in favour of the investor any incompatibility that may exist with any other international agreement.[157]

248.   Claimants also argue that the ECT is compatible with the judicial system of the EU, as they bring this claim on the basis of violations of the ECT and not of EU law.  The reference, made by the Respondent, to Article 258 of the TFEU concerns a different case, in which the EC initiates infringement proceedings against a Member State for violation of obligations under Treaties, making it legitimate for it to go before the CJEU.  This arbitration is neither between Member States nor

---

[149] Reply, para. 429; PHB1 Claimants, para. 16.
[150] Reply, para. 430.
[151] Reply, paras. 431 and 432; PHB2 Claimants, para. 117.
[152] Reply, para. 272; Article 1 TFEU; Article 2 ECT.
[153] Reply, para. 273.
[154] Reply, para. 275 et seq.; citing *Eastern Sugar*, paras. 159-165 and *Eureko v. Slovakia*, para. 245.
[155] *Eastern Sugar*, paras. 168-170; *Eureko v. Slovakia*, paras. 263, 274; *Electrabel v. Hungary*, paras. 4.146, 4.166.
[156] Judgment in *OLG Frankfurt* by the High Regional Court of Frankfurt on 10 May 2012.
[157] Reply, paras. 286-289.

between a State and the EU, but between investors of a Contracting Party of the ECT and another Contracting Party.[158] Decisions of the CJEU cited by the Respondent in this regard are irrelevant since they refer to acts of the Community unrelated to the present case,[159] or to disputes between States.[160]

249. Although the present dispute does not concern EU law but the ECT, the Claimants assert that whilst the CJEU is competent to perform the definitive interpretation of EU law, the arbitral tribunals and other national courts could and should apply this law when it is necessary to resolve a dispute.[161]

250. Regarding interpretation of the ECT in accordance with Articles 31 and 32 of the VCLT, the Claimants maintain that the literal interpretation of Article 26(1) of the ECT solely requires that the investment has been made in the territory of a Contracting Party and that this party has breached its obligations under the ECT with regard to investors of another Contracting Party. In the present case, the investment was made on Spanish territory, it was Spain that breached the ECT and the Claimants come from the Netherlands and Luxembourg.

251. As for the argument of Spain regarding the territory of the REIO, the ECT in reality distinguishes between two types of territories, the territory of the Contracting Party and the territory of the REIO. When claiming against a Member State, its territory will be relevant; in case of the REIO, the relevant territory will be the one of the REIO. If the intention of the signatory parties of the ECT had been to exclude internal claims between countries that form part of the REIO, then such an exception would have been expressly stated.[162]

252. As for the Respondent's argument[163] and the letter of the European Commission[164] regarding the existence of an implicit disconnection clause in the ECT for the EU Member States, according to which the ECT would not be applicable to intra-community relations, the Claimants submit that it is clear that the disconnection

---

[158] Reply, paras. 294-296.
[159] Defence, paras. 231-232, citing decisions by the CJEU, *Parti écologiste 'Les Verts' v. European Parliament*, of 23 April 1986, Case C-294/83, and *Kadi and Al Barakaat International Foundation v. Council and Commission*, joined Cases C-402/05P and C-415/05P.
[160] *Mox Plant*.
[161] Reply, paras. 301 et seq. citing *Eureko v. Slovakia*, paras. 278-283; Judgment in *OLG Frankfurt*, para. 2; *Camimalaga, SAU v. DAF Vehiculos Industriales, SAU*, Auto of the Provincial Court of Madrid, 18 October 2013, section 28; *Emilio Augustin Maffezini v. Spain*, ICSID Case No. ARB/97/7, 13 November 2000 ("*Maffezini v. Spain*"), paras. 65 et seq.
[162] Reply, paras. 313-314.
[163] Rejoinder, para. 436.
[164] *Amicus Curiae* brief, para. 13.

clause does not exist in an explicit manner in the ECT, even though the signatory States knew about this mechanism and in fact applied it to less relevant issues.[165]

253.    Neither are relevant the EC's arguments with regard to the definition of the REIO in Article 1(3) of the ECT, stipulating that Member States of the REIO have transferred to it competences, including the competence to "*make binding decisions*",[166] as it only constitutes a general description of the REIO without establishing which competences have been transferred or which decisions of the REIO would be binding, and, therefore, does not allow to reach the conclusions that the EC is seeking.[167]

254.    The Claimants also claim that the text of the document "*Transparency; Policies, practices and conditions of the Contracting Parties*"[168] cited by the EC[169] does not preclude in any way an EU Member State from initiating arbitral proceedings under Article 26(1) of the ECT against another Member State.  This document refers to cases where a claim was brought against the EU under the ECT, admitting a possibility of simultaneous claims against a Member State and the EU, but from such text it cannot be inferred what the EC is seeking.[170]

255.    The Claimants also note that the Respondent's arguments based on Article 27 of the ECT and Articles 344 and 259 of the TFEU, and the decision in the *Mox Plant* case are irrelevant in this case, as it is not a dispute between States.[171]  Besides, the Claimants contend that the Respondent's analysis of the *Mox Plant* decision is incorrect as the CJEU indeed took into account that the dispute was between States and did not conclude that international treaties signed by both Member States as well as the EU itself are part of EU law; the CJEU rather considered that the areas to which the United Nations Convention on the Law of the Sea was applied, were broadly regulated by Community acts, and, therefore, constituted a part of the Community's legal order.[172]

---

[165] PHB1 Claimants, paras. 52-54, referring to Annex 2 of the Final Act of the European Energy Charter Conference regarding the Svalbard Treaty.
[166] *Amicus Curiae* brief, para. 9.
[167] PHB1 Claimants, paras. 55-57.
[168] Document included in Annex ID of the ECT.
[169] *Amicus EC*, para. 22.
[170] PHB1 Claimants, para. 60.
[171] Reply, para. 315; PHB1, paras. 64 et seq.
[172] PHB1 Claimants, paras. 74-77.

256. The Claimants assert that no arbitral tribunal or EU tribunal has determined that EU law prevents an arbitral tribunal from assuming jurisdiction over a dispute between an investor of a Member State and another Member State.[173]

257. With respect to the instruments formulated by the EC and invoked by the Respondent,[174] none of them meets the requirements of Article 31(2)(b) of the VCLT as they were not "*made* […] *in connection with the conclusion of the treaty*" or "*accepted by the other* [Contracting Parties to the ECT] *as an instrument related to the treaty.*" In any event, such documents make no reference to intra-community disputes.[175]

258. Regarding the subsequent acts that, according to the the Respondent, would support its position,[176] the Claimants maintain that they cannot be considered as "*subsequent practice*" within the meaning of Article 31(3)(b) of the VCLT, that allow to interpret the content of Articles 1(7) and 26 of the ECT, as they do not refer to the application of such articles, neither are they useful to prove the agreement of the parties , as they emanate from EU organs and not from the States parties of the ECT, and moreover they lack the necessary frequency and coherence to be considered as concordant, common and coherent practice.[177] On the other hand, the EU Regulation 1219/2012 recognises in its fifth recital that "*bilateral investment agreements remain binding on the Member States under public international law and will be progressively replaced by agreements of the Union relating to the same subject matter*".[178]

259. The position of the European Commission in previous cases does not have the relevance assigned by the Respondent because the EC is not a party to the ECT, but an organ that has intervened in arbitration proceedings to defend its own interests. In addition, arbitral tribunals have consistently rejected the EC's arguments, which the Respondent brings in support of its claims.[179]

---

[173] PHB1 Claimants, para. 70.
[174] Rejoinder, paras. 481 and 485.
[175] PHB1 Claimants, paras. 86-89
[176] Defence, para. 268. Regulation Proposal by the European Parliament and the Council to establish a framework for financial liability in relation to the dispute settlement by tribunals between investors and States established by international agreements; EU Regulation No. 1219/2012 of the European Parliament and the Council, of 12 December 2013, on transitional provisions on BITs between Member States and Third States.
[177] Reply, para. 322, with reference to the criteria established by the Appellate Body of the WTO in its report on "Japan - Alcoholic Beverages " (CL-88, p. 16).
[178] Reply, para. 323.
[179] Reply, paras. 324-325, citing decisions in *Eureko v. Slovakia* and *Electrabel v. Hungary*.

260.    The Claimants deny that the Arbitral Tribunal is under an obligation to "*make an effort to ensure systemic integration*" of EU law with Article 26 of the ECT or to "*collaborate with the harmonious evolution of international law*" as alleged by Spain,[180] they also affirm that in any event the Respondent did not prove that there is a risk of production of inconsistent decisions within the the EU justice system in this case.[181]

261.    With regard to invoking supplementary means of interpretation in accordance with Article 32 of the VCLT, the Claimants affirm that this Article is inapplicable to Article 26 of the ECT since it is neither ambiguous or obscure, nor does it not lead to a result which is manifestly absurd or unreasonable, and the Respondent failed to demonstrate in any way that it is.[182]  In any case, the arguments put forward regarding the circumstances of conclusion of the ECT[183] and the *travaux préparatoires*[184] are not capable of supporting Spain's position.[185]

262.    Regarding the fact that the seat of arbitration is Madrid and that matters of public order are not considered arbitrable under Spanish law on arbitration, the Claimants stress that their claims do not concern public policy aspects of EU law but relate to breaches of obligations under the ECT.[186]

    4.  Claimants are investors of another ECT Contracting Party

263.    The Claimants submit that Charanne and Construction are companies validly incorporated in accordance with the laws of the Netherlands and Luxembourg, which is the only requirement that this Tribunal must take into account in assessing whether the Claimants are investors of another Contracting Party under Article 1(7) of the ECT.[187]  The Respondent's objection would amount to adding an additional requirement that was not intended by the Contracting Parties to the ECT.[188]

264.    According to the Claimants, the decisions of the arbitral tribunals that have applied Article 1(7) of the ECT support their interpretation of that Article.[189]  The Arbitral

---

[180] Rejoinder, paras. 490 and 496.
[181] PHB1 Claimants, paras. 95-97.
[182] PHB1 Claimants, paras. 100-104.
[183] Rejoinder, para. 506.
[184] Rejoinder, paras. 511-522.
[185] PHB1 Claimants, paras. 105 et seq.
[186] Reply, para. 327.
[187] Reply, para. 330.
[188] Rejoinder, para. 333; PHB1 Claimants, paras. 120 et seq.
[189] Reply, paras. 334 et seq., citing *Plama Consortium Limited v. Bulgaria*, Decision on Jurisdiction, 08 February 2005, ICSID Case No. ARB/03/24 ("***Plama v. Bulgaria-Jurisdiction***") (CL-59); *Yukos Universal Limited v. The*

Tribunal must also take into account the awards that have been rendered under investment treaties containing provisions similar to that of Article 1(7) of the ECT, which constitute a single and uninterrupted line of interpretation, contrary to the exception raised by Spain.[190]

265. In this regard, the Respondent relies on ICSID cases related to the requirements of Article 25(2)(b) of the ICSID Convention, that involve radically different criteria to those set forth in Article 1(7) ECT, and are therefore irrelevant.[191]

266. Regarding the Respondent's request to lift the corporate veil of the Claimants, the latter submits that it would be an exceptional measure going against the principle of recognition of the independent existence of companies and their shareholder; lifting of the veil requires specific circumstances such as the existence of an abuse or fraud, which is not the case here and has not been alleged nor proven by the Respondent.[192]

267. Finally, the Claimants submit that the present arbitration does not entail discrimination against Spanish citizens contrary to the Spanish Constitution, as the Claimants, on one hand, do not have Spanish nationality but are companies validly incorporated in the Netherlands and Luxembourg.[193] On the other hand, and in any case, in the event of a hypothetical discrimination between investors relating to access to arbitration under an investment treaty to some of them but not to others, such an assumption could lead to an enlargement of the right of disadvantaged investors but in no case a limitation of the rights of the Claimants in the arbitration nor to the exoneration of the State from its international obligations.[194]

---

*Russian Federation*, PCA Case No. AA 227, UNCITRAL, Interim Award on Jurisdiction and Admissibility, 30 November 2009 ("*Yukos v. Russia*") (CL-58a), paras. 406-407; *Veteran Petroleum Limited v. The Russian Federation*, PCA Case No. AA 228, UNCITRAL, Interim Award on Jurisdiction and Admissibility, 30 November 2009 ("*Veteran Petroleum v. Russia*") (CL-58b), paras. 406-407; *Hulley Enterprises Limited v. The Russian Federation*, PCA Case No. AA 226, UNCITRAL, Interim Award on Jurisdiction and Admissibility, 30 November 2009 ("*Hulley*") (CL-58c), paras. 406-407.

[190] Reply, paras. 347 et seq., citing *KT Asia Investment Group BV v. Kazakhstan*, ICSID Case No. ARB/09/8, Award, 17 October 2013 ("*KT ASIA Investment v. Kazakhstan*"), paras. 113 et seq.; *Tokios Tokelés*, para. 18; *Rompetrol*, para. 99; *Saluka Investments B.V. v. Czech Republic*, Partial Award, 17 March 2006, CPA ("*Saluka v. Czech Republic*") (CL-44), para. 241.

[191] PHB1 Claimants, paras. 127-129; PHB2 Claimants, paras. 149-151, referring to decisions in *Tokios Tokeles* and *TSA v. Argentina* cited by the Respondent.

[192] Reply, paras. 337-341.

[193] Reply, para. 359.

[194] Reply, para. 360, citing the judgment in *OLG Frankfurt*, para. 4.

# VII. PARTIES' POSITIONS ON MERITS

## A. The Claimants

268.   The Claimants submit that (**1**) the modifications introduced by the Government of Spain have retroactively affected the legal and economic regimes established by previous regulations on which the Claimants relied upon in carrying out their investments, (**2**) therefore, resulting in various breaches of the ECT, which (**3**) have caused damage to the Claimants that must be repaired.

### 1.   Regulatory changes

269.   The Claimants refer to the following changes implemented through RD 1565/2010 and RDL 14/2010:

### a)   *Limited term for regulated tariffs*

270.   Article 1.10 of RD 1565/2010 removed the second stage of regulated tariffs for facilities covered by RD 661/2007, i.e. the compensation applicable for the first 25 years from the date of commissioning of the facility. Although the limit for regulated tariffs in the first stage was subsequently extended to the first 30 years by Law 2/2011, the provision of Article 1.10 of RD 1565 eliminated the possibility of regulated tariffs thereafter.[195]

271.   According to the Claimants, photovoltaic solar facilities do not have a limited lifespan as long as adequate technical maintenance is carried out,[196] which does not violate Article 4.3 of RD 661/2007.[197] In any case, the rules existing at the time did not limit the useful lifespan of the facilities in a specific number of years.[198]

272.   The Claimants also allege that the Respondent is not correct in its assertion that for facilities covered in RD 1578/2008 the extension of the period to 30 years with entitlement to regulated tariffs offsets the operating time limits imposed by RDL 14/2010[199] since the extension of the period entitling to regulated tariffs applies only to facilities covered by RD 661/2007, but not by RD 1578/2008.[200]

---

[195] Claim, paras. 188-191.
[196] Claim, para. 192.
[197] Reply, para. 456(a).
[198] Reply, para. 168, according to the Minetur at the time, during negotiations previous to the adoption of RDL 14/2010, Minetur proposed extending the tariffs to 35 years, see C-84.
[199] Defence, para. 814.
[200] Reply, para. 456(c), see First Final Provision of RDL 14/2010.

### b) *Imposition of limits on equivalent production hours*

273.    The First Additional Provision of RDL 14/2010 established a limit of equivalent hours of reference within which the facilities covered by RD 661/2007 and RD 1578/2008 can receive the regulated tariff.   The electricity produced beyond that limit would not benefit from the regulated tariff price.

274.    The Claimants contend that that limit was not based on the regulatory framework, in which there did not exist any differentiation of treatment or limitation of hours based on geographic area.  According to the text of the PER 2005-2010 referred to by the Respondent to assert the existence of previously implicit limits,[201] the text solely refers to standard cases, which do not impose maximum limit on operating hours.[202]

### c) *Obligation to fulfil technical requirement against voltage dips*

275.    Article 1.5 of RD 1565/2010 established a new obligation to comply with the technical requirements to respond to voltage dips.  According to the Claimants, this new obligation involved a significant expense for the generators, without considering any financial compensation whatsoever, unlike what was done previously with respect to wind technology, where Spain had indeed proposed to compensate investors by paying a specific complement of 0,38 Euro cents for compliance with the technical requirements.[203]

### d) *Obligation to pay a charge for grid access*

276.    The First Transitional Provision of RDL 14/2010 introduced a new obligation for electricity producers to pay a charge for access to the transportation network of 0,5 EUR/MWh from January 2011, as long as charges that should be paid by producers of electric energy are not developed.[204]   The mentioned charge had to be paid entirely by the photovoltaic facilities that were covered by a priority regime with which they cannot amortise on the electricity prices, unlike ordinary producers.[205]

---

[201] Rejoinder, para. 257-259; PER 2005-2010 (RL-78), p. 168, fig. 11.
[202] PHB1 Claimants, para. 253.
[203] Claim, paras. 186-187; see also the seventh additional provision of RD 661/2007.
[204] CT-1, p. 9.
[205] Claim, para. 299.

2. Breaches of the ECT

277. According to the Claimants, through the actions outlined above, Spain (**a**) expropriated Claimants' investments in breach of Article 13 ECT and breached, (**b**) its obligation to provide fair and equitable treatment of investment in accordance with Article 10(1) ECT, and (**c**) its duty to provide investors with effective means to defend their rights under Article 10(12).

### a) *Expropriation in breach of Article 13 of the ECT*

278. The Claimants submit that the ECT includes a broad concept of investment in Article 1(6), and therefore its protection covers the shares that the Claimants own in T-Solar, including not only ownership but also their economic value and returns.[206]

279. Furthermore, the Claimants allege that protection against expropriation according to Article 13(1) ECT not only refers to expropriation in the traditional sense of the term, but includes measures of equivalent effect, that is, measures that, although not directly affecting formal ownership of an asset, affect its potential profitability, which is diminished or eliminated by the action of the State.[207]

280. According to the Claimants, Spain's measures have deprived them of the value of shares as well as of the profits from the facilities, and therefore said measures have an effect equivalent to nationalisation or expropriation in breach of Article 13(1) ECT.[208]

281. The Claimants deny the Respondent's arguments in the sense that the hope for future profits can not be considered as a right,[209] and affirm that in Spanish law returns in a company constitute essential rights of the partners in such company with a well defined and integrated economic content in the investments of the Claimants.[210]

---

[206] Claim, para. 253. Reply, para. 442 et seq.

[207] Claim, para. 256; Reply, para. 457 et seq., citing *Técnicas Medioambientales Tecmed, S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003 ("***Tecmed v. Mexico***") (RL-64); *Ioannis Kardassopoulos v. Republic of Georgia*, ICSID Case No. ARB/05/18, Award, 03 March 2010 ("***Kardassopoulos v. Georgia***") (CL-113).

[208] Claim, paras. 260-271; Reply, paras. 437 et seq.; PHB1 Claimants, para. 327.

[209] Defence, paras. 445-446.

[210] Reply, para. 451.

282.    And although they consider irrelevant the alleged requirement that it should consist in "acquired" rights, which is not contained in the ECT,[211] the Claimants also assert that the facilities that complied with the requirements for registration with the RAIPRE and the RPR, had indeed acquired the right to compensation established by RD 661/2007 and RD 1578/2008.[212]

283.    The severity of the impact of the measures is the essential element to assess the occurrence of an expropriation, as it is necessary to deprive the investor of a significant part of the enjoyment or economic use of his investment.[213]    The Claimants contend that the arbitral jurisprudence does not require the total destruction of the investment but that a significant or substantial interference would be enough.[214]

284.    According to the Claimants, the measures adopted in RD 1565/2010 and RDL 14/2010 have caused a brutal economic impact on the profitability of the activity of T-Solar and constitute an expropriation of a substantial part of the value and returns of the Claimants' investment.[215]    The legislative amendments by Spain have reduced the profitability of the plants subject to RD 1578/2008 by 10% (from 9,41% to 8,48%) and plants subjected to RD 661/2007 by 8,5% (from 7,36% to 6,72%), such a loss is considered severe in the business environment.[216]

285.    Moreover, the Claimants submit that such measures have not been taken for a purpose which is in the public interest, are discriminatory, in the case of RDL 14/2010 were not carried out under due process of law, and have not been accompanied by the payment of prompt, adequate and effective compensation.[217]

---

[211] PHB2 Claimants, paras. 295-297.

[212] Reply, paras. 470-472.

[213] Claim, para. 258, citing the case of *Compañia de Agues del Aconquija S.A. and Vivendi Universal v. Argentine*, ICSID Case No. ARB/97/3, Award, 20 August 2007 ("*Vivendi v. Argentina II*") (CL-31), para. 7.5.17.

[214] Reply, paras. 461 et seq., citing MacLachlan, Shore and Weiniger, *"International Investment Arbitration: Substantial Principles"*, Oxford International Arbitration (2008), para 8.86, and decisions in *Metalclad Corporation v. Mexico*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000 ("*Metalclad v. Mexico*") (CL-30); *Marvin Roy Feldman Karpa v. United Mexican States*, ICSID Case No. ARB(AF)/99/1, Award, 16 December 2002 ("*Marvin Feldman v. Mexico*") (RL-62); *CMS Gas Transmission Company v. Argentina*, ICSID Case No. ARB/01/8, Award, 12 May 2005 ("*CMS v Argentina*") (RL-77), para.262; *Middle East Cement Shipping & Handling Co. S.A. v. Arab Republic of Egypt*, ICSID Case No. ARB/99/6, Award, 12 April 2002 ("*Middle East v. Egypt*"); *SD Myers Inc. v. The Government of Canada*, UNCITRAL case, Partial Award, 13 November 2000 ("*SD Myers v. Canada*") (RL-54).

[215] Claim, paras. 263-265; Deloitte Report 1, p. 61; Reply, paras. 453, 467 et seq.

[216] PHB1 Claimants, para. 359.  Although the variation of profitability in absolute terms is 0,93% and 0,64% in terms of relative value the measures of Spain would have meant a variation of the profitability of 10% for plants under RD 1578/2008 and 8,5% for plants under RD 661/2007, PHB2 Claimants, para. 308.

[217] Reply, para. 439.

286.    In this regard, the Claimants claim that it is not necessary to prove the bad faith of the State, but that the essential element is the effect suffered by the investment.[218]

287.    The Claimants reject that the changes were justified to correct the tariff deficit caused by energy producers under the special regime.[219] The deficit has existed long before, and the real reason lies with the Spanish Government that for economic, social and electoral policy reasons has not taken the necessary measures to implement the principle of tariff sufficiency and now pretends to apply a principle of "sustainability or economic and financial stability."[220] The measures taken by the government are hasty and improvised and have caused great instability.[221]

288.    In addition, the tariff deficit cannot justify the breach by Spain of the ECT by failing to provide a prompt, adequate and effective compensation following expropriation as the ECT does not include provisions of "state of necessity", and, in any case, the Respondent has not claimed such defence.[222]

289.    The Claimants submit that the transfer of wealth is one of the most visible elements that allows expropriation to be identified, and in the present case such a transfer of wealth has occurred when the Spanish government finances the deficit in electricity tariffs through coercive measures against the Claimants and other photovoltaic producers.[223]

290.    The Claimants add that the Respondent's actions are permanent as there is no prospect that Spain would rectify its measures and that Claimants' losses should be considered final.[224]

---

[218] Reply, paras. 485 et seq. citing *Ebrahimi Shahin Shaine v. The Islamic Republic of Iran* (1994) 30, Iran-US CTR, Award, 10 October 1994, paras. 170, 190 (CL-115); *Harold Birnbaum v. The Islamic Republic of Iran*, (1993) 29 Iran-US CTR, Award, paras. 260-270; *Phillips Petroleum Co. Iran v. The Islamic Republic of Iran* (1989) 21 Iran-US CTR. 39, Award, 29 June 1989 (CL-116), para. 115.
[219] Reply, paras. 475-476, referring to the Respondent's arguments in the Defence, para. 478.
[220] Reply, paras. 476 et seq.
[221] Reply, paras. 478 et seq., citing the Memorandum 2010 of the State Council (C-85), pp. 177-191.
[222] Reply, para. 480.
[223] Claim, paras. 267-268.
[224] Claim, para. 271.

### b) Breach of fair and equitable treatment contrary to Article 10(1) of the ECT

291.    According to the Claimants, the standard of fair and equitable treatment of the ECT is broad and flexible and gives the tribunal a wide margin of appreciation to analyse the just character of the acts of the States.[225]

292.    Since this is a specific obligation of an international treaty, it is not necessary for the Tribunal to establish that there was a breach of Spanish law in order to conclude that the conduct of Spain breached its duty to provide fair and equitable treatment.[226]    Moreover, the determination of bad faith is not necessary either to assess the violation of the standard.[227]

293.    The Claimants submit that the standard of fair and equitable treatment requires the maintenance of a stable and predictable legal framework, which derives from the wording of Article 10(1) of the ECT, referring to an obligation to "*encourage and create stable* […] *conditions*"[228] for investors of other contracting parties to make their investments.    This requirement has also been recognised by various arbitral tribunals,[229] and it is the premise of protection of legitimate expectations of investors that has become a central element of the obligation to provide fair and equitable treatment.[230]

294.    Specifically, the Claimants claim that Spain violated the standard of fair and equitable treatment frustrating legitimate expectations of the Claimants by breaking the stability of the regulatory framework under which they invested.

295.    The Claimants allege that legitimate expectations are violated when the host State makes commitments and representations or adopts a line of action, on which the

---

[225] Claim, para. 284.

[226] Claim, para. 281.

[227] Claim, para. 258, citing *CMS v. Argentina*, para. 280; and *Enron Corporation and Ponderosa Assets L.P. v. Argentina*, ICSID Case No. ARB/01/3, Award, 22 May 2007 ("***Enron v. Argentina***") (CL-39), para. 268.

[228] Claim, para. 287.

[229] Claim, paras. 286-289, citing *Enron v. Argentina*, para. 260; *Sempra Energy International v. Argentina*, ICSID Case No. ARB/02/16, Award, 18 September 2007 ("***Sempra v. Argentina***") (CL-40), para. 300; *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Sirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007 ("***PSEG v. Turkey***") (CL-41), para. 254; *LESI SpA and Astaldi SpA v. The People's Democratic Republic of Algeria*, ICSID Case No. ARB(AF)/05/3, Award, 04 November 2008 ("***LESI v. Algeria***") (CL-42), para. 151.

[230] Reply, para. 513, citing *Occidental Exploration and Production Company v. Republic of Ecuador,* LCIA Case No. UN3467 ("***Occidental v. Ecuador***") (CL-105), para. 183; PHB1 Claimants, paras. 257 et seq. citing *El Paso Energy Company v. Republic of Argentina*, ICSID Case No. ARB/03/15, Final Award, 13 October 2011 ("***El Paso v. Argentina***") (RL-168), para. 348; *Perenco Ecuador Limited v. Republic of Ecuador*, ICSID Case No. ARB/08/6, Decision on the outstanding issues of Jurisdiction and Liability, 12 September 2014 ("***Perenco v. Ecuador***") (RL-394), para. 560.

investor relies at the time of the investment, and later changes its initial position.[231] Even in the absence of specific commitments, the investor's expectations are frustrated when the host State performs acts incompatible with criteria for economic rationality, the public interest or the principle of rationality.[232]

296. According to the Claimants, the formation of legitimate expectations does not require the existence of a stabilisation clause in a contract, and the precedents cited by the Respondent in this regard are irrelevant as they refer to different circumstances and have been cited only partially.[233] In fact, the main element that defines legitimate expectations of an investor is the legal framework in force at the time of investment.[234]

297. The Claimants made their investments in Spain relying on the special regime of RD 661/2007 and RD 1578/2008 and, in particular, the right to receive concrete and revised regulated tariffs applicable to the entire net production of electricity facility in operation, which allowed the producer to calculate compensation with a high degree of certainty.[235] These rules, being directed at a specific and limited group of investors that fulfilled the requested requirements within the established time limits, constituted specific commitments of Spain.[236]

298. The Claimants allege that the economic regime of RD 661/2007 and RD 1578/2008 was precisely established to attract investment and to meet the objectives of the PER 2005-2010, by offering investors a stable and predictable framework that

---

[231] Claim, para. 292; *National Grid Plc. v. Argentina*, (UNCITRAL), Award of 03 November 2008, ("**National Grid**") (RL-116), paras. 175-180.

[232] Claim, para. 293, citing *Total v. Argentina*, para. 333.

[233] Reply, para. 510; PHB1 Claimants, 295 et seq., referring to *Perenco v. Ecuador*, *EDF v. Romania*, *Methanex v. USA*, *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, 05 September 2008, *El Paso v. Argentina, AES Summit Generation Limited & Andy AES-Tisza Erömu Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010. ("*AES v. Hungary*") (CL-56), and referring to authors Michele Potestà, Rudolf Dolzer and Christoph Schreuer, and Thomas Wälde.

[234] Reply, paras. 506 et seq. citing Rudolph Dolzer and Christoph Schreuer, "*Principles of International Investment Law*", Oxford University Press, (2012) (CL-118), p. 124; PHB1 Claimants, para. 311 referring to the cases *Total v. Argentina*, *CMS v. Argentina*, *Enron v Argentina*, *LG&E Energy Corp. and others v. Republic of Argentina*, ICSID Case No. ARB(AF)/02/1, Decision on Liability, 03 October 2006 (CL-45), paras. 125 and 127; *BG Group Energy International v. Republic of Argentina*, UNCITRAL, Final Award, 24 December 2007 (RL-104), paras. 298, 307, 310; *PSEG v. Turkey*, *National Grid v. Argentina*, *Sempra Energy v. Argentina*, *Tecmed v. Mexico*, *Occidental v. Ecuador*, *Lesi and Astaldi v. Algeria*, *Metalclad v. Mexico*; PHB2 Claimants citing *Duke Energy Electroquil Partners & Electroquil S.A. v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008 ("**Duke Energy v. Ecuador**") (RL-112).

[235] Reply, paras. 521 et seq.

[236] PHB2 Claimants, paras. 159-160, 261.

prevented producers from turning to the market, guaranteeing compensation for entire production throughout the lifetime of the installation.[237]

299.   The Claimants submit that in addition to legislation the Government of Spain promoted investment in this sector through various publicity.   In particular, the Claimants submit that presentation *"The Sun Can be Yours 2005"* announced that returns on investment in the photovoltaic sector could reach up to 15%, and that there were possibilities of funding by the Institute for Diversification and Energy Saving ("**IDEA**") and Instituto de Crédito Oficial ("**ICO**").[238]   The prospectus "*The Sun Can be Yours 2007*" announced that there were two types of regulated tariffs, one for the first 25 years and another for a period thereafter.[239]

300.   Spain's strategy to attract investment worked and the Government reached its objectives, but thereafter the Spanish Government changed its objectives and turned to concentrate on the reduction of the tariff deficit, completely altering the economic balance of the regime and frustrating the legitimate expectations of investors.[240]

301.   The Claimants deny that the only expectation that the Spanish legislation allowed for investors was to obtain reasonable profitability as provided in Article 30.4 of the LSE as this reasonableness was an indeterminate and empty concept that could be defined at anytime by the Government.   According to the Claimants, reasonable compensation was precisely specified in the regulations.[241]   In effect, by reading Article 30.4 it cannot be discarded that the reception of reasonable rates of profitability constituted the limit of offered profitability, neither was it the sole element of the State offer, nor this criteria would condition or annul later conditions offered by the State.[242]   In reality, the concept of reasonable profitability was only defined in RDL 9/2013.[243]

302.   According to the Claimants, it is not true that Spain's measures corresponded to the implicit limits of the regime.   Nothing has established that the lifespan of facilities would be less than 30 years as imposed by RD 1565/2010.   On the contrary, and according to the report by Deloitte, the average lifespan of facilities

---

[237] Reply, paras. 546-548.
[238] Reply, para. 542; C-86.
[239] Reply, para. 547; C-86.
[240] Claim, paras. 297-300; Reply, paras. 554 et seq.
[241] Reply, paras. 528-530, referring to *CMS v. Argentina*, para. 137.
[242] PHB1 Claimants, paras. 186 et seq.
[243] PHB1 Claimants, paras. 197-199.

is between 35 and 50 years.[244]   The limits of equivalent hours entitled to tariffs imposed by RDL 14/2010 was also absent from the PER 2005-2010, which only referred to standard cases as reference and not to maximum limits.[245]

303.   The Claimants submit that the right to the regulated tariff was not a mere expectation but a right that was consolidated in the investment of the owner of the facility when it complied with all the requirements in the legislation and obtained registration of the facility with the RAIPRE.[246]

304.   According to the Claimants, the tariff deficit or the fact that Spain was going through a difficult economic situation, apart from problems caused by the Spanish Government itself, do not exempt Spain from complying with the ECT or from payment of compensation for the damage caused.[247]

305.   The Claimants contend that they acted diligently and sought advice both with respect to the technical, economic[248] and legal aspects[249] before undertaking their investment.   Nonetheless, it was impossible to foresee the subsequent actions of Spain.

306.   Regarding the Supreme Court judgments cited by the Respondent,[250] the Claimants argue that only eight of them predate their investment, and could therefore have been considered; however, these such judgments are irrelevant, inapplicable and out of context.[251]

307.   The Claimants also allege the retroactive nature of the provisions adopted by Spain, as contrary to the Respondent's affirmations,[252] the facilities had a vested right to the tariff stipulated in RD 661/2007 and RD 1578/2008.   In this regard, the Claimants submit that interpretation of the Spanish Supreme Court is not relevant , and that it is for the Arbitral Tribunal to determine if the conduct is retroactive on the basis of international law and not Spanish law.[253]

---

[244] PHB2 Claimants, para. 165 citing CT-1, pp. 49-50.
[245] PHB2 Claimants, para. 166.
[246] Reply, paras. 524-526.
[247] Reply, paras. 479-483.
[248] Reply, paras. 573-574; C-261 to C-290.
[249] Reply, para. 575.
[250] Defence, paras. 638 et seq.
[251] Reply, paras. 588 et seq.; PHB1 Claimants, paras. 205-225.
[252] Defence, para. 736.
[253] Reply, paras. 617-618.

### c) Breach of duty to provide effective means for the assertion of claims and the enforcement of rights with respect to investments contrary to Article 10(12) of the ECT

308. The Claimants submit that the obligation provided in Article 10(12) of the ECT is not a mere reformulated prohibition of denial of justice, but that it incorporates a different and less strict test than the latter.[254] What is required by the standard in Article 10(12) of the ECT is that the State not only provides investors with a mechanism to enforce their rights, but also that this mechanism is useful or effective.[255]

309. According to the Claimants, Spain breached Article 10(12) of the ECT by resorting to the exceptional deployment of the Royal Decree-Law to introduce time restrictions on the right to benefit from the regulated tariffs in conformity with RD 661/2007.[256]

310. The use of a Royal Decree-Law ("**RDL**") – RDL 14/2010 – was not justified by a situation of extreme urgency, as it is required, as the situation of alleged tariff deficit predates the measure and also the content of RDL 14/2010 is very similar to RD 1614/2010, adopted a few days before, and for which it was preferred to use the form of a Royal Decree in regards to the photovoltaic sector, as opposed to the consensus reached by the Government with wind, solar, thermal and co-generation energy producers concerned with RD 1614/2010.[257]

311. According to the Claimants, the true intention of the Respondent when resorting to this legal form was to avoid the proceeding of public inquiry required for implementation of regulations, and prevent the Claimants from accessing ordinary courts to challenge these measures.[258] In this regard, the Claimants deny the Respondent's arguments that the Royal Decree-Laws also allow for effective challenge procedures, as the inherent limits to such procedures do not permit a comprehensive judicial assessment of the RDL equivalent to the assessment of a contentious-administrative proceeding, and, therefore, do not respect the

---

[254] Claim, para. 304 citing *Chevron Corporation and Texaco Petroleum Company v. Republic of Ecuador*, UNCITRAL, Partial Award on the Merits, 30 March 2010 ("***Chevron v. Ecuador***") (CL-47), paras. 241 et seq.
[255] Reply, paras. 656-657.
[256] Reply, para. 626.
[257] PHB1 Claimants, paras. 377 et seq.
[258] Claim, paras. 202 et seq.; PHB1 Claimants, para. 378.

fundamental right to effective judicial protection required by the Spanish Constitution and Article 10(12) of the ECT.[259]

312.     The Claimants cannot directly challenge a legal norm before the courts and must wait until the implementing administrative acts are issued, taking into account that the approval of the definitive liquidation for the 2010 exercise was delayed until September 2014 and that it is unknown when the settlements regarding the 2011, 2012 and 2013 exercises, relevant to this arbitration, will be approved.[260]

   3.   Damages

313.     The Claimants allege to have suffered damages as a result of Spain's violations of (**a**) Article 13 of the ECT, (**b**) Article 10(1) of the ECT, and (**c**) Article 10(12) of the ECT.   The Claimants also argue that (**d**) the proposed methodology for calculating damages is appropriate, and (**e**) the Respondent cannot take advantage of its own regulatory uncertainty to avoid compensating investors.   Finally, the Claimants submit that (**f**) RDL 9/2013 does not affect the calculation of damages and also (**g**) claim interest on the damages caused.

        *a)  Damages for breach of Article 13 of the ECT – Expropriation*

314.     Regarding expropriation, the Claimants submit that, pursuant to Article 13(1) of the ECT, Spain is obliged to pay compensation in a prompt, adequate and effective form with an equivalent amount "*of fair market value of the investment expropriated at the time immediately before the announcement of the expropriation became known, or the intent to carry out the expropriation as to affect the value of the investment.*"[261]

315.     Therefore, the Respondent must compensate the Claimants with a sum equivalent to the fair market value of the investment immediately before the publication in the BOE of RD 1565/2010 and RDL 14/2010, i.e. 24 December 2010.[262]

316.     The calculation of fair value is the difference between the expected value of cash flow by the equity of the Claimants' investments in T-Solar, on the basis of RD 661/2007 and RD 1578/2008 ("counter-factual hypothesis") and the actual cash flow value of the equity ("real hypothesis").

---

[259] Reply, paras. 635 et seq.; PHB1 Claimants, paras. 383-399.
[260] PHB2 Claimants, para. 324.
[261] Claim, para. 276.
[262] Reply, para. 671.

317.    According to the Claimants, the fair market value of the investment expropriated amounts to […] in respect of Charanne and […] in respect of Construction, after deduction of taxes.[263]

### b) Damages for breach of Article 10(1) of the ECT – Fair and equitable treatment

318.    The Claimants submit that in the absence of a specific standard for remedies for breach of Article 10(1) of the ECT, the general principle of international law of full reparation must be applied, so that the reparation removes all consequences of the unlawful act and put the party in the situation in which it would have been had the damage not occurred.[264]

319.    According to the Claimants, the approval of RD 1565/2010 and RDL 14/2010 caused a drop in cash flow for T-Solar and its subsidiaries, and a loss of value of the Claimants' shares in these companies.[265]

320.    As in the case of expropriation, the Claimants calculate the amount of damages as the difference between the value of expected of cash flow by the equity of the Claimants in T-Solar on the basis of RD 661/2007 and RD 1578/2008 (counter-factual hypothesis) and the actual cash flow value of the equity (real hypothesis).[266]

321.    According to the Claimants, the reparation for the consequences of the illegal act and return to *status quo* for the Claimants amounts to […] for Charanne and […] for Construction, after deduction of taxes.[267]

### c) Damages for breach of Article 10(12) of the ECT – Effective means for exercising rights

322.    According to the Claimants, the act that violated Article 10(12) of the ECT, preventing access to effective means for assertion of claims was RDL 14/2010, therefore, Spain must compensate the Claimants for the damage caused by RDL 14/2010, which has been calculated by the Claimants' expert as […] for Charanne and […] for Construction.[268]

---

[263] CT-1, p. 8, paras. 67-68.
[264] Claim, paras. 332-336; Reply, para. 676.
[265] Reply, paras. 678-679.
[266] Reply, para. 680.
[267] Reply, para. 667; CT-1, p. 8, paras. 67-68.
[268] Reply, paras. 682-683; CT-1, p. 9.

#### d) *The focus of the Claimants' expert is correct*

323. The Claimants submit that the Respondent's arguments must be dismissed as in the calculation of the damages the "reasonable return rate" was not taken into account which would be the threshold under which investors could claim damages.[269]

324. According to the Claimants, the concept of "reasonable return rate" had not been determined in the applicable legal framework, in which profitability of the projects came determined by its own characteristics, without the existence of any rules that limited through a rate of specific percentage profitability of the projects.[270]

325. The Claimants submit that the calculation of damages should be therefore based both on the loss of the investment's economic value, and the discounted cash flow method used by the expert of Deloitte as this is the most appropriate method.[271]

326. Although the discussion concerning the TIR is irrelevant, Deloitte established that the TIR of the Claimants' projects was reasonable and that from the normative changes onwards the TIR of the projects have been reduced without exception.[272]

327. Regarding the Respondent's criticism on the use of exaggerated CAPEX and OPEX values in calculation of the impact of the new legislation as done by Deloitte, the Claimants, after denying the allegation, point out that even if the data on costs was flawed it would still be irrelevant because in the end the same costs apply in both hypotheses, real and counter-factual, therefore, the impact of the alleged error would be set off.[273]

#### e) *Spain cannot benefit from the uncertainty caused by its own actions to limit compensation*

328. The Claimants submit that the Respondent's argument, according to which the uncertainty of the price market for electricity in the future prevents the Claimants' calculation of damages, is inadmissible and should be rejected because it would compensate the Respondent for its breaches of the ECT and for maintaining a normative instability.[274]

329. The Claimants assert that their evaluation is based on the predictions that would be made by a theoretical buyer and a theoretical seller to establish the market value of

---

[269] Reply, paras. 648 et seq. referring to Defence, para. 803.
[270] Reply, paras. 686, 690.
[271] Reply, paras. 688-689.
[272] Reply, paras. 691-693; CT-2, p. 6.
[273] PHB2 Claimants, paras. 365-369.
[274] Reply, para. 695.

equity in T-Solar, and that it is for the violating State to support the risk of an abnormal behaviour of the market that could undermine these predictions.[275]

### f) RDL 9/2013 has no impact on the damages suffered by the Claimants

330.   According to the Claimants, although RDL 9/2013 completely repealed the previous regime of RD 661/2007 and RD 1578/2008, and is not the focus of this arbitration, the new legislation did not offset the damage caused by the 2010 norms, but, on the contrary, has aggravated the situation further.  Therefore, RDL 9/2013 has no impact on the assessment of damages made by the Claimants which in any case subsequently worsened.[276]

331.   Regarding expropriation, Article 13(1) of the ECT provides that the assessment should be made "*immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment.*"  The expropriation was carried out in late 2010 and consequently RDL 9/2013, approved in July 2013, does not affect this valuation.[277]

332.   With respect to the breach of duty to accord fair and equitable treatment, Article 10(1) of the ECT does not specify the valuation date, but according to the general principles of international law and the position of the Respondent itself, this valuation should be made at the date of the award.[278]

333.   As for the damage suffered by the Claimants from the entry into force of the relevant legislation until 14 July 2013 (entry into force of RDL 9/2013) (historical damage), the Claimants allege that damages amount to […] for Charanne and […] for Construction, for a total of […].[279]

334.   The Claimants finally insist that there is no risk of *double recovery*, because in this arbitration it is only the impact of RD 1565/2010 and RDL 14/2010 which have been assessed, while in the other ongoing arbitration proceedings no claims are based on these two specific laws.  Regarding the alleged absorption of the previous norms by the new regulatory framework, the Respondent has not conclusively demonstrated how and why such an absorption would occur.[280]

---

[275] Reply, para. 698.
[276] PHB1 Claimants, paras. 416-422.
[277] PHB1 Claimants, paras. 426-428.
[278] PHB1 Claimants, paras. 429-432, referring to the case of *Chorzów Factory* and an article by Manuel A. Abdala and Pablo T. Spiller, "*Chorzów's Standard Rejuvenated - Assessing Damages in Investment Treaty Arbitrations*", Journal of International Arbitration (Kluwer Law International 2008), Vol. 25, Issue 1, p. 119.
[279] PHB1 Claimants, paras. 448-452.
[280] PHB2 Claimants, paras. 374-375.

### g) *Interest*

335.    Considering that the breaches of the ECT by Spain have prevented the Claimants from the opportunity to invest the amounts from which they were deprived, the Claimants claim interests on the damages.  Such interests shall be calculated from the date of entry into force of the measures to the date when the Kingdom of Spain pays to the Claimants the amount, if any, determined in an eventual award.[281]

336.    The Claimants submit that they could have obtained a return of 7,398%, which is the rate corresponding to the currently reasonable return guaranteed by Spain in RD 413/2014 of 6 June.[282]

## B. The Respondent

337.    The Respondent asserts that regulatory adjustments made by Spain through RD 1565/2010 and RDL 14/2010 are reasonable changes carried out in the public interest, in a non-discriminatory manner, proportionate to the interest they aim to protect, and in compliance with due process.[283]

338.    The Respondent affirms that Spain (**1**) did not expropriate the Claimants' investment, (**2**) neither violated the obligation to provide fair and equitable treatment, (**3**) nor breached its obligation to provide investors with effective ways to assert their rights.  For the above reasons, (**4**) the Respondent submits that no damages have been caused to the Claimants.

### 1.   The Respondent did not expropriate the investments of the Claimants

339.    According to the Respondent, what the Claimants in reality argue is that Spain would have expropriated their "*right to obtain a regulated tariff for the entire lifespan of the facility*",[284] however, this alleged right cannot qualify as an investment protected under Article 1(6) of the ECT as it defined "investment" as assets "*owned or controlled directly or indirectly by an Investor*", and the Claimants cannot, under Spanish law, control or own future returns they expected

---

[281] PHB2 Claimants, paras. 377-378.
[282] PHB2 Claimants, para. 379.
[283] Defence, paras. 78-79.
[284] Defence, para. 445.

to receive as they constitute mere expectations and not rights incorporated to their patrimony.[285]

340.     In this regard, the Respondent claim that a distinction must be drawn between legal provisions that simply grant ordinary rights and the so-called 'acquired rights', which imply a special title of acquisition.[286]   Spanish law, which must be considered to determine what rights may be expropriated,[287] establishes that the right to a tariff under the regime established by a regulation is not an acquired right and its modification by the State is perfectly legitimate without compensation.[288]

341.     In particular, the Respondent allege that registration with the RAIPRE is simply an administrative requirement to operate and sell energy, and did not imply that the registered facilities had acquired an infinite right to receive a certain compensation.[289]

342.     The Respondent also argues, based on various decisions of other arbitral tribunals,[290] that the changes undertaken by Spain are an expression of the sovereign power of the State to regulate and do not constitute measures tantamount to expropriation, as they fall within the normal exercise of the State's powers, they were not discriminatory, were adopted in good faith, in accordance with due process, and are proportionate with the aim of protecting the public interest by preventing the collapse of the Spanish electricity system.[291]   In this regard, the Respondent submits that, by quoting the *Santa Elena* award,[292] the Claimants refer to an old position according to which one must only consider the economic effects,

---

[285] Defence, paras. 446 et seq.; Rejoinder, paras. 600 et seq.

[286] Rejoinder, paras. 602 et seq.

[287] Defence, para. 448, citing *Suez, Sociedad General de Aguas de Barcelona S.A. and Inter Aguas Servicios Integrales de Agua S.A. v. Republic of Argentina* ("***Suez v. Argentina***"), ICSID Case No. ARB/03/17, Decision on Liability, 30 July 2010 (RL-137), Report of "*UNCTAD Series on Issues in International Investment Agreements, Expropriation*", 2012, (RL-125), p. 22; *EnCana Corporation v. Republic of Ecuador*, LCIA Case No. UN3481, UNCITRAL, Final Award, 03 February 2006 ("***EnCana v. Ecuador***") (RL-81), para. 184.

[288] Defence, paras. 447, 451-452; Rejoinder, para. 628.

[289] Rejoinder, para. 633(e).

[290] *Fireman's Fund Insurance Company v. United Mexican States*, ICSID Case No. ARB(AF)/02/1, Award, 17 July 2006 ("***Fireman's Fund v. Mexico***") (RL-87), para. 176; *CME Czech Republic B.V. v. Czech Republic*, UNCITRAL, Partial Award, 13 September 2001 ("***CME v. Czech Republic***") (RL-59), para. 603; *Saluka v. Czech Republic*, paras. 255-265; *El Paso v. Argentina*, paras. 236-241; *Methanex Corporation v. United States of America*, UNCITRAL, Final Award on Jurisdiction and Merits, 03 August 2005 ("***Methanex v. USA***"), Part IV, chapter D, p. 7, para. 15.

[291] Defence, paras. 467-475; Rejoinder, paras. 671 et seq.; RL-215.

[292] Reply, para. 481, citing *Compañia del Desarrollo de Santa Elena S.A. v. Costa Rica*, ICSID Case No. ARB/96/1, Award, 17 February 2000 (CL-114), para. 72.

but that position has been superseded, and it is now argued that the nature, purpose and character of the measure in question shall also be considered.[293]

343.     The regulatory changes also do not comply with the requirements elaborated in several arbitral decisions in determining whether the effects of a measure are tantamount to an expropriation: the substantial deprivation of the economic use and enjoyment of the investment, the irreversible or permanent character of the measure, and the substantial scope of the economic damage.[294]  The changes did not involve cessation of operations, takeover of control of the shares or management of T-Solar, nor permanent destruction of its value, moreover, they were made to benefit the society, and did not imply a transfer of profits or assets to the Government of Spain or to a private entity.[295]

344.     Even if one admits that there was an impact, and that the damage alleged by the Claimants is real, such damage is not sufficiently significant to conclude that the measures are tantamount to expropriation.[296]

345.     Regarding the allegation that mere partial interference can constitute expropriation, the Respondent asserts that there is no jurisprudence or doctrine that supports such a view, and that in any case the precedents on which the Claimants rely do not support their position.[297]

346.     Finally, the Respondent contends that it is incorrect to analyse the possible impact of investors' expectations from the point of view of an alleged expropriation, and argues that such an analysis should be performed on the basis of the fair and equitable treatment standard.[298]

   2.   The Respondent Did Not Violate the Standard of Fair and Equitable Treatment under Article 10(1) of the ECT

347.     After (**a**) establishing its position on the applicable standard of fair and equitable treatment, the Respondent (**b**) states that the measures adopted by Spain were reasonable and predictable, and claims that they (**c**) did not infringe legitimate expectations of the Claimants, nor (**d**) had a retroactive effect.

---

[293] Rejoinder, paras. 674 et seq.; RL-75, pp. 15-16, 22.
[294] Defence, paras. 491 et seq.; Rejoinder, paras. 651 et seq. citing *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008 ("***Plama v. Bulgaria – Award***") and *Perenco v. Ecuador*, paras. 672, 685, 687.
[295] Defence, paras. 511 et seq.
[296] Defence, paras. 536-539; Rejoinder, para. 659.
[297] Rejoinder, paras. 647-648, referring to decisions in *Middle East v. Egypt* and *SD Myers v. Canada*.
[298] Rejoinder, paras. 617-618.

### a) *The applicable standard*

348. With respect to the standard of fair and equitable treatment, the Respondent opposes the Claimants' interpretation, as it considers that it reflects an extensive trend that could impose unrealistic demands on States.[299]  Instead, the Respondent suggests that a balanced assessment must be struck between the legitimate interest of the State to regulate its own legal order and the interest of foreign investors regarding the investment.[300]

349. The Respondent asserts that the standard of fair and equitable treatment implies reasonableness and must be considered in the context of this element.  In addition, although the standard includes the assessment of legitimate and reasonable expectations that an investor had when undertaking its investment,[301] it is not reduced to this component, which is not even mentioned in Article 10(1) of the ECT,[302] but a balanced approach must be sought between reasonable expectations of an investor and the exercise of regulatory powers, among others, of the State.[303]

### b) *The measures taken by the Kingdom of Spain were reasonable and predictable*

350. In relation to the changes introduced by RD 1565/2010 and RDL 14/2010, on which the Claimants' claims are based, the Respondent makes the following observations.

351. The limitation of the right to the regulated tariff to 30 years coincides with the average operational lifespan of the facility,[304] since for it to last longer it would be necessary to carry out "substantial changes" on the facility which, in accordance with the applicable law, would make them lose benefits under RD 661/2007 and RD 1578/2008.[305]  In addition, and for the same reason, contracts for use of land on which the Claimants' plants are located also have terms not exceeding 30 years,[306] therefore limiting the benefit of the regulated tariff to the first thirty years in reality would not have any practical consequences.[307]

---

[299] Defence, para. 555.
[300] Defence, para. 557.
[301] Defence, para. 559, citing *El Paso v. Argentina*, paras. 339 and 375.
[302] Rejoinder, paras. 701-704.
[303] Rejoinder, paras. 706-709, citing *Perenco v. Ecuador*, paras. 558-560.
[304] Rejoinder, paras. 315(2) et seq.; Report G&A, pp. 172-182; RL-385, p. 26.
[305] Article 4 of RD 661/2007.
[306] CT-1, p. 50.
[307] Between 25 and 30 years.  Defence, para. 590(b)(ii)

352. The requirement to cover voltage surges is a coherent and reasonable rule as it is aimed at preventing the technical collapse of the system contributing to enhanced security and better management.[308]

353. As for the limitations of the equivalent hours imposed by RDL 14/2010, these limitations were based on production forecasts that were made in PER 2005-2010[309] and were taken into account by RD 661/2007 and RD 1578/2008 to calculate compensation for the plants and, consequently, are neither unexpected nor unreasonable.[310] In this regard, the Respondent also asserts that already in RD 661/2007 the geographical areas by sun exposure table has been already noted.[311]

354. Finally, the requirement to pay a charge of 0,5 Euro cents for the use of the transportation and distribution network was not invented by Spain as such, but was directly authorised by the European Regulation EU 774 of 2 September 2010.[312]

### c) *Regarding the Claimants' alleged legitimate expectations*

355. The Respondent contends that although the standard of fair and equitable treatment provides that a stable regulatory framework must be granted to investments, this does not imply that a legal system should be frozen, as the obligation of fair and equitable treatment is not equivalent to a stabilisation clause and States can continue to legislate to respond to changing circumstances,[313] what is forbidden is that the States acts in inequitable and unreasonable manner when legislating.[314]

356. Spain argues that the adjustments to the legislative framework were legitimate, coherent and reasonable to adapt to changing economic circumstances and solve the problem of tariff deficit. In addition, incentives previously envisaged for photovoltaic producers have not been changed, including the system of regulated tariffs and its value for 30 years, the possibility of selling all their production in a prioritised manner, and the system of access to public loans of the ICO.[315]

---

[308] Defence, para. 590(b)(v); RL-262.
[309] PER 2005-2010, p. 168 (RL-78).
[310] Defence, para. 591(b)(i); Annex XII to RD 661/2007 (RL-97).
[311] Annex XII to RD 661/2007; PHB1 Respondent, para. 118 referring to Transcripts 2014, day 2, p. 118.
[312] Defence, para. 591(b)(i); RL-140.
[313] Defence, para. 571; Rejoinder, para. 718 citing *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 08 October 2009 ("***EDF v Romania***") (RL-126); *El Paso v. Argentina*; *Saluka v. Czech Republic*; *Parkerings Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/8, Award, 11 September 2007 ("***Parkerings v. Lithuania***") (RL-101); *Electrabel v. Hungary*; *Continental v. Argentina*.
[314] Defence, para. 584.
[315] Rejoinder, paras. 40 and 43; RL-282.

357. The Respondent alleges, based on various arbitral decisions, that in order to invoke the violation of legitimate expectations it is necessary that a specific commitment of the State exists,[316] and Spain never undertook specific commitments to the Claimants that would guarantee them the freezing of the compensation scheme of RD 661/2007 and RD 1578/2008.[317]

358. According to the Respondent, Article 40 of RD 463/2004 did not immobilise the regulatory framework applicable to electricity production through renewable sources, in fact this norm was subsequently modified by RD 661/2007, and the Spanish Supreme Court had the opportunity to comment on these regulatory changes, confirming their legality and establishing, in particular, that there is no right to an unaltered maintenance of the economic regime for receipt of premiums and that modification of the regime is possible within the framework of the LSE without affecting legal security and legitimate confidence.[318]

359. According to the Respondent, Article 44.3 of RD 661/2007 cannot serve as the basis for the Claimants' stabilisation expectation, as it does not refer to the subjects that were modified in 2010. Article 44.3 refers to the future revisions of the amount of the tariffs not to affect facilities under this Decree. However, the provisions of RD 1565/2010 and RDL 14/2010 did not modify the regulated tariffs; the former established a time limit for their perception and RDL 14/2010 set a limit for sale hours under the tariff. But the regulated tariff, as set in the table of Article 36 of RD 661/2007, was not modified by these later regulations.[319]

360. Furthermore, Article 44.3 of RD 661/2007 cannot be considered as a specific State commitment with a stabilisation effect. Apart from the fact that the validity and efficacy of stabilisation clauses are highly contested,[320] they must be interpreted

---

[316] Rejoinder, para. 720, citing *Methanex v. USA*, *Plama v. Bulgaria*, *ADF Group Imc. v. United States of America*, ICSID Case No. ARB(AF)/00/1, Award, 09 January 2003 ("***ADF v. USA***") (RL-63); *Biwater Gauff (Tanzania) Ltd v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008 (RL-111); *Jan de Nul NV and Dredging International NV v. Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Award, 06 November 2008 (RL-317), *William Nagel v. Czech Republic*, SCC Case No. 049/2002, Award, 09 September 2003 (RL-66); *Ulysseas Inc. v. Republic of Ecuador*, UNCITRAL Final Award, 12 June 2012 ("***Ulysseas***") (RL-204), para. 249; *Toto Construzioni*, para. 244. The Respondent and the Claimants also refer to the same authors, Rufold Dolzer and Christoph Schreuer, "*Principles of International Investment Law*", Oxford University Press (2012), p. 148.
[317] Rejoinder, para. 710.
[318] Defence, para. 641, citing judgments by the Supreme Court of Spain of 15 December 2005 (RL-79), 25 October 2006 (RL-90) and 20 March 2007 (RL-94).
[319] Defence, paras. 605 et seq.
[320] Defence, para. 617, citing Thomas W. Walde and George N.D. "*Stabilizing International Investment Commitments: International Law versus Contract Interpretation*", International Law Journal (RL-38), pp. 243-245.

restrictively, and must be limited in terms of the addressee, purpose and term.[321] Article 44.3 of RD 661/2007 cannot be compared to such a clause as it is a mandatory legislative provision which by its very nature is general and is subject to alterations.[322] In any event, its wording does not include guarantees of stability or commitments of the State not to exercise its legislative authority.[323]

361. As for the other advertising documents, the Respondent asserts that they can not give rise to legitimate expectations as they do not contain specific commitments. The Claimants cited isolated fragments of presentations called "*The Sun Can Be Yours*" of May 2005 and November 2008, but omitted to refer to the specific presentation made in June 2007 regarding RD 661/2007, from which it can be seen that there was a departure from the premise that the plants would operate 25 years producing 1,250 hours per year, and that in these terms a plant would be able to recoup their investment in 10 years and earn an TIR of 8,29%.[324]

362. With regard to the document "*Renewables Made in Spain*",[325] the Respondent notes that it is dated from March 2010, which is after the investments and could not in any event influence the perception of the regulatory framework that the Claimants had at the time of the investment.[326]

363. In relation to agreements between IDAE and ICO for the financing of photovoltaic projects cited by the Claimants,[327] none of them was signed in the context of incentives introduced by RD 661/2007 and RD 1578/2008 and neither do they refer to the stability of cash flow to repay the loans, nor guarantee the stabilisation of the regulatory scheme.[328]

364. The Respondent argues that investors' expectations must be objective, reasonable and legitimate and that to determine their scope, one must consider what knowledge the investor had or should have had of the regulatory framework of the country concerned.[329]

---

[321] Defence, paras. 615-619, 630.
[322] Defence, paras. 617-623.
[323] Defence, paras. 627 et seq.
[324] Defence, paras. 657-659.
[325] C-4.
[326] Defence, para. 660(c).
[327] Claim, footnote 16, C-6, C-7, C-8.
[328] Defence, paras. 663, 665.
[329] Defence, paras. 678 et seq., citing decisions in *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004 ("***MTD v. Chile***") (RL-73), paras. 169-170, 178, 242; *Alex Genin, Eastern Credit Limited, Inc., and A.S. Baltoil v. Republic of Estonia*, ICSID Case No. ARB/99/2, Award, 25 June 2001 ("***Genin v. Estonia***") (RL-57), para. 345; *Methanex v. USA*, Part IV, chapter D, para. 10; *Electrabel*

365. According to the Respondent, any reasonably informed investor should know that the Spanish Government could amend the regulatory framework for renewable energy and the benefits granted to producers under this regime are not unchangeable nor permanent as long as the principle of reasonable profitability is respected,[330] which was the only legitimate expectation the investors could have. This was already established by the Supreme Court,[331] the Constitutional Court,[332] the State Council,[333] and the General Legal State Service[334] before the investment was made and was confirmed subsequently upon the entry into force of RD 661/2007,[335] and during various legal challenges filed later against RD 1565/2010.[336]

366. According to the Respondent, the Claimants did not prove to have made any *due diligence* analysis of the Spanish legal framework, and in the arbitration only presented technical reports of the plants and a consultancy report dated after the date of investment.[337]

367. With respect of the Memorandum of the State Council of 2010, which the Claimants invoke in support of their position, it expressly states that RD 1565/2010 and RDL 14/2010 are perfectly in accordance with the law.[338]

### d) *Regarding the alleged retroactive application of the norms*

368. The Respondent denies that the adaptations of the regulatory framework are retroactive, because for that to happen, the norm has to affect acquired rights and the Respondent contends that the Claimants have never had an acquired right in relation to the regulated tariff regime or to the reception of future incentives.[339] Moreover, the adaptations of RD 1565/2010 and RDL 14/2010 cannot be

---

*v. Hungary*, Part VII, p. 21, paras. 7.77-7.78; *Metalpas S.A. and Buen Aire S.A. v Republic of Argentina*, ICSID Case No. ARB/03/5, Award on the Merits, 06 June 2008 ("*Metalpar v. Argentina*") (RL-10).
[330] Defence, paras. 688-689 et seq.
[331] Defence, paras. 694 et seq. Decisions by the Supreme Court of 11 June 1996 (RL-39), 15 December 2005 (RL-79), 25 October 2006 (RL-90) and 20 March 2007 (RL-94).
[332] Decision by the Constitutional Court of 28 October 1997 (RL-285).
[333] Opinion by the State Council of 26 April 2007, (RL-96).
[334] Opinion No. 223/2007 by the Ministry of Industry concerning RD 436/2004, Energy Law (RL-92).
[335] Defence, para. 698 et seq.; Decisions by the Supreme Court of 03 December 2009 (RL-128), 09 December 2009 (RL-129), and 18 November 2009 (RL-127).
[336] Defence, para. 705, citing Decisions by the Supreme Court of 12 April 2012 (RL-180).
[337] PHB1 Respondent, paras. 14, 869 et seq. referring to exhibits C-233 to C-290.
[338] Rejoinder, paras. 800-804.
[339] Defence, para. 736.

considered retroactive neither under international law[340] nor Spanish law,[341] as they refer to changes in the future, which in no way affect the electricity that has already been sold by the plants.

### 3. Spain did not breach Article 10(12) of the ECT

369.    The Respondent affirms that Article 10(12) of the ECT requires the host State to establish an appropriate system of laws and institutions which operate effectively, and argues that this requirement should be evaluated in accordance with an objective international standard.[342]  The Respondent also argues that although the standard does not require that domestic remedies are exhausted, it is necessary that the means made available to the investor are used.

370.    The Claimants' claim refers to the use of an RDL, RDL 14/2010 to regulate the subject, as it would have deprived them from the possibility to assert their rights before the Spanish courts.[343]

371.    In this regard, the Respondent submits that Royal Decree-Laws are legal instruments which are usually used in systems of constitutional monarchy, such as the Spanish system, and are subject to strict conditions, controls and limitations.[344] In this case, the use of RDL 14/2010 was justified under the circumstances.[345]

372.    Either way, according to the Respondent, the use of a RDL does not prevent the Claimants from utilising the mechanisms envisaged under the Spanish legal system to challenge these norms.  In particular, the Spanish system offers two routes for challenging an RDL, the constitutionality question, which is an indirect claim that can be raised during legal proceedings, to request that the Constitutional Court rules on the constitutionality of a norm,[346] and the action in investment liability that allows any person that has sustained damage as a consequence of the operation of a public service, to request compensation, firstly, before the administration and, if necessary, before the contentious-administrative courts.[347]

---

[340] Defence, paras. 740-741.
[341] Defence, paras. 747-751.
[342] Defence, paras. 758-759.
[343] Defence, para. 754.  Claim, paras. 309 et seq.
[344] Defence, para. 765.
[345] Defence, paras. 785-789.
[346] Defence, paras. 766-767.
[347] Defence, paras. 768-773.

4. On the damages claimed

373.　The Respondent argues that (**a**) the Claimants' claim for damages has become without a subject matter, and (**b**) that the period 2010-2013 cannot be considered in isolation.  In alternative, the Respondent argues that (**c**) the Claimants have failed to prove the existence of damage and its quantum.

### a) The claim for damages has become without subject matter

374.　The Claimants' claim is based on RDL 14/2010 and RD 1565/2010, however, these regulatory changes remained without effect after the approval of RDL 9/2013.[348]

375.　RDL 9/2013 has established a new compensation system, different from the previous one, determining a new regulatory framework.[349]

376.　The Respondent submits therefore that the Claimants' claim and its estimates of damages are based on regulations that have been repealed and, thus, lack any sense.[350]  Any calculation made in this respect would be theoretical, false and unjust as the remuneration of the Claimants' facilities is now governed by RDL 9/2013.[351]

### b) The 2010-2013 period cannot be considered in isolation

377.　According to the Respondent, considering that RDL 9/2013 completely absorbed all previous regulatory charnges, it is impossible to make any calculation of compensation for plants under the RD 661/2007, RD 1578/2008, RD 1565/2010 or RDL 14/2010 without taking the new regulations into account.[352]

378.　Accordingly, the Respondent quotes its own experts in this arbitration (Mac Group - Altran), who indicated "*we have come to the conclusion that the period 2010-2013 cannot be considered in isolation regarding the possible impact of regulatory measures, as its effect is taken into account when providing an adequate profitability to all facilities throughout their monetary life, in accordance with the provisions of Royal Decree-Law 9/2013, Royal Decree 413/2014 and Ministerial Order IET 1045/2014.*"[353]

---

[348] Rejoinder, para. 1174.
[349] Rejoinder, para. 1183.
[350] Rejoinder, paras. 1185-1188.
[351] PHB2 Respondent, para. 174.
[352] PHB1 Respondent, para. 969; PHB2 Respondent, paras. 171 et seq.
[353] RT-3, para. 29

### c) *Claimants did not prove damage nor quantum*

379.   According to the Respondent, the expert reports on which the Claimants' claims for damages are based are incomplete, partial and erroneous and, therefore, are ineffective in determining quantum.[354]

380.   In particular, the reports do not explain nor justify that damage has occurred, but assume damage as an established fact.[355] The damage has not been proven as it depends on a variable that cannot be determined with certainty, i.e. the future market price of the electricity market.[356]

381.   Moreover, the reports contain information contradicting other documents filed by the Claimants and publicly available information.[357]

382.   The methodological approach used by the Claimants is incorrect since it is based on cash flow values in absolute terms and does not take into account the reasonable profitability rate threshold, which could be used to claim damages in the case that the cash flow is calculated according to it.[358]

383.   With respect to the alleged damage caused by the established 30 years maximum term for receiving the regulated tariff, the Respondent contends that it could not have caused damage to the Claimants as it coincides with the end of the facilities' lifespan, and in order to extend the lifespan of these facilities it would be necessary to implement significant changes which in any way would preclude them from the possibility of benefiting from the regulated tariffs regime.[359] For this reason the contracts concluded by the Claimants for the use of land where the facilities are located have a term of less than 30 years.[360]

384.   The Respondent submits that the change in terms of limited time periods to receive the regulated tariff actually benefits the Claimants, as in the case of facilities covered by RD 661/2007, the previously regulated tariff would be reduced by 80% from year 26, whereas it now extends to 30 years, and consequently the facilities are entitled to the full rate for a longer period.[361]

---

[354] Rejoinder, para. 1216.
[355] Rejoinder, paras. 1210-1213.
[356] Rejoinder, para. 1215.
[357] Rejoinder, paras. 1214, 1216(a) and (c) referring to the statement on income and costs in Annex III of CT-1, and information contained in exhibits C-233 to C-259, and C-260.
[358] Defence, paras. 801-804; RT-1, paras. 489-490; Rejoinder, paras. 1217-1219.
[359] Defence, paras. 807-810; RT-1, para. 54; Report CT-1, p. 51. Article 4 of RD 661/2007.
[360] Defence, para. 811.
[361] Defence, para. 813; RT-1, p. 26, number 18.

385.   Moreover, leaving out the plants' lifespan, in any case, the loss would result from the difference between the regulated tariff and the market price, nevertheless, it is impossible to know in advance what will be the market price in 2037.[362]

386.   With respect to the limit of equivalent hours of production, the Respondent contends that the calculation of the alleged damage that would cause this limitation is argumentative because after exceeding the limit, the plants can continue to sell their electricity at market price, and that price is variable and unknown in the future.[363]  Either way, the Respondent contends that although the hour limitation would affect plants, it allows investors to continue receiving a reasonable profit that is the threshold guaranteed by the regulatory framework.[364]

387.   For the above mentioned reasons, the Respondent contends that the damage alleged by the Claimants is merely speculative because it depends on variations of the market price of electricity in Spain which, as a volatile parameter, can not be predicted for 20 years in advance, and also assumes a productivity over the time limitations provided in RDL 14/2010 without considering the physical erosion of the facilities.[365]

388.   Being entirely uncertain and totally speculative, the alleged damage is not compensable in accordance with decisions of other international investment tribunals.[366]

389.   Regarding the damage alleged by the Claimants for increase in financing costs, the Respondent contends that there is no causal link between the actions of the State and these costs, which are the result of decisions of the project promoter and the financial entity.[367]

390.   The Respondent contends that it is not appropriate to compensate the Claimants for the costs of technical changes included in the regulation regarding supervision of voltage dips and access to the distribution network because they respond to

---

[362] Defence, para. 816.
[363] Defence, para. 820.
[364] Defence, para. 821; RT-1, para. 56.
[365] Defence, paras. 823-825; Report RT-1, para. 56 and pp. 267 to 269.
[366] Defence, paras. 826 et seq, citing *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Sirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007 ("***PSEG v. Turkey***") (CL-41), para. 315; *Autopista Concesionada de Venezuela, C.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/00/5, 23 September 2003 ("***Aucoven v. Venezuela***") (RL-67), para. 362; *Wena Hotels Ltd. v. Arab Republic of Egypt*, ICSDI Case No. ARB/98/4, Award, 08 December 2000 ("***Wena v. Egypt***") (RL-55), para. 123.
[367] Defence, paras. 832-833.

technical measures predictable for any investor in the Spanish photovoltaic sector, which have been planned since PER 2005-2010.[368]

391. Finally, the Respondent argues that the damage claimed by the Claimants does not correspond to their current shareholding in T-Solar as has been submitted in this arbitration by the Claimants themselves.[369] The expert report CT-1 considers the participation of the Claimants in T-Solar as of 28 April 2011 to calculate the alleged damage caused to the Claimants, however, the participation has changed since then and the calculation does not correspond with the present reality.[370]

# VIII. RELIEF SOUGHT

## A. The Claimants

392. The Claimants request the Arbitral Tribunal to:

1. Declare that Spain has breached its international obligations under Part III of the ECT; in particular, Spain:

   a) expropriated the investments of the Claimants without payment of a prompt, fair, adequate and effective compensation, in violation of Article 13 of the ECT;

   b) breached its obligation to provide the investments of the Claimants fair and equitable treatment, in violation of Article 10(1) of the ECT; and

   c) breached its obligation to ensure that its domestic law provides effective means for the assertion of claims and the enforcement of rights, in violation of Article 10(12) of the ECT; and consequently;

2. Order Spain to pay Charanne and Construction […] and […] respectively, with an interest at a rate of 7,398% calculated from 4 March 2011 until full payment; or

3. Alternatively, in the case that Spain would not have been ordered to make payments to Charanne and Construction, to order Spain to compensate Charanne and Construction […] and […] respectively, with an interest rate of

---

[368] Defence, para. 838.
[369] Rejoinder, para. 1201; C-104.
[370] Rejoinder, para. 1208(b).

7,398% calculated from 4 March 2011 until full payment for violation of Article 10(12) of the ECT;

4. Grant any other relief it deems appropriate; and

5. Order Spain to pay all costs and expenses incurred in this arbitration, including the costs and fees of the Arbitral Tribunal and the Arbitration Institute of the SCC; also, to order Spain to reimburse the Claimants all the expenses incurred as a result of this arbitration, including lawyers' and experts' fees.

## B. The Respondent

393.   The Respondent requests the Tribunal to:

1. Reject the Claimants' claims as inadmissible since the arbitration has become redundant;

2. Dismiss the Claimants' claims for lack of jurisdiction;

3. Alternatively, and in the event that the Tribunal decides that it has jurisdiction to hear the present dispute, to dismiss all the claims of the Claimants on the merits since Spain did not breach the ECT in any way;

4. Alternatively, to dismiss all financial claims of the Claimants on the basis that they have not suffered damage as a consequence of the adaptations carried out by Spain; and

5. Order the Claimants to pay all costs and expenses arising from this arbitration, including administrative expenses incurred by the European Commission, the arbitrators' fees and fees for legal representation of Spain, their experts and advisers, including a reasonable rate of interest from the date on which these costs occurred until the date of actual payment.

# IX. ANALYSIS BY THE TRIBUNAL

## A. Jurisdiction

394.   In the last prayer for relief, the Respondent requests, first, that the Claimants' claims should be dismissed as inadmissible since arbitration has become without object and, second, that the Tribunal declares that it lacks jurisdiction over the present dispute.  The Arbitral Tribunal considers, however, that the Respondent's argument regarding the inadmissibility for supervening lack of purpose is an issue

that should be treated as a matter of substance. Indeed, the Tribunal cannot enter into a discussion if the object of the dispute disappeared without having jurisdiction over it.

395. Before commencing the discussion on jurisdiction, it is worth recalling that the Claimants have limited the subject of this dispute to the alleged unlawful nature of RD 1565/2010 and RDL 14/2010 ("**the 2010 norms**") and decided to exclude from their claims RD 9/2013 and subsequent legislation.[371] Thus, the claims have been limited to the consequences of the 2010 norms, while complaints regarding the subsequent norms have been submitted by different companies of their group to another arbitral tribunal.

396. The Respondent has structured its submissions regarding jurisdiction as three main arguments that we will examine: (**1**) that the Claimants have renounced the jurisdiction of this Tribunal by triggering the *fork in the road* provision, (**2**) that the Claimants, being entirely controlled by nationals of the Kingdom of Spain, are not investors in accordance with Article 1(7) of the ECT, and (**3**) that the Arbitral Tribunal lacks jurisdiction to hear a dispute between European investors against a European State subject to the regulatory regime of the EU. The Tribunal will examine each of these arguments in turn.

397. Before turning to the analysis of these arguments, the Arbitral Tribunal recalls that in its Defence,[372] the Respondent argued that the Claimants had failed to prove that they are investors and that they have made protected investments under the terms of the ECT, as the Claimants had not submitted official certificates or incorporation documents of the companies to certify their existence, nationality and ownership of these investments. This argument has been abandoned by the Respondent as the Claimants have provided the requested documentation and proved the existence, nationality and ownership of the companies. Therefore, in the latest submissions of the Respondent, there is no objection as to the existence of a protected investment in recent writings of the Respondent. In any case, the Arbitral Tribunal considers that the Claimants have provided satisfactory evidence of the existence, nationality and ownership of Charanne B.V. and Construction Investment S.A.R.L.

---

[371] PHB1 Claimants, para. 405; PHB2 Claimants, para. 79.
[372] Defence, paras. 334 et seq.

as well as the existence of a protected investment within the meaning of Article 1(6) of the ECT.[373]

1. *Fork in the Road* provision:

398.   The Respondent alleges that the Claimants have activated the *fork in the road* provision of Article 26(2)(a) and (b) of the ECT by presenting two contentious-administrative claims (No. 60-2011 and No. 64-2011) before the Supreme Court in relation to RD 1565/2010 and the European Court of Human Rights ("**ECHR**") in relation to RDL 14/2010.

399.   The Claimants deny that the conditions for activating the *fork in the road* provision have been met in this case in the absence of the triple identity test of parties, object and legal basis between the proceedings before the Supreme Court and the ECHR, and the present Arbitral Tribunal is not met.

400.   Article 26(2) of the ECT allows the affected investor to choose a forum to submit a dispute under the ECT to (i) the ordinary or administrative courts of the Contracting Party involved in the dispute; or (ii) in accordance with a previously agreed dispute settlement procedure, or (iii) in accordance with the following paragraphs of Article 26(2), in particular, an arbitration proceeding administered by the Institute.[374]   But Article 26(3)(b)(i) excludes the consent of the parties to submit their disputes to arbitration in accordance with Article 26(4) in the event that the affected investor has previously resorted to the ordinary or administrative courts of the party involved in the dispute or in accordance with the previously agreed dispute settlement procedure.

401.   Based on the above, in order for the *fork in the* road provision to be triggered, it is necessary that the investor has opted to submit the dispute to be resolved in conformity with one of the mechanisms identified in Article 26(2)(a) or (b) of the ECT.[375]   From this it can be deduced, necessarily, that it applies condition of identity of the parties.   For the *fork in the road* provision of Article 26 to apply, it is necessary that the investor that has previously submitted the same dispute to arbitration in accordance with Article 26(4), has previously opted to submit the same dispute for resolution to one of the mechanisms provided for in Article

---

[373] Reply, paras. 370-399.
[374] Article 26(4)(c) ECT.
[375] Article 26(3)(b)(i) ECT.

26(2)(a) or (b). The terms of the ECT are clear and neither of the Parties have alleged that they must be interpreted.

402. The first question, therefore, that the Tribunal must analyse is whether the Claimants have chosen to submit their dispute to one of the mechanisms provided for in Article 26(2)(a) or (b).

403. It is not in dispute in this regard that the Claimants in this arbitration are different from the claiming parties before the Spanish Supreme Court and the ECHR. Indeed, the proceedings before the Supreme Court were initiated by the T-Solar Group and Isolux Corsan together with the Spanish companies owners of the plants, and the procedure brought before the ECHR was initiated by various subsidiaries of T-Solar.

404. The Respondent submits, however, that the absence of identity between the parties in different procedures should not prevent the application of the *fork in the road* provision based on a flexible interpretation of the triple identity test developed by some recent decisions of international tribunals.[376] According to the argument put forward by the Kingdom of Spain, the Tribunal should only examine the "essence" of the claims[377] to determine whether the same dispute has been submitted to both forums.

405. According to the Arbitral Tribunal, for the *fork in the road* provision in Article 26(3)(b)(i) to apply, it is above all necessary that the investor has previously resorted to local courts or another previously agreed method of dispute settlement. It follows from this provision that this investor is necessarily the investor affected by the alleged illegal measure.

406. In this respect, the Respondent contends that, to assess whether there is identity of the parties, the Tribunal should analyse the economic reality of the corporate structure of the different entities present in the various procedures in question. Indeed, if this was not the case "*any claimant company could modify its corporate structure, using intermediary companies, subsidiaries, and ultimately restructuring its participation in the corporate chain, to justify inapplicability of the triple identity test with regard to the identity of the party.*"[378] The Arbitral Tribunal does not disagree with this analysis which, however, would apply if it was

---

[376] *Pantechniki v. Albania, H&H Enterprises v. Egypt, Vivendi v. Argentina II – Annulment.*
[377] PHB1 Respondent, para. 401.
[378] PHB1 Respondent, para. 405.

demonstrated that the Claimants, on the one hand, and the companies T-Solar Group and Isolux Corsan S.A. group, on the other hand, are in fact the same entity, so that it may be considered that the actions brought before the Supreme Court and the ECHR have been actually brought by the Claimants through intermediary companies.

407. The Arbitral Tribunal considers that this demonstration has not been provided by the Kingdom of Spain. In its Reply, the Claimants have argued that "*both in the date of the entry into force of RD 1565/2010 and the entry into force of RDL 14/2010, Charanne possessed a share in Tuin Zonne S.A. (now T-Solar Global S.A. Group) representing 18,6583% of its social capital*", and that "*both at the date of the entry into force of RD 1565/2010 and the entry into force of RDL 14/2010, Construction possessed a share in Tuin Zonne, S.A. (now T-Solar Global S.A. Group) representing 2,8876% of its social capital.*"[379]

408. While it is true that the Claimants are part of the same group of the company Grupo T-Solar and of the company Grupo Isolux Corsan S.A., this is insufficient to consider that there is a substantial identity of the parties, even under a flexible interpretation of the triple identity test. For that to be the case it would have been necessary to demonstrate that the Claimants enjoy decision-making powers in Grupo T-Solar and Grupo Isolux Corsan S.A. in such a way that these companies have been in reality intermediary companies. This demonstration has not been provided. Neither has it been alleged that the corporate structure of the group of the claiming parties has been designed or modified with a fraudulent purpose to allow the Claimants to avoid the *fork in the road* provision of the ECT. In the absence of proof to that effect, the Arbitral Tribunal cannot consider that, in accordance with Article 26 of the ECT, the Claimants have chosen to submit the dispute to the Supreme Court or the ECHR.

409. Although this is sufficient to reject the jurisdictional objection based on the *fork in the road* provision, the Tribunal adds that, as correctly submitted by the Claimants, the ECHR cannot be considered as a court of the Contracting Party within the meaning of Article 26(2)(a). Indeed, the Contracting Party to which Article 26(2)(a) refers is the respondent Contracting Party, in this case Spain. And there is no doubt that the ECHR is not a court of the Kingdom of Spain. Neither can it

---

[379] Reply, para. 378.

be considered that the procedure before the ECHR is "*a process of dispute resolution previously agreed*" within the meaning of Article 26(2)(b) of the ECT, since there is no agreement between the parties to submit their dispute to the ECHR.

410. Based on the above, the Tribunal rejects the objection to jurisdictional objection based on the *fork in the road* provision of the ECT, without it being necessary to examine the arguments of the Parties as to the subject identity and identity of legal basis, since it would not change the decision of the Arbitral Tribunal in this respect, not meeting the requirement to establish the identity of parties in the proceedings.

### 2. Claimants are not investors in accordance with Article 1(7) of the ECT

411. The Respondent alleges, first, (**a**) that the ultimate beneficiaries of the Claimants' companies are Spanish nationals and that, therefore, the Arbitral Tribunal lacks jurisdiction and, secondly, (**b**) that the resolution of the present dispute by the Arbitral Tribunal would be contrary to the Spanish Constitution.

#### a) *The actual Claimants are Spanish nationals*

412. The Kingdom of Spain argues that the Claimants are two "empty shells" through which two individuals of Spanish nationality, Mr José Gomis Cañete and Mr Luis Antonio Delso Heras "*realise their investments*", and that "*to allow Claimants to benefit from the protections that the ECT offers to foreign investors would amount to overlooking the aim sought by the instrument, that is no other than to protect foreign investors, and not domestic investors that structure their investment in an artificially complex manner.*"[380]

413. The Respondent also argues, on the basis of Articles 26(1) and l(7)(a), that "*the diversity of nationalities is a requirement under the ECT.*"[381]  Although the Claimants are Dutch and Luxembourg companies, the Respondent argues that "*the 'foreign' nature of the legal entity is not a formal requirement, but an objective condition that allows the arbitral tribunals to lift the corporate veil to determine the real controller of the company.*"

414. The Arbitral Tribunal does not share the position of the Kingdom of Spain.  The protection provided by the ECT applies to investments made by an investor.  The

---

[380] PHB1 Respondent, para. 531.
[381] PHB1 Respondent, para. 537.

quality of investor is defined in Article 1(7) of the ECT, in what concerns to legal persons, like those that are "*organized in accordance with the law applicable in that Contracting Party*".  There is no dispute as to the fact that the two Claimants meet this requirement, as the Netherlands and Luxembourg are Contracting Parties to the ECT.  Article 1(7)(a)(ii) of the ECT does not contains any other requirement but that the investor is constituted in accordance with the applicable law of the Contracting Party, in this case, the Netherlands and Luxembourg.

415.  While it is perfectly conceivable to lift the corporate veil and ignore the legal personality of an investor in the case of fraud directed at jurisdiction, as could be an instrumental transfer of the assets of the investment after the emergence of the dispute, there is no basis for importing to the ECT a general rule according to which the nationality of the investor should be analysed according to an economic criterion, when the ECT itself refers to the legal criterion of incorporation of the company under the law of a Contracting Party.  In the present case, the Respondent party does not make any allegation nor proves a fraudulent nature in the structure of the Claimants' investments that could justify the lifting of the corporate veil.

416.  To adopt the argument of Spain would amount to denial of benefits whenever an investor, legal entity incorporated under the applicable law of a Contracting Party in accordance with Article 1(7)(a)(ii), was controlled by citizens or nationals of the State receiving the investment.  However, the drafters of the ECT did not intend to include this hypothesis in the denial of benefits clause of Article 17, which relates to the situation of a legal entity controlled by shareholders of a third country (a third country being a country not party to the ECT).  Regardless of whether a denial of benefits under Article 17 is a matter of merits or jurisdiction – question that the Tribunal does not have to assess in this award – is an illustration of the fact that the drafters of the ECT did not want to exclude from the scope of its application the investors as legal entities controlled by nationals of the Contracting State receiving the investment.

417.  On a more general level, the Arbitral Tribunal shares the position taken under the ECT by the tribunal in the Yukos case, according to which "*the Tribunal knows of no general principles of international law that would require investigating the*

*structure of a company or another organization when the applicable treaty simply requires it to be organized in accordance with the laws of a Contracting Party.*"[382]

418.    Based on the above, the Arbitral Tribunal rejects the Respondent's objections to jurisdiction based on Article 1(7) of the ECT.

### b)  On the alleged breach of the Spanish Constitution that the decision of this Tribunal would cause

419.    The Kingdom of Spain submits that, if the Arbitral Tribunal finds it has jurisdiction, the Spanish public order applicable to this arbitration would be violated, and in particular, the principle of equality set out in Article 14 of the Spanish Constitution as "*it would make available to Spanish citizens (natural persons owners of the shareholding of the claimants) a mechanism to resolve disputes with certain procedural aspects (choice of the tribunal, application of a more flexible procedural scheme) to which any other Spanish citizen would not have access to.*"[383]

420.    The Arbitral Tribunal does not agree with this argument.

421.    Firstly, the competence of this Arbitral Tribunal has to be assessed under the ECT and not in accordance with the national law of the Respondent.  Therefore, the Spanish public order, although it may be taken into account in resolving a dispute in the merits stage, has little to do in determining the jurisdiction of this Tribunal under an international treaty to which the Kingdom of Spain is a contracting party.

422.    Secondly, as correctly pointed out by the Claimants, this argument is nothing more than a different presentation of the argument, already rejected by the Arbitral Tribunal, according to which the Claimants would actually be Spanish nationals acting through "empty corporate shells."

423.    Thirdly, and in any event, it does not appear the Claimants' resort to arbitration provided for by the ECT would violate the principles of equality and the right to effective judicial protection provided by Articles 14 and 24 of the Spanish Constitution.  Such principles, in fact, only ensure the right of any Spanish national to equal access and effective protection by tribunals, and in no way prohibits Spanish citizens from proceedings according to their own situation.

---

[382] *Yukos v. Russia,* para. 415.  Free translation: "*the Tribunal knows of no general principles of international law that would require investigating how a company or another organization when the applicable treaty simply requires it to be organized in accordance with the laws of a Contracting Party.*"
[383] PHB1 Respondent, para. 564.

3. The Dispute is an intra-EU dispute which is subject to the regulatory regime of the EU

424. The Kingdom of Spain contends, relying in particular on the *Amicus EC* presented by the European Commission on 19 January 2015, that "n*either Spain nor the Netherlands or Luxembourg have agreed that disputes under the ECT are to be resolved through international arbitration in intra-EU context.*"

425. First of all, the Arbitral Tribunal wishes to clarify that it has given the most careful consideration to the *Amicus EC*, which it has found very useful. The Tribunal wishes to thank the European Commission for it. However, the Tribunal recalls that the European Commission is not party to these proceedings and, therefore, in this award the Tribunal will only respond to the arguments of the Parties, in light, of course, of the elements of reflection provided by the EC.

426. The jurisdictional objection of the Kingdom of Spain relies on three arguments: firstly, (**a**) all the parties in this procedure are part of the same Regional Economic Integration Organisation ("**REIO**") and, therefore, there is no diversity of territories. (**b**) Secondly, there is an implicit disconnection clause in the ECT for intra-EU disputes. (**c**) Thirdly, EU law does not allow EU Member States to agree to submit the present dispute to a dispute resolution mechanism different from the envisaged by the EU. The Tribunal will examine each of these three arguments in turn.

*a) On the inexistence of diversity of territories*

427. The Kingdom of Spain contends that the present dispute does not meet the requirement of diversity of territories between the investor and the Contracting Party provided in Article 26 of the ECT. The argument rests on the idea, expressed with some clarity in the *Amicus EC,* that "*investors of an EU Member State requesting the settlement of a dispute with another Member State cannot be considered investors of another contracting party within the meaning of Article 26, paragraph 1 of the ECT*", because "*the EU is a contracting party to the ECT and investors of Member States of the EU are, for the purposes of the Charter, investors of the EU.*" The EC also underlines that "*Article 10 paragraph 1, second paragraph of the ECT provides that with respect to a REIO (i.e. the EU), the term*

*territory will encompasses the territories of the member States of such an organisation.*"[384]

428.    Based on Article 26 of the ECT, disputes between a Contracting Party and an investor of another Contracting Party relating to an investment in the territory of the former may be submitted to arbitration.  It can be deduced that, as correctly raised by the Kingdom of Spain, there must be a diversity of nationality between the parties.  The Arbitral Tribunal has already decided that the Claimants are legal persons of the Netherlands and Luxembourg respectively, and not Spanish investors.  The issue that the Arbitral Tribunal has to resolve is whether, in the context of this dispute, the Claimants can be considered as investors of the Netherlands and Luxembourg respectively or whether they should be considered as investors of the EU.  In the latter case, since Spain is part of the EU, the dispute would cease to oppose a contracting party and an investor of another contracting party within the meaning of Article 26(1) of the ECT as it would be the case of an investment by an investor of the EU in the territory of the EU.

429.    In the opinion of the Arbitral Tribunal, this argument ignores that, although the EU is a Contracting Party of the ECT, the States that compose it have not ceased to be Contracting Parties as well.  Both the EU, as its Member States, may have legal standing as Respondent in an action based on the ECT.

430.    Article 1(10) of the ECT, in order to define the concept of "area" refers to both the territory of the Contracting States (Article 1(10)(a)) and the EU territory (Article 1(10) second paragraph).  Therefore, it appears reasonable to deduce that, in referring to investments made "in the territory" of a contracting party, Article 26(1) refers to both, in the case of a EU member State, to the territory of a national State as well as the territory of the EU.  There is no rule in the ECT according to which a different interpretation can be inferred.

431.    To know if the term "territory" refers to one or the other depends on the content of the claim and the entity against which the claim is directed.  An investor may well sue the EU based on allegedly unlawful acts committed by it.  In this case, it could be considered that for the purposes of Article 26 of the ECT, the dispute is related to an investment made in the territory of the EU.  The Tribunal nonetheless does not have to decide whether in that case jurisdiction in such circumstances would

---

[384] *Amicus EC,* paras. 19-20.

exist under the ECT, as the present situation is completely different. In the present case, claims are not based on EU actions, but on allegedly unlawful acts committed by the Kingdom of Spain in the exercise of its national sovereignty. Nor is the claim directed against the EU, or somehow implies that the EU should be held responsible, thus, there is no doubt for the Arbitral Tribunal that Spain has a passive legitimacy to act in this arbitration and therefore the territory to which Article 26(1) of the ECT refers, for jurisdictional purposes, is the territory of the Kingdom of Spain and not the territory of the EU.

432. Based on the above analysis, the Arbitral Tribunal finds that the dispute refers to an investment made by investors from the Netherlands and Luxembourg in the territory of the Kingdom of Spain. The Tribunal therefore rejects the objection raised by the Respondent on the basis of Article 26 of the ECT.

### b) *The alleged implicit disconnection clause*

433. The Kingdom of Spain, adopting the reasoning in *Amicus EC*, argues that the ECT contains an "*implicit disconnection clause for intra-EU relations.*"[385] The purpose of this clause is to dissociate Member States, in relations *inter se*, from the ECT.

434. The argument is based, first of all, on a parallelism with Article 27 of the ECT. Said Article provides for the possibility that a dispute between Contracting Parties is to be submitted to an *ad hoc* arbitral tribunal. Now it is true that, in accordance with Article 267 TFEU and the *Mox Plant* decision of the European Court of Justice, no dispute between EU Member States can be resolved by an *ad hoc* arbitral tribunal, which would be according to Spain "*further evidence of the application of the implicit disconnection clause between EU Member States.*"[386]

435. However, this analogy does not seem to be relevant to this Arbitral Tribunal. Article 27 of the ECT in fact expressly subjects the resort to arbitration between Contracting Parties to the fact that they did not "*agree otherwise.*" The applicable provision to the present dispute is, however, Article 26 of the ECT and not Article 27. However, no agreement to derogate from Article 26 exists in this case between the States parties to the ECT, nor is there any agreement of this nature between the Parties to this dispute. As for disputes between Member States, the prohibition of submitting them to arbitration results from Article 267 TFEU, and there doe not

---

[385] PHB1 Respondent, para. 466; *Amicus EC*, para. 13.
[386] PHB1 Respondent, para. 471.

exist a similar provision that applies to a dispute between a private party and a Member State of the EU.

436.   Equally unconvincing is the argument of the Kingdom of Spain that there is a custom union in the EU that would prove the existence of an implicit disconnection clause in relation to Article 7 of ECT as the notion of transit can only apply in the EU as a whole and not between Member States. However, this fact solely demonstrates that Member States fulfil their obligations arising under Article 7 in the framework of the European customs union. The existence of the EU does not imply any contradiction or impediment to the full implementation by EU Member States of their obligations under Article 7 of the ECT, thus, there is no need for an implied disconnection clause.

437.   The issue raised by the Respondent is, in the end, a matter of interpretation of the ECT. Only through the interpretation of the treaty could the Arbitral Tribunal reach the conclusion that the intention of the Contracting Parties was to include an implicit disconnection clause. Any interpretation of the ECT should be made in accordance with Article 31 of the Vienna Convention on the Law of the Treaties according to which the fundamental rule is an interpretation in good faith according to the ordinary meaning of the terms of the treaty in their context and taking into account object and purpose of the treaty. However, the Arbitral Tribunal considers that the terms of the treaty are clear and do not justify any additional interpretation that could lead to reading into the ECT an implicit disconnection clause for intra-EU disputes.

438.   In reality, the Tribunal considers that the Contracting Parties to the ECT had no need to agree on a disconnection clause, be either implicitly or explicitly. The role of a disconnection clause would be, in effect, to resolve a conflict between the ECT and the TFEU. However, there is no conflict between the two treaties. As stated in previous sections of the present award, the competence of the Arbitral Tribunal to decide on a claim filed by an investor of an EU Member State against another EU Member State on the basis of the alleged illegal nature of the actions carried out in the exercise of its national sovereignty, is perfectly compatible with the participation of the EU as a REIO in the ECT. And, as we shall see in subsequent sections of the present award, there is no rule of EU law which prevents EU Member States to resolve through arbitration their disputes with investors from

other Member States through arbitration. Nor is there any EU law rule that prevents an arbitral tribunal to apply EU law to resolve such a dispute.

439.    Having determined the above, the Arbitral Tribunal does not have to resolve the arguments of the parties concerning Article 16 of the ECT. In fact, this rule would be only relevant in the event of an inconsistency between the ECT and EU law. The Tribunal is aware of the conclusion that was reached on this matter by the tribunal in *Electrabel v. Hungary*, according to which "*from whatever perspective the relationship between the ECT and EU Law is examined, the Tribunal concludes that EU law would prevail over the ECT in case of any material inconsistency.*"[387] However, as we will see in the following paragraphs, in the present case there is no contradiction whatsoever between the ECT and EU law.

### c) On the compatibility of the dispute resolution mechanism of the ECT with EU Law

440.    The Kingdom of Spain submits that Article 344 TFEU does not allow Member States to resolve disputes relating to EU law through international arbitration. To decide on this argument, the Tribunal must first examine (**i**) whether Article 344 TFEU is applicable to an investor-state arbitration and then, if it is applicable, (**ii**) if the present dispute relates to the interpretation or application of the European treaties within the meaning of Article 344. Finally, (**iii**) the Arbitral Tribunal will examine whether there is any EU rule of public policy prohibiting the resolution of this dispute through arbitration.

#### (i)    Application of Article 344 TFEU to arbitration between investors and EU Member States

441.    In accordance with Article 344 TFEU, "*Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein*". Literally, this rule applies to agreements relating to disputes between Member States, and not between a private party and a Member State.

442.    However, the Kingdom of Spain argues that "*the fact that such consent to arbitrate given by the Member State was accepted by another Member State or by an investor is irrelevant. The offer to arbitrate would not be valid by application of Article*

---

[387] *Electrabel v. Hungary*, para. 4.191. Free translation: "*from whatever perspective the relationship between the ECT and EU Law is examined, the Tribunal concludes that EU law would prevail over the ECT in case of any material inconsistency.*"

*344 TFEU.*"[388]   The argument is based on a textual interpretation of Article 344. According to the Respondent, "*if Article 344 was restricted to state-state disputes, it could have been clarified in the corresponding section 'Member States undertake not to submit disputes between Member States concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein' [...] However [...] the contracting parties to the TFEU did not establish such a distinction in Article 344 TFEU.*"[389]   In other words, "*the object and purpose of Article 344 TFEU is that a Member State cannot be party to a dispute involving State responsibility.  If this dispute arises, this would inherently affect the interpretation of European legislation and consequently should remain within the jurisdiction of the European institutions.*"[390]

443.   The Arbitral Tribunal does not find convincing the interpretation of Article 344 TFEU made by the Kingdom of Spain.  If the Respondent's argument was true, no state tribunal could ever decide any issue that involved an interpretation of the European treaties whenever the responsibility of a Member State would be at stake.  However, it is true that Member States are respondents in many proceedings before national courts in which the interpretation or application of the European treaties may come into play.  Similarly, a Member State can agree to submit a dispute that may involve issues of EU law to an arbitration.  Finally, it is today universally accepted that an arbitral tribunal not only has the power, but also the duty to apply EU law.[391]

444.   The scope of Article 344 TFEU cannot, therefore, be to prohibit Member States to submit any dispute that could involve an interpretation of European treaties to a dispute settlement proceedings other than those provided by EU framework.  As rightfully noted by the tribunal in *Electrabel v. Hungary*, the scope of Article 344 TFEU is more limited.  This is to guarantee that the Court of Justice of the European Union has the last word in interpretation of EU law to ensure its uniform interpretation.[392]   In this regard, Article 344 TFEU cannot be given the scope argued by Spain since the Article should be viewed as one of the tools prohibiting

---

[388] PHB1 Respondent, para. 304.
[389] PHB1 Respondent, paras. 505-506.
[390] PHB1 Respondent, para. 509.
[391] CJEU, Case C-126/97, Rec., p I-3055, 01 June 1999, *Eco Swiss*.
[392] *Electrabel v. Hungary,* paras. 4.146-4.147.

agreements of dispute resolution between Member States in order to ensure harmonious application of EU law.

445.   This conclusion is reinforced by the fact that the tribunal in *Electrabel v. Hungary* also considered relevant that the European Union signed the ECT, thus, accepting the possibility of arbitration between investors and Member States under Article 26.[393]   In this regard, it is relevant to note that the ECT does not allow reservations.[394]

      (ii)   Whether the present dispute concerns the interpretation or application of the European treaties within the meaning of Article 344

446.   The Kingdom of Spain also contends that the present dispute relates to the interpretation or application of the European treaties within the meaning of Article 344 TFEU because the ECT forms part of EU law.   The Respondent bases this argument on the decision in the *Mox Plant* case and argues that the ECT, being a mixed agreement, has the same rank in the Community judicial order as other Community agreements.[395]

447.   Nevertheless, the Arbitral Tribunal does not have to rule on this argument for it has already been decided that Article 344 TFEU does not apply to Investor-State arbitration.

      (iii)   Whether there are any rules of European public order prohibiting the Resolution of the present dispute through arbitration

448.   Apart from its arguments based on Article 344 TFEU, the Kingdom of Spain does not identify in its submissions any rule of European public order prohibiting the submission of a dispute between an investor and a Member State to arbitration.   It is appropriate to note that this case does not involve any assessment of the validity of Community acts or decisions adopted by organs of the European Union and does not concern in any way allegations by the European Union of violations of EU law nor claims directed against such organisation.   There is no argument in this arbitration according to which the content of the laws at issue (in particular RD 661/2007 and RD 1578/2008 and/or the 2010 norms) would be contrary to EU law.

---

[393] *Electrabel v. Hungary*, para. 4.158.
[394] Article 46 ECT.
[395] PHB1 Respondent, para. 516, citing *Mox Plant*, paras. 84, 126-127.

Beyond the arguments regarding the allegedly contrary character to EU law of the submission of the dispute to arbitration (which have already been discussed and resolved), the Kingdom of Spain has not argued that the decision rendered by this Tribunal (whether it considers the demands in whole, in part or dismisses them) could somehow violate the European judicial order.

449. It is true that, as the Respondent points out,[396] recently the European Commission has recently decided to initiate a process of preliminary review of state aid, which has extended to the compensation regime for renewable energy envisaged in RD 661/2007 and RD 1578/2008. However, and as pointed out by the Claimants,[397] this initiative has not led to any decision so far. In any event, even if there is such a problem, it would be a matter of public policy which the Arbitral Tribunal shall take into account when deciding the dispute on the merits; and this would be for a court to consider if the validity of the resultant Award is challenged.

450. Based on the above, the Arbitral Tribunal has jurisdiction over the present dispute.

## B. Merits

451. Firstly, the Tribunal will (**1**) review the Respondent's argument on the inadmissibility of arbitration by supervening lack of subject matter. Then, it will analyse the Claimants' claims regarding breach of (**2**) Article 13(1) of the ECT (expropriation); (**3**) Article 10(12) of the ECT (obligation to provide effective means for the assertion of claims), and (**4**) Article 10(1) of the ECT. Subsequently, (**5**) the Arbitral Tribunal will consider the Parties' arbitration costs.

1. <u>Regarding inadmissibility for lack of subject matter</u>

452. It is appropriate to recall that the Claimants have decided to limit the scope of the present dispute to the alleged illegal nature of RD 1565/2010 and RDL 14/2010 and decided to exclude from their claims RD 9/2013 and subsequent legislation.[398] The claims presented in this arbitration are therefore based exclusively on these 2010 legislations. The sole repealing provision of RD 9/2013 provides in paragraphs 2 (a) and (b) that RD 661/2007, regulating the activity of electricity production under the special regime and RD 1578/2008, regulating the

---

[396] PHB1 Respondent, paras. 133-134.
[397] PHB2 Claimants, para. 61.
[398] See above para. 395.

compensation for electricity production using solar photovoltaic technology for facilities subsequent to the deadline regarding the maintenance of the compensation scheme under RD 661/2007 for this technology, are repealed. Moreover, the repealing provision provides in its paragraph 1 that "*all provisions of equal or lower rank that contradict or oppose the provisions of this Royal Decree-Law are repealed*". It is not disputed that such repealing measures entail the repeal of the 2010 norms object of the present arbitration.[399]

453. According to the Respondent "*we are therefore faced with a clear case of supervening disappearance of the object of this arbitration.*"[400]

454. The Arbitral Tribunal notes, however, that although those provisions have been repealed on the date of entry into force of RDL 9/2013, i.e. 14 July 2013, the 2010 laws were applied until that date and thereafter on a transitional basis, until the approval of the development regulation of RDL 9/2013. Accordingly, operators duly registered under RD 661/2007 and RD 1578/2008 continued receiving the corresponding compensation provided by these laws, as modified by the 2010 norms, albeit as payment on account of the liquidation resulting from the application of the new methodology adopted on the basis of RDL 9/2013. Therefore, the Arbitral Tribunal considers that the 2010 laws could have affected, although in a transitory manner, the rights of the investors. Thus, it cannot be considered that the present dispute is devoid of subject matter. The Tribunal will now examine whether the 2010 norms are in violation of the ECT.

2. Article 13 of the ECT (Expropriation)

455. Article 13(1) of the ECT prohibits nationalization, expropriation or measures having equivalent effect, except where such measures are for reasons of public interest, non-discriminatory, carried out under a due process of law and accompanied by payment of prompt, adequate and effective compensation.

456. The Claimants contend that RD 1565/2010 and RDL 14/2010 by "*the brutal economic impact on the profitability of the activity developed by T-Solar*" constitute "*an expropriation of a substantial part of the value and of the returns on the investment.*"[401] According to the Claimants, the impact on the economic value

---

[399] PHB2 Claimants, paras. 88-89; PHB1 Respondents, paras. 386(a), 611.
[400] PHB1 Respondent, para. 392.
[401] Claim, para. 265.

of the investment, although not affecting the ownership, is sufficient to constitute an indirect expropriation.[402] More precisely, the Claimants submit that, in order to constitute an indirect expropriation, "*total destruction of the investment or loss of control is not required since a significant interference with the enjoyment of the investment or its profits can be enough.*"[403]

457. According to Article 1(6) of the ECT, protected investment means:

> "*every kind of asset, owned or controlled directly or indirectly by an Investor and includes:*
>
> (a) *tangible and intangible, and movable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;*
>
> (b) *a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;*
>
> (c) *claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment;*
>
> (d) *Intellectual Property;*
>
> (e) *Returns;*
>
> (f) *any right conferred by law or contract or by virtue of any licenses and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.*"

458. In the present case, the investments made by the Claimants are indirect stakes in the company T-Solar Group S.A. Thus, the Claimants invested in shares (Article l(6)(b) of the ECT).

459. However, the Claimants claim to have invested in returns (Article 1(6)(e) of the ECT) to support its argument that, by affecting future cash flow of T-Solar, the measures in dispute constitute indirect expropriation.[404] According to the Claimants, by reducing the returns of the plants, the 2010 norms would have expropriated such returns.[405] The Arbitral Tribunal is not convinced by this argument. The object of the investment was not the returns, but the company T-Solar. The Kingdom of Spain also correctly raised the argument that an investment

---

[402] Reply, para. 458.
[403] Reply, para. 461.
[404] Reply, para. 452.
[405] PHB1 Claimants, para. 335.

protected under Article 1(6) must be owned or controlled by the investor, and that the Claimants neither own nor control the future returns of the plants, which are not rights attached to their investment.[406] The Tribunal therefore considers that the Claimants invested in shares (Article l(6)(b) of the ECT) and not in returns.

460. Article 13(1) of the ECT prohibits both expropriatory measures as well as measures having an effect equivalent to expropriation. To be characterised as an indirect expropriation under the ECT, a measure must have an effect equivalent to expropriation. The concept of expropriation is generally accepted as a taking involving a deprivation of property.[407] Consequently, to determine whether there was an indirect expropriation, the Tribunal must consider whether the disputed measures had the effect of depriving the investor of all or part of its rights as shareholders of T-Solar.

461. The Arbitral Tribunal shares the position adopted by several arbitral tribunals that standard of indirect expropriation under international law implies a substantial effect on the property rights of the investor.[408] Such an effect can materialise in the case of an effective deprivation of all or part of the assets constituting the investment, or a loss of value that could be equal by its magnitude to a deprivation of the investment.[409]

462. However, it is not disputed that the Claimants still remain holders of their shares in T-Solar. Nor has there been allegations that their rights as shareholders of T-Solar have been limited or affected in some way by the measures discussed in these proceedings. Finally, it is not disputed that the company T-Solar Group continues operating and making profits, and it has not been alleged that, although the

---

[406] Reply, section 4.2.1.

[407] "*The term "expropriation" […] must be interpreted in light of the whole body of state practice, treaties and judicial interpretations of that term in international law cases. In general, the term "expropriation" carries with it the connotation of a "taking" by a governmental-type authority of a person's "property" with a view to transferring ownership of that property to another person, usually the authority that exercised its de jure or de facto power to do the "taking".* S.D. Myers v. Canada, UNCITRAL, Partial Award, 13 November 2000, para. 280, (RL-54). Free translation: "*The term "expropriation" […] must be interpreted in light of the whole body of state practice, treaties and judicial interpretations of that term in international law cases. In general, the term "expropriation" carries with it the connotation of a "taking" by a governmental-type authority of a person's "property" with a view to transferring ownership of that property to another person, usually the authority that exercised its de jure or de facto power to do the "taking".*

[408] *CMS v. Argentina*, paras. 262-264; *Marvin Feldman v. Mexico*, para. 100; *Electrabel v. Hungary*, paras. 6.53, 6.63; *Pope & Talbot Inc v. the Government of Canada*, NAFTA Case, UNCITRAL, Partial Award, 26 June 2000, para. 102 (RL-51); *Sempra v. Argentina*, para. 285, *AES v. Hungary*, paras. 14.3.1 to 14.3.4.

[409] PHB1 Claimants, paras. 589-590, citing *Mobil Corporation, Venezuela Holdings, B.V., Mobil Cerro Negro Holding, Ltd., Mobil Venezuelana de Petróleos Holdings, Inc., Mobil Cerro Negro, Ltd. and Mobil Venezuelana de Petróleos, Inc. v. Venezuela,* ICSID Case No. ARB/07/27, Award, 09 October 2014, para. 286.

measures in dispute may have affected their profitability, the company has been deprived of all or part of its property or assets.

463. In fact, the Claimants complain of a decrease in profitability of T-Solar, and consequently of value of their shares. According to the Claimants, the alleged laws adopted by the Kingdom of Spain "*have reduced the profitability of plants subjected to RD 1578/2008 of a [ …] plant and subject to RD 661/2007 of a [ …].*"[410] The Claimants consider that "*a loss of profitability of this magnitude is generally considered serious in the business environment.*"[411]

464. The Claimants maintain, with reason, that an indirect expropriation can arise both from loss of value of an investment and loss of control over it.[412] However, in order for a loss of value to be tantamount to expropriation, it has to be of such a magnitude as to amount to a deprivation of property. In this regard, the 2012 UNCTAD report on expropriation precisely refers to the hypothesis of a "*destruction of value*" of the investment.[413]

465. The Arbitral Tribunal is of the opinion that, although the profitability of T-Solar could have been seriously affected, such impact is not in itself sufficient to amount to an expropriation. The Claimants' reasoning would lead to the conclusion that any measure affecting profitability of a company could be considered an expropriation by the mere fact that it entails a decrease in profits and, therefore, in value. This, of course, cannot be the case. For a measure to be considered as equivalent to an expropriation, its effects must be of such a significance that it could be considered that the investor has been deprived, in whole or in part, of its investment. A simple decrease in the value of the shares constituting the investment cannot constitute an indirect expropriation, unless the loss of value is such that it can be considered equivalent to a deprivation of property.

466. In the present case, if the calculation proposed by the Claimants is accepted, the profitability of the plants would have decreased to […] for plants subject to a RD 1578/2008 and to […] for plants subject to RD 661/2007. While such a reduction in profitability have had serious economic and financial consequences, the Arbitral Tribunal considers that it is not of such significance as to destroy the value of the

---

[410] PHB1 Claimants, para. 359.
[411] PHB1 Claimants, para. 359.
[412] PHB1 Claimants, para. 363.
[413] RL-215, free translation: "Destruction of value".

investment.  The Claimants concede that, although the value has been reduced, profitability of the plants remains positive (of […] for a plant subject to RD 1578/2008 and […] for those subject to RD 661/2007).[414]

467.  Therefore, the Arbitral Tribunal considers that the Claimants failed to prove that the disputed measures had an effect tantamount to an expropriation.

3.  Article 10(12) of the ECT (effective means for the assertion of claims)

468.  Article 10(12) of the ECT provides that "*[e]ach Contracting Party shall ensure that its domestic law provides effective means for the assertion of claims and the enforcement of rights with respect to Investments, investment agreements, and investment authorizations.*"

469.  The Claimants submit that the Kingdom of Spain has violated that rule by adopting RDL 14/2010 since the use of a Royal Decree-Law has been motivated by "*the sole purpose of avoiding the political and social debate that may generate controversial legislative modifications as in the case of economic restrictions adopted by RDL 14/2010.*"[415]  According to the Claimants, Spanish law does not allow the filing of a contentious-administrative claim against a RDL and the use of this measure with the aim of "*avoiding the myriad of contentious-administrative claims that the members of the photovoltaic industry would have presented to challenge the measures*"[416] constitutes a violation of the obligation under Article 10(12) of the ECT to provide effective means for the assertion of claims.

470.  The standard of effective mechanisms as foreseen in Article 10(12) of the ECT requires States to provide a legal framework that guarantees effective remedies to investors for realization and protection of their investments.[417]  To verify whether such requirements are met, tribunals must examine the legal system in question as a whole.  The standard, however, does not impose any obligation on States regarding the way in which it organizes its judicial system.  It is sufficient that an adequate system of laws and institutions is established and that it functions effectively.[418]

---

[414] PHB1 Claimants, para. 359.
[415] PHB1 Claimants, para. 376.
[416] PHB1 Claimants, para. 378.
[417] Defence, para. 761 and *Chevron v. Ecuador*, para. 238.
[418] *White Industries Australia Limited v. Republic of India* (UNCITRAL), Final Award, 30 November 2011 (CL-48), para. 11.3.2 referring to the decision in *Chevron v. Ecuador*.

471. In the present case, the Kingdom of Spain argues that Royal Decree-Law may be challenged by any citizen through seizure of ordinary court who may submit a question of unconstitutionality to the Constitutional Court. Moreover, an investor has an access to the Spanish courts by way of an action for damages on prior administrative complaint before the organ that carried out the action causing damage and losses.[419]

472. According to the Arbitral Tribunal, these means are sufficient to meet the obligation to provide effective mechanism. The Claimants complain that the question of unconstitutionality may only be submitted incidentally in the ordinary framework, which compels the investor to wait for the administration to issue a development or application norm related to the RDL.[420] However, the standard of effective means in international law cannot result in imposing on the State specific requirements for organizing its review system, such as forcing the State to provide a system of direct control of the constitutionality of acts with a legislative character. The Claimants also complain that the claim for damages does not allow the constitutional control of the RDL. The latter complaint, however, does not constitute a violation of the standard to provide effective means in international law from the moment the Respondent proves the existence of means allowing both constitutional control (albeit incidentally) and compensation for damage and losses.

473. Nor may the Claimants argue that these remedies are ineffective, as it has been clearly shown that the Board of Contentious-Administrative Litigation of the Supreme Court was aware of, and indeed it decided, questions concerning the constitutionality of RDL 14/2010.[421]

474. Based on the above, the Arbitral Tribunal rejects the Claimants' claims regarding violation of the standard of effective means.

4. Article 10(1) of the ECT (fair and equitable treatment)

475. The Claimants essentially claim that (**a**) Spain breached the standard of fair and equitable treatment by modifying in unexpected ways its regulatory and economic

---

[419] Rejoinder, paras. 1135 et seq.
[420] PHB1 Claimants, para. 383.
[421] Defence, para. 767; RL-276, RL-277, RL-278.

regime and by undermining their legitimate expectations. The Claimants also argue that (**b**) the measures violate their rights as they are retroactive.

### a) Alteration of the regulatory framework and infringement of the legitimate expectations of the investor

476. Article 10(1) of the ECT provides that *"[e]ach Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area."* Moreover, Article 10(1) provides that the obligation to grant investments fair and equitable treatment forms part of these conditions.

477. It follows from Article 10(1) that the obligation to provide fair and equitable treatment is included in the more general obligation to create stable, equitable, favourable and transparent conditions.

478. Firstly, in their Claim, the Claimants submit that Spain violated Article 10(1) of the ECT by "*modifying in an unexpected fashion of its regulatory and economic regime, and by the violation of the legitimate expectations of the Claimants.*"[422]

479. In its Reply,[423] the Claimants argue in this respect that, by altering the regulatory framework, Spain subjected the Claimants' investments to a "*regulatory instability that lasts today"*. More specifically, the Claimants allege that the "*new regulatory offensive began with RD 1565/2010*" to continue with RDL 14/2010 and ending with the claim that "*it is enough to look at the current legal framework (RDL 9/2013 and Law 24/2013 to confirm that* [...] *today, the compensation regime for photovoltaic plants, objective of Charanne's and Construction's investments, remains unknown.*"[424]

480. The Claimants then describe the evolution of the regulatory framework from 2010 until today to argue that, as a whole, the 2010 and 2013 reforms created a situation of instability contrary to Article 10(1) of the ECT. The Claimants also appear to argue a lack of clarity of the regulatory framework.

481. The Arbitral Tribunal cannot, however, determine whether the 2013 regulations contributed to the lack of stability or clarity of the regulatory framework contrary to the ECT without exceeding its powers. Indeed, the Claimants themselves have

---

[422] Claim, para. 296 et seq.
[423] Reply, paras. 562-567.
[424] Reply, para. 567.

excluded from the framework of this arbitration the 2013 norms. In that regard, the Claimants very precisely allege that "*they do not ask for any declaration of the Tribunal on RDL 9/2013 and its implementing measures.*"[425]

482. Accordingly, the 2013 norms cannot be analysed as a fact generating responsibility neither can they, as being posterior to the 2010 norms (sole object of this arbitration), have any relevance in assessing whether these regulations are in violation of Spain's international obligations.

483. The analysis of the existence of the alleged lack of stability and clarity of the regulatory framework should therefore be limited to the subject of this dispute, as has been defined by the Claimants, i.e. solely the 2010 norms.

484. In this limited context of the 2010 norms, the Arbitral Tribunal cannot reach the conclusion that Spain violated its obligation of regulatory stability. Assessing whether the evolution of the regulatory framework constitutes an instability contrary to Article 10(1) of the ECT would, in fact, suppose the examination as a whole of all the regulatory changes introduced to date.

485. Regarding the clarity of the regulatory framework, it has not been alleged that the 2010 norms were ambiguous or difficult to understand as such. The claim that "*the compensation regime for photovoltaic plants, object of Charanne's and Construction's investment remains unknown*" refers to the combination of the evolutions of the regulatory framework until 2013 and, thus, cannot be evaluated in this arbitration.[426]

486. To analyse whether the 2010 norms violate other obligations provided in Article 10(1) of the ECT, the existence of legitimate expectations of the investor is a relevant factor. The Tribunal shares the position of tribunals that have estimated, based on good faith principle of customary international law, that a State cannot induce an investor to make an investment, hereby generating legitimate expectations, to later ignore the commitments that had generated such expectations.[427]

---

[425] PHB1 Claimants, para. 405.
[426] Reply, para. 567.
[427] *El Paso v. Argentina*, *International Thunderbird Gaming Corporation v. United Mexican States*, NAFTA Ad hoc, UNCITRAL, Final Award, 26 January 2006 (RL-376); *Waste Management Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004; *Saluka v. Czech Republic*; *CME v Czech Republic*.

487. The Claimants argue that, by adopting RD 1565/2010 and RDL 14/2010, Spain has infringed the legitimate expectations generated for investors with the prior rule, in particular RD 661/2007 and RD 1578/2008.[428]

488. To demonstrate that these latest rules generated legitimate expectations, the Claimants rely on several decisions of investment tribunals,[429] as well as on the 2012 study by the UNCTAD on Fair and Equitable Treatment.[430]

489. The UNCTAD study on which the Claimants base their claim[431] notes that "*arbitral decisions suggest* [...] *that an investor may derive legitimate expectations either from (a) specific commitments personally, for example in the form of stabilization clause, or (b) rules that are not specifically addressed to a particular investor but which are put in place with a specific aim to induce foreign investment and on which the foreign investor relied in making his investment.*"[432]

490. In the present case, there are no specific commitments adopted by Spain directed at the Claimants. Such commitments could have been made on the basis of a stabilization clause, or with any kind of statement that the State had directed to the investors, according to which the existing regulatory framework will not change. Such declarations have not been addressed to the Claimants.

491. The Claimants consider however that RD 661/2007 and RD 1578/2008 were specific commitments by Spain as they are directed at a specific limited group of investors who meet the requirements within the established time periods.[433]

492. The Tribunal will further consider whether such regulatory framework was such as to generate legitimate expectations that it would not be modified as it was in 2010. The Tribunal, however, does not accept the argument that such rules may constitute or be equivalent to a specific commitment.

493. Although RD 661/2007 and RD 1578/2008 were directed to a limited group of investors, it does not make them to be commitments specifically directed at each investor. The rules at issue do not lose the general nature that characterizes any law or regulation by their specific scope. To convert a regulatory standard into a

---

[428] PHB1 Claimants, para. 578.
[429] *El Paso v. Argentina, Perenco v. Ecuador, Total v. Argentina, CMS v Argentina, Enron v. Argentina.*
[430] RL-174.
[431] PHB1 Claimants, para. 260.
[432] Unofficial translation: "*arbitral decisions suggest* [...] *that an investor may derive legitimate expectations either from (a) specific commitments personally, for example in the form of stabilization clause, or (b) rules that are not specifically addressed to a particular investor but which are put in place with a specific aim to induce foreign investment and on which the foreign investor relied in making his investment.*"
[433] PHB2 Claimants, paras. 159-160, 261.

specific commitment of the state, by the limited character of the persons who may be affected, would constitute an excessive limitation on power of states to regulate the economy in accordance with the public interest.

494. Based on the foregoing, the Tribunal concludes that there was no specific commitment by Spain vis-à-vis the Claimants. Thus, the question is whether the legal order in force at the time of the investment could in itself generate legitimate expectations, and if so, which ones.

495. A finding that there has been a violation of investor's expectations must be based on an objective standard or analysis, as the mere subjective belief that could have had the investor at the moment of making of the investment is not sufficient. Moreover, the application of the principle accordingly depends on whether the expectation has been reasonable in the particular case with relevance to representations possibly made by the host State to induce the investment.

496. Firstly, the analysis of the arguments presented by the Claimants to argue that Spain waged a "*campaign to attract investment*"[434] must be performed. According to the the Claimants, such campaign materialized in the distribution of documents such as "*The Sun Can be Yours*" in which high returns were announced.[435] The Tribunal does not believe that, by themselves, these documents could have generated a legitimate expectation as to the fact that the tariff anticipated at the time of the investment would not be modified.

497. It is true that these documents and their presentations that were conducted in Spain indicate the will of the Respondent to promote and attract investment in the sector of renewable energy generation. However, these documents are not specific enough to have generated an expectation as to the fact that RD 661/2007 and 1578/2008 would not be modified. Although the 2007 presentation does contain a reference to RD 661/2007, it does not include any language from which it can reasonably be inferred that the regulated tariff would remain untouched for the rest of the regulatory lives of the plants.

498. Thus, the relevant question is whether the existing regulatory framework at the time of investment could give rise to a legitimate expectation protected by international

---

[434] PHB1 Claimants, paras. 143 et seq.
[435] PHB1 Claimants, para. 148.

law that it would not be modified or altered by norms such as those adopted in 2010.

499. According to the Arbitral Tribunal and in the absence of a specific commitment, an investor cannot have a legitimate expectation that existing rules will not be modified.

500. The Tribunal agrees in this respect with the position adopted by the tribunal in *Electrabel v. Hungary* under the ECT, according to which "*[w]hile the investor is promised protection against unfair changes, it is well established that the host State is entitled to maintain a reasonable degree of regulatory flexibility to respond to changing circumstances in the public interest. Consequently, the requirement of fairness must not be understood as the immutability of the legal framework, but as implying that subsequent changes should be made fairly, consistently and predictably, taking into account the circumstances of the investment.*"[436]

501. The Tribunal also deems relevant the considerations delivered by other tribunals although taken under other treaties. The Arbitral Tribunal agrees with the tribunal in *CMS v. Argentina*, in that "*it is not a question of whether the legal framework may need to be frozen as it can always evolve and be adapted to changing circumstances, but neither is it a question of whether the framework can be dispensed with all together when specific commitments to the contrary have been made. The law of foreign investment and its protection has been developed with the specific objection of avoiding such adverse legal effects.*"[437]

502. Moreover, the tribunal in *El Paso v. Argentina* considered that "*if the often repeated formula to the effect that "the stability of the legal and business framework is an essential element of fair and equitable treatment" were true, legislation could never be changed: the mere enunciation of that proposition shows its irrelevance. Such a standard of behaviour, if strictly applied, is not realistic,*

---

[436] *Electrabel v. Hungary*, part VII, p. 21, para 7.77. Unofficial translation: "*While the investor is promised protection against unfair changes, it is well-established that the host State is entitled to maintain a reasonable degree of regulatory flexibility to respond to changing circumstances in the public interest. Consequently, the requirement of fairness must not be understood as the immutability of the legal framework, but as implying that subsequent changes should be made fairly, consistently and predictably, taking into account the circumstances of the investment.*" See *Continental Casualty v. Argentina*, para. 258; *Marvin Feldman v. Mexico*, para. 103.

[437] *CMS v. Argentina*, para. 277. Unofficial translation: "*It is not a question of whether the legal framework might need to be frozen as it can always evolve and be adapted to changing circumstances, but neither is it a question of whether the framework can be dispensed with altogether when specific commitments to the contrary have been made. The law of foreign investment and its protection has been developed with the specific objective of avoiding such adverse legal effects.*"

*nor is it the BITs' purpose that States guarantee that the economic and legal conditions in which investments take place will remain unaltered ad infinitum.*" [...] "*In other words, the Tribunal cannot follow the line of cases in which fair and equitable treatment was viewed as implying the stability of the legal and business framework. Economic and legal life is by nature evolutionary.*"[438]

503.    In this case, the Claimants could not have the legitimate expectation that the regulatory framework established by RD 661/2007 and RD 1578/2008 would remain unchanged for the lifetime of their plants. Admitting the existence of such an expectation would, in effect, be equivalent to freeze the regulatory framework applicable to eligible plants, although circumstances may change. Any modification in the amount of the tariff or any limitation of the number of eligible hours would then constitute a violation of international law. In practice, the situation would be the same that if the State had signed a stabilisation clause or adopted a commitment to not modify the regulatory framework. The Arbitral Tribunal cannot support such a conclusion. The Claimants have made very clear that they do not claim to have had the legitimate expectation that the regulatory framework would remain unchanged.[439]

504.    The Tribunal's conclusion according to which, in the absence of a specific commitment, the Claimants could not have a reasonable expectation that the regulatory framework established by RD 661/2007 and RD 1578/2008 remain frozen is reinforced by the fact that the jurisprudence of the highest Spanish judicial authorities had clearly established, prior to the investment, the principle that national law allowed to make changes to the regulation.

505.    In this regard, the Arbitral Tribunal shares the Respondent's position according to which, "*in order to exercise the right of legitimate expectations, the Claimants should have made a diligent analysis of the legal framework for the investment.*"[440] This position is consistent with the position adopted by other tribunals. The tribunal in *Frontier*, for example, considered that "*a foreign investor has to make its business decisions and shape its expectations on the basis of the law and the factual situation prevailing in the country as it stands at the moment of the*

---

[438] *El Paso v. Argentina*, paras. 350, 352.
[439] PHB1 Claimants, para. 285.
[440] Rejoinder, para. 876.

*investment.*"[441]  Indeed, in order to be in violation of the legitimate expectations of the investor, regulatory measures must not have been reasonably foreseeable at the time of the investment.  The Arbitral Tribunal considers that in the present case, the Claimants could have easily foreseen possible adjustments to the regulatory framework as those introduced by the rules of 2010.  In fact, the Spanish law clearly left open the possibility that the system of compensation applicable to photovoltaics could be modified.

506.  For example, the Spanish Supreme Court had estimated in December 2005 that "*no legal hurdle exists for the Government, in the exercise of its regulatory power and in light of the broad competences on which relies a strict regulated subject such as electricity, to modify the compensation system provided that it acts under the framework established by the LSE.*"[442]  In October 2006, the Supreme Court similarly decided that "*the owner of the facilities of electricity production in the special regime do not have a 'frozen right' that the economic regime that regulates the reception of bonus remain unaltered. Such a regime actually tries to encourage the use of renewable energy through an incentive mechanism that, as any other, has no guarantee to remain unchanged for the future.*"[443]

507.  The Tribunal does not share the position of the Claimants that those decisions would be irrelevant or taken out of context.  Although they relate to different rules, these failures clearly establish the principle that national law allowed to provide, within the framework of the LSE, changes to an economic system to encourage the generation of renewable energy as it was established with RD 661/2007 and RD 1578/2008.  The Tribunal considers that the Claimants could have, at the time they made their investment in 2009, an analysis of the legal framework of its investment in Spanish law and understand that there was a possibility that the regulations adopted in 2007 and 2008 could be modifications.  At least that is the level of care that would be expected of a foreign investor in a highly regulated as the energy sector, where a preliminary and comprehensive legal framework applicable to the sector analysis is essential to proceed with the investment.

---

[441] *Frontier Petroleum Services Ltd. v. Czech Republic*, UNCITRAL Award, 12 November 2010, para. 287. Unofficial translation: "*a foreign investor has to make its business decisions and shape its expectations on the basis of the law and the factual situation prevailing in the country as it stands at the time of the investment.*"
[442] Decision by the Supreme Court of 15 December 2005 (RL-76).
[443] Decision by the Supreme Court of 25 October 2006 (RL-90); See also decisions by the Supreme Court of 09 October 2007 (RL-331) and 09 December 2009 (RL-332).

508.    Although decisions of the Spanish courts are not binding on the Arbitral Tribunal, they remain relevant as factual elements to verify that an investor could not, at the time of the disputed investment, have the reasonable expectation that in the absence of a specific commitment the regulation would not be modified throughout the life of the plants.

509.    The Claimants have alleged in this regard that under the existing regulatory framework, the registration to the RAIPRE gave generators an acquired right to the perception of the tariff,[444] which would establish a legitimate expectation that it would not be subsequently modified.  The Tribunal does not accept this argument.

510.    Firstly, the Respondent has convincingly demonstrated that, in Spanish law, the registration to the RAIPRE was simply an administrative requirement to be able to sell energy and did not imply that the registered facilities had an acquired right to a determined compensation.[445]  Secondly, the existence of legitimate expectations must be analysed under international law and not under national law.  However, as stated in previous sections of this award, in the absence of a specific commitment toward stability, an investor cannot have a legitimate expectation that a regulatory framework such as that at issue in this arbitration is to not be modified at any time to adapt to the needs of the market and to the public interest.

511.    The Tribunal therefore concludes that the Claimants could not have the legitimate expectation that RD 661/2007 and RD 1578/2008 would not be changed during the lifespan of its facilities.

512.    That does not mean, however, that the rules of 2010 cannot by themselves violate the standard of fair and equitable treatment.

513.    In the Statement of Claim, the Claimants submit in this regard that "*the legitimate expectations of the investor [...] are frustrated, even in the absence of specific commitments, when the receiving State performs acts incompatible with a criterion of economic reasonableness, with public interest or with the principle of proportionality.*"[446]

514.    The Arbitral Tribunal accepts the principle behind this approach.  In fact, an investor has a legitimate expectation that, when modifying the existing regulation

---

[444] Claim, paras. 95-96, 320; Reply, para. 524.
[445] Rejoinder, paras. 633(e), 831-833
[446] Claim, para. 293.

based on which the investment was made, the State will not act unreasonably, disproportionately or contrary to the public interest.

515.   The legitimate expectations on which the Claimants rely are based on the contents of RD 661/2007 and RD 1578/2008.  The Tribunal will therefore analyse whether, by amending these regulations through the 2010 norms, the Respondent acted unreasonably, against the public interest, or in a disproportionate fashion.

516.   The existing regulatory framework at the time of the regulation was essentially constituted by RD 661/2007 and RD 1578/2008.  Such norms can be summarized as follows:

- firstly, an investor could have recourse to the regime only upon meeting certain requirements, among others, the realization of the investment in facilities and their registration to the RAIPRE within the statutory deadlines;

- secondly, the generators that managed to launch their facilities within the deadlines set by the Government would benefit from the implementation of a particular tariff ("*Feed in Tariff*" or "**FIT**") attached to the regime.  For facilities under RD 661/2007 - registered prior to 30 September 2008, the FIT would apply for the first 25 years and may be reduced to 80% of its value from year 26.  For facilities regulated under RD 1578/2008, the tariff was determined for the first 25 years of operation; and

- thirdly, both RD 661/2007 and RD 1578/2008 authorized to place all of the net production of energy in the system and no hourly limit was established for the implementation of FIT.

517.   As for proportionality, the Arbitral Tribunal considers that this criterion is satisfied as long as the changes are not capricious or unnecessary and do not amount to suddenly and unpredictably eliminate the essential characteristics of the existing regulatory framework.

518.   The Arbitral Tribunal considers RD 661/2007 and RD 1578/2008 established specific rules whose essential characteristics are to ensure each operator who meets the requirements a guaranteed tariff (or where applicable a premium) and privileged access to the electricity distribution grid.  These principles allow, within

the framework of the LSE, to ensure renewable energy generators reasonable profitability referred by Article 30.4 of the LSE.

519. However, the 2010 norms have not eliminated these features from the existing regulation.

520. Indeed, RD 1565/2010 maintained the tariff until year 26, constraint that was subsequently extended by Law 2/2011 until year 30 for eligible plants. The difference between the situation resulting from the Law 2/2011 and the previous situation is that under RD 661/2007 the tariff remained in effect, albeit reduced to 80% of its previous value, from the year 26 and for the lifetime of the facility.

521. There is a debate between the Parties as to whether the life of a photovoltaic plant could exceed thirty years. If it could not, it is obvious that the modification introduced in 2010 could not in any way affect the investors.

522. The Tribunal does not find convincing the Claimants' evidence that the life of a plant can actually exceed 30 years.

523. The Claimants submit that the useful life of the facilities lies between 35 and 50 years[447] and also argue that the fact that the plants could forever obtain the FTI was a fundamental aspect of the regulatory regime under RD 661/2007.[448]

524. The Respondent asserts that the life of a plant is between 25 and 30 years, and that in the event of the life extension of the plant, it would be necessary to almost replace all the equipment which would imply a *"substantial modification"* according to Article 4 RD 661/2007 and would preclude rights to the tariff.[449]

525. Although the Claimants agree with the Respondent that the substantial modifications would imply the preclusion of the regulated tariff,[450] the Claimants argue that it was not necessary to make substantial modifications since making minor maintenance changes could extend the useful life of the facilities beyond 30 years.[451]

526. According to the Respondent, the fact that the expectation of the Claimants did not exceed 30 years confirms the fact that this limit coincides with the maximum duration of leases for use of the land on which plants are located.[452] In this regard,

---

[447] PHB2 Claimants, paras. 17(a) and 165, citing CT-1, pp. 49-50.
[448] PHB1 Claimants, para. 160.
[449] Defence, paras. 78, 146-147, 590(b)(i-iv), 807-812 citing Report RT-1, para. 54; Rejoinder, para. 238.
[450] Reply, para. 251; Rejoinder, para. 315.
[451] Reply, para. 252, C-293.
[452] Defence, para. 811.

the Claimants contend that this is not essential because the contracts had clauses that allowed extensions.[453]

527. The Tribunal is convinced by the arguments and explanations advanced by the Respondent and its expert from Altran Mac-Group[454] in the sense that, taking into account the available technology at the time of the facilities' constructions, the maximum lifespan would not exceed 30 years without making essential modifications. Either way, regardless of the objective analysis on the lifespan of each plant, it appears to the Tribunal that in the majority of cases the Claimants foresaw a duration of 25 years for the land leases contracts (24 our of 34); with some contracts reaching 30 years (6 out of 34), and only 2 contracts with a duration over 30 years. In fact, and as described by the Claimant's expert's report on calculation of future cash flows, the average "*time limit for facilities' operation*" is 27,5 years.[455]

528. On the other hand, other documents prior to investment that have been raised by the Claimants as generators of expectations such as the PER 2005-2010[456] and the 2005 and 2007 *The Sun Can Be Yours* presentations[457] also refer in their templates of plants whose lifespan was 25 years.

529. For the foregoing reasons, the Tribunal does not find convincing the Claimants' assertion that an essential element of their expectations as investors was to be able to exploit the plant for a period of between 35 and 50 years without making any essential changes and thus enjoying the tariffs. The modification made by RD 1565/2010 and by implementation of Law 2/2011 extended the application of tariffs to the first 30 years of the plant's operation and could not violate the legitimate expectations of the Claimants.

530. The other element of change introduced by the 2010 norms was the limitation of the yearly eligible hours to the tariff based on two elements (i) the climatic zone according to the average solar radiation in Spain according to RD 314/06and (ii) the type of technology used (fixed or on one or two axes). The Arbitral Tribunal considers that the number of hours eligible for the tariff is not likely to create legitimate expectations under international law. The opposite position would be

---

[453] PHB2 Claimants, para. 59
[454] RT-1, pp. 172-182.
[455] CT-1, p. 51, table 16.
[456] C-9, p. 168.
[457] C-86, pp. 14-29; C-87, pp. 14-17.

tantamount to freeze the existing regulatory framework in 2008 in terms of duration, amount and number of eligible hours. Spain argues that the limitation of eligible hours according to climate zones and type of technology used is simply the result of PER 2005- 2010, which links electricity generation from photovoltaic technology to the solar resource, establishing a plan of the average daily quantity of energy per unit area in five climatic zones defined in the Technical Construction Code.[458]

531. The Tribunal remains convinced by the arguments put forward by the Respondent according to which the limits of RDL 14/2010 were limits of eligible production hours taken into account by the legislator in RD 661/2007 and 1578/2008 to calculate the compensation for the plants (to calculate the tariff). Regarding the zones, Spain demonstrated that Annex XII of RD 661/2007 already contained a table showing that time zones were anticipated.[459]

532. These circumstances reinforce the Arbitral Tribunal in the conclusion that the introduction of an hourly limitation based on the principle of adjustment with climatic zones established in PER 2005-2010 was not disproportionate and cannot have violated any legitimate expectation under international law.

533. To be sure, the 2010 norms have implemented adjustments and adaptations that did not eliminate the fundamental characteristics of the existing regulatory framework, considering that the photovoltaic operators remained entitled to a tariff (FIT) as well as the possibility to sell their electricity production to the system in priority, which in the opinion of this Arbitral Tribunal cannot have violated any legitimate expectation under international law.

534. In terms of economic rationality, the Tribunal finds that both the temporal limitation as the limitation of eligible hours cannot be branded as irrational. As mentioned above, the limitation of the tariff to thirty years reflects an objective criterion that is the expected lifetime of a photovoltaic power plant, while limiting eligible hours reflects an objective criterion based on the climate zone in which the plant is located and the technology used. In the opinion of the Arbitral Tribunal, although these measures may harm economic interests of generators, they have

---

[458] Defence, paras. 178-179; RL-83.
[459] Transcripts 2014, day 2, p. 119, lines 17-31, and p. 120, lines 1-4; RL-97; similarly, the presentation The Sun Can Be Yours 2005 contained a map of the 5 geographic areas of solar radiation in Spain (C-86, p. 6).

been adopted on the basis of objective criteria and cannot be considered irrational or arbitrary.

535. Nor has it been proven that the 2010 norms would be against the public interest. Although there is a debate between the Parties on the evolution of the tariff deficit, it is true that premiums paid to the photovoltaic sector accounted for more than what is paid to all other technologies in absolute terms,[460] and were increasing every year in important proportions.[461] The Arbitral Tribunal also believes that the price paid by domestic consumers per KW/hour was increasing in Spain above the average proportion of the European Union.[462]

536. In view of all these circumstances, it is not arbitrary, irrational or contrary to public interest for the Respondent to have implemented measures to try to limit the deficit and price increases. Furthermore, the Claimants have the burden of proving the arbitrary or irrational nature of the measures under discussion and have not provided such evidence.

537. Nor the Claimants have provided any proof that the other disputed measures, i.e. the requirement to pay a toll of 0.5 Euros/MWh for access to the transportation and distribution network as set by the first transitional provision of RDL 14/2010 and according to European standards, as well as the implementation of security measures against voltage sags of the facilities according to Article 1.5 of RD 1565/2010, were irrational, arbitrary, disproportionate or contrary to public interest and, therefore, contrary to international law.

538. The Kingdom of Spain rightfully argues that the requirement to cover voltage sags is reasonable because it aims at preventing the technical collapse of the system and contributes to ensure better security and better management. The Claimants have alleged that the rules relating to voltage sags would be discriminatory as they would not apply the same compensation provided for wind generation.[463] The Tribunal does not find this argument convincing, as the State may well apply different rules to different industrial sectors without violating the obligation not to discriminate in international law.

---

[460] Presentation by Mac Group-Altran during the hearing on 29 July 2015, p. 3.
[461] Presentation by Mac Group-Altran during the hearing on 29 July 2015, p. 4.
[462] Defence, para. 189; Rejoinder, para. 112; Report RT-1, paras. 354-357.
[463] Claim, para. 187; Reply, paras. 171-172.

539.    In summary, the Tribunal finds that the 2010 norms cannot be considered to violate the ECT.  These rules, in fact, introduce limited amendments to the regulatory framework existing at the time of the investment without eliminating its essential characteristics, in particular the existence of a guaranteed tariff throughout the life of the facility.  The Claimants have not demonstrated that the 2010 norms would violate the legitimate expectations under the ECT by being unreasonable, arbitrary, contrary to public interest, or disproportionate.  Nor is there any proof that these norms were unfair or inconsistent.  Finally, the Claimants have not shown that the 2010 norms had been adopted in violation of Spanish legislative and regulatory due process.[464]

540.    Therefore, the Tribunal considers that on the limited basis of the 2010 norms referred to it by the Claimants, no violation of the obligation of Spain to grant fair and equitable treatment can be proven.

541.    Finally, the Claimants have neither claimed nor shown any violation of Spain's obligation to ensure full protection and security, or the obligation not to take unreasonable or discriminatory measures that could prejudice the management, maintenance, use, enjoyment or liquidation of the investment.

542.    In reaching this conclusion, the Arbitral Tribunal obviously does not in any way prejudge the conclusions that could reach another arbitral tribunal based on the analysis of all the norms adopted to date, including the 2013 norms that have not been examined by the Tribunal by choice of the Parties.

### b)  Retroactivity

543.    The Claimants submit that, in applying immediately to the plants registered in the RAIPRE, the 2010 measures undermined "*acquired rights of T-Solar.*"[465]  The Claimants further argue that "*T-Solar was entitled to a fixed tariff, without hourly restrictions, during the time period established in RD 661/2007.  The substitution of this right by a scattered version that alters the economic balance under which Claimants decided to invest is an act of retroactive regulation incompatible with art. 10(1) of the ECT.*"[466]  In its Reply, the Claimants reiterated this argument, adding that their "acquired right" constituted "*a real asset incorporated to the*

---

[464] The Tribunal shares the observations made by Spain in Exhibit 3 of PHB2, paras. 19-21.
[465] Claim, para. 316.
[466] Claim, para. 327.

*facilities operated by T-Solar, integrated into its heritage, capable of economic assessment and transferable with the facility.*"[467]  The Claimants rely on the award in *CMS v. Argentina* as well as other awards where Argentina was condemned for the effects of the conversion of dollars into pesos.

544.  The Arbitral Tribunal does not agree with the Claimants' argument regarding the alleged retroactivity of the 2010 measures.

545.  Firstly, the present situation is very different from the situation addressed in the *CMS v. Argentina* award, in which there a violation of contractual commitments. In this case, there is no similar commitment.  Here the issue is to determine to what extent the State can modify and immediately apply regulatory measures of general application.

546.  In fact, the Claimants' argument on retroactivity is simply a different formulation of the argument that the State did not have any possibility to alter the legal framework benefiting the Claimant's plants.  However, this Tribunal has already explained that the obligation to accord fair and equitable treatment does not mean that the regulatory framework should remain the same for all eligible plants throughout their lifespans.  In fact, such an approach would amount to freeze the regulatory framework, limiting any change of the regulation to new generation plants that would settle after such changes.

547.  The Tribunal has already determined in previous sections of this award that, in Spanish law, the registration with the RAIPRE was simply an administrative requirement to sell energy and that it did not imply that the registered facilities had a acquired right to a certain remuneration.[468]

548.  The Claimants do not explain in their submissions in what extent should international law lead to the conclusion that there is an acquired right to the maintenance of the tariff, nor the reason why the application of the 2010 norms to plants that were registered with the RAIPRE would violate the ECT.  In this regard, it is not disputed that the 2010 norms applied immediately from their entry into force when the plants were already in operation, but did not apply retroactively to prior periods.  The Arbitral Tribunal considers that there is no principle of international law prohibiting a State to take regulatory measures with immediate

---

[467] Reply, para. 615.
[468] See above, paras. 508-509.

effect in situations in progress except when there are specific commitments as those resulting from a contract. At the very least, the existence of such a principle has not been demonstrated by the Claimants.

549. Based on the foregoing, the Tribunal rejects the Claimants' argument according to which the immediate implementation of the 2010 norms would violate Article 10(1) of the ECT.

## 5. Arbitration costs

### a) Costs of arbitration (Article 43 of the Rules)

550. In accordance with Article 43 of the Rules, the arbitration costs include the fees and expenses of the Arbitral Tribunal, the administrative fee and expenses of the Institute, as well as the reasonable costs incurred by the Parties under Article 44 of the Rules.

551. On 19 January 2016, the Board of the Institute set the arbitration costs as follows:

The fees for the President of the Arbitral Tribunal, Alexis Mourre, amount to […] and compensation for expenses to […];

The fees for the arbitrator Guido Santiago Tawil amount to […] and compensation for expenses […];

The fees for arbitrator Claus Von Wobeser amount to […] and compensation for expenses amount to […].[469]

The administrative fee of the Stockholm Chamber of Commerce amount to […] and the expenses incurred amount to […].[470]

552. According to the above, although the parties had made anticipated deposits of […], the Council of the Institute fixed the total costs in accordance with article 43 of the Rules to […] and […]. The value added tax (V.A.T) must be added to these amounts where applicable.

### b) Reasonable Costs of the Parties (Article 44 of the Rules)

553. On 15 September 2015, each Party submitted its submissions on costs.[471]

---

[469] […]
[470] These expenses are incurred by the SCC to anticipate the expenses of arbitrator Tawil. This sum will thus be only counted once to determine the fixed total cost of the Institute.
[471] On 16 September 2015, the Claimants submitted a supplementary brief completing the expenses incurred for professional services of the Deloitte experts on damages and the amounts paid in respect of arbitration costs.

554. Claimants declared […] Euro incurred for costs of arbitration and request the Tribunal to order Spain to pay all costs and expenses arising from the arbitration proceedings.

555. According to the itemisation of this amount, from the claimed total […] is claimed for the anticipated costs of the arbitration, […] for the costs related to the organisation of hearings and transcripts, […] regarding the Expert fees of Deloitte and […] regarding their lawyers' fees.

556. The Respondent claimed to have incurred a total of […] in costs of arbitration, and asks that the Tribunal to impose such costs on the Claimants and objects to pay any of the costs incurred by the Claimants.

557. According to the itemisation of this amount, from the claimed total […] is claimed for the anticipated costs of the arbitration, […] for the costs related to the organisation of hearings and transcripts,[472] […] regarding Expert fees of Altran Group-Mac, and […] regarding its lawyers' fees.

### c) *Decision of the Arbitral Tribunal on Costs*

558. Article 43(5) of the Rules provides that, unless otherwise agreed by the parties, at the request of a party the Arbitral Tribunal shall allocate the costs of arbitration between them, taking into consideration the outcome of the case and other relevant circumstances.

559. Article 44 of the Rules in turn provides that unless otherwise agreed by the parties, the Arbitral Tribunal may, in the final award and at the request of a party, order a party to pay any reasonable costs incurred by the other party, including costs of legal representation, taking into consideration the outcome of the case and other relevant circumstances.

560. In this case, there is no agreement of the Parties in regards the costs allocation and consequently each Party has asked the Tribunal to order the other Party to pay the incurred costs.

561. The Arbitral Tribunal considers that the Claimants were not successful in their demands and therefore must bear all expenses and the share of the costs of arbitration paid in advance. The Claimants are therefore not entitled to any refund by the Respondent.

---

[472] According to invoices submitted by the Respondent on 09 December 2015.

562.  The Tribunal considers that since the Respondent was successful on the Merits but not regarding the jurisdictional issues raised before this Tribunal, the Respondent is only refunded of a part of its own reasonable costs.

563.  Regarding lawyers' fees, the Arbitral Tribunal notes the disproportion between the amount of […] claimed by the Respondent in fees and expenses of its lawyers and the claim made by the Claimants of […]. The Tribunal considers that Respondent's claims regarding fees is disproportionate in comparison with the value of the claims, which is less than ten million euros. Although the matters under discussion can be complex, the Tribunal considers that the parties could have limited their spending considering the limited value of the dispute.

564.  Thus, the Arbitral Tribunal considers, in light of all relevant circumstances, that the reasonable amount regarding expenses of legal representation is one million Euro.

565.  However, the Tribunal also takes into account that the Respondent has not been successful in its jurisdictional arguments, which, because of their complexity, have occupied a substantial part of the time of the parties and of the Tribunal in this arbitration. The Tribunal therefore considers it appropriate to limit the reimbursement to which the Respondent is entitled to 50% of the costs of reasonable legal representation.

566.  Based on the above, the Arbitral Tribunal decides that the Claimants shall pay the Respondent the sum of 500,000 EUR for costs of legal representation.

567.  As for the costs of the experts, the Respondent contends a sum of […] for fees of the experts. The Arbitral Tribunal considers that, as such expenses were based on the merits part of this arbitration, the Respondent is entitled to full payment of this sum.

568.  As for the share of the arbitration costs fixed by the Council of the Institute were paid in advance by the Respondent, i.e. the sum of 269,208.29 EUR and 10,310 USD the Arbitral Tribunal finds that, for the same reasons given regarding costs of legal representation, Claimants shall pay Respondent half of this amount, i.e. 134,604.14 EUR and 5,155 USD. Value added tax (V.A.T) may be added to this amount if applicable.

569.  Finally, the Respondent is entitled to be paid for their entire share of the costs of organisation of hearings and transcripts, i.e. 16,610.31 EUR.

570.    In conclusion, the Claimants shall pay Respondent the sum of 1,310,785.45 EUR and 5,155 USD for costs and reasonable fees.

571.    The Respondent asks for interests at a "*a reasonable rate*" on such amount from the date on which such costs occurred until the actual payment date.[473]

572.    The Respondent, however, has not demonstrated the date on which it paid the claimed sums and therefore it is not possible in this award to identify the starting date for interests. Consequently, the Arbitral Tribunal will only order interests posterior to this award. Regarding the interest rate applicable, and as the sums have been paid by the Spanish State the Tribunal considers it appropriate to apply the legal rate applicable in Spain.

## X. DECISION

573.    For the reasons stated above, the Arbitral Tribunal:

    a)  Has jurisdiction to resolve the present dispute;

    b)  Rejects Claimants' claims in their entirety;

    c)  Orders the Claimants, jointly and severally, to pay the Respondent:

        -  for arbitration costs, as fixed by the Council of the Institute according to Article 43 of the Rules, the sum of 134,604.14 EUR and 5,155 USD.  The value added tax (V.A.T) must be added if applicable.

        -  for reasonable costs, incurred by the Respondent under Article 44 of the Rules, the sum of 1,176,181.31 EUR.

    d)  The amounts referred to in paragraph (c) will attract interest in favour of the Respondent at the legal rate in force in Spain after the date of this award and until the date of payment.

---

[473] PHB1 Respondent, para. 983(e).

Seat: Madrid, Spain

Date: 21/06/2016

[signature]                              [signature]

Dr. Guido Tawil                    Mr. Claus von Wobeser

(dissenting)

[signature]

Mr. Alexis Mourre

Translation by Mena Chambers

Charanne B.V.
Construction Investments S.A.R.L.

v.

The Kingdom of Spain

(Arbitration No.: 062/2012)


Dissenting Opinion of
Prof. Guido Santiago Tawil

1. I concur with the findings of my distinguished arbitrator colleagues on aspects relating to the recognition of the jurisdiction of this Arbitral Tribunal to resolve this dispute. In that sense, I agree that the Tribunal has jurisdiction to decide the dispute between the Claimants and the Kingdom of Spain under the Energy Charter Treaty ("**ECT**").

2. Regarding the substance, I agree with the standard of "indirect expropriation" applied by the majority of the Arbitral Tribunal in paragraph 461 of the Award, to the extent that it is characterized by the existence of a "substantiate deprivation" of property rights. As the reasoning and decision of this Tribunal was limited - by decisions of the parties – to the issuance and entry into force of RD 1565/2010 and RDL 14/2010 (the "2010 norms" according to the definition used in the Award) and excluding from the analysis norms issued subsequently, I also agree that an indirect expropriation of the investment by the Kingdom of Spain under Article 13(1) of the ECT is not established.

3. Unfortunately, I cannot agree with the rationale and conclusions of the majority on the approach of "*legitimate expectations*" that make up the standard of "*fair and equitable treatment*" under Article 10(1) of the ECT.

4. Firstly, I agree that the verification of whether there has been violation of legitimate expectation must be in accordance with an "objective" standard or analysis - not on the mere subjective belief that the investor may have had at the date of the investment – criterion that must to be evaluated case by case. Consequently, I admit that the application of the principle depends on whether the expectation had been reasonable in the case at hand,[1] with particular relevance on the representations made by the host State to induce the investment and, in that regard, the modification of the legal regime produced once the investment has been made.

5. My disagreement with the majority is that, in my opinion, the creation of legitimate expectations for an investor is not solely limited to the existence of a "specific commitment" – whether of a contractual nature or based on statements or specific terms granted by the host State – but can also originate or be based on the legal order in force when the investment is made.[2]

---

[1] See: Suez, Sociedad General de Aguas de Barcelona SA and Vivendi Universal S.A c. Argentina Republic (ICSID Case No. ARB / 03/19), Award on liability of July 30, 2010, 226.
[2] See: United Nations Conference on Trade and Development (UNCTAD), Fair and Equitable Treatment, 2012, p. 69: "*Suggest Arbitration decisions [...] That an investor May legitimate expectations arising from Either (a) specific Commitments personally addressed to it, for example, in the form of a stabilization clause, or (b) That are not Specifically rules addressed to a private investor but which are put in place with a specific aim to induce*

6. In the case under review, the regulatory scheme of the special regime put in place by the Kingdom of Spain through RD 661/07 and from 1578/08, setting a fixed "Feed in Tariff" ("**FIT**") with a temporal validity – of a minimum – of 25 years which *was declared as not impacted by future tariff revisions*,[3] together with other documents at issued at the same time by the Spanish Government[4] – which although cannot potentially generate legitimate expectations by themselves but are used to interpret the context and the objective of the regulatory measures – appear as decisive, in my opinion, for the investor to decide to invest in photovoltaic plants. Therefore, confronted to the enactment of RD 661/07 and RD1578/08, the applicants could have "objectively" imagined that the tariff regime established in each one of them[5] would be maintained and not altered.

7. In this sense, the system established by RD 661/07 and RD1578/08 constituted a regime of promotion and "*encouragement*", a traditional instrument of economic policy aimed at creating different incentives to direct private capital in a given direction, aim that would probably not be achieved otherwise. This is a legitimate action of the Spanish State directed at "protecting and promoting" these economic activities by individuals that satisfy public needs or general utility, omitting the employment of coercion the beneficial activity that characterise a public service.

---

foreign investments and on which the foreign investor relied in making his investment '. In *Total v. Argentina*, the Tribunal concluded that not only can contracts, concessions and stabilization clauses create legitimate expectations but any intentional conduct from the host State that give the investor the belief that it has "*the intent to pursue a certain conduct in the future*" or that creates "*expectations in potential investors with respect to particular treatment or comportment*". See: *Total S.A. v Argentine Republic* (ICSID Case No. ARB / 04/1), Decision on Liability of 27 December 2010, 119 to 121. In the same vein, Rudolph Dolzer and Christoph Schreuer, "*Principles of International Investment Law, Oxford University Press*," second edition, (2012), p. 145.

[3] See: Article 44.3 of Royal Decree 661/07 ("In 2010, in view of the results of the monitoring reports on the degree of compliance with the Renewable Energy Plan (PER) 2005-2010 Strategy and Efficiency Savings Energy in Spain (E4), as well as new targets to be included in the next Renewable Energy Plan for 2011-2020, it will be proceeded to a revision of tariffs, premiums, supplements and the lower and upper limits defined in this Royal Decree, taking into account the costs associated with each of these technologies, the level of involvement in the special regime regarding the coverage of demand and their impact on technical and economic management of the system, albeit always guaranteeing a reasonable profitability with reference to cost of currency in the capital market. Every four years thereafter, a new review will be performed with the above mentioned criteria. *The revisions to which this section refers for the regulated tariff and the upper and lower limits will not affect the facilities whose commissioning date would be before the first of January of the second following year in which the revision was made*") (Emphasis mine).

[4] View: Renewable Energy Plan 2005-2010, approved by the Spanish government through the Council of Ministers Agreement of 26 August 2005. In the same vein, the document "The sun can be yours" (PHB1 Plaintiffs, to 148.).

[5] With greater incentives for those who availed before September 29, 2008 the regime established by Royal Decree 661/07. See, well, art. 22 of RD 661/07, the CNE resolution of September 27, 2007 and Art. 2 RD 1578/2008.

8.  Moreover, I am of the opinion that the regime implemented by RD 661/07 and RD 1578/08 was not directed at a non-determined "generality" or to a vague and unspecified group, but rather to a small number of potential recipients, who had enough capital to invest in the analysed industry and that the Kingdom of Spain considered appropriate to encourage to do so, avoiding in turn to use its own capital.

9.  This regime did not have a validity *sine* die or indefinite, but required the investment in photovoltaic facilities to be conducted, registered at the registrar[6] and being operational prior to the expiration of a deadline.  Failure to comply with this temporal pattern prevented the access to special benefits established in the regulation.  These two elements, i.e. (i) a provision that created a strong incentive to invest in renewable energy generation, directed to a determinable number of potential applicants and (ii) a short period of coverage allowing entitlement to benefits, hereby directing private capital to the realization of the desired investment, are defining, in my view, to accept the existence of the Claimants' legitimate expectations.

10. Once the Claimants made their investment, complying with all the requirements provided by the norm in force regarding the granting of the expected benefit (in this case the FIT), it does not appear as legally acceptable to recognize a prerogative to the host State to modify and eliminate this benefit without any judicial consequences.

11. There is an argument often used in the Award which considers that admitting legitimate expectations in this case would amount to admit that the regulatory power of the host State is "frozen" *sine die* indefinitely or that the legislation cannot be subsequently modified in accordance with the public interest.  I respectfully disagree with that assessment.  There is no doubt that, as a general rule, there is no acquired right to the maintenance of a particular general legal regime, nor a legitimate expectation to the stability of laws and regulations.  The host State always retains its regulatory power and can modify its legislation, even in cases where a stabilisation cause has been granted.  Nevertheless, if in the valid exercise of that regulatory power of the host State affects acquired rights or legitimate expectations, the State must compensate the damage caused.

---

[6] See: Article 14 of Royal Decree 661/07: "*The definitive registration in the Administrative Register for production facilities under the special regime will be required for this facility to benefit from the regulated economic regime in this decree, with effects from the first day of the month following the date of the facility's commissioning*".

12. In short, when an investor complies with all the requirements established by the legislation in force to be granted a specific and particular benefit, its subsequent ignorance by the host State of the investment violates a legitimate expectation. The Kingdom of Spain was empowered to modify or remove the promotional regime, there was no risk of freezing, petrification or immutability of the regulatory framework. Nevertheless, if the modification of the benefit granted to those who have invested according to this special regime – by establishing in this case a limitation on operating hours and years with a right to a regulated tariff – caused damage without adequate compensation it would violate the legitimate expectations created and, consequently, fair and equitable treatment protected in Article 10 of the ECT.

13. Given the way in which the majority decided, there is no need to give any declaration in relation to the existence or non existence of the alleged damage, its magnitude or the compensation required.

[Signature]
Prof. Guido Santiago Tawil
Arbitrator
Date: 21 December 2015