KADI v COUNCIL AND COMMISSION

## JUDGMENT OF THE COURT OF FIRST INSTANCE
### (Second Chamber, Extended Composition)
### 21 September 2005 [*]

In Case T-315/01,

**Yassin Abdullah Kadi,** residing in Jeddah (Saudi Arabia), represented by D. Pannick QC, P. Saini, Barrister, G. Martin and A. Tudor, Solicitors, with an address for service in Luxembourg,

applicant,

v

**Council of the European Union,** represented by M. Vitsentzatos and M. Bishop, acting as Agents,

and

**Commission of the European Communities,** represented by A. Van Solinge and C. Brown, acting as Agents, with an address for service in Luxembourg,

defendants,

[*] Language of the case: English.

II - 3659

supported by

**United Kingdom of Great Britain and Northern Ireland,** represented initially by J.E. Collins, and subsequently by R. Caudwell, acting as Agents, and S. Moore, Barrister, with an address for service in Luxembourg,

intervener,

APPLICATION, originally, for annulment of, first, Council Regulation (EC) No 467/2001 of 6 March 2001 prohibiting the export of certain goods and services to Afghanistan, strengthening the flight ban and extending the freeze of funds and other financial resources in respect of the Taliban of Afghanistan, and repealing Regulation (EC) No 337/2000 (OJ 2001 L 67, p. 1) and, second, Commission Regulation (EC) No 2062/2001 of 19 October 2001 amending, for the third time, Regulation No 467/2001 (OJ 2001 L 277, p. 25) and, subsequently, for annulment of Council Regulation (EC) No 881/2002 of 27 May 2002 imposing certain specific restrictive measures directed against certain persons and entities associated with Usama bin Laden, the Al-Qaeda network and the Taliban, and repealing Regulation No 467/2001 (OJ 2002 L 139, p. 9), in so far as those acts concern the applicant,

THE COURT OF FIRST INSTANCE
OF THE EUROPEAN COMMUNITIES
(Second Chamber, Extended Composition),

composed of N.J. Forwood, President, J. Pirrung, P. Mengozzi, A.W.H. Meij and M. Vilaras, Judges,

Registrar: H. Jung,

having regard to the written procedure and further to the hearing on 14 October 2003,

gives the following

## Judgment

### Legal framework

1    Under Article 24(1) of the Charter of the United Nations, signed at San Francisco (United States of America) on 26 June 1945, the members of the United Nations 'confer on the Security Council primary responsibility for the maintenance of international peace and security, and agree that in carrying out its duties under this responsibility the Security Council acts on their behalf'.

2    Under Article 25 of the Charter of the United Nations, '[t]he Members of the United Nations agree to accept and carry out the decisions of the Security Council in accordance with the present Charter'.

3    In accordance with Article 48(2) of the Charter of the United Nations, the decisions of the Security Council for the maintenance of international peace and security 'shall be carried out by the Members of the United Nations directly and through their action in the appropriate international agencies of which they are members'.

4    According to Article 103 of the Charter of the United Nations, '[i]n the event of a conflict between the obligations of the Members of the United Nations under the present Charter and their obligations under any other international agreement, their obligations under the present Charter shall prevail.'

5    In accordance with Article 11(1) EU:

'The Union shall define and implement a common foreign and security policy covering all areas of foreign and security policy, the objectives of which shall be:

—   to safeguard the common values, fundamental interests, independence and integrity of the Union in conformity with the principles of the United Nations Charter,

—   to strengthen the security of the Union in all ways,

—   to preserve peace and strengthen international security, in accordance with the principles of the United Nations Charter ...'

6    Under Article 301 EC:

'Where it is provided, in a common position or in a joint action adopted according to the provisions of the Treaty on European Union relating to the common foreign

II - 3662

and security policy, for an action by the Community to interrupt or to reduce, in part or completely, economic relations with one or more third countries, the Council shall take the necessary urgent measures. The Council shall act by a qualified majority on a proposal from the Commission.

7    Article 60(1) EC provides:

'If, in the cases envisaged in Article 301, action by the Community is deemed necessary, the Council may, in accordance with the procedure provided for in Article 301, take the necessary urgent measures on the movement of capital and on payments as regards the third countries concerned.'

8    In accordance with the first paragraph of Article 307 EC:

'The rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of this Treaty.'

9    Lastly, Article 308 EC provides:

'If action by the Community should prove necessary to attain, in the course of the operation of the common market, one of the objectives of the Community, and this Treaty has not provided the necessary powers, the Council shall, acting unanimously on a proposal from the Commission and after consulting the European Parliament, take the appropriate measures.'

JUDGMENT OF 21. 9. 2005 — CASE T-315/01

**Background to the dispute**

10    On 15 October 1999 the Security Council of the United Nations ('the Security Council') adopted Resolution 1267 (1999), in which it inter alia condemned the fact that Afghan territory continued to be used for the sheltering and training of terrorists and planning of terrorist acts, reaffirmed its conviction that the suppression of international terrorism was essential for the maintenance of international peace and security and deplored the fact that the Taliban continued to provide safe haven to Usama bin Laden and to allow him and others associated with him to operate a network of terrorist training camps from territory held by the Taliban and to use Afghanistan as a base from which to sponsor international terrorist operations. In the second paragraph of the resolution the Security Council demanded that the Taliban should without further delay turn Usama bin Laden over to the appropriate authorities. In order to ensure compliance with that demand, paragraph 4(b) of Resolution 1267 (1999) provides that all the States must, in particular, 'freeze funds and other financial resources, including funds derived or generated from property owned or controlled directly or indirectly by the Taliban, or by any undertaking owned or controlled by the Taliban, as designated by the Committee established by paragraph 6 below, and ensure that neither they nor any other funds or financial resources so designated are made available, by their nationals or by any persons within their territory, to or for the benefit of the Taliban or any undertaking owned or controlled, directly or indirectly, by the Taliban, except as may be authorised by the Committee on a case-by-case basis on the grounds of humanitarian need'.

11    In paragraph 6 of Resolution 1267 (1999) the Security Council decided to establish, in accordance with rule 28 of its provisional rules of procedure, a committee of the Security Council composed of all its members ('the Sanctions Committee'), responsible in particular for ensuring that the States implement the measures imposed by paragraph 4, designating the funds or other financial resources referred to in paragraph 4 and considering requests for exemptions from the measures imposed by paragraph 4.

12    Taking the view that action by the Community was necessary in order to implement that resolution, on 15 November 1999 the Council adopted Common Position 1999/727/CFSP concerning restrictive measures against the Taliban (OJ 1999 L 294, p. 1). Article 2 of that Common Position prescribes the freezing of funds and other financial resources held abroad by the Taliban under the conditions set out in Security Council Resolution 1267 (1999).

13    On 14 February 2000, on the basis of Articles 60 EC and 301 EC, the Council adopted Regulation (EC) No 337/2000 concerning a flight ban and a freeze of funds and other financial resources in respect of the Taliban of Afghanistan (OJ 2000 L 43, p. 1).

14    On 19 December 2000 the Security Council adopted Resolution 1333 (2000), demanding, inter alia, that the Taliban should comply with Resolution 1267 (1999), and, in particular, that they should cease to provide sanctuary and training for international terrorists and their organisations and turn Usama bin Laden over to appropriate authorities to be brought to justice. The Security Council decided in particular to strengthen the flight ban and freezing of funds imposed under Resolution 1267 (1999). Accordingly paragraph 8(c) of Resolution 1333 (2000) provides that the States are, inter alia, '[t]o freeze without delay funds and other financial assets of Usama bin Laden and individuals and entities associated with him as designated by the [Sanctions Committee], including those in the Al-Qaeda organisation, and including funds derived or generated from property owned or controlled directly or indirectly by Usama bin Laden and individuals and entities associated with him, and to ensure that neither they nor any other funds or financial resources are made available, by their nationals or by any persons within their territory, directly or indirectly for the benefit of Usama bin Laden, his associates or any entities owned or controlled, directly or indirectly, by Usama bin Laden or individuals and entities associated with him including the Al-Qaeda organisation'.

JUDGMENT OF 21. 9. 2005 — CASE T-315/01

15    In the same provision, the Security Council instructed the Sanctions Committee to maintain an updated list, based on information provided by the States and regional organisations, of the individuals and entities designated as associated with Usama bin Laden, including those in the Al-Qaeda organisation.

16    In paragraph 23 of Resolution 1333 (2000), the Security Council decided that the measures imposed inter alia by paragraph 8 were to be established for 12 months and that, at the end of that period, it would decide whether to extend them for a further period on the same conditions.

17    Taking the view that action by the Community was necessary in order to implement that resolution, on 26 February 2001 the Council adopted Common Position 2001/154/CFSP concerning additional restrictive measures against the Taliban and amending Common Position 96/746/CFSP (OJ 2001 L 57, p. 1). Article 4 of that Common Position provides:

'Funds and other financial assets of Usama bin Laden and individuals and entities associated with him, as designated by the Sanctions Committee, will be frozen, and funds or other financial resources will not be made available to Usama bin Laden and individuals or entities associated with him as designated by the Sanctions Committee, under the conditions set out in [Resolution 1333 (2000)].'

18    On 6 March 2001, on the basis of Articles 60 EC and 301 EC, the Council adopted Regulation (EC) No 467/2001 prohibiting the export of certain goods and services to Afghanistan, strengthening the flight ban and extending the freeze of funds and other financial resources in respect of the Taliban of Afghanistan, and repealing Regulation No 337/2000 (OJ 2001 L 67, p. 1).

II - 3666

19    Article 1 of Regulation No 467/2001 defines what is meant by 'funds' and 'freezing of funds'.

20    Under Article 2 of Regulation No 467/2001:

'All funds and other financial resources belonging to any natural or legal person, entity or body designated by the ... Sanctions Committee and listed in Annex I shall be frozen.

No funds or other financial resources shall be made available, directly or indirectly, to or for the benefit of, persons, entities or bodies designated by the Taliban Sanctions Committee and listed in Annex I.

Paragraphs 1 and 2 shall not apply to funds and financial resources for which the Taliban Sanctions Committee has granted an exemption. Such exemptions shall be obtained through the competent authorities of the Member States listed in Annex II.'

21    Annex I to Regulation No 467/2001 contains the list of persons, entities and bodies affected by the freezing of funds imposed by Article 2. Under Article 10(1) of Regulation No 467/2001, the Commission was empowered to amend or supplement Annex I on the basis of determinations made by either the Security Council or the Sanctions Committee.

22    On 8 March 2001 the Sanctions Committee published a first consolidated list of the entities which and the persons who must be subjected to the freezing of funds pursuant to Security Council Resolutions 1267 (1999) and 1333 (2000) (see the Committee's press release AFG/131 SC/7028 of 8 March 2001). That list has since been amended and supplemented several times. The Commission has in consequence adopted various regulations pursuant to Article 10 of Regulation No 467/2001, in which it has amended or supplemented Annex I to that regulation.

23    On 19 October 2001 the Sanctions Committee published a new addition to its list of 8 March 2001, including in particular the name of the following person:

—  'Al-Qadi, Yasin (A.K.A. Kadi, Shaykh Yassin Abdullah; A.K.A. Kahdi, Yasin), Jeddah, Saudi Arabia'.

24    By Commission Regulation (EC) No 2062/2001 of 19 October 2001 amending, for the third time, Regulation No 467/2001 (OJ 2001 L 277, p. 25), the name of the person in question was added, with others, to Annex I to that regulation.

25    On 16 January 2002 the Security Council adopted Resolution 1390 (2002), which lays down the measures to be directed against Usama bin Laden, members of the Al-Qaeda network and the Taliban and other associated individuals, groups, undertakings and entities. Articles 1 and 2 of that resolution provide, in essence, that the measures, in particular the freezing of funds, imposed by Article 4(b) of Resolution 1267 (1999) and Article 8(c) of Resolution 1333 (2000) are to be maintained. In accordance with paragraph 3 of Resolution 1390 (2002), those measures are to be

KADI v COUNCIL AND COMMISSION

reviewed by the Security Council 12 months after their adoption, at the end of which period the Council will either allow those measures to continue or decide to improve them.

26    Taking the view that action by the Community was necessary in order to implement that resolution, on 27 May 2002 the Council adopted Common Position 2002/402/ CFSP concerning restrictive measures against Usama bin Laden, members of the Al-Qaeda organisation and the Taliban and other individuals, groups, undertakings and entities associated with them and repealing Common Positions 96/746, 1999/727, 2001/154 and 2001/771/CFSP (OJ 2002 L 139, p. 4). Article 3 of that Common Position prescribes, inter alia, the continuation of the freezing of the funds and other financial assets or economic resources of the individuals, groups, undertakings and entities referred to in the list drawn up by the Sanctions Committee in accordance with Security Council Resolutions 1267 (1999) and 1333 (2000).

27    On 27 May 2002, on the basis of Articles 60 EC, 301 EC and 308 EC, the Council adopted Regulation (EC) No 881/2002 imposing certain specific restrictive measures directed against certain persons and entities associated with Usama bin Laden, the Al-Qaeda network and the Taliban, and repealing Council Regulation (EC) No 467/2001 (OJ 2002 L 139, p. 9).

28    According to the fourth recital in the preamble to that regulation, the measures laid down by, inter alia, Security Council Resolution 1390 (2002) fall within the scope of the Treaty and, 'therefore, notably with a view to avoiding distortion of competition, Community legislation is necessary to implement the relevant decisions of the Security Council as far as the territory of the Community is concerned'.

29    Article 1 of Regulation No 881/2002 defines 'funds' and 'freezing of funds' in terms which are essentially identical to those used in Article 1 of Regulation No 467/2001.

30    Under Article 2 of Regulation No 881/2002:

'All funds and economic resources belonging to, or owned or held by, a natural or legal person, group or entity designated by the Sanctions Committee and listed in Annex I shall be frozen.

No funds shall be made available, directly or indirectly, to, or for the benefit of, a natural or legal person, group or entity designated by the Sanctions Committee and listed in Annex I.

No economic resources shall be made available, directly or indirectly, to, or for the benefit of, a natural or legal person, group or entity designated by the Sanctions Committee and listed in Annex I, so as to enable that person, group or entity to obtain funds, goods or services.'

31    Annex I to Regulation No 881/2002 contains the list of persons, groups and entities affected by the freezing of funds imposed by Article 2. That list includes, inter alia, the name of the following natural person: 'Al-Qadi, Yasin (aka Kadi, Shaykh Yassin Abdullah; aka Kahdi, Yasin), Jeddah, Saudi Arabia'.

32    On 20 December 2002 the Security Council adopted Resolution 1452 (2002), intended to facilitate the implementation of counter-terrorism obligations. Paragraph 1 of that resolution provides for a number of derogations from and exceptions to the freezing of funds and economic resources imposed by Resolutions 1267 (1999), 1333 (2000) and 1390 (2002) which may be granted by the Member States on humanitarian grounds, on condition that the Sanctions Committee gives its consent.

33    On 17 January 2003 the Security Council adopted Resolution 1455 (2003), intended to improve the implementation of the measures imposed in paragraph 4(b) of Resolution 1267 (1999), paragraph 8(c) of Resolution 1333 (2000) and paragraphs 1 and 2 of Resolution 1390 (2002). In accordance with paragraph 2 of Resolution 1455 (2003), those measures are again to be improved after 12 months or earlier if necessary.

34    Taking the view that action by the Community was necessary in order to implement Security Council Resolution 1452 (2002), on 27 February 2003 the Council adopted Common Position 2003/140/CFSP concerning exceptions to the restrictive measures imposed by Common Position 2002/402/CFSP (OJ 2003 L 53, p. 62). Article 1 of that Common Position provides that, when implementing the measures set out in Article 3 of Common Position 2002/402/CFSP, the European Community is to provide for the exceptions permitted by United Nations Security Council Resolution 1452 (2002).

35    On 27 March 2003 the Council adopted Regulation (EC) No 561/2003 amending, as regards exceptions to the freezing of funds and economic resources, Regulation (EC) No 881/2002 (OJ 2003 L 82, p. 1). In the fourth recital in the preamble to that regulation, the Council states that it is necessary, in view of the Security Council's Resolution 1452 (2002), to adjust the measures imposed by the Community.

36    Under Article 1 of Regulation No 561/2003:

'The following Article shall be inserted in Regulation (EC) No 881/2002:

"*Article 2a*

1. Article 2 shall not apply to funds or economic resources where:

II - 3671

(a) any of the competent authorities of the Member States, as listed in Annex II, has determined, upon a request made by an interested natural or legal person, that these funds or economic resources are:

   (i) necessary to cover basic expenses, including payments for foodstuffs, rent or mortgage, medicines and medical treatment, taxes, insurance premiums, and public utility charges;

   (ii) intended exclusively for payment of reasonable professional fees and reimbursement of incurred expenses associated with the provision of legal services;

   (iii) intended exclusively for payment of fees or service charges for the routine holding or maintenance of frozen funds or frozen economic resources; or

   (iv) necessary for extraordinary expenses; and

(b) such determination has been notified to the Sanctions Committee; and

(c) (i) in the case of a determination under point (a)(i), (ii) or (iii), the Sanctions Committee has not objected to the determination within 48 hours of notification; or

(ii) in the case of a determination under point (a)(iv), the Sanctions Committee has approved the determination.

2. Any person wishing to benefit from the provisions referred to in paragraph 1 shall address its request to the relevant competent authority of the Member State as listed in Annex II.

The competent authority listed in Annex II shall promptly notify both the person that made the request, and any other person, body or entity known to be directly concerned, in writing, whether the request has been granted.

The competent authority shall also inform other Member States whether the request for such an exception has been granted.

3. Funds released and transferred within the Community in order to meet expenses or recognised by virtue of this Article shall not be subject to further restrictive measures pursuant to Article 2.

..."'.

**Procedure and forms of order sought by the parties**

37    By application lodged at the Registry of the Court of First Instance on 18 December 2001, registered under No T-315/01, Yassin Abdullah Kadi brought an action against the Council and the Commission under Article 230 EC, claiming that the Court should:

— annul Regulations Nos 2062/2001 and 467/2001, in so far as they relate to the applicant;

— order the Council and/or the Commission to pay the costs.

38    In their defences, lodged at the Registry of the Court of First Instance on 20 and 21 February 2002 respectively, the Council and the Commission contend that the Court should:

— dismiss the application;

— order the applicant to pay the costs.

39    By letter from the Court Registry of 13 June 2002, the parties were invited to submit their observations on the consequences of repeal of Regulation No 467/2001 and of its replacement by Regulation No 881/2002.

KADI v COUNCIL AND COMMISSION

40    By act lodged at the Court Registry on 28 June 2002, annexed to his observations, the applicant extended his original claims and pleas in law to Regulation No 881/2002 ('the contested regulation'), in so far as it concerned him.

41    In its observations lodged at the Registry on 28 June 2002, the Council declared that it had no objection to that extension of the original claims and pleas in law set out in the application.

42    In its observations lodged at the Registry on 1 July 2002, the Commission argued that the original application must be dismissed as inadmissible, inasmuch as it is directed against Regulation No 467/2001, as the conditions laid down in the fourth and fifth paragraphs of Article 230 EC have not been satisfied. According to that institution, the original claim for annulment of that regulation can be understood only as an objection of illegality under Article 241 EC. The original application must therefore be seen as directed principally against Regulation No 2062/2001 and as challenging Regulation No 467/2001 only indirectly. Nevertheless, in the interests of due administration of justice and procedural economy, and in view of the fact that the legal effects of Regulation No 2062/2001 are continued in the contested regulation, the Commission does not object to the applicant's amending his pleadings to include the last-mentioned regulation.

43    Furthermore, the Commission asks the Court to find, in accordance with Article 113 of its Rules of Procedure, that the action against Regulation No 2062/2001 has become devoid of purpose and that there is no need to adjudicate on it, that regulation having lost all legal effect as a result of the repeal of Regulation No 467/2001 and its replacement by the contested regulation. To that effect it cites Joined Cases 294/86 and 77/87 *Technointorg* v *Commission and Council* [1988] ECR 6077, and Case T-13/96 *TEAM and Kolprojekt* v *Commission* [1997] ECR II-983.

JUDGMENT OF 21. 9. 2005 — CASE T-315/01

44    In addition, the Commission requests, pursuant to Articles 115(1) and 116(6) of the Rules of Procedure, that it should be granted the status of intervener in support of the forms of order sought by the Council, and maintains its contention that the applicant should pay the costs incurred by the Commission in the period during which the applicant challenged Regulation No 2062/2001.

45    By order of the President of the First Chamber of the Court of First Instance of 10 September 2002, the United Kingdom of Great Britain and Northern Ireland was given leave to intervene in support of the forms of order sought by the defendants, pursuant to Article 116(6) of the Rules of Procedure.

46    As a result of the changes to the composition of the chambers of the Court of First Instance in the new judicial year beginning 1 October 2002, the Judge-Rapporteur was attached to the Second Chamber, to which this case has, in consequence, been assigned.

47    After hearing the parties the Court referred the case to a Chamber composed of five Judges, in accordance with Article 51 of its Rules of Procedure.

48    Upon hearing the Report of the Judge-Rapporteur, the Court of First Instance (Second Chamber, Extended Composition) decided to open the oral procedure and, in respect of the measures of organisation of procedure provided for in Article 64 of the Rules of Procedure, put some written questions to the Council and the Commission, which answered them within the period prescribed.

49    By order of the President of the Second Chamber (Extended Composition) of the Court of First Instance of 18 September 2003, this case and Case T-306/01 *Aden and Others* v *Council and Commission* were joined for the purposes of the oral procedure, in accordance with Article 50 of the Rules of Procedure.

50    By letter of 8 October 2003 the applicant asked the Court of First Instance to add to the file the Terrorism (United Nations Measures) Order 2001 (order of the United Kingdom of 2001 concerning terrorism). By letter of even date, the Commission asked the Court of First Instance to add to the file the 'Guidelines of the [Sanctions] Committee for the conduct of its work', as adopted by that Committee on 7 November 2002 and amended on 10 April 2003. The two requests were granted by the President of the Second Chamber (Extended Composition) of the Court of First Instance on 9 October 2003.

51    The oral arguments of the parties were heard, and their replies to the questions asked by the Court of First Instance were given, at the hearing of 14 October 2003.

**On the procedural consequences of the adoption of the contested regulation**

52    The main parties in the proceedings are at one in acknowledging that the applicant is entitled to alter his claims and pleas in law so as to seek annulment of the contested regulation that repeals and replaces Regulation No 467/2001, as amended by Regulation No 2062/2001. By document lodged at the Registry on 28 June 2002, the applicant in fact requested that his original claims and pleas in law be modified to that effect.

53    On this point, it must be borne in mind that where, during the proceedings, one decision is replaced by another having the same subject-matter, this must be considered a new factor allowing the applicant to adapt its pleas in law and claims for relief. It would indeed be contrary to the due administration of justice and the requirements of procedural economy to oblige the applicant to make a fresh application. Moreover, it would be inequitable if the defendant institution were able, in order to counter criticisms of a decision contained in an application made to the Community judicature, to amend the contested decision or to substitute another for it and to rely in the proceedings on such an amendment or substitution in order to

deprive the other party of the opportunity of extending his original pleadings to the later decision or of submitting supplementary pleadings directed against that decision (Case 14/81 *Alpha Steel* v *Commission* [1982] ECR 749, paragraph 8; Joined Cases 351/85 and 360/85 *Fabrique de Fer de Charleroi and Dillinger Huttenwerke* v *Commission* [1987] ECR 3639, paragraph 11; Case 103/85 *Stahlwerke Peine-Salzgitter* v *Commission* [1988] ECR 4131, paragraphs 11 and 12, and Joined Cases T-46/98 and T-151/98 *CEMR* v *Commission* [2000] ECR II-167, paragraph 33).

54    That case-law may be applied to a situation in which a regulation of direct and individual concern to a person is replaced, during the proceedings, by another regulation having the same subject-matter.

55    That hypothesis corresponding on all points to that at issue in this case, the applicant's request that his action should seek annulment of the contested regulation, in so far as it concerns him, must be allowed, and the parties must be permitted to redraft their claims for relief, pleas in law and arguments in the light of that new factor.

56    In those circumstances, it must be held that the applicant's original application for annulment in part of Regulation No 467/2001 has become devoid of purpose on account of the repeal of that act by the contested regulation. There is, therefore, no longer any need to give a decision on that application or, consequently, on the objection of inadmissibility raised by the Commission (see paragraph 42 above). Nor are there grounds for ruling on the application for annulment in part of Regulation No 2062/2001, that too having been rendered devoid of purpose.

57    It follows from the foregoing that there are no longer any grounds for ruling on the action in so far as it is directed against the Commission. In the circumstances of the case, however, the principle of proper administration of justice and the requirements

of procedural economy on which the decisions cited in paragraph 53 above are based provide justification for account to be taken also of the Commission's claims, pleas in law and arguments, redrafted as mentioned in paragraph 55 above, but without its being necessary formally to readmit that institution to the proceedings under Articles 115(1) and 116(6) of the Rules of Procedure, as intervening in support of the forms of order sought by the Council.

58    Having regard to the foregoing, this action must be regarded as being directed henceforth against the Council alone, supported by the Commission and the United Kingdom, and its sole object must be considered to be a claim for annulment of the contested regulation, in so far as it concerns the applicant.

**On the substance**

1. *Preliminary considerations*

59    In support of his claims, the applicant has put forward in his application three grounds of annulment alleging breaches of his fundamental rights. The first alleges breach of the right to a fair hearing, the second, breach of the right to respect for property and of the principle of proportionality, and the third, breach of the right to effective judicial review.

60    In his reply, the applicant put forward a fourth ground, alleging lack of competence and that acts were adopted ultra vires, in that the defendant institutions adopted Regulations Nos 467/2001 and 2062/2001 on the basis of Articles 60 EC and 301 EC, whereas those provisions authorise the Community to interrupt or reduce relations

JUDGMENT OF 21. 9. 2005 — CASE T-315/01

with third countries, but not to freeze individuals' assets. However, following repeal of Regulation No 467/2001 and its replacement by the contested regulation, adopted on the basis of Articles 60 EC, 301 EC and 308 EC, the applicant stated in his observations lodged at the Court Registry on 28 June 2002 that he withdrew that new ground of annulment.

61    The Court has nevertheless decided to consider of its own motion whether the Council was competent to adopt the contested regulation on the legal basis of Articles 60 EC, 301 EC and 308 EC. In point of fact, the ground of annulment based on the alleged incompetence of the author of the contested act is a matter of public policy (Opinion of Advocate General Lagrange in Case 66/63 *Netherlands* v *High Authority* [1964] ECR 533, at p. 553) and may therefore be considered by the Community judicature of its own motion (Case 14/59 *Société des fonderies de Pont-à-Mousson* v *High Authority* [1959] ECR 215, at p. 229; Case 19/58 *Germany* v *High Authority* [1960] ECR 225, at p. 233; Case 108/81 *Amylum* v *Council* [1982] ECR 3107, paragraph 28; Case C-210/98 P *Salzgitter* v *Commission* [2000] ECR I-5843, paragraph 56; Joined Cases T-79/89, T-84/89, T-85/89, T-86/89, T-89/89, T-91/89, T-92/89, T-94/89, T-96/89, T-98/89, T-102/89 and T-104/89 *BASF and Others* v *Commission* [1992] ECR II-315, paragraph 31, and Case T-182/94 *Marx Esser and Del Amo Martinez* v *Parliament* [1996] ECR-SC I-A-411 and II-1197, paragraph 44).

62    Neither the Council nor the Commission having had the opportunity during the written procedure to take up a position on that point, the Court invited them to do so in writing as part of the measures of organisation of procedure (see paragraph 48 above). Those institutions have complied with the Court's request within the period allowed them for that purpose. Furthermore, at the hearing the applicant challenged the Council's competence to adopt the contested regulation on the basis of Articles 60 EC, 301 EC and 308 EC. The United Kingdom also expressed its opinion on that question at the hearing.

63    The Court has decided to rule first of all on the plea, raised of its own motion, that it was not within the Council's competence to adopt the contested regulation. The Court will then go on to rule on the three grounds of annulment based on breach of the applicant's fundamental rights, taking them together.

2. *Concerning the ground of annulment alleging that the Council lacked competence to adopt the contested regulation*

*Questions asked by the Court and the parties' answers*

64    In its written questions addressed to the Council and the Commission, the Court of First Instance recalled that in its Opinion 2/94 of 28 March 1996 (ECR I-1759, paragraphs 29 and 30) the Court of Justice stated that Article 235 of the EC Treaty (now Article 308 EC) is designed to fill the gap where no specific provisions of the Treaty confer on the Community institutions express or implied powers to act, if such powers appear none the less to be necessary to enable the Community to carry out its functions with a view to attaining one of the objectives laid down by the Treaty. That provision, being an integral part of an institutional system based on the principle of conferred powers, cannot serve as a basis for widening the scope of Community powers beyond the general framework created by the provisions of the Treaty as a whole and, in particular, by those that define the tasks and the activities of the Community. On any view, Article 235 cannot be used as a basis for the adoption of provisions the effects of which would, in substance, amount to an amendment of the Treaty without following the procedure which it provides for that purpose. In the light of that Opinion, the Court of First Instance has more particularly asked the Council and the Commission to state what Community objectives under the EC Treaty they sought to attain by means of the provisions laid down in the contested regulation.

65    The Council answered, in essence, that those provisions pursue an objective of economic and financial coercion which is, in its view, an objective of the EC Treaty.

66    On this point, the Council argues that the Community's objectives are not only those defined in Article 3 EC, but that they may also flow from more specific provisions.

67    The determining element in this respect lies, according to the Council, in the fact that since the revision under the Maastricht Treaty, Articles 60 EC and 301 EC have defined the tasks and activities of the Community in the domain of economic and financial sanctions and have offered a legal basis for an express transfer of powers to the Community in order to attain them. Those powers are expressly linked to and actually depend on the adoption of an act pursuant to the provisions of the Treaty on European Union in the field of the common foreign and security policy (CFSP). Now, one of the objectives of the CFSP is, under the third indent of Article 11(1), 'to preserve peace and strengthen international security, in accordance with the principles of the United Nations Charter'.

68    It should therefore be accepted that economic and financial coercion for reasons of policy, especially in the implementing of a binding decision of the Security Council, constitutes an express and legitimate objective of the EC Treaty, even if that objective is marginal, linked only indirectly to the main objectives of that Treaty, in particular those concerned with the free movement of capital (Article 3(1)(c) EC) and the establishment of a system ensuring that competition in the internal market is not distorted (Article 3(1)(g) EC), and linked to the Treaty on European Union.

69    The Council submits that, in the circumstances of this case, Article 308 EC was included as a legal basis for the contested regulation in order to supplement the base supplied by Articles 60 EC and 301 EC, so as to make it possible to adopt measures not only in respect of third countries but also in respect of individuals who and non-State bodies which are not necessarily linked to the governments or regimes of those countries, in cases where the EC Treaty does not provide the powers of action necessary to that end.

70    By so doing, the Community has been able, continues the Council, to keep up with the development of international practice, which has been to adopt 'smart sanctions' aimed at individuals who pose a threat to international security rather than at innocent populations.

KADI v COUNCIL AND COMMISSION

71    The Council maintains that the conditions in which it had recourse to Article 308 EC are no different from those in which that provision has been used in the past in order to attain one of the objects of the EC Treaty in the course of the operation of the common market, where the Treaty has not provided the powers of action necessary to that end. To that effect it refers:

— in the sphere of social policy, to the various directives which, on the basis of Article 235 of the EC Treaty, sometimes supplemented by Article 100 of the EC Treaty (now Article 94 EC), have extended the principle of equal pay for male and female workers, as laid down in Article 119 of the EC Treaty (Articles 117 to 120 of the EC Treaty have been replaced by Articles 136 EC to 143 EC), to convert it into a general principle of equal treatment in all areas in which potential discrimination might subsist and to allow self-employed workers, including those in the agricultural sector, to benefit from it too, in particular Council Directive 76/207/EEC of 9 February 1976 on the implementation of the principle of equal treatment for men and women as regards access to employment, vocational training and promotion, and working conditions (OJ 1976 L 39, p. 40); Council Directive 79/7/EEC of 19 December 1978 on the progressive implementation of the principle of equal treatment for men and women in matters of social security (OJ 1979 L 6, p. 24); Council Directive 86/378/EEC of 24 July 1986 on the implementation of the principle of equal treatment for men and women in occupational social security schemes (OJ 1986 L 225, p. 40) and Council Directive 86/613/EEC of 11 December 1986 on the application of the principle of equal treatment between men and women engaged in an activity, including agriculture, in a self-employed capacity, and on the protection of self-employed women during pregnancy and motherhood (OJ 1986 L 359, p. 56);

— in the sphere of free movement of persons, to the various acts which, on the basis of Article 235 of the EC Treaty and Article 51 of the EC Treaty (now, after amendment, Article 42 EC), have extended to self-employed persons, to members of their families and to students the rights enjoyed by employed

JUDGMENT OF 21. 9. 2005 — CASE T-315/01

persons moving within the Community, in particular Council Regulation (EEC) No 1390/81 of 12 May 1981 extending to self-employed persons and members of their families Regulation (EEC) No 1408/71 on the application of social security schemes to employed persons and their families moving within the Community (OJ 1981 L 143, p. 1);

— and, more recently, to Council Regulation (EC) No 1035/97 of 2 June 1997 establishing a European Monitoring Centre on Racism and Xenophobia (OJ 1997 L 151, p. 1), adopted on the basis of Article 213 of the EC Treaty (now Article 284 EC) and Article 235 of the EC Treaty.

72    The Court of Justice itself has confirmed that this practice is lawful (Case C-114/88 *Delbar* [1989] ECR 4067).

73    What is more, the Community legislature has in the past resorted to the legal basis of Article 235 of the EC Treaty in the field of sanctions. On this point, the Council explains that, before Articles 301 EC and 60 EC were added to the EC Treaty, various Council regulations imposing commercial sanctions were based on Article 113 of the EC Treaty (now, after amendment, Article 133 EC) (see, for example, Council Regulation (EEC) No 596/82 of 15 March 1982 amending the import arrangements for certain products originating in the USSR (OJ 1982 L 72, p. 15); Council Regulation (EEC) No 877/82 of 16 April 1982 suspending imports of all products originating in Argentina (OJ 1982 L 102, p. 1) and Council Regulation (EEC) No 3302/86 of 27 October 1986 suspending imports of gold coins from the Republic of South Africa (OJ 1986 L 305, p. 11)). However, when those measures went beyond the ambit of the common commercial policy or concerned natural or legal persons within the Community, they were also based on Article 235 of the EC Treaty. Such was the case in particular of Council Regulation (EEC) No 3541/92 of 7 December 1992 prohibiting the satisfying of Iraqi claims with regard to contracts

II - 3684

KADI v COUNCIL AND COMMISSION

and transactions, the performance of which was affected by United Nations Security Council Resolution 661 (1990) and related resolutions (OJ 1992 L 361, p. 1), Article 2 of which provides that '[i]t shall be prohibited to satisfy or to take any step to satisfy a claim made by ... any person or body acting, directly or indirectly, on behalf of or for the benefit of one or more persons or bodies in Iraq'.

74    In answer to those same questions asked by the Court of First Instance, the Commission has argued that implementation of sanctions imposed by the Security Council could fall, in whole or in part, within the scope of the EC Treaty, either under the common commercial policy or in connection with the internal market.

75    In this instance, the Commission maintains, referring to the fourth recital in the preamble to the contested regulation, that the measures at issue were necessary to ensure uniform implementation and application of the restrictions on the movement of capital introduced in accordance with the resolutions concerned of the Security Council, so as to preserve the free movement of capital within the Community and to avoid distortions of competition.

76    Furthermore, the Commission considers that the promotion of international security, both within the Union and without, must be regarded as forming part of the general framework of the provisions of the EC Treaty. In that regard, it refers first to Articles 3 EU and 11 EU and second to the preamble to the EC Treaty, in which the Contracting Parties confirmed 'the solidarity which binds Europe and the overseas countries ... in accordance with the principles of the Charter of the United Nations' and declared themselves resolved to 'strengthen peace and liberty'. The Commission infers therefrom a 'general objective which the Community has to ensure peace and security', of which Articles 60 EC and 301 EC are specific emanations, while at the same time they are also specific emanations of the Community's competence in regulating the movement of capital, internally and externally.

77    Title III, Chapter 4, of the EC Treaty on the movement of capital not conferring any specific powers on the Community, Article 308 EC has been used, in this instance, as an additional legal basis in order to ensure that the Community should be able to impose the restrictions in question, especially those vis-à-vis individuals, in accordance with the common position adopted by the Council.

78    At the hearing the United Kingdom described the Community objective sought by adoption of the contested regulation as being the uniform implementation across the Community of obligations as regards restrictions on capital movement imposed on Member States by the Security Council.

79    The United Kingdom emphasises that the creation of an internal market in the sphere of capital movements is one of the objectives of the Community identified in Article 3 EC. It submits that it is an essential part of the creation of an internal market that any restrictions on the free movement of capital on the market should be applied uniformly.

80    If, however, action at Community level had not been taken to implement the resolutions of the Security Council concerned, that would, according to the United Kingdom, have created a danger of differences in the application of the freezing of assets from one Member State to another. Had the Member States implemented those resolutions individually, then differences of interpretation as regards the scope of the obligation imposed upon them would have been inevitable and would have created disparities in the sphere of free movement of capital between Member States, thus creating a risk of distortion of competition.

81    Furthermore, the United Kingdom submits that measures aimed at freezing the funds of individuals with a view to interrupting economic relations with international terrorist organisations, rather than with third countries, cannot be regarded as widening 'the scope of Community powers beyond the general

framework created by the provisions of the Treaty as a whole', as stated in Opinion 2/94, cited in paragraph 64 above. Under the general framework of the Treaty the Community has competence to take action to regulate capital movements and, moreover, to do this by taking action against individuals. It follows that whilst action regulating capital movements by individuals with a view to interrupting economic relations with international terrorist organisations is a matter for which the Treaty has not provided specific powers and whilst such action requires resort to Article 308 EC, it cannot be considered to go beyond the general framework of the Treaty.

82    The United Kingdom maintains that the use of Article 308 EC in the circumstances of the present case is no different from its use in situations, especially in the sphere of social policy, in which that article has been relied upon in order to attain other Community objectives, where the Treaty had not provided a specific legal basis (see paragraph 71 above).

83    At the hearing the applicant argued that the Council was incompetent to adopt the contested regulation on the basis of Articles 60 EC, 301 EC and 308 EC.

84    First, he claimed that recourse to Articles 60 EC and 301 EC was not authorised in the circumstances of the case, since the contested regulation provides for the adoption of measures directed at individuals and not at third countries.

85    Second, recourse to Article 308 EC was not authorised either, since the contested regulation does not seek to attain any objective of the EC Treaty, but merely CFSP objectives under the Treaty on European Union. In particular, the freezing of

individuals' assets bears no actual real relation to the objective 'notably of avoiding distortion of competition' referred to in the fourth recital in the preamble to the contested regulation (Case C-376/98 *Germany* v *Parliament and Council* [2000] ECR I-8419, paragraphs 84 and 85).

86    In this regard, the applicant more particularly argues that in order for it to be possible for a measure to be adopted by the Community on the basis of Article 308 EC, it is not sufficient that it should seek to attain one of the objectives of the Treaty on European Union. Thus, in Opinion 2/94 (paragraph 64 above), the Court of Justice held that that provision did not permit the Community to accede to the European Convention for the Protection of Human Rights and Fundamental Freedoms (ECHR), even though the Treaty on European Union expressly refers to the objective of respect for human rights. The applicant therefore invites the Court to reject the broad interpretation of Article 308 EC proposed by the Council and the Commission, the result of which would, in his view, be to give that provision potentially unlimited scope.

*Findings of the Court*

87    Unlike Regulation No 467/2001, the contested regulation has for its legal basis not only Articles 60 EC and 301 EC but also Article 308 EC. That reflects the development of the international situation of which the sanctions successively decreed by the Security Council and implemented by the Community form part.

88    Adopted in connection with the actions taken for the purpose of suppressing international terrorism, considered essential for the maintenance of international peace and security (see the seventh recital in the preamble), Resolution 1333 (2000) of the Security Council none the less specifically referred to the Taliban regime which at the time controlled the greater part of Afghan territory and offered refuge and assistance to Usama bin Laden and his associates.

KADI v COUNCIL AND COMMISSION

89    It is just that expressly established link with the territory and governing regime of a third country which prompted the Council to consider that a legal basis could be found for Regulation No 467/2001 in Articles 60 EC and 301 EC. That view must be approved, for nothing in the wording of those provisions makes it possible to exclude the adoption of restrictive measures directly affecting individuals or organisations, in so far as such measures actually seek to reduce, in part or completely, economic relations with one or more third countries.

90    As the Council has correctly observed, the measures provided for by Regulation No 467/2001 were among what are conventionally known as 'smart sanctions', which appeared in United Nations practice during the 1990s. Those sanctions replace classic general trade embargos aimed at a country with more targeted and selective measures, so as to reduce the suffering endured by the civilian population of the country concerned, while none the less imposing genuine sanctions on the targeted regime and those in charge of it. The practice of the institutions has developed in the same way, the Council having successively considered that Articles 60 EC and 301 EC allowed it to take restrictive measures against entities which or persons who physically controlled part of the territory of a third country and against entities which or persons who effectively controlled the government apparatus of a third country and also against persons and entities associated with them and who or which provided them with financial support.

91    That interpretation, which is not contrary to the letter of Article 60 EC or Article 301 EC, is justified both by considerations of effectiveness and by humanitarian concerns.

92    However, Security Council Resolution 1390 (2002) was adopted on 16 January 2002 after the collapse of the Taliban regime following the armed intervention of the international coalition in Afghanistan, launched in October 2001. As a result, and although it still expressly refers to the Taliban, the resolution is no longer aimed at

their fallen regime, but rather directly at Usama bin Laden, the Al-Qaeda network and the persons and entities associated with them.

93    The fact that there is nothing to link the sanctions to be taken under that resolution with the territory or governing regime of a third country, as pointed out in paragraph 2 of the statement of reasons for the proposal for a Council regulation presented by the Commission on 6 March 2002, which is the source of the contested regulation [document COM(2002) 117 final], was explicitly acknowledged by the Council at the hearing, at least with regard to persons and entities not in Afghanistan at that time.

94    In the absence of such a connection, the Council and the Commission considered that Articles 60 EC and 301 EC did not, in themselves, constitute a sufficient legal basis allowing for the adoption of the contested regulation. Those considerations must be upheld.

95    Indeed, Article 60(1) EC provides that the Council, in accordance with the procedure provided for in Article 301 EC, may 'as regards the third countries concerned' take the necessary urgent measures on the movement of capital and payments. Article 301 EC expressly permits action by the Community to interrupt or reduce, in part or completely, economic relations 'with one or more third countries'.

96    Furthermore, the fact that those provisions authorise the adoption of 'smart sanctions' not only vis-à-vis a third country as such but also vis-à-vis the rulers of such a country and the individuals and entities associated with them or controlled by them, directly or indirectly (see paragraphs 89 to 91 above), does not give grounds for considering that those individuals and entities may still be targeted when the

governing regime of the third country in question has disappeared. In such circumstances, there in fact exists no sufficient link between those individuals or entities and a third country.

97 It follows that on any view Articles 60 EC and 301 EC did not constitute in themselves a sufficient legal basis for the contested regulation.

98 Moreover, contrary to the view expressed by the Commission in the proposal for a Council regulation which is the source of the contested regulation (see paragraph 93 above), the Council considered that Article 308 EC did not on its own constitute an adequate legal basis for the adoption of the regulation either. That consideration must also be approved.

99 On this point, according to the case-law (Case 45/86 *Commission* v *Council* [1987] ECR 1493, paragraph 13), it follows from the very wording of Article 308 that recourse to that provision as the legal basis for a measure is justified only where no other provision of the Treaty gives the Community institutions the necessary power to adopt the measure in question. In such a situation, Article 308 EC allows the institutions to act with a view to attaining one of the objectives of the Community, despite the lack of a specific provision conferring on them the necessary power to do so.

100 As regards the first condition for the applicability of Article 308 EC, it is not disputed that no specific provision of the EC Treaty provides for the adoption of measures of the kind laid down in the contested regulation relating to the campaign against international terrorism and, more particularly, to the imposition of economic and financial sanctions, such as the freezing of funds, in respect of individuals and entities suspected of contributing to the funding of terrorism, where no connection whatsoever has been established with the territory or governing regime of a third state. The first condition is therefore satisfied in the instant case.

101    In order for the second condition of the applicability of Article 308 EC to be satisfied in the instant case, it is necessary, in accordance with the case-law cited in paragraph 99 above, that it should be possible to connect the campaign against international terrorism and, more particularly, the imposition of economic and financial sanctions, such as the freezing of funds, in respect of individuals and entities suspected of contributing to the funding of terrorism, to one of the objectives which the Treaty entrusts to the Community.

102    In this instance, the preamble to the contested regulation wastes very few words on that point. At the very most, the Council has stated in the fourth recital in the preamble to that regulation that the measures necessary under Resolution 1390 (2002) and Common Position 2002/402 fell 'under the scope of the Treaty' and that Community legislation had therefore to be adopted, 'notably with a view to avoiding distortion of competition'.

103    With regard to the statement that the measures at issue fall within the scope of the Treaty, which begs the question, it must on the contrary be held from the outset that none of the objectives of the Treaty, as expressly set out in Articles 2 EC and 3 EC, appears capable of being attained by the measures at issue.

104    In particular, unlike the measures provided for by Regulation No 3541/92 against certain natural or legal persons established in the Community, relied on by the Council in support of its arguments (see paragraph 73 above), the measures provided for by the contested regulation could not be authorised by the object of establishing a common commercial policy (Article 3(1)(b) EC), in connection with which it has been held that the Community has the power to adopt trade embargo measures under Article 133 EC, since the Community's commercial relations with a third country are not at issue in this case.

KADI v COUNCIL AND COMMISSION

105    As regards the objective of creating a system ensuring that competition in the internal market is not distorted (Article 3(1)(g) EC), the assertion that there is a risk of competition's being distorted, which according to its preamble the contested regulation seeks to prevent, is unconvincing.

106    The competition rules of the EC Treaty are addressed to undertakings and Member States when they disturb equal competition between undertakings (see, with regard to Article 87 EC, Case 173/73 *Italy* v *Commission* [1974] ECR 709, paragraph 13, and with regard to Article 81 EC, Case 170/83 *Hydrotherm* [1984] 2999, paragraph 11).

107    In this case, however, it has not been alleged that the reference to individuals or entities by the contested regulation is made to them as undertakings for the purposes of the EC Treaty rules on competition.

108    Nor has any explanation been put forward that might make it possible to understand how competition between undertakings could be affected by the implementation, whether at Community level or at the level of its Member States, of the specific restrictive measures against certain persons and entities prescribed by Security Council Resolution 1390 (2002).

109    The foregoing considerations are not called into question by the connection made, both by the Commission in its written answer to the Court's questions and by the United Kingdom at the hearing, between the objective sought by Article 3(1)(g) EC and the objective of seeking to create an internal market characterised by the abolition, as between Member States, of obstacles to the free movement of capital (Article 3(1)(c) EC) (see, inter alia, paragraphs 75 and 78 to 80 above).

110    In this regard, it must be pointed out that the Community has no express power to impose restrictions on the movement of capital and payments. However, Article 58 EC allows the Member States to adopt measures having such an effect to the extent to which this is, and remains, justified in order to achieve the objectives set out in the article, in particular, on grounds of public policy or public security (see, by analogy with Article 30 EC, Case C-367/89 *Richardt* [1991] ECR I-4621, paragraph 19, and the decision cited therein). The concept of public security covering both the State's internal and external security, the Member States are therefore as a rule entitled to adopt under Article 58(1)(b) EC measures of the kind laid down by the contested regulation. In so far as those measures are in keeping with Article 58(3) EC and do not go beyond what is necessary in order to attain the objective pursued, they are compatible with the rules on free movement of capital and payments and with the rules on free competition laid down by the EC Treaty.

111    It has to be added that, if a mere finding of a risk of disparities between the various national rules and a theoretical risk of obstacles to the free movement of capital or payments or of distortions of competition liable to result therefrom were sufficient to justify the choice of Article 308 EC as a legal basis for a regulation together with Article 3(1)(c) and (g) EC, not only would the provisions of Chapter 3 of Title VI of the EC Treaty be rendered ineffective, but also review by the Court of the correctness of the choice of the proper legal basis might be rendered wholly ineffective. The Community judicature would then be prevented from discharging the function entrusted to it by Article 220 EC of ensuring that the law is observed in the interpretation and application of the Treaty (see, to that effect, with regard to Article 100a of the EC Treaty, now, after amendment, Article 95 EC, Case C-376/98 *Germany* v *Parliament and Council*, cited in paragraph 85 above, paragraphs 84, 85 and 106 to 108, and the case-law cited therein).

112    In any event, the elements presented to the Court provide no grounds for considering that the contested regulation actually helps to avoid the risk of impediments to the free movement of capital or of appreciable distortion of competition.

113   The Court considers in particular that, contrary to what the Commission and the United Kingdom maintain, the implementation of the Security Council resolutions in question by the Member States rather than by the Community is not capable of giving rise to a plausible and serious danger of discrepancies in the application of the freezing of funds from one Member State to another. First, those resolutions in fact contain clear, precise and detailed definitions and obligations that leave scarcely any room for differing interpretation. Second, the importance of the measures they call for, with a view to their implementation, does not appear to be such that there is reason to fear such a danger.

114   In those circumstances, the measures at issue in this case cannot find authorisation in the objective referred to in Article 3(1)(c) and (g) EC.

115   Moreover, the various examples of recourse to the additional legal basis of Article 308 EC adduced by the Council (see paragraphs 71 and 73 above) are irrelevant in this instance. First, it is not apparent from those examples that the conditions for the application of Article 308 EC, particularly the condition relating to the attainment of a Community objective, were not satisfied in the circumstances of the cases concerned. Second, the legal acts at issue in those cases were not challenged on that ground before the Court of Justice, particularly in the case giving rise to the judgment in *Delbar*, paragraph 72 above. In any event, it is settled case-law that what is merely Council practice cannot derogate from the rules laid down in the Treaty, and cannot therefore create a precedent binding on the Community institutions with regard to the choice of the correct legal basis (see, in particular, Case 68/86 *United Kingdom* v *Council* [1988] ECR 855, paragraph 24, and the Opinion of the Court 1/94 of 15 November 1994, [1994] ECR I-5267, paragraph 52).

116   It follows from all the foregoing that the fight against international terrorism, more particularly the imposition of economic and financial sanctions, such as the freezing of funds, in respect of individuals and entities suspected of contributing to the funding of terrorism, cannot be made to refer to one of the objects which Articles 2 EC and 3 EC expressly entrust to the Community.

JUDGMENT OF 21. 9. 2005 — CASE T-315/01

117 In addition to the Treaty objectives expressly set out in Articles 2 EC and 3 EC, the Commission has also pleaded, in its written answer to the Court's questions, a more general object of the Community which in the circumstances, it claimed, justified recourse to the legal basis of Article 308 EC. The Commission thus infers from the preamble to the EC Treaty a 'general objective which the Community has to ensure [international] peace and security' (see paragraph 76 above). That argument cannot be accepted.

118 Contrary to what the Commission maintains, indeed, nowhere in the preamble to the EC Treaty is it stated that that act pursues a wider object of safeguarding international peace and security. Although it is unarguably a principal aim of that treaty to put an end to the conflicts of the past between the peoples of Europe by creating 'an ever closer union' among them, this is without any reference whatsoever to the implementation of a common foreign and security policy. The latter falls exclusively within the objects of the Treaty on European Union which, as emphasised in the preamble thereto, seeks to 'mark a new stage in the process of European integration undertaken with the establishment of the European Communities'.

119 While, admittedly, it may be asserted that that objective of the Union must inspire action by the Community in the sphere of its own competence, such as the common commercial policy, it is not however a sufficient basis for the adoption of measures under Article 308 EC, above all in spheres in which Community competence is marginal and exhaustively defined in the Treaty.

120 Last, it appears impossible to interpret Article 308 EC as giving the institutions general authority to use that provision as a basis with a view to attaining one of the objectives of the Treaty on European Union. In particular, the Court considers that the coexistence of Union and Community as integrated but separate legal orders, and the constitutional architecture of the pillars, as intended by the framers of the Treaties now in force, authorise neither the institutions nor the Member States to rely on the 'flexibility clause' of Article 308 EC in order to mitigate the fact that the Community lacks the competence necessary for achievement of one of the Union's objectives. To decide otherwise would amount, in the end, to making that provision

applicable to all measures falling within the CFSP and within police and judicial cooperation in criminal matters (PJC), so that the Community could always take action to attain the objectives of those policies. Such an outcome would deprive many provisions of the Treaty on European Union of their due ambit and would be inconsistent with the introduction of instruments specific to the CFSP (common strategies, joint actions, common positions) and to the PJC (common positions, decisions, framework decisions).

121    It must therefore be concluded that Article 308 EC does not, any more than Article 60 EC and Article 301 EC taken on their own, constitute of itself a sufficient legal basis for the contested regulation.

122    However, both in the recitals in the preamble to the contested regulation and in its written reply to the questions asked by the Court, the Council has argued that Article 308 EC, in conjunction with Articles 60 EC and 301 EC, gives it the power to adopt a Community regulation relating to the battle against the financing of international terrorism conducted by the Union and its Member States under the CFSP and imposing, to that end, economic and financial sanctions on individuals, without establishing any connection whatsoever with the territory or governing regime of a third country. Those considerations must be accepted.

123    In this context, account has to be taken of the bridge explicitly established at the time of the Maastricht revision between Community actions imposing economic sanctions under Articles 60 EC and 301 EC and the objectives of the Treaty on European Union in the sphere of external relations.

124    It must be held that Articles 60 EC and 301 EC are wholly special provisions of the EC Treaty, in that they expressly contemplate situations in which action by the Community may be proved to be necessary in order to achieve, not one of the objects of the Community as fixed by the EC Treaty but rather one of the objectives specifically assigned to the Union by Article 2 EU, namely, the implementation of a common foreign and security policy.

125    Under Articles 60 EC and 301 EC, action by the Community is therefore in actual fact action by the Union, the implementation of which finds its basis on the Community pillar after the Council has adopted a common position or a joint action under the CFSP.

126    According to Article 3 EU, the Union is to be served by a single institutional framework which is to ensure the consistency and the continuity of the activities carried out in order to attain its objectives while respecting and building upon the *acquis communautaire.* The Union is in particular to ensure the consistency of its external activities as a whole in the context of its external relations, security, economic and development policies. The Council and the Commission are to be responsible for ensuring such consistency and are to cooperate to this end. They are to ensure the implementation of these policies, each in accordance with its respective powers.

127    Now, just as all the powers provided for by the EC Treaty may be proved to be insufficient to allow the institutions to act in order to attain, in the operation of the common market, one of the objectives of the Community, so the powers to impose economic and financial sanctions provided for by Articles 60 EC and 301 EC, namely, the interruption or reduction of economic relations with one or more third countries, especially in respect of movements of capital and payments, may prove to be insufficient to allow the institutions to attain the objective of the CFSP, under the Treaty on European Union, in view of which those provisions were specifically introduced into the EC Treaty.

128    There are therefore good grounds for accepting that, in the specific context contemplated by Articles 60 EC and 301 EC, recourse to the additional legal basis of Article 308 EC is justified for the sake of the requirement of consistency laid down in Article 3 EU, when those provisions do not give the Community institutions the power necessary, in the field of economic and financial sanctions, to act for the purpose of attaining the objective pursued by the Union and its Member States under the CFSP.

129    Thus it is possible that a common position or joint action, adopted under the CFSP, should require of the Community measures imposing economic and financial sanctions going beyond those expressly provided for by Articles 60 EC and 301 EC, which consist of the interruption or reduction of economic relations with one or more third countries, especially with regard to movements of capital and payments.

130    In such a situation, recourse to the cumulative legal bases of Articles 60 EC, 301 EC and 308 EC makes it possible to attain, in the sphere of economic and financial sanctions, the objective pursued under the CFSP by the Union and its Member States, as expressed in a common position or joint action, despite the lack of any express attribution to the Community of powers to impose economic and financial sanctions on individuals or entities with no sufficient connection to a given third country.

131    In this instance, the fight against international terrorism and its funding is unarguably one of the Union's objectives under the CFSP, as they are defined in Article 11 EU, even where it does not apply specifically to third countries or their rulers.

132    Furthermore, it is not disputed that Common Position 2002/402 was adopted by the Council acting unanimously in relation to that campaign and that it prescribes the imposition by the Community of economic and financial sanctions in respect of individuals suspected of contributing to the funding of international terrorism, where no connection whatsoever has been established with the territory or governing regime of a third country.

133    In this context, recourse to Article 308 EC, in order to supplement the powers to impose economic and financial sanctions conferred on the Community by Articles 60 EC and 301 EC, is justified by the consideration that, as the world now stands, states can no longer be regarded as the only source of threats to international peace

and security. Like the international community, the Union and its Community pillar are not to be prevented from adapting to those new threats by imposing economic and financial sanctions not only on third countries, but also on associated persons, groups, undertakings or entities engaged in international terrorist activity or in any other way constituting a threat to international peace and security.

134    It is therefore apparent that, by having recourse in the circumstances of this case to the additional legal basis of Article 308 EC, the Council has not widened the scope of Community powers beyond the general framework created by the provisions of the Treaty as a whole and, in particular, by those that define the tasks and the activities of the Community.

135    The institutions and the United Kingdom are therefore right to maintain that the Council was competent to adopt the contested regulation which sets in motion the economic and financial sanctions provided for by Common Position 2002/402, on the joint basis of Articles 60 EC, 301 EC and 308 EC.

3.    *Concerning the three pleas alleging breach of the applicant's fundamental rights*

*Arguments of the parties*

136    In the factual part of his arguments, the applicant states that he is an international businessman, a national of Saudi Arabia, with substantial financial interests in the European Union. Since Regulation No 2062/2001 and then the contested regulation entered into force his funds and assets in the European Union have been frozen and he has been unable to manage his business. Furthermore, his personal and professional reputation has been damaged by his inclusion in the list in Annex I to

the contested regulation. The applicant alleges that he is the victim of a serious miscarriage of justice and he affirms that he has never been involved in terrorism or in any form of financial support for such activity, whether connected with Usama bin Laden or Al-Qaeda or otherwise.

137    The applicant adds that he is the subject also of national orders freezing his funds in the United Kingdom, the United States and Switzerland, the lawfulness of each of which measures he challenges. In particular, he has issued proceedings for judicial review against the order of HM Treasury (in the United Kingdom) freezing his funds. At a preliminary hearing in connection with those proceedings, the court hearing the matter held that the plea alleging that that order was unlawful was not manifestly lacking any basis in national law. None the less, the United Kingdom Government submits that, because of the direct effect of Community law, the action brought by the applicant in the national court must be futile unless he also successfully challenged the regulation in question. Furthermore, the applicant supposes that the information on the basis of which he was included in the Sanctions Committee list is the same as was provided by the United Kingdom Government in the course of the national proceedings referred to above.

138    In the legal part of his arguments, the applicant emphasises as an introductory point that, according to the case-law (Case 4/73 *Nold* v *Commission* [1974] ECR 491, paragraph 13), fundamental rights recognised and guaranteed by the constitutions of the Member States, especially those enshrined in the ECHR, form an integral part of the Community legal order.

139    Next, he puts forward in support of his claims three grounds of annulment: the first alleges breach of the right to a fair hearing, the second breach of the fundamental right of respect for property and of the principle of proportionality and the third breach of the right to effective judicial review.

JUDGMENT OF 21. 9. 2005 — CASE T-315/01

140    According to the applicant, the Security Council resolutions relied on by the Council and the Commission do not confer on those institutions the power to abrogate those fundamental rights without justifying that stance before the Court by producing the necessary evidence. As a legal order independent of the United Nations, governed by its own rules of law, the European Union must justify its actions by reference to its own powers and duties vis-à-vis individuals within that order.

141    With more particular regard to the alleged infringement of his right to a fair hearing, the applicant acknowledges that, on account of the very nature of the original measure freezing his assets, no prior notice could have been given of its implementation.

142    He claims, nevertheless, the right to make his views known to the Council and the Commission with a view to obtaining the removal of his name from the list of persons and entities to whom and to which the sanctions apply, in accordance with the general principle of Community law that persons affected by decisions of public authorities must be given the right to make their points of view known (Case 17/74 *Transocean Marine Paint Association* v *Commission* [1974] ECR 1063, paragraph 15). The applicant maintains that respect for the right to a fair hearing, which is a principle of a fundamental nature, must be ensured in all proceedings likely to affect the person concerned and entail adverse consequences for him (Case 85/87 *Dow Benelux* v *Commission* [1989] ECR 3137, and Case C-49/88 *Al-Jubail Fertilizer and Saudi Arabian Fertilizer* v *Council* [1991] ECR I-3187).

143    He argues that, in the circumstances of this case, the contested regulation is clearly in breach of those fundamental principles, in that it makes it possible for the Council to freeze the applicant's funds indefinitely without giving him any opportunity to make known his views on the correctness and relevance of the facts and circumstances alleged and on the evidence adduced against him.

144    With more particular regard to the alleged breach of the fundamental right to respect for property, guaranteed by Article 1 of the First Additional Protocol to the ECHR and by the general principles of Community law, and to the alleged breach of the principle of proportionality, the applicant states that the contested regulation permits his funds to be frozen solely on the basis of the inclusion of his name in the list drawn up by the Sanctions Committee, although the Community institutions have not the slightest power to assess the available evidence or the considerations which might justify such a measure and there has been no weighing-up of the interests concerned.

145    In his reply the applicant notes that, on their own admission, the institutions did not conduct any weighing-up of interests or consider any of the evidence laid against him. Furthermore, they have not submitted to the Court any evidence to suggest that, if such a weighing-up exercise had been carried out, the freezing of his assets would have been justified. In the circumstances the Court has no means to assess whether the contested regulations justify the draconian measures taken against the applicant's property.

146    With more particular regard to the alleged breach of the right to effective judicial review, the applicant observes that in its judgment in Case 222/84 *Johnston* [1986] ECR 1651, paragraph 18, the Court of Justice held that the right to effective judicial review constitutes a general principle of Community law.

147    In this case the contested regulation does not provide any opportunity for such review, in particular of the evidence laid against him, in breach of that general principle.

148    The applicant adds that, if there were such a review, he would be in a position to demonstrate that the allegations against him have no basis.

149    Furthermore, countering the Council's argument that he has been subjected to mere administrative measures and not to any form of penalty or confiscation of his property capable of extending to him the protection of Article 6 ECHR, the applicant asserts that he has been accused of the most serious form of criminal wrongdoing, namely, involvement in a terrorist organisation responsible for the attacks of 11 September 2001, that his reputation has been destroyed and his property frozen without limit in time or as to quantum, all of which has happened in circumstances in which, first, the Council has not considered the evidence against him; second, the Council is unwilling to provide him with any opportunity to dispute the freezing of his assets and is not in a position to do so and, third, the Council asserts that the Court cannot take any action to investigate the correctness of the decision to freeze his assets.

150    According to the applicant, the Community institutions cannot abdicate their responsibility to respect his fundamental rights by taking refuge behind decisions adopted by the Security Council, especially since those decisions themselves fail to respect the right to a fair hearing. With regard to a Community regulation, he maintains that he is entitled to judicial review within the Community context. The fact that the Council claims to have no discretion in the matter and that it is required to act on the instructions of the United Nations evidences the very defect which vitiates the regulation at issue.

151    In his reply the applicant adds that he has sought to approach the Sanctions Committee directly, in order to have his name removed from the list in question. The response he received was that representations made by individuals would not be accepted and that complaints concerning sanctions imposed at national level must be addressed to the competent courts. He then sought the assistance of the Saudi Arabian Ministry of Foreign Affairs in asserting his rights before the Sanctions Committee. Moreover, he took steps in the United States to make representations to the Office of Foreign Assets Control (OFAC). The institutions cannot therefore accuse him of not having taken all conceivable measures to have his assets released.

II - 3704

KADI v COUNCIL AND COMMISSION

152  Finally, the contention that the applicant has been able to bring these proceedings is not a good argument if the Court cannot investigate the merits of the action. In order to satisfy the requirements of effective judicial review the Court ought either to investigate the validity of the evidence produced before it or strike down the regulation in question on the ground that it provides no legal basis for an investigation of that kind.

153  As their principal argument, the Council and the Commission, referring in particular to Articles 24(1), 25, 41, 48(2) and 103 of the Charter of the United Nations, submit, first, that the Community, like the Member States of the United Nations, is bound by international law to give effect, within its spheres of competence, to resolutions of the Security Council, especially those adopted under Chapter VII of the Charter of the United Nations; second, that the powers of the Community institutions in this area are limited and that they have no autonomous discretion in any form; third, that they cannot therefore alter the content of those resolutions or set up mechanisms capable of giving rise to any alteration in their content and, fourth, that any other international agreement or domestic rule of law liable to hinder such implementation must be disregarded.

154  On that point the Council and the Commission observe that the contested regulation transposes into the Community legal order Security Council resolutions 1267 (1999), 1333 (2000) and 1390 (2002), adopted pursuant to Chapter VII of the Charter of the United Nations, originally against the Taliban of Afghanistan and subsequently in response to terrorist activity linked to the attacks of 11 September 2001 in New York City and Washington DC (both in the United States of America). More specifically, after the applicant's name was added on 17 October 2001 to the list drawn up by the Sanctions Committee, Regulation No 2062/2001 amended the list of persons whose funds were frozen because of their links to the Taliban, Usama bin Laden or the Al-Qaeda network so as to include his name, in accordance with Article 10 of Regulation No 467/2001.

155   The intention of the institutions was thus to give effect to the obligations imposed on the Member States of the Community by Article 25 of the Charter of the United Nations by means of the automatic transposition into the Community legal order of the lists of individuals or entities drawn up by the Security Council or by the Sanctions Committee in accordance with the applicable procedures.

156   In this connection, the Council and the Commission maintain that, as members of the United Nations, the Member States of the Community have agreed to carry out without reservation the decisions taken in their name by the Security Council, in the higher interest of the maintenance of international peace and security (see Articles 24(1) and 25 of the Charter of the United Nations). The obligations imposed on a Member of the United Nations under Chapter VII of the Charter of the United Nations prevail over every other international obligation to which the member might be subject. In that way Article 103 of the Charter makes it possible to disregard any other provision of international law, whether customary or laid down by convention, in order to apply the resolutions of the Security Council, thus creating an 'effect of legality'.

157   Nor, according to the institutions, can national law stand in the way of implementing measures adopted pursuant to the Charter of the United Nations. If a Member of the United Nations were able to alter the contents of Security Council resolutions the uniformity of their application, essential to their effectiveness, could not be maintained.

158   Although the Community itself is not a Member of the United Nations, it is required to act, in its spheres of competence, in such a way as to fulfil the obligations imposed on its Member States as a result of their belonging to the United Nations. On that point the Commission notes that the Community's powers must be exercised in compliance with international law (Case C-286/90 *Poulsen and Diva Navigation* [1992] ECR I-6019, paragraph 9, and Case C-162/96 *Racke* [1998] ECR I-3655, paragraph 45). The Council and the Commission also cite the judgment of the Court of First Instance in Case T-184/95 *Dorsch Consult* v *Council and Commission* [1998] ECR II-667. Although that judgment concerned the imposition of a trade embargo, a

KADI v COUNCIL AND COMMISSION

measure of common commercial policy falling, in accordance with Article 133 EC, within the exclusive competence of the Community, the Council and the Commission consider that the principle laid down in that judgment applies equally to restrictions on the movement of capital and payments adopted, as in this case, pursuant to Articles 60 EC and 301 EC.

159 The Council puts that proposition in general terms, arguing that when the Community acts to discharge obligations imposed on its Member States as a result of their belonging to the United Nations, either because they have transferred to it the necessary powers or because they consider it politically opportune, the Community must be regarded for all practical purposes as being in the same position as the members of the United Nations, having regard to Article 48(2) of the Charter of the United Nations.

160 According to the Council and Commission, it was not open to the Community, without infringing its international obligations and those of its Member States, to exclude particular individuals from the list drawn up by the Sanctions Committee or to serve prior notice on them or otherwise to provide for a review process at the end of which some individuals might have been removed from the list. In the Council's submission, that would have been contrary to the duty to cooperate in good faith owed by the Member States and the Community, imposed by Article 10 EC.

161 The Council adds that, even if the contested regulation were to be regarded as violating the applicant's fundamental rights, the circumstances in which it was adopted preclude any unlawful conduct on its part, having regard to Article 48(2) of the Charter of the United Nations. According to that institution, when the Community takes measures for purposes reflecting the desire of its Member States to perform their obligations under the Charter of the United Nations, it necessarily enjoys the protection conferred by the Charter and, in particular, the 'effect of legality'. The Council submits that that effect applies with regard to fundamental rights which may, as provided for by the appropriate international legal instruments, be temporarily suspended in time of emergency.

JUDGMENT OF 21. 9. 2005 — CASE T-315/01

162    In any event, the Council is of the opinion that in this case the Court's jurisdiction must be limited to considering whether the institutions committed a manifest error in implementing the obligations laid down by Security Council Resolution 1390 (2002). Beyond that limit, any claim of jurisdiction, which would be tantamount to indirect and selective judicial review of the mandatory measures decided upon by the Security Council in carrying out its function of maintaining international peace and security, would cause serious disruption to the international relations of the Community and its Member States, would be open to challenge in the light of Article 10 EC and would be liable to undermine one of the foundations of the international order of States established after 1945. The Council submits that such measures may not be challenged at national or regional level, but only before the Security Council itself.

163    The Commission too submits that any decision to remove or alter the list as adopted by the Security Council might seriously disrupt the international relations of the Community and its Member States. Such a situation would lead the Community into breach of its general obligation to observe international law and the Member States into breach of their specific obligations under the Charter of the United Nations. It could also affect the uniformity of application of Security Council decisions, which is essential to ensure their effectiveness. The Commission further notes that the principle of comity of nations obliges the Community to implement those measures inasmuch as they are designed to protect all States against terrorist attacks.

164    That, according to the Commission, precludes any examination by the Court of the consistency of the contested regulations with the rights claimed by the applicant. Even if — quod non — those rights have been infringed, the Community would still be obliged to implement the Security Council resolutions and, if it should fail to act, the Member States would be under the obligation to do so.

165    As their secondary argument, if the Court should decide to proceed to a full examination of the merits of the three grounds for annulment put forward by the applicant, the Council and the Commission argue that the contested regulation does not violate fundamental rights or freedoms as alleged.

166    First, the contested regulation does not prejudice the applicant's right to a hearing.

167    In the present case, they argue, the Community institutions have no investigative powers, no discretion so far as the facts are concerned and no room for political evaluation. They are simply obliged to implement the measures adopted by the Security Council in order to ensure international peace and security, and have no power to include any mechanism by which to review those measures. The Council and the Commission submit, therefore, that the right to a hearing, which is clearly necessary in the context of administrative procedures, is not applicable in circumstances such as those of this case.

168    Second, the measures implemented by the contested regulation do not infringe the principle of proportionality or the applicant's fundamental right to respect for his property, since that right does not enjoy absolute protection and its exercise may be subject to restrictions justified by public-interest objectives.

169    In this case the general interest of the Community and its Member States in compliance with the obligations imposed by the Security Council, in order to ensure that individuals' assets cannot be used to promote terrorism, could not be clearer. The measures taken by the Community, which are limited to implementing binding decisions of the Security Council, were dictated by the importance of that objective

and they did not strike an unfair balance between the requirements of the public interest and those relating to the protection of the individual's fundamental rights. In those circumstances, the Council holds the view that the measures taken, even if severe for the applicant, cannot be regarded as inappropriate or disproportionate.

170    In so far as the applicant appears to reproach the Community institutions for not having set up any review mechanism whatsoever, the Commission observes that the institutions were simply ensuring implementation of Security Council decisions which they were not in a position to alter.

171    In so far as the applicant argues that the means used to achieve the objectives are disproportionate, the Commission submits that that claim can be made with regard only to the Security Council decisions.

172    Third, as regards the right to effective judicial review, the Council and the Commission point out in particular that the applicant has been able to bring this action under Article 230 EC.

173    The Council submits that determining the extent of judicial review which would be warranted or appropriate in the circumstances is a separate issue and one which the Court must decide.

174    In this connection the Council submits that where the Community acts without exercising any discretion, on the basis of a decision adopted by the body on which the international community has conferred sweeping powers for the sake of

preserving international peace and security, full judicial review would run the risk of undermining the United Nations system as established in 1945, might seriously damage the international relations of the Community and its Member States and would fall foul of the Community's duty to observe international law.

175    The Council and the Commission also submit that the applicant, represented if necessary by Saudi Arabia, has every opportunity to approach the Security Council or the Sanctions Committee, either directly or through HM Treasury, in order to make his views known. Admittedly, the United Nations, as an inter-governmental organisation, will not consider the representations of the applicant as an individual. Nevertheless, the United Nations cannot disregard the views of its Members. So, if the Saudi authorities are persuaded of the applicant's innocence, there is no reason why efforts should not be made to have his inclusion in the Sanctions Committee's list re-examined. The applicant provides no information as to the outcome of his approaches to that body, nor as to the opinion it might have expressed, whereas at least some of the persons affected by the Sanctions Committee list have been able to do so.

*Findings of the Court*

Preliminary observations

176    The Court can properly rule on the pleas alleging breach of the applicant's fundamental rights only in so far as they fall within the scope of its judicial review and as they are capable, if proved, of leading to annulment of the contested regulation.

177    In this instance, the institutions and the United Kingdom maintain, in essence, that neither of those two conditions is satisfied, because the obligations imposed on the Community and its Member States by the Charter of the United Nations prevail over every other obligation of international, Community or domestic law. Consideration of those parties' arguments thus appears to be a precondition to any discussion of the applicant's arguments.

178    The Court considers it appropriate to consider, in the first place, the relationship between the international legal order under the United Nations and the domestic or Community legal order, and also the extent to which the exercise by the Community and its Member States of their powers is bound by resolutions of the Security Council adopted under Chapter VII of the Charter of the United Nations.

179    This consideration will effectively determine the scope of the review of lawfulness, particularly having regard to fundamental rights, which the Court will carry out in the second place in respect of the Community acts giving effect to such resolutions.

180    Thirdly and finally, if it should find that they fall within the scope of its judicial review and that they are capable of leading to annulment of the contested regulation, the Court will rule on the alleged breaches of the applicant's fundamental rights.

Concerning the relationship between the international legal order under the United Nations and the domestic or Community legal order

181    From the standpoint of international law, the obligations of the Member States of the United Nations under the Charter of the United Nations clearly prevail over

every other obligation of domestic law or of international treaty law including, for those of them that are members of the Council of Europe, their obligations under the ECHR and, for those that are also members of the Community, their obligations under the EC Treaty.

182  As regards, first, the relationship between the Charter of the United Nations and the domestic law of the Member States of the United Nations, that rule of primacy is derived from the principles of customary international law. Under Article 27 of the Vienna Convention on the Law of Treaties of 23 May 1969, which consolidates those principles (and Article 5 of which provides that it is to apply to 'any treaty which is the constituent instrument of an international organisation and to any treaty adopted within an international organisation'), a party may not invoke the provisions of its internal law as justification for its failure to perform a treaty.

183  As regards, second, the relationship between the Charter of the United Nations and international treaty law, that rule of primacy is expressly laid down in Article 103 of the Charter which provides that, '[i]n the event of a conflict between the obligations of the Members of the United Nations under the present Charter and their obligations under any other international agreement, their obligations under the present Charter shall prevail'. In accordance with Article 30 of the Vienna Convention on the Law of Treaties, and contrary to the rules usually applicable to successive treaties, that rule holds good in respect of Treaties made earlier as well as later than the Charter of the United Nations. According to the International Court of Justice, all regional, bilateral, and even multilateral, arrangements that the parties may have made must be made always subject to the provisions of Article 103 of the Charter of the United Nations (judgment of 26 November 1984, delivered in the case concerning military and paramilitary activities in and against Nicaragua (Nicaragua v. United States of America), *ICJ Reports*, 1984, p. 392, paragraph 107).

184  That primacy extends to decisions contained in a resolution of the Security Council, in accordance with Article 25 of the Charter of the United Nations, under which the Members of the United Nations agree to accept and carry out the decisions of the

Security Council. According to the International Court of Justice, in accordance with Article 103 of the Charter, the obligations of the Parties in that respect prevail over their obligations under any other international agreement (Order of 14 April 1992 (provisional measures), Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya v United States of America), *ICJ Reports*, 1992, p. 16, paragraph 42, and Order of 14 April 1992 (provisional measures), Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya v United Kingdom), *ICJ Reports*, 1992, p. 113, paragraph 39).

185    With more particular regard to the relations between the obligations of the Member States of the Community by virtue of the Charter of the United Nations and their obligations under Community law, it may be added that, in accordance with the first paragraph of Article 307 EC, 'The rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of this Treaty.'

186    According to the Court of Justice's settled case-law, the purpose of that provision is to make it clear, in accordance with the principles of international law, that application of the EC Treaty does not affect the duty of the Member State concerned to respect the rights of third countries under a prior agreement and to perform its obligations thereunder (Case C-324/93 *Evans Medical and Macfarlan Smith* [1995] ECR I-563, paragraph 27; Case 10/61 *Commission* v *Italy* [1962] ECR 1; Case C-158/91 *Levy* [1993] ECR I-4287, and Case C-124/95 *Centro-Com* [1997] ECR I-81, paragraph 56).

187    Now, five of the six signatory States to the Treaty establishing the European Economic Community, signed at Rome on 25 March 1957, were already members of the United Nations on 1 January 1958. While it is true that the Federal Republic of Germany was not formally admitted as a member of the UN until 18 September 1973, its duty to perform its obligations under the Charter of the United Nations

KADI v COUNCIL AND COMMISSION

also predates 1 January 1958, as is apparent from the Final Act of the Conference held in London from 28 September to 3 October 1954 (known as 'The Conference of the Nine Powers') and the Paris Agreements signed on 23 October 1954. Furthermore, all the States that subsequently acceded to the Community were members of the United Nations before accession.

188  What is more, Article 224 of the Treaty establishing the European Economic Community (now Article 297 EC) was specifically introduced into the Treaty in order to observe the rule of primacy defined above. Under that provision, 'Member States shall consult each other with a view to taking together the steps needed to prevent the functioning of the common market being affected by measures which a Member State may be called upon to take ... in order to carry out obligations it has accepted for the purpose of maintaining peace and international security'.

189  Resolutions adopted by the Security Council under Chapter VII of the Charter of the United Nations are thus binding on all the Member States of the Community which must therefore, in that capacity, take all measures necessary to ensure that those resolutions are put into effect (Opinions of Advocate General Jacobs in Case C-84/95 *Bosphorus* [1996] ECR I-3953, at I-3956, paragraph 2, and Case C-177/95 *Ebony Maritime and Loten Navigation* [1997] ECR I-1111, at I-1115, paragraph 27).

190  It also follows from the foregoing that, pursuant both to the rules of general international law and to the specific provisions of the Treaty, Member States may, and indeed must, leave unapplied any provision of Community law, whether a provision of primary law or a general principle of that law, that raises any impediment to the proper performance of their obligations under the Charter of the United Nations.

191    Thus, in *Centro-Com*, cited in paragraph 186 above, the Court of Justice specifically held that national measures contrary to the common commercial policy provided for in Article 113 of the EC Treaty could be justified under Article 234 of the EC Treaty (now, after amendment, Article 307 EC) if they were necessary to ensure that the Member State concerned performed its obligations under the Charter of the United Nations and a resolution of the Security Council.

192    However, it follows from the case-law (*Dorsch Consult* v *Council and Commission*, paragraph 158 above, paragraph 74) that, unlike its Member States, the Community as such is not directly bound by the Charter of the United Nations and that it is not therefore required, as an obligation of general public international law, to accept and carry out the decisions of the Security Council in accordance with Article 25 of that Charter. The reason is that the Community is not a member of the United Nations, or an addressee of the resolutions of the Security Council, or the successor to the rights and obligations of the Member States for the purposes of public international law.

193    Nevertheless, the Community must be considered to be bound by the obligations under the Charter of the United Nations in the same way as its Member States, by virtue of the Treaty establishing it.

194    In that regard, it is not in dispute that at the time when they concluded the Treaty establishing the European Economic Community the Member States were bound by their obligations under the Charter of the United Nations.

195    By concluding a treaty between them they could not transfer to the Community more powers than they possessed or withdraw from their obligations to third countries under that Charter (see, by analogy, Joined Cases 21/72 to 24/72 *International Fruit Company and Others* ('*International Fruit*') [1972] ECR 1219, paragraph 11).

196    On the contrary, their desire to fulfil their obligations under that Charter follows from the very provisions of the Treaty establishing the European Economic Community and is made clear in particular by Article 224 and the first paragraph of Article 234 (see, by analogy, *International Fruit*, paragraphs 12 and 13, and the Opinion of Advocate General Mayras in those cases, ECR 1231, at page 1237).

197    Although that latter provision makes mention only of the obligations of the Member States, it implies a duty on the part of the institutions of the Community not to impede the performance of the obligations of Member States which stem from that Charter (Case 812/79 *Burgoa* [1980] ECR 2787, paragraph 9).

198    It is also to be observed that, in so far as the powers necessary for the performance of the Member States' obligations under the Charter of the United Nations have been transferred to the Community, the Member States have undertaken, pursuant to public international law, to ensure that the Community itself should exercise those powers to that end.

199    In this context it is to be borne in mind, first, that in accordance with Article 48(2) of the Charter of the United Nations, the decisions of the Security Council 'shall be carried out by the Members of the United Nations directly and through their action in the appropriate international agencies of which they are members' and, second, that according to the case-law (*Poulsen and Diva Navigation*, paragraph 158 above, paragraph 9, and *Racke*, paragraph 158 above, paragraph 45, and Case 41/74 *Van Duyn* [1974] ECR 1337, paragraph 22), the Community must respect international law in the exercise of its powers and, consequently, Community law must be interpreted, and its scope limited, in the light of the relevant rules of international law.

200    By conferring those powers on the Community, the Member States demonstrated their will to bind it by the obligations entered into by them under the Charter of the United Nations (see, by analogy, *International Fruit*, paragraph 15).

JUDGMENT OF 21. 9. 2005 — CASE T-315/01

201   Since the entry into force of the Treaty establishing the European Economic Community, the transfer of powers which has occurred in the relations between Member States and the Community has been put into concrete form in different ways within the framework of the performance of their obligations under the Charter of the United Nations (see, by analogy, *International Fruit*, paragraph 16).

202   Thus it is, in particular, that Article 228a of the EC Treaty (now Article 301 EC) was added to the Treaty by the Treaty on European Union in order to provide a specific basis for the economic sanctions that the Community, which has exclusive competence in the sphere of the common commercial policy, may need to impose in respect of third countries for political reasons defined by its Member States in connection with the CFSP, most commonly pursuant to a resolution of the Security Council requiring the adoption of such sanctions.

203   It therefore appears that, in so far as under the EC Treaty the Community has assumed powers previously exercised by Member States in the area governed by the Charter of the United Nations, the provisions of that Charter have the effect of binding the Community (see, by analogy, on the question whether the Community is bound by the General Agreement on Tariffs and Trade (GATT) of 1947, *International Fruit*, paragraph 18; see also, in that it recognises that the Community exercises circumscribed powers when giving effect to a trade embargo imposed by a resolution of the Security Council, *Dorsch Consult* v *Council and Commission*, paragraph 158 above, paragraph 74).

204   Following that reasoning, it must be held, first, that the Community may not infringe the obligations imposed on its Member States by the Charter of the United Nations or impede their performance and, second, that in the exercise of its powers it is bound, by the very Treaty by which it was established, to adopt all the measures necessary to enable its Member States to fulfil those obligations.

KADI v COUNCIL AND COMMISSION

205   In this instance, the Council found in Common Position 2002/402, adopted pursuant to the provisions of Title V of the Treaty on European Union, that action by the Community within the confines of the powers conferred on it by the EC Treaty was necessary in order to put into effect certain restrictive measures against Usama bin Laden, members of the Al-Qaeda network and the Taliban and other associated individuals, groups, undertakings and entities, in accordance with Security Council Resolutions 1267 (1999), 1333 (2000) and 1390 (2002).

206   The Community put those measures into effect by adopting the contested regulation. As has been held at paragraph 135 above, it was competent to adopt that act on the basis of Articles 60 EC, 301 EC and 308 EC.

207   It must therefore be held that the arguments put forward by the institutions, as summarised in paragraph 153 above, are valid, subject to this reservation that it is not under general international law, as those parties would have it, but by virtue of the EC Treaty itself, that the Community was required to give effect to the Security Council resolutions concerned, within the sphere of its powers.

208   On the other hand, the applicant's arguments based on the view that the Community legal order is a legal order independent of the United Nations, governed by its own rules of law, must be rejected.

Concerning the scope of the review of legality that the Court must carry out

209   As a preliminary point, it is to be borne in mind that the European Community is based on the rule of law, inasmuch as neither its Member States nor its institutions can avoid review of the question whether their acts are in conformity with the basic

constitutional charter, the Treaty, which established a complete system of legal remedies and procedures designed to enable the Court of Justice to review the legality of acts of the institutions (Case 294/83 *Les Verts* v *Parliament* [1986] ECR 1339, paragraph 23; Case 314/85 *Foto-Frost* [1987] ECR 4199, paragraph 16; Case C-314/91 *Weber* v *Parliament* [1993] ECR I-1093, paragraph 8; Joined Cases T-222/99, T-327/99 and T-329/99 *Martinez and Others* v *Parliament* [2001] ECR II-2823, paragraph 48; see also Opinion 1/91 of the Court of Justice of 14 December 1991, ECR I-6079, paragraph 21).

210   As the Court has repeatedly held (*Johnston*, paragraph 146 above, paragraph 18; Case C-97/91 *Oleificio Borelli* v *Commission* [1992] ECR I-6313, paragraph 14, Case C-1/99 *Kofisa Italia* [2001] ECR I-207, paragraph 46; Case C-424/99 *Commission* v *Austria* [2001] ECR I-9285, paragraph 45, and Case C-50/00 P *Unión de Pequeños Agricultores* v *Council* [2002] ECR I-6677, paragraph 39), 'judicial control ... reflects a general principle of law which underlies the constitutional traditions common to the Member States ... and which is also laid down in Articles 6 and 13 of the [ECHR]'.

211   In the case in point, that principle finds expression in the right, conferred on the applicant by the fourth paragraph of Article 230 EC, to submit the lawfulness of the contested regulation to the Court of First Instance, provided that the act is of direct and individual concern to him, and to rely in support of his action on any plea alleging lack of competence, infringement of an essential procedural requirement, infringement of the EC Treaty or of any rule of law relating to its application, or misuse of powers.

212   The question that arises in this instance is, however, whether there exist any structural limits, imposed by general international law or by the EC Treaty itself, on the judicial review which it falls to the Court of First Instance to carry out with regard to that regulation.

KADI v COUNCIL AND COMMISSION

213  It must be recalled that the contested regulation, adopted in the light of Common Position 2002/402, constitutes the implementation at Community level of the obligation placed on the Member States of the Community, as Members of the United Nations, to give effect, if appropriate by means of a Community act, to the sanctions against Usama bin Laden, members of the Al-Qaeda network and the Taliban and other associated individuals, groups, undertakings and entities, which have been decided and later strengthened by several resolutions of the Security Council adopted under Chapter VII of the Charter of the United Nations. The recitals of the preamble to that regulation refer expressly to Resolutions 1267 (1999), 1333 (2000) and 1390 (2002).

214  In that situation, as the institutions have rightly claimed, they acted under circumscribed powers, with the result that they had no autonomous discretion. In particular, they could neither directly alter the content of the resolutions at issue nor set up any mechanism capable of giving rise to such alteration.

215  Any review of the internal lawfulness of the contested regulation, especially having regard to the provisions or general principles of Community law relating to the protection of fundamental rights, would therefore imply that the Court is to consider, indirectly, the lawfulness of those resolutions. In that hypothetical situation, in fact, the origin of the illegality alleged by the applicant would have to be sought, not in the adoption of the contested regulation but in the resolutions of the Security Council which imposed the sanctions (see, by analogy, *Dorsch Consult* v *Council and Commission*, paragraph 158 above, paragraph 74).

216  In particular, if the Court were to annul the contested regulation, as the applicant claims it should, although that regulation seems to be imposed by international law, on the ground that that act infringes his fundamental rights which are protected by the Community legal order, such annulment would indirectly mean that the resolutions of the Security Council concerned themselves infringe those fundamental rights. In other words, the applicant asks the Court to declare by implication that the provision of international law at issue infringes the fundamental rights of individuals, as protected by the Community legal order.

217   The institutions and the United Kingdom ask the Court as a matter of principle to decline all jurisdiction to undertake such indirect review of the lawfulness of those resolutions which, as rules of international law binding on the Member States of the Community, are mandatory for the Court as they are for all the Community institutions. Those parties are of the view, essentially, that the Court's review ought to be confined, on the one hand, to ascertaining whether the rules on formal and procedural requirements and jurisdiction imposed in this case on the Community institutions were observed and, on the other hand, to ascertaining whether the Community measures at issue were appropriate and proportionate in relation to the resolutions of the Security Council which they put into effect.

218   It must be recognised that such a limitation of jurisdiction is necessary as a corollary to the principles identified above, in the Court's examination of the relationship between the international legal order under the United Nations and the Community legal order.

219   As has already been explained, the resolutions of the Security Council at issue were adopted under Chapter VII of the Charter of the United Nations. In these circumstances, determining what constitutes a threat to international peace and security and the measures required to maintain or re-establish them is the responsibility of the Security Council alone and, as such, escapes the jurisdiction of national or Community authorities and courts, subject only to the inherent right of individual or collective self-defence mentioned in Article 51 of the Charter.

220   Where, acting pursuant to Chapter VII of the Charter of the United Nations, the Security Council, through its Sanctions Committee, decides that the funds of certain individuals or entities must be frozen, its decision is binding on the members of the United Nations, in accordance with Article 48 of the Charter.

KADI v COUNCIL AND COMMISSION

221    In light of the considerations set out in paragraphs 193 to 204 above, the claim that the Court of First Instance has jurisdiction to review indirectly the lawfulness of such a decision according to the standard of protection of fundamental rights as recognised by the Community legal order, cannot be justified either on the basis of international law or on the basis of Community law.

222    First, such jurisdiction would be incompatible with the undertakings of the Member States under the Charter of the United Nations, especially Articles 25, 48 and 103 thereof, and also with Article 27 of the Vienna Convention on the Law of Treaties.

223    Second, such jurisdiction would be contrary to provisions both of the EC Treaty, especially Articles 5 EC, 10 EC, 297 EC and the first paragraph of Article 307 EC, and of the Treaty on European Union, in particular Article 5 EU, in accordance with which the Community judicature is to exercise its powers on the conditions and for the purposes provided for by the provisions of the EC Treaty and the Treaty on European Union. It would, what is more, be incompatible with the principle that the Community's powers and, therefore, those of the Court of First Instance, must be exercised in compliance with international law (*Poulsen and Diva Navigation*, paragraph 158 above, paragraph 9, and *Racke*, paragraph 158 above, paragraph 45).

224    It has to be added that, with particular regard to Article 307 EC and to Article 103 of the Charter of the United Nations, reference to infringements either of fundamental rights as protected by the Community legal order or of the principles of that legal order cannot affect the validity of a Security Council measure or its effect in the territory of the Community (see, by analogy, Case 11/70 *Internationale Handelsgesellschaft* [1970] ECR 1125, paragraph 3; Case 234/85 *Keller* [1986] ECR 2897, paragraph 7, and Joined Cases 97/87 to 99/87 *Dow Chemical Ibérica and Others* v *Commission* [1989] ECR 3165, paragraph 38).

II - 3723

225    It must therefore be considered that the resolutions of the Security Council at issue fall, in principle, outside the ambit of the Court's judicial review and that the Court has no authority to call in question, even indirectly, their lawfulness in the light of Community law. On the contrary, the Court is bound, so far as possible, to interpret and apply that law in a manner compatible with the obligations of the Member States under the Charter of the United Nations.

226    None the less, the Court is empowered to check, indirectly, the lawfulness of the resolutions of the Security Council in question with regard to *jus cogens*, understood as a body of higher rules of public international law binding on all subjects of international law, including the bodies of the United Nations, and from which no derogation is possible.

227    In this connection, it must be noted that the Vienna Convention on the Law of Treaties, which consolidates the customary international law and Article 5 of which provides that it is to apply 'to any treaty which is the constituent instrument of an international organisation and to any treaty adopted within an international organisation', provides in Article 53 for a treaty to be void if it conflicts with a peremptory norm of general international law (*jus cogens*), defined as 'a norm accepted and recognised by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character'. Similarly, Article 64 of the Vienna Convention provides that: 'If a new peremptory norm of general international law emerges, any existing treaty which is in conflict with that norm becomes void and terminates'.

228    Furthermore, the Charter of the United Nations itself presupposes the existence of mandatory principles of international law, in particular, the protection of the fundamental rights of the human person. In the preamble to the Charter, the peoples of the United Nations declared themselves determined to 'reaffirm faith in fundamental human rights, in the dignity and worth of the human person'. In addition, it is apparent from Chapter I of the Charter, headed 'Purposes and Principles', that one of the purposes of the United Nations is to encourage respect for human rights and for fundamental freedoms.

KADI v COUNCIL AND COMMISSION

229   Those principles are binding on the Members of the United Nations as well as on its bodies. Thus, under Article 24(2) of the Charter of the United Nations, the Security Council, in discharging its duties under its primary responsibility for the maintenance of international peace and security, is to act 'in accordance with the Purposes and Principles of the United Nations'. The Security Council's powers of sanction in the exercise of that responsibility must therefore be wielded in compliance with international law, particularly with the purposes and principles of the United Nations.

230   International law thus permits the inference that there exists one limit to the principle that resolutions of the Security Council have binding effect: namely, that they must observe the fundamental peremptory provisions of *jus cogens*. If they fail to do so, however improbable that may be, they would bind neither the Member States of the United Nations nor, in consequence, the Community.

231   The indirect judicial review carried out by the Court in connection with an action for annulment of a Community act adopted, where no discretion whatsoever may be exercised, with a view to putting into effect a resolution of the Security Council may therefore, highly exceptionally, extend to determining whether the superior rules of international law falling within the ambit of *jus cogens* have been observed, in particular, the mandatory provisions concerning the universal protection of human rights, from which neither the Member States nor the bodies of the United Nations may derogate because they constitute 'intransgressible principles of international customary law' (Advisory Opinion of the International Court of Justice of 8 July 1996, The Legality of the Threat or Use of Nuclear Weapons, Reports 1996, p. 226, paragraph 79; see also, to that effect, Advocate General Jacobs's Opinion in *Bosphorus*, paragraph 189 above, paragraph 65).

232   It is in the light of those considerations that the pleas alleging breach of the applicants' fundamental rights must be examined.

Concerning the alleged breaches of the applicant's fundamental rights

233    The Court will consider first the alleged breach of the fundamental right to respect for property and of the principle of proportionality, then the alleged breach of the right to be heard and, last, the alleged breach of the right to effective judicial review.

—  Concerning the alleged breach of the right to respect for property and of the principle of proportionality

234    The applicant alleges a breach of his right to respect for property, as guaranteed by Article 1 of the First Additional Protocol to the ECHR, and also a breach of the principle of proportionality as a general principle of Community law.

235    Nevertheless, in so far as the alleged infringements arise exclusively from the freezing of the applicant's funds, as decided by the Security Council, through its Sanctions Committee, and put into effect by the contested regulation, without the exercise of any discretion whatsoever, it is in principle by the sole criterion of the standard of universal protection of the fundamental rights of the human person falling within the ambit of *jus cogens* that the applicant's claims may appropriately be examined, in accordance with the principles set out above.

236    The extent and severity of the freezing of the applicant's funds having altered with the passage of time (see, successively, Article 2 of Regulation No 467/2001, Article 2 of Regulation No 881/2002 in its original version and, finally, Article 2a of the contested regulation, as inserted by Article 1 of Regulation No 561/2003), it is

moreover appropriate to point out that, in the context of the present action for annulment, the Court's judicial review must relate solely to the state of the legislation as it is currently in force. In proceedings for annulment, the Community judicature usually takes account of events that affect the actual substance of the dispute during the course of the proceedings, such as the repeal, extension, replacement or amendment of the contested act (see, in addition to *Alpha Steel* v *Commission*, *Fabrique de Fer de Charleroi and Dillinger Huttenwerke* v *Commission* and *CEMR* v *Commission*, paragraph 53 above, the order of the Court of Justice of 8 March 1993 in Case C-123/92 *Lezzi Pietro* v *Commission* [1993] ECR I-809, paragraphs 8 to 11). All the parties signified their agreement on this point at the hearing.

237  It falls therefore to be assessed whether the freezing of funds provided for by the contested regulation, as amended by Regulation No 561/2003, and, indirectly, by the resolutions of the Security Council put into effect by those regulations, infringes the applicant's fundamental rights.

238  The Court considers that such is not the case, measured by the standard of universal protection of the fundamental rights of the human person covered by *jus cogens*.

239  On this point, it is to be emphasised straight away that the contested regulation, in the version amended by Regulation No 561/2003, adopted following Resolution 1452 (2002) of the Security Council, provides, among other derogations and exemptions, that on a request made by an interested person, and unless the Sanctions Committee expressly objects, the competent national authorities may declare the freezing of funds to be inapplicable to the funds necessary to cover basic expenses, including payments for foodstuffs, rent, medicines and medical treatment, taxes or public utility charges (see paragraph 36 above). In addition, funds necessary for any 'extraordinary expense' whatsoever may henceforth be unfrozen, on the express authorisation of the Sanctions Committee.

240    The express provision of possible exemptions and derogations thus attaching to the freezing of the funds of the persons in the Sanctions Committee's list clearly shows that it is neither the purpose nor the effect of that measure to submit those persons to inhuman or degrading treatment.

241    Moreover, it must be noted that while Article 17(1) of the Universal Declaration of Human Rights, adopted by the General Assembly of the United Nations on 10 December 1948, provides that '[e]veryone has the right to own property alone as well as in association with others', Article 17(2) of that Universal Declaration specifies that '[n]o one shall be arbitrarily deprived of his property'.

242    Thus, in so far as respect for the right to property must be regarded as forming part of the mandatory rules of general international law, it is only an arbitrary deprivation of that right that might, in any case, be regarded as contrary to *jus cogens*.

243    Here, however, it is clear that the applicant has not been arbitrarily deprived of that right.

244    In fact, in the first place, the freezing of his funds constitutes an aspect of the sanctions decided by the Security Council against Usama bin Laden, members of the Al-Qaeda network and the Taliban and other associated individuals, groups, undertakings and entities.

245    In that regard, it is appropriate to stress the importance of the campaign against international terrorism and the legitimacy of the protection of the United Nations against the actions of terrorist organisations.

KADI v COUNCIL AND COMMISSION

246  In the preamble to Resolution 1390 (2002), the Security Council formally condemned, inter alia, the terrorist attacks of 11 September 2001, expressing its determination to prevent all such acts; noted that Usama bin Laden and the Al-Qaeda network continued to support international terrorism; condemned the Al-Qaeda network and associated terrorist groups for the multiple criminal terrorist acts they had committed, aimed at causing the deaths of numerous innocent civilians and the destruction of property, and reaffirmed further that acts of international terrorism constituted a threat to international peace and security.

247  It is in the light of those circumstances that the objective pursued by the sanctions assumes considerable importance, which is, in particular, under Resolution 1373 (2001) of the Security Council of 28 September 2001, referred to by the third recital in the preamble to the contested regulation, to combat by all means, in accordance with the Charter of the United Nations, threats to international peace and security caused by terrorist acts. The measures in question pursue therefore an objective of fundamental public interest for the international community.

248  In the second place, freezing of funds is a temporary precautionary measure which, unlike confiscation, does not affect the very substance of the right of the persons concerned to property in their financial assets but only the use thereof.

249  In the third place, the resolutions of the Security Council at issue provide for a means of reviewing, after certain periods, the overall system of sanctions (see paragraphs 16, 25 and 33 above, and paragraph 266 below).

250  In the fourth place, as will be explained below, the legislation at issue settles a procedure enabling the persons concerned to present their case at any time to the Sanctions Committee for review, through the Member State of their nationality or that of their residence.

251    Having regard to those facts, the freezing of the funds of persons and entities suspected, on the basis of information communicated by the Member States of the United Nations and checked by the Security Council, of being linked to Usama bin Laden, the Al-Qaeda network or the Taliban and of having participated in the financing, planning, preparation or perpetration of terrorist acts cannot be held to constitute an arbitrary, inappropriate or disproportionate interference with the fundamental rights of the persons concerned.

252    It follows from the foregoing that the applicant's arguments alleging breach of the right to respect for property and of the general principle of proportionality must be rejected.

— The alleged breach of the right to be heard

253    While recognising that the original measure freezing his funds did not have to be notified before being put into effect, the applicant charges the Council with not having given him any opportunity of being heard on the facts and circumstances alleged and on the evidence adduced against him (paragraphs 141 to 143 above). The applicant seems, moreover, also to complain that the Security Council's decisions at issue themselves do not observe the right to a fair hearing (see paragraph 150 above).

254    In this regard, a distinction must be drawn between the applicant's alleged right to be heard by the Council in connection with the contested regulation's adoption and his alleged right to be heard by the Sanctions Committee in connection with his inclusion in the list of persons whose funds must be frozen pursuant to the Security Council's resolutions at issue.

KADI v COUNCIL AND COMMISSION

255   With regard, first, to the applicant's alleged right to be heard by the Council in connection with the adoption of the contested regulation, it must be borne in mind that, according to settled case-law, observance of the right to a fair hearing is, in all proceedings initiated against a person which are liable to culminate in a measure adversely affecting that person, a fundamental principle of Community law which must be guaranteed even in the absence of any rules governing the proceedings at issue. That principle requires that any person on whom a penalty may be imposed must be placed in a position in which he can effectively make known his views on the evidence on the basis of which the sanction is imposed (see, to that effect, Case C-135/92 *Fiskano* v *Commission* [1994] ECR I-2885, paragraphs 39 and 40; Case C-32/95 P *Commission* v *Lisrestal and Others* [1996] ECR I-5373, paragraph 21, and Case C-462/98 P *Mediocurso* v *Commission* [2000] ECR I-7183, paragraph 36).

256   The Council and the Commission were, however, right in observing that this case-law was developed in areas such as competition law, anti-dumping action and State aid, but also disciplinary law and the reduction of financial assistance, in which the Community institutions enjoy extensive powers of investigation and inquiry and wide discretion.

257   As a matter of fact, respect for the procedural rights guaranteed by the Community legal order, especially the right of the person concerned to make his point of view known, is correlated to the exercise of discretion by the authority which is the author of the act at issue (Case C-269/90 *Technische Universität München* [1991] ECR I-5469, paragraph 14).

258   In this instance, as is apparent from the preliminary observations above on the relationship between the international legal order under the United Nations and the Community legal order, the Community institutions were required to transpose into the Community legal order resolutions of the Security Council and decisions of the Sanctions Committee that in no way authorised them, at the time of actual implementation, to provide for any Community mechanism whatsoever for the examination or re-examination of individual situations, since both the substance of

the measures in question and the mechanisms for re-examination (see paragraphs 262 et seq. below) fell wholly within the purview of the Security Council and its Sanctions Committee. As a result, the Community institutions had no power of investigation, no opportunity to check the matters taken to be facts by the Security Council and the Sanctions Committee, no discretion with regard to those matters and no discretion either as to whether it was appropriate to adopt sanctions vis-à-vis the applicants. The principle of Community law relating to the right to be heard cannot apply in such circumstances, where to hear the person concerned could not in any case lead the institution to review its position.

259    It follows that the Council was not obliged to hear the applicant on the subject of his inclusion in the list of persons and entities affected by the sanctions, in the context of the adoption and implementation of the contested regulation.

260    The applicant's arguments based on the alleged infringement of his right to be heard by the Council in connection with the adoption of the contested regulation must therefore be rejected.

261    As regards, second, the applicant's alleged right to be heard by the Sanctions Committee in connection with his inclusion in the list of persons whose funds must be frozen pursuant to the Security Council's resolutions at issue, it is clear that no such right is provided for by the resolutions in question.

262    Nevertheless, although the resolutions of the Security Council concerned and the subsequent regulations that put them into effect in the Community do not provide for any right of audience for individual persons, they set up a mechanism for the re-examination of individual cases, by providing that the persons concerned may

address a request to the Sanctions Committee, through their national authorities, in order either to be removed from the list of persons affected by the sanctions or to obtain exemption from the freezing of funds (see, inter alia, paragraphs 20, 32 and 34 to 36 above).

263    The Sanctions Committee is a subsidiary body of the Security Council, composed of representatives of States which are members of the Security Council. It has developed into an important standing body responsible for the day-to-day supervision of the enforcement of the sanctions and can promote the consistent interpretation and application of the resolutions by the international community (Advocate General Jacobs's Opinion in *Bosphorus*, paragraph 189 above, paragraph 46).

264    With particular regard to an application for re-examination of an individual case, for the purpose of having the person concerned removed from the list of persons affected by the sanctions, section 7 of the 'Guidelines of the [Sanctions] Committee for the conduct of its work', adopted on 7 November 2002 and amended on 10 April 2003 (see paragraph 50 above), provides as follows:

'(a)  Without prejudice to available procedures, a petitioner (individual(s), groups, undertakings, and/or entities on the 1267 Committee's consolidated list) may petition the government of residence and/or citizenship to request review of the case. In this regard, the petitioner should provide justification for the de-listing request, offer relevant information and request support for de-listing;

(b)  The government to which a petition is submitted (the petitioned government) should review all relevant information and then approach bilaterally the government(s) originally proposing designation (the designating government(s))

to seek additional information and to hold consultations on the de-listing request;

(c) The original designating government(s) may also request additional information from the petitioner's country of citizenship or residency. The petitioned and the designating government(s) may, as appropriate, consult with the Chairman of the Committee during the course of any such bilateral consultations;

(d) If, after reviewing any additional information, the petitioned government wishes to pursue a de-listing request, it should seek to persuade the designating government(s) to submit jointly or separately a request for de-listing to the Committee. The petitioned government may, without an accompanying request from the original designating government(s), submit a request for de-listing to the Committee, pursuant to the no-objection procedure;

(e) The Committee will reach decisions by consensus of its members. If consensus cannot be reached on a particular issue, the Chairman will undertake such further consultations as may facilitate agreement. If, after these consultations, consensus still cannot be reached, the matter may be submitted to the Security Council. Given the specific nature of the information, the Chairman may encourage bilateral exchanges between interested Member States in order to clarify the issue prior to a decision.'

265    The Court finds that, by adopting those Guidelines, the Security Council intended to take account, so far as possible, of the fundamental rights of the persons entered in the Sanctions Committee's list, and in particular their right to be heard.

266    The importance attached by the Security Council to observance of those rights is, moreover, clearly apparent from its resolution 1526 (2004) of 30 January 2004 which is intended, on the one hand, to improve the implementation of the measures imposed by paragraph 4(b) of Resolution 1267 (1999), paragraph 8(c) of Resolution 1333 (2000), and paragraphs 1 and 2 of Resolution 1390 (2002) and, on the other, to strengthen the mandate of the Sanctions Committee. In accordance with paragraph 18 of Resolution 1526 (2004), the Security Council '[s]trongly encourages all States to inform, to the extent possible, individuals and entities included in the Committee's list of the measures imposed on them, and of the Committee's guidelines and resolution 1452 (2002)'. Paragraph 3 of Resolution 1526 (2004) states that those measures are to be further improved in 18 months, or sooner if necessary.

267    Admittedly, the procedure described above confers no right directly on the persons concerned themselves to be heard by the Sanctions Committee, the only authority competent to give a decision, on a State's petition, on the re-examination of their case. Those persons are thus dependent, essentially, on the diplomatic protection afforded by the States to their nationals.

268    Such a restriction of the right to be heard, directly and in person, by the competent authority is not, however, to be deemed improper in the light of the mandatory prescriptions of the public international order. On the contrary, with regard to the challenge to the validity of decisions ordering the freezing of funds belonging to individuals or entities suspected of contributing to the financing of international terrorism, adopted by the Security Council through its Sanctions Committee under Chapter VII of the Charter of the United Nations on the basis of information communicated by the States and regional organisations, it is normal that the right of the persons involved to be heard should be adapted to an administrative procedure on several levels, in which the national authorities referred to in Annex II of the contested regulation play an indispensable part.

269    Further, Community law itself recognises the lawfulness of such procedural adaptations in the context of economic sanctions against individuals (see, by analogy, the order of the President of the Second Chamber of the Court of First Instance of 2 August 2000 in Case T-189/00 R *Invest Import und Export and Invest Commerce* v *Commission* [2000] ECR II-2993).

270    It may be added that, as the United Kingdom has quite rightly pointed out at the hearing, it is open to the persons involved to bring an action for judicial review based on domestic law, indeed even directly on the contested regulation and the relevant resolutions of the Security Council which it puts into effect, against any wrongful refusal by the competent national authority to submit their cases to the Sanctions Committee for re-examination (see, by analogy, the order of the President of the Court of First Instance in Case T-47/03 R *Sison* v *Council* [2003] ECR II-2047, paragraph 39).

271    In this instance, the file shows that by means of a letter from his lawyers of 1 March 2002 the applicant approached Saudi Arabia's permanent representative to the United Nations in order to assert his rights before the Sanctions Committee. According to the additional explanations given at the hearing, the applicant has never received any reply to that letter.

272    However, those circumstances have nothing to do with the Community and are therefore foreign to this dispute, the sole subject-matter of which is the lawfulness of the contested regulation.

273    In any case, the fact remains that any opportunity for the applicant effectively to make known his views on the correctness and relevance of the facts in consideration of which his funds have been frozen and on the evidence adduced against him appears to be definitively excluded. Those facts and that evidence, once classified as confidential or secret by the State which made the Sanctions Committee aware of

them, are not, obviously, communicated to him, any more than they are to the Member States of the United Nations to which the Security Council's resolutions are addressed.

274   None the less, in circumstances such as those of this case, in which what is at issue is a temporary precautionary measure restricting the availability of the applicant's property, the Court of First Instance considers that observance of the fundamental rights of the person concerned does not require the facts and evidence adduced against him to be communicated to him, once the Security Council or its Sanctions Committee is of the view that that there are grounds concerning the international community's security that militate against it.

275   It follows that the applicant's arguments alleging breach of his right to be heard by the Sanctions Committee in connection with his inclusion in the list of persons whose funds must be frozen pursuant to the resolutions of the Security Council in question must be rejected.

276   It follows that the applicant's arguments alleging breach of the right to be heard must be rejected.

— Concerning the alleged breach of the right to effective judicial review

277   Examination of the applicant's arguments relating to the alleged breach of his right to effective judicial review must take into account the considerations of a general nature already given to them in connection with the examination of the extent of the review of lawfulness, in particular with regard to fundamental rights, which it falls to the Court to carry out in respect of Community acts giving effect to resolutions of the Security Council adopted pursuant to Chapter VII of the Charter of the United Nations.

278  In the circumstances of this case, the applicant has been able to bring an action for annulment before the Court of First Instance under Article 230 EC.

279  In dealing with that action, the Court carries out a complete review of the lawfulness of the contested regulation with regard to observance by the institutions of the rules of jurisdiction and the rules of external lawfulness and the essential procedural requirements which bind their actions.

280  The Court also reviews the lawfulness of the contested regulation having regard to the Security Council's regulations which that act is supposed to put into effect, in particular from the viewpoints of procedural and substantive appropriateness, internal consistency and whether the regulation is proportionate to the resolutions.

281  Giving a decision pursuant to that review, the Court finds that it is not disputed that the applicant is indeed one of the natural persons entered in the Sanctions Committee's list on 19 October 2001 (see paragraph 23 above).

282  In this action for annulment, the Court has moreover held that it has jurisdiction to review the lawfulness of the contested regulation and, indirectly, the lawfulness of the resolutions of the Security Council at issue, in the light of the higher rules of international law falling within the ambit of *jus cogens*, in particular the mandatory prescriptions concerning the universal protection of the rights of the human person.

283  On the other hand, as has already been observed in paragraph 225 above, it is not for the Court to review indirectly whether the Security Council's resolutions in question are themselves compatible with fundamental rights as protected by the Community legal order.

II - 3738

284    Nor does it fall to the Court to verify that there has been no error of assessment of the facts and evidence relied on by the Security Council in support of the measures it has taken or, subject to the limited extent defined in paragraph 282 above, to check indirectly the appropriateness and proportionality of those measures. It would be impossible to carry out such a check without trespassing on the Security Council's prerogatives under Chapter VII of the Charter of the United Nations in relation to determining, first, whether there exists a threat to international peace and security and, second, the appropriate measures for confronting or settling such a threat. Moreover, the question whether an individual or organisation poses a threat to international peace and security, like the question of what measures must be adopted vis-à-vis the persons concerned in order to frustrate that threat, entails a political assessment and value judgments which in principle fall within the exclusive competence of the authority to which the international community has entrusted primary responsibility for the maintenance of international peace and security.

285    It must thus be concluded that, to the extent set out in paragraph 284 above, there is no judicial remedy available to the applicant, the Security Council not having thought it advisable to establish an independent international court responsible for ruling, in law and on the facts, in actions brought against individual decisions taken by the Sanctions Committee.

286    However, it is also to be acknowledged that any such lacuna in the judicial protection available to the applicant is not in itself contrary to *jus cogens*.

287    Here the Court would point out that the right of access to the courts, a principle recognised by both Article 8 of the Universal Declaration of Human Rights and Article 14 of the International Covenant on Civil and Political Rights, adopted by the United Nations General Assembly on 16 December 1966, is not absolute. On the one hand, at a time of public emergency which threatens the life of the nation, measures may be taken derogating from that right, as provided for on certain conditions by Article 4(1) of that Covenant. On the other hand, even where those exceptional circumstances do not obtain, certain restrictions must be held to be inherent in that right, such as the limitations generally recognised by the community

of nations to fall within the doctrine of State immunity (see, to that effect, the judgments of the European Court of Human Rights in *Prince Hans-Adam II of Liechtenstein* v *Germany* of 12 July 2001, *Reports of Judgments and Decisions* 2001-VIII, paragraphs 52, 55, 59 and 68, and in *McElhinney* v *Ireland* of 21 November 2001, *Reports of Judgments and Decisions* 2001-XI, in particular paragraphs 34 to 37) and of the immunity of international organisations (see, to that effect, the judgment of the European Court of Human Rights in *Waite and Kennedy* v *Germany* of 18 February 1999, *Reports of Judgments and Decisions,* 1999-I, paragraphs 63 and 68 to 73).

288   In this instance, the Court considers that the limitation of the applicant's right of access to a court, as a result of the immunity from jurisdiction enjoyed as a rule, in the domestic legal order of the Member States of the United Nations, by resolutions of the Security Council adopted under Chapter VII of the Charter of the United Nations, in accordance with the relevant principles of international law (in particular Articles 25 and 103 of the Charter), is inherent in that right as it is guaranteed by *jus cogens.*

289   Such a limitation is justified both by the nature of the decisions that the Security Council is led to take under Chapter VII of the Charter of the United Nations and by the legitimate objective pursued. In the circumstances of this case, the applicant's interest in having a court hear his case on its merits is not enough to outweigh the essential public interest in the maintenance of international peace and security in the face of a threat clearly identified by the Security Council in accordance with the Charter of the United Nations. In this regard, special significance must attach to the fact that, far from providing for measures for an unlimited period of application, the resolutions successively adopted by the Security Council have always provided a mechanism for re-examining whether it is appropriate to maintain those measures after 12 or 18 months at most have elapsed (see paragraphs 16, 25, 33 and 266 above).

290   Last, the Court considers that, in the absence of an international court having jurisdiction to ascertain whether acts of the Security Council are lawful, the setting-up of a body such as the Sanctions Committee and the opportunity, provided for by

KADI v COUNCIL AND COMMISSION

the legislation, of applying at any time to that committee in order to have any individual case re-examined, by means of a procedure involving both the 'petitioned government' and the 'designating government' (see paragraphs 263 and 264 above), constitute another reasonable method of affording adequate protection of the applicant's fundamental rights as recognised by *jus cogens*.

291    It follows that the applicant's arguments alleging breach of his right to effective judicial review must be rejected.

292    None of the applicant's pleas in law or arguments having been successful, the action must be dismissed.

**Costs**

293    Under Article 87(2) of the Rules of Procedure, the unsuccessful party is to be ordered to pay the costs if they have been asked for in the other party's pleadings. Under the first subparagraph of Article 87(4), the Member States and institutions which have intervened in the proceedings are to bear their own costs. Under Article 87(6), where a case does not proceed to judgment, costs are to be in the Court's discretion.

294    Having regard to the circumstances of the case and the forms of order sought by the parties, those provisions will find equitable application in a decision that the applicant will bear, in addition to his own costs, those of the Council and those incurred by the Commission up until 1 July 2002. The United Kingdom, and the Commission for the period after 1 July 2002, must bear their own costs.

On those grounds,

## THE COURT OF FIRST INSTANCE
(Second Chamber, Extended Composition)

hereby:

1.  Declares that there is no need to adjudicate on the application for annulment in part of Council Regulation (EC) No 467/2001 of 6 March 2001 prohibiting the export of certain goods and services to Afghanistan, strengthening the flight ban and extending the freeze of funds and other financial resources in respect of the Taliban of Afghanistan, and repealing Regulation (EC) No 337/2000 and for annulment of Commission Regulation (EC) No 2062/2001 of 19 October 2001 amending, for the third time, Regulation No 467/2001;

2.  Dismisses the action in so far as it is brought against Council Regulation (EC) No 881/2002 of 27 May 2002 imposing certain specific restrictive measures directed against certain persons and entities associated with Usama bin Laden, the Al-Qaeda network and the Taliban, and repealing Regulation No 467/2001;

3.  Orders the applicant to bear, in addition to his own costs, those of the Council and those incurred by the Commission until 1 July 2002;

KADI v COUNCIL AND COMMISSION

4. **Orders the United Kingdom of Great Britain and Northern Ireland, and the Commission for the period after 1 July 2002, to bear their own costs.**

Forwood          Pirrung          Mengozzi

Meij                    Vilaras

Delivered in open court in Luxembourg on 21 September 2005.

H. Jung                                              J. Pirrung

Registrar                                            President

II - 3743

JUDGMENT OF 21. 9. 2005 — CASE T-315/01

Table of contents

Legal framework  ................................................................  II - 3661

Background to the dispute ........................................................  II - 3664

Procedure and forms of order sought by the parties  ...................................  II - 3674

On the procedural consequences of the adoption of the contested regulation .............  II - 3677

On the substance ...............................................................  II - 3679

    1.    Preliminary considerations  ................................................  II - 3679

    2.    Concerning the ground of annulment alleging that the Council lacked competence to adopt the contested regulation  ...........................  II - 3681

        Questions asked by the Court and the parties' answers .....................  II - 3681

        Findings of the Court  ..................................................  II - 3688

    3.    Concerning the three pleas alleging breach of the applicant's fundamental rights    II - 3700

        Arguments of the parties  ...............................................  II - 3700

        Findings of the Court  ..................................................  II - 3711

        Preliminary observations ................................................  II - 3711

        Concerning the relationship between the international legal order under the United Nations and the domestic or Community legal order ................  II - 3712

        Concerning the scope of the review of legality that the Court must carry out .  II - 3719

        Concerning the alleged breaches of the applicant's fundamental rights  .......  II - 3726

        — Concerning the alleged breach of the right to respect for property and of the principle of proportionality ...........................................  II - 3726

        — The alleged breach of the right to be heard  ...........................  II - 3730

        — Concerning the alleged breach of the right to effective judicial review ....  II - 3737

Costs ........................................................................  II - 3741