**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

**NEXTERA ENERGY GLOBAL HOLDINGS B.V. AND NEXTERA ENERGY SPAIN HOLDINGS B.V.**

**V.**

**KINGDOM OF SPAIN**

**(ICSID CASE NO. ARB/14/11)**

I hereby certify that the attached document is a true copy of the English version of the Tribunal's Award dated 31 May 2019, which was rendered in the English and Spanish languages.

Meg Kinnear
Secretary-General

Washington, D.C., 31 May 2019

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**NEXTERA ENERGY GLOBAL HOLDINGS B.V. AND
NEXTERA ENERGY SPAIN HOLDINGS B.V.**

Claimants

and

**KINGDOM OF SPAIN**

Respondent

**ICSID Case No. ARB/14/11**

---

# AWARD

---

***Members of the Tribunal***
Professor Donald M. McRae, C.C., President of the Tribunal
The Honourable L. Yves Fortier, P.C., C.C., O.Q., Q.C., Arbitrator
Professor Laurence Boisson de Chazournes, Arbitrator

***Secretary of the Tribunal***
Ms. Luisa Fernanda Torres

*Date of dispatch to the Parties:* 31 May 2019

## REPRESENTATION OF THE PARTIES

*Representing Claimants:*

Ms. Karyl Nairn QC
Mr. George Zimmerman
Mr. David Herlihy
Ms. Teresa Queirós
Ms. Sara Nadeau-Séguin
Mr. Jacob Lefkowitz
Ms. Carla Alves
Skadden, Arps, Slate, Meagher & Flom (UK) LLP
40 Bank Street
London E14 5DS
United Kingdom

and

Mr. Alberto Fortún
Mr. Luis Pérez de Ayala
Cuatrecasas, Gonçalves Pereira
Calle de Almagro 9
28010, Madrid
Spain

*Representing Respondent:*

Mr. José Manuel Gutiérrez Delgado
Mr. Javier Castro López
Mr. Pablo Elena Abad
Mr. Antolín Fernández Antuña
Mr. Roberto Fernández Castilla
Ms. Patricia Fröhlingsdorf Nicolás
Ms. Mónica Moraleda Saceda
Ms. Elena Oñoro Sainz
Ms. Almudena Pérez-Zurita Gutiérrez
Ms. Amaia Rivas Kortazar
Ms. María José Ruíz Sánchez
Mr. Diego Santacruz Descartín
Mr. José María Alonso

Abogacía General del Estado
Ministry of Justice of the Government of
Spain
Calle Ayala 5
28001, Madrid
Spain

i

## TABLE OF CONTENTS

I.  INTRODUCTION AND PARTIES ................................................................................... 1

II.  PROCEDURAL HISTORY ........................................................................................... 1

III.  DAMAGES .................................................................................................................. 3

    A.  The Parties' Positions .......................................................................................... 3

    B.  The Tribunal's Analysis ....................................................................................... 4

        (1)  Damages........................................................................................................ 4

        (2)  Interest .......................................................................................................... 4

IV.  COSTS ......................................................................................................................... 5

    A.  The Parties' Positions .......................................................................................... 5

        (1)  Claimants' Position ...................................................................................... 5

        (2)  Respondent's Position .................................................................................. 7

    B.  The Costs of the Proceeding ................................................................................ 9

    C.  The Tribunal's Analysis ..................................................................................... 10

        (1)  Costs of the Proceeding .............................................................................. 10

        (2)  Costs of the Parties..................................................................................... 11

V.  AWARD ..................................................................................................................... 11

## TABLE OF SELECTED ABBREVIATIONS

| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
|---|---|
| C-[#] | Claimants' Exhibit |
| CL-[#] | Claimants' Legal Authority |
| Cl. Bif. | Claimants' Observations on the Request for Bifurcation dated 2 October 2015 |
| Cl. Costs | Claimants' Statement of Costs dated 28 September 2018 |
| Cl. Costs Update | Claimants' Updated Statement of Costs dated 11 April 2019 |
| Cl. C-Mem. Jur. | Claimants' Counter-Memorial on Preliminary Objections dated 8 August 2016 |
| Cl. Mem. Merits | Claimants' Memorial on the Merits dated 22 May 2015 |
| Cl. Rej. Jur. | Claimants' Rejoinder on Preliminary Objections dated 14 November 2016 |
| Cl. Reply Merits | Claimants' Reply on the Merits dated 10 August 2016 |
| Cl. Skeleton | Claimants' Skeleton Argument dated 9 December 2016 |
| Cl. PH Mem. | Claimants' Response to Tribunal's Post-Hearing Question dated 27 February 2017 |
| Cl. PH Reply | Claimants' Reply to Spain's Submission of 27 February 2017, dated 7 March 2017 |
| ECT | Energy Charter Treaty |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |

| R-[#] | Respondent's Exhibit |
|---|---|
| RL-[#] | Respondent's Legal Authority |
| Resp. Costs | Respondent's Statement of Costs dated 28 September 2018 |
| Resp. C-Mem. Merits | Respondent's Counter-Memorial on the Merits dated 4 March 2016 |
| Resp. Mem. Jur. | Respondent's Memorial on Preliminary Objections and Request for Bifurcation dated 9 September 2015 |
| Resp. Rej. Merits | Respondent's Rejoinder on the Merits dated 20 October 2016 |
| Resp. Reply Jur. | Respondent's Reply on Preliminary Objections dated 14 October 2016 |
| Resp. Skeleton | Respondent's Skeleton Argument dated 9 December 2016 |
| Resp. PH Mem. | Respondent's Response to Tribunal's Post-Hearing Question dated 27 February 2017 |
| Resp. PH Reply | Respondent's Reply to Claimants' Submission of 27 February 2017, dated 7 March 2017 |
| Request for Arbitration | Request for Arbitration dated 12 May 2014 |
| Tr. Day [#] [Speaker(s)] [page:line] | Transcript of the Hearing (English) (as revised by the Parties in February 2017) |
| Tribunal | Arbitral Tribunal constituted on 23 January 2015 |

## I.    INTRODUCTION AND PARTIES

1.    This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**"), on the basis of the Energy Charter Treaty, which entered into force on 16 April 1998 for the Netherlands and the Kingdom of Spain (the "**ECT**"), and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**").

2.    The Claimants are NextEra Energy Global Holdings B.V. ("**NextEra Global**"), and NextEra Energy Spain Holdings B.V. ("**NextEra Spain**"), both limited liability companies incorporated under the laws of the Netherlands (*besloten vennootschap met beperkte aansprakelijkheid*), (together, "**Claimants**").

3.    The Respondent is the Kingdom of Spain ("**Spain**" or "**Respondent**").

4.    Claimants and Respondent are collectively referred to as the "Parties." The Parties' representatives and their addresses are listed above on page (i).

## II.    PROCEDURAL HISTORY

5.    On 12 March 2019, the Tribunal rendered its Decision on Jurisdiction, Liability and Quantum Principles. That Decision constitutes an integral part of this Award and it is hereby incorporated as **Annex A**. The Procedural History of this arbitration leading up to the rendering of the Decision on Jurisdiction, Liability and Quantum Principles is summarized at Section II of that Decision.[1]  A summary of the procedural steps thereafter follows below.

6.    In the Decision on Jurisdiction, Liability and Quantum Principles, the Tribunal ruled:

---

[1] In addition, it is noted that on 11 March 2019, the Respondent filed an application seeking leave to introduce an additional legal authority to the record, namely, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.á.r.l v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and Principles of Quantum, 30 November 2018 ("**RREEF Decision**"). Claimants filed a response also on 11 March 2019, opposing the application. The Tribunal dismissed the application by its letter of 12 March 2019.

1

*"The Tribunal decides:*

*(i) That it has jurisdiction over this dispute.*

*(ii) That Respondent did not comply with its obligation under Article 10(1) of the ECT to provide fair and equitable treatment in that it failed to protect Claimants' legitimate expectations.*

*(iii)That Claimants are entitled to damages based on a return on the capitalized value of their assets as of 30 June 2016 on the basis of the WACC of the Termosol Plants plus a premium of 200bps, together with pre-judgment interest on the basis of 5-year Spanish sovereign bonds as at the date of the Award, compounded monthly.*

*(iv) That Claimants are to recalculate their damages claim of EUR 398.4 million in the light of a premium of WACC plus 200 bps and advise the Tribunal and Respondent of this recalculated amount within 10 days of the receipt of this Decision.*

*(v) That Claimants are entitled to post-judgment interest from the date of the Award on the basis of 5-year Spanish sovereign bonds as at the date of the Award, compounded monthly, until payment."[2]*

7.    On 19 March 2019, Respondent filed an application asking that its quantum experts be *"allowed by the Arbitral Tribunal to revise the calculations requested in the Tribunal's decision, paragraph 682."*

8.    On 21 March 2019, the Tribunal wrote to the Parties noting: "[t]*he Decision* [...] *provided that the Claimants' recalculation be forwarded to the Respondent and the Tribunal. If on receipt of the Claimants' recalculated damages the Respondent discovers that there has been an error in calculation then it is free to draw that to the Tribunal's attention.*"

9.    Thereafter, on 21 March 2019, Claimants submitted the calculation requested at paragraphs 680 and 682(iv) of the Decision on Jurisdiction, Liability and Quantum Principles, and made submissions concerning the interest rate.

---

[2] Decision on Jurisdiction, Liability and Quantum, 12 March 2019, ¶ 682. *See also, id.*, ¶ 680.

10. On 5 April 2019, Respondent informed the Tribunal that it had no observations to Claimants' recalculations of its damages claim of 21 March 2019, and that it did not find it appropriate to revisit the decision on the interest rate at that stage.

11. Following an invitation from the Tribunal, on 11 April 2019 Claimants submitted an updated Statement of Costs. On 16 April 2019, Respondent informed the Tribunal that it did not intend to file an updated Statement of Costs.

12. The proceeding was closed on 9 May 2019.

## III. DAMAGES

### A. THE PARTIES' POSITIONS

13. The Parties' submissions concerning quantum issues were summarized at Section VIII(A) of the Decision on Jurisdiction, Liability and Quantum Principles.

14. Following issuance of the above referenced Decision, in their letter of 21 March 2019, Claimants (i) submitted that the Tribunal had already heard the Parties' arguments on quantum and determined the applicable quantum principles, with the only issue remaining being an arithmetical reduction of 100 bps from the premium above the WACC;[3] (ii) confirmed that "*Claimants' damages figure 'based on a return on the capitalized value of their assets* [EUR 720.6 million] *as of 30 June 2016 on the basis of the WACC of the Termosol Plants plus a premium of 200 bps' is **EUR 290.6 million** (excluding interest) as of 30 June 2016;*"[4] and (iii) opposed any attempt by Respondent to reopen quantum matters pertaining to the alternative but-for scenario.[5] As to the quantification of interest, Claimants observed that Spain's central bank publishes the Spanish sovereign bond rates daily, and asked that the Tribunal "*specify the figure of the intended applicable rate directly in the Award so that there can be no ambiguity on enforcement.*"[6] Claimants also requested that a precise interest rate be specified in

---

[3] Cl. Letter, 21 March 2019, p. 1.

[4] Cl. Letter, 21 March 2019, pp. 2-3.

[5] Cl. Letter, 21 March 2019, p. 3.

[6] Cl. Letter, 21 March 2019, p. 4.

3

connection with the interest awarded on legal costs, and referred to the Parties' prior submissions on the matter.[7]

15.   In its communication of 5 April 2019, Respondent stated that "*it ha*[d] *no observations on the mathematical calculations of the Claimants' recalculation of their damages claim communicated* [...] *in the Claimants' letter of 21 March 2019.*"[8] As to quantification of interest, Respondent submitted that the Tribunal had already decided that the interest rate "*will be based on 5-year Spanish sovereign bonds at the date of the Award, compounded monthly*" and that it was not appropriate to revisit the Tribunal's decision on the interest rate at this stage.[9]

## B.   THE TRIBUNAL'S ANALYSIS

### (1)   Damages

16.   As pointed out above, in its Decision of 12 March 2019, the Tribunal left open the precise quantification of damages in light of its conclusions on the principles applicable to that quantification, and it invited Claimants to recalculate their damages claim in light of the Tribunal's Decision that damages should be calculated on the basis of a premium of WACC plus 200bps.

17.   As noted, Claimants responded on 21 March 2019 indicating that the recalculated amount was **EUR 290.6 million**, which had already been anticipated by its expert Compass Lexecon in its Second Report. Respondent raised no question about the accuracy of this recalculation. Accordingly, the Tribunal accepts the amount of **EUR 290.6 million** as the accurate calculation of the damages in this case.

### (2)   Interest

18.   The Tribunal also recalls that in its Decision of 12 March 2019 it concluded that both pre-judgment and post-judgment interest were to be awarded on the basis of 5-year Spanish

---

[7] Cl. Letter, 21 March 2019, p. 4 (citing Cl. Costs, ¶ 1, Cl. Mem. Merits, ¶¶ 305-311, Cl. Reply Merits, ¶¶ 602-604 and 606 (4) and (5); Resp. Costs, ¶ 9, Resp. C-Mem. Merits, ¶¶ 896-900 and 901(d), Resp. Rej. Merits, ¶¶ 1238 and 1240 (d).)

[8] Resp. Email, 5 April 2019.

[9] Resp. Email, 5 April 2019 (emphasis in original).

4

sovereign bonds as at the date of the Award, compounded monthly. At the time of making the Decision the 5-year sovereign bond rate was 0.234%. However, if interest were determined on the basis of 5-year sovereign bonds as of the date of this Award, that amount would be essentially zero which is the last rate published by Spain's Central Bank (Banco de España) on the date of the Award.[10] Since an award of zero interest is not consistent with the conclusion of the Tribunal (Decision, ¶ 671) that an award of interest was appropriate in this case, the Tribunal has decided to award interest at the rate of 0.234%, the rate for 5-year sovereign bonds at the date of the Decision. Prejudgment interest is thus to be awarded at this rate from the date of valuation, 30 June 2016, to the date of this Award. Post-judgment interest is to be awarded at this rate from the date of this Award until payment.

## IV. COSTS

### A. THE PARTIES' POSITIONS

#### (1) Claimants' Position

19. In the Reply on the Merits, Claimants asked that the Tribunal rendered an Award:

> "*(5) Ordering the Respondent to pay the Claimants the full costs of this arbitration, including, without limitations, arbitrator's fees, administrative costs of the Centre, counsel fees, expert fees, and all other costs associated with these proceedings, together with post-award interest on all such sums so awarded at the rates specified in sub-paragraph (4) above* [an appropriate commercial rate, 6.84%, or alternatively, EURIBOR + 3.5%]; [...]"[11]

---

[10] *See* Banco de España, Interest Rates and Exchange Rates at https://www.bde.es/webbde/en/estadis/infoest/tipos/tipos.html under Interest Rates (daily data), 1.3 Interest Rates on the Secondary Market for (Government and Private) Securities, Table TI.1.3 (last consulted on 31 May 2019). The Tribunal notes that the last rate publicly available on 31 May 2019 in the PDF "**Table TI.1.3**" on this website is the rate of 0.00 for 30 May 2019, and in the Excel "**Time Series of Chapter TI.1.3**" on this website is the rate of 0.004 for 30 May 2019.

[11] Cl. Reply Merits, ¶ 606(5). *See also*, Cl. Mem. Merits, ¶ 314(6).

20. In their statement of Costs dated 28 September 2018, Claimants reiterated that should their claims succeed, Respondent should bear the total arbitration costs incurred by Claimants.[12]

21. As updated on 11 April 2019, Claimants submit the following claim for legal costs and other expenses (*excluding* the advances made to ICSID to cover the costs of the proceeding):[13]

| Description | | Amount Claimed |
|---|---|---|
| Skadden professional fees | $ | **11,514,359.45** |
| Translation costs | $ | 175,714 |
| Other disbursements: copying, travel, lodging | $ | 441,556 |
| Cuatrecasas (Claimants' Spanish Law counsel) professional fees and disbursements | € | 287,102 |
| Compass Lexecon (Claimants' experts on quantum) professional fees and disbursements | € | **2,830,522.90** |
| Henry Price (Claimants' expert on the useful life of the Plants and nameplate capacity) professional fees and disbursements | $ | 206,074 |
| Client direct costs (travel and lodging for the merits hearing) | $ | 54,169 |
| No charge is made for the time of in-house counsel. | € | 6,117 |
| Witness disbursements (travel and lodging for the merits hearing) | $ | 49,223 |
| | € | 2,664 |
| Totals | $ | **12,441,095.45** |
| | € | **3,126,405.90** |

22. In addition, Claimants have also submitted the following claim for the advances made to ICSID to cover the costs of the proceeding:[14]

---

[12] Cl. Costs, ¶ 1.
[13] Cl. Costs Update, Annex A, Section I.

| Description | Amount Claimed |
|---|---|
| ICSID Registration Fee and share of advance on costs (calculated as a total of $525,000 less $41,000 in costs of interpretation that the Centre has paid out of the Claimants' advance and which they have agreed not to seek by way of cost recovery)[11] | $ 484,000 |

23. For the purposes of ICSID Arbitration Rule 28(2), Claimants submit that their costs were *"reasonably incurred"* because (i) they are consistent with the amounts deemed reasonable in prior ICSID cases; (ii) they are commensurate with the size, duration and complexity of this proceeding; (iii) the pleadings were extensive; (iv) Claimants have tried to reduce the length of the proceeding; and (v) Claimants have had to incur in more costs than Respondent.[15]

### (2) Respondent's Position

24. In its Statement of Costs dated 28 September 2018, the Respondent asks:

> *"As requested in Paragraph 901 d) of the Counter-Memorial on the Merits and in Paragraph 1240 d) of Rejoinder on the Merits, the Kingdom of Spain respectfully asks the Arbitral Tribunal to order the Claimants to pay all costs and expenses arising from this arbitration, including the ISCID* [sic] *administrative expenses, the arbitrators' fees and the attorneys' fees of the Kingdom of Spain, its experts and advisers, as well as any other cost or expenses incurred, including a reasonable rate of interest as of the date on which said costs were incurred to the date of their effective payment, for the* [...] *costs incurred by Respondent due to this arbitration."*[16]

---

[14] Cl. Costs, Annex A, Section II. Claimants explain that they *"do not seek reimbursement of the costs of hiring the IDRC, court reporters, interpreters or catering during the hearings in London, which the Claimants agreed to bear in full, regardless of the outcome of the arbitration, in return for Spain's agreement to convene the merits hearings in London,"* and note that *"these costs have been excluded from the Claimants' disbursements claimed in this submission."* Claimants add that "[f]or the same reason, the Claimants have also deducted the sum of $41,000 from their claimed share of the ICSID advances on costs, which [...] represent the costs of interpretation paid by ICSID." Cl. Costs, n. 11.

[15] Cl. Costs, ¶¶ 2-7.

[16] Resp. Costs, ¶ 9.

25.    Respondent submits the following claim for its legal costs and other expenses (*excluding the advances made to ICSID to cover the costs of the proceeding*):[17]

| Description | Amount |
| --- | --- |
| Courier | EUR 6,870.15 |
| Editing Services | EUR 61,267.43 |
| Expert Reports | EUR 367,688.86 |
| Hearing | N/A |
| Other Costs (services from public notaries) | EUR 3,632.50 |
| Translations | EUR 54,561.53 |
| Travel Expenses | EUR 16,216.33 |
| Legal Fees | EUR 2,592,390.00 |
| **Total (excluding advances on costs to ICSID)** | **EUR 3,102,626.80** |

26.    In addition, Respondent submits the following claim for the advances made to ICSID to cover the costs of the proceeding: **EUR 439,422.13**.[18]

27.    According to Respondent, "*the costs incurred by the Respondent should be paid by the Claimants in the case that the Tribunal decides not to uphold the Claimants' claim*."[19] While recognizing that under Article 61(2) of the ICSID Convention the Tribunal has discretion to allocate costs, Respondent submits that the Tribunal's decision must be well grounded and not be arbitrary, and it should consider the complexity of the proceeding and the Parties' conduct.[20]

28.    In that regard, Respondent contends that its conduct has been serious, professional, and in good faith, and that Spain has shown willingness to cooperate.[21] According to Spain, the Tribunal should consider (i) that Respondent submitted its pleadings in a timely manner, in contrast with Claimants' actions in connection with the timing for submission of the

---

[17] Resp. Costs, ¶¶ 11-18.

[18] Resp. Costs, ¶ 10.

[19] Resp. Costs, ¶ 23.

[20] Resp. Costs, ¶ 22.

[21] Resp. Costs, ¶ 24.

Reply on the Merits and the Addendum to Second Expert Report of Compass Lexecon;[22] (ii) that Respondent refrained from disturbing Claimants' preparation of their pleadings with document production applications, while Claimants did the opposite; (iii) Claimants' conduct during the document production phase including their failure to produce some data ordered by the Tribunal and their refusal to allow Respondent's expert to visit the Termosol Plants; (iv) Claimants' filing of a last minute witness statement by Mr. Arechabala.[23]

## B.   THE COSTS OF THE PROCEEDING

29.   The costs of the arbitration, including the fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount to (in USD):

Arbitrators' Fees and Expenses

| | |
|---|---|
| Prof. Donald M. McRae | USD 213,650.29 |
| The Honourable L. Yves Fortier | USD 148,193.74 |
| Prof. Laurence Boisson de Chazournes | USD 183,884.70 |
| ICSID's Administrative Fees | USD 180,000.00 |
| Direct Expenses | USD 109,505.42 |
| **Total** | **USD 835,234.15** |

30.   The above costs have been paid out of the advances made by the Parties.[24] The expended portion of each Party's advances to cover the above costs of the arbitration was: USD 438,127.56 (for Claimants) and USD 397,106.59 (for Respondent).[25]

---

[22] Resp. Costs, ¶ 25.

[23] Resp. Costs, ¶ 25.

[24] The ICSID Secretariat will provide the Parties with a Final Financial Statement of the case account. The remaining balance will be reimbursed to the Parties in proportion to the payments that they advanced to ICSID.

[25] The difference in the disbursements from the case fund allocated to each Party relates to the Parties' agreement that the costs of interpretation at the Hearing held 12-19 December 2016 paid from the case fund be covered by the Claimants only. *See* emails of 27 August 2015, 6 June 2016, and 24 June 2016; ICSID Letter of 8 December 2017. It should also be noted that, in accordance with the Parties' agreement, there were no disbursements from the case fund administered by ICSID for court reporting and venue relating to the Hearing held in London 12-19 December 2016. *Id.*

## C.     THE TRIBUNAL'S ANALYSIS

31.     Article 61(2) of the ICSID Convention provides:

> "*In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*"

32.     The Tribunal notes that Respondent lost on essentially all of the jurisdictional grounds and on the merits. However, Respondent's arguments on jurisdiction, particularly relating to the nature of the Dutch investment, were not trivial and Claimants' arguments on the merits were not fully endorsed, in particular their principal basis for assessing damages was rejected. In the view of the Tribunal, this should be reflected in the allocation of costs.

### (1)     Costs of the Proceeding

33.     With respect to the costs of the proceeding, while Respondent should pay the greater part, Claimants should also contribute to those costs. Accordingly, the Tribunal assesses the costs of the proceeding to be divided on the basis of two-thirds to be paid by Respondent and one-third by Claimants. The total costs of the proceeding paid from the case fund as indicated above amount to USD 835,234.15 (*supra*, ¶ 29), but this amount includes cost of the interpretation for the Hearing in December 2016 that Claimants agreed to bear in full regardless of the outcome of the arbitration.[26]     Accordingly, excluding those interpretation costs (USD 41,020.97), the costs of the proceeding paid from the case fund that the Tribunal is allocating among the Parties amount to USD 794,213.18.

34.     Two thirds of the above amount would be USD 529,475.45 (Respondent's share) and one third of that amount would be USD 264,737.73 (Claimants' share). The expended portion of Claimants' advances to ICSID *excluding* what pertains to costs of the interpretation for the Hearing in December 2016 is USD 397,106.59. The difference

---

[26] *See supra*, n. 14; Cl. Costs, n. 11.

10

between USD 397,106.59 and USD 264,737.73 is USD 132,368.86. Accordingly, the Tribunal orders Respondent to pay Claimants **USD 132,368.86**.

**(2)    Costs of the Parties**

35.    With respect to the costs of the Parties, the Respondent should bear its own costs and one third of Claimants' costs.

36.    Claimants' costs excluding the item for costs of the proceeding (*i.e.* excluding lodging fee and advances on costs to ICSID) amount to USD 12,441,095.45 + EUR 3,126,405.90 (*supra*, ¶ 21). One third of those amounts are **USD 4,147,031.81 + EUR 1,042,135.3**, which would be Respondent's share of Claimants' costs.

## V.    AWARD

37.    For the reasons set forth above, the Tribunal decides as follows:

(1)    The Tribunal's Decision on Jurisdiction, Liability and Quantum Principles of 12 March 2019, attached as **Annex A** is hereby reaffirmed.

(2)    Respondent shall pay Claimants the sum of **EUR 290.6 million** in compensation for its breach of Article 10(1) of the ECT to provide Claimants with fair and equitable treatment.

(3)    Respondent shall pay Claimants prejudgment interest on that amount from 30 June 2016 until the date of this Award at the rate of 0.234%, compounded monthly.

(4)    Respondent shall pay Claimants the amount of **USD 132,368.86** representing its share of the costs of the proceeding.

(5)    Respondent shall pay Claimants the amount of **USD 4,147,031.81** *plus* **EUR 1,042,135.3**, representing one-third of the Claimants' costs in this arbitration.

(6)    Respondent shall pay Claimants post-judgment interest on the amounts owing under this Award from the date of the Award until date of payment at the rate of 0.234%, compounded monthly.

The Honourable L. Yves Fortier, P.C., C.C., O.Q., Q.C.
Arbitrator    MAY 10 2019

Professor Laurence Boisson de Chazournes
Arbitrator

MAY 15 2019

Professor Donald M. McRae, C.C.
President

MAY 30 2019

12

ANNEX A

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**NEXTERA ENERGY GLOBAL HOLDINGS B.V. AND
NEXTERA ENERGY SPAIN HOLDINGS B.V.**

Claimants

and

**KINGDOM OF SPAIN**

Respondent

**ICSID Case No. ARB/14/11**

---

# DECISION ON JURISDICTION, LIABILITY AND QUANTUM PRINCIPLES

---

*Members of the Tribunal*
Professor Donald M. McRae, C.C., President of the Tribunal
The Honourable L. Yves Fortier, P.C., C.C., O.Q., Q.C., Arbitrator
Professor Laurence Boisson de Chazournes, Arbitrator

*Secretary of the Tribunal*
Ms. Luisa Fernanda Torres

*Date of dispatch to the Parties:* 12 March 2019

# REPRESENTATION OF THE PARTIES

*Representing Claimants:*

Ms. Karyl Nairn QC
Mr. George Zimmerman
Mr. David Herlihy
Ms. Teresa Queirós
Ms. Sara Nadeau-Séguin
Mr. Jacob Lefkowitz
Ms. Carla Alves
Skadden, Arps, Slate, Meagher & Flom (UK) LLP
40 Bank Street
London E14 5DS
United Kingdom

and

Mr. Alberto Fortún
Mr. Luis Pérez de Ayala
Cuatrecasas, Gonçalves Pereira
Calle de Almagro 9
28010, Madrid
Spain

*Representing Respondent:*

Mr. José Manuel Gutiérrez Delgado
Mr. Javier Castro López
Mr. Pablo Elena Abad
Mr. Antolín Fernández Antuña
Mr. Roberto Fernández Castilla
Ms. Patricia Fröhlingsdorf Nicolás
Ms. Mónica Moraleda Saceda
Ms. Elena Oñoro Sainz
Ms. Almudena Pérez-Zurita Gutiérrez
Ms. Amaia Rivas Kortazar
Ms. María José Ruíz Sánchez
Mr. Diego Santacruz Descartín
Mr. José María Alonso

Abogacía General del Estado
Ministry of Justice of the Government of
Spain
Calle Ayala 5
28001, Madrid
Spain

i

# TABLE OF CONTENTS

I. INTRODUCTION AND PARTIES ................................................................. 1

II. PROCEDURAL HISTORY .......................................................................... 1

   A. Registration and Constitution of the Tribunal .................................... 1

   B. The First Session ................................................................................ 2

   C. The Parties' Written Submissions and Procedural Applications........... 3

   D. The Non-Disputing Party Application ................................................ 12

   E. The Oral Procedure .......................................................................... 14

   F. The Post-Hearing Procedure ............................................................ 17

III. FACTUAL BACKGROUND ....................................................................... 22

   A. Introduction ..................................................................................... 23

   B. The Regulatory Framework for Renewable Energy Investments ......... 24

      (1) The Initial Framework ................................................................ 24

         a. The Electricity Law ................................................................ 25

         b. RD 2818/1998, RD 1432/2002, RD 436/2004, RDL 7/2006 ...... 27

      (2) Regulatory Framework I ............................................................ 32

         a. RD 661/2007 ....................................................................... 32

         b. RDL 6/2009 ......................................................................... 35

         c. RD 1614/2010 ..................................................................... 38

      (3) Other Developments in 2010-2012 ............................................ 40

         a. RDL 14/2010 ....................................................................... 40

         b. Law 2/2011 ......................................................................... 40

         c. RDL 1/2012 ......................................................................... 42

      (4) Regulatory Framework II ........................................................... 42

         a. Law 15/2012 ....................................................................... 42

         b. RDL 2/2013 ......................................................................... 43

      (5) Regulatory Framework III .......................................................... 44

         a. RDL 9/2013 ......................................................................... 44

         b. Law 24/2013 ....................................................................... 46

         c. RD 413/2014 and Ministerial Order IET/1045/2014 ............... 47

   C. Claimants' Investment........................................................................ 47

IV. THE PARTIES' CLAIMS AND REQUEST FOR RELIEF ............................. 50

V. JURISDICTION ....................................................................................... 53

A.  First Objection:  Lack of Jurisdiction *Ratione Materiae* and *Ratione Personae* – Lack of an Investment and an Investor ................................................................ 55

    (1)  The Parties' Positions ........................................................................... 55

        a.  Respondent's Position ............................................................... 55

        b.  Claimants' Position .................................................................. 58

    (2)  The Tribunal's Analysis ......................................................................... 60

        a.  Lack of an "*Investment*" under Article 1(6) of the ECT ............... 60

        b.  Lack of an "*Investor*" under Article 1(7) of the ECT.................... 61

B.  Second Objection: Lack of Jurisdiction *Ratione Voluntatis* – Denial of Benefits ....... 62

    (1)  The Parties' Positions ........................................................................... 62

        a.  Respondent's Position ............................................................... 62

        b.  Claimants' Position .................................................................. 68

    (2)  The Tribunal's Analysis ......................................................................... 76

        a.  Are Claimants Owned or Controlled by the Citizens or Nationals of a Third State? ............................................................................. 77

        b.  Do Claimants Have "Substantial Business Activities" in The Netherlands?....................................................................... 78

        c.  Assuming that Respondent Had the Right to Deny Benefits Did It Exercise that Right in a Timely Fashion? ......................................... 80

C.  Third Objection:  Lack of Jurisdiction *Ratione Personae* – Intra-EU Objection.......... 83

    (1)  The Parties' Positions ........................................................................... 83

        a.  Respondent's Position ............................................................... 83

        b.  Claimants' Position .................................................................. 90

    (2)  The Non-Disputing Party's Written Submission ................................................ 104

        a.  Spain's Offer to Arbitrate in the ECT Does Not Cover Investors from EU Member States........................................................................ 104

        b.  Spain's Offer to Arbitrate Is Not Valid ...................................... 106

    (3)  The Tribunal's Analysis ......................................................................... 108

        a.  Whether the ECT Excludes *Inter Se* Obligations Among EU Member States?................................................................................... 110

        b.  Whether the Subsequent Overlap Between the ECT and EU Law Rendered Spain's Offer to Arbitrate Invalid?................................................ 112

D.  Fourth Objection: Lack of Jurisdiction Over Claims Under Article 10(1) of the ECT Arising Out of the TVPEE and the Tax on Hydrocarbons......................................... 115

    (1)  The Parties' Positions ........................................................................... 115

|  |  | a. | Respondent's Position ................................................................. | 115 |
|  |  | b. | Claimants' Position ................................................................... | 118 |
|  |  | (2) | The Tribunal's Analysis ............................................................... | 120 |
| | E. | Fifth Objection: Lack of Jurisdiction Over Claims Under Article 10(7) of the ECT Arising Out of the TVPEE | | 121 |
|  |  | (1) | The Parties' Positions ................................................................ | 121 |
|  |  | a. | Respondent's Position ................................................................. | 121 |
|  |  | b. | Claimants' Position ................................................................... | 122 |
|  |  | (2) | The Tribunal's Analysis ............................................................... | 124 |
| VI. | APPLICABLE LAW | | | 124 |
|  | A. | The Parties' Positions ................................................................... | | 124 |
|  |  | (1) | Claimants' Position ................................................................... | 124 |
|  |  | (2) | Respondent's Position ................................................................. | 125 |
|  | B. | The Tribunal's Analysis ................................................................. | | 126 |
| VII. | LIABILITY | | | 126 |
|  | A. | The Parties' Positions ................................................................... | | 127 |
|  |  | (1) | The Standard in Article 10(1) of the ECT ........................................ | 127 |
|  |  | a. | Claimants' Position ................................................................... | 127 |
|  |  | b. | Respondent's Position ................................................................. | 131 |
|  |  | (2) | Article 10(1) of the ECT: Repudiation of Legitimate and Reasonable Expectations | 134 |
|  |  | a. | Claimants' Position ................................................................... | 134 |
|  |  | b. | Respondent's Position ................................................................. | 158 |
|  |  | (3) | Article 10(1) of the ECT: Failure to Provide a Stable, Consistent and Transparent Framework | 179 |
|  |  | a. | Claimants' Position ................................................................... | 179 |
|  |  | b. | Respondent's Position ................................................................. | 184 |
|  |  | (4) | Article 10(1) of the ECT: Unreasonable, Disproportionate and Discriminatory Measures | 191 |
|  |  | a. | Claimants' Position ................................................................... | 191 |
|  |  | b. | Respondent's Position ................................................................. | 196 |
|  |  | (5) | Article 10(1) of the ECT: Breach of Obligations Assumed Towards Claimants' Investments | 200 |
|  |  | a. | Claimants' Position ................................................................... | 200 |

   b. Respondent's Position ................................................................ 200

(6) Article 10(1) of the ECT and Article 10(7) of the ECT: Breach Due to the TVPEE in Law 15/2012 .............................................................. 200

   a. Claimants' Position ................................................................ 201

   b. Respondent's Position ............................................................ 201

B. The Tribunal's Analysis ................................................................ 201

(1) The Standard in Article 10(1) of the ECT ...................................... 201

(2) Article 10(1) of the ECT: Repudiation of Legitimate and Reasonable Expectations .............................................................................. 202

(3) Other Claims .............................................................................. 208

VIII. DAMAGES ............................................................................................ 208

A. The Parties Positions .................................................................... 208

(1) Claimants' Position .................................................................... 208

   a. Standard of Compensation ...................................................... 208

   b. Method of Valuation .............................................................. 209

   c. Damages Valuation ................................................................ 211

   d. Impact of the TVPEE ............................................................ 218

   e. Interest ................................................................................ 219

(2) Respondent's Position ................................................................ 220

   a. Method of Valuation .............................................................. 220

   b. Damages Valuation ................................................................ 220

   c. Impact of the TVPEE ............................................................ 223

   d. Interest ................................................................................ 224

B. Tribunal Analysis ........................................................................ 224

(1) The DCF Method for Determining Damages .................................. 224

(2) An Alternative Basis for a Damages Assessment ............................ 226

(3) The Quantification of Loss .......................................................... 226

   a. Value of Assets ...................................................................... 226

   b. What Constitutes a Reasonable Rate of Return? ........................ 229

   c. The Taxation Issue ................................................................ 230

   d. The Effect of Debt Restructuring .............................................. 231

   e. Interest ................................................................................ 231

   f. Other Issues ........................................................................ 233

   g. Conclusion ............................................................................ 233

IX.  COSTS .......................................................................................................................... 233

X.   DECISION ..................................................................................................................... 233

## TABLE OF SELECTED ABBREVIATIONS

| | |
|---|---|
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| C-[#] | Claimants' Exhibit |
| CL-[#] | Claimants' Legal Authority |
| Cl. Bif. | Claimants' Observations on the Request for Bifurcation dated 2 October 2015 |
| Cl. C-Mem. Jur. | Claimants' Counter-Memorial on Preliminary Objections dated 8 August 2016 |
| Cl. Mem. Merits | Claimants' Memorial on the Merits dated 22 May 2015 |
| Cl. Rej. Jur. | Claimants' Rejoinder on Preliminary Objections dated 14 November 2016 |
| Cl. Reply Merits | Claimants' Reply on the Merits dated 10 August 2016 |
| Cl. Skeleton | Claimants' Skeleton Argument dated 9 December 2016 |
| Cl. PH Mem. | Claimants' Response to Tribunal's Post-Hearing Question dated 27 February 2017 |
| Cl. PH Reply | Claimants' Reply to Spain's Submission of 27 February 2017, dated 7 March 2017 |
| Cl. Obs. Eiser | Claimants' Observations on the Eiser Award dated 22 June 2017 |
| Cl. Reply Eiser | Claimants' Reply Observations on the Eiser Award dated 18 July 2017 |
| Cl. Obs. EC Decision | Claimants' Observations on the EC Decision of 10 November 2017 in Case SA.40348 (20155/NN) dated 8 January 2018 |
| Cl. Obs. Achmea | Claimants' Observations on the Achmea Judgment, the Novenergía II Award, and the Blusum Award dated 9 April 2018 |

| CER- | Claimants' Expert Report |
|---|---|
| CER-Compass Lexecon First | First Expert Report of Professor Pablo T. Spiller and Dr. Manuel A. Abdala of Compass Lexecon dated 4 March 2015 |
| CER-Compass Lexecon Second | Second Expert Report of Professor Pablo T. Spiller and Dr. Manuel A. Abdala of Compass Lexecon dated 9 August 2016 |
| CER-Compass Lexecon Third | Addendum to Second Expert Report of Professor Pablo T. Spiller and Dr. Manuel A. Abdala of Compass Lexecon dated 19 August 2016 |
| CER-Price | Expert Report of Mr. Henry Price dated 9 August 2016 |
| CWS- | Claimants' Witness Statement |
| CWS-Arechabala First | First Witness Statement of Mr. Miguel Ignacio Arechabala dated 19 May 2015 |
| CWS-Arechabala Second | Second Witness Statement of Mr. Miguel Ignacio Arechabala dated 8 August 2016 |
| CWS-Arechabala Third | Third Witness Statement of Mr. Miguel Ignacio Arechabala dated 21 November 2016 |
| CWS-Davidson First | First Witness Statement of Mr. F. Mitchell Davidson dated 21 May 2015 |
| CWS-Davidson Second | Second Witness Statement of Mr. F. Mitchell Davidson dated 2 August 2016 |
| CWS- Kujawa First | First Witness Statement of Ms. Rebecca Kujawa dated 19 May 2015 |
| CWS- Kujawa Second | Second Witness Statement of Ms. Rebecca Kujawa dated 10 August 2016 |
| CWS- Nicolaï First | First Witness Statement of Mr. George Nicolaï dated 8 August 2016 |
| CWS- Nicolaï Second | Second Witness Statement of Mr. George Nicolaï dated 14 November 2016 |
| CWS-Sorensen | Witness Statement of Mr. Mark Sorensen |

| | dated 10 November 2016 |
|---|---|
| ECT | Energy Charter Treaty |
| EC First Application | European Commission's Application for Leave to Intervene as a Non-Disputing Party dated 12 November 2014 |
| EC Written Submission | European Commission's Written Submission dated 5 September 2016 |
| Hearing | Hearing on Jurisdiction and Merits held 12-19 December 2016 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| R-[#] | Respondent's Exhibit |
| RL-[#] | Respondent's Legal Authority |
| Resp. C-Mem. Merits | Respondent's Counter-Memorial on the Merits dated 4 March 2016 |
| Resp. Mem. Jur. | Respondent's Memorial on Preliminary Objections and Request for Bifurcation dated 9 September 2015 |
| Resp. Rej. Merits | Respondent's Rejoinder on the Merits dated 20 October 2016 |
| Resp. Reply Jur. | Respondent's Reply on Preliminary Objections dated 14 October 2016 |
| Resp. Skeleton | Respondent's Skeleton Argument dated 9 December 2016 |
| Resp. PH Mem. | Respondent's Response to Tribunal's Post-Hearing Question dated 27 February 2017 |
| Resp. PH Reply | Respondent's Reply to Claimants' Submission of 27 February 2017 dated 7 March 2017 |
| Resp. Obs. Eiser | Respondent's Observations on the Eiser Award |

| | dated 11 July 2017 |
|---|---|
| Resp. Reply Eiser | Respondent's Reply Observations on the Eiser Award dated 25 July 2017 |
| Resp. Obs. EC Decision | Respondent's Observations on the EC Decision of 10 November 2017 in Case SA.40348 (20155/NN) dated 8 January 2018 |
| Resp. Obs. Achmea | Respondent's Observations on the Achmea Judgment, the Novenergía II Award, and the Blusum Award dated 9 April 2018 |
| RER- | Respondent's Expert Report |
| RER-Accuracy First Economic | First Expert "*Economic Report on the Plaintiffs and their Claim*" of Mr. Eduard Saura, Mr. Christophe Schmit and Mr. Stéphane Perrotto of Accuracy dated 2 March 2016 |
| RER-Accuracy Second Economic | Second Expert "*Report on Claims of the Claimants*" of Mr. Eduard Saura, Mr. Christophe Schmit and Mr. Stéphane Perrotto of Accuracy dated 20 October 2016 |
| RER-Accuracy on Lack of Activity | Expert "*Economic Report on the Lack of Economic Activity of the Plaintiffs in the Netherlands*" of Mr. Eduard Saura and Mr. Christophe Schmit dated 14 October 2016 |
| RER-Casanova | Expert Report of Mr. Jesús Casanova dated 19 October 2016 |
| RER-Servert First | First Expert Report of Mr. Jorge Servert dated 14 October 2016 |
| RER-Servert Second | Supplementary Expert Report of Mr. Jorge Servert submitted 13 December 2016 |
| RWS- | Respondent's Witness Statement |
| RWS-Montoya First | First Witness Statement of Mr. Carlos Montoya dated 3 March 2016 |
| RWS-Montoya Second | Second Witness Statement of Mr. Carlos Montoya dated 19 October 2016 |

| Request for Arbitration | Request for Arbitration dated 12 May 2014 |
| --- | --- |
| Tr. Day [#] [Speaker(s)] [page:line] | Transcript of the Hearing (English) (as revised by the Parties in February 2017) |
| Tribunal | Arbitral Tribunal constituted on 23 January 2015 |

## I. INTRODUCTION AND PARTIES

1.  This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**"), on the basis of the Energy Charter Treaty, which entered into force on 16 April 1998 for the Netherlands and the Kingdom of Spain (the "**ECT**"), and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**").

2.  The Claimants are NextEra Energy Global Holdings B.V ("**NextEra Global**"), and NextEra Energy Spain Holdings B.V. ("**NextEra Spain**"), both limited liability companies incorporated under the laws of the Netherlands (*besloten vennootschap met beperkte aansprakelijkheid*), (together, "**Claimants**").

3.  The Respondent is the Kingdom of Spain ("**Spain**" or "**Respondent**").

4.  Claimants and Respondent are collectively referred to as the "Parties." The Parties' representatives and their addresses are listed above on page (i).

5.  This dispute relates to measures implemented by Respondent modifying the regulatory and economic regime of renewable energy projects.

## II. PROCEDURAL HISTORY

### A. REGISTRATION AND CONSTITUTION OF THE TRIBUNAL

6.  On 15 May 2014, ICSID received a Request for Arbitration dated 12 May 2014, accompanied by exhibits C-001 to C-012, from Claimants against Spain (the "**Request for Arbitration**"). On 21 May 2014, the Centre formulated a question to Claimants regarding the Request for Arbitration, and Claimants submitted a response on 22 May 2014.

7.  On 23 May 2014, in accordance with Article 36(3) of the ICSID Convention, the Secretary-General of ICSID registered the Request for Arbitration, as supplemented by

letter of 22 May 2014, and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings (the "**Institution Rules**").

8. In accordance with Article 37(2)(a) of the ICSID Convention, the Parties agreed to constitute the Tribunal as follows: three arbitrators, one to be appointed by each Party, and the third, presiding arbitrator to be appointed by agreement of the Parties. Pursuant to the Parties' agreed method of constitution, failing an agreement of the Parties on the presiding arbitrator, s/he would be appointed by the Chairman of the ICSID Administrative Council without limitation to the ICSID Panel of Arbitrators.

9. The Tribunal is composed of Professor Donald M. McRae, a national of Canada and New Zealand, President, appointed by agreement of the Parties; Mr. L. Yves Fortier, a national of Canada, appointed by Claimants; and Professor Laurence Boisson de Chazournes, a national of France and Switzerland, appointed by Respondent.

10. On 23 January 2015, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**ICSID Arbitration Rules**"), the Secretary-General of ICSID notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Ms. Luisa Fernanda Torres, ICSID Legal Counsel, was designated to serve as the Secretary of the Tribunal.

## B. THE FIRST SESSION

11. On 15 May 2015, a date agreed by the Parties, in accordance with ICSID Arbitration Rule 13(1) the Tribunal held a first session with the Parties in-person in Washington, DC.

12. On 21 May 2015, following the First Session, the Tribunal issued **Procedural Order No. 1**, supplemented on 3 June 2015 with its Annex A (Procedural Calendar). Procedural Order No. 1 embodied the Parties' agreements on procedural matters and the Tribunal's decisions on the disputed issues. It established, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural languages would

2

be English and Spanish, that the place of proceeding would be Washington, DC, and it also set out the Procedural Calendar for this arbitration.

## C. THE PARTIES' WRITTEN SUBMISSIONS AND PROCEDURAL APPLICATIONS

13.   On 22 May 2015, Claimants filed their Memorial on the Merits ("**Memorial on the Merits**"), accompanied by exhibits C-001 to C-124; legal authorities CL-001 to CL-064; three (3) witness statements by: Mr. F. Mitchell Davidson, Mr. Miguel Ignacio Arechabala and Ms. Rebecca Kujuwa, respectively; and one (1) expert report by Dr. Manuel Abdala and Prof. Pablo Spiller of Compass Lexecon, with exhibits CLEX-001 to CLEX-106.[1]

14.   On 23 June 2015, pursuant to the Procedural Calendar, Respondent provided a notice of its intent to submit Objections to Jurisdiction and a Request for Bifurcation.

15.   On 9 September 2015, Respondent filed a Memorial on Preliminary Objections with Request for Bifurcation ("**Memorial on Jurisdiction and Request for Bifurcation**"); accompanied by exhibits R-001 to R-028; and legal authorities RL-001 to RL-019.

16.   On 18 September 2015, following a joint request by the Parties, the Tribunal amended the Procedural Calendar ("**Procedural Calendar – Amendment No. 1**").

17.   On 28 September 2015, Claimants filed an application asking the Tribunal to order Respondent to produce a legal authority to the Tribunal to assess its relevance, and then to Claimants if the Tribunal found the authority relevant, namely, *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction (13 October 2014) ("*PV Investors* **Award on Jurisdiction**").   On 5 October 2015, Respondent filed observations on this application, together with exhibit R-029.

---

[1] Exhibits C-001 to C-012 had been previously submitted with the Request for Arbitration. *See supra*, ¶ 6.

18.     On 2 October 2015, Claimants filed their Observations on Respondent's Request for Bifurcation ("**Response on Bifurcation**"); accompanied by legal authorities CL-086 to CL-133.[2]

19.     On 28 October 2015, the Tribunal issued **Procedural Order No. 2**, dismissing Respondent's Request for Bifurcation.

20.     On 6 January 2016, the Tribunal decided not to issue the order requested in Claimants' application of 28 September 2015, but encouraged Respondent to make its best efforts to make the *PV Investors* Award on Jurisdiction available to the Tribunal. On 18 February 2016, Respondent submitted the *PV Investors* Award on Jurisdiction to the record (without a designated legal authority number), together with evidence of consent of the claimants in the *PV Investors* proceeding.[3]

21.     On 4 March 2016, Respondent filed its Counter-Memorial on the Merits ("**Counter-Memorial on the Merits**"), accompanied by exhibits R-030 to R-231; legal authorities RL-020 to RL-098; one (1) witness statement by Mr. Carlos Montoya; and one (1) expert report by Mr. Eduard Saura, Mr. Christophe Schmit and Mr. Stéphane Perrotto of Accuracy, with exhibits ACQ-001 to ACQ-039.

22.     On 22 March 2016, Claimants informed the Centre and the Tribunal that the Spanish law firm Cuatrecasas Gonçalves Pereira had been retained as co-counsel in this matter, and on 20 May 2016 provided the corresponding power of attorney.

23.     On 13 May 2016, following exchanges between the Parties, the Parties submitted for decision by the Tribunal their respective Redfern Schedules including their Requests, Objections and Replies on Document Production.

24.     On 3 June 2016, the Tribunal issued **Procedural Order No. 4** on Document Production.

---

[2] The legal authorities were submitted electronically on 5 October 2015.

[3] On 8 August 2016, Claimants resubmitted a copy of this Award with their Counter-Memorial on Jurisdiction, as CL-134.

25. On 8 August 2016, Claimants filed their Counter-Memorial on Preliminary Objections ("**Counter-Memorial on Jurisdiction**") accompanied by exhibits C-126 to C-167; legal authorities CL-134 to CL-144; and one (1) witness statement, by Mr. George Nicolaï.[4]

26. On 8 and 9 August 2016, the Parties informed the Tribunal of an agreed extension of the deadline for the Claimants' Reply on the Merits until 10 August 2016, Respondent's agreement being conditioned upon Claimants' submission of certain evidence of the circumstances causing the delay together with the Reply on the Merits.

27. On 11 August 2016, Claimants filed their Reply on the Merits ("**Reply on the Merits**") accompanied by exhibits C-168 to C-271; legal authorities CL-145 to CL-175; three (3) witness statements by: Mr. F. Mitchell Davidson, Mr. Miguel Ignacio Arechabala, and Ms. Rebecca Kujawa, respectively; two (2) expert reports: one by Dr. Manuel Abdala and Prof. Pablo Spiller of Compass Lexecon, with exhibits CLEX-107 to CLEX-282, an another by Mr. Henry Price, with exhibits SD-001 to SD-024.

28. On 11 August 2016, Claimants also filed a communication explaining the circumstances underlying the extension for the submission of the Reply on the Merits, and announcing that "[u]*nless the Tribunal otherwise direct*[ed], *Dr Abdala and Professor Spiller w*[ould] *supplement their evidence with a brief further report*" to take account of those circumstances, approximately within two weeks. In addition, alleging delays in Respondent's document production, Claimants requested a further opportunity to analyze the materials received during document production and to introduce them into the record at a later time, by consent or with leave from the Tribunal. On 11 August 2016, Respondent filed a response objecting to the delay in the filing of the Reply on the Merits and opposing to Claimants' requests of 11 August 2016. On 12 August 2016, Claimants submitted reply observations.

29. On 17 August 2016, the Tribunal (i) informed the Parties that the consequences of the delay in the filing of the Reply on the Merits could be considered in the determination of costs but did not affect the admissibility of the submission, and it invited Respondent to

---

[4] The exhibits and legal authorities were submitted electronically on 9 August 2016.

provide comments concerning the subsequent Procedural Calendar; and (ii) indicated that it would rule on the issue of admissibility of any further reports or documents if and when an application for leave to file them was made. On 18 August 2016, Respondent filed observations on the subsequent Procedural Calendar, and Claimants filed a reply on the same day.

30. On 19 August 2016, Claimants submitted an Addendum to the Second Expert Report of Dr. Abdala and Prof. Spiller, with exhibits CLEX-283 to CLEX-286. On 22 August 2016, the Tribunal invited Respondent to make observations on the admissibility of this report, and it informed the Parties that the report would not be transmitted to the Tribunal Members until a ruling on its admissibility had been made. On 29 August 2016, Respondent filed a response, opposing the admissibility the report, and requesting an extension for the filing of its Rejoinder on the Merits. On 30 August 2016, Claimants submitted observations on the requested extension.

31. On 15 September 2016, the Tribunal (i) admitted into the record the Addendum to the Second Expert Report of Dr. Abdala and Prof. Spiller dated 19 August 2016; and (ii) granted Respondent an extension for the filing of the Rejoinder on the Merits ("**Procedural Calendar – Amendment No. 2**").

32. On 14 October 2016, Respondent filed its Reply on Preliminary Objections ("**Reply on Jurisdiction**"), accompanied by exhibits R-232 to R-276; legal authorities RL-099 to RL-110; and one (1) expert report by Mr. Eduard Saura and Mr. Christophe Schmit of Accuracy, with exhibits ACQ-040 to ACQ-042.

33. On 20 October 2016, Respondent filed its Rejoinder on the Merits ("**Rejoinder on the Merits**"), accompanied by exhibits R-277 to R-424; legal authorities RL-111 to RL-120; one (1) witness statement by Mr. Carlos Montoya, with exhibits R-225_CMR to R-266_CMR; three (3) expert reports by: Mr. Eduard Saura, Mr. Christophe Schmit and Mr. Stéphane Perrotto of Accuracy with exhibits ACQ-043 to ACQ-090, Mr. Jesús Casanova

6

with five unnumbered exhibits, and Prof. Jorge Servert with exhibits JSR-001 to JSR-010 and JSRC-001 to JSRC-041, respectively.[5]

34.     On 27 October 2016, Respondent filed an application requesting authorization from the Tribunal to submit an additional exhibit (R-424) and certain corrected exhibits (JSR-05 and JSR-10). On the same day, Claimants consented to the request. On 28 October 2016, the Tribunal granted Respondent's application, and on 3 November 2016 the documents were submitted by Respondent.

35.     On 8 November 2016, the Tribunal held a pre-hearing organizational conference with the Parties by telephone.

36.     On 11 November 2016, the Tribunal issued **Procedural Order No. 5** embodying the Parties' agreements on procedural matters pertaining to the organization of the Hearing and the Tribunal's decisions on the disputed issues.

37.     On 7 November 2016, Claimants filed an application asking the Tribunal (i) to order Respondent to produce certain documents not produced and to provide a complete copy of an exhibit already on record (R-078); and (ii) to grant Claimants leave to introduce the materials into the record if they elected to do so upon review. On 8 November 2016, Respondent (i) filed observations on Claimants' application of 7 November 2016; (ii) filed its own application asking the Tribunal to order Claimants to produce a number of documents not produced; and (iii) communicated to the Tribunal its willingness to introduce into the record a new legal authority, namely *Isolux Infrastructure Netherlands BV v. Kingdom of Spain*, SCC Case V2013/153, Award (12 July 2016) ("*Isolux* **Award**") subject to a guarantee of confidentiality by the present Tribunal. On 15 November 2016, Claimants provided observations on Respondent's application of 8 November 2016.[6]

---

[5] Exhibits R-424, JSR-005 and JSR-010 were submitted electronically on 3 November 2016. *See infra*, ¶ 34.

[6] On 21 and 22 November 2016, the Parties filed further communications relating to one of the matters at issue in Respondent's application (Respondent's Request for Document Production No. 52), further discussed *infra*, ¶ 42. In addition, in the communication of 22 November 2016, Respondent reiterated its request to the Tribunal to order the confidentiality of the *Isolux* Award, and asked for the same order with respect to another legal authority filed by Claimants, namely *CSP Equity Investment S.à.r.l v. Kingdom of Spain*, SCC Case 2013/094, Award on Jurisdiction (13 May 2016) (**CL-176**).

38. On 14 November 2016, Claimants filed their Rejoinder on Preliminary Objections ("**Rejoinder on Jurisdiction**"), accompanied by exhibits C-272 to C-282; legal authorities CL-176 to CL-192; and two (2) witness statements by: Mr. George Nicolaï, and Mr. Mark Sorensen, respectively.[7]

39. On 16 November 2016, Respondent filed a request for clarification of Procedural Order No. 5. The Tribunal responded on the same day.

40. On 18 November 2016, the Parties notified the witnesses and experts called for examination at the Hearing.

41. On 23 November 2016, the Tribunal issued **Procedural Order No. 6** concerning the Parties' applications of 7 and 8 November 2016 (*supra*, ¶ 37). The Tribunal (i) ruled on the Parties' respective requests for document production, ordering production of some documents and dismissing some requests; (ii) deferred the decision relating to one of the matters at issue (Respondent's Request for Document Production No. 52); (iii) invited the Parties to liaise directly concerning another of the matters at issue (Respondent's Request for Document Production No. 55); (iv) authorized the introduction of the *Isolux* Award into the record granting confidentiality with respect to that award, and to "*any other award provided to the Tribunal where confidentiality is required.*" On 25 November 2016, following the Tribunal's authorization, Respondent submitted the *Isolux* Award to the record (RL-121) in Spanish.

42. From 21 November 2016 to 30 November 2016, the Parties filed a number of additional procedural applications and communications in response to them, as follows:

- On 21 November 2016: (i) Respondent submitted an application for leave from the Tribunal to add new documents to the record;[8] (ii) Claimants filed observations concerning the production of documents relating to Respondent's Request for Document Production No. 52, and applied to introduce those documents into the record; and (iii) Claimants submitted a second application to add new documents to the record,[9] to file a supplementary witness statement by

---

[7] One of the exhibits (C-282) was submitted electronically on 15 November 2016.

[8] These documents were provisionally identified as R-425 to R-442, RL-122 to RL-123. *See* Respondent's communication of 25 November 2016.

[9] These documents were provisionally identified as C-283 to C-293.

Mr. Miguel Ignacio Arechabala, and to supplement certain legal authorities already on the record.[10] On 22 November 2016, Respondent filed a response to Claimants' applications of 21 November 2016, and Claimants filed a communication on this matter on the same day. On 25 November 2016, the Parties filed further submissions concerning these pending applications to add new materials to the record.

- On 24 November 2016, in connection with Procedural Order No. 6, Respondent submitted a communication regarding Respondent's Request for Document Production No. 55, asking the Tribunal to order Claimants to produce complete documents. On 25 November 2016, Claimants filed a response. On 26 November 2016, Respondent filed reply observations. On 28 November 2016, Claimants filed rejoinder observations. And, on 29 November 2016, Respondent submitted a further communication addressing *inter alia* Claimants' communication of 28 November 2016 in connection with this issue.

- On 24 November 2016, the Parties submitted a communication to the Tribunal, indicating that they had not been able to reach an agreement on the Hearing Agenda, highlighting two specific areas of disagreement among them.

- On 26 November 2016, Claimants submitted a request that Respondent be ordered to provide an English translation of the *Isolux* Award by a certain date. On 28 November 2016, Respondent submitted observations regarding this request, together with an update on the document production ordered in Procedural Order No. 6. On 28 November 2016, Claimants submitted a communication addressing, *inter alia*, the timing for the production of the *Isolux* Award and the documents ordered by Procedural Order No. 6. On 29 November 2016, Respondent made further submissions concerning these matters. On 30 November 2016, Claimants filed a response.

- On 26 November 2016, Respondent made an additional application to add further documents to the record.[11] On 28 November 2016, Claimants filed observations in response. On 29 November 2016, Respondent submitted a communication replying, *inter alia,* to Claimants' observations of 28 November 2016 relating to this application.

43. On 1 December 2016, the Tribunal issued **Procedural Order No. 7**, concerning the above referenced applications (*supra* ¶ 42) (i) authorizing the Parties to introduce into the record the documents referred to in their respective applications of 21 November 2016; (ii) authorizing the filing of the new witness statement from Mr. Arechabala and affording Respondent additional time at the Hearing (over its already allotted time) to

---

[10] The legal authorities referred to were CLEX-006, CLEX-052, CLEX-117, CLEX-174, CL-005, RL-115.

[11] These documents were provisionally identified as R-443 to R-446.

address this witness statement through direct examination of Prof. Servert and Mr. Montoya; (iii) inviting Claimants to use their best efforts to produce more responsive data with regard to Respondent's Request for Document Production No. 55; (iv) ruling on the Parties' disagreements concerning the Hearing Agenda; (v) asking Respondent to provide a translation of the *Isolux* Award; and (vi) instructing the Parties to file Skeleton Arguments by 9 December 2016.

44.    On 2 December 2016, the Parties submitted a joint application to add a number of additional documents into the record,[12] observing that Respondent's exhibits referred in this application were the same at issue Respondent's application of 26 November 2016 (*supra*, ¶ 42, last bullet). On 2 December 2016, in light of the Parties' agreement, the Tribunal authorized the introduction of these exhibits to the record.

45.    From 5 to 9 December 2016, pursuant to Procedural Order No. 7 and the Tribunal's ruling of 2 December 2016, the Parties introduced into the record the following materials:

Claimants

- On 5 December 2016, a third witness statement by Mr. Miguel Ignacio Arechabala dated 21 November 2016.

- On 6 December 2016, exhibits C-283 to C-302.

- On 9 December 2016, exhibits C-303, and legal authorities CL-193 to CL-194.

Respondent

- On 5 December 2016, exhibits R-425 to R-458,[13] and legal authorities RL-122 to RL-123.

- On 5 December 2016, an English translation of the *Isolux* Award (RL-121), and an additional translation of exhibit C-027.

46.    On 5 December 2016, the Parties submitted their proposed Hearing Agenda.

---

[12] These documents were provisionally identified as exhibits C-294 to C-299, R-443 to R-446, and supplements to CLEX-056 and CLEX-124.

[13] The number designations do not correspond to those initially proposed by Respondent in its applications of 21 and 26 November 2016, and 2 December 2016. Respondent submitted the documents related to Procedural Order No. 7 as R-425 to R-454, and those relating to the Tribunal's letter of 2 December 2016 as R-455 to R-458.

47.     On 6 December 2016, Respondent filed an application requesting leave from the Tribunal to introduce additional documents to the record.[14]  On 7 December 2016, Claimants filed a response.  On 8 December 2016, Respondent filed reply observations, and requested leave from the Tribunal to submit a supplementary report by Prof. Jorge Servert.  On 8 December 2016, the Tribunal ruled on this application, authorizing the submission of Prof. Servert's supplementary report and additional exhibits.  Thus, on 13 December 2016, Respondent filed a Supplementary Expert Report by Prof. Jorge Servert, accompanied by exhibits JSR-011 to JSR-018, JSR-020 to JSR-030, JSRN-002, JSRN-003, JSRN-009 to JSRN-015 and JSRN-37 to JSRN-38.

48.     On 9 December 2016, the Parties submitted their respective Skeleton Arguments.

49.     On 11 December 2016, Claimants submitted corrected versions of two previously filed exhibits (C-151 and C-152).  On 12 December 2016, the Tribunal heard both Parties orally on this matter during Day 1 of the Hearing, and took note that Respondent did not object.[15]  Accordingly, the revised versions of exhibits C-151 and C-152 were admitted.

50.     On 13 December 2016, during Day 2 of the Hearing, Claimants submitted a corrected version of Mr. Nicolaï Witness Statement.  The Tribunal heard both Parties orally on this matter that day, and the corrections were introduced into the record.[16]

51.     On 13 December 2016, Claimants submitted corrected versions of Mr. Arechabala's three witness statements.  On 14 December 2016, the Tribunal heard both Parties orally on this matter during Day 3 of the Hearing.  Respondent did not object.[17]

52.     On 16 December 2016, Claimants filed an application to add a new document to the record (namely, a draft Renewables Energies Directive published on 30 November 2016 by the European Union).  The application attached a previous exchange between the Parties on that same day, including a communication from Respondent objecting to the introduction of this document with its reasons.  On 17 December 2016, the Tribunal ruled

---

[14] These documents were provisionally identified as exhibits JSR-011 to JSR-027, and JSRN-037 to JSRN-038.

[15] Tr. Day 1 (ENG), 10:18–12:1 (President, Mr. Santacruz, Ms. Nairn).

[16] Tr. Day 2 (ENG), 425:17–427:12; 428:6–429:6 (Mr. Santacruz, President, Ms. Nairn).

[17] Tr. Day 3 (ENG), 488:2–490:14 (President, Ms. Nairn, Mr. Santacruz).

on the matter orally during Day 6 of the Hearing, allowing the introduction of the document into the record.[18]   Thus, on 17 December 2016, Claimants introduced the document as exhibit C-304.

53.   On 17 December 2016, Claimants filed a communication inquiring whether the Tribunal required the production of certain invoices, in connection with a question raised by one of the arbitrators during Day 2 of the Hearing (13 December 2016).   On 18 December 2016, the Tribunal responded in the affirmative, inviting Claimants to provide the documents to the Tribunal and Respondent.   On 20 December 2016, Claimants submitted the invoices in question (without designated exhibit numbers).   On 21 December 2016, Respondent filed observations on these documents.   On 22 December 2016, Claimants filed a response.

## D.   THE NON-DISPUTING PARTY APPLICATION

54.   On 14 November 2014, the European Commission ("**EC**") filed an Application for Leave to Intervene as a Non-Disputing Party dated 12 November 2014 ("**EC First Application**").   The EC First Application was communicated to the Parties on the same day it was received, and to the Tribunal upon its constitution on 23 January 2015.

55.   Following the First Session, pursuant to ICSID Arbitration Rule 37(2) the Tribunal invited the Parties to provide comments on the EC First Application in accordance with the Procedural Calendar set forth in Procedural Order No. 1, Annex A issued on 3 June 2015 (*supra*, ¶ 12).

56.   On 4 June 2015, the Tribunal informed the EC that: (i) it had received the EC First Application; (ii) it had invited the Parties to provide observations thereon pursuant to ICSID Arbitration Rule 37(2); and (iii) it expected to render its decision after receipt of the Parties' observations.

---

[18] Tr. Day 6 (ENG), 1136:7–1138:15 (President).

57. On 22 September 2015, the Parties filed their respective Observations on the EC First Application. Claimants' observations were accompanied with legal authorities CL-065 to CL-085.[19]

58. On 2 October 2015, Respondent filed a Reply to Claimants' Observations on the EC First Application.

59. On 5 October 2015, Claimants filed a Reply to Respondent's Observations on the EC First Application, accompanied by exhibit C-125.

60. On 6 January 2016, the Tribunal issued **Procedural Order No. 3** ruling on the EC First Application. The Tribunal (i) authorized the EC to file a written submission on the issue of the application of the ECT to intra-EU disputes; (ii) granted the Parties an opportunity to file observations on the EC's written submission; (iii) granted the EC access to certain portions of the Parties' written pleadings relating to the issue on which the EC would make its submission, with redactions of commercially sensitive information; (iv) denied the EC's request to attend the Hearing to present oral argument, but it invited the Parties to inform the Tribunal after receipt of the EC's written submission whether they would agree to attendance of the EC to a limited portion of the Hearing for the exclusive purpose of answering any questions that the Tribunal and/or the Parties might have concerning such written submission; and (v) rejected Claimants' request that the intervention by the EC be conditioned on an undertaking to pay Claimants' costs in dealing with the EC's intervention.

61. On 13 January 2016, the Parties communicated to the Tribunal their agreed schedule for various of the procedural steps ordered in Procedural Order No. 3. On 28 January 2016, the Tribunal approved the Parties' agreement and established additional deadlines in connection with this matter. That same day, the Tribunal communicated to the EC the calendar for its written submission and the other steps pertaining to the EC.

62. On 15 August 2016, the Parties informed the Tribunal that the relevant excerpts of the pleadings could be transmitted to the EC without redactions. In addition, on 17 August

---

[19] The legal authorities were submitted electronically on 23 September 2015.

2016, the Parties informed the Tribunal that they would be amenable to providing to the EC copies of the legal authorities cited in their submissions, if requested.

63. On 17 August 2016, pursuant to Procedural Order No. 3, the Tribunal transmitted to the EC certain excerpts of the Parties' pleadings, directing that the EC could use them *"exclusively for the purposes of preparing its written submission in this arbitration and shall not communicate them to third parties or use them outside this arbitration."*

64. Following a request by the EC dated 31 August 2016, agreed upon by the Parties, on 2 September 2016, the Tribunal transmitted to the EC three legal authorities and three exhibits filed by the Parties, under the same condition referred to *supra*, ¶ 63.

65. On 5 September 2016, the EC submitted its written submission accompanied by exhibits EC-001 to EC-018 (**"EC Written Submission"**).

66. On 11 November 2016, as part of Procedural Order No. 5 and having heard the Parties' views, the Tribunal decided that the EC would not be invited to the Hearing, in light of Claimants' objection and ICSID Arbitration Rule 32(2).

## E. THE ORAL PROCEDURE

67. The Hearing on Jurisdiction and the Merits was held in the International Dispute Resolution Centre Ltd. (IDRC), London, United Kingdom,[20] from 12-19 December 2016 (**"the Hearing"**).[21]

68. The following persons were present during the Hearing:

*Tribunal*:

| | |
|---|---|
| Prof. Donald M. McRae | President |
| The Honourable L. Yves Fortier | Arbitrator |
| Prof. Laurence Boisson de Chazournes | Arbitrator |

---

[20] The venue for the Hearing was established pursuant to the Parties' agreement communicated to the Tribunal on 27 August 2015.

[21] The Tribunal reserved 20 December 2016 as an additional day for deliberations.

*ICSID Secretariat*:

Ms. Luisa Fernanda Torres                    Secretary of the Tribunal

*For Claimants*:

Counsel
Ms. Karyl Nairn QC                           Skadden, Arps, Slate, Meagher & Flom (UK) LLP
Mr. David Herlihy                            Skadden, Arps, Slate, Meagher & Flom (UK) LLP
Mr. George Zimmerman                         Skadden, Arps, Slate, Meagher & Flom (UK) LLP
Ms. Sara Nadeau-Séguin                       Skadden, Arps, Slate, Meagher & Flom (UK) LLP
Ms. Teresa Queirós                           Skadden, Arps, Slate, Meagher & Flom (UK) LLP
Mr. Jacob Lefkowitz                          Skadden, Arps, Slate, Meagher & Flom (UK) LLP
Ms. Paula Henin                              Skadden, Arps, Slate, Meagher & Flom (UK) LLP
Mr. Aaron Shorr                              Skadden, Arps, Slate, Meagher & Flom (UK) LLP
Ms. Carla Alves                              Skadden, Arps, Slate, Meagher & Flom (UK) LLP
Ms. Mónica Lasquibar                         Cuatrecasas Gonçalves Pereira
Mr. Luis Perez de Ayala                      Cuatrecasas Gonçalves Pereira

Party Representatives
Mr. Mitchell S. Ross                         Party Representative
Mr. Robert B. Sendler                        Party Representative
Mr. Fernando Bergón                          Party Representative
Mr. Charlie Sieving                          Party Representative
Mr. Mark Sorensen                            Party Representative
Mr. George Nicolaï                           Party Representative

Witnesses (*)
Mr. F. Mitchell Davidson                     NextEra Energy Resources, LLC (Retired)
Mr. Miguel Ignacio Arechabala                NextEra Energy Resources, LLC
Ms. Rebecca Kujawa                           NextEra Energy Resources, LLC
Mr. George Nicolaï                           NextEra Energy Global Holdings Coöperatieve U.A.
Mr. Mark Sorensen                            NextEra Energy Resources, LLC and NextEra
                                             Energy Global Holdings Coöperatieve U.A.

Experts
Dr. Manuel Abdala                            Compass Lexecon, LLC
Prof. Pablo Spiller                          Compass Lexecon, LLC
Mr. Henry Price                              Solar Dynamics, LLC
Mr. Julian Delamer                           Compass Lexecon, LLC
Mr. Alan Rozenberg                           Compass Lexecon, LLC
Mr. Jack Ghaleb                              Compass Lexecon, LLC

*For Respondent*:

Counsel
Ms. Mónica Moraleda                          Abogacía del Estado, Ministerio de Justicia
Mr. Diego Santacruz                          Abogacía del Estado, Ministerio de Justicia
Ms. Amaia Rivas                              Abogacía del Estado, Ministerio de Justicia
Mr. Javier Castro                            Abogacía del Estado, Ministerio de Justicia
Mr. José María Alonso                        Abogacía del Estado, Ministerio de Justicia
Mr. Antolín Fernández                        Abogacía del Estado, Ministerio de Justicia

Party Representatives
Mr. Alfonso Olivas                    IDAE
Ms. Raquel Vázquez                    IDAE

Witnesses (*)
Mr. Carlos Montoya                    IDAE

Experts
Mr. Eduard Saura                      Accuracy
Mr. Christophe Schmit                 Accuracy
Mr. Stéphane Perrotto                 Accuracy
Ms. Laura Cózar                       Accuracy
Mr. Alberto Fernández                 Accuracy
Mr. Carlos Canga                      Accuracy
Mr. Jesús Casanova                    ETSIIM
Prof. Jorge Servert                   STA

*Court Reporters*:

Mr. Paul Pelissier                    DR-ESTENO
Mr. Dante Rinaldi                     DR-ESTENO
Mr. Dionisio Rinaldi                  DR-ESTENO
Ms. Diana Burden                      Diana Burden Ltd.
Ms. Laurie Carlisle                   Diana Burden Ltd.

*Interpreters*:

Mr. Jesús Getan Bornn
Mr. Mark Viscovi
Ms. Amalia Thaler de Klem

(*) not present before their testimony

69.    The following persons were examined during the Hearing:

*On behalf of Claimants*:                    *On behalf of Respondent*:

Witnesses                                    Witnesses
Mr. F. Mitchell Davidson                     Mr. Carlos Montoya
Mr. Miguel Ignacio Arechabala
Ms. Rebecca Kujawa
Mr. George Nicolaï
Mr. Mark Sorensen

Experts                                      Experts
Mr. Henry Price                              Mr. Jesús Casanova
Dr. Manuel Abdala                            Prof. Jorge Servert
Prof. Pablo Spiller                          Mr. Eduard Saura
                                             Mr. Stéphane Perrotto

16

70. Throughout the Hearing, each Party submitted various demonstrative exhibits, as follows:

- Claimants: Claimants' Opening Presentation (unnumbered); Mr. Henry Price's Hearing Presentation (unnumbered); Compass-Lexecon Hearing Presentation (unnumbered); Claimants' Closing Presentation (unnumbered).

- Respondent: Respondent's Opening Presentations I to IV (R-459 to R-462); Accuracy Hearing Presentations I and II (unnumbered); Prof. Jorge Servert's Hearing Presentation (unnumbered); and Mr. Jesús Casanova's Hearing Presentation (unnumbered); Respondent's Closing Presentation (R-463)

71. On 16 December 2016, during Day 5 of the Hearing, a list of areas of agreement and disagreement among the technical experts was distributed.[22]

72. On 10, 14 and 15 February 2017, the Parties submitted their agreed corrections to the Hearing transcripts. On 14 February 2017, the Tribunal informed the Parties that the agreed revised versions would stand as the final versions of the transcript.

## F.    THE POST-HEARING PROCEDURE

73. On 8 February 2017, the Tribunal formulated a Post-Hearing question to the Parties.

74. Following an extension agreed by the Parties and approved by the Tribunal, on 27 February 2017, each Party submitted its Post-Hearing Submission addressing the Tribunal's question.

75. Following authorization from the Tribunal, on 7 March 2017, Claimant filed its Post-Hearing Reply, and 8 March 2017, Respondent filed its Post-Hearing Reply.[23]

76. On 11 May 2017, Claimants submitted an application seeking authorization to add one additional legal authority to the record, namely: *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB 13/36, Award (4 May 2017) ("***Eiser* Award**") in Spanish, requesting an order to Spain to provide the

---

[22] Tr. Day 5 (ENG), 1096:20-1098:8.

[23] Following the Tribunal's instructions and Procedural Order No. 1, § 12.3, once both Parties' submissions had been received by the Secretary of the Tribunal, they were transmitted simultaneously to both Parties and the Tribunal on 8 March 2017. On 10 March 2017, the Tribunal indicated that it would respond to the requests made in these Post-Hearing submissions in due course, but in the circumstances, it decided that it was unnecessary to do so.

English version, and an opportunity to file submissions on this legal authority. On 17 and 18 May 2017, Respondent filed observations in response. On 23 May 2017, the Tribunal authorized the introduction of the *Eiser* Award into the record, invited Respondent to introduce the English version, and afforded the Parties an opportunity to file submissions on this legal authority. Accordingly, on 30 May 2017, Respondent introduced the *Eiser* Award into the record in English and Spanish (without a designated legal authority number).

77. Having considered the Parties' respective positions, on 8 June 2017, the Tribunal established a schedule for the Parties' submissions on the *Eiser* Award, later amended on 6 July 2017. Accordingly, the Parties filed their submissions as follows: on 22 June 2017, Claimants filed observations on the *Eiser* Award; on 11 July 2017, Respondent filed response observations on the *Eiser* Award; on 18 July 2017, Claimants filed reply observations on the *Eiser* Award; and on 25 July 2017, Respondent filed rejoinder observations on the *Eiser* Award.

78. On 18 July 2017, Claimants also filed a communication raising a procedural matter arising out of Spain's observations on the *Eiser* Award. Specifically, Claimants observed *"[t]hat Spain has contended that a proper application of the Eiser award on liability requires a new and different approach to quantum, excluding each of the measures referred to in this case as Regulatory Framework II."* While opposing Respondent's contention as a matter of principle and substance, and raising procedural objections to the introduction of a new quantum defence at this stage of the proceeding, Claimants asserted that *"should the Tribunal nonetheless wish to proceed to consider the long-term quantum impact of Regulatory Framework II, or any of its individual elements, the Claimants agree with Spain that this would require the parties to provide new expert reports addressing those calculations, following a procedure that ensures due process [...]."* Following an invitation by the Tribunal, on 25 July 2017, Respondent provided observations on this matter as part of its rejoinder observations on the *Eiser* Award. It asserted inter alia that *"the expert reports [...] do not reflect, in any way, the separate impact of the individual measures disputed by Claimants in this arbitration"* and agreed with Claimants that the quantification of that impact would require new expert reports.

79. On 25 July 2017, as part of its rejoinder observations on the *Eiser* Award, Respondent filed an application to introduce additional documents to the record. On 17 August 2017, Claimants submitted a response, and on 28 August 2017, Respondent submitted a reply. On 26 September 2017, the Tribunal authorized the introduction of only some of the documents to the record, namely: the Notice of Registration of Spain's annulment application of the *Eiser* Award, dated 28 July 2017 and its accompanying cover letter. Accordingly, on 28 September 2017, Respondent submitted those documents to the record as exhibits R-464 and R-465.

80. On 23 November 2017, Respondent filed an application to introduce an additional document to the record, namely, the EC Decision on State Aid, Case SA.40348 (2015/NN) (10 November 2017) ("**the EC Decision**"), and asked the Tribunal to afford the Parties an opportunity to file submissions in connection therewith. On 29 November 2017, Claimants submitted a response. On 5 December 2017, Respondent submitted a reply. On 14 December 2017, the Tribunal authorized the introduction of the EC Decision into the record, and it granted the Parties an opportunity to submit written submissions in connection therewith. Accordingly, on 15 December 2017, Respondent submitted the EC Decision, designated as RL-124.

81. On 8 January 2018, each Party filed its respective submission on the EC Decision.

82. On 5 March 2018, Claimants filed an application seeking leave to add an additional legal authority to the record, namely: *Novenergía II – Energy & Environment (SCA), SICAR v. Kingdom of Spain* (SCC Case No. 2015/063), Award (15 February 2018) ("*Novenergía* **Award**"). On 9 March 2018, Respondent submitted a response to Claimants' application, and in turn filed an application seeking authorization to add three additional legal authorities to the record, namely: the Ruling of the EUCJ in case C-284/16 (Achmea Case) (6 March 2018) ("*Achmea* **Judgment**"); *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award (27 December 2016) ("*Blusun* **Award**"), and *Mr. Jürgen Wirtgen, Mr. Stefan Wirtgen, Mrs. Gisela Wirtgen and JSW Solar (swei) GmbH & Co. KG v. The Czech Republic*, PCA Case No. 2014-03, Award (11 October 2017). On 15 March 2018, Claimants submitted a

response to Respondent's application. On 21 March 2018, Respondent submitted a reply, which also added a request to introduce into the record Spain's request for clarification and supplementation of the *Novenergía* Award. On 26 March 2018, the Tribunal ruled on these applications, authorizing the introduction of the *Novenergía* Award, the *Achmea* Judgment and the *Blusum* Award into the record, and dismissing the other requests. The Tribunal also afforded the Parties an opportunity to file submissions on these new legal authorities. Accordingly, on 28 March 2018, Claimants submitted the *Novenergía* Award, as legal authority CL-195; and on 29 March 2018, Respondent submitted the *Achmea* Judgment and the *Blusun* Award, as legal authorities RL-125 and RL-126.

83. In its application of 9 March 2018 referred to above, Respondent "*reserve*[d] *its right to request that new expert reports be filed by both parties to determine the real impact of each of the disputed measures.*" This statement was repeated in the reply submission of 21 March 2018. In their 15 March 2018 response, Claimants observed they "*consider that they have provided the expert evidence necessary to quantify their damages resulting from Spain's violations of the ECT.*"[24] In its ruling of 26 March 2018, the Tribunal observed that "*the Tribunal will deal with any such application if and when it is actually made.*"

84. On 9 April 2018, each Party filed its respective submission on the *Novenergía* Award, the *Blusun* Award and the *Achmea* Judgment.

85. On 16 April 2018, Claimants filed an application to add an additional legal authority to the record, namely: *Novenergía II – Energy & Environment (SCA), SICAR v. Kingdom of Spain* (SCC Arbitration 2015/063), Procedural Order No. 17 (9 April 2018) ("***Novenergía* PO 17**"). On 19 April 2018, Respondent filed a response to Claimants' application, and in turn, it filed its own application seeking leave to (i) introduce a number of additional documents to the record; (ii) conduct a site visit to Claimants' domicile; and (iii) file a short expert report addressing the facts referred to in the

---

[24] That said, Claimants also added that "*if the Tribunal requires any further assistance in quantifying damages, the appropriate mechanism for receiving any such evidence would be a request from the Tribunal itself, not a quantum report submitted as an observation on the Novenergia award.*"

application.[25]  On 23 April 2018, Claimants filed a reply.  On 27 April 2018, Respondent filed a rejoinder.  On 2 May 2018, Claimants filed a communication asking the Tribunal for a brief opportunity to respond to one of the assertions in Respondent's communication of 27 April 2018.

86.     On 4 May 2018, the Tribunal issued **Procedural Order No. 8** ruling on the above referenced applications.  The Tribunal (i) authorized the introduction of the *Novenergía* PO17, and the *Novenergía* Annulment Notice of Registration into the record; and (ii) it rejected the requests to add other documents to the record, conduct a site visit and to file an additional expert report.  Accordingly, on 9 May 2018, Claimants submitted the *Novenergía* PO 17, as legal authority CL-196; and on 6 June 2018, Respondent submitted the *Novenergía* Annulment Notice of Registration, as exhibit R-466.

87.     On 16 May 2018, the EC submitted a communication stating that "*in case the Tribunal would deem that useful for its deliberations, the Commission would be available to up-date its written observations in the light of the recent judgment of the European Court of Justice in Case C-284/16 Achmea v Slovak Republic, and in particular to set out its view on the consequences of that judgment for pending arbitration cases based on the Energy Charter Treaty*" ("**EC Second Application**").  The communication was transmitted to the Parties and the Tribunal on 17 May 2018.

88.     Following an invitation from the Tribunal, on 23 May 2018, each Party filed observations on the EC Second Application.

89.     On 29 May 2018, the Tribunal ruled on the EC Second Application. Noting that "*the Parties have already provided comprehensive comments on the Achmea decision including comments on the implications of the decision for arbitration cases based on the Energy Charter Treaty*" (*supra*, ¶ 84), the Tribunal ruled that it did not need an update of the EC Written Submission, and so informed the EC and the Parties.

---

[25] That is, to demonstrate that (i) "[s]*ome impairments that the Solar thermal Plants recorded initially after the measures have been, due to updated valuations, reversed*" and "[…] *the PTEs are not in liquidation anymore but are 'going concern*'"; (ii) the "[d]*amages calculated by Compass Lexecon have been discredited and are speculative and therefore unproven*" and (iii) the "[l]*ack of economic activity of the Claimants in the Netherlands and everywhere else persists*." Resp. Letter, 19 April 2018; Resp. Letter, 27 April 2018.

90.     On 28 September 2018, the Parties submitted their respective Statements of Costs. On 11 October 2018, Respondent filed a request for support of certain assertions in Claimants' Statement of Costs; on 17 October 2018, Claimants provided observations in response; and on 23 October 2018, Respondent filed a reply accepting that the matter could be resolved through a letter from Claimants' counsel. On 26 October 2018, the Tribunal wrote to the Parties, noting that it understood the matter had been resolved and needed no ruling from the Tribunal. On 29 October 2018, Claimants' counsel provided the letter requested by Respondent.

91.     On 25 January 2019, Respondent filed an application seeking authorization to add an additional legal authority to the record, namely, the "*Declaration of the Representatives of the Government of the Member States of 15 January* [2019] *on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union*," and to authorize the Parties to file written submissions addressing this declaration. Following an invitation from the Tribunal, on 31 January 2019, Claimants filed a response. On 5 February 2019, the Tribunal authorized Respondent to introduce into the record the full set of declarations issued by the EU Member States in January 2019. On 20 February 2019, Respondent introduced the EU Member States Declarations into the record as legal authorities RL-127 to RL-129.

## III.    FACTUAL BACKGROUND

92.     The section that follows provides an overview of the facts underlying this dispute. It does not purport to be an exhaustive narrative of all the facts that have been discussed in this proceeding or of all factual allegations made by the Parties. To the extent the Tribunal has deemed it appropriate, certain facts and factual allegations made by the Parties are also described and addressed in the course of the Tribunal's legal analysis of the claims at issue. This said, the Tribunal has considered the entirety of the Parties' submissions of fact in their written and oral submissions, whether or not they are expressly discussed in this section.

22

## A.    INTRODUCTION

93.    This case concerns a project for the construction of two concentrated solar power ("CSP") plants in Navalvillar de Pela (Badajoz) in the autonomous community of Extremadura in Spain by the Claimants, known as Termosol 1 and Termosol 2 (together, the "**Termosol Plants**").[26]    The dispute revolves around measures implemented by Respondent modifying the regulatory and economic regime of renewable energy projects in Spain and their effect on the Claimants' investments.

94.    The Claimants were incorporated in the Netherlands in 2008.    NextEra Energy Global Holdings B.V. ("**NextEra Global**") was incorporated on 27 March 2008;[27] while NextEra Energy Spain Holdings B.V. ("**NextEra Spain**") was incorporated on 7 May 2008.[28]

95.    NextEra Global is the 100% owner of NextEra Spain, which is the 100% owner of the Spanish company NextEra Energy España S.L.U. ("**NEE España**"), which in turn is the 100% owner of the Spanish companies Planta Termosolar de Extremadura, S.L.U. ("**PTE**"), Planta Termosolar de Extremadura 2, S.L.U. ("**PTE2**"), and NextEra Energy España Operating Services, S.L.U ("**NEEOS**").    The PTEs own and operate the Termosol Plants.[29]

96.    Since 2011, NextEra Global has been 100% owned by the Netherlands corporation NextEra Energy Global Holdings Cooperative U.A., which in turn is a subsidiary of NextEra Energy Inc., a U.S. corporation.[30]    Throughout these proceedings, NextEra Energy Inc. has been treated as the parent company of the Claimants.

---

[26] Cl. Mem. Merits, ¶¶ 1, 15.

[27] **C-037**, Certificate of Incorporation of FPLE Global Asset Holdings B.V., 8 May 2008, ¶ 1.    The name of the company was changed to the current name in December 2011. **C-039**, Minutes of the Meeting of the Board of Managing Directors of FPLE Global Asset Holdings B.V., 1 December 2011 at p. 7.

[28] **C-038**, Certificate of Incorporation of FPLE Global Asset Spain Holdings B.V., 8 May 2008, ¶ 1.    The name of the company changed to the current name in December 2011. **C-040**, Minutes of the Meeting of the Board of Managing Directors of FPLE Global Asset Spain Holdings B.V., 1 December 2011 at p. 5.

[29] Cl. Mem. Merits, ¶¶ 2, 223; Cl. Skeleton, ¶ 3.

[30] Resp. Mem. Jur., ¶¶ 117-118; Cl. C-Mem. Jur., ¶¶ 52, 54; **R-019**, Annual Accounts of NextEra Energy Global Holdings Coöperative U.A. 2011, 2012, 2013.

97.    Claimants contend that "[a]*fter the Claimants' Spanish companies had irrevocably committed to constructing the Termosol Plants and had spent around 750 million euros substantially completing construction, Spain completely and retroactively altered the remuneration regime applicable to the Termosol Plants* [...]."[31]

98.    With this context, the Tribunal now proceeds to describe the regulatory framework for renewable energy investments in Spain, in particular for CSP investments, its evolution and the measures that have given rise to this dispute. The Tribunal will then describe the Claimants' investments in Spain.

## B.    THE REGULATORY FRAMEWORK FOR RENEWABLE ENERGY INVESTMENTS

99.    As a preliminary matter, the Tribunal notes that the Parties agree that the Spanish system is formed by different types of instruments, namely, the Spanish Constitution, Organic Laws, Ordinary Laws, Royal Decree-Laws ("**RDL**"), Royal-Decrees ("**RD**"), Ministerial Orders and Resolutions.[32] It is also agreed that an RDL has the force of a Law, it may be enacted by the Executive branch in extraordinary and urgent circumstances, and it must be ratified by the Legislative branch;[33] an RD also emanates from the Executive, and it is of lower hierarchy *vis-à-vis* Laws and RDLs;[34] and a Ministerial Order is a regulation adopted by one of the different Ministries, lower in the legislative hierarchy than RDs.[35] Respondent has also submitted that Resolutions are instruments which emanate from competent Government bodies, lower in the hierarchy than Ministerial Orders.[36]

### (1)    The Initial Framework

100.   Within the context of the 1992 United Nations Framework Convention on Climate Change ("**UNFCC**"), on 11 December 1997 a number of nations adopted the Kyoto Protocol, an international agreement committing its Parties by setting internationally

---

[31] Cl. Skeleton, ¶ 7.

[32] *See*, Cl. Mem. Merits, n. 44; Resp. C-Mem. Merits, ¶ 35.

[33] *See*, Cl. Mem. Merits, n. 44; Resp. C-Mem. Merits, ¶ 35.

[34] *See*, Cl. Mem. Merits, n. 44; Resp. C-Mem. Merits, ¶ 35.

[35] *See*, Cl. Mem. Merits, n. 44; Resp. C-Mem. Merits, ¶ 35.

[36] Resp. C-Mem. Merits, ¶ 35.

binding greenhouse emission reduction targets.[37] The Protocol was signed by Spain on 29 April 1998, and ratified on 31 May 2002.[38] It entered into force on 16 February 2005.[39]

101. On 14 May 1997, the European Commission issued Communication COM(97) 196, setting a target to reduce greenhouse gas emissions by 15% by year 2010, *vis-à-vis* the levels existing in year 1990.[40]

### a. The Electricity Law

102. In the above context, on 27 November 1997, Spain enacted Law 54/1997 on the Electricity Sector ("**Electricity Law**" or "**Law 54/1997**"),[41] which regulated the activities for the provision of electricity in Spain.[42] The Electricity Law distinguished between electricity generation under an "*Ordinary Regime*" (Title IV, Chapter I), and under a "*Special Regime*" (Title IV, Chapter II).

103. Pursuant to Article 27 of the Electricity Law, electricity generation activities were considered part of the Special Regime in a number of categories listed by the law, "*whenever they* [were] *carried out from facilities having installed capacity of no more than 50 MW.*" The categories listed included facilities where "*non-consumable renewable energies, bio-mass or biofuels of any type are used as primary energy,*

---

[37] **C-025**, UNFCC Website, Kyoto Protocol.

[38] United Nations Treaty Collection, Status of Treaties, Chapter XXVII, Environment, 7.a., Kyoto Protocol to the United Nations Framework Convention on Climate Change, available at https://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=XXVII-7-a&chapter=27&clang=_en.

[39] **C-025**, UNFCC Website, Kyoto Protocol.

[40] **C-026**, Communication from the European Commission: The Energy Dimension of Climate Change, COM(97) 196 Final, 14 May 1997.

[41] **C-024 / R-003**, Law 54/1997 on the Electric Power Sector, 27 November 1997, published on 28 November 1997 ("**Electricity Law**"). The English translation at R-003 does not correspond to the original version of the law enacted in 1997, but to the Electricity Law as amended up to 2008. Prior to Law 54/1997, Law 49/1984 of 26 December 1984 and Law 40/1994 of 30 December 1994 had governed the electricity system in Spain. **R-038**, Law 49/1984, 26 December 1984 (published 29 December 1984); **R-039**, Law 40/1994, 30 December 1994 (published 31 December 1994). Article 16 of Law 40/1994 established certain parameters for the establishment of the user tariffs and of the retribution of activities within the system. Respondent has argued that the system thereby reflected coincides with the current one. Resp. C-Mem. Merits, ¶ 105.

[42] **C-024**, Electricity Law, Art. 1.

provided their holder [did] *not engage in generation activities under the ordinary regime.*"[43]

104.    Article 30 of the Electricity Law established the rights and obligations of producers under the Special Regime.[44]    Those obligations included, among others, "[t]*o comply with technical generation standards as well as with the standards governing transport and the technical management of the system;*" and "[t]*o provide the Authorities with information concerning the generation, consumption and sale of energy and on any other points as determined.*"[45]    Article 30(4) of the Electricity Law provided that:

> "*4. […] the generation of electricity via renewable energy sources (other than hydroelectric), biomass and also hydroelectric power stations with capacity of equal to or less than 10 MW will receive a premium to be set by the Government, so that the price of the electricity sold by these facilities will fall within a range of between 80% and 90% of the average electricity price, to be calculated by dividing the income generated by invoicing for electricity supplied by the energy supplied.*
>
> *To calculate the premiums, consideration will be given to the voltage level where the energy enters the network, to the effective contribution to environmental improvement, primary energy savings and energy efficiency, and to any investment costs that may have been incurred, in order to achieve reasonable profitability rates by reference to the cost of money in capital markets.*
>
> [...]
>
> *On an exceptional basis, for solar energy, the Government shall be able to set a premium in addition to the limits defined in this article.*"[46]

105.    Article 31 of the Electricity Law required facilities in the Special Regime to register in an Administrative Registry for Electricity Production Facilities ("*Registro Administrativo de Instalaciones de Producción de Energía Eléctrica*"), in the Ministry of Industry and

---

[43] **C-024**, Electricity Law, Art. 27.

[44] **C-024**, Electricity Law, Art. 30.

[45] **C-024**, Electricity Law, Art. 30(1)(b) and (d).

[46] **C-024**, Electricity Law, Art. 30(4).    The Electricity Law has been subject of various modifications, including through RDL 7/2006, RDL 6/2009, RDL 14/2010, and RDL 9/2013. For example, Article 30(4) of the Electricity Law has been amended by RDL 7/2006 and by RDL 9/2013. *See infra*, ¶ 158.

Energy, specifying the remunerative regime adopted in each case.[47] That registry would also include information about the conditions and the power of the facility ("*condiciones*" y "*potencia de la instalación*").[48] Autonomous communities were authorized to create the local registries for the facilities located in their territory.[49]

### b. RD 2818/1998, RD 1432/2002, RD 436/2004, RDL 7/2006

106.  On 23 December 1998, Spain enacted Royal Decree 2818 ("**RD 2818/1998**"),[50] to regulate the requirements and procedures to qualify for the Special Regime, the procedure for registration, the conditions for delivery of electricity and the applicable economic regime.[51] Article 9 established the Administrative Registry for Production Facilities under the Special Regime ("*Registro Administrativo de Instalaciones de Producción en Régimen Especial*" or "**RAIPRE**").[52] Article 23 provided for a "*premium or incentive*" in addition to the market price, for facilities with power (*potencia*) equal to or less than 50MW that were registered in the RAIPRE.[53] Article 32 established that the premiums would be revised every four years.[54]

107.  The Electricity Law required that, "[i]*n order for renewable energy sources to cover at least 12% of Spain's total energy demand by the year 2010,*" a plan should be "*drawn up to promote renewable energies and whose objectives shall be taken into account in the setting of premiums.*"[55] Accordingly, on 30 December 1999, Spain's Council of Ministers approved the 2000-2010 Renewable Energy Plan.[56] That Plan set forth "*the principal elements and guidelines [...] relevant in the articulation of a strategy [...] for*

---

[47] **C-024**, Electricity Law, Art. 31. *See also, id.* Art. 24(4).

[48] **C-024**, Electricity Law, Art. 24(4).

[49] **C-024**, Electricity Law, Art. 24(4).

[50] **C-028 / R-058**, Royal Decree 2818/1998, 23 December 1998, published on 30 December 1998 ("**RD 2818/1998**").

[51] **C-028 / R-058**, RD 2818/1998, Art. 1.

[52] **C-028 / R-058**, RD 2818/1998, Art. 9.

[53] **C-028 / R-058**, RD 2818/1998, Art. 23.

[54] **C-028 / R-058**, RD 2818/1998, Art. 32.

[55] **C-024**, Electricity Law, Sixteenth Transitional Provision.

[56] **C-020**, Plan for the Development of Renewable Energy in Spain 2000-2010, December 1999 ("**2000-2010 Renewable Energy Plan**").

*the growth of each of the renewable energy areas, taken together, to cover at least 12% of primary energy in the year 2010."*[57]

108.    On 27 September 2001, the European Parliament and Council adopted Directive 2001/77/EC on the promotion of electricity produced from renewable energy sources in the internal electricity market (**"2001 Renewable Energy Directive"**).[58]    Article 3 required Member States *"to take appropriate steps to encourage greater consumption of electricity produced from renewable energy sources in conformity with the national indicative targets [...]."*[59]    Spain's indicative target for the contribution of electricity produced from renewable energy sources to gross electricity consumption by 2010 was set at 29.4.[60]    Recital 12 noted that "[t]*he need for public support in favour of renewable energy sources is recognised in the Community guidelines for State aid for environmental protection [...],"* adding that *"the rules of the Treaty, and in particular Articles 87 and 88 thereof, will continue to apply to such public support."*[61]

109.    The Electricity Law also required that every year, or when required by special circumstances, the Government would approve or amend a reference or average electricity tariff through a Royal Decree.[62]    Accordingly, on 27 December 2002, Spain enacted Royal Decree 1432/2002 (**"RD 1432/2002"**),[63]  which established the methodology to set the annual reference or average electricity tariff.[64]

---

[57] **C-020**, 2000-2010 Renewable Energy Plan, Introduction.

[58] **C-029 / R-046**, Directive 2001/77/EC of the European Parliament and Council, 27 September 2001 (**"2001 Renewable Energy Directive"**).

[59] **C-029 / R-046**, 2001 Renewable Energy Directive, Art. 3.

[60] **C-029 / R-046**, 2001 Renewable Energy Directive, Annex.

[61] **C-029 / R-046**, 2001 Renewable Energy Directive, Recital 12.

[62] **C-024**, Electricity Law, Art. 17(2).

[63] **C-030 / R-060**, Royal Decree 1432/2002, 27 December 2002, published 31 December 2002 (**"RD 1432/2002"**). RD 1432/2002 was preceded by an opinion by the Spanish Council of State dated 19 December 2002. **C-031**, Opinion of the Council of State 3616/2002, 19 December 2002.

[64] **C-030 / R-060**, RD 1432/2002, Art. 1.

110. On 12 March 2004, Spain enacted Royal Decree 436/2004 ("**RD 436/2004**"),[65] which derogated from RD 2818/1998.[66] RD 436/2004 established a new "*methodology for the updating and systematisation of the legal and economic regime*" for production of electricity under the Special Regime. Pursuant to Article 22, producers under the Special Regime would have the option to: (i) sell to a distributor under a "*regulated tariff*" ("**feed-in-tariff**" or "**FiT**") or (ii) sell on the wholesale market "*through the system of offers and bids managed by the market operator*" at a "*sale price of the electricity [...] resulting in the organised market [...] or the price freely traded by the plant operator or representative, supplemented by an incentive and, as the case may be, by a premium [...]*" ("**pool + premium**").[67] Both options were "*expressed in euro cents per kilo-watt hour;*"[68] and both were established by reference to a percentage of the annual reference or average electricity tariff, and therefore subject to market fluctuations.[69] In addition, Article 40 established that:

> "*1. During 2006, [...] the tariffs, premiums, incentives and supplements defined in this Royal Decree shall undergo revision. [...]. Every four years, starting from 2006, a new revision shall take place.*
>
> *2. The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall come into force on January 1st of the second year subsequent to the year that the revision has been carried out.*
>
> *3. The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the plants that commence operating subsequent to the date of the entry into force referred to in the paragraph above and shall not have a backdated effect on any previous tariffs and premiums. [...].*"[70]

---

[65] **C-032 / R-059**, Royal Decree 436/2004, 12 March 2004, published 27 March 2004 ("**RD 436/2004**"). RD 436/2004 was preceded by an opinion by the Spanish Council of State dated 4 March 2004. **C-033**, Opinion of the Council of State 386/2004, 4 March 2004.

[66] **C-032 / R-059**, RD 436/2004, Sole Repeal Provision.

[67] **C-032 / R-059**, RD 436/2004, Art. 22(1).

[68] **C-032 / R-059**, RD 436/2004, Art. 22(1).

[69] **C-032 / R-059**, RD 436/2004, Arts. 23-24.

[70] **C-032 / R-059**, RD 436/2004, Art. 40.

111.  On 26 August 2005, Spain's Council of Ministers approved the 2005-2010 Renewable Energy Plan,[71] which revised the earlier 2000-2010 Renewable Energy Plan. The revision sought to "*maintain*[ ] *the commitment to cover at least 12% of the total energy consumption in 2010;*" and it incorporated the other two objectives for 2010, namely "*29.4% electricity generated using renewable energies and 5.75% biofuels in transport.*"[72]

112.  In August 2005, the Ministry of Industry, Tourism and Commerce and the Institute for the Diversification and Saving of Energy also produced a summary of the 2005-2010 Renewable Energy Plan.[73] That summary stated that "*different technical and financial hypotheses* [were] *considered in order to determine the profitability of typical projects*" and that "[r]*eturns were calculated based on an Internal Rate of Return (IRR) measured in current euros for each project type of close to 7%, financed with equity (before external finance) and after tax.*"[74]

113.  On 15 December 2005, the Spanish Supreme Court ruled and rejected a challenge against RD 436/2004.[75] The Supreme Court held that:

> "[…] *There is no legal obstacle* […] *to prevent the Government, in the exercise of the regulatory powers and of the broad entitlements it has in a strongly regulated issue such as electricity, from modifying a specific system of remuneration so long as this is done within the framework established by the Electricity Law.* […]."[76]

114.  On 23 June 2006, Spain enacted Royal Decree-Law 7/2006 ("**RDL 7/2006**"),[77] which adopted certain urgent measures for the energy sector. Article 1(12) afforded producers in the Special Regime "[p]*riority for access to the networks for the transport and*

---

[71] **C-019 / R-052 / R-296**, Plan for Renewable Energy in Spain 2005-2010, August 2005 ("**2005-2010 Renewable Energy Plan**").

[72] **C-019**, 2005-2010 Renewable Energy Plan, Introduction.

[73] **C-034**, Summary of the Spanish Renewable Energy Plan (PER) 2005-2010, Ministry of Industry, Tourism and Commerce and Institute for the Diversification and Saving of Energy, August 2005 ("**Summary 2005-2010 Renewable Energy Plan**").

[74] **C-034**, Summary 2005-2010 Renewable Energy Plan, § 7.2.

[75] **R-147**, Supreme Court, Third Chamber, Judgement, 15 December 2005; Resp. C-Mem. Merits, ¶ 191.

[76] **R-147**, Supreme Court, Third Chamber, Judgement, 15 December 2005, Legal Grounds, EIGHT.

[77] **C-036 / R-041**, Royal Decree-Law 7/2006, 23 June 2006, published 24 June 2006 ("**RDL 7/2006**").

distribution of generated energy, always maintaining the reliability and safety of the networks."[78]

115.    On 25 October 2006, the Spanish Supreme Court ruled on a challenge against some amendments to RD 436/2004.[79] The Supreme Court held:

> "THREE – [...] Article 30 of the Electricity Law [...] allows [...] companies to expect that the fixing of the premiums can be included as a factor relevant to their obtaining 'reasonable rates of return with reference the cost of money in the capital market' or [...] 'reasonable compensation for their investments.' However the payment regime under examination does not guarantee to special regime electricity producers that a certain level of profits or revenues will be unchanged relative to those obtained in previous years, or that the formulas for fixing the premiums will stay unchanged."[80]

116.    On 14 February 2007, the Spanish *Comisión Nacional de Energía* ("**CNE**") issued Report 3/2007. That report addressed a proposed Royal Decree "*for the regulation of the generation of electricity under the special regime and of specific facilities using comparable technologies under the ordinary regime.*"[81] The report stated:

> "***Minimise regulatory uncertainty.*** *The CNE understands that transparency and predictability in the future of economic incentives reduce regulatory uncertainty, which encourages investment in new capacity and minimises the cost of financing projects, reducing the final cost to the consumer. The regulation must offer sufficient guarantees to ensure that the economic incentives are stable and predictable throughout the life of the facility, setting in such case, both transparent annual update mechanisms associated with the evolution of robust indices (such as the average or reference rate, the CPI, ten-year bonds, etc.), as well as periodic reviews, for example, every four years, which only affect new installations, in terms of investment costs, and which may affect the reduction of costs operation also to existing plants.*"[82]

---

[78] **C-036**, RDL 7/2006, Art. 1(12) (amending Art. 30(2) of the Electricity Law). *See also*, **R-041**, RDL 7/2006, Art. 1(12).

[79] **R-057**, Supreme Court, Third Chamber, Judgement, 25 October 2006, Factual Background, SECOND; Resp. C-Mem. Merits, ¶¶ 192-194.

[80] **R-057**, Supreme Court, Third Chamber, Judgement, 25 October 2006, Legal Grounds, TWO and THREE.

[81] **C-021 / R-298**, CNE Report 3/2007 (14 February 2007) ("**CNE Report 2007**"); Cl. Mem. Merits, ¶ 27.

[82] **C-021**, CNE Report 2007, p. 16.

117.    On 20 March 2007, the Spanish Supreme Court ruled on a challenge against RD
        2392/2004 which had set the electricity tariff for 2005.  The petitioners had asked that
        certain provisions of RD 2392/2004 regarding the premiums for 2005 be declared null,
        and that RD 2818/1998 and RD 436/2004 be applied instead.[83]  The Supreme Court held
        that:

> "*Owners of facilities under a Special Regime are not guaranteed the
> intangibility of a given benefit or income regime in relation to those
> obtained in previous years, nor are they guaranteed the indefinite
> permanence of the formulas used to fix premiums.*"[84]

### (2)    Regulatory Framework I[85]

#### a.  RD 661/2007

118.    On 25 May 2007, Spain enacted Royal Decree 661/2007 "*regulating the activity of
        electricity production under the Special Regime*" ("**RD 661/2007**").[86]  RD 661/2007
        replaced RD 436/2004.[87]  According to its Preamble:

> "*The economic framework established in the present Royal Decree
> develops the principles provided in Law 54/1997, of 27 November, on the
> Electricity Sector, guaranteeing the owners of facilities under the special
> regime a reasonable return on their investments, […].*"[88]

119.    Pursuant to Article 24(1) of RD 661/2007, producers under the Special Regime continued
        to have the option to (a) "[s]*ell the electricity to the system through the transport or
        distribution grid, receiving for it a regulated tariff, which shall be the same for all*

---

[83] **R-062**, Supreme Court, Third Chamber, Judgement, 20 March 2007, Factual Background, SECOND; Resp. C-Mem. Merits, ¶ 195.

[84] **R-062**, Supreme Court, Third Chamber, Judgement, 20 March 2007, Legal Grounds, SECOND.  On 9 October 2007, the Supreme Court ruled on another challenge, this time against RD 1454/2005, which modified certain provisions of RD 436/2004. **R-063**, Supreme Court, Third Chamber, Judgement, 9 October 2007; Resp. C-Mem. Merits, ¶ 195.  Respondent contends that this decision confirmed the principles set forth by the earlier ones. Resp. C-Mem. Merits, ¶ 195.

[85] Claimants have referred to the various instruments in the Spanish system for renewable energy as follows: (i) "Regulatory Framework I" including RD 661/2007, RDL 6/2009 and RD 1614/2010; (ii) "Regulatory Framework II" including Law 15/2012 and RDL 2/2013; and (iii) "Regulatory Framework III" including RDL 9/2013, RD 413/2014 and Ministerial Order IET/1045/2014.  *See, e.g.*, Cl. Mem. Merits, p. vii and Appendix A, and ¶ 162.  For ease of reference, the Tribunal has adopted those denominations.

[86] **C-017 / R-042**, Royal Decree 661/2007, 25 May 2007, published 26 May 2007 ("**RD 661/2007**").

[87] **C-017 / R-042**, RD 661/2007, Art. 1 and Sole Derogatory Provision.

[88] **C-017 / R-042**, RD 661/2007, Preamble. *See, e.g.*, Cl. Mem. Merits, ¶ 61; Resp. C-Mem. Merits, ¶ 181.

scheduling periods expressed in Euro cents per kilowatt/hour;" ("**feed-in-tariff**" or "**FiT**") or (b) "[s]ell the electricity in the electrical energy production market" at "the price obtained in the organised market or the price freely negotiated by the proprietor or the representative of the facility, supplemented where appropriate by a premium, in Eurocents per kilowatt/hour" ("**pool + premium**").[89]   Producers were allowed to elect either option for periods of no less than one year, and could change their selected option with notice of at least one month.[90]

120.    Article 2 of RD 661/2007 established categories of facilities, in relation to the primary energy used, the type of technology and the energy yield.   Category b.1.2 covered "[f]acilities which use thermal processes alone for the transformation of solar energy, as the primary energy, into electricity."   Those facilities were permitted to employ equipment which used "a fuel for the maintenance of the temperature of the heat transfer fluid in order to compensate for a lack of solar irradiation which may affect the planned delivery of energy," provided that the generation of electricity from such fuel was less than 12% of the total production of electricity, or up to 15% in certain circumstances.[91]

121.    Article 36 of RD 661/2007 dealt with the tariffs and premiums for solar energy facilities in category b.   With respect to category b.1.2, it provided that "[t]he tariffs and premiums corresponding to facilities in Category b) shall be as provided in Table 3."   Table 3 provided the following in the relevant portion:[92]

---

[89] **C-017 / R-042**, RD 661/2007, Art. 24(1).

[90] **C-017 / R-042**, RD 661/2007, Art. 24(4).

[91] **C-017 / R-042**, RD 661/2007, Art. 2(1)(b), Sub-group b.1.2.

[92] **C-017**, RD 661/2007, Art. 36.

| Group | Sub-Group | Power | Term | Regulated tariff, c /kWh | Reference premium, c /kWh | Upper Limit, c /kWh | Lower Limit, c /kWh |
|---|---|---|---|---|---|---|---|
| b.1 | b.1.1 | P≤100 kW | first 25 years | 44.0381 | | | |
| | | | thereafter | 35.2305 | | | |
| | | 100 kW<P≤10 MW | first 25 years | 41.7500 | | | |
| | | | thereafter | 33.4000 | | | |
| | | 10<P≤50 MW | first 25 years | 22.9764 | | | |
| | | . | thereafter | 18.3811 | | | |
| | b.1.2 | | first 25 years | 26.9375 | 25.4000 | 34.3976 | 25.4038 |
| | | | thereafter | 21.5498 | 20.3200 | | |

122. According to Article 44, "[t]*he values of the tariffs, premiums, supplements, and lower and upper limits to the hourly price of the market as defined in this Royal Decree, for Category b) [...] shall be updated on an annual basis using as a reference the increase in the RPI* [Consumer Price Index] *less the value set out in the Additional Provision One* [...]," namely, 0.25% until 31 December 2012 and 0.50% thereafter.[93]  Article 44(3) addressed the matter of reviews of tariffs, premiums, supplements and lower and upper limits in the following terms:

> "*During the year 2010, on sight of the results of the monitoring reports on the degree of fulfilment of the Renewable Energies Plan (PER) 2005-2010, and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies, the degree of participation of the special regime in covering the demand and its impact upon the technical and economic management of the system, and a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in the capital markets. Subsequently a further review shall be performed every four years, maintaining the same criteria as previously.*
>
> *The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second*

---

[93] **C-017** / **R-042**, RD 661/2007, Art. 44 and Additional Provision One.

> *year following the year in which the revision shall have been performed.*"[94]

123. For the CSP sector, the economic regime set out in RD 661/2007 would accrue to the first 500 MW of installed capacity.[95]

124. Facilities for the production of energy under the Special Regime were subject to "*compulsory registration*" in the RAIPRE.[96] Moreover, "*the final registration of the facility in the* [RAIPRE]" was a "*necessary requirement for the application of the economic regime regulated under* [RD 661/2007] *to such facility, with effect from the first day of the month following the date of the final deed of entry into service of the facility.*"[97]

125. In addition to the economic regime, RD 661/2007 afforded producers under the Special Regime the rights to "*enjoy priority in access and connection to the electricity grid*" under certain conditions set forth in Annex XI of RD 661/2007 or in subsequent regulations; and the right to sell their electricity output via distribution companies, or to "*sell all or part of their net production by way of direct lines.*"[98]

126. On 3 and 9 December 2009, the Spanish Supreme Court ruled and rejected various claims brought by renewable energy producers against certain provisions of RD 661/2007.[99] Among others, the petitioners had argued that the first transitory provision of RD 661/2007 was in breach of Article 40(3) of RD 436/2004.[100]

### b. RDL 6/2009

127. On 23 April 2009, the European Parliament and Council adopted Directive 2009/28/EC on the promotion of the use of energy from renewable sources ("**2009 Renewable**

---

[94] **C-017 / R-042**, RD 661/2007, Art. 44(3).

[95] **C-017 / R-042**, RD 661/2007, Art. 37. *See also*, Art. 17(c) and 22.

[96] **C-017 / R-042**, RD 661/2007, Art. 9.

[97] **C-017 / R-042**, RD 661/2007, Art. 14.

[98] **C-017 / R-042**, RD 661/2007, Art. 17 (b), (d) and (e); Annex XI.

[99] **R-064**, Supreme Court, Third Chamber, Judgement, 3 December 2009, Factual Background, FIRST; **R-002**, Supreme Court, Third Chamber, Judgement, 9 December 2009, Factual Background, FIRST.

[100] **R-064**, Supreme Court, Third Chamber, Judgement, 3 December 2009, Legal Grounds, FOURTH.

**Energy Directive**").[101]   This new directive set a *"target of at least a 20 % share of energy from renewable sources in the Community's gross final consumption of energy in 2020."*[102]

128.   Shortly thereafter, on 30 April 2009, Spain adopted Royal Decree-Law 6/2009 ("**RDL 6/2009**").[103]   The Preamble of RDL 6/2009 observed that the growing tariff deficit in Spain, that is, *"the difference between collections based on the regulated rates set by the Administration and paid by consumers for their regulated supplies and access rates set on the deregulated market and the actual costs associated with those rates"* was affecting the electricity system, putting at risk both *"the financial situation of companies in the electricity sector"* and the *"sustainability of the system."*[104]

129.   Referring to the growing impact of the Special Regime on the tariff deficit, one of RDL 6/2009's stated objectives was the introduction of measures to control the cost of that Special Regime and thereby the tariff deficit.[105]   Expressing concern for the financial viability of facilities already finalized, RDL 6/2009 also indicated that it was *"necessary to adopt a measure of urgency to guarantee the necessary legal security for those who ha*[d] *made investments."*[106]

130.   RDL 6/2009 put in place a Mechanism of Registration of Pre-assignment of Payment for the Special Regime Installations (*"Mecanismo de Registro de Pre-asignación de Retribución para las Instalaciones del Régimen Especial"*) ("**Pre-Assignment Registry**").[107]   Article 4(2) of RDL 6/2009 provided that enrolment in the Pre-Assignment Registry was a *"necessary condition to obtain the right to the economic scheme established in* [RD 661/2007] [...]*."*[108]   Article 4(3) established a number of

---

[101] **R-009**, Directive 2009/28/EC of the European Parliament and Council, 23 April 2009 (published 5 June 2009) ("**2009 Renewable Energy Directive**").

[102] **R-009**, 2009 Renewable Energy Directive, Art. 3(1).

[103] **C-044 / R-085**, Royal Decree-Law 6/2009, 30 April 2009 (published 7 May 2009) ("**RDL 6/2009**").

[104] **C-044 / R-085**, RDL 6/2009, Preamble, at p. 39404.

[105] **C-044 / R-085**, RDL 6/2009, Preamble, at p. 39405.

[106] **C-044 / R-085**, RDL 6/2009, Preamble, at p. 39405.

[107] **R-085**, RDL 6/2009, Art. 4.

[108] **R-085**, RDL 6/2009, Art. 4(2).

detailed requirements for registration in the Pre-Assignment Registry.[109] In turn, Article 4(8) provided that facilities registered in the Pre-Assignment Registry had a deadline of 36 months to be definitely registered in the RAIPRE, absent which *their economic right associated with inclusion in the* [Pre-Assignment Registry] *shall be revoked.*"[110]

131. Pursuant to the 4th transitory provision of RDL 6/2009, installations had a deadline of 30 days from entry into force of the RDL to submit their application for entry into the Pre-Assignment Registry (*i.e.* until 6 June 2009).[111] In turn, the 5th transitory provision established that if the capacity of the projects registered in the Pre-Assignment Registry exceeded the objectives set in RD 661/2007:

> "[…] *the economic system established in* […] *Royal Decree 661/2007* […] *will be applicable and will be exhausted through those registered installations. In this case, by means of a resolution from the Council of Ministers at the initiative of the Ministry of Industry, Tourism and Commerce, annual restrictions may be established on the commissioning and start-up of the registered facilities and their prioritization, to avoid compromising the technical and economic sustainability of the system, appropriately extending the maximum term established in Article 4.8 of this Royal Decree-Law, if applicable.* […]."[112]

132. On 13 November 2009, the Spanish Council of Ministers entered into an Agreement to "*establish* [ ] *the order of priority of the projects or plants presented to the administrative registry for pre-allocation of payment for the installations for the production of electrical energy, as established in* [RDL 6/2009] […]." ("**Agreement of the Council of Ministers**").[113] At the time, there had been 104 applications to the Pre-Assignment Registry for the CSP sector, for a total power capacity of 4,499 MW; which together with the capacity already installed exceeded the power targets of RD 661/2007.[114]

---

[109] **C-044 / R-085**, RDL 6/2009, Art. 4(3).

[110] **R-085**, RDL 6/2009, Art. 4(8).

[111] **C-044**, RDL 6/2009, 4th Transitory Provision.

[112] **C-044**, RDL 6/2009, 5th Transitory Provision.

[113] **C-007**, Agreement of the Council of Ministers of 13 November 2009 (incorporated through a Resolution of the Secretary of Energy dated 19 November 2009, and published in the Official State Bulletin on 24 November 2009) ("**Agreement of the Council of Ministers**").

[114] **C-007**, Agreement of the Council of Ministers, § III, at p. 99849.

133. According to the Agreement of the Council of Ministers, projects and facilities that had applied to the Pre-Assignment Registry were organized starting with those whose application and registration had occurred within the deadline established in RDL 6/2009, and in chronological order according to the date of their registration.[115] The commissioning of the facilities was staggered in various phases, which were as follows for CSP: phase 1 (up to 850 MW); phase 2 (up to 1,350 MW); phase 3 (up to 1,850 MW) and phase 4 (rest of the power registered in the Pre-Assigned Registry).[116] Annual restrictions were established with regard to the start-up and entry into operation of the facilities registered in the Pre-Assignment Registry, such that facilities could not begin delivering energy via the distribution or transportation network before certain dates, as follows: 1 January 2011 (for phase 2), 1 January 2012 (for phase 3) and 1 January 2013 (for phase 4).[117] In addition, such facilities were required to obtain permanent registration in the RAIPRE and to commence selling energy prior to the following dates: 1 January 2013 (for phases 2 and 3), and 1 January 2014 (for phase 4).[118]

### c. RD 1614/2010

134. On 19 November 2010, Spain adopted Royal Decree 1565/2010 *"regulating and modifying certain aspects in relation to the activity of electricity production under the special regime."*[119]

135. A few weeks later, on 7 December 2010, Spain enacted Royal Decree 1614/2010 (**"RD 1614/2010"**), which *"regulates and amends given aspects relative to the production of electric energy from solar thermal electric and wind power."*[120] Article 4 of RD 1614/2010 provided that:

> *"For solar thermal electric technology facilities falling within* [RD 661/2007] *revisions of tariffs, premiums and upper and lower limits, referred to in Article 44.3 of* [RD 661/2007]*, shall not affect those*

---

[115] **C-007**, Agreement of the Council of Ministers, § VI(1) at p. 99853.

[116] **C-007**, Agreement of the Council of Ministers, § VI(2), at p. 99853.

[117] **C-007**, Agreement of the Council of Ministers, § VI(4), at p. 99853.

[118] **C-007**, Agreement of the Council of Ministers, § VI(4), at p. 99854.

[119] **R-065**, Royal Decree 1565/2010, 19 November 2010 (published 23 November 2010).

[120] **C-016 / R-068**, Royal Decree 1614/2010, 7 December 2010 (published 8 December 2010) (**"RD 1614/2010"**).

> *facilities definitively registered in the* [RAIPRE as] *of 7 May 2009, or those that shall have been registered in the* [Pre-Assignment Registry] *under the fourth transitional provision of* [RDL 6/2009], *and shall have fulfilled the obligation envisaged in Article 4.8 thereof, extended until 31 December 2013 for those facilities associated with phase 4 envisaged in the Agreement of the Council of Ministers of 13 November 2009.*"[121]

136. Article 2 of RD 1614/2010 reduced the allowed operating hours of plants qualifying for the Special Regime. For CSP plants of 9-hour storage, those hours were set at 4,000 a year.[122] Article 2(3) went on to provide that:

> "[…] *The equivalent hours of reference envisaged in the preceding table shall not be revisable during their operating life for those facilities registered definitively in the* [RAIPRE as] *of 7 May 2009 and for those registered in the* [Pre-Assignment Registry] *under the aegis of the fourth transitional provision of* [RDL 6/2009], *and which fulfil the obligation envisaged in Article 4.8 thereof, extended until 31 December 2013 for those facilities associated with phase 4 envisaged in the* [Agreement] *of the Council of Ministers of 13 November 2009* […]."[123]

137. In turn, Article 3 required projects to opt for the regulated "feed-in-tariff" option for the first twelve months of operation.[124]

138. RD 1614/2010 also allowed, under certain conditions, Special Regime facilities registered in the Pre-Assignment Registry classified under phases 2 to 4, to begin discharging energy to the grid on a trial basis 9 months before the 1 January applicable to their respective phases.[125] In this case, the decree also established that the "*calculation of the period during which the facility shall have the right to a premium or equivalent premium, shall take place as of the starting date of the collection of the premium or equivalent premium, as appropriate.*"[126] RD 1614/2010 further provided that facilities registered in the Pre-Assignment Registry that had decided not to move forward with the

---

[121] **C-016**, RD 1614/2010, Art. 4.

[122] **C-016**, RD 1614/2010, Art. 2(3). Claimants contend that the Termosol Plants were the only plants in the 9h category. Cl. Mem. Merits, ¶ 161, n. 186.

[123] **C-016**, RD 1614/2010, Art. 2(3).

[124] **C-016**, RD 1614/2010, Art. 3.

[125] **C-016 / R-068**, RD 1614/2010, Transitory Provision 1.

[126] **C-016**, RD 1614/2010, Transitory Provision 1.

facility, had a three-month period from the entry into force of the decree to "*desist from the procedure*," to avoid enforcement of the guarantees they had provided.[127]

### (3) Other Developments in 2010-2012

#### a. RDL 14/2010

139. On 23 December 2010, Spain adopted Royal Decree-Law 14/2010 ("**RDL 14/2010**"), to adopt certain "*urgent measures for the correction of the tariff deficit in the Electricity Sector.*"[128] According to RDL 14/2010, since RDL 6/2009 there were supervening circumstances that had a direct impact on the tariff deficit exceeding the maximum deficit limits set forth in RDL 6/2009.[129] Article 1 of RDL 14/2010 (which amended Article 15 of the Electricity Law), provided that "[c]*ompensation for regulated activities shall be financed through revenues collected by access fees for transmission and distribution networks, fully paid by consumers and producers.*"[130]

#### b. Law 2/2011

140. On 4 March 2011, Spain enacted Law 2/2011.[131] The stated purpose of the law was to "*introduc*[e] *in the legal order the structural reforms necessary to create conditions to favour a sustainable economic development.*"[132] Article 78 established "[a] *minimum national goal of 20%* [...] *for the participation of renewable energies in gross energy consumption for the year 2020.*"[133] Articles 77-79 dealt with principles of energy policy; national objectives for energy saving and efficiency and renewable energies; and aspects of indicative energy planning.[134]

141. In 11 November 2011, Spain's Council of Ministers approved the 2011-2020 Renewable Energy Plan.[135] Its purpose was to "*establish*[ ] *objectives in accordance with* [the 2009

---

[127] **C-016 / R-068**, RD 1614/2010, Transitory Provision 2.

[128] **R-049**, Royal Decree-Law 14/2010, 23 December 2010 (published 24 December 2010) ("**RDL 14/2010**").

[129] **R-049**, RDL 14/2010, Preamble, ¶ 2.

[130] **R-049**, RDL 14/2010, Article 1.

[131] **R-291**, Law 2/2011, 4 March 2011 ("**Law 2/2011**").

[132] **R-291**, Law 2/2011, Art. 1 [Tribunal's translation].

[133] **R-291**, Law 2/2011, Art. 78(1).

[134] **R-291**, Law 2/2011, Arts. 77-79.

[135] **C-075 / R-052**, Renewable Energy Plan 2011-2020 ("**2011-2020 Renewable Energy Plan**").

Renewable Energy Directive] *and, pursuant to the stipulations of* [RD] *661/2007,* [...] *and of Law 2/2011* [...].''[136]

142. On 19 December 2011, S.E. Mariano Rajoy gave an inaugural address to Congress as re-elected Prime Minister. Referring to an accumulated tariff deficit of EUR 22,000 million, and observing that ''[e]*lectricity tariffs for domestic consumers are the third most expensive in Europe, and the fifth highest for industrial consumers*,'' Prime Minister Rajoy stated that:

> ''[...] *If reforms are not made, the imbalances will be unsustainable, and increases in prices and tariffs will place Spain at the greatest disadvantage in terms of energy costs in the entire developed world. We must therefore introduce policies based on putting a brake on and reducing the average costs of the system, take decisions without demagoguery, employ all the technologies available, without exception, and regulate with the competitiveness of our economy as our prime objective.*''[137]

143. On 28 December 2011, the CNE issued a press release concerning ''*the review of grid access fees and certain tariffs and premiums for facilities operating under the special regime.*''[138] The CNE referred to:

> ''[...] *the need to immediately implement, amongst other measures, proposals for the regulation of activities, aimed at getting rid of the system's structural deficit and mitigating debt financing costs. Notwithstanding, to attain sufficiency it would be necessary to make larger scale additional adjustments to the costs of the activities regulated and to the tolling paid by consumers. An analysis could also be carried out of the introduction of measures to finance the costs of activities regulated externally to the access tolling.*''[139]

---

[136] **C-075**, 2011-2020 Renewable Energy Plan, at p. 5 (cover page).

[137] **R-094**, S.E. Mariano Rajoy Speech to Congress during his Inauguration as President of the Government, 19 December 2011, p. 11.

[138] **R-095**, CNE, Press Release, ''*The CNE Analyses the Review of Grid Access Fees and Certain Tariffs and Premiums for Facilities Operating under the Special Regime,*'' 28 December 2011.

[139] *Id.*

### c. RDL 1/2012

144. On 27 January 2012, Spain adopted Royal Decree-Law 1/2012 ("**RDL 1/2012**"), which "*suspend*[ed] *the procedure for the pre-assignment of payment and remov*[ed] *the financial incentives for new electricity generating facilities generating using cogeneration, renewable energy sources and waste.*"[140] RDL 1/2012 applied to facilities that had not been registered in the Pre-Assignment Registry by the time RDL 1/2012 entered into effect, namely, 28 January 2012.[141]

145. On that same day, the Ministry of Industry, Energy and Tourism issued a press release stating that, the decree had been adopted "*to temporarily suspend*" the Pre-Assignment Registry procedures and the economic incentives for new renewable energy installations, "*until a reform in the electric system is implemented that avoids the tariff deficit from being generated* [...]."[142]

146. On 27 April 2012, Spain approved its National Reform Program for 2012, which included a section discussing "*measures directed towards solving the existing imbalance between revenue and costs of the electricity system.*"[143]

147. In 2012, Spain undertook a series of additional reforms to the legal and economic regime for renewable energy investments.

### (4) Regulatory Framework II

#### a. Law 15/2012

148. On 27 December 2012, Spain enacted Law 15/2012 "*On Tax Measures for Energy Sustainability,*" which entered into effect on 1 January 2013.[144] This Law adopted the following measures:

---

[140] **C-088 / R-096**, Royal Decree-Law 1/2012, 27 January 2012 (published 28 January 2012) ("**RDL 1/2012**").

[141] **C-088 / R-096**, RDL 1/2012, Art. 2.

[142] **R-097**, Ministry of Industry, Energy and Tourism, *The Government will Temporarily Suspend Premiums for New Special Regime Facilities*, Press Release, 27 January 2012.

[143] **R-102**, National Reform Program, Kingdom of Spain, 2012, § III(5) 71.

[144] **C-091 / R-024**, Law 15/2012, 27 December 2012 (published 28 December 2012) ("**Law 15/2012**"), Fifth Final Provision.

149. *First*, it amended Article 30 of the Electricity Law, to provide that production based on natural gas would now only receive the pool price.[145]

150. *Second*, it created and regulated a Tax on the Value of the Production of Electrical Energy ("**TVPEE**").[146] It imposed a 7% rate on "*the total amount that the taxpayer receives for the electric power production and its incorporation into the electricity system, measured at the power station busbars, for each installation, during the tax period.*"[147]

### b. RDL 2/2013

151. On 1 February 2013, Spain enacted Royal Decree-Law 2/2013 ("**RDL 2/2013**"), adopting "*urgent measures in the electricity system and in the financial sector.*"[148] RDL 2/2013, adopted the following measures:

152. *First*, it amended the inflation index applicable under the Special Regime, from the Consumer Price Index to the "*Consumer Price Index at constant rates without unprocessed food or energy products.*"[149]

153. *Second,* it amended Article 36 of RD 661/2007 (Table 3), such that the reference premium for renewable energy under the Special Regime was set at zero (0).[150]

154. *Third*, Article 3 provided that Special Regime facilities that as of the effective date of RDL 2/2013 (*i.e.* 2 February 2013)[151] had opted for the pool + premium option under Article 24(1)(b) of RD 661/2007 could not subsequently change that option.[152] Further, (i) Special Regime facilities which between 1 January to 2 February 2013 had sold energy under the pool + premium option of Article 24(1)(b) of RD 661/2007 would "*be paid the premium by the National Energy Commission, taking into consideration the*

---

[145] **C-091**, Law 15/2012, First Final Provision.

[146] **C-091 / R-024**, Law 15/2012, Arts. 1-11.

[147] **C-091,** Law 15/2012, Arts. 6(1) and 8.

[148] **C-092 / R-125**, Royal Decree-Law 2/2013, 1 February 2013 (published 2 February 2013) ("**RDL 2/2013**").

[149] **C-092**, RDL 2/2013, Art. 1.

[150] **C-092**, RDL 2/2013, Art. 2(2).

[151] **C-092**, RDL 2/2013, Final Provision.

[152] **C-092**, RDL 2/2013, Art. 3.

energy produced during that period as if they had invoked [the feed-in-*tariff* option];" and (ii) Special Regime facilities which as of 2 February 2013 were selling under the pool + premium option of Article 24(1)(b) of RD 661/2007 would "*automatically*" be switched to the feed-in-tariff option in Article 24(1)(a) of RD 661/2007 "*effective January 1, 2013, unless they expressly advise*[d] *the General Directorate of Energy and Mining policy of their desire to remain under* [...] *option b)* [pool + premium] *prior to February 15, 2013.*" If they did so, however, they would have to "*adhere to said option under the conditions regulated in* [RDL 2/2013]" and in consequence could not change that option thereafter.[153]

155. On 19 February 2015, the Spanish Constitutional Court dismissed a constitutional challenge against RDL 2/2013;[154] and on 26 March 2015, the Spanish Supreme Court also dismissed a petition asking it to bring a motion for unconstitutionality of RDL 2/2013 before the Constitutional Court.[155]

### (5) Regulatory Framework III

#### a. RDL 9/2013

156. On 12 July 2013, Spain enacted Royal Decree-Law 9/2013 ("**RDL 9/2013**") on "*emergency measures to guarantee the financial stability of the electrical system.*"[156] RDL 9/2013 repealed RD 661/2007, and certain provisions of RDL 6/2009.[157]

157. RDL 9/2013 substituted the prior remuneration regime for renewable energy facilities for a new one, applicable both to new and existing installations.

158. Under the new regime, renewable energy producers receive: (i) a payment of the wholesale market price for the electricity produced ("**Market Payment**"); (ii) a payment per Mwh of electricity produced to compensate operating costs not covered by the market price ("**Operating Payment**"); and (iii) and a payment per MWh of installed capacity on

---

[153] **C-092**, RDL 2/2013, Sole Additional Provision.

[154] **R-126**, Constitutional Court, Judgement, 19 February 2015.

[155] **R-127**, Supreme Court, Judgement, 26 March 2015, Factual Background, SECOND (ii).

[156] **C-093 / R-113**, Royal Decree-Law 9/2013, 12 July 2013 (published 13 July 2013) ("**RDL 9/2013**").

[157] **C-093 / R-113**, RDL 9/2013, Sole Repeal Provision (2)(a) and (c) (repealing RD 661/2007 and Art. 4, First Add. Prov., and Fifth Trans. Provision (2) of RDL 6/2009).

the basis of the net investment costs of a "*standard*" reference plant, also referred to as an "*installation type*" ("*instalación tipo*") ("**Investment Payment**").[158] The remuneration would be calculated on the basis of standard income for the sale of electricity, standard exploitation costs and a standard value of the initial investment.[159] RDL 9/2013 also provided that the parameters of the regime could be revised every six years.[160]

159. According to RDL 9/2013, the "*reasonable profitability*" for facilities that as of the effective date of RDL 9/2013 "*had a right to a premium economic regimen* [...] *shall, before taxes, be in function of the mean yield on State Bonds on the secondary market for the ten years preceding the effective date of this royal decree-law plus 300 basis points*" and "*without prejudice to the revision provided in the last paragraph of*" Article 30(4) of Law 54/1997.[161]

160. RDL 9/2013 entered into effect on 14 July 2013.[162] At that time, however, neither the standard reference plant categories, nor the values of the Investment Payment and the Operating Payment for each category had been determined. As a result, the feed-in-tariff regime of RD 661/2007 (but not the pool + premium option already abolished by RDL 2/2013) continued operating until June 2014, when further regulatory measures (RD 413/2014 and Ministerial Order IET 1045/2014, discussed further below) were published. The payments received during this transitional period were made, however, as a "*payment on account*" of the payments that would be received under the new regime.[163]

161. On 17 December 2015 and 18 February 2016, the Spanish Constitutional Court dismissed constitutional challenges against certain provisions of RDL 9/2013.[164]

---

[158] **C-093**, RDL 9/2013, Art. 1 (Two) (amending Art. 30(4) of the Electricity Law); Cl. Mem. Merits, ¶ 190.

[159] **C-093**, RDL 9/2013, Art. 1 (Two).

[160] **C-093**, RDL 9/2013, Art. 1 (Two).

[161] **C-093**, RDL 9/2013, First Additional Provision.

[162] **C-093 / R-113**, RDL 9/2013, Tenth Final Provision.

[163] **C-093 / R-113**, RDL 9/2013, Third Transitory Provision.

[164] **R-056**, Constitutional Court, Judgement, 17 December 2015; **R-072**, Constitutional Court, Judgement, 18 February 2016; **R-075**, Constitutional Court, Judgement, 18 February 2016.

### b. Law 24/2013

162. On 12 September 2013, the Spanish Council of State issued an opinion (*Dictamen*) on the draft of a new Electricity Law.[165]

163. On 26 December 2013, Spain adopted Law 24/2013 on the Electricity Sector, which eliminated the distinction between the Ordinary and the Special Regimes.[166] It re-affirmed and developed the regime set forth in RDL 9/2013.

164. Article 14(4) provided that the *"payment parameters"* for renewable energy projects under the new regime were set for regulatory periods of six-years, which could be revised before the start of the next regulatory period. It set forth certain guidelines for the *"modification of the payment parameters"* applicable to renewable energy facilities, including that (i) in each regulatory period revision *"modifications may be made to all payment parameters;"* and between those periods *"the value on which reasonable profitability will depend"* can also be modified; (ii) once established, *"the regulatory useful life or the standard value of the initial investment of a facility"* cannot be modified; (iii) estimates of income for the sale of energy will be revised every three years, and the payment parameters adjusted in response to market price fluctuation *vis-à-vis* the prior three year estimate; and (iv) annual revisions of payment values for technologies whose operating costs depended on fuel prices.[167]

165. Article 14(7) of Law 24/2013 provided for the creation of a specific remuneration regime under which remuneration would be calculated on the basis of standard income from the energy produced, standard operating costs and a standard initial investment figure, and will provide a reasonable return for the installation type in each applicable case.[168]

166. In addition, Article 19 of Law 24/2013 established that *"deviations occurring between electricity system income and costs"* that are *"not offset positively via the access tariffs*

---

[165] **R-144,** Council of State, Opinion 937/2013, 12 September 2013.

[166] **C-097 / R-037,** Law 24/2013, 26 December 2013 (published 27 December 2013) ("**Law 24/2013**"); Resp. C-Mem. Merits, ¶ 128.

[167] **C-097,** Law 24/2013, Art. 14(4).

[168] **C-097,** Law 24/2013, Art. 14(7).

*and charges, will be financed by participants in the payment system, in direct proportion to the corresponding remuneration for their generation.*"[169]

### c. RD 413/2014 and Ministerial Order IET/1045/2014

167. In 2014 Spain adopted two further implementing regulations for the new framework. On 6 June 2014, Spain adopted Royal Decree 413/2014 ("**RD 413/2014**").[170] A few days later, on 16 June 2014, the Ministry of Industry, Energy and Tourism issued Order IET/1045/2014 ("**Ministerial Order IET/1045/2014**").[171]

## C. CLAIMANTS' INVESTMENT

168. The involvement of the NextEra companies with solar energy in Spain began with the agreements entered into in 2007, by a subsidiary of NextEra, relating to land easements, water rights and the development of up to four 49.9 MW CSP plants in Extremadura.[172] In 2008, the Claimants were incorporated.[173] Between 2008 and 2009, the Claimants devoted their efforts to development activities.[174]

169. On 14 May 2009, PTE applied for inscription of the first Termosol plant ("**Termosol 1**") in the Pre-Assignment Registry.[175] On that same day, PTE2 applied for inscription of the second Termosol plant ("**Termosol 2**") in the Pre-Assignment Registry.[176]

170. On 11 December 2009, the Termosol Plants were registered in the Pre-Assignment Registry and assigned to Phase 3 of the timetable set forth in the Agreement of the Council of Ministers (*supra*, ¶¶ 132-133).[177]

---

[169] **C-097**, Law 24/2013, Art. 19.

[170] **C-095 / R-124**, Royal Decree 413/2014, 6 June 2014 (published 10 June 2014) ("**RD 413/2014**").

[171] **C-096 / R-122**, Ministerial Order IET/1045/2014, 16 June 2014 (published 20 June 2014) ("**Ministerial Order IET/1045/2014**").

[172] Cl. Mem. Merits, ¶¶ 30-33.

[173] *Supra*, ¶ 94 .

[174] Cl. Mem. Merits, ¶¶ 79-80.

[175] **C-046**, Letter of Application for Pre-Registration from PTE to the Directorate General for Energy Policy and Mines, Ministry of Industry, Tourism and Trade, 11 May 2009 (stamped 14 May 2009).

[176] **C-047**, Letter of Application for Pre-Registration from PTE2 to the Directorate General for Energy Policy and Mines, Ministry of Industry, Tourism and Trade, 11 May 2009 (stamped 11 May 2009).

171. On 16 December 2009, each of the PTEs and Sener Ingeniería y Sistemas S.A. ("**Sener**") signed Engineering, Procurement Support and Construction Support Services Agreements.[177]

172. On 22 December 2009, each PTE and PTE2 filed an application with the Directorate General for Energy Policy and Mines to delay their construction deadlines for Termosol 1 and Termosol 2, and instead be moved to Phase 4 of the Agreement of the Council of Ministers.[179]

173. On 18 February 2010, the Directorate General for Energy Policy and Mines issued two resolutions approving the application to move the Termosol Plants to Phase 4 of the Agreement of the Council of Ministers.[180]  As a result, the Termosol Plants were then required to obtain permanent registration in the RAIPRE by 31 December 2013 (*supra*, ¶¶ 133, 135-136).

174. On 2 December 2010, PTE and PTE2 sent deeds waiving the date of entry into operation of Termosol 1 (1 January 2013) and Termosol 2 (15 March 2013) which had been set by virtue of the change to Phase 4 approved in the Resolution of the Directorate General for Energy Policy and Mines of 18 February 2010.[181]  Both deeds asked the Directorate

---

[177] **C-049**, Resolution of the Directorate General for Energy Policy and Mines for Inscription in the Pre-Assignment Registry of Termosol 1 owned by PTE, 11 December 2009 ("**Pre-Assignment Registration Notice Termosol 1**"); and **C-050**, Resolution of the Directorate General for Energy Policy and Mines for Inscription in the Pre-Assignment Registry of Termosol 2 owned by PTE2, 11 December 2009 ("**Pre-Assignment Registration Notice Termosol 2**").

[178] **C-051**, Engineering, Procurement Support and Construction Support Services Agreement between PTE and Sener Ingeniería y Sistemas, S.A., 16 December 2009; **C-052**, Engineering, Procurement Support and Construction Support Services Agreement between PTE2 and Sener Ingeniería y Sistemas, S.A., 16 December 2009.

[179] **C-053**, Application for Change in Phase filed by Mike O'Sullivan (NextEra Energy Resources, LLC) on behalf of PTE, 22 December 2009; **C-054**, Application for Change in Phase filed by Mike O'Sullivan (NextEra Energy Resources, LLC) on behalf of PTE2, 22 December 2009.

[180] **C-055**, Resolution of the Directorate General for Energy Policy and Mines for Termosol 1, 18 February 2010; **C-056**, Resolution of the Directorate General for Energy Policy and Mines for Termosol 2, 18 February 2010.

[181] **C-070**, Deed of Renunciation Regarding the Entry into Operation on a Particular Date, within the Phase Assigned to the Installation "Termosol 1" by a Resolution from the Directorate General of Energy Policy and Mines dated 15 February 2010, and Request for a Resolution Communicating the Conditions for Remuneration during the Operational Life of the Installation, 2 December 2009 ("**Deed of Renunciation PTE**"); **C-071**, Deed of Renunciation Regarding the Entry into Operation on a Particular Date, within the Phase Assigned to the Installation "Termosol 2" by a Resolution from the Directorate General of Energy Policy and Mines dated 15 February 2010, and Request for a Resolution Communicating the Conditions for Remuneration during the Operational Life of the Installation, 2 December 2009 ("**Deed of Renunciation PTE2**").

General to "*communicate the remunerative conditions for the operative life of the installation.*"[182]

175. On 28 December 2010, the Directorate General of Energy Policy and Mines of the Ministry of Industry, Tourism and Commerce issued documents for each of the Termosol Plants.[183] Among others, the Directorate General stated:[184]

> "*Two. It communicates that, at the present time, by virtue of the provisions of paragraph 1 of the fifth transitional provision of* [RDL 6/2009] *the remuneration applicable to the facility consists of the tariffs, premiums, upper and lower limits and complementary provisions established in Royal Decree 661/2007, of 25 May, updated annually by Order of the Ministry of Industry, Tourism and Commerce, and the values in force as from 1 January 2011 are as follows:*

| Term | Regulated tariff cf./kWh | Reference premium cC/kWh | Upper limit cC/kWh | Lower Limit cC/kWh |
|------|-----|-----|-----|-----|
| first 25 years | 29.0916 | **27.4312** | 37.1483 | 27.4353 |
| Thereafter | 23.2731 | 21.9449 | | |

> *Reference value of complement for reactive energy for application of bonus or penalty percentages: 8.4681 c€/kWh*

176. On 28 April 2011, PTE and PTE2 entered into the loan agreements with a bank syndicate of Spanish and international lenders for a credit facility up to EUR 589,200,000 to finance construction of the Termosol Plants.[185]

177. According to Claimants, construction of the Termosol 1 and 2 Plants proceeded in 2011-2012 without material issues.[186]

---

[182] **C-070**, Deed of Renunciation PTE, Third; **C-071**, Deed of Renunciation PTE2, Third.

[183] **C-009**, Resolution of the Directorate General for Energy Policy and Mines of the Ministry of Industry, Tourism and Commerce for Termosol 1, 28 December 2010 ("**2010 Resolution Termosol 1**"); **C-010**, Resolution of the Directorate General for Energy Policy and Mines of the Ministry of Industry, Tourism and Commerce for Termosol 2, 28 December 2010 ("**2010 Resolution Termosol 2**")

[184] **C-009**, 2010 Resolution Termosol 1; **C-010**, 2010 Resolution Termosol 2. Respondent disputes certain aspects of the translation provided by Claimants. *See*, Resp. C-Mem. Merits, n. 233.

[185] **C-074**, Credit Agreement between PTE and PTE2 (Borrowers) and Lenders, 28 April 2011.

[186] Cl. Mem. Merits, ¶ 170.

178. On 29 May 2013, the Termosol 1 Plant obtained final registration into the RAIPRE; and on 7 June 2013, the same was granted to the Termosol 2 Plant.[187] The resolutions stated that: "[t]*he economic regime applicable for invoicing the power and energy fed to the grid shall be the one established by Royal Decree 661/2007, of 25 May, which regulates the activity of production of electrical energy under the special regime.*"[188]

179. Claimants state that NEE España entered into liquidation in 2013, although final liquidation has been avoided. In 2015 the PTEs were placed in mandatory liquidation; in August 2016, the PTEs agreed to a debt restructuring with their lenders;[189] and Claimants have stated that the PTEs' liquidation has been avoided.[190]

## IV. THE PARTIES' CLAIMS AND REQUEST FOR RELIEF

180. Claimants initially asked the Tribunal to:

> "[…] [R]*ender an Award:*
>
> *(1) Declaring that the Tribunal has jurisdiction over the claims presented in this Memorial and in the Request for Arbitration;*
>
> *(2) Declaring that the Respondent has breached its obligations under Articles 10(1) and 10(7) of the Energy Charter Treaty;*
>
> *(3) Determining that each such breach has caused damages to the Claimants;*
>
> *(4) Ordering the Respondent to pay to the Claimants damages based on the principle of full reparation, as determined by the Tribunal based on the expert report of Dr Manuel A. Abdala and Professor Pablo T. Spiller of Compass Lexecon, estimated in their report at €393.6 million (subject to any updating in their Reply Report, at the merits hearing and in any post-hearing submissions that may be directed by the Tribunal);*

---

[187] **C-004**, Resolution of the Government of Extremadura (Department of Agriculture, Rural Development, Environment and Energy) for Termosol 1, 29 May 2013 ("**2013 RAIPRE Resolution Termosol 1**"); **C-005**, Resolution of the Government of Extremadura (Department of Agriculture, Rural Development, Environment and Energy) for Termosol 2, 7 June 2013 ("**2013 RAIPRE Resolution Termosol 2**").

[188] *Id.*

[189] Cl. Mem. Merits, ¶¶ 214-215; Cl. Reply Merits, ¶ 605.

[190] Cl. Letter, 23 April 2018; Tr. Day 1 (ENG), 156:16-18 (Mr. Zimmerman).

*(5) Ordering the Respondent to pay pre-award interest, where applicable, as well as ordering post-award interest on the all [sic] sums awarded to the Claimants at the rate of 7.62%, EURIBOR +3.5%, or such other rate as the Tribunal deems appropriate, from the date of the Award until the date of full payment;*

*(6) Ordering the Respondent to pay the Claimants the full costs of this arbitration, including, without limitation, arbitrators' fees, the ICSID administrative costs, attorneys' fees, expert fees, and all other costs associated with these proceedings, together with interest on all sums so awarded; and*

*(7) Ordering any such other relief as the Tribunal may deem appropriate.*"[191]

181.    In their Reply on the Merits, Claimants updated their request for relief, asking the Tribunal to:

"[…] [R]*ender an Award:*

*(1) Dismissing the Respondent's Preliminary Objections;*

*(2) Dismissing the Respondent's defences to liability and declaring that the Respondent has breached its obligations under Art. 10 of the ECT;*

*(3) Ordering the Respondent to pay the Claimants, in full reparation, damages in an amount to be determined by the Tribunal, based on the but for scenario or alternative but-for scenarios presented in the Second Expert Report of Compass Lexecon dated 9 August 2016;*

*(4) Ordering the Respondent to pay post-award interest on the above sums to the Claimants at an appropriate commercial rate, 6.84%, or alternatively, EURIBOR + 3.5%;*

*(5) Ordering the Respondent to pay the Claimants the full costs of this arbitration, including, without limitations, arbitrator's fees, administrative costs of the Centre, counsel fees, expert fees, and all other costs associated with these proceedings, together with post-award interest on all such sums so awarded at the rates specified in sub-paragraph (4) above; and*

---

[191] Cl. Mem. Merits, ¶ 314.

*(6) Ordering any such other relief as the Tribunal deems appropriate.*"[192]

182.    As to jurisdiction, Claimants have asked the Tribunal to:

"[…] [D]*eny each of Spain's preliminary objections; uphold its jurisdiction over the Claimants' claims; and render the relief requested in Part VII of the Claimants' Memorial and Part IX of the Reply Memorial.*"[193]

183.    Respondent, in turn, has asked the Tribunal:

"[…] [T]*o render an Award:*

*a) Declaring that the Tribunal lacks jurisdiction over the claims of the Claimant or, where applicable, their inadmissibility, pursuant to the provisions of the Statement of Objections to Jurisdiction of the Kingdom of Spain dated 9 September 2015;*

*b) Additionally, should the Arbitral Tribunal decide that it has jurisdiction to hear this dispute, dismissing all of the intentions* [sic] *of the Claimant insofar as the merits, as the Kingdom of Spain has in no way been in breach of the ECT, as indicated in Section III of this Memorial, referring to the Merits;*

*c) Additionally, dismissing all of the claims regarding reparation of damages of the Claimant, as it is not entitled to compensation, pursuant to the provisions of Section IV of this Writ; and*

*d) Ordering the Claimant to pay all costs and expenses arising from this arbitration, including the ISCID* [sic] *administrative expenses, the arbitrators' fees and the attorneys' fees of the Kingdom of Spain, its experts and advisers, as well as any other cost or expenses incurred, including a reasonable rate of interest as of the date on which said costs were incurred to the date of their effective payment.*"[194]

184.    As to jurisdiction, Respondent asks that the Tribunal:

---

[192] Cl. Reply Merits, ¶ 606.

[193] Cl. C-Mem. Jur., ¶ 92; Cl. Rej. Jur., ¶ 160 (adding also a request that the Tribunal "*reject the observations submitted by the Commission*").

[194] Resp. C-Mem. Merits, ¶ 901. *See also*, Resp. Rej. Merits, ¶ 1240.

"[…] *b) Declare that it lacks jurisdiction to hear the whole present arbitration or, in the alternative exclude from the scope of this arbitration the taxation and legislative measures to which D, E and F Objections refer to.*

*c) Directing the Claimants to pay all the costs and expenses incurred that arise from the present arbitration, including the administrative expenses incurred by ICSID, the fees of the Arbitrators and the fees of the legal representation of the Kingdom of Spain, as well as any other cost or expense incurred.*"[195]

185.    In the Reply on Jurisdiction, Respondent formulated its request for relief in slightly different terms, asking the Tribunal to:

"*a) declare its lack of jurisdiction to hear the claims of the Claimants, or if applicable their inadmissibility, in accordance with what is set forth in Section III of this Memorial, referring to Jurisdictional Objections; and*

*d) Sentence* [sic] *the Claimants to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees, and the fees of the legal representatives of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred and the date of their actual payment.*"[196]

186.    The Parties' positions are summarized in the various sections below. At the outset, the Tribunal emphasizes that it has considered the entirety of the Parties' arguments in their written and oral submissions, irrespective of whether an argument is mentioned expressly in the summaries of the Parties' respective positions included in this Decision.

## V.    JURISDICTION

187.    In the Memorial on Jurisdiction, Respondent raised six objections to jurisdiction (one of which was ultimately withdrawn). The order in which these objections were presented

---

[195] Resp. Mem. Jur., ¶ 249.
[196] Resp. Reply Jur., ¶ 392.

was explicitly adjusted later in the Reply on Jurisdiction.[197] In the sequence presented in the Reply on Jurisdiction, the objections are:

- *First*, that the Tribunal lacks jurisdiction *ratione materiae* and *ratione personae*, because Claimants do not own or control directly or indirectly the claimed investments in this case, and therefore there is no "*Investment*" for purposes of Article 1(6) of the ECT; nor are Claimants "*Investors*" under the definition in Article 1(7) of the ECT, and in consequence, there is no "*Investment*" under the ECT either.[198]

- *Second*, that the Tribunal lacks jurisdiction *ratione voluntatis*, because pursuant to Article 17 of the ECT, in the Memorial on Jurisdiction Respondent denied the application of Part III of the ECT to Claimants.[199]

- *Third*, that the Tribunal lacks jurisdiction *ratione personae* because Claimants are not protected investors under the ECT, as the ECT is not applicable to disputes between a European Union ("**EU**") Member State, and nationals of another EU Member State ("**intra-EU**" disputes).[200]

- *Fourth*, that the Tribunal lacks jurisdiction *ratione voluntatis* to hear Claimants' claim for breach of Article 10(1) of the ECT regarding a tax measure established in Law 15/2012, *i.e.*, the TVPEE, because pursuant to Article 21 of the ECT, Article 10(1) does not apply to taxation measures.[201] This is a partial objection.[202]

- *Fifth*, that the Tribunal lacks jurisdiction to hear Claimants' claims for breach of Article 10(7) of the ECT regarding the TVPEE, because (i) pursuant to Article 21(3) of the ECT, Article 10(7) does not apply to this measure; and (ii) in any event, Article 10(7) cannot apply to impose most-favored-nation obligations.[203] This is a partial objection.[204]

---

[197] Resp. Reply Jur., ¶ 4.

[198] Resp. Mem. Jur., § III(C), ¶¶ 15, 141-170; Resp. Reply Jur., § IV(A). The contention that Claimants did not own the claimed investments was initially made in the Memorial on Jurisdiction, but it was later withdrawn in the Reply on Jurisdiction. Resp. Reply Jur., ¶ 55.

[199] Resp. Mem. Jur., § III(B), ¶¶ 14, 84-140; Resp. Reply Jur., § IV(B).

[200] Resp. Mem. Jur., § III(A), ¶¶ 13, 26-83; Resp. Reply Jur., § IV(C).

[201] Resp. Mem. Jur., § III(D), ¶¶ 16, 171-209; Resp. Reply Jur., § IV(D). The objection initially also encompassed claims arising out of the amendment to the Tax on Hydrocarbons, but it was later circumscribed to the claim arising out of the TVPEE, on the basis that the Tax on Hydrocarbons was not one of measures challenged by Claimants. Resp. Reply Jur., n. 124, ¶ 358.

[202] Resp. Mem. Jur., ¶ 20.

[203] Resp. Mem. Jur., § III(E), ¶¶ 17, 210-221; Resp. Reply Jur., § IV(E). Respondent had also initially included a sixth objection: that the Tribunal lacked jurisdiction *ratione voluntatis* with respect to the disputes concerning Law 24/2013, RD 413/2014, and Ministerial Order IET/1045/2014, due to Claimants' failure to comply with the notice and cooling off period requirements in Article 26 of the ECT; or in the alternative, that these claims were inadmissible. Resp. Mem. Jur., § III(F), ¶¶ 18, 222-237. While an introductory paragraph of the Memorial appeared

## A. FIRST OBJECTION: LACK OF JURISDICTION *RATIONE MATERIAE* AND *RATIONE PERSONAE* – LACK OF AN INVESTMENT AND AN INVESTOR

### (1) The Parties' Positions

#### a. Respondent's Position

##### (i) Lack of an "*Investment*" Under Article 1(6) of the ECT

188. Respondent contends that the requirement of an "*Investment*" as the term is defined in Article 1(6) of the ECT is lacking in this case.[205]  Observing that according to this provision, "'*Investment' means every kind of asset, owned or controlled directly or indirectly by an Investor* […]," Spain initially argued that Claimants had neither ownership nor control over the assets claimed to constitute the investment in this case,[206] namely: (i) a 100% of the shares of NEE España, the Spanish company that in turn owns three other Spanish companies: PTE, PTE2, and NEEOS; and (ii) a bridge loan granted to the Termosol Plants by Claimants.[207]  According to Spain, the alleged investment included the indirect participation in PTE, PTE2 and NEEOS.[208]

189. Respondent's initial position was that Claimants' connection to these assets was "*indirect*,"[209] and that the notion of indirect ownership in Article 1(6) of the ECT required finding the "*real and ultimate possession of the asset*."[210]  That, according to Spain, corresponded to NextEra Energy Inc., Claimants' U.S. parent company.[211] Therefore, neither Claimant owned the above-mentioned assets either directly or indirectly.[212]  In addition, Respondent argued, the assets were not controlled by Claimants directly or indirectly as required by Article 1(6) of the ECT and its

---

to extend this objection to claims arising out of Ministerial Order IET/1168/2014 and Ministerial Order IET/1182/2014, neither of these two measures were mentioned again in the sections developing the objection. *Id.*, ¶ 18. The objection was expressly withdrawn with the Reply on Jurisdiction. Resp. Reply Jur., n. 1.

[204] Resp. Mem. Jur., ¶ 20.

[205] Resp. Mem. Jur., ¶¶ 149, 168.

[206] Resp. Mem. Jur., ¶ 168; **CL-001 / RL-055**, Energy Charter Treaty ("**ECT**"), Art. 1(6).

[207] Resp. Mem. Jur., ¶ 147.

[208] Resp. Mem. Jur., ¶ 151.

[209] Resp. Mem. Jur., ¶ 154.

[210] Resp. Mem. Jur., ¶ 145. *See also*, *id.*, ¶¶ 158, 162, 165.

[211] Resp. Mem. Jur., ¶ 166.

[212] Resp. Mem. Jur., ¶ 148 (second bullet).

corresponding Understanding 3, because the actual control fell again on NextEra Energy Inc., the U.S. parent company.[213]

190. Respondent's position was, however, amended in the Reply on Jurisdiction. There, Respondent asserted that it had been "*able to effectively confirm that by means of certain internal asset transfer operations, the Claimants currently, formally and indirectly 'own' the shares in the Termosol Power Plants*," and stated that, as a result, Respondent was no longer "*maintain*[ing] *that the Claimants do not 'own' the assets*."[214]

(ii) Lack of an "*Investor*" Under Article 1(7) of the ECT

191. This said, Respondent argues that the conceded indirect ownership is insufficient, because for there to be an "*Investment*" under Article 1(6) of the ECT, the asset must be owned or controlled by an "*Investor*" in the sense of Article 1(7).[215] Absent an "*Investor*," there is no "*Investment*" either.[216]

192. According to Spain, there is no "*Investor*" under Article 1(7) of the ECT, because Article 1(7)(a)(ii) refers to "*a company or other organization organized in accordance with the law applicable in that Contracting Party*," and neither Claimant qualifies as a "*company or other organization*."[217]

193. In Spain's view, the terms "*company or organization*" should not be equated with "*legal entity*," as confirmed by, the ordinary meaning of those words, EU Law and Netherlands Law, and a "*systematic interpretation*" of the ECT.[218]

194. According to Respondent, in their ordinary meaning the terms company or organization refer to "*associations established according to, or for the performance of, an end or purpose*" that "*require the disposition or order of personal and material resources in*

---

[213] Resp. Mem. Jur., ¶¶ 146, 148 (first bullet). *See also, id.*, ¶ 167.

[214] Resp. Reply Jur., ¶ 55.

[215] Resp. Reply Jur., ¶¶ 56, 58.

[216] Resp. Reply Jur., ¶¶ 56, 103-104.

[217] Resp. Mem. Jur., ¶ 150; Resp. Reply Jur., ¶ 102; **CL-001 / RL-055**, ECT, Art. 1(7).

[218] Resp. Reply Jur., ¶ 68.

*order to achieve an end*."[219] Claimants do not meet this ordinary meaning, Spain contends, because they have no workers, material or technical resources, and are pure holding companies.[220]

195. Respondent also observes that, pursuant to Article 1(7) of the ECT, Claimants must be a company or organization in accordance with the law applicable in the country where they are established, *i.e.* the Netherlands. In the Netherlands, EU Law is applicable and prevails over internal law,[221] or must be considered part of the national law.[222] Referring to EU notions in the fields of small and medium size enterprises, tax law, competition law, state aid law and jurisprudence of the Court of Justice of the European Union ("**CJEU**") Respondent ultimately contends: "*for an entity to be a company under EU Law, there must be an organisation whose purpose is to provide services or produce goods on the market. And an entity that simply has shares or stakes in other companies is not a company. EU Law does not accept that shell companies are undertakings.*"[223] Accordingly, Spain argues, Claimants are not a company or other organization established under the applicable law.[224]

196. Spain further maintains that the ECT distinguishes between the notions of "*company*" or "*organization*," and those of "*legal entity*" or "*enterprise*,"[225] noting that: (i) Article 17 of the ECT uses only the expression "*legal entity*;" and (ii) Article 26(7) of the ECT is drafted as it is to avoid the use of the expression "*legal person*" in Article 25(2)(b) of the ICSID Convention.[226]

---

[219] Resp. Reply Jur., ¶ 70.

[220] Resp. Reply Jur., ¶ 73.

[221] Resp. Reply Jur., ¶¶ 74, 76.

[222] Resp. Reply Jur., ¶ 78.

[223] Resp. Reply Jur., ¶ 87.

[224] Resp. Reply Jur., ¶ 87. *See also,* Resp. Mem. Jur., ¶ 150 (arguing that Claimants do not comply with the structure for developing a business activity demanded by EU Law, which is applicable international and domestic law). In the context of this objection, Respondent expressly relies on the arguments concerning lack of business activity developed in the context of the denial of benefits objection, and summarized *infra* at ¶¶ 219 *et seq.* Resp. Reply Jur., ¶¶ 13-14.

[225] Resp. Reply Jur., ¶ 88.

[226] Resp. Reply Jur., ¶¶ 89, 91-94.

197. Finally, the object and purpose of the ECT also support this objection, given that "*the Charter and the ECT aspire to promote the investment activity of companies that are actively involved in the energy market, which cannot be achieved by means of mere holding companies.*"[227]

### b. Claimants' Position

198. Claimants contend that (i) the dispute concerns Claimants' "*Investments*" as defined in Article 1(6) of the ECT;[228] and (ii) Claimants are qualifying "*Investors*" under Article 1(7) of the ECT.[229] Claimants point out that Respondent conflates two separate concepts ("*Investment*" and "*Investor*") within the overall concept of jurisdiction *ratione materiae*.[230]

### (i) Claimants Have an "*Investment*" Under Article 1(6) of the ECT

199. Answering Respondent's initial contentions in the Memorial on Jurisdiction, Claimants argued that they do own protected "*Investments*" in the territory of Spain.[231] According to Claimants, their investments were precisely identified in their initial submissions, which referred to "*Claimants' 100% equity shareholding in NEE España.*" Claimants explained that "[t]o the extent that NEE España itself owns assets (such as their 100% ownership of the PTEs and NEEOS)* [...] '*these are qualifying investments under* [...] *the ECT* [...] *but they are ultimately reflected in the value of the Claimants' shareholding in NEE España and the Claimants do not seek double-recovery for those investments.*'"[232] In Claimants' view, that 100% equity interest in NEE España, directly owned by NextEra Spain (Claimant 2) and indirectly owned by NextEra Global (Claimant 1), unquestionably qualifies within Article 1(6)(b) of the ECT.[233] It also settled law that an investor can "*claim for harm to the value of its shareholding if the assets of the company*

---

[227] Resp. Reply Jur., ¶ 101.

[228] Cl. C-Mem. Jur., ¶¶ 13-15.

[229] Cl. C-Mem. Jur., ¶¶ 9-12.

[230] Cl. Bif. ¶ 84.

[231] Cl. C-Mem. Jur., ¶ 13.

[232] Cl. Bif., ¶ 86 (referring to Cl. Mem., ¶ 223).

[233] Cl. Bif., ¶ 87.

in which it owns shares suffer harm by reason of a State's unlawful conduct."[234]  For Claimants, "*Spain has not disputed that the Claimants directly or indirectly own 100% of the issued share capital in NEE España*" the "*Investment*" identified since the Request for Arbitration.[235]

200.  Claimants also opposed Respondent's interpretation of Article 1(6) of the ECT, on the ground that: (i) it was contradicted by the ordinary meaning of the text, and it would require reading into the provision a criterion of "*ultimate ownership*" that was not there;[236] (ii) the discussion of "*control*" was irrelevant because the express wording of Article 1(6) refers to two deliberate alternatives ("*owned or controlled*");[237] (iii) Article 17 of the ECT did not assist Spain, because that provision necessarily presupposes that an investor who is not the ultimate owner is *prima facie* protected until a denial is validly exercised;[238] and (iv) the case law invoked by Spain did not support its position, and in fact tribunals have routinely accepted claims by intermediary subsidiaries.[239]

201.  Given Respondent's amendment of its position, in the Rejoinder on Jurisdiction Claimants merely observed that "*Spain* [...] *admits that Claimants' indirect participation in the capital of the Termosol Plants*" is an "*Investment*" under Article 1(6) of the ECT, and focused on the contentions relating to Article 1(7) of the ECT.[240]

(ii)  Claimants Are "*Investors*" Under Article 1(7) of the ECT

202.  Observing that Article 1(7)(a)(ii) of the ECT defines "*Investor*" as "*a company or other organization organized in accordance with the law applicable in that Contracting Party*," Claimants argue that, by its plain terms this provision imposes no further requirements;[241] adding that ECT tribunals have consistently rejected attempts to alter the scope of this

---

[234] Cl. Bif., ¶ 88.

[235] Cl. C-Mem. Jur., ¶ 14.

[236] Cl. Bif., ¶¶ 92-93.

[237] Cl. Bif., ¶ 90.

[238] Cl. Bif., ¶¶ 95-97

[239] Cl. Bif., ¶¶ 98-106. *See also*, Cl. C-Mem. Jur., ¶ 15.

[240] Cl. Rej. Jur., ¶ 7.

[241] Cl. C-Mem. Jur., ¶ 9; **CL-001 / RL-055**, ECT, Art. 1(7).

definition.[242] Claimants assert that the definition is satisfied here because "*each of the Claimants is a company organised in accordance with the laws of the Netherlands*" and the Netherlands is an ECT Contracting Party.[243]

203. In Claimants' view, Spain's contentions on the basis of the economic theory of organizations and concepts in EU tax, competition and state aid law and in the EU regulations for small and medium enterprises are "*inapposite*," "*irrelevant*," and "*unconvincing*," and cannot alter the treaty text.[244] Moreover, Claimants argue that Article 17(1) of the ECT does not assist with the interpretation of Articles 1(6) and 1(7) of the ECT; and further point out that there has been no argument of fraud or malfeasance in the ownership structure to trigger a debate over veil piercing.[245]

### (2) The Tribunal's Analysis

#### a. Lack of an "*Investment*" under Article 1(6) of the ECT

204. Article 1(6) of the ECT provides that an "*Investment*" means "*every kind of asset, owned or controlled directly or indirectly by an Investor,*" including "*a company or business enterprise.*"[246]

205. Initially Respondent argued that in order to have an investment an investor must own the assets on which the investment was based, and it was not sufficient just to have a 100% ownership of the shares of the investment. Respondent also argued that Claimants did not control the investment. Ownership and control, in Respondent's view, rested with the American parent.[247] Respondent ultimately accepted that Claimants owned the Spanish companies and did not pursue the argument that Claimants did not own the investment, and argued only that since Claimants are not "*Investors*" within the meaning of Article

---

[242] Cl. C-Mem. Jur., ¶ 10 (referring to **CL-114**, *Yukos Universal Ltd v. Russia*, UNCITRAL, PCA Case No. AA 227, Interim Award on Jurisdiction and Admissibility (30 November 2009) (hereinafter "*Yukos*"); **RL-008**, *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction (8 February 2005) (hereinafter "*Plama Jurisdiction*"); and **CL-125**, *Petrobart Limited v. The Kyrgyz Republic*, SCC Arbitration No. 126/2003, Arbitral Award (29 March 2005) (hereinafter "*Petrobart*").

[243] Cl. C-Mem. Jur., ¶ 11. *See also*. Cl. Bif., ¶ 91.

[244] Cl. Rej. Jur., ¶ 9.

[245] Cl. Rej. Jur., ¶ 10.

[246] **CL-001 / RL-055**, ECT, Art. 1(6).

[247] Resp. Mem. Jur., § III(C).

1(7) of the ECT, then they cannot have an *"Investment"* within the meaning of Article 1(6) of the ECT.[248]   In the light of the conclusion below relating to Article 1(7) of the ECT on the meaning of *"Investor,"* this argument fails.

206.   Thus, the Tribunal rejects Respondent's objection that the condition of Article 1(6) of the ECT has not been met.

### b.   Lack of an *"Investor"* under Article 1(7) of the ECT

207.   Article 1(7) defines an *"Investor"* of a Contracting Party to include: *"a company or other organization organized in accordance with the law applicable within that Contracting Party."*[249]

208.   It is not disputed that Claimants, NextEra Global and NextEra Spain are incorporated in accordance with the law of the Netherlands.   Respondent argues, nonetheless, that the words *"company"* and *"organization"* in Article 1(7) have a meaning different from legal entity.   According to Spain, a company must be understood in economic terms and this means it must be engaged in economic activity itself and not just be a shell company.   Thus, pure holding companies do not meet the requirements of Article 1(7).   Respondent refers to EU Law and the law of the Netherlands in support of its position on the particular meaning of *"company"* and *"organization."*

209.   However, cases involving Article 1(7) of the ECT have been fairly consistent in interpreting that provision on the basis of the ordinary meaning of the words, and treating as decisive the fact that the company is organized within the territory of a Contracting Party.   This was the view adopted in *Yukos*[250] and in *Charanne*.[251]   The same view was reiterated in *Saluka*[252] in respect of a similar provision in the Netherlands-Czech Republic BIT.

---

[248] Resp. Reply Jur., ¶¶ 103-104; Tr. Day 1 (ENG), 182:5 ff (Ms. Rivas).

[249] **CL-001 / RL-055**, ECT, Art. 1(7).

[250] **CL-114**, *Yukos*, ¶ 411 (on the basis of an opinion by James Crawford).

[251] **RL-088**, *Charanne BV and Construction Investment S.A.R.L. v. Kingdom of Spain*, SCC Case No. 062/2012, Final Award (21 January 2016) (hereinafter **"Charanne"**), ¶ 414.

[252] **RL-098**, *Saluka Investments B.V. v. the Czech Republic*, UNCITRAL, Partial Award (17 March 2006) (hereinafter **"Saluka"**), ¶ 241.

210. Moreover, in *RREEF*, Spain advanced similar arguments about the nature of a company in order to show that the alleged shell company in that case was not an investor within the meaning of Article 1(7) of the ECT.[253] That argument was rejected.

211. The Tribunal sees no ground for concluding that Article 1(7) of the ECT must be interpreted on the basis of a particular meaning under EU or Netherlands law. The ECT is a treaty and must be interpreted in accordance with the principles of treaty interpretation set out in Article 31-33 of the Vienna Convention on the Law of Treaties ("**VCLT**"). Under Article 31(1) of the VCLT, treaties are to be given their ordinary meaning in their context and in light of the object and purpose of the treaty. Applying that rule, Claimants are companies that are organized under the law of the Netherlands and thus are "*Investors*" within the meaning of Article 1(7) of the ECT.

212. Thus, the Tribunal rejects Respondent's objection that the condition of Article 1(7) of the ECT has not been met.

## B. SECOND OBJECTION: LACK OF JURISDICTION *RATIONE VOLUNTATIS* – DENIAL OF BENEFITS

### (1) The Parties' Positions

#### a. Respondent's Position

213. Respondent argues that the Tribunal does not have jurisdiction *ratione voluntatis* as a result of Respondent's exercise in the Memorial on Jurisdiction of its right under Article 17 of the ECT to deny the benefits of Part III to Claimants.[254] This is a matter of jurisdiction, Spain says, because the consent to arbitration given in Article 26(1) of the ECT refers to disputes that "*concern an alleged breach of an obligation [...] under Part III.*"[255] In turn, the consequence of a denial of benefits under Article 17 is the "*non-application of Part III,*" when the conditions set for in the provision are met, as they are

---

[253] **CL-135**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction (6 June 2016) (hereinafter "*RREEF*"), ¶¶ 132-134; 145-146.

[254] Resp. Mem. Jur., ¶¶ 84, 134.

[255] **CL-001 / RL-055**, ECT, Art. 26(1); Resp. Reply Jur., ¶¶ 108-109, 111.

here.[256]  Since there can be no obligation under Part III due to the denial of benefits, it follows that there can be no breach thereof, and consequently there is no consent to arbitration under Article 26.[257]

(i) The Requirements of Article 17 of the ECT Are Met

214. Respondent explains that the requirements of Article 17 of the ECT for exercising a denial of benefits are met because:[258]  (i) each Claimant is a legal entity incorporated in the territory of an ECT Contracting Party other than Spain;[259] (ii) each Claimant is owned and controlled by citizens or nationals of the United States, a third State not party to the ECT;[260] and (iii) neither Claimant performs any business activity in the Netherlands or in any other country.[261]

215. *Legal Entity Incorporated in the Netherlands.*  Respondent explains that, should the Tribunal dismiss the intra-EU objection (*infra*, § V.C) and instead conclude that the Netherlands and Spain are separate ECT Contracting Parties, then it should find that Claimants are legal entities incorporated in the territory of an ECT Contracting Party (the Netherlands), different from Spain.[262]

216. *Owned and Controlled by U.S. Citizens or Nationals.*  Respondent argues that NextEra Spain (Claimant 2) is 100% owned by NextEra Global (Claimant 1), in turn 100% owned by NextEra Energy Global Holdings Cooperative U.A., in turn 99% owned by NextEra Energy Inc. (formerly known as FPL Group International Inc.), a U.S. company, and 1% by High Group Investments LLC, a Gibraltar company.[263]  Further, according to Respondent, the certificates of the Dutch Registry reflect that NextEra Energy Global Holdings Cooperative U.A. administers NextEra Global (Claimant 1); while NextEra

---

[256] Resp. Mem. Jur., ¶¶ 105, 138; Resp. Reply Jur., ¶ 115.

[257] Resp. Mem. Jur., ¶¶ 84, 96, 102, 108-109, 139; Resp. Reply Jur., ¶¶ 116, 148-149.

[258] Resp. Mem. Jur., ¶¶ 111-112, 132.

[259] Resp. Mem. Jur., ¶¶ 113-114.

[260] Resp. Mem. Jur., ¶¶ 116-121.

[261] Resp. Mem. Jur., ¶¶ 122-137.

[262] Resp. Mem. Jur., ¶¶ 113, 115.

[263] Resp. Mem. Jur., ¶¶ 117-118.

Global (Claimant 1) administers NextEra Spain (Claimant 2).[264] It follows, Spain says, that NextEra Energy Inc. is not only the owner, but also the controller of both Claimants.[265] This is underscored by the fact that it was the President of NextEra Energy Inc., Mr. F. Mitchell Davidson, who handled all communications on behalf of the NextEra Group with the Spanish Government during the investment process.[266]

217. This said, in Spain's view, it is incorrect to assert that the requirements of ownership and control by nationals of a third State in Article 17 of the ECT are cumulative.[267] It is sufficient that one of them is satisfied.[268] Moreover, Respondent argues, when referring to "*citizens or nationals of a third state,*" Article 17 is looking for the "*natural persons*" who own or control the legal person, for the ultimate or beneficial owner.[269] And in this case, Spain argues, the "*citizens or nationals*" who own and control Claimants are in the United States.[270]

218. As to the notion of "*control*" in Article 17 of the ECT, Spain argues that it must be interpreted in accordance with Understanding 3 relating to Article 1(6) of the ECT. Pursuant to that Understanding, "*control of an Investment means control in fact, determined after an examination of the actual circumstances in each situation.*"[271] Spain also maintains that the burden of proof to establish control is on Claimants;[272] and argues that it is incorrect to simply attribute control of NextEra Spain to NextEra Global, and control of NextEra Global to NextEra Energy Global Holdings Cooperative U.A, since the relevant test is "*control in fact.*" [273] In any event, Spain contends that it has been established that Claimants are controlled by "*American citizens,*" namely NextEra Energy Inc. and the staff in the companies in the NextEra Group in the United States, in

---

[264] Resp. Mem. Jur., ¶ 120.

[265] Resp. Mem. Jur., ¶ 121. *See also*, Resp. Reply Jur., ¶ 108.

[266] Resp. Mem. Jur., ¶ 121.

[267] Resp. Reply Jur., ¶ 166.

[268] Resp. Reply Jur., ¶ 167.

[269] Resp. Reply Jur., ¶ 168.

[270] Resp. Reply Jur., ¶ 168.

[271] Resp. Reply Jur., ¶¶ 169-170; **CL-001 / RL-055**, ECT, Understandings, § 3.

[272] Resp. Reply Jur., ¶ 172.

[273] Resp. Reply Jur., ¶ 172.

particular the U.S. citizens serving as Directors in category A of Claimants' boards of directors.[274] This is underscored by the fact that the communications relied upon as the basis for Claimants' alleged legitimate expectations were exchanged with senior management of NextEra in the United States.[275]

219. *Lack of Any Business Activity.* According to Spain, Claimants do not have "*any*" business activity in the Netherlands or elsewhere.[276] Pursuant to their certificates of registration they are merely "*financial holding*" companies, classified under a category that refers to holdings not engaged in management, strategic planning or decision making of the company they hold.[277] Holding shares, Spain argues, is not a business activity under EU Law, which is applicable law by virtue of Article 26(6) of the ECT, and it is also part of the national law of the Netherlands and Spain.[278]

220. Moreover, Respondent argues, Claimants (i) have no employees of their own, as shown by their own Commercial Registers at the Chamber of Commerce;[279] (ii) have a registered office that: corresponds to the address of an entity dedicated to the creation and maintenance of companies (Intertrust Group B.V.), is shared with over 1,000 other companies, and has no footprint of Claimants in it;[280] (iii) have financial statements typical of holding companies, that are short, not audited, without management or board of directors reports, with the total assets being the holdings in the NextEra Group subsidiaries, with limited liabilities and no income or cash flow statements;[281] (iv) have two categories of directors in their boards (A and B), with only the U.S. directors (category A) having decision making power;[282] and (v) have no footprint online, or in the

---

[274] Resp. Reply Jur., ¶¶ 173-174, 179.

[275] Resp. Reply Jur., ¶ 180.

[276] Resp. Mem. Jur., ¶¶ 123, 126; Resp. Reply Jur., ¶¶ 13, 50, 108.

[277] Resp. Reply Jur., ¶¶ 20, 23, 25.

[278] Resp. Mem. Jur., ¶ 126.

[279] Resp. Mem. Jur., ¶¶ 125, 129; Resp. Reply Jur., ¶¶ 30-34.

[280] Resp. Mem. Jur., ¶¶ 130-131; Resp. Reply Jur., ¶¶ 38-40.

[281] Resp. Reply Jur., ¶ 36.

[282] Resp. Reply Jur., ¶¶ 41-46.

NextEra Group SEC filings.[283]  For Spain, they are mere "*shell companies*" through which funds flow from the United States to Spain.[284]

221.  Respondent objects to Claimants' allegation (based in *Amto*) that the term "*substantial*" in Article 17 of the ECT should be analysed from a qualitative point of view, as opposed to a quantitative one.  In Respondent's view, this interpretation is in tension with the Spanish version of Article 17, which uses the term "*important*" ("*importantes*") when referring to the activities.[285]  It is also contrary to the decision in *Plama*, which considered the term "*substantial*" as a quantitative one.[286]  In any event, Respondent says, *Amto* does not assist Claimants because the finding of substantial activities there was based on facts that are not met in this case, namely, the existence of two full time employees, an office permanently leased, and investments in other countries following instructions from within the country; while the holding of a bank account was not found determinative.[287]

(ii)  The Denial of Benefits Was Timely and the Effects Can Be Retroactive

222.  Respondent argues that its denial was timely,[288] because (i) there are no provisions in the ECT regarding timing for the exercise of Article 17;[289] (ii) the right can only be exercised when it is known that it is being invoked, and when Respondent is made aware of the arbitration and the exact characteristics of the alleged investor;[290] and (iii) Spain could only verify whether the requirements of Article 17 of the ECT were met after receiving and analysing the Memorial.[291]

223.  It is Spain's position that the denial of benefits "*may be exercised from the moment there is knowledge of the dispute being submitted, without any prior obligation to communicate*

---

[283] Resp. Reply Jur., ¶¶ 47-48.

[284] Resp. Reply Jur., ¶ 17.

[285] Resp. Reply Jur., ¶¶ 163-164.

[286] Resp. Reply Jur., ¶ 163 (referring to **RL-008**, *Plama Jurisdiction*, ¶ 169).

[287] Resp. Reply Jur., ¶ 165 (referring to **CL-143**, *Limited Liability Company Amto v. Ukraine*, SCC Case No. 080/2005, Award (26 March 2008) (hereinafter "*Amto*")).

[288] Resp. Reply Jur., ¶ 108.

[289] Resp. Mem. Jur., ¶ 89; Resp. Reply Jur., ¶¶ 124-125.

[290] Resp. Mem. Jur., ¶ 89; Resp. Reply Jur., ¶¶ 123, 147 (a).

[291] Resp. Mem. Jur., ¶ 89; Resp. Reply Jur., ¶ 147.

*said denial at the beginning of the arbitration or at the time of pre-investment.*"[292] Respondent observes that *Plama* relied on Article 1113 of NAFTA, which contains a requirement of prior communication and prior notification in connection with a denial of benefits, but has no equivalent in the ECT and it is thus not applicable.[293] The absence of this provision in the ECT, Spain says, must mean that the intention of the ECT Contracting Parties was that the denial of benefits could be exercised at any time, given that other ECT provisions do contain express notice or consultation requirements.[294] The position is also supported by the negotiating history of the ECT, Spain argues. According to Respondent, during the negotiations the United States had reserved the right to deny benefits at the time of the arbitration, and it was the United States' proposal that ultimately prevailed.[295]

224. Respondent argues that the dispute in this case arose in 2014, as the first trigger letter was sent in February 2014 and the Request for Arbitration was filed in May 2014.[296] Prior to that, Spain says, the "*only and first*" communication sent to Spain revealing the existence of the Claimants was a letter of 15 March 2012, which for Spain only shows the "*opacity in the business structure of the real investor, NextEra Energy Inc.*"[297] Respondent waited for the Request for Arbitration, it alleges, in order to have a correct picture of the structure used by NextEra Energy Inc., all in good faith and in accordance with the ICSID Arbitration Rules.[298] And Spain did not have all the information to determine whether Article 17 of the ECT could be triggered until the Memorial was studied.[299]

---

[292] Resp. Reply Jur., ¶ 133.

[293] Resp. Reply Jur., ¶ 126.

[294] Resp. Reply Jur., ¶¶ 126-128.

[295] Resp. Reply Jur., ¶¶ 130-131.

[296] Resp. Reply Jur., ¶¶ 120-121.

[297] Resp. Reply Jur., ¶ 122 (referring to **C-090**, Letter from John Ketchum (NextEra Energy Resources, LLC) to José Maria Soria López (Minister for Industry, Tourism and Trade) and Fernando Martí Scharfhausen (Secretary of State for Energy), 15 March 2012).

[298] Resp. Reply Jur., ¶ 147(b).

[299] Resp. Reply Jur., ¶ 147. Moreover, Spain says, the Spanish assets were transferred to the Dutch companies through private documents only produced to Respondent in the document production phase of this proceeding. Resp. Reply Jur., ¶¶ 122, 147(c).

225. In Respondent's view, both Article 41(1) of the ICSID Convention and ICSID Arbitration Rule 41(1), together with arbitral case law support the proposition that the denial of benefits was validly exercised in the Memorial on Jurisdiction.[300] That is because under ICSID Arbitration Rule 41(1), objections to jurisdiction "*shall be made as early as possible* [...] *no later than the expiration of the time limit fixed for the filing of the counter-memorial* [...]."[301]

226. Spain further objects to the conclusion in *Plama* that a denial of benefits must be prospective. Relying on the decisions in *Ulysseas* and *Guaracachi*, Spain argues that *Plama* has been superseded by subsequent decisions that have allowed the exercise of the denial of benefits with retroactive effect.[302] For Respondent, limiting the effects of a denial of benefits to the future amounts to introducing a restriction that is not reflected in the text of Article 17 of the ECT.[303]

227. Finally, Spain opposes Claimants' contention that the form of the denial of benefits in this case is defective, observing that the form in which the denial was activated here (an express statement in the Memorial on Jurisdiction) was completely different from that in *Plama,* the case on which Claimants rely.[304]

### b. Claimants' Position

228. Claimants' first argument is that the question of application of Article 17 of the ECT is not a matter of jurisdiction, but one for the merits. By its express terms, they say, the

---

[300] Resp. Reply Jur., ¶¶ 135-146 (referring to **RL-009**, *Ulysseas, Inc. v. Republic of Ecuador*, UNCITRAL, Interim Award (28 September 2010) (hereinafter "***Ulysseas***"); **RL-010**, *Guaracachi America Inc. & Rurelec, Plc. v. Bolivia*, PCA Case No. 2011-17, Award (31 January 2014) (hereinafter "***Guaracachi***"); **RL-104**, *Empresa Eléctrica del Ecuador, Inc. v. Republic of Ecuador*, ICSID Case No. ARB/05/9, Award (2 June 2009); **CL-120**, *Pac Rim Cayman LLC v. El Salvador*, ICSID Case No. ARB/09/12, Decision on the Respondent's Jurisdictional Objections (1 June 2012) (hereinafter "***PacRim***")).

[301] Resp. Reply Jur., ¶ 137.

[302] Resp. Mem. Jur., ¶¶ 135-137 (referring to **RL-009**, *Ulysseas*; **RL-010**, *Guaracachi*). *See also*, Resp. Reply Jur., ¶¶ 152-159.

[303] Resp. Reply Jur., ¶ 152.

[304] Resp. Reply Jur., ¶¶ 105-106, n. 38.

provision is limited to the benefits in Part III of the ECT, and has no impact on the consent in Part V.[305]

229. In addition, Claimants argue, the objection fails for various reasons: (i) Article 17 of the ECT was not timely invoked; (ii) Spain was aware of Claimants' corporate structure several years before this arbitration begun; (iii) Claimants engage in substantial business activities in the Netherlands; and (iv) Claimants are Dutch owned and controlled.[306]

> (i) The Exercise of Article 17 of the ECT Is Untimely and Procedurally Improper

230. In Claimants' view, the unanimous body of ICSID awards in ECT cases prevents the State from denying the benefits of the ECT to an investor after an investment has been made and a dispute has arisen;[307] and the non-ECT awards relied upon by Spain are inapposite.[308] Recognizing that the Tribunal is not bound by earlier decisions, Claimants observe that stability and predictability are very important in this area.[309] In addition, Claimants argue, their position is supported by the ordinary meaning and context of Article 17(1) of the ECT, and the object and purpose of the ECT of promoting *"long term-cooperation in the energy field."*[310]

231. Quoting from the decision in *Khan*, Claimants argue that the position adopted by the uniform body of cases makes *"eminent sense,"* as *"[i]t is difficult to imagine that any Contracting Party [...] would refrain from exercising its right to deny the substantive protections of the ECT to an investor who has already commenced arbitration [...]"* and

---

[305] Cl. Bif., ¶ 56.

[306] Cl. C-Mem. Jur., ¶ 49.

[307] Cl. C-Mem. Jur., ¶ 51 (discussing **CL-139**, *Ampal-American Israel Corporation et al. v. Arab Republic of Egypt,* ICSID Case No. ARB/12/11, Decision on Jurisdiction (1 February 2016)); Cl. Bif., ¶¶ 57, 63 (discussing **RL-008**, *Plama Jurisdiction;* **CL-114**, *Yukos;* **CL-006**, *Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan,* ICSID Case No. ARB/07/14, Excerpts of Award (22 June 2010) (hereinafter *"Liman"*); **CL-113 / CL-140**, *Khan Resources Inc., et al. v. Government of Mongolia and MonAtom LLC,* UNCITRAL, PCA Case No. 2011-09, Decision on Jurisdiction (25 July 2012) (hereinafter *"Khan"*); **RL-013**, *Anatolie Stati, Gabriel Stati, Ascom Group SA and Terra Raf Trans Traiding Ltd v. Republic of Kazakhstan,* SCC Case, Award (19 December 2013) (hereinafter *"Stati"*)). *See also,* Cl. Rej. Jur., ¶¶ 95-96. Claimants argue that Respondent's attempt to distinguish *Plama* on the basis of its reference to Article 1113 of NAFTA, cannot obscure the fact that that tribunal reached its decision based on Article 17 of the ECT. Cl. Rej. Jur., ¶ 97.

[308] Cl. Bif., ¶¶ 77-78; Cl. C-Mem. Jur., ¶ 51.

[309] Cl. Bif., ¶¶ 65-67.

[310] Cl. Bif., ¶¶ 59-63; Cl. Rej. Jur., ¶ 98 (citing **CL-006**, *Liman,* ¶ 225).

"[a] *good faith interpretation does not permit the Tribunal to choose a construction of Article 17 that would allow host States to lure investors by ostensibly extending to them the protections of the ECT, to then deny these protections when the investor attempts to invoke them* [...].["311]

232.    Furthermore, Claimants contend, Spain cannot argue that it only recently acquired knowledge of the relevant facts giving rise to the denial, because: (i) Spain has known "[a]*t all times*" that the ultimate owner of this investment was a U.S. corporation; (ii) since 2008 prior to the construction of the Termosol Plants, it has been a matter of public record that NEE España was owned by NextEra Spain (Claimant 2), a Dutch corporation; and (iii) after NextEra officials in the United States notified Spain of a potential ECT claim by the Dutch Claimants in 2012, Spain did not invoke its right under Article 17 of the ECT, and instead, continued to encourage the investments.[312]  In particular, Claimants point out that:

- Claimants never sought to conceal the link between the U.S. Group and the Spanish investments, as also shown in the initial correspondence with high Spanish Government officials in July 2009, December 2009, April 2010 and March 2012, which involved U.S. interlocutors.[313]  Spain received these letters and responded to some in September 2009, January 2010 and April 2012.[314]   NEE España's consolidated accounts also show that its ultimate principal entity was NextEra

[311] Cl. C-Mem. Jur., ¶ 51 (quoting **CL-140**, *Khan*, ¶ 429).

[312] Cl. C-Mem. Jur., ¶ 52; Cl. Bif., ¶¶ 69-70, 73-74 (referring to **C-090**, Letter from John Ketchum (NextEra Energy Resources, LLC) to José Maria Soria López (Minister for Industry, Tourism and Trade) and Fernando Martí Scharfhausen (Secretary of State for Energy), 15 March 2012) and ¶ 79.

[313] Cl. C-Mem. Jur., ¶ 53 (citing **C-048**, Letter from Mitch Davidson (NextEra Energy Resources, LLC), to Pedro Marín (Secretary of State for Energy), 8 July 2009; **C-014**, Letter from Mitch Davidson (NextEra Energy Resources, LLC) to Miguel Sebastián (Minister for Industry, Tourism and Trade), 9 December 2009, **C-058**, Letter from Mitch Davidson (NextEra Energy Resources, LLC) to José Luis Rodriguez Zapatero (President of the Government of Spain), 22 April 2010; and **C-090**, Letter from John Ketchum (NextEra Energy Resources, LLC) to José Maria Soria López (Minister for Industry, Tourism and Trade) and Fernando Martí Scharfhausen (Secretary of State for Energy), 15 March 2012).

[314] Cl. C-Mem. Jur., ¶ 54 (citing **C-006**, Letter from Pedro Marín (Secretary of State for Energy) to Mitch Davidson (NextEra Energy Resources, LLC), 3 September 2009; **C-008**, Letter from Pedro Marín (Secretary of State for Energy) to Mitch Davidson (NextEra Energy Resources, LLC), 11 January 2010; **C-011**, Letter from Ignacio Grangel Vicente (Chief of Staff to the Secretary of State for Energy) to John Ketchum (NextEra Energy Resources, LLC), 3 April 2012).

Energy Inc., as seen in the consolidated financial statements of 2008, 2009, 2010 and 2013.[315]

- Spain cannot claim to have been unaware of the Dutch Claimants. A letter of 15 March 2012 to Spain explicitly invoked the Dutch ownership and the ECT.[316] In addition, NEE España notified Spanish authorities that NextEra Spain was its sole shareholder, as shown by the extracts of the Spanish Mercantile Registry since May 2008, NEE España's annual financial statements filed annually with that Registry, and notarized deeds also filed with that Registry documenting NextEra Spain's corporate actions as sole shareholder of NEE España.[317] And NextEra Global's ownership interest was publicly available to Spain in notarized deeds filed with the Spanish Mercantile Registry, and Claimants' Dutch accounts are publicly available.[318]

- On 25 August 2009, the PTEs made filings with the Ministry of Industry, laying out the full structure of the investment.[319]

- Claimants' registration as Dutch holding companies, in which Respondent relies now, has been a matter of public record since 2008.[320]

233. As a legal consequence of the foregoing: (i) Spain cannot claim that the information needed to trigger a denial of benefits is new; and (ii) Spain has "*acquiesced*" in the facts it now seeks to challenge, which prevents it from raising the denial *ex post facto*. Acquiescence, Claimants argue, is a principle of international law linked to the principle of good faith.[321]

---

[315] Cl. C-Mem. Jur., ¶ 54 (citing **C-124**, 2013 Consolidated Financial Statements for NEE España, 22 July 2014; **C-132**, NEE España's 2008 Abbreviated Financial Statements, 31 March 2009; **C-133**, NEE España's 2009 Abbreviated Financial Statements, 31 March 2010; to **C-134**, NEE España's 2010 Consolidated Financial Statements, 22 July 2011).

[316] Cl. C-Mem. Jur., ¶ 55 (citing **C-090**, Letter from John Ketchum (NextEra Energy Resources, LLC) to José Maria Soria López (Minister for Industry, Tourism and Trade) and Fernando Martí Scharfhausen (Secretary of State for Energy), 15 March 2012).

[317] Cl. C-Mem. Jur., ¶ 55 (citing **C-124**, 2013 Consolidated Financial Statements for NEE España, 22 July 2014; **C-132**, NEE España's 2008 Abbreviated Financial Statements, 31 March 2009; **C-133**, NEE España's 2009 Abbreviated Financial Statements, 31 March 2010; to **C-134**, NEE España's 2010 Consolidated Financial Statements, 22 July 2011; **C-083**, Notarised Deed Corporate Resolutions adopted by NextEra Energy España, S.L., 9 June 2010; **C-135**, Notarised Deed Appointment of new Director, 9 June 2010).

[318] Cl. C-Mem. Jur., ¶ 56 (citing **C-080**, First Notarised Deed Corporate Resolution adopted by FPLE Solar Assets, SL, 2 June 2009; and **C-083**, Notarised Deed Corporate Resolutions adopted by NextEra Energy España, S.L., 9 June 2010)

[319] Cl. Rej. Jur., ¶¶ 99-100 (citing **C-280**, Annex 2 to the PTE Letter of Rectification, 25 August 2009).

[320] Cl. Rej. Jur., ¶¶ 101-102.

[321] Cl. C-Mem. Jur., ¶ 58. *See also*, Cl. Rej. Jur., ¶ 104; Cl. Bif., ¶ 76.

234.    Finally, Claimants argue, the facts of this case are distinguishable from those relied upon by Respondent (*Guaracachi, Ulysseas* and *PacRim*), where there was no evidence that the State was aware of the ownership and control before the dispute arose. Indeed, Claimants say that they are not aware of any decision upholding the validity of a denial of benefits exercised during the course of an arbitration on the basis of information made available to the State beforehand.[322]

### (ii)    The Form of the Denial is Deficient

235.    Relying on *Plama*, Claimants argue that the denial ought "*necessarily be associated with publicity or other notice*," either through "*a general declaration in a Contracting State's official gazette* […]; *or a statutory provision in a Contracting States' investment or other laws; or even an exchange of letters with a particular investor or class of investors.*"[323] *Plama* rejected the State's exercise of the denial via two communications to the ICSID Acting Secretary General expressly indicating the intention to exercise Article 17 of the ECT, and this is analogous to Respondent's actions in the present case. It follows that the denial here is invalid as a matter of form.[324]

236.    In response to Respondent's contention that the text of Article 17 of the ECT does not require any prior notification, publication or consultation, Claimants contend that "[t]*he text of Art*[icle] *17 of the ECT presupposes that the right reserved therein be expressly and unambiguously exercised outside the context of an existing arbitration with the relevant investor, which can only be done through some form of notification, publication or communication.*"[325]

### (iii)    The Conditions of Article 17 of the ECT Are Not Met

237.    Claimants contend that Respondent has the burden to prove the two cumulative conditions of Article 17 of the ECT.[326] Dismissing Respondent's attempt to shift the burden to Claimants, they argue that as Article 17 is being raised as an exception to the

---

[322] Cl. C-Mem. Jur., ¶ 59.

[323] Cl. C-Mem. Jur., ¶ 60 (quoting **RL-008**, *Plama Jurisdiction,* ¶ 157).

[324] Cl. C-Mem. Jur., ¶¶ 60-61; Cl. Rej. Jur., ¶ 105.

[325] Cl. Rej. Jur. n. 156.

[326] Cl. C-Mem. Jur., ¶ 62; Cl. Rej. Jur., ¶ 106.

applicability of Part III of the ECT, it falls on Respondent to establish that all of the elements of the exception are met.[327] In Claimants' view, this burden has not been discharged, as in fact: (i) Claimants have substantial business activities in the Netherlands; and (ii) each Claimant is owned by another Dutch entity, and that ownership confers control in the ordinary way.[328]

238. *Substantial Business Activities*. Claimants argue that there is no check-list of mandatory factors, and the inquiry is qualitative, rather than quantitative, *i.e.* the decisive question is the "*materiality, not the magnitude of the business activity*."[329]

239. Respondent's attempt to rely on the different adjectives used in the English and the Spanish version of the ECT ("*substantial*" and "*importantes*") is irrelevant, because both are met. That said, Claimants argue that as both the English and Spanish texts are equally authentic, pursuant to Article 33(3) of the VCLT they should be presumed to have the same meaning. That meaning would be the meaning endorsed by *Amto*, which is the common denominator in the various other authentic languages of the ECT.[330] Claimants add that, if the Tribunal is not satisfied, and considers that the authentic texts disclose a difference of meaning, pursuant to Article 33(4) of the VCLT, the Tribunal must (i) remove the difference applying Article 31 and 32 of the VCLT, or (ii) should that fail, adopt the meaning that "*best reconciles the texts, having regard to the object and purpose of the treaty*."[331] The analysis under either of those steps, Claimants contend, also leads to the meaning adopted in *Amto*.[332]

240. Claimants argue that they "*exceed the standard for 'substantial business activities,'*"[333] and have activities in the Netherlands that are quantitatively and qualitatively substantial.[334] This, they say, is demonstrated by the witness statement of Mr. George

---

[327] Cl. Rej. Jur., ¶ 108.

[328] Cl. C-Mem. Jur., ¶ 63.

[329] Cl. C-Mem. Jur., ¶ 64 (quoting **CL-143**, *Amto*, ¶ 69).

[330] Cl. Rej. Jur., ¶¶ 114-117.

[331] Cl. Rej. Jur., ¶ 116.

[332] Cl. Rej. Jur., ¶¶ 117-119.

[333] Cl. C-Mem. Jur., ¶ 67.

[334] Cl. Rej. Jur., ¶ 120.

Nicolai and documentary evidence, showing that Claimants: (i) are incorporated in the Netherlands; (ii) have a registered office in Amsterdam, which they have use of, and have hired a company named Intertrust to provide secretarial and communication facilities; (iii) hold the vast majority of their board meetings in the Netherlands; (iv) make decisions within the Netherlands, as the board of NextEra Energy Global Holdings Cooperative U.A. can only pass resolutions if adopted by majority of both A and B directors present, and the B directors are Dutch nationals; (v) convene annual general shareholder meetings in the Netherlands; (vi) have bank accounts in the Netherlands; (vii) are Dutch residents for tax purposes; (viii) prepare and file statutory annual accounts in the Netherlands; (ix) have adopted significant business decisions concerning the investments in Spain, including purchase of equipment, equity injections, causing NextEra Spain to subscribe the shares in NEE España, reviewing operations summaries of the Termosol Plants, appointing auditors, prosecuting claims in this arbitration by hiring counsel, overseeing, assessing and assisting with the potential sale of NEE España, reviewing debt restructurings, and dealing with the potential liquidation of NEE España.[335] In addition, Claimants' administrative costs for conducting business in the Netherlands exceed approximately EUR 37,000 per year and the management and corporate secretarial costs exceed EUR 85,000 per year.[336] Furthermore, NextEra Global is also the holding company for large renewable energy investments in Canada, which is part of the factual matrix for determining whether this company has substantial business activities in the Netherlands.[337]

241. None of the factors referred to by Spain detract from the above substantial business activities. Many of Spain's contentions have already been rejected by other arbitral tribunals.[338] There is no rule in investment treaty arbitration against the *bona fide* use of holding companies.[339] There is a distinction between holding companies – which could in principle have substantial business activities – and shell companies, and even if the

---

[335] Cl. C-Mem. Jur., ¶ 67. *See also*, Cl. Rej. Jur., ¶ 123; Cl. Bif., ¶ 81.

[336] Cl. C-Mem. Jur., ¶ 68.

[337] Cl. C-Mem. Jur., ¶ 68; Cl. Rej. Jur., ¶ 123 (third bullet).

[338] Cl. C-Mem. Jur., ¶¶ 69-70. Claimants rely on the statements of Mr. George Nicolai and Mr. Mark Sorensen to counter assertions made in the Accuracy Report on this subject. Cl. Rej. Jur., ¶ 122.

[339] Cl. C-Mem. Jur., ¶ 72.

Tribunal concluded that Claimants are shell companies, there would be no basis to deprive them of protection, as held in *RREEF*.[340]  It is also irrelevant that Claimants' Dutch annual accounts are abbreviated, because they qualify as small companies under Dutch law and are thus not required to include cash flows or board statements or audit their accounts.[341]  Respondent's reliance only on the filed accounts is misleading, as the accounts produced for the shareholders include more detailed information; and Claimants do hire Dutch auditors.[342]  Finally, the code used in the Dutch registry has the sole purpose of describing the main object of the company at the time of registration; it has no legal consequences and does not restrict the activities of the entity.[343]

242.  *Dutch Ownership and Control.*  Claimants contend that Dutch ownership is demonstrated because each Claimant is owned by a Dutch national:  NextEra Global (Claimant 1) owns 100% of NextEra Spain (Claimant 2); and a Dutch cooperative owns 100% of NextEra Global (Claimant 1).[344]  Dutch control is also showed by the fact that no voting arrangements prevent these owners from "*exercising control over their immediate subsidiary, in the normal way.*"[345]  Moreover, contrary to Spain's contentions, Claimants' board of directors is not dominated or controlled by U.S. citizens, as each director has a free vote and neither of the categories (A or B) plays a more important role.[346]

243.  Claimants also observe that, by contrast with Article 1(6) of the ECT – concerning the definition of "*Investment*" – Article 17 does not include any reference to indirect ownership or control.  Accordingly, they say, the ordinary meaning and the context of Article 17 refer to *direct* ownership and *direct* control.[347]  Spain's reliance on Understanding 3 relating to Article 1(6) of the ECT is a red herring, because, had the ECT Contracting Parties wished to include within the ambit of Article 17(1) indirect ownership or control, they could have easily transposed the language from Article 1(6),

[340] Cl. C-Mem. Jur., ¶¶ 74-75 (referring to **CL-120**, *PacRim*; **CL-135**, *RREEF*).  *See also*, Cl. Rej. Jur. ¶ 121.
[341] Cl. C-Mem. Jur., ¶ 76.
[342] Cl. C-Mem. Jur., ¶ 77.
[343] Cl. Rej. Jur., ¶ 121.
[344] Cl. C-Mem. Jur., ¶ 80; Cl. Rej. Jur., ¶ 110; Cl. Bif., ¶ 82.
[345] Cl. C-Mem. Jur., ¶ 80; Cl. Rej. Jur., ¶ 110.
[346] Cl. Rej. Jur., ¶ 112.
[347] Cl. C-Mem. Jur., ¶ 81.

and they did not.[348] In addition, Claimants say, Spain's view is inconsistent with the functions of Article 1(6) and Article 17 of the ECT: the first one provides a broad definition of "*Investment*," while the second one provides limited exceptions to the general applicability of the ECT to those "*Investments*."[349]

### (iv)  The Denial Can Only Produce Effects to the Future

244.  Finally, Claimants argue that, even if the conditions of Article 17 were met, the denial could only have effect as of 9 September 2015 (date of the Memorial on Jurisdiction), when it was raised for the first time; and all the challenged measures in this case occurred prior to that date.[350]

### (2)  The Tribunal's Analysis

245.  Article 17 was invoked by Respondent as a preliminary objection and argued that way. The Tribunal notes Claimants' argument that this objection is not really a jurisdictional objection since it is a challenge only to the application of Part III of the ECT. However, since the matter has been argued as a preliminary objection, the Tribunal will deal with it on this basis.

246.  Article 17(1) of the ECT provides:

> "*Each Contracting Party reserves the right to deny the advantages of this Part to:*
>
> *(1) a legal entity if citizens or nationals of a third state own or control such entity and if that entity has no substantial business activities in the Area of the Contracting Party in which it is organized;* [...]."[351]

247.  Respondent argues that Claimants are owned and controlled by the American company NextEra Energy Inc. and do not have substantial business activities in the Netherlands. It

---

[348] Cl. Rej. Jur., ¶ 111.

[349] Cl. Rej. Jur., ¶ 111.

[350] Cl. C-Mem. Jur., ¶ 82.

[351] **CL-001 / RL-055**, ECT, Art. 17(1).

argues that it exercised its right under Article 17(1) to deny the benefits of Part III of the ECT to Claimants in its Memorial on Preliminary Objections.[352]

248.  The Tribunal will deal first with the question whether Claimants are owned or controlled by the citizens or nationals of a third State, second with whether they have substantial business activities in the Netherlands, and third with whether Respondent has exercised effectively a denial of the advantages of Part III of the ECT under Article 17(1).

### a.  Are Claimants Owned or Controlled by the Citizens or Nationals of a Third State?

249.  Claimants argue that they are 100% owned by a Dutch cooperative and control follows that ownership.  The second Claimant, NextEra Spain, is registered in the Netherlands and is 100% owned by the first Claimant NextEra Global, also registered in the Netherlands, which in turn is 100% owned by NextEra Energy Global Holdings Cooperative U.A, which, too, is registered in the Netherlands.  On that basis, Claimants are not controlled by the nationals of a non-ECT State.  Nor, Claimants argue, do the voting arrangements prevent the Dutch owners from exercising control.  In any event, Claimants argue, since there is no reference to *"indirect"* ownership or *"indirect"* control in Article 17(1) of the ECT, the word control in Article 17(1) is limited to *"direct"* control.

250.  The Tribunal sees no basis for concluding that control in Article 17(1) of the ECT is limited to direct control.  It is control in fact that counts, just as control in fact is what is meant in respect of Article 1(6) (Understanding 3).  It makes no sense to say that the test for control in determining whether an investment is controlled by the nationals of another Contracting Party is different from the test for determining whether an investment is controlled by the nationals of a third State.

251.  NextEra Energy, Inc., a U.S. corporation is the ultimate principal entity in the NextEra group and notwithstanding the formal provisions on voting, the reality is that the Dutch companies are controlled by the American company and the principal activities of Claimants in respect of the investments in Spain are conducted by the American

---

[352] Resp. Mem. Jur., ¶ 138.

company. It was officials of the American companies who dealt with the Spanish authorities in making the investment and, as will be discussed later, all of the representations by the Spanish authorities on which Claimants rely for their legitimate expectations claim in this case were made to those officials. In short, the reality of control is with U.S. nationals.

252.    In light of this, the Tribunal concludes that Claimants are controlled by the citizens or nationals of a third State and thus the first criterion in Article 17(1) is met.

### b. Do Claimants Have "Substantial Business Activities" in The Netherlands?

253.    Respondent argues that Claimants do not have any business activities in the Netherlands. They are essentially holding companies whose function is to hold shares not to conduct business activities. Claimants argue that there is no barrier to holding companies meeting the test of having substantial business activities and list a variety of activities which it claims show that they meet this test, including having a bank account in the Netherlands, holding meetings there, providing annual accounts and taking decisions on such matters as equipment and funding of the Spanish subsidiaries. The question according to Claimants is the materiality of the business activities not the magnitude.

254.    The question of what constitutes "*substantial business activities*" has been dealt with in several cases, although not all related to Article 17(1) of the ECT. In *Pac-Rim*,[353] a case brought under the Central American Free Trade Agreement ("**CAFTA**"), the tribunal concluded that there were no "*substantial business activities*" of the claimant in the United States. It simply held the shares of other companies. Apparently, it had no board of directors and no bank account in the U.S. The tribunal did say that a "*traditional holding company*" could be engaged in "*substantial business activities*." Such a company in its view would have "*a board of directors, board minutes, a continuous physical presence and a bank account.*"[354]

---

[353] **CL-120**, *PacRim*.

[354] **CL-120**, *PacRim,* ¶ 4.72.

255. In *Amto*,[355] the tribunal decided that since investment activities were conducted from premises in Latvia and the claimants had a small permanent staff, they met the test of having "*substantial business activities*" there.[356] The company also had a bank account in Latvia and paid taxes.[357]

256. In the present case, the claimed "*substantial business activities*" of the Claimants are more substantial than those in *PacRim*, where there was no board of directors and no bank accounts in the United States. The Claimants in this case would also meet the requirements set out in *PacRim* for a "*traditional holding company*" in that it had "*a board of directors, board minutes, a continuous physical presence and a bank account.*"[358]

257. The facts of *Amto* bear some similarity to the present case, but there are differences. The principal difference is that the NextEra Claimants have no permanent employees; they contract with Intertrust, which conducts Claimants' business in the Netherlands. However, this does not seem an important distinction. Whether one operates a business through permanent employees or contracts that work out to someone else is simply a business decision about how to operate. In either case, substantive work is being done for the company. The question is whether that work constitutes substantial business activities. In this regard, the Tribunal does not give any weight to the fact that the Spanish version of the treaty refers to "*important*" rather than "*substantial*" business activities. Since it is the quality and not just the quantity of the activities that is relevant, whether the term "*important*" or the term "*substantial*" is used does not make a difference.

258. *Amto* provides a useful test, in that it looked to see if "*investment activities*" were being conducted by the Latvian claimant. Applying that approach to the present case involves

---

[355] **CL-143**, *Amto*.

[356] **CL-143**, *Amto*, ¶ 68.

[357] In *Guaracachi*, the tribunal concluded that substantial business activities had not been established although it did not set out any criteria for reaching that decision. The claimant had argued that the company had offices in the US, held shareholder's meetings and Board of Directors meetings there, and prepared minutes of those meetings. **RL-010**, *Guaracachi*, ¶ 217.

[358] **CL-120**, *PacRim*, ¶ 4.72.

asking whether Claimants were engaged in investment activities from the Netherlands. In this regard, the meetings of the Board of Directors in the Netherlands are significant. In their Counter Memorial on Jurisdiction, Claimants argue that in fact *"significant"* business decisions relating to their investments were taken by Claimants, including purchasing equipment for the Termosol Plants in 2008, equity injections of EUR 209 million, appointing auditors in the Netherlands, hiring counsel for these arbitration proceedings, and hiring liquidators to oversee the liquidation of NEE España in 2013.[359] They also refer to reviewing operation summaries of the Termosol Plants, and reviewing proposed debt restructuring.

259.    In short, Claimants' argument is that they are not shell companies in the Netherlands; through their Board of Directors they play an active role in making decisions for their investments and have been engaged in reviewing the activities of their investments.

260.    The Tribunal notes that although there has not been a significant jurisprudence on the question of *"substantial business activities,"* the tribunals that have found such activities to exist have been prepared to do so on the basis of a relatively small number of activities both in terms of quantity and quality. And that is true of the claim to having substantial business activities in the Netherlands in the present case. As pointed out earlier, the investment activities in respect of the Spanish investment are those of the U.S. parent and Claimants have a very limited role.

261.    However, in view of the decision that the Tribunal reaches in respect of denial of benefits below, it does not have to decide whether Claimants' business activities in the Netherlands were substantial. Even if they were not substantial, Respondent still failed to exercise its right to deny benefits in accordance with Article 17(1) of the ECT.

### c.    Assuming that Respondent Had the Right to Deny Benefits Did It Exercise that Right in a Timely Fashion?

262.    Article 17 of the ECT provides no guidance on the time at which the right to deny benefits must be exercised and the cases seem to be divided on this.

---

[359] Cl. C-Mem. Jur., ¶ 67.

263. In the present case, the denial was asserted by Spain on 9 September 2015 in its Memorial on Jurisdiction.[360] The question is whether that is too late. Although there has been some controversy over when the right to deny benefits must be exercised, recent cases have suggested that the right must be exercised no later than the time the benefits are claimed (*Ulysseas* and *Guaracachi*). On that basis, by denying benefits in its Memorial on Jurisdiction, Respondent was responding to the attempt by Claimants to exercise ECT rights in bringing this claim.

264. However, the filing of the claim was not the first time that Respondent was aware of a potential ECT claim by NextEra. As set out above, NextEra had engaged with the Spanish authorities on its plan to invest in the solar industry as early as July 2009, both in person and through correspondence. It was clear to the government that it was dealing with an American corporation, but it was also made clear that this investment was operated through a Dutch company.[361] The details of Claimants' ownership were available in public registers and Respondent must be taken to be aware of the status of Claimants. The contacts between the NextEra Energy group and the Spanish government both written and in person were extensive, up to and including the prime ministerial level. Encouragement and reassurances were provided to NextEra without any suggestion that Spain would invoke Article 17(1) of the ECT and deny the benefits of the treaty to Claimants.

265. More specifically, in a letter dated 15 March 2012 from John W. Ketchum, Vice President, NextEra Energy Resources LLC to the Minister for Industry, Energy and Tourism and the Secretary of State for Energy, the Spanish authorities were advised that the Dutch company which owned the NextEra investment in Spain was the "*beneficiary of the protective provisions set forth in the Energy Charter Treaty*" and that NextEra would defend their rights including through international arbitration.[362]

---

[360] Resp. Mem. Jur., ¶ 138.

[361] Cl. C-Mem. Jur., ¶¶ 52 *et seq.*

[362] **C-090**, Letter from John Ketchum (NextEra Energy Resources, LLC) to José Maria Soria López (Minister for Industry, Tourism and Trade) and Fernando Martí Scharfhausen (Secretary of State for Energy), 15 March 2012.

266.    Thus, by 15 March 2012, Respondent was aware that the NextEra Spanish investment
        was owned by a Dutch company, which regarded itself as having rights under the ECT,
        and that NextEra was willing to enforce those rights through international arbitration.
        The Spanish government gave no indication that it would deny those rights. Indeed,
        following this letter, the Spanish government made further assurances to NextEra and
        Claimants went ahead and completed the building of the Termosol Plants.[363]

267.    In light of this, can Respondent then deny the benefits of Part III of the ECT once a claim
        has formally been made? In *Khan* the tribunal said:

> "*A good faith interpretation does not permit a tribunal to choose a
> construction of Article 17 to allow host states to lure investors by
> ostensibly extending to them the protections of the ECT, to then deny them
> these protections when the investor attempts to invoke them in
> international arbitration.*"[364]

268.    In the view of the Tribunal, once Spain became aware not just that it had a right to deny
        benefits but that Claimants were relying on Spain's statements and actions and were
        reserving a right to invoke the provisions of the ECT, it was put on notice of a potential
        exercise of ECT rights by NextEra. To delay until its Memorial on Jurisdiction on 9
        September 2015, more than three years later, to exercise its right to deny benefits under
        Article 17(1) of the ECT is hardly a good faith exercise of its right as contemplated by
        the *Khan* tribunal. During that period Spain gave assurances about the protection the
        NextEra investment would receive in full knowledge that it was an investment that, in
        Claimants' view, was proceeding under and with the protections of the ECT. As a result,
        Claimants were justified in proceeding on the assumption that Spain would not exercise
        its right to deny benefits under Article 17 of the ECT.

269.    Respondent was confronted on 15 March 2012 with a clear assertion that NextEra's
        international Dutch investment company had rights under the ECT and that NextEra
        planned to exercise such rights. Faced with such an assertion, and knowing that it had the
        right to deny the benefits that Claimants were asserting, Respondent could not stay silent,

---

[363] Cl. Bif., ¶¶ 70 *et seq*.

[364] **CL-113**, *Khan,* ¶ 429.

82

but it did. Its conduct can only be viewed as acquiescence in Claimants' assertion of ECT rights precluding Respondent from later seeking to assert a right to deny benefits when it filed its Memorial on Jurisdiction on 9 September 2015.

270. In light of this, the Tribunal concludes that even if Claimants did not have *"substantial business activities"* in the Netherlands, Respondent failed to exercise its right to deny benefits under Article 17(1) in a timely fashion.

271. Accordingly, the Tribunal rejects the second preliminary objection.

## C. THIRD OBJECTION: LACK OF JURISDICTION *RATIONE PERSONAE* – INTRA-EU OBJECTION

### (1) The Parties' Positions

#### a. Respondent's Position

272. Spain objects to the Tribunal's jurisdiction arguing that Claimants are not protected investors under the ECT, because the dispute resolution mechanism set forth in Article 26 of the ECT does not apply to controversies arising between an investor of a EU Member State and a EU Member State (**"intra-EU"**).[365]

273. As both the Netherlands and Spain were EU Member States at the time they entered into the ECT, and the EU is a Contracting Party to the ECT, Respondent contends, Claimants are not investors of *"another Contracting Party"* as required by Article 26 of the ECT.[366] The requirement of diversity in the Contracting Party *"inevitably implies"* the exclusion of intra-EU disputes.[367]

274. Spain has observed, however, that it does not contend that the ECT contains *"an express or implied disconnection clause."*[368] Relying on the EC's opinion, Respondent argues that the introduction of such clause was *"entirely without relevance"* *"given that the*

---

[365] Resp. Mem. Jur., ¶ 13.
[366] Resp. Mem. Jur., ¶¶ 13, 27-28, 83; Resp. Reply Jur., ¶¶ 184, 240.
[367] Resp. Mem. Jur., ¶ 27.
[368] Resp. Reply Jur., ¶ 237.

*agreement envisaged cover*[ed] *areas for which a complete harmonisation ha*[d] *been carried out.*"[369]

### (i) The Principle of Primacy of EU Law

275. In support of this objection, Respondent contends that:

- Being both EU Member States at the time of their ratification of the ECT, Spain and the Netherlands could not deviate from their obligations in the EU internal market.[370]

- The EU system already grants EU citizens an "*integral*" system of "*specific and preferential protection*" for their investments, which applies over the ECT; prohibits dispute resolution mechanisms different from those established in the EU Treaties that could interfere with the internal EU market;[371] and offers the appropriate legal resources for the protection of investors' rights before national courts.[372]

- Given this "*integral*" system of protection, within the EU, there is no distinction between investors of a EU Member State and those of another Member State, and therefore the category of foreign investor exclusively refers to investors from non-EU Member States.[373]

- EU Law – which is also applicable international law – prevails over the ECT in the event of conflict.[374]

276. Respondent emphasizes that underlying this objection is the essential principle of primacy of EU Law in intra-EU relations, pursuant to which EU Law must be applied over any other national or international law,[375] regardless of whether EU Law is more favourable or not.[376] It follows for Spain that "*it is the* [law] *of the EU and not the ECT which must be applied to resolve this dispute.*"[377]

---

[369] Resp. Reply Jur., ¶ 238.

[370] Resp. Mem. Jur., ¶ 29.

[371] Resp. Mem. Jur., ¶¶ 30-31, 34.

[372] Resp. Mem. Jur., ¶ 40.

[373] Resp. Mem. Jur., ¶ 41.

[374] Resp. Mem. Jur., ¶ 31.

[375] Resp. Reply Jur., ¶¶ 187, 189.

[376] Resp. Reply Jur., ¶ 189.

[377] Resp. Reply Jur., ¶ 198.

277. For Spain, the preferential application of the EU system between EU Member States is recognized by the ECT's text, context and purpose.[378]

278. With respect to the text of the ECT, Respondent points out:

- *First*, that Article 1(2) of the ECT includes Regional Economic Integration Organizations ("**REIO**"), such as the EU, within the definition of a "*Contracting Party*," and the definition of REIO in Article 1(3) recognizes that certain competences have been conferred to the EU by its Member States irrevocably and with binding nature, including on certain matters governed by the ECT.[379] Moreover, the definition of "*Contracting Party*" in Article 1(2) recognizes that ECT Contracting Parties need to have agreed to be bound to one another, which neither Spain or the Netherlands could do, because they no longer had the competence to do so.[380]

- *Second,* that Article 36(7) of the ECT reaffirms the conclusions above, in providing that EU Members States and the EU cannot vote simultaneously.[381] This means, Respondent says, that the EU and each of its Member States can only vote in the areas within the scope of their competences, and it is for the CJEU – not for the Tribunal – to determine who is the competent Contracting Party in each subject matter.[382]

- *Third,* that the regulation of the relation between the ECT and other agreements (including the EU Treaties) in Article 16 of the ECT recognizes that, in intra-EU relations, the EU Treaties prevail over the ECT.[383]

- *Fourth*, that pursuant to Article 25 of the ECT, the EU integral system of promotion and protection of investments cannot be applied to other ECT Contracting Parties that are not EU Member States via the Most Favored Nation ("**MFN**") clause,[384] which is an "*explicit recognition*" of the principle of primacy of EU Law in intra-EU relations.[385]

- *Fifth,* that Article 26(1) of the ECT allows submission to arbitration of disputes only between a "*Contracting Party*" and "*an Investor of another Contracting*

---

[378] Resp. Mem. Jur., ¶ 43 *et seq.*

[379] Resp. Mem. Jur., ¶ 45; Resp. Reply Jur., ¶¶ 228-229; **CL-001 / RL-055**, ECT, Art. 1(3) ("'*Regional Economic Integration Organization'* means an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters.")

[380] Resp. Reply Jur., ¶¶ 226-227.

[381] Resp. Reply Jur., ¶¶ 230-231.

[382] Resp. Mem. Jur., ¶ 49; Resp. Reply Jur., ¶¶ 231-232; **CL-001 / RL-055**, ECT, Art. 36(7).

[383] Resp. Mem. Jur., ¶ 47; **CL-001 / RL-055**, ECT, Art. 16.

[384] Resp. Mem. Jur., ¶ 48; **CL-001 / RL-055**, ECT, Art. 25.

[385] Resp. Reply Jur., ¶¶ 190, 192 (highlighting the words "*preferential treatment*" in Art. 25).

*Party*;" and cannot give rise to obligations among EU Member States, because at the time the ECT was entered into, EU Member States had already given over their sovereignty in connection with the internal market to the EU and could not assume *inter-se* obligations concerning that market.[386] As the consent in Article 26 of the ECT is limited to disputes arising out of alleged breaches of obligations of Part III, and EU Member States could not contract obligations among themselves under Part III, Article 26 cannot apply to intra-EU disputes.[387] Further, in addition to arbitration, Article 26 provides for conciliation and recourse to national courts, without establishing an order of preference or indicating that arbitration is more favourable.[388]

- *Finally*, that Article 26(6) provides that the Tribunal shall decide the issues in dispute "*in accordance with this Treaty and applicable rules and principles of international law,*" thereby recognizing that EU Law must be applied "*on an equal level* […] *as applicable international law.*"[389] Accordingly, any conflict between the ECT and EU Law must be resolved pursuant to Article 25 of the ECT, which recognizes both the primacy of EU Law in intra-EU relations, and that the process of economic integration of the EU is more advanced than the ECT and therefore more favorable.[390]

279. Respondent dismisses Claimants' interpretation of the above-mentioned provisions, arguing that it is "*literal and completely out of context.*"[391] Instead, Respondent urges that an effective interpretation of the ECT leads to the conclusion that the ECT recognizes the primacy of EU Law in intra-EU relations and excludes arbitration.[392]

280. According to Respondent, the ECT's object and purpose also support its position. That is, Spain says, because admitting the intra-EU application of the ECT would dispense with the ECT's object and purpose, as (i) it would mean that the EU and its Member States promoted the ECT to cover an area (intra-EU investments) already covered by EU Law in an exhaustive and superior manner; (ii) it would take away competences from the CJEU; and (iii) it would reflect a lack of trust in the EU system.[393]

---

[386] Resp. Mem. Jur., ¶¶ 50, 58.

[387] Resp. Reply Jur., ¶¶ 225-226.

[388] Resp. Reply Jur., ¶¶ 233-234.

[389] Resp. Mem. Jur., ¶ 50; **CL-001 / RL-055**, ECT, Art. 26. *See also*, Resp. Mem. Jur., ¶ 78.

[390] Resp. Reply Jur., ¶¶ 235-236.

[391] Resp. Reply Jur., ¶ 222.

[392] Resp. Reply Jur., ¶ 224. *See also, id.*, ¶ 236.

[393] Resp. Mem. Jur., ¶ 61.

281. It is Spain's position that Article 26(6) of the ECT prevents intra-EU disputes, because that would contravene EU Law, which is applicable international law.[394]  Article 344 of the Treaty on the Functioning of the European Union ("**TFEU**") prohibits the submission of questions relating to the internal electricity market to arbitration, and in this arbitration the Tribunal is being called upon to decide on the rights of a EU investor in the internal market.[395]  That is, Spain argues, because "*the EU Directives in the area of renewable energies are the framework of* [the] *Spanish legislation in which the Claimants allegedly rely on making an investment*" and as such "*the question must be resolved in light of the interpretation of the EU law.*"[396]  Moreover, for Spain, the dispute affects essential elements and pillars of EU Law, namely, the notions of State Aid, competition law, free movement of capital and freedom of establishment, and as such the Tribunal does not have jurisdiction to resolve it, as this power is reserved to the EU's judicial system.[397]

282. For Respondent, it is significant that the objection is backed by the EC – "*one of the most authorised voices on interpreting the ECT*" and an ECT negotiator; and by legal doctrine.[398]  The EC has recognized the "*incompatibility of the Investment Treaties signed between EU Member States and EU Law,*" and of the arbitration provisions in the ECT and EU Law, when applied to intra-EU disputes.[399]

283. Spain also draws significant support for this objection from the CJEU judgment in *Achmea*, of 6 March 2018.[400]  Spain contends that pursuant to this judgment "*an*

---

[394] Resp. Mem. Jur., ¶ 51.

[395] Resp. Mem. Jur., ¶¶ 52-53; **RL-021 / R-004**, Treaty on the Functioning of the European Union ("**TFEU**"), Art. 344 ("*Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.*") *See also*, Resp. Reply Jur., ¶ 219.

[396] Resp. Mem. Jur., ¶ 77.

[397] Resp. Reply Jur., ¶ 197.  *See also*, *id.*, ¶¶ 193, 194, 219. In the context of this objection, in its Memorial on Jurisdiction, Respondent referred to the potential impact that a procedure initiated by the EC to evaluate the renewable energy measures in Spain captioned "SA.40348 2014/N" could have in the present arbitration. Resp. Mem. Jur., ¶¶ 79 *et seq.*  Respondent's arguments on this matter are summarized *infra*, ¶¶ 510 *et seq.*

[398] Resp. Mem. Jur., ¶¶ 66-82.

[399] Resp. Reply Jur., ¶ 186.

[400] **RL-125**, *Slovak Republic v. Achmea B.V.*, Preliminary Ruling of the Court of Justice of the European Union in C-284/16, 6 March 2018 (hereinafter "*Achmea*").  In the Reply on Jurisdiction, Respondent had anticipated that at that time there were two pending cases before the CJEU "*regarding the compatibility between the BITs and EU Law,*" stating that it would maintain the objection until the CJEU made a decision.  Resp. Reply Jur., ¶ 186 and n. 81

*arbitration clause in an International Agreement concluded between EU Member States (intra-EU BIT) is incompatible with EU law and, in particular, the autonomy of the EU legal order.*"[401]

284.    Respondent first highlights that the *Achmea* judgment endorses the principles that: (i) the judicial system established in the EU Treaties is intended to ensure consistency and uniformity in the interpretation of the EU Law; (ii) pursuant to Article 19 of the TFEU, it falls on national courts and tribunals and on the CJEU to ensure the application of EU Law in the EU Member States; (iii) the preliminary ruling system established in Article 267 of the TFEU is intended to ensure uniformity in the interpretation of EU Law; (iv) EU Law is both part of the law of each EU Member State and also derives from an international agreement.[402]

285.    Spain then explains that the CJEU has concluded that the above principles are not fulfilled through the establishment of an investment tribunal because: (i) the tribunal might be called to interpret or apply EU Law, without being part of the EU judicial system; (ii) not being a court or tribunal of a EU Member State within the meaning of Article 267 of the TFEU, such tribunal cannot refer a matter to the CJEU; (iii) the tribunal's decision is final and judicial review limited by national law; (iv) investment arbitration involves disputes that may concern the application or interpretation of EU Law, but that system does not allow disputes to be resolved in a way that ensures the full effectiveness of EU Law.[403]

286.    For Spain, the above-mentioned conclusions also apply in the context of the ECT. In that regard, Respondent observes that *Achmea* refers to an "*international agreement,*" which the ECT is, and not exclusively to bilateral investment treaties.[404]  Spain further contends that the Achmea judgment's reasoning is fully applicable here because: (i) under Article

---

(citing "*Preliminary Ruling C-284/16 (Achmea Case) on the Compatibility Between the BIT Signed in 1991 by the Netherlands and Slovakia (EC-13)*" and "*Case T-624/15 relating to the Application for Annulment of the European Commission Decision of 30 March 2015 in Case SA 38517 (Arbitral Award of Case Micula v. Romania, 11 December 2013).*") *See also*, Resp. Reply Jur., ¶ 202.

[401] Resp. Obs. Achmea, ¶¶ 2, 3.

[402] Resp. Obs. Achmea, ¶ 5.

[403] Resp. Obs. Achmea, ¶ 6.

[404] Resp. Obs. Achmea, ¶ 8.

26(6) of the ECT tribunals are required to interpret and apply EU Law to decide all the issues in dispute, "*not only as International Law, but also as internal law and as a fact;*"[405] (ii) EU Law applies to this dispute because the controversy affects a key institution of EU Law: State Aid;[406] (iii) an ICSID tribunal "*does not form part of the judicial system of EU Law*" and therefore cannot request a preliminary ruling from the CJEU under Article 267 TFEU,[407] and (iv) there is no certainty that in enforcement proceedings the CJEU would have full knowledge and control over the EU Law applied by the tribunal.[408]

### (iii) The Decisions Relied Upon by Claimants are Not Dispositive or Persuasive

287. Finally, Respondent dismisses Claimants' reliance on prior decisions of other arbitral tribunals, arguing that aside from those in cases against Spain, those decisions are not dispositive of the matters at issue in this case because they: (i) "*refer to Bilateral Investment Treaties which have nothing to do with a multilateral and mixed treaty promoted and signed by the EU;*" or (ii) refer to States that were not EU Member States when they entered into the ECT.[409] As to the cases involving Spain, Respondent contends that the decisions did not embark in a proper analysis of the principle of primacy of EU Law;[410] did not consider various of the arguments made by Respondent;[411] or incorrectly concluded that EU Law was not relevant.[412]

---

[405] Resp. Obs. Achmea, ¶¶ 10, 13.

[406] Resp. Obs. Achmea, ¶ 15.

[407] Resp. Obs. Achmea, ¶ 23.

[408] Resp. Obs. Achmea, ¶ 23.

[409] Resp. Reply Jur., ¶ 200.

[410] Resp. Reply Jur., ¶¶ 200, 220 (referring to **CL-134**, *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction (13 October 2014) (hereinafter "*PV Investors*"); **RL-088**, *Charanne*; **CL-135**, *RREEF*).

[411] Resp. Obs. Eiser, ¶ 9 (discussing *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award (4 May 2017) (hereinafter, "*Eiser*"), submitted to record on 30 May 2017 with no RL- designation).

[412] Resp. Obs. Achmea, ¶ 49 (discussing **CL-195**, *Novenergía II – Energy & Environment (SCA), SICAR v. Kingdom of Spain*, SCC Case No. 2015/063, Final Award (15 February 2018) (hereinafter "*Novenergía*").

288. In any event, Respondent takes the view that the application of the principles set forth in the cases relied upon by Claimants, in particular those referring to intra-EU BITs and the decision in *Electrabel*,[413] supports the conclusion that EU Law must be applied.[414]

289. In this context, Spain has argued that:

- A comparison of the object and purpose of the ECT and the EU Treaties leads to the conclusion that the latter prevail, by virtue of Articles 30 and 59 of the VCLT.[415] For Respondent, especially after the 2007 Treaty of Lisbon, which "*expressly gathers competence in favour of the EU over foreign investment*," it is unquestionable that EU Law prevails over the ECT in application of the *lex posteriori* principle in Article 59 of the VCLT.[416]

- It is "*impossible*" to sustain that the rights afforded to investors under Article 10(1) of the ECT are "*different or superior*" or "*in addition*" to those granted to them under EU Law.[417]

- The contention that the ECT offers investors an additional right not afforded by EU Law, namely, arbitration of investment disputes, overlooks that Article 26 of the ECT also refers to national courts as a suitable dispute resolution mechanism and assumes without evidence that arbitration is superior. The argument, Respondent says, reflects a complete lack of confidence in the EU judicial system incompatible with EU Law.[418]

- While the tribunal in *Electrabel* did not find any inconsistency between the ECT and EU Law, such inconsistency does exist if Article 26 of the ECT is extended to intra-EU disputes. This is more serious in the ICSID context, Spain argues, because an ICSID award is not subject to appeal, which prevents the CJEU from weighing in on matters that are within its strict powers.[419]

### b. Claimants' Position

290. Claimants oppose Respondent's objection.

---

[413] **RL-001**, *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability (30 November 2012) (hereinafter "*Electrabel*")

[414] Resp. Reply Jur., ¶ 204.

[415] Resp. Reply Jur., ¶ 214; **RL-023**, Vienna Convention on the Law of Treaties, 23 May 1969, published in the Official State Gazette on 17 June 1980 (hereinafter "**VCLT**").

[416] Resp. Reply Jur., ¶ 214.

[417] Resp. Reply Jur., ¶¶ 215-216.

[418] Resp. Reply Jur., ¶ 217.

[419] Resp. Reply Jur., ¶ 221.

(i)     The Text of the ECT Contradicts the Objection

291.    For Claimants, the ordinary meaning of Article 26 of the ECT unambiguously demonstrates that Spain consented to arbitration of disputes with investors of all other Contracting Parties, including EU Member States.[420]  By its express terms, Claimants say, Article 26 permits arbitration of claims of an Investor of one Contracting Party (the Netherlands), against another Contracting Party (Spain).[421]

292.    The plain wording of the ECT contradicts the contention that the EU and its Member States are a single Contracting Party for purposes of Article 26 of the ECT.[422]  The ECT is a "*mixed agreement*" that was entered into by the EU and its Member States, and it is binding on both; and when EU Member States become parties to a mixed agreement they enter into relations *inter se*.[423]  The competence of EU Member States to enter into the ECT was expressly recognized by the EU in 1997.[424]  Moreover, under EU Law, citizenship of the EU is not intended to replace national citizenship;[425]  Claimants are Dutch nationals under Dutch Law;[426]  and Claimants plainly meet the definition of "*Investor*" in Article 1(7)(a)(ii) of the ECT, which is deliberately different from the definition of REIO in Article 1(3).[427]

293.    Each of the Netherlands and Spain is a distinct Contracting Party occupying its own area for purposes of the ECT; each is a State that executed and ratified the ECT in its own name and right; each is a separate subject of international law different from the EU; and each would continue to be an ECT Contracting Party even if it left the EU.[428]

294.    The definition of "*Area*" in the Article 1 of the ECT is clear, and it means for each Spain and the Netherlands "*the territory under its sovereignty, it being understood that territory*

---

[420] Cl. Rej. Jur., § III(3)(A).

[421] Cl. Bif., ¶ 38.

[422] Cl. Bif., § III(A)(1)(b).  *See also*, Cl. C-Mem. Jur., § II(3)(A).

[423] Cl. Bif., ¶ 38; Cl. C-Mem. Jur., ¶ 20.

[424] Cl. C-Mem. Jur., ¶ 22.

[425] Cl. Bif., ¶ 39.

[426] Cl. Bif., ¶ 39.

[427] Cl. Bif., ¶ 40.

[428] Cl. C-Mem. Jur., ¶ 20; Cl. Rej. Jur., ¶ 20.

*includes land, internal waters and the territorial sea*;" and it is undisputed that the plants and measures at issue in this case are located or took place in Spain.[429] As the decisions in *PV Investors* and *Charanne* held:

> "*The phrase 'in the Areas of the former* [Contracting Party]*' in Article 26(1) of the ECT refers to a particular dispute initiated by the investor. If the investor commences arbitration against a member state of the EU (rather than against the EU itself) then 'Area' means 'with respect to a state that is a Contracting Party' the territory of that particular member state, in accordance with the first sentence of Article 1(10). In other words, the relevant area is that of the Contracting Party that is party to the dispute.*"[430]

295. Therefore, Claimants argue, there is no question that the Netherlands or Spain can be conflated with the EU for Article 26(1) of the ECT purposes.[431] To the contrary, the ordinary meaning of Article 26 of the ECT leads clearly and unambiguously to the opposite conclusion.[432]

296. As to Respondent's attempt to rely on other provisions of the ECT to support this objection, Claimants argue that:

- The contentions based on the definitions of REIO Article 1(3) and of "*Area*" in Article 1(10) are a "*detour.*"[433] Claimants submit that (i) recognizing the "*Area*" of the EU as a REIO does not negate the existence of the "*Areas*" of each of the EU Member States;[434] (ii) Article 1(3) does not define the extent of the EU's competence;[435] (iii) Article 1(3) in fact affirms the primacy of the ECT, as it recognizes that matters under the treaty "*are governed by*" the ECT;[436] (iv) "*the natural and most straightforward interpretation of Arts. 1(2), 1(3) and 1(10) of the ECT, which gives them full effet utile, is that a claim under Art. 26 of the ECT can be brought against a REIO such as the EU or the applicable Member State,*

---

[429] Cl. C-Mem. Jur., ¶ 20; **CL-001 / RL-055**, ECT, Art. 1(10).

[430] Cl. C-Mem. Jur., ¶ 23 (quoting **CL-134**, *PV Investors*, ¶ 179); Cl. C-Mem. Jur., ¶ 24 (referring to **RL-088**, *Charanne*, ¶ 431). *See also*, Cl. Rej. Jur., ¶ 24.

[431] Cl. Bif., ¶ 40.

[432] Cl. Rej. Jur., ¶ 32.

[433] Cl. Rej. Jur., ¶ 22.

[434] Cl. Rej. Jur., ¶ 23.

[435] Cl. Rej. Jur., ¶ 25.

[436] Cl. Rej. Jur., ¶ 25.

*depending on the circumstances*," and it is in fact Spain's position that would render nugatory the text of Article 26(1).[437]

- Article 16 of the ECT is a conflict of laws provision that "*has nothing to do with the effectiveness of the right to arbitrate under Art. 26 of the ECT*,"[438] and it is unnecessary to reach Article 16 because there is no conflict between the ECT and EU Law.[439]

- Article 25 of the ECT is a routine provision in investment treaties only intended to prevent the extension to non-EU Member States of the benefits of EU membership, and it does not concern intra-EU disputes.[440]

- The voting provisions established in Article 36(7) of the ECT pursuant to which each the EU and the Member States vote in accordance with their competences, are simply a reflection of the fact that the ECT is a mixed agreement, and have nothing to do with the effects of the ECT between EU Member States.[441] For Claimants, Article 36(7) "*does no more, and no less, than regulate the Contracting Parties' voting rights under the ECT*" and it "*says nothing about the allocation of competences between the EC (now the EU) and its Member States.*"[442]

### (ii) The ECT Does Not Have a Disconnection Clause

297. In Claimants' view, there is no basis in the text of the ECT to contend that it does not apply intra-EU, because that would have required a reservation or an unequivocal disconnection clause.[443] But the ECT contains no disconnection clause of the type Spain seeks to imply into it,[444] and nothing suggests that this was inadvertent.[445] The ordinary wording of the ECT should thus put an end to this argument.[446]

298. That said, Claimants add, the EU treaty practice, the ECT drafting history and unanimous holdings of prior ECT tribunals also contradict the theory of an implied disconnection clause.[447] Claimants point out that: (i) the EU had used disconnection clauses in over 20

---

[437] Cl. Rej. Jur., ¶ 26.
[438] Cl. C-Mem. Jur., ¶ 26.
[439] Cl. C-Mem. Jur., ¶¶ 26, 33.
[440] Cl. C-Mem. Jur., ¶ 27.
[441] Cl. C-Mem. Jur., ¶ 28.
[442] Cl. Rej. Jur., ¶ 25.
[443] Cl. Rej. Jur., § III(3)(B)(i); ¶¶ 33-34.
[444] Cl. Bif., § III(A)(1)(c); Cl. C-Mem. Jur., § II(3)(B); Cl. Rej. Jur., § III(3)(B)(ii).
[445] Cl. Bif., ¶¶ 41, 43.
[446] Cl. C-Mem. Jur., ¶ 29.
[447] Cl. C-Mem. Jur., ¶ 29.

occasions to ensure that a treaty did not apply in the intra-EU context, including in treaties signed prior to the ECT or that were being negotiated in parallel with the ECT;[448] (ii) when the ECT Contracting Parties wished to restrict the effect of the ECT they did so expressly, for example in the declarations relating to the Svalbard Treaty, and in the EU statement in the context in Article 26(3)(b)(ii) restricting its consent in a "*fork-in-the-road*" situation when the dispute had already been submitted to the CJEU;[449] (iii) the EC considered including a disconnection clause in the ECT and this proposal was ultimately not accepted;[450] and (iv) the tribunals in *Charanne* and *RREEF* have rejected the existence of an implicit disconnection clause.[451]

299.   Claimants contend that the EC Written Submission in this case provides no answer on these points,[452] and argued in the Rejoinder on Jurisdiction that neither the EC, nor Spain had been able to produce any contemporaneous evidence or a subsequent agreement showing that the intent of the ECT was to exclude intra-EU disputes.[453]

300.   As to Spain's assertion that its argument is not that the ECT contains a disconnection clause, because such clause was superfluous, Claimants observe that the issue remains the same whether the question is the existence of a disconnection clause, or the lack of necessity of one: had the ECT Contracting Parties sought to carve out intra-EU disputes from Article 26, they would have included express language, and they did not.[454]

301.   Responding to the contention that a disconnection clause is only needed where the application of EU Law between EU Member States affects third parties' rights or obligations, or where derogation from a provision would be incompatible with the object and purpose of the treaty, Claimants submit that "*derogating to such an enormous extent*

---

[448] Cl. Bif., ¶ 42; Cl. C-Mem. Jur., ¶ 32.

[449] Cl. C-Mem. Jur., ¶¶ 30-31.

[450] Cl. C-Mem. Jur., ¶ 35, n. 31.

[451] Cl. C-Mem. Jur., ¶¶ 33-34 (quoting **RL-088**, *Charanne*, ¶ 437; **CL-135**, *RREEF*, ¶¶ 86-89).

[452] Cl. Rej. Jur., ¶ 38.

[453] Cl. Rej. Jur., ¶ 40.

[454] Cl. Rej. Jur., ¶ 37.

*from Parts III and V of the ECT would be incompatible with the ECT's object and purpose of promoting long-term cooperation in the energy field.*"[455]

302. Claimants finally point out that none of the ECT Contracting Parties entered any reservation, and in fact Article 46 of the ECT excludes reservations to the ECT.[456] As held in *PV Investors*, the consent by EU Member States expressed in Article 26 of the ECT is "*unconditional*" and subject only to two exceptions contained in Article 26(3), which are irrelevant for the issue at hand.[457]

           **(iii)** Neither the Context of the ECT nor Supplementary Means of Interpretation Support the Objection

303. According to Claimants, the EC Written Submission invites the Tribunal to disregard the text of the ECT on the basis of the alleged treaty "*context*;" but such context cannot displace the treaty text and, in any event, it does not support the objection.[458] In particular, referring to the principles in Article 31(3) of the VCLT, Claimants observed in the Rejoinder on Jurisdiction that:

- There is no subsequent agreement between the ECT Contracting Parties, or subsequent practice in the application of the ECT supporting the EC's interpretation.[459]

- While Article 31(3)(c) of the VCLT provides that in treaty interpretation "[t]*here shall be taken into account, together with the context:* [...] *relevant rules of international law applicable in relations between the parties*," (i) the word "*rules*" suggests a certain degree of specificity not met by reliance on the "*Union legal order*" and "*multilateral agreements to which both the Union and its Member States are a party under Union Law*;"[460] (ii) the rules must be "*relevant*," *i.e.* must relate to the same subject matter of the treaty under interpretation, and also applicable in the relations between all the treaty parties;[461] (iii) the rules "*must always be considered within the context of the terms of the treaty under interpretation*,"[462] (iv) since Claimants are seeking to benefit from Article 26 of

---

[455] Cl. Rej. Jur., ¶ 42.
[456] Cl. Rej. Jur., ¶ 35.
[457] Cl. Rej. Jur., ¶ 35.
[458] Cl. Rej. Jur., ¶ 43.
[459] Cl. Rej. Jur., ¶¶ 44-46.
[460] Cl. Rej. Jur., ¶ 48.
[461] Cl. Rej. Jur., ¶ 49.
[462] Cl. Rej. Jur., ¶ 50.

the ECT (Part V) and to invoke the substantive protections of Part III, which they consider more favourable to them than EU Law, pursuant to Article 16 of the ECT "*nothing in EU Law 'shall be construed to derogate from' these provisions of the ECT.*"[463]

304. For Claimants, the arguments advanced by Respondent and the EC on the basis of the object and purpose of the ECT, and the circumstances of its conclusion are also unconvincing.[464]

305. Relying on Article 32(a) of the VCLT, Claimants first contention is that because the text of the ECT is clear, and it does not lead to manifestly absurd or unreasonable results, there is no room to resort to supplementary means of interpretation "*including the preparatory work of the treaty and the circumstances of its conclusion.*"[465]

306. As to the object and purpose, while Claimants acknowledge that Article 31(1) of the VCLT provides that the ECT must be interpreted "*in the light of its object and purpose,*" they argue that (i) such object and purpose must rest on more than speculation; and (ii) the VCLT makes a choice in favor of an objective and textual interpretation over a subjective one based on the intention of the parties.[466] Moreover, for Claimants, nothing in Article 2 of the ECT (on the object and purpose of the treaty), suggests that the ECT provisions are waived intra-EU.[467] In fact, Claimants argue, the application of the ECT intra-EU facilitated the ECT's object and purpose, as it offered companies investing in Eastern Europe continuity of protection for investments in that region, as many of those countries acceded to the EU later.[468]

307. Claimants also argued in the Rejoinder on Jurisdiction that there was no evidence showing that EU Member States share the position that the ECT did not produce effects intra-EU; a position that Spain adopted opportunistically in the face of numerous treaty

---

[463] Cl. Rej. Jur., ¶¶ 50-52; **CL-001 / RL-055**, ECT, Art. 16.

[464] Cl. Rej. Jur., ¶ 53.

[465] Cl. Rej. Jur., ¶ 55.

[466] Cl. Rej. Jur., ¶¶ 56-57.

[467] Cl. Rej. Jur., ¶ 59.

[468] Cl. Rej. Jur., ¶ 61.

claims against it, and it never expressed between 1994-2014.[469]   And the arguments based on the historical context of the ECT's conclusion and those based on the negotiating history of the WTO should not serve as supplementary means of interpretation.[470]

(iv)   Article 26 of the ECT is Not Affected by the Transfer of Competences to the EU

308.   Claimants further oppose the contention that the provisions in Part III of the ECT and Article 26 fall within the competence of the EU, such that when entering into the ECT the EU Member States did not have competence to enter into *inter-se* obligations on the matter of investment protection.[471]

309.   Article 25 of the ECT lends no support to the proposition that EU Law must prevail in case of conflict between the ECT and EU Law.[472]   For Claimants, this article is not a conflict rule giving primacy to EU Law over the ECT.   It simply clarifies that the preferential treatment that applies *inter-se* among EU Member States cannot be extended to non-EU States via the MFN clause.[473]

310.   Claimants equally consider *"flatly irrelevant"* the EC's reference to the alleged principle of international law of *"liability follows competence."*[474]   This is a secondary rule of international law, concerning attribution for purposes of determining an international organization's responsibility for wrongful acts, and has nothing to do with the creation or extent of positive international obligations.[475]

311.   Instead, Claimants argue that the relevant body to determine whether valid treaty obligations were entered into is the VCLT, and rely on the finding in *CSP* that jurisdiction *"would not necessarily be affected by a finding that EU law barred the EU*

---

[469] Cl. Rej. Jur., ¶ 60.
[470] Cl. Rej. Jur., ¶ 62.
[471] Cl. Rej. Jur., ¶ 63.
[472] Cl. Rej. Jur., ¶¶ 64-66.
[473] Cl. Rej. Jur., ¶ 66.
[474] Cl. Rej. Jur., ¶ 67.
[475] Cl. Rej. Jur., ¶ 67.

*and/or EU member states from entering into a treaty which provides for arbitration over intra-EU investments.*"[476]

> (v) There is No Ground to Invalidate Spain's Consent in Article 26 under the VCLT

312. Claimants contend that Spain's offer to arbitrate in Article 26 is valid and effective, and reject the view that such offer is invalid because (i) it would violate EU Law which must prevail over the ECT in the event of conflict, or (ii) it was modified or superseded pursuant to Articles 41(1)(b) or Article 30(4)(a) of the VCLT.[477]

313. Claimants explain that: (i) the sole grounds for invalidating a State's consent to be bound by a treaty are in the VCLT, and are not applicable in the present instance; (ii) even if EU Law were relevant to determining the validity of Spain's consent – which it is not – EU Law does not prohibit arbitration of intra-EU investor State disputes; (iii) arguments about the alleged primacy of EU Law substantive provisions over the ECT are irrelevant for the jurisdictional analysis, and implausible in light of Article 16 of the ECT; (iv) Articles 41(1)(b), 30(4)(a) or 59 of the VCLT do not apply here.[478]

314. Recalling that under Article 42(1) of the VCLT the validity of a treaty or the consent to be bound by it can only be impeached by application of the VCLT, Claimants conduct an analysis under Articles 46 and 45 of the VCLT.[479] Claimants contend that EU Law forms part of Spain's domestic law, and therefore, in application of Article 46 of the VCLT "*Spain may not invoke, in support of its plea of invalidity, the fact that its consent to be bound by a treaty was expressed in violation of a provision of EU law unless that violation was manifest and concerned a rule of EU law of fundamental importance.*"[480]

315. As the ECT was negotiated and concluded by the EU and its Member States, it is implausible to argue that Spain was not competent under EU Law to conclude the treaty;

---

[476] Cl. Rej. Jur., ¶ 68 (quoting **CL-176**, *CSP Equity Investment S.à.r.l v. Kingdom of Spain*, SCC Case No. 2013/094, Award on Jurisdiction (13 May 2016) (hereinafter "***CSP***"), ¶ 158).

[477] Cl. Rej. Jur., ¶ 70.

[478] Cl. Rej. Jur., ¶ 71.

[479] Cl. Rej. Jur., ¶¶ 72-74.

[480] Cl. Rej. Jur., ¶ 75.

and in any event, the alleged lack of competence would not be manifest, as shown by the lack of evidence to that effect contemporaneous with the negotiation and conclusion of the ECT.[481]   Moreover, even if there was any ground under Article 46, it would have been waived under Article 45(b) of the VCLT because Spain never questioned the validity of its consent in Article 26 of the ECT until the recent arbitrations, and has not event sought to terminate intra-EU BITs.[482]

316.   Contrary to Spain's contentions, Claimants further argue that "*nothing in EU law prohibits EU Member States from consenting to arbitrate disputes with EU investors under an investment treaty,*" and that is so "*even where those cases involve questions of EU law.*"[483]

317.   Noting that Spain's argument rests on Article 344 of the TFEU, Claimants point out that prior arbitral tribunals have already concluded that "*Article 344 TFEU, [...] applies only to disputes involving two or more EU member states but does not prohibit the submission of disputes between other actors to a different method of settlement not contemplated in the EU treaties;*"[484] "*[t]he scope of Article 344 TFEU cannot be so broad as to prevent Member States from submitting any dispute concerning the interpretation of EU treaties to a dispute settlement procedure different from those provided in EU legislation;*"[485] "*it cannot be reasonably maintained that Article 344 TFEU sets up an 'interpretative monopoly' in favour of the CJEU;*"[486] there is no inconsistency between the ECT and EU Law, and the exclusive jurisdiction of the CJEU does not prevent other courts or tribunals from applying EU Law.[487]   These conclusions were not altered by the jurisprudence of the CJEU;[488] nor can the EC's own self-serving declaration in the context of the

---

[481] Cl. Rej. Jur., ¶ 75.

[482] Cl. Rej. Jur., ¶ 76.

[483] Cl. C-Mem. Jur., ¶¶ 38, 46. *See also*, Cl. Rej. Jur., § III(4)(B).

[484] Cl. C-Mem. Jur., ¶ 39 (quoting **CL-134**, *PV Investors*, ¶ 189).

[485] Cl. C-Mem. Jur., ¶ 40 (quoting **RL-088**, *Charanne*, ¶ 444).

[486] Cl. C-Mem. Jur., ¶ 41 (quoting **CL-135**, *RREEF*, ¶ 80). *See also*, Cl. Rej. Jur., ¶ 81 (quoting **CL-176**, *CSP*, ¶ 164).

[487] Cl. Bif., ¶ 26; Cl. C-Mem. Jur., ¶¶ 42-43 (referring to **RL-001**, *Electrabel*)

[488] Cl. Rej. Jur., ¶ 79.

International Energy Charter Treaty in May 2015 provide any evidentiary support to this objection, as it was issued 20 years after the ECT's conclusion.[489]

318.   Moreover, Claimants point out that Spain and the EC accept that national courts and arbitral commercial tribunals apply EU Law without violating Article 344 of the TFEU, and there is no reason to treat investment treaty arbitration differently.[490]

319.   According to Claimants, all the arguments based on the alleged primacy of EU Law over the substantive protections of the ECT are, at best, relevant to the analysis of the merits, but have no bearing on jurisdiction.[491]   In any event, they are misplaced because there is no conflict in this regard between the ECT and EU Law, and should there be one, the ECT would prevail.[492] The conflict of law rule in Article 351 of the TFEU (former Article 307 of the TEC) does not give priority to EU Law over the ECT, because the ECT is the later in time treaty: Article 351 only concerns rights and obligations in agreements concluded prior to 1 January 1958 or for acceding States, prior to their accession to the EU, and the ECT was concluded in 1994 and in force in 1998 after Spain acceded to the EU in 1986.[493]   Instead, should the Tribunal find a conflict, it should resolve it by straight application of Article 16 of the ECT.[494]

320.   Lastly, Claimants assert that "*the ECT, and in particular its Art*[icle] *26, has been neither modified nor superseded by the provisions of later EU Treaties under either of Art*[icles] *41 or 30 of the VCLT; nor did the Treaty of Lisbon lead to the termination of the ECT pursuant to Art*[icle*] *59 of the VCLT.*"[495]   Claimants explain that:

---

[489] Cl. Rej. Jur., ¶ 79.

[490] Cl. Rej. Jur., ¶¶ 80-81.

[491] Cl. Rej. Jur., ¶¶ 82-83. *See also,* Cl. Bif., ¶¶ 50-51. In their Observations on Bifurcation, Claimants also dismissed Respondent's references to the investigation of the Spain measures by the EC under the State Aid regime and to the Micula case, arguing that the relevance of these issues to jurisdiction is at best unclear because: (i) jurisdiction does not depend on ease of enforcement of an award; and (ii) state aid issues should not be confused with intra-EU issues, so that, even if the EC were to decide that the Spain regime was unlawful under its State Aid rules, that "*is not a bar to jurisdiction but an issue for the merits.*"   Cl. Bif., ¶ 54.

[492] Cl. Rej. Jur., ¶ 84.

[493] Cl. Rej. Jur., ¶ 87.

[494] Cl. Rej. Jur., ¶ 87.

[495] Cl. Rej. Jur., ¶ 71,

- Article 41(1)(b) of the VCLT refers to amendment of a treaty by a later treaty, and it does not apply here as none of the Treaties of Amsterdam, Nice and Lisbon are agreements to modify the ECT between EU Member States.[496] In any case, since Spain did not rely on this provision the Tribunal does not need to address it.[497]

- Article 30(4)(a) of the VCLT only applies to *"successive treaties relating to the same subject-matter,"* which the EU Treaties and Article 26 of the ECT are not, since the EU Treaties are silent on investor-State arbitration.[498] Further, the principle in Article 30(3) of the VCLT, pursuant to which the later in time rule applies in the event of incompatibility, requires (i) that there is a true incompatibility between the ECT and the EU Treaties, and (ii) that the provisions of the EU Treaties deemed incompatible are in fact the latter in time, as opposed to pre-existing provisions when the ECT was concluded in 1998; and neither has been demonstrated.[499]

- Even if the ECT and the EU Treaties related to the same subject matter and were mutually incompatible, *quad non*, Article 16 of the ECT is *lex specialis* that should be applied. Accordingly, in the event of conflict between Part III or Part V of the ECT and an earlier or later treaty between ECT Contracting Parties, the ECT prevails to the extent more favorable to investors.[500] Thus the ECT prevails over any *"incompatible"* provision in the EU Treaties.

- Article 59 of the VCLT (concerning termination of a treaty implied by conclusion of another treaty) does not apply, because (i) it only concerns a situation where *"all the parties"* to the treaty allegedly terminated conclude a later treaty, and not all the ECT Contracting Parties concluded the Treaty of Lisbon; (ii) the ECT and the EU Treaties do not relate to the same subject matter, and are not *"so far incompatible"* or *"not capable of being applied at the same time;"* and (iii) there is no evidence that all the ECT Contracting Parties intended the matter to be governed by the Treaty of Lisbon.[501]

    **(vi)** **The Objection Has Been Rejected by Prior Tribunals and Legal Doctrine,[502] and the *Achmea* Judgment Does Not Apply**

321.    Throughout their pleadings Claimants emphasize that *"[e]very tribunal to have analysed the objection has unanimously rejected it,"*[503] including in other ECT cases, in cases

---

[496] Cl. Rej. Jur., ¶ 89.
[497] Cl. Rej. Jur., ¶ 89.
[498] Cl. Rej. Jur., ¶ 90.
[499] Cl. Rej. Jur., ¶ 90.
[500] Cl. Rej. Jur., ¶ 91.
[501] Cl. Rej. Jur., ¶ 92.
[502] Cl. Bif., § III(A)(1)(a) and (d).
[503] Cl. Bif., ¶¶ 24, 25-36; Cl. C-Mem. Jur., ¶ 46.

against Spain,[504] and in cases involving intra-EU BITs.[505] Claimants also rely on a number of commentators supporting the view that the ECT does apply between EU Member States.[506] Lastly, Claimants observe that, despite its position in this case, the EC has not been uniform in opposing the jurisdiction of tribunals hearing intra-EU disputes.[507]

322. As to the *Achmea* judgment of 6 March 2018 relied upon by Spain,[508] Claimants contend that: (i) it concerns a different treaty, a bilateral investment treaty concluded prior to the accession of one of the States to the EU and not the ECT which is a multilateral treaty to which the EU is a Contracting Party,[509] and (ii) it concerns different applicable law – the host State law and other agreements between the State parties to the BIT were part of the governing law according to the underlying BIT, and the ICSID Convention did not apply.[510] These distinctions, Claimants say, have an important bearing on the analysis under the ECT, for various reasons:[511]

- As the ECT was concluded by the EU and the EU Member States, it was a conscious decision by them to assume binding treaty obligations, it does not undermine the EU Law principle of mutual trust, and it is binding on them as a matter of international law and EU Law.[512]

---

[504] Cl. Bif., ¶¶ 26-27; Cl. C-Mem. Jur., ¶¶ 23-25, 33-34, 38, 42-45 (referring to **RL-001**, *Electrabel*; **CL-076**, *EDF International S.A. v. Republic of Hungary*, UNCITRAL Rules (Ad-hoc), GAR Article (11 December 2014); **CL-134**, *PV Investors*; **RL-088**, *Charanne*; **CL-135**, *RREEF*); Cl. Rej. Jur., ¶ 13 (referring to **CL-176**, *CSP*; and **CL-177**, *Électricité de France (EDF) International S.A. v. Republic of Hungary*, PCA Case No. 2009-13, Award (3 December 2014)); Cl. Obs. Eiser, ¶ 2.1; Cl. Obs. Achmea, ¶¶ 1.1-1.2 (referring to **CL-195**, *Novenergía*), and ¶¶ 3.5, 3.10 (referring to **RL-126**, *Blusun S.A Jean Pierre Lecrocier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award (27 December 2016) (hereinafter "***Blusun***")).

[505] Cl. Bif., ¶¶ 28-35 (referring to **CL-072**, *Eastern Sugar BV v. Czech Republic*, SCC Case No. 088/2004, Partial Award (27 March 2007); **CL-073**, *Achmea (formerly known as Eureko) v. Slovak Republic*, UNCITRAL, PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension (26 October 2010); **CL-075**, *Binder v. Czech Republic*, UNCITRAL, Award on Jurisdiction (6 June 2007); **CL-074**, *European American Investment Bank AG v. Slovak Republic*, PCA Case No. 2010-17, Award on Jurisdiction (22 October 2012)).

[506] Cl. Bif., ¶¶ 45-47.

[507] Cl. Bif., ¶ 44 (referring to **RL-001**, *Electrabel*; **CL-084**, *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award (23 September 2010) (hereinafter "***AES***").

[508] **RL-125**, *Achmea*.

[509] Cl. Obs. Achmea, ¶¶ 2.1, 2.6.

[510] Cl. Obs. Achmea, ¶ 2.6.

[511] Cl. Obs. Achmea, ¶ 2.7.

[512] Cl. Obs. Achmea, ¶ 2.8.

- The *Achmea* judgment does not apply to treaties to which the EU is a Contracting Party, such as the ECT.[513]

- The CJEU interpreted that the BIT at issue in *Achmea* required the application of the EU Treaties, because the governing law clause included "*any other relevant Agreements between the Contracting Parties*" and the host-State law. By contrast, Article 26(6) of the ECT expressly requires the Tribunal to resolve the dispute according to international law and the ECT; and it does not require the Tribunal to interpret the EU Treaties or EU Law.[514] In addition, the claims in this case concern violation of Article 10(1) of the ECT, not whether Spain violated EU Law provisions;[515] and the legal character of the claims is not altered even if incidental points of EU Law might arise.[516]

- Both Spain and the Netherlands were part of the EU when they entered into the ECT. The two provisions of the EU Treaties which form the basis of the *Achmea* judgment (Articles 267 and 344 of the TFEU) had their origin in the 1957 Treaty of Rome, and were already binding on Spain and the Netherlands when they entered into the ECT. Neither is new, nor do they amount to a treaty subsequent to the ECT. While the Lisbon Treaty changed the title of the EU Treaty to the TFEU and amended some aspects of it, that does not make it *lex posteriori* to the ECT.[517] Thus, when entering into the ECT: the EU and its Member States did not consider themselves in contravention of now Article 344 of the TFEU; in the event of inconsistency, according to Article 16(2) of the ECT, the ECT prevails over the EU Treaties; and since Article 344 of the TFEU is not a new treaty conflicting with an earlier treaty, the ECT is the *lex posteriori*.[518]

323. But, Claimants argue, even if Spain had demonstrated an inconsistency between EU Law and the ECT in light of the *Achmea* judgment, the ECT would prevail.[519] The alleged principle of primacy of EU Law is an *internal* EU Law principle reflecting supremacy of EU Law over the law of the EU Member States, and it does not alter the hierarchy of the ECT over EU Law established by virtue of Article 16(2) of the ECT and customary international law.[520] If the Tribunal concludes that the ECT and the TFEU cover the same subject matter, Article 16(2) of the ECT must be applied; if the Tribunal concludes

---

[513] Cl. Obs. Achmea, ¶¶ 2.11-2.12.

[514] Cl. Obs. Achmea, ¶ 2.13. Claimants argue that, in light of that express choice in Article 26(6), the Tribunal does not have to reach the second sentence of Article 42(1) of the ICSID Convention. Cl. Obs. Achmea, ¶ 2.13.

[515] Cl. Obs. Achmea, ¶ 2.14.

[516] Cl. Obs. Achmea, ¶ 2.15.

[517] Cl. Obs. Achmea, ¶ 2.16.

[518] Cl. Obs. Achmea, ¶ 2.16.

[519] Cl. Obs. Achmea, ¶¶ 2.3, 2.17-2.23.

[520] Cl. Obs. Achmea, ¶ 2.18.

that they do not cover the same subject matter, there is no conflict and no predicate to apply Article 30 or 59 of the VCLT.[521]

324. Finally, "[t]*he CJEU itself recognised the EU law is not to be treated as international law, but instead as a body of law which is 'autonomous' and 'independent' of both international law and the national law of each Member State, and binding domestically in (and not just on) each Member State – in contrast to the plane occupied by international law.*"[522] And it is a basic principle of international law recognized in Articles 7 and 32 of the International Law Commission Articles on State Responsibility ("**ILC Articles on State Responsibility**") that "*a State cannot invoke its own breach of its domestic law as an excuse for violating its international obligations,*" and in Article 46 of the VCLT, which "*prevents a State from pleading domestic law requirements to honour its international treaty commitments.*"[523]

### (2)  The Non-Disputing Party's Written Submission

#### a.  Spain's Offer to Arbitrate in the ECT Does Not Cover Investors from EU Member States

325. The EC takes the view that the ECT does not create *inter se* obligations and does not apply in the relationship between EU Member States that were EU Members when the ECT was ratified.[524] This, it says, follows from the text of the ECT, the nature of multilateral agreements, and the object and purpose of the ECT:

- *The Text.* Articles 1(2), 1(3) and 36(7) of the ECT recognize that the EU Members transferred competences to the EU on matters governed by the ECT.[525] Similarly, the definition of "*Area*" in Article 1(10), contains an express reference to the provisions of the EU Treaties, and recognizes that the relationships of the Members to a REIO are governed by the agreements establishing that REIO. Further, the definition of "*Area*" of the EU comprises all the Areas of the EU Member States, such that intra-EU there is no diversity of Area.[526] A different

---

[521] Cl. Obs. Achmea, ¶ 2.18.

[522] Cl. Obs. Achmea, ¶ 2.19 (relying on **RL-125**, *Achmea*, ¶ 33).

[523] Cl. Obs. Achmea, ¶ 2.20.

[524] EC Written Submission, ¶¶ 12, 52.

[525] EC Written Submission, ¶¶ 16-18.

[526] EC Written Submission, ¶ 20.

interpretation deprives Article 1(3) and 1(10) of *effet utile*, and encourages "respondent shopping," prohibited by ECT.[527]

- *The Nature of Multilateral Agreements.* A multilateral agreement to which both the EU and its Member States are a party is EU Law, and the CJEU is in general competent to interpret it, except if the provision is exclusively within the competence of the EU Member State.[528] In negotiating these agreements, the EU and its Member States are bound by the principle of unity of EU Law,[529] and in the case of the ECT they acted like a single block.[530]

- *The Object and Purpose.* The historical process that led to the ECT makes clear that its objective was to create an international framework for cooperation in the energy sector between the EU, and Russia, the CIS and Central and Eastern Europe. Also, when created, the ECT was perceived as a part of the EU external energy policy and was never intended to influence the internal energy policy.[531] The object and purpose of the ECT reflect that all the ECT Contracting Parties understood that the EU Member States did not intend to create *inter se* obligations in areas for which they retained competence.[532]

- Disconnection clauses were used in international treaties where the EU would not become a Contracting Party, to serve as a "*reminder*" of its existence. But that is completely different in international treaties where EU is a party, and is explicitly recognized in its role as REIO, such as the ECT. There, all Contracting Parties were fully aware of the specificities of the EU legal order.[533] Further, Claimants' argument on the disconnection clause relies on academic articles unsupported by the sources that they cite.[534]

326.  But even if the ECT had created intra-EU obligations, which the EC denies, such obligations would not comprise the provisions on investment protection in Part III of the ECT or the dispute settlement provision in Article 26, because EU Member States had transferred to the EU competence on those subjects.[535] Pursuant to Article 64 of the ILC Articles on Responsibility of International Organizations and case law, the principal law applicable for determining the extent of the international obligations and international

---

[527] EC Written Submission, ¶¶ 24-25.
[528] EC Written Submission, ¶ 29.
[529] EC Written Submission, ¶ 31.
[530] EC Written Submission, ¶ 33.
[531] EC Written Submission, ¶¶ 41-42.
[532] EC Written Submission, ¶ 45.
[533] EC Written Submission, ¶ 50.
[534] EC Written Submission, ¶¶ 47-49.
[535] EC Written Submission, ¶¶ 13, 53. *See also, id.*, ¶ 93.

liability of EU Member States is *"liability follows competence."*[536]  For the EC, *"protection and promotion of investments in other Member States, as well as energy, fall into the external competence of the Union."*[537]  Further, an *inter-se* investment protection treaty between EU Member States *"might affect common rules or alter their scope,"* that is, the EU system of investment protection.[538]  As such, pursuant to Article 3(2) of the TFEU, EU Member States did not have the external competence to conclude such type of treaty.[539]

327.  EU Member States are presumed to be aware of the rules governing distribution of competences; and the ECT recognizes that the EU Member States had transferred competences to the EU on matters covered by ECT.  Accordingly, all the ECT Contracting Parties were aware of the existence of the distribution of liability.[540]  As a result, the ECT provisions on investment promotion and protection bind the EU, but not the EU Member States *inter-se*.[541]

328.  Should the Tribunal consider that the ECT is ambiguous with respect to the question of intra-EU obligations, the EC argues, it should favour an interpretation that does not conflict with EU Law, namely, that the ECT does not apply between EU Member States at all, or at least that Part III and Article 26 do not apply between them.[542]

**b. Spain's Offer to Arbitrate Is Not Valid**

329.  According to the EC, even if Spain had made an offer to arbitrate to intra-EU Investors, that offer would not be valid because: (i) it would violate EU Law, which prevails over the ECT in the event of conflict pursuant to Article 351 of the TFEU;[543] and (ii) that offer

---

[536] EC Written Submission, ¶ 58.
[537] EC Written Submission, ¶ 65.
[538] EC Written Submission, ¶ 80.
[539] EC Written Submission, ¶ 81.  Awards and academic writings taking the opposite view are flawed, in that they consider that the EU Member States internal competence for the internal market is a *"shared competence"* with the EU.  EC Written Submission, ¶ 83.
[540] EC Written Submission, ¶¶ 87, 89-90.
[541] EC Written Submission, ¶ 94.
[542] EC Written Submission, ¶ 95.
[543] EC Written Submission, ¶¶ 97, 98-136.

would have been modified or superseded pursuant to Articles 41(1)(b) or 30(4)(a) of the VCLT.[544]

330.    According to the EC: (i) the intra-EU application of the substantive protections of the ECT would violate Article 3(2) of the TFEU, because EU Law provides a complete set of rules on investment protection, and the EU Member States did not have competence on those matters;[545] and (ii) treaty-based investor-State arbitration of intra-EU disputes violates Articles 19(1) of the TEU and Articles 267 and 344 of the TFEU, and the general principles of effectiveness and unity of EU Law.[546] Pursuant to those provisions, the EC argues, disputes concerning the application of the EU Treaties are to be resolved before the CJEU – for disputes involving two Member States, or the national courts – for disputes between a private party and EU Member State.[547] Thus, when EU Member States create a separate body for dispute resolution that is required to apply EU Law, such as Article 26 of the ECT does, they violate Article 344 of the TFEU.[548] Further, for the EC, the decisions by investment tribunals holding that Article 344 only applies to disputes between EU Member States overlook that national courts are part of the EU legal order and can therefore apply EU Law, and miss distinctions between commercial arbitration and investment arbitration.[549]

331.    The EC goes on to add that, having identified a conflict with EU Law, the applicable conflict rule would be Article 351 of the TFEU, pursuant to which the ECT provisions incompatible with EU Law (*i.e.* Part III and Article 26) would become inapplicable.[550] But even if the matter were to be analyzed under the general rules of conflict in the

---

[544] EC Written Submission, ¶¶ 97, 137-145.
[545] EC Written Submission, ¶¶ 104-106.
[546] EC Written Submission, ¶¶ 107-129.
[547] EC Written Submission, ¶ 109.
[548] EC Written Submission, ¶¶ 110, 120. In the alternative, the EC urged that the Tribunal stayed this proceeding until the CJEU judgement in *Achmea* on this point was rendered; or in the further alternative, to refer this matter to the CJEU. EC Written Submission, ¶¶ 127, 129. Claimants opposed. Cl. Rej. Jur., ¶¶ 140-151. No stay took place. The *Achmea* judgement was rendered during the pendency of this proceeding. *See supra*, ¶ 82.
[549] EC Written Submission, ¶¶ 111-118.
[550] EC Written Submission, ¶ 135.

VCLT, intra-EU obligations were superseded by virtue of Articles 30(4)(a) and 41(1)(b) of the VCLT.[551] The EC argues in particular:

- Article 41(1)(b) of the VCLT on the amendment of a treaty by a later treaty would operate here because the Treaties of Amsterdam, Nice and Lisbon "*re-affirmed*" the EU rules on investment protection, competences and the system of judicial protection.[552] And the conditions of Article 41(1)(b) of the VCLT are met because (i) suppressing *inter se* obligations between EU Member States only concerns EU Member States; and (ii) suppressing the provision at issue (investor-State arbitration in Article 26) would not be incompatible with the object and purpose of the ECT as a whole.[553]

- If no amendment took place, Article 30 of the VCLT would operate as the rule to resolve a conflict between an earlier treaty and a later treaty relating to the same subject matter; pursuant to which the earlier treaty applies only if compatible with the later treaty.[554] The ECT and the EU Treaties relate to the same subject matter.[555] And given that in the Treaties of Amsterdam, Nice and Lisbon, EU Member States "*re-affirmed*" their commitment to EU Law, then the ECT (concluded in 1994) is the earlier treaty.[556] As the provisions of the ECT on investment protection (Part III and Article 26) are incompatible with EU Law if applied intra-EU, they are not applicable pursuant to Article 30(4)(a) of the VCLT.[557]

### (3) The Tribunal's Analysis

332. As a preliminary remark, the Tribunal thanks the European Commission for its assistance in the current proceedings on the matter of jurisdiction regarding intra-EU investments operations.

---

[551] EC Written Submission, ¶ 137. In its submission, the EC also observed that "*Spain ha*[d] *notified its national support scheme for RES electricity and the subsequent adoption of various legislative and regulatory measures that affect producers of RES electricity to the Commission on the basis of Article 108(3) TFEU*" on State Aid, and added that the EC decision on that matter was pending at the time. Arguing that the matter was relevant to the merits, it invited the tribunal to stay the proceeding until the EC made its ruling. EC Written Submission, ¶¶ 11, 149-150. Respondent's arguments on this matter are summarized *infra* ¶¶ 510 *et seq*.

[552] EC Written Submission, ¶ 140.

[553] EC Written Submission, ¶ 139.

[554] EC Written Submission, ¶¶ 141-142.

[555] EC Written Submission, ¶ 143.

[556] EC Written Submission, ¶ 145.

[557] EC Written Submission, ¶ 145.

333. The Tribunal wishes to approach the issue taking into account earlier cases where tribunals have upheld jurisdiction under Article 26 of the ECT,[558] as well as the *Achmea* judgment rendered by the CJEU,[559] which marked a turning point in the on-going debate surrounding the compatibility of intra-EU investment agreements with EU Law, since it found investor-State arbitration clauses in intra-EU BITs to be incompatible with EU Law.

334. Despite the notable difference that in *Achmea*, the CJEU was asked to determine the lawfulness of an intra-EU *bilateral* investment treaty, the Tribunal is mindful that the *Achmea* judgment is also discussed in the context of the investor-State arbitration mechanism established under the ECT.[560]

335. Respondent has objected to the Tribunal's jurisdiction on the basis that the dispute resolution mechanism set forth in Article 26 of the ECT does not apply to controversies arising between an investor of the EU and another EU Member State. These objections are in line with the observations expressed by the European Commission in its EC Written Submission, which takes the view that the ECT does not create *inter se* obligations among EU Members States and that a correct application of the principles of supremacy and autonomy of EU Law render Spain's offer to arbitrate invalid.

336. From the outset, the Tribunal wishes to recall that consent to jurisdiction in international adjudication must be *established*. In this respect, the Tribunal does not believe that the jurisdiction of a tribunal is bounded by the way in which a claimant may decide to frame its claims. It is not because an investor has solely based its claim on the ECT that the Tribunal will retain its jurisdiction. The principle of *compétence de la compétence*

---

[558] **RL-088**, *Charanne*; **CL-134**, *PV Investors*; **CL-135**, *RREEF*; *Eiser* (submitted to the record on 30 May 2017 with no RL- designation); **CL-195**, *Novenergía*; **RL-001**, *Electrabel*.

[559] **RL-125**, *Achmea*.

[560] **RL-127**, Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, 15 January 2019; **R-128**, Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union, 16 January 2019; **R-129**, Declaration of the Representatives of the Government of Hungary on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union, 16 January 2019.

requires an arbitral tribunal to *establish* the extent and limits of its jurisdiction *objectively*, on the basis of the title of jurisdiction that is conferred to the said tribunal.

337.  In this case, a correct exercise of the principle of *compétence de la compétence*, requires the Tribunal to look into the terms of the ECT, and in particular into the terms of Article 26 setting up the dispute resolution mechanisms.

338.  In light of the objections put forward by Respondent, the Tribunal finds it pertinent to address the issue of jurisdiction through the following questions: the first question is whether the ECT applies to relations *inter se* of EU Member States and whether the ECT Contracting Parties intended to carve out and exclude jurisdiction over intra-EU disputes (a); the second question is whether the subsequent overlap that may exist between the ECT and EU Law regarding investment operations rendered Spain's offer to arbitrate invalid (b).

### a.  Whether the ECT Excludes *Inter Se* Obligations Among EU Member States?

339.  Respondent contends that the present Tribunal lacks jurisdiction to hear intra-EU disputes because Article 26(1) of the ECT implies that the Parties must be of different nationalities and that in the present case, the diversity requirement fails since both Parties are from the European Union.   Thus, Respondent objects to the Tribunal's jurisdiction because Claimants are not from "*another Contracting Party*" as required by Article 26.

340.  In particular, Respondent relies on Article 1(3) of the ECT defining a REIO as "*an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters,*" as well as Article 1(10) defining the term "*Area*" of a REIO as "*the Areas of the member states of such Organization, under the provisions contained in the agreement establishing that Organization.*"[561]

---

[561] **CL-001 / RL-055**, ECT, Art. 1.

341.     It is true that the very dynamic nature and rapid evolution of EU Law may complicate the interpretation of treaties such as the ECT, and that a harmonious interpretation remains the most effective tool to avoid a conflict among the two sets of norms. But, for the purpose of establishing jurisdiction, the Tribunal remains bounded by the explicit terms of the relevant Treaty (*i.e.* the ECT), with due regard to its object and purpose in accordance with the VCLT.

342.     The Tribunal cannot infer from the terms of Articles 1(3) and (10) of the ECT that the Contracting Parties intended to exclude intra-EU investment operations from the jurisdiction of investment tribunals. The fact that the EU is a Contracting Party to the ECT did not deprive the EU Member States of their competence to enter into obligations under the ECT at the time of its conclusion. Therefore, in absence of a disconnection clause and a revision of the ECT by the Contracting Parties, the Tribunal cannot conclude that presence of the EU as REIO consenting to the provisions of the ECT would supersede the consent given by each EU Member State individually to the ECT. Rather, a good faith interpretation of the terms of the ECT leads to the conclusion that a REIO, such as the EU, may have standing under the ECT in arbitration proceedings. However, concluding that Contracting Parties, taken individually, lack standing when the investment operation remains in the European Area would go beyond the terms of the Treaty.

343.     As explained by the tribunal in *Blusun* "[t]*he inter se obligations in the ECT are not somehow invalid or inapplicable because of an allocation of competence that the EC says can be inferred from a set of EU laws and regulations dealing with investment. The more likely explanation, consistent with the text of the ECT, is that, at the time the ECT was signed, the competence was a shared one.*"[562]    The fact that it ultimately became transferred to the EU cannot be used by this Tribunal as an argument to establish or decline its jurisdiction alone. The ECT operates among Member States since it was not concluded as an agreement between the EU and its Members States but as an ordinary multilateral agreement.

---

[562] **RL-126**, *Blusun*, ¶ 283.

344.   Therefore, the Tribunal concludes that Claimants satisfy the literal requirement as set forth in Article 1(7)(a)(ii) to be an investor of a "*Contracting Party*," and the terms of the ECT do not suggest that the Contracting Parties intended to exclude *inter se* obligations or that an EU investor is precluded from bringing a claim against an EU Contracting Party. A follow up question is whether the overlap existing between the ECT and the EU Law has rendered Spain's offer to arbitrate under the ECT invalid.

### b.   Whether the Subsequent Overlap Between the ECT and EU Law Rendered Spain's Offer to Arbitrate Invalid?

345.   Respondent and the EC argued that Article 26(6) of the ECT directs the Tribunal to apply both international and EU Law and that, in the event of conflict, Article 344 of the TFEU and EU Law should prevail. Moreover, it was argued that Article 26 of the ECT has been superseded by the provisions of later EU treaties under either Articles 41 or 30 of the VCLT.

346.   Article 344 of the TFEU provides that "*Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.*"[563]

347.   Article 26 of the ECT entitled Settlement of disputes between an Investor and a Contracting Party states in its relevant parts:

> "*(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably. (2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:* […] *(6) A tribunal established under paragraph 4 shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.*"[564]

---

[563] **RL-021 / R-004**, TFEU, Art. 344.

[564] **CL-001 / RL-055**, Art. 26.

348. Respondent and the EC have found Article 26 of the ECT to be in contradiction with Article 344 of the TFEU. It was argued that in *Achmea,* the CJEU confirmed this approach when it concluded that "*Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT* [between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic] [...]."[565] According to the CJEU, Article 267 TFEU has been breached because an arbitral tribunal is not a court which belongs to one of the court systems of the Member States, which means that the Member States have given the competence to interpret EU Law to a court other than the CJEU.

349. The present Tribunal is not empowered to decide whether a dispute submitted by a European investor against a European State under the ECT falls under Article 344 or is in breach of Article 267 of the TFEU. The task of this Tribunal is to determine whether such dispute falls under the provisions of the ECT. Likewise, it is not the task of this Tribunal to determine whether the scope of this dispute concerns the application of the TFEU, but rather whether such dispute concerns the application of the substantive provisions of the ECT.

350. If the Tribunal were to follow the approach of the EC and Respondent and treat the present dispute as an "*internal dispute,*" it would mean that EU Law is applicable for the purpose of jurisdiction. However, the ECT and – in particular Article 26 – is the instrument governing the present Tribunal's jurisdiction as well as Article 25 of the ICSID Convention. Therefore, through the dispute settlement mechanism of the ECT "*this Tribunal is placed in a public international law context and not a national or regional context.*"[566] The intra-EU nature of *the parties* does not by itself make the present dispute into a purely European one.

351. Although the Tribunal understands that in the present case, EU Law may find application, it cannot state that overlap between the two sets of rules strips the present dispute of its international aspects. In other words, the Tribunal cannot *infer* its own competence – or

---

[565] **RL-125**, *Achmea,* ¶ 60.
[566] **RL-001**, *Electrabel*, ¶ 4.112.

incompetence – from the principle of primacy of EU Law over the ECT for intra-EU disputes. The fact that there may exist a partial overlap between the two set of rules on the merits (such as FET and Fundamental Freedoms), cannot, *for the purpose of jurisdiction*, be resolved in favour of EU Law. This is because the questions pertaining to the Tribunal jurisdiction must be answered in light of Article 26 of the ECT.

352. Respondent and the EC have further argued that intra-EU obligations were superseded in application of Articles 41(1)(b) of the VCLT on the amendment of a treaty by a later treaty, and, that if the Tribunal were to consider that no amendment took place, Article 30(4)(a) of the VCLT on "*application of successive treaties relating to the same subject matter*" would operate as a rule to resolve a conflict between the two treaties. The Tribunal considers that the rule relating to "*treaties relating to the same subject matter*" is not applicable to the present situation where treaties negotiated by a smaller number of States, *i.e.,* the EU founding Treaties, are claimed to modify a treaty such as the ECT. These treaties do not "*relate to the same subject matter*" in the sense of Article 30.[567] Moreover, the Tribunal has had no evidence placed before it that would demonstrate that the subsequent EU Treaties were amending the ECT for the purpose of Article 41(1)(b) of the VCLT.

353. The Tribunal notes in this regard that the CJEU in its *Achmea* judgment did not rely on the aforementioned articles of the VCLT to resolve the alleged conflict between the intra-EU BIT and EU Laws.

354. The Tribunal notes that the internal constitutional laws of the EU and its constant changes and interpretations by the CJEU, as the Member States seek to minimize their mutual obligations in another context, are of no relevance for the present Tribunal.

355. In the Tribunal's view, "*the ECT's genesis generates a presumption that no contradiction exists between the ECT and EU law,*"[568] and as a consequence, the Tribunal cannot retroactively construe Spain's offer to arbitrate under the ECT as invalid.

---

[567] **RL-023**, VCLT, Art. 30.
[568] **RL-001**, *Electrabel*, ¶ 4.134.

356.    Respondent – not the EC – further argued that primacy of EU Law is reflected in Article 25 of the ECT entitled *Economic Integration Agreements,*" which states "[t]*he provisions of this Treaty shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement (hereinafter referred to as 'EIA') to extend, by means of most favoured nation treatment, to another Contracting Party which is not a party to that EIA, any preferential treatment applicable between the parties to that EIA as a result of their being parties thereto.*"[569]   For the Tribunal, Article 25 specifies that the treatment that may apply inter-se among EU Member States cannot be extended to non-EU Member States via the MFN clause.   This does not imply that investors from Member States of the European Union are deprived of their procedural rights as recognized by Article 26 of the ECT.

357.    For the above-mentioned reasons, the Tribunal is not in a position to conclude that Spain's consent to submit ECT disputes to arbitration excluded intra-EU investment disputes and that primacy of EU Law excludes jurisdiction of the present Tribunal established under the ECT.   Therefore, this Third Objection to jurisdiction is dismissed.

**D.     FOURTH OBJECTION: LACK OF JURISDICTION OVER CLAIMS UNDER ARTICLE 10(1) OF THE ECT ARISING OUT OF THE TVPEE AND THE TAX ON HYDROCARBONS**

**(1)     The Parties' Positions**

**a.     Respondent's Position**

358.    In their Memorial on Jurisdiction, Respondent objected to the Tribunal's jurisdiction to hear claims concerning violation of Article 10(1) of the ECT as a result of the tax measures enacted in Law 15/2012, namely, the TVPEE and the amendment to the Tax on Hydrocarbons.[570]   The objection was later limited to the claim arising out of the TVPEE, in view of Claimants' statement that their damages claim did not include any damages arising out of the Tax on Hydrocarbons.[571]

---

[569] **CL-001 / RL-055**, ECT, Art. 25.
[570] Resp. Mem. Jur., ¶ 208.
[571] Resp. Reply Jur., ¶ 241, n. 124, ¶ 358.   *See also*, Cl. Bif., ¶ 107.

359. Spain contends that it has not consented to arbitration of this claim, given that Article 26 of the ECT only concerns claims for violation of Part III of the Treaty, and pursuant to Article 21 of the ECT, Article 10(1) (although located in Part III) does not give rise to obligations in connection with tax measures.[572] Respondent explains that "*if no obligation derived from [P]art III of the ECT exists, there can be no alleged breach of it, and, thus, there is no consent of the Contracting Party to resort to arbitration and the Arbitral Tribunal lacks jurisdiction to hear the issue.*"[573]

360. Spain explains that Article 21 of the ECT contains a general exclusion of taxation measures from the scope of the ECT (the "**taxation carve-out**"), with a few exceptions specifically listed in the same Article.[574] None of those exceptions, Respondent says, refers to Article 10(1) of the ECT.[575]

361. The TVPEE is a "*Taxation Measure*" within the meaning of Article 21(7)(a) of the ECT, according to which the term includes: "*(i) any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; [...].*"[576] Spain notes that Law 15/2012 is a law passed by the Spanish Parliament and is thus part of its domestic law, and argues that the provisions concerning the TVPEE are "*relating to taxes.*"[577]

362. In Spain's view, the law governing the determination of whether a provision is relating to taxes is the domestic law of the Contracting Party to the ECT.[578] This is supported by (i) the wording of Article 21(7)(a)(i) of the ECT, and (ii) the Netherlands-Spain double taxation treaty, which must be taken into account pursuant to Article 31(3)(c) of the VCLT.[579] That said, Respondent argues that, even if the Tribunal concluded that

---

[572] Resp. Mem. Jur., ¶¶ 16, 171-174, 177, 184-185, 207.
[573] Resp. Mem. Jur., ¶ 182. *See also*, Resp. Reply Jur., ¶ 357.
[574] Resp. Mem. Jur., ¶¶ 186-187.
[575] Resp. Mem. Jur., ¶ 194.
[576] Resp. Mem. Jur., ¶¶ 199-200; Resp. Reply Jur., ¶¶ 248-315; **CL-001 / RL-055**, ECT, Art. 21(7)(a)(i).
[577] Resp. Mem. Jur., ¶¶ 202-203, 206, 207(i); Resp. Reply Jur., ¶¶ 261-262.
[578] Resp. Reply Jur., ¶¶ 249-250, 258.
[579] Resp. Reply Jur., ¶¶ 251, 254-255.

international law governs this question due to Article 26(6) of the ECT, the conclusion will be the same: the TVPEE is a tax.[580]

363.    Under domestic law, Spain maintains, there can be no doubt that the TVPEE is a tax, as ratified by the Constitutional Court itself.[581] It follows clearly from the text of Article 1 of Law 15/2012 that the TVPEE is a *"direct tax on the performance of the activities of production and incorporation into the electrical system of electrical energy in the Spanish electrical system."*[582] This is confirmed by Article 2 of Law 58/2003 on General Taxation.[583] The TVPEE is a tax of general application that covers both renewable and ordinary generation facilities; its tax base is the total amount received for the production of electrical energy and its introduction into the grid in the taxable period; the rate is 7%; the taxable period is generally the calendar year; and the tax is accrued on the last day of the period.[584] It is also deductible from corporate tax.[585]

364.    There can also be no doubt that the TVPEE is a tax from the perspective of international law, Spain argues.[586] It fits within the concept of tax developed by arbitral decisions because: it is established by law, and it imposes an obligation on a class of people to pay money to the State for public purposes.[587] In addition, the EC has confirmed both that it is a tax, and that it conforms with EU Law.[588]

365.    Respondent takes the view that the above is sufficient to conclude that the TVPEE is a tax, without engaging in an additional analysis of its economic effects and the good faith

---

[580] Resp. Reply Jur., ¶¶ 257-258.

[581] Resp. Reply Jur., ¶¶ 263, 273.

[582] Resp. Reply Jur., ¶ 264.

[583] Resp. Reply Jur., ¶ 265.

[584] Resp. Reply Jur., ¶ 266.

[585] Resp. Reply Jur., ¶ 270.

[586] Resp. Reply Jur., ¶ 278.

[587] Resp. Reply Jur., ¶¶ 279, 280-302.

[588] Resp. Reply Jur., ¶¶ 279, 303-315.

of the measure.[589]  In any event, Respondent contends that the TVPEE is a *bona fide* taxation measure, arguing that:[590]

- Contrary to Claimants' contentions, the TVPEE is not discriminatory: it is of general application to both renewable and conventional producers, and grants the same treatment to both.[591]

- There is no discrimination between conventional and renewable producers in terms of "*repercussion*," that is, the possibility to transfer the amount of the tax by the payer to another person.[592]  Being a direct tax, there is no "*legal repercussion*" in connection with the TVPEE.[593]  There is also no discrimination from the perspective of "*economic repercussion*," because the costs of this tax on renewable energy producers are remunerated to them under the applicable regulatory regime, so its effect on them is neutralized.[594]

- The TVPEE's objective is to raise revenue for the State for public purposes.  It is an income integrated into the State's general budget, and it is allocated to finance the costs of the electricity system.[595]  It does not seek to carry out a disguised tariff cut, as shown by the fact that its effects on renewable energy producers is neutralized.[596]

366.  Respondent also points out that various tribunals have already upheld objections to jurisdiction over claims arising out of violation of Article 10(1) of the ECT resulting from the TVPEE, finding that the TVPEE is a "*Taxation Measure*" for purposes of the ECT.[597]

### b.  Claimants' Position

367.  Claimants contend that the objection based on the exclusion in Article 21 of the ECT is not a matter of jurisdiction.[598]  For Claimants, the contention that Article 21 of the ECT

---

[589] Resp. Reply Jur., ¶¶ 317-321.

[590] Resp. Reply Jur., ¶¶ 245, 322-356.

[591] Resp. Reply Jur., ¶¶ 323-326.

[592] Resp. Reply Jur., ¶¶ 337-351.

[593] Resp. Reply Jur., ¶¶ 340-343.

[594] Resp. Reply Jur., ¶¶ 344-346.

[595] Resp. Reply Jur., ¶¶ 352-354.

[596] Resp. Reply Jur., ¶ 356.

[597] Resp Obs. Eiser, ¶ 7 (discussing *Eiser*); Resp. Obs. Achmea, ¶¶ 35-38 (discussing **CL-195**, *Novenergía*).

[598] Cl. C-Mem. Jur., ¶ 83.

excludes the consent in Article 26 improperly seeks to read into the later provision a specific exclusion to the ECT's dispute settlement mechanism, which is not there.[599]

368. Claimants acknowledge that Article 21 of the ECT *"does not directly include 'Taxation Measures'"* within the scope of Article 10(1) of the ECT, but argue that the TVPEE can be one of the Disputed Measures in this case because: (i) it is an *ad valorem* charge on gross revenue, and the functional equivalent a tariff cut as acknowledged by the Government, not a tax on *"income or capital"* within the meaning of Article 21(3) of the ECT;[600] and (ii) even if the TVPEE were considered to be a tax, because it is *not* a tax on income or on capital, pursuant to Article 21(3) of the ECT it can be assessed under Article 10(7) of the ECT – the MFN Clause –, which applies to *"Taxation Measures."*[601] According to Claimants, the tribunals that have addressed the issue of jurisdiction over the claims arising out of the TVPEE have not considered these same arguments.[602]

369. Although in their pleadings Claimants answered the Fourth and Fifth Objections together as a whole,[603] the present Section addresses the objection pertaining to claims for breach of Article 10(1) of the ECT. Claimants' arguments pertaining to Article 10(7) of the ECT are further summarized in Section E(1)b *infra*.

370. To support the argument that the TVPEE is just an *"ad valorem levy"* and not a *"tax on income or capital,"* Claimants point out that: (i) in October 2012, the Ministry of Industry acknowledged that Spain could have achieved the same result as the TVPEE through a direct tariff cut; (ii) Law 15/2012 does not even describe itself as deriving its validity from the Government's taxation power in Article 66 of the Spanish Constitution, but rather from Article 45 concerning environmental protection; and (iii) the ordinary meaning of the term *"taxes on income"* refers to taxes on net income.[604] On this basis,

---

[599] Cl. C-Mem. Jur., n. 91.
[600] Cl. Mem., ¶ 278; Cl. Mem. Jur., ¶ 86; Cl. Rej. Jur., ¶ 129.
[601] Cl. Mem., ¶ 278; Cl. Mem. Jur., ¶ 89; Cl. Rej. Jur., ¶ 130.
[602] Cl. Obs. Eiser, ¶ 2.2; Cl. Reply Eiser, ¶ 2.1.
[603] Cl. C-Mem. Jur., ¶¶ 83-91; Cl. Rej. Jur., ¶¶ 126-139.
[604] Cl. C-Mem. Jur., ¶¶ 86-87; Cl. Rej. Jur., ¶ 129.

Claimants argue that it is "*questionable whether the 7% levy is a Taxation Measure at all for ECT purposes.*"[605]

371.    Claimants also emphasize that, in any event, if the Tribunal were to find that the TVPEE is a tax caught by the exclusion in Article 21 of the ECT, this would have a minimal impact on damages of around EUR $1.1 million on historical damages.[606] They go on to explain that, given that the TVPEE is an operating cost that renewable energy producers can recover under Regulatory Framework III, the losses under Regulatory Framework III do not result from the TVPEE. Thus, the TVPEE would only be relevant to a small portion of Claimants' historical losses, *i.e.* those between start of commercial operation (29 May 2013 for Termosol 1, and 7 June 2012 for Termosol 2) and the date marking the beginning of the retroactive application of Regulatory Framework III (9 July 2013).[607] Further, Claimants argue, if the Tribunal does not adopt the primary "*but for*" analysis for quantification of damages, but instead adopts the alternative damages case based on a finding that only a "*reasonable return*" could be expected, damages would not need to be adjusted on account of lack of jurisdiction over the TVPEE.[608]

### (2)    The Tribunal's Analysis

372.    In the view of the Tribunal, the TVPEE is a "*Taxation Measure*" within the meaning of Article 21(7) of the ECT, and thus falls within the exclusion of taxation measures from the application of the ECT under Article 21(1) of the ECT. The 7% levy imposed under the TVPEE is, as Respondent points out, "*established by law,*" and it "*imposes an obligation on a class of people*" to "*pay*[] *money to the State for public purposes.*"[609] It does not matter that, as Claimants argue, the economic effect of the TVPEE is functionally equivalent to a tariff cut.

373.    Accordingly, the Tribunal concludes that damages could not be awarded on the basis of loss resulting from the imposition of the TVPEE. However, the Tribunal also points out

---

[605] Cl. Rej. Jur., ¶ 129.

[606] Cl. Mem. Jur., ¶ 85; Cl. Rej. Jur., ¶ 126; Cl. Obs. Eiser, ¶¶ 2.3, 4.8; Cl. Obs. Achmea, ¶ 1.4.

[607] Cl. Mem. Jur., ¶ 85; Cl. Rej. Jur., ¶ 126.

[608] Cl. Obs. Eiser, ¶ 4.10.

[609] Resp. Reply Jur., ¶¶ 289-294. *See also*, *Eiser*, ¶ 266.

that, in light of its conclusions below regarding liability and damages, the impact of the TVPEE is not relevant in the assessment of damages in any event. In short, as a result of the Tribunal's conclusion on liability, the Fourth Objection becomes moot.

### E. FIFTH OBJECTION: LACK OF JURISDICTION OVER CLAIMS UNDER ARTICLE 10(7) OF THE ECT ARISING OUT OF THE TVPEE

#### (1) The Parties' Positions

##### a. Respondent's Position

374. Respondent contends that the Tribunal has no jurisdiction to hear Claimants' claim that Spain has breached Article 10(7) of the ECT through the imposition of the TVPEE.[610] Spain argues that, although Article 10(7) of the ECT does apply to *"Taxation Measures,"* pursuant to Article 21(3) of the ECT, Article 10(7) does *not* apply to taxes on income or on capital.[611] Put another way, says Spain, Article 10(7) does *not* apply to direct taxes (*i.e.* those *"levying direct manifestations of the economic capacity"* that *"cannot be legally passed-on"* to another person), but only to indirect ones (*i.e.* those *"levying indirect manifestations of the economic capacity of tax payers, such as consumption"* that can *"passed-on to another person"*).[612]

375. According to Respondent, the TVPEE is a direct tax, and specifically a tax on income: it levies income obtained for the production and incorporation into the grid of electrical energy. As such, Article 10(7) of the ECT does not apply to it.[613] It is irrelevant that the TVPEE is a tax on gross income (as opposed to net), because the definition of tax on income in Article 21(7)(b) of the ECT does not refer to net income.[614]

376. Because Spain's consent to arbitration in Article 26 of the ECT refers to disputes arising out of violations of Part III of the ECT, and there is no obligation under Article 10(7)

---

[610] Resp. Reply Jur., ¶¶ 359-361; Resp. Mem. Jur., ¶ 221.

[611] Resp. Reply Jur., ¶¶ 362, 367, 369; Resp. Mem. Jur., ¶¶ 211-212.

[612] Resp. Reply Jur., ¶¶ 371, 373. *See also, id.,* ¶ 380; Resp. Mem. Jur., ¶ 214.

[613] Resp. Reply Jur., ¶ 375; Resp. Mem. Jur., ¶¶ 214-215.

[614] Resp. Reply Jur., ¶ 378.

with respect to the TVPEE, there can be no breach thereof, and therefore, there is no consent.[615]

377. But even if Article 10(7) of the ECT could cover the TVPEE, Spain argues, it could not impose MFN obligations in the form intended by Claimants.[616] This is because pursuant to Article 21(3)(a) of the ECT, Article 10(7) "*shall not apply to: (a) impose most favoured nation obligations with respect to advantages accorded by a Contracting Party pursuant to the tax provisions of any convention, agreement or arrangement described in subparagraph (7)(a)(ii) or resulting from membership of any Regional Economic Integration Organization; […].*" In turn, Article 21(7)(a)(ii) of the ECT refers to "*any convention for the avoidance of double taxation or of **any other international agreement or arrangement by which the Contracting Party is bound**.*"[617]

378. For Spain, the Uruguay-Spain BIT that Claimants attempt to import via the MFN clause is an international agreement to which Spain is bound, within the meaning of Article 21(7)(a)(ii) of the ECT. To the extent its substantive provisions (including FET) are applied to taxes, they are "*provisions relating to taxes.*"[618] In consequence, Article 10(7) of the ECT cannot serve to import protections from the Uruguay-Spain BIT.[619]

### b. Claimants' Position

379. As noted earlier, in their pleadings Claimants answered the Fifth Objection together with the Fourth.[620] The present section summarizes the arguments pertaining to the applicability of Article 10(7) of the ECT, and its consequences. To recall, as mentioned in Section D(1)b *supra*, Claimants' position is that, even if the TVPEE were considered a tax, because it is *not* a tax on income or capital, it would fall to be assessed within the

---

[615] Resp. Reply Jur., ¶¶ 363, 381.

[616] Resp. Reply Jur., ¶¶ 384, 390; Resp. Mem. Jur., ¶¶ 211, 216, 219

[617] Resp. Reply Jur., ¶¶ 385-386; **CL-001 / RL-055**, ECT, Art. 21(3)(a) and Art. 21(7)(a)(ii) (emphasis added).

[618] Resp. Reply Jur., ¶ 387.

[619] Resp. Reply Jur., ¶ 388.

[620] Cl. C-Mem. Jur., ¶¶ 83-91; Cl. Rej. Jur., ¶¶ 126-139.

scope of Article 10(7) of the ECT (the MFN Clause), which does apply to "*Taxation Measures*" per Article 21(3) of the ECT.[621]

380. By virtue of Article 10(7) of the ECT, Claimants say, Spain is prevented from applying the TVPEE in a *de facto* discriminatory matter; and the TVPEE indeed discriminates against renewable energy producers in favour of conventional energy producers.[622] Pursuant to Article 10(7) of the ECT, Spain is also required to give Dutch investors the same treatment that it gives to other foreign investors. Since in other investment treaties Spain has agreed to provide Fair and Equitable Treatment ("**FET**") in connection with taxation, in particular, in the Spain-Uruguay BIT, then Claimants are entitled to the same FET, even if the TVPEE is considered a tax.[623]

381. Claimants dismiss Respondent's allegation that the TVPEE is not covered by Article 10(7) of the ECT because it *is* a tax on income or capital. For Claimants, the view that Article 10(7) only applies to indirect taxes is not supported by Article 21(3) or Article 21(7)(b) of the ECT, which draw no distinction.[624] It is also clear that the TVPEE is *not* a tax on income or capital, but rather on gross revenue for the production and transmission of electricity.[625]

382. Claimants also counter Respondent's reliance on Articles 21(3)(a) and 21(7)(a)(ii) of the ECT to support the conclusion that Article 10(7) of the ECT cannot impose MFN obligations in relation to the TVPEE, thereby preventing importation of the Spain-Uruguay BIT.[626] Claimants explain that the purpose of Article 21(3)(a) of the ECT is to limit the application of Article 10(7) by saying that "*the advantages* [...] *pursuant to the tax provisions of any convention, agreement or arrangement described in subparagraph (7)(a)(ii) or resulting from membership of any Regional Economic Integration Organization*" do not extend to the other ECT Contracting Parties via the MFN provision. However, the Spain-Uruguay BIT neither contains "*tax provisions,*" nor it is a

---

[621] Cl. Mem., ¶ 278; Cl. Mem. Jur., ¶ 89; Cl. Rej. Jur., ¶ 130.
[622] Cl. Mem., ¶¶ 89-90.
[623] Cl. Mem., ¶ 278; Cl. Mem. Jur., ¶ 91.
[624] Cl. Rej. Jur., ¶¶ 133-134.
[625] Cl. Rej. Jur., ¶ 135.
[626] Cl. Rej. Jur., ¶¶ 136-139.

123

"*convention, agreement or arrangement*" of the types referred to in Article 21(7)(a)(ii) when defining "*Taxation Measure.*"[627]

### (2) The Tribunal's Analysis

383. The Tribunal is of the view that Article 21(3) of the ECT, which excludes taxation on capital and income from taxation measures otherwise covered under Article 10(7) of the ECT, prevents a claim on the basis of the TVPEE from being pursued under Article 10(7) of the ECT. The TVPEE is a tax on revenue derived from the supply of electricity into the Spanish grid. It is, therefore a tax on gross income. There is no basis for assuming that the reference to income in Article 21(3) of the ECT was a reference to net income. Thus, there is no basis for Claimants to pursue a claim under Article 10(7) of the ECT.

384. However, as pointed out in respect of the Fourth Objection, in light of the Tribunal's conclusions below on regarding liability and damages, the impact of the TVPEE is not relevant to the assessment of damages in any event. In short, as a result of the Tribunal's conclusion on liability the Fifth Objection becomes moot.

## VI. APPLICABLE LAW

### A. THE PARTIES' POSITIONS

#### (1) Claimants' Position

385. Claimants contend that the applicable procedural law is composed of the procedural provisions of the ECT and the ICSID Arbitration Rules.[628] They argue, in turn, that the applicable substantive law pursuant to Article 26(6) of the ECT consists of (i) the ECT substantive provisions; (ii) the VCLT; and (iii) applicable rules and principles of international law.[629] Lastly, according to Claimants, Spanish law is relevant as a fact to be taken into consideration in certain circumstances, but an ECT tribunal "*can only*

---

[627] Cl. Rej. Jur., ¶ 138.

[628] Cl. Mem. Merits, ¶ 226.

[629] Cl. Mem. Merits, ¶ 227.

*decide the issues in dispute in accordance with the applicable rules and principles of international law."*[630]

386. Claimants have also emphasized that Spain cannot invoke its own domestic law to justify breaches of international law.[631] Claimants argue that *"[d]omestic Spanish law principles are not 'applicable rules and principles of international law' and this Tribunal is not authorised to apply them as part of the applicable law."*[632]

387. Claimants also submit (in the context of discussing the EC Decision of 10 November 2017 on State Aid) that the Tribunal is mandated to apply the ECT over EU Law in the event of inconsistency.[633]

**(2)    Respondent's Position**

388. Respondent also espouses the view that the substantive law to be applied, pursuant to Article 26(6) of the ECT consists of (i) the ECT substantive provisions; (ii) the VCLT; and (iii) applicable rules and principles of international law.[634] Spain further agrees that Spanish law is relevant as a fact to be considered in certain circumstances, but it emphasizes that *"Spanish law is also decisive in shaping the legitimate expectations that any investor may have at the time of investing in Spain."*[635]

389. Spain also takes the view that *"European Union law constitutes applicable international law for the resolution of this dispute under Article 26(6) of the ECT."*[636]   On those bases Respondent has argued that the EC Decision of 10 November 2017 on State Aid as part

---

[630] Cl. Mem. Merits, ¶ 227.

[631] Cl. Reply Merits, § VII(1), ¶¶ 377-382. Claimants criticize Respondent's reliance on a long description about the Spanish Electricity System, decisions of its Supreme Court, principles of Spanish law on administrative acts or retroactivity, allegations about the authority of a certain Government official to bind the State, noting that *"Spain fails to explain why its own domestic law is relevant when the law applicable to the dispute is, according to Art. 26(6) ECT, the ECT itself and applicable rules and principles of international law."* Cl. Reply Merits, ¶ 378.

[632] Cl. Reply Merits, ¶ 378.

[633] Cl. Obs. EC Decision, ¶ 1.4. *See also, infra,* ¶ 457.

[634] Resp. C-Mem. Merits, ¶ 599 (quoting Cl. Mem. Merits, ¶ 227).

[635] Resp. C-Mem. Merits, ¶ 599; Resp. Rej. Merits, ¶ 33.

[636] Resp. Obs. EC Decision, ¶ 4.

of EU Law is also binding on tribunals where they apply EU Law, and that as a result, this Tribunal's decision must be compatible with that EC Decision.[637]

## B. THE TRIBUNAL'S ANALYSIS

390. In the view of the Tribunal the applicable law is the ECT and any rules of international law relevant to its interpretation and application. The Tribunal will refer to provisions of Spanish law and EU Law if appropriate. Their particular weight and relevance will be assessed in this decision in the context of the issues in respect of which they have been raised.

## VII. LIABILITY

391. Claimants contend that Respondent has violated Articles 10(1) and Article 10(7) of the ECT.[638] They argue that "*Spain's enactment of Law 15/2012, RDL 2/2013, RDL 9/2013, RD 413/2014, and the* [Ministerial] *Order* [IET/1045/2014], *coupled with the application of those measures to the Termosol Plants and the PTEs, gives rise to a breach of Article 10(1) of the ECT through actions which violated the FET standard and breached obligations assumed by Spain towards the Claimants' investments.*"[639] According to Claimants, "*Spain breached Article 10 ECT when it overhauled the remuneration regime pursuant to which the Claimants invested and replaced it with Regulatory Framework III.*"[640] Spain has breached its obligations in three ways, according to Claimants: (i) by repudiating Claimants' legitimate expectations; (ii) by breaching its duty to provide a stable, consistent and transparent framework; and (iii) by failing to adopt reasonable, proportionate and non-discriminatory measures.[641]

---

[637] Resp. Obs. EC Decision, ¶¶ 4, 33. *See also, infra*, ¶ 510.

[638] Cl. Mem. Merits, ¶ 314(2).

[639] Cl. Mem. Merits, ¶ 258.

[640] Cl. Skeleton, ¶ 33. As noted, Claimants have referred in their submissions to three different "Regulatory Frameworks," as follows: (i) "Regulatory Framework I" including RD 661/2007, RDL 6/2009 and RD 1614/2010; (ii) "Regulatory Framework II" including Law 15/2012 and RDL 2/2013; and (iii) "Regulatory Framework III" including RDL 9/2013, RD 413/2014 and Ministerial Order IET/1045/2014. *See* Cl. Mem. Merits, p. vii and Appendix A.

[641] Cl. Skeleton, ¶ 33; Cl. Reply Merits, § VII(3)(B-D).

392. In turn, Respondent denies that it has breached Article 10(1) of the ECT,[642] or Article 10(7) of the ECT.[643] Respondent argues that (i) it has not breached Claimants' legitimate expectations at the time of investment;[644] (ii) it has not breached the commitment to provide stable conditions;[645] (iii) its conduct has been transparent;[646] (iv) the challenged measures are proportionate and non-discriminatory,[647] were adopted for *"justifiable reasons of public interest,"* and are also reasonable.[648]

## A.   THE PARTIES' POSITIONS

### (1)    The Standard in Article 10(1) of the ECT

#### a.   Claimants' Position

393. Claimants contend that the commitment to grant Fair and Equitable Treatment (**"FET"**) in Article 10(1) of the ECT is an *"autonomous treaty standard [...] independent of the minimum standard of treatment under customary international law."*[649] It is to be applied *"in light of the European Energy Charter's commitment to legal stability and the environmental protection goals explicitly identified in the ECT's Preamble, Article 2 and Article 19."*[650]

394. According to Claimants, Article 10(1) of the ECT imposes a number of distinct, but related obligations.[651] The FET standard in Article 10(1) comprises requirements for the host-State to: (i) protect *"an investor's legitimate and reasonable expectations;"* (ii) *"maintain reasonable stability in its legal framework;"* (iii) *"act in good faith;"* (iv) *"act proportionately;"* and (v) respect due process and avoid denial of justice;[652] with facets

---

[642] Resp. C-Mem. Merits, ¶ 642.

[643] *See, e.g.,* Resp. Rej. Merits, ¶¶ 726-727.

[644] Resp. C-Mem. Merits, § III(F)(2); Resp. Rej. Merits, § III(B)(3.1).

[645] Resp. C-Mem. Merits, § III(F)(3); Resp. Rej. Merits, § III(B)(3.2).

[646] Resp. C-Mem. Merits, § III(F)(4); Resp. Rej. Merits, § III(B)(3.3).

[647] Resp. C-Mem. Merits, § III(F)(5); Resp. Rej. Merits, § III(B)(3.4).

[648] Resp. C-Mem. Merits, ¶ 642.

[649] Cl. Mem. Merits, ¶ 230. *See also,* Cl. Reply Merits, ¶¶ 416, 435; Cl. Skeleton, ¶ 29.

[650] Cl. Mem. Merits, ¶ 239. *See also, id.,* ¶¶ 236-238.

[651] Cl. Mem. Merits, ¶ 229 (quoting **CL-001 / RL-055**, ECT, Art. 10(1)).

[652] Cl. Mem. Merits, ¶¶ 240, 242, 250; Cl. Reply Merits, ¶¶ 416, 435.

(i) and (ii) being especially relevant in this case.[653]   Article 10(1) also guarantees transparency in actions by the State; and it precludes arbitrary, unfair, unjust, idiosyncratic, and discriminatory conduct.[654]

395.   *Protection of Legitimate and Reasonable Expectations.*   Claimants contend that the protection of legitimate and reasonable expectations is an integral part of the autonomous FET standard,[655] and the revocation of a State's assurances giving rise to those expectations constitutes a breach of the standard.[656]  Relying on *Plama*, Claimants argue that the legitimate expectations protected under Article 10(1) *"include the conditions that were specifically offered by the State to the Investor when making the Investment and that were relied upon by the Investor to make its Investment."*[657]   And referring to *Suez*, Claimants add that investors are protected when they have *"derived reasonable expectations from the laws and regulations adopted by the host country, acted in reliance upon those laws and regulations and changed their economic position as a result."*[658] They add, however, that the FET standard also protects against *"changes in law affecting a long-term capital intensive investment (even in the absence of the specific additional assurances provided by Spain in this case)."*[659]

396.   *Stability, Consistency and Transparency of the Legal Framework.*   Claimants also argue that FET includes legitimate expectations of a *"stable and predictable investment*

---

[653] Cl. Mem. Merits, ¶ 241.

[654] Cl. Reply Merits, ¶ 416.

[655] Cl. Mem. Merits, ¶¶ 240-241 (citing **CL-018**, *Técnicas Medioambientales TECMED SA v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award (29 May 2003) (hereinafter *"Tecmed"*), ¶ 154; **CL-013**, *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award (29 July 2008), ¶ 609; **CL-022**, *Deutsche Bank AG v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/09/02, Award (31 October 2012), ¶ 420; **CL-023**, *Jan Oostergetel and Theodora Laurentius v. The Slovak Republic*, UNCITRAL, Final Award (23 April 2012), ¶ 221).

[656] Cl. Mem. Merits, ¶ 244 (citing **CL-024**, *CMS Gas Transmission Co. v. Republic of Argentina*, ICSID Case No. ARB/01/8, Award (12 May 2005) (hereinafter *"CMS"*), ¶ 275; **CL-025**, *CME Czech Republic BV v. Czech Republic*, UNCITRAL, Partial Award (13 September 2001), ¶ 611).

[657] Cl. Mem. Merits, ¶ 246 (quoting **CL-028 / RL-092**, *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award (27 August 2008) (hereinafter *"Plama Award"*), ¶ 176).

[658] Cl. Mem. Merits, ¶ 248 (citing **CL-030**, *Suez, Sociedad General de Aguas de Barcelona S.A. and Vivendi Universal v. Argentine Republic*, ICSID Case No. ARB/03/19, Decision on Liability (30 July 2010), ¶ 226).

[659] Cl. Mem. Merits, ¶ 249 (citing **CL-031**, *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/1, Decision on Liability (27 December 2010), ¶¶ 309(g), 333).

*environment.*"[660] Article 10(1) of the ECT expressly requires States to "*encourage and create stable, equitable, favourable and transparent conditions for Investors;*"[661] a point also reflected in the European Energy Charter (basis for the ECT), and further confirmed by the Energy Charter Conference.[662] The importance of a stable legal and business environment has been recognized by tribunals in their analyses of the FET standard.[663]

397. In Claimants' view, Respondent unduly restricts the scope of Article 10(1) of the ECT by arguing that it does not impose limits on a State's regulatory power.[664] Claimants explain that while they do not contend that "*States should be precluded from enacting laws when the circumstances change,*" such regulatory authority is not limitless, and it is also "*not impervious to scrutiny under international law.*"[665] According to Claimants, "[b]*y entering into the ECT, Spain accepted a limitation on its powers to alter the remuneration framework applicable to the Claimants' investments.*"[666]

398. Claimants also oppose the view that the FET standard in Article 10(1) of the ECT is limited to the Minimum Standard of Treatment under customary international law ("**MST**"). In their view, conflating the FET standard with MST would ignore the rules of treaty interpretation in Article 31 of the VCLT; it is not supported by the text of the ECT or by supplementary means of interpretation.[667] The phrase "[i]*n no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations*" in Article 10(1) of the ECT does not alter the conclusion because: (i) it appears much later, after the FET obligation located in the first

---

[660] Cl. Mem. Merits, ¶ 250.

[661] Cl. Mem. Merits, ¶ 251; **CL-001 / RL-055**, ECT, Art. 10(1).

[662] Cl. Mem. Merits, ¶¶ 251-252.

[663] Cl. Mem. Merits, ¶¶ 253-257 (referring to **CL-035**, *Joseph Charles Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability (14 January 2010) (hereinafter "*Lemire*"), ¶ 284; **CL-011**, *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Şirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award (19 January 2007), ¶¶ 250, 254; **CL-024**, *CMS*, ¶ 275; **CL-036**, *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Award (28 September 2007), ¶ 303; **CL-027**, *Metalclad Corp. v. United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award (30 August 2000), ¶ 99). *See also*, Cl. Skeleton, ¶ 41.

[664] Cl. Reply Merits, ¶¶ 436-442.

[665] Cl. Reply Merits, ¶ 437. *See also*, Cl. Skeleton, ¶ 32.

[666] Cl. Reply Merits, ¶ 440.

[667] Cl. Reply Merits, ¶¶ 417-419; Cl. Skeleton, ¶ 30.

sentence, thereby confirming that the FET standard is not equivalent to MST;[668] and (ii) Article 10(1) uses different words to articulate the FET obligation and MST, thereby showing that they have a different meaning.[669] The opposite interpretation would not give effect to all the terms of Article 10(1).[670]

399. Moreover, Claimants contend, the conclusion that the FET standard in Article 10(1) of the ECT goes beyond MST is supported by decisions in ECT cases,[671] and also in BIT cases referring to provisions with references to international law similar to that in Article 10(1) of the ECT.[672]

400. Claimants also take issue with Respondent's reliance on Article 2 of the 1991 European Energy Charter, arguing that the fact that this provision sought to achieve non-discrimination and market-oriented price formation does not give license to ignore the text of Article 10(1). Both the ECT and the 1991 European Energy Charter indicate that their purpose is to promote investment and economic cooperation,[673] and "[t]*he promotion of investment and economic cooperation* [...] *supposes positive obligations that go beyond the* [MST]."[674]

401. Claimants further deny that the FET standard in Article 10(1) of the ECT is limited to national treatment.[675] This conclusion, Claimants argue, cannot be reconciled with (i) the text of Article 10(1) which includes a separate prohibition against discrimination in a stand-alone sentence; or (ii) the definition of "*Treatment*" in Article 10(3) of the ECT; or (iii) Article 10(7) of the ECT.[676]   If FET were limited to national treatment, these

---

[668] Cl. Reply Merits, ¶ 420.

[669] Cl. Reply Merits, ¶ 421.

[670] Cl. Reply Merits, ¶ 422.

[671] Cl. Reply Merits, ¶ 429 (citing **CL-006**, *Liman*, ¶ 263).

[672] Cl. Reply Merits, ¶ 430 (citing **CL-017**, *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award (14 July 2006), ¶ 361; **CL-035**, *Lemire*, ¶ 253).

[673] Cl. Reply Merits, ¶ 426.

[674] Cl. Reply Merits, ¶ 427. *See also*, Cl. Skeleton, ¶ 30.

[675] Cl. Reply Merits, ¶¶ 431-435.

[676] Cl. Reply Merits, ¶ 431; Cl. Skeleton, ¶ 31.

provisions would have been unnecessary; and equating them renders the provisions meaningless.[677]

402. Lastly, Claimants take issue with what they describe as Spain's effort to "*second-guess whether or not the granting of special privileges for foreign investors is warranted.*"[678] In Claimants' view, whatever policy debates might exist, "*Spain made the policy decision to accord a right of FET to qualifying energy sector investors in its territory, on the basis that Spanish investors would benefit from the same rights in the Netherlands and in all other ECT Contracting States,*" which was "*not a one-sided policy choice*" but rather "*one based on reciprocity;*" freely made and not open to the Tribunal to second-guess.[679]

### b. Respondent's Position

403. Respondent contends that the aim and purpose of the ECT is to grant foreign investors national or non-discriminatory treatment.[680] Spain denies that the ECT affords higher protection than MST, or that it offers protection directly related to the support of renewable energy investments.[681]

404. According to Spain, the ECT's investment protection system is aimed at achieving an energy open market in Europe based on the principle of non-discrimination.[682] Thus, the ECT's principal investment protection objective is to afford "*domestic treatment*" or "*non-discrimination*" once an investment has already been made.[683] This objective, Spain argues, is not breached by the adoption of measures that are (i) proportionate; (ii) justified by public interest; and (iii) applied *erga ommes* to both foreign and domestic

---

[677] Cl. Reply Merits, ¶ 431.
[678] Cl. Reply Merits, ¶ 442.
[679] Cl. Reply Merits, ¶ 442.
[680] Resp. C-Mem. Merits, § III(E)(1). *See also*, Resp. Rej. Merits, ¶¶ 32, 1114.
[681] Resp. C-Mem. Merits, ¶ 603.
[682] Resp. C-Mem. Merits, ¶ 607. *See also*, Resp. Rej. Merits, ¶ 1015.
[683] Resp. C-Mem. Merits, ¶¶ 611-612, 618.

investors.[684]    Subsidies that distort competition in the energy market (such as those Claimants' seek) are incompatible with the ECT.[685]

405.    Further, in Spain's view, the obligation in Article 10(1) of the ECT to afford treatment "[i]n no case [...] less favourable than that required by international law, including treaty obligations" refers to MST under customary international law, with "domestic treatment" or "national treatment" being the maximum protection granted to foreign investments when more favourable.[686] Put another way, as the objective of the ECT is to achieve non-discrimination, "[o]nly when the absence of discrimination does not guarantee the investors treatment in accordance with the minimum standards of International law do these standards go into effect to ensure their protection."[687]

406.    Respondent goes on to argue that the protection afforded by Article 10(1) of the ECT varies depending on the stage at which the investment is at. The "commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment" applies during the "making [of the] investment," because this particular sentence of Article 10(1) refers to the preceding one dealing with "conditions [...] to make Investments in its Area."[688] But, once an investment has been made, Article 10(1) offers protection "against discriminatory and irrational measures that affect the management, maintenance, use, enjoyment, and disposal of the investment," setting as a minimum that "[i]n no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations."[689]    Further, national treatment protection contains an exception in the field of State aid, as shown in Article 10(8) of the ECT.[690]

---

[684] Resp. C-Mem. Merits, ¶ 618.

[685] Resp. Rej. Merits, ¶ 1017.

[686] Resp. C-Mem. Merits, ¶¶ 613, 619.

[687] Resp. Rej. Merits, ¶ 1007. See also, id., ¶ 1016; Resp. Skeleton, ¶ 21.

[688] Resp. Rej. Merits, ¶ 1021.

[689] Resp. Rej. Merits, ¶ 1022.

[690] Resp. Rej. Merits, ¶ 1024.

407. Spain denies that its interpretation of Article 10(1) of the ECT renders Article 10(7) meaningless, observing that Article 10(7) also includes an MFN guarantee, in addition to national treatment.[691]

408. According to Respondent the ECT does not guarantee sustainable energy development at any cost, as it has to be both economic and environmental.[692] Respondent argues that the purpose of the ECT is stated in Article 2, and that Article 19 on environmental protection is of minor importance.[693] For Spain, while Article 19 provides that the ECT Contracting Parties shall *"have particular regard to Improving Energy Efficiency"* and *"to developing and using renewable energy sources,"* it does not mandate the granting of *"petrified"* public subsidies, and the ECT respects the State's regulatory power in the area of State aid.[694]

409. Spain also takes the view that, while the ECT requires the creation of stable and transparent conditions for investment, it does not prevent the adoption of justified and non-discriminatory macroeconomic control measures by a State.[695] The ECT does not require Contracting Parties to maintain a regulatory framework stable and predictable throughout the whole investment, as Article 10(1) refers to stable *"conditions"* and not to a stable *"regulatory framework."*[696] Further, the ECT does not *"cancel or limit to the extreme"* the State's regulatory power, nor provide an insurance policy to investors against regulatory changes.[697] The only limit to the State regulatory power in the ECT is MST, and an objective of non-discrimination.[698]

410. In Respondent's view, the context and subject matter of the ECT support its interpretation. Because the ECT concerns investments in a highly regulated and strategic sector such as the energy sector, Spain says, "[i]*t is not very realistic*" to interpret it as an

---

[691] Resp. Rej. Merits, ¶ 1023.

[692] Resp. C-Mem. Merits, ¶ 623.

[693] Resp. C-Mem. Merits, ¶ 624.

[694] Resp. C-Mem. Merits, ¶ 623.

[695] Resp. C-Mem. Merits, § III(E)(2), ¶ 610. *See also*, Resp. Rej. Merits, ¶¶ 1027, 1115; Resp. Skeleton, ¶ 21.

[696] Resp. C-Mem. Merits, ¶ 628; Resp. Rej. Merits, ¶¶ 1031, 1033.

[697] Resp. C-Mem. Merits, ¶ 610.

[698] Resp. C-Mem. Merits, ¶ 632; Resp. Rej. Merits, ¶ 1035.

insurance policy for foreign investors *"against regulatory reforms adopted for reasons of public interest."*[699] The obligations in Article 10 of the ECT must be *"tempered"* by the provisions in Part IV referring to sovereignty and the State's economic regulatory power, tax veto and attribution rules.[700]

411. Finally, Spain also argues that arbitral awards interpreting the FET standard in the ECT support its position, in particular the notion that *"in the absence of a specific commitment to stability, an Investor cannot have an expectation that a regulatory framework such as the one discussed in this arbitration will not be amended."*[701]

### (2) Article 10(1) of the ECT: Repudiation of Legitimate and Reasonable Expectations

#### a. Claimants' Position

412. Claimants contend that Respondent *"actively induced [them] to invest by offering a long-term and stable remuneration system, backed by repeated assurances from the most senior Spanish government officials addressed specifically to NextEra representatives."*[702]

413. According to Claimants, they held legitimate expectations that the Termosol Plants would benefit from the remuneration regime in RD 661/2007 *"as stabilised in RDL 6/2009 and RD 1614/2010"* (**"Regulatory Framework I"**[703]) for their entire useful life, and that they relied on those expectations to invest in Spain.[704] For Claimants, Regulatory Framework I *"guaranteed specific tariffs and premiums, operating hours, and upper and lower remuneration limits for the lifetime of their plants,"*[705] and Claimants *"moved their*

---

[699] Resp. Rej. Merits, ¶ 1032.

[700] Resp. Rej. Merits, ¶ 1033 (quoting **RL-056**, T.W. Wälde, *Arbitration in the Oil, Gas and Energy Field: Emerging Energy Charter Treaty Practice*, 1 TDM (2004)).

[701] Resp. Rej. Merits, ¶¶ 1028-1030 (referring to **RL-092**, *Plama Award*, ¶ 219; **RL-024**, *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award (23 September 2010) (hereinafter *"AES"*), ¶ 9.3.25; **RL-091**, *Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Award (25 November 2015) (hereinafter *"Electrabel"*), ¶¶ 165-166; **RL-088**, *Charanne*, ¶¶ 493, 510).

[702] Cl. Mem. Merits, § II.3. *See also*, Cl. Reply Merits, ¶¶ 12-13.

[703] Cl. Mem. Merits, p. vii and Appendix A.

[704] Cl. Skeleton, ¶ 34; Cl. Mem. Merits, ¶¶ 259-261.

[705] Cl. Skeleton, ¶ 35.

*investments forward only after they had clear assurances from Spain they would earn the specific revenues of Regulatory Framework I.*"[706] Without a framework that provided legal certainty, Claimants say, they would have never invested.[707]

414. Respondent breached those expectations, Claimants argue, by "*dismantling Regulatory Framework I via Regulatory Framework III,*"[708] which is (i) fundamentally different from Regulatory Framework I; and (ii) yields a very different rate of return (from an anticipated 11.6% post-tax to a 1.9% post-tax).[709]

### (i) Claimants' Expectations

415. More specifically, Claimants contend that they legitimately expected that the Termosol Plants:[710]

- Would have the option to receive either (i) the prevailing market price plus a reference premium or (ii) a regulated tariff, as defined by RD 661/2007 and adjusted annually based on the Spanish Consumer Price Index less 0.5%.[711]

- Would receive tariffs and premiums exempted from the four-year review contemplated under RD 661/2007, *i.e.* insulated from changes beyond annual adjustment for inflation; or put another way, that any future cuts would not apply to existing plants accepted into the Pre-Assignment Registry in accordance with RDL 6/2009 and RD 1614/2010.[712]

- Were accepted by Spain as having a 9-hour storage capacity and a maximum annual qualifying production of 4,000 hours.[713]

- Would have the possibility to derive a percentage of their annual qualifying electricity output from natural gas: 12% (feed-in-tariff option) or 15% (pool + premium option).[714]

---

[706] Cl. Skeleton, ¶ 39.

[707] Cl. Mem. Merits, ¶¶ 25, 124.

[708] Cl. Skeleton, ¶ 34. *See also, id.*, ¶ 40.

[709] Cl. Skeleton, ¶ 40.

[710] Cl. Mem. Merits, ¶ 259.

[711] Cl. Mem. Merits, ¶ 259 (citing **C-017**, RD 661/2007, Art. 44 and Additional Provision One). Claimants note, however, that the first year of operations was limited to the regulated tariff. Cl. Mem. Merits, n. 316.

[712] Cl. Mem. Merits, ¶ 259 (citing **C-016**, RD 1614/2010, Art. 4).

[713] Cl. Mem. Merits, ¶ 259 (citing **C-016**, RD 1614/2010, Art. 2). Claimants assert that the they built the Termosol Plants with a 9-hour storage facility with support fuel only because under the law applicable at the time the plants were designed, the plants were allowed to generate up to 4,000 hours of annual electronical output, and were allowed to derive a % of their qualifying production from a support fuel. Cl. Mem. Merits, ¶ 21.

- Would have priority of grid access and dispatch.[715]

- Would receive a guaranteed minimum reasonable rate of return on their investments even if Spain reneged on its commitments to specific tariffs and premiums,[716] ranging between 10% and 11.5% post-tax, plus approximately 300 bps for the regulated feed-in-tariff with a further margin of approximately 160 bps for the premium option.

- Once eligible, would receive the applicable tariff or premium for an initial period of 25 years, followed by a further period without any time limit for the remainder of their useful life.[717]

### (ii) Source of the Expectations

416. Those expectations were formed, Claimants say, from: (i) the terms of Regulatory Framework I; (ii) the registration of the Termosol Plants in the Pre-Assignment Registry of 11 December 2009 (iii) two Ministerial Resolutions of 28 December 2010; (iv) *"uniquely explicit and specific assurances of stability concerning the Termosol Plants"* by the highest levels of the Spanish Government to NextEra officials; and (v) the final registration in the RAIPRE of 29 May and 7 June 2013.[718] In addition, the capital-intensive nature of a CSP-investment in which the Government alone can drive success or failure also served as basis of Claimants' expectations.[719]

417. Claimants argue that Spain's laws up to 2012 provided *"clear commitments to maintain its production-based remuneration regime for the long term."*[720] These laws, Claimants say, *"did not envisage, or provide any warning of, the fundamental changes that Spain*

---

[714] Cl. Mem. Merits, ¶ 259 (citing **C-017**, RD 661/2007, Arts. 24.1(a), 24.1(b), 2.1(b)).

[715] Cl. Mem. Merits, ¶ 259 (citing **C-017**, RD 661/2007, Art. 17 and Annex XI).

[716] Cl. Mem. Merits, ¶ 259 (citing **C-017**, RD 661/2007, Preamble).

[717] Cl. Mem. Merits, ¶ 259 (citing **C-017**, RD 661/2007, Art. 36).

[718] Cl. Mem. Merits, ¶ 259; Cl. Skeleton, ¶ 35.

[719] Cl. Skeleton, ¶ 35.

[720] Cl. Mem. Merits, ¶ 262 (referring to **C-024**, Electricity Law; **C-028**, RD 2818/1998, Preamble; **C-030**, RD 1432/2002, Preamble; **C-032**, RD 436/2004, Preamble and Art. 1; **C-017**, RD 661/2007, Preamble, and Art. 36; **C-044**, RDL 6/2009, General Provisions, and 5th Transitory Provision; **C-016**, RD 1614/2010, General Provisions, and Art. 4).

*eventually passed in 2012 and 2013,"[721]* and on the contrary show that when Spain preserved the ability to change the scheme, it did so expressly.[722]

418. More specifically, Claimants assert that *"Regulatory Framework I expressly committed to provide long-term certainty around the premiums and tariffs available to CSP plants that had been admitted by Spain within its Pre-Assignment Registry,"* and in particular, argue that:[723]

- Article 36 of RD 661/2007 expressly defined the long-term tariffs and premiums for an initial 25-year period and an indefinite period thereafter.

- Article 4(2) of RDL 6/2009 stated that plants accepted within the Pre-Assignment Registry would receive *"the right to the economic regime established by Royal Decree 661/2007."*

- The Fifth Transitory Provision of RDL 6/2009 stabilized the economic regime applicable to plants that had applied for pre-assignment registration by 6 June 2009.

- Article 4 of RD 1614/2010 *"made clear that the four-yearly reviews contemplated by Article 44(3) of RD 661/2007 would not apply to any of the tariffs, premiums or upper and lower limits granted to CSP plants that were approved within the Pre-Assignment Registry and completed within the timeframes set out in the Agreement of the Council of Ministers."*[724] Claimants reject Respondent's interpretation of Article 4 of RD 1610/2010, and deny that its sole purpose was to extend the second paragraph of Article 44(3) of RD 661/2007 to plants commissioned in 2013.[725] Such interpretation, Claimants say, is contradicted by the plain wording, the Government's own analysis of Article 4 and the drafting history of the provision.[726]

- Article 2(3) of RD 1614/10 barred any further cap on operating hours for those plants.

---

[721] Cl. Mem. Merits, ¶ 263.

[722] Cl. Mem. Merits, ¶ 263. Claimants note, for example, that Article 44.3 of RD 661/2007 *"made it clear that the values of tariffs, premiums, supplements, and upper and lower limits of the regulated tariff and premiums would be updated annually, and that there could be changes to the applicable tariffs and premiums every four years […] for plants which it had not approved for pre-registration under the deadlines in RDL 6/2009 […]." Id.*

[723] Cl. Reply Merits, ¶¶ 49, 446.

[724] Cl. Reply Merits, ¶¶ 49, 58, 66-67.

[725] Cl. Reply Merits, ¶¶ 53, 56.

[726] Cl. Reply Merits, ¶¶ 54-66, 472.

419. Claimants argue that, contrary to Respondent's allegations, the assurances in Regulatory Framework I are sufficient to ground Claimants' expectations.[727] According to Claimants, "[i]t *is now well-established that the legal framework surrounding an investment may contribute to the creation of legitimate expectations for investors.*"[728]

420. In any event, Claimants argue, their expectations were "*reinforced*" by specific assurances given by the Spanish Government that induced them to invest, and in particular, to proceed with construction of the Termosol Plants in December 2010.[729] According to Claimants, those assurances were provided in:

- Meetings held in the summer of 2009 with Spanish officials.[730]

- A 3 September 2009 letter from the Secretary of State for Energy.[731]

- Meetings held in November 2009 with the Minister for Industry, Tourism and Trade memorialized in a letter subsequently written by NextEra officials.[732]

- A 13 November 2009 Agreement of the Spain Council of Ministers.[733]

- The 11 December 2009 admission of the Termosol Plants in the Pre-Assignment Registry,[734] which "*gave plants the right to the RD 661/2007 economic regime if they had submitted their application for Pre-Assignment registration before a certain date* [6 June 2009] *and went on to complete construction and obtain final RAIPRE registration within 36 months.*"[735] According to Claimants, this is similar to a license and amounts to a stabilization guarantee.[736]

---

[727] Cl. Reply Merits, ¶ 444. Claimants have argued elsewhere that Respondent has ultimately conceded that investors can derive legitimate expectations from the framework surrounding their investment. Cl. Skeleton, ¶ 36.

[728] Cl. Reply Merits, ¶ 449. Claimants distinguish the present case from *Charanne* arguing, inter alia, that that PV case lacked the critical stabilization commitments given to the CSP sector in RDL 6/2009 and RD 1614/2010, and go on to contend that this decision cannot stand as authority for the proposition that regulatory frameworks can never ground legitimate expectations. Cl. Reply Merits, ¶¶ 452-453.

[729] Cl. Mem. Merits, ¶ 264. *See also*, Cl. Reply Merits, ¶¶ 125-129, 448, 473-474.

[730] CWS-Davidson First, ¶ 15.

[731] **C-006**, Letter from Pedro Marín (Secretary of State for Energy) to Mitch Davidson (NextEra Energy Resources, LLC), 3 September 2009.

[732] **C-014**, Letter from Mitch Davidson (NextEra Energy Resources, LLC) to Miguel Sebastián (Minister for Industry, Tourism and Trade), 9 December 2009.

[733] **C-007**, Agreement of the Council of Ministers, 13 November 2009. *See also*, Cl. Reply Merits, ¶ 473 (3d bullet).

[734] **C-049**, Pre-Assignment Registration Notice Termosol 1, 11 December 2009; **C-050**, Pre-Assignment Registration Notice Termosol 2, 11 December 2009.

[735] Cl. Reply Merits, ¶¶ 70-77, 484.

[736] Cl. Reply Merits, ¶ 484.

- An 11 January 2010 letter from the Secretary of State for Energy.[737]

- A 4 February 2010 meeting with President Zapatero.[738]

- Meetings held in 2010 with Spanish officials, including the Minister for Industry, Tourism and Trade and the Secretary of State for Energy.[739]

- A 2 July 2010 "*Agreement with the Solar Thermal Industry*" sent by the Ministry of Industry, Tourism and Trade, and a 2 July 2010 Ministerial press release regarding this agreement.[740]

- Two 28 December 2010 Ministerial Resolutions issued to PTE and PTE2, respectively.[741]

- A 3 April 2012 letter from the Chief of Staff to the Secretary of State for Energy.[742]

421.  To the above, Claimants add that "[t]he *Termosol Plants' final registration in the RAIPRE constituted an additional assurance that the Termosol Plants would benefit from the remuneration of RD 661/2007 throughout their operational life.*"[743] For Claimants, this registration, which took place on 29 May 2013 (Termosol 1) and 7 June 2013 (Termosol 2), qualified the installations under the Special Regime and made them legally entitled to the incentives set out in RD 661/2007, as confirmed by the registration

---

[737] **C-008**, Letter from Pedro Marín (Secretary of State for Energy) to Mitch Davidson (NextEra Energy Resources, LLC), 11 January 2010.

[738] CWS-Davidson First, ¶ 36; **C-013**, Letter from Mitch Davidson (NextEra Energy Resources, LLC) to Miguel Sebastián (Minister for Industry, Tourism and Trade), 21 April 2010.

[739] CWS-Arechabala First, ¶¶ 47, 53; **C-057**, Email from Mike Arechabala (NextEra Energy España, S.L.) to Antonio De Juan Fernandez (Pöyry Consulting), 12 May 2010.

[740] **C-065**, Agreement with the Solar Thermal Industry (*Acuerdo con el Sector Termosolar*), 2 July 2010; **C-066**, Ministry for Industry, Tourism and Trade, Press Release, *Industry Ministry Reaches an Agreement with the Wind and Solar Thermal Sectors for the Revision of their Payment Framework*, 2 July 2010.

[741] **C-009**, 2010 Resolution Termosol 1, 28 December 2010; and **C-010**, 2010 Resolution Termosol 2, 28 December 2010.

[742] **C-011**, Letter from Ignacio Grangel Vicente (Chief of Staff to the Secretary of State for Energy) to John Ketchum (NextEra Energy Resources, LLC), 3 April 2012.

[743] Cl. Reply Merits, ¶ 82. *See also*, Cl. Mem. Merits, ¶ 259.

resolutions.[744] It is also similar to a license granted by the host-State and amounts to a stabilization guarantee.[745]

422.    Spain's commitments, Claimants argue, were also echoed as the Government's policy during "*roadshows*" by the Ministry of Industry, Tourism and Trade and InvestInSpain.[746] According to Claimants, Spain engaged in a "*worldwide campaign aimed at enticing international investors*" conducted by InvestInSpain, including presentations which describe the tariffs set in RD 661/2007 as "*guaranteed*" for the life of the asset in an initial period of 25 years and an indefinite period thereafter.[747] In addition, between 2007-2010, the CNE, "*consistently represented to investors that Spain was committed to providing regulatory stability, in the form of economic support mechanisms that were [...] subject of a 'warranty by law', and that the revisions to tariffs and premiums foreseen at four-year intervals in Art. 44 of RD 661/2007 would apply only to new plants, not to existing ones.*"[748]

423.    Claimants oppose Respondent's analysis of these assurances arguing: *first*, that Spain isolates them and omits some of them, contrary to "*a well-settled principle [...] that the existence of legitimate expectations must be assessed in the light of the 'totality of the circumstances' of a case;*"[749] *second*, that the clear text of the letters and witness evidence contradict Spain's interpretation,[750] and *third*, that any allegation of ambiguity in the assurances fails as a matter of law because "*it is the host State, not the investor, who bears the consequences of any ambiguity in its representations to foreign investors.*"[751]

---

[744] Cl. Reply Merits, ¶¶ 78-83 (referring to **C-004**, 2013 RAIPRE Resolution Termosol 1, 29 May 2013; **C-005**, 2013 RAIPRE Resolution Termosol 2, 7 June 2013). Claimants contend that these resolutions distinguish the present case from *Charanne*. Cl. Reply Merits, n. 101.

[745] Cl. Reply Merits, ¶ 484.

[746] Cl. Mem. Merits, ¶¶ 32, 265.

[747] Cl. Reply Merits, ¶¶ 31-33 (discussing **C-023**, *InvestInSpain: Opportunities in Renewable Energy In Spain*, Manuela García (November 2008); **C-172**, InvestInSpain, Presentations (January, November 2008; March 2009, April 2009). *See also*, Cl. Reply Merits, ¶ 473 (7th bullet).

[748] Cl. Reply Merits, ¶¶ 35, 46. *See also, id.*, ¶¶ 36-45, 473 (8th bullet).

[749] Cl. Reply Merits, ¶ 476.

[750] Cl. Reply Merits, ¶ 478 (referring to CWS-Davidson Second, ¶¶ 6-18).

[751] Cl. Reply Merits, ¶ 479.

424.    Claimants have argued that the timeline of their investments is marked by three phases: (i) a first exploratory phase, *"predicated on the tariffs, and premiums set in RD 661/2007 being available,"* but with Claimants not going beyond the initial project outlay due to flaws in RD 661/2007; (ii) a second phase in which Claimants increased their investment *"[p]ursuant to further assurances including RDL 6/2009,"* which came to a halt in April 2010 amid rumours of a cut in tariffs and premiums; and (iii) a third and final phase, commencement of construction in December 2010, *"marked by the conclusion of a process which culminated in the passing of RD 1614/2010."*[752]

425.    Claimants contend that when approached in early 2007 by Casas de Hitos to co-develop a solar energy project, the project had an *"initial interest"* because at the time *"Spain was […] actively encouraging foreign investments in renewable generation through long term incentives […]."*[753]    Claimants say that, while they viewed these initial incentives as insufficient, they did engage in discussions with this company and signed an initial set of contracts in December 2007, which did not require the development of the Termosol Plants, but were *"a framework for doing so if the Spanish regulatory conditions improved."*[754]

426.    According to Claimants, prior to their decision to proceed with construction of the Termosol Plants in December 2010, Spanish law had already started offering a framework intended to provide regulatory certainty and to promote and develop renewable energy, *"based around a commitment to provide a clear, transparent regime which ensured a reasonable profit for investors, through payments based on the amount of electricity produced."*[755]    Such framework was formed by the 1997 Electricity Law, RD 2818/1998, the 2000-2010 Renewable Energy Plan, RD 1432/2002, RD 436/2004,

---

[752] Cl. Reply Merits, ¶ 131. *See also*, Cl. Skeleton, ¶ 5 (arguing that Claimants' *"ultimate decision to proceed with building the Termosol Plants was made in December 2010 […]."*)
[753] Cl. Mem. Merits, ¶ 32.
[754] Cl. Mem. Merits, ¶ 33.
[755] Cl. Mem. Merits, ¶ 35.

the 2005-2010 Renewable Energy Plan, RDL 7/2006, and RD 661/2007.[756] Claimants argue that, at the time of their initial development contracts in December 2007, the two key legal instruments were the 1997 Electricity Law and RD 661/2007.[757]

427. Claimants contend that RD 661/2007 was deliberately intended to stimulate investment,[758] *"by prescribing specific long-term premiums and tariffs that it committed to provide to developers within the Special Regime."*[759] Referring to Article 36, Claimants argue that *"Spain committed to deliver these tariffs and premiums throughout a plant's operational life, with no fixed time limit."*[760] In addition, Claimants argue that, while Article 44(3) contemplated a review of the tariffs in 2010, it *"assure[d] investors that future cuts to the remuneration system would affect only new plants, not plants that had been constructed within the first 500 MW of CSP capacity"* if they had *"started operations within two years of the changes [...]."* Claimants add, however, that this *"did not cure the uncertainty over whether or not any given plant would be among the first 500 MW of installed capacity [...]."*[761] Claimants also highlight that RD 667/2007 provided that tariffs and premiums would be updated for inflation annually by reference to the Consumer Price Index, less a reduction of 0.25% until 31 December 2012 and 0.5% after (Article 44 and Add. Provision 1); allowed the use of a support fuel to produce electricity not exceeding 12% of the total annual production (regulated tariff option) and 15% (pool + premium option) (Article 2); and granted priority of access and dispatch (Article 17 and Annex XI).[762]

428. According to Claimants, however, Spain's assurances of a *"reasonable return"* were not sufficient to attract them, and they *"proceeded with their investment"* only because Spain

---

[756] Cl. Mem. Merits, ¶¶ 34, 37-73; Cl. Reply Merits, ¶ 15. According to Claimants, the 2005-2010 Renewable Energy Plan was enacted to attract foreign investment, and it contradicts Respondent's case in this arbitration in many respects. Cl. Reply Merits, ¶¶ 18-21 (discussing **R-052**, Plan for Renewable Energy in Spain 2005-2010).

[757] Cl. Mem. Merits, ¶ 37.

[758] Cl. Mem. Merits, ¶ 60. *See also*, Cl. Reply Merits, ¶¶ 16, 22.

[759] Cl. Mem. Merits, ¶ 61. *See also, id.* ¶ 62.

[760] Cl. Mem. Merits, ¶¶ 64-66.

[761] Cl. Mem. Merits, ¶¶ 70-71. Elsewhere, Claimants state that *"Art. 44(3) stated that a review of the feed-in tariffs would take place in 2010 but went on to state that adjustments to the regulated tariffs and the lower and upper thresholds would not affect pre-registered plants."* Cl. Reply Merits, ¶ 467 (5th bullet).

[762] Cl. Mem. Merits, ¶¶ 67-68.

went further in 2009 and 2010 offering a system which guaranteed an express and pre-defined long-term tariff and premium, *i.e. a "commitment to a specific revenue level."*[763] In other words, Claimants say that *"[b]y itself [...] RD 661/2007 was not enough to entice* [them] *to take their investment beyond the exploratory stage,"* and *"Spain had to provide (and did subsequently provide) an express commitment to adhere to the tariffs and premiums being offered thereunder for plants constructed in reliance on RD 661/2007."*[764] Claimants argue nonetheless that *"RD 661/2007 (as further stabilised through laws enacted in 2009 and 2010) was a key factor in the [...] decision to invest in Spain."*[765]

429.   RDL 6/2009 led Claimants to *"further increase[] their initial investments in Spain,"*[766] they argue, because: (i) the Pre-Assignment Registry established therein provided certainty, given that Article 4(2) established that pre-registered plants would receive *"the right to the economic regime established by Royal Decree 661/2007;"*[767] (ii) it *"expressly stabilised the existing economic regime for qualifying plants whose applications for entry in the Pre-Assignment Registry were filed within a defined deadline* [6 June 2009]," which the Termosol Plants did on 14 May 2009;[768] (iii) it reassured investors that, if the targets for CSP electricity were oversubscribed, Spain would address that matter before investors commenced construction not after;[769] and (iv) through RDL 6/2009, Spain also committed to gradually reduce its tariff deficit levels and eliminate any further increase in the deficit by 2013.[770]

430.   Claimants add, however, that despite the assurances in RDL 6/2009, they required more certainty to proceed with construction, because the decree *"arguably left open a question whether the four-yearly reviews under RD 661/2007 were indirectly imported into RDL*

---

[763] Cl. Mem. Merits, ¶ 36.
[764] Cl. Mem. Merits, ¶ 77. *See also*, Cl. Reply Merits, ¶ 131.
[765] Cl. Mem. Merits, ¶ 73.
[766] Cl. Mem. Merits, ¶ 95. *See also*, Cl. Reply Merits, ¶ 131.
[767] Cl. Mem. Merits, ¶ 89.
[768] Cl. Mem. Merits, ¶¶ 90-91, 98 (referring to **C-044**, RDL 6/2009, Transitory Provisions 4th and 5th).
[769] Cl. Mem. Merits, ¶ 93 (referring to **C-044**, RLD 6/2009, Transitory Provision 5th).
[770] Cl. Mem. Merits, ¶ 94 (referring to **C-044**, RLD 6/2009, Art. 1).

*6/2009*."[771]   Thus, according to Claimants: (i) from *"July to November 2009, Spanish officials* [gave] *NextEra specific assurances that Spain* [would] *not change the regulatory regime applicable to the Termosol Plants*;"[772] (ii) the Spain Council of Ministers provided further reassurances and support for the expansion of renewable energy in the agreement dated 13 November 2009,[773] which *"reaffirmed Spain's commitment to providing the economic benefits promised under RD 661/2007 and RDL 6/2009, even though uptake on the Special Regime under RDL 6/2009 greatly exceeded Spain's initial target of 500 MW of installed power for CSP facilities;"*[774] and (iii) between December 2009-February 2010 Spain accepted the Termosol Plants into the Pre-Assignment Registry and provided further assurances of regulatory stability.[775]

431.   Claimants say that they put their investments on hold in April 2010 amid rumours that Spain may cut the applicable tariffs and premiums,[776] and that the PTEs only commenced construction in December 2010 after Spain provided further assurances of regulatory stability.[777] In this regard, Claimants refer to:

- An *"Agreement with the Solar Thermal Industry"* sent by the Ministry of Industry, Tourism and Trade to the Spanish Association of the Thermoelectric Solar Industry (**"Protermosolar"**) on 2 July 2010, which is said to be the result of a compromise reached with the industry.[778] This agreement, Claimants argue,

---

[771] Cl. Mem. Merits, ¶ 99.

[772] Cl. Mem. Merits, § II(3)(G)(a), ¶¶ 99-106 (referring to **C-048**, Letter from Mitch Davidson (NextEra Energy Resources, LLC), to Pedro Marín (Secretary of State for Energy), 8 July 2009; **C-006**, Letter from Pedro Marín (Secretary of State for Energy) to Mitch Davidson (NextEra Energy Resources, LLC), 3 September 2009; an October 2009 conference described at CWS-Davidson First, ¶¶ 22-23; **C-014**, Letter from Mitch Davidson (NextEra Energy Resources, LLC) to Miguel Sebastián (Minister for Industry, Tourism and Trade), 9 December 2009).

[773] Cl. Mem. Merits, § II(3)(G)(b), ¶¶ 107-115 (referring to **C-007**, Agreement of the Council of Ministers, 13 November 2009).

[774] Cl. Mem. Merits, ¶ 109.

[775] Cl. Mem. Merits, § II(3)(G)(c), ¶¶ 116-125 (referring to **C-049**, Pre-Assignment Registration Notice Termosol 1, 11 December 2009; **C-050**, Pre-Assignment Registration Notice Termosol 2, 11 December 2009; **C-008**, Letter from Pedro Marín (Secretary of State for Energy) to Mitch Davidson (NextEra Energy Resources, LLC), 11 January 2010; a meeting with President Zapatero, described at CWS-Davidson First, ¶ 35 and **C-013**, Letter from Mitch Davidson (NextEra Energy Resources, LLC) to Miguel Sebastián (Minister for Industry, Tourism and Trade), 21 April 2010; **C-057**, Email from Mike Arechabala (NextEra Energy España, S.L.) to Antonio De Juan Fernandez (Pöyry Consulting), 12 May 2010).

[776] Cl. Mem. Merits, § II(3)(H), ¶¶ 126-132. *See also,* Cl. Reply Merits, ¶ 131.

[777] Cl. Mem. Merits, ¶ 132. *See also, id.,* ¶¶ 7, 154, 163; Cl. Reply Merits, ¶ 131.

[778] Cl. Mem. Merits, ¶¶ 142-144 (referring to **C-065**, Agreement with the Solar Thermal Industry, July 2010); Cl. Reply Merits, ¶ 84.

"*reaffirmed Spain's commitment that pre-assigned plants could proceed with construction knowing that they would receive the remuneration promised under RD 661/2007*" and allowed a 4,000 hour operating hour limit for plants of 9 hours of storage capacity.[779] According to Claimants, this was an agreement that went beyond normal consultations by the Spanish legislature;[780] but even if it was not an agreement, it was in any event implemented in Spain's law.[781]

- RD 1614/2010 of 7 December 2010. According to Claimants, this decree was a compromise that reduced the projected returns of the Claimants' investment but provided even greater assurances of regulatory certainty, negotiated both through the 2 July 2010 Agreement and specific exchanges between Spain and Claimants' representatives.[782] In Claimants' view, RD 1614/2010 "*stabilize*[d] *the key elements of the remuneration regime applicable to the Termosol Plants,*"[783] and in particular, provided two safeguards upon which Claimants relied to commence construction: (i) a promise that the feed-in-tariffs and premiums would not change other than for inflation,[784] set forth in Article 4 which "*established that any future revision of tariffs, premiums, and the lower and upper limits set out in Article 44.3 of RD 661/2007 would not apply to plants registered with the Pre-Assignment Registry in accordance with the 4th Transitory Provision of RDL 6/2009 (i.e., those that had submitted their applications for pre-assignment registration before 6 June 2009 and went on to complete construction and obtain final RAIPRE registration within the relevant time limits);*"[785] and (ii) a promise set forth in Article 2(3) that Spain would not further reduce the annual operating hours eligible for remuneration under the Special Regime (capped through RD 1614/2010) throughout the operational life of the plants which met the same conditions identified above.[786] The Termosol Plants, Claimants argue, were given definitive RAIPRE registration within the relevant deadlines.[787]

- The Ministry of Industry, Tourism and Trade Resolutions of 28 December 2010. According to Claimants, these "*expressly confirmed that the Termosol Plants would be subject to the remuneration system then in force,*" and "*amounted to specific undertakings by Spain, addressed to the PTEs, confirming that Spain would remunerate the Termosol Plants in accordance with RD 661/2007 and RDL*

---

[779] Cl. Mem. Merits, ¶ 146 (referring to **C-066**, Ministry for Industry, Tourism and Trade, Press Release, *Industry Ministry Reaches an Agreement with The Wind and Solar Thermal Sectors for the Revision of Their Payment Framework*, 2 July 2010).

[780] Cl. Reply Merits, ¶¶ 84-117, 480.

[781] Cl. Reply Merits, ¶ 480.

[782] Cl. Mem. Merits, ¶ 154. *See also, id.*, ¶¶ 147-150.

[783] Cl. Mem. Merits, § II(3)(I)(a).

[784] Cl. Mem. Merits, ¶ 158.

[785] Cl. Mem. Merits, ¶ 159 (referring to **C-016**, RD 1614/2010, Art. 4).

[786] Cl. Mem. Merits, ¶¶ 158, 159 (referring to C-016, RD 1614, Art. 2.3).

[787] Cl. Mem. Merits, ¶ 172 (referring to **C-004**, 2013 RAIPRE Resolution Termosol 1, 29 May 2013; **C-005**, 2013 RAIPRE Resolution Termosol 2, 7 June 2013).

*6/2009.*"[788] Claimants reject Respondent's contention that these resolutions only informed of the remuneration applicable to the plants "*at the present time*" but did not ensure that it would be constant throughout the Termosol Plants operating life, and argue that Respondent's position is contradicted by the text of the resolutions, and the context in which they were issued.[789] Moreover, Claimants argue that whether or not the Directorate that issued them had power to bind the Government under domestic law is not material because "[i]*nternational law recognises the competence of State officials and agencies to bind their State by unilateral statements without regard to any internal authorisation process under municipal law.*"[790]

432. Claimants go on to argue that Spain's reassurances continued while construction was on-going, referring to the 2011-2020 Renewable Energy Plan, which "*confirmed the existing legislative framework to promote the use of energy from renewable sources, including RD 661/2007, RDL 6/2009 and RD 1614/2010.*"[791]

433. Claimants lastly contend that the history of Claimants' capital contributions to NEE España illustrate the reliance placed on Spain's assurances, as shown by a table of their contributions starting in 2008 until December 2013.[792] According to Claimants, the table shows "*comparatively modest contributions in 2009, followed by increased contributions in March 2010, one further contribution in July 2010 as Spain began to put flesh on the proposals that became RD 1614/2010*" with "*the most significant expenditures coming from April 2011 onwards [...].*"[793]

434. In response to Respondent's allegations, Claimants deny that there are any contradictions in their case resulting from the above timeline. Thus, Claimants explain that:

---

[788] Cl. Mem. Merits, ¶¶ 165-167 (referring to **C-009**, 2010 Resolution Termosol 1, 28 December 2010; and **C-010**, 2010 Resolution Termosol 2, 28 December 2010).

[789] Cl. Reply Merits, ¶¶ 118-124, 481. Claimants argue that Spain had conditioned enactment of RD 1614/2010 on CSP developers providing formal deeds of renunciation waiving the right to commence commercial operations prior to certain dates, which were provided by the PTEs on 2 December 2010. And in those deeds, the PTEs had asked the Ministry for express confirmation of the remuneration that the Termosol Plants would receive for their operating life, a confirmation that, Claimants say, was negotiated as part of the agreed compromise, and that was given in the 28 December 2010 resolutions. Cl. Mem. Merits, ¶¶ 151-153; Cl. Reply Merits, ¶ 123; **C-070**, Deed of Renunciation PTE, 2 December 2010; **C-071**, Deed of Renunciation PTE2, 2 December 2010.

[790] Cl. Reply Merits, ¶ 482.

[791] Cl. Mem. Merits, ¶ 171.

[792] Cl. Mem. Merits, ¶ 175 (Table of Equity Contributions from NextEra Spain to NEE España).

[793] Cl. Mem. Merits, ¶ 175.

- "[T]*heir initial decision to invest was predicated on the remuneration scheme defined by RD 661/2007, but the Claimants only moved beyond the exploratory phase once Spain had addressed the flaws inherent to RD 661/2007 by passing RDL 6/2009.*"[794]

- Their capital contributions to NEE España in March 2010 were approved at a time when there was no inkling of the possibility that Spain would renege on its commitments as the rumors began in April 2010, and the decisions to make those contributions were all taken in December 2009 months before the rumors of regulatory changes began to surface. In addition, the committal of equity did not commit NEE España to spending that money, unless and until there was sufficient certainty from the Government.[795]

435. Finally, referring to Spain's allegation that 2011 is the proper year for measuring the Claimants' expectations, Claimants contend that Spain has therefore admitted that "*2011 is the correct year*" and that the analysis must include the commitments made in RD 1614/2010.[796] That said, during the Hearing, Claimants clarified that their position is that the date of the investment is December 2010 (not April 2011).[797]

      **(iv)** Expectation of the Specific Revenues of RD 661/2007, Not of a Variable "*Reasonable Return*"

436. Claimants deny that Regulatory Framework I *only* guaranteed a "*reasonable return*" for their investments as a dynamic concept subject to change.[798] Claimants' view is that (i) such concept is "*irrelevant*" because Spain did guarantee that the Termosol Plants would receive the regime in Regulatory Framework I; and (ii) as a matter of Spanish law, the concept of "*reasonable return*" was a directive to the regulator, superseded by the specific tariffs and premiums set forth in RD 661/2007.[799]

437. Claimants say that they would have never invested in Spain if Respondent had merely committed to providing an amorphous "*reasonable return*" to the Termosol Plants. But even if "*reasonable return*" had been the only guarantee, at the time of investment Spain had effectively quantified such reasonable return at 7.6%-11% after-tax for CSP

---

[794] Cl. Reply Merits, ¶ 132.
[795] Cl. Reply Merits, ¶ 133.
[796] Cl. Reply Merits, ¶¶ 50, 134.
[797] Tr. Day 2 (ENG), 375:18-376:24 (Ms. Nairn).
[798] Cl. Reply Merits, ¶¶ 178-179; Cl. Skeleton, ¶ 36.
[799] Cl. Reply Merits, ¶¶ 462, 468; Cl. Skeleton, ¶ 36.

investments, and 7% after-tax for renewable energy investments in general (not at the 7% pre-tax that Spain now claims is a "*reasonable return*" under Regulatory Framework III).[800]   In the alternative, Claimants argue, by committing to the regime in RD 661/2007, Spain is deemed to have accepted that the return that Claimants would have earned under that regime (expected to be between 11.5% and 11.9%) was reasonable, lawful and appropriate.[801]   In either case, in Claimants' view Spain is now estopped from asserting a contrary position in this proceeding.[802]   More specifically, Claimants contend that Spain cannot now argue that Claimants' expected project Internal Return Rate ("**IRR**") was unreasonable, or that they were being overcompensated.[803]

438.   Claimants also object to the contention that any commitments to preserve the regime in RD 661/2007 would be invalid under Spanish law for being incompatible with the dynamism inherent in the notion of "*reasonable return*." Claimants argue that they relied on "*unique specific assurances*" by senior Spanish Government officials that the Termosol Plants would receive the specific revenues in RD 661/2007 (not a "*reasonable return*"), which they were entitled to assume were in accordance with Spanish law, and a State cannot rely on domestic law to justify breach of international obligations.[804]

(v)   Legitimacy of the Expectations: Due Diligence and Supreme Court Case Law

439.   Claimants reject Respondent's contention that they misunderstood Spanish law in believing that Spain had committed itself to stabilize the tariff regime, and that Claimants were imprudent investors.[805]

440.   Claimants argue that they conducted extensive technical and legal due diligence before investing in Spain,[806] which "*confirmed that Spain was a safe place to invest and that the*

---

[800] Cl. Reply Merits, ¶¶ 13, 183-184.  *See also, id.*, ¶¶ 185-199, 462.  Other times, Claimants argue that Spain had regarded a return of up to 11.6% after-tax as reasonable, lawful and appropriate for CSP investments.  *Id.*, ¶¶ 192, 196, 198, 200.

[801] Cl. Reply Merits, ¶¶ 200-203.

[802] Cl. Reply Merits, ¶¶ 199, 203, 408-413.

[803] Cl. Reply Merits, ¶ 412.

[804] Cl. Skeleton, ¶¶ 50-51.

[805] Cl. Reply Merits, ¶ 130.

*commitments provided to the Claimants were likely to be honoured.*"[807]  Claimants add that their legal due diligence included meetings with and letters with senior Spanish officials, to confirm their understanding of the regulatory regime in place.[808]

441.  Claimants also argue that Respondent's allegations about insufficient due diligence are both unfair and misguided as a matter of international law.  According to Claimants, "[i]*nsufficient due diligence by investors (which was not the case here) does not relieve the host States of their obligations, including their positive duty 'to ensure investors are not misled and are made to realise where the 'true' directions of government policy for the issue at stake.'*"[809]

442.  Claimants also deny that they knew that Spain would alter the remuneration system applicable to the Termosol Plants.[810]  In particular, Claimants argue that (i) they were not put on notice that "*reasonable return*" was an overriding concept and the only guarantee – a notion that is an objective for the Spanish legislator and not a mandated form of return that overrides other commitments, and which was superseded by the specific tariffs and premiums set forth in RD 661/2007;[811] (ii) the prior regulatory interventions in the PV sector did not foreshadow the changes to the remuneration system applicable to the Termosol Plants – the dynamics of the PV and CSP sectors were very different, and "[w]*hen the PV sector was hit with cuts, the Government specifically promised to the*

---

[806] Cl. Reply Merits, § III(2)(B), ¶¶ 135-144 (referring to **CLEX-009**, Alatec, *Technical Evaluation of the Thermoelectric Plant with Parabolic Trough Collectors "Termosol 1" Sited in Navalvillar de Pela (Cáceres)*, 26 April 2011; **CLEX-062**, RWB, *Independent Engineer's Report. NextEra Energy Resources, LLC. Termosol I Solar Power Project*, 27 April 2011; **CLEX-63**, RWB, *Independent Engineer's Report. NextEra Energy Resources, LLC Termosol II Solar Power Project*, 27 April 2011; **CLEX-106**, Alatec, *Technical Evaluation of the Thermoelectric Plant with Parabolic Trough Collectors "Termosol 2" Sited in Navalvillar de Pela (Cáceres)*, 26 April 2011; **C-202**, Pöyry, *Current and Future Trends in the Spanish Solar Industry, An ILEX Energy Report to FPL*, November 2008 (hereinafter "**2008 Pöyry Report**"); **C-203**, Pöyry, *Spanish Energy Markets: A Presentation to NextEra Energy Resources*, November 2010).

[807] Cl. Reply Merits, ¶ 144.

[808] Cl. Reply Merits, ¶ 142 (referring to **C-048**, Letter from Mitch Davidson (NextEra Energy Resources, LLC), to Pedro Marín (Secretary of State for Energy), 8 July 2009; **C-014**, Letter from Mitch Davidson (NextEra Energy Resources, LLC) to Miguel Sebastián (Minister for Industry, Tourism and Trade), 9 December 2009; **C-090**, Letter from John Ketchum (NextEra Energy Resources, LLC) to José Maria Soria López (Minister for Industry, Tourism and Trade) and Fernando Martí Scharfhausen (Secretary of State for Energy), 15 March 2012).

[809] Cl. Reply Merits, ¶ 486.

[810] Cl. Reply Merits, § III(2)(C), ¶¶ 145-171.

[811] Cl. Reply Merits, ¶¶ 147-148; Cl. Skeleton, ¶ 36.

*CSP sector that it would not be similarly affected;*[812] (iii) their letters provide no evidence of Claimants' knowledge and acceptance of future change;[813] and (iv) they put in place normal risk mitigation measures in their contracts with commercial partners, which do not mean that Claimants believed that the risk would materialize.[814]

443. Claimants go on to argue that *"even if it could be established that the Claimants knew about a possible regulatory risk, they did not accept it."*[815] Moreover, *"[e]ven if the Claimants had assumed the risk of regulatory change (they did not), that risk would have been taken on the assumption that any deprivation would be accomplished in a fair manner and with compensation."*[816]

444. Claimants further oppose Spain's reliance on the jurisprudence of the Spanish Supreme Court to demonstrate that the Court has allowed certain changes to the renewable energy regime (in other situations). In particular, Claimants argue that: (i) the question of breach of the FET is to be resolved under the ECT (not Spanish law); and (ii) even taking Spanish law as a fact, the decisions of the Supreme Court do not diminish Claimants' legitimate expectations.[817]

445. More specifically, Claimants contend that: (i) *"[n]one of the Supreme Court decisions interpreting deviations from the remuneration system in RD 661/2007 had been rendered by the time that the Claimants committed to build the Termosol Plants (December 2010),"* so Claimants could not have been aware of them;[818] (ii) the *"Supreme Court decisions rendered during the construction of the Termosol Plants (in 2011 and 2012) considered only the 2010 cuts to PV remuneration (cuts that the CSP sector had agreed to through the July 2010 Agreement);"*[819] (iii) none of the Supreme Court decisions questioned the validity of the stabilization commitments given to the CSP sector,

---

[812] Cl. Reply Merits, ¶¶ 149-151.
[813] Cl. Reply Merits, ¶¶ 152-157.
[814] Cl. Reply Merits, ¶¶ 158-171, 487.
[815] Cl. Reply Merits, ¶ 487.
[816] Cl. Reply Merits, ¶ 488.
[817] Cl. Reply Merits, ¶¶ 172, 463.
[818] Cl. Reply Merits, ¶ 173.
[819] Cl. Reply Merits, ¶ 174.

including Article 4 of RD 1614/2010 or the specific assurances given to the NextEra officials;[820] (iv) the Supreme Court decisions relied upon by Spain are distinguishable on the facts as those claims failed given that there were no specific assurances.[821] In fact, Claimants argue, Spanish law recognizes and protects legitimate expectations arising out of Government's conduct.[822]

### (vi) The Self-Sufficiency Excuse Fails in Fact and Law

446. Claimants oppose Spain's reliance on the Electricity Law to import the principle of self-sufficiency of the system in the analysis of Claimants' expectations.[823] Claimants (i) deny that the Spanish electricity system was designed to be self-sufficient or closed, and argue that this was not the case at the time they invested since the principle was introduced as a binding parameter in December 2012, and it is not an absolute one;[824] (ii) argue that it is Respondent who "*determines (in large part) the costs and revenues of the system*" so that "*if there is a shortfall, it is because Spain has decided to price electricity at a level that does not reflect its true cost, or because Spain has included in the basket of electricity system costs other measures that [...] could have been financed from the State budget [...],*" and as such, Spain can hardly invoke its self-generated insufficiency to justify a breach of the ECT;[825] (iii) contend that "*Spain had previously assured investors that the costs of the Special Regime had to be assessed in light of its enormous benefits*" of renewable energy, but it now forgets that, and "*weighs the costs of the system without balancing them against these critical wider benefits;*"[826] and (iv) argue that Regulatory Framework III goes too far and imposes excessive cuts, even by the "*self-sufficiency*" standard.[827]

---

[820] Cl. Reply Merits, ¶ 175.
[821] Tr. Day 7 (ENG), 1410:6-17 (Ms. Nairn).
[822] Cl. Reply Merits, ¶ 176.
[823] Cl. Reply Merits, ¶¶ 217, 464.
[824] Cl. Reply Merits, ¶¶ 213, 218-225, 464.
[825] Cl. Reply Merits, ¶¶ 213, 226-230, 464.
[826] Cl. Reply Merits, ¶¶ 213, 231.
[827] Cl. Reply Merits, ¶ 232.

### (vii) The Installed Capacity Excuse Fails in Fact and Law

447. Claimants argue that the final registration into the RAIPRE entitled the Termosol Plants to receive the benefits of the Special Regime contained in RD 661/2007, and oppose Respondent's allegation that the Termosol Plants are not entitled to benefit from that regime because each plant has an installed capacity in excess of 50 MW.[828] Claimants explain that the issue revolves around Article 27 of the Electricity Law, which provides that electricity generation activities can fall under the Special Regime "*whenever they are carried out from facilities having installed capacity of no more than 50 MW,*" and RD 661/2007 which addresses the conditions the plants qualifying for the Special Regime must meet, and deals with power of the facilities in Article 3(1).[829] Claimants contend that:

- The "*Termosol Plants are in full compliance with the Special Regime requirements under Spanish law,*" because (i) the expression "*installed capacity*" in Article 27 of the Electricity Law equates to "*nominal capacity*"; (ii) Article 3(1) of RD 661/2007 provides two reference points to determine nominal power: the nominal capacity *of the plant* itself, *or* the nominal power of the generator as displayed on the specifications nameplate; (iii) the nominal capacity of the Termosol Plants is 49.9 MW; and (iv) in the alternative, even if Article 3(1) of RD 661/2007 referred to the nominal power of the generator/alternator as displayed on the nameplate, the plants comply with that test too.[830]

- Spain's "*novel interpretation of the installed capacity of a power plant*" is "*not supported by Spanish law or industry practice.*"[831] The gross generation at the generator level is not the qualifying factor.[832]

- "*Spain's interpretation of the law is also not consistent with how the Claimants, other renewable producers and Spanish authorities interpreted the 50 MW limit.*" For instance, the Spanish authority that registered the Termosol Plants into the RAIPRE and authorized their inclusion into the Special Regime shared Claimants' understanding of the 50MW limit.[833]

- Spain is estopped from asserting that the Termosol Plants don't qualify for the Special regime because (i) "*the qualification of the Termosol Plants under the*

---

[828] Cl. Reply Merits, ¶ 254.
[829] Cl. Reply Merits, ¶¶ 255-256.
[830] Cl. Reply Merits, ¶¶ 254, 255-261.
[831] Cl. Reply Merits, ¶¶ 254, 262-268.
[832] Cl. Reply Merits, ¶¶ 264, 267.
[833] Cl. Reply Merits, ¶¶ 254, 269-271.

*Special Regime was confirmed by various administrative organs of the Spanish State in full knowledge of the actual capacity of the generators at the Termosol Plants,*" and (ii) inspections carried out in September 2014 by the CNMC for the express purpose of checking compliance with the Special Regime presupposed that a net output of 49.9MW was compliant.[834]

- In any event, Claimants argue, "[g]*iven that the Termosol Plants were duly approved by the Junta de Extremadura, the current proceedings are not the right forum to second guess the approval granted by Spain's own organs.*" According to Claimants, "[t]*he central Government of Spain has no power to revoke authorisations issued by a competent regional authority to a CSP plant or to revoke its inscription in the RAIPRE.*"[835]

448.    Claimants have also submitted that Respondent's installed capacity argument has already been denied by another tribunal ruling on the Spanish measures.[836]

449.    As a result of allegations made at the Hearing, Claimants further opposed the contention that the Termosol Plants should not be compensated for all the electricity they deliver to the grid, but instead, some should be reclassified as internal consumption.[837]   For Claimants, that contention is logically flawed,[838] inconsistent with Spanish law,[839] and procedurally improper giving its timing.[840]   In addition, Claimants also deny that they have always been aware that Termosol Plants were only permitted to export 44.9 MW to the grid under the Special Regime, and have deliberately sought to receive an overpayment.[841]   According to Claimants, this submission ignores that Spanish officials were made aware of the capacity of the Termosol Plants.[842]   Claimants contend that they legitimately expected that the Termosol Plants would be able to deliver 49.9 MW under the Special Regime for their lifetime.[843]

---

[834] Cl. Reply Merits, ¶¶ 254, 272-278. *See also, id.*, ¶¶ 394-398.
[835] Cl. Reply Merits, ¶ 397.
[836] Cl. Obs. Eiser, ¶ 3.12 (referring to *Eiser*).
[837] *See*, Cl. PH Mem., ¶¶ 9-11, 16-17.
[838] Cl. PH Mem., ¶¶ 12-17.
[839] Cl. PH Mem., ¶¶ 18-22.
[840] Cl. PH Mem., ¶¶ 23-27.
[841] Cl. PH Reply, ¶ 2.
[842] Cl. PH Reply, ¶¶ 7-11.
[843] Cl. PH Reply, ¶ 10.

### (viii) Breach of the Expectations

450.   Claimants argue that, contrary to the commitments given to them stressing legal stability, Spain has "*retroactively rewritten the legal framework*" basis of the Claimants' investment, with changes that are so severe that have more than decimated the value of their equity in NEE España, and do not provide the expected return on their investment.[844]

451.   In particular, Claimants point out that: (i) RD 661/2007 and RD 1614/2010 have been abolished; (ii) the regulated feed-in-tariff and the pool + premium option have been abolished; (iii) the market price remuneration is subject to a new 7% levy on revenue; (iv) electricity generated through natural gas only receives the prevailing market price; (v) the revenue-based remuneration system has been replaced with a "*retroactive system of payments based on installed capacity*;" (vi) Regulatory Framework III produces unfair and inequitable results;[845] (vii) the remuneration is no longer payable for the life of the plant, but is limited to a 25 year regulatory useful life; (viii) indexation of the tariffs to the Consumer Price Index has been abolished; and (ix) the return has been reduced to 7.4% pre-tax and is calculated over a cost base that excludes important costs.[846]

452.   In Claimants' view, Regulatory Framework III is a complete departure from Regulatory Framework I, as recognized by the CNE, with changes so far-reaching that they crossed the threshold of unfair treatment for purposes of Article 10(1) of the ECT.[847]

453.   For Claimants, the results of Regulatory Framework III are unfair and inequitable, because the new framework: (i) fixes the Net Value of the Asset ("**NVA**") of the Termosol Plants at levels far below their actual investment costs and applying it retroactively; (ii) excludes from the NVA reasonable costs such as financing costs during construction;[848] (iii) ignores Claimants' actual costs for plants that are the only type in

---

[844] Cl. Mem. Merits, ¶¶ 267-268. *See also, id.,* ¶¶ 8-9.

[845] Cl. Mem. Merits, ¶ 268. *See also, id.*, ¶ 209; Cl. Reply Merits, ¶ 283.

[846] Cl. Reply Merits, ¶ 283.

[847] Cl. Reply Merits, § VI(1), ¶¶ 281-284.

[848] Claimants argue that it is unfair of Spain to exclude from the NVA financing costs, capitalized intercompany costs, and the investment in the Valdecaballeros station; and that by rejecting these categories Spain is effectively denying Claimants the possibility of a return in their investment. Cl. Reply Merits, ¶¶ 333-351.

their regulatory category; (iv) introduces arbitrary limits on operating hours and regulatory useful lives of the plants; (v) subjects the NVA to a rate of return of 5.2% after-tax which is well below a reasonable return, and even below the minimum 7% after-tax rate that Spain had previously admitted as reasonable; (vi) yields revenues insufficient to meet the PTEs' debt obligations triggering events of default and mandatory liquidation; (vii) caused NEE España to write off its equity investment in the PTEs, thereby making Claimants' equity investments "*virtually worthless.*"[849]

454. According to Claimants, as of June 2014 the value of their equity in NEE España had been cut from EUR 397.4 to EUR 15.5 million.[850] Those figures were later updated, and in its latest expert report, Claimants' experts stated that the drop in value of equity in NEE España as of June 2016 had been from EUR 450.6 to EUR 41.7 million.[851] Claimants further contend the revenues of the Termosol Plants have been cut "*in the order of 36%.*"[852]

(ix)  The EC Decision of 10 November 2017 on State Aid

455. Claimants argue that, contrary to Spain's allegations, the EC Decision of 10 November 2017,[853] which approved Regulatory Framework III from a State Aid perspective, does not alter Respondent's violation of Claimants' legitimate expectations in breach of Article 10(1) of the ECT.[854]

456. *First*, Claimants contend that the EC Decision is irrelevant to the assessment of Spain's liability because it contains no substantive analysis of Regulatory Framework I, or the critical factors giving rise to Claimants' expectations.[855]  It decides only that Regulatory

---

[849] Cl. Mem. Merits, ¶ 268 (referring to *id.*, ¶ 209).  *See also*, Cl. Mem. Merits, ¶¶ 209-211, 214-215; Cl. Reply Merits, ¶ 352.

[850] Cl. Mem. Merits, ¶ 216; CER-Compass Lexecon First, ¶ 11, Table I.

[851] CER-Compass-Lexecon Third, ¶ 4, Table I.

[852] Cl. Reply Merits, ¶ 489. *See also, id.*, ¶ 330.

[853] **RL-124**, EC Decision on State Aid, Case SA.40348 (2015/NN) (10 November 2017) ("the **EC Decision**").

[854] Cl. Obs. EC Decision, § 1, ¶¶ 1.1-1.9.

[855] Cl. Obs. EC Decision, ¶ 1.1.

Framework III does not violate the EU State Aid regime, but declines to assess Regulatory Framework I given that such framework has been replaced.[856]

457. In addition, in Claimants' view, the EC generic remarks about legitimate expectations of investors under EU Law are *obiter*, out of context of the facts of this case, and without reference to principles of international law.[857] Claimants deny that EU Law trumps the ECT in the event of inconsistency, and instead argue that the Tribunal is mandated to apply the ECT over EU Law in the event of inconsistency.[858] Claimants deny that under EU Law, Spain's failure to notify the EC of Regulatory Framework I in 2007 forecloses any claim of legitimate expectations.[859] According to Claimants, Spain's alleged failure to notify State Aid cannot affect liability under Article 10(1) of the ECT, because (i) a State cannot invoke its own breach of domestic law as an excuse for violating international law (ILC Articles on State Responsibility, Articles 7 and 32); and (ii) investors protected by a treaty are entitled to assume that an EU Member State is acting lawfully when it enacts legislation intending to attract investment.[860]

458. In any event, Claimants argue, it is also wrong to assume that State Aid principles are engaged with respect to Regulatory Framework I, for reasons of: (i) timing – neither Spain, nor investors considered Regulatory Framework I a source of notifiable State Aid until 2014; and (ii) substance – in Regulatory Framework I the funds were paid by the private consumers, not the State.[861] For Claimants, this is significant because the Parties are in agreement that the legitimate expectations are to be assessed at the time of the investment,[862] and as of December 2010 no reasonable investor could have been aware that Spain might have acted unlawfully.[863] And, since Claimants' case on legitimate expectations under the ECT is not substantively inconsistent with State Aid rules, the

---

[856] Cl. Obs. EC Decision, ¶ 1.2.

[857] Cl. Obs. EC Decision, ¶ 1.2.

[858] Cl. Obs. EC Decision, ¶¶ 1.4-1.5.

[859] Cl. Obs. EC Decision, ¶ 1.4.

[860] Cl. Obs. EC Decision, ¶ 1.7.

[861] Cl. Obs. EC Decision, ¶ 1.8.

[862] Cl. Obs. EC Decision, ¶ 1.9. Claimants contend elsewhere that Spain has admitted that 2011 is the correct year for judging the expectations. Cl. Reply Merits, ¶¶ 50, 134.

[863] Cl. Obs. Decision, ¶ 1.9.

Tribunal need not address the issue of priority between the ECT and EU Law in this respect.[864]

459. *Second*, Claimants contend that, even if Claimants' expectations were to be determined under EU Law rather than the ECT (which they don't accept), the EC Decision shows no inconsistency between EU Law and Claimants' case under the ECT.[865]

460. Claimants argue that no diligent businessman would have foreseen that Regulatory Framework I was notifiable State Aid, given that between 2007-2014 the EC never directed Spain to notify Regulatory Framework I as State Aid, and the notification was only made in December 2014.[866] Claimants acted diligently in 2010 believing that Spain had acted lawfully in enacting Regulatory Framework I, and their legitimate expectations at the time of their investment are not affected by the CJEU *Elcogas* ruling of October 2014 which obliged the notification of the support measures for renewable energy, or by Spain's failure to notify.[867]

461. Furthermore, the EC Decision does not conclude that Regulatory Framework I was incompatible with the levels of aid permitted under State Aid law guidelines at the relevant time, and indeed EU Law permits and indeed encourages State aid to facilitate renewable energy.[868] Even if there was a formal defect due to Spain's failure to notify Regulatory Framework I, Claimants argue, "*substantively there is nothing unlawful in the type of remuneration which the Claimants seek in this proceeding*" vis-à-vis State Aid rules.[869] Far from ordering Spain to terminate Regulatory Framework I, the EC criticized Spain for dismantling it, and Spain never asserted at the time that the 2013-2014 changes were necessary to comply with State Aid rules.[870]

---

[864] Cl. Obs. Decision, ¶ 1.9.
[865] Cl. Obs. EC Decision, § 2, ¶¶ 2.1-2.5.
[866] Cl. Obs. EC Decision, ¶ 2.1.
[867] Cl. Obs. EC Decision, ¶ 2.2. *See also, id.*, ¶ 1.8.
[868] Cl. Obs. EC Decision, ¶ 2.3.
[869] Cl. Obs. EC Decision, ¶ 2.4.
[870] Cl. Obs. EC Decision, ¶ 2.4.

462. Claimants add that Spain is estopped from asserting State Aid as a defence, because at the time of the investment the EC had been fully aware of Regulatory Framework I for three years and had taken no step to investigate it or to assert any violation of State Aid law.[871]

463. *Third*, Claimants argue that "[e]*ven if Spain had proven: (i) that RF I was substantively in breach of EU State aid rules, and (ii) that Spain repealed RD 661/2007 for State aid reasons (neither of which it has established), the Spanish Government was still under an ECT obligation to respect the Claimants' legitimate expectations through alternative measures, insofar as State aid rules allowed.*"[872]

464. *Finally,* in Claimants' view, matters of enforcement of an Award in this case are not a relevant consideration for the Tribunal, and the EC is wrong to suggest that enforcement of an Award in favour of Claimants would violate EU Law.[873]

### b. Respondent's Position

465. Respondent denies that it has breached any legitimate expectations.[874]

#### (i) The Regulatory Framework and Circumstances at the Time of Investment

466. Respondent contends that a finding of breach of the FET standard necessitates a determination of the expectations that Claimants had or should have had at the time of investment, and whether those were reasonable and legitimate in light of the regulatory framework at that time.[875] At the time of investment, Respondent argues, an investor must be aware of the host-State's regulatory framework (both rules and case law), its application, and its effect on the investment.[876] It should also be aware of the risks of

---

[871] Cl. Obs. EC Decision, ¶ 2.5.

[872] Cl. Obs. EC Decision, ¶ 3.1. In the Reply on the Merits, Claimants opposed Spain's attempt to argue that compliance with State Aid concerns motivated Regulatory Framework III. Claimants argued that even if Regulatory Framework III complies with State Aid guidelines, that does not mean Regulatory Framework I did not, and submitted that when introducing Regulatory Framework III, Respondent did not seek to claim that it was motivated by a need to reduce compensation for State Aid reasons. Cl. Reply Merits, ¶ 377.

[873] Cl. Obs. EC Decision, § 4, ¶¶ 4-1-4.2.

[874] Resp. C-Mem. Merits, ¶ 731; Resp. Rej. Merits, ¶ 34.

[875] Resp. C-Mem. Merits, ¶ 647; Resp. Rej. Merits, ¶ 1051.

[876] Resp. C-Mem. Merits, ¶¶ 648, 654. *See also,* Resp. Rej. Merits, ¶¶ 1051-1052, 1055.

making an investment and assume them.[877]   Moreover, legitimate expectations must be "*objective*" and "*derived from the specific circumstances at the time of investing in the host state.*"[878]

467.   For Respondent, the ECT is not an insurance policy against regulatory changes: (i) it is necessary to establish "*specific commitments*" made to an investor that a regulation will remain unchanged; (ii) expectations must be reasonable and justified in connection with changes in the host-State laws; (iii) an investor is required to conduct a preliminary and comprehensive analysis of the legal framework applicable to its investment, taking into account the due diligence it has conducted, anticipating that circumstances can change, and structuring its investment to be able to adapt to potential changes in the legal framework.[879]

468.   Respondent further submits that Claimants' expectations should be assessed as of 28 April 2011, namely, the date on which the financing contracts for the projects were signed.[880]

469.   *Regulatory Framework.*   Respondent argues that Claimants' depiction of the regulatory framework in Spain at the time of investment is partial, biased and decontextualized.[881]

470.   According to Spain, the framework was established on the basis of certain essential principles that would form the "*objective legitimate expectations of any investor,*" namely: (i) the principle of hierarchy of rules; (ii) the notion that the 1997 Electricity Law was the basis of the system, with regulations being subject to that law and to the case law of the Supreme Court; (iii) the fundamental principle that the subsidies of the Special Regime are a cost to the electricity system, subordinated to the principle of economic sustainability of that system; (iv) the principle that the remuneration system for the Special Regime seeks to provide renewable energy producers a "*reasonable return*"

---

[877] Resp. C-Mem. Merits, ¶ 648.

[878] Resp. C-Mem. Merits, ¶ 657.

[879] Resp. C-Mem. Merits, ¶ 649. *See also, id.,* ¶¶ 723-729 (discussing case law); Resp. Rej. Merits, ¶ 1063.

[880] Resp. Rej. Merits, ¶¶ 60, 1044 (referring to Cl. Reply Merits, ¶¶ 50, 134). *See also,* Resp. Skeleton, ¶ 23; Tr. Day 2 (ENG), 299:2-13 (Ms. Moraleda).

[881] Resp. C-Mem. Merits, ¶ 641(a).

according to the capital market and considering the investment costs for the type of facility; (v) the principle of *"reasonable return,"* and the resulting dynamic character of the remuneration system under the Special Regime; (vi) the notion that premiums were calculated based on changes in demand and other economic data; (vii) the notion that regulatory changes in the Special Regime system – including some prior to Claimants' investment – were motivated by the need to correct overcompensation, or to correct strong alteration of the economic data that served as basis for the initial configuration of the system.[882]

471.　In light of these principles, Respondent says, Claimants could not have legitimately expected that the State would refrain from adopting measures to resolve an economic imbalance impacting the sustainability of the system, or to resolve situations of over-remuneration.[883]

472.　Respondent emphasizes that the renewable energy system in Spain has always been built around the principle of *"reasonable return,"* set forth in Article 30(4) of the 1997 Electricity Law, and which remains in Article 14(7) of Law 24/2013.[884]　And this principle, Respondent contends, is characterized by (i) balancing the costs of the premiums with the return to the investor; (ii) being dynamic, meaning that it can be adapted to the circumstances; (iii) providing a guarantee to the investor; (iv) being referenced, meaning that it may not be arbitrarily set by the Government but rather, it must be referenced to the *"cost of money in capital markets;"* and (v) imposing on the regulator an obligation of concrete result, while not requiring a particular set mechanism.[885]　According to Respondent, the various regulations that have developed the 1997 Electricity Law (referring to, RD 2818/1998, RD 436/2004, RD 661/2007, and RD 1614/2010) *"have had the objective of setting at each historical moment the 'reasonable*

---

[882] Resp. C-Mem. Merits, ¶ 655 (referring to *id.*, § III(A)-(D)). *See also, id.*, ¶ 7; Resp. Rej. Merits, ¶¶ 1086-1087.
[883] Resp. Rej. Merits, ¶¶ 1087-1088.
[884] Resp. C-Mem. Merits, ¶ 11. *See also, id.* ¶¶ 50, 106-112, 150, 159.
[885] Resp. C-Mem. Merits, ¶¶ 160-176.

*return' in function of the forecasted costs and revenues in specific macroeconomic situations.*"[886]

473. Spain further contends that "*the existing regulatory framework, at the time when the Claimant made its investment, allowed regulatory changes to existing facilities, while maintaining the principle of reasonable return.*"[887] The Spanish regulatory framework, Spain says, contained no specific commitment to the immutability of the regime in RD 661/2007, RDL 6/2009 and RD 1614/2010.[888] The only commitment assumed by Spain was to maintain a "*reasonable return.*"[889] And, as reasonable return is an end that can be achieved through various means, no investor could have a legitimate expectation to a specific formula.[890] The Spanish regulation for the Special Regime was never enacted to attract foreign investment.[891]

474. Respondent thus denies that any of the rules relied upon by Claimants "*contain any reference to or guarantee of the freezing of a particular subsidy scheme.*"[892] In particular, Respondent argues the following with respect to the various instruments:

- *1997 Electricity Law.* Respondent denies that the entire electricity system was based on market liberalization (abandoning the principle of compensation for costs).[893]

- *RD 2818/1998 and RD 1432/2002.* Respondent argues that neither of these decrees froze the remuneration conditions, and it contends that both demonstrate that since the 1997 Electricity Law the only guarantee was "*reasonable return,*" not a specific formula for its calculation.[894]

[886] Resp. C-Mem. Merits, ¶ 177. *See also, id.*, ¶¶ 178-184; Resp. Rej. Merits, ¶ 17.
[887] Resp. C-Mem. Merits, ¶ 668.
[888] Resp. Rej. Merits, ¶¶ 1065-1074.
[889] Resp. Rej. Merits, ¶ 42.
[890] Resp. Rej. Merits, ¶¶ 245-249.
[891] Resp. Rej. Merits, ¶ 64.
[892] Resp. C-Mem. Merits, ¶¶ 671-672.
[893] Resp. C-Mem. Merits, ¶ 671.
[894] Resp. C-Mem. Merits, ¶ 671.

- *RD 436/2004.* Respondent points out that this decree contained a provision identical to Article 44 of RD 661/2007, which did not prevent modification of the remuneration regime contained in it.[895]

- *RD 661/2007.* Respondent argues that this decree develops the 1997 Electricity Law and the principle of *"reasonable return"* as the basis of the system, and denies that Article 44(3) operated a stabilization clause to prevent *any* regulatory change or *any* revision of the regulated tariff. According to Respondent, Article 44(3) only deals with the compulsory adjustments due every four years.[896] Moreover, Respondent argues, Claimants' case is contradictory in arguing both that RD 661/2007 was a determining factor in their decision to invest, but also that this decree was not enough to entice them to take the investment beyond the preliminary phase.[897] Respondent further denies that this decree (or the 2005-2010 Renewable Energy Plan) was enacted to attract foreign investment.[898]

- *RDL 6/2009.* According to Respondent, the object of this decree was to address the tariff deficit, and Claimants knew that it was not unalterable and recognized the risk that it be repealed together with RD 661/2007.[899] Respondent denies that the fourth and fifth transitory provisions froze the rates and premiums established in RD 661/2007.[900] It further contends that the inscription in the Pre-Assignment Registry created by this decree was a necessary condition but not the only one to receive the right to the regime in RD 661/2007.[901]

- *RD 1614/2010.* For Respondent, *"far from guaranteeing the unmodifiability of the remuneration system,"* this decree *"was limited to saving the staggering of the rollout implied by RD-L 6/2009 and the Council of Ministers Agreement of 13th November 2009."* Article 4 was intended to prevent that plants affected by the staggering were impacted by the tariff review scheduled for 2010, but provided no stabilization clause against subsequent revisions or amendments. The decree also emphasized the need to ensure a *"reasonable return"* as the cornerstone of the system.[902]

475. Moreover, Respondent says, other regulatory instruments not mentioned by Claimants also serve to support Respondent's case:

---

[895] Resp. C-Mem. Merits, ¶ 671. *See also, id.,* ¶ 14.

[896] Resp. C-Mem. Merits, ¶¶ 671, 248-254; Resp. Rej. Merits, ¶¶ 162-163, 588-597, 1065, 1067.

[897] Resp. C-Mem. Merits, ¶ 671.

[898] Resp. C-Mem. Merits, ¶ 246; Resp. Rej. Merits, ¶ 18.

[899] Resp. C-Mem. Merits, ¶ 671 (citing CWS-Davidson First, ¶¶ 41, 43). *See also, id.,* ¶¶ 276-281.

[900] Resp. C-Mem. Merits, ¶ 267.

[901] Resp. C-Mem. Merits, ¶ 263.

[902] Resp. C-Mem. Merits, ¶ 671. *See also, id.,* ¶¶ 299-301, 317; Resp. Rej. Merits, ¶¶ 156, 627-633, 1070.

- *RDL 14/2010.* According to Respondent, this provision enacted a few days after RD 1614/2010 introduced an access fee to all producers, and decreased the remuneration of the Termosol Plants.[903]

- *Law 2/2011.* This law, passed in March 2011 (which, according to Respondent, pre-dates the investment), announced the necessary reform to the sector, thus giving notice that the new standards would be approved.[904]

476. According to Respondent, Claimants' case ignores that a diligent investor should have been aware that rights and duties are imposed by different regulations, which are structured hierarchically. As a result, regulations cannot contradict the provisions of a higher-ranking norm, such as a Law.[905] As RD 661/2007 and RD 1614/2010 were subordinate to the 1997 Electricity Law, they could not contradict its provisions.[906] And given that the 1997 Electricity Law pivots on the principle of sustainability of the Spanish Electricity System, a diligent investor should have known that RD 661/2007 could not freeze the remuneration regime as this would infringe that principle;[907] nor could a diligent investor expect stability of a regime generating levels of profitability that were not reasonable, as that would be contrary to the principle of *"reasonable return"* enshrined in the 1997 Electricity Law.[908]

477. Respondent rejects Claimants' contention that the principle of reasonable return was superseded by the system in RD 661/2007, and instead argues that such principle *"sets out any rights or expectations of investors in the Spanish regulatory framework."*[909]

478. Respondent also takes the view that the regulatory evolution in fact demonstrates that there was no commitment to stability. Thus, Spain observes that prior to Article 44(3) of RD 661/2007, RD 436/2004 contained a similar provision in Article 40(3), which did not prevent the modification of the regime through RD 661/2007. In addition, after RD 661/2007, other amendments were made through RD 1578/2008, RDL 6/2009, RD

---

[903] Resp. C-Mem. Merits, ¶ 331; Resp. Rej. Merits, ¶ 1071.
[904] Resp. Rej. Merits, ¶¶ 509-510, 1073.
[905] Resp. Rej. Merits, ¶¶ 94-95. *See also,* Resp. C-Mem. Merits, ¶¶ 35-41.
[906] Resp. Rej. Merits, ¶¶ 97, 106.
[907] Resp. Rej. Merits, ¶¶ 100, 106.
[908] Resp. Rej. Merits, ¶¶ 101, 106. *See also, id.,* ¶¶ 598-599.
[909] Resp. Rej. Merits, § III(A)(1.4), ¶¶ 190-193, 197-198, 214.

1614/2010, RD 1565/2010 and RDL 14/2010, affecting the remuneration of the already existing facilities despite the wording of Article 44 (3) of RD 661/2007.[910]

479.     Moreover, Respondent argues, Claimants did not believe that RD 661/2007, RDL 6/2009 or RD 1614/2010 contained a stabilization clause, nor could they have legitimately done so.     Respondent observes that (i) 2007 and 2008 reports by the CNE and the Attorney General's Office reflect Claimants' awareness that regulatory changes could impact existing plants; (ii) no due diligence has been provided confirming the existence of these stabilization clauses; (iii) the enactment of RD 1614/2010 and RDL 14/2010 showed that the Government would not hesitate to introduce modifications to the regime to ensure the sustainability of the system; (iv) after the alleged commitments in RD 1614/2010, Claimants entered into several contracts that included change in law protections; (v) Claimants and Protermosolar pushed for the introduction in RD 1614/2010 of language incorporating an obligation of the Secretary of State to issue individual decisions determining the compensation regime for the life of the facility, which was ultimately not accepted;[911] and (vi) in March 2011, before the financing agreements were entered into, the Government enacted Law 2/2011, which announced necessary and desired reforms to the Spanish Electricity System.[912]

480.     *Domestic Case Law.* Respondent contends that the Supreme Court case law is significant to determine the extension and limits of Claimants' rights and expectations at the time of their investments.[913] Thus, Respondent submits that the principle of *"reasonable return"* has been the subject of numerous cases in Spanish courts, which have *"established that this principle does not imply that the remuneration set a certain point cannot be changed"* and instead hold that *"the characteristic of this principle is its dynamism [...]."*[914] Put differently, according to Respondent, *"[t]he Supreme Court has [...]*

---

[910] Resp. Rej. Merits, ¶¶ 601-604.

[911] Resp. Rej. Merits, ¶¶ 638-650, 656-659, 661.

[912] Resp. Rej. Merits, ¶ 660.

[913] Resp. Rej. Merits, ¶¶ 12, 145.

[914] Resp. C-Mem. Merits, ¶¶ 154-155 (citing **R-054**, Supreme Court, Third Chamber, Judgement, 25 September 2012; **R-055**, Supreme Court, Third Chamber, Judgement, 19 June 2012), ¶ 157 (citing **R-056**, Constitutional Court, Judgement, 17 December 2015).     According to Respondent, the principle was also known and invoked by Protermosolar and the producers in the Spanish thermosolar sector. Resp. C-Mem. Merits, ¶ 158.

*enshrined that the content of this right does not grant producers an unchangeable acquired right of always receiving the same remuneration amount for its generation activity.*"[915]

481. Respondent emphasizes that when ruling on the validity of amendments to the regime in RD 436/2004 in a judgment in 2006, the Supreme Court "*expressly denied the investors the right to the payment of an unchangeable tariff,*" it only acknowledged the right to a reasonable return,[916] and it also confirmed that amendments to the remuneration system did not contradict the principles of legal certainty or legitimate expectations.[917] According to Respondent, the Supreme Court subsequently confirmed that there was no acquired right to a premium in two judgments in 2007;[918] and later, in a series of three judgements in 2009, it also confirmed that there was no right to the economic immutability of the system in RD 436/2004, despite the provisions in Article 40(3) of that decree,[919] and reiterated the same principle in the context of appeals against the remuneration framework in RD 661/2007.[920]

482. It follows, Respondent argues, that "[e]*very diligent investor was aware and should be aware that the remuneration for electricity generation under the* [Special Regime]*, from renewable sources in Spain, is based on an essential principle* [...] *of 'reasonable return'.*"[921] Moreover, "[n]*o diligent investor could ignore either the principle of 'reasonable return' or its interpretation made by the Supreme Court Case Law;*"[922] and in light of the judgments that pre-date the alleged investment, "[a] *diligent investor* [...]

---

[915] Resp. C-Mem. Merits, ¶ 190. *See also, id.,* ¶¶ 191-195 (referring to **R-147**, Supreme Court, Third Chamber, Judgement, 15 December 2005; **R-057**, Supreme Court, Third Chamber, Judgement, 25 October 2006; **R-062**, Supreme Court, Third Chamber, Judgement, 20 March 2007; **R-063**, Supreme Court, Third Chamber, Judgement, October 2007). *See also,* Resp. C-Mem. Merits, ¶ 175 (citing **R-057**).

[916] Resp. C-Mem. Merits, ¶ 192 (referring to **R-057**, Supreme Court, Third Chamber, Judgement, 25 October 2006).

[917] Resp. C-Mem. Merits, ¶ 194.

[918] Resp. C-Mem. Merits, ¶ 195 (referring to **R-062**, Supreme Court, Third Chamber, Judgment, 20 March 2007; **R-063**, Supreme Court, Third Chamber, Judgment, October 2007).

[919] Resp. C-Mem. Merits, ¶¶ 198-199, 201-202 (referring to **R-064**, Supreme Court, Third Chamber, Judgement, 3 December 2009).

[920] Resp. C-Mem. Merits, ¶¶ 203-204 (referring to **R-002**, Supreme Court, Third Chamber, Judgement, 9 December 2009).

[921] Resp. C-Mem. Merits, ¶ 157.

[922] Resp. C-Mem. Merits, ¶ 187.

*could not base a claim relating to the right or legitimate expectations to which the premium regime remains indefinitely unchanged in any economic circumstances.*"[923]

483. Respondent goes on to add that the case law on the limits of the principle of reasonable return was further reiterated by the Supreme Court in a long series of judgements rendered from April to November 2012, in the context of challenges to the amendments to RD 661/2007 via RD 1565/2010 and RDL 14/2010.[924] Spain highlights that, in those judgments, the Court ruled that the principle of reasonable return did not guarantee a right to a regulated tariff for a given period of time, or to receive a certain remuneration throughout the entire operational lifetime of a facility,[925] and also denied the notion that a certain rate of return could remain unaltered.[926] Those rulings, Spain says, have also been reiterated in 2013 and 2016 judgements dealing with challenges related to RD 1565/2010 and RDL 14/2010,[927] and in judgments of the Constitutional Court in 2015 and 2016 in connection with RDL 9/2013, which confirm that the amendments to the system conformed to the principles of legal certainty and legitimate expectations, regulatory hierarchy and non-retroactivity.[928] Respondent explains that the judgements that post-date the investment are still relevant in that they confirm the principles previously established in the earlier cases.[929]

484. Responding to Claimants' contention that the judgements of the Supreme Court are not applicable here because Article 4 of RD 1614/2010 introduced grandfathering commitments that prior regulations did not include, Spain contends that Article 4

---

[923] Resp. C-Mem. Merits, ¶ 196.

[924] Resp. C-Mem. Merits, ¶ 206 (citing **R-074**, Supreme Court, Third Chamber, Judgement, 12 April 2012; **R-162**, Supreme Court, Third Chamber, Judgement, 20 December 2011; **R-163**, Supreme Court, Third Chamber, Judgement, 24 September 2012; **R-164**, Supreme Court, Third Chamber, Judgement, 12 April 2012; **R-066**, Supreme Court, Judgements, 2011-2012; **R-067**, Supreme Court, Judgement, 12 April 2012; **R-069**, Supreme Court, Judgement, 19 June 2012).

[925] Resp. C-Mem. Merits, ¶¶ 209-210.

[926] Resp. C-Mem. Merits, ¶ 211.

[927] Resp. C-Mem. Merits, ¶¶ 212-213 (citing **R-070**, Supreme Court, Judgement, 25 June 2013; **R-071**, Supreme Court, Judgement, 21 January 2016).

[928] Resp. C-Mem. Merits, ¶¶ 215-225 (citing **R-056**, Judgement of the Constitutional Court, 17 December 2015, num. 5347/2013; **R-072**, Judgement of the Constitutional Court, 18 February 2016, num. 5582-2013 and **R-075**, Judgement of the Constitutional Court, 18 February 2016, num. 6031-2013).

[929] Resp. Rej. Merits, ¶ 148.

contains no such commitment.[930] Respondent further contends that several key players, including the Supreme Court itself, the CNE, and Protermosolar recognize the importance of the Supreme Court case law, contradicting Claimants' contentions.[931]

485.  Lastly, Respondent observes that, in *Charanne*, the tribunal concluded that RD 661/2007 did not contain a specific commitment towards claimants' investments; absent a specific commitment, an investor could not have legitimate expectations that RD 661/2007 would remain unchanged throughout the life of the plant; and the decisions of the Supreme Court were relevant facts to reach these conclusions.[932]  In addition, relying on *AES*, Respondent further submits that in the ECT context, a stability clause cannot be deduced from a general regulatory framework.[933]

486.  *Economic Circumstances*.  Respondent further maintains that Spain was facing a difficult economic situation well known to the solar thermal sector, which required safeguarding the sustainability of the Spanish Electricity System.  The remuneration system for the Special Regime was not reflecting the standard of *"reasonable return."*  These elements, Respondent argues, were the driving force behind the measures taken, and were recognized in the rules immediately preceding Claimants' investment, *i.e.* RDL 6/2009 and RDL 14/2010.[934]  Respondent adds that the memoranda for RDL 6/2009 and RDL 14/2010 *"demonstrate that the Claimant was fully aware that (i) the system of incentives for renewable energies under no circumstances could allow for over remuneration against the principle of reasonable return, (ii) the overall costs of the Special Regime had contributed significantly to the deficit, (iii) the difficulties of* [the Spanish Electricity System] *should be resolved internally and (iv) Spain had taken and would continue to take measures to ensure the sustainability of* [the Spanish Electricity System]."[935] According to Respondent, Claimants were also aware that these same motives lay behind

---

[930] Resp. Rej. Merits, ¶ 156.

[931] Resp. Rej. Merits, ¶¶ 152(iv), 165-184.

[932] Resp. C-Mem. Merits, ¶¶ 673-675 (citing **RL-088**, *Charanne*, ¶¶ 491-499; 504-508). *See also*, Resp. C-Mem. Merits, ¶¶ 227-228; Resp. Rej. Merits, ¶¶ 185-186, 1066-1067.

[933] Resp. C-Mem. Merits, ¶ 685 (citing **RL-024**, *AES*, ¶¶ 9.3.29, 9.3.31).

[934] Resp. C-Mem. Merits, ¶¶ 658-662.

[935] Resp. C-Mem. Merits, ¶ 665.

RD 1614/2010.[936] In these circumstances, Respondent says, no diligent investor could expect that while the tariff deficit was unresolved Spain would stop taking measures.[937]

487. It follows, Respondent argues, that Claimants were aware that in 2009 and 2010 (prior to the Claimants' investments) the Government had already corrected imbalances in the system of renewable energy (including thermosolar), and knew that these actions were based on the guiding principle of ensuring the sustainability of the system.[938] Claimants were also aware, Respondent argues, that the imbalance in other technologies (PV) had caused the regulator to take action to restore the *"reasonable return,"* and were aware that adjustments would continue to be adopted as long as the sustainability of the system remained at risk or situations of overcompensation affected the principle of reasonable return.[939]

(ii)   Source of the Expectations

488. In addition to the alleged errors in the description of the Spanish regulatory framework, Respondent also denies that the other sources presented by Claimants could have validly served as basis for the expectations they allege to have had.

489. *Pre-Assignment Registry of RDL 6/2009.*   According to Spain, the purpose of RDL 6/2009 was to confront the tariff deficit, not to freeze the legal system; and entry into the Pre-Assignment Registry *"did not grant by itself a right to the economic regime laid-down by Royal Decree 661/2007."*[940]   Moreover, the regime was subordinate to the dynamism of the concept of *"reasonable return."*[941]

490. *The 28 December 2010 Resolutions.*   Respondent denies that these documents confirm any commitment or constitute any new commitment to maintain the RD 661/2007 regime.   According to Spain, they (i) merely informed what the current regime was at the time the communication was being issued with respect to two issues (payment conditions

---

[936] Resp. C-Mem. Merits, ¶ 666.
[937] Resp. C-Mem. Merits, ¶ 667.
[938] Resp. C-Mem. Merits, ¶ 15.
[939] Resp. C-Mem. Merits, ¶¶ 16-17.
[940] Resp. C-Mem. Merits, ¶ 678. *See also*, Resp. Rej. Merits, ¶ 705.
[941] Resp. C-Mem. Merits, ¶ 678.

and discharge capacity), but contained no promise of stability of RD 661/2007;[942] (ii) were issued by the Director General of Energy Policy and Mines who had no power to bind the State on regulatory matters, and as such could not form the basis of legitimate expectations;[943] and (iii) were merely communications, not an administrative resolution.[944] Moreover, Spain adds, these resolutions in fact demonstrate that Claimants did not believe that RD 1614/2010 contained any commitment to stability, because otherwise, the Termosol Plants would have never sought the additional commitment they hoped to get with these resolutions.[945]

491. *Alleged Assurances by High Government Officials.* Respondent argues that (i) none of the communications relied upon by Claimants in this proceeding were authored by Claimants or addressed to them; (ii) the communications authored by Spain answered to NextEra U.S letters, but were not sent on Spain's initiative; (iii) the communications cannot be interpreted outside of their context, and some are authored by NextEra U.S. officials attributing statements to the Government of Spain that have not been verified; (iv) the letters of 21 and 22 April 2010 to the Minister for Industry and to the Prime Minister were not answered by Spain, and accordingly, Spain has not confirmed the interpretation of the legal regime embodied in those letters; (v) the number of letters sent contradicts the notion that the letters generated any expectations of stability; (vi) Claimants' actions subsequent to these letters also confirm that the communications did not generate such expectations; (vii) the letter sent on 15 March 2012 by a high ranking NextEra Energy Resources official reveals the true expectations generated by these letters, referring to "*regulatory uncertainty.*"[946] According to Respondent, this last letter

---

[942] Resp. C-Mem. Merits, ¶¶ 681-682. *See also, id.,* § III(C)(7), ¶¶ 335-359; Resp. Rej. Merits, ¶¶ 73, 664-694.

[943] Resp. C- Mem. Merits, ¶ 683 (citing **RL-089**, *ECE Projektmanagement International GmbH and Kommanditgesellschaft PANTA Achtundsechzigste Grundstücksgesellschaft mbH & Co v. Czech Republic,* PCA Case No. 2010-5, Award, 19 September 2013, ¶ 4.771).

[944] Resp. Rej. Merits, ¶ 671.

[945] Resp. Rej. Merits, ¶ 73.

[946] Resp. C-Mem. Merits, ¶ 688. *See also,* Resp. Rej. Merits, ¶¶ 70-71.

evidences that Claimants did not believe in the existence of any commitments to stability, and they knew in March 2012 that a new reform was forthcoming.[947]

492. Discussing the communications individually, Respondent denies that each did or could have validly generated any expectation of stability.[948] Among others, Respondent argues that (i) the Engineering, Procurement and Construction Contract, signed in December 2009 after one of the letters was sent, expressly foresees that the rates in Article 36 of RD 661/2007 might be modified;[949] (ii) an amendment to the Development Agreement, signed in December 2010 after another of the letters was sent and even after RD 1614/2010 was enacted included a clause for regulatory risk; and the credit agreement with the bank syndicate signed in April 2011 contemplates "*regulatory changes*" and "*changes in law*;"[950] (iii) one of the communications is of 3 April 2012, after the bank financing contract had been entered into in April 2011, and as such could not have had much impact on the decision to invest.[951] Respondent further contends that: (i) all the letters pre-date the approval of RD 1614/2010, RDL 14/2010 and Law 2/2011, and therefore, Claimants could hardly believe in view of the enactment of those norms that no measures to protect the sustainability of the system would be adopted;[952] and (ii) in May

[947] Resp. Rej. Merits, ¶ 1112 (referring to **C-090**, Letter from John Ketchum (NextEra Energy Resources, LLC) to José Maria Soria López (Minister for Industry, Tourism and Trade) and Fernando Martí Scharfhausen (Secretary of State for Energy), 15 March 2012).

[948] Resp. C-Mem. Merits, ¶¶ 690-709 (referring to **C-006**, Letter from Pedro Marín (Secretary of State for Energy) to Mitch Davidson (NextEra Energy Resources, LLC), 3 September 2009; **C-008**, Letter from Pedro Marín (Secretary of State for Energy) to Mitch Davidson (NextEra Energy Resources, LLC), 11 January 2010; **C-013**, Letter from Mitch Davidson (NextEra Energy Resources, LLC) to Miguel Sebastián (Minister for Industry, Tourism and Trade), 21 April 2010; **C-058**, Letter from Mitch Davidson (NextEra Energy Resources, LLC) to José Luis Rodriguez Zapatero (President of the Government of Spain), 22 April 2010; **C-011**, Letter from Ignacio Grangel Vicente (Chief of Staff to the Secretary of State for Energy) to John Ketchum (NextEra Energy Resources, LLC), 3 April 2012). *See also*, *id.*, ¶ 282-283 (discussing **C-008**); Resp. Rej. Merits, ¶ 1084 (referring to **C-008**, **C-013** and **C-014**, Letter from Mitch Davidson (NextEra Energy Resources, LLC) to Miguel Sebastián (Minister for Industry, Tourism and Trade), 9 December 2009).

[949] Resp. C-Mem. Merits, ¶¶ 690-694 (discussing **C-006**, Letter from Pedro Marín (Secretary of State for Energy) to Mitch Davidson (NextEra Energy Resources, LLC), 3 September 2009; and **C-051**, Engineering, Procurement Support and Construction Support Services Agreement between PTE and Sener Ingeniería y Sistemas, S.A., 16 December 2009; and **C-052**, Engineering, Procurement Support and Construction Support Services Agreement between PTE2 and Sener Ingeniería y Sistemas, S.A., 16 December 2009). *See also*, Resp. C-Mem. Merits, ¶ 285.

[950] Resp. C-Mem. Merits, ¶¶ 700-706 (discussing **C-013**, Letter from Mitch Davidson (NextEra Energy Resources, LLC) to Miguel Sebastián (Minister for Industry, Tourism and Trade), 21 April 2010; **CLEX-034**, CdH Amendment to Project Development Agreement, 10 December 2010). *See also*, Resp. C-Mem. Merits, ¶¶ 321-327; 360-366.

[951] Resp. C-Mem. Merits, ¶¶ 708-709 (discussing **C-011**, Letter from Ignacio Grangel Vicente (Chief of Staff to the Secretary of State for Energy) to John Ketchum (NextEra Energy Resources, LLC), 3 April 2012).

[952] Resp. Rej. Merits, ¶ 72. *See also*, *id.*, ¶ 641.

2010, before this dispute arose and before RD 1614/2010 was enacted, Claimants were indeed aware that a reform of the system was imminent and did not believe that there was a commitment to the petrification of RD 661/2007.[953]

493. *RAIPRE Registration.* Relying on *Charanne*, Respondent argues that no diligent investor could have legitimately expected that registration into the RAIPRE entitled it to the freezing of the RD 661/2007 regime, as the RAIPRE was merely an administrative requirement to sell energy.[954] Respondent also contends that Claimants' argument as to the RAIPRE is based only on Article 4 of RD 1614/2010, overseeing that the regulatory regime included also the 1997 Electricity Law, other regulations and the case law of the Supreme Court, which make it clear that the only guarantee was of a return on the investment, but not of a specific system.[955]

494. *Agreement with the Thermosolar Sector.* Respondent denies that this alleged agreement of 2 July 2010 could have been source of expectations, arguing that Protermosolar's actions thereafter in 2012 did not refer to any such agreement, nor did the PTEs do so during the consultation process for RD 1614/2010.[956] Respondent further denies that the enactment of RD 1614/2010 was the result of a negotiation with the sector, or that there was ever an agreement with the sector, arguing that the alleged negotiation process on which Claimants rely was simply the normal consultation procedure for the enactment of the decree, and that the 2 July 2010 *"agreement"* was simply a part of that process.[957]

495. *Foreign Investment Campaign.* Respondent denies that a worldwide campaign to attract foreign investment was launched by Spain.[958] Spain (i) maintains that Claimants have never demonstrated that the presentations of InvestinSpain or the CNE on which they rely were ever known and relied upon by Claimants to invest; (ii) argues that the presentations pre-date the alleged investment by several years; and (iii) disputes Claimants'

[953] Resp. C-Mem. Merits, ¶¶ 293-294.
[954] Resp. C-Mem. Merits, ¶ 680 (citing **RL-088**, *Charanne*); Resp. Rej. Merits, ¶¶ 696-700; 1080-1082.
[955] Resp. C-Mem. Merits, ¶¶ 710-711.
[956] Resp. C-Mem. Merits, ¶ 714.
[957] Resp. C-Mem. Merits, ¶¶ 309-313. *See also,* Resp. Rej. Merits, ¶¶ 64, 487-489.
[958] Resp. Rej. Merits, ¶¶ 65, 1085.

interpretation of the content of the presentations.[959]  Respondent further submits that InvestinSpain was a private law entity without public prerogatives, and that the CNE presentations were merely educational and not for advertising or investment development.[960]

496.  *Change of Law Provisions.*  According to Respondent, Claimants *"never believed"* in the alleged commitments that they now invoke, as shown by contracts signed after the enactments of RD 661/2007, RDL 6/2009 and RD 1614/2010.[961]  Respondent refers to (i) the Project Development Agreement with Casas de Hitos, which Respondent says contemplates the possibility that RD 661/2007 might be repealed or replaced;[962] (ii) the Engineering, Procurement and Construction Contract, signed in December 2009, foreseeing that the rates in Article 36 of RD 661/2007 might be modified;[963] (iii) an amendment to the Development Agreement, signed in December 2010 including a clause for regulatory risk;[964] and (iv) the credit agreement with the bank syndicate signed in April 2011, which contemplates *"regulatory risk"* and *"changes in law."*[965]

497.  Respondent further submits that other evidence submitted by Claimants serves to refute the allegations of legitimate expectations, including a proposal submitted by Protermosolar to the Ministry in June 2010 concerning measures to address the tariff deficit, containing a proposal for amendment of Article 44(3) of RD 661/2007 and recognizing State liability in the event of change, which was ultimately not accepted –

---

[959] Resp. Rej. Merits, ¶¶ 65, 711-713.

[960] Resp. Rej. Merits, ¶¶ 714-715.

[961] Resp. Rej. Merits, ¶¶ 44, 1095; Resp. Rej. Merits, ¶¶ 74-77; Resp. Skeleton, ¶ 36.

[962] Resp. Rej. Merits, ¶¶ 1096-1098 (discussing **CLEX-019**, CdH Project Development Agreement, 10 December 2007).

[963] Resp. Rej. Merits, ¶¶ 1099-1101 (discussing **C-051**, Engineering, Procurement Support and Construction Support Services Agreement between PTE and Sener Ingeniería y Sistemas, S.A., 16 December 2009; and **C-052**, Engineering, Procurement Support and Construction Support Services Agreement between PTE2 and Sener Ingeniería y Sistemas, S.A., 16 December 2009).

[964] Resp. Rej. Merits, ¶¶ 1102-1104 (discussing **CLEX-034**, CdH Amendment to Project Development Agreement, 10 December 2010).

[965] Resp. Rej. Merits, ¶¶ 1105-1107 (discussing **C-074**, Credit Agreement, 28 April 2011).

thereby showing the sector's awareness that RD 1614/2010 did not stabilize RD 661/2007.[966]

### (iii) The Timeline of the Investment and Expectations

498. Referring to Claimants' depiction of the timeline of their equity contributions to NEE España, Respondent highlights that by March 2010 the Government had already announced its intention to amend the regime for CSP installations in RD 661/2007, and nonetheless Claimants allegedly made significant equity contributions.[967] Spain further denies that the 2011-2020 Renewable Energy Plan provided any certainty about the regime, and it argues that, in fact it acknowledged the possibility of future amendments to tariffs and premiums.[968]

499. Recalling that, in its view, the expectations must be assessed as of 28 April 2011 (date of the bank financing contracts),[969] Respondent observes that by then numerous facts had occurred that undermine Claimants' legitimate expectations case: (i) RDL 14/2010 of 23 December 2010 had already been enacted, introducing toll access fees for all renewable energy producers, thereby reducing the remuneration and undermining Claimants' allegation of immutability of the returns;[970] (ii) Law 2/2011 had just been enacted, announcing an imminent reform to the electricity sector;[971] (iii) it was public knowledge that the first international arbitration arising out of the measures in the PV sector had been brought;[972] (iv) neither the CSP sector or the wind sector had argued the immutability of the regime;[973] (v) the renewable energy target in the 2005-2010 Renewable Energy Plan had already been fulfilled.[974]

---

[966] Resp. C-Mem. Merits, ¶¶ 718-719. *See also, id.*, ¶¶ 318-321.
[967] Resp. C-Mem. Merits, ¶¶ 367-368 (referring to Cl. Mem. Merits, ¶ 175).
[968] Resp. C-Mem. Merits, ¶¶ 369-371.
[969] Resp. Rej. Merits, ¶ 60.
[970] Resp. Rej. Merits, ¶ 61 (a) (referring to **R-049**, RDL 14/2010). *See also, id.*, ¶¶ 503-504.
[971] Resp. Rej. Merits, ¶ 61(b).
[972] Resp. Rej. Merits, ¶ 61(c).
[973] Resp. Rej. Merits, ¶ 61(d).
[974] Resp. Rej. Merits, ¶ 61(e).

500. In addition, Respondent argues, in January 2011, the Minister of Industry, Tourism and Trade advised that the measures taken during 2009 and 2010 were not sufficient, and that further measures had to be taken.[975]

501. Lastly, since 2007 and 2008, Respondent contends, Claimants were aware of the risk that *"the Spanish Regulatory Framework, while respecting acquired rights, could establish reforms going forwards that are applicable to pre-existing situations such as plants in operation,"* and they still decided to make their investment in 2011.[976]

> **(iv) No Legitimate Expectations: Due Diligence and Supreme Court Case Law**

502. Respondent contends that Claimants have failed to show that at the time of investment in April 2011, Claimants had conducted due diligence with respect to the alleged commitments under RD 661/2007, RDL 6/2009 and RD 1614/2010.[977] After criticizing Claimants for relying on legal privilege to avoid producing their due diligence reports, Spain contends that the reports that have been produced were issued much earlier than the Claimants' investment.[978]

503. One of those reports (2008 Pöyry Report), Respondent argues, warned Claimants that the renewable energy support mechanisms were contingent upon the economic sustainability of the system; referred to the changes in the PV sector, and advised Claimants that the risk now lied with the CSP sector.[979] According to Spain, the report further warned Claimants about *"(1) the effects that the increase in the tariff deficit might have, and (2) the Government's commitment to provide a Reasonable rate of return through subsidies"* and it *"does not contain a single mention of the existence of any stabilisation clause in RD 661/2007."*[980]

---

[975] Resp. Rej. Merits, ¶ 508.

[976] Resp. Rej. Merits, ¶¶ 584-585 (referring to **C-021**, CNE Report 3/2007, 14 February 2007; **C-175**, CNE Report 30/2008, 29 July 2008; **C-210**, Opinion of the State Attorney, about the proposal of RD 661/2007, 29 March 2007).

[977] Resp. Rej. Merits, ¶ 1057. *See also,* Resp. Skeleton, ¶ 38.

[978] Resp. Rej. Merits, ¶ 68.

[979] Resp. Rej. Merits, ¶¶ 134-135, 215-217 (referring to **C-202**, 2008 Pöyry Report). *See also,* Resp. Rej. Merits, ¶¶ 280-288.

[980] Resp. Rej. Merits, ¶ 538.

504. Respondent further takes issue with the contention that the case law of the Supreme Court was not relevant in the formation of the expectations, and argues that as a result of Claimants' disregard of this case law their expectations were neither real nor objective.[981] Moreover, Respondent contends that the evidence indeed shows that Claimants were aware of the case law of the Supreme Court, but there is no evidence that they examined it or requested due diligence about it.[982]

(v) No Legitimate Expectations: The Installed Capacity of the Termosol Plants

505. Respondent contends that the Termosol Plants have an installed capacity that exceeds 50 MW, and as result are not entitled to the economic regime set forth in Article 36 of RD 661/2007 (instead, they are only entitled to the regime in Article 45 of that decree). In consequence, Respondent argues, Claimants could not have legitimate expectations that their plants would receive the regime in Article 36 of RD 661/2007 for 30 years.[983]

506. According to Spain, Claimants knew or should have known that the installed power of the installations could not exceed 50MW.[984] Respondent points out that Article 27 of the 1997 Electricity Law required as an *"essential condition"* that in order to qualify for the regime in Article 36 of RD 661/2007 the installations had an *"installed capacity [...] no greater than 50MW."*[985] In addition, the CNE was also clear about the requirement, when answering public questions about the regime in a 2008 report.[986]

507. Emphasizing the term *"installed"* power, Respondent argues that the requirement also excluded installations with an installed power exceeding 50MW, with necessary management to ensure delivery of only 49.99 MW to the grid.[987] Respondent refutes Claimants' contention that the notion of *"installed power"* should be determined by

---

[981] Resp. Rej. Merits, ¶ 1061. *See also, id.,* ¶¶ 145.

[982] Resp. Rej. Merits, ¶ 79 (referring to **R-396**, Email from Joana Sánchez, 21 April 2010). *See also, id.,* ¶¶ 140, 575.

[983] Resp. C-Mem. Merits, ¶¶ 122, 126; Resp. Rej. Merits, ¶¶ 45, 91, 961-982; Resp. Skeleton, ¶ 56; Resp. PH Mem., ¶¶ 8-9.

[984] Resp. C-Mem. Merits, ¶ 121; Resp. Rej. Merits, ¶¶ 961-966.

[985] Resp. C-Mem. Merits, ¶¶ 113-116 (quoting **R-003**, Electricity Law, Art. 27).

[986] Resp. C-Mem. Merits, ¶¶ 118-120 (citing **R-043**, CNE Report, 28 February 2008).

[987] Resp. C-Mem. Merits, ¶ 121; Resp. Rej. Merits, ¶ 964.

reference to Article 3 of RD 661/2007 referring to the specifications in the name plate of the motor or alternator, observing that the CNE contradicts this contention.[988]

508.   According to Respondent, the technical due diligence attached to Claimants' own expert reports shows that Claimants were not in compliance with the requirement, as they have installed power greater than 50MW.[989]   In addition, Respondent argues, the data for electricity production discharged to the network also confirms it;[990] and Claimants themselves have admitted that the plants are over the power limits.[991]   The expert opinion of Mr. Jesús Casanova further supports the argument.[992]   This said, Respondent emphasizes that it has never verified or calculated empirically the installed power of the Termosol Plants, because Claimants have not allowed it.[993]

509.   Spain also opposes the contention that the principle of estoppel prevents Spain from raising this argument.   According to Respondent, Spain has never stated that the Termosol Plants were not overpowered (and in fact, it has never verified the installed capacity empirically).[994]   Moreover, Respondent contends, (i) estoppel is not a principle recognized in Spain, and is also not applicable here as it is already embodied in the FET standard;   (ii) the registration in the RAIPRE was based on compliance with administrative requirements (not technical ones);   (iii) the CNE verified only that the plants had the documents and permits necessary to operate, but did not conduct an empirical power test;   (iv) the *"Electricity System"* is a technical operator and not an administrative control body, and as such, it does not do verifications of the economic

---

[988] Resp. Rej. Merits, ¶¶ 968-971.

[989] Resp. C-Mem. Merits, ¶ 123 (citing **CLEX-062**, RWB, *Independent Engineer's Report. NextEra Energy Resources, LLC. Termosol I Solar Power Project*, 27 April 2011; **CLEX-063**, RWB, *Independent Engineer's Report. NextEra Energy Resources, LLC, Termosol II Solar Power Project*, 27 April 2011); Resp. Rej. Merits, ¶ 967.

[990] Resp. Rej. Merits, ¶ 967.

[991] Resp. Rej. Merits, ¶ 968.

[992] Resp. Rej. Merits, ¶ 977.

[993] Resp. Rej. Merits, ¶ 974.

[994] Resp. Skeleton, ¶ 55; Resp. Rej. Merits, ¶¶ 29, 974.

regime a facility had or should have had;[995] and (v) Claimants have concealed their real installed power on the nameplate, thereby preventing Respondent from verifying it.[996]

### (vi) The EC Decision of 10 November 2017 on State Aid

510. According to Respondent, the EC Decision is binding not only on Spain, but also on this Tribunal, because EU Law is international law applicable pursuant to Article 26(6) of the ECT, and EC decisions are part of EU Law.[997]

511. On this basis, Respondent contends that the FET standard cannot have a broader scope than the EU notions of legal certainty and legitimate expectations in the context of a State Aid regime;[998] and the CJEU's doctrine on legitimate expectations, legal certainty, transparency and retroactivity is to be taken into account when determining the content of the standard in Article 10(1) of the ECT.[999]

512. In Respondent's view, any investor in the renewable energy sector in Spain should have known that the support scheme for renewable energy: (i) constituted State Aid, and as such no investor could expect that it would be preserved; (ii) must be compliant with the rule of proportionality; (iii) was aimed at achieving a reasonable return until the plants reached a level playing field; (iv) was limited in its duration until such level playing field was achieved; and (v) was subject to continue State review.[1000] This follows, Respondent says, from the fact that the renewable energy scheme was passed in accordance with EU Directives 2001/77 and 2009/28, which recognized the need for State Aid in favour of renewable energy.[1001]

513. These EU guidelines, Respondent adds, demonstrate that Spain was required to guarantee the reasonability and proportionality of the rates of return by renewable energy

---

[995] Resp. Rej. Merits, ¶ 973. *See also*, Resp. Rej. Merits, ¶¶ 983, 987, 995-996.
[996] Resp. Rej. Merits, ¶ 997.
[997] Resp. Obs. EC Decision, ¶¶ 4-5, 33.
[998] Resp. Obs. EC Decision, ¶ 5.
[999] Resp. Obs. EC Decision, ¶ 6.
[1000] Resp. Obs. EC Decision, ¶ 12.
[1001] Resp. Obs. EC Decision, ¶ 11-12.

generators, and to adapt the remuneration regime to ensure both objectives.[1002] Accordingly, renewable generators *"could not seek to obtain, sine die, the tariffs and premiums of RD 661/2007."*[1003]

514.    Spain further points out that the EC Decision concludes that the subsidies granted by Spain constitute State Aid within the meaning of Article 107(1) of the TFEU, and that there is no right to State Aid. It follows, Respondent says, that the rights Claimants allege to have are inexistent both under international law or domestic law.[1004] Relying on the EC Decision, Respondent emphasizes that *"a recipient of State aid cannot, in principle, have legitimate expectations in the lawfulness of aid that has not been notified to the Commission"* and, goes on to argue that, a diligent business man should have been able to determine whether the State Aid procedure had been followed.[1005]

515.    Respondent further submits that: (i) the EC Decision ratified the proportionality and rationality of the challenged measures;[1006] (ii) confirmed that the regulatory lifetime set forth in the current regime is correct;[1007] and (iii) welcomed the transparency of the new regime and Spain's commitment to periodic assessments to guarantee proportionality.[1008]

516.    Finally, Respondent observes that the EC Decision dismisses the contention that there has been an infringement of the FET standard under the ECT; and argues that this Tribunal's decision must be *"compatible"* with the EC's Decision, given its role as applicable international law, domestic law, paramount fact and relevant interpretation criterion.[1009]

---

[1002] Resp. Obs. EC Decision, ¶ 14.
[1003] Resp. Obs. EC Decision, ¶ 14.
[1004] Resp. Obs. EC Decision, ¶ 16-19.
[1005] Resp. Obs. EC Decision, ¶¶ 19-20.
[1006] Resp. Obs. EC Decision, ¶ 23.
[1007] Resp. Obs. EC Decision, ¶ 27.
[1008] Resp. Obs. EC Decision, ¶ 29.
[1009] Resp. Obs. EC Decision, ¶ 32.

### (vii) No Legitimate Expectations Were Breached

517. According to Respondent, all the challenged measures were foreseeable and consistent with the principles underlying the Spanish Electricity System.[1010]  Contrary to Claimants' assertions, the new remuneration model does not entail a complete revision from the prior one; and a number of elements were present since the 1997 Electricity Law.[1011]  In particular, Respondent contends that the new framework:

- Maintains the principle of priority of access and dispatch.[1012]

- Remains built upon the principle of *"reasonable return."*[1013]  However, while before the law did not contain a formula for calculating such return, that is now established with a differential of 300 basic points to the Spanish ten-year bond, and assumes a profitability of 7.398 pre-tax.[1014]

- Maintains the same structure as the prior one: a market price and a subsidy.[1015]

- Preserves the same model of efficiency.[1016]

- Establishes the subsidies on the basis of standard facilities, as the prior model.[1017]

- Preserves the dynamic character typical of a system based on the principle of *"reasonable return."*[1018]

- Provides a reasonable return, between 6.3% to 6.9% after-tax.[1019]

### (3) Article 10(1) of the ECT:  Failure to Provide a Stable, Consistent and Transparent Framework

#### a. Claimants' Position

518. Claimants argue that Article 10(1) of the ECT requires Contracting Parties to *"encourage and create stable, equitable, favourable and transparent conditions for Investors,"* and

---

[1010] Resp. Rej. Merits, ¶ 718.
[1011] Resp. Rej. Merits, ¶ 782.
[1012] Resp. Rej. Merits, ¶¶ 783-785.
[1013] Resp. Rej. Merits, ¶¶ 786-798.
[1014] Resp. Rej. Merits, ¶ 796.
[1015] Resp. Rej. Merits, ¶¶ 799-809.
[1016] Resp. Rej. Merits, ¶¶ 812-818.
[1017] Resp. Rej. Merits, ¶¶ 819-837.
[1018] Resp. Rej. Merits, ¶¶ 838-865.
[1019] Resp. Rej. Merits, ¶¶ 894-905.

this is both a stand-alone obligation, and one that informs the interpretation of the FET standard in the ECT.[1020]

519.    In Claimants' view, the rollercoaster of legal changes in Spain from 2012 to 2014 cannot be reconciled with Spain's ECT obligation to provide a stable legal framework, nor were the measures *"sufficiently transparent."*[1021]

(i)    Failure to Provide a Stable and Consistent Framework

520.    Claimants submit that Respondent breached this standard by *"substantially"* modifying the legal framework basis for their investment, making the new regime retroactive.[1022] According to Claimants, the changes are so far-reaching that they do not even preserve their equity outlay.[1023]    Regulatory Framework III is retroactive, Claimants say, because it applies not only to new plants, but also to existing ones, and it *does* affect acquired rights of owners of pre-registered plants.[1024]

521.    *Lack of Stability.*  For Claimants the changes introduced through Regulatory Framework III are the antithesis of stability:[1025]    (i) they completely changed the applicable remuneration system leaving Claimants with a negative return on their investments; (ii) they claim to correct overcompensation but there is no evidence that such overcompensation existed; and (iii) they effectively penalize Claimants for a tariff deficit of Spain's own making.[1026]  Claimants emphasize that while a State has a right to change its laws, *"that right must be exercised consistently with the commitments it has undertaken with respect to particular investments and its ECT obligations."*[1027]

522.    Claimants argue that Respondent's defences to this head of claim lack merit because (i) it is not true that Regulatory Framework I only guaranteed a *"reasonable return,"* in fact it

[1020] Cl. Reply Merits, ¶ 490.
[1021] Cl. Mem. Merits, ¶ 269.  *See also*, Cl. Reply Merits, ¶ 491.
[1022] Cl. Mem. Merits, ¶ 267; Cl. Skeleton, ¶ 42.
[1023] Cl. Mem. Merits, ¶ 268 (further discussed *supra*, ¶¶ 450-454).
[1024] Cl. Skeleton, ¶ 44.
[1025] Cl. Reply Merits, § VII(3)(C)(b), ¶¶ 493-499.
[1026] Cl. Reply Merits, ¶ 493.  Claimants have also argued that Spain is estopped from arguing that Claimants were being overcompensated, or from using the tariff deficit as an excuse.  Cl. Reply Merits, ¶¶ 412, 407.
[1027] Cl. Reply Merits, ¶ 494.

"*guaranteed specific revenues;*" (ii) it is not true that under the new regime Claimants continue to receive a "*reasonable return*" on their investment, in fact their return is negative and their equity has been eviscerated; (iii) a State's sovereign right to enact legislation must be exercised in accordance with any commitments undertaken towards investors, including those in the ECT; (iv) it is factually incorrect that Regulatory Framework III was needed to preserve sustainability of the system and eliminate overcompensation.[1028]

523. *Retroactivity.* Claimants contend that Regulatory Framework III is retroactive in character.[1029] Claimants argue that: (i) Article 1 of RDL 2/2013 reduced the inflation indexing substituting the Consumer Price Index with a new index, applying the change retroactively to 1 January 2013;[1030] (ii) RDL 9/2013 entered into effect on 14 July 2013, but it only put in place a basic framework that left undefined key concepts (standard reference plants, the Investment Payment and the OPEX) which were only defined in June 2014, which meant that the regulated tariff option continued to apply for almost a year but subject to a claw-back that operated retroactively from 9 July 2013;[1031] (iii) Regulatory Framework III applies to plants already designed, optimized and built in reliance on Regulatory Framework I, which makes it especially unfair;[1032] or put another way, (iv) RD 413/2014 and Ministerial Order IET/1045/2014 apply to plants already installed and pre-registered, not only to plants commissioned in the future.[1033] According to Claimants:

> "*This retroactivity is apparent from the text of RD 413/2014 and Ministerial Order IET/1045/2014, which provides that they apply retroactively to 13 July 2013, when RD 9/2013 first abolished the feed-in-tariff and feed-in-premium based renewable remuneration schemes that had been in place since RD 661/2007, although they were passed in June 2014. In practice, for generators that had started producing before 13 July 2013, the retroactivity of Regulatory Framework III goes even further*

---

[1028] Cl. Skeleton, ¶ 43.

[1029] Cl. Reply Merits, § VII(3)(C)(c), ¶¶ 500-504.

[1030] Cl. Mem. Merits, ¶ 187, n. 213; Cl. Reply Merits, ¶ 503 (3ᵈ bullet).

[1031] Cl. Mem. Merits, ¶¶ 193-194; Cl. Reply Merits, ¶ 503 (3ᵈ bullet).

[1032] Cl. Mem. Merits, ¶ 209(iii); Cl. Reply Merits, ¶ 503 (2ᵈ bullet).

[1033] Cl. Reply Merits, ¶ 354; Cl. Reply Merits, ¶ 503 (1ˢᵗ bullet).

181

> *as: Regulatory Framework III is not only retroactive to 13 July 2013, as indicated by the text of the regulation, but goes all the way back to the first moment of commercial operation, regardless of the date on which commercial operations commenced.*"[1034]

524. Finally, Claimants argue that Regulatory Framework III is retroactive in that there are still considerable uncertainties about how it will evolve, including that Spain: (i) retains the right to add additional parameters to the notion of *"standard plant"* every three or six years; (ii) is able to revise and adjust the rate of return every six years; and (iii) retains the right to withdraw remuneration payment to plants before their estimated useful life, if it determines that the standard plant has already earned a reasonable return.[1035]

525. Claimants dispute Respondent's reliance on the case-law of the Spanish Constitutional Court in support of the contention that Regulatory Framework III is not retroactive, arguing that: (i) Spain cannot rely on its own domestic law to justify an international law breach; and (ii) the Constitutional Court only ruled on a Spanish law question which is completely different from the factual question before the Tribunal.[1036] Claimants also oppose Spain's reliance on *Charanne*, arguing that such award relates to a different sector and is factually different.[1037] Lastly, Claimants submit that international institutions have openly criticized Spain for the retroactivity of the measures.[1038]

(ii) Failure to Provide a Transparent Framework

526. Claimants contend that Spain's conduct also fell short of the transparency standard imposed by Article 10(1) of the ECT.[1039] Claimants articulate that standard by reference to the decisions in *Tecmed*, *Electrabel* and *Plama*.[1040]

---

[1034] Cl. Reply Merits, ¶ 355.

[1035] Cl. Reply Merits, ¶ 503 (4th bullet).

[1036] Cl. Reply Merits, ¶¶ 356, 501. In addition, in response to Respondent's allegations, Claimants argue that the change for wind producers from RD 436/2004 to RD 661/2007 does not evidence that Spanish law allows for retroactive changes, because the later decree maintained the core features of the regime for the farms registered in the RAIPRE, improved the remuneration mechanism and only effected a slight retroactive change, and was implemented in a way that confirms that the legislator knows that retroactive changes could not be introduced abruptly . Cl. Reply Merits, ¶ 357.

[1037] Cl. Reply Merits, ¶ 504.

[1038] Cl. Reply Merits, ¶¶ 358-367.

[1039] Cl. Reply Merits, ¶ 513.

527. In Claimants' view, Regulatory Framework III violates the ECT requirement of transparency for a number of reasons, including:[1041]

- That "[t]he NVA, OPEX Payment, Investment Payment, operating hour limits, regulatory useful life and 'reasonable return' were determined in secret."[1042]

- That "neither RD 413/2014 nor [Ministerial] Order [IET/1045/2014] explains how Spain arrived at the new CSP plant categories, nor how Spain determined the permitted investment and OPEX costs of the 'standard' plant against which Spain measures the Termosol Plants [...]" and "Spain produced no reasoning or justification for the 3,060 hour cap on annual operating hours that it imposed."[1043]

- That "Regulatory Framework III does not expressly state what cost items Spain has allowed (or disallowed) in arriving at the permitted NVA (and thus the resulting Investment Payment)."[1044]

528. Claimants also argue, in particular, that Respondent (i) did not hold proper consultations in the lead to RDL 9/2013, and that to the extent it held formal consultations with respect to RD 413/2014 and Ministerial Order IET/1045/2014 it did not meaningfully engage with the industry participants;[1045] (ii) left investors in the dark for almost a year while it determined several concepts (standard plant categories, capital investment values and OPEX payments);[1046] (iii) set several criteria behind closed doors (operating hour limits and criteria for a "well-managed" operator).[1047] The industry and the Spanish regulator itself criticized the lack of transparency in certain parameters of the new regime;[1048] and Respondent refused to disclose documents and technical studies upon which it intended to base the parameters in Regulatory Framework III (including the BCG and Roland Berger Reports).[1049]

---

[1040] Cl. Reply Merits, ¶¶ 506-508 (citing **CL-018**, *Tecmed*; **RL-091**, *Electrabel*; **CL-028**, *Plama Award*).

[1041] Cl. Mem. Merits, ¶¶ 209, 275. *See also*, Cl. Reply Merits, ¶ 286.

[1042] Cl. Mem. Merits, ¶ 209(iv).

[1043] Cl. Mem. Merits, ¶ 209(v).

[1044] Cl. Mem. Merits, ¶ 209(vi).

[1045] Cl. Reply Merits, ¶¶ 291, 295, 510; Cl. Skeleton, ¶ 45.

[1046] Cl. Reply Merits, ¶ 510; Cl. Skeleton, ¶ 45.

[1047] Cl. Reply Merits, ¶ 510; Cl. Skeleton, ¶ 45.

[1048] Cl. Reply Merits, ¶ 510 (referring to criticism by the CNE); Cl. Skeleton, ¶ 45.

[1049] Cl. Reply Merits, ¶¶ 286, 302-316, 512; Cl. Skeleton, ¶ 45.

529. Claimants also (i) deny that Spain gave prior notice of the changes it implemented in 2013 since the general election in November 2011 or with the CNE Report of 7 March 2012; (ii) argue that even the initial measures in 2012 did not reveal the magnitude of the change forthcoming; and (iii) contend that, in any event the purported events of notice occurred well after Claimants had committed to the investment.[1050]

### b. Respondent's Position

#### (i) No Failure to Provide a Stable and Consistent Framework

530. *Stability*. Respondent denies that it has breached any obligation to provide a stable legal framework. According to Spain, the challenged measures have maintained the essential characteristics of the framework under which Claimants made their investment,[1051] and the regulatory framework for renewable energy has remained stable.[1052] Respondent maintains that the changes enacted are not arbitrary, disproportionate or abusive, and were approved to preserve the *"reasonable return"* mandated by the 1997 Electricity Law.[1053]

531. In particular, Respondent contends that the following key elements are maintained: (i) the essential principles of the Spanish Electricity System; (ii) the principle of economic sustainability of the Spanish Electricity System; and (iii) *"the specific model of remuneration to* [Renewable Energies] *(integration in* [the Spanish Electricity System], *perception of market price plus subsidy, subsidy as* [...] *costs* [of the Spanish Electricity System] *and a reasonable return objective)."*[1054] Further, according to Respondent, the basic principles of priority of access and priority of dispatch are also maintained;[1055] the historic methodology to determine reasonable return (involving standard facilities and common standards) has been maintained; and the new framework continues to guarantee

---

[1050] Cl. Reply Merits, ¶¶ 317-323.

[1051] Resp. C-Mem. Merits, ¶ 733. *See also*, Resp. Rej. Merits, ¶ 35.

[1052] Resp. C-Mem. Merits, ¶¶ 746, 765; Resp. Rej. Merits, ¶ 1131.

[1053] Resp. C-Mem. Merits, ¶¶ 733, 746, 765.

[1054] Resp. C-Mem. Merits, ¶¶ 737-738. *See also,* Resp. Rej. Merits, ¶ 22 (a-g).

[1055] Resp. C-Mem. Merits, ¶ 19. *See also,* Resp. Rej. Merits, ¶¶ 22(c), 1129.

184

a reasonable return (the return being better that the discount rate of the sector and of Claimants themselves).[1056]

532. Respondent contends that the ECT does not grant investors a right to freezing the regulatory framework.[1057] Relying on *Plama*, Respondent alleges that a "*regulatory framework in itself does not constitute a specific commitment.*"[1058] And relying on *AES*, Respondent argues that the provision of the ECT referring to stable conditions is not a stability clause, as a legal framework is subject to change by definition.[1059] Thus, Respondent contends that "*although investors can reasonably and legitimately expect a host State to provide them with stable conditions for investment,*" that "*cannot prevent a host State [...] [from] undertaking regulatory, legitimate and reasonable reforms imposed by justified circumstances.*"[1060]

533. Respondent denies Claimants' characterizations of Regulatory Framework III presented in support of their allegations of lack of stability.[1061] In particular, Respondent contends that:

- The investment costs in Regulatory Framework III were based on type of facilities, as "*reasonable return should be based on an analysis of the actual average costs in the sector adapted to cost-effective and well-managed facilities*" given that the "*return must also be reasonable for the consumer*" who has a right to an electricity supply at the "*lowest possible cost.*"[1062]

- No reasonable costs are excluded. Since the 2005-2010 Renewable Energy Plan and RD 661/2007, the concept of "*reasonable return*" has referred to a "*project financed with independent sources,*" and the financial structure of each investor is an individual and free business decision.[1063]

---

[1056] Resp. Rej. Merits, ¶ 22 (h-i).

[1057] Resp. C-Mem. Merits, ¶ 747.

[1058] Resp. C-Mem. Merits, ¶ 740 (citing **RL-092**, *Plama Award*).

[1059] Resp. C-Mem. Merits, ¶ 741 (citing **RL-024**, *AES*, ¶ 9.3.29).

[1060] Resp. C-Mem. Merits, ¶ 744. *See also, id.* ¶ 747; Resp. Rej. Merits, ¶ 1126.

[1061] Resp. C-Mem. Merits, ¶ 750 (discussing Cl. Mem. Merits, ¶ 268).

[1062] Resp. C-Mem. Merits, ¶ 750(i).

[1063] Resp. C-Mem. Merits, ¶ 750(ii).

- Investment costs do not refer to the specific costs of each plant, and the alleged uniqueness of the Termosol Plants relates only to their storage capacity and their larger solar field, which have been taken into account in the new legislation.[1064]

- It is erroneous to assert that Regulatory Framework III establishes arbitrary limits for operational hours and lives of the plants, because the operating hours limits only concern subsidized hours, but Claimants may continue to produce above the limit and sell at market price; and the limit on hours had already been outlined since RD 1614/2010.[1065]

- Claimants are wrong in equating the return of 7.398% to a 5.2% after-tax return, which in truth amounts to 6% after-tax.[1066]

- Because the 2005-2010 Renewable Energy Plan and RD 661/2007 refer to the *"reasonable return"* of a project funded with independent sources, *"the sufficiency or insufficiency of income received by Plants to meet their credit obligations"* is *"a matter removed from the disputed measures."*[1067]

- Claimants have not substantiated the allegation that their large capital investments are virtually worthless; and the PTEs receive between 30-34 million EUR annually in subsidies.[1068]

534. According to Respondent, the ECT standard of stability allows the *"adoption of reasonable and proportionate macroeconomic control measures, provided that they are motivated by a reasonable cause."*[1069] No instability has occurred here, as *"the changes made have been aimed precisely (1) to apply the principle of reasonable return; (2) to correct situations of over-compensation not covered by this principle; (3) to solve imbalanced situations with* [the Spanish Electricity System], *which endangered the economic sustainability of the same institution and (4) strengthen the stability of the regulatory framework by raising through a legal rule some aspects previously governed by a regulation."*[1070] According to Spain, after the disputed measures, investors still receive the value of their investment, long-term costs and a reasonable rate of return.[1071]

---

[1064] Resp. C-Mem. Merits, ¶ 750(iii).

[1065] Resp. C-Mem. Merits, ¶ 750(iv).

[1066] Resp. C-Mem. Merits, ¶ 750(v).

[1067] Resp. C-Mem. Merits, ¶ 750(vi).

[1068] Resp. C-Mem. Merits, ¶ 750(vii).

[1069] Resp. C-Mem. Merits, ¶ 752. *See also*, Resp. Rej. Merits, ¶ 1115; Resp. Skeleton, ¶ 42.

[1070] Resp. C-Mem. Merits, ¶ 764 (emphasis omitted). *See also*, Resp. Rej. Merits, ¶ 1130; Resp. Skeleton, ¶ 43.

[1071] Resp. Rej. Merits, ¶ 1117.

535.	Respondent distinguishes the case law relied upon by Claimants, arguing that it refers to cases involving concession agreements or licenses expressly limiting reforms in the agreement.[1072] Moreover, Respondent contends that, even if measured under the standard of stability in the arbitral doctrine invoked by Claimants, no breach has occurred as: (i) the legislation was adopted in the exercise of legislative power, with full respect for established procedures and with the aim of preserving the balance and sustainability of the system; (ii) no legitimate expectations have been breached since investors should have known the regulatory framework and how it had been applied in case law;[1073] (iii) there has been no complete transformation or significant change of the legal framework.[1074]

536.	*Non-Retroactivity.* Respondent denies that the new regime is retroactive, both under international law, and under Spanish law.[1075] It contends that the effects of the disputed measures *"only unfold towards the future, as they have to respect the payments made prior to the*[ir] *entry into force."*[1076]

537.	As to international law, relying on *Nations Energy*, Respondent contends that a norm would be retroactive only if it affects *"acquired rights,"* but not when the rules apply to future events without affecting existing rights.[1077] And Claimants, Spain argues, have never had an *"acquired right"* to a fixed remuneration feed-in-tariff system.[1078] Put another way, according to Respondent, international law allows a rule to apply to situations originated before the rule came into effect, but only with regard to future effects.[1079] Respondent also submits that the *Charanne* tribunal has already ruled that the measures taken by Spain were not retroactive, holding that *"unless there are specific commitments in place such as those stemming from a contract, there is no principle of*

---

[1072] Resp. C-Mem. Merits, ¶ 753.

[1073] Resp. C-Mem. Merits, ¶ 758.

[1074] Resp. C-Mem. Merits, ¶ 762.

[1075] Resp. C-Mem. Merits, ¶ 766; Resp. Rej. Merits, ¶¶ 87, 547-567.

[1076] Resp. C-Mem. Merits, ¶ 771. *See also*, Resp. Skeleton, ¶ 44.

[1077] Resp. C-Mem. Merits, ¶¶ 767-768 (citing **RL-069**, *Nations Energy Inc. et al. v. Republic of Panama*, ICSID Case No. ARB/06/19, 24 November 2010, ¶¶ 642, 644, 646).

[1078] Resp. Rej. Merits, ¶¶ 542, 558, 1134.

[1079] Resp. Rej. Merits, ¶¶ 556-557.

*international law preventing a State from adopting regulatory measures with immediate effect on ongoing situations."*[1080]

538.   As to domestic law, Spain argues that its Constitutional Court has already ruled that RDL 9/2013 was not retroactive, in judgements of 17 December 2015 and 18 February 2016;[1081] and its Council of State *(Consejo de Estado)* has also ratified that the legality of the measures, which apply to the future without affecting acquired rights.[1082]

539.   Respondent argues that Regulatory Framework III applies only to the future and does not impact subsidies previously paid; and there is no retroactivity in the notion that granted subsidies are offset with future profit.[1083]   According to Spain, what the regulator has done is to establish *"a reasonable rate of return in the useful activity of the facility as a whole,"* which *"makes it possible to take into consideration the remunerations already received from the facility commissioning date, for the purpose of calculating the future subsidies to be received outside of the market, without incurring in retroactivity."*[1084] Moreover, according to Respondent *"if the subsidies already received in the past were not taken into account in the calculation of future subsidies, excess remuneration for the plants could occur, thus distorting the market rules comprising illegal State Aid, with an infraction of EU Law."*[1085]

540.   And according to Respondent, Claimants were aware that the measures were not retroactive, as they were advised since 2007, 2008 and 2010 that reforms could be introduced affecting the remuneration for existing installations.[1086]

---

[1080] Resp. C-Mem. Merits, ¶ 769 (citing **RL-088**, *Charanne*, ¶¶ 546, 548).

[1081] Resp. C-Mem. Merits, ¶ 772 (citing **R-056**, Judgement of the Constitutional Court, 17 December 2015, num. 5347/2013; **R-075**, Judgment of the Constitutional Court, 18 February 2016, num. 6031/2013; **R-072**, Judgement of the Constitutional Court, 18 February 2016, num. 5582/2013).

[1082] Resp. C-Mem. Merits, ¶ 774 (citing **R-144**, Opinion 937/2013, Permanent Commission of the State Council, 12 September 2013); Resp. Rej. Merits, ¶¶ 560-567.

[1083] Resp. Rej. Merits, ¶ 1139.

[1084] Resp. Rej. Merits, ¶ 1139 (emphasis omitted).

[1085] Resp. Rej. Merits, ¶ 565.

[1086] Resp. Rej. Merits, ¶ 87 (referring to **C-202**, 2008 Pöyry Report; **R-396**, Email from Joana Sánchez, 21 April 2010).

541. Finally, Respondent contends that Claimants have not been able to articulate which protection in Article 10(1) is breached by the alleged retroactivity.[1087]

### (ii) No Failure to Provide a Transparent Framework

542. Respondent alleges that the Memorial failed to properly articulate the claim for alleged lack of transparency.[1088] That said, Respondent contends that it has acted transparently, and has not breached the obligation to provide transparent conditions in Article 10(1) of the ECT. Spain argues that it: *"(i) [...] justified and publicised the need for reforms, (ii) has followed the legally established procedures and ensured participation in the regulatory process of the holders of legitimate rights (iv) has not incurred contrary retroactivity into national law (v) has not withheld any information that would affect the development of reforms and (vi) has approved a regulatory system enabled with foreseeability and dynamism."*[1089]

543. *First*, according to Respondent, the need for reform of the electricity sector was announced years before, as reflected in RDL 6/2009, RDL 14/2010 and announcements of a new Electricity Law made *"continuously since December 2011."*[1090] It was known to Claimants prior to their investment.[1091] Respondent further highlights that on 7 March 2012, the CNE issued a report referring to the need for reform in the regime.[1092]

544. *Second,* for Respondent, the development of its laws was transparent, and all stakeholders had timely access to information and for the submission of comments.[1093] For example, Respondent mentions that the enactment of RD 413/2014 and Ministerial Order IET/1045/2014 (i) complied with all the formalities required by Spanish law; (ii) followed several public hearings, and a report from the Council of State among other entities; (iii) counted with the participation of Protermosolar; (iv) hundreds of claims by producers and industry associations were heard, and Claimants themselves participated

---

[1087] Resp. Rej. Merits, ¶ 1135.
[1088] Resp. C-Mem. Merits, ¶¶ 777-778.
[1089] Resp. C-Mem. Merits, ¶ 779. *See also, id.*, ¶¶ 800-801; Resp. Rej. Merits, ¶ 1142.
[1090] Resp. C-Mem. Merits, ¶ 782. *See also*, Resp. Rej. Merits, ¶¶ 38, 1148-1149.
[1091] Resp. Rej. Merits, ¶¶ 1148, 1150.
[1092] Resp. Rej. Merits, ¶ 1150.
[1093] Resp. C-Mem. Merits, ¶ 783; Resp. Rej. Merits, ¶ 1151.

actively via Protermosolar.[1094]   In fact, Respondent argues, some parameters of Ministerial Order IET/1045/2014 were modified in response to allegations made by the Termosol Plants during the consultation process.[1095]   Respondent further explains that Claimants' complaint that there was no consultation process during the enactment of RDL 9/2013 overlooks that RDLs are measures of extraordinary and urgent need that do not allow for a consultation process, and in any event, it was a transitory measure superseded by Law 24/2013, RD 413/2014 and Ministerial Order IET/1045/2014.[1096]

545.   *Third,* Respondent contends that there was "[a]*bsolute transparency*" regarding all relevant information.[1097]   Referring to Claimants' specific allegations of lack of transparency with regard to certain reports commissioned by the Government to determine the parameters of the new regulation by Boston Consulting and Roland Berger, Spain argues that neither report was crucial in the development of the regulations, nor did Claimants request them during the process of enactment of the norms.[1098]   Respondent explains that the Boston Consulting contract was terminated before a report had been delivered to Spain, and the Roland Berger report was received after the enactment of RD 413/2014 and the Ministerial Order IET/1045/2014.   It was not a prerequisite for the regulation, but rather technical support to IDEA in the analysis of costs of the plants, and Claimants have had access to it.[1099]   For Respondent, failure to deliver documents that were not taken into account during the drafting process of the regulation cannot entail a breach of the ECT.[1100]

546.   *Fifth,* Respondent takes issue with Claimants' allegation that they were in the dark with respect to certain concepts of the new framework.   In particular, Respondent contends that (i) the new rate of return of 7,398 was indeed proposed by the renewable energy sector in 2009; (ii) the 10-year bond was considered a good index since the 2007 CNE

---

[1094] Resp. C-Mem. Merits, ¶¶ 784-790. *See also*, Resp. Rej. Merits, ¶¶ 37, 84, 1153-1154.
[1095] Resp. Rej. Merits, ¶ 83.
[1096] Resp. Rej. Merits, ¶ 1152.
[1097] Resp. C-Mem. Merits, §III(F)(4)(3).
[1098] Resp. C-Mem. Merits, ¶ 794.
[1099] Resp. C-Mem. Merits, ¶¶ 792-793. *See also*, Resp. Rej. Merits, ¶ 1159.
[1100] Resp. Rej. Merits, ¶ 1158.

190

Report 3/2007, and indeed other regulated activities have also been remunerated using the same index;[1101] (iii) the hour reduction was a function of eliminating production with gas; and (iv) the concept of a well-managed company is inherent in Government standards for State Aid.[1102]

547. *Finally,* Respondent contends that contrary to Claimants' allegations, the new system establishes predictable regulatory periods (not discretionary ones) aimed at ensuring a reasonable return during the regulatory life cycle.[1103]

### (4) Article 10(1) of the ECT: Unreasonable, Disproportionate and Discriminatory Measures

#### a. Claimants' Position

##### (i) Spain's Measures Were Unreasonable, Disproportionate and Discriminatory

548. Claimants argue that Regulatory Frameworks II and III do not meet the independent standards of proportionality and non-discrimination, which *"further contributes to a finding of liability under Article 10(1) of the ECT."*[1104]

549. *Unreasonable.* Relying on *BG Group*, Claimants submit that Regulatory Framework III is *"unreasonable"* because the unilateral withdrawal of undertakings given to investors as inducements to invest is, by definition, unreasonable.[1105]

550. Claimants further argue that although Spain seeks to defend the reasonability and proportionality of the measures relying on the tariff deficit, the fall in electricity demand and the notion of overcompensation in the renewable energy sector, it has not demonstrated the necessary connection between these alleged circumstances and the dismantling of Regulatory Framework I.[1106] Claimants argue that: (i) the tariff deficit

---

[1101] Resp. Rej. Merits, ¶ 1156.

[1102] Resp. Rej. Merits, ¶ 1157.

[1103] Resp. C-Mem. Merits, ¶¶ 797, 799.

[1104] Cl. Mem. Merits, ¶ 270; Cl. Reply Merits, ¶ 514.

[1105] Cl. Mem. Merits, ¶ 275, n. 350 (citing **CL-032**, *BG Group PLC. v. Republic of Argentina*, UNCITRAL, Final Award (24 December 2007), ¶¶ 343-346).

[1106] Cl. Skeleton, ¶ 46.

cannot justify Spain's actions because there were many other ways open to Spain to address it;[1107] (ii) the drop in electricity demand cannot assist Spain because it was Respondent itself who decided how much electricity capacity it wanted, Spain was on notice of the drop in electricity demand before it affirmed the timetable for CSP roll out in RD 1614/2010, and Spain had other means to deal with over-capacity;[1108] and (iii) the allegation that Claimants were overcompensated is unsubstantiated – the IRR expected by Claimants did not change materially before December 2012 when Law 15/2012 was introduced, and therefore is not credible to assert that a 36% cut in revenues is reasonable.[1109]

551.    *Disproportionate.*  In addition, Claimants argue that, even if Spain had not committed to stable revenues for the Termosol Plants and regardless of tariff deficit or capacity difficulties, Regulatory Framework III breached Article 10(1) of the ECT *"because it inflicts a disproportionate level of harm to the Claimants' investments by virtually wiping out the value of the Claimants' equity as a means to extract Spain from a budgetary shortfall of Spain's own making."*[1110]  In Claimants' view, there were less restrictive alternatives that Respondent could have deployed in pursue of its policies, while still meeting the ECT.[1111]

552.    Claimants contend that Spain's measures *"have reduced the value of the Claimants' equity in NEE España **from €397.4 million to €15.5 million** and imposed other losses on NEE España's loans to the PTEs and the Claimants' indirect equity interest in NEEOS (further losses of €4.4 million) as well as lost historical cash flows of €7.3 million producing a **total loss of €393.6 million**."*[1112]  These amounts were later updated by

---

[1107] Cl. Reply Merits, ¶ 521. Claimants also argue that Spain is estopped from using the tariff deficit as an excuse. Cl. Reply Merits, ¶ 407.

[1108] Cl. Reply Merits, ¶¶ 519-520.

[1109] Cl. Reply Merits, ¶ 522. *See also, id.* ¶ 523. Claimants also maintain that Spain is estopped from arguing that Claimants were being overcompensated.  Cl. Reply Merits, ¶ 412.

[1110] Cl. Mem. Merits, ¶ 271. *See also*, Cl. Skeleton, ¶ 46.

[1111] Cl. Skeleton, ¶ 46.

[1112] Cl. Mem. Merits, ¶ 274 (emphasis in original).  Claimants note that, while the severity of the impact is sufficient to be considered a *"substantial deprivation"* of their investment within the expropriation test under customary international law, in their view the measure of damages should be the same as Claimants' case on FET, and therefore they are *not* presenting a claim for breach of Article 13 of the ECT. Cl. Mem. Merits, ¶ 279.

Claimants. Thus, in their last expert report, Claimants argued that the reduction in value of the Claimants' equity in NEE España was from EUR 450.6 to EU 41.7 million; and that their total loss was of EUR 521.4 million.[1113] They also observe that there has been a 36% cut to the Termosol Plants revenues, which cannot be considered proportionate.[1114] Claimants also add that "*the return presently given to the Project by the Regulatory Framework III is insufficient to allow the recovery of the Claimants' investment*" and they "*are now facing a near total loss of their equity investment of €209.6 million.*"[1115] In addition, the PTEs and NEE España have also suffered severe financial consequences as a result of Regulatory Framework III, and while the PTEs difficulties have been alleviated to a certain extent after agreements with the project lenders in August 2016, Claimants are still facing a "*near total loss of their equity.*"[1116]

553.    For Claimants, severity of effect is a good indication of whether there is an FET violation, since the FET standard requires States to act proportionately in their dealings with foreign investors.[1117] Tribunals have recognized the need for a reasonable relation of proportionality between the alleged regulatory aim, the means taken to achieve it and the burden on the investor.[1118]

554.    Spain fails to meet this test, Claimants argue, because there is no rational connection between the measures and the public purpose that Spain invokes: (i) Spain, not Claimants, was responsible for accumulating the tariff deficit and the alleged over-capacity; and (ii) Spain has not demonstrated the rational connection between the measures and the alleged overcompensation to CSP investors.[1119]    In addition, the

---

[1113] CER-Compass Lexecon Third, ¶ 4, Table I.

[1114] Cl. Reply Merits, ¶ 533.

[1115] Cl. Skeleton, ¶ 48.

[1116] Cl. Skeleton, ¶ 49.

[1117] Cl. Mem. Merits, ¶ 272. *See also*, Cl. Reply Merits, ¶ 524.

[1118] Cl. Reply Merits, ¶¶ 526, 528.

[1119] Cl. Reply Merits, ¶ 529. *See also*, Cl. Reply Merits, ¶¶ 407, 412 (arguing that Spain is estopped from arguing the tariff deficit or overcompensation as an excuse).

measures taken are not the least restrictive measure Spain could have deployed to achieve its stated goals, in Claimants' view.[1120]

555. *Discriminatory.* Claimants argue that the new regime is discriminatory because it penalizes high quality and productive plants built in reliance on Regulatory Framework I, in breach of Article 10(1) of the ECT.[1121] Claimants make clear that this particular one is not a standalone claim of discrimination under Article 10(7) of the ECT, as it is not based on MFN treatment or national treatment.[1122]

556. Claimants argue that: (i) "[t]*he capacity-based payment system, compounded by Spain's application of its 'standard' NVA and the new cap on operating hours, discriminates against the Termosol Plants,*" because they were designed to maximize electricity output on the basis of Regulatory Framework I, and under the new system only a small portion of the remuneration is based on electricity production;[1123] (ii) "[t]*he new 'regulatory useful life'* [of 25 years] *further discriminates against the Claimants,*" as they built their plants with the intention that they would last 30 years or longer;[1124] and (iii) "*Regulatory Framework III also discriminates against the Termosol Plants by failing to differentiate among CSP plants that have very different investment costs and operating expenditures on the basis of the size of thermal storage.*"[1125]

557. Claimants observe that Respondent's reliance on Article 10(8) of the ECT to argue that Claimants have not been guaranteed the maximum standard of non-discrimination is irrelevant, because this claim is being asserted under Article 10(1) of the ECT.[1126] Claimants also argue that Spain's response that the measures are of general application has no merit in law, because it is well established that *de facto* discrimination entails a breach of the standard.[1127] Finally, Claimants argue that Spain cannot defend arguing

---

[1120] Cl. Reply Merits, ¶ 530 (referring to *id.*, § V(2) and V(3)).
[1121] Cl. Mem. Merits, ¶ 270. *See also, e.g.,* Cl. Mem. Merits, ¶ 209 (x-xi).
[1122] Cl. Reply Merits, ¶ 535.
[1123] Cl. Mem. Merits, ¶ 209 (x); Cl. Reply Merits, ¶ 536 (1st bullet).
[1124] Cl. Mem. Merits, ¶ 209 (xi); Cl. Reply Merits, ¶ 536 (2d bullet).
[1125] Cl. Reply Merits, ¶ 536 (3d bullet).
[1126] Cl. Reply Merits, ¶ 515.
[1127] Cl. Reply Merits, ¶ 537.

that the Termosol Plants are not penalized since they can produce above the limit and sell at market price, because such market price is so much lower that it will never permit the PTEs to recover their sunk costs.[1128]

<blockquote>(ii) The Tariff Deficit and Over-Capacity Excuses Fail in Fact and Law</blockquote>

558. Claimants contend that neither the tariff deficit, nor the overcapacity of the system can justify Spain's actions.[1129]

559. *Tariff Deficit.* Claimants oppose Respondent's reliance on the tariff deficit, arguing that such deficit: (i) does not rise to the level of necessity in customary international law, and has not been invoked as such;[1130] (ii) *"arose from Spain's failure to comply with its own law and a political decision to prioritise cheap electricity;"* [1131] (iii) *"was known to Spain at all relevant times prior to the investment"* and Spain assured NextEra officials it could manage it without threat to the stability of the RD 661/2007 regime, such that Spain is estopped from invoking it;[1132] and (iv) could have been addressed through many alternative ways while still honouring Spain's ECT commitments.[1133]

560. *Over-Capacity.* Claimants contend that Respondent's excuses relating to the alleged over-capacity in the renewable sector are unavailing because: (i) it was Spain (not Claimants) who determined how much capacity to build; (ii) by nature renewable technologies require an excess in capacity and in fact, Spain approved more plants than were built; (iii) the issue is not unique to Spain; (iv) Spain still does not produce more renewable electricity than it consumes; and (v) Spain has other ways of dealing with any over-capacity.[1134]

561. *Necessity.* Responding to Spain's allegations that the reforms in Regulatory Framework III were reasonable, proportionate and non-discriminatory in light of the need to respond

---

[1128] Cl. Reply Merits, ¶ 538.
[1129] Cl. Reply Merits, ¶ 212.
[1130] Cl. Reply Merits, ¶¶ 235(i), 236.
[1131] Cl. Reply Merits, ¶¶ 214, 235(ii), 237-239.
[1132] Cl. Reply Merits, ¶¶ 214, 235(iii), 240; 399-407.
[1133] Cl. Reply Merits, ¶¶ 214, 235 (iv), 241-247.
[1134] Cl. Reply Merits, ¶ 215. See also, *id.*, ¶¶ 248-253.

to macro-economic conditions allegedly threatening the sustainability of the system, Claimants contend that: (i) Spain has not sought to bring its action under the security interests provision in Article 24 of the ECT, nor has Spain raised a necessity defence under customary international law, thereby acknowledging that the measures were not the only way to preserve an essential interest of the State from a grave or imminent peril;[1135] (ii) even if Spain had raised a necessity defence, it could have never been successful as the elements in Article 25 of the ILC Articles on State Responsibility have not been demonstrated; and (iii) even if it had been demonstrated as of 2013, a state of necessity would only provide temporary absolution while it lasted, which would no longer be the case as Spain has experienced three years of growth.[1136]

### b. Respondent's Position

562.  Spain denies that the measures it has adopted were disproportional, excessive, irrational or discriminatory.[1137]    It highlights that Article 10(8) of the ECT does not guarantee Claimants the maximum standard of non-discrimination.[1138]

563.  *Reasonability.*   Respondent argues that the measures were reasonable in light of the circumstances at the time of their adoption.   In particular, Respondent refers to (i) the drop in the demand for electricity; (ii) the existence of an excess remuneration in the renewable energy sector; and (iii) the tariff deficit; all of which, according to Respondent, contributed to making the system unsustainable.[1139]    According to Respondent, these reasons were foreseeable to a diligent investor, and indeed, Claimants were so informed in a due diligence report in 2008.[1140]

564.  Respondent takes issue with Claimants' contention that the CSP sector did not contribute to the tariff deficit, arguing that the Claimants' theory is deceitful, and based on 2012 figures which are not significant in light of the staggered commissioning of CSP

---

[1135] Cl. Reply Merits, ¶ 518. *See also*, Cl. Skeleton, ¶ 52.
[1136] Cl. Skeleton, ¶ 52.
[1137] Resp. C-Mem. Merits, ¶ 803; Resp. Rej. Merits, ¶ 1194.
[1138] Resp. C-Mem. Merits, ¶ 804.
[1139] Resp. C-Mem. Merits, ¶ 805. *See also,* Resp. Rej. Merits, ¶¶ 1174-1177.
[1140] Resp. Rej. Merits, ¶ 36.

plants.[1141]  Moreover, Respondent contends, while Claimants argue that there were other alternatives to resolve the tariff deficit, they have not established the viability of those other alternatives.[1142]

565.  Respondent further opposes Claimants' contention that estoppel prevents raising the deficit as a defence, arguing that there was never a promise to Claimants that the deficit would not affect their remuneration conditions.[1143]

566.  Spain further maintains that the disputed measures have been considered reasonable and attractive by domestic and foreign investors, as shown by the *"massive influx of new investors,"* as well as by international authorities such as the European Commission, the International Monetary Fund and the International Energy Agency.[1144]

567.  According to Respondent, the measures were reasonable with the aim of ensuring investors a *"reasonable return."*[1145]  The reasonableness is shown, Respondent says, by (i) reference to certain generally accepted criteria, including the opportunity cost, which was calculated among 6.38% and 6.86% (below the 7.398% granted by the new regime); (ii) comparison with the profitability of other activities of the same risk level; and (iii) comparison with the profitability levels given by banks.[1146]  Moreover, Respondent says, that 7.398% profitability was that requested by the sector from the Government in 2009.[1147]

568.  Respondent opposes Claimants' reliance on the principle of estoppel with respect to the rate of return, arguing that there is no evidence that Spain promised or guaranteed a return of 11.6% for thirty years.[1148]

---

[1141] Resp. Rej. Merits, ¶ 1173(1).
[1142] Resp. Rej. Merits, ¶ 1173(3).
[1143] Resp. Rej. Merits, ¶¶ 29, 998.
[1144] Resp. C-Mem. Merits, ¶¶ 808-813.
[1145] Resp. Rej. Merits, ¶¶ 1178-1186.
[1146] Resp. Rej. Merits, ¶¶ 1180-1182, 1186.
[1147] Resp. Rej. Merits, ¶ 1184.
[1148] Resp. Rej. Merits, ¶¶ 349, 999-1002.

569. *Proportionality*.    Respondent also rejects Claimants' reliance on the test of proportionality endorsed by the tribunal in *Occidental*, arguing that the cases are distinguishable.   In particular, Spain argues that the disputed measures in this case are a clear exercise of the State's regulatory power, not comparable to those at issue in *Occidental*.[1149]

570. Respondent contends that Claimants' allegations of lack of proportionality overlook that (i) proportionality is measured by the relation between the need for the measures and the sacrifice of the investor; (ii) the measures impacted all agents in proportion to their contribution to the deficit; (iii) the impact is measured with regard to typical plants, not specific ones; (iv) the IRR of 11% included in the Financial Report for RD 661/2007 was a maximum return.[1150]

571. *Non-Discrimination*.  Respondent contends that Claimants have not shown how the new regime penalizes and discriminates against plants built under Regulatory Framework I. Ministerial Order IET/1045/2014 does consider the special characteristics of Claimants' plants, including their larger solar park and their greater storage capacity, and are afforded greater investment costs.[1151]

572. Referring to the test for discriminatory conduct endorsed by the tribunal in *EDF*, Respondent contends that none of those criteria are met in this case.   In particular, Respondent argues that (i) the purpose of the measures was legitimate, aimed at redressing an imbalance in the system; (ii) the measures fully respected existing regulations and the case law of the Supreme Court, and they are general in scope; (iii) the reasons put forward for the adoption of the measures, namely, to guarantee sustainability of the system, were the reasons behind the measures; (iv) the measures were not taken in wilful disregard of due process, and indeed followed the legally established procedures

---

[1149] Resp. C-Mem. Merits, ¶¶ 814-816 (referring to **CL-039**, *Occidental Petroleum Corporation, Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID, Case no. ARB/06/11, Award (5 October 2012)).

[1150] Resp. Rej. Merits, ¶ 1168.

[1151] Resp. C-Mem. Merits, ¶¶ 817-818.

for the enactment of the regulations on the standard of remuneration in the electricity sector.[1152]

573. In addition, Respondent argues that the disputed measures also meet the standard for reasonable and non-discriminatory conduct set forth in *AES*.[1153] Specifically, Respondent contends that (i) the measures respond to a rational policy and a public economic objective – restoring the balance in the system reducing excessive profits by investors and lessening the burden on Spanish consumers that was playing a key role in the tariff deficit;[1154] (ii) the measures were reasonable in light of the objective of the public policy sought – they impacted all the actors in the system (consumers, producers, distributors),[1155] and were proportionate as they allow producers to reach a reasonable return of 7.398% over its investment costs, while restoring the equilibrium *vis-à-vis* consumers and the sustainability of the system.[1156] In short, for Respondent, the measures responded to rational policy implemented via a reasonable action.[1157]

574. Respondent further observes that Claimants' contention is one for discrimination against the Termosol Plants, rather than the investor or its investment, and as such it does not fall under the protection of the ECT.[1158] But, in any event, Spain contends, the alleged discrimination does not exist because (i) there is no evidence of extraordinary characteristics of the Termosol Plants (with storage capacity and larger solar field being the only distinguishing factors that resulted in the creation of a specific category for them in Ministerial Order IET/1045/2014);[1159] (ii) there is no evidence that the Termosol Plants will have an life beyond 25 years;[1160] and (iii) financing costs have never been

---

[1152] Resp. C-Mem. Merits, ¶ 824 (referring to **RL-062**, *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award (8 October 2009)).

[1153] Resp. C-Mem. Merits, ¶¶ 826-839 (referring to **RL-024**, *AES*).

[1154] Resp. C-Mem. Merits, ¶¶ 828, 830.

[1155] Resp. C-Mem. Merits, ¶ 833.

[1156] Resp. C-Mem. Merits, ¶¶ 834, 836.

[1157] Resp. C-Mem. Merits, ¶ 838.

[1158] Resp. Rej. Merits, ¶ 1188.

[1159] Resp. Rej. Merits, ¶¶ 1190-1191.

[1160] Resp. Rej. Merits, ¶ 1192.

considered when establishing subsidies, and Claimants have not shown the origin and applicability of the intra-group operational costs it claims should be considered.[1161]

### (5) Article 10(1) of the ECT: Breach of Obligations Assumed Towards Claimants' Investments

#### a. Claimants' Position

575. In their Memorial on the Merits, Claimants stated that "*Spain's enactment of Law 15/2012, RDL 2/2013, RDL 9/2013, RD 413/2014, and the* [Ministerial] *Order* [IET/1045/2014], *coupled with the application of those measures to the Termosol Plants and the PTEs, gives rise to a breach of Article 10(1) of the ECT through actions which* [...] *breached obligations assumed by Spain towards the Claimants' investments*."[1162] At the Hearing, Claimants argued that this statement amounted to a claim under the umbrella clause of Article 10(1) of the ECT.[1163]

#### b. Respondent's Position

576. Respondent protested that no umbrella clause claim has been raised by Claimants in the course of the proceeding,[1164] and emphasized that no such claim was developed in Claimants' written submissions.[1165]

### (6) Article 10(1) of the ECT and Article 10(7) of the ECT: Breach Due to the TVPEE in Law 15/2012

577. The Parties' positions on this issue have already been summarized in the context of Respondent's jurisdictional objections, and the Tribunal refers to that more detailed summary.[1166]

---

[1161] Resp. Rej. Merits, ¶ 1193.

[1162] Cl. Mem. Merits, ¶ 258.

[1163] Tr. Day 7 (ENG), 1539:14–20 (Ms. Nairn) (also referring to Cl. Mem. Merits, ¶ 229 and Cl. Rej. Jur., ¶ 35).

[1164] Tr. Day 7 (ENG), 1482:9–21 (Ms. Moraleda).

[1165] Tr. Day 7 (ENG), 1540:11–1541:9 (Mr. Santacruz).

[1166] *Supra*, §§ V(D)(1) and V(E)(1).

### a. Claimants' Position

578. In short, Claimants' contention is that the TVPEE (i) can be assessed under Article 10(1) of the ECT because it is an *ad valorem* levy on gross revenues, not a tax on "*income or capital*" within the meaning of Article 21(3) of the ECT; but that (ii) even if it were a tax, since it is not a tax on income or capital, it can be assessed under Article 10(7) of the ECT which applies to "*Taxation Measures*" pursuant to Article 21(3). Article 10(7) prohibits discriminatory taxation, and the TVPEE discriminates renewable energy producers in favour of conventional energy producers. In addition, Article 10(7) of the ECT allows Claimants to import the FET provision from the Spain-Uruguay BIT.[1167]

### b. Respondent's Position

579. In turn, Respondent's contention is that neither Article 10(1), nor Article 10(7) of the ECT apply to the TVPEE, because (i) pursuant to Article 21 of the ECT, Article 10(1) of the ECT does not give rise to obligations with respect to "*Taxation Measures*," and the TVPEE is one; and (ii) pursuant to Article 21(3) of the ECT, Article 10(7) does not apply to taxes on income or capital, and the TVPEE is a tax on income. Respondent further denies that Article 10(7) of the ECT can serve to import the FET provisions from another treaty for purposes of applying that substantive provision to a tax measure.[1168] In any event, Respondent also submits that the TVPEE does not discriminate against foreign investors in favour of domestic ones, and instead applies to all producers of renewable and conventional energy.[1169]

## B. THE TRIBUNAL'S ANALYSIS

### (1) The Standard in Article 10(1) of the ECT

580. The Tribunal notes the views of the Parties on the objectives of the ECT and the intended scope of Article 10. In the view of the Tribunal there is little value in establishing at this stage an overall view of the objectives of the ECT. Article 10 is a treaty provision and has to be interpreted in accordance with Articles 31 and 32 of the VCLT. That

---

[1167] *Supra*, §§ V.D(1)b and V.E(1)b.
[1168] *Supra*, §§ V.D(1)a and V.E(1)a.
[1169] Resp. Rej. Merits, ¶¶ 728-729.

interpretative process requires the Tribunal to look at the words used in Article 10 in their context and in light of the object and purpose of the treaty as a whole. Thus, while the objectives of the ECT may enter into the interpretative process this does not require an overall perspective by the Tribunal of the objectives of the ECT.

581.  Article 10(1) is a broad-ranging provision which includes obligations to "*encourage and create stable, equitable, favourable and transparent conditions for Investors,*" to accord to investments "*fair and equitable treatment,*" to provide investments with "*the most constant protection and security,*" not to impair investments "*by unreasonable or discriminatory measures,*" and to accord investments treatment that is "*no […] less favourable than that required by international law, including treaty obligations.*"[1170] Several of these obligations have been raised in this case and the Tribunal will address each one as appropriate.

(2)    Article 10(1) of the ECT: Repudiation of Legitimate and Reasonable Expectations

582.  Claimants' primary claim is that Respondent failed to provide fair and equitable treatment by failing to protect Claimants' legitimate expectations. The Tribunal accepts that the protection of legitimate expectations is an essential element of the provision of fair and equitable treatment and this applies under Article 10 of the ECT.

583.  Their legitimate expectations, Claimants argue, were founded on the terms of Regulatory Framework I, registration of the Termosol Plants in the Pre-Assignment Registry and in the RAIPRE, the Ministerial Resolutions of 28 December 2010, and specific statements or representations made to NextEra by Spanish officials.[1171]

584.  The Tribunal is not convinced that in the circumstances of the present case the mere fact of Regulatory Framework I was a sufficient basis for the expectation that Claimants would be guaranteed the terms of Regulatory Framework I. The Framework was based on legislation and legislation can be changed. As Respondent has pointed out, Claimants should have been aware that changes could be made to the regulatory regime. Thus, on

---

[1170] **CL-001 / RL-055**, ECT, Art. 10(1).
[1171] Cl. Mem. Merits, ¶¶ 259, 264.

its own, Regulatory Framework I could not reasonably have been the basis for an expectation by Claimants that they would be entitled to receive precisely the benefits that such Regulatory Framework prescribed.

585.    Equally, the Tribunal does not consider that registration in the Pre-Assignment Registry or in the RAIPRE, while a necessary part of the process for obtaining the benefits of the regulatory regime, did of itself grant any right to the economic regime set out in RD 661/2007.[1172]   As the *Charanne* tribunal said, "*registration with the RAIPRE was a mere administrative requirement in order to be able to sell energy, and by no means implied that registered facilities had a vested right to a certain remuneration.*"[1173]

586.    Nor is the Tribunal persuaded that the Ministerial Resolutions of December 2010 themselves provide a reasonable basis for a legitimate expectation that there was a guarantee of the terms of Regulatory Framework I.   The resolutions reiterate the applicable terms of Regulatory Framework I.   If Regulatory Framework I was not a guarantee of its terms, then the Ministerial Resolutions could not do what the legislation to which they applied had not done.

587.    While none of these claims individually constitute a basis for Claimants' legitimate expectations claim, they do provide context for that claim.   The primary basis for the claim, however, is that statements and assurances were made directly to NextEra by Spanish authorities and that these created expectations about the economic regime that would apply to Claimants in respect of their investment.   In other words, the terms of Regulatory Framework I, and the circumstances surrounding the registration of NextEra's investment, provide a context in which the representations and assurances of the Spanish authorities could be the basis for a legitimate expectations claim.

588.    The statements and assurances on which Claimants rely fall into five categories:

---

[1172] Resp. C-Mem. Merits, ¶¶ 678, 680.
[1173] **RL-088**, *Charanne*, ¶ 510.

(1)    Statements made in writing to NextEra by Spanish officials.[1174]

(2)    Statements made in writing by NextEra representatives to Spanish officials that were not contradicted or disagreed with by Spanish officials (although not responded to or agreed to).[1175]

(3)    NextEra's internal memoranda reporting on meetings with the Spanish officials.[1176]

(4)    Witness statements indicating NextEra's understanding of the Spanish position.[1177]

(5)    Statements made to industry,[1178] and statements made to the PTEs.[1179]

589.    The Tribunal notes that the statements relied on have various levels of probity. Indeed, Spain argued that the statements evidenced no commitments on behalf of the Spanish government and, in many instances they constituted a unilateral understanding of Claimants that had never been confirmed by the Spanish authorities. Letters written by Spain were often not initiated by it but were responses to letters from NextEra.

590.    In the view of the Tribunal, statements made in writing by Spanish officials constitute the best evidence of Spanish assurances that could be the basis for legitimate expectations. The rest are unilateral statements by NextEra officials of their understanding of Spain's position. However, although Respondent attempted to cast doubt on the weight that could be attached to those statements, it never denied that the statements were made even when the statements were recorded only in NextEra's own documents or in the witness statements of Mr. Davidson and Mr. Arechabala. Respondent did not cross-examine

---

[1174] **C-006**, Letter from Pedro Marín (Secretary of State for Energy) to Mitch Davidson (NextEra Energy Resources, LLC), 3 September 2009; **C-008**, Letter from Pedro Marín (Secretary of State for Energy) to Mitch Davidson (NextEra Energy Resources, LLC), 11 January 2010.

[1175] **C-014,** Letter from Mitch Davidson (NextEra Energy Resources, LLC) to Miguel Sebastián (Minister for Industry, Tourism and Trade), 9 December 2009.

[1176] **C-057**, Email from Mike Arechabala (NextEra Energy España, S.L.) to Antonio De Juan Fernandez (Pöyry Consulting), 12 May 2010.

[1177] CWS-Davidson First, ¶¶ 15, 36; CWS-Arechabala First, ¶¶ 47, 53.

[1178] **C-065**, Agreement with the Solar Thermal Industry, July 2010; **C-066**, Ministry for Industry, Tourism and Trade, Press Release, *Industry Ministry Reaches an Agreement with the Wind and Solar Thermal Sectors for the Revision of their Payment Framework*, 2 July 2010.

[1179] **C-009**, 2010 Resolution Termosol 1, 28 December 2010; **C-010**, 2010 Resolution Termosol 2, 28 December 2010.

those witnesses on what they said had been told to them by Spanish officials.[1180] As a result, what NextEra claims to be assurances of Spanish officials was not contradicted by Respondent and thus can be relied upon by the Tribunal.

591. What, then, was being assured and what was the scope of the legitimate expectations that could have been reasonably held by Claimants? As mentioned above, Claimants could not have had the expectation that the RD 661/2007 regime was frozen and could not be changed. But the broader question is whether, in light of the assurances that they were given by Spain, Claimants had a legitimate expectation that the regime would not be changed in a way that would undermine the security that Claimants had in respect of the economic regime set out in RD 661/2007.

592. The assurances on which such an expectation can be based include the letter from Secretary Marin to Mr. Davidson, which said, *"the absolute vocation of said legislation is to preserve the legal security of all investments currently underway, thereby guaranteeing the forecasts under which said investments are to be made;"*[1181] and the subsequent letter from Secretary Marin to Mr. Davidson, which said, *"the new framework for the promotion of renewable energies is governed by the principles of judicial and regulatory stability and visibility, and that the actual pre-assignment in the registry guarantees the promoter the benefits of the economic regime under which it made its investment decision."*[1182] The Tribunal does not see these as *"commitments"* by Spain, but *"legitimate expectations"* can exist in the absence of actual formal commitments.

593. The question is whether what was said could reasonably give rise to expectations about the future conduct of the government. In the present context, the use of terms such as *"guaranteeing"* and *"preserv*[ing] *legal security,"* in letters from a Spanish minister can reasonably be taken as statements that the Spanish government had no intention of making significant changes to the investment regime set out in RD 661/2007 and that this could be relied on by an investor. That NextEra took these statements, and other

---

[1180] Tr. Day 7 (ENG), 1375:3-12 (Ms. Nairn).

[1181] **C-006**, Letter from Pedro Marín (Secretary of State for Energy) to Mitch Davidson (NextEra Energy Resources, LLC), 3 September 2009.

[1182] **C-008**, Letter from Pedro Marín (Secretary of State for Energy) to Mitch Davidson (NextEra Energy Resources, LLC), 11 January 2010.

statements reportedly made by Spanish officials, as assurances of the *"long-term tariff and premium stability"* they were looking for is evidenced in the witness statements of Mr. Davidson and Mr. Arechabala.[1183]

594. The process by which RD 1614/2010 came into effect would also have engendered the expectation that Spain would not unilaterally make changes to the regime without consultation with the solar energy sector. This process had involved extensive consultations with industry with amendments being proposed by NextEra among others and accepted by the Spanish government.[1184] This process also would have reinforced the expectation that Claimants could expect that there would be no radical changes made to the economic regime based on RD 661/2007 as modified in RD 1614/2010.

595. Respondent argues that *"lack of due diligence prevents the expectations [...] from being considered to be real and objective"* and that Claimants did not do proper due diligence.[1185] However, the Tribunal is not convinced that a lack of due diligence has been established. Claimants had the Poyry consultant reports and Claimants refer to legal opinions they received on Spanish law. The fact that Claimants refused to waive their privilege in respect those legal opinions should not lead to any adverse inferences. Non-disclosure means that Respondent and the Tribunal have not had access to the content of those opinions, but the fact that Claimants received legal advice is not really contested. In short, the Tribunal does not consider that the assertion that there was a lack of due diligence on the part of Claimants has been established.

596. The Tribunal concludes that on the basis of the assurances given to them by the Spanish authorities, in the broader context of the specific terms of Regulatory Framework I, registration in the Pre-assignment Registry and the Ministerial Resolutions of 28 December 2010, Claimants had a legitimate expectation that the regulatory regime in RD 661/2007 would not be changed in a way that would undermine the security and viability of their investment.

---

[1183] CWS-Davidson First, ¶¶ 16-20; CWS-Arechabala First, ¶ 36.
[1184] CWS-Arechabala First, ¶ 68.
[1185] Resp. Rej. Merits, ¶ 1061.

597. The changes made to the economic regime under Regulatory Framework III were substantial. They included that, the Termosol Plants were now to be paid on the basis of capacity, not on the basis of the amount of electricity produced; the regulated FiT and the pool + premium options were abolished; remuneration was no longer payable for the life of the plants but was limited to a 25-year "*regulatory useful life*"; indexation of tariffs to the CPI was abolished; electricity generated through natural gas as a support fuel now received no payment other than the prevailing market price whereas under RD 661/2007 (confirmed by RD 1614/2010), plants had been entitled to use natural gas as a support fuel for up to 12% or 15% of their annual production (depending on whether they sold at a feed-in option or they sold through the pool + premium option); and the market price remuneration was subject to a new 7% levy on gross revenues.

598. While individually these changes might not have constituted a denial of fair and equitable treatment, collectively the economic regime under Regulatory Framework III is substantially different from that under Regulatory Framework I. As the CNE put it, Regulatory Framework III "*completely changes the remuneration mechanism applicable to date.*"[1186]

599. In short, the regime was fundamentally and radically changed. Claimants were deprived of the security and certainty that, in light of the assurances they had received from Spanish authorities about guaranteeing the legal security of investments underway as well as the forecasts under which the investments were made and affirming legal and regulatory stability, they could have expected. The changes went beyond anything that might have been reasonably expected by Claimants when they undertook their investment.

600. Respondent argues, however, that all that could have been expected by Claimants was a reasonable return on their investment. In other words, the change from Regulatory Framework I to Regulatory Framework III was a change on the form of delivery of benefits, but under both regimes the objective was to deliver a reasonable return and that is all Claimants could have expected. However, the assurances made by the Spanish

---

[1186] Cl. Reply Merits, ¶ 282 (quoting **C-238**, CNE Report 18/2013, 4 September 2013).

authorities were not about a reasonable return; they were about the regulatory certainty and stability that NextEra could expect. The denial of legitimate expectations is based on the failure to provide that certainty and security by changing fundamentally the regime under which remuneration was to be calculated.

601.    In light of this failure by Respondent to protect Claimants' legitimate expectations, the Tribunal concludes that there has been a denial of fair and equitable treatment and hence a violation of ECT Article 10.

### (3)    Other Claims

602.    In view of the decision reached by the Tribunal in respect of the above breach of Article 10 of the ECT, in the exercise of judicial economy the Tribunal considers it unnecessary to consider the additional arguments of Claimants regarding the breach of Article 10(1) of the ECT, namely: the failure to provide a stable, consistent and transparent framework; unreasonable, disproportionate and discriminatory measures; and the breach of obligations assumed towards the Claimants' investments. It equally finds it unnecessary to consider Claimants' arguments regarding the breach of Articles 10(1) and 10(7) due to the TVPEE in Law 15/2012. The TVPEE has been dealt with already in the jurisdictional findings.

## VIII.  DAMAGES

### A.    THE PARTIES POSITIONS

#### (1)    Claimants' Position

##### a.  Standard of Compensation

603.    Claimants assert that due to Spain's breach of Article 10 of the ECT, they are entitled to full reparation or *restitutio in integrum*, as the standard has been articulated by the Permanent Court of International Justice's Judgment in *Chrozów Factory* and embodied in Article 31 of the ILC Articles on State Responsibility, and affirmed by arbitral tribunals.[1187]  Full reparation can be achieved either through restitution or, if restitution is

---

[1187] Cl. Mem. Merits, ¶¶ 281-284; Cl. Reply Merits, ¶ 543.

impossible or imposes a disproportionate burden on the State, the payment of compensation;[1188] and compensation should cover all financially assessable damages caused by the wrongful act, including lost profits according to Article 36 of the ILC Articles on State Responsibility.[1189] Furthermore, full reparation requires comparing the situation of the injured party in a scenario absent the wrongful act and the actual situation of that party as a result of the wrongful act.[1190] Claimants submit that, as Article 10(1) of the ECT does not prescribe a treaty standard for reparation, customary international law applies to the quantification of damages.[1191]

### b. Method of Valuation

604.   Arguing that Spain has "*not made reparation by reapplying Regulatory Framework I to the Claimants' investments and compensating the Claimants for any damages not covered through restitution,*" Claimants plead their case as one for compensation.[1192] The requested compensation has been calculated, Claimants argue, by "*compar*[ing] *the current value of the Claimants' investment under Regulatory Framework III against the but-for value of those investments under Regulatory Framework I, together with historical losses prior to the valuation date (taken as the date of the Tribunal's award).*"[1193]   Claimants initially chose a valuation date of 30 June 2014, this being the date of the last audited accounts of the PTEs.[1194] The calculations were later updated as of 30 June 2016.[1195]   In the alternative, Claimants have also argued that, should the Tribunal decide to assess damages as of the date of injury, 30 June 2014 would be the appropriate date, as the last of the "*cumulative measures*" giving rise to Spain's liability (Ministerial Order IET/1045/2014) was enacted on 20 June 2014.[1196]

---

[1188] Cl. Mem. Merits, ¶ 285; Cl. Reply Merits, ¶ 543.

[1189] Cl. Mem. Merits, ¶ 286.

[1190] Cl. Mem. Merits, ¶ 286; Cl. Reply Merits, ¶ 543.

[1191] Cl. Mem. Merits, ¶ 287.

[1192] Cl. Mem. Merits, ¶ 288.

[1193] Cl. Mem. Merits, ¶ 288. *See also*, Cl. Reply Merits, ¶¶ 540, 548.

[1194] Cl. Mem. Merits, ¶ 289.

[1195] Cl. Reply Merits, ¶ 540.

[1196] Cl. Mem. Merits, ¶ 289.

605.    Claimants' view, however, is that the date of award is the more reliable touchstone because it takes into account the latest information on PTEs revenues, free cash flows to NEE España and the impact of debt restructuring.[1197]

606.    Claimants contend that international tribunals have regularly adopted the fair market value ("**FMV**") standard for breaches of FET and, in this case, the most appropriate way to determine the FMV is through the Discounted Cash Flow ("**DCF**") method.[1198] This requires, Claimants argue, "*project*[ing] the *future cash flows that an asset would have generated for equity-holders in the absence of the alleged wrongful government conduct, and then discount*[ing] *them back to the valuation date at a rate that accounts for the risk associated with those cash flows.*"[1199] Claimants' experts applied the free cash flows to equity approach which allows the Tribunal to assess the equity value of a company directly, and thus argue that the discount rate applicable is the cost of equity.[1200]

607.    Claimants submit that the DCF method has been widely endorsed by arbitral tribunals in determining compensation both for expropriation and other international law breaches.[1201] It is also "*the most appropriate method in this case*" because: (i) "[…] *a forward looking valuation is more appropriate to investments which stem from the anticipated future cash flows;*" (ii) "*is based on fundamental principles of economics and finance;*" (iii) "*is one of the most generally accepted and used techniques* […];" and (iv) "*is particularly suited to valuing companies whose projected revenues are defined by law or regulation, because their future cash flows are less volatile and more predictable than those of an unregulated business.*"[1202]

608.    Claimants further submit that DCF is appropriate here because: (i) the CSP technology used in the Termosol Plants has been successfully in operation for decades, the Termosol Plants are the most mature of the four categories of CSP plants, and their technology is

---

[1197] Cl. Obs. Eiser, ¶ 4.14. *See also*, Cl. Reply Eiser, ¶ 6.12.
[1198] Cl. Mem. Merits, ¶¶ 290-291, 294; Cl. Reply Merits, ¶ 549.
[1199] Cl. Mem. Merits, ¶ 291.
[1200] Cl. Mem. Merits, ¶ 293.
[1201] Cl. Mem. Merits, ¶ 292.
[1202] Cl. Mem. Merits, ¶ 294; Cl. Reply Merits, ¶ 549.

commercially proven;[1203] (ii) there is a track record of experience in operating and maintaining plants similar to the Termosol Plants, as the technology used in the Termosol Plants had already been used in 9 projects in Spain, and a number of projects with that technology have been in operation for 8 years and more are being built and developed;[1204] (iii) there is no uncertainty in the revenue and cost projection calculations, as shown by the fact that the projections were assessed and regarded as credible in the financial model agreed between Claimants and their project lenders (the "**Bank Model**");[1205] and there is little risk in the revenue projections given that RD 661/2007 provided "*a predictable tariff adjusted by an inflation factor.*"[1206]  In addition, the projected costs are predictable, Claimants argue, as the historic costs are sunk and known, and many of the operational costs are the subject of long-term agreements, and the financing costs are known.[1207]

609.     Claimants further contend that it is no answer to state that the Termosol Plants had been operational for only one year as of 30 June 2014, given that the task is to perform a valuation as of the date of the award, and as of 30 June 2016 there were already two further years of actual operation data, which is closely in line with the Bank Model and underscores the reliability of those projections.[1208]

### c.  Damages Valuation

610.     Claimants explain that their expert's valuation (i) assumes a 30-year operational life for the Termosol Plants;[1209] (ii) calculates but-for-revenues based on the pool + premium option under Regulatory Framework I, as this would have been the logical operating choice for the PTEs;[1210] (iii) forecasts the electricity generation of the Termosol Plants and sale levels based on the Bank Model;[1211] (iv) calculates the debt costs based on the

---

[1203] Cl. Reply Merits, ¶¶ 552-553.
[1204] Cl. Reply Merits, ¶ 554.
[1205] Cl. Reply Merits, ¶ 555.
[1206] Cl. Reply Merits, ¶ 556.
[1207] Cl. Reply Merits, ¶ 556.
[1208] Cl. Reply Merits, ¶ 557.
[1209] Cl. Mem. Merits, ¶ 295.
[1210] Cl. Mem. Merits, ¶ 296.
[1211] Cl. Mem. Merits, ¶ 296.

actual loans made to the PTEs;[1212]  (v) determines operating expenses based on the Bank Model.[1213]

611.    As to the discount rate, Claimants use the Capital Asset Pricing Model ("**CAPM**"), which in their view is a standard method in the industry.[1214] Based on this method, Claimants' experts *"assess a cost of equity for the Claimants' investments in Spain of 7.62% and a cost of debt of 5.79% pre-tax (which translates to a rate of 4.05% post-tax)."*[1215]

612.    On this basis, the Memorial on the Merits asserted total losses of EUR 393.6 million as Claimants' primary case, composed as follows:[1216]

- *"The value of the Claimants' equity in NEE España (reflecting their indirect 100% ownership of the PTEs and the PTEs' shareholding in the EVC grid connection joint venture), has fallen from €397.4 million to €15.5 million (a loss of €381.9 million)."*

- *"The value of the Claimants' interest in the loans from NEE España to the PTEs has fallen from €19.6 million to €15.7 million (a loss of €3.9 million)."*

- *"The Claimants' indirect 100% equity stake in NEEOS has fallen from €6.3 million to €5.8 million (a loss of €0.5 million)."*

- *"Lost historical cash flows to 30 June 2014 of €7.3 million."*

613.    In their updated calculation as of 30 June 2016, presented with Claimants' Reply on the Merits, Claimants' experts *"assess damages [...] at **€503.5 million as of 30 June 2016**, comprised of €60.4 million in historical cash flow damages from the implementation of the Measures up to 30 June 2016 and a loss of €443.1 million in the fair market value of the Claimants' equity investments on that date."*[1217]

614.    In a further updated calculation presented on 19 August 2016 after the Reply on the Merits to reflect the impact on damages resulting from the PTE's agreed restructuring of

---

[1212] Cl. Mem. Merits, ¶ 297.
[1213] Cl. Mem. Merits, ¶ 297.
[1214] Cl. Mem. Merits, ¶ 298.
[1215] Cl. Mem. Merits, ¶ 298.
[1216] Cl. Mem. Merits, ¶ 299.
[1217] Cl. Reply Merits, ¶ 540 (emphasis added).

their debt with the project lenders,[1218] Claimants submitted that, using the DCF methodology their damages would be **EUR 521.4 million**:[1219]

Table I.     Summary of Updated Damages to Claimants – in € million as of June 30, 2016

| | But-For | A&S Second Report | | A&S Addendum | |
|---|---|---|---|---|---|
| | | Actual | Damages | Actual | Damages |
| | (a) | (b) | (a) - (b) | (c) | (a) - (c) |
| **FMV of Claimants Investments in NEEE** | 487.2 | 44.0 | 443.1 | 26.1 | 461.0 |
| *NEEE Equity Value in PTEs* | 450.6 | 8.1 | 442.4 | 41.7 | 408.9 |
| *NEEE Intercompany Loans to PTEs* | 29.4 | 29.5 | 0.0 | 0.0 | 29.4 |
| *NEEE Equity Value in NEEOS* | 7.2 | 6.4 | 0.7 | -31.8 | 39.0 |
| *Value of New Management Fee to NEEE* | 0.0 | 0.0 | 0.0 | 16.2 | -16.2 |
| **Historical Cash Flows** | 47.1 | -13.3 | 60.4 | -13.3 | 60.4 |
| **Total Damages** | 534.3 | 30.7 | 503.5 | 12.8 | 521.4 |

Source: Updated DCF Valuation Model – Including Actual Debt Restructuring (CLEX-283).
Note: The table includes only the value of Claimants' investments affected by the Measures. "A&S" stands for Abdala & Spiller.

615. While reiterating that its primary case is based on a present day ("*date of award*") valuation, because the date of award is a more reliable date, Claimants also submit that if the Tribunal were to be minded to adopt the approach of other tribunals "*by excluding historical losses during the period up to 30 June 2014, this would reduce the Claimants' €521.4 million damages figure by €7.3 million*" with "[t]*otal damages […] then be*[ing] €*514.1 million, excluding interest from 30 June 2016.*"[1220]

616. Claimants have also presented an "*alternative but-for-scenario*" for the event that the Tribunal were to conclude that Claimants could only have a legitimate expectation of a "*reasonable return*" on their investment, rather than the FiT and pool + premium options in Regulatory Framework I.[1221] Claimants have emphasized, however, that their main position is that their legitimate expectations were of the specific tariffs and premiums in RD 661/2007, and not just rooted on a "*reasonable return*."[1222] Claimants assert that the

[1218] *See* Cl. Reply Merits, ¶ 605; CER-Compass Lexecon Third, ¶ 1.
[1219] CER-Compass Lexecon Third, Table I, p.5; Cl. Skeleton, ¶ 54.
[1220] Cl. Obs. Eiser, ¶ 4.17.
[1221] Cl. Mem. Merits, ¶ 301; Cl. Reply Merits, ¶ 573; Cl. Skeleton, ¶ 58.
[1222] Cl. Mem. Merits, ¶ 300.

alternative but-for scenario would apply "*in the event that the Tribunal were to conclude that Spain was lawfully entitled to terminate Regulatory Framework I and to replace it with a tariff regime as set up by Regulatory Framework III.*"[1223]  Claimants have further explained that in this scenario, their experts have assumed that Regulatory Framework III applies, but "*they correct two components of that framework which are unfair and depart from standard regulatory conduct,*"[1224] namely, the allowable project costs and the allowed rate of return.[1225]

617.    The alternative scenario is "*based on an investment allowance equal to the Claimants' independently-audited capitalized costs of the project (€720.6 million)*" to which they "*apply a return based on the WACC of the Termosol Plants plus 300 (bps),*" finally grossed up to take account of taxation.[1226]    Under this scenario, Claimants initially claimed in the Memorial total losses of EUR 357.6 million, as follows:[1227]

- "*The value of the Claimants' equity in NEE España (reflecting their indirect 100% ownership of the PTEs, and the PTEs' shareholding in the EVC grid connection joint venture), has fallen from €357.6 million to €15.5 million (**a loss of €342.1 million**).*"

- "*The value of the Claimants' interest in the loans from NEE España to the PTEs has fallen from €19.6 million to €15.7 million (**a loss of €3.9 million**).*"

- "*The value of the Claimants' indirect 100% equity stake in NEEOS is unchanged.*"

- "*Lost historical cash flows to 30 June 2014 of **€11.5 million**.*"

618.    With the Reply on the Merits, Claimants "*updated the alternative damages case as of 30 June 2016,*" and argued that "*damages payable to the Claimants are €398.4 million, comprised of €63.8 million in historical cash flow damages from the implementation of the Measures up to 30 June 2016 and a loss of €334.6 million in the fair market value of the Claimants' equity investments on that date.*"[1228]

---

[1223] Cl. Reply Merits, ¶ 541.
[1224] Cl. Reply Merits, ¶ 573.
[1225] *See*, Cl. Reply Merits, ¶ 575.
[1226] Cl. Mem. Merits, ¶ 301; Cl. Reply Merits, ¶¶ 541, 574; Cl. Skeleton, ¶ 60.
[1227] Cl. Mem. Merits, ¶ 302 (emphasis in original); CER-Compass Lexecon First, ¶ 109, Table V.
[1228] Cl. Reply Merits, ¶ 541; CER-Compass Lexecon Second, ¶ 20, Table IV. *See also*, Cl. Reply Merits, ¶ 574.

619. And in the further updated calculation presented on 19 August 2016 after the Reply on the Merits to reflect the impact on damages resulting from the PTE's agreed restructuring of their debt with the project lenders,[1229] Claimants submitted that their damages under the alternative but-for scenario would be **EUR 416.3 million**.[1230]

Table II.     Summary of Updated Damages to Claimants under the Alternative But-For Scenario – in € million as of June 30, 2016

| | Updated Damages to Claimants | | | | |
|---|---|---|---|---|---|
| | | A&S Second Report | | A&S Addendum | |
| | But-For | Actual | Damages | Actual | Damages |
| | (a) | (b) | (a) - (b) | (c) | (a) - (c) |
| **FMV of Claimants Investments in NEEE** | 378.6 | 44.0 | 334.6 | 26.1 | 352.5 |
| *NEEE Equity Value in PTEs* | 342.8 | 8.1 | 334.7 | 41.7 | 301.1 |
| *NEEE Intercompany Loans to PTEs* | 29.4 | 29.5 | 0.0 | 0.0 | 29.4 |
| *NEEE Equity Value in NEEOS* | 6.4 | 6.4 | 0.0 | -31.8 | 38.2 |
| *Value of New Management Fee to NEEE* | 0.0 | 0.0 | 0.0 | 16.2 | -16.2 |
| **Historical Cash Flows** | 50.5 | -13.3 | 63.8 | -13.3 | 63.8 |
| **Total Damages** | 429.1 | 30.7 | 398.4 | 12.8 | 416.3 |

*Source: Updated DCF Valuation Model – Including Actual Debt Restructuring (CLEX-283).*
*Note: The table includes only the values of Claimants' investments affected by the Measures. "A&S" stands for Abdala & Spiller.*

620. Claimants submit that other than an inappropriate dismissal of Claimants' method of valuation, Respondent has not challenged a number of valuation parameters. Thus, Claimants argue that (i) Spain "*does not dispute that the net effect of the regulatory changes at issue in this case is a 36% reduction in the annual revenues that the PTEs expected*;" (ii) there is no substantial dispute over the fact that "*the Claimants injected €210 million in equity into NEE España and this is worth significantly less now*," with Claimants' experts valuing that equity stake as of 30 June 2016 at EUR 44 million, and Spain's experts implicitly conceding that, as of 30 June 2016, the value of Claimants' equity stake under the new framework has at least fallen between EUR 64.2 and 80.1 million.[1231]

---

[1229] *See* Cl. Reply Merits, ¶ 605; CER-Compass Lexecon Third, ¶ 1.
[1230] CER-Compass Lexecon Third, Table II, p. 6; Cl. Skeleton, ¶ 58.
[1231] Cl. Reply Merits, ¶ 544.

621. Claimants further submit that Spain's objections to the specifics of Claimants' DCF calculations are unavailing.[1232]  In particular, Claimants submit that:

- It is incorrect to calculate the "*but for*" FMV of the Termosol Plants based on what Regulatory Framework III deems to be Claimants' investment costs.[1233]  The valuation of an asset derives from its capacity to generate cash flow, not from historic cost.[1234]

- Spain's assertion that Claimants' DCF calculations imply a disproportionate IRR of 36.6% as compared to the 16.6% equity IRR expected at the time of investment is misleading.[1235]  The 16.6% IRR in the Bank Model is the return from "*building and operating the Plants for their entire useful life – in other words, from 2008-2043,*"[1236] while the 36.6% IRR covers a much shorter time span (2009 to 2014).[1237]

- It is incorrect to assert that the claim is speculative because the implicit IRR in Claimants' DCF model exceeds the industry Weighted Average Cost of Capital ("**WACC**").[1238]  The comparison is not appropriate, and in any event, the IRR can exceed the WACC,[1239] because RD 661/2007 "*was specifically designed to provide an investment return higher than the industry WACC in order to induce large scale investments in solar energy projects on an accelerated basis.*"[1240] Furthermore, a fundamental thesis of prudent investments is to choose projects in which the investor expects a profit, *i.e.* a rate of return higher than the cost of capital.[1241]

622. Similarly, Claimants dismiss Spain's objections to the calculation of the alternative but-for scenario, arguing that:

- Claimants' actual sunken costs (EUR 720.6 million), not Spain's hypothetical "*efficient and standard*" project costs (EUR 644.0 million), are the proper foundation for calculating a reasonable return.[1242]  Claimants argue that (i) virtually all European regulatory regimes for electricity or gas distribution use

---

[1232] Cl. Reply Merits, § VIII(3).

[1233] Cl. Reply Merits, ¶¶ 560-561.

[1234] Cl. Reply Merits, ¶ 561.

[1235] Cl. Reply Merits, ¶ 564.

[1236] Cl. Reply Merits, ¶ 565.

[1237] Cl. Reply Merits, ¶ 566.

[1238] Cl. Reply Merits, ¶ 568.

[1239] Cl. Reply Merits, ¶¶ 568-569.

[1240] Cl. Reply Merits, ¶ 569.

[1241] Cl. Reply Merits, ¶ 571.

[1242] Cl. Reply Merits, § VIII(4)(A), ¶¶ 577-582.

actual historical costs;[1243] (ii) this is apposite when the *rate of return* regime is applied retroactively after an investor has already incurred costs;[1244] (iii) Spain's selection of EUR 644 million as investment costs is flawed because it disallows several elements, in particular, EUR 72.3 million in financing costs incurred during construction.[1245]

- The WACC plus 300 bps is the uniform method of determining a reasonable return (not the sovereign bond yield plus 300 bps argued by Spain).[1246] Claimants contend that (i) their approach is endorsed by common regulatory practice in 20 European countries;[1247] (ii) 300 basis point premium over WACC is appropriate, and Spain's argument that an investor would have invested only receiving a return of the WACC is contrary to academic theory, the historical context of the solar energy initiative to attract investment, business common sense and witness evidence.[1248] Claimants contend that the CNE analyzed the FiT and pool + premium tariffs at the WACC plus 300 bps as the appropriate IRR to incentivize deployment of funds, plus 160 bps to compensate exposure to wholesale spot prices.[1249]

- The rate of return proposed by Spain is unreasonable because (i) it is lower than the cost of capital for similar solar thermal projects as of the time of Regulatory Framework III; (ii) it is lower than the investor's expectations at the time of closing of Claimants' investment (11.6% post-tax); and (iii) it is lower than the rate of return the CNE was expecting (10% for FiT, and 11.6% for the premium tariff).[1250]

623. Claimants also argue that Spain's application of the DCF method in its subsidiary calculations for assessing damages is flawed. For Claimants, Spain's calculations applied a wrong discount rate, made incorrect adjustments to the projection parameters and applied a liquidity discount without basis.[1251]

---

[1243] Cl. Reply Merits, ¶ 578.

[1244] Cl. Reply Merits, ¶ 579.

[1245] Cl. Reply Merits, ¶¶ 580-581.

[1246] Cl. Reply Merits, § VIII(4)(B), ¶¶ 583-596.

[1247] Cl. Reply Merits, ¶¶ 584-586.

[1248] Cl. Reply Merits, ¶¶ 588-592.

[1249] Cl. Reply Merits, ¶ 592.

[1250] Cl. Reply Merits, ¶ 595.

[1251] Cl. Reply Merits, ¶ 599.

#### d. Impact of the TVPEE

624.  Claimants contend that *"neither side's quantum experts attributed any specific loss in future revenues to the TVPEE."*[1252] According to Claimants, *"the effect of declining jurisdiction over the TVPEE"* is that *"it would reduce their historical damages by €1.1 million (which is the loss resulting from the application of the levy from the dates that the Termosol Plants started operation (19 May 2013 and 7 June 2013) until 9 July 2013, when Regulatory Framework III took effect)."*[1253] Claimants argue that this quantification has not been challenged.[1254] Therefore, Claimants submit that, since they have quantified damages applying the DCF methodology at EUR 521.4 million as of 30 June 2016, which includes lost historical cash flows as of that date (EUR 60.4 million), if the Tribunal rules that it has no jurisdiction over the TVPEE *"the historical loss component for the period up to 20 June 2014 during the temporary application of Regulatory Framework II would be reduced by €1.1 million, resulting in total damages of €520.3 million as of 30 June 2016."*[1255]

625.  Claimants add, however, that if the Tribunal were to conclude *"that the Claimants could only expect a 'reasonable return,' there would be no need to make any adjustments for the TVPEE,"* because this *"alternative applies Regulatory Framework III but uses the independently-audited capitalised investment costs of the Termosol Plants and the return of WACC + 300 bps identified as reasonable by Spain under Regulatory Framework I."*[1256] Thus, *"in that alternative but-for, the TVPEE is reimbursed on all electricity revenues in accordance with the principle enshrined in Ministerial Order IET/1045/2014."*[1257]

---

[1252] Cl. Obs. Eiser, ¶ 4.8.
[1253] Cl. Obs. Eiser, ¶ 4.8.
[1254] Cl. Obs. Eiser, ¶ 4.8.
[1255] Cl. Obs. Eiser, ¶ 4.15.
[1256] Cl. Obs. Eiser, ¶ 4.10.
[1257] Cl. Obs. Eiser, ¶ 4.10.

### e. Interest

626. Claimants assert interest is an integral component of full compensation under customary international law.[1258] According to Claimants, if the Tribunal applies the principle of full reparation as of the date of the award, including historical losses, pre-award interest would not be necessary. However, if the Tribunal decides to apply a valuation date prior to the date of the award, pre-award interest would be owed from that date onwards until the date of the award.[1259] In addition, Claimants submit, they are entitled to post-award interest from the date of the award until the date of payment, "*at a commercial rate established on a market basis.*"[1260] According to Claimants, while this is mentioned in the ECT in the context of expropriation, "*there is no logical reason for applying a different approach to interest in respect of a breach of Art. 10(1) of the ECT.*"[1261]

627. Claimants submit that it would be appropriate to award a "*rate reflecting the cost of equity applicable to the underlying investment,*" on the ground that this compensates the cost of raising the equity funds of which they have been deprived.[1262] In particular, Claimants initially requested an interest rate of 7.62% in the Memorial on the Merits,[1263] and later in the Reply on the Merits requested a rate of 6.84% as of 30 June 2016.[1264] In the alternative, Claimants request interest at "*commercial interest rate prevailing in Spain for credit risk similar to the Termosol project*s," such as the interest rate of EURIBOR + 3.5% prescribed in the credit agreement negotiated between the PTEs and their project lenders.[1265] Claimants further submit that interest should be compounded.[1266]

---

[1258] Cl. Mem. Merits, ¶ 303.
[1259] Cl. Mem. Merits, ¶ 304.
[1260] Cl. Mem. Merits, ¶ 305.
[1261] Cl. Mem. Merits, n. 386.
[1262] Cl. Mem. Merits, ¶ 306.
[1263] Cl. Mem. Merits, ¶ 310.
[1264] Cl. Reply Merits, ¶ 602.
[1265] Cl. Mem. Merits, ¶ 311; Cl. Reply Merits, ¶ 602.
[1266] Cl. Mem. Merits, ¶¶ 312-313; Cl. Reply Merits, ¶ 543.

628. Claimants dismiss Spain's approach to the subject of interest rates, arguing that it does not provide "*any convincing substantiation*," and argues that using a rate equivalent to the cost of equity ensures full reparation.[1267]

**(2) Respondent's Position**

629. Spain's primary contention is that, as there has been no violation, no damages are due.[1268] That said, Spain also opposes Claimants' damages case, arguing that: (i) it is speculative; (ii) the DCF method is inappropriate in this case; (iii) the arguments on the alternative case are inaccurate; and (iii) the requested interest rates are not correct.[1269]

**a. Method of Valuation**

630. Respondent argues that the DCF method is inappropriate in the circumstances of this case,[1270] because: (i) there is insufficient financial record (less that one year); (ii) this is a capital intensive business with a significant asset base, with no relevant intangibles to be valued; (iii) the solar thermal industry lacks maturity; (iv) cash flows are highly dependent on volatile and unpredictable elements such as the pool price; (v) weakness of the non-recourse project finance agreed; (vi) the long term for the forecast: 30 years; (vii) there is a contradiction between such timespan, and the average life cycle of the Termosol Plants in their official accounting (20-25 years); (viii) there is disproportion between the track record of one year and the forecasts to 30 years; (ix) there is disproportion between the alleged investment and the amount claimed.[1271]

631. According to Spain, the appropriate method would be one based on cost of the asset.[1272]

**b. Damages Valuation**

632. For Respondent, the damages assessed by Claimants are speculative.[1273] Spain argues that a calculation based in the difference between historic and future cash flows, on an

---

[1267] Cl. Reply Merits, ¶ 603.
[1268] Resp. C-Mem. Merits, ¶ 842.
[1269] Resp. C-Mem. Merits, ¶ 844.
[1270] Resp. C-Mem. Merits, ¶¶ 859, 878.
[1271] Resp. C-Mem. Merits, ¶ 859.
[1272] Resp. C-Mem. Merits, ¶¶ 861-864.

arbitrary valuation date of 30 June 2014, ignores the basic concepts of the regulatory life cycles, and overlooks the *"joint consideration of past and potential cash flows to guarantee a reasonable return of the investments made."*[1274] Furthermore, the comparison between the real and counterfactual scenarios is simplistic, hypothetical and unrealistic, as it *"presume[s] that the 'real' scenario will be maintained over forthcoming decades and overlook[s] the fact that the governing principle of the system is formed by the guaranteed reasonable return."*[1275] The calculation is speculative, Respondent argues, due to its long time horizon and the fact that there is no guarantee that the remuneration will remain petrified in the current form.[1276]

633.    Respondent further submits that the but-for valuation is exaggerated if compared to the book value;[1277] and the implicit IRR in Claimants' valuation is an unjustifiable 36.6%, when compared to the 16.6% foreseen at the time of investment, and the 7.62% discount rate calculated by Claimants' expert.[1278]

634.    Respondent further criticizes Claimants' valuation, arguing that *"[t]here is a large disparity (+84.7%) between the Plant's value in Lexecon's But For (€1.1625 billion) and the value of investment (€629.3 million)"* which given the *"barely 3 years of operations cannot be justified by economic motives that are intrinsic to the business."*[1279] Moreover, for Respondent, the shareholder's exit IRR of 30.4%, and the project's exit IRR of 16.5% *"are extraordinarily high and therefore unimaginable in a regulated market that provides protection to the players."*[1280] In addition, Respondent argues that Claimants' calculations include a series of payments as *"investment or operating costs when they are*

---

[1273] Resp. C-Mem. Merits, ¶ 845; Resp. Rej. Merits, ¶ 1199.

[1274] Resp. C-Mem. Merits, ¶ 847; Resp. Rej. Merits, ¶ 1210.

[1275] Resp. C-Mem. Merits, ¶ 849; Resp. Rej. Merits, ¶ 1201.

[1276] Resp. Rej. Merits, ¶ 1202.

[1277] Resp. C-Mem. Merits, ¶ 871.

[1278] Resp. C-Mem. Merits, ¶¶ 873-876.

[1279] Resp. Rej. Merits, ¶ 1217 (quoting RER-Accuracy Second Economic, § 1.4).

[1280] Resp. Rej. Merits, ¶ 1217 (quoting RER-Accuracy Second Economic, § 1.4).

*actually, [...] either dividends disguised as management fees paid to the NextEra group or 'promote or success fees' outside the market paid to linked entities.*"[1281]

635.	Respondent also contends that Claimants' alternative but-for scenario errs in various ways: (i) it replaces the appropriate investment basis (standard investment costs of standard facilities) with the costs declared by Claimants; (ii) it fixes a rate of return *ad eternum*, overlooking the dynamic nature of the notion of *"reasonable return;"* (iii) it calculates reasonable return unjustifiably adding 300 bps to the WACC; and (iv) it errs in calculating the post-tax WACC, as it applies the nominal tax rate to its pre-tax WACC.[1282]	According to Respondent, the applicable effective rate of return of 7.398% (pre-tax) guaranteed by the current regime, leads to a reasonable return of 6.5% to 6.9% post-tax.[1283]

636.	Lastly, while objecting to the use of the DCF, Spain presents its own DCF calculation as a *"subsidiary contention."*	In the initial calculations presented with the Counter-Memorial on the Merits, Respondent argued that the results ranged from an increase of EUR 19.3 million in Claimants' investment (a positive impact on Claimants) to a negative impact on Claimants' investment of EUR 34.5 million.[1284]	In the updated calculation filed with the Rejoinder on the Merits, Respondent reiterated that the current regime is more beneficial in purely financial terms, arguing that the impact of the dispute measures is a positive impact of EUR 32.5 million.[1285]

637.	Respondent further submits that Claimants have erroneously applied the premium of Article 36 of RD 661/2007, which only *"applies to facilities of no more than 50 MW,"* while the Termosol Plants *"have more than 50 MW"* and are thus under the *"lower premium of Article 45 [...]."*[1286]	But according to Spain, even applying the regime in

---

[1281] Resp. Rej. Merits, ¶ 1218.

[1282] Resp. C-Mem. Merits, ¶ 888. *See also, id.*, ¶¶ 883-886; Resp. Rej. Merits, ¶¶ 1223-1225.

[1283] Resp. C-Mem. Merits, ¶ 887.

[1284] Resp. C-Mem. Merits, ¶ 892.

[1285] Resp. Rej. Merits, ¶ 1231.

[1286] Resp. Rej. Merits, ¶ 1232. At the Hearing and in Post-Hearing submissions, Respondent further argued that, "[b]*y having an installed capacity over 50 MWs, the Termosol Plants are receiving the payments of Article 36 of RD 661/2007 for the MWs that should be destined to their self-consumption.*" Resp. PH Mem., ¶ 16. This is because, if the installed capacity of the Termosol Plants were actually 50 MW, their output would be 44.9MW after deducting

Article 36 of RD 661/2007, the results would remain significantly below Claimants' calculations. Respondent's expert calculated the impact in this scenario as a negative impact of EUR 23.1 million.[1287]

638. Respondent also takes issue with other parameters in Claimants' valuation, arguing that: (i) the appropriate life cycle of the plants is 25 years and not 30 years;[1288] and (ii) the but-for-scenario would involve a higher risk than the actual scenario.[1289] It goes on to submit that, "*in purely financial terms, the current scheme might be more beneficial to the Claimants than RD 661/2007, depending on the parameters and hypothesis considered.*"[1290]

639. Finally, referring to the issue of the impact of the date of valuation, Respondent submits that the question has a great effect on quantum, and argues that it cannot accept a date of award valuation.[1291] Respondent further opposes Claimants' allegation that if the Tribunal were to adopt the approach of other tribunals "*by excluding historical losses during the period up to 30 June 2014*" the effect would be a reduction in Claimants' claim of EUR 7.3 million.[1292] Respondent contends that the expert reports simply do not address the separate impact of the individual disputed measures.[1293]

### c. Impact of the TVPEE

640. With regard to the effect of the TVPEE on damages calculations, Respondent submits that to eliminate the TVPEE's impact is not enough to eliminate the "*historical damages.*"[1294] Moreover, for Respondent, "*even though in the Actual world the TVPEE tax is neutralized (as recognized by both parties), [...] for damages calculation, it must*

---

MWs for self-consumption. Resp. PH Mem., ¶ 5. But Respondent has also explained that the effect of this on *quantum* is not to subtract the payment from those excess MWs, but rather, to apply to the Termosol Plants the economic regime in Article 45 of RD 661/2007 in the but-for-scenario. Resp. PH Mem., ¶¶ 16-17.

[1287] Resp. Rej. Merits, ¶ 1234.

[1288] Resp. C-Mem. Merits, ¶ 893; Resp. Rej. Merits, ¶ 1236.

[1289] Resp. C-Mem. Merits, ¶ 894; Resp. Rej. Merits, ¶ 1237.

[1290] Resp. C-Mem. Merits, ¶ 890.

[1291] Resp. Reply Eiser, ¶ 63.

[1292] Resp. Obs. Eiser, ¶¶ 67-70.

[1293] Resp. Obs. Eiser, ¶ 71.

[1294] Resp. Obs. Eiser, ¶ 45.

*be deducted from the But-for value, since that measure implies, by definition, an expense of 7% of plants' revenues"* while *"the Actual value remains the same, since it is not affected by any Tribunals' declaration regarding jurisdiction or liability."*[1295]  In Spain's view, however, neither Party's experts reports reflect the separate impact of the individual measures, and new expert reports would be required if that impact needs to be assessed.[1296]

### d. Interest

641. For Spain, the interest rates proposed by Claimants lack grounds and are intended to compensate risks never effectible borne.[1297]  According to Spain, at most, the applicable rate should be *"equivalent to the Spanish sovereign bond,"*[1298] which according to Respondent's experts would be a rate of 0.9%.[1299]  For pre-award interest, Spain further submits that, instead of a 10-year bond, Respondent's experts have applied an interest equivalent to the bond for the period between the appraisal date and the estimated date of award.  For Spain, the same criteria must apply to post-award interest.[1300]

## B. TRIBUNAL ANALYSIS

642. While Respondent takes issue with the entitlement of the Claimants to any damages in this case and disputes the approach of the Claimants to the measurement of damages, it does not dispute the proposition of the Claimants that the principles set out in the *Chrozów Factory Case* and in Article 31 of the ILC Articles on State Responsibility, are applicable to the measurement of damages. Thus the arguments before the Tribunal related to the correct way to assess any loss determined by the Tribunal to have occurred.

### (1) The DCF Method for Determining Damages

643. The Tribunal recognizes that the DCF method is frequently invoked in investor-State arbitrations and has been applied by tribunals.  However, a critical element in the

---

[1295] Resp. Obs. Eiser, ¶ 48.
[1296] Resp. Obs. Eiser, ¶ 48.
[1297] Resp. C-Mem. Merits, ¶ 898.
[1298] Resp. C-Mem. Merits, ¶ 899.
[1299] Resp. C-Mem. Merits, ¶ 900.
[1300] Resp. Rej. Merits, ¶¶ 1238-1239.

application of the DCF method is finding an appropriate base for the forecast of future earnings. The difficulty in this case is that the Termosol Plants had been in operation for less than one year when the breach occurred. As Respondent points out, Claimants were relying on less than a year of profits in order to project long-term earnings for the next 30 years.

644. Claimants argue that this is not a problem in this case, because Regulatory Framework I provides the basis for calculating future profits. The report of Dr. Abdala and Professor Spiller calculate the "*but for*" revenues on the basis of the "*pool + premium*" option set out in Regulatory Framework I.[1301]

645. However, the Tribunal is not convinced that Regulatory Framework I provides an appropriate basis for what might have happened in the absence of Regulatory Framework III. The assumption that in the absence of Regulatory Framework III Claimants would be entitled to Regulatory Framework I is based on the view that there was an entitlement to the terms of Regulatory Framework I. But, as pointed out earlier (*supra*, ¶¶ 591, 596) Claimants could not have had a legitimate expectation of an entitlement to Regulatory Framework I; they just had a legitimate expectation that there would not be a substantial or fundamental change to Regulatory Framework I.

646. Other changes to Regulatory Framework I might have occurred. For example, if Respondent had changed the options and abolished the pool + premium approach and provided only the FiT option leaving everything else intact, that might have been a legitimate exercise of regulatory authority involving no denial of FET. If that was possible then why should the pool + premium option be the appropriate basis for the "*but for*" analysis in determining loss?[1302]

647. In the absence of Regulatory Framework I as the touchstone, there is no obvious starting point for the "*but for*" analysis under a DCF approach. What is left is less than one year

[1301] Cl. Mem. Merits, ¶¶ 295-296.
[1302] There is a similar problem with relying on the 2011 Bank Model (the financial model agreed with Claimants' lenders, which was equally based on Regulatory Framework I).

of actual profits as the basis for the DCF calculation. In the Tribunal's view, this is not a sufficient basis for the application of the DCF method in this case.

### (2) An Alternative Basis for a Damages Assessment

648. Having rejected the DCF method of valuation in the circumstances of this case, the Tribunal must now find another valuation method. As an alternative approach to the calculation of loss, Claimants expert, Compass Lexecon has provided an "*alternative but-for scenario*" on the basis of a "*reasonable rate of return*."[1303] This approach was not dissimilar from the asset-value approach, proposed by Respondent, based on the value of the assets and a reasonable return.[1304]

649. The Tribunal notes that the Parties are not completely in accord on this alternative method of valuation and they disagree on how it should be applied, each producing results that are substantially different from each other.

650. Nonetheless, the Tribunal is of the view that in this case this "*alternative*" valuation discussed by the Parties in their pleadings, based on a calculation of the value of the assets and a reasonable return on that value is an appropriate method for valuation of loss in this case.

### (3) The Quantification of Loss

651. The disagreement of the Parties on quantification relates to the valuation of the assets, whether there should be an additional 300 bps added to the WAAC, and how the impact of taxation should be calculated.

#### a. Value of Assets

652. In their initial pleadings both Parties valued assets as of 30 June 2014.[1305] However, in its second report, Compass Lexecon updated its valuation to 30 June 2016.[1306] Although Respondent continued to criticize the figures in Claimants' alternative but-for approach,

---

[1303] Cl. Mem. Merits, ¶¶ 301-302.

[1304] Resp. Rej. Merits, ¶ 1197 (claiming is less speculative and easier to apply); Resp. C-Mem. Merits, ¶ 862.

[1305] CER-Compass Lexecon, First, ¶ 109, Table V; RER-Accuracy Second Economic, ¶ 329.

[1306] CER-Compass Lexecon Second, ¶ 20, Table IV; and CER-Compass Lexecon Third, ¶ 5, Table II.

it did not raise any objection to the 30 June 2016 valuation date. Accordingly, the Tribunal will use that date for its analysis.

653.    Claimants derive the value of the assets from their actual value relying on Claimants' *"independently-audited capitalized costs of the project."*[1307] Respondent disagrees with basing the asset value on costs actually incurred, arguing, *"a model of a reasonable return must in all cases take into account the standard costs of cost effective standard facilities."* They object to the inclusion of capitalized intercompany costs and investments in related companies, arguing that there was insufficient information to justify either.[1308]

654.    In the Tribunal's view, Respondent's argument that the standardized costs of efficient cost-effective facilities should be the basis for any calculation might be relevant for devising a regulatory regime based on a reasonable return. The regulatory regime would then set out what return is being offered and investors could decide whether or not to invest on the basis of the return they could receive for their investment. But that is not the situation here.

655.    The task for the Tribunal is to determine what loss Claimants suffered as a result of Respondent's breach of its obligation to provide fair and equitable treatment. Claimants did not suffer a notional loss based on the *"standard costs of cost effective standard facilities."* They had actual sunk costs and those costs have to be the basis for assessing their loss.

656.    The principal difference between the Parties in the valuation of assets is whether financing costs should be included.[1309] Respondent's expert, Accuracy, argues that financing costs are not really part of the investment. They are the personal decision of the investor on its financing scheme and have no implications for the generation of power.[1310] Claimants see the financing of an investment as an integral part of the

---

[1307] Cl. Mem. Merits, ¶ 301.
[1308] RER-Accuracy First Economic, ¶ 417.
[1309] Cl. Reply Merits, ¶ 581.
[1310] RER-Accuracy First Economic, ¶ 417.

investment. Long-term investments like the Termosol Plants could not occur without financing arrangements.[1311] Moreover, Claimants argue that Spain was well aware that projects would be funded from third party funding. Its own energy plan for 2005-2010 had a line for financing from external sources.[1312]

657. The Tribunal considers that Respondent once again is conflating what might be devised in a regime established to provide a reasonable return with the losses suffered by an investor in the event of breach of its obligations under the ECT. An investment regime might be based on the exclusion of financing costs in calculating a reasonable return under that regime. Indeed Respondent's expert Accuracy, in criticizing the use by Claimants' expert Lexecon of financing costs in its alternative but-for model, says *the profitability model of a regulated activity must, in any case, be based on efficient, standardized cost and be independent of financing costs.*[1313] That is a reference to devising a model for a reasonable return, not in assessing loss resulting from Respondent's breach of its obligations towards the investor.

658. The question before the Tribunal is not how a regulated activity should determine what constitutes a reasonable return, but what loss the Claimants suffered. On undertaking an investment an investor would reasonably expect that the returns from the investment would cover all the costs of making that investment. The examples given by Claimants where regulatory regimes do include financing costs in determining a reasonable rate of return reinforce the reasonableness of this expectation.[1314] No rational investor would sink money into a project that did not offer a return that would cover its costs. And, the financing of projects of this size and duration inevitably involves a regime with third party financing.

659. In its first report Respondent's expert, Accuracy, also objected to the inclusion in the Claimants' valuation of assets capitalized intercompany costs and investment in related

---

[1311] Cl. Reply Merits, ¶ 581.
[1312] Tr. Day 1 (ENG), 132:19–133:16 (Mr. Zimmerman).
[1313] RER-Accuracy First Economic, ¶ 418.
[1314] Cl. Reply Merits, ¶¶ 578, 581.

companies.[1315]  In its second report, Accuracy changed its position and included investment in related companies[1316] following Claimants' expert Compass Lexecon's explanation that the company in question EVC, had been developed by Claimants and the PTEs "*to deliver their electricity production to the Spanish national grid.*"[1317]

660.  As far as intercompany costs are concerned, as Compass Lexecon pointed out, these costs relate to technical, legal and financial services related to the construction of the plants.  If these services were not provided by companies of the NextEra group they would have had contracted for from outside.[1318]  In the Tribunal's view, these were therefore costs incurred in the construction of the Termosol Plants and should be included in the calculation of Claimants' losses.

661.  Accordingly, the Tribunal concludes that financing costs, intercompany costs and investments in related companies should be included in determining the valuation of Claimants' assets.  Thus, the Tribunal accepts Claimants' figure of EUR 720.6 million for the capitalized costs of the project for the purpose of calculating a reasonable rate of return.

### b.  What Constitutes a Reasonable Rate of Return?

662.  The Tribunal notes that the Parties agree that the WACC of the Termosol plants provides the appropriate basis for determining a reasonable rate of return in an assessment not based on the DCF method.  The difference between them is whether the WACC should be supplemented by 300bps.  Spain had chosen to provide a return under Regulatory Framework I that was significantly higher than the WACC in order to attract "*accelerated investment in renewables.*"[1319]  Claimants' expert, Compass Lexecon, also points out that a premium above WACC is common in regulatory regimes in European

---

[1315] RER-Accuracy First Economic, ¶ 417.
[1316] RER-Accuracy Second Economic, ¶ 340.
[1317] CER-Compass Lexecon Second, ¶ 102.
[1318] CER-Compass Lexecon Second, ¶ 101.
[1319] Cl. Reply Merits, ¶ 590.

jurisdictions.[1320] CNE supported an IRR of WACC plus 300bps when providing advice on the development of the regulatory regime that became Regulatory Framework I.[1321]

663. Taking account of these considerations, the Tribunal considers that a premium in addition to the WACC is appropriate in determining the loss that would be suffered under a reasonable rate of return approach to measuring damages. The question is whether 300bps over the WACC is the appropriate rate.

664. For the reasons given earlier, the Tribunal considers that Regulatory Framework I is not the proper basis for determining loss in this case. Thus, the premium that was proposed for Regulatory Framework I could not be presumed automatically to be the appropriate premium for this damages calculation. On the information provided to the Tribunal, there is no consistent practice of fixing the premium at 300bps in European jurisdictions that provide for a premium when calculating a return on investment in regulated sectors.

665. In determining the appropriate bps to be added to the WACC, the Tribunal took into in account the desire to encourage entrants into the Spanish solar energy system as well as the view expressed by CNE that a premium over WACC was a reasonable expectation of return.

666. Taking all of this into account, the Tribunal concludes that the appropriate return on investment for the calculation of loss should be WACC plus 200bps.

### c. The Taxation Issue

667. The Tribunal notes the difference between the Parties over whether taxation should be taken into account by converting a post-tax rate of return into a pre-tax rate of return on the basis of a nominal tax rate of 30%, or whether the rate of conversion should an effective rate rather than a nominal rate. In considering this, the Tribunal took account of the fact that the statement of Compass Lexecon that the use of the nominal rate is "*accepted regulatory practice*" was not contradicted by Respondent and noted the

---

[1320] CER-Compass Lexecon Second, ¶ 132, Table XVI; Tr. Day 1 (ENG), 136:24–137:6 (Mr. Zimmerman).
[1321] CER-Compass Lexecon Second, ¶ 108(c).

difficulty of calculating an "*effective rate*" for each year if a nominal rate were not to be used.

668.   The Tribunal concludes, therefore, that the use of a nominal tax rate is appropriate for the purpose of converting the post-tax rate of return into a pre-tax rate of return in the circumstances of this case.

### d.   The Effect of Debt Restructuring

669.   The Tribunal does not consider that the effect of debt restructuring is an appropriate consideration to include in the valuation of Claimants' investment.   The decision to restructure the debt and to accept the arrangement that was finally concluded was a decision of the Claimants.   There is no objective way for the Tribunal to determine whether that was the best arrangement for restructuring the investment or whether another arrangement might have been made to minimize the impact on the value of the Claimants' investment.

670.   Accordingly, the Tribunal has not included the effect of debt restructuring in its calculation of damages.

### e.   Interest

671.   The Tribunal accepts that interest is appropriate in this case.   However, the ECT makes no provision for calculating interest in cases of violation of Article 10.   In the case of expropriation, the ECT provides in Article 13, that interest is to be provided "*at a commercial rate established on a market basis.*"[1322]   This is consistent with the purpose of interest, which is to compensate Claimants for their loss of the opportunity to use their capital, and is applicable to both pre-judgment and post-judgment periods.

672.   Claimants propose an interest rate of 7.62% based on a calculation of a notional cost of capital for the purposes of their DCF approach to the determination of damages.   In other words, it is a rate based on certain assumptions, including market and country risk

---

[1322] **CL-001 / RL-055**, ECT, Art. 13.

premiums.[1323]   It is not based on empirical evidence of what rate could actually be obtained in the market.   Their alternative proposal for interest of EURIBOR + 3.5%, is based in what the PTEs negotiated with the project lenders.   This rate suffers from the fact that it is Claimants themselves who are effectively setting the rate.

673.   Respondent argues that interest must be based on the rate that would apply in the case of a risk-free asset, Spanish sovereign bonds, on the basis of the rate that would apply during the period between date of valuation and the Award.   The tribunal in *Novenergia* adopted 10-year Spanish sovereign bonds as the appropriate basis for setting the interest rate.[1324] The tribunal in *Eiser* stated that in the interest of encouraging early payment of the award, it set prejudgment interest at 2.07 % and post-judgment interest at 2.50%.[1325]

674.   The Tribunal notes that the only evidence before it of a market rate is the rate of Spanish sovereign bonds.   This may not be a commercial rate, but in the absence of any evidence of a commercial rate other than what Claimants managed to negotiate with respect to the project lenders, there is nothing for the Tribunal to go on in setting a rate that can be described as a market rate.   Thus, the Tribunal accepts the rate on 5-year Spanish sovereign bonds at the date of the Award as the appropriate interest rate in this case.

675.   Claimants argue that interest should be compounded; Respondent makes no specific submission on this point.   The Tribunal accepts that compound interest is commonly awarded in investment arbitrations and considers it appropriate in this case.

676.   Accordingly, the Tribunal decides that the interest rate will be based on 5-year Spanish sovereign bonds at the date of the Award, compounded monthly.   This rate will apply to pre-judgment interest calculated from the date of valuation, 30 June 2016, to the date of the Award, and to post-judgment interest from the date of the Award until the date of payment.

---

[1323] CER-Compass Lexecon First, pp. 70-71, ¶ 132, Table VI.
[1324] **CL-195**, *Novenergía*, ¶ 846.
[1325] *Eiser*, ¶ 478.

#### f. Other Issues

677. The Tribunal notes that since it has based its damages calculation on a valuation of assets and a reasonable return, the arguments of the Parties relating to damages based on a DCF calculation are no longer relevant and have not been dealt with in this Decision.

#### g. Conclusion

678. The Tribunal has concluded that Claimants are entitled to damages based on a return on the capitalized value of their assets as of 30 June 2016 on the basis of the WAAC of the Termosol Plants plus a premium of 200bps. In its Reply on the Merits, Claimants calculated their loss on the basis of a premium of 300bps. That amount prior to debt restructuring came to EUR 398.4 million.[1326] Since the Tribunal has accepted the arguments of the Claimants with respect to the valuation of assets and taxation and rejected its arguments on debt restructuring the amount of EUR 398.4 million has to be recalculated on the basis of WACC plus 200 bps instead of WACC plus 300 bps.

679. The Tribunal has also concluded that both pre-judgment and post-judgment interest are to be awarded on the basis of 5-year Spanish sovereign bonds as at the date of the Award, compounded monthly.

680. The Tribunal invites Claimants to recalculate their damages claim of EUR 398.4 million in the light of a premium of WACC plus 200 bps and advise the Tribunal and Respondent of this recalculated amount within 10 days of the receipt of this Decision.

## IX.   COSTS

681. The Tribunal reserves the determination of costs until its Award.

## X.   DECISION

682. The Tribunal decides:

    (i)    That it has jurisdiction over this dispute.

---

[1326] Cl. Reply Merits, ¶ 541.

(ii) That Respondent did not comply with its obligation under Article 10(1) of the ECT to provide fair and equitable treatment in that it failed to protect Claimants' legitimate expectations.

(iii) That Claimants are entitled to damages based on a return on the capitalized value of their assets as of 30 June 2016 on the basis of the WACC of the Termosol Plants plus a premium of 200bps, together with pre-judgment interest on the basis of 5-year Spanish sovereign bonds as at the date of the Award, compounded monthly.

(iv) That Claimants are to recalculate their damages claim of EUR 398.4 million in the light of a premium of WACC plus 200 bps and advise the Tribunal and Respondent of this recalculated amount within 10 days of the receipt of this Decision.

(v) That Claimants are entitled to post-judgment interest from the date of the Award on the basis of 5-year Spanish sovereign bonds as at the date of the Award, compounded monthly, until payment.

The Honourable L. Yves Fortier, P.C., C.C., O.Q., Q.C.
Arbitrator

Professor Laurence Boisson de Chazournes
Arbitrator

Professor Donald M. McRae, C.C.
President