**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

**EISER INFRASTRUCTURE LIMITED AND
ENERGIA SOLAR LUXEMBOURG S.A.R.L.**

**v.**

**KINGDOM OF SPAIN**

**ICSID Case No. ARB/13/36 – ANNULMENT PROCEEDING**

_____

# DECISION ON STAY OF ENFORCEMENT OF THE AWARD
_____

*Members of the Committee*
Mr. Ricardo Ramírez Hernández, President
Ms. Teresa Cheng
Judge Dominique Hascher

*Secretary of the Committee*
Ms. Mairée Uran Bidegain

23 March 2018

THE PARTIES' REPRESENTATIVES

*Representing Eiser Infrastructure Limited and Energia Solar Luxembourg S.a r.l.:*

*Gibson, Dunn & Crutcher LLP*
c/o Mr Jeffrey Sullivan
Ms Ceyda Knoebel
Ms Nadia Wahba
Telephone House 2-4 Temple Avenue
London, EC4Y 0HB
United Kingdom

Mr Rahim Moloo
200 Park Avenue
New York, NY 10166
United States of America

*Representing the Applicant*:

*Abogacía General del Estado*
*Ministry of Justice*
*of the Government of Spain*
c/o Mr. Diego Santacruz Descartín
Ms. Mónica Moraleda Saceda
Mr. Javier Torres Gella
Ms. Amaia Rivas Kortazar
Mr. Antolín Fernandez Antuña
Mr. Javier Castro López
Ms. Elena Oñoro Sainz
Mr. Roberto Fernández Castilla
Ms. Patricia Froehlingsdorf Nicolás
Ms. Ana María Rodríguez Esquivias
Mr. Álvaro Navas López
Ms. Gloria de la Guardia Limeres
Calle Ayala 5
28001, Madrid
Spain

*Curtis, Mallet-Prevost, Colt & Mosle LLP*
Ms. Miriam K. Harwood
101 Park Avenue
New York, New York
10178-0061
United States of America

Mr. Benard V. Preziosi
99 Gresham Street
London EC2V 7NG
United Kingdom

Ms. Claudia Frutos-Peterson
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
United States of America

Ms. Gabriela Alvarez-Avila
Rubén Darío 281, Piso 9
Col. Bosque de Chapultepec
11580 Ciudad de México
México

i

# TABLE OF CONTENTS

I.     PROCEDURAL HISTORY .................................................................................... 1

II.    POSITION OF THE PARTIES ............................................................................ 3

       a.    Spain's request to continue the Provisional Stay ....................................... 3

       b.    Eiser's opposition to the continuation of the Provisional Stay ................... 9

III.   ANALYSIS OF THE COMMITTEE ................................................................... 16

       a.    The applicable standard ............................................................................ 16

       b.    The Application for Annulment is based on serious grounds .................... 20

       c.    Eiser cannot show it would be prejudiced by continuing the Provisional Stay ....... 22

       d.    Spain runs a risk of non-recoupment if the Provisional Stay is lifted .................... 23

       e.    There is no risk that Spain would fail to comply with the Award, if it is not annulled
             ................................................................................................................ 24

       f.    Conflict between ICSID Convention and EU law ..................................... 24

IV.    COSTS .............................................................................................................. 25

V.     DECISION ........................................................................................................ 25

## I.    PROCEDURAL HISTORY

1.    On 28 July 2017, the Acting Secretary-General registered an application for annulment of the Award rendered on 4 May 2017 in *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à.r.l v. Kingdom of Spain* (ICSID Case No. ARB/13/36) (the "**Award**"), filed by the Kingdom of Spain (the "**Application for Annulment**"). The Application for Annulment included a stay of enforcement request. Specifically, it requested that the Secretary-General notify the Parties of the provisional stay of enforcement of the Award, and that the stay be maintained until the Decision of the *ad hoc* Committee is rendered.[1]

2.    On that same date, the Acting Secretary-General notified the Parties of the provisional stay of the enforcement of the Award, pursuant to ICSID Arbitration Rule 54(2) (the "**Provisional Stay**").

3.    On 23 October 2017, the *ad hoc* Committee was constituted in accordance with ICSID Arbitration Rules 6, 52(2), and 53. Its Members are: Mr. Ricardo Ramírez Hernández (Mexican) President, Ms.Teresa Cheng (Chinese), and Judge Dominique Hascher (French) (the "**Committee**").

4.    On 22 November 2017, the Kingdom of Spain ("**Spain**" or the "**Respondent**" or the "**Applicant**") filed a Submission in Support of Continuation of the Provisional Stay of Enforcement of the Award (the "**Submission**").

5.    On 4 December 2017, at the invitation of the Committee, Eiser Infrastructure Limited and Energía Solar Luxembourg S.à.r.l ("**Eiser**" or the "**Claimants**") filed its Response to the Kingdom of Spain's Submission in Support of the Continuation of the Provisional Stay of Enforcement of the Award (the "**Response**").

---

[1] Application for Annulment, para. 59.

6.     The first session was held by the Committee in Paris on 9 December 2017 (the "**First Session**"). At the occasion of the First Session, Spain and Eiser presented their oral submissions on the Continuation of the Stay of Enforcement.

7.     On 4 December 2017, the Committee invited the Parties to present further written submissions on the question of the Stay of Enforcement of the Award.

8.     On 21 December 2017, Spain filed another Submission in Support of Continuation of the Stay of Enforcement ("**Spain 21 Dec. Submission**"). On the same date, Eiser filed its Further Submission on the Continuation of the Provisional Stay ("**Eiser 21 Dec. Submission**").

9.     On 4 January 2018, Spain filed its Further Submission in Support of Continuation of the Stay of Enforcement ("**Spain 4 Jan. Submission**"). On the same date, Eiser filed its Final Submission on the Continuation of the Provisional Stay of Enforcement of the Award ("**Eiser 4 Jan. Submission**").

10.    The Spain 4 Jan. Submission was accompanied by a cover letter, whereby Spain requested that the Committee direct Eiser: (i) to provide disclosure on an immediate basis as to whether they have sold or otherwise transferred their interests in the Award to one or more third parties; (ii) to identify the third-party buyers/transferees; and (iii) to provide a copy of the agreement(s) with those parties, to understand the terms of the arrangement. Spain further alleged that the Claimants had withheld their final arguments, until after Spain had filed its first submission, thereby denying Spain an opportunity to fully respond to the Claimants' arguments (the "**Spain 4 Jan. Letter**").

11.    On 8 January 2018, without requesting leave from the Committee, Spain submitted an additional letter reiterating the arguments of its 4 Jan. Letter ("**Spain 8 Jan. Letter**").

12.    On 15 January 2018, at the request of the Claimants, the Committee invited the Claimants to provide their observations on the Spain 4. Jan. Letter.

13.    On 19 January 2018, the Committee issued its Procedural Order No. 1.

2

14. On 22 January 2018, Eiser filed a reply to Spain's letters of 4 and 8 January Letters ("**Eiser 22 Jan. Letter**").

## II.   POSITION OF THE PARTIES

### a.   *Spain's request to continue the Provisional Stay*

15. Spain requests that the Committee maintain a continuation of the Secretary-General's Provisional Stay, until it renders its final Decision on the Respondent's Application for Annulment.  It alleges that: (a) granting stays is considered common practice in ICSID proceedings and the circumstances that could justify deviating from such practice are not present in this case; (b) Eiser has not met its burden of proving that the stay would unduly prejudice the Claimants and on the other hand, there would be serious prejudice and harm caused to Spain if the Provisional Stay were revoked; and (c) there is no financial risk that Spain will not be able to comply with its obligation to pay the Award if the annulment is unsuccessful, nor does Spain have a history of non-compliance with international arbitral awards.[2]

16. With regard to the legal standard, Spain underscores that under Article 52(5) of the ICSID Convention and Arbitration Rule 54(2), the Committee may continue the stay of enforcement "if it considers that the circumstances so require." Absent exceptional circumstances, granting the stay of enforcement of the award during the pendency of the annulment has been considered the norm in ICSID practice.[3]  In support of this assertion, Spain notes that:

   a. ICSID *ad hoc* committees have granted stays in at least 75% of those requested,[4] and have only been denied in 8 out of 55 cases.[5] Spain argues that these figures, as well as a close look to the relevant case law to date, illustrate a common practice of granting a

---

[2] Spain 21 Dec. Submission, para. 2.
[3] Submission, paras. 3, 6-9.
[4] Spain 21 Dec. Submission, para. 2; Spain 4 Jan. Submission, para. 18.
[5] Spain 21 Dec. Submission, para. 9.

permanent stay of ICSID awards, without there being compelling reasons to deviate from it, in the present case.[6]

    b.   The minority of cases in which stays were not granted cannot be relied upon by Eiser to argue that stays can only be granted in "exceptional" circumstances.[7] Spain adds that Eiser's argument of Spain having to prove exceptional circumstances is "completely fabricated" and incorrect, as no such term can be found in the ICSID Convention or Arbitration Rules, nor is it supported by prior cases. [8]

17.    The Applicant also submits that on the basis of ICSID Convention Article 52(5), there is no strict "burden of proof" approach, but instead, determining who bears the burden of establishing circumstances requiring a stay is part of the Committee's discretionary power.[9] Spain also considers that the case law cited by Eiser to support their position on the burden of proof is inapposite, and that Spain had properly discharged its burden of proof, while stating that there are "certain matters" that should "logically" be demonstrated by Eiser.[10]

18.    According to Spain, the circumstances commonly considered relevant by *ad hoc* committees to decide on a request for stay the enforcement of an award include:

    a.   Whether the annulment application is obviously frivolous or dilatory in nature;

    b.   The adverse consequence caused to either party by granting or denying the stay;

    c.   The risk of non-recoupment of the award, if paid and later annulled;

    d.   The risk of non-compliance of the award if the annulment application is unsuccessful.[11]

---

[6] Spain 21 Dec. Submission, paras. 8-19.
[7] Spain 21 Dec. Submission, para. 11.
[8] Spain 21 Dec. Submission, paras. 7, 12-14.
[9] Spain 4 Jan. Submission, paras. 13-14 (quoting *Standard Chartered Bank (Hong Kong) Limited v. Tanzania Electric Supply Company Ltd.*, ICSID Case No. ARB/10/20, Decision on Applicant's Request for a Continued Stay on Enforcement of the Award, 12 April 2017 ("*Standard Chartered Bank v. Tanzania*") (CL-260), para. 53; and citing *Ioan Micula, Viorel Micula and others v. Romania*, ICSID Case No. ARB/05/20, Decision on Annulment, 26 February 2018, ("*Micula v. Romania*") (CL-249), para. 33).
[10] Spain 4 Jan. Submission, paras. 15-17.
[11] Submission, paras. 3, 8; Spain 21 Dec. Submission, para. 5; Spain 4 Jan. Submission, para. 19.

19.     None of these circumstances would justify lifting the Provisional Stay in this case. *First,*
        Spain indicates that its Application for Annulment is based on serious grounds, has been
        made in good faith and is not dilatory.[12] Spain contests Eiser's argument that the strength
        of the merits of the Application for Annulment have no bearing on whether a stay should
        be granted and highlights Eiser's unwillingness to discuss the same.[13] Spain describes in
        detail why it believes its grounds for annulment are serious enough to confirm the good
        faith and well-grounded bases of its Application for Annulment.[14]

20.     *Second,* and continuing with the application of the standard, Spain alleges that Eiser cannot
        show it would be prejudiced should the Committee decide to continue the Provisional
        Stay.[15]  This is because Eiser has not argued that its economic viability depends on
        immediate receipt of payment and it continues to draw profits from the operation of the
        solar power plants at issue in the original arbitration, in which it continues to have
        interests.[16]

21.     In any case, the delay in payment resulting from the continuation of the Provisional Stay
        would be remedied by the 2.5% per annum, post-award interest rate, compounded monthly,
        recognized in the Award, even if the Application for Annulment is eventually denied.[17]  In
        this respect, Spain contests Eiser's argument that a delay in payment is, in and of itself,
        prejudicial against them, noting that other *ad hoc* committees have found accrual of interest
        as sufficient compensation for any deferral in payment of an award.[18]

22.     Spain further contests Eiser's assertion that continuing the Provisional Stay would "force
        [Eiser] to the back of a potentially long queue of creditors."[19] Spain declares that there is
        no reason to assume the other cases pending against it will result in liability awards and, in

---

[12] Submission, paras. 10-14; Spain 21 Dec. Submission, para. 21.
[13] Spain 21 Dec. Submission, para. 22; Spain 4 Jan. Submission, paras. 10-11.
[14] Spain argues that the Tribunal's calculation of quantum was inconsistent with its decision on liability and, therefore, allowing Eiser to obtain full payment of the Award would be "a travesty." Spain also brings up the undisclosed relationship between Eiser's arbitrator, Mr. Stanimir Alexandrov, and Eiser's quantum and regulatory experts, as grounds that should be considered equally serious. Spain 21 Dec. Submission, paras. 21-28.
[15] Submission, para. 15; Spain 4 Jan. Submission, paras. 29-35.
[16] Submission, para. 15; Spain 21 Dec. Submission, para. 30.
[17] Submission, paras. 16-17; Spain 21 Dec. Submission, paras. 34-35; Spain 4 Jan. Submission, paras. 31-34, 45.
[18] Submission, para. 16; Spain 21 Dec. Submission, paras. 32-34.
[19] Spain 21 Dec. Submission, para. 36.

fact, the *Eiser* case is the only one so far that has been successful in bringing about a liability and damages award. Spain adds that most of the cases against it are far from concluded and, therefore, the long queue of creditors which Eiser refers to does not exist.[20]

23.  *Third*, Spain considers that it runs a real risk of non-recoupment if the stay is lifted and it is compelled to pay the Award that will be annulled. The money may be distributed to its stockholders, making it unavailable for recovery, placing an important burden on the Parties for the exchange of funds back and forth.[21] In connection with this line of argument, Spain indicates that "it ha[d] come to the attention of the Kingdom of Spain" that the Claimants "had sold their rights in the Award" to a third party.[22] The Applicant underscores the potential impossibility to recover the funds from third parties and criticizes Claimants' decision to keep silent on this issue.[23] Spain further requested that the Committee direct Eiser to, among other things, provide a disclosure, on whether such a transfer had taken place.[24]

24.  *Fourth*, there is no risk that Spain would fail to comply with the Award, if it is not annulled.[25]  Spain is the fifth-largest economy in the European Union (the "**EU**"), with sufficient resources to pay the Award if needed.[26]  Moreover, the Applicant is a modern country that will abide by its international obligations, including its obligations under Article 53 of the ICSID Convention.[27] Spain observes that there is no history of its non-compliance with any prior arbitral award and points to the award in the *Maffezini* case, as an example of Spain fulfilling its obligations, even in an award considered to be controversial.[28] The Applicant denies Eiser's allegations that Spain is resisting payment, explaining instead that the Claimants failed to address their request to the proper Spanish

---

[20] Spain 21 Dec. Submission, para. 36.
[21] Submission, para. 18; Spain 21 Dec. Submission, paras. 46-48.
[22] Spain 4 Jan. Letter, p. 2; Spain 4 Jan. Submission, paras. 4-5.
[23] Spain 4 Jan. Submission, paras. 36-39.
[24] Spain 4 Jan. Letter, p. 2; Spain 4 Jan. Submission, paras. 4-5, 40; Spain 8 Jan. Letter, p. 1.
[25] Spain 4 Jan. Submission, para. 47.
[26] Submission, para. 19; Spain 21 Dec. Submission, para. 53.
[27] Submission, paras. 18-20.
[28] Submission, para. 20; Spain 21 Dec. Submission, paras. 54-55.

6

authorities and that they submitted applications to the United States' courts in violation of the Foreign Sovereign Immunities Act of the United States.[29]

25.  *Fifth*, the Applicant contends that if the Award is not stayed during the pendency of the annulment proceeding, Spain will be "forced to violate either the ICSID Convention or EU law, to immediately comply with an award that is being challenged for well-grounded reasons"[30] and thus "precipitating a crisis of conflicting international obligations on the part of the State."[31] Spain explains that in accordance with a Decision rendered on 10 November 2017, by the European Commission ("**EC**"), the Award constitutes notifiable State aid, under Articles 107 and 108 of the Treaty on the Functioning of the European Union ("**TFEU**") (the "**EC Decision**"). Thus, Spain would need to obtain "clearance" from the EC to pay the Award.[32] It is unclear, however, whether the EC will determine that it is incompatible with the EU internal market (i.e. whether it will distort competition in the EU internal market) and "it is premature to know what the outcome will be."[33]

26.  Thus, "[t]o the degree that the Eiser Parties are insisting upon 'immediate' payment of the Award […] that would be inconsistent with Spain's obligations […] to submit the Award to review and clearance by the EC before payment," and therefore the contradiction of mandatory norms exists already.[34] Spain also confirms its commitment to seek the authorization of the EC to pay the Award, in the event the Award is not annulled, and to pay Eiser promptly, after receiving authorization to do so.[35]

---

[29] Spain 21 Dec. Submission, paras. 56-58.
[30] Spain 21 Dec. Submission, para. 89; *see also*, Spain 21 Dec. Submission, para. 75; TR 110:18-119:1 (Rivas Kortazar).
[31] Spain 21 Dec. Submission, para. 89. *See also*, TR 110:18-119:1 (Rivas Kortazar); Spain 4 Jan. Submission, para. 35.
[32] Submission, paras. 20-21, Spain 21 Dec. Submission, paras. 61-66, 70, and 74, referring to the European Commission, Decision regarding Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste, dated 10 November 2017, p. 33 (R-269); *see also*, Spain 4 Jan. Submission, paras. 22-24.
[33] Spain 21 Dec. Submission, para. 70; *see also*, TR 77:6-25; 128:6-8 (Harwood).
[34] Spain 4 Jan. Submission, para. 24.
[35] Submission, para. 21; Spain 21 Dec. Submission, para. 59; *see also*, TR 74:8-75:4 (Harwood) and 108:19-109:9 (Rivas Kortazar).

27.     Spain submits that the process for the EC to make a determination can be "completed within two months."[36]  It also notes that Spain's actions to explain the approval process before the EC are not motivated by a desire to block payment, but rather by a need to comply with all of its obligations under international law and EU law.[37]  Spain also emphasizes that all parties to this proceeding are subject to the EU legal system and cannot ignore it or disregard it.[38]

28.     Spain further affirms that in accordance with Articles 30(1) and 30(3) of the Vienna Convention on the Law of Treaties ("**VCLT**"), "Article 53 of the ICSID Convention only applies to the extent that is compatible with Article 107 and 108 of the TFEU."[39]  This is because the treaties relate to the same subject matter and the ICSID Convention pre-dates the TFEU. Thus, the TFEU prevails in the event of conflicts. This is also consistent with the principle of the primacy of EU law. However, Article 52(5) "offers a solution to this incompatibility, the granting of a stay."[40]

29.     Finally, Spain objects to Eiser's suggestion of providing a security in the form of payment of the full amount of the Award into an escrow account based in the United States. It considers that the reasons summarized above justify the granting of an unconditional stay, and that, in any case, the conditions proposed by Eiser are unacceptable, as: (a) having the escrow in the United States is a blatant attempt of the Claimants to circumvent their legal obligations as EU nationals; and (b) such an order would give rise to the same legal complications previously mentioned thus "precipitating the crisis" of requiring Spain to "choose between its competing international obligations under the [TFEU], the ICSID Convention and the ECT."[41]  In addition, requiring immediate payment of funds into an escrow for full payment of the Award, would put Eiser in a more advantageous position than they would have been if the annulment had not been commenced, and elevate their

---

[36] Spain 4 Jan. Submission, paras. 27-28.
[37] Spain 21 Dec. Submission, paras. 71-73, 88.
[38] Spain 21 Dec. Submission, para. 76; Spain 4 Jan. Submission, para. 21.
[39] Spain 21 Dec. Submission, para. 80. *See also,* Spain 21 Dec. Submission, paras. 76-79.
[40] Spain 21 Dec. Submission, para. 80. *See also,* Spain 21 Dec. Submission, paras. 76-79.
[41] Spain 21 Dec. Submission, para. 49; *see also*, Spain 4 Jan. Submission, paras. 41-42.

position as an award creditor. In sum, requiring a security will cause harm and prejudice to Spain, and is not justified nor appropriate.[42]

### b. *Eiser's opposition to the continuation of the Provisional Stay*

30.     Eiser requests that Spain's Application for a Continuation of the Stay be dismissed. In the alternative, if a stay were to be maintained, it requests that Spain be ordered to provide a security in the form of: (a) payment of the full amount of the Award into an escrow located in the United States or elsewhere outside the EU; or (b) a binding and unconditional written undertaking of the payment of the Award if the Application for Annulment is rejected, along with the designation of an agent for service in the United States and a waiver of sovereign immunity as to the attachment of its assets.[43]  The Claimants further clarify that they would not be opposed to a permanent stay if the security is granted.[44]  In support of its request, the Claimants advance, *inter alia*, the arguments set forth below.

31.     With regard to the legal standard, Eiser agrees with Spain that under Article 52(5) of the ICSID Convention *ad hoc* committees have the power to stay enforcement of the award pending the annulment proceeding, if they consider "that the circumstances so require." However, Eiser contests Spain's assertion that granting stays is the norm in ICSID practice, and considers instead that it is an exception.[45] The Claimants consider that staying the enforcement is an exceptional remedy, tied to the exceptional nature of the annulment itself.[46]  The exceptional nature of the stay is confirmed by the finality of ICSID awards under Article 53(1) of the ICSID Convention, and by the fact that under ICSID Arbitration

---

[42] Spain 4 Jan. Submission, paras. 48-50.
[43] Response, paras. 4.1-4.3.
[44] Response, para. 4.4; Eiser 4 Jan. Submission, paras. 4.88-4.91.
[45] Response, paras. 1.3, 2.9; Eiser 21 Dec. Submission, para. 4; Eiser 4 Jan. Submission, paras. 2.2-2.5.
[46] Response, paras. 2.1, 2.11 and 2.13 (relying on among others, the *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Stay of Enforcement of the Award, 31 August 2017 (CL-247), para. 72 ("[…] *while a party to a dispute may request the annulment of an award, it has no right to the annulment. Similarly, the party requesting annulment may request a stay of enforcement but it has no right to the stay. On the other hand, both parties to the dispute are obliged to abide by an award notwithstanding an annulment proceedin*g.") and the *SGS Société Générale de Surveillance S.A. v. Republic of Paraguay*, ICSID Case No. ARB/07/29, Decision on Paraguay's Request for the Continued Stay of Enforcement of the Award, 22 March 2013 ("*SGS v. Paraguay*") (CL-259), paras. 84-85 ("[…] *the binding nature of the award is the rule, whereas its annulment is the exception*" and added that "*awards must be enforced and only in very specific cases where the circumstances so require, may enforcement be stayed by the corresponding committee.*"). *See also*, Eiser 4 Jan. Submission, paras. 2.6-2.7.

Rule 54(2) a provisional stay "automatically […] terminate[s]" if there is not a definite ruling on the request, within 30 days of the committee's constitution.[47]

32.   The Claimants do not dispute that out of 55 cases where stays were requested, in 39 it was granted. They clarify however that of those 39 cases, *ad hoc* committees have granted the stay subject to some form of security undertaking, and that in at least 11 cases the stays were terminated because the conditions were not satisfied.[48]

33.   Eiser further argues that Spain inappropriately attempted to shift the burden of proof. It holds that Article 52(5) of the ICSID Convention places the burden of proving that there are circumstances requiring the stay on Spain, the requesting party, not on the Claimants, as Spain suggests,[49] and criticizes Spain for failing to address the burden of proof issue.[50]

34.   For the Claimants, the determination of a stay of enforcement is dependent on a two-stage analysis. "First, the Committee must determine whether circumstances are present that necessitate a stay. Second, only if the Committee has concluded that such circumstances exist, *may* it decide to impose such a stay."[51] Eiser recognizes that neither Article 52(5) of the Convention, nor ICSID Arbitration Rule 54 detail what circumstances would be relevant to prompt a continuation of the stay. Instead, previous *ad hoc* committees have considered the following elements:

   a.   evidence of hardship to the applicant;

   b.   prospects of recoupment from the award creditor if the annulment is successful;

---

[47] Response, paras. 2.2-2.7, 2.9; Eiser 4 Jan. Submission, paras. 2.8-2.9.

[48] Eiser 4 Jan. Submission, para. 2.10 (referring to the ICSID Updated Background Paper on Annulment for the Administrative Council of ICSID, 5 May 2016) (C-299)).

[49] Response, paras. 1.6, 2.15-2.20 (quoting para. 26 of the *Ioannis Kardassopoulos and Ron Fuchs v. Georgia*, ICSID Case Nos. ARB/05/18 and ARB/07/15, Decision of the *Ad Hoc* Committee on the Stay of Enforcement of the Award, November 12, 2010 ("*Kardassopoulos v. Georgia*") (CL-250) and para. 80 of *Border Timbers Limited, Border Timbers International (Private) Limited and Hangani Development Co. (Private) Limited v. Republic of Zimbabwe*, ICSID Case No. ARB/10/25, Decision on Stay of Enforcement of the Award, April 24, 2017 ("*Border v. Zimbabwe*") (CL-246) (*"It is for the party requesting continuation of the stay to establish that there are circumstances that require such continuation; it is not for the counterparty to show that there are 'exceptional circumstances' that require the lifting of the stay."*). Eiser 21 Dec. Submission, para. 4.

[50] Eiser 4 Jan. Submission, para. 3.1.

[51] Response, para. 2.10 (emphasis omitted).

c.  a dilatory motive on the part of the award debtor that filed for annulment; and

d.  prospects of compliance (or non-compliance) with the award by the award debtor.[52]

35.  In Eiser's views, these elements justify lifting the Provisional Stay. *First*, when touting its financial standing, Spain proved that it does not stand to suffer economic hardship should the stay be lifted.[53] It is not Eiser who needs to prove that it would suffer prejudice if the stay is granted. Instead it is Spain who has the burden of proving that the prejudice resulting from lifting the stay warrants the continuation. Spain has failed to meet this burden.[54]

36.  On the other hand, according to Eiser, a permanent stay would cause prejudice to Claimants that cannot be remedied by post-award interests.[55] Besides the delay the stay would cause, Eiser faces a declining chance of recovery under the Award because Spain is currently the State facing the largest number of ICSID arbitrations. This may, in turn, create further award debt and further enforcement claims against Spain and force Eiser "to the back of a potentially long queue of creditors."[56] Such prejudice can only be prevented by lifting the Provisional Stay, or alternatively, by a provision of "adequate security" by Spain. Moreover, Eiser has already suffered adverse consequences resulting from Spain's action, as demonstrated by the original tribunal's finding that the Applicant had caused damage to Eiser in the amount of €128 million.[57]

37.  *Second*, Spain has not offered any evidence of risk of non-recoupment if its Application for Annulment is successful, and instead has confirmed that the Claimants have substantial financial resources.[58] In any event, either party's risk of non-recoupment can be addressed by ordering Spain to make payment of the Award into an escrow account which would be transferred to either party according to the results of the Application for Annulment.[59] The

---

[52] Response, para. 3.1; *see also*, Eiser 4 Jan. Submission, para. 3.4.
[53] Response, para. 3.6.
[54] Response, para. 3.5; Eiser 4 Jan. Submission, paras. 3.13, 3.3.
[55] Eiser 4 Jan. Submission, paras. 3.20-3.22.
[56] Response, para. 3.8.
[57] Eiser 4 Jan. Submission, para. 3.18.
[58] Response, para. 3.11.
[59] Response, paras. 1.11, 3.12; Eiser 21 Dec. Submission paras. 9-10.

Claimants also rely on the decision of the *ad hoc* committee in *SGS Société Générale de Surveillance S.A. v. The Republic of Paraguay ("SGS v. Paraguay")*, to underline that even if Spain had to pay the Award and subsequently be reimbursed, this is just the "natural consequence of the enforcement regime created by the ICSID Convention, where a stay is the exception and not the rule."[60]  They consider that this alleged burden of having the funds pass from one hand to the other, is not and cannot form a "circumstance" requiring a stay.[61]

38.    With regard to Spain's allegations that the Claimants have sold or transferred their rights in the Award to a third party, thus magnifying their risk of non-recoupment, Eiser states the following: "[w]hile the Claimants have entered into a financing arrangement with a third-party, they have not sold the Award. They are (and always have been) the legal and beneficial owner of the Award and they retain all rights to collect the monies due and owing to them by Spain pursuant to it."[62] The Claimants add that to put the issue to rest, they are "willing to provide the following written undertaking":

> *The Claimants undertake promptly to repay Spain any and all amounts received in satisfaction of the Award to the extent that the annulment application is successful. The Claimants further undertake not to disburse or transfer any amounts received in satisfaction of the Award to their investors or to any other third party while the annulment proceeding is ongoing (or thereafter to the extent the annulment application is successful).*[63]

39.    *Third*, relying on a consistent line of *ad hoc* committee decisions, the Claimants allege that the merits or seriousness of the Application for Annulment has no bearing on the Committee's decision to grant a permanent stay of enforcement.[64] Instead, the only relevant inquiry is whether Spain's Application for Annulment is manifestly dilatory.[65] According

---

[60] Eiser 21 Dec. Submission, para. 7 (emphasis omitted, quoting *SGS v. Paraguay* (CL-259), para. 93).
[61] Eiser 21 Dec. Submission, para. 7.
[62] Eiser 22 Jan. Letter, p. 3.
[63] Eiser 22 Jan. Letter, p. 4.
[64] Eiser 4 Jan. Submission, paras. 3.3, 3.5-3.6.
[65] Response, paras. 3.15-3.16 (citing the *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/1, Decision on Stay of Enforcement of the Award, 4 December 2014 ("*Total v. Argentina*") (CL-262), para. 83); *see also*, Eiser 21 Dec. Submission, paras. 12-13.

to the Claimants, Spain's allegations that it is currently facing conflicting international obligations when none exist, confirm Spain's intent to delay the payment of the Award or avoid its payment altogether and thus justify lifting the Provisional Stay.[66] Moreover, since the Committee has not been briefed by the Claimants on the merits of the Application for Annulment, the Committee would incur in a violation of due process if the seriousness of the Application for Annulment were considered. In any case, Spain has not provided evidence of the merits of its Application for Annulment, but only a self-serving assessment of the merits of the Application for Annulment which the Claimants refute.[67]

40.    *Fourth*, Eiser also opposes the assertions that Spain does not have a history of non-compliance and argues that, in fact, Spain presents a real and evident risk of non-payment.[68] For this purpose, it recounts its enforcement efforts undertaken after the Award was rendered before the Spanish authorities and before State Courts in the United States, and the difficulties it has faced to obtain payment to date.[69] The Claimants also consider that Spain's refusal to agree to the escrow arrangement, leads to the conclusion that it is unwilling to pay.[70]

41.    Eiser also submits that the risk of non-payment is compounded by Spain's allegation that it will require "clearance" from a third-party, in this case the EC, to render payment of the Award.[71] Eiser submits that "Spain's claims that some further internal EU law process must be followed prior to paying the Award is clear evidence that Spain is unwilling to comply with its ICSID Convention obligations."[72] The Claimants consider that this not only undermines the finality of the Award and the very purpose of the ICSID Convention,[73] but also it is a matter of internal EU law, that cannot be relied upon to avoid its international obligations.[74] Eiser notes that in the *RREEF* case, a similar argument relying on EU law

---

[66] Eiser 21 Dec. Submission, para. 21.
[67] Eiser 4 Jan. Submission, paras. 3.8-3.9, 3.12.
[68] Response, paras. 1.7-1.8.
[69] Response, paras. 3.18-3.22.
[70] Eiser 4 Jan. Submission, para. 3.32.
[71] Response, paras. 3.24-3.25; Eiser 4 Jan. Submission, paras. 1.6, 3.35.
[72] Response, para. 1.10. *See also*, Response, paras. 3.40-3.41; Eiser 21 Dec. Submission, paras. 15-17; Eiser 4 Jan. Submission, para. 3.37.
[73] Response, paras. 3.26-3.28.
[74] Response, paras. 3.32-3.35 (relying on the *Total v. Argentina* (CL-262), para. 85).

was used by Spain and the Tribunal in this case stated "EU law does not and cannot 'trump' public international law."[75] Eiser further objects to Spain's interpretation of the EC Decision and concludes that "Spain is … wrong, as a matter of law, to claim that it is facing conflicting international obligations."[76] The Claimants allege that "the EC has not made any assessment of the Award as state aid. […] As matters now stand, neither the Commission, nor the EU or any national court have declared that the Award qualifies as State aid within the meaning of Article 107(1) TFEU."[77] Thus, Eiser continues, Spain is not obliged to notify the Award to the EC prior to making payment under it. No such thing is mandated by either the EC Decision or Articles 107 to 108 of the TFEU.

a.  As to the EC Decision, the paragraphs to which Spain refers to (allegedly confirming that the Award constituted notifiable State aid), have no binding force as a matter of EU law. The Award is not mentioned in the operative part of the EC Decision and thus the EC Decision did not contain an "assessment" of the Award.[78]

b.  State aid is an objective measure under the TFEU. Neither a national nor a European court has found that the Award involves State aid.  Thus, at this point there is neither a notification obligation under the TFEU, nor does the standstill obligation prevent Spain from paying the Award.  The contrary assumption would mean that all awards against EU Member States are notifiable State aid, and according to Spain's line of reasoning, the enforcement of all awards, as notifiable State aid, must be stayed. This would be detrimental to the *effet utile* of the ICSID Convention and create a systemic problem.[79]

42.  The Claimants further conclude that since Spain has committed to pay the Award if it is not annulled and is committed to ask for authorization from the EC at that point, what they are really raising in this proceeding, is an "issue of timing" (i.e. that they would prefer to seek authorization from the EC later instead of now), not of conflicting international

---

[75] Response, para. 3.35 (quoting para. 87 of the *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016 (CL-257)) (emphasis omitted). *See also*, Response, paras. 3.36-3.38.
[76] Eiser 21 Dec. Submission, para. 21; Eiser 4 Jan. Submission, paras. 3.49-3.53.
[77] Eiser 21 Dec. Submission, para. 20 (emphasis omitted).
[78] Eiser 4 Jan. Submission, paras. 3.49-3.54.
[79] Eiser 4 Jan. Submission, paras. 3.56-3.61.

obligations. Moreover, by Spain's own account, the Applicant could pay the Award now, and if the EC considers that the payment of the Award is incompatible State aid and thus must be recovered, it can then proceed to execute the EC's orders.  Thus, there is no real conflict at this point. Spain can comply with its international law obligations under the ECT and the ICSID Convention, as well as its EU law obligations.[80]

43.    Contrary to Spain's position, the application of the VCLT does not support the notion that EU law would prevail over Spain's ICSID Convention and ECT obligations. In particular, the *lex posteriori* principle is irrelevant for this purpose as the TFEU is not posterior to Spain's accession to the ICSID Convention. Instead, it is the ICSID Convention that can be considered posterior to the TFEU for purposes of Article 30(3) of the VCLT, if such provision were to be applicable to this case. Thus, this argument would militate in favor of the ICSID Convention provisions taking precedence.[81] If anything, the combined effect of Article 16 and 26(8) of the ECT – governing any conflicts between the ECT and any prior or subsequent treaty – confirm that Spain cannot rely on EU law to avoid payment of the Award.[82]

44.    The Claimants submit that the Committee is "fully empowered" to condition the stay on the provision of assurances, as has been confirmed by "ample case law."[83]  Eiser further characterizes the "escrow arrangement" as a "middle ground solution which addresses fully each argument raised by Spain," namely, no funds will be transmitted back and forth between the parties, and there would be neither a "premature enforcement", nor a risk of non-recoupment for either party.[84]

---

[80] Eiser 4 Jan. Submission, paras. 3.44-3.48.
[81] Eiser 4 Jan. Submission, paras. 3.72-3.77.
[82] Eiser 4 Jan. Submission, paras. 3.78-3.84.
[83] Response, para. 4.2.
[84] Eiser 4 Jan. Submission, paras. 1.3-1.4, 3.25-3.27 (emphasis omitted).

## III.     ANALYSIS OF THE COMMITTEE

### a.  The applicable standard

45.     We begin our analysis by laying out the applicable standard. Our interpretation will be guided by the VCLT. The basis for Spain's request is provided for in Article 52(5) of the ICSID Convention, which provides:

> *(5) The Committee **may, if it considers that the circumstances so require, stay enforcement of the award pending its decision**. If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Committee rules on such request.* (Emphasis added)

46.     The Committee notes that the word "may" clearly conveys the discretionary power that the Committee has to grant a request for stay. The discretionary nature that stems out of this provision has also been previously noted by other *ad hoc* committees, such as in *Standard Chartered Bank (Hong Kong) Limited v. Tanzania Electric Supply Company Limited ("Standard Chartered Bank v. Tanzania")* or *Libananco Holdings Co. Limited v. Republic of Turkey ("Libananco v. Turkey")*, when stating that:

> *The use of the word "may" indicates that it is a matter within the discretion of the committee whether or not to stay enforcement of the award pending its decision on an application for annulment.*[85]

> *[…] the Committee has discretion to grant the Stay Request after giving the parties the opportunity to be heard and after consideration of all the circumstances relevant to the Stay Request. (…) The exercise of the discretion of the Committee depends on the circumstances surrounding the Stay Request […].*[86]

47.     Continuing with the relevant provision, the phrase "if it considers that the circumstances so require", qualifies this discretionary power to "circumstances" that "so require". This

---

[85] *Standard Chartered Bank v. Tanzania* (CL-260), para. 50.
[86] *Libananco Holdings Co. Limited v. Republic of Turkey*, ICSID Case No. ARB/06/8, Decision on Applicant's Request for a Continued Stay of Enforcement of the Award, 7 May 2012 ("*Libananco v. Turkey*") (CL-252), paras. 41, 43.

Committee also attaches importance to the specific use of the verb "require" in its imperative form as opposed to other "less categorical verbs" such as "recommend", "deserve" or "justify".[87] The Committee also observes that this provision omits any qualification as to the type of circumstances required (for example 'exceptional' or 'unforeseen') or a list or enumeration as to which circumstances will merit granting a request to stay. However, it is clear that such circumstances must surround the particular case at hand and that although some circumstances may be similar in some cases, and therefore invoked by the Parties, the end-result of a decision to continue the stay of enforcement must be based on the specific facts of the case at hand. In this regard, the Committee is mindful of the decision in *Border Timbers Limited and others v. Republic of Zimbabwe ("Border v. Zimbabwe")*, whereby the *ad hoc* committee stated that:

> (...) not just any circumstances, even if relevant to the case, may justify a stay; the circumstances must be sufficiently compelling so as to "require" a stay.[88]

48. The Committee fails to see any textual support in the ICSID Convention or in the Arbitration Rules for the notion that there is a presumption in favor of granting a request for stay. Such interpretation does not derive from the provisions applicable to the stay of enforcement and, in the opinion of this Committee, it cannot be inferred from the context surrounding such provisions. Considering that such a notion exists would deprive the power granted to the *ad hoc* committees, to some extent, from its discretionary nature. In this regard, the Committee does not consider that the stay of enforcement is automatic.[89]

---

[87] *See also*, *OI European Group B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Decision on Stay of Enforcement of the Award, 4 April 2016 ("*OI European v. Venezuela*") (CL-256), para. 89 and *SGS v. Paraguay* (CL-0259), para. 87.

[88] *Border v. Zimbabwe* (CL-246), para. 78.

[89] To the extent that the following decisions have considered a stay of enforcement as not automatic, *see for example*: *MTD Equity Sdn Bhd. & MTD Chile S.A. v. The Republic of Chile*, ICSID Case No. ARB/01/7, Decision on the Respondent's Request for a Continued Stay of Execution, 1 June 2005 ("*MTD v. Chile*") (RL-88), para. 26. *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award, 1 September 2006 ("*CMS v. Argentina*") (RL-89), para. 35. *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award, 5 March 2009 ("*Sempra v. Argentina*") (CL-258), para. 27. *Kardassopoulos v. Georgia* (CL-250), para. 26; *Libananco v. Turkey* (CL-252), para. 43; *SGS v. Paraguay* (CL-259), para. 82; *Total v. Argentina* (CL-262), para. 76; *Micula v. Romania* (CL-249), para. 33; *OI European v. Venezuela* (CL-256), para. 89; *Border v. Zimbabwe* (CL-246), para. 80.

Particularly, the Committee concurs with the decision in *Total S.A. v. Argentine Republic*, ("*Total v. Argentina*") to the extent that:

> *The fact that statistically ad hoc committees may have granted the stay in the vast majority of cases does not mean that the stay is automatic.*[90]

49.   In discerning the type of circumstance which merits granting a stay, we have to bear in mind as relevant context Article 53 of the ICSID Convention, which provides that:

> *(1) The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.*

50.   The Committee sees that in reviewing the circumstances which would justify a stay of enforcement, a committee needs to take into account the binding nature of the award and the obligation of the parties to abide by it. This exercise needs to be done on a case-by-case basis, considering the evidence and arguments put forward by the parties as "circumstances" in order for the committee to effectively establish that such circumstances are present and that they "so require" a stay of the award pending the decision on annulment.

51.   Additionally, we also see as relevant context the procedure for requesting a stay of enforcement of the Award provided in Article 54 of the Arbitration Rules. Such provision indicates that a request "shall specify the circumstances that require the stay or its modification or termination" and that "[a] request shall only be granted after the Tribunal or Committee has given each party an opportunity of presenting its observations."

52.   The Committee understands that, since there is no specific rule on burden of proof, general rules would be applicable, *i.e.* the burden of proof lies on the party asserting an affirmative

---

[90] *Total v. Argentina* (CL-262), para. 76.

claim or defense. Such general rules have guided the interpretation of other International Tribunals:

> […] we find it difficult, indeed, to see how any system of judicial settlement could work if it incorporated the proposition that the mere assertion of a claim might amount to proof. It is, thus, hardly surprising that various international tribunals, including the International Court of Justice, have generally and consistently accepted and applied the rule that the party who asserts a fact, whether the claimant or the respondent, is responsible for providing proof thereof. Also, it is a generally-accepted canon of evidence in civil law, common law and, in fact, most jurisdictions, that the burden of proof rests upon the party, whether complaining or defending, who asserts the affirmative of a particular claim or defence. If that party adduces evidence sufficient to raise a presumption that what is claimed is true, the burden then shifts to the other party, who will fail unless it adduces sufficient evidence to rebut the presumption.[91]

53.  Consequently, it is for the party requesting the stay to demonstrate that there are circumstances that will justify or merit the granting or continuation of the stay. Such circumstances will be examined by the committee in each particular case in order to establish the existence of circumstances requiring the stay. It is clear that the party who is against, or wants to, lift the stay is also entitled to put forward arguments and evidence to support its case. This, in our view, does not affect the proposition that the party requesting the stay bears, in the first instance, the burden to substantiate such request.

54.  We find support in the interpretation rendered by other *ad hoc* committees in cases such as, *Border v. Zimbabwe*, *Ioannis Kardassopoulos and Ron Fuchs v. Georgia*, *OI European v. Venezuela* and *SGS v. Paraguay*, when indicating:

> It is for the party requesting continuation of the stay to establish that there are circumstances that require such continuation; it is not for the counterparty to show that there are "exceptional circumstances" that require the lifting of the stay. […] it is for the requesting party – whether the applicant or the respondent

---

[91] WTO, Appellate Body Report, *United States — Measure Affecting Imports of Woven Wool Shirts and Blouses from India*, WT/DS33/AB/R, 25 April 1997, p. 14.

> *– to establish that the stay should be continued, or that it should be terminated, as the case may be.*[92]

> *[…] a stay is contingent upon the existence of relevant circumstances which must be proven by the Applicant. (…) An ad hoc committee enjoys rather all latitude to find the proper balance between the interests of the parties in a given case and the legitimate right to enforce the award in order to rule on the request.*[93]

> *[…] it is for the party seeking the continuation of the stay to show that such circumstances exist, and thus, that the stay of enforcement of the Award should be continued.*[94]

> *Based on the plain language of Rule 54(4) of the ICSID Arbitration Rules, it is also clear to the Committee that the party interested in the continued stay bears the burden of proof to demonstrate the existence of circumstances that warrant said continuation. […] In sum, to order a continued stay of enforcement of the award, the Committee must be certain that the circumstances of the particular case so require. It is for the interested party to show that such circumstances exist, and thus, the stay of enforcement of the award should be continued.*[95]

55.   We turn now to analyze the merits of each circumstance for stay as put forward by Spain.

### b. *The Application for Annulment is based on serious grounds*

56.   There is agreement among the Parties that the grounds of annulment put forward by the Applicant are not dilatory. The Committee notes that even in this scenario:

> *[…] the mere fact that the application is not dilatory is not sufficient to grant the extension of the stay […] a serious application is the least that can be expected from an applicant, and nowhere in the ICSID Convention – or in the*

---

[92] *Border v. Zimbabwe* (CL-246), para. 80.
[93] *Kardassopoulos v. Georgia* (CL-250), paras. 26, 29.
[94] *OI European v. Venezuela* (CL-256), para. 94.
[95] *SGS v. Paraguay* (CL-259), paras. 86, 88. In the same sense *see*: *Total v. Argentina* (CL-262), para. 80. The Committee also notes that other *ad hoc* committees have stated that: "*[…] it is for the award debtor to advance grounds (supported as necessary by evidence) for the stay*" in *Standard Chartered Bank v. Tanzania* (CL-260), para. 54, and that "*[…] it cannot be assumed that there should be a presumption in favour of a stay or that the primary burden is placed on the award creditor to show that continuation of the stay should not be granted*" in *Sempra v. Argentina* (CL-258), para. 27.

> *practice of ad-hoc committees – compliance with such minimum duty results in the extension of the stay.*[96]

57.     The question is whether any assessment of these grounds needs to be undertaken by the Committee in reaching a decision on the request to stay.[97] On this question, the Committee agrees with the statements provided by early *ad hoc* committees in *Mr. Patrick Mitchell v. Democratic Republic of the Congo*, *MTD Equity Sdn Bhd. & MTD Chile S.A. v. The Republic of Chile*, and *CMS Gas Transmission Company v. Argentine Republic,* to the extent that they considered:

> *As a matter of fact, any discussion on the merits and on the chances of annulment of the Award would be misplaced.*[98]

> *[…] it is not for the Committee to assess as a preliminary matter whether or not it is likely to succeed. […] the Committee does not need to form any view as to the likelihood of success of the application for annulment in the present case.*[99]

> *[…] it is not for the Committee to assess as a preliminary matter whether or not it is likely to succeed.*[100]

58.     This reasoning was recently followed as well in *Total v. Argentina,*[101] *OI European v. Venezuela,*[102] and *Standard Chartered Bank v. Tanzania*:

> *The Committee does not consider appropriate at this time to evaluate whether there is a strong case for or against annulment in deciding on the Stay Request. The Committee is guided by the reasoning expressed by annulment committees,*

---

[96] *Total v. Argentina* (CL-262), paras. 83, 84. *OI European v. Venezuela* (CL-256), para. 116.
[97] Submission, paras. 10-14 and Spain 21 Dec. 21 Submission, paras. 20-29.
[98] *Mr. Patrick Mitchell v. Democratic Republic of the Congo*, ICSID Case No. ARB/99/7, Decision on the Stay of Enforcement of the Award, 30 November 2004, para. 26.
[99] *MTD v. Chile* (RL-88), para. 28.
[100] *CMS v. Argentina* (RL-89), para. 37.
[101] *Total v. Argentina* (CL-262), para. 83.
[102] *OI European v. Venezuela* (CL-256), para. 115.

> *which have recognized that the prima facie grounds for annulment are not relevant to whether an applicant on annulment is entitled to a stay.*[103]

59.   The Committee believes that at this stage, it would not be proper to look at the merits of the case. Looking into the merits of the case could raise due process issues. Additionally, the merits to be analyzed are not relevant and do not affect the decision on whether continuation of the stay is required. Therefore, the Committee does not consider these grounds amount to "circumstances" in terms of Article 52(5) of the ICSID Convention.

### c.  *Eiser cannot show it would be prejudiced by continuing the Provisional Stay*

60.   As a second ground, Spain contends that Eiser would not be prejudiced if the Provisional Stay continues. Spain argues that any delay "would be remedied" by the interest established in the Award, should the Application for Annulment be denied. The Committee considers that the arguments put forward by Spain in this regard are not a valid circumstance to substantiate a stay of enforcement of the Award. Post-award interests only compensate for the deprivation of the principal until payment of the award, but they are not directly related to the issue of enforcement of the award. Moreover, accepting the argument of not affecting the other party as a valid ground for staying the enforcement, could imply a shift in the burden of proof and be contrary to the binding nature of an award according to Article 53 of the ICSID Convention. In this regard, the Committee bears in mind the interpretations rendered on burden of proof and agrees with the statement made by the *ad hoc* committee in *SGS v. Paraguay* that:

> *The inevitable consequence of the foregoing reasoning is that, despite an application for annulment, awards must be enforced and only in very specific cases where the circumstances so require, may enforcement be stayed by the corresponding committee.*[104]

61.   Thus, the Committee is not convinced that the arguments presented by Spain demonstrate that continuation of the Provisional Stay is required.

---

[103] *Standard Chartered Bank v. Tanzania* (CL-260), para. 60.
[104] *SGS v. Paraguay* (CL-259), para. 85.

**d.  *Spain runs a risk of non-recoupment if the Provisional Stay is lifted***

62.     As a third ground, Respondent claims that should the Provisional Stay be lifted, there is a risk of not being able to recoup, in case Spain prevails in this proceeding. The reasons posed are, first, that it would be more difficult to recover the money once it is distributed to the shareholders. The second relates to the allegation that Claimants "had sold their rights in the award". On the other hand, Eiser argues that Spain has confirmed that Claimants have substantial financial resources and that, in any case, any risk of non-recoupment could be addressed by ordering payment into an escrow account. With regard to the second argument, Eiser notes that it has entered into a financing agreement but that the Award has not been sold. Finally, Claimants offer to provide an undertaking regarding repayment and disbursement of the amounts related to the Award.[105]

63.     In addressing the first argument, at the outset, the Committee agrees with the committee in *SGS v. Paraguay* that payment of an award is "the natural consequence of the enforcement regime created by the ICSID Convention."[106]  Thus, the burden of exchange of funds going back and forth could not be a valid basis to support a request for stay on enforcement. More importantly, we take note of Respondent's assertion that:

> [T]he Eiser Parties are 'experienced and sophisticated investors' with 'substantial financial resources'. They continue to maintain ownership of their interest in the solar power plants in Spain at issue in this case, and those plants continue to operate and generate revenues heavily supported by government subsidies.[107]

64.     Thus, we are not convinced that Spain has met its burden of showing that there is a real risk of non-recoupment.

---

[105] The text of the Undertaking is the following: "*The Claimants undertake promptly to repay Spain any and all amounts received in satisfaction of the Award to the extent that the annulment application is successful. The Claimants further undertake not to disburse or transfer any amounts received in satisfaction of the Award to their investors or to any other third party while the annulment proceeding is ongoing (or thereafter to the extent the annulment application is successful).*" Eiser 22 Jan. Letter, p. 4
[106] *SGS v. Paraguay* (CL-259), para. 93.
[107] Submission, para. 15.

65.     Turning to the alleged fact that the rights in the Award had been sold by Claimants, we
        take note of Claimants' clarification as to the status of their rights in the Award. As to the
        undertaking, the Committee will address it once it comes to a final decision on the request
        for stay.

   *e. There is no risk that Spain would fail to comply with the Award, if it is not annulled*

66.     Spain alleges that is has sufficient resources to pay the Award, if necessary. Also, Spain
        claims that it has always complied with its international obligations. The Committee
        considers that more than a valid ground or circumstance to request a stay of enforcement
        of the award in this case, this argument is directed at rebutting an eventual argument by
        Claimants that there is a risk that Spain would not comply with the Award. We observe
        that in their submissions, Claimants only respond to Spain's allegation that there is no
        history of non-compliance[108] but they are not arguing in this context that there is a risk that
        Spain would not comply with the Award. The argument regarding risk of non-compliance
        by the Claimants is made in context of Spain's allegation that a further process under EU
        law is necessary to comply with the Award.[109] We will address this argument in the
        following section.

   *f. Conflict between ICSID Convention and EU law*

67.     Spain makes the argument that, if denied, Spain will have to undertake a step required
        under EU law and request "clearance" to make the payment of the Award. On the other
        hand, Eiser argues that such process constitutes "clear evidence that Spain is unwilling to
        comply with its ICSID Convention obligations."[110] Eiser also disagrees that, as a matter of
        EU law, Spain is required to notify the EC about the Award prior to making payment.

68.     The Committee has some difficulty coming to a clear understanding as to the exact
        circumstance that Spain is alleging as a basis for its request to stay the enforcement of the
        Award. If Spain is arguing that given the likelihood of prevailing on the merits in this

---

[108] Response, paras. 3.17-3.22.
[109] Response, paras. 3.23-3.41.
[110] Response, paras. 1.10.

proceeding it is not worth it to go through the internal process of seeking clearance from the EC, we reject this ground for the reasons stated regarding making any assessment of the merits of the case at this stage of the proceeding. We also consider that accepting this argument will run contrary to the binding nature of the Award.

69. If the argument is that seeking clearance would create a contradiction between the ICSID Convention Rules and EU law, this issue, together with the need to request clearance from the EU, has been heavily debated by the Parties. The Committee considers that Spain has not shown that *the manner through which or the process that will be followed* to comply with its obligation contained in Article 53(1) of the ICSID Convention would be affected by the fact that the request for stay is granted or denied *now* or when *the final ruling* of the Committee is issued. Thus, the Committee denies this ground for request to stay the enforcement of the Award.

## IV. COSTS

70. The decision on costs for proceedings related to the Provisional Stay of the Award will be made together with the final decision on the Application for Annulment.

## V. DECISION

71. In view of the above, the Committee hereby:

a. Decides that there are no circumstances that require the stay to be continued pending its decision on annulment.

b. Confirms and gives full effect to Claimants' undertaking to *"promptly ... repay Spain any and all amounts received in satisfaction of the Award to the extent that the annulment application is successful"* and not to *"disburse or transfer any amounts received in satisfaction of the Award to their investors or to any other third party while the annulment proceeding is ongoing (or thereafter to the extent the annulment application is successful)."* To this effect, the Committee orders Claimants to submit, with all the necessary formalities, such undertaking to the Kingdom of Spain.

Ms. Teresa Cheng
Member of the *ad hoc* Committee

Judge Dominique Hascher
Member of the *ad hoc* Committee

Mr. Ricardo Ramírez Hernández
President of the *ad hoc* Committee