**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NEXTERA ENERGY GLOBAL HOLDINGS B.V. *and* NEXTERA ENERGY SPAIN HOLDINGS B.V.,<br><br>                    Petitioners,<br><br>          v.<br><br>KINGDOM OF SPAIN,<br><br>                    Respondent. | No. 19-cv-01618-TSC |

**REPLY EXPERT DECLARATION OF PROFESSOR DR. STEFFEN HINDELANG**
**IN SUPPORT OF THE KINGDOM OF SPAIN'S MOTION TO STAY**
**AND ULTIMATELY DISMISS PETITION TO ENFORCE ARBITRAL AWARD**

1.      I, STEFFEN HINDELANG, submit this reply declaration upon the request of counsel for the Respondent Kingdom of Spain ("Spain") in the above-captioned action to provide my further expert opinions in this matter.

2.      Preliminarily, I hereby affirm all the statements made in my first declaration (DE 15-6).[1]  This reply declaration is submitted in particular to address opinions related to European Union ("EU") law made by my colleague Professor George A. Bermann in his declaration (DE 22), submitted in support of the Petitioners' Response to Spain's Motion to Stay and Ultimately Dismiss Petition to Enforce Arbitral Award.

3.      In general, the opinions set out herein by me are restricted to issues concerning European Union ("EU") law and public international law that are relevant to this Court in regards to the Petition.  For ease of reference, exhibits to this reply declaration are sequentially numbered after those submitted in my First Declaration.

---

[1] Referred to herein as "First Hindelang Declaration or "First Declaration."

## I.    Introduction

### 1.    Summary of Opinion from my First Declaration

4.    In my First Declaration, I explained how in its recent decision, *Slovak Republic v. Achmea*, the CJEU confirmed that any dispute resolution mechanism in an international treaty entered into by EU Member States which impedes the functioning of the EU judicial system, comprising the CJEU and the EU Member State courts, violates Articles 344 and 267 of the Treaty on the Functioning of the European Union ("TFEU") and the principles of primacy and autonomy they codify.[2]

5.    In this regard, the CJEU concluded:

> Articles 267 and 344 TFEU must be interpreted as precluding <u>a provision in an international agreement concluded between Member States</u>, *such as* Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[3]

6.    In other words, such a <u>purported offer to arbitrate</u> in an international agreement <u>concluded between EU Member States</u> <u>is not such an offer at all</u>, and cannot provide the necessary consent to arbitration that the parties appear to agree is a prerequisite to arbitration.

7.    As I further explained in my First Declaration, Article 26 of the Energy Charter Treaty ("ECT"),[4] which is purported to have formed the basis of the purported arbitration agreement in the Award at issue in this case, is a dispute resolution mechanism in an

---

[2] First Hindelang Declaration, ¶¶ 43-46; CJEU, Case C-284/16, ECLI:EU:C:2018:158, ¶¶ 32-33 – *Achmea* ("*Achmea*") (DE 15-52, Ex. 46 to First Hindelang Declaration).

[3] *Achmea*, ¶ 62 (emphasis added) (DE 15-52, Ex. 46 to First Hindelang Declaration).

[4] The Court will note that the United States of America is a not a signatory of the Energy Charter Treaty.

international treaty entered into by EU Member States which impedes the functioning of the EU judicial system, and as such violates Articles 267 and 344 of the TFEU, as described by the CJEU in *Achmea*, and is precluded by the EU Treaties.[5]

8.    Because CJEU decisions determine the law as it stands <u>from its enactment</u>, Article 26 of the ECT is inoperative between EU Member States *ex tunc*, *i.e.*, from the time the ECT came into force.[6]

9.    This in turn means that <u>even at the moment the ECT was concluded</u>, no valid offer to arbitrate disputes with nationals of another EU Member State could have been made by any EU Member State on the basis of this agreement.  For this reason, there could not have been an arbitration agreement between Spain, on the one hand, and the EU company, NextEra, on the other hand, under Article 26 of the ECT, because there was no offer to begin with.[7]

10.    In contrast to Professor Bermann, I have not addressed any ICSID or non-ICSID arbitral decisions in my First Declaration; nor do I intend to address those decisions in this declaration.[8]  The simple reason for this is that they are irrelevant to my analysis.  *First*, there is no rule of precedent in general public international law nor within the specific ICSID system.[9]  Thus, these awards (including any jurisdictional analysis captained in them) are not binding on the CJEU, or on courts of the EU Member States, or any other court or arbitral

---

[5] First Hindelang Declaration, ¶¶ 47-56.

[6] *See, e.g.*, CJEU, Case C-292/04, ECLI:EU:C:2007:132, ¶ 34 – *Meilicke, et al. v. Finanzamt Bonn-Innenstadt* (Annxed hereto as Exhibit 66).

[7] First Hindelang Declaration, ¶ 56.

[8] *See* Bermann Declaration, ¶ 65, footnote 47 and ¶ 66, footnote 49.

[9] *See* Steffen Hindelang, Investor-State Dispute Settlement ('ISDS') and Alternatives of Dispute Resolution in International Investment Law, in: European Parliament (ed.), Investor-State Dispute Settlement ('ISDS') Provisions in the EU's International Investment Agreements, Brussels 2014, p. 39 et seqq., p. 66 et seqq. (Annexed hereto as Exhibit 67).

tribunal. *Second*, the relevant authority as to the issues here in my opinion is the CJEU and its decisions and findings on the interpretation and application of the EU Treaties since the EU Member States by virtue of the EU Treaties have chosen to have their relationship *inter se* "governed by EU law to the exclusion ... of any other law," if EU law so requires.[10] This is why the *Achmea* decision is so important when addressing the question of whether two parties within the EU have agreed to arbitrate. Various cases are currently pending in the EU related to the issues in this case, such as *Greentech* and *Novenergia*,[11] and there have been requests that the EU Member State courts refer questions to the CJEU for further clarity on this issue. Therefore, I expect there will be further guidance and developments from the CJEU relevant to the questions that this Court is called upon to determine in the near future. Indeed, if NextEra wanted to get a ruling on or further guidance from the CJEU on the issues that are before this Court, it could do so by bringing a proceeding to enforce the award in the EU and asking the Member State court to refer a question to the CJEU for such guidance.

### 2. Overview of Fundamental Flaws in Professor Bermann's Opinion

#### a) Professor Bermann Fundamentally Disregards the EU Legal Order and EU Treaties

11. Professor Bermann's opinion is fundamentally flawed as it fails to properly address core issues raised by *Achmea*.[12] In particular, Professor Bermann's declaration improperly ignores the fundamental conflict between (i) the purported intra-EU arbitration agreement based on Article 26 of the ECT and (ii) the EU law principle of autonomy, as

---

[10] *See* CJEU, Opinion 2/13, ECLI:EU:C:2014:2454, ¶ 212 – ECHR (DE 15-48, Ex. 42 to First Hindelang Declaration).

[11] *Greentech*, Case No. T3229-19 and *Novenergia II*, Case No. T4658-18.

[12] For the sake of brevity, I did not address each and every point raised by Professor Bermann. This, however, does not mean that I necessarily agree with what was stated.

codified in Articles 19(1), 267 and 344 of the TFEU, and the principle of primacy, a cornerstone of the EU Treaties reflected in the "Declaration concerning Primacy."[13]

12.    Professor Bermann's conclusions therefore rely on an erroneous presentation of the nature and substance of the legal order created by the EU Treaties and its effects on conflicting international commitments entered into by the EU Member States *inter se*.  More specifically, Professor Bermann incorrectly assumes, citing no supporting authority, that EU Member States can "opt out" of their obligations under the EU Treaties by concluding agreements *inter se*.[14]  Such an assertion is akin to the contention that the parts of a federal state, like the States in the United States of America, for example, could deviate from the U.S. Constitution or from a decision of the U.S. Supreme Court, amongst each other or each other's citizens, at will by concluding interstate compacts.[15]

13.    The European Union is comprised of 27 Member States that have *ceded* to the EU aspects of *sovereignty* to establish one integrated Europe characterized by common laws, values, and a single internal market.  The EU Treaties—part of the most important primary sources of EU law—have limited the Members States' sovereignty more significantly than "typical" founding instruments of international organisations.

14.    This is evidenced by the fact that in case of a conflict between a rule created by the EU Member States and EU law, EU law takes precedence and overrides such a rule. Irrespective of the qualification of a legal rule created by or between EU Member States as

---

[13] *See* Consolidated version of the Treaty on the Functioning of the European Union, Declarations annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon, Declaration concerning primacy, 2008 O.J. (C 115) 335, 334 (D.E. 15-16, Ex. 10 to First Hindelang Declaration).

[14] *See, e.g.,* Bermann Declaration, ¶ 56.

[15] *See* Article I, Section 10, Clause 3 of the United States Constitution.  I do not wish to make any pronouncements on US law.  The reference here merely serves illustrative purposes.

domestic,[16] interstate or international,[17] if this rule *conflicts with* the EU Treaties, the resolution of this conflict must always lead to the same outcome:  The EU Treaties prevail and the conflicting rule created by or between EU Member States is invalid.[18]

15.     Even if EU Member States were willing to resort to means of an international agreement *inter se* with the view to circumvent their obligations flowing from EU law, like depriving the CJEU of its constitutionally allocated jurisdiction,[19] such an attempt would be futile as they cannot escape the primacy of the EU Treaties.

16.     Resorting to international law in an intra-EU context does not place this law outside the reach of the EU Treaties.  This all-encompassing conflict rule is known in EU law parlance, as the underline principle of primacy of EU law.  As discussed below, no derogation is permitted from this rule, save through a formal amendment procedure required to change the terms of the EU Treaties.[20]  Indeed, if EU Member States vis-à-vis each other were allowed to "contract out" of the EU legal order by *inter se* agreements, the fundamental principle of equality before the law in the European Union would be violated.

17.     Hence, in an intra-EU context, the distinction Professor Bermann seeks to draw between "domestic" and "international" law created by the EU Member States and "domestic" and "international" tribunals established on that basis is immaterial.[21]  When it comes to the

---

[16] *See* Simmenthal II, ¶¶ 21-22 (DE 15-23, Ex. 17 to First Hindelang Declaration).

[17] *See* Achmea, ¶ 41 (DE 15-52, Ex. 46 to First Hindelang Declaration); CJEU, Case C-478/07, ECLI:EU:C:2009:521, ¶ 98 – Budějovický Budvar (DE 15-43, Ex. 37 to First Hindelang Declaration).

[18] *Id.*

[19] *See Achmea* (DE 15-52, Ex. 46 to First Hindelang Declaration).

[20] *See* TEU, art. 48 (DE 15-15, Ex. 9 to First Hindelang Declaration).

[21] *See, e.g.,* Bermann Declaration, ¶¶ 92, 132, 136, 148.

resolution of conflicts between laws created by the EU Member States and EU law, in an intra-EU context, there is no difference in result depending on whether these laws are "domestic" —i.e. created by one EU Member State—, or "international" —i.e. contained in an agreement between two and more EU Member States.

18.    My background assists in fully appreciating these principles.  As outlined in my CV,[22]  I have been teaching EU law, public international law, as well as German public law since 2004 at German and Danish universities as well as at various places around the world as guest professor, e.g. at Nagoya University (Japan), Uppsala University (Sweden), Moscow State Institute of International Relations (Russia), Université de Lausanne (Switzerland), and the Università Commerciale Luigi Bocconi Milan (Italy).  I am currently a professor of law at the University of Southern Denmark, and adjunct faculty at Humboldt-Universität and Technische Universität, both of Berlin (Germany).  I have written extensively on questions of EU law, including on the relationship of EU law and international investment law.  Furthermore, I am fully qualified for the office of a German judge as well as attorney (*Rechtsanwalt*).  I am also a listed expert of the Committee of International Trade of the European Parliament for the term 2018-2023.  In this and other capacities, I have produced major studies for and provided expert advice to the European Union on EU and international investment law and policy matters.

19.    With this expertise in matters involving EU law, the EU Treaties, and other relevant public international law, Professor Bermann's suggestion that the EU Treaties are irrelevant in this dispute involving the fundamental question of <u>whether an EU Member State, Spain, and a national of another EU Member State, the Netherlands, and both Spain and the Netherlands being bound by the EU Treaties, have agreed to arbitrate</u> have no basis

---

[22] *See* First Hindelang Declaration, Ex. 1 and 2 (DE 15-7 and 15-8).

whatsoever.  Indeed, Professor Bermann's apparent acceptance of the *Achmea* decision—at least as to the specific dispute resolution mechanism in the bilateral investment treaty between the Netherlands and Slovakia (the "Dutch-Slovak BIT")[23]—shows that the EU Treaties and the judgments of the CJEU are very relevant to the *NextEra* dispute before this Court.

20.     Indeed, in my opinion, the EU Treaties and the judgments of the CJEU are the most important authorities going to the question of whether there is an arbitration agreement between NextEra and Spain.

> **b) Professor Bermann's Efforts to Differentiate Achmea's Rules from the ECT Deal with Immaterial Points, and His References to Applicable Law and the CETA are not correct**

21.     Professor Bermann focuses on immaterial differences between the Dutch-Slovak BIT at issue in *Achmea* and the ECT in order to try to shift attention away from *Achmea* and its ruling, but these differences do not warrant distinguishing the dispute resolution clause in the Dutch-Slovak BIT from Article 26 of the ECT in applying the CJEU's judgement in *Achmea*.

22.     Professor Bermann also misstates the applicable law in an intra-EU investor-State dispute on the basis of Article 26 of the ECT and the reach of the principles of autonomy and primacy of EU law.[24]  However, that the EU Treaties may be more limiting on the Member States' sovereign powers than other international agreements does not change the fact that <u>EU law is characterised as public international law by the CJEU when applied between the EU Member States; albeit with a superior rank in relation to other public international law</u>

---

[23] *See* Bermann Declaration, ¶¶ 97 et seqq.

[24] *See* Bermann Declaration, ¶¶ 75-87 and ¶¶ 131-13, respectively.

applicable between the EU Member States.[25]

23.    Moreover, Professor Bermann's analysis of the Comprehensive Economic and Trade Agreement ("CETA") between Canada, of the one part, and the European Union and its Member States, of the other part is incorrect.  It fails to account for the fundamental difference between the ECT and the CETA: the CETA does not contain an agreement between the EU Member States to submit *intra-EU* disputes to arbitration.  NextEra asserts that the ECT does.

24.    As elaborated below, *first*, *Achmea* precludes intra-EU arbitration under Article 26 of the ECT, and none of Professor Bermann's arguments to the contrary survives scrutiny under international law.  In particular, the ruling and reasoning of *Achmea* apply to any provision purporting to contain an offer to arbitrate, whether contained in a bilateral or multilateral treaty.  It is, thus, irrelevant that the ECT is a multilateral treaty.  Nor does EU's participation in the ECT save Article 26 of the ECT from violating the EU Treaties.  The Absence of a so-called "disconnection clause" in the ECT is immaterial.  *Second*, the EU Treaties are applicable law under Article 26(6) of the ECT.[26]  *Third*, in contrast to Professor Bermann's reading of CJEU's Opinion 1/17 on CETA, the opinion in fact underscores that Article 26 of the ECT is inoperative as between EU Member States.  *Fourth*, the principle of primacy of EU law, enshrined in the EU Treaties, is the supreme conflict rule governing the relationship between the EU Treaties and other international agreements with regard to obligations of the EU Member States *inter se*.  This means that Article 26 of the ECT does not apply between EU Member States and precludes an EU Member State from extending a valid

---

[25] *See Achmea*, ¶ 41 (DE 15-52, Ex. 46 to First Hindelang Declaration); CJEU, Case C-478/07, ECLI:EU:C:2009:521, ¶ 98 – Budĕjovický Budvar (DE 15-43, Ex. 37 to First Hindelang Declaration).

[26] Article 26(6) of the ECT reads: "A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law." (*See* DE 1-6).

offer to arbitrate to a national of another EU Member State. *Finally*, paying any amount in satisfaction of the Award would require the EU Commission's approval in order not to violate EU law. The recent decision from the General Court of the European Court of Justice ("GC") relied on by Professor Bermann does not change this conclusion in any way.

## II.    The Ruling and Reasoning of the *Achmea* Judgment Preclude Intra-EU Arbitration under the ECT

### 1.    The *Achmea* Judgment Applies to the ECT

#### a)    It Is Irrelevant That the ECT Is a Multilateral Treaty

25.    Professor Bermann argues that "the *Achmea* judgment clearly distinguished between bilateral investment treaties and multilateral treaties"; because the ECT is a multilateral treaty, and not a bilateral treaty between two EU Member States (as the one involved in *Achmea*), the *Achmea* ruling does not affect the application of Article 26 to intra-EU disputes.[27]  However, these conclusions are incorrect and based on a mistaken reading of the *Achmea* ruling.

26.    *First,* the *Achmea* judgment is not limited to "bilateral" treaties. That term does not appear in the main holding of the judgment:

> Articles 267 and 344 TFEU must be interpreted as precluding *a provision in an international agreement concluded between Member States*, *such as* Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[28]

---

[27] *See* Bermann Declaration, ¶ 107.

[28] *Achmea*, ¶ 62 (emphasis added) (DE 15-52, Ex. 46 to First Hindelang Declaration).

27.    The term used in *Achmea* is "international agreement," which can include a bilateral investment agreement as well as a multilateral treaty.  Further, as explained below, the *Achmea* holding is preceded by the CJEU references to a line of cases involving multilateral agreements that reach the same conclusion as *Achmea* regarding the invalidity of dispute resolution clauses that do not respect the autonomy of the EU legal order as provided for in the EU Treaties.[29]

28.    *Second*, while the ECT is a multilateral treaty, the specific provision at issue, Article 26, just like Article 8 of the Dutch-Slovak BIT, is premised on bilateral undertakings among the contracting parties, whereby one "Contracting Party" and "another Contracting Party," the home of an investor, agree to submit investment disputes between the first Party and the investor to arbitration.[30]  Indeed, I am very much in agreement with Professor Bermann when he states in that regard that "[m]ultilateral investment treaties, such as the ECT, operate in much the same way" as bilateral investment treaties.[31]  The CJEU found that Article 8 of the Dutch-Slovak BIT was precluded by EU law because "the Member States parties to it established a mechanism for settling disputes between an investor and a Member State which could prevent those disputes from being resolved in a manner that ensures the full effectiveness of EU law, even though they might concern the interpretation or application of that law."[32]

---

[29] *See id.*, ¶ 57.

[30] The CJEU has previously addressed the situation where a multilateral treaty contains bilateral relationships whereby Member States make certain undertakings *inter se. See, e.g.,* CJEU, Case 10/61, ECLI:EU:C:1962:2 – *Commission v. Government of the Italian Republic* (DE 15-20, Ex. 14 to First Hindelang Declaration) (addressing the situation of bilateral rights and obligations in a multilateral treaty in respect of the General Agreement on Tariffs and Trade (GATT); holding that GATT tariffs rules cannot be applied between the EU Member States to the extend they contradict obligations in EU law).

[31] Bermann Declaration, ¶ 38.

[32] *Achmea*, ¶ 56 (DE 15-52, Ex. 46 to First Hindelang Declaration).

This is precisely what Article 26 of the ECT does.

29.    Further, the key factors that caused the CJEU to declare the dispute resolution provision of Article 8 of the Dutch-Slovak BIT inoperative also apply to Article 26 of the ECT: Article 26 creates arbitral tribunals that are plainly not courts or tribunals within the EU legal system; these tribunals "may be called on" to interpret and apply EU law; but they cannot refer questions of EU law to the EU Court of Justice under Article 267 of the TFEU.[33]

30.    In sum, whether a treaty is bilateral or multilateral was irrelevant to the CJEU's analysis.  The CJEU confirmed that Article 344 of the TFEU is not only applicable to proceedings between EU Member States, but also to proceedings between individuals and EU Member States that circumvent the preliminary ruling procedure,[34] and this includes Article 26 of the ECT.

>    b)  **The EU's Membership in the ECT Does Not Save Article 26 of the ECT from Being Inoperative in Accordance with Achmea**

31.    Professor Bermann also suggests that the inclusion of Article 26 of the ECT in an agreement to which individual EU Member States are parties in their own right, alongside the EU and third countries does not violate Article 344 TFEU and the principle of mutual trust between the EU Member States which it reflects.  He says, the principle "applies as between the EU Member States . . . [and does not] logically translate [. . .] to a situation where the EU itself, and all of the EU Member States, decide to enter into a multilateral treaty, such as the ECT,"[35] and on this basis he concludes that the *Achmea* judgement is irrelevant in the case at

---

[33] *Achmea*, ¶¶ 42, 49, 56 (DE 15-52, Ex. 46 to First Hindelang Declaration).

[34] *Id. at* ¶ 60.

[35] Bermann Declaration, ¶ 108.

hand.[36]  He further opines that the "CJEU's Opinion 1/17 confirms that international arbitration agreements to which the EU is a party − such as CETA and the ECT − are not threats to the autonomy of EU law."[37]  But these opinions are based on erroneous readings of the CJEU's *Achmea* judgement and Opinion 1/17, as well as a misinterpretation of the principles which guide them.

32.    *First,* the application of the principle of "mutual trust" is not limited to treaties between EU Member States to which the EU is not a party.  Article 344 of the TFEU reads: "[EU] Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein."  This provision encapsulates the Member States' undertaking, irrespective of the character of a particular agreement or treaty by which they make this undertaking:  Such broad reading was confirmed by the CJEU in CJEU, Opinion 2/13, ECLI:EU:C:2014:2454 – ECHR ("Opinion 2/13"), which relates to the draft agreement of the EU's accession to the ECHR, a multilateral agreement to which the EU Member States, third countries, and the EU were supposed to become a party.  The CJEU held that the draft agreement was "liable to affect Article 344 of the TFEU in so far as it does not preclude the possibility of disputes between Member States or between Members States and the EU" concerning matters of EU law.[38]  Thus, it is not possible for the EU Member States to circumvent their obligations arising out of the EU Treaties, especially by encroaching on the exclusive jurisdiction of the CJEU, by acting together with the EU.

33.    *Second*, Professor Bermann's conclusion that "the CJEU made it clear that

---

[36] Bermann Declaration, ¶¶ 107, 108, 115.

[37] Bermann Declaration, ¶ 120.

[38] Opinion 2/13, ¶ 214 (DE 15-48, Ex. 42 to First Hindelang Declaration).

investment treaties to which the EU is a party – such as the ECT – are situated very differently from BITs entered into by pairs of EU Member States"[39] is based on his misreading of paragraphs 57 and 58 of *Achmea*.[40] The CJEU's reasoning in *Achmea* does not limit its legal conclusions on EU law to international agreements to which the EU is not a party. In particular, the CJEU did *not* hold that an agreement to arbitrate is precluded by the TFEU only when contained in an international agreement between EU Member States that does not include other parties. To the contrary, the CJEU's reasoning in *Achmea* supports its application to any international agreement between Member States, such as the ECT, regardless of whether third countries or the EU itself is also a signatory.

34.    Professor Bermann focuses on the paragraphs leading to the final holding in paragraph 62 of *Achme*a in which the CJEU notes that, in principle, the EU can agree to a dispute resolution mechanism in an international agreement in compliance with the EU Treaties,[41] but Professor Bermann ignores the critical proviso in the CJEU's ruling:

> The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, *provided that the autonomy of the EU and its legal order is respected*.[42]

35.    The CJEU cites three cases in support of this general rule: CJEU, Opinion 1/91, ECLI:EU:C:1991:490,    ¶¶ 40,    70   –   *EEA*   ("Opinion   1/91");   Opinion   1/09, ECLI:EU:C:2011:123, ¶¶ 74, 76 – *European and Community Patents Court* ("Opinion 1/09")

---

[39] Bermann Declaration, ¶ 115

[40] *See* Bermann Declaration, ¶¶ 115, 116.

[41] *Achmea*, ¶ 57 ("It is true that, according to settled caselaw of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law.") (DE 15-52, Ex. 46 to First Hindelang Declaration).

[42] *Achmea,* ¶ 57 (emphasis added) (internal citations omitted).

(Agreement creating a unified patent litigation system); and Opinion 2/13, ¶¶ 182-83.  All of the treaties at issue in these cases were multilateral and the EU was a party to each one. Contrary to Professor Bermann's conclusions, the CJEU found that these agreements were in breach of EU law—precisely because they failed to respect "the autonomy of the EU and its legal order."

36.    Opinion 1/91, referred to above, addressed the compatibility of the dispute settlement bodies established by a draft international agreement between the EU and its Member States, on the one hand, and the four countries of the European Free Trade Association, on the other, relating to the creation of the European Economic Area.  The CJEU found such bodies to be "incompatible" with the TFEU because they would impinge on the CJEU's exclusive jurisdiction to make final determinations of EU law.[43]

37.    Opinion 1/09 involved a multilateral agreement intending to create a European and Community Patent Court to which the EU was a party.  There, too, the CJEU found that the envisaged European and Community Patent Court was not compatible with EU law.  The CJEU focused on the fact that the European and Community Patent Court had the effect of removing disputes from the domestic judiciary of the EU Member States.  Here, the CJEU concluded that the agreement in question was in violation of the principle of autonomy of the EU legal order precisely because the European and Community Patent Court deprived domestic courts of the EU Member States of their rights and obligations to request preliminary rulings from the CJEU under Article 267 of the TFEU.[44]

38.    Finally, in Opinion 2/13, the CJEU addressed the draft agreement of the EU's accession to the ECHR, another international agreement to which the EU was supposed to

---

[43] *See* Opinion 1/91, ¶¶ 31-36, 40, 70-72 (DE 15-30, Ex. 24 to First Hindelang Declaration).

[44] Opinion 1/09, ¶¶ 80, 83, 89 (DE 15-45, Ex. 39 to First Hindelang Declaration).

become a party. Again, the CJEU found that the accession agreement's dispute resolution provisions were not compliant with EU law.[45] It reasoned that the agreement interfered with the judicial dialogue established by Article 267 of the TFEU, and was therefore "liable adversely to affect the specific characteristics of EU law and its autonomy."[46] The CJEU also concluded, as already mentioned before, that it was "liable to affect Article 344 of the TFEU in so far as it does not preclude the possibility of disputes between Member States or between Members States and the EU" concerning matters of EU law.[47]

39.    *Achmea* simply applies these precedents to the bilateral investment treaty between Slovakia and the Netherlands. It extends their holdings on the preclusive power of Articles 344 and 267 of the TFEU to any investor-state dispute resolution clauses that purport to operate as between EU Member States.[48] The holdings in *Achmea* and the preceding cases extend to *any* international agreement which contains dispute settlement mechanisms incompatible with Articles 267 and 344 of the TFEU, including the ECT.[49]

40.    The EU's participation in the ECT is thus irrelevant to the question of whether the EU Member States violated the principles of autonomy and primacy of EU law by circumventing the preliminary ruling procedure of Article 267 of the TFEU when providing *for intra-EU investment arbitration in Article 26 of the ECT.*

41.    *Third,* contrary to Professor Bermann's suggestion,[50] the CJEU's Opinion 1/17

---

[45] Opinion 2/13, ¶ 258 (DE 15-48, Ex. 42 to First Hindelang Declaration).

[46] *Id.*, ¶¶ 199-200, 236-248.

[47] *Id.*, ¶¶ 214, 224, 258.

[48] *Achmea*, ¶ 58 (DE 15-52, Ex. 46 to First Hindelang Declaration).

[49] *Id.*, ¶ 62.

[50] Bermann Declaration, ¶¶ 117-120.

on CETA does not lead to any other conclusion.  In particular, the CJEU in no way confirmed "that international arbitration agreements to which the EU is a party – such as . . . the ECT – are not threats to the autonomy of EU law, even though tribunals constituted thereunder cannot make preliminary references to the CJEU on issues of EU law."[51]

42.    Only by failing to recognise that the CETA's Chapter Eight on investment does *not* govern investment relations between EU Member States can Professor Bermann make the surprising claim that "there is no reason why this same position [with regard to the CETA] should not be equally applicable to the ECT, to which the EU is also a party."[52]  Clearly, intra-EU investment claims are not within the scope of the CETA as the agreement is intended to apply only between Canada, on the one hand, and the European Union and its Member States, on the other.

43.    In contrast to Professor Bermann's reading of Opinion 1/17, the CJEU explicitly stated that it is necessary to distinguish between the application of the principle of autonomy of EU law in an intra-EU context, on the one hand, and a third-country context, on the other. The question of the compatibility with the principle of autonomy of EU law "of the creation or preservation of an investment tribunal by means of . . . an agreement [applied between EU Member States] must be distinguished from the question of the compatibility . . . of the creation of such a tribunal by means of an agreement between the Union and *a non-Member State.*"[53] Only with regard to non-EU Member States considerations "of the reciprocal nature of international agreements [with third countries] and the need to maintain the powers of the Union in international relations"[54] may lead to a "softening" of the prerequisites flowing from

---

[51] Bermann Declaration, ¶ 120.

[52] Bermann Declaration, ¶ 119.

[53] Opinion 1/17, ¶ 127 (emphasis added) (Annexed hereto as Exhibit 68).

[54] Opinion 1/17, ¶ 117 (Annexed hereto as Exhibit 63).

the principle of autonomy of EU law.  CETA being applicable to investment relations with third countries only, the CJEU in Opinion 1/17 did not revert its own finding in *Achmea* that *the EU Member States* violated the principles of autonomy and primacy of EU law by circumventing the preliminary ruling procedure of Article 267 of the TFEU when providing for intra-EU investment arbitration.

### c)   The Absence of a so-called "Disconnection Clause" in the ECT Is Irrel-evant

44.    Professor Bermann argues that if the EU "wants to carve away a treaty's application to intra-EU situations, . . . [it] negotiate[s] for and have inserted in the treaty a so-called 'disconnection clause.' A disconnection clause in a treaty entered into by the EU is a provision stating unambiguously that a treaty has no application to relationships that are entirely internal to the EU."[55]  Such an inference is unwarranted and legally irrelevant.

45.    The lack of a disconnection clause in the ECT does not mean the EU held Professor Bermann's position at the time of the ECT's ratification.  Indeed, the European Commission's own statements disproves that contention: At the time of the ECT's conclusion, "the EU Member States did not intend to create inter se obligations between them, just as in the case of the WTO agreement" and that Article 26 of the ECT was not intended to be applied in the intra-EU context.[56]

---

[55] Bermann Declaration, ¶ 57.  In fact, disconnection clauses have no bearing on intra-EU relations. They serve the purpose to signify third, i.e. non-EU Member States that some parties to a multilateral treaty will deviate from the treaty and apply EU law *inter se*. In the case at hand there is no risk that rights of third parties to the ECT are effected by the application of EU law in an intra-EU context. *See* also M. Cremona, Disconnection Clauses in EU Law and Practice, in Mixed Agreements Revisited: The EU and its Member States in the World 166 (Hillion & Koutrakos eds. 2010) (DE 22-4).

[56] *See, e.g.,* European Commission, *Amicus Curiae* Brief ¶¶ 11-45, *Novenergia II – Energy & Environment (SCA) v. Kingdom of Spain*, SCC Case No. 2015/063 (May 2, 2017) (DE 15-66, Ex. 60 to First Hindelang Declaration).

46.     Further, even if the EU had taken the position advanced in Professor Bermann's Declaration, the EU's ratification of the ECT without a disconnection clause would not cure Article 26's incompatibility with the EU Treaties.  The CJEU has authoritatively determined that the EU Treaties prohibit investor-state arbitration clauses agreed to between Member States such as the one in Article 26 of the ECT.  As noted above, the EU cannot by its "agreement" override the EU Treaties.

47.     Moreover, the absence of a disconnection clause in the ECT does not save Article 26 of the ECT from violating Articles 267 and 344 of the TFEU.  For example, the absence of a "disconnection clause" in the draft accession agreement of the EU to the ECHR did not cure the breach of EU law.  Rather, it rendered the agreement *irreconcilable* with Article 344 TFEU. In Opinion 2/13 the CJEU held:

> the procedure for the resolution of disputes provided for in Article 33 of the ECHR could apply to any Contracting Party and, therefore, also to disputes between the Member States, or between those Member States and the EU, even though it is EU law that is in issue . . . The very existence of such a possibility undermines the requirement set out in Article 344 TFEU [CJEU, Opinion 2/13, ECLI:EU:C:2014:2454, ¶ 208 – *ECHR*] . . . In those circumstances, only the express exclusion of the ECtHR's jurisdiction under Article 33 of the ECHR over disputes between Member States or between Member States and the EU in relation to the application of the ECHR within the scope ratione materiae of EU law would be compatible with Article 344 TFEU.[57]

Similarly, here, the non-existence of a disconnection clause in the ECT only underscores the arbitration clause's incompatibility with EU law.

48.     Moreover, even if one were to assume, for the sake of argument, that some sort of "disconnection" would be required, there is no need for an explicit disconnection clause in the ECT because the EU Treaties and secondary law can disconnect EU Member States from a treaty *inter se*.  For example, the 1961 Hague Convention on Abolishing the Requirement of

---

[57] Opinion 2/13, ¶¶ 205-13 (DE 15-48, Ex. 42 to First Hindelang Declaration).

Legalization of Public Foreign Documents (the "Apostille Convention") has been joined (by ratification or accession) by 118 States (all Contract Parties to the Apostille Convention), and has no disconnection clause at all; and yet, the EU has disconnected (*inter se*) from this convention through secondary EU law.[58]  There are many such examples, and so many in fact, that they can support that no express disconnection clause is required in a treaty as a matter of (regional) customary international law,[59] in the sense of Article 38(1) lit. b of the Statute of the International Court of Justice[60]. If nothing more, EU Member States can disconnect from a treaty regardless of whether there is a disconnection clause. This is because the autonomy and primacy of EU Law can be understood and explained as having developed into an international custom applicable between EU Member States.[61]  There has been long-standing case law of the CJEU, observed by the EU Member States, establishing autonomy and primacy of EU law, which Professor Bermann appears to concede,[62] and there is *opinio iuris* that due to the autonomy and primacy of EU law that the EU Member States can disconnect *inter se* from

---

[58] *See* Regulation 2016/1191, Article 19 (Annexed hereto as Exhibit 77) (stating "this Regulation shall, in relation to matters to which it applies and to the extent provided for therein, prevail over other provisions contained in bilateral or multilateral agreements or arrangements concluded by the Member States in the relations between the Member States party thereto".)

[59] *See, e.g.*, International Court of Justice Case Concerning Right of Passage Over Indian Territory (Portugal v. India), Merits Judgment of 12 April 1960 ("Right of Passage case") p. 9, 21, 37 (Annexed hereto as Exhibit 78) ("The Court sees no reason why long continued practice between two States accepted by them as regulating their relations should not form the basis of mutual rights and obligations between the two States.")

[60] *See* Statute of the International Court of Justice, Article 38 (Annexed hereto as Exhibit 79).

[61] Such customary practice can be regional or local, and in the EU there is State practice and also *opinio iuris* (continued practice between two states accepted by them as regulating their relations).  *See* Right of Passage case, p. 44 (Annexed hereto as Exhibit 78).

[62] *See, e.g*., CJEU, Case 6/64, ECLI:EU:C:1964:66 – *Costa v ENEL* (DE 15-22, Ex. 16 to First Hindelang Declaration); CJEU, Case 26/62 – Van Gend & Loos (Annexed hereto as Exhibit 80).

international treaties with no disconnection clause , *i.e.*, for intra-EU affairs[63].  In sum, the lack of the disconnection clause in the ECT is irrelevant, and does not mean that the EU Member States cannot "disconnect" from the ECT as to intra-EU disputes.

## 2.   The EU Treaties are Applicable Law under Article 26(6) of the ECT

### a)   The EU Treaties Constitute the Rules of International Law Applicable between the EU Member States within the Meaning of Article 26(6) of the ECT

49.    Professor Bermann's Declarations seek to obfuscate the fact that the EU Treaties create rules of international law applicable between the EU Member States that *comprehensively* govern the relations between them.  Professor Bermann asserts that the reference to "rules of international law" in Article 26(6) of the ECT is a reference to "general rules and principles of international law (applicable to all ECT Contracting Parties)."[64]  He also suggests that Article 26(6) of the ECT would be applicable to the merits of the dispute only.[65]  On that basis, Professor Bermann concludes that Article 26(6) of the ECT precludes the application of EU law by tribunals established under that provision.[66]

50.    This position is logically unsustainable because the EU Treaties are rules of international law, are applicable between EU Member States even though not binding on Non-

---

[63] That, for example in regard to the above-mentioned  Regulation 2016/1191 and the Apostille Convention, this longstanding practice has, to the best of my knowledge (*See Status report on the* Apostille Convention*, available at* https://www.hcch.net/en/instruments/conventions/status-table/?cid=41), not fundamentally been contested by, among others, the United States of America, just underlines that an explicit "disconnection clause" in an international treaty is superfluous when a disconnection by the EU Treaties or EU secondary law is not affecting third countries. *See* footnote 55 above. **once FSIA jurisdiction over a sovereign has been established**

[64] Bermann Declaration, ¶ 81.

[65] *See* Bermann Declaration, ¶ 83.

[66] *See id.*

EU Contracting Parties to the ECT, and Article 26(6) of the ECT does not exclude any rules of international law from its coverage nor is its application restricted to the merits of a dispute.

51.     *First,* Professor Bermann's Declaration ignores that Article 26(6) of the ECT, by its terms, includes *all* "applicable rules of international law."  Professor Bermann's and *NextEra*'s reading of Article 26(6) of the ECT thus contradicts Article 31 of the VCLT, which provides:

> 1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose
> . . .
> 3. There shall be taken into account, together with the context:
> . . .
> (c) any relevant rules of international law applicable in the relations between the parties.

52.     As the principal judicial organ of the United Nations, the International Court of Justice, has stated: "an international instrument has to be interpreted and applied within the framework of the entire legal system prevailing at the time of the interpretation."[67]

53.     The EU Treaties are international treaties and satisfy the definition of a treaty set out in Article 2(1)(a) of the VCLT that a treaty is "[a]n international agreement concluded between [s]tates in written form and governed by international law."  The EU Treaties are thus undeniably international law.[68]  As such, they would be "relevant rules of international law

---

[67] *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970), Advisory Opinion*, I.C.J. Reports 1971, p. 31, ¶ 53 (Annexed hereto as Exhibit 69) (emphasis added).

[68] Professor Bermann claims that in *Achmea* the "CJEU declined to hold that EU law fell within the BIT's reference to "general principles of international law" (which is the closest comparable wording in that treaty)". Bermann Declaration, ¶ 122. On this basis, he asserts that EU law is domestic law (*See* Bermann Declaration, ¶¶ 86, 136) or, at least, not public international law (Bermann Declaration, ¶ 122). This view is based on a misstatement of the CJEU in *Achmea* and a misreading of Article 8(6) of the Dutch-Slovak BIT containing the applicable law clause.

applicable in the relations between" Spain and the Netherlands under Article 31(3)(c) of the VCLT and must be taken into account when interpreting and applying the ECT.

54.    More importantly, they form part of the mandate in Article 26(6) of the ECT that a tribunal "shall decide the issues in dispute in accordance with . . . applicable rules and principles of international law."  Any court or tribunal interpreting or applying the ECT must therefore apply the EU Treaties as international law to decide all issues in dispute, including jurisdiction and merits alike.

55.    Accordingly, there is no doubt that Article 26 of the ECT falls within the ambit of *Achmea's* rule that a dispute resolution provision violates the EU Treaties if the tribunal "may be called on to interpret or . . . apply EU law."[69]

56.    *Second*, Professor Bermann also argues that EU law – like any other treaty concluded between the EU Member States – cannot have been intended to form part of the

---

The CJEU in *Achmea* put it beyond doubt that EU law between the EU Member States is international law:

> "Given the nature and characteristics of EU law . . . , that law must be regarded both as forming part of the law in force in every Member State and as deriving from an *international agreement between the Member States.*"

*Achmea*, ¶ 41 (emphasis added). Thus, while the CJEU indeed did not qualify EU law as "general principles of international law", Professor Bermann misreads Article 8(6) of the Dutch-Slovak BIT which–contrary to his claim (*See* Bermann Declaration, ¶ 122, footnote 115)–references public international law not only by way of "general principles of international law" but also by way of treaties in public international law ("The arbitral tribunal shall decide on the basis of the law, taking into account in particular though not exclusively: . . . the provisions of this Agreement, *and other relevant agreements* [in public international law] between the Contracting Parties . . . [and] the general principles of international law". The CJEU qualified the EU Treaties as "international agreement", thus as "rules of international law" in the meaning of Article 26(6) of the ECT.

[69] *Achmea*, ¶ 42 (DE 15-52, Ex. 46 to First Hindelang Declaration).

"applicable rules and principles of international law," because it "cannot be right."[70]  He sees no need to provide any reference for his extraordinary claim. However, this would have been helpful as such claim already ignores the language of Article 26(6) of the ECT, which does not refer to international law binding between all Contracting Parties, but to international law applicable to "the issues in dispute."  His conclusion also overlooks the multilateral nature of the ECT and, moreover, directly contradicts his own earlier (correct) statement that the ECT essentially operates as bilateral commitments between the contracting parties, including between the EU Member States.[71]  Thus, EU law can be applicable to the issues in dispute between two EU parties even though it is not binding on Non-EU Contracting Parties.

57.    *Third*, Professor Bermann seeks to exclude the EU Treaties from Article 26(6) of the ECT arguing that the provision "does not apply to matters of jurisdiction,"[72] but in so arguing effectively tries to rewrite the article.  He attempts to justify rewriting Article 26(6) by referring to Article 26(1) of the ECT which defines arbitrable disputes as those which concerns an alleged breach of an obligation . . . under Part III [of the ECT]".[73]  However, the scope of arbitrable disputes and the applicable law provisions are distinct.  Article 26(1) of the ECT defines which disputes the arbitral tribunal may decide.  Article 26(6) of the ECT determines what law it is to apply in deciding those disputes.  The jurisdiction of an arbitral tribunal does not limit the law that the tribunal can apply.

58.    The EU Treaties are "applicable" whenever they are relevant to determining the "issues in dispute."  It is untenable to maintain that the ECT tribunals will never be called upon

---

[70] Bermann Declaration, ¶ 85.

[71] Bermann Declaration, ¶¶ 37-38.

[72] Bermann Declaration, ¶ 83.

[73] ECT, art. 26(1) (DE 1-6).

to apply and interpret EU law.  The arbitral tribunal in *NextEra*, for example, interpreted EU law when it decided that the EU Treaties did not preclude it from exercising jurisdiction.[74]  It is indeed not uncommon for ICSID tribunals to face questions of EU law.  By way of another example, in *Isolux v. Spain,* the tribunal found that the EU Treaties formed part of the "applicable rules and principles of international law" within Article 26(6) of the ECT, and concluded that "[i]t is admitted toda*y, in a general manner*, that arbitral tribunals not only have the power, but rather the obligation to apply EU law."[75]

b)  **Article 26(6) of the ECT Is Not Similar to the Applicable Law Provision of the CETA**

59.    Professor Bermann's Declaration seeks to justify the exclusion of the EU Treaties from Article 26(6) of the ECT in an intra-EU investment arbitration by drawing parallels between Article 26(6) of the ECT and the applicable law provision in the CETA.[76] He concludes that CETA's applicable law clause "is still further evidence that, in international law agreements entered into by the EU, such as the ECT, international law, including the terms of the treaty, is applicable law, and EU law is not."[77]  This attempt is fundamentally flawed: The CETA does not define the applicable law "in terms similar to Article 26(6) of the ECT".[78]

---

[74] *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Quantum Principles, ¶¶ 332-357 (DE 1-4).

[75] *See Isolux Netherlands, BV v. Kingdom of Spain,* SCC Case V2013/153, ¶ 654 (DE 22-28). The original text in Spanish reads "Además, se admite hoy, de modo general, que los tribunales arbitrales no solamente tienen el poder sino también el deber de aplicar el derecho europeo." (emphasis added). *See also Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, ¶¶ 4.151-4.160 (Nov. 25, 2015) (Annexed hereto as Exhibit 69).

[76] Bermann Declaration, ¶¶ 119, 121.

[77] Bermann Declaration, ¶ 121.

[78] Bermann Declaration, ¶ 117, footnote 108.

60.    As already stated above, the CETA's Chapter Eight on investment does not govern investment relations between EU Member States. Intra-EU investment claims are not within the scope of the CETA as the agreement is intended to apply only between Canada, *on the one hand*, and the European Union and its Member States, *on the other*.[79]  The question of application (and primacy) of the EU Treaties would not arise in this context because Canada is not a party to the EU Treaties.  The CETA's applicable law provision referring to, in particular, "rules and principles of international law applicable *between the Parties*" (emphasis added) would not include the EU Treaties because they do not regulate the relationships between Canada, *on the one hand*, and the European Union and its Member States, *on the other*.  In contrast, as noted above, under the ECT, the EU Treaties obviously form part of the relevant rules and principles of international law applicable to issues in dispute between EU parties to the ECT.

61.    Specifically, in *NextEra*, investors from the Netherlands brought a claim against Spain on the basis of Article 26 of the ECT, purportedly extending an offer to arbitrate by *an EU Member State to an investor of another EU Member State*.  Thus, the alleged basis for the dispute are reciprocal commitments *between two EU Member States*, the Netherlands and Spain.  Such an (intra-EU) conflict simply cannot arise with regard to the CETA—not even theoretically.

62.    Surprisingly, Professor Bermann explicitly states in his Declaration that the CETA applies between "Canada, *on the one hand*, and the EU and the EU Member States, *on*

---

[79] *See* the Parties mentioned in the Title of the CETA. The same can be also drawn from Article 8.1 in conjunction with Article 8.25.1 of the CETA. Article 8.1 of the CETA defines the respondent as "Canada or, in the case of the European Union, either the Member State of the European Union or the European Union pursuant to Article 8.21". And Article 8.25.1 of the CETA provides that "[t]he respondent consents to the settlement of the dispute by the Tribunal in accordance with the procedures set out in this Section." Thus, an EU Member States does not extent an offer to arbitrate to an investor of another EU Member State.

*the other hand*",[80] and, thus, not between EU Member States. He, fails, however, to recognize that this simple but fundamental difference is determinative of what law—including treaty law—is part of the "rules and principles of international law" applicable between the relevant parties.

63.     In this regard, the CJEU's recent Opinion 1/17 on CETA made it clear that this distinction is material and was at the core of its finding that the applicable law provisions of the CETA did not violate the EU Treaties:

> The question of the compatibility, with EU law [i.e. the EU Treaties and sec-ondary law], of the creation or preservation of an investment tribunal by means of such an agreement [containing commitments of the EU Member States inter se] must be distinguished from the question of the compatibility, with EU law, of *the creation of such a tribunal* by means of an agreement *between the Union and a non-Member State* . . . . The Member States are, in any area that is subject to EU law, required to have due regard to the principle of mutual trust. That principle obliges each of those States to consider, other than in exceptional cir-cumstances, that all the other Member States comply with EU law, including fundamental rights, such as the right to an effective remedy before an independ-ent tribunal laid down in Article 47 of the Charter . . . . However, that principle of mutual trust, with respect to, inter alia, compliance with the right to an effec-tive remedy before an independent tribunal, is not applicable *in relations be-tween the Union and a non-Member State*.[81]

64.     In sum, the CJEU's conclusions about the CETA's applicable law provision do not contradict the application of *Achmea* to Article 26(6) of the ECT in the intra-EU context.

### 3.  Opinion 1/17 on CETA Underscores that Article 26 of the ECT Is Inoper-ative as between EU Member States

65.     CJEU's Opinion 1/17 on CETA supports the conclusion that Article 26 of the ECT is in conflict with the principle of autonomy of EU law. In my first declaration, I explained why intra-EU investor-State dispute settlement on the basis of Article 26 of the ECT

---

[80] Bermann Declaration, ¶ 117 (emphasis added).

[81] CJEU Opinion 1/17 on CETA, ¶¶ 126-129 (emphasis added) (Annexed hereto as Exhibit 68).

is irreconcilable with the principle of autonomy of EU law.[82]

66.    In Opinion 1/17 on the CETA, the CJEU analysed the compliance of the CETA's dispute resolution system with the principle of autonomy of EU law with regard to third countries.[83]  The CJEU explained that, among others, investment tribunals may not "in the course of making findings on restrictions on the freedom to conduct business challenged within a claim, *call into question the level of protection of a public interest that led to the introduction of such restrictions by the Union* with respect to all operators who invest in the commercial or industrial sector at issue of the internal market."[84]

67.    In order to ensure that an arbitral tribunal cannot "call into question the level of protection of public interest that led to the introduction of such restrictions by the Union", the CJEU highlights certain safeguards to be included in an international agreement.[85]  In contrast to the CETA, the ECT does not contain similar safeguards to prevent an arbitral tribunal established on the basis of Article 26 of the ECT to declare incompatible the level of protection of public interests determined by the European Union.

68.    With regard to the ECT, it suffices to note that in the context of intra-EU investment arbitrations, it would be an astonishing departure from its prior decisions, including Opinion 1/17, for the CJEU to abandon the requirement for safeguards the Court considered with respect to the CETA and allow intra-EU arbitral tribunals, such as the one in *NextEra*, to "call into question the level of protection of public interest that led to the introduction of such

---

[82] First Hindelang Declaration, ¶¶ 47-56.

[83] CJEU Opinion 1/17 on CETA, ¶¶ 106-161 (Annexed hereto as Exhibit 68).

[84] CJEU Opinion 1/17 on CETA, ¶¶ 148-151 (emphasis added). (Annexed hereto as Exhibit 68)

[85] CJEU Opinion 1/17 on CETA, ¶¶ 148, 152, 154-159 (Annexed hereto as Exhibit 68).

restrictions [on the freedom to conduct business] by the Union."[86]

69.    Opinion 1/17 on CETA thus supports one conclusion: The provisions in the ECT, purportedly allowing for investor-State dispute settlement within an intra-EU context are in conflict with the principle of autonomy of EU law.

### 4. The Principle of Primacy of EU Law Renders Article 26 of the ECT Inapplicable in an Intra-EU Context

#### a) The Principle of Primacy of EU Law Applies to the Rules Contained in International Agreements Creating Inter Se Obligations between EU Member States

70.    As I explained in my first declaration, the EU Treaties establish an all-encompassing *conflict rule*, the principle of primacy of EU law.[87]  This rule means that in the international law relationships between EU Member States, the EU Treaties and the legal order created by them prevail over any inconsistent treaty provision entered into by the Member States.

71.    A conflict between Article 26 of the ECT and the EU Treaties exists because, under *Achmea,* Article 26, when applied to intra-EU investment disputes, conflicts with Articles 267 and 344 of the TFEU.[88]  Thus, as with Article 8 of the Dutch-Slovak BIT in *Achmea*, the conflict between Article 26 of the ECT and the EU Treaties must be resolved by giving priority to the provisions of Articles 267 and 344 of the TFEU.

72.    Professor Bermann admits the existence of the principle of primacy under the

---

[86] CJEU Opinion 1/17 on CETA, ¶¶ 148  (Annexed hereto as Exhibit 68).  In contrast to the dispute settlement mechanism in the CETA which is applicable only in relation to Canada, a third State, "the need to maintain the powers of the Union in international relations" (CJEU, Opinion 1/17, ¶ 117) does *not* play any role in an intra-EU context.

[87] First Hindelang Declaration, ¶¶ 22-31.

[88] First Hindelang Declaration, ¶¶ 47-56.

EU Treaties, but argues that "the principle of primacy in EU law, properly understood, has nothing to do with the relationship between EU law and international law, which is the issue at hand."[89]  Refusing to take into account the conflict rule established by the EU Treaties, Professor Bermann argues that if there was a conflict between the ECT and EU law, the ECT would prevail.[90]

73.    This is incorrect. As set out below, *first*, the principle of primacy of EU law applies to any rules contained in international agreements creating *inter se* obligations between EU Member States.  *Second,* neither the EU nor its Member States can derogate from the principle that the EU Treaties enjoy primacy.  Any conflict rule seeking to take precedence over the principle of primacy of EU law is not operational under the EU Treaties.

## 1.    The Principle of Primacy of EU Law Applies to the Rules Contained in International Agreements Creating Inter Se Obligations between EU Member States

74.    Professor Bermann is only able to assert his position because he suggests that the principle of primacy of EU law would only apply in relation to domestic law of the EU Member States. Thus, he denies that the principle of primacy of EU law applies to any rules found in international treaties creating *inter se* obligations between EU Member States.[91]  This is incorrect.

75.    Professor Bermann ignores the "settled caselaw of the [CJEU that] an international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the

---

[89] Bermann Declaration, ¶ 131.

[90] Bermann Declaration, ¶¶ 68-96.

[91] Bermann Declaration, ¶¶ 131, 136.

Court."[92]

76.    The CJEU's caselaw contradicts Professor Bermann's suggestion—made without any reference—that the principle of autonomy of EU law "cannot mean, that, in the event of conflict between EU law and international law on the international plane, the former prevails."[93]  As early as in 1962, the CJEU stated in *Commission v. Government of the Italian Republic* that "a Member State which by virtue of the entry into force of the EEC Treaty [a predecessor to the EU Treaties], assumes new obligations which conflict with rights held under an earlier agreement, refrains from exercising such rights to the extent necessary for the performance of its new obligations; Article 234 of the EEC Treaty [now Article 351 of the TFEU] only guarantees the rights held by third countries under earlier agreements."[94]

77.    The CJEU made clear that "in matters governed by the EEC Treaty [a predecessor to the EU Treaties,] that Treaty *takes precedence* over agreements concluded between Member States before its entry into force, including agreements made within the framework of GATT [General Agreement on Tariffs and Trade of 1947]."[95]  In this respect, it is worth pointing out that GATT of 1947 is a multilateral agreement to which, in 1962, the EU Member States and third countries were parties to.  The EU joined in 1995.

78.    While *Commission v. Italian Republic* dealt with treaties in force prior to the entry into force of the EEC Treaty, since then, the CJEU has developed as a bedrock principle of EU law that "the provisions of a convention concluded . . . by a Member State with another

---

[92] *Achmea*, ¶ 32 (DE 15-52, Ex. 46 to First Hindelang Declaration).

[93] Bermann Declaration, ¶ 72.

[94] CJEU, Case 10/61, ECLI:EU:C:1962:2 – *Commission v. Government of the Italian Republic*, Summary Point 1 ("*Commission v. Italian Republic*") (DE 15-20, Ex. 14 to First Hindelang Declaration).

[95] *Commission v. Italian Republic* (emphasis added) (DE 15-20).

Member State *could not apply . . .* in the relations between those States if they were found to be contrary to the rules of the Treat[ies]."[96] This applies whether the offending treaty was concluded before or after the Member State's accession to the EU treaties.

79.    Professor Bermann advances a number of unconvincing arguments seeking to discredit the application of the principle of primacy of the EU Treaties to international agreements under which EU Member States undertake *inter se* commitments.

80.    *First*, Professor Bermann claims that the "CJEU's remit is limited to interpreting and applying EU law, not international law."[97]  This is a simplistic depiction of

---

[96] CJEU, Case C-3/91, ECLI:EU:C:1992:420, ¶ 8 – *Exportur* (emphasis added) (DE 15-31). *See also* CJEU, Case 235/87, ECLI:EU:C:1988:460, ¶ 23 – *Matteucci* (Annexed hereto as Exhibit 71) ("A bilateral agreement which reserves the scholarships in question for nationals of the two Member States which are the parties to the agreement cannot prevent the application of the principle of equality of treatment between national and Community workers established in the territory of one of those two Member States."); CJEU, Case C-469/00, ECLI:EU:C:2003:295, ¶ 37 – *Ravil* ("*Ravil*") (DE 15-38, Ex. 32 to First Hindelang Declaration) ("It should be observed, first, that the provisions of a convention between two Member States *cannot apply* in the relations between those States *if* they are *found to be contrary to the rules of the Treaty*, in particular the rules on the free movement of goods . . . ") (emphasis added); CJEU, Case C-478/07, ECLI:EU:C:2009:521, ¶ 98 – *Budějovický Budvar* ("*Budějovický Budvar*") (DE 15-43, Ex. 37 to First Hindelang Declaration) ("It follows that, since the bilateral instruments at issue now concern two Member States, their provisions cannot apply in the relations between those States if they are found to be contrary to the rules of the Treaty, in particular the rules on the free movement of goods".); CJEU, Case C-546/07, ECLI:EU:C:2010:25, ¶ 44 – *Commission v. Germany* ("*Commission v. Germany*") (DE 15-44, Ex. 38 to First Hindelang Declaration) ("Nevertheless, . . . application of the German-Polish Agreement concerns, since the accession of the Republic of Poland to the Union, two Member States, with the result that the provisions of that agreement can apply to relations between those Member States only in compliance with Community law, in particular with the Treaty rules on the free provision of services."). I note that Professor Bermann suggests that *Budějovický Budvar* "is not comparable to the present situation". Bermann Declaration, ¶75, footnote 59. This is incorrect. Unfortunately, however, beyond the obvious that the case did not deal with the ECT, he does not explain why he thinks that the legal principle exemplified and applied in *Budějovický Budvar*, i.e. that EU law takes precedence over *inter se* treaty obligations of the EU Member States, is not applicable to the "present situation". He also does not comment on the fact that the *Budějovický Budvar* is just one decision in a long line of caselaw, again and again, confirming the said principle.

[97] Bermann Declaration, ¶ 106.

the CJEU's jurisdiction.  It is the EU Treaties that give the CJEU the authority to resolve conflicts in international law between the EU Treaties and other treaties creating obligations between EU Members States.  This is exactly what the CJEU did in *Achmea*.

81.     But Professor Bermann's protestations regarding the status of the CJEU are irrelevant.  It is a common ground between Professor Bermann and me that the CJEU cannot declare *void or annul* an international agreement between the EU Member States conflicting with the EU Treaties.  Nor does the CJEU have jurisdiction to declare void or annul any domestic law of the EU Member States which violates the EU Treaties.[98]

82.     It is therefore a misrepresentation of what I explained in my first declaration if Professor Bermann claims that I suggested that "any agreement entered into by an EU Member State that would empower an arbitral tribunal established by that treaty to interpret and apply EU law without the possibility of making a preliminary reference to the CJEU . . . is invalid".[99]

---

[98] Professor Bermann further states that the "CJEU has ruled that it has sole power to declare acts of the EU invalid; EU Member State courts cannot make such a ruling. Yet, in effect, this is what Spain now invites this non-EU Court [the United States District Court for the District of Columbia] to do when it argues that the Achmea ruling extends to the ECT." Bermann Declaration, ¶ 125. This statement is based on an inaccurate description of the situation in the case at hand. In *NextEra*, and similar intra-EU investment arbitrations, the tribunal was neither obliged nor asked to *invalidate* the ECT or rule on the EU's act of accession to the ECT. Rather, the tribunal was obliged, according to the principle of primacy of EU law, to decline to apply any provision in an international agreement containing *inter se* obligations between EU Member States that would conflict with the EU Treaties, such as Article 26 of the ECT.  Thus, the United States District Court for the District of Columbia in the present proceedings has never been invited to invalidate the ECT, or the EU's act of accession to the ECT, but to draw the appropriate conclusions from the fact that dispute resolution provisions like Article 26 of the ECT are precluded as between EU Member States, and that such provisions do not constitute valid offers to arbitrate with investors from other EU Member States and no arbitration agreement can be formed thereunder. In fact, based upon the Petition, it appears that Petitioner, a EU-based party, is asking this court to contradict the rulings of the CJEU which apply to Petitioner.

[99] Bermann Declaration, ¶ 83.

As explained in my first declaration, according to the CJEU's well-established caselaw, giving priority to EU law means that a rule created by the EU Member States conflicting with EU law is *disapplied, i.e.* inoperative.[100]  That is to say, the ECT is not invalidated, but rather the offending provision is not effective <u>as between the EU Member States</u>.  Hence, as Article 26 of the ECT has not been effective, there has not been an offer to arbitrate by Spain to an investor from the Netherlands.  In consequence, there has never been and could have never been an arbitration agreement between (i) the Kingdom of Spain and (ii) investors from the Netherlands, such as *NextEra*, on the basis of the ECT.

83.    Professor Bermann also claims that Spain "invokes EU law solely for the purposes of challenging the ECT's very validity."[101]  I am not aware of such claim of the Kingdom of Spain.  If Professor Bermann further holds that intra-EU BIT provisions, as a consequence of the conflict with EU law established in *Achmea*, would be "invalid"[102], this is either a fundamental misunderstanding or misstatement of the effects of EU law in general and the principle of primacy of EU law in particular.  The CJEU in *Achmea*—in line with its established caselaw—did not invalidate the respective treaty provision but stated that "Articles 267 and 344 TFEU must be interpreted as *precluding* [the application, though not invalidating ] a provision in an international agreement concluded between Member States . . . under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceeding against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept."[103]

---

[100] Cf. First Hindelang Declaration, ¶¶ 47-56 and the cited caselaw there.

[101] Bermann Declaration, ¶ 83

[102] Bermann Declaration, ¶ 103.

[103] *Achmea*, ¶ 60 (emphasis added) (DE 15-52, Ex. 46 to First Hindelang Declaration).

The same holds true for Article 26 of the ECT: it is and remains "valid" but the provision is inoperative in intra-EU disputes.

84.     Professor Bermann also refers to the CJEU judgement in *Kadi* with the view to support his view that "European Union law is not capable of overriding an international obligation . . . that arises under the ECT"[104] as allegedly the CJEU "drew a sharp distinction between validity under EU law, on the one hand, and validity under international law."[105] However, *Kadi* does not prove his point.  The CJEU was asked to annul a lower-ranking *EU act* implementing a UN Security Council Chapter VII Resolution insofar as it was incompatible with the (higher-ranking) EU Treaties.  The annulment of the lower-ranking EU act, of course, would have no effect on the UN Security Council Chapter VII Resolution.  The CJEU in *Kadi* did not address the question in the present proceedings of whether a commitment undertaken in an international agreement *between the EU Member States* conflicts with the EU Treaties' provisions and what consequences flow from such conflict.

85.     This was the question in *Achmea*, where the CJEU was asked whether the arbitration clause of the Netherlands-Slovak BIT, if applied *between the EU Member States*, would be incompatible with the EU Treaties.  The answer was in the affirmative and the consequence was that Article 8 of the BIT was inoperative *ab initio.*

86.     *Second*, Professor Bermann claims that the CJEU's rulings, including the one in *Achmea*, "are not binding on institutions outside the EU."[106]  He attempts to deny the consequences of that decision on arbitral tribunals established on the basis of the ECT in an intra-EU context.

---

[104] Bermann Declaration, ¶ 96.

[105] Bermann Declaration, ¶ 95.

[106] Bermann Declaration, ¶ 106.

87.     I find this approach already deeply flawed in its basic presumption: Intra-EU investment tribunals, such as the one in *NextEra* are not outside the reach of the EU Treaties. In an intra-EU context, the principle of primacy of EU law obliges, among others, any body deriving its authority from the EU Member States, tasked with applying an international rule originating from the EU Member States, to disregard it, if incompatible with EU law. Professor Bermann's argument cannot be squared with the German Federal Court of Justice's conclusion that the ruling of the CJEU in *Achmea* required it to conclude that there is no valid arbitration agreement. The reason was straightforward: The Federal Court of Justice had no choice but to apply the principle of primacy of EU law, which required it to disregard the provision in an international agreement that conflicted with the provisions of the EU Treaties. The *NextEra* tribunal was precisely under the same obligation: It was under the obligation to disregard Article 26 of the ECT containing purportedly an offer to arbitrate from one EU Member State to an investor from another EU Member State. It failed to do so. The fact that it did not do so only underscores the actual conflict of having an arbitral tribunal decide matters where the EU Treaties are implicated.

88.     *Thirdly,* Professor Bermann seems to suggest that Article 218(11) of the TFEU would confirm that the EU Treaties cannot, on an international plane, override any treaties or agreements which already entered into force, like the ECT.[107] He explains the special CJEU procedure contained in Article 218(11) of the TFEU which "expressly authoriz[es] the European Commission to solicit a ruling by the CJEU on the compatibility with EU law of a proposed treaty between the EU and other States. If the CJEU finds the treaty to be incompatible with EU law, it cannot be concluded. In other words, the Opinion mechanism is essentially prophylactic. It keeps the EU from entering into a treaty that it cannot perform

---

[107] Bermann Declaration, ¶¶ 134-135.

without violating EU law."[108]

89.     What Professor Bermann fails to stress is that Article 218 of the TFEU is about the relationship of the EU *vis-a-vis third, i.e. non-EU countries*.  Article 218(1) of the TFEU makes this clear:  "Without prejudice to the specific provisions laid down in Article 207, agreements *between the Union and third countries* or international organisations shall be negotiated and concluded in accordance with the following procedure."[109]  In other words, Article 218(11) of the TFEU is about preventing the EU from entering into agreements with *third countries*, which are contrary to the EU Treaties.  The *NextEra* case, however, is not about the application of the ECT between the EU and a third country; it implicates its application between EU Member States.

90.     In sum, the reference to the fact that investment arbitration on the basis of the ECT in a third country context may also be in conflict with the principle of autonomy of EU law is detached from and indeed irrelevant to the question of the *consequences* of a violation of the EU Treaties by provisions in an international agreement applicable between the EU Member States, flowing from the EU Treaties.

b)  **The EU Treaties Take Precedence Over International Agreements in Relations Between the EU Member States, Including Any Conflict Rule such as Article 16 of the ECT**

91.     Article 16(2) of the ECT cannot save Article 26 of the ECT from being precluded from application in intra-EU investment arbitrations, such as the one in *NextEra*.

92.     Professor Bermann's assertion that "the ECT would prevail"[110] rests upon the

---

[108] *Id.* at ¶ 134.

[109] TFEU, art. 218 (emphasis added) (DE 15-14, Ex. 8 to First Hindelang Declaration).

[110] Bermann Declaration, ¶ 89

false conclusion that the ECT is later in time than the EU Treaties and the false presumption that EU Member States (with or without the EU) can circumvent the EU Treaties by concluding international treaties between them.[111]

93.    As regards the false conclusion, Professor Bermann claims that the ECT is later in time than the principle of primacy of EU law.[112]  To rebut this point it is sufficient to note that the ECT entered into force in 1998 and EU Member States, including Spain and the Netherlands, revised the EU Treaties in 1999, 2003, and 2009, thereby reconfirming the principle of primacy of EU three times in a row after the entry into force of the ECT.

94.    Furthermore, the EU Treaties in an intra-EU context prevail over commitments of the EU Member States *inter se* contained in international agreements, irrespective of whether these agreements are earlier or later in time.[113]

95.    As regards the false presumption, EU Member States are not permitted to derogate from or contract around the primacy of EU law (or any other rule established by the EU Treaties) by concluding other international agreements between them.  In *Kadi* the CJEU made abundantly clear that "the obligations imposed by an international agreement cannot

---

[111] *See* Bermann Declaration, ¶ 61.

[112] *See* Bermann Declaration, ¶ 90.

[113] In CJEU, Case 6/64, ECLI:EU:C:1964:66 – *Costa v ENEL* (DE 15-22, Ex. 16 to First Hindelang Declaration), the CJEU decided that there is no room for the lex posterior rule in relation to law created by the EU Member States. While the case was on the relationship of the EU Treaties and domestic law, the principle of primacy was later on extended to international agreements of the EU Member States *inter se* and with it, implicitly, also the non-applicability of the lex posterior rule. *See* CJEU, Case C-3/91, ECLI:EU:C:1992:420, ¶ 8 – *Exportur* (DE 15-31, Ex. 25 to First Hindelang Declaration.  *See also Commission v. Italian Republic* (DE 15-20); *Ravil*, ¶ 37 (DE 15-38, Ex. 32); *Budějovický Budvar*, ¶ 98 (DE 15-43, Ex. 38); *Commission v. Germany*, ¶ 44 (DE 15-44, Ex. 38).

have the effect of prejudicing the . . . principles of the [EU Treaties]."[114]

96.    The EU Member States cannot escape their obligations flowing from the EU Treaties by resorting to international law in their *inter se* dealings.  The all-encompassing conflict rule of primacy of EU law provides that the EU Treaties cannot be overwritten by domestic or international law created by the EU Member States alone or *inter se* respectively.

97.    In sum, the principle of primacy enshrined in the EU Treaties is applicable to any international agreements between EU Member States, including the ECT.  It takes precedence over any other conflict rule in an intra-EU context.  Assuming that Article 16 of the ECT is relevant in relation to the provisions of the EU Treaties, the principle of primacy takes precedence over Article 16 and it takes precedence over any other default provisions found in the VCLT.  The EU Member States cannot create any other "special" rules, such as the purported conflict rule in Article 16 of the ECT, to derogate from their obligations under the EU Treaties.

## III.    Paying Any Amount In Satisfaction of the Award Would Require the Commission's Approval in Order Not to Violate EU Law

98.    In my first declaration, I demonstrated that the Award in *NextEra* seeks to compensate the Petitioners for the changes in the premium economic scheme brought about by the revised scheme without prior review and approval of this State aid measure by the Commission.[115]  However, under the TFEU, only the EU Commission has the authority and power to investigate State aid measures and to make decisions on whether such measures can

---

[114] *Kadi*, ¶ 285. *See* CJEU, Case C-266/16, ECLI:EU:C:2018:118, ¶ 46 – *Western Sahara Campaign UK* (DE 15-47, Ex. 47) (concluding in the context of an international agreement concluded by the EU, its Member States and third countries, that "[t]he provisions of such agreements must therefore be entirely compatible with the Treaties and with the constitutional principles stemming therefrom.").

[115] First Hindelang Declaration, ¶¶ 57-62.

be implemented.[116]

99.    I respectfully disagree with Professor Bermann' analysis and conclusions on whether the Award in *NextEra* would constitute State aid.[117]  He argues that when "Spain pays an award rendered against it, it is not conferring a benefit."[118]  However, it is self-evident that the compensation ordered by the tribunal confers an economic advantage upon *NextEra* that would not otherwise have been available to it under normal market conditions.[119]

100.    Further, the advantage is selective because the obligation to pay damages did not arise from the application of a general rule of law for government liability.[120]  Here, the criteria for State aid are satisfied.[121, 122]

---

[116] *See* TFEU, arts. 107, 108 (DE 15-14, Ex. 8 to First Hindelang Declaration).

[117] He also submits again, that the EU State aid rules, like the whole EU legal order, are a "domestic matter". Bermann Declaration, ¶ 148. Above I already explained that this view is based on the misperceived nature of the EU Treaties and the legal order based upon them.

[118] Bermann Declaration, ¶ 149.

[119] *See* CJEU Case C-39/94, ECLU:EU:C:1996:285, ¶ 60 – *SFEI and Others* (DE 15-32, Ex. 26 to First Hindelang Declaration); CJEU, Case C-342/96, ECLI:EU:C:1999:210 ¶ 41 – *Spain v. Commission* (Annexed hereto as Exhibit 72).

[120] *See* Commission Decision 2015/1470 of 30 March 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania – arbitral award *Micula v. Romania* of 11 December 2013, O.J. (L 232) 43, ¶¶ 109 *et seq* (DE 15-54, Ex. 48 to First Hindelang Declaration).

[121] *See* First Hindelang Declaration, ¶ 62.

[122] Professor Bermann claims that the General Court of the European Union ("GC") in Cases T-624/15, T-694/15 and T-704/15, ECLI:EU:T:2019:423 – *European Food and Others* (Ex. #) ("*European Food and Others*") "relied on the Asteris case [(*See* Joined Cases 106-120/1987, ECLI:EU:C:1988:457, Asteris AE v. Greece, (DE 22-40)] and it annulled a European Commission decision which had condemned Romania's payment of an ICSID award as an illegal state aid." Bermann Declaration, ¶ 152. It is important to stress – and I note that Professor Bermann also acknowledges this – that "[t]he result in that case ultimately turned entirely on a question of timing". Bermann Declaration , ¶ 152. In order to avoid any possibility of misunderstanding, the GC based its entire reasoning essentially on the fact that the large portion of the aid granted in the cases at hand compensated for the periods *predating* Romania's accession to the EU—i.e., at that *time when EU law was not applicable* to the applicants. The GC made this clear stating that "in the present case, the arbitral tribunal was not bound to apply EU law to events occurring *prior to the accession* before it, unlike the situation in the case which gave

101.    Professor Bermann, further, claims that payment and enforcement of an arbitral award must be distinguished, and "basic logic and principles of attribution lead to the conclusion that a decision by a U.S. District Court recognizing an ICSID award rendered against Spain, and allowing petitioners to seize Spanish assets on the basis of the award, is not an act attributable to Spain."[123]  He does not provide any reference for what he perceives as "basic logic and principles of attribution."

102.    Attribution, according to the CJEU's caselaw, is a broad concept guided by the idea to mitigate the "real risk that State aid may be granted through the intermediary . . . and in breach of the rules on State aid laid down by the Treaty."[124]  Therefore, "it must be accepted that the imputability to the State of an aid measure . . . may be *inferred* from a set of *indicators* arising from the *circumstances* of the case and the *context* in which that measure was taken."[125] It therefore suffices that there are indications that an EU Member State contributed to the

---

rise to the judgment of 6 March 2018, Achmea (C-284/16, EU:C:2018:158, ¶ 38 to 41))." *European Food and Others*, ¶ 87 (emphasis added) (DE 22-40). The GC did not decide that awards, such as the one in *NextEra*, would *not* qualify as notifiable State aid trigging the standstill obligation contained in Article 108(3) of the TFEU to not pay the awards. Put differently, the GC did not at all assess the question of whether the award, in respect of the amount relating to the time period *after* Romania's accession to the EU, can be regarded as compensation for the withdrawal of aid which is unlawful or incompatible with EU law. *European Food and Others*, ¶¶ 89-90. The GC held that "[t]herefore, the compensation for the withdrawal of the EGO scheme, at least in respect of the amounts relating to the period from 22 February 2005 to 1 January 2007, cannot be regarded as compensation for the withdrawal of aid which is unlawful or incompatible with EU law." *European Food and Others*, ¶¶ 105-106. Notably, the situation in the case in front of this Court is different because the regimes at issues were implemented and amended by Spain when it was an EU Member State. In any event, the GC's judgment was appealed before the Court of Justice. *See* CJEU, C-638/19 P, pending – Commission v. European Food and Others.

[123] Bermann Declaration, ¶ 154.

[124] CJEU, Case C-482/99, ECLI:EU:C:2002:294, ¶ 53 – *French Republic v. Commission* (Annexed hereto as Exhibit 73).

[125] CJEU, Case C-482/99, ECLI:EU:C:2002:294, ¶ 55 – *French Republic v. Commission* (emphasis added) (Annexed hereto as Exhibit 73).

relevant aid measure. Spain created the "real risk that State aid may be granted through the intermediary . . . and in breach of the rules on State aid laid down by the Treaty"[126] by ratifying the ECT and the ICSID Convention, and, thus, Spain contributed to the situation in which it is facing enforcement of an award in a foreign court in contravention of its obligations under Article 108(3) of the TFEU. Thus, under EU law, the enforcement actions undertaken in a foreign jurisdiction can be attributed to Spain.

103.    Furthermore, Spain requested the Commission's confirmation that the payment of a similar award issued in another arbitration matter involving the same regulatory scheme addressed in State Aid Decision 7384, would be unlawful under the EU law.[127]    The Commission confirmed that it would, in fact, be unlawful.[128]    The Commission also recalled that "the payment of compensation before the Commission rules on its compatibility would be contrary to Union Law, in particular to Article 108(3) TFEU."[129]

104.    Professor's Bermann's statement that "the European Commission [has never] launched an investigation into the legality of the incentive scheme whose cancellation underlies NextEra's claims in this case, much less made a formal determination that that scheme amounted to an illegal state aid"[130] is immaterial. The standstill obligation contained in Article 108(3) of the TFEU to not pay the Award is triggered independently of the

---

[126] CJEU, Case C-482/99, ECLI:EU:C:2002:294, ¶ 53 – *French Republic v. Commission* (Annexed hereto as Exhibit 73).

[127] *See Communication from the Legal Service of the European Commission to the Attorney General of the Kingdom of Spain* 2-3 (October 26, 2018) (Annexed hereto as Exhibit 74).

[128] *Id.* ("[U]nder Article 108(3) of the Treaty on the Functioning of the European Union (TFEU), Member States cannot put the State aid measures into effect without prior approval by the Commission of the State aid in question as aid compatible with the internal market.").

[129] *Id.*, p. 2.

[130] Bermann Declaration, ¶ 153.

Commission's statements as the Award constitutes unlawful State aid.[131]  Under the TFEU, only the EU Commission has the authority and power to investigate State aid measures and to make decisions on whether such measures can be implemented.[132]  EU Member States may not implement State aid measures without the Commission's approval.

105.    Professor Bermann's argument that the tribunal did not encroach on the Commission's competence to review State aid because "[t]he Tribunal [in *NextEra*] never made any determination, or purported to make any determination, of whether the measure taken by Spain constituted a state aid" misses the obvious.[133]  It is one thing to review State aid issues, and fundamentally another to issue and compel payment in violation of the EU State aid rules.[134]  Regardless of the tribunal's reasoning and findings in the underlying arbitration, it awarded State aid by issuing the Award, which Spain cannot pay without violating the EU Treaties and being subjected to serious sanctions under EU law.

106.    In sum, Spain's payment of the Award in contravention of its obligations under Article 108(3) of the TFEU and the respective implementation legislation[135] would make Spain liable under EU law.  The Commission has, then, the power to compel Spain to recover any amounts paid under the Award without the Commission's approval.  It can also commence an infringement proceeding against Spain before the CJEU if Spain is unable to recover such

---

[131] First Hindelang Declaration, ¶ 62.

[132] *See* TFEU, arts 107, 108 (First Hindelang Declaration, ¶ 58).

[133] *See* Bermann Declaration, ¶ 156.

[134] *See* Commission Decision 2015/1470 (DE 15-54, Ex. 48 to First Hindelang Declaration ) (determining that payment by Romania of an arbitral award rendered by a tribunal for breaches of an intra-EU investment treaty constituted unlawful State aid even though the arbitral tribunal did not review State aid).

[135] Cf. Council Regulation (EU) 2015/1589 of 13 July 2015 laying down detailed rules for the application of Article 108 of the Treaty on the Functioning of the European Union (codification), O.J. (L 248) 9, 14 (Annexed hereto as Exhibit 75).

payments, and, eventually, may seek the imposition of monetary penalties.

107.    For example, in *Commission v. Greece*, the CJEU ordered Greece to pay 10 million euros as well as a periodic penalty payment of 7,294,000 Euros for every six-month period in which the unlawful State aid granted by Greece to *Hellenic Shipyards* had not yet been recovered.[136]

I declare under the penalty of perjury under the laws of the United States of America and of the Federal Republic of Germany that the foregoing is true and correct.

Signed on 7 February 2020, in Berlin, Germany.

_____

Steffen Hindelang

---

[136] CJEU, Case C-93/17, ECLI:EU:C:2018:903 – *Commission v. Greece* (Annexed hereto as Exhibit 76).