# EXHIBIT 67



**EUROPEAN PARLIAMENT**

## DIRECTORATE-GENERAL FOR EXTERNAL POLICIES

# POLICY DEPARTMENT



# INVESTOR-STATE DISPUTE SETTLEMENT (ISDS) PROVISIONS IN THE EU'S INTER-NATIONAL INVEST-MENT AGREEMENTS

# VOLUME 2-STUDIES

### INTA



EN



2014



**DIRECTORATE-GENERAL FOR EXTERNAL POLICIES OF THE UNION**

**DIRECTORATE B**

**POLICY DEPARTMENT**

## STUDY

# INVESTOR-STATE DISPUTE SETTLEMENT (ISDS) PROVISIONS IN THE EU'S INTERNATIONAL INVESTMENT AGREEMENTS

# VOLUME 2 - STUDIES

This workshop and the studies were requested by the European Parliament's Committee on International Trade.
This publication consists of 2 parts:
-Volume 1: Workshop
-Volume 2: Studies

## AUTHORS:

Dr Pieter Jan KUIJPER, Professor, University of Amsterdam, The Netherlands
Dr Dr h.c. Ingolf PERNICE, Professor, Humboldt-Universität zu Berlin, Germany
Dr Steffen HINDELANG, LL.M., Associate Professor, Freie Universität Berlin, Germany
Michael SCHWARZ, Research Assistant, Humboldt-Universität zu Berlin, Germany
Martin REULING, Research Assistant, University of Amsterdam, The Netherlands

## ADMINISTRATOR RESPONSIBLE:

Elfriede BIERBRAUER, Roberto BENDINI
Directorate-General for External Policies of the Union
Policy Department
SQM 03Y53
rue Wiertz 60
B-1047 Brussels

Editorial Assistant: Györgyi MÁCSAI

## LINGUISTIC VERSIONS

Original: EN

## ABOUT THE EDITOR

Editorial closing date: 4 September 2014.
© European Union, 2014

*Printed in Belgium*

ISBN: 978-92-823-5961-7
Doi: 10.2861/68289

The Information Note is available on the Internet at
http://www.europarl.europa.eu/activities/committees/studies.do?language=EN

If you are unable to download the information you require, please request a paper copy
by e-mail : poldep-expo@europarl.europa.eu

## DISCLAIMER

Any opinions expressed in this document are the sole responsibility of the authors and do not necessarily represent the official position of the European Parliament.

Reproduction and translation, except for commercial purposes, are authorised, provided the source is acknowledged and provided the publisher is given prior notice and supplied with a copy of the publication.

**TABLE OF CONTENTS**

**JOINT INTRODUCTION** 6

**PART I: STUDY ON INVESTMENT PROTECTION AGREEMENTS AS INSTRUMENTS OF INTERNATIONAL ECONOMIC LAW (Dr Kuijper)** 8

**1. INTRODUCTION** 8

**2. HISTORY AND OBJECTIVES OF BITS** 9

2.1 SOME SHORT HISTORY 9
2.2 BITS AND DISPUTE SETTLEMENT CENTRES 11

**3. ELEMENTS AND OBJECTIVES OF CONTEMPORARY BITS** 13

3.1 DEFINITIONS 14
3.2 ACCESS AND STANDARDS OF TREATMENT: TWO MODELS 15
   **3.2.1 National treatment (NT)** 15
   **3.2.2 Most-favoured nation clauses (MFN)** 16
   **3.2.3 Minimum Standard and Fair and Equitable Treatment (FET)** 16
   **3.2.4 Umbrella Clause** 17
   **3.2.5 Free Transfer of Capital and Free Transfer of Funds** 18
3.3 PROTECTION CLAUSES 19
   **3.3.1 Nationalisation and Expropriation** 19
   **3.3.2 War, National Emergencies and Civil Unrest** 21
   **3.3.3 Compensation** 21
   **3.3.4 Continued Protection after Termination or Expiration of a Treaty** 22
3.4 DISPUTE SETTLEMENT CLAUSES 22
   **3.4.1 Consultations** 23
   **3.4.2 International Arbitration** 24
   **3.4.3 Enforcement of Arbitral Awards** 26

**4. HOW INTERNATIONAL INVESTMENT BECAME INTERLINKED WITH INTERNATIONAL TRADE LAW** 28

4.1 GATT AND TRADE-RELATED INVESTMENT MEASURES 28
4.2 THE GATS AND SERVICES PROVIDED THROUGH ESTABLISHMENT OF 'COMMERCIAL PRESENCE' 30
4.3 TRIPS AND INTELLECTUAL PROPERTY RIGHTS RECOGNISED AS 'INVESTMENTS' 30

**5. OVERLAPPING AREAS OF INTERNATIONAL TRADE LAW AND INTERNATIONAL INVESTMENT LAW: POSSIBLE SUBSTANTIVE AND PROCEDURAL CONFLICTS?** 31

**6. FOREIGN DIRECT INVESTMENT AS PART OF EXCLUSIVE EU COMPETENCES** 32

**7. CONCLUSION**     **33**

**BIBLIOGRAPHY**     **36**

**PART II: STUDY ON INVESTOR-STATE DISPUTE SETTLEMENT ('ISDS') AND ALTERNATIVES OF DISPUTE RESOLUTION IN INTERNATIONAL INVESTMENT LAW (Dr Hindelang)**     **39**

**ABSTRACT**     **39**

**1. EXECUTIVE SUMMARY**     **39**

1.1    THE UNIVERSE OF INVESTOR-STATE DISPUTE SETTLEMENT (ISDS) MECHANISMS     39

1.2    VIRTUES OF ISDS     40

1.3    CONQUERING CHALLENGES ASSOCIATED WITH ISDS     40

    **1.3.1**    **Mitigating inconsistency**     **40**

    **1.3.2**    **Securing the 'right balance' between private and public interests**     **41**

    **1.3.3**    **Establishing integrity of arbitral proceedings**     **44**

    **1.3.4**    **Preventing misuse, allowing for error correction, managing financial risks**     **45**

**2. ANALYSIS**     **46**

2.1    INTRODUCTION     46

2.2    PERCEIVED VIRTUES OF ISDS     51

    **2.2.1**    **Managing political risk and promoting an international rule of law**     **52**

    **2.2.2**    **Making substantive commitments in investment instruments credible and, at the same time, contributing towards a de-politicisation of investment disputes**     **54**

    **2.2.3**    **Instrument perceived to attract foreign investments**     **55**

2.3    PERCEIVED CHALLENGES OF ISDS     56

    **2.3.1**    **Consistency and predictability**     **59**

    **2.3.2**    **Public interests**     **72**

    **2.3.3**    **Procedural integrity**     **96**

    **2.3.4**    **Perceived misuse**     **105**

    **2.3.5**    **Erroneous decisions**     **107**

    **2.3.6**    **Financial risks**     **109**

**3. RECOMMENDATIONS**     **113**

**4. ANNEX – CASE STUDIES**     **115**

4.1    ETHYL CORPORATION V. GOVERNMENT OF CANADA     115

    **4.1.1**    **Factual and Legal Background**     **115**

    **4.1.2**    **Brief discussion**     **116**

4.2    GLAMIS GOLD LTD. V. UNITED STATES OF AMERICA     117

    **4.2.1**    **Factual and Legal Background**     **117**

    **4.2.2**    **Brief discussion**     **117**

**BIBLIOGRAPHY**     **119**

## PART III: STUDY ON INTERNATIONAL INVESTMENT PROTECTION AGREEMENTS AND EU LAW (Dr Pernice)                                                   132

## ABSTRACT                                                                      132

## EXECUTIVE SUMMARY                                                             132

## 1.  INTRODUCTION                                                              133

1.1   GENERAL REMARKS                                                            133

1.2   INVESTMENT PROTECTION AGREEMENTS OF THE EU                                 134

    1.2.1   **EU competence to conclude direct investment treaties**        **135**

    1.2.2   **Scope of EU investment protection treaties and national competences**   **136**

    1.2.3   **Primacy and direct effect of EU direct investment treaties**    **136**

1.3   TENSIONS BETWEEN EU LAW AND IPAS IN GENERAL                                138

    1.3.1   **The "regulatory chill"**                                       **139**

    1.3.2   **The EU state aid regime**                                       **143**

    1.3.3   **The principle of non-discrimination**                           **143**

    1.3.4   **ISDS clauses and the autonomy of the Union's legal order**     **145**

## 2.  DESIGNING INVESTMENT PROTECTION IN CONFORMITY WITH EU LAW                 **151**

2.1   CONFIGURING IPAS IN COMPLIANCE WITH EU LAW                                 151

    2.1.1   **Regulatory autonomy - overcoming the "regulatory chill"**       **151**

    2.1.2   **Repercussions of the "EU model" on the state aid regime**       **155**

    2.1.3   **Securing respect for the principle of non-discrimination**     **155**

    2.1.4   **Preserving the autonomy of the Union's legal order**           **156**

2.2   ONE-SIZE-FITS-ALL OR TAILOR-MADE SOLUTIONS ?                               158

2.3   DELAYING OR DIFFERENTIATING INVESTOR'S ACCESS TO ISDS                      159

    2.3.1   **Local remedies privilege**                                     **159**

    2.3.2   **Differentiation ratione materiae**                             **160**

    2.3.3   **Differentiation ratione tempore – urgency and interim measures**   **160**

## 3.  INSTITUTIONAL AND PROCEDURAL ISSUES OF ISDS SYSTEMS                        160

3.1   SHOULD THERE BE AN AD HOC TRIBUNAL OR A STANDING COURT?                    161

3.2   ACCESS TO ISDS, THE LOCAL REMEDIES RULE AND THE ROLE OF A "SPECIAL COMMITTEE"                                                              162

3.3   PRESERVING THE AUTONOMY AND COHERENCE OF THE UNION'S LEGAL ORDER           162

3.4   TRANSPARENCY AND ACCESS TO INFORMATION                                     163

3.5   PUBLIC PARTICIPATION IN THE PROCEEDINGS                                    163

3.6   CHOICE AND DEONTOLOGY OF THE ARBITRATORS                                   163

3.7   APPEAL MECHANISM                                                           164

## 4.  CONCLUSIONS                                                               **164**

## BIBLIOGRAPHY                                                                  **167**

# JOINT INTRODUCTION

The studies comprise three parts; Part I serving as a background and primer to the two others which deal with more specific issues. While the three parts share a common general understanding and relate to one another, each of them remains in the individual responsibility of the respective author.

Part I, written by Professor Kuijper, is devoted to the topic of investment protection agreements as instruments of international economic law. He seeks to briefly set out the historical background and the development of present-day bilateral investment treaties (BITs) that have grown in sophistication and in number since the first one of this type of treaties was concluded between the Federal Republic of Germany and Pakistan in 1959. Part I explains how such BITs combined elements of the historical international law doctrine on the treatment of aliens and their property and investments and of commercial arbitration. A third, very important, element was the linkage of such agreements to international dispute settlement treaties or centres, which enabled foreign investors to take action directly against the host State, often even bypassing its law and its judicial system. The key provisions that are habitually included in such agreements are explained and briefly analysed. Next, Part I shows how trade and investment were closely linked in the drafts for the post-World War II economic order, were allowed to develop separately and are now being integrated into single comprehensive trade agreements once again, of which the budding Trans-Atlantic Trade and Investment Partnership (TTIP) between the EU and the US is an example. The complications flowing from bringing together trade and investment in one agreement, but each subject to a different dispute settlement procedure, are given a first analysis.

In Part II, Professor Hindelang addresses issues connected with including investor-state dispute settlement ('ISDS') in future EU agreements and evaluates possible alternatives of dispute resolution in international investment law. He suggests that ISDS is a useful means of enforcing substantive investment protection standards contained in international investment agreements. The mechanism should therefore continue to form part of European international investment policy. However, the EU has to address four major challenges tied to this dispute settlement tool, i.e. (1) mitigating inconsistency, (2) securing the right balance between private and public interests, (3) establishing integrity of arbitral proceedings and (4) preventing misuse, allowing for error-correction and managing financial risk associated with ISDS. Among others, Part II suggests (1) strengthening the role of the state parties to international investment agreements, (2) establishing an appeals facility, (3) giving well-functioning domestic court systems an adequate role in resolving investor-state disputes by introducing a novel elastic local remedies rule and (4) considering the implementation of tenured judges; at least on an appeals level.

In Part III, Professor Pernice deals with the interrelation of international investment protection agreements and EU law. He argues that international investment protection agreements with ISDS concluded with third states by the European Union present special characteristics compared to traditional bilateral investment treaties concluded among states. Alongside controversial issues in the current debate – the preservation of the right to regulate being one of them – tensions with regard to the functioning of the EU state aid regime, the principle of non-discrimination in the internal market and, in particular, the autonomy of the EU legal order need to be addressed. Part III suggests considering a more EU model-like solution to the problems and, if this is politically not available, opting for a differentiated system including safeguards for the prerogatives of the ECJ regarding the interpretation of EU law, but also a number of institutional and procedural provisions such as the establishment of a standing court as well as the possibility for a „Special Committee" to give guidance on the application of the agreement and harmonised policies. Transparency, public participation and openness in the negotiation of the agreement and the proceedings at the standing court yet to be

established should be provided for, coupled with transparent and democratic procedures for the choice of adjudicators. A new negotiation culture in international relations as part of global governance should be developed in accordance with the principles set out in Article 21 TEU.

# PART I: STUDY ON INVESTMENT PROTECTION AGREEMENTS AS INSTRUMENTS OF INTERNATIONAL ECONOMIC LAW

*by Dr Pieter Jan Kuijper[1]*

## Abstract

This study seeks to set out briefly the historical background and the development of present-day Bilateral Investment Treaties (BITs) that have grown in sophistication and in number since the first one of this type of treaties was concluded between the Federal Republic of Germany and Pakistan in 1959. It explains how such BITs combined elements from the historical international law doctrine on the treatment of aliens and their property and investments and from commercial arbitration. A third, very important, element was the linkage of such agreements to international dispute settlement treaties or centres, which enabled foreign investors to complain directly against the host State, often even bypassing its law and its judicial system. The key provisions that are habitually included in such agreements are explained and briefly analysed. Next, the paper shows how trade and investment were closely linked in the drafts for the post World War II economic order, were allowed to develop separately and now are being integrated again into single comprehensive trade agreements, of which the budding Trans-Atlantic Trade and Investment Partnership (TTIP) between the EU and the US is an example. The complications flowing from bringing together trade and investment in one agreement, but needing two different dispute settlement procedures, are given a first analysis. Careful technical legal work is still necessary to guide this into the right channels. Is the effort needed for that worth the trouble, given that the EU and the US have been able mutually to accommodate huge flows of investments without provoking major conflicts or economic accidents? That question is given a tentative answer in the Conclusion. This study serves as background and primer to two other studies prepared for the European Parliament by professors Ingolf Pernice and Steffen Hindelang.

## 1.    INTRODUCTION

Ever since the first Bilateral Investment Treaty was signed in 1959, these instruments of international law have spread far and wide throughout the world. Almost 3000 Bilateral Investment Treaties (BITs) were in existence at the end of 2013[2]. This impressive number serves as a first indication of the importance of BITs in a globalized economy. The present report aims to provide insight into the relevance, content and context of Bilateral Investment Treaties. In order to do so, section (II) will analyse the objectives and purpose of Bilateral Investment Treaties based on the history of their emergence. Section (III) will discuss the usual elements of contemporary BITs and shed some light on the main policy questions that are attached to the drafting of these treaties. Section (IV) will analyse the relationship between international trade law and international investment law and explain how investment law came to be intertwined with international trade law and policy (again). In section (V) we will discuss some potential procedural and substantial conflicts that are caused by the overlap between areas of trade law and

---

[1] Prof. Dr Pieter Jan Kuijper, Professor of the Law of International Economic Organisations, University of Amsterdam. The author extends particular thanks to his assistant Martin Reuling for his invaluable support in researching this report. Without him the report could not have been finished in time. Many thanks are due for valuable comments on earlier drafts of this paper to my co-rapporteurs Ingolf Pernice and Steffen Hindelang and to Professor Makane Mbengue of the University of Geneva.
[2] UNCTAD, *World Investment Report 2013. Global Value Chains: Investment and Trade for Development* (2013), available at: http://unctad.org/en/publicationslibrary/wir2013_en.pdf (last accessed 21 March 2014), p. X.

areas of investment law. In section (VI) some light will be shed on how international investment law became a part of EU competences. In section (VII) we will make some concluding observations.

## 2.      HISTORY AND OBJECTIVES OF BITS

### 2.1      Some short history

Even though the first Bilateral Investment Treaty was signed in the second half of the twentieth century, its roots can be traced back to the seventeenth century, when new formed nation-states entered treaties exempting their nationals from taxes and jurisdiction of their contracting party[3]. The Friendship, Commerce and Navigation treaties (FCN) that emerged in the second half of the eighteenth century and retained their importance until far into the twentieth century can be seen as the direct predecessors to BITs. These were general economic treaties concerning a broad range of topics[4].

The need for investment protection became more apparent during the nineteenth and early twentieth century in the light of conflicts between mostly Latin American states on the one side and Western-European states and the United States on the other side, concerning the applicable standard of protection for foreign investment or rather, as it was called at the time, the standard of treatment of aliens and their property. Latin American states adhered to the so-called *Calvo-Doctrine*, which was based on the assumption that aliens and their property should be subject to national treatment, that is to say that they should be treated in the same way as national investors, thus binding foreign investors to the domestic judicial systems of the receiving state and excluding external intervention or internationally defined minimum standards of treatment. At the same time Western European states and the US held that international law prescribed a so-called 'international minimum standard' that protected foreign investors from extremely low standards of national treatment and from domestic instabilities. Both theories collided vehemently in the wake of *coups d'état* and civil wars in Latin American states and of the 'socialization' of the factors of production by the Soviet Union following the Russian Revolution. During the 1920s, international jurisprudence by the Permanent Court of International Justice (PCIJ) and other tribunals established the minimum standard of treatment as an accepted principle of international law[5].

After a number of failed attempts throughout the twentieth century to reach a multilateral system of investment protection, Germany initiated the negotiation of specialised investment treaties on a bilateral basis. In 1959 this program would result in the conclusion of the first ever Bilateral Investment Treaty, in broadly the form that we know today, between the Federal Republic of Germany and Pakistan[6].

The German parliamentary history of this Treaty reveals the main objectives behind its conclusion.  The 1959 Budget Act contained a provision allowing the Ministry of Finance to provide guarantees or (re-)insurance for German foreign investments, provided that an agreement concerning the treatment of

---

[3] Jeswald W Salacuse, *The Law of Investment Treaties,* Oxford, Oxford University Press 2010, p. 83.
[4] Chester Brown, 'The Development and Importance of the Model Bilateral Investment Treaty', *in:*  Chester Brown (ed.), Commentaries on Selected Model Investment Treaties, Oxford: Oxford University Press 2013, 1, p. 4.
[5] Andrew Newcombe and Lluís Paradell, *Law and Practice of Investment Treaties. Standards of Treatment*, Alphen aan den Rijn, Kluwers Law International 2009, pp. 13-15. An important PCIJ case was: Certain German Interests in Polish Upper Silesia, Judgement of 25 May 1926, PCIJ Series A, No. 7. Considerable influence on the development and application of an international standard of treatment, especially as applicable in times of civil unrest and revolution, has been exercised in the nineteenth century by the Mexican Claims Commission and in the late twentieth century by the Iran-US Tribunal. These two institutions have each generated enormous quantities of case law.
[6] Treaty between the Federal Republic of Germany and Pakistan for the Promotion and Protection of Investments (signed 25 November 1959, entry into force 28 April 1962), 457 UNTS 23.

the investment had been concluded, or, absent such agreement, the legal system of the respective state sufficiently guaranteed the safety of the investment[7]. This provision would enable the German Government to foster development abroad through private investment[8]. The Government recalled this legal requirement of guaranteed safety of investments when it presented the BIT with Pakistan to the *Bundestag* in the same year. Stating that the adoption of this treaty would in itself fulfil the legal requirements of the relevant provision of the Budget Act, the Government added that this specialized investment treaty extended the economic aspects of the traditional FCN treaties and would at the same time create more favourable conditions for German investors in Pakistan[9]. The initial motives for the conclusion of the first BIT were thus, besides codification of customary law (as seen by Western capital exporting countries) and protection of legal interests of investors, 'predominantly' a consequence of the insurance and guarantee system for outward investment in the Federal Republic of Germany[10]. More generally, however, the asymmetrical relationship between investor states and host states (often developing countries) in these early years indicates that BITs were intended by investor states to protect investments of their nationals[11]. In spite of the conclusion of such treaties the precise content of the international minimum standard remained controversial throughout the 'sixties and the 'seventies. Especially in the United Nations General Assembly, the developing countries used their numbers and mounted an offensive *inter alia* against this standard in a series of resolutions on Permanent Sovereignty over Natural Resources, on the New International Economic Order and on Economic Rights and Duties of States. All these resolutions, each in their own way, emphasized national treatment, put in doubt the status of the international minimum standard and its contents, in particular the standard for compensation after nationalization[12].

On the other hand, perhaps in the present international economic system more than in 1959, there also seems to be a link between the extent to which developing countries are willing to conclude BITs and the credit ratings that these countries receive from the international rating agencies. An Austrian-Mexican expert on investment protection has recently pointed to this link as one of the reasons why Mexico for instance continued to conclude such agreements in spite of its not very favourable experience with for instance the NAFTA investment chapter. The possibility to borrow against an interest rate a few basis points lower than would otherwise be the case, in his view, explained Mexico's continued support for BITs[13].

Many Western-European states followed the example of Germany through the 1960s and 1970s, in part because of a wave of expropriations during the 1970s, while the USA followed in the 1980s. The dissolution of the Soviet-Union and the emergence of new market economies in Central and Eastern Europe, combined with the growing willingness of Latin-American countries to accept BITs led to a

---

[7] Gesetz über die Feststellung des Bundeshaushaltplans für das Rechnungsjahr 1959 (German Budget Act 1959), (1959) 31 *Bundesgesetzblatt II*, 793, par. 18.

[8] Deutscher Bundestag (German Federal Diet), Entwurf eines Gesetzes über die Feststellung des Bundeshaushaltplans für das Rechnungsjahr 1959 (Haushaltsgesetz 1959). Denkschrift (1 December 1958), Drucksache 03/650, pp. 6-7.

[9] Deutscher Bundestag (German Federal Diet), Entwurf eines Gesetzes zu dem Vertrag vom 25. November 1959 zwischen der Bundesrepublik Deutschland und Pakistan zur Förderung und zum Schutz von Kapitalanlagen. Denkschrift (15 February 1961), Drucksache 03/2495, p. 13.

[10] Justus Alenfeld, *Die Investitionsförderungsverträge der Bundesrepublik Deutschland*, Frankfurt am Main, Athenäum Verlag GmbH 1971, p. 17.

[11] Andrew Newcombe and Lluís Paradell, *op. cit.* fn. 5, at p. 43.

[12] UNGA Res. 1803 (XVII) Permanent Sovereignty over Natural Resources of 14 December 1962, point 4; UNGA Res. 3201(S-VI) Declaration on the Establishment of a New International Economic Order of 1 May 1974, point 4(e); and UNGA Res. 3281 (XXIX) Charter of Economic Rights and Duties of States of 12 December 1974, Article 2.

[13] View expressed by Herfried Wöss in a comment to Anne van Aken on the OGEMID blog on 23 March 2014 (last accessed 23 May 2014).

rapid proliferation of BITs. The number of BITs in existence would rise from less than 400 in 1989 to approximately 2400 in 2004[14].

## 2.2    BITs and dispute settlement centres

When the budgets of governmental aid programs stagnated in the second half of the 1950s, efforts were made to promote private investment in developing countries in order to foster development. Political and non-economic risks appeared to discourage investors to invest in developing countries[15]. Furthermore, investment disputes had been traditionally settled through interstate channels under diplomatic protection. This depended on the political will of a state to aid its nationals in case of problems with foreign investment and ultimately to espouse the claim of its nationals as its own[16]. Direct investor-state arbitration, making such espousal redundant, would only be included in BITs in the late 1960s. For this reason, during the late 1950s efforts were made to create a multilateral regime for the protection of private foreign investment, especially a mechanism of international investor-state arbitration.

In 1965, the OECD requested the World Bank to draft a Convention for an International Investment Insurance Agency. This did however not lead to the establishment of such Agency. As early BITs did not contain provisions on investor-state disputes the need for action continued to exist. Based on considerable experience the World Bank decided to continue to seek a solution for investor-state disputes, convinced that it would be easier to reach agreement on a procedure for dispute settlement than to reach agreement on international standards of treatment[17]. In 1961 the Bank began work on a Draft Convention for the Resolution of Disputes between States and Nationals of Other States[18]. Negotiations lasted until 1965 and the International Centre for the Settlement of Investment Disputes (ICSID) was created in October 1966[19]..

The Centre faced a slow start, as many developing countries were reluctant to accept third-party arbitration, rather insisting on their sovereignty and the competences of their domestic courts. The first BIT enabling ICSID arbitration was concluded in 1968[20]. In these early years ICSID developed considerable experience in appointing ad hoc arbitrators and aiding in conciliations. At the same time, it became a knowledge centre for foreign investment law. These early years allowed the Centre to build a reputation as a reliable centre of expertise. This reputation, combined with the large number of new BITs referring to ICSID arbitration during the 1980s and 1990s led to a growing importance and caseload of ICSID in subsequent years[21]. For the moment the ICSID Convention does not yet accept international organizations as parties. However the European Commission has declared that the EU should strive to become a party[22], which would necessitate an amendment to the ICSID Convention.

In the course of the spread of investment treaties, other centres for dispute settlement emerged. The Permanent Court of Arbitration (PCA) is by far the oldest of these and was founded in 1899, during the

---

[14] Chester Brown, *op. cit. fn.* 4, pp. 9-10; Jeswald W Salacuse, *op. cit. fn. 3, at* p. 95.

[15] Antonio R. Parra, *The History of ICSID,* Oxford, Oxford University Press 2012, p. 12.

[16] Jeswald W Salacuse, *op. cit. fn. 3,* at p. 93

[17] Chester Brown, *op. cit. fn.* 4, at pp. 8-9.

[18] Antonio R. Parra, *op. cit. fn.* 16, at pp. 17-19 & 97.

[19] This was done by the Convention on the Settlement of Investment Disputes between States and Nationals of other States (signed 18 March 1965, entry into force 14 October 1966), 575 UNTS 159 ('ICSID Convention').

[20] Jeswald W Salacuse, *op. cit. fn. 3,* at p. 94.

[21] Antonio R. Parra, *op. cit. fn.* 15, pp. 121-122 & 200-209.

[22] European Commission, 'Communication from the Commission to the Council, the European Parliament, the European Economic and Social Committee and the Committee of the Regions. Towards a Comprehensive European International Investment Policy', (Communication), COM (2010) 343 final, *available at:* http://trade.ec.europa.eu/doclib/docs/2011/may-/tradoc_147884.pdf, p. 10.

first of The Hague peace conferences. It had already built considerable expertise in international arbitration between States prior to the conclusion of the first BIT. In the meantime the PCA has developed into an institution that provides registry services and administrative support in international arbitrations involving various combinations of states, state entities, international organizations and private parties. Thus there are PCA rules for Arbitration of Disputes between states or international organizations and private parties[23]. Important treaties, such as the Energy Charter Treaty, which contains an investment chapter, refer to the PCA as dispute settlement forum[24].

The Paris-based International Chamber of Commerce (ICC) developed a dispute settlement mechanism that became one of the most-used for the settlement of investment disputes. The London Chamber of Commerce created a Chamber of Arbitration in the nineteenth century that is nowadays widely known as the London Court for International Arbitration. The Stockholm Chamber of Commerce developed a similar institute, the Arbitration Institute of the Stockholm Chamber of Commerce. The Singapore International Arbitration Centre was founded in 1991 as an NGO.

All these initiatives and the arbitration rules they spawned originally were intended primarily for commercial arbitration, but their wording was, or has become, so general – referring to the two sides in an arbitral procedure merely as 'the parties' – that these facilities, just as the PCA, can also be used for investor-State arbitration (including investor-EU arbitration, if necessary)[25].

Lastly, attention needs to be drawn to the independent arbitration under the rules created by the United Nations Commission on International Trade Law (UNCITRAL). UNCITRAL originally concentrated its work entirely on private law and commercial arbitration.  However, between the first version of its Arbitration Rules (1976)[26] and its latest version[27] there again occurred the same evolution as sketched above, namely that the wording expanded both as to subject matter of, and parties to, the dispute so as to encompass investor-State arbitration. In addition UNCITRAL has drafted recently important rules on transparency in treaty-based investor-State arbitration[28]. UNCITRAL does not include, as the PCA and the Chambers of Commerce initiatives referred to above, a registry and administrative support. Its rules are referred to in other agreements, including BITs, and can be used in procedures supported by ICSID, PCA and other arbitration centres.

Dispute Settlement under BITs thus occurs on the basis of two or three international law instruments: the substantive rules of the BITs, the Arbitration Rules of UNCITRAL and the services of arbitration centres; in many cases, however, the arbitration centres also provide the arbitration rules and it is not impossible to combine all three bases in one legal instrument, a single BIT or BIT-like treaty[29].

---

[23] See www.pca-cpa.org
[24] European Energy Charter Treaty, *Official Journal of the European Union – Law* (31 December 1994) L 380/24.
[25] Most documents concerning these arbitration rules can be found in Martins Paparinskis (ed.), *Basic Documents on International Investment Protection,* Oxford and Portland, Hart 2012, pp. 681 ff.
[26] UN Doc. A/Res/31/98 of 15 December 1976.
[27] UN Doc. A/Res/65/22 of 11 January 2011.
[28] Dated July 11, 2013, reprinted in 52 ILM 2013, p. 1300 ff.
[29] This is a road that is open to the EU as newcomer in the field of BITs and BITs arbitration, especially as an important instrument as ICSID is, for the time being, not open to it.

# 3.    ELEMENTS AND OBJECTIVES OF CONTEMPORARY BITS

Even though differences exist between the exact content and wording amongst the nearly 3000 BITs that were in existence at the end of the year 2013, a certain set of provisions can be found at the core of contemporary investment treaties[30]. The preambles to such treaties provide valuable information about the object and purpose of BITs. For example, the Preamble to the 1959 Germany-Pakistan BIT stated that the object of the treaty was to intensify economic cooperation and create favourable conditions for foreign investment in order to 'increase the prosperity' of both states[31]. The preambles to modern BITs make it very clear that the object and purpose of BITs has shifted. While the 2008 Austrian Model BIT contains extensive references to investment as means of development, friendship between the peoples of the contracting parties, sustainability of economic growth, corporate responsibility, respect for human rights, anti-corruption efforts, the UN Global Compact and other values, most contemporary BITs barely mention development as an objective[32]. For example, the preamble of the 1997 Sweden-Turkey BIT mentions intensified economic cooperation, fair and equitable treatment and expansion of economic relations as only objectives[33]. This move away from development as objective can partly be explained by the fact that BITs are increasingly concluded between states of comparable levels of development.[34] Another trend that has acquired new prominence is the wish to achieve the objectives of BITs "in a manner consistent with the protection of health, safety, and the environment, and the promotion of internationally recognized labor rights".[35] As we will see below, the protection of such regulatory powers is also strongly influenced by the clarity and precision of the provisions on Fair and Equitable Treatment (FET) and on indirect expropriation.

Pursuant to their main objectives, stimulating foreign investment through legal certainty, and promoting economic development in the host state and, more generally, the economic relations between states, the substantial provisions of BITs can be roughly divided into two interrelated, sometimes overlapping categories[36]. The first category of provisions is aimed at enabling access of foreign investors to the host state and preventing discriminatory measures, by prescribing conditions for entry of foreign investment, and standards of treatment (i.e. non-discrimination). The second category of substantial obligations consists of investment protection clauses, including rules on nationalisation. Formal or procedural provisions guarantee investors legal redress through the judicial system of the host state and/or international arbitration. If one looks at the most recent draft of the Investment Chapter of CETA, the Comprehensive Economic and Trade Agreement between the EU and Canada, the sections are (1) Scope and Definitions, (2) Establishment of Investments, (3) Non-

---

[30] Naboth van den Broek, 'Protection of Investors in International Trade and Investment Regime: A Practical Comparison', in: Jorge Huerta-Goldman, Antoine Romanetti and Franz Stirnimann (ed.), WTO Arbitration, Investment Arbitration, and Commercial Arbitration, Alphen aan den Rijn: Kluwer Law International 2013, 15, p. 23; Jeswald W Salacuse, *op. cit. fn.* 3, at p. 138; UNCTAD, *op. cit. fn. 2*, at p. X.

[31] Treaty between the Federal Republic of Germany and Pakistan for the Promotion and Protection of Investments (signed 25 November 1959, entry into force 28 April 1962), 457 UNTS 23.

[32] August Reinisch, 'Austria', *in:* Chester Brown (ed.), Commentaries on Selected Model Investment Treaties , Oxford, Oxford University Press 2013, 15, p. 20.

[33] Agreement Between the Kingdom of Sweden and the Republic of Turkey on the Reciprocal Promotion and Protection of Investments (signed 11 April 1997, entry into force 8 October 1998) 2313 UNTS 159.

[34] There even is an example of a multilateral investment agreement concluded between developing countries only: the Investment Agreement for the COMESA Common Investment Area (2007), not yet in force, see http://www.tralac.org/wp-content/blogs.dir/12/files/2011/uploads/Investment_agreement_for_the_CCIA.pdf.

[35] See the fifth preambular paragraph and Articles 12 and 13 of the 2004 US Model BIT, in Martins Paparinskis (ed.), *op. cit. fn. 26,* at p. 526.

[36] Tarcisio Gazzini, 'Bilateral Investment Treaties', *in:* Tarcisio Gazzini and Eric de Brabandere (ed.), *International Investment Law. The Sources of Rights and Obligations,* Leiden/Boston: Martinus Nijhoff Publishers 2012, 99, pp. 106-107.

discriminatory Treatment, (4) Investment Protection, (5) Reservations and Exceptions, (6) Investor-State Dispute Settlement and (7) Final Provisions[37].

This section will now discuss the most important provisions of each category, and analyse their relevance and relation to other provisions. This discussion will be based on the text of so-called Model Treaties[38] that have been issued mostly by developed countries as well as on provisions of actually existing Bilateral Investment Treaties. Technical provisions, such as those containing rules on entry into force, amendment etc. and which are based on general rules of the law of treaties, will therefore not be discussed here, except insofar as they deviate from what is considered normal in treaty practice.

## 3.1      Definitions

As Bilateral Investment Treaties are international agreements in the sense of the 1969 Vienna Convention on the Law of Treaties, their contractual nature requires clear definition of the scope of the agreement and the obligations it will entail[39]. This necessitates careful definition of the transactions and actors that fall within the scope of protection of the treaty, in order to avoid legal uncertainty. Already the first BIT, concluded between the Federal Republic of Germany and Pakistan in 1959, contained a provision with definitions of terms as 'investment', 'returns' and 'nationals'[40].

For example, capital-exporting countries will seek to draft the definition of 'investment' that is covered by the BIT very broadly, since economic activities falling outside of the scope of this definition are not protected under the terms of the BIT. For this reason, investment is in many BITs defined as 'any kind of asset' and illustrated with a non-exclusive list of examples. Critics of overly broad definitions submit that certain investments, such as financial instruments that contribute to a currency crisis or that entail other detrimental effects, should be excluded from the protection of a BIT. Furthermore, overly broad definitions of investment could limit the regulatory competences of governments. Careful definition of 'investment' is thus crucial[41].

Another definition that is of great importance is that of 'national of a Party' or 'investor of a Party'. This definition determines who can invoke the protection of a BIT. For instance, the definition of the term 'Nationals' in the Dutch Model BIT and in most actual Dutch BITS is drafted so that, if a US company organizes its structure in such a way as to have its overseas subsidiaries attached under a Dutch so-called financial centre of that company[42], BITs claims concerning the treatment of the overseas subsidiaries can be made by the Dutch financial centre on the basis of the Netherlands BIT with the

---

[37] The most recent public version of the CETA investment chapter, from April 2014, can be found in a paper published by the European Commission on the occasion of the consultation on the investment rules of the TTIP, European Commission, Note for the Attention of the Trade Policy Committee (Services and Investment). EU Canada FTA Negotiations: Investment Chapter, Trade B2/CBA/cg/Ares 1151153 (7 April 2014).

[38] Such Model Treaties have gone through different so-called generations. We have done our best in the following to use Model BITs from the latest generation.

[39] Tarcisio Gazzini, *op. cit. fn.* 37, at p. 106.

[40] Treaty between the Federal Republic of Germany and Pakistan for the Promotion and Protection of Investments (signed 25 November 1959, entry into force 28 April 1962), 457 UNTS 23, art. 8.

[41] Kenneth J Vandevelde, *Bilateral Investment Treaties. History, Policy and Interpretation*, Oxford: Oxford University Press 2010, p. 122 ff. See also the Dissenting Opinion of Georges Abi-Saab in *Abaclat v. Argentina*, para. 57, in which he casts aspersion on the protection as an investment of government bonds, which he describes as 'widely dispersed financial products with their high velocity of circulation and their remoteness, the same as their holders, from the State in whose territory the investment is supposed to take place', which 'seem at first blush to be worlds apart from the direct foreign investment model, which is usually long negotiated and extensively embedded in the legal environment of the host State', ICSID Case ARB/07/5

[42] Note that having a so-called financial centre in the Netherlands does not require a large lay-out in money and personnel, but can be fiscally highly attractive.

country hosting the overseas subsidiary in question[43]. This is so-called 'BITs hopping' and permits large multinational companies, even with a minimum of activities in the Netherlands, to have access to a large number of BITs that a small country with a mid-size economy and a good reputation in the field of development aid has been able to conclude with many developing countries[44].

## 3.2        Access and standards of treatment: two models

The access for foreign investments to the host state can be regulated pursuant to two models. The first model contains no specifically defined obligations for the state parties and leaves entry and regulation of foreign investment to the discretion of each state. The states enter no specific obligations concerning access, entry and establishment. In this case a provision will often declare that state parties undertake to create 'favourable conditions' for foreign investment 'in accordance with the laws and regulations' of each state. This model, which is often referred to as the 'admission model' or 'investment-control model', does not influence existing legislation and will thus be easier to agree upon. Parties retain a broad competence to control and regulate the access of foreign investment. Such broad provisions are more of an aspirational character and thus create little concrete and enforceable obligations. A vast majority of existing BITs still adheres to this approach[45].

The other model of access consists of a combination of treatment standards that serve as thresholds to foreign investors. The exact combination and wording of applied standards varies per treaty, but their goal is always to guarantee the highest attainable standard of treatment for foreign investors.

### 3.2.1        National treatment (NT)

National treatment clauses guarantee foreign investors that fall within the scope of the BIT treatment no less favourable than domestic investors[46]. The phrase 'no less favourable' is of crucial importance, since it signifies that states are not obliged to give foreign investment exactly equal treatment to domestic investment. As long as any differences in treatment do not create any burdens that disadvantage foreign investors in comparison to domestic investors, states are allowed to treat foreign investors differently from domestic investors. National treatment provisions prohibit discrimination based on the nationality of the investor and ensure equal competitive opportunities of both foreign and domestic investors[47]. This standard can be limited to the post-establishment phase in order to grant the host state more control over the entry of investment, or it can be extended also to the pre-establishment phase, thus improving accessibility for foreign investors.

National treatment can be extended or limited by using either a positive list or a negative list, which demarcates the categories of investment that benefit from national treatment[48]. A relatively new way of limiting national treatment is to prescribe that it applies to investors and to investment of those investors of the capital exporting country, only if they are in "like situations (or circumstances)" as those of investors or their investments of the host State. This creates opportunities to discriminate for regulatory purposes, if it is arguable that the situation of the foreign investors is not "like" that of the

---

[43] On this phenomenon see Roos van Os and Roeline Knotnerus, *Dutch Bilateral Investment Treaties. A Gateway to 'Treaty-Shopping' for Investment Protection by Multinational Companies*, Amsterdam SOMO 2011 and Timothy G. Nelson, Going Dutch – the Many Virtues of the Dutch Model BIT, 6 (2012) 2 Dispute Resolution International, 161.

[44] The Netherlands has over 90 BITs with many different countries. Many cases brought on the basis of Dutch BITs have been started by foreign companies with limited activity in the Netherlands, a well-known example being *Aguas de Tunari SA v. Republic of Bolivia*, ICSID Case ARB 2/03.

[45] August Reinisch, *Standards of Investment Protection,* Oxford, Oxford University Press 2008, at p. 11.

[46] Naboth van den Broek, *op. cit. fn.* 30, at p. 24.

[47] Andrew Newcombe and Lluís Paradell, *op. cit. fn.* 5, at p. 151.

[48] August Reinisch, Standards of Investment Protection, op. cit. fn. 45, at p. 13.

national investors[49]. States have historically been rather reluctant to accept national treatment clauses as they limit their ability to protect domestic industries through subsidies and other instruments. This has led to a great variety in formulation of such clauses[50]. The national treatment standard is a comparative standard, which means that it only links foreign investment protection to that of domestic investors but does not contain any substantive rules that the host State has to observe. For this reason, BITs often also contain a number of more substantial standards, which will be discussed in the following sections[51].

### 3.2.2     Most-favoured nation clauses (MFN)

Most-Favoured Nation clauses prohibit discrimination between foreign investors from different countries. Under these clauses, states are obliged to apply to investors from the state party a treatment standard that they granted investors from a third state, if that standard would be more favourable to foreign investors from the state party. Most-Favoured Nation treatment creates parity of treatment amongst foreign investors and serves as an insurance against (involuntary) errors or shortcomings in specific BITs as compared to other BITs[52]. Like national treatment, it is a comparative standard with no substantive content of its own. National treatment and most-favoured nation treatment combined serve to maintain a level playing field on the investment market of a country as between all foreign and national investors.

### 3.2.3     Minimum Standard and Fair and Equitable Treatment (FET)

While national treatment and most-favoured nation clauses contain obligations that are shaped by comparison with domestic or third-state investors, the so-called minimum standard contains obligations whose content is not determined by such comparison. This minimum standard of treatment is widely claimed to be part of customary international law (at least in western countries)[53]. It may contain elements of the following specific categories of clauses to be found in BITS. The first commonly recognized category refers to the customary law on treatment of aliens and their property, which sometimes takes the form of a mere reference to customary international law[54]. This is not a clause that one continues to see frequently in BITS of the newer generations

Secondly, the principle of fair and equitable treatment (FET) can serve as a broad clause that may be applied in cases that are not covered by clear rules of law. The principle contains a broad category of general standards and principles that allude to non-discrimination and the rule of law. It has been argued that the current case law on the notion of FET shows up the following recurrent elements derived from well-known legal principles: good faith; legitimate expectations, both with respect to the state of the law of the host country and its application, as well as in direct contacts between a foreign investor and the host state authorities (representations, contractual links, regulatory actions); due process, transparency, freedom from official harassment and even coercion, absence of arbitrary or

---

[49] Article X.7.2 of the draft CETA applies this restricted version of national treatment to investment at the provincial level in Canada and to the Member State level in the EU. The full national treatment applies only at the federal, respectively the Union level, see Article X.7.1 draft CETA, *loc. cit.* fn 37. Both the US and Canada are presently experimenting with this restriction of national treatment in recent BITs or comprehensive trade and investment agreements. See also Article 17 Investment Agreement for the CCIA, *loc. cit* fn. 34

[50] Jeswald W Salacuse, *op. cit. fn.* 3, at p. 246.

[51] Andrea K. Bjorklund, 'National Treatment', *in:* August Reinisch, *Standards of Investment Protection,* Oxford, Oxford University Press 2008, 29, at p. 31. See below section iii, iv,v and vi and the so-called protection clauses, discussed in 3) below.

[52] Andrew Newcombe and Lluís Paradell, *op. cit. fn.* 5, at p. 195.

[53] Jacob Stone, 'Arbitrariness, the Fair and Equitable Treatment Standard, and the International Law of Investment', 25 (2012) Leiden Journal of International Law 77, 82.

[54] Andrew Newcombe and Lluís Paradell, *op. cit. fn.* 5, at p. 234.

xenophobic treatment by the authorities[55]. Some of these elements of FET are often mentioned separately in BITs, whilst other BITs limit themselves to mentioning that the parties shall treat foreign investments fairly and equitably[56]. On the other hand, CETA attempts to define FET by *exhaustively* listing such elements and thus takes an important step forward.[57]  Some BITs go so far as to use FET as a kind of container concept that even includes a combination of NT and MFN; this is a clause that uses the phrase 'treatment not less favourable than' treatment accorded to its own nationals' investments and to investments of nationals of third States (so-called TNLF clause)[58].

Clauses on the standard of full protection and security are normally directly linked to FET clauses. The former entail a positive obligation of state parties to ensure the safety of foreign investment through its laws, policy and conduct, including law enforcement measures[59]. Moreover, BITs can contain standards for compensation in case of extraordinary losses resulting from damages due to war or revolutionary events (see below 3.3.2).

Fair and equitable treatment can be either included in minimum-standards provisions, or it can be stipulated in a separate article[60]. The exact relation between both standards is subject of considerable debate. Especially developing countries have often insisted that fair and equitable treatment contains no additional rights in comparison with the minimum standard[61]. The exact relationship between both standards often only becomes clear in the course of arbitration[62]. Whether seen as a part of the minimum standard or treated as a separate threshold, the term fair and equitable treatment refers to the same group of principles that are widely seen as part of customary law. In order to achieve greater certainty about the precise content of the notion of FET, it is highly commendable to follow the precedent set by the CETA chapter on investment and to list exhaustively the elements that constitute FET.

It is clear that many of the aforementioned standards and provisions are strongly interrelated or even interdependent. It is however crucial to appreciate them as distinct instruments. The combination of included standards of treatment depends on political agreement between the parties to a BIT.

### 3.2.4    Umbrella Clause

The term umbrella clause is used to indicate provisions in a BIT that aim to include private law obligations contracted between the investor and the authorities of the host state within the protection

---

[55] Rudolf Dolzer, 'Fair and Equitable Treatment: Today's Contours', 12 (2013) Santa Clara Journal of International Law, 7, pp. 16-31.

[56] This is for example the case in the German Model BIT. Article 2(2) provides that the contracting states shall accord foreign investors from the other contracting state 'fair and equitable treatment as well as full protection under this treaty'. Article 2(3) prohibits discriminatory or arbitrary measures, but the document does not provide more information on the content of these standards. See Rudolf Dolzer and Yun-i Kim, 'Germany', *in:*  Chester Brown (ed.), *Commentaries on Selected Model Investment Treaties*, Oxford, Oxford University Press 2013, p. 287, pp. 306-310.

[57]  See Article X.9 (2) of the CETA Draft as published by the European Commission, *op. cit. fn. 37*. The elements mentioned are: denial of justice, fundamental breach of due process; manifest arbitrariness; targeted discrimination on such suspect grounds as race, gender, and religion; and abusive treatment of investors, such as coercion, duress and harassment. Finally the Parties may agree on other elements of conduct that may constitute FET.

[58] See Article 3(2) 2004 Netherlands Model BIT. Such TNLF clauses also occur in other BITs, but not necessarily as part of an FET article.

[59] Naboth van den Broek, *op. cit. fn.* 30, at p. 27.

[60] Jorge Huerta-Goldman, Antoine Romanetti and Franz Stirnimann, *WTO Arbitration, Investment Arbitration, and Commercial Arbitration*, Alphen aan den Rijn, Kluwer Law International 2013, p. 26.

[61] Jeswald W Salacuse, *op. cit. fn.* 3, at p. 223. See Article 14 of the Investment Agreement for the CCIA, loc. cit. fn. 34, which states that FET shall be granted in accordance with international customary law, which is reduced to a prohibition of denial of justice in accordance with the principle of due process.

[62] Jacob Stone, *op. cit. fn.* 54, at p. 82.

of the BIT. Such private law obligations are often included in outright investment contracts, but also in side contracts linked to the unilateral acts of public authority that accompany the first investment by a foreign investor in the host State. More generally, conflicts between a foreign investor and the host State encompass not just government acts that allegedly breach the government's obligations to respect such principles as NT and MFN or FET, but often breach private law contractual obligations as well. In such a situation it is important for the foreign investor to be able to bring the whole of the conflict directly to international arbitration and not to have to differentiate between the public law and private law aspects of the dispute.

Many umbrella clauses, however, are drafted very broadly[63] and can be interpreted so as to bring every small contractual obligation of the government under the protection of the BIT, raise its breach to the level of a breach of the treaty and take it out of the jurisdiction of the local courts of the host State. And they have indeed been so interpreted[64]. At almost the same time other investment tribunals took a radically opposed viewpoint, arguing that such a broad interpretation would constitute so much of an inroad on the sovereignty of States that it was implausible[65]. It would seem that in the meantime other cases have been decided, which have found a reasonable equilibrium between these two extremes, largely based on whether the host State acted in a 'sovereign' capacity or as a 'market participant' in concluding the contract of which the breach is alleged. And yet the umbrella clause remains controversial and its interpretation still somewhat unsettled[66]. This unsettled nature is reflected in the draft text of the investment chapter of CETA: Canada did not propose any text for an umbrella clause, whilst the EU proposed a rather classical umbrella clause, emphasizing however that any breach could only result from the exercise of governmental authority.[67]

### 3.2.5 Free Transfer of Capital and Free Transfer of Funds

Besides assuring the highest possible standard of treatment, the right to freely transfer capital is of crucial importance to investors. Without this freedom, investors might not be able to set up and maintain their investments, withdraw their capital from the host state if need be, or repatriate the income over their investment[68]. For this reason, investor states often seek to assure the greatest possible freedom of transfer for their investors. Investment receiving states are however usually reluctant to grant unlimited freedom of transfer, fearing that sudden large capital movements might negatively influence their foreign exchange reserves and economies[69]. For this reason, most BIT provisions concerning transfer of capital define the right of foreign investors to transfer their capital, clarify the payments that fall within this freedom, and provide applicable currencies and exchange rates and the term within which investors must be allowed to make such transfers[70].

---

[63] See, for instance, Article 3(4) of the BIT between the Netherlands and the Czech and Slovak Republic: ' Each Contracting Party shall observe any obligation it may have entered into with regard to the investments of investors of the other Contracting Party.' Martins Paparinskis (ed.), *op. cit. fn. 26*, at p. 58.
[64] See *Noble Ventures v. Romania,* Award 12 October 2005, ICSID Case No. ARB/01/11, paras 50-62.
[65] See SGS v Pakistan, Decision on Jurisdiction, 6 August 2003 42 ILM (2003), 1290.
[66] For further detail on the relevant cases see Rudolph Dolzer and Christoph Schreuer, *Principles of International Investment Law,* Oxford, Oxford University Press 2008, 153-162.
[67] See Article X. of the CETA, placed between X:9 and X:10. Draft as published by the European Commission, *op. cit. fn. 37*
[68] Andrew Newcombe and Lluís Paradell, *op. cit. fn. 5*, at p. 399.
[69] Jeswald W Salacuse, *op. cit. fn.* 3, at p. 259.
[70] *Ibid.,* at p. 134. An example of a rather simple clause of this nature is Article 5 of the Agreement on Encouragement and Reciprocal Protection of Investments between Venezuela and the Netherlands 1991; a very complete version of such an article is contained in Article 7 of the 2012 US Model BIT, *available at:* http://www.state.gov/documents/organization/-188371.pdf (last accessed 8 June 2014).

The right of investors to move their financial assets freely out of the host State is also linked to the right to prompt, adequate, and effective compensation. If an investor is expropriated and subsequently denied the right to move the financial compensation at his own discretion, the money becomes hostage to the host state and will in effect be lost to the investor. To avoid such situations, clauses guaranteeing the free movement of capital are of great importance to the protection of foreign investment. Free transfer of compensation for nationalization is however a widely featured aspect of the free transfer clauses in BITs[71].

## 3.3    Protection Clauses

Access and standard of treatment clauses guarantee foreign investors that they can act as freely and receive treatment as favourable as possible. This ensures an unhindered flow of capital. When investors invest in another state, they subject their capital to the jurisdiction of the host state. This requires investors to carefully consider the risks that such investment brings. Doubts about the security of investments or their value might cause investors to refrain from such transactions. Confidence of foreign investors in the security of their investments is thus crucial for states that seek to attract foreign investment. On the other hand, investor states have a large interest in seeing the investments of their nationals protected, as sudden loss of foreign investment might have negative consequences on the economy of the host state.  There are a number of situations in which the standards of treatment were not seen as sufficient security. These situations were seen as such risks to the value of foreign investment that they required extensive regulation in separate provisions. Such provisions are called investment protection clauses. They regulate a vast array of potential situations, from direct and indirect nationalisation to war and national disasters. It is however not correct to say that protection clauses are always necessary to attract foreign investment. Brazil and the United Kingdom have attracted considerable foreign investment without entering into protection clauses, or even without concluding great numbers of investment treaties in the first place[72]. The most common elements of these protection clauses will be discussed in the following paragraphs.

### 3.3.1    Nationalisation and Expropriation

Nationalisation of complete sectors of industrial production or of specific services, notably health services, was widely resorted to throughout the twentieth century.[73] Governments often defended such practices by claiming that they had not violated their obligations to provide national treatment to foreign investors, thus dismissing investor state claims that nationalisations violate the international minimum standard of treatment[74]. Under customary law, states are obliged to pay compensation when they expropriate foreign nationals[75]. The disagreement concerning nationalization caused investor states to seek inclusion of more elaborate treatment and protection systems in their BITs relative to individual expropriation.

Such protection clauses need to clearly define three matters. First, it is important to define which property is protected against expropriation. For this reason it is of crucial importance that the aforementioned definition clauses contain clear and inclusive definitions of the term investment.

---

[71] Andrew Newcombe and Lluís Paradell, *op. cit. fn.* 5, at p. 378.
[72] Surya P. Subedi, *International Investment Law. Reconciling Policy and Principle,* Oxford/Portland, Hart Publishers 2008, p. 86.
[73] Nationalization is used here as the term that designates the mass phenomenon of bringing a whole economic or industrial sector under State control, whereas the term expropriation will be used for individual acts of State appropriation of private property.
[74] Jeswald W Salacuse, *op. cit. fn.* 3, at p. 286.
[75] Andrew Newcombe and Lluís Paradell, *op. cit. fn.* 5, at p. 322. This is an obligation that in many States is rooted in the "right to property"; in Europe this is laid down in Protocol I to the ECHR and in Article 17 of the Charter of Fundamental Rights of the European Union.

Second, it is crucial to clearly define against which actions by governments foreign investment is protected. In other words, it is of paramount importance to define which acts amount to expropriation[76]. Third, expropriation protection clauses need to prescribe a standard of compensation for situations in which individual expropriation or nationalisation of a sector cannot be avoided[77].

Foreign investment needs to be protected against both direct and indirect expropriation. Direct expropriation is easy to understand and consists of a total expropriation of foreign investors, with an attendant loss of title of foreign investors[78]. Direct expropriation normally is required to be imposed in the public interest, by law, on a non-discriminatory basis and subject to compensation in order to be BIT-consistent. Indirect expropriation refers to a broad category of government measures which *de facto* nullify or impair the property rights of the investor, not necessarily leading to a loss of title. This may result in a partial or total loss of the value of the investment[79]. Such indirect expropriation can take the form of disproportionate tax increases, revocation of government permits and licenses, interference with contractual rights, etc. The large number of situations that might amount to indirect expropriation requires a broad definition of the term[80].

At the same time it is crucial to distinguish between measures that amount to indirect expropriation or nationalisation and those that are part of the legitimate competences of a state to regulate production and trade. A recent example of conflict between governmental regulatory powers and the interests of foreign investors is the arbitration between Swedish power company Vattenfall AB and the Federal Republic of Germany, in reaction to the 2011 amendment to the German Nuclear Energy Act. The Amendment provides for the immediate closure of several power plants and a staged closure of all German nuclear power plants until the year 2022 as a reaction to the Fukushima nuclear accident[81]. Vattenfall, which, after a recent acquisition of a German power company, operates two nuclear power plants that were to be closed pursuant to the new Act, requested proceedings at the International Centre for the Settlement of Investment Disputes (ICSID) on the basis of the Energy Charter Treaty.  An arbitral tribunal was constituted in December 2012. Proceedings are currently pending, but remain as yet confidential[82]. This case demonstrates that it is of paramount importance that nationalisation protection clauses guarantee both sufficient respect for the deliberate exercise of governmental regulatory powers in the public interest, but also provide a reasonable measure of protection of foreign investment against direct and indirect expropriation resulting from abrupt changes of policy.

Again the draft chapter on investment from CETA contains a commendable attempt to contain the concept of indirect expropriation within reasonable bounds and thereby protects the right to regulate. First, Article X:11(2) indicates which factors must be assessed before an arbitral panel can arrive at the conclusion that there is a case of indirect expropriation[83]. Secondly, paragraph 3 of the same provision

[76] Jeswald W Salacuse, *op. cit. fn.* 3, at p. 291.
[77] Andrew Newcombe and Lluís Paradell, *op. cit. fn.* 5, at p. 322. See para. III.3.iii below on compensation.
[78] Jeswald W Salacuse, *op. cit. fn.* 3, at p. 294.
[79] Andrew Newcombe and Lluís Paradell, *op. cit. fn.* 5, at p. 325. For an example of definitions of direct and indirect expropriation see Annex B of the US Model BIT 2012 *loc. cit. fn.* 70.
[80] Naboth van den Broek, *op. cit. fn.* 30, at p. 24.
[81] 13. Atomgesetz-Änderungsgesetz (Thirteenth Amendment to the German Atomic Energy Act) (2011), *Bundesgesetzblatt I*, 1704.
[82] Vattenfall AB and others v. Federal Republic of Germany, ICSID Case No. ARB/12/12. In the same case Vattenfall has joined German energy companies E.ON and RWE in constitutional cases before the Bundesverfassungsgericht, see cases 1 BVR 2821/11, 1 BVR 321/12, and 1 BVR 1456/12. Proceedings are currently still pending.
[83] Draft as published by the European Commission, *op. cit. fn 38.*  These factors include: the economic impact and duration of the measures; the degree of interference with reasonable investment-backed expectations; and the object, context and intent of the measures.

states that measures designed and applied to protect legitimate public welfare objectives, such as health, safety, and the environment do not constitute indirect expropriations.[84]

### 3.3.2    War, National Emergencies and Civil Unrest

Numerous BITs contain provisions concerning compensation for damages to foreign investment as a result of war, national emergencies or civil unrest. Such provisions usually guarantee foreign investors the same rights to compensation as a Government might grant its domestic investors, thus ensuring compensation on an equal base. Such cases may also entail state liability for loss of or damage to foreign investment caused by the national armed forces[85]. The second situation led to arbitration in 1987, when a Hong-Kong based company claimed compensation from the Sri Lankan Government under the UK-Sri Lanka BIT for damages caused to one of its factories during a 1987 military operation against Tamil insurgents[86].

### 3.3.3    Compensation

Since nationalisation cannot always be avoided under all circumstances, most provisions allow nationalization under strict conditions, such as the existence of a situation of necessity or for reasons of public interest, the fulfilment of due process obligations and the payment of compensation[87]. The regime of compensation is particularly important. Guaranteeing investors equitable compensation will attract investment and protect investing states from the negative consequences of expropriations of its nationals.

Obtaining compensation that covers the losses caused by the expropriation within a reasonable period of time and in a way that allows investors to use and benefit from the compensation is crucial. For this reason, the often applied 'Hull formula' prescribes that compensation must be prompt, adequate, and effective. 'Prompt' means that the requirement that compensation follows in due course. 'Effective' refers to the nature of the compensation, which should be offered in directly transferable currency that allows immediate use of the compensation sum. 'Adequate' defines the amount of compensation paid, and is in many BITs linked to the market value of the investment before nationalisation.

Especially this last qualification of the compensation is subject to considerable debate. Most jurisprudence and doctrine and a large number of investment treaties point towards the fair market value of the investment as the applicable standard of compensation. Most compensation regimes also provide for the payment of interest on compensation, which is often due from the day of the expropriation onwards[88].

---

[84] *Ibid,* Article X:11(3).
[85] M. Sornarajah, *The International Law on Foreign Investment (Third Ed.),* Oxford, Oxford University Press 2010, p. 213. An example of such a clause is Article 5(3) of the 2004 French Model BIT, in: Martins Paparinskis ed., *op. cit.* fn. 25, 552 ff.
[86] Asian Agricultural Products Ltd v. Sri Lanka, ICSID Case No. ARB/87/3.
[87] Andrew Newcombe and Lluís Paradell, *op. cit. fn.* 5, at pp. 375-377. For an example Article 5(1) of the 2008 UK Model BIT, in: Martins Paparinskis ed., *op. cit.* fn 26, 576 ff.
[88] Jeswald W Salacuse, *op. cit. fn.* 3, at pp. 323-324 & 396. For a good example of a clause containing such rules: Article 5 of the 1975 Agreement between the UK and Egypt for the Promotion and Protection of Investments, in: Martins Papaprinskis (ed.), *op. cit. fn 25*, 582 ff.

### 3.3.4     Continued Protection after Termination or Expiration of a Treaty

Most BITs contain provisions that extend their protection over investments made while the treaty was in force over a defined period after termination or expiration of the Treaty[89]. It is important in this context to distinguish between the expiration and termination of a Treaty. While many BITs are agreed for a predetermined period of time and thus expire after that period has passed, termination is usually a unilateral act by one of the parties to end the contractual relation between both states while the treaty is still in force.

In case of termination of a treaty, the period over which protection is extended is usually set between 10 and 20 years following termination[90]. These provisions guarantee that termination of the Treaty will not immediately affect the security of foreign investments and thus limit the political risks of foreign investment. This continued protection is especially important in light of the nature of foreign investments, which usually consist of a long-term presence of the investor in the host state that only becomes profitable after a number of years[91].

The prolongation of investment protection for a considerable period of time even after termination of the Treaty is a clear deviation from the standard norm laid down in the 1969 Vienna Convention on the Law of Treaties, which prescribes that parties are released from obligations stemming from the Treaty pursuant to its termination and only prohibits retroactive consequences of a treaty's termination[92]. In the succession between the Member States' BITs and new EU Investment Protection Agreements, the question arises to what extent these prolongation of protection clauses are extinguished by this succession, in view of the fact that the new EU agreement is likely to have a comparable clause.

### 3.4     Dispute settlement clauses

In case a dispute arises between states and foreign investors about a matter falling under a BIT, parties can resort to dispute settlement. Most BITs create a facetted system of dispute settlement reaching from consultations to domestic judicial settlement and international arbitration. An important difference between investment disputes and trade disputes is that trade disputes usually arise between two sovereign states, whilst investment disputes most commonly occur between private investors and states. Normally this entails that the private (foreign) investor has to turn to the courts of the host State, when a dispute arises between him and the host state authorities about the investment. In case of investor-state disputes, BITs usually grant access to the domestic legal system, and sometimes prescribe that investors need to exhaust all domestic remedies before resorting to international arbitration. Over the years, however, developed countries have sought to grant their investors direct access to international arbitration[93]. In modern BITs one hardly finds a full exhaustion clause any longer; if there is an obligation to turn to the national courts first, this is normally linked to a maximum period. If after that period the dispute is still on-going, it shall be brought to an international arbitral tribunal[94]. Indeed,

---

[89] See, for example, Article 13 of the France-Argentina Agreement on the Promotion and Protection of Investments provides that after 'expiry of the validity of this Agreement, investments made while it was in force shall continue to be protected by its provisions for an additional period of 15 years. See Martins Paparinskis (ed.), *op. cit fn. 26*, 621.

[90] Andrea Carska-Sheppard, 'Issues Relevant to the Termination of Bilateral Investment Treaties', 26 (2009) 6 Journal of International Arbitration, 755, 763.

[91] Robert Ginsburg, 'Political Risk Insurance and Bilateral Investment Treaties: Making the Connection', 14 (2013) 6 Journal of World Investment & Trade 943, 947.

[92] Compare Vienna Convention on the Law of Treaties (signed 23 May 1969, entry into force 27 January 1980), 1155 UNTS 331, Article 70 As is usual in the Vienna Convention, parties to a treaty can always deviate from the rules of the Convention – which they have done in the most emphatic manner in most BITs.

[93] Surya P. Subedi, *op. cit. fn.* 73, at p. 18.

[94] An example of such a clause is Article 10(2) and (3) of the Agreement between Germany and Argentina on the Encouragement and Protection of Investments 1991, in Martins Paparinskis, *op. cit. fn* 25, 604 ff.

stimulated by the evolving provisions of BITs in this respect, there has been a development, moving away from domestic courts as principal forum for dispute settlement towards direct access to international arbitration as the most important way of solving investment conflicts[95]. There are three reasons for this development.

First, the practice of espousal of claims, in which governments take over an investment claim of their nationals against another State after they have exhausted all local remedies, make it their own and then proceed to litigate the claim on a State-to-State basis was increasingly regarded as arbitrary and unsatisfactory for the investors. There is no *right* of espousal of claims under international law[96]. Under national law espousal of claims usually remains purely discretionary and the basis, on which one claim is espoused by the government and another is not, is often non-transparent[97]. Since a private claim by espousal is made into a claim of the government, it is also discretionary whether the investor in the end would obtain full compensation, even if the State received it.

Secondly, the domestic legal systems of capital-receiving states were often seen as unfit to protect the interests of foreign investors. In the case of developing countries domestic legal systems were often perceived as weak, lacking the capacity and the independence or authority to assess complicated claims against the State. As to developed countries, judicial systems were regarded as too complicated, consisting of too many layers (local, regional, federal, European) or too many different specialized judicial authorities (administrative, civil, tax and customs jurisdictions) and as requiring legal assistance that is frequently too costly[98].

Thirdly, by removing the requirement of exhaustion of domestic remedies and allowing immediate access to international procedures BITs guarantee faster and more efficient proceedings. Although the average BITs arbitration nowadays also takes three years, this is still considerably faster than the time it takes to exhaust available remedies in most developed national judicial systems[99]. The setting aside of the need for espousal of a private claim and bringing a claim directly to international arbitration outside any national legal system is clearly influenced by the common practice in commercial arbitration.

### 3.4.1    Consultations

Most BITs prescribe consultations before allowing resort to courts or international arbitration. In order to oblige both parties to participate in such consultations, such provisions usually prescribe a minimum period of often six months during which parties need to negotiate in order to settle their dispute[100]. Parties are often also free to rely on services of good will or conciliation by third parties. Enabling settlement of the dispute before resorting to arbitration is important, as it can avoid lengthy and costly arbitration trajectories. If consultations do not lead to agreement both the capital exporting state and the investors themselves can start legal procedures against the capital receiving state.

---

[95] Naboth van den Broek, *op. cit. fn.* 30, at p. 27.

[96] Robert Jennings and Arthur Watts (eds.), *Oppenheim's International Law*, 9th ed. London, Longman 1993, 934

[97] If, as is argued by Annemarieke Vermeer-Künzli, 'Restricting Discretion: Judicial Review of Diplomatic Protection', 75 (2006) *Nordic Journal of International Law* 279, there is an increasing tendency to restrict the discretion of states in offering diplomatic protection in cases of serious breaches of human rights law, this development seems to have had very limited resonance where espousal of economic claims is concerned.

[98] It also bears pointing out that the success rate of private claims in the administrative courts in Western Europe is, according to statitical evidence somewhere between 10% in France and 30% in Germany.

[99] I am indebted to Steffen Hindelang for the information on the average length of investment arbitrations. I am relying largely on my own experience with a multitude of administrative and civil claims that have risen to the highest national level <u>and</u> gone through a preliminary question to the ECJ in Luxemburg to be able to say that one would have to be very lucky to make it within three years before the ECJ. Slow justice often becomes injustice.

[100] Jeswald W Salacuse, *op. cit. fn.* 3, at p. 362.

### 3.4.2    International Arbitration

Most BITs contain an extensive set of rules for the international settlement of investment disputes. These articles appoint the bodies that will be called upon to settle the dispute, and indicate the applicable law governing the dispute.

BITs often contain a list of potential tribunals that may be entrusted with the settlement of an investment dispute. Such can be institutions like the International Centre for the Settlement of Investment Disputes, the Permanent Court of Arbitration, the International Chamber of Commerce of Paris, or the London Court of International Arbitration. Another option most BITs mention is ad hoc arbitration, which means that both parties will appoint a number of arbitrators who will form an ad hoc tribunal[101].

International arbitration usually applies the law that the parties declared applicable when entering contractual agreements. For this reason, most BITs provide which laws govern the dispute. Here, considerations of territoriality usually lead to application of the laws of the host state. But parties can also declare a vast array of other sources of law applicable, such as the 'general principles of law applicable in Western Europe' or rules of international law[102]. On the other hand the choice of tribunal sometimes influences the applicable law, as for example the ICC and the Stockholm Arbitration Institute have their own rules concerning applicable law[103]. Clear choice of law is important, as it improves legal certainty. If a lack of clarity about applicable law leads to a conflict of law, the arbitral tribunal has to determine the applicable law[104].

The question of applicable law is of great importance, when the dispute is principally about the alleged breach of an investment contract or of contractual obligations ancillary to other actions under public law by the host State's authorities that affect an investment protected by a BIT. When the acts by the authorities of the host State, whether of a legislative, regulatory, or purely executive nature are at the core of a dispute, there can be no doubt that the applicable law is the BIT itself and general international law, in particular its rules of treaty interpretation, in the background. It can be regretted that BITs mostly do not explicitly declare that they have to be interpreted according to the rules of interpretation of international law. In practice it appears that arbitrators, especially those that have a background in commercial arbitration, are insufficiently aware of this. Hence such an affirmation would be useful.

Here it is necessary to return for a moment to the selection of arbitrators who make up the Arbitration Tribunals that decide investment disputes. The ICSID, the PCA, the ICC of Paris, the LCIA and the Stockholm Arbitration Institute are, as was already briefly indicated in the Introduction, service institutes that help to compose the Arbitration Tribunals and provide registry services and administrative support (against certain fees). They also serve as appointing authorities, but the actual selection of the members of the Arbitral Tribunal is in the hands of the parties or rather their law firms, which will later on plead the case in front of the Tribunal that they will have helped select themselves. This is a practice that comes from the world of commercial arbitration. The law firms each propose to their client several names of possible candidates, from which the clients choose. That choice is implemented by the law

---

[101] Naboth van den Broek, *op. cit. fn.* 31, at p. 28.
[102] Rupert Reece, Alexis Massot and Marie-Hélène Bartoli, 'Searching for the Applicable Law in WTO Litigation, Investment and Commercial Arbitration', *in:* Jorge Huerta-Goldman, Antoine Romanetti and Franz Stirnimann (ed.), WTO Arbitration, Investment Arbitration, and Commercial Arbitration, Alphen aan den Rijn, Kluwer Law International 2013, 199, pp. 201-202.
[103] See Art. 21 of the ICC 2012 Rules of Arbitration and Art. 22 of the Arbitration Rules of the Stockholm Arbitration Institute, which are broadly identical.
[104] Rupert Reece, Alexis Massot and Marie-Hélène Bartoli, *op. cit. fn.* 103, at p. 203.

firms and thus the 'arbitrators of the parties' are selected. These two are supposed to agree on their President, a process that is again steered by the law firms under more or less stringent guidance of their clients[105].

As a consequence of this procedure the law firms specializing in international arbitration have great influence on the kind of people who sit on investment tribunals. Naturally they have a tendency to look for people with knowledge of and experience in arbitration, which in practice means mostly male lawyers from similar firms and the odd (again male) professor who is a specialist in international arbitration. Since law firms specializing in international arbitration are mainly present in Western Europe, the US and (to a lesser extent) Latin-America[106], the selection mechanism leads to panels of arbitrators which show not only a lack of gender diversity, but also of diversity in national and cultural background[107]. In addition, because of the selection practices the pool from which members of investment arbitration tribunals have been selected is quite small. This leads to situations in which, for instance, two members of an arbitration tribunal will meet each other as lawyers on opposite sides in another BITs arbitration and vice versa; or one of them will have to plead another case in front of the other quite soon[108]. Especially when such cases have points in common, which is not exceptional given the fairly limited scope of the legal questions that may arise in BITs cases due to the quasi-uniformity among BITs, this can lead to situations which are rather painful and are likely to be regarded at the very least as undesirable, if they do not amount to a full-fledged conflict of interest.

Fortunately some initiatives are being taken to remedy the selection problem. The Secretariat of ICSID, which has a certain informal influence on the choice of persons considered for serving as arbitrators[109], has done its best to enhance gender and cultural diversity by proposing more women and also to be sensitive to national and cultural diversity. This is beginning slowly to have some effect, but it is high time that a stronger and more general effort is made.

Professional societies are attentive to situations of conflict of interest and other incompatibilities. The International Bar Association (IBA) has adopted rules on conflict of interest and ethics in the field of arbitration. These are often referred to when panels of arbitrators are composed or when challenges to the composition of panels are made.[110] In addition two professional societies, the American Society of

---

[105] If the arbitrators of the parties cannot agree, there often is a safety mechanism according to which the President of the ICJ, the Secretary-General of ICSID or another authority figure appoints the President of the Arbitration Tribunal, see e.g. Article X-25 of CETA as published by the European Commission, *loc. cit. fn* 38.

[106] It should be noted that Singapore is styling itself more and more as the arbitration capital of Asia and there is no doubt that this is already having an effect.

[107] For instance in all ICSID cases 46% of all arbitrators are from Western Europe and 22% from North America, whereas 1% of the cases has a European defendant State and 5% have a North-American State (including Mexico) as defendant. Women are appointed as arbitrators in 5.6% of the ICSID cases and three quarters of those appointments are taken by two women only. See Chiara Giorgetti, 'Is the Truth in the Eyes of the Beholder? The Perils and Benefits of Empirical Research in International Investment Arbitration', 12 Santa Clara Journal of International Law 2013, 263.

[108] Note in this respect the initiative of the ICJ a few years ago in which it announced that it considered it undesirable that lawyers who served as judges *ad hoc* on the Court, i.e. as judges appointed by a party that is not represented on the Court, while the other party in the dispute has an elected judge on the Court, would be taken from lawyers who regularly appeared before the Court as advocates. International Court of Justice, *Practice Directions*, available at: http://www.icj-cij.org/publications/en/acts-and-documents-no-6.pdf (last accessed 23 May 2013) p. 163, Practice Direction XIII.

[109] This influence is largely brought to bear by suggesting names for arbitrators and possible Presidents of tribunals to the lawyers of the parties in ICSID arbitrations. There has been quite some empirical research on the selection of arbitral panels and dissenting opinions. This literature is critically discussed in Catherine Rogers, 'The Politics of International Investment Arbitrators', 12 Santa Clara Journal of International Law 2013, 223 and in Chiara Giorgetti, *op. cit. fn* 107.

[110] International Bar Association, IBA Guidelines on Conflicts of Interest in International Commercial Arbitration and Rules of Ethics for International Arbitrators available at: http://www.ibanet.org/Publications/publications_IBA_guides_and_free-_materials.aspx (last accessed 23 May 2014). Referred to in Article X.25.6 of CETA as published by the European Commission, loc. cit. fn 36.

International Law (ASIL) and the International Council for Commercial Arbitration (ICCA) have taken the initiative to create an international commission under mixed US-European chairs that is to report on issue conflict in international arbitration, including BITs arbitration[111].

When the WTO Agreement was negotiated, it was considered that WTO panels often would take decisions with serious consequences for individual Members.  Hence, the WTO dispute settlement system was equipped with the newly created Appellate Body. It is suggested that decisions of arbitration panels under BITs can have effects at least as important and dramatic as those of WTO panels. It would seem, therefore, that an appellate mechanism is highly desirable also in investment dispute settlement[112]. A big practical problem is that investment dispute settlement is not based on a single international agreement like WTO dispute settlement. Nevertheless, it is urgent that some kind of appeal mechanism should be organised. At present, the only mechanism that exists is the so-called annulment procedure under the ICSID Convention, which is handicapped by the extremely limited grounds for annulment of arbitral awards (unlawful constitution of the panel; manifest *excès de pouvoir*, corruption of a member of the panel; breach of fundamental rule of procedure; failure to state reasons)[113].

### 3.4.3      Enforcement of Arbitral Awards

There is no doubt that arbitral awards under ISDS procedures are binding between the disputing parties.[114] Under international law this implies that all organs of a State or International Organization, party to a BIT, are bound to observe and carry out the arbitral award. This includes the judicial organs of the State or international organization. In the EU this means that not only the Commission, the Council of Ministers and the European Parliament are bound by an award of an investment tribunal, but also the Court of Justice. The Court itself has admitted as much, when it stated that, in case the EU were to conclude an international agreement which included a dispute settlement mechanism and an international tribunal, it would be bound by the judgments of that tribunal.[115] However, the ECJ's record of wholehearted acceptance of, for instance, the reports of WTO panels and the Appellate Body – a comparable international jurisdiction to investment tribunals – is quite sketchy. The picture is obscured by the consistent rejection of the direct effect of the WTO Agreements, but also the direct application by the ECJ of an international court's sentences is often shrouded in quite some mystery. Going by the experience of the ECJ's handling of WTO panel and Appellate Body cases lost by the EU, one may expect that the ECJ will follow adverse investment tribunal rulings without being explicit about it, often relying on interpretation of Union law in order to enable the Union's other institutions to follow and implement

[111] See ASIL Blog: http://www.asil.org/blogs/icca-asil-joint-task-force-issue-conflicts-investor-state-arbitration. So-called issue conflict means that a person ought to be disqualified to sit on an arbitration panel, not so much because of a conflict of interest (which is fairly well defined in most legal systems), but conflict that may arise because of previous positions held, previous publications, and previous arbitral decisions etc.
[112] An example in investment arbitration is the procedure in Articles 20.13 and 20.14 of the so-called CAFTA Agreement, in: Martins Paparinskis, op. cit. fn 26, 27 ff. This is a procedure very much like the interim review procedure laid down in Article 15 of the DSU of the WTO. That is to say a provisional or interim report of the panel can be commented by the parties, after which the final panel report will be issued, modified or not. It is not a real appeal procedure; in the WTO it precedes the appeal and has proved largely superfluous as a consequence.
[113]  See Article 52 (1) of the ICSID Convention, op. cit. fn. 19.
[114] Article 9(5) of the 2008 German Model Treaty and Article 9(5) of the 2008 UK Model Treaty, see also Article 53 of the ICSID Convention, in: Martins Papaprinskis ed., *op. cit fn 26*, 573, 580 and 693 respectively. See also Article X-39 of the draft chapter on ISDS in CETA, Draft as published by the European Commission, *op. cit. fn 38*.
[115] Opinion 1/91, *EEA Agreement I*  [1991] ECR I-6079, para. 39. See also Pieter Jan Kuijper, "It shall contribute to the strict observance and development of international law…." The Role of the Court of Justice, in: "The Court of Justice and the Construction of Europe. Analyses and Perspectives on Sixty Years of Case Law, The Hague, T.M.C. Asser Instituut 2013, 589, at 608-610 and literature and case law cited there.

these rulings, too.[116] A clear limit is reached for the ECJ in case a judgment of an international court that is binding on the Union would be contrary to the constitutional core values of the Union.[117] It is important to note that the above applies to the situation, when the EU concludes a trade and investment agreement with a third State, like the TTIP. The position of the ECJ in cases decided by investment tribunals on the basis of intra-EU BITs between different Member Sates is probably a different one, but not the subject of this contribution.

After obtaining a binding arbitral award, it is of paramount importance that the award is enforced and recognised in the country where it ought to take effect. For example, in case arbitrators have ruled that a foreign investor should receive compensation following indirect nationalisation, it is of greatest importance to the investor to have the award recognised and enforced by the domestic courts of the host state, in order actually to receive the compensation in case the state does not comply voluntarily. This is however not always easy, since a judgement by an arbitral tribunal is often not a directly enforceable judgement like domestic jurisprudence. For this reason, various international instruments govern the recognition and enforcement of arbitral awards. The matter is even more complicated if an investor seeks to have an award by a foreign domestic court recognised and enforced before the courts of the host state. Both situations need to be separated, and are governed by different instruments of law.

The aforementioned *Convention on the Settlement of Investment Disputes between States and Nationals of other States* (the ICSID Convention) provides that arbitral awards made pursuant to the Convention shall be binding on the parties, and that state parties to the Convention must treat such awards as if they were 'a final judgement of a court in that state' and thus pay all damages awarded[118]. Thus, states party to the Convention are bound to enforce ICSID arbitral awards as judgments by national courts.

The most important other instrument concerning the recognition and enforcement of international arbitral awards is the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the 'New York Convention'), which was initially created primarily for the execution of awards resulting from commercial arbitration, but can also be used for the enforcement of other international arbitral awards, such as investment arbitration awards[119]. Currently, there are 149 state parties to the Convention[120]. The Convention provides a presumptive obligation of states to recognize and enforce arbitral awards, provided that certain requirements have been met. Most importantly, the Convention applies only to international awards, that is, awards made outside of the state where enforcement or recognition is sought. Awards from domestic courts of the state where enforcement is sought are usually dealt with under a separate regime of domestic law. However the Convention also applies to non-domestic awards, awards that the State where enforcement is sought does not consider as domestic even though they were made in that state. Thus the Convention allows states to extend its

---

[116] An example is Case C-351/04 *Ikea Wholesale Ltd v Commissioners of Customs and Excise,* [2007] ECR I-7723, paras 53-57. For a case in which the Court exceptionally refers approvingly to an AB report, see case C-245/02, *Anheuser-Busch v Budejovicki Budvar,* [2004] ECR I-11018, paras 49 and 67.

[117] This follows from the so-called Kadi cases, see Joined Cases C-402/05 P and 415/05 P, *Yassin Abdullah Kadi v Commission and Council,* [2008] ECR I-6351, paras. 307 ff and Joined Cases C-584/10 P, C-593/10 P and C-595/10 P *European Commission and United Kingdom v Yassin Abdullah Kadi.*para. 97 ff.

[118] Convention on the Settlement of Investment Disputes between States and Nationals of other States (signed 18 March 1965, entry into force 14 October 1966), 575 UNTS 159, Articles 53 & 54. For similar provisions in the TFEU concerning the enforcement of the ECJ's judgments in the Member States see articles 280 and 299 TFEU.

[119] UN Convention on the Recognition and Enforcement of Foreign Arbitral Awards (signed 10 June 1958, entry into force 7 June 1959), 330 UNTS 3 ('the New York Convention').

[120] A list of all state parties to the New York Convention is available at: http://www.uncitral.org/uncitral/en/-uncitral_texts/arbitration/NYConvention_status.html [last accessed 14 May 2014].

application and treat these non-domestic awards like international awards[121]. An example of this is the US courts' practice to treat awards made within the US as non-domestic if the award bears a 'reasonable relation' to another state, which for example would be the case if the award were made pursuant to the laws of another state[122]. Other requirements are of a formal nature, for example obliging applying claimants to translate the award into the language of the state where enforcement is sought[123].

Once these requirements have been met, the presumptive obligation to recognise and enforce the award can be effectively blocked by a state on several defences. Recognition and enforcement may for example be rejected in case of invalidity of the arbitration agreement, if the rights of the defendant were impaired during the proceedings, in case of procedural shortcomings in the appointment of the arbitrators, if parts of the award were made outside of the jurisdiction of the Tribunal, if the award has not become binding on the parties because of suspension by a competent domestic authority, if domestic law excludes the subject matter of the award from arbitration, or if recognition and enforcement would be contrary to public policy of the state in which the award is invoked. This list is exhaustive; no other grounds for refusal to recognise or enforce an award are permissible[124]. Since the domestic courts of the state in which recognition or enforcement is sought have to decide on the fulfilment of one of the grounds for refusal, state practice on this matter can vary considerably[125].

Since many states have signed and ratified both the New York and ICSID Conventions, these two Conventions, each in their own way, ensure recognition and enforcement in a large number of cases. This has made valuable contributions to foreign investment security.

## 4.    HOW INTERNATIONAL INVESTMENT BECAME INTERLINKED WITH INTERNATIONAL TRADE LAW

### 4.1    GATT and Trade-related investment measures

Immediately after the Second World War, trade and investment were supposed to be joined in one broad international convention, the founding treaty of the International Trade Organization (ITO). As is well known, the ITO never made it to wide ratification, after President Truman renounced putting it before the US Senate, given the hostile position of this body to the agreement. Article 12 of ITO contained a number of provisions that would at least have laid down a number of minimum rules and aspirational norms on international investment and an encouragement to conclude bilateral investment agreements[126]. When after the ITO's demise only the provisionally applied GATT was left over, the link between trade and investment was torn asunder for quite some time to come.

There remained nevertheless a number of fundamental GATT provisions that are affected by measures that were in the past often taken by governments that applied a license system for foreign investment. As a condition for the investment being approved governments often imposed so-called performance requirements, i.e. requirements which obliged the investor to buy a specific minimum quantity of

[121] New York Convention, *loc. cit. fn.*120, Articles 1-3.
[122] Gary B. Born, *International Arbitration. Law and Practice,* Alphen aan den Rijn, Kluwer Law International 2012, p 372,
[123] New York Convention, *loc. cit. fn.*120, Article 4.
[124] Alan Radfern, Martin Hunter and others, *Law and Practice of International Commercial Arbitration*, London: Sweet & Maxwell 2004, pp. 440-459; New York Convention, *loc. cit. fn.*119, Article 5.
[125] Herbert Kronke, 'Introduction: The New York Convention Fifty Years on: Overview and Assessment', *in:* Herbert Kronke , Patricia Nacimiento , et al. (eds), *Recognition and Enforcement of Foreign Arbitral Awards. A Global Commentary on the New York Convention*, Alphen aan den Rijn, Kluwer Law International 2010, pp. 1-18, p. 16.
[126] The ITO Final Act, including the ITO Agreement, can be found on the WTO website, http://www.wto.org/english/docs_e/-legal_e/havana_e.pdf (last accessed 22 May 2014).

national products of the host State as inputs for its production, or which subjected the investor to a minimum export performance, in case he wanted to import such inputs instead. Many other requirements of this nature were devised, always making the initial investment itself and the way the business was run dependent on a certain performance that was likely to discriminate in favour of national products or that had a restraining effect on imports or a stimulating effect on exports. In a famous GATT dispute settlement case of 1984, *Canada – Administration of the Foreign Investment Review Act (FIRA)* the panel determined that such practices breached the national treatment clause of Article III:4 of GATT and was potentially also contrary to Article XI, the prohibition of quantitative restrictions[127].

The *FIRA case* was considered so important that its codification became part of the Uruguay Round negotiation mandate and led to the *Agreement on Trade Related Investment Measures* (TRIMs Agreement)[128]. The negotiators, however, could not agree to go beyond what the *FIRA case* had already decided and its immediate logical consequences[129]. Article 2 of TRIMs simply states that no Member shall apply TRIMs that are inconsistent with the Articles III and XI of GATT and then refers to the illustrative list of such TRIMs contained in Annex 1 to the agreement. The practices contained in the illustrative list cover not only the conditions of access to the market of investment in the production of goods, but also the conditions under which continued enjoyment of the gains of the investment remain possible. There is little doubt that this leads to an overlap between the TRIMs Agreement and numerous BITs on the point of national treatment, and possibly on FET. It might also be argued that in this situation the potential value of the investment is truncated from the beginning, because of the conditions imposed, but it would go rather far to characterize this *ab initio* as a partial expropriation without compensation.

The TRIMs Agreement is not an agreement that has attracted an enormous amount of litigation under the WTO Dispute Settlement Understanding. Any litigation that has taken place has remained largely true to the text of the Agreement and its Annex containing the illustrative list and has further extrapolated the fundamental ideas behind the *FIRA case*. Since Article 2 of the TRIMs Agreement simply refers to Articles III and XI of the GATT, cases such as *Indonesia - Autos*[130], *India - Autos*[131] and *China – Auto Parts*[132] have not done much more than apply existing case law to clear cases of discrimination in favour of national products through tax and legislative means under Article III: 2 and 4 and obvious quantitative restrictions under Article XI respectively, with the occasional reference to the examples mentioned in Annex I of TRIMs.

It is remarkable that the Comprehensive Economic and Trade Agreement (CETA) between the EU and Canada in its draft Chapter on Investment has included an elaborate list of Performance Requirements, which in reality is a further development of the illustrative list of Annex I of the TRIMs Agreement. At the same time parties seem to want to leave their obligations under the TRIMs Agreements unaffected[133].This can lead to all kinds of complications, especially in dispute settlement in the relation between WTO dispute settlement and CETA dispute settlement and within CETA it will be unclear whether to treat Performance requirements under the trade dispute settlement provisions on the basis

---

[127] See Panel Report adopted on 7 February 1984, GATT BISD 30S/140, paras 5.4-5.12 (on Art. III:4) and 5.14 (on Art. XI:1).
[128] See the first preambular paragraph to the TRIMs Agreement and its reference to the Declaration of Punta del Este.
[129] Art. 2 TRIMs Agreement and its Annex 1
[130] See Case DS 54, 55, 59 and 64 *Indonesia Autos*
[131] Case DS146 and 175 *India Autos*.
[132] Case DS339, 340, 342 *China Auto Parts*
[133] See Article X:5 of the draft CETA as published by the European Commission, *loc. cit.* fn. 37. This article seems to have been borrowed from Article 1106 of NAFTA.

of the national treatment principle and the prohibition of quantitative restriction or under the investment chapter ISDS or both.

## 4.2        The GATS and services provided through establishment of 'commercial presence'

The GATT and, therefore, the TRIMs Agreement cover trade in all goods and thus subject all TRIMs on goods trade to the basic rules of national treatment and the prohibition on quantitative restrictions. However, the GATS has a different structure and only has similar effects once Members have made commitments to subject trade in services to the full force of the national treatment principle and thus to open up their market for services in whole or in part to foreign competition[134]. The GATS distinguishes between four so-called modes of providing services and the mode that is relevant for our discussion is the third mode, namely 'the supply of a service .... by a service supplier of one Member, through commercial presence in the territory of any other Member'[135]. This mode of service supply essentially operates by the establishment of a subsidiary or branch in another WTO Member and therefore constitutes an investment within the meaning of most definition clauses of most BITs.

It is obvious that, insofar as Members have made commitments for various service sectors in their schedules of commitments for services, this entails *ipso facto* that the various kinds of quantitative restrictions, which were habitually imposed by most States on many services sectors are no longer acceptable[136]. This shows that the quantitative limitations that were covered by Article XI:1 GATT are also covered by GATS, once commitments are given. In addition the applicability of the national treatment clause of GATS is automatically triggered as well by making a commitment for a certain service sector and thus this aspect of the TRIMs Agreement is also covered by GATS[137].

The difference between GATT and GATS where the regulation of foreign investment is concerned can be explained as follows. Under GATT and TRIMs investment in goods production is disciplined only indirectly, namely insofar as it has an influence on trade in goods. Under GATS investment in services <u>as such</u> is subjected to the most important provisions of that Treaty, but only insofar as Members have liberalized their services trade by making a commitment to observe national treatment. Attempts have been made to characterize GATS rules as pre-establishment rules and all other norms on the treatment of investment as true investment rules and on that basis to decide where to allocate disputes. Nevertheless, it is clear that there is potential overlap between the national treatment clauses of most BITs and the provisions on national treatment of services delivered by the third mode of commercial presence (at least insofar as services commitments have been made by Members).

## 4.3        TRIPs and intellectual property rights recognised as 'investments'

The TRIPs Agreement provides for a minimum harmonization of intellectual property rights even for those WTO Members which are not parties to (all) major world-wide intellectual property conventions. This level of minimum harmonization is subject to the classical GATT clauses of most-favoured nation and national treatment. Since intellectual property rights in general come under the definitions of 'investment' given in most BITs[138]. It is obvious that, therefore, there are considerable zones of overlap between the TRIPs Agreement and BITs as far as the protection and equal treatment of intellectual

---

[134] Such 'commitments' are the equivalent of tariff concessions under the GATT.
[135] Art. 1.1(c) of GATS.
[136] See Article XVI GATS, which lists the kinds of limitations that are no longer allowed after making a commitment
[137] See Article XVII GATS on national treatment
[138] See Article 1 (Definitions) in the Model Investment Agreement of France, the US, the Netherlands, Germany and India and Art. 2 of the Norwegian Model Treaty, see Martins Paparinskis ed., *op. cit. fn.* 26, at p. 45-53. See also Article X:3 CETA draft as published by the European Commission, *loc. cit. fn 38.*

property rights are concerned. The only (model) BIT so far that is dealing (partially) with this problem seems to be the 2012 US Model BIT[139].

# 5.  OVERLAPPING AREAS OF INTERNATIONAL TRADE LAW AND INTERNATIONAL INVESTMENT LAW: POSSIBLE SUBSTANTIVE AND PROCEDURAL CONFLICTS?

The preceding paragraphs have shown that there is considerable overlap between the substantive law of international trade and the substantive law of international investment.  It is evident that both fields of law can be seen as two sides of the same coin. Hence there is logic in treating them together in the same broad (trade) treaty and negotiating about these matters together in the process leading up to such treaty.

Both the overlap and the lack of it can generate problems. If there are conflicts between two provisions, one of trade law and the other of investment law, this will raise problems. This is likely to be relatively rare, since in international law, especially WTO law, there is a somewhat lamentable tendency to give a very restrictive interpretation to the notion of conflict between two treaty provisions[140]. But also a lack of overlap may cause problems, for instance if one body of law, namely trade law, contains exceptions (art. XX GATT; Art. XIV GATS; but no corresponding provision on TRIPs) that the other body of law, investment law, does not recognize or believes not to need at all[141]. These exceptions are generally seen as important guarantees safeguarding a reasonable measure of regulatory freedom of the WTO Members. Such overlap (or lack thereof) as between two bodies of substantive law can also generate clashes of jurisdiction between the dispute settlement mechanisms active in the two bodies of international law.

It is obvious that such problems are exacerbated, if the two subject matters are included in the same international agreement and it thus becomes possible to litigate matters in the field of services as an investment matter rather than as a trade matter, where the general exceptions of Article XIV GATS might be successfully invoked. Is that what negotiators intended? Perhaps not, but then it might be better to express that intention very clearly by introducing an exception like Article XIV GATS also in the investment chapter. In the field of TRIPs it is clearly necessary to demarcate which measures by a State will be regarded as TRIPs measures and which ones as investment measures. It may no longer be satisfactory to regard *all* intellectual property rights always as investments, as used to be normal in most BITs.

An easy way out for the arbitration courts handling respectively trade and investment disputes would be to argue that the two procedures are so different, one a State to State procedure and another an investor to State procedure, that it is not necessary to take these differences and contradictions into

---

[139] See Article 6.5 which states that certain practices with respect to intellectual property rights, such as *inter alia* compulsory licenses, are not to be considered expropriations, *loc. cit.* fn. 71.

[140] The tendency in the conflict clauses that rule the relation between the GATT and the Agreements on Trade in Goods and that between the WTO Agreement and many Agreements annexed to it is to define a conflict as the situation in which one obligation and another obligation from another agreement clash with each other and then only 'to the extent of the conflict.' It is, however, equally justified to regard a clash between a right and an obligation as a true conflict, even though one of the parties can forego his right, in order to accommodate the obligation of the other party. It would be to underestimate the importance of rights, if they were condemned to have to give way consistently to obligations.

[141] Indeed most BITS do not contain exception clauses comparable to Articles XX GATT and XIV GATS. For example, the Italian Model BIT contains no exception clauses. See Federico Ortino, 'Italy', *in:* Chester Brown (ed.), Commentaries on Selected Model Investment Treaties, Oxford: Oxford University Press 2013, 321. On the contrary, Article 4(2) of the Dutch Model BIT does contain a limited version of an exception clause. See Paparinskis, *op. cit. fn.* 26, at p. 522.

account. This could also be the attitude of the negotiators. This approach would pay insufficient attention to the fact that the investor to State procedure in the final analysis also rests on a State to State agreement and that the consequences can be largely comparable, namely that the State finds its regulatory autonomy considerably restricted.

In CETA, the parties have sought to prevent problems surrounding a possible uneven impact of exception clauses by creating a unified exceptions chapter (largely based on the wording of Article XX GATT) covering the whole agreement[142]. This is an example well worth considering in the framework of TTIP negotiations.

Finally it is important to point out that the remedies in the two procedures are very different. In the WTO and in most bilateral trade agreements, the emphasis is on compliance and there are compensation and trade retaliation as provisional remedies. The real objective is that parties carry out their obligations by complying with the ruling of the arbitrators, since only that ensures that obstacles to trade stay at the agreed level and that is the level at which welfare and competitive consequences of the agreement reach their maximum agreed effect. The logic of the remedies of investment agreements or investment chapters in a trade agreement is totally different. There it is assumed that irreparable damage has already been done to an investor and he must be fully compensated: thus the emphasis is not on compliance (*restitutio in integrum*) but on damages. It is not excluded that compliance and *restitutio in integrum* should also become the first line remedy in investment disputes. This may have the advantage that the investor could return to his investment. For property claims, at least, such return to the *status quo ante*, has been introduced in CETA[143].

## 6.    FOREIGN DIRECT INVESTMENT AS PART OF EXCLUSIVE EU COMPETENCES

The section on how international investment law and the law of international trade became interlinked also explains the logic behind making foreign direct investment part of the trade policy power of the EU. Since TRIMs were part of the trade in goods agreements of the Uruguay Round, this segment of foreign direct investment was part of the exclusive commercial policy powers of the Union in the view of the ECJ as from the beginning of the WTO[144]. After the Treaty of Nice, it was clear that foreign direct investment in services was also part of the exclusive commercial policy powers of the Union. Hence there were only rather limited aspects of foreign direct investment, both in goods production and in services (in particular transport services) still outside the Union's exclusive power in the trade domain, when the negotiations for a Constitution for Europe started. It was on this basis that the Constitutional Convention decided that it was rational to make all of foreign direct investment a subject of the common commercial policy[145]. The Inter-Governmental Conference did not change that in the end, although there was resistance from some Member States, and it was not changed in the Lisbon Treaty either[146].

---

[142] See CETA Investment text as published by the European Commission, *loc. cit.* fn 38, p. 20.

[143] Article X.36 (b) CETA Draft, as published by the European Commission, *op. cit. fn.* 38.

[144] See Opinion 1/94 (WTO Agreements), 1994 ECR I-5267, paras 84-86.

[145] Jan Ceyssens, 'Towards a Common Foreign Investment Policy? – Foreign Investment in the European Constitution', 2005 (3) 32 Legal Issues of Economic Integration 259, pp. 269 ff.

[146] See the proposed Treaty Establishing a Constitution for Europe Article III-217 and the Treaty of Lisbon Amending the Treaty on European Union and the Treaty Establishing the European Community (Lisbon Treaty) Article 158, consolidated into Article 207 TFEU.

The main controversial point, when the discussions about the implementation of the new Article 207 started, was whether portfolio investment could be seen as an integral part of the term foreign direct investment[147]. There are indeed good arguments to say that portfolio investment is normally not included in foreign direct investment and is therefore not covered by the exclusive trade policy powers of Article 207; especially the word 'direct' is an arguable obstacle to that. There is no doubt on the other hand that portfolio investment is covered by the free movement of capital with third countries and thus by the regulatory powers under Article 64 TFEU. Then again the Member States in the Council could refuse to use these non-exclusive powers and demand that EU BITs and trade agreements containing investment chapters should be concluded as mixed agreements. That would go straight against their intention as *'Herren der Verträge'* to create a single comprehensive trade policy article that would cover all the aspects, including investment, of this policy. The considerable number of cases on the delimitation between EU powers and remaining Member State powers in the field of external action, and the common commercial policy powers in particular, which is presently pending before the Court of Justice, seems to indicate that Member States in the present political climate are attempting to roll back part of the *acquis communautaire* and to delay or halt the full implementation of the Lisbon Treaty in this field. Thus far the Court has proved to be resistant to these attempts precisely in respect of the common commercial policy and has handed the Council and the Member States three resounding defeats.[148] It is likely that the Court will also have to decide on the scope of the notion of "foreign direct investment" sooner rather than later.

## 7. CONCLUSION

Modern Bilateral Investment Treaties are the result of a mix of elements on the one hand from the nineteenth and early twentieth century tug of war about how aliens and their property and investments should be treated by their host countries and protected by their countries of nationality and on the other hand from commercial arbitration. The first movement resulted in establishing the notion of an international minimum standard that, even though it always remained contested, acquired clear dominance, especially in treaty practice after the Second World War. Such treaty practice initially held on to State –State dispute settlement in case of a conflict between the parties. The second movement injected elements of avoidance of national judicial systems, direct participation of affected individuals and companies, and new elements of execution into the mix. As a third element in the mix there emerged a number of dispute settlement treaties or centres, such as the treaty-based UNCITRAL rules and the treaty based ICSID, but also the more informally constituted ICC of Paris, the LCIA of London and the Stockholm Institute of Arbitration, which could be used for the settlement of investment disputes.

This led to the type of modern BIT that has become dominant, with progressively refined provisions, first between developed and developing countries and later also between countries at the same or nearly the same level of development. Their objectives varied with the parties, initially strongly

---

[147] The discussion in the literature on the questions on the interpretation of the term foreign direct investment in Article 207 was sometimes highly partisan and also driven by the interests of private law firms that were traditionally involved in international investment litigation. Fairly balanced accounts have been produced by Dimopoulos and Bungenberg. See Angelos Dimopoulos, 'The Validity and Applicability of International Investment Agreements Between EU Member States under EU and International Law', 48 (2011) Common Market Law Review, 63, and Marc Bungenberg. The Division of Competences between the EU and its Member States in the Area of Investment Politics', in Marc Bungenberg , Joern Griebel and Steffen Hindelang (eds.), *International Investment Law and EU Law*, Heidelberg, New York, Springer 2011, 29 - 42..

[148] See Cases C-414/11 *Daiichi-Sankyo and Sanofi-Aventis* (scope of 'trade-related intellectual property rights' under Article 207 TFEU) *C-137/12 Commission v Council*  (scope of 'services' under Article 207 TFEU) and C-114/12 *Commission v Council* (Article 3(2) TFEU and exclusive external competence of the EU).

development oriented, aiming at the stimulation of the export of capital to developing countries, later more matter of fact, avowing explicitly the mutual protection of investments as an objective and, in some recent instances, showing concern for the State's right to regulate.

Modern BITs fall into two parts: substantive provisions and dispute settlement provisions. The substantive part of modern BITs contain a large number of identical or near identical provisions: definitions, National Treatment, MFN treatment, Fair and Equitable Treatment and Full Protection and Security, a so-called Umbrella clause, free transfer of capital and free transfer of funds, criteria for nationalization or expropriation, the consequences of war, national emergencies and civil unrest, and finally on the criteria for the level of compensation. In the paper all these provisions have been briefly explained and analysed. The dispute settlement clauses of modern BITs are mostly characterized by a direct right of the aggrieved investor to go for international arbitration. In some instances (mostly older BITs) the exhaustion of local remedies is still maintained, although in many instances it is linked to a maximum period, after which the right to international arbitration becomes available to the investor. Some of these provisions have become controversial over time and appear to be in need of improvement. Such improvement is already apparent in the most recent BITs and Model BITs, including the draft investment chapter of the Comprehensive Economic and Trade Agreement (CETA) between the EU and Canada.

After this largely descriptive part the paper analyses how international investment protection became interlinked with international trade law, in the end to such an extent that foreign direct investment became part of the common commercial policy powers, which fall under the exclusive competences of the EU. It turns out that investment was already part and parcel of the failed post-war International Trade Organization treaty. Moreover, certain investment measures had strong trade consequences that were already recognized and condemned by the GATT dispute settlement mechanism. These practices were codified as forbidden in the TRIMs Agreement that was part of the WTO package.

Investment protection clauses now turn up more and more in comprehensive bilateral trade agreements. This creates overlap between trade provisions and investment provisions of the same agreement and potential clashes of jurisdiction and, as such may cause a number of problems that need to be carefully taken account of, when drafting such agreements. This also applies to TTIP. The co-existence of trade provisions and investment protection clauses in the same treaty has to be carefully managed, as there can be considerable overlap between the latter and provisions laying down performance requirements which can be seen as trade measures forbidden under national treatment, as well as provisions relating to liberalization of trade in services through the establishment of subsidiaries or branches or trade-related intellectual property measures. In addition different exceptions relating to trade and to investment provisions of the treaty (and even the absence of the latter) may cause painful surprises. This is of particular importance in dispute settlement, for which there must be normally two different procedures, one for trade and one for investment, plus in the background the WTO dispute settlement procedure. All this requires very careful technical legal work in order to avoid needless conflicts or unexpected and unwanted outcomes. A lot of work on this has been done already in the framework of the negotiations on CETA between Canada and the EU and it would be indicated to take over some of the results of that work and perfect it further, where necessary.

Are all these technical complications worth the trouble in order to have an EU-US treaty that covers both trade and foreign investment? Can't we leave out the investment protection part? Is that really necessary between two entities that have been making huge investments in each other's territory without great complications for a long time? Are there really such serious problems in the judicial systems on both sides of the Atlantic that a dispute settlement provision with direct access to international arbitration for investors is necessary?

If one looks at the actual investment disputes brought so far, one is struck by the fact that many procedures have been brought by mid-size investors and even individuals. It would seem that they derive a certain assurance from the existence of these treaties and derive a remedy from it, if necessary. All lawyers who have worked within governments or have started procedures against them know that even the best-organized and seemingly humane governments are capable of acting surprisingly often with great callousness and wantonness against private interests that are somehow seen as not belonging to the normal constituency of that government. And if an element of 'strangeness' is put in the mix, even judicial authorities of countries with highly developed judicial systems turn out to be capable of producing a miscarriage of justice. The EU may have its Bulgaria and Romania, where the judicial system is still under special scrutiny under certain post-accession procedures, the US has its Mississippi, where a Canadian investor was hounded out of the state under pressure of a jury trial that defies description[149]. In short, it is likely that all States have their Bulgaria, Romania, or Mississippi.

The questions about the need of an investment protection treaty between two entities like the EU and the US are certainly legitimate, but it is also too easy to dismiss that need in a facile flush of self-satisfaction about the functioning of our judicial systems on both sides of the Atlantic.

---

[149] See Loewen v US, ICSID case ARB98/03.

# Bibliography

Justus Alenfeld, *Die Investitionsförderungsverträge der Bundesrepublik Deutschland*, Frankfurt am Main, Athenäum Verlag GmbH 1971.

Andrea K. Bjorklund, 'National Treatment', *in:* August Reinisch, *Standards of Investment Protection,* Oxford, Oxford University Press 2008, 29.

Gary B. Born, *International Arbitration. Law and Practice,* Alphen aan den Rijn, Kluwer Law International 2012.

Naboth van den Broek, 'Protection of Investors in International Trade and Investment Regime: A Practical Comparison', *in:* Jorge Huerta-Goldman, Antoine Romanetti and Franz Stirnimann (ed.), WTO Arbitration, Investment Arbitration, and Commercial Arbitration, Alphen aan den Rijn, Kluwer Law International 2013.

Chester Brown, 'The Development and Importance of the Model Bilateral Investment Treaty',*in:* Chester Brown (ed.), Commentaries on Selected Model Investment Treaties, Oxford, Oxford University Press 2013, 1.

Marc Bungenberg and Christoph Hermann (eds.), *Common Commercial Policy After Lisbon*, Heidelberg, New York, Springer 2013.

Andrea Carska-Sheppard, 'Issues Relevant to the Termination of Bilateral Investment Treaties', 26 (2009) 6 Journal of International Arbitration, 755.

Jan Ceyssens, 'Towards a Common Foreign Investment Policy? – Foreign Investment in the European Constitution', 2005 (3) 32 Legal Issues of Economic Integration 259.

Angelos Dimopoulos, 'The Validity and Applicability of International Investment Agreements Between EU Member States under EU and International Law', 48 (2011) Common Market Law Review, 63.

Rudolph Dolzer and Christoph Schreuer,*Principles of International Investment Law,* Oxford, OUP 2008

Rudolf Dolzer, 'Fair and Equitable Treatment: Today's Contours', 12 (2013) Santa Clara Journal of International Law, 7, pp. 16-31.

Rudolph Dolzer and Christoph Schreuer, *Principles of International Investment Law,* Oxford, Oxford University Press 2008.

Rudolf Dolzer and Yun-i Kim, 'Germany', *in:* Chester Brown (ed.), *Commentaries on Selected Model Investment Treaties*, Oxford, Oxford University Press 2013, p. 287.

European Commission, 'Communication from the Commission to the Council, the European Parliament, the European Economic and Social Committee and the Committee of the Regions. Towards a Comprehensive European International Investment Policy', (Communication), COM (2010) 343 final, *available at:* http://trade.ec.europa.eu/doclib/docs/2011/may/tradoc_147884.pdf

Tarcisio Gazzini, 'Bilateral Investment Treaties', *in:* Tarcisio Gazzini and Eric de Brabandere (ed.), *International Investment Law. The Sources of Rights and Obligations,* Leiden/Boston: Martinus Nijhoff Publishers 2012, 99.

Robert Ginsburg, 'Political Risk Insurance and Bilateral Investment Treaties: Making the Connection', 14 (2013) 6 Journal of World Investment & Trade, 943.

Chiara Giorgetti, 'Is the Truth in the Eyes of the Beholder? The Perils and Benefits of Empirical Research in International Investment Arbitration', 12 Santa Clara Journal of International Law 2013, 263.

Jorge Huerta-Goldman, Antoine Romanetti and Franz Stirnimann, WTO Arbitration, Investment Arbitration, and Commercial Arbitration, Alphen aan den Rijn, Kluwer Law International 2013.

Robert Jennings and Arthur Watts (eds.), *Oppenheim's International Law*, 9th ed. London, Longman 1993

Herbert Kronke, 'Introduction: The New York Convention Fifty Years on: Overview and Assessment', *in:* Herbert Kronke , Patricia Nacimiento , et al. (eds), *Recognition and Enforcement of Foreign Arbitral Awards. A Global Commentary on the New York Convention*, Alphen aan den Rijn, Kluwer Law International 2010.

Pieter Jan Kuijper, "It shall contribute to the strict observance and development of international law…." The Role of the Court of Justice, in: "The Court of Justice and the Construction of Europe. Analyses and Perspectives on Sixty Years of Case Law, The Hague, T.M.C. Asser Instituut 2013, 589.

Multilateral Investment Guarantee Agency, *Commentary on the Convention Establishing the Multilateral Investment Guarantee Agency*, available at: http://www.miga.org/documents/commentary_convention_november_2010.pdf.

Timothy G. Nelson, *Going Dutch – the Many Virtues of the Dutch Model BIT,* Dispute Resolution International Vol. 6 No. 2 October 2012, 161.

Andrew Newcombe and Lluís Paradell, *Law and Practice of Investment Treaties. Standards of Treatment*, Alphen aan den Rijn, Kluwers Law International 2009.

Federico Ortino, 'Italy', *in:* Chester Brown (ed.), Commentaries on Selected Model Investment Treaties, Oxford, Oxford University Press 2013, 321.

Roos van Os and Roeline Knotnerus, *Dutch Bilateral Investment Treaties. A Gateway to 'Treaty-Shopping' for Investment Protection by Multinational Companies,* Amsterdam, SOMO 2011.

Martins Paparinskis (ed.), *Basic Documents on International Investment Protection,* Oxford and Portland, Hart 2012.

Antonio R. Parra, *The History of ICSID,* Oxford, Oxford University Press 2012.

Alan Radfern, Martin Hunter and others, *Law and Practice of International Commercial Arbitration*, London, Sweet & Maxwell 2004.

Rupert Reece, Alexis Massot and Marie-Hélène Bartoli, 'Searching for the Applicable Law in WTO Litigation, Investment and Commercial Arbitration', *in:* Jorge Huerta-Goldman, Antoine Romanetti and Franz Stirnimann (ed.), WTO Arbitration, Investment Arbitration, and Commercial Arbitration, Alphen aan den Rijn, Kluwer Law International 2013, 199.

August Reinisch, 'Austria', *in:* Chester Brown (ed.), Commentaries on Selected Model Investment Treaties , Oxford, Oxford University Press 2013, 15.

August Reinisch, *Standards of Investment Protection,* Oxford, Oxford University Press 2008, at p. 11.

Catherine Rogers, 'The Politics of International Investment Arbitrators', 12 Santa Clara Journal of International Law 2013, 223

Jeswald W Salacuse, *The Law of Investment Treaties,* Oxford, Oxford University Press 2010.

M. Sornarajah, *The International Law on Foreign Investment (Third Ed.),* Oxford, Oxford University Press 2010, p. 213

Jacob Stone, 'Arbitrariness, the Fair and Equitable Treatment Standard, and the International Law of Investment', 25 (2012) Leiden Journal of International Law 77, 82.

Surya P. Subedi, *International Investment Law. Reconciling Policy and Principle,* Oxford, Portland, Hart Publishers 2008.

UNCTAD, *World Investment Report 2013. Global Value Chains: Investment and Trade for Development* (2013), available at: http://unctad.org/en/publicationslibrary/wir2013_en.pdf (last accessed 21 May 2014).

Kenneth J Vandevelde, *Bilateral Investment Treaties. History, Policy and Interpretation*, Oxford, Oxford University Press 2010

Annemarieke Vermeer-Künzli, 'Restricting Discretion: Judicial Review of Diplomatic Protection', 75 (2006) Nordic Journal of International Law 279.

# PART II: STUDY ON INVESTOR-STATE DISPUTE SETTLEMENT ('ISDS') AND ALTERNATIVES OF DISPUTE RESOLUTION IN INTERNATIONAL INVESTMENT LAW

*by Dr Steffen Hindelang[1]*

## Abstract

Investor-State Dispute Settlement (ISDS) is a useful means of enforcing substantive investment protection standards contained in international investment agreements. The mechanism should therefore continue to form part of European international investment policy. However, the EU has to address four major challenges tied to this dispute settlement tool, i.e. (1) mitigating inconsistency, (2) securing the right balance between private and public interests, (3) establishing integrity of arbitral proceedings and (4) preventing misuse, allowing for error-correction and managing financial risk associated with ISDS.

Among others, this study suggests (1) strengthening the role of the state parties to international investment agreements, (2) establishing an appeals facility, (3) giving well-functioning domestic court systems an adequate role in resolving investor-state disputes by introducing a novel elastic local remedies rule and (4) considering the implementation of tenured judges; at least on an appeals level.

## 1.    EXECUTIVE SUMMARY

### 1.1        The universe of investor-state dispute settlement (ISDS) mechanisms

ISDS mechanisms vary in terms of access, procedure and consequences of a breach of a substantive standard – such as fair and equitable treatment – contained in an investment instrument[2], as well as in respect of enforcement of an award. Nonetheless, they display features roughly common to all:

The investor can – due to a general consent of the host state given in the investment instrument and independent from its home state – initiate international arbitral proceedings against a host state. In doing so the investor may challenge its host state's measures on the grounds that they were incompatible with the substantive standards in the investment agreement. These measures typically accrue from the exercise of public authority of the host state and can be executive, legislative or judicial in nature. Usually, three ad-hoc arbitrators – two party-appointed, the third appointed in consensus or, in lieu thereof, by a third person – sit on a case. If a violation of a substantive standard can be established, an enforceable remedy – mainly pecuniary – is awarded. An arbitral tribunal's decision is binding on the host state and, in principle, final. It can be challenged only on exceptional grounds. An appeals facility is currently not provided for.

---

[1] This study is one out of a series of three interrelated studies dealing with the European international investment policy. The author would like to thank Prof. Dr Dr h. c. Ingolf Pernice and Prof. Dr Pieter Jan Kuijper for their cooperation and wishes to express his gratitude to cand. iur. Pauline Brosch, stud. iur. Daniel Ncube, and cand. iur. Sebastian Schreiber for their highly appreciated editorial support.
[2] For the purpose of this study, the term 'investment instrument' refers to treaties relating to the protection of foreign investment concluded by states or the EU with other states or international organisations in public international law, such as bilateral or regional investment (protection) treaties or investment chapters in so-called comprehensive free trade agreements.

## 1.2        Virtues of ISDS

ISDS *as a concept* is prescribed as one of the most effective tools to manage political risk and to promote the international rule of law (below 2.2.1 (p. 52)). By largely replacing state-driven enforcement mechanisms in public international law, ISDS renders substantive commitments in investment instruments more credible and contributes towards a de-politicisation of investment disputes (below 2.2.2 (p. 54)). Mainly developing states have signed up to international investment instruments with the expectation it would facilitate attracting foreign investment (below 2.2.3 (p. 55)).

ISDS' contribution to the promotion of an international rule of law should be stressed in particular. Bilateral and regional investment protection treaties can be viewed as the extension of a century-old idea within public international law: that everyone is entitled to a minimum standard of treatment abroad at any given time. ISDS is a key mechanism to hold an investor's host state accountable for conduct falling short of certain standards without having (largely) to rely on domestic judicial relief, which might be unavailable precisely then when it is desperately needed.

## 1.3        Conquering challenges associated with ISDS

Critique of ISDS is as old as the system itself. Lately, though, criticism has reached also the middles of those societies which commonly supported robust investment protection backed up by strong ISDS mechanisms.

### 1.3.1        Mitigating inconsistency

ISDS practice has been criticized by civil society, academia and even by business organisations for *not producing consistent and predictable outputs* so that especially host states lack guidance on their obligations accepted under a certain investment instrument.

'*Inconsistency*' in decision making in ISDS *is, first and foremost, the result of the current state of international investment law*, atomized into over 3.000 investment instruments and dozens of arbitration rules. Arbitral awards are rendered on the basis of similarly worded but legally hardly comparable investment instruments. One must, hence, be careful not to compare apples with oranges when drawing parallels between arbitral awards handed down on the basis of different investment instruments. Overall, it appears to be more appropriate to speak of *fragmentation* instead of 'inconsistency' of ISDS practice (below 2.3.1 (p. 59)).

#### 1.3.1.1        Long-term: true multilateralisation

While a *multilateral investment agreement with a centralised dispute resolution mechanism and/or appeals facility* replacing the over 3.000 bilateral or regional investment instruments might be well suited to counter current 'inconsistency' concerns and should, therefore, be a long-term goal, political prospects of such a proposal currently appear to be dim (below 2.3.1.1 (p. 61)).

#### 1.3.1.2        Short- and medium-term: strengthening the role of the state parties; establishing an appeals facility

Investment tribunals themselves want to advance 'consistency' by way of '*de facto precedent*' and similar concepts, i.e. relying on previous rulings by other arbitral tribunals for interpreting an investment instrument. Attractive as it may be at first glance, such concepts seem *highly problematic* when sidestepping the binding methodology of interpretation in public international law enshrined in the Vienna Convention on the Law of Treaties (VCLT). By abandoning this methodology, a tribunal frees itself from the bonds of its masters: the state parties to the treaty as the legitimate guardians of the common good (below 2.3.1.2 (p. 66)).

State parties have largely been inactive in continuously monitoring the interpretation of investment instruments. The EU and its treaty partners should consider taking a proactive approach in their investment instruments (below 2.3.1.3 (p. 69)) by endowing these with

- a *treaty committee*[3], staffed with representatives of all state parties, which perpetually monitors ISDS practice and puts forth authoritative[4] interpretations of the provisions of the investment instrument if perceived necessary and, in addition,

- a *preliminary reference procedure* to provide authoritative interpretation or a *mandatory review procedure for draft awards*, conducted with a view to preserving consistency in interpretation.

As long as there is no multilateral agreement on substantive standards in international investment law, the consistency effect of an appeals facility would be limited to the individual investment instrument. However, if a rather large number of claims on the basis of a single EU investment instrument – such as the TTIP – is expected, the EU should seriously consider, right from the outset,

- the establishment of an *appeals mechanism* in order to correct erroneous awards and secure consistency in interpretation (below 2.3.1.1.2 (p. 64)).[5]

While *less openly drafted substantive standards* in investment instruments can contribute to *some predictability* of outcomes in ISDS, not each and every possible contentious constellation can be anticipated. Furthermore, the more detailed international investment instruments become, the *less flexible* they are to adapt to later shifts in policy priorities. In contrast, the more openly phrased they are, the more room is left for adjudicative bodies to put forward interpretations which may not match the mutual intentions of the state parties or contradict previous decisions on the basis of the same agreement (below 2.3.1.5 (p. 77)).

Other tools such as the *consolidation* of different claims involving similar questions of law and fact (below 2.3.1.4 (p. 71)) also appear suitable to cushion inconsistency concerns but equally entail drawbacks.

## 1.3.2    Securing the 'right balance' between private and public interests

Investment tribunals deal with *highly sensitive political issues* in host states. They are asked to rule on the introduction of cigarette plain packaging, nuclear power phase-outs or crisis-related austerity measures. High-profile cases contribute towards the growing *perception,* especially among members of civil society but also in some state governments and academia, *that ISDS practice is unduly interfering with democratic policy choices.*

These fears have been gathering momentum as tribunals have, for some time, had to face reasonable questions of whether they are willing and able to sufficiently take into account public interests such as human rights, financial stability, environmental protection, public health or others.

---

[3] A treaty committee may be established to specifically monitor ISDS practice evolving from a given investment instrument. In the context of a comprehensive trade agreement, such a task may be attributed to a 'general' treaty committee or a sub-committee charged with the task to perpetually monitor the implementation of the said treaty or parts of it.

[4] There is some confusion in legal literature as to the precise meaning of the term 'authoritative' interpretation. For the purpose of this study it shall refer to a (joint) interpretation of a treaty in public international law, *binding* beyond an individual case, issued by the state parties to this agreement or a treaty committee charged with such a task.

[5] In such situations a preliminary reference procedure to seek authoritative interpretation or a mandatory review procedure for draft awards would not necessarily be required.

*Securing the 'right balance'* – i.e. preserving space for democratic policy choices and, simultaneously, respecting private property interests – has, among others, been at the centre of the ongoing reform debate on ISDS.

*Abandoning ISDS* provided for in international agreements *entirely and replacing it* by domestic courts (below 2.3.2.2.1.1 (p. 76)), arbitration based on investor-state contracts or national legislation (below 2.3.2.2.1.2 (p. 78)), diplomatic protection, state-state arbitration (below 2.3.2.2.1.3 (p. 80)) and/or non-binding dispute resolution mechanisms (below 2.3.2.2.1.4 (p. 81)) is seemingly *not an attractive option for the EU*.

Rather, ISDS should be *re-adjusted* with a view to securing preservation of the 'right balance' the state parties – and not subsequently the tribunals – struck when they concluded the investment instrument. However, states should be aware that making an appeal to tribunals to treat the issue of balancing private and public interests with 'more caution' might not suffice to sustainably address the issue.

### 1.3.2.1  Drafting treaty texts more precisely, strengthening authoritative interpretation by state parties

*Providing explicitly for public objectives* considered important to the state parties in the preamble or elsewhere in an investment treaty helps preserving the intended balance between private and public interests. This way, tribunals have not to engage in looking for such objectives beyond the investment instrument itself; a task in which they have not been overly successful as yet. However, taking public interests into consideration and balancing them with private interests does not say anything about the weight given to each of them. This would require *further specification* in an investment instrument if not intended to be left to tribunals.[6]

Turning to the post-ratification period, arbitral tribunals have not always faithfully followed the binding international rules on treaty interpretation. Instead, some tribunals superposed the rules on interpretation contained in the VCLT by a highly problematic 'system of de facto precedent' which is basically backward looking, path-dependent and prone to repeating old mistakes. In the worst case, the balance reached in treaty negotiations between private and public interests might be distorted or even replaced by a new one struck by the arbitrators.

To hedge in (to some extent) power-seizing processes inherent in treaty interpretation by ad-hoc tribunals, state parties should make use more extensively of a *treaty committee*[7], as outlined before. If necessary, authoritative interpretative notes could be issued; even with regard to ongoing arbitrations. Such interpretation would have to be taken into consideration by tribunals (below 2.3.2.2.2.1 (p. 83)).

Further tools which lend themselves for securing the 'right balance' between private and public interests comprise, inter alia, the redrafting of substantive standards (below 2.3.2.2.2.2 (p. 86)) and the restriction or delay of access to ISDS (below 2.3.2.2.2.3 (p.87)). In respect of the latter, a novel elastic exhaustion of local remedies rule in particular appears to be central to preserve the 'right balance' between private and public interests.

---

[6] Achieving such aims presupposes, of course, that the state parties succeed in clarifying the scope of the substantive standards and, furthermore, that tribunals would abide by the more detailed directions given by the state parties.
[7] On the notion of 'treaty committee' see above footnote 3.

### 1.3.2.2 Introducing a novel elastic local remedies rule

In contrast to other areas of public international law, in international investment law an investor is hardly required to exhaust local remedies before resorting to ISDS ('local remedies rule'). This has rendered ISDS an alternative to national courts, a circumstance which sits uncomfortably with international investment law's original idea, i.e. the notion of ISDS as a backup for foreign investors in case legal remedies available in the host state fail to provide sufficient protection.

This overall development does not sufficiently reflect the advantages of resorting to local courts before initiating international arbitration. Moreover, it seems to operate on the questionable assumption that all domestic legal systems are more or less the same: biased, inefficient and incapable of guaranteeing a sufficient level of protection for foreign investment.

*Regarding the advantages of resorting to domestic courts* (below 2.3.2.2.2.3.2.1 (p. 88)): domestic courts, at least in developed legal systems with a strong rule of law[8], may operate in a legal environment more *consistent and predictable* than current ISDS practice. Also, in contrast to the current ISDS model, *erroneous decisions can be corrected* by appeals mechanisms. Furthermore, domestic courts can, under certain circumstances, provide a *single forum* in which the dispute is adjudicated in respect of both whether the host state measure was in compliance with domestic laws and the international commitments of the host state. Even if domestic courts are prevented from directly applying an international investment instrument, this would still be no argument against their involvement prior to ISDS. Protection against misuse or abuse of governmental powers is a standard feature of domestic law. At least in advanced systems, the standard should *generally* not fall below what is offered in international investment law.

These may not be the only advantages of prior involvement of domestic courts: when states are worried that investment tribunals do not pay sufficient attention to public interests in the process of balancing them with private property interests, domestic courts might be better suited to take a first shot. Domestic courts are experienced in considering an investment case against the background of the whole domestic legal system. This system mirrors the elaborate, complex and refined balance of private and public interests agreed to in the host state. Domestic courts may be in a better position to comprehensively appreciate this balance than arbitral tribunals.

If the domestic court fails to resolve the dispute to the satisfaction of the investor and the latter initiates investment arbitration, a tribunal may benefit from the 'pre-processing' of facts and the (domestic) law. Especially the domestic court's treatment of its domestic law can inspire the tribunal's holdings to the extent that it conforms to the investment instrument. Overall, such arbitral awards might be closer to the consensus present in the host state and, hence, may be more easily accepted and perceived as legitimate by the public in that state. Ultimately, it would render ISDS what it was actually meant to be: a safety net present in the event of a failure of the domestic system; not an alternative to it.

Certainly, possible virtues of taking recourse to domestic courts before resorting to investment arbitration may vary significantly across national jurisdictions and would hold true generally only for advanced legal systems. The EU should make concessions to the fact that domestic jurisdictions exhibit different levels of development.

---

[8] Factors indicating a strong rule of law might relate, inter alia, to effective constraints on government powers, the absence of corruption, open government essential for effective public oversight, strong fundamental rights and assurance of security of persons and property.

State practice on investment treaty negotiation shows that it is possible to negotiate investment agreements which differentiate between states and their level of development. Insofar concerns that we might see a 'race to the bottom' in terms of the general level of protection advanced by investment instruments can be allayed.

On a pragmatic level, treaty negotiators would be well-advised to go beyond the classic option of merely deciding in favour of or against a local remedies rule in an investment instrument. Opting for a treaty stipulation prescribing a fixed time period in which the investor is obliged to pursue domestic remedies before proceeding to arbitration on an international level might also not be the ideal solution; such a regulation does not do justice to the diversity of legal issues at stake in investment conflicts. If one were to allow investors to initiate investor-state arbitration prior to expiry of the fixed time period prescribed in the local remedies rule by arguing that the domestic system falls short of certain criteria – which should be previously specified in an investment instrument – one would very carefully need to evaluate the 'intrinsic' motivations of those who shall be charged with deciding over such an investor's plea.

Instead, one should consider an *elastic time period for pursuing local remedies.* This time period would be *attached to a third-party index measuring the potential of domestic courts to produce effective solutions to claims of (foreign) investors.* A 'low-ranking' domestic legal system would lead to a waiver of the local remedies rule. Significant improvements in the rule of law in a state would result in an increasing involvement of local courts and vice versa.

Such an approach would, first, signal that *no formal distinction is made between developed and developing states* and, hence, tribute is paid to the notion of formal equality of states. At the same time, second, such a *rule would* also *recognise* that there are *factual differences between states.* Such a local remedies rule would even allow for flexibility within one agreement without having to compromise the idea that both state parties to a treaty are bound by the same rules. (below 2.3.2.2.2.3.2.2 (p. 90))

### 1.3.2.3    Reflecting critically on other suggested policy tools

Another tool states have already deemed appropriate to preserve their policy space better is to limit remedies in ISDS to pecuniary remedies. However, whether this instrument is indeed effective or rather counterproductive has yet to be critically assessed (below 2.3.2.2.2.3.2.2 (p. 90)). Likewise, in order to give sufficient weight to public interests in investment arbitration, some observers suggest allowing for host state claims. While this idea has some merit it also encounters several difficulties which might offset the advantages (below 2.3.2.2.2.5 (p. 95)).

Since the interpretation of an investment instrument in ISDS, especially when containing novel or innovative clauses is difficult to predict, it is essential to preserve some flexibility for future changes without having to renegotiate the whole agreement. *Review periods and/or termination clauses specific to certain investment provisions and ISDS clauses would lend themselves to control treaty practice better.* (below 2.3.2.2.2.6 (p. 96)).

### 1.3.3    Establishing integrity of arbitral proceedings

When allowing international tribunals to review administrative, judicial and legislative acts of host states, the public in these states has a vital interest in securing the integrity of the proceedings. However, ISDS has largely been carried out behind closed doors and arbitral awards are not published by default. Only lately criticism has mounted in Europe that this is not acceptable anymore. *Clear improvements in terms of transparency* can already be witnessed in EU draft agreements or negotiating directives (below 2.3.3.1 (p. 98)).

Another serious matter of concern is the alleged *appearance of bias of arbitrators and arbitration institutions* in favour of investors. If one subscribes to the view that not only justice must be done, but it must also be seen to be done, overcoming this issue without significantly altering the current system of ad-hoc nominated arbitrators will prove challenging (below 2.3.3.2 (p. 100)).

### 1.3.4    Preventing misuse, allowing for error correction, managing financial risks

Like any other litigation or commercial arbitration instrument, ISDS also carries in it the potential for misuse. Investors might restructure their investments after a dispute arose in order to take advantage of the protection offered by a certain investment instrument (below 2.3.4.1 (p. 105)). Furthermore, initiating investment arbitration without having a substantiated case can form a tool to pressure host states into compromises to which they would otherwise not have agreed to (below 2.3.4.2 (p. 107)). Mechanisms to prevent such behavior are accessible to treaty drafters. To which extent they are employed largely depends on political priorities.

Given the issues at stake in investor-state arbitration, investment instruments should also provide for sufficient safeguards to correct erroneous decisions. Current agreements hardly provide for meaningful correction mechanisms. The creation of an appeals facility could open up the possibility to correct errors of law and fact. In light of the considerable public interests at issue it can hardly be argued that poorly reasoned or erroneous decisions would be more acceptable than (slightly) prolonged proceedings (below 2.3.5 (p. 107)).

Last but not least, the financial risks involved in ISDS (below 2.3.6 (p. 109)) – in terms of both arbitration costs and the amount of damages awarded – are significant. Tools to improve predictability of costs and control these risks better – at least to some extent – are available but would involve respective policy choices.

# 2. ANALYSIS

## 2.1 Introduction

International investment law is *at a crossroads*: rising numbers of investor-state-disputes and newly signed investment agreements suggest the *continuous importance and attractiveness* of this field of law. In 2012, 58 new investor–state claims were filed, the highest number of disputes ever registered in one year, confirming foreign investors' steadily increasing reliance on this system[9]. Equally, bilateral investment agreements (BITs) and so-called comprehensive free trade agreements (FTAs), which include chapters on investment, enjoy continuing popularity and support among many state governments around the globe. Recent events, such as the accession of Canada to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (ICSID-Convention)[10], the inclusion of an investment protection chapter in the negotiation agendas of both the EU and the USA on the Transatlantic Trade and Investment Partnership (TTIP)[11], that of the EU and Canada on the Comprehensive Economic and Trade Agreement (CETA)[12] as well as the opening of negotiations between the EU and China on an investment agreement highlight this trend[13].

At the same time, *contestations* are also growing: Some countries, such as South Africa[14] or Indonesia[15], have not renewed or have even terminated existing BITs while others, such as Ecuador, have withdrawn from the ICSID-Convention[16]. In addition, high-profile cases against industrialised countries such as the pending arbitrations in matters of *Vattenfall v. Germany*[17], *Philip Morris v. Australia*[18], or *Eli Lilly v. Canada*[19] lead to continuously growing public opposition to investor-state dispute settlement by way of ad-hoc arbitration (ISDS). Calls by governments[20], civil society[21], think

---

[9] Note that not all arbitrations initiated might be publicly known. UNCTAD, *World Investment Report 2013*, p. 110. In 2013, at least 57 arbitrations were initiated. Cf. UNCTAD, *Recent Developments in Investor-State Dispute Settlement (ISDS)*, IIA Issues Note 2014/1, available at http://unctad.org/en/PublicationsLibrary/webdiaepcb2014d3_en.pdf (visited 28 April 2014).

[10] https://icsid.worldbank.org/ICSID/ICSID/RulesMain.jsp (visited 28 April 2014).

[11] http://ec.europa.eu/trade/policy/in-focus/ttip/ (visited 28 April 2014).

[12] http://ec.europa.eu/trade/policy/countries-and-regions/countries/canada/ (visited 28 April 2014).

[13] EU-China 2020 Strategic Agenda for Cooperation, available at http://eeas.europa.eu/delegations/china/documents/-news/20131123.pdf (visited 28 April 2014).

[14] Cf. Woolfrey, S., in: Hindelang/Krajewski (eds.), *Shifting Paradigms in International Investment Law (provisional title)*, Oxford University Press, forthcoming 2015.

[15] In March 2014, Indonesia informed the Netherlands that it has decided to terminate the Bilateral Investment Treaty. As a side note the Indonesian Government indicated that it intends to terminate all of its 67 bilateral investment treaties. Cf. http://indonesia.nlembassy.org/organization/departments/economic-affairs/termination-bilateral-investment-treaty.html (visited 28 April 2014). See for an in-depth analysis of the recent shift in Indonesia's foreign direct investment policy Knörich, J./Berger, A., *Friends of foes? Interactions between Indonesia's international investment agreements and national law*, Studies of the German Development Institute, Bonn, 2014.

[16] In 2009 Ecuador informed the World Bank that it would renounce the ICSID-Convention. Cf. https://icsid.worldbank.org-/ICSID/FrontServlet?requestType=CasesRH&actionVal=OpenPage&PageType=AnnouncementsFrame&FromPage=Announcements&pageName=Announcement20 (visited 28 April 2014). In respect of general Latin American developments cf. Aidid, A. and Clarkson, St., *Researching International Norm Diffusion: Brazilian and Latin American Resistance to Investor-State Dispute Settlement*, Annual Congress of the International Studies Association, San Francisco, 6.4.2013, abstract available at http://ssrn.com/abstract=2252721 (visited 2. May 2014).

[17] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, documents available at http://www.italaw.com/cases/documents/1655 (visited 28 April 2014).

[18] *Philip Morris Asia Limited v. The Commonwealth of Australia*, Uncitral, PCA Case No. 2012-12, documents available at http://www.italaw.com/cases/851 (visited 28 April 2014).

[19] *Eli Lilly and Company v. Government of Canada*, documents available at http://italaw.com/sites/default/files/case-documents/italaw1582.pdf (visited 28 April 2014).

[20] Cf. e.g. German government in respect of TTIP Deutscher Bundestag, Antwort der Bundesregierung auf die Kleine Anfrage der Fraktion der SPD, Drucksache 17/14724, 24 September 2013, p. 2 ('Investitionsschutz gehört in den Verhandlungen über die TTIP nicht zu den offensiven Interessen der Bundesregierung, da die USA als Mitglied der Organisation für wirtschaftliche Zusammenarbeit und Entwicklung EU-Investoren hinreichend Rechtsschutz vor nationalen Gerichten gewähren und US-

tanks[22], business associations[23] and in academic literature for preserving (more) policy space are yet another indication that the perception of international investment law is undergoing a profound change. Latest signs of this trend are policy proposals by inter-governmental organisations such as the United Nations Conference on Trade and Development (Unctad)[24] or the Commonwealth Secretariat[25] for the (re-)negotiation of BITs with a stronger focus on sustainable development.

In the light of these contradictory developments, the international investment law regime is currently in a 'state of transition', albeit not for the first time. The principles and basic functions of international investment law can be traced back to the century-old international law of aliens[26]. A first major evolutionary step towards the paradigm of international investment law currently attracting much criticism can be envisaged in the *emergence of bilateral investment treaties in the late 1950s*[27] spelling out substantive protection standards for foreign investment ('substantive standards')[28]. However, it

---

Investoren in der EU hinreichende Rechtsschutzmöglichkeiten vor nationalen Gerichten besitzen.'); see also Zacharakis, Z. and Endres, A., Regierung gegen Investorenschutz im Freihandelsabkommen, *ZEIT online*, 13 March 2014, available at http://www.zeit.de/wirtschaft/2014-03/investitionsschutz-freihandelsabkommen-bundesregierung-ttip (visited 2 May 2014); Pinzler, P., Ein Herz für Kanadas Konzerne, *ZEIT online*, 10 April 2014, available at http://www.zeit.de/wirtschaft/2014-04/TTIP-Kanada-Investorenschutzklagen-Kommentar (visited 2 May 2014); in respect of the UK cf. House of Lords, European Union Committee, *The Transatlantic Trade and Investment Partnership*, 14th Report of Session 2013-14, available at http://www.publications.parliament.uk/pa/ld201314/ldselect/ldeucom/179/179.pdf (15 May 2014), para 169 ('We nonetheless conclude that proponents of investment protection provisions enforced by an ISDS mechanism have yet to make a compelling case for their inclusion in TTIP or to convincingly dispel public concerns.'); see also Wright, O. and Morris, N., British sovereignty 'at risk' from EU-US trade deal: UK in danger of surrendering judicial independence to multinational corporations, warn activists, *The Independent*, 14 January 2014, available at http://www.independent.co.uk/news/uk/politics/british-sovereignty-at-risk-from-euus-trade-deal-uk-in-danger-of-surrendering-judicial-independence-to-multinational-corporations-warn-activists-9057318.html (visited 2 May 2014).

[21] Cf., e.g. open letter entitled 'Stop the Corporate Giveaway! A transatlantic plea for sanity in the EU–Canada CETA negotiations' addressed to the EU Commission and the Canadian Government and signed by over 100 NGOs, available at http://www.s2bnetwork.org/fileadmin/dateien/downloads/Stop_the_Corporate_Giveaway_-_A_transatlantic_plea_for_sanity_in_the_EU_Canada_CETA_negotiations.pdf (visited 2 May 2014); see also Bernasconi-Osterwalder, N., and Rosert, D., *Investment Treaty Arbitration: Opportunities to reform arbitral rules and processes*, The International Institute for Sustainable Development, January 2014, available at http://www.iisd.org/sites/default/-files/pdf/2014/investment_treaty_arbitration.pdf (visited 2 May 2014); Bernasconi-Osterwalder, N. and Mann, H., *A Response to the European Commission's December 2013 Document "Investment Provisions in the EU-Canada Free Trade Agreement (CETA)"*, The International Institute for Sustainable Development, February 2014, available at http://www.iisd.org/sites/default/-files/pdf/2014/reponse_eu_ceta.pdf (visited 5 May 2014); McDonagh, Th., *Unfair, Unsustainable and Under the Radar - How Corporations use Global Investment Rules to Undermine a Sustainable Future*, The Democracy Center, 2013, available at http://democracyctr.org/wp/wp-content/uploads/2013/05/Under_The_Radar_English_Final.pdf (visited 28 April 2014).

[22] Ikenson, D., The Transatlantic Trade and Investment Partnership: A Roadmap for Success, *Free Trade Bulletin*, No. 55, 14 October 2013, available at http://www.cato.org/publications/free-trade-bulletin/transatlantic-trade-investment-partnership-roadmap-success (visited 28 April 2014).

[23] Bundesverband der Deutschen Industrie e.V., *Positionspapier: Schutz europäischer Investitionen im Ausland: Anforderungen an Investitionsabkommen der EU*, Bundesverband der Deutschen Industrie e. V. (BDI), March 2014, available at http://www.bdi.eu/download_content/GlobalisierungMaerkteUndHandel/Schutz_europaeischer_Investitionen_im_Ausland.pdf (visited 28 April 2014).

[24] E.g. UNCTAD, *Investment Policy Framework for Sustainable Development*; UNCTAD, 2012, available at http://unctad.org/en-/PublicationsLibrary/webdiaepcb2012d6_en.pdf (visited 5 May 2014); see also Hindelang/Krajewski (eds.), *Shifting Paradigms in International Investment Law (provisional title)*, Oxford University Press, forthcoming 2015 - conference proceedings on *International Investment Agreements – Balancing Sustainable Development and Investment protection*, Freie Universität Berlin, 10-11 October 2013, conference website, available at http://www.internationalinvestmentlaw.com (visited 2 May 2014).

[25] VanDuzer, J. et al., *Integrating Sustainable Development into International Investment Agreements – A Guide for Developing Countries*, Commonwealth Secretariat, August 2012, available at http://www.iisd.org/pdf/2012/6th_annual_forum-_commonwealth_guide.pdf (visited 28 April 2014).

[26] Sornarajah, M., *The International Law on Foreign Investment*, Cambridge University Press, New York, 3th Edition, 2010, pp. 19 et seqq.; Herdegen, M., *Principles of International Economic Law*, Oxford University Press, Oxford,2013, pp. 13 et seqq.

[27] The first being the 1959 Germany-Pakistan BIT, Bundesgesetzblatt (German Law Gazette) II 1961, p. 793.

[28] Such substantive standards frequently relate to fair and equitable treatment, national and most-favoured-nation treatment, full protection and security and non-discrimination. Such treaties also stipulate criteria for a lawful expropriation.

was not until the *1970s* when so-called *investor-state dispute settlement clauses*[29] were included in such treaties[30] and, subsequent to the fall of the 'Iron Curtain', that those gained practical significance. Today, the vast majority of bilateral and regional investment treaties (hereafter jointly also referred to as 'investment instruments[31]') provide for investor-state dispute settlement[32]. This, however, should not lead to the erroneous conclusion that there is a single legal regime on international investment law or one ISDS mechanism. In fact, there are as many ISDS mechanisms as there are investment instruments; over 3.000 by the end of 2012 according to Unctad[33].

While *ISDS mechanisms vary in terms of access, procedure and consequences of a breach of a substantive standard* contained in an investment *instrument, as well as in respect of enforcement of an award*, they nonetheless display features roughly common to all: The investor can – due to a general consent of the host state given in the investment instrument[34] and independent from its home state – initiate international arbitral proceedings against a host state challenging its measures on grounds that they were incompatible with the substantive standards in the investment agreement. These measures accrue from the exercise of public authority of the host state and can be executive, legislative or judicial in nature[35]. Usually, three ad-hoc arbitrators – two party-appointed, the third appointed in consensus or, in lieu thereof, by a third person – sit on a case. If a violation of a substantive standard can be established, an enforceable remedy – mainly pecuniary – is awarded[36]. An arbitral tribunal's decision is binding on the host state and, in principle, final. It can be challenged only on exceptional grounds. An appeals facility is not provided for.

*States*, so far, have *defined* the *procedural framework* in which arbitral proceedings are conducted *rather loosely* compared to domestic procedural frameworks. This remains true even if the default

---

[29] These ISDS clauses were generally included alongside state-state dispute settlement provisions. According to Newcombe, A. and Paradell, L., *Law and practice of Investment Treaties: Standards of Treatment*, Kluwer Law International, The Hague, 2009, pp. 44-45 the first BIT which included an unqualified consent to investor-state arbitration was the 1969 Italy-Chad BIT. Only since the late 1980s have investment instruments generally contained strong and broad ISDS clauses. See Yackee, J., Conceptual Difficulties in the Empirical Study of Bilateral Investment Treaties, *Brooklyn Journal of International Law*, Vol. 33 (2008), pp. 405 et seqq., pp. 423–33.

[30] Pohl, J. et al., *Dispute settlement provisions in international investment agreements: A large sample survey*, OECD Working Papers on International Investment No. 2012/2, available at http://www.oecd.org/daf/inv/investment-policy/WP-2012_2.pdf (visited 28 April 2014), p. 11.

[31] See also above footnote2.

[32] According to the OECD, among the 1.660 bilateral investment treaties considered in a sample study, 96% mention ISDS mechanisms. Cf. Pohl, J. et al., *Dispute settlement provisions in international investment agreements: A large sample survey*, OECD Working Papers on International Investment No. 2012/2, available at http://www.oecd.org/daf/inv/investment-policy/WP-2012_2.pdf (visited 28 April 2014), p.10.

[33] UNCTAD, *Towards a New Generation of International Investment Policies: Unctad's Fresh Approach to Multilateral Investment Policy-Making*, IIA Issues Note 2013/5, available at http://unctad.org/en/PublicationsLibrary/webdiaepcb2013d6_en.pdf (visited 28 April 2014), p. 4.

[34] Cf. for a view on the nature of this consent Van Harten, G., *Investment Treaty Arbitration and Public International Law*, Oxford University Press, Oxford, 2007, p. 63.

[35] By and large, administrative acts have been put up for review in ISDS, cf. Caddel, J. and Jensen, M., *Which host country government actors are most involved in disputes with foreign investors*, Columbia FDI Perspectives, No. 120, available at http://www.vcc.columbia.edu/content/which-host-country-government-actors-are-most-involved-disputes-foreign-investors (visited 28 April 2014).

[36] Cf., e.g. Articles 37-40 (constitution of the tribunal), Articles 49-55 (award, recognition and enforcement) Convention on the Settlement of Investment Disputes Between States and Nationals of Other States (ICSID- Convention, adopted 18 March 1965, entered into force 14 October 1966); Articles 8-10 (appointment), Article 34 (award) Uncitral Arbitration Rules as revised in 2010; Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York Convention, adopted 10 June 1958, entered into force 7 June 1959).

arbitration rules in the ICSID-Convention[37] and the Uncitral arbitration rules[38], which are the most frequently proposed ones in investment instruments[39], are taken into consideration. Most basic issues, such as the composition of tribunals, applicable law, remedies, allocation of costs are often not addressed in investment instruments but in more (or rather less) detail in arbitration rules[40].

It is this very concept of enforcing substantive protection standards to which the European Parliament[41], Council[42] and Commission[43] have expressed their fundamental backing – albeit to a significantly varying degree – on several occasions since major competences were conferred upon the European Union (EU) in the area of foreign investment with the entry into force of the Lisbon Treaty[44]. So far, all negotiation mandates[45], negotiation positions[46] and treaty draft texts[47] provide for investor-state dispute settlement by means of ad-hoc arbitration[48].

---

[37] Convention on the Settlement of Investment Disputes between States and Nationals of Other States (ICSID- Convention, adopted 18 March 1965, entered into force 14 October 1966), available at https://icsid.worldbank.org/ICSID/StaticFiles/basicdoc/CRR_English-final.pdf (visited 1 May 2014).

[38] Available at http://www.uncitral.org/pdf/english/texts/arbitration/arb-rules-revised/arb-rules-revised-2010-e.pdf (visited 1 May 2014).

[39] OECD, *Transparency and Third Party Participation in Investor-State Dispute Settlement Procedures*, OECD Working Papers on International Investment No. 2005/01, available at http://www.oecd.org/daf/inv/internationalinvestmentagreements-/34786913.pdf (visited 6 May 2014), p. 3.

[40] Pohl, J. et al., *Dispute settlement provisions in international investment agreements: A large sample survey*, OECD Working Papers on International Investment No. 2012/2, available at http://www.oecd.org/daf/inv/investment-policy/WP-2012_2.pdf (visited 28 April 2014).

[41] Cf., e.g. European Parliament resolution of 9 October 2013 on the EU-China negotiations for a bilateral investment agreement, EP Doc No P7_TA-PROV(2013)0411 (Procedural file 2013/2674(RSP)); European Parliament resolution of 23 May 2013 on EU trade and investment negotiations with the United States of America, EP Doc No P7_TA(2013)0227 (Procedural file 2013/2558(RSP)); European Parliament resolution of 8 June 2011 on EU-Canada trade relations EP Doc No P7_TA(2011)0257 (Procedural file 2011/2623(RSP)); Note also European Parliament Research Service (EPRS), *Investor-State Dispute Settlement (ISDS) - State of play and prospects for reform*, Briefing 21.1.2014, available at http://www.europarl.europa.eu/RegData/bibliotheque/briefing/2014/130710/LDM_BRI%282014%29130710_REV2_EN.pdf (visited 1 May 2014).

[42] Cf., e.g. Council of the European Union, *Conclusions on a comprehensive European international investment policy*, 3041st Foreign Affairs Council Meeting, 25 October 2010, available at https://www.consilium.europa.eu/uedocs/cms_data-/docs/pressdata/EN/foraff/117328.pdf (visited 5 May 2014); note also the mandates approved by the Council at its 3109th meeting, 12 September 2011, available at http://www.s2bnetwork.org/themes/eu-investment-policy/eu-documents/text-of-the-mandates.html (visited 1 May 2014); European Commission, *Recommendation for a Council Decision authorising the opening of negotiations on a comprehensive trade and investment agreement, called the Transatlantic Trade and Investment Partnership, between the European Union and the United States of America*, COM(2013) 136, 12 March 2013, available at http://trade.ec.europa.eu/doclib/docs/2013/march/tradoc_150760.pdf (visited 1 May 2014).

[43] European Commission, *Towards a comprehensive European international investment policy*, COM(2010)343 final, 7 July 2010, idem., *Investment Protection and Investor-to-State Dispute Settlement in EU agreements*, November 2013, available at http://trade.ec.europa.eu/doclib/docs/2013/november/tradoc_151916.pdf (visited 1 May 2014); idem., *Investment Provisions in the EU-Canada free trade agreement (CETA)*, 3 December 2013, available at http://trade.ec.europa.eu/doclib/docs/2013/-november/tradoc_151918.pdf (visited 1 May 2014); for more documents go to EU Commission, DG Trade website, available at http://ec.europa.eu/trade/policy/ (visited 1 May 2014). Note also Hoffmeister, F. and Alexandru, G., A First Glimpse of Light on the Emerging Invisible EU Model BIT, *Journal of World Investment & Trade*, Vol. 15 (2014), pp. 379 et seqq.

[44] Cf. on the EU law issues with respect of evolving European international investment policy Pernice, I., *International Investment Protection Agreements and EU Law*, Study for the European Parliament. See also Hindelang, S., Der primärrechtliche Rahmen einer EU-Investitionsschutzpolitik: Zulässigkeit und Grenzen von Investor-Staat-Schiedsverfahren aufgrund künftiger EU Abkommen, in: Bungenberg/Herrmann (eds.), *Die Gemeinsame Handelspolitik der Europäischen Union „nach Lissabon"*, Nomos, Baden-Baden, 2011, pp. 157 et seqq., also available at: Der primärrechtliche Rahmen einer EU Investitionsschutzpolitik: Zulässigkeit und Grenzen von Investor-Staat-Schiedsverfahren aufgrund künftiger EU Abkommen, WHI-Paper 01/11, 2011, available at http://www.whi-berlin.eu/tl_files/documents/whi-paper0111.pdf (visited 4 May 2014); an abridged version in the English language can be found at Hindelang, S., The Autonomy of the European Legal Order – EU Constitutional Limits to Investor-State Arbitration on the Basis of Future EU Investment-related Agreements, in: Bungenberg/ Herrmann (eds.), *Common Commercial Policy after Lisbon - Special Issue to the European Yearbook of International Economic Law*, Springer; New York, 2013, pp. 187 et seqq.

[45] China, India, Singapore (initialed; according to a statement issued by DG Trade on 20 September 2013 negotiations on the investment protection chapter are ongoing, cf. European Commission, DG Trade website, available at cf.

The rationales the EU might pursue when proposing to include an ISDS mechanism in its free trade or stand-alone investment agreements are several: ISDS is perceived as a forceful tool to *manage political risk* and to *promote the international rule of law* (below 2.2.1 (p. 52)). It is said to *make substantive commitments in investment instruments credible* and, at the same time, contributes towards a *de-politicisation of investment disputes* (below 2.2.2 (p. 54)). Developing states in particular often sign up to international investment instruments in the *belief that these constitute an instrument to attract foreign investment* (below 2.2.3 (p. 55)).

However, ISDS may not be without significant political, legal, and economic costs. ISDS practice has been criticised for *not creating a predictable legal environment* for host states and investors due to contradictory interpretations in arbitral awards (below 2.3.1 (p. 59)). Moreover, ISDS practice is suspected of being *preoccupied with the protection of individual economic interests against political risk*. It is accused of not paying sufficient attention to legitimate public interests such as human rights, environmental protection, public health or labour standards and, hence, *excessively curtails national regulatory space to implement policies directed at general welfare* (below 2.3.2 (p. 72)). Investor-state arbitrations have frequently been conducted *behind closed doors*, full-length awards are not published by default and *party-appointed arbitrators and arbitration institutions face allegations of bias towards the investors' interests*. Taking into account that investor-state tribunals review the exercise of public authority, such charges are capable of eroding the integrity and legitimacy of the ISDS mechanism (below 2.3.3 (p. 96)). Other concerns relate to *abusive claims* brought only to pressure the host state into compromises it would otherwise not have agreed to (below 2.3.4 (p. 105)), to *difficulties to correct erroneous decisions* of tribunals (below 2.3.5 (p. 107)) and to *high costs* for host states responding to investor-state claims (below 2.3.6 (p. 109)).

The EU and its institutions are well advised to carefully evaluate each of the inadequacies, thoroughly verify whether and to which extent they can be mitigated in a specific investment instrument and weigh them against the perceived virtues before subscribing to a particular model of adjudication; legacy alone should be no argument. The evaluation process must be conducted with even more rigour, considering that investment protection related clauses, especially in comprehensive free trade agreements, are not easily renegotiated or terminated.

---

http://trade.ec.europa.eu/doclib/press/index.cfm?id=961 (visited 1 May 2014)), Japan, Thailand, and Vietnam, Tunisia, Morocco, Jordan, and Egypt. Cf. European Commission, DG Trade website, available at http://ec.europa.eu/trade/policy/-accessing-markets/investment/ (visited 1 May 2014); Seattle to Brussels Network website, available at http://www.s2bnetwork.org/themes/eu-investment-policy/eu-documents/text-of-the-mandates.html (visited 1 May 2014); Bilaterals.org Website, available at http://www.bilaterals.org/?-Negotiations-&lang=en. (visited 1 May 2014). For the EU negotiation position on TTIP to be concluded with the USA please refer to http://www.s2bnetwork.org/themes/eu-investment-policy/eu-documents/text-of-the-mandates.html (visited 1 May 2014). Note though that all 'EU-related documents' not made publicly available by the EU institutions themselves might not be authentic.

[46] Cf. for TTIP negotiations Pinzler, P., EU will laut Geheimdokument Sonderrechte für Konzerne, *ZEIT online*, 27 February 2014, available at http://www.zeit.de/wirtschaft/2014-02/freihandelsabkommen-eu-sonderrechte-konzerne (visited 1 May 2014).

[47] Cf. e.g. for CETA text EU Investment Policy: Looking behind closed doors, Website, http://www.secretdeals.info/ceta/ (visited 3. May 2014) and European Commission, *Commission to consult European public on provisions in EU-US trade deal on investment and investor-state dispute settlement*, IP/14/56, 21 January 2014, available at http://europa.eu/rapid/press-release_IP-14-56_en.pdf (visited 1 May 2014). Note though that all 'EU-related documents' not made publicly available by the EU-related institutions themselves might not be authentic.

[48] In January 2014 the Commission stopped negotiations on the investment chapter in TTIP and launched a public consultation. Cf. *Commission to consult European public on provisions in EU-US trade deal on investment and investor-state dispute settlement*, IP/14/56, 21.1.2014, available at http://europa.eu/rapid/press-release_IP-14-56_en.pdf (visited 1 May 2014); idem, Questions and Answers: Public online consultation on investor protection in TTIP, MEMO/14/206, 27 March 2014, available at http://europa.eu/rapid/press-release_MEMO-14-206_en.pdf (visited 1 May 2014).

A critical assessment also includes *all* possible policy instruments being put up for review, as ISDS is not the only adjudicative mechanism available to settle claims of foreign investors against their host states. For example, ISDS mechanisms can be supplemented or replaced by investor-state consultations and mediation, domestic court proceedings, contract-based dispute settlement, diplomatic protection, state-state arbitration or state-state international court proceedings. Each of these policy options exhibit specific advantages and disadvantages (below 2.3.2.2.1 (p. 75)). Providing for a policy mix in EU agreements might partly compensate for the disadvantages resulting from the sole application of a specific tool.

One illusion is to be warned against right from the outset: due to the current fragmented state of international investment law and ISDS practice, there is neither an easy nor quick solution to the challenges posed. Rather, it will take years, if not decades, to address them properly. However, the EU as a major new player entering the 'great game' of investment treaty making is presented with the unique opportunity to lay the foundations to a more predictable and balanced approach of protecting foreign investment and preserving sufficient policy space with a view to adequately addressing the puzzling regulatory questions of the future in a common interest.

Due to the study's limited scope and mandate it constrains itself to focus on main virtues, to address selected issues associated with current ISDS practice and to point to some policy options and tools to tackle the most pressing challenges in this field. In order to tie the study's recommendations to the evolving EU international investment policy, at suitable places reference is made to the Comprehensive Economic and Trade Agreement between the EU and Canada and its 'Investor-to-State Dispute Settlement text' of 4 February 2014 (CETA Draft of 4 February 2014)[49] and of 3 April 2014 (CETA Draft of 3 April 2014)[50] and the text of the 'Investment Chapter' of 21 November 2013 (CETA Draft Investment Text of 21 November 2013)[51] and of 4 April 2014 (CETA Draft Investment Text of April 2014)[52]. Due to the nature of those documents any statement in this respect can only be preliminary and is meant to be illustrative only. Although a strict distinction is sometimes hard to achieve, the study focuses on procedural issues; concerns raised in respect of substantive standards contained in investment instruments which arise during arbitration are dealt with only cursorily[53]. With a view to improving readability, when this study refers to states and state parties this also includes the EU.

## 2.2        Perceived virtues of ISDS

ISDS as a concept can be prescribed as one of the most effective tools to manage political risk and to promote the international rule of law (below 2.2.1 (p. 52)). By largely replacing state-driven enforcement mechanisms ISDS renders substantive commitments in investment instruments more credible and contributes towards a de-politicisation of investment disputes (below 2.2.2 (p. 54)). Developing states in particular have signed up to international investment instruments with the expectation it would facilitate attracting foreign investment (below 2.2.3 (p. 55)).

---

[49] Available through EU Investment Policy: Looking behind closed doors, Website, available at http://eu-secretdeals.info/upload/EU-COM_CETA-ISDS_text_February4th-2014_clean.pdf (visited 5 May 2014).
[50] Available through EU Investment Policy: Looking behind closed doors, Website, available at http://eu-secretdeals.info/upload/2014/02/EU-Canada-CETA_Draft-ISDS-text-April3-2014_clean.pdf (visited 5 May 2014).
[51] Available through EU Investment Policy: Looking behind closed doors, Website, available at http://eu-secretdeals.info/upload/COM-doc-CETA_-investment-protection-newText-Nov-21-2013_clean.pdf (visited 5 May 2014).
[52] Available through EU Investment Policy: Looking behind closed doors, Website, available at http://eu-secretdeals.info/upload/2014/02/EU-Canada-FTA-Negotiations-Investment-chapter-4-April-2014_clean.pdf (visited 5 May 2014).
[53] See on this as well as the interrelation of investment and WTO agreements Kuijper, P. J., *Investment Protection Agreements as Instruments of International Economic Law*, Study for the European Parliament.

### 2.2.1    Managing political risk and promoting an international rule of law

As soon as a foreign individual or corporation has entered the territory of a certain state it is subject to its jurisdiction. In that state, governments, policies and legal systems might change; not just for better but also for worse. And foreigners might be affected by these changes more the stronger their individual and/or financial commitment is set for the long term. The foreign individual or corporation might not just face policy changes occurring 'naturally' over time and part of the ordinary risk of life or doing business. It might suddenly be exposed to discrimination, unfair or arbitrary treatment or face expropriation of its property or even threats to life and limb. In such situations foreigners may turn to the courts of the host state. However, those courts could fail to dispense justice due to being biased in favour of their own government or due to a lack of independence from the same. Courts may be corrupt or simply lacking the competence or adequate capacities to render a decision in respectable quality and reasonable time[54].

While it is a public international law truism that a foreigner is generally subject to the jurisdiction of its host state, today it is also (again) widely accepted that home states cannot treat foreigners at their discretion but must conform to minimum standards in terms of an international rule of law. This minimum standard is embodied in the so-called law of aliens[55].

In pursuit of the idea that everyone is entitled to a minimum standard of treatment abroad at any given time, bilateral and regional investment protection treaties appeared at a time when the formerly universal consensus in customary international law was challenged. The Communist bloc and developing countries in the course of de-colonisation claimed that foreign nationals were not entitled to an international minimum standard and subject to the national jurisdiction of the host state only.

Today, over 3.000 investment instruments afford individuals and corporations active in cross-border investment with a *tool to manage and mitigate political risk*. They do so by providing an advanced adjudicative mechanism in public international law to hold the host state accountable for conduct falling short of the standards[56] described in the individual instrument without having (exclusively[57]) to rely on national means of judicial relief.

Certainly, it is true, and regrettable at the same time, that not all elements of the international minimum standard for aliens were developed further with equal focus and lasting success like international investment law which now forms a comprehensive legal sub-field of public international law affording, at least partially, *protection beyond a minimum standard*[58]. The *grand idea*

---

[54] VanDuzer, J. et al., *Integrating Sustainable Development into International Investment Agreements – A Guide for Developing Countries,* Commonwealth Secretariat, August 2012, available at http://www.iisd.org/pdf/2012/6th_annual_forum_commonwealth_guide.pdf (visited 28 April 2014), p. 400; Guzman, A., Why LDCs Sign Treaties That Hurt Them: Explaining the Popularity of Bilateral Investment Treaties, *Virginia Journal of International Law*, Vol. 38 (1998), pp. 639 et seqq., pp. 658 et seqq.; Hindelang, S., Bilateral Investment Treaties, Custom and a Healthy Investment Climate - The Question of Whether BITs Influence Customary International Law Revisited, *The Journal of World Investment and Trade*, Vol. 5 (2004), pp. 789 et seqq.
[55] OECD, *Fair and Equitable Treatment Standard in International Investment Law*, Working Papers on International Investment No. 2004/03, available at http://www.oecd.org/daf/inv/internationalinvestmentagreements/33776498.pdf (visited 5 May 2014), p. 8.
[56] Cf. in respect of the substantive investment protection standards Kuijper, P. J., *Investment Protection Agreements as Instruments of International Economic Law*, Study for the European Parliament.
[57] For the question of the prerequisite of exhausting local remedies cf. 2.3.2.2.2.3.2 (p.88).
[58] Cf. e.g. Johnson, L. and Volkov, O., Investor-State Contracts, Host-State "Commitments" and the Myth of Stability in International Law, *American Review of International Arbitration*, Vol. 24 (2013), pp. 361 et seqq.

underlying these efforts should, however, not be forgotten: *limiting governmental arbitrariness* towards foreigners by stipulating *legal* standards enforceable in *independent* arbitral proceedings[59].

It is therefore somewhat ironic to see some of the same civil society groups who have vigorously fought for an international rule of law in areas such as human rights now find themselves on the side of those states which engage in curtailing or demolishing another facet of this very international rule of law. To be clear on this point: ISDS, as it currently operates, generates harsh criticism, some of which is rightfully voiced[60]. However, significantly weakening or even completely renouncing ISDS calls into question part of the achievements made in respect of an international rule of law.

Instead of approaching the challenges posed by current ISDS practice with a destructive attitude, one should seize the moment of transition and put forward reform proposals which aim in two directions: First, options should be explored on how to improve the situation of those individuals who currently do not or only insufficiently benefit from the protection of public international law by strengthening human rights and the law of aliens in respect of non-economic activities. Second, the operation of international investment law in general and ISDS in particular should be critically assessed and reformed with a view to preserving the achievements made in respect of an international rule of law. At the same time, however, aberrations of international investment law must be cut back to its initial idea: providing a *safety net in case the primary means available in a host state fail* to prevent or remedy abuse of sovereign power. Put differently, international investment law and ISDS can only regain legitimacy when they do *not aim at replacing national administrative and judicial safeguards* but back them up in case of failure[61].

The idea of providing a fallback, a last line of defence, can equally be applied to developing as well as developed legal systems if we want to accept that even the most advanced legal system may fall short of certain standards in exceptional cases[62]. In principle, providing for ISDS among developed countries as well signals that international investment law is not about 'post-colonialism' or directed against developing countries, but rather about an international rule of law. At the same time, it is also reasonably clear that such a 'rough' fallback mechanism – not available without significant political, legal and economic costs[63] – must fade into the background when there are domestic courts capable of diligently resolving foreign investment disputes. Most of all, investment instruments providing for ISDS must not negate factual differences between individual states and undermine the domestic rule of law and democratic governance. What is needed, therefore, is a flexible approach which takes into consideration both aspects[64].

---

[59] Cf. Montt, S., *State Liability in Investment Treaty Arbitration*, Hart Publishing, Oxford, 2009, p. 83 who even argues that there is a collective international interest in developing *general* standards governing investment.

[60] Cf. below 2.3 (p.56).

[61] In pursuit of the old idea to be ruled by laws, and not by men, the furthering of the rule of law can be a source of legitimacy of investment arbitration. However, this presupposes, inter alia, that norms directing (state) conduct are crystallised – at least to a large extent – before an adjudicative process takes place. However, the broad substantive standards commonly contained in investment instruments coupled with current ISDS practice of 'de facto precedent' (cf. 2.3.1.2 (p.66)), among others, cast serious doubts that one could advance such an argument in respect of the present state of the system. Cf. Montt, S., *State Liability in Investment Treaty Arbitration*, Hart Publishing, Oxford, 2009, pp. 146 et seqq. Nonetheless, this is not to say that the 'rule of law' could not serve as a source of legitimacy.

[62] In this respect it is worth noting that the EU is far away from being a monolithic bloc in terms of the rule of law. Cf. European Commission, The 2014 EU Justice Scoreboard, Speech Viviane Reding, SPEECH/14/225, 17 March 2014, available at http://europa.eu/rapid/press-release_SPEECH-14-225_en.htm (visited 14 May 2014).

[63] See below 2.3 (p. 24).

[64] See below 2.3.2.2.2.3.2 (p.88).

## 2.2.2    Making substantive commitments in investment instruments credible and, at the same time, contributing towards a de-politicisation of investment law disputes

While *ISDS is not the only mechanism available to force a host state to comply* with material commitments taken up in an investment instrument[65], it is *certainly one of the most effective ones*. Absent ISDS in an investment instrument, on the international level individuals would mainly have to rely on their home state resorting to the mechanism of 'diplomatic protection' to enforce substantive investment protection standards against the host state[66].

Traditionally, the law of aliens[67] – though not undisputed in legal writing[68] – does not treat individuals and corporations as subjects of public international law. In respect of the protection of alien property this means that rights and obligations exist exclusively between sovereign states. The injured individual is not privy to this legal relationship and cannot claim the international law obligations in his own right[69]. He must turn to his home state which claims injury and reparation towards the other state, i.e. exercising diplomatic protection.

*Diplomatic protection* is *characterised by political discretion and political arbitration*. Pursuing and resolving investment disputes under the concept of diplomatic protection carries with it potential spill-over effects into other, unrelated policy areas as the host state in particular will aim at expanding its bargaining powers on the diplomatic stage. It also involves 'diplomatic humiliation' by way of being exposed to a claim in traditional international judicial *fora*, such as the International Court of Justice (ICJ). Hence, due to political considerations and constraints, the home state might decide not to pursue a claim against the host state or could choose not to pass along reparation taking the form of, e.g., compensation to the individual. In many domestic legal orders it is difficult for an individual to legally force his home state to exercise diplomatic protection as the latter enjoys an enormous margin of appreciation[70].

If the *individual investment dispute* is *'de-politicised' by taking recourse to ISDS* – i.e. relegated from the diplomatic stage or traditional international judicial *fora* – it *helps preventing individual investment disputes straining general inter-state relations* and, in turn, promotes the intended stability in economic and non-economic inter-state relations[71]. 'De-politicisation' of investment relations has been

---

[65] See below 2.3.2.2.1 (p.75).

[66] The following paragraphs rely on Hindelang, S., Restitution and Compensation – Reconstructing the Relationship in International Investment Law, in: Hofmann/Tams (eds.), *International Investment Law and General International Law: From Clinical Isolation to Systemic Integration*, Nomos, Baden-Baden, 2011, pp. 161 et seqq.; also available as Hindelang, S., *Restitution and Compensation – Reconstructing the Relationship in International Investment Law*, WHI-Paper 02/11, 2011, http://www.whi-berlin.eu/tl_files/documents/whi-paper0211.pdf (visited 1 May 2014).

[67] Janis, M., Individuals as Subjects of International Law, *Cornell International Law Journal*, Vol. 17 (1984), pp. 61 et seqq.

[68] Opposing: de Visscher, C., Cours général de droit international public, *Collected Courses of the Hague Academy of International Law*, Vol. 86 (1954), pp. 507 et seqq.; see in this respect also Garcia-Amador, F., Sixth Report on State Responsibility, *Yearbook of the International Law Commission*, 1961, Vol. II, Document A/CN.4/134 & Add. 1, p. 1, para. 176: *'The "injury" or "damage" should be considered in terms of the subject in fact harmed — i.e., the alien — and reparation should be considered in terms of its real and only object — i.e., not as reparation "due to the State", but as reparation due to the individual in whose behalf diplomatic protection is being exercised.'*

[69] *'Anyone who mistreats a citizen indirectly offends the State.'* Cf. de Vattel, E., *Le droit des gens ou les principes de la loi naturelle*, Vol. 1, Paris, 1835, p. 368.

[70] Decisions by the Bundesverfassungsgericht (Federal Constitutional Court) of Germany and the Bundesverwaltungsgericht (Federal Administrative Court) of Germany, for example, have repeatedly accorded the Federal Government a great degree of discretion in granting such requests made by German citizens, Ruffert, M., Diplomatischer und konsularischer Schutz, in: Isensee/Kirchhof (eds.), *Handbuch des Staatsrechts*, Band X, C. F. Müller, Heidelberg, 3rd ed., 2012, p. 87.

[71] Shihata, I., Towards a Greater Depoliticization of Investment Disputes: The Roles of ICSID and MIGA, *ICSID Review*, Vol. 1 (1986), pp. 1 et seqq.; Schreuer, C., *The ICSID Convention: A Commentary*, Cambridge University Press, Cambridge, 2nd Edition, 2009, pp. 415 et seqq.

effectuated by nominating the investor – an 'international law lightweight' – as a claimant in investment arbitration and making him responsible for collecting any relief directly attributed to him. To draw a realistic picture, however, due to the nature of conflict at hand – i.e. the balancing of private and public interests – a *complete 'de-politicisation'* has been *difficult to achieve*[72].

In sum, while the host state of an investor might be caught in a web of multiple political interests and diplomatic constraints, an investor will primarily seek to protect its property interests. Opening up the possibility to initiate international arbitration at the discretion of the investor makes an enforcement of substantive investment standards in case of violations more likely. Hence, given the increased risk of enforcement, the host state should be inclined to pay attention to the substantive standards in the first place, rendering the commitments taken up more credible.

### 2.2.3        Instrument perceived to attract foreign investments

An investment instrument which also provides for ISDS demonstrates a strong *commitment to a stable and predictable investment environment* in the host state. Many states have *perceived* investment instruments *as strategic means to attract or encourage investment* in their territories with a view to promoting economic development by raising or stabilising living conditions[73].

The commitment to substantive investment protection standards and the threat with or even the defeat in international investment arbitration might also initiate a *learning process* and *could facilitate internal judicial or administrative reform politically* in countries with weak institutions and poor legal systems in order to live up to the substantive standards contained in an investment instrument[74]. At

---

[72] Note, for example, the tensions in the German-Philippine bilateral relations due to *Fraport's* expropriated investment in the Philippines: *Fraport AG Frankfurt Airport Services Worldwide v. Philippines*, ICSID Case No. ARB/03/25, Award of 16 August 2007; Decision on the Application for Annulment of 23 December 2010, documents available at http://www.italaw.com/cases/456 (visited 1 May 2014). Despite the (provisional) defeat of the investor in an – although not uncontroversial – investment arbitration the Auswärtiges Amt (German Federal Foreign Office) declared on its website: '*Economic relations between Germany and the Philippines were, however, marred by the Philippine government's expropriation, in December 2004, of Manila Airport's new international terminal, construction of which by a German-Philippine consortium was completed in December 2002.*' (Auswärtiges Amt, Website, available at http://www.auswaertiges-amt.de/EN/Aussenpolitik/Laender/Laenderinfos/01-Nodes/Philippinen_node.html (visited 26 February2014).

[73] Cf. Poulsen, L., Bounded Rationality and the Diffusion of Modern Investment Treaties, *International Studies Quarterly*, Vol. 58 (2013), pp. 1 et seqq., p. 12 who suggests that esp. *developing states wanted to believe that investment instruments help attract foreign investment*. Whether they indeed do attract foreign investment is a different question. The more universal similarly worded international investment instruments become, the less of a comparative advantage over other competing states they might be able to provide. Cf. Mills, A., Antinomies of Public and Private at the Foundations of International Investment Law and Arbitration, *Journal of International Economic Law*, Vol. 14 (2011), pp. 469 et seqq., p. 487. Economists have not reached consensus on the effects of investment instruments on economic development, cf. Aisbett, E., Bilateral Investment Treaties and Foreign Direct Investment: Correlation Versus Causation, in: Sauvant/Sachs (eds.), *The Effect of Treaties on Foreign Direct Investments*, Oxford University Press, New York, 2009, pp. 395 et seqq.; Peinhardt, C. and Allee, T., Failure to Deliver: The Investment Effects of US Preferential Economic Agreements, *World Economy*, Vol. 35 (2012), pp. 757 et seqq.; Berger, A. et al., Do trade and investment agreements lead to more FDI? - Accounting for key provisions inside the black box, *International Economics and Economic Policy*, Vol. 10 (2013), pp. 247 et seqq.; Sasse, J., *An Economic Analysis of Bilateral Investment Treaties*, Gabler, Wiesbaden, 2011; all with further references. Note also the study by Poulsen, L. et al., *Costs and Benefits of an EU-USA Investment Protection Treaty*, 2013, available at http://www.italaw.com/sites-/default/files/archive/costs-and-benefits-of-an-eu-usa-investment-protection-treaty.pdf (visited 1 May 2014), p. 18: 'Overall, we find it unlikely that an EU-US investment protection agreement would have an tangible impact on the amount of US investment flowing to the UK.'

[74] Admittedly, this process may take longer as the example of Central and Eastern Europe shows. Some EU Member States have gathered considerable experience in defending a multitude of investor-state claims. As we still see a steady flow of new requests for arbitration being filed, one may wonder whether the pressure exercised on the respective governments was not sufficient to bring about substantial change to the internal legal and administrative structures to prevent future arbitrations. See also Gutbrod, M. and Hindelang, S., Externalization of Effective Legal Protection against Indirect Expropriation – Can the Legal Order of Developing Countries Live up to the Standards Required by International Investment Agreements? A Disenchanting Comparative Analysis, *The Journal of World Investment and Trade*, Vol. 7 (2006), pp. 59 et seqq.

the same time it may discourage future governments from turning back reforms 'to the worse' in terms of the rule of law; at least with regard to the foreign investor[75]. In this sense ISDS might even be seen as *one element of development policy* which[76], of course, in certain cases needs to be accompanied by substantial technical assistance such as institution-building and rule of law training.

## 2.3      Perceived challenges of ISDS

Critique of ISDS is as old as the system itself[77]. Lately, though, criticism has also reached the middles of those societies which commonly supported robust investment protection backed up by strong ISDS mechanisms[78]. To begin with, ISDS practice has been criticised by civil society, academia and even by business organisations[79] for *not producing consistent and predictable outputs* so that especially host states lack guidance on their obligations accepted under a certain investment instrument (below 2.3.1 (p. 59)). While several improvements have been suggested, not each appears equally politically feasible or legally suitable to address these concerns.

While a *multilateral investment agreement with a centralised dispute resolution mechanism and/or appeals facility* might be well suited to counter current inconsistency concerns and should be targeted in the long run, currently political prospects of such a proposal appear to be dim (below 2.3.1.1 (p. 61)).

Investment tribunals themselves want to advance 'consistency' by way of *'de facto precedent'* and similar concepts, i.e. relying on previous rulings by arbitral tribunals for interpreting an investment instrument. Attractive as it may be at first glance, such concepts seem *highly problematic* when sidestepping the binding methodology of interpretation in public international law. Abandoning the methodology of interpretation enshrined in the Vienna Convention on the Law of Treaties (VCLT)[80], the tribunals would free themselves from the bonds of their masters: the state parties to an investment treaty (below 2.3.1.2 (p. 66)). Other tools such as *securing and strengthening authoritative interpretation* of an investment instrument by state parties (below 2.3.1.3 (p. 69)), the *consolidation* of different claims involving similar questions of law and fact (below 2.3.1.4 (p. 71)) or drafting of *less*

---

[75] VanDuzer, J. et al., *Integrating Sustainable Development into International Investment Agreements – A Guide for Developing Countries,* Commonwealth Secretariat, August 2012, available at http://www.iisd.org/pdf/2012/6th_annual_forum_-commonwealth_guide.pdf (visited 28 April 2014), p. 401. See generally O'Hara, E. and Ribstein, L., *The Law Market*, Oxford University Press, Oxford, 2009; Elkins, Z. et al., Competing for Capital: The Diffusion of Bilateral Investment Treaties, 1960–2000, *International Organisation*, Vol. 60 (2006), pp. 811 et seqq.

[76] Cf. also 2.3.2.2.2.3.2.2 (p.90). Note also Reisman, W. and Robert, R., Indirect Takings and its Valuation in the BIT generation, *British Yearbook of International Law,* Vol. 74 (2003), pp. 115 et seqq., p. 117; disillusioning Ginsburg, T., International Substitutes for Domestic Institutions: Bilateral Investment Treaties and Governance, *International Review of Law and Economics*, Vol. 25 (2005), pp. 107 et seqq., pp. 118 et seqq.

[77] For an early critic cf. Sornarajah, M., *The International Law on Foreign Investment*, Cambridge University Press, New York, 3th Edition, 2010.

[78] Cf., in the press e.g. Pinzler, P., Extrarechte für Multis, *DIE ZEIT*, 5 December 2013; Henrich, A. et al., Schattenjustiz im Nobelhotel, *WirtschaftsWoche*, 29 April 2013; Ludwig, G., Klagerechte für Konzerne unter der Lupe, *Handelsblatt*, 28 March 2014; Kohlenberg, K. et al., Im Namen des Geldes, *DIE ZEIT*, 27 February 2014; Schiessl, M., Der Freifahrtschein, *DER SPIEGEL*, 20 January 2014.

[79] The Federation of German Industries concedes in a recent position paper that concerns in respect of ISDS have to be taken seriously and current investment instruments and ISDS practice display diverse weaknesses. Cf. Bundesverband der Deutschen Industrie e.V., *Positionspapier: Schutz europäischer Investitionen im Ausland: Anforderungen an Investitionsabkommen der EU*, available at http://www.bdi.eu/download_content/GlobalisierungMaerkteUndHandel-/Schutz_europaeischer_Investitionen_im_Ausland.pdf (visited 28 April 2014). See also Verband der Chemischen Industrie e.V., *Fragen und Antworten der Chemischen Industrie zu TTIP,* 2014, available at https://www.vci.de/Downloads/PDF/Fragen%20und%20Antworten%20der%20chemischen%20Industrie%20zu%20einem%20Freihandelsabkommen%20EU%20USA.pdf (visited 1 May 2014).

[80] Vienna Convention on the Law of Treaties, adopted 22 May 1969, entered into force 27 January 1980, available at https://treaties.un.org/doc/Publication/UNTS/Volume%201155/volume-1155-I-18232-English.pdf (visited 26 April2014).

*vague substantive standards* (below 2.3.1.5 (p. 71)) appear more suitable to cushion inconsistency concerns but also entail drawbacks. Due to the overall fragmented character of international investment law and absent any multilateral arrangement, *only modest improvements of consistency and predictability can be expected.*

Investment tribunals deal with *highly sensitive political issues* in host states[81]. They are asked to rule on the introduction of cigarette plain packaging with a view to addressing health risks associated with smoking in Australia[82] and Uruguay[83], the nuclear power phase-out in Germany[84] or crisis-related austerity measures taken by Belgium in the course of the European financial crisis[85]. Such high-profile cases contribute towards the growing *perception,* especially among members of civil society, *that ISDS practice is unduly interfering with democratic policy choices*[86]. In the past, tribunals have repeatedly faced questions of whether they are willing and able to sufficiently take into account public interests such as financial stability, environmental protection, public health or others. In legal terms, what has been criticised is that tribunals' awards seem to inaccurately reflect in their interpretation of a given investment instrument the 'right balance' between private property protection and the public interests which the state parties to the investment instrument meant to strike in their investment treaties[87].

*Securing the 'right balance'* – i.e. preserving space for democratic policy choices and, at the same time, respecting private property interests – has, among others, been at the centre of the reform debate on ISDS.

More radical suggestions call for *abandoning ISDS and replacing it* by domestic courts (below 2.3.2.2.1.1 (p. 76)), arbitration based on investor-state contracts or national legislation (below 2.3.2.2.1.2 (p. 78)), diplomatic protection and state-state arbitration (below 2.3.2.2.1.3 (p. 80)) or non-binding dispute resolution mechanisms (below 2.3.2.2.1.4 (p. 81)).

Others want to preserve the possibility for individuals or corporations to bring claims against a sovereign. They aim to *re-balance ISDS* with a view to preserving the 'right balance' the state parties – and not subsequently the tribunals – struck when they concluded the investment instrument. Tools

---

[81] Cf. for an overview of host state measures challenged in 2013 UNCTAD, *Recent Developments in Investor-State Dispute Settlement (ISDS)*, IIA Issues Note, 2014/1, available at http://unctad.org/en/PublicationsLibrary/webdiaepcb2014d3_en.pdf (visited 19 May 2014), pp. 5 et seq.

[82] Philip Morris Asia Limited v. The Commonwealth of Australia, Uncitral, PCA Case No. 2012-12, documents available at http://www.italaw.com/cases/851 (visited 1 May 2014); see also Voon, T. and Mitchell, A., Implications of international investment law for plain tobacco packaging: lessons from the Hong Kong–Australia BIT, in: Voon/Mitchell/Libermann/Ayres (eds.), *Public Health and Plain Packaging of Cigarettes: Legal Issues*, Edward Elgar, Cheltenham, 2012, pp. 137–172, also available at SSRN http://ssrn.com/abstract=2377919 (visited 1 May 2014).

[83] *Philip Morris Brands Sàrl, Philip Morris Products S.A. and Abal Hermanos S.A. v. Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7 (formerly FTR Holding SA, Philip Morris Products S.A. and Abal Hermanos S.A. v. Oriental Republic of Uruguay), documents available at http://www.italaw.com/cases/460 (visited 1 May 2014).

[84] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, documents available at http://www.italaw.com/documents/1655 (visited 1 May 2014).

[85] *Ping An Life Insurance Company of China, Limited and Ping An Insurance (Group) Company of China, Limited v. Kingdom of Belgium*, ICSID Case No. ARB/12/29, documents available at http://www.italaw.com/cases/2042 (visited 1 May 2014).

[86] Johnson, L. and Volkov, O., State Liability for Regulatory Change: How International Investment Rules are Overriding Domestic Law, *Investment Treaty News*, Vol. 5 (2014), pp. 3 et seqq., see also an open letter by various international NGOs addressed to US Trade Representative Michael Froman and EU Trade Commissioner Karel de Gucht calling for dismissing ISDS from TTIP, available at http://action.sierraclub.org/site/DocServer/TTIP_Investment_Letter_Final.pdf?docID=14701 (visited 1 May 2014).

[87] This study operates with the assumption that state parties to investment instruments never wanted to provide for completely unqualified private property protection but – even though not always spelling it out in detail within an investment instrument – wanted to see private property interests balanced with public interests, referenced in the same or other international agreements, or other sources of public international law or found in the domestic legal context.

which lend themselves for such an objective comprise, inter alia, the activation of the power of authoritative interpretation of an investment instrument by the state parties (below 2.3.2.2.2.1 (p. 83)), the redrafting of substantive standards (below 2.3.2.2.2.2 (p. 86)) and the restriction or delay of access to ISDS. In respect of the latter, a novel elastic exhaustion of local remedies rule (below 2.3.2.2.2.3.2 (p. 88)) appears to be central to preserving the 'right balance' between private and public interests. Another tool states have already deemed appropriate to better preserve their policy space is to limit remedies in ISDS to (monetary) compensation. However, whether this instrument is indeed effective or rather counterproductive has yet to be critically assessed (below 2.3.2.2.2.4 (p. 93)). Likewise, in order to give sufficient weight to public interests in investment arbitration, some observers suggest allowing for host state claims. While this idea has some merit it also entails several difficulties which might offset the advantages (below 2.3.2.2.2.5 (p. 95)).

Since the interpretation of an investment instrument in ISDS, especially when containing novel or innovative clauses, can hardly be predicted, it is decisive to preserve some flexibility for future changes without having to renegotiate the whole agreement. Aside from tools for authoritative interpretation, review periods and/or termination clauses specific to certain investment provisions and ISDS clauses would lend themselves to better control treaty practice (below 2.3.2.2.2.6 (p. 96)).

When allowing international tribunals to review administrative, judicial and legislative acts of host states, the public in this state has a vital interest in securing the integrity of the proceedings. However, ISDS has been carried out behind closed doors and arbitral awards are not published by default[88]. Only lately criticism has mounted in Europe that this is not acceptable anymore. Clear improvements in terms of transparency can already be witnessed in EU draft agreements or negotiating directives (below 2.3.3.1 (p. 98)). Another serious matter of concern is the alleged appearance of bias of arbitrators and arbitration institutions in favour of investors. If one subscribes to the view that not only justice must be done, but it must also be seen to be done, overcoming this issue without significantly altering the current system of ad-hoc nominated arbitrators will prove challenging (below 2.3.3.2 (p. 100)).

Like any other litigation or arbitration instrument, ISDS also carries in it the potential for misuse. Investors might restructure their investments after a dispute arose in order to take advantage of the protection offered by a certain investment instrument (below 2.3.4.1 (p. 105)). Furthermore, simply by bringing an investment claim (even if the case is not a substantiated one), foreign investors can gain a bargaining chip to pressure host states into compromises to which they would otherwise not have agreed to (below 2.3.4.2 (p. 107)).

Given the issues at stake in investor-state arbitration, investment instruments should also provide for sufficient safeguards to correct erroneous decisions. Current agreements hardly provide for meaningful correction mechanisms (below 2.3.5. (p. 107)).

Last but not least, the financial risks involved in ISDS – in terms of both arbitration costs and the amount of damages awarded (below 2.3.6 (p. 109)) – are significant. Tools to control these risks better, at least to some extent, are available. Negotiating state parties only need to make respective policy choices.

---

[88] Note in this respect that – in contrast to popular belief – ICISID also does not publish awards in full by default but only by consent of the parties to the disputes. Excerpts of the legal reasoning in an award are published where a party does not agree to publish that award, cf. Article 48(4) ICSID-Arbitration Rule.

### 2.3.1    Consistency and predictability

It is commonly held that consistency in decision making, i.e., resolving the same or similar legal or factual questions in the same or similar way in a sequence of cases, is not just a matter of equality, legitimacy and perceived fairness of an adjudicative mechanism but also allows for predictability and long term planning of those subjected to this system[89].

However, when it comes to ISDS there is *neither a single legal basis for a claim, nor* is there *a single global adjudicative mechanism:*

Ad-hoc tribunals render decisions on the basis of over 3.000, by and large, *similar but rarely identically worded,* mostly bilateral investment instruments containing broad or even vague substantive protection standards. Other substantive rules applicable in addition to the investment instrument may vary from case to case[90]. Such additional rules may relate to domestic law, rights and duties under customary international law and such flowing from other treaties concluded between the state parties to the investment instrument[91].

In a nutshell, the Vienna Convention on the Law of Treaties, containing the compulsory[92] means of interpretation (hereafter referred to as 'Vienna rules'), establishes, among others, a duty to interpret an investment instrument in the broader context of the entire legal relations of the state parties[93]. In the case of a bilateral investment treaty, the bunch of bilateral rights and duties between two states hardly ever resemble the bunch of bilateral rights and duties between two other states. Just imagine the bilateral legal relations between Germany and the USA on the one side and such between Malaysia and the United Arab Emirates on the other. Hence, *each bilateral investment instrument has its unique broader context in the light of which it has to be interpreted.*

---

[89] Franck, S., The Legitimacy Crisis in Investment Treaty Arbitration: Privatizing Public International Law Through Inconsistent Decisions, *Fordham Law Review,* Vol. 73 (2005), pp. 1521 et seqq., p. 1584; Brower, C., Structure, Legitimacy, and NAFTA's Investment Chapter, *Vanderbilt Journal of Transnational Law,* Vol. 36 (2003), pp. 37 et seqq., p. 51; Bucher, A., Is There a Need to Establish a Permanent Reviewing Body?, in: Gillard (ed.), *The Review of International Arbitration Awards,* JurisNet, Huntington, 2010, pp. 285 et seqq., pp.290 et seqq.; Franck, T., *The Power of Legitimacy among Nations,* Oxford University Press , New York, 1990, p. 52; Kalb, J., Creating an ICSID Appellate Body, *UCLA Journal of International Law and Foreign Affairs,* Vol. 10 (2005), pp. 179 et seqq., pp. 196 et seqq.; Montt, S., State Liability in Investment Treaty Arbitration, Hart Publishing, Oxford, 2009, pp. 137 et seqq.

[90] Absent a pre-determination of the applicable law in the investment instrument and, furthermore, if the parties to the dispute have not specified it, the determination of the applicable substantive law in investment arbitration depends on the arbitration (default) rules such as Article 42(1) 2. Sentence ICSID-Convention which offer little guidance. The provision reads: 'In the absence of such agreement [on the rules], the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable.' The CETA draft determines in Article x-12 (1) CETA draft of 4 February 2014 = Article x-27(1) of CETA draft of 3 April 2014 that the applicable law is the investment instrument itself, interpreted in accordance with the Vienna Convention on the Law of Treaties and other rules and principles of international law applicable between the state parties.

[91] The Vienna Convention on the Law of Treaties significantly controls the relationship of the investment instrument to other treaties such as environmental, human rights or border treaties which may be relevant to the dispute, cf. Articles 30, 59 VCLT.

[92] Absent the agreement of the state parties to abandon or vary the Vienna rules.

[93] Article 31 VCLT stipulates that the provisions of a treaty have to be interpreted, inter alia, in its context. Along with the context any subsequent agreements between the state parties regarding the interpretation of the treaty (Article 31(3) lit a VCLT), subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation (Article 31(3) lit b VCLT) and *any relevant rules of international law applicable in the relations between the parties* (Article 31(3) lit c VCLT) are to be taken into account.

Furthermore, arbitral proceedings are governed by *a variety of procedural norms* – such as ICSID or Uncitral arbitrational rules. Investment instruments frequently provide for a selection of arbitration rules[94] from which the claimant can choose.

Taken together, these points should make it reasonably clear that investment disputes are *hardly ever governed by 'the same set of rules'*; neither in substantive nor in procedural terms[95]. Speaking of international investment law as 'a legal system' such as the World Trade Organisation (WTO) or similar multilateral arrangements would clearly be a depiction *de lege ferenda*[96]. As soon as two foreign investors in a host state do not share the same home state, they have to make their claims based on different investment instruments. Even if the disputes might arise from one and the same governmental measure and the substantive provisions of the investment instruments governing the disputes are identical, the provisions of each investment instrument still have to be interpreted in their unique broader (bilateral) contexts.

In such a regulatory environment, *consistency and predictability* are, *by necessity, limited*[97]. Hence 'inconsistency' in decision making in ISDS is first and foremost the result of the current state of international investment law, atomized into over 3.000 investment instruments and dozens of arbitration rules. It would therefore be more appropriate to speak of *fragmentation* instead of

---

[94] Cf. Article x-8(2) CETA draft of 4 February 2014 = Article x-22(2) of CETA draft of 3 April 2014: ICSID-Convention, ICSID Additional Facility and Uncitral Arbitration Rules, and any other agreed on by the disputing parties.

[95] A notable exception are, for example, the Argentina cases on the basis of the US-Argentina BIT: CMS Gas Transmission Co. v. Argentine Republic, ICSID Case No. ARB/01/8, Award (12 May 2005), available at http://www.italaw.com/sites/default/files/case-documents/ita0184.pdf (visited 8 May 2014); CMS Gas Transmission Co. v. Argentine Republic, ICSID Case No. ARB/01/8, Annulment Decision (25 September 2007), available at http://www.italaw.com/sites/default/files/case-documents/ita0184.pdf (visited 8 May 2014); Enron Corporation and Ponderosa Assets, L.P. v. Argentine Republic, ICSID Case No. ARB/01/3 (also known as: Enron Creditors Recovery Corp. and Ponderosa Assets, L.P. v. The Argentine Republic), documents available at http://www.italaw.com/cases/401 (visited 8 May 2014); Enron Corporation and Ponderosa Assets, L.P. v. Argentine Republic, ICSID Case No. ARB/01/3 (also known as: Enron Creditors Recovery Corp. and Ponderosa Assets, L.P. v. The Argentine Republic), Award (22 May 2007), available at http://www.italaw.com/sites/default/files/case-documents/ita0293.pdf (visited 8 May 2014); Enron Corporation and Ponderosa Assets, L.P. v. Argentine Republic, ICSID Case No. ARB/01/3 (also known as: Enron Creditors Recovery Corp. and Ponderosa Assets, L.P. v. The Argentine Republic), Annulment Decision (30 July 2010), available at http://www.italaw.com/sites/default/files/case-documents/ita0299.pdf (visited 8 May 2014); LG&E Energy Corp., LG&E Capital Corp., and LG&E International, Inc. v. Argentine Republic, ICSID Case No. ARB/02/1, Decision on Liability (3 October 2006), available at http://italaw.com/sites/default/files/case-documents/ita0460.pdf (visited 8 May 2014); Sempra Energy Int'l v. Argentine Republic, ICSID Case No. ARB/02/16, Award (28 September 2007), available at http://www.italaw.com/sites/default/files/case-documents/ita0770.pdf (visited 8 May 2014); Sempra Energy Int'l v. Argentine Republic, ICSID Case No. ARB/02/16, Annulment Decision (29 June 2010), available at http://www.italaw.com/sites/default/files/case-documents/ita0776.pdf (visited 8 May 2014); Continental Casualty Company v. Argentine Republic, ICSID Case No. ARB/03/9 (5 September 2008), Annulment Decision (16 September 2011), available at http://www.italaw.com/sites/default/files/case-documents/ita0231.pdf (visited 8 May 2014).

[96] Ten Cate, I., The Costs of Consistency: Precedent in Investment Treaty Arbitration, *Columbia Journal of Transnational Law*, Vol. 51 (2013), pp. 418 et seqq., p. 425 with further references. For an account of the impact of the multitude of investment instruments on customary international law see Hindelang, S., Bilateral Investment Treaties, Custom and a Healthy Investment Climate - The Question of Whether BITs Influence Customary International Law Revisited, *The Journal of World Investment and Trade*, Vol. 5 (2004), pp. 789 et seqq.

[97] Some have chosen to style the situation of an 'inconsistency by structure' in terms of a 'legitimacy crisis' in international investment law. Cf. Burke-White, W. and von Staden, A., Private Litigation in a Public Law Sphere: The Standard of Review in Investor-State Arbitrations, *Yale Journal of International Law*, Vol. 35 (2010), pp. 283 et seqq., p. 299; Schreuer, C. and Weiniger, M., *Conversations Across Cases – Is There a Doctrine of Precedent in Investment Arbitration?*, p. 1 et seqq., available at http://www.univie.ac.at/intlaw/conv_across_90.pdf (visited 25 July 2014); Kingsbury, B. and Schill, S., Investor-State Arbitration as Governance: Fair and Equitable Treatment, Proportionality and the Emerging Global Administrative Law, in: van den Berg (ed.), *50 Years of the New York Convention: ICCA International Arbitration Conference*, Kluwer Law International, The Hague, 2009, pp. 5 et seqq. For a recent example on ISDS practice making reasonably obvious the 'limitations on consistency' cf. *TECO Guatemala Holdings, LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Award, para. 485 et seqq., available at http://www.italaw.com/sites/default/files/case-documents/italaw3035.pdf (visited 8 May 2014).

'inconsistency' as the latter appears to presuppose the application of identical or at least comparable legal rules which form the basis of a tribunal's decision. However, as explained above, identity or comparability of the legal basis of a tribunal's decision exist *stricto sensu* only to a very limited extent. One must, therefore, be careful not to compare apples with oranges when comparing arbitral awards handed down on the basis of different investment instruments.

This overall situation renders any reliable prediction of conformity of a certain state measure with a given investment instrument a risky and resource-intensive task[98]. For host states a diligent assessment would require an evaluation of any state measure with relevance for private property in the light of *each* individual investment instrument and its broader public international law context. And still, even if a host state would be able to devote sufficient resources, such assessments would still be burdened with a considerable degree of uncertainty.

A high degree of consistency – beyond arbitral awards handed down on the basis of one and the same investment instrument – is an illusion absent a treaty with a broad geographic coverage and (more) centralised adjudicative mechanisms (below 2.3.1.1 (p. 61)). Even worse, calling for more consistency of awards rendered on the basis of *different* investment instruments effectuated by mechanisms such as 'de facto precedent' might involve the danger of depriving the state parties of their control over the investment instruments (below 2.3.1.2 (p. 66))[99]. Rather, state parties to an investment instrument should activate their power of authoritative interpretation (below 2.3.1.3 (p. 69)), provide for consolidation of claims (below 2.3.1.4 (p. 71)) and more clearly define substantive standards in investment instruments (below 2.3.1.5 (p. 71)).

### 2.3.1.1    Establishment of a permanent investment court or an appeals mechanism

### 2.3.1.1.1    Permanent investment court

Introducing a standing investment court with tenured judges has for long been rejected on the grounds that standing courts, compared to ad-hoc tribunals, supposedly show a stronger tendency of construing their own jurisdiction expansively and developing it in directions not desired by states. When opting for ad-hoc arbitration and bilateral investment treaties, states may have exchanged inconsistency for avoiding unintended developments in the jurisprudence of a permanent court and have so circumvented answering the questions of, first, what the 'right development' would be and, second, who would control such a permanent court absent a multilateral governance structure. Hence, ad-hoc arbitration might have intentionally been chosen to limit powers of 'dispute resolvers' and much better protect the state parties' intentions and interests balanced and fixed in a given investment treaty[100].

However, as experience with the North American Free Trade Agreement (NAFTA)[101] has demonstrated[102], it can be doubted that ad-hoc tribunals effectively perform the claimed role of a guardian of the state parties' intentions. On the contrary, if tribunals had respected the intentions of

---

[98] See on this issue also Brühl, J., Europa vor Gericht, *Sueddeutsche.de*, 1 May 2014), available at http://www.sueddeutsche.de/wirtschaft/investitionsschutz-im-freihandelsabkommen-ttip-europa-vor-gericht-1.1947266 (visited 5 May 2014).

[99] Cf. below 2.3.1.2 (p.66).

[100] Montt, S., *State Liability in Investment Treaty Arbitration*, Hart Publishing, Oxford, 2009, pp. 155 et seqq.

[101] NAFTA was signed by Canada, Mexico, and the United States of America. It created a trilateral rules-based trade bloc in North America. In Chapter 11 it contains substantive as well procedural rules on foreign investment; text available at https://www.nafta-sec-alena.org/Default.aspx?tabid=97&ctl=SectionView&mid=1588&sid=539c50ef-51c1-489b-808b-9e20c9872d25&language=en-US (visited 5 May 2014).

[102] See below 2.3.2 (p.72).

the state parties in interpreting an investment instrument – to which they were compelled by the binding rules of interpretation of treaties in public international law – there would not have been the need for the NAFTA Free Trade Commission – bringing together the state parties to NAFTA to authoritatively decide on questions of interpretation – to fix the substantive treatment standards of fair and equitable treatment and full protection and security to the customary international law minimum standard of treatment of aliens[103]. Previous to the interpretative note, some tribunals construed the standard more broadly[104].

What is more, the alleged (but hardly proven) power-limiting effect is no argument against a permanent court's possible contribution towards more consistency in ISDS practice[105]. In the name of equality, predictability and credibility[106], such a court, endowed with an institutional memory, would in tendency better ensure that like cases would indeed be treated alike. If many cases are potentially decided on the basis of *one and the same investment instrument* the establishment of a permanent court would probably contribute to more consistency. For example, if a standing court had adjudicated the claims of US American investors against Argentina in the aftermath of its financial crisis, it would probably have avoided the conflicting decisions of the different ad-hoc tribunals[107]. Depending on the number of claims expected[108], establishing *a permanent court could*, hence, *also*

---

[103] Cf. NAFTA Free Trade Commission, *Notes of Interpretation of Certain Chapter 11 Provisions (Article 1105 and the Availability of Arbitration Documents)*, 31 July 2001, available at http://www.sice.oas.org/tpd/nafta/Commission/-CH11understanding_e.asp (last visited 1 May 2014).

[104] In the aftermath, arbitrators reacted in a 'flexible' manner to the perceived 'challenge' by holding 'both customary international law and the minimum standard of treatment of aliens it incorporates, are constantly in a process of development'. Cf. *ADF Group v. United States of America*, ICSID Case No. ARB (AF)/00/1, Award (9 January 2003), para. 179, available at http://www.italaw.com/sites/default/files/case-documents/ita0009.pdf (visited 8 May 2014). See also Brower II, C. H., Structure, Legitimacy, and NAFTA's Investment Chapter, *Vanderbilt Journal of Transnational Law*, Vol. 36 (2003), pp. 37 et seqq., pp. 84 et seqq. on the issue of distinguishing authoritative interpretation from treaty amendment. In order to avoid any doubts, treaty parties should make explicit in their treaty texts that tribunals are not allowed to reject an authoritative interpretation by the state parties on the grounds that it would allegedly or actually amount to a treaty amendment or modification (cf. Art. 39 VCLT). See also UN General Assembly, International Law Commission, Special Rapporteur Nolte, G., *Second report on subsequent agreements and subsequent practice in relation to treaty interpretation*, A/CN.4/671 of 26 March 2014, para. 56-57, 143-145, 150-155, 165.

[105] The establishment of a permanent investment court could also contribute towards the resolution of other issues regularly referred to with ISDS, i.e. transparency of decision making and the independence and impartiality of adjudicators. Cf. below 2.3.3 (p.96).

[106] Note also the differently tailored argument in favour of a permanent court which suggests that it is the nature of the legal question dealt with in ISDS, i.e. to review the legality of the use of sovereign authority towards an individual, which renders private models of adjudication inadequate. Cf. Van Harten, G., *A Case for International Investment Court*, Inaugural Conference of the Society for International Economic Law, 16 July 2008, available at http://papers.ssrn.com/sol3-/papers.cfm?abstract_id=1153424 (visited 1 May 2014).

[107] Cf. for a more detailed discussion of the Argentina cases which were adjudicated on the basis of the same investment instruments and departed in particular on the question of the relationship between host state defences under the instrument and under customary international law: Ten Cate, I., International Arbitration and the Ends of Appellate Review, *New York University Journal of International Law and Politics*, Vol. 44 (2012), pp. 1109 et seqq., p. 1180; Ten Cate, I., The Costs of Consistency: Precedent in Investment Treaty Arbitration, *Columbia Journal of Transnational Law*, Vol. 51 (2013), pp. 418 et seqq.

[108] Cf. Poulsen, L. et al., *Costs and Benefits of an EU-USA Investment Protection Treaty*, 2013, available at http://www.italaw.com/sites/default/files/archive/costs-and-benefits-of-an-eu-usa-investment-protection-treaty.pdf (visited 1 May 2014), pp. 21 et seqq. who, with regard to the UK, predict a higher number of cases brought by US investors on the basis of TTIP than, in the NAFTA context, initiated by US investors against Canada. In respect of the EU one could make the following rough calculations which are certainly statistically inadequate but nevertheless may provide some initial indication on the possible number of claims: Canada – home of about 7.8 percent of US FDI stock in 2012 – had to respond to 33 claims (notice of intent filed) by US investors within the period of 20 years. In 2012, the EU was home of 50 percent of US FDI stock. Hence, if a NAFTA-like agreement between the USA and the EU would enter into force today, the EU could have to respond to about *211 claims by US investors in 20 years or about ten claims per year*. Cf. for the numbers on FDI stock UNCTAD, *Bilateral FDI Statistics*, 2014, available at http://unctad.org/en/Pages/DIAE/FDI%20Statistics/FDI-Statistics-Bilateral.aspx (visited 5 May 2014). It would be interesting to see a study on the expected caseload for the whole of the EU.

*make sense in the EU-US or EU-Canada relations* when it comes to consistency. However, in such an institutional setting consistency is also bought at the expense of a 'dialogue' among different ad-hoc tribunals on what is the 'right' interpretation of the investment instrument. A middle course option would be to allow for ad-hoc tribunals and establish a permanent appeals facility which guarantees some consistency[109].

Consistency effects flowing from an international investment court charged to adjudicate *on a regional or global scale[110]* would currently be limited due to the fragmented state of international investment law. Such a court would have to rule on the basis of many (yet still) different bilateral and regional investment instruments. As mentioned above, bilateral or regional investment treaties might be roughly similar but not necessarily identical. Even if they might be identical, when interpreting a certain bilateral investment treaty other bilateral legal obligations between the state parties to the investment treaty would have to be taken into account (cf. Article 31 VCLT). The bunch of bilateral rights and duties between two states hardly ever resemble the bunch of bilateral rights and duties of two other states. Hence, provisions are interpreted and cases are adjudicated in different bilateral legal contexts. As will be explained in more detail further below[111], the transfer of an interpretation of a substantive standard from one bilateral context to another is fraught with problems: The intentions of the state parties encapsulated in the substantive standards of an individual investment treaty could be replaced by interpretations developed in another bilateral context; by arbitrary choice of the court.

Hence, only in the event of states concluding regional or multilateral agreements containing common substantive standards, consistency effects flowing from a permanent global or regional investment court would significantly increase[112]. This, however, would require a major policy shift in regulating international investment by a large number of states which would not only have to agree on a common set of procedural but also substantive rules[113].

---

See also UNCTAD, *Investor-State Dispute Settlement: An Information Note on the United States and the European Union*, IIA Issues Note 2014/2, available at http://unctad.org/en/PublicationsLibrary/webdiaepcb2014d4_en.pdf (visited 22 July 2014).
[109] Cf. 0 (p.64).
[110] An approach which appears suitable for establishing an international investment court *without having to revise all bilateral or regional investment instruments* would be the one chosen for the Uncitral Rules on Transparency in Treaty-based Investor-State Arbitration. Article 1(1), (2) lit a of these Rules reads: 'The UNCITRAL Rules on Transparency in Treaty-based Investor-State Arbitration ("Rules on Transparency") shall apply to investor-State arbitration initiated under the UNCITRAL Arbitration Rules pursuant to a treaty providing for the protection of investments or investors ("treaty")* concluded on or after 1 April 2014 unless the Parties to the treaty** have agreed otherwise. [...] In investor-State arbitrations initiated under the Uncitral Arbitration Rules pursuant to a treaty concluded before 1 April 2014, these Rules shall apply only when: [...] The Parties to the treaty or, in the case of a multilateral treaty, the State of the claimant and the respondent State, have agreed after 1 April 2014 to their application.' Hence, what the state parties essentially agreed on was to apply the Uncitral Transparency Rules 'on top' of their investment instruments. Taken the 'institutional cloud' and reputation of Uncitral such approach might lend itself to a more far-reaching 'step-by-step multilateralisation' and harmonisation of the fragmented body of international investment law.
[111] Cf. 2.3.1.2 (p.66).
[112] In such situations, interpretation would not be scattered by binary relations as only such other treaties have to be taken into account to which all parties to the multilateral investment treaty are also party to. Cf. McLachlan, C., The Principle of Systematic Integration and Article 31 (3) (C) of the Vienna Convention, *International and Comparative Law Quarterly*, Vol. 54 (2005), pp. 279 et seqq., p. 315; see also International Law Commission, *Conclusions of the work of the Study Group on the Fragmentation of International Law: Difficulties arising from the Diversification and Expansion of International Law*, 2006, para. 21.
[113] UNCTAD, *Reform of Investor-State Dispute Settlement: In Search of a Roadmap*, IIA Issues Note 2013/2, available at http://unctad.org/en/PublicationsLibrary/webdiaepcb2013d4_en.pdf (visited 19 May 2014), p. 10.

### 2.3.1.1.2    Appeals facility

An appeals facility, so it is hoped, could correct erroneous decisions and, coincidentally, would contribute to more consistency and predictability in investment law decision making[114]. Especially domestic legal experience shows that lower courts or tribunals would, in tendency, be inclined to follow the jurisprudence of an appeals facility in order not to get overturned, even if former decisions of the appeals facility would not be legally binding upon the lower level. A combination of a multitude of courts or tribunals at entry level and an appeals facility may enable a judicial dialogue on the questions of interpretation among the lower level[115].

However, currently, there is *no appeals mechanism in ISDS*. Challenging awards is restricted to *annulment* or *setting aside proceedings* which can only lead to the *invalidation* of an individual decision or *refusal of its enforcement*. Introducing an appeals facility in ISDS, in contrast, may allow for *modifying* a decision of a tribunal and, thus, can contribute – subject to the conditions set out further below – to harmonising investment law jurisprudence in the way described above[116].

WTO experience demonstrates that establishing a (permanent) appeals facility must *not necessarily* be *related to a significant increase in costs and time*[117]. Some may nevertheless want to argue that the finality of arbitration proceedings – i.e. only very limited or no appeals mechanisms – was one of the advantages of investment arbitration over domestic court systems as it puts an end to a dispute. This might in turn contribute to a de-politicisation of an investment conflict as it is quickly taken off the public agenda[118]. However, since investment arbitration involves considerable public interests such as product safety, environmental protection, labour standards, public health or nuclear power phase-

---

[114] Burke-White, W and von Staden, A., Private Litigation in a Public Law Sphere: The Standard of Review in Investor-State Arbitrations, *Yale Journal of International Law*, Vol. 35 (2010), pp. 283 et seqq., p. 299; Blackaby, N., Public Interest and Investment Treaty Arbitration, in: van den Berg, A. (ed.), *International Commercial Arbitration: Important Contemporary Questions,* Kluwer Law International, The Hague, 2003, pp. 355 et seqq., p. 364. Cf. also for a general account Sauvant, K. (ed.), *Appeals Mechanism in International Investment Disputes*, Oxford University Press, New York, 2008; see for a summary of a discussion among OECD countries OECD, *Improving the System of Investor-State Dispute Settlement: An Overview*, OECD Working Papers on International Investment No. 2006/1, available at http://www.oecd.org/daf/inv/internationalinvestment-agreements/36052284.pdf (visited 5 May 2014); for an optimistic view see also UNCTAD, *Reform of Investor-State Dispute Settlement: In Search of a Roadmap*, IIA Issues Note 2013/2, available at http://unctad.org/en/PublicationsLibrary/webdiaepcb2013d4_en.pdf (visited 19 May 2014), p. 9.

[115] Ten Cate, I., International Arbitration and the Ends of Appellate Review, *New York University Journal of International Law and Politics*, Vol. 44 (2012), pp.1109 et seqq., pp. 1185-1187.

[116] A follow-up question would be whether an appeals facility would be permanent or ad-hoc. While an ad-hoc appeals tribunal might be able to correct real or perceived errors or provide a second opinion, a permanent appeals facility would bring an institutional memory and contribute to some consistency in respect of the interpretation of a certain investment instrument.

[117] Gaukrodger, D. and Gordon, K., *Investor-State Dispute Settlement: A Scoping Paper for the Investment Policy Community*, OECD Working Papers on International Investment No. 2012/03, available at http://dx.doi.org/10.1787/5k46b1r85j6f-en (visited 20 May 2014), p. 59. Max. 90 days are reserved for the appeals procedure at the WTO. Cf. Article 17(5) DSU.

[118] Legum, B., Visualizing an Appellate System, in: Ortino, F. et al. (eds.), *Investment Treaty Law: Current Issues- Vol. 1*, British Institute of International and Comparative Law, London, 2006, pp. 121 et seqq.; Paulsson, J., Avoiding Unintended Consequences, in: Sauvant/Chiswick-Patterson (eds.), *Appeals Mechanism in Investment Disputes*, Oxford University Press, New York, 2008, pp. 241 et seqq., pp. 258 et seqq.; Qureshi, A. and Khan S., Implications of an Appellate Body for Investment Disputes from a Developing Country Point of View, in: Sauvant/Chiswick-Patterson (eds.), *Appeals Mechanism in Investment Disputes*, Oxford University Press, New York, 2008, pp. 267 et seqq., pp. 277 et seq.; Laird, I and Askew, R., Finality Versus Consistency: Does Investor-State Arbitration Need an Appellate System?, *Journal of Appellate Practice and Process*, Vol. 7 (2005), pp. 285 et seqq., p. 290, p. 302; Bucher, A., Is There a Need to Establish a Permanent Reviewing Body?, in: Gaillard (ed.), *The Review of international Arbitration Awards No. 6*, Juris Publishing, Huntington, 2010, pp. 285 et seqq., pp. 290 et seqq. Note though that the average length of ICSID arbitration is well above three years. The longest lasted over ten years, the shortest a little over one year. Cf. Sinclair, A. et al., ICSID arbitration: how long does it take? *Global Arbitration Review*, Vol. 4 (2009), Issue 5, p. 14 et seqq.

outs accepting the – not just theoretical – risk of inconsistent and/or poorly reasoned or erroneous decisions appears hardly justifiable in the name of finality of arbitration.

As establishing an appeals' facility might involve incremental law making in the sense that it develops the law and adopts it to new situations, legitimacy concerns may be raised. In a domestic legal context, judicial activism is checked and balanced by the legislature which is absent in an international context. Again, WTO experience – which might, overall, be described as positive[119] – can provide a useful case study here[120]. Furthermore, establishing a treaty committee vested with the power to hand down authoritative interpretations on behalf of the state parties might mitigate legitimacy concerns as it could also 'correct' interpretations adopted by an appeals facility[121].

As already explained with regard to a permanent investment court[122], the current fragmented regulatory environment is anything but ideal to actually realise the potential for more consistency inherent in an appeals facility[123]. As long as international investment law consists predominantly of binary relations, consistency can be achieved (lawfully) only with regard to the awards rendered on the basis of one and the same investment instrument. The situation is even further complicated by the choice of arbitral fora generally provided for in investment instruments[124].

Absent a single multilateral investment instrument, calling for more 'consistency' across different (basically bilateral) investment instruments through 'interpretation' – could not only collide with the Vienna rules on treaty interpretation but may involve power shifting from state parties of the investment instruments to the investment tribunals and the appeals facility. Again, each investment instrument reflects a specific balance between public and private interests established in the negotiations between states. By importing standards from one investment instrument into another one at the discretion of an appeals facility, this facility would turn into a powerful self-styled and unchecked lawmaker[125].

In the CETA draft Canada and the EU appear merely to be able to agree on a *commitment to consult* on the establishment of an appeals facility or the subjection of decisions rendered on the basis of CETA

---

[119] Gantz, D., An Appellate Mechanism for Review of Arbitral Decisions in Investor-State Disputes: Prospects and Challenges, *Vanderbilt Journal of Transnational Law*, Vol. 39 (2006), pp. 39 et seqq., pp. 56–57; see for problems of transferring the WTO model on investment arbitration McRae, D., The WTO Appellate Body: A Model for an ICSID Appeals Facility?, *Journal of International Dispute Settlement*, Vol. 1 (2010), pp. 371 et seqq., pp. 382–87; Legum, B., Options to Establish an Appellate Mechanism for Investment Disputes, in: Sauvant/Chiswick-Patterson (eds.), *Appeals Mechanism in Investment Disputes*, Oxford University Press, New York, 2008, pp. 231 et seqq., pp. 234–235.

[120] Ioannidis, M., A Procedural Approach to the Legitimacy of International Adjudication: Developing Standards of Participation in WTO Law, *German Law Journal*, Vol. 12 (2011), pp. 1175 et seqq., pp. 1190–91; cf. von Bogdandy, A. and Venzke, I., Beyond Dispute: International Judicial Institutions as Lawmakers, *German Law Review*, Vol. 12 (2011), pp. 979 et seqq., p. 994; Alvarez, J., The Emerging Foreign Direct Investment Regime, *Proceedings of the Annual Meeting – American Society of International Law*, 2005, pp. 94, 96.

[121] Cf. on authoritative interpretation more generally 2.3.1.3 (p.69).

[122] Cf. 2.3.1.1.1 (p.61). See for a possible approach on how to establish a single multilateral appeals facility for arbitrations on the basis of already existing and future investment instruments footnote 105.

[123] Ten Cate, I., International Arbitration and the Ends of Appellate Review, *New York University Journal of International Law and Politics*, Vol. 44 (2012), pp. 1109 et seqq., p. 1188; note also McRae, D., The WTO Appellate Body: A Model for an ICSID Appeals Facility?, *Journal of International Dispute Settlement*, Vol. 1 (2010), pp. 371 et seqq., p. 387; Tams, C., An Appealing Option? The Debate about an ICSID Appellate Structure, in: Tietje, et al. (eds.), *Essays in Transnational Economic Law*, No. 57/June 2006, available at http://telc.jura.uni-halle.de/sites/default/files/altbestand/Heft57.pdf (visited 2 May 2014). Very sceptical from a practitioner's perspective Legum, B., Options to Establish an Appellate Mechanism for Investment Disputes, in: Sauvant/Chiswick-Patterson (eds.), *Appeals Mechanism in Investment Disputes*, Oxford University Press, New York, 2008, pp. 231 et seqq.

[124] For a summary of problems to be overcome see Ten Cate, I., International Arbitration and the Ends of Appellate Review, *New York University Journal of International Law and Politics*, Vol. 44 (2012), pp. 1109 et seqq., pp. 1200 et seqq.

[125] Cf. 2.3.1.2 (p.66).

to an appeals facility pursuant to other institutional arrangements outside CETA[126]. Absent the actual establishment of an appeals facility, the commitment to consult might exercise some (very modest) disciplining effect on ad-hoc tribunals not to depart too significantly from the original balance struck by the state parties.

Ultimately, the number of claims[127] and the degree of departure of the tribunals' holdings from the balance between public and private interests which was envisaged by the state parties to the agreement may decide on the prospects of successful negotiations on the establishment of an appeals facility[128].

### 2.3.1.2    'De facto precedent system'- Quis custodiet ipso custodes?

There is no general doctrine of precedent in public international law[129], nor do investment instruments or arbitration rules prescribe past decisions as legally binding on later investor-state tribunals[130]. However, in current ISDS practice a significant number of tribunals tend to justify their interpretation of a substantive standard by reference to the interpretation adopted in previous awards rendered by ad-hoc tribunals on the basis of different investment instruments[131]. Some claim that such a 'de facto precedent system' might contribute to more coherence in international investment arbitration[132].

---

[126] Article x-26(1) lit c CETA draft of 4 February 2014 = Article x-42(1) lit C of CETA draft of 3 April 2014. Note also the European Commission, Public consultation on modalities for investment protection and ISDS in TTIP, available at http://trade.ec.europa.eu/doclib/docs/2014/march/tradoc_152280.pdf (visited 5 May 2014), which contains in its Annex to Question 12 a 'teaser text' of a provision establishing an appellate mechanism.

[127] Cf. above footnote 108.

[128] Since providing for an appeals facility may also increase legal complexity and require devoting more resources to a legal conflict, an EU investment instrument with less and least developed countries or other international arrangements may provide for technical or legal assistance to them.

[129] Land and Maritime Boundary (Cameroon v. Nigeria), 1998 International Court of Justice, Preliminary Objections, Judgement, I.C.J Reports pp. 275, 292. Cf. for an overview of the use of precedent on the international level Guillaume, G., The Use of Precedent by International Judges and Arbitrators, *Journal of International Dispute Settlement*, Vol. 2 (2011), pp. 5 et seqq.

[130] Cf. e.g. Article 59 ICSID-Convention.

[131] Cf. e.g. Saipem S.p.A. v. The People's Republic of Bangladesh, ICSID Case No. ARB/05/07, Decision on Jurisdiction and Recommendation on Provisional Measures, para. 67, available at http://www.italaw.com/sites/default/files/case-documents/ita0733.pdf (visited 8 May 2014); AES Corporation v. Argentine Republic, ICSID Case No. ARB/02/17, Decision on Jurisdiction, para. 30-33, available at http://www.italaw.com/sites/default/files/case-documents/ita0011.pdf (visited 8 May 2014). For a more detailed review of approaches taken by tribunals cf. Sureda, A., *Investment Treaty Arbitration – Judging Under Uncertainty*, Cambridge University Press, Cambridge, 2012, pp. 117 et seqq.

[132] For prior decisions of investment tribunals as persuasive authority cf. Bjorklund, A., The Emerging Civilization of Investment Arbitration, *Penn State Law Review*, Vol. 113 (2009), pp. 1269 et seqq., p. 1273; Commission, J., Precedent in Investment Treaty Arbitration: A Citation Analysis of a Developing Jurisprudence, *Journal of International Arbitration*, Vol. 24 (2007), pp. 129 et seqq., pp. 143-154; Schill, S., Enhancing International Investment Law's Legitimacy: Conceptual and Methodological Foundations of a New Public Law Approach, *Virginia Journal of International Law*, Vol. 52 (2011), pp. 57 et seqq., pp. 82 et seqq.; Stone Sweet, A., Investor-State Arbitration: Proportionality's New Frontier, *Law and Ethics of Human Rights*, Vol. 4 (2010), pp. 47 et seqq., p. 61; Sureda, A., Precedent in Investment Treaty Arbitration, in: Binder, C. et al. (eds.), *International Investment Law for the 21st Century: Essays in Honour of Christoph Schreuer*, Oxford University Press, Oxford, 2009, pp. 830 et seqq., pp. 833 et seqq.; as *'jurisprudence constante'* (i.e. a line of consistent awards) cf. Kaufmann-Kohler, G., Is Consistency a Myth?, in: Banifatemi/Gaillard (eds.), *Precedent in International Arbitration Law*, Juris Publishing, Huntington, 2008, pp. 137 et seqq., pp. 138 et seqq., 146 et seqq.; Brower, C. and Schill, S., Is Arbitration a Threat or a Boon to the Legitimacy of International Investment Law?, *Chicago Journal of International Law*, Vol. 9 (2009), pp. 471 et seqq., p. 474; Wälde, T., Confidential Awards as Precedent in Arbitration: Dynamics and Implication of Award Publication, in: Banifatemi/Gaillard (eds.), *Precedent in International Arbitration Law*, Juris Publishing, Huntington, 2008, pp. 113 et seqq., p. 115; Bjorklund, A., Investment Treaty Arbitral Decisions as Jurisprudence Constante, in: Picker, C. et al. (eds.), *International Economic Law: The State and Future of the Discipline*, Hart Publishing, Oxford, 2008, pp. 265 et seqq., pp. 272-273. See also Sureda, A., *Investment Treaty Arbitration – Judging Under Uncertainty*, Cambridge University Press, Cambridge, 2012, pp. 130

Empirical evidence[133] confirms that a significant number of tribunals prefer to support their findings by referring to previous awards *instead of diligently following the arduous path of interpreting* the substantive provisions of a certain investment instrument governing the dispute *in accordance with the binding rules* on interpretation contained *in the Vienna Convention on the Law of Treaties*[134].

The Vienna rules prescribe a certain methodology of interpretation in order to secure a transparent interpretive process and a legitimate result most close *to the intention of the state parties to the treaty*. According to Article 31 VCLT, a tribunal is charged to interpret an investment instrument in good faith in accordance with its ordinary meaning to be given to the terms of the treaty in their context, and in the light of its object and purpose.

If a tribunal *sidesteps* this methodology by entertaining a 'de facto precedent system', it basically engages in 'cherry-picking' previous awards allegedly supporting a tribunal's reading of a certain treaty provision. In this context, it is important to recall that the precise meaning of substantive standards in a given bilateral investment instrument is also the result of unique bilateral legal relations of the state parties – cf. Article 31(3) VCLT – in which it is inextricably embedded. Arbitrarily choosing from a selection of interpretations of similarly worded provisions previously developed in different, usually incomparable bilateral contexts, carries the risk that the state parties' intentions with regard to the substantive standards in a specific investment instrument might be replaced by other, extraneous intentions. Put differently, the tribunal would not enforce values that the state parties collectively agreed to enshrine in the authoritative legal text but values it – consciously or unconsciously – deems worth promoting[135].

Hence, creating 'consistency' by a 'de facto precedent system' which sidesteps the primary means of interpretation comes at great costs. By abandoning the methodology of interpretation enshrined in the Vienna Convention on the Law of Treaties the tribunals would free themselves from the bonds of their masters, i.e. the state parties to the investment treaties.

---

et seqq.; Schill, S., *The Multilateralization of International Investment Law*, Cambridge University Press, New York, 2009, pp. 321 et seqq.

[133] Studies show that tribunals often pay nothing more than lip service to the Vienna rules: For the case of ICSID tribunals, see Fauchald, O., The Legal Reasoning of ICSID Tribunals – An Empirical Analysis, *European Journal of International Law*, Vol. 19 (2008), pp. 301 et seqq., p. 314. See also Waibel, M., International Investment Law and Treaty Interpretation, in: Hofmann/Tams (eds.), *International Investment Law and General International Law: From Clinical Isolation to Systemic Integration*, Nomos, Baden-Baden, 2011, pp. 29 et seqq.; Arsanjani, M. and Reisman, W., Interpreting Treaties for the Benefit of Third Parties: The "Salvors' Doctrine" and the Use of Legislative History in Investment Treaties Editorial Comment, *American Journal of International Law*, Vol. 104 (2010), p. 597 et seqq.; Berner, K., in: Hindelang/Krajewski (eds.), *Shifting Paradigms in International Investment Law (provisional title)*, Oxford University Press, forthcoming 2015.

[134] Cf. Schill, S., *The Multilateralization of International Investment Law*, Cambridge University Press, New York, 2009, pp. 328-338, who perceives this as 'delegated law making'. One may wonder whether one should speak of delegation or, instead, rather of accroached law making since the state parties obviously have never suspended arbitral tribunals from applying the Vienna rules. See also UNCTAD, *Interpretation of IIAs: What States Can Do*, IIA Issues Note 2011/3, available at http://unctad.org/en/Docs/webdiaeia2011d10_en.pdf (visited 19 May 2014), p. 5.

[135] Also Article 38 (1) lit d in connection with Article 59 Statute of the International Court of Justice (ICJ Statute) would not justify a 'de facto precedent system'. According to this provision, judicial decisions may give *evidence* of a source of international law – treaty, custom, or general principle – mentioned in Article 38 (1) lit a-c ICJ Statute. The crucial question then would be the one of which rule an arbitral tribunal provides evidence when interpreting an investment instrument. An award of an arbitral tribunal, first and foremost, provides evidence of the rules of the specific investment instrument the tribunal is charged to interpret. If another ad-hoc tribunal, later on, interprets a rule by reference to a previous award handed down *not* on the very same investment instrument, it does not refer to 'evidence' of the rule it interprets but to evidence of a different, completely unrelated rule from another treaty, which merely is worded similarly. Too permissible in this respect Schill, S., *The Multilateralization of International Investment Law*, Cambridge University Press, New York, 2009, p. 326.

While a tribunal could arguably turn to previous decisions of tribunals as *supplementary means of interpretation* according to Article 32 VCLT[136], it is *not allowed to disregard the primary means of interpretation* contained in Article 31 VCLT. According to Article 32 VCLT, recourse to previous decisions of tribunals as supplementary means of interpretation is *only* possible 'in order to *confirm* the *meaning* resulting from the application of Article 31, or to *determine* the meaning *when* the interpretation according to Article 31 (a) leaves the *meaning ambiguous or obscure*; or (b) leads to a result which is manifestly absurd or unreasonable'[137]. If a tribunal finds itself in such a position, it is under the obligation to make this reasonably clear before simply jumping to any arbitrarily chosen 'de facto precedent'[138]. Otherwise it would too easily subject itself to the criticism of illegitimate and unchecked law making[139].

In summary, a tribunal's primary task is to decide the dispute presented to it in accordance with the governing rules by using the means of interpretation prescribed for in the VCLT. Interpretation is the task of establishing the intention of the masters of the investment instrument, i.e. the state parties[140]. Referring to arbitrarily chosen previous decisions rendered on treaties different to the one under consideration does not spare a tribunal from interpreting a treaty in accordance with the primary means of interpretation in Article 31 VCLT. A call for a 'persuasive precedent'[141], for a '*jurisprudence constante*'[142] or for any other form of a 'de facto precedent system' in deviation of the Vienna rules is a call for a power shift: away from the state parties as the legitimate guardians of the common good towards self-styled new guardians[143].

European investment instruments should carefully address the danger inherent in 'interpretation'. Reminding tribunals to apply the Vienna Convention on the Law of Treaties might be important[144], but at the same time will probably not suffice. Decisions must be monitored *on a regular basis*

---

[136] For such an approach cf. NAFTA tribunal in Canadian Cattlemen, para. 50. Even stricter, not wanting to accept previous awards as supplementary means of interpretation Orakhelashvili, A., Principles of Treaty Interpretation in the NAFTA Arbitral Award on Canadian Cattlemen, *Journal of International Arbitration*, Vol. 26 (2009), pp. 159 et seqq., p. 167; Ten Cate, I., The Costs of Consistency: Precedent in Investment Treaty Arbitration, *Columbia Journal of Transnational Law*, Vol. 51 (2013), pp. 418 et seqq., p. 427.

[137] Italics added.

[138] Cf. Dörr, O., in: Dörr/Schmalenbach (eds.), *Vienna Convention on the Law of Treaties*, Springer, Berlin, 2012, Article 32, para. 27, 34. See also Waibel, M., *Uniformity versus Specialisation: A Uniform Regime of Treaty Interpretation?*, University of Cambridge Faculty of Law Legal Studies Research Paper Series, Paper Nr. 54/2013, November 2013, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2353833 (visited 22 May 2014).

[139] Cf. Orakhelashvili, A., Principles of Treaty Interpretation in the NAFTA Arbitral Award on Canadian Cattlemen, *Journal of International Arbitration*, Vol. 26 (2009), pp. 159 et seqq., pp. 169 et seqq.; on a metaphysical level Schultz, Z., Against Consistency in Investment Arbitration, in: Douglas/Pauwelyn/Viñuales (eds.), *The Foundations of International Investment Law*, Oxford University Press, Oxford, 2014, pp. 297 et seqq.

[140] *Kurtz* appears to argue in broadly similar directions when he notes that 'arbitral tribunals should be understood as exercising a constrained agent function with an expectation that their authority is exercised closely in line with immediate state preferences und objectives.' Cf. Kurtz, J., *Building Legitimacy Through Interpretation in Investor-State Arbitration: On Consistency, Coherence and the Identification of Applicable Law*, Melbourne Legal Studies Research Paper No. 670, Melbourne Law School, p. 50. A different view is taken by *Roberts*, who wants to create an 'interpretative balance between treaty parties and tribunals created by investment treaties', which would amount to nothing less than a disguised partial disempowerment of the state parties to an investment treaty. In order to reach such a conclusion *Roberts* purposefully equates human rights and investment treaties. Cf. Roberts, A., Power and Persuasion in Investment Treaty Interpretation: The Dual Role of States, *American Journal of International Law*, Vol. 104 (2010), pp. 179 et seqq., p. 225. On principle critical towards 'special' rules on interpretation for certain kinds of treaties Dörr, O., in: Dörr/Schmalenbach (eds.), *Vienna Convention on the Law of Treaties*, Springer, Berlin, 2012, Article 31, para. 29.

[141] See Fn. 132.

[142] See Fn. 132.

[143] Cf. Ten Cate, I., The Costs of Consistency: Precedent in Investment Treaty Arbitration, *Columbia Journal of Transnational Law,* Vol. 51 (2013), pp. 418 et seqq. for more arguments against a 'de facto precedent system', albeit from a more legal policy and theory point of view.

[144] Cf. x-12 (1) CETA draft of 4 February 2014 = Article x-27(1) of CETA draft of 3 April 2014.

regarding whether they still represent the balance envisaged by the state parties. If decisions show signs of deviation from the original balance, mechanisms – such as those on authoritative interpretation by state parties – should be in place to regain control over the content of the agreement.

### 2.3.1.3    Strengthening authoritative interpretation of investment instruments by state parties

Delegating to the investment tribunal the task of resolving a certain issue between the host state and an investor does not mean cutting off the agreement's ties to its state parties. Quite to the contrary, state parties remain the masters of the treaty and retain the right to provide an authoritative interpretation of its provisions[145]. Put differently, they have 'the last word' on the meaning given to provisions of their investment instrument[146]. They have yet to make use of these powers more proactively[147].

Consistency in interpretation and outcome across different cases which are all adjudicated on the basis of *one and the same investment instrument* can, to some degree, be achieved by the issuance of *ad-hoc authoritative interpretations*[148]. If the state parties notice that the interpretation of a certain provision – for example that on fair and equitable treatment or indirect expropriation – advanced by different arbitral tribunals divert from each other, they could issue such a joint interpretation. According to Article 31(3) lit a VCLT, an investment tribunal would be under the obligation to take this into account while interpreting the investment instrument.[149] In the event of state parties

---

[145] '[I]t is too often forgotten that the parties to a treaty, that is, the states which are bound by it at the relevant time, own the treaty. It is their treaty. It is not anyone else's treaty. In the context of investment treaty arbitration there is a certain tendency to believe that investors own bilateral investment treaties, not the states parties to them. So, for example, when the North American Free Trade Agreement (NAFTA) provides for interpretation of its provisions by a Commission of the state parties, that is regarded as somehow an infringement on the inherent rights of the investors under NAFTA. That is not what international law says. International law says that the parties to a treaty own the treaty and can interpret it.' Cf. Crawford, J., A Consensualist Interpretation of Article 31(3) of the Vienna Convention on the Law of Treaties, in: Nolte (ed.), *Treaties and Subsequent Practice*, Oxford University Press, Oxford, 2013, pp. 29 et seqq., p. 31, See also Dörr, O., in: Dörr/Schmalenbach (eds.), *Vienna Convention on the Law of Treaties*, Springer, Berlin, 2012, Article 31, para. 20.; cf. for the legal treatment in WTO law von Bogdandy, A., Law and Politics in the WTO - Strategies to Cope with a Deficient Relationship, *Max Planck Y.B. U.N. L.*, Vol. 5 (2001), pp. 609 et seqq., 628, 632.

[146] Cf. Delimitation of the Polish-Czechoslovakian Frontier (Question of Jaworzina), Advisory Opinion, 1923 Permanent Court of International Justice (Series B) No. 8, p. 37; Kasikili/Sedudu Island (Botswana v. Namibia), 1999 International Court of Jusitce, Judgement of 13 December 1999 para. 63. Some investment instruments make this explicit, cf. 2012 U.S. Model BIT, Article 30(3), available at http://www.ustr.gov/sites/default/files/BIT%20text%20for%20ACIEP%20Meeting.pdf (visited 4 May 2014); 2004 Canada Model BIT, Arts. 40(2), 41, 51(2)(b), available at http://italaw.com/documents/Canadian2004-FIPA-model-en.pdf (visited 4 May 2014); Association of Southeast Asian Nations (ASEAN) Comprehensive Investment Agreement, Article 40(3); 2012 Canada-China FIPA, 74, arts. 18(1)(b), 30, available at http://www.international.gc.ca/trade-agreements-accords-commerciaux/agr-acc/fipa-apie/china-text-chine.aspx?lang=eng&view=d (visited 4 May 2014).

[147] UNCTAD, *Interpretation of IIAs: What States Can Do*, IIA Issues Note 2011/3, available at http://unctad.org/en/Docs/webdiaeia2011d10_en.pdf (visited 19 May 2014) p. 4.

[148] Cf. 2.3.2.2.2 (p.82).

[149] Article 31 VCLT ('General rule of interpretation') describes interpretation as a 'single combined operation' in which all means of interpretation referred to thereunder do not form a hierarchy. This, arguably, may preclude automatically attaching 'higher authority' to subsequent agreements between the parties to the treaty in accordance with Article 31(3) lit a VCLT. Cf. UN General Assembly, International Law Commission, *First report on subsequent agreements and subsequent practice in relation to treaty interpretation*, A/CN.4/660 of 19 March 2013, para. 68; UN General Assembly, International Law Commission, *Subsequent agreements and subsequent practice in relation to treaty interpretation, Text of draft conclusions 1-5 provisionally adopted by the Drafting Committee at the sixty-fifth session of the International Law Commission*, A/CN.4/L.813 of 24 May 2013, para. 6. UN General Assembly, International Law Commission, Special Rapporteur Nolte, G., *Second report on subsequent agreements and subsequent practice in relation to treaty interpretation*, A/CN.4/671 of 26 March 2014, para. 56-57, 143-165. To avoid any uncertainty as to the effect of such an ad-hoc authoritative interpretation, the negotiating parties can and should expressly provide in the treaty text for the binding effect of such interpretation on a tribunal.

perceiving certain interpretations adopted by tribunals as inappropriate but disagreeing on a joint interpretation, they could initiate state-state arbitration to resolve such questions[150].

A *more formalised approach* would comprise the establishment of a *treaty committee*. Such a committee would be staffed with representatives of all state parties, monitor the adjudicative practice of the tribunals and issue authoritative interpretations of treaty provisions if required.[151] It appears that this route is taken by the EU.[152] In the CETA draft Canada and the EU intend to establish a *Committee on Services and Investment* which may, on agreement of the parties, and after completion of the respective legal requirements and procedures of the parties, decide to recommend to the *CETA Trade Committee* the adoption of interpretations of provisions on non-discrimination and investment protection where serious concerns arise as regards matters of interpretation[153].

Institutionalising the power of authoritative interpretation is not limited to the establishment of a treaty committee which basically reacts to consistency issues. The state parties could provide for a *preliminary reference procedure* built in the arbitral proceedings in order to allow tribunals to actively request authoritative interpretation of treaty clauses[154]. Alternatively, or complementing such a procedure[155], a *mandatory review process of draft arbitral awards* by the state parties[156] before their issuance could be established[157]. Here one could, for example, borrow from the WTO dispute settlement mechanism[158]. If the state parties unanimously would come to conclude that the interpretation of the investment instrument does not mirror their mutual intentions and/or previous awards they could refer the draft award – perhaps even together with interpretative guidance – back to the tribunal for re-consideration.[159]

---

[150] Cf. 2.3.2.2.1.3 (p.80). In this respect Article x-24 CETA draft of 4 February 2014 = Article x-40 of CETA draft of 3 April 2014 should be examined critically whether it overly and unnecessarily curtails the role of the state parties as masters of the treaties to the benefit of investor-state tribunals.

[151] See footnote 153.

[152] If all Member States were party to an agreement alongside the EU (mixed agreement), the EU and the Member States should make arrangements to be able to speak with one voice once the agreement enters into force in order not to diminish the effectiveness of the mechanism. Furthermore, in order to efficiently fulfil its monitoring tasks a treaty committee should be granted unrestricted access to arbitral proceedings.

[153] Article x-26(3) lit a in connection with Article x-12('3') CETA draft of 4 February 2014 = Article 42(3) lit a in connection with Article x-27(2) CETA draft of 3 April 2014. To avoid any uncertainty as to the effect of an interpretative note, the negotiating parties should (1) make its binding effect on a tribunal explicit, i.e. stressing that an interpretative note is not just one out of many means of interpretation in a single combined operation of treaty interpretation but the prevailing means and (2) stress that a tribunal may not question an interpretative note on the grounds that it would be a 'ultra vires' treaty modification in accordance with Art. 39 VCLT. Cf. in respect of NAFTA experience Brower II, C. H., Structure, Legitimacy, and NAFTA's Investment Chapter, Vanderbilt Journal of Transnational Law, Vol. 36 (2003), pp. 37 et seqq, 84 et seqq. See also UN General Assembly, International Law Commission, Special Rapporteur Nolte, G., *Second report on subsequent agreements and subsequent practice in relation to treaty interpretation*, A/CN.4/671 of 26 March 2014, para. 56-57, 143-145, 150-155, 165.

[154] Cf. Republic of Ecuador v. United States of America, PCA Case No.2012-5, documents available at http://www.italaw.com/cases/1494 (visited 4 May 2014); Cf. also Kaufmann-Kohler, G., In Search of Transparency and Consistency: ICSID reform proposal, *Transnational Dispute Management*, Vol. 2(2005), pp. 1 et seqq., available at http://www.lk-k.com/data/document/search-transparency-and-consistency-icsid-reform-proposals-transnational-dispute-management.pdf (visited 8 May 2014); Kaufmann-Kohler, G., Arbitral Precedent: Dream, necessity or excuse, *Arbitration International*, Vol. 23 (2007), pp. 357 et seqq.

[155] The success or failure of a preliminary reference procedure would largely depend on the tribunals' attitude taken towards it if not coupled with some compelling element such as an annulment.

[156] Such functions could also be performed by a treaty committee.

[157] Such a process could be tied to a strict and short timeline.

[158] Cf. Article 17(14) DSU. A report is adopted if the state parties do not decide *by consensus* to reject the report.

[159] In order to counter legitimacy concerns possibly raised from the outset, state parties to an investment instrument should consider providing for a transparent working process governing a 'preliminary reference procedure', a 'mandatory review process' or the authoritative interpretation issued by a treaty committee.

#### 2.3.1.4    Consolidation of claims

Cases brought by different claimants but arising out of the same circumstances, having a question of law or fact in common and adjudicated on the basis of the *same* investment instrument, can be consolidated if an investment instrument provides so[160]. Consolidation reduces the risk of differing outcomes on identical questions of fact or law. A decision on consolidation should not be left to the consent of the disputing parties but to a tribunal newly established to rule on the request when raised by either party to the dispute. In this respect it is important that the economic incentives for the arbitrators are set rightly to ensure an effective and cost-efficient functioning of the mechanism. However, should the tribunal established to rule on the consolidation decide to assume jurisdiction only on part of the claims, this mechanism might lead to some more consistency but also to additional proceedings, i.e. two or more 'initial' arbitrations which claims shall be consolidated and one or more 'consolidated tribunals' ruling on specific claims or issues common to all 'initial' arbitrations.

#### 2.3.1.5    Less vague substantive standards

The predictability of outcomes of arbitral proceedings could at least be increased[161] by more detailed and precisely worded substantive standards[162]. At the same time, more detailed and precise substantive standards in the investment instrument might better 'lock-in' the balance struck by the state parties between public and private interests[163].

A (modestly) increasing regulatory density in investment instruments over the last four decades might also be perceived as a response to growing concerns in respect of hardly predictable outcomes in ISDS[164]. However, more detailed provisions and arguably a higher degree of predictability of outcomes of arbitral proceedings is traded in for a decreased flexibility of an investment instrument to adapt to international policy shifts. Over time emphasis on either public or private interests in investment instruments might change[165]. Broader – but not boundless – standards coupled with a well-functioning treaty committee charged with the power of authoritative interpretation might be an alternative to (overly) detailed substantive standards. Such an approach would open up the possibility for state parties to react to future developments – in terms of major policy shifts or 'unwanted' interpretations by investment tribunals – without having to renegotiate the whole agreement. Renegotiation of substantive standards is likely to become even more difficult when investment instruments are included in comprehensive free trade agreements which represent complex compromises extending beyond the investment protection chapter.

---

[160] See for a semi-effective consolidation procedure Article 1126 NAFTA. Note also Yannaca-Small, C., Consolidation of Claims: A Promising Avenue for Investment Arbitration?, in: OECD (ed.) *International Investment Perspectives*, 2006, available at http://www.oecd.org/investment/internationalinvestmentagreements/40079691.pdf, (visited 22 May 2014); cf. Article x-25 CETA draft of 4 February 2014 = Article x-41 of CETA draft of 3 April 2014.

[161] Any effort to more clearly or even narrowly define substantive standards might be frustrated by an unqualified most-favoured-nation treatment clause which allows the import of standards from other investment instruments.

[162] The reform of substantive standards is not part of this study and is therefore only briefly touched upon here.

[163] Cf. also 2.3.2.2.2.2 (p.86). However, interpretive approaches adopted by tribunals could also easily frustrate such efforts as NAFTA experience tells. Cf. footnote 241.

[164] Just compare the development of the US Model BIT: Alvarez, J., Comparison U.S. Model BIT (1984) and U.S. Model BIT (2004), *Transnational Dispute Management*, Vol. 7 (2010), pp. 23 et seqq.; Vandevelde, K., A Comparison of the 2004 and 1994 US Model BITs, in: Sauvant (ed.), *Yearbook on International Investment Law and Policy 2008-2009*, Oxford University Press, New York, 2009, pp. 283 et seqq.; sceptical in respect of an actual success of such drafting exercises Ortino, F., Refining the content and role of investment 'rules' and 'standards': A bolder approach to international investment treaty-making, *ICSID Review*, Vol. 1 (2013), pp. 152 et seqq.

[165] Sullivan, K., Foreword: the Justices of Rules and Standards, *Harvard Law Review*, Vol. 105 (1993), pp. 22 et seqq., pp. 66-67.

## 2.3.2    Public interests

One of the objectives of investment instruments is to provide legal protection against the abuse of power and egregious behaviour of governments[166]. Nowadays, abuse rarely involves treatment such as 'outright' nationalisation without compensation and expulsion of the investor solely for the benefit of some cronies of a corrupt host state government. Power abuse to the detriment of the foreign investor often comes more subtle. Licenses necessary to operate a certain business may suddenly be revoked on mere formal grounds, tax or environmental regulations are enforced more rigorously towards the foreign investor than towards nationals. Permissions previously promised by officials are suddenly not issued. Or certain public health standards are introduced or raised with the knowledge or intention that the changes hit mainly the foreign investor.

However, this is just one side of the coin. Adapting to new situations, governments may alter their regulatory framework in good faith in order to better promote public welfare. Due to newly available scientific research, environmental standards may be raised or certain health-damaging products may be banned. A state may decide to abandon certain energy production methods on a precautionary basis as it finds the risks involved unacceptable.

Pursuing legitimate aims in a 'good faith attitude' does not, however, justify any means to reach a given end. Due to a lack of knowledge and experience, weak institutional structures or careless regulatory adaptations may easily lead to disproportionate 'collateral harms' negatively impacting an investment.

All state measures – irrespective of whether taken in bad faith for personal advantage by a corrupt official or in bona fide attitude by parliament in a democratic process with a view to serving the general welfare – can negatively impact an investment, foreign and domestic alike. The great challenge is to distinguish those state measures negatively impacting an investment which shall be compensable and those which have to be borne as part of the ordinary risk of life or business.

Certainly, investment instruments cannot reasonably be construed in a way that state parties wanted to surrender their right to regulate and compensate for any change in the regulatory environment subsequent to the establishment of a foreign investment. Implicitly or explicitly, international investment instruments recognise the right to regulate[167], which arises out of the basic attributes of sovereignty[168]. Simultaneously, the mere pursuit of a legitimate public policy goal like environmental protection and product safety cannot sanction any state measure adversely impacting an investment. Treating an investment fair and equitably, for example, would also entail a duty to implement new policies diligently and in a transparent and in itself consistent manner which might include transition periods or sufficient consideration given to specific situations.

Achieving the 'right' balance between the interests of investors and those of the host state implementing its policies has been subject to critical discussions over the last years. And it is not hard to predict that discussions will continue as policy priorities keep shifting over time: At some moment, market-oriented convictions dominate which tend to emphasis property protection as a key element of personal freedom and view state intervention sceptically. At other times economic theories

---

[166] See above 1.3.1 (p.40).
[167] UNCTAD, *Towards a New Generation of International Investment Policies: Unctad's Fresh Approach to Multilateral Investment Policy-Making*, IIA Issues Note 2013/5, available at http://unctad.org/en/PublicationsLibrary/webdiaepcb2013d6_en.pdf (visited 19 May 2014), p. 6.
[168] Cf. Crawford, J., *Brownlie's Principles of Public International Law*, 8th edition, 2012, pp. 448 et. seqq.; Brownlie, I., *Principles of Public International Law*, 7th edition, 2008, pp.292-293.

wanting to strike a balance between free markets and state intervention in support of social wellbeing might gain the upper hand.

Moreover, the focus on property protection or preservation of policy space might shift when a state changes its role from a capital importer to (also) a capital exporter or vice-versa.[169] Equally, the number of claims 'own' businesses file against other states and the number of claims received from investors might impact the perception of the 'right' balance between the protection of property and the preservation of regulatory space[170].

In the first place, it is *the task of the state parties to an investment instrument to strike a* certain *balance* which reflects domestic policy decisions and the result of the treaty negotiation process[171]. *Investment tribunals are charged* with the task of deciding a specific case, thereby *interpreting the investment instrument so as to best reflect the intentions of the state parties*. Such tribunals have, however, repeatedly been accused of failing to sufficiently take into account public interests such as human rights, environmental protection, public health or others. Hence, tribunals are blamed of inaccurately reflecting the 'right balance' between private and public interests in their interpretation of a given investment instrument (below 2.3.2.1 (p. 73)). Some states have already reacted to ensure that their regulatory space is not restricted beyond the point they perceive as acceptable. However, their policy approaches vary greatly (below 2.3.2.2 (p. 74)).

### 2.3.2.1    Challenges to the 'right balance' between private and public interests

While legal commentators are divided over the real reason[172], many of them broadly agree on the finding that investment tribunals have not been overly successful in adequately paying attention to public interests of the host state when interpreting, in particular, the fair and equitable treatment standards and their exceptions or (indirect) expropriation clauses[173]. Recent research has

---

[169] Cf., e.g., *Eurostat*, Foreign direct investment statistics, Website, available at http://epp.eurostat.ec.europa.eu/-statistics_explained/index.php/Foreign_direct_investment_statistics (visited 22.6.2014).
[170] Cf. for a more detailed depiction Spears, S., The Quest for Policy Space in a new Generation of International Investment Agreements, *Journal of International Economic Law*, Vol. 13 (2010), pp. 1037 et seqq., pp. 1039 et seqq.
[171] Mills, A., Antinomies of Public and Private at Foundations of International Investment Law and Arbitration, *Journal of International Economic Law*, Vol. 14 (2011) pp. 469 et seqq., p. 490.
[172] E.g. Neo-liberal bias of arbitrators Sornarajah, M., A Coming Crisis: Expansionary Trends in Investment Treaty Arbitration, in: Sauvant (ed.), *Appeals Mechanism in International Disputes*, Oxford University Press, New York, 2008, pp. 39 et seqq.; Sornarajah, M., The Retreat of Neo-Liberalism in Investment Treaty Arbitration, in: Rogers/Alford (eds.), *The Future of Investment Arbitration*, Oxford: Oxford University Press, New York, 2009, pp. 199 et seqq., pp. 278, 293; Van Harten, G., *Investment Treaty Arbitration and Public Law*, Oxford University Press, Oxford, 2007, pp. 136 et seqq.; a neo-liberal bias encapsulated in investment instruments Alvarez, J., Book Review of Gus Van Harten, Investment Treaty Arbitration and Public Law, *American Journal of International Law*, Vol. 102 (2008), pp. 909 et seqq.; Alvarez, J., The Evolving BIT, Address at Juris Conference on Investment Treaty Arbitration: Interpretation in Investment Arbitration, 30 April 2009; Alvarez, J. and Khamsi, K., The Argentine Crisis and Foreign Investors, in: Sauvant (ed.), *Yearbook on International Investment Law and Policy 2008–2009*, Oxford University Press, New York, 2009, pp. 379 et seqq., p. 414; annulment fears Brower II, C., Obstacles and Pathways to Consideration of the Public Interest in Investment Treaty Disputes, in: Sauvant (ed.), *Yearbook on International Investment Law and Policy 2008–2009*, Oxford University Press, New York, 2009, pp. 356 et seqq., p. 375.
[173] Spears, S., The Quest for Policy Space in a new Generation of International Investment Agreements, *Journal of International Economic Law*, Vol. 13 (2010), pp. 1037 et seqq., pp. 1046 et seq.; see also Stone Sweet, A., Investor-State Arbitration: Proportionality's New Frontier, *Law & Ethics of Human Rights*, Vol. 47 (2010), pp. 47 et seqq., pp. 63 et seq.; McLachlan, C. et al., *International Investment Arbitration: Substantive Principles*, Oxford University Press, Oxford, 2007, p. 67; Alvarez, J. and Khamsi, K., The Argentine Crisis and Foreign Investors, in: Sauvant (ed.), *Yearbook on International Investment Law and Policy 2008–2009*, Oxford University Press, New York, 2009, pp. 379 et seqq., pp. 447 et seqq.; Brower II, C., Obstacles and Pathways to Consideration of the Public Interest in Investment Treaty Disputes, in: Sauvant (ed.), *Yearbook on International Investment Law and Policy 2008–2009*, Oxford University Press, New York, 2009, pp. 356 et seqq., pp. 356 et seqq.; see also Burke-White, W., The Argentine Financial Crisis: State Liability under BITs and the Legitimacy of the ICSID System, in: Waibel/Kaushal/Chung/Balchin (eds.), *The Backlash against Investment Arbitration: Perceptions and Reality*, Kluwer Law International, The Hague, pp. 407 et seqq.; note also the detailed analysis in Kulick, A., *Global Public Interest in*

demonstrated that, thanks to the extensive interpretation of substantive standards on part of investment tribunals, protection afforded by investment instruments goes beyond what the US legal order would provide in respect of regulatory changes impacting on investor-state contracts[174]. Such findings would not warrant any further consideration if the US system were to fall short of an international minimum standard. However, if the protection afforded on the national level is already far beyond this standard, ISDS practice must critically ask itself on which rationale it actually wants to place such rulings.

Furthermore, ISDS is increasingly associated with exercising a so-called 'chilling effect' on governments. The latter refrain from regulatory measures taken in the public interest due to the threat of investment arbitration. This 'regulatory chill' is said to exist because governments would face difficulties in assessing the precise content and scope of their obligations under international investment law. Ever broader interpretations of substantive standards advanced by arbitral tribunals would exacerbate the situation. Recent empirical studies show that this may be true at least for developed countries capable to some reasonable degree of appreciating their international legal obligations with respect to foreign investments[175]. A 'chilling effect' can be exemplified by New Zealand's decision to postpone plain packaging regulation[176] due to an ongoing investment claim brought by *Philip Morris* against *Australia* (Hong Kong-Australia BIT)[177].

### 2.3.2.2    Preserving the 'right balance' between private and public interests

States have increasingly realised that making an appeal to tribunals to treat the issue of balancing private and public interests with 'more caution' might not suffice. In order to preserve the regulatory space deemed necessary by states to implement policies without having to fear that ordinary business risks are socialised by way of ISDS on the basis of international investment instruments they are presented with a variety of options, some of them already tested in practice. They can basically be divided into two broad strands:

States may decide to withdraw from international investment instruments altogether *or* assess and decide – on a case-by-case basis – whether to include ISDS provisions in investment instruments (below 2.3.2.2.1 (p. 75)). Some commentators suggest that such a move would not significantly influence international investment flows. Going abroad simply also involves subjecting oneself to a foreign jurisdiction and foreign investors are, in principle, quite capable of evaluating risks in a host

---

*International Investment Law*, Cambridge University Press, Cambridge, 2012, pp. 258—268 (environmental concerns), pp.300-306 (human rights), pp. 327—341. For a general critique of the current system cf. Van Harten, G., *Investment Treaty Arbitration and Public International Law*, Oxford University Press, Oxford, 2007; apparently of a different view Schwebel, S., The overwhelming merits of bilateral investment treaties, *Suffolk Transnational Law Review*, Vol. 32 (2009), pp. 263 et seqq.
[174] Johnson, L. and Volkov, O., Investor-State Contracts, Host-State "Commitments" and the Myth of Stability in International Law, *American Review of International Arbitration*, Vol. 24 (2013), pp. 361 et seqq.; see also Wells, L., Backlash to Investment Arbitration: Three Causes, in: Waibel/Kaushal/Chung/Balchin (eds.), *The Backlash against Investment Arbitration: Perceptions and Reality*, Kluwer Law International, The Hague, 2010, pp. 341–352.
[175] Poulsen, L., Bounded Rationality and the Diffusion of Modern Investment Treaties, *International Studies Quarterly*, Vol. 58 (2013), pp. 1 et seqq.
[176] Poulsen, L., *Submission to House of Lords EU Sub Committee on External Affairs: The Transatlantic Trade and Partnership Agreement*, 5 March 2014; Turia, T., Government moves forward with plain packaging of tobacco products, *Beehive.govt.nz: The Official Website of the New Zealand Government*, 19 February 2013, available at http://www.beehive.govt.nz/-release/government-moves-forward-plain-packaging-tobacco-products (visited 4 May 2014): 'To manage this [the legal risk], Cabinet has decided that the Government will wait and see what happens with Australia's legal cases, making it a possibility that if necessary, enactment of New Zealand legislation and/or regulations could be delayed pending those outcomes.'
[177] Philip Morris Asia Limited v. The Commonwealth of Australia, Uncitral, PCA Case No. 2012-12, documents available at http://www.italaw.com/cases/851 (visited 4 May 2014); Agreement between the Government of Hong Kong and the Government of Australia for the Promotion and Protection of Investments, available at http://unctad.org/sections/dite/-iia/docs/bits/hongkong_australia.pdf (visisted 4 May 2014).

state compared to the expected returns. Political risks could be mitigated through purchasing additional insurance through market mechanisms[178].

Alternatively, instead of abandoning ISDS in investment instruments, states may want to adapt their negotiation guidelines to tackle perceived deficits of current ISDS practice (below 2.3.2.2.2 (p. 82)).

### 2.3.2.2.1    Abandoning ISDS in investment instruments

Some states chose to pull out of investment instruments altogether[179] or adopted a policy of deciding on a case-by-case basis whether to conclude investment instruments with other states (cf. South Africa[180]). Others, while still negotiating investment instruments, have abandoned ISDS as a standard feature in their investment instruments and include it only when perceived opportune in the individual case (cf. Australia[181]). In both constellations, foreign investors might have to rely on alternative avenues to seek redress in case of interference with their property.

Absent ISDS provided in an investment instrument and any other specific arrangement, foreign investors would have to take recourse to domestic courts (below 2.3.2.2.1.1 (p. 76)). In lieu thereof, foreign investors could approach a host state with a view to concluding an investment contract providing for international arbitration. Host states may choose to offer foreign investors access to international arbitration through national legislation (below 2.3.2.2.1.2 (p. 78)). Foreign investors could also lobby their home state to take up 'their case' in state-state arbitrations if they feel mistreated by the host state government (below 2.3.2.2.1.3 (p. 80)). Opening up investment instruments for non-binding dispute resolution mechanisms might help to settle a dispute with a host state amicably in an early stage (below 2.3.2.2.1.4 (p. 81)).

---

[178] Ikenson, D., A Compromise to Advance the Trade Agenda: Purge Negotiations of Investor-State Dispute Settlement, *Free Trade Bulletin*, No. 57; 4.3.2014, p. 2; who is of the opinion that, in economic terms and policy, there is no need for ISDS at all, at least in respect of TTIP.

[179] Some Latin American countries are beginning to reject investment instruments for investor-state arbitration and espouse the absolute competence of their domestic courts. In 2008, Venezuela abrogated its investment treaty with the Netherlands. Since 2009, Ecuador is pursuing plans to cancel several BITs. In 2012, Bolivia announced the termination of its bilateral investor protection agreement with the United States. Cf. https://www.federalregister.gov/articles/2012/05/23/2012-12494/notice-of-termination-of-united-states-bolivia-bilateral-investment-treaty (visited 5 May 2014). Furthermore, Bolivia, Ecuador, and Venezuela have withdrawn from the ICSID Convention. See ICSID, *List of Contracting States and Other Signatories of the Convention*, available at https://icsid.worldbank.org/ICSID/FrontServlet?requestType=ICSIDDocRH&action-Val=ContractingStates&ReqFrom=Main (visited 4 May 2014). In March 2014, Indonesia informed the Netherlands that it has decided to terminate the Bilateral Investment Treaty. Cf. above footnote 15.

[180] Woolfrey, S., in: Hindelang/Krajewski (eds.), *Shifting Paradigms in International Investment Law (provisional title)*, Oxford University Press, forthcoming 2015.

[181] Cf. Gillard Government's Trade Policy Statement, *Trading our way to more jobs and prosperity*, April 2011, available at http://blogs.usyd.edu.au/japaneselaw/2011_Gillard%20Govt%20Trade%20Policy%20Statement.pdf (visited 4 May 2014), which abandoned ISDS in future treaties. Australia-Unites States Free Trade Agreement contains no ISDS, but merely the possibility to initiate state party consultations in case one state party sees the need to introduce ISDS, available at https://www.dfat.gov.au/fta/ausfta/final-text/chapter_11.html (visited 4 May 2014); likewise, the Australia-Japan Economic Partnership Agreement is reported also not to include ISDS, cf. http://www.smh.com.au/federal-politics/political-opinion/isds-the-trap-the-australiajapan-free-trade-agreement-escaped-20140407-zqrwk.html and http://www.dfat.gov.au/fta/jaepa/downloads/jaepa-key-outcomes.pdf (both visited 4 May 2014); but see the Korea-Australia FTA, Chapter 11 which includes ISDS (Article 11.15 et seqq.) provisions, available at https://www.dfat.gov.au/fta/kafta/downloads/KAFTA-chapter-11.pdf (visited 4 May 2014).

### 2.3.2.2.1.1    Domestic courts

Absent any ISDS mechanism or other specific procedural arrangements, foreign investors would have to turn to *domestic courts* – the *'natural forum'*, so to say – in whose territorial jurisdiction the dispute arose.

Domestic courts – at least in advanced legal systems – operate in an environment of long established procedures and rules which lend some *consistency and predictability* to the adjudicative process. *Erroneous decisions* of the court of entry *can* in many cases *be corrected* by a higher domestic court[182]. Moreover, some domestic legal systems provide for courts specialised and, thus, experienced in reviewing the exercise of governmental authority towards the individual; i.e. administrative and constitutional courts[183].

In terms of substantive standards, at least advanced legal systems provide for a multitude of safeguards for investors against an abuse of governmental powers, such as the right to property or the freedom of profession enshrined in domestic constitutions. When appreciating an investor's claim the domestic court will usually consider it against the background of the whole domestic legal system. Such a system reflects an elaborate, complex and refined balance of private and public interests to which the society in which the foreigner voluntarily chose to do its business agreed in a democratic process. When a court decides a case its *holding would echo this societal consensus and is more likely to be accepted and perceived as legitimate by the public*.

Investments are frequently also protected by international or supranational law such as regional[184] or global human rights conventions[185] or the fundamental freedoms in the Treaty on the Functioning of the European Union[186]. States may of course choose to even further fortify protection of (specifically foreign) investors by concluding international investment instruments stipulating substantive standards for the treatment of foreign investment.

If domestic courts are allowed[187] – and here traditions vary greatly among states[188] – also to apply and interpret international treaties including any given investment instrument *one single forum* would exist in which a dispute is adjudicated in respect of whether the host state measure was in compliance with domestic laws *and* international obligations of the host state[189]. Domestic courts of a

---

[182] Domestic courts only rarely award pecuniary remedies in actions against administrative measures. The primary remedy would be *restitutio in rem*. Furthermore, legislative acts cannot regularly be challenged in domestic legal orders. Liability for judicial acts is frequently restricted.

[183] For a brief overview on remedies in advanced systems of domestic administrative law cf. Gaukrodger, D. and Gordon, K., *Investor-State Dispute Settlement: A Scoping Paper for the Investment Policy Community*, OECD Working Papers on International Investment No. 2012/03, available at http://dx.doi.org/10.1787/5k46b1r85j6f-en  (visited 20 May 2014), pp. 79 et seqq.

[184] Cf., e.g., Article 1 of Protocol 1 to the European Charter of Human Rights and Fundamental Freedoms; Article 17 of the Charter of Fundamental Rights of the European Union; Article 21 of the American Convention on Human Rights; Articles 13, 14 and 21 African Charter on Human and Peoples' Rights.

[185] Cf. Article 17 of the Universal Declaration of Human Rights; Article 5 (v) of the International Convention on the Elimination of All Forms of Racial Discrimination; Articles 15 and 16 Convention on the Elimination of All Forms of Discrimination against Women.

[186] Cf. esp. Articles 49, 63(1) TFEU.

[187] In order to put this question beyond doubt, state parties to investment instruments might be in the position to explicitly stipulate that the respective provisions of the instruments shall be directly applicable in their domestic courts. See for a more recent (contrarian) approach of the EU in respect of its international agreements on trade Semertzi, A., The Preclusion of Direct Effect in the Recently Concluded EU Free Trade Agreements, *Common Market Law Review*, Vol. 51 (2014), pp. 1125 et seqq.

[188] Cf. Jacobs/Roberts (eds.), *The Effect of Treaties in Domestic Law*, Sweet & Maxwell, London, 1987; Sloss (ed.), *The Role of domestic courts in treaty enforcement*, Cambridge University Press, Cambridge, 2009.

[189] In disputes involving foreign investment questions of national and international law are often intertwined. For example, when a permission or concession is removed the question of whether the investor was expropriated or not treated fair and

considerable number of states even engage in interpreting domestic law in accordance with international treaties despite the fact that those might not be directly applicable in the domestic forum[190].

In any event, even if international treaties, such as comprehensive trade agreements, cannot be applied and interpreted by domestic courts and, hence, a foreign investor could not directly rely on the provisions of an investment instrument in domestic proceedings, this does not mean that recourse to domestic courts would be fruitless. A state is free to decide in which way it secures the observance of its international obligations. The protection advanced by an investment instrument can therefore be contained in domestic legislation – especially and typically enshrined in constitutions – which might also predate a specific investment instrument[191].

Furthermore, by charging domestic courts with the task of adjudicating disputes involving foreign and domestic investors alike, *criticism that investment instruments favour foreigners over locals by granting additional legal remedies*[192] *could be mitigated*.

However, as already pointed out earlier, domestic courts may also fail to impartially adjudicate a conflict between a host state and a foreign investor[193]. They might be, rightly or wrongly, perceived by investors as being biased towards the host state government[194]. Domestic courts may also be corrupt or lack expertise in resolving a dispute in reasonable quality and time.

---

equitably within the meaning of an investment instrument also depends on whether the host state authorities acted in conformity with national law. Cf. Robert Azinian, Kenneth Davitian, and Ellen Baca v. United Mexican States, ICSID Case No. ARB (AF)/97/2, documents available at http://www.italaw.com/cases/114 (visited 5 May 2014); Metalclad Corporation v. United Mexican States, ICSID Case No. (ARB (AF)/97/1, documents available at http://www.italaw.com/cases/671 (visited 2 May 2014); See also McLachlan/Shore/Weiniger (eds.), *International Investment Arbitration - Substantive Principles*, Oxford University Press, Oxford, 2007, pp. 99 et seqq.

[190] Cf. in respect of Germany Frowein, J., Federal Republic of Germany, in: Jacobs/Roberts (eds.), *The effect of treaties in domestic law*, Sweet & Maxwell, London, 1987, pp. 63 et seqq., p. 73. Obviously, the degree to which national law can be brought in line with international obligations by domestic courts greatly varies from state to state. However, at least in tendency one can say that domestic courts are not ignorant to international treaties. Cf. Van Alstine, M., The Role of Domestic Courts in Treaty Enforcement: Summary and Conclusions, in: Sloss (ed.), *The Role of domestic courts in treaty enforcement*, Cambridge University Press, Cambridge, 2009, pp. 555 et seqq., pp. 593 et seqq.

[191] It would therefore be no argument against the involvement of domestic courts that a foreign investor cannot rely directly on the provisions of an investment treaty in domestic court proceedings as long as the national legal system provides a similar standard of protection. Note in this respect the Australia-Unites States Free Trade Agreement. Neither US American nor Australian courts may apply the treaty. Cf. Dodge, W., Investor-State Dispute Settlement Between Developed Countries: Reflections on the Australia-United States Free Trade Agreement, *Vanderbilt Journal of Transnational Law*, Vol. 39 (2006), pp. 1 et seqq., p. 25. An investor has to rely on domestic provisions granting the same standard of protection or resort to diplomatic protection by its home state to get the substantive standards enforced against its host state.

[192] Investor-state arbitration provided for in an international investment instrument would only be available to foreign investors vis-à-vis its host state, i.e., for example, in case of CETA a Canadian investor could initiate arbitration proceedings vis-à-vis the EU or an EU Member State, dependent on who afforded the treatment challenged. An EU national, affected by the same measure, would have to turn to national and EU courts. It is the respective domestic legal order, in particular the fundamental rights in national constitutions and other fundamental rights documents as well as the fundamental freedoms contained in the TFEU, which determines the extent to which a state or the EU can subscribe to such a situation. These questions are, however, beyond the scope of this study.

[193] Kurtz, J., Australia's Rejection of Investor–State Arbitration: Causation, Omission and Implication, *ICSID Review*, Vol. 27 (2012), pp. 65 et seqq., p. 75; Sornarajah, M., *The International Law on Foreign Investment*, Cambridge University Press, New York, 3th Edition, 2010, p. 250; Schreuer, C. et al, The ICSID Convention: A Commentary, Cambridge University Press, Cambridge, 2nd Edition, 2009, p. 5 et seqq.

[194] For example, a domestic court could be more inclined to uphold public interest defences than to protect foreign private property. Cf. Trakman, L., Choosing Domestic Courts Over Investor–State Arbitration: Australia´s Repudiation of the Status Quo, *UNSW Law Journal*, Vol. 35 (2012), pp. 979 et seqq., p. 1001.

While some of those concerns associated with domestic courts could be mitigated to some degree[195], others cannot. The issue of perceived or real bias in domestic courts – if one does not want to subscribe to the view that these are also just an item in a cost and benefit analysis of an investor – are difficult to overcome as long as one wants to stick with the host state courts as the only appropriate forum. Allowing, for example, a claimant to name an 'associated judge', i.e. person he considers trustworthy[196], would possibly raise many complicated constitutional questions. Such a suggestion is unlikely to be implemented politically. Within the context of regional investment instruments it was, furthermore, suggested to entrust a domestic court of a non-disputing state party with the resolution of a dispute[197]. This would, however, require, inter alia, a comparable quality of the domestic legal systems involved and, even more important, similar perceptions of the balance struck between public and private interests in the courts of the respective non-disputing party. Such conditions render the idea difficult to implement.

In sum, given that the capacities of domestic courts vary greatly from state to state and European investors could indeed face serious challenges to exercise and enforce property rights in some foreign domestic courts and, furthermore, accepting that also in advanced legal systems courts can fall short of the international standards in the individual case, allowing for domestic fora *only* in EU agreements appears no preferable option. In the CETA draft the EU goes to the other extreme and provides for ISDS as an *alternative* route to domestic courts which, in turn, might not sufficiently appreciate the positive part domestic courts may play in adjudicating (foreign) investment disputes[198].

### 2.3.2.2.1.2 Dispute settlement mechanisms based on investor-state contracts (investment contracts) or national legislation (investment laws)

#### 2.3.2.2.1.2.1 Investor-state contracts

With a view to avoiding host state jurisdiction, a foreign investor could enter into contractual arrangements with the host state and agree on a neutral forum, i.e. resorting to international arbitration or, rarely, to submitting to foreign courts[199]. Dispute settlement clauses can be included and are frequently found in all kinds of contracts such as concessions, project agreements or built-and-operate agreements[200].

---

[195] What concerns quality of adjudication, by providing for the *establishment of specialised domestic investment courts* in investment instruments, the general level of judicial expertise in a host state could be raised. Basic procedural requirements and qualifications of judges could also be stipulated in investment instruments. If necessary, e.g. in case of developing countries, such commitments could be coupled with bilateral technical assistance or involvement of international organisations in order to facilitate the building up of adjudicative capacities. In this sense, investment instruments could directly contribute to the promotion of the rule of law from which not only foreign investors would benefit.

[196] Randón de Sansó, H., Proposed Changes to the Investment Dispute-Resolution System: A South American Perspective, *Investment Treaty News*, Vol. 5 (2014), pp. 10 et seqq.

[197] Randón de Sansó, H., Proposed Changes to the Investment Dispute-Resolution System: A South American Perspective, *Investment Treaty News*, Vol. 5 (2014), pp. 10 et seqq.

[198] See below 2.3.2.2.3.2 (p.88).

[199] Cf. generally Bishop/Crawford/Reisman (eds.), *Foreign Investment Disputes*, Kluwer Law International, The Hague, 2005, pp. 213 et seqq.; Dugan, C. et al., *Investor-State Arbitration*, Oxford University Press, Oxford, 2008, pp. 225 et seqq.; Alvik, I., *Contracting with Sovereignty: State Contracts and International Arbitration*, Hart Publishing, Oxford, 2011; Salacuse, J., *The Three Laws of International Investment*, Oxford University Press, Oxford, 2013, pp. 159 et seqq.; see in respect of Brazil's approach which neither ratified investment instruments nor enacted specific legislation to promote or protect FDI Levy/de Borja/Pucci (eds.), *Investment protection in Brazil*, Kluwer Law International, The Hague, 2013.

[200] 19 percent of all ICSID claims are based on investment contracts. Cf. ICSID, *The ICSID Caseload Statistics (Issue 2014-1)*, 2014, pp. 10 et seqq., available at https://icsid.worldbank.org/ICSID/FrontServlet?requestType=ICSIDDocRH&action-Val=ShowDocument&CaseLoadStatistics=True&language=English51 (visited 4 May 2014).

Entering into an investment contract appears not open to any foreign investor but only to those whose investment appears particularly beneficial to a host state's economy or, which might go hand-in-hand, to such investors with significant bargaining power towards the host state. Small- and medium-sized undertakings would probably end up without such a safety net.

Against this background, popular criticism on ISDS resolution on the basis of a general consent to arbitrate provided for in an investment *treaty* governed by public international law (investment instrument) appears in a completely different light. Depicting ISDS as free private fast-lane legal protection for multinational corporations[201] seems less than half the truth: in many situations multinational corporations could even do without ISDS provided for in an investment instrument. Small- and medium-sized undertakings – already facing many more hurdles than multinationals when pursuing an internationalisation strategy – would be those who might lose most if access to ISDS in investment instruments is generally abandoned[202].

Furthermore, in case a conflict arises, jurisdiction of arbitral tribunals established on the basis of a contract is frequently challenged with the argument that the very same contract was invalid or terminated and, hence, the consent to arbitrate void. Such issues do not arise in equal measure when consent to arbitrate is given in an investment instrument[203].

### 2.3.2.2.1.2.2    National legislation

Host states occasionally provide their consent to resort to international arbitration in disputes with foreign investors in national legislation, commonly in (foreign) investment laws which establish a special regime for the promotion, admission and treatment of foreign investment[204]. The advantage of such an approach for host states would be that it is at their discretion to set conditions or even to withdraw consent to arbitration by altering the law. If there is an offer to enter into arbitration in national legislation, then this is usually made to the *whole* foreign investment community. In contrast, consent provided in investment contracts operates inter partes. The general consent to arbitrate in bilateral investment treaties includes only nationals and corporations of the state parties to the agreement. In practice, investment laws exhibit a great variety in terms of language and 'degree' of

---

[201] Open letter by various international NGOs directed at US Trade Representative Michael Froman and EU Trade Commissioner Karel de Gucht calling for dismissing ISDS from TTIP, available at http://action.sierraclub.org/site/-DocServer/TTIP_Investment_Letter_Final.pdf?docID=14701 (visited 4 May 2014); McDonagh, T., *Unfair, Unsustainable and Under the Radar* - How Corporations use Global Investment Rules to Undermine a Sustainable Future, The Democracy Center, available at http://democracyctr.org/wp/wp-content/uploads/2013/05/Under_The_Radar_English_Final.pdf (visited 28 April 2014); Pinzler, P. et al., In Namen des Geldes. *DIE ZEIT*, 27 February 2014.
[202] Admittedly, small- and medium-sized undertakings struggle to cover the costs of arbitration also in the current system of ISDS based on consent provided in an investment instrument. Here, the introduction of a small-claims centre might be helpful. See for the cost issue 2.3.6.1 (p.109).
[203] Dugan, C. et al., *Investor-State Arbitration*, Oxford University Press, Oxford, 2008, pp. 226 et seq.
[204] Early ISCID arbitrations were commenced this way. Cf. Southern Pacific Properties v Arab Republic of Egypt, ICSID Case No. ARB/84/03 (1992); see generally in respect of national investment law Investment Climate Advisory Services of the World Bank Group, *Investment Law Reform - A handbook for development practitioners*, 2010, available at https://www.wbginvestmentclimate.org/uploads/Investment-Law-Reform-Handbook.pdf (visited 4 May 2014), pp. 49 et seqq.; Schreuer, C., Investment arbitration based on national legislation, in Hafner/Matscher/Schmalenbach (eds.), *Völkerrecht und die Dynamik der Menschenrechte - Liber Amicorum Wolfram Karl*, Facultas, Wien, 2012, pp. 527 et seqq.; Salacuse, J., *The Three Laws of International Investment*, Oxford University Press, Oxford, 2013, pp. 89 et seqq.

exposure to arbitration[205]. In consequence, debate frequently arises whether and to which extent a certain national legislation indeed allowed for the initiation of investor-state arbitration[206]

### 2.3.2.2.1.3    Diplomatic protection and state-state arbitration

### 2.3.2.2.1.3.1    Diplomatic protection

After having exhausted local remedies[207], the investor can approach its home state asking to enforce the substantive standards contained in an investment instrument which does not provide for ISDS through exercising *diplomatic protection on behalf of its national*[208]. Recourse to diplomatic protection would include a wide spectrum of means such as mediation, arbitration or judicial proceedings between the home and host state of the investor. *Taking up the case*, however, *would usually be at the discretion of the home state*. Put differently, the home state would weigh its interest in pursuing the cause of its national against other interests. If the home state choses to pursue its national's cause, political friction in the relationship with the host state is likely to occur. Even if the home state should be able to secure damages from the host state, the investor would not be entitled to benefit from this settlement, although the home state may choose to pass them on to its own national.

While diplomatic protection is of little benefit to the investor, a perceived advantage of diplomatic protection – from the perspective of the home state – is that it allows for screening for frivolous claims, which, of course, also comes at some bureaucratic cost[209]. The host state benefits from the exhaustion of local remedies rule as it receives a chance to correct the foreigners' mistreatment before the matter receives publicity on the international level[210]. This rule can be understood as an expression of respect towards the judiciary of a sovereign which is, as a starting point, perceived as being capable of doing justice[211].

---

[205] Cf. Moïse Mbengue, M., Consent to Arbitration Through National Investment Legislation, *IISD Treaty News*, 19 July 2012, available at http://www.iisd.org/itn/2012/07/19/consent-to-arbitration-through-national-investment-legislation/#_ftn6 (visited 4 May 2014).
[206] Dugan, C. et al., *Investor-State Arbitration*, Oxford University Press, Oxford, 2008, pp. 230 et seqq.; on the issue of interpretation Caron, D., The Interpretation of National Foreign Investment Laws as Unilateral Acts Under International Law, in: Arsanjani/Cogan/Sloane/Weissner (eds.), *Looking to the Future: Essays on International Law in Honor of W. Michael Reisman*, Martinus Nijhoff Publishers, Leiden/Boston, 2011, pp. 649 et seqq.; Tejera Pérez, V., Do Municipal Laws Always Constitute a Unilateral Offer to Arbitrate? The Venezuelan Investment Law: A Case Study, in: Laird/Weiler (eds.), *Investment Treaty Arbitration and International Law*, JurisNet, Huntington, 2008, pp. 89 et seqq.
[207] Exhaustion of local remedies is a precondition for the exercise of diplomatic protection. Cf. Mavrommatis Palestine Concessions (Greece v. United Kingdom), 1924 Permanent Court of International Justice (Series A) No. 2, at p. 12; Interhandel Case (Switzerland v. United States of America), 1959 International Court of Justice, Judgment of 21 March 1959, pp. 5, 27.
[208] Draft Articles on Diplomatic Protection, art. 1, UN Doc. A/CN.4/L.647 (INT'L L. COMM'N 2004) ('Diplomatic protection consists of resorting to diplomatic action or other means of peaceful settlement by a State adopting in its own right the cause of its national in respect of an injury to that national arising from an internationally wrongful act of another State.'). Cf. also Mavrommatis Palestine Concessions (Greece v. United Kingdom), 1924 Permanent Court of International Justice (Series A); cf. also 0 (p.54).
No. 2, at 12 (Aug. 30).
[209] Bjorklund, A., Waiver and the Exhaustion of Local Remedies Rule in NAFTA Jurisprudence, in: Weiler, T. (ed.), *NAFTA Investment Law and Arbitration*, Transnational Publishers, Ardsley, 2004, pp. 253 et seqq., p. 258.
[210] Dodge, W., Investor-State Dispute Settlement Between Developed Countries: Reflections on the Australia-United States Free Trade Agreement, *Vanderbilt Journal of Transnational Law*, Vol. 39 (2006), pp. 1 et seqq., pp. 6 et seqq.
[211] Borchard, E., *The Diplomatic Protection of Citizens Abroad*, The Banks Law Publishing, New York, 1925, p. 817.

### 2.3.2.2.1.3.2    State-state arbitration

Since 1959, with the conclusion of the first BIT between Germany and Pakistan[212], investment instruments have provided for *state-state arbitration* geared towards settling disputes *concerning their interpretation and application*. Today, investment instruments rarely provide for such modes of settlement only but usually do so alongside with ISDS.

If the home state takes up the cause of its national in state-state arbitration with a host state then this can also be described as a form of exercising diplomatic protection[213]. State-state arbitration has also been used differently, however, e.g. for interpretive issues[214] or for seeking a declaratory decision in abstract terms that an investment instrument has or has not been violated[215].

Providing for state-state arbitration in investment instruments only would be of little benefit for a foreign investor as, in essence, he would face all the disadvantages associated with diplomatic protection[216].

If an investment instrument would make available both investor-state and state-state arbitration, the latter could be utilised to control the activities of investor-state arbitral tribunals, e.g. by way of providing authoritative interpretations if the state parties cannot agree on such amicably.[217]

### 2.3.2.2.1.4    Non-binding means – investor-state consultations and mediation, and conciliations

Most investment instruments provide for *consultations* between the investor and host state for a fixed period of time before a claim can be submitted to binding investor-state arbitration. Consultations aim at an amicable and mutually satisfactory settlement of a dispute with the view of avoiding an adversarial legal procedure involving winners and losers which could damage long-term

---

[212] Article 11(2) lit b. 1959 Germany-Pakistan BIT, Bundesgesetzblatt (German Law Gazette) II 1961, p. 793.

[213] E.g. Republic of Italy v. Republic of Cuba, Sentence préliminaire, (Ad-hoc Arb. Trib. 15 March 2005), available at http://italaw.com/sites/default/files/case-documents/ita0434_0.pdf (visited 4 May 2014); Republic of Italy v. Republic of Cuba, Sentence finale (Ad-hoc Arb. Trib. 15 January 2008), available at http://italaw.com/sites/default/files/case-documents/ita0435_0.pdf (visited 4 May 2014).

[214] E.g. Peru v Chile Arbitration, cf. Peterson, L., ICSID Tribunal Declines to Halt Investor Arbitration in Deference to State-to-State Arbitration, *INVEST-SD: Investment Law and Policy Weekly News Bulletin*, 19 December 2003, available at http://www.iisd.org/pdf/2003/investment_investsd_dec19_2003.pdf (visited 4 May 2014); Ecuador v. United States, PCA Case No. 2012-5, Request for Arbitration, 1 (Perm. Ct. Arb. 2011), available at http://www.italaw.com/sites/default/files/case-documents/ita1056.pdf (visited 8 May 2014); Hepburn, J. and Peterson, L., US-Ecuador Inter-State Investment Treaty Award Released to Parties - Tribunal Members Part Ways on Key Issues, *Investment Arbitration Reporter*, 30 October 2012, available at www.iareporter.com/articles/20121030_1 (visited 4 May 2014).

[215] E.g. In Cross-Border Trucking Services (United Mexican States v. United States of America), Case No. USA-MEX-98-2008-01, North America Free Trade Agreement Chapter 20 Arb. Trib. Panel Decision, Final Report, 2, (6 February 2001), available at http://www.nafta-sec-alena.org/app/DocRepository/1/Dispute/english/NAFTA__Chapter_20/USA/ub98010e.pdf (visited 4 May 2014).

[216] Cf. Republic of Ecuador v. United States of America (PCA Case No. 2012-5), Expert Opinion with Respect to Jurisdiction of Michael Reisman, at http://www.italaw.com/sites/default/files/case-documents/ita1061.pdf (visited 5 May 2014), p.21. *Reisman* fears that allowing for a greater role of state-state tribunals would endanger the rights created for third party beneficiaries (investors) whereby he equals the substantive standards in investment instruments with human rights. In order to effectively protect or preserve those rights he essentially wants to create a jurisdictional monopoly for investor-state tribunals in this respect. However, *Reisman's* interpretation does not appear compelling as it lacks persuasive evidence – firmly grounded on a prudent interpretation based on ordinary meaning, context and object and purpose of investment instruments – that state parties wanted to deprive themselves of the role of master of the treaty. Cf. Roberts, A., State-to-State Investment Treaty Arbitration: A Hybrid Theory of Interdependent Rights and Shared Interpretive Authority, *Harvard International Law Journal*, Vol. 55 (2014), pp. 1 et seqq., pp. 10 et seqq.

[217] In this respect, Article X-24 CETA draft of 4 February 2014 = Article x-40 of CETA draft of 3 April 2014 should be examined critically whether it overly and unnecessarily curtails the role of the state parties as masters of the treaty to the benefit of investor-state tribunals.

relationships[218]. The absence of a fixed procedural framework may, for example, avoid possible inflexible rules regarding evidence and allows stakeholders other than the investor and the host state to take part more easily in the dispute resolution process[219]. With the same overall rationale, investment instruments may also provide for mediation and conciliation (all three modes are hereafter referred to as 'alternative dispute resolution (ADR)') whereby the borders between the individual concepts are blurred. *Mediation* commonly refers to a technique of amicable dispute resolution with the assistance of a neutral third person. The mediator may either evaluate the legal merits of the dispute or assist the parties in defining the issue[220]. *Conciliation* would describe situations in which the neutral third person suggests possible solutions of the conflict to the parties. In both concepts binding decisions are left to the disputing parties. Due to a less legally regulated discourse allegedly not requiring (costly) legal expertise, some praise ADR as being more cost efficient than such occurring in domestic courts or in arbitration[221].

To some extent ADR could help resolve a dispute between an investor and its host state. Without pressure of a binding dispute settlement mechanism – like ISDS – in the background, the parties to the dispute might however be less inclined to come to an amicable solution.

The CETA draft provides for mandatory consultation[222] before the submission of a claim to arbitration[223] as well as for a voluntary mediation[224] which would not preclude subsequent access to arbitration.

### 2.3.2.2.2    Reforming ISDS

Instead of abandoning ISDS as a standard concept in international investment instruments, states may choose to activate the power of authoritative interpretation of state parties to an investment instrument (below 2.3.2.2.2.1 (p. 83)), to re-draft substantive standards in investment instruments (below 2.3.2.2.2.2 (p. 86)), to restrict or delay access to ISDS (see below 2.3.2.2.2.3 (p. 87)), to restrict available remedies within investor-state arbitration (below 2.3.2.2.2.4 (p. 93)), to allow more broadly for host state claims (below 2.3.2.2.2.5 (p. 95)) or to include review or termination clauses specific to the investment-related provisions in an international agreement (below 2.3.2.2.2.6 (p. 96)).

---

[218] Cf also Echandi, R. and Kher, P., Can International Investor–State Disputes be Prevented? - Empirical Evidence from Settlements in ICSID Arbitration, *ICSID Review*, Vol. 29 (2014), pp. 41 et seqq. Note also the initiatives taken by the Pacific Alliance (Chile, Colombia, Mexico, and Peru) on dispute prevention. Instead of abandoning ISDS they set up projects which aim to communicate host state investment commitments to stakeholders and provide training for government agencies in order to secure compliance. Cf. Clarkson, S. et al., *Looking South While Looking North: Mexico's Ambivalent Engagement with Overlapping Regionalism*, Paper presented to Kolleg-Forschergruppe on 'The Transformative Power of Europe' conference on 'Dealing with Overlapping Regionalism: Complementary or Competitive Strategies?', Freie Universität Berlin, 16 May, 2014.

[219] Consultations can also be more institutionalised by providing an *ombudsman* for foreign investors. Cf. Constain, S., Mediation in Investor–State Dispute Settlement - Government Policy and the Changing Landscape, *ICSID Review*, Vol. 29 (2014), pp. 25 et seqq., 30 et seqq.

[220] On mediation generally in investment disputes cf. Franck, S., Using Investor–State Mediation Rules to Promote Conflict Management - An Introductory Guide, *ICSID Review*, Vol. 29 (2014), pp. 66 et seqq.; Constain, S., Mediation in Investor–State Dispute Settlement - Government Policy and the Changing Landscape, *ICSID Review*, Vol. 29 (2014), pp. 25 et seqq.

[221] However, calls for the introduction of formalised, *compulsory* mediation or conciliation must be viewed with caution as it is also subject to professionalisation – not different to ISDS – and, like every industry, seeks to extend its market share. Cf. Welsh, N and Schneider, A., The Thoughtful Integration of Mediation into Bilateral Investment Arbitration, *Harvard Negotiation Law Review*, Vol. 18 (2013), pp. 71 et seqq.,p. 72, who recommend 'the establishment of a small pool of well-known and well-respected investment treaty mediators who will offer a reasonably strong and pragmatic guarantee of quality in the short-term and engender a heightened perception of trust in the process.'

[222] Article x-4 CETA draft of 4 February 2014 ≈ Article x-18 of CETA draft of 3 April 2014.

[223] Article x-7(1) lit b CETA draft of 4 February 2014 = Article x-21(1) lit b of CETA draft of 3 April 2014.

[224] Article x-5 CETA draft of 4 February 2014 = Article x-19 of CETA draft of 3 April 2014.

### 2.3.2.2.2.1    Activating the power of authoritative interpretation resting with state parties

Older investment treaty texts hardly refer to public interests[225]. This, however, would not foreclose sufficient consideration of such interests in investment arbitration. The Vienna Convention on the Law of Treaties explicitly stipulates in Article 31(3) lit c to interpret substantive standards in the light of other international rules applicable between the state parties which may include such on human rights, environmental protection or social security[226]. The Vienna rules offer, hence, an open and neutral tool to take into account public interests shared by the state parties to the investment instrument.

However, as shown elsewhere in this study[227], arbitral tribunals have not always faithfully followed the binding rules on treaty interpretation[228]. Instead, some tribunals superposed the Vienna rules by a highly problematic 'system of de facto precedent' which is basically backward looking, path-dependent and prone to repeating old mistakes[229].

If arbitral tribunals interpret substantive standards contained in investment instruments in the light of self-chosen previous awards without paying attention to the fact that they were handed down on the basis of different investment instruments, the balance reached in treaty negotiations between private and public interests might be distorted or even replaced by a new one struck by the arbitrators[230].

Irrespective of the controversy of whether there might be incentives in the structure of ISDS which work in favour of private interests[231] or whether a re-balancing in favour of private interest is merely the consequence of some arbitrators 'just' wanting to strike some sort of equitable compromise in the particular case, state parties are constantly threatened with losing power over the ultimate determination of the content of the investment instrument.

Hence, *making the host state's right to regulate explicit* in an investment instrument might be useful to preserve the 'right balance' envisaged by the state parties in the course of interpretation of an investment instrument by an arbitral tribunal. The EU may employ a variety of measures to prevent power-gripping by tribunals:

*At the drafting stage* the EU may include in the ISDS section in an investment instrument a *reference to the Vienna Convention on the Law of Treaties* in order to signal to a tribunal to rigorously follow its rules on interpretation. *Stipulating that 'other rules of international law between the parties'* – including, but

---

[225] Spears, S., The Quest for Policy Space in a new Generation of International Investment Agreements, *Journal of International Economic Law*, Vol. 13 (2010), pp. 1037 et seqq., p. 1045.
[226] Cf. Berner, K., in: Hindelang/Krajewski (eds.), *Shifting Paradigms in International Investment Law (provisional title)*, Oxford University Press, forthcoming 2015 who equally demonstrates that Article 31(3) lit c VCLT has not convincingly been used by investment tribunals. Cf. also McLachlan, C. et al., *International Investment Arbitration: Substantive Principles*, Oxford University Press, Oxford, 2007, p. 67; McLachlan, C., Investment Treaties and General International Law, *International & Comparative Law Quarterly*, Vol. 57 (2008), pp. 361 et seqq., pp. 395 et seqq.; Brower II, C., Obstacles and Pathways to Consideration of the Public Interest in Investment Treaty Disputes, in: Sauvant (ed.), *Yearbook on International Investment Law and Policy 2008–2009*, Oxford University Press, New York, 2009, pp. 356 et seqq., pp. 374 et seq.
[227] Cf. 2.3.1.2 (p.66).
[228] Cf. also Van Harten, G., *Investment Treaty Arbitration and Public International Law*, Oxford University Press, Oxford, 2007, pp. 122 et seqq., who points to a variety of interpretive approaches adopted by tribunals originating from commercial arbitration which appear ill-fitting for the public international law context in which investment arbitration operates.
[229] Alexander, L., Constrained by Precedent, *Southern California Law Review*, Vol. 63 (1989), pp. 1 et seqq., p. 10.
[230] Cf. 2.3.1.2 (p.66).
[231] In particular the economic interests of arbitrators may encourage strengthening private interests in ISDS since arbitrations are initiated by investors in nearly all cases. Cf. Van Harten, G., *Investment Treaty Arbitration and Public International Law*, Oxford University Press, Oxford, 2007, pp. 167 et seqq.

not limited to such on human rights or environment – *are to be taken into account* when interpreting the investment instrument, reiterates Article 31(1), (3) lit c VCLT[232].

*Providing explicitly for public objectives* considered important to the state parties in the preamble or elsewhere in an investment treaty also helps preserving the intended balance between private and public interests as the tribunal is then freed from looking for such objectives beyond the investment instruments itself[233]. As a tribunal is obliged to interpret a treaty, inter alia, in the light of its objective (Article 31(1) VCLT) explicit references should at least ensure interpretative consideration[234]. However, taking public interests into consideration and balancing them with private interests does not say anything about the weight given to each. This would require further specification in an investment instrument if not intended to be left to tribunals[235].

According to the Canadian Technical Summary of Final Negotiated Outcomes[236], the preamble of CETA reaffirms the state parties' right to regulate in a manner consistent with the agreement[237]. In principle, such a reference can influence the meaning of a substantive standard[238]. However, such language would not put *additional* emphasis on public interests or may not create an inherent assumption that a regulatory measure taking in the public interest would be in compliance with the investment agreement[239].

Turning to the post-ratification period, after an investment treaty has entered into force, the state parties have further means at hand to control the interpretation of an investment instrument. NAFTA-experience[240] demonstrates that – as in the case of inconsistency of ISDS practice – *a committee* staffed with representatives from both state parties and *charged with the power to authoritatively interpret the substantive standards contained in the treaty* can be of assistance[241] in hedging in (to some extent) power-seizing processes inherent in treaty interpretation by ad-hoc tribunals in the course of

---

[232] Cf. Article x-12(1) CETA draft of 4 February 2014 = Article x-27(1) of CETA draft of 3 April 2014.

[233] Spears, S., The Quest for Policy Space in a new Generation of International Investment Agreements, *Journal of International Economic Law*, Vol. 13 (2010), pp. 1037 et seqq., pp. 1065 et seqq.

[234] Cf. UNCTAD, *Interpretation of IIAs: What States Can Do*, IIA Issues Note 2011/3, available at http://unctad.org-/en/Docs/webdiaeia2011d10_en.pdf (visited 19 May 2014), pp. 8 et seqq.

[235] For policy options see Spears, S., The Quest for Policy Space in a new Generation of International Investment Agreements, *Journal of International Economic Law*, Vol. 13 (2010), pp. 1037 et seqq., pp. 1048 et seqq.

[236] Technical Summary of Final Negotiated Outcomes, Canada-European Union Comprehensive Economic and Trade Agreement, p. 24. Available at http://www.actionplan.gc.ca/sites/default/files/pdfs/ceta-technicalsummary.pdf (visited 4 May 2014).

[237] See also Article 7.1(4) EU-South Korea FTA: 'Consistent with this Chapter, each Party retains the right to regulate and to introduce new regulations to meet legitimate policy objectives.'

[238] Cf. Article 31 (1) VCLT.

[239] Of the view that such treaty language would even lead to the contrary, i.e. emphasising property interests Bernasconi-Osterwalder N. and Mann, H., *A Response to the European Commission's December 2013 Document "Investment Provisions in the EU-Canada Free Trade Agreement (CETA)"*, IISD Report, March 2014, available at http://www.iisd.org/sites/-default/files/pdf/2014/reponse_eu_ceta.pdf (visited 2 May 2014), p. 2.

[240] Cf. NAFTA Free Trade Commission, Notes of Interpretation of Certain Chapter 11 Provisions (Article 1105 and the Availability of Arbitration Documents), 31 July 2001, available at http://www.sice.oas.org/tpd/nafta/Commission/-CH11understanding_e.asp (visited 4 May 2014).

[241] The NAFTA Free Trade Commission, in its interpretive note, bound the substantive treatment standards of 'fair and equitable treatment' and 'full protection and security' to the customary international law minimum standard of treatment of aliens (cf. NAFTA Free Trade Commission, *Notes of Interpretation of Certain Chapter 11 Provisions (Article 1105 and the Availability of Arbitration Documents)*, 31 July 2001, available at http://www.sice.oas.org/tpd/nafta-/Commission/CH11understanding_e.asp (visited 4 May 2014)). Arbitrators, however, reacted 'flexibly' by, among others, holding 'both customary international law and the minimum standard of treatment of aliens it incorporates, are constantly in a process of development'. Cf. ADF Group v United States of America, ICSID Case No. ARB(AF)/00/1, Award (9 January 2003), para 179, available at http://www.italaw.com/sites/default/files/case-documents/ita0009.pdf (visited 8 May 2014).

dispute resolution[242]. If provided for in EU agreements – the CETA draft does so[243] – such a committee does not only facilitate exchange and cooperation among the state parties but could constantly monitor the activity of arbitral tribunals subsequent to the entry into force of the agreement. If necessary, interpretative notes could be issued. Such authoritative interpretation would have to be taken into consideration by tribunals along with any *ad-hoc authoritative interpretation* by the state parties[244]. Such ad-hoc authoritative interpretation can for example be brought about when (all) the non-disputing (state) parties intervene in the proceeding in support of the defendant state party regarding the interpretation of the investment instrument[245].

While providing an authoritative interpretation on substantive standards to influence ongoing arbitrations might be seen as conflicting with the idea of equality of arms in ISDS and should be handled with caution, it nevertheless remains within the discretion of the state parties as the masters of the treaties in the same way they are entitled to remove or to modify the benefits enjoyed by the investor[246]. Since an authoritative interpretation requires the consent of all state parties, the investor is to some degree shielded from inappropriate case-driven interferences with ongoing proceedings if the home state of the investor perceives the claim as having some merit. On the other hand, issuing an interpretative note may not be confused with negotiations conducted in the context of exercising 'classic' diplomatic protection. Discussions on authoritative interpretations – even issued during ongoing arbitrations – would have to focus on the interpretation of the investment instrument not (just) in the individual case but in all future cases. The host state of today's claimant might be tomorrow's respondent and vice-versa.

As explained already elsewhere in this study[247], authoritative interpretation could equally be 'institutionalised' by providing for a *preliminary reference procedure* to request authoritative interpretation of a clause through state-to-state consultation or arbitration[248] or allowing for a *mandatory review process* of draft awards by the state parties or a treaty committee[249].

---

[242] Mills, A., Antinomies of Public and Private at the Foundations of International Investment Law and Arbitration, *Journal of International Economic Law*, Vol. 14 (2011), pp. 469 et seqq., pp. 490 et seqq.
[243] Cf. Article x-26(2) CETA draft of 4 February 2014 = Article x-42(2) of CETA draft of 3 April 2014.
[244] Cf. in respect of the effect of such interpretation and advisable clarifications in future EU agreements above footnotes 149 and 153. See also UNCTAD, *Interpretation of IIAs: What States Can Do*, IIA Issues Note 2011/3, available at http://unctad.org/en/Docs/webdiaeia2011d10_en.pdf (visited 19 May 2014), pp. 4 et seqq., pp. 11 et seqq.
[245] UNCTAD, *Interpretation of IIAs: What States Can Do*, IIA Issues Note 2011/3, available at http://unctad.org/en/Docs/webdiaeia2011d10_en.pdf (visited 19 May 2014), p. 14. The CETA draft allows for such non-disputing (state) party intervention in Article x-19(2) CETA draft of 4 February 2014 = Article x-35(2) of CETA draft of 3 April 2014. For certain problems faced by the non-disputing parties to gain access to oral submissions in a NAFTA-dispute cf. Detroit International Bridge Company v The Government of Canada, PCA Case No. 2012-25, Procedural Order No. 8 (12 May 2014), available at http://www.italaw.com/sites/default/files/case-documents/italaw3169.pdf (visited 22 July 2014).
[246] Arguably, substantive standards neither create rights for individuals nor can the latter have legitimate expectations that state parties refrain from clarifying or modifying substantive standards. Cf. Hindelang, S., Restitution and Compensation – Reconstructing the Relationship in International Investment Law, in: Hofmann/Tams (eds.), *International Investment Law and General International Law: From Clinical Isolation to Systemic Integration*, Nomos, Baden-Baden, 2011, pp. 161 et seqq.; also available as Hindelang, S., *Restitution and Compensation – Reconstructing the Relationship in International Investment Law*, WHI-Paper 02/11, 2011, http://www.whi-berlin.eu/tl_files/documents/whi-paper0211.pdf (visited 1 May 2014); Cf. also Van Harten, G., *Investment Treaty Arbitration and Public International Law*, Oxford University Press, Oxford, 2007, p. 131: 'Investment treaty arbitration is a matter of pacta sunt servanda between state parties, not between disputing parties.' In order to avoid doubts, treaty makers should make it explicit in the text of an agreement that authoritative interpretation can also have binding effect in ongoing arbitrations.
[247] See above 2.3.1.3 (p.69).
[248] The state-to-state arbitration mechanism built in virtually any investment instrument would provide a convenient tool in each case in which the state parties cannot agree amicably on the authoritative interpretation.
[249] Cf. for a similar solution adopted in WTO-law Article 16 (4) DSU which reads 'Within 60 days after the date of circulation of a panel report to the Members, the report shall be adopted at a DSB meeting unless a party to the dispute formally notifies

### 2.3.2.2.2.2    Redrafting substantive standards

Balancing public and private interests by adapting substantive provisions should be approached with the necessary prudence and, in any event, be a conscious policy decision. Lately, organisations such as Unctad promote the idea of defining *substantive* standards in investment instruments more clearly and thereby also reducing their scope in order to preserve more policy space for states[250]. When talking about preserving or even increasing policy space at home, in many cases what is not explicitly mentioned is that this often goes along with reducing the standard of property protection abroad. This is not to suggest any specific balance but merely to stress that state parties and the societies represented by them should carefully evaluate their interests and make informed and more widely accepted policy choices before entering into negotiations.

Whatever balance state parties may be able to strike between public and private interests in treaty negotiations, in any event they should carefully review the treaty language adopted *and* provide for authoritative interpretation mechanisms to preserve the balance struck. By rule of thumb, the more open the substantive standards are formulated the more leeway investment tribunals enjoy later[251] and, hence, the stronger the tools securing authoritative interpretation should be. However, it is also worth mentioning that past experience has demonstrated that state parties' attempts at trimming certain substantive standards were met with some 'avoidance strategies' by tribunals[252].

Another issue already mentioned[253] and associated with more clearly and/or narrowly defined substantive standards is the ensuing reduction of flexibility in adapting a treaty text to possibly different future policy priorities without having to renegotiate. While today, say the 'public finance sector' might be perceived as a very sensitive policy area and is carved out from the scrutiny of international arbitration, tomorrow it might be a different one for which social groups mobilise public indignation in domestic arenas.

---

the DSB of its decision to appeal or the DSB decides by consensus not to adopt the report. If a party has notified its decision to appeal, the report by the panel shall not be considered for adoption by the DSB until after completion of the appeal. This adoption procedure is without prejudice to the right of Members to express their views on a panel report.'; see also Article 18(14) DSU for adoption of appellate body reports.

[250] Cf., e.g., UNCTAD, *Investment Policy Framework for Sustainable Development*, 2012, available at http://unctad.org/en/PublicationsLibrary/webdiaepcb2012d6_en.pdf (visited 4 May 2014); for a current suggestion of redrafting the expropriation and FET clauses in investment instruments cf. Ortino, F., Refining the content and role of investment 'rules' and 'standards': A bolder approach to international investment treaty-making, *ICSID Review*, Vol. 28 (2013), pp. 152 et seqq., pp. 160 et seqq.

[251] Cf. Trachtman, J., The Domain of WTO Dispute Resolution, *Harvard International Law Journal*, Vol. 40 (1999), pp. 333 et seqq., p. 335 phrases the issue in legitimacy terms: '[W]here decision-making authority is allocated to a dispute resolution body, less specific standards are consistent with a transfer of power to an international organization—the dispute resolution body itself—while more specific rules are more consistent with the reservation of continuing power by member states. From a more critical standpoint, it might be argued that allocation of authority to a transnational dispute resolution body by virtue of standards can be used as a method to integrate sub rosa, and outside the visibility of democratic controls'.

[252] For example, linking the fair and equitable treatment standard to the minimum standard in customary international law (Cf. NAFTA Free Trade Commission, *Notes of Interpretation of Certain Chapter 11 Provisions (Article 1105 and the Availability of Arbitration Documents)*, 31 July 2001, available at http://www.sice.oas.org/tpd/nafta/Commission/CH11understanding_e.asp (visited 4 May 2014) did not lead to the desired outcome of significantly reducing its scope. Rather, tribunals adopted an expansive 'interpretation' of the minimum standard in customary international law *without* a thorough analysis of actual evidence of state practice and *opinio juris*; both necessary to identify a rule of customary international law. Instead, some tribunals again relied on the highly questionable doctrine of 'de facto precedent' (cf. 2.3.1.2 (p.66) and 0 (p.83)) to back up their reading of fair and equitable treatment and hereby 'rebalanced' the investment instrument. Cf., e.g. Railroad Development Corp. v. Guatemala, ARB /07/23, Award paras. 212 et seqq., esp. para 219, available at http://www.italaw.com/sites/default/files/case-documents/ita1051.pdf (visited 8 May). See for a notable exception Glamis Gold, Ltd. v. United States of America, Uncitral, Award (8.6.2009), paras. 600-605, available at http://www.state.gov/-documents/organization/125798.pdf (visited 8 May 2014).

[253] Cf. above 2.3.1.5 (p.71).

Since a review of the substantive treatment standards is not part of this study, suffice it to say that the CETA draft Investment Text contains all 'traditional' substantive standards. As of writing it is unclear, however, whether there will be an 'umbrella clause'. As a general exception clause for non-discrimination commitments contained in the CETA draft Article XX GATT, whose operation in investment arbitration remains yet to be seen, is incorporated[254]. While progress appears to have been made in more clearly defining indirect expropriation and, in particular, carving out non-discriminatory measures to protect legitimate public welfare objectives such as health, safety and the environment except in rare circumstances[255], doubts exist as to whether the negotiation partners succeeded in a more precise definition of the fair and equitable treatment standard which would offer clearer guidance to investment tribunals[256].

Even if the CETA negotiation parties would finally agree on placing a stronger emphasis on public interests or even on restricting the scope of the substantive treatment standards, the current language of the most-favoured-nation treatment clause[257] would allow for importing broader substantive standards from other investment instruments – in respect of the EU, for example, i.e. the Energy Charter Treaty – to which the state parties subscribed or will subscribe.[258]

### 2.3.2.2.2.3    Restricting and delaying access to ISDS

### 2.3.2.2.2.3.1    Excluding certain sectors or economic activities from ISDS

An alternative or cumulative approach to limit the exposure to ISDS would be to address concerns about sufficient policy space by way of curtailing access to ISDS.

For example, sensitive policy areas such as national security, the review of incoming investments, measures to protect the environment, health and human rights, tax measures or sovereign bonds could simply be *excluded from an investor-state tribunal's jurisdiction*. However, in the course of later arbitration, such an approach will probably lead to discussions circling around the question to which policy area a certain contested state measure has to be attributed. Such exercises often involve difficult, hardly clear-cut and, at times, unpredictable delineation processes. Furthermore, sectors or governmental activities perceived as very sensitive to the host state might change over time and, hence, a given list of activities might be over- or under-representative when a dispute arises in the future.

The jurisdiction of investor-state arbitral tribunals can in principle be even further curtailed – and, thus, protection of private interests further reduced – by excluding certain substantive standards, such as fair and equitable treatment, from the jurisdiction of a tribunal. Alleged breaches of excluded substantive standards could then only be enforced by means of diplomatic protection and, possibly,

---

[254] Cf. 'Article X: General exceptions' CETA draft Investment Text of 4 April 2014. In earlier drafts, cf. 'Article X: General Exceptions' CETA draft Investment Text of 21 November 2013, the exception applied to the *whole* investment chapter and did not incorporate Article XX GATT. See. also General Agreement on Tariffs and Trade, available at http://www.wto.org/english/docs_e/legal_e/gatt47_e.pdf (visited 7 May 2014).

[255] Article X.11 in connection with 'Annex: Expropriation' CETA draft Investment Text of 21 November 2013 = Article X.11 in connection with 'Annex X.11: Expropriation' CETA draft Investment Text of 4 April 2014.

[256] Cf. Article X.9(1)-(5) CETA draft Investment Text of 21 November 2013 ≈ Article X.9(1)-(4) CETA draft Investment Text of 4 April 2014. For a critical view cf. Bernasconi-Osterwalder, N. and Mann, H., *A Response to the European Commission's December 2013 Document "Investment Provisions in the EU-Canada Free Trade Agreement (CETA)"*, February 2014, available at http://www.iisd.org/sites/default/files/2014/reponse_eu_ceta.pdf (visited 5 May 2014), pp. 5 et seqq.

[257] Cf. Article X.8 CETA draft Investment Text of 21 November 2013 ≈ Article X.8 CETA draft Investment Text of 4 April 2014.

[258] Arguably, even existing Member States' BIT could lend themselves to such exercise, if the investment instrument is concluded as a so-called 'mixed agreement', i.e. asides the EU also Member States would become party to the investment instrument.

in domestic courts. To some degree such a drafting approach could be – depending on the perspective – frustrated or absorbed by tribunals switching to other substantive standards still included in their jurisdiction. These standards would simply be interpreted broader. Especially the substantive standards of fair and equitable treatment and indirect expropriation lend themselves to such tactics as they partly overlap[259].

The CETA drafters appear to have carved in particular market access provisions[260]. Apart from that, negotiators seem to focus on more clearly defining, re-balancing or restricting substantive standards.

### 2.3.2.2.2.3.2    Exhaustion of local remedies

### 2.3.2.2.2.3.2.1    Advantages of prior involvement of domestic courts

In contrast to other areas of public international law[261], in international investment law an investor is hardly required to exhaust local remedies before resorting to ISDS ('local remedies rule')[262]. This is due to the silence of most investment instruments on this point which was read – in conjunction with other evidence[263] – by tribunals as a 'waiver' of the local remedies rule[264].

Apart from textual considerations, eminent commentators justify the dropping of the local remedies rule in ISDS, as a choice of principle, with arguments such as the following: host states' courts are perceived as *lacking objectivity*, are often bound to *apply domestic law only* even though this falls

---

[259] Kläger, R., *'Fair and Equitable Treatment' in International Investment Law*, Cambridge University Press, Cambridge, 2011, pp. 296 et seqq.; Reed, L. and Bray, D., Fair and Equitable Treatment: Fairly and Equitably Applied in Lieu of Unlawful Indirect Expropriation?, in: Rovine (ed.), *Contemporary Issues in International Arbitration and Mediation: The Fordham Papers 2007*, Martinus Nijhoff Publishers, Leiden, 2007, pp. 13 et seqq., p. 14.

[260] Cf., e.g., Article x-1(1) CETA draft of 4 February 2014 = Article x-17(1) of CETA draft of 3 April 2014.

[261] Cf. in respect of the requirement of exhaustion of local remedies in other fields Bjorklund, A., Waiver and the Exhaustion of Local Remedies Rule in NAFTA Jurisprudence, in: Weiler, T. (ed.), *NAFTA Investment Law and Arbitration*, Transnational Publishers, Ardsley, 2004, pp. 253 et seqq., p. 258 et seqq. See also Article 35(1) European Convention on Human Rights (ECHR).

[262] Certain 'variations' of the local remedies rule have surfaced in ISDS practice in situations in which investor-state contracts contained exclusive jurisdiction clauses pointing to local courts or as a substantive requirement to be met within protection standards in investment instruments such as indirect expropriation or fair and equitable treatment. Cf. Schreuer, C., Calvo's Grandchildren: The Return of Local Remedies in Investment Arbitration, *The Law & Practice of International Courts and Tribunals*, Vol. 4 (2005), pp. 1 et seqq.; Foster, G., Striking a Balance between Investor Protections and National Sovereignty - The Relevance of Local Remedies in Investment Treaty Arbitration, *Columbia Journal of Transnational Law*, Vol. 49 (2011), pp. 201 et seqq., available at http://ssrn.com/abstract=1865489 (visited 4 May 2014); Dodge, W., *Local Remedies under NAFTA Chapter 11*, 2011, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2217059 (visited 4 May 2014). For a discussion of the current interplay of investment tribunals and domestic courts cf. Bubrowski, H., *Internationale Investitionsschiedsverfahren und nationale Gerichte*, Mohr Siebeck, Tübingen, 2013.

[263] For example, in respect of ICSID arbitration such a reading is, inter alia, supported by Article 26 ICSID-Convention which stipulates that states are required to expressly state that they no *not* dispense with the requirement of exhausting local remedies.

[264] E.g. Yaung Chi Oo Trading Pte. Ltd. v. Government of the Union of Myanmar, ASEAN I.D. Case No. ARB/01/1, Award (31 March 2003), para. 40, available at http://www.italaw.com/sites/default/files/case-documents/ita0909.pdf (visited 9 May 2014); Loewen Group, Inc. and Raymond L. Loewen v. United States of America, ICSID Case No. ARB(AF)/98/3, Award (26 June 2003), paras. 142 et seq., available at http://www.italaw.com/sites/default/files/case-documents/ita0470.pdf (visited 9 May 2014); SGS Société Générale de Surveillance S.A. v. Islamic Republic of Pakistan, ICSID Case No. ARB/01/13, Decision on Jurisdiction (6 August 2003), paras. 35 et seq., available at http://www.italaw.com/sites/default/files/case-documents/ita0779.pdf (visited 9 May 2014). Cf. Articles 1117 and 1121 NAFTA require the claimant to waive their right to initiate or continue before any administrative tribunal or court under the law of any party, or other dispute settlement procedures, any proceedings with respect to the measure of the disputing party that is alleged to be in breach with the substantive standards in NAFTA. This was taken by arbitral tribunals as an implicit waiver of the local remedies rule by the state parties. Cf. Bjorklund, A., Waiver and the Exhaustion of Local Remedies Rule in NAFTA Jurisprudence, in: Weiler, T. (ed.), *NAFTA Investment Law and Arbitration*, Transnational Publishers, Ardsley, 2004, pp. 253 et seqq., pp. 260 et seqq.; Van Harten, G., *Investment Treaty Arbitration and Public International Law*, Oxford University Press, Oxford, 2007, pp. 110 et seqq.

short of international investment protection standards and *domestic litigations* would mean *additional costs and delay* for the foreign investor[265].

However, such or similar justifications tend not just to blind out the virtues of resorting to local courts before initiating international arbitration but also seem to operate on the assumption that all domestic legal systems are more or less the same: biased, inefficient and incapable of guaranteeing a sufficient level of protection for foreign investment[266].

*Advantages of resorting to domestic courts* were already pointed out elsewhere in this study[267]. In a nutshell: domestic courts, at least in advanced systems, may operate in a legal environment more *consistent and predictable* than current ISDS practice. Also, in contrast to the current ISDS model, *erroneous decisions can be corrected* by appeals mechanisms. If permitted to apply and interpret the given investment instrument as well[268], domestic courts can provide a *single forum* in which the dispute is adjudicated in respect of both whether the host state measure was in compliance with domestic laws and the international commitments of the host state. While some might argue that domestic judges are less experienced in international law matters than arbitrators, this does not mean that they are inexperienced. In many domestic courts public international law is applied or accommodated on a rather frequent basis[269]. And even if domestic courts are prevented from directly applying an international investment instrument, this would still be no argument against their involvement prior to ISDS[270]. Protection against misuse or abuse of governmental powers is a standard feature of domestic law. At least in advanced systems the standard should *generally* not fall below what is offered in international law[271].

These may not be the only advantages of prior involvement of domestic courts: when states are worried that investment tribunals do not pay sufficient attention to public interests in the process of balancing them with private property interests, domestic courts might be better suited to take a first shot. Domestic courts are experienced in considering an investment case against the background of the whole domestic legal system. This system mirrors the elaborate, complex and refined balance of private and public interests agreed to in the host state. Domestic courts might be in a better position to comprehensively appreciate this balance than arbitral tribunals; the latter operating in a comparatively loosely defined, 'minimalistic' legal environment not always highly sensitive to legitimate policy choices made in a host state[272].

---

[265] Schreuer, C., Calvo's Grandchildren: The Return of Local Remedies in Investment Arbitration, *The Law & Practice of International Courts and Tribunals*, Vol. 4 (2005), pp. 1 et seqq.; very critical Sornarajah, M., *The International Law on Foreign Investment*', Cambridge University Press, New York, 3th Edition, 2010, p. 219 with reference to the case of Elettronica Sicula S.p.A. (ELSI), United States of America v. Italy before the ICL, Judgement (20 July 1989), available at http://www.icj-cij.org/docket/index.php?sum=395&p1=3&p2=3&case=76&p3=5 (visited 5 May 2014).

[266] Also ideas of creating 'competition' between developed domestic systems and ISDS are rather ill-fitting when it comes to reviewing of the exercise of public authority as 'competition' might not only encourage working more efficiently but also could initiate a race to the bottom in terms of quality of control if competition conditions are not comparable.

[267] Cf. 0 (p.76).

[268] See for a study Yimer, B. et al., *Application of International Investment Agreements by Domestic Courts*, Trade and Investment Law Clinic, The Graduate Institute Geneva, 2011, available at http://graduateinstitute.ch/files/live/sites/iheid-/files/sites/ctei/shared/CTEI/Law%20Clinic/Memoranda%202011/UNCTAD_Memo.pdf (visited 4 May 2014).

[269] EU law, while not strictly international law in nature for domestic courts, as well the ECHR can serve as obvious examples.

[270] This argument appears true at least as long as we stick to the idea that ISDS is a subsidiary means of legal redress. For an investor it cannot make a difference if a wrong is remedied on the basis of national or international law as long as national law does not fall below the standard of international law.

[271] Cf. 0 (p.76).

[272] Note also the in-depth analysis of consequences of disregarding domestic legal systems in ISDS practice by Montt, S., *State Liability in Investment Treaty Arbitration*, Hart Publishing, Oxford, 2009, pp. 293 et seqq.; esp. pp. 366 et seqq.

If the domestic court would fail to resolve the dispute to the satisfaction of the investor, i.e. falling below the international standard – which could happen even in jurisdictions which regard themselves as most advanced[273] – and the latter would initiate investment arbitrations, a tribunal may benefit from the 'pre-processing' of facts and the (domestic) law. Especially the domestic court's treatment of its domestic law, echoing a societal consensus between private and public interests, can inspire the tribunal's holdings to the extent that it conforms with the investment instrument. Overall, such arbitral awards might be closer to the consensus present in the host state and, hence, may be more easily accepted and perceived as legitimate by the public in that state. In the end, it would render ISDS what it was actually meant to be: a safety net in case of a failure of the domestic system, not an alternative to it[274].

### 2.3.2.2.2.3.2.2 Responding to varying capacities of domestic courts

Certainly, possible *advantages of taking recourse to domestic courts* before resorting to investment arbitration may *vary significantly across national jurisdictions* and would hold true generally only for advanced legal systems. This leads to the question of whether states should make concessions to the fact that domestic jurisdictions exhibit different levels of development[275]. Put differently, should the EU, for example, allow for direct ISDS claims of investors, i.e. waive the exhaustion of local remedies, in a possible investment instrument concluded with Canada (ranked 11th out of 99 in the World Justice Project Rule of Law Index 2014[276]) in the same way as in a possible agreement with China which ranks 76/99 in the same index?

Considering the potential weight and significance of interests and far-reaching consequences at stake in investment arbitrations, the potential contributions domestic courts can make to get the decision 'right' and, ultimately, widely accepted suggests that the *requirement of exhausting local remedies should be waived only where the domestic courts and domestic legal systems generally fail to meet international standards*.

An argument which is commonly advanced against a local remedies rule is that it is difficult to negotiate investment agreements which differentiate between states. What is feared is a 'race to the bottom' in terms of the level of protection. If, for example, the EU would prescribe for exhaustion of local remedies in relation to Canada, China would, so the argument continues, also demand such a clause. Obviously, there is a difference in development between those two domestic legal systems and European investors would end up having to go through the instances in China before pursuing arbitration; a cumbersome exercise, some may say.

---

[273] Cf. Loewen Group, Inc. and Raymond L. Loewen v. United States of America, ICSID Case No. ARB(AF)/98/3, documents available at http://www.italaw.com/cases/632 (visited 8 May 2012); see also European Union, The 2014 EU Justice Scoreboard, Speech Viviane Reding, EU Commission, available at http://europa.eu/rapid/press-release_SPEECH-14-225_en.htm (visited 4 May 2014).

[274] Also in this direction Burke-White, W. and von Staden, A., Private Litigation in a Public Law Sphere: The Standard of Review in Investor-State Arbitrations, *Yale Journal of International Law*, Vol. 35 (2010), pp. 283 et seqq. pp. 332-333;. Hachez, N. and Wouters, J., *International Investment Dispute Settlement in the 21st Century: Does the Preservation of the Public Interest Require an Alternative to the Arbitral Model?*, Leuven Centre for Global Governance Studies Working Paper No. 81, pp. 20 et seqq., available at: http://ssrn.com/abstract=2009327 or http://dx.doi.org/10.2139/ssrn.2009327 (both visited 4 May 2014); cf. also Montt, S., *State Liability in Investment Treaty Arbitration*, Hart Publishing, Oxford, 2009, pp. 153 et seqq.

[275] Such seems also to be suggested by the European Parliament, *Report on the Future European International Investment Policy*, 22 March 2011, available at http://www.europarl.europa.eu/sides/getDoc.do?pubRef=-//EP//TEXT+REPORT+A7-2011-0070+0+DOC+XML+V0//EN (visited 4 May 2014). Very critical on this Sattorova, M., Denial of Justice Disguised? – Investment Arbitration and the Protection of Foreign Investors from Judicial Misconduct, *International and Comparative Law Quarterly*, Vol. 61 (2012), pp. 223 et seqq., p. 230 who fears that the local remedies rule would only be waived for developed states which she perceives as unfair.

[276] http://data.worldjusticeproject.org/ (visited 4 May 2014).

However, such a 'negotiator's argument' can be confronted in three ways: First, *on a factual level* it can be argued that states – like Australia – seem to be able to differentiate in their negotiations with other states. Some agreements contain ISDS mechanisms, others do not[277]. Second, *on a more fundamental level*, one must question whether a (currently incalculable) success[278] in ongoing treaty negotiations with China would justify completely denouncing a domestic courts system in all other EU agreements, especially when it comes to protecting foreign property originating from, e.g., Canada or the USA. ISDS practice has encountered some serious problems in delivering legally and, even more importantly, societally more widely acceptable decisions on balancing private and public interests[279]. In contrast, an advanced, well-functioning domestic legal system may work as a more predictable and societally established solver or at least pre-processor of investment disputes. In respect of the latter, even if domestic courts might not satisfactorily resolve an investment dispute in the individual case, it might lend legitimacy to the subsequent arbitration as the community in which the dispute arose at least had *the chance* to tackle the dispute with its own means. Third, *on a pragmatic level* one could consider a solution which avoids hard choices by going beyond the classic options of 'no local remedies', 'full exhaustion of local remedies' and requiring a fixed time period in which the investor has to pursue domestic remedies before proceeding to arbitration[280].

A pragmatic solution could involve prescribing what is referred to as an '*elastic' local remedies rule* here. Such a rule would *link the obligation to pursue local remedies to a third-party index which measures the potential of domestic courts to produce effective solutions to claims of foreign investors*. Regress could be taken for example to the already mentioned World Justice Project (WJP) Rule of Law Index[281] or any other index which appears suitable to the state parties[282]. A lower rank of a domestic legal index

---

[277] Australia-Unites States Free Trade Agreement contains no ISDS, but merely the possibility to initiate state party consultations in case one state party sees the need to introduce ISDS. (Article 11.16); available at https://www.dfat.gov.au/fta/ausfta/final-text/chapter_11.html (visited 4 May 2014), but see the Korea-Australia FTA, Chapter 11 which includes ISDS (Article 11.15 et seqq.) provisions, available at https://www.dfat.gov.au/fta/kafta/downloads/KAFTA-chapter-11.pdf (visited 4 May 2014).

[278] Success would probably mean a strong protection of European investment in China, including a waiver of the local remedies rule.

[279] Cf. 2.3.2.1 (p.73).

[280] Prescribing a fixed time period might just be the second best option as it does not do justice to the diversity of legal issues at stake. However, prescribing a reasonable fixed time period might be better than no exhaustion of local remedies rule at all in an investment instrument due to the reasons stated above. The time period should not be set too short in order to allow for domestic appeals also. The argument that this would lead to more costs and additional delay on part of the investor should not be given weight except for the situation that domestic court proceedings take up an excessive time period amounting to a denial of justice. This having been said some additional flexibility could be brought about by allowing investors to initiate investor-state arbitration *before* expiry of the fixed time period provided for in the exhaustion of local remedies rule by arguing that the domestic system falls short of certain criteria previously specified in an investment instrument. Criteria could comprise such which typically characterise a functioning judiciary built on the rule of law. However, before allowing for such a model one would carefully need to evaluate the 'intrinsic' motivations of those who shall be charged with deciding over such an investor's plea. Furthermore, it is worth noting that in those situations in which the investment instrument expressly stipulated a duty to pursue local remedies for a certain period of time, claimants were able to import more favourable arbitration clauses, i.e. such which do not prescribe for local remedies, via the most-favoured nation treatment standard. Cf. Emilio Agustín Maffezini v. The Kingdom of Spain, ICSID Case No. ARB/97/7, Decision on Jurisdiction (25 January 2000), paras. 38 et seq., available at http://www.italaw.com/sites/default/files/case-documents/ita0479.pdf (visited 8 May 2014); Siemens A.G. v. Argentine Republic, ICSID Case No. ARB/02/8, Decision on Jurisdiction (3 August 2004), paras. 82 et seq., available at http://www.italaw.com/sites/default/files/case-documents/ita0788.pdf (visited 8 May 2014).

[281] http://www.worldjusticeproject.org/.

[282] The choice or development of a suitable index will certainly prove to be a crucial point, yet also a thorny issue in treaty negotiations. Among others, international organisations such as the UN developed rule of law 'indicators' for specific situations. Cf. Office of the High Commissioner for Human Rights, The United Nations Rule of Law Indicators, available at http://www.un.org/en/peacekeeping/publications/un_rule_of_law_indicators.pdf (visited 5 May 2014); See also the project

could lead to a waiver of the local remedies rule. Improvements in the rule of law would lead to an increasing involvement of local courts and vice versa. An elastic local remedies rule would not just differentiate between a waiver of local remedies and full exhaustion, but prescribe for different levels of domestic court involvement depending on their capacities[283].

Such an approach would, first, signal that *no formal distinction is made between developed and developing states* and, hence, tribute is paid to the notion of formal equality of states. At the same time, second, such a *rule would* also *recognise* that there are *factual differences between states.* A notion of *common but differentiated commitments* would be given a fresh twist and may even *encourage internal reform* of the judicial system with reference to achieving a better ranking in a given rule of law index and bringing investment claims back home to domestic courts.[284] Such a local remedies rule would even allow for flexibility within one agreement without having to compromise the idea that both state parties to a treaty are bound by the same rules.

Finally, concerns that an arbitral award deviating from a final court decision in a host state might face resistance as it would not be possible to pass it off politically can easily be dispelled. Longstanding experience with the jurisprudence of the European Court of Human Rights (ECtHR)[285], the Court of Justice of the European Union (CJEU)[286], the European Free Trade Association (EFTA) Court[287] or even the International Court of Justice (ICJ)[288] demonstrates that the unsuccessful state party generally implements an international ruling without further ado despite the fact that its domestic courts initially held differently.

In the CETA draft the EU addresses the issue of *parallel claims* in domestic and international fora by the rule that a claimant has to waive domestic claims before pursuing arbitration, essentially mimicking the NAFTA model. However, *nothing in the CETA draft encourages the use of domestic courts.* In contrast, CETA would allow for initiating investment arbitration *without* having to engage in

---

of the Bertelsmann Stiftung, Bertelsmann Transformation Index, Political Transformation, Website, available at http://www.bti-project.org/bti-home/ (visited 6 May 2014).

[283] Levels of domestic court involvement can be pre-determined in the investment instrument and linked to a certain rank in a justice index. For example, a rank among the top 15 in the WJP Rule of Law Index would require full exhaustion of local remedies, a rank among the top 30 would require pursuing local remedies for a period of not more than e.g. five years, etc. A rank in the lowest 50-70 could lead to a waiver of local remedies. For the sake of foreseeability, an elastic local remedies rule could be adjusted automatically to new factual situations in the host country, reflected in the respective justice index, not on a daily basis but every two to three years. Moreover, even *regional differences* in terms of development of the rule of law within a state or the EU – cf. above footnote 62 – could be taken into consideration. In addition, a novel elastic local remedies rule could also *differentiate in respect of the nature of the claim* advanced by the investor. If, for example, the claim is based on a free transfer of capital clause in an investment instrument and, hence, might be time sensitive, exhaustion of local remedies would only be required in the most advanced domestic legal orders while claims based on expropriation might initially also be dealt with by domestic jurisdictions only reaching a medium ranking in terms of their 'rule of law capacities'. See in respect of the latter also Pernice, I., *International Investment Protection Agreements and EU Law*, Study for the European Parliament.

[284] Not infrequently international law recognises factual differences in the development of states with a view to reach a common goal. Examples comprise international trade and environmental law. One might wonder why this should not be possible for international investment law.

[285] Council of Europe, Supervision of the Execution of Judgements and Decisions of the European Court of Human Rights, 7th Annual Report of the Committee of Ministers 2013, available at http://www.coe.int/t/dghl/monitoring/execution/-Source/Publications/CM_annreport2013_en.pdf (visited 4 May 2014).

[286] Cf. CJEU, *Annual report 2013 – Provisional Full Version*, http://curia.europa.eu/jcms/upload/docs/application/pdf/2014-03/en_version_provisoire_web.pdf (visited 4 May 2014); see also Andersen, S., *The Enforcement of EU Law: The Role of the European Commission*, Oxford University Press, Oxford, 2012; Brian, J., Article 260(2) TFEU: An Effective Judicial Procedure for the Enforcement of Judgements?, *European Law Journal*, Vol. 19 (2013), pp. 404 et seqq.

[287] Baudenbacher, C., The Implementation of Decisions of the ECJ and of the EFTA Court in Member States' Domestic Legal Orders, *Texas International Law Journal*, Vol. 40 (2004), pp. 383 et seqq.

[288] Llamzon, A., Jurisdiction and Compliance in Recent Decisions of the International Court of Justice, *European Journal of International Law*, Vol. 18 (2007), pp. 815 et seqq.

domestic court proceedings.[289] Given the growing unease with tribunals' past treatment of public concerns in their interpretative approaches such a text appears insensitive. The EU might seriously consider including an *elastic exhaustion of local remedies* rule in its agreements out of the reasons provided above.[290].

### 2.3.2.2.2.4    Restricting available remedies to (monetary) compensation?

In today's investor-state arbitration practice the most commonly awarded form of reparation is (pecuniary) compensation. Restitution, i.e., for example, the order of repeal of a challenged administrative act or law or the restitution of property previously taken is rare[291].

Only occasionally do investment instruments explicitly prohibit non-compensatory relief[292]. In most cases they are silent on this question which would arguably call for application of the rules in general public international law where restitution is the primary form of reparation[293].

---

[289] As a side note, it appears that, so far, no convincing justification has been offered by the EU for a different treatment of foreign and domestic investors in terms of access to judicial remedies.

[290] Also, from a EU constitutional perspective including an (elastic) local remedies clause might help addressing possibly arising issues of autonomy of EU law in respect of ISDS, cf. Note also Pernice, I., *International Investment Protection Agreements and EU Law*, Study for the European Parliament; Hindelang, S., Der primärrechtliche Rahmen einer EU-Investitionsschutzpolitik: Zulässigkeit und Grenzen von Investor-Staat-Schiedsverfahren aufgrund künftiger EU Abkommen, in: Bungenberg/Herrmann (eds.), *Die Gemeinsame Handelspolitik der Europäischen Union „nach Lissabon"*, Nomos, Baden-Baden, 2011, pp. 157 et seqq., also available at: *Der primärrechtliche Rahmen einer EU Investitionsschutzpolitik: Zulässigkeit und Grenzen von Investor-Staat-Schiedsverfahren aufgrund künftiger EU Abkommen*, WHI-Paper 01/11, available at http://www.whi-berlin.eu/tl_files/documents/whi-paper0111.pdf (visited 4 May 2014); an abridged version in the English language can be found at Hindelang, S., The Autonomy of the European Legal Order – EU Constitutional Limits to Investor-State Arbitration on the Basis of Future EU Investment-related Agreements, in: Bungenberg/ Herrmann (eds.), *Common Commercial Policy after Lisbon - Special Issue to the European Yearbook of International Economic Law*, Springer; New York, 2013, pp. 187 et seqq.

[291] This section draws on Hindelang, S., Restitution and Compensation – Reconstructing the Relationship in International Investment Law, in: Hofmann/Tams (eds.), *International Investment Law and General International Law: From Clinical Isolation to Systemic Integration*, Nomos, Baden-Baden, 2011, pp. 161 et seqq.; also available as Hindelang, S., *Restitution and Compensation – Reconstructing the Relationship in International Investment Law*, WHI-Paper 02/11, 2011, http://www.whi-berlin.eu/tl_files/documents/whi-paper0211.pdf (visited 1 May 2014).; For non-pecuniary provisional remedies cf. Article 47 ICSID-Convention, ICSID Arbitration Rule 39, note also Article 1134 NAFTA; see also Gaukrodger, D. and Gordon, K., *Investor-State Dispute Settlement: A Scoping Paper for the Investment Policy Community*, OECD Working Papers on International Investment No. 2012/03, available at http://dx.doi.org/10.1787/5k46b1r85j6f-en  (visited 20 May 2014), pp. 28 et seqq.; Malintoppi, L., Provisional Measures in Recent ICSID Proceedings: What Parties Request and what Tribunals Order, in: Binder/Kriebaum/Reinisch/Wittich (eds.), *International Investment Law for the 21st Century: Essays in Honour of Christoph Schreuer*, Oxford University Press, Oxford, 2009, pp. 157 et seqq.

[292] Articles 1135 et seqq. NAFTA.

[293] Cf. Articles 34-39 of Articles on state responsibility. Restitution is said to conform 'most closely to the general principle of the law on responsibility according to which the author State is bound to 'wipe out' all the legal and material consequences of its wrongful act by re-establishing the situation that would exist if the wrongful act had not been committed'. Cf. Arangio-Ruiz, G., Preliminary Report on State Responsibility, in: International Law Commission (ed.), *Yearbook of the International Law Commission*, Vol. II, United Nations Publications, Geneva, 1988; UN Document No. A/CN.4/416 & Corr. 1 & 2 and Add.1 & Corr.1, para. 114. In fact, the question of whether investment tribunals are or should be allowed to order restitutio in rem is contentious. Cf. Hindelang, S., Restitution and Compensation – Reconstructing the Relationship in International Investment Law, in: Hofmann/Tams (eds.), *International Investment Law and General International Law: From Clinical Isolation to Systemic Integration*, Nomos, Baden-Baden, 2011, pp. 161 et seqq.; also available as Hindelang, S., *Restitution and Compensation – Reconstructing the Relationship in International Investment Law*, WHI-Paper 02/11, 2011, http://www.whi-berlin.eu/tl_files/documents/whi-paper0211.pdf (visited 1 May 2014).; Possibly a different view Crawford, J., The ILC's Articles on Responsibility of States for Internationally Wrongful Acts – A Retrospective, *American Journal of International Law*, Vol. 96 (2002), pp. 874 et seqq., p. 881; see also Marboe, I., State responsibility and Comparative state liability for administrative and legislative harm to economic interest, in: Schill (ed.), *International Investment Law and Comparative Public Law*, Oxford University Press, Oxford, 2010, pp. 377 et seqq.

The preference granted to a pecuniary remedy is often explained in the way that it would suit, in most cases, the interest of the investor and, furthermore, preserve regulatory space for the host state which would not have to repeal a certain measure but 'just' pay compensation[294].

However, it appears that this is just one perspective on the question of whether arbitral tribunals should be able to order restitution – separately or in combination with a pecuniary remedy – or even give priority to it. To begin with, the threat of a substantial final monetary award can have effects similar to a restitution order. This is particularly true when the contested measure is of a general nature, such as a law, and affects more than just one foreign investor. Copy-cat cases are not unknown to international investment arbitration[295]. Especially for developing countries with considerable budgetary constraints it might be preferable to repeal a certain measure instead of paying substantial compensation and thereby possibly putting at risk vital governmental activities such as providing basic medical healthcare, schooling and so forth.

Broadening the picture, restitution of, e.g., unlawfully taken property could mean continued presence and perhaps retention of business activities in a host state. Compensation often opens up the possibility to seek new investment opportunities beyond the borders of the host state. Restitution or compensation, remaining invested or leaving the country –  perhaps in this, admittedly simplified, way one could sketch the choice to be made when deciding between the two forms of reparation in investment arbitration. Viewed against this background, prioritising restitution may better contribute to the overall aim of the state parties to the investment instrument to establish and maintain *long term* and *stable* investment relations on the basis of the rule of law. Among others, this is because it may – to some extent – render it less attractive for a host state to employ (internationally) wrongful means to rid itself of a 'disliked' foreign investor. The possibility of 'buying oneself out' of the investment relationship by way of paying compensation would be restricted. Seen positively, prioritising restitution would give the host state a second chance to present itself as being committed to establishing and maintaining long term and stable investment relations on the basis of the rule of law. Already by knowing that it might see the foreign investor 'again', the host state has an increased interest in constantly working on the relationship. Of course, absent an express statement in the investment instrument to the contrary, restitution must not be ruled out by the claimant in the arbitral proceedings, still be possible and not constitute an excessive onerousness[296]. Furthermore, if an investment instrument would provide for restitution as the primary remedy, it would also have to specifically address compliance and enforcement questions[297].

---

[294] 'The judicial restitution required in this case would imply modification of the current legal situation by annulling or enacting legislative and administrative measures that make over the effect of the legislation in breach. The Tribunal cannot compel Argentina to do so without a sentiment of undue interference with its sovereignty.' LG&E Energy Corp., LG&E Capital Corp., and LG&E International, Inc. .v. Argentine Republic, ICSID Case No.ARB/02/1, Award (25 July 2007), para. 87, available at http://italaw.com/sites/default/files/case-documents/ita0462.pdf (visited 8 May 2014).

[295] Two examples are highly illustrative in this respect: in the wake of the Argentine economic crisis at the turn of the century, several US investors took recourse to ISDS, modelling their cases along similar lines; see above at footnote 95. Similarly, an erratic change in its energy policy led to a wave of ISDS arbitrations against Turkey in various arbitration fora; see Hindelang, S. et al., Turkey – Soon to Face a Wave of International Investment Arbitrations?, *Journal of International Arbitration*, Vol. 26 (2009), pp. 701 et seqq.

[296] Hindelang, S., Restitution and Compensation – Reconstructing the Relationship in International Investment Law, in: Hofmann/Tams (eds.), *International Investment Law and General International Law: From Clinical Isolation to Systemic Integration*, Nomos, Baden-Baden, 2011, pp. 161 et seqq., p. 167, also available as Hindelang, S., *Restitution and Compensation – Reconstructing the Relationship in International Investment Law*, WHI-Paper 02/11, 2011, http://www.whi-berlin.eu/tl_files/documents/whi-paper0211.pdf (visited 5 May 2014), p. 5.

[297] Gaukrodger, D. and Gordon, K., *Investor-State Dispute Settlement: A Scoping Paper for the Investment Policy Community*, OECD Working Papers on International Investment No. 2012/03, available at http://dx.doi.org/10.1787/5k46b1r85j6f-en (visited 20 May 2014), pp. 98 et seqq.

The CETA draft appears to take a somewhat middle ground position. While an order to repeal a law or court or administrative decision would not be possible, a tribunal may award restitution of property. Besides that, it has missed the opportunity to explore further advantages associated with non-pecuniary remedies[298].

### 2.3.2.2.2.5    Host state claims

ISDS could be criticised for discriminating against public interests by not putting host states on equal footing with the investor regarding access to arbitration. It is the investor who typically initiates arbitration and counterclaims by host states – while not an overly rare instance – are still infrequent[299]. Investment instruments have predominantly been designed to facilitate claims of investors against host states; not vice versa. It has been argued that the right to initiate investment arbitration against a host state is not really a unilateral advantage of the investor but a modest 'compensation' for the fact that a host state has all powers to hold a foreigner operating in its territory accountable and force them to comply with domestic law[300].

Currently the admissibility of counterclaims depends very much on the precise wording of the individual investment instrument's general arbitration offer[301] as well as the nature of the claim and counterclaim. Investment instruments generally do not impose any direct obligations on investors[302]. Therefore, counterclaims are more likely to arise from concession contracts posing difficult questions of applicable law and might compel a tribunal to apply even more extensively domestic law; for which expertise might be limited[303].

The policy question which has to be answered by the negotiating state parties is whether they want to allow for host state claims more broadly by adapting the treaty language respectively. In favour of such an approach it may be argued that by allowing more broadly for host state claims the inquiry into an investment conflict is centralised as the conflict could be appreciated and adjudicated in respect of alleged 'misconduct' of both the investor and the host state. This may avoid diverging results in different fora and disputes might be resolved more efficiently[304]. Investors having to expect counterclaims on a regular basis would also more carefully assess their claim before submitting it to arbitration which would have an overall moderating effect on ISDS. Furthermore, in respect of developing states it would possibly avoid the charge of double standards: a host state is told to 'surrender' sovereignty by allowing direct arbitral claims due to weak domestic institutions, but then

---

[298] Cf. Article x-20(1) CETA draft of 4 February 2014 = Article x-36(1) of CETA draft of 3 April 2014.

[299] On current arbitration practice, cf. Hoffmann, A., Counterclaims in Investment Arbitration, *ICSID Review*, Vol. 28 (2013), pp. 438 et seqq., Laborde, G., The Case for Host State Claims in Investment Arbitration, *Journal of International Dispute Settlement*, Vol. 1 (2010), pp. 97 et seqq.

[300] Schwebel, S., The Overwhelming Merits of Bilateral Investment Treaties, *Suffolk Transnational Law Review*, Vol. 32 (2009), pp. 263 et seqq.

[301] Arbitration rules allow for counterclaims, cf., e.g. Article 46 ISCID 'Except as the parties otherwise agree, the Tribunal shall, if requested by a party, determine any incidental or additional claims or counterclaims arising directly out of the subject-matter of the dispute provided that they are within the scope of the consent of the parties and are otherwise within the jurisdiction of the Centre.'

[302] Substantive obligations of the host state as well as potential obligations of investors are not part of the assignment and therefore not further discussed here. See on the question of whether investment instruments should contain substantive investor obligations VanDuzer, J. et al., '*Integrating Sustainable Development into International Investment Agreements – A Guide for Developing Countries*', Commonwealth Secretariat, August 2012, available at http://www.iisd.org/pdf/2012/6th_annual_forum_commonwealth_guide.pdf (visited 28 April 2014), pp. 104 et seqq.; see also Articles 10 et seqq. 2012 Southern African Development Community Model Bilateral Investment Treaty, http://www.iisd.org/itn/wp-content/uploads/2012/10/SADC-Model-BIT-Template-Final.pdf (visited 5 May 2014).

[303] Kalicki, J., Counterclaims by States in Investment Arbitration, *IISD Investment Treaty News*, Vol. 3 (2013), pp. 3 et seqq.

[304] Spyridon Roussalis v. Romania, ICSID Case No. ARB/06/1, Declaration (28 November 2011) of Prof. M. Reismann, available at http://www.italaw.com/sites/default/files/case-documents/ita0724.pdf (visited 5 May 2014).

denied to bring counterclaims in the neutral international forum with the argument that the host state has all powers to hold a foreigner operating in its territory accountable; occasionally this might be difficult to achieve with the said weak institutions[305].

The question of counterclaims does not seem to be addressed directly in the CETA draft. As the CETA draft allows for claims and awards 'against a respondent' only[306] and reserves the latter role for the state parties to the agreement[307], it appears that counterclaims – arguably – are not permissible[308].

### 2.3.2.2.2.6    Review or expiration of investment instruments and ISDS mechanisms

Political and economic costs associated with the operation of specific designs of the substantive standards and dispute settlement provisions in an investment agreement can often only be evaluated by the state parties after a certain period of time has elapsed[309]. When deficiencies are identified it often requires considerable political effort as well as time and other resources to start and successfully conclude re-negotiation of an investment instrument[310]. 'Built-in flexibility' in the treaty appears vital to react to new political, economic or other challenges in the future. Against this background, if state parties feel that the risk of unexpected developments is beyond effective control by means of authoritative interpretation then investment chapters or specific provisions in comprehensive free trade agreements could be coupled with a time component. An investment chapter or a certain provision can be subjected to automatic renewal in case the state parties acquiesce to it, or they may expire or be suspended for review in a certain frequency.

The CETA draft Investment Text does not appear to provide for automatic termination or renewal. It provides merely for a 'sunset-clause' preserving the substantive protection standards and ISDS for further 20 years after termination of the *entire* free trade agreement[311]. While the envisaged CETA Committee on Services and Investment shall provide a forum for consultations of state parties on the implementation and improvement of the investment chapter, it may adopt and amend supplementary arbitration rules, mediation rules and such on transparency only. Substantive standards and core arbitration rules are not covered by this mandate.

### 2.3.3    Procedural integrity

By concluding investment instruments state parties restrict their policy space by promising to each other to treat an investor of the other state party in accordance with the substantive standards contained in an investment instrument. Investor-state arbitral tribunals shall determine whether a state party acted inconsistently with these substantive standards. In fulfilling this task, arbitral tribunals predominantly[312] review the exercise of governmental powers by the host state towards a

---

[305] Kalicki, J., Counterclaims by States in Investment Arbitration, *IISD Investment Treaty News*, Vol. 3 (2013), pp. 3 et seqq.

[306] Cf. Article x-20(1) CETA draft of 4 February 2014 = Article x-36(1) of CETA draft of 3 April 2014.

[307] Cf. Article x-3 CETA draft of 4 February 2014 = Article x-0 of CETA draft of 3 April 2014.

[308] In Article x-21 CETA draft of 4 February 2014 = Article x-37(1) of CETA draft of 3 April 2014.the text briefly touches upon counterclaims in the context of indemnification or other compensation.

[309] Cf generally on treaty renewal, UNCTAD, *International Investment Policymaking in Transition: Challenges and Opportunities of Treaty Renewal*, IIA Issues Note 2013/4, available at http://unctad.org/en/PublicationsLibrary/webdiaepcb2013d9_en.pdf (visited 5 May 2014).

[310] The possibility of 'exit' can also be a source of legitimacy, cf. Montt, S., *State Liability in Investment Treaty Arbitration*, Hart Publishing, Oxford, 2009, 145 et seqq.

[311] Article X.18 CETA draft Investment Text of 21 November 2013 = Article X.04 (to be included in the 'Final Provisions part of the Agreement') CETA draft Investment Text of 4 April 2014.

[312] There is a debate of whether investment instruments cover, by way of umbrella clauses, (also) mere private disputes arising out of contracts between the investor and the host state or whether a regulatory measure must interfere with the said contract. Cf. Dolzer, R. and Schreuer, C., *Principles of International Investment Law*, Oxford University Press, Oxford, 2nd Edition, 2012, pp. 153 et seqq.; El Paso Energy International Company v. Argentine Republic, ICSID Case No. ARB/03/15,

private party. Such *disputes do not* arise *out of a reciprocal relationship between investor and state* but are characterised by a legal relationship in which the state exercises powers that are not vested in any private person but only in the state. In this way *ISDS displays significant functional similarities to domestic constitutional and administrative courts*[313].

Despite these striking resemblances, current investment instruments rely heavily on an ad-hoc commercial arbitration model which is characterised by the concept of party autonomy, sanctity of contract and confidentiality[314]. Thus, most *ISDS proceedings are not accessible* by the public and *awards* are *not made available to the public* for scrutiny *by default* but by consent of the disputing parties[315]. There is no general obligation to publish decisions in full length. Many *investment instruments do not contain procedural rules* including such on transparency. Hence, the degree of transparency depends basically on the chosen arbitration rules[316]. Arbitrations administered by the International Centre for Settlement of Investment Disputes (ICSID) are currently the most transparent ones, providing lists of submitted claims and abstracts of awards[317]. Other arbitration institutions – in particular the International Chamber of Commerce[318] – are more secretive. Thus, in some cases it might not even be publicly known that a claim was adjudicated.

The current ISDS model, furthermore, relies on *party appointed arbitrators* which are subject to only relatively few and usually broadly drafted qualification, transparency, disclosure and impartiality[319] rules frequently contained in the respective arbitration rules[320], sometimes also found in an investment instrument itself[321] and/or in a specific code of conduct[322].

---

Decision on Jurisdiction (27 April 2006), paras. 81, 82, available at http://www.italaw.com/sites/default/files/case-documents/ita0268_0.pdf (visited 8 May 2014); Salini Construttori S.p.A. and Italstrade S.p.A. v. The Hashemite Kingdom of Jordan, ICSID Case No. ARB/02/13, Decision on Jurisdiction (29 November 2004), para. 155, available at http://www.italaw.com/sites/default/files/case-documents/ita0735.pdf (visited 8 May 2014).

[313] Van Harten, G., *Investment arbitration and public law*, Oxford University Press, Oxford, 2007, Chapters 3, 5; Montt, S., *State Liability in Investment Treaty Arbitration*, Hart Publishing, Oxford, 2009, p. 137.

[314] On the character of investment arbitration cf. Van Harten, G., *Investment arbitration and public law*, Oxford University Press, Oxford, 2007, pp. 59 et seqq.

[315] In 2002, NAFTA state parties chose to authoritatively interpret the Treaty in a way allowing them to make submissions and decisions publicly available. Cf. NAFTA Free Trade Commission, *Notes of Interpretation of Certain Chapter 11 Provisions (Article 1105 and the Availability of Arbitration Documents)*, 31 July 2001, available at http://www.sice.oas.org/tpd/nafta/Commission/CH11understanding_e.asp (last visited 5 May 2014).

[316] Ultimately, the parties to the dispute can largely dispose of the arbitral rules, including those on transparency.

[317] OECD, *Transparency and Third Party Participation in Investor-State Dispute Settlement Procedures*, OECD Working Papers on International Investment No. 2005/01, available at http://www.oecd.org/daf/inv/internationalinvestmentagreements-/34786913.pdf (visited 6 May 2014), p. 3.

[318] See Article 1 to Appendix II of the International Chamber of Commerce's rules of Arbitration, available at http://www.iccwbo.org/Products-and-Services/Arbitration-and-ADR/Arbitration/Rules-of-arbitration/ICC-Rules-of-Arbitration/ (visited 3 May 2014).

[319] Such rules address questions such as whether there is evidence of an attitudinal bias (e.g. from previous writing or speeches) or whether the arbitrator maintains or maintained ties with one of the disputing parties.

[320] Cf. for a comparison of DC Bar International Law Section – International Dispute Resolution Committee, Working Group on Practical Aspects of Transparency and Accountability in International Treaty Arbitration, *Comparison Chart on Arbitrators' Standards of Conduct*, available at http://www.dcbar.org/sections/international-law/upload/for_lawyers-sections-international_law-conductChart.pdf (visited 2 May 2014); see by way of comparison The World Trade Organization Rules of Conduct for the Understanding on Rules and Procedures Governing the Settlement of Disputes, available at http://www.wto.org/english/tratop_e/dispu_e/rc_e.htm (visited 3 May 2014).

[321] Cf., e.g., Article 29(2) of the 2004 Canadian model Foreign Investment Promotion and Protection Agreement, available at http://italaw.com/documents/Canadian2004-FIPA-model-en.pdf (visited 5 May 2014); Article 23(2) of the 2009 ASEAN-Australia-New Zealand Free Trade Agreement, available at http://www.asean.fta.govt.nz/chapter-11-investment/ (visited 5 May 2014).

[322] Cf., e.g., Code of Conduct for Dispute Settlement Procedures under Chapters 19 and 20 of NAFTA (state-state arbitration), available at www.worldtradelaw.net/nafta/19-20code.pdf (visited 3 May 2014).

In contrast to many domestic jurisdictions and their courts charged to control the exercise of public authority – and alien to the concept of arbitration itself – *arbitrators do not enjoy security of tenure*.

The obvious functional similarities of domestic constitutional and administrative courts and ISDS proceedings on the one hand and the equally obvious deviation in public control (below 2.3.3.1 (p. 98)) and in institutional and procedural design safeguarding impartial and independent adjudication (below 2.3.3.2, (p. 100)) on the other – coupled with the bypass of domestic courts provided for in most investment instruments – has led to critique among domestic governmental[323] and international[324] institutions, academia[325] and civil society[326].

### 2.3.3.1    Transparency

The lack of transparency might be owed in part to ISDS' roots in commercial arbitration which is characterised by secrecy. However, transparency in ISDS has steadily been improving over the last years[327]. Whether it has reached a satisfactory level is debatable. In any event, transparency of arbitral proceedings would allow *parliament and the public* not only to *better scrutinise* whether *their government* has honoured its international commitments and whether it does not compromise essential public interests in bargaining with the investor in the course of the arbitration proceedings. It might also allow for scrutinising investors' claims. *Public attention could deter from bringing claims with little chance of succeeding if investors have to fear consumers' choices to substitute one product by another.*

Those who champion (more) transparency in ISDS proceedings and the publicity of awards mainly base their claim on the *nature of the conflict* adjudicated, i.e. the review of exercise of public authority towards an individual[328], and are influenced by domestic perceptions of democracy[329]. Resorting to current public international law as the basis for a claim that investment arbitration proceedings have

---

[323] Deutscher Bundestag, Antwort der Bundesregierung auf die Kleine Anfrage der Fraktion der SPD – Drucksache 17/14724 – 24 September 2013; see also Zacharakis, Z. and Endres, A., Regierung gegen Investorenschutz im Freihandelsabkommen, *ZEIT Online*, 13 March 2014, available at http://www.zeit.de/wirtschaft/2014-03/investitionsschutz-freihandelsabkommen-bundesregierung-ttip (visited 3 May 2014).

[324] UNCTAD, *Reform of Investor-State Dispute Settlement: In Search of a Roadmap*, IIA Issues Note 2013/2, available at http://unctad.org/en/PublicationsLibrary/webdiaepcb2013d4_en.pdf (visited 5 May 2014).

[325] Cf. e.g. VanDuzer, J., Enhancing the Procedural Legitimacy of Investor-State Arbitration Through Transparency and Amicus Curiae Participation, *McGill Law Journal*, Vol. 52 (2007), pp. 681 et seqq.

[326] McDonagh, T., *Unfair, Unsustainable and Under the Radar* - How Corporations use Global Investment Rules to Undermine a Sustainable Future, The Democracy Center, available at http://democracyctr.org/wp/wp-content/uploads/2013/05/Under_The_Radar_English_Final.pdf (visited 28 April 2014); Eberhard, P. and Olivet, C., *Profiting from Injustice - How Law Firms, Arbitrators and Financiers are Fuelling an Investment Arbitration Boom*, Corporate Europe Observatory, November 2012, available at http://corporateeurope.org/sites/default/files/publications/profiting-from-injustice.pdf (visited 2 May 2014).

[327] Cf. e.g. Article 1137(4) NAFTA and Annex 1137.4; Article 28 Canada-China BIT, 2006 amendment to Article 37(2) ICSID Rules, 2014 Uncitral Rules on Transparency in Treaty-based Investor-State Arbitration. See also Maupin., J., Transparency in International Investment Law: The Good, the Bad, and the Murky, in: Bianchi, A., Peters, A. (eds.), *Transparency in International Law*, Cambridge University Press, Cambridge, 2013, pp. 142 et seqq.

[328] E.g. Van Harten, G., *Investment Treaty Arbitration and Public International Law*, Oxford University Press, Oxford, 2007, p. 161; Wälde, T., Transparency, Amicus Curiae Briefs and Third Party Rights ,*The Journal of World Investment & Trade*, Vol. 5 (2004), pp. 337 et seqq.; Blackaby, N., Public Interest and Investment Treaty Arbitration, in: van den Berg (ed.), *International Commercial Arbitration: Important Contemporary Questions*, ICCA Congress Series, Vol. 11 (2003), Kluwer Law International, The Hague, 2003, pp. 355 et seqq., p. 358; Magraw, D. and Amerasinghe, N., American Branch ILA/American Society of International Law Joint Study on the Implementation of Transparency Norms in International Commercial Arbitration – Part I, *ILSA Journal of International & Comparative Law*, Vol. 15 (2008-2009), pp. 337 et seqq., pp. 338 et seq.

[329] States are accountable to their people who must be in the position to control the exercise of public authority. A different question is whether these domestic concepts can easily be transferred to the international realm. See for an attempt in respect of the WTO dispute settlement mechanism Reusch, R., *Die Legitimation des WTO-Streitbeilegungsverfahrens*, Duncker & Humblot, Berlin, 2007.

to be conducted more openly would by any means be challenging[330]. From a legal perspective it is the domestic laws of the contracting state parties which essentially control the degree of openness or secrecy of ISDS to which they can lawfully subscribe in an international treaty[331]. National governments traditionally enjoy a wide margin of appreciation in external affairs[332]. This having been said, the degree of transparency of ISDS proceedings on the basis of a given investment instrument is thus to a large extent a political discretionary decision of the state parties influenced by their internal legal conditions and political situations and the result of bargaining in the treaty negotiations.

*Amici curiae* – a concept more widely used in common law but also in public international law[333] – usually intervene in proceedings without request of an investment court tribunal[334]. Often they believe to have an interest in the outcome of the proceedings or claim to advocate public interests. *Amici curiae* – these can be public interest groups such as environmental activists, affected local communities, business associations but also supranational organisations such as the EU – may function as sources of information and/or expert advice for a tribunal[335]; often, the *amici* aim at influencing the decision[336]. While *amicus curiae* interventions can certainly create additional legitimacy of an arbitral decision due to the submission and possible appreciation of additional information or public interest considerations, it is difficult to find evidence[337] of a contribution to transparency of arbitral proceedings, although often claimed[338]. While in ISDS practice tribunals have in principle

---

[330] Sackmann, J., *Transparenz im völkerrechtlichen Investitionsschiedsverfahren*, Nomos, Baden-Baden, 2012, pp. 132 et seqq.; see also Kingsbury, B., Donaldson, M., Global Administrative Law, in: Wolfrum, R. (ed.) *Max Planck Encyclopedia of Public International Law,* Oxford University Press, Oxford, para. 21; Chesterman, S., Rule of Law, in: in: Wolfrum, R. (ed.) *Max Planck Encyclopedia of Public International Law*, Oxford University Press, Oxford, 2007, para. 20.

[331] In respect of constitutional limits in Germany cf. Wolff, J., Nicht-öffentliche Schiedsverfahren mit Beteiligung der öffentlichen Hand am Maßstab des Verfassungsrechts, *Neue Zeitschrift für Verwaltungsrecht,* 2012, pp. 205 et seqq.

[332] Cf. for a discussion of EU law obligations to provide access to arbitration-related documents Sackmann, J., *Transparenz im völkerrechtlichen Investitionsschiedsverfahren*, Nomos, Baden-Baden, 2012, pp. 209 et seqq.

[333] Cf. Article 36 ECHR in connection with Rule 44 of the 2014 'Rules of Court', available  http://www.echr.coe.int/Documents-/Rules_Court_ENG.pdf (visited 8 may 2014); Rule 103 International Criminal Court Rules of Evidence and Procedure, available at   http://www.icc-cpi.int/en_menus/icc/legal%20texts%20and%20tools/official%20journal/Documents/RulesProcedure-EvidenceEng.pdf (visited 8 May 2014). For the ICJ's approach cf. Shelton, D., The Participation of Non-government Organizations in. International Judicial Proceedings, *American Journal of International Law*, Vol. 88 (1994), pp. 611 et seqq., pp. 617, 619 et seqq. For the WTO cf. United States of America – Import Prohibition of Certain Shrimp and Shrimp Products, WT/DS58/AB/R, 12 October 1998, para. 104-109; United States of America – Imposition of Countervailing Duties on Certain Hot-Rolled Lead and Bismuth Carbon Steal Products, WT/DS138/AB/R, 10 May 2000, para. 39-42; European Communities – Measures Affecting Asbestos and Asbestos-Containing Products, WT/DS135/AB/R, 12 March 2001, para. 39 et seqq.

[334] For a concise depiction of recent trends cf. Bastin, L., Amici Curiae in Investor-State Arbitration - Eight Recent Trends, *Arbitration International*, Vol. 30 (2014), pp. 125 et seqq.

[335] Bartholomeusz, L., The Amicus Curiae before International Courts and Tribunals, *Non-State-Actors and International Law*, Vol. 5 (2005), pp. 209 et seqq., pp. 278 et seqq.

[336] Ala'i, P., Judicial Lobbying at the WTO: The Debate over the Use of Amicus Curiae Briefs and the U.S. Experience, *Fordham International Law Journal*, Vol. 24 (2000), pp. 62 et seqq.; Umbricht, G., An 'Amicus Curiae Brief' on Amicus Curiae Briefs at the WTO, *Journal of International Economic Law*, Vol. 4 (2001),pp. 773 et seqq., p. 778.

[337] Convincing Sackmann, J., *Transparenz im völkerrechtlichen Investitionsschiedsverfahren*, Nomos, Baden-Baden, 2012, pp. 173, 176 et seqq., 189, 195 et seqq., see also Maxwell, I., Transparency in Investment Arbitration – Are Amici Curiae the Solution?, *Asian International Arbitration Journal*, Vol. 3 (2007), pp. 176 et seqq., p. 183.

[338] Suez, Sociedad General de Aguas de Barcelona, *S.A.*and Vivendi Universal, *S.A.* v. Argentine Republic, ICSID Case No. ARB/03/19 (formerly Aguas Argentinas, S.A.,Suez, Sociedad General de Aguas de Barcelona, S.A.and Vivendi Universal, *S.A.* v. Argentine Republic*),* Order in Response to a Petition for Transparency and Participation as Amicus Curiae, 19 January 2005, para. 22, available at  http://italaw.com/sites/default/files/case-documents/ita0815.pdf (visited 8 May 2014); Methanex Corporation v. United States of America, NAFTA/Uncitral Arbitration Rules, Decision on Petition from Third Persons to Intervene as 'Amici Curiae', 15. January 2001, para. 22, available at  http://italaw.com/sites/default/files/case-documents/ita0517_0.pdf (visited 8 May 2014); Methanex Corporation v. United States of America in reference to this assessment; Biwater Gauff (Tanzania) Ltd. v. Tanzania, ICSID Case No. ARB/05/22, Procedural Order No. 5, 2. February 2006, para. 54, available at http://www.italaw.com/sites/default/files/case-documents/ita0091_0.pdf (visited 8 May 2014).

accommodated for the submission of *amicus curiae* briefs, though largely at their discretion[339], access to documents and participation in the proceedings was frequently denied[340]. Arguments against greater participation basically rested on the concept of secrecy of proceedings; still dominant in the arbitration rules of the different arbitration institutions[341]. If one wants to strengthen the role of *amici curiae* in this respect, one would have to provide explicitly for transparency of proceedings – e.g. by way of access to the hearings and documents – in the investment instruments first. In this way they could subsequently render better informed submissions.

The CETA drafts of 4 February 2014 and of 3 April 2014 provide for reference to the 2014 Uncitral Rules on Transparency in Treaty-based Investor-State Arbitration (2014 Uncitral rules) and to an 'Annex I'[342]. The 'Annex I', which was attached to the CETA draft of 15 November 2013 but disappeared in the CETA draft of 4 February 2014, contained substantial rules on transparency of arbitral proceedings and *amicus curiae* submissions similar to the 2014 Uncitral rules.

Even ISDS critics from civil society concede that the EU's intensified efforts in respect of transparency and amicus curia participation are 'a very welcome development'[343]. In fact, partly – for example in respect of publication of submissions[344] – they go beyond the level of transparency which can be found in developed domestic legal orders.

### 2.3.3.2    Qualified independent adjudication

The current ISDS model, characterised in particular by the missing element of security of tenure[345], has been criticized for being biased in two ways in particular:

Firstly, the discretionary powers over the unfolding of a dispute settlement system vested in *arbitration institutions* like ICSID[346] could be perceived as vulnerable to (mis-)use in favour of certain

---

[339] Cf. Suez, Sociedad General de Aguas de Barcelona, S.A.and Vivendi Universal, S.A. v. Argentine Republic, ICSID Case No. ARB/03/19 (formerly Aguas Argentinas, S.A.,Suez, Sociedad General de Aguas de Barcelona, S.A.and Vivendi Universal, S.A. v. Argentine Republic), Order in Response to a Petition for Transparency and Participation as Amicus Curiae, 19 January 2005, where amici curia were allowed to submit briefs for the first time. For a full discussion of arbitral practice in relation to Uncitral and ICSID arbitration cf. Sackmann, J., *Transparenz im völkerrechtlichen Investitionsschiedsverfahren*, Nomos, Baden-Baden, 2012, pp. 139 et seqq.; For the first time on the basis of Article 37(2) ICSID Rules of procedure Biwater Gauff (Tanzania) Ltd. v. Tanzania, ICSID Case No. ARB/05/22, Procedural Order No. 5, 2 January 2007, (submission of brief, but no participation in the hearings, no document access). See also the brief case study on Glamis Gold Ltd. v. United States of America in the Annex.

[340] Cf. Bastin, L., Amici Curiae in Investor-State Arbitration - Eight Recent Trends, *Arbitration International*, Vol. 30 (2014), pp. 125 et seqq., p. 142.

[341] See Article 1 to Appendix II of the International Chamber of Commerce's rules of Arbitration, available at http://www.iccwbo.org/Products-and-Services/Arbitration-and-ADR/Arbitration/Rules-of-arbitration/ICC-Rules-of-Arbitration/ (visited 3 May 2014); Rule 15 of the ICSID Rules of Procedure for Arbitration Proceedings, available at https://icsid.worldbank.org/ICSID/StaticFiles/basicdoc/CRR_English-final.pdf (visited 5 May 2014); Uncitral Rules on Transparency in Treaty-based Investor-State Arbitration, available at http://www.uncitral.org/pdf/english/texts/-arbitration/rules-on-transparency/Rules-on-Transparency-E.pdf (visited 5 May 2014).

[342] Article x-18 CETA draft of 4 February 2014 ≈ Article x-33 of CETA draft of 3 April 2014.

[343] Bernasconi-Osterwalder, N. and Mann, H, *A Response to the European Commission's December 2013 Document "Investment Provisions in the EU-Canada Free Trade Agreement (CETA)"*, IISD Report, February 2014, p. 20.

[344] Cf., e.g. §§ 169, 171a - 175 Gerichtsverfassungsgesetz (German code on court constitution), Bundesgesetzblatt I 1975, p. 1077; § 1(1) Informationsfreiheitsgesetz (German Freedom of Information Act), Bundesgesetzblatt I 2005, p. 2722; see also Article 15(3), subsection 3 TFEU.

[345] Another issue relates to an issue of qualification, c.f. VanDuzer, J. et.al., *Integrating Sustainable Development into International Investment Agreements – A Guide for Developing Countries*, Commonwealth Secretariat, August 2012, available at http://www.iisd.org/pdf/2012/6th_annual_forum_commonwealth_guide.pdf (visited 28 April 2014), pp. 423 et seqq.

[346] ICSID appoints the presiding ad-hoc arbitrators in case of disagreement of disputing parties. If one assumes that every disputing party appoints an arbitrator which best suits its predominant goal – i.e. to win the case – and, hence, party-appointed arbitrators might split on crucial questions of law and fact in a tribunal's deliberation, the role of the presiding arbitrator appears crucial. Cf. also Gaukrodger, D. and Gordon, K., *Investor-State Dispute Settlement: A Scoping Paper for the*

investors and/or certain influential states dominating the arbitration institution by selecting a specific individual as arbitrator[347]. While ICSID appointments are sketched as appointments 'through the political process of an international organisation' in which certain states exercise a dominant role[348], other arbitration institutions, such as the International Chamber of Commerce, describe themselves as business organisations, are staffed accordingly and might lead to a public perception of a business bias when nominating arbitrators which shall resolve matters of great public concern[349]. In fact, the possibility that appointing institutions might develop a life of their own has always been viewed critically in arbitration, commercial and investment alike. One way to respond to this concern was allowing for party-appointment of ad-hoc arbitrators[350].

Secondly, offence is taken at the *employment of ad-hoc arbitrators* itself, *with changing professional roles as adjudicator and party representative* from case to case[351]. It is argued that they could be – i.e. not saying that they actually are[352] – perceived by the general public as having an interest in interpreting an investment instrument in a way encouraging more and more investment claims and, thereby, advancing their business model, hoping for re-appointment as arbitrator or party representative. As it is the *investor* who *brings the claim* the public might suspect inherent bias in favour of the investor is present; broadening available remedies under an investment instrument would allow for more claims[353].

If one subscribes to the view that *not only justice must be done, but it must also be seen to be done*[354] – and this is what investment arbitration should aspire to[355] – then the aforementioned criticism should

---

*Investment Policy Community*, OECD Working Papers on International Investment No. 2012/03, available at http://dx.doi.org/10.1787/5k46b1r85j6f-en (visited 20 May 2014), pp. 89 et seqq. on selection of presiding arbitrators. Furthermore, arbitration institutions decide on arbitrator challenges on grounds of conflict of interests and name ad-hoc arbitrators sitting on an annulment tribunal.

[347] Van Harten, G., Perceived Bias in Investment Treaty Arbitration, in: Waibel/Kaushal/Chung/Balchin (eds.), *The Backlash against Investment Arbitration: Perceptions and Reality*, Kluwer Law International, The Hague, 2010, pp. 433 et seqq., pp. 441 et seq.; Van Harten, G., *Investment Treaty Arbitration and Public International Law*, Oxford University Press, Oxford, 2007, p. 169.

[348] Paulsson, J., Arbitration Without Privity, *ICSID Review*, Vol. 10 (1995), pp. 232 et seqq., p. 244.

[349] Van Harten, G., Perceived Bias in Investment Treaty Arbitration, in: Waibel/Kaushal/Chung/Balchin (eds.), *The Backlash against Investment Arbitration: Perceptions and Reality*, Kluwer Law International, The Hague, 2010, pp. 433 et seqq., pp. 444 et seq.

[350] Paulsson, J., *Moral Hazard in International Dispute Resolution*, Inaugural Lecture as Holder of the Michael R. Klein Distinguished Scholar Chair, University of Miami School of Law, 29.4.2010, p. 13.

[351] Critically on the dual hat role: Buergenthal, T., The Proliferation of Disputes, Dispute Settlement Procedures and Respect for the Rule of Law, *Arbitration International*, Vol. 22 (2006), pp. 495 et seqq., p. 498; Marshall, F., *Defining New Institutional Options for Investor-State Dispute Settlement*, IISD, 2009, available at http://www.iisd.org/pdf/2009/defining_new_-_institutional_options.pdf (visited 2 May 2014), pp. 8-14. The dual role could indeed further nourish public concerns about a lack of integrity of investor-state arbitration. In particular the operation of the 'de facto precedent' system in investment arbitration might lead to the perception that an arbitrator could be influenced in his or her decision by his or her interests as a counsel. It is not denied that individual arbitrators might be able to distance themselves from their role when simultaneously or consecutively acting as counsel in proceedings involving similar legal issues. This appears however not only an intellectually challenging task but it appears also difficult not deny that there could be a public perception of bias.

[352] Van Harten, G., *Investment Treaty Arbitration and Public International Law*, Oxford University Press, Oxford, 2007, pp. 172 et seqq.

[353] Van Harten, G., *Investment Treaty Arbitration and Public International Law*, Oxford University Press, Oxford, 2007, p. 169; Van Harten, G., Perceived Bias in Investment Treaty Arbitration, in: Waibel/Kaushal/Chung/Balchin (eds.), *The Backlash against Investment Arbitration: Perceptions and Reality*, Kluwer Law International, The Hague, 2010, pp. 433 et seqq., p. 445; Van Harten, G., Arbitrator Behaviour in Asymmetrical Adjudication - An Empirical Study of Investment Treaty Arbitration, *Osgoode Hall Law Journal*, Vol. 50 (2012), pp. 211 et seqq.

[354] R v Sussex Justices, Ex parte McCarthy, [1924] 1 KB 256, [1923] All ER Rep 233.

[355] A different standard of impartiality would be to blind out 'the structural settings' of ISDS and look at the individual arbitrator and arbitration only and ask for 'hard evidence' of an actual bias in the individual case. Opposing Van Harten, G.,

be taken seriously if investor-state arbitration should not be accused of failing to produce high quality independent adjudication too easily[356].

Some statistics commonly used in an attempt to counter or prove bias are only of limited value. Pointing to UN statistics on ISDS, stakeholders suggest that there is little evidence of bias since the majority of all investment cases up to 2012 was won by states[357]. Others – trying to prove the opposite – point to the fact that in 2012 over 70 percent of those cases which proceeded to the merits stage were decided in favour of the investor[358].

However, all those numbers might be beside the point. They all are meant to show that there is or is no *actual* bias which would be a different, a lower standard to which most advanced legal systems would aspire to. Furthermore, they fail to take into account that an outcome of arbitration can have a multitude of reasons. To demonstrate further the trouble with statistics one might want to consider the following example: In 2012, in less than 10 percent of all cases in German administrative courts the private claimant succeeded fully or in part[359]. If put in relation to the success rate in ISDS should we take this as proof of an investor bias in ISDS where private claimants seem to perform three to five times better than in German administrative courts? This appears questionable to say the least. However, there is a perspective which appears worth considering when looking at the German case: Despite an extremely low probability of succeeding against government in German administrative court proceedings, to the best of the author's knowledge nobody seriously accuses German administrative judges of a bias towards the government.

This indeed might have to do with the fact that in domestic courts of democratic societies, judges are granted security of tenure[360] and other privileges in order to make them independent from government and other powerful forces in a society. It is, inter alia, their *perceived* independence (and impartiality) on which their legitimacy to control other branches of government rests.

When conferring jurisdiction to control the exercise of state powers upon ISDS mechanisms state parties should very critically assess (and cross-check against their constitutional constraints) how close these adjudicative bodies should or even must be modelled on the 'normative claim of impartiality' made in democratic societies and to which extent judicial standards can be moderated in order to facilitate other legitimate ends. In practice no court, no judge, no tribunal and no arbitrator are perfectly independent (nor would complete independence be desirable). However, the closer one gets to the 'normative claim' also in respect of investor-state arbitration the more likely a decision will be regarded as legitimate by those affected.

---

*Sovereign Choices and Sovereign Constrains - Judicial Restraint in Investment Treaty Arbitration*, Oxford University Press, Oxford, 2013).

[356] The *legally* required level of transparency and judicial independence and impartiality is mainly informed by the domestic legal system. Hence, when signing an international treaty state parties must critically ask themselves whether – by outsourcing adjudication – they are still in compliance with the standards set by their constitutions.

[357] EU Commission, *Incorrect Claims about Investor-State Dispute Settlement*, available at http://trade.ec.europa.eu/doclib/docs/2013/october/tradoc_151790.pdf (visited 5 May 2014); Bundesverband der Deutschen Industrie e.V., *Positionspapier: Schutz europäischer Investitionen im Ausland: Anforderungen an Investitionsabkommen der EU*, available at http://www.bdi.eu/download_content/GlobalisierungMaerkteUndHandel/Schutz-_europaeischer_Investitionen_im_Ausland.pdf (visited 28 April 2014), p. 8.

[358] UNCTAD, *Recent Developments in Investor-State Dispute Settlement (ISDS)*, IIA Issues Note 2013/1, available at http://unctad.org/en/PublicationsLibrary/webdiaepcb2014d3_en.pdf (visited 19 May 2014)., p. 5.

[359] Statistisches Bundesamt, Fachserie 10 Reihe 2.4, Rechtspflege, Verwaltungsgerichte 2012, published 2013, available at https://www.destatis.de/DE/Publikationen/Thematisch/Rechtspflege/GerichtePersonal/Verwaltungsgerichte2100240127004.pdf?__blob=publicationFile (visited 2 May 2014).

[360] I.e. office is referred upon them for a period of time or even for lifetime and sufficient financial means are provided regardless of their performance in the individual case.

State parties have, inter alia, the following policy options available to improve public perception of independence of the adjudicative process in ISDS; some of which more of a long term goal, others readily implemented.

An international investment court, modelled e.g. on the International Court of Justice or the WTO Appellate Body with tenured judges might be a solution 'closer to the ideal' as it abolishes arbitration institutions as appointing arbitrators and would also provide personal independence by way of long term office coupled with financial independence[361]. However, since the current system of ISDS rests on thousands of bilateral and regional investment instruments and dozens of arbitration institutions, not to be succeeded by a multilateral regime with centralised adjudication overnight, one should be prepared for compromise and look for pragmatic solutions until the best of options finally prevails.

When pondering possible pragmatic improvements to the current ISDS system, major factors to keep in mind are the fragmentation of international investment law and the dubious 'de facto precedent system' which allows for migration of 'interpretative' concepts from treaty to treaty. Rules which are directed at securing the public perception of independence and impartiality of arbitrators should not require a multilateral framework but work within the scope of one, mostly bilateral, investment instrument.

In order to reduce the perception of bias in respect of the *arbitration institution* appointing, for example, the presiding arbitrator in case of disagreement between the disputing parties, the introduction of an *objective element in the selection process* should be considered. A simple but effective way would be to maintain a public list of highly qualified arbitrators which are *appointed in fixed order of their appearance* on the list and not reappointed until the list has been exhausted. The critical question then becomes the one of who nominates potential arbitrators, to which we shall turn in a moment.

Regarding the *perceived bias of individual arbitrators* towards investors, a solution would be to break or at least to weaken the link, real or perceived, between expanding the breadth of ISDS and thereby expanding its arbitrator's business model.

A possible approach would be to put host states on equal footing with the investor concerning initiating arbitration[362]. In such situations, one might argue, favouring the investor would not make sense anymore. However, if such 'equality of arms' would only be created in one or a few out of over 3.000 investment instruments, an alleged pro-investor bias could still pay out. Certain interpretations supposedly favouring the investor developed in the context of investment instruments in which states could also initiate arbitration could be relied on by other tribunals as 'de facto precedent' in arbitrations in which states could not bring claims. In this way – one may argue – a business bias would still pay out as it expands the ISDS system which might increase the likelihood of reappointment. Thus, by placing the host state on equal footing in terms of commencement of arbitration in just one or few investment instruments the appearance of bias could hardly be avoided.

Irrespective of whether one wants to stick to the investor as the one who initiates arbitration or not, one of the crucial questions appears to be *how to insulate an investment instrument from the others in order not to frustrate the efforts taken in an agreement to confine appearance of bias.* If one wants to stick *with ad-hoc arbitrators* making their living from regular appointments and/or party representation this appears *difficult to achieve.*

---

[361] If there were no possibility of reappointment then this would further strengthen independence.
[362] The question of host state claims – in itself not unproblematic – has been discussed elsewhere in this study. Cf. 2.3.2.2.2.5 (p.95).

State parties with considerable negotiation power might, however, achieve a *modest improvement over time*: Within the scope of an investment agreement it would be possible to *weaken the perceived link* between 'investor-friendly biased application' and 'business interest of the arbitrator'. Currently, only a very small number of people are active as arbitrators in investor-state disputes. Among this group an even smaller fraction executes an incredibly large portion of the adjudicative work[363]. If the *group of arbitrators would drastically be expanded* and if, at the same time, the *number of engagements of one individual arbitrator* within a certain period of time would *dramatically be reduced*, an arbitrator's likelihood to benefit from an investor-friendly bias by way of re-appointment or counsel work modestly declines. This would require creating a roster of arbitrators from which arbitrators are appointed in order of their appearance on the list. In order to keep the re-appointment numbers low, the list should be opened up for self-nomination[364]. A treaty committee or a suitable third party institution would police that requirements set out in greater detail in an investment instrument are met by a successful candidate.

However, as mentioned before, such a mechanism installed in one agreement alone would not mitigate the appearance of investor-friendly bias, as 'everything would remain as it is' outside of the agreement. Only if a dominant state party can convince other states to adopt such a model, the link between the perceived 'investor-friendly bias' and own business interests might be weakened in the long term.

The CETA draft basically mimics the ICSID model. Under the ICSID-Convention[365] as well as the CETA draft[366] parties to a dispute are free to agree on arbitrators. Each appoints one arbitrator in its own account. In case of disagreement between the disputing parties on the third, presiding arbitrator the CETA draft provides for nomination by the Secretary General of ICSID from a roster of at least 15 arbitrators compiled and maintained by the treaty committee[367]. Against the background of the discussion above, it remains doubtful that this procedure 'will [fully] eliminate the risk of vested interests', as the Commission claims[368].

---

[363] Van Harten, G., Beware the discretionary choices of arbitrators, *Columbia FDI Perspectives*, No. 110 (2013), with further references.
[364] A self-nomination roster would also have another advantage. In an ideal world state parties would perhaps nominate those professionally as well as personally best-qualified for a given roster of arbitrators. However, as for example the story of nominating judges for the ECtHR teaches us, in everyday life things are far from ideal. Cf. Bubrowski, H., Qualifikation ist auch nur ein Wort, *Frankfurter Allgemeine Zeitung*, 10 March 2014, p. 4; Engel, N., More Transparency and Governmental Loyalty for Maintaining Professional Quality in the Election of Judges to the European Court of Human Rights, *Human Rights Law Journal*, Vol. 32 (2012), pp. 448 et seqq. In order to prevent the mere pretense of cronyism, to obviate the development of an oligopoly and securing competition and quality among arbitrators the EU should strongly *resist the temptation to agree on exclusive state party nomination*.
[365] ICSID maintains a list of Conciliators and Arbitrators. Cf. Articles 12 et seqq. ICSID-Convention, see also Regulation 21 of the ICSID Administrative and Financial Regulations.
[366] Article x-10 (1) CETA draft of 4 February 2014 = Article x-25(1) of CETA draft of 3 April 2014.
[367] Article x-10(2), (3) CETA draft of 4 February 2014 = Article x-25(2), (3) of CETA draft of 3 April 2014.
[368] European Union Commission, *Fact sheet - Investment Protection and Investor-to-State Dispute Settlement in EU agreements*, 26.11.2013, available at http://trade.ec.europa.eu/doclib/docs/2013/november/tradoc_151916.pdf (visited 2 May 2014), p. 9.

### 2.3.4 Perceived misuse

#### 2.3.4.1 Treaty shopping, multiple claims, and forum shopping

Most investment instruments do not only protect investments of nationals and corporations of one state made *directly* in another state but also so-called *indirect investments*. Such indirect investments are established in a state party to the investment instrument but controlled by investors established in a non-party state. Although no mass-phenomenon[369] and tax considerations being a more important factor for corporate structuring[370], companies can engage in nationality planning in order to bring an investment within the scope of application of an investment instrument[371] and/or to benefit from those investment instruments offering the highest protection standards ('*treaty shopping'*).

Frequently minority shareholders also qualify as investors which may have various nationalities[372]. The value of their shares might be diminished due to certain measures taken in respect of a company operating and incorporated in the host state. If the host state ratified investment instruments with many or all home states of the minority shareholders, it can easily face multiple claims in respect of one and the same investment and the same regulatory measure. Consolidating claims brought on the basis of different investment instruments is hard to achieve[373]. In an attempt to (partly) overcome this deficiency parties could agree to appoint the same arbitrators[374]. However, even if a claim is brought on the basis of one and the same investment instrument, absent the consent of the parties to the disputes or an explicit provision in the investment instrument[375], in most cases a consolidation would fail due to the fact that the frequently used arbitration rules – i.e. the ICSID-Convention and Uncitral – do not provide for such.

---

[369] Cf. survey in respect of US businesses which hardly structure their investment according to the protection offered by investment instruments Yackee, J., Do Bilateral Investment Treaties Promote Foreign Direct Investment? - Some Hints from Alternative Evidence, *Virginia Journal of International Law*, Vol. 51 (2010), pp. 397 et seqq.

[370] This is probably one of the reasons why many investment claims are brought on the basis of Dutch investment instruments. Cf. Knottnerus, R. and van Os, R., The Netherlands: A Gateway to 'Treaty Shopping' for Investment Protection, *Investment Treaty News*, Vol. 2 (2011), pp.10 et seqq. Against this background statistics on the origin of claims should also be read with some caution as they usually do not look beyond the shell company.

[371] Australia argues that Philip Morris structured its investment in a manner to benefit from the Australia-Hong Kong BIT. Cf. Philip Morris v. Australia, Australia's Response to the Notice of Arbitration (21 December 2001), para. 7, 29 et seqq. available at          http://www.ag.gov.au/Internationalrelations/InternationalLaw/Documents/Australias%20Response%20to%-20the%20Notice%20of%20Arbitration%2021%20December%202011.pdf (visited 2 May 2014).

[372] The claims brought against Argentina in the aftermath of its economic crisis provide a meaningful case study. Cf. OECD, *Improving the System of Investor-State Dispute Settlement: An Overview*, OECD Working Papers on International Investment No. 2006/1, available at http://www.oecd.org/daf/inv/internationalinvestmentagreements/36052284.pdf (visited 5 May 2014), para. 72 et seqq.

[373] E.g. in the cases CME Czech Republic B.V. v. Czech Republic, Uncitral, documents available at http://italaw.com/cases/documents/1250 (visited 7 May 2014) and Ronald S. Lauder v. Czech Republic, Uncitral, documents available at http://www.italaw.com/cases/610 (visited 7 May 2014) the Czech republic refused to consolidate.

[374] Cf. for examples in investment arbitration, e.g. OECD, *Improving the System of Investor-State Dispute Settlement: An Overview*, OECD Working Papers on International Investment No. 2006/1, available at http://www.oecd.org/daf/inv-/internationalinvestmentagreements/36052284.pdf (visited 5 May 2014), para. 88 et seqq.

[375] Cf. Article 1126 NAFTA was probably the first investment instrument to provide for consolidation. The first request came from Mexico, cf. Corn Products International, Inc. v. United Mexican States, ICSID Case No. ARB (AF)/04/1, Order of the Consolidation Tribunal (20 May 2005), available at http://www.italaw.com/sites/default/files/case-documents/ita0242.pdf (visited 8 May 2014). Consolidation clauses spread in particular through investment instruments to which either the US or Canada is a party. Cf. OECD, *Improving the System of Investor-State Dispute Settlement: An Overview*, OECD Working Papers on International Investment No. 2006/1, available at http://www.oecd.org/daf/inv/internationalinvestmentagreements/-36052284.pdf (visited 5 May 2014), para. 86.

As discussed above[376], the CETA draft addresses this issue and provides for the consolidation of claims brought under *this* investment instrument[377]. Treaty shopping shall be made more difficult by requiring for enterprises 'substantial business activities' in the home state – similar to Article 1113(2) NAFTA – in order to qualify as an investor under CETA[378]. This would exclude the possibility of merely registering a 'mailbox company' in the territory of the state parties to make use of the investment instrument.

Another phenomenon – different from 'treaty shopping' – in international investment arbitration is '*forum shopping*' by the claimant[379]. The latter refers to options offered to investors in an investment instrument or elsewhere to pursue its claim before an investment arbitral tribunal under different arbitration rules (ICSID, ICSID additional Facility, Uncitral, etc.) and/or national courts of the host state[380]. The rationale behind allowing for a choice is that different fora come with different advantages and disadvantages depending on the nature of a dispute. In order to prevent duplication of claims and double recovery, state parties can include so-called 'fork-in-the-road clauses' in investment instruments: Once the claim has been submitted to either national courts, commercial or investment arbitration, the remaining avenues are barred. An alternative approach would be to require a claimant's waiver of other judicial choices before it can initiate investment arbitration[381]. Such a waiver clause can be found in Article 1121 NAFTA und is, on principle, also allowed for in the CETA draft[382]. The effectiveness of such treaty clauses is not uncontested, however, considering arbitral tribunals' 'liberal' practice on jurisdiction. It has been debated whether the tribunals' approach is driven by the motivation to protect the investor from (exclusive) jurisdiction clauses in investor-state contracts imposed upon them by an 'almighty' host state with a view to confounding effective legal protection or by self-serving interests of arbitrators[383].

---

[376] Cf. 0 (p.71).

[377] Article x-25 CETA draft of 4 February 2014 = Article x-41 of CETA draft of 3 April 2014.

[378] Cf. Article X.3 CETA draft Investment Text of 21 November 2013 = Article X.3 CETA draft Investment Text of 4 April 2014

[379] An investor may engage in a combination of treaty and forum shopping. See generally on forum shopping Salles, L. E., *Forum Shopping in International Adjudication: The Role of Preliminary Objections*, Cambridge University Press, Cambridge, 2014.

[380] Gaukrodger, D. and Gordon, K., *Investor-State Dispute Settlement: A Scoping Paper for the Investment Policy Community*, OECD Working Papers on International Investment No. 2012/03, available at http://dx.doi.org/10.1787/5k46b1r85j6f-en (visited 20 May 2014), p. 53.

[381] While a fork-in-the-road-clause would automatically eliminate the remaining options of solving a dispute once the investor opts for an available forum, a waiver clause (e.g. Article 1121 NAFTA) would require the investor to expressly refrain from initiating or continuing dispute resolution in any other forum in order to be permitted to commence with ISDS.

[382] Cf. x-7(1) lit f and g CETA draft of 4 February 2014 = Article x-21(1) lit f and g of CETA draft of 3 April 2014. Note, though, that this waiver applies only to a claim or proceeding seeking *compensation or damages* before a tribunal or court under domestic or international law but not to claims seeking redress other than pecuniary damages.

[383] The overlap of contract and investment treaty-based claims has long been subject to discussion in literature. For a critical account of a perceived de facto policy of allowing for parallel claims Van Harten, G., The Boom in Parallel Claims in Investment Treaty Arbitration, *Investment Treaty News*, Vol. 5 (2014), pp. 7 et seqq.

### 2.3.4.2    Frivolous claims

In order to control arbitration costs and to save other host state resources bound by responding to investment claims one can seek to eliminate those claims in an early stage of the proceedings which have no chance of succeeding as they are brought in bad faith merely to harass a respondent, mostly with the view of gaining a better bargaining position[384].

While frivolous investment claims have not been a significant issue on a global scale, the inclusion of provisions explicitly addressing the issue in the CETA draft might emanate from NAFTA experience where a significant number of claims were filed[385] by US investors against Canada but later withdrawn or became inactive[386]. In the context of ongoing TTIP negotiations it might be worth reflecting on assessments of government agencies such as 'UK Trade and Investment (UKTI)'[387] depicting US investors as extensively using litigation and arbitration as a strategic device[388].

The CETA draft appears to address such claims twice as 'claims manifest without legal merit' [389] and 'claims unfounded as a matter of law'[390]. While these clauses might provide useful tools for arbitrators to dismiss frivolous claims, much of the provisions' effectiveness depends on the incentive structure present in the tribunal to eliminate frivolous claims as early as possible in arbitration proceedings. In itself, these provisions do not restrict the access to investment arbitration or broaden regulatory space of the host state.

### 2.3.5    Erroneous decisions

In current ISDS practice correcting erroneous awards is difficult to achieve. Under the ICSID-Convention an ad-hoc ICSID Committee may *annul*[391] a decision of a tribunal according to Article 52(1) ICSID

- when the tribunal was not properly constituted;

- the tribunal has manifestly exceeded its powers;

- there was corruption on the part of a member of the tribunal;

- there has been a serious departure from a fundamental rule of procedure; or

- the award has failed to state the reasons on which it is based.

Such narrowly defined grounds of annulment have not only been criticised[392] for *not allowing correcting decisions even if 'manifest errors in law' would be discovered*[393]. Review under existing rules

---

[384] Cf. also Article 41(5) ICSID-Convention Article 28 USA-Uruguay BIT.

[385] 'Filed' meaning that a notice of intent was sent to the respondent.

[386] Poulsen, L. et al., *Costs and Benefits of an EU-USA Investment Protection Treaty*, 2013, available at http://www.italaw.com/sites/default/files/archive/costs-and-benefits-of-an-eu-usa-investment-protection-treaty.pdf (visited 1 May 2014).

[387] Cf. https://www.gov.uk/government/organisations/uk-trade-investment (visited 2 May 2014).

[388] UKTI Trade Services, *Establishing a business presence in the USA*, London, 2013, available at https://www.gov.uk-/government/uploads/system/uploads/attachment_data/file/301343/Establishing_a_Business_Presence_in_the_USA.pdf (visited 2 May 2014).

[389] Article x-14 CETA draft of 4 February 2014 ≈Article x-29 of CETA draft of 3 April 2014.

[390] Article x-15 CETA draft of 4 February 2014 ≈ Article x-30 of CETA draft of 3 April 2014.

[391] Annulment is different from appeal. While an annulment can only lead to the invalidation of the decision, an appeal may end in modifying a decision. Cf. OECD, *Improving the System of Investor-State Dispute Settlement: An Overview*, OECD Working Papers on International Investment No. 2006/1, available at http://www.oecd.org/daf/inv/internationalinvestment-agreements/36052284.pdf (visited 5 May 2014), para. 12.

[392] UNCTAD, *Reform of Investor-State Dispute Settlement: In Search of a Roadmap*, IIA Issues Note 2013/2, available at http://unctad.org/en/PublicationsLibrary/webdiaepcb2013d4_en.pdf (visited 19 May 2014), p. 3.

does not contribute to consistency either as individual awards are reviewed by individual ad-hoc committees which may diverge in their views on the grounds of annulment contained in Article 52(1) ICSID-Convention and in the way they review the tribunals' decisions *in concreto*[394].

If arbitration is conducted outside ICSID, review is controlled by the law applicable at the seat of arbitration. Hence, grounds for setting aside or not enforcing awards vary from arbitration seat to arbitration seat. To some extent grounds are 'harmonised' by Uncitral Model Law on International Commercial Arbitration (Uncitral Model Law)[395] which references Article 5 of the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York Convention)[396]. Many countries have adopted similar provisions in their domestic laws. A correction of errors of law is not envisaged in the Uncitral Model Law.

### 2.3.5.1    Correcting erroneous decisions

The *creation of an appeals facility* could open up the possibility to correct errors of law and fact and, at the same time, contribute to some consistency in arbitration practice. In light of the considerable public interests at stake in investment arbitration it would be questionable whether poorly reasoned or erroneous decisions would be more acceptable than (slightly) prolonged proceedings.

As explained above, the CETA draft opts for a 'wait-and-see' approach by providing for a commitment to consult on the establishment of an appeals facility in the agreement[397].

### 2.3.5.2    Preventing erroneous decisions

Some arbitration rules[398] or investment instruments[399] provide for a quality control of the decision before issuance in order to correct obvious *formal* mistakes.

*Securing high standards with regard to arbitrators* which are legible to serve on an investment tribunal could be another way to decrease the error rate from the outset. It would not only be necessary to prescribe for sufficient *expertise in public international law*, in particular international investment law[400] but also to ensure that *sufficient time and other resources* are devoted to an individual case. The *quality of reasoning* and reaching at the *correct legal result*, it is recalled, might prove to be an important source of legitimacy of an arbitral decision.

---

[393] Cf. CMS Gas Transmission Company v.The Republic of Argentina, ICSID Case No.ARB/01/8, Decision of the ad-hoc Committee on the application for annulment (25 September 2007), paras. 97, 127, 136, 150, 157-159, available at http://www.italaw.com/sites/default/files/case-documents/ita0187.pdf (visited 8 May 2014).

[394] So for example in respect of the Argentina crisis: Ten Cate, I., International Arbitration and the Ends of Appellate Review, *New York University Journal of International Law and Politics*, Vol. 44 (2012), pp. 1109 et seqq., p. 1180.

[395] Article 36(1) Uncitral Model Law http://www.uncitral.org/pdf/english/texts/arbitration/ml-arb/07-86998_Ebook.pdf (visited 2 May 2014) mentions: incapacity of the parties to enter into the arbitration agreement or invalidity of the arbitration agreement; 2) lack of proper notice to a party or incapacity to present its case; 3) inclusion in the award of matters outside the scope of submission; 4) irregularities in the composition of the tribunal or the arbitral procedure; 5) non-arbitrability of the subject matter and 6) violation of domestic public policy.

[396] Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York Convention, adopted 10 June 1958, entered into force 7 June 1959), available at http://www.uncitral.org/pdf/english/texts/arbitration/NY-conv/XXII_1_e.pdf (visited 2 May 2014).

[397] Article x-26(1) lit c CETA draft of 4 February 2014 = Article x-42(1) lit c of CETA draft of 3 April 2014.

[398] Article 27 ICC Court of Arbitration rules.

[399] Cf. 2012 U.S. Model BIT, Article 28(9), available at http://www.ustr.gov/sites/default/files/BIT%20text%20for%20ACIEP-%20Meeting.pdf (last visited 4 May 2014).

[400] Cf. Article x-10(5) CETA draft of 4 February 2014 = Article x-25(5) of CETA draft of 3 April 2014: 'Arbitrators appointed pursuant to this section shall have expertise or experience in public international law, in particular international investment law. It is desirable that they have expertise or experience in international trade law, and the resolution of disputes arising under international investment or international trade agreements.'

While in well-functioning legal orders institutionalised selection processes usually exist which signal to the public that those sitting in court are capable of resolving a legal dispute in a sufficient minimum quality and hereby increase trust in the judicial body, *selecting ad-hoc arbitrators in ISDS is currently a highly non-transparent process*. Whether government-sponsored rosters of arbitrators always follow the logic of expertise is also open to debate[401]. If one would like to stick with the notion of party-appointed arbitrators which *ideally* would also contain some elements of competition, state parties should specify in greater detail qualifications, experience and other prerequisites to be met by arbitrators and police arbitrators' nominations more rigorously, e.g. by treaty committees. The award is not only as good as the law on which a dispute is decided but the outcome also significantly depends on the qualifications of arbitrators.

### 2.3.6 Financial risks

Both arbitration costs (below 2.3.6.1 (p. 109)) as well as the amount of damages awarded (below 2.3.6.2, p. 112)) have lately become of concern, not just to the general public but also to governments and academia.

### 2.3.6.1 Arbitration costs

The OECD has calculated that the average cost for both parties participating in investor-state arbitration amounts to US$ eight million[402]. In some cases costs exceed US$ 30 million. Eighty-two percent of the total costs occurring in investor-state arbitration are allocated to party representatives and expert witnesses for fees and expenses. Sixteen percent of costs relate to arbitrators and two percent are payable to the arbitration institution administering a case[403]. It is argued, for example by Unctad in one of its *IIA Issues Notes*, that these facts 'put into doubt the oft-quoted notion that arbitration represents a speedy and low-cost method'[404].

The explanations offered by commentators for these average costs vary greatly. Some point to the arbitrators: Only a very small group of people[405] are frequently nominated and accept appointment despite heavy caseloads. Hence, some might be overworked and/or suffer from weak case management despite some secretarial support by arbitration institutions and assistance by law clerks. Procedural issues might also play a role. Since arbitral awards can be challenged on grounds that arbitrators denied fair hearing, they could tend to allow for broad latitude to counsels presenting their case which increases billable hours on both sides.

---

[401] The problems encountered nominating suitable judges for the ECtHR in Strasbourg can serve as a telling example. Cf. Bubrowski, H., Qualifikation ist auch nur ein Wort, *Frankfurter Allgemeine Zeitung*, 10 March 2014, p. 4; Engel, N., More Transparency and Governmental Loyalty for Maintaining Professional Quality in the Election of Judges to the European Court of Human Rights, *Human Rights Law Journal*, Vol. 32 (2012).

[402] OECD, Investor-State Dispute Settlement, Public Consultation: 16 May–23 July 2012, p. 19, available at: http://www.oecd.org/daf/inv/investment-policy/ISDSconsultationcomments_web.pdf (5 May 2014); Franck, S., Rationalizing Costs in Investment Arbitration, *Washington University Law Review*, Vol. 88 (2011), pp. 769 et seqq.

[403] Gaukrodger, D. and Gordon, K., *Investor-State Dispute Settlement: A Scoping Paper for the Investment Policy Community*, OECD Working Papers on International Investment No. 2012/03, available at http://dx.doi.org/10.1787/5k46b1r85j6f-en (visited 20 May 2014), p 19.

[404] UNCTAD, *Reform of Investor-State Dispute Settlement: In Search of a Roadmap*, IIA Issues Note 2013/2, available at http://unctad.org/en/PublicationsLibrary/webdiaepcb2013d4_en.pdf (visited 19 May 2014),  p. 4.

[405] Cf. 2.3.3.2 (p.100).

Others tend to make counsels responsible for the occurring costs in arbitration. International law firms frequently employed in investment arbitration might resort to expensive litigation techniques. Party-appointed expert witnesses can also cause considerable costs[406].

However, charges of 'excessive costs' should not be made all too quickly. While specialised in-house investment arbitration departments – such as the ones the USA and Canada already maintain – might save costs (and would help accumulate knowledge and expertise which might be even more important), they would require a steady flow of cases to justify the fixed costs. For developing countries, setting up specialised arbitration departments would hardly be an option anyway. Transparent public procurement procedures and qualified controlling of party representatives by the respective disputing parties could contribute to more cost efficiency. Equally, active dispute prevention[407] and resorting to alternative dispute resolution techniques[408] or functioning domestic courts[409] might reduce some costs. Terminating frivolous investment arbitration claims at an early stage of proceedings[410] could also contribute to some cost reduction. Above all, a clear rule, e.g. contained in the investment instrument, that the unsuccessful party has to bear all costs and expenses of the proceedings would certainly be helpful containing costs on both the claimant's as well as respondent's side[411]. However, one should not give in to the world of illusions by assuming that such a rule would seriously deter financially robust claimants from resorting to arbitration if it would serve strategic interests.

Currently it is extremely difficult to predict the outcome of cost awards[412]. Due to only broad guidelines on costs and their attribution in arbitration rules[413] and investment instruments, arbitral tribunals enjoy broad discretion and have split over the attribution question[414]. In more than half of

---

[406] Gaukrodger, D. and Gordon, K., *Investor-State Dispute Settlement: A Scoping Paper for the Investment Policy Community*, OECD Working Papers on International Investment No. 2012/03, available at http://dx.doi.org/10.1787/5k46b1r85j6f-en (visited 20 May 2014), pp. 20 et seqq.

[407] Note, e.g., the initiatives taken by the Pacific Alliance (Chile, Colombia, Mexico and Peru). Instead of abandoning ISDS they set up projects which aim at communicating host state investment commitments to stakeholders and provide training for government agencies in order to secure compliance. Cf. Clarkson, S. et al., Looking South While Looking North: Mexico's Ambivalent Engagement with Overlapping Regionalism, Paper presented to Kolleg-Forschergruppe on 'The Transformative Power of Europe' conference on 'Dealing with Overlapping Regionalism: Complementary or Competitive Strategies?', Freie Universität Berlin, 16 May, 2014.

[408] UNCTAD, *Investor–State Disputes: Prevention and Alternatives to Arbitration*, UNCTAD Series on International Investment Policies for Development, New York and Geneva,2010, available at http://unctad.org/en/docs/diaeia200911_en.pdf (visited 5 May 2014). Cf. also 2.3.2.2.1.4 (p.81).

[409] Cf. 0 (p.76) and 2.3.2.2.2.3.2 (p.88).

[410] Cf. ICSID Rule 41(5) and Diop, A., Objections under Rules 41(5) of the ICSID Arbitration Rules, *ICSID Review*, Vol. 25 (2010), p. 312 et seqq., p. 312; See also Global Trading Resource Corp. and Globex International, Inc. v. Ukraine, ICSID Case No. ARB/09/11, documents available at http://www.italaw.com/cases/documents/507 (visited 5 May 2014); RSM Production Corporation v. Grenada, ICSID Case No. ARB/05/14, documents available at http://www.italaw.com/cases/940 (visited 5 May 2014); See Trans-Global Petroleum, Inc. v. The Hashemite Kingdom of Jordan, ICSID Case No. ARB/07/25, documents available at http://www.italaw.com/cases/documents/1114 (visited 5 May 2014); Brandes Investment Partners, LP v. The Bolivarian Republic of Venezuela, ICSID Case No. ARB/08/3, documents available at http://www.italaw.com/cases/174 (visited 5 May 2014). Cf. also 2.3.4.2 (p.107).

[411] Article x-20(5) CETA draft of 4 February 2014 ≈ Article x-36 of CETA draft of 3 April 2014.

[412] Cf. Schreuer, C. et al, *The ICSID Convention: A Commentary*, Cambridge University Press, Cambridge, 2nd Edition, 2009, p. 1229 ('the practice of ICSID tribunals in apportioning costs is neither clear nor uniform'). In respect of Uncitral or SCC ISDS cases cf. Smith, D., Shifting Sands: Cost-and-Fee Allocation in International Investment Arbitration, *Virginia Journal of International Law*, Vol. 51 (2011), pp. 749 et seqq., pp. 775, 780.

[413] Article 61(2) ICSID-Convention requires a final award to address the issue. Rules 42(1) and 40(2) Uncitral 2010 provide for costs to be borne on principle by the unsuccessful party, but the tribunal may decide otherwise.

[414] For a discussion cf. Franck, S., Rationalizing Costs in Investment Arbitration, *Washington University Law Review*, Vol. 88 (2011), pp. 769 et seqq.; Smith, D., Shifting Sands: Cost-and-Fee Allocation in International Investment Arbitration, *Virginia Journal of International Law*, Vol. 51 (2011), pp. 749 et seqq.; Reed, L., More on Corporate Criticism of International Arbitration, Kluwer Arbitration Blog, 16 July 2010, available at http://kluwerarbitrationblog.com/blog/2010/07/16/more-on-

the cases by 2011 they applied the rule generally used in public international law, i.e. each party has to bear its own costs and arbitrators and institutional costs are split. Others tend to shift at least some costs to the unsuccessful party[415]. Unctad argues that not allocating all reasonable occurred costs to the unsuccessful party would put a significant burden especially on developing countries' budgets. The threat of high arbitration costs could even be used to force governments into compromise in cases where such would not be necessary[416]. This logic, however, would also apply to small and medium sized investors, whose access to arbitration might be diminished by high costs[417].

However, one illusion should be shattered: recalling that investor-state disputes often involve complex questions of law and fact, touching sensible areas of the common good, dispensing justice cannot be expected to be 'free of charge', neither in investment arbitration nor in domestic courts.

When criticising the *length of arbitral proceedings*, one also has to reflect on the average duration of court proceedings in domestic fora.[418]. Furthermore, while one may question whether the length of the average investment arbitration is still reasonable, at the same time one may wonder why only a very small group of arbitrators are entrusted with a significant number of all cases[419]. State parties to the investment instrument, even the parties to a dispute, are free to more strictly regulate arbitration proceedings by providing incentives for speedy *and* yet high quality arbitral proceedings.

The CETA draft addresses the issue of arbitration costs on several levels. It provides for termination of frivolous claims in an early stage in investment arbitration[420]. It establishes, as a basic rule, that the unsuccessful party has to bear the costs[421]. Furthermore, the CETA draft provides for the possibility to resort to mediation before going to arbitration[422].

---

corporate-criticism-of-international-arbitration/ (visited 2 May 2014); Ulmer, N., The Cost Conundrum, *Arbitration International* , Vol. 26 (2010), pp. 221 et seqq.; Lalive, P., Dérives arbitrales (II), ASA Bulletin 1/2006, available at http://www.lalive.ch/data/publications/pla_derives_arbitrales_2.pdf (visited 2 May 2014).

[415] Smith, D., Shifting Sands: Cost-and-Fee Allocation in International Investment Arbitration, *Virginia Journal of International Law*, Vol. 51 (2011), pp. 749 et seqq., p. 753.

[416] The access of less-developed countries to high-quality legal defense at a reasonable price could be afforded through technical assistance and at a bilateral or multilateral level. Cf. UNCTAD, *Reform of Investor-State Dispute Settlement: In Search of a Roadmap*, IIA Issues Note 2013/2, available at http://unctad.org/en/PublicationsLibrary/webdiaepcb2013d4_en.pdf (visited 19 May 2014), p. 7; see also Gaukrodger, D. and Gordon, K., *Investor-State Dispute Settlement: A Scoping Paper for the Investment Policy Community*, OECD Working Papers on International Investment No. 2012/03, available at http://dx.doi.org/10.1787/5k46b1r85j6f-en (visited 20 May 2014), p. 23.

[417] Gaukrodger, D. and Gordon, K., *Investor-State Dispute Settlement: A Scoping Paper for the Investment Policy Community*, OECD Working Papers on International Investment No. 2012/03, available at http://dx.doi.org/10.1787/5k46b1r85j6f-en (visited 20 May 2014), p. 23. Small- and medium-sized undertakings could benefit from a small 'small claims center' with simplified procedures and lower costs in order to allow for access to ISDS.

[418] European countries which pride themselves on having one of the most developed legal systems are also criticised by the ECtHR for excessive length of court proceedings. Cf. European Court of Human Rights, R v. Germany, Application No. 46344/06; European Court of Human Rights, S v. Germany, Application No. 75529/01; European Court of Human Rights, Tetu v. France, Application No. 60983/09; European Court of Human Rights, Ferantelli and Santangelo v. Italy, Application No. 19874/92; European Court of Human Rights, C v. Ireland, Application No. 24643/08; European Court of Human Rights, Schouten and Meldrum v. The Netherlands, Application Nos 19005/91; 19006/91; See also damages proceedings for excessive length of administrative court proceedings Bundesverwaltungsgericht (German Federal Administrative Court), Judgement of 11.7.2013, Az. 5 C 23.12 D u. 5 C 27.12 D.

[419] Cf. for measures taken by the ICSID to reduce costs and speed up proceedings Gaukrodger, D. and Gordon, K., *Investor-State Dispute Settlement: A Scoping Paper for the Investment Policy Community*, OECD Working Papers on International Investment No. 2012/03, available at http://dx.doi.org/10.1787/5k46b1r85j6f-en (visited 20 May 2014).

[420] Articles x-14, x-15 CETA draft of 4 February 2014 ≈Articles x-29, x-30 of CETA draft of 3 April 2014; cf. also 2.3.4.2 (p.107).

[421] Article x-20(5) CETA draft of 4 February 2014 = Article x-36(5) of CETA draft of 3 April 2014.

[422] Article x-5 CETA draft of 4 February 2014 = Article x-19 of CETA draft of 3 April 2014; cf. also 2.3.2.2.1.4 (p.81).

### 2.3.6.2   Damages awards

In developed administrative law systems pecuniary remedies are usually secondary to non-pecuniary remedies such as annulling an administrative measure or prohibiting certain governmental conduct when found illegal[423]. Legislative acts cannot regularly and only under certain strict conditions be challenged in domestic legal orders. Liability for judicial acts is frequently restricted. These constraints generally do not exist in investment arbitration. Hence, a host state can be held accountable for administrative, legislative and judicial measures falling below the substantive standards contained in an investment instrument. As mentioned earlier, most frequently pecuniary damages are awarded[424].

Depending on the state measure, damages awarded can reach billions of US$. The (extreme) example frequently cited[425] in this respect is *Occidental Petroleum v. Ecuador*[426] awarding to the claimant US$ 1,77 Billion (US$2.3 billion with interest applied) which equals about five or 6,3 percent respectively of Ecuador's annual budget in 2012[427]. Unctad and others do not fail to point out that such amounts of damages have the potential of exerting significant pressure on public finances. Critics take this as evidence of the aberration of the system[428]. However, while one can certainly criticize ISDS in general and investment tribunals in particular in respect of many aspects[429], one should not be surprised that tribunals actually fulfil their task and allocate responsibility between host states and investors and award damages for governmental conduct falling short of the substantive standards in an investment instruments.

Most *investment agreements are silent on the question of remedies and the calculation of damages* which opens up recourse to public international law which requires generally 'to wipe out' all consequences of a wrongful act which indeed also contains 'hypothetical elements' including lost profit or consequential damages[430].

If states feel the need to restrict damages awards they are free to do so in investment instruments. Means to control damages awards would relate to more clearly defining the standard of compensation – i.e. for example excluding lost profits –, excluding certain types of damages such as moral or punitive damages, agreeing on certain methods of damages calculation, or even introducing absolute amounts of damages possibly awarded, like insurance companies frequently do in cases of a high

---

[423] For a more detailed account cf. Gaukrodger, D. and Gordon, K., *Investor-State Dispute Settlement: A Scoping Paper for the Investment Policy Community*, OECD Working Papers on International Investment No. 2012/03, available at http://dx.doi.org/10.1787/5k46b1r85j6f-en (visited 20 May 2014), p. 26 and Annex 4.

[424] Cf. 2.3.2.2.2.4 (p.93).

[425] McDonagh, T., Unfair, *Unsustainable and Under the Radar - How Corporations use Global Investment Rules to Undermine a Sustainable Future*, The Democracy Center, available at http://democracyctr.org/wp/wpcontent/uploads/-2013/05/Under_The_Radar_English_Final.pdf (visited 28 April 2014). p. 11.

[426] Occidental Petroleum Corporation and Occidental Exploration and Production Company v. The Republic of Ecuador, ICSID Case No. ARB/06/11, Award (5 October 2012), available at http://italaw.com/sites/default/files/case-documents/italaw1094.pdf (visited 2 May 2014). On 11.10.2012 Ecuador filed a request for annulment of the award which is pending on 20 March 2014. Cf. https://icsid.worldbank.org/ICSID/FrontServlet?requestType=CasesRH&actionVal=-viewCase&reqFrom=Home&caseId=C80 (visited 2 May 2014).

[427] In 2012 it was 35,5 billion US$. Cf. CIA world fact book, available at https://www.cia.gov/library/publications/the-world-factbook/geos/ec.html (visited 5 May 2014).

[428] McDonagh, T., *Unfair, Unsustainable and Under the Radar - How Corporations use Global Investment Rules to Undermine a Sustainable Future*, The Democracy Center, 2013, available at http://democracyctr.org/wp/wpcontent/uploads/2013/-05/Under_The_Radar_English_Final.pdf (visited 28 April 2014), p. 8.

[429] Cf. above 2.3 (p.56).

[430] Arangio-Ruiz, G., Preliminary Report on State Responsibility, in: International Law Commission (ed.), *Yearbook of the International Law Commission*, Vol. II, United Nations Publications, Geneva, 1988; UN Document No. A/CN.4/416 & Corr. 1 & 2 and Add.1 & Corr.1, para. 114.

degree of uncertainty. Depending on the economic and political situation of a state and its eagerness to attract foreign investment, such limits could be set accordingly.

Furthermore, it should be explored whether and in which way greater weight can be given to non-pecuniary remedies in investment instruments[431]. In respect of investor-state tribunals this would in any event require removing existing insecurities among tribunals of whether they possess the relevant competence to grant non-pecuniary remedies[432].

The CETA draft provides that a tribunal may only award pecuniary damages (and interest) as well as restitution of property[433]. It further specifies that pecuniary damages shall not be greater than the loss suffered by the claimant, reduced by any prior damages or compensation already provided. For the calculation of pecuniary damages, a tribunal shall also reduce the damages to take into account any restitution of property or repeal or modification of the measure. A tribunal may not award punitive damages. Lost profit appears not to be excluded from a possible damages award.

## 3.    RECOMMENDATIONS

- *Investor-state dispute settlement (ISDS) as a tool to enforce substantive investment protection standards should continue to be part of European investment instruments*[434]. Reliance on state-state arbitration, diplomatic protection, investment contracts or laws or domestic remedies only would not form an equivalent alternative.

- At the same time, the *protection offered to foreign investment in domestic legal orders should not be discounted*. Some domestic legal orders do not only provide meaningful legal remedies but national jurisdictions can also lend legitimacy to ISDS when approached first before recourse is taken to arbitration. Hence, ISDS should be shaped in a way constituting *no alternative but, rather, a subsidiary legal remedy* to the domestic legal system.

- An adequate role of domestic legal systems in protecting foreign investments is secured by a novel drafting approach to the *exhaustion of local remedies rule* in all European investment instruments. *This rule must be furnished with elasticity*; i.e. responding to the changing capacities of the domestic legal system in providing meaningful legal redress over time without operating with a rigid period reserved for local remedies.

- In order to *improve consistency* of ISDS practice in respect of an investment instrument and to *secure the 'right balance' between private and public interests* the role of the *state parties as 'masters of the treaty' must be strengthened*. This is achieved by *activating the powers of*

---

[431] Cf. Gaukrodger, D. and Gordon, K., *Investor-State Dispute Settlement: A Scoping Paper for the Investment Policy Community*, OECD Working Papers on International Investment No. 2012/03, available at http://dx.doi.org/10.1787/5k46b1r85j6f-en (visited 20 May 2014) pp. 28 et seqq., Annex 6; opposite view UNCTAD, *Investment Policy Framework for Sustainable Development*; UNCTAD, 2012, available at http://unctad.org/en/PublicationsLibrary/webdiaepcb2012d6_en.pdf (visited 5 May 2014), p. 57.

[432] Cf. Hindelang, S., Restitution and Compensation – Reconstructing the Relationship in International Investment Law, in: Hofmann/Tams (eds.), *International Investment Law and General International Law: From Clinical Isolation to Systemic Integration*, Nomos, Baden-Baden, 2011, pp. 161 et seqq.; also available as Hindelang, S., *Restitution and Compensation – Reconstructing the Relationship in International Investment Law*, WHI-Paper 02/11, 2011, http://www.whi-berlin.eu/tl_files/documents/whi-paper0211.pdf (visited 1 May 2014); cf. also 2.3.2.2.2.4 (p.93).

[433] Article x-20(1) CETA draft of 4 February 2014 = Article x-36 (1) of CETA draft of 3 April 2014.

[434] The term 'investment instrument' refers to treaties concluded by states or the EU among one another in public international law, such as bilateral or regional investment (protection) treaties.

*authoritative interpretation*[435]. In a first step, European investment instruments should therefore provide for a treaty committee, staffed with representatives of all state parties, which *continuously monitors ISDS practice* and *puts forward authoritative interpretations* of the provisions of the investment instrument as necessary.

- If a rather large number of claims on the basis of a single EU investment instrument – such as the TTIP – is expected, the EU should establish, right from the outset, an *appeals mechanism in order to correct erroneous awards* and *secure consistency in interpretation*.

- If no appeals facility is established, European investment instruments should at least make available *a preliminary reference procedure* to seek authoritative interpretation or a *mandatory review procedure for draft awards*, conducted with a view *to preserving consistency in interpretation* and the *balance between private and public interests* enshrined in the investment instrument.

- *Concepts like 'de facto precedent' or 'jurisprudence constante'* found in ISDS practice *do not sit well with general public international law* but pose a *serious challenge to the state parties' ownership of the investment instrument*. State parties should make provisions in their treaties to counter such attempts.

- European agreements should provide for *broad transparency* rules such as those found in the 2014 Uncitral Rules on Transparency in Treaty-based Investor-State Arbitration.

- If one subscribes to the view that *not only justice must be done, but it must also be seen to be done*, overcoming the *issue of alleged appearance of bias of arbitrators and arbitration institutions* without significantly altering the current system of ad-hoc nominated arbitrators will prove challenging. The EU should consider providing for *tenured judges*; at least on an appellate level.

---

[435] There is some confusion in legal literature as to the precise meaning of the term 'authoritative' interpretation. For the purpose of this study it shall refer to a (joint) interpretation of a treaty in public international law, binding beyond an individual case, issued by the state parties to this agreement or a treaty committee charged with such a task.

# 4.    ANNEX – CASE STUDIES

In its assignment, the European Parliament asked for the provision of two concise studies of cases some of its Members perceive as critical.

## 4.1    Ethyl Corporation v. Government of Canada[436]

### 4.1.1    Factual and Legal Background

In the *Ethyl Corp. v. Canada* arbitration, an issue was put up for (re-)assessment on the international level which is also addressed in the domestic realm, i.e. what amounts to a compensable taking and what is to be regarded as regulatory non-compensable taking[437]. More precisely, the question to be answered by the tribunal was that of what level of harm inherent in a certain economic activity has to be borne by society and which by the individual entrepreneur. Ultimately it was left open due to a settlement by the disputing parties.

'In that case, a U.S. company that made a gasoline additive called MMT challenged a law by Canada that banned the *importation* or *inter-provincial trade* of MMT. This substance was claimed to have [evident indirect potential[438]] toxic properties that were feared to cause health concerns, and to cause certain equipment on car exhaust systems to malfunction.'[439] However, production and sale of MMT in Canada itself was not banned as long as it was not brought across a Canadian provincial or state border but manufactured and distributed entirely within each of Canada's provinces[440]. Ethyl Corp. claimed US$ 251 million in damages plus interest asserting that the measure violated NAFTA's prohibition on performance requirements [[441]] and national treatment discrimination [[442]], as well as [NAFTA's] expropriation [clause[443]]. After a NAFTA tribunal rejected Canada's defence that it lacked jurisdiction over the case, the case was ultimately settled for approximately U.S. $13 million in damages, and Canada withdrew the legislation and provided a letter admitting that there was no [conclusive] *scientific evidence* of any health risk of MMT or any adverse impact on car exhaust systems.'[444]

---

[436] Award on jurisdiction available at http://italaw.com/sites/default/files/case-documents/ita0300_0.pdf (visited 2 May 2013); all procedural documents can be accessed through http://www.international.gc.ca/trade-agreements-accords-commerciaux/topics-domaines/disp-diff/ethyl.aspx?lang=eng (visited 2 May 2014).

[437] UNCTAD, *Taking of Property,* UNCTAD Series on Issues in International Investment Agreements, New York and Geneva, 2000, available at http://unctad.org/en/docs/psiteiitd15.en.pdf (visited 19 May 2014), p. 6.

[438] Ethyl Corporation v Government of Canada Statement of Defence, available at http://www.international.gc.ca/trade-agreements-accords-commerciaux/assets/pdfs/disp-diff/ethyl-05.pdf (visited 5 May 2014), para. 70.

[439] Emphasis added Sampliner, G., Arbitration of Expropriation Cases Under U.S. Investment Treaties - A Threat to Democracy or the Dog That Didn't Bark?, *ICSID Review*, Vol. 18 (2003), pp. 1 et seqq., pp. 27 – 28.

[440] So at least claimed by Ethyl Corp. Cf. Ethyl Corporation v Government of Canada Preliminary Tribunal Award on jurisdiction, available at http://www.international.gc.ca/trade-agreements-accords-commerciaux/assets/pdfs/disp-diff/ethyl-08.pdf (visited 5 May 2014), para. 6.

[441] Article 1106 NAFTA.

[442] Article 1102 NAFTA.

[443] Article 1110 NAFTA.

[444] Emphasis added Sampliner, G., Arbitration of Expropriation Cases Under U.S. Investment Treaties - A Threat to Democracy or the Dog That Didn't Bark?, *ICSID Review*, Vol. 18 (2003), pp. 1 et seqq., pp. 27 – 28.

## 4.1.2    Brief discussion

'Some point to the first NAFTA arbitration filed by Ethyl Corp. against Canada, as a case that demonstrates the dangers of NAFTA's investment chapter to environmental regulation.'[445] Civil society campaigners criticised the outcome of the Ethyl case as 'a precedent where, under NAFTA and similar agreements, a government would have to compensate investors when it wishes to regulate them or their products for public health or environmental reasons.'[446] Moreover, offence was taken that corporate interests appear to weigh more than democratic laws. Some argued: 'A government bill approved by the Parliament of Canada has been vetoed by Ethyl Corp. of Virginia. This is the substance of the matter. What is not of substance is whether MMT poisons the air, destroys catalytic converters, is harmful to children, older people, and those suffering from respiratory ailments, or frightens the horses - or whether it doesn't. The Canadian government and Parliament, whether certain, uncertain, or indifferent, has the sovereign power to pass whatever laws it wishes. At least, that had been the case.'[447]

However, such criticism clearly misses the point. It, to begin with, fails to mention that NAFTA – like the MMT regulation – was also voted on and approved by the Canadian parliament. Hence, the Canadian people opened up the possibility to let their governmental acts be scrutinised against the protection standards contained in an international treaty. While the effects of NAFTA initially might not have been well understood by all stakeholders, one cannot accept international commitments and later claim 'unfettered sovereignty.'

Furthermore, this case can also not be interpreted as a *clash* of different approaches towards the regulation of risk on domestic and international levels as the NAFTA tribunal simply did not render a decision on the merits[448]. Claiming that a corporation 'vetoed' a parliamentary act by taking recourse to NAFTA chapter 11 appears rather populistic. In fact, Canada adopted a precautionary approach

---

[445] Sampliner, G., Arbitration of Expropriation Cases Under U.S. Investment Treaties - A Threat to Democracy or the Dog That Didn't Bark?, *ICSID Review*, Vol. 18 (2003), pp. 1 et seqq., p. 27.

[446] Sforza, M. and Vallianatos, M., NAFTA & Environmental Laws: Ethyl Corp. v. Government of Canada - Chemical Firm Uses Trade Pact to Contest Environmental Law, 1997, available at http://www.globalpolicy.org/component/-content/article/212/45381.html (visited 5 May 2014).

[447] Camp, D., You Can Thank Free Trade Agreement for MMT Travesty, *Toronto Star*, 29 July 1998, p. 1, available at http://pqasb.pqarchiver.com/thestar/doc/437783099.html?FMT=ABS&FMTS=ABS:FT&type=current&date=Jul+29%2C+1998&author=&pub=Toronto+Star&edition=&startpage=&desc=You+can+thank+free+trade+agreement+for+MMT+travesty (visited 5 May 2014); see also Dale, S., NAFTA-Based Lawsuit Angers Activists, *Albion Monitor*, 6 October 1996, available at http://www.monitor.net/monitor/9610a/naftammt.html (visited 5 May 2014).

[448] In this respect it is worth mentioning that Article 1114 (1) NAFTA explicitly addresses environmental measures providing: 'Nothing in this Chapter shall be construed to prevent a Party from adopting, maintaining or enforcing any measure *otherwise consistent with this Chapter* that it considers appropriate to ensure that investment activity in its territory is undertaken in a manner sensitive to environmental concerns.' [Emphasis added]. The italicised phrase has proved critical in investment disputes as Article 1114 (1) NAFTA does not exempt any environmental measure taken in a bona fide attitude from review, but allows only for such which are 'otherwise' consistent with the substantive standards of protection contained in NAFTA chapter 11.

towards MMT in its regulation[449] that could not even be sustained in domestic proceedings as it was held to be disproportionate[450].

## 4.2        Glamis Gold Ltd. v. United States of America[451]

### 4.2.1        Factual and Legal Background

In *Glamis Gold Ltd. v. Canada*, 'a Canadian corporation engaged in the mining of precious metals, submitted a claim to arbitration alleging that certain federal government actions and California measures, with respect to open-pit mining operations [in south-eastern California], were in violation of the United States' obligations under NAFTA. The California measures included regulations requiring backfilling and grading for mining operations in the area of sacred Native American sites.'[452] Glamis Gold claimed that these measures violated the 'minimum standard of treatment under international law (including full protection and security and fair and equitable treatment of its investment) guaranteed by Article 1105 and … expropriated Glamis … valuable mining property interests without providing prompt and effective compensation as guaranteed by Article 1110 [NAFTA]'.[453] Glamis sought damages of US $50 million plus interest and costs.

### 4.2.2        Brief discussion

The decision is worth highlighting in respect of two aspects, one procedural and another substantive[454]. In *Glamis* the tribunal expanded *amicus curiae* participation in a NAFTA ISDS context. The tribunal accepted written statements by a coalition of non-governmental organizations, by a business association, and by a Native American tribe which would have been affected by mining operations[455].

In terms of substantive treatment of the claim the tribunal appears to have adopted a test to determine whether an indirect expropriation had taken place which grants significant greater policy space than tests applied previously[456], as for example in *Metalclad Corporation v. United Mexican*

---

[449] In the Ethyl case the arguments advanced in defense of the MMT measure were not so much based on international (environmental) commitments taken up by Canada, in contrast, e.g. to Compañiá del Desarrollo de Santa Elena, S.A. v. The Republic of Costa Rica, ICSID Case No. ARB/96/1, award available at http://italaw.com/documents/santaelena_award.pdf (visited 8 May 2014) where the respondent built its defence of restrictive measure on the compliance with commitments in public international law. The tribunal was not overly successful in appreciating such an argument in the light of its obligations under Article 31(3) lit c VCLT. Cf. Berner, K., in: Hindelang/Krajewski (eds.), *Shifting Paradigms in International Investment Law (provisional title)*, Oxford University Press, forthcoming 2015.

[450] Report of the Article 1704 Panel Concerning a Dispute Between Alberta and Canada Regarding the Manganese-Based Fuel Additives Act, Winnipeg 12 July 1998, available at http://www.international.alberta.ca/documents/international/ait_ab-can_mmt_rpt-12june98.pdf (visited 2 May 2014).

[451] All documents including the award are available at http://www.state.gov/s/l/c10986.htm (visited 2 May 2014).

[452] Grandbois, M. and Buchard, M-C., Public Participation in Transnational Law: Access to Justice in Environmental Matters in North American Treaties, *Macquarie Journal of International and Comparative Environmental Law*, Vol. 7 (2011), pp. 1 et seqq., p. 17.

[453] Glamis Gold, Ltd. v. United States of America Notice of Arbitration, available at http://www.state.gov/documents/-organization/27320.pdf (visited 5 May 2014).

[454] See also for a discussion Schill, S., Glamis Gold Ltd. v. United States – Award, *The American Journal of International Law*, Vol. 104 (2010), pp. 253 et seqq.; Mann, H., Glamis Gold Ltd. v. United States of America, in: Bernasconi-Osterwalder/Johnson (eds.), *International Investment Law and Sustainable Development - Key cases from 2000–2010*, 2011, available at http://www.iisd.org/sites/default/files/pdf/2011/int_investment_law_and_sd_key_cases_2010.pdf (visited 2 May 2014), pp. 59 et seqq.; for a critical account in terms of policy Oxfam America, *Glamis Gold: A Case Study of Investing in Destruction*, available at http://www.oxfamamerica.org/static/oa3/files/OA-Glamis_Gold_English.pdf (visited 5 May 2014), p. 4.

[455] Mann, H., Glamis Gold Ltd. v. United States of America, in: Bernasconi-Osterwalder/Johnson (eds.), *International Investment Law and Sustainable Development - Key cases from 2000–2010*, 2011, available at http://www.iisd.org/sites/-default/files/pdf/2011/int_investment_law_and_sd_key_cases_2010.pdf (visited 2 May 2014), pp. 59 et seqq., p. 61 – 62.

[456] Glamis Gold, Ltd. v. United States of America, Uncitral, available at http://www.italaw.com/sites/default/files/case-documents/ita0378.pdf (visited 2 May 2014), para. 356 et seqq.; 536.

*States*[457]. The tribunal seems to have adopted the same prudent approach in respect of its treatment of the international minimum standard[458]. Here as well, the tribunal paid due regard – in contrast to, e.g. *Metalclad Corporation v. United Mexican States*[459], *S.D. Myers, Inc. v. Government of Canada*[460], *Pope & Talbot Inc. v. Government of Canada*[461] or *Técnicas Medioambientales Tecmed, S.A. v. United Mexican States* [462] – to the binding authoritative interpretation issued by the NAFTA state parties in 2001[463].

---

[457] Metalclad Corporation v. United Mexican States, ICSID Case No. ARB (AF)/97/1, documents available at http://www.italaw.com/cases/671 (visited 2 May 2014).

[458] Mann, H., Glamis Gold Ltd. v. United States of America, in: Bernasconi-Osterwalder/Johnson (eds.), *International Investment Law and Sustainable Development - Key cases from 2000–2010*, 2011, available at http://www.iisd.org/sites/default/files/pdf/2011/int_investment_law_and_sd_key_cases_2010.pdf (visited 2 May 2014), pp. 59 et seqq., pp. 62-63.

[459] Metalclad Corporation v. United Mexican States, ICSID Case No. ARB (AF)/97/1, documents available at http://www.italaw.com/cases/671 (visited 2 May 2014).

[460] S.D. Myers, Inc. v. Government of Canada, Uncitral (NAFTA), documents available at http://www.italaw.com/cases/-documents/977 (visited 2 May 2014).

[461] Uncitral (NAFTA), documents available at http://italaw.com/cases/documents/865 (visited 2 May 2014).

[462] Técnicas Medioambientales Tecmed, S.A. v. United Mexican States, ICSID Case No. ARB (AF)/00/2, documents available at http://www.italaw.com/cases/1087 (visited 2 May 2014).

[463] Glamis Gold, Ltd. v. United States of America Award, available at http://www.italaw.com/sites/default/files/case-documents/ita0378.pdf (visited 2 May 2014), para. 542 et seqq.

## Bibliography

Aisbett, E., Bilateral Investment Treaties and Foreign Direct Investment: Correlation Versus Causation, in: Sauvant/Sachs (eds.), *The Effect of Treaties on Foreign Direct Investments*, Oxford University Press, New York, 2009, pp. 395 et seqq.

Ala'i, P., Judicial Lobbying at the WTO: The Debate over the Use of Amicus Curiae Briefs and the U.S. Experience, *Fordham International Law Journal*, Vol. 24 (2000), pp. 62 et seqq.

Alexander, L., Constrained by Precedent, *Southern California Law Review*, Vol. 63 (1989), pp. 1 et seqq.

Alvarez, J. and Khamsi, K., The Argentine Crisis and Foreign Investors, in: Sauvant (ed.), *Yearbook on International Investment Law and Policy 2008–2009*, Oxford University Press, New York, 2009, pp. 379 et seqq.

Alvarez, J., Book Review of Gus Van Harten, Investment Treaty Arbitration and Public Law, *American Journal of International Law*, Vol. 102 (2008), pp. 909 et seqq.

Alvarez, J., Comparison U.S. Model BIT (1984) and U.S. Model BIT (2004), *Transnational Dispute Management*, Vol. 7 (2010)

Alvarez, J., The Emerging Foreign Direct Investment Regime, *Proceedings of the Annual Meeting – American Society of International Law*, 2005, pp. 94 et seqq.

Alvik, I., *Contracting with Sovereignty: State Contracts and International Arbitration*, Hart Publishing, Oxford, 2011

Andersen, S., *The Enforcement of EU Law: The Role of the European Commission*, Oxford University Press, Oxford, 2012

Arangio-Ruiz, G., Preliminary Report on State Responsibility, in: International Law Commission (ed.), *Yearbook of the International Law Commission*, Vol. II, United Nations Publications, Geneva, 1988

Arsanjani, M. and Reisman, W., Interpreting Treaties for the Benefit of Third Parties: The "Salvors' Doctrine" and the Use of Legislative History in Investment Treaties Editorial Comment, *American Journal of International Law*, Vol. 104 (2010), p. 597 et seqq.

Bartholomeusz, L., The Amicus Curiae before International Courts and Tribunals, *Non-State-Actors and International Law*, Vol. 5 (2005), pp. 209 et seqq.

Bastin, L., Amici Curiae in Investor-State Arbitration - Eight Recent Trends, *Arbitration International*, Vol. 30 (2014), pp. 125 et seqq.

Baudenbacher, C., The Implementation of Decisions of the ECJ and of the EFTA Court in Member States' Domestic Legal Orders, *Texas International Law Journal*, Vol. 40 (2004), pp. 383 et seqq.

Berger, A. et al., Do trade and investment agreements leed to more FDI? - Accounting for key provisions inside the black box, *International Economics and Economic Policy*, Vol. 10 (2013), pp. 247 et seqq.

Bernasconi-Osterwalder, N. and Mann, H., *A Response to the European Commission's December 2013 Document "Investment Provisions in the EU-Canada Free Trade Agreement (CETA)"*, February 2014, available at http://www.iisd.org/sites/default/files/pdf/2014/reponse_eu_ceta.pdf (visited 5 May 2014)

Bernasconi-Osterwalder, N., and Rosert, D., *Investment Treaty Arbitration: Opportunities to reform arbitral rules and processes*, January 2014, available at

http://www.iisd.org/sites/default/files/pdf/2014/investment_treaty_arbitration.pdf (visited 2 May 2014)

Berner, K., in: Hindelang/Krajewski (eds.), *Shifting Paradigms in International Investment Law (provisional title)*, Oxford University Press, forthcoming 2015

Bjorklund, A., Investment Treaty Arbitral Decisions as Jurisprudence Constante, in: Picker et al. (eds.), *International Economic Law: The State and Future of the Discipline*, Hart Publishing, Oxford, 2008, pp. 265 et seqq.

Bjorklund, A., The Emerging Civilization of Investment Arbitration, *Penn State Law Review*, Vol. 113 (2009), pp. 1269 et seqq.

Bjorklund, A., Waiver and the Exhaustion of Local Remedies Rule in NAFTA Jurisprudence, in: Weiler, T. (ed.), *NAFTA Investment Law and Arbitration*, Transnational Publishers, Ardsley, 2004, pp. 253 et seqq.

Blackaby, N., Public Interest and Investment Treaty Arbitration, in: van den Berg, A. (ed.), *International Commercial Arbitration: Important Contemporary Questions*, Kluwer Law International, The Hague, 2003, pp. 355 et seqq.

Borchard, E., *The Diplomatic Protection of Citizens Abroad*, The Banks Law Publishing, New York, 1925

Brian, J., Article 260(2) TFEU: An Effective Judicial Procedure for the Enforcement of Judgements?, *European Law Journal*, Vol. 19 (2013), pp. 404 et seqq.

Brower II, C., Obstacles and Pathways to Consideration of the Public Interest in Investment Treaty Disputes, in: Sauvant (ed.), *Yearbook on International Investment Law and Policy 2008–2009*, Oxford University Press, New York, 2009, pp. 356 et seqq.

Brower II, C., Structure, Legitimacy, and NAFTA's Investment Chapter, *Vanderbilt Journal of Transnational Law*, Vol. 36 (2003), pp. 37 et seqq.

Brower, C. and Schill, S., Is Arbitration a Threat or a Boon to the Legitimacy of International Investment Law?, *Chicago Journal of International Law*, Vol. 9 (2009), pp. 471

Brower, C., Structure, Legitimacy, and NAFTA's Investment Chapter, *Vanderbilt Journal of Transnational Law*, Vol. 36 (2003), pp. 37 et seqq.

Brownlie, I., *Principles of Public International Law*, Oxford University Press, Oxford, 7th edition, 2008

Bubrowski, H., *Internationale Investitionsschiedsverfahren und nationale Gerichte*, Mohr Siebeck, Tübingen, 2013

Bucher, A., Is There a Need to Establish a Permanent Reviewing Body?, in: Gillard (ed.), *The Review of International Arbitration Awards*, JurisNet, Huntington, 2010, pp. 285 et seqq.

Buergenthal, T., The Proliferation of Disputes, Dispute Settlement Procedures and Respect for the Rule of Law, *Arbitration International*, Vol. 22 (2006), pp. 495 et seqq.

Bundesverband der Deutschen Industrie e.V., *Positionspapier: Schutz europäischer Investitionen im Ausland: Anforderungen an Investitionsabkommen der EU'*, available at http://www.bdi.eu/download_content/GlobalisierungMaerkteUndHandel/Schutz_europaeischer_Investitionen_im_Ausland.pdf (visited 28 April 2014)

Burke-White, W. and von Staden, A., Private Litigation in a Public Law Sphere: The Standard of Review in Investor-State Arbitrations, *Yale Journal of International Law,* Vol. 35 (2010), pp. 283 et seqq.

Burke-White, W., The Argentine Financial Crisis: State Liability under BITs and the Legitimacy of the ICSID System, in: Waibel/Kaushal/Chung/Balchin (eds.), *The Backlash against Investment Arbitration: Perceptions and Reality*, Kluwer Law International, The Hague, pp. 407 et seqq.

Caddel, J. and Jensen, M., *Which host country government actors are most involved in disputes with foreign investors*, Columbia FDI Perspectives No. 120, available at http://www.vcc.columbia.edu/content/which-host-country-government-actors-are-most-involved-disputes-foreign-investors (visited 28 April 2014)

Caron, D., The Interpretation of National Foreign Investment Laws as Unilateral Acts Under International Law, in: Arsanjani/Cogan/Sloane/Weissner (eds.), *Looking to the Future: Essays on International Law in Honor of W. Michael Reisman*, Martinus Nijhoff Publishers, Leiden/Boston, 2011, pp. 649 et seqq.

Commission, J., Precedent in Investment Treaty Arbitration: A Citation Analysis of a Developing Jurisprudence, *Journal of International Arbitration*, Vol. 24 (2007), pp. 129 et seqq.

Constain, S., Mediation in Investor–State Dispute Settlement - Government Policy and the Changing Landscape, *ICSID Review*, Vol. 29 (2014), pp. 25 et seqq.

Crawford, J., A Consensualist Interpretation of Article 31(3) of the Vienna Convention on the Law of Treaties, in: Nolte (ed.), *Treaties and Subsequent Practice*, Oxford University Press, Oxford, 2013, pp. 29 et seqq.

Crawford, J., *Brownlie's Principles of Public International Law*, Oxford University Press, Oxford, 8th edition, 2012

Crawford, J., The ILC`s Articles on Responsibility of States for Internationally Wrongful Acts – A Retrospective, *American Journal of International Law*, Vol. 96 (2002), pp. 874 et seqq.

de Vattel, E., *Le droit des gens ou les principes de la loi naturelle*, vol. 1, Paris, 1835

de Visscher, C., Cours général de droit international public, *Collected Courses of the Hague Academy of International Law*, Vol. 86 (1954), pp. 445 et seqq.

Diop, A., Objections under Rules 41(5) of the ICSID Arbitration Rules, *ICSID Review*, Vol. 25 (2010), p. 312 et seqq.

Dodge, W., Investor-State Dispute Settlement Between Developed Countries: Reflections on the Australia-United States Free Trade Agreement, *Vanderbilt Journal of Transnational Law*, Vol. 39 (2006), pp. 1 et seqq.

Dodge, W., *Local Remedies under NAFTA Chapter 11*, 2011, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2217059 (visited 4 May 2014)

Dolzer, R. and Schreuer, C., *Principles of International Investment Law*, Oxford University Press, Oxford, 2nd Edition, 2012

Dörr, O., in: Dörr/Schmalenbach (eds.), *Vienna Convention on the Law of Treaties*, Springer, Berlin, 2012, Article 31, 32

Dugan, C. et al., *Investor-State Arbitration*, Oxford University Press, Oxford, 2008

Eberhard, P. and Olivet, C., Profiting from Injustice - How Law Firms, Arbitrators and Financiers are Fuelling an Investment Arbitration Boom, November 2012, available at http://corporateeurope.org/sites/default/files/publications/profiting-from-injustice.pdf (visited 2 May 2014)

Echandi, R. and Kher, P., Can International Investor–State Disputes be Prevented? - Empirical Evidence from Settlements in ICSID Arbitration, *ICSID Review*, Vol. 29 (2014), pp. 41 et seqq.

Elkins, Z. et al., Competing for Capital: The Diffusion of Bilateral Investment Treaties, 1960–2000, *International Organisation*, Vol. 60 (2006), pp. 811 et seqq.

Fauchald, O., The Legal Reasoning of ICSID Tribunals – An Empirical Analysis, *European Journal of International Law*, Vol. 19 (2008), pp. 301 et seqq.

Foster, G., Striking a Balance between Investor Protections and National Sovereignty - The Relevance of Local Remedies in Investment Treaty Arbitration, *Columbia Journal of Transnational Law*, Vol. 49 (2011), pp. 201 et seqq., available at http://ssrn.com/abstract=1865489 (visited 4 May 2014)

Franck, S., Rationalizing Costs in Investment Arbitration, *Washington University Law Review*, Vol. 88 (2011), pp. 769 et seqq.

Franck, S., The Legitimacy Crisis in Investment Treaty Arbitration: Privatizing Public International Law Through Inconsistent Decisions, *Fordham Law Review*, Vol. 73 (2005), pp. 1521 et seqq.

Franck, S., Using Investor–State Mediation Rules to Promote Conflict Management - An Introductory Guide, *ICSID Review*, Vol. 29 (2014), pp. 66 et seqq.

Franck, T., *The Power of Legitimacy among Nations*, Oxford University Press , New York, 1990

Frowein, J., Federal Republic of Germany, in: Jacobs/Roberts (eds.), *The effect of treaties in domestic law*, Sweet & Maxwell, London, 1987, pp. 63 et seqq.

Gantz, D., An Appellate Mechanism for Review of Arbitral Decisions in Investor-State Disputes: Prospects and Challenges, *Vanderbilt Journal of Transnational Law*, Vol. 39 (2006), pp. 39 et seqq.

Gaukrodger, D. and Gordon, K., *Investor-State Dispute Settlement: A Scoping Paper for the Investment Policy Community*, OECD Working Papers on International Investment No. 2012/03, available at http://dx.doi.org/10.1787/5k46b1r85j6f-en (visited 20 May 2014)

Ginsburg, T., International Substitutes for Domestic Institutions: Bilateral Investment Treaties and Governance, *International Review of Law and Economics*, Vol. 25 (2005), pp. 107 et seqq.

Grandbois, M. and Buchard, M-C., Public Participation in Transnational Law: Access to Justice in Environmental Matters in North American Treaties, *Macquarie Journal of International and Comparative Environmental Law*, Vol. 7 (2011), pp. 1 et seqq.

Guillaume, G., The Use of Precedent by International Judges and Arbitrators, *Journal of International Dispute Settlement*, Vol. 2 (2011), pp. 5 et seqq.

Gutbrod, M. and Hindelang, S., Externalization of Effective Legal Protection against Indirect Expropriation – Can the Legal Order of Developing Countries Live up to the Standards Required by International Investment Agreements? A Disenchanting Comparative Analysis, *The Journal of World Investment and Trade*, Vol. 7 (2006), pp. 59 et seqq.

Guzman, A., Why LDCs Sign Treaties That Hurt Them: Explaining the Popularity of Bilateral Investment Treaties, *Virginia Journal of International Law*, Vol. 38 (1998), pp. 639 et seqq.

Hachez, N. and Wouters, J., *International Investment Dispute Settlement in the 21st Century: Does the Preservation of the Public Interest Require an Alternative to the Arbitral Model?*, Leuven Centre for Global Governance Studies Working Paper No. 81, available at: http://ssrn.com/abstract=2009327 or http://dx.doi.org/10.2139/ssrn.2009327 (both visited 4 May 2014)

Hepburn, J. and Peterson, L., US-Ecuador Inter-State Investment Treaty Award Released to Parties - Tribunal Members Part Ways on Key Issues, *Investment Arbitration Reporter*, 30.10. 2012, available at www.iareporter.com/articles/20121030_1 (visited 4 May 2014).

Herdegen, M., *Principles of International Economic Law*, Oxford University Press, Oxford, 2013

Hindelang, S. et al., Turkey – Soon to Face a Wave of International Investment Arbitrations?, *Journal of International Arbitration*, Vol. 26 (2009), pp. 701 et seqq.

Hindelang, S., Bilateral Investment Treaties, Custom and a Healthy Investment Climate - The Question of Whether BITs Influence Customary International Law Revisited, *The Journal of World Investment and Trade,* Vol. 5 (2004), pp. 789 et seqq.

Hindelang, S., Der primärrechtliche Rahmen einer EU-Investitionsschutzpolitik: Zulässigkeit und Grenzen von Investor-Staat-Schiedsverfahren aufgrund künftiger EU Abkommen, in: Bungenberg/Herrmann (eds.), *Die Gemeinsame Handelspolitik der Europäischen Union „nach Lissabon"*, Nomos, Baden-Baden, 2011, pp. 157 et seqq., also available as Hindelang, S., *Der primärrechtliche Rahmen einer EU Investitionsschutzpolitik: Zulässigkeit und Grenzen von Investor-Staat-Schiedsverfahren aufgrund künftiger EU Abkommen*, WHI-Paper 01/11, 2011, available at http://www.whi-berlin.eu/tl_files/documents/whi-paper0111.pdf (visited 4 May 2014)

Hindelang, S., Restitution and Compensation – Reconstructing the Relationship in International Investment Law, in: Hofmann/Tams (eds.), *International Investment Law and General International Law: From Clinical Isolation to Systemic Integration*, Nomos, Baden-Baden, 2011, pp. 161 et seqq.; also available as Hindelang, S., *Restitution and Compensation – Reconstructing the Relationship in International Investment Law*, WHI-Paper 02/11, 2011, http://www.whi-berlin.eu/tl_files/documents/whi-paper0211.pdf (visited 1 May 2014).

Hindelang, S., The Autonomy of the European Legal Order – EU Constitutional Limits to Investor-State Arbitration on the Basis of Future EU Investment-related Agreements, in: Bungenberg/ Herrmann (eds.), *Common Commercial Policy after Lisbon - Special Issue to the European Yearbook of International Economic Law*, Springer; New York, 2013, pp. 187 et seqq.

Hoffmann, A., Counterclaims in Investment Arbitration, *ICSID Review*, Vol. 28 (2013), pp. 438 et seqq.

Hoffmeister, F. and Alexandru, G., A First Glimpse of Light on the Emerging Invisible EU Model BIT, *Journal of World Investment & Trade*, Vol. 15 (2014), pp. 379 et seqq.

Ikenson, D., A Compromise to Advance the Trade Agenda: Purge Negotiations of Investor-State Dispute Settlement*, Free Trade Bulletin*, No. 57; 04.3.2014

Ikenson, D., The Transatlantic Trade and Investment Partnership: A Roadmap for Success, *Free Trade Bulletin*, No. 55, 14.10.2013, available at http://www.cato.org/publications/free-trade-bulletin/transatlantic-trade-investment-partnership-roadmap-success (visited 28 April 2014)

Ioannidis, M., A Procedural Approach to the Legitimacy of International Adjudication: Developing Standards of Participation in WTO Law, *German Law Journal*, Vol. 12 (2011), pp. 1175 et seqq.

Jacobs/Roberts (eds.), *The Effect of Treaties in Domestic Law*, Sweet & Maxwell, London, 1987

Janis, M., Individuals as Subjects of International Law, *Cornell International Law Journal,* Vol. 17 (1984), pp. 61 et seqq.

Johnson, L. and Volkov, O., Investor-State Contracts, Host-State "Commitments" and the Myth of Stability in International Law, *American Review of International Arbitration*, Vol. 24 (2013), pp. 361 et seqq.

Johnson, L. and Volkov, O., State Liability for Regulatory Change: How International Investment Rules are Overriding Domestic Law, *Investment Treaty News,* Vol. 05 (2014); pp. 3 et seqq.

Kalb, J., Creating an ICSID Appellate Body, *UCLA Journal of International Law and Foreign Affairs,* Vol. 10 (2005), pp. 179 et seqq.

Kalicki, J., Counterclaims by States in Investment Arbitration, *Investment Treaty News*, Vol. 3 (2013), pp. 3 et seqq.

Kaufmann-Kohler, G., Is Consistency a Myth?, in: Banifatemi, Y. and Gaillard, E. (ed.), *Precedent in International Arbitration Law*, Juris Publishing,, Huntington, 2008, pp. 137 et seqq.

Kaufmann-Kohler, G., In Search of Transparency and Consistency: ICSID reform proposal, *Transnational Dispute Management*, Vol. 2(2005), pp. 1 et seqq.

Kingsbury, B. and Schill, S., Investor-State Arbitration as Governance: Fair and Equitable Treatment, Proportionality and the Emerging Global Administrative Law, in: van den Berg (ed.), *50 Years of the New York Convention: ICCA International Arbitration Conference*, Kluwer Law International, The Hague, 2009, pp 5 et seqq.

Kläger, R., *'Fair and Equitable Treatment' in International Investment Law*, Cambridge University Press, Cambridge, 2011

Knörich, J. / Berger, A., *Friends of foes? Interactions between Indonesia's international investment agreements and national law*, Studies of the German Development Institute, Bonn, 2014.

Knottnerus, R. and van Os, R., The Netherlands: A Gateway to 'Treaty Shopping' for Investment Protection, *Investment Treaty News*, Vol. 2 (2011), pp.10 et seqq.

Kuijper, P. J., *Investment Protection Agreements as Instruments of International Economic Law*, Study for the European Parliament.

Kulick, A., *Global Public Interest in International Investment Law*, Cambridge University Press, Cambridge, 2012

Kurtz, J., Australia's Rejection of Investor–State Arbitration: Causation, Omission and Implication, *ICSID Review*, Vol. 27 (2012), pp. 65 et seqq.

Kurtz, J., *Building Legitimacy Through Interpretation in Investor-State Arbitration: On Consistency, Coherence and the Identification of Applicable Law*, Melbourne Legal Studies Research Paper No. 670, Melbourne Law School

Laborde, G., The Case for Host State Claims in Investment Arbitration, *Journal of International Dispute Settlement*, Vol. 1 (2010), pp. 97 et seqq.

Laird, I. and Askew, R., Finality Versus Consistency: Does Investor-State Arbitration Need an Appellate System?, *Journal of Appellate Practice and Process*, Vol. 7 (2005), pp. 285 et seqq.

Lalive, P., Dérives arbitrales (II), ASA Bulletin 1/2006, available at http://www.lalive.ch/data/publications/pla_derives_arbitrales_2.pdf (visited 2 May 2014)

Legum ,B., Visualizing an Appellate System, in: Ortino (ed.), *Investment Treaty Law: Current Issues- Vol. 1*, British Institute of International and Comparative Law, London, 2006, pp. 121 et seqq.

Legum, B., Options to Establish an Appellate Mechanism for Investment Disputes, in: Sauvant/Chiswick-Patterson (eds.), *Appeals Mechanism in Investment Disputes*, Oxford University Press, New York, 2008, pp. 231 et seqq.

Levy/de Borja/Pucci (eds.), *Investment protection in Brazil*, Kluwer Law International, The Hague, 2013

Llamzon, A., Jurisdiction and Compliance in Recent Decisions of the International Court of Justice, *European Journal of International Law*, Vol. 18 (2007), pp. 815 et seqq.

Magraw, D. and Amerasinghe, N., American Branch ILA/American Society of International Law Joint Study on the Implementation of Transparency Norms in International Commercial Arbitration – Part I, *ILSA Journal of International & Comparative Law*, Vol. 15 (2008-2009), pp. 337 et seqq.

Malintoppi, L., Provisional Measures in Recent ICSID Proceedings: What Parties Request and what Tribunals Order, in: Binder/Kriebaum/Reinisch/Wittich (eds.), *International Investment Law for the 21st Century: Essays in Honour of Christoph Schreuer*, Oxford University Press, Oxford, 2009, pp. 157 et seqq.

Mann, H., Glamis Gold Ltd. v. United States of America, in: Bernasconi-Osterwalder/Johnson (eds.), *International Investment Law and Sustainable Development - Key cases from 2000–2010*, 2011, available at http://www.iisd.org/sites/default/files/pdf/2011/int_investment_law_and_sd_key_cases_2010.pdf (visited 02 May 2014), pp. 59 et seqq.

Marboe, I., State responsibility and Comparative state liability for administrative and legislative harm to economic interest, in: Schill (ed.), *International Investment Law and Comparative Public Law*, Oxford University Press, Oxford, 2010, pp. 377 et seqq.

Marshall, F., *Defining New Institutional Options for Investor-State Dispute Settlement*, IISD 2009, available at http://www.iisd.org/pdf/2009/defining_new_institutional_options.pdf (visited 2 May 2014)

Maupin., J., Transparency in International Investment Law: The Good, the Bad, and the Murky, in: Bianchi, A., Peters, A. (eds.), *Transparency in International Law*, Cambridge University Press, Cambridge, 2013, pp. 142 et seqq.

Maxwell, I., Transparency in Investment Arbitration – Are Amici Curiae the Solution?, *Asian International Arbitration Journal*, Vol. 3 (2007), pp. 176 et seqq.

McDonagh, T., *Unfair, Unsustainable and Under the Radar -* How Corporations use Global Investment Rules to Undermine a Sustainable Future, The Democracy Center, available at http://democracyctr.org/wp/wp-content/uploads/2013/05/Under_The_Radar_English_Final.pdf (visited 28 April 2014)

McLachlan, C. et al*., International Investment Arbitration: Substantive Principles*, Oxford University Press, Oxford, 2007

McLachlan, C., Investment Treaties and General International Law, *International & Comparative Law Quarterly*, Vol. 57 (2008), pp. 361 et seqq.

McLachlan, C., The Principle of Systematic Integration and Article 31 (3) (C) of the Vienna Convention, *International and Comparative Law Quarterly*, Vol. 54, 2005, pp. 279 et seqq.

McLachlan/Shore/Weiniger (eds.), *International Investment Arbitration - Substantive Principles*, Oxford University Press, Oxford, 2007

McRae, D., The WTO Appellate Body: A Model for an ICSID Appeals Facility?, *Journal of International Dispute Settlement*, Vol. 1 (2010), pp. 371 et seqq.

Mills, A., Antinomies of Public and Private at the Foundations of International Investment Law and Arbitration, *Journal of International Economic Law*, Vol. 14 (2011), pp. 469 et seqq.

Moïse Mbengue, M., Consent to Arbitration Through National Investment Legislation, *IISD Treaty News*, 19.7.2012, available at http://www.iisd.org/itn/2012/07/19/consent-to-arbitration-through-national-investment-legislation/#_ftn6 (visited 4 May 2014)

Montt, S., *State Liability in Investment Treaty Arbitration*, Hart Publishing, Oxford, 2009

Newcombe, A. and Paradell, L., *Law and practice of Investment Treaties: Standards of Treatment*, Kluwer Law International, The Hague, 2009

OECD, *Fair and Equitable Treatment Standard in International Investment Law*, OECD Working Papers on International Investment No. 2004/03, available at http://www.oecd.org/daf/inv/internationalinvestmentagreements/33776498.pdf (visited 5 May 2014)

OECD, *Transparency and Third Party Participation in Investor-State Dispute Settlement Procedures*, OECD Working Papers on International Investment No. 2005/01, available at http://www.oecd.org/daf/inv/internationalinvestmentagreements/34786913.pdf (visited 6 May 2014)

OECD, *Improving the System of Investor-State Dispute Settlement: An Overview*, OECD Working Papers on International Investment No. 2006/1, available at http://www.oecd.org/daf/inv/internationalinvestmentagreements/36052284.pdf (visited 5 May 2014)

O'Hara, E. and Ribstein, L., *The Law Market*, Oxford University Press, Oxford, 2009

Orakhelashvili, A., Principles of Treaty Interpretation in the NAFTA Arbitral Award on Canadian Cattlemen, *Journal of International Arbitration*, Vol. 26, 2009, pp. 159 et seqq.

Ortino, F., Refining the content and role of investment 'rules' and 'standards': A bolder approach to international investment treaty-making, *ICSID Review*, Vol. 28 (2013), pp. 152 et seqq.

Paulsson, J., Arbitration Without Privity, *ICSID Review*, Vol. 10 (1995), pp. 232 et seqq.

Paulsson, J., Avoiding Unintended Consequences, in: Sauvant/Chiswick-Patterson (eds.), *Appeals Mechanism in Investment Disputes*, Oxford University Press, New York, 2008, pp. 241 et seqq.

Paulsson, J., *Moral Hazard in International Dispute Resolution*, Inaugural Lecture as Holder of the Michael R. Klein Distinguished Scholar Chair, University of Miami School of Law, 29 April 2010

Peinhardt, C. and Allee, T., Failure to Deliver: The Investment Effects of US Preferential Economic Agreements, *World Economy*, Vol. 35 (2012), pp. 757 et seqq.

Pernice, I., *International Investment Protection Agreements and EU Law*, Study for the European Parliament.

Peterson, L., ICSID Tribunal Declines to Halt Investor Arbitration in Deference to State-to-State Arbitration, *INVEST-SD: Investment Law and Policy Weekly News Bulletin*, 19.12.2003, available at http://www.iisd.org/pdf/2003/investment_investsd_dec19_2003.pdf (visited 4 May 2014)

Pohl, J. et al., *Dispute settlement provisions in international investment agreements: A large sample survey*, OECD Working Papers on International Investment No. 2012/2, available at http://www.oecd.org/daf/inv/investment-policy/WP-2012_2.pdf (visited 28 April 2014)

Poulsen, L. et al., *Costs and Benefits of an EU-USA Investment Protection Treaty*, 2013, available at http://www.italaw.com/sites/default/files/archive/costs-and-benefits-of-an-eu-usa-investment-protection-treaty.pdf (visited 1 May 2014)

Poulsen, L., Bounded Rationality and the Diffusion of Modern Investment Treaties, *International Studies Quarterly,* Vol. 58 (2013), p. 1 et seqq.

Poulsen, L., *Submission to House of Lords EU Sub Committee on External Affairs: The Transatlantic Trade and Partnership Agreement*, 5 March 2014

Qureshi, A. and Khan S., Implications of an Appellate Body for Investment Disputes from a Developing Country Point of View, in: Sauvant/Chiswick-Patterson (eds.), *Appeals Mechanism in Investment Disputes*, Oxford University Press, New York, 2008, pp. 267 et seqq.

Randón de Sansó, H., Proposed Changes to the Investment Dispute-Resolution System: A South American Perspective, *Investment Treaty News*, Vol. 5 (2014), pp. 10 et seqq.

Reed, L. and Bray, D., Fair and Equitable Treatment: Fairly and Equitably Applied in Lieu of Unlawful Indirect Expropriation?, in: Rovine (ed.), *Contemporary Issues in International Arbitration and Mediation: The Fordham Papers 2007*, Martinus Nijhoff Publishers, Leiden, 2007, pp. 13 et seqq.

Reed, L., More on Corporate Criticism of International Arbitration, Kluwer Arbitration Blog, 16 July 2010, available at http://kluwerarbitrationblog.com/blog/2010/07/16/more-on-corporate-criticism-of-international-arbitration/ (visited 2 May 2014)

Reisman, W. and Robert, R., Indirect Takings and its Valuation in the BIT generation, *British Yearbook of International Law*, Vol. 74 (2003), pp. 115 et seqq.

Reusch, R., *Die Legitimation des WTO-Streitbeilegungsverfahrens*, Duncker & Humblot, Berlin, 2007

Roberts, A., Power and Persuasion in Investment Treaty Interpretation: The Dual Role of States, *American Journal of International Law*, Vol. 104 (2010), pp. 179 et seqq.

Roberts, A., State-to-State Investment Treaty Arbitration: A Hybrid Theory of Interdependent Rights and Shared Interpretive Authority, *Harvard International Law Journal*, Vol. 55 (2014), pp. 1 et seqq.

Ruffert, M., Diplomatischer und konsularischer Schutz, in: Isensee/Kirchhof (eds.), *Handbuch des Staatsrechts*, Band X, C. F. Müller, Heidelberg, 3rd ed., 2012, pp. 67 et seqq.

Sackmann, J., *Transparenz im völkerrechtlichen Investitionsschiedsverfahren*, Nomos, Baden-Baden, 2012

Salacuse, J., *The Three Laws of International Investment*, Oxford University Press, Oxford, 2013

Salles, L. E., *Forum Shopping in International Adjudication: The Role of Preliminary Objections*, Cambridge University Press, Cambridge, 2014

Sampliner, G., Arbitration of Expropriation Cases Under U.S. Investment Treaties - A Threat to Democracy or the Dog That Didn't Bark?, *ICSID Review*, Vol. 18 (2003), pp. 1 et seqq.

Sasse, J., *An Economic Analysis of Bilateral Investment Treaties*, Gabler, Wiesbaden, 2011

Sattorova, M., Denial of Justice Disguised? – Investment Arbitration and the Protection of Foreign Investors from Judicial Misconduct, *International and Comparative Law Quarterly*, Vol. 61 (2012), pp. 223 et seqq.

Sauvant (ed.), *Appeals Mechanism in International Investment Disputes*, Oxford University Press, New York, 2008

Schill, S., Enhancing International Investment Law's Legitimacy: Conceptual and Methodological Foundations of a New Public Law Approach, *Virginia Journal of International Law*, Vol. 52 (2011), pp. 57 et seqq.

Schill, S., Glamis Gold Ltd. v. United States – Award, *The American Journal of International Law*, Vol. 104 (2010), pp. 253 et seqq.

Schill, S., *The Multilateralization of International Investment Law*, Cambridge University Press, New York, 2009

Schreuer, C. and Weiniger, M., *Conversations Across Cases – Is There a Doctrine of Precedent in Investment Arbitration?*, pp. 1 et seqq., available at http://www.univie.ac.at/intlaw/conv_across_90.pdf (visited 25 July 2014)

Schreuer, C. et al, *The ICSID Convention: A Commentary*, Cambridge University Press, Cambridge, 2nd Edition, 2009

Schreuer, C., Calvo's Grandchildren: The Return of Local Remedies in Investment Arbitration, *The Law & Practice of International Courts and Tribunals*, Vol. 4 (2005), pp. 1 et seqq.

Schreuer, C., Investment arbitration based on national legislation, in Hafner/Matscher/Schmalenbach (eds.), *Völkerrecht und die Dynamik der Menschenrechte - Liber Amicorum Wolfram Karl*, Facultas, Wien, 2012, pp. 527 et seqq.

Schreuer, C.,*The ICSID Convention: A Commentary*, Cambrindge University Press, Cambridge, 2nd Edition, 2009

Schultz, Z., Against Consistency in Investment Arbitration, in: Douglas/Pauwelyn/Viñuales (eds.), *The Foundations of International Investment Law,* Oxford University Press, Oxford, 2014, pp. 297 et seqq.

Schwebel, S., The Overwhelming Merits of Bilateral Investment Treaties, *Suffolk Transnational Law Review*, Vol. 32 (2009), pp. 263 et seqq.

Shelton, D., The Participation of Non-government Organizations in. International Judicial Proceedings, *American Journal of International Law*, Vol. 88 (1994), pp. 611 et seqq.

Semertzi, A., The Preclusion of Direct Effect in the Recently Concluded EU Free Trade Agreements, *Common Market Law Review*, Vol. 51 (2014), pp. 1125 et seqq.

Shihata,I., Towards a Greater Depoliticization of Investment Disputes: The Roles of ICSID and MIGA, *ICSID Review*, Vol. 1 (1986), pp. 1 et seqq.

Sinclair, A. et al., ICSID arbitration: how long does it take? *Global Arbitration Review*, Vol. 4 (2009), pp. 14 et seqq.

Sloss (ed.), *The Role of domestic courts in treaty enforcement*, Cambridge University Press, Cambridge, 2009

Smith, D., Shifting Sands: Cost-and-Fee Allocation in International Investment Arbitration, *Virginia Journal of International Law*, Vol. 51 (2011), pp. 749 et seqq.

Sornarajah, M., A Coming Crisis: Expansionary Trends in Investment Treaty Arbitration, in: Sauvant (ed.), *Appeals Mechanism in International Disputes*, Oxford University Press, New York, 2008, pp. 39 et seqq.

Sornarajah, M., *The International Law on Foreign Investment*, Cambridge University Press, New York, 3th Edition, 2010

Sornarajah, M., The Retreat of Neo-Liberalism in Investment Treaty Arbitration, in: Rogers/Alford (eds.), *The Future of Investment Arbitration*, Oxford University Press, New York, 2009, pp. 199 et seqq.

Spears, S., The Quest for Policy Space in a new Generation of International Investment Agreements, *Journal of International Economic Law*, Vol. 13 (2010), pp. 1037 et seqq.

Stone Sweet, A., Investor-State Arbitration: Proportionality's New Frontier, *Law & Ethics of Human Rights*, Vol. 47 (2010), pp. 47 et seqq.

Sullivan, K., Foreword: the Justices of Rules and Standards, *Harvard Law Review*, Vol. 106 (1992), pp. 22 et seqq.

Sureda, A., Investment Treaty Arbitration – Judging Under Uncertainty, Cambridge University Press, Cambridge, 2012

Sureda, A., Precedent in Investment Treaty Arbitration, in: Binder et al. (eds.), *International Investment Law for the 21st Century: Essays in Honour of Schreuer*, C., Oxford University Press, Oxford, 2009, pp. 830 et seqq.

Tams, C., An Appealing Option? The Debate about an ICSID Appellate Structure, in: Tietje, et al. (eds.), *Essays in Transnational Economic Law*, No. 57/June 2006, available at http://telc.jura.uni-halle.de/sites/default/files/altbestand/Heft57.pdf (visited 2 May 2014)

Tejera Pérez, V., Do Municipal Laws Always Constitute a Unilateral Offer to Arbitrate? The Venezuelan Investment Law: A Case Study, in: Laird/Weiler (eds.), *Investment Treaty Arbitration and International Law*, JurisNet, Huntington, 2008, pp. 89 et seqq.

Ten Cate, I., International Arbitration and the Ends of Appellate Review, *New York University Journal of International Law and Politics*, Vol. 44 (2012), pp. 1109 et seqq.

Ten Cate, I., The Costs of Consistency: Precedent in Investment Treaty Arbitration, *Columbia Journal of Transnational Law*, Vol. 51 (2013), pp. 418 et seqq.

Trachtman, J., The Domain of WTO Dispute Resolution, *Harvard International Law Journal*, Vol. 40 (1999), pp. 333 et seqq.

Trakman, L., Choosing Domestic Courts Over Investor–State Arbitration: Australia´s Repudiation of the Status Quo, *UNSW Law Journal*, Vol. 35 (2012), pp. 979 et seqq.

UKIT Trade Services, *Establishing a business presence in the USA*, London, 2013, available at https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/301343/Establishing_a_Business_Presence_in_the_USA.pdf (visited 2 May 2014)

Ulmer, N., The Cost Conundrum, *Arbitration International*, Vol. 26 (2010), pp. 221 et seqq.

Umbricht, G., An 'Amicus Curiae Brief' on Amicus Curiae Briefs at the WTO, *Journal of International Economic Law*, Vol. 4 (2001), pp. 773 et seqq.

Van Alstine, M., The Role of Domestic Courts in Treaty Enforcement: Summary and Conclusions, in: Sloss (ed.), *The Role of domestic courts in treaty enforcement*, Cambridge University Press, Cambridge, 2009, pp. 555 et seqq.

Van Harten, G., Arbitrator Behaviour in Asymmetrical Adjudication - An Empirical Study of Investment Treaty Arbitration, *Osgoode Hall Law Journal*, Vol. 50 (2012), pp. 211 et seqq.

Van Harten, G., *Beware the discretionary choices of arbitrators*, Columbia FDI Perspectives No. 110, 2013

Van Harten, G., *Investment Treaty Arbitration and Public International Law*, Oxford University Press, Oxford, 2007

Van Harten, G., Perceived Bias in Investment Treaty Arbitration, in: Waibel/Kaushal/Chung/Balchin (eds.), *The Backlash against Investment Arbitration: Perceptions and Reality*, Kluwer Law International, The Hague, 2010, pp. 433 et seqq.

Van Harten, G., *Sovereign Choices and Sovereign Constrains - Judicial Restraint in Investment Treaty Arbitration*, Oxford University Press, Oxford, 2013

Van Harten, G., The Boom in Parallel Claims in Investment Treaty Arbitration, Investment Treaty News, Vol. 5 (2014), pp. 7 et seqq.

Van Harten, G.,*A Case for International Investment Court*, Inaugural Conference of the Society for International Economic Law, 16.7.2008, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1153424 (visited 2 May 2014)

Vandevelde, K., A Comparison of the 2004 and 1994 US Model BITs, in: Sauvant (ed.), *Yearbook on International Investment Law and Policy 2008-2009*, Oxford University Press, New York, 2009, p. 283

VanDuzer, J. et al., '*Integrating Sustainable Development into International Investment Agreements – A Guide for Developing Countries',* Commonwealth Secretariat, August 2012, available at http://www.iisd.org/pdf/2012/6th_annual_forum_commonwealth_guide.pdf (visited 28 April 2014)

VanDuzer, J., Enhancing the Procedural Legitimacy of Investor-State Arbitration Through Transparency and Amicus Curiae Participation, *McGill Law Journal*, Vol. 52 (2007), pp. 681 et seqq.

Verband der Chemischen Industrie e.V,, *Fragen und Antworten der Chemischen Industrie zu TTIP*, 2014, available at https://www.vci.de/Downloads/PDF/Fragen%20und%20Antworten%20der%20chemischen%20Industrie%20zu%20einem%20Freihandelsabkommen%20EU%20USA.pdf (visited 1 May 2014)

von Bogdandy, A., Law and Politics in the WTO - Strategies to Cope with a Deficient Relationship, *Max Planck Y.B. U.N. L.*, Vol. 5 (2001), pp. 609 et seqq.

von Bogdandy, A. and Venzke, I., Beyond Dispute: International Judicial Institutions as Lawmakers, *German Law Review*, Vol. 12 (2011), pp. 979 et seqq.

Voon, T. and Mitchell, A., Implications of international investment law for plain tobacco packaging: lessons from the Hong Kong–Australia BIT, in: Voon/Mitchell/Libermann/Ayres (eds.), *Public Health and Plain Packaging of Cigarettes: Legal Issues*, Edward Elgar, Cheltenham, 2012, pp. 137 et seqq., also available at SSRN http://ssrn.com/abstract=2377919 (visited 1 May 2014)

Waibel, M., International Investment Law and Treaty Interpretation, in: Hofmann/Tams (eds.), *International Investment Law and General International Law: From Clinical Isolation to Systemic Integration*, Nomos, Baden-Baden, 2011, pp. 29 et seqq.

Waibel, M., *Uniformity versus Specialisation: A Uniform Regime of Treaty Interpretation?*, University of Cambridge Faculty of Law Legal Studies Research Paper Series, Paper Nr. 54/2013, November 2013, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2353833 (visited 22 May 2014).

Wälde, T., Confidential Awards as Precedent in Arbitration: Dynamics and Implication of Award Publication, in: Banifatemi/Gaillard (eds.), *Precedent in International Arbitration Law*, Juris Publishing, Huntington, 2008, pp. 113 et seqq.

Wälde, T., Transparency, Amicus Curiae Briefs and Third Party Rights ,*The Journal of World Investment & Trade*, Vol. 5 (2004), pp. 337 et seqq.

Wells, L., Backlash to Investment Arbitration: Three Causes, in: Waibel/Kaushal/Chung/Balchin (eds.), *The Backlash against Investment Arbitration: Perceptions and Reality*, Kluwer Law International, The Hague, 2010, pp. 341 et seqq.

Welsh, N and Schneider, A., The Thoughtful Integration of Mediation into Bilateral Investment Arbitration, *Harvard Negotiation Law Review*, Vol. 18 (2013), pp. 71 et seqq.

Wolff, J., Nicht-öffentliche Schiedsverfahren mit Beteiligung der öffentlichen Hand am Maßstab des Verfassungsrechts, *Neue Zeitschrift für Verwaltungsrecht*, 2012, pp. 205 et seqq.

Woolfrey, S., in: Hindelang/Krajewski (eds.), *Shifting Paradigms in International Investment Law Law (provisional title)*, Oxford University Press, forthcoming 2015.

Yackee, J., Conceptual Difficulties in the Empirical Study of Bilateral Investment Treaties, *Brooklyn Journal of International Law*, Vol. 33 (2008), p. 405 et seqq.

Yackee, J., Do Bilateral Investment Treaties Promote Foreign Direct Investment? - Some Hints from Alternative Evidence, *Virginia Journal of International Law*, Vol. 51 (2010), pp. 397 et seqq.

Yannaca-Small, C., Consolidation of Claims: A Promising Avenue for Investment Arbitration?, in: OECD (ed.) *International Investment Perspectives*, 2006, available at http://www.oecd.org/investment/internationalinvestmentagreements/40079691.pdf, (visited 22 May 2014).

Yimer, B. et al., *Application of International Investment Agreements by Domestic Courts*, 2011, available at http://graduateinstitute.ch/files/live/sites/iheid/files/sites/ctei/shared/CTEI/Law%20Clinic/Memoranda%202011/UNCTAD_Memo.pdf (visited 4 May 2014)

# PART III: STUDY ON INTERNATIONAL INVESTMENT PROTECTION AGREEMENTS AND EU LAW

*by Dr Ingolf Pernice*

## Abstract

Investment Protection Agreements with investor-state dispute settlement arrangements concluded by the European Union with third states present special characteristics compared to traditional bilateral investment treaties concluded between states. Beside controversial issues in the current debate, like the preservation of the right to regulate, tensions with regard to the functioning of the EU state aid regime, the principle of non-discrimination in the internal market and, in particular, the autonomy of the EU legal order need to be addressed. The present study suggests considering a more EU model-like solution to the problems and, if this is politically not available, to choose for a differentiated system including safeguards for the prerogatives of the ECJ regarding the interpretation of Union law, but also a number of institutional and procedural provisions such as the establishment of a standing court as well as the possibility for a „Special Committee" to give guidance on the application of the agreement and harmonised policies. Transparency, public participation and openness in the negotiation of the agreement as well as for the proceedings at the court should be provided for, as well as transparent and democratic procedures for the choice of judges or arbitrators. A new negotiation culture in international relations as part of global governance should be developed in accordance with the principles set out in Article 21 TEU.

## EXECUTIVE SUMMARY

Given the multilevel structure of the European Union and its legal system the relationship between EU law and international investment protection agreements concluded by the EU with third countries has certain characteristics and poses a number of special problems. One is the question of competence for the negotiation and conclusion of such agreements. The present study accepts that the competences of the EU fully cover the contents of the investment protection agreements (IPAs), as far as known, and that this competence is exclusive. Another is to clarify, in each given case, who – the EU or a Member State – is responsible for any alleged violation of a standard established by the IPA.

As an integral part of Union law, the provisions of these agreements, under the conditions laid down by the ECJ and unless otherwise provided, may be accorded direct effect by the ECJ and enjoy primacy over the law of the Member States. Reciprocity should be ensured insofar. Provisions need to be included to avoid, to the greatest possible extent, any "regulatory chill" for the European and for the national legislators fallowing from the threat that democratically decided policies are found to be violating standards set by the IPA under ISDS rules. In particular, with a view to ensuring reciprocity in the relationship with the third countries involved, express provisions should be included in IPAs providing for – or excluding – their direct effect in the legal system of the contracting parties.

Investor-state-dispute-settlement (ISDS) clauses in IPAs provide for foreign investors special procedural rights and a remedy with regard to the respect of the standards established by the IPA that could result in a competitive privilege vis-à-vis domestic investors, disrupt the functioning of the EU state aid regime and be in tension with the autonomy of the EU legal order. The present study discusses several solutions. Given the very different development of the legal systems around the globe, a "one-size-fits-all" solution does not seem to be a choice. With countries meeting highly developed standards and values comparable to the EU, establishing a "EU-model" system based upon non-discrimination, direct effect of the market freedoms and equal protection for all investors throughout the (common) market, some provision for common decision-making on standards and for judicial review would probably solve

most of the problems. If this is unrealistic, and for other countries, a local remedies rule or – at least – a local remedies privilege should be considered as necessary part of the ISDS. This would not only help clarifying who, the EU or a Member State, is responsible for any measure at stake. It would also give the ECJ an opportunity to decide upon the validity and interpretation of any EU law provision at stake before an arbitration tribunal may base its award on its own understanding. Neither this solution nor a "prior involvement procedure", though, would exclude that a tribunal bases its decisions on substantive EU law or on the conditions for the liability of the EU or Member States on an interpretation that could be in tension with the interpretation of the ECJ and, thus, with the autonomy of EU law.

An ISDS-clause in an IPA should preferably establish a standing court the judges of which are to be selected under rule-based democratic and transparent systems and subject to a strong ethical code. This court would develop a reliable case-law in public and participatory proceedings, so to ensure an open discourse on the interpretation of the underlying legal provisions, legal certainty and an environment of trust in the law and the institutions established by the agreements. A joint or "special committee" composed by representatives of the contracting parties and the president of the court could help, with a view to develop a spirit of trust and cooperation, to come to amicable settlements even before legal proceedings are initiated, assess any threat by such proceedings to the regulatory autonomy of the contracting parties and give guidance on the "authentic" interpretation of any relevant clauses of the IPA and, as appropriate, suggest harmonised approaches for legislative measure in all relevant policy areas.

# 1.    INTRODUCTION

## 1.1    General remarks

International Investment Protection Agreements (IPAs) must be recognized as an important step forward in international law to give international law more bite. Allowing for arbitration under an Investor State Dispute Settlement (ISDS) provisions with final awards to be enforced at whatever place in the world means **taking law seriously**. It provides investors with legal certainty and, thus, establishes a reliable foundation for some legal certainty and trust, which is a crucial condition for prosperous foreign investment.

It is also a step towards developing a global legal order **taking people seriously** as foreign nationals would not depend entirely on the will of the sovereign in the host country; instead, they are recognized as holding individual and enforceable (procedural) rights independently of the respective national system of judicial review, eventually even against what the actual government or legislator considers to be opportune. This is an important development, since – in contrast to international law in general – enforcement of rights against the host state under the IPA is not left only to the government of the country of origin and to diplomatic consultations between the two governments involved, but the individual concerned has legal standing in her own right.[1]

---

[1] Divergent views on the question whether the rights in substance are those of the home country and only exercised by the investor, or the investor defends her own rights established by the IPA, will not be dealt with here. The general position seems to be that the questions are of an international law nature and, therefore, issues among states (see Ian Brownlie, *Principles of Public International Law*, 7th ed. (2008), pp. 519-551, where the key reference seems to be diplomatic protection, ibid. p. 519). The issues at stake, however – such as national treatment, international minimum standards, denial of justice, expropriation – relate to individuals, and it is difficult to deny that individual (procedural) rights are involved, at least when, by ISDS-clauses, the individual investor concerned is given legal standing for defending her property, legitimate expectations, access to justice etc.

Yet, there are tensions between IPAs and **national sovereignty**. While it is true that concluding international treaties is an expression of national sovereignty, rather than limiting it, this assumption is questionable if external bodies are given the power to assess and effectively sanction acts of the "sovereign".[2] A state party to IPAs may therefore be limited by such chilling effects in the democratic choice of its policies; the more foreign investment it has accepted, the more costly and difficult certain political choices may become with a view to the damages or compensation expected to be awarded by arbitral tribunals. Such financial risks may even reach prohibitive levels.[3] On the other hand, national policies have an impact on people in and of other states, "external effects" which cannot be neglected. Foreign investment and the legitimate interests of the investor and its state of origin for protection is but one example. Within a deeply interconnected global system these effects need to be taken into account also in terms of democratic legitimation.[4]

As a result, IPAs with ISDS-clauses must be drafted so as to ensure the legitimate rights of foreign investors and establish the level of trust necessary for economically meaningful investment, but at the same time strike a balance with the protection of the democratic and legal autonomy of each state party, so as to leave enough leeway to articulate and implement policies pursuing in the name of national public interest. Such a balance seems to require that:

- as a general rule there is no discrimination of, nor privilege for foreign investors as compared to nationals or residents;

- legitimate expectations and rights of foreign investors regarding the conditions for operating in the host country are honoured;

- state parties to the IPAs are not discouraged to articulate and implement democratically decided policies of public interest;

- as fundamental public interests and/or individual rights are at stake, dispute settlement must be public, transparent and organized through legitimate bodies.

## 1.2        Investment Protection Agreements of the EU

The abovementioned principles apply to states and to the EU accordingly. To a certain extent they are reflected in what is described as "the Brussels consensus".[5] It is important to note that specific reference is made to the objectives of EU external action laid down in Article 21 TEU. Not only the promotion of democracy, human rights and sustainable development[6] are among these objectives, but also to strive for "an international system based on stronger multilateral cooperation and good global governance

---

[2] See also Santiago Montt, *State Liability in Investment Treaty Arbitration. Global Constitutional and Administrative Law in the BIT Generation*, Hart Publishing 2009, p. 125, who talks about „Trading Off Sovereignty for Credibility".

[3] See on this Brownlie (note 1), p. 537, on nationalization which is possible if prompt and adequate compensation is paid: „In reality this renders any major economic or social programme impossible, since few states can produce the capital value of a large proportion of their economies promptly".

[4] See for further developments with more references Ingolf Pernice, Domestic courts, constitutional constraints and European democracy: What solution for the crisis?, in: Maurice Adams, Federico Fabbrini & Pierre Larouche (eds.), *The Constitutionalization of European Budgetary Constraints* (Hart Publishing 2014), p. 297, 301-303.

[5] Frank Hoffmeister and Gabriela Alexandru, A First Glimpse of Light on the Emerging EU Model BIT, in: The Journal of World Investment & Trade Vol. 15 (2014), forthcoming, para. II.4., summarise this compromise with five points:
(1) provide a high level of protection for EU investors through standard clauses;
(2) respect the right to regulate in order to meet legitimate public policy objectives;
(3) increase legal certainty for both investors and host states;
(4) be consistent with broader principles and objectives of the Union's external action; and
(5) include a state-of-the-art dispute settlement chapter with investor-to-state procedures.

[6] For modalities of the integration of this objective into European IPAs in particular see Hoffmeister and Alexandru (note 5), para. III.8.

(Article 21 (2) (h) TEU). New model IPAs negotiated by the EU worldwide could be a way forward. In developing this new model, nevertheless, account has to be taken of the fact that the situation of the EU as a party to IPAs is of a specific nature. The EU is not a (federal) state and whatever investment is made within the EU takes necessarily place on the territory and, therefore, within the jurisdiction of at least one of its Member States. Two interrelated sets of norms are applicable, the internal law of that Member State and Union law. These peculiarities of the EU are important when discussing general issues of IPAs and, in particular, their ISDS-clauses.

Questions arise in particular with regard to the competence and the responsibilities of the EU and the Member States (infra 1.), the scope of IPAs and their impact on national policies and freedom of action (infra 2.), and the direct effect of these agreements and their status in the national legal systems (infra 3.).

### 1.2.1    EU competence to conclude direct investment treaties

There is the question of who is competent to conclude IPAs with third countries and who is responsible for their proper implementation, at the legislative and at the administrative level. The answer seems to be clear regarding foreign *direct* investment involving a longer lasting effective participation in the management or control of the company concerned.[7] Articles 3 (1) (e) and 207 (1) TFEU confer an exclusive competence upon the EU. Unless expressly empowered by the EU or regarding the administrative implementation of EU acts, Member States may not take action in this field, e.g. negotiate bilateral agreements with third states. The situation is less clear, however, regarding *portfolio*-investments. The specific provisions of Articles 63-66 TFEU on free movement of capital within the EU and with third countries are applicable here, though there seems to be little room left for national action or agreements with third countries.[8] What follows is that the EU has competence to conclude IPAs including ISDS-clauses with all possible implications on policy choices and, therefore, the exercise of democratic sovereignty at the national level.[9]

IPAs include provisions on direct or indirect expropriation. With regard to the guaranty in Article 345 TFEU read together with Article 207 (6) TFEU for the rules in Member States governing the system of property ownership it could be argued that insofar the EU has no competence and IPAs would, therefore, have to be concluded in the form of mixed agreements and, thus, with the participation of the Member States and ratification in accordance with their respective constitutional provisions. This would be true, however, only if the agreements were about to affect the national systems of property ownership. This notion has got a restrictive interpretation, however, and would not exclude the

---

[7] For a definition see ECJ Case C-446/04, *Test Claimants in the FII Litigation* [2006] ECR I-11814, paras. 177-182, with reference to the definitions in Annex I of Directive 88/361/EEC; this definition is broadly applied also for interpreting Article 307 (1) TFEU, see Marc Bungenberg, § 13 Europäischer Internationaler Investitionsschutz, in: Andreas von Arnauld (ed.), Europäische Außenbeziehungen. Enzyklopädie Europarecht, vol 10 (2014), p. 743, 748-749. See also Frank Hoffmeister and Günes Ünüvar, "From BITS and Pieces towards European Investment Agreements", in: Marc Bungenberg, August Reinisch and Christian Tietje (eds.), EU and Investment Agreements: Open Questions and Remaining Challenges (Nomos 2013), p. 57, 65.
[8] See the Explanatory Memorandum of the Commission on the Proposal for a regulation establishing a framework for managing financial responsibility linked to investor-state dispute settlement tribunals established by international agreements to which the European Union is party, COM(2012) 335 final, para. 1.2.
[9] See also Hindelang, "Der primärrechtliche Rahmen einer EU-Investitionsschutzpolitik: Zulässigkeit und Grenzen von Investor-Staat-Schiedsverfahren aufgrund künftiger Abkommen", in: Marc Bungenberg & Christoph Herrmann (eds.), Die gemeinsame Handelspolitik der Europäischen Union nach Lissabon (Nomos 2011), pp. 159-164. Hoffmeister and Ünüvar (note 7), p. 66.

application of the general provisions of the Treaties on non-discrimination, the freedom of establishment or the free movement of capital.[10]

Within the limits imposed by the autonomy of Union law and the functions of the ECJ (to be dealt with below) this competence of the EU includes the power to confer jurisdiction for the interpretation and application of IPAs to dispute settlement bodies at the international level.

### 1.2.2    Scope of EU investment protection treaties and national competences

The binding effect upon national policies is of a general nature, as IPAs do not distinguish among policy areas but just set criteria like non-discrimination, fair and equitable treatment, access to justice, etc.; these criteria may be applied, in a given case, equally to policy areas where the EU is competent to legislate (e.g. agriculture, environmental protection, consumer protection) and where Member States have kept their legislative autonomy (e.g. economic, fiscal, social, culture, education, health policies, property ownership). Limiting effects of IPAs concluded by the EU on sovereign policies including the national level, therefore, may well touch upon policy areas that remain within the scope of national competence. The EU draft proposal on trade in services, investment and e-commerce for the TTIP negotiations of 2nd July 2013, for instance, excludes the audio-visual from the liberalisation of investments and, thus, indirectly also from the provisions on investment protection.[11] Other areas like arms industries could be excluded accordingly, though problems may arise in cases of overlapping, e.g. if business activities relate to more than one policy field. But this is a question of political preferences and would not have implications on the question of EU competence. As long as trade in goods or services are at stake the exclusive competence of the EU under Article 207 (1) TFEU leaves no room, in any event, for claiming that effects of IPAs on areas of national competence require the agreements to be concluded as mixed agreements.[12]

### 1.2.3    Primacy and direct effect of EU direct investment treaties

Under Article 216 (2) TFEU agreements concluded by the Union are binding upon the institutions and its Member States. According to the established case-law of the European Court of Justice (ECJ) they become an integral part of the Union legal order.[13] Their provisions could, if the special conditions[14] are

---

[10] ECJ Case C-92/92 and C- 326/92, *Phil Collins* [1993] ECR I-5171, para. 22; ECJ Case C-30/90, *Commission/United Kingdom* [1992] ECR I-858, para. 18: „…*the provisions of the Treaty, and in particular Article 222 according to which the Treaty in no way prejudices the rules in Member States governing the system of property ownership, cannot be interpreted as reserving to the national legislature, in relation to industrial and commercial property, the power to adopt measures which would adversely affect the principle of free movement of goods within the common market as provided for and regulated by the Treaty." See also Hoffmeister and Ünüvar* (note 7), p. 68-69, and *Bungenberg* (note 7), p. 749. *For* the debate regarding property and the question weather an IPA concluded in conformity with Articles 207, 208 and 218 TFEU may "prejudice" these national rules, unless the Member States participate, as contracting parties, to the agreement see: Hindelang, *ibid.*, p. 163; see further the Explanatory Memorandum (note 8), para. 1.2., and 3.

[11] For the English draft text see:  http://www.bilaterals.org/IMG/pdf/eu-kommission-position-in-den.pdf.: Chapter II Investment Section 1 Liberalisation of Investments Article 3: Scope, Abs. 2: "The provisions of the Section shall not apply to audio-visual services". The CETA-Agreement, as published by the Commission within the Consultation procedure launched in March 2014 (http://trade.ec.europa.eu/doclib/docs/2014/march/tradoc_152280.pdf#Question1) provides in Article X: Reservations and Exceptions following § 5: "Audiovisual: For the EU, the Section on Establishment and Section on Non-Discriminatory Treatment do not apply to measure with respect to Audiovisual services".

[12] For the aspect of Article 345 TFEU see, however, *supra* note 9. That Art. 207 TFEU further contains the competence to include ISDS mechanisms in future EU IPAs is uncontested, Stephan W. Schill, "Luxembourg Limits: Conditions for Investor-State Dispute Settlement under Future EU Investment Agreements, in: Marc Bungenberg, August Reinisch and Christian Tietje (eds.), *EU and Investment Agreements: Open Questions and Remaining Challenges* (Nomos 2013), p. 40.

[13] Established case law since ECJ Case 181/73 *Haegeman* [1974] ECR 449, para. 5; see more recently ECJ Case C-211/01 *Commission v Council* [2003] I-8913, para. 57.

[14] ECJ Case 12/86 *Demirel* [1997] ECR 3719, para. 14: " A provision in an agreement concluded by the Community with non-Member countries must be regarded as being directly applicable when, regard being had to its wording and the purpose

met, be invoked against acts of secondary EU law to the extent that these acts are in conflict with them.[15] The ECJ has recognised direct effect to provisions of association and free trade agreements, even if the same is not recognized by the other contracting party.[16] The contracting parties, the ECJ affirms, are free to determine in the agreement what legal effect its provisions shall have in their respective internal legal systems. More importantly, the provisions of international agreements – including decisions by legal bodies established through the treaty – would take part in the principles of primacy and direct effect of Union law.[17] It is well established that primacy is to be accorded by national or Union judges even with regard to national constitutional law.[18] Where investors can invoke a violation of an IPA concluded by the EU with their country of origin or establishment, it follows from these principles that not only secondary EU legislation but also the national measure at stake, be it administrative, adjudicative or legislative – even on the constitutional level, would be inapplicable – and not only give a right to compensation – simply because it amounts to an infringement of the IPA that forms part of the Union's legal order and thus takes part in the primacy of Union law.[19]

By virtue of taking part in the primacy of EU law, IPAs concluded by the EU, thus, seem to pose greater difficulties regarding national sovereignty and regulatory autonomy than state-to-state bilateral investment treaties (BITs). And their general scope reaches policy areas beyond what is covered by the substantive powers of the EU. Third state investors would be provided with rights within the jurisdiction of the Member States, which they would not benefit from in national BITs, and be bestowed with rights that EU investors in a third country party to an EU-agreement would not enjoy.

This "overdrive"-effect brought about by the incorporation of international agreements into EU law at the national level, of course, only applies if a direct effect is accorded to the substantial provisions of the IPAs or to decisions of arbitral tribunals. As long as the ECJ, as is its rationale in WTO matters, was to refuse doing so,[20] there would be no problem. But the situation may not be comparable to the WTO system, so that it is most likely that ISDS-clauses would be recognised to have direct effect.[21]

---

and nature of the agreement itself, the provision contains a clear and precise obligation which is not subject, in its implementation or effects, to the adoption of subsequent measure". See also Francesca Martinez, "Direct effect of International Agreements of the European Union", in: *European Journal of International Law* 25 (2014), 129.

[15] ECJ Case C-366/10 *Air Transport Association of America*, nyr, paras. 50 et seq.

[16] ECJ Case 104/81 *Kupferberg*, [1982] ECR 3641, paras 18, 26. See also Koen Lenaerts and Piet Van Nuffel, *European Union Law*, 3rd ed. (Sweet & Maxwell 2011), para. 22-045.

[17] See Wolfgang Weiß, "Human Rights in the EU: Rethinking the Role of the European Convention on Human Rights after Lisbon", in: *European Constitutional Law Review* 7 (2011), 64, 72 & 91.

[18] ECJ Case 11/70 *Internationale Handelsgesellschaft* [1970] ECR 1125, para. 3. For the pivotal role EU law befits the legal concept of primacy regarding external influences see Christina Eckes, "Protecting Supremacy from External Influences: A Precondition for a European Constitutional Order?", *European Law Journal* 18 (2012), pp. 230-50.

[19] If, however, the IPA represents a mixed agreement by both the EU and the Member States, a qualification is needed: in the case of mixed agreements, the primacy of the IPA as forming an integral part of the EU legal order pursuant to Art. 216(2) TFEU is, of course, restricted to the EU's competences as the federal order of competences between the Union and the Member States may not be altered through the conclusion of international agreements and thereby bypassing procedural rules for Treaty amendments. Therefore, within the ambit of the Member States' exclusive competences the rank of an IPA relative to national law is not ruled by EU law; insofar national law must determine the rank of the IPA provisions within the Member States' legal orders. Here, the situation is still what it was in the past in the IP sector, see ECJ Case C-431/05 *Merck Genéricos* [2007] ECR I-7026, paras. 34, 47,

[20] The ECJ refuses to accord direct effect in WTO matters (including the decisions of the WTO Panels and Appellate Body) because of the specificity of the obligations and the enforcement mechanism as well as for a lack of reciprocity. Indirectly already ECJ Joined Cases 21-24/72 *International Fruit*, [1972] ECR 1219, paras. 19 et seq.; more expressly Case C-377/02 *Van Parys* [2005] ECR I-1465, paras. 51-54. See, for an assessment of the ECJ's jurisprudence, Nikos Lavranos, "The CJEU's Relationship with Other International Courts and Tribunals", in: Karsten Hagel-Sorensen et al. (eds.), *Europe: The New Legal Realism – Essays in Honour of Hjalte Rasmussen* (Djof Publ. 2010), pp. 395 et seq.

[21] For the positive tendency of the ECJ to recognise the direct effect of provisions of international agreements of the EU see: Francis G. Jacobs, The Internal Legal Effects of the EU's International Agreements and the Protection of Individual Rights, in:

To apply the principles of direct effect and primacy unilaterally within the EU with no reciprocity, however, would not be a satisfying result. A solution could be to expressly exclude any direct effect of the provisions of the IPAs and, in particular, of decisions taken under ISDS clauses. Another, and perhaps more efficient solution could be to expressly provide for the direct effect of the agreement to both parties. While, at least with the United States, this latter solution does not seem to be a realistic option, the former may not necessarily be effective, as questions of primacy and direct effect are of a constitutional nature and secondary law cannot set aside what the ECJ could find necessary to conclude in accordance with the general principles of EU law. Nevertheless, as the Court stated with regard to the extension of the EU emissions trading system to the air transport industry in the case of the Air Transport Association of America and Others in its judgment of 21 December 2011, the contracting parties to an international agreement have a say on the direct effect of its provisions:

> "In conformity with the principles of international law, European Union institutions which have power to negotiate and conclude an international agreement are free to agree with the third States concerned what effect the provisions of the agreement are to have in the internal legal order of the contracting parties. Only if that question has not been settled by the agreement does it fall to be decided by the courts having jurisdiction in the matter, and in particular by the Court of Justice, in the same manner as any question of interpretation relating to the application of the agreement in the European Union".[22]

### 1.3         Tensions between EU law and IPAs in general

The relationship and possible tensions between European Union law and international IPAs concluded by the EU have been assessed in literature to some extent.[23] *George Bermann* deals with tensions between international arbitration treaties and EU law in general, and shows how direct conflicts between these two legal regimes have been settled by "accommodation" in a number of cases.[24] In situations of confrontation of the two regimes, however, for the simple fact that "the international arbitral tribunals from which awards emanate are themselves the product of that regime", he shows that these tribunals are

---

Anthony Armull et al. (eds.), *A Constitutional Order of States? Essays in EU Law in Honour of Alan Dashwood*, (Hart 2011), p. 529, 532-539. To incorporate a provision into the IPA excluding such primacy and direct effect derived from the mere fact that the EU concluded the agreement does not seem to be a solution. Contrary to was is suggested, Article 1 (4) of the Draft revised agreement on the accession of the European Union to the Convention for the Protection of Human Rights and Fundamental Freedoms (Council of Europe Doc 47+1(2013)008rev2, available at http://www.coe.int/t/dghl/standardsetting-/hrpolicy/Accession/Meeting_reports/47_1%282013%29008rev2_EN.pdf), does not seem to have this purpose; on this see most recently, Paul Gragl, "A giant leap for European Human Rights? The Final Agreement on the European Union's accession to the European Convention on Human Rights", 51 *Common Market Law Review* (2014), pp. 13-58). A simple provision of an international agreement is not sufficient to exclude the application of principles having of a constitutional nature at the level of primary law.
[22] ECJ Case C-366/10, *Air Transport Association of America* [2011] ECR I-13833, summary § 1 (only in the html document: http://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=CELEX:62010CJ0366&rid=2.
[23] Prominently George A. Bermann, "Navigating International Law and the Law of International Arbitration", in: 28 *Arbitration International* (2012), pp. 397-445, on conflicts of obligations from BITs with EU law, in particular, ibid. p. 420-440, dealing however mainly with questions arising from Member State's BITs. See also Ramses A. Wessel, "Between the Authority of International Law and the Autonomy of EU Law, in: J. Diez-Hochleitner et al. (Eds.), *Últimas tendencias en la jurisprudencia del Tribunal de Justicia de la Unión Europea* (Wolters Kluwer 2012), pp. 759-65; August Reinisch, "The EU on the Investment Path – Quo Vadis Europe? The Future of EU BITs and other Investment Agreements", in: 12 *Santa Clara Journal of International Law* (2014), p. 111; Marc Bungenberg, August Reinisch, Christian Tietje (eds.), *EU and Investment Agreements: Open Questions and Remaining Challenges* (Nomos 2013); Hindelang (note 9), p. 157.
[24] Bermann (note 23), pp. 425-431. The cases, however, generally concern intra-EU BITs where national courts were considering appeals against arbitral awards for public policy issues.

"likely to favour the mandates of the international arbitral regime when conflicts with EU law cannot be avoided. Every indication from the recent jurisdictional rulings of investment arbitration tribunals supports this prediction".[25]

EU law, thus, does not seem to be given the regard it would deserve. On the other hand, with a view of the ECJ case law defending the autonomy of the EU legal order, he rightly notices that there is "no reason to assume that the ECJ will prove more deferential in principle to the international arbitral system than it has been to these other national and international legal orders".[26]

What may hold true for Member State's BITs concluded prior to the entry into force of the Lisbon Treaty[27] does not necessarily pertain to IPAs concluded with third countries by the EU since it has exclusive competence in this field. The EU and its courts will arguably not be able to rely upon any claim of primacy for its own law over legal commitments it has taken in an international agreement. In other words: While legal conflicts of measures by Member States undertaken in accordance with their bilateral investment treaties on the one hand, but in breach of their duties under EU law on the other hand (e.g. state aids, consumer protection etc.), may well need a solution giving precedence to EU law over international obligations, no such argument can be accepted *a priori* regarding the international obligations the EU has agreed to.[28]

Hence, where tensions may arise between general EU law and obligations under IPAs concluded by the EU,[29] it is of highest interest for the EU to ensure that appropriate instruments to resolve such conflicts are found prior to the entry into force of such agreements in order to ensure that both EU and national public policies are not compromised by the risk of foreign investors questioning the measures deemed necessary, or claiming compensation. Though most of the thousands of bilateral investment agreements worldwide seem to function smoothly, regarding some recent experience with existing agreements of the Member States the following problem areas can be identified:

### 1.3.1    The "regulatory chill"

One of the most prominent cases illustrating the risks involved in investment protection is that of *Vattenfall* on the construction of a new power plant at Moorburg near Hamburg. To avoid damages said to be of some 1.4 billion Euros Germany has issued, as part of the amicable settlement, "a modified water use permit".[30] A much more difficult example is the *Vattenfall* claim for damages argued to be

---

[25] Bermann (note 23), p. 435.

[26] Bermann (note 23), p. 436, inviting however the ECJ to „seriously consider doing just that".

[27] Art. 351 TFEU entails a *prima facie* exception to the general fidelity of Member States to EU law. However, it also states that: "To the extent that such agreements are not compatible with the Treaties, the Member States or States concerned shall take all appropriate steps to eliminate the incompatibilities established." To this end, "Member States shall, where necessary, assist each other", and "where appropriate, adopt a common attitude". See as an example the ATEL case, ECJ, C-264/09 *European Commission v Slovak Republic* [2011] ECR I-8065, where the Court ruled on the legality of Slovakia granting priority transmission rights to a Swiss investor (ATEL) under a BIT between Slovakia and Switzerland, which had adverse effects on the functioning of the internal market, particularly the Directive 2003/54/EC on the Internal Market in Electricity. For a perceptive view on how the duty under Art. 351 TFEU to "take all necessary steps to eliminate the incompatibilities" see Jan Kleinheisterkamp, "Financial Responsibility in the European International Investment Policy", ICLQ 63:2 (2014), forthcoming.

[28] See also Bermann (note 23), p. 438, with a different argument, however: "As the European Union increasingly constitutes itself a participant in binding international legal regimes – as if it were a nation-state, even though it most certainly is not – it will find itself correspondingly less comfortable asserting a privilege not to be bound by the authoritative rulings of the judicial bodies of those regimes".

[29] Without denying tensions see: Hoffmeister and Alexandru (note 5), para. IV regarding enforcement by ISDS-clauses: „There is also no legal impediment to include such clauses at EU level", referring to the case law of the ECJ showing that „the EU's competence to conclude international agreements necessarily entails the power to submit itself to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions".

[30] See ICSID Award Case No- ARB/09/6 of March 11, 2011, http://www.encharter.org/fileadmin/user_upload/Investor-State_Disputes/Vattenfall-Germany_Award.pdf. On the issue see also Sebastian Knauer, Vattenfall vs. Deutschland.

caused by the German nuclear energy phase out which was unpredictable for the claimant.[31] Based upon the provisions of the European Energy Charter Treaty *Vattenfall* filed a claim for some 3.7 billion Euros at an arbitration tribunal established under the ICSID convention.[32] Article 10 (1) of the Energy Charter Treaty gives investors the guarantee of "fair and equitable treatment" and of "most constant protection and security". It states that "no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal"; nor shall such investments "be accorded treatment less favourable than that required by international law, including treaty obligations". Other relevant provisions are Article 13 on expropriation and Article 14 on free transfers related to investments. Article 13 of the Energy Charter Treaty seems to be of particular interest:

> "Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation…".[33]

With these very general terms it is difficult to determine whether certain policies are or are not impairing "by unreasonable" measures the enjoyment of an investment. What exactly are measures having equivalent effect to a legal expropriation? We know from the ECJ case law on Article 34 TFEU how broadly such terms may be construed.[34] The EU Draft for the CETA provisions on investment protection strive to draw a limit in an annex to Article 14 on expropriation:

> „For greater certainty, except in the rare circumstance where the impact of the measure of series of measures is so severe in light of its purpose that it appears manifestly excessive, non-discriminatory measures by a Party that are designed and applied to protect legitimate public welfare objectives, such as health, safety and the environment, do not constitute indirect expropriation".[35]

---

Machtkampf um Moorburg, in: *Spiegel Online* available at http://www.spiegel.de/wirtschaft/vattenfall-vs-deutschland-machtkampf-um-moorburg-a-635520-2.html.

[31] See Knauer (note 31), part 1. See also *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, not public. For the procedure so far see the summary given by the World Bank, available under: https://icsid.worldbank.org-/ICSID/FrontServlet?requestType=CasesRH&reqFrom=ListCases&caseId=C2220&actionVal=viewCase.

[32] See comments by Jakob Schlandt, 15 Juristen gegen die Demokratie, *Frankfurter Rundschau* of 13 May 2013, available at: http://www.fr-online.de/wirtschaft/vattenfall-15-juristen-gegen-die-demokratie,1472780,22189216.html. See also Kerstin Kohlenberg, Petra Pinzler and Wolfgang Uchatius, Im Namen des Geldes, *Die Zeit* No. 10, Dossier, 27 February 2014, p. 15, talking of more than four billion Euros.

[33] See also the terms of Article 14 of the TTIP Draft on Investment Protection, *supra* note 11. An Annex to this provision (as it is not yet included in the Energy Charter Treaty) distinguishes between direct and indirect expropriation, the latter occurring "where a measure of series of measures by a Party has an effect equivalent to direct expropriation, in that it substantially deprives the investor of the fundamental attributes of property in its investment, including the right to use, enjoy and dispose of its investment, without formal transfer or title or outright seizure." The Commissions consultation documents (supra note 11) contain the full text of Article X of the CETA-Draft Agreement on expropriation with similar texts.

[34] See particularly ECJ Case 8/74 *Dassonville* [1974] ECR 837; even though the ECJ has progressively narrowed the definition established here (see ECJ Case C-120/78 *Cassis de Dijon* [1979] ECR 649, Joined Cases C-267/91 and 268/91 *Keck and Mithouard* [1993],ECR I-6097, it remains open finally to the ECJ in each case to determine whether or not a case is covered by Article 34 TFEU.

[35] Annex on Expropriation to Article X of the Draft CETA Investment Text published for the public consultation on ISDS in the TTIP launched in March 2014 (supra, note 11). The Consultation further includes in Question 4 on expropriation a reference to more detailed clarifications on direct and indirect expropriations in Article X of the CETA, pointing to "an effect equivalent to direct expropriation, in that it substantially deprives the investor of the fundamental attributes of property in its investment, including the right to use, enjoy and dispose of its investment, without formal transfer of title or outright seizure", and indicates specific factors to be considered (http://trade.ec.europa.eu/doclib/docs/2014/march-/tradoc_152280.pdf). For another to clarifying the terms see the Commission's Factsheet on Investment Protection and Investor-to-State Dispute Settlement in EU agreements, see:  http://trade.ec.europa.eu/doclib/docs/2013/november/-tradoc_151916.pdf, p. 7-8.

These explanations resemble the proportionality criteria applied by courts in disputes over the fundamental right to private property when reviewing measures that do adversely affect the right to property but do not constitute a case of expropriation.[36] Handing this task over to international arbitral tribunals could be a big and risky step, unless there are strong precautions against an uncontrolled use.[37] International investor arbitration, as some fear, seems to involve what is called a "regulatory chill" deterring national legislators to adopt policies that are democratically felt desirable, and it is open whether general provisions on the regulatory autonomy of the contracting parties could be a way out.[38]

The impression that in cases such as *Moorburg* the final settlement sacrificed environmental policies is alarming; the more so as Article 19 of the Energy Charter Treaty expressly obliges the Contracting Parties to "strive to minimize in an economically efficient manner harmful environmental impacts occurring either within or outside its Area… taking proper account of safety". Was this provision taken into account and given serious thought? Why was the settlement not published fully, including the modified water use permit mentioned above? In the other *Vattenfall*-case on the German withdrawal from the civilian use of nuclear power, a reaction to the Fukushima disaster, it remains to be seen if not only environmental requirements but also the exception granted under Article 24 (1) (b) (i) of the Energy Charter for any measure "necessary to protect human, animal or plant life or health" will play a pivotal role in the balancing act against the investors' pecuniary interests.

The reference to the ICSID system or other procedures for dispute settlement in Article 26 of the Energy Charter Treaty hands over matters of such high political salience to arbitral tribunals, the decisions of which are in principle final and can be enforced worldwide.

Even if it is only for a small number of cases, it would be difficult to accept that democratically enacted environmental policies or measures taken on consumer protection and public health decided at the European or national level within the EU are scrutinized and, if the three lawyers of an international arbitration tribunal taking a different view on the legitimate interests at stake, deem it appropriate, to order compensation for the foreign investors who feel that their investment or profit expectations are adversely affected by them. Such risk for the legislative authorities could amount to be prohibitive for policies regarded necessary for the public good. In the Australian tobacco-case, *Philipp Morris* is claiming billions of dollars in compensation for losses due to strict measures regarding advertising and packing of tobacco-products,[39] but also the pending NAFTA law suit of *Lone Pine* against Canada for a moratorium on fracking in the province of Quebec[40] should be taken as alarming examples for the potential legal risks taken by the EU if it decided to conclude IPAs modelled after the European Energy Charter Treaty or NAFTA with third states. Moreover, depending on the interpretation to be given by the arbitral tribunals – often still in strictly confidential proceedings! – of provisions like fair and equitable treatment, etc., social policies like the introduction of minimum wages and the reform of the

---

[36] See for Article 17 of the Charter of Fundamental Rights: Wolfgang Durner, "Wirtschaftliche Grundrechte", in: Detlef Merten / Hans-Jürgen Papier (eds.), *Handbuch der Grundrechte in Deutschland und Europa VI/1* (C.F. Müller 2010) § 162 paras. 49-56; for Article 14 of the German Basic Law see: BVerfGE 58, 300.

[37] For an attempt to give some clarity on the notion of indirect expropriation on a comparative law basis see Montt (note 2) p. 231 et seq., 288-289, concluding, however, that regarding the expropriation clause there is a „considerable degree of deference towards the regulatory state". The problem is in his eyes rather „the ad hoc characterisation of its application" (ibid., p. 290) – „which makes the adjudication process highly uncertain, unpredictable, and overly dependent upon the personal biases of individual arbitrators" (ibid., p. 236).

[38] With more references see Reinisch (note 23), pp. 146-148.

[39] See Kohlenberg & others (note 32), p. 16.

[40] See Ilana Solomon, "No Fracking Way: How Companies Sue Canada to Get More Resources", *Huffington Post* available at: http://www.huffingtonpost.ca/ilana-solomon/lone-pine-sues-canada-over-fracking_b_4032696.html. See also the Council of Canadians for Social Justice: Fracking is not a right. Tell Lone Pine to drop its NAFTA lawsuit against Quebec's moratorium on fracking!, available at: http://www.canadians.org/action/petition/index.php.

EU data protection regime[41] may be jeopardized by proceedings initiated by foreign investors on the basis of the IPAs. Compared to the protection foreign investors benefit from in their home state, the practice of the arbitration tribunals in some cases risks to develop towards a "super-protection" in foreign countries, with adverse effects upon the host countries' legislative autonomy.[42]

What might have been very much in the interest of capital exporting countries like the US, the UK or Germany in their relationship to third world countries needing investment during the last decades now turns back on EU Member States with unexpected legal risks against their own policies. This should further demand to re-evaluate the function of ISDS-clauses in future IPAs between the EU and third countries altogether: as historically the "logic of dispensing foreign investors from exhausting national remedies emerged as a solution to the low effectiveness of the rule of law in many developing countries and at a time where investment streams where unidirectional"[43], the conditions in this respect have changed drastically in cases like the EU-Canada Comprehensive Economic and Trade Agreement (CETA) or the Agreement on Transatlantic Trade and Investment Partnership (TTIP). It should follow that in order to justify the incorporation of ISDS-clauses at all, a comparative evaluation of the decisive aspects of the legal regimes involved and the effectiveness of judicial protection for foreign operators must take place prior to the conclusion of any IPA, which very well may arrive at the result that the exhaustion of local remedies on both sides is deemed perfectly bearable and that there is no need for additional ISDS mechanisms. Could a combination of express provisions on the direct applicability of IPA standards with ISDS-clauses to be built into free trade agreements as a device of last resort encourage national courts to becoming more respectful of individual rights and the rule of law equally for foreign and local investors?

The approach chosen by the Commission is to emphasise progressively the right to regulate. Since 2006 the Commission underlined the need to avoid the lowering of domestic environmental, labour or occupational health and safety legislation and standards as a means to attract foreign investment, and the EU-Korea Free Trade Agreement provisionally in force since 2011 provides for each party the "right to regulate and to introduce new regulations to meet legitimate policy objectives".[44] More extensively, the same goal is pursued by the provisions in the Preamble and several provisions of the Draft CETA agreement made public by the Commission within the framework of its new consultation procedure opened in March 2014, where – apart from a commitment to sustainable development –

> "the right of the Parties to take measures to achieve legitimate public policy objectives on the basis of the level of protection they deem appropriate"

---

[41] Privacy seems to be an area for which Article X: General exceptions, of the Draft CETA Investment text of 21 November 2013 refers to in para. 1 (a) (iii).

[42] Based upon an analysis of the US practice see Lise Johnson & Oleksandr Volkov, "Investor-state contracts, host-state 'commitments' and the myth of stability in international law", in: 24 *The American Review of International Arbitration* (2013), p. 365: "…this paper's finding that investment treaty arbitration has developed principles of ,super-protection' that jump beyond domestic legal principles is notable in that it suggests foreign investors are not merely able to maintain and rely on developed home country safeguards when investing in foreign territories, but are also able to draw from a set of stronger protections newly created by ad hoc arbitral tribunals. In this way, the scope of investor's rights becomes untethered from domestic systems, enabling firms with global operations to benefit from heightened standards and rights offered by private arbitrators' interpretations of treaty provisions, while bypassing the balances struck through domestic lawmaking processes." For details see *ibid*., pp. 406 et seq., p. 414: "…investor-state arbitrations largely shift the risk of regulatory change from investors to states (and taxpayers), putting greater pressure on governments to refrain from taking action to refine and upgrade their laws and regulations." For the risks see also Montt (note 2), p. 370: "danger that international investment law jurisprudence could cristallise conservative rules that overprotect the status quo".

[43] Kleinheisterkamp (note 7), p. 12.

[44] Article 7.1 (4) of the EU-Korea FTA; see for this approach taken by the Commission Hoffmeister and Ünüvar (note 7), p. 62-63.

is not only recognised but also more concretely defined. Such provisions will certainly counterbalance the interests of investors for protection of their business and property. The do not give assurance, however, to the host state that in each case their legitimate and democratically decided policies are not impaired by the decision of an arbitration tribunal under ISDS.

### 1.3.2    The EU state aid regime

The EU state aid regime is another useful example when it comes to the pitfalls in the design of future IPAs between the EU and third countries like Canada, the US or China. Under Article 108 (3) TFEU Member States must notify the Commission of any state aid measure to be undertaken, and such measures shall not be put into effect until the Commission has reached a positive final decision. When a Member State or a regional government grants an aid to a foreign investor with a view to give an incentive for creating jobs in the region or otherwise contributing to the general economic welfare, or even just promises to do so in an official statement, without this measure being duly reported to the Commission, this aid is unlawful and, if actually granted, will have to be recovered according to the ECJ case-law and the provisions of Regulation 1999/659.[45] But even in other cases, such as the German arrangements for renewable energy with its exceptions for energy-intensive industries like aluminium, state aid rules may simply not have been understood to be applicable and, thus, not been taken care of.[46]

The investor may not be satisfied with the recovery of the aid and argue that she had rightfully trusted the government having promised or granted the aid or the otherwise beneficial policy exception later qualified as an aid. If the protest proves to be unsuccessful, the investor may invoke fair and equitable treatment or other rights granted under the IPA and be accorded the amount equal to that of the state aid in compensation. How can it be made sure that Articles 107 and 108 TFEU are effectively applied, in such a situation, and that the distortions of competition in the internal market stated by the Commission to result from the unlawful aid are excluded nonetheless?[47] Some experience with intra-EU investment protection agreements shows that arbitration tribunals are willing to take account of opinions given by the Commission as an *amicus curiae* and recognised the argument that compliance of a Member State with EU law would not breach the Energy Charter Law,[48] but there is little assurance that similar recognition is given to EU law at the international level.

### 1.3.3    The principle of non-discrimination

IPAs frequently contain clauses granting national treatment and non-discrimination, they also contain most favoured nation clauses. Such clauses can be found in the draft Articles X.1 and X.2 of the draft CETA text on investment,[49] national treatment will probably also be granted in the TTIP. But what does "national" treatment exactly mean in an IPA concluded by the EU, which is not a state and thus has no "nationals"?

With regard to an IPA concluded by the EU three groups of investors can be distinguished:

- National investors: those who are investing in the Member State where they are established; equal treatment of all national investors is granted by national (constitutional) law.

---

[45] See, in particular, Articles 3, 11 and 14 of Regulation 659/1999 laying down detailed rules for the application of Article 93 of the EC Treaty, as amended by 734/2013.

[46] See infra, 4.c. For an attempt to settle the conflict see the Commission's Energy and Environmental State aid guidelines of 9.4.2014, C(2014) 2322, http://ec.europa.eu/competition/sectors/energy/eeag_en.pdf.

[47] See also Hindelang (note 23), pp. 177-178.

[48] With more details and references see: Hoffmeister and Ünüvar (note 7), p. 59-60.

[49] For a public version of the relevant CETA text see the annex to the Public consultation on modalities for investment protection and ISDS in TTIP, European Commission, http://trade.ec.europa.eu/doclib/docs/2014/march/tradoc_152280.pdf.

- European investors: those who are established within a EU Member State but investing across boarders in other Member States; all EU investors benefit from Article 18 TFEU, market freedoms and secondary Union law, even if national law would allow for discriminations.

- Third country (foreign) investors: those who are established outside the EU but making investments in one or more of the Member States; there is protection under Article 63 (1) TFEU[50] and under international law (customary minimal legal standards for the treatment of aliens or BITs).

If foreign investors are granted "national treatment" so that they are aligned with national investors in each Member State, they would have to comply with all national legislation regarding corporate law, tax law, labour law, environmental and consumer protection law, etc. in the host country. If incorporated under the national law of a chosen Member State, such a company, however, is treated "automatically", in accordance with Article 54 TFEU, as a European investor regarding its investments in other Member States and therefore benefits from the principle of mutual recognition and from secondary EU legislation facilitating intra-EU transactions. According to Article 62 TFEU this assimilation applies to the freedom of establishment as well as to services. National treatment granted in an IPA between the EU and a third country extends this guarantee to third country nationals established in one of the EU Member States. There is no reason to refuse non-discrimination or national treatment-clauses in IPAs and the recognition of direct effect, as the ECJ has done in numerous EU-agreements.[51] It follows that third country nationals would enjoy the same rights as Member States nationals regarding establishment, providing services as well as for participation in the capital of companies in other Member States under Article 55 TFEU.[52]

The guarantee of national or most favoured nation treatment in IPAs does not imply, however, that foreign investors would be given the status of, or be assimilated to Union citizens pursuant to Article 20 TFEU. This status reaches far beyond what is needed for the exercise of economic rights including free and secure foreign investment and, in particular, involves political and social rights.[53]

In case one EU Member State unlawfully impinges on the investment of a foreign investor established in another Member State, national treatment would mean that the investor would dispose of the same legal remedies as other companies established in this Member State. The case would be brought to a national court that may, if the case falls within the scope of Union law, submit any questions of interpretation or validity of relevant EU law to the ECJ. This ultimately begs the question: Would ISDS-clauses provide foreign investors the right to choose the dispute settlement procedure to reach a judgment more quickly? Moreover: Could that judgment even differ in substance from that of the national court based upon a preliminary ruling of the ECJ?

As a result, foreign investors using ISDS as a "fast track" procedure would be privileged compared to EU investors both in procedure as well as in substance. Such privileges would result in what we already

---

[50] See Steffen Hindelang, The Free Movement of Capital and Foreign Direct Investment (OUP 2009), pp. 204-7.

[51] ECJ Case 104/81 *Kupferberg* [1982] ECR 3641, para. 26. See also Case C-12/86 *Demirel* [1987] ECR 3719,,para. 14; Case C-171/01 *Wählergruppe Gemeinsam* [2003] ECR I-4301, para. 54. For an overview see Jacqueline Dutheil de la Rochère, "L'effet direct des accords internationaux", in: Allan Rosas, Egils Levits and Yves Bot (eds.), *The Role of the Court of Justice, in: The Court of Justice and the Construction of Europe: Analyses and Perspectives on Sixty Years of Case Law* (Asser Press Springer 2013), pp. 637, 643-644.

[52] For a possibility for exceptions to the "treatment"-provisions of Article 10 (2) and (3) to Regional Economic Integration Organisations see, however, Article 10 (9) of the European Energy Charter. See also Article 24 (4) (a) of this Charter regarding free trade areas and customs unions, as well as Article 25 of the Energy Charter granting a general exception from the most favoured nation clause for Economic Integration Areas.

[53] See Articles 21-24 TFEU and, for non-discrimination regarding social rights ECJ Case C-456/02 *Trojani* [2004] ECR I-7573.

know in the internal market context as "reverse discrimination". This time, however, "reverse discrimination" would not simply affect the national citizens due to the limited scope of EU law in cases lacking any cross-border element, but it would put all EU investors to a disadvantage due to the procedural and substantive benefits granted to foreign investors under the IPAs. Equally important, granting arbitral tribunals the authority to independently adjudicate in cases involving said tensions between IPA provisions and EU law in cases involving not only states but individuals could exclude the ECJ from giving its interpretation to the relevant Union law and, therefore, pose a threat to the autonomy of the EU legal order.

### 1.3.4 ISDS clauses and the autonomy of the Union's legal order

ISDS-clauses in an IPA concluded by the EU can raise problems for the autonomy of Union law and its interpretation. Similarly cases regarding clashes between European or national rules on the one side, and provisions protecting more or less legitimate expectations of foreign investors, etc. on the other side, may involve questions of Union law with regard to its interpretation and at times even its validity.

ISDS clauses establishing the competence of arbitral tribunals in these cases could be understood as posing a threat to the autonomy of the EU legal order and, in particular, to exclude the ECJ from its competence under Article 267 TFEU,[54] and its duty to ensure that in the interpretation and application of the Treaties the law is observed (Art. 19 TEU). This could be contrary to Article 344 TFEU which states that:

> "Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein".

Contrary to the case of intra-EU BITs, however, the IPAs concluded by the EU would not be covered by this prohibition[55]: Not the Member States, at least *prima facie*, but the EU would be the contracting party. The mere participation of the Member States would not imply that disputes among Member States are within the focus of the agreements – and this is what Article 344 TFEU strives to reserve to the ECJ – but the IPA would only cover disputes between the EU or the Member State responsible and a third country party to the IPA.

Could ISDS-clauses, nevertheless, be a threat to the autonomy of the Union's legal order? Thus far, there is no case-law on this issue.

On the one hand, it is true that the ECJ in Opinion 1/91 on the European Economic Area acknowledges that the Union may generally conclude international agreements including a binding dispute settlement procedure with decisions that legally bind the European Union and its institutions, and that the Court would itself feel bound by judgments of such judicial organs or arbitral courts.[56] There are examples for this in the case of WTO where the ECJ has accepted rulings of the Appellate Body to which the Court refers approvingly.[57] Also with the ratification of the Treaty on the accession of the EU to the

---

[54] On this question see also Reinisch (note 23), pp. 152-156, with more references. See also Hindelang (note 23), pp. 168-183; Ingolf Pernice, "The Autonomy of the EU Legal Order - Fifty Years After Van Gend", *50ème anniversaire de l'arrêt Van Gend en Loos : 1963-2013 : actes du colloque, Luxembourg, 13 mai 2013* (Ed. Office des publications de l'Union européenne – Luxembourg 2013) p. 55, pp. 75-79.

[55] Schill (note 12), p. 44.

[56] See ECJ Opinion 1/91, *EEA* [1991] ECR I-6079, para. 39.

[57] ECJ Case C-245/02, *Anheuser Busch* [2004] ECR I-10989, para. 55; Case C-638/11 P *Gul Ahmed Textile Mills*, nyr, para. 32. See on this also Pieter Jan Kuijper, "It Shall Contribute to … the Strict Observance and Development of International Law", in: Allan Rosas, Egils Levits and Yves Bot (eds.), *The Role of the Court of Justice, in: The Court of Justice and the Construction of Europe: Analyses and Perspectives on Sixty Years of Case Law* (Asser Press Springer 2013), pp. 589, 609 note 86.

European Convention of Human Rights (ECHR)[58] the EU and its institutions will be bound by judgments of another Court, the European Court of Human Rights (ECtHR), and there is little doubt that the ECJ in its upcoming Opinion on this treaty[59] will accept this binding effect and not find autonomy at risk.[60] In these cases the EU plays a role similar to that of a state party to an international agreement, and as far as a judicial or arbitral institution is established to judge upon compliance of the contracting parties with the provisions of the agreement or the interpretation thereof, it is difficult to see how the autonomy of the Union's legal order should be affected or could be opposed to such an arrangement.

In the case of an ISDS as part of an IPA between the EU and a third country, however, the situation may be different. Though the arbitration tribunal would only assess whether or not the guarantees given to investors in that agreement are violated and, if so, declare the EU or a Member State liable for damages or compensation, the legal effect of such an award could well reach beyond what is accepted under the WTO or ECHR systems. The WTO system does not know individual rights and is a flexible system based ultimately upon negotiations between states. The judgments of the ECHR, even if ordering for compensation, cannot be enforced. By contrast, ISDS are made to give the investor final awards on compensation or damages that can be directly enforced, often worldwide.[61] Even if the tribunal would not give a binding ruling on the interpretation or applicability of Union law, its decisions could well impact the functioning of the EU legal order and so considerably affect its autonomy. In this perspective the following examples may be considered:

- With a view to comply with new standards laid down in a EU directive on water or air quality, a Member State has revised the environmental conditions of the authorization for an industrial activity in which an American firm has invested and the profitable operation of which is now in question. Threatened to be held liable under the ISDS for damages because of an indirect expropriation, the Member State would grant an exception for this case and not apply the directive. Would the ECJ in an infringement procedure under Article 258 TFEU accept that the directive is not applied in the case, because of the IPA, or should it condemn the Member State for its violation of EU law? – Or, what is the situation if the Member State complied with the directive and was held liable for compensation by the arbitral tribunal established under the IPA, while the EU competitors have to bear the additional costs without any compensation? This would amount to a case of "reverse discrimination" for it certainly creates distortions of competition similar to those created by a state aid in favour of a third state undertaking. The EU would have to change its law to avoid such tensions.

- As explained, national treatment granted in an EU-third state IPA may be invoked by a third state investor established in a Member States for enjoying the same rights as a national investor under EU law for a secondary investment or for providing services in another Member State. In case of an arguably unjustified restriction on the exercise of these freedoms, it could, like European investors, appeal to the competent national court, which might make a reference to the ECJ, in order to enforce its freedom.[62] The "fast track", however, would be to file a complaint

---

[58] Draft of 24 June 2011, Council of Europe CDDH-UE(2011)16.
[59] ECJ Opinion 1/14, ECHR, forthcoming.
[60] For more details see Pernice, (note 54), pp. 70-74.
[61] Even if it is argued that individual undertakings must be considered, in terms of international law, enforcing rights of their state of origin against the other contracting party, the purpose and the result are that the individual gets protection and, in a given case, compensation or damages, as if it would enforce its own rights.
[62] If the agreements contains a clause excluding from national treatment the special rights accorded within a Regional Economic Integration Organisation, this would not be possible. Enforcement worldwide is provided for under ICSID, see Articles 53-55 of the Convention on the Settlement of Investment Disputes between States and Nationals of other States.

directly with the arbitral tribunal, claiming unjust discrimination or unfair treatment. The tribunal's binding and enforceable decision would not only set a sort of precedent for future assessments of similar cases, including European investors asking for equal treatment, but would also undermine the balance drawn by the ECJ or by the Union legislator between the market freedoms and the mandatory requirements of public interest of Member States justifying restrictions of trade, on the freedom to provide services or of establishment. With this respect, the bypassing of national courts and the ECJ can by no means be considered a fast track to justice *stricto sensu*. As the arbitral tribunal may only grant damages to the injured party on the grounds of the IPA but has no authority to annul the administrative decision or the underlying legislative act, the ISDS mechanism partly defeats the purpose of judicial review and promotes an "endure and cash in" attitude. This is contrary to both EU standards and the common principles on state liability in most Member States,[63] where first the annulment of the measure is to be sought in order to require "the competent Community institutions to take the necessary measures to remedy that illegality".[64]

- The German policy of encouraging the use of renewable energies is based upon a system under which the additional costs for the producers of renewable energy are financed by a levy on the price of traditional energy paid by industries and consumers, the *EEG-Gesetz* (Federal Statute on Regenerative Energy). The Commission takes the view that certain exceptions from this levy conceded to energy-intensive industries amount to a violation of EU state aid rules. If so, Germany would be requested by the Commission to recover the "state aid" equivalent to the savings of these industries under the exception-rule. While there is no escape from this for Europeans, foreign investors – not aware of such extensions of state aid law and assuming that Germany has checked the conformity with the applicable legislation – could in such a case file a claim for damages or compensation under the ISDS. Even though they are free to hear the EU Commissions' views and take account of EU law concerns,[65] the arbiters would not need to consider details of EU state aid law, procedural issues and the application of the Union principle of legitimate expectations. While European investors are deemed to know the law and could not rely on their expectations, the expectations of foreign investors would be honoured, as arbiters may treat the case as a question of fair and equitable treatment,[66] or find it a case of indirect expropriation and declare Germany – or the EU? – liable for compensation; the result would be that Germany is in (forced) infringement to Article 107 TFEU.[67] In particular, the prohibition of Article 108 (3) TFEU cannot be implemented, while the foreign investor would enjoy the competitive privilege the state aid rules are about to prevent. Though it is difficult to say that the ISDS involved interpretations of Union law binding upon the ECJ or other institutions, such an outcome would be felt discriminatory by the German competitors, distort competition and put at risk the proper functioning of the Union's state aid system.

---

[63] Kleinheisterkamp (note 27), pp. 11-2.

[64] ECJ, Order of November 8, 2007 in Case C-421/06 *Fratelli Martini and Cargill* [2007] ECR I-152, para. 52.

[65] See, with references to Case AES v. Hungary, Hoffmeister and Ünüvar (note 7), p. 60. Also in the Case Electrabel v. Hungary the submissions made by the EU Commission under Article 26 ECT were broadly discussed, see ICSID Case No. ARB/07/19, available at: http://www.italaw.com/sites/default/files/case-documents/italaw1071clean.pdf, paras. 4.89 et seq., with the result that EU law is treated like national law as a "fact" only (para. 4.127), and particularly on the claim for the need of "harmonious interpretation", the autonomy of the ECJ and how to deal with possible conflicts between ECT and EU law, ibid., para. 4.144-4.189.

[66] Considering that even the German Government was surprised by the critical position of the European Commission qualifying the measure as a state aid.

[67] The system could, in addition, be considered contrary to the WTO Subsidies Agreement.

- The EU is a special contracting party to IPAs, as legal competence as well as responsibility and liability for the acts at issue in an ISDS may rest with the EU, with one or more of the Member States or even shared. This is the reason why the Commission has proposed a regulation establishing the method and procedures of attribution of responsibilities.[68] As this regulation can only be for internal use within the EU, special provision has to be made in an IPA for the right of the EU and its Member States to determine who will be the respondent, and to determine if an award is given ordering payment of damages or compensation, whether the EU or a Member State will pay the bill.[69] The EU draft for the TTIP, e.g., so provides in its chapter on Negotiation on Investor-State Dispute Settlement that "before submitting a claim against the EU, or a Member State, the investor must request a determination as to whether the EU or the Member State will act as respondent in any particular case".[70] Provisions to this effect can also be found in the Article X-20 ("determination of the respondent") of the CETA Draft of April 2014. Even if a note to this provision states that "the tribunal shall be bound by the determination made pursuant to article x-…", absent such determination in a given case it may be the arbitration tribunal who decides who is liable for damages and, thus, judges upon the question of responsibility of the EU or a Member State for a specific act or omission. While paragraph 4 of the aforementioned provision sets out criteria for adjudicating the responsibility, based upon the origin of the measure, exclusively of a Member State or including EU measures, it will still be for the tribunal to interpret and apply them in a given case. Yet, such questions pertain to the internal structure and the federal distribution of competences between the levels of government in the EU. Deciding upon them is reserved exclusively to the ECJ.

- In addition to grasping a say over what entity (EU or Member State) will be held responsible and therefore liable for an act or omission causing damage to a foreign investor under the IPA, the arbitral tribunal by awarding damages further may carry out a task specifically attributed to the ECJ, namely to determine the compensation for Union legislative acts which are in full conformity with the Treaties. Clearly, a distinction is to be drawn between internal EU liability and liability established under international law. Yet, under international law, responsibility of states is a settled issue among states. The case of liability to individuals is not established, except for ISDS. This is new, and, therefore, the distinction referred to is not a compelling argument if, under an international treaty like CETA or TTIP, it is the EU itself to create a system for liability of the EU for individual claims in addition to what the Treaties already provide for. Article 340 (2) TFEU states that "In the case of non-contractual liability, the Union shall, in accordance with the general principles common to the laws of the Member States, make good any damage caused by its institutions or by its servants in the performance of their duties." Hence, the ECJ is to derive the standards and legal boundaries of the Union's "objective liability", i.e. liability for legislative acts in conformity with EU law and regardless of any degree of culpability, from a comparative analysis of the Member States law on state liability.[71] The

---

[68] Commission Proposal for a regulation establishing a framework for managing financial responsibility linked to investor-state dispute settlement tribunals established by international agreements to which the European Union is party, COM(2012) 335 final.

[69] For a discussion of the distribution of financial responsibility and state liability see Kleinheisterkamp (note 27), pp. 9-17.

[70] See para. 8) of the chapter, *supra* note 11.

[71] See Kleinheisterkamp (note 27), pp. 13-5. The Court generally takes a restrictive approach to non-contractual liability, see joined cases C-120/06 and 121/06 *FIAMM and Fedon* [2008] ECR para. 174: "The Court has, moreover, stated that the strict approach taken towards the liability of the Community in the exercise of its legislative activities is attributable to two considerations. First, even where the legality of measures is subject to judicial review, exercise of the legislative function must not be hindered by the prospect of actions for damages whenever the general interest of the Community requires legislative measures to be adopted which may adversely affect individual interests. Second, in a legislative context

current restrictive approach to EU liability for legislative acts in conformity with EU law would not only be widened significantly in substantive terms through EU-third state IPAs, but ISDS-clauses would hand over to arbitral tribunals the task of determining the scope and extent of compensation for objective legislative liability, which – as a legal responsibility not only to adjudicate existing standards but also to actively develop such standards – is expressly assigned to the ECJ under Art. 340 (2) TFEU. It is doubtful whether the competence of the ECJ under Articles 268 in combination with Article 340 (2) TFEU allows conferring power to decide upon the liability of the EU to other courts or tribunals even by international agreements at all.[72] Proper consideration of why the ECJ is so restrictive in according damages in cases of legislative acts even more so seems to apply to what has been said, above, about the "regulatory chill" of arbitration under ISDS-clauses.

These examples are far from being clear cases where the autonomy of the EU legal order can be said are violated. The ECJ, however, is rather strict on this question. The relevant series of cases starts with the Opinion 1/91 of the ECJ on the Treaty relating to the establishment of the European Economic Area. The Court found this Treaty impinging on the autonomy of the EU legal order for "the machinery of courts provided for in the agreement" conflicted with the EU provisions regarding the prerogatives of the ECJ namely under ex-Article 164 EC, now Article 19 TEU.[73] In the context of mixed agreements, the preservation of the autonomy of the EU legal order requires that the international dispute settlement mechanism may not decide upon matters concerning the distribution of competences between the EU and the Member States.[74] As in the present examples nothing allows to conclude that the arbitration tribunals could give interpretations of EU law binding the ECJ, the criteria established in the Opinion 1/91 do not seem to pose problems for ISDS.

The ECJ has taken a more restrictive view in its Opinion 1/09 on the draft agreement on the European and Community Patents Court. Though it rejected the argument that Article 344 TFEU was violated, for the jurisdiction of the Patent Court to be established related "only to disputes between individuals in the field of patent",[75] it nevertheless found the Agreement in conflict with the Treaty. The reason was that a substantial part of the responsibilities of the ECJ in the EU judicial system was to be conferred to a body outside of its ultimate control. The Court, therefore, concluded that:

> "the envisaged agreement, by conferring on an international court which is outside the institutional and judicial framework of the European Union an exclusive jurisdiction to hear a significant number of actions brought by individuals in the field of the Community patent and to interpret and apply European Union law in that field, would deprive courts of Member States of their powers in relation to the interpretation and application of European Union law and the Court of its powers to reply, by preliminary ruling, to questions referred by those courts and, consequently, would alter the essential character of the powers which the Treaties confer on the institutions of the European Union and on

---

characterised by the exercise of a wide discretion, which is essential for implementing a Community policy, the Community cannot incur liability unless the institution concerned has manifestly and gravely disregarded the limits on the exercise of its powers."

[72] The situation is different from that of the WTO with a dispute settlement system that involves states and the EU only, not private parties, where in case the EU is found violating WTO law retaliatory tariffs may be allowed by the Appellate Body against EU imports to the third state concerned or compensation among contracting parties concerned.

[73] ECJ Opinion 1/91 *EEA* [1991] ECR I-6079, para 46.

[74] *Ibid.*, paras. 39-40. From this it follows that ISDS clauses in future IPAs must not determine what contracting party, the EU or a Member State, is to be considered the proper respondent in an arbitration but must leave this question for the EU and the Member States to decide, see Schill (note 12), p. 49.

[75] ECJ Opinion 1/09 *Patent Court*, [2011] ECR I-1137, para. 63.

the Member States and which are indispensable to the preservation of the very nature of European Union law."[76]

ISDS clauses providing for international arbitral tribunals to settle investor-state disputes, including those of the ICSID system, would give these tribunals a final and binding say as to the relevant interpretation of EU law at stake, even if understood as "facts" only, without the ECJ necessarily being involved. Though this competence may not be exclusive, like in the case of the European Patent Court, arbitration tribunals would nonetheless *de facto* be the forum where questions of EU law are adjudicated with binding effect upon the EU institutions and the Member States.

Preservation of the EU legal order, the Court has stated in its Opinion on the European Common Aviation Area,

> "requires that the procedures for ensuring uniform interpretation of the rules of the ECAA Agreement and for resolving disputes will not have the effect of binding the Community and its institutions, in the exercise of their internal powers, to a particular interpretation of the rules of Community law referred to in that agreement."[77]

Hence, the Court takes a firm stand when it comes to questions of EU law that fall within the exclusive competence of the ECJ, such as the interpretation of EU law and the judicial dialogue between the ECJ and the national courts,[78] and is not willing to cede ground. It is difficult to see how an award given by an arbitration tribunal would not frequently involve the interpretation of EU law, at least as preliminary questions. Though this may, basically, be understood as a question of fact within the framework of assessing, under the ISDS, the conformity of EU or Member States' measures with the provisions or standards set up in the IPA, comparable to the functioning of the WTO dispute settlement mechanism, the legal implications are different. The ISDS-system produces binding rulings for the benefit of private actors and not decisions applicable between states only. There is no room for negotiations between the governments involved once the ruling is given; the investor can directly enforce it, mostly worldwide.

If these rulings are not directly binding, as the ECJ states in the ECAA case, the Union and its institutions, in the exercise of their internal powers, to a particular interpretation of the relevant rules of Union law,[79] the mechanism is comparable, nevertheless, to that the ECJ has given its Opinion 1/09 on the Patent Agreement; what was quoted above from the Courts' Opinion[80] can easily be applied to ISDS: In the conferring on an international court which is outside the institutional and judicial framework of the European Union an exclusive jurisdiction to hear a significant number of actions brought by individuals in the field of *foreign investment* and to interpret and apply European Union law in that field, would deprive courts of Member States of their powers in relation to the interpretation and application of European Union law and the Court of its powers to reply, by preliminary ruling, to questions referred by those courts. The autonomy of Union law, therefore, is at stake; and the fact that EU judges are not necessarily included in the international tribunal, as in some of the cases on autonomy judged by the ECJ,[81] would not make it easier but even more difficult to accept the arrangement.

Thus, as far as ISDS bodies' decisions produce binding interpretations on EU law, it is concluded that, at least, a preliminary ruling procedure analogous to Art. 267 TFEU has to be implemented whenever

---

[76] *Ibid.*, para. 89.
[77] ECJ Opinion 1/00 *ECAA* [2002] ECR I-3493, para. 13.
[78] *Ibid.*, paras. 12-13; ECJ Opinion 1/09 *Patent Court*, [2011] ECR I-1137, para. 89.
[79] See the previous quote, at note 77.
[80] See quote supra note 76.
[81] E.g. ECJ Opinion 1/91 *EEA* [1991] ECR I-6079, para 46, referred to supra, note 73.

questions of EU law arise in arbitration. [82] And in order to preserve the autonomy of the EU legal order and its *effet utile* the preliminary ruling would indeed have to be binding for the tribunal.[83]

It is very doubtful however, whether any third country would accept such a role of the ECJ; and the interpretation given to Union law by an arbitration tribunal is not necessarily binding for the ECJ. Nevertheless, as established in the examples given, awards issued under ISDS could bring Member States in conflict with obligations under EU law, lead to discriminations of European investors, distort competition and endanger the functioning of the Union legal order. This could be all the more relevant for the ECJ with a view to the autonomy of Union law, as questions regarding the delimitation of responsibilities between the EU and the Member States may also play a role in such cases. The ECJ has made clear already in Opinion 1/91 that such questions are not to be adjudicated by courts other than the ECJ.[84]

# 2.    DESIGNING INVESTMENT PROTECTION IN CONFORMITY WITH EU LAW

Given the commonly accepted benefits of investment protection in international trade it is of highest interest how provisions safeguarding investments and, in particular, provisions on investor-state dispute settlement should be configured in IPAs between the EU and third countries so to comply with primary EU law (*infra* I.). A particular question in this context is whether it is possible to envisage a model, which is generally applicable or if tailor-made solutions are needed, depending on the level of development of the partner country in question (*infra* II.). If tailor-made solutions are deemed preferable, it will have to be determined if these differentiated solutions could involve delays or limitations for some investors' access to ISDS (infra III.).

## 2.1    Configuring IPAs in compliance with EU law

With regard to the abovementioned problems of IPAs concluded by the EU with third countries the following solutions may be considered for ensuring compliance with the law of the European Union.

### 2.1.1    Regulatory autonomy - overcoming the "regulatory chill"

Given the legitimate criticism against the "regulatory chill" by IPA commentators, the European Parliament and the Commission agree that the regulatory autonomy of all contracting parties must be guaranteed by an express provision in the agreement. The key problem with ISDS in this context seems to be the vagueness of the protection clauses (*infra* a.). Given all the adverse implications of ISDS, the best solution, therefore, would seem to opt for a more integrative solution, one that would be designed according to what may be called the "European model" (*infra* b.). As far as this proves politically undesirable or impossible, detailed provisions may be envisaged for the IPA aiming at more legal certainty regarding the preservation of the regulatory autonomy of the contracting parties (*infra* c.).

---

[82] See Schill (note 12), pp. 51-52. For an extensive discussion of such a system of referral see von Papp (note 103), pp. 1065-81.

[83] ECJ Opinion 1/91 *European Common Aviation Area* [1991]  ECR I-6097, paras. 61-65.

[84] ECJ Opinion 1/91 *EEA* [1991] ECR I-6079, para. 2: "...*Contracting Parties". As far as the Community is concerned, that expression covers the Community and the Member States, or the Community, or the Member States. Consequently, that court will have to rule on the respective competences of the Community and the Member States as regards the matters governed by the provisions of the agreement. To confer that jurisdiction on that court is incompatible with Community law, since it is likely adversely to affect the allocation of responsibilities defined in the Treaties and the autonomy of the Community legal order, respect for which must be assured exclusively by the Court of Justice". On this point see also* Reinisch (note 23), p. 155.

**The problem of vagueness and intended privileges**

The European Parliament vehemently expressed its concerns in 2011 as follows:[85] It

> "23. Stresses that future investment agreements concluded by the EU must respect the capacity for public intervention;
>
> 24. Expresses its deep concern regarding the level of discretion of international arbitrators to make a broad interpretation of investor protection clauses, thereby leading to the ruling out of legitimate public regulations; calls on the Commission to produce clear definitions of investor protection standards in order to avoid such problems in the new investment agreements;
>
> 25. Calls on the Commission to include in all future agreements specific clauses laying down the right of parties to the agreement to regulate, inter alia, in the areas of protection of national security, the environment, public health, workers' and consumers' rights, industrial policy and cultural diversity;"

As far as can be seen, considerable efforts have been made by the Commission for the CETA Agreement[86] and are promised to be made also for the TTIP on Trade in Services, Investment and E-Commerce, regarding definitions and clarification so as to make sure that the national and European authority to regulate is effectively protected. Also the EU Commissions' spokesman for trade, *John Clancy*, announced in a Memorandum of 20 December 2013 that under the treaty actually negotiated:

> "Legitimate policy measures taken by public authorities to protect the environment or public health and which apply to all firms in the same way – foreign or national – cannot be successfully challenged under these provisions under the guise of investment protection...
>
> ...we will leave no room for doubt. TTIP should explicitly state that legitimate government public policy decisions cannot be over-ridden. It will be made crystal clear that this agreement will not limit the scope for governments to take decisions on, for example, the balance between public provision of healthcare and private services. A company will not receive compensation merely because its profits drop due to health or environmental regulation."[87]

Accordingly, the Annex to the Article on Expropriation in the draft CETA Investment Text specifies that

> "3. For greater certainty, except in the rare circumstance where the impact of the measure of series of measures is so severe in light of its purpose that it appears manifestly excessive, non-discriminatory measures by a Party that are designed and applied to protect legitimate public welfare objectives, such as health, safety and the environment, do not constitute indirect expropriations".[88]

---

[85] European Parliament resolution of 6 April 2011 on Future European international Investment Policy (2010/2203(INI)).
[86] See supra, note 49.
[87] European Commission Directorate-General for Trade, Memorandum United States Brussels, 20 December 2013, *Investment protection does not give multinationals unlimited rights to challenge any legislation*. A statement by EU Trade Spokesman John Clancy about the investment protection provisions in Free Trade Agreements like TTIP (Transatlantic Trade and Investment Partnership), available at: http://trade.ec.europa.eu/doclib/press/index.cfm?id=1008.
[88] Supra, note 49.

But is it possible to achieve this degree of clarity through the general terms of an agreement?[89] What is the meaning of "legitimate" policy measure? And where's the tipping point, where a measure cannot be considered "legitimate" any longer? Is it not exactly for this legal grey area that the ISDS is established, with "neutral" arbiters instead of arguably biased national judges of the host state?

Ensuring that no discrimination of foreign investors may take place, is a most legitimate concern, and ISDS seems to be a legitimate and effective procedural safeguard to this effect. But is there, in turn, any safeguard against foreign investors to be privileged? The Commission aims at excluding any differentiated treatment: National and foreign investors are to be treated alike. The question, however, is whether and under which conditions privileging foreign investors could even become a purpose of the IPA. Take the case of a direct or indirect expropriation decided for a specific sector of the national economy, and little compensation only, if any, is accorded to the investors concerned because of a real public need; is it not precisely the purpose of IPAs in such a case to better protect foreign investors than national firms? Foreign investors have no representation in the political process of their host state; they are dependent upon what may come up with in a democratic process. They have, as *Albert Hirschman* would have expressed it, no voice and may therefore only vote with their feet by choosing the exit option[90] which frequently would mean to suffer significant losses. In this situation, foreign investors' protection exists for making investments safe and attractive. In this vein, the IPA could even be understood to make visible the external effects of "sovereign" national policies and, in particular, to internalize their external costs – nothing strange in a world of interdependent economies.

### The "European model" as an alternative?

If neither the desired clarity can be achieved nor a strict concept of equal treatment, thus, can serve the specific purpose of an IPA, could the drafters of the EU IPAs with third countries, such as the TTIP, possibly draw from the EU's own experience? Article 21 TEU invites us to think in this direction. The EU, in some way, deals with the democratic deficits of its Member States which result from the external effects of national policies; in accordance with the principle of subsidiarity it establishes a system of common decision-making to deal with issues one state cannot manage at all, or not without interfering with the interests of people in, or investors of other countries.[91]

Within the EU there is neither need nor place for investment protection agreements, for there are other – and sufficient – safeguards for the protection of investors from one Member State in other Member States. First of all, the general principle of non-discrimination on grounds of nationality (Article 18 TFEU), gives a fundamental assurance to intra-EU investors. A set of guarantees, secondly, for the freedoms of establishment and to provide services of free movement of capital and free payments, construed by the ECJ as individual rights of the investor exclude any unjustified restrictions. And there is common legislation for setting common standards for the preservation or promotion of common public goods. All this is based upon the common foundation of basic values including the rule of law and access to justice (Articles 2 and 19 (1) TEU, Article 47 of the Charter of Fundamental Rights).

---

[89] For an attempt to clarify of definitions and standards see Hoffmeister and Alexandru (note 5), para. III.

[90] Albert O. Hirschmann, Exit, Voice and Loyalty: Responses to Decline in Firms and Organizations and States (Harvard University Press 1970).

[91] See Jürgen Neyer, *The Justification of Europe. A Political Theory of Supranational Integration* (OUP 2012), pp. 4, 57, 68-70. Instead of replacing democracy at the European level by a "right to justification" (*ibid.*, pp. 15, 85-111), but with similar premises see Ingolf Pernice, Solidarität in Europa. Eine Ortsbestimmung im Verhältnis zwischen Bürger, Staat und Europäischer Union, in: Christian Calliess (ed.), *Europäische Solidarität und nationale Identität* (Mohr Siebeck 2013), pp. 44-56.

As this system works fairly well,[92] it would seem appropriate to build upon the "European model" granting all investors equal rights and legal certainty, instead of relying upon the traditional investment protection clauses, the effect and purpose of which are to give foreign investors a special legal status. Clearly, neither primacy nor direct applicability as accepted among Member States for Union law can easily be expected to be accepted by third countries for similar provisions established by an IPA under international law. ISDS provisions in IPAs are an attempt to achieve a similar effectiveness for the investor, if awards are final, binding and directly enforceable. As shown above, however, they remain a foreign and, sometimes, disruptive element for the internal legal system, while under the "European model" the legal system encompasses the foreign investor's rights. To make the "European model" effective, a joint commission or a court to settle disputes will be needed as well as a mechanism ensuring proper implementation of the decisions made by such institutions. Drawing from the EU experience with the European Economic Area and earlier free trade arrangements, and with some innovative thinking it nevertheless seems to be possible to find an adequate formula for ensuring effective application of the agreements to come on the basis of mutual recognition and common institutions.[93]

Contrary to IPAs including ISDS-clauses, the "EU model" would not involve special threats to the regulatory autonomy of the EU or its Member States, as there are no special rights and remedies for foreign investors. On the other hand, European investors in the US would not benefit from special protection either: US and EU investors would be treated equally, including their access to justice. As the EU trade spokesman *John Clancy* has explained:

> "the reason ISDS is needed in TTIP is that the US system does not allow companies to use international agreements like TTIP as a legal basis in national courts. So European companies – and especially SMEs – will only be able to enforce the agreement through an international arbitration system like ISDS".[94]

Against the evidence put forward by the Commission suggesting that ISDS clauses in international agreements are needed to ensure effective investment protection in litigation before U.S. courts, Jan Kleinheisterkamp in a detailed analysis states that such claims are unfounded and the underlying problems will not successfully be dealt with through ISDS but reveal a general weakness of investor state arbitration.[95] This is not about the direct application of the obligations under an international investment treaty. The question is whether there is valid reason to stir doubts about full respect for the rule of law on both sides and non-discrimination regarding access to justice. If both sides of the TTIP are proud of the respect of the rule of law and common values within their respective jurisdiction, arrangements more sophisticated than ISDS may be appropriate to meet the respective interests.

Clearly, an "EU-model" arrangement would be a novelty in this regard, and to introduce it would be beyond traditional international law and imply new thinking based upon new concepts both for the US system and for the EU. But the benefits compared to according special rights to foreign investors, as

---

[92] Exceptions must be conceded with regard to certain difficulties regarding the efficiency of the judicial system in a number of EU Member States, see: http://ec.europa.eu/justice/effective-justice/scoreboard/index_en.htm.

[93] See, for instance, Kleinheisterkamp (note 27), pp. 23-5, 27, who argues that since, for once, the EU is a very particular actor in the field of international arbitration, which has yet to establish legal standards for IPAs with third countries and is not bound to either the standards entailed in Member state BITs or other IPAs the present negotiations with Canada or the U.S. mark a decisive and precedent-setting period; hence, what is needed is a more "mature solution" that relies largely on a comparative approach that examines and outlines in more detail the "exact rights to protection that both European investors abroad as well as foreign investors in the EU should be entitled to" in the IPAs.

[94] See *supra* note 87.

[95] See Jan Kleinheisterkamp, "Is there a Need for Investor-State Arbitration in the Transatlantic Trade and Investment Partnership (TTIP)?", draft available on SSRN <www.ssrn.com>.

well as to the ISDS, with regard to the preservation of regulatory autonomy and the principle of equal treatment might be a proper argument for both sides to think about such a substantial change.

**Preserving regulatory autonomy through clear definitions and a joint committee**

If it is impossible to reach agreement with third countries upon such a system the alternative would be to spell out what regulatory autonomy entails in legal terms. Given the vagueness of many provisions of Union law regarding the internal market and objectives of complementary policies, IPAs should, thus, include a provision, perhaps in the form of an exception clause, stating clearly that neither environmental, consumer and health protection, social and welfare policies, nor policies regarding national security and cultural diversity of the contracting parties shall be jeopardised.[96] On the basis of the existing experience with investor arbitration, it should be made clear what kind of instances may not be taken as cases of direct or indirect expropriation or breaches of legitimate expectations. Such a negative list could certainly not be exhaustive, but it would give guidance to the arbiters on the limits of investors' protection.

On the procedural side, there should be provisions for a joint committee of the contracting parties or a similar body competent to give, by consensus, guiding interpretation to the provisions of the agreement after it becomes clear, in a tribunal's award that what the arbitration came up with is not what was intended by the contracting parties. Such a political body may not have competence to review an individual award, but its authentic interpretation will be of great value for the subsequent case law.

### 2.1.2    Repercussions of the "EU model" on the state aid regime

Absent special protection for foreign investors on the basis of equal treatment tensions with the EU state aid regime, as explained above, can be avoided. Investors from third countries would be subject to the same obligations regarding aids granted by Member States as investors from any EU Member State. There would be no room for claims related to commitments of national authorities of the host country with regard to a state aid, which might be found binding by an arbitral tribunal at a later stage[97] and be opposed to the order for recovery in application of the EU state aid law.

In the interest of legal certainty an IPA with ISDS-clauses shall contain express references to the obligations under the EU state aid regime and to the procedures applicable, making clear that legitimate expectations may not be based upon commitments made by a national authority regarding the compatibility of a measure with state aid law.

### 2.1.3    Securing respect for the principle of non-discrimination

Foreign investors should neither be disadvantaged nor privileged when investing abroad. Both would be cases of illegitimate discrimination. As established above, particularly ISDS-clauses could be contrary not only to the principle of non-discrimination but also to the autonomy of Union law.

Giving the foreign investors a special remedy, however, is exactly what the agreements with ISDS-clauses are about. This would not only discriminate against EU investors inside the EU but equally

---

[96] In a similar vein, Kleinheisterkamp (note 27), p. 17, looking at the EU's regulatory autonomy in the Internal Market, holds that "The core problem for the Internal Market is the high degree of legal uncertainty resulting from the vagueness of the investor protection standards and the large spectrum of possible interpretations which might be given to them in the decentralized system of investment arbitration. This uncertainty – both for states and investors – is what ultimately puts the effectiveness of EU regulation of the Internal Market into question." (internal footnotes omitted).

[97] For a general appraisal of how commitments or contractual arrangements granting stability for the investor are judged by arbitral tribunals in practice see Johnson & Volkov (note 87), pp. 372, 374 et seq.

become an incentive for investors generally to invest abroad instead of within their respective countries. To ensure equal treatment effectively would need establishing a common legal system including directly applicable guarantees in substance and procedure, along the lines given by the model of the European internal market.

### 2.1.4      Preserving the autonomy of the Union's legal order

To have no ISDS clause in an IPA would avoid any problem with regard to the autonomy of the EU legal order. The IPA would, however, loose one of the elements deemed most important and effective. To overcome any possible reluctance of US courts to apply directly the provisions of an IPA, a clear and express provision could, however, be included. With regard to the EU, the ECJ has clearly accepted that such provisions would be binding for the EU and its Member States in case on the conformity with international law of the extension of the European emissions-trading system to the air transport sector:

> "In conformity with the principles of international law, European Union institutions which have power to negotiate and conclude an international agreement are free to agree with the third States concerned what effect the provisions of the agreement are to have in the internal legal order of the contracting parties".[98]

On the assumption that American or Canadian courts as well as European courts do apply the standards set in the IPA directly in a foreign investors case, ISDS clauses would not be needed or, at least, be established as a remedy of last resort only. If, however, neither the "EU model" suggested above nor such clauses of direct applicability are politically not available, it is necessary to design ISDS arrangements so to avoid at best all implications giving reasons for concern that the autonomy of the Union's legal order be negatively affected. Not only for this purpose, but also to preserve reciprocity in this case, there should be, instead, an express clause excluding that provisions of the IPA are given direct effect.

#### 2.1.4.1      Exhaustion of local remedies

Access to ISDS was suggested to be subject to the exhaustion of local remedies. This would give national courts the opportunity to submit preliminary questions on Union law to the ECJ, so that the ECJ could give its ruling as a basis for a final judgment of an EU court. Though it would give strong guidance to an arbitration tribunal dealing with the matter subsequently, such a preliminary ruling cannot be binding upon an international arbitration tribunal while the rulings of the arbitrators are binding upon the institutions of the EU and its Member States and may provide private parties with directly enforceable rights. Yet, the ECJ's Opinion 1/00 on the European Civil Aviation Area excludes that an international court established by an agreement to which the EU is a contracting party is given jurisdiction upon the interpretation of Union law with binding effect for the EU institutions and the Member States.[99] Even if an arbitration tribunal, thus, has full information on the interpretation of the relevant provisions of EU law thanks to the provision for a local remedies clause, therefore, such a clause does not fully resolve the problem of the autonomy of the EU legal order.

#### 2.1.4.2      A standing court with power to make references under Article 267 TFEU

Instead of *ad hoc* arbitration, the IPAs of the EU could contain provisions on the establishment of a permanent court for the settlement of disputes under the IPA. Can such a court be legally bound to refer questions to the ECJ under Article 267 TFEU when the interpretation of the Treaties or the

---

[98] ECJ Case C-366/10 *Air Transport Association of America* [2011] ECR I-13833, summary para. 1.
[99] *Supra* note 77.

interpretation or validity of EU legal acts adopted according to the Treaties is at stake?[100] The question is whether an arbitration tribunal established by the EU, possibly in a mixed agreement ratified also by the Member States with a third country, can be considered as a "court or tribunal of a Member State" as required by Article 267 TFEU. The ECJ has accepted the BENELUX Court as a court of a Member State,[101] it has refused to accept, however, the complaints board of European Schools as a court allowed to make references to the ECJ, as it is a court not of a Member State but of an international organisation established by the Member States under an international agreement.[102] The wording of Article 267 TFEU would be stretched to its limits if a court established with third states would be accepted to be a court of a Member State. On the other hand, a teleological interpretation recognising the coherence of the Union's legal order and the unity of the application of Union law as the central purpose of Article 267 TFEU and the *effet utile*, could well argue in favour of a broader reading. The ISDS would have to meet the other conditions set by the Court, in particular, it would have to be established by law (though not by a legislative act of a Member State), its jurisdiction would have to be compulsory to the extent that the respondent cannot evade or circumvent its jurisdiction, the tribunal would have to be independent, awards would have to be given according to rules of law and binding. Only if the ISDS provided for a permanent arbitration court or tribunal, however, this institution could be understood as a court within the meaning of Article 267 TFEU.[103]

The question remains open, nevertheless, whether a third state would be ready to accept that the ECJ's rulings are binding upon the arbitration tribunal. At least it would request a similar assurance for its courts. As the purpose of the arbitration clauses, however, is to have a neutral judge giving a decision independently of what judges of one or the other contracting party would find appropriate, the system of Article 267 TFEU does not seem to be a proper solution to the problem of autonomy.

### 2.1.4.3    Prior involvement procedure

Taking Article 3(6) of the draft treaty on the accession of the EU to the ECHR as an example, a somewhat "softer" solution could be found in the introduction of prior involvement procedure.[104] The idea is to ensure that, where questions of EU law are at stake, the ECJ is given an opportunity to judge upon the validity or the interpretation of the act in question against the standard of EU law taking into account the obligations under the IPA before the arbitration tribunal takes its decision. Such a fully-fledged prior involvement procedure would, moreover, change the nature of investor-state arbitration if it were construed so as to give the ECJ the opportunity and power to annul the act in question. It would follow that investment arbitration would be more than a remedy for compensation and better help serve

---

[100] See on this question Reinisch (note 23), pp. 155-156.

[101] ECJ Case C-337/95 *Dior* [1997] ECR I-6013, para. 31.

[102] ECJ Case C-196/09 *Miles* [2011] ECR I-5105, paras. 39-41.

[103] For the conditions see ECJ Case C- 54/96 *Dorsch* [1997] ECR I-4961, para. 23, confirmed in Case C-96/04 *AG Niebüll*, [2006] ECR I-3561, para. 12. For a comprehensive discussion see Constanze von Papp, "Clash of 'Autonomous Legal Orders': Can EU Member State Courts Bridge the Jurisdictional Divide Between Investment Tribunals and the ECJ? A Plea for Direct Referral From Investment Tribunals to the ECJ", 50 *Common Market Law Review* (2013), pp. 1066-1076, with additional references. See also Pernice (note 54), pp. 78-79.

[104] Art. 3(6) of the Draft Accession Treaty reads: "In proceedings to which the European Union is a co-respondent, if the Court of Justice of the European Union has not yet assessed the compatibility with the rights at issue defined in the Convention or in the protocols to which the European Union has acceded of the provision of European Union law as under paragraph 2 of this article, sufficient time shall be afforded for the Court of Justice of the European Union to make such an assessment, and thereafter for the parties to make observations to the Court. The European Union shall ensure that such assessment is made quickly so that the proceedings before the Court are not unduly delayed. The provisions of this paragraph shall not affect the powers of the Court."

justice.[105] If the ECJ nullifies the relevant act, this would of course change the legal situation to be assessed by the tribunal. But even if there is only an interpretation given to the relevant Union acts, and even if this ruling if the ECJ is not binding for the tribunal, in the spirit of sincere cooperation underlying each IPA, it would take this interpretation as a given fact and contemplate on that basis upon the claims lodged by the investor.[106]

What remains unanswered, however, is how to construe the adjudicatory competence of the ECJ in such cases. Neither Article 267 TFEU on preliminary rulings nor Article 272 TFEU on the possibility for the ECJ to be conferred upon "jurisdiction to give judgment pursuant to any arbitration clause contained in a contract concluded by or on behalf of the Union" seem to allow for the less invasive construction of prior involvement,[107] for the ECJ would not be the arbiter and judge of last instance but just a "consultant" for the arbitral tribunal. Likewise, Article 273 TFEU stating that the ECJ shall have jurisdiction in any dispute between Member States which relates to the subject matter of the Treaties if the dispute is submitted to it under a special agreement between the parties, only applies to disputes between Member States, not the EU and third parties.[108] That the ECJ may be asked for its legal opinion, particularly in an international law context, can be seen from Article 218 (11) TFEU. But this provision is very specific and neither susceptible to an extensive application nor open for an application by analogy. The Court in its Opinion 1/92 on the European Economic Area made clear that despite the fact that the powers conferred upon the Court by the Treaties may only be modified pursuant to the procedures established therein and "an international agreement concluded by the Community may confer new powers on the Court, provided that in so doing it does not change the nature of the function of the court as conceived in the EEC Treaty."[109] In the opinion of the Court, the function-preserving character required for the conferral of new competences invariably implies the binding effect of the Court's decisions.[110] Prior involvement, conceived as a less invasive instrument, would, therefore, be a new competence of the ECJ and require prior amendment of the TFEU.[111]

## 2.2    One-size-fits-all or tailor-made solutions?

There seems to be a political preference for adopting one model for IPAs with ISDS-clauses for all economic partners of the EU worldwide. It could allow for the interpretation of the specific criteria to be applied for the protection of foreign investors, and so enhance legal certainty in an – ideally – global market to the benefit of all countries and the people thereof.[112] It could even end up in, at least indirectly, a sort of *global ius commune* insofar as other countries may feel induced to agree on similar terms as laid down in the "model-agreement". To reach such a solution, a transparent process and some openness for the participation of other countries – as observers – in the negotiation of the first important IPAs of the European Union could be of great help.

---

[105] Cf. *supra* III.4.
[106] Some provisions of a similar kind are made in Article 3 of Annex 1 to Article X-27 of the draft CETA Investor-to-State Dispute Settlement Text for „a person or an entity that is not a disputing party (third persons(s)") to file a written submission with the arbitral tribunal regarding a matter within the scope of the dispute".
[107] Unless, however, one would follow the broader approach to Art. 267 TFEU and the parties to the IP would be willing to design the ISDS system in accordance with the criteria set out, see *supra* b.
[108] ECJ, Case C-370/12 *Pringle*, nyr, para. 175.
[109] ECJ, Opinion 1/92 *EWR II* [1992] ECR I-2821, para. 32.
[110] Ibid., para. 33.
[111] Insofar, preference might be given to system where local remedies need to be exhausted, see *infra* III.1.
[112] In this vein see Montt (note 2) p. 371 et seq., with a comparative law approach, concluding:"…investment treaty jurisprudence is currently following and should follow this general structure. Restricting the scope of expropriations to claims involving total and substantial deprivations – global constitutional law – and assigning the FET clause to claims involving the periphery – global administrative law – serve as a proper and convenient interpretation of investment treaties".

The existing system of bilateral investment agreements governed by international law and the Vienna Convention on the Law of Treaties with its rules on the interpretation of international treaties, however, is far from such a "systematic" solution. Also with a view to the diversity of the development both, economically and regarding to good governance, individual rights, the rule of law and judicial protection there are doubts whether a one-size-fits-all solution is at all realistic. It seems, rather, to be appropriate to consider a "European model" solution as suggested *supra* B.I.1.b. in the framework of agreements upon free trade areas such as under the TTIP with the US or the CETA with countries having similarly developed systems of fundamental rights and judicial review. In a medium or long term perspective, this solution, once adopted, could be offered as the standard model to more and more partners in the world as the appropriate means to ensure free trade and investment on the basis of non-discrimination, the rule of law and other shared values.

Cooperation with other countries could be developed upon the basis of agreements containing ISDS clauses of a "new generation" that make sure that national public policies are not jeopardised. Effective protection could be conditioned in such agreements by clauses making sure that the investors fully respect certain internationally agreed rules of behaviour, including the standards of corporate social responsibility (CSR).

### 2.3        Delaying or differentiating investor's access to ISDS

At first sight, it is difficult to find reasons for differentiating among investors with regard to access to ISDS. Such differentiation could easily be understood as discriminatory. There are cases, nevertheless, where a differentiation should be seriously considered. Among those instances, the "local remedies privilege" seems to be most attractive (*infra* 1.). Another approach of differentiation could be to distinguish *ratione materiae*, i.e. with a view to the diverse guarantees given in an IPA (*infra* 2.). A third differentiation could be considered with regard to the urgency of the matter (*infra* 3.).

#### 2.3.1        Local remedies privilege

While no investor may be admitted to pursue her issue at national court and an arbitral tribunal in parallel,[113] if an investor has exhausted local remedies in the host country it may be justified to facilitate its access to the ISDS both, regarding procedure and regarding fees.

The investor choosing first to pass through the proper channels of the national legal system in the host country, including, if applicable, reference to the ECJ under Article 267 TFEU, before availing herself with the rights under ISDS, could not be held as using an unfair privilege in comparison to the national competitors. Understanding the ISDS as a remedy of last resort would indicate that the investor has taken seriously the judicial system, the law and the regulatory autonomy of the host country. Prior involvement of the ECJ in the ISDS proceedings would not be needed. All questions on law and facts relevant in the case would be on the table and this would considerably facilitate the tasks of the arbitration tribunal. This would facilitate and probably also accelerate the arbitration, and so compensate to some extent, for some of the losses in time and fees suffered because of the use of local remedies.

If it is accepted that the effectiveness of ISDS would be in question if the exhaustion of local remedies was made a general condition for the access to ISDS – an assumption that might not be true in all cases and would be wrong if procedures were accelerated at the national level –, providing for a "local remedies privilege", therefore, could have considerable advantages. Furthermore, it would induce investors to accept the domestic judicial system as a first and hopefully effective remedy. The potential

---

[113] See also Hoffmeister and Alexandru  (note 5), para. IV.2.

"control" by an arbitration tribunal under ISDS-clauses would encourage the national judges to carefully consider the case also with regard to the standards set by the IPA, and it would therefore probably reduce the number of claims in the ISDS and so save costs and time for the investors as well as for the contracting parties.

### 2.3.2    Differentiation ratione materiae

It is appropriate to give investors privileged access to ISDS in cases of violation of the principle of fair and equitable treatment where access to justice in the host country is refused. There are good reasons to allow in such circumstances direct access to ISDS. The question is what provisions may be adopted to allow that the problem be rapidly remedied. The most appropriate seems to be that, after all efforts for amicable settlement have failed, the arbitration tribunal can order the re-examination of the matter by the domestic authorities or courts with penalties to be paid for any undue delay, if it does not directly award adequate compensation to the investor for the failure of the national authorities of the host state to ensure fair and equal treatment.

Similar preference could be considered for cases where the transfer of capital related to the investment is restricted. Such cases need rapid remedy, and there seems to be no major difficulty in assessing the legitimacy of a claim or of the measure put to scrutiny. Like in the case where access to justice is refused, there could be an accelerated procedure to come rapidly to a final decision.

Other cases such as compensation for direct or indirect expropriation or violations of the principles of national or most favoured nation treatment may be more difficult to judge, in particular where the regulatory autonomy of the host state is at stake. Such cases could, when all efforts for an amicable settlement have failed, be subject to a two step procedure under which a claim to the arbitration tribunal is admissible only after a "special committee" to be established by the contracting parties has found that the claim under the ISDS is not abusive. Delays caused by this method seem to be justified if the matter touches directly the democratically established policies of a contracting party and the opening of a procedure under ISDS would, therefore, create considerable political problems.

### 2.3.3    Differentiation ratione tempore – urgency and interim measures

Special attention should be paid to cases where a rapid decision by the arbitration tribunal or even interim measures can avoid greater damage. There should be an accelerated procedure upon request of the investor for such cases, if the "special committee" finds the request *prima facie* well grounded. However, the arbitration tribunal in charge may decide to deal with the case in normal proceeding if the reasons given for the accelerated procedure prove not to hold in substance.

## 3.    INSTITUTIONAL AND PROCEDURAL ISSUES OF ISDS SYSTEMS

The primary purpose of ISDS mechanisms in investor protection agreements of the EU must be the preservation of the rule of law. It can be seen as a first step to take international law seriously. In spite of the contracting parties being states – or the EU – which accord procedural rights to individuals, the fact that private persons or companies can enforce guarantees contained in the IPA benefitting them against the host state, must be understood as a major achievement in international relations.

Against this backdrop several questions need to be addressed with regard to the concrete design of ISDS procedures to form an integral part of the EU legal order in the future. Should there be a permanent court (*infra* I.)? What should the conditions for access to the ISDS be and, in particular, should the exhaustion of local remedies be required (*infra* II.)? How can the autonomy and coherence of the Union's legal order be preserved (*infra* III.)?

Other questions regard the confidentiality of the procedures, the exclusion of the public and the composition of the tribunals. In response to the various criticisms against an ISDS to be established with the US as part of the TTIP the European Commission has made clear that it will ensure that the following principles determine the system:

> "(3) Third, we will open up investment tribunals to scrutiny. Documents will be public. Hearings will be open and interested parties - including NGOs and civil society groups - will be able to make submissions. Transparency is the principle.

> (4) Finally, we will eliminate any risk of conflict of interests. The arbitrators who decide on EU cases must be above suspicion. The defending party will have a right to veto two of the three arbitrators appointed in any case. All of them will be required to sign up to a strict, enforceable, code of conduct. We will also push for the inclusion of appeal mechanisms in future agreements".[114]

These commitments cover important conditions under which ISDS can only be acceptable: Transparency and access to information (*infra* IV.), public participation in the proceedings (infra V.), careful selection of the arbitrators (*infra* VI.) and the introduction of an appeal mechanism (*infra* VII.).

## 3.1        Should there be an ad hoc tribunal or a standing court?

It has been said that only with a standing court the introduction of a preliminary question-procedure involving the ECJ could be considered.[115] Apart from this rather unrealistic option, the criterion for the choice of an *ad hoc* tribunal or a standing court should be the authority and legitimacy of this institution. Given the power of the ISDS tribunals to issue awards which may affect the regulatory autonomy of the contracting parties, legitimacy requirements are of utmost importance. It is the choice and the independence of the tribunal and of the arbitrators, it is the transparency of the proceedings, but it is also the visibility and stability of the institution to be held accountable for its case law what makes up legitimacy. If *ad hoc* tribunals with changing composition appear and disappear, if arbitrators are appointed *ad hoc,* after having worked as lawyers in other cases and before returning to other business when the case is decided, it will be more than difficult for the general public to hold them accountable, to assess the awards and to react to the performance of the system at large. With a permanent court, in contrast, some kind of jurisprudence will be developed within the framework of each agreement that the judges have to stand for and on which basis some legal certainty may emerge progressively.

While *ad hoc* arbitration tribunals seem better to correspond to a diplomatic approach of relations and negotiation among sovereign states, a standing court with carefully selected judges would be an important element in the emerging system of global governance committed to the rule of law. Though the authority and legitimacy will always have its source in the will of the contracting parties, the public will have an interest in its work and the discourse on it has a legitimizing effect, too. This discourse, and with it the accountability of the ISDS to the public is certainly facilitated with a standing court the judges of which are known as well as the case-law developed.

---

[114] Memorandum of 20 December 2013, *supra* note 87. More details about how these provisions look like can be found in the Draft CETA Agreement (note 11), Article x-33: Transparency of Proceedings.
[115] In this vein Nikolaos Lavranos, Designing an International Investor-to-State Arbitration System after Opinion 1/09, in: Marc Bungenberg & Christoph Herrmann (eds.), European Yearbook of International Economic Law – Special Issue: Common Commercial Policy after Lisbon (Springer 2013), p. 216, who proposes to assign a "special court in the Member [State] or within the ECJ that would act as an investor-to-state arbitration court."

**3.2        Access to ISDS, the local remedies rule and the role of a "special committee"**

Among the Commission's principles for the ISDS reference is made to the amicable settlement, which shall be encouraged.[116] Indeed, the arbitration tribunal should be regarded as a solution of last resort only. As a consequence, access to ISDS should be subject to a compulsory attempt to reach settlement.

Whether or not the exhaustion of local remedies should be made a condition for the access to ISDS is questionable. On the one hand, local courts could rapidly remedy the problems, and they might be more familiar with the exact circumstances of the case and contribute to proper fact-finding. Compulsory exhaustion of local remedies would also, in the case of the EU, offer the opportunity for the ECJ to be involved and to rule on any question of Union law.[117] On the other hand, they may be suspect of being biased, and the investors' protection could loose much of its effectiveness if the investors had to go through all instances of national courts before being admitted to ISDS. In any event, the local remedies rule could only be admitted as a compulsory condition if a time limit is included giving the investor a right to pass on to the ISDS if within the given time limit the national courts have not come to a satisfactory decision.[118]

The more appropriate solution seems to be, as explained above, to arrange for a "local remedies privilege" by which investors who have tried to pursue their case in the host state would benefit from some advantages regarding the ISDS.

As all ISDS procedures are time consuming and costly for both sides, there should be some filter for rejecting *a limine* claims that are abusive or evidently unfounded. The permanent court should be assisted for this purpose by a "special committee", as already mentioned, which may be composed of one representative of each of the contracting parties and the chair of the arbitration tribunal they may agree upon. This committee could also be in charge of admitting investors for the "accelerated procedure" when good reasons are given for the urgency of the matter.

**3.3        Preserving the autonomy and coherence of the Union's legal order**

In cases where local remedies have not been exhausted – and the ECJ has not been given an opportunity to rule on relevant questions of EU law – it would be of great help, as explained, to provide for a prior involvement of the ECJ as a part of the ISDS. Some discrimination and distortion of competition among investors which may affect the proper functioning of the EU legal system could so be avoided, even if the rulings of the ECJ would not have legally binding effect for the arbitration tribunals.

These tribunals, in turn, should be bound, in applying the provisions of the IPA, to abstain from giving their own interpretation to provisions of national or Union law but endeavour to follow authoritative guidance from the ECJ or hear the European Commission – to be invited as *amicus curiae* – for obtaining information on how relevant Union law should be understood. Provisions to this effect should be included in the agreement on ISDS.

---

[116] See the explanations given on ISDS in the consultation document, supra, note 49: „The EU will encourage the amicable settlement of disputes, through a required period for consultations, and the possibility of mediation".
[117] See already supra B.III.1. The problem remains, that such preliminary rulings would not be binding upon the arbitration tribunal, see supra B.I.4.a.
[118] On this point see the discussion in the study of Steffen Hindelang, Investor-State Dispute Settlement (‚ISDS') and Alternatives of Dispute Resolution in International Investment Law (2014, part 2 of the present project for the EP), para.1.3.2.2, suggesting also „an ‚elastic' local remedies rule" as a pragmatic solution that takes account of the position of the contracting party in the Rule of Law Index (ibid.).

## 3.4        Transparency and access to information

One of the fundamental requirements of legitimacy both for the negotiation process of IPA establishing ISDS and of the functioning of ISDS is transparency. "Information is the currency of democracy", these words, attributed to *Thomas Jefferson*, have got new emphasis in the past decades, namely with the internet. As early as in 1990 the European Union has introduced provisions on open access to information, unknown so far in most of the Member States with its Directive 90/313 on the freedom of access to information regarding the environment.[119] The United States follow this trend, as shown by the „Open-Government-Initiative" promoted by President Obama striving for a change towards transparency and public participation guided by the idea of „collaborative governance".[120] This shows that transparency is a precondition and an essential element of democratic governance.[121]

The time of secret diplomacy in processes of international rule-making seems to be over. As the experience with the ACTA-agreement shows, people in Europe are reluctant to accept secretly negotiated provisions relevant to their daily lives. The drafts and documents related to the CETA, the TTIP and other agreements should, therefore, be made available to the public and open discussion. Accordingly, the proposals of the Commission to provide for public access to information and documents related to ISDS proceedings shall be welcomed. It allows scrutiny and criticism by all interested parties and, thus, contributes to the legitimacy of the tribunals, academic analysis and, finally also to legal certainty for investors and states. In this vein, all arbitral proceedings under ISDS to which a Member State is party must be open to the public and its decisions be published.[122] It is only under the conditions of transparency that parliamentary control can take place effectively. The launch of a public consultation on the EU's investment chapter within the negotiations of the TTIP early 2014 by Commissioner De Gucht was a first important step.[123]

## 3.5        Public participation in the proceedings

The same is true for allowing public participation in the proceedings, namely that, for instance, NGOs and civil society at large have an opportunity to submit their views. The more the discourse is open to the public, the less suspicion will remain regarding the integrity of the process. Organising ISDS as an open and participatory instrument for finding an appropriate balance between sovereign democratic decisions of the host country and the protection of legitimate business interests of the investor would be a great step towards a new culture of openness in global governance.

## 3.6        Choice and deontology of the arbitrators

Arbitrators in ISDS are exercising an enormous power, their choice and deontology must therefore be beyond any doubt. The current practice is opaque and all initiatives for introducing a transparent and rule-based system for the selection of arbitrators and for establishing a code of conduct for their activities must be welcomed. These rules could follow the system for selection of judges for supreme or

---

[119] Council Directive 90/313/EEC of 7 June 1990 on the freedom of access to information on the environment. O.J. L 158, 23 June 1990, pp. 56–8.
[120] White House: "Transparency and Open Government", available at: http://www.whitehouse.gov/open/about. Critical regarding the practical implementation and acceptance: *G. Wewer*, Eine Blaupause für Deutschland? Barack Obama und die kollaborative Verwaltung, in: dms 2013, pp. 182 et seq.
[121] For more details see Ingolf Pernice, "Verfassungs- und europarechtliche Aspekte der Transparenz staatlichen Handelns", in: Alexander Dix et al. (Hrsg.) *Informationsfreiheit und Informationsrecht. Jahrbuch 2013* (Lexxikon 2014), pp. 17-34.
[122] For this transparency see also Hoffmeister and Alexandru (note 5), para. IV.3. From a German constitutional law perspective arriving at the same conclusion Johanna Wolff, "Nicht-öffentliche Schiedsverfahren mit Beteiligung der öffentlichen Hand am Maßstab des Verfassungsrechts", Neue Zeitschrift für Verwaltungsrecht 2012, pp. 205-209.
[123] Se for this Hoffmeister and Alexandru (note 5), para. V. with reference to European Commission, Press Release of 21 January 2014, http://trade.ec.europa.eu/doclib/press/index.cfm?id=1015.

international courts, if there is a standing court as suggested above; but even if a system of ad-hoc tribunals is envisaged, the list of persons available for participating in an arbitration tribunal should be established in a transparent and rule-based procedure excluding any conflict of interest and doubts about the integrity of the arbitrators.

### 3.7    Appeal mechanism

With a view to give the public interest of the contracting parties a decisive role and to allow some control over the outcome of ISDS in a given case, it seems to be appropriate to provide for an appeal mechanism allowing a final review by the contracting parties of the awards given by the arbitration tribunal. There is no reason, though, to duplicate the arbitration-model. The review should rather be a matter for a joint committee composed by representatives of both contracting parties. Appeals should be open to be launched both, by the investor or by the respondent. Only if the joint committee comes to an agreement upon the incorrectness of the award, the award may be nullified and sent back to the arbitration tribunal with instruction about the agreed interpretation of the rules in question or, if there is no room for further consideration, be amended so as to comply with the authoritative interpretation given to the IPA by the contracting parties.

Clearly, the appeal procedure should be open and transparent like the proceedings of the ISDS.

## 4.    CONCLUSIONS

International investment protection agreements are a challenge with regard to European Union law for several reasons. As an important instrument for securing some legal certainty and protection for European investors worldwide, their application among countries that have developed sophisticated systems of judicial remedies and protection of fundamental rights on the basis of the rule of law would, to some extent, imply that these countries do not seriously believe in their own achievements of civilisation. These symptoms of crisis should, first, give rise to revisiting internally, for each party, their internal legal system with a view to ensure effective legal protection without discrimination for all investors: foreign investors, but to ensure equal treatment also for local, national and European investors. The existing problems could, second and in addition, be taken as an incentive for developing, at the international – if not global – level safeguards that provide for investors (and why not for private individuals in general) an effective judicial remedy "of last resort" in case the agreed standards of protection of fundamental rights in general, including protection against direct or indirect expropriation, unfair and inequitable treatment etc. are violated.

A double strategy, thus, is needed that would not only be more consistent with the common values affirmed by the EU-Treaty, in particular as guiding its external action (Articles 2, 3 (5) and 21 (1) TEU) as well as many international instruments, and generally improve the investment climate worldwide, but also contribute to avoiding certain tensions that may only in part be remedied by a specific configuration of international investment agreements including ISDS systems to be concluded by the European Union.

With this perspective, the findings of the present study can be understood also as presenting elements for a strategy of progressively establishing a framework of mutual trust and legal certainty for global trade and investment based upon the rule of law, due process and the respect of fundamental rights common to democratic societies.

1.    Given the differences in development of the legal systems worldwide, some differentiation regarding IPAs seems to be unavoidable: ISDS have a special history, special reasons and special purposes: What may be successful for asymmetric relationships in terms of development and

good governance may not be the best solution for contracting parties with similarly effective systems for the effective protection of national and foreign investors.

2. IPAs concluded by the EU with third countries would be applicable with no regard to the division of powers and responsibilities within the EU. Due to their general terms and absent any express exceptions, such as envisaged for the audio-visual industry, they apply to any sector of activities within the Member States. The rules on primacy and direct effect of EU law would be applicable within the Member States, including to national constitutional law. Their rules in substance as well as regarding the interpretation, thus, need to be carefully framed.

3. Particular attention should be given to issues like the "regulatory chill" challenging the autonomy of the democratic legislator, and the "super-protection" privilege of foreign investors using the "fast track" for defending their interests at arbitration tribunals instead of national courts where their local competitors have to appeal to. Also tensions with the EU state aid system and – at least indirect – threats to the autonomy of the EU legal order demand differentiated solutions.

4. A more sophisticated, integration-oriented "European model"-solution with common legislative and judicial institutions might be the better way to address questions of discrimination and direct or indirect expropriation, or to ensure fair and equitable treatment within the framework of transatlantic free trade arrangements and agreements with states having similar values and standards. As the European experience shows, real free trade presupposes more than mutual recognition of technical, health, environmental, consumer protection etc. norms and standards, but requires norm-setting mechanisms; and some provision for dispute settlement is needed not only for investments but also more generally with regard to the effective functioning of a free trade area.

5. With the perspective of stretching such an arrangement to other countries that may not yet be considered ready to join such a system, or if it proves to be too audacious to pursue this path, a new generation of IPA's with ISDS, to be negotiated and concluded in an open and transparent manner should be envisaged. Specific features of such agreements, deemed to ensure to the highest possible degree conformity with the EU law, namely preserving the autonomy with the EU legal order, might be:

   a. an express provision for the direct effect of the guarantees laid down in the IPA before the courts of each contracting party

   b. a local remedies privilege encouraging the request, where appropriate, of preliminary rulings of the ECJ giving guidance to the arbitration tribunal, if needed, on the interpretation of EU law

   c. a prior involvement-clause for the ECJ to be given the right to take a decision where questions of (validity of) EU law are at stake in so far, as no other authoritative interpretation is available.

6. IPAs including ISDS-clauses should provide for the establishment of a standing court responsible for all settlements under each particular IPA, with permanent judges chosen by the contracting parties under rule-based, democratic and transparent procedures, and subject to a strict ethical code of conduct. This court – or if an ad hoc tribunal is established – this tribunal shall

   a. provide for public access to the documents submitted in each case

   b. accept submissions of third parties and NGO's

    c.   hear the case in a public hearing

    d.   develop its case-law on a comparative law basis with a view to ensuring legal certainty

    e.   provide for an appeal mechanism giving the contracting parties the opportunity to scrutinise an award and, if necessary, nullify it or give an authentic interpretation to the relevant terms of the IPA.

7.   A joint institution should be established, composed of representatives of the contracting parties as well as of the president of the arbitration tribunal, to act as a "special committee" with all necessary powers to

    a.   serve as a mediator making every possible effort to find an amicable settlement of the disputes

    b.   assess whether or not a claim to the tribunal is abusive for it constitutes a threat to the national legislative autonomy

    c.   allow for an accelerated procedure where interim measures seem to be necessary for avoiding irreparable damage

    d.   give authoritative guidance upon the interpretation of relevant provisions of the IPA and suggest general solutions for harmonised approaches in all policy areas relevant for the full implementation of the IPA.

8.   The principle of transparency should also apply to the negotiation of IPAs by the EU institutions. The opportunity should be taken for developing and negotiating a new model of cooperation between the EU and third countries regarding international investment protection in an open and public process as a first step towards conditions that Article 21 (2) (h) TEU calls "good global governance".

## Bibliography

Bermann, George A., "Navigating EU Law and the Law of International Arbitration", in: 28 Arbitration International (2012), pp. 397-445

Brownlie, Ian, Principles of Public International Law, 7th ed. (2008)

Bungenberg, Marc, Reinisch, August, Tietje, Christian (eds.), EU and Investment Agreements: Open Questions and Remai-ning Challenges (Nomos 2013)

de la Rochère, Jacqueline Dutheil, "L'effet direct des accords internationaux", in: Allan Rosas, Egils Levits and Yves Bot (eds.), The Role of the Court of Justice, in: The Court of Justice and the Construction of Europe: Analyses and Perspectives on Sixty Years of Case Law (Asser Press Springer 2013)

Durner, Wolfgang, "Wirtschaftliche Grundrechte", in: Detlef Merten / Hans-Jürgen Papier (eds.), Handbuch der Grund-rechte in Deutschland und Europa VI/1 (C.F. Müller 2010) § 162 paras. 49-56

Eckes, Christina, "Protecting Supremacy from External Influences: A Precondition for a European Constitutional Or-der?", European Law Journal 18 (2012), pp. 230-50

European Commission, Press Release of 21 January 2014, http://trade.ec.europa.eu/doclib/press/index.cfm?id=1015

Gragl, Paul, "A giant leap for European Human Rights? The Final Agreement on the European Union's accession to the European Convention on Human Rights", 51 Common Market Law Review (2014), pp. 13-58

Hindelang, Steffen, "Der primärrechtliche Rahmen einer EU-Investitionsschutzpolitik: Zulässigkeit und Grenzen von Investor-Staat-Schiedsverfahren aufgrund künftiger Abkommen", in: Marc Bungenberg & Christoph Herrmann (eds.), Die gemeinsame Handelspolitik der Europäischen Union nach Lissabon (Nomos 2011), p. 157

Hindelang, Steffen, The Free Movement of Capital and Foreign Direct Investment (OUP 2009)

Hirschmann, Albert O., Exit, Voice and Loyalty: Responses to Decline in Firms and Organizations and States (Harvard University Press 1970)

Hoffmeister, Frank and Ünüvar, Günes, From BITS and Pieces towards European Investment Agreements, in: Marc Bungenberg, August Reinisch and Christian Tietje (eds.), EU and Investment Agreements: Open Questions and Remaining Challenges (Nomos 2013), p. 57

Hoffmeister, Frank and Gabriela Alexandru , A First Glimpse of Light on the Emerging EU Model BIT, in: The Journal of World Investment & Trade Vol. 15 (2014), forthcoming

Jacobs, Francis G., The Internal Legal Effects of the EU's International Agreements and the Protection of Individual Rights, in: Anthony Armull et al. (eds.), A Constitutional Order of States? Essays in EU Law in Honour of Alan Dashwood, (Hart 2011), p. 529

Johnson, Lise and Volkov, Oleksandr, "Investor-state contracts, host-state 'commitments' and the myth of stability in international law", in: 24 The American Review of International Arbitration  (2013), p. 365

Kleinheisterkamp, Jan, "Financial Responsibility in the European International Investment Policy", ICLQ 63:2 (2014), forthcoming

Kleinheisterkamp, Jan, "Is there a Need for Investor-State Arbitration in the Transatlantic Trade and Investment Part-nership (TTIP)?", draft available on SSRN http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2410188

Knauer, Sebastian, Vattenfall vs. Deutschland. Machtkampf um Moorburg, in: Spiegel Online available at http://www.spiegel.de/wirtschaft/vattenfall-vs-deutschland-machtkampf-um-moorburg-a-635520-2.html

Kohlenberg, Kerstin, Pinzler, Petra and Uchatius, Wolfgang, Im Namen des Geldes, Die Zeit No. 10, Dossier, 27 February 2014, p. 15

Kuijper, Pieter Jan, "It Shall Contribute to … the Strict Observance and Development of International Law", in: Allan Rosas, Egils Levitz and Yves Bot (eds.), The Role of the Court of Justice, in: The Court of Justice and the Construction of Europe: Analyses and Perspectives on Sixty Years of Case Law (Asser Press Springer 2013), pp. 589

Lavranos, Nikolaos, Designing an International Investor-to-State Arbitration System after Opinion 1/09, in: Marc Bungenberg & Christoph Herrmann (eds.), European Yearbook of International Economic Law – Special Issue: Com-mon Commercial Policy after Lisbon (Springer 2013), p. 216

Lavranos, Nikos, "The CJEU's Relationship with Other International Courts and Tribunals", in: Karsten Hagel-Sorensen et al. (eds.), Europe: The New Legal Realism – Essays in Honour of Hjalte Rasmussen (Djof Publ. 2010), pp. 395 et seqq.

Lenaerts, Koen and Van Nuffel, Piet, European Union Law, 3rd ed. (Sweet & Maxwell 2011),

Martinez, Francesca, "Direct effect of International Agreements of the European Union", in: European Journal of Inter-national Law 25 (2014), 129

Montt, Santiago, State Liability in Investment Treaty Arbitration. Global Constitutional and Administrative Law in the BIT Generation, Hart Publishing 2009

Neyer, Jürgen, The Justification of Europe. A Political Theory of Supranational Integration (OUP 2012)

Pernice, Ingolf, "The Autonomy of the EU Legal Order - Fifty Years After Van Gend", 50ème anniversaire de l'arrêt Van Gend en Loos : 1963-2013 : actes du colloque, Luxembourg, 13 mai 2013 (Ed. Office des publications de l'Union eu-ropéenne – Luxembourg 2013) p. 55

Pernice, Ingolf, "Verfassungs- und europarechtliche Aspekte der Transparenz staatlichen Handelns", in: Alexander Dix et al. (Hrsg.) Informationsfreiheit und Informationsrecht. Jahrbuch 2013 (Lexxikon 2014), pp. 17-34

Pernice, Ingolf, Domestic courts, constitutional constraints and European democracy: What solution for the crisis?, in: Maurice Adams, Federico Fabbrini & Pierre Larouche (eds.), The Constitutionalization of European Budgetary Con-straints (Hart Publishing 2014)

Pernice, Ingolf, Solidarität in Europa. Eine Ortsbestimmung im Verhältnis zwischen Bürger, Staat und Europäischer Union, in: Christian Calliess (ed.), Europäische Solidarität und nationale Identität (Mohr Siebeck 2013)

Reinisch, August, "The EU on the Investment Path – Quo Vadis Europe? The Future of EU BITs and other Investment Agreements", in: 12 Santa Clara Journal of International Law (2014), p. 111

Schill, Stephan W., "Luxembourg Limits: Conditions for Investor-State Dispute Settlement under Future EU Investment Agreements, in: Marc Bungenberg, August Reinisch and Christian Tietje (eds.), EU and Investment Agreements: Open Questions and Remaining Challenges (Nomos 2013), p. 44

Schlandt, Jakob, 15 Juristen gegen die Demokratie, Frankfurter Rundschau of 13 May 2013, available at: http://www.fr-online.de/wirtschaft/vattenfall-15-juristen-gegen-die-demokratie,1472780,22189216.html

Solomon, Ilana, "No Fracking Way: How Companies Sue Canada to Get More Resources", Huffington Post available at: http://www.huffingtonpost.ca/ilana-solomon/lone-pine-sues-canada-over-fracking_b_4032696.html

von Papp, Constanze, "Clash of 'Autonomous Legal Orders': Can EU Member State Courts Bridge the Jurisdictional Di-vide Between Investment Tribunals and the ECJ? A Plea for Direct Referral From Investment Tribunals to the ECJ", 50 Common Market Law Review (2013), pp. 1066-1076

Weiß, Wolfgang, "Human Rights in the EU: Rethinking the Role of the European Convention on Human Rights after Lisbon", in: European Constitutional Law Review 7 (2011), 64

Wessel, Ramses A., "Between the Authority of International Law and the Autonomy of EU Law, in: J. Diez-Hochleitner et al. (Eds.), Últimas tendencias en la jurisprudencia del Tribunal de Justicia de la Unión Europea (Wolters Kluwer 2012), pp. 759-65

Wewer, G, Eine Blaupause für Deutschland? Barack Obama und die kollaborative Verwaltung, in: dms 2013, pp. 182 et seq.

White House: "Transparency and Open Government", available at: http://www.whitehouse.gov/open/about

Wolff, Johanna, "Nicht-öffentliche Schiedsverfahren mit Beteiligung der öffentlichen Hand am Maßstab des Verfassungsrechts", Neue Zeitschrift für Verwaltungsrecht 2012, pp. 205-209



EUROPEAN PARLIAMENT

QA-04-14-805-EN-N

**DIRECTORATE-GENERAL FOR EXTERNAL POLICIES**

# POLICY DEPARTMENT

## Role

Policy departments are research units that provide specialised advice
to committees, inter-parliamentary delegations and other parliamentary bodies.

## Policy Areas

Foreign Affairs
    Human Rights
    Security and Defence
Development
International Trade

## Documents

Visit the European Parliament website: **http://www.europarl.europa.eu/studies**



PHOTO CREDIT: iStock International Inc.

ISBN 978-92-823-5961-7
doi: 10.2861/68289



Publications Office