# EXHIBIT 68

OPINION 1/17 OF THE COURT (Full Court)

30 April 2019

(Opinion pursuant to Article 218(11) TFEU — Comprehensive Economic and Trade Agreement between Canada, of the one part, and the European Union and its Member States, of the other part (CETA) — Investor-State Dispute Settlement (ISDS) — Establishment of a Tribunal and an Appellate Tribunal — Compatibility with primary EU law — Requirement to respect the autonomy of the EU legal order — Level of protection of public interests determined, in accordance with the EU constitutional framework, by the EU institutions — Equal treatment of Canadian investors and EU investors — Charter of Fundamental Rights of the European Union — Article 20 — Access to the above Tribunals and their independence — Article 47 of the Charter — Financial accessibility — Commitment to guarantee that accessibility for natural persons and small and medium-sized enterprises — External and internal aspects of the requirement of independence — Appointment, remuneration and ethics of the Members — Role of the CETA Joint Committee — Binding interpretations of the CETA determined by that Committee)

Table of contents

I. The request for an opinion

II. The CETA
   A. The signature of the CETA and the envisaged establishment of a mechanism for the resolution of disputes between investors and States
   B. The concepts of 'investment' and 'investor'
   C. The scope of the envisaged ISDS mechanism
   D. The law applicable
   E. The procedural rules
   F. The Members of the envisaged Tribunal and Appellate Tribunal
   G. The Joint Committee and the Committee on Services and Investment
   H. No direct effect of the CETA in the legal systems of the Parties
   I. The Joint Interpretative Instrument and Statement No 36

III. Summary of the doubts expressed by the Kingdom of Belgium
   A. Doubts as to the compatibility of the envisaged ISDS mechanism with the autonomy of the EU legal order
   B. Doubts as to the compatibility of the envisaged ISDS mechanism with the general principle of equal treatment and the requirement of effectiveness
   C. Doubts as to the compatibility of the envisaged ISDS mechanism with the right of access to an independent tribunal

IV. Summary of the observations submitted to the Court
   A. The compatibility of the envisaged ISDS mechanism with the autonomy of the EU legal order
   B. The compatibility of the envisaged ISDS mechanism with the general principle of equal treatment and with the requirement of effectiveness
   C. The compatibility of the envisaged ISDS mechanism with the right of access to an independent tribunal

V. Position of the Court
   A. The compatibility of the envisaged ISDS mechanism with the autonomy of the EU legal order
      1. Principles
      2. No jurisdiction to interpret and apply rules of EU law other than the provisions of the CETA

3. No effect on the operation of the EU institutions in accordance with the EU constitutional framework
B. The compatibility of the envisaged ISDS mechanism with the general principle of equal treatment and with the requirement of effectiveness
    1. Principles
    2. Compatibility with the principle of equal treatment
    3. Compatibility with the requirement of effectiveness
C. The compatibility of the envisaged ISDS mechanism with the right of access to an independent tribunal
    1. Principles
    2. Compatibility with the requirement of accessibility
    3. Compatibility with the requirement of independence

VI. Answer to the request for an opinion
In Opinion procedure 1/17,

REQUEST for an Opinion pursuant to Article 218(11) TFEU, made on 7 September 2017 by the Kingdom of Belgium,

THE COURT (Full Court)

composed of K. Lenaerts, President, R. Silva de Lapuerta, Vice-President, J.-C. Bonichot, A. Arabadjiev, A. Prechal, M. Vilaras, E. Regan, T. von Danwitz, C. Toader, F. Biltgen, K. Jürimäe and C. Lycourgos, Presidents of Chambers, A. Rosas, E. Juhász, M. Ilešič (Rapporteur), J. Malenovský, E. Levits, L. Bay Larsen, M. Safjan, D. Šváby, C.G. Fernlund, C. Vajda and S. Rodin, Judges,

Advocate General: Y. Bot,

Registrar: M.-A. Gaudissart, Deputy Registrar,

having regard to the written procedure and further to the hearing on 26 June 2018,

after considering the observations submitted on behalf of:

–   the Kingdom of Belgium, by C. Pochet, L. Van den Broeck, M. Jacobs and J.-C. Halleux, acting as Agents,

–   the Danish Government, by J. Nymann-Lindegren, acting as Agent,

–   the German Government, by T. Henze and S. Eisenberg, acting as Agents,

–   the Estonian Government, by N. Grünberg, acting as Agent,

–   the Greek Government, by G. Karipsiadis and K. Boskovits, acting as Agents,

–   the Spanish Government, by M.A. Sampol Pucurull and S. Centeno Huerta, acting as Agents,

–   the French Government, by F. Alabrune, D. Colas, D. Segoin and E. de Moustier, acting as Agents,

–   the Lithuanian Government, by R. Dzikovič and D. Kriaučiūnas, acting as Agents,

–   the Netherlands Government, by M. Bulterman and M.A.M. de Ree, acting as Agents,

–   the Austrian Government, by G. Hesse and J. Schmoll, acting as Agents,

–   the Slovenian Government, by N. Pintar Gosenca, V. Klemenc, J. Groznik, A. Dežman Mušič and M. Jakše, acting as Agents,

–    the Slovak Government, by M. Kianička, acting as Agent,

–    the Finnish Government, by J. Heliskoski and H. Leppo, acting as Agents,

–    the Swedish Government, by A. Falk, A. Alriksson and P. Smith, acting as Agents,

–    the Council of the European Union, by B. Driessen and S. Boelaert, acting as Agents,

–    the European Commission, by R. Vidal Puig, A. Buchet, B. De Meester and U. Wölker, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 29 January 2019,

gives the following

**Opinion**

## I.    The request for an opinion

1    The request for an opinion submitted to the Court by the Kingdom of Belgium is worded as follows:

'Is Section F ('Resolution of investment disputes between investors and states') of Chapter Eight ('Investment') of the Comprehensive Economic and Trade Agreement between Canada, of the one part, and the European Union and its Member States, of the other part, signed in Brussels on 30 October 2016 (OJ 2017 L 11, p. 23; 'the CETA') compatible with the Treaties, including with fundamental rights?'

## II.    The CETA

### A.    *The signature of the CETA and the envisaged establishment of a mechanism for the resolution of disputes between investors and States*

2    The Comprehensive Economic and Trade Agreement, better known under the acronym 'CETA', is a free trade agreement that contains, in addition to provisions on the reduction of customs duties and of non-tariff barriers to trade in goods and services, rules relating, inter alia, to investment, public procurement, competition, intellectual property protection and sustainable development.

3    The CETA has not yet been concluded, within the meaning of Article 218(6) TFEU. Recital 2 of Council Decision (EU) 2017/37 of 28 October 2016 on the signing on behalf of the European Union of the Comprehensive Economic and Trade Agreement (CETA) between Canada, of the one part, and the European Union and its Member States, of the other part (OJ 2017 L 11, p. 1), states, in that regard, that the CETA should be signed 'subject to the fulfilment of the procedures required for its conclusion at a later date', and Article 1 thereof provides that the signing, on behalf of the Union, of the CETA 'is hereby authorised, subject to its conclusion'.

4    While a number of provisions of the CETA are applied provisionally under Council Decision (EU) 2017/38 of 28 October 2016 on the provisional application of the Comprehensive Economic and Trade Agreement (CETA) between Canada, of the one part, and the European Union and its Member States, of the other part (OJ 2017 L 11, p. 1080), the provisions of Section F of Chapter Eight of the CETA, which are the subject of the present request for an opinion, are not. As regards Chapter Eight, Article 1(1)(a) of Decision 2017/38 provides that 'only [Articles 8.1 to 8.8, 8.13, 8.15, with the exception of paragraph 3 thereof, and 8.16] shall be provisionally applied, and only in so far as foreign direct investment is concerned'.

5      Section F of Chapter Eight of the CETA, which contains Articles 8.18 to 8.45 of that agreement, concerns the establishment of a mechanism for the resolution of investment disputes between investors and States ('the ISDS mechanism') also known as the Investor-State Dispute Settlement system.

6      To that end, Article 8.27 of the CETA provides for the creation of a Tribunal ('the Tribunal' or 'the CETA Tribunal') upon the entry into force of the CETA and Article 8.28 thereof provides for the creation of an Appellate Tribunal ('the Appellate Tribunal' or 'the CETA Appellate Tribunal').

7      Article 8.29 of the CETA further provides for the subsequent establishment of a multilateral investment tribunal and appellate mechanism ('the multilateral investment Tribunal'), the establishment of which will bring to an end the operation of the CETA Tribunal and the CETA Appellate Tribunal.

8      There is thus envisaged, as indicated in Statement No 36 by the Commission and the Council on investment protection and the Investment Court System, entered into the Council minutes in relation to the signature of the CETA and annexed to Decision 2017/37 (OJ 2017 L 11, p. 20; 'Statement No 36'), the establishment of an Investment Court System, also known under the acronym 'ICS', of which the CETA Tribunal and Appellate Tribunal are to constitute only the first stage.

### B.    The concepts of 'investment' and 'investor'

9      Under Article 8.1 of the CETA, the concept of 'investment', for the purposes of that agreement, means:

'… every kind of asset that an investor owns or controls, directly or indirectly, that has the characteristics of an investment, which includes a certain duration and other characteristics such as the commitment of capital or other resources, the expectation of gain or profit, or the assumption of risk. Forms that an investment may take include:

(a)      an enterprise;

(b)      shares, stocks and other forms of equity participation in an enterprise;

(c)      bonds, debentures and other debt instruments of an enterprise;

(d)      a loan to an enterprise;

(e)      any other kind of interest in an enterprise;

(f)      an interest arising from [certain contracts];

(g)      intellectual property rights;

(h)      other moveable property, tangible or intangible, or immovable property and related rights;

(i)      claims to money or claims to performance under a contract.'

10      Article 8.1 of the CETA also states that the concept of 'covered investment means, with respect to a Party, an investment:

(a)      in its territory;

(b)      made in accordance with the applicable law at the time the investment is made;

(c)      directly or indirectly owned or controlled by an investor of the other Party; and

(d)      existing on the date of entry into force of this Agreement, or made or acquired thereafter'.

11    The concept of an 'investor' is defined in Article 8.1 as follows:

'a Party, a natural person or an enterprise of a Party, other than a branch or a representative office, that seeks to make, is making or has made an investment in the territory of the other Party.

For the purposes of this definition, an enterprise of a Party is:

(a)    an enterprise that is constituted or organised under the laws of that Party and has substantial business activities in the territory of that Party; or

(b)    an enterprise that is constituted or organised under the laws of that Party and is directly or indirectly owned or controlled by a natural person of that Party or by an enterprise mentioned under paragraph (a);

…

natural person means:

(a)    in the case of Canada, a natural person who is a citizen or permanent resident of Canada; and

(b)    in the case of the EU Party, a natural person having the nationality of one of the Member States of the European Union … according to their respective laws …'.

### C.    The scope of the envisaged ISDS mechanism

12    While being entitled 'Resolution of investment disputes between investors and States', Section F of Chapter 8 of the CETA also covers disputes between a Canadian investor and the European Union.

13    In that regard, Article 8.21 of the CETA provides that, if a Canadian investor intends to submit a claim, he is required to deliver to the European Union 'a notice requesting a determination of the respondent', identifying the measures in respect of which the investor intends to submit a claim. The European Union is then required to inform that investor 'whether the European Union or a Member State … [is to] be the respondent'.

14    Article 8.18.1 of the CETA, that article being headed 'Scope', defines as follows the disputes that may be submitted by investors under the envisaged ISDS mechanism:

'… an investor of a Party may submit to the Tribunal constituted under this Section a claim that the other Party has breached an obligation under:

(a)    [Chapter Eight] Section C, with respect to the expansion, conduct, operation, management, maintenance, use, enjoyment and sale or disposal of its covered investment, or

(b)    [Chapter Eight] Section D,

where the investor claims to have suffered loss or damage as a result of the alleged breach.'

15    Section C is entitled 'Non-discriminatory treatment' and contains Articles 8.6 to 8.8 of the CETA, which are worded as follows:

'Article 8.6

National treatment

… Each Party shall accord to an investor of the other Party and to a covered investment treatment no less favourable than the treatment it accords, in like situations to its own investors and to their investments with

respect to the establishment, acquisition, expansion, conduct, operation, management, maintenance, use, enjoyment and sale or disposal of their investments in its territory. …

Article 8.7

Most-favoured-nation treatment

… Each Party shall accord to an investor of the other Party and to a covered investment treatment no less favourable than the treatment it accords in like situations, to investors of a third country and to their investments with respect to the establishment, acquisition, expansion, conduct, operation, management, maintenance, use, enjoyment and sale or disposal of their investments in its territory. …

Article 8.8

Senior management and boards of directors

A Party shall not require that an enterprise of that Party, that is also a covered investment, appoint to senior management or board of director positions, natural persons of any particular nationality.'

16    Under Article 28.3.2 of the CETA, the provisions of Section C are not to be 'construed to prevent the adoption or enforcement by a Party of measures necessary … to protect public security or public morals or to maintain public order, … to protect human, animal or plant life or health …', 'subject to the requirement that such measures are not applied in a manner which would constitute a means of arbitrary or unjustifiable discrimination between the Parties where like conditions prevail, or a disguised restriction on trade in services'.

17    Section D of the CETA, entitled 'Investment Protection' contains Articles 8.9 to 8.14 of the CETA, which are worded as follows:

'Article 8.9

Investment and regulatory measures

1.    For the purpose of this Chapter, the Parties reaffirm their right to regulate within their territories to achieve legitimate policy objectives, such as the protection of public health, safety, the environment or public morals, social or consumer protection or the promotion and protection of cultural diversity.

2.    For greater certainty, the mere fact that a Party regulates, including through a modification to its laws, in a manner which negatively affects an investment or interferes with an investor's expectations, including its expectations of profits, does not amount to a breach of an obligation under this Section.

…

4.    For greater certainty, nothing in this Section shall be construed as preventing a Party from discontinuing the grant of a subsidy or requesting its reimbursement …, or requiring that Party to compensate the investor therefor.

Article 8.10

Treatment of investors and of covered investments

1.    Each Party shall accord in its territory to covered investments of the other Party and to investors with respect to their covered investments fair and equitable treatment and full protection and security in accordance with paragraphs 2 through 7.

2.     A Party breaches the obligation of fair and equitable treatment referenced in paragraph 1 if a measure or series of measures constitutes:

(a)     denial of justice in criminal, civil or administrative proceedings;

(b)     fundamental breach of due process, including a fundamental breach of transparency, in judicial and administrative proceedings;

(c)     manifest arbitrariness;

(d)     targeted discrimination on manifestly wrongful grounds, such as gender, race or religious belief;

(e)     abusive treatment of investors, such as coercion, duress and harassment; or

(f)     a breach of any further elements of the fair and equitable treatment obligation adopted by the Parties in accordance with paragraph 3 of this Article.

3.     The Parties shall regularly, or upon request of a Party, review the content of the obligation to provide fair and equitable treatment. The Committee on Services and Investment … may develop recommendations in this regard and submit them to the CETA Joint Committee for decision.

4.     When applying the above fair and equitable treatment obligation, the Tribunal may take into account whether a Party made a specific representation to an investor to induce a covered investment, that created a legitimate expectation …

5.     For greater certainty, "full protection and security" refers to the Party's obligations relating to the physical security of investors and covered investments.

6.     For greater certainty, a breach of another provision of this Agreement, or of a separate international agreement does not establish a breach of this Article.

7.     For greater certainty, the fact that a measure breaches domestic law does not, in and of itself, establish a breach of this Article. In order to ascertain whether the measure breaches this Article, the Tribunal must consider whether a Party has acted inconsistently with the obligations in paragraph 1.

Article 8.11

Compensation for losses

… each Party shall accord to investors of the other Party, whose covered investments suffer losses owing to armed conflict, civil strife, a state of emergency or natural disaster in its territory, treatment no less favourable than that it accords to its own investors …

Article 8.12

Expropriation

1.     A Party shall not nationalise or expropriate a covered investment either directly, or indirectly through measures having an effect equivalent to nationalisation or expropriation ("expropriation"), except:

(a)     for a public purpose;

(b)     under due process of law;

(c)     in a non-discriminatory manner; and

(d)    on payment of prompt, adequate and effective compensation.

For greater certainty, this paragraph shall be interpreted in accordance with Annex 8-A.

…

Article 8.13

Transfers

1.    Each Party shall permit all transfers relating to a covered investment to be made without restriction or delay in a freely convertible currency and at the market rate of exchange applicable on the date of transfer. Such transfers include:

(a)    contributions to capital, such as principal and additional funds to maintain, develop or increase the investment;

(b)    profits, dividends, interest, capital gains, royalty payments, … or other forms of returns or amounts derived from the covered investment;

(c)    proceeds from the sale or liquidation of the whole or a part of the covered investment;

(d)    payments made under a contract entered into by the investor or the covered investment, including payments made pursuant to a loan agreement;

…

2.    A Party shall not require its investors to transfer, or penalise its investors for failing to transfer, the income, earnings, profits or other amounts derived from, or attributable to, investments in the territory of the other Party.

3.    Nothing in this Article shall be construed to prevent a Party from applying in an equitable and non-discriminatory manner and not in a way that would constitute a disguised restriction on transfers, its laws relating to:

(a)    bankruptcy, insolvency, or the protection of the rights of creditors;

(b)    issuing, trading or dealing in securities;

(c)    criminal or penal offences;

(d)    financial reporting or record keeping of transfers when necessary to assist law enforcement or financial regulatory authorities; and

(e)    the satisfaction of judgments in adjudicatory proceedings.

Article 8.14

Subrogation

If a Party, or an agency of a Party, makes a payment under an indemnity, guarantee or contract of insurance that it has entered into in respect of an investment made by one of its investors in the territory of the other Party, the other Party shall recognise that the Party or its agency shall be entitled in all circumstances to the same rights as those of the investor in respect of the investment. …'

18    Annexe 8-A to the CETA, to which reference is made by Article 8.12.1 of that agreement, states:

'The Parties confirm their shared understanding that:

1.    Expropriation may be direct or indirect:

    (a)    direct expropriation occurs when an investment is nationalised or otherwise directly expropriated through formal transfer of title or outright seizure; and

    (b)    indirect expropriation occurs if a measure or series of measures of a Party has an effect equivalent to direct expropriation, in that it substantially deprives the investor of the fundamental attributes of property in its investment, including the right to use, enjoy and dispose of its investment, without formal transfer of title or outright seizure.

2.    The determination of whether a measure or series of measures of a Party, in a specific fact situation, constitutes an indirect expropriation requires a case-by-case, fact-based inquiry that takes into consideration, among other factors:

(a)    the economic impact of the measure or series of measures, although the sole fact that a measure or series of measures of a Party has an adverse effect on the economic value of an investment does not establish that an indirect expropriation has occurred;

(b)    the duration of the measure or series of measures of a Party;

(c)    the extent to which the measure or series of measures interferes with distinct, reasonable investment-backed expectations; and

(d)    the character of the measure or series of measures, notably their object, context and intent.

3.    For greater certainty, except in the rare circumstance when the impact of a measure or series of measures is so severe in light of its purpose that it appears manifestly excessive, non-discriminatory measures of a Party that are designed and applied to protect legitimate public welfare objectives, such as health, safety and the environment, do not constitute indirect expropriations.'

19    Article 1.1 of the CETA provides that 'for the purposes of this Agreement and unless otherwise specified', the term 'measure' means 'a law, regulation, rule, procedure, decision, administrative action, requirement, practice or any other form of measure by a Party'.

20    Article 8.2 of the CETA states:

'1.    [Chapter Eight] applies to a measure adopted or maintained by a Party in its territory relating to:

(a)    an investor of the other Party;

(b)    a covered investment; …

…

4.    Claims may be submitted … in compliance with the procedures set out in Section F. … Claims under Section C with respect to the establishment or acquisition of a covered investment are excluded from the scope of Section F. Section D applies only to a covered investment and to investors in respect of their covered investment.

…'

### D.    The law applicable

21    Article 8.31 of the CETA provides:

'1.     When rendering its decision, the Tribunal established under this Section shall apply this Agreement as interpreted in accordance with the Vienna Convention on the Law of Treaties [of 23 May 1969 (*United Nations Treaty Series*, Vol. 1155, p. 331; 'the Vienna Convention'], and other rules and principles of international law applicable between the Parties.

2.     The Tribunal shall not have jurisdiction to determine the legality of a measure, alleged to constitute a breach of this Agreement, under the domestic law of a Party. For greater certainty, in determining the consistency of a measure with this Agreement, the Tribunal may consider, as appropriate, the domestic law of a Party as a matter of fact. In doing so, the Tribunal shall follow the prevailing interpretation given to the domestic law by the courts or authorities of that Party and any meaning given to domestic law by the Tribunal shall not be binding upon the courts or the authorities of that Party.

3.     Where serious concerns arise as regards matters of interpretation that may affect investment, the Committee on Services and Investment may … recommend to the CETA Joint Committee the adoption of interpretations of this Agreement. An interpretation adopted by the CETA Joint Committee shall be binding on the Tribunal established under this Section. The CETA Joint Committee may decide that an interpretation shall have binding effect from a specific date.'

22    Article 8.28.2 of the CETA provides:

'The Appellate Tribunal may uphold, modify or reverse the Tribunal's award based on:

(a)     errors in the application or interpretation of applicable law;

(b)     manifest errors in the appreciation of the facts, including the appreciation of relevant domestic law;

(c)      the grounds set out in Article 52(1)(a) through (e) of the [Convention on the Settlement of Investment Disputes between States and Nationals of Other States, signed in Washington on 18 March 1965; 'the ICSID Convention'], in so far as they are not covered by paragraphs (a) and (b).'

### E.     *The procedural rules*

23    Article 8.23.1 and 8.23.2 of the CETA provide:

'1.     If a dispute has not been resolved through consultations, a claim may be submitted under this Section by:

(a)     an investor of a Party on its own behalf; or

(b)     an investor of a Party, on behalf of a locally established enterprise which it owns or controls directly or indirectly.

2.     A claim may be submitted under the following rules:

(a)     the ICSID Convention and Rules of Procedure for Arbitration Proceedings;

(b)      the ICSID Additional Facility Rules if the conditions for proceedings pursuant to paragraph (a) do not apply;

(c)     the UNCITRAL [United Nations Commission on International Trade Law] Arbitration Rules;

(d)     any other rules on agreement of the disputing parties.'

24    The term 'locally established enterprise' used in Article 8.23 means, according to Article 8.1 of the CETA, 'a juridical person that is constituted or organised under the laws of the respondent and that an

investor of the other Party owns or controls directly or indirectly'.

25     As regards the consultations that must, in accordance with Article 8.23, first take place, Article 8.19.2 and Article 8.19.3 state:

'2.     Unless the disputing parties agree otherwise, the place of consultation shall be:

(a)     Ottawa, if the measures challenged are measures of Canada;

(b)     Brussels, if the measures challenged include a measure of the European Union; or

(c)     the capital of the Member State of the European Union, if the measures challenged are exclusively measures of that Member State.

3.     The disputing parties may hold the consultations through videoconference or other means where appropriate, such as in the case where the investor is a small or medium-sized enterprise.'

26     Further, Article 8.22 of the CETA states:

'1.     An investor may only submit a claim pursuant to Article 8.23 if the investor:

(a)     delivers to the respondent, with the submission of a claim, its consent to the settlement of the dispute by the Tribunal in accordance with the procedures set out in this Section;

(b)     allows at least 180 days to elapse from the submission of the request for consultations and, if applicable, at least 90 days to elapse from the submission of the notice requesting a determination of the respondent;

(c)     has fulfilled the requirements of the notice requesting a determination of the respondent;

(d)     has fulfilled the requirements related to the request for consultations;

(e)     does not identify a measure in its claim that was not identified in its request for consultations;

(f)     withdraws or discontinues any existing proceeding before a tribunal or court under domestic or international law with respect to a measure alleged to constitute a breach referred to in its claim; and

(g)     waives its right to initiate any claim or proceeding before a tribunal or court under domestic or international law with respect to a measure alleged to constitute a breach referred to in its claim.

…

5.     The waiver provided pursuant to subparagraph 1(g) or paragraph 2 as applicable shall cease to apply:

(a)     if the Tribunal rejects the claim on the basis of a failure to meet the requirements of paragraph 1 or 2 or on any other procedural or jurisdictional grounds;

(b)     if the Tribunal dismisses the claim pursuant to Article 8.32 or Article 8.33; or

(c)     if the investor withdraws its claim … within 12 months of the constitution of the division of the Tribunal.'

27     Articles 8.32 and 8.33 of the CETA, to which reference is made by Article 8.22.5(b) thereof, concern, respectively, 'claims manifestly without legal merit' and 'claims unfounded as a matter of law', the latter being defined as claims 'for which [no] award in favour of the claimant may be made … even if the facts alleged were assumed to be true'. Those articles provide that the CETA Tribunal is required to address and

decide as a preliminary question whether a claim should be dismissed as being manifestly without legal merit or unfounded as a matter of law, if the respondent has raised an objection to that effect.

28    Article 8.25.1 of the CETA is worded as follows:

'The respondent consents to the settlement of the dispute by the Tribunal in accordance with the procedures set out in this Section.'

29    Article 8.27 of the CETA provides, in paragraphs 6, 7 and 9:

'6.    The Tribunal shall hear cases in divisions consisting of three Members of the Tribunal, of whom one shall be a national of a Member State of the European Union, one a national of Canada and one a national of a third country. The division shall be chaired by the Member of the Tribunal who is a national of a third country.

7.    Within 90 days of the submission of a claim pursuant to Article 8.23, the President of the Tribunal shall appoint the Members of the Tribunal composing the division of the Tribunal hearing the case on a rotation basis, ensuring that the composition of the divisions is random and unpredictable, while giving equal opportunity to all Members of the Tribunal to serve.

…

9.    Notwithstanding paragraph 6, the disputing parties may agree that a case be heard by a sole Member of the Tribunal to be appointed at random from the third country nationals. The respondent shall give sympathetic consideration to a request from the claimant to have the case heard by a sole Member of the Tribunal, in particular where the claimant is a small or medium-sized enterprise or the compensation or damages claimed are relatively low. Such a request shall be made before the constitution of the division of the Tribunal.'

30    Article 8.28.5, 8.28.7 and 8.28.9 of the CETA provide:

'5.    The division of the Appellate Tribunal constituted to hear the appeal shall consist of three randomly appointed Members of the Appellate Tribunal.

…

7.    The CETA Joint Committee shall promptly adopt a decision setting out the following … matters regarding the functioning of the Appellate Tribunal:

…

(b)    procedures for the initiation and the conduct of appeals …;

…

9.    Upon adoption of the decision referred to in paragraph 7:

(a)    a disputing party may appeal an award rendered pursuant to this Section to the Appellate Tribunal within 90 days after its issuance;

…

(c)    an award rendered pursuant to Article 8.39 shall not be considered final and no action for enforcement of an award may be brought until either:

(i)    90 days from the issuance of the award by the Tribunal has elapsed and no appeal has been initiated;

(ii)    an initiated appeal has been rejected or withdrawn; or

(iii)    90 days have elapsed from an award by the Appellate Tribunal and the Appellate Tribunal has not referred the matter back to the Tribunal;

(d)    a final award by the Appellate Tribunal shall be considered as a final award for the purposes of Article 8.41;

…'

31    Article 8.39 of the CETA states:

'1.    If the Tribunal makes a final award against the respondent, the Tribunal may only award, separately or in combination:

(a)    monetary damages and any applicable interest;

(b)    restitution of property, in which case the award shall provide that the respondent may pay monetary damages representing the fair market value of the property …, and any applicable interest, in lieu of restitution, …

2.    Subject to paragraphs 1 and 5, if a claim is made under Article 8.23.1(b):

(a)    an award of monetary damages and any applicable interest shall provide that the sum be paid to the locally established enterprise;

(b)    an award of restitution of property shall provide that restitution be made to the locally established enterprise;

…

3.    Monetary damages shall not be greater than the loss suffered …

4.    The Tribunal shall not award punitive damages.

5.    The Tribunal shall order that the costs of the proceedings be borne by the unsuccessful disputing party. In exceptional circumstances, the Tribunal may apportion costs between the disputing Parties if it determines that apportionment is appropriate in the circumstances of the claim. Other reasonable costs, including costs of legal representation and assistance, shall be borne by the unsuccessful disputing party, unless the Tribunal determines that such apportionment is unreasonable in the circumstances of the claim. If only parts of the claims have been successful the costs shall be adjusted, proportionately, to the number or extent of the successful parts of the claims.

6.    The CETA Joint Committee shall consider supplemental rules aimed at reducing the financial burden on claimants who are natural persons or small and medium-sized enterprises. Such supplemental rules may, in particular, take into account the financial resources of such claimants and the amount of compensation sought.

7.    … The Tribunal shall issue its final award within 24 months of the date the claim is submitted pursuant to Article 8.23. If the Tribunal requires additional time to issue its final award, it shall provide the disputing Parties the reasons for the delay.'

32    Article 8.41 of the CETA states:

'1.      An award issued pursuant to this Section shall be binding between the disputing parties and in respect of that particular case.

2.      … a disputing party shall recognise and comply with an award without delay.

…

4.      Execution of the award shall be governed by the laws concerning the execution of judgments or awards in force where the execution is sought.

…'

### F.    *The Members of the envisaged Tribunal and Appellate Tribunal*

33    Article 8.27 of the CETA, in paragraphs 2 to 5 and 12 to 16, provides:

'2.      The CETA Joint Committee shall, upon the entry into force of this Agreement, appoint fifteen Members of the Tribunal. Five of the Members of the Tribunal shall be nationals of a Member State of the European Union, five shall be nationals of Canada and five shall be nationals of third countries.

3.      The CETA Joint Committee may decide to increase or to decrease the number of the Members of the Tribunal by multiples of three. Additional appointments shall be made on the same basis as provided for in paragraph 2.

4.      The Members of the Tribunal shall possess the qualifications required in their respective countries for appointment to judicial office, or be jurists of recognised competence. They shall have demonstrated expertise in public international law. It is desirable that they have expertise in particular, in international investment law, in international trade law and the resolution of disputes arising under international investment or international trade agreements.

5.      The Members of the Tribunal appointed pursuant to this Section shall be appointed for a five-year term, renewable once. However, the terms of seven of the 15 persons appointed immediately after the entry into force of this Agreement, to be determined by lot, shall extend to six years. Vacancies shall be filled as they arise. …

…

12.      In order to ensure their availability, the Members of the Tribunal shall be paid a monthly retainer fee to be determined by the CETA Joint Committee.

13.      The fees referred to in paragraph 12 shall be paid equally by both Parties …

14.      Unless the CETA Joint Committee adopts a decision pursuant to paragraph 15, the amount of the fees and expenses of the Members of the Tribunal on a division constituted to hear a claim, other than the fees referred to in paragraph 12, shall be those determined pursuant to Regulation 14(1) of the Administrative and Financial Regulations of the ICSID Convention in force on the date of the submission of the claim and allocated by the Tribunal among the disputing Parties in accordance with Article 8.39.5.

15.      The CETA Joint Committee may, by decision, transform the retainer fee and other fees and expenses into a regular salary, and decide applicable modalities and conditions.

16.      The ICSID Secretariat shall act as Secretariat for the Tribunal and provide it with appropriate support.'

34    Article 8.28 of the CETA, in paragraphs 3, 4 and 7, states:

'3.      The Members of the Appellate Tribunal shall be appointed by a decision of the CETA Joint Committee at the same time as the decision referred to in paragraph 7.

4.      The Members of the Appellate Tribunal shall meet the requirements of Article 8.27.4 and comply with Article 8.30.

…

7.      The CETA Joint Committee shall promptly adopt a decision setting out the following administrative and organisational matters regarding the functioning of the Appellate Tribunal:

…

(c)      procedures for filling a vacancy on the Appellate Tribunal and on a division of the Appellate Tribunal constituted to hear a case;

(d)      remuneration of the Members of the Appellate Tribunal;

(e)      provisions related to the costs of appeals;

(f)      the number of Members of the Appellate Tribunal; …

…'

35      Article 8.30 of the CETA provides:

'1.      The Members of the Tribunal shall be independent. They shall not be affiliated with any government. They shall not take instructions from any organisation or government with regard to matters related to the dispute. They shall not participate in the consideration of any disputes that would create a direct or indirect conflict of interest. They shall comply with the International Bar Association Guidelines on Conflicts of Interest in International Arbitration [approved on 22 May 2004 by the IBA Council; 'the IBA Guidelines'] or any supplemental rules adopted pursuant to Article 8.44.2. In addition, upon appointment, they shall refrain from acting as counsel or as party-appointed expert or witness in any pending or new investment dispute under this or any other international agreement.

…

4.      Upon a reasoned recommendation from the President of the Tribunal, or on their joint initiative, the Parties, by decision of the CETA Joint Committee, may remove a Member from the Tribunal where his or her behaviour is inconsistent with the obligations set out in paragraph 1 and incompatible with his or her continued membership of the Tribunal.'

36      Appended to the second sentence of Article 8.30.1 is a footnote that states that 'for greater certainty, the fact that a person receives remuneration from a government does not in itself make that person ineligible'.

### G.      The Joint Committee and the Committee on Services and Investment

37      Article 26.1 of the CETA provides:

'1.      The Parties hereby establish the CETA Joint Committee comprising representatives of the European Union and representatives of Canada. The CETA Joint Committee shall be co-chaired by the Minister for International Trade of Canada and the Member of the European Commission responsible for Trade, or their respective designees.

…

3.    The CETA Joint Committee is responsible for all questions concerning trade and investment between the Parties and the implementation and application of this Agreement. …

4.    The CETA Joint Committee shall:

…

(e)    make decisions as set out in Article 26.3; …

5.    The CETA Joint Committee may:

…

(e)    adopt interpretations of the provisions of this Agreement, which shall be binding on tribunals established under Section F of Chapter Eight (Resolution of investment disputes between investors and states) and Chapter Twenty-Nine (Dispute Settlement);

…'

38    Article 26.3 of the CETA states:

'1.    The CETA Joint Committee shall, for the purpose of attaining the objectives of this Agreement, have the power to make decisions in respect of all matters when this Agreement so provides.

2.    The decisions made by the CETA Joint Committee shall be binding on the Parties ...

3.    The CETA Joint Committee shall make its decisions and recommendations by mutual consent.'

39    Article 8.44.2 of the CETA is worded as follows:

'2.    The Committee on Services and Investment shall, on agreement of the Parties, and after completion of their respective internal requirements and procedures, adopt a code of conduct for the Members of the Tribunal to be applied in disputes arising out of this Chapter, which may replace or supplement the rules in application, and may address topics including:

(a)    disclosure obligations;

(b)    the independence and impartiality of the Members of the Tribunal; and

(c)    confidentiality.

The Parties shall make best efforts to ensure that the code of conduct is adopted no later than the first day of the provisional application or entry into force of this Agreement, as the case may be, and in any event no later than two years after such date.'

### H.    *No direct effect of the CETA in the legal systems of the Parties*

40    Article 30.6.1 of the CETA provides that 'nothing in this Agreement shall be construed as … permitting this Agreement to be directly invoked in the domestic legal systems of the Parties.'

### I.    *The Joint Interpretative Instrument and Statement No 36*

41    Article 30.1 of the CETA provides that 'the protocols, annexes, declarations, joint declarations, understandings and footnotes to this Agreement constitute integral parts thereof'.

42　　At the time of signature of the CETA, the European Union and its Member States and Canada established a Joint Interpretative Instrument (OJ 2017 L 11, p. 3; 'the Joint Interpretative Instrument'), in which Point 1(b) and (d) state:

'(b)　　CETA embodies the shared commitment of Canada and the European Union and its Member States to free and fair trade in a vibrant and forward-looking society. …

…

(d)　　The European Union and its Member States and Canada will therefore continue to have the ability to achieve the legitimate public policy objectives that their democratic institutions set, such as public health, social services, public education, safety, environment, public morals, privacy and data protection and the promotion and protection of cultural diversity. … Imported goods, service suppliers and investors must continue to respect domestic requirements, including rules and regulations. …'

43　　Point 2 of that instrument states:

'CETA preserves the ability of the European Union and its Member States and Canada to adopt and apply their own laws and regulations that regulate economic activity in the public interest, to achieve legitimate public policy objectives such as the protection and promotion of public health, social services, public education, safety, the environment, public morals, social or consumer protection, privacy and data protection and the promotion and protection of cultural diversity.'

44　　Point 6 of that instrument states:

'(a)　　CETA includes modern rules on investment that preserve the right of governments to regulate in the public interest including when such regulations affect a foreign investment, while ensuring a high level of protection for investments and providing for fair and transparent dispute resolution. CETA will not result in foreign investors being treated more favourably than domestic investors. CETA does not privilege recourse to the investment court system set up by the agreement. Investors may choose instead to pursue available recourse in domestic courts.

(b)　　CETA clarifies that governments may change their laws, regardless of whether this may negatively affect an investment or investor's expectations of profits. …

…

(d)　　CETA requires a real economic link with the economies of Canada or the European Union in order for a firm to benefit from the agreement and prevents "shell" or "mail box" companies established in Canada or the European Union by investors of other countries from bringing claims against Canada or the European Union and its Member States. …

(e)　　In order to ensure that Tribunals in all circumstances respect the intent of the Parties as set out in the Agreement, CETA includes provisions that allow Parties to issue binding notes of interpretation. Canada and the European Union and its Member States are committed to using these provisions to avoid and correct any misinterpretation of CETA by Tribunals.

(f)　　CETA moves decisively away from the traditional approach of investment dispute resolution and establishes independent, impartial and permanent investment Tribunals, inspired by the principles of public judicial systems in the European Union and its Member States and Canada, as well as … international courts such as the International Court of Justice and the European Court of Human Rights. Accordingly, the Members of these Tribunals will be individuals qualified for judicial office in their respective countries, and these will be appointed by the European Union and Canada for a fixed term. Cases will be heard by three randomly selected Members. Strict ethical rules for these

individuals have been set to ensure their independence and impartiality, the absence of conflict of interest, bias or appearance of bias. The European Union and its Member States and Canada have agreed to begin immediately further work on a code of conduct to further ensure the impartiality of the Members of the Tribunals, on the method and level of their remuneration and the process for their selection. The common aim is to conclude the work by the entry into force of CETA.

(g)     CETA is the first agreement to include an Appeal mechanism which will allow the correction of errors and ensure the consistency of the decisions of the Tribunal of first instance.

(h)     Canada and the European Union and its Member States are committed to monitoring the operation of all these investment rules, to addressing in a timely manner any shortcomings that may emerge and to exploring ways in which to continually improve their operation over time.

(i)     Therefore, CETA represents an important and radical change in investment rules and dispute resolution. It lays the basis for a multilateral effort to develop further this new approach to investment dispute resolution into a Multilateral Investment Court. The [European Union] and Canada will work expeditiously towards the creation of the Multilateral Investment Court. It should be set up once a minimum critical mass of participants is established, and immediately replace bilateral systems such as the one in CETA, and be fully open to accession by any country that subscribes to the principles underlying the Court.'

45     Further, in the wording of Statement No 36:

'CETA aims at a major reform of investment dispute resolution, based on the principles common to the courts of the European Union and its Member States and of Canada, as well as to international courts recognised by the European Union and its Member States and Canada …

All of these provisions [in relation to disputes] having been excluded from the scope of provisional application of CETA, the Commission and the Council confirm that they will not enter into force before the ratification of CETA by all Member States, each in accordance with its own constitutional procedures.

The Commission is committed to further review, without delay, of the dispute settlement mechanism (ICS), and allowing sufficient time so that Member States can consider it in their ratification processes, according to the following principles:

There will be a rigorous process for selecting all judges of the Tribunal and the Appellate Tribunal, under the control of the European Union institutions and the Member States, with the aim of guaranteeing the judges' independence and impartiality, as well as the highest degree of competence. As regards the European judges in particular, the selection process must also ensure that the richness of European legal traditions is reflected, above all over the long term. Consequently:

–     Candidate European judges will be nominated by the Member States, which will also participate in the assessment of candidates.

–     Without prejudice to the other conditions set out in Article 8.27.4 of [the CETA], the Member States will propose candidates who fulfil the criteria set out in Article 253(1) TFEU.

–     The Commission, in consultation with the Member States and Canada, will ensure an equally rigorous assessment of the candidacies of the other judges of the Tribunal.

The judges will be paid by the European Union and Canada on a permanent basis. The system should progress towards judges who are employed full time.

The ethical requirements for Members of the Tribunals, already provided for in CETA, will be set out in detail as soon as possible and allowing sufficient time so that Member States can consider them in their

ratification processes, in an obligatory and binding code of conduct (which is also already provided for in CETA). …

There will be better and easier access to this new court for … [small and medium-sized enterprises] and private individuals. To that end:

–      The adoption by [the CETA Joint Committee] of additional rules, provided for in Article 8.39.6 of the CETA, intended to reduce the financial burden imposed on applicants who are natural persons or small and medium-sized enterprises, will be expedited so that these additional rules can be adopted as soon as possible.

–      Irrespective of the outcome of the discussions within [the CETA Joint Committee], the Commission will propose appropriate measures of (co)-financing of actions of small and medium-sized enterprises before that Court and the provision of technical assistance.

…'

### III. Summary of the doubts expressed by the Kingdom of Belgium

#### A.      Doubts as to the compatibility of the envisaged ISDS mechanism with the autonomy of the EU legal order

46      The Kingdom of Belgium recalls that, in paragraph 246 of Opinion 2/13 (*Accession of the European Union to the ECHR*) of 18 December 2014 (EU:C:2014:2454), the Court set out 'the principle that the Court has exclusive jurisdiction over the definitive interpretation of EU law'.

47      That exclusive jurisdiction must be respected in order to ensure the autonomy of the EU legal order. In that regard, the Kingdom of Belgium recalls that the Court ruled, in Opinion 1/09 (*Agreement on the creation of a unified patent litigation system*) of 8 March 2011 (EU:C:2011:123), that there is an incompatibility with the autonomy of the EU legal order where an international court or tribunal established by an agreement that is binding on the Union may be called on to interpret and apply not only the provisions of that agreement but also provisions of primary and secondary EU law, general principles of EU law or fundamental rights of EU law.

48      In this instance, the demarcation of the jurisdiction of the CETA Tribunal, made in Article 8.31 of that agreement, does not alter the fact that, where the CETA Tribunal will have to examine whether a measure adopted by the Union is contrary to one of the provisions of Sections C and D of Chapter Eight of that agreement, it will be compelled to interpret the effect of that measure, and will not necessarily be able to rely on an interpretation previously provided by the Court.

49      Further, the jurisdiction of the CETA Tribunal with respect to examining whether a measure adopted by Canada, the Union or by a Member State is contrary to one of the provisions of Section C or D of that Chapter would empower that Tribunal, notwithstanding the limitations stemming from Article 8.31 of the CETA, to engage in the assessment of issues of substantive law that involve, where the contested measure was adopted by the Union, EU primary law. That Tribunal could be required to take into account, in the course of its examination of the dispute, provisions of EU primary law on the basis of which the Union adopted that measure. The Tribunal would, in such a situation, have to undertake an assessment of the effect of those provisions.

50      Since there is no provision in the envisaged ISDS mechanism that imposes any obligation on the CETA Tribunal to refer to the Court a question for a preliminary ruling on the interpretation of EU law or even gives it an option to do so, the Kingdom of Belgium seeks to ascertain whether that mechanism, which may result in final awards that are binding on the Union, is compatible with the principle of the exclusive jurisdiction of the Court over the definitive interpretation of EU law.

**B.    Doubts as to the compatibility of the envisaged ISDS mechanism with the general principle of equal treatment and the requirement of effectiveness**

51    The Kingdom of Belgium observes that enterprises that are constituted under Canadian law and natural persons who are Canadian nationals or who are permanently resident in Canada (together, 'the Canadian enterprises and natural persons' or 'the Canadian investors') will be able, with respect to their investments within the European Union, to bring a dispute before the CETA Tribunal, whereas enterprises that are constituted under the law of an EU Member State and natural persons who are nationals of such a State ('the enterprises and natural persons of the Member States' or 'the EU investors') will not, with respect to their investments within the European Union, have that possibility.

52    The Kingdom of Belgium argues that it is necessary to examine whether such a situation is compatible with Article 20 of the Charter of Fundamental Rights of the European Union ('the Charter'), which provides that 'everyone is equal before the law', and with Article 21 of the Charter, paragraph 2 of which states that 'within the scope of application of the Treaties and without prejudice to any of their specific provisions, discrimination on grounds of nationality shall be prohibited'.

53    More specifically, the Kingdom of Belgium observes that it follows from Article 8.39.2(a) of the CETA that, where a Canadian investor brings proceedings before the CETA Tribunal on behalf of a 'locally established enterprise', that is, an enterprise established within the European Union and owned or controlled directly or indirectly by that investor, the damages awarded by that Tribunal will have to be paid to that locally established enterprise. The Kingdom of Belgium considers that the compatibility of that rule with Articles 20 and 21 of the Charter has to be examined.

54    The Kingdom of Belgium further seeks to ascertain whether, in the event that the CETA Tribunal were to make a finding that a fine imposed by the Commission or by an authority of a Member State on a Canadian investor for an infringement of competition law was incompatible with a provision of Section C or Section D of Chapter Eight of the CETA, and were to award damages equivalent to that fine, the extinction of the effects of that fine would be compatible with the principle of equal treatment and with the requirement that EU law should be effective.

55    The Kingdom of Belgium observes, in that regard, that Article 8.9.4 of the CETA means that, where the Union declares State aid to be incompatible with Article 108 TFEU and orders its repayment, the CETA Tribunal is precluded from ruling that that decision is contrary to the CETA. That agreement does not, however, contain a similar rule ensuring the protection of decisions adopted by the Commission or by the authorities of Member States in the context of Articles 101 and 102 TFEU. A Canadian investor could therefore evade the financial consequences of an infringement of EU competition law, whereas EU investors cannot evade them, a situation which might be incompatible with Articles 20 and 21 of the Charter, and with the requirement that EU law should be effective.

**C.    Doubts as to the compatibility of the envisaged ISDS mechanism with the right of access to an independent tribunal**

56    The Kingdom of Belgium seeks to ascertain whether Section F of Chapter Eight of the CETA is compatible with the fundamental right of access to an independent tribunal, as enshrined, in particular, in Article 47 of the Charter.

57    The Kingdom of Belgium observes, first, that the rules laid down in Section F might make it excessively difficult for small and medium-sized enterprises to obtain access to the CETA Tribunal, since it follows from Article 8.27.14 of the CETA that the fees and expenses of the Members of that Tribunal hearing a claim on a dispute will have to be borne by the Parties to that dispute, and since Article 8.39.5 of the CETA states that both the costs of the proceedings and the costs of legal representation and assistance are, other than in exceptional circumstances, to be borne by the unsuccessful party.

58      Further, the CETA does not currently offer the possibility of the grant of legal aid, although the right to such aid in so far as necessary to ensure access to justice is expressly laid down in the third paragraph of Article 47 of the Charter, the Court having held, in the judgment of 22 December 2010, *DEB* (C‑279/09, EU:C:2010:811), that that right extends to enterprises.

59      The risk of being obliged to bear the entire costs in expensive proceedings might, according to the Kingdom of Belgium, deter an investor that has only limited financial resources from lodging a claim.

60      The Kingdom of Belgium is uncertain, second, as to the compatibility of the conditions governing the remuneration of the Members of the CETA Tribunal and Appellate Tribunal, as laid down in Articles 8.27.12 to 15, and 8.28.7(d) of the CETA, with the right of access to 'an independent and impartial tribunal previously established by law', enshrined in the second paragraph of Article 47 of the Charter. Since those remuneration conditions are not primarily set out in the actual text of the CETA, but left to a great extent to the discretion of the CETA Joint Committee, it is permissible to question their compatibility with the principles applicable in relation to the separation of powers.

61      The fact that the CETA provides that the remuneration of the Members of the Tribunal will not, or at least not yet, consist of a fixed and regular salary, but of a monthly retainer fee to which will be added fees depending on the number of working days devoted to a dispute, might be incompatible with the right of access to an independent tribunal. In that regard, the Kingdom of Belgium refers to Article 6 of the European Charter on the statute for judges, adopted on 10 July 1998 by the Council of Europe, in accordance with which the remuneration of judges must be fixed 'so as to shield them from pressures aimed at influencing their decisions'.

62      That European Charter on the statute for judges also makes reference to recommendations adopted within the Council of Europe, in accordance with which the remuneration of judges must be determined on the basis of a general scale. It is however apparent from the conditions governing remuneration as currently laid down in the CETA that the remuneration of Members of the CETA Tribunal is partially dependent on the number of disputes brought by investors. Consequently, the development of case-law favourable to investors could have a positive impact on the remuneration of those Members and could thereby give rise to a conflict of interest.

63      The Kingdom of Belgium is uncertain, third, as to the compatibility, with the second paragraph of Article 47 of the Charter, of the rules concerning the appointment of the Members of Tribunal and of the Appellate Tribunal, as laid down in Article 8.27.2 and 8.27.3, and in Article 8.28.3 and 8.28.7(c), of the CETA.

64       The Kingdom of Belgium observes that those Members are to be appointed by the CETA Joint Committee, which is to be co-chaired by the Minister for International Trade of Canada and the Member of the Commission responsible for Trade (or by their respective designees). It is however clear from the European Charter on the statute for judges, to which reference is made by the recommendations of the Consultative Council of European Judges (CCJE), that where judges are appointed by the executive, such appointments must necessarily take place following a recommendation by an independent authority composed, in significant numbers, of members of the judiciary.

65      Fourth, the Kingdom of Belgium has doubts as to the compatibility, with the second paragraph of Article 47 of the Charter, of the conditions governing the removal of Members of the CETA Tribunal and Appellate Tribunal, as laid down in Article 8.30.4 of the CETA, the effect of that provision being that a Member may be removed by decision of the CETA Joint Committee. However, it follows from the European Charter on the statute for judges and from the recommendations of the CCJE that any decision to remove a judge must involve an independent body, be given in accordance with a fair procedure that respects the rights of defence, and be open to an appeal before a higher judicial body. In any event, in order to guarantee the independence of judges, it should not be possible for them to be removed by the executive.

66      Fifth and last, the Kingdom of Belgium questions the compatibility, with the second paragraph of Article 47 of the Charter, of the rules of ethics with which the Members of those Tribunals will have to comply under Article 8.28.4, Article 8.30.1 and Article 8.44.2 of the CETA.

67      The Kingdom of Belgium observes that those provisions essentially provide that those Members will have to comply with the IBA Guidelines, pending the adoption of a code of conduct by the Committee on Services and Investments. It follows, however, from the Magna Carta of Judges, adopted on 17 November 2010 by the CCJE, that the rules of ethics applicable to the judges must be developed by the judges themselves or, at the very least, that the judges should play a major role in the adoption of those rules.

68      The Kingdom of Belgium observes that since the IBA Guidelines are intended for arbiters and not for judges, they may contain standards of independence that are not adapted to those acting in a judicial capacity.

69      The Kingdom of Belgium also comments that the CETA provides in Article 8.30.1 thereof that the Members of the CETA Tribunal and Appellate Tribunal are to 'refrain from acting as counsel or as party-appointed expert or witness in any pending or new investment dispute under this or any other international agreement', but does not require those Members to declare their outside activities nor a fortiori that those activities should be subject to prior approval. The relevant international instruments, however, such as the European Charter on the statute for judges, state that the exercise of such activities must be declared and must be the object of a prior authorisation.

## IV.    Summary of the observations submitted to the Court

### A.    *The compatibility of the envisaged ISDS mechanism with the autonomy of the EU legal order*

70      The majority of the governments that have submitted observations, and also the Council and the Commission, state that Article 8.31 of the CETA unequivocally bars the CETA Tribunal from interpreting provisions of EU primary and secondary law. In that respect, the CETA should be distinguished from the draft agreement examined by the Court in Opinion 1/09 (*Agreement on the creation of a unified patent litigation system*) of 8 March 2011 (EU:C:2011:123).

71      It follows, moreover, from Article 8.31 that the interpretations of provisions of the CETA to be provided by the CETA Tribunal, in accordance with public international law, will not be binding on the Court. The CETA should be distinguished, therefore, from the draft agreement examined in Opinion 2/13 (*Accession of the European Union to the ECHR*) of 18 December 2014 (EU:C:2014:2454).

72      Further, Article 8.31.2 and Article 8.39.1 of the CETA deny to the CETA Tribunal as well as, by consequence, the CETA Appellate Tribunal, any power to determine the legality of the contested measure.

73      The awards of the CETA Tribunal lack, moreover, any *erga omnes* effect, since Article 8.41 of the CETA states that those awards are binding only between the Parties to the dispute. From that perspective also, there would be no possibility of an award of that Tribunal impinging on the exclusive jurisdiction of the Court over the definitive interpretation of EU law.

74      In addition, by virtue of the mechanism referred to in Article 8.21 of the CETA, that Tribunal cannot take notice of the division of powers between the European Union and its Member States. The difficulty identified by the Court in paragraphs 33 to 36 of Opinion 1/91 (*EEA Agreement — I*) of 14 December 1991 (EU:C:1991:490), and in paragraphs 224 and 225 of Opinion 2/13 (*Accession of the European Union to the ECHR*) of 18 December 2014 (EU:C:2014:2454), therefore does not arise in this case.

75      It is asserted that, by means of all the rules and procedures contained in the CETA, the Parties have maintained the autonomy of the EU legal order.

76      Those governments, the Council and the Commission accept that there will be, in the disputes that arise between a Canadian investor and the European Union, situations in which the CETA Tribunal will be required, in order to assess whether there is an infringement of a provision of Section C or D of Chapter Eight of the CETA, to examine the effect of the EU measure that is contested by that investor. However, as stated in Article 8.31.2 of the CETA, in such situations, the Tribunal will have to confine itself to an examination of EU law as a matter of fact and will not be able to engage in interpretation of points of law.

77      Thus, it is asserted that the exclusive jurisdiction of the Court over the definitive interpretation of EU law is not adversely affected because the CETA Tribunal will have to apply and interpret international law, constituted of the CETA itself and rules of international law, and not EU law. The CETA Tribunal, on the one hand, and the Court, on the other, operate within legal orders that are wholly separate. The fact that the CETA has no direct effect in the domestic legal systems of the Parties, as laid down in Article 30.6 of the CETA, highlights that separation.

78      In the light of that separation, there is no need, within the system concerning the settlement of disputes before the CETA Tribunal, to provide a mechanism for the prior involvement of the Court. An analysis of the kind carried out by the Court in paragraphs 236 to 248 of Opinion 2/13 (*Accession of the European Union to the ECHR*) of 18 December 2014 (EU:C:2014:2454) is of no relevance in the present case. Further, the grounds that led the Court to examine the possibility of a prior involvement mechanism in Opinion 1/91 (*EEA Agreement — I*) of 14 December 1991 (EU:C:1991:490, paragraphs 54 to 65) are also absent in the present case. Unlike the agreement on the European Economic Area (EEA), it is not at all an aim of the CETA to extend a part of the EU law *acquis* to Canada.

### B.    The compatibility of the envisaged ISDS mechanism with the general principle of equal treatment and with the requirement of effectiveness

79      The majority of the governments that have submitted observations, and also the Council and the Commission, observe that the Canadian enterprises and natural persons that invest within the European Union, on the one hand, and enterprises and natural persons of Member States that invest within the European Union, on the other, are not in comparable situations, since the former make international investments and the latter intra-EU investments.

80      The only situations that are comparable are that of Canadian enterprises and natural persons that invest within the European Union and that of enterprises and natural persons of the Member States that invest in Canada.

81      Moreover, it is clear from the Court's case-law that the EU law principle of equal treatment is not applicable to relations between the Union and non-Member States. Articles 20 and 21 of the Charter are, according to a number of the governments that have submitted observations and the Council, of no relevance to the examination of the compatibility of the CETA with EU law.

82      That principle is also not applicable in a situation where, on the one hand, 'locally established enterprises', within the meaning of Article 8.1 of the CETA, owned or controlled by a Canadian investor and, on the other, enterprises established within the Union that are not owned or controlled by such an investor are treated differently.

83      The former enterprises constitute investments made by Canadian enterprises and natural persons and should be considered as such in the context of the CETA. Consequently, as regards locally established enterprises, the difference in treatment referred to by the Kingdom of Belgium should be equated with the difference in treatment of, on the one hand, the Canadian enterprises and natural persons that invest within the Union and, on the other, the enterprises and natural persons of the Member States that invest within the Union.

84      The difference in treatment referred to in the request for an opinion is, in any event, justified by the objective of contributing to free and fair trade, within the meaning of Article 3(5) TEU, and by the

objective of integrating all countries into the world economy, as laid down in Article 21(2)(e) TEU. The competence of the Union to conclude, under Article 207 TFEU, agreements concerning direct investments with non-Member States and, under Article 4(1) and (2)(a) TFEU, agreements concerning investments other than direct investments with such States, would be meaningless if the EU law principle of equal treatment were to prohibit the Union from entering into specific commitments with respect to investments deriving from non-Member States.

85    In so far as the Kingdom of Belgium is also uncertain as to the compatibility of the ISDS mechanism with the requirement that EU law be effective, alluding to the possibility that the CETA Tribunal might hold that a fine imposed by the Commission or by a competition authority of a Member State on a Canadian investor was contrary to a substantive provision of Chapter Eight of the CETA and might award compensation equivalent to the amount of that fine, the majority of the governments that have submitted observations, the Council and the Commission consider that this is not a real problem.

86    The reason is that it is highly improbable that that Tribunal, which will be obliged, not least because of the right to regulate emphasised in Article 8.9 of the CETA, to respect EU competition law, will hold that a fine imposed in accordance with that law is contrary to the CETA.

### C.    The compatibility of the envisaged ISDS mechanism with the right of access to an independent tribunal

87    A number of the governments that have submitted observations and the Council argue that Article 47 of the Charter and the other European texts referred to in the request for an opinion are inapplicable to the envisaged ISDS mechanism.

88    They observe, on that subject, that those texts are not binding on Canada and that the CETA falls within the scope, not of EU law, but of international law, the only law applicable to that mechanism.

89    Other governments that have submitted observations and the Commission consider, for their part, that Article 47 of the Charter is applicable. However, they maintain that its provisions are, contrary to what is suggested in the request for an opinion, respected by the CETA.

90    In that regard, they observe, first, that the CETA Tribunal will have a 'hybrid' character in that it will incorporate not only elements of judicial dispute resolution, but also elements drawn from international arbitration proceedings. The latter elements include, inter alia, the requirement of prior consultation, a number of components of the proceedings before the Tribunal, the conditions governing appointment, remuneration and removal of the Members of that Tribunal, and the fact that awards have no *erga omnes* effect. Further, the CETA Tribunal is not a court that has compulsory jurisdiction, since an investor may submit a dispute either before an ordinary court or before that Tribunal. It follows that the requirement of independence does not apply to that Tribunal in the same way as it does to an ordinary court or tribunal.

91    Further, they state that, unlike the greater part of the provisions of the CETA, Section F of Chapter Eight thereof is not to be applied provisionally and that the aspects alluded to by the Kingdom of Belgium with respect to its doubts as to the compatibility of the envisaged ISDS mechanism with the right of access to an independent tribunal, namely access for small and medium-sized enterprises, the conditions governing appointment, remuneration and removal of the Members of the CETA Tribunal and Appellate Tribunal, and the rules of ethics applicable to them, are all still to be developed. The existence of a commitment with respect to such further detail would clearly follow from Article 8.27.15, Article 8.39.6, and Article 8.44.2 of the CETA, from Point 6(f) and (h) of the Joint Interpretative Instrument, and from Statement No 36.

92    Since, in the context of an Opinion, the Court has to examine the agreement as it is 'envisaged', account has to be taken of that commitment, which, once given effect, will strengthen the safeguards already incorporated in the CETA.

93    Last, those governments, the Council and the Commission argue that, even if the projected improvements are set aside, the doubts expressed in the request for an opinion are unfounded.

94    As regards, first, the access of small and medium-sized enterprises to the CETA Tribunal, they state that investors are not compelled to bring their disputes before that Tribunal, since the legal remedies before the domestic courts and tribunals of the Parties, which provide all safeguards in term of legal aid, are also open to them. Consequently, if an investor were, for financial reasons, to find itself unable to bring a dispute before the CETA Tribunal, that investor would not thereby be deprived of the right of access to an independent tribunal.

95    Moreover, the grant of legal aid is not a reliable parameter in order to determine whether the fundamental right of access to a tribunal is respected.

96    They also observe that the rule laid down in Article 8.39.5 of the CETA, that the costs before the CETA Tribunal are as general rule to be borne by the unsuccessful party, does not differ from the rule that is normally applicable before the ordinary courts and tribunals.

97    As regards, second, the conditions governing the remuneration of the Members of the CETA Tribunal, those governments, the Council and the Commission consider that the Kingdom of Belgium is wrong to classify the CETA Joint Committee as an 'executive body'. They observe, in that regard, that any decision taken by that Committee that entails legal effects will have to comply with the procedure laid down in Article 218(9) TFEU, which will mean that the Council and Commission will be called on to play an essential role in that decision-making process.

98    Article 8.27.12 of the CETA, which provides that the CETA Joint Committee is to fix the monthly retainer fee of the Members of the CETA Tribunal, therefore raises no difficulties. Moreover, in the light of the requirement of independence specified in Article 8.30.1 of the CETA, that Committee will have to ensure that the amount of that retainer fee and method of determining it do not call into question the independence of those Members. The same could be said with respect to the regular salary referred to in Article 8.27.15 of the CETA and the remuneration of the Members of the Appellate Tribunal, the subject of Article 8.28.7(d) of the CETA.

99    Further, it is argued that, since the remuneration of the Members of the CETA Tribunal, as provided for in Article 8.27.14 of the CETA, will be determined on the basis of a fixed scale established by the Secretary General and the President of the ICSID, the Kingdom of Belgium is wrong to assert that that remuneration will depend on the workload of those Members.

100    As regards, third, the appointment of Members of the CETA Tribunal, the majority of the governments that have submitted observations and the Council and the Commission state that the Members of international courts and tribunals are appointed by the governments concerned and therefore by the executive.

101    With respect to, fourth, the conditions concerning the removal of Members of the CETA Tribunal, the above governments and institutions comment that it is normal to provide that the Parties to an agreement establishing an international court or tribunal have the option of discharging the Members of that court or tribunal. That is the case, for example, with respect to the International Criminal Court.

102    As regards, fifth, the rules of ethics applicable to the Members of the envisaged tribunals, it is asserted that the Kingdom of Belgium is mistaken in its observation that those Members will not have to declare their outside activities. It follows from Article 8.30.1 of the CETA that those Members will have to comply with the IBA Guidelines or with any other rule adopted by the CETA Committee on Services and Investment under Article 8.44.2 of the CETA. The IBA Guidelines provide for a wide transparency obligation with respect to all facts and circumstances that might affect the impartiality or independence of the judges.

103   While, for the remainder, the Members of the envisaged tribunals will be able to pursue outside activities, that is justified by the fact that, initially, those Members will not be employed full time. For that reason, Article 8.27.12 of the CETA provides that, where there is no dispute, a monthly retainer fee will be paid to those Members to ensure their availability.

104   If, in those circumstances, the Members of the envisaged tribunals were not permitted to pursue an outside activity, they would have no guarantee of sufficient income.

## V.   Position of the Court

105   As a preliminary point, it is clear that the request for an opinion concerns Section F of Chapter Eight of the CETA and that, in light of the fact mentioned in paragraph 3 of the present Opinion, that request relates to an 'agreement envisaged' within the meaning of Article 218(11) TFEU. That request is therefore admissible, none of the governments or institutions that are participating in the procedure having, moreover, expressed any doubt in that regard.

### A.   *The compatibility of the envisaged ISDS mechanism with the autonomy of the EU legal order*

### 1.   *Principles*

106   It must be recalled, at the outset, that an international agreement providing for the creation of a court responsible for the interpretation of its provisions and whose decisions are binding on the European Union, is, in principle, compatible with EU law. Indeed, the competence of the European Union in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court that is created or designated by such agreements as regards the interpretation and application of their provisions (Opinion 2/13 (*Accession of the Union to the ECHR*) of 18 December 2014, EU:C:2014:2454, paragraph 182; see also Opinion 1/91 (*EEA Agreement — I*) of 14 December 1991, EU:C:1991:490, paragraph 40 and 70, and Opinion 1/09 (*Agreement on the creation of a unified patent litigation system*) of 8 March 2011, EU:C:2011:123, paragraph 74).

107   An international agreement entered into by the Union may, moreover, affect the powers of the EU institutions provided, however, that the indispensable conditions for safeguarding the essential character of those powers are satisfied and, consequently, there is no adverse effect on the autonomy of the EU legal order (see, inter alia, Opinion 1/00 (*Agreement on the establishment of a European Common Aviation Area*) of 18 April 2002, EU:C:2002:231, paragraphs 20 and 21, and Opinion 2/13 (*Accession of the Union to the ECHR*) of 18 December 2014, EU:C:2014:2454, paragraph 183).

108   It follows that the CETA, in so far as it provides, as is apparent from Point 6(f), (g) and (i) of the Joint Interpretative Instrument and as the Advocate General observed in point 18 of his Opinion, a process of submitting to judicial adjudication the resolution of disputes between investors and States by means of establishing a CETA Tribunal and Appellate Tribunal and, in the longer term, a multilateral investment Tribunal, may be compatible with EU law only if it has no adverse effect on the autonomy of the EU legal order.

109   That autonomy, which exists with respect both to the law of the Member States and to international law, stems from the essential characteristics of the European Union and its law. EU law is characterised by the fact that it stems from an independent source of law, namely the Treaties, by its primacy over the laws of the Member States, and by the direct effect of a whole series of provisions that are applicable to their nationals and to the Member States themselves. Those characteristics have given rise to a structured network of principles, rules and mutually interdependent legal relations binding the European Union and its Member States reciprocally as well as binding its Member States to each other (see, inter alia, judgment of 10 December 2018, *Wightman and Others*, C-621/18, EU:C:2018:999, paragraph 45 and the case-law cited).

110   That autonomy accordingly resides in the fact that the Union possesses a constitutional framework that is unique to it. That framework encompasses the founding values set out in Article 2 TEU, which states that the Union 'is founded on the values of respect for human dignity, freedom, democracy, equality, the rule of law, and respect for human rights', the general principles of EU law, the provisions of the Charter, and the provisions of the EU and FEU Treaties, which include, inter alia, rules on the conferral and division of powers, rules governing how the EU institutions and its judicial system are to operate, and fundamental rules in specific areas, structured in such a way as to contribute to the implementation of the process of integration described in the second paragraph of Article 1 TEU (see, to that effect, Opinion 2/13 (*Accession of the Union to the ECHR*) of 18 December 2014, EU:C:2014:2454, paragraph 158).

111   In order to ensure that those specific characteristics and the autonomy of the legal order thus created are preserved, the Treaties have established a judicial system intended to ensure consistency and uniformity in the interpretation of EU law. In accordance with Article 19 TEU, it is for the national courts and tribunals and the Court to ensure the full application of that law in all the Member States and to ensure effective judicial protection, the Court having exclusive jurisdiction to give the definitive interpretation of that law. To that end, that system includes, in particular, the preliminary ruling procedure provided for in Article 267 TFEU (Opinion 2/13 (*Accession of the Union to the ECHR* ) of 18 December 2014, EU:C:2014:2454, paragraphs 174 to 176 and 246).

112   In this case, having regard to the doubts raised in the request for an opinion, it is necessary to examine whether the ISDS mechanism provided for in Section F of Chapter Eight of the CETA is such as to prevent the Union from operating in accordance with the abovementioned constitutional framework.

113   For the purposes of that examination, it must be stated, at the outset, that the envisaged ISDS mechanism stands outside the EU judicial system.

114   The courts envisaged by the CETA are indeed separate from the domestic courts of Canada, the Union and its Member States. The CETA Tribunal and Appellate Tribunal cannot, consequently, be considered to form part of the judicial system of either of the Parties.

115   However, the fact that the envisaged ISDS mechanism stands outside the EU judicial system does not mean, in itself, that that mechanism adversely affects the autonomy of the EU legal order.

116   Indeed, with respect to international agreements entered into by the Union, the jurisdiction of the courts and tribunals specified in Article 19 TEU to interpret and apply those agreements does not take precedence over either the jurisdiction of the courts and tribunals of the non-Member States with which those agreements were concluded or that of the international courts or tribunals that are established by such agreements.

117   Accordingly, while those agreements are an integral part of EU law and may therefore be the subject of references for a preliminary ruling (see, inter alia, judgments of 30 April 1974, *Haegeman*, 181/73, EU:C:1974:41, paragraphs 5 and 6; of 25 February 2010, *Brita*, C-386/08, EU:C:2010:91, paragraph 39; and of 22 November 2017, *Aebtri*, C-224/16, EU:C:2017:880, paragraph 50), they concern no less those non-Member States and may therefore also be interpreted by the courts and tribunals of those States. It is, moreover, precisely because of the reciprocal nature of international agreements and the need to maintain the powers of the Union in international relations that it is open to the Union, as is clear from the case-law cited in paragraph 106 of the present Opinion, to enter into an agreement that confers on an international court or tribunal the jurisdiction to interpret that agreement without that court or tribunal being subject to the interpretations of that agreement given by the courts or tribunal of the Parties.

118   It follows from the foregoing that EU law does not preclude Section F of Chapter Eight of the CETA either from providing for the creation of a Tribunal, an Appellate Tribunal and, subsequently, a multilateral investment Tribunal or from conferring on those Tribunals the jurisdiction to interpret and apply the provisions of the agreement having regard to the rules and principles of international law applicable between the Parties. On the other hand, since those Tribunals stand outside the EU judicial system, they

cannot have the power to interpret or apply provisions of EU law other than those of the CETA or to make awards that might have the effect of preventing the EU institutions from operating in accordance with the EU constitutional framework.

119    Consequently, in order to determine the compatibility of the envisaged ISDS mechanism with the autonomy of the EU legal order, it is necessary to be satisfied that:

–    Section F of Chapter Eight of the CETA does not confer on the envisaged tribunals any power to interpret or apply EU law other than the power to interpret and apply the provisions of that agreement having regard to the rules and principles of international law applicable between the Parties, and

–    Section F of Chapter Eight of the CETA does not structure the powers of those tribunals in such a way that, while not themselves engaging in the interpretation or application of rules of EU law other than those of that agreement, they may issue awards which have the effect of preventing the EU institutions from operating in accordance with the EU constitutional framework.

### 2.    No jurisdiction to interpret and apply rules of EU law other than the provisions of the CETA

120    Article 8.18 of the CETA, which is within Section F of Chapter Eight thereof, confers on the CETA Tribunal the power to examine any claim by an investor of one Party that another Party has infringed an obligation laid down in Sections C (Articles 8.6 to 8.8) or D (Articles 8.9 to 8.14) of Chapter Eight.

121    To that end, that Tribunal is to apply, as provided in Article 8.31.1 of the CETA, 'this Agreement as interpreted in accordance with the [Vienna Convention], and other rules and principles of international law applicable between the Parties'. However, that Tribunal will not have jurisdiction, as is made clear by the first sentence of Article 8.31.2 of that agreement, 'to determine the legality of a measure, alleged to constitute a breach of this Agreement, under the domestic law of a Party'.

122    It follows that the power of interpretation and application conferred on that Tribunal is confined to the provisions of the CETA and that such interpretation or application must be undertaken in accordance with the rules and principles of international law applicable between the Parties.

123    Section F of Chapter Eight of the CETA must be distinguished in that respect from the draft agreement on the creation of a unified patent litigation system, declared to be incompatible with EU law in Opinion 1/09 (*Agreement on the creation of a unified patent litigation system*) of 8 March 2011 (EU:C:2011:123).

124    The 'applicable law' in the context of that draft agreement, defined in Article 14a thereof, included, inter alia, 'directly applicable Community law, in particular Council Regulation … on the Community patent, and national law of the Contracting States implementing Community law'. The Court concluded, in paragraph 78 of that Opinion, that the patent court the creation of which was envisaged would be called upon to interpret and apply not only the provisions of the agreement in question, but also the future regulation on the Community patent and other instruments of European Union law, in particular regulations and directives in conjunction with which that regulation would, when necessary, have to be read. The Court also stated, in that paragraph, that that court might be called upon to determine a dispute pending before it in the light of the fundamental rights and general principles of European Union law, or even to examine the validity of an act of the European Union.

125    Those considerations led to the Court's finding that the conclusion of that draft agreement would have altered the essential character of the powers that the Treaties confer on the EU institutions and on the Member States and that are indispensable to the preservation of the very nature of EU law (Opinion 1/09 (*Agreement on the creation of a unified patent litigation system*) of 8 March 2011, EU:C:2011:123, paragraph 89).

126    Section F of Chapter Eight of the CETA must also be distinguished from the investment agreement at issue in the case that gave rise to the judgment of 6 March 2018, *Achmea* (C‑284/16, EU:C:2018:158), since, as stated by the Court in paragraphs 42, 55 and 56 of that judgment, that agreement established a tribunal that would be called upon to give rulings on disputes that might concern the interpretation or application of EU law.

127    That judgment concerned, moreover, an agreement between Member States. The question of the compatibility, with EU law, of the creation or preservation of an investment tribunal by means of such an agreement must be distinguished from the question of the compatibility, with EU law, of the creation of such a tribunal by means of an agreement between the Union and a non‑Member State (judgment of 6 March 2018, *Achmea*, C‑284/16, EU:C:2018:158, paragraphs 57 and 58).

128    The Member States are, in any area that is subject to EU law, required to have due regard to the principle of mutual trust. That principle obliges each of those States to consider, other than in exceptional circumstances, that all the other Member States comply with EU law, including fundamental rights, such as the right to an effective remedy before an independent tribunal laid down in Article 47 of the Charter (see, inter alia, to that effect, Opinion 2/13 (*Accession of the Union to the ECHR* ) of 18 December 2014, EU:C:2014:2454, paragraph 191, and judgment of 26 April 2018, *Donnellan*, C‑34/17, EU:C:2018:282, paragraphs 40 and 45).

129    However, that principle of mutual trust, with respect to, inter alia, compliance with the right to an effective remedy before an independent tribunal, is not applicable in relations between the Union and a non‑Member State.

130    The finding made in paragraph 122 of the present Opinion is not invalidated by Article 8.31.2 of the CETA, which provides, that 'in determining the consistency of a measure with this Agreement, the Tribunal may consider, as appropriate, the domestic law of a Party as a matter of fact' and further states that, 'in doing so, the Tribunal shall follow the prevailing interpretation given to the domestic law by the courts or authorities of that Party', adding that 'any meaning given to domestic law by the Tribunal shall not be binding upon the courts or the authorities of that Party'.

131    Those provisions serve no other purpose than to reflect the fact that the CETA Tribunal, when it is called upon to examine the compliance with the CETA of the measure that is challenged by an investor and that has been adopted by the investment host State or by the Union, will inevitably have to undertake, on the basis of the information and arguments presented to it by that investor and by that State or by the Union, an examination of the effect of that measure. That examination may, on occasion, require that the domestic law of the respondent Party be taken into account. However, as is stated unequivocally in Article 8.31.2 of the CETA, that examination cannot be classified as equivalent to an interpretation, by the CETA Tribunal, of that domestic law, but consists, on the contrary, of that domestic law being taken into account as a matter of fact, while that Tribunal is, in that regard, obliged to follow the prevailing interpretation given to that domestic law by the courts or authorities of that Party, and those courts and those authorities are not, it may be added, bound by the meaning given to their domestic law by that Tribunal.

132    The fact that there is no jurisdiction to interpret the rules of EU law other than the provisions of the CETA is also reflected in Article 8.21 of that agreement, which confers not on the CETA Tribunal, but on the Union, the power to determine, when a Canadian investor seeks to challenge measures adopted by a Member State and/or by the Union, whether the dispute is, in the light of the rules on the division of powers between the Union and its Member States, to be brought against that Member State or against the Union. The exclusive jurisdiction of the Court to give rulings on the division of powers between the Union and its Member States is thereby preserved, and Section F of Chapter Eight of the CETA must be distinguished in that regard from the draft agreement that was the subject of Opinion 2/13 (*Accession of the Union to the ECHR*) of 18 December 2014, (EU:C:2014:2454, paragraphs 224 to 231).

133    Nor will the CETA Appellate Tribunal be called upon to interpret or apply the rules of EU law other than the provisions of the CETA. Article 8.28.2(a) of that agreement states that the Appellate Tribunal will be

able to 'uphold, modify or reverse the Tribunal's award based on … errors in the application or interpretation of applicable law', that 'applicable law' covering, in the light of the law to be applied by the CETA Tribunal under Article 8.31.1 of that agreement, the CETA and the rules and principles of international law in the light of which that agreement has to be interpreted and applied. While Article 8.28.2(b) of the CETA adds that the Appellate Tribunal may also identify 'manifest errors in the appreciation of the facts, including the appreciation of relevant domestic law', it is nonetheless clear from the preceding provisions that it was in no way the intention of the Parties to confer on the Appellate Tribunal jurisdiction to interpret domestic law.

134    Since the CETA Tribunal and Appellate Tribunal stand outside the EU judicial system and since their powers of interpretation are confined to the provisions of the CETA in the light of the rules and principles of international law applicable between the Parties, it is, moreover, consistent that the CETA makes no provision for the prior involvement of the Court that would permit or oblige that Tribunal or Appellate Tribunal to make a reference for a preliminary ruling to the Court.

135    For the same reasons, it is, moreover, consistent that the CETA confers on those Tribunals the power to give a definitive ruling on a dispute brought by an investor against the investment host State or against the Union, without establishing any procedure for the re-examination of the award by a court of that State or by the Court and without that investor being permitted — subject to the specific exceptions listed in Article 8.22.5 of the CETA — to bring, during or on the conclusion of the procedure before those Tribunals, the same dispute before a court of that State or before the Court.

136    It follows from the foregoing that Section F of Chapter Eight of the CETA does not confer on the envisaged tribunals any jurisdiction to interpret or apply EU law other than that relating to the provisions of that agreement.

### 3.    No effect on the operation of the EU institutions in accordance with the EU constitutional framework

137    The Kingdom of Belgium and some of the governments that have submitted observations have stated that, in order to give rulings on disputes brought before it against the Union, the CETA Tribunal might, in the course of its examination of the relevant facts, which may include the primary law on the basis of which the contested measure was adopted, weigh the interest constituted by the freedom to conduct business, relied on by the investor bringing the claim, against public interests, set out in the EU and FEU Treaties and in the Charter, relied on by the Union in support of its defence.

138    That Tribunal would accordingly be called upon, without having to undertake an interpretation as such of those Treaties or of the Charter, to make findings as to the effect of those texts and to decide on the basis of that weighing of interests, inter alia, whether that EU measure is 'fair and equitable', within the meaning of Article 8.10 of the CETA, whether it constitutes indirect expropriation, within the meaning of Article 8.12 of that agreement, or whether it has to be considered to be an unjustified restriction on the freedom to make payments and transfers of capital as provided for in Article 8.13 of that agreement. That Tribunal might accordingly give rulings on acts of secondary EU law on the basis of findings of the same kind as the Court is empowered to make. Such findings by the CETA Tribunal would lead to definitive decisions that would be binding on the Union. The question would therefore arise whether such situations, which are likely to occur often, would adversely affect the exclusive jurisdiction of the Court over the definitive interpretation of EU law and, accordingly, the autonomy of the EU legal order.

139    In order to respond to those doubts, it must be noted, first, that the definition of the concept of 'investment', contained in Article 8.1 of the CETA, is particularly broad and thereby permits the envisaged tribunals to hear a wide range of disputes. Those brought against the Union or a Member State may, subject to the specific exceptions mentioned in the CETA, concern measures in any area that relates, within the Union, to business activity and the use of moveable or immovable property, securities, intellectual property rights, claims to money and any other type of investment.

140     It must be noted, second, that, notwithstanding Article 8.21 of the CETA, which confers on the Union the power to determine whether, if a claim is lodged before the CETA Tribunal by a Canadian investor, the Union will itself be the respondent or whether it will leave that position to the investment host Member State, the Union will not be able to object, when the contested measure was adopted by it, to that measure being examined by that Tribunal. It follows from the rules of procedure laid down in the CETA, and in particular Article 8.25.1 of that agreement, that the respondent, whether that is the investment host Member State or the Union itself, is required to consent to the settlement of that dispute by that Tribunal.

141     It must be stated, third, that, while, by means of the definition of the concept of 'investor' set out in Article 8.1 of the CETA, and by means of the clarification contained in Point 6(d) of the Joint Interpretative Instrument, the CETA restricts the right to bring a dispute before the CETA Tribunal against the Union or a Member State to natural and legal persons who have a real link with Canada, the fact remains that that agreement permits those persons to challenge, before that Tribunal, any 'measure', within the meaning of Article 1.1 of the CETA, as circumscribed, with respect to Chapter Eight of that agreement, by Article 8.2 of the CETA.

142     Since Article 1.1 defines the term 'measure' as including 'a law, regulation, rule, procedure, decision, administrative action, requirement, practice or any other form of measure by a Party', the disputes brought against the Union may relate to any form of act or practice of the Union, provided that, in accordance with Article 8.2 of the CETA, read together with Sections C, D and F of Chapter Eight of that agreement, the act or practice at issue 'relates to' a 'covered investment', within the meaning of Article 8.1 of the CETA or an 'investor of the other Party' with respect to that covered investment.

143     While it is thus stated in the CETA that the dispute must concern a measure that relates to the claimant or its covered investment, that agreement does not however preclude that measure from being one of general application or from implementing an act of general application.

144     Fourth, it must be observed that, while the CETA Tribunal may not, as is apparent from the term 'only' in Article 8.39.1 of that agreement and from the wording of Article 8.39.4, either annul the contested measure, or require that the domestic law of the Party concerned should be rendered compatible with the CETA, or impose a penalty on the respondent Party, the CETA Tribunal may, however, where it finds that that measure is in breach of one of the provisions of Sections C or D of Chapter Eight of the CETA, under Article 8.39.1(a) order the respondent Party to pay to the claimant investor a sum intended to provide compensation for damage suffered by that investor because of that breach, together with any interest applicable.

145     Since Article 8.41.2 of the CETA states that 'a disputing party shall recognise and comply with an award without delay', the Union will have to make payment of that sum when it is ordered to do so by means of a final award made by the CETA Tribunal or, according to the rules laid down in Article 8.28.9 of that agreement, by the CETA Appellate Tribunal.

146     In that regard, it must be observed that the power, laid down in Article 8.39.1(a) of the CETA, of the envisaged tribunals to award damages to a private investor is an aspect of the ISDS regime established by that agreement that distinguishes that regime from the system in force within the World Trade Organisation (WTO) for the resolution of disputes between WTO contracting parties, that system being partly based on negotiations between those contracting parties and offering a number of options for giving effect to awards (see, to that effect, judgment of 9 September 2008, *FIAMM and Others* v *Council and Commission*, C-120/06 P and C-121/06 P, EU:C:2008:476, paragraph 116).

147     The characteristics of the jurisdiction of the CETA Tribunal and Appellate Tribunal set out in paragraphs 139 to 145 of the present Opinion are, admittedly, consistent with the protection of foreign investors that is the object of that agreement.

148     However, without prejudice to a situation where the Parties have agreed, within the framework of the CETA, to harmonise their legislation, the jurisdiction of those tribunals would adversely affect the

autonomy of the EU legal order if it were structured in such a way that those tribunals might, in the course of making findings on restrictions on the freedom to conduct business challenged within a claim, call into question the level of protection of a public interest that led to the introduction of such restrictions by the Union with respect to all operators who invest in the commercial or industrial sector at issue of the internal market, rather than confine itself to determining whether the treatment of an investor or a covered investment is vitiated by a defect mentioned in Section C or D of Chapter Eight of the CETA.

149    If the CETA Tribunal and Appellate Tribunal were to have jurisdiction to issue awards finding that the treatment of a Canadian investor is incompatible with the CETA because of the level of protection of a public interest established by the EU institutions, this could create a situation where, in order to avoid being repeatedly compelled by the CETA Tribunal to pay damages to the claimant investor, the achievement of that level of protection needs to be abandoned by the Union.

150    If the Union were to enter into an international agreement capable of having the consequence that the Union — or a Member State in the course of implementing EU law — has to amend or withdraw legislation because of an assessment made by a tribunal standing outside the EU judicial system of the level of protection of a public interest established, in accordance with the EU constitutional framework, by the EU institutions, it would have to be concluded that such an agreement undermines the capacity of the Union to operate autonomously within its unique constitutional framework.

151    It must be emphasised, in that regard, that EU legislation is adopted by the EU legislature following the democratic process defined in the EU and FEU Treaties, and that that legislation is deemed, by virtue of the principles of conferral of powers, subsidiarity and proportionality laid down in Article 5 TEU, to be both appropriate and necessary to achieve a legitimate objective of the Union. In accordance with Article 19 TEU, it is the task of the Courts of the European Union to ensure review of the compatibility of the level of protection of public interests established by such legislation with, inter alia, the EU and FEU Treaties, the Charter and the general principles of EU law.

152    With respect to the jurisdiction of the envisaged tribunals to declare infringements of the obligations contained in Section C of Chapter Eight of the CETA, Article 28.3.2 of that agreement states that the provisions of Section C cannot be interpreted in such a way as to prevent a Party from adopting and applying measures necessary to protect public security or public morals or to maintain public order or to protect human, animal or plant life or health, subject only to the requirement that such measures are not applied in a manner that would constitute a means of arbitrary or unjustifiable discrimination between the Parties where like conditions prevail, or a disguised restriction on trade between the Parties.

153    It follows from the foregoing that, in those circumstances, the CETA Tribunal has no jurisdiction to declare incompatible with the CETA the level of protection of a public interest established by the EU measures specified in paragraph 152 of the present Opinion and, on that basis, to order the Union to pay damages.

154    In the same way, as regards the jurisdiction of the envisaged tribunals to declare infringements of obligations contained in Section D of Chapter Eight of the CETA, Article 8.9.1 of that agreement states explicitly that Parties have the right 'to regulate within their territories to achieve legitimate policy objectives, such as the protection of public health, safety, the environment or public morals, social or consumer protection or the promotion and protection of cultural diversity'. Further, Article 8.9.2 of that agreement provides that 'for greater certainty, the mere fact that a Party regulates, including through a modification to its laws, in a manner which negatively affects an investment or interferes with an investor's expectations, including its expectations of profits, does not amount to a breach of an obligation under this Section'.

155    Moreover, Point 1(d) and Point 2 of the Joint Interpretative Instrument provide that the CETA 'will … not lower [the standards and regulations of each Party] related to food safety, product safety, consumer protection, health, environment or labour protection', that 'imported goods, service suppliers and investors must continue to respect domestic requirements, including rules and regulations', and that the CETA

'preserves the ability of the European Union and its Member States and Canada to adopt and apply their own laws and regulations that regulate economic activity in the public interest'.

156    It is apparent from reading those provisions together that the discretionary powers of the CETA Tribunal and Appellate Tribunal do not extend to permitting them to call into question the level of protection of public interest determined by the Union following a democratic process.

157    That is also the purport of Point 3 of Annex 8-A to the CETA, which states that 'for greater certainty, except in the rare circumstances when the impact of a measure or series of measures is so severe in light of its purpose that it appears manifestly excessive, non-discriminatory measures of a Party that are designed and applied to protect legitimate public welfare objectives, such as health, safety and the environment, do not constitute indirect expropriations'.

158    It must be added that the jurisdiction of the CETA Tribunal to find infringements of the obligation, laid down in Article 8.10 of the CETA, to accord 'fair and equitable treatment' to covered investments is specifically circumscribed, since Article 8.10.2 lists exhaustively the situations in which such a finding can be made.

159    In that regard, the Parties have concentrated on, inter alia, situations where there is abusive treatment, manifest arbitrariness and targeted discrimination, which reveals, once again, that the required level of protection of a public interest, as established following a democratic process, is not subject to the jurisdiction conferred on the envisaged tribunals to determine whether treatment accorded by a Party to an investor or a covered investment is 'fair and equitable'.

160    It is accordingly apparent from all those provisions, contained in the CETA, that, by expressly restricting the scope of Sections C and D of Chapter Eight of that agreement, which are the only sections that can be relied upon in claims before the envisaged tribunals by means of Section F of that Chapter, the Parties have taken care to ensure that those tribunals have no jurisdiction to call into question the choices democratically made within a Party relating to, inter alia, the level of protection of public order or public safety, the protection of public morals, the protection of health and life of humans and animals, the preservation of food safety, protection of plants and the environment, welfare at work, product safety, consumer protection or, equally, fundamental rights.

161    In the light of the foregoing, it must be concluded that Section F of Chapter Eight of the CETA does not adversely affect the autonomy of the EU legal order.

### B.    The compatibility of the envisaged ISDS mechanism with the general principle of equal treatment and with the requirement of effectiveness

### 1.    Principles

162    The doubts set out in the request for an opinion on the compatibility of the envisaged ISDS mechanism with the general principle of equal treatment concern the issue of whether that mechanism complies with Article 20 of the Charter, which enshrines the guarantee of 'equality before the law', and with Article 21(2) of the Charter, which prohibits discrimination on grounds of nationality.

163    In the view of a number of the governments that have submitted observations and that of the Council, there is no requirement that that mechanism be compatible with those provisions of the Charter.

164    It must therefore be determined, first, whether the request for an opinion, which asks the Court to state its position on the compatibility of Section F of Chapter Eight of the CETA 'with the Treaties, including fundamental rights', does or does not call for an examination with regard to the Charter.

165    On that subject, it must be recalled that international agreements entered into by the Union must be entirely compatible with the Treaties and with the constitutional principles stemming therefrom (see, inter

alia, Opinion 1/15 (*EU-Canada PNR Agreement*) of 26 July 2017, EU:C:2017:592, paragraph 67, and judgment of 27 February 2018, *Western Sahara Campaign UK*, C-266/16, EU:C:2018:118, paragraph 46).

166     Article 218(11) TFEU, which states that a Member State, the European Parliament, the Council or the Commission may obtain the opinion of the Court as to whether an agreement envisaged is compatible 'with the Treaties', must be construed in the light of that general requirement of compatibility with the EU constitutional framework.

167     It must be possible, therefore, for all questions that are liable to give rise to doubts as to the substantive or formal validity of the agreement with regard to the Treaties to be examined in the context of the procedure provided for in Article 218(11) TFEU. A judgment on the compatibility of an agreement with the Treaties may, in that regard, depend, inter alia, not only on provisions concerning the powers, procedure or organisation of the institutions of the European Union, but also on provisions of substantive law. The same is true of a question relating to the compatibility of an envisaged international agreement with the guarantees enshrined in the Charter, since the Charter has the same legal status as the Treaties (Opinion 1/15 (*EU-Canada PNR Agreement*) of 26 July 2017, EU:C:2017:592, paragraph 70).

168     As regards Article 21(2) of the Charter, which provides that, 'within the scope of application of the Treaties and without prejudice to any of their specific provisions, any discrimination on grounds of nationality shall be prohibited', that provision corresponds, according to the Explanations relating to the Charter (OJ 2007 C 303, p. 17), to the first paragraph of Article 18 TFEU and must be applied in compliance with that provision of the FEU Treaty.

169     However, as the Court has previously held, the first paragraph of Article 18 TFEU is not intended to apply to cases where there is a possible difference in treatment between nationals of Member States and nationals of non-Member States (judgment of 4 June 2009, *Vatsouras and Koupatantze*, C-22/08 and C-23/08, EU:C:2009:344, paragraph 52).

170     It follows that Article 21(2) of the Charter is of no relevance to the issue, as raised by the Kingdom of Belgium, of examining whether the envisaged ISDS mechanism may lead to discrimination in the treatment of EU investors as compared with Canadian investors.

171     On the other hand, Article 20 of the Charter, which provides that 'everyone is equal before the law', does not contain any express limitation on its scope and is therefore applicable to all situations governed by EU law, including those falling within the scope of an international agreement entered into by the Union (see, to that effect, judgments of 26 February 2013, *Åkerberg Fransson*, C-617/10, EU:C:2013:105, paragraphs 19 to 21; of 26 September 2013, *Texdata Software*, C-418/11, EU:C:2013:588, paragraph 72; and of 16 May 2017, *Berlioz Investment Fund*, C-682/15, EU:C:2017:373, paragraph 49).

172     Subject to certain conditions, investments made within the Union by Canadian enterprises and natural persons, no less than investments made within the Union by the enterprises and natural persons of the Member States, fall within the scope of EU law and, therefore, within the scope of the equality before the law guaranteed in Article 20 of the Charter. That fundamental right is available to all persons whose situations fall within the scope of EU law, irrespective of their origin.

173     Admittedly, as observed by the Council, Article 20 of the Charter does not oblige the Union to accord, in its external relations, equal treatment to different non-Member States (judgment of 21 December 2016, *Swiss International Air Lines*, C-272/15, EU:C:2016:993, paragraphs 24 to 26 and the case-law cited).

174     However, as the Advocate General stated, in points 198 and 199 of his Opinion, that case-law does not preclude an examination of whether an international agreement, to the extent that it establishes a difference in treatment, within the Union itself, of persons of a non-Member State and persons of Member States is contrary to Article 20 of the Charter.

175   It is therefore necessary to examine the doubts raised in that part of the request for an opinion with respect to Article 20 of the Charter.

176   Equality before the law, as laid down in that article, enshrines the principle of equal treatment, which requires that comparable situations must not be treated differently and different situations must not be treated in the same way, unless such treatment is objectively justified (judgments of 17 October 2013, *Schaible*, C-101/12, EU:C:2013:661, paragraph 76, and of 12 July 2018, *Spika and Others*, C-540/16, EU:C:2018:565, paragraph 35).

177   The requirement that situations must be comparable, for the purpose of determining whether there is a breach of the principle of equal treatment, must be assessed in the light of all the elements that characterise them and, in particular, in the light of the subject matter and purpose of the act that makes the distinction in question, while the principles and objectives of the field to which the act relates must also be taken into account (judgments of 16 December 2008, *Arcelor Atlantique and Lorraine and Others*, C-127/07, EU:C:2008:728, paragraph 26; of 7 March 2017, *RPO*, C-390/15, EU:C:2017:174, paragraph 42; and of 22 January 2019, *Cresco Investigation*, C-193/17, EU:C:2019:43, paragraph 42). If the situations are not comparable, a difference in the treatment of the situations concerned is not in breach of equality before the law as enshrined in Article 20 of the Charter (judgment of 22 May 2014, *Glatzel*, C-356/12, EU:C:2014:350, paragraph 84).

178   As regards, lastly, the requirement that EU law be effective, the request for an opinion refers to that requirement only within the context of a specific concern, in relation to a possible situation in which the CETA Tribunal were to find that the imposition, on the basis of an infringement of Article 101 TFEU or Article 102 TFEU, of a fine on a Canadian investor is incompatible with Sections C or D of Chapter Eight of the CETA. It will be necessary, therefore, to examine that concern from the perspective of the requirement that EU competition law be effective, that law prohibiting any restriction on the application of the provisions of the FEU Treaty designed to ensure undistorted competition in the internal market (see, inter alia, judgment of 5 June 2014, *Kone*, C-557/12, EU:C:2014:1317, paragraph 32 and the case-law cited).

## 2.   Compatibility with the principle of equal treatment

179   The difference in treatment referred to in the request for an opinion arises from the fact that it will be impossible for enterprises and natural persons of Member States that invest within the Union and that are subject to EU law to challenge EU measures before the tribunals envisaged by the CETA, whereas Canadian enterprises and natural persons that invest within the same commercial or industrial sector of the EU internal market will be able to challenge those measures before those tribunals.

180   However, it is clear that, while Canadian enterprises and natural persons that invest within the Union are, in the light of the object and purpose — set out in paragraphs 199 and 200 of the present Opinion — of inserting in the CETA provisions concerning non-discriminatory treatment and the protection of foreign investments, in a situation that is comparable to that of enterprises and natural persons of Member States that invest in Canada, their situation is not, on the other hand, comparable to that of enterprises and natural persons of Member States that invest within the Union.

181   In that regard, it must be observed that the reason why Canadian enterprises and natural persons that invest within the Union have the possibility of relying on the provisions of the CETA before the envisaged tribunals is that those Canadian persons, in their capacity as foreign investors, are to have a specific legal remedy against EU measures, whereas enterprises and natural persons of the Member States who, like those Canadian persons, invest within the Union, are not foreign investors there and will therefore not have access to that specific legal remedy and nor will they be able, having regard to the rule stated in Article 30.6.1 of the CETA, to invoke directly the provisions contained in that agreement before the courts and tribunals of the Member States and of the European Union.

182    The finding made in paragraph 180 of the present Opinion is not invalidated by the fact, alluded to in the request for an opinion, that the damages awarded by the CETA Tribunal to a Canadian investor will, in accordance with Article 8.39.2(a) of that agreement, have to be paid to the enterprise established within the Union that investor owns or controls, when it is on behalf of that 'locally established enterprise' that investor has made a claim before that Tribunal.

183    Suffice it to state, in that regard, as observed by the Advocate General in point 193 of his Opinion, that such an enterprise is itself an investment of that Canadian investor, and consequently the involvement of that enterprise in the proceedings before the envisaged tribunals and in the implementation of the award is not such as to invalidate the above conclusion arrived at on examining the comparability of the situation of Canadian investors and that of EU investors.

184    Nor is the equality of treatment of those two categories of persons affected by the fact that the Parties chose not to exclude the possibility of the CETA Tribunal issuing an award in terms of which a fine imposed by the Commission or by a competition authority of a Member State on a Canadian investor, because of an infringement of Article 101 TFEU or Article 102 TFEU, constitutes a breach of one of the provisions of Sections C and D of Chapter Eight of the CETA.

185    It must be held, in that regard, that, in the light of the provisions of Sections C and D, such an award is conceivable solely in a scenario where the decision imposing the fine were to be vitiated by one of the defects specified in Article 8.10.2 of the CETA or were to deprive the investor of the fundamental attributes of property in its investment, including the right to use, enjoy and dispose of its investment, within the meaning of point 1(b) of Annex 8-A to that agreement. Such an award is, conversely, unimaginable where the competition rules have been correctly applied by the Commission or by a competition authority of a Member State, in that the Parties to the CETA have expressly recognised, in Article 17.2 of that agreement, 'the importance of free and undistorted competition in their trade relations', and acknowledged that 'anti-competitive business conduct has the potential to distort the proper functioning of markets and undermine the benefits of trade liberalisation'.

186    If a fine vitiated by such a defect or resulting in such expropriation was imposed by the Commission or by a competition authority of a Member State on an EU investor, that investor would have available to it the legal remedies necessary to ensure the annulment of that fine. It follows that, while it is not inconceivable that, in exceptional circumstances, an award by the CETA Tribunal such as that described in the request for an opinion might have the consequence of cancelling out the effects of a fine that has been imposed because of an infringement of Article 101 TFEU or Article 102 TFEU, the effect of that award will not however be to create a situation of unequal treatment to the disadvantage of an EU investor on which a fine vitiated by a similar defect has been imposed.

### 3.    *Compatibility with the requirement of effectiveness*

187    In so far as the request for an opinion raises the issue of whether the fact that the CETA Tribunal may issue an award that has the consequences described in paragraph 184 of the present Opinion may adversely affect the effectiveness of EU competition law, suffice it to state that, in the only circumstances, set out in paragraph 185 of this Opinion, where such an award appears to be conceivable, the cancelling out of the fine would not create such a risk. As stated in the preceding paragraph of the present Opinion, EU law itself permits annulment of a fine when that fine is vitiated by a defect corresponding to that which could be identified by the CETA Tribunal.

188    Since Section F of Chapter Eight of the CETA consequently does not impede the full application of the provisions of the FEU Treaty designed to ensure the preservation of undistorted competition in the internal market, it must be concluded, in accordance with the case-law cited in paragraph 178 of the present Opinion, that those provisions of the CETA do not adversely affect the requirement that EU competition law be effective.

*C.     The compatibility of the envisaged ISDS mechanism with the right of access to an independent tribunal*

### 1.     Principles

189     In its request for an opinion, the Kingdom of Belgium makes reference to the right, laid down in the second paragraph of Article 47 of the Charter, to a remedy before an 'independent and impartial tribunal previously established by law', and to 'effective access to justice' laid down in the third paragraph of Article 47.

190     In that regard, it is a consequence of Article 47, which is binding on the Union in accordance with the case-law cited in paragraphs 165 and 167 of the present Opinion, that, when the Union enters into an international agreement that encompasses the establishment of bodies that are primarily judicial in nature and that are called on to resolve disputes between, in particular, private investors and States, such as the CETA Tribunal and Appellate Tribunal, the Union is subject, as regards the rules governing access to those bodies and their independence, to the provisions of the second and third paragraphs of Article 47 of the Charter.

191     Accordingly, the Union must ensure, having regard to the nature and specific features of such bodies and to the international framework of which those bodies form part, that Section F of Chapter Eight of the CETA and any other provisions that determine the effect of Section F guarantee that, once that agreement has been concluded and implemented, the tribunals that are established will each have the characteristics of an accessible and independent tribunal.

192     That finding is not invalidated by the fact that the non-Member State with which the Union negotiates the agreement is not affected by the safeguards provided under EU law. In this case, while Canada is indeed not bound by those safeguards, the Union is so bound and therefore cannot, as follows from the case-law cited in paragraphs 165 and 167 of the present Opinion, enter into an agreement that establishes tribunals with the jurisdiction to issue awards that are binding on the Union and to deal with disputes brought before them by EU litigants if those safeguards are not provided.

193     Nor is that finding invalidated by the fact that the envisaged ISDS mechanism is, as was observed before the Court, 'hybrid' in nature, in that it contains, in addition to characteristics of judicial bodies, a number of elements that continue to be based on traditional arbitration mechanisms in relation to investments.

194     As regards the last point, it must be observed that, while the rules contained in Section F of Chapter Eight of the CETA on the bringing of cases before the CETA Tribunal are largely inspired by traditional ISDS mechanisms, that is not the case with respect to the rules on the composition of that Tribunal and on dealing with those cases.

195     In particular, Article 8.27 of the CETA, which provides for the establishment of a permanent tribunal of 15 Members, and states (in Article 8.27.7) that a division of three Members will '[hear] the case on a rotation basis, ensuring that the composition of the divisions is random and unpredictable', and Article 8.28.5 of that agreement, which states that the division of the CETA Appellate Tribunal constituted to hear the appeal is to consist of three randomly appointed Members, are clearly distinct from the rules in relation to arbitration and give concrete expression to the intention of Parties, stated in Point 6(f) of the Joint Interpretative Instrument, that the 'CETA moves decisively away from the traditional approach of investment dispute resolution and establishes independent, impartial and permanent investment Tribunals, inspired by the principles of public judicial systems'.

196     The 'important and radical change in investment rules and dispute resolution', identified in conclusion by the Parties in Point 6(i) of the Joint Interpretative Instrument, is also attested, under Point 6(g) thereof, by the fact that the CETA provides for an appeal mechanism in order to ensure, inter alia, the 'consistency of the decisions of the Tribunal of first instance'.

197    Accordingly, without there being any need to ascertain whether the Parties will formally classify those tribunals as 'judicial bodies' or whether their Members, as suggested by Statement No 36, will be called 'judges', it follows from the foregoing factors that those tribunals will, in essence, exercise judicial functions. They will be permanent and they will be established by law in the form of the acts approving the CETA adopted by the Parties. They will apply, following an adversarial procedure, rules of law, will be required to exercise their functions wholly autonomously and will issue decisions that are final and binding.

198    As regards whether the jurisdiction of those tribunals is compulsory, it must be observed that that jurisdiction is mandatory not only for the respondent, who will have to accept it under Article 8.25 of the CETA, but also for the claimant investor, in the event that the latter seeks to rely directly on the provisions of the CETA. Since Article 30.6 of the CETA deprives investors of the possibility of relying directly on the CETA before the domestic courts and tribunals of the Parties, any action directly based on the provisions of that agreement will have to be brought before the CETA Tribunal. Thereafter, any appeal against the decision of that Tribunal will have to be brought before the CETA Appellate Tribunal.

199    As regards the level of accessibility and independence that those tribunals must achieve in order that Section F of Chapter Eight of the CETA can be considered to be compatible with Article 47 of the Charter, it must be observed that the purpose of inserting in the CETA provisions concerning non-discriminatory treatment and protection of investments, and the creation of tribunals that stand outside the judicial systems of the Parties to ensure compliance with those provisions, is to give complete confidence to the enterprises and natural persons of a Party that they will be treated, with respect to their investments in the territory of the other Party, on an equal footing with the enterprises and natural persons of that other Party, and that their investments in the territory of that other Party will be secure.

200    In providing for the creation of such a mechanism, standing outside the judicial systems of the Parties, the aim of Section F of Chapter Eight of the CETA is, as observed by the Council and the Commission, to ensure that the confidence of foreign investors extends to the body that has jurisdiction to declare infringements, by the host State with respect to their investments, of Sections C and D of that Chapter. It is apparent, therefore, that the independence of the envisaged tribunals from the host State and the access to those tribunals for foreign investors are inextricably linked to the objective of free and fair trade that is stated in Article 3(5) TEU and that is pursued by the CETA.

201    The guarantee of accessibility entails that the possibility provided for in Article 8.18 of the CETA that any investor specified in Article 8.1 of that agreement may bring a dispute before the CETA Tribunal, in order to obtain a declaration of a breach of Section C or D, can be limited solely by proportionate restrictions, including restrictions linked to the payment of court costs, that pursue a legitimate aim and do not adversely affect the very essence of the right of access to such a tribunal (judgment of 30 June 2016, *Toma and Biroul Executorului Judecătoresc Horaţiu-Vasile Cruduleci*, C-205/15, EU:C:2016:499, paragraph 44 and the case-law cited).

202    The requirement of independence is, for its part, inherent in the task of adjudication and has two aspects. The first aspect, which is external in nature, presupposes that the body concerned exercises its functions wholly autonomously, without being subject to any hierarchical constraint or subordinated to any other body and without taking orders or instructions from any source whatsoever, thus being protected against external interventions or pressure liable to impair the independent judgment of its members and to influence their decisions. That essential freedom from such external factors requires certain guarantees appropriate for protecting the person of those who have the task of adjudicating in a dispute, such as guarantees against removal from office. Their receipt of a level of remuneration commensurate with the importance of the functions that they carry out also constitutes a guarantee essential to independence (judgment of 25 July 2018, *Minister for Justice and Equality (Deficiencies in the judicial system)*, C-216/18 PPU, EU:C:2018:586, paragraphs 63 and 64 and the case-law cited).

203    The second aspect, which is internal in nature, is linked to impartiality and seeks to ensure that an equal distance is maintained from the parties to the proceedings and their respective interests with regard to the

subject matter of those proceedings. That aspect requires objectivity and the absence of any interest in the outcome of the proceedings apart from the strict application of the rule of law (judgment of 25 July 2018, *Minister for Justice and Equality (Deficiencies in the judicial system)*, C-216/18 PPU, EU:C:2018:586, paragraph 65 and the case-law cited).

204    Those guarantees of independence and impartiality require rules, particularly as regards the composition of the body and the appointment, length of service and grounds for abstention, rejection and dismissal of its members, in order to dispel any reasonable doubt in the minds of individuals as to the imperviousness of that body to external factors and its neutrality with respect to the interests before it (judgment of 25 July 2018, *Minister for Justice and Equality (Deficiencies in the judicial system)*, C-216/18 PPU, EU:C:2018:586, paragraph 66).

### 2.    *Compatibility with the requirement of accessibility*

205    It is apparent from Articles 8.1 and 8.18 of the CETA that the aim of that agreement is to ensure that the CETA Tribunal is accessible to any Canadian enterprise and any Canadian natural person that invests within the Union and to any enterprise and any natural person of a Member State of the Union that invests in Canada.

206    Section F of Chapter Eight of the CETA is an expression, in that regard, of the objective of the Parties to structure the ISDS mechanism in such a way that the investors who have limited resources to pursue a costly procedure, such as natural persons and small and medium-sized enterprises, have, no less than enterprises that have greater resources, an effective access to the envisaged tribunals.

207    Accordingly, the Parties state, in Article 8.39.6 of that agreement, that it will be the task of the CETA Joint Committee to 'consider supplemental rules aimed at reducing the financial burden on claimants who are natural persons or small and medium-sized enterprises'.

208    The 'financial burden' the reduction of which is thus contemplated includes, in particular, the costs and expenses referred to in Article 8.39.5 of that agreement.

209    That burden consists, first, of the costs of legal representation and assistance incurred both by the claimant investor and by the respondent Party. It follows from Article 8.39.5 that the investor may, if his claim is dismissed, have to bear those costs in their entirety.

210    That financial burden consists, second, in payment of the costs of the proceedings. It is apparent in that regard from reading Article 8.39.5 of the CETA and Article 8.27.14 of that agreement together that those costs include in particular the fees and expenses of the Members of the Tribunal who are appointed to deal with the dispute. The claimant investor may, if his claim is dismissed, have to bear those fees and expenses in their entirety.

211    The extent of the financial risk undertaken by bringing proceedings before the CETA Tribunal may accordingly be such, for a natural person or a small and medium-sized enterprise, as to deter that investor from initiating the proceedings.

212    The CETA Tribunal's lack of accessibility in that respect, with which many investors may be confronted, is not offset by the possibility, provided for in Article 8.27 9 of the CETA, of having the case heard by a sole Member of that Tribunal. That partial reduction of the financial burden will, according to the wording of that disposition, only be obtained if the respondent agrees.

213    It is accordingly apparent that, in the absence of rules designed to ensure that the CETA Tribunal and Appellate Tribunal are financially accessible to natural persons and small and medium-sized enterprises, the ISDS mechanism may, in practice, be accessible only to investors who have available to them significant financial resources. Such a situation would give rise to an inconsistency with the scope *ratione personae* of Section F of Chapter Eight of the CETA, which extends to all the enterprises and natural

persons of one of the Parties that invest in the territory of the other Party, as well as with the objective of free and fair trade, laid down in Article 3(5) TEU, which the CETA seeks to achieve by means of, inter alia, the legal remedy made available to foreign investors before tribunals that stand outside the judicial system of the host State.

214    It is necessary, consequently, in order to assess the compatibility of Section F of Chapter Eight of the CETA with Article 47 of the Charter, to examine whether the provisions, contained in Section F and in the texts that determine the effect of Section F, on improving the financial accessibility of the envisaged tribunals for natural persons and for small and medium-sized enterprises, represent commitments that a body of rules to ensure the level of accessibility required by Article 47 of the Charter will be put in place as soon as those tribunals are established.

215    Such commitments are not contained either in Article 8.27.15 of the CETA, according to which the CETA Joint Committee 'may', by decision, transform the retainer fee and other fees and expenses into a regular salary, or in Article 8.39.6 of that agreement, which provides that the CETA Joint Committee may 'consider' supplemental rules aimed at reducing the financial burden on natural persons and small and medium-sized enterprises.

216    Nor do the other provisions of Section F of Chapter Eight of the CETA contain any legally binding commitments relating to the financial accessibility of the envisaged tribunals for small or medium-sized investors.

217    However, Statement No 36 states that 'there will be better and easier access to this new court for the most vulnerable users, namely [small and medium-sized enterprises] and private individuals' and provides, to that end, that the 'adoption by the Joint Committee of additional rules, provided for in Article 8.39.6 of the CETA … will be expedited so that these additional rules can be adopted as soon as possible' and that, 'irrespective of the outcome of the discussions within the Joint Committee, the Commission will propose appropriate measures of (co)-financing of actions of small and medium-sized enterprises before that Court'.

218    It is clear that, by means of that Statement, the Commission and the Council have given a commitment to implement, rapidly and adequately, Article 8.39.6 of the CETA and to ensure the accessibility of envisaged tribunals to small and medium-sized enterprises, even if work within the CETA Joint Committee were to be fruitless.

219    That commitment is sufficient justification, in the context of the present Opinion proceedings, for the conclusion that the CETA, as an 'agreement envisaged', within the meaning of Article 218(11) TFEU, is compatible with the requirement that those tribunals should be accessible.

220    To quote an explanatory sentence that precedes the statements, one of which is Statement No 36, those statements 'form an integral part of the context in which the Council adopts the decision to authorise the signature of CETA on behalf of the Union. They will be entered into the Council minutes on this occasion'.

221    The approval of the CETA by the Union is thus dependent on the abovementioned commitment by the Union to guarantee effective access to the envisaged tribunals for all EU investors subject to the CETA. It must be observed, in that regard, that, according to Statement No 36, this commitment forms part of the 'principles' on the basis of which 'the Commission is committed to further review, without delay, of the dispute settlement mechanism … allowing sufficient time so that Member States can consider it in their ratification processes'. In the light of the preceding paragraph of Statement No 36, whereby the Council and the Commission confirm that the entry into force of the provisions of Section F of Chapter Eight of the CETA will not occur before the ratification of the CETA by all the Member States, it must be held that the conclusion of the CETA by the Council is envisaged subject to the premiss that the financial accessibility of the CETA Tribunal and Appellate Tribunal for all EU investors concerned will be ensured.

222    Taking into consideration this connection that is made, by the Union, between the financial accessibility of those tribunals and the conclusion of the CETA, it must be held that the agreement envisaged is not incompatible, from that perspective, with Article 47 of the Charter.

### 3.    Compatibility with the requirement of independence

223    As regards the external aspect of the requirement of independence, which requires that the tribunals concerned exercise their functions wholly autonomously, it is clear that, first, the CETA provides, in Article 8.27.4 and 8.27.5, that the Members of the CETA Tribunal will be appointed for a fixed term and will have to possess specific expertise.

224    The CETA ensures, next, in Article 8.27.12 to 15, that the Members will receive a level of remuneration commensurate with the importance of their duties.

225    The CETA guarantees, last, the protection against removal of those Members, in that the possibility of their removal is, in Article 8.30.4 of the CETA, limited to the situation where a member's behaviour is inconsistent with the obligations set out in Article 8.30.1 thereof, in particular the prohibition on taking instructions from others or being in a position of conflict of interest.

226    Article 8.28 of the CETA extends the applicability of Article 8.27.4 and Article 8.30 of that agreement to the Members of the Appellate Tribunal. While the other abovementioned components of independence are not, with the same degree of detail, mentioned in Article 8.28, it is however apparent from the use of the term 'Tribunals' in Point 6(f) of the Joint Interpretative Instrument that the Parties impose on the Appellate Tribunal the same standards of independence as on the Tribunal. That finding is confirmed by the concordance table with respect to the Joint Interpretative Instrument and the CETA text, which is annexed to that instrument and mentions Article 8.28 of the CETA among the provisions corresponding to Point 6(f) of the Joint Interpretative Instrument.

227    In so far as the Kingdom of Belgium and some governments that have submitted observations have doubts as to the compatibility, with the external aspect of the requirement of independence, of the power that Article 8.27.2 and 8.27.3, together with Article 8.28.3 and 8.28.7, of the CETA, confer on the CETA Joint Committee to appoint the Members of the Tribunal and of the Appellate Tribunal and to determine or adjust the number, by multiples of three, of Members of whom those Tribunals are to be constituted, consideration must be taken of the fact that the identity of the Members appointed will not be specified in advance in the CETA text and that the same is true of the increase or reductions which might in the future be required as regards the number of Members. The guarantees set out in paragraph 202 of the present Opinion can in no way be construed as precluding a non-judicial body, such as the CETA Joint Committee, from having the power to appoint, while complying strictly with the rules laid down in Article 8.27.4 and 8.27.5 of the CETA, those Members and to adjust, by multiples of three, the number of those Members. Nor do those guarantees preclude such a body from having the power, in accordance with Article 8.30.4 of the CETA, to remove those Members.

228    It is apparent, moreover, from Articles 26.1 and 26.3 of the CETA that the CETA Joint Committee will comprise representatives of both Parties, and that it will adopt its decisions by mutual consent. Those considerations mean, as the Advocate General observed in point 267 of his Opinion, that it can be held that neither the appointment nor any removal of a Member of the Tribunal or of the Appellate Tribunal will be subject to conditions other than those laid down in, inter alia, Article 8.27.4 and in Article 8.30.1 of the CETA.

229    For the same reason, it must be held that it was open to the Parties, without adversely affecting the requirement of independence, to stipulate, in Article 8.27.12 of the CETA, that the amount of the monthly retainer fee to ensure the availability of the Members of those Tribunals will be determined by the CETA Joint Committee and, in Article 8.27.15, that that body may decide to transform that retainer fee and fees and expenses into a regular salary, and decide applicable modalities.

230    The possibility that that power of the CETA Joint Committee with respect to remuneration may not be immediately exercised does not entail that the remuneration of those Members may, initially, be indeterminate. Under Article 8.27.14 of the CETA, the fees and expenses of the Members of the envisaged tribunals will be determined in accordance with Article 14(1) of the Administrative and Financial Regulations of the ICSID, which refers to the scale that is set from time to time by the Secretary-General of the ICSID.

231    As the Advocate General stated in points 260 and 261 of his Opinion, the fact that those provisions concerning the remuneration of Members of the CETA Tribunal and Appellate Tribunal are intended to evolve cannot be perceived as constituting a threat to the independence of those Tribunals, but conversely permits the gradual establishment of a court composed of Members who will be employed full-time.

232    Nor do Article 8.31.3 of the CETA, according to which the CETA Joint Committee may, in addition, adopt interpretations of the agreement that will be binding on the CETA Tribunal, and Article 8.10.3 of that agreement, which must be read in conjunction with Article 8.31.3, adversely affect the capacity of that Tribunal — or that of the CETA Appellate Tribunal — to exercise its functions wholly autonomously.

233    It is neither illegitimate nor unusual, under international law, for provision to be made that the Parties to an international agreement may clarify, as their joint wishes concerning the effect of that agreement develop, the interpretation of that agreement. Such clarification may be introduced by the Parties themselves or by a body set up by the Parties on which they confer a power to adopt decisions that will be binding on them.

234    In this case, it is clear that the CETA Joint Committee is, by virtue of Article 26.1.1 of the CETA, a committee composed of representatives of both Parties that, by virtue of Article 26.1.4(e) and Article 26.3 of the CETA, has the power to adopt, by mutual consent, decisions that are binding, such as, in accordance with Article 26.1.5(e) and Article 8.31.3 of the CETA, decisions on the interpretation of that agreement that are binding on the Parties and on the Tribunals established by the CETA, without any breach of the requirements laid down in Article 47 of the Charter, and, in particular, the requirement of independence. Those interpretative acts have the legal effects stemming from Article 31(3) of the Vienna Convention, which states that account is to be taken, for the interpretation of a treaty, of 'any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions'.

235    It must be observed that the participation of the Union in the determination, by the CETA Joint Committee, of such binding interpretations, is governed by Article 218(9) TFEU. The consent of the Union to any decision specified in Article 8.31.3 of the CETA will, consequently, have to comply with EU primary law, in particular the principles that are part of that law and that are set out or clarified in the present Opinion.

236    It is important, moreover, in the light of the requirement of independence of the CETA Tribunal and Appellate Tribunal, that interpretations determined by the CETA Joint Committee have no effect on the handling of disputes that have been resolved or brought prior to those interpretations. If it were otherwise, the CETA Joint Committee could have an influence on the handling of specific disputes and therefore participate in the ISDS mechanism.

237    Although that safeguard of no retroactive effect and no direct effect on pending cases is not expressly provided for in Article 8.31.3 of the CETA, it must again be observed that the consent of the Union to any decision specified in Article 8.31.3 of the CETA will have to comply with EU primary law and, in particular, with the right to an effective remedy enshrined in Article 47 of the Charter. Accordingly, Article 8.31.3 of the CETA cannot be interpreted, having regard to Article 47, as permitting the Union to consent to decisions on interpretation of the CETA Joint Committee that would produce effects on the handling of disputes that have been dealt with or are pending.

238    As regards the internal aspect of the requirement of independence, which concerns in particular impartiality, the maintenance of an equal distance from the parties to the proceedings, and the absence of

any personal interest of the Members in the outcome of the proceedings, it must be observed, first, that an equal distance is guaranteed not only in Article 8.27.6 and Article 8.27.7 of the CETA, which provide that cases are to be heard by a division, the composition of which is to be random and therefore unpredictable for the Parties, consisting of three Members of whom one is to be a national of a Member State of the Union, one a national of Canada and one a national of a third country, but also by the reference, made in Article 8.30.1 of the CETA, to the IBA Guidelines, from which it follows, in accordance with the initial general principle stated in those guidelines, that the Members of the CETA Tribunal must be impartial and independent of the parties both at the time when a claim is brought before them and throughout the proceedings until those proceedings are terminated.

239    For that reason, it must also be held that the internal aspect of the requirement of independence is not called into question by the fact, highlighted by the Kingdom of Belgium in its request for an opinion, that the remuneration of the Members of the Tribunal will consist, at least initially, not only in a monthly retainer fee, but also in fees calculated on the basis of the days of work devoted to a dispute. That is because any failure to meet the requirements set out in the IBA Guidelines, including the initial general principle stated in the preceding paragraph of the present Opinion, is liable to require the removal of the Member or Members concerned, in accordance with Article 8.30.4 of the CETA.

240    It is, further, stated, in Article 8.30.1 of that agreement that the Members 'shall not be affiliated with any government'. While it is explained, in the footnote to that provision, that 'the fact that a person receives remuneration from a government does not in itself make that person ineligible', it must be held that that explanation is, as set out by the Commission during the oral procedure before the Court, linked to the fact that, initially, the Members of the envisaged tribunals will most likely not be employed full-time and may include, for example, Members, such as law professors, who receive remuneration from a State but are not however involved, directly or indirectly, in the determination of the policies of the government of that State.

241    As regards the fact that the third sentence of Article 8.30.1 of the CETA states that the Members of the CETA Tribunal 'shall not take instructions from any organisation, or government with regard to matters related to the dispute', it must be observed that that sentence must be read in the light of the requirement of independence contained in the first sentence of Article 8.30.1, which means that the Members may not, other than in the scenario defined in paragraphs 232 to 237 of the present Opinion, be subject to any instructions in exercising their duties, whether or not a particular dispute is concerned.

242    As regards, second, the absence of any personal interest of the Members in the outcome of the dispute, Article 8.30 of the CETA contains a general prohibition on conflict of interest, direct or indirect, which includes, by means of reference to the IBA Guidelines, rules of ethics in relation to outside activities.

243    Article 8.30 of the CETA makes reference to the power of the Committee on Services and Investment, the subject of Article 8.44 of that agreement, to adopt 'supplemental rules' in that regard, the use of the term 'supplemental' ensuring that that committee does not possess any power to diminish the effect of the prohibition on conflict of interest already contained in that agreement, but will have to confine itself, while maintaining the high standard of independence that stems from that prohibition, to adapting the rules stated in the IBA Guidelines to the realities of an investment tribunal that is primarily judicial in nature.

244    In the light of all the foregoing, it must be concluded that the agreement envisaged is compatible with the requirement of independence.

## VI.  Answer to the request for an opinion

245    It follows from all the foregoing that Section F of Chapter Eight of the CETA is compatible with EU primary law.

Consequently, the Court (Full Court) gives the following Opinion:

**Section F of Chapter Eight of the Comprehensive Economic and Trade Agreement between Canada, of the one part, and the European Union and its Member States, of the other part, signed in Brussels on 30 October 2016, is compatible with EU primary law.**

| | | |
|---|---|---|
| Lenaerts | Silva de Lapuerta | Bonichot |
| Arabadjiev | Prechal | Vilaras |
| Regan | von Danwitz | Toader |
| Biltgen | Jürimäe | Lycourgos |
| Rosas | Juhász | Ilešič |
| Malenovský | Levits | Bay Larsen |
| Safjan | Šváby | Fernlund |
| Vajda | | Rodin |

Delivered in open court in Luxembourg on 30 April 2019.

A. Calot Escobar                       K. Lenaerts

Registrar                               President