# EXHIBIT 69

Case 1:19-cv-01618-TSC   Document 25-4   Filed 02/07/20   Page 2 of 5
Summaries of Judgments, Advisory Opinions and Orders of the International Court of Justice
Not an official document

# LEGAL CONSEQUENCES FOR STATES OF THE CONTINUED PRESENCE OF SOUTH AFRICA IN NAMIBIA (SOUTH-WEST AFRICA) NOTWITHSTANDING SECURITY COUNCIL RESOLUTION 276 (1970)

## Advisory Opinion of 21 June 1971

In its advisory opinion on the question put by the Security Council of the United Nations, "What are the legal consequences for States of the continued presence of South Africa in Namibia notwithstanding Security Council resolution 276 (1970)?", the Court was of opinion,

by 13 votes to 2,

(1) that, the continued presence of South Africa in Namibia being illegal, South Africa is under obligation to withdraw its administration from Namibia immediately and thus put an end to its occupation of the Territory;

by 11 votes to 4,

(2) that States Members of the United Nations are under obligation to recognize the illegality of South Africa's presence in Namibia and the invalidity of its acts on behalf of or concerning Namibia, and to refrain from any acts and in particular any dealings with the Government of South Africa implying recognition of the legality of, or lending support or assistance to, such presence and administration;

(3) that it is incumbent upon States which are not Members of the United Nations to give assistance, within the scope of subparagraph (2) above, in the action which has been taken by the United Nations with regard to Namibia.

*
*   *

For these proceedings the Court was composed as follows: President Sir Muhammad Zafrulla Khan; Vice-President Ammoun; Judges Sir Gerald Fitzmaurice, Padilla Nervo, Forster, Gros, Bengzon, Petrén, Lachs, Onyeama, Dillard, Ignacio-Pinto, de Castro, Morozov and Jiménez de Aréchaga.

The President of the Court, Sir Muhammad Zafrulla Khan, has appended a declaration to the Advisory Opinion. Vice-President Ammoun and Judges Padilla Nervo, Petrén, Onyeama, Dillard and de Castro have appended separate opinions. Judge Sir Gerald Fitzmaurice and Judge Gros have appended dissenting opinions.

*Course of the Proceedings*
(paras. 1–18 of the Advisory Opinion)

The Court first recalls that the request for the advisory opinion emanated from the United Nations Security Council, which decided to submit it by resolution 284 (1970) adopted on 29 July 1970. The Court goes on to recapitulate the different steps in the subsequent proceedings.

It refers in particular to the three Orders of 26 January 1971 whereby the Court decided not to accede to the objections raised by the Government of South Africa against the participation in the proceedings of three Members of the Court. These objections were based on statements which the Judges in question had made in a former capacity as representatives of their Governments in United Nations organs dealing with matters concerning Namibia, or on their participation in the same capacity in the work of those organs. The Court came to the conclusion that none of the three cases called for the application of Article 17, paragraph 2, of its Statute.

*Objections against the Court's Dealing with the Question*
(paras. 19–41 of the Advisory Opinion)

The Government of South Africa contended that the Court was not competent to deliver the opinion, because Security Council resolution 284 (1970) was invalid for the following reasons: (*a*) two permanent members of the Council abstained during the voting (Charter of the United Nations, Art. 27, para. 3); (*b*) as the question related to a dispute between South Africa and other Members of the United Nations, South Africa should have been invited to participate in the discussion (Charter, Art. 32) and the proviso requiring members of the Security Council which are parties to a dispute to abstain from voting should have been observed (Charter, Art. 27, para. 3). The Court points out that (*a*) for a long period the voluntary abstention of a permanent member has consistently been interpreted as not constituting a bar to the adoption of resolutions by the Security Council; (*b*) the question of Namibia was placed on the agenda of the Council as a *situation* and the South African Government failed to draw

Continued on next page

the Council's attention to the necessity in its eyes of treating it as a *dispute*.

In the alternative the Government of South Africa maintained that even if the Court had competence it should nevertheless, as a matter of judicial propriety, refuse to give the opinion requested, on account of political pressure to which, it was contended, the Court had been or might be subjected. On 8 February 1971, at the opening of the public sittings, the President of the Court declared that it would not be proper for the Court to entertain those observations, bearing as they did on the very nature of the Court as the principal judicial organ of the United Nations, an organ which, in that capacity, acts only on the basis of law, independently of all outside influences or interventions whatsoever.

The Government of South Africa also advanced another reason for not giving the advisory opinion requested: that the question was in reality contentious, because it related to an existing dispute between South Africa and other States. The Court considers that it was asked to deal with a request put forward by a United Nations organ with a view to seeking legal advice on the consequences of its own decisions. The fact that, in order to give its answer, the Court might have to pronounce on legal questions upon which divergent views exist between South Africa and the United Nations does not convert the case into a dispute between States. (There was therefore no necessity to apply Article 83 of the Rules of Court, according to which, if an advisory opinion is requested upon a legal question "actually pending between two or more States", Article 31 of the Statute, dealing with judges *ad hoc,* is applicable; the Government of South Africa having requested leave to choose a judge *ad hoc,* the Court heard its observations on that point on 27 January 1971 but, in the light of the above considerations, decided by the Order of 29 January 1971 not to accede to that request.)

In sum, the Court saw no reason to decline to answer the request for an advisory opinion.

*History of the Mandate*
(paras. 42–86 of the Advisory Opinion)

Refuting the contentions of the South African Government and citing its own pronouncements in previous proceedings concerning South West Africa (Advisory Opinions of 1950, 1955 and 1956; Judgment of 1962), the Court recapitulates the history of the Mandate.

The mandates system established by Article 22 of the Covenant of the League of Nations was based upon two principles of paramount importance: the principle of nonannexation and the principle that the well-being and development of the peoples concerned formed a sacred trust of civilisation. Taking the developments of the past half-century into account, there can be little doubt that the ultimate objective of the sacred trust was self-determination and independence. The mandatory was to observe a number of obligations, and the Council of the League was to see that they were fulfilled. The rights of the mandatory as such had their foundation in those obligations.

When the League of Nations was dissolved, the raison d'etre and original object of these obligations remained. Since their fulfilment did not depend on the existence of the League, they could not be brought to an end merely because the supervisory organ had ceased to exist. The Members of the League had not declared, or accepted even by implication, that the mandates would be cancelled or lapse with the dissolution of the League.

The last resolution of the League Assembly and Article 80, paragraph 1, of the United Nations Charter maintained the obligations of mandatories. The International Court of Justice has consistently recognized that the Mandate survived the demise of the League, and South Africa also admitted as much for a number of years. Thus the supervisory element, which is an essential part of the Mandate, was bound to survive. The United Nations suggested a system of supervision which would not exceed that which applied under the mandates system, but this proposal was rejected by South Africa.

*Resolutions by the General Assembly and the Security Council*
(paras. 87–116 of the Advisory Opinion)

Eventually, in 1966, the General Assembly of the United Nations adopted resolution 2145 (XXI), whereby it decided that the Mandate was terminated and that South Africa had no other right to administer the Territory. Subsequently the Security Council adopted various resolutions including resolution 276 (1970) declaring the continued presence of South Africa in Namibia illegal. Objections challenging the validity of these resolutions having been raised, the Court points out that it does not possess powers of judicial review or appeal in relation to the United Nations organs in question. Nor does the validity of their resolutions form the subject of the request for advisory opinion. The Court nevertheless, in the exercise of its judicial function, and since these objections have been advanced, considers them in the course of its reasoning before determining the legal consequences arising from those resolutions.

It first recalls that the entry into force of the United Nations Charter established a relationship between all Members of the United Nations on the one side, and each mandatory Power on the other, and that one of the fundamental principles governing that relationship is that the party which disowns or does not fulfil its obligations cannot be recognized as retaining the rights which it claims to derive from the relationship. Resolution 2145 (XXI) determined that there had been a material breach of the Mandate, which South Africa had in fact disavowed.

It has been contended (*a*) that the Covenant of the League of Nations did not confer on the Council of the League power to terminate a mandate for misconduct of the mandatory and that the United Nations could not derive from the League greater powers than the latter itself had; (*b*) that, even if the Council of the League had possessed the power of revocation of the Mandate, it could not have been exercised unilaterally but only in co-operation with the Mandatory; (*c*) that resolution 2145 (XXI) made pronouncements which the General Assembly, not being a judicial organ, was not competent to make; (*d*) that a detailed factual investigation was called for; (*e*) that one part of resolution 2145 (XXI) decided in effect a transfer of territory.

The Court observes (*a*) that, according to a general principle of international law (incorporated in the Vienna Convention on the Law of Treaties), the right to terminate a treaty on account of breach must be presumed to exist in respect of all treaties, even if unexpressed; (*b*) that the consent of the wrongdoer to such a form of termination cannot be required; (*c*) that the United Nations, as a successor to the League, acting through its competent organ, must be seen above all as the supervisory institution competent to pronounce on the conduct of the Mandatory; (*d*) that the failure of South Africa to comply with the obligation to submit to supervision cannot be disputed; (*e*) that the General Assembly was not making a finding on facts, but formulating a legal situation; it would not be correct to assume that, because it is in principle vested

79

with recommendatory powers, it is debarred from adopting, in special cases within the framework of its competence, resolutions which make determinations or have operative design.

The General Assembly, however, lacked the necessary powers to ensure the withdrawal of South Africa from the Territory and therefore, acting in accordance with Article 11, paragraph 2, of the Charter, enlisted the co-operation of the Security Council. The Council for its part, when it adopted the resolutions concerned, was acting in the exercise of what it deemed to be its primary responsibility for the maintenance of peace and security. Article 24 of the Charter vests in the Security Council the necessary authority. Its decisions were taken in conformity with the purposes and principles of the Charter, under Article 25 of which it is for member States to comply with those decisions, even those members of the Security Council which voted against them and those Members of the United Nations who are not members of the Council.

*Legal Consequences for States of the Continued Presence of South Africa in Namibia*
(paras. 117–127 and 133 of the Advisory Opinion)

The Court stresses that a binding determination made by a competent organ of the United Nations to the effect that a situation is illegal cannot remain without consequence.

South Africa, being responsible for having created and maintained that situation, has the obligation to put an end to it and withdraw its administration from the Territory. By occupying the Territory without title, South Africa incurs international responsibilities arising from a continuing violation of an international obligation. It also remains accountable for any violations of the rights of the people of Namibia, or of its obligations under international law towards other States in respect of the exercise of its powers in relation to the Territory.

The member States of the United Nations are under obligation to recognize the illegality and invalidity of South Africa's continued presence in Namibia and to refrain from lending any support or any form of assistance to South Africa with reference to its occupation of Namibia. The precise determination of the acts permitted—what measures should be selected, what scope they should be given and by whom they should be applied—is a matter which lies within the competence of the appropriate political organs of the United Nations acting within their authority under the Charter. Thus it is for the Security Council to determine any further measures consequent upon the decisions already taken by it. The Court in consequence confines itself to giving advice on those dealings with the Government of South Africa which, under the Charter of the United Nations and general international law, should be considered as inconsistent with resolution 276 (1970) because they might imply recognizing South Africa's presence in Namibia as legal:

(*a*) Member States are under obligation (subject to (*d*) below) to abstain from entering into treaty relations with South Africa in all cases in which the Government of South Africa purports to act on behalf of or concerning Namibia. With respect to existing bilateral treaties member States must abstain from invoking or applying those treaties or provisions of treaties concluded by South Africa on behalf of or concerning Namibia which involve active intergovernmental co-operation. With respect to multilateral treaties, the same rule cannot be applied to certain general conventions such as those with humanitarian character, the non-performance of which may adversely affect the people of Namibia: it will be for the competent international organs to take specific measures in this respect.

(*b*) Member States are under obligation to abstain from sending diplomatic or special missions to South Africa including in their jurisdiction the territory of Namibia, to abstain from sending consular agents to Namibia, and to withdraw any such agents already there; and to make it clear to South Africa that the maintenance of diplomatic or consular relations does not imply any recognition of its authority with regard to Namibia.

(*c*) Member States are under obligation to abstain from entering into economic and other forms of relations with South Africa on behalf of or concerning Namibia which may entrench its authority over the territory.

(*d*) However, non-recognition should not result in depriving the people of Namibia of any advantages derived from international co-operation. In particular, the illegality or invalidity of acts performed by the Government of South Africa on behalf of or concerning Namibia after the termination of the Mandate cannot be extended to such acts as the registration of births, deaths and marriages.

As to States not members of the United Nations, although they are not bound by Articles 24 and 25 of the Charter, they have been called upon by resolution 276 (1970) to give assistance in the action which has been taken by the United Nations with regard to Namibia. In the view of the Court, the termination of the Mandate and the declaration of the illegality of South Africa's presence in Namibia are opposable to all States in the sense of barring *erga omnes* the legality of the situation which is maintained in violation of international law. In particular, no State which enters into relations with South Africa concerning Namibia may expect the United Nations or its Members to recognize the validity or effects of any such relationship. The Mandate having been terminated by a decision of the international organization in which the supervisory authority was vested, it is for non-member States to act accordingly. All States should bear in mind that the entity injured by the illegal presence of South Africa in Namibia is a people which must look to the international community for assistance in its progress towards the goals for which the sacred trust was instituted.

Accordingly, the Court has given the replies reproduced above on page 1.

*Propositions by South Africa concerning the Supply of Further Factual Information and the Possible Holding of a Plebiscite*
(paras. 128–132 of the Advisory Opinion)

The Government of South Africa had expressed the desire to supply the Court with further factual information concerning the purposes and objectives of its policy of separate development, contending that to establish a breach of its substantive international obligations under the Mandate it would be necessary to prove that South Africa had failed to exercise its powers with a view to promoting the well-being and progress of the inhabitants. The Court found that no factual evidence was needed for the purpose of determining whether the policy of apartheid in Namibia was in conformity with the international obligations assumed by South Africa. It is undisputed that the official governmental policy pursued by South Africa in Namibia is to achieve a complete physical separation of races and ethnic groups. This means the enforcement of distinctions, exclusions, restrictions and limitations exclusively based on grounds of race, colour, descent or national or ethnic origin which constitute a denial of fundamental human rights. This the Court views as a fla-

grant violation of the purposes and principles of the Charter of the United Nations.

The Government of South Africa had also submitted a request that a plebiscite should be held in the Territory of Namibia under the joint supervision of the Court and the Government of South Africa. The Court having concluded that no further evidence was required, that the Mandate had been validly terminated and that in consequence South Africa's presence in Namibia was illegal and its acts on behalf of or concerning Namibia illegal and invalid, it was not able to entertain this proposal.

By a letter of 14 May 1971 the President informed the representatives of the States and organizations which had participated in the oral proceedings that the Court had decided not to accede to the two above-mentioned requests.

*
*   *

## DECLARATION AND SEPARATE OR DISSENTING OPINIONS

Subparagraph 1 of the operative clause of the Advisory Opinion (illegality of the presence of South Africa in Namibia—see page 1 of this Communiqué) was adopted by 13 votes to 2. Subparagraphs 2 and 3 were adopted by 11 votes to 4.

Judge Sir Gerald Fitzmaurice (dissenting opinion) considers that the Mandate was not validly revoked, that the Mandatory is still subject to the obligations of the Mandate whatever these may be, and that States Members of the United Nations are bound to respect the position unless and until it is changed by lawful means.

Judge Gros (dissenting opinion) disagrees with the Court's conclusions as to the legal validity and effects of General Assembly resolution 2145 (XXI), but considers that South Africa ought to agree to negotiate on the conversion of the Mandate into a United Nations trusteeship.

Judges Petrén and Onyeama (separate opinions) voted for subparagraph 1 of the operative clause but against subparagraphs 2 and 3, which in their view ascribe too broad a scope to the effects of non-recognition.

Judge Dillard (separate opinion), concurring in the operative clause, adds certain mainly cautionary comments on subparagraph 2.

Judges Sir Gerald Fitzmaurice, Gros, Petrén, Onyeama and Dillard also criticize certain decisions taken by the Court with reference to its composition.

The President (declaration) and Judges Padilla Nervo and de Castro (separate opinions) accept the operative clause in full.

The Vice-President (separate opinion), while sharing the views expressed in the Advisory Opinion, considers that the operative clause is not sufficiently explicit or decisive.