# EXHIBIT 72

JUDGMENT OF THE COURT (Sixth Chamber)
29 April 1999 *

In Case C-342/96,

**Kingdom of Spain**, represented by Paloma Plaza García, Abogado del Estado, acting as Agent, with an address for service in Luxembourg at the Spanish Embassy, 4-6 Boulevard E. Servais,

applicant,

v

**Commission of the European Communities**, represented by Paul F. Nemitz and Fernando Castillo de la Torre, of its Legal Service, acting as Agents, with an address for service in Luxembourg at the office of Carlos Gómez de la Cruz, of its Legal Service, Wagner Centre, Kirchberg,

defendant,

---

* Language of the case: Spanish.

I - 2471

JUDGMENT OF 29. 4. 1999 — CASE C-342/96

APPLICATION under Article 173 of the EC Treaty for annulment of Commission Decision 97/21/ECSC, EC of 30 July 1996 on State aid granted in favour of Compañía Española de Tubos por Extrusión SA, located in Llodio, Álava (OJ 1997 L 8, p. 14),

THE COURT (Sixth Chamber),

composed of: G. Hirsch (Rapporteur), President of the Second Chamber, acting for the President of the Sixth Chamber, G. F. Mancini and H. Ragnemalm, Judges,

Advocate General: A. La Pergola,
Registrar: H. A. Rühl, Principal Administrator,

having regard to the Report for the Hearing,

after hearing oral argument from the parties at the hearing on 14 May 1998, at which the Spanish Government was represented by Nuria Díaz Abad, Abogado del Estado, acting as Agent, and the Commission was represented by Paul F. Nemitz and Juan Guerra Fernández, of its Legal Service, acting as Agent,

after hearing the Opinion of the Advocate General at the sitting on 9 July 1998,

I - 2472

gives the following

# Judgment

1   By application lodged at the Court Registry on 16 October 1996, the Kingdom of Spain brought an action under the first paragraph of Article 173 of the EC Treaty for the annulment of Commission Decision 97/21/ECSC, EC of 30 July 1996 on State aid granted in favour of Compañía Española de Tubos por Extrusión SA, located in Llodio, Álava (OJ 1997 L 8, p. 14, hereinafter 'the contested decision').

2   The Compañía Española de Tubos por Extrusión SA (hereinafter 'Tubacex') is a company governed by private law, established at Llodio (Álava), which produces seamless steel tubes. It has a steel-producing subsidiary, Acería de Álava, established in Amurrio (Álava).

3   In June 1992, after several years of serious financial difficulties, Tubacex was declared provisionally insolvent in accordance with the Ley de suspensión de pagos (Spanish Law on Insolvency), and suspended debt repayments. In October 1993 an agreement with creditors made it possible to lift that suspension.

4   On 25 February 1995, following preliminary investigations into various aspects of the financial restructuring of the undertaking and other related matters, the Commission decided to initiate proceedings pursuant to Article 93(2) of the EC Treaty and to Article 6(4) of Commission Decision No 3855/91/ECSC of 27 November 1991 establishing Community rules for aid to the steel industry (OJ 1991 L 362, p. 57), so far as it concerns, in particular, possible aid elements in repayment agreements concluded with the Fondo de Garantía Salarial (hereinafter 'Fogasa') and the financial restructuring of Tubacex, particularly the possible aid elements in the

participation of the Social Security Fund in the lifting of the suspension of debt repayments.

## The applicable national legislation

*Fogasa*

5   Fogasa is an independent organisation under the control of the Ministry of Employment and Social Security and financed by contributions paid by undertakings. Under the first paragraph of Article 33 of the regulations governing employees, its main role is to pay to workers the salaries which they have not been paid on account of insolvency, suspension of payments, bankruptcy or in the event of agreement between the creditors of the companies. The fourth paragraph of Article 33 requires employees' rights and causes of action to be subrogated to Fogasa in order to obtain repayment of the sums advanced.

6   The formalities to be complied with in order to obtain repayment are set out in Royal Decree No 505/85 of 6 March 1985 on the organisation and operation of Fogasa, which supplements the regulations governing employees. In that connection, Article 32(1) provides:

'In order to assist the recovery of sums due, the Wages Guarantee Fund may conclude repayment agreements defining matters concerning the form, time-limits and guarantees, linking the effect of the subrogatory action to the requirements of keeping the undertaking running and of preserving jobs.

Sums whose repayment has been rescheduled shall bear interest at the statutory rate in force.'

*Social security*

7   In accordance with Article 20 of the General Law on Social Security:

'1. Debts owed in respect of social security contributions or in increased contributions may be rescheduled or paid by instalments.'

In accordance with Article 27 of the same Law, surcharges for delay are to be added to the rescheduled debts.

8   The conditions under which payments may be rescheduled or paid by instalments are set out in Royal Decree No 1517/91 of 11 October 1991 approving the general regulation on the levying of resources under the social security system. That royal decree, which constitutes the basis for any action taken by the Social Security Fund, provides in Article 41, headed 'Form, conditions and procedures':

'2. ... rescheduling or repayment by instalments of social security debts shall give rise to the payment, from the date on which authorisation was granted for rescheduling or payment by instalments until the date of payment, of interest at the statutory rate in force at the time of authorisation, pursuant to Law No 24/1984 of 29 June.'

The repayment agreements concluded with Fogasa

9   As soon as the procedure for suspension of payments was opened in June 1992, the employees of the undertakings concerned applied to Fogasa for payment of the wages due to them. Following negotiations, on 10 July 1992 Tubacex, Acería de Álava and Fogasa concluded an agreement under which the latter would pay the employees' wages, the total amount of which was provisionally fixed at ESP 444 327 300. For their part, the two companies undertook to repay that amount, with the additional sum of ESP 211 641 186 of interest calculated at the simple annual rate of 10%, in six-monthly instalments of ESP 40 998 011 over a period of eight years.

10  After the employees had been paid, the repayment agreement was amended on 8 February 1993; under that amendment the sums payable amounted to ESP 376 194 837 for the principal, together with ESP 183 473 133 interest, a sum repayable in 16 six-monthly instalments, at an interest rate of 9%, as from 1 August 1993. The amount of the instalments, including interest, increased by stages from ESP 33 million at the beginning of the repayment period to ESP 37 million at the end of the period, the interest being gradually reduced. A further amendment on 16 February 1994 fixed the sums payable at ESP 372 million for the principal, a sum to which was added ESP 154 138 830 interest, repayable at the rate of 9%.

11  On 10 March 1994 a new agreement was signed to take into consideration a social plan agreed with the work force. The sums to be repaid came to ESP 465 727 750 as the principal, and ESP 197 580 900 by way of interest, repayable from 30 December 1994 over a period of eight years at 9% simple interest. The payment of the interest was postponed until the last three years of that period and repayments of 71% of the principal sum became payable only from 30 December 1998. According to the Spanish authorities, after that second agreement had been signed, the undertaking proposed immediate payment of ESP 4 194 839, a sum corresponding to the first repayment agreement and to several new associated mortgage agreements.

12   That second repayment agreement was also amended under an agreement concluded on 3 October 1994. It is apparent from the latter that the definitive amount owed was ESP 469 491 521 in principal, together with ESP 205 335 378 in interest, to be repaid over a period of eight years starting on 30 December 1994. The payment of the interest was deferred until the last three years of that period and the repayment of 70% of the principal amount was deferred until 30 December 1998.

**The agreements concluded with the Social Security Fund relating to the rescheduling and payment by instalments of contributions**

13   Tubacex owed the Social Security Fund a series of debts, which were settled by the agreement on the lifting of the suspension of debt repayments of October 1993 (see paragraph 3 above). As a result of that agreement, Tubacex and Acería de Álava again ceased payment of social security contributions within the statutory periods, thus accumulating a debt of ESP 1 156 601 560 for Tubacex, and ESP 255 325 925 for Acería de Álava. In accordance with Article 27 of the General Law on social security, those debts were increased by late payment surcharges at the rate of 20% for the sums of ESP 253 335 669 and ESP 49 083 697 respectively, which represented the total amounts of ESP 1 409 957 329 and ESP 274 409 604 to be paid by Tubacex and Acería de Álava respectively.

14   On 25 March and 12 April 1994 the Social Security Fund entered into agreements with Tubacex and Acería de Álava with a view to recovering the debts owed it by those two undertakings. By those agreements, the parties agreed to reschedule the debts and to pay them in instalments in accordance with the provisions of national law cited at paragraphs 7 and 8 above. Under the first of those agreements, Acería de Álava had to repay the principal sum of its debt, amounting to ESP 274 409 604, together with interest at 9%. Repayment was to be phased over a period of five years and 51% of the amount payable was not to be paid until the fifth year. The second agreement, concluded with Tubacex, provided that rescheduled payment of

debt amounting to ESP 1 409 957 329, together with interest also calculated at the rate of 9%, was to be made under conditions similar to those applicable to Acería de Álava.

**The contested decision**

15   Article 1 of the contested decision states:

'The following measures by Spain in relation to Compañía Española de Tubos por Extrusión SA (Tubacex) and Acería de Álava contained aid elements which were granted illegally and are incompatible with the common market pursuant to Article 92 of the EC Treaty and Decision No 3855/91/ECSC in so far as the rate of interest was below market rates:

1.  the 10 July 1992 loan agreement between the wage guarantee fund (Fogasa), Tubacex and Acería de Álava covering ESP 444 327 300 in principal, as amended by agreements of 8 February 1993 and 16 February 1994 (covering principal of ESP 376 194 872 and ESP 372 000 000 respectively);

2.  the 10 March 1994 loan agreement between Fogasa, Tubacex and Acería de Álava covering ESP 465 727 750 in principal, as amended by the agreement of 3 October 1994 covering ESP 469 491 521 in principal;

    3.   the agreement of 25 March 1994 between the Social Security Fund and Acería de Álava to reschedule debts amounting to ESP 274 409 604;

    4.   the agreement of 12 April 1994 between the Social Security Fund and Tubacex to reschedule debts amounting to ESP 1 409 957 329.'

16   Article 2 of the contested decision provides:

'Spain shall abolish the aid elements contained in the measures referred to in Article 1 by withdrawing them or by applying normal market conditions to the interest rate, with effect from when the Fogasa loans were initially granted and from when the rescheduling of the post-suspension Social Security debts was agreed; and by recovering the sum corresponding to the difference between this rate and the rate actually charged up until the date of abolition of the aid.

This sum shall be recovered in accordance with the procedures and provisions of Spanish law together with interest. The interest rate used shall be the same normal market rate referred to in the preceding paragraph, with such interest starting to run from the date of the grant of the aid until the date of effective reimbursement.'

17   In support of its application, the Kingdom of Spain puts forward two pleas in law alleging infringement of Articles 118 and 92(1) of the Treaty.

Infringement of Article 118 of the Treaty

18   First of all, the Kingdom of Spain maintains that the measures which the Commission has treated as State aid are, in fact, arrangements arising under employment law, more specifically from the social security rules, a sphere falling within the exclusive competence of the Member States and in which the Commission's role is simply to propose and to coordinate. In particular it claims that Fogasa merely pays workers the wages which have not been paid by the undertaking, its role thus being to provide the wages guarantee which forms an integral part of the actual provisions of the contract of employment. Recovery of debts owed by undertakings to the Social Security Fund where contributions payable have not been paid is governed by the General Law on social security; that is, in consequence, a social security rule laying down the detailed rules for payment of obligations provided for by that same law.

19   By contrast, the Commission contends that the actions of Fogasa and the Social Security have no direct social purpose. Fogasa's essential function is to guarantee payment of wages not paid by undertakings. In this respect, the provisions of the regulations governing employees are not affected by the contested decision since it never challenged that payment. The Social Security Fund has merely rescheduled a series of debts for the sole purpose of resolving the undertaking's financial problems, the workers' rights having been perfectly safeguarded in any case since they had received their wages and were not in any way affected with regard to the covering of risks by the Social Security.

20   It should be borne in mind that the first paragraph of Article 118 of the Treaty entrusts the Commission, without prejudice to the other provisions of the Treaty and in conformity with its general objectives, with the 'task of promoting close cooperation between Member States in the social field ...'. The second paragraph provides that the Commission is to act in close contact with the Member States by making studies, delivering opinions and arranging consultations.

21   Consequently, Article 118 of the Treaty does not encroach upon the Member States' powers in the social field in so far as the latter is not covered by other provisions of the Treaty (Joined Cases 281/85, 283/85 to 285/85 and 287/85 *Germany, France, Netherlands, Denmark and United Kingdom* v *Commission* [1987] ECR 3203, paragraph 14).

22   The fact that, in Article 1 of the contested decision, the Commission finds that measures adopted by the Kingdom of Spain in favour of Tubacex and Acería de Álava contain aid elements which were granted illegally and which are incompatible with Article 92 of the Treaty and with Decision No 3855/91 does not affect the competence of the Member States in the social field, since they are required in any event to comply with Community rules on competition.

23   The Court has, moreover, already held elsewhere that the social character of State aid is not sufficient to exclude it outright from being categorised as aid for the purposes of Article 92 of the Treaty (Case C-241/94 *France* v *Commission* [1996] ECR I-4551, paragraph 21).

24   The first plea alleging infringement of Article 118 of the Treaty cannot, consequently, be accepted.

**Infringement of Article 92(1) of the Treaty**

25   It should be observed as a preliminary point that the Kingdom of Spain here confines itself to pleading an infringement of Article 92 of the Treaty, without challenging the validity of the contested decision in the light of Decision No 3855/91.

26  The application of that latter decision finds justification in the fact that, in accordance with the second recital in Chapter VI of the contested decision, Acería de Álava produces products listed in Annex I to the ECSC Treaty and therefore falls within the scope of that Treaty and, in particular, of Community rules for aid to the steel industry.

27  By contrast, according to the fourth recital in Chapter VI, the measures granted in favour of Tubacex are subject to Articles 92 and 93 of the EC Treaty, since that company's activities, which consist of the production of seamless stainless steel tubes, are regarded as non-ECSC activities.

28  In those circumstances, having regard to the fact that in its second plea the Kingdom of Spain challenges the legality of the contested decision only in the light of Article 92 of the Treaty, its application for annulment of that decision must therefore be dismissed in so far as the decision declares the measures adopted by the Kingdom of Spain in favour of Acería de Álava to be incompatible with Decision No 3855/91.

29  The Kingdom of Spain claims that the measures adopted in favour of Tubacex do not meet the conditions necessary to be classified as State aid within the meaning of Article 92 of the Treaty. In its view, those measures do not constitute aid specifically favouring one undertaking or a given production sector, do not proceed from State resources and do not affect the level of such resources and are not liable to restrict competition.

Restriction of competition

30   On this point, which should be considered first, the Kingdom of Spain claims that the Commission was wrong to consider in the 5th, 6th and 11th recitals in Chapter V of the contested decision that the application of the statutory interest rate of 9% to the repayment agreements concluded with Fogasa and to the agreements concluded with the Social Security Fund to reschedule or pay by instalments the contributions payable is not consistent with normal market conditions, under which the average rate of interest charged by private banks in Spain on loans for more than three years is considerably higher than that applied in the arrangements.

31   As a preliminary point, the Kingdom of Spain recalls that, as the Commission itself stated in the fourth recital in Chapter V, the agreements between Fogasa and Tubacex do not contain elements of State aid. The measures taken by Fogasa and by the Social Security Fund in favour of Tubacex are not, therefore, in the nature of a loan, since those bodies have simply ensured that their debts may be recovered by means of rescheduling. They therefore acted as a private creditor would have done in order to recover his debts.

32   The Kingdom of Spain states that the interest rate charged by the creditor where payment of his debt is rescheduled is never subject to the same criteria as those used by a private bank when it grants a loan, in so far as a loan and the rescheduling of a debt pursue different objectives. In its view, a creditor does not seek to make any special profit on the money which is due to him, but merely wishes to recover in full the sums he has advanced without suffering any financial loss. To that end,

where he agrees to the rescheduling of his debt for the purpose of ensuring that it is repaid, he requires the further payment of interest, the purpose of which is to compensate him for depreciation of the money as a result of the rescheduling.

33  By contrast, the private bank granting a loan does not pursue the same objective. The rate of interest which it charges its client is not intended to spare it loss arising from currency depreciation. On the contrary, the interest is the profit which each bank seeks to obtain when granting a loan since a private bank's financial resources are earned by making its own income from money, in so far as profit is both its purpose and its *raison d'être*, banks being profit-making bodies.

34  Consequently, in order to determine normal market conditions, Fogasa and the Social Security Fund's conduct ought therefore to be compared with that of a public or private creditor acting with a view to recovering its debt.

35  The Commission first states that, in so far as Article 33 of the regulations governing employees requires Fogasa to pay workers' wages in the event of suspension of payments and requires the workers' rights to be assigned to it for the recovery of the sums paid, that is a general and objective obligation the basis of which is to be found in Council Directive 80/987/EEC of 20 October 1980 on the approximation of the laws of the Member States relating to the protection of employees in the event of the insolvency of their employer (OJ 1980 L 283, p. 23). That action does not constitute aid since it was not reserved to a specific class of undertakings. The question in issue in the proceedings concerns the conditions of repayment of the debt contracted as a result of the payment of wages.

36   Second, the Commission acknowledges that when public bodies lend money, they do not do so in order to make a profit. Nevertheless, since interest is one of the normal costs of running a business, it ought to have been charged to the undertaking's own resources. In those circumstances, it is necessary to consider what would have happened if the Social Security Fund or Fogasa had refused any rescheduling of repayment, as they were entitled to do. If that had been the case, Tubacex would have had to have recourse to the capital market, on less favourable conditions than those offered by the authorities.

37   According to the Commission, it seems logical to conclude that aid was given since it found, in the sixth and eleventh recitals of Chapter V of the contested decision, that there was a difference in 1994 of 3.51% between the statutory rate of 9% and the market rate of 12.51%, the rescheduling of the debt being equivalent, in financial terms, to the granting of a loan.

38   Furthermore, the Commission points out that the theory that a creditor never seeks to obtain financial advantage when concluding a credit or loan contract reflects an inaccurate view of how the market works. Any creditor undertaking would act in such a way as to make a profit. In addition, in the case of Tubacex, which was an undertaking in difficulty coming out of a major financial crisis, a creditor would have taken that risk into account by charging a higher rate of interest.

39   Finally, the Commission argues that, in the circumstances, what is in issue is not an earlier debt already in existence at the time of the declaration of the suspension of payments in respect of which a creditor might be expected to make certain allowances, but, on the contrary, the negotiation and conclusion of a new agreement relating to sums payable after suspension of payments.

40  Article 92(1) of the Treaty declares that aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods is, in so far as it affects trade between Member States, incompatible with the common market.

41  The Court has held in this regard that, in order to determine whether a State measure constitutes aid for the purposes of Article 92 of the Treaty, it is necessary to establish whether the recipient undertaking receives an economic advantage which it would not have obtained under normal market conditions (Case C-39/94 *SFEI and Others* [1996] ECR I-3547, paragraph 60).

42  It has also held that the same is true of loans at reduced rates of interest granted by public authorities to an undertaking which enable the latter to avoid having to bear costs which would normally have had to be met out of the undertaking's own financial resources, thereby preventing market forces from having their normal effect (Case C-301/87 *France* v *Commission* [1990] ECR I-307, paragraph 41).

43  In the circumstances, it must first of all be stated that, as is apparent from the 12th recital in Chapter IV of the contested decision, Fogasa does not award loans to undertakings in liquidation or in difficulties, but settles all valid claims put forward by employees with money which it pays and then recovers from the undertakings. The applicable national legislation requires subrogation of the workers' rights and causes of action to that body in order to obtain repayment of the sums advanced.

In order to make it easier to recover the sums payable, Fogasa may conclude repayment agreements enabling it to reschedule the sums payable or to make them payable by instalments.

44  Similarly, the Social Security Fund may agree to rescheduling the payment of debts in respect of social security contributions or to their payment by instalments.

45  In the fourth recital in Chapter V of the contested decision, the Commission states that, in that respect, the arrangements made with Fogasa do not contain any elements of State aid.

46  Next, it should be noted that the State did not act as a public investor whose conduct must be compared to the conduct of a private investor laying out capital with a view to realising a profit in the relatively short term (Case C-42/93 *Spain* v *Commission* [1994] ECR I-4175, paragraph 14). On the assumption that, as the Commission acknowledges, the fact that the sums advanced by Fogasa to pay the wages of Tubacex's employees are not State aid has been established, it follows that in restructuring the conditions for repayment of those advances, Fogasa must be held to have acted as a public creditor which, like a private creditor, seeks to recover sums due to it and which, to that end, concludes agreements with the debtor, under which the accumulated debts are to be rescheduled or paid by instalments in order to facilitate their repayment.

47  In that connection it is necessary to take into account the fact that, contrary to the Commission's submission, the agreements referred to at paragraphs 9 to 14 above were concluded on account of the fact that Tubacex was already subject to the

pre-existing statutory obligation to repay the wages advanced by Fogasa and to pay its debts in respect of social security contributions. The agreements in question did not therefore create any new debts owed by Tubacex to the public authorities.

48  The interest normally applicable to that type of debt is intended to make good the loss suffered by the creditor because of the debtor's delay in performing its obligation to pay off its debt, namely default interest. If the rate of default interest applied to the debts of a public creditor is not the same as the rate charged for the debts owed to a private creditor, it is the latter rate which ought to be charged if it is higher than the former.

49  It follows, therefore, that the contested decision must be annulled in so far as it declares incompatible with Article 92 of the Treaty the measures adopted by the Kingdom of Spain in favour of Tubacex, in so far as the rate of interest of 9% charged on the sums owed by Tubacex to Fogasa and to the Social Security Fund is lower than the prevailing market rates.

**Costs**

50  Under Article 69(2) of the Rules of Procedure, the unsuccessful party is to be ordered to pay the costs if costs have been applied for in the successful party's pleadings. However, the first subparagraph of Article 69(3) provides that the Court may order that the costs be shared or that the parties bear their own costs if each party succeeds on some and fails on other heads. Since the Kingdom of Spain and the Commission have each been unsuccessful on some heads, each party must be ordered to bear its own costs.

On those grounds,

THE COURT (Sixth Chamber),

hereby:

1. Annuls Commission Decision 97/21/ECSC, EC of 30 July 1996 on State aid granted in favour of Compañía Española de Tubos por Extrusión SA in so far as it declares incompatible with Article 92 of the EC Treaty the measures adopted by the Kingdom of Spain in favour of Compañía Española de Tubos por Extrusión SA inasmuch as the interest rate of 9% charged on the sums owed by the latter to the Fondo de Garantía Salarial and to the Social Security Fund is lower than the prevailing market rates;

2. Dismisses the remainder of the application;

3. Orders each party to bear its own costs.

    Hirsch                      Mancini                      Ragnemalm

Delivered in open court in Luxembourg on 29 April 1999.

R. Grass                                                                            P. J. G. Kapteyn

Registrar                                                         President of the Sixth Chamber