# EXHIBIT 78

INTERNATIONAL COURT OF JUSTICE

———

REPORTS OF JUDGMENTS,
ADVISORY OPINIONS AND ORDERS

———

# CASE CONCERNING
# RIGHT OF PASSAGE OVER
# INDIAN TERRITORY

(PORTUGAL *v.* INDIA)

MERITS

JUDGMENT OF 12 APRIL 1960

# 1960

COUR INTERNATIONALE DE JUSTICE

———

RECUEIL DES ARRÊTS,
AVIS CONSULTATIFS ET ORDONNANCES

———

# AFFAIRE DU
# DROIT DE PASSAGE
# SUR TERRITOIRE INDIEN

(PORTUGAL c. INDE)

FOND

ARRÊT DU 12 AVRIL 1960

This Judgment should be cited as follows:

*"Case concerning Right of Passage over Indian Territory (Merits),*
*Judgment of 12 April 1960: I.C.J. Reports 1960, p. 6."*

————————

Le présent arrêt doit être cité comme suit:

*« Affaire du droit de passage sur territoire indien (fond),*
*Arrêt du 12 avril 1960: C. I. J. Recueil 1960, p. 6. »*

Sales number
N° de vente : **226**

6

## INTERNATIONAL COURT OF JUSTICE

<div style="float:left">
1960
12 April
General List:
No. 32
</div>

### YEAR 1960

**12 April 1960**

# CASE CONCERNING RIGHT OF PASSAGE OVER INDIAN TERRITORY

### (PORTUGAL v. INDIA)

### MERITS

*Jurisdiction of Court.—Optional Clause.—Declaration of acceptance of jurisdiction of Court.—Reservation of disputes as to matters falling within domestic jurisdiction.—Jurisdiction accepted subject to reservation* ratione temporis.*—"Disputes" and "facts or situations" subsequent to specified date.*

*Merits.—Judicial determination of right claimed.—Maratha period.—British and post-British periods.—Practice accepted as law by Parties.—Local custom.—Question of right of passage in respect of private persons, civil officials, goods in general, armed forces, armed police, and arms and ammunition.—Exercise of power of regulation and control by Sovereign of intervening territory.*

### JUDGMENT

*Present:* President KLAESTAD; *Vice-President* ZAFRULLA KHAN; *Judges* BASDEVANT, HACKWORTH, WINIARSKI, BADAWI, ARMAND-UGON, KOJEVNIKOV, MORENO QUINTANA, CÓRDOVA, WELLINGTON KOO, SPIROPOULOS, Sir Percy SPENDER; *Judges ad hoc* CHAGLA and FERNANDES; *Deputy-Registrar* GARNIER-COIGNET.

4

7    RIGHT OF PASSAGE OVER INDIAN TERRITORY (JUDGM. 12 IV 60)

In the case concerning right of passage over Indian territory,

*between*

the Republic of Portugal,

represented by

Dr. João de Barros Ferreira da Fonseca, Ambassador of Portugal at The Hague,

as Agent,

and by

Professor Inocêncio Galvão Telles, Director of the Faculty of Law in the University of Lisbon, Member of the Upper House,

as Agent, Advocate and Counsel,

assisted by

M. Maurice Bourquin, Professor of the Faculty of Law in the University of Geneva and in the Graduate Institute of International Studies,

as Advocate and Counsel,

and by

M. Guilherme Braga da Cruz, Director of the Faculty of Law in the University of Coimbra, Member of the Upper House,

M. Pierre Lalive d'Épinay, Professor of the Faculty of Law in the University of Geneva,

M. Joaquim Moreira da Silva Cunha, Professor of the Faculty of Law in the University of Lisbon, Member of the Upper House,

as Counsel,

and by

M. Henrique Martins de Carvalho, Counsellor for Overseas Affairs at the Ministry for Foreign Affairs,

M. Alexandre Marques Lobato, Secretary of the Centre for Overseas Historical Studies,

M. João de Castro Mendes, Assistant in the Faculty of Law in the University of Lisbon,

as Experts,

and by

M. José de Oliveira Ascensão, Assistant in the Faculty of Law in the University of Lisbon,

M. Carlos Macieira Ary dos Santos, Secretary of the Embassy of Portugal at The Hague,

M. António Leal da Costa Lobo, Secretary of Legation,

as Secretaries,

5

8   RIGHT OF PASSAGE OVER INDIAN TERRITORY (JUDGM. 12 IV 60)

*and*

the Republic of India,

represented by

   Shri M. C. Setalvad, Attorney-General of India,

   as Agent and Counsel,

   assisted by

   Maître Henri Rolin, Professor of International Law in the Free University of Brussels, Advocate, Member of the Belgian Senate,

   The Rt. Hon. Sir Frank Soskice, Q.C., M.P., former Attorney-General of England,

   M. Paul Guggenheim, Professor of International Law of the Law Faculty in the University of Geneva and in the Graduate Institute of International Studies,

   Professor C. H. M. Waldock, C.M.G., O.B.E., Q.C., Chichele Professor of Public International Law in the University of Oxford,

   Mr. J. G. Le Quesne, Member of the English Bar,

   as Counsel,

   and by

   Shri Vasant Govind Joshi,

   Shri Vishwanath Govind Dighe,

   Shri Vithal Trimbak Gune,

   Shri Leofredo Agenor de Gouvea Pinto,

   Shri Ram Swarup Bhardwaj, from the Goa Research Unit, Ministry of External Affairs,

   Shri João Francisco Caraciolo Cabral, of the Legal Department, High Commission of India, London,

   as Expert Advisers,

   and by

   Shri J. M. Mukhi, Legal Adviser in the Ministry of External Affairs,

   as Assistant Agent and Secretary,

THE COURT,

composed as above,

*delivers the following Judgment:*

By its Judgment of 26 November 1957, the Court rejected four of six Preliminary Objections raised by the Government of India to the jurisdiction of the Court to entertain an Application insti-

6

tuting proceedings by the Government of Portugal, filed on 22 December 1955, and joined the Fifth and the Sixth Objections to the merits.

At the same time the Court ordered the resumption of the proceedings on the merits and fixed time-limits for the further pleadings. Requests for the extension of these time-limits were granted by Orders of 10 February 1958, 28 August 1958, 6 November 1958 and 17 January 1959, and the Counter-Memorial, Reply and Rejoinder were filed within the time-limits so fixed. The case became ready for hearing on the filing of the last pleading on 5 February 1959.

The Court included on the Bench Mr. Mahomed Ali Currim Chagla, Ambassador of India to the United States and Mexico and Minister of India to Cuba, and M. Manuel Fernandes, Director-General of the Ministry of Justice of Portugal and a member of the International Relations Section of the Upper House, who had respectively been chosen by the Government of India and the Government of Portugal, in accordance with Article 31, paragraph 3, of the Statute, to sit as Judges *ad hoc*.

Public hearings were held on 21, 22, 23, 24, 25, 26, 28, 29 and 30 September, on 1, 2, 3, 5, 6, 9, 10, 12, 13, 14, 15, 16, 17, 19, 20, 21, 24, 26, 27, 28, 29, 30 and 31 October, and on 3, 4, 5 and 6 November 1959. At these hearings the Court heard oral arguments and replies by M. Galvão Telles, M. Bourquin, M. Braga da Cruz, M. Pierre Lalive d'Épinay and M. Moreira da Silva Cunha, on behalf of the Government of Portugal, and by Shri Setalvad, Me Rolin, Sir Frank Soskice, M. Guggenheim and Professor Waldock, on behalf of the Government of India.

In the course of the written and oral proceedings the following Submissions were presented by the Parties:

*On behalf of the Government of Portugal,*

in the Application:

"May it please the Court,

*(a)* To recognize and declare that Portugal is the holder or beneficiary of a right of passage between its territory of Damão (littoral Damão) and its enclaved territories of Dadrá and Nagar-Aveli, and between each of the latter, and that this right comprises the faculty of transit for persons and goods, including armed forces or other upholders of law and order, without restrictions or difficulties and in the manner and to the extent required by the effective exercise of Portuguese sovereignty in the said territories.

*(b)* To recognize and declare that India has prevented and continues to prevent the exercise of the right in question, thus committing an offence to the detriment of Portuguese sovereignty over the enclaves of Dadrá and Nagar-Aveli and violating its international obligations deriving from the above-mentioned sources and from any others, particularly treaties, which may be applicable.

(c) To adjudge that India should put an immediate end to this *de facto* situation by allowing Portugal to exercise the above-mentioned right of passage in the conditions herein set out."

In the Memorial:

"May it please the Court,

I. To adjudge and declare:

(a) that Portugal has a right of passage through the territory of India in order to ensure communications between its territory of Daman (coastal Daman) and its enclaved territories of Dadra and Nagar-Aveli;

(b) that this right comprises the transit of persons and goods, as well as the passage of representatives of the authorities and of armed forces necessary to ensure the full exercise of Portuguese sovereignty in the territories in question.

2. To adjudge and declare:

(a) that the Government of India must respect that right;

(b) that it must therefore abstain from any act capable of hampering or impeding its exercise;

(c) that neither may it allow such acts to be carried out on its territory;

3. To adjudge and declare that the Government of India has acted and continues to act contrary to the obligations recalled above;

4. To call upon the Government of India to put an end to this unlawful state of affairs."

As final Submissions filed on 6 October 1959:

"I.—*Submissions relating to the Claims of Portugal*

Whereas the claim of the Portuguese Government is designed to secure: 1. Recognition of the right possessed by Portugal to pass over Indian territory to the extent necessary for the exercise of its sovereignty over the enclaves of Dadra and Nagar-Aveli; 2. A finding of India's failure to respect the obligation binding upon it as the result of that right.

A. *As to Portugal's right of transit*

Whereas the territories of Dadra and Nagar-Aveli, which are undeniably under the sovereignty of Portugal, are wholly enclaved within the territory of the Union of India;

Whereas the exercise of Portuguese sovereignty over these territories would therefore be impossible if Portugal were not assured of being able to communicate with them by passing over the few kilometres of Indian territory separating them one from another and from the coastal district of Daman;

Whereas the claim of India to possess in this connection a discretionary power is manifestly incompatible with that necessity;

Whereas indeed such a claim would entitle India to oppose the communications of Portugal with its enclaves on grounds of which

8

India would be the sole judge and whenever India considered that its convenience or its interests led it to adopt such an attitude;

Whereas the international legal system is essentially based upon mutual respect of sovereignties;

Whereas the Union of India has unequivocally recognized the sovereignty of Portugal over the two enclaves just as indeed it had been recognized by the previous sovereigns of the Indian territory;

Whereas, by that recognition, the Union of India and its predecessors admitted that the existence of the two Portuguese enclaves within Indian territory was a part of the legal system and undertook to respect that situation;

Whereas, in order to justify the discretionary power which the Union of India claims to possess in respect of Portuguese transit, it would be necessary to accept that, while recognizing the sovereignty of Portugal over the enclaves, it tacitly reserved a right at its will to render impossible the exercise of that sovereignty;

Whereas such a reservation cannot logically be admitted and would be contrary to the elementary requirements of good faith;

Whereas the right claimed by Portugal is moreover confirmed by the agreements which it formerly concluded with the Marathas, by local custom and by general custom, as well as by the concordance of municipal legal systems with respect to access to enclaved land;

Whereas, indeed, the above-mentioned agreements cannot be construed otherwise than as granting to Portugal the right of passage necessary for the exercise of the powers which those agreements conferred upon it in the enclaves;

Whereas, furthermore, in the relations between Portugal and the successive sovereigns of the territories adjoining the enclaves there was established and consolidated in the course of nearly two centuries, an unbroken practice in respect of the maintenance of the indispensable communications between coastal Daman and the enclaves; and whereas that practice was based, on the part of all concerned, on the conviction that what was involved was a legal obligation *(opinio juris sive necessitatis)*;

Whereas general custom likewise fully confirms the right claimed by Portugal; whereas the practice of States reveals no disagreement in this connection; whereas, while the conditions of the exercise of the right of passage naturally vary according to the circumstances, the right of the sovereign of the enclave to have with the enclave the communications necessary for the exercise of sovereignty is universally admitted, and whereas it would be impossible to contend that that unanimity and uniformity do not bear witness to a conviction of the existence of a legal duty *(opinio juris sive necessitatis)*;

Whereas, lastly, the municipal laws of the civilized nations are unanimous in recognizing that the holder of enclaved land has a right, for purposes of access to it, to pass through adjoining land; whereas it is rare to find a principle more clearly emerging from the universal practice of States *in foro domestico* and more perfectly

12  RIGHT OF PASSAGE OVER INDIAN TERRITORY (JUDGM. 12 IV 60)

meeting the requirements of Article 38, paragraph 1 *(c)*, of the Statute of the Court;

Whereas each of the titles invoked by Portugal would in itself be sufficient to justify the right which it is claiming and whereas these titles reinforce each other and their coexistence reveals the solidity of their common basis;

Whereas Portugal is in no sense claiming a right of access to Indian territory, but merely a right of transit, designed to assure the communications between the enclaves themselves and between the enclaves and the coastal district of Daman;

Whereas this right of transit is claimed only to the extent necessary for the exercise of Portuguese sovereignty over the enclaves;

Whereas in claiming this right Portugal in no way disputes that sovereignty over the territory, through which transit must be effected, belongs exclusively to India; whereas it is in no way claiming to be entitled to withdraw persons or goods in transit from the exercise of that sovereignty, and does not directly or indirectly seek for them any immunity;

Whereas the transit forming the subject-matter of its claim therefore remains subject to the regulation and control of India, which must exercise these by taking, in good faith and on its own responsibility, the necessary decisions;

Whereas Portugal merely asserts that the territorial competence of India is not in this respect a discretionary competence, since India is obliged, on its own responsibility, not to prevent the transit necessary for the exercise of Portuguese sovereignty in the enclaves;

Whereas the Indian Government contends that the subject-matter of the Portuguese claim is too vague for the Court to be able to pass upon it by the application only of the legal rules enumerated in Article 38, paragraph 1, of the Statute; whereas, however, that contention fails to stand up to examination;

Whereas, indeed, the rules of international law referred to in paragraph 1 of Article 38 are far from necessarily requiring greater precision than those upon which the Portuguese Government relies, which are recalled above;

For these reasons,

May it please the Court

To adjudge and declare

that the right of passage between the enclaves of Dadra and Nagar-Aveli and between these enclaves and the coastal district of Daman, as defined above, is a right possessed by Portugal and which must be respected by India.

B. *As to the failure of India to respect its obligation*

Whereas the attitude of the Indian Government with regard to Portuguese transit changed in the last months of the year 1953, after Portugal's refusal to accede to the request for the cession of its territories in India (Rejoinder, paragraph 417);

Whereas this change was marked in the first instance by a series of restrictions which, while not immediately rendering impossible the exercise of Portuguese sovereignty in the enclaves, undeniably gravely impeded it and were such as to be liable to paralyse it completely if exceptional events occurred which obliged Portugal to take rapid measures to ensure the maintenance of order at Dadra and Nagar-Aveli (Memorial, Annex 40);

Whereas the threat of action directed against the Portuguese territories of India could not be a matter of which the Indian Government was unaware; whereas the imminence of that action had moreover been publicly announced on many occasions and in particular on 2 July 1954, in a manifesto, adopted at Bombay by persons directing anti-Portuguese groups, which was reproduced in the Indian Press (Indian Annex A. No. 7);

Whereas it was clearly incumbent upon the Indian Government to take the measures which lay in its power to prevent the realization of such a design (Judgment of the Court of 9 April 1949, in the *Corfu Channel Case, Reports*, p. 22);

Whereas the Indian Government took no such measures but, on the contrary, did not hesitate still further to weaken Portugal's capacity for resistance against the danger which threatened it, by increasing the restrictions placed upon transit (Note from the Consul-General of India at Goa, dated 17 July 1954, notifying the Portuguese Governor-General of a series of immediate measures, including in particular a prohibition of the transport of munitions and military equipment—Memorial, Annex 47);

Whereas a week elapsed between the occupation of Dadra (during the night 21/22 July) and the expedition against Nagar-Aveli which, having been begun on 29 July, was completed only in August;

Whereas after the occupation of Dadra, there could be no doubt that a similar action would be undertaken against Nagar-Aveli, the larger of the two Portuguese enclaves;

Whereas moreover, as early as 23 July, the President of the so-called 'United Front of Goans' and leader of the expedition against Dadra, publicly announced that this would take place and that the action would be begun as soon as the necessary preparations were completed (Observations on the Preliminary Objections, Annex 1, Appendix 2);

Whereas the Indian Government took no step to prevent that second expedition;

Whereas, so far from thus performing its duty towards Portugal, it firmly opposed all communications of Portugal with the enclaves;

Whereas, while the Parties are in disagreement on the question whether communications between Daman and the enclaves had been completely cut *before* the operation against Dadra, it is in any event certain that the isolation of the two enclaves had become complete immediately after the occupation of Dadra and before the expedition against Nagar-Aveli;

Whereas, as from that time no further transit visa was granted, either to Portuguese or to persons in the service of the Portuguese Government, for the purpose of going to Dadra or to Nagar-Aveli (Counter-Memorial, paragraph 211);

Whereas on 24 July the Portuguese Government requested the necessary transit facilities for the despatch of reinforcements to Dadra (Memorial, Annex 50); whereas on 26 July, while confirming the earlier request, it asked that a few delegates of the Governor of Daman (if necessary limited to three) should be enabled to go to Nagar-Aveli, in order to enter into contact with the population, examine the situation, and take the necessary measures on the spot (Memorial, Annex 51);

Whereas, in a note of 28 July, the Government of India refused these two requests (Memorial, Annex 52);

Whereas, at that time, the occupation of Nagar-Aveli existed only as a threat and whereas it is consequently established that before any occupation of the enclave, Portugal found itself completely cut off from the enclave as a result exclusively of the will of India;

Whereas the attitude adopted by India is thus in two respects contrary to the duty imposed upon it by international law, since instead of protecting Portugal against the unlawful enterprise with which the latter was threatened, it placed Portugal in a situation in which it was impossible for that State to defend itself against that enterprise;

Whereas, since that date, the prohibitions imposed by India in respect of Portuguese transit have been maintained without exception, thus enabling those who profited by them to consolidate their position in the enclaves;

For these reasons,

May it please the Court

To adjudge and declare

that India has not complied with the obligations incumbent upon it by virtue of Portugal's right of passage.

II.—*Submissions relating to the various arguments propounded by the Indian Government as to the effect of the present circumstances on the exercise of the right of passage*

Whereas India contends, in the event of the right of passage claimed by Portugal being upheld by the Court, that that right cannot be exercised in the present circumstances;

Whereas, if this contention were well-founded, its only effect could in any case be to suspend temporarily, and to the extent necessary, the exercise of the right of passage, without affecting the existence of that right itself;

Whereas it is clearly for India to establish the basis for its contention;

Whereas India asserts that the present situation is characterized by a general insurrection of the population of the enclaves; whereas,

however, this interpretation of the facts, which is formally challenged by Portugal, is far from finding confirmation in the evidence supplied by the Indian Government and whereas this interpretation, on the contrary, runs counter to a number of factors which render that interpretation improbable;

Whereas, furthermore, even if the existence of an insurrectional movement were established, the legal consequences which India seeks to deduce therefrom would nonetheless be devoid of foundation;

Whereas Portugal has never renounced its sovereignty over the enclaves and whereas it was, from the very beginning, prevented from taking in the enclaves the measures necessary for the restoration of order;

Whereas if Portugal's action has thus been paralysed it is because India has opposed it by depriving the Portuguese authorities of all communication with the enclaves;

Whereas India is therefore not entitled in any case to impair, in any form, the right of sovereignty which belongs to Portugal alone;

Whereas it is in the light of this fundamental observation that it is necessary to examine the various arguments propounded by the Indian Government in support of its contention that the exercise of the right of passage ought to be suspended in the present circumstances;

A. *As to India's right to adopt an attitude of neutrality in the conflict between the lawful Government and the alleged insurgents*

Whereas there has been no recognition of belligerency in the present case;

Whereas, in the absence of such recognition, no obligation of neutrality is incumbent upon third States, and whereas, if the latter are entitled in such cases, in order to safeguard their interests, to take certain measures analogous to those provided for by the regime of neutrality, what is then involved is in any event only a *right* and not a *legal duty;*

Whereas India could not avail itself of that right for the purpose of evading the obligations binding upon it as a result of Portugal's right of passage; and whereas any conflict between that right and those obligations could only be resolved in favour of the obligations;

Whereas, moreover, the very concept of neutrality can clearly only apply in a case of conflict between the lawful Government and the insurgents if the State relying thereon is not involved in that conflict;

Whereas this is certainly not so in the present case, since the cause of the so-called insurgents is merged with that of India, their efforts being directed, through different means, to the achievement of one and the same end, namely, the incorporation of the enclaves in the territory of the Indian Union;

Whereas, while the sympathy felt by a State for one or the other of two adversaries does not prevent that State from adopting an

attitude of neutrality in the conflict between them, the position is not the same when the design pursued by one of them forms an integral part of the policy openly practised by the said State; whereas it is indeed impossible to be neutral in one's own cause;

Whereas India cannot therefore justify a suspension of the exercise of the right of passage by the argument based on its alleged neutrality;

B. *As to the application of the provisions of the United Nations Charter relating to human rights and to the right of self-determination of peoples*

Whereas in cases of insurrection the rights and obligations of foreign States in relation to the lawful Government are governed by a body of rules which form a part of general international law and whereas India is under a further obligation in relation to Portugal, which is binding upon it as a result of Portugal's right of passage;

Whereas India contends that the legal regime thus determined is modified by Articles 1, 55, 56 and 62 of the United Nations Charter, in the sense that these Articles lay upon it an obligation to 'abstain from action which is diametrically opposed to the whole purpose and spirit of those Articles' (Rejoinder, paragraph 640);

Whereas the terms in which this assertion is couched disclose the uncertainty felt by India itself with regard to the exact scope of its argument;

Whereas India recognizes moreover that the principles of the Charter to which it has referred can be regarded as ethical principles and not as legal principles and whereas India seeks, on the other hand, to disregard, in so far as these principles are concerned, the provisions of Article 38, paragraph 1, of the Statute of the Court (Rejoinder, paragraph 641);

Whereas these considerations would, if necessary, suffice to dispose of its contention, since the Parties to the present dispute have only accepted the compulsory jurisdiction of the Court subject to the conditions laid down in the Statute of the Court;

Whereas, however, the provisions of Articles 1, 55, 56 and 62 of the United Nations Charter are not at all involved in the dispute now before the Court;

Whereas while Portugal has a legitimate desire to restore the order which has been disturbed by the violent action of hostile elements which penetrated into the enclaves in 1954, it does not propose in any way to disregard the duties laid upon it by the United Nations Charter;

Whereas on the other hand, the Indian Government, whilst relying on these Articles in refusing to allow Portugal to exercise its right of passage, does not hesitate to declare that, in the event of the populations concerned opting in favour of the maintenance of Portuguese sovereignty, India would not be disposed to tolerate this (declaration made on 6 September 1955 by the Prime Minister of India before the Rajya Sabha—Observations on the Preliminary Objections, Annex I, Appendix 4, p. 16), which constitutes the very negation of the right of self-determination of peoples;

C. *As to the argument that the existence in the enclaves of a provisional* de facto *local government, which is not represented before the Court, debars the Court from adjudicating, in the present circumstances, on the Portuguese claim*

Whereas this argument can find no basis either in the Statute of the Court or in the declarations by which the Parties have accepted its compulsory jurisdiction; whereas these declarations contain a general undertaking, accompanied by certain reservations which are exclusively confined to those expressed, none of which relates to the contingency now contemplated by India;

Whereas, nevertheless, to justify its contention, India invokes the principle applied by the Court in its Judgment of 15 June 1954 in the case concerning *Monetary Gold removed from Rome;*

Whereas this is the principle which makes the jurisdiction of the Court dependent upon the consent of the States concerned; whereas this is indeed a fundamental principle which is manifestly embodied in the Statute; whereas, however, this principle is entirely irrelevant to the present case;

Whereas the Court is not called upon to adjudicate upon an international dispute to which the alleged *de facto* government of the enclaves is a party and in respect of which the Court cannot therefore exercise jurisdiction without that *de facto* government's consent;

Whereas it is not sufficient, to prevent the Court from exercising jurisdiction, that the dispute before it should interest a third party and that that third party should not be represented before the Court, even if that third party be a State;

Whereas, not only can the alleged *de facto* government of the enclaves not be regarded on any ground as the organ of a State but it does not even possess international legal personality;

Whereas it constitutes no more than a provisional *de facto* administration; and whereas such an administration possesses no legal personality on the international plane so long as that administration has not been recognized;

Whereas, furthermore, the legal personality acquired by it in the event of recognition exists only to the extent that such recognition has granted it;

Whereas the Government of India purports to have recognized the present administration of the enclaves as a provisional *de facto* administration, but whereas this declaration, made for the first time in the Counter-Memorial, is incompatible with the declaration which appears at paragraph 16 of the Preliminary Objections to the effect that the Government of India had not up to that time had any relations with that administration; whereas the alleged recognition was therefore subsequent to the filing of the Preliminary Objections (April 1957); whereas it was even subsequent to the oral argument which took place before the Court on those Preliminary Objections from 23 September to 11 October 1957;

Whereas this alleged recognition would be an implicit recognition; whereas it would only have been given external manifestation—apart from the assertions made in the Counter-Memorial and in the Rejoinder—by contacts with local officials with regard to such day-to-day matters of administration as police, posts, transport, etc.—which contacts are expressed to have been limited to the indispensable minimum (Counter-Memorial, paragraph 353);

Whereas it is difficult to confer upon such contacts the status of recognition;

Whereas that recognition, on the assumption that it was given, could only have an extremely limited legal scope; whereas its effects would be limited to India's relations with the local administration in the matters for which these contacts were made; whereas such recognition can certainly not be invoked as against Portugal and cannot in any way affect either Portugal's right of passage or the jurisdiction of the Court in the dispute which has been regularly brought before it;

Whereas, furthermore, this alleged recognition would only follow from a change in India's intentions after the argument of the Preliminary Objections, and whereas a party to a dispute is certainly not entitled to modify during the course of the proceedings and to the detriment of the other party, by a mere manifestation of will, the conditions in which the dispute presents itself;

Whereas therefore viewed from any angle, the argument that the Court is prevented in the present case from discharging the judicial function conferred upon it, on the pretext that the Court is not open to the provisional *de facto* administration of the enclaves, must be rejected as devoid of foundation;

D. *As to the argument that the exercise of the right of passage by Portugal would involve, under the present circumstances, grave dangers to India's public order and that India is therefore entitled to oppose it*

Whereas this argument is independent of the assertion that the events which occurred in the enclaves amounted to an insurrection of the local population; whereas this argument is based solely on India's right to preserve its internal order and on the existence of a danger which is said seriously to threaten that order;

Whereas, as appears from paragraph 388 of the Reply, if by reason of exceptional circumstances at any given moment the passage of Portuguese armed forces over the few kilometres of road which lead from Daman to the enclaves should really appear likely seriously to disturb the public order of India, by provoking acts of violence on its territory, Portugal would agree that passage should be temporarily suspended, to the extent necessary for the preservation of India's public order;

Whereas the issue is therefore whether the aforementioned conditions which must be satisfied for a suspension of the passage of armed forces have in fact been fulfilled;

Whereas India confines itself to the expression in this connection of certain apprehensions the basis for which has not been established;

Whereas India invokes the risk that the so-called insurgents might push back on to its territory any elements of the Portuguese public forces sent to the enclaves to restore order there;

Whereas, however, India can easily protect itself against this contingency; whereas it undeniably has at its disposal the means to do so; whereas its internal order could only be exposed to the danger it refers to if it refrained from utilizing these means;

Whereas it is the more difficult to agree, in these circumstances, that its argument has any validity, inasmuch as the prolongation of the prohibition of passage would have for Portugal consequences of obvious gravity which Portugal could not possibly avoid;

Whereas, if the Court should nevertheless be of opinion that, in the present circumstances, the passage of Portuguese armed forces should be suspended, as stated above, by reason of the danger it would represent for the internal order of India, it is obvious that this temporary suspension ought to end as soon as the danger justifying that suspension disappears;

Whereas, for its part, India would naturally have the duty not to take any measure which might consolidate the position of the adversaries of the lawful Government in the enclaves; whereas it is indeed inconceivable that India should take advantage of the suspension in order to further the aggravation or prolongation of the circumstances relied upon in support of that claim;

For these reasons,

May it please the Court

*(a)* to hold that the arguments of India set out above under A, B and C are without foundation;

*(b)* as to the argument of India set out above under D:

1. If the Court is of opinion that the above-mentioned conditions which must be satisfied to justify the suspension of the passage of Portuguese armed forces are not fulfilled,

To adjudge and declare

That India must end the measures by which it opposes the exercise of the right of passage of Portugal;

2. If the Court is of opinion that the above-mentioned conditions which must be satisfied to justify the suspension of the passage of Portuguese armed forces are fulfilled,

To adjudge and declare

That the said passage shall be temporarily suspended; but that this suspension shall end as soon as the course of events discloses that the justification for the suspension has disappeared;

That during such suspension, India must abstain from any measure which might strengthen the position of the adversaries of the lawful Government in the enclaves and thus provoke the aggravation or

prolongation of the circumstances relied upon in support of that suspension;

That there is no legitimate reason entitling India to ask that the other forms of the exercise of the right of passage should likewise be suspended.

### III.—*Submissions relating to the Preliminary Objections of India*

#### A. *As to the fifth objection*

Whereas the fifth of the Preliminary Objections raised by India was designed to secure a finding by the Court that the dispute is not within the Court's jurisdiction on the ground that it relates to a question which, according to international law, falls exclusively within the jurisdiction of India, and that the Declaration of 28 February 1940, by which India accepted the compulsory jurisdiction of the Court, excludes such disputes from the Court's jurisdiction;

Whereas, by its Judgment of 26 November 1957, the Court decided to join this objection to the merits;

Whereas it is clear from the arguments that Portugal's claim is based on international law; whereas all the titles relied upon in respect of that claim fall within the domain of international law; and whereas the validity of these titles has been fully established;

Whereas the question involved in this dispute is therefore certainly not a question which, according to international law, falls within the exclusive jurisdiction of India;

For these reasons,

May it please the Court

To dismiss the Objection.

#### B. *As to the sixth objection*

Whereas the sixth of the Preliminary Objections raised by India was designed to secure a finding by the Court that the dispute does not fall within the jurisdiction of the Court, by virtue of the reservation *ratione temporis* in the Declaration of 28 February 1940, under which India accepted the jurisdiction of the Court in respect of disputes 'arising after 5 February 1930, with regard to situations or facts subsequent to that date';

Whereas, by its Judgment of 26 November 1957, the Court decided to join this objection to the merits;

Whereas in the Preliminary Objections of the Indian Government this objection was solely based on the second part of the aforementioned reservation, that Government recognizing that the dispute was subsequent to 5 February 1930, whilst contending that it related to situations or facts prior to that date;

Whereas it was only in the course of the oral argument on the Preliminary Objections, in the Oral Reply of the Attorney-General of India (Oral Proceedings, pp. 213-221) that an objection based on the first part of the aforementioned reservation was raised, i.e. an objection based on the ground that the dispute allegedly arose before 5 February 1930;

Whereas, quite apart from this consideration, neither the objection based on the first part of the reservation nor the objection based on the second part of the reservation, can be accepted;

Whereas the dispute referred to the Court is in fact subsequent to 5 February 1930, since the dispute dates from 1954, the year in which the divergence of views, which constitutes the dispute, arose between the Portuguese Government and the Indian Government;

Whereas furthermore the situations or facts in respect of which the dispute arose are likewise subsequent to 5 February 1930, since they also date from 1954;

Whereas these situations or facts are really nothing but those giving rise to the dispute and, whereas one must regard as such the situations or facts imputed by the applicant State to the respondent State as unlawful, i.e. as constituting violations of the respondent State's international obligations;

Whereas the situations or facts which Portugal imputes to the Indian Union as unlawful also date from 1954, as has already been pointed out;

For these reasons,

May it please the Court

To dismiss the Objection."

*On behalf of the Government of India,*

in the Counter-Memorial:

"May it please the Court to declare that it has no jurisdiction to decide on the claim presented by the Portuguese Government, and, in the alternative, to declare the claim ill-founded."

As final Submissions filed on 21 October 1959:

"Having regard to the Submissions presented at the hearing of 6 October 1959 by the Agent for Portugal,

Whereas, by its Judgment of 26 November 1957, the Court joined to the merits the consideration of the Fifth and Sixth Preliminary Objections;

I.—*As to the Fifth Objection*

Whereas, if its examination of the merits should lead the Court to a finding that Portugal has not established the existence of the titles which she has invoked, and that these titles must accordingly be regarded as non-existent, it must follow that the question of the grant or refusal of the passage claimed over Indian territory falls exclusively within the domestic jurisdiction of India and that the dispute is outside the jurisdiction of the Court;

II.—*As to the Sixth Objection*

Whereas the Indian declaration of acceptance of the compulsory jurisdiction expressly provides that only disputes arising after 5 February 1930 and with regard to situations or facts subsequent to the same date may be submitted to the jurisdiction of the Court;

Whereas, according to the Submissions filed by the Agent for Portugal on 6 October 1959, and the explanations given in the course of the Oral Proceedings by Counsel for Portugal the object of the Portuguese claim is (1) recognition of the right which Portugal claims to possess to pass over Indian territory to the extent necessary for the exercise of her sovereignty over the enclaves of Dadra and Nagar-Aveli (2) a finding of India's failure to respect the obligation binding upon her as the result of that alleged right (3) an injunction to India that she should re-establish the right of passage or, in the alternative, in the event of its being found that the exercise of that right was rightfully suspended in respect of Portuguese armed forces, to limit the suspension in its scope and in its duration while refraining from consolidating the situation justifying that suspension;

Whereas the above-mentioned second and third objects of the claim are manifestly ancillary to the first, their consideration being subject to the existence of the right of passage defined under (1);

Whereas claims relating to the passage were raised by Portugal before 5 February 1930 and whereas the situation to which the titles now invoked by Portugal refer was repeatedly the subject of difficulties prior to 5 February 1930;

Whereas the dispute referred to the Court by Portugal accordingly fails to satisfy either of the two time conditions to which the Indian Union made its acceptance of the compulsory jurisdiction of the Court subject;

### III.—*On the merits*

#### A. *As to the right claimed and its basis*

Whereas the right claimed by Portugal has been presented as a right of passage relating to private persons and to goods as well as to official organs and armed troops, limited to the needs of the exercise of Portuguese sovereignty and subject to the restrictions and regulations prescribed by the Indian Union, the sovereign in the intermediate territory, without any claim by Portugal to any immunity;

Whereas the right as thus defined and the correlative obligation contain such contradiction and lack of precision that their judicial recognition would appear to be impossible;

whereas in particular the concept of the essential needs for the maintenance of Portuguese sovereignty does not provide the Parties with an objective criterion enabling them to arrive at a common appreciation or making it possible for some arbitral or judicial body to decide as between them in the event of a divergence of opinion;

whereas moreover it is difficult to see how such a concept of the requirements of sovereignty could lead to any right of passage for private persons and goods in whose favour the enjoyment of the right is however still claimed although the exercise of Portuguese sovereignty in the enclaves is manifestly paralysed;

whereas similarly the statement by Portugal that the right of passage claimed includes no immunity is incompatible with the

23   RIGHT OF PASSAGE OVER INDIAN TERRITORY (JUDGM. 12 IV 60)

character of a State organ which necessarily attaches to armed military forces under command passing through foreign territory;

whereas it is unimaginable that a right of passage can be recognized generally, even within the limits required by the needs of the applicant State, without any regard to the objections of the State through which passage is to be effected; whereas in the third part of her Submissions Portugal indeed recognizes that the interests of the State through which passage is to be effected entitle it sometimes to refuse to permit the exercise of the right claimed; whereas there is not however any trace of any such limitation in the definition proposed which must accordingly be rejected as unacceptable also on that ground;

Whereas it is self-evident that a right which is so contradictory and the content of which is so indeterminate and indeterminable can find no basis in any of the general or particular titles alleged by Portugal, that is to say, either in general custom, or in the principles of international law which can be derived therefrom, or in the general principles of law recognized by civilized States, or in particular agreements, or in local custom which, if it exists, must be assimilated to the particular agreements;

Whereas reliance has wrongly been placed upon the respect due to the sovereignty of Portugal in the enclaves;

whereas the sovereignty invoked is essentially territorial and does not in itself involve any right whatsoever upon Indian territory;

Whereas Portugal is equally unfounded in her reliance upon recognition of Portuguese sovereignty in the enclaves, either contained in a treaty of 1779 negotiated by Portugal with the Maratha Empire, or flowing from the attitude of the British or Indian Governments between 1818 and 1954;

Whereas the negotiations of 1779 never resulted in an agreement and whereas the draft treaty in contemplation in any event involved no transfer of sovereignty;

Whereas if it is true that sovereignty over the enclaves was subsequently usurped by Portugal, this could not give rise to any right of passage;

Whereas even if this were not the case it has been clearly established in the written proceedings that recognition of the fact of Portuguese sovereignty was never at any time accompanied by recognition of any obligations whatsoever with regard to the alleged right of passage;

whereas from 1818 to 1954 the Governments of Great Britain or of India granted or refused passage as they saw fit;

whereas the particular agreements concluded on this subject with Portugal in 1819, 1844, 1861, 1879, 1893, 1913, 1920 and 1940 were concluded for a short period, or were revocable, their content being always limited and very far removed from the definition of the right now proposed by Portugal;

whereas it accordingly appears that apart from the brief periods during which these agreements were in force Great Britain and India retained in respect of passage a discretionary competence without any sort of limitation;

whereas the course thus adopted by Great Britain and by India in no way diverged from the usual practice followed by the Governments of other States having foreign enclaves within their territory;

Whereas, far from revealing the existence of a general customary rule in conformity with the claims of Portugal relating to a right of passage, an examination of the practice followed, and in particular of the agreements which have been concluded on this subject, establishes the categorical refusal of States to be bound by formal undertakings either with regard to the transit of goods where the enclave is included within the customs regime of the State through which passage is to be effected, or with regard to the transit of armed forces at least where those forces exceed a given number, or where the passage is designed to prevent or to put down political, social or economic disturbances.

B. *As to the violation of the alleged right in July-August 1954*

Whereas the non-existence of the right claimed is sufficient in law to dispose of the complaint of its violation;

Whereas the Indian Union however desires indignantly to reject the accusation of having used its discretionary competence, in respect of the passage of Portuguese troops, to assist the overthrowing of Portuguese power in pursuance of annexationist designs;

Whereas the Indian Government and people have doubtless never concealed their desire that the Goans should be allowed to join the Union of Independent India to which they are attached ethnically and culturally, whereas however the Indian Government has always said with equal force that that reunion must be achieved without violence; whereas it is difficult to see why any different attitude should have been adopted with regard to the enclaves which are of negligible political and economic importance to India;

Whereas the restrictions imposed by India at the end of 1953 and the beginning of 1954 on the passage to the enclaves of Portuguese agents are fully explicable on the ground of the determination of the Government of New Delhi to answer the restrictive measures adopted by the Goan administration in respect of Indian nationals, by its concern not to assist the extension to the enclaves of the reign of terror brought into being in Goa by the Portuguese authorities to prevent and put down by violence any manifestation of Indian national sentiment, and by its decision to forbid passage over Indian territory to Portuguese officials who had demonstrated their contempt for the Asians;

Whereas Portugal likewise wrongly maintains that the Government of India must have foreseen the coup which occurred at Dadra on 22 July 1954;

whereas the manifesto of the Goan National Movement of 2 July which has been relied upon does not in fact contain the slightest indication to that effect and whereas the Portuguese authorities refrained from communicating to India any information gathered on this point by their intelligence services with regard to what was being prepared;

Whereas the liberation of Dadra was a matter of a few minutes only, whereas quite naturally it immediately gave rise to a great stirring of the people in the neighbouring enclave of Nagar-Aveli, but whereas in that enclave the insurgents encountered scarcely any resistance, the Portuguese authorities having decided on 1 August to evacuate the capital, Silvassa, and to withdraw into Indian territory 'to avoid an encounter';

Whereas once the liberation movement had been begun at Dadra, the Indian Union was entitled, both in accordance with the principle of international law of non-intervention and out of regard for the right of self-determination of peoples recognized by the Charter, to refuse the Portuguese authorities authorization for the passage of reinforcements assuming that any had been available;

Whereas finally it is not reasonably possible to describe the events which occurred in the enclaves as 'invasion' or foreign 'occupation', when the few individuals, who in fact came from outside to Dadra and Nagar-Aveli to support the liberation movement, were for the most part Goans, that is, the compatriots and the kith of the inhabitants, whereas the majority of these left the enclaves a few days after having entered them, whereas the independent administration which was then constituted and which has since functioned, is in large part composed of people born in the enclaves or who have for a long time resided there, and whereas the sympathies of the inhabitants for the nationalist movement had as early as 1931 and on diverse occasions since then been noted by the Portuguese administrators;

Whereas it follows from the considerations set out above that no complaint can be made against the Indian Union on the ground of the use it made of its discretionary competence in refusing passage over its territory to the agents of the Portuguese State in July 1954.

C. *As to the claim for an injunction*

Whereas this claim implies that since July/August 1954 the Indian Union has violated its international obligations relating to transit by refusing Portugal permission for the passage over Indian territory of the armed forces necessary to re-establish her authority in the enclaves;

Whereas the reasons indicated above in refutation of the accusation of violation in respect of the period July/August 1954 are sufficient to dispose of the complaint formulated with regard to the subsequent period;

Whereas moreover even if obligations with regard to passage had in the past been binding upon India, they should be regarded as having lapsed as a result of the change which has occurred in the

essential circumstances, in particular by reason of the formation at Silvassa of an independent local administration;

Whereas the existence and the stabilization of that administration can only have served to reinforce the propriety of the attitude of non-intervention adopted by India in the conflict between that administration and Portugal;

Whereas this fact is equally one which must hold the attention of the Court whose decision would run counter to the interests of justice if, without a hearing, it were to condemn to extinction the independent entity which has been constituted;

Whereas finally there can be no doubt that a restoration of the Portuguese power in the enclaves brought about by force of arms would encounter desperate resistance on the part of a population rejoicing in the political, economic, social and cultural progress which it has enjoyed for five years;

whereas the fighting to which such resistance would give rise could not fail to extend to the surrounding Indian territory, the population of which would feel solidarity with the resistance and whereas this would result in an undoubted threat to the internal order and external peace of the Indian Union;

Whereas this situation should in itself suffice according to the Submissions of Portugal themselves to bring about the rejection of the claim for an injunction;

D. *As to the alternative claim for an injunction*

Whereas in the absence of the re-establishment of the alleged right of passage relating to armed forces, Portugal claims:

*(a)* that the suspension of the alleged right be declared to be limited to the continuation of the situation justifying it;

*(b)* that India be prohibited from taking any action which might strengthen the position of the adversaries of the Portuguese regime in the enclaves,

*(c)* that the suspension of the alleged right of passage be limited to the armed forces,

Whereas none of these claims would appear to be justified;

*(a)* whereas in the event of the right of passage being recognized by the Court which should at the same time declare its exercise to be suspended, it is difficult to see any point in accepting the temporary character of that situation since it would appear to be impossible to foresee and to define the various events capable of putting an end to it;

*(b)* whereas it would likewise appear to be inadmissible to seek by means of a judicial decision to prevent in perpetuity any evolution of the situation in a sense unfavourable to the restoration of the Portuguese regime or to regulate the relationships which the Indian Union inevitably has with the population and the administration of enclaves integrated in its economic system;

*(c)* whereas finally the concern manifested by Portugal with regard to the passage of private persons and of goods—more than ever unconnected with the exercise of a sovereignty recognized to be

paralysed—would appear to be all the less justified inasmuch as the regulation of the passage of goods has not undergone any change and that the passage of private persons encounters no impediment save those brought about by the Portuguese authorities at Daman.

For these reasons and all others advanced in the pleadings and oral arguments submitted by the Indian Union

May it please the Court

To hold that it is without jurisdiction

In the alternative

to hold that the claim is unfounded."

\* \* \*

The present dispute was referred to the Court by an Application filed on 22 December 1955.

In that Application the Government of the Portuguese Republic states that the territory of Portugal in the Indian Peninsula is made up of the three districts of Goa, Daman and Diu. It adds that the district of Daman comprises, in addition to its littoral territory, two parcels of territory completely surrounded by the territory of India which constitute enclaves: Dadra and Nagar-Aveli. It is in respect of the communications between these enclaves and Daman and between each other that the question arises of a right of passage in favour of Portugal through Indian territory, and of a correlative obligation binding upon India. The Application states that in July 1954, contrary to the practice hitherto followed, the Government of India, in pursuance of what the Application calls "the open campaign which it has been carrying on since 1950 for the annexation of Portuguese territories", prevented Portugal from exercising this right of passage. This denial by India having been maintained, it has followed, according to the Application, that the enclaves of Dadra and Nagar-Aveli have been completely cut off from the rest of the Portuguese territory, the Portuguese authorities thus being placed in a position in which it became impossible for them to exercise Portuguese rights of sovereignty there.

It is in that situation, and in order to secure a remedy therefor, that Portugal has referred the matter to the Court.

\* \* \*

The questions submitted to the Court have been argued at length by the Parties in the course of the proceedings. Their final formulation is to be found in the Submissions by which each of the Parties has stated what it asks the Court to adjudge and declare.

Since Portugal is the Applicant, it is in its Submissions that the formulation of the claims on which the Court must adjudicate is to be sought. Furthermore, subject to what will be said with regard

to the jurisdiction of the Court, India has confined itself in its Submissions on the merits to adopting the negative position of requesting the Court "to hold that the claim is unfounded".

<div align="center">*   *   *</div>

The Submissions presented by Portugal in the Application request the Court in the first place "To recognize and declare that Portugal is the holder or beneficiary of a right of passage", the characteristics of which are set forth. In the course of the proceedings stress was laid by both Parties on the importance of this claim and the answer to be given to it.

This claim was repeated in the Submissions filed on 6 October 1959 on behalf of the Government of Portugal. The Court was there asked:

> "To adjudge and declare
>
> That the right of passage between the enclaves of Dadra and Nagar-Aveli and between these enclaves and the coastal district of Daman, as defined above, is a right possessed by Portugal and which must be respected by India."

Thus formulated, the claim reveals both the right claimed by Portugal and the correlative obligation binding upon India.

But, as thus formulated, the claim requires clarification of its subject-matter, since it contains a reference to the grounds relied upon in its support. It is clear from this reference that the right of passage is invoked by Portugal "only to the extent necessary for the exercise of Portuguese sovereignty over the enclaves". It is not contended that passage is accompanied by any immunity in favour of those who effect it. It is made clear that such passage remains subject to the regulation and control of India, which must be exercised in good faith, India being under an obligation not to prevent the transit necessary for the exercise of Portuguese sovereignty over the enclaves.

The Court must adjudicate upon the claim as thus presented, stating whether the right invoked by Portugal is or is not a right possessed by that State. But with reference to what date must the Court ascertain whether the right invoked by Portugal exists or does not exist?

If the date selected is the eve of the events of 1954 which brought about a new situation which has since prevented the exercise by Portugal of its authority in the enclaves without, however, having substituted therefor that of India, the factors relevant for the guidance of the Court in its decision will be those existing on the eve of those events. If, on the other hand, the issue is viewed as it stands at the date of the present Judgment, it will be necessary to take into account—whatever may be their weight—the argu-

ments of India designed to establish that the right of passage, assuming it to have existed previously, came to an end as a result of the events of 1954 and has lapsed in the present circumstances.

Portugal has not indicated which date is the relevant one in this connection and, having regard to its silence on the point, the inclination might be to regard as the relevant date that of the Application or that of the Judgment. But this would fail to take into account the circumstances in which the question of the existence of a right of passage was put to the Court.

That question was put to the Court in respect of the dispute which has arisen between India and Portugal with regard to obstacles placed by India in the way of passage. Portugal—and this was the immediate purpose of the Application—sought a finding as to the character, in its opinion unlawful, of these obstacles. It was in support of this contention that it invoked its right of passage and asked the Court to declare the existence of that right. This being so, it is the eve of the creation of these obstacles that must be selected as the standpoint from which to ascertain whether or not Portugal possessed such a right.

This will leave open the arguments of India regarding the subsequent lapse of the right of passage and of the correlative obligation. It is in connection with what may have to be decided, not as to the past, but as to the present and the future, that these arguments may, if such questions arise, be taken into consideration.

Accordingly the first question with regard to which the Submissions of Portugal call upon the Court to decide is whether, on the eve of the events which occurred at Dadra and at Nagar-Aveli in 1954, Portugal had a right of passage over the territory of India to the extent necessary for the exercise of Portuguese sovereignty over the enclaves, which right was subject to the regulation and control of India.

Portugal asks the Court to hold that it had this right. India asks it to hold that the claim is unfounded.

\* \* \*

To this first claim Portugal adds two others, though these are conditional upon a reply, wholly or partly favourable, to the first claim, and will lose their purpose if the right alleged is not recognized. The formulation of these two claims, also, is to be sought in the Submissions filed on behalf of Portugal on 6 October 1959.

Portugal asks the Court in the first place:

"To adjudge and declare

That India has not complied with the obligations incumbent upon it by virtue of Portugal's right of passage."

This claim specifically refers to the obligations devolving upon India as a result of Portugal's right of passage, and for this reason

it must be considered and decided by the Court, if the Court recognizes the said right of passage.

However, the grounds set forth in support of this claim include certain considerations which go beyond its subject-matter. Reference is made to the circumstances in which the alleged breach is said to have occurred. Mention is made of the events leading to the overthrow of Portuguese authority at Dadra and Nagar-Aveli in July and August 1954 brought about, in particular, by the action of elements coming from Indian territory. In this connection allusion is made to India's failure to respect the obligation, said to be binding on it under general international law, to adopt suitable measures to prevent the incursion of subversive elements into the territory of another State. With regard to the events of July 1954, it is stated among the grounds in support of the Portuguese Submissions that "the threat of action directed against the Portuguese territories of India could not be a matter of which the Indian Government was unaware"; that "it was clearly incumbent upon the Indian Government to take the measures which lay in its power to prevent the realization of such a design"; that "the Indian Government took no such measures"; that, following the public announcement of an expedition by the "United Front of Goans" against Nagar-Aveli, "the Indian Government took no step to prevent that second expedition"; and that, "so far from thus performing its duty towards Portugal, it firmly opposed all communications of Portugal with the enclaves". All this is stated, not merely to demonstrate in what circumstances India impeded or prohibited passage by Portugal, but also to demonstrate that, as well as failing to respect its special obligation in the matter of passage, India was in breach of a general obligation under international law; and the grounds in support of the Submissions make this clear by adding, after the description of the events of that time, that "the attitude adopted by India is thus in two respects contrary to the duty imposed upon it by international law, since instead of protecting Portugal against the unlawful enterprise with which the latter was threatened, it placed Portugal in a situation in which it was impossible for that State to defend itself against that enterprise".

In terms much more definite even than the above, Counsel for Portugal, speaking at the hearing of 29 October 1959, accused India of failure to fulfil its international obligations by tolerating on its territory enterprises directed against Portuguese authority at Dadra, and later at Nagar-Aveli. India denied this and, more particularly in the grounds set forth in answer to Portugal's second Submission, "indignantly" rejects the accusation thus brought against it, and explains what course it actually followed.

The Court is not required to deal with this issue, for it has not been asked, either in the Application or in the final Submissions of the Parties, to decide whether or not India's attitude towards those who instigated and brought about the events which occurred in

1954 at Dadra and Nagar-Aveli constituted a breach of its obligations under international law. The Court is only asked to adjudicate upon the compatibility of India's action with the obligations resulting from Portugal's right of passage. It is not asked to determine whether India's conduct was compatible with any other obligation alleged to be imposed upon it by international law.

This limitation derives from the very terms of the second claim advanced by Portugal.

\*   \*   \*

After setting forth these two claims, which refer, implicitly or explicitly, to the past—that is, to the legal situation as it existed in 1954 and to India's actions at that time—Portugal's Submissions follow the course adopted in the Application and the Memorial, but with greater complexity; they turn to the present and the future, requesting the Court to determine certain measures to be adopted in the event of a decision recognizing the right claimed by Portugal and finding that India has committed a breach of its correlative obligation. In this connection the Application and the Memorial had merely sought respectively a decision by the Court, and a call by the Court to India, designed to secure the termination of the unlawful state of affairs resulting from India's alleged infringement of Portugal's right. In the Submissions filed on behalf of the Government of Portugal on 6 October 1959, this claim is put forward in an alternative form depending upon whether or not the Court holds that there should be a temporary suspension of the right of passage. If the Court is not of opinion that there should be such a suspension, it is asked to decide "that India must end the measures by which it opposes the exercice of the right of passage of Portugal". If the Court is of opinion that there should be a temporary suspension of the right of passage, it is asked to hold now that "this suspension shall end as soon as the course of events discloses that the justification for the suspension has disappeared".

Before putting forward its third claim, Portugal raised another point. It invited the Court "to hold that the arguments of India ... are without foundation" on three points. These are arguments selected from the contentions by which India opposes the claims made by Portugal regarding the decision it seeks as to the future effect of the right of passage. These arguments relate to:

(1) "India's right to adopt an attitude of neutrality in the conflict between the lawful Government and the alleged insurgents";

(2) "The application of the provisions of the United Nations Charter relating to human rights and to the right of self-determination of peoples";

(3) The bar constituted by "the existence in the enclaves of a ... local government which is not represented before the Court" to

the Court's "adjudicating, in the present circumstances, on the Portuguese claim".

It goes without saying that the Court would take such arguments into consideration in the reasons for its Judgment if it regarded any of them as likely to assist it in arriving at the decision it is called upon to take. But it is no part of the judicial function of the Court to declare in the operative part of its Judgment that any of those arguments is or is not well-founded.

\* \* \*

Before proceeding to the consideration of the merits, the Court must ascertain whether it has jurisdiction to do so, a jurisdiction which India has expressly contested.

Following upon the Application instituting proceedings by Portugal filed on 22 December 1955, the Court was seised of six preliminary objections raised by the Government of India. By a Judgment given on 26 November 1957 the Court rejected four of them and joined to the merits the two others, by which the Government of India continued to dispute the jurisdiction of the Court to deal with the present case.

The Court has first to adjudicate upon these two objections, which, as originally submitted, constituted the Fifth and Sixth Preliminary Objections.

\* \* \*

In its Fifth Preliminary Objection the Government of India relied upon the reservation which forms part of its Declaration of 28 February 1940 accepting the jurisdiction of the Court and which excludes from that jurisdiction disputes with regard to questions which by international law fall exclusively within the jurisdiction of India. The Government of India argues that on that score the present dispute is outside the jurisdiction of the Court.

In support of its challenge of the jurisdiction the Government of India contended, in the grounds in support of its Submissions of 21 October 1959, that:

> "if its examination of the merits should lead the Court to a finding that Portugal has not established the existence of the titles which she has invoked, and that these titles must accordingly be regarded as non-existent, it must follow that the question of the grant or refusal of the passage claimed over Indian territory falls exclusively within the domestic jurisdiction of India...".

That statement admits of no dispute, but it cannot be inferred therefrom, as the Indian Government does, that the Court has no jurisdiction, since the statement proceeds from a finding by the Court that the titles invoked by Portugal are invalid. The Court

30

can only arrive at that finding after first establishing its competence to examine the validity of these titles.

In the present case Portugal is claiming a right of passage over Indian territory. It asserts the existence of a correlative obligation upon India. It asks for a finding that India has failed to fulfil that obligation. In support of the first two claims it invokes a Treaty of 1779, of which India contests both the existence and the interpretation. Portugal relies upon a practice of which India contests not only the substance, but also the binding character as between the two States which Portugal seeks to attach to it. Portugal further invokes international custom and the principles of international law as it interprets them. To contend that such a right of passage is one which can be relied upon as against India, to claim that such an obligation is binding upon India, to invoke, whether rightly or wrongly, such principles is to place oneself on the plane of international law. Indeed, in the course of the proceedings both Parties took their stand upon that ground and on occasion expressly said so. To decide upon the validity of those principles, upon the existence of such a right of Portugal as against India, upon such obligation of India towards Portugal, and upon the alleged failure to fulfil that obligation, does not fall exclusively within the jurisdiction of India.

The Fifth Objection cannot therefore be upheld.

\*   \*   \*

The Sixth Preliminary Objection by which India has challenged the jurisdiction of the Court likewise relates to a limitation of India's acceptance of the jurisdiction of the Court, as set out in its Declaration of 28 February 1940.

By the terms of that Declaration India accepted the jurisdiction of the Court "over all disputes arising after February 5th, 1930, with regard to situations or facts subsequent to the same date". India contends that the present dispute does not satisfy either of the two conditions stated and that the Court is therefore without jurisdiction.

In order to form a judgment as to the Court's jurisdiction it is necessary to consider what is the subject of the dispute.

A passage in the Application headed "Subject of the Dispute" indicates that subject as being the conflict of views which arose between the two States when, in 1954, India opposed the exercise of Portugal's right of passage. If this were the subject of the dispute referred to the Court, the challenge to the jurisdiction could not be sustained. But it appeared from the Application itself and it was fully confirmed by the subsequent proceedings, the Submissions of the Parties and statements made in the course of the hearings, that the dispute submitted to the Court has a threefold subject:

34    RIGHT OF PASSAGE OVER INDIAN TERRITORY (JUDGM. 12 IV 60)

(1) The disputed existence of a right of passage in favour of Portugal;

(2) The alleged failure of India in July 1954 to comply with its obligations concerning that right of passage;

(3) The redress of the illegal situation flowing from that failure.

The dispute before the Court, having this three-fold subject, could not arise until all its constituent elements had come into existence. Among these are the obstacles which India is alleged to have placed in the way of exercise of passage by Portugal in 1954. The dispute therefore as submitted to the Court could not have originated until 1954. Thus it satisfies the time-condition to which the Declaration of India made its acceptance of the jurisdiction of the Court subject.

Even if we consider only the part of the dispute relating to the Portuguese claim, which India contests, to a right of passage over Indian territory, the position is the same. It is clear from the material placed before the Court that before 1954, passage was effected in a way recognized as acceptable to both sides. Certain incidents occurred, but they did not lead the Parties to adopt clearly-defined legal positions as against each other. The "conflict of legal views" between Parties which the Permanent Court of International Justice in the case of the *Mavrommatis Palestine Concessions* (Series A, No. 2, p. 11) includes in its definition of a dispute had not yet arisen. This is clear in particular from statements made by Counsel for India at the hearings of 15 October and 3 November, and by Counsel for Portugal at the hearing of 28 October 1959.

Accordingly there is no justification for saying that the dispute before the Court arose before 5 February 1930. There is not therefore, so far as the date of the birth of the dispute is concerned, any bar to the jurisdiction of the Court.

But India further contends that the dispute is one with regard to facts and situations prior to that date and that this takes it outside the jurisdiction of the Court.

On the point here under consideration, the Declaration of 28 February 1940, by which India has accepted the jurisdiction of the Court, does not proceed on the principle of excluding from that acceptance any given disputes. It proceeds in a positive manner on the basis of indicating the disputes which are included within that acceptance. By its terms, the jurisdiction of the Court is accepted "over all disputes arising after February 5th, 1930, with regard to situations or facts subsequent to the same date".

In accordance with the terms of the Declaration, the Court must hold that it has jurisdiction if it finds that the dispute submitted to it is a dispute with regard to a situation subsequent to 5 February 1930 or is one with regard to facts subsequent to that date.

32

The facts or situations to which regard must be had in this connection are those with regard to which the dispute has arisen or, in other words, as was said by the Permanent Court in the case concerning the *Electricity Company of Sofia and Bulgaria*, only "those which must be considered as being the source of the dispute", those which are its "real cause". The Permanent Court, in this connection, was unwilling to regard as such an earlier arbitral award which was the source of the rights claimed by one of the Parties, but which had given rise to no difficulty prior to the facts constituting the subject of the dispute. "It is true", it said, "that a dispute may presuppose the existence of some prior situation or fact, but it does not follow that the dispute arises in regard to that situation or fact." (Series A/B, No. 77, p. 82.) The Permanent Court thus drew a distinction between the situations or facts which constitute the source of the rights claimed by one of the Parties and the situations or facts which are the source of the dispute. Only the latter are to be taken into account for the purpose of applying the Declaration accepting the jurisdiction of the Court.

The dispute submitted to the Court is one with regard to a situation and, at the same time, with regard to certain facts: on the one hand there is the situation of the Portuguese enclaves within the territory of India, which gave rise to the need for a right of passage for Portugal and to its claim to such a right; on the other hand there are the facts of 1954 which Portugal advances as showing the failure of India to comply with its obligations, infringements of that right.

Up to 1954 the situation of those territories may have given rise to a few minor incidents, but passage had been effected without any controversy as to the title under which it was effected. It was only in 1954 that such a controversy arose and the dispute relates both to the existence of a right of passage to go into the enclaved territories and to India's failure to comply with obligations which, according to Portugal, were binding upon it in this connection. It was from all of this that the dispute referred to the Court arose; it is with regard to all of this that the dispute exists. This whole, whatever may have been the earlier origin of one of its parts, came into existence only after 5 February 1930. The time-condition to which acceptance of the jurisdiction of the Court was made subject by the Declaration of India is therefore complied with.

A finding that the Court has jurisdiction in this case will not involve giving any retroactive effect to India's acceptance of the compulsory jurisdiction, an effect against which the Permanent Court, in the *Phosphates in Morocco* case, sought to utter a warning as one which would be in conflict with the intention which led to such acceptance (Series A/B, No. 74, p. 24). The Court indeed will only have to pass upon the existence of the right claimed by Portugal as at July 1954, upon the alleged failure of India to comply with its obligations at that time and upon any redress in respect of

such a failure. The Court has not been asked for any finding whatsoever with regard to the past prior to 5 February 1930.

It would be idle to argue that the contentions put forward with regard to the existence of a right of passage would, if that question had been argued before 1930, have been the same as when it is today. Apart from the fact that that consideration relates only to a part of the present dispute, it overlooks the fact that the condition to which the Court's jurisdiction is subject does not relate to the nature of the arguments susceptible of being advanced. The fact that a treaty, of greater or lesser antiquity, that a rule of international law, established for a greater or lesser period, are invoked, is not the yardstick for the jurisdiction of the Court according to the Indian Declaration. That Declaration is limited to the requirement that the dispute shall concern a situation or facts subsequent to 5 February 1930: the present dispute satisfies that requirement.

The Court is therefore of opinion that the Sixth Objection should not be upheld and, consequently, it is of opinion that it has jurisdiction to deal with the present dispute.

\* \* \*

The Court will now proceed to consider the merits.

It follows from what has been indicated above, that the Court has only three questions to consider on the merits:

(1) The existence in 1954 of a right of passage in Portugal's favour to the extent necessary for the exercise of its sovereignty over the enclaves, exercise of that right being regulated and controlled by India;

(2) Failure by India in 1954 to fulfil its obligation in regard to that right of passage;

(3) In the event of a finding of such failure, the remedy for the resulting unlawful situation.

Portugal claims a right of passage between Daman and the enclaves, and between the enclaves, across intervening Indian territory, to the extent necessary for the exercise of its sovereignty over the enclaves, subject to India's right of regulation and control of the passage claimed, and without any immunity in Portugal's favour. It claims further that India is under obligation so to exercise its power of regulation and control as not to prevent the passage necessary for the exercise of Portugal's sovereignty over the enclaves.

India contends that the right claimed by Portugal is too vague and contradictory to enable the Court to pass judgment upon it by the application of the legal rules enumerated in Article 38 (1) of the Statute. Portugal answers that the right which it claims is definite enough for determination on the basis of international law, and that all that the Court is called upon to do is to declare the existence

of the right in favour of Portugal, leaving its actual exercise to be regulated and adjusted between the Parties as the exigencies of the day-to-day situation might require.

India argues that the vague and contradictory character of the right claimed by Portugal is proved by Portugal's admission that on the one hand the exercise of the right is subject to India's regulation and control as the territorial sovereign, and that on the other hand the right is not accompanied by any immunity, even in the case of the passage of armed forces.

There is no doubt that the day-to-day exercise of the right of passage as formulated by Portugal, with correlative obligation upon India, may give rise to delicate questions of application, but that is not, in the view of the Court, sufficient ground for holding that the right is not susceptible of judicial determination with reference to Article 38 (1) of the Statute. The Court is satisfied that the right of passage claimed by Portugal has, in the circumstances, been defined with sufficient precision to enable the Court to pass upon it.

\* \* \*

In support of its claim, Portugal relies on the Treaty of Poona of 1779 and on *sanads* (decrees), issued by the Maratha ruler in 1783 and 1785, as having conferred sovereignty on Portugal over the enclaves with the right of passage to them.

India objects on various grounds that what is alleged to be the Treaty of 1779 was not validly entered into and never became in law a treaty binding upon the Marathas. The Court's attention has, in this connection, been drawn *inter alia* to the divergence between the different texts of the Treaty placed before the Court and to the absence of any text accepted as authentic by both parties and attested by them or by their duly authorized representatives. The Court does not consider it necessary to deal with these and other objections raised by India to the form of the Treaty and the procedure by means of which agreement upon its terms was reached. It is sufficient to state that the validity of a treaty concluded as long ago as the last quarter of the eighteenth century, in the conditions then prevailing in the Indian Peninsula, should not be judged upon the basis of practices and procedures which have since developed only gradually. The Marathas themselves regarded the Treaty of 1779 as valid and binding upon them, and gave effect to its provisions. The Treaty is frequently referred to as such in subsequent formal Maratha documents, including the two *sanads* of 1783 and 1785, which purport to have been issued in pursuance of the Treaty. The Marathas did not at any time cast any doubt upon the validity or binding character of the Treaty.

35

India contends further that the Treaty and the two *sanads* of 1783 and 1785 taken together did not operate to transfer sovereignty over the assigned villages to Portugal, but only conferred upon it, with respect to the villages, a revenue grant of the value of 12,000 rupees per annum called a *jagir* or *saranjam*.

Article 17 of the Treaty is relied upon by Portugal as constituting a transfer of sovereignty. From an examination of the various texts of that article placed before it, the Court is unable to conclude that the language employed therein was intended to transfer sovereignty over the villages to the Portuguese. There are several instances on the record of treaties concluded by the Marathas which show that, where a transfer of sovereignty was intended, appropriate and adequate expressions like cession "in perpetuity" or "in perpetual sovereignty" were used. The expressions used in the two *sanads* and connected relevant documents establish, on the other hand, that what was granted to the Portuguese was only a revenue tenure called a *jagir* or *saranjam* of the value of 12,000 rupees a year. This was a very common form of grant in India and not a single instance has been brought to the notice of the Court in which such a grant has been construed as amounting to a cession of territory in sovereignty.

It is argued that the Portuguese were granted authority to put down revolt or rebellion in the assigned villages and that this is an indication that they were granted sovereignty over the villages. The Court does not consider that this conclusion is well-founded. If the intention of the Marathas had been to grant sovereignty over the villages to the Portuguese, it would have been unnecessary for the grant to recite that the future sovereign would have authority to quell a revolt or rebellion in his own territory. In the context in which this authorization occurs, it would appear that the intention was that the Portuguese would have authority on behalf of the Maratha ruler and would owe a duty to him to put down any revolt or rebellion in the villages against his authority.

It therefore appears that the Treaty of 1779 and the *sanads* of 1783 and 1785 were intended by the Marathas to effect in favour of the Portuguese only a grant of a *jagir* or *saranjam,* and not to transfer sovereignty over the villages to them.

Having regard to the view that the Court has taken of the character of the Maratha grant in favour of the Portuguese, the situation during the Maratha period need not detain the Court further in its consideration of Portugal's claim of a right of passage to and from the enclaves. During the Maratha period sovereignty over the villages comprised in the grant, as well as over the intervening territory between coastal Daman and the villages, vested in the Marathas. There could, therefore, be no question of any enclave or of any right of passage for the purpose of exercising sovereignty over enclaves. The fact that the Portuguese had access to the villages

for the purpose of collecting revenue and in pursuit of that purpose exercised such authority as had been delegated to them by the Marathas cannot, in the view of the Court, be equated to a right of passage for the exercise of sovereignty.

\* \* \*

It is clear from a study of the material placed before the Court that the situation underwent a change with the advent of the British as sovereign of that part of the country in place of the Marathas. The British found the Portuguese in occupation of the villages and exercising full and exclusive administrative authority over them. They accepted the situation as they found it and left the Portuguese in occupation of, and in exercise of exclusive authority over, the villages. The Portuguese held themselves out as sovereign over the villages. The British did not, as successors of the Marathas, themselves claim sovereignty, nor did they accord express recognition of Portuguese sovereignty, over them. The exclusive authority of the Portuguese over the villages was never brought in question. Thus Portuguese sovereignty over the villages was recognized by the British in fact and by implication and was subsequently tacitly recognized by India. As a consequence the villages comprised in the Maratha grant acquired the character of Portuguese enclaves within Indian territory.

For the purpose of determining whether Portugal has established the right of passage claimed by it, the Court must have regard to what happened during the British and post-British periods. During these periods, there had developed between the Portuguese and the territorial sovereign with regard to passage to the enclaves a practice upon which Portugal relies for the purpose of establishing the right of passage claimed by it.

With regard to Portugal's claim of a right of passage as formulated by it on the basis of local custom, it is objected on behalf of India that no local custom could be established between only two States. It is difficult to see why the number of States between which a local custom may be established on the basis of long practice must necessarily be larger than two. The Court sees no reason why long continued practice between two States accepted by them as regulating their relations should not form the basis of mutual rights and obligations between the two States.

As already stated, Portugal claims a right of passage to the extent necessary for the exercise of its sovereignty over the enclaves, without any immunity and subject to the regulation and control of India. In the course of the written and oral proceedings, the existence of the right was discussed with reference to the different categories making up the right, namely private persons, civil officials, goods in general, armed forces, armed police, and arms and

ammunition. The Court will proceed to examine whether such a right as is claimed by Portugal is established on the basis of the practice that prevailed between the Parties during the British and post-British periods in respect of each of these categories.

It is common ground between the Parties that the passage of private persons and civil officials was not subject to any restrictions, beyond routine control, during these periods. There is nothing on the record to indicate the contrary.

Goods in general, that is to say, all merchandise other than arms and ammunition, also passed freely between Daman and the enclaves during the periods in question, subject only, at certain times, to customs regulations and such regulation and control as were necessitated by considerations of security or revenue. The general prohibition of the transit of goods during the Second World War and prohibitions imposed upon the transit of salt and, on certain occasions, upon that of liquor and materials for the distillation of liquor, were specific measures necessitated by the considerations just referred to. The scope and purpose of each prohibition were clearly defined. In all other cases the passage of goods was free. No authorization or licence was required.

The Court, therefore, concludes that, with regard to private persons, civil officials and goods in general there existed during the British and post-British periods a constant and uniform practice allowing free passage between Daman and the enclaves. This practice having continued over a period extending beyond a century and a quarter unaffected by the change of regime in respect of the intervening territory which occurred when India became independent, the Court is, in view of all the circumstances of the case, satisfied that that practice was accepted as law by the Parties and has given rise to a right and a correlative obligation.

The Court therefore holds that Portugal had in 1954 a right of passage over intervening Indian territory between coastal Daman and the enclaves and between the enclaves, in respect of private persons, civil officials and goods in general, to the extent necessary, as claimed by Portugal, for the exercise of its sovereignty over the enclaves, and subject to the regulation and control of India.

As regards armed forces, armed police and arms and ammunition, the position is different.

It appears that during the British period up to 1878 passage of armed forces and armed police between British and Portuguese possessions was regulated on a basis of reciprocity. No distinction appears to have been made in this respect with regard to passage between Daman and the enclaves. There is nothing to show that passage of armed forces and armed police between Daman and the

41   RIGHT OF PASSAGE OVER INDIAN TERRITORY (JUDGM. 12 IV 60)

enclaves or between the enclaves was permitted or exercised as of right.

Paragraph 3 of Article XVIII of the Treaty of Commerce and Extradition of 26 December 1878 between Great Britain and Portugal laid down that the armed forces of the two Governments should not enter the Indian dominions of the other, except for the purposes specified in former Treaties, or for the rendering of mutual assistance as provided for in the Treaty itself, or in consequence of a formal request made by the Party desiring such entry. Subsequent correspondence between the British and Portuguese authorities in India shows that this provision was applicable to passage between Daman and the enclaves.

It is argued on behalf of Portugal that on twenty-three occasions during the years 1880-1889 Portuguese armed forces crossed British territory between Daman and the enclaves without obtaining permission. In this connection, it should be observed that on 8 December 1890 the Government of Bombay forwarded to the Government of Portuguese India a complaint to the effect that "armed men in the service of the Portuguese Government are in the habit of passing without formal request through a portion of the British Pardi *taluka* of Surat en route from Daman to Nagar Haveli and back again. It would appear that the provisions of Article XVIII of the Treaty are thus violated." In his letter of 22 December 1890 addressed to the Governor of Bombay, the Governor-General of Portuguese India stated: "On so delicate a subject I request leave to observe that Portuguese troops never cross British territory without previous permission", and went on to add: "For centuries has this practice been followed, whereby the treaties have been respected and due deference shown to the British Authorities." The statement that this practice concerning the passage of armed forces from the territory of one State to that of the other had continued over a long period even before the enclaves came into existence finds support, for instance, in a Treaty of 1741 between the Marathas and the Portuguese which contained the following provision: "A soldier of the *Sarkar* [Maratha ruler] entering the territory of Daman will do so only with the permission of the *Firangee* [Portuguese]. If a soldier of the *Firangee* were to enter the territory of the *Sarkar*, he will do so only with the permission of the *Sarkar*. There is no reason to enter without permission."

In consequence of the British complaint that passage of armed men between Daman and the enclaves took place in contravention of Article XVIII of the Treaty of 1878 and of the reply of the Governor-General of Portuguese India of 22 December 1890, a certain amount of further correspondence took place and the matter was concluded with the assurance contained in the letter of the Secretary-General of the Government of Portuguese India dated 1 May 1891, in which he stated: "His Excellency thanks you for the communication with regard to the circumstances in which the

39

42   RIGHT OF PASSAGE OVER INDIAN TERRITORY (JUDGM. 12 IV 60)

matter is placed, and requests me to state that on the part of this Government injunctions will be given for the strictest observance of the provisions of Article XVIII of the Anglo-Portuguese Treaty."

The Court is not concerned with the question whether any violation of the relevant provision of the Treaty in fact took place. Whether any such violation did or did not take place, the legal position with regard to the passage of armed forces between Daman and the enclaves appears clearly from this correspondence.

The requirement of a formal request before passage of armed forces could take place was repeated in an agreement of 1913.

With regard to armed police, the position was similar to that of armed forces. The Treaty of 1878 regulated the passage of armed police on the basis of reciprocity. Paragraph 2 of Article XVIII of the Treaty made provision for the entry of the police authorities of the parties into the territories of the other party for certain specific purposes, e.g., the pursuit of criminals and persons engaged in smuggling and contraband practices, on a reciprocal basis. An agreement of 1913 established an arrangement providing for a reciprocal concession permitting parties of armed police to cross intervening territory, provided previous intimation was given. An agreement of 1920 provided that armed police below a certain rank should not enter the territory of the other party without consent previously obtained.

An agreement of 1940 concerning passage of Portuguese armed police over the Daman-Silvassa (Nagar-Aveli) road provided that, if the party did not exceed ten in number, intimation of its passage should be given to the British authorities within twenty-four hours after passage had taken place, but that "If any number exceeding ten at a time are required so to travel at any time the existing practice should be followed and concurrence of the British authorities should be obtained by prior notice as heretofore."

Both with regard to armed forces and armed police, no change took place during the post-British period after India became independent.

It would thus appear that, during the British and post-British periods, Portuguese armed forces and armed police did not pass between Daman and the enclaves as of right and that, after 1878, such passage could only take place with previous authorization by the British and later by India, accorded either under a reciprocal arrangement already agreed to, or in individual cases. Having regard to the special circumstances of the case, this necessity for authorization before passage could take place constitutes, in the view of the Court, a negation of passage as of right. The practice predicates that the territorial sovereign had the discretionary power to withdraw or to refuse permission. It is argued that permission was always granted, but this does not, in the opinion of the Court, affect the legal position. There is nothing in the record

to show that grant of permission was incumbent on the British or on India as an obligation.

As regards arms and ammunition, paragraph 4 of Article XVIII of the Treaty of 1878 provided that the exportation of arms, ammunition or military stores from the territories of one party to those of the other "shall not be permitted, except with the consent of, and under rules approved of by, the latter".

Rule 7 A, added in 1880 to the rules framed under the Indian Arms Act of 1878, provided that "nothing in rules 5, 6, or 7 shall be deemed to authorize the grant of licences ... to import any arms, ammunition or military stores from Portuguese India, [or] to export to Portuguese India ... [such objects] ... except ... by a special licence". Subsequent practice shows that this provision applied to transit between Daman and the enclaves.

There was thus established a clear distinction between the practice permitting free passage of private persons, civil officials and goods in general, and the practice requiring previous authorization, as in the case of armed forces, armed police, and arms and ammunition.

The Court is, therefore, of the view that no right of passage in favour of Portugal involving a correlative obligation on India has been established in respect of armed forces, armed police, and arms and ammunition. The course of dealings established between the Portuguese and the British authorities with respect to the passage of these categories excludes the existence of any such right. The practice that was established shows that, with regard to these categories, it was well understood that passage could take place only by permission of the British authorities. This situation continued during the post-British period.

*     *     *

Portugal also invokes general international custom, as well as the general principles of law recognized by civilized nations, in support of its claim of a right of passage as formulated by it. Having arrived at the conclusion that the course of dealings between the British and Indian authorities on the one hand and the Portuguese on the other established a practice, well understood between the Parties, by virtue of which Portugal had acquired a right of passage in respect of private persons, civil officials and goods in general, the Court does not consider it necessary to examine whether general international custom or the general principles of law recognized by civilized nations may lead to the same result.

As regards armed forces, armed police and arms and ammunition, the finding of the Court that the practice established between the

44   RIGHT OF PASSAGE OVER INDIAN TERRITORY (JUDGM. 12 IV 60)

Parties required for passage in respect of these categories the permission of the British or Indian authorities, renders it unnecessary for the Court to determine whether or not, in the absence of the practice that actually prevailed, general international custom or the general principles of law recognized by civilized nations could have been relied upon by Portugal in support of its claim to a right of passage in respect of these categories.

The Court is here dealing with a concrete case having special features. Historically the case goes back to a period when, and relates to a region in which, the relations between neighbouring States were not regulated by precisely formulated rules but were governed largely by practice. Where therefore the Court finds a practice clearly established between two States which was accepted by the Parties as governing the relations between them, the Court must attribute decisive effect to that practice for the purpose of determining their specific rights and obligations. Such a particular practice must prevail over any general rules.

\*     \*     \*

Having found that Portugal had in 1954 a right of passage over intervening Indian territory between Daman and the enclaves in respect of private persons, civil officials and goods in general, the Court will proceed to consider whether India has acted contrary to its obligation resulting from Portugal's right of passage in respect of any of these categories.

Portugal complains of the progressive restriction of its right of passage between October 1953 and July 1954. It does not, however, contend that India had, during that period, acted contrary to its obligation resulting from Portugal's right of passage. But Portugal complains that passage was thereafter denied to Portuguese nationals of European origin, whether civil officials or private persons, to native Indian Portuguese in the employ of the Portuguese Government, and to a delegation that the Governor of Daman proposed to send to Nagar-Aveli and Dadra.

It may be observed that the Governor of Daman was granted the necessary visas for a journey to and back from Dadra as late as 21 July 1954.

The events that took place in Dadra on 21-22 July 1954 resulted in the overthrow of Portuguese authority in that enclave. This created tension in the surrounding Indian territory. Thereafter all passage was suspended by India. India contends that this became necessary in view of the abnormal situation which had arisen in Dadra and the tension created in surrounding Indian territory.

On 26 July the Portuguese Government requested that delegates of the Governor of Daman (if necessary limited to three) should be

enabled to go to Nagar-Aveli in order to enter into contact with the population, examine the situation and take the necessary administrative measures on the spot. The request stated that if possible this delegation would also visit Dadra and examine the situation there. It mentioned that the delegation could be routed directly to Nagar-Aveli from Daman and need not necessarily pass through Dadra. The Government of India in its reply dated 28 July refused this request. The reply stressed *inter alia* the tension that prevailed in the intervening Indian territory, and went on to state:

> "This tension is bound to increase if Portuguese officials are permitted to go across Indian territory for the purposes mentioned in the note. The passage of these officials across Indian territory might also lead to other undesirable consequences in view of the strong feelings which have been aroused by the repressive actions of the Portuguese authorities. In these circumstances, therefore, the Government of India regret that they cannot entertain the demand of the Portuguese authorities for facilities to enable them to send a delegation from Daman to Dadra and Nagar-Aveli across Indian territory."

In view of the tension then prevailing in intervening Indian territory, the Court is unable to hold that India's refusal of passage to the proposed delegation and its refusal of visas to Portuguese nationals of European origin and to native Indian Portuguese in the employ of the Portuguese Government was action contrary to its obligation resulting from Portugal's right of passage. Portugal's claim of a right of passage is subject to full recognition and exercise of Indian sovereignty over the intervening territory and without any immunity in favour of Portugal. The Court is of the view that India's refusal of passage in those cases was, in the circumstances, covered by its power of regulation and control of the right of passage of Portugal.

For these reasons,

THE COURT,

by thirteen votes to two,

rejects the Fifth Preliminary Objection;

by eleven votes to four,

rejects the Sixth Preliminary Objection;

by eleven votes to four,

finds that Portugal had in 1954 a right of passage over intervening Indian territory between the enclaves of Dadra and Nagar-Aveli and the coastal district of Daman and between these enclaves, to the extent necessary for the exercise of Portuguese sovereignty over

the enclaves and subject to the regulation and control of India, in respect of private persons, civil officials and goods in general;

by eight votes to seven,

finds that Portugal did not have in 1954 such a right of passage in respect of armed forces, armed police, and arms and ammunition;

by nine votes to six,

finds that India has not acted contrary to its obligations resulting from Portugal's right of passage in respect of private persons, civil officials and goods in general.

Done in English and French, the English text being authoritative, at the Peace Palace, The Hague, this twelfth day of April, one thousand nine hundred and sixty, in three copies, one of which will be placed in the archives of the Court and the others transmitted to the Government of the Portuguese Republic and to the Government of the Republic of India, respectively.

*(Signed)*  Helge KLAESTAD,
President.

*(Signed)* GARNIER-COIGNET,
Deputy-Registrar.

The PRESIDENT and Judges BASDEVANT, BADAWI, KOJEVNIKOV and SPIROPOULOS append Declarations to the Judgment of the Court.

Judge WELLINGTON KOO appends to the Judgment of the Court a statement of his Separate Opinion.

Judges WINIARSKI and BADAWI append to the Judgment of the Court a statement of their Joint Dissenting Opinion. Judges ARMAND-UGON, MORENO QUINTANA and Sir Percy SPENDER and Judges *ad hoc* CHAGLA and FERNANDES append to the Judgment of the Court statements of their Dissenting Opinions.

*(Initialled)*  H. K.

*(Initialled)*  G.-C.

————————