# EXHIBIT 2



**Hilary Term**
**[2020] UKSC 5**
*On appeals from: [2018] EWCA Civ 1801*
*and [2019] EWHC 2401 (Comm)*

# JUDGMENT

# Micula and others (Respondents/Cross-Appellants) *v* Romania (Appellant/Cross-Respondent)

**before**

**Lady Hale**
**Lord Reed**
**Lord Hodge**
**Lord Lloyd-Jones**
**Lord Sales**

## JUDGMENT GIVEN ON

## 19 February 2020

**Heard on 18 June and 7, 8 and 9 October 2019**

| | |
|---|---|
| *Appellant/Cross-Respondent (Romania)*<br>Robert O'Donoghue QC<br>Gerard Rothschild<br>Emily MacKenzie<br>(Instructed by Thrings LLP) | *1ˢᵗ Respondent/Cross-Appellant*<br>Sir Alan Dashwood QC<br>Patrick Green QC<br>Jonathan Worboys<br>(Instructed by Croft Solicitors) |
| | *2ⁿᵈ-5ᵗʰ Respondents*<br>Marie Demetriou QC<br>Hugo Leith<br>(Instructed by White & Case LLP) |
| | *Intervener (European Commission)*<br>Nicholas Khan QC<br>(Instructed by the European Commission, assisted by Langleys Solicitors LLP) |

**Respondents/Cross-Appellants:-**
(1)     Mr Viorel Micula
(2)     Mr Ioan Micula
(3)     SC European Food SA
(4)     SC Starmill SRL
(5)     SC Multipack SRL

**LORD LLOYD-JONES AND LORD SALES: (with whom Lady Hale, Lord Reed and Lord Hodge agree)**

Introduction

1.      On 11 December 2013 an International Centre for Settlement of Investment Disputes ("ICSID") tribunal made a final investment arbitration award ("the Award") in favour of the Respondents to this appeal ("the Claimants") against the appellant ("Romania"). The Award related to investments made by the Claimants in food production in Romania prior to Romania's accession to the European Union on 1 January 2007.

2.      The present appeal is the latest chapter in the Claimants' extensive attempts in a number of different jurisdictions to enforce their award against Romania and the attempts of the European Commission ("the Commission") to prevent enforcement on the ground that it would infringe EU law prohibiting unlawful State aid. More specifically, this appeal arises out of Romania's application in the Commercial Court to set aside the registration of the Award or to stay enforcement pending the determination of the proceedings in the EU courts, and out of the Claimants' application in response for security in the amount of the Award.

Factual and procedural background

3.      The First and Second Claimants are brothers born in Romania who became Swedish nationals in 1995 and 1992 respectively, having renounced their Romanian nationality. The Third to Fifth Claimants are Romanian companies incorporated by the First and Second Claimants.

4.      In 1993 Romania entered into an association agreement with the European Community and the then 15 member states of that Community, which entered into force in 1995 ("the Europe Agreement"). The Europe Agreement included a provision on State aid and required Romania eventually to introduce State aid rules similar to the EC rules on State aid. The Europe Agreement further encouraged Romania to establish and improve a legal framework which favours and protects investment and to conclude agreements for the promotion and protection of investment.

5.      In 1997 to 1998 the Commission was of the view that Romania did not yet meet the criteria for EU membership and recommended, inter alia, that Romania

pursue rapid privatisation, secure foreign direct investment and engage in regional development.

6.    In 1999, in the context of attempting to develop its regional policy, Romania adopted an investment incentive scheme in the form of Emergency Government Ordinance No 24/1998 ("EGO 24"). With effect from 1 April 1999 the Ştei-Nucet region of Romania was designated as a disfavoured region for a ten-year period. The designation was later extended to include Drăgăneşti.

7.    On 30 June 1999 Romania adopted Law No 143/1999 incorporating State aid rules into domestic law and designating the Romanian Competition Council as the competent authority for authorising the grant of State aid. On 15 May 2000 the Romanian Competition Council issued Decision No 244/2000 declaring that certain facilities provided under EGO 24 distorted competition because they constituted incompatible State aid within the meaning of Law No 143/1999 and therefore had to be eliminated unless modified. On 16 June 2000 Romania passed Emergency Government Ordinance No 75/2000 which, with effect from 1 July 2000 modified but did not eliminate EGO 24. The Claimants do not accept that the Romanian Competition Council had authority to require the revocation of the schemes or that its decision followed from EU State aid rules.

8.    During the early 2000s, the Claimants, in reliance on the EGO 24 incentives (which required investments to be maintained for twice the period of the benefits received) invested in a large, highly integrated food production operation in that region as part of a ten-year business plan.

9.    In 2002 Romania and Sweden negotiated the Sweden-Romania Bilateral Investment Treaty on the Promotion and Reciprocal Protection of Investments ("the BIT"). The BIT entered into force on 1 April 2003. It provided for reciprocal protection of investments and included provision for investor-State dispute resolution under the Convention on the Settlement of Investment Disputes between States and Nationals of Other States ("the ICSID Convention"). Romania had ratified the ICSID Convention in 1975 and the United Kingdom had done so in 1966.

10.    During the formal accession negotiations between Romania and the EU from 2000 to 2004, the EU informed Romania that various Romanian government schemes, including the EGO 24 scheme, were not in line with the State aid rules of the *acquis communautaire*. The EU urged Romania to bring its schemes into alignment without delay. The EU in 2001 also invited Romania to identify existing schemes that Romania considered were compatible with the *acquis* and to provide information on the benefits of schemes to disfavoured regions. In a 2003 paper the EU proposed that Romania close existing schemes to new entrants.

11.     On 31 August 2004 Romania passed a Government Ordinance repealing all but one of the tax incentives provided in EGO 24 subject to certain transitional periods agreed with the EU with effect from 22 February 2005. The government report accompanying these measures indicated that the repeal was effected in order to meet the criteria in the Community rules on State aid and also facilitate completion of accession negotiations.

12.     On 28 July 2005 the Claimants filed a request for arbitration with ICSID under the terms of the BIT, claiming that the repeal of the EGO 24 incentives was a breach of the BIT. Romania contended that it was forced to revoke the incentives in order to comply with EU requirements and allow lawful accession by Romania to the EU. The Commission participated in the arbitration as *amicus*. Both Romania and the Commission submitted that any payment of compensation arising out of any award in the arbitration would constitute illegal State aid under EU law and render the award unenforceable in the EU.

13.     On 1 January 2007 Romania acceded to the EU.

14.     On 24 September 2008 the ICSID Tribunal dismissed Romania's objections on jurisdiction and admissibility and concluded that it had jurisdiction over the claims asserted by the Claimants.

15.     On 11 December 2013 the ICSID Tribunal issued the Award. It held that Romania had breached the terms of the BIT by failing to ensure fair and equitable treatment, respect the Claimants' legitimate expectations and act transparently. Compensation of RON 376,433,229 was awarded (approximately £70m at the time) plus interest to the date of the award of RON 424,159,150 (approximately £80m at the time) plus compound interest until satisfaction of the Award. The Tribunal declined to address in the Award the effect of the EU State aid rules on its enforceability.

16.     On 9 April 2014 Romania applied to annul the Award under the procedure set out in the ICSID Convention and to suspend its enforcement pending a decision on that application.

17.     Following Romania purportedly implementing the Award in part by setting off tax debts owed by the Third Claimant (which set-off was later annulled by the Romanian courts), on 26 May 2014 the Commission issued an injunction under article 11(1) of Regulation 659/1999 ("the injunction decision") ordering Romania to suspend any action which might lead to the execution or implementation of the Award until the Commission had taken a final decision on the compatibility of that State aid with the EU internal market, on the ground that the execution of the Award

appeared to the Commission to constitute unlawful State aid contrary to article 107(1) of the Treaty on the Functioning of the EU ("TFEU").

18.    On 7 August 2014 the ICSID *ad hoc* Committee agreed to a continuation of the stay of enforcement of the Award, provided that Romania filed an assurance that it would pay the Award in full and subject to no conditions whatsoever if the annulment application was dismissed. Romania did not give this assurance and the stay was revoked in September 2014.

19.    On 1 October 2014 the Commission took a decision formally opening the State aid investigation ("the initiating decision").

20.    On 30 March 2015 the Commission adopted Final Decision 2015/1470 ("the Commission Decision") which was addressed to Romania. It decided that the payment of the Award by Romania constituted State aid within article 107(1) TFEU and was incompatible with the internal market. It prohibited Romania from making any payment of such State aid to the Claimants and demanded that Romania recover any payments already made under the Award. It further provided that the Claimants and five other entities directly or indirectly owned by the First and Second Claimants were jointly liable to repay any sums received by any one of them as part payment of the Award.

21.    Proceedings seeking annulment of the Commission Decision were commenced before the General Court of the European Union ("GCEU") by the Third to Fifth Claimants on 6 November 2015, by the First Claimant on 28 November 2015 and by the Second Claimant on 30 November 2015. The Claimants did not apply for interim relief before the GCEU.

22.    On 26 February 2016, having heard arguments from the parties to the arbitration and from the Commission as *amicus*, the ICSID *ad hoc* Committee delivered a decision rejecting Romania's application to annul the Award.

23.    On 18 June 2019 the GCEU annulled the Commission Decision on the ground that the Commission had purported retroactively to apply its powers under article 108 TFEU and Regulation No 659/1999 to events predating Romania's accession to the EU: *European Food SA and Others v European Commission* (Cases T-624/15, T-694/15 and T-704/15) EU:T:2019:423. The GCEU did not rule upon certain other grounds of appeal presented by the Claimants because, in the light of its decision, they did not arise.

24.    On 31 July 2019 the Commission adopted a decision to appeal against the decision of the GCEU. That decision was communicated to this court and the parties on 13 August 2019. On 27 August 2019 the Commission lodged its appeal to the Court of Justice of the European Union ("CJEU"). The appeal is limited to the pleas of law addressed by the GCEU in its judgment of 18 June 2019. Should it succeed on its appeal, the Commission has invited the CJEU to remit the remaining pleas to the GCEU for further consideration.

25.    There are ongoing enforcement proceedings by the Claimants in the United States, France, Belgium, Luxembourg and Sweden. On 12 March 2019 the Brussels Court of Appeal referred three questions to the CJEU concerning the enforcement of the Award and the principle of sincere co-operation in EU law.

26.    On 7 September 2018 the Commission responded to a request for an opinion from Romania stating, inter alia, that it continued to view the payment into court of security by Romania as breaching the Commission Decision, the position it maintained throughout the High Court and Court of Appeal proceedings.

27.    On 7 December 2018 the Commission adopted a decision empowering it to refer Romania to the CJEU for infringement proceedings for failure to recover sums said to have been paid by Romania to the Claimants under the Award.

*The proceedings in this jurisdiction*

28.    On 2 October 2014 the First Claimant applied without notice for registration of the Award in the Commercial Court, pursuant to the Arbitration (International Investment Disputes) Act 1966 ("the 1966 Act"). Registration was effected on 17 October 2014. On 28 July 2015 Romania filed an application to the Commercial Court to vary or set aside the registration order. By a counter application the Claimants sought an order for security to be made in the event that a stay of enforcement was ordered.

29.    In a judgment dated 20 January 2017 [2017] EWHC 31 (Comm); [2017] Bus LR 1147 Blair J dismissed Romania's application to set aside registration, but granted Romania's application to stay enforcement of the Award pending determination of the proceedings in the GCEU.

(1)    The Claimants had advanced a case on the basis that the Award was res judicata. The judge held that he could not determine whether the Award could be enforced on this basis, because this was in issue in the pending proceedings before the GCEU and accordingly there was a real risk of

inconsistent decisions if the domestic court were to decide as a matter of EU law that the Award could be enforced.

(2)    The judge held that the Commission Decision did not prevent registration of the Award and accordingly he refused Romania's application to set aside registration. However, he held that the domestic court could not enforce the judgment consequent on registration of the Award in circumstances in which the Commission had prohibited Romania from making any payment under the Award to the Claimants. In his view this did not create a conflict with the international obligations of the United Kingdom under the ICSID Convention, because a purely domestic judgment would be subject to the same limitation.

(3)    The judge held that the domestic court could not rule on whether article 351 TFEU applies in the present case because it was being considered by the GCEU and so there was a real risk of conflicting decisions if the domestic court were now to rule on the issue.

(4)    The judge held that there was no conflict between the European Communities Act 1972 and the 1966 Act and accordingly he rejected a submission on behalf of the Claimants that the court should give priority on this ground to the 1966 Act.

(5)    The judge held that he could not rule on the Claimants' arguments that EU law did not preclude enforcement because the issue had been raised before the GCEU and there was a real risk of conflict.

(6)    The judge rejected arguments by Romania that the Award had already been paid in full.

(7)    The judge held that the domestic court cannot rule on the validity of the BIT between Sweden and Romania, although he accepted the submission of behalf of the Claimants that the validity of that treaty was not relevant to the issues to be decided.

30.    Following a further hearing in May 2017, Blair J handed down a second judgment on 15 June 2017 [2017] EWHC 1430 (Comm) in which he refused the Claimants' application for security. He considered that, as payment under the Award was prohibited under the Commission Decision, if the court were to proceed to enforce the award against the assets of Romania it would be acting in direct contradiction of the Decision. Accordingly, it was not possible to order security as

a condition of the stay. The judge also rejected a submission on behalf of the Claimants that the consequences of non-compliance with an order for security need not be set out in the order which could instead provide that the parties could come back to court to consider what the consequences should be. He considered that the balance at that time was against ordering security but he did not rule it out definitively for the future.

31.    The Claimants appealed both orders to the Court of Appeal. On 27 July 2018 the Court of Appeal (Arden, Hamblen and Leggatt LJJ) [2018] EWCA Civ 1801; [2019] Bus LR 1394 dismissed the appeal against the order for a stay but allowed the appeal against the security order and ordered that security should be provided in the sum of £150m.

32.    In dismissing the Claimants' appeal against the grant of a stay:

(1)    The Court of Appeal did not agree with Blair J that the issue ought not to be decided because of a risk of conflict with the GCEU. However, it considered that to permit enforcement on the basis that the Award was res judicata would frustrate the effective application of EU State aid law.

(2)    Arden and Leggatt LJJ held that Blair J had erred in holding that the effect of the 1966 Act, in implementing the ICSID Convention in domestic law, is to give an award upon registration the same status within English law as any other judgment. Hamblen LJ dissented on this issue and considered that Blair J had correctly held that there was no conflict between the international obligations of the United Kingdom under the ICSID Convention (and the 1966 Act which gives effect to those obligations) and under EU law.

(3)    Arden and Leggatt LJJ held that a stay was within the powers of the domestic court because it was consistent with the purposes of the ICSID Convention and it was appropriate to exercise the discretion to order a stay on the facts of the case.

(4)    Leggatt and Hamblen LJJ held that, if there was a conflict between the international obligations of the United Kingdom under the ICSID Convention as reflected in the 1966 Act and the court's duties under EU law, the judge had correctly concluded that there ought to be a stay because the applicability of article 351 TFEU was an issue before the GCEU and there was a clear risk of conflicting decisions.

33.    The Court of Appeal held that there was power to order security. It considered that the judge was correct in holding that the duty of sincere co-operation precluded the provision of security as a condition of the stay. However, the Court of Appeal held that EU law did not preclude an order for security which did not provide as a consequence of any failure to provide security that the stay would be lifted. It considered that there was no material risk of conflict which would preclude such an order. Accordingly, it ordered Romania to provide security in the sum of £150m. It suspended enforcement of the Court of Appeal security order, however, to allow Romania time to lodge an application for permission to appeal to the Supreme Court.

34.    On 31 October 2018 the Supreme Court granted Romania permission to appeal limited to Grounds 1, 3 and 4 as set out in the notice of appeal. The Supreme Court also ordered that the stay of the security order made by the Court of Appeal be continued until determination of the appeal or further order. The same order granted the Commission permission to intervene in the appeal, as it had in the High Court and the Court of Appeal. On 11 April 2019 the Supreme Court granted the Claimants permission to cross-appeal in relation to the order for a stay on Grounds 1 and 2 in the notice of cross-appeal and reserved to the hearing the question of permission to cross-appeal on Grounds 3 and 4 in that notice. The grounds of appeal are set out at paras 37 to 39 below.

35.    The appeal was listed for hearing over three days commencing on 18 June 2019. On the morning of that day the GCEU handed down its judgment annulling the Commission Decision. As the Court of Appeal's order of a stay had lapsed with the GCEU giving its judgment, and as security had been ordered as a term of the stay, by its order of 18 June 2019, the Supreme Court adjourned the hearing to a further hearing listed for 7-9 October 2019 and gave directions for other steps to be taken with a view to establishing or clarifying the basis on which it would have jurisdiction to hear the appeals.

36.    Following the Commission's confirmation that it intended to appeal against the decision of the GCEU to the CJEU, Romania issued an application for the stay of enforcement of the Award, which had lapsed with the GCEU's judgment, to be imposed or extended pending determination of the appeal to the CJEU. The Claimants also issued applications against Romania for security in respect of any stay. These applications were heard by Phillips J on 9 September 2019. On 10 September 2019 Phillips J [2019] EWHC 2401 (Comm) ordered that enforcement of the Award be stayed pending the final determination of the CJEU appeal proceedings. He also ordered that Romania provide security in the amount of £150m by 17 October 2019. Following judgment, the parties applied for certificates for a leapfrog appeal to the Supreme Court under the Administration of Justice Act 1969, which the judge granted.

Grounds of appeal

37.     Romania appeals against the order for security on the following grounds.

      Ground 1:     The Court of Appeal erred in its approach to assessing whether there was a risk of conflict.

      Ground 3:     The security ordered and whether it is to be used to pay the Award is to be subject to the jurisdiction of the Commercial Court, which, from the date on which the United Kingdom withdraws from the EU, will not be bound to observe EU law. While the United Kingdom remains a member state of the EU, it is contrary to EU law for the Court of Appeal as an emanation of the State to create a situation whereby the authority of the EU institutions could be wholly circumvented.

      Ground 4:     By ordering Romania to provide security, the Court of Appeal has erred in going further than the process of enforcement which it itself considered to be premature.

38.     The Claimants cross-appeal against the grant of a stay on the following original grounds.

      Original Ground 1:  Under the ICSID Convention and the 1966 Act there is no power to order a stay of the Award.

      Original Ground 2:  The stay is incompatible with the ICSID Convention in any event and serves no useful purpose.

      Original Ground 3:  The European Communities Act 1972 does not require the United Kingdom to breach its pre-accession obligations under the ICSID Convention as implemented by the 1966 Act.

      Original Ground 4:  Article 351 TFEU applies with the result that the obligations of the United Kingdom under the pre-accession ICSID Convention are not subject to the over-riding effect of EU law.

39.     In addition, the Claimants, with the permission of the Supreme Court, rely on a new ground of appeal:

New Ground:  The effect of the GCEU's judgment annulling the Commission Decision is that the duty of sincere co-operation can no longer require courts in this jurisdiction to stay enforcement of the award.

40.    It is convenient to consider the Claimants' appeal (by way of the cross-appeal) in respect of the stay first.

The Stay Appeal

The new ground

41.    Article 4(3) of the Treaty on European Union ("TEU") provides:

"Pursuant to the principle of sincere cooperation, the Union and the member states shall, in full mutual respect, assist each other in carrying out tasks which flow from the Treaties.

The member states shall take any appropriate measure, general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the Union.

The member states shall facilitate the achievement of the Union's tasks and refrain from any measure which could jeopardise the attainment of the Union's objectives."

42.    The duty of sincere co-operation contained in article 4(3) TEU was described, in its application to State aid law, in the following terms by the Court of Justice in *Deutsche Lufthansa AG v Flughafen Frankfurt-Hahn GmbH (Ryanair Ltd intervening)* (Case C-284/12) [2014] 2 CMLR 20, para 41:

"It is also important to note that the application of the European Union rules on State aid is based on an obligation of sincere co-operation between the national courts, on the one hand, and the Commission and the courts of the European Union, on the other, in the context of which each acts on the basis of the role assigned to it by the Treaty. In the context of that co-operation, national courts must take all the necessary measures, whether general or specific, to ensure fulfilment of the obligations under European Union law and refrain from those which may

> jeopardise the attainment of the objectives of the Treaty, as
> follows from article 4(3) TEU. Therefore, national courts must,
> in particular, refrain from taking decisions which conflict with
> a decision of the Commission ..."

In imposing and upholding the stay in the present case, Blair J and the Court of Appeal both referred to this passage and acted on the premise that the Commission Decision was valid in accordance with the principle stated in *Masterfoods v HB Ice Cream* (Case C-344/98) [2001] All ER (EC) 130, para 53 that:

> "Acts of the Community institutions are in principle presumed
> to be lawful until such time as they are annulled or withdrawn."

43.    In the changed circumstances brought about by the decision of the GCEU annulling the Commission Decision, however, the Claimants now advance, with the permission of this court, their new ground of appeal. The courts below proceeded on the basis that the duty of sincere co-operation in EU law required a stay of enforcement because there was a valid Commission decision which imposed a direct prohibition on Romania from paying the Award. The Claimants now submit that as the Commission Decision has been annulled and the Commission has not sought interim measures staying the effect of the judgment, there is no EU law duty on courts in this jurisdiction to stay enforcement of the Award. They submit that the presumption of validity no longer applies in respect of the Commission Decision and that, on the contrary, the applicable and binding act of the EU institutions is now the judgment annulling the Commission Decision. In their submission the authoritative determination of the EU institutions, binding on the UK courts, is that the Commission had no competence to find that the Award was State aid or to apply EU law to the Award at all and that, accordingly, the basis for the stay has fallen away entirely. They further point to article 278 TFEU which states:

> "Actions brought before the Court of Justice of the European
> Union shall not have suspensory effect. The Court may,
> however, if it considers that circumstances so require, order
> that application of the contested act be suspended."

In the present case, no application has been made to suspend the application of the judgment of the GCEU. Similarly, article 279 TFEU provides that the CJEU may, in any cases before it, prescribe any necessary interim measures. No such measures have been sought or ordered. Accordingly, the Claimants submit that the reasoning in and the annulment ordered pursuant to the GCEU's judgment have full legal effect.

44.    In response, the Commission and Romania submit that the effects of the GCEU's judgment are limited to annulling the Commission Decision, and that this does not extend to:

> (1)    the injunction decision of 26 May 2014 prohibiting Romania from implementing the award pending further investigation by the Commission; or

> (2)    the initiating decision of 1 October 2014 by which the Commission formally opened the State aid investigation.

They contend that neither is the subject of any successful or pending legal challenge and that, accordingly, the consequence of the relief granted by the GCEU is that the Commission's State aid investigation into Romania's implementation of the Award is reopened. The effect of this, they say, is that even if the Commission does not succeed in its appeal to the CJEU, it will be open to the Commission to re-take a State aid decision provided it can do so by addressing and avoiding the legal difficulties identified in the GCEU's judgment. In the meantime, the injunction decision continues to have effect. They maintain that the duty of sincere co-operation requires courts in this jurisdiction to refrain from taking decisions that would conflict with these decisions. In addition, they point to the pending appeal by the Commission to the CJEU and the possibility that the Commission Decision may yet be vindicated as creating a further risk of conflict which engages the duty of sincere co-operation.

45.    Before considering these submissions, it is appropriate to consider what precisely was decided in the judgment of the GCEU. In the view of the GCEU, the ICSID Tribunal in the Award had confined itself to determining the exact damage suffered by the Claimants on the basis of the repeal of EGO 24 and calculated the amount of damages corresponding to a right to compensation which arose at the time of the infringements committed by Romania in 2005 (para 74). The right to receive the compensation awarded arose prior to Romania's accession to the EU on 1 January 2007. The Award was simply the recognition of that right and payments made in 2014 merely represented the enforcement of that right which arose in 2005 (para 78). EU law was not applicable in Romania before its accession and it was only from Romania's accession that the Commission acquired the competence enabling it to review Romania's actions pursuant to article 108 TFEU (para 79). As the EGO 24 incentives were repealed in 2005, "the Commission was by no means competent to assess their alleged unlawfulness in the light of EU law, at least with regard to the period predating accession" (para 86). The GCEU noted that, as the compensation awarded was calculated from the repeal of EGO 24 on 22 February 2005 until its scheduled expiry on 1 April 2009, that period covered 27 months during which Romania was a member of the EU (para 89). The amounts awarded as compensation for the pre-accession period could not constitute State aid in EU law

and the Commission had exercised its powers retroactively "in relation to a situation predating Romania's accession to the European Union, at least with regard to those amounts" (para 90). With regard to the award of compensation in respect of the post-accession period,

> "even assuming that the payment of compensation relating to that period could be classified as incompatible aid, given that the Commission did not draw a distinction between the periods of compensation for the damage suffered by the applicants before or after accession, the Commission has, in any event, exceeded its powers in the area of State aid review." (para 91)

46.    The GCEU then addressed the classification by the Commission of the Award as an advantage and a State aid within the meaning of article 107 TFEU and concluded as follows:

> "107. … the Commission is not competent and … EU law is not applicable to the EGO scheme, to its revocation or to the compensation for that revocation, because the arbitral award, which found that there was a right to compensation in 2013, did not have the effect of triggering the applicability of EU law and the Commission's competence to the earlier EGO tax incentives and, accordingly, to the compensation at issue which resulted therefrom.

> 108.    Therefore, as the compensation at issue covered, at least in part, a period predating accession (from 22 February 2005 to 1 January 2007) and as the Commission did not draw a distinction, among the amounts to be recovered, between those falling within the period predating accession and those falling within the period subsequent to accession, the decision by which it classified the entirety of the compensation as aid is necessarily unlawful.

> 109.    It follows that the contested decision is unlawful in so far as it classified as an advantage and aid within the meaning of article 107 TFEU the award, by the arbitral tribunal, of compensation intended to compensate for the damage resulting from the withdrawal of the tax incentives, at least in respect of the period predating the entry into force of EU law in Romania."

In summary, the GCEU held that the Commission had exceeded its competence to the extent that it had applied its State aid powers retroactively to events predating Romania's accession and the Commission Decision was unlawful to the extent that it classified as an advantage or aid compensation relating to the period prior to Romania's accession to the EU. As the Commission had not distinguished between the pre- and post-accession periods, the Commission Decision as a whole was annulled.

*Initiating decision and injunction decision*

47.    Romania and the Commission submit that the effect of that relief is that the position prior to the Commission Decision is restored. They submit that the injunction decision and the initiating decision commencing the formal investigation into State aid arising from the Award are distinct from the annulled Commission Decision and are unchallenged. (The Claimants did, in fact, challenge the injunction decision before the GCEU but they later withdrew that action: *Micula v European Commission* (Case T-646/14) EU:T:2016:135. The initiating decision has never been challenged.) The result, Romania and the Commission therefore submit, is that the Commission's investigation into Romania's implementation of the Award is reopened and that both the injunction decision and the initiating decision are restored. The Commission submits that the reopening of the investigation means that the investigation must be closed, either by a successful appeal to the CJEU reinstating the Commission Decision, or by the Commission adopting a new final decision. The Commission also points to the fact that the initiating decision recalls Romania's obligations under the standstill provision in article 108(3) TFEU which provides that the member state concerned shall not put its proposed measures into effect until this procedure has resulted in a final decision.

48.    The case law of the Court of Justice establishes that annulment of an EU measure does not necessarily affect the preparatory acts (*R v Ministry of Agriculture, Fisheries and Food, Ex p Fedesa* (Case C-331/88) [1990] ECR I-4023, para 34; *Kingdom of Spain v Commission of the European Communities* (Case C-415/96) [1998] ECR I-7008, para 32). In certain circumstances, therefore, it may be possible to resume the procedure for replacing a measure at the point at which the illegality occurred. In the present case, Romania and the Commission, relying on *ArcelorMittal Tubular Products Ostrava v Commission* (Case T-364/16) EU:T:2018:696, para 64, maintain that the prior acts adopted in the context of the investigation, the injunction decision and the initiating decision, are separate acts unaffected by the judgment of the GCEU and must therefore be presumed to be lawful. On that basis they rely on *Deutsche Lufthansa AG* (Case C-284/12) which establishes that where the Commission has initiated a formal investigation procedure under article 108(2) TFEU with regard to a State measure which has not been notified and is being implemented, a national court is required, pursuant to the duty of sincere co-operation, to adopt all the necessary measures with a view to drawing

the appropriate conclusions from an infringement of the obligation to suspend the implementation of that measure. (See also *European Commission v Hansestadt Lübeck* (Case C-524/14 P) EU:C:2016:971, paras 29, 30 where this was endorsed by the Grand Chamber of the Court of Justice.) Moreover, *Deutsche Lufthansa* also establishes that where a national court, in these circumstances, entertains doubts as to whether the measure at issue constitutes State aid within article 107(1) TFEU, or as to the validity of interpretation of the decision to initiate the formal examination procedure, the appropriate course is for it to seek clarification from the Commission or to refer a question to the Court of Justice for a preliminary ruling.

49.    In response the Claimants submit that the injunction decision and the initiating decision are tainted by the same illegality as the Commission Decision which has been annulled by the GCEU. Relying on *Asteris AE v Commission of the European Communities* (Joined Cases 97/86, 193/86, 99/86 and 215/86) [1988] ECR 2181, paras 27-29, they submit that the Commission is under an obligation by virtue of article 266 TFEU to comply not only with the operative part of the judgment but also with its reasoning. In *Asteris* the Greek government had secured the annulment of a regulation fixing aid for the production of tomato concentrates for the 1983/84 marketing year. While that case had been pending before the Court of Justice the Commission had made the same error in relation to regulations adopted in relation to subsequent marketing years. The Court of Justice held that the Commission was bound to have regard "not only to the operative part of the judgment but also to the grounds which led to the judgment and constitute its essential basis, in so far as they are necessary to determine the exact meaning of what is stated in the operative part" (para 27) and concluded:

> "However, by virtue of the retroactive effect of judgments by which measures are annulled, the finding of illegality takes effect from the date on which the annulled measure entered into force. It follows that in the present case the institution concerned is also under an obligation to eliminate from the regulations already adopted when the annulling judgment was delivered and governing marketing years after 1983/84 any provisions with the same effect as the provision held to be illegal." (para 30)

On behalf of the Claimants, Ms Demetriou QC submits that the injunction decision and the initiating decision are vitiated by the same legal errors which resulted in the annulment of the Commission Decision and that it is, therefore, not open to the Commission to rely on the preceding decisions as giving rise to a duty of sincere co-operation on the part of national courts.

50.    In determining the effect of the annulment of an EU measure on a preparatory measure, it is necessary, in each case, to identify the precise provision held to be illegal and the specific reasons which underlie the finding of illegality and which the institution concerned must take into account when replacing the annulled measure (*Asteris*, para 27; *Kingdom of Spain v Commission of the European Communities*, para 31). As stated above, the Commission Decision was flawed because the Commission exceeded its competence by applying its State aid powers retroactively to events predating Romania's accession and because the Commission Decision classified as an advantage or aid compensation relating to the period prior to Romania's accession to the EU. The failure to distinguish between pre- and post-accession periods led to the annulment of the whole Commission Decision. These errors also characterise the injunction decision and the initiating decision. The initiating decision (C (2014) 6848), while expressly stating in the preamble, para (57) that the obligation not to put into effect any aid measure only applies to aid measures put into effect after the entry into force of the Romanian Treaty of Accession on 1 January 2007, continues:

> "(58)  The Commission considers that executing the Award would amount to 'new aid' in the sense of article 1(c) of Regulation (CE) No 659/1999 of 22 March 1999, as the decision to execute the Award would take place after the entry into force of the Treaty for Romania.

> (59)   It does not matter that the revocation of the EGO 24 facilities occurred before the entry into force of the Treaty for Romania or that the amount granted or to be granted would correspond, at least partially, to the operating expenses incurred by the claimants before the entry into force of the Treaty for Romania. For the purposes of State aid law it does not matter at which time these expenses were incurred; rather, the decisive point in time is the moment at which the State decides to relieve the undertaking of the economic burden that those expenses constitute."

Similarly, at para (34) the Commission states that implementation of the Award would grant to the Claimants an amount corresponding to the advantages foreseen under the abolished EGO 24 scheme from the moment it was repealed (22 February 2005) until the scheduled expiry (1 April 2009) and that this constitutes an economic advantage within article 107(1) TFEU. In the same way the preamble to the injunction decision states at para 23 that by implementing the award Romania is reinstating the EGO incentives and will grant to the Claimants the advantages foreseen under the abolished EGO 24 from its repeal until its scheduled expiry. These preliminary decisions are, therefore, subject to the same flaws as the Commission Decision.

51.     Nevertheless, we are not persuaded that these errors in the preparatory decisions prevent the Commission from relying on the initiating decision as giving rise to a duty of sincere co-operation on the part of national courts. The judgment of the GCEU leaves in existence an extant Commission investigation into State aid. In the absence of a final decision of the Commission closing the formal investigation procedure, the effects of that initiating decision subsist (*European Commission v Hansestadt Lübeck* (Case C-524/14 P), para 31). This necessarily imposes a duty of sincere co-operation on the part of the United Kingdom. Whereas in *Asteris* the reasoning of the Court of Justice totally undermined the legality of the regulations in respect of subsequent years, it may well be open to the Commission to reconfigure the investigation in the present case so as to avoid the errors which resulted in the annulment of the Decision. Thus, for example, it may be open to the Commission to reframe its investigation so that it is limited to the post-accession period. Similarly, we note that the reasoning of the GCEU judgment does not address the Commission's case, founded on the terms of Romania's accession agreement (L 157/203, 21.6.2005; Annex V, section 2, para 5) which exceptionally permits the Commission to object to any aid measure granted in the pre-accession period from 1 September 2004 and to initiate a formal investigation procedure in relation to it and which empowers the Commission to decide thereafter that Romania shall take all necessary measures to recover the aid from the beneficiary. It may be open to the Commission to reconfigure its investigation on this basis. In any event, courts in this jurisdiction cannot be confident that the judgment of the GCEU rules out such possibilities. For these reasons, we consider that the subsisting initiating decision continues to engage the duty of sincere co-operation owed by national courts, notwithstanding the failure of the Commission to apply to suspend the effect of the GCEU decision or to seek an interim order from the CJEU.

52.     With regard to the injunction decision, the Claimants object that on its construction it cannot have any application in the present circumstances. The operative part of the decision provides that Romania shall immediately suspend any action which may lead to the execution or implementation of the Award "until the Commission has taken a final decision on the compatibility of that State aid with the internal market". The Claimants submit that this created only an interim prohibition until the Commission took a final decision, that that final decision was taken on 31 March 2015 and that at that point this injunction ceased to apply. Whether the injunction may have revived as a result of the annulment of the Commission Decision, as suggested by the Commission, was a point not fully argued before us. In any event, it is not necessary to reach a concluded view on this point in the light of the conclusions to which we have come on the parties' other submissions.

*The pending appeal*

53.     The decision of the GCEU is currently under appeal to the CJEU. Romania and the Commission submit that, as a result, the duty of sincere co-operation

continues to apply. They observe that it has not been suggested that the Commission's appeal has no realistic prospect of success and they point to a risk of conflict between the EU courts and courts in this jurisdiction if the GCEU judgment does not stand and the Commission Decision is vindicated.

54.    In *Masterfoods* (Case C-344/98) the Irish High Court had granted HB a permanent injunction restraining Masterfoods from inducing retailers to store Masterfoods' products in freezers belonging to HB, in breach of an exclusivity clause, thereby rejecting Masterfoods' case that the clause and HB's conduct infringed EC competition rules. In parallel proceedings before the Commission, the Commission ruled that the exclusivity provision infringed article 85(1) of the Treaty establishing the European Community ("EC") and that HB's inducement to retailers in Ireland to enter into freezer cabinet agreements subject to a condition of exclusivity infringed article 86 EC. The Irish Supreme Court made a preliminary reference to the Court of Justice in which it asked whether the obligation of sincere co-operation required the Supreme Court to stay the proceedings pending the disposal of the appeal to the Court of First Instance against the decision of the Commission and any subsequent appeal to the Court of Justice. The Court of Justice expressed the duty on a national court in such circumstances in the following terms:

> "When the outcome of the dispute before the national court depends on the validity of the Commission decision, it follows from the obligation of sincere co-operation that the national court should, in order to avoid reaching a decision that runs counter to that of the Commission, stay its proceedings pending final judgment in the action for annulment by the Community Courts, unless it considers that, in the circumstances of the case, a reference to the Court of Justice for a preliminary ruling on the validity of the Commission decision is warranted." (para 57)

55.    On behalf of the Claimants, Ms Demetriou seeks to distinguish *Masterfoods* on two grounds. First, she points to the fact that the decision by the Commission in that case was valid and subsisting whereas the Commission Decision with which we are concerned has been annulled. Secondly, she submits that in *Masterfoods* the national court was seized with precisely the same issue of law as had been decided by the Commission in its decision, namely the application of the same competition provisions to the same agreements, and that accordingly the Court of Justice was concerned to avoid a direct conflict which would have infringed the principle of legal certainty. By contrast, she submits, there is no such risk in the present case. In these proceedings the court is not asked to determine whether the award or any part of it constitutes State aid, so there is no risk of conflicting judgments on that point or on EU law more generally. In the absence of a stay of the national proceedings, the award could be enforced which might result in Romania paying compensation

to the Claimants. Should the Court of Justice allow the Commission's appeal, she submits, that would oblige Romania to recover the payments of compensation which would not be a conflict but, at most, a possible practical inconvenience. Moreover, that possibility would be remote because if the Commission were to succeed on appeal before the Court of Justice it would be necessary for the matter to be remitted to the GCEU to resolve the other grounds for annulment not yet ruled on by that court.

56.     The first suggested ground of distinction may be dealt with very briefly. The judgment of the Court of Justice in *Masterfoods* makes clear that the duty of sincere co-operation (and therefore the obligation to stay national proceedings) continues pending final judgment in the action for annulment by the Community Courts (paras 57, 59). We are also unable to accept the second suggested ground of distinction. The duty of sincere co-operation is intended to preserve the effectiveness of actions taken by EU bodies with relevant competence. While it is true that the present state of legal proceedings before the EU courts and in this jurisdiction does not present the stark direct conflict apparent in *Masterfoods*, we are concerned with potentially contradictory decisions on the same subject matter between the same parties (cf *Crehan v Inntrepreneur Pub Co* [2007] 1 AC 333, per Lord Bingham of Cornhill, at para 11). Ms Demetriou minimises unduly the risk of conflict which the duty of sincere co-operation is intended to avoid. It is only where there is "scarcely any risk" of a conflict between decisions of domestic and EU institutions that national authorities should proceed (*Delimitis v Henninger Brau AG* (Case C-234/89) at para 50; *Emerald Supplies Ltd v British Airways plc (Nos 1 & 2)* (CA) [2016] Bus LR 145, para 70). Moreover, it appears by analogy with *Kernkraftwerke Lippe-Ems GmbH v Hauptzollamt Osnabruck* (Case C-5/14) EU:C:2015:354 at para 33, that national institutions should defer even if the impediment to the full effectiveness of EU law is only temporary. Subject to the other grounds of appeal considered below, it is not possible to conclude that there is scarcely any risk of conflict. On the contrary, the risk of the consequences to which Ms Demetriou points would amount to a substantial impediment to the operation of EU law. Accordingly, the existence of a pending appeal to the Court of Justice with a real prospect of success is, in itself, sufficient to trigger the duty of cooperation and, subject to the further grounds of appeal considered below, requires the grant of a stay so as not to undermine the effect of the Commission Decision, should it be upheld.

57.     For these reasons, we would dismiss this ground of appeal.

<u>Cross-Appeal Original Ground 1: Under the ICSID Convention and the 1966 Act
there is no power to stay</u>

<u>Cross-Appeal Original Ground 2: The stay is incompatible with the ICSID
Convention in any event and serves no useful purpose</u>

58.    Grounds 1 and 2 may conveniently be considered together.

59.    There are currently 154 State parties to the ICSID Convention. Both the
United Kingdom and Romania are Contracting States. The United Kingdom became
a party in 1966, prior to its accession to the EEC in 1973. Romania became a party
in 1975, prior to its accession to the EU in 2007. The EU is not a party to the ICSID
Convention.

60.    Section 6 of Chapter IV of the ICSID Convention provides for the recognition
and enforcement of awards. Article 53 provides in relevant part:

> "Article 53
>
> > (1)    The award shall be binding on the parties and
> > shall not be subject to any appeal or to any other remedy
> > except those provided for in this Convention. Each party
> > shall abide by and comply with the terms of the award
> > except to the extent that enforcement shall have been
> > stayed pursuant to the relevant provisions of this
> > Convention. …"

Article 54 provides in relevant part:

> "Article 54
>
> > (1)    Each Contracting State shall recognize an award
> > rendered pursuant to this Convention as binding and
> > enforce the pecuniary obligations imposed by that award
> > within its territories as if it were a final judgment of a
> > court in that State. …
> >
> > (2)    A party seeking recognition or enforcement in
> > the territories of a Contracting State shall furnish to a

competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General. Each Contracting State shall notify the Secretary-General of the designation of the competent court or other authority for this purpose and of any subsequent change in such designation.

(3)    Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought."

61.    Article 55 provides that nothing in article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution.

62.    Article 53(1) prohibits "any appeal or … any other remedy except those provided for in this Convention". The exception is a reference to the provisions in section 5 of Chapter IV of the Convention. Article 50 provides for any dispute between the parties as to the meaning or scope of an award to be decided by a Tribunal. Article 51 provides for revision of an award by a Tribunal on the ground of the discovery of some fact which decisively affects the award. Article 52 provides for the annulment of an award by an *ad hoc* Committee on the grounds that the Tribunal was not properly constituted, that it has manifestly exceeded its powers, that there was corruption on the part of a member of the Tribunal, that there has been a serious departure from a fundamental rule of procedure, or that the award has failed to state the reasons on which it is based. In each case the Tribunal or Committee concerned may stay enforcement of the award pending its decision.

63.    The Arbitration (International Investment Disputes) Act 1966 implements the ICSID Convention in the domestic law of the United Kingdom. Section 1(2) provides that a person seeking recognition or enforcement of an ICSID award shall be entitled to have the award registered in the High Court. Section 2 provides:

"2.    Effect of registration.

(1)    Subject to the provisions of this Act, an award registered under section 1 above shall, as respects the pecuniary obligations which it imposes, be of the same force and effect for the purposes of execution as if it had been a judgment of the High Court given when the award was rendered pursuant to the Convention and

entered on the date of registration under this Act, and, so far as relates to such pecuniary obligations -

    (a)    proceedings may be taken on the award,

    (b)    the sum for which the award is registered shall carry interest,

    (c)    the High Court shall have the same control over the execution of the award,

as if the award had been such a judgment of the High Court.

(2)    Rules of court under section 84 of the Senior Courts Act 1981 may contain provisions requiring the court on proof of the prescribed matters to stay execution of any award registered under this Act so as to take account of cases where enforcement of the award has been stayed (whether provisionally or otherwise) pursuant to the Convention, and may provide for the provisional stay of execution of the award where an application is made pursuant to the Convention which, if granted, might result in a stay of enforcement of the award."

64.    A rule of court, CPR 62.21(5), provides with regard to registration under the 1966 Act:

"Where, on granting permission to register an award or an application made by the judgment debtor after an award has been registered, the court considers -

    (a)    that the enforcement of the award has been stayed (whether provisionally or otherwise) under the Convention; or

    (b)    that an application has been made under the Convention which, if granted, might result in a stay of the enforcement of the award,

> the court may stay the enforcement of the award for such time
> as it considers appropriate."

65.    At first instance, Blair J dismissed the application by Romania to set aside the order of Burton J registering the award. In Blair J's view, registration of the award would not place Romania in breach of the Commission Decision. However, he stayed enforcement of the award pending the resolution of the annulment proceedings in the GCEU on the basis that under the ICSID Convention and under section 2 of the 1966 Act an arbitral award was to be equated for the purposes of enforcement with a judgment of the High Court. As the High Court would not enforce a domestic judgment which conflicted with a decision of the Commission, it could not enforce the Award pending the outcome of the annulment proceedings. Accordingly, article 351 TFEU (set out at para 90, below) did not apply because there was no conflict between the obligations of the United Kingdom under the ICSID Convention and the EU Treaties.

66.    The Court of Appeal unanimously dismissed the appeal against the order for a stay. The majority (Arden and Leggatt LJJ) held that while section 2(1) of the 1966 Act did not have the effect of making an ICSID award registered under section 1 equivalent for all purposes to an ordinary domestic judgment, the domestic court could grant a stay of execution if in the circumstances of the case it was just to do so, provided the stay was temporary and consistent with the purposes of the ICSID Convention. Hamblen LJ (dissenting on this point) held that the ICSID Convention and the 1966 Act conferred on a registered award the same status as a final domestic judgment. Since such a judgment would not be enforced where inconsistent with EU law, there was no inconsistency with the ICSID Convention or the 1966 Act in not enforcing an award where inconsistent with EU law.

67.    On behalf of the Claimants it is submitted that Blair J and the Court of Appeal were in error in granting a stay because the ICSID Convention and the 1966 Act do not permit a stay in such circumstances. Distinguishing between enforcement and execution, they submit that a stay of enforcement may only be granted pursuant to articles 50-52 of the ICSID Convention. Article 54 imposes a duty on national courts to enforce awards and does not permit a national court to refuse enforcement where it would refuse to enforce a domestic judgment. They accept that the national court has control over the execution of an award, including power to grant a temporary stay; however, this is strictly for procedural (not substantive) reasons and only where no inconsistency arises with the duties to recognise and enforce the award. They submit that the stay granted in these proceedings was not a stay of execution but a stay of enforcement pending the determination of the GCEU proceedings, which the Court had no power to order.

68.     The provisions of the 1966 Act must be interpreted in the context of the ICSID Convention and it should be presumed that Parliament, in enacting that legislation, intended that it should conform with the United Kingdom's treaty obligations. It is a notable feature of the scheme of the ICSID Convention that once the authenticity of an award is established, a domestic court before which recognition is sought may not re-examine the award on its merits. Similarly, a domestic court may not refuse to enforce an authenticated ICSID award on grounds of national or international public policy. In this respect, the ICSID Convention differs significantly from the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards 1958. The position is stated in this way by Professor Schreuer in his commentary on article 54(1):

> "The system of review under the Convention is self-contained and does not permit any external review. This principle also extends to the stage of recognition and enforcement of ICSID awards. A domestic court or authority before which recognition and enforcement is sought is restricted to ascertaining the award's authenticity. It may not re-examine the ICSID tribunal's jurisdiction. It may not re-examine the award on the merits. Nor may it examine the fairness and propriety of the proceedings before the ICSID tribunal. This is in contrast to non-ICSID awards, including Additional Facility awards, which may be reviewed under domestic law and applicable treaties. In particular, the New York Convention gives a detailed list of grounds on which recognition and enforcement may be refused …" (Christoph H Schreuer, *The ICSID Convention: A Commentary*, 2nd ed (2009), p 1139, para 81)

> "The Convention's drafting history shows that domestic authorities charged with recognition and enforcement have no discretion to review the award once its authenticity has been established. Not even the *ordre public* (public policy) of the forum may furnish a ground for refusal. The finality of awards would also exclude any examination of their compliance with international public policy or international law in general. The observance of international law is the task of the arbitral tribunal in application of article 42 of the Convention subject to a possible control by an ad hoc committee … Nor would there be any room for the application of the Act of State doctrine in connection with the recognition and enforcement of an ICSID award …" (Schreuer, pp 1140-1141, para 85)

69.     Contracting States may not refuse recognition or enforcement of an award on grounds covered by the challenge provisions in the Convention itself (articles 50-

52). Nor may they do so on grounds based on any general doctrine of *ordre public*, since in the drafting process the decision was taken not to follow the model of the New York Convention. However, although it is recognised that this is the general position under the Convention, it is arguable that article 54(1), by framing the relevant obligation as to enforcement as an obligation to treat an award under the Convention as if it were a final judgment of a local court, allows certain other defences to enforcement which are available in local law in relation to such a final judgment to be raised.

70.     The principle that arbitration awards under the ICSID Convention should be enforceable in the courts of all Contracting States and with the same status as a final judgment of the local courts in those States, as eventually set out in article 54(1), was a feature from an early stage in the drafting of the Convention. Mr Aron Broches, General Counsel of the World Bank at the time who chaired the regional consultative meetings ("the Regional Consultative Meetings") that occurred as part of the Convention's drafting, explained to delegates that by virtue of this formula Contracting States would be entitled to apply their local law of sovereign or state immunity with regard to the enforcement of awards, and thereby avoid or minimise possible embarrassment at having to enforce awards against other friendly Contracting States. Accordingly, it was made clear that article 54(1) had the substantive effect of introducing to some degree a principle of equivalence between a Convention award and a local final judgment as regards the possibility of applying defences in respect of enforcement. See ICSID, *History of the ICSID Convention* (Washington DC, 1968) vol II-1: Doc 22 (20 September 1963) "Memorandum of the discussion by the Executive Directors, September 10, 1963, Discussion of the First Preliminary Draft Convention", p 177); Doc 25, (30 April 1964) "Summary Record of Proceedings, Addis Ababa Consultative Meetings of Legal Experts, December 16-20, 1963", p 242; Doc 31 (20 July 1964) "Summary Record of Proceedings, Bangkok Consultative Meetings of Legal Experts, April 27-May 1, 1964", p 520.

71.     In his report on the Regional Consultative Meetings, Mr Broches referred to certain comments that had dealt with the effect of what was then draft section 15 (which became article 54(1)) on existing law with respect to sovereign immunity. Mr Broches "explained that the drafters had no intention to change that law. By providing that the award could be enforced as if it were a final judgment of a local court, section 15 implicitly imported the limitation on enforcement which in most countries existed with respect to enforcement of court decisions against Sovereigns. However, this point might be made explicit in order to allay the fears expressed by several delegations" (*History*, vol II-1: Doc 33 (9 July 1964) "Chairman's Report on the Regional Consultative Meetings of Legal Experts", p 575; and see Doc 27 (12 June 1964) "Summary Record of Proceedings, Santiago Consultative Meetings of Legal Experts, February 3-7, 1964", pp 342 et seq, where Mr Broches again indicated that this was the intended effect of what became article 54(1), but that it could be made completely clear to allay concerns).

72.    Accordingly, the provision which eventually became article 55 was included in what was designated as the First Draft of the Convention and was retained in the final version of the Convention (*History*, vol I, 254; vol II-1, Doc 43 (11 September 1964) "Draft Convention: Working Paper for the Legal Committee", p 636). The official Report of the Executive Directors on the Convention confirmed that this provision was introduced for the avoidance of doubt (as its text indicates): see ICSID, *Report of the Executive Directors of the International Bank for Reconstruction and Development on the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (Washington DC, 1965), para 43; Mr Broches made the same point in his Memorandum to the Executive Directors (*History*, vol II-2, Doc 128 (19 January 1965) "Memorandum from the General Counsel and Draft Report of the Executive Directors to accompany the Convention", paras 43-44). The law of State immunity varies from State to State, and the Convention made no attempt to harmonise it. As Professor Schreuer points out in his commentary on article 54, persons seeking to enforce arbitration awards made pursuant to the Convention will tend to choose to do so in those jurisdictions which have the least generous rules of State immunity for the protection of the assets of other Contracting States (Schreuer, p 1124, para 27).

73.    The fact that the specific qualification of the obligation to enforce an award like a final court judgment relating to state immunity was expressly dealt with in article 55 for the avoidance of doubt indicates that article 54(1) was itself understood to have the effect of allowing the possibility of certain other defences to enforcement if national law recognised them in respect of final judgments of local courts.

74.    The travaux préparatoires also indicate that it was accepted that further defences available in national law in relation to enforcement of court judgments could be available in exceptional circumstances by virtue of the formulation of the obligation in article 54(1). Mr Broches pointed out "that the First Draft went further than the Secretariat draft since treating awards in the same way as court judgments implied that exceptional grounds only could be invoked to prevent recognition and enforcement" (Aron Broches, "Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution", (1987) ICSID Rev 287, 312). But he also resisted a proposal by the Austrian representative to delete the words (in what became article 54(1)) requiring an award to be enforced "as if it were a final judgment [of a local court]", so as to make the obligation in that provision an unqualified one, since the Austrian representative noted that "there were several possibilities for annuling [sic] judgments even after they had been declared final" (*History*, vol II-2, Doc 120 (11 January 1965) "Summary Proceedings of the Legal Committee meeting, December 11, morning", p 901). Mr Broches stated that in his opinion "by making an award the equivalent of a final judgment one had reached the maximum obtainable" (that is to say, in practical terms, given the issues raised in the drafting meetings) (Broches, p 314). So, for example, there was discussion of the possibility in English law of applying to have a final judgment of a national court set aside on the grounds that it was

obtained by fraud, and Mr Broches confirmed that this would also be applicable in relation to a Convention award: see *History*, vol II-2, Doc 113 (11 January 1965) "Summary Proceedings of the Legal Committee meeting, December 10, afternoon", p 889 ("If a final judgment against a sovereign State could not be executed, then an award could not be executed either; and in the same way, if a final judgment was open to some extraordinary remedy in the case of fraud or similar occurrence, that would be true for the award as well."). Later, Mr Broches resisted a suggestion that what is now article 55 should be expanded so as also to "cover the cases where there were laws which, although not related to immunities, might limit the execution of the award against the State", on the grounds that he "thought this was unnecessary because full recognition had been given to the laws of the State in article [54]" and "[article 55] dealt with one specific problem on which certain delegations had expressed concern" (*History*, vol II-2, Doc 120, p 905).

75.    In his commentary on article 54, Professor Schreuer observes that at the stage of recognition and enforcement of awards "[t]he otherwise self-contained nature of the Convention does not apply" (p 1120, para 10). At, pp 1142-1143, para 91 he says (omitting references):

> "The fact that article 54(1) assimilates ICSID awards to final judgments of domestic courts implies that enforcement may be resisted in countries where national rules provide for an exceptional refusal to enforce a final judgment. Though this possibility was already acknowledged during the drafting of the Convention, it has not yet been relied upon in practice in order to defy recognition and enforcement of ICSID awards. Instead, past attempts to resist enforcement of awards have relied upon immunity from execution."

76.    Article 54(3) of the Convention is concerned with execution of awards. Its effect is that the available processes of execution will be those in the law of the State where enforcement is sought. It does not require that State to make available any other processes of execution. This provision does not limit the obligation on Contracting States to enforce awards. Once again, the matter is explained by Professor Schreuer in his commentary: having regard to all the authentic language versions of the Convention, no distinction is to be drawn between enforcement and execution (p 1134, para 64). He observes in his commentary on article 54(3):

> "The drafting history and the context of article 54(3) make it clear that the laws of the enforcing State that govern execution of an ICSID award are of a procedural nature only. Article 54(3) does not detract from the obligation of every State party to the Convention to enforce awards. In particular, the laws of

> the enforcing State may not serve as a standard for the review of awards. Article 54(3) does not affect the finality and non-reviewability of awards …" (p 1149, para 112)

77.    Articles 50(2), 51(4) and 52(5) make specific provision for staying enforcement of an award in certain specific situations, none of which applies here. Section 2(2) of the 1966 Act and CPR 62.21(5) make corresponding provision in domestic law for the grant of a stay in such situations. These stays pursuant to the Convention are available only in the context of interpretation, revision and annulment of awards addressed by those articles. In the present case, Romania has already exercised and exhausted its right under article 52 of ICSID to seek annulment of the Award. The ICSID *ad hoc* Committee upheld the Award on 26 February 2016.

78.    However, in light of the wording of articles 54(1) and 55 and the travaux préparatoires reviewed above, it is arguable that there is scope for some additional defences against enforcement, in certain exceptional or extraordinary circumstances which are not defined, if national law recognises them in respect of final judgments of national courts and they do not directly overlap with those grounds of challenge to an award which are specifically allocated to Convention organs under articles 50 to 52 of the Convention. Mr Broches proposed at the drafting meeting on 11 December 1964 referred to above that representatives "should consciously accept something that was of necessity not precise, which each country in good faith would seek to translate into appropriate local law. He thought that it was necessary to leave some freedom to the Contracting States to interpret in good faith the principal concept laid down in the Convention" (ie the obligation in article 54(1)) (*History*, vol II-2, Doc 120, 903).

79.    In the Court of Appeal Hamblen LJ accepted Romania's submission that the relevant obligation of the United Kingdom under article 54(1) was one of "equivalence". He considered that, while there will be different national rules and procedures relating to enforcement, provided the same rules and procedures are applied to registered awards as to final court judgments in the State concerned article 54 will be complied with. In his view, the effect of section 2(1) of the 1966 Act was to make an ICSID award registered under section 1 of the Act equivalent for all purposes to a judgment of the High Court given in ordinary domestic proceedings. As a result, in his view, if the present award had been a final decision of the English court there could be little doubt that the English court would stay enforcement because payment was prohibited by a subsequent Commission decision. On that basis, he considered that enforcement of the Award had to be stayed. The courts have general powers under the CPR to order a stay where that would be appropriate outside the specific situations dealt with in CPR 62.21: see in particular CPR 3.1(2)(f), CPR 40.8A and CPR 83.7(4).

80.     Hamblen LJ's view on the general question whether article 54(1) operates on the basis of a principle of "equivalence" gains some support from the points set out above and the travaux préparatoires referred to. But as appears below, even if he is right on that point, consideration of the effect of article 351 TFEU means that it does not follow that Romania succeeds in showing that the enforcement of the Commission Award should be refused under the ICSID Convention and the 1966 Act.

81.     On the other hand, it might be said that this reading of the obligation of each Contracting State under article 54(1) to enforce the pecuniary obligations imposed by an ICSID award "as if it were a final judgment of a court in that State" fails to take proper account of the scheme of the ICSID Convention as described above. It is arguable that there is countervailing force in the view of Arden and Leggatt LJJ in the Court of Appeal that it would be inconsistent with that scheme for a national court to refuse to enforce an award on the ground that, if it had been an ordinary domestic judgment, giving effect to it would be contrary to a provision of national law and that the only circumstances in which the validity or enforceability of an ICSID award can be challenged are those set out in the ICSID Convention itself. It is arguable that the words "as if it were a final judgment of a court in that State" in article 54(1) should not be read as referring to the circumstances in which an award is enforceable in the State concerned or as importing national standards as a requirement of enforceability. Rather it is arguable that, as Leggatt LJ put it (at para 258), albeit without consideration of the travaux préparatoires, "the purpose of equating an award with a final judgment of a court in the state where enforcement is sought is to give legal force to an award for the purpose of executing it and to provide machinery for that purpose". If that is right, then section 2(1) of the 1966 Act, which implements article 54(1), would not entitle courts in this jurisdiction to refuse to enforce an award on grounds that would justify staying enforcement of a domestic judgment. On this view, article 54(1) simply provides a legal basis for execution. If anything, this might be said to emerge even more clearly from section 2(1) which provides that an award shall "be of the same force and effect *for the purposes of execution* …" (emphasis added) as a domestic judgment (although clearly that provision should be read so as to conform with article 54(1), to which it is intended to give effect).

82.     Nevertheless, despite the view they took about the effect of article 54(1), Arden and Leggatt LJJ came to the conclusion that it was open to the court to grant a stay. In their view article 54(3) gave the national court control over the process of execution which includes its manner and timing and that was reflected in section 2(1)(c) of the 1966 Act. Rules of court, CPR 40.8A and CPR 83.7(4), confer wide discretionary powers to stay the execution of a final judgment. Accordingly, it was open to courts in this jurisdiction to grant a stay of execution if in the particular circumstances of the case it was just to do so, provided that the stay was temporary and consistent with the purposes of the ICSID Convention (Arden LJ at paras 122-126; Leggatt LJ at paras 260-262). Both emphasised, however, that this power could

not extend to declining to enforce an award because of a substantive objection to it or staying enforcement of an award permanently or indefinitely (at paras 125, 262).

83.    The difference between Hamblen LJ on the one hand and Arden and Leggatt LJJ on the other regarding the proper interpretation of article 54(1) of the ICSID Convention is something which ultimately could only be authoritatively resolved by the International Court of Justice. There are valid arguments on both sides. It is perhaps not altogether surprising that there is some doubt about the true meaning and effect of article 54, given that the work on drafting that provision was carried out "under great time pressure and is described by Broches as being characterized by great fluidity, sometimes bordering on confusion" (Schreuer, p 1135, para 66). However, the important point for present purposes is that whichever view is correct, it does not assist Romania in this case.

84.    We first address the position which arises on the interpretation of article 54(1) preferred by Arden and Leggatt LJJ. We agree with them that courts in this jurisdiction have the power to stay execution of an ICSID award in the limited circumstances which they describe. However, we consider that in granting a stay of execution of the Award in the present case pending the determination of the annulment proceedings in the GCEU (or further order in the meantime) they exceeded the proper limits of that power. The grant of a stay in these circumstances was not consistent with the ICSID Convention, on their interpretation of it, under which the United Kingdom and its courts had a duty to recognise and enforce the Award. This was not a limited stay of execution on procedural grounds, but a prohibition on enforcement of the Award on substantive grounds until the GCEU had ruled on the apparent conflict between the ICSID Convention and the EU Treaties. Effect was given to the Commission Decision until such time as the GCEU might pronounce upon it. The logic of the position adopted by Arden and Leggatt LJJ was that if the GCEU upheld the Commission Decision, the stay would continue indefinitely (and the same would be true if the CJEU allows the Commission's appeal against the decision of the GCEU). But the grounds of objection raised by the Commission, even if upheld before the EU courts, were not valid grounds of objection to the Award or its enforcement under the ICSID Convention, as interpreted by Arden and Leggatt LJJ. The principle laid down in article 53(1) that awards are binding on the parties and are not subject to any appeal or other remedy except those provided under the Convention and reflected in article 54 (on their interpretation of it) was disregarded. In substance, the Court of Appeal made use of powers to stay execution granted by domestic law in order to thwart enforcement of an award which had become enforceable under the ICSID Convention.

85.    On the other hand, if article 54(1) incorporates the principle of equivalence, in line with Hamblen LJ's interpretation, it remains the case that Romania's submission in answer to the Claimants' cross-appeal cannot succeed. This is because article 351 TFEU has the effect that any obligation on the UK courts to give effect

to a decision such as the Commission Decision pursuant to the duty of sincere co-operation which might arise under the Treaties in other circumstances does not arise in this case. The discussion below of Original Ground 4 of the cross-appeal, explains that the United Kingdom owes relevant obligations to non-EU member states under the ICSID Convention, a treaty to which the United Kingdom was party before it became a member state. By virtue of article 351 TFEU this means that the obligations on the United Kingdom arising from the ICSID Convention are "not … affected by the provisions of the Treaties".

86.     Leaving aside the Treaties, in the circumstances of the present case the English courts are obliged under article 54(1) of the ICSID Convention to give effect to the Award in favour of the Claimants and this is not a case in which any of the exceptional possible types of defence to enforcement contemplated by Mr Broches and Professor Schreuer arise. Leaving the Treaties out of the analysis, if the Award were a final judgment of an English court it would be enforced without question. Similarly, on Hamblen LJ's interpretation of article 54(1) involving the principle of equivalence, it must follow that the Award would be enforced in the same way. Article 351 TFEU means that this obligation cannot be affected by anything in the Treaties, which are the foundation for the legal effect of Commission rulings and for the obligation of sincere co-operation on which Romania seeks to rely. Romania's attempt to pray in aid the obligation of sincere co-operation is an attempt to pull itself up by its own bootstraps. It cannot make out the necessary foundation for its argument, since it cannot show that the obligation of sincere co-operation has any application at all.

87.     Finally, in this regard, we should refer to the submission on behalf of Romania that to the extent that there is any uncertainty as to the meaning of the relevant provisions of the ICSID Convention and the 1966 Act, this court is bound by EU law to interpret them so far as possible in accordance with EU law in order to comply with the EU principle of effectiveness (seeking to gain support from *van Munster v Rijksdienst voor Pensioenen* (Case C-165/91) [1994] ECR I-4686, para 34; *Budějovický Budvar národní podnik v Rudolf Ammersin GmbH* (Case C-216/01) [2003] ECR I-13657, paras 168-169). This is another bootstraps argument on behalf of Romania. The first step in the analysis should be to ask whether the United Kingdom has relevant obligations arising from the ICSID Convention which, by operation of article 351 TFEU, preclude the application of the Treaties. As explained below in relation to Cross-Appeal Original Ground 3 (paras 101-108), on a proper interpretation of the ICSID Convention, the United Kingdom clearly does have such obligations. Therefore, the Treaties do not have any relevant effect and this court is not bound by EU law to interpret the Convention in the manner for which Romania contends. In any event, the proper interpretation of the Convention is given by principles of international law applicable to all Contracting States and it cannot be affected by EU law.

Cross-Appeal Original Ground 3: The European Communities Act 1972 does not require the United Kingdom to breach its pre-accession obligations under the ICSID Convention, as implemented by the 1966 Act

88.    On behalf of the First Claimant, Viorel Micula, Mr Patrick Green QC advances this ground of appeal, which the other Claimants adopt, on the basis that a conflict might be said to arise between the United Kingdom's obligations under the ICSID Convention and EU law. Mr Green submits that the UK Parliament, in enacting section 2(1) of the European Communities Act 1972, could not have intended to empower the EU to put the United Kingdom in breach of pre-accession international obligations, with only EU institutions as arbiters of the lawfulness of doing so. He says this is so for two reasons. First, it undermines the scheme of the Convention and the express terms and purpose of the 1966 Act. Secondly, at the time Parliament enacted the 1972 Act there was before it a treaty which provided, in what has become article 351 TFEU, that it would not affect the pre-accession international obligations of member states. The effect of the 1972 Act was to confer defined competences within limited fields and the limitations included the preservation of prior international obligations falling within what is now article 351 TFEU. In this regard he relies on the decision of the Court of Appeal in *Shindler v Chancellor of the Duchy of Lancaster* [2016] EWCA Civ 469; [2017] QB 226, in particular the observations of Elias LJ at paras 58-59, and the observations of Lord Mance in *Pham v Secretary of State for the Home Department* [2015] UKSC 19; [2015] 1 WLR 1591, para 82.

89.    The constitutional principles which underlie this submission are clearly correct. Under the UK constitution Parliament is sovereign and EU law has effect within the United Kingdom only to the extent that it has been given such effect by section 2(1) of the European Communities Act 1972 (*R (Buckinghamshire County Council) v Secretary of State for Transport* (*"HS2"*) [2014] UKSC 3; [2014] 1 WLR 324, para 79; *Pham v Secretary of State for the Home Department* [2015] 1 WLR 1591, paras 80, 90; *R (Miller) v Secretary of State for Exiting the European Union* [2017] UKSC 5; [2018] AC 61, paras 60, 61). It is for the UK courts to decide on the scope and effect of section 2(1) and, as Lord Reed observed in *HS2* at para 79, if there is a conflict between a constitutional principle and EU law, that conflict has to be resolved by our courts as an issue arising under the constitutional law of the United Kingdom. However, by contrast with *HS2*, which concerned article 9 of the Bill of Rights, the present case concerns obligations arising under the ICSID Convention which are given effect by the 1966 Act, which is not a statute of fundamental constitutional importance. In these circumstances, there is no sound basis for concluding that the effect of section 2(1) of the European Communities Act 1972 was impliedly excluded so far as the 1966 Act is concerned. In any event, successive treaties which have been given effect in the domestic law of the United Kingdom by section 2(1) of the 1972 Act have included a provision equivalent to the current article 351 TFEU. As a result, the 1972 Act has already made provision

for the effect of accession on pre-accession treaties and, accordingly, this ground of appeal collapses into Original Ground 4 to which we now turn.

Cross-Appeal Original Ground 4: Article 351 TFEU (formerly article 307 EC)

90.    Article 351 TFEU provides:

> "The rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more member states on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties.
>
> To the extent that such agreements are not compatible with the Treaties, the member state or States concerned shall take all appropriate steps to eliminate the incompatibilities established. member states shall, where necessary, assist each other to this end and shall, where appropriate, adopt a common attitude.
>
> In applying the agreements referred to in the first paragraph, member states shall take into account the fact that the advantages accorded under the Treaties by each member state form an integral part of the establishment of the Union and are thereby inseparably linked with the creation of common institutions, the conferring of powers upon them and the granting of the same advantages by all the other member states."

91.    At first instance Blair J held that article 351 TFEU did not apply because there was no conflict between the obligations of the United Kingdom under the ICSID Convention and the EU Treaties. In the Court of Appeal the majority (Hamblen and Leggatt LJJ) considered that the issue of whether there was a conflict between the United Kingdom's duties under EU law and under the ICSID Convention depended on the proper application of article 351 TFEU. That issue had been before the GCEU in the annulment proceedings, although not in precisely the same way, and Blair J had been entitled to stay the proceedings on the basis that without a stay, there would be a clear risk of conflicting decisions with the EU courts. There had been no appeal against his finding on that point. Leggatt LJ considered that while the point could be taken by the court of its own motion, it was inappropriate to do so. Arden LJ (dissenting on this point) considered that the interpretation of article 351 TFEU was a point which should be taken by the court of its own motion. It was for the UK courts to decide whether article 351 TFEU

applied to the ICSID Convention. In view of her conclusion that a stay could be ordered consistently with the ICSID Convention, there was no need to reach a final decision on the article 351 TFEU point. However, she considered that there was little overlap between that issue and the proceedings in the GCEU.

92.    Before the Supreme Court, the parties have addressed this ground of cross-appeal on the basis that it arises only if Blair J and the Court of Appeal erred in concluding that to stay the enforcement or execution of the award pending the annulment proceedings is consistent with the ICSID Convention. We agree that the matter should be approached on this basis. In those circumstances, Romania and the Commission submit that the EU duty of sincere co-operation nevertheless requires the imposition of a stay, while the Claimants submit that the United Kingdom's obligations to recognise and enforce awards under the ICSID Convention are pre-accession treaty obligations within article 351 TFEU and are therefore unaffected by EU obligations.

*Preliminary issue: permission to appeal*

93.    A preliminary issue which arises under this ground of cross-appeal is whether the Claimants should be given permission to appeal on this ground, the question of permission having been reserved to the full hearing.

94.    At first instance, the Claimants argued that article 351 TFEU applied with the result that the obligations of the United Kingdom arising from the pre-accession ICSID Convention were not subject to the over-riding effect of EU law. Blair J did not express any conclusion as to the United Kingdom's separate international law obligations under the ICSID Convention, but considered that article 351 TFEU was one of the grounds on which the Claimants asked the GCEU to annul the Commission Decision and that, even though those issues were not necessarily the same as those which arose in these proceedings, there was a risk of conflicting decisions if the court were to decide the effect of article 351 TFEU while the GCEU proceedings were pending (Blair J, Judgment of 20 January 2017 [2017] EWHC 31 (Comm); [2017] Bus LR 1147, para 152). In the Court of Appeal, Leggatt LJ (at para 265) and Hamblen LJ (at paras 160-164) agreed with that conclusion.

95.    The grounds of appeal of the Claimants before the Court of Appeal did not raise objection to the judge's rejection of their arguments on article 351 TFEU. However, although the position is not entirely clear, it seems that they did seek to rely on article 351 TFEU in the course of argument without amending their grounds of appeal (see Arden LJ at para 172, cf Leggatt LJ at para 265). Romania now objects to the Supreme Court considering the submissions of the Claimants on article 351 TFEU, on the ground that the point was not appealed from Blair J to the Court of Appeal.

96.    We would grant permission to appeal on this ground. First, we agree with the observation of Arden LJ in the Court of Appeal (at para 173) that courts in this jurisdiction should normally, so far as the law allows, exercise their powers so as to ensure compliance with the international obligations of the United Kingdom. The article 351 TFEU issue as now presented to this court is concerned with seeking to identify what are the relevant international obligations of the United Kingdom and, in the event of a conflict, which obligations are to prevail. Furthermore, we are persuaded that this issue goes to the heart of the present dispute and that the parties cannot by their conduct withdraw it from the court's consideration. Secondly, the ground is a pure point of law and we are satisfied that Romania and the Commission have had ample time to enable them to meet the case which is now put against them.

*Article 351 TFEU*

97.    Article 351 TFEU is an express provision of EU law regulating priority where there are potentially conflicting obligations. It is general in scope and applies to any international agreement, irrespective of subject matter, which is capable of affecting the application of the EU Treaties (*Criminal proceedings against Levy* (Case C-158/91) [1993] ECR I-4287, para 11). It applies to agreements concluded by the United Kingdom before its accession on 1 January 1973 (*Commission of the European Communities v United Kingdom of Great Britain and Northern Ireland ("Open Skies")* (Case C-466/98) [2003] 1 CMLR 6, para 25). Article 351 TFEU is intended to establish, in accordance with principles of international law, that the application of the EU Treaties does not affect the duty of a member state to respect the rights of non-member states under a prior agreement and to perform its obligations thereunder (*Commission of the European Economic Community v Government of the Italian Republic, In re Italian Customs Duties on Radio Valves* (Case C-10/61) [1962] ECR 1; *Attorney General v Burgoa* (Case C-812/79) [1980] ECR 2787, para 8; *Levy* (Case C-158/91), para 11; *R v Secretary of State for the Home Department, Ex p Evans Medical Ltd* (Case C-324/93) EU:C:1995:84; [1995] All ER (EC) 481, para 27). It also implies a duty on the part of the EU institutions not to impede the performance of the obligations of the member states which stem from a prior agreement (*Attorney General v Burgoa* (Case C-812/79), para 9). The rule in article 351 TFEU is concerned with conflicting obligations. Accordingly, where an international agreement merely permits but does not require a member state to act in a manner contrary to EU law, the member state must refrain from such conduct (*Evans Medical* (Case C-324/93), para 32). Moreover, article 351 TFEU does not apply to the obligations of a member state under a pre-accession agreement where the rights of non-member states are not involved. If the only obligations in play are those owed to other member states, the matter is regarded as an intra-EU matter and EU law prevails over obligations under pre-accession agreements (*Commission v Italy, In re Italian Customs Duties on Radio Valves* (Case C-10/61) [1962] ECR 1, 10; *Radio Telefis Eireann v Commission of the European Communities ("RTE")* (Joined Cases C-241/91 P and C-242/91 P) [1995] All ER (EC) 416, para 84).

*Determining the scope of obligations under pre-accession agreements*

98.     In order to determine whether a rule of EU law may be deprived of effect by a pre-accession international agreement, it is necessary to consider whether that agreement imposes on the member state concerned obligations the performance of which may still be required by non-member states which are parties to it (*Levy* (Case C-158/91), para 13; *Evans Medical* (Case C-324/93), para 28). In *Levy* the Court of Justice considered a submission that an International Labour Organization Convention, ratified by France prior to the entry into force of the Treaty of Rome, was inconsistent with a Council Directive. The Court of Justice held:

> "… [I]n proceedings for a preliminary ruling, it is not for this Court but for the national court to determine which obligations are imposed by an earlier international agreement on the member state concerned and to ascertain their ambit so as to be able to determine the extent to which they constitute an obstacle to the application of … the directive." (para 21) [See also *Office national de l'emploi v Minne* (Case C-13/93) [1994] ECR I-371, para 18.]

Similarly, in *Evans Medical* (Case C-324/93) the Court of Justice held (paras 29-30) that it was not for that court but for the national court to determine which obligations were imposed by the Single Convention on Narcotic Drugs, a treaty concluded by the United Kingdom before its accession, and to ascertain their ambit so as to be able to determine the extent to which they thwarted the application of Community law. The authorities cited by Romania on this point cast no doubt on the principle stated in *Levy* and *Evans Medical*. In *Budějovický Budvar národní podnik v Rudolf Ammersin GmbH* (Case C-216/01) [2003] ECR I-13657, the obligation owed under the prior bilateral treaty was common ground (para 147). In *T Port GmbH & Co v Hauptzollamt Hamburg-Jonas* (Joined Cases C-364/95 and C-365/95) [1998] ECR I-1023 the Court of Justice merely held that what is now article 351 TFEU did not apply in a case involving imports from a third country which was not at the relevant time a party to a prior international agreement concluded by member states (paras 61-65).

99.     Both *Levy* and *Evans Medical* were concerned with proceedings for a preliminary ruling. As Advocate General Lenz explained in *Evans Medical* (at EU:C:1994:357, para 39), what is now article 267 TFEU empowers the Court of Justice to give preliminary rulings on EU law. It does not confer any power to interpret agreements in international law which member states concluded with non-member states before the entry into force of the Treaties or prior to their own accession. Accordingly, it would not be possible for the Supreme Court to make a preliminary reference to the CJEU on this issue in the present case. While it may

well be open to the Court of Justice to rule on the extent of a member state's prior treaty obligations in other circumstances - for example in infringement proceedings (see *Evans Medical* per Advocate General Lenz at para 44; *European Commission v Slovak Republic* (Case C-264/09) [2011] ECR I-8065, paras 32-40) or in direct actions (*RTE* (Joined Cases C-241/91 P and C-242/91 P)), *Levy* and *Evans Medical* make clear that this is not a question of EU law and that there can be no objection to the courts of a member state deciding the issue. Furthermore, as this is a matter of the interpretation of the prior agreement in international law, EU courts are no better placed to determine the scope of obligations under a pre-accession agreement than the courts of the member state concerned or, indeed, a court or tribunal which has jurisdiction to rule on its meaning under the prior agreement itself.

100.   On behalf of Romania, Mr O'Donoghue QC submits that in applying article 351 TFEU it is necessary to distinguish between two questions. The first is whether there is a relevant prior international obligation in play at all. The second is whether, even if as a matter of international or domestic law the obligation is in some sense owed to all parties to the prior agreement, "the effect of that is that the case does not only involve 'intra-Community relations' for the purposes of article 351 TFEU". His formulation of the second limb, however, mis-states the effect of the authorities. While it is correct that in order for article 351 TFEU to apply relevant obligations under the prior treaty must be owed to a non-member state, that does not impose an additional requirement that the particular dispute before the court must relate to extra-EU activities or transactions. The decisions of the Court of Justice demonstrate that the opposite is the case. Thus, *Levy* was concerned only with conduct within France. Similarly, *Evans Medical* concerned activities entirely within the EU - the importation of drugs from the Netherlands to the United Kingdom - but article 351 TFEU was nevertheless engaged. In both cases what mattered was that the relevant obligations under the prior treaties were owed to non-member states. Thus, notwithstanding the fact that the United Kingdom, Sweden and Romania were at the material times all member states, if the relevant obligations under the ICSID Convention are owed to ICSID contracting States which are non-member states, article 351 TFEU will be engaged.

*Does article 351 TFEU apply to the United Kingdom's relevant obligations under the ICSID Convention?*

101.   It is not difficult to see that all States which are parties to the ICSID Convention have an interest in the effective operation of the Convention scheme for the enforcement of arbitral awards. However, article 351 TFEU is concerned with conflicting obligations and, accordingly, it is only if a relevant obligation under ICSID is owed by the United Kingdom to a non-member state that the Claimants can succeed on this ground. We also accept the submission on behalf of Romania that we are not here concerned with the general question whether the United Kingdom owes obligations under the ICSID Convention to non-member states, but

with the question whether the specific obligation of the United Kingdom under the ICSID Convention to enforce this award is owed by the United Kingdom to non-member states. Romania's case is that the only legal obligation of the United Kingdom which is in play is the obligation owed under the ICSID Convention to Sweden, which is an EU member state. It submits that Sweden is the only State with a direct interest in the enforcement of the award. The Claimants, on the other hand, identify as the relevant obligations of the United Kingdom articles 54 and 69 of the ICSID Convention. Article 54(1) provides that each contracting State shall recognise an award rendered pursuant to the Convention as binding and shall enforce the pecuniary obligations imposed by that award as if it were a final judgment of a court in that State. Article 69 provides that each Contracting State shall take such legislative or other measures as may be necessary for making the provisions of the ICSID Convention effective in its territories. The Claimants submit that these obligations are owed to all other parties to the ICSID Convention.

102.    Mr O'Donoghue on behalf of Romania submits that if the Claimants are correct in their submission, this would apply equally to every significant obligation in every multilateral treaty with the result that every multilateral treaty involving some parties which are not EU member states would fall within article 351 TFEU. He submits that this clearly is not correct and points to decisions of the Court of Justice relating to other multilateral conventions where, he says, article 351 TFEU did not apply: *Commission v Italy, In re Italian Customs Duties on Radio Valves* (Case C-10/61); *Ministere Public v Deserbais* (Case C-286/86) [1988] ECR 4907; *RTE* (Joined Cases C-241/91 P and C-242/91 P). Thus, for example, he submits that in *RTE* (Joined Cases C-241/91 P and C-242/91 P), a direct action, the CJEU found that the rights of non-member states under the Berne Convention were not involved, since the case - involving the United Kingdom and Ireland - only concerned the rights of EU member states, notwithstanding that the Berne Convention was a multilateral treaty involving multiple non-member states. He relies in particular on para 84 of the judgment where the Court of Justice observed:

> "It is, however, settled case law that the provisions of an agreement concluded prior to entry into force of the Treaty or prior to a member state's accession cannot be relied on in intra-Community relations if, *as in the present case*, the rights of non-member countries are not involved …" (Emphasis added)

We note, however, that since its decision in *RTE*, the Court of Justice has had occasion to consider the Berne Convention in *Luksan v van der Let* (Case C-277/10) EU:C:2012:65; [2013] ECDR 5, where it stated (para 58) that the Berne Convention displayed the characteristics of an international agreement for the purposes of article 351 TFEU, although it concluded (para 62) that article 351 TFEU was not engaged in that case because the relevant provision of the Convention allowed but did not require a member state to adopt a measure which appears to be contrary to EU law.

103.    There is, however, a shorter and more fundamental answer to this submission of Romania: it is founded on a non sequitur. In order to determine whether article 351 TFEU applies in any particular case it will be necessary to construe the prior agreement in question in order to ascertain whether any relevant obligations arising from it are owed to non-member states. The authorities on which Romania relies can cast no light on the question whether obligations under articles 54 and 69 of the ICSID Convention are owed to all Contracting States.

104.    It is clear that the specific duties in articles 54 and 69 of the ICSID Convention are owed to all other Contracting States. The Convention scheme is one of mutual trust and confidence which depends on the participation and compliance of every Contracting State. The importance within this scheme of the effective recognition and enforcement of awards is apparent from the preamble which emphasises the requirement that "any arbitral award be complied with".

105.    The structure of the ICSID Convention supports this interpretation. The Convention establishes the International Centre for Settlement of Investment Disputes to provide facilities for conciliation and arbitration of investment disputes between Contracting States and nationals of Contracting States (article 1). The Convention provides that in relation to such disputes any Contracting State or any national of a Contracting State can apply to a tribunal appointed pursuant to Chapter IV of the Convention. However, article 64 provides a separate route for resolution of disputes between Contracting States by permitting an aggrieved State to refer the matter to the International Court of Justice. This is required to provide a remedial mechanism in cases of infringement of direct obligations owed to other States. The obligations of Contracting States in articles 53, 54 and 69 are expressed in unqualified terms, without limit as to the persons to whom they are owed. Article 64 is expressed in entirely general terms which are apt to include disputes regarding the obligations set out in those articles. These features of the Convention regime provide a strong indication that a Contracting State which has obligations under the Convention in relation to an award owes those obligations to all other States party to the Convention as well as to any party to the award. Article 27(1) confirms that the obligation on a Contracting State against whom an arbitration award is made to comply with the award is not just owed to the other parties to the dispute, since it recognises that any Contracting State whose national is involved in the dispute may bring an international claim against the other Contracting State if it fails to comply with the award rendered. Professor Schreuer in his commentary on article 53 confirms that the obligation of compliance under article 53 is in fact owed to every other Contracting Party: p 1100, para 13 and p 1109, para 46. The same is true of the obligation under article 54, as Professor Schreuer confirms in his commentary on that provision at p 1125, para 28, (non-compliance with article 54 "would carry the usual consequences of state responsibility …").

106.    The Claimants identify four features of the scheme, which demonstrate that its purpose requires that the relevant obligations must be owed, not only to the State of nationality of the party seeking to enforce the award, but to all Contracting States. First, a key purpose of the Convention is to encourage investment by providing investors with reassurance that a monetary award can be enforced in the territories of all Contracting States. The failure of any Contracting State to enforce an award in accordance with article 54 would undermine the Convention scheme on which investors and Contracting States all rely. This points to a network of mutual enforcement obligations. Secondly, were a Contracting State, when implementing its Convention obligations into domestic law, to qualify them by providing that no award was to be recognised or enforced if illegal under domestic law or contrary to its public policy, that would represent a plain breach of duty owed to all other Contracting States of which they would all be entitled to complain, even before such legislation came to be applied in any particular case. Thirdly, if a Contracting State were to fail to enforce an award in accordance with the ICSID scheme the beneficiaries of the award would be compelled to seek enforcement elsewhere and the burden of enforcement would fall on other States involving expenditure of resources within their legal systems. Fourthly, in such situations attempts to enforce in an alternative forum might result in the party against which enforcement is sought reducing or withdrawing its commercial assets in that alternative forum to the detriment of the State concerned.

107.    The travaux préparatoires of the ICSID Convention also support the view that obligations to comply with the Convention scheme are owed to all Contracting States. Thus, at the Fifth Session held on 18 December 1963, responding to a suggestion by the representative of Dahomey that, by analogy with article 94 of the UN Charter, the Security Council be given power to enforce awards, the Chairman stated that he did not believe that any State which had acceded to the Convention would fail to fulfil its provisions but added:

> "If it did, other Contracting States might take such action as might be appropriate." (*History*, vol II-I, Doc 25 (30 April 1964) "Summary Record of Proceedings, Addis Ababa Consultative Meetings of Legal Experts, December 16-20, 1963", p 273)

Similarly, in the Sixth Session held on 20 February 1964 the Chairman acknowledged that a Contracting State's duty to comply with an award was owed to all other Contracting States.

> "Apart from legal sanctions based on the revival of the right of diplomatic protection of the investor's State there would be even more serious indirect sanctions because a State which did

> not comply would fail to meet its obligations not only to the investor but also to the community of Contracting States which would presumably include capital-exporting countries from which the losing State could expect assistance." (*History*, vol II-I, Doc 29 (1 June 1964) "Summary Record of Proceedings, Geneva Consultative Meetings of Legal Experts, February, 17-22, 1964", p 425)

Although these statements were made in the context of compliance with awards, as opposed to recognition and enforcement, they are powerful indications that obligations under the ICSID Convention are owed by all Contracting States to the community of Contracting States.

108.    Accordingly, neither the Convention nor its travaux préparatoires provide any warrant for restricting the duties owed by a Contracting State under articles 54 and 69 so that they are owed only to the State of nationality of an award beneficiary.

*Does the article 351 TFEU issue give rise to a risk of conflict which requires the imposition of a stay pending the outcome of the proceedings before the EU courts?*

109.    Romania and the Commission submit that this court is precluded from deciding the issue of the extent of the obligations of the United Kingdom and to whom those obligations are owed because there would be a risk of a conflict between such a ruling and a future ruling by an EU court in the present dispute. It is said that the duty of sincere co-operation requires courts in this jurisdiction to impose a stay pending the resolution of the issue by the EU courts.

110.    Neither the EU courts nor domestic courts have competence to give an authoritative decision, binding as between States, as to the existence and extent of obligations under a prior multilateral convention. The convention itself will usually make provision for the resolution of disputes. In the case of the ICSID Convention that function is reserved to the International Court of Justice by article 64. However, both the EU courts (for example, in infringement proceedings or direct actions) and domestic courts (in national proceedings) have competence to consider and rule upon the effect of a multilateral treaty, insofar as it may bear upon the outcome of the proceedings before them.

111.    In the present case, the duty of sincere co-operation does not require courts in this jurisdiction to decline to decide this issue pending its resolution by the EU courts, or otherwise to defer to the EU courts on this issue, for the following reasons.

112.    First, the case law of the Court of Justice makes clear that, as a matter of EU law, questions as to the existence and extent of obligations under prior treaties, in the context of article 351 TFEU, are not reserved to the EU courts. In *Levy* and *Evans Medical* the Court of Justice has accepted the appropriateness of national courts ruling on such issues. Such questions are not governed by EU law and the Court of Justice is in no better position than a national court to answer them. This is addressed at paras 98-99 above.

113.    Secondly, although the Claimants have raised an article 351 TFEU issue in the proceedings before the EU courts, it is not the same issue as that with which this court is seized. In the proceedings to annul the Commission Decision, the Claimants advanced eight pleas of law, one of which was that the Commission Decision was in breach of article 351 TFEU, because that provision affords primacy to Romania's pre-existing international obligations under the BIT and the ICSID Convention. The GCEU did not rule on that plea and, accordingly, it is not the subject of the appeal to the CJEU by the Commission. Although the pleadings before the GCEU made references to article 54 of the ICSID Convention in conjunction with article 53, the essential article 351 TFEU issue raised by the Claimants in the annulment proceedings concerned Romania's obligation to abide by and comply with the award under article 53 of the ICSID Convention. By contrast, the issue with which we are concerned in these proceedings is the United Kingdom's obligations to implement the ICSID Convention and to recognise and enforce the award under articles 54 and 69 of the ICSID Convention. The extent of the United Kingdom's obligations under those articles has not been raised before the EU courts. There is, therefore, no congruence of the issues before the domestic courts and the EU courts.

114.    Thirdly, the prospect of an EU court addressing the applicability of article 351 TFEU to pre-accession obligations under the ICSID Convention in the context of the present dispute is remote. Although the Claimants raised in the annulment proceedings the issue of Romania's obligations under the ICSID Convention, the GCEU did not rule on this issue. The pending appeal to the CJEU is limited to those grounds on which the GCEU decided the application. Accordingly, if the Commission fails on the appeal, the article 351 TFEU issue will not be addressed in those proceedings. If the Commission succeeds on the appeal, however, the matter will have to be remitted to the GCEU for consideration of the other pleas advanced by the Claimants and the article 351 TFEU issue, so far as concerns the obligations of Romania, may then be considered by the GCEU or on a further appeal by the CJEU.

115.    The preliminary reference to the CJEU made by the Belgian court does not raise any issue in relation to article 351 TFEU. Belgium was an original signatory of the Treaty of Rome and the entry into force of that treaty pre-dated Belgium's ratification of the ICSID Convention.

116.   It is conceivable that if the United Kingdom courts were to conclude that no stay of enforcement is required, because article 351 TFEU secures pre-accession obligations owed to non-member states under articles 54 and 69 of the ICSID Convention, and if the United Kingdom were to enforce the award on that basis, the Commission might thereafter bring infringement proceedings against the United Kingdom in which that issue would be squarely raised. It is important to point out, however, that the Commission has given no indication that it is contemplating any such proceedings and the possibility is entirely speculative. There is no good answer to the Claimants' submission that relevant duties are owed by the United Kingdom under articles 54 and 69 of the ICSID Convention to non-member states, so it seems unlikely that the Commission could bring infringement proceedings on this basis. It would have no realistic prospect of success in disputing the existence of such obligations. Moreover, were it to seek to do so, the principle of comity and the two-way application of the principle of sincere co-operation would be likely to lead the Court of Justice to leave the interpretation of the Convention, to which the EU is not a party, to the domestic courts of the United Kingdom as a Contracting State. (In this regard see the observation of the Court of Justice in *Commission v Slovak Republic* (Case C-264/09), para 40.) In any event, it would not be appropriate for this court to stay enforcement in deference to the EU courts on this issue, which is not one of EU law, simply because of the speculative possibility of infringement proceedings in the future. (See, generally, *Patmalneice v Secretary of State for Work and Pensions* [2011] 1 WLR 783.)

117.   The possibility that the EU courts may consider this issue at some stage in the future is both contingent and remote. We cannot accept that in such circumstances the duty of sincere co-operation requires the imposition of a stay on the enforcement of the award.

Conclusion on the cross-appeal

118.   For these reasons the duty of sincere co-operation is not applicable in this case and there is no impediment to the lifting of the stay, which is an unlawful measure in international law and unjustified and unlawful in domestic law. We would therefore allow the cross-appeal of the Claimants and lift the stay on enforcement of the award.

The appeal

119.   In the light of our conclusion in relation to the cross-appeal, it is no longer necessary to consider the appeal in relation to the provision of security. We would discharge the order for security.