# EXHIBIT 3

# FEDERAL COURT OF AUSTRALIA

## Eiser Infrastructure Ltd v Kingdom of Spain [2020] FCA 157

| | |
|---|---|
| File numbers: | NSD 601 of 2019<br>NSD 602 of 2019 |
| Judge: | **STEWART J** |
| Date of judgment: | 24 February 2020 |
| Catchwords: | **ARBITRATION** – international arbitration – applications for recognition and enforcement of awards of the International Centre for Settlement of Investment Disputes (ICSID) under s 35(4) of the *International **Arbitration Act** 1974* (Cth)<br><br>**PRIVATE INTERNATIONAL LAW** – foreign state immunity – where foreign state respondent asserts sovereign immunity – interaction between s 9 of the *Foreign States **Immunities Act** 1985* (Cth) and the *Convention on the Settlement of Investment Disputes between States and Nationals of Other States* (the **Investment Convention**) which is given the force of law by s 32 of the *Arbitration Act* – where s 9 of the *Immunities Act* provides that a foreign state is immune from the jurisdiction of the courts of Australia in a proceeding – where Art 54 of the Investment Convention provides that each Contracting State shall recognise an award rendered pursuant to the Investment Convention as binding and enforce the pecuniary obligations imposed by that award as if it were a final judgment of a court of that state – whether the apparent inconsistency between Art 54 of the Investment Convention and s 9 of the *Immunities Act* can be resolved – whether submission to jurisdiction under s 10 of the *Immunities Act*<br><br>**PRIVATE INTERNATIONAL LAW** – foreign state immunity – interpretation of the Investment Convention – whether the Investment Convention excludes any claim for foreign state immunity in proceedings for the recognition and enforcement of an award – distinction between recognition and enforcement of award as if it were a final judgment of a court under Art 54(1) and execution of an award in Art 54(3) of the Investment Convention – where Art 55 provides that nothing in Art 54 shall be construed as derogating from the law in force in relation to immunity from execution |

**STATUTORY INTERPRETATION** – public international law – Vienna Convention on the Law of Treaties – construction of the Investment Convention – reconciling the English, French and Spanish authentic texts

Legislation:

*Acts Interpretation Act 1901* (Cth) s 13

Explanatory Memorandum, *Foreign States Immunities Bill 1985* (Cth)

Explanatory Memorandum, *ICSID Implementation Bill 1990* (Cth)

*Federal Court of Australia Act 1976* (Cth) s 43

*Foreign Judgments Act 1991* (Cth)

*Foreign States Immunities Act 1985* (Cth) Pts II, IV; ss 3, 7, 9, 10, 17, 30, 31, 32, 33, 34, 35

*ICSID Implementation Act 1990* (Cth)

*International Arbitration Act 1974* (Cth) Pt IV; ss 2D, 8, 31, 32, 34, 35

*Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, opened for signature 10 December 1984, 1465 UNTS 85 (entered into force 26 June 1987)

*Convention on the Settlement of Investment Disputes between States and Nationals of Other States*, opened for signature 18 March 1965, 575 UNTS 159 (entered into force 14 October 1966) Arts 26, 27, 49, 50, 51, 52, 53, 54, 55

*The Energy Charter Treaty*, opened for signature 17 December 1994, 2080 UNTS 95 (entered into force 16 April 1998) Arts 1, 10, 26, 38, 39

*Vienna Convention on the Law of Treaties*, opened for signature  23 May 1969, 1155 UNTS 331, [1974] ATS 2 (entered into force 27 January 1980) Arts 31, 32, 33

Cases cited:

*AED Oil Ltd v Puffin FPSO Ltd* [2010] VSCA 37; 27 VR 22

*Associated Electric and Gas Insurance Services Ltd v European Reinsurance Co of Zurich* [2003] UKPC 11; [2003] 1 WLR 1041

*Benvenuti & Bonfant v People's Republic of the Congo*, Cour d'appel, Paris (26 June 1981) 65 ILR 88

*Blue Ridge Investments LLC v Republic of Argentina* 735 F3d 72 (2d Cir 2013)

*Clarke v Fennoscandia Ltd* [2007] UKHL 56; 2008 SC (HL) 122

*Comandate Marine Corporation v Pan Australia Shipping*

*Pty Ltd* [2006] FCAFC 192; 157 FCR 45

*Comptroller-General of Customs v Pharm-A-Care Laboratories Pty Ltd* [2020] HCA 2

*Ferdinands v Commissioner for Public Employment* [2006] HCA 5; 225 CLR 130

*Firebird Global Master Fund II Ltd v Republic of Nauru* [2015] HCA 43; 258 CLR 31

*Government of the Republic of Zimbabwe v Fick* [2012] ZASCA 122

*Government of the Republic of Zimbabwe v Fick* [2013] ZACC 22; 2013 (5) SA 325

*Infrastructure Services Luxembourg S.A.R.L v Kingdom of Spain* [2019] FCA 1220

*La Macchia v Minister for Primary Industries and Energy* [1992] FCA 673; 110 ALR 201

*Lahoud v The Democratic Republic of Congo* [2017] FCA 982

*Li v Zhou* [2014] NSWCA 176; 87 NSWLR 20

*Liberian Eastern Timber Corporation (LETCO) v The Government of the Republic of Liberia* 650 FSupp 73 (SDNY 1986)

*Micula v Romania* [2018] EWCA Civ 1801

*Mobil Cerro Negro Ltd v Bolivarian Republic of Venezuela* 863 F3d 96 (2d Cir 2017)

*Morrison v Peacock* [2002] HCA 44; 210 CLR 274

*Povey v Qantas Airways Ltd* [2005] HCA 33; 216 ALR 427

*PT Garuda Indonesia Ltd v ACCC* [2012] HCA 33; 247 CLR 240

*Republic of Ecuador v Occidental Exploration and Production Co* [2005] EWCA Civ 1116; [2006] QB 432

*Silk Bros Pty Ltd v State Electricity Commission (Vic)* [1943] HCA 2; 67 CLR 1

*Slovak Republic v Achmea BV* [2018] 4 WLR 87 (ECJ)

*Société Ouest Africaine des Bétons Industriels (SOABI) v Senegal* (1991) 30 ILM 1169 (Cour de Cassation)

*TCL Air Conditioner (Zhongshan) Co Ltd v Judges of the Federal Court of Australia* [2013] HCA 5; 251 CLR 533

*Traxys Europe SA v Balaji Coke Industry Pvt Ltd (No 2)* [2012] FCA 276; 201 FCR 535

*Tridon Australia Pty Ltd v ACD Tridon Inc* [2004] NSWCA 146

*Uganda Telecom Ltd v Hi-Tech Telecom Pty Ltd (No 2)* [2011] FCA 206; 277 ALR 441

*Undershaft (No 1) Ltd v Federal Commissioner of Taxation*

[2009] FCA 41; 175 FCR 150

*Zhang v Zemin* [2010] NSWCA 255; 79 NSWLR 513

Booysen H, "The Municipal Enforcement of Arbitration Awards against States in Terms of Arbitration Conventions, with Special Reference to the New York Convention – Does International Law Provide for a Municipal Law Concept of an Arbitrable Act of State?" (1986/87) 12 *South African Yearbook of International Law* 73

Briggs A, *The Conflict of Laws* (3rd ed, Oxford University Press, Clarendon Series, 2013)

Broches A, "Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution" (1987) 2 *ICSID Review – Foreign Investment Law Journal* 287

Buckley RP, "Now We Have Come to the ICSID Party: Are Its Awards Final and Enforceable" (1992) 14 *Sydney Law Review* 358

Chukwumerije O, "ICSID Arbitration and Sovereign Immunity" (1990) 19 *Anglo-American Law Review* 166

Collins, Lord Lawrence (ed), *Dicey, Morris & Collins on The Conflict of Laws* (15th ed, Sweet & Maxwell, 2012)

Delaume GR, "Arbitration with Governments: Domestic v. International Awards" (1983) 17 *The International Lawyer* 687

Delaume GR, "Contractual Waivers of Sovereign Immunity: Some Practical Considerations" (1990) 5 *ICSID Review – Foreign Investment Law Journal* 230

Delaume GR, "ICSID Arbitration and the Courts" (1983) 77 *American Journal of International Law* 784

Delaume GR, "Judicial Decisions Related to Sovereign Immunity and Transactional Arbitration" (1987) 2 *ICSID Review – Foreign Investment Law Journal* 403

Fox H and Webb P, *The Law of State Immunity* (3rd ed, Oxford University Press, 2013)

Franzoni BD, "International Law – Enforcement of International Centre for Settlement of Investment Disputes Arbitral Awards in the United States" (1988) 18 *Georgia Journal of International and Comparative Law* 101

Gardiner R, *Treaty Interpretation* (2nd ed, Oxford University Press, 2015)

Hill J and Chong A, *International Commercial Disputes: Commercial Conflict of Laws in English Courts* (Hart Publishing, 2010)

*History of the ICSID Convention* (International Centre for

Settlement of Investment Disputes, 1970) Vol I-IV

Holmes M and Brown C, *The International Arbitration Act 1974: A Commentary* (3rd ed, LexisNexis Butterworths, 2018)

Juratowitch B, "Waiver of State Immunity and Enforcement of Arbitral Awards" (2016) 6 *Asian Journal of International Law* 199

Korontzis G, "Making the Treaty" in Hollis D (ed.) *The Oxford Guide to Treaties* (Oxford University Press, 2012)

Law Reform Commission, *Foreign State Immunity,* (Report No 24, Australian Government Publishing Service, 1984)

McClean D and Ruiz Abou-Nigm V, *The Conflict of Laws* (8th ed, Sweet & Maxwell, 2012)

Pearce DC, *Statutory Interpretation in Australia* (9th ed, LexisNexis Butterworths, 2019)

Schreuer CH, *The ICSID Convention: A Commentary* (2nd ed, Cambridge University Press, 2009)

Smutny AC, Smith AD and Pitt M, "Enforcement of ICSID Convention Arbitral Awards in US Courts" (2016) 43 *Pepperdine Law Review* 649

Soley DA, "ICSID Implementation: An Effective Alternative to International Conflict" (1985) 19 *The International Lawyer* 521

Toope SJ, *Mixed International Arbitration* (Grotius Publications Ltd, 1990)

van den Berg AJ, "Recent Enforcement Problems under the New York and ICSID Conventions" (1989) 5 *Arbitration International* 2

van den Berg AJ, "Some Recent Problems in the Practice of Enforcement under the New York and ICSID Conventions" (1987) 2 *ICSID Review – Foreign Investment Law Journal* 439

| | |
|---|---|
| Date of hearing: | 29 October 2019 |
| Date of last submissions: | 11 February 2020 |
| Registry: | New South Wales |
| Division | General Division |
| National Practice Area: | Commercial and Corporations |
| Sub-area: | International Commercial Arbitration |

Category:                         Catchwords

Number of paragraphs:             214

In NSD 601 of 2019:

Counsel for the Applicants:       J A Hogan-Doran and C Brown

Solicitor for the Applicants:     Norton Rose Fulbright

Counsel for the Respondent:       I M Jackman SC and M R Tyson

Solicitor for the Respondent:     Squire Patton Boggs

In NSD 602 of 2019:

Counsel for the Applicants:       J A Hogan-Doran and C Brown

Solicitor for the Applicants:     Norton Rose Fulbright

Counsel for the Respondent:       I M Jackman SC and M R Tyson

Solicitor for the Respondent:     Squire Patton Boggs

# ORDERS

**NSD 601 of 2019**

| | |
|---|---|
| **BETWEEN:** | **EISER INFRASTRUCTURE LTD**<br>First Applicant |
| | **ENERGIA SOLAR LUXEMBOURG S.A.R.L**<br>Second Applicant |
| **AND:** | **KINGDOM OF SPAIN**<br>Respondent |

| | |
|---|---|
| **JUDGE:** | **STEWART J** |
| **DATE OF ORDER:** | **24 FEBRUARY 2020** |

**THE COURT ORDERS THAT:**

1. The applicants have leave under s 35(4) of the *International Arbitration Act 1974* (Cth) to enforce the award of the International Centre for Settlement of Investment Disputes dated 4 May 2017 in Case No. ARB/13/36 against the respondent;

2. The respondent pay the applicants €128,000,000;

3. The respondent pay the applicants interest on €128,000,000 from 20 June 2014 to 4 May 2017 at the rate of 2.07%, compounded monthly, and from 5 May 2017 to the date of payment at the rate of 2.50%, compounded monthly;

4. The respondent pay the applicants' costs of the proceeding, save that if any party wishes to vary this order 4 it may apply to do so by filing an interlocutory application to that effect with written submissions of no more than three pages within 14 days of the making of these orders.

Note:  Entry of orders is dealt with in Rule 39.32 of the *Federal Court Rules 2011*.

- ii -

# ORDERS

**NSD 602 of 2019**

| | |
|---|---|
| **BETWEEN:** | **INFRASTRUCTURE SERVICES LUXEMBOURG S.A.R.L.**<br>First Applicant |
| | **ENERGIA TERMOSOLAR B.V.**<br>Second Applicant |
| **AND:** | **KINGDOM OF SPAIN**<br>Respondent |

| | |
|---|---|
| **JUDGE:** | **STEWART J** |
| **DATE OF ORDER:** | **24 FEBRUARY 2020** |

**THE COURT ORDERS THAT:**

1. The applicants have leave under s 35(4) of the *International Arbitration Act 1974* (Cth) to enforce the award of the International Centre for Settlement of Investment Disputes dated 15 June 2018 as rectified by the award dated 29 January 2019 in Case No. ARB/13/31 against the respondent;

2. The respondent pay the applicants €101,000,000;

3. The respondent pay the applicants interest on €101,000,000 from 20 June 2014 to 15 June 2018 at the rate of 2.07%, compounded monthly, and from 16 June 2018 to the date of payment at the rate of 2.50%, compounded monthly;

4. The respondent pay the applicants US$635,431.70 and £2,447,008.61;

5. The respondent pay the applicants' costs of the proceeding, save that if any party wishes to vary this order 5 it may apply to do so by filing an interlocutory application to that effect with written submissions of no more than three pages within 14 days of the making of these orders.

Note:  Entry of orders is dealt with in Rule 39.32 of the *Federal Court Rules 2011*.

# REASONS FOR JUDGMENT

**STEWART J:**

INTRODUCTION [1]

BACKGROUND [4]

The relief sought [4]

Background to NSD601 [9]

*The ECT* [12]

*The ICSID arbitration* [16]

*Spain's application for annulment of the Award* [21]

Background to NSD602 [25]

*The ICSID arbitration* [27]

*Spain's request for rectification of the Award* [30]

*Spain's application for annulment of the award and the stay of the enforcement proceeding* [32]

THE PROCEEDINGS IN THIS COURT [37]

Spain's immunity claim [37]

The applicants' case on immunity [39]

THE IMMUNITIES ACT [44]

The ALRC Report [44]

Part II – Immunity from jurisdiction [46]

Part IV – Enforcement [59]

THE *ARBITRATION ACT* AND THE INVESTMENT CONVENTION [68]

The *Arbitration Act* [68]

The Investment Convention [79]

Interpretation of the Investment Convention [83]

DISTINCTION BETWEEN ENFORCEMENT AND EXECUTION IN THE *ARBITRATION ACT* AND THE INVESTMENT CONVENTION [89]

Some terminology [89]

The English text of Arts 53-55 of the Investment Convention [95]

Object and purpose [114]

The preparatory materials [117]

- 4 -

The French and Spanish texts of Arts 53-55 [136]

Commentary on the Investment Convention [145]

The foreign cases [162]

Conclusion [173]

SUBMISSION TO JURISDICTION [177]

SECTION 34 OF THE ARBITRATION ACT [202]

IMPLIED REPEAL [204]

CONCLUSION [209]

**INTRODUCTION**

1    These two cases concern the interaction of the *Foreign States **Immunities** Act 1985* (Cth) and the *Convention on the Settlement of Investment Disputes between States and Nationals of Other States*, opened for signature 18 March 1965, 575 UNTS 159 (entered into force 14 October 1966) (**the Investment Convention**) which is given the force of law by s 32 of the *International **Arbitration** Act 1974* (Cth).  Section 9 of the *Immunities Act* provides that a foreign state is immune from the jurisdiction of the courts of Australia in a proceeding, but Art 54 of the Investment Convention provides that each Contracting State, which includes Australia, shall recognise an award rendered pursuant to the Investment Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that state.  The question is whether the apparent inconsistency between these provisions can be resolved.

2    Put differently, is a foreign state immune from the recognition and enforcement of an arbitral award made under the Investment Convention notwithstanding that the Investment Convention inherently envisages arbitration awards being made against foreign states and it provides that such awards "shall" be recognised and enforced by Australian courts?

3    That question arises from the fact that the applicants in each case have substantial arbitral awards in their favour against the respondent, the Kingdom of **Spain**, which they seek to have recognised and to enforce by way of judgment in terms of the awards.  Spain relies on foreign state immunity to resist that.  The awards were issued by tribunals appointed under the auspices of the International **Centre** for the Settlement of Investment Disputes (or **ICSID**) which is established under the Investment Convention.

## BACKGROUND

### The relief sought

4       In case **NSD601**/2019, the two applicants, Eiser Infrastructure Ltd, which is incorporated in England and Wales, and Energia Solar Luxembourg S.à.r.l., which is incorporated in Luxembourg, seek the following relief against Spain:

(1)     Pursuant to s 35(4) of the *Arbitration Act*, the applicants have leave to have the award of the Centre in Case No. ARB/13/36 against Spain dated 4 May 2017 enforced as if it were a judgment of the Court.

(2)     Spain pay the applicants €128,000,000.00.

(3)     Spain pay the applicants interest on the amount of €128,000,000.00 from 20 June 2014 to 4 May 2017 at the rate of 2.07%, compounded monthly, and interest from 5 May 2017 to the date of payment at the rate of 2.50%, compounded monthly.

(4)     Pursuant to s 43(1) of the *Federal Court of Australia Act 1976* (Cth) (**FCA Act**), Spain is to pay the applicants' costs of this proceeding as agreed or assessed.

5       In case **NSD602**/2019, the two applicants, Infrastructure Services Luxembourg S.à.r.l., which is incorporated in Luxembourg, and Energia Termosolar BV, which is incorporated in the Netherlands, seek the following relief against Spain:

(1)     Pursuant to s 35(4) of the *Arbitration Act*, the applicants have leave to have the award of the Centre in Case No. ARB/13/31 against Spain dated 15 June 2018 as rectified by the award dated 29 January 2019 enforced as if it were a judgment of the Court.

(2)     Spain pay the applicants €101,000,000.00.

(3)     Spain pay the applicants interest on the amount of €101,000,000.00 from 20 June 2014 to 15 June 2018 at the rate of 2.07%, compounded monthly, and interest from 16 June 2018 to the date of payment at the rate of 2.07%, compounded monthly.

(4)     Spain pay the applicants US$635,431.70 as a contribution to the payment of their share of the costs of the proceedings and £2,447,008.61 as a contribution to the payment of their legal representation costs and expenses.

(5)     Pursuant to s 43(1) of the *FCA Act*, Spain is to pay the applicants' costs of this proceeding as agreed or assessed.

6    In short, in both cases the applicants seek, under s 35 of the *Arbitration Act*, the recognition and enforcement of arbitration awards in their favour by converting them into judgments of the Court.  They do not, at least not at this stage, seek to execute on the judgments.  The distinction between recognition and enforcement, on the one hand, and execution on the other, is central to these reasons.

7    The underlying dispute in both proceedings arose from the applicants' investment in solar power projects in Spain and, as it was found in the arbitrations that gave rise to the awards, Spain's failure to accord fair and equitable treatment to the applicants' investments, in breach of Art 10(1) of The Energy Charter Treaty (**ECT**), opened for signature 17 December 1994, 2080 UNTS 95 (entered into force 16 April 1998).

8    The background facts set out below in relation to each proceeding are summarised from the arbitration award in each case.

**Background to NSD601**

9    From 1997, Spain adopted a series of regulatory measures aimed at promoting the development of solar power and other sources of renewable energy.  In particular, in 2007 Spain adopted legislation known as "RD 661/2007" aimed at establishing a stable subsidy system that guaranteed attractive profitability for electricity production from solar power and other renewable resources.

10   Relying on the financial incentives and inducements available to the applicants under this legislative regime, the applicants invested approximately €126 million in solar power projects in Spain's territory.

11   Following a change in government, Spain adopted a series of laws between 2012 and 2014 reducing, and eventually revoking, the financial incentives on which the applicants had relied when making their investments in Spain.  The new measures adopted by Spain were intended to, and did, accomplish the objective of significantly reducing the level of subsidies paid to solar power and other renewable energy generators.  The changes in Spain's legislative regime caused substantial harm to the value of the applicants' investments.

*The ECT*

12   The ECT is a multilateral treaty which was opened for signature in 1994 and entered into force in 1998.  According to Art 2 of the ECT, its purpose is to establish a legal framework in order

to promote long-term cooperation in the energy field, based on "complementarities and mutual benefits" in accordance with the objectives and principles of the European Energy Charter (adopted in the Concluding Document of the Hague Conference on the European Energy Charter signed at The Hague on 17 December 1991).

13    Article 10(1) of the ECT obliges Contracting Parties to encourage and create stable, equitable, favourable and transparent conditions for investors of other contracting parties, including to accord to their investments fair and equitable treatment.

14    Article 26 of the ECT provides for dispute resolution mechanisms which include, at the option of an Investor (as defined in Art 1(7) of the ECT) in certain circumstances, arbitration under the auspices of the Centre pursuant to the Investment Convention.  I will return to the specifics of this mechanism when I consider the applicants' argument that Spain submitted to the jurisdiction of this Court, amongst others, for recognition and enforcement of the awards in this case and thereby waived any reliance on foreign state immunity.  See at [178]-[179] below.

15    In the meanwhile, it can be noted that Spain is a Contracting Party to the ECT and a Contracting State to the Investment Convention.  The applicants are Investors under the ECT and are incorporated in countries that are Contracting Parties to the ECT and Contracting States to the Investment Convention.  Australia is also a signatory to the ECT, although it has not ratified it. By Arts 38 and 39 of the ECT, signature alone is not sufficient to cause a state to be bound by the ECT.  See G Korontzis, "Making the Treaty" in D Hollis (ed.) *The Oxford Guide to Treaties* (Oxford University Press, 2012) 195-201.

*The ICSID arbitration*

16    In December 2013, the applicants commenced arbitration proceedings under the auspices of the Centre.  ICSID case number ARB/13/36 was allocated to the proceeding.  In summary, the applicants contended that Spain's legislative actions that resulted in the diminution of the value of their investments constituted a breach of its obligation under Art 10(1) of the ECT to provide fair and equitable treatment.  A three-member tribunal was established.

17    The tribunal conducted a "Hearing on Jurisdiction and the Merits" in Paris, France, in February 2016.  The applicants and Spain both took an active part in the arbitration at all stages.

18    The tribunal issued its award on 4 May 2017, finding that:

- 8 -

    (1)     it had jurisdiction to determine the claim under the ECT and the Investment Convention; and

    (2)     Spain had breached Art 10(1) of the ECT by failing to accord fair and equitable treatment to the applicants' investments.

19    The award requires Spain to pay the applicants:

    (1)     €128,000,000 as compensation; and

    (2)     Interest on the sum awarded from 20 June 2014 to 4 May 2017 at the rate of 2.07%, compounded monthly, and interest at the rate of 2.5% from 5 May 2017 until the date of payment, compounded monthly.

20    The tribunal decided that each party should bear its own costs.

### Spain's application for annulment of the Award

21    Following publication of the award, Spain made an application to the Centre for annulment of the award, including a stay of enforcement.  Article 52 of the Investment Convention provides for either party to an arbitration to request annulment of the award issued by the tribunal on one or more specified grounds, but not by way of a review of the merits of the award.  In July 2017, the Secretary-General of the Centre provisionally stayed the enforcement of the award as required under the Art 52(5) of the Investment Convention and r 54(2) of the ICSID Rules of Procedure for Arbitration Proceedings 2006 (**ICSID Arbitration Rules**) pending the appointment of the Annulment Committee.

22    In March 2018, the Annulment Committee issued a decision not to continue the stay of enforcement of the award pending its decision on annulment.  Spain made a subsequent application to stay the award but that was rejected by the Annulment Committee with the result that the stay remained terminated as from 23 March 2018.

23    In March 2019, the Annulment Committee held a hearing on annulment in Paris, France.  As at the date of the hearing in this Court, no decision had yet been issued on Spain's annulment application.  However, the Committee's decision not to continue the stay on enforcement of the award means that there is no obstacle (in this respect) to the recognition and enforcement of the award by this Court.

24    Thus far, Spain has failed to comply with the award in whole or in part.  In other words, nothing has been paid by Spain to the applicants in discharge of the award.  The reasons for Spain not

- 9 -

having paid and the applicants seeking enforcement in Australia rather than Spain were not canvassed, and are not presently relevant.  They may be related to the controversy arising from the judgment of the Court of Justice of the European Union in *Slovak Republic v Achmea BV* [2018] 4 WLR 87.  The ECJ held (at [60]) that the Treaty on the Functioning of the European Union precludes a provision in an international agreement concluded between Member States under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.

**Background to NSD602**

25    The underlying dispute in this proceeding concerns the same factual scenario as in NSD601 outlined at [9]-[11] above. The only material difference between the matters for present purposes is that the applicants in NSD602 invested approximately €139.5 million in solar power projects in Spain's territory.

26    As outlined above (at [15]), Spain is a Contracting Party to the ECT and the Investment Convention. The applicants are Investors under the ECT and are incorporated in countries that are Contracting Parties to the ECT and the Investment Convention.

***The ICSID arbitration***

27    In November 2013, the applicants commenced arbitration proceedings against Spain under the auspices of the Centre.  ICSID case number ARB/13/31 was allocated to the proceeding.  The duly constituted three-member arbitral tribunal – constituted differently from the tribunal in the other case – conducted a hearing on jurisdiction and the merits in Paris, France, in October 2016.  The applicants and Spain both took an active part in the arbitration at all stages.

28    On 15 June 2018, the arbitral tribunal issued an award, finding that:

(1)    It had jurisdiction to determine the claim under the ECT and the Investment Convention; and

(2)    Spain had breached Article 10(1) of the ECT by failing to accord fair and equitable treatment to the applicants' investments.

29    The award required Spain to pay the applicants:

(1)    €112,000,000 as compensation;

- 10 -

(2)     Interest on the sum awarded from 20 June 2014 to 15 June 2018 at the rate of 2.07%, compounded monthly, and interest at the rate of 2.07% from 16 June 2018 until the date of payment, compounded monthly; and

(3)     US$635,431.70 as a contribution to the payment of the applicants' share of the costs of the arbitral proceeding and £2,447,008.61 as a contribution to the payment of the applicants' legal representation costs and expenses.

***Spain's request for rectification of the Award***

30    In July 2018, Spain applied to the tribunal for rectification of the award in accordance with Art 49 of the Investment Convention and r 49 of the ICSID Arbitration Rules.  Spain contended that the tribunal had made a clerical error in the computation of the compensation.

31    The tribunal issued its decision on rectification of the award on 29 January 2019.  The tribunal rectified certain paragraphs of the award with the effect of reducing the award of compensation in favour of the applicants by €11 million to €101 million. The award must now be read in light of the rectification decision.  The applicants only seek enforcement of the award as rectified.

***Spain's application for annulment of the award and the stay of the enforcement proceeding***

32    In May 2019, Spain applied to the Centre for the annulment of the award and requested a stay of the enforcement of the award.  The Secretary-General granted an automatic provisional stay of enforcement of the award as required under the Art 52(5) of the Investment Convention and r 54(2) of the ICSID Arbitration Rules. These matters are dealt with in *Infrastructure Services Luxembourg S.A.R.L v Kingdom of Spain* [2019] FCA 1220 in which I stayed proceeding NSD602 because of the provisional stay on the enforcement of the award.

33    On 21 October 2019, the ad hoc committee hearing Spain's application for annulment of the award issued its decision discontinuing the provisional stay of enforcement of the award.

34    On 25 October 2019, the applicants applied to the Court to lift the stay on the proceeding in this Court and also sought orders that the proceeding be heard substantively and concurrently with proceeding NSD601 which was listed for hearing four days' later.  Spain indicated, through correspondence, that it would neither object nor consent to the orders that were sought by the applicants.  On that basis, I made orders lifting the stay of the proceeding and dealing with ancillary matters, including that this matter be listed for final hearing concurrently with proceeding NSD601 on 29 October 2019.

- 11 -

35    At the hearing, senior counsel for Spain confirmed that Spain took no issue with the two matters being heard together on that day.  Indeed, Spain had previously contended that the two matters should be heard together on the immunity point even if enforcement of the award in NSD602 was still stayed.

36    As at the date of the hearing, no hearing had yet been held on Spain's annulment application and Spain has failed to comply with the award in whole or in part.

## THE PROCEEDINGS IN THIS COURT

### Spain's immunity claim

37    In both proceedings in this Court, Spain has appeared conditionally to assert foreign state immunity in reliance on s 9 of the *Immunities Act*.  It asserts that it is immune from the jurisdiction of the Court in the proceedings in which money judgments of the Court are sought against it.  Its ability to appear and assert immunity, and to claim the costs of doing so, is protected from amounting to a submission to jurisdiction by s 10(7) of the *Immunities Act*.

38    Spain asserts, and the applicants accept, that since Spain has invoked immunity that question must be decided as a preliminary issue before the substantive applications can proceed to be determined.  That is clearly correct: ***Zhang v Zemin*** [2010] NSWCA 255; 79 NSWLR 513 per Spigelman CJ at [33]-[35] with Allsop P at [157] and McClellan CJ at CL at [174] agreeing; ***PT Garuda*** *Indonesia Ltd v ACCC* [2012] HCA 33; 247 CLR 240 per French CJ, Gummow, Hayne and Crennan JJ at [22].  However, Spain has identified that its only objection or defence to the applications that it wishes to assert is immunity.  Therefore, if I find that Spain is not immune and I am otherwise satisfied that the applicants have made out their cases, it will be proper to go on to grant the relief that is sought.

### The applicants' case on immunity

39    On the face of it, at least, Spain is entitled to immunity from the applicants' suits in reliance on s 9 of the *Immunities Act*.  The applicants' case to avoid this as the ultimate conclusion can be summarised as follows.

40    As a *foundational argument*, the applicants submit that the Investment Convention excludes any claim for foreign state immunity in proceedings for the recognition and enforcement of an award, as opposed to in relation to any steps to execute upon a judgment that recognises and enforces such an award.  This arises principally from the distinction between the recognition of an award as binding and the enforcement of the pecuniary obligations imposed by the award

- 12 -

as if it were a final judgment of a court as referred to in Art 54(1), on the one hand, and the execution of an award in Art 54(3), on the other. It rests also on Art 55 that provides that nothing in Art 54 shall be construed as derogating from the law in force relating to immunity from execution, without reference to recognition or enforcement.

41    In summary, Spain submits in response that the foundational argument must fail principally on the basis that the French and Spanish versions of the Investment Convention draw no distinction between recognition/enforcement, on the one hand, and execution, on the other. Properly interpreted, Spain submits, the Investment Convention makes no such distinction with the result that Art 55 expressly preserves the operation of domestic law on foreign state immunity in relation to the enforcement that the applicants seek.

42    If the applicants' foundational argument is correct, then there is on the face of it an inconsistency between the immunity conferred by s 9 of the *Immunities Act* and the exclusion of such immunity in relation to the recognition and enforcement of ICSID arbitration awards under the *Arbitration Act*. The applicants advance three alternative arguments for the resolution of that apparent inconsistency:

- *First*, the applicants submit that by becoming a Contracting Party to the ECT and a Contracting State to the Investment Convention, Spain submitted to the jurisdiction of this Court within the meaning of s 10 of the *Immunities Act* and has to that extent waived the immunity provided for in s 9.

- *Second*, the applicants submit that s 34 of the *Arbitration Act*, which excludes "other laws relating to the recognition and enforcement of arbitral awards", has the effect that the *Immunities Act* simply does not apply at the recognition and enforcement stage under the *Arbitration Act* and the Investment Convention.

- *Third*, the applicants submit that the relevant provisions of the *Arbitration Act* and the Investment Convention that are given the force of law, which were enacted after the *Immunities Act*, impliedly repealed the *Immunities Act* to the extent of the inconsistency.

43    Before considering each of the arguments in more detail, it is convenient to identify relevant provisions of, and principles applicable to, the *Immunities Act* and the *Arbitration Act* and Investment Convention.

- 13 -

## THE IMMUNITIES ACT

### The ALRC Report

44    The position of the law in Australia on foreign state immunity prior to the *Immunities Act* is set out comprehensively in the learned report of the Law Reform Commission, *Foreign State Immunity,* (Report No. 24, Australian Government Publishing Service, 1984) (**the ALRC Report**) that proposed legislation that became the *Immunities Act*.  The report has been described as "a useful source of instruction about the purpose of the [*Immunities Act*] or, in earlier terminology, about the mischief to which it was directed" (*Zhang* at [67] and [138] per Spigelman CJ) and as "valuable" and part of the context in which the *Immunities Act* must be interpreted (*Zhang* at [158] per Allsop P).

45    In *PT Garuda* it was acknowledged that the ALRC Report identifies the purpose of the proposed Australian legislation that became the *Immunities Act* as being to reflect the more "restrictive view" of the common law immunity which had been taken in other countries and adopted in legislation (at [7] per French CJ, Gummow, Hayne and Crennan JJ).  This is as opposed to absolute immunity and is reflected in various exceptions to immunity set out in the *Immunities Act*.  See also **Firebird** *Global Master Fund II Ltd v Republic of Nauru* [2015] HCA 43; 258 CLR 31 at [5]-[6] and [173].

### Part II – Immunity from jurisdiction

46    Part II of the *Immunities Act* is headed "Immunity from jurisdiction", which is the subject with which it deals, as opposed to Pt IV which is headed "Enforcement".  I will return to Pt IV.  In the meanwhile, Pt II opens with s 9 which is as follows:

> **9  General immunity from jurisdiction**
>
> Except as provided by or under this Act, a foreign State is immune from the jurisdiction of the courts of Australia in a proceeding.

47    Sections 10 to 22 then provide for exceptions to the general immunity from jurisdiction set out in s 9.  Before turning to the exceptions, there are some important observations to make about s 9.

48    By enacting Pt II, Parliament intended to remove the uncertainty in the state of both international law and the common law by creating, in s 9, an absolute immunity and providing, in subsequent sections, for a precise and complete list of exceptions: *Zhang* at [136] per Spigelman CJ.  His Honour reasoned (at [137]) that the Act purports to cover the field and there is no room for international law to make up any deficiency which may appear in the law.

- 14 -

49   Allsop P held (*Zhang* at [161]) that the *Immunities Act* is set against a background of lack of clarity at the time in the underlying principles of foreign state immunity.  It sought, by its terms, to lay down, as a matter of legislative expression, the extent and restrictions on the immunity. It is not to be interpreted as "an instrument of plasticity", including or not including immunity depending on the development of international law.

50   In *PT Garuda* it was held (at [8]) that the general provision in s 9 is exhaustive of the common law and indicates that statute provides the sole basis for foreign state immunity in Australian courts.  That position was reiterated in *Firebird* (at [5] per French CJ and Kiefel J and at [174] per Nettle and Gordon JJ).

51   As opposed to subject matter jurisdiction, it is clear that in s 9 and elsewhere in the *Immunities Act* the term "jurisdiction" is used with reference to the amenability of a defendant to the process of Australian courts.  In *PT Garuda* it was held (at [17]) per French CJ, Gummow, Hayne and Crennan JJ that:

> The notion expressed by the term "immunity" is that the Australian courts are not to implead the foreign State, that is to say, will not by their process make the foreign State against its will a party to a legal proceeding.  Thus, the immunity may be understood as a freedom from liability to the imposition of duties by the process of Australian courts.

52   See also *Firebird* at [35], [133]-[134] and [185].

53   The term "proceeding" in s 9 refers to any application to a court in its civil jurisdiction for its intervention or action; that is, some method permitted by law for moving a court to do some act according to law.  In the context of s 9 and foreign state immunity, it may be understood to refer to a process by which the jurisdiction of an Australian court is invoked, in which a foreign state is named as a party and in which judicial power may be exercised against the foreign state and its interests: *Firebird* at [36], [135] and [184]-[185].

54   In *Firebird* it was held (at [47]-[49]) that an *ex parte* application for registration of a foreign judgment under the **Foreign Judgments Act 1991** (Cth) is a "proceeding" within the meaning of s 9 of the *Immunities Act*.  The same must be true of an application to enforce an arbitration award under s 35 of the *Arbitration Act*.  Unsurprisingly, it was common ground that each proceeding in this Court is a "proceeding" within the meaning of s 9.

- 15 -

55    Of the various exceptions to foreign state immunity in Pt II of the *Immunities Act*, the only one relied on by the applicants is submission to jurisdiction in s 10 which relevantly provides as follows:

> **10    Submission to jurisdiction**
>
> (1)    A foreign State is not immune in a proceeding in which it has submitted to the jurisdiction in accordance with this section.
>
> (2)    A foreign State may submit to the jurisdiction at any time, whether by agreement or otherwise, but a foreign State shall not be taken to have so submitted by reason only that it is a party to an agreement the proper law of which is the law of Australia.
>
> (3)    A submission under subsection (2) may be subject to a specified limitation, condition or exclusion (whether in respect of remedies or otherwise).
>
> (4)    Without limiting any other power of a court to dismiss, stay or otherwise decline to hear and determine a proceeding, the court may dismiss, stay or otherwise decline to hear and determine a proceeding if it is satisfied that, by reason of the nature of a limitation, condition or exclusion to which a submission is subject (not being a limitation, condition or exclusion in respect of remedies), it is appropriate to do so.
>
> (5)    An agreement by a foreign State to waive its immunity under this Part has effect to waive that immunity and the waiver may not be withdrawn except in accordance with the terms of the agreement.
>
> …
>
> (11)    In addition to any other person who has authority to submit, on behalf of a foreign State, to the jurisdiction:
>
>> (a)    the person for the time being performing the functions of the head of the State's diplomatic mission in Australia has that authority; and
>>
>> (b)    a person who has entered into a contract on behalf of and with the authority of the State has authority to submit in that contract, on behalf of the State, to the jurisdiction in respect of a proceeding arising out of the contract.

56    In s 3(1) of the *Immunities Act* "agreement" is defined to mean an agreement in writing which includes "a treaty or other international agreement in writing". This is relevant because the applicants rely on Spain being a party to the ECT and the Investment Convention to found their case that Spain submitted to the jurisdiction of this Court under s 10.

57    Although the applicants only rely on s 10 of the *Immunities Act*, Spain refers to s 17 in its submission that in a proceeding for the recognition or enforcement of an arbitration award against a state it is only the s 17 exception from foreign state immunity that can apply. I will deal with that submission below (at [186]-[190]), but in the meanwhile it is pertinent to identify that s 17 deals with two distinct exceptions to immunity in respect of arbitrations to which a

- 16 -

state is a party.  The first, in s 17(1), is in relation to the supervisory jurisdiction of a court in respect of such an arbitration.  It is not presently relevant.  The second, in s 17(2), is in respect of "a proceeding concerning the recognition as binding for any purpose, or for the enforcement, of an award made pursuant to the arbitration, wherever the award was made."

58    Section 17(2) provides an exception to immunity in a proceeding for recognition and enforcement only where, apart from when the parties agreed that immunity would nevertheless apply, the foreign state would not be immune in a proceeding concerning a transaction or event and the foreign state is a party to an agreement to submit to arbitration a dispute about that transaction or event.  That is to say, the foreign state will enjoy immunity from recognition and enforcement proceedings unless the foreign state would not be immune in a proceeding concerning the underlying transaction or event the subject of the award: *Firebird* at [205].

**Part IV – Enforcement**

59    As will be seen, Pt IV of the *Immunities Act* is also relevant to the applicants' argument.  In that regard, s 7(4) provides that Pt IV only applies where, by virtue of a provision of Pt II, the foreign state is not immune from the jurisdiction of the courts of Australia in the proceeding concerned.  Thus, if no exception to immunity from jurisdiction applies – and in this case s 10 is the only exception that is relied on – then Pt IV will not apply.

60    Pt IV of the *Immunities Act* relevantly provides as follows:

> **Part IV—Enforcement**
>
> **30    Immunity from execution**
>
> Except as provided by this Part, the property of a foreign State is not subject to any process or order (whether interim or final) of the courts of Australia for the satisfaction or enforcement of a judgment, order or arbitration award or, in Admiralty proceedings, for the arrest, detention or sale of the property.

61    Section 31 then deals with "Waiver of immunity from execution", s 32 with "Execution against commercial property" and s 33 with "Execution against immovable property etc.".  Section 34 deals with restrictions on penalties or fines being imposed on a foreign state or a person on behalf of a foreign state.  Section 35, being the last section in Pt IV, deals with the application of Pt IV to separate entities of a foreign state.

62    Contrary to what was submitted on behalf of Spain, the heading to s 30 (and the heading to each other section) forms part of the Act and can be referred to as an intrinsic aid to interpretation.  That much is plain from s 13(1) of the *Acts Interpretation Act 1901* (Cth) which

- 17 -

provides that all material from and including the first section of an Act to the end of the last section of the Act, or the last Schedule to the Act if there is a Schedule, is part of the Act. See Pearce DC, *Statutory Interpretation in Australia* (9th ed., LexisNexis Butterworths, 2019) at [4.59] and [4.71]. The headings in a statute can be taken into consideration in determining the meaning of a provision where that provision is ambiguous, and may sometimes be of service in determining the scope of a provision, although the heading cannot limit the operation of a provision if its meaning is clear: *Silk Bros Pty Ltd v State Electricity Commission (Vic)* [1943] HCA 2; 67 CLR 1 at 16 per Latham CJ.

63    It is quite apparent that the *Immunities Act* draws a distinction between immunity of a foreign state from jurisdiction, which is dealt with in Pt II, and immunity of property from execution of a judgment or arbitral award, which is dealt with in Pt IV. That distinction is apparent from the substance of each of those Pts of the *Immunities Act* as well as from the headings to ss 30-33 all of which include the word "execution". Although s 30 uses the language of "satisfaction or enforcement" in respect of arbitral awards, it is "the property of a foreign State" that enjoys immunity. Immunity of property from "enforcement" of an arbitral award can only operate with respect to the execution of a judgment on the award. The arbitrators, whose jurisdiction arises from the consent of the parties, do not have powers of coercion in relation to property – their decisions can only have that effect through the means of enforcement by judgment of a court and then execution.

64    The ALRC Report also makes the distinction clear. It recognised (at xxi [32]) that "because questions of enforcement are controversial, and because the rules on jurisdictional immunity cannot simply be applied or transferred to this area, special provisions are necessary". It also recognised (at 11 [13]) that the practice of governments with regard to immunity draws a distinction between recognition and execution. With reference to Art 55 of the Investment Convention, to which I shall return in some detail, the ALRC Report (at 12 [13] and fn 74) recognised that the Investment Convention also distinguishes between recognition and execution.

65    The ALRC Report, in explaining its basic approach to its proposed legislation (at 35 [66]), acknowledged that immunity from jurisdiction and immunity from execution are connected but stated that there are sound practical reasons for treating them separately. It recommended that the proposed legislation should treat them differently which was then reflected in its proposal

- 18 -

that was ultimately adopted – separate chapters were to deal with "immunity from jurisdiction" and "immunity from execution".

66    The Explanatory Memorandum to the *Foreign State Immunities Bill* 1985 (Cth) that was proposed by the Law Reform Commission and which was adopted as the *Immunities Act*, which is in Appendix A to the ALRC Report, explains (at 138) that Pt IV "deals with the extent to which execution of a judgment can be levied against property of foreign states".

67    Thus, the heading "Enforcement" to Pt IV and the use of "enforcement" in s 30 must be understood to mean enforcement by way of execution rather than enforcement by way of recognition and judgment.  In other words, Pt IV deals with the enforcement of judgments of the courts (i.e. execution).  It does not deal with pre-execution jurisdiction which would include jurisdiction in proceedings for the enforcement by way of judgment on arbitral awards or foreign judgments.

## THE *ARBITRATION ACT* AND THE INVESTMENT CONVENTION

### The *Arbitration Act*

68    Part IV of the *Arbitration Act* deals with the Investment Convention.  That is the only Part of the *Arbitration Act* that is relevant for present purposes.  It was inserted by the *ICSID Implementation Act 1990* (Cth) in order to fulfil Australia's obligations under the Investment Convention: *Arbitration Act*, s 2D(f).  The Investment Convention entered into force on 14 October 1966.  It was signed by Australia on 24 March 1975 (*Arbitration Act*, s 31(1)) and ratified on 2 May 1991.

69    As explained in the Explanatory Memorandum to the *ICSID Implementation Bill 1990* (Cth) (at 1), the Investment Convention establishes the Centre which provides facilities for arbitration or conciliation of investment disputes between states and nationals of other states under its auspices.  By providing this dispute resolution machinery, the Centre aims to improve the international investment climate and stimulate a larger flow of private international investment.

70    Section 31(2) provides that except so far as the contrary intention appears, a word or expression used in Pt IV and in the Investment Convention has, in Pt IV, the same meaning as it has in the Investment Convention.

- 19 -

71    Section 32 provides that subject to Pt IV, Chs II to VII of the Investment Convention have the force of law in Australia.  As will be seen, Ch IV is particularly relevant to the present proceedings.

72    Section 33(1) provides that an award is binding on a party to the investment dispute to which the award relates.  Section 33(2) provides that an award is not subject to any appeal or to any other remedy, otherwise than in accordance with the Investment Convention.

73    Section 34 is in the following terms:

> **34    Investment Convention awards to prevail over other laws**
>
> Other laws relating to the recognition and enforcement of arbitral awards, including the provisions of Parts II and III, do not apply to:
>
> > (a)    a dispute within the jurisdiction of the Centre; or
> >
> > (b)    an award under this Part.

74    As will be recalled, the applicants submit that the combined effect of s 33(2) and s 34 is that the *Immunities Act*, which is said to be another law "relating to the recognition and enforcement of arbitral awards", does not apply to their applications for the recognition and enforcement of the awards in their favour against Spain.  I consider this submission at [202]-[203] below.

75    Section 35 relevantly provides as follows:

> **35    Recognition of awards**
>
> (1)    The Supreme Court of each State and Territory is designated for the purposes of Article 54.
>
> (2)    An award may be enforced in the Supreme Court of a State or Territory with the leave of that court as if the award were a judgment or order of that court.
>
> (3)    The Federal Court of Australia is designated for the purposes of Article 54.
>
> (4)    An award may be enforced in the Federal Court of Australia with the leave of that court as if the award were a judgment or order of that court.

76    Art 54 of the Investment Convention, which is quoted below (at [81]), deals with the recognition of awards and the enforcement of the pecuniary obligations of awards.  More specifically, Art 54(2) refers to courts being designated for the purposes of recognition and enforcement.  Thus, by s 35(3) of the *Arbitration Act* this Court is a designated court for the purposes of the enforcement of an award under Art 54 of the Investment Convention.

77    Because of the operation of s 31(2) (see [70] above), the word "enforce" as used in ss 35(2) and 35(4) will have the same meaning as it has in the Investment Convention.

- 20 -

78    In Australia, enforcement of an award under s 35(4) of the *Arbitration Act* and Art 54(1) of the Investment Convention "as if the award were a final judgment of a court" is done by making a judgment on the award.  That was held to be the case in respect of the similarly worded s 8(3) of the *Arbitration Act* in *Traxys Europe SA v Balaji Coke Industry Pvt Ltd (No 2)* [2012] FCA 276; 201 FCR 535 at [72] per Foster J.  Steps must be taken to render the award as a judgment or order of the court.  The judgment or order cannot differ in any material way from the terms of the decision of the tribunal as embodied in the award.

### The Investment Convention

79    Sections 32-35 of the *Arbitration Act* give effect to what is referred to as the "closed" or "self-contained" system of remedies that parties can seek as set out in Arts 26, 27, 49(2) and 50-53 of the Investment Convention.  These provisions cover the entitlement of parties subject to a Centre award to apply for the interpretation, revision or annulment of the award.  Unlike under the 1958 New York Convention and the UNCITRAL Model Law, which are also given effect to by the *Arbitration Act*, the Investment Convention leaves no grounds for refusal of recognition and enforcement of a Centre award by national courts – not even on public policy grounds.

80    As explained in the Explanatory Memorandum to the *ICSID Implementation Bill 1990* (Cth) (at 7), a Centre award is not subject to any appeal or to any remedy apart from those provided for in the Investment Convention.  This ensures that the objectives of the Investment Convention will not be able to be frustrated through ancillary litigation.  Arbitration under the Investment Convention "is to the exclusion of any other remedy".

81    Section 6 of Ch IV of the Investment Convention contains the provisions critical to the present cases.  It is in the following terms:

**Recognition and Enforcement of the Award**

*Article 53*

(1)   The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.

(2)   For the purposes of this Section, "award" shall include any decision interpreting, revising or annulling such award pursuant to Articles 50, 51 or 52.

*Article 54*

(1)   Each Contracting State shall recognize an award rendered pursuant to this

- 21 -

Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.

(2)   A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General. Each Contracting State shall notify the Secretary-General of the designation of the competent court or other authority for this purpose and of any subsequent change in such designation.

(3)   Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought.

*Article 55*

Nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution.

82    In the testimonium (or formal words of conclusion) (Gardiner R, *Treaty Interpretation* (2nd ed, Oxford University Press, 2015), 85) at the end of the Investment Convention, after Art 75 and outside of any part of the Investment Convention that is given the force of law in Australia by s 32 of the *Arbitration Act*, it is recorded that the Convention was "done" at Washington "in the English, French and Spanish languages, all three texts being equally authentic".   Spain relies on this provision to refer to the French and Spanish language texts of the Investment Convention in its submissions on the proper interpretation of the Investment Convention.

**Interpretation of the Investment Convention**

83    The proper approach to the construction of an international convention or treaty is to be found in the ***Vienna Convention*** *on the Law of Treaties*, opened for signature  23 May 1969, 1155 UNTS 331, [1974] ATS 2 (entered into force 27 January 1980).   Section 3 of Pt III deals with the interpretation of treaties.   It is relevantly in the following terms:

*Article 31.*  **GENERAL RULE OF INTERPRETATION**

1.        A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

2.        The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

(a)        Any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;

(b)        Any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as

- 22 -

an instrument related to the treaty.

3.  There shall be taken into account, together with the context:

    (a)  Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

    (b)  Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

    (c)  Any relevant rules of international law applicable in the relations between the parties.

4.  A special meaning shall be given to a term if it is established that the parties so intended.

### Article 32. SUPPLEMENTARY MEANS OF INTERPRETATION

Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:

    (a)  Leaves the meaning ambiguous or obscure; or

    (b)  Leads to a result which is manifestly absurd or unreasonable.

### Article 33. INTERPRETATION OF TREATIES AUTHENTICATED IN TWO OR MORE LANGUAGES

1.  When a treaty has been authenticated in two or more languages, the text is equally authoritative in each language, unless the treaty provides or the parties agree that, in case of divergence, a particular text shall prevail.

2.  A version of the treaty in a language other than one of those in which the text was authenticated shall be considered an authentic text only if the treaty so provides or the parties so agree.

3.  The terms of the treaty are presumed to have the same meaning in each authentic text.

4.  Except where a particular text prevails in accordance with paragraph 1, when a comparison of the authentic texts discloses a difference of meaning which the application of articles 31 and 32 does not remove, the meaning which best reconciles the texts, having regard to the object and purpose of the treaty, shall be adopted.

84   The effect of Art 31 of the Vienna Convention is that although primacy must be given to the written text of the Investment Convention, the context, object and purpose of the treaty must also be considered.  The need to give the text primacy in interpretation results from the tendency of multilateral treaties to be the product of compromises by the parties to such treaties. However, treaties should be interpreted in a more liberal manner than ordinarily adopted by a court construing exclusively domestic legislation.  See *Morrison v Peacock* [2002] HCA 44; 210 CLR 274 at [16] per Gleeson CJ, McHugh, Gummow, Kirby and Hayne JJ.

- 23 -

85    The proper construction and interpretation of the *Arbitration Act* in respect of its implementation of the Investment Convention requires an understanding of the context of the Investment Convention and an understanding of the subjects of concern and debate leading to its formation.  This process assists in understanding the public policy lying behind the enactment of the Investment Convention into Australian municipal law.  See *Comandate Marine Corporation v Pan Australia Shipping Pty Ltd* [2006] FCAFC 192; 157 FCR 45 at [191] per Finn, Finkelstein and Allsop JJ.  Also, international treaties should be interpreted uniformly by contracting states with the result that it would be wrong to interpret the Investment Convention with reference to existing domestic law such as the *Immunities Act*: *Povey v Qantas Airways Ltd* [2005] HCA 33; 216 ALR 427 at [25] and [32] per Gleeson CJ, Gummow, Hayne and Heydon JJ.

86    Importantly, under Art 32 of the Vienna Convention, recourse to the preparatory materials is "supplementary" to the application of the techniques in Art 31 and is for the purpose of confirming the meaning resulting from the application of those techniques, or to determine the meaning when the interpretation according to Art 31 leaves the meaning ambiguous or obscure or leads to a result which is manifestly absurd or unreasonable.  See **Li v Zhou** [2014] NSWCA 176; 87 NSWLR 20 at [26].

87    The parties are agreed that the fact that the testimonium is not part of those chapters of the Investment Convention that are given the force of law does not detract from the equal authenticity of the three texts and the application of Art 33 of the Vienna Convention.  The testimonium is part of the Investment Convention that was signed and ratified by Australia and Spain, and it forms part of the necessary context to any particular article that is being construed. Reference must necessarily be made to that context under Art 31(2) of the Vienna Convention.

88    I can now turn to consider the applicants' foundational argument.

## DISTINCTION BETWEEN ENFORCEMENT AND EXECUTION IN THE *ARBITRATION ACT* AND THE INVESTMENT CONVENTION

### Some terminology

89    There are three concepts at play here, namely recognition, enforcement and execution. Before turning to the text of the Investment Convention, it is useful to consider those concepts at a more general level in the context of arbitral law and practice.

- 24 -

90    Recognition is a distinct and necessarily prior step to enforcement, but recognition and enforcement are closely linked: Briggs A, *The Conflict of Laws* (3rd ed, Oxford University Press, Clarendon Series, 2013) 140-141; *Clarke v Fennoscandia Ltd* [2007] UKHL 56; 2008 SC (HL) 122 at [18]-[23]. An award may be recognised without being "enforced" by a court: *TCL Air Conditioner (Zhongshan) Co Ltd v Judges of the Federal Court of Australia* [2013] HCA 5; 251 CLR 533 at [23]. Examples would be where an award is recognised as giving rise to res judicata, issue estoppel, cause of action estoppel or set-off, or as a claim in an insolvent estate. See *Associated Electric and Gas Insurance Services Ltd v European Reinsurance Co of Zurich* [2003] UKPC 11; [2003] 1 WLR 1041 at [15] as an example of recognition by estoppel.

91    An arbitral award is enforced through the means of the entering of a judgment on the award, either in the form of a money judgment for the amount of an award or for damages for failing to honour an award. That form of enforcement by a court is an exercise of judicial power: *TCL* at [32]. There is some debate in the authorities as to whether an award can be enforced by means of a court making a declaration. See *Tridon Australia Pty Ltd v ACD Tridon Inc* [2004] NSWCA 146 and *AED Oil Ltd v Puffin FPSO Ltd* [2010] VSCA 37; 27 VR 22 at [18]-[20]. It is not necessary to enter upon that debate for present purposes because Art 54(3) of the Investment Convention requires the enforcement of only the pecuniary obligations of an award. That would seem to exclude declaratory awards, injunctions and orders for specific performance.

92    An award cannot, however, be executed, in the sense of executed against the property of an award debtor, without first being converted into a judgment of a court: *Uganda Telecom Ltd v Hi-Tech Telecom Pty Ltd (No 2)* [2011] FCA 206; 277 ALR 441 at [12]-[13]. Nevertheless, it is not a strain of language to refer to an award being enforced by way of execution.

93    Thus, depending on the context, reference to the enforcement of an arbitral award can be used to mean the entering of a judgment on the award to the exclusion of execution or it can mean execution, or it can encompass both.

94    Recognition and enforcement by judgment on the award is equivalent to what is referred to in civilian jurisdictions as *exequatur* (see *Firebird* at [47]-[48] and Briggs A, *The Conflict of Laws* (3rd ed, Oxford University Press, Clarendon Series, 2013), 139).

**The English text of Arts 53-55 of the Investment Convention**

95    As identified above (at [84]), the starting point in the task of construction of the Investment Convention is the text.

96    Section 6 of Ch IV of the Investment Convention uses all three of the concepts recognition, enforcement and execution.  The heading to the section refers to recognition and enforcement. Art 54(1) draws a distinction between recognition of an award and the enforcement of the pecuniary obligations of an award, but in its second sentence refers to the enforcement of an award generally, i.e. not qualified with reference to the pecuniary obligations of the award.  Art 54(2) refers to recognition <u>or</u> enforcement, which suggests that they are different although possibly overlapping.  As will be seen, the French and Spanish equivalent texts speak of recognition <u>and</u> enforcement.  That difference does not appear to have any significance in the present cases.

97    Articles 54(3) and 55 then refer to execution only.  In Art 54(3) that is clearly in the context of post-judgment execution measures.  That much is clear from the reference being to "execution of judgments in force in the state".  There can be no execution of judgments without there first being a judgment.  There is nothing to suggest that execution has a different meaning in Art 55 to what it has in Art 54(3) – use of the same word, in particular in such close proximity, and distinctly from the use of recognition and enforcement, would suggest that both uses are the same.

98    Therefore, with reference to only the English text of the Investment Convention, there is a clear distinction drawn between recognition/enforcement and execution.  On that basis, Art 54(1) means that an award sounding in money (i.e. having "pecuniary obligations") shall be recognised as binding and shall be enforced by the courts designated under Art 54(2) as if it were a judgment of the court.  Also, it is only the foreign state immunity law in relation to post-judgment execution that is preserved by Art 55 and there is no preservation of such immunity in relation to recognition or other forms of pre-execution enforcement – such preservation is inconsistent with the obligation on designated courts to enforce Centre awards under the Investment Convention.

99    In *Lahoud v The Democratic Republic of Congo* [2017] FCA 982, Gleeson J (at [20]) held that Arts 54 and 55 expressly distinguish between an initial stage of recognition of an award and a final stage of execution, and that issues under domestic law relating to sovereign immunity might arise only in the latter stage.  Her Honour also concluded (at [28]) that jurisdiction was

- 26 -

not excluded by foreign state immunity on the basis that the respondent had submitted to the jurisdiction of the ICSID tribunals. However, because that case proceeded ex parte the arguments that have been raised before me were not raised before her Honour.

100    Notwithstanding the authority that *Lahoud* clearly constitutes, I must independently consider and decide the arguments that have been presented and not follow *Lahoud* only in the event that I am persuaded that it is clearly wrong: *La Macchia v Minister for Primary Industries and Energy* [1992] FCA 673; 110 ALR 201 at 204 and *Undershaft (No 1) Ltd v Federal Commissioner of Taxation* [2009] FCA 41; 175 FCR 150 at [68]-[88]. Thus far in the analysis, *Lahoud* serves to confirm the approach that I have come to.

101    Spain submits that this approach, which leaves no room to invoke foreign state immunity at the stage of recognition and enforcement of a Centre award, would have the effect of creating a new exception to the general immunity under s 9 of the *Immunities Act*. It submits that there can be no such new exception and that the approach is therefore incorrect.

102    That submission misses the point because the question of interaction with the *Immunities Act* only arises at the next stage of analysis. As will be seen, the interpretation of the Investment Convention in the way in which I have identified does not create a new exception to foreign state immunity, but rather informs the inquiry whether, by becoming a signatory to the Investment Convention, Spain submitted to the jurisdiction of designated courts and therefore, in Australia, waived immunity under s 10 of the *Immunities Act*.

103    Spain also submits that if the applicants' contention, that the effect of Arts 54(3) and 55 is to limit consideration of immunity to the time after a Centre award is registered as a judgment, was accepted it would lead to an absurdity – the court would be engaged in an exercise in futility by converting a Centre award into a judgment only to have that judgment rendered unenforceable on the grounds of immunity when execution is sought. Spain submits that, in other words, a "zombie judgment" is created and that it cannot have been the intention of the legislature to create a scheme in which the courts would participate in such an absurdity.

104    That submission is wrong for two reasons.

105    *First*, once again, the question of interaction with the *Immunities Act* arises only at the next stage of analysis.

106    *Secondly*, because of the distinction in the *Immunities Act* between immunity from jurisdiction and immunity from execution (see [63]-[67] above), if there is no immunity from jurisdiction

- 27 -

(which is the consequence of the applicants' contention) then the question of immunity from execution arises (see s 7(4) of the *Immunities Act*). In any particular case, depending on whether one of the exceptions to immunity from execution in ss 31-35 of the *Immunities Act* can be established, it may be that there is immunity from execution.

107    In other words, the *Immunities Act* envisages that a foreign state may not enjoy immunity from a proceeding under Pt II of the *Immunities Act* with the result that there might be a judgment against it, but that such a judgment is not able to be executed because no exception to immunity from execution in Pt IV of the *Immunities Act* can be established. That is the inevitable consequence of the separate treatment of immunity from jurisdiction and immunity from execution in Pts II and IV. This demonstrates that a so-called "zombie judgment" is not viewed by the legislature as an absurdity.

108    In another case, where an exception to Pt IV execution immunity can be established, a judgment against a foreign state will be able to be executed. In the present cases, if the applicants are successful in having judgments entered against Spain on their Centre awards, and leaving aside what benefit those judgments might give the applicants in Australia or elsewhere in seeking to get Spain to pay the awards, they can then go about seeking to establish an exception to Pt IV immunity. One possibility, by way of example, would be to find "commercial property" of Spain in Australia within the meaning of s 32 of the *Immunities Act*. Such property would be susceptible to execution. There would then be no "zombie judgment".

109    Spain submits, with reference to the *Immunities Act*, that Australian law on foreign state immunity knows no dichotomy in language between the recognition or enforcement of a judgment or arbitral award and, separately, execution. Thus, Spain submits, such a dichotomy should not be discerned in Arts 54-55 of the Investment Convention. As already canvassed above, enforcement is used variously in legal language to refer to pre-execution steps and also to execution. For the reasons already given, in my view Pt IV of the *Immunities Act* deals with the execution stage, even though the terminology of enforcement is also used in relation to it. The dichotomy between pre-execution (i.e. up to and including judgment) steps and execution (i.e. post-judgment) steps is quite clear in the *Immunities Act* itself, and that it was intended to be present is clear from the ALRC Report.

110    In any event, in relation to each of Spain's submissions dealt with at [101]-[109] above, it would be wrong to seek to interpret the Investment Convention with reference to the *Immunities Act*. That is because of the requirement that the Investment Convention be given

- 28 -

an international interpretation as explained above (at [83]-[85]) and because the Investment Convention pre-dates the *Immunities Act* by nearly two decades.

111    Spain also submits that "enforcement" and "execution" are used synonymously in private international law, and on this basis submits that that is how they should be understood in the Investment Convention.  In support of that submission, Spain refers to Collins, Lord Lawrence (ed), ***Dicey, Morris & Collins*** *on The Conflict of Laws* (15th ed, Sweet & Maxwell, 2012) at [14-003].  That paragraph, which deals with the recognition and enforcement of foreign judgments, uses the language of enforcement synonymously with execution – it states that a person seeking to have a foreign judgment "executed or otherwise carried out as against the person against whom it is given … is then seeking to *enforce* the judgment" (emphasis in the original).  However, it also characterises the setting up of a foreign judgment by way of counterclaim or other cross-proceeding as being "enforcement" of the foreign judgment, which is not what would ordinarily be characterised as execution.  Thus even in the context of foreign judgments, enforcement and execution are not uses synonymously.

112    More tellingly, in the chapter dealing with arbitration and foreign awards, *Dicey, Morris & Collins* use the terminology of enforcement with reference to suing on a foreign award or applying to a court for judgment on an award (e.g. [16-105], and [16-114]).  Those are necessarily pre-execution steps.  Specifically with reference to the Investment Convention, the authors state that Contracting States are bound to recognise a Centre award "and enforce it in accordance with Art 54(1)" but that the Convention "does not … affect the law in relation to state immunity from execution" (at [16-189]).  The authors thus draw the same distinction between enforcement and execution in the context of the Investment Convention that I have drawn, and there is nothing in what they say that supports Spain's contention to the contrary.

113    It is also clear from comparative international law that the distinction between enforcement by way of recognition and judgment and enforcement by way of execution is common in the law of foreign state immunity in other jurisdictions: Fox H and Webb P, *The Law of State Immunity* (3rd ed, Oxford University Press, 2013) Ch 4 (dealing with immunity from jurisdiction) and Ch 16 (dealing with immunity from enforcement of judgment, i.e. execution); Hill J and Chong A, *International Commercial Disputes: Commercial Conflict of Laws in English Courts* (Hart Publishing, 2010) at [2.3.14]-[2.3.38] ("immunity from adjudicative jurisdiction") and [2.3.39]-[2.3.57] ("immunity from enforcement jurisdiction" where enforcement refers to orders for specific performance and injunctions and execution against property); McClean D

- 29 -

and Ruiz Abou-Nigm V, *The Conflict of Laws* (8th ed, Sweet & Maxwell, 2012) at [6-13]-[6-14].

**Object and purpose**

114    The object and purpose of the Investment Convention can be gleaned from its preamble, although there is little there to assist on the issue at hand.  In its sixth clause, however, it recognises that the mutual consent by parties to disputes that arise in connection with investments between Contracting States and the nationals of other Contracting States constitutes a binding agreement which requires, in particular, that any arbitral award be complied with.  Thus, it is apparent that the existence of an effective enforcement mechanism in the scheme of the Investment Convention underpins the object and purpose of the Investment Convention.

115    The report of the Executive Directors of the World Bank of 18 March 1965, which is referred to in more detail below (at [119]), gives further insight into the object and purpose of the Investment Convention (International Bank for Reconstruction and Development, ***Report of the Executive Directors on the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States*** (18 March 1965)).  The primary purpose of the Investment Convention is described as being to stimulate a larger flow of private international investment into territories (at [12] of the report).  It is also said that the creation of an institution designed to facilitate the settlement of disputes between states and foreign investors can be a major step toward promoting an atmosphere of mutual confidence and thus stimulating a larger flow of private international capital into those countries which wish to attract it (at [9] of the Report).  In that context, it is said that the provisions of the Investment Convention maintain a careful balance between the interests of investors and those of host states and that the Executive Directors have constantly had in mind that the provisions of the Convention should be equally adapted to the requirements of both host states as well as investors (at [13] of the Report).  The preamble to the Investment Convention is consistent with this idea of equality of treatment in its statement that there is a desire to create facilities for international arbitration "to which Contracting States and nationals of other Contracting States" may submit disputes.

116    It might thus be said that the object and purpose of the Investment Convention support the notion that effective enforcement mechanisms that treat investors and state parties to the Convention equally were intended.  That would support the notion that, insofar as the text allows, arbitral awards should be recognised and enforceable equally against investors and state

- 30 -

parties.  The obvious textual limitation on this idea of equal treatment is the preservation of foreign state immunity in respect of execution in Art 55.

**The preparatory materials**

117    Under Art 32 of the Vienna Convention, recourse may be had to the preparatory materials in order to confirm the meaning resulting from the application of Art 31.

118    The Investment Convention was formulated by the Executive Directors of the International **Bank** for Reconstruction and Development (commonly referred to as the World Bank) after extensive preparatory work by the staff of the Bank performed in part with the assistance of national legal experts convened in four regional Consultative Meetings.  The deliberations of a special Legal Committee were also taken into account. See ***History** of the ICSID Convention* (International Centre for Settlement of Investment Disputes, 1970) Vol I, ii.

119    The extensive consultative processes led to the Executive Directors, meeting formally, adopting a resolution approving the text of the Investment Convention and their Report on it on 18 March 1965.  The resolution instructed the President to transmit the draft Investment Convention and the Report to all member governments of the Bank whereafter the process of the signing of the Investment Convention by a number of states commenced leading ultimately to it coming into force on 14 October 1966. See *History* Vol I, 8-10.

120    The *travaux préparatoires*, or preparatory materials, as I shall refer to them, were published by the Centre in 1970.  They consist of a systematic and complete presentation of all relevant preparatory documents: the successive drafts with annotations thereto, proposed amendments, staff memoranda and the records of all reports of the debates in the Consultative Meetings and the Legal Committee and by the Executive Directors and the Board of Governors of the World Bank.  There are four volumes.  Volume I is in English, French and Spanish and consists of a brief narrative account of the formulation of the Investment Convention, followed by an article-by-article historical analysis of its text and complete lists of all relevant documents produced by the Bank and of the names of all persons who participated in this work.  Volumes II (in two parts), III and IV contain, respectively in English, French and Spanish, comprises all the documents having any substantive significance in connection with the formulation of the Investment Convention. See *History* Vol I, ii-iv.

121    In the debates and consultations that preceded the final draft and the Report, there are conflicting indications as to whether the ultimate preservation of foreign state immunity as

- 31 -

provided for in Art 55 was for the whole of states' domestic law on foreign state immunity, or whether it was limited to that law in relation to the execution of judgments. Indeed, the language of enforcement and execution is used loosely and at times interchangeably in the debates, which is perhaps not surprising given that the original languages of the participants varied considerably and the participants themselves also changed from time to time. It is therefore difficult to discern a common use of language and a common understanding of the relevant concepts.

122     Some examples will illustrate the inconsistencies. Before turning to them, it is necessary to introduce Mr Aron Broches. He was General Counsel of the World Bank in the period 1959-1979, which covered the years in which the Investment Convention was drafted and adopted. In that position, he was in charge of the World Bank's staff work on the Investment Convention and was chair of the regional Consultative Meetings and of the Legal Committee advising the Executive Directors on the Convention. See Broches A, "Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution" (1987) 2 *ICSID Review – Foreign Investment Law Journal* 287, 287 (***Broches***). Mr Broches is regarded as the principal architect of the Investment Convention: Schreuer CH, *The ICSID Convention: A Commentary* (2nd ed, Cambridge University Press, 2009) (***Schreuer***), 2 [2].

123     Because of the role that he played, particularly as chair of many of the sessions and in summarising the contributions by others, reference to the contributions by Mr Broches to the debates are inherently more useful as an indication of consensus or common understanding than reference to the contributions of disparate delegates. Even so, until the final stages of the process and the adoption of the report by the Executive Directors, not much assistance or clarity can be gleaned from the preparatory materials on the point in issue.

124     In a memorandum of the discussion by the Executive Directors on the first preliminary draft Investment Convention on 10 September 1963, Mr Broches is reported as explaining that each Contracting State was required to recognise an award of a tribunal as binding and enforce it within its territories as if that award were a final judgment of the courts of that state. However, as to whether forced execution following upon an award would be obtained against the government, that would depend on the force of a final judgment in the country in which enforcement was sought. In general, it would not be possible to enforce a judgment against the state in the sense of seizing its property and selling it in forced execution. See *History* Vol II,

- 32 -

177 [12].  This tends to support the interpretation I have thus far arrived at even though it uses enforcement and execution interchangeably.

125    At the consultative meeting of legal experts in Addis Ababa in December 1963, Mr Broches explained that awards of arbitral tribunals rendered pursuant to the Investment Convention would be recognised by, and enforceable in, all Contracting States as if they were final judgments of their national courts, regardless of whether the state in which enforcement was sought was or was not a party to the dispute in question.  But he made clear that where, as in most countries, the law of state immunity from execution would prevent enforcement against a state as opposed to execution against a private party, the Investment Convention would leave that law unaffected.  All the Investment Convention would do would be to place an arbitral award rendered pursuant to it on the same footing as a final judgment of the national courts.  If such a judgment could be enforced under the domestic law in question, so could the award; if that judgment could not be so enforced, neither could the award.  See *History* Vol II, 242.  This is less clear, and, in at least one respect, appears to conflate execution and enforcement.

126    At the consultative meeting of legal experts in Santiago in February 1964, Mr Broches, in summarising the discussion on recognition and enforcement of awards, said that it had been suggested that it might be useful to distinguish between recognition of awards as binding and their execution.  See *History* Vol II, 347-348.  This supports the interpretation I have thus far arrived at.

127    At the consultative meeting of legal experts in Geneva later in February 1964, Mr Broches emphasised that the intention was not to modify the existing law on state immunity.  He said that the view had been expressed at the Santiago meeting that the then current draft would force a modification in state practice and law on the question of states' immunity from execution, but that he thought that this view was unfounded.  He added that an express proviso removing any doubt as to the intent of the draft might be inserted.  He said that the lack of uniformity in state practice concerning the immunity of other states from execution had convinced him that it was preferable to refrain from attempting to legislate either positively or negatively on this question.  See *History* Vol II, 428-429.  In this instance the preservation of foreign state immunity is expressed to be in relation to "execution" with enforcement not mentioned in that context.

128    At the consultative meeting of legal experts in Bangkok in April 1964, Mr Broches is reported as having said almost exactly the same as what he had said at the Addis Ababa meeting

- 33 -

(summarised at [125] above).  See *History* Vol II, 464-465.  At the same meeting, Mr Broches later said that the majority view was that forced execution should not lie against a state and that the Investment Convention would not change the principles (including the limitations on those principles) applying in Contracting States to enforcement of final judgments against states.  See *History* Vol II, 520.  The use of the language of "enforcement of final judgments" is synonymous with execution and is thus supportive of the interpretation that I have thus far arrived at.

129     In a report on the regional consultative meetings of the Legal Experts, dated 9 July 1964, Mr Broches explained that the then draft provided in substance that an award shall be recognised as binding in each Contracting State, whether or not it was a party to the dispute, and that it shall be enforceable as if it were a final judgment of the courts of that state.  He then said that the drafters had no intention to change the law on sovereign immunity.  By providing that the award would be enforced as if it were a final judgment of a local court, the draft implicitly imported the limitation on enforcement which in most countries existed with respect to enforcement of court decisions against Sovereigns.  He said that the point might be made explicit in order to allay the fears expressed by several delegations.  See *History* Vol II, 574-575.  Here it is not clear whether the terminology of enforcement is being used only in the execution sense or in a broader sense, although the statement with regard to maintaining the status quo on foreign state immunity is ambiguous and supportive of Spain's position.

130     A subsequent draft of the Convention (dated 11 September 1964) was thereafter prepared and circulated.  At a meeting of the Legal Committee on 11 December 1964, Mr Broches commented on what was then draft Art 58.  It provided that nothing in Art 57, which dealt with recognition and enforcement, "shall be construed as derogating from the law in force in any Contracting State relating to immunity of that state or of any foreign state from execution" (see *History* Vol II, 637).  It will immediately be noticed that that wording is very similar to the ultimate Art 55.  Mr Broches explained that Art 58 had been inserted merely to make it clear that the Convention did not seek to change the law of the Contracting States with respect to foreign state immunity, and in that respect it was merely a clarification of the terms.  He said that in many countries a final judgment against a foreign state and even against the local state could not be enforced, in which event the award should not be enforced either.  See *History* Vol II, 905.  Again, the sense in which "enforcement" is used is not clear and the intention to preserve domestic law on "foreign state immunity" is certainly stated so broadly as to include immunity from jurisdiction.

- 34 -

131    A further subsequent draft of the Convention (dated 11 December 1964) had Arts 53-55 that
closely correspond with the ultimate Arts 53-55 (*History* Vol II, 927-928).  The memorandum
from the General Counsel, Mr Broches, in the form of a draft report of the Executive Directors
to accompany the Convention, dated 19 January 1965, explained the relevant articles (*History*
Vol II, 962-963 [42]-[44]).  Save for one amendment that is not presently relevant (apparent at
*History* Vol II, 1026), that report was adopted by the Executive Directors as their report to
accompany the Convention.  This is the Report referred to at [115] and [119] above.

132    Critically for present purposes, the Report (*History* Vol II, 1083) states that Art 54 requires
every Contracting State "to recognize the award as binding and to enforce the pecuniary
obligations imposed by the award as if it were a final decision of a domestic court" ([42]) and
"to equate an award rendered pursuant to the Convention with a final judgment of its own
courts" ([43]).  If that was not clear enough, it then states that Art 54 does not require
Contracting States to go beyond that "and to undertake forced execution of awards rendered
pursuant to the Convention in cases in which final judgments could not be executed" ([43])
and, "in order to leave no doubt on this point", Art 55 provides that nothing in Art 54 "shall be
construed as derogating from the law in force in any Contracting State relating to immunity of
that state or of any foreign state from execution".

133    The French (*History* Vol III, 863-864) and Spanish (*History* Vol IV, 714-715) versions of the
report of the Executive Directors of 18 March 1965 appear to be to the same effect and, as far
as I can tell, just as clear.

134    There is nothing in the Report of the Executive Directors which would indicate that where
foreign state immunity is preserved under Art 55 that includes foreign state immunity from the
jurisdiction of any court.  What is preserved is foreign state immunity from the execution of
judgments, and that up to and including the recognition and enforcement of awards by making
judgments on them no foreign state immunity is intended to be preserved.  Indeed, Contracting
States are obliged to equate an award rendered pursuant to the Investment Convention with a
final judgment of its own court.

135    In the circumstances, reference to the preparatory materials in the form of the 18 March 1965
Report of the Executive Directors, which is both unambiguous and authoritative, serves to
confirm the interpretation that I have thus far placed on Arts 53-55 of the Investment
Convention insofar as the distinction between recognition/enforcement and execution is
concerned, and the limited preservation of foreign state immunity to the sphere of execution.

- 35 -

**The French and Spanish texts of Arts 53-55**

136    Spain's principal argument in opposition to the above analysis is based on the French and Spanish texts which, as explained above (at [82] and [87]), are equally authentic.

137    Under Art 33(3) of the Vienna Convention the terms of the treaty are presumed to have the same meaning in each authentic text.    Also, under Art 33(4), when a comparison of the authentic texts discloses a difference in meaning which the application of Arts 31 and 32 does not remove, the meaning which best reconciles the texts, having regard to the object and purpose of the treaty, shall be adopted.    It is thus necessary to consider whether there is a difference in meaning between the three authentic texts and, if there is, to seek to reconcile the texts in the prescribed manner.    See Gardiner R, *Treaty Interpretation* (2nd ed., Oxford University Press, 2015) 423.    In that regard, every effort should be made to find a common meaning for the texts before preferring one to another, and a meaning must be sought that gives effect, simultaneously, to all the terms of the treaty as they are used in each authentic language: *Comptroller-General of Customs v Pharm-A-Care Laboratories Pty Ltd* [2020] HCA 2 at [36] per Kiefel CJ, Bell, Gageler, Keane and Gordon JJ.

138    In the French and Spanish texts of Arts 53 to 55, there is no clear distinction in the language between what in English is reflected as "enforcement" and "execution".    In the title to Section 6 of Ch IV, the French text speaks of *reconnaissance et de l'exécution* and the Spanish text of *reconocimiento y ejecución* in place of the English "recognition and enforcement".    Consistent with that, thereafter where the English text uses "enforce" or "enforcement" the French text uses *l'exécution* and the Spanish text uses *ejecutar, ejecuten* or *ejecución*.    However, where the English text uses "execution" the French text still uses *l'exécution* (or *d'exécution)* and the Spanish text still uses *ejecución* (or *ejecutará*).

139    No evidence was adduced by any party as to the meaning of the French and Spanish words relied on by Spain to found its contention that the language of the French and Spanish texts does not make a distinction between enforcement and execution.    The contention is based on the apparent use of the same word, or a similar word of presumably the same origin and therefore associated meaning, in the French and Spanish texts in contrast to the English text where the clearly different words enforcement and execution are used.

140    It is to be noted, though, that the French and Spanish texts do recognise as distinct the concepts of enforcement and execution.    That is apparent from Art 54(3); where the English text refers to the execution of judgments the French and Spanish texts do the same – *l'exécution des*

- 36 -

*jugements* and *ejecución de sentencias* respectively. Thus, *l'exécution* in French and *ejecución* in Spanish can, depending on context, mean what in English would be understood as enforcement or execution.

141     Since in the French and Spanish texts there is no clear distinction in language between enforcement and execution, the preservation in Art 55 of the law relating to foreign state immunity is not clearly restricted to that law in relation to execution, as it is in the English text, and could be more broadly applicable in relation to enforcement. However, because the French and Spanish texts use the same word for enforcement and for execution, it is not necessarily the case that the use of that word in Art 55 carries with it the implication that the broader concept of enforcement is intended.

142     Indeed, given that *l'exécution* in French and *ejecución* in Spanish are used in the text in some places to mean what in English would be understood as "enforcement" and in other places as "execution", the only way of reading the three texts consistently with each other is to give those words the meaning of the English word "execution" where they are used in Art 54(3) and Art 55.

143     In contrast, Spain submits that the word "execution" in the English text of Art 54(3) and Art 55 should be given the meaning of "enforcement" which would resolve the inconsistency between the different texts. I do not accept that submission. Properly interpreted, "execution", *l'exécution* and *ejecución* in Art 54(3) in all three texts can only mean what in English would be understood as post-judgment execution. That flows from the phrase "execution of judgments" and its French and Spanish equivalents identified above. It is therefore clear that in some places in the French and Spanish texts the words *l'exécution* and *ejecución* (or their equivalents or derivatives), respectively, mean execution and in other places they mean enforcement. Spain's approach, although achieving consistency between the texts, would merely introduce inconsistency within each text. That is not a satisfactory outcome.

144     Therefore, in my judgement the application of Art 33 of the Vienna Convention leads to Art 55 of the Investment Convention preserving the law in force in any Contracting State relating to immunity of that state or of any foreign state from execution in the sense of post-judgment execution and not the broader concept of enforcement. It also leads to Art 54(1) requiring Contracting States to enforce the pecuniary obligations of awards within their territories as if they were final judgments of their designated courts. In Australia that is done by making a judgment on the award.

- 37 -

**Commentary on the Investment Convention**

145    The parties sought to enlist various commentaries on the Investment Convention in support of their respective positions.  I consider these commentaries to see whether they challenge or disturb the conclusion that I have come to this far.

146    In *Broches* (referred to at [122] above), Mr Broches sets out his experience of the process of drafting and negotiating the Investment Convention, focusing in particular on Arts 53-55.  He says that the language of Art 54 leaves no doubt that it obliges Contracting States to give effect in the domestic legal order to the binding and obligatory force of an award decreed by Art 53 of the Investment Convention and to do so whether or not they or any of their nationals had been parties to the dispute.  Further, Contracting States have two obligations: to recognise an award as binding and to enforce the pecuniary obligations imposed by it.  The award is equated to a final court decision for both purposes.  See *Broches* at 317.

147    Mr Broches observes that the use of the term "enforce" in Art 54(1), standing alone, might be considered as including execution, but that Art 54(3), which deals separately with execution, makes clear that that is not the intention.  He says that there is a clear distinction between enforceability, which is governed and decreed by the Investment Convention, and its implementation by execution, which is governed by domestic law.  See *Broches* at 318.

148    With regard to Art 55, Mr Broches (at 329) refers to what he had stated in all four regional Consultative Meetings (as identified above at [125]-[128]), i.e. that where the law of state immunity would prevent execution against state property, the Convention would leave that law unaffected.  He says (at 330) that immunity from execution was a specific problem on which certain delegations had expressed concern.

149    Spain refers to the chapter on Art 54 in *Schreuer* (referred to above at [122]).  Professor Schreuer (at 1134), in the chapter dealing with Art 54, says that although the English text apparently suggests that "enforcement" and "execution" stand for different concepts, such a distinction cannot be sustained on the basis of the French and Spanish texts.  He says (at 1135) that the meaning which best reconciles the texts, having regard to the object and purpose of the treaty, would appear to be that the words "enforcement" and "execution" are identical in meaning.

150    However, in the chapter dealing with Art 55, Professor Schreuer states (at 1153) that Art 55 only applies to immunity from execution; it does not apply to immunity from jurisdiction.  He

- 38 -

says (at 1153) that the question of immunity from jurisdiction does not arise in the context of the Investment Convention.  In support of that proposition, the author cites Delaume GR, "Judicial Decisions Related to Sovereign Immunity and Transactional Arbitration" (1987) 2 *ICSID Review – Foreign Investment Law Journal* 403, 404; Delaume GR, "Contractual Waivers of Sovereign Immunity: Some Practical Considerations" (1990) 5 *ICSID Review – Foreign Investment Law Journal* 230, 250-252.

151    Professor Schreuer goes on to state (at 1153):

> State immunity cannot be used to thwart proceedings for the recognition of an award. In addition, State immunity does not affect the *res judicata* effect of an award once it has been recognised. … State immunity only comes into play when concrete measures of execution are taken to enforce the award's pecuniary obligations, typically after recognition has been granted.

152    This view stands in tension with Professor Schreuer's view, articulated in respect of Art 54, that enforcement and execution are the same and interchangeable.  If they were, then Art 55 would not have the limited scope that he gives to it, unless execution has different meanings in Arts 54 and 55.  That is not a satisfactory solution.

153    For the reasons that I have already given, I do not subscribe to Professor Schreuer's view that Art 54 is to be interpreted in such a way that "enforcement" and "execution" are identical in meaning.  In my view, the only sensible way of reconciling the three authentic texts is to interpret "enforcement" in Art 54(1) to include enforcement by recognition and by judgment, and to interpret "execution" as meaning post-judgment execution.  "Execution" in Art 55 has the same meaning.  I otherwise agree with what Professor Schreuer says about Art 55 – it clearly only deals with immunity from execution and not immunity from jurisdiction at the prior stage of enforcement.

154    Spain also refers to Smutny AC, Smith AD and Pitt M, "Enforcement of ICSID Convention Arbitral Awards in US Courts" (2016) 43 *Pepperdine Law Review* 649, 657-758 in support of the proposition that a distinction between enforcement and execution cannot be sustained with reference to the French and Spanish texts.   Citing *Scheuer*, the authors observe that that proposition has been advanced, but they do not themselves advocate that as the correct approach.

155    There are a number of other commentators who recognise the distinction in Art 54 between enforcement and execution and who argue that foreign state immunity only applies at the stage of execution and not at the stage of judgment.

- 39 -

156 Booysen H, "The Municipal Enforcement of Arbitration Awards against States in Terms of Arbitration Conventions, with Special Reference to the New York Convention – Does International Law Provide for a Municipal Law Concept of an Arbitrable Act of State?" (1986/87) 12 *South African Yearbook of International Law* 73 says (at 110) that an award under the Investment Convention is final and automatically enforceable without any further examination by the courts of the contracting state. Professor Booysen says (at 110-111) that the Convention distinguishes between the recognition and enforcement, on the one hand, and the execution of an award, on the other. He says (at 112) that the view is generally held that the agreement to arbitrate amounts to a waiver of immunity in respect of the recognition and enforcement, but not in respect of the execution, of the award.

157 Franzoni BD, "International Law – Enforcement of International Centre for Settlement of Investment Disputes Arbitral Awards in the United States" (1988) 18 *Georgia Journal of International and Comparative Law* 101 (at 115) says that the Investment Convention draws a distinction between enforcement and execution, that immunity from enforcement of arbitral awards is not available to Contracting States, and that the law on foreign state immunity resolves only the issue of which assets of a Contracting State are available for execution of the award.

158 Soley DA, "ICSID Implementation: An Effective Alternative to International Conflict" (1985) 19 *The International Lawyer* 521 (at 525) says that the Art 54 obligation to recognise and enforce an award as if it was a final judgment from a domestic court means that a judgment must be rendered to enforce whatever pecuniary obligations have been established. The author says that the Investment Convention distinguishes between the notions of enforcement and execution. He says that this is the obligation regardless of defences such as sovereign immunity and public policy, but that execution – being the actual seizing and selling of the debtor's property – is subject to domestic procedures and sovereign immunity laws existing in the country hearing the suit.

159 Delaume GR, "Arbitration with Governments: Domestic v. International Awards" (1983) 17 *The International Lawyer* 687 (at 695) says that the Investment Convention segregates issues of recognition and enforcement from subsequent measures of execution, and that Art 54 prevents the contracting state party to the dispute from raising, at the time of recognition and enforcement, the defence of immunity from suit. The author says that in the system of the Investment Convention, recognition and enforcement are considered as constituting the

- 40 -

ultimate phase of the arbitration process and the contracting state party to the dispute is deemed to have waived any defence, including immunity from suit, which would interfere with the ICSID machinery and would be inconsistent with the consent given by that state to ICSID arbitration.  See also Delaume GR, "ICSID Arbitration and the Courts" (1983) 77 *American Journal of International Law* 784, 799-800.

160    Other commentators to similar effect on the distinction between enforcement and execution in the Investment Convention include Buckley RP, "Now We Have Come to the ICSID Party: Are Its Awards Final and Enforceable" (1992) 14 *Sydney Law Review* 358, 368-369; Chukwumerije O, "ICSID Arbitration and Sovereign Immunity" (1990) 19 *Anglo-American Law Review* 166, 178-180; van den Berg AJ, "Recent Enforcement Problems under the New York and ICSID Conventions" (1989) 5 *Arbitration International* 2, 11-14; van den Berg AJ, "Some Recent Problems in the Practice of Enforcement under the New York and ICSID Conventions" (1987) 2 *ICSID Review – Foreign Investment Law Journal* 439, 447-451; Toope SJ, *Mixed International Arbitration* (Grotius Publications Ltd, 1990) 245-247; Juratowitch B, "Waiver of State Immunity and Enforcement of Arbitral Awards" (2016) 6 *Asian Journal of International Law* 199.

161    It is apparent that the weight of commentary favours the interpretation that I have thus far arrived at, and that Professor Schreuer stands on his own in considering that enforcement and execution mean the same thing in Art 54.

**The foreign cases**

162    The distinction between recognition and enforcement, on the one hand, and execution, on the other, is recognised in decisions of foreign courts.

163    In *Benvenuti & Bonfant v People's Republic of the Congo,* Cour d'appel, Paris (26 June 1981) 65 ILR 88, the claimants sought recognition and enforcement (by *exequatur*) of a Centre award against the Congo and took steps to secure the recognition of the award before the French courts. At first instance, the Tribunal de Grande Instance granted recognition of the award, but made recognition subject to the condition that "no measure of execution, or even a conservatory measure, shall be taken pursuant to the said award, on any assets located in France without the prior authorization of this Court" (at 90).  The claimant appealed this condition, arguing that under Art 54(2) the judge at first instance could only ascertain the authenticity of the award and that he had confused two different stages, that relating to the obtaining of an *exequatur* and that relating to actual execution (at 90).

- 41 -

164    The Cour d'appel agreed with the claimant, and ordered that the condition be removed.  It held that the provisions of Art 54 of the Investment Convention lay down a simplified procedure for obtaining an *exequatur* and restrict the function of the court to ascertaining the authenticity of the award certified by the Secretary-General of the Centre (at 91).  It held that the order granting recognition and enforcement to an arbitral award does not constitute a measure of execution but is only a decision preceding possible measures of execution and that acting on a request pursuant to Art 54, the court could therefore not, without exceeding its competence, become involved in the second stage, being execution, to which the question of the immunity from execution of foreign states relates (at 91).

165    In *Société Ouest Africaine des Bétons Industriels (SOABI) v Senegal* (1991) 30 ILM 1169, recognition of an award against Senegal had initially been granted by the Paris Tribunal de Grande Instance under Art 54, but that had been reversed by the Cour d'appel on the ground that recognition would violate the immunity of Senegal from execution.  In a further appeal, the Cour de Cassation observed that a foreign state which has consented to arbitration has thereby agreed that the award may be granted recognition (*exequatur*) which, as such, does not constitute a measure of execution that might raise issues pertaining to the immunity from execution of the state concerned (at 1169).

166    It is significant that the French courts, presumably with reference to the French text of the Convention, have recognised and maintained the distinction between recognition/ enforcement and execution in Arts 54 and 55.  That rather tells against Spain's reliance on that text as revealing no such distinction.

167    In *Liberian Eastern Timber Corporation (LETCO) v The Government of the Republic of Liberia* 650 FSupp 73 (SDNY 1986), the Government of Liberia sought to vacate the judgment of the United States District Court which enforced the Centre award in issue and, in the alternative, sought to vacate the execution of that judgment against its property.  The District Court rejected the Government of Liberia's application and held that Liberia, as a signatory to the Investment Convention, waived its sovereign immunity in the United States with respect to the enforcement of any arbitration award entered pursuant to the Convention.  It held (at 76) that, by agreeing to arbitration under the Investment Convention, Liberia:

> invoked the provision contained in Article 54 of the Convention which requires enforcement of such an award by Contracting States. That action, and reading the treaty as a whole, leaves little doubt that the signatories to the Convention intended that awards made pursuant to its provisions be given full faith and credit in their respective

- 42 -

> jurisdictions subject to such rights as are reserved by signatories thereunder. Therefore, Liberia clearly contemplated the involvement of the courts of any of the Contracting States, including the United States as a signatory to the Convention, in enforcing the pecuniary obligations of the award.

168     The question of execution was decided separately with reference to foreign state immunity from execution as preserved by Art 55 (at 77).

169     This approach was followed in **Blue Ridge** *Investments LLC v Republic of* Argentina 735 F3d 72 (2d Cir 2013).  Argentina sought to rely on state immunity to resist enforcement of a Centre award against it.  The United States Court of Appeals for the Second Circuit upheld (at 84) the first instance decision that Argentina had waived its sovereign immunity in respect of recognition and enforcement by becoming a party to the Investment Convention, which expressly provides for the automatic recognition and enforcement of awards in Contracting States. The Court stated (at 84):

> In light of the enforcement mechanism provided by the ICSID Convention, we agree with the District Court that Argentina 'must have contemplated enforcement actions in other [Contracting] [S]tates', including the United States.

170     *Blue Ridge* was more recently affirmed in *Mobil Cerro Negro Ltd v Bolivarian Republic of Venezuela* 863 F3d 96 (2d Cir 2017).

171     The Court of Appeal of England and Wales in *Micula v Romania* [2018] EWCA Civ 1801 at [258]-[260] per Legatt LJ recognised that the reference to execution in Art 54(3) is a reference to post-judgment execution and that that article gives the national court control over the process of execution of the award.  Enforcement of the award, in contrast, is intended to be automatic.

172     It is thus apparent that the weight of comparative case law favours the interpretation that I have thus far come to.

**Conclusion**

173     In my view, it is not only the English text of the Investment Convention that makes a clear and workable distinction between enforcement and execution, but that that distinction is also clear from the preparatory materials.  The fact that the French and Spanish texts are not as clear on the distinction, although it is still there in Art 54(3) as I have explained, does not lead to the conclusion that the English text must be interpreted in such a way as to discard the distinction. In contrast, in my view the French and Spanish texts would be more readily interpreted in the same way as the English text in any exercise to interpret the equally authentic texts consistently.

- 43 -

174   I am not persuaded by Professor Schreuer's view to the contrary, and in any event I find much
       in what Professor Schreuer has written elsewhere, particularly in relation to Art 55, to support
       the view that I have formed.  The weight of other commentators also take that view, and there
       is considerable support for it in decisions of foreign courts.

175   In the circumstances, in my view the Art 54(1) of the Investment Convention imposes on each
       Contracting State the obligation to enforce the pecuniary obligations of a Centre award in its
       territory as if it were a judgment of its designated courts.  That obligation includes the
       obligation to recognise such an award by *exequatur* or judgment on the award.  Also, Art 55
       preserves any claim to foreign state immunity in relation to any steps to execute upon a
       judgment that recognises and enforces such an award and not in proceedings for the recognition
       and enforcement of an award.

176   The conclusion that I have reached with regard to the proper construction of the Investment
       Convention means that the applicants' foundational argument is established.  That means that
       there is, on the face of it, a conflict between the effect of the Investment Convention as given
       the force of law in Australia by the *Arbitration Act* and s 9 of the *Immunities Act* insofar as
       foreign state immunity is concerned.  The resolution of the conflict requires consideration of
       the applicants' subsidiary arguments, of which the first is that Spain submitted to the
       jurisdiction of this Court (amongst others), within the meaning of s 10 of the *Immunities Act*,
       by becoming a signatory to the ECT and the Investment Convention.

**SUBMISSION TO JURISDICTION**

177   As canvassed above (at [55]), a state is not immune from jurisdiction in a proceeding in which
       it has submitted to the jurisdiction of the court (*Immunities Act*, s 10(1)).  Further, a state may
       submit to the jurisdiction at any time "by agreement or otherwise", which includes by treaty or
       other international agreement (*Immunities Act*, s 10(2) and the definition of "agreement" in
       s 3(1)).  An agreement by a foreign state to waive its immunity under Pt II has effect to waive
       that immunity and the waiver may not be withdrawn except in accordance with the terms of
       the agreement (*Immunities Act*, s 10(5)).

178   The ECT, to which Spain is a signatory, in Art 26(2), gives an Investor party to a dispute with
       a Contracting Party three options for the resolution of disputes.  The third option, in Art 26(2)(c)
       with reference to Art 26(3)(a) and Art 26(4), is by submitting the dispute to one or other of
       three modes of arbitration.  In that regard, each Contracting Party gave "its unconditional
       consent to the submission of a dispute to international arbitration or conciliation in accordance

- 44 -

with the provisions of [Art 26]" (Art 26(3)(a)).   One of the modes of arbitration which is available, if the "Contracting Party of the Investor" (i.e. the investor's home state) and the Contracting Party to the dispute are both parties to the Investment Convention, is submission of the dispute to the Centre established pursuant to the Investment Convention (Art 26(4)(a)).

179      It was thus apparently the intention of the parties to the ECT to create rights in favour of private investors capable of enforcement in consensual arbitration against one or other state parties to the ECT.   The election of the applicants to exercise the Investment Convention dispute resolution option given to them by the ECT must be considered as giving rise to an enforceable obligation on the part of Spain to arbitrate under the Investment Convention.   See *Republic of Ecuador v Occidental Exploration and Production Co* [2005] EWCA Civ 1116; [2006] QB 432 at [32].   Thus, by being a Contracting Party to the ECT and a Contracting State to the Investment Convention, Spain submitted to the arbitrations under the Investment Convention which produced the awards they seek to enforce.

180      The question then is whether, by doing so, Spain also submitted to the jurisdiction of the designated courts (including this Court) for the purposes of enforcement (as opposed to execution) of those awards.

181      On the construction of the Investment Convention which I have arrived at, it must be that Spain has so submitted.   In that regard, it has agreed to the terms of the Investment Convention which provide, amongst other things, that a Centre award is binding on the parties and is not subject to any appeal or any other remedy except those provided for in the Convention (Investment Convention, Art 53), that Contacting States (including Australia) are obliged to "recognise and enforce the pecuniary obligations imposed" by the award "as if it were a final judgment of a court in that state" (Art 54(1)), that in order for the applicants to seek recognition and enforcement of an award all that has to be done by them is to furnish to the competent court (which in Australia includes this Court) a copy of the award certified by the Secretary-General (Art 54(2)), and that foreign state immunity can be raised only at the stage of execution (Arts 54(3) and 55).

182      By agreeing to the designated courts of Contracting States having the power, and the obligation, to recognise and enforce arbitral awards against it, Spain inevitably consented to them doing so.   It thereby waived any reliance on foreign state immunity from the jurisdiction of such courts in proceedings to recognise and enforce such awards.

- 45 -

183    Art 54 of the Investment Convention, which is at the heart of what I have found to be Spain's submission to the jurisdiction of designated courts for the purposes of recognition and enforcement of Centre arbitral awards, can be contrasted with Art 14 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, opened for signature 10 December 1984, 1465 UNTS 85 (entered into force 26 June 1987) which was at the heart of the unsuccessful contention in *Li v Zhou* that China as a party to that Convention had submitted to the courts of Australia.  Article 14(1) relevantly provides that "[e]ach State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible".  It says nothing equivalent to the provisions of Art 54 of the Investment Convention that the pecuniary obligations of arbitral awards must be enforced as if they were final judgments of a court.  *Li v Zhou* is clearly distinguishable.

184    Spain draws attention to Art 26(8) of the ECT which provides that each Contracting Party must make provision for the effective enforcement of awards "in its Area".  Area is defined under the ECT with respect to a state that is a Contracting Party to mean the territory under its sovereignty (Art 1(10)).  From this, Spain argues that it did not submit to the enforcement of the awards in this case in other countries, including Australia, but only within its Area.

185    That submission might have had some validity if the ECT was simply an agreement between Spain and investors foreign to Spain.  However, it is a treaty between Contracting Parties by which each state that is a Contracting Party promised to the others that it would "carry out without delay" any award and that it would make provision for the effective enforcement, in its area, of such an award.  But in any event, the applicants need rely on the ECT only to the extent that it gave them the option to arbitrate under the auspices of the Centre under the Investment Convention.  The applicants having accepted Spain's offer in Art 26(4) of the ECT in that regard, the arbitrations were conducted under the Investment Convention and it is to its terms that one must have regard for the purposes of recognition and enforcement.

186    Spain submits that s 17 of the *Immunities Act* deals exhaustively with the circumstances in which a foreign state would lose its immunity in proceedings for the recognition and enforcement of arbitral awards with the result that s 10 cannot be relied on in such proceedings.  It submits that s 17 constitutes a comprehensive statement on the loss of state immunity in an arbitration and that the scope of s 10 (concerned with acts of waiver) cannot be expanded, as

- 46 -

the applicants seek to do, by employing the general words of s 10 to further extend the arbitration exception in s 17.

187    There is nothing in the *Immunities Act*, or the ALRC Report, to support the proposition that there can be no overlap in the application of the exceptions to immunity set out in ss 10 to 22 of the *Immunities Act*.  For example, there is no reason in principle why if the exception in s 11 in respect of commercial transactions applies, the exception in s 10 in respect of submission to jurisdiction should not also be able to apply, i.e. a state party to a commercial transaction can also submit to the jurisdiction of the Court such as to enliven the s 10 exception to immunity. Equally, "there is no reason to prevent, for example, a tort which fails to come within the tort exception to immunity [s 12] being brought under, say, the commercial transaction exception provided the facts permit" (ALRC Report [88]).  The corollary is that if the tort exception does apply, the commercial transaction exception may also apply, depending on the facts.

188    The High Court in *Firebird* reasoned that the exceptions to immunity can overlap: [62] per French CJ and Kiefel J, [131] per Gageler J and [203]-[204] per Nettle and Gordon JJ.

189    The ALRC Report recognised that a foreign state arbitral award debtor in respect of an arbitration that does not meet the requirements of s 17 (which are identified at [57]-[58] above) may nevertheless not enjoy immunity in proceedings for the recognition and enforcement of an arbitration award if it has submitted to jurisdiction.  That much is clear from the following discussion in the Report (at [107]) of the s 17 arbitration exception:

> A foreign state is competent to waive its immunity, and (by agreement to accept service or otherwise) to submit to the jurisdiction of the courts of any country.  <u>In the absence of express submission</u> the more defensible view is that the local courts should only be able to enforce an award against a foreign state if, had the underlying dispute being brought before those courts for resolution, the foreign state would not have been immune.  This will allow the enforcement of awards arising out of commercial transactions, or of other transactions of the foreign state over which the courts would have had jurisdiction.  <u>Private parties seeking the enforceability of foreign awards in a wider category of cases are of course free to stipulate to that effect in the agreement to arbitrate</u>.  Foreign states cannot convincingly object, in view of the widespread acceptance of international commercial arbitration and of the New York Convention of 1958, if a foreign arbitral award is enforced in this way.  <u>The Commission believes that it is sufficient to assert a similar rule for local arbitrations, leaving any more general abrogation of immunity to be provided for by agreement of the parties.</u>

> (Emphasis added.)

190    This is exactly the point: on the proper construction of the Investment Convention (as I have found), Spain by becoming a Contracting State expressly submitted to the jurisdiction of the courts of other Contracting States in respect of the recognition and enforcement, but not

- 47 -

execution, of any resulting award.  If that is correct, then it satisfies the requirements of submission/waiver under s 10 of the *Immunities Act* and there is no basis to conclude that, notwithstanding such a submission, Spain nevertheless enjoys immunity because the particular arbitration in question does not meet the requirements of the exception in s 17.

191    Spain also submits that if a foreign state, absent any express submission to jurisdiction, was to be taken to have waived immunity from jurisdiction throughout the world in respect of enforcement proceedings for the purposes of s 10 of the *Immunities Act* simply by agreeing to arbitrate a dispute, s 17(2) would have no role to play.

192    This submission misses the point.  It is not the case that "simply by agreeing to arbitrate the dispute" Spain has submitted to the jurisdiction of the Court under s 10 of the *Immunities Act*; that submission to jurisdiction arises from Spain's agreement to the Investment Convention the terms of which include mutual obligations to recognise and enforce Centre awards.  That carries with it the inevitable consent to Centre awards being recognised and enforced in fulfilment of that obligation.  Section 17(2) will continue to apply, and be required, in circumstances where the parties have submitted their dispute to arbitration without such submission amounting to a submission to the jurisdiction of the Court for the purposes of recognition and enforcement.

193    Insofar as foreign case law is concerned, several of the cases referred to above in the context of the distinction between enforcement and execution in the Investment Convention, namely *SOABI* (at [165] above), *LETCO* (at [167] above) and *Blue Ridge Investments* (at [169] above), also support the proposition that by becoming a signatory to the Investment Convention Spain submitted to the jurisdiction of the designated courts of Contracting States for the purposes of recognition and enforcement (but not execution) of any ensuing awards.

194    The applicants also refer to *Government of the Republic of Zimbabwe v Fick* [2012] ZASCA 122 as an example of a court finding that by becoming a signatory to a treaty that creates a dispute resolution tribunal, a Contracting State submitted to the jurisdiction of the courts of other Contracting States for the purposes of enforcing decisions of the tribunal and thereby waived foreign state immunity.

195    In that case, the South African Supreme Court of Appeal (SCA) held that by becoming a signatory to the Southern African Development Community (SADC) Treaty and a Protocol that established the SADC Tribunal, Zimbabwe "clearly both waived any immunity it might otherwise have been entitled to claim from the jurisdiction of the courts of member states and

- 48 -

agreed that orders of the Tribunal would be enforceable in those courts" (at [44]).  That arose from Art 32 of the Protocol which provided that the law and rules of civil procedure for the registration and enforcement of foreign judgments in force in the territory of the Member State in which the judgment is to be enforced shall govern enforcement and that decisions of the SADC Tribunal shall be binding upon the parties to the dispute in respect of that particular case and enforceable within the territory of the Member State concerned.  The result and reasoning of the SCA was upheld by the Constitutional Court in *Government of the Republic of Zimbabwe v Fick* [2013] ZACC 22; 2013 (5) SA 325 at [33]-[35].

196    In detailed analysis of each of the foreign cases relied upon by the applicants, Spain ultimately submits that they "are of no real assistance" because Spain's plea of foreign state immunity arises in a very specific context; in accordance with the precise and unique terms of the *Immunities Act* Spain invokes sovereign immunity as a procedural bar to jurisdiction.

197    There are two things to be said in response to that submission.  *First*, my analysis and conclusions have been reached independently of consideration of the foreign cases.  *Second*, and in any event, that analysis and those conclusions, both with regard to the proper interpretation of Arts 53-55 of the Investment Convention concerning the distinction between recognition/enforcement and execution and with regard to Spain's submission to the jurisdiction of this Court in respect of the recognition and enforcement of the applicants' awards, are supported by the foreign cases.  Relevantly, that analysis and those conclusions are not with regard to the construction of the *Immunities Act* – which is a domestic statute the interpretation of which, I accept, is not apt to be assisted by foreign case analysis.

198    It is of course correct that each state has its own law on foreign state immunity, and that considerable divergence exists.  There is also no uniform international law on foreign state immunity: ALRC Report at [13], *PT Garuda* at [33].  The foreign cases cannot, therefore, assist in interpreting the *Immunities Act*, but that is not why I refer to them.  They are cited on the question of the proper, international, construction of the Investment Convention.  That, in turn, informs what it is that Contracting States agreed to, which is a necessary step in the analysis of whether such agreement amounts to submission to jurisdiction and waiver of foreign state immunity under s 10.

199    Finally, Spain argues that in considering whether it submitted to jurisdiction I must give primacy to the Spanish text of the Investment Convention because Spain, a Spanish-speaking country, can be taken to have principally referenced that text in signing the Investment

- 49 -

Convention. On that basis, Spain submits, I should not regard Spain as having agreed to the distinction between recognition/enforcement and execution that is apparent in the English text.

200    Spain's submission cannot be accepted. In becoming a Contracting State to the Investment Convention, Spain agreed to the whole of the Convention including the testimonium which provides for all three texts to have equal authenticity. There is no basis upon which preference can be given to Spain's asserted subjective intention to give the Spanish text primacy when, objectively with reference to its terms, the Investment Convention was done in three authentic texts.

201    In view of my conclusion on submission, it is not necessary to deal with the two alternative bases on which the applicants seek to avoid the conflict between the immunity in s 9 of the *Immunities Act* and the Investment Convention as given the force of law by the *Arbitration Act*, namely the effect of s 34 of the *Arbitration Act* and implied repeal. I will therefore state my conclusions on them only briefly.

**SECTION 34 OF THE ARBITRATION ACT**

202    As indicated above (at [42]), the applicants rely on the statement in s 34 of the *Arbitration Act* that "other laws relating to the recognition and enforcement of arbitral awards" do not apply to disputes within the jurisdiction of the Centre or Centre awards. The applicants submit that such "other laws" include the *Immunities Act*. I am not persuaded by that submission.

203    In my view, the *Immunities Act* is not such an "other law" because it is not a law "relating to the recognition and enforcement of arbitral awards". It is a statute that "deals with the special and discrete topic of foreign state immunity in Australia": *Firebird* at [85]. As with the *Foreign Judgments Act* and the *Immunities Act*, the *Arbitration Act* and the *Immunities Act* "deal with different subject matters and the overlap between them is only slight": *Firebird* at [86].

**IMPLIED REPEAL**

204    It will be recalled that the applicants submit that the relevant provisions of the *Arbitration Act* and the Investment Convention that are given the force of law, which were enacted after the *Immunities Act*, impliedly repealed the *Immunities Act* to the extent of the inconsistency.

205    Inconsistency is at the root of the principle of implied repeal: *Ferdinands v Commissioner for Public Employment* [2006] HCA 5; 225 CLR 130 at [18]. Because of my conclusion with regard to the construction of the Investment Convention, and consequently with regard to a

- 50 -

foreign state's submission to the jurisdiction of designated courts by becoming a signatory to the Investment Convention, there is no inconsistency between the relevant statutes – agreement to the Investment Convention will constitute submission to jurisdiction under s 10 of the *Immunities Act*.

206    However, if there were such an inconsistency, as there was in *Firebird* (at [87]) in relation to the *Foreign Judgments Act*, the potential conflict is resolved by reading the relevant provisions of the *Arbitration Act* and the Investment Convention (i.e. those provisions that provide for the recognition and enforcement of Centre awards) to apply only where a defendant, including a foreign state defendant, is amenable to the jurisdiction of the court exercising jurisdiction under the *Arbitration Act*.

207    In *Firebird* it was held (at [85]-[86]) that the *Foreign Judgments Act* and the *Immunities Act* deal with quite different subjects and that it is not to be supposed that a later general statute dealing with the subject of the enforcement of foreign judgments was intended to derogate from the *Immunities Act*.  That reasoning applies equally in the present context in relation to the *Arbitration Act*.

208    Thus, on the authority and reasoning of *Firebird*, even if there was inconsistency in the present case, I would not accept the applicants' submissions about the implied repeal of the *Immunities Act* with regard to its applicability to proceedings for the recognition and enforcement of Centre awards.

**CONCLUSION**

209    For the above reasons, Spain's plea of foreign state immunity fails.

210    As Spain has indicated that it intends to raise no other defence or objection to the relief that the applicants seek, and the applicants have established the authenticity of the awards on which they rely, they are entitled to recognition and enforcement of the awards.

211    The applicants have sought leave under s 35(4) of the *Arbitration Act* to enforce the awards as if they were judgments of the Court.  They have established that they are entitled to such leave and to judgments in their favour for payment of the pecuniary obligations of the awards.

212    The applicants have also sought the costs of these proceedings.  I do not at present see any reason why the costs should not follow the event.  In that regard, by s 10(10) of the *Immunities Act*, where a foreign state has submitted to the jurisdiction in a proceeding, then, subject to an

exception not presently relevant, it is not immune in relation to a claim made in the proceeding that arises out of or relates to the transactions or events to which the proceeding relates. The applicants' claims for costs are claims that arise out of or relate to the ICSID arbitral proceedings which are the transactions and events to which the proceedings before this Court relate. Therefore, Spain does not enjoy immunity from the applicants' costs claims.

213    In any event, by s 43(1) of the *FCA Act*, subject to certain exceptions not presently relevant, the Court has jurisdiction to award costs in all proceedings before the Court, including proceedings dismissed for want of jurisdiction.

214    However, because I have not had submissions from the parties on the question of costs I will give them the opportunity to re-agitate the costs orders should they wish to. Although I have expressed a view on the costs, that is only a preliminary view and I remain open to considering any submissions to the contrary.

I certify that the preceding two hundred and fourteen (214) numbered paragraphs are a true copy of the Reasons for Judgment herein of the Honourable Justice Stewart.

Associate:

Dated: 24 February 2020