# Exhibit 1



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**
1818 H STREET, NW  |  WASHINGTON, DC 20433  |  USA
TELEPHONE +1 (202) 458 1534  |  FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

## C E R T I F I C A T E

### EISER INFRASTRUCTURE LIMITED AND ENERGÍA SOLAR LUXEMBOURG S.À R.L.

#### V.

### KINGDOM OF SPAIN

### (ICSID CASE NO. ARB/13/36) – ANNULMENT PROCEEDING

I hereby certify that the attached document is a true copy of the *ad hoc* Committee's Decision on the Kingdom of Spain's Application for Annulment, rendered in English and Spanish on June 11, 2020.

Meg Kinnear
Secretary-General

Washington, D.C., June 11, 2020

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the annulment proceeding between

**EISER INFRASTRUCTURE LIMITED AND
ENERGÍA SOLAR LUXEMBOURG S.À R.L.**

Claimants

and

**KINGDOM OF SPAIN**

Applicant/Respondent

**ICSID Case No. ARB/13/36**

---

**DECISION ON THE KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

---

**Members of the *ad hoc* Committee**
Prof. Ricardo Ramírez Hernández, President
Mr. Makhdoom Ali Khan, Member
Judge Dominique Hascher, Member

**Secretary of the *ad hoc* Committee**
Mr. Paul-Jean Le Cannu

*Date of dispatch to the Parties:* June 11, 2020

# REPRESENTATION OF THE PARTIES

*Representing Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l.*:

*Representing the Kingdom of Spain*:

### Gibson, Dunn & Crutcher LLP

Mr. Jeffrey Sullivan
Ms. Ceyda Knoebel
Mr. Theo Tyrrell
Telephone House, 2-4 Temple Avenue
London, EC4Y 0HB
United Kingdom

Mr. Rahim Moloo
Ms. Ankita Ritwik
200 Park Avenue
New York, NY 10166
United States of America

### Abogacía General del Estado-Ministry of Justice of the Government of Spain

Mr. José Manuel Gutiérrez Delgado
Mr. Pablo Elena Abad
Mr. Antolín Fernández Antuña
Ms. Patricia Froehlingsdorf Nicolás
Ms. María del Socorro Garrido Moreno
Mr. Rafael Gil Nievas
Ms. Elena Oñoro Sainz
Ms. Amaia Rivas Kortazar
Mr. Mariano Rojo Pérez
Ms. Mª José Ruiz Sánchez
Mr. Francisco de la Torre Díaz
Mr. Alberto Torró Molés
Mr. Luis Enrique Vacas Chalfoun
C/Marqués de la Ensenada, 14-16 2da planta
28004, Madrid
Spain

### Curtis, Mallet-Prevost, Colt & Mosle LLP

Mr. Benard V. Preziosi
99 Gresham Street
London, EC2V 7NG
United Kingdom

Ms. Gabriela Alvarez-Avila
Mr. Ricardo Mier y Teran
Rubén Darío 281, 9th Floor
Col. Bosque de Chapultepec
11580, Mexico City
Mexico

Ms. Arianna Sánchez
Ms. Miriam K. Harwood (until January 2019)
101 Park Avenue,
New York, NY, 10178

United States of America

Ms. Claudia Frutos-Peterson
1717 Pennsylvania Avenue, NW
Washington, D.C. 20006
United States of America

**TABLE OF CONTENTS**

REPRESENTATION OF THE PARTIES....................................................................I

TABLE OF CONTENTS...................................................................................... III

TABLE OF SELECTED ABBREVIATIONS/DEFINED TERMS........................... VI

I.     INTRODUCTION AND PARTIES ............................................................... 1

II.    PROCEDURAL HISTORY........................................................................... 2

III.   PARTIES' ARGUMENTS ............................................................................ 9

       A.   Improper Constitution Of The Tribunal ............................................ 9

            1.   Spain's Arguments.................................................................... 9

                 a)   The lack of impartiality and independence of an arbitrator warrants the annulment of an award due to the improper constitution of the tribunal .............. 9

                 b)   The Applicant can raise the issue because the facts upon which it bases its argument became known after the Award was rendered................................ 11

                 c)   The appropriate standard to determine lack of independence and impartiality is a "manifest appearance of bias".................................................. 11

                 d)   The "appearance of bias" is demonstrated by the longstanding relationship between Dr. Alexandrov and Brattle, and by the failure to disclose this relationship.................................................................................. 12

            2.   Eiser Parties' Arguments ........................................................ 17

                 a)   An award can only be annulled for failure to comply with the steps necessary to constitute the tribunal at the outset of the proceeding ................... 17

                 b)   In any event, the standard applicable to a challenge of an arbitrator is high and is even higher at the annulment phase .......................................... 18

                 c)   The Applicant has waived its right to challenge Dr. Alexandrov since it should have known of his professional relationship with Brattle during the arbitration ................................................................................... 19

                 d)   Dr. Alexandrov's relationship with the Brattle Group does not warrant disqualification ...................................................................................... 20

                 e)   Failure to disclose does not automatically imply the lack of impartiality and independence of an arbitrator ..................................................... 23

                 f)   There is no evidence of bias in this case .................................... 24

       B.   Manifest Excess Of Powers.............................................................. 25

            1.   Spain's Arguments.................................................................. 25

                 a)   The Tribunal acted beyond the scope of its jurisdiction by awarding €128 million in compensation to the Eiser Parties ..................................... 26

b) The Tribunal's determination of liability constitutes a manifest excess of powers because it failed to apply the proper law, as interpreted by the Tribunal ........................................................................................................... 27

2. Eiser Parties' Arguments ............................................................................ 28

a) The Tribunal committed no excess of powers with respect to its determination on damages .................................................................................. 29

b) The Tribunal correctly identified the applicable law and applied it.............. 30

C. Serious Departure From A Fundamental Rule Of Procedure ....................................... 31

1. Spain's Arguments ....................................................................................... 31

a) The Tribunal lacked independence and impartiality ..................................... 33

b) Spain was denied the right to be heard and to be treated equally ................ 33

2. Eiser Parties' Arguments ............................................................................. 35

a) The Tribunal did not lack independence and impartiality............................. 36

b) There are no grounds to annul the Award on the basis of the rights to be heard and to be treated equally .................................................................... 36

D. Failure To State Reasons ....................................................................................... 38

1. Spain's Arguments ....................................................................................... 38

a) The award of damages contradicts the Tribunal's own reasoning and determinations on jurisdiction and liability ................................................... 39

b) The award of damages contradicts the Tribunal's finding that Spain had a sovereign right to regulate ........................................................................ 39

c) The Tribunal had no basis to conclude that the economic impact of the "new system" was more drastic than that of the "old system" ........................... 40

d) The Tribunal relied on the destruction of value of the investment as a basis to find an FET violation ...................................................................... 40

2. Eiser Parties' Arguments ............................................................................. 41

IV. ANALYSIS OF THE *AD HOC* COMMITTEE ................................................................... 43

A. Improper Constitution Of The Tribunal ................................................................... 43

1. Interpretation of Article 52(1)(a) of the ICSID Convention ................................. 44

a) Spain's Arguments ..................................................................................... 44

b) Eiser Parties' Arguments............................................................................. 45

c) Analysis of the Committee ......................................................................... 47

2. What is the applicable standard?................................................................... 57

a) Was the right to raise this matter waived because the party concerned had not raised it sufficiently promptly?.......................................................... 58

iv

b)  If the matter has been raised sufficiently promptly, has the party seeking annulment established that a third party would find an evident or obvious appearance of lack of impartiality on a reasonable evaluation of the facts of the case?.................................................................................................. 62

B.   Serious Departure From A Fundamental Rule Of Procedure...................................... 81

1.   Spain's Arguments............................................................................................ 81

2.   Eiser Parties' Arguments ................................................................................. 82

3.   Analysis of the Committee................................................................................ 83

a)  Whether the right to the independence and impartiality of an arbitrator is a fundamental rule of procedure......................................................... 84

b)  Whether there has been a departure from a fundamental rule of procedure .................................................................................................................. 84

c)  Whether the lack of impartiality or independence on the part of Dr. Alexandrov may have had a material effect on the Award and thus amounts to a serious departure from a fundamental rule of procedure ............... 85

V.   COSTS ........................................................................................................................... 89

A.   Spain's Submission On Costs.................................................................................. 89

B.   Eiser Parties' Submission On Costs ...................................................................... 90

C.   Committee's Decision On Costs ............................................................................. 91

VI.  DECISION ...................................................................................................................... 95

**TABLE OF SELECTED ABBREVIATIONS/DEFINED TERMS**

| | |
|---|---|
| Annulment Counter-Memorial | Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l.'s Counter-Memorial on Annulment dated June 11, 2018 |
| Annulment Hearing | Hearing on Annulment held on March 14 and 15, 2019 in Paris |
| Annulment Memorial | Spain's Memorial on Annulment dated March 8, 2018 |
| Annulment Rejoinder | Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l.'s Rejoinder on Annulment dated November 6, 2018 |
| Annulment Reply | Spain's Reply on Annulment dated August 24, 2018 |
| Application for Annulment | Spain's Application for Annulment of the Award dated July 21, 2017 |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings |
| Award | Award rendered by the Arbitral Tribunal on May 4, 2017 |
| Brattle Group/ Brattle | The Brattle Group, the Eiser Parties' quantum and regulatory experts in the Underlying Arbitration |
| Committee | The *ad hoc* Committee composed of Prof. Ricardo Ramírez Hernández (President), Mr. Makhdoom Ali Khan, and Judge Dominique Hascher |
| CSP Plant | Concentrated Solar Power Plant |
| Dr. Alexandrov | Dr. Stanimir A. Alexandrov, member of the Arbitral Tribunal in the Underlying Arbitration |
| EC | European Commission |
| ECT | Energy Charter Treaty, which entered into force on April 16, 1998 for Luxembourg, the United Kingdom and the Kingdom of Spain |
| Eiser Parties/ Claimants | Eiser Infrastructure Limited and Energía Solar |

| | Luxembourg S.à r.l. |
|---|---|
| Ex. C-[#] | Eiser Parties' Exhibit |
| Ex. CL-[#] | Eiser Parties' Legal Authority |
| Ex. R-[#] | Spain's Exhibit |
| Ex. RL-[#] | Spain's Legal Authority |
| First Brattle Quantum Report | Expert Report of The Brattle Group – Financial Damages to EISER, dated October 30, 2014 submitted in the Underlying Arbitration |
| First Brattle Regulatory Report | Expert Report of The Brattle Group – Changes to the Regulation of Concentrated Solar Power Installations in Spain, dated October 29, 2014 submitted in the Underlying Arbitration |
| ICSID Convention | Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on October 14, 1966 |
| ICSID or Centre | International Centre for Settlement of Investment Disputes |
| Mr. Lapuerta | Mr. Carlos Lapuerta (Principal of The Brattle Group), expert on economic analysis and financial valuation in the Underlying Arbitration |
| Second Brattle Quantum Report | Second Expert Report of The Brattle Group – Rebuttal Report: Financial Damages to EISER, dated September 17, 2015 submitted in the Underlying Arbitration |
| Second Brattle Regulatory Report | Second Expert Report of The Brattle Group – Rebuttal Report: Changes to the Regulation of Concentrated Solar Power Installations in Spain, dated September 17, 2015 submitted in the Underlying Arbitration |
| Sidley Austin | Sidley Austin LLP |
| Spain/ Applicant/ Respondent | the Kingdom of Spain |
| Tr. Day [#] [speaker], [page:line] | English transcript of the Annulment Hearing (as revised by the Parties on May 9, 2019) |
| Tribunal | Arbitral Tribunal composed of Prof. John R. Crook (President), Dr. Stanimir A. Alexandrov, and Prof. Campbell McLachlan |

| Underlying Arbitration | Arbitration proceedings between Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. and the Kingdom of Spain, ICSID Case No. ARB/13/36 |
|---|---|
| Vienna Convention | Vienna Convention on the Law of Treaties. United Nations Treaty Series, Vol. 1155, p. 331 (May 23, 1969) |

# I.     INTRODUCTION AND PARTIES

1.      This case concerns an application by the Kingdom of Spain for annulment ("**Spain's Application**" or the "**Application for Annulment**") of the Award rendered on May 4, 2017 (the "**Award**") by the Arbitral Tribunal composed of Prof. John R. Crook (President), Dr. Stanimir A. Alexandrov, and Prof. Campbell McLachlan (the "**Tribunal**") in the arbitration proceedings between Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. and the Kingdom of Spain, ICSID Case No. ARB/13/36 (the "**Underlying Arbitration**").

2.      The Award relates to a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the 1994 Energy Charter Treaty (the "**ECT**"), which entered into force on April 16, 1998 for Luxembourg, the United Kingdom and the Kingdom of Spain, as well as the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on October 14, 1966 (the "**ICSID Convention**").

3.      The Parties are, on the one hand, the Kingdom of Spain ("**Spain**", the "**Applicant**" or the "**Respondent**") and, on the other hand, the Claimants in the original arbitration proceedings: Eiser Infrastructure Limited, a private limited company incorporated under the laws of the United Kingdom, and Energía Solar Luxembourg S.à r.l., a private limited liability company (*société à responsabilité limitée*) incorporated under the laws of Luxembourg, who are Respondents in these annulment proceedings (the "**Eiser Parties**" or the "**Claimants**").

4.      The Applicant and the Claimants are hereinafter collectively referred to as the "**Parties**", and individually referred to as a "**Party**." The Parties' representatives and their addresses are listed above on page (i).

5.      The dispute in the Underlying Arbitration proceedings related to claims asserted under the ECT, in respect of measures implemented by Spain. These measures according to the Eiser

Parties modified the regulatory and economic regime of renewable energy projects thereby failing to accord fair and equitable treatment to them under Article 10(1) of the ECT.

6. In the Award, the Tribunal unanimously held that it had jurisdiction to hear the dispute under the ECT and the ICSID Convention, and that the Applicant had violated Article 10(1) of the ECT by failing to accord fair and equitable treatment to the Claimants.[1] It further decided that it need not determine the Claimants' remaining claims, on the grounds of judicial economy (financial and jurisprudential), as these remaining claims would not alter the outcome or affect the damages to which Claimants are entitled.[2] As a result of this breach, the Tribunal ordered the Applicant to pay the Eiser Parties €128 million in damages.[3] Pre-Award interest was ordered at the rate of 2.07%, compounded monthly (June 20, 2014 to May 4, 2017), and Post-Award interest at a rate of 2.50%, compounded monthly (May 4, 2017 to the date of payment).[4] The Tribunal also ordered that each Party bears its legal fees and other expenses, and that the Parties bear the costs of the arbitration in equal shares.[5]

7. Spain seeks the annulment of the Award under Article 52(1) (a), (b), (d) and (e) of the ICSID Convention. The grounds for such annulment under Article 52(1) of the ICSID Convention state as follows: *(a)* the Tribunal was not properly constituted; *(b)* the Tribunal manifestly exceeded its powers; *(d)* there was a serious departure from a fundamental rule of procedure; and *(e)* the Award failed to state the reasons on which it was based.

## II.    PROCEDURAL HISTORY

8. On July 21, 2017, the Secretary-General of ICSID received Spain's Application for Annulment, together with Annexes 1 to 18, seeking the annulment of the Award and

---

[1] Award, ¶ 486(a).
[2] Award, ¶ 486(b).
[3] Award, ¶ 486(c).
[4] Award, ¶ 486(d).
[5] Award, ¶ 486(e).

requesting that enforcement of the Award be stayed until the Application for Annulment was decided.

9.      On July 28, 2017, the Acting Secretary-General registered Spain's Application for Annulment. The Parties were also notified that the enforcement of the Award was provisionally stayed pursuant to Rule 54(2) of the ICSID Arbitration Rules.

10.     By letter dated October 23, 2017, the Secretary-General notified the Parties that, in accordance with Rules 6, 52(2), and 53 of the ICSID Arbitration Rules, an *ad hoc* Committee composed of Prof. Ricardo Ramírez Hernández (a national of Mexico), Ms. Teresa Cheng (a national of China), and Judge Dominique Hascher (a national of France) (the "**Committee**") had been constituted. The Parties were also informed that Prof. Ricardo Ramírez Hernández would be the President of the Committee and Ms. Mairée Uran Bidegain, ICSID Team Leader and Legal Counsel, would serve as Secretary of the Committee.

11.     On November 22, 2017, Spain filed a Submission in Support of the Continuation of the Provisional Stay of Enforcement of the Award, accompanied by Exhibits R-0262 to R-0270 and Legal Authorities RL-0001-bis, RL-0084-bis, and RL-0085 to RL-0094 (the "**Application for Stay**").

12.     By letter of November 27, 2017, the Committee invited the Eiser Parties to provide their observations, if any, on Spain's Application for Stay by no later than December 4, 2017. The Committee informed the Parties that they would have the opportunity to address the Committee on this issue, should they wish to do so, during the First Session scheduled for December 9, 2017. In addition, the Committee informed the Parties that it had decided to extend the stay until it had heard the Parties and was in a position to reach a final determination on the Application for Stay.

13.     On December 4, 2017, the Eiser Parties filed their Response to Spain's Application for Stay, accompanied by Exhibits C-0299 to C-0303 and Legal Authorities CL-0244 to CL-0264.

14.    On December 9, 2017, the Parties, the Committee and the Secretary of the Committee held the first session of the Committee at the World Bank Group premises in Paris, France (the "**First Session**"). On the occasion of the First Session, Spain and the Eiser Parties presented their oral submissions on the continuation of the stay of enforcement.

15.    By letter of December 14, 2017, the Committee invited the Parties to present two rounds of further written submissions on the question of the stay of enforcement of the Award.

16.    On December 21, 2017, Spain filed a second Submission in Support of Continuation of the Stay of Enforcement, accompanied by Exhibits R-0271 to R-0274 and Legal Authorities RL-0090-bis and RL-0095 to RL-0101. On the same date, the Eiser Parties filed their Further Submission on the Continuation of the Provisional Stay.

17.    On January 4, 2018, Spain filed its Further Submission in Support of Continuation of the Stay of Enforcement, accompanied by Exhibits R-0275 to R-0279. On the same date, the Eiser Parties filed their Final Submission on the Continuation of the Provisional Stay of Enforcement of the Award, accompanied by Exhibits C-0304 to C-0311 and Legal Authorities CL-0265 to CL-0271.

18.    Spain's submission of January 4, 2018 was accompanied by a cover letter, whereby Spain requested that the Committee direct the Eiser Parties: *(a)* to provide disclosure on an immediate basis as to whether they have sold or otherwise transferred their interests in the Award to one or more third parties (including either the right to collect funds and/or the right to enforcement); *(b)* to identify the third-party buyers/transferees; and *(c)* to provide a copy of the agreement(s) with those parties, so that Spain may understand the terms of the arrangement. Spain further alleged that the Claimants had withheld their final arguments until after Spain had filed its submission first, thereby denying Spain an opportunity to fully respond to the Claimants' arguments.

19.    On January 8, 2018, without requesting leave from the Committee, Spain submitted an additional letter reiterating the arguments of its letter dated January 4, 2018.

20.    On January 15, 2018, at the request of the Claimants, the Committee invited the Claimants to provide their observations on Spain's letter dated January 4, 2018.

21.    The Committee issued Procedural Order No. 1 on January 19, 2018, concerning various procedural matters. The Parties confirmed, among other items, that the 2006 ICSID Arbitration Rules would apply to the annulment proceedings.

22.    On January 22, 2018, the Eiser Parties filed a reply to Spain's letters of January 4 and 8, 2018.

23.    On March 8, 2018, in accordance with the procedural calendar set out in Procedural Order No. 1, Spain filed its Memorial in Support of Application for Annulment ("**Annulment Memorial**"), along with an Appendix on the Assumptions and Calculations in the Brattle Model, Exhibits R-0280 to R-0311, and Legal Authorities RL-0102 to RL-0164.

24.    On March 23, 2018, the Committee issued a decision on the stay of enforcement of the Award, deciding that there were no circumstances that required the stay to be continued pending its decision on annulment ("**Decision on Stay**"). However, the Committee confirmed and gave full effect to the Eiser Parties' undertaking to "promptly […] repay Spain any and all amounts received in satisfaction of the Award to the extent that the annulment application is successful" and not to "disburse or transfer any amounts received in satisfaction of the Award to their investors or to any other third party while the annulment proceeding is ongoing (or thereafter to the extent the annulment application is successful)."[6] To this effect, the Committee ordered the Eiser Parties to submit, with all the necessary formalities, such undertaking to Spain.

25.    By letter of April 2, 2018, pursuant to the instructions of the Committee in its Decision on Stay, counsel for the Claimants provided Spain with an undertaking to promptly repay any and all amounts received in satisfaction of the Award rendered on May 4, 2017 to the extent that the annulment application was successful. Counsel for the Eiser Parties further confirmed their undertaking not to disburse or transfer any amounts received in satisfaction of the Award to their investors or to any other third party while the annulment proceedings were ongoing (or thereafter to the extent the annulment application was successful).

---

[6] Decision on Stay, ¶ 71(b).

26.     On April 4, 2018, following the resignation of Committee member Teresa Cheng, the Secretary-General notified the Parties of the vacancy on the Committee and that the proceedings were suspended pursuant to ICSID Arbitration Rules 10(2) and 53.

27.     By its letter of April 5, 2018, Spain argued that Claimants' letter of April 2 failed to satisfy the "necessary formalities" as ordered by the Committee in its Decision on Stay. It further requested that the Eiser Parties provide the required undertaking with the "necessary formalities", and advised that until and unless the requirement was met it would consider that the provisional stay of enforcement remained in effect.

28.     On April 20, 2018, Mr. Makhdoom Ali Khan accepted his appointment as a member of the Committee by the Chairman of the Administrative Council, in accordance with ICSID Arbitration Rules 11 and 53. The Parties were notified that the Committee was hereby reconstituted. Its members are: Prof. Ricardo Ramírez Hernández (a national of Mexico), as President, Mr. Makhdoom Ali Khan (a national of Pakistan), and Judge Dominique Hascher (a national of France). In accordance with ICSID Arbitration Rules 12 and 53, the proceedings were resumed from the point in time when the vacancy had occurred.

29.     On May 31, 2018, Spain filed a Request for Modification of the Committee's Decision on Stay of Enforcement of the Award ("**Request for Modification**"), together with Exhibits R-0312 to R-0319 and Legal Authorities RL-0165 to RL-0168.

30.     On June 11, 2018, the Eiser Parties filed Claimants' Counter-Memorial on Annulment ("**Annulment Counter-Memorial**"), accompanied by Exhibits C-0304 to C-0323 and Legal Authorities CL-0265 to CL-0299.

31.     On June 22, 2018, the Eiser Parties filed a response to the Request for Modification, accompanied by Legal Authorities CL-0300 to CL-0306.

32.     On July 19, 2018, the European Commission ("**EC**") filed an Application for Leave to Intervene as a Non-Disputing Party ("**Application for Leave**"), pursuant to ICSID Arbitration Rule 37(2).

33.     On August 7, 2018, the Eiser Parties filed observations on the Application for Leave, together with Exhibits C-0324 to C-0325 and Legal Authorities CL-0307 to CL-0310. On the same date, Spain filed observations on the Application for Leave, together with Exhibit R-0320.

34.     On August 10, 2018, the Committee issued Procedural Order No. 2 concerning the Request for Modification in which it: *(a)* rejected the Request for Modification, confirming that the stay of enforcement was terminated as of March 23, 2018, pursuant to the Decision on Stay; *(b)* ordered the Eiser Parties to provide further evidence supporting the fact that the Directors signing the undertaking dated April 18, 2018 were duly authorized to bind the Eiser Parties regarding repayment and disbursement of funds and that their decisions could not be overridden; and *(c)* ordered the Eiser Parties to provide confirmation of the above referred undertaking.

35.     By letter of August 13, 2018, the Acting Secretary-General of ICSID informed the Parties that Mr. Paul-Jean Le Cannu had been appointed to serve as the Secretary of the Committee, replacing Ms. Uran Bidegain.

36.     On August 24, 2018, Spain filed its Reply Memorial in Support of Application for Annulment ("**Annulment Reply**"), accompanied by Exhibits R-0321 to R-333 and Legal Authorities RL-0169 to RL-0193.

37.     On October 11, 2018, the Committee issued Procedural Order No. 3 concerning the EC's Application for Leave pursuant to ICSID Arbitration Rule 37(2). The Committee allowed the European Commission to file a written submission as a non-disputing party on whether the Tribunal had seriously departed from a fundamental rule of procedure by requiring a commitment from the European Commission to pay the costs associated with such written submission, and by refusing the Commission's written submission after it refused to provide the requested commitment.

38.     On November 6, 2018, the Eiser Parties filed Claimants' Rejoinder on Annulment ("**Annulment Rejoinder**"), accompanied by Exhibits C-0326 to C-0347 and Legal Authorities CL-0311 to CL-0321.

39.  On November 12, 2018, the European Commission filed an *Amicus Curiae* submission pursuant to ICSID Arbitration Rule 37(2) ("**EC *amicus curiae* submission**"), accompanied by Exhibits EC-01 to EC-40.

40.  On December 12, 2018, the Eiser Parties filed observations on the EC *amicus curiae* submission pursuant to ICSID Arbitration Rule 37(2), together with Exhibits C-0367 to C-0370 and Legal Authorities CL-0322 to CL-0340. On the same date, Spain filed observations on the EC *amicus curiae* submission pursuant to ICSID Arbitration Rule 37(2), together with Legal Authority RL-0194.

41.  On March 1, 2019, the Committee issued Procedural Order No. 4 concerning procedural matters, including the organization of the hearing on annulment ("**Annulment Hearing**").

42.  On March 14 and 15, 2019, the Committee held the Annulment Hearing in Paris. In addition to the Members of the Committee and the Secretary of the Committee, the following persons were present at the Annulment Hearing:

> *For the Applicant*:
> Counsel

| | |
|---|---|
| Mr. José Manuel Gutiérrez Delgado | Abogacía del Estado, Ministerio de Justicia |
| Ms. María José Ruiz Sánchez | Abogacía del Estado, Ministerio de Justicia |
| Mr. Pablo Elena Abad | Abogacía del Estado, Ministerio de Justicia |
| Ms. Patricia Elena Froehlingsdorf Nicolás | Abogacía del Estado, Ministerio de Justicia |
| Ms. Gabriela Álvarez Ávila | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Mr. Benard Preziosi | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Ms. Arianna Sanchez (by videoconference) | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Mr. Ricardo Mier y Terán | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Ms. Mariana Gómez Vallin | Curtis, Mallet-Prevost, Colt & Mosle LLP |

> *For the Eiser Parties*:
> Counsel

| | |
|---|---|
| Mr. Jeffrey Sullivan | Gibson, Dunn & Crutcher LLP |
| Mr. Rahim Moloo | Gibson, Dunn & Crutcher LLP |
| Ms. Ceyda Knoebel | Gibson, Dunn & Crutcher LLP |

| | |
|---|---|
| Ms. Ankita Ritwik | Gibson, Dunn & Crutcher LLP |
| Mr. Theo Tyrrell | Gibson, Dunn & Crutcher LLP |

*Court Reporters:*

| | |
|---|---|
| Mr. Dante Rinaldi | D-R Esteno |
| Ms. Dawn Larson | Worldwide Reporting |

*Interpreters:*

| | |
|---|---|
| Ms. Amalia Thaler - de Klemm | English/Spanish Interpreter |
| Ms. Gertrudis Durkop | English/Spanish Interpreter |
| Mr. Daniel Giglio | English/Spanish Interpreter |

43. On July 5, 2019, each Party filed a submission on costs.

44. The Committee declared the proceedings closed on April 14, 2020, in accordance with Rules 38(1) and 53 of the ICSID Arbitration Rules.

## III.    PARTIES' ARGUMENTS

### A.    IMPROPER CONSTITUTION OF THE TRIBUNAL

### 1.    Spain's Arguments

45. Spain argues that: *(a)* the lack of impartiality and independence of an arbitrator warrants the annulment of the award due to the improper constitution of the tribunal; *(b)* it can raise the issue because the facts upon which it bases its argument became known only after the Award was rendered; *(c)* the appropriate standard to determine lack of impartiality and independence is a "manifest appearance of bias"; and, *(d)* in the case at hand, such "manifest appearance of bias" arises from the long-standing relationship between Dr. Alexandrov and the Brattle Group ("**Brattle Group**" or "**Brattle**"), and the failure to disclose this relationship.

#### a)    *The lack of impartiality and independence of an arbitrator warrants the annulment of an award due to the improper constitution of the tribunal*

46. Under Article 52(1)(a) of the ICSID Convention, a party may seek the annulment of an award if the tribunal "was not properly constituted." According to the Applicant, this

provision has to be read together with Chapter IV, Section 2 of the ICSID Convention titled "Constitution of the Tribunal", which includes Article 40(2). Article 40(2) states that the arbitrators must possess the qualities listed in Article 14(1), which include impartiality and independence. Thus, under Article 52(1)(a) of the ICSID Convention, an award can be annulled for improper constitution of the tribunal if an arbitrator did not possess the qualities of impartiality and independence.[7]

47.     For the Applicant, Dr. Alexandrov's inability to furnish explanations in the annulment proceeding does not change its position. The Committee has the necessary information to decide the issue and Dr. Alexandrov's inability to provide comments should not undercut the Applicant's right to have an independent and impartial tribunal.[8]

48.     The Applicant rejects the Eiser Parties' argument that Article 52(1)(a) of the ICSID Convention only applies to procedural deficiencies regarding the constitution of the tribunal at the outset of an arbitration. The Applicant's position is based on the following reasons: *(i)* the Eiser Parties have not provided a single authority that supports such interpretation;[9] *(ii)* issues related to the independence and impartiality of the arbitrators can arise throughout the entire proceeding, as supported by Rule 6 of the Arbitration Rules;[10] and, *(iii)* previous committees and commentators have recognized that the tribunal was not properly constituted if an arbitrator did not possess the qualities of independence and impartiality.[11]

---

[7] Annulment Memorial, ¶¶ 73-75; *citing* **Ex. RL-0102**, *EDF International S.A., SAUR International S.A. and León Participaciones Argentinas S.A. v. Argentine Republic*, ICSID Case No. ARB/03/23, Decision dated February 5, 2016 ("*EDF v. Argentina*, Decision on Annulment"), ¶¶ 126-127; **Ex. RL-0103**, *Suez, Sociedad General de Aguas de Barcelona S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/03/19, Decision on Argentina's Application for Annulment dated May 5, 2017 ("*Suez v. Argentina*, Decision on Annulment"), ¶ 77; Annulment Reply, ¶¶ 34-35.

[8] Annulment Reply, ¶¶ 46-47.

[9] Annulment Reply, ¶¶ 27, 34, 37.

[10] Annulment Reply, ¶¶ 31-32, 38-39, 48.

[11] Annulment Reply, ¶ 37; *citing* **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶ 126; **Ex. RL-0103**, *Suez v. Argentina*, Decision on Annulment, ¶ 77.

### b) The Applicant can raise the issue because the facts upon which it bases its argument became known after the Award was rendered

49. The Applicant recognizes that, as a general rule, a party must challenge the arbitrator promptly, when the relevant facts are known and, in any event, before the proceeding is declared closed. However, it has been recognized that a party can still challenge the independence and impartiality of an arbitrator in annulment proceedings if the relevant facts only became known once the arbitration proceedings were closed.[12]

50. According to the Applicant, the facts surrounding the close relationship between Dr. Alexandrov and Brattle only came to light after the Award was rendered, when public reports of such relationship emerged in July 2017, as a consequence of a challenge filed in an unrelated arbitration involving Pakistan.[13] Therefore, it can still raise the challenge to Dr. Alexandrov's independence and impartiality at the annulment stage.

### c) The appropriate standard to determine lack of independence and impartiality is a "manifest appearance of bias"

51. According to the Applicant, to demonstrate the lack of independence and impartiality of an arbitrator, it must prove that a reasonable third party would consider that there were reasonable grounds for an appearance of dependence or bias.[14] It is not required, however,

---

[12] Annulment Memorial, ¶¶ 76-77, *relying on* **Ex. RL-0106**, Christoph H. Schreuer et al., THE ICSID CONVENTION: A COMMENTARY (2nd ed., Cambridge University Press: 2009) ("Schreuer et al., THE ICSID CONVENTION"), p. 937; **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶ 130.

[13] Application for Annulment, ¶ 31; Annulment Memorial, ¶¶ 70, 72, 77; *citing* **Ex. R-0280**, T. Jones, *Pakistan challenges arbitrator over valuation method*, GLOBAL ARBITRATION REVIEW, July 12, 2017; **Ex. R-0281**, L. Peterson, *As damages phase unfolds in Pakistan mining case, a challenge is lodged against Stanimir Alexandrov – citing his client's alleged interest in a rarely-used valuation method under scrutiny*, INVESTMENT ARBITRATION REPORTER, July 11, 2017; Annulment Reply, ¶ 25.

[14] Annulment Memorial, ¶¶ 80-81; Annulment Reply, ¶¶ 49-52, 54, 58; *citing, inter alia*, **Ex. RL-0104**, *Blue Bank International & Trust (Barbados) Ltd. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/20, Decision on the Parties' Proposals to Disqualify a Majority of the Tribunal dated November 12, 2013 ("*Blue Bank v. Venezuela*, Decision on Disqualification"), ¶¶ 59-60; **Ex. RL-0105**, *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on the Proposal for Disqualification of Professor Francisco Orrego Vicuña dated December 13, 2013 ("*Burlington Resources v. Ecuador*, Decision on Disqualification"), ¶¶ 66-67; **Ex. RL-0107**, *Repsol S.A. and Repsol Butano S.A. v. Argentine Republic*, ICSID Case No. ARB/12/38, Decision on the Proposal to Disqualify a Majority of the Tribunal dated December 13, 2013 ("*Repsol v. Argentina*, Decision on Disqualification"), ¶¶ 71-72; **Ex. RL-0108**, *Caratube International Oil Company LLP and Mr. Devincci Salah Hourani v. Republic of Kazakhstan*, ICSID Case No. ARB/13/13, Decision on the Proposal for Disqualification of Mr. Bruno Boesch dated March 20, 2014 ("*Caratube v. Kazakhstan*, Decision on Disqualification"), ¶¶ 54, 57, 77.

to prove actual bias.[15] Further, pursuant to Article 57 of the ICSID Convention, the lack of the required qualities must be "evident" or "obvious" but does not need to be "self-evident."[16] When the challenge to the independence and impartiality of an arbitrator is raised for the first time in annulment, the committee must approach the question *de novo*.[17]

### d) The "appearance of bias" is demonstrated by the longstanding relationship between Dr. Alexandrov and Brattle, and by the failure to disclose this relationship

52.     For the Applicant, no reasonable third-party observer would conclude that Dr. Alexandrov could be relied upon to exercise impartial and unbiased judgment regarding the expert reports and testimony presented by Brattle.[18] In support of its allegation, the Applicant relies on the following two reasons: *(i)* the close relationship between Dr. Alexandrov and Sidley Austin LLP ("**Sidley Austin**") on the one hand, and Mr. Lapuerta and the Brattle Group on the other; and *(ii)* Dr. Alexandrov's failure to disclose this relationship in the Underlying Arbitration.[19] The Applicant concludes that the Award must be annulled on the ground of improper constitution of the Tribunal.[20]

---

[15] Annulment Reply, ¶ 27; Annulment Reply, ¶¶ 53-54.

[16] Annulment Reply, ¶ 52; *citing* **Ex. RL-0175**, *Raiffeisen Bank International AG and Raiffeisenbank Austria D.D. v. Republic of Croatia*, ICSID Case No. ARB/17/34, Decision on the Proposal to Disqualify Stanimir Alexandrov dated May 17, 2018 ("*Raiffeisen Bank v. Croatia*, Decision on Disqualification"), ¶ 79; **Ex. RL-0104**, *Blue Bank v. Venezuela*, Decision on Disqualification, ¶ 59; **Ex. RL-0105**, *Burlington Resources v. Ecuador*, Decision on Disqualification, ¶ 66; **Ex. RL-0107**, *Repsol v. Argentina*, Decision on Disqualification, ¶ 71; **Ex. RL-0108**, *Caratube v. Kazakhstan*, Decision on Disqualification, ¶¶ 57, 77; **Ex. RL-0173**, *İçkale İnşaat Limited Şirketi v. Turkmenistan*, ICSID Case No. ARB/10/24, Decision on Claimant's Proposal to Disqualify Professor Philippe Sands dated July 11, 2014 ("*İçkale v. Turkmenistan*, Decision on Disqualification"), ¶ 117; **Ex. RL-0174**, *BSG Resources Limited, BSG Resources (Guinea) Limited and BSG Resources (Guinea) SARL v. Republic of Guinea*, ICSID Case No. ARB/14/22, Decision on the Proposal to Disqualify All Members of the Arbitral Tribunal dated December 28, 2016 ("*BSG Resources v. Guinea*, Decision on Disqualification"), ¶ 57; **Ex. CL-0291**, *Tethyan Copper Company Pty Limited v. Islamic Republic of Pakistan*, ICSID Case No. ARB/12/1, Decision on the Respondent's Proposal to Disqualify All Members of the Tribunal dated February 5, 2018 ("*Tethyan Copper v. Pakistan*, Decision of ICSID Administrative Council Chairman"), ¶ 98.

[17] Annulment Memorial, ¶ 78; Annulment Reply, ¶¶ 41-45, *relying on* **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶ 132.

[18] Annulment Memorial, ¶ 82.

[19] Annulment Memorial, ¶¶ 83, 95, 116.

[20] Application for Annulment, ¶¶ 22-29; Annulment Memorial, ¶ 67; Annulment Reply, ¶ 29.

53.  *First*, according to the Applicant, during the course of his 15 years at Sidley Austin's Washington, D.C. office, where Dr. Alexandrov was a partner and co-head of the firm's international arbitration practice, Dr. Alexandrov and his team appointed the Brattle Group in numerous cases where he served as counsel, including, but not limited to, nine investor-State arbitrations, including eight at ICSID alone, and numerous commercial arbitrations.[21] In four of these cases Mr. Lapuerta was the testifying expert.[22]

54.  In Spain's view, the fact that this took place while Dr. Alexandrov was at Sidley Austin is of particular relevance for two reasons. First, the identity of an arbitrator and his law firm must be considered as one for the purpose of identifying and revealing conflicts of interest. Similarly, individual experts cannot simply be detached from the company for which they

---

[21] The Applicant refers to: (i) *Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29 (Stanimir Alexandrov as counsel for the claimant, Brattle as the claimant's damages expert); (ii) *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Şirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5 (Stanimir Alexandrov as counsel for the respondent, Brattle (Carlos Lapuerta) as the respondent's damages expert); (iii) *Archer Daniels Midland Company and Tate & Lyle Ingredients Americas, Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/04/5 (Stanimir Alexandrov as counsel for the claimants, Brattle as the claimants' damages expert); (iv) *Alapli Elektrik B.V. v. Republic of Turkey*, ICSID Case No. ARB/08/13 (Stanimir Alexandrov as counsel for the respondent, Brattle (Carlos Lapuerta) as the respondent's damages expert); (v) *Pluspetrol Peru Corporation and others v. Perupetro S.A.*, ICSID Case No. ARB/12/28 (Stanimir Alexandrov as counsel for the respondent, Brattle (Carlos Lapuerta) as the respondent's damages expert); (vi) *LSF-KEB Holdings SCA and others v. Republic of Korea*, ICSID Case No. ARB/12/37 (Stanimir Alexandrov as counsel for the claimants, Brattle as the claimants' damages expert); (vii) *Bear Creek Mining Corporation v. Republic of Peru*, ICSID Case No. ARB/14/21 (Stanimir Alexandrov as counsel for the respondent, Brattle as the respondent's damages expert); and (viii) *Veolia Environnement and others v. Republic of Lithuania*, ICSID Case No. ARB/16/3 (Stanimir Alexandrov as counsel for the claimants, Brattle as the claimants' damages expert). In addition to these cases, Dr. Alexandrov revealed that "Brattle has been engaged by a client in an investor-state arbitration that is at an initial stage" and that "the parties have entered into a confidentiality agreement and thus I am not in a position to disclose further information." (**Ex. C-0317**, Letter from Dr. Alexandrov to ICSID in *SolEs Badajoz v. Spain* dated August 18, 2017, pp. 3-4; **Ex. R-0321**, Letter from Dr. Alexandrov to ICSID in *SolEs Badajoz v. Spain* dated October 12, 2017, p. 1). Annulment Memorial, ¶ 101, fn. 176; *citing* **Ex. R-0282**, *Embattled over Brattle – Spain's challenge to Alexandrov divides co-arbitrators*, GLOBAL ARBITRATION REVIEW, October 24, 2017, p. 2; Annulment Reply, ¶ 79. *See also* **Ex. R-0283**, T. Jones, *Pakistan challenges entire tribunal over Alexandrov expert ties*, GLOBAL ARBITRATION REVIEW, November 29, 2017, p. 2.

[22] The Applicant refers to: (i) *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Şirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5; (ii) *Alapli Elektrik B.V. v. Republic of Turkey*, ICSID Case No. ARB/08/13; (iii) *Pluspetrol Peru Corporation and others v. Perupetro S.A.*, ICSID Case No. ARB/12/28; and (iv) one unidentified commercial arbitration. Annulment Memorial, ¶¶ 98, 101; Annulment Reply, ¶¶ 25, 74-80, 90; *citing, inter alia*, **Ex. R-0282**, *Embattled over Brattle – Spain's challenge to Alexandrov divides co-arbitrators*, GLOBAL ARBITRATION REVIEW, October 24, 2017; **Ex. R-0283**, T. Jones, *Pakistan challenges entire tribunal over Alexandrov expert ties*, GLOBAL ARBITRATION REVIEW, November 29, 2017; **Ex. C-0316**, Letter from ICSID to the parties in *SolEs Badajoz v. Spain* dated July 26, 2017; **Ex. C-0317**, Letter from Dr. Alexandrov to ICSID in *SolEs Badajoz v. Spain* dated August 18, 2017, p. 3.

work, as the Eiser Parties assert.[23]  Second, it has been recognized that the fact that an arbitrator is co-head of his firm's worldwide international arbitration practice implies a degree of connection and coordination that creates conflicts even if the arbitrator himself was not involved in the representation.[24]

55.     Moreover, in two of these cases, Dr. Alexandrov was working with Brattle at the same time that the Underlying Arbitration was taking place. In *Pluspetrol* and *Bear Creek*, Dr. Alexandrov and/or his client appointed Mr. Lapuerta and the Brattle Group as the experts, and worked together while the Underlying Arbitration was still pending.[25]

56.     Further, in *SolEs Badajoz*, *Tethyan Copper*, *Blusun S.A.*, and *Ioan Micula*, Dr. Alexandrov was appointed by the claimant as arbitrator while the Brattle Group also served as the claimant's expert.[26] The Applicant makes the following arguments with respect to the first two cases.

57.     <u>SolEs Badajoz</u>: Spain challenged Dr. Alexandrov for similar reasons. After being provided information that, simultaneously with the <u>*SolEs Badajoz*</u> proceedings, Dr. Alexandrov had engaged Brattle in two inactive cases, the co-arbitrators informed ICSID that they were 'equally divided', thereby suggesting, according to Spain, that one of his co-arbitrators thought "there were justifiable doubts regarding [Dr. Alexandrov's] impartiality due to his relationship with Brattle […]."[27] If this was the position taken with respect to two pending but inactive cases, the Applicant argues that this case warrants the same conclusion given

---

[23] Annulment Memorial, ¶¶ 90, 102-103; *citing* **Ex. RL-0104**, *Blue Bank v. Venezuela*, Decision on Disqualification, ¶ 66; Annulment Reply, ¶¶ 72-73, 106

[24] Annulment Memorial, ¶¶ 103-104; *citing* **Ex. RL-0104**, *Blue Bank v. Venezuela*, Decision on Disqualification, ¶¶ 67, 69.

[25] Annulment Memorial, ¶¶ 99-100; Annulment Reply, ¶¶ 25, 28, 81-82; *citing* **Ex. RL-0130**, *Pluspetrol Peru Corporation S.A. and others v. Perupetro S.A.*, ICSID Case No. ARB/12/28, Award dated May 21, 2015 ("*Pluspetrol v. Perupetro*, Award"), ¶¶ 29, 204; **Ex. RL-0131**, *Bear Creek Mining Corporation v. Republic of Peru*, ICSID Case No. ARB/14/21, Award dated November 30, 2017 ("*Bear Creek v. Peru*, Award"), ¶ 30, fn. 815; Second Expert Report of The Brattle Group – Rebuttal Report: Changes to the Regulation of Concentrated Solar Power Installations in Spain, dated September 17, 2015 ("Second Brattle Regulatory Report"); Second Expert Report of The Brattle Group – Rebuttal Report: Financial Damages to EISER, dated September 17, 2015 ("Second Brattle Quantum Report").

[26] Annulment Memorial, ¶ 71, fn. 131.

[27] Annulment Memorial, ¶ 105.

that, simultaneously with the Underlying Arbitration, Dr. Alexandrov was working with Brattle in at least two active cases.[28]

58.    _Tethyan Copper_: According to the Applicant, in this proceeding, the Eiser Parties have filed non-public documents from the record of the _Tethyan Copper_ case, which are subject to confidentiality orders issued by the tribunal. Therefore, the Eiser Parties should explain how they obtained such documents and, in case they were illegally obtained, the Committee must not admit them into the record.[29] In any event, while a challenge to Dr. Alexandrov was rejected in that case, the _Tethyan Copper_ case and the case at hand are substantially different.[30]

59.    For the Applicant, the evidence put before the Committee regarding "the scope and extent of the relationship between Mr. Alexandrov and Brattle before, during and after the _Eiser_ arbitration, including the fact that Mr. Alexandrov and Brattle were working together on two other cases simultaneously with the _Eiser_ case, manifestly gives rise to the appearance of bias, impairing Mr. Alexandrov's ability to impartially assess Brattle's opinions."[31] This in turn required the disqualification of Dr. Alexandrov and warrants the annulment of the Award.[32]

60.    _Second_, the Applicant argues that, although the existence of a longstanding relationship between Dr. Alexandrov and Brattle alone is sufficient to constitute the appearance of bias, such appearance of bias is also demonstrated by Dr. Alexandrov's failure to disclose such relationship.[33]

61.    Pursuant to ICSID Arbitration Rule 6(2)(b), arbitrators are continuously obliged to disclose "any circumstance" that could create doubts, from the parties' standpoint, regarding their

---

[28] Annulment Memorial, ¶¶ 71-72, 96-97, 105, 107; Annulment Reply, ¶¶ 84, 87, 95.

[29] Annulment Reply, ¶¶ 88-90.

[30] Annulment Memorial, ¶¶ 72, 107-109, 116-117; Annulment Reply, ¶¶ 83, 87, 91-103.

[31] Annulment Reply, ¶ 98.

[32] Annulment Reply, ¶ 107. _See also_ Annulment Reply, ¶ 104; Application for Annulment, ¶ 30.

[33] Annulment Reply, ¶ 108.

independence and impartiality. Therefore, in Spain's view, Dr. Alexandrov had to disclose his close working relationship with the Brattle Group.[34] Nevertheless, during the course of the arbitration, Dr. Alexandrov never disclosed his 15-year long relationship with the Brattle Group, nor that he was working simultaneously with Brattle while the arbitration was taking place.[35] Notably, Brattle also failed to disclose such relationship, which it had a duty to do pursuant to Article 5(2) of the IBA Rules on the Taking of Evidence in International Arbitration.[36]

62.   Although a failure to disclose does not automatically demonstrate the arbitrator's lack of impartiality and independence, it does so, according to the Applicant, when it is a "part of a pattern of circumstances raising doubts as to impartiality."[37] For the Applicant, Dr. Alexandrov's failure to disclose his relationship with Brattle Group is not an isolated occurrence and has also occurred in the *Raiffeisen Bank*, *SolEs Badajoz*, and *Tethyan Copper* cases.[38] A reasonable third party would therefore conclude that Dr. Alexandrov

---

[34] Annulment Memorial, ¶¶ 84-89, 91, *relying on* **Ex. RL-0113**, Karel Daele, CHALLENGE AND DISQUALIFICATION OF ARBITRATORS IN INTERNATIONAL ARBITRATION (Kluwer Law International 2012) ("Daele, CHALLENGE AND DISQUALIFICATION OF ARBITRATORS"), p. 8, ¶¶ 1-020, 1-023-1-024; **Ex. RL-0114**, *Alpha Projektholding GmbH v. Ukraine*, ICSID Case No. ARB/07/16, Decision on Respondent's Proposal to Disqualify Arbitrator Dr. Yoram Turbowicz dated March 19, 2010 ("*Alpha Projektholding v. Ukraine*, Decision on Disqualification"), ¶¶ 15, 52-56; Annulment Reply, ¶¶ 55, 57, 65, 67-70, *relying on* **Ex. RL-0175**, *Raiffeisen Bank v. Croatia*, Decision on Disqualification, ¶ 82; **Ex. RL-0174**, *BSG Resources v. Guinea*, Decision on Disqualification, ¶ 57; **Ex. RL-0105**, *Burlington Resources v. Ecuador*, Decision on Disqualification, ¶ 66; **Ex. RL-0104**, *Blue Bank v. Venezuela*, Decision on Disqualification, ¶ 59; **Ex. RL-0107**, *Repsol v. Argentina*, Decision on Disqualification, ¶ 71.

[35] Annulment Memorial, ¶¶ 68, 70-72, 93-94, 100, 114, 116, *relying on* **Ex. RL-0114**, *Alpha Projektholding v. Ukraine*, Decision on Disqualification, ¶ 64; **Ex. RL-0126**, *Suez, Sociedad General de Aguas de Barcelona S.A. and others v. Argentine Republic*, ICSID Case Nos. ARB/03/19 and ARB/03/17, Decision on a Second Proposal for the Disqualification of a Member of the Arbitral Tribunal dated May 12, 2008 ("*Suez v. Argentina*, Disqualification Decision II"), ¶ 44; **Ex. RL-0127**, *Tidewater Inc. and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Claimants' Proposal to Disqualify Professor Brigitte Stern, Arbitrator dated December 23, 2010 ("*Tidewater v. Venezuela*, Disqualification Decision"), ¶ 47; **Ex. RL-0128**, Loretta Malintoppi and Andrea Carlevaris, Challenges of Arbitrators, Lessons from the ICC, in CHALLENGES AND RECUSALS OF JUDGES AND ARBITRATORS IN INTERNATIONAL COURTS AND TRIBUNALS (C. Giorgetti ed., Brill 2015), pp. 150, 160-161; **Ex. RL-0129**, Thomas W. Walsh and Ruth Teitelbaum, The LCIA Court Decisions on Challenges to Arbitrators: An Introduction, 27(3) ARBITRATION INTERNATIONAL 283 (2011), pp. 288-289; Annulment Reply, ¶¶ 25, 28, 40.

[36] Annulment Memorial, ¶¶ 69, 100, 110-112; Annulment Reply, ¶ 25.

[37] Annulment Reply, ¶ 60; *citing* **Ex. RL-0114**, *Alpha Projektholding v. Ukraine*, Decision on Disqualification, ¶ 64; **Ex. RL-0126**, *Suez v. Argentina*, Disqualification Decision II, ¶ 44. *See also* Annulment Reply, ¶¶ 61-63.

[38] Annulment Memorial, ¶¶ 95, 113; Annulment Reply, ¶¶ 109-111.

was unable to objectively and impartially assess the opinions of Brattle and that the Award should be annulled.[39]

### 2.    Eiser Parties' Arguments

63.    The Eiser Parties argue that there is no basis to annul the Award for improper constitution of the Tribunal for the following reasons: *(a)* an award can only be annulled for failure to comply with the steps necessary to constitute the tribunal at the outset of the proceedings; *(b)* in any event, the standard applicable to a challenge of an arbitrator is high and is even higher in the annulment phase; *(c)* the Applicant has waived its right to challenge the independence and impartiality of Dr. Alexandrov; *(d)* there was no conflict of interest arising from the alleged relationship between Dr. Alexandrov and the Brattle Group that would warrant annulment; *(e)* failure to make the alleged disclosure does not automatically imply the lack of impartiality and independence of an arbitrator; and, *(f)* there is no objective evidence of bias.

### a)    *An award can only be annulled for failure to comply with the steps necessary to constitute the tribunal at the outset of the proceeding*

64.    For the Eiser Parties, Article 52(1)(a) of the ICSID Convention is not meant to allow for the *post hoc* challenge of one of the arbitrators, and only applies to the procedural steps necessary to constitute the tribunal at the outset of the proceeding.[40] Since Spain does not allege anything in relation to these procedural steps, there is no basis to invoke Article 52(1)(a) of the ICSID Convention.[41]

65.    The Eiser Parties accept that this article must be read in light of Chapter IV, Section 2 of the Convention, which deals with the process to be followed to constitute the Tribunal at the outset of the proceeding and not with issues that may arise during the course of the proceedings. Article 57 of the ICSID Convention differentiates between challenges based on a manifest lack of the qualities required by Article 14(1) (used by the Applicant for its

---

[39] Annulment Reply, ¶ 112.

[40] Annulment Counter-Memorial, ¶¶ 36-37; Annulment Rejoinder, ¶¶ 19(a), 27, 29.

[41] Annulment Counter-Memorial, ¶ 38.

argument) and challenges based on the improper constitution of the tribunal under Section 2 of Chapter IV, to which Article 52(1)(a) refers. Thus, a challenge based on the lack of the qualities required by Article 14(1) is not a ground for annulment under Article 52(1)(a).[42]

### b)  *In any event, the standard applicable to a challenge of an arbitrator is high and is even higher at the annulment phase*

66.   If the Committee were to accept a more expansive interpretation of Article 52(1)(a) of the ICSID Convention and allowed the application of Article 57 of the ICSID Convention "under the guise of annulment",[43] a view which the Eiser Parties do not support, the Committee would have to do so "with the safeguards imposed by the Convention on the standards of review for annulment",[44] especially because the challenged arbitrator cannot furnish any explanations.[45]

67.   Accordingly, the Committee must be satisfied, based on the evidence before it, that the arbitrator in question failed to exercise independent judgment, that such failure was "manifest" (*i.e.*, evident or obvious) and that it put the integrity of the proceedings into question. If all of these elements are met, the Committee must consider whether, in light of the totality of the circumstances, it is appropriate to exercise its discretion to annul the Award. In doing so, the Committee cannot reconsider the merits of the decisions taken in the arbitration nor perform a *de novo* assessment of the facts.[46]

---

[42] Annulment Counter-Memorial, ¶ 37; Annulment Rejoinder, ¶ 33.

[43] Annulment Counter-Memorial, ¶ 39.

[44] Annulment Counter-Memorial, ¶ 39.

[45] Annulment Counter-Memorial, ¶¶ 39-40; Annulment Rejoinder, ¶¶ 43-45; *citing* **Ex. RL-0103**, *Suez v. Argentina*, Decision on Annulment, ¶ 83.

[46] Annulment Counter-Memorial, ¶¶ 41-54; Annulment Rejoinder, ¶¶ 26(a), 42, 46, 48-52; *citing*, *inter alia*, **Ex. CL-0284**, *OPIC Karimum Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/14, Decision on the Proposal to Disqualify Professor Philippe Sands, Arbitrator dated May 5, 2011 ("*OPIC v. Venezuela*, Decision on Disqualification"), ¶ 45; **Ex. CL-0265**, *Abaclat and others v. Argentine Republic*, ICSID Case No. ARB/07/5, Decision on the Proposal to Disqualify a Majority of the Tribunal dated February 4, 2014 ("*Abaclat v. Argentina*, Decision on Disqualification"), ¶ 77; **Ex. CL-0272**, *ConocoPhillips Petrozuata B.V. and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/30, Decision on the Proposal to Disqualify a Majority of the Tribunal, May 5, 2014 ("*ConocoPhillips v. Venezuela*, Disqualification Decision I"), ¶ 53; **Ex. CL-0273**, *ConocoPhillips Petrozuata B.V. and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/30, Decision on the Proposal to

c)   *The Applicant has waived its right to challenge Dr. Alexandrov since it should have known of his professional relationship with Brattle during the arbitration*

68.   According to the Eiser Parties, the Applicant should have known about the relationship between Dr. Alexandrov and Brattle during the course of the arbitration. Therefore, it has waived its right to challenge his independence and impartiality at the annulment stage.[47]

69.   The fact that Dr. Alexandrov had previously worked on the same cases in which Mr. Lapuerta acted as an independent expert was public knowledge years before the Award was issued.[48]

70.   In the eyes of the Eiser Parties, the awards of *PSEG v. Turkey*, *Pluspetrol v. Perupetro*, and *Alapli v. Turkey*, used by the Applicant as evidence that Dr. Alexandrov and Mr. Lapuerta were engaged by the same party as counsel and expert, were issued in June 2004, January 2007, and May 2015, long before the *Eiser* Award was issued.[49]

71.   The Eiser Parties also emphasize that Global Arbitration Review ("**GAR**") published an article in May 2015, at the same time that the Underlying Arbitration was pending, specifically stating that Dr. Alexandrov and Mr. Lapuerta were engaged by the respondent in *Pluspetrol v. Perupetro*.[50]

72.   The "publicly available" information on which the Applicant is relying includes awards issued and made public in November 2007 and August 2009, and a GAR article dated

---

Disqualify a Majority of the Tribunal, July 1, 2015 ("*ConocoPhillips v. Venezuela*, Disqualification Decision II"), ¶ 84; **Ex. RL-0105**, *Burlington Resources v. Ecuador*, Decision on Disqualification, ¶ 65; **Ex. RL-0104**, *Blue Bank v. Venezuela*, Decision on Disqualification, ¶ 58; **Ex. RL-0103**, *Suez v. Argentina*, Decision on Annulment, ¶¶ 85, 92; **Ex. RL-0139**, *CDC Group plc v. Republic of the Seychelles*, ICSID Case No. ARB/02/14, Decision of the *ad hoc* Committee on the Application for Annulment of the Republic of Seychelles dated June 29, 2005 ("*CDC v. Seychelles*, Decision on Annulment"), ¶ 37; **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶ 73; **Ex. C-0299**, Updated Background Paper on Annulment for the Administrative Council of ICSID dated May 5, 2016 ("Updated Background Paper on Annulment"), ¶ 75.

[47] Annulment Rejoinder, ¶¶ 85-86, 96-97; *citing* **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶¶ 131, 136(a) and (c).

[48] Annulment Rejoinder, ¶ 89.

[49] Annulment Rejoinder, ¶ 90.

[50] Annulment Rejoinder, ¶¶ 91-92.

September 2016. This information was therefore publicly available long before the Award was issued.[51]

73. Finally, Dr. Alexandrov's *curriculum vitae*, which was provided to the Parties when he was appointed, confirmed that he was currently or had recently represented, among others, Bulgaria, Costa Rica, Peru, and Turkey. This declaration covered the cases of *PSEG v. Turkey*, *Pluspetrol v. Perupetro*, and *Bear Creek v. Peru* and the information related to such cases was already publicly available.[52]

74. Because of all this publicly available information, Spain should have known about the relationship, especially in light of the duty of due diligence that the Parties have.[53] By not acting on information that Spain admits was available to it at the time, Spain has waived its right to raise any objections regarding Dr. Alexandrov's impartiality and independence.[54]

> ### d) Dr. Alexandrov's relationship with the Brattle Group does not warrant disqualification

75. The Eiser Parties argue that experts are chosen and appointed by the clients and not by counsel, and are engaged to provide their independent opinion. Therefore, a conflict regarding an expert could only arise on the basis of the expert's individual and close relationship with an individual arbitrator.[55]

76. In the case at hand, the Applicant has failed to objectively demonstrate Dr. Alexandrov's alleged bias because:[56] *(i)* it failed to show how Sidley Austin's activities created a conflict; *(ii)* the cases where Brattle worked alongside Sidley Austin do not create a conflict for Dr. Alexandrov; *(iii)* Mr. Lapuerta and Dr. Alexandrov only had a professional relationship that does not necessarily create a conflict; and *(iv)* previous tribunals have already decided

---

[51] Annulment Rejoinder, ¶ 93.

[52] Annulment Rejoinder, ¶ 94.

[53] Annulment Rejoinder, ¶¶ 95, 99.

[54] Annulment Rejoinder, ¶ 100.

[55] Annulment Counter-Memorial, ¶¶ 71-73.

[56] Annulment Counter-Memorial, ¶ 58.

that Dr. Alexandrov's relationship with Brattle does not constitute a ground for disqualification.

77.    *First*, the Eiser Parties argue that even though an arbitrator may be considered to bear the identity of his law firm, the IBA Guidelines make it clear that the activities of an arbitrator's law firm should not automatically create a conflict of interest, and this should be assessed on a case by case basis. According to the Eiser Parties, Spain has failed to explain how Sidley Austin's activities create a conflict in the present case.[57]

78.    *Second*, the cases in which experts from Brattle, other than Mr. Lapuerta, worked together with lawyers from Sidley Austin do not support Dr. Alexandrov's close personal relationship with Mr. Lapuerta. These include:[58]

-    Five ICSID cases where Mr. Lapuerta was not involved and that were handled by Sidley Austin's arbitration team in Washington D.C.;[59]

-    Four commercial arbitration cases handled in whole or in part by Sidley Austin's arbitration team in Washington D.C.;[60] and

-    One investment arbitration case at the initial stages.[61]

79.    *Third*, Dr. Alexandrov and Mr. Lapuerta's relationship was only "professional."[62] Over the 15-year period referred to by the Applicant, there have been only three ICSID cases and

---

[57] Annulment Rejoinder, ¶¶ 74, 111-115.

[58] Annulment Counter-Memorial, ¶ 80.

[59] Annulment Counter-Memorial, ¶ 79; *citing* **Ex. C-0317**, Letter from Dr. Alexandrov to ICSID in *SolEs Badajoz v. Spain* dated August 18, 2017, p. 3.

[60] Annulment Counter-Memorial, ¶ 79; *citing* **Ex. C-0317**, Letter from Dr. Alexandrov to ICSID in *SolEs Badajoz v. Spain* dated August 18, 2017, p. 3.

[61] Annulment Counter-Memorial, ¶ 79; *citing* **Ex. C-0317**, Letter from Dr. Alexandrov to ICSID in *SolEs Badajoz v. Spain* dated August 18, 2017, p. 4.

[62] Annulment Counter-Memorial, ¶ 66.

one commercial arbitration in which Dr. Alexandrov was personally involved as counsel and Mr. Lapuerta was appointed as an expert by the same party.[63]

80.     Out of these four cases, there is only one in which Dr. Alexandrov worked with Mr. Lapuerta while the Underlying Arbitration was taking place, namely *Pluspetrol v. Perupetro*. As recognized by the Secretary-General of the PCA, "concurrent service as an arbitrator and as counsel in an unrelated matter in which the same expert has been engaged does not automatically result in a conflict of interest warranting disqualification under the ICSID Convention."[64]

81.     For the Eiser Parties, the *SolEs Badajoz* and *Tethyan Copper* cases are irrelevant for establishing the basis of any conflict because, in these cases, Dr. Alexandrov was acting as an arbitrator and not as counsel.[65] Further, the Eiser Parties argue that the Applicant's description of the *SolEs Badajoz* case is misleading. While the unchallenged co-arbitrators were equally divided on the matter, the Applicant cannot know without being privy to the deliberations that one of the co-arbitrators believed that there were justifiable doubts regarding Dr. Alexandrov's impartiality.[66]

82.     In any event, even if the Committee concludes that Dr. Alexandrov's engagements with Mr. Lapuerta constituted a close professional relationship, such relationship does not necessarily create a conflict.[67] Dr. Alexandrov has further confirmed that his relationship

---

[63] These are *PSEG v. Turkey* [**Ex. CL-0049**], *Alapli v. Turkey* [**Ex. CL-0244**], *Pluspetrol v. Perupetro* [**Ex. RL-0130**], and one commercial arbitration. Annulment Counter-Memorial, ¶¶ 77-78; Annulment Rejoinder, ¶¶ 116-117; *citing* **Ex. C-0316**, Letter from ICSID to the parties in *SolEs Badajoz v. Spain* dated July 26, 2017.

[64] Annulment Rejoinder, ¶ 118; *citing* **Ex. CL-0289**, *Tethyan Copper Company Pty Limited v. Islamic Republic of Pakistan*, ICSID Case No. ARB/12/01, Opinion Pursuant to the Request by ICSID dated July 28, 2017 on the Respondent's Proposal for the Disqualification of Dr. Stanimir Alexandrov dated July 7, 2017 dated August 31, 2017 ("*Tethyan Copper v. Pakistan*, PCA Opinion"), ¶ 120; Annulment Counter-Memorial, ¶ 68.

[65] Annulment Counter-Memorial, ¶ 69.

[66] Annulment Counter-Memorial, ¶ 88; Annulment Rejoinder, ¶¶ 26(b), 107; *citing* **Ex. C-0319**, Letter from J. Donoghue and A. Joubin-Bret to ICSID in *SolEs Badajoz v. Spain* dated October 19, 2017.

[67] Annulment Counter-Memorial, ¶¶ 84-85, 90; *citing* **Ex. RL-0126**, *Suez v. Argentina*, Disqualification Decision II, ¶ 32; **Ex. CL-0295**, Schreuer et al., THE ICSID CONVENTION, Art. 40, p. 513, ¶¶ 22-23.

with the Brattle Group did not go beyond engaging them as experts and that he has not had any other joint activities with Mr. Lapuerta or any other expert from Brattle.[68]

83.    *Fourth*, the Eiser Parties draw the Committee's attention to the fact that in three different instances, it has already been decided that Dr. Alexandrov's relationship with Brattle does not constitute a ground for disqualification. In fact, the very same issue that the Applicant is presenting to the Committee was already decided in *Tethyan Copper v. Pakistan*. In that case, it was decided that there was no manifest lack of impartiality on the part of Dr. Alexandrov.[69]

84.    On this point, the Eiser Parties argue that the Applicant's request to strike from the record the decisions issued in the *Tethyan Copper* case should be rejected. The information available on the ICSID website does not show that such decisions are subject to a confidentiality order. In fact, the Eiser Parties contacted the counsel for the claimant in that case and confirmed that such confidentiality order is not in place.[70]

85.    In light of the foregoing, the Eiser Parties conclude that the Applicant has failed to demonstrate that Dr. Alexandrov manifestly lacked independence or impartiality when considering the evidence and facts of the Underlying Arbitration.[71]

e)    *Failure to disclose does not automatically imply the lack of impartiality and independence of an arbitrator*

86.    For the Eiser Parties, a lack of disclosure does not automatically imply the existence of a lack of independence and impartiality.[72] The obligation to disclose under ICSID

---

[68] Annulment Counter-Memorial, ¶ 82; *citing* **Ex. C-0316**, Letter from ICSID to the parties in *SolEs Badajoz v. Spain* dated July 26, 2017, p. 2; **Ex. C-0317**, Letter from Dr. Alexandrov to ICSID in *SolEs Badajoz v. Spain* dated August 18, 2017, p. 4.

[69] Annulment Counter-Memorial, ¶¶ 55-56, 91-103; Annulment Rejoinder, ¶¶ 21, 108-110; *citing* **Ex. CL-0290**, *Tethyan Copper Company Pty Limited v. Islamic Republic of Pakistan*, ICSID Case No. ARB/12/1, Decision on Respondent's Request for Disqualification of Dr. Stanimir Alexandrov dated September 5, 2017 ("*Tethyan Copper v. Pakistan*, Decision of Co-Arbitrators"); **Ex. CL-0289**, *Tethyan Copper v. Pakistan*, PCA Opinion; **Ex. CL-0291**, *Tethyan Copper v. Pakistan*, Decision of ICSID Administrative Council Chairman.

[70] Annulment Rejoinder, ¶¶ 139-140.

[71] Annulment Counter-Memorial, ¶ 110.

[72] Annulment Counter-Memorial, ¶¶ 58, 111.

Arbitration Rule 6(2)(b) is a subjective standard. As such, it is for the arbitrator to exercise his or her discretion whether to disclose a fact or circumstance. An arbitrator cannot be criticized for honestly exercising that discretion.[73]

87.     According to the Eiser Parties, the existence of a professional relationship between an expert and an arbitrator is not necessarily perceived as worthy of disclosure. In fact, none of the applicable rules impose the duty on an arbitrator to disclose a professional relationship with an independent expert.[74] Because of this, it is not unreasonable for Dr. Alexandrov to have concluded that Mr. Lapuerta's engagement as an expert did not constitute a circumstance that required disclosure, and nothing in the Applicant's submissions suggest that the lack of disclosure was anything other than an honest exercise of discretion. Thus, the Applicant's case must fail.[75]

### f)     There is no evidence of bias in this case

88.     According to the Eiser Parties, even if the Committee decides to review *de novo* the request to disqualify Dr. Alexandrov, it must reject Spain's case because there is no manifest appearance of bias or dependence. Spain has the burden to point to specific facts that demonstrate bias, which it fails to do because its arguments are based on inferences and speculation and not on objective evidence.[76]

89.     Accordingly, unless the Applicant points to specific objective facts that demonstrate Dr. Alexandrov's bias in favor of the Brattle reports and that the case was decided on

---

[73] Annulment Counter-Memorial, ¶¶ 113-115; *citing* **Ex. CL-0294**, C. A. Rogers, *Ethics in International Arbitration* (Oxford Univeristy Press: 2014) (Excerpt), ¶ 2.112; **Ex. RL-0126**, *Suez v. Argentina*, Disqualification Decision II, ¶ 46.

[74] Annulment Counter-Memorial, ¶ 116; Annulment Rejoinder, ¶¶ 57, 68, 72-77.

[75] Annulment Counter-Memorial, ¶ 129; Annulment Rejoinder, ¶ 78.

[76] Annulment Rejoinder, ¶¶ 85, 101-105; *citing* **Ex. CL-0315**, *SGS Société Générale SA v. Islamic Republic of Pakistan*, ICSID Case No. ARB/01/13, Decision on Claimant's Proposal to Disqualify Arbitrator dated December 19, 2002 ("*SGS v. Pakistan*, Decision on Disqualification"), ¶ 20; **Ex. CL-0286**, *Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/13, Decision on Claimant's Proposal to Disqualify Mr. Gabriel Bottini from the Tribunal under Article 57 of the ICSID Convention dated February 27, 2013 ("*Saint-Gobain v. Venezuela*, Decision on Disqualification"), ¶ 60.

considerations other than the merits of the submissions before the Tribunal, a presumption of impartiality must apply.[77]

90.    According to the Eiser Parties, the Applicant only uses online articles to support its position, which are not evidence of a "manifest" lack of independence or impartiality, and has failed to provide further evidence on this issue.[78] In fact, the Award shows that the Tribunal effectively scrutinized both sets of submissions, decided to make adjustments to Mr. Lapuerta's calculations on damages and even criticized Mr. Lapuerta's opinion where relevant.[79] Further, the Award was adopted unanimously by all the Members of the Tribunal and there is no reason to doubt Dr. Alexandrov's independence and ability to assess the merits of the case objectively.[80]

### B.    MANIFEST EXCESS OF POWERS

### 1.    Spain's Arguments

91.    Spain contends that the Tribunal committed a manifest excess of powers under Article 52(1)(b) of the ICSID Convention by: *(a)* acting outside the Parties' consent by awarding compensation for measures over which it did not have jurisdiction or which it found not to be in breach of the ECT; and *(b)* failing to apply the proper law in the Award's determination of liability.[81]

---

[77] Annulment Counter-Memorial, ¶¶ 130, 133; Annulment Rejoinder, ¶¶ 120-123, 125-126; *citing* **Ex. CL-0286**, *Saint-Gobain v. Venezuela*, Decision on Disqualification, ¶¶ 77, 80-81; **Ex. CL-0313**, *Nations Energy Corporation, Electric Machinery Enterprises Inc., and Jaime Jurado v. Republic of Panama*, ICSID Case No. ARB/06/19, Decision on the Proposal to Disqualify Dr. Stanimir A. Alexandrov dated September 7, 2011, ¶¶ 22-23, 64, 66-68; **Ex. CL-0289**, *Tethyan Copper v. Pakistan*, PCA Opinion, ¶ 120.

[78] Annulment Counter-Memorial, ¶¶ 70, 75.

[79] Annulment Counter-Memorial, ¶¶ 134-136.

[80] Annulment Counter-Memorial, ¶ 137.

[81] Application for Annulment, ¶¶ 32-33; Annulment Memorial, ¶¶ 126, 128, 132-133, 199, 203-206, 209-210; Annulment Reply, ¶¶ 124, 162, 164-165, 203, 205; Tr. Day 1 [Mr. Preziosi], 47:12-18, 102:22-103:5; [Ms. Álvarez Ávila], 108:7-13, 108:15-109:4.

a) ***The Tribunal acted beyond the scope of its jurisdiction by awarding €128 million in compensation to the Eiser Parties***

92. Spain contends that, by awarding €128 million to the Claimants, the Tribunal acted beyond the scope of its authority and jurisdiction under the ECT and the ICSID Convention.[82]

93. According to Spain, the measures which the Eiser Parties claimed had violated the ECT were:[83] *(i)* Law 15/2012; *(ii)* RDL 2/2013; *(iii)* RDL 9/2013; *(iv)* Law 24/2013; *(v)* RD 413/2014; and *(vi)* MO IET/1045/2014 (the "**Disputed Measures**"). In the Award, the Tribunal decided that it did not have jurisdiction over the 7% tax measure implemented by Law 15/2012 and that Law 15/2012 and RDL 2/2013 did not violate the ECT, either "individually or collectively."[84]

94. During the Arbitration, the Eiser Parties and their damages expert, the Brattle Group, argued that the appropriate methodology to calculate the economic impact of the Disputed Measures was the DCF methodology.[85] The Brattle Group divided the damages between: *(i)* the damages pertaining to the "historical" period prior to June 20, 2014 (*i.e.*, when MO IET/1045/2014 was published and whereby the "new regime" comprised of RDL 9/2013, Law 24/2013 and RD 413/2014 was implemented); and *(ii)* the damages pertaining to the period after June 20, 2014 and up to the end of the life of the CSP Plants.[86]

95. According to Spain, to calculate the damages, the Brattle Group compared the difference in cash flows between the "But For" and the "Actual" scenarios. In the "But For" scenario, the expert assumed that the RD 661/2007 regime remained unchanged for the entire lifespan of the CSP Plants and that all the Disputed Measures constituted violations under

---

[82] Annulment Memorial, ¶ 128.
[83] Annulment Memorial, ¶¶ 154-155.
[84] Annulment Memorial, ¶¶ 143, 145, 159, 242-243; Annulment Reply, ¶¶ 126, 163; Tr. Day 1 [Mr. Preziosi], 57:8-21, 65:11-15.
[85] Annulment Memorial, ¶ 155.
[86] Annulment Memorial, ¶ 157.

the ECT and, therefore, should be treated as if they were "never implemented." In the "Actual" scenario, the expert included the impact of all the Disputed Measures.[87]

96.    Spain argues that the Tribunal accepted this methodology with only one adjustment on the CSP Plants' lifespan.[88] This methodology, and therefore the Tribunal, assumed that all the Disputed Measures warranted compensation, including those that did not violate the ECT. As such, the damages awarded by the Tribunal did not reflect its findings on jurisdiction and liability and were much higher than they should have been if the Tribunal had properly adjusted the calculation.[89] Spain concludes that this award of overstated damages amounts to a manifest excess of powers.[90]

97.    If the proper adjustments were made to the model presented by the Brattle Group, Spain contends that the difference between the "But For" and the "Actual" scenarios would be only €7 million and not €128 million.[91] According to Spain, this new calculation is just illustrative and is not new expert testimony.[92]

   *b)*    ***The Tribunal's determination of liability constitutes a manifest excess of powers because it failed to apply the proper law, as interpreted by the Tribunal***

98.    Spain contends that the Tribunal manifestly exceeded its powers by failing to apply Article 10(1) of the ECT.

99.    Spain argues that, according to the Tribunal, it "had a sovereign right to regulate, including the right to change the regulatory regime governing the renewable energy industry that had been established under RD 661/2007, […] the Eiser Parties had no right to stabilization of

---

[87] Annulment Memorial, ¶¶ 142, 161-170; Annulment Reply, ¶¶ 134, 182; Tr. Day 1 [Mr. Preziosi], 72:20-73:8, 82:17-93:10.

[88] Application for Annulment, ¶ 37; Annulment Memorial, ¶¶ 158, 171-173, 176-177; Annulment Reply, ¶ 134; Tr. Day 1 [Mr. Preziosi], 82:14-16.

[89] Application for Annulment, ¶¶ 7-8; Annulment Memorial, ¶¶ 38-45, 52, 134-135, 141, 146, 158-159, 173-174, 190-195; Annulment Reply, ¶¶ 130, 140, 142, 183; Tr. Day 1 [Mr. Preziosi], 52:7-53:10, 66:22-67:3, 68:9-12, 69:3-70:11, 72:3-7, 93:11-18., 98:16-99:8.

[90] Application for Annulment, ¶ 40; Annulment Memorial, ¶¶ 194, 198; Annulment Reply, ¶¶ 141-142.

[91] Annulment Memorial, ¶¶ 189-198; Annulment Reply, ¶¶ 132-133, 188-195.

[92] Tr. Day 1 [Mr. Preziosi], 75:17-76:10.

that regime, […] investment treaties such as the ECT did not abrogate the State's right to regulate, and […] the fair and equitable treatment standard did not provide Claimants with a right to regulatory stabilization."[93]  However, despite these express findings, the Tribunal also "found Spain liable for breach of fair and equitable treatment, and liable for damages, precisely because Spain made revisions to the energy regulations that the Tribunal held it had a right to revise and for which the Claimants had no right to stabilization."[94] In Spain's view, this determination of liability amounted to a manifest excess of powers.[95]

100.    Further, according to Spain, the Tribunal stated that it would only decide claims presented under Article 10(1) of the ECT and that it would not decide claims related to expropriation under the ECT on the ground of judicial and financial economy.[96] The Tribunal decided that Article 10(1) of the ECT sets the FET standard and that the relevant elements are those of "stability" and "transparency."[97] However, Spain submits, the Tribunal never concluded that the measures were adopted in a non-transparent manner and inexplicably analyzed the FET claim under expropriation-based principles.[98] This constitutes, in Spain's view, a failure to apply the proper law and as such a manifest excess of powers.[99]

### 2.    Eiser Parties' Arguments

101.    For the Eiser Parties, under Article 52(1)(b) of the ICSID Convention, Spain has the burden to prove that the Tribunal acted in excess of its powers, and that this excess is manifest or plainly obvious.[100] According to them, for the annulment to be successful, the Committee would be required to find that the Tribunal acted manifestly outside the scope of its mandate in its jurisdictional analysis or in its determination of the applicable law (*i.e.*, that

---

[93] Application for Annulment, ¶ 34.

[94] Application for Annulment, ¶ 36.

[95] Application for Annulment, ¶ 36.

[96] Annulment Memorial, ¶ 253.

[97] Annulment Memorial, ¶¶ 253-260, 271.

[98] Annulment Memorial, ¶¶ 10, 200, 213, 226, 228-230, 261-263, 269, 276, 280; Annulment Reply, ¶¶ 198, 201, 204, 206, 208, 217, 235, 243-245; Tr. Day 1 [Ms. Álvarez Ávila], 109:10-22, 112:10-116:5.

[99] Annulment Memorial, ¶¶ 270, 277; Annulment Reply, ¶¶ 208, 246, 249; Tr. Day 1 [Ms. Álvarez Ávila], 116:12-117:2.

[100] Annulment Counter-Memorial, ¶¶ 212-213, 216, 266.

it failed to apply the proper law).[101] Annulment is not warranted in cases of an alleged inappropriate award of damages or misapplication of the proper law, which is what the Applicant alleges.[102]

a)    *The Tribunal committed no excess of powers with respect to its determination on damages*

102.    In relation to the Tribunal's quantification of damages, the Eiser Parties argue that: *(i)* the arguments presented by the Applicant do not go to the Tribunal's jurisdiction nor to the failure to apply the applicable law, the only proper grounds for annulment;[103] and, *(ii)* in reality, Spain is trying to challenge the assessment of the evidence made by the Tribunal, which is not a proper ground for annulment. They submit that reconsidering evidence falls outside the powers of the Committee, which cannot serve as an appeal court.[104]

103.    On the first point, the Eiser Parties argue that the Tribunal correctly stated that the applicable laws were the ECT and the rules of international law. Thereafter, the Tribunal applied said laws in its determination of damages.[105]

104.    On the second point, the Eiser Parties argue that: *(1)* Spain mischaracterizes the conclusions of the Tribunal regarding damages; and, *(2)* Spain is trying to reargue its case on damages by presenting a new quantum model that should be rejected.

105.    The Eiser Parties do not dispute the list of measures presented by the Applicant nor the conclusions reached by the Tribunal regarding such measures.[106] However, they argue that the Tribunal did not award compensation as if all the Disputed Measures violated the ECT.[107] On the contrary, the Tribunal made specific deductions from the claimed damages

---

[101] Annulment Counter-Memorial, ¶¶ 217-218, 220; Annulment Rejoinder, ¶ 153; Tr. Day 1 [Mr. Sullivan], 148:10-16, 149:5-18, 233:5-7, 235:4-6.

[102] Annulment Counter-Memorial, ¶¶ 191, 227-228; Tr. Day 1 [Mr. Sullivan], 148:17-149:4; [Mr. Moloo], 241:21-22.

[103] Annulment Counter-Memorial, ¶ 221; Tr. Day 1 [Mr. Sullivan], 233:8-13.

[104] Annulment Counter-Memorial, ¶¶ 190-192, 215, 221, 229, 232, 237, 288; Annulment Rejoinder, ¶¶ 150, 155, 159.

[105] Annulment Counter-Memorial, ¶¶ 222-226.

[106] Annulment Counter-Memorial, ¶¶ 155-158.

[107] Annulment Counter-Memorial, ¶¶ 160-161, 164.

to fully account for its findings on liability and jurisdiction;[108] it also explained why its calculation on damages was not affected by its lack of jurisdiction over the tax measure introduced by Law 15/2012.[109] According to the Eiser Parties, the Tribunal had no obligation to disaggregate the damages by each individual measure or to seek alternative calculations.[110]

106.    According to the Eiser Parties, Spain disputes the deductions made by the Tribunal, which in its view are not "the right adjustments."[111] Spain is attempting to re-argue its case on damages by advancing a new model that was never presented to the Tribunal, and which Spain could have presented with its Rejoinder.[112] This new model is now presented without leave from the Committee and in violation of the instructions established in Procedural Order 1.[113] As such, this new model should be disregarded by the Committee.[114]

b)    *The Tribunal correctly identified the applicable law and applied it*

107.    In relation to the Tribunal's determinations on liability and the FET standard, the Eiser Parties argue that all the Committee must do is to assess whether the Tribunal correctly identified the applicable law and applied it, which it did.[115]

108.    The Eiser Parties argue that Spain mischaracterized the Tribunal's findings in relation to the FET standard. According to them, the Tribunal found that: *(i)* Spain has a right to regulate but it is not unfettered and may trigger a breach of the FET standard that requires compensation; and *(ii)* stability and transparency, while not absolute requirements, are

---

[108] Annulment Counter-Memorial, ¶¶ 161-163, 165-167; Annulment Rejoinder, ¶¶ 157, 161-162, 165, 169, 186.

[109] Annulment Counter-Memorial, ¶¶ 168-169; Tr. Day 1 [Mr. Sullivan], 197:14-17, 201:15-203:11, 204:5-205:3, 210:15-211:10.

[110] Annulment Rejoinder, ¶¶ 197-210.

[111] Annulment Counter-Memorial, ¶ 165.

[112] Annulment Counter-Memorial, ¶¶ 165, 167, 170-171, 180, 182, 193-198, 200, 210, 221, 232; Annulment Rejoinder, ¶¶ 155, 158; Tr. Day 1 [Mr. Sullivan], 153:22-154:15, 198:3-20, 203:14-22, 211:18-212:5, 215:11-17, 226:10-231:5, 231:14-232:14.

[113] Annulment Counter-Memorial, ¶¶ 12-14, 172-181, 183-186; Annulment Rejoinder, ¶¶ 218-220, 222-224.

[114] Annulment Counter-Memorial, ¶ 187.

[115] Annulment Counter-Memorial, ¶¶ 265, 276.

critical components of the FET standard that can be used to establish a breach.[116] It was based on this, they submit, that the Tribunal found that Spain had "crossed the line", that the measures were disproportionate, and that Spain was required to compensate the Eiser Parties for violation of the FET standard.[117]

109.    In addition, the Eiser Parties argue that it is incorrect to conclude that the Tribunal applied an "expropriation-based analysis."[118] The Eiser Parties further argue that, "in any event, the destructive nature of a state's measure on an investment can be as relevant to assessing an FET breach as to assessing whether an indirect expropriation has taken place."[119] According to the Eiser Parties, Spain ignores its own submissions that the Tribunal should consider the economic impact of the Disputed Measures and their proportionality as part of the FET standard.[120]

110.    Further, for the Eiser Parties, Spain ignores the Tribunal's clear and extensive analysis throughout the Award explaining how a State's obligation to provide stability can be breached as a result of drastic regulatory changes, notwithstanding the impact on value. Stability was at the heart of the Tribunal's decision that the FET standard had been breached.[121] Also, the Tribunal set out many "other facts that led to its finding of a FET breach, none of which relate to deprivation in value of the Investments."[122]

## C.    SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE

### 1.    Spain's Arguments

111.    According to the Applicant, under Article 52(1)(d) of the ICSID Convention, an award may be annulled if "there has been a serious departure from a fundamental rule of

---

[116] Annulment Counter-Memorial, ¶¶ 271, 277-278, 280, 282, 284.

[117] Annulment Counter-Memorial, ¶ 283.

[118] Annulment Counter-Memorial, ¶ 273.

[119] Annulment Counter-Memorial, ¶ 273.

[120] Annulment Counter-Memorial, ¶¶ 15, 273, 296-297.

[121] Annulment Counter-Memorial, ¶¶ 16, 298-305.

[122] Annulment Counter-Memorial, ¶ 304.

procedure." This requires that the departure be: *(a)* "serious"; and, *(b)* from a "fundamental" rule of procedure.[123] For the Applicant, this test is the same as the "three-limb test" proposed by the Eiser Parties since the additional requirement - the existence of a departure - is implied in this two-tier test.[124]

112.    On the one hand, for a departure to be "serious", it must have had or may have had a material effect on the tribunal's decision.[125] According to the Applicant, contrary to the Eiser Parties' contention, evidence of an "actual material prejudice" and the showing that the violation created a substantially different result are not required.[126] On the other hand, the term "fundamental rule of procedure" refers to a set of minimal standards of procedure that must be respected and includes the right to an independent and impartial tribunal, and the right for the parties to be heard and to be treated equally.[127]

---

[123] Annulment Memorial, ¶ 118; *citing* **Ex. C-0299**, Updated Background Paper on Annulment, ¶ 99; **Ex. RL-0106**, Schreuer et al., THE ICSID CONVENTION, Art. 52, p. 980, ¶ 280; **Ex. RL-0136**, *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Annulment dated February 1, 2016 ("*Total v. Argentina*, Decision on Annulment"), ¶ 310; Annulment Reply, ¶ 113.

[124] Application for Annulment, ¶ 51; Annulment Reply, ¶ 113, fn. 196.

[125] Annulment Memorial, ¶ 119; Annulment Reply, ¶¶ 114, 116, 121; *citing, inter alia*, **Ex. RL-0136**, *Total v. Argentina*, Decision on Annulment, ¶ 310; **Ex. RL-0137**, *Daimler Financial Services AG v. Argentine Republic*, ICSID Case No. ARB/05/1, Decision on Annulment dated January 7, 2015 ("*Daimler v. Argentina*, Decision on Annulment"), ¶ 263; **Ex. RL-0138**, *Maritime International Nominees Establishment (MINE) v. Government of Guinea*, ICSID Case No. ARB/84/4, Decision on the Application by Guinea for Partial Annulment of the Arbitral Award dated December 14, 1989 ("*MINE v. Guinea*, Decision on Application for Partial Annulment"), ¶ 5.05; **Ex. RL-0139**, *CDC v. Seychelles*, Decision on Annulment, ¶ 49; **Ex. RL-0061**, *Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Decision on the Annulment Application of Caratube International Oil Company LLP dated February 21, 2014 ("*Caratube v. Kazakhstan*, Decision on Annulment"), ¶ 99 (emphasis added) (quoting **Ex. CL-0065**, *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Decision on the Application by the Arab Republic of Egypt for Annulment dated February 5, 2002 ("*Wena Hotels v. Egypt*, Decision on Annulment"), ¶ 61).

[126] Annulment Reply, ¶¶ 115-120; *citing* **Ex. RL-0151**, *Víctor Pey Casado and Foundation "Presidente Allende" v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment of the Republic of Chile dated December 18, 2012 ("*Pey Casado v. Chile*, Decision on Annulment"), ¶¶ 78, 80; **Ex. RL-0147**, *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Annulment dated December 30, 2015 ("*Tulip v. Turkey*, Decision on Annulment"), ¶ 78.

[127] Application for Annulment, ¶ 52; Annulment Memorial, ¶¶ 120-121, 282, 285; Annulment Reply, ¶¶ 114, 121, 251; *citing, inter alia*, **Ex. CL-0065**, *Wena Hotels v. Egypt*, Decision on Annulment, ¶ 57; **Ex. RL-0140**, *Duke Energy International Peru Investments No. 1, Ltd. v. Republic of Peru*, ICSID Case No. ARB/03/28, Decision of the *ad hoc* Committee dated March 1, 2011, ¶ 168; **Ex. RL-0141**, *Iberdrola Energía, S.A. v. República de Guatemala*, ICSID Case No. ARB/09/5, Decision on the Application by Iberdrola Energía S.A. for Annulment of the Award dated January 13, 2015 ("*Iberdrola Energía v. Guatemala*, Decision on Annulment"), ¶ 105; **Ex. CL-0255**, *MTD Equity Sdn Bhd.*

113.   Accordingly, the Applicant argues that the Award should be annulled under Article 52(1)(d) of the ICSID Convention because: *(a)* the Tribunal lacked independence and impartiality; and *(b)* Spain was denied the right to be heard and to be treated equally.[128]

### a)    *The Tribunal lacked independence and impartiality*

114.   The Applicant argues that, because of the relationship between Dr. Alexandrov and the Brattle Group and the failure to disclose such relationship,[129] it was deprived of the opportunity to have its case heard and decided by a tribunal composed of three independent and impartial individuals. This stripped the Applicant of the protection afforded by the fundamental right to be heard by an independent and impartial tribunal. The Award should therefore be annulled.[130]

### b)    *Spain was denied the right to be heard and to be treated equally*

115.   According to the Applicant, the right to be heard encompasses different protections including: *(i)* the right to submit arguments and evidence that it deems relevant to support its case, and to do so with a comparatively equal opportunity to that given to the other party;[131] *(ii)* the right to respond to the arguments and evidence submitted by the other party, including the right to make submissions when new evidence is received and

---

& *MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment dated March 21, 2007, ¶ 49; **Ex. RL-0139**, *CDC v. Seychelles*, Decision on Annulment, ¶ 49 (approvingly citing *Wena Hotels*).

[128] Annulment Memorial, ¶¶ 122, 281.

[129] *See* the summary of the Applicant's arguments in Section III.A.1.d).

[130] Application for Annulment, ¶ 54; Annulment Memorial, ¶¶ 123-125; Annulment Reply, ¶¶ 122-123.

[131] Annulment Memorial, ¶¶ 283-284; *citing*, *inter alia*, **Ex. CL-0065**, *Wena Hotels v. Egypt*, Decision on Annulment, ¶ 57; **Ex. RL-0147**, *Tulip v. Turkey*, Decision on Annulment, ¶ 80, 82, 145; **RL-0141**, *Iberdrola Energía v. Guatemala*, Decision on Annulment, ¶ 105; **Ex. RL-0151**, *Pey Casado v. Chile*, Decision on Annulment, ¶ 184; **Ex. RL-0146**, *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment of the Award dated November 2, 2015 ("*Occidental v. Ecuador*, Decision on Annulment"), ¶ 60; **Ex. RL-0148**, *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Decision on the Application for Annulment of Fraport AG Frankfurt Airport Services Worldwide dated December 23, 2010 ("*Fraport v. Philippines*, Decision on Annulment"), ¶ 202; **Ex. RL-0138**, *MINE v. Guinea*, Decision on Application for Partial Annulment, ¶ 5.06; **Ex. CL-0144**, *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Application for Annulment of the Argentine Republic dated September 1, 2009 ("*Azurix v. Argentina*, Decision on Annulment), ¶¶ 213-214.

considered by the tribunal;[132] and *(iii)* not being unjustifiably denied a request for document production, especially when the tribunal, after denying such request, concludes that there was an absence of evidence on the matter.[133]

116.   The Applicant thus argues that the Tribunal seriously departed from its fundamental right to be heard when it took the below listed decisions.[134]

117.   The Tribunal allowed the Eiser Parties, during the Hearing, to submit new documents into the record, one of which was used by Brattle as a basis for its new damages calculations presented for the first time at the Hearing. Despite the Applicant's objections, the Tribunal allowed this, failed to give a reasonable opportunity to the Applicant to rebut this new material, and relied on such calculations in its determination of damages in the Award.[135]

118.   The Tribunal denied the Applicant's request for the production of documents regarding the costs of the CSP Plants, through which it intended to demonstrate that the costs were inflated. Even though the Tribunal denied this request, it made material findings in the Award regarding the investment costs, stated that there was no serious dispute concerning the amounts and decided that Spain had not proved that such costs were inflated. All of this had an important impact on the Tribunal's determinations on the economic effect of the "new regime."[136]

119.   The Tribunal denied the Applicant's request to introduce the *Isolux* award into the record while at the same time allowing the Eiser Parties to submit new documents during the

---

[132] Annulment Memorial, ¶¶ 286-287, 289, 310; Annulment Reply, ¶ 252; *citing* **Ex. RL-0147**, *Tulip v. Turkey*, Decision on Annulment, ¶¶ 80, 82*;* **Ex. RL-0148**, *Fraport v. Philippines*, Decision on Annulment, ¶ 200.

[133] Annulment Memorial, ¶¶ 291-292; Annulment Reply, ¶ 252; *citing*, *inter alia*, **Ex. RL-0160**, Gabrielle Kaufmann-Kohler, Globalization of Arbitral Procedure, 36 VANDERBILT JOURNAL OF TRANSNATIONAL LAW 1313 (October 2003), pp. 1327-1328, fn. 66; **Ex. RL-0106**, Schreuer et al., THE ICSID CONVENTION, Art. 43, p. 642, ¶ 4.

[134] Application for Annulment, ¶¶ 55-58; Annulment Memorial, ¶ 293; Annulment Reply, ¶ 250.

[135] Annulment Memorial, ¶¶ 294-310; Annulment Reply, ¶¶ 254-259; *citing* **Ex. BQR-0105**, Brattle Quantum Hearing Presentation dated February 2016, Slide 3 (providing revised calculations for the Eiser Parties' past and future lost cash flows, which had been "updated for free-tax [*sic*] depreciation"; **Ex. BQR-0104**, Spreadsheet Showing the Amount for Free Depreciation Available for ASTE and DIOXIPE).

[136] Annulment Memorial, ¶¶ 311-316; Annulment Reply, ¶¶ 260-267.

Hearing and allowed them to introduce the *RREEF* award into the record. The Tribunal ultimately relied on the *RREEF* award to dismiss the Applicant's intra-EU objection.[137]

120.    Finally, the Tribunal rejected the EC's requests to file written submissions as a non-disputing party. The Tribunal rejected the first request and then conditioned the grant of subsequent requests on the EC's provision of a cost undertaking. Such decision denied Spain the benefit of the EC's intervention, which would have provided the Tribunal with authoritative clarification and confirmation of Spain's obligations as an EU Member State.[138]

### 2.    Eiser Parties' Arguments

121.    According to the Eiser Parties, for an award to be annulled under Article 52(1)(d), it is required that: *(a)* the procedural rule alleged to be violated be "fundamental"; *(b)* there be a departure from such rule; and, *(c)* the departure be "serious." Not every departure from a rule of procedure justifies the annulment of an award.[139]

122.    For the Eiser Parties, there are two different positions that have been adopted regarding what constitutes a "serious" departure. One position, favored by the Eiser Parties, requires the existence of actual material prejudice and a showing that the violation has caused a "substantially different result."[140] The other position, favored by the Applicant, is that it is sufficient to demonstrate a "potential effect" of the departure on the award.[141] For the Eiser

---

[137] Annulment Memorial, ¶¶ 317-325; Annulment Reply, ¶¶ 268-270; *citing*, *inter alia*, **Ex. R-0296**, Letter from the Tribunal to the Parties dated August 26, 2016; **Ex. CL-0257**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à. r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction dated June 6, 2016.

[138] Annulment Memorial, ¶¶ 326-329; Annulment Reply, ¶¶ 271-286.

[139] Annulment Counter-Memorial, ¶¶ 140, 148, 311; Annulment Rejoinder, ¶ 322; *citing* **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶ 200; **Ex. RL-0137**, *Daimler v. Argentina*, Decision on Annulment, ¶ 260; **Ex. RL-0146**, *Occidental v. Ecuador*, Decision on Annulment, ¶ 62; **Ex. RL-0061**, *Caratube v. Kazakhstan*, Decision on Annulment, ¶ 88; **Ex. C-0299**, Updated Background Paper on Annulment, ¶ 99.

[140] Annulment Counter-Memorial, ¶¶ 143-144; Annulment Rejoinder, ¶¶ 143, 145-146; *citing*, *inter alia*, **Ex. RL-0148**, *Fraport v. Philippines*, Decision on Annulment, ¶¶ 245-246; **Ex. RL-0149**, *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17, Decision of the *ad hoc* Committee on the Application for Annulment dated January 24, 2014 ("*Impregilo v. Argentina*, Decision on Annulment"), ¶ 164.

[141] Annulment Counter-Memorial, ¶¶ 145-146; Annulment Rejoinder, ¶ 143; *citing*, *inter alia*, **Ex. RL-0061**, *Caratube v. Kazakhstan*, Decision on Annulment, ¶ 99; **Ex. RL-0147**, *Tulip v. Turkey*, Decision on Annulment, ¶ 78.

Parties, under either position, Article 52(1)(d) requires a departure that is outcome-determinative.[142]

### a)     The Tribunal did not lack independence and impartiality

123.    The Eiser Parties do not dispute that the right to an independent and impartial arbitrator is a fundamental rule of procedure. They argue, however, that the other two elements of the test – a "departure" that is "serious" - are not fulfilled.[143] According to the Eiser Parties, there is no departure from such a rule because Spain has not adduced any evidence that proves a manifest lack of independence and impartiality on the part of Dr. Alexandrov.[144]

124.    In addition, even if there was a departure from a fundamental rule, the Applicant has failed to show that it may have had an impact on the Award. The Applicant has not submitted any objective evidence that demonstrates that the relationship between Dr. Alexandrov and Brattle, and/or its non-disclosure, may have caused the Tribunal to reach a substantially different result than the one it would have otherwise reached.[145]

### b)     There are no grounds to annul the Award on the basis of the rights to be heard and to be treated equally

125.    The Eiser Parties do not contest that the right to be heard has been recognized as a fundamental rule of procedure. However, for the annulment to proceed, it must be unequivocally and objectively established that a tribunal has violated this right. As such, this right is not violated when a party does not avail itself of the opportunity to be heard that was granted to it and does not preclude the Tribunal's discretion to admit and evaluate evidence. Similarly, the right to be treated equally is not violated when a request for

---

[142] Annulment Counter-Memorial, ¶¶ 147, 321; Annulment Rejoinder, ¶ 143; *citing*, **Ex. RL-0151**, *Pey Casado v. Chile*, Decision on Annulment, ¶ 80.

[143] Annulment Counter-Memorial, ¶ 142.

[144] Annulment Counter-Memorial, ¶ 149; Annulment Rejoinder, ¶¶ 148-149. *See also* the summary of the Eiser Parties' arguments in Section III.A.2.f).

[145] Annulment Counter-Memorial, ¶¶ 150-152; Annulment Rejoinder, ¶ 147.

document production is denied and does not require the parties to have been granted an equal number of requests.[146]

126.    For the Eiser Parties, none of the contentions of the Applicant come even close to constituting a serious departure from a fundamental rule of procedure. With respect to the specific allegations, the Eiser Parties offered the following response.[147]

127.    The Eiser Parties' application to introduce nine new documents in the arbitration was based on Spain's belated submission of its DCF calculation, which was made with Spain's Rejoinder on the Merits. Moreover, the Applicant fails to mention that it consented to the introduction of four of the documents and that, in any event, all the documents complied with the safeguards imposed by the Tribunal to ensure that the Applicant had the opportunity and time to consider the new documents.[148] Further, the Applicant has failed to show that the introduction of the documents had a material impact on the outcome of the case, especially given that the alleged depreciation error was not dispositive or even highly material to the outcome of the arbitration.[149]

128.    Further, the Applicant conflates two different concepts: *(i)* the amounts invested by the Eiser Parties to purchase the shareholding interest in the holding companies that own the CSP Plants; and *(ii)* the actual investment costs incurred to construct and operate the CSP Plants in Spain. Regarding the first category, the Tribunal was correct in stating that there was no dispute since these amounts were based on documents provided by the Eiser Parties and never contested by the Applicant. Regarding the second category, the Applicant never articulated the precise relevance of its arguments regarding the alleged inflated

---

[146] Annulment Counter-Memorial, ¶¶ 315-316, 319-320; *citing* **Ex. RL-0147**, *Tulip v. Turkey*, Decision on Annulment, ¶¶ 71, 84; **Ex. CL-0253**, *Libananco Holdings Co. Limited v. Republic of Turkey*, ICSID Case No. ARB/06/8, Excerpts of Decision on Annulment dated May 22, 2013, ¶ 85; **Ex. CL-0144**, *Azurix v. Argentina*, Decision on Annulment, ¶ 233; Annulment Rejoinder, ¶¶ 324-326, 329.

[147] Annulment Counter-Memorial, ¶¶ 310, 314, 321; Annulment Rejoinder, ¶ 321.

[148] Annulment Counter-Memorial, ¶¶ 326-347; Annulment Rejoinder, ¶¶ 334-343, fn. 498.

[149] Annulment Rejoinder, ¶¶ 344-352.

construction costs and, in any case, the Tribunal expressly rejected the valuation method based on such investment costs.[150]

129.    The Tribunal's decisions regarding the *RREEF* and the *Isolux* awards were based on the specific circumstances of each request. Apart from the fact that the request to admit the *RREEF* award was made shortly after it became available and decided after both parties had the opportunity to comment, the ultimate decision to reject the introduction of the *Isolux* decision was based on Spain's failure to confirm that the claimant in the *Isolux* case had consented to the disclosure of the award.[151]

130.    Finally, the Tribunal's decision to reject the EC's *amicus curiae* brief was a result of the EC's own choice not to provide the requested undertaking. Pursuant to the ICSID Arbitration Rules, the Tribunal was entitled to request such an undertaking to guarantee that the EC's submission would not unduly burden or unfairly prejudice either party.[152] In any event, there is no fundamental right to *amicus curiae* submissions that would support a party's position and the failure to submit an *amicus curiae* brief is by no means "serious."[153]

### D.    FAILURE TO STATE REASONS

### 1.    Spain's Arguments

131.    Spain recalls that under Article 52(1)(e) of the ICSID Convention, an award may be annulled if the tribunal "has failed to state the reasons on which it is based."[154] Pursuant to Articles 48(3) and 52(1)(e) of the ICSID Convention, a reader must be able to follow how

---

[150] Annulment Counter-Memorial, ¶¶ 349-368; Annulment Rejoinder, ¶¶ 353-361.

[151] Annulment Counter-Memorial, ¶¶ 371-385; Annulment Rejoinder, ¶¶ 362-367.

[152] Annulment Counter-Memorial, ¶¶ 388-403; Annulment Rejoinder, ¶¶ 368-378.

[153] Annulment Rejoinder, ¶¶ 379-387.

[154] Application for Annulment, ¶ 41; Annulment Memorial, ¶¶ 136, 214; Annulment Reply, ¶ 209; Tr. Day 1 [Mr. Preziosi], 48:9-21; [Ms. Álvarez Ávila], 110:1-12.

the tribunal went from Point A to Point B, and the reasons given shall not be contradictory or frivolous.[155]

132.    According to Spain, the Award should be annulled because: *(a)* the award of damages contradicts the Tribunal's own reasoning and determinations on jurisdiction and liability;[156] *(b)* the award of damages contradicts the Tribunal's finding that Spain had a sovereign right to regulate;[157] *(c)* the Tribunal had no basis to conclude that the economic impact of the "new system" was more drastic than that of the "old system";[158] and *(d)* the Tribunal relied on the destruction of value of the investment as a basis to find an FET violation.[159]

### a)    *The award of damages contradicts the Tribunal's own reasoning and determinations on jurisdiction and liability*

133.    As stated in Section III.B.1.a) of this Decision, Spain argues that the Tribunal adopted a calculation of damages that assumed that all the Disputed Measures violated the ECT. This finding ignored the Tribunal's decision that some of the measures did not violate the ECT and/or were outside its jurisdiction.[160] According to Spain, it is impossible to follow how the Tribunal went from its finding that not all measures were FET violations to its award of damages, with the latter suggesting that all the Disputed Measures were wrongful.[161]

### b)    *The award of damages contradicts the Tribunal's finding that Spain had a sovereign right to regulate*

134.    As indicated in Section III.B.1.b) of this Decision, Spain argues that the Tribunal found that the Claimants had not been given any stabilization guarantees and that Spain had a

---

[155] Annulment Memorial, ¶¶ 137, 215-216, 219; Annulment Reply, ¶¶ 146, 210, 212-216; Tr. Day 1 [Mr. Preziosi], 48:9-21; [Ms. Álvarez Ávila], 110:13-111:8.

[156] Application for Annulment, ¶ 43; Annulment Memorial, ¶¶ 126, 141, 199.

[157] Application for Annulment, ¶¶ 44-46, 49; Annulment Memorial, ¶¶ 199, 226; Annulment Reply, ¶¶ 201, 217.

[158] Application for Annulment, ¶¶ 47-48; Annulment Memorial, ¶¶ 199, 226; Annulment Reply, ¶¶ 201, 217.

[159] Annulment Memorial, ¶¶ 226, 270; Annulment Reply, ¶¶ 201, 217.

[160] Annulment Memorial, ¶¶ 141-146; Tr. Day 1 [Mr. Preziosi], 53:11-16.

[161] Annulment Memorial, ¶¶ 126, 152, 175; Annulment Reply, ¶¶ 149, 153, 155-161; Tr. Day 1 [Mr. Preziosi], 103:6-20.

sovereign right to regulate, including the right to change the regulatory regime for renewable energy.[162] In spite of this first finding, the Tribunal, when awarding damages, assumed that there was a stabilization guarantee. This contradicts the earlier portion of the Tribunal's reasoning.[163] For the Applicant, it is impossible to follow how the Tribunal went from the absence of stabilization guarantees to the award of damages assuming that the regulatory regime of RD 661/2007 would remain unchanged.[164]

c)    *The Tribunal had no basis to conclude that the economic impact of the "new system" was more drastic than that of the "old system"*

135.    According to Spain, the Tribunal concluded that the measures adopted by Spain prior to June 2014 did not constitute FET violations whereas the "new regime" breached Article 10(1) of the ECT because it introduced a "drastic" change.[165] To reach this conclusion, Spain submits, the Tribunal needed to identify the effect of each individual measure and compare the effect of the "old regime" *vis-à-vis* the "new regime."[166] However, the Tribunal reached its conclusion without any basis, without doing such comparison, without the necessary evidence, and without asking for additional evidence.[167]

d)    *The Tribunal relied on the destruction of value of the investment as a basis to find an FET violation*

136.    As mentioned in Section III.B.1.b) of this Decision, Spain takes issue with the fact that the Tribunal used an expropriation-based approach in its analysis of the violation of the FET standard. According to Spain, the Tribunal did not state the reasons for starting from the

---

[162] Annulment Memorial, ¶¶ 149, 200, 232-234.

[163] Annulment Memorial, ¶¶ 9, 150-151, 235-237; Annulment Reply, ¶¶ 154, 219-225; Tr. Day 1 [Ms. Álvarez Ávila], 112:10-14, 122:13-124:21.

[164] Annulment Memorial, ¶¶ 152, 238; Tr. Day 1 [Ms. Álvarez Ávila], 125:22-126:10, 127:1-128:6.

[165] Annulment Memorial, ¶¶ 132, 200, 242-243.

[166] Annulment Memorial, ¶¶ 245, 248.

[167] Annulment Memorial, ¶¶ 239, 246-247, 249-252; Annulment Reply, ¶¶ 226-234; Tr. Day 1 [Ms. Álvarez Ávila], 117:22-121:8

position that the fundamental element of the FET standard is "stability", and then using a destruction-of-value approach to find a violation of the FET standard.[168]

## 2.    Eiser Parties' Arguments

137.    The Eiser Parties emphasize that the threshold for annulment is high. In their view, "a tribunal is only required to state *any* reason for its conclusions, sufficient to allow a committee to follow the reasons for the decision: mere disagreement with the tribunal's reasoning is not grounds for annulment."[169] The Committee should seek to construe the language of any award in a way that results in consistency as opposed to finding contradictions.[170]

138.    For the Eiser Parties, Spain has the burden of demonstrating that the Tribunal's reasoning is "'*unintelligible or contradictory or frivolous or absent*' and that such defect is compelling from the face of the Award."[171] Spain, the Eiser Parties submit, has failed to discharge such burden.[172] With this in mind, the Eiser Parties reject the arguments presented by Spain in relation to the alleged failure to state reasons.[173]

139.    *First*, the Eiser Parties argue that the Tribunal gave reasons and explained precisely how it reached the damages figure it awarded to them. It considered its findings on liability when making the adjustments to such award on damages.[174] In reality, Spain is seeking annulment not because there is a contradiction in the Award's reasoning, but because it disagrees with the conclusions reached by the Tribunal.[175]

---

[168] Annulment Memorial, ¶¶ 10, 200, 239, 270, 277-280; Annulment Reply, ¶¶ 235-249.

[169] Annulment Counter-Memorial, ¶ 241 (emphasis in original and footnote omitted).

[170] Annulment Counter-Memorial, ¶¶ 240-242, 245, 265, 267-269, 276; Annulment Rejoinder, ¶¶ 262, 271, 284-288; Tr. Day 1 [Mr. Sullivan], 151:14-152:14, 236:4-13, 237:20-238:2; [Mr. Mooloo] 243:17-20, 244:7-245:7, 245:20-246:1.

[171] Annulment Counter-Memorial, ¶ 246 (emphasis in original and footnote omitted).

[172] Annulment Counter-Memorial, ¶ 246.

[173] Annulment Counter-Memorial, ¶¶ 238, 262.

[174] Annulment Counter-Memorial, ¶¶ 10, 161-163, 248, 250, 254-259; Annulment Rejoinder, ¶¶ 264-270; Tr. Day 1 [Mr. Sullivan], 205:14-206:2, 206:13-16, 236:17-237:6, 238:19-239:2.

[175] Annulment Counter-Memorial, ¶¶ 11, 253, 260.

140.     *Second*, the Eiser Parties argue that the Tribunal did not contradict its findings on liability.[176] Spain ignores the Tribunal's findings that the right to regulate and the right to stability are not absolute, and that stability and transparency are critical components of the FET standard. That is why the Tribunal was able to conclude *(a)* that a "fundamental change to the regulatory regime […] in a manner that does not take account of the circumstances of existing investments" will breach the FET standard, and, *(b)* ultimately, that Spain owed compensation to the Eiser Parties.[177] The Tribunal's careful and detailed analysis focused on the degree of change in the regulatory framework and there can be no doubt that the Tribunal provided a clear and easy-to-follow reasoning when finding a breach of the FET standard.[178]

141.     *Third*, the Eiser Parties argue that Spain disagrees with the Tribunal's factual findings, something that is not relevant to any annulment standard in annulment proceedings.[179] In any case, the Eiser Parties consider that the Tribunal looked at the economic impact of Spain's measures on the Eiser Parties' investments to determine that the Disputed Measures were disproportionate and clearly stated the reasons for finding a breach of the FET standard.[180] To do so, the Tribunal compared the fundamental assumptions and features of the original regime with those of the post-June 2014 regulatory regime.[181]

142.     *Fourth*, according to the Eiser Parties, the Tribunal did not improperly apply an "expropriation-based analysis" in finding an FET breach. In their view, in any event, and as the Tribunal explained, "the destructive nature of a state's measure on an investment can be as relevant to assessing an FET breach as [it is] to assessing whether an indirect expropriation has taken place."[182]

---

[176] Annulment Counter-Memorial, ¶¶ 270, 275.

[177] Annulment Counter-Memorial, ¶¶ 278-279. *See also* Annulment Counter-Memorial, ¶¶ 271, 280-285; Annulment Rejoinder, ¶¶ 296-299, 302; Tr. Day 1 [Mr. Moloo], 247:7-251:22.

[178] Annulment Counter-Memorial, ¶¶ 277-279, 285; Tr. Day 1 [Mr. Moloo], 255:22-257:10.

[179] Annulment Counter-Memorial, ¶ 272.

[180] Annulment Counter-Memorial, ¶¶ 272, 289-294; Annulment Rejoinder, ¶¶ 304-309; Tr. Day 1 [Mr. Moloo], 252:1-254:3.

[181] Annulment Counter-Memorial, ¶¶ 290-291; Tr. Day 1 [Mr. Moloo], 257:11-262:2.

[182] Annulment Counter-Memorial, ¶ 273. *See also* Annulment Counter-Memorial, ¶¶ 296-298, 305; Annulment Rejoinder, ¶¶ 314-320; Tr. Day 1 [Mr. Moloo], 262:3-267:8.

## IV.    ANALYSIS OF THE *AD HOC* COMMITTEE

143.    For the reasons provided below, the Committee has concluded that the Award must be annulled on the following grounds: *(A)* improper constitution of the Tribunal (Article 52(1)(a) of the ICSID Convention); and *(B)* serious departure from a fundamental rule of procedure (Article 52(1)(d) of the ICSID Convention).

### A.    IMPROPER CONSTITUTION OF THE TRIBUNAL

144.    This section will set forth the reasons for which the Committee has concluded that the Tribunal was improperly constituted. This section is divided as follows: *(1)* the Committee will first interpret the provisions of Article 52(1)(a) of the ICSID Convention, in accordance with Article 31 of the Vienna Convention on the Law of Treaties ("**Vienna Convention**"), and determine whether a tribunal may be held to have been improperly constituted where an arbitrator lacked independence or impartiality; *(2)* the Committee will then determine what standard ought to be applied under Article 52(1)(a) of the ICSID Convention where an application for annulment is made on the basis that an arbitrator lacked independence or impartiality and no proposal for disqualification had been made before the proceeding was declared closed. Similar to the *EDF* committee, this Committee will apply a three-step test and determine *(a)* whether the Applicant has waived the right to raise the issue because it had, allegedly, not raised it sufficiently promptly; and *(b)* whether the standard for disqualification is met. In a separate section, in its analysis on the seriousness of the departure from a fundamental rule of procedure, the Committee will address the third step of the test and determine whether the alleged lack of independence or impartiality could have had a material impact on the Award.[183]

---

[183] *See infra* Section IV.B.3.c) of this Decision.

1.    **Interpretation of Article 52(1)(a) of the ICSID Convention**

a)    *Spain's Arguments*

145.    Spain submits that a party may seek the annulment of an award under Article 52(1)(a) of the ICSID Convention if the tribunal was "not properly constituted", which covers the situation in which a member of the tribunal lacked the qualities of independence and impartiality.[184]

146.    In Spain's view, this is confirmed by: *(a)* the Updated Background Paper on Annulment, which explains that under this provision "[t]he parties may raise an objection concerning compliance with [the provisions of Chapter I of the ICSID Arbitration Rules, entitled 'Establishment of the Tribunal']";[185] and *(b)* the committee in *EDF v. Argentina*, which stated that Article 52(1)(a) must be understood as referring to the requirements of Chapter IV, Section 2 of the ICSID Convention ("Constitution of the Tribunal"). These provisions regarding the "constitution of tribunal", in turn, include all those qualities that an arbitrator must possess.[186]

147.    Article 40 of the ICSID Convention, which is also part of Chapter IV, Section 2 of the same instrument, establishes that arbitrators "shall possess the qualities stated in paragraph (1) of Article 14." According to the Applicant, it is well stablished that Article 14 of the ICSID Convention includes the qualities of impartiality and independence.[187] Therefore, if an arbitrator did not possess the qualities of Article 14, including those of independence and

---

[184] Annulment Memorial, ¶ 73.

[185] Annulment Memorial, ¶ 73; *quoting* **Ex. C-0299**, Updated Background Paper on Annulment, ¶ 78.

[186] Annulment Memorial, ¶¶ 73-74; *relying on* **Ex. C-0299**, Updated Background Paper on Annulment, ¶ 78; **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶ 126; **Ex. RL-0103**, *Suez v. Argentina*, Decision on Annulment, ¶ 77.

[187] Annulment Memorial, ¶ 74; Annulment Reply, ¶¶ 34-35; *citing* **Ex. RL-0104**, *Blue Bank v. Venezuela*, Decision on Disqualification, ¶ 58 and fn. 37; **Ex. RL-0105**, *Burlington Resources v. Ecuador*, Decision on Disqualification, ¶ 65 and fn. 77; **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶ 108; **Ex. RL-0103**, *Suez v. Argentina*, Decision on Annulment, ¶ 77.

impartiality, the tribunal was not properly constituted and, therefore, the award might be annulled under Article 52(1)(a) of the ICSID Convention.[188]

148. The Applicant rejects the Eiser Parties' argument that Article 52(1)(a) of the ICSID Convention is only applicable to procedural deficiencies regarding the constitution of the tribunal at the *outset* of the arbitration.[189] For the Applicant, this interpretation ignores the content of Chapter IV, Section 2 of the ICSID Convention and the ordinary meaning of the provisions contained therein.[190]

149. The Applicant argues that Article 52(1)(a) of the ICSID Convention deals with the substantive qualities that arbitrators must possess *throughout* the proceedings, including those of independence and impartiality.[191] This is confirmed by ICSID Arbitration Rule 6, which requires arbitrators to assume a continuing obligation to promptly notify the Secretary-General of any relationship or circumstance that may bear upon the "reliability for independent judgment." If the arbitrator's independence and impartiality was only relevant at the outset of the case, there would be no need for this continuing obligation.[192]

150. The Applicant's position is unaffected by the fact that Dr. Alexandrov would be unable to furnish explanations regarding his relationship with the Brattle Group during the annulment proceeding. According to Spain, its right to the independence and impartiality of all the members of the Tribunal simply "cannot be lost on that basis."[193]

b)    *Eiser Parties' Arguments*

151. The Eiser Parties disagree with the Applicant's interpretation and argue that Article 52(1)(a) of the ICSID Convention only covers the procedural steps to constitute the

---

[188] Annulment Memorial, ¶ 75; Annulment Reply, ¶¶ 37, 48; *citing*, *inter alia*, **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶ 126; **Ex. RL-0103**, *Suez v. Argentina*, Decision on Annulment, ¶ 77.
[189] Annulment Reply, ¶¶ 27, 31-32.
[190] Annulment Reply, ¶ 34.
[191] Annulment Reply, ¶ 34.
[192] Annulment Reply, ¶¶ 38-39.
[193] Annulment Reply, ¶ 46.

tribunal at the outset of the proceedings. For them, if the grounds for disqualification became known after the award was rendered, then the appropriate remedy is to seek revision of the award.[194]

152.  They argue that the Applicant's broad interpretation is not consistent with the ordinary meaning of Article 52(1)(a) of the ICSID Convention, as interpreted in accordance with the Vienna Convention.[195] A plain reading of this provision does not allow the Committee to consider a disqualification proposal at the annulment stage "because the Convention expressly treats the challenges based on the '*improper constitution*' and challenges based on the alleged lack of independence or impartiality separately."[196]

153.  Article 52(1)(a) must be read together with Chapter IV, Section 2 of the Convention ("Constitution of the Tribunal") which addresses, among other things, the process to be followed to constitute the tribunal at the outset of the proceedings. This section does not address issues that would arise during the course of the proceeding and that would warrant the disqualification of the arbitrator; these issues are dealt in Chapter V of the Convention.[197] Further, Article 57 of the ICSID Convention expressly differentiates between challenges based on a manifest lack of qualities required by Article 14(1) (which is what Spain claims) and challenges based on the improper constitution of the tribunal under Section 2 of Chapter IV, which is what Article 52(1)(a) of the ICSID Convention refers to.[198]

154.  For the Eiser Parties, when the facts on which a challenge is based became known after the award was rendered, the appropriate remedy is the revision of the award in accordance with Article 51 of the ICSID Convention. Thus, the Applicant should seek the revision of the

---

[194] Annulment Counter-Memorial, ¶¶ 36-37; Annulment Rejoinder, ¶ 34.

[195] Annulment Counter-Memorial, ¶ 37; Annulment Rejoinder, ¶¶ 27, 29.

[196] Annulment Rejoinder, ¶ 29.

[197] Annulment Counter-Memorial, ¶ 37; Annulment Rejoinder, ¶ 30.

[198] Annulment Rejoinder, ¶¶ 32-33.

Award and not its annulment, which will also allow Dr. Alexandrov to furnish explanations.[199]

155.    The Eiser Parties criticize the decision of the *EDF* committee, relied upon by Spain, for erring in the interpretation of Article 52(1)(a) of the ICSID Convention. According to them, the *EDF* decision failed to address the drafting history of the ICSID Convention.[200] It is also inconsistent since, one the one hand, it concluded that challenges to the independence and impartiality of an arbitrator should be heard by the remaining members of the tribunal and, on the other hand, still rejected that the revision is the appropriate remedy.[201] In addition, the *EDF* decision is inconsistent with the object and purpose of the Convention and with the role of the annulment committee, which should not undertake a *de novo* review as if it were an arbitral tribunal assessing the merits of a disqualification proposal.[202]

### c)    *Analysis of the Committee*

156.    The Parties are in disagreement as to the correct interpretation of Article 52(1)(a) of the ICSID Convention. The Committee will interpret this provision in accordance with the customary rules of interpretation, as reflected in Article 31 of the Vienna Convention. Accordingly, the Committee will interpret Article 52(1)(a) in light of its *(1)* text; *(2)* context; *(3)* object and purpose; and, *(4)* in light of any relevant rules of international law applicable in the relations between the Parties.[203]

---

[199] Annulment Rejoinder, ¶¶ 35-37; *citing* **Ex. CL-0144**, *Azurix v. Argentina*, Decision on Annulment, ¶ 281; **Ex. CL-0299**, History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the settlement of Investment Disputes between States and Nationals of Other States, Vol. II-2 (ICSID: 2006), p. 872.

[200] Annulment Rejoinder, ¶ 39; *citing* **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶ 130.

[201] Annulment Rejoinder, ¶ 41; *citing* **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶ 139.

[202] Annulment Rejoinder, ¶¶ 42-45; *citing* **Ex. RL-0103**, *Suez v. Argentina*, Decision on Annulment, ¶ 83.

[203] Under Article 31(1) of the Vienna Convention, the general rule requires a treaty to be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their "context" and in the light of the treaty's "object" and "purpose". *See* **Ex. CL-0047**, *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award dated August 24, 2008, ¶ 117.

(1)  Text of Article 52(1)(a) of the ICSID Convention

157.  Article 52(1)(a) of the ICSID Convention states:

> (1) Either party may request annulment of the award by an application in writing addressed to the Secretary-General on one or more of the following grounds:
>
> (a) that the Tribunal was not properly constituted;
>
> […]

158.  Beginning with the text, the words "was" and "constituted" indicate a sentence in passive voice, which by its nature emphasizes the interest in the person or object that experiences an action *i.e.*, in this case the Tribunal. "Constitute" means "[b]e (a part) of a whole; [g]ive legal or constitutional form to (an institution); establish by law."[204] "Properly" means "[c]orrectly or satisfactorily."[205] It is significant that the phrase is in the past tense. This is not without reason. It is the view of this Committee that the phrase is in the past tense because annulment is sought after the relevant grounds, relied upon, have arisen. The Spanish text of Article 52(1)(a) reads "*que el Tribunal se hubiere constituido incorrectamente*." In the Spanish version, "*constituir*" means "[f]*ormar, componer, ser* [...] [e]*stablecer, erigir, fundar* [...] *Constituirse EN tribunal*", but also "[d]*icho de un tribunal* […] [r]*eunirse o congregarse*."[206] The French text reads as follows: "*Chacune des parties peut demander, par écrit, au Secrétaire général l'annulation de la sentence pour l'un quelconque des motifs suivants: (a) vice dans la constitution du Tribunal*." The plain meaning of the words and the corresponding Spanish and French texts do not suggest that the expression "properly constituted" is restricted to "the initial formation of a given body."[207] Given their plain meaning and read in their proper context they mean that the

---

[204] Oxford Dictionary, https://www.lexico.com/en/definition/constitute (last checked on May 15, 2020).

[205] Oxford Dictionary, https://www.lexico.com/en/definition/properly (last checked on May 15, 2020).

[206] *Diccionario de la Real Academia de la Lengua Española*, https://www.rae.es (last checked on May 15, 2020).

[207] **Ex. CL-0348**, *OI European Group B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Decision on the Application for Annulment of the Bolivarian Republic of Venezuela dated December 6, 2018 ("*OI European Group v. Venezuela*, Decision on Annulment"), ¶ 96.

Tribunal must have not only been correctly formed, initially, but must have also continued to remain so for the duration of its existence. This Committee is aware of observations to the contrary, of another committee,[208] but in view of the plain meaning of the words as well as the context in which they are used, it is inclined to take a different view. Further reasons for this conclusion and for not following the observations of the other committee follow.[209]

(2) Context of Article 52(1)(a) of the ICSID Convention

159. As summarized in Sections IV.A.1.a) and IV.A.1.b) above, the Parties have based their interpretations of Article 52(1)(a) on different provisions of the ICSID Convention. The Parties disagree as to whether annulment can be sought for improper constitution of the tribunal where a party alleges a lack of impartiality or independence on the part of an arbitrator and whether revision is the appropriate remedy in the case at hand. The Committee will address the Parties' contextual arguments below.

160. In their proper context, as used in Article 52(1)(a), the words "properly constituted" cannot be said to be referring only to the initial constitution of a tribunal. This Committee notes that other clauses of paragraph (1) of Article 52 also refer to actions which take place in the past. In all those cases, as well, if any one or more of the grounds mentioned in paragraph (1) of Article 52 are established, the award can be annulled by a committee.

161. Further, Article 52 itself ought to be read in the context of the Convention. This provision is embedded in Chapter IV of the Convention. That "the Tribunal was not properly constituted" is a ground on which a party can base its application for annulment of an award, under clause (a) of paragraph (1) of Article 52. Section 2, which too, is a part of Chapter IV is titled "Constitution of the Tribunal." Section 2 consists of four articles *i.e.*, Articles 37 to 40. Article 37 calls for a swift constitution of the tribunal after registration of a request for arbitration, and provides the number of arbitrators. Article 38 establishes the timeline for appointment of arbitrators; the process to be followed in case an arbitrator or arbitrators are not appointed; and the rules on nationality. Article 39 also provides rules on nationality of arbitrators and when these can be waived by agreement of the parties.

---

[208] **Ex. CL-0348**, *OI European Group v. Venezuela*, Decision on Annulment.
[209] **Ex. CL-0348**, *OI European Group v. Venezuela*, Decision on Annulment.

Article 40 provides when arbitrators may be appointed from outside the "Panel of Arbitrators" but makes clear that they must nevertheless "possess the qualities stated in paragraph (1) of Article 14" required of persons "designated to serve on the Panels." The qualifications provided for persons designated to serve on the Panels of Arbitrators, therefore, apply with equal force to arbitrators appointed from outside the Panels of Arbitrators. According to paragraph (1) of Article 14, these qualifications are as follows:

> (1) Persons designated to serve on the Panels shall be persons of high moral character and recognized competence in the fields of law, commerce, industry or finance, who may be relied upon to exercise independent judgment. Competence in the field of law shall be of particular importance in the case of persons on the Panel of Arbitrators.

162.    The Committee notes the difference between the Spanish and English texts of paragraph (1) of Article 14. Whilst the English text reads, "may be relied upon to exercise independent judgment", the Spanish version uses the words "*inspirar plena confianza en su imparcialidad de juicio*" which may be translated into English as "to inspire full confidence in their impartiality of judgment."[210] Earlier, other committees have observed that this requirement encompasses two qualities: independence and impartiality. This Committee cites with approval the observations of the *EDF* committee:[211]

> [...] the general practice has been to require that arbitrators may be relied upon to exercise independent judgment and inspire full confidence in their impartiality.[212]

163.    In light of the above, not only the failure to comply with the requirements set forth in Articles 37 to 40 but also the failure to "exercise independent judgment" or a lack of impartiality would amount to "improper constitution." Any doubt in this regard is dispelled

---

[210] The French version is very similar to the English text: "*offrir toute garantie d'indépendance dans l'exercice de leurs fonctions.*"

[211] *See* **Ex. CL-0288**, *Suez, Sociedad General de Aguas de Barcelona S.A. and others v. Argentine Republic*, ICSID Case Nos. ARB/03/19 and ARB/03/17, Decision on the Proposal for the Disqualification of a Member of the Arbitral Tribunal dated October 22, 2007 ("*Suez v. Argentina*, Disqualification Decision I"), ¶ 28; **Ex. RL-0104**, *Blue Bank v. Venezuela*, Decision on Disqualification, note 97, above, ¶ 58; and **Ex. RL-0105**, *Burlington Resources v. Ecuador*, Decision on Disqualification, ¶ 65.

[212] **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶ 108.

by paragraph (2) of Article 40. As stated above, it incorporates, by reference, the same qualifications, for arbitrators appointed "from outside the Panel of Arbitrators" as are required, under Article 14 of the ICSID Convention, of individuals designated on the Panel of Arbitrators. Prof. Schreuer expresses this as follows:

> Art. 14(1) describes the qualifications of individuals who may be designated to serve on the Panel of Arbitrators […] the individuals must be persons of high moral character who may be relied upon to exercise their independent judgment. Under Art. 40(2) even arbitrators appointed from outside the Panel of Arbitrators must possess these qualities. Appointment of an arbitrator who manifestly does not possess these qualities may be put forward as a ground for annulment […].[213]

164. This view of the Committee is reinforced by the language of paragraph (1) of Article 54. It mandates that each Contracting State shall recognize an award as binding and enforce the pecuniary obligations imposed by that award as if it were a final judgment of a Court in that State. This commitment by the Contracting States is predicated upon the imperative that awards be rendered in full compliance with fundamental and basic norms of justice such as the independence and impartiality of tribunals.

165. The Eiser Parties argue that their interpretation is supported by Article 57 of the Convention. This Article, according to them, distinguishes between a disqualification based on challenges to the qualities required of an arbitrator under paragraph (1) of Article 14, on the one hand, and the ineligibility of an arbitrator under Section 2 of Chapter IV, on the other.[214] According to the Eiser Parties, this provides contextual support to the distinction between challenges based on eligibility and qualification. They submit that the qualities stated in paragraph (1) of Article 14 cannot, therefore, provide a ground for annulment.

166. Article 57 speaks about "disqualification" of an arbitrator "on account of any fact indicating a manifest lack of the qualities required by paragraph (1) of Article 14" and "in addition" also speaks about "disqualification" of an arbitrator on the ground that he was

---

[213] **Ex. CL-0295**, Schreuer et al., THE ICSID CONVENTION, p. 936, ¶ 123.
[214] Annulment Rejoinder, ¶¶ 32-33.

"ineligible" for appointment to a tribunal under Section 2 of Chapter IV. The Committee notes that in Article 57 the word "disqualification" is used when referring to the "manifest lack of the qualities required by paragraph (1) of Article 14." It further notes that the same word "disqualification" is also used in cases where an arbitrator is "ineligible" for appointment under Section 2 of Chapter IV.

167.    It is the view of the Committee that both where an arbitrator "manifestly lacks the qualities" required under Article 14(1) as well as where he or she is "ineligible" for appointment under Section 2 of Chapter IV, the consequence is the same *i.e.*, "disqualification." This Committee is not inclined to, therefore, accept the submission of the Eiser Parties that a failure to exercise "independent judgment",[215] as required by paragraph (1) of Article 14, cannot be a ground of annulment. In the view of this Committee, a tribunal cannot be held to be "properly constituted" under Article 52(1)(a) where an arbitrator, whose ability to exercise independent judgment is in doubt, is either appointed to, or continues to be a member of, a tribunal.

168.    The requirement that a tribunal be properly constituted is not confined to the time of the appointment of arbitrators, *i.e.* the constitution of a tribunal. It is a continuing requirement. It begins with the constitution of the tribunal and ends only when the proceedings culminate in a decision or award making the tribunal *functus officio*. From the time of his or her appointment until he or she becomes *functus officio* an arbitrator must exercise independent judgment and be impartial. A failure in this regard would impact the proper constitution of the tribunal and form a ground for annulment under Article 52(1)(a).

169.    The Committee further notes that this distinction also appears to be related more to the timing of requesting the disqualification than to the difference between challenges. When Article 57 is invoked the case is already ongoing. Thus, the rationale seems to be that a party may challenge an arbitrator based on a lack of qualities required by paragraph (1) of Article 14 but "in addition" it has an opportunity to seek disqualification of the arbitrator if he or she was "ineligible" when appointed under Section 2 of Chapter IV. Article 57,

---

[215] The Committee has already observed that in the context that the words "independent judgment" are used and on an examination of the English and Spanish texts, it is clear that these words include a requirement of impartiality.

thus, confirms the close relation between Section 2 of Chapter IV and paragraph (1) of Article 14.

170. The Committee now turns to the argument raised by the Eiser Parties according to which the proper remedy that the Applicant should seek is the revision of the Award and not its annulment. The Committee has already concluded that the Applicant can seek the annulment of the Award under Article 52(1)(a) (improper constitution of the tribunal) due to the alleged lack of independence or impartiality of one of the Tribunal's members. Thus, there is no need for the Committee to decide whether revision would be an appropriate remedy in the case at hand. However, in light of the arguments raised by the Eiser Parties, the Committee will briefly address this issue below.

171. Revision and annulment are different remedies available to the parties under different circumstances. Revision of the award under Article 51 of the ICSID Convention provides a remedy where "some fact of such a nature as decisively to affect the award [is discovered], provided that when the award was rendered that fact was unknown to the Tribunal and to the applicant and that the applicant's ignorance of that fact was not due to negligence." It is a re-adjudication of the merits of the dispute in light of new facts. It is, therefore, considered by the same tribunal. If the tribunal concludes that the unknown fact was of such a nature as decisively to affect the award, the tribunal issues a decision revising the award and this decision becomes part of the award for the purposes of recognition and enforcement.[216]

172. By contrast, the focus of the annulment remedy under Article 52 of the ICSID Convention is not the merits or the substance of the award. It "was designed purposefully to confer a limited scope of review which would safeguard against 'violation of the fundamental principles of law governing the Tribunal's proceedings.'"[217]

---

[216] Article 53(2) of the ICSID Convention.

[217] **Ex. C-0299**, Updated Background Paper on Annulment, ¶ 71.

173.    Although the Eiser Parties have argued on the basis of previous decisions that revision and disqualification are the preferable remedy in cases such as the present, they have not been able to satisfactorily explain why a serious challenge to the independence or impartiality of an arbitrator falls outside the scope of paragraph (1) of Article 52.[218] This Committee has difficulty accepting as correct the submission that it cannot examine a challenge to the impartiality and independence of an arbitrator which affects the integrity of the proceedings or the validity or legitimacy of an award. Such an interpretation, in the view of this Committee, would be clearly contrary to the mandate of Article 52 as recalled above.

174.    Finally, the Committee is not persuaded by the argument that revision would be the proper remedy on the ground that an arbitrator "has no means to provide his perspective against allegations of his bias and partiality"[219] at the annulment phase, the way she or he would have in the Underlying Arbitration had there been a disqualification proceeding. It is the view of this Committee that this procedure is not required in annulment proceedings because annulment committees have no authority to disqualify arbitrators from serving in an arbitration that has already concluded or to propose any action with regard to their conduct. All that the Committee is authorized to do is to annul the award if satisfied that the conduct was such that it constituted a ground of annulment under Article 52. The various remedies provided by the ICSID Convention flow from different objectives and rationales. Revision is aimed at ensuring that if some fact, which was unknown to the tribunal and the applicant before the award was rendered, is later discovered, the tribunal ought to have an opportunity to correct it. Ordinarily this remedy would be available where

---

[218] Neither the drafting history of the Convention, nor earlier decisions (nor the Eiser Parties) indicate whether revision alone would be the remedy or whether revision and disqualification should be combined. Aaron Broches said during the negotiation of the Convention that "[…] if the grounds for disqualification only became known after the award was rendered, this would be a new fact which would enable a revision of the award." (**Ex. CL-0299**, History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, Vol. II-2 (ICSID: 2006), p. 872). As pointed out by the Eiser Parties, the request for revision would be submitted to the original tribunal, including the arbitrator whose impartiality is called into question by one of the parties. This means that this arbitrator would be called upon to rule on the request for revision although his/her alleged lack of impartiality is at the very heart of the request (it would be the alleged new "fact of such a nature as decisively to affect the award" (Art. 51 of the ICSID Convention)). Finally, the split advocated by the Eiser Parties between annulment and revision to deal with criticisms related to the arbitral tribunal would lack economy and efficiency in the absence of a coordination between these two remedies in the ICSID Convention.

[219] Annulment Rejoinder, ¶ 45.

fraud or material suppression of facts, by a party, has resulted in an award different from what it would otherwise have been. Revision is, thus, primarily concerned with the substance of the award. The primary concern of annulment is to protect the integrity of the proceedings. Its object is to safeguard procedural justice as encapsulated in the sub-paragraphs of Article 52, paragraph 1. The arbitrator not having the means to put his or her perspective before the Committee, in annulment proceedings, is, therefore, of little consequence.

(3)  Object and Purpose of Article 52(1)(a) of the ICSID Convention

175. With respect to object and purpose of the text, features such as the finality of awards, exclusion of appeals, and the exceptional nature of the annulment remedy may be among those that inform the role of annulment committees.[220] As other committees have observed, the role of an annulment committee relates to "procedural legitimacy",[221] "the legitimacy of the award,"[222] and "safeguard[ing] the integrity" of the proceedings and the award.[223] Thus, while agreeing with the Eiser Parties about the "limited scope" of the annulment procedure,[224] this Committee holds that there can be no greater threat to the legitimacy and integrity of the proceedings or of the award than the lack of impartiality or independence of one or more of the arbitrators. As the *Suez* committee stated:

> In this regard, the Committee agrees with Respondent that the parties' confidence in the independence and impartiality of the arbitrators deciding their case is essential for ensuring the integrity of the proceedings and the dispute resolution mechanism as such;

---

[220] *See e.g.*, **Ex. C-0299**, Updated Background Paper on Annulment,  ¶¶ 7-9, 71-74 (see the different quotes under para. 74, section 2); **Ex. CL-0295/Ex. RL-0106**, Schreuer et al., THE ICSID CONVENTION, p. 899, ¶ 3; p. 903, ¶ 15.

[221] **Ex. RL-0139**, *CDC v. Seychelles*, Decision on Annulment, ¶ 34.

[222] **RL-0155**, *M.C.I. Power Group L.C. and New Turbine Inc. v. Republic of Ecuador*, ICSID Case No. ARB/03/6, Decision on Annulment dated October 19, 2009, ¶ 24.

[223] **RL-0066**, *Hussein Nuaman Soufraki v. United Arab Emirates*, ICSID Case No. ARB/02/7, Decision of the *ad hoc* Committee on the Application for Annulment of Mr. Soufraki dated June 5, 2007, ¶ 20. *See also* **Ex. CL-0244**, *Alapli Elektrik B.V. v. Republic of Turkey*, ICSID Case No. ARB/08/13, Decision on Annulment dated July 10, 2014 ("*Alapli Elektrik v. Turkey*, Decision on Annulment"), ¶ 32; **Ex. RL-0147**, *Tulip v. Turkey*, Decision on Annulment, ¶ 41.

[224] Annulment Rejoinder, ¶¶ 42-43.

55

thus, in principle, a lack of the qualities in Article 14(1) may serve as ground for annulment under Article 52(1)(a).[225]

(4)  Interpretation in accordance with any relevant rules of international law applicable to the relations between the parties

176.    The Committee has already observed that, on its proper interpretation, Article 52(1)(a) of the ICSID Convention establishes the right of the parties to an independent and impartial tribunal. That right arises from the time a tribunal is constituted and continues throughout its life.

177.    Neither Party has referred to Article 31(3)(c) of the Vienna Convention[226] in their respective submissions. The Committee, however, refers to it and the relevant jurisprudence here to show that its analysis of Article 52(1)(a) of the ICSID Convention is consistent with the requirements of the Vienna Convention. Article 31(3)(c) of the Vienna Convention provides that, together with the context, any relevant rules of international law that are applicable in the relation between the parties shall be taken into account. The right to an independent and impartial tribunal has been recognized as a general principle of law.[227] As such, the right to an independent and impartial tribunal is a relevant rule of international law which the Committee had to take into account when interpreting the meaning of "improper constitution" under Article 52(1)(a) of the ICSID Convention.

178.    Thus, in light of the text, context and object and purpose of Article 52(1)(a) of the ICSID Convention, this Committee concludes that, for purposes of determining whether the Tribunal was properly constituted, it has the authority to examine whether the members of the Tribunal were and remained (and were seen to be/remain) impartial and independent

---

[225] **Ex. RL-0103**, *Suez v. Argentina*, Decision on Annulment, ¶ 77.

[226] As the Committee had arrived at its interpretation of Article 52(1)(a) of the ICSID Convention without any reference to Article 31(3)(c) of the Vienna Convention it did not consider it necessary to invite any additional submissions from the Parties in this regard.

[227] *See* Bin Cheng, a "judge must not only be impartial, but there must be no possibility of suspecting his impartiality" (General Principles of Law as Applied by International Courts and Tribunals, 1953, p. 289) and Kotuby/Sobota, "[…] an impartial and independent judge has long been a fundamental tenet of international due process. […] Today nearly every nation provides in its written law for an independent judiciary. That consensus has been mirrored on the international plane, too, as intergovernmental and nongovernmental organizations have expressly recognized judicial impartiality and independence as integral to the basic right of access to justice. […] The same standards apply to arbitrators as well." (General Principles of Law and International Due Process, pp. 165, 168-169 (footnotes omitted)).

throughout the proceedings. The role of an *ad hoc* committee is to ensure that the integrity of the proceedings and the legitimacy of the award was not undermined. The impartiality and independence of the arbitrators, being an essential requirement for a valid and legitimate award, can, therefore, be assessed in the context of annulment proceedings.

### 2.      What is the applicable standard?

179.    In the previous section, the Committee concluded that the "improper constitution" of a tribunal under Article 52(1)(a) of the ICSID Convention did not confine the Committee to reviewing whether the procedural steps to constitute the tribunal had been properly followed at the outset of the arbitration. The review under Article 52(1)(a) extends to situations where an arbitrator is alleged to have lacked impartiality and independence at any time during the arbitration. The Committee now turns to the applicable standard to determine if an award should be annulled under Article 52(1)(a) of the ICSID Convention.

180.    This standard was framed by the annulment committee in *EDF v. Argentina*, when an application for annulment is made pursuant to Article 52(1)(a) and (d), "on the basis that there were reasonable grounds to doubt the independence or impartiality of one of the arbitrators and no proposal for disqualification had been made before the proceedings were declared closed."[228] This Committee agrees with the approach taken by the *EDF* committee by addressing the matter on a *de novo* basis and applying a similar three-step test to determine whether annulment is warranted in this case:[229]

> a)   was the right to raise this matter waived because the party concerned had not raised it sufficiently promptly?
>
> b)   if not, has the party seeking annulment established that a third party would find an evident or obvious appearance of lack of impartiality or independence on the part of an arbitrator on a reasonable evaluation of the facts of the case (the *Blue Bank* standard)? and

---

[228] **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶ 136. *See also ibid.*, ¶¶ 130-135.
[229] **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶ 136.

c) if so, could the manifestly apparent lack of impartiality or independence on the part of that arbitrator have had a material effect on the award?

181. The Committee will now address each of the steps of the test outlined above. As indicated in paragraph 144 above, the third step of the test (step c) will be addressed together with the Committee's analysis of the seriousness of the departure from a fundamental rule of procedure in Section IV.B.3.c).

### a) *Was the right to raise this matter waived because the party concerned had not raised it sufficiently promptly?*

(1) Spain's Arguments

182. According to the Applicant, as a general rule, a party challenging an arbitrator for lack of independence and impartiality is required to do so promptly and, in any event, before the proceeding is closed. However, it has been recognized that this general rule cannot prevent a party from challenging that arbitrator for the first time in the annulment phase if the relevant facts only became known after the arbitration proceedings were closed.[230] In this case, the Applicant argues that it became aware of the facts on which it bases its challenge to Dr. Alexandrov only after the *Eiser* Award was rendered. According to the Applicant, in these circumstances, it must be allowed to raise the issue in this annulment proceeding.

183. The Applicant argues that the relationship between Dr. Alexandrov and the Brattle Group, in particular Mr. Lapuerta, came to the Applicant's attention after the *Eiser* Award was issued in May 2017. It is only in July 2017 that public reports of this relationship emerged, in the context of a disqualification proposal filed in an unrelated arbitration involving

---

[230] Annulment Memorial, ¶¶ 76-77; Annulment Reply, ¶ 41; *citing* **Ex. RL-0106**, Schreuer et al., THE ICSID CONVENTION, p. 937; **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶ 130.

Pakistan.[231] As a consequence, Spain was deprived of the opportunity to challenge Dr. Alexandrov in the course of the Underlying Arbitration proceeding.[232]

184.     Further, Spain argues that it was unaware of these facts because, throughout the three-year course of the Underlying Arbitration, Dr. Alexandrov never disclosed his 15-year relationship with the Brattle Group. Nor did he disclose that he was simultaneously working as counsel with Brattle and, specifically, Mr. Lapuerta, in cases where they were engaged as experts by his own clients.[233]

(2)   Eiser Parties' Arguments

185.     The Eiser Parties argue that Spain waived its right to challenge Dr. Alexandrov because Spain should have known of his professional relationship with the Brattle Group during the course of the Underlying Arbitration.[234]

186.     The Eiser Parties note that Spain relies on a series of press reports published in GAR and Investment Arbitration Reporter in July 2017, which refer to a challenge filed in the *Tethyan Copper v. Pakistan* case.[235] However, in their view, the fact that Dr. Alexandrov had previously worked on the same cases alongside Mr. Lapuerta was public knowledge years before the Award was issued.[236] The Eiser Parties point to the following factors:

a)   The decision and awards in *PSEG v. Turkey* and *Pluspetrol v. Perupetro*, cases in which Dr. Alexandrov and Mr. Lapuerta worked together, were issued in

---

[231] Annulment Memorial, ¶¶ 70-71; *citing* **Ex. R-0280**, T. Jones, *Pakistan challenges arbitrator over valuation method*, GLOBAL ARBITRATION REVIEW, July 12, 2017; **Ex. R-0281**, L. Peterson, *As damages phase unfolds in Pakistan mining case, a challenge is lodged against Stanimir Alexandrov – citing his client's alleged interest in a rarely-used valuation method under scrutiny*, INVESTMENT ARBITRATION REPORTER, July 11, 2017; Annulment Reply, ¶ 25.

[232] Annulment Memorial, ¶¶ 72, 77.

[233] Annulment Memorial, ¶¶ 68-69; Annulment Reply, ¶¶ 25, 40.

[234] Annulment Rejoinder, ¶ 58.

[235] Annulment Rejoinder, ¶ 87.

[236] Annulment Rejoinder, ¶ 89.

June 2004,[237] January 2007,[238] and May 2015,[239] years before the *Eiser* Award was issued in May 2017;[240]

b)  GAR published an article in May 2015 where it was stated that both Dr. Alexandrov and Mr. Lapuerta were retained by the respondent in *Pluspetrol v. Perupetro*;[241]

c)  Spain itself relies on information that was publicly available, including awards issued and made public in November 2007 and August 2009, and in a GAR article of September 2016;[242]

d)  Dr. Alexandrov's *curriculum vitae*, which was provided to the Parties when he was appointed as arbitrator in the *Eiser* case, listed his representations of Bulgaria, Costa Rica, Peru and Turkey. For the Eiser Parties, this covers the cases of *PSEG v. Turkey*, *Pluspetrol v. Perupetro*, and *Bear Creek v. Peru*.[243]

187.  Given all of the information that was available before the *Eiser* Award was rendered, Spain should have known of the relationship, especially given the duty of due diligence and investigation that the Parties had. By not acting on the information that was available at the time, Spain has waived its right to raise any objections on Dr. Alexandrov's impartiality and independence.[244]

(3)  Analysis of the Committee

188.  It is uncontested among the Parties that Dr. Alexandrov did not disclose the relationship he had with the Brattle Group and, in particular, with Mr. Lapuerta. They disagree, however,

---

[237] **Ex. CL-0314**, *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Şirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Decision on Jurisdiction dated June 4, 2004 ("*PSEG v. Turkey*, Decision on Jurisdiction").

[238] **Ex. CL-0049**, *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Şirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award dated January 19, 2007 ("*PSEG v. Turkey*, Award").

[239] **Ex. RL-0130**, *Pluspetrol v. Perupetro*, Award.

[240] Annulment Rejoinder, ¶ 90.

[241] Annulment Rejoinder, ¶ 91; *citing* **Ex. C-0335**, S. Perry, *Peru Prevails In Gas Exports Dispute*, GLOBAL ARBITRATION REVIEW, May 26, 2015, available at: https://globalarbitrationreview.com/article/1034480/peru-prevails-in-gas-exports-dispute.

[242] Annulment Rejoinder, ¶ 93.

[243] Annulment Rejoinder, ¶ 94.

[244] Annulment Rejoinder, ¶¶ 95-101.

on the extent and effect of such relationship, which will be addressed later in this Decision. At this point, the relevant question that the Committee has to address is whether Spain knew or should have known about such relationship, as argued by the Eiser Parties.

189.   The Committee is not inclined to accept these submissions of the Eiser Parties. They have failed to point out a clear instance where Spain either was, or reasonably ought to have been aware of this relationship and its extent before the Award was issued. The fact that materials, which predate the Award, have been referred to by the Eiser Parties cannot be accepted as proof either of Spain's knowledge of these materials or that it knew of the extent of the relationship between Dr. Alexandrov and Mr. Lapuerta. Nothing in these materials suggest that Spain had actual or constructive knowledge of or that had it been vigilant it ought to have reasonably been aware of the long and extensive relations between Mr. Lapuerta and/or the Brattle Group with Dr. Alexandrov and/or Sidley Austin. The Committee notes that the Eiser Parties, in particular, submitted that the *PSEG* award of January 19, 2007 was part of the record in the Underlying Arbitration.[245] The Committee accepts that the award was in a case where Dr. Alexandrov and Brattle acted as counsel and expert for the same party. This was, however, more than seven years before the appointment of Dr. Alexandrov as arbitrator in the Eiser and Spain arbitration. Nothing in that award could have possibly led Spain to suspect the extent of Dr. Alexandrov's relationship with Brattle, in general, and Mr. Lapuerta, in particular.[246] It also gave no indication, as it obviously could not, that the close relationship had continued in the seven years that followed. Similar considerations affect the other evidence relied on by the Eiser Parties, in this respect.

190.   There is nothing on the record to prove that Spain had such knowledge, the burden has not been discharged by the Eiser Parties. The existence of the information in the public domain does not discharge the burden of the Eiser Parties to prove that Spain was aware of the relevant facts. A clear and unequivocal waiver of a right so fundamental as to challenge the impartiality and independence of an arbitrator, goes to the very root of the proper constitution of a tribunal. Such a waiver cannot be established without proof that the party

[245] **Ex. CL-0049**, *PSEG v. Turkey*, Award. *See also* Annulment Rejoinder, ¶ 90, fn. 141.
[246] *Ibid*.

61

concerned had actual or constructive knowledge of all the facts. The Committee is not satisfied that the Eiser Parties have proved that Spain had such knowledge. The Committee is, therefore, of the view that Spain did not waive its objections to the independence and impartiality of Dr. Alexandrov.

b) *If the matter has been raised sufficiently promptly, has the party seeking annulment established that a third party would find an evident or obvious appearance of lack of impartiality on a reasonable evaluation of the facts of the case?*

(1) Spain's Arguments

191. For the Applicant, the standards for the disqualification of arbitrators under Article 57 of the ICSID Convention are directly applicable to the annulment under Article 52(1)(a). Accordingly, pursuant to the decision in *Blue Bank* and many others that have followed it, there has to be an objective "appearance of dependence or bias" and the Applicant is not required to demonstrate "proof of actual dependence or bias."[247] Thus, the standard is "whether, based on a reasonable evaluation of the facts […] a third party would find" an "evident or obvious appearance of lack of impartiality."[248]

192. Further, the Applicant argues that the word "manifest" included in Article 57 of the ICSID Convention must be interpreted as meaning "evident" or "obvious." It does not require, however, the lack independence or impartiality to be self-evident.[249]

193. For the Applicant, the objective "appearance of dependence or bias" is demonstrated by both *(a)* the existence of a 15-year relationship between Dr. Alexandrov and the Brattle Group, in particular with Mr. Lapuerta; and *(b)* the lack of disclosure of such relationship.[250] These, for the Applicant, are "each sufficient reasons on their own to create

---

[247] Annulment Memorial, ¶¶ 79-81; Annulment Reply, ¶¶ 49-52; *citing*, *inter alia*, **Ex. RL-0104**, *Blue Bank v. Venezuela*, Decision on Disqualification, ¶¶ 59-60.

[248] Annulment Reply, ¶ 54; *citing* **Ex. RL-0108**, *Caratube v. Kazakhstan*, Decision on Disqualification, ¶ 77.

[249] Annulment Reply, ¶ 52; *citing* **Ex. RL-0108**, *Caratube v. Kazakhstan*, Decision on Disqualification, ¶ 77.

[250] Annulment Memorial, ¶¶ 68, 82-83, 107.

an appearance of bias regarding Mr. Alexandrov" that would warrant annulment of the Award.[251]

194.    *First*, the Applicant argues that proof of the relationship between Dr. Alexandrov and the Brattle Group, in particular with Mr. Lapuerta, is based on the following facts:[252]

    a)    During his time at Sidley Austin, where he was a partner and co-head of international arbitration, Dr. Alexandrov and his team appointed Brattle in numerous cases, four of which involved Mr. Lapuerta as the testifying expert.[253] According to Spain, this is particularly relevant because the arbitrator bears the identity of his firm, which is reinforced by his role as co-head of the firm's worldwide international arbitration practice;[254]

    b)    At the same time he was serving as arbitrator in *Eiser*, Dr. Alexandrov was working with the Brattle Group in *Pluspetrol* and *Bear Creek*. In *Pluspetrol*, the testifying expert was Mr. Lapuerta;[255]

    c)    In four cases, *Blusun v. Italy*, *Ioan Micula v. Romania*, *Tethyan v. Pakistan*, and *SolEs Badajoz v. Spain*, Dr. Alexandrov was appointed as an arbitrator by the same party that engaged the Brattle Group as its expert. In *Blusun* and *SolEs Badajoz*, the testifying expert was Mr. Lapuerta.[256]

---

[251] Annulment Memorial, ¶ 116; Annulment Rejoinder, ¶ 25.

[252] Annulment Memorial, ¶¶ 98, 101-102, 105.

[253] Annulment Memorial, ¶¶ 98, 101; Annulment Rejoinder, ¶¶ 25, 75, 79; *citing* **Ex. R-0282**, *Embattled over Brattle – Spain's challenge to Alexandrov divides co-arbitrators*, GLOBAL ARBITRATION REVIEW, October 24, 2017; **Ex. R-0283**, T. Jones, *Pakistan challenges entire tribunal over Alexandrov expert ties*, GLOBAL ARBITRATION REVIEW, November 29, 2017.

[254] Annulment Memorial, ¶¶ 90, 102-104; Annulment Reply, ¶¶ 72-74; *citing* **Ex. RL-0104**, *Blue Bank v. Venezuela*, Decision on Disqualification, ¶ 66; **Ex. RL-0117**, Background Information on the IBA Guidelines on Conflicts of Interest in International Arbitration, 5(3) BUSINESS LAW INTERNATIONAL (September 2004), p. 445.

[255] Annulment Memorial, ¶¶ 99-100; Annulment Reply, ¶¶ 25, 28, 81-82; *citing* **Ex. RL-0130**, *Pluspetrol v. Perupetro*, Award, ¶¶ 29, 204; **Ex. RL-0131**, *Bear Creek v. Peru*, Award, ¶ 30, fn. 815; Second Brattle Regulatory Report; Second Brattle Quantum Report.

[256] Annulment Memorial, ¶ 71.

195.    Because of this relationship, Dr. Alexandrov "undoubtedly developed a close working relationship with Mr. Lapuerta as well as his colleagues at Brattle."[257] In Spain's view, individual experts like Mr. Lapuerta cannot simply be detached from the company for which they work. In the present case, this relationship created an unfair imbalance in the way that Dr. Alexandrov judged the reports presented by the Brattle Group as well as their testimony during the Hearing.[258]

196.    *Second*, the Applicant argues that, in accordance with Arbitration Rule 6(2), Dr. Alexandrov had the continuous obligation to disclose such relationship, an obligation that was not subject to his discretion. This relationship had to be disclosed because it was "likely to give rise to justifiable doubts as to the arbitrator's reliability for independent judgement."[259]

197.    According to the Applicant, this failure to disclose is evidence of a lack of independence and impartiality, especially when it forms part of a pattern of circumstances raising doubts as to the arbitrator's impartiality, and a basis for disqualification.[260] In the case at hand, Dr. Alexandrov's failure to disclose is not an isolated occurrence since it also happened in previous cases like *SolEs Badajoz* and *Tethyan Copper*.[261]

(2)    Eiser Parties' Arguments

198.    The Eiser Parties do not dispute that, if the Committee were to examine this challenge, the applicable standard would be the one used for the disqualification of an arbitrator under Article 57 of the ICSID Convention. They contend, however, that this is a high standard and that it is even higher at the annulment phase.[262]

---

[257] Annulment Memorial, ¶ 107.

[258] Annulment Memorial, ¶¶ 107-108; Annulment Reply, ¶¶ 83-84, 106-107.

[259] Annulment Memorial, ¶¶ 84-93, 112; Annulment Reply, ¶¶ 56-57, 66-67; *citing, inter alia,* **Ex. RL-0114**, *Alpha Projektholding v. Ukraine*, Decision on Disqualification, ¶¶ 52-55; **Ex. RL-0113**, Daele, CHALLENGE AND DISQUALIFICATION OF ARBITRATORS, p. 8, ¶ 1-020.

[260] Annulment Memorial, ¶¶ 93-94, 113-114; Annulment Reply, ¶¶ 60-62, 108.

[261] Annulment Memorial, ¶ 95; Annulment Reply, ¶¶ 109-111.

[262] Annulment Counter-Memorial, ¶ 46; Annulment Rejoinder, ¶ 46.

199.    Accordingly, the Committee must be satisfied, based on the evidence put before it, that the challenged arbitrator failed to exercise independent judgment, that such failure was "manifest", and that it put the integrity of the proceedings into question.[263] Thus, the applicable standard is whether "a third party would find that there is an evident or obvious lack of impartiality or independence based on a reasonable evaluation of the facts."[264] The Eiser Parties add that "Spain does not have to show the existence of actual bias" but the "appearance of bias has to be '*clearly and objectively established*.'"[265]

200.    For the Eiser Parties, Spain has failed to show "manifest" evidence of a lack of independence and impartiality given that neither the professional relationship between Dr. Alexandrov and the Brattle Group, nor the failure to disclose it, meet such a standard.[266]

201.    *First*, the Eiser Parties contend that there was no conflict of interest arising from the alleged relationship between Dr. Alexandrov and Mr. Lapuerta.[267] They argue that: *(a)* experts are chosen and appointed by the clients and not counsel; *(b)* experts testify in their own capacity and express their own independent opinions; as such, a conflict can only arise due to the expert's individual relationship with an individual arbitrator; *(c)* the activities of an arbitrator's law firm do not automatically create a conflict of interest and, therefore, cases handled by Sidley Austin lawyers do not show a "close personal relationship" with

---

[263] Annulment Counter-Memorial, ¶¶ 46, 48-51; *citing*, *inter alia*, **Ex. CL-0288**, *Suez v. Argentina*, Disqualification Decision I, ¶ 41; **Ex. RL-0126**, *Suez v. Argentina*, Disqualification Decision II, ¶ 29; **Ex. RL-0127**, *Tidewater v. Venezuela*, Disqualification Decision, ¶ 39; Annulment Rejoinder, ¶ 50.

[264] Annulment Counter-Memorial, ¶ 51; *citing*, *inter alia*, **Ex. RL-0108**, *Caratube v. Kazakhstan*, Decision on Disqualification, ¶ 57; Annulment Rejoinder, ¶¶ 48-49; *citing*, *inter alia*, **Ex. RL-0104**, *Blue Bank v. Venezuela*, Decision on Disqualification, ¶¶ 59-61; **Ex. RL-0111**, *Urbaser S.A. and Consorcio de Aguas Bilbao Bizkaia, Bilbao Biskaia Ur Partzuergoa v. Argentine Republic*, ICSID Case No. ARB/07/26, Decision on Claimants' Proposal to Disqualify Professor Campbell McLachlan, Arbitrator dated August 12, 2010 ("*Urbaser v. Argentina*, Decision on Disqualification"), ¶¶ 43-45.

[265] Annulment Rejoinder, ¶ 48 (emphasis in original). The Eiser Parties state that the fact that evidence of manifest appearance of bias is sufficient "is not an issue in dispute." (*Ibid.*)

[266] Annulment Counter-Memorial, ¶ 54.

[267] Annulment Counter-Memorial, ¶¶ 57, 64-67.

Mr. Lapuerta; and, *(d)* there are no reasons to equate Mr. Lapuerta with the Brattle Group.[268]

202.     In the eyes of the Eiser Parties, Spain's case is based on speculations. Spain has resorted to misrepresenting the facts in an attempt to amplify the magnitude of the professional relationship between Dr. Alexandrov and Mr. Lapuerta.[269] Specifically, the Eiser Parties argue that:

  a)  In the 15-year period at issue, there are only three ICSID cases in which Dr. Alexandrov and Mr. Lapuerta were respectively engaged by the same party as counsel and expert; these are *PSEG v. Turkey*, *Alapli v. Turkey*, and *Pluspetrol v. Perupetro*;[270]

  b)  *Pluspetrol* is the only case in which Mr. Lapuerta and Dr. Alexandrov were engaged by the same party at the same time Dr. Alexandrov was sitting as arbitrator in the Underlying Arbitration;[271]

  c)  Mr. Lapuerta was not the testifying expert in *Bear Creek*;[272]

  d)  There is an undisclosed commercial arbitration in which the same party engaged Sidley Austin and Mr. Lapuerta; as of October 12, 2017, this arbitration was suspended and Dr. Alexandrov was asked by the party to remain involved only if the proceeding resumed;[273]

---

[268] Annulment Counter-Memorial, ¶¶ 72-74, 80; Annulment Rejoinder, ¶¶ 111-113.

[269] Annulment Rejoinder, ¶ 104.

[270] Annulment Counter-Memorial, ¶ 77; *citing* **Ex. C-0317**, Letter from Dr. Alexandrov to ICSID in *SolEs Badajoz v. Spain* dated August 18, 2017, p. 3; Annulment Rejoinder, ¶ 116.

[271] Annulment Counter-Memorial, ¶ 68; Annulment Rejoinder, ¶ 118.

[272] Annulment Counter-Memorial, ¶ 68; Annulment Rejoinder, ¶ 117.

[273] Annulment Memorial, fn. 176; Annulment Reply, fns. 35, 139, and ¶ 79; *citing* **Ex. R-0321**, Letter from Dr. Alexandrov to ICSID in *SolEs Badajoz v. Spain* dated October 12, 2017; **Ex. C-0317**, Letter from Dr. Alexandrov to ICSID in *SolEs Badajoz v. Spain* dated August 18, 2017.

e) The *SolEs Badajoz* and *Tethyan Copper* cases are irrelevant for the purpose of establishing the basis of any conflict because Dr. Alexandrov was acting as arbitrator and not counsel;[274] and

f) Overall, there are only four cases in which Dr. Alexandrov and Mr. Lapuerta worked, respectively, as counsel and expert witness for the same party (*PSEG v. Turkey*, *Alapli v. Turkey*, *Pluspetrol v. Perupetro*, and a commercial arbitration, which was in abeyance).[275]

203. The Eiser Parties conclude that Spain has offered no evidence of any "'close relationship'" between Dr. Alexandrov and Mr. Lapuerta or any "'unique reliance'" by the former upon the latter.[276] On the contrary, his relationship with any of the experts from the Brattle Group did not go beyond engaging them as experts, which is common practice in international arbitration.[277] In any case, even if the Committee were to conclude that Dr. Alexandrov's engagements with Mr. Lapuerta constitute a close professional relationship, the Eiser Parties contend that such a relationship does not create a conflict.[278]

204. *Second*, contrary to Spain's assertions, Dr. Alexandrov did not have the obligation to disclose his relationship with the Brattle Group. In fact, an arbitrator has the discretion to determine whether to disclose a fact or circumstance, and cannot be criticized for honestly exercising such discretion. As such, Dr. Alexandrov's lack of disclosure does not establish the existence of a lack of independence or impartiality and was just an honest exercise of said discretion.[279]

---

[274] Annulment Counter-Memorial, ¶ 69.

[275] Annulment Counter-Memorial, ¶¶ 77, 78.

[276] Annulment Counter-Memorial, ¶ 81; *quoting* Annulment Memorial, ¶ 107.

[277] Annulment Counter-Memorial, ¶¶ 81-82, 110.

[278] Annulment Counter-Memorial, ¶¶ 84-85; *citing* **Ex. RL-0126**, *Suez v. Argentina*, Disqualification Decision II, ¶ 32.

[279] Annulment Counter-Memorial, ¶¶ 57-58, 112-117, 120-125; Annulment Rejoinder, ¶¶ 57-84; *citing*, *inter alia*, **Ex. RL-0126**, *Suez v. Argentina*, Disqualification Decision II, ¶ 46; **Ex. RL-0114**, *Alpha Projektholding v. Ukraine*, Decision on Disqualification, ¶ 61.

(3)  Analysis of the Committee

205.  Based on the submissions of the Parties, the Committee has identified the following relevant uncontested facts:

a)  Dr. Alexandrov was appointed as an arbitrator by the Eiser Parties in the Underlying Arbitration;[280]

b)  Mr. Lapuerta, together with other experts from the Brattle Group, was selected as the damages expert by the Claimants in the Underlying Arbitration;[281]

c)  Between May 2002 and August 2017, Dr. Alexandrov worked at Sidley Austin. He served as partner and co-chair of Sidley Austin's international arbitration practice;[282]

d)  The Tribunal in the Underlying Arbitration was constituted in July 2014 and the Award was rendered in May 2017;[283]

e)  There are four cases in which Dr. Alexandrov was appointed as arbitrator and the Brattle Group was engaged by the party that appointed him as arbitrator; these cases are *Blusun v. Italy*, *Ioan Micula v. Romania*, *Tethyan Copper v. Pakistan*, and *SolEs Badajoz v. Spain*;[284]

---

[280] Award, ¶ 9.

[281] Award, ¶ 73. *See also* Annex 9 to the Application for Annulment "*Financial Damages to Eiser*", prepared by Mr. Carlos Lapuerta and Mr. Richard Caldwell, The Brattle Group dated October 2014 submitted in the Underlying Arbitration.

[282] Annulment Memorial, ¶ 98. *See also* **Ex. R-0284**, *Curriculum Vitae* of Stanimir Alexandrov submitted in the Underlying Arbitration, p. 1; **Ex. R-0285**, Douglas Thomson, *Alexandrov quits Sidley Austin to go solo*, Global Arbitration Review, August 2, 2017. In a letter dated October 12, 2017, Dr. Alexandrov states that at that time he continued working in two arbitrations with Sidley Austin as co-counsel. *See* **Ex. R-0321**, Letter from Dr. Alexandrov to ICSID in *SolEs Badajoz v. Spain* dated October 12, 2017.

[283] Award, ¶ 10.

[284] Annulment Memorial, fn. 131, *referring to* **Ex. CL-0326,** *Blusun S.A. and others v. Italian Republic*, ICSID Case No. ARB/14/3; **Ex. CL-0031**, *Ioan Micula and others v. Romania*, ICSID Case No. ARB/5/20; **Ex. RL-0181**, *Tethyan Copper Company Pty Limited v. Islamic Republic of Pakistan*, ICSID Case No. ARB/12/1; **Ex. R-0323**, *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38; Annulment Counter-Memorial, ¶ 69.

        i. In two of these four cases, the testifying expert was Mr. Lapuerta: *Blusun v. Italy* and *SolEs Badajoz v. Spain*; and

        ii. Three of these cases ran in parallel with the Underlying Arbitration: *Blusun v. Italy*, *Tethyan Copper v. Pakistan*, and *SolEs Badajoz v. Spain*.

f) There are at least eight other cases in which Dr. Alexandrov was engaged as counsel by the party that engaged the Brattle Group as its expert;[285]

        i. These eight cases are *Bayindir v. Pakistan*, *PSEG v. Turkey*, *Archer Daniels v. Mexico*, *Alapli v. Turkey*, *Pluspetrol v. Perupetro*, *LSF-KEB Holdings v. Korea*, *Bear Creek v. Peru*, and *Veolia v. Lithuania*;[286]

        ii. At least two of these cases - *Pluspetrol v. Perupetro*, *Bear Creek v. Peru* - overlapped with the Underlying Arbitration;

        iii. In three of these cases - *Pluspetrol v. Perupetro*, *PSEG v. Turkey*, and *Alapli v. Turkey* - the testifying expert was Mr. Lapuerta; and

        iv. In *Bear Creek v. Peru*, Mr. Lapuerta was not the testifying expert.

---

[285] Annulment Memorial, ¶¶ 99-100 and fn. 176; Annulment Counter-Memorial, ¶¶ 68, 77; Annulment Reply, fns. 35, 139, and ¶¶ 79, 81-82.

[286] **Ex. RL-0180**, *Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29 (Stanimir Alexandrov as counsel for the claimant, Brattle as the claimant's damages expert); **Ex. CL-0049**, *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Şirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5 (Stanimir Alexandrov as counsel for the respondent, Brattle (Carlos Lapuerta) as the respondent's damages expert); **Ex. RL-0179**, *Archer Daniels Midland Company and Tate & Lyle Ingredients Americas, Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/04/5 (Stanimir Alexandrov as counsel for the claimants, Brattle as the claimants' damages expert); **Ex. CL-0244**, *Alapli Elektrik B.V. v. Republic of Turkey*, ICSID Case No. ARB/08/13 (Stanimir Alexandrov as counsel for the respondent, Brattle (Carlos Lapuerta) as the respondent's damages expert); **Ex. RL-0130**, *Pluspetrol Peru Corporation and others v. Perupetro S.A.*, ICSID Case No. ARB/12/28 (Stanimir Alexandrov as counsel for the respondent, Brattle (Carlos Lapuerta) as the respondent's damages expert); **Ex. CL-0333**, *LSF-KEB Holdings SCA and others v. Republic of Korea*, ICSID Case No. ARB/12/37 (Stanimir Alexandrov as counsel for the claimants, Brattle as the claimants' damages expert); **Ex. RL-0131**, *Bear Creek Mining Corporation v. Republic of Peru*, ICSID Case No. ARB/14/21 (Stanimir Alexandrov as counsel for the respondent, Brattle as the respondent's damages expert); and **Ex. R-0325**, *Veolia Environnement and others v. Republic of Lithuania*, ICSID Case No. ARB/16/3 (Stanimir Alexandrov as counsel for the claimants, Brattle as the claimants' damages expert).

g) In addition to the above-mentioned eight cases, there is at least one undisclosed investor-state arbitration and one undisclosed commercial arbitration in which Sidley Austin was engaged as counsel by the party that engaged the Brattle Group as experts;[287]

    i. Both cases overlapped with the Underlying Arbitration; however, as of October 12, 2017, the tribunal in the investor-state arbitration was yet to be constituted;[288] and

    ii. Mr. Lapuerta was engaged as the testifying expert only in the commercial arbitration.[289]

206. With these facts in mind, the Committee must determine if the standard for disqualification has been met. The Committee agrees that the appropriate standard is the one adopted by the Chairman of the ICSID Administrative Council in *Blue Bank*[290] and numerous other cases:[291]

> Impartiality refers to the absence of bias or predisposition towards a party. Independence is characterized by the absence of external control. Independence and impartiality both "*protect parties against arbitrators being influenced by factors other than those related to the merits of the case*." Articles 57 and 14(1) of the ICSID Convention do not require proof of actual dependence or bias; rather it is sufficient to establish the appearance of dependence or bias.
>
> The applicable legal standard is an "*objective standard based on a reasonable evaluation of the evidence by a third party*." As a consequence, the subjective belief of the party requesting the

---

[287] Annulment Memorial, fn. 176; Annulment Reply, fns. 35, 139, and ¶ 79; *citing* **Ex. R-0321**, Letter from Dr. Alexandrov to ICSID in *SolEs Badajoz v. Spain* dated October 12, 2017; **Ex. C-0317**, Letter from Dr. Alexandrov to ICSID in *SolEs Badajoz v. Spain* dated August 18, 2017.

[288] **Ex. R-0321**, Letter from Dr. Alexandrov to ICSID in *SolEs Badajoz v. Spain* dated October 12, 2017; **Ex. C-0317**, Letter from Dr. Alexandrov to ICSID in *SolEs Badajoz v. Spain* dated August 18, 2017.

[289] **Ex. R-0321**, Letter from Dr. Alexandrov to ICSID in *SolEs Badajoz v. Spain* dated October 12, 2017.

[290] **Ex. RL-0104**, *Blue Bank v. Venezuela*, Decision on Disqualification.

[291] *See e.g.*, **Ex. RL-0105**, *Burlington Resources v. Ecuador*, Decision on Disqualification, ¶¶ 66-68, 80; **Ex. CL-0265**, *Abaclat v. Argentina*, Decision on Disqualification, ¶ 71; **Ex. CL-0272**, *ConocoPhillips v. Venezuela*, Disqualification Decision I, ¶ 47; **Ex. CL-0273**, *ConocoPhillips v. Venezuela*, Disqualification Decision II, ¶ 82.

disqualification is not enough to satisfy the requirements of the Convention.

Finally, regarding the meaning of the word "manifest" in Article 57 of the Convention, a number of decisions have concluded that it means "evident" or "obvious," and that it relates to the ease with which the alleged lack of the qualities can be perceived.[292]

[…] the Chairman concludes that it has been demonstrated that a third party would find an evident or obvious appearance of lack of impartiality on a reasonable evaluation of the facts in this case.[293]

207. Accordingly, the Committee will determine whether a third party would find an evident or obvious appearance of bias on the part of Dr. Alexandrov on an objective assessment of the facts in this case. To that end, the Committee will first address whether there was a close relationship between Dr. Alexandrov/Sidley Austin and Mr. Lapuerta/the Brattle Group that could create a manifest appearance of bias[294] on the part of Dr. Alexandrov. Second, the Committee will determine whether Dr. Alexandrov had to disclose this relationship and what are the consequences of his failure to do so.

*(a) The existence of a relationship between Dr. Alexandrov and Mr. Lapuerta.*

208. The Committee will determine whether in light of the cases cited by the Parties, there exists a relationship that creates a manifest appearance of bias[295] in the eyes of a third party, on an objective assessment of the facts. The Committee starts by noting that the facts in

---

[292] **Ex. RL-0104**, *Blue Bank v. Venezuela*, Decision on Disqualification, ¶¶ 59-61 (footnotes omitted).

[293] **Ex. RL-0104**, *Blue Bank v. Venezuela*, Decision on Disqualification, ¶ 69.

[294] The Committee is conscious of the fact that the jurisprudence on the subject uses different labels. Sometimes interchangeably. Some of these are "manifest appearance of bias", "real likelihood of bias", "real danger of bias", and "giving rise to justifiable doubts". The Committee is of the view that the applicable standard is that on an objective assessment of the facts it would manifestly appear to a third party that justice was either not done or not seen to be done. Or, in other words, justice should not only be done, but should manifestly and undoubtedly be seen to be done. It is in this sense that the expression has been used by the Committee.

The Committee also notes with approval, the following passage from Prof. Schreuer:

> A conflict of interest is an objective criterion that is independent of the moral character of the arbitrator in question. In particular, a conflict of interest may exist even if there is no suspicion or likelihood of corruption in the sense of Art. 52(1)(c) […].

**Ex. CL-0295/Ex. RL-0106**, Schreuer et al., THE ICSID CONVENTION, p. 512.

[295] The word "bias" wherever used by the Committee is in the sense of a "conflict of interest" which may manifestly appear to a third party, on an objective assessment of the facts, as a lack of independence or impartiality.

paragraph 205 show unequivocally that, before and during the Underlying Arbitration, there were several past and present professional connections and interaction in various capacities between Dr. Alexandrov, as counsel and as member of the law firm Sidley Austin, on the one hand, and Mr. Lapuerta and the Brattle Group, on the other.

209.    Moreover, Dr. Alexandrov's interaction with Brattle experts has been the subject of challenge and discussions previously by the PCA's Secretary-General and the World Bank's Chairman of the Administrative Council in the *Tethyan Copper* case. The unchallenged arbitrators in *SolEs Badajoz* also discussed these interactions in the context of a challenge against Dr. Alexandrov for the same reasons. The Committee starts by observing that the conflict issue in those cases arose while they were ongoing and not in the context of annulment proceedings.

### *Tethyan Copper*:

210.    In *Tethyan Copper*, Pakistan challenged arbitrator Dr. Alexandrov based on his relationship with the Brattle Group.[296]   The PCA's Secretary-General Hugo Hans Siblesz found in his Opinion that Pakistan "has not shown that the relationship between Dr. Alexandrov and Brattle goes beyond a normal working relationship as is common between counsel and valuation experts involved in international arbitration cases" and that "such a working relationship would [not] lead to a lack of the required qualities of an arbitrator."[297]   Having reviewed the Parties' submissions, Dr. Alexandrov's explanations and the PCA Secretary-General's Opinion, the unchallenged arbitrators reached the conclusion that the Proposal for the Disqualification of Dr. Alexandrov did not meet the standard set forth in Article 57 of the ICSID Convention. In the same case, later in the proceeding, Dr. Jim

---

[296] Annulment Reply, ¶¶ 92-103. The challenge was denied by the two other arbitrators (Lord Hoffmann and Prof. Sachs) on September 5, 2017. *See* **Ex. CL-0290**, *Tethyan Copper v. Pakistan*, Decision of Co-Arbitrators.

[297] **Ex. CL-0289**, *Tethyan Copper v. Pakistan*, PCA Opinion, ¶ 100.

Yong Kim (Chairman of the Administrative Council) dismissed a further challenge against Dr. Alexandrov and his fellow arbitrators.[298]

211.    Spain has raised the illicit disclosure of these decisions.[299] The Committee is satisfied with the Eiser Parties' clarification from counsel in the *Tethyan Copper* arbitration that there are no confidentiality orders which would cover these decisions[300] and cannot identify any breach of Spain's rights of defense related to the submission of the *Tethyan Copper* decisions.

212.    The Committee is of the view that the fact pattern in the Underlying Arbitration is not the same.[301] First, an important difference between *Tethyan Copper* and the case at hand is that in *Tethyan Copper* the Members of the Tribunal were aware of Dr. Alexandrov's relationship with Brattle and Prof. Davis. Moreover, the unchallenged arbitrators (Lord Hoffmann and Prof. Sachs) issued a decision on the disqualification proposal regarding Dr. Alexandrov after receiving the PCA Secretary-General's Opinion, on September 5, 2017.[302]  It was clear, therefore, that the other two arbitrators did not believe that his involvement would affect their deliberations.

213.    Moreover, in *Tethyan Copper*, the Brattle Group expert involved was Prof. Davis. When asked, Dr. Alexandrov stated that he had only interacted, as counsel, with this expert in a single case. Furthermore, it was Prof. Davis' disclosure regarding the *Bear Creek* case which triggered the challenge against Dr. Alexandrov.[303] Even though it could be said that the *Bear Creek* case where Prof. Davis acted as damages expert, with Dr. Alexandrov acting as counsel, was concurrent with the *Tethyan Copper* case where Dr. Alexandrov

---

[298] **Ex. CL-0291**, *Tethyan Copper v. Pakistan*, Decision of ICSID Administrative Council Chairman, ¶ 138.

[299] Annulment Reply, ¶ 89.

[300] Annulment Rejoinder, ¶¶ 138-140.

[301] Cfr. The same is true given the very same facts of this case. See Annulment Counter-Memorial, ¶ 103; Annulment Rejoinder, ¶ 128.

[302] *See* **Ex. CL-0290**, *Tethyan Copper v. Pakistan*, Decision of Co-Arbitrators.

[303] Prof. Graham Davis' disclosure stated: "I provided expert testimony on behalf of the Republic of Peru in *Bear Creek Mining Corporation v. Republic of Peru* (ICSID Case No. ARB/14/21), having been retained by a team at Sidley Austin LLP that included Dr. Stanimir Alexandrov, a member of this Arbitral Tribunal. My engagement in that matter has concluded" (**Ex. CL-0289**, *Tethyan Copper v. Pakistan*, PCA Opinion, ¶ 11).

acted as arbitrator, the fact is that as Prof. Davis stated, his "[…] engagement [in the *Bear Creek* case] ha[d] concluded."[304] This is confirmed by the fact that the *Bear Creek* case was almost over, with no filings pending, when the challenge was brought by Pakistan.[305] It seems that the PCA's Secretary-General based his ruling on the same assumption, *i.e.* that in *Tethyan Copper* there was no "concurrent service" with Dr. Alexandrov acting as arbitrator in *Tethyan Copper* and Dr. Alexandrov working as counsel with the damages expert in *Bear Creek*:

> Against this background, I conclude that the present procedural situation may, in principle, give rise to an issue conflict. As a general matter, it cannot be ruled out **that the concurrent service of an arbitrator as counsel in another pending arbitration, in which the damages expert of the party that he represents has submitted a similar and "innovative" damage valuation method, may prevent that arbitrator from evaluating this method with an open mind**. Whether an issue conflict that warrants the disqualification of the arbitrator arises will however depend on the specific facts of a case and the applicable legal standard.[306] (emphasis added)

214.   The facts are materially different here. Dr. Alexandrov and Mr. Lapuerta worked in four cases as counsel and expert for the same party. Two of them, *Pluspetrol* and the confidential commercial arbitration, were pending when Dr. Alexandrov was sitting as arbitrator in the Underlying Arbitration. In addition, Dr. Alexandrov was working simultaneously in the *Bear Creek* arbitration with other Brattle experts. Besides there were several past and present professional connections and interactions between them.

---

[304] This declaration was made on March 22, 2017 in the *Tethyan Copper* arbitration when Prof. Davis' expert report was submitted (*see* **Ex. CL-0289**, *Tethyan Copper v. Pakistan*, PCA Opinion, ¶ 10). The hearing on jurisdiction and merits in the *Bear Creek* case took place on September 7-14, 2016 in Washington, D.C. (*see* https://icsid.worldbank.org/en/Pages/cases/casedetail.aspx?CaseNo=ARB/14/21).

[305] The disqualification proposal was submitted on July 7, 2017 (**Ex. CL-0289**, *Tethyan Copper v. Pakistan*, PCA Opinion, ¶ 3). The parties filed their last submissions (statements of costs) on March 29 and April 14, 2017 (*see* https://icsid.worldbank.org/en/Pages/cases/casedetail.aspx?CaseNo=ARB/14/21).

[306] **Ex. CL-0289**, *Tethyan Copper v. Pakistan*, PCA Opinion, ¶ 141.

### *SolEs Badajoz*:

215.  In *SolEs Badajoz*, Spain also based its challenge on the relationship between an arbitrator, Dr. Alexandrov, and an expert of the Brattle Group, Mr. Lapuerta. The unchallenged arbitrators could not agree on the outcome of the challenge, and stated that they were "equally divided on the matter and have failed to reach a decision."[307] Later, Dr. Alexandrov resigned from the case.[308]

216.  The difference between the *SolEs Badajoz* facts and those before us, in this case, is that in *SolEs Badajoz*, Dr. Alexandrov **was not simultaneously acting, as counsel,** with Mr. Lapuerta, as damages expert. Conversely, it is uncontested that, during the Underlying Arbitration, Dr. Alexandrov and Mr. Lapuerta were working simultaneously, as counsel and damages expert, for the same party, in two other pending arbitrations. In addition, as he was sitting as arbitrator in the *Eiser* case, Dr. Alexandrov was working simultaneously as counsel in the *Bear Creek* arbitration with other Brattle Group experts.

217.  The Committee has carefully reviewed the uncontested facts, as well as other decisions in such cases. As pointed out in the *Suez* case, it is true that arbitrators, lawyers and experts doing investment arbitrations live on the same planet.[309] Some interaction is, therefore, inevitable. Nevertheless, it is obvious and it is to be expected that the more "connections"

---

[307] **Ex. C-0319**, Letter from J. Donoghue and A. Joubin-Bret to ICSID in *SolEs Badajoz v. Spain* dated October 19, 2017.

[308] In this regard, the letter stated:

> In light of that development, I have decided to step down from the Tribunal in this case. I continue to believe that the Proposal for Disqualification lacks merit. However, assuming that the Chairman of the Administrative Council rejects the Proposal, I will face a situation of serving on a tribunal where one of the two co-arbitrators may have doubts about my impartiality. In those circumstances, I believe that my continued service as an arbitrator on this Tribunal would likely be impaired and could thus be a disservice to the parties.

**Ex. R-0323**, Letter from Dr. Alexandrov to ICSID *in SolEs Badajoz v. Spain* dated October 24, 2017. *See also* Annulment Reply, ¶¶ 84-87.

[309] In this regard, the *Suez* tribunal wrote:

> Arbitrators are not disembodied spirits dwelling on Mars, who descend to earth to arbitrate a case and then immediately return to their Martian retreat to await inertly the call to arbitrate another. Like other professionals living and working in the world, arbitrators have a variety of complex connections with all sorts of persons and institutions.

**Ex. RL-0126**, *Suez v. Argentina*, Disqualification Decision II, ¶ 32.

there are between them, across cases and, particularly, in different roles, the more chances there are that these may give rise to conflicts. For the sake of the fair and objective conduct of the arbitral proceedings, these should, therefore, be declared and specifically brought to the attention of the parties and other arbitrators.

218. The Committee finds that this case does not bring forth merely an isolated instance of Mr. Lapuerta and Dr. Alexandrov working together. In addition to the several past and present professional connections and interactions between them, the Committee has taken particular note of four instances where Dr. Alexandrov and Mr. Lapuerta worked for the same party, as counsel and expert respectively. In two of those cases, Dr. Alexandrov, as counsel, was interacting with Mr. Lapuerta as expert, at the same time that he was acting in this case as an arbitrator and Mr. Lapuerta as a damages expert of one of the parties. This was in addition to the longstanding relationship between the Brattle Group and Dr. Alexandrov's the then law firm, Sidley Austin, and included another concurrent case – *Bear Creek* – in which Dr. Alexandrov was working as counsel with Brattle Group experts (Prof. Davis).

219. Arbitrators should either not sit in cases or be prepared to be challenged and/or disqualified where, on an objective assessment of things, assessed by a fair minded and informed third party observer, they may not be perceived as independent and impartial. The role of a third party observer, when these matters are challenged, in annulment proceedings, is performed by annulment committees. It matters not that Dr. Alexandrov may not even have been conscious of the insidious effects of this association. What matters is that an independent observer, on an objective assessment of all the facts, would conclude that there was a manifest appearance of bias on the part of Dr. Alexandrov.

*(b) The lack of disclosure of the relationship*

220. In the previous section, the Committee has concluded that the relationship between Dr. Alexandrov and Mr. Lapuerta, creates a manifest appearance of bias. In this section,

the Committee will determine: *(1)* whether Dr. Alexandrov had the obligation to disclose said relationship; and *(2)* what are the consequences of his non-disclosure.[310]

221. *First*, the Committee will address whether Dr. Alexandrov had the duty to disclose his relationship with Mr. Lapuerta. The issue is whether the relationship could be considered a "circumstance" which "might cause [Dr. Alexandrov's] reliability for independent judgment to be questioned" or was "likely to give rise to justifiable doubts as to [his] reliability for independent judgment",[311] and, therefore, warranted disclosure during the arbitration proceedings, in accordance with Rule 6 of the Arbitration Rules.[312]

222. Two relevant and connected responsibilities flow from an arbitrator's duty of disclosure, one substantive and the other temporal. Substantive is the obligation to disclose "any other circumstance that might cause [his/her] reliability for independent judgment to be

---

[310] On the consequences of Dr. Alexandrov's non-disclosure, *see infra* ¶¶ 245-253.

[311] **Ex. RL-0114**, *Alpha Projektholding v. Ukraine*, Decision on Disqualification, ¶¶ 52-55. *See also*, *Suez*: "[a] reasonable interpretation of ICSID Arbitration Rule 6 is that an arbitrator is required to disclose a fact only if he or she reasonably believes that such fact would reasonably cause his or her reliability for independent judgment to be questioned by a reasonable person" (**Ex. RL-0126**, *Suez v. Argentina*, Disqualification Decision II, ¶ 46).

[312] Rule 6 of the Arbitration Rules ("Constitution of the Tribunal") states:

> (2) Before or at the first session of the Tribunal, each arbitrator shall sign a declaration in the following form:
>
> "To the best of my knowledge there is no reason why I should not serve on the Arbitral Tribunal constituted by the International Centre for Settlement of Investment Disputes with respect to a dispute between _____ and _____.
>
> "I shall keep confidential all information coming to my knowledge as a result of my participation in this proceeding, as well as the contents of any award made by the Tribunal.
>
> "I shall judge fairly as between the parties, according to the applicable law, and shall not accept any instruction or compensation with regard to the proceeding from any source except as provided in the Convention on the Settlement of Investment Disputes between States and Nationals of Other States and in the Regulations and Rules made pursuant thereto.
>
> "Attached is a statement of (a) my past and present professional, business and other relationships (if any) with the parties and (b) any other circumstance that might cause my reliability for independent judgment to be questioned by a party. I acknowledge that by signing this declaration, I assume a continuing obligation promptly to notify the Secretary-General of the Centre of any such relationship or circumstance that subsequently arises during this proceeding."
>
> Any arbitrator failing to sign a declaration by the end of the first session of the Tribunal shall be deemed to have resigned.

questioned by a party."[313] Temporal is the connected and ongoing nature of this substantive obligation, whereby the arbitrator "assume[s] a continuing obligation promptly to notify the Secretary-General of the Centre of any such relationship or circumstance that subsequently arises during this proceeding."[314]

223.    The ongoing obligation to disclose cannot be construed narrowly in favor of the arbitrator. It must be approached from the point of view of a party.[315] Disclosure inoculates arbitrators from the possibility of any, real or perceived, conflict of interest. As the IBA Guidelines state, "[a]ny doubt as to whether an arbitrator should disclose certain facts or circumstances should be resolved in favour of disclosure."[316] There are multiple ways in which a conflict of interest may arise when an arbitrator also acts or has acted as counsel, in another dispute, albeit between different parties. The risks and possibilities of conflict of interest, inherent in double-hatting, dictate caution.

224.    The question before the Committee is whether, in light of the facts[317] before the Committee, the relationship between Dr. Alexandrov and Sidley Austin, on the one hand, and Mr. Lapuerta and the Brattle Group, on the other, was a circumstance which should have been disclosed to avoid doubts about Dr. Alexandrov's independence and impartiality, as an arbitrator, in the arbitration proceedings.

225.    It is the view of this Committee that these facts[318] demonstrated enough past and present professional connections and interaction between Dr. Alexandrov, as counsel and as

---

[313] Rule 6 of the Arbitration Rules. The Committee agrees that such obligation "'includes virtually any kind of relationship, interest or contact with anything or anyone that is in some degree related to the case,' including 'relationships of the arbitrator and the arbitrator's law firm with counsel, co-arbitrators and fact or expert witnesses appearing in the matter.'" *See* Annulment Memorial, ¶ 86; *citing* **Ex. RL-0113**, Daele, CHALLENGE AND DISQUALIFICATION OF ARBITRATORS, p. 8, ¶¶ 1-020, 1-023, 1-024 (emphasis in original).

[314] Rule 6 of the Arbitration Rules ("Constitution of the Tribunal").

[315] **Ex. RL-0116**, IBA Guidelines on Conflicts of Interest in International Arbitration (2014), General Standard 3(d). *See also* **Ex. RL-0113**, Daele, CHALLENGE AND DISQUALIFICATION OF ARBITRATORS, p. 8, ¶¶ 1-023, 1-024. *See* Annulment Reply, ¶ 65.

[316] **Ex. RL-0116**, IBA Guidelines on Conflicts of Interest in International Arbitration (2014), General Standard 3(d).

[317] *See supra* ¶ 205.

[318] *Ibid.*

member of the law firm Sidley Austin,[319] on the one hand, and the Brattle Group and Mr. Lapuerta, on the other, to require that this relationship be disclosed to the Parties and to the other arbitrators. These past and present connections and interactions should have alerted Dr. Alexandrov to the possibility that his independence and impartiality may be questioned, by one of the Parties to the case before him. As the House of Lords observed in the *Pinochet* case: "impartiality may be compromised not only through a specific act but also where the *appearance* of impartiality has not been strongly guaranteed."[320]

226.    The Eiser Parties argue that the IBA Guidelines do not expressly list this particular relationship *i.e.*, of counsel and expert as subject to mandatory disclosure.[321] It could not, therefore, according to them have led to his disqualification, as a member of the Tribunal. Similarly, according to them, this relationship cannot provide a ground for annulment under Article 52. The Committee has difficulties accepting this submission as correct. First, the Committee understands that the IBA Guidelines' list is not exhaustive.[322] Second, these are "guidelines" and cannot be treated as a set of binding and exhaustive rules with respect to conflicts. Third, the Committee notes that the Guidelines do not include this type of relationship in the "Green List", either. The Green List identifies, "specific situations where no appearance and no actual conflict of interest exists from an objective point of view."[323]

227.    The Eiser Parties also contend that "experts are chosen and appointed by clients not by counsel"[324] and that "independent experts testify in their own capacity based upon their own expertise and qualifications in the particular field in question."[325] In the opinion of the Committee, nothing turns on the answer to the questions about who appoints the expert or

---

[319] "The arbitrator is in principle considered to bear the identity of his or her law firm." *See* **Ex. RL-0116**, IBA Guidelines on Conflicts of Interest in International Arbitration (2014), General Standard 6(a). *See also* Annulment Reply, ¶¶ 72-73.

[320] **Ex. CL-0289**, *Tethyan Copper v. Pakistan*, PCA Opinion, ¶ 54; *citing* Opinions of the Lord of Appeal for Judgment in re: *Pinochet; Hrvaška v. Slovenia*, ICSID Case No. ARB/05/24, Decision on the disqualification of a counsel dated May 6, 2008, ¶ 22.

[321] Annulment Counter-Memorial, ¶¶ 58-65, 116. *See* **Ex. RL-0116**, IBA Guidelines on Conflicts of Interest in International Arbitration (2014).

[322] Annulment Reply, ¶¶ 69-70.

[323] **Ex. RL-0116**, IBA Guidelines on Conflicts of Interest in International Arbitration (2014), p. 19.

[324] Annulment Counter-Memorial, ¶ 72.

[325] Annulment Counter-Memorial, ¶ 73.

what are the qualifications or expertise of such a damages expert. What is important is that damages experts work closely with counsel in the preparation of a case. In the course of an arbitration there are multiple exchanges between them. They do not and cannot possibly maintain between them the kind of professional distance which is required to be maintained between a party, its counsel and its experts in a case, on the one hand, and the member of the tribunal hearing that case, on the other.

228.    In the Committee's view, in this case, the duty to disclose was warranted due to the respective roles of a damages expert and counsel in an arbitration. It was warranted not only because of the existence of such a relationship but also by the extent of the past and present interactions, at issue. These taken together triggered Dr. Alexandrov's obligation to disclose. The Committee is, therefore, of the view that Dr. Alexandrov should have disclosed his relationship with Mr. Lapuerta. Spain submits that there was also a duty on the part of Mr. Lapuerta, as an expert, to disclose his relationship with Sidley Austin and Dr. Alexandrov according to the IBA Rules on the Taking of Evidence in International Arbitration.[326] The Committee is not inclined to express any opinion on this submission, as even a disclosure by Mr. Lapuerta would not have absolved Dr. Alexandrov from his disclosure obligations as an arbitrator.

229.    To conclude this section, the Committee recalls that it has determined: *(i)* that the Applicant has not waived its right to raise this issue, and *(ii)* that a third party would find a manifest appearance of bias on the part of Dr. Alexandrov based on an objective assessment of the facts. As indicated above,[327] the third and last component of the standard set forth at paragraph 181, namely whether the manifest appearance of bias may have had a material effect on the Award, will be addressed in Section IV.B.3.c).

---

[326] *See* Annulment Memorial, ¶¶ 110-112. The Committee notes that the IBA Rules on Evidence were only used in the arbitration as guidelines for the production of documents. *See* **Ex. R-0288**, Procedural Order No. 1 in the Underlying Arbitration dated September 29, 2014, section 15.

[327] *See supra* ¶¶ 144, 181.

### B.     SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE

230.    Section B will set the reasons for which the Committee has concluded that there was a serious departure from a fundamental rule of procedure. The Committee will *(1)* summarize the Parties' positions on this issue; and *(2)* set the appropriate standard to be followed under Article 52(1)(d) of the ICSID Convention. Accordingly, the Committee will determine whether: *(a)* the impartiality and independence of an arbitrator is a fundamental rule of procedure; *(b)* there was a departure from such rule; and *(c)* the departure was serious and may have had a material effect on the Award.

231.    It is noteworthy that the Committee is of the view that the issues and facts related to the proper constitution of the tribunal under Article 52(1)(a) are also relevant to its analysis of the alleged serious departure from a fundamental rule of procedure under Article 52(1)(d).

### 1.     Spain's Arguments

232.    According to the Applicant, for an award to be annulled under Article 52(1)(d) of the ICSID Convention, two elements are required: *(a)* the departure has to be "serious"; and *(b)* it must be from a "fundamental" rule of procedure.[328] For Spain, there is no doubt that the right to an independent and impartial tribunal is a fundamental rule of procedure.[329]

233.    Spain further argues that a departure is serious if it deprives a party of the protection afforded by the rule of procedure and/or the departure had or may have had a material effect on the tribunal's decision.[330] Spain rejects the Eiser Parties' assertion that the departure is

---

[328] The Applicant states that this is the same test presented by the Eiser Parties. Annulment Memorial, ¶ 118; *citing* **Ex. C-0299**, Updated Background Paper on Annulment, ¶ 99; **Ex. RL-0106**, Schreuer et al., THE ICSID CONVENTION, Art. 52, p. 980, ¶ 280; **Ex. RL-0136**, *Total v. Argentina*, Decision on Annulment, ¶ 310; Annulment Reply, ¶ 113.

[329] Annulment Memorial, ¶ 121; *citing* **Ex. C-0299**, Updated Background Paper on Annulment, ¶ 99; **Ex. RL-0142**, *Klöckner Industrie-Anlagen GmbH and others v. United Republic of Cameroon and Société Camerounaise des Engrais S.A.*, ICSID Case No. ARB/81/2, Decision on the Application for Annulment Submitted by Klöckner Against the Arbitral Award dated May 3, 1985 ("*Klöckner v. Cameroon*, Decision on Annulment"), ¶ 95; **Ex. CL-0065**, *Wena Hotels v. Egypt*, Decision on Annulment, ¶ 57; **Ex. RL-0139**, *CDC v. Seychelles*, Decision on Annulment, ¶ 49; **Ex. RL-0136**, *Total v. Argentina*, Decision on Annulment, ¶¶ 309, 314.; Annulment Reply, ¶ 114.

[330] Annulment Memorial, ¶ 119; *citing, inter alia,* **Ex. RL-0061**, *Caratube v. Kazakhstan*, Decision on Annulment, ¶ 99 (emphasis added) (quoting **Ex. CL-0065**, *Wena Hotels v. Egypt*, Decision on Annulment, ¶ 61); Annulment Reply, ¶¶ 116, 121.

"serious" only if there is "actual material prejudice" and there is "a showing that the violation of the rule has in fact caused a 'substantially different result.'" Such a standard is "unrealistic and highly speculative."[331]

234. In this case, both the existence of the relationship between Dr. Alexandrov and the Brattle Group and the failure to disclose such relationship, "have irreparably tainted the Arbitration and the resulting Award."[332] According to Spain, "Mr. Alexandrov's presence on the Tribunal, notwithstanding his failure to disclose his relationship with Brattle, in violation of the disclosure obligations of ICSID Arbitration Rule 6, and his apparent bias in favor of the Eiser Parties' experts, stripped Spain of the protection afforded by the fundamental right to be heard by an independent and impartial tribunal."[333] Thus, the lack of impartiality of the part of Dr. Alexandrov amounts a serious departure from a fundamental rule of procedure that warrants the annulment of the Award.[334]

### 2. Eiser Parties' Arguments

235. The Eiser Parties argue that for an award to be annulled under Article 52(1)(d), three elements are required: *(a)* a "fundamental" rule of procedure; *(b)* a departure from such rule; and *(c)* the departure must be serious. Accordingly, not every departure from a rule of procedure justifies annulment.[335] For the Eiser Parties, there is no doubt that the right to an independent and impartial arbitrator is a fundamental rule of procedure. However, the other two remaining elements of the test ((b) and (c)) are not met in this case.[336]

236. They argue that committees have adopted two positions to consider that a departure is "serious." The first approach, preferred by the Eiser Parties, requires the existence of an

---

[331] Annulment Reply, ¶¶ 115-118, 120; *citing*, *inter alia*, **Ex. RL-0151**, *Pey Casado v. Chile*, Decision on Annulment, ¶¶ 78, 80; **Ex. RL-0147**, *Tulip v. Turkey*, Decision on Annulment, ¶ 78.

[332] Annulment Memorial, ¶ 123.

[333] Annulment Memorial, ¶ 124. *See also* Annulment Reply, ¶ 122.

[334] Annulment Memorial, ¶¶ 122, 125.

[335] Annulment Counter-Memorial, ¶¶ 140-141; *citing*, *inter alia*, **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶ 200; **Ex. RL-0137**, *Daimler v. Argentina*, Decision on Annulment, ¶ 260; **Ex. RL-0146**, *Occidental v. Ecuador*, Decision on Annulment, ¶ 62; **Ex. RL-0061**, *Caratube v. Kazakhstan*, Decision on Annulment, ¶ 88.

[336] Annulment Counter-Memorial, ¶ 142.

actual material prejudice and the showing that the violation of the rule caused a "substantially different result."[337] The second approach, presented by the Applicant, requires only the showing of a "potential effect" of the departure on the award.[338] Under either approach, the departure has to be "outcome-determinative."[339]

237.   For the Eiser Parties, there is no departure from a fundamental rule of procedure since there is neither a relationship between Dr. Alexandrov and Mr. Lapuerta that could give rise to a conflict, nor a violation of the rules on disclosure.[340] Second, irrespective of the approach adopted, there is no evidence that, at a minimum, the alleged departure may have had an impact on the Award. There is no evidence that the Tribunal sided with Mr. Lapuerta's analysis because of an alleged undisclosed bias, nor that such alleged bias made the Tribunal, and particularly the other two arbitrators, reach a different decision than the one they would have otherwise reached.[341]

### 3.    Analysis of the Committee

238.   In the Committee's view, there are no substantial differences between the standards proposed by Spain and the Eiser Parties. The Committee will, therefore, examine: *(a)* whether the procedural rule alleged to be violated is fundamental; *(b)* whether there is a departure from that rule; and *(c)* if there is a departure under *(b)*, whether such departure is "serious" in terms of Article 52(1)(a).

---

[337] Annulment Counter-Memorial, ¶¶ 143-144; *citing*, *inter alia*, **Ex. RL-0148**, *Fraport v. Philippines*, Decision on Annulment, ¶¶ 245-246; **Ex. RL-0149**, *Impregilo v. Argentina*, Decision on Annulment, ¶ 164; Annulment Rejoinder, ¶¶ 143, 145-146.

[338] Annulment Counter-Memorial, ¶¶ 145-146; *citing*, *inter alia*, **Ex. RL-0147**, *Tulip v. Turkey*, Decision on Annulment, ¶ 78.

[339] Annulment Counter-Memorial, ¶ 147; Annulment Rejoinder, ¶ 143; *citing* **Ex. RL-0151**, *Pey Casado v. Chile*, Decision on Annulment, ¶ 80.

[340] Annulment Counter-Memorial, ¶ 149; Annulment Rejoinder, ¶¶ 148-149.

[341] Annulment Counter-Memorial, ¶¶ 148, 150-152; Annulment Rejoinder, ¶¶ 144, 147.

### a) Whether the right to the independence and impartiality of an arbitrator is a fundamental rule of procedure

239.   In the Committee's view, independence and impartiality of an arbitrator is a fundamental rule of procedure. This means that the arbitrator has a duty not only to be impartial and independent but also to be perceived as such by an independent and objective third party observer. This duty includes the duty to disclose any circumstance that might cause his reliability for independent judgment to be reasonably questioned by a party. In this respect, this Committee subscribes to the *EDF* committee's views that "[i]t is difficult to imagine a rule of procedure more fundamental than the rule that a case must be heard by an independent and impartial tribunal."[342] There can be no right to a fair trial or a right of fair defense without an independent and impartial tribunal.

### b) Whether there has been a departure from a fundamental rule of procedure

240.   As explained in Section IV.A.2.b)(3) of this Decision, the Committee is of the view that to an independent third party observer, based on an objective assessment of all the facts, it would be manifestly apparent that Dr. Alexandrov lacked impartiality.

241.   In this case, the Committee is of the opinion that in the facts and circumstances of this case, Dr. Alexandrov's absence of disclosure, deprived Spain of the opportunity to challenge him in the arbitration proceedings. Consequently, it also deprived Spain from seeking the benefit and protection of an independent and impartial tribunal which the right to challenge is intended to provide. This affected Spain's right of defense and fair trial, as well. This failure cannot be regarded as a mere inconsequential error or omission or something insignificant having no bearing on the outcome of the proceedings before the Tribunal.

242.   Accordingly, the Committee cannot but conclude that there has also been a departure from a fundamental rule of procedure.

---

[342] **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶ 123.

c) *Whether the lack of impartiality or independence on the part of Dr. Alexandrov may had a material effect on the Award and thus amounts to a serious departure from a fundamental rule of procedure*

243.  It was established in Section IV.A.2.b)(3) that an independent third party observer would find, on an objective assessment of all the facts, that there was a manifest appearance of bias on the part of Dr. Alexandrov. It has also been concluded in Section IV.B.3.b) that such lack of independence and impartiality, whether actual or manifestly apparent, by even one arbitrator, in a three member tribunal, constitutes a departure from a fundamental rule of procedure.

244.  As observed above at paragraph 231 of this Decision, because the Committee considers that the facts and issues are relevant to its analysis under Article 52(1)(a) and (d), the Committee will now address the third step of the *EDF* test, namely whether the manifestly apparent lack of impartiality on the part of Dr. Alexandrov may have had a material effect on the Award under Article 52(1)(a) and Article 52(1)(d), *i.e.* whether the departure from a fundamental rule of procedure was "serious."

245.  In so doing, the Committee has to keep in sight the fact that Dr. Alexandrov's non-disclosure resulted in the Parties' pleading, and the Tribunal deliberating, without any knowledge of Dr. Alexandrov's and/or Sidley Austin's relationship with Mr. Lapuerta and/or the Brattle Group.

246.  Turning to the Award itself, unanimity does not impede annulment. This is axiomatic because it is impossible for an annulment committee to pierce the veil of a tribunal's deliberations or poll arbitrators.[343] Irrespective of the independence and impartiality of the two other arbitrators on the Tribunal,[344] each member of the Tribunal, including Dr. Alexandrov, is expected to have influenced the other two with his views and analysis, during the course of deliberations. It is in the very nature of deliberations that arbitrators

---

[343] The *EDF* committee stated that: "It is impossible to tell what degree of influence on one or both colleagues an arbitrator might have had in the course of what are necessarily confidential deliberations. The fact that an award was rendered unanimously may be a relevant consideration in relation to the exercise of the discretion not to annul an award but **the Committee does not accept that unanimity necessarily precludes annulment**", **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶ 135 (emphasis added). Cfr. Annulment Counter-Memorial, ¶¶ 137-138. *See also* **Ex. RL-0142**, *Klöckner v. Cameroon*, Decision on Annulment, ¶ 84.

[344] Annulment Counter-Memorial, ¶¶ 137, 152.

exchange opinions and are persuaded or influenced by the opinions of their colleagues. That makes us conclude that it would be unsafe to hold that Dr. Alexandrov's views and analysis could not have had any material bearing on the opinions of his fellow arbitrators. It is not improbable that they had such effect and, therefore, excluding this possibility from consideration would go against the nature of deliberations.

247. The Committee now turns to the damages section of the Award since there, in particular, the relationship of Dr. Alexandrov and Mr. Lapuerta is of particular significance. The Committee begins with the fact, as stated previously, that both Mr. Lapuerta and Dr. Alexandrov failed to disclose their relationship. Upon examination of the Award, the Committee sees nothing there which could signal or suggest that Mr. Lapuerta's damages report had no material effect on the reasoning or findings in the Award. The Committee further notes that the Tribunal adopted Mr. Lapuerta's model for damages in its entirety.[345]

248. The Eiser Parties contend that "there is no evidence to support the notion that the Tribunal's preference to adopt certain of the calculations submitted by Mr. Lapuerta in the Brattle Reports had anything to do with Dr. Alexandrov's alleged predisposition to Mr. Lapuerta as a Brattle expert."[346] In the Committee's opinion, this is precisely the problem. The Committee cannot determine the impact of the participation of Dr. Alexandrov on the other two arbitrators. It is not possible for the Committee to conclude that had the relationship between Dr. Alexandrov and Mr. Lapuerta and the Brattle Group been disclosed and the other arbitrators made aware of it, it would have had no significant effect on the deliberations between them and Dr. Alexandrov. The Committee also cannot ignore the fact that the Tribunal adopted the damages model proposed by Brattle[347] with Mr. Lapuerta as the testifying expert.[348]

---

[345] "[T]he Tribunal apparently failed to properly scrutinize Brattle's calculations and blindly adopted its valuation", Annulment Memorial, ¶ 109. The Committee notes that Spain in fact takes issue in these annulment proceedings with the substance of the damages determination.

[346] Annulment Counter-Memorial, ¶ 134. *See also* Annulment Counter-Memorial, ¶¶ 135-136.

[347] **Ex. R-0290**, Brattle Model-Illustrative Adjustments.

[348] **BQR-105**, Brattle Quantum Hearing Presentation.

249.    The Eiser Parties sought to downplay the role of Mr. Lapuerta in this case, by arguing that he was not the main testifying expert on damages, and that he only acted as a regulatory expert in the case. On this basis they further argued that it was an insufficient ground for annulment. The Committee does not share this view. The obligation to disclose cannot be undermined or diluted by the fact that Mr. Lapuerta was not the main testifying expert in the present case.[349] He had an important role in the case.[350] The Committee, thus, finds critical the fact that the other arbitrators had no knowledge of the relationship between Dr. Alexandrov and Mr. Lapuerta. Had this information been shared with them, either by Dr. Alexandrov or by Mr. Lapuerta and the Brattle Group, it may have affected both the deliberations and the outcome. In any event it is impossible to conclude that such disclosure would have had no material effect on the arbitrators, their deliberations and the ultimate outcome.

250.    The Committee is not suggesting that each arbitrator did not conduct its own assessment of the evidence. Its opinion is that in the ordinary course, the views of each arbitrator influence and are expected to influence the views of the others, during deliberations. The influence of Dr. Alexandrov on his co-arbitrators would have been perceived differently in every material respect, had they known the full facts and extent of his and Sidley Austin's longstanding relationship with the Brattle Group and Mr. Lapuerta. The Committee also cannot rule out the likelihood of this, in turn, having a material bearing on the outcome of the case including but not limited to a different damages evaluation.

251.    It is not possible for the Committee to conclude that, had the relationship been disclosed, the arbitrators would have remained unanimous in their adoption of the Brattle model.[351] In any event, after such disclosures, the arbitrators would have arrived at their decision with full knowledge of the Alexandrov-Sidley Austin-Lapuerta-Brattle Group relationship, whatever the outcome. What the Committee can also conclude is that due to this non-disclosure Spain lost the possibility of a different award.

---

[349] Tr. Day 1 [Mr. Sullivan], 155:13-156:5.

[350] Award, ¶¶ 73, 74, fns. 454, 542, 598.

[351] Award, ¶¶ 441-473.

252.  Finally, the Committee finds useful to quote the *Caratube* committee:

> A departure is serious if the violation of the fundamental rule of procedure produced a material impact on the award. The applicant however is not required to prove that the violation of the rule of procedure was decisive for the outcome, or that the applicant would have won the case if the rule had been applied. As the *Wena* committee stated, what the applicant must simply demonstrate is "the impact that the issue may have had on the Award."[352]

253.  Looking at all these elements holistically, the Committee concludes that this undisclosed relationship could have had a material effect on the Award. The non-disclosure was, therefore, serious and warrants annulment both under clauses (a) and (d) of paragraph (1) of Article 52.

254.  Finally, the Eiser Parties also argued that, even if the requirements under Article 52 are met, the Committee still has the discretion to decide not to annul the Award.[353] The Committee agrees with the *Pey Casado* committee which took the view that "it has no discretion not to annul an award if a serious departure from a fundamental rule is established"[354] and that in any case "[t]he discretion of the Committee lies in the evaluation of the impact."[355] The impact will be material and require an annulment if the departure affects the legal right of the parties with respect to an outcome-determinative issue. When one of the most basic requirements of justice, such as the right to an independent and impartial tribunal, is disregarded, an award cannot stand and must be annulled in its entirety. In a case such as this, it is neither possible nor would it be proper to parse the Award and hold that the conduct affected only a certain part of the Award and had no impact on other parts. The curtailment of the right to an independent and impartial tribunal permeates the Award. The doctrine of severability has no application to a case such as this.

255.  Annulment committees are guardians of the ICSID system and must set the bar high, with regard to disclosure obligations, in particular, and, in general, with respect to addressing

---

[352] **Ex. RL-0061**, *Caratube v. Kazakhstan*, Decision on Annulment, ¶ 99.
[353] Annulment Counter-Memorial, ¶¶ 43, 46.
[354] **Ex. RL-0151**, *Pey Casado v. Chile*, Decision on Annulment, ¶ 80.
[355] **Ex. RL-0151**, *Pey Casado v. Chile*, Decision on Annulment, ¶ 80.

conflict of interest of arbitrators who also choose to act as counsel in investment disputes. The Committee, thus, declares the Award annulled for improper constitution of the Tribunal and for a serious departure from a fundamental rule of procedure.

256. In view of its decision to annul the Award on the aforementioned grounds, the Committee sees no need to address the other grounds for annulment raised by the Applicant.

## V.    COSTS

257. On July 5, 2019, both Parties filed their respective submission on costs pursuant to ICSID Arbitration Rules 28(2) and 53, paragraph 20 of Procedural Order No. 1, paragraph 16 of Procedural Order No. 4 and the Parties' agreement of April 17, 2019.

### A.    SPAIN'S SUBMISSION ON COSTS

258. Spain seeks recovery from the Eiser Parties of the fees and expenses incurred in these proceedings. Such fees and expenses are broken down by Spain as follows:[356]

| CATEGORY | AMOUNT |
|---|---|
| ICSID fees and advance payments | US$525,000 |
| Legal fees directly incurred by the Kingdom of Spain | US$1,100,000 |
| Legal fees Curtis, Mallet-Prevost, Colt & Mosle LLP | US$2,200,000 |

---

[356] Applicant's Statement of Costs, section IV.

| CATEGORY | AMOUNT |
|---|---|
| Expenses directly incurred by the Kingdom of Spain | €275,467 |
| Expenses Curtis, Mallet-Prevost, Colt & Mosle LLP | US$62,315.38 |

### B.    EISER PARTIES' SUBMISSION ON COSTS

259.    The Eiser Parties seek an award on costs pursuant to Article 61(2) of the ICSID Convention ordering that Spain bear the Eiser Parties' costs for legal representation totaling €2,587,765.80, broken down as follows:

| CATEGORY | AMOUNT |
|---|---|
| Legal fees | €2,392,729.45 |
| Disbursements | €195,036.35 |

260.    Having referred to Articles 61(2) and 52(4) of the ICSID Convention, ICSID Administrative and Financial Regulation 14(3)(e), and the ECT, the Eiser Parties argue that the Committee has wide discretion to allocate costs between the Parties.[357] They further argue that they must be allowed to recover the costs they have incurred in the annulment

---

[357] Claimants' Statement of Costs, ¶¶ 7-10.

proceedings in order to be fully compensated for the damage they suffered as a result of Spain's violations of the ECT, as held by the *Eiser* Tribunal.[358] This would not only be in accordance with the practice of annulment committees but it would also be warranted in this case because Spain used these annulment proceedings to file several baseless claims and to relitigate issues that the *Eiser* Tribunal had already decided.[359] The Eiser Parties therefore request that they be awarded "the full value of their costs" and that Spain "remain responsible for its own costs and the costs of the Annulment proceedings."[360]

### C.    COMMITTEE'S DECISION ON COSTS

261.    The Committee begins by noting that the ECT does not contain applicable provisions regarding the allocation of costs in disputes between an investor and a Contracting Party. Thus, the Committee will base its decision on costs taking into account the applicable provisions of the ICSID Convention and Arbitration Rules.

262.    Article 61(2) of the ICSID Convention provides:

> In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.

263.    Arbitration Rule 47(1)(j) prescribes that the award shall be in writing and shall contain "any decision of the Tribunal regarding the cost of the proceeding."

264.    Pursuant to Article 52(4) of the ICSID Convention and Arbitration Rule 53, Article 61(2) and Arbitration Rule 47(1)(j) apply *mutatis mutandis* to annulment proceedings.

265.    In addition, Regulation 14(3)(e) of the ICSID Administrative and Financial Regulations provides:

---

[358] Claimants' Statement of Costs, ¶ 11.
[359] Claimants' Statement of Costs, ¶ 12.
[360] Claimants' Statement of Costs, ¶ 13.

[I]n the event that an application for annulment of an award is registered, the above provisions of this Rule shall apply *mutatis mutandis*, except that the applicant shall be solely responsible for making the advance payments requested by the Secretary-General to cover expenses following the constitution of the Committee, and without prejudice to the right of the Committee in accordance with Article 52(4) of the Convention to decide how and by whom expenses incurred in connection with the annulment proceeding shall be paid.

266.    Article 61(2) of the ICSID Convention grants discretion to the Committee to allocate expenses incurred by the parties in connection with annulment proceedings, fees and expenses of the members of the Committee, and charges for the use of the facilities of the Centre. This discretion is also recognized in Regulation 14(3)(e) of the ICSID Administrative and Financial Regulations.

267.    Absent additional guidance in the Convention, the Arbitration Rules, and the Administrative and Financial Regulations, the Committee has the discretion either to apply the "costs follow the event" principle (*i.e.*, the "loser pays" principle)[361] or to apportion fees and expenses of the parties, fees and expenses of the members of the Committee and charges for the use of the facilities of the Centre differently between the parties.[362] In light of the circumstances of this case, the Committee will apply the "costs follow the event" principle. As explained below, these "circumstances" are: (1) that the Parties agreed to the "loser pays" approach; (2) that other committees have adopted this approach, as pointed

---

[361] *See* **Ex. CL-0244**, *Alapli Elektrik v. Turkey*, Decision on Annulment, ¶¶ 258-264; **Ex. CL-0266**, *Adem Dogan v. Turkmenistan*, ICSID Case No. ARB/09/9, Decision on Annulment dated January 15, 2016, ¶¶ 275-281; **Ex. RL-0139**, *CDC v. Seychelles*, Decision on Annulment, ¶¶ 88-90; **Ex. CL-0312**, *CEAC Holdings Limited v. Montenegro*, ICSID Case No. ARB/14/08, Decision on Annulment dated May 1, 2018, ¶¶ 149-155; *Venoklim Holding B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/22, Decision on Annulment dated February 2, 2018, ¶¶ 288-298.

[362] *See* **Ex. RL-0102**, *EDF v. Argentina*, Decision on Annulment, ¶¶ 388-391; **Ex. CL-0248**, *Industria Nacional de Alimentos, S.A. and Indalsa Perú, S.A. v. Republic of Peru*, ICSID Case No. ARB/03/4, Decision on Annulment dated September 5, 2007, ¶ 131; **Ex. RL-0097**, *Tidewater Investment SRL and Tidewater Caribe, C.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment dated December 27, 2016, ¶¶ 224-229; **Ex. RL-0096**, *Venezuela Holdings B.V. and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Annulment dated March 9, 2017, ¶¶ 193-195.

out by the Eiser Parties; and (3) the Award was annulled in its entirety for improper constitution of the Tribunal and serious departure from a fundamental rule of procedure.

268.   *First*, the Committee notes that the Parties are in agreement on the application of this rule. Spain seeks recovery from the Eiser Parties of the ICSID administrative fees and advance payments as well as of its legal fees and expenses.[363] The Eiser Parties seek recovery of its cost for its legal fees and disbursements and contend that Spain shall bear the costs of the annulment proceedings.[364]

269.   *Second*, the Eiser Parties refer to the recent practice of annulment committees to award costs to the prevailing party as described in *Venoklim Holding v. Venezuela* and contend that "[t]here are no good reasons for the Committee to depart from this practice."[365]

270.   *Third*, in the case at hand, the Committee has declared the Award annulled in its entirety for improper constitution of the Tribunal and for "serious" departure from a fundamental rule of procedure. The Applicant was compelled to go through these annulment proceedings because it was deprived of the opportunity to challenge Dr. Alexandrov, and consequently, deprived of the benefit and protection of an independent and impartial tribunal. The Committee has already mentioned that this situation also affected the Applicant's right of defense and fair trial. Thus, in the exercise of its discretion, the Committee decides that the Eiser Parties shall be responsible for the fees and expenses of the members of the Committee; the charges for the use of the facilities of the Centre made in advance by the Applicant; and the fees and expenses that the Applicant incurred in connection with these proceedings.

---

[363] Applicant's Statement of Costs, section IV.

[364] Claimants' Statement of Costs, ¶¶ 14-15.

[365] Claimants' Statement of Costs, ¶ 11; *relying on Venoklim Holding B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/22, Decision on Annulment dated February 2, 2018, ¶¶ 293-294.

271.   The costs of the annulment proceedings, including the fees and expenses of the Committee, ICSID's administrative fees, and direct expenses, amount to (in USD):

| | |
|---|---|
| Committee's fees and expenses | US$329,753.68 |
| ICSID's administrative fees | US$126,000.00 |
| Direct expenses | US$110,774.50 |
| Total | US$566,528.18 |

272.   The above costs have been paid out of the advances on costs made by Spain.[366] As indicated above, the Eiser Parties shall reimburse the Applicant the expended portion of the advances on costs, which amounts to US$566,528.18. In addition, the Eiser Parties are ordered to pay the Applicant's legal fees and expenses, which amount to US$3,362,315.38 and €275,467.

---

[366] A copy of the final financial statement in this case will be provided to the Parties shortly. The remaining balance on the case account will be reimbursed to Spain.

## VI.    DECISION

273.    For the foregoing reasons, the Committee unanimously decides:

    a)  the Award of May 4, 2017 rendered in *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain* (ICSID Case No. ARB/13/36) is annulled in its entirety; and

    b)  the Eiser Parties shall bear the full costs of the proceedings, which amount to US$566,528.18, and shall pay the totality of the Applicant's legal fees and expenses, which amount to US$3,362,315.38 and €275,467.

_____
Mr. Makhdoom Ali Khan
Member of the *ad hoc* Committee

Date: *19 May 2020*

_____
Judge Dominique Hascher
Member of the *ad hoc* Committee

Date:

_____
Prof. Ricardo Ramírez Hernández
President of the *ad hoc* Committee

Date:

_____
Mr. Makhdoom Ali Khan
Member of the *ad hoc* Committee

Date:

_____
Judge Dominique Hascher
Member of the *ad hoc* Committee

Date: 15/05/2020

_____
Prof. Ricardo Ramírez Hernández
President of the *ad hoc* Committee

Date:

97

_____          _____
Mr. Makhdoom Ali Khan                         Judge Dominique Hascher
Member of the *ad hoc* Committee          Member of the *ad hoc* Committee

Date:                                                     Date:


_____
Prof. Ricardo Ramírez Hernández
President of the *ad hoc* Committee

Date: 16 | 05 | 2020