# EXHIBIT A

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW  |  WASHINGTON, DC 20433  |  USA
TELEPHONE +1 (202) 458 1534  |  FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

### NEXTERA ENERGY GLOBAL HOLDINGS B.V. AND NEXTERA ENERGY SPAIN HOLDINGS B.V.

**v.**

### KINGDOM OF SPAIN

### (ICSID CASE NO. ARB/14/11)

### ANNULMENT PROCEEDING

I hereby certify that the attached document is a true copy of the English version of the *ad hoc* Committee's Decision on Annulment dated 18 March 2022.

Martina Polasek
Acting Secretary-General

Washington, D.C., 18 March 2022

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

NEXTERA ENERGY GLOBAL HOLDINGS B.V. AND
NEXTERA ENERGY SPAIN HOLDINGS B.V.

v.

KINGDOM OF SPAIN

**ICSID Case No. ARB/14/11**
**Annulment Proceeding**

---

# DECISION ON ANNULMENT

---

**Members of the *ad hoc* Committee**
Prof. Joongi Kim, President of the *ad hoc* Committee
Prof. Lawrence Boo, Member of the *ad hoc* Committee
Mr. Humberto Sáenz-Marinero, Member of the *ad hoc* Committee

**Secretary of the *ad hoc* Committee**
Ms. Natalí Sequeira

*Date of dispatch to the Parties:* 18 March 2022

## REPRESENTATION OF THE PARTIES

*Representing NextEra Energy Global Holdings*
*B.V. and NextEra Energy Spain Holdings B.V.:*

*Representing the Kingdom of Spain:*

Ms. Karyl Nairn
Mr. David Herlihy
Mr. George Zimmerman
Ms. Teresa Queirós
Ms. Sophia Lekakis
Mr. Olivier Peeters
Ms. Carla Alves
Skadden, Arps, Slate, Meagher & Flom (UK) LLP
40 Bank Street
Canary Wharf
London, E14 5DS
United Kingdom

Ms. María del Socorro Garrido Moreno
Ms. Gabriela Cerdeiras Megías
Ms. Lorena Fatás Pérez
Ms. Ana Fernández-Daza Álvarez
Mr. Rafael Gil Nievas
Ms. Lourdes Martínez de Victoria Gómez
Ms. Amparo Monterrey Sánchez
Ms. Elena Oñoro Sainz
Mr. Francisco Javier Peñalver Hernández
Abogacía General del Estado
Departamento de Arbitrajes Internacionales
c/ Marqués de la Ensenada, 14-16, 2ª planta
28004, Madrid
Spain

i

TABLE OF CONTENTS

I.      INTRODUCTION AND PARTIES ................................................................. 1

II.     PROCEDURAL HISTORY ........................................................................... 2

III.    REQUEST FOR RELIEF .............................................................................. 9

IV.     APPLICABLE LEGAL STANDARDS FOR ANNULMENT ...................... 13

        A.    Manifest Excess of Powers (Art. 52(1)(b) of the ICSID Convention) ................. 15

              a.    Spain's Position ................................................................ 16

              b.    The NextEra Entities' Position ........................................... 17

              c.    The Committee's Analysis ................................................. 18

        B.    Serious Departure from a Fundamental Rule of Procedure (Art. 52(1)(d) of the ICSID Convention) ................................................................... 23

              a.    Spain's Position ................................................................ 24

              b.    The NextEra Entities' Position ........................................... 25

              c.    The Committee's Analysis ................................................. 27

        C.    Award's Failure to State Reasons (Art. 52(1)(e) of the ICSID Convention) ........ 30

              a.    Spain's Position ................................................................ 31

              b.    The NextEra Entities' Position ........................................... 33

              c.    The Committee's Analysis ................................................. 36

V.      GROUNDS FOR ANNULMENT ................................................................. 39

        A.    Tribunal's Decision Concerning its Jurisdiction *ratione personae* ..................... 39

        (1)   Manifest Excess of Powers and Failure to State Reasons to Exercise Jurisdiction: The NextEra Entities' Nationality and Status as Investor (Art. 52(1)(b) and Art. 52(1)(e)) (Annulment Grounds (a) and (b)) ................................................. 39

              a.    Spain's Position ................................................................ 39

ii

      b.    The NextEra Entities' Position ....................................................... 41

      c.    The Committee's Analysis ............................................................. 43

B.    Tribunal's Decision concerning its Jurisdiction *ratione materiae* ...................... 46

  (1)  Manifest Excess of Powers to Exercise Jurisdiction and Failure to State Reasons:
Whether a Protected Investment and Direct Relationship Existed between the
Parties (Art. 52(1)(b) and Art. 52(1)(e))(Annulment Grounds (a) and (b)).......... 46

      a.    Spain's Position ............................................................................. 46

      b.    The NextEra Entities' Position ....................................................... 48

      c.    The Committee's Analysis ............................................................. 49

C.    Tribunal's Decision concerning its Jurisdiction *ratione voluntatis* ..................... 52

  (1)  Manifest Excess of Powers to Exercise Jurisdiction and Failure to State Reasons:
Denial of Benefits under Art. 17 of the ECT. (Art. 52(1)(b) and (e)) (Annulment
Grounds (c) and (d)).......................................................................................... 52

      a.    Spain's Position ............................................................................. 52

      b.    The NextEra Entities' Position ....................................................... 53

      c.    The Committee's Analysis ............................................................. 54

D.    Spain's Allegations as to Manifest Excess of Powers .......................................... 57

  (1)  Manifest Excess of Powers by Upholding Jurisdiction despite Spain's Installed
Capacity and "*Unclean Hands*" Objection (Art. 52(1)(b) (Annulment Ground (e))
     57

      a.    Spain's Position ............................................................................. 57

      b.    The NextEra Entities' Position ....................................................... 58

      c.    The Committee's Analysis ............................................................. 59

(2) Manifest Excess of Powers by Hearing a Dispute between an Investor of an EU Member State and an EU Member State – "*Intra-EU Objection*" (Art. 52(1)(b)) (Annulment Ground (g)) .......................................................................... 63

    a. Spain's Position ...................................................................................... 63

    b. The NextEra Entities' Position ................................................................ 65

    c. The Committee's Analysis ...................................................................... 66

(3) Manifest Excess of Powers by not Applying the Applicable International Rules, the ECT and EU Law to the Merits of the Case (Art. 52(1)(b)) (Annulment Ground (i)) 68

    a. Spain's Position ...................................................................................... 68

    b. The NextEra Entities' Position ................................................................ 69

    c. The Committee's Analysis ...................................................................... 70

(4) Manifest Excess of Powers Regarding the Tribunal's Assessment of Legitimate Expectation Regarding the State Aid (Art. 52(1)(b)) (Annulment Ground (k)) ... 72

    a. Spain's Position ...................................................................................... 72

    b. The NextEra Entities' Position ................................................................ 74

    c. The Committee's Analysis ...................................................................... 74

(5) Manifest Excess of Powers Regarding the Tribunal's Granting of Damages (Art. 52(1)(b)) (Annulment Ground (p)) ...................................................................... 76

    a. Spain's Position ...................................................................................... 76

    b. The NextEra Entities' Position ................................................................ 77

    c. The Committee's Analysis ...................................................................... 77

E. Spain's Allegations as to Failures to State Reasons ............................................. 80

(1) Failure to State Reasons Regarding the Installed Capacity Objection– "*Unclean Hands Objection*" (Art. 52(1)(e)) (Annulment Ground (f)) ................................. 80

a.    Spain's Position ..................................................................... 80

b.    The NextEra Entities' Position ............................................ 82

c.    The Committee's Analysis ................................................... 83

(2)   Failure to State Reasons in Hearing a Dispute between an Investor of an EU
      Member State and an EU Member State – "*Intra-EU Objection*" (Art. 52(1)(b))
      (Annulment Ground (h)) ........................................................................ 86

a.    Spain's Position ..................................................................... 86

b.    The NextEra Entities' Position ............................................ 87

c.    The Committee's Analysis ................................................... 88

(3)   Failure to State Reasons for not Applying Applicable International Rules, the ECT
      and EU law (Art. 52(1)(e)) (Annulment Ground (j)) .......................... 89

a.    Spain's Position ..................................................................... 89

b.    The NextEra Entities' Position ............................................ 90

c.    The Committee's Analysis ................................................... 91

(4)   Failure to State Reasons for its Conclusion on the Breach of Legitimate
      Expectations (Art. 52(1)(e)) (Annulment Ground (l)) ........................ 95

a.    Spain's Position ..................................................................... 95

b.    The NextEra Entities' Position ............................................ 97

c.    The Committee's Analysis ................................................... 97

(5)   Failure to State Reasons Regarding the Date of Investment (Art. 52(1)(e))
      (Annulment Ground (m)) ................................................................... 101

a.    Spain's Position ................................................................... 101

b.    The NextEra Entities' Position .......................................... 102

c.    The Committee's Analysis ................................................. 103

v

(6)   Failure to State Reasons for its Conclusion on Liability (Art. 52(1)(e)) (Annulment Ground (n)) ................................................................................ 104

    a.   Spain's Position ......................................................................... 104

    b.   The NextEra Entities' Position .................................................. 105

    c.   The Committee's Analysis ......................................................... 106

(7)   Failure to State Reasons Regarding the Quantification of Damages (Art. 52(1)(e)) (Annulment Ground (o)) ......................................................... 107

    a.   Spain's Position ......................................................................... 107

    b.   The NextEra Entities' Position .................................................. 108

    c.   The Committee's Analysis ......................................................... 109

(8)   Failure to State Reasons in Relation to the Evidentiary Activity and the Assessment of Evidence (Art. 52(1)(e)) (Annulment Ground (s)) ........................................ 111

    a.   Spain's Position ......................................................................... 111

    b.   The NextEra Entities' Position .................................................. 112

    c.   The Committee's Analysis ......................................................... 112

(9)   Failure to State Reasons when Admitting an Alleged Erroneous Translation (Art. 52(1)(e)) (Annulment Ground (v)) ........................................................ 114

    a.   Spain's Position ......................................................................... 114

    b.   The NextEra Entities' Position .................................................. 114

    c.   The Committee's Analysis ......................................................... 115

F.   Spain's Allegations as to Violations of Fundamental Rules of Procedure ......... 117

(1)   Serious Departure from a Fundamental Rule of Procedure Regarding Late Submissions (Art. 52(1)(d)) (Annulment Ground (q)) ...................................... 117

    a.   Spain's Position ......................................................................... 117

    b.   The NextEra Entities' Position .................................................. 118

       c.    The Committee's Analysis ........................................................................ 120

(2)   Serious Departure from a Fundamental Rule of Procedure in Relation to the Evidentiary Activity and Assessment of Evidence (Art. 52(1)(d) (Annulment Ground (r)) .................................................................................................... 120

       a.    Spain's Position .................................................................................... 120

       b.    The NextEra Entities' Position ............................................................ 122

       c.    The Committee's Analysis ................................................................... 123

(3)   Serious Departure from a Fundamental Rule of Procedure by Breaching the Principle of Congruence and Infringing the Right of Defense (Art. 52(1)(d)) (Annulment Ground (t)) ....................................................................................... 127

       a.    Spain's Position .................................................................................... 127

       b.    The NextEra Entities' Position ............................................................ 128

       c.    The Committee's Analysis ................................................................... 128

(4)   Serious Departure from a Fundamental Rule of Procedure by Admitting an Alleged Erroneous Translation (Art. 52(1)(d)) (Annulment Ground (u)) ........................ 131

       a.    Spain's Position .................................................................................... 131

       b.    The NextEra Entities' Position ............................................................ 131

       c.    The Committee's Analysis ................................................................... 132

G.    Waiver .................................................................................................................... 133

(1)   Waiver of the Grounds for Annulment (ICSID Arbitration Rule 27) ................ 133

       a.    The NextEra Entities' Position ............................................................ 133

       b.    Spain's Position .................................................................................... 135

       c.    The Committee's Analysis ................................................................... 135

H.    Residual Discretion ............................................................................................... 136

(1)  Residual Discretion of *ad hoc* Committees (Art. 52(3) of the ICSID Convention) 136

      a.    The NextEra Entities' Position ................................................................. 136

      b.    Spain's Position ..................................................................................... 137

      c.    The Committee's Analysis ..................................................................... 137

VI.    COSTS ..................................................................................................................... 138

    A.    Spain's Cost Submissions ................................................................................... 138

    B.    The NextEra Entities' Cost Submissions ........................................................... 140

    C.    The Committee's Decision on Costs ................................................................... 143

VII.    DECISION .............................................................................................................. 147

TABLE OF SELECTED ABBREVIATIONS

| | |
|---|---|
| Application | Application for Annulment filed by the Kingdom of Spain on 26 September 2019 |
| Award | Award issued on 31 May 2019 |
| C-[#] | The NextEra Entities' Exhibit |
| CL-[#] | The NextEra Entities' Legal Authority |
| Committee | *ad hoc* Committee composed of Prof. Joongi Kim (President); Prof. Lawrence Boo; and Mr. Humberto Sáenz-Marinero, constituted on 16 December 2019 |
| Counter-Memorial | The NextEra Entities' Counter-Memorial on Annulment dated 9 July 2020 |
| Decision | The Tribunal's Decision on Jurisdiction, Liability and Quantum dated 12 March 2019 |
| ECT | Energy Charter Treaty |
| Hearing | Hearing on Annulment held on 19 & 21 December 2020 |
| ICSID Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| ICSID Convention | Convention on the Settlement of Investment Disputes between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| Memorial | Spain's Memorial on Annulment dated 16 April 2020 |
| R-[#] | Spain's Exhibit |
| Rejoinder | The NextEra Entities' Rejoinder on Annulment dated 19 November 2020 |

| RL-[#] | Spain's Legal Authority |
|---|---|
| Tr. Day [#] [Speaker(s)], [page:line] | Revised Transcript of the Hearing |
| Tribunal | Arbitral tribunal composed of Prof. Donald M. McRae (President); The Honorable Yves Fortier, P.C., C.C., O.Q., Q.C., and Prof. Laurence Boisson de Chazournes, constituted on 23 January 2015 |

## I.    INTRODUCTION AND PARTIES

1.    This annulment proceeding concerns an application for annulment (the "**Application**") of the award rendered on 31 May 2019 in the arbitration proceeding between NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. and the Kingdom of Spain (ICSID Case No. ARB/14/11) (the "**Award**") rendered by a Tribunal composed of Professor Donald M. McRae (President), the Honourable Yves Fortier, P.C., C.C., O.Q., Q.C., and Professor Laurence Boisson de Chazournes (the "**Tribunal**").

2.    The respondents on annulment are NextEra Energy Global Holdings B.V. ("**NextEra Global**"), and NextEra Energy Spain Holdings B.V. ("**NextEra Spain**"), both limited liability companies incorporated under the laws of the Netherlands (*besloten vennootschap met beperkte aansprakelijkheid*), (collectively, "**NextEra Entities**" or the "**Claimants**").[1]

3.    The applicant on annulment is the Kingdom of Spain ("**Spain**" or the "**Applicant**").

4.    The NextEra Entities and Spain are collectively referred to as the "**Parties**". The Parties' representatives and their addresses are listed above on page (i).

5.    The Award decided on a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Energy Charter Treaty (the "**ECT**"), which entered into force on 16 April 1998 for the Netherlands and Spain, and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**").

6.    The dispute in the original proceeding related to regulatory measures implemented by Spain modifying the economic regime for renewable energy investments in Spain.

7.    In the Decision on Jurisdiction, Liability and Quantum dated 12 March 2019 (the "**Decision**"), issued 80 days before the Award, the Tribunal found Spain liable for breach of the fair and equitable treatment standard in Art. 10(1) of the ECT.[2] The Tribunal

---

[1] While the Applicant uses the "*Florida Power & Light, Inc*", "*FPL*" and "*NextEra*" interchangeably in its submissions, for purposes of this decision, the Committee uses "*NextEra Entities*" or "*Claimants*" unless otherwise relevant.

[2] Decision on Jurisdiction, Liability and Quantum, 12 March 2019 ("Decision"), RL-132, ¶ 682.

stipulated that the Decision constituted an "*integral part of this Award and it is hereby incorporated as Annex A*".[3] The Tribunal found that "*on the basis of the assurances given to them by the Spanish authorities, in the broader context of the specific terms of Regulatory Framework I, registration in the Pre-assignment Registry and the Ministerial Resolutions of 28 December 2010, Claimants had a legitimate expectation that the regulatory regime in RD 661/2007 would not be changed in a way that would undermine the security and viability of their investment*".[4] The Tribunal further held that, the "*denial of legitimate expectations is based on the failure to provide that certainty and security by changing fundamentally the regime under which remuneration was to be calculated*".[5] The Tribunal did not rule on the other liability claims.[6]

8.    In its Award, the Tribunal reaffirmed the Decision and ordered Spain to pay the NextEra Entities damages assessed at EUR 290.6 million, together with pre-Award and post-Award interest and costs.[7]

9.    Spain applied for the annulment of the Award on the basis of Art. 52(1) of the ICSID Convention, identifying three grounds for annulment: (i) the Tribunal manifestly exceeded its powers (ICSID Convention, Art. 52(1)(b)); (ii) there was a serious departure from a fundamental rule of procedure (ICSID Convention, Art. 52(1)(d)); and (iii) the Award failed to state the reasons on which it was based (ICSID Convention, Art. 52(1)(e)).[8]

## II.    PROCEDURAL HISTORY

10.    On 26 September 2019, Spain submitted its Application on annulment of the Award. In the Application, Spain also requested (i) a provisional stay of enforcement of the Award in accordance with Art. 52(5) of the ICSID Convention and ICSID Arbitration Rule 54(2), which provide that the Secretary-General shall grant an automatic provisional stay until the

---

[3] Award, 31 May 2019 ("Award"), RL-130, ¶ 5.

[4] Decision, RL-132, ¶ 596.

[5] Decision, RL-132, ¶ 600.

[6] Decision, RL-132, ¶ 602.

[7] Award, RL-130, ¶ 37.

[8] Application for Annulment of the Award, 26 September 2019 ("Application"), ¶ 17.

*ad hoc* committee rules on such request; and (ii) the continuation of the stay of enforcement until the decision in this annulment proceeding is rendered by the *ad hoc* committee.

11. On 2 October 2019, pursuant to ICSID Arbitration Rule 50(2), the acting Secretary-General of ICSID registered the Application. On the same date, in accordance with ICSID Arbitration Rule 54(2), the acting Secretary-General informed the Parties that the enforcement of the Award had been provisionally stayed.

12. By letter dated 16 December 2019, in accordance with ICSID Arbitration Rules 6 and 53, the Parties were notified that an *ad hoc* committee composed of Professor Joongi Kim, a national of the Republic of Korea, Professor Lawrence Boo, a national of Singapore, and Mr. Humberto Sáenz-Marinero, a national of El Salvador, had been constituted following its members' appointment by the Chairman of the Administrative Council ("the **Committee**"). On the same date, the Parties were notified that Ms. Natalí Sequeira, Team Leader – Legal Counsel, ICSID, would serve as Secretary of the Committee.

13. On 16 January 2020, Spain filed a request to continue the stay of enforcement of the Award.

14. On 26 January 2020, the NextEra Entities filed an opposition to Spain's request to continue the stay of enforcement of the Award.

15. On 30 January 2020, Spain filed a reply on the request to continue the stay of enforcement of the Award.

16. On 5 February 2020, the NextEra Entities filed a rejoinder on the request to continue the stay of enforcement of the Award.

17. In accordance with ICSID Arbitration Rules 53 and 13(1), the Committee held a First Session with the Parties on 11 February 2020 by teleconference. On the same date before the First Session, the Committee held a hearing in which the Parties' representatives explained their arguments in favor of and against the continuance of the stay of

enforcement. They further discussed and agreed to the applicable rules for the annulment proceeding.

18.    On 17 February 2020, the NextEra Entities submitted a letter that sought to clarify whether they could execute an undertaking to protect against attachment of any funds by third parties and to offer proof as to the corporate relationship between NextEra Global, NextEra Energy Canada Holdings B.V., and the nine wind farm projects in Canada identified in their opposition to Spain's request to continue the stay of enforcement of the Award.

19.    On 24 February 2020, the European Commission ("**EC**") submitted an application for leave to intervene as a non-disputing party pursuant to ICSID Arbitration Rule 37(2). The Centre transmitted the application to the Parties and the members of the Committee on 25 February 2020.

20.    On 27 February 2020, the Committee invited the Parties to submit any observations on EC's application.

21.    Following the first session, on 4 March 2020, the Committee issued Procedural Order No. 1 ("**PO1**") recording the agreement of the Parties on procedural matters and the Committee's decision on disputed issues. PO1 provided, *inter alia*, that the procedural languages would be English and Spanish, and that the place of proceeding would be Washington, D.C.  PO1 also set out the agreed procedural calendar for the proceeding.

22.    On 6 March 2020, Spain submitted its comments to the EC's application, requesting that the Committee grant the request for intervention as a non-disputing party.

23.    On the same date, the NextEra Entities filed their comments to EC's application, requesting that the Committee reject the application.

24.    On 13 March 2020, Spain filed a request for leave to submit three types of new expert evidence into the annulment proceeding.

25.    On 15 March 2020, the Committee invited the NextEra Entities to respond to Spain's request.

26.     On 18 March 2020, the NextEra Entities filed observations on Spain's request, requesting the Committee to deny it in its entirety.

27.     On 2 April 2020, the Committee issued its Decision on the Request to Admit New Evidence, allowing Spain to submit "*one expert report or declaration by a university professor that addresses the relevant rules and principles of European Union* [("**EU**")] *Law for purposes of Art. 52(1)(b) and (e) of the ICSID Convention under the terms stipulated in Section 15.3 of Procedural Order No. 1*", and denying Spain's other requests to submit additional expert evidence.[9]

28.     On 3 April 2020, the Committee issued its Decision on the EC's Application to Intervene as a Non-Disputing Party, granting EC permission to present a written submission, "*addressing why the Arbitral Tribunal lacked jurisdiction based upon the conflict of EU Law and the ECT*".[10] The Committee denied the EC's "*participation in the ruling of the stay of enforcement*" and deferred its decision on whether to allow the EC to participate in the hearing.[11]

29.     On 6 April 2020, the Committee issued its Decision on the Stay of Enforcement of the Award, extending the stay of enforcement of the Award "*on a provisional basis*".[12]

30.     On 16 April 2020, Spain filed a Memorial on Annulment.

31.     On 23 April 2020, the EC filed a written submission pursuant to ICSID Arbitration Rule 37(2).

32.     On 25 May 2020, the NextEra Entities filed their observations on the EC's written submission.

---

[9] Decision on the Request to Admit New Evidence, 2 April 2020, ¶ 19.

[10] Decision on the European Commission's Application to Intervene as a Non-Disputing Party, 3 April 2020, ¶ 51(a).

[11] Decision on the European Commission's Application to Intervene as a Non-Disputing Party, 3 April 2020, ¶¶ 51(b), (e).

[12] Decision on the Stay of Enforcement of the Award, 6 April 2020, ¶ 102.

33.     On 28 May 2020, pursuant to ICSID Arbitration Rule 54(3), the Committee issued a Decision Terminating the Stay of Enforcement of the Award as of the date of the notification.

34.     On 9 July 2020, the NextEra Entities filed a Counter-Memorial on Annulment.

35.     On 17 September 2020, Spain filed a Reply on Annulment.

36.     On 19 November 2020, the NextEra Entities filed a Rejoinder on Annulment.

37.     On 15 December 2020, Spain filed a request for leave to submit a communication the *Abogacía del Estado* received from the Public Prosecutor's Office and Art. 262 of the Criminal Procedural Law as new evidence into the annulment proceeding.

38.     On the same date, the Committee invited the NextEra Entities to submit any comments on Spain's request.

39.     On 16 December 2020, the NextEra Entities filed comments on Spain's request, requesting the Committee to deny it in its entirety.

40.     On 17 December 2020, the Committee issued its Decision on the Request to Admit New Evidence, rejecting Spain's request to introduce new evidence into the record.

41.     On 17 December 2020, the Committee issued Procedural Order No. 2 concerning the organization of the hearing.

42.     On 19 and 21 December 2020, the Committee held a hearing by video conference (the "**Hearing**"). The following persons were present at the Hearing[13]:

        ***Committee*:**

        Joongi Kim                            President of the Committee
        Lawrence Boo                          Member of the Committee
        Humberto Sáenz-Marinero              Member of the Committee

---

[13] Both Parties presented expert reports but neither side sought to cross-examine the other side's experts.

*ICSID Secretariat:*

| | |
|---|---|
| Natalí Sequeira | Secretary of the Committee |

*Representing the NextEra Entities:*

| | |
|---|---|
| Karyl Nairn | Skadden, Arps, Slate, Meagher & Flom (UK) LLP |
| David Herlihy | Skadden, Arps, Slate, Meagher & Flom (UK) LLP |
| Sophia Lekakis | Skadden, Arps, Slate, Meagher & Flom (UK) LLP |
| Olivier Peeters | Skadden, Arps, Slate, Meagher & Flom (UK) LLP |
| Carla Alves | Skadden, Arps, Slate, Meagher & Flom (UK) LLP |
| Aaron Shorr | Skadden, Arps, Slate, Meagher & Flom (UK) LLP |
| Michiel van Schijndel | Director, NextEra Energy Global Holdings BV and NextEra Energy Spain Holdings BV |
| Susanne ten Berge | Director, NextEra Energy Global Holdings BV and NextEra Energy Spain Holdings BV |
| Mitchell S. Ross | General Counsel, NextEra Energy Resources, LLC |

*For the Kingdom of Spain:*

| | |
|---|---|
| Rafael Gil Nievas | *Abogacía General del Estado* |
| Elena Oñoro Sainz | *Abogacía General del Estado* |
| Socorro Garrido Moreno | *Abogacía General del Estado* |
| Lourdes Martínez de Victoria Gómez | *Abogacía General del Estado* |
| Gabriela Cerdeiras Megias | *Abogacía General del Estado* |
| Ana Fernández-Daza Alvarez | *Abogacía General del Estado* |
| Lorena Fatás Pérez | *Abogacía General del Estado* |
| José Manuel Gutiérrez Delgado | *Abogacía General del Estado* |
| Juan Quesada Navarro | *Abogacía General del Estado* |
| Gloria de la Guardia Limeres | *Abogacía General del Estado* |

7

***Court Reporters:***

| | |
|---|---|
| Trevor McGowan | Caerus Reporting Ltd<br>[English Court Reporter] |
| Dante Rinaldi | DR – Esteno<br>[Spanish Court Reporter] |
| Marta Rinaldi | DR – Esteno<br>[Spanish Court Reporter] |
| Rodolfo Rinaldi | DR – Esteno<br>[Spanish Court Reporter] |
| Regina Spector | DR – Esteno<br>[Spanish Court Reporter] |
| Eliana Da Silva | DR – Esteno<br>[Spanish Court Reporter] |

***Interpreters:***

| | |
|---|---|
| Jesus Getan Bornn | Interpretation Services |
| Anna Sophia Chapman | Interpretation Services |
| Amalia Thaler de Klemm | Interpretation Services |

43. The Parties filed their submissions on costs on 25 February 2021.

44. On 10 September 2021, Spain filed a request to introduce into the record the Court of Justice of the European Union (**"CJEU"**) Judgment dated 2 September 2021 issued in the Case C-741/19, *Republic of Moldova v. Komstroy*, which was rendered in a request for a preliminary ruling made by the Paris Court of Appeal to the CJEU concerning the interpretation of certain provisions of the Energy Charter Treaty and the concept of "*investment*" under the same.

45. Following the Committee's invitation, on 14 September 2021, the NextEra Entities submitted their response to Spain's application opposing the introduction of the CJEU Judgment into the record.

46. On 17 September 2021, the Committee granted Spain's request to submit the CJEU Judgment as a new legal authority. The Committee further granted leave for the Parties to submit their observations on the CJEU Judgment, together with "*an elaboration of how the Judgment is related to the nature and purpose of the annulment proceeding given the annulment committee's mandate under the ICSID Convention*". On 24 September 2021,

8

Spain submitted its comments on the new legal authority introduced per the Committee's decision.

47.    On 1 October 2021, the NextEra Entities presented their observations on the newly introduced legal authority.

48.    The proceeding was closed on 1 December 2021.

49.    On 3 December 2021, Spain filed a request to reopen the proceeding to introduce two new documents into the record.

50.    On 4 December 2021, the Committee invited the NextEra Entities to submit their comments on Spain's request.

51.    The NextEra Entities filed their observations on 7 December 2021.

52.    On 21 December 2021, the Committee issued its Decision on Spain's Request on Reopening the Proceeding rejecting Spain's request.

53.    Pursuant to ICSID Arbitration Rules 28(2) and 53, on 21 December 2021, the Committee invited the Parties to submit their final statements on costs. On 7 January 2022, the Claimants submitted their updated statement on costs. After receiving an extension, the Applicant submitted its updated statement on costs on 25 January 2022.

## III.    REQUEST FOR RELIEF

54.    Spain requests the Committee to:

(i) annul the Award in its entirety or, alternatively, annul it in part on the basis of the following grounds and arguments:

(a) in accordance with Art. 52(1)(b) of the ICSID Convention, the Tribunal manifestly exceeded its powers for any or all of the following reasons: (i) the NextEra Entities did not have investor status; (ii) the NextEra Entities did not make

an investment; or (iii) there was no direct relationship between the investor and Spain;

(b) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons why the Tribunal considered that the NextEra Entities had an investment and were investors;

(c) in accordance with Art. 52(1)(b) of the ICSID Convention, the Tribunal manifestly exceeded its powers when Spain availed itself of the power provided for in Art. 17 of the ECT and the Tribunal rejected it by inventing requirements for the exercise of that power not provided for in the ECT;

(d) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons why it did not accept the denial of benefits ground provided for in Art. 17 of the ECT and imposed requirements for such refusal not set out in Art. 17;

(e) under Art. 52(1)(b) of the ICSID Convention, the Tribunal manifestly exceeded its powers by conferring international protection on those who did not turn to the Tribunal with clean hands and being against *jus cogens* and the principle that international arbitration cannot shelter or protect fraudulent actions;

(f) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons why it considered that the Tribunal had jurisdiction to hear an arbitration initiated by the NextEra Entities in order to obtain protection for investments made without clean hands;

(g) under Art. 52(1)(b) of the ICSID Convention, the Tribunal manifestly exceeded its powers when it heard a dispute between an alleged investor of an EU Member State and an EU Member State;

(h) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons why it considered that the Tribunal had jurisdiction to hear a dispute between an alleged investor of an EU Member State and an EU Member State;

(i) under Art. 52(1)(b) of the ICSID Convention, the Tribunal manifestly exceeded its powers by dispensing with the application of applicable international rules, including the ECT itself and totally dismissing the application of all EU law;

(j) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons why it disregarded the application of applicable international standards, including the ECT itself and why it totally disregarded the application of all EU law;

(k) under Art. 52(1)(b) of the ICSID Convention, the Tribunal manifestly exceeded its powers by making a manifestly incorrect application of applicable law to be taken into account in assessing legitimate expectations;

(l) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons for how there may be legitimate expectations of petrification of subsidies contrary to EU law and other applicable legislation;

(m) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons in determining which date should be taken into account as the date of the investment and, without deciding on the date of the investment, resolving on the alleged legitimate expectations;

(n) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons with regard to liability;

(o) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons with regard to damages;

(p) under Art. 52(1)(b) of the ICSID Convention, the Tribunal manifestly exceeded its powers by granting damages contrary to its own conclusions on quantum;

(q) under Art. 52(1)(d)  of the ICSID Convention, there was a serious departure from a fundamental rule of procedure to the extent that the Tribunal allowed the NextEra Entities to submit documents, expert reports, memorials and witness

statements outside the deadlines set by the Tribunal, breaking the balance of the Parties in the process;[14]

(r) under Art. 52(1)(d) of the ICSID Convention, there was a serious departure from a fundamental rule of procedure to the extent that the Tribunal committed multiple procedural breaches in relation to the evidentiary activity and the assessment of evidence developed in the Arbitration;

(s) under Art. 52(1)(e) of the ICSID Convention, the Award repeatedly failed to state the reasons in relation to the evidentiary activity and the assessment of evidence developed in the Arbitration;

(t) under Art. 52(1)(d) of the ICSID Convention, there was a serious departure from a fundamental rule of procedure insofar as the Tribunal, in breach of the principle of congruence, infringed the right of defence of the Spain by condemning on grounds different from those expressed by the NextEra Entities in their memorials;[15]

(u) under Art. 52(1)(d) of the ICSID Convention, there was a serious departure from a fundamental rule of procedure to the extent that the Tribunal relied on a false document to make its decision; and

(v) under Art. 52(1)(e) of the ICSID Convention, the Award failed to state the reasons in so far as Spain denounced and demonstrated the falsehood of a key document in the proceedings and the Tribunal completely failed to resolve or even comment on this point.

(ii) reject all requests made by the NextEra Entities;

(iii) order the NextEra Entities to pay all the costs of the proceedings, including the fees and expenses of the Spain's legal service, together with interest at an appropriate rate; and

---

[14] Spain withdrew its application based on this ground at the hearing, *see* Revised Tr. Day 2 (Gil Nievas), 6:16–7:1.

[15] Memorial of Reply on Annulment, 17 September 2020 ("Reply"), ¶ 391; the Applicant also uses the expression "*writing of Claim*" in its Memorial. Memorial on Annulment, 16 April 2020 ("Memorial"), ¶ 457(t).

(iv) annul the Award if the facts described by Spain constitute a ground for annulment according to Art. 52(1) of the ICSID Convention, other than those grounds alleged by Spain.[16]

55.    The NextEra Entities request the Committee issue a final decision:

(i) declaring that Spain has not established any ground for annulling the Award, in whole or in part; or

(ii) in the alternative, declaring that any ground for potential annulment established by Spain shall not result in annulment of the Award, exercising the Committee's discretion under Art. 52(3) of the ICSID Convention;

(iii) denying Spain's Application;

(iv) ordering Spain to bear the entire costs of this annulment proceeding, including the fees and expenses of the Members of the Committee and all associated costs including the ICSID fees and translators' fees; and

(v) ordering Spain to reimburse the NextEra Entities for their full legal costs and expenses incurred in the defence of these annulment proceedings (including expert fees), together with interest to run from the date of the Committee's Decision on Annulment until the date of payment by Spain, at the same rate of interest ordered by the Tribunal in its Award.[17]

## IV.    APPLICABLE LEGAL STANDARDS FOR ANNULMENT

56.    As an initial matter, the Committee extends its appreciation to the Parties and their representatives for their consummate professionalism and extensive written and oral submissions. The Committee has carefully considered all of the Parties' arguments even if

---

[16] Memorial, ¶¶ 457–459; Reply, ¶¶ 674–676.

[17] Claimants' Counter-Memorial on Annulment, 9 July 2020 ("Counter-Memorial"), ¶ 468; Claimants' Rejoinder on Annulment, 19 November 2020 ("Rejoinder"), ¶ 454(c).

not referred to expressly, or not set out in full in this Decision and they are subsumed in the Tribunal's analysis.

57. The Committee first provides its analysis on the applicable legal standards for annulment. The Committee observes that the ICSID Convention and the ICSID Arbitration Rules provide the legal standards that apply in an annulment proceeding and are the source of the Committee's mandate.

58. Art. 52(1) of the ICSID Convention provides that a party may seek annulment on one or more of the following grounds:

     (a) that the Tribunal was not properly constituted;

     (b) that the Tribunal has manifestly exceeded its powers;

     (c) that there was corruption on the part of a member of the Tribunal;

     (d) that there has been a serious departure from a fundamental rule of procedure; or

     (e) that the award has failed to state the reasons on which it is based.

59. The Committee confirms that the five grounds under Art. 52(1) are the exclusive grounds for annulment.

60. Art. 52(3) of the ICSID Convention adds that an *ad hoc* committee "*shall have the authority to annul the award or any part thereof on any of the grounds set forth in paragraph (1)*".[18]

61. Art. 53(1) of the ICSID Convention confirms that an annulment should not amount to an appeal by providing that an "*award shall be binding on the parties and shall not be subject to any appeal*". A fundamental goal of the ICSID system is to assure the finality of an ICSID arbitration award.[19]

---

[18] Art. 52(3) is reviewed in Section V.H, *infra*.

[19] Updated Background Paper on Annulment for the Administrative Council of ICSID, prepared by the ICSID Secretariat, May 5, 2016 ("Updated Background Paper"), p. 31, ¶ 71.

62.    As an initial matter, the Committee observes that the Vienna Convention on the Law of Treaties ("**Vienna Convention**")[20] as such is not applicable to the ICSID Convention, which predates it. Nevertheless, its provisions on treaty interpretation are widely regarded as declaratory of customary international law. Both Parties extensively cite the Vienna Convention in their memorials and the Netherlands and Spain are both contracting parties to the Vienna Convention. The Committee considers it appropriate to be guided by the General Rule of Interpretation in Art. 31 of the Vienna Convention such that interpretation of relevant provisions of the ICSID Convention should be conducted "*in good faith and in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose*".[21]

63.    The Parties have referred to prior *ad hoc* committee decisions for the various criteria to be considered when deciding an annulment. The Committee confirms that prior decisions of other *ad hoc* committees are non-binding, and notes, as prior *ad hoc* committees have, that no *jurisprudence constante* can be discerned regarding annulment. The Committee concludes that, subject to the specific facts of the relevant case, due consideration should be given to earlier cases where these are indicative of a certain line of jurisprudential consistency. The Committee's decision ultimately remains one based on its own opinion given the particular circumstances of the case at hand.

A.    MANIFEST EXCESS OF POWERS (ART. 52(1)(b) OF THE ICSID CONVENTION)

64.    Art. 52(1)(b) of the ICSID Convention provides that a committee may annul an award if "*the Tribunal has manifestly exceeded its powers*".

---

[20] RL-23/CL-7; Memorial, ¶¶ 94, 106, 107, 111, 143; Reply, ¶¶ 71, 122, 144, 210, 217, 547; Counter Memorial, ¶¶ 147, 160, 238; Rejoinder, ¶¶ 113, 174.
[21] RL-23, Art. 31(1).

### a.    Spain's Position

65.    As Spain points out, regarding Art. 52(1)(b), committees have "*on some occasions, made a very uniform and undisputed interpretation of the standard"* but *"on other occasions there are certain nuances among the arbitral precedents*".[22]

66.    Spain indicates that in Spanish, the Dictionary of the Royal Spanish Academy of the Spanish Language cited by Spain provides that the first meaning of "*manifiesta*" is "*descubierta*" or "*discovered*".[23] In English, the Oxford dictionary provides that "*manifest*" means "*easy to see or understand*".[24] In French, the Larousse dictionary cited by Spain provides that "*manifeste*" means "*dont la nature, la réalité, l'authenticité s'imposent avec évidence*" or "*whose nature, reality or authenticity are evident*".[25] Spain suggests that manifest should be interpreted to mean that "*if an overshoot of powers is discovered*" or "*becomes evident*".[26]

67.    Spain cites the ICSID Background Paper on Annulment and the History of the ICSID Convention to assert that a manifest excess of powers may exist, *inter alia*, when a tribunal does not "*apply the appropriate law (including ius cogens) or when the Tribunal exceeds its jurisdiction or has no jurisdiction or the Tribunal decides on matters not raised by the Parties*".[27] Spain considers mistaken or wrong application of the law could be annullable. Spain relies on *Soufraki v. The United Arab Emirates* and *Occidental Petroleum v. Ecuador* and other *ad hoc* committees' observations for the view that "[i]*n exceptional*

---

[22] Reply, ¶ 49.

[23] https://dle.rae.es/manifiesto?m=form, Reply, ¶ 73, fn 47.

[24] https://www.oxfordlearnersdictionaries.com/definition/english/manifest_2; Reply, ¶ 74, fn 48.

[25] https://www.larousse.fr/dictionnaires/francais/manifeste/49162?q=manifeste#49069; Reply, ¶ 75, fn 49.

[26] Reply, ¶¶ 73 & 74.

[27] Memorial, ¶ 57, citing the Updated Background Paper on Annulment, RL-134, ¶ 87 and History of the ICSID Convention: documents concerning the origin and the formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of other States, volumes II-1 and II-2 (ICSID 2006) ("History of ICSID Convention"), RL-192, p. 851.

circumstances…a <u>gross or egregious error of law</u> could be construed to amount to a failure to apply the proper law" and could be grounds for annulment.[28] (emphasis added).

68.    Spain also cites *Pey Casado v. Chile I,* which concluded that a manifest excess of power could exist "*as long as it is sufficiently clear and serious*" even though a Tribunal engaged in "*extensive argumentation and analysis*".[29]

### b.    The NextEra Entities' Position

69.    The NextEra Entities assert that Art. 52(1)(b) sets a demanding threshold. The Claimants submit that a "*manifest*" excess of jurisdiction must be "*obvious, i.e., not discerned through elaborate arguments by each side*".[30] The NextEra Entities note that in Spanish, the Dictionary of the Royal Spanish Academy of the Spanish Language cited by Spain provides that "*manifiesta*" has the meaning of not only "*descubierta*" or "*discovered*" but also "*patente*" or "*patent*", or "*clara*" or "*clear*".[31] In French, the NextEra Entities cite the French Academy's Dictionary that provides the meaning of "*manifeste*" as "*dont l'existence, la réalité est évidente, incontestable; flagrant, patent*" or "*whose existence* [and] *reality is evident, incontestable; flagrant, patent*".[32]

70.    The Claimants point out that an *ad hoc* committee is not empowered to verify whether a tribunal's jurisdictional analysis was "*correct*", but only whether it was "*tenable*". Where other ICSID tribunals have reached the same jurisdictional finding, where "*reasonable minds*" disagree as to jurisdiction, or where there can be more than one possible interpretation of a dispute provision, for instance, the "*manifest*" requirement cannot be fulfilled.[33]

---

[28] Memorial, ¶¶ 58 & 59; Reply, ¶¶ 62 & 66; *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment, 2 November 2015 ("*Occidental Petroleum v. Ecuador*"), RL-179, ¶ 56 .

[29] Memorial, ¶ 58; Reply, ¶ 66.

[30] Counter-Memorial, ¶ 87.

[31] Rejoinder, ¶ 53.

[32] Rejoinder, ¶ 54.

[33] Counter-Memorial, ¶ 87.

71.     The NextEra Entities argue that an error related to the applicable law does not amount to a manifest excess of powers.[34] They assert only a failure to choose the proper law applicable to the merits would be annullable. They also cite *Occidental Petroleum v. Ecuador* for the view that even then "*annulment…is only permitted if the tribunal totally disregarded applicable law or grounded its award on a law other than the applicable law*".[35] They stress that the few committees that annulled based on a failure to apply the applicable law have been "*widely criticised as unfortunate examples of committees straying past their limited mandate*".[36]

### c.     The Committee's Analysis

72.     The Committee observes that for annulment to occur under Art. 52(1)(b) a tribunal must have "*exceeded its powers*" in a "*manifest*" manner.  An application under Art. 52(1)(b) must therefore demonstrate both an "*excess of powers*" and that such excess was "*manifest*".[37]

73.     The Committee notes that a key consideration under Art. 52(1)(b) is what constitutes a "*manifest*" excess of powers. The Spanish version of the ICSID Convention uses the term "*manifiestamente*" and the French version, the term "*manifeste*". All three terms are equally authoritative and appear to derive from the same word.

74.     In Spanish, the *Diccionario de la Lengua Española de la Real Academia Española* (Dictionary of the of the Spanish Language of the Royal Spanish Academy) cited by both Parties provides that "*manifiestamente*" means "*de una manera manifiesta*".[38] In turn, "*manifiesta*" means not only "*descubierta*" ("*discovered*"), but also "*patente*" ("*patent*"), or "*clara*" ("*clear*").[39] In French, the Larousse dictionary cited by Spain provides that

---

[34] Counter-Memorial, ¶ 91.

[35] *Occidental Petroleum v. Ecuador*, RL-179, ¶ 309.

[36] Counter-Memorial, ¶ 94.

[37] The *prima facie* approach has been adopted by some committees where "*a summary examination is undertaken in order to ascertain if any alleged excess of powers was so egregious as to be manifest*", *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Decision on Annulment, 29 June 2012, RL-071, ¶ 32.

[38] See https://dle.rae.es/manifiestamente?m=form.

[39] See https://dle.rae.es/manifiesto?m=form; Memorial, ¶ 73, fn 47.

"*manifeste*" means "*dont la nature, la réalité, l'authenticité s'imposent avec évidence*" or "*whose nature, reality or authenticity are evident*".[40] Whereas the French Academy's Dictionary, as cited by the NextEra Entities, provides the meaning of "*manifeste*" as "*dont l'existence, la réalité est évidente, incontestable; flagrant, patent*" or "*whose existence* [and] *reality is evident, incontestable; flagrant, patent*". In English, the Oxford dictionary cited by both Parties provides that "*manifest*" means "*easy to see or understand*".[41] The NextEra Entities also referred to the dictionary meaning "*clearly apparent, obvious*" as cited by the *Dugan v. Turkmenistan* committee.[42]

75.  The Committee finds that the ordinary meaning as described in the dictionary of "*manifest*", "*manifiesta*" and "*manifeste*" is virtually identical in all three languages and the meaning of "*patent*", "*clear*", "*evident*", "*clearly apparent*", "*obvious*", "*flagrant*" are practically interchangeable. Spain's suggestion that "*manifest*" should be interpreted to mean "*become evident*" or "*is discovered*" as though "*manifest*" means one must engage in some additional process to "*become evident*" or "*be discovered*" are not persuasive and deviate from the plain meaning of the term as described in the various dictionaries.

76.  The Committee concludes that based on the ordinary meaning of the term "*manifest*", the excess of power must reach the level of being "*patent*", "*clear*", "*evident*" and "*easy to see or understand*". The Committee decides that its analysis should focus on the "*ease with which* [the excess of power] *is perceived*" such that it must be "*discerned with little effort and without deeper analysis*".[43] Thus, instead of the "*gravity*" or "*seriousness*" of the excess of powers, the focus should be on "*the cognitive process that makes it apparent*".[44]

77.  Numerous other *ad hoc* committees have broadly reached the same conclusion regarding the meaning of the term "*manifest*". *Soufraki v. The United Arab Emirates* proclaimed that

---

[40] Reply, ¶ 75, fn 49.

[41] Reply, ¶ 74, fn 48; see also https://www.oxfordlearnersdictionaries.com/definition/english/manifest_2.

[42] Rejoinder, ¶ 51, citing *Adem Dogan v. Turkmenistan*, ICSID Case No. ARB/09/9, Decision on Annulment, 15 January 2016, CL-306, ¶ 103, fn 181. (The American Heritage Dictionary of English Language, 5th ed. (2015) defines "*manifest*" as "*clearly apparent to the sight or understanding; obvious*" (available at https://www.ahdictionary.com/word/search.html?q=manifest)).

[43] C.H. Schreuer, *et al.*, *The ICSID Convention: A Commentary* (Cambridge University Press, 2nd ed., excerpts) ("Schreuer"), RL-210/RL-257/CL-279, Art. 52, ¶ 135; Updated Background Paper, RL-134, ¶ 83.

[44] Schreuer, RL-210, Art. 52, ¶ 135.

"'*manifest*' *is a strong and emphatic term referring to <u>obviousness</u>*" and should be "*textually obvious and substantively serious*".[45] (emphasis added). *CDC v. Seychelles* described that "*the excess must be <u>plain on its face</u>*" (emphasis added) and *Rumeli v. Kazakhstan* similarly held it must be "*evident on the face of the award*".[46] The *Wena Hotels v. Egypt* committee stated "*manifest*" must be "<u>*self-evident* rather than the product of</u> *elaborate interpretation one way or the other*".[47] (emphasis added).

78.    Hence, the term "*manifest*" establishes a high threshold that an applicant must meet.

79.    The ordinary meaning of "*manifest*" must be interpreted in its context, and in light of the object and purpose of the ICSID Convention. Art. 52 establishes the exclusive grounds for annulment and Art. 53 stipulates the finality and binding nature of an award. The drafting history also confirms that "*manifest*" was added to address concerns that "*annulment posed a risk of frustrating awards and therefore the annulment provision should be made more restrictive*".[48]

80.    The Committee agrees with past *ad hoc* committees that if any apparent excess in the exercise of the tribunal's powers is "*susceptible of argument 'one way or the other'*"[49] (*CDC v. Seychelles*), or if "*reasonable minds differ as to whether or not the tribunal issued a correct decision*" (*Standard Chartered v. Tanzania Electric*), then the manifest requirement would not be satisfied.[50] Put it differently, as *TECO v. Guatemala* explained,

---

[45] *Hussein Nuaman Soufraki v. The United Arab Emirates*, ICSID Case No. ARB/02/07, Decision of the *ad hoc* Committee on the Application for Annulment, 5 June 2007 ("*Soufraki v. The United Arab Emirates*"), RL-107, ¶¶ 39, 40.

[46] *CDC Group plc v. Republic of the Seychelles*, ICSID Case No. ARB/02/14, Decision of the *ad hoc* Committee on the Application for Annulment of the Republic of Seychelles, 29 June 2005 ("*CDC v. Seychelles*"), RL-208, ¶ 41; *Rumeli, Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Decision of the *ad hoc* Committee on Annulment, 25 March 2010 ("*Rumeli v. Kazakhstan*"), CL-241, ¶ 96.

[47] *Wena Hotels Ltd. v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, 5 February 2002, 41 Int'l Legal Materials 934 (2002) ("*Wena Hotels v. Egypt*"), RL-140, at ¶ 25.

[48] Updated Background Paper, RL-134, ¶ 14.

[49] *CDC v. Seychelles*, RL-208, ¶ 41.

[50] *Standard Chartered Bank (Hong Kong) Limited v. Tanzania Electric Supply Company Limited (TANESCO)*, ICSID Case No. ARB/10/20, Decision on the Application for Annulment, 22 August 2018 ("*Standard Chartered v. Tanzania Electric*"), CL-244, ¶ 183. See also *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Application for Annulment of the Argentine Republic, 1 September 2009 ("*Azurix v. Argentina*"), RL-176, ¶¶ 68 & 69.

"*an annulment committee is not empowered to verify whether a tribunal's jurisdictional analysis or a tribunal's application of the law was correct, but only whether it was tenable as a matter of law*".[51] The Committee agrees that its role is not to determine whether a tribunal's analysis was correct, but only whether it was "*tenable*". If its decision was tenable, a tribunal could not have committed an excess of powers that is "*patent*", "*clear*", "*evident*" or "*easy to see or understand*".

81.    A manifest excess of powers based on a tribunal's treaty interpretation will be generally difficult to establish. The Committee agrees with the *Lucchetti v. Peru* committee that treaty interpretation by its nature is "*not an exact science, and it is frequently the case that there is more than one possible interpretation of a disputed provision*".[52] If other ICSID committees reached a similar finding or interpretation on the same issue, this will demonstrate that an issue was "*susceptible of argument 'one way or the other'*". One interpretation of a treaty among many possible ones will not qualify as a manifest excess of powers. As *Alapli v. Turkey* held, "[t]*he Applicant would need to prove that its interpretation is a monolithic and firmly settled principle of law that is 'not subject to debate'*".[53]

82.    The ICSID Annulment Background Paper confirms that the focus of the excess of powers provision pertains to a tribunal's powers to decide on its jurisdiction and to the applicable law.[54] It will include, for example, the failure to exercise jurisdiction or a failure to apply the law agreed to by the parties.[55] As found by the committee in *Impregilo v. Argentina*, "[f]*ailure to apply the law is part of the concept of manifest excess of powers and for the reasons set out above, should be self-evident, clear, obvious, flagrant and substantially*

---

[51] *TECO Guatemala Holdings LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment, 5 April 2016 ("*TECO v. Guatemala*"), RL-207, ¶ 78.

[52] *Industria Nacional de Alimentos, S.A. (previously Empresas Lucchetti, S.A.) and Indalsa Perú, S.A. (previously Lucchetti Perú, S.A.) v. The Republic of Peru*, ICSID Case No. ARB/03/4, Decision on Annulment, 5 September 2007, CL-274, ¶ 112.

[53] *Alapli Elektrik B.C. v. Republic of Turkey*, ICSID Case No. ARB/08/13, Decision on Annulment, 10 July 2014 ("*Alapli v. Turkey*"), CL-273, ¶ 82.

[54] Updated Background Paper, RL-134, ¶ 81.

[55] Schreuer, RL-210, Art. 52, ¶¶ 167–171; 191–270.

*serious*".[56]  The Committee also agrees with Schreuer that annulment for non-application of the applicable law would be possible where a tribunal has failed to apply the proper law *in toto*.[57]

83.    The Parties hold different positions on whether an error in the application of the law or a misapplication of the law qualifies as a manifest excess of powers. Both Parties cite *Occidental Petroleum v. Ecuador* in support of their respective positions. Spain believes a gross and egregious error may be annullable grounds whereas the NextEra Entities disagree. The Committee observes that the "*fine line between failure to apply the proper law and erroneous application of the law*" is difficult to discern.[58] An alleged misapplication could easily overstep the line to become an appeal instead of an annulment. The drafting history of the ICSID Convention confirms that an "*erroneous application of the law could not amount to an annullable error, even if it is manifest*".[59] The drafting Legal Committee of the ICSID Convention confirmed that even a "*manifestly incorrect application of the law*" was not a ground for annulment.[60] The Committee finds that unlike a non-application or disregarding of the law, a mere misapplication or incorrect application of the law would not meet the high threshold of a manifest excess of powers.[61]

84.    The Committee finds that for a misapplication of the law to become annullable it would require meeting an "*extraordinarily high standard*".[62] The Committee agrees with the *Alapli v. Turkey* committee that it would require a "*'gross and egregious' misapplication*

---

[56] *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17, Decision of the *ad hoc* Committee on the Application for Annulment, 24 January 2014 ("*Impregilo v. Argentina*"), RL-205, ¶ 132. *See also Helnan International Hotels A/S v. Arab Republic of Egypt*, ICSID Case No. ARB/05/19, Decision of the *ad hoc* Committee, 14 June 2010, RL-191, ¶ 41; *Víctor Pey Casado and Foundation* "*Presidente Allende*" *v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment of the Republic of Chile, 18 December 2012 ("*Pey Casado v. Chile I*"), RL-182, ¶ 66.

[57] Schreuer, CL-279, Art. 52, ¶ 226.

[58] Updated Background Paper, RL-134, ¶ 93.

[59] Updated Background Paper, RL-134, ¶ 90. *See also Maritime International Nominees Establishment (MINE) v. Government of Guinea,* ICSID Case No. ARB/84/4, Decision on the Application by Guinea for Partial Annulment of the Arbitral Award, 14 December 1989, ICSID Review 96 ("*MINE v. Guinea*"), RL-178, at ¶¶ 5.08–5.09.

[60] Updated Background Paper, RL-134, ¶ 72.

[61] History of ICSID Convention, RL-192, Vol II, Part 1, p. 518; Schreuer, RL-210, ¶ 195.

[62] *Alapli v. Turkey*, CL-273, ¶ 82.

*of law*" reaching the level of "*non-application of the proper law*".[63] An applicant would have to show that the tribunal's legal analysis was "*so untenable or implausible that the error is evident on the face of the award*'".[64]    As *Occidental Petroleum v. Ecuador* similarly provided, "[o]*nly exceptionally gross or egregious errors of law, acknowledged as such by any reasonable person, could be construed to amount to a failure to apply the proper law, and could give rise to the possibility of annulment*".[65] Furthermore, as suggested by *Soufraki v. The United Arab Emirates,* the "*gross and consequential misinterpretation or misapplication of the proper law*" must be such that "*no reasonable person ('bon père de famille') could accept*" it.[66] The Committee concludes that a misapplication of the law could only be annullable if it was so "*gross and egregious*" that "*no reasonable person could accept it*" and amounted to a non-application of the law.

85.    Overall, as long as a tribunal's decision and its reasoning reflected in the Award is tenable, it would not be a "*patent*", "*clear*", "*evident*", "*obvious*", "*flagrant*" or "*easy to see or understand*" excess of powers, and a tribunal could not have manifestly exceeded its powers to justify annulment of an award.[67]

## B.    SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE (ART. 52(1)(d) OF THE ICSID CONVENTION)

86.    Art. 52(1)(d) of the ICSID Convention provides that a committee may annul an award if "*there has been a serious departure from a fundamental rule of procedure*".

---

[63] *Alapli v. Turkey*, CL-273, ¶ 82.

[64] *Alapli v. Turkey*, CL-273, ¶ 82. *Soufraki v. The United Arab Emirates* similarly provided that "[m]*isinterpretation or misapplication of the proper law may, in particular cases, be so gross or egregious as substantially to amount to failure to apply the proper law*", *Soufraki v. The United Arab Emirates*, RL-107, ¶ 86.

[65] *Occidental Petroleum v. Ecuador*, RL-179, ¶ 309.

[66] *Soufraki v. The United Arab Emirates*, RL-107, ¶ 86.

[67] *Helnan International Hotels A/S v. Arab Republic of Egypt, ICSID Case No. ARB/05/19*, Decision of the ad hoc Committee, 14 June 2010, RL-191, ¶ 55, also citing *Klöckner Industrie-Anlagen GmbH and others v. United Republic of Cameroon and Société Camerounaise des Engrais S.A.*, ICSID Case No. ARB/81/2, Decision on the Application for Annulment Submitted by Klöckner Against the Arbitral Award, 3 May 1985 ("*Klöckner v. Cameroon*"), RL-194, ¶ 52. See also *Rumeli v. Kazakhstan*, CL-241, ¶ 96, also citing *Klöckner v. Cameroon*, ¶ 115.

23

### a.    Spain's Position

87.    According to Spain, a departure is serious if a party is "*deprived of the protection afforded by the relevant procedural rule*".[68] A procedural rule is fundamental if it refers to the "*essential impartiality that must govern all proceedings and is included within the minimum standards of 'due process' required by international law*".[69] Spain focuses its claim on the right to be heard, equality of arms, treatment of evidence, and the rules on the burden of proof.[70]

88.    Spain contends the right to be heard can be violated when a party cannot submit "*all the arguments and all the evidence it* [deems] *relevant*",[71] "*does not have the opportunity to respond adequately to the arguments and evidence submitted by the other party*",[72] or a request for the submission of documents is unjustifiably refused.[73]

89.    Spain agrees with *Fraport v. Philippines* that "[i]*t is* [not an] *answer to a failure to accord such a right that both parties were equally disadvantaged*".[74] Spain also claims that the infringement of a simple procedural rule such as admitting a document as evidence or accepting false evidence can constitute a "*serious*" offence.[75] Spain cites *Teco v. Guatemala* for the position that a "*serious breach of a fundamental rule of procedure cannot be justified in light of a tribunal's discretion*".[76]

---

[68] Memorial, ¶ 373.

[69] Memorial, ¶ 373.

[70] Reply, ¶¶ 367–370.

[71] Memorial, ¶ 377, quoting *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Annulment, 30 December 2015 ("*Tulip v. Turkey*"), RL-181, ¶ 80.

[72] Memorial, ¶ 378.

[73] Memorial, ¶ 382.

[74] Reply, ¶ 373, citing *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Decision on the Application for Annulment of Fraport AG Frankfurt Airport Services Worldwide, 23 December 2010, RL-177, ¶ 202.

[75] Reply, ¶ 376.

[76] Reply, ¶ 381, quoting *Teco v. Guatemala*, RL-207, ¶ 196.

90. In terms of the equality of arms, Spain argues that the Tribunal refused Spain's right to present the evidence it considered necessary for the defense of its case and on an equal footing with the other party.[77]

91. As to the effect of a departure on the outcome, in its Memorial, Spain states that an applicant has "*no obligation to prove that the result of the Arbitration would have been different…but only the seriousness of the breach*".[78] At the Hearing, Spain repeated this position.[79] In its Reply, however, Spain recalibrates its position and states that an applicant would have to show "*the clear possibility that…there would have been a difference in some relevant aspect of the dispute*".[80] (emphasis added). Spain then cites with approval *Teco v. Guatemala*'s position, and similarly *Tulip v. Turkey*'s, that it would be enough to show "*whether the tribunal's compliance with a rule of procedure could potentially have affected the award*".[81] (emphasis added).

### b.    The NextEra Entities' Position

92. The NextEra Entities claim that "*Spain has waived the majority of its procedural complaints, if not all of them, pursuant to ICSID Arbitration Rule 27*".[82]

93. The NextEra Entities argue that the legal threshold to establish a serious violation of a fundamental rule of procedure is far higher than what Spain asserts. They claim that "[o]*nly rules of natural justice, which concern the essential fairness of the proceedings, can be considered fundamental*".[83] They cite the Background Paper's summary that "*it excludes the Tribunal's failure to observe ordinary arbitration rules*".[84]

---

[77] Reply, ¶ 370.

[78] Memorial, ¶ 387, citing *Pey Casado v. Chile I*, RL-182, ¶ 78.

[79] Tr. Day 1 (Gil Nievas), 43:21-44:2.

[80] Reply, ¶ 378.

[81] Reply, ¶ 379, quoting *Teco v. Guatemala*, RL-207, ¶ 85. *See also* Memorial, ¶ 399, citing *Tulip v. Turkey*, RL-181, ¶ 78.

[82] Counter-Memorial, ¶ 363.

[83] Counter-Memorial, ¶ 374.

[84] Counter-Memorial, ¶ 375, quoting the Updated Background Paper, RL-134, ¶ 98.

94.     They contend that an application must (1) identify a fundamental rule of procedure; (b) show that the Tribunal departed from that fundamental rule; and (c) demonstrate that the departure was serious.[85]

95.     They contend that Spain confuses the meaning of the right to be heard with how the Tribunal decided on its arguments after hearing them.[86] The Claimants claim that *Fraport v. Philippines*, *Amco v. Indonesia II*, *Pey Casado v. Chile I* and *Teco v. Guatemala*, the four examples of annulment on this ground, had "*readily distinguishable*" violations of procedure.[87]

96.     They cite *Churchill Mining v. Indonesia* to stress that "*the right to be heard is commonly considered as not absolute, but rather subject to possible limitations, provided that they are reasonable and proportional to the aim to be achieved*".[88] They also argue that Spain denies effect to the adjective "*serious*".[89]

97.     The NextEra Entities argue that for a departure to be "*serious*" it must have either "*caused the tribunal to reach a result substantially different from what it would have awarded had such a rule been observed*"(*Wena Hotels v. Egypt*) or "*a material effect on the outcome of the award*".[90] (emphasis in original). They also cite the *MINE v. Guinea* standard that the term "*serious*" "*establishes both quantitative and qualitative criteria: the departure must be substantial and be such as to deprive a party of the benefit or protection which the rule was intended to provide*".[91] They disagree with Spain's view that a "*potential impact*" would suffice and submit that an actual impact is necessary.

---

[85] Counter-Memorial, ¶ 371.

[86] Counter-Memorial, ¶ 364.

[87] Rejoinder, ¶ 81.

[88] Rejoinder, ¶ 80(b), quoting *Churchill Mining PLC and Planet Mining Pty Ltd v. Republic of Indonesia*, ICSID Case No. ARB/12/14 and 12/40, Decision on Annulment, 18 March 2019 ("*Churchill Mining v. Indonesia*"), CL-287, ¶ 178.

[89] Counter-Memorial, ¶ 378.

[90] Rejoinder, ¶ 82, quoting *Wena Hotels v. Egypt*, RL-140, at ¶ 58.

[91] Counter Memorial, ¶ 379.

### c.    The Committee's Analysis

98.   Art. 52(1)(d) provides for annulment if "*there has been a serious departure from a fundamental rule of procedure*". To meet this ground, an applicant must establish that a "*rule of procedure*" that was "*fundamental*" existed, and that a "*departure from*" it, occurred in a "*serious*" manner. The Committee observes that the ICSID Convention does not stipulate what rules of procedure are "*fundamental*", what is a "*departure*", and what constitutes a "*serious*" departure. The Committee finds that the meaning of "*fundamental*", "*departure*", and "*serious*" should be interpreted in accordance with their ordinary meaning, in their context, and in light of the object and purpose of the ICSID Convention.

99.   In terms of what constitutes a "*fundamental*" rule of procedure, the Committee agrees with the conclusions reached by *Fraport v. Philippines* that it should be "*restricted to the principles of natural justice, including the principles that both parties must be heard and that there must be adequate opportunity for rebuttal*".[92] Only rules of natural justice or rules concerned with the "*essential fairness of the proceeding*"[93] (*CDC v. Seychelles*) or "*essential to the integrity and fairness of the arbitral process*"[94] (*Occidental Petroleum v. Ecuador*), for example, would qualify. As *Wena Hotels v. Egypt* provided, a fundamental rule of procedure refers to a "*set of minimal standards of procedure to be respected as a matter of international law*".[95] The ICSID Convention's drafting history also provides that this ground concerns principles of due process that are necessary to ensure a full and fair hearing "*but that it excludes the Tribunal's failure to observe ordinary arbitration rules*".[96]

---

[92] *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Decision on the Application for Annulment of Fraport AG Frankfurt Airport Services Worldwide, 23 December 2010, RL-177, ¶ 186. *See also MINE v. Guinea,* RL-178, at ¶ 5.06.

[93] *CDC v. Seychelles,* RL-208, ¶ 49. *See also Teco v. Guatemala,* RL-207, ¶ 86; *Total S.A. v. Argentine Republic*, ICSID Case No ARB/04/1, Decision on Annulment, 1 February 2016, RL-211, ¶ 313.

[94] *Occidental Petroleum v. Ecuador*, RL-179, ¶ 62.

[95] Memorial, ¶¶ 374–5; Updated Background Paper, RL-134, ¶ 98; *Wena v. Egypt*, RL-140, at ¶ 57; *Iberdrola Energía, S.A. v. Republic of Guatemala*, ICSID Case No. ARB/09/5, Decision on the Remedy for Annulment of the Award Submitted by Iberdrola Energía, S.A., 13 January 2015, RL-180, ¶ 105; *Total S.A. v. Argentine Republic*, ICSID Case No ARB/04/1, Decision on Annulment, 1 February 2016, RL-211, ¶ 51; CL-302, *Orascom TMT Investments S.à r.l. v. People's Democratic Republic of Algeria*, ICSID Case No. ARB/12/35, Decision on Annulment, 17 September 2020, ¶ 140.

[96] Updated Background Paper, RL-134, ¶ 98.

100.    The Committee notes that Spain contends that the fundamental rules of procedure in dispute consist of the right to be heard, equality of arms, and the rules on the burden of proof.[97] The Claimants do not challenge that these are fundamental rules of procedure but stress that "[o]*nly rules of natural justice, which concern the essential fairness of the proceedings, can be considered fundamental*".[98]

101.    Most of Spain's claims under this ground focus on the right to be heard. Spain takes a broader view of the scope of the right to be heard and argues for the view taken by *Tulip v. Turkey* that a party should be able to submit "*all the arguments and all the evidence it* [deems] *relevant*".[99]   The Claimants assert the view of *Churchill Mining v. Indonesia* that the "*the right to be heard is commonly considered as not absolute, but rather subject to possible limitations, provided that they are reasonable and proportional to the aim to be achieved*".[100]

102.    The Committee finds that Art. 52(1)(b) only applies to a "*serious departure*" of a fundamental rule of procedure that is essential to the fairness and integrity of the proceeding. Given that only a serious departure of the right to be heard would qualify, the Committee concludes that the right should be limited by a standard of reasonableness. The Committee agrees with *Churchill Mining v. Indonesia* that the right to be heard could be subject to "*reasonable and proportional*" limitations provided that the fairness and integrity of the proceeding were maintained.

103.    Furthermore, the Committee finds that in accordance with its ordinary meaning, in its context, and in light of the object and purpose of the ICSID Convention, a serious departure from a fundamental rule of procedure would not be meaningful unless it is interpreted to have a material impact on the outcome. Committees have diverged on how seriously affected an applicant must be. Some committees believe an applicant must demonstrate

---

[97] Memorial, ¶¶ 374–5. Spain mentions other rules of procedure such as the absence or abuse of deliberation by the arbitrators; the violation of the rules of legal standing only in passing, *see* Memorial, ¶ 385.

[98] Counter-Memorial, ¶ 374.

[99] Memorial, ¶ 377, quoting *Tulip v. Turkey*, RL-181, ¶ 80.

[100] Counter-Memorial, ¶ 377, quoting *Churchill Mining v. Indonesia*, CL-287, ¶ 178.

that the final decision of the tribunal would have been different but for the breach, whereas others consider a potential impact would suffice.[101]

104.   The NextEra Entities adopt the former view. They argue that, for a departure to be "*serious*", it must have either "*caused the tribunal to reach a result substantially different from what it would have awarded had the rule been observed*" or "*a material effect on the outcome of the award*".[102] They cite *Wena Hotels v. Egypt* for the view that "*the violation of such a rule must have caused the Tribunal to reach a result substantially different from what it would have awarded had such a rule been observed*".[103] They also cite *MINE v. Guinea* that held that the term "*serious*" "*establishes both quantitative and qualitative criteria: the departure must be substantial and be such as to deprive a party of the benefit or protection which the rule was intended to provide*".[104]

105.   Other committees such as *Pey Casado v. Chile I* and *Tulip v. Turkey* have adopted Spain's position in its Reply, and focused on whether the final decision could have been different but for the breach.[105] *Pey Casado v. Chile I*, for example, held that "*a distinct possibility (a 'chance') that it may have made a difference on a critical issue*" would be sufficient. *Tulip v. Turkey* held that "*the potential of causing the tribunal to render an award substantially different from what it actually decided*" was all that needed to be shown.[106] Notably, some committees have gone further and followed Spain's original position in its Memorial that a breach alone was sufficient for an award to be annulled. This view suggests that the effect on the outcome need not be shown as long as the breach was serious enough. The Committee concurs with the Claimants that Spain's reference in its Memorial to *Tulip*

---

[101] *Wena Hotels v. Egypt*, RL-140, at ¶ 58; *CDC v. Seychelles*, RL-208, ¶ 49; *Azurix v. Argentina*, RL-176, ¶ 234; *Enron Creditors Recovery Corp. Ponderosa Assets, L.P. v. The Argentine Republic*, Decision on the Application for Annulment of the Argentine Republic, ICSID Case No. ARB/01/3, 30 July 2010 ("*Enron v. Argentina*"), RL-197, ¶ 71; *Impregilo v. Argentina*, RL-205, ¶ 164; *Total S.A. v. Argentine Republic*, ICSID Case No ARB/04/01, Decision on Annulment, 1 February 2016, RL-211, ¶ 308; *Occidental Petroleum v. Ecuador*, RL-179, ¶ 62; *OI European Group B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Decision on the Application for Annulment of the Bolivarian Republic of Venezuela, 6 December 2018, CL-240, ¶ 248.

[102] Rejoinder, ¶ 82.

[103] *Wena Hotels v. Egypt*, RL-140, at ¶ 58.

[104] *MINE v. Guinea,* RL-178, at ¶ 5.05.

[105] *Pey Casado v. Chile I*, RL-182, ¶ 78, 269; *CEAC Holdings Limited v. Montenegro*, ICSID Case No. ARB/14/08, Decision on Annulment, 1 May 2018 ("*CEAC v. Montenegro*"), CL-284, ¶ 93; *Tulip v. Turkey*, RL-181, ¶ 78.

[106] *Pey Casado v. Chile I*, RL-182, ¶ 77; *Tulip v. Turkey*, RL-181, ¶ 78.

*v. Turkey* and *Pey Casado v. Chile I* as support for this view is inapposite but does find *Churchill Mining v. Indonesia* serves as an example for this view.[107]

106.    The Committee agrees with Spain's position in its Reply and the committees that have held that it is sufficient to demonstrate that the departure had the potential of causing a material impact on the outcome of the award. Requiring an applicant to establish that a departure would have had a material impact on the outcome would constitute an unreasonable burden. A committee does not have to go so far as to determine whether the award would have been substantially different. At the same time, having an applicant only establish a breach of the standard without any potential impact would undermine the purpose of the annulment proceeding.

107.    Finally, in terms of ICSID Arbitration Rule 27, the Committee notes that the Parties agree that, for an applicant to be entitled to seek annulment based on a serious departure of a fundamental rule of procedure, the applicant must object in a timely manner at the time the procedural violation occurred.[108] Failure to make a timely objection would preclude annulment based on these grounds.[109]

## C.    AWARD'S FAILURE TO STATE REASONS (ART. 52(1)(e) OF THE ICSID CONVENTION)

108.    Art. 52(1)(e) provides that an award may be annulled if it "*fail*[s] *to state the reasons on which it is based*". This provision should be considered within the context of Art. 48(3) which requires that "*the award shall deal with every question submitted to the Tribunal, and shall state the reasons upon which it is based*".

---

[107] *Churchill Mining v. Indonesia*, CL-287, ¶ 180.

[108] Reply, ¶¶18(a), 18(b); Rejoinder, ¶ 84.

[109] *Joseph C. Lemire v. Ukraine,* ICSID Case No. ARB/06/18, Decision on Ukraine's Application for Annulment of the Award, 8 July 2013, CL-275, ¶ 272.

### a.    Spain's Position

109.    Spain submits that committees have "*uniformly established*" that Arts. 48(3) and 52(1)(e) require "*at least, that the award allow the reader to 'follow how the tribunal proceeded from Point A. to Point B*'".[110]

110.    Spain cites *TECO v. Guatemala* for support that an award should be annulled if a tribunal "*ignored the existence in the record of evidence which at least appeared to be relevant to its analysis*".[111]

111.    Spain recites examples of what would qualify as a failure to state reasons. First, Spain submits that "*a failure to deal with 'every question submitted to the Tribunal'*" would qualify.[112] (emphasis added). Spain contends that an award must "*address all issues submitted to the Tribunal by the parties and state the reasons on which it is based (Article 48) so that, if those reasons are not stated, the award must be annulled under Article 52(1)(e)*"[113] (emphasis added). At the same time, Spain acknowledges that "*all arguments and evidences may not be addressed in an Award*".[114] It agrees with *MINE v. Guinea* that "*the lack of response to each of the arguments presented by the parties was not constitutive of the cause of annulment*".[115] Yet, Spain submits that when a tribunal "*fails to rule on relevant issues raised by the parties*" this constitutes a failure to state reasons.[116]

112.    Second, in terms of the "*adequacy of the reasons*", Spain submits the reasons must be "*comprehensive and consistent*",[117] "*sufficiently relevant*" (*Klöckner v. Cameroon*)[118], or

---

[110] Application, ¶ 79; Memorial, ¶ 179, quoting *MINE v. Guinea*, RL-178, at ¶ 5.09, and other committees; Reply, ¶ 494.

[111] Memorial, ¶ 188, quoting *Teco v. Guatemala,* RL-207, ¶ 138.

[112] Reply, ¶ 484, quoting *Klöckner v. Cameroon*, RL-194, ¶ 115.

[113] Reply, ¶ 127.

[114] Reply, ¶ 115.

[115] Reply, ¶ 495, citing *MINE v. Guinea,* RL-178, at ¶¶ 5.08, 5.09.

[116] Reply, ¶ 509, citing *Pey Casado v. Chile I*, RL-182, but the actual text is "*pivotal or outcome-determinative point*", *see* ¶ 86.

[117] Memorial, ¶ 180.

[118] Reply, ¶ 485, quoting *Klöckner v. Cameroon*, RL-194, ¶ 120.

"*sufficiently pertinent*" (*Amco v. Indonesia I*).[119] An award must "*detail the reasoning which enabled the Tribunal to reach that particular conclusion*".[120] Spain explains that an award would fail to state reasons if the reasons are "*insufficient or inadequate*" (*Soufraki v. The United Arab Emirates*)[121] or "*so inadequate that the coherence of the reasoning is seriously affected*" (*Mitchell v. The Democratic Republic of Congo*)[122].

113.    Third, the reasons must not be "*frivolous*" or "*contradictory*".[123] Spain submits that reasoning that is "*inconsistent or contradictory*"[124] or "*seriously contradictory*" (*Mitchell v. The Democratic Republic of Congo*)[125] would be annullable. It cites *MINE v. Guinea* and *Amco v. Indonesia I* as examples of annulment because the tribunal "*contradicted itself*".[126]

114.    Finally, Spain argues that if a tribunal "*does not treat a specific question referred to it*" or "*fails to cover certain relevant proof or evidence*" for its determination it would justify annulment.[127]

115.    Spain stresses the finding in *Klöckner v. Cameroon* that "*it is not for the Committee to imagine what might or should have been the arbitrators' reasons, any more than it should substitute 'correct' reasons for possibly 'incorrect' reasons, or deal 'ex post facto' with questions submitted to the Tribunal which the Award left unanswered*".[128]

116.    Spain also cites *MINE v. Guinea* regarding the "*relevance*" of the questions that did not have reasons and suggests that it was necessary that the answer to those questions "*might*

---

[119] Reply, ¶ 490, quoting *Amco Asia Corporation, et al. v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision of the *ad hoc* Committee on the Application for Annulment, 16 May 1986, 1 ICSID Reports 509, RL-196, at ¶ 43.

[120] Reply, ¶ 509, citing *MINE v. Guinea*, RL-178, and *Teco v. Guatemala*, RL-207.

[121] Memorial, ¶ 182, quoting *Soufraki v. The United Arab Emirates*, RL-107, ¶¶ 122–123.

[122] Reply, ¶ 509, citing *Mr. Patrick Mitchell v. The Democratic Republic of Congo*, ICSID Case No. ARB/99/7, Decision on the Application for Annulment of the Award, 1 November 2006 ("*Mitchell v. The Democratic Republic of Congo")*, RL-206, ¶ 21.

[123] Memorial, ¶ 183.

[124] Memorial, ¶ 183.

[125] Reply, ¶ 497, citing *Mitchell v. The Democratic Republic of Congo*, RL-206, ¶ 21.

[126] Memorial, ¶¶ 183–184.

[127] Memorial, ¶ 187, quoting, Updated Background Paper, RL-134, ¶ 104. The actual wording is "*failure to address a particular question submitted to it*" and "*failure to address certain evidence relevant to the determination of damages*".

[128] Reply, ¶ 488.

*have affected the Tribunal's conclusion*".[129] At the same time, Spain cites *Pey Casado v. Chile I* which suggests that reasons must be provided for "*a pivotal or outcome-determinative point*".[130]

### b.    The NextEra Entities' Position

117.    As provided in response to Annulment Ground (e) in Section V.D(1), *infra,* the Claimants submit that under ICSID Arbitration Rule 27 the Applicant waived its objections on these grounds.[131] The NextEra Entities argue that Spain has waived its right to seek annulment because it became aware of the issue when it received the Tribunal's Decision but failed to object within the 80 days since the Award was rendered. Spain's waiver is compounded because it did not request a supplementary decision on, or rectification of, the Award.[132]

118.    The NextEra Entities emphasize the high threshold that must be met for annulment for failure to state reasons.[133] First, Art. 52(1)(e) only requires a tribunal to address the questions that are "*essential*" or "*necessary*" to its award.[134] A tribunal does not have to deal with every question or argument submitted to it.[135] The Claimants criticize the Applicant's failure to address the difference between Art. 48(3) and Art. 52(1)(e) and how "*failure to deal with every question submitted to a Tribunal*" is not a basis for annulment.[136] Citing *MINE v. Guinea*, the Claimants argue that the sole exception is where the question is so "*essential*" the failure to deal with it would "*render*[ ] *the award 'unintelligible'*".[137] The Claimants claim that Spain misquoted *Sempra v. Argentina* for the view that

---

[129] Reply, ¶ 495, quoting *MINE v. Guinea,* RL-178, at ¶ 6.99.

[130] Reply, ¶ 502, quoting *Pey Casado v. Chile I*, RL-182, ¶ 86.

[131] Counter-Memorial, ¶ 79.

[132] Counter-Memorial, ¶ 174.

[133] Rejoinder, ¶ 61.

[134] Counter-Memorial, ¶¶ 175–176, quoting *Ioan Micula and Ors. v. Romania,* ICSID Case No. ARB/05/20, Decision on Annulment, 26 February 2016*,* CL-188, ¶ 139, and *Joseph C. Lemire v. Ukraine,* ICSID Case No. ARB/06/18, Decision on Ukraine's Application for Annulment of the Award, 8 July 2013, CL-275, ¶ 279 (citing *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, ICSID Review 90 ("*Vivendi v. Argentina I*"), CL-276.

[135] Counter-Memorial, ¶¶ 182–185.

[136] Rejoinder, ¶¶ 70–71.

[137] Counter-Memorial, ¶ 189, citing *MINE v. Guinea,* RL-178, at ¶ 5.13.

"*comprehensive*" reasoning is needed because the actual wording is that awards should be "*reasonably comprehensible and consistent*".[138]

119.   Along similar lines, the Claimants submit a tribunal is not required to address every piece of evidence. Citing *Tza Yap Shum v. Peru,* they argue that a tribunal does not have to "*explain […] itself in respect of each piece of evidence adduced by either party which is not outcome determinative*".[139] The Claimants submit that "*even for issues that are outcome-determinative*", a tribunal does not have to "*traverse every single argument or piece of evidence*".[140]

120.   Second, Art. 52(1)(e) does not permit a review of the merits of a tribunal's decision. As provided by *Tidewater v. Venezuela,* a committee "*must not re-argue the merits of the case*".[141]

121.   Third, Art. 52(1)(e) does not involve an inquiry into the sufficiency or adequacy of a tribunal's reasons but only the existence of reasons.[142] The Claimants submit that "[a]*nnulment committees have widely rejected the claim that Art. 52(1)(e) allows an inquiry into the adequacy or sufficiency of a tribunal's reasons*".[143] The Claimants disagree with Spain and claim Spain mis-cites *Mitchell v. The Democratic Republic of Congo*, which endorsed the *MINE v. Guinea* test when it stated "*the adequacy of the reasoning is not an appropriate standard of review*".[144]

122.   Fourth, tribunals are given considerable discretion as to how they provide their reasons, both expressly and implicitly, and they may do so succinctly.[145] As summarized by the

---

[138] Counter-Memorial, ¶ 181(a); *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Decision on the Argentine Republic's Request for Annulment of the Award, 29 June 2010", RL-133, ¶ 167.

[139] Counter-Memorial, ¶ 192, quoting *Mr. Tza Yap Shum v. Republic of Peru*, ICSID Case No. ARB/07/6, Decision on Annulment, 12 February 2015, RL-195, ¶ 110 (emphasis added by the Claimants); and citing with approval *Teco v. Guatemala,* RL-207, ¶ 125.

[140] Rejoinder, ¶ 77.

[141] Counter-Memorial, ¶ 194, quoting *Tidewater Investment SRL and Tidewater Caribe, C.A. v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/10/5, Decision on Annulment, 27 December 2016, RL-141, ¶ 171.

[142] Counter-Memorial, ¶¶ 196–201.

[143] Rejoinder, ¶ 67.

[144] Rejoinder, ¶ 67, quoting *Mitchell v. The Democratic Republic of Congo*, RL-206, ¶ 21.

[145] Counter-Memorial, ¶¶ 203–206, quoting *Wena Hotels v. Egypt*, RL-140, at ¶ 81.

*Wena Hotels v. Egypt* committee: "[t]*he Tribunal's reasons may be implicit in the considerations and conclusions contained in the award, provided they can be reasonably be inferred from the terms used in the decision*".[146] They also point out that a committee may "*explain or clarify*" a tribunal's reasons.[147] Contrary to Spain's assertions, the NextEra Entities argue that Spain's own authorities provide that tribunals: (i) can state their reasons without reference to the underlying factual or legal bases of such reasons; and (ii) are not required to document reasons with elaborate citations to decisions and exhibits.[148] The Claimants highlight that tribunals are given even greater discretion as to their statement of reasons on quantum.

123.    Fifth, Art. 52(1)(e) sets a high threshold for proving contradictory reasons and awards are presumed not to contain them.[149] They cite *Daimler v. Argentina* for the position that a committee should, "*to the extent possible and considering each case, prefer an interpretation which confirms an award's consistency as opposed to its alleged inner contradictions*".[150] They also cite *Standard Chartered v. Tanzania Electric* for the view that contradictory reasons must "*completely cancel each other out, leaving the Award with a total absence of reasons*".[151]

124.    The Claimants also invoke *Gambrinus v. Venezuela* to point out that a "*Tribunal cannot be faulted in not addressing* [an issue] *when it was not raised specifically as an issue or argued in extensor* [sic] *by the Applicant before the Tribunal*".[152] The Claimants raise this point due to the "*extensive new merits and jurisdictional arguments contained in Spain's Reply on Annulment and the Reply Report of Professor Gosalbo*".[153]

---

[146] Counter-Memorial, ¶ 207.

[147] Counter-Memorial, ¶ 208.

[148] Counter-Memorial, ¶ 209.

[149] Counter-Memorial, ¶¶ 212–215.

[150] Counter-Memorial, ¶ 212, quoting *Daimler Financial Services A.G. v. Republic of Argentina*, ICSID Case No. ARB/05/1, Decision on Annulment, 7 January 2015 ("*Daimler v. Argentina)*, CL-283, ¶ 78.

[151] Counter-Memorial, ¶ 213, quoting *Standard Chartered v. Tanzania Electric*, CL-244, ¶ 611.

[152] Rejoinder, ¶ 79, quoting *Gambrinus, Corp. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/31, Decision on Annulment, 3 October 2017, CL-307, ¶ 199.

[153] Rejoinder, ¶ 79.

125.    Finally, the Claimants challenge Spain's assertion that a tribunal's summation of the parties' arguments cannot be considered to be part of the tribunal's reasoning. The Claimants assert that awards should be read as a whole.[154] As support, they invoke *Continental v. Argentina* for the position that "*in determining whether the reasons given for a conclusion on a particular question are sufficient, it is necessary not to look in isolation at the particular paragraphs of the award dealing specifically with that question. Those paragraphs must always be read together with the award as a whole*".[155]

### c.    The Committee's Analysis

126.    Art. 52(1)(e) provides for annulment if an award fails to state the reasons on which it is based. Unlike other grounds, Art. 52(1)(e) does not include any limiting terms such as "*manifest*", "*serious*", or "*fundamental*". The Committee agrees with the Claimants that Art. 52(1)(e) should be interpreted within the context of Art. 48(3). While Art. 48(3) requires that a tribunal should answer "*every question submitted*", a failure to do so was specifically not included as a basis for annulment in Art. 52(1)(e).[156] A tribunal's failure to address all questions submitted to it by the parties is not in itself a basis for annulment. As Schreuer explains, "[t]*he duty to state reasons refers only to a minimum requirement. It does not call for tribunals to strain every sinew in an attempt to convince the losing party that the decision was the right one*".[157]

127.    Both Parties cite *MINE v. Guinea* to support their positions on Art. 52(1)(e) with Spain calling it "*one of the most followed interpretations*" and the NextEra Entities, one that has

---

[154] Counter-Memorial, ¶ 205.

[155] Counter-Memorial, ¶ 205, quoting *Continental Casualty Company v. The Argentine Republic*, ICSID Case No. ARB/03/9, Decision on the Application of the Partial Annulment of Continental Casualty Company and the Application for Partial Annulment of the Argentine Republic, 16 September 2011, CL-282, ¶ 261; Rejoinder, fn 668, citing *Continental Casualty v. Argentina* and referring to cases that they cite with approval: *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Decision on Annulment, 29 June 2012, RL-071, ¶ 157; *Churchill Mining v. Indonesia*, CL-287, ¶ 257; *Enron v. Argentina*, RL-197, ¶¶ 269, 326; and suggesting to *see also Duke Energy International Peru Investments No. 1, Ltd. v. Republic of Peru*, ICSID Case No. ARB/03/28, Decision of the *ad hoc* Committee, 1 March 2011, RL-204, ¶ 180; *Rumeli v. Kazakhstan*, CL-241, ¶ 11; *Azurix v. Argentina*, RL-176, ¶ 244.

[156] Schreuer, RL-257, ¶¶ 308–309, citing *MINE v. Guinea,* RL-178, at ¶ 5.13. *See also MINE v. Guinea,* RL-178, at ¶ 5.08; Rejoinder, ¶¶ 70–71.

[157] Schreuer, RL-257, Art. 52, ¶ 342.

been "*largely settled*".[158] The Parties agree that under Art. 52(1)(e) an award must allow a reader to "*follow how the tribunal proceeded from Point A. to Point B., and eventually to its conclusion, even if it made an error of fact or law. This minimum requirement is in particular not satisfied by either contradictory or frivolous reasons*".[159] *MINE v. Guinea*'s pronouncement on the meaning of Art. 52(1)(e) is well-established, although the Parties differ in its application.

128.   One issue concerns whether the correctness, persuasiveness, or adequacy of an award's reasoning should be considered. The Committee notes the admonishment by Schreuer that Art. 52(1)(e) "*is most likely to blend into an examination of the award's substantive correctness and hence to cross the border between annulment and appeal*".[160] The Committee confirms that its mandate requires it must not engage in an appeal but only assess whether to annul within the limits prescribed under Art. 52(1). The Committee finds that it must not engage in an assessment of the "*correctness*" of the Tribunal's reasoning or whether it was "*appropriate or convincing*". The Committee agrees with *Vivendi v. Argentina I* that "[p]*rovided that the reasons given by a tribunal can be followed and relate to the issues that were before the tribunal, their correctness is beside the point in terms of Article 52(1)(e)*".[161] Along similar lines, the Committee agrees with the analysis of *CEAC v. Montenegro* that a committee is "*not empowered to reconsider whether the Tribunal's reasons were appropriate or convincing*".

129.   Echoing *MINE v. Guinea*, *CEAC v. Montenegro* summarizes that "[t]*he test is simply whether the Tribunal was guilty of a failure to state its reasons in such a way that there is a lack of expressed rationale or that the reasoning cannot be followed*".[162] The failure to state reasons must leave the decision on a particular point essentially lacking in any expressed rationale or the reasoning could not be followed. Second, that point must itself

---

[158] Reply, ¶ 494; Counter-Memorial, ¶ 198.

[159] *MINE v. Guinea,* RL-178, at ¶ 5.09; Reply, ¶¶ 494, 512; Counter-Memorial, ¶ 229.

[160] Schreuer, RL-257, Art. 52, ¶ 344.

[161] *Vivendi v. Argentina I*, CL-276, at ¶ 64, as cited in *Soufraki v. The United Arab Emirates*, RL-107, ¶ 124.

[162] *CEAC v. Montenegro*, CL-284, ¶ 139.

be necessary to the tribunal's decision. As long as there is some rationale, the focus of the analysis is whether the reasoning could be "*followed*".

130.    In terms of adequacy of the reasoning, the Committee does not agree with Spain's assertion that "*the mere expression in the Decision or the Award of an opinion is not an expression of reasoning if it does not detail the reasoning which enabled the Tribunal to reach that particular conclusion*" and "*the mere expression of reasons is not sufficient to validate the Award…if they are not adequate*".[163] Art. 52(1)(e) does not require a committee to determine if a tribunal "*detail*[ed] *the reasoning which enabled* [it] *to reach* [a] *particular conclusion*". Instead, as found above, the Committee finds that it must not venture into whether a tribunal "*detailed*" its reasoning and whether it was "*adequate…to reach* [a] *particular conclusion*". Should a committee assess the adequacy or completeness of the reasoning it should only do so to determine if the reasoning could be "*followed*".

131.    Both Parties agree that "*contradictory*" or "*frivolous*" reasons may, in certain circumstances, give rise to a potential ground for annulment.[164] The Committee agrees with both Parties that contradictory reasons exist when they cancel each other out.[165] The Committee concurs with *Vivendi v. Argentina I,* that a committee should be "*careful not to discern contradiction when what is actually expressed in a tribunal's reasons could more truly be said to be but a reflection of such conflicting considerations*".[166] The Committee notes that the Applicant has not explicitly raised "*frivolous*" reasons as a basis for annulment.

132.    Both Parties cite the view from *Wena Hotels v. Egypt* that reasons must be "*reasonably inferred from the terms used in the decision*".[167] The Committee agrees with the decisions that follow *Wena Hotels v. Egypt,* such as *Azurix v. Argentina*, *CMS v. Argentina*, and

---

[163] Reply, ¶ 509.

[164] Memorial, ¶ 183; Rejoinder, ¶ 68.

[165] Reply, ¶ 484; Counter-Memorial, ¶ 213; *Tidewater Investment SRL and Tidewater Caribe, C.A. v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/10/5, Decision on Annulment, 27 December 2016, RL-141, ¶ 170.

[166] *Vivendi v. Argentina I*, CL-276, at ¶ 65.

[167] Reply, ¶ 499, quoting *CMS Gas Transmission Company v. Argentine Republic*, Decision of the *ad hoc* Committee on the Application for Annulment of the Argentine Republic, ICSID Case No. ARB/01/8, 25 September 2007, RL-075, ¶ 97; *CMS v. Argentina* quotes this from *Wena Hotels v. Egypt*, RL-140, at ¶ 81.

*Enron v. Argentina* that reasons may be "*implicit*" but at the same time "*provided they can be reasonably inferred from the terms used in the decision*".[168] The Committee concurs with the view of *Vivendi v. Argentina I* that "*reasons may be stated succinctly or at length, and different legal traditions differ in their modes of expressing reasons. Tribunals must be allowed a degree of discretion as to the way in which they express their reasoning*".[169] A tribunal should be granted a measure of discretion when providing its reasons such that the reasoning may be implicit as long as it can be "*reasonably inferred*".

## V.    GROUNDS FOR ANNULMENT

### A.    TRIBUNAL'S DECISION CONCERNING ITS JURISDICTION *RATIONE PERSONAE*

#### (1)    Manifest Excess of Powers and Failure to State Reasons to Exercise Jurisdiction: The NextEra Entities' Nationality and Status as Investor (Art. 52(1)(b) and Art. 52(1)(e)) (Annulment Grounds (a) and (b))

##### a.    *Spain's Position*

133.    Spain submits that the Tribunal committed a manifest excess of powers by upholding jurisdiction *ratione personae* given the Claimants' nationality and lack of status as an "*Investor*" under the ECT.

134.    Spain starts by explaining the following:

> The ECT does not give further criteria as to what is to be understood as the 'enterprise' *making the investment in accordance with Article 1(7). The determination of the ECT is to refer to the law of the contracting party. It was clearly explained in the Arbitration that an* 'enterprise' *could only be considered as such for the purposes of the ECT if under the law applicable to that entity it is qualified as* 'enterprise'.[170]

---

[168] *Wena Hotels v. Egypt*, RL-140, at ¶ 81. Cited with approval in *Azurix v. Argentina*, RL-176, ¶ 54; *Enron v. Argentina,* RL-197, ¶ 75.

[169] *Vivendi v. Argentina I*, CL-276, at ¶ 64, as cited in *Soufraki v. The United Arab Emirates*, RL-107, ¶ 124.

[170] Memorial, ¶ 89.

135.    Spain claims that the Tribunal erred in its analysis in connection with the existence of an "*Investor*" under the ECT because it merely resorted to case law, which is not a source of international law, and did not look at the factual circumstances.[171] Under the ECT, to analyze whether a company can be qualified as an "*Investor*", it was necessary to analyze the law of the State concerned. Spain recalls that the ECT refers to the legislation of the State concerned to determine the existence or inexistence of an enterprise that can qualify as an "*Investor*" under the treaty.[172] The Tribunal did not conduct such an analysis of Dutch or EU legislation. According to Spain, based on the ECT and following the criteria for interpretation stated in the Vienna Convention, the NextEra Entities did not qualify under Dutch law as an enterprise or another legally constituted organization for the purpose of the ECT.[173]

136.    Spain rebuts the NextEra Entities' point that the Tribunal interpreted Art. 1(7) consistently with dozens of other ECT tribunals by arguing that: (i) ECT awards "*are not a source of international law*"; (ii) "*it is perfectly feasible that many tribunals have been mistaken on the same point before*"; and (iii) "*previous decisions are not comparable to the case. The case here is different, since the Tribunal does not apply the ECT directly*".[174]

137.    On similar grounds, Spain adds that the Award failed to state reasons in finding jurisdiction *ratione personae* based on the nationality of the NextEra Entities and their status as investors under the ECT.[175] Spain claims it provided evidence of Florida Power and Light's ("**FPL**") control and direction of the Claimants and the implications of this under the applicable Dutch and EU legislation. Yet, the Tribunal ruled on the matter without giving any reasons other than relying on arguments from other awards. It disregarded the evidence and did not justify why the evidence submitted by the Parties led to its judgment.[176]

---

[171] Memorial, ¶ 92.

[172] Memorial, ¶ 94.

[173] Memorial, ¶ 94.

[174] Reply, ¶ 102.

[175] Reply, ¶ 137.

[176] Reply, ¶¶ 129–130.

138.    According to Spain, the Tribunal dismissed the claims under Art. 1(7) of the ECT without analyzing the applicable Dutch or EU law and without analyzing a "*single piece of evidence*".[177] The Tribunal "*totally and absolutely dispense*[d] *with any explanation of why it understands that there is an investor*" under the ECT.[178]

139.    Spain submits the Award is "*obviously contradictory, when it mentions the CVDT* [Vienna Convention] *but does not apply the ordinary meaning of the ECT and consequently applies the law applicable in the Netherlands*".[179] Alternatively, the Award should be annulled for "*failure to apply EU law to a company formally incorporated in the EU to determine its nationality and therefore to apply the appropriate law*".[180]

### b.    The NextEra Entities' Position

140.    The NextEra Entities start by claiming that Spain waived its argument on this ground because after it reviewed the Decision, it knew, or should have known, of its objection that the Tribunal had failed to deal with all of Spain's arguments about the existence of an investment. Spain did not promptly object, and it also failed to apply to the Tribunal to rectify or supplement this aspect of its Decision under Art. 49(2) of the ICSID Convention.[181] They cite Schreuer to contend that jurisdictional objections must be raised as soon as they are known and if these are not raised, they are deemed to be waived.[182]

141.    The NextEra Entities refer to their Observations on the EC's Amicus Brief of 23 April 2020, where they explained that:

> ...(a) a 'manifest' excess of jurisdiction must be obvious, i.e., not discerned through elaborate arguments by each side; (b) an annulment committee is not empowered to verify whether a tribunal's jurisdictional analysis was correct, but only whether it was tenable; (c) where multiple other ICSID tribunals have reached the same jurisdictional finding, an alleged excess of powers cannot

---

[177] Reply, ¶ 131.
[178] Reply, ¶ 126.
[179] Reply, ¶ 136.
[180] Reply, ¶ 137.
[181] Counter-Memorial, ¶ 98.
[182] Counter-Memorial, ¶ 104.

> *be manifest; and (d) where 'reasonable minds' disagree as to jurisdiction, the 'manifest' requirement is not fulfilled.*[183]

142.    The NextEra Entities contend that it is not a function of an *ad hoc* committee in an annulment proceeding to substitute its own view of the law and its own appreciation of the facts for those of the tribunal.[184]

143.    The NextEra Entities explain as follows:

> *...the ECT contains broad definitions of* 'Investor' *(based on a place of incorporation test)....Unsurprisingly, the Tribunal found that the Claimants satisfied* [the] *definition* [ ] *because they were companies incorporated in the Netherlands, which held direct and indirect equity interests in NEE España (the Spanish holding company that, in turn, owned the Spanish project companies).*[185]

144.    The Claimants claim that dozens of ECT tribunals have interpreted Art. 1(7) of the ECT in accordance with its ordinary meaning with the result that it covers holding companies incorporated in a relevant State just as the Tribunal did. Where many other tribunals have adopted the same interpretation, any alleged excess of powers cannot be manifest.[186]

145.    The NextEra Entities conclude that there was no manifest excess of powers as the Tribunal's interpretation was plainly tenable because it applied the express language of the ECT to undisputed facts such as NextEra Entities' place of incorporation.[187]

146.    Similarly, they claim that there was no failure to state reasons because reasoning was provided and it could be followed. The Decision identified the relevant treaty text in Art. 1(7) of the ECT and applied it to the fact that the Claimants were incorporated in the Netherlands and the Claimants owned the shareholding in NEE España.[188] The Tribunal was not required to address all of the Spain's arguments, particularly irrelevant ones, and was entitled to state its reasons succinctly. The Tribunal explained why it rejected

---

[183] Counter-Memorial, ¶ 87; NextEra Entities' Observations on the EC's Amicus Brief, 25 May 2020, Section III.

[184] Counter-Memorial, ¶ 89; *Venezuela Holdings B.V. and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Annulment, 9 March 2017, RL-198, ¶ 114.

[185] Counter-Memorial, ¶ 100.

[186] Counter-Memorial, ¶ 101.

[187] Counter-Memorial, ¶ 113.

[188] Decision, RL-132, ¶¶ 204, 207–212.

interpreting Art. 1(7) on the basis of EU and Dutch law and instead why it interpreted it based on the Vienna Convention.[189]

147.  The Claimants contend the Decision's reasoning was not contradictory. Spain's sole basis for claiming a contradiction in paragraph 205 of the Decision was that since there was no "*Investment*" there was no "*Investor*". The Claimants argue the reasoning within the paragraph "*fit* [s] *logically together*".[190] Each aspect of the Tribunal's reasoning was plain and could be followed by any reasonable reader of the Decision from "*Point A. to Point B.*".[191]

### c.    The Committee's Analysis

148.  The Committee must determine whether the Tribunal's interpretation and application of Art. 1(7) of the ECT to uphold jurisdiction *ratione personae* constitute a manifest excess of powers and whether the Award fails to state the reasons on which it is based.

149.  First, the Committee examines the Tribunal's exercise of its powers to determine whether it had jurisdiction *ratione personae*. The Tribunal noted that the ECT was a treaty and should be interpreted based on the Vienna Convention and its terms should be given their ordinary meaning in their context, and in light of the object and purpose of the treaty. The Tribunal first quoted the definition of "*Investor*" under Art. 1(7)(a)(ii) that provided "*a company or other organisation organised in accordance with the law applicable within that Contracting Party*".

150.  The Tribunal found that the NextEra Entities qualified as a "*company or other organisation*" under Art. 1(7). The Committee finds that the Tribunal's application of the plain wording of Art. 1(7)(a)(ii) that "*a company or other organisation*" would include holding companies and indirect equity interests was not untenable or implausible as a matter of law.

---

[189] Decision, RL-132, ¶ 211; Rejoinder, ¶ 99.

[190] Rejoinder, ¶ 103 (refers to "*paragraphs 247 and 248*" of the Decision but apparently meant to refer to the two sentences in paragraph 205 of the Decision that are referenced with footnote numbers 247 and 248).

[191] Counter-Memorial, ¶ 113(b).

151.    The Tribunal proceeded to declare that it was "*not disputed that Claimants, NextEra Global and NextEra Spain are incorporated in accordance with the law of the Netherlands*".[192] The Tribunal found that the NextEra Entities satisfied the second component of the definition of "*Investor*" under the ECT. The Tribunal based this decision on the fact that the Claimants were incorporated in the Netherlands and owned the subsidiary NEE España, the Spanish holding company that owned the Spanish project companies. The incorporation and ownership are not contested.[193] The Committee finds that the Tribunal analyzed the status of the Claimants under Dutch law and does not agree with Spain that the Tribunal "*dispensed with*" an analysis of the applicable law. The Tribunal identified the conditions for *ratione personae* by establishing that the dispute involved a Contracting State and a national of another Contracting State. The Committee therefore finds that the Tribunal's interpretation and application of Art. 1(7) to the Claimants were tenable and plausible as a matter of law and could not be considered a manifest excess of powers. The Tribunal's decision does not fall under the realm of being a "'*gross and egregious' misapplication of law*" that a "*reasonable person could not accept*" and does not reach the level of being a "*non-application of the proper law*".[194]

152.    The Committee observes that, as noted by the Tribunal itself, other tribunals applying the ECT have reached the same conclusions on jurisdiction *ratione personae* as the Tribunal in interpreting Art. 1(7).[195] As noted by the NextEra Entities, a "*dozens of ECT tribunals*" have interpreted Art. 1(7) in accordance with its ordinary meaning and held that they include "*holding companies incorporated in a relevant State, and indirect equity interests*".[196] Spain has not challenged this fact or cited any decisions disputing this argument.[197] While the decisions of other tribunals are not binding, they do shed light on whether a view is tenable. At a minimum, the fact that other tribunals have arrived at the

---

[192] Decision, RL-132, ¶ 208.

[193] Spain's Memorial on Preliminary Objections with Request for Bifurcation, 9 September 2015, C-307, ¶¶ 114–118; Spain's Reply on Preliminary Objections, 14 October 2016, R-470, ¶¶ 17, 55.

[194] See also *Alapli v. Turkey*, CL-273, ¶ 82.

[195] Decision, RL-132, ¶¶ 209–210.

[196] Counter-Memorial, ¶ 101, citing Decision, RL-132, ¶¶ 199, 200, 204–212 and fn 242.

[197] Spain only contends that (i) ECT awards "*are not a source of international law*"; (ii) "*it is perfectly feasible that many tribunals have been mistaken on the same point before*"; and (iii) "*previous decisions are not comparable to the case. The case here is different, since the Tribunal does not apply the ECT directly*", Reply, ¶ 102.

same conclusion supports the position that the Tribunal's findings were not only "*susceptible of argument 'one way or the other'*" but also "*tenable as a matter of law*". This also confirms that the Tribunal's decision on jurisdiction *ratione personae* and the applicable law could not constitute an excess of powers that was "*plain*", "*clear*", "*obvious*", "*flagrant*", "*evident*" or "*easily understood or recognized by the mind*".

153. Second, on a similar basis, the Committee finds that Spain has not demonstrated that the Award failed to state reasons based on the NextEra Entities' nationality and jurisdiction *ratione personae*. The Tribunal considered Spain's argument that pure holding companies did not comply with Art. 1(7) and that it had to be interpreted on the basis of a particular meaning under EU or Netherlands law. [198] The Tribunal then applied the rules of interpretation according to Art. 31(1) of the Vienna Convention to find that the "*Claimants are companies that are organized under the law of the Netherlands*" and were thus "*investors*" under Art. 1(7). The Committee concludes that the Tribunal's decision on the Claimant's status as investors under Art. 1(7) of the ECT did not lack a rationale and that its reasoning could be followed. The Award did not fail to state reasons concerning its finding that the Claimants qualified as investors.

154. The Committee concludes that the Tribunal interpreted and applied Art. 1(7) of the ECT based on its plain meaning to find jurisdiction *ratione personae.* This was not untenable or implausible and overall the reasons could be followed. Therefore, the Tribunal did not manifestly exceed its powers and the Award did not fail to provide reasons.

---

[198] Decision, RL-132, ¶¶ 209–211.

**B.**     TRIBUNAL'S DECISION CONCERNING ITS JURISDICTION *RATIONE MATERIAE*

**(1)**     **Manifest Excess of Powers to Exercise Jurisdiction and Failure to State Reasons: Whether a Protected Investment and Direct Relationship Existed between the Parties (Art. 52(1)(b) and Art. 52(1)(e))(Annulment Grounds (a) and (b))**

*a.*     ***Spain's Position***

155.    Spain considers that the Tribunal manifestly exceeded its powers as it lacked jurisdiction to hear the present case, because there was neither an investment nor a direct relationship between the NextEra Entities and the events that gave rise to the alleged legitimate expectation.

156.    Relying on *Isolux v. Spain*, Spain states that according to the ECT an investment requires the existence of three elements: (i) contribution of funds; (ii) receipt of benefits; and (iii) assumption of risk.[199] The text of Art. 1(6) of the ECT should be read to require a "*real and effective economic investment, in an objective sense*".[200]

157.    Spain argues that the NextEra Entities did not contribute any funds as all economic obligations and risks were assumed by the American company FPL[201].

158.    Referring to the NextEra Entities, Spain explains that "[t]*hese Claimants acted as a mere conduit through which funds flow from the United States to Spain, without providing any economic value*".[202]

159.    As provided with respect to Art. 1(7), Spain rebuts the NextEra Entities' point that the Tribunal interpreted Art. 1(6) consistently with dozens of other ECT tribunals by providing that: (i) ECT awards "*are not a source of international law*"; (ii) "*it is perfectly feasible that many tribunals have been mistaken on the same point before*"; and (iii) "*previous*

---

[199] Memorial, ¶ 82. *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, Case No. SCC V2013/153, Award, 12 July 2016, RL-121, ¶¶ 683–685.

[200] Memorial, ¶ 78.

[201] Memorial, ¶ 88.

[202] Memorial, ¶ 88.

*decisions are not comparable to the case. The case here is different, since the Tribunal does not apply the ECT directly*".[203]

160. Spain claims on similar grounds that the Award failed to state reasons for finding jurisdiction *ratione materiae* based on the NextEra Entities' investment. According to Spain, the Award did not provide reasons as to why the NextEra Entities' investment qualified as a protected investment and "*totally and absolutely dispenses with any explanation of why it understands that there is an investment*".[204] Spain argues that the Tribunal did not address its argument that since the Claimants are not "*Investors*" within the meaning of Article 1(7) of the ECT, then they cannot have an "*Investment*" within the meaning of Article 1 (6) of the ECT.

161. Spain contends the Tribunal ruled on the matter without giving any reasons, and simply relied on arguments from other awards. It disregarded the evidence and did not justify why the evidence submitted by the Parties led to its judgment.[205] Spain also submits that the Award is "*obviously contradictory, when it mentions the CVDT* [Vienna Convention] *but does not apply the ordinary meaning of the ECT and consequently applies the law applicable in the Netherlands*".[206]

162. Spain then invokes Art. 25 of the ICSID Convention and Art 26 (1) of the ECT. Spain asserts that there was no direct relationship between the NextEra Entities and Spain that could justify any legitimate expectation. The letters that the Claimants rely upon for their claim of damages were addressed to an American entity.[207] Spain concludes by saying that "*there is not a dispute directly arising from expectations that the Kingdom of Spain would have generated in the Claimants. And the direct relationship required by the treaties is therefore non-existent*".[208]

---

[203] Reply, ¶ 102.
[204] Reply, ¶ 126.
[205] Reply, ¶¶ 129–130.
[206] Reply, ¶ 136.
[207] Memorial, ¶ 96.
[208] Memorial, ¶ 96.

163. Finally, Spain claims the Award wrongly concludes that it waived its objections under Art. 1(6). Spain submits that the Tribunal no longer dealt with Spain's claims as to why there was no investment under the *Salini* test just because it determined that Spain recognized that the Claimants owned the investment.[209] Spain also denies that the *Salini* arguments were raised for the first time and argues that the entire rationale was raised in the underlying arbitration.[210]

### b. The NextEra Entities' Position

164. The NextEra Entities again contend that Spain's argument regarding the existence of an investment has been waived because Spain did not promptly object and also failed to apply to the Tribunal to rectify or supplement this aspect of the Decision under Art. 49(2) of the ICSID Convention.[211] They cite Schreuer to contend that jurisdictional objections must be raised as soon as they are known and if these are not raised, they are deemed to be waived.[212]

165. The NextEra Entities explain that Spain cannot relitigate the existence of an investment by introducing new arguments not raised in the arbitration, such as the *Salini* test.[213] They explain that doing so would breach the well-established principle that an annulment proceeding is not an appeal or a "*challenge to the correctness*" and is not a forum to expand a party's original arguments.[214] According to the Claimants, other than claiming that without an "*Investor*" under Art. 1(7) there could be no "*investment*", Spain pursued no other arguments concerning the requirements of Art. 1(6).[215]

166. The Tribunal found that the Claimants satisfied the definition of investment because the companies incorporated in the Netherlands held direct and indirect equity interests in NEE España, the Spanish holding company that owned the Spanish project companies. The ECT

---

[209] Memorial, ¶¶ 86–88.
[210] Reply, ¶ 109.
[211] Counter-Memorial, ¶ 98.
[212] Counter-Memorial, ¶ 104.
[213] Counter-Memorial, ¶ 103.
[214] Counter-Memorial, ¶¶ 103–104.
[215] Counter-Memorial, ¶ 107.

48

contains broad definitions of "*Investment*" that expressly extend to investments held both directly and indirectly.

167.    The Claimants cite that dozens of ECT tribunals have interpreted Art. 1(6) in accordance with its ordinary meaning with the result that they cover holding companies and indirect equity interests just as the Tribunal did. Where many other tribunals have adopted the same interpretation, any alleged excess of powers cannot be manifest.[216]

168.    In addition, the NextEra Entities contend that Spain's argument regarding the need for a direct relationship between the investor and the State confuses the requirements under Art. 1(6) of the ECT and Art. 25(1) of the ICSID Convention. First, they claim that Spain never raised this argument in the arbitration. Second, they claim that Art. 25(1) does not require a direct relationship between the parties for the purposes of legitimate expectations but only a direct relationship between the investment and the dispute.[217]

169.    The Tribunal did not fail to state reasons because each aspect of the Tribunal's reasoning is plain and can be followed by any reasonable reader of the Decision from Point A to Point B.

c.    *The Committee's Analysis*

170.    Art. 1(6)(b) of the ECT provides that an "*Investment*" means "*every kind of asset, owned or controlled directly or indirectly by an Investor*" and includes "*a company or business enterprise*". The Committee examines the Tribunal's exercise of its powers to determine it had jurisdiction *ratione materiae* based on Art. 1(6) and whether the Award fails to state the reasons on which it is based.

171.    First, the Tribunal addressed Spain's argument that an investor had to own and control the assets on which the investment was based and found that Spain conceded that the Claimant's owned the Spanish companies. The Tribunal then considered Spain's next argument that since the Claimants were not "'*Investors' within the meaning of Art. 1(7)*"

---

[216] Counter-Memorial, ¶ 101.
[217] Counter-Memorial, ¶ 116; Rejoinder, ¶ 98.

they consequently could not have an "'*Investment' within the meaning of Art. 1(6)*".[218] The Tribunal concluded that since the Claimants were determined to be "*Investors*" under Art. 1(7), Spain's related argument under Art. 1(6) failed. The Committee finds that the Tribunal's reasoning concerning whether an investment existed pursuant to Art. 1(6) was based on the dismissal of Spain's argument concerning Art. 1(7). In the view of the Committee, the Tribunal considered that once Spain's argument based on Art. 1(7) was dismissed, Spain's basis to challenge the existence of an investment under Art. 1(6) was undermined. The Committee notes that this constituted Spain's core objection concerning Art. 1(6).

172.    As for the *Salini* test, Spain does not dispute that it did not specifically cite the *Salini v. Morocco* case in the underlying arbitration. At the same time, the Claimants recognize that Spain did raise an argument based on the principles outlined in the *Salini* test through the *Isolux v. Spain* case.[219] Nevertheless, the Committee concludes that whether the *Salini* test should have been applied calls for an assessment of the correctness of the decision and need not be considered in an application under Art. 52(1)(b) or (e).

173.    The Committee finds that the Tribunal interpreted and applied the plain wording of Art. 1(6)(b) to find a legal dispute arising directly out of an investment based on the NextEra Entities ownership. This conclusion was tenable and cannot be considered a manifest excess of powers. Whether Art. 1(6)(b) requires an investment to be a "*real and effective economic investment, in an objective sense*" or a "*direct*" relationship concerns the correct interpretation and relates to an alleged misapplication of the law beyond the subject of review under Art. 52(1)(b). The Tribunal's decision does not fall under the realm of being a "'*gross and egregious' misapplication of law*" to reach the level of being a "*non-application of the proper law*".[220]

174.    Again, the Committee observes that, as noted by the Tribunal itself, other tribunals applying the ECT have reached the same conclusions on jurisdiction *ratione materiae* as

---

[218] Decision, ¶ 205.

[219] Counter-Memorial, fn 119.

[220] *Alapli v. Turkey*, CL-273, ¶ 82.

the Tribunal in interpreting Art. 1(6).[221] As noted by the NextEra Entities, "*dozens of ECT tribunals*" have interpreted the wording of Art. 1(6) in accordance with its ordinary meaning and held that it includes "*holding companies incorporated in a relevant State, and indirect equity interests*".[222] Spain has not challenged this fact or cited any decisions disputing this argument.[223] The decisions of other tribunals are not binding but do shed light on whether a view is tenable. At a minimum, the fact that other tribunals have made such a decision supports the position that the Tribunal's findings were not only "*susceptible of argument 'one way or the other'*" but also "*tenable as a matter of law*". This also confirms that the Tribunal's decision on jurisdiction *ratione materiae* and the applicable law could not be deemed an excess of powers that was "*plain*", "*clear*", "*obvious*", "*flagrant*", "*evident*" or "*easily understood or recognized by the mind*".

175. On a similar basis, the Committee also finds that Spain has not demonstrated that the Tribunal failed to state reasons when finding it had jurisdiction *ratione materiae* based on the existence of a protected investment under the ECT. The Tribunal first addressed Spain's argument regarding whether an investor must own and control the assets on which the investment was based. The Tribunal found that Spain conceded that the Claimants owned the Spanish companies. According to the Tribunal, Spain argued that since the Claimants were not investors under Art. 1(7) they consequently could not have an investment under Art. 1(6).[224] The Tribunal concluded that since the Claimants were determined to be investors under Art. 1(7), Spain's related argument under Art. 1(6) failed. The Committee notes that this was the core of Spain's argument concerning Art. 1(6). A tribunal's reasons may be stated "*succinctly*" and adequacy and comprehensibility are not the test under Art. 52(1)(e). The Award did not lack a rationale in finding that the Claimant's investment met Art. 1(6) of the ECT.

[221] Decision, RL-132, ¶¶ 209–210.
[222] Counter-Memorial, ¶ 101, citing Decision, RL-132, ¶¶ 199, 200, 204–212 and fn 242.
[223] Spain only contends that (i) ECT awards "*are not a source of international law*"; (ii) "*it is perfectly feasible that many tribunals have been mistaken on the same point before*"; and (iii) "*previous decisions are not comparable to the case. The case here is different, since the Tribunal does not apply the ECT directly*". Reply, ¶ 102.
[224] Decision, RL-132, ¶ 205.

51

176.    The Committee finds the Tribunal's reasoning concerning whether an investment existed under Art. 1(6) of the ECT focused on rebutting Spain's argument based on Art. 1(7). In the view of the Committee, the Tribunal considered that once Spain's argument based on Art. 1(7) was dismissed, Spain's basis to challenge the existence of an investment under Art. 1(6) was undermined.

177.    The Committee also agrees with the Claimants that the Applicant confuses the requirements under Art. 1(6) of the ECT and Art. 25(1) of the ICSID Convention. The plain wording of the Art. 25(1) provides that it does not require a direct relationship between the parties for the purposes of legitimate expectations but only a direct relationship between the investment and the dispute.

178.    The Committee concludes that the Applicant has not established that the Tribunal manifestly exceed its powers or that the Award failed to state the reasons when it determined it had jurisdiction *ratione materiae* based on Art. 1(6) of the ECT.

**C.    TRIBUNAL'S DECISION CONCERNING ITS JURISDICTION *RATIONE VOLUNTATIS***

**(1)    Manifest Excess of Powers to Exercise Jurisdiction and Failure to State Reasons: Denial of Benefits under Art. 17 of the ECT. (Art. 52(1)(b) and (e)) (Annulment Grounds (c) and (d))**

***a.    Spain's Position***

179.    Referring to the denial of benefit clause of Art. 17 of the ECT, Spain contends that the Tribunal exceeded its powers when rejecting Spain's decision to deny benefits to the NextEra Entities based on a non-existent time requirement.[225] The Tribunal's interpretation created a new requirement not provided for in Art. 17, and violated the criteria for interpretation of the Vienna Convention. Spain's right of defense was infringed contrary to general principles of law when it was deprived of the denial of benefits clause under Art. 17.

---

[225] Application, ¶¶ 35–42; Memorial, ¶ 104.

180.    Spain contends that the Tribunal "*violated a general principle of international law and violated the right of defense of the accused of an international wrong and gave an interpretation of Article 17 favourable to the accuser and not to the accused*".[226]

181.    In furtherance of its argument, Spain states that Art. 17 "*does not set time limits on the exercise of this right and may not be freely created by arbitral* [t]*ribunals without support in the ECT or in the interpretation thereof under the Vienna Convention*".[227]

182.    The Tribunal exceeded its power by relying on decisions of "*international courts*", which are not a source of international law according to Article 38 of the Statute of the International Court of Justice ("**ICJ**"). Spain argues that the Tribunal created international law by relying upon "*decisions of international courts*" to create new requirements under Art. 17.

183.    Referring to the "*denial of benefit*" clause of Art. 17 of the ECT, Spain also contends that the Award fails to state the reasons "*why it* [did] *not accept the denial of benefits provided for in Article 17 of the ECT and impose*[d] *requirements for such refusal not set out in Article 17 of the ECT*".[228]

    **b.    The NextEra Entities' Position**

184.    The NextEra Entities argue that Spain waived its right to object to the Award on this ground because six months passed since the Tribunal issued its Decision.[229]

185.    In addition, the Claimants explain that "*numerous ECT tribunals had found that a State cannot deny the benefits of the ECT after the investment had been made. Acknowledging the two authorities submitted by Spain (*Ulysseas *and* Guaracachi *- neither of which was decided under the ECT), the Tribunal noted the 'controversy' surrounding this question*

---

[226] Reply, ¶ 149.
[227] Memorial, ¶ 107.
[228] Memorial, ¶ 457.d).
[229] Counter-Memorial, ¶ 122.

*and stated that* '*recent cases have suggested that the right must be exercised no later than the time the benefits are claimed*'".[230]

186. The NextEra Entities assert that the Tribunal held that Spain's government knew that it was dealing with an American corporation but that the investment was going to be operated through a Dutch company and it provided assurances to the NextEra Entities without any suggestions that it would invoke Art. 17(1) of the ECT.[231]

187. The NextEra Entities highlight that even after they communicated to Spain their willingness to enforce their rights under the ECT through arbitration, Spain did not invoke Art. 17(1) of the ECT.[232]

188. The NextEra Entities recall that the Tribunal held that Spain's "*conduct can only be viewed as acquiescence in Claimants' assertion of ECT rights precluding Respondent from later seeking to assert a right to deny benefits when it filed its Memorial on Jurisdiction on 9 September 2015*".[233]

189. The NextEra Entities conclude that the Tribunal's reasoning was plainly tenable and its decision did not manifestly exceed its powers in rejecting Spain's Art. 17 defense.[234] To them, Spain impermissibly raises an issue regarding the correctness of the interpretation of the ECT. They also argue that the Award did not fail to state reasons because it provided reasoning that could be followed.

### c.    *The Committee's Analysis*

190. Art. 17 of the ECT provides that "[e]*ach Contracting Party reserves the right to deny the advantages of this Part to: (1) a legal entity if citizens or nationals of a third state own or control such entity and if that entity has no substantial business activities in the Area of the Contracting Party in which it is organised*". The Committee examines whether the

---

[230] Counter-Memorial, ¶ 128; Decision, RL-132, ¶ 263.

[231] Counter-Memorial, ¶ 129; Decision, RL-132, ¶ 264.

[232] Counter-Memorial, ¶ 129; Decision, RL-132, ¶¶ 266, 269.

[233] Counter-Memorial, ¶ 129; Decision, RL-132, ¶ 269.

[234] Counter-Memorial, ¶ 130.

Tribunal manifestly exceeded its powers to determine it had jurisdiction *ratione voluntatis* despite Spain's objection under Art. 17 and whether the Award stated the reasons on which it is based.

191.    First, the Committee notes that the Tribunal rejected Spain's denial of benefits defense under Art. 17 of the ECT. The Tribunal considered the objection was three years too late such that Spain had acquiesced to the Claimants' assertion of rights under the ECT.[235] The Tribunal reached its decision based upon the submissions of both Parties and its assessment of the evidence. It focused on the timeline of Spain's knowledge that the Claimants were controlled by citizens or nationals of a third State and when it could have potentially asserted an objection under the ECT. The Committee notes that the Tribunal then cites *Khan Resources v. Mongolia* concerning what would constitute a "*good faith interpretation*" of Art. 17. The Tribunal concluded that if a State could deny an investor's benefits under the Art. 17 of ECT after luring an investor into an investment, this would not be a "*good faith exercise of its rights*".[236]

192.    The Committee finds that the Tribunal's interpretation and application of Art. 17 of the ECT and rejection of Spain's denial of benefits defense based on the general concept of good faith were tenable as a matter of law. The Committee does not agree that the Tribunal created international law, imposed a new requirement, or violated a general principle of international law or Spain's right of defense. The Tribunal did not exceed its powers in reaching this decision, let alone in a manifest manner. The Tribunal's interpretation of Art. 17 could also not be considered a non-application of the law or a misapplication of the law.

193.    The Committee observes that various ICSID tribunals applying the ECT reached the same conclusions as the Tribunal in rejecting a denial of benefits defense after an investment was made.[237] While other tribunal decisions are not binding, the fact that so many other tribunals made the same decision supports the position that the Tribunal's decision was not

---

[235] Decision, RL-132, ¶¶ 268–269.
[236] Decision, RL-132, ¶¶ 267–268.
[237] Decision, fn 307.

only "*susceptible of argument 'one way or the other*'" but also "*tenable as a matter of law*".[238] This further confirms that the Tribunal's decision to reject Spain's denial of benefits defense was not a manifest excess of powers.

194.    Next, the Committee finds that the Tribunal did not fail to state reasons concerning the Applicant's objections under Art. 17. The Tribunal first dealt with the question whether the Claimants were owned and controlled by the citizens or nationals of a third State and concluded that the first criterion under Art. 17(1) was met because the "*ultimate principal entity*" that controlled them was an "*American company*".[239] Second, the Tribunal considered whether the Claimants had substantial business activities in the Netherlands but concluded it was unnecessary to determine based on the subsequent denial of benefits decision.[240] Third, the Tribunal reviewed when Spain became aware that the investment was made through a Dutch company controlled by an American corporation and whether the Applicant exercised a denial of benefits under Art. 17(1) in a timely fashion.[241] The Committee finds that the Tribunal did explain why it did not accept Spain's denial of benefits objection under Art. 17 and no grounds for annulment exist under Art. 52(1)(e).

195.    Thus, in view of the above, the Committee concludes that the Tribunal did not manifestly exceed its powers and did not fail to state reasons when it determined it had jurisdiction *ratione voluntatis*.

---

[238] *CDC v. Seychelles*, RL-0208, ¶ 41; *CEAC v. Montenegro*, CL-284, ¶ 87; *SGS v. Paraguay*, CL-228, ¶ 113; *Daimler v. Argentina*, CL-283, ¶ 187; *TECO v. Guatemala*, RL-0207, ¶ 78.

[239] Decision, ¶¶ 249–252.

[240] Decision, ¶¶ 253–261.

[241] Decision, ¶¶ 262–270.

**D.    SPAIN'S ALLEGATIONS AS TO MANIFEST EXCESS OF POWERS**

**(1)    Manifest Excess of Powers by Upholding Jurisdiction despite Spain's Installed Capacity and "*Unclean Hands*" Objection (Art. 52(1)(b) (Annulment Ground (e))**

*a.    Spain's Position*

196.    Spain argues that the NextEra Entities "*consciously made misrepresentations*" in connection with the installed capacity of its investment to benefit from a system of subsidies to which they would not have been entitled having "*acted in bad faith, fraudulently or unlawfully*".[242]

197.    In support of its position, Spain recalls what the tribunal held in *Plama Consortium Limited v. Bulgaria*:

> *...The Tribunal is of the view that granting the ECT's protections to Claimant's investment would be contrary to the principle* nemo auditur propriam turpitudinem allegans *invoked above. It would also be contrary to the basic notion of international–public policy - that a contract obtained by wrongful means (fraudulent misrepresentation) should not be enforced by a tribunal...*[243]

198.    Spain explains that the NextEra Entities "*lied*" by saying that the installed capacity of the project was lower than 50 MW when, according to Spain, it was above 50 MW.[244] According to Spain, "*Article 27 of the 1997 Electricity Sector Act required as an essential condition that, in order to qualify for the system of Article 36 of the RD 661/2007, the installations had an 'installed power* [which] *does not exceed 50 MW*".[245] Spain submits that since the plants had an installed capacity of more than 50 MW, they could not benefit from the privileged system of subsidies.

---

[242] Memorial, ¶¶ 113, 120.

[243] Memorial, ¶ 124, referring to "RL-008" but citing *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶¶ 143, 144 and 146. Publicly available at: https://www.italaw.com/cases/857.

[244] Memorial, ¶ 122.

[245] Memorial, ¶ 121.

199.    Spain submits that NextEra Entities' misrepresentation constituted the crime of subsidy fraud and the crime of falsehood in public documents under Spanish law.[246]

200.    The Tribunal committed a manifest excess of powers by upholding jurisdiction and conferring international protection on the Claimants when they were not entitled to it due to their unclean hands. The Tribunal should have found a lack of jurisdiction or inadmissibility of the NextEra Entities' claim.[247] Spain submits that the Tribunal's decision is against *ius cogens,* "*essential principles of international law*", and the principle that international arbitration cannot shelter or protect fraudulent actions.[248]

201.    In this regard, Spain contends that it raised a jurisdictional objection in the underlying arbitration "*because legitimate expectations cannot be protected in those who access benefits with fraud and falsehood*".[249] Spain claims that the Tribunal committed a manifest excess of its power by "*omitting any pronouncement on the matter*" and deciding on the merits of the case when it should have "*declared itself incompetent*" or "*dismiss*[ed] *the substance of the claim*" due to the "*unlawful investment*".[250] Spain also contends that the Committee must annul the Award because the Tribunal did not have jurisdiction or because "*it is contrary to the essential principles of international law and to the* ius cogens *that protection is granted to those who go to a Tribunal without clean hands*".[251]

### b.    *The NextEra Entities' Position*

202.    The NextEra Entities highlight that:

> ...*it is not an option for a party first to await the outcome of the proceedings on the merits without making an objection to jurisdiction and then, if the award turns out to be unfavourable, to*

---

[246] Reply, ¶ 166.

[247] Reply, ¶ 173.

[248] Memorial, ¶ 457.(e); Reply, ¶¶ 173, 175.

[249] Memorial, ¶ 37.

[250] Memorial, ¶ 126.

[251] Memorial, ¶ 127.

> *request annulment on the ground of an excess of powers because the*
> *tribunal acted outside of its competence…*[252]

203.   According to the NextEra Entities, Spain is precluded from raising any argument in connection with the installed capacity based on two reasons: (i) Spain cannot invoke the installed capacity objection or unclean hands allegation as a jurisdictional issue because Spain never raised that issue as a jurisdictional objection in the arbitration; and (ii) ICSID Arbitration Rule 27 is applicable to the annulment and therefore the argument has been waived because it was not promptly raised after the Decision.[253] Spain also did not seek a supplemental decision under Art. 49 of the ICSID Convention.

204.   The NextEra Entities also argue that the Tribunal ultimately did not need to decide upon the installed capacity issue because it was a matter only relevant for its primary claim. They added that in any event the Tribunal did decide upon the matter implicitly. A tribunal does not "*manifestly*" exceed its powers by finding it does not need to resolve a particular question.[254]

205.   The NextEra Entities also argue that the Committee is not able to make findings of fact as that is "*beyond its remit"*.[255]

206.   In this regard, it requests the Committee dismiss Spain's grounds of annulment regarding the installed capacity issue.[256]

### c.   *The Committee's Analysis*

207.   The Committee examines whether the Tribunal committed a manifest excess of powers because it upheld jurisdiction or admitted the Claimants' claims despite their unclean hands concerning the installed capacity issue. Spain contends that upholding jurisdiction or admitting their claims would be contrary to the "*essential principles of international law*

---

[252] Counter-Memorial, ¶ 76, quoting Schreuer, CL-279, Art. 52, ¶ 174.

[253] Counter-Memorial, ¶ 134.

[254] Counter-Memorial, ¶ 135.

[255] Counter-Memorial, ¶ 136.

[256] Counter-Memorial, ¶ 139.

*and* ius cogens".[257] According to Spain, the Tribunal should have "*declared itself incompetent to deal with an unlawful investment or, alternatively, dismiss the substance of the claim*".[258] The Committee considers that the Applicant has raised this annulment ground as a jurisdictional objection and a matter of inadmissibility.

208.    The Committee focuses its attention on how this argument was presented in the underlying arbitration. In the underlying arbitration, Spain did not plead the installed capacity issue ("**Installed Capacity Objection**") as a jurisdictional objection. As the Claimants point out, the Applicant specifically stated that it was "*not defending the investment violation by the Claimants as a grounds* [sic] *affecting the Tribunal's jurisdiction*" in the underlying arbitration.[259] Spain reaffirmed this fact in its 27 February 2017 post-hearing letter to the Tribunal.[260] The Applicant only raised installed capacity as a merits and quantum issue in the underlying arbitration and specifically did not as a jurisdictional objection.[261] Spain instead raised five, specific jurisdictional objections in the underlying arbitration that were based on (1) *ratione materiae* and *ratione personae*, (2) *ratione voluntatis*, (3) *ratione personae*, (4) Art. 10(1) of the ECT, and (5) Art. 10(7) of the ECT, none of which were related to the Installed Capacity Objection.[262] Spain's two key pleadings on jurisdiction, its Memorial on Preliminary Objections with Request for Bifurcation dated 9 September 2015 and Reply on Preliminary Objections dated 14 October 2016, did not raise installed capacity as the basis for a jurisdictional objection.[263]

209.    The Committee further finds that Spain did not frame the installed capacity issue as an issue involving unclean hands, illegality, fraud, misrepresentation or bad faith on the part

---

[257] Memorial, ¶ 127; Reply, ¶ 173.

[258] Counter-Memorial, ¶ 126.

[259] Spain's Rejoinder on the Merits, 20 October 2016, R-471, ¶ 982.

[260] Letters from Spain to the Tribunal, 27 February and 7 March 2017, R-476, fn 1.

[261] Spain's Rejoinder on the Merits, 20 October 2016, R-471, ¶ 982.

[262] Decision, Section V (Jurisdiction), ¶¶ 187–384. Spain did initially raise an objection related to the cooling-off period that it subsequently withdrew, *see* Spain's Reply on Preliminary Objections, 14 October 2016, R-470, fn 1.

[263] Spain's Memorial on Preliminary Objections with Request for Bifurcation, 9 September 2015, R-496/C-307; Spain's Reply on Preliminary Objections, 14 October 2016, R-470; Spain's Counter-Memorial on the Merits and Rejoinder on Merits confirm that these two pleadings were the basis for its jurisdictional objections. Spain's Counter-Memorial on the Merits, 4 March 2016, R-491, ¶ 901(a); Spain's Rejoinder on the Merits, 20 October 2016, R-471, ¶ 1240.(a).

of the Claimants (collectively "**Unclean Hands Argument**") in the underlying arbitration. The Committee notes that Spain's related claims based on a violation of *ius cogens*, "*essential principles of international law*", and Spanish criminal law, were also not raised before the annulment proceeding. The Committee considers the Unclean Hands Argument as a subsidiary argument of the Installed Capacity Objection. The key memorials Spain submitted such as its Memorial on Preliminary Objections with Request for Bifurcation dated 9 September 2015, Reply on Preliminary Objections dated 14 October 2016, Counter-Memorial on the Merits dated 4 March 2016, or its Rejoinder on the Merits of 20 October 2016 contain nothing regarding the Unclean Hands Argument.[264] At most, in its Rejoinder on the Merits, Spain raised the issue that the real installed capacity was "*concealed*".[265] Subsequently, during the arbitration hearing, Spain alleged that it had been "*deluded*" and that the nameplate contained "*false information*".[266] Further, in two post-hearing letters Spain submitted that information was "*hidden*" or "*concealed*".[267] Spain did not formally advance the Unclean Hands Argument in the underlying arbitration and introduced it for the first time in its Application.[268]

210.   The Committee concludes that Spain therefore raised both the Installed Capacity Objection and the Unclean Hands Argument as jurisdictional objections at the annulment stage for the first time. The Committee assesses the consequences of the Applicant raising these jurisdictional objections for the first time at the annulment stage. ICSID Arbitration Rule 41(1) stipulates that "[a]*ny objection that the dispute or any ancillary claim is not*

---

[264] Spain's Memorial on Preliminary Objections with Request for Bifurcation, 9 September 2015, R-496/C-307; Spain's Reply on Preliminary Objections, 14 October 2016, R-470; Spain's Counter-Memorial on the Merits, 4 March 2016, R-491; Spain's Rejoinder on the Merits, 20 October 2016, R-471.

[265] "*Claimants have <u>concealed</u> the real installed power on their technical data plate and they have demonstrated the Respondent from verifying the real installed power technically*", Spain's Rejoinder on the Merits, 20 October 2016, R-471, ¶ 997 (emphasis added).

[266] Arbitration Hearing, Day 2, 12 December 2016, C-316, 338:15–6 ("*And we have been deluded by the Claimants*"), 338:19–20 ("*On the plate of the generator there is information that is false information…*")(emphasis added).

[267] Letter from Spain to the Tribunal, 27 February, R-476 ("*the Respondent did not introduce a new fact or argument that could affect the damages calculation issue; it just provided a numeric example of the reasons or interest that led the Claimant to equip the Termosol Plants with an installed capacity over the authorised threshold (50 MW) and hide it from the Respondent*".), p. 7 (emphasis added); Letter from Spain to the Tribunal, 7 March 2017, R-476 ("Termosol Plants have been hidden to the Respondent their real installed capacity", "*the estoppel argument cannot be applied in this case, because the Claimants concealed the actual installed capacity of the Termosol Plants*".), p. 12 (emphasis added).

[268] Application, Title of 3.3 and ¶ 96.

*within the jurisdiction of the Centre or, for other reasons, is not within the competence of the Tribunal shall be made <u>as early as possible</u>*". (emphasis added). ICSID Arbitration Rule 41(1) adds that where the facts concerning the objection are known, the party must file its objection before its counter-memorial. Spain itself confirmed that parties must raise jurisdictional objections no later than their counter-memorial where they know of the facts underlying the objection.[269] Spain has not denied that it was aware of the installed capacity issue before it filed its Counter-Memorial on the Merits.

211.    ICSID Arbitration Rule 41(1) does not stipulate the consequences of failing to raise a jurisdictional objection "*as early as possible*" or before the counter-memorial. The Claimants argue that taken together with ICSID Arbitration Rule 27 the consequences should be a waiver of the objection. They contend that Spain was aware of the issue and, under ICSID Arbitration Rule 27, had to "*state promptly its objection*".[270] They claim that by not "*promptly*" complaining, Spain waived its right to object under ICSID Arbitration Rule 27.

212.    The implications of failing to comply with ICSID Arbitration Rule 41(1) and whether it should automatically lead to a waiver under ICSID Arbitration Rule 27 are not specified under the ICSID Arbitration Rules. In any event, the Committee finds that the Installed Capacity Objection and Unclean Hands Argument were never raised before the Tribunal as a jurisdictional objection. Spain raised five specific jurisdictional objections before the Tribunal but none of them concerned installed capacity or unclean hands.

213.    The Tribunal rejected all five jurisdictional objections and upheld jurisdiction. The Tribunal could not have committed a manifest excess of powers because it did not consider a jurisdictional objection that was never advanced before it. A jurisdictional argument that was never advanced before a tribunal cannot be brought before an *ad hoc* committee *de novo* and serve as a basis for annulment. Spain has not claimed that the facts behind the Installed Capacity Objection and Unclean Hands Argument were unknown and recently discovered. Therefore, in the words of Schreuer, "*it would appear unacceptable to let a*

---

[269] Spain's Reply on Preliminary Objections, 14 October 2016, R-470, ¶ 137.
[270] Counter-Memorial, ¶¶ 29, 76; Rejoinder, ¶¶ 34–39.

*party that has knowingly failed to challenge a serious irregularity before the tribunal later attack the award in annulment proceedings*".[271] Along the same lines, the Committee finds it is unnecessary to consider Spain's *ius cogens*, "*essential principles of international law*", and Spanish criminal law arguments since they are dependent upon the Unclean Hands Argument and were never advanced in the underlying arbitration either.

214. In addition to the jurisdictional objection, Spain also claims the Tribunal committed a manifest excess of powers because the NextEra Entities' claims should have been inadmissible based on the Installed Capacity Objection and the Unclean Hands Argument. The Committee notes that admissibility is not a concept mentioned or used in the ICSID Convention. As a general matter, the Committee observes that, if admissibility is considered, it should be viewed as a narrower concept than jurisdiction, and a tribunal should be granted substantial discretion in its assessment of what is admissible in a particular circumstance. The Committee ultimately finds that admissibility need not be considered since it was never raised before the Tribunal.

215. The Committee concludes that Spain's claim that the Tribunal committed a manifest excess of powers based on Spain's Unclean Hands Argument and Install Capacity Objection must be denied because they were not advanced as a jurisdictional objection or admissibility challenge in the underlying arbitration and cannot be raised for the first time on annulment.

**(2)    Manifest Excess of Powers by Hearing a Dispute between an Investor of an EU Member State and an EU Member State – "*Intra-EU Objection*" (Art. 52(1)(b)) (Annulment Ground (g))**

*a.    Spain's Position*

216. Spain argues that "*there is no possibility of investment arbitration between a company of an EU Member State and a Member State*".[272] Spain refers to Professor Gosalbo's two expert reports and provides that "[a]*ll the reasons stated by Professor Gosalbo are assumed*

---

[271] Schreuer, CL-279, Art. 52, ¶ 60.
[272] Memorial, ¶ 128.

*by the Kingdom of Spain*".[273]  Professor Gosalbo opined that (1) the ECT does not apply to intra-EU disputes; (2) the Treaty on the Functioning of the EU ("**TFEU**") provides that international agreements such as the ECT cannot be contradictory to EU law since the latter has primacy; and (3) the CJEU has exclusive jurisdiction over EU law issues.[274]

217.    According to Spain, EU Member States decided that EU legislation should apply to intra-community affairs and intra-EU disputes, while international conventions remain in force for relations with third countries.[275]

218.    Referring to the *Achmea* decision, Spain remarks that the CJEU found that:

> *Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept...*[276]

219.    Spain claims that Art. 26 of the ECT does not apply within the EU for disputes between Member States. It further holds that the Tribunal did not carry out an analysis of all the rules of interpretation provided in Art. 31 of the Vienna Convention, but merely indicated that there was no disconnection clause and on that basis stated its conclusion.[277]

220.    Spain argues that the CJEU judgment in *Moldova v. Komstroy* decides for the first time that arbitration of intra-EU investment disputes under the ECT is not allowed and not compatible with EU law, EU treaties, and the autonomy principle. Spain adds that the

---

[273] Memorial, ¶ 129; Reply, ¶ 193.

[274] Gosalbo Expert Report, 13 April 2020, ¶¶ 21–26, 46–47; 65–71; Gosalbo Second Expert Report, 8 September 2020, ¶¶ 2–27.

[275] Memorial, ¶ 133.

[276] Memorial, ¶ 138; *The Slovak Republic v. Achmea B.V.*, Judgment of the Court, CJEU Case No. C-284/16, 6 March 2018, RL-135, ¶ 60.

[277] Memorial, ¶ 143.

decision is binding upon the Netherlands and Spain, and Dutch investors cannot have any rights different than the rights and legal framework that is applicable to the Netherlands.[278]

221.    Spain concludes by saying that admitting jurisdiction for investment arbitration within the EU for disputes between Member States constitutes a manifest excess of jurisdiction.[279]

### b.    The NextEra Entities' Position

222.    The NextEra Entities submit that there can hardly be a manifest excess of jurisdiction by the Tribunal where all other ECT tribunals to date have unanimously upheld their jurisdiction over intra-EU disputes.[280] The Tribunal's conclusion on jurisdiction was instead plainly tenable.[281]

223.    Additionally, the NextEra Entities consider that this is an attempt from Spain to re-argue the correctness of the case that is beyond the bounds of Art. 52 of the ICSID Convention.[282]

224.    Finally, the NextEra Entities refer to Professor Piet Eeckhout's expert opinion:

> ...In particular, Professor Eeckhout explains that: (i) the ECT applies on an intra-EU basis; (ii) there is in fact no conflict between the ECT and EU law; and (iii) even if such a conflict existed, it would have to be resolved in favour of the ECT and international law, not EU law, based on the express terms of Art. 16 of the ECT.[283]

225.    According to the Claimants, the "*elaborate arguments*" that Spain, Professor Gosalbo and the EC through "*more than one hundred pages of complex (and highly disputed) legal argument*" illustrate that the Tribunal's decision was not an excess of powers "*evident on its face*".[284] The Claimants argue that the Applicant attempts to "*re-argue jurisdiction de novo*" through its arguments based on Art. 38 of the ICJ Statute.[285]

---

[278] Spain's Final Comments on the *Komstroy* CJEU Decision, 24 September 2021, ¶ 49.

[279] Memorial, ¶ 152.

[280] Counter-Memorial, ¶ 141; NextEra Entities' Observations on the EC's Amicus Brief, 25 May 2020, ¶ 27.

[281] Rejoinder, ¶ 153(a).

[282] Counter-Memorial, ¶ 147.

[283] Counter-Memorial, ¶ 149; Eeckhout Expert Opinion, 9 July 2020, ¶¶ 7–24, 25–79, 80–96.

[284] Rejoinder, ¶ 153(b).

[285] Rejoinder, ¶ 174; Counter-Memorial, fn 179.

226.    As for the *Moldova v. Komstroy* CJEU judgment, the Claimants submit that it was rendered years after the Tribunal's award. This precludes it from being a basis for annulment. Spain's attempt to rely on it contradict the settled law that *ad hoc* committees assess a tribunal's decision based on the record before it at the time of its award, not on subsequent materials.[286]

227.    For these reasons, according to the NextEra Entities, Spain failed to establish that the Tribunal manifestly exceeded its powers by upholding jurisdiction over an intra-EU claim.[287]

    *c.    The Committee's Analysis*

228.    The Committee examines whether the Tribunal committed a manifest excess of powers by hearing a dispute between an investor from an EU Member State and another Member State.

229.    The Committee finds that the Tribunal's decision was based on a straightforward analysis of the ECT, the Vienna Convention, and the applicable rules and principles of international law, which, as agreed by the Parties, together constituted the applicable substantive law.[288] The Tribunal first reviewed the decisions of previous tribunals that upheld jurisdiction under Art. 26 of the ECT, the *Achmea* judgment, and the observations of the EC.[289] The Tribunal then considered whether the ECT applied to relations between EU Member States or whether it excluded jurisdiction over intra-EU disputes.[290] The Tribunal decided that absent a "*disconnection clause and a revision of the ECT*" the EU's consenting to the ECT did not supersede each EU Member State's individual consent to the ECT.[291]

---

[286] NextEra Entities' Observations on the Court of Justice of the European Union Judgment in Case C-741/19 *Republic of Moldova v. Komstroy*, 1 October 2021, ¶ 3.

[287] Counter-Memorial, ¶ 150.

[288] Decision, ¶¶ 385 and 388.

[289] Decision, ¶ 333.

[290] Decision, ¶¶ 339–344.

[291] Decision, ¶ 342.

230.     The Tribunal next considered whether the overlap that might exist between the ECT and EU law affected Spain's offer to arbitrate.[292] The Tribunal concluded that even if there was an overlap, its jurisdiction "*must be answered in light of Article 26 of the ECT*" and not EU law.[293] The Tribunal also decided that intra-EU obligations were not superseded by subsequent treaties because the treaties did not relate to the same subject matter.[294] The Tribunal concluded that it could not hold that "*Spain's consent to submit ECT disputes to arbitration excluded intra-EU investment disputes*" and that "*primacy of EU Law exclude*[d] *jurisdiction of the present Tribunal established under the ECT*".[295]

231.     The Committee finds that the Tribunal did not exceed its powers by upholding jurisdiction to hear the case under Art. 26 of the ECT despite Spain's intra-EU objection. The Tribunal's decision was tenable as a matter of law and it could not be deemed a gross or egregious misapplication of the law that a reasonable person could not accept such that it would amount to a non-application of the law. In terms of application of Art. 38 of the ICJ Statute, the Committee agrees that this argument was raised *de novo* during the annulment proceedings and need not be considered since it was not brought before the Tribunal. Spain did not demonstrate that it made any reference to Art. 38 of the ICJ Statute in the underlying arbitration.

232.     The Committee also notes that, as the Claimants submit, 32 ICSID tribunals applying the ECT have rejected the alleged primacy of EU law over intra-EU disputes between an investor of the EU and another EU Member State under the ECT.[296] As Spain contends, the Committee agrees that it is not bound by these decisions and arguably they may not even be correct. Yet, the Committee finds that the fact that so many other tribunals reached the same conclusion on the same issue as the Tribunal confirms that the Tribunal's interpretation of the ECT was tenable as a matter of law. In contrast, Spain did not submit any ICSID decisions upholding its intra-EU argument. This reaffirms that the Tribunal's

---

[292] Decision, ¶ 345.
[293] Decision, ¶ 351.
[294] Decision, ¶ 352.
[295] Decision, ¶ 357.
[296] Rejoinder, fn 237.

decision to uphold its jurisdiction for the intra-EU dispute under the ECT and reject Spain's argument based on the primacy of EU law over intra-EU disputes cannot be considered as being an excess of powers, let alone a plain, clear, obvious, flagrant or evident one.

233. The Committee finds that the CJEU judgment *Moldova v. Komstroy* was rendered more than two years after the Tribunal's Award. Art. 52(1)(b) is limited to assessing a tribunal's decision based on the record and law at the time it was rendered. This precludes the Committee from considering the CJEU judgment and it cannot serve as a basis for annulment.

234. The Committee concludes that the Tribunal did not manifestly exceed its powers in finding jurisdiction to hear the intra-EU dispute and instead had a tenable basis to do.

**(3)    Manifest Excess of Powers by not Applying the Applicable International Rules, the ECT and EU Law to the Merits of the Case (Art. 52(1)(b)) (Annulment Ground (i))**

*a.    Spain's Position*

235. According to Spain, the Tribunal manifestly exceeded its powers by going beyond its jurisdiction and totally omitting the application of applicable international rules and applicable international law, the ECT, and EU law.[297]

236. In furtherance of this argument, Spain states that the Tribunal exceeded its powers when deciding that the applicable law was the "*ECT and any rules of international law relevant to its interpretation and application*" and did not recognize the "*autonomy and primacy*" of EU law.[298]

---

[297] Memorial, ¶ 154.
[298] Memorial, ¶¶ 159 and 161; Reply, ¶¶ 262, 279–282.

237.  Relying on *Soufraki v. The United Arab Emirates*[299] and *Sempra v. Argentina*,[300] Spain highlights that:

> ... *Committees have concluded that there is also an excess of powers, where the Tribunal fails in determining the applicable law or when it manifestly fails in interpreting the law applicable to the dispute...*[301]

238.  Spain argues that under Art. 26(6) of the ECT, the Tribunal should have applied the "*applicable rules and principles of international law*" but instead limited the application of the rules and principles of international law to only what may be "*relevant to the application and the interpretation*" of the ECT.[302]

### b.  The NextEra Entities' Position

239.  Based on *Lemire v. Ukraine*, the NextEra Entities argue that Spain should have raised its objection that the Tribunal failed to apply the applicable law promptly after receipt of the Decision.[303]

240.  The NextEra Entities also add that the Tribunal's interpretation of the applicable law clause contained in Art. 26(6) of the ECT was consistent with the interpretation reached by numerous other ECT tribunals.[304]

241.  In addition, the NextEra Entities highlight that:

> ...*Consistent with that finding, the Tribunal then proceeded to decide the dispute in accordance with Art. 10(1) of the ECT and applicable rules of international law relevant to the interpretation and application of the ECT, such as the rules of interpretation set out in the VCLT.*[305]

---

[299] Memorial, ¶ 167; *Soufraki v. The United Arab Emirates*, RL-107, ¶¶ 41–45.

[300] Memorial, ¶ 167; *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Decision on the Argentine Republic's Request for Annulment of the Award, 29 June 2010, RL-133, ¶¶ 164–165.

[301] Memorial, ¶ 167.

[302] Memorial, ¶ 160.

[303] Counter-Memorial, ¶ 153.

[304] Counter-Memorial, ¶ 154.

[305] Counter-Memorial, ¶ 160.

242. All in all, the NextEra Entities conclude that the Tribunal's decision to not apply EU law, including EU State aid rules, as a substantive law, is not a manifest excess of power but the natural consequence of the Tribunal's finding as to the applicable law.[306]

### c.    The Committee's Analysis

243. The Committee examines whether the Tribunal committed a manifest excess of powers concerning the applicable law and rules. Art. 26(6) of the ECT provides that "[a] *tribunal…shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law*".[307]

244. Spain's claims that the Tribunal dispensed with the application of (1) "*applicable international rules*" and "*applicable international law*", (2) the ECT, and (3) all EU law.[308] The Committee considers Spain's argument as being that the Tribunal committed a manifest excess of powers by improperly interpreting and applying Art. 26(6) of the ECT and by not determining and applying the applicable law and rules, which included the ECT and all EU law. As provided in Section V.A(1)c, *supra*, Spain's claim of a manifest excess of powers is, all the more difficult because it primarily seeks to challenge the interpretation of a treaty provision. A party seeking annulment on this basis must "*prove that its interpretation is a monolithic and firmly settled principle of law that is 'not subject to debate'*".[309]

245. The Committee finds that the Tribunal held that it was common ground between the Parties that the substantive law included the ECT, the Vienna Convention, and the "*applicable rules and principles of international law*".[310] They also agreed that Spanish law was "*relevant*", although they disagreed as to how much weight should be given to Spanish law and EU law.[311] The Tribunal interpreted the meaning of Art. 26(6) of the ECT and

---

[306] Counter-Memorial, ¶ 161.

[307] ECT, CL-001, Art. 26(6).

[308] Memorial, ¶ 457 ("*dispensing with the application of applicable international rules*").(i); Reply, ¶ 323 ("*dispensed with the application of the applicable international law*").

[309] *Alapli v. Turkey*, CL-273, ¶ 82.

[310] Decision, ¶¶ 385 and 388.

[311] Decision, ¶¶ 385–389.

determined the applicable law and rules when it held that "*the applicable law is the ECT and any rules of international law relevant to its interpretation and application*".[312] The Tribunal added that it would "*refer to provisions of Spanish law and EU law if appropriate*".[313] The Committee finds that the Tribunal's interpretation is based on the general agreement between the Parties on the substantive law and the express text of Art. 26(6). The Committee finds that the Tribunal decided that it only needed to determine the meaning of "*applicable rules and principles of international law*" under Art. 26(6) and the relevance and weight to be given to Spanish and EU law.

246.    The Committee notes that the Tribunal then proceeded to apply the applicable law and rules. Contrary to Spain's assertion, the Committee finds that the Tribunal did not "*dispense*[] *with the application of applicable international rules*" and "*applicable international law*".[314] The Tribunal instead rejected Spain's preferred application of the "*applicable law and rules*" concerning the weight to be given to EU law.

247.    As provided in Section V.D(2), *supra,* the Tribunal chose to reject Spain's intra-EU objection based on EU law. The Tribunal accordingly rejected Spain's claim concerning the "*applicable rules and the principles of international law*" under Art. 26(6) of the ECT and the weight to be given to EU law. As found above, the Committee considers that the Tribunal's interpretation and application of the ECT were tenable as a matter of law. Even if this application was a misapplication, it could not be considered a non-application of law. A tenable decision to not apply a certain law is not a failure to apply the law annullable under Art. 52(1)(b).

248.    The Committee notes again that various ICSID tribunals applying the ECT reached the same conclusion as the Tribunal's regarding the interpretation of Art 26(6) of the ECT and the limited application of EU Law. The Committee agrees with Spain that it is not bound to follow these other tribunals' decisions and there are tribunals that have decided

---

[312] Decision, ¶ 390.
[313] Decision, ¶ 390.
[314] Memorial, ¶ 457(i); Reply, ¶ 323.

differently.[315] Yet, the fact that so many other tribunals reached the same decision regarding the same matter reinforces that the Tribunal's interpretation was at a minimum tenable as a matter of law. This reaffirms that the Tribunal's decision to determine the applicable law based on the ECT and the weight to be given to EU Law could not be deemed an excess of powers, let alone one that was plain, clear, obvious, flagrant or evident.

249.    In terms of application of Art. 38 of the ICJ Statute, as provided in Section V.D(2)c, *supra*, the Committee repeats that this argument was raised *de novo* during the annulment proceedings and need not be considered since it was not raised before the Tribunal.

250.    The Committee finds that the Applicant has not established a manifest excess of powers under Art. 52(1)(b) based upon the interpretation and application of the applicable law under Art. 26(6) of the ECT.

### (4)    Manifest Excess of Powers Regarding the Tribunal's Assessment of Legitimate Expectation Regarding the State Aid (Art. 52(1)(b)) (Annulment Ground (k))

#### a.    *Spain's Position*

251.    Spain argues that the Tribunal misapplied and dispensed with EU law and the decision of the EC, both applicable laws, to assess legitimate expectations.

252.    In their submissions, both Spain and the EC, the latter as *amicus curiae*, stressed that the State aid schemes for renewable energies should have been notified to the EC and they were not in the present case.[316]

---

[315] *Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, RL-091, ¶ 4.195; *Belenergia S.A. v. Italian Republic*, ICSID Case No. ARB/15/40, Award, 6 August 2019, CL-246, ¶ 292; *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain,* ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019, RL-165, ¶ 591(a).

[316] Memorial, ¶ 172.

253.   Therefore, Spain explains that under the EU law on State aid "*it could not be understood that there was any legitimate expectation that the subsidy would remain unchanged*".[317] Based on *Electrabel v. Hungary*, Spain argues that:

> ...*interpretation must be made in accordance with EU law and that it cannot be held that Article 10 of the ECT has been infringed to the extent that there is another rule of international law (recognised by Article 1 (3) of the ECT itself) that prevents legitimate expectations from being considered.*[318]

254.   Spain concludes by saying that:

> *In the event that it was understood that the Arbitral Tribunal applied European Union law (*quod non*), it would have made a blatantly erroneous application by completely disregarding the value of the Commission's Decision applicable to the case and by declaring that there were legitimate expectations contrary to what this European Commission's Decision states.*[319]

255.   According to Spain, the Tribunal should have also applied the State aid regime as part of Spanish (*i.e.*, national) law.[320] The Claimants could not have had any expectation to something that was "*illegal*" or "*not authorised by law*".[321] Spain also adopts "*all the reasons stated by*" Professor Gosalbo who argued that "*there is a likelihood of frustration of enforcement of intra-EU ECT awards dealing with State Aid*".[322]

256.   The Tribunal failed to apply EU State aid law and committed a "*blatantly erroneous application*" of the applicable law.[323] The Tribunal manifestly exceeded its powers through "*a manifestly incorrect application of applicable law to be taken into account in assessing legitimate expectations*".[324]

---

[317] Memorial, ¶ 173.

[318] Memorial, ¶ 173; *Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, RL-091.

[319] Memorial, ¶ 176.

[320] Memorial, ¶ 174.

[321] Reply, ¶¶ 349, 354. The Committee addressed this argument in terms of a jurisdictional objection in Section V.D(1), *supra*.

[322] Gosalbo Expert Report, ¶ 137; Memorial, ¶ 170.

[323] Memorial, ¶ 176.

[324] Memorial, ¶ 457(k).

### b.    The NextEra Entities' Position

257.   As an initial matter, the NextEra Entities claim that if the Committee denies Spain's Annulment Ground (i), *supra,* Spain's Annulment Ground (k) necessarily fails by extension.[325]

258.   The NextEra Entities contend that Spain offers no substantive analysis as to why a EC decision is a "*rule and principle of international law*" that is applicable in deciding whether Spain breached the ECT.[326]

259.   The NextEra Entities explain that:

> [n]*umerous ECT tribunals have declined to follow* Electrabel*'s reasoning on the law applicable to merits of an ECT claim, illustrating that there can be no manifest excess of powers where an ECT tribunal elects not to subordinate Art. 10(1) of the ECT to EU law, or to EU State aid law in particular.*[327]

260.   The NextEra Entities highlight that the Tribunal was entitled to interpret the applicable law clause in the Art. 26(6) in the way it did. The Tribunal's application of Art. 10 of the ECT, exclusive of EU law, as the governing standard for determining legitimate expectations could not serve as a basis for annulment.[328] This interpretation was tenable as a matter of law.

261.   The NextEra Entities also conclude by saying that Spain's request to this Committee concerns an alleged erroneous application of the law and is an attempt to re-argue the merits of the case, both of which lie beyond the scope of Art. 52(1)(b) of the ICSID Convention.

### c.    The Committee's Analysis

262.   The Committee examines whether the Tribunal's assessment of legitimate expectation that was based on its decision not to apply EU State aid law was a manifest excess of powers.

---

[325] Rejoinder, ¶ 233(a).

[326] Counter-Memorial, ¶ 162.

[327] Counter-Memorial, ¶ 163.

[328] Counter-Memorial, ¶ 165.

263.   The Committee agrees with the Claimants that this ground cannot be sustained based on the same reasons as Annulment Ground (i). Spain itself concedes that this ground is "*subsidiary*" to the previous ground on EU law.[329]  If the Tribunal did not commit a manifest excess of powers when it found that the law applicable to the merits was the ECT and applicable rules and principles of international law, and EU law where appropriate, then it could not have committed a manifest excess of powers when it found legitimate expectations under Art. 10 of the ECT without applying EU State aid law. This premise establishes that the Tribunal's decision could not be deemed an excess of powers, let alone one that was plain, clear, obvious, flagrant or evident.

264.   For completeness, the Committee does not find that the Tribunal committed a "*blatantly erroneous application*", that the Tribunal should have applied the EU State aid regime as part of Spanish (*i.e.*, national) law,[330] or that the Claimants could not have had any expectation to something that was "*illegal*" or "*not authorised by law*" that breaches the EU State aid law. The Committee finds that Applicant's claims are at most assertions that the Tribunal incorrectly applied the applicable law. The Committee observes that the Tribunal decided that since EU law was not applicable to determining the alleged breach of fair and equitable treatment, then EU State aid law should not be applied to determine the Claimants' legitimate expectations. As noted in Section V.D(1), *supra,* the Committee notes that the installed capacity issue was not framed in terms of illegality in the underlying arbitration. The Tribunal's decision does not reach the bar established by *Alapli v. Turkey* that the "*legal analysis was so untenable or implausible that the error* [wa]*s evident on the face of the award*".[331] The Tribunal's decision could not be considered a gross or egregious misapplication of the law that a reasonable person could not accept and amount to a failure to apply the law.

265.   The Committee confirms that other ICSID tribunals applying the ECT such as *AES v. Hungary* reached the same conclusions as the Tribunal and found legitimate expectations

---

[329] Memorial, ¶ 169.

[330] Memorial, ¶ 174.

[331] *Alapli v. Turkey*, CL-273, ¶ 82.

based on Art. 10(1) of the ECT without applying EU law.[332] For the Committee's purposes, whether *AES v. Hungary* or *Electrabel v. Hungary* were correct does not matter. What matters is that some tribunals reached the same decision on legitimate expectations as the Tribunal. This confirms that the Tribunal's decision was at least tenable as a matter of law.

266.    The Committee also agrees with the Claimants that Art. 52(1)(b) does not permit annulment based on the potential for enforcement and Professor Gosalbo's report in this regard may be disregarded.

267.    The Committee concludes that the Tribunal did not commit a manifest excess of powers based on its assessment of legitimate expectation under Spain's State aid regime.

**(5)    Manifest Excess of Powers Regarding the Tribunal's Granting of Damages (Art. 52(1)(b)) (Annulment Ground (p))**

*a.    Spain's Position*

268.    Spain asserts that the Decision is inconsistent with the Tribunal's finding on liability because, among other things, the Tribunal intended to provide the Claimants with a return fixed at the weighted average cost of capital ("**WACC**") established as of the valuation date of June 2016 plus 200 basis points ("**bps**") but did not do so.[333] Spain submits that the Decision provides that the Claimants were entitled to a return equal to WACC plus 200 bps at the valuation date, and did not distinguish "*between periods or different expectations at an earlier stage*".[334] According to Spain, the Decision on quantum is inconsistent with this.

269.    While primarily focused on the failure to state reasons grounds, Spain also submits "*where appropriate*"[335] that the Tribunal committed a manifest excess of powers due to the following: (1) for the capitalization of historical damages, a risk-free rate should have been

---

[332] *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, CL-084, ¶ 7.6.4.

[333] Memorial, ¶ 335; Reply, ¶¶ 621–623, 633.

[334] Memorial, ¶ 331.

[335] Reply, ¶ 665.

used instead of the cost of equity; (2) for the primary claim of the actual scenario, the benchmark for the regulatory rate of return was not set even though it was disputed by the experts of the Parties; (3) for the premium added to the WACC reference, although disputed by the experts, the use of 200 bps was not "*specifically justified*"[336]; and (4) for the effective tax conversion rate, although disputed by the experts, Compass Lexecon's assumption of using a nominal tax rate was accepted without mentioning and explaining the reasons for rejecting Accuracy's arguments.[337]

### b.    The NextEra Entities' Position

270.    The NextEra Entities claim that the Tribunal's approach to quantum was straightforward and consistent since it adopted the alternative but-for damages model put forward by Compass Lexecon in its entirety with one adjustment in the form of a reduction of 100 bps to the allowed rate of return.

271.    The Claimants submit that Spain's argument is a "*complete rewriting of the Decision*" because there was no "*contradiction*" and that Spain is trying to appeal the Tribunal's findings on quantum as being "*incorrect*".[338]

272.    Under settled law, annulment is not a forum for challenging the correctness of an award and would not qualify as a manifest excess of powers.

### c.    The Committee's Analysis

273.    The Committee examines whether the Tribunal committed a manifest excess of power when it awarded damages as Spain claims. As a general matter, the Committee agrees with the consensus that exists among committees that tribunals have a wide margin of appreciation when determining damages. As provided in *Occidental Petroleum v. Ecuador*, "[a]*nnulment of quantum decisions face an additional hurdle:* ad hoc *committees have consistently held that tribunals have a wide margin of discretion with respect to the*

---

[336] Memorial, ¶ 364.
[337] Memorial, ¶ 368.
[338] Rejoinder, ¶ 356; Reply, ¶ 622.

*calculation of damages*".[339] By its nature, a tribunal must engage in a fact intensive inquiry and must make a discretionary judgment to assess what it deems appropriate for damages. An annulment application based on damages must meet a higher bar.

274.    The Committee notes that for the first regulatory period from 2014 to 2019, the Tribunal used a WACC prevailing as of 30 June 2014 that was equal to 6.0% (on a post-tax basis), then added a 200-bps premium and converted it to a pre-tax basis resulting in a reasonable rate of return of 11.4%. For the subsequent regulatory period from 2020 onwards, the Tribunal used a WACC that reflected the date of valuation 30 June 2016, then again added a 200-bps premium and converted it to a pre-tax basis resulting in a reasonable rate of return of 9.2%.

275.    First, Spain claims that the Tribunal included the Claimants' damages experts' "*incorrect quantification*" of the capitalization of historical damages that should have included a risk-free rate instead of the cost of equity used.[340] The Committee considers that even if Spain's contention is accepted and the quantification of the Claimants' damages experts was incorrect, it would not constitute an excess of powers since it was tenable.

276.    Second, Spain argues that the experts did not agree on the benchmark for reasonable return used in the Actual Scenario and the Tribunal "*overlooked*" this and did not "*substantiate*[] *its decision*" for choosing the rate proposed by the Claimants' experts.[341] The Committee finds that a difference of opinion among experts only supports the view that tenable arguments existed on both sides. The Tribunal's decision to choose one benchmark over the other was tenable and not an excess of powers.

277.    Third, Spain asserts that the Tribunal added 200 bps to the WACC reference instead of 300 bps. The Committee finds that the Tribunal considered three factors in making this decision: (1) "*there is no consistent practice of fixing the premium at 300bps in European jurisdictions that provide for a premium when calculating a return on investment in*

---

[339] *Occidental Petroleum v. Ecuador*, RL-179, ¶ 412. See also *Duke Energy International Peru Investments No. 1, Ltd. v. Republic of Peru*, ICSID Case No. ARB/03/28, Decision of the ad hoc Committee, 1 March 2011, RL-204, ¶ 256; *Wena Hotels v. Egypt*, RL-140, at ¶ 91; *Impregilo v. Argentina*, RL-205, ¶ 160.

[340] Memorial, ¶ 343.

[341] Memorial, ¶ 348.

*regulated sectors*"; (2) "*the desire to encourage entrants into the Spanish solar energy system*"; and (3) "*the view expressed by CNE* [the Comisión Nacional de Energía] *that a premium over WACC was a reasonable expectation of return*".[342] What matters is not whether it would have been more "*appropriate*" to have granted a premium between "*0 and 100 basis points*"[343]; what matters is whether the decision was tenable. The Committee finds the decision was tenable based on these factors.

278.    Fourth, Spain submits that the Tribunal used a nominal tax rate over an effective tax conversion rate that was disputed among the experts and the Tribunal "*simply accepted*" the Claimants' expert's position. The Committee again holds that the key issue is whether the Tribunal decision on the nominal tax rate was a tenable one. The Tribunal explained that it "*took account of the fact that the statement of Compass Lexecon that the use of the nominal rate* [was] *'accepted regulatory practice' was not contradicted by Respondent and noted the difficulty of calculating an 'effective rate' for each year*".[344] The Committee concludes that the Tribunal's decision to adopt an "*accepted regulatory practice*" instead of the position of Spain's experts in light of the difficulty of calculating an "*effective rate*" for each year was a tenable one.[345] The Committee again confirms that a difference of opinion among experts only supports the view that tenable arguments existed on both sides. The Tribunal's decision to prefer one expert's methodology and choose a nominal tax rate over an effective tax conversion rate cannot constitute a manifest excess of powers.

279.    The Committee's role under a claim under Art. 52(1)(b) is not to assess the correctness of the Tribunal's decision or whether it had "*inconsistencies*" but only whether it was tenable as a matter of law and not a "*plain*", "*clear*", "*obvious*", "*flagrant*", or "*evident*" excess of powers. Paragraph 678 of the Decision provides that the "*Claimants are entitled to damages based on a return on the capitalized value of their assets as of 30 June 2016 on the basis of the WAAC of the Termosol Plants plus a premium of 200bps*". Spain claims that the Tribunal intended to provide the Claimants with a return based on a fixed WACC

---

[342] Decision, ¶¶ 664–665.
[343] Memorial, ¶ 364.
[344] Decision, ¶ 667; Memorial, ¶ 369.
[345] Decision, ¶ 667.

established as of the valuation date of June 2016 plus 200 bps for the entire period, including the first regulatory period, but that the Award provided otherwise. The Claimants contend that the Tribunal's reference to 30 June 2016 "*corresponds to the <u>date of valuation for the capitalised value of the Claimants' assets, and not the date on which to establish the rate of return</u> for the first regulatory period*".[346] (emphasis in original). The Committee finds that the Decision might be ambiguous whether the same WACC plus a 200-bps premium was meant to apply for the entire period, including the first regulatory period. Theoretically, both Parties' interpretations are tenable. The Committee's mandate is not to determine which view is more tenable. All in all, the Tribunal's decision on quantum in the Award cannot be considered a manifest excess of powers.

E.    SPAIN'S ALLEGATIONS AS TO FAILURES TO STATE REASONS

(1)    **Failure to State Reasons Regarding the Installed Capacity Objection–"*Unclean Hands Objection*" (Art. 52(1)(e)) (Annulment Ground (f))**

a.    ***Spain's Position***

280.    Spain argues that the Award fails to state the reasons why it has "*jurisdiction to hear an arbitration initiated by Claimants in order to obtain protection for investments made without clean hands*".[347] Spain submits that "*the falsehoods committed by FPL in the investment, which <u>prevent it from going to the Tribunal to claim</u> and, in any case, <u>would determine inadmissibility</u> on the grounds as legitimate expectations cannot cover an investor fraud*".[348] (emphasis added). A violation of the clean-hands doctrine leads to the Tribunal's "*lack of jurisdiction*" or that the "*claim should* [have been] *dismissed*", because international arbitration cannot protect fraud or those without clean hands.[349] Spain submits that "*it is clear that the legality of the investment, in so far as it determines the material scope of the Tribunal's own <u>jurisdiction</u>, or where appropriate, the <u>admissibility</u>*

---

[346] Rejoinder, ¶ 357.

[347] Memorial, ¶ 457(f).

[348] Memorial, ¶ 177.

[349] Memorial, ¶ 304.

_of the Claim_, are aspects of what should have been pronounced by the Award".[350] (emphasis added).

281.    As noted in Section V.D(1)a, paragraph 198, _supra,_ Spain explains that the NextEra Entities "_lied_" by saying that the installed capacity of the project was lower than 50 MW when, according to Spain, it was above 50 MW.[351] According to Spain, "_Article 27 of the 1997 Electricity Sector Act required as an essential condition that, in order to qualify for the system of Article 36 of the RD 661/2007, the installations had an 'installed power_ [which] _does not exceed 50 MW'_".[352]  Since the plants had an installed capacity of more than 50 MW, they could not benefit from the privileged system of subsidies.

282.    Spain also submits that the Tribunal did not apply or interpret international _jus cogens,_ "_which prevents those who seek to benefit from falsehoods and frauds from being granted international protection_". [353] The Award does not give any reasoning on this "_transcendental issue that centered the debate on the Arbitration_".[354] The Tribunal failed to state reasons on the "_fraudulent access…to subsidies to which_ [the Claimants were] _not entitled due to_ [their] _false statements on installed power_".[355]

283.    Spain contends that it raised a jurisdictional objection in the underlying arbitration "_because legitimate expectations cannot be protected in those who access benefits with fraud and falsehood_".[356] On the first day of the Hearing, Spain stated that not only that the fraud "_should not be admitted_", but it also provided "_on the basis of such a false declaration, one cannot have legitimate expectations_".[357] (emphasis added). On the second day of the Hearing, Spain expanded upon the Tribunal's failure to state reasons on how the

---

[350] Memorial, ¶ 306.
[351] Memorial, ¶ 122.
[352] Memorial, ¶ 121.
[353] Reply, ¶ 188.
[354] Reply, ¶ 188.
[355] Reply, ¶ 611.
[356] Memorial, ¶ 37.
[357] Tr. Day 1 (Gil Nievas), 56:19–22; Spain's Opening Presentation, Slide 84.

Claimants could have a legitimate expectation in light of the unclean hands issue surrounding the installed capacity.[358]

284.     Spain claims that tribunals may not be required to state their reasoning in full extent but a "*minimum pronouncement is required on the essential issues raised by the parties*" such as the "*legality of the investment*".[359] According to Spain, the Tribunal acknowledged that both Parties made arguments regarding the installed capacity of the project, but the Award failed to make any pronouncement, even brief, on these matters and did not refer to the evidence presented.[360]

### b.     The NextEra Entities' Position

285.     The NextEra Entities argue that most of the arguments under this ground overlap with Annulment Ground (e) in Section V.D(1), *supra*.

286.     The Claimants argue that Spain has waived its right to seek annulment because it became aware of the issue when it received the Tribunal's Decision but failed to object within the 80 days since the Award was rendered.  This cannot be allowed. As cited above in response to Annulment Ground (e), in Section V.D(1), *supra,* the Claimants submit that under Art. 27 the Applicant waived its objections on these grounds.[361]

287.     The NextEra Entities stress that Spain raised the unclean hands, illegality, fraud, and misrepresentation arguments as a jurisdictional objection for the first time in the annulment proceedings. They claim that Spain did not raise a jurisdictional objection in the underlying arbitration arising from fraud and falsehood. The Claimants argue that an objection based on admissibility cannot be sustained even more so.[362]

288.     The Claimants submit that even if, *quod non*, the Applicant's objections were permissible, they are not sustainable because no unclean hands, falsehood, fraud, or misrepresentation

---

[358] Tr. Day 2 (Gil Nievas), 36:15–40:25; Spain's Closing Presentation, Slides 81–96.

[359] Memorial, ¶ 306.

[360] Memorial, ¶ 316.

[361] Counter-Memorial, ¶ 79.

[362] Counter-Memorial, ¶¶ 75–79; Rejoinder, ¶¶ 128–33, fn 206.

existed. The Claimants argue that they were transparent about the installed capacity.[363] They state Spain is asserting a novel interpretation of the installed capacity of a power plant not supported by Spanish law or industry practice, and the qualification of the Termosol Plants under the Special Regime was confirmed by various administrative organs of the Spanish State in full knowledge of the actual capacity of the Termosol Plants.[364] The NextEra Entities claim they presented evidence to this effect not challenged by Spain.[365]

289.    The NextEra Entities contend that given the Tribunal's findings on liability and legitimate expectations based on the Claimants' alternative claim, it did not have to decide upon the installed capacity issue. Since the Tribunal found that the Claimants were not entitled to damages based on RD 661/2007, but on a corrected version of Regulatory Framework III, it was unnecessary to decide the installed capacity objection.[366]

290.    The Claimants finally argue that the Tribunal implicitly provided reasons concerning the installed capacity issue. Based on the *Wena Hotels v. Egypt* case, the NextEra Entities explain that a tribunal's reasons "*may be implicit in the considerations and conclusions contained in the award, provided they can be reasonably inferred from the terms used in the decision*".[367]

c.      *The Committee's Analysis*

291.    The Committee examines whether the Award failed to state reasons regarding "*a potential fraud on the installed MW that would determine that the Claimants didn't come with clean hands to the ICSID and that they were out of legal scope they benefited from*".[368] (emphasis added). The Applicant claims that the Claimants made a "*misrepresentation*" or "*possible misrepresentation*" on the installed capacity to be "*entitled to*" or "*benefit*" from the special subsidies.[369] Spain's Memorial states that the clean hands doctrine means the Tribunal

---

[363] Counter-Memorial, ¶ 315; fn 167; Rejoinder, ¶¶ 136–137.

[364] Tr. Day 2 (Herlihy), 98:19–99:7.

[365] Counter-Memorial, ¶¶ 311–315. *Wena Hotels v. Egypt*, RL-140, at ¶ 81.

[366] Counter-Memorial, ¶¶ 306–309.

[367] Counter-Memorial, ¶ 207, quoting *Wena Hotels v. Egypt*, RL-140, at ¶ 81.

[368] Application, Title 3.3.

[369] Application, ¶¶ 96, 98.

should be "*declared without jurisdiction, or simply that the claim should be dismissed*".[370] Spain added that the "*legality of the investment, insofar as it determines the material scope of the Tribunal's own <u>jurisdiction</u> or, where appropriate, the <u>admissibility</u> of the Claim, are aspects of what should have been pronounced by the Award*".[371] (emphasis added).

292. As determined in Section V.D(1), *supra,* in the underlying arbitration, the Installed Capacity Objection was raised as a merits issue and the Unclean Hands Argument was not advanced at all. Both issues were advanced as jurisdictional issues for the first time on annulment. In addition to the jurisdictional objection, Spain claims that the Tribunal failed to state reasons because the NextEra Entities' claims should have been inadmissible based on the Installed Capacity Objection and the Unclean Hands Argument. Yet, based on its conclusions above in Section V.D(1), *supra,* the Committee similarly finds that admissibility need not be considered since it was never raised before the Tribunal.

293. The Committee focuses its analysis on whether the Tribunal failed to state reasons concerning the Installed Capacity Objection issue. The Committee holds the Unclean Hands Argument need not be considered because it was not raised as a merits issue in the underlying arbitration. The Committee first examines whether it was relevant or necessary for the Tribunal to state reasons concerning the Installed Capacity Objection in terms of its merits. The Tribunal rejected the primary claim based on RD 661/2007 and instead chose to adopt the alternative claim. While the installed capacity issue was relevant for the primary claim, whether it was, for the alternative claim is the question.

294. Spain argues that the installed capacity was a threshold issue that could not be divorced from Regulatory Framework III even if the claim was not based upon Art. 36 of RD 661/2007. Spain emphasizes that the Decision summarizes that "*Respondent points out that Article 27 of the 1997 Electricity Law required as an 'essential condition' that in order to qualify for the regime in Article 36 of RD 661/2007 the installations had an 'installed*

---

[370] Memorial, ¶ 304.

[371] Memorial, ¶ 306. The Memorial similarly provided "*the falsehoods committed by FPL in the investment, which prevent it from going to the Tribunal to claim and, in any case, would determine inadmissibility on the grounds as legitimate expectations cannot cover an investor fraud*". Memorial, ¶ 177 (emphasis added).

capacity [ ... ] no greater than 50MW'".[372] The Claimants, in contrast, cite *RREEF v. Spain* as an example where a tribunal found it was not necessary to decide the installed capacity issue because its decision was not based on the special regime under RD 661/2007.[373]  The *RREEF v. Spain* tribunal explained:

> *concerning more specifically* [the] *Arenales* [CSP plant]*, the question debated between the Parties as to its installed capacity has no consequence in the Tribunal's reasoning since the compensation awarded to the Claimants is based on an assessment of the reasonableness of the actual return, not on that resulting from the special regime under RD 661/2007 which was limited to plants of an installed capacity of 50 MW and below.*[374]

295.    The Committee does not find that the installed capacity issue was an "*essential condition*" under the alternative claim. The Tribunal ultimately based its finding on legitimate expectations not on a specific law but on the broad assurances of the Spanish authorities that legal security would be guaranteed and the economic regime would not be significantly changed. The Tribunal concluded that based on those assurances the "*Claimants had a legitimate expectation that the regime would not be changed in a way that would underline the security that Claimants had in respect of the economic regime set out in RD 661/2007*".[375] (emphasis added).

296.     Tribunals may be succinct in their reasoning and do not have to address all issues. What matters is whether a matter was "*relevant or necessary*". As *TECO v. Guatemala* explains:

> [i]*nsufficiency of reasons is not a ground for annulment where a tribunal did not explain why it rejected arguments, evidence or authorities that were not relevant or necessary for its analysis…. Similarly, 'inadequate' reasons may justify annulment only if they*

---

[372] Decision, ¶ 506.

[373] Counter-Memorial, ¶ 305, citing *RREEF Infrastructure (G.P) Limited and RREEF Pan-European Infrastructure Two Lux S.á.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, CL-261.

[374] *RREEF Infrastructure (G.P) Limited and RREEF Pan-European Infrastructure Two Lux S.á.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, CL-261, ¶ 522.

[375] Decision, ¶ 591.

> *cannot logically explain the decision they are purportedly supporting.*[376]

297.  Spain has not convinced the Committee that it was "*relevant or necessary*" for the Tribunal to address the installed capacity issue given that it rejected the primary claim. The Tribunal did not explicitly deal with the installed capacity although it was extensively explored by the Parties in the underlying arbitration. The Committee finds this can be logically explained because it was not "*relevant or necessary*" to consider it in the alternative claim.

298.  The Committee concludes that Spain's claim that the Award failed to state reasons concerning the Installed Capacity Objection should be denied because it was not necessary or relevant for the Tribunal's decision. Furthermore, as determined in Section V.D(1), *supra,* Spain's claim that the Award failed to state reasons concerning the Unclean Hands Argument and Installed Capacity Objection cannot be sustained as a jurisdictional objection or admissibility challenge because they were not advanced in the underlying arbitration and cannot be raised for the first time on annulment.

**(2)    Failure to State Reasons in Hearing a Dispute between an Investor of an EU Member State and an EU Member State – "*Intra-EU Objection*" (Art. 52(1)(b)) (Annulment Ground (h))**

*a.  Spain's Position*

299.  Spain refers to Professor Gosalbo's report and argues that:

> *...there is no possibility of investment arbitration between a company of an EU Member State and a Member State.*[377]

300.  According to Spain, Member States of the EU decided that EU legislation should apply to intra-community affairs and intra-EU disputes, while international conventions remain in force for relations with third countries.[378]

---

[376] *TECO v. Guatemala*, RL-207, ¶¶ 249–250.

[377] Memorial, ¶ 128.

[378] Memorial, ¶ 133.

301.    Referring to the *Achmea* decision, Spain remarks that the CJEU found that*:*

> *Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept...*[379]

302.    Spain claims that the Tribunal did not explain how Art. 26 of the ECT applies within the EU. It further holds that the Tribunal did not carry out an analysis of all the rules of interpretation provided in Art. 31 of the Vienna Convention, but merely indicated that there was no disconnection clause and on that basis stated its conclusion.[380]

303.    Spain concludes that the Tribunal failed to state its reasons for admitting jurisdiction for an investment arbitration within the EU.

### b.    The NextEra Entities' Position

304.    The NextEra Entities submit that the Tribunal did provide reasons for upholding its jurisdiction over intra-EU disputes.[381]

305.    To rebut Spain's argument, the NextEra Entities explain that the Tribunal found that EU law did not apply for the purpose of jurisdiction. Instead, the jurisdictional question was to be determined under the ECT (Art. 26) and the ICSID Convention (Art. 25).[382]

306.    The NextEra Entities conclude by saying:

> *On any analysis, the Tribunal therefore stated reasons for its decision that the ECT and the ICSID Convention – rather than EU law – provided the basis for determining its jurisdiction.*[383]

---

[379] Memorial, ¶ 138; *The Slovak Republic v. Achmea B.V.*, Judgment of the Court, CJEU Case No. C-284/16, 6 March 2018, RL-135, ¶ 60.

[380] Memorial, ¶ 143.

[381] Counter-Memorial, ¶ 141; NextEra Entities' Observations on the EC's Amicus Brief, 25 May 2020, ¶ 27.

[382] Counter-Memorial, ¶ 221.

[383] Counter-Memorial, ¶ 223.

307.    The Claimants cite Professor Piet Eeckhout's expert opinion:

> *...In particular, Professor Eeckhout explains that: (i) the ECT applies on an intra-EU basis; (ii) there is in fact no conflict between the ECT and EU law; and (iii) even if such a conflict existed, it would have to be resolved in favour of the ECT and international law, not EU law, based on the express terms of Art. 16 of the ECT.*[384]

308.    According to the NextEra Entities, Spain did not establish that the Tribunal failed to state reasons for upholding jurisdiction over an intra-EU claim.[385]

### c.    The Committee's Analysis

309.    The Committee examines whether the Award failed to state reasons to uphold jurisdiction to hear the dispute between an investor of an EU Member State and another EU Member State under the ECT. The Committee finds that much of the reasoning in this section overlaps with the analysis concerning Annulment Ground (g) in Section V.D(2), *supra*, and that the Award stated its reasons in finding jurisdiction to hear the intra-EU dispute.

310.    As provided in Section V.D(2), *supra*, the Tribunal first reviewed the earlier decisions from other tribunals that upheld jurisdiction under Art. 26 of the ECT, the *Achmea* judgment, and the observations of the EC.[386] The Tribunal then considered whether the ECT applied to relations *inter se* of EU Member States and whether the ECT intended to carve out and exclude jurisdiction over intra-EU disputes.[387] The Tribunal analyzed Arts. 1(3) and 10 of the ECT and noted in the absence of a "*disconnection clause and a revision of the ECT*" it could not conclude that EU's consenting to the ECT would supersede the consent given by the EU Member States individually to the ECT.[388] The Tribunal cited the reasoning of *Blusun v. Italy* to support its views and held it could not infer a carve-out to exclude intra-EU disputes as Spain argued.

---

[384] Counter-Memorial, ¶ 149; Expert Opinion of Professor Piet Eeckhout, 9 July 2020, ¶¶ 7–24, 25–79, 80–96.

[385] Counter-Memorial, ¶ 150.

[386] Decision, ¶ 333.

[387] Decision, ¶¶ 339–344.

[388] Decision, ¶ 342.

311.   The Tribunal next reviewed whether the subsequent overlap that may exist between the ECT and EU law regarding investment operations rendered Spain's offer to arbitrate invalid.[389] The Tribunal noted that it was not empowered to determine whether a dispute under the ECT falls under the TFEU and instead held that the ECT was "*the instrument governing the present Tribunal's jurisdiction*".[390] The Tribunal rejected Spain's arguments that any intra-EU obligations were superseded by subsequent treaties because it found the treaties did not relate to the same subject matter under Art. 30 of the Vienna Convention.[391] As support, the Tribunal also cited *Electrabel v. Hungary* that "*the ECT's genesis generates a presumption that no contradiction exists between the ECT and EU law*".[392] The Tribunal concluded that it could not hold that "*Spain's consent to submit ECT disputes to arbitration excluded intra-EU investment disputes*" and that "*primacy of EU Law exclude*[d] *jurisdiction of the present Tribunal established under the ECT*".[393] The Tribunal therefore rejected Spain's argument based on the primacy of EU law over intra-EU disputes between an investor and EU.

312.   The Committee finds that the Award provided reasoning that can be followed in upholding jurisdiction over an intra-EU dispute under the ECT. The Committee holds that the Tribunal provided reasoning for rejecting Spain's intra-EU objection and that the Award did not fail to state its reasons concerning intra-EU disputes. The Committee denies Spain's Application based on this ground.

### (3)   Failure to State Reasons for not Applying Applicable International Rules, the ECT and EU law (Art. 52(1)(e)) (Annulment Ground (j))

#### a.   *Spain's Position*

313.   Spain explains that Art. 52(1)(e) of the ICSID Convention states that an award must be annulled if it fails to indicate the reasons on which it is based. Additionally, Spain holds

---

[389] Decision, ¶¶ 345–356.

[390] Decision, ¶ 350.

[391] Decision, ¶ 352.

[392] Decision, ¶ 355; *Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015, RL-091, ¶ 4.134.

[393] Decision, ¶ 357.

that pursuant to Art. 48(3) of the ICSID Convention, the Tribunal must deal with all matters referred to it and state the reasons on which it bases its conclusions.[394]

314. Citing the *Amco v. Indonesia I* case, Spain points out the following:

> *...supporting reasons must be more than a matter of nomenclature and must constitute an appropriate foundation for the conclusions reached through such reasons. Stated a little differently, there must be a reasonable connection between the bases invoked by a tribunal and the conclusions reached by it.*[395]

315. Spain argues that the Tribunal rejected the application of EU law by denying it the character of international law without giving any justification.[396]

316. In addition, Spain explains that according to Art. 26(6) of the ECT, arbitral tribunals must apply the ECT and the applicable rules of international law which, according to Spain, lead to the application of Art. 38 of the ICJ Statute.[397]

317. Spain claims that:

> *...the Award, without justification or motivation, modifies the International Law and invents a new rule of* 'international law' *by pointing out that the rules of International Law apply only to the extent relevant to (the) interpretation and application (of the ECT).*[398]

### b. *The NextEra Entities' Position*

318. The NextEra Entities again argue that Spain waived its claims under this ground based on ICSID Arbitration Rule 27. Spain did not raise its objection promptly after receiving the Tribunal's Decision and prior to the Award.

---

[394] Memorial, ¶ 178.

[395] Memorial, ¶ 179; *Amco Asia Corporation, et al. v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision of the *ad hoc* Committee on the Application for Annulment, 16 May 1986, 16 May 1986, 1 ICSID Reports 509, RL-196, ¶ 43.

[396] Memorial, ¶ 191.

[397] Memorial, ¶ 194.

[398] Memorial, ¶ 194.

319.    Referring to the *Micula v. Romania* case, the NextEra Entities argue that the committee in that case explained the threshold for establishing a failure to state reason by saying that:

> *The standard for annulment under Art. 52(1)(e) of the ICSID Convention is, therefore, high. It does not permit an* ad hoc *committee to second-guess the reasoning of the tribunal. It imposes on the applicant the burden of proving that the reasoning of the tribunal on a point that is essential for the outcome of the case was either absent, unintelligible, contradictory or frivolous. To succeed, the Applicant must discharge this burden.*[399]

320.    In addition, they cite the *Daimler v. Argentina* case where it was held that:

> *...in reviewing the apparent contradictions, the* ad hoc *committee should, to the extent possible and considering each case, prefer an interpretation which confirms an award's consistency as opposed to its alleged inner contradictions.*[400]

321.    The NextEra Entities further argue that any objective reader would be able to follow the Tribunal's reasons. The Tribunal's decision is reasoned because it recounts the Parties' arguments and it is based on the express text of Art. 26(6) ECT, to which the Tribunal had referred in the immediately preceding paragraphs.[401]

322.    They claim that the Tribunal not only referred to the treaty text, but went further and interpreted it. They point out that the Decision found that the reference to "*applicable rules and principles of international law*" in Art. 26(6) meant "*any rules of international law relevant to* [the ECT's] *interpretation and application*" (emphasis added by the Claimants) rather than "*international law*" at large or EU law.[402]

### c.    *The Committee's Analysis*

323.    The Committee examines whether Spain demonstrated that the Award failed to provide reasons concerning the applicable law and rules. Art. 26(6) of the ECT provides that "*A*

---

[399] Counter-Memorial, ¶ 175 (emphasis omitted); *Ioan Micula and Ors. v. Romania,* ICSID Case No. ARB/05/20, Decision on Annulment, 26 February 2016, CL-188, ¶ 139.

[400] Counter-Memorial, ¶ 212; *Daimler v. Argentina*, CL-283, ¶ 78.

[401] Counter-Memorial, ¶ 234.

[402] Counter-Memorial, ¶ 235.

*tribunal…shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law*".[403] The Tribunal first summarized that the Parties were largely in agreement that the applicable substantive law pursuant to Art. 26(6) of the ECT was (i) the ECT substantive provisions; (ii) the Vienna Convention; and (iii) "*applicable rules and principles of international law*".[404] The Tribunal then explained that the Parties differed in their view on the relevance and weight of Spanish law and EU law.[405]

324.     The Tribunal explained in its "Analysis" that "*the applicable law is the ECT and any rules of international law relevant to its interpretation and application*". The Tribunal added that it will "*refer to provisions of Spanish law and EU law if appropriate*".[406] The Tribunal concluded that "[t]*heir particular weight and relevance will be assessed in this decision in the context of the issues in respect of which they have been raised*".[407]

325.     The Committee finds that the reasoning of the Award is based on the general agreement between the Parties on the substantive law and the express text of Art. 26(6) of ECT. The Committee finds the Tribunal provided reasons when determining the meaning of "*applicable rules and principles of international law*" under Art. 26(6) and the relevance and weight to be given to Spanish and EU law. The Tribunal explained that "*applicable rules and principles of international law*" in Art. 26(6) meant "*any rules of international law relevant to* [the ECT's] *interpretation and application*"[408]. The Tribunal therefore distinguished between "*rules of international law relevant to its* [i.e. the ECT's] *interpretation and application*" and "*Spanish law and EU law*". While the applicable law was the "*ECT and rules of international law relevant to its interpretation and application*", the Tribunal would separately "*refer*" to Spanish and EU law "*if appropriate*". The Tribunal explained that how much "*weight*" *and* "*relevance*" Spanish and EU law would

---

[403] ECT, Art. 26(6), CL-001.

[404] Decision, ¶¶ 385, 388.

[405] Decision, ¶¶ 386–387; ¶¶ 389–390; the Tribunal also noted that the Claimants contended that the applicable procedural law was the procedural provisions of the ECT and the ICSID Arbitration Rules, Decision, ¶ 385.

[406] Decision, ¶ 390.

[407] Decision, ¶ 390.

[408] Decision, ¶ 390.

be given would depend upon the "*context of the issues in respect of which they have been raised*".[409]

326.    The Committee agrees with the Claimants' view that the Tribunal did not consider EU law to be among the "*rules of international law relevant to* [the] *interpretation and application*" of the ECT.[410] The Tribunal (i) dealt with each body of law in separate sentences; (ii) placed EU law in the same category as Spanish law; (iii) found that EU law could be "*referred to*" and "*applied*" or not "*if appropriate*"; and (iv) provided that "*weight*" and "*relevance*" given to EU law would depend upon the "*context of the issues in respect of which they have been raised*". Spain itself admits that the Tribunal "*devotes a single paragraph to the analysis of the applicable law*".[411]

327.    The Tribunal then separately referred to EU law to determine its potential application in relation to intra-EU disputes under the ECT. In terms of EU law, the Tribunal explained when addressing Spain's intra-EU objection that "*it is not the task of this Tribunal to determine whether the scope of this dispute concerns the application of the TFEU, but rather whether such dispute concerns the application of substantive provisions of the ECT*".[412] As explained in Section V.E(2)c, *supra*, the Tribunal then held that the ECT applies and EU law does not have primacy in an intra-EU dispute. The Committee finds that the Tribunal's analysis on the applicable law provides reasons that could be followed and grounds for annulment under Art. 52(1)(e) were not met.

328.    Spain also challenges how the Tribunal interprets the ECT and its application of international law and suggests that the Tribunal did not provide "*justification or reasoning*" or "*sufficient grounds*".[413] The Committee is not persuaded. As Spain concedes, the Tribunal "*devotes paragraphs 332 to 357 to try to justify the existence of jurisdiction to know the intra-EU disputes*".[414] The Committee concludes that these issues therefore were

---

[409] Decision, ¶ 390.

[410] Counter-Memorial, ¶ 236.

[411] Memorial, ¶ 192.

[412] Decision, ¶ 349.

[413] Memorial, ¶¶ 194–195.

[414] Memorial, ¶ 190.

covered in these paragraphs. The Tribunal did provide "*justification or reasoning*" and "*sufficient grounds*" when it analyzed (1) whether the ECT applied to relations *inter se* of EU Member States; (2) whether the ECT Contracting Parties intended to carve out and exclude jurisdiction over intra-EU disputes; and (3) whether any subsequent overlap between the ECT and EU law regarding investment operations rendered Spain's offer to arbitrate invalid.

329. Spain next cites the Tribunal's failure to address the EU rules on State aid or the EC's decision.[415] The Committee finds that the Tribunal's decision to reject the primacy of EU law resulted in an umbrella that subsumed these issues, rendered them moot, and made it unnecessary to "*give reasons*" or "*even mention*" them.[416]

330. Spain's assertion that the reasoning of the Award contained "*flaws and clumsiness*"[417] focuses on the adequacy and correctness of the Tribunal's decision. These factors do not constitute a basis for annulment under Art. 52(1)(e) as long as the reasoning could be followed and was not contradictory or frivolous.

331. As provided in paragraph 126, *supra*, while Art. 48(3) of the ICSID Convention requires an award to "*deal with every question submitted to the Tribunal*" this does not serve as a ground for annulment.[418] Art. 52(1)(e) provides for annulment only when a failure to state reasons exists. The test for the Committee is whether the reasoning could be followed. The Tribunal did not have to address all of Spain's assertions regarding the applicable international law and rules.

332. The Committee observes that Spain finds fault with the Tribunal's justification and the adequacy of such justification. Yet, the correctness and adequacy of the Tribunal's justification do not qualify as annulment grounds under Art. 52(1)(e). The Committee concludes that the Tribunal stated its reasons for determining the applicable law and how

---

[415] Memorial, ¶¶ 196–197.
[416] Memorial, ¶ 197.
[417] Memorial, ¶ 190.
[418] Updated Background Paper, RL-134, ¶ 103.

EU law should apply. The reasoning could be followed and was not contradictory or frivolous.

**(4)    Failure to State Reasons for its Conclusion on the Breach of Legitimate Expectations (Art. 52(1)(e)) (Annulment Ground (l))**

*a.    Spain's Position*

333.    According to Spain, the NextEra Entities' legitimate expectation claim was based on five bases, four of which were dismissed by the Tribunal.[419] Spain asserts the Tribunal did not explain how the Claimants could have had legitimate expectations of the petrification of subsidies contrary to EU law and other applicable legislation.

334.    Spain argues that "*the* [Tribunal's] *decision jumps from one conclusion to another without being able to follow how one arrives at one*", "*its paragraphs jump from one point to another without reasoning*", and "*in each conclusion*" Spain can "*find aspects that are either unsubstantiated or frankly contradictory*".[420] Spain blames the Tribunal's reasoning for its "*absences and serious inconsistencies*".[421]

335.    Spain points out that the Tribunal found that "*legitimate expectations can exist in the absence of actual formal commitment*".[422] Spain claims that this conclusion was in complete disconnection with the Tribunal's findings[423] and that the Tribunal did not explain its reasoning to arrive to such conclusion.[424]

---

[419] Memorial, ¶¶ 223–235.
[420] Reply, ¶¶ 552, 554.
[421] Reply, ¶ 556.
[422] Memorial, ¶ 239; Decision, ¶ 592.
[423] Memorial, ¶ 242.
[424] Memorial, ¶ 246.

336.    Citing *Continental v. Argentina*,[425] *Charanne v. Spain*,[426] *Isolux v. Spain*,[427] *Stadtwerke v. Spain*,[428] and *PV Investors v. Spain*,[429] Spain argues that the Award is contradictory because absent "*specific formal immutability commitments*" there cannot be legitimate expectations of immutability.[430]

337.    Spain reinforces its argument by saying that:

> *...such Tribunal affirmation, that in the absence of a formal commitment to immutability in the regulatory framework or by the Spanish authorities, may nevertheless raise legitimate expectations, is not supported by sufficient and non-contradictory reasons offered by the Court. And this affirmation is the substance on which the declaration of liability against Spain hinges, so that it must be annulled.*[431]

338.    Spain concludes by saying that:

> *...the lack of expression of reasons is notable and the Decision does not allow to follow the reasoning from Point A to B and now C: the State retains the regulatory power to accommodate the regulation to the economic situation for reasons of general interest (Point A), a State for those same reasons cannot change the regulation unexpectedly, altering essential characteristics of the regulation (Point B), Spain has altered essential characteristics of its regulation and that this also leads to point C that Spain has consequently infringed the ECT.*[432]

---

[425] Memorial, ¶ 248; *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, 5 September 2008, RL-209, ¶ 261.

[426] Memorial, ¶ 248; *Charanne v. The Kingdom of Spain*, SCC Case No. 062/2012, Final Award, 21 January 2016, RL-088, ¶¶ 493, 150, 545 and 546.

[427] Memorial, ¶ 248; *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, Case No. SCC V2013/153, Award, 12 July 2016, RL-121, ¶¶ 764–765.

[428] Memorial, ¶ 248; *Stadtwerke München GMBH, RWE Innogy GMBH, and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019, RL-167, ¶¶ 259 et seq.

[429] Memorial, ¶ 248; *The PV Investors v. The Kingdom of Spain*. UNCITRAL, PCA Case No. 2012-14, Final Award, 28 February 2020, RL-188, ¶¶ 587 *et seq*.

[430] Memorial, ¶ 248.

[431] Memorial, ¶ 250.

[432] Memorial, ¶ 300.

b.      *The NextEra Entities' Position*

339.    On this point, the NextEra Entities explain that the Tribunal analyzed each of the sources on which the NextEra Entities based their legitimate expectation claim.

340.    The NextEra Entities also highlight that the Tribunal went on to explain why it was not convinced that any of these arguments, viewed in isolation, were sufficient for the expectation that the NextEra Entities would be guaranteed the terms of Regulatory Framework I.[433]

341.    Nevertheless, it went on to say that the Tribunal found that these elements:

> did *'*provide context for [the] claim*' that the final component identified by the Claimants – i.e., the specific statements and representations made to NextEra by Spanish officials – created protected legitimate expectations.*[434]

342.    According to the NextEra Entities, the Tribunal thereby reasoned that the NextEra Entities could not have had the expectation that the regime would remain frozen and could not be changed. However, based on the assurances given by Spanish authorities, they had a legitimate expectation that the regime would not be changed in a way that would undermine the security and viability of their investment.[435]

343.    The NextEra Entities conclude by denying any contradiction in the Tribunal's reasoning and highlighting that the Tribunal found the regime was fundamentally and radically changed, violating the NextEra Entities' legitimate expectations.[436]

c.      *The Committee's Analysis*

344.    The Committee finds that the test under Art. 52(1)(e) is not whether a tribunal's decision "*jumps from one point to another without reasoning*" but whether it can be "*followed*" overall. A tribunal's decision can "*jump from one point to another without reasoning*" as

---

[433] Counter-Memorial, ¶¶ 269–270.

[434] Counter-Memorial, ¶ 271.

[435] Counter-Memorial, ¶¶ 272–274.

[436] Counter-Memorial, ¶¶ 280–290.

long as the reader can follow how the tribunal's reasoning proceeded from point to point. The Committee also confirms that tribunals have discretion to decide on a legal standard for legitimate expectations.

345.    The Committee is not convinced by Spain's contentions concerning the lack of reasoning. First, the Committee does not find that the decision "*jumps*" from one point to the next without reasoning in a manner that cannot be followed. The Committee finds that Spain's claim of a lack of reasoning pertaining to legitimate expectations concerns more the adequacy and correctness of the reasoning. A reasonable reader can understand that the Tribunal reached a finding on legitimate expectations based on the assurances and representations that Spanish authorities made guaranteeing the security of the regulatory framework that went beyond the immutability of legislation. In this regard, the Committee finds that Tribunal met its "*minimum requirement*" to state reasons.[437]

346.    The Tribunal does not have to "*strain every sinew*" as Spain's detailed analysis of the Award would suggest.[438] A committee's mandate does not include assessing "*the quality or persuasiveness of reasons*" and a committee may be "*dissatisfied with the adequacy of reasons, but provided they meet the conditions set out in* MINE" the grounds under Art. 52(1)(e) will not be met.[439]

347.    The Committee disagrees with Spain that the lack of "*reasonable and sufficient explanations*",[440] lack of "*understandable*"[441] reasoning, "*flaws in the findings*",[442] failure to "*develop* [an] *idea in order to clear...doubts*",[443] and "*ambiguities*"[444] would qualify for an application under Art. 52(1)(e). These factors would call upon the Committee to consider the merits in the manner of an appeal, which is beyond its mandate.

---

[437] See Schreuer, CL-279, Art. 52, ¶ 342.
[438] Schreuer, CL-279, Art. 52, ¶ 342.
[439] Schreuer, RL-210, Art. 52, ¶ 388.
[440] Memorial, ¶ 253.
[441] Memorial, ¶ 271.
[442] Memorial, ¶ 264.
[443] Memorial, ¶ 267.
[444] Memorial, ¶ 278.

348.  The Committee holds that "*serious inconsistencies*" could constitute grounds under Art. 52(1)(e) but only if they reached the level of being "*contradictions*" that led to an absence of reasons.[445] An assessment of whether such inconsistencies existed could only be conducted to determine if they amounted to contradictory reasons that cancelled each other. An inquiry beyond that would fall prey to the slippery slope of an impermissible inquiry into the adequacy and correctness of the reasoning.

349.  The *ad hoc* committee's mandate under Art. 52(1)(e) does not include a reassessment of the Tribunal's analysis of the evidence and the weight and significance it placed on the evidence. The *ad hoc* Committee's mandate does not include how the Tribunal determined (1) whether the statements that the Spanish authorities made amounted to guarantees of security; (2) whether the Claimants conducted due diligence; (3) how other tribunals treated the regulatory changes; (4) how to treat the jurisprudence of the Spanish Supreme Court; and (5) whether the assurances were made to a legal entity different from the Claimants. The fact that the letters were characterized as being "*from a Spanish minister*" instead of a "*Secretario de Estado*" is similarly at most a "*mistake*" and an error of fact.[446]

350.  The Committee does not find any contradictions or "*antinomy*"[447] to sustain a basis for an application under Art. 52(1)(e). The Committee notes that Spain also based its Application under Art. 52(1)(e) on the existence of frivolous reasons but does not fully elaborate this basis.[448]

351.  Spain's claims are more a dissatisfaction with the adequacy, correctness, and quality of the reasons, which, however fair the criticisms might be, would not form the basis for the "*lack of reasons*" ground.

352.  The Committee agrees with the Claimants that the Tribunal rejected the Claimant's primary claim and did not find legitimate expectations based on the petrification of the subsidies.

---

[445] Memorial, ¶ 247 ("*contradictio in terminis*"); Reply, ¶ 556 ("*serious inconsistencies*"); ¶¶ 559, 588 ("*contradictions*"), ¶ 560 ("*inconsistencies*"), ¶ 561 ("*inconsistencies and inadequacies*").

[446] Memorial, ¶ 262.

[447] Memorial, ¶¶ 254, 257.

[448] Reply, ¶ 509.

The Tribunal stated that it was "*not convinced that in the circumstances of the present case the mere fact of Regulatory Framework 1 was a sufficient basis for the expectation that Claimants would be guaranteed the terms of Regulatory Framework I. The Framework was based on legislation and legislation can be changed*".[449] The Tribunal held that the Claimants could not have any legitimate expectations concerning the petrification of subsidies solely based on the immutability of legislation itself. Under these circumstances, contrary to Spain's assertions, the Tribunal did not have to determine whether "*there may be a legitimate expectation that the legal framework would not be amended*" even though the "*the legal framework* [did] *not have any immutability clause*".[450] The Committee finds that the Tribunal's rejection of the primary claim does not contradict finding legitimate expectation based on the separate assurances of the Spanish authorities concerning the regulatory framework.[451]

353.    The Committee finds that the Tribunal did provide reasoning on this point. The Tribunal explained that the various statements and assurances by the Spanish authorities might not have been "*actual formal commitments*" but considered that the "*question* [wa]*s whether what was said could reasonably give rise to expectations about the future conduct of the government*".[452] The Tribunal elaborated that the specific assurances of a Spanish minister could "*reasonably be taken as statements that the Spanish government had no intention of making significant changes to the investment regime…and that this could be relied on by an investor*".[453] Spain claims that the Decision does not "*clearly identify the content*" of the Claimants' legitimate expectations and does not "*analyse each of the disputed measures under the prism of the FET standard*".[454] The Committee finds that the Tribunal stated its reasoning that specific assurances could lead to legitimate expectations even though they were not formal commitments. The Tribunal provided reasons when finding that legitimate

---

[449] Decision, ¶ 584.

[450] Reply, ¶ 564.

[451] Reply, ¶ 586.

[452] Decision, ¶¶ 592–593.

[453] Decision, ¶ 593.

[454] Memorial, ¶ 276.

expectations could exist, particularly in the "*absence of actual formal commitment*". The Committee does not agree with Spain that "*this assertion is not reasoned*".[455]

354. Spain also claims that this assertion "*remains unjustified*", but this would not be a basis for annulment under Art. 52(1)(e).[456] For instance, whether other tribunal's "*stated the opposite*" and reached contrary conclusions goes to the correctness of the reasoning not the lack of it.[457] The Committee finds that Spain is ultimately challenging the correctness of the Tribunal's reasoning, which cannot be the basis for an application under Art. 52(1)(e).

355. The Committee concludes that, given the reasoning that the Tribunal provided, the Applicant's assertion of failure to state reasons based on Art. 52(1)(e) cannot be sustained.

**(5)    Failure to State Reasons Regarding the Date of Investment (Art. 52(1)(e)) (Annulment Ground (m))**

*a.    Spain's Position*

356. Spain claims that the Tribunal failed to decide the date on which the purported investment was made, which was a matter disputed by the Parties during the proceedings.

357. Spain considers that the investment date is a key issue for a "*motivated analysis*" of the Claimants' expectation.[458]  Spain states as follows:

> *The Kingdom of Spain considered that FPL had made its alleged investment in April 2011. However, the Claimants stated that the investment was made in December 2010.*[459]

---

[455] Reply, ¶ 564.

[456] Reply, ¶ 565; Memorial, ¶¶ 245–248.

[457] Reply, ¶ 565.

[458] Memorial, ¶ 205.

[459] Memorial, ¶ 206.

358.    Spain alleges that the failure of the Tribunal to rule upon this "*fundamental issue in dispute*"[460] constituted a violation to Art. 48 of the ICSID Convention and constituted grounds for annulment of the Award under Art. 52(1)(e) of the ICSID Convention.[461]

359.    Spain asserts that while the Award reflects the Parties' positions it does not state who is right and why. Spain contends that the date of the investment was relevant for liability or quantum because it acts as the date from which an investor's legitimate expectations may be assessed.[462]

### b.    The NextEra Entities' Position

360.    The NextEra Entities deny that the Tribunal failed to determine when the NextEra Entities' investment was made. However, even if this were a valid argument, it holds that Spain waived this claim long ago in accordance with ICSID Arbitration Rule 27 as it was not promptly raised after receiving the Decision and prior to the Award.[463] The NextEra Entities explain that Spain never raised this alleged lack of decision until it filed for annulment of the Award, which cannot be considered to be a "*prompt*" objection on Spain's part as provided under ICSID Arbitration Rule 27.[464]

361.    The NextEra Entities argue that Spain's arguments are a challenge to the correctness of the Decision and its appreciation of the evidence, rather than a failure to state reasons or to decide when the investment took place.[465]

362.    In any case, they contend that the Award was not silent on the date of the investment because it expressly recorded the Parties' respective positions on the issue and included express findings of fact that referred to the investment.[466]

---

[460] Reply, ¶ 533.
[461] Memorial, ¶¶ 210–211.
[462] Reply, ¶¶ 533–534.
[463] Counter-Memorial, ¶ 225.
[464] Counter-Memorial, ¶ 226.
[465] Counter-Memorial, ¶ 249.
[466] Counter-Memorial, ¶ 244.

363.  The NextEra Entities add that the date of the investment was not relevant for liability or quantum as the Tribunal found that the NextEra Entities could not have expected the regime to remain unchanged, but nevertheless could expect that there would be no radical changes made to the economic regime.[467]

c.    *The Committee's Analysis*

364.  The Committee examines whether Spain has established that the Tribunal failed to state reasons concerning the date of the investment.

365.  The Tribunal did make findings of fact as to how and when the Claimants' investment was made and was not silent on the issue of the investment date.[468] At the same time, the Committee agrees with Spain that the Tribunal did not make a determination about the exact investment date that was disputed between the Parties. The passages in the Decision that the Claimants cite as examples where the Tribunal provided reasons consist of only summaries of the Parties' respective positions.[469]

366.   Nevertheless, the Committee ultimately determines that whether the investment date was December 2010, as the Claimants argued, or April 2011, as the Applicant argued, does not affect the finding on legitimate expectations in this case. The Committee notes that neither investment date would have affected the Tribunal's finding on legitimate expectations. Both dates were related to the Claimants' primary claim that was dismissed, but not the alternative claim that the Tribunal adopted.

367.  Under these circumstances, the Committee does not consider that it was "*relevant or necessary*" to rule on this issue. Even if the Tribunal failed to state reasons on the investment date, it would not qualify as a ground for annulment because it was not relevant or necessary. As *TECO v. Guatemala* explains:

> [i]*nsufficiency of reasons is not a ground for annulment where a tribunal did not explain why it rejected arguments, evidence or authorities that were not relevant or necessary for its*

---

[467] Counter-Memorial, ¶¶ 251–253.

[468] Decision, ¶¶ 168–178.

[469] Counter-Memorial, ¶¶ 244–249, citing Decision, RL-132, ¶¶ 168–178, 413, 424, 431, 435, 468, 499, 500.

> *analysis…Similarly, insufficiency of reasons does not warrant annulment if the tribunal did not address every argument, piece of evidence or authority in the record…Similarly, 'inadequate' reasons may justify annulment only if they cannot logically explain the decision they are purportedly supporting.*[470]

368.    The Committee concludes that the Applicant's claims based on the investment date cannot be sustained under Art. 52(1)(e).

**(6)     Failure to State Reasons for its Conclusion on Liability (Art. 52(1)(e)) (Annulment Ground (n))**

*a.     Spain's Position*

369.    Spain claims the following:

> *…the NextEra Tribunal has not sufficiently reasoned: (1) neither Article 10(1) ECT nor the interpretation that should be given to it in accordance with the Vienna Convention; (2) the alleged breaches by the Kingdom of Spain of the applicable standards and regulations…*[471]

370.    Spain argues that the Tribunal failed to examine the standards contained in Art. 10(1) of the ECT which, according to the NextEra Entities, were violated.[472] In particular, Spain considers that there is a lack of reasons on the Tribunal's decision not to carry out an analysis of the alleged breached of Art. 10 of the ECT after finding the "*alleged breach of legitimate expectations as an integral part of the Fair and Equitable Treatment*".[473]

371.    Spain claims that the Tribunal did not conduct any analysis on the "*concept of legitimate expectations, its application by arbitral jurisprudence, its configuration, content, and scope*".[474] The Tribunal only cited one prior investment treaty award when discussing legitimate expectations.

---

[470] *TECO v. Guatemala*, RL-207, ¶¶ 249–250.

[471] Memorial, ¶ 214.

[472] Memorial, ¶ 215.

[473] Memorial, ¶ 216.

[474] Memorial, ¶ 220.

372.   As a result, according to Spain, it is not possible to verify whether such reasoning was correct or not and whether it was "*well applied in relation to the facts*" of the case, preventing Spain from rebutting what the Tribunal considered when deciding on Spain's liability.[475]

### b.   The NextEra Entities' Position

373.   The NextEra Entities start by saying that:

> *Annulment is not a forum for correcting an allegedly* 'flawed application of Article 10(1) of the ECT'. *Nor is annulment concerned with whether the reasoning in an award is* 'valid'. *Even less so can an annulment committee determine what should have been* 'the content of [the NextEra Entities'] legitimate expectations' *(which is a fact-driven inquiry) or second-guess the Tribunal's* 'assessment of the disputed measures'.[476]

374.   The NextEra Entities recall that Spain has waived these arguments by virtue of ICSID Arbitration Rule 27, because they arose from a claim that the Tribunal failed to state reasons when issuing the Decision. Spain should therefore have raised its objections promptly upon receipt of the Decision and before the Award.[477]

375.   The NextEra Entities explain that the Tribunal summarized the Parties' views on the legal standard contained in Art. 10(1) of the ECT, including legitimate expectations. Under the heading "*The Standard in Article 10(1) of the ECT*", the Tribunal explained its views on the scope of that article. The NextEra Entities further hold that Tribunal's analysis clearly allows a reader to follow its reasoning.[478]

376.   The NextEra Entities conclude that Spain is trying to expand the scope of the annulment proceeding to re-argue the case and has not established that the Award failed to state reasons when finding liability.[479]

---

[475] Memorial, ¶ 221.

[476] Counter-Memorial, ¶ 256.

[477] Counter-Memorial, ¶ 264.

[478] Counter-Memorial, ¶¶ 265–266.

[479] Counter-Memorial, ¶ 267.

### c.     The Committee's Analysis

377.    The Committee examines whether Spain met the grounds for annulment based on the Award's failure to state reasons concerning Spain's liability under the ECT.

378.    The Committee notes that the Tribunal first sought to analyze and interpret Art. 10(1) of the ECT in accordance with Arts. 31 and 32 of the Vienna Convention by "*look*[ing] *at the words used in Article 10 in their context and in light of the object and purpose of the treaty as a whole*".[480] The Tribunal found that based on the words of Art. 10(1) it was a "*broad-ranging provision*".[481] It then determined that "*the protection of legitimate expectations* [wa]*s an essential element of the provision of fair and equitable treatment*" under Art. 10[482] and that it served as the legal basis for Spain's liability.[483] The Tribunal explained that the source and content of the Claimants' legitimate expectations were the assurances given by the Spanish authorities. The other factors such as the terms of the Regulatory Framework I, the registration of the Termosol Plants in the Pre-Assignment Registry and in the Administrative Registry for Production Facilities under the Special Regime (RAIPRE), and the Ministerial Resolutions of 28 December 2010 provided "*context*".[484] The Tribunal then described how Spain breached those expectations through the "*substantial*" changes to the economic regime under Regulatory Framework III.[485]

379.    The Committee can clearly follow the Award's reasoning from "*Point A. to Point B.*" on how the Tribunal reached its decision on legitimate expectations based on Art. 10(1).[486] The Committee finds that the Tribunal did interpret Art. 10 in accordance with Arts. 31 and 32 of the Vienna Convention to determine the scope and content of legitimate expectations as part of the fair and equitable treatment standard.[487]

---

[480] Decision, ¶ 580.
[481] Decision, ¶ 581.
[482] Decision, ¶ 582.
[483] Decision, ¶¶ 581–582.
[484] Decision, ¶¶ 583–587.
[485] Decision, ¶ 597.
[486] *MINE v. Guinea*, RL-178, at ¶ 5.09.
[487] Reply, ¶¶ 544, 547.

380. The Tribunal provided reasons that could be followed. Tribunals are not required to address every argument that the parties raise and the adequacy and correctness of reasons do not serve as a basis for annulment. Overall, the Committee concludes that Tribunal did not fail to provide reasons when finding Spain liable for a breach of legitimate expectation under Art. 10(1) of the ECT.

### (7) Failure to State Reasons Regarding the Quantification of Damages (Art. 52(1)(e)) (Annulment Ground (o))

#### a. *Spain's Position*

381. In connection with this point, Spain argues that:

> ...the reasons for the annulment of the Award in relation to quantum are as follows:
>
> a.- There is a clear inconsistency between the principles of the decision on quantum and the amount of damages awarded; and
>
> b.- There is a lack reasoning in the Award related to several issues that have significant impact on quantum: the capitalisation of historical damages, the 200 bps premium above the WACC granted, and the effective tax conversion rate.[488]

382. Spain further recalls that the NextEra Entities' experts on quantum departed from the instructions given by the Tribunal when calculating damages for the period that went from 2014–2019.[489]

383. Spain concludes that the Tribunal did not adopt Compass Lexecon's approach and that Compass Lexecon's quantification is inconsistent with the quantum principles set forth in the Decision. This includes the capitalization of historical losses until the valuation date of 30 June 2016, the regulatory rate of return in the actual scenario, the magnitude of the 200

---

[488] Memorial, ¶ 324; Reply, ¶ 628.
[489] Memorial, ¶¶ 330–331.

bps premium of the WACC, and the tax rate to convert the reasonable rate of return into a pre-tax return.[490] Therefore, the Award should be annulled.

384.    Spain adds that it did not confirm that it agreed with Compass Lexecon's approach or that it had no criticism with the Decision and Award when it did not claim anything when questioned by the Tribunal. Spain only confirmed that Compass Lexecon's calculation was "*mathematically*" correct.[491]

### b.    The NextEra Entities' Position

385.    The NextEra Entities recall the scope of annulment proceedings and that Spain is trying to re-argue the case.[492] The Claimants reiterate their general waiver argument and claim that Spain has failed to address this.

386.    They first contend that the Award did not have any "*inconsistencies*" with the decision on liability and the approach to quantum, as Spain claims.

387.    They also explain that the Tribunal provided ample reasons for its determination of damages and that the approach to quantum was entirely consistent with the Tribunal's findings on liability by using an "*alternative but-for scenario*".[493] The Tribunal covered the capitalization of historical losses, the regulatory return in the actual scenario, the magnitude of the 200-bps premium above the WACC, and the nominal tax rate.

388.    The NextEra Entities recall that the Tribunal instructed them to re-calculate their damages claim following the principles that the Tribunal set forth in its Decision. As a result, the NextEra Entities submitted their calculations, amounting to EUR 290.6 million (excluding interest) as of 30 June 2016, to which Spain replied it had "*no observations on the mathematical calculations of the Claimants' recalculation of their damages claim*".[494]

---

[490] Reply, ¶ 634.

[491] Reply, ¶ 632.

[492] Counter-Memorial, ¶ 325.

[493] Counter-Memorial, ¶ 326.

[494] Counter-Memorial, ¶ 333, citing Award ¶¶ 10, 15, 17.

Spain was allowed to comment on the Claimants' re-calculated damages but it did not disagree or raise any concerns with the rate used.

### c.    *The Committee's Analysis*

389.    The Committee examines whether the Tribunal failed to state reasons concerning damages. As an initial matter, the Committee reiterates that it agrees with the general consensus that exists among committees that tribunals have a wide margin of appreciation to assess the parties' positions on damages and determine a reasonable approximation of damages.[495]

390.    Spain initially argues that the Award has inconsistencies between the quantum decision and the damages awarded concerning the WACC and the 200-bps premium granted in the but-for scenario. Spain reiterates its argument regarding the appropriate investment date to be used for the WACC that was made under Annulment Ground (m) in Section V.E(5)a, *supra*. As provided in Section V.E(5)c, *supra,* the Committee does not find a clear inconsistency that could be considered a contradiction or lack of reasoning concerning damages.

391.    Spain  claims that the Award failed to state reasons concerning the capitalization of historical damages, the benchmark of reasonable return used in the Actual Scenario, the 200-bps premium added to the WACC reference, and the effective tax conversion rate. First, Spain claims that the Tribunal included the Claimants' damages experts' "*incorrect quantification*" of the capitalization of historical damages that should have included a risk-free rate instead of the cost of equity used.[496] The Committee considers that even if the quantification was, as Spain argues, incorrect it would not constitute an annullable error.

392.    Second, Spain argues that the experts did not agree on the benchmark for reasonable return used in the Actual Scenario and the Tribunal "*overlooked*" this and did not "*substantiate*[] *its decision*" for choosing the rate proposed by the Claimants' experts.[497] The Committee

---

[495] Section V.D(5)(c), *supra*, citing *Occidental Petroleum v. Ecuador,* RL-0179, ¶ 412; *Duke Energy International Peru Investments No. 1, Ltd. v. Republic of Peru*, ICSID Case No. ARB/03/28, Decision of the *ad hoc* Committee, 1 March 2011, RL-204, ¶ 256; *Wena Hotels v. Egypt*, RL-140, at ¶ 91; *Impregilo v. Argentina*, RL-205, ¶ 160.

[496] Memorial, ¶ 343.

[497] Memorial, ¶ 348.

finds that the Tribunal chose the benchmark that Compass Lexecon proposed and stated its reasons for doing so. It explained that it chose the model because it was "*based on a calculation of the value of the assets and a reasonable return on that value*" and was "*an appropriate method for valuation of loss in this case*".[498]

393.    Third, Spain asserts that the Tribunal failed to state the reasons why it chose to add a 200-bps premium to the WACC reference. As described in paragraph 277 in Section V.D(5)c, *supra*, the Committee finds that the Tribunal provided reasons in choosing a premium of 200 bps instead of 300 bps.[499] Spain's argument that the Tribunal did not "*specifically justif*[y] *its decision to adopt the 200 basis points*" is not convincing.[500] Spain's suggestion that it would have been more "*appropriate*" to have granted a premium between 0 and 100 bps is not a ground for annulment.[501]

394.    Fourth, Spain submits that the Tribunal failed to state reasons concerning the use of a nominal tax rate over an effective tax conversion rate that was disputed among the experts. Spain also claims that the Tribunal "*simply accepted*" the Claimants' experts' position.[502] The Committee does not agree with Spain that not mentioning its expert's view and not providing the reason for rejecting those views would necessarily qualify as grounds for annulment. The key factor is whether the Tribunal provided reasons for its decision on the nominal tax rate. Furthermore, the Committee finds that the Tribunal did consider Spain's expert's view and did provide reasons for rejecting it. The Tribunal provided reasons for its decision by stating that it "*took account of the fact that the statement of Compass Lexecon that the use of the nominal rate is 'accepted regulatory practice' was not contradicted by Respondent and noted the difficulty of calculating an 'effective rate' for each year*".[503] The Tribunal provided reasoning when it explained that it adopted an "*accepted regulatory practice*".[504] The Tribunal considered the view of Spain's experts in

---

[498] Decision, ¶¶ 648, 650.

[499] Decision, ¶¶ 664–665.

[500] Memorial, ¶ 364.

[501] Memorial, ¶ 364.

[502] Memorial, ¶ 369.

[503] Memorial, ¶ 369; Decision, ¶ 667.

[504] Decision, ¶ 667.

that they chose not to dispute that the use of the nominal rate was an "*accepted regulatory practice*" and also explained that a reason for rejecting the Spanish experts' view was the difficulty of calculating an effective rate for each year.

395.    The Committee concludes that the Tribunal did not fail to state reasons concerning the quantification damages, as Spain claims.

### (8)    Failure to State Reasons in Relation to the Evidentiary Activity and the Assessment of Evidence (Art. 52(1)(e)) (Annulment Ground (s))

### a.    Spain's Position

396.    Spain asserts a failure to state reasons based on its claim under Annulment Ground (r) in Section V.F(2), *infra*. Spain argues that pursuant to Art. 52(1)(e) of the ICSID Convention, the Award must be annulled for its failure to state reasons pertaining to the evidentiary activity and the assessment of evidence, including regarding the burden of proof, both in terms of its incorporation and in terms of its assessment.

397.    Spain submits that the Award relies on reasons "*not properly explained*",[505] that its "*argument*[s] [are] *not understood*",[506] that it "*does not analyse*",[507] that it reveals a "*blatant absence of any reference to the evidentiary activity carried out in the oral hearing*",[508] that it "*does not make any assessment of such evidence*",[509] and that it "*lack*[s]…*valid reasons*".[510] The Award "*without any reasons, place*[d] *on Spain the negative consequences of (allegedly) not carrying out evidential work on a question*" that was the Claimants' burden to prove.[511] The Applicant submits that the Tribunal kept "*an absolute silence in relation to a whole array of evidences*", including "*many internal*

---

[505] Memorial, ¶ 417.

[506] Memorial, ¶ 418.

[507] Memorial, ¶ 426.

[508] Memorial, ¶ 427.

[509] Memorial, ¶ 434.C.

[510] Memorial, ¶ 439.

[511] Reply, ¶ 430.

*documents*" of the Claimants, "[t]*he normative evolution of the regulatory framework prior to the alleged investment*", and the "*numerous Rulings by the of* [sic] *Supreme Court*".[512]

### b.    The NextEra Entities' Position

398.  The Claimants deny the Applicant's assertions and submit that the Tribunal did state reasons in this regard. The Claimants dealt with this ground together with Annulment Ground (r).

399.  Regarding Spain's burden of proof argument, the Claimants submit that it was "*plainly not a reversal of the burden of proof*".[513] The Tribunal's decision was based on Spain's election not to both adduce any witness testimony from its own officials who provided the alleged assurances and cross-examine the Claimants' witnesses.[514] This was "*a classic instance of a tribunal evaluating the evidence and (in this case) finding that it was unrebutted*".[515] The Claimants submit that this was an "*entirely reasonable finding*".[516]

400.  The Claimants point out that the Tribunal "*stated the reasons on which its decision was based*" and "*was not required to explain why it did not refer to any particular witness statement or factual exhibit in its analysis of liability*".[517]

### c.    The Committee's Analysis

401.  The Committee examines whether the Applicant established that the Tribunal failed to state reasons in relation to the evidentiary activity and the assessment of evidence pursuant to Art. 52(1)(e) of the ICSID Convention.

402.  Spain presented its claims based on these grounds together with its claim under Annulment Ground (r) in Section V.F(2), *infra*. The NextEra Entities largely rebutted both grounds

---

[512] Reply, ¶¶ 445–446.

[513] Rejoinder, ¶ 390.

[514] Counter-Memorial, ¶ 430; Rejoinder, ¶ 390.

[515] Counter-Memorial, ¶ 430.

[516] Rejoinder, ¶ 391.

[517] Rejoinder, ¶ 396; Counter-Memorial, ¶¶ 191–193.

together.[518] The Committee concludes that considerable overlap exists in its analysis under the present ground and Annulment Ground (r).

403.    As an initial matter, the Committee agrees with the Claimants that Art. 52(1)(e) does not require a tribunal to state why it has not referred to any individual piece of written or oral fact evidence. The Tribunal was not required to provide reasons as to why it did not refer to all of the evidentiary activity carried out at the Hearing such as Mr. Montoya's evidence. As provided in *Enron v. Argentina*, "*a tribunal is not required to comment on all arguments of the parties in relation to each of the questions that it decides*".[519] The Committee similarly agrees with *Rumeli v. Kazakhstan* that "[t]*he Committee is neither empowered nor competent to conduct a re-evaluation of the significance of the factual evidence weighed by the Tribunal*".[520] The evaluation of the significance of factual evidence is a realm for the Tribunal.

404.    Hence, the Committee agrees that an award cannot be annulled because it did not state reasons concerning all of the evidentiary activity and assessment of evidence. The Committee finds that the Applicant has not established that the Award could not be "*followed*", or was "*contradictory*", "*frivolous*" or rendered "*unintelligible*" due to the Tribunal's failure to address certain evidentiary activity or to assess particular evidence.[521]

405.    The Committee finds that the Award did state the reasons on which it was based concerning the evidentiary activity and assessment of evidence and therefore the Committee dismisses Spain's argument that this constituted an annullable ground under Art. 52(1)(e).

---

[518] Rejoinder, ¶ 408.
[519] *Enron v. Argentina*, RL-197, ¶ 221.
[520] *Rumeli v. Kazakhstan*, CL-241, ¶ 104.
[521] *MINE v. Guinea,* RL-178, at ¶ 5.13.

### (9)    Failure to State Reasons when Admitting an Alleged Erroneous Translation (Art. 52(1)(e)) (Annulment Ground (v))

#### a.    Spain's Position

406.    Spain claims that pursuant to Art. 52(1)(e) of the ICSID Convention, the Award must be annulled given the Tribunal was "*silent on the claim and evidence made by the Kingdom of Spain at this point*" concerning false and fraudulent translation of Exhibit C-006.[522]

407.    Spain's claim focuses on how the words "*se realizaron*" in the sentence "*las inversiones en marcha, garantizando por tanto las perspectivas bajo las que se realizaron dichas inversiones*" were translated. (emphasis added). For the translation of the tense of the verb "*se realizaron*", as "*are to be made*" instead of "*were made*", Spain submits that the Claimants' "*misrepresentation* [was] *very serious and seems clearly intended*".[523] Spain argues that the "*clear error*" in translation was "*identical to that of falsehood and fraud*".[524] The translation made a huge difference and was a bad faith attempt to gain protection for future investments.

408.    Spain claims that "*the Award is based on the document whose translation (in front of interpreters) is discussed as the basis for the given Award*".[525] Despite this, the Tribunal "*completely disregarded any consideration of this matter and used in its deliberation*" and "*did not even rule on this matter*" and failed to state reasons accordingly.[526]

#### b.    The NextEra Entities' Position

409.    The NextEra Entities assert that Spain has waived the right to challenge the translation of Exhibit C-006 under ICSID Arbitration Rule 27 as it was part of the record of the proceeding from the very outset of the case when it was filed with the Claimants' Request for Arbitration. Spain even devoted a specific section of its Counter-Memorial on the

---

[522] Memorial, ¶ 2(k).

[523] Memorial, ¶¶ 451–452; Tr. Day 2 (Gil Nievas), 133:19–21; During the hearing, Spain withdrew its challenge related to the translation of the term "*perspectivas*". Tr. Day 2 (Gil Nievas), 133:11–19.

[524] Memorial, ¶¶ 443–444.

[525] Memorial, ¶ 454.

[526] Memorial, ¶¶ 453, 456; Reply, ¶ 477.

Merits to the exhibit that never questioned the accuracy of the English translation. Spain only raised an objection to the translation for the first time during its oral closing.[527]

410.  The Claimants submit that a debate on the translation would not have had any impact on the proceedings.[528] According to the Claimants, the Applicant's revised translation would still serve as evidence of the Claimants' legitimate expectations. The Claimants add that the Tribunal placed no particular emphasis on the phrases the Applicant claimed were incorrect.[529]

411.  Furthermore, the Claimants contend that the translation of the Spanish verb "*realizaron*" as "*are to be made*" was entirely legitimate in the context of the sentence in which it appears. They also point out that Spain never filed its own translation or requested a certified translation as provided under Procedural Order No. 1 of the underlying arbitration ("PO1-A") in the case of a dispute in the translation.[530]

   c.  *The Committee's Analysis*

412.  The Committee examines whether the Tribunal failed to state reasons by not ruling on the translation issue concerning Exhibit C-006.

413.  The Committee takes note that Spain did not object to the translation even though it was used in an exhibit that was part of the Claimants' Request for Arbitration in May 2014.[531] Spain did not challenge the translation until its closing argument on the last day of the underlying arbitration in December 2016 when it stated it should have been the "*perspective – not the forecast but the perspective – under which said investments were made*".[532] In response to the Claimants' objection that the Applicant belatedly raised the translation issue, the Applicant replied thereafter that "[t]*he last point I wanted to talk about*

---

[527] Counter-Memorial, ¶ 446; Rejoinder, ¶ 439.

[528] Rejoinder, fn 692.

[529] Rejoinder, ¶ 444.

[530] Counter-Memorial, ¶ 449; Rejoinder, fn 692.

[531] Letter from Pedro L. Marín Uribe, Secretary of State for Energy, to Mitchell Davidson, President of NextEra Energy Resources, 3 September 2009, C-006.

[532] Arbitration Hearing, Day 7, 19 December 2016, R-474/C-313, 1494:6–15.

*was the translation of the English word 'forecast' into Spanish. We don't have anything to add to that. I apologise. I certainly don't want to reopen the debate, Mr President*".[533] Spain never even requested a certified translation through the procedure established for disputed translations under PO1-A. Spain apparently did not raise the translation issue in any of its written post-hearing submissions, including its 27 February 2017 Post-Hearing Submission or its 8 March 2017 Post-Hearing Reply. Even after receiving the Tribunal's Decision, which stated the Tribunal's reliance upon the exhibit, Spain still did not raise any issues regarding the translation.

414.  Under these circumstances, the Committee agrees with the Claimants that the Applicant waived its right to challenge this procedural matter as provided under ICSID Arbitration Rule 27 by not "*promptly*" objecting to it. Spain was aware of the document from the onset of the arbitration. Spain's awareness of the document is confirmed because it even raised its own arguments based on the document. It never challenged the translation under the procedures stipulated under PO1-A. It raised the translation issue over two and a half years after the document in question was submitted. This can hardly be considered as "*promptly*" objecting as required under ICSID Arbitration Rule 27. Furthermore, after raising the issue for the first time, it appeared to withdraw its concern about the translation overall when responding to Claimants' objection by stating, "[w]*e don't have anything to add to that* [the translation of 'forecast']. *I apologise. I certainly don't want to reopen the debate*".[534] It did not mention any issue with the tense used in the translation and did not make any reservations when withdrawing its concerns.[535] Thereafter, the Applicant never raised the translation issue even after receiving the Decision that relied upon the exhibit.

415.  The Committee holds that disputes concerning a translation of a document, particularly one that existed from the beginning of a proceeding, are a procedural matter concerning a "*rule*[]...*applicable to the proceeding*" under ICSID Arbitration Rule 27. The Applicant

---

[533] Arbitration Hearing, Day 7, 19 December 2016, R-474/C-313, 1541:10–14.

[534] Arbitration Hearing, Day 7, 19 December 2016, R-474/C-313, 1541:10–14.

[535] As noted previously, during the hearing, Spain withdrew its challenge related to the translation of the term "*perspectivas*". Tr. Day 2 (Gil Nievas), 133:11–19.

waived any basis to present its Application on the translation issue because it "*fail*[ed] *to state promptly its objection*" pursuant to ICSID Arbitration Rule 27.

416.    Irrespective of the waiver under ICSID Arbitration Rule 27, the Committee also finds that it was not necessary for the Tribunal to state any reasons concerning the translation issue because the Applicant appeared to withdraw the issue overall at the hearing without reservation and did not present it before the Tribunal thereafter. The Tribunal reasonably considered the issue was withdrawn.

417.    Hence, the Applicant waived its rights to bring a claim on this basis and the Tribunal did not fail to state reasons when using the translation by not ruling on this matter.

## F.    SPAIN'S ALLEGATIONS AS TO VIOLATIONS OF FUNDAMENTAL RULES OF PROCEDURE

### (1)    Serious Departure from a Fundamental Rule of Procedure Regarding Late Submissions (Art. 52(1)(d)) (Annulment Ground (q))

#### a.    *Spain's Position*

418.    Spain claims that pursuant to Art. 52(1)(d) of the ICSID Convention, an award must be annulled if there is a serious deviation from a fundamental procedural rule. Spain explains that:

> *A departure is serious if a party is deprived of the protection afforded by the relevant procedural rule. A procedural rule is fundamental if it refers to the essential impartiality that must govern all proceedings and is included within the minimum standards of 'due process' required by international law.*[536]

419.    Spain further explains that:

> *...if a Tribunal quotes a lack of evidence as the basis for its decision, and it has previously refused requests to submit documents to constitute said evidence, there could be a serious departure from rules of procedure.*[537]

---

[536] Memorial, ¶ 373; Updated Background Paper, RL-134, ¶ 98.
[537] Memorial, ¶ 383.

420.     Spain further recalls the *Iberdrola v. Guatemala* case where the following was decided,

>    *This Committee understands that a fundamental rule of procedure is one that establishes a minimum procedural standard that must be respected in accordance with international law, as defined in* Wena Hotels v. Egypt. *In general, the following hypotheses have been recognized as a violation of fundamental rules: (i) the lack of impartiality and unequal treatment of the parties, (ii) the violation of the right to be heard, (iii) the absence or abuse of deliberation by the arbitrators; (iv) the violation of the rules of proof and (v) the violation of the rules of legal standing.*[538]

421.     Spain explains that the Tribunal accepted the NextEra Entities' reply on the merits despite being filed late and in violation of PO1-A. According to Spain, the Tribunal explained that the late submission would not have any consequences in terms of admission but could have consequences in terms of costs.[539]

422.     In addition, Spain argues that this violation was obvious and decisive for the result because:

>    *...there is no doubt that we speak of violations that affect the pretension, the amount claimed and the reports and witnesses on which the claim and the amount are based.*[540]

### b.     The NextEra Entities' Position

423.     The NextEra Entities explain that Art. 52(1)(d) provides that parties may request annulment of an award on the ground "*that there has been a serious departure from a fundamental rule of procedure*".[541]

424.     Referring to the *MINE v. Guinea* case "[t]*he text of Article 52(1)(d) makes clear that not every departure from a rule of procedure justifies annulment; it requires that the departure*

---

[538] Memorial, ¶ 385; *Iberdrola Energía, S.A. v. Republic of Guatemala*, ICSID Case No. ARB/09/5, Decision on the Remedy for Annulment of the Award Submitted by Iberdrola Energía, S.A., 13 January 2015, RL-180, ¶ 105.

[539] Memorial, ¶ 392.

[540] Memorial, ¶ 398.

[541] Counter-Memorial, ¶ 367.

be a _serious_ one and that the rule of procedure be _fundamental_ in order to constitute a ground for annulment"[542] (emphasis in original).

425.   Furthermore, the NextEra Entities highlight that the committee in _MINE v. Guinea_ held that the term "_serious_" "_establishes both quantitative and qualitative criteria: the departure must be substantial and be such as to deprive a party of the benefit or protection which the rule was intended to provide_".[543]

426.   Moreover, the _Wena Hotels v. Egypt_ committee elaborated on this standard by saying that:

> [i]_n order to be a 'serious' departure from a fundamental rule of procedure, the violation of such a rule must have caused the Tribunal to reach a result substantially different from what it would have awarded had such a rule been observed._[544]

427.   Therefore, the NextEra Entities argue that:

> _If a breach of a fundamental rule has no material impact, even if it deprived a party of the benefit it was intended to provide, then it can hardly be considered to be so serious as to require the exceptional remedy of annulment._[545]

428.   In connection with Spain's argument, the NextEra Entities explain that the Tribunal admitted its Reply on the Merits 55 minutes after the relevant deadline and also permitted the NextEra Entities to file a supplemental quantum report nine days later, but these examples do not meet the threshold of a serious violation of fundamental rule of procedure.[546]

429.   The NextEra Entities also argue that in any case Spain has waived this argument as it did not raise it until it filed its Application.[547]

---

[542] Counter-Memorial, ¶ 367; _MINE v. Guinea_, RL-178, at ¶ 4.06.

[543] Counter-Memorial, ¶ 379; _MINE v. Guinea,_ RL-178, at ¶ 5.05.

[544] _Wena Hotels v. Egypt_, RL-140, at ¶ 58.

[545] Counter-Memorial, ¶ 381.

[546] Counter-Memorial, ¶ 386.

[547] Counter-Memorial, ¶ 387.

430.  Finally, the NextEra Entities refer to the Tribunal's decision dated 17 August 2016 where, after the hearing, it held that failing to meet deadlines can be considered in the determination of costs but does not affect the admissibility of documents filed.[548]

### c.  The Committee's Analysis

431.  The Committee confirms that Spain withdrew its Application based on this ground at the Hearing.[549] The Committee therefore holds that this ground need not be considered.

### (2)  Serious Departure from a Fundamental Rule of Procedure in Relation to the Evidentiary Activity and Assessment of Evidence (Art. 52(1)(d) (Annulment Ground (r))

### a.  Spain's Position

432.  Spain asserts that the Tribunal committed a series of breaches in relation to "*evidential activity and the assessment of evidence*". Such violations breached the rules of evidence (and in particular the rules on the burden of proof), the right to be heard, and the right to equality of arms.[550]

433.  Spain claims this ground for annulment based on the Claimants' concealment of essential documents, the Tribunal's practice in the hearing, and the Tribunal's other lack of assessment of the evidence submitted. In terms of Claimant's concealment of essential documents, Spain argues that the Tribunal's denial of access and use of documents relevant to Spain's defense and its refusal to order the submission of documents violated Spain's right to be heard.[551] Spain argues that on several occasions, the Tribunal pointed out the relevance of the NextEra Entities' due diligence reports concerning the regulatory framework under which they made their investment.[552] The NextEra Entities opposed the production of the due diligence reports alleging attorney-client privilege or attorney work

---

[548] Counter-Memorial, ¶ 388.

[549] Tr. Day 2 (Gil Nievas), 6:16–7:1.

[550] Memorial, ¶¶ 404–441; Reply, ¶ 384.

[551] Memorial, ¶¶ 411–412, 419–420.

[552] Memorial, ¶ 409.

product. The Tribunal "*ignore*[d] *the lack of evidence*" and denied the production of the documents holding that the request was "*too broad*".[553] Spain claims that the Tribunal ignored "*the lack of evidence derived from failure to provide legal reports*" and ignored Pöyry's report provided by the NextEra Entities, which was "*incompatible with any legitimate expectation of the immutability of the system*".[554] By ignoring the lack of evidence, it violated the rules on the burden of proof.[555]

434.    In terms of the Tribunal's practice in the hearing, Spain submits that the Tribunal violated the rules of the burden of proof, by not complying with the principle of *onus probandi incumbit actori* and extracting negative inferences from the lack of questions by Spain concerning two witnesses.[556] The Tribunal unlawfully reversed the burden of proof. Spain claims that the Tribunal did not examine and assess the content of the statements made by the witnesses or experts and did not "*refer*[ ] *to the evidentiary activity carried out at the hearing*", particularly Mr. Carlos Montoya's testimony, in violation of the right to be heard.[557]

435.    In terms of the Tribunal's other lack of assessment of the evidence, Spain explains that on numerous occasions the Tribunal did not consider documentary evidence that negated any legitimate expectation, such as: (i) the possibility of rule change was expressly reflected in various agreements signed by the Claimants and the Claimants' own internal documents and emails; (ii) the existence, prior to the investments, of multiple modifications to the legal framework showing that the Claimants knew that the legal framework was not petrified; (iii) the Pöyry report, submitted by the NextEra Entities, highlighted those modifications, and showing the NextEra Entities were aware of them; and (iii) the Supreme Court's judgment, which was also provided, where it was decided that no one could claim to have a right to the immutability of tariffs.[558]

---

[553] Memorial, ¶¶ 419, 410.
[554] Memorial, ¶ 419.
[555] Memorial, ¶¶ 419–420.
[556] Reply, ¶¶ 424–425.
[557] Memorial, ¶ 427; Reply, ¶¶ 435–436.
[558] Memorial, ¶ 434.

436.    This series of breaches infringed Spain's right of defense in the form of the right to be heard. The violations, both individually and as a whole, are of the necessary magnitude to have had a clear impact on the Award and warrant annulment.

### b.    The NextEra Entities' Position

437.    The NextEra Entities recall the high threshold contained in Art. 52(1)(d) and argue that Spain did not meet it.

438.    In particular, the NextEra Entities explain that the Tribunal was entitled to exercise its discretion by not ordering the disclosure of documents and that privilege is widely recognized as a ground to refuse disclosure of documents. In addition, the NextEra Entities allege they provided adequate and substantial evidence regarding their due diligence.[559]

439.    Relying on *Azurix v. Argentina*, the NextEra Entities highlight that the committee decided the following:

> *...a party cannot, simply by requesting the tribunal to call upon the other party to produce documents which are said to be relevant to a particular allegation, mandate the tribunal either to require the production of those documents or to accept the truth of the allegation in default of production...Regardless of whether or not the tribunal decides to call upon a party to produce documents, it will decide all of the issues on the basis of the evidence before it. However, the fact that the tribunal decides to exercise its discretion one way rather than the other cannot in itself be annullable error. To establish an annullable error, it is not sufficient to show that the tribunal rejected repeated requests for the production of evidence that the requesting party considered crucial to its case. Rather, it is necessary to establish that, in all circumstances there has been a serious departure from a fundamental rule of procedure.[560]*

440.    Regarding Spain's burden of proof argument, the Claimants submit that it was "*plainly not a reversal of the burden of proof*".[561] The Tribunal's decision was based on Spain's election not to adduce any witness testimony from its own officials who provided the

---

[559] Counter-Memorial, ¶ 400.

[560] Counter-Memorial, ¶ 406; *Azurix v. Argentina*, RL-176, ¶ 219.

[561] Rejoinder, ¶ 390.

alleged assurances or cross-examine the Claimants' witnesses. This was "*a classic instance of a tribunal evaluating the evidence and (in this case) finding that it was unrebutted*".[562] The Claimants submit that this was an "*entirely reasonable finding*".[563]

441.     The Claimants submit that the lack of congruence cannot serve as a basis for annulment *per se*.[564] Spain has not provided a single authority to support this alleged principle.

442.     As for Mr. Montoya's evidence, the Claimants submit that it is "*not the role of an annulment committee to decide which parts of the oral or written evidence a tribunal should give emphasis to in its award*".[565] They further explain that this evidence was irrelevant to the claim of legitimate expectations.

443.     The NextEra Entities conclude that this argument does not show a case of serious departure from a fundamental rule of procedure and argue that Spain is trying to expand the scope of annulment.[566]

*c.      The Committee's Analysis*

444.     The Committee examines whether the Tribunal's decision pertaining to the Claimants' alleged concealment of essential documents, the Tribunal's practice at the hearing, the Tribunal's alleged lack of assessment of the evidence submitted, or the Tribunal's decision regarding the alternative but-for scenario amounted to a serious departure of fundamental rules of procedure.

445.     ICSID Arbitration Rule 34(1) stipulates that that "*the Tribunal shall be the judge of the admissibility of any evidence adduced and of its probative value*". The Committee observes that a tribunal has considerable discretion in formulating its opinions about the relevance and evaluation of the elements of evidence presented by the parties. It would require exceptional circumstances for a tribunal's opinions about the relevance and evaluation of

---

[562] Counter-Memorial, ¶ 430.

[563] Rejoinder, ¶ 391.

[564] Counter-Memorial, ¶¶ 435–437.

[565] Rejoinder, ¶ 398; Counter-Memorial, ¶ 424.

[566] Counter-Memorial, ¶ 407.

the elements of evidence to amount to a serious departure of fundamental rules of procedure.

446.   Other committees such as *Wena Hotels v. Egypt* have similarly declared that "[i]*rrespective whether the matter is one of substance or procedure, it is in the Tribunal's discretion to make its opinion about the relevance and evaluation of the elements of proof presented by each Party*".[567] *Tulip v. Turkey* is also consistent with the Committee's views when it stated that "*an applicant's dissatisfaction with the way a tribunal has exercised its discretion in evaluating evidence cannot be a basis for a finding that there has been unequal treatment*".[568]

447.   The Committee first finds that a tribunal is entitled to a measure of discretion in its decision on whether to order the disclosure of documents. The Committee notes that Spain has not offered any case where a decision on document disclosure has served as the basis for annulment by constituting a serious departure of a fundamental rule of procedure.

448.   Although explained within the context of Art. 43(a) of the ICSID Convention, the Committee finds the *Azurix v. Argentina* committee's views persuasive where it stated that: "[t]*he extent to which the tribunal does call upon one party to produce documents at the request of another party will always be a matter for the tribunal to determine in its discretion*".[569] As further found in *Azurix v. Argentina*,

> [t]*o establish an annullable error, it is not sufficient to show that the tribunal rejected repeated requests for the production of evidence that the requesting party considered crucial to its case. Rather, it is necessary to establish that, in all of the circumstances there has been a serious departure from a fundamental rule of procedure.*[570]

449.   The Committee considers that the Tribunal's treatment and assessment of the evidence concerning the Claimants' alleged due diligence and privilege attached to certain documents was within its discretion. The Tribunal had the "*discretion to make its opinion*

---

[567] *Wena Hotels v. Egypt*, RL-140, at ¶ 65.

[568] *Tulip v. Turkey*, RL-181 ¶ 85.

[569] *Azurix v. Argentina*, RL-176, ¶ 217.

[570] *Azurix v. Argentina*, RL-176, ¶ 219.

*about the relevance and evaluation of the elements of proof*" concerning the assessment of the due diligence and privilege.[571]

450.    Furthermore, the Committee does not find that Spain has established that, had the documents Spain requested been produced, it could have led to a "*substantially different*" Award or it could have had a "*material impact on the outcome*" on the Award.

451.    The Committee also finds that the Tribunal's alleged lack of reference to the evidentiary record does not constitute annullable grounds. The Committee finds that even if the Tribunal chose not to refer to the evidentiary record, particularly regarding specific testimony such as Mr. Carlos Montoya's, this would be within the realm of its discretion in weighing the evidence. Again, the Tribunal had the "*discretion to make its opinion about the relevance and evaluation of the elements of proof*" that was presented during the hearing.[572] Spain's attempts to distinguish the present case from *Tulip v. Turkey* are not convincing given that, as a general matter, whether a tribunal mentions any witnesses is within its discretion. The Tribunal did mention the testimony of two of the Claimants' witnesses. The Tribunal's choice not to mention Spain's only witness could not be deemed as a failure of its "*duty to respect the right to be heard of both parties in an equitable manner*".[573] Just because one witness was not mentioned does not mean that the witness' testimony was not considered or that the right to be heard was violated.

452.    The Committee similarly does not find Spain's arguments persuasive concerning the burden of proof and the Tribunal's practices concerning the hearing. The Committee considers that weighing the evidence and effect of a party's failure to cross-examine a witness is broadly within the province of a tribunal's discretion. Spain cites Section 18.2 of PO1-A and the IBA Rules for the proposition that "*a decision not to call a witness cannot per se imply the assumption of correctness of his or her statement*".[574] Section 18.2 provides that "[i]*f the appearance and/or examination of a witness has not been requested, none of the parties shall be deemed to have (i) admitted any facts or opinions stated in the*

---

[571] *Wena Hotels v. Egypt*, RL-140, at ¶ 65.

[572] *Wena Hotels v. Egypt*, RL-140, at ¶ 65.

[573] Reply, ¶ 444.

[574] Reply, ¶ 429.

*witness statement or (ii) agreed to the correctness of the content of the witness statement*".[575] The Committee does not find this means that the Tribunal cannot take this into consideration when weighing the evidence. It only means that a party will not be deemed to have "*admitted any facts or opinions*" or "*agreed to the correctness*". The Tribunal is free to assess the weight of a witness' testimony when it is not challenged. The Tribunal's consideration of the witness statements presented by the Claimants containing various alleged statements made by the Spanish government officials and the consequences of Spain's choice not to challenge the witnesses were matters within the Tribunal's discretion.

453.    The Tribunal's alleged lack of assessment of the other evidence submitted appears based on a lack of reference to the evidence and is similarly unpersuasive. The Tribunal's assessment of the various documentary evidence that Spain contends might have negated any legitimate expectation was within its permissible discretion. The Tribunal had the "*discretion to make its opinion about the relevance and evaluation of the elements of proof*" concerning the assessment of the various forms of evidence.[576] The Tribunal was not required to reference the "*whole array of evidence*[]" and not doing so did not mean they did not "*examine…key elements*".[577] The Tribunal had the "*discretion to make its opinion about the relevance and evaluation of the elements of proof*" and could choose not to mention evidence. A lack of reference to evidence does not necessarily mean a lack of its assessment.

454.    The Committee finds that Spain briefed the relevant issues through both written and oral submissions and was given the opportunity to be heard. All in all, the Committee concludes that the Tribunal's decision pertaining to the Claimants' alleged concealment of essential documents, the Tribunal's practice at the hearing, the Tribunal's lack of reference to the evidence submitted, or the Tribunal's consideration of the alternative but-for scenario did not constitute a serious departure of fundamental rules of procedure under Art. 52(1)(d).

---

[575] Arbitration Procedural Order No. 1, 21 May 2015, R-468, Section 18.2.
[576] *Wena Hotels v. Egypt*, RL-140, at ¶ 65.
[577] Reply, ¶¶ 445, 446.

**(3)    Serious Departure from a Fundamental Rule of Procedure by Breaching the Principle of Congruence and Infringing the Right of Defense (Art. 52(1)(d)) (Annulment Ground (t))**

*a.    Spain's Position*

455.    Spain asserts a lack of congruence between the Claimants' claims and the considerations the Tribunal made to find liability. In terms of the Tribunal's lack of congruence between the Claimants' claims and the Tribunal's considerations to find liability, Spain submits that the Tribunal found liability based on reasons not set forth by the Claimants and, as a result, it could not defend itself properly.[578]

456.    Spain submits that the Tribunal went beyond the facts that were "*prefigured*" and "*on which the debate between the parties* [was] *established*", and ruled on the "*alleged factual grounds which clearly deviate*[d] *from those which were the subject of the debate*".[579] To Spain, the Tribunal introduced "ex novo" and "*invent*[ed] *an alternative theory different from the one put forward*" that Spain had no opportunity to defend against.[580] The Tribunal invented an alternative theory that was not based on the principle of reasonable returns as argued by the Parties.

457.    Spain also submits that the Tribunal's "*lack of congruence*" infringed its rights to be heard. According to Spain, if "*the Tribunal goes beyond the facts which are prefigured by the Claim, and on which the debate between the parties has been established, and rules on alleged factual grounds which clearly deviate from those which were the subject of the debate, the right of the party to be heard is violated*".[581]  Spain cites *TECO v. Guatemala* and *Caratube v. Kazakhstan* as support for this principle.[582]

---

[578] Memorial, ¶ 440.

[579] Reply, ¶ 397.

[580] Reply, ¶¶ 412, 421.

[581] Reply, ¶ 397.

[582] Reply, ¶¶ 400–401.

### b.    The NextEra Entities' Position

458.    The Claimants argue that there was no lack of congruence as Spain claims.

459.    The Claimants submit that they briefed both the primary claim and alternative case with respect to liability and quantum from the outset. For its primary claim, they anticipated Spain's position that the Claimants did not have a legitimate expectation to receive the tariffs and premiums applicable under Regulatory Framework I.

460.    They also made the alternative claim that they had a legitimate expectation to earn a "*reasonable return*" on their investment.[583] The Claimants' quantum expert Compass Lexecon used Regulatory Framework III for the primary claim and an adjusted Regulatory Framework III for the alternative but-for claim.

461.    The Claimants also submit that "*Spain* [has] *not provided a single authority for the 'principle of congruence*'".[584]

### c.    The Committee's Analysis

462.    The Committee examines Spain's claim that the Tribunal committed a serious departure from a fundamental rule of procedure under Art. 52(1)(b) by breaching the principle of congruence and infringing the right of defense.

463.    At the outset, the Committee agrees with the Claimants' point that the Applicant has not provided any specific authority for the "*principle of congruence*" that it pleads. The definition of the principle and its boundaries remain unclear. To the extent it may exist, the Committee concludes that it falls within the principle of a right to be heard and will analyze Spain's application accordingly.

464.    The Committee agrees that, as found in *TECO v. Guatemala*, a breach of Art. 52(1)(d) could arise "*when a tribunal <u>effectively surprises</u> the parties with an issue that neither party has invoked, argued or reasonably could have anticipated during the proceedings.*

---

[583] Counter-Memorial, ¶ 438.
[584] Counter-Memorial, ¶ 435.

*In such a scenario, a reasonable question to ask is whether the parties' right to be heard has been <u>seriously affected</u>*".[585] (emphasis added). As provided under *TECO v. Guatemala*, two issues to consider are whether a party was "*effectively surprised*" and whether a party's rights were "*seriously affected*". Other cases cited by the Parties such as *Fraport v. Philippines* and *Pey Casado v. Chile I*, also confirm that a key element is whether a party was afforded an opportunity to address the relevant matter.[586] The present case differs from *TECO v. Guatemala*, where a central legal concept ("*unjust enrichment*") which served as the basis for the tribunal's decision was never raised before the parties.

465.    Furthermore, the Committee agrees with the *Caratube v. Kazakhstan* committee that provided:

> *Tribunals do not violate the parties' right to be heard if they ground their decision on legal reasoning not specifically advanced by the parties, provided that the tribunal's arguments can be <u>fitted within the legal framework argued during the procedure and therefore concern aspects on which the parties could reasonably be expected to comment</u>, if they wished their views to be taken into account by the tribunal"..*[587] (emphasis added).

466.    The Committee does not find Spain could have been "*effectively surprised*" and instead finds the Tribunal's arguments "*fitted within the legal framework argued during the procedure and therefore concern*[ed] *aspects on which the parties could reasonably be expected to comment*".[588] The Committee finds that the Claimants' primary claim and alternative case with respect to liability and quantum "*fit*[ ] *within the legal framework*

---

[585] *TECO v. Guatemala*, RL-207, ¶ 184.

[586] *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Decision on the Application for Annulment of Fraport AG Frankfurt Airport Services Worldwide, 23 December 2010, RL-177, ¶ 202; *Pey Casado v. Chile I*, RL-182, ¶ 262.

[587] *Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Decision on the Annulment Application of Caratube International Oil Company LLP, 21 February 2014 ("*Caratube v. Kazakhstan")*, RL-174, ¶ 94.

[588] *Caratube v. Kazakhstan*, RL-174, ¶ 94.

*argued during the procedure*". The central tenets of the alternative claim fit within the same general legal framework of the primary claim.[589]

467.    Contrary to Spain's claims, the Committee considers that the Tribunal's finding of a legitimate expectation through the Claimants' alternative claim did not constitute an annullable ground under Art. 52(1)(d). The Tribunal found that the Claimants had a legitimate expectation that Spain would honor its commitments in terms of regulatory certainty, stability, and viability. The Committee does not find that the Tribunal "*invented*" an alternative theory, and "*effectively surprised*" and denied Spain the opportunity to defend itself. The Tribunal's decision was within the framework and arguments presented by the Parties concerning legitimate expectations and a right to a reasonable return on actual sunk costs and actual cost of capital plus a margin. Spain was not denied a right to be heard. After the Claimants raised the alternative theory, the Spain had the full opportunity to respond and responded to the allegations that formed the basis of the alternative case.[590]

468.    The Committee concludes that the Tribunal decided the case on liability within the framework presented by the Parties. The Tribunal therefore did not infringe Spain's right to be heard and there was no serious departure from a fundamental rule of procedure under Art. 52(1)(d).

---

[589] NextEra Entities' Memorial on the Merits, 22 May 2015, R-488, Parts II and V.5; NextEra Entities' Reply on the Merits, 10 August 2016, R-492, Parts III and IV; NextEra Entities' Skeleton Argument, 9 December 2016, C-333, ¶¶ 41–45; 57–61; NextEra Entities' Opening Presentation in Arbitration Hearing, C-332, Slides 3, 7, 23–27, 31–33, 37, 39–41.

[590] Spain's Counter-Memorial on the Merits, R-491, 4 March 2016, ¶¶ 240–316 (regarding the principle of reasonable return), ¶¶ 374–598 (regarding the legal regime applicable), ¶¶ 643–719 and ¶¶ 720–731 (regarding the FET standard); ¶¶ 678 *et seq*, 335–359, Part F; Spain's Rejoinder on the Merits, 20 October 2016, R-471, ¶¶ 190–344 (regarding the principle of reasonable return), 356–535 (regarding the legal regime applicable), ¶¶ 1041–1112 (regarding the FET standard).

**(4)      Serious Departure from a Fundamental Rule of Procedure by Admitting an Alleged Erroneous Translation (Art. 52(1)(d)) (Annulment Ground (u))**

*a.      Spain's Position*

469.    Spain's raises the same issues concerning the translation of Exhibit C-006 as Annulment Ground (v) in Section V.E(9), *supra,* but based on Art. 52(1)(d) of ICSID Convention.

470.    Spain claims the following:

> As can be seen from the Award, the Tribunal bases the hypothetical legitimate expectations on two simple letters from the Secretario de Estado de Energía *to the American company FLP (not to the instrumental masks of the Claimants). The fact is that the translation of one of these letters is blatantly erroneous, tending to change the meaning of it and benefit the position of the Claimants. The Kingdom of Spain considers that the result is identical to that of falsehood and fraud.*[591]

471.    Spain explains that because the Award was based on a false document, it can be assumed that the result of the arbitration could have been different.[592]

472.    A serious departure of a fundamental rule of procedure occurred because the Award relied upon a false and fraudulent translation.

*b.      The NextEra Entities' Position*

473.    The NextEra Entities reiterate that Spain's ground on annulment that relies upon the allegedly incorrect translation has been waived under ICSID Arbitration Rule 27.[593]

474.    In any event, the NextEra Entities argue the following:

> Spain's revised translation would still be evidence of the Claimants' legitimate expectations: Spain does not challenge the fact in this letter that Secretary Marín informs Mitch Davidson of NextEra 'that

---

[591] Memorial, ¶ 444.

[592] Memorial, ¶ 446.

[593] Counter-Memorial, ¶ 451.

> *the absolute vocation of said legislation is to preserve the legal*
> *security of all investments currently underway'*.[594]

475.    The NextEra Entities conclude by saying that even using Spain's preferred translation, the overall meaning of the letter would not be materially changed.[595] They also argue that the translation was not incorrect.[596]

476.    The Claimants contend that a serious departure of a fundamental rule of procedure did not occur due to the translation of the Exhibit C-006.[597]

### c.    The Committee's Analysis

477.    The Committee examines whether the Tribunal committed a serious departure from a fundamental rule of procedure concerning the translation issue for Exhibit C-006.

478.    This ground overlaps with the Annulment Ground (v) in Section V.E(9), *supra*. The Committee reiterates that Spain did not to object to the translation even though it was used as an exhibit that was part of the Claimants' Request for Arbitration in May 2014.  Spain did not challenge the translation until its closing argument on the last day of the underlying arbitration hearing in December 2016. In response to the Claimants' objection that the Applicant belatedly raised the translation issue, the Applicant replied shortly thereafter that "[t]*he last point I wanted to talk about was the translation of the English word 'forecast' into Spanish. We don't have anything to add to that. I apologise. I certainly don't want to reopen the debate, Mr President*".[598] Spain never even requested a certified translation through the procedure established for disputed translations under PO1-A. Spain apparently did not raise the translation issue in any of its written post-hearing submissions, including its 27 February 2017 Post-Hearing Submission or its 8 March 2017 Post-Hearing Reply. Even after receiving the Tribunal's Decision, which stated the Tribunal's reliance upon the exhibit, Spain did not raise any issues regarding the translation.

---

[594] Counter-Memorial, ¶ 454 (emphasis omitted).

[595] Counter-Memorial, ¶ 456.

[596] Counter-Memorial, ¶ 445.

[597] Counter-Memorial, ¶ 452.

[598] Arbitration Hearing, Day 7, 19 December 2016, R-474/C-313, 1541:10–14.

479. Under these circumstances, the Committee agrees with the Claimants that the Applicant waived its right to challenge this procedural matter as provided under ICSID Arbitration Rule 27 by not promptly objecting to it. Spain was aware of the document from the onset of the arbitration. Spain's awareness of the document is confirmed because it even raised its own arguments based on the document. It never challenged the translation under the procedures provided for in PO1-A. It raised the translation issue over two and a half years after the document in question was submitted. This cannot be considered as "*promptly*" objecting under ICSID Arbitration Rule 27. Furthermore, after raising the issue for the first time, it appeared to withdraw its concern about the translation as a general matter by stating, "[w]*e don't have anything to add to that* [the translation of 'forecast']. *I apologise. I certainly don't want to reopen the debate*".[599] It did not mention any issue with the tense used in the translation and it did not make any reservations when withdrawing its concerns. Thereafter, the Applicant never raised the issue even after receiving the Decision that relied upon the exhibit.

480. The Committee holds that the dispute concerning a translation of a document, particularly one that existed from the beginning of a proceeding, was a procedural matter concerning a "*rule*[ ]...*applicable to the proceeding*" under ICSID Arbitration Rule 27. The Applicant waived any basis to present its Application based on the translation issue because it "*fail*[ed] *to state promptly its objection*" pursuant to ICSID Arbitration Rule 27.

481. Hence, Spain waived its rights to bring a claim on this basis and the Tribunal's use of the translation did not constitute a serious departure of a fundamental rules of procedure.

## G. WAIVER

### (1) Waiver of the Grounds for Annulment (ICSID Arbitration Rule 27)

#### a. *The NextEra Entities' Position*

482. According to ICSID Arbitration Rule 27, the NextEra Entities contend that:

---

[599] Arbitration Hearing, Day 7, 19 December 2016, R-474/C-313, 1541:10–14.

133

> *A party which knows or should have known that a provision of the Administrative and Financial Regulations, of these Rules, of any other rules or agreement applicable to the proceeding, or of an order of the Tribunal has not been complied with and which fails to state promptly its objections thereto, shall be deemed—subject to Article 45 of the Convention—to have waived its right to object.*[600]

483.   The NextEra Entities continue by asserting that ICSID *ad hoc* committees have concurred on two basic principles: (i) ICSID Arbitration Rule 27 applies to annulment proceedings; and (ii) the rule prevents a party from raising as ground for annulment something that it failed to object promptly before the tribunal if it had an opportunity to do so.[601]

484.   The NextEra Entities rely on *Lemire v. Ukraine* where the committee held that Ukraine's right to claim the annulment of the decision on jurisdiction and liability were waived in light of ICSID Arbitration Rule 27.

485.   The *Lemire v. Ukraine* committee explained that:

> *the waiver provided by Arbitration Rule 27 applies to the case at hand on the basis that Respondent knew or should have known about such violations since the moment the Decision on Jurisdiction and Liability was issued on January 14, 2010. Consequently, Respondent should have objected to such violations and should have reserved its rights to claim these objections in a subsequent annulment proceeding. There was no reason for Respondent to remain silent and wait until the Award was issued to object to the terms and content of the first decision. Respondent's silence amounts to a waiver of its rights to object to the Decision on Jurisdiction and Liability at the present stage.*[602]

486.   Among other things, "*Spain chose not to raise its current complaints with the Tribunal throughout the period of almost three months (80 days, to be more precise) between the Decision and the final Award*".[603]

---

[600] Counter-Memorial, ¶ 31.

[601] Counter-Memorial, ¶ 35.

[602] Counter-Memorial, ¶¶ 39–40; *Joseph C. Lemire v. Ukraine,* ICSID Case No. ARB/06/18, Decision on Ukraine's Application for Annulment of the Award, 8 July 2013, CL-275, ¶¶ 201–203.

[603] Counter-Memorial, ¶ 48.

487.    As a result, the NextEra Entities argue that because Spain failed to act promptly it waived most of the grounds on which it now seeks to annul the Award.

### b.    *Spain's Position*

488.    Spain claims that the NextEra Entities are trying to apply ICSID Arbitration Rule 27 not only to procedural grounds for annulment but also to other grounds such as a manifest excess of powers and failure to state reasons. In this regard, Spain states that such interpretation is contrary to the wording and purpose of the provision and must be rejected.[604]

489.    Spain explains that ICSID Arbitration Rule 27 is applicable to those cases in which there was an opportunity, during the proceedings, to use the mechanisms provided for purging them.[605]

490.    Spain also cites *Pey Casado v. Chile I* for the view that "*'waiver' can only be triggered if the applicant knew that the tribunal by its conduct had not complied with the rule and thus had a reasonable opportunity to raise its objection. If the objecting party acquired actual or constructive knowledge of a rule violation only after the award has become available, it cannot be considered as having waived its right to object*".[606]

491.    According to Spain, due to the nature of the mistakes in the Award, the annulment proceeding was the only available procedural mechanism.[607]

### c.    *The Committee's Analysis*

492.    In light of its rulings above*,* the Committee exercises its procedural economy and decides it is not necessary to render a separate decision on this issue.

---

[604] Reply, ¶¶ 21–22 and 33.

[605] Reply, ¶ 23.

[606] Reply, ¶ 19 citing *Pey Casado v. Chile I*, RL-182, ¶ 82.

[607] Reply, ¶¶ 23–24.

H.    **RESIDUAL DISCRETION**

(1)    **Residual Discretion of *ad hoc* Committees (Art. 52(3) of the ICSID Convention)**

a.    ***The NextEra Entities' Position***

493.    The NextEra Entities hold that Art. 52(3) of the ICSID Convention entrusts an *ad hoc* committee with the authority and not the obligation to annul an award. In this regard, they highlight that:

> *This is borne out by the plain wording of Art. 52(3), which provides that a committee* 'shall have the authority to annul the award'. *It does not say* 'shall annul the award'.[608]

494.    The NextEra Entities say:

> *For the reasons explained in this Counter-Memorial, Spain has failed to establish any of the Art. 52(1) grounds of annulment. However, if the Committee considers that Spain has established a possible ground for annulment, NextEra respectfully requests the Committee exercise its discretion to deny Spain's Annulment Application and uphold the Award in full.*[609]

495.    Finally, the NextEra Entities point out that regarding this discretion the Committee should follow the factors mentioned in *CEAC v. Montenegro*. In exercising its discretion, the Committee should consider as follows:

> [the] *gravity of the relevant issue and its impact on the Award; the impact on each party that annulment would produce; the length of the proceeding, which began in 2014; the costs for both sides of a resubmitted dispute; the undisputed commitments that Spain provided to NextEra in this case; and the importance of the finality of the Award in the ICSID system.*[610]

---

[608] Rejoinder, ¶ 449.

[609] Counter-Memorial, ¶ 465.

[610] Counter-Memorial, ¶¶ 466–467; *CEAC v. Montenegro*, CL-284, ¶ 84.

b.    *Spain's Position*

496.    Spain argues that:

> The ICSID Convention does not provide that ad hoc annulment committees have 'discretion' to refuse to annul an award once it is determined that there are grounds for annulment. Nor does the drafting history of the ICSID Convention support that position.[611]

497.    Spain relies on *Klöckner v. Cameroon*, *Pey Casado v. Chile I*, and *Eiser v. Spain,* where committees held that if there are grounds for annulment, then the award should be annulled without the committee having any discretion.[612]

c.    *The Committee's Analysis*

498.    The Committee finds that Art. 52(3) of the ICSID Convention must be interpreted based upon the ordinary meaning as provided under the Vienna Convention. The plain wording of Art. 52(3) provides that a committee "*shall have the authority to annul the award*". It does not say "*shall annul the award*". This suggests that a committee has "*the authority*" to determine whether or not to annul an award based upon its discretion. The discretion of committees is well-established. As the *Pey Casado v. Chile II* committee found in 2020, "*the Committee agrees with the position of the* CEAC *committee, which is itself in line with well-established case law, that committees should not automatically declare an award annulled if one of the grounds for annulment is present*".[613] As described by Professor Schreuer, committees no longer adopt the "*hair trigger*" standard of automatically annulling awards.[614]

---

[611] Reply, ¶ 667.

[612] Reply, ¶¶ 669–672; *Klöckner v. Cameroon*, RL-194, ¶ 179; *Pey Casado v. Chile I*, RL-182, ¶ 80; *Eiser Infrastructure Limited and Energía Solar Luxembourg S.À R.I. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Decision on the Kingdom of Spain's Application for Annulment, 11 June 2020, RL-255, ¶ 254.

[613] *Víctor Pey Casado and Foundation President Allende v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on Annulment, 8 January 2020 ("*Pey Casado v. Chile II*"), CL-239, ¶ 210. See also *MINE v. Guinea*, RL-178, at ¶ 4.09.

[614] Christoph Schreuer, "Three Generations of ICSID Annulment Procedures", in *Annulment of ICSID Awards* by Emmanuel Gaillard and Yas Banifatemi, 2004, CL-294, p. 19.

499.   The Committee agrees that the discretion should be subject to reasonable limits and that various factors should be taken into consideration when exercising this discretion. As listed in *Pey Casado v. Chile II*, factors to be considered include "*the gravity of the circumstances which constitute the ground for annulment*", and, "*whether they had – or could have had – a material effect upon the outcome of the case*".[615] *CEAC v. Montenegro* also cites (1) "*the importance of the finality of the award*" and (2) "*the overall question of fairness to both Parties*".[616]

500.   In light of its rulings above that Spain has not established any grounds for annulment, the Committee decides it is not necessary to render a separate decision on this issue.

## VI.   COSTS

### A.   SPAIN'S COST SUBMISSIONS

501.   In its submission on costs, the Applicant requests that the Claimants be ordered to pay the total costs of the arbitration proceeding and the legal fees and expenses incurred by the Applicant, amounting to EUR 2,014,749.04[617], broken down as follows:

| ICSID Fees and Advance Payments | EUR 497,742.25[618] |
|---|---|
| Legal Fees | EUR 1,527,890.00 |
| Expert Reports | EUR 71,125.00 |
| Translations | EUR 5,858.46 |

---

[615] *Pey Casado v. Chile II*, CL-239, ¶ 210.

[616] *CEAC v. Montenegro*, CL-284, ¶ 84.

[617] Spain filed a Submission on Costs on 25 February 2021 ("**Spain's 2021 Submission on Costs**") for a total amount of EUR 2,836,038, which was updated by the Statement of Costs of 25 January 2022 ("**Spain's 2022 Statement of Costs**") a total amount of EUR 2,014,749.04.

[618] According to paragraph 4 of Spain's 2022 Statement of Costs, this total amount results from deducting EUR 97,405.20 (USD 110,790.62) (identified as a "*reimbursement by ICSID*") from Spain's advance payments of EUR 572,275.79 (USD 650,000). The Committee observes, however, ICSID has not made any reimbursements out of the advance payments concerning the annulment proceeding.

| Printing Services | EUR 1,386.37 |
|---|---|
| Courier Services | EUR 729.16 |
| Other Expenses | EUR 17.80 |
| Total | EUR 2,104,749.04 |

(Currency: EUR)

502.    Spain acknowledges that, pursuant to Article 52(4) of the ICSID Convention and Arbitration Rule 53, Article 61(2) of the ICSID Convention and Rule 47(1)(j) apply *mutatis mutandis* to annulment proceedings. Article 61(2) grants the Committee a "*degree of discretion*" to allocate the costs of the proceeding.[619]

503.    Spain "*understands that the Committee should be guided by the principle that 'costs follow the event' if there are no indications that a different approach should be called for*".[620]

504.    Spain further argues that it was "*compelled to go through these annulment proceedings*".[621] It asserts that the Tribunal lacked jurisdiction to hear the dispute and that the Claimants should be responsible for the costs Spain incurred as they decided to initiate the dispute. Furthermore, according to Spain, the Claimants should bear the costs since they "*filed a conscious false translation that led the Tribunal to an erroneous holding*", and they "*got access to a privileged subsidies framework due to a false statement that made them go to the Arbitration with no clean hands*".[622]

505.    Spain contends that if the Committee annuls the Award, the Claimants should pay for the legal, arbitration, and annulments costs of Spain.[623] Spain adds that even if the Committee does not annul the Award in its entirety it should be entitled to recover its costs.[624]

---

[619] Spain's 2021 Submission on Costs, ¶ 5.
[620] Spain's 2021 Submission on Costs, ¶ 6.
[621] Spain's 2021 Submission on Costs, ¶ 7.
[622] Spain's 2021 Submission on Costs, ¶ 7.
[623] Spain's 2021 Submission on Costs, ¶ 10.
[624] Spain's 2021 Submission on Costs, ¶ 8.

506.    Spain notes that its costs are "*reasonable in light of the complexity and duration of the case*".[625]

507.    Spain further requests that the Claimants should pay "*post-award interest on the foregoing sums, at a compound rate of interest to be determined by the Committee until the date of full satisfaction of the Committee's decision*".[626]

508.    Finally, Spain reserves its right to submit "*additional arguments in accordance with the ICSID Rules and the instructions of the ad hoc Committee for the purpose of responding to the allegations made by the Respondent on Annulment*".[627]

**B.    THE NEXTERA ENTITIES' COST SUBMISSIONS**

509.    In its submissions on costs, the Claimants submit that the Applicant should bear all the costs, fees, and expenses of these annulment proceedings and reimburse the Claimants' attorneys' fees, expert fees, and other disbursements for a total amount of USD 3,529,855.95, broken down as follows:

| | |
|---|---|
| Skadden Professional Fees | USD 3,382,592.83[628] |
| Translations | USD 47, 918.13 |
| Trial graphics consultant fees | USD 61,182.00 |
| Expert fees of Prof. Eeckhout | USD 35,253.69 |
| Miscellaneous (copying, courier, legal technology, outside legal research) | USD 2,909.30 |
| Total | USD 3,529,855.95 |

---

[625] Spain's 2021 Submission on Costs, ¶ 11.

[626] Spain's 2021 Submission on Costs, ¶ 24.

[627] Spain's 2021 Submission on Costs, ¶ 25.

[628] This corresponds to the total amount of fees reflected in the Claimants' Submission on Costs of 25 February 2021, ¶ 31 (i.e. USD 3,285,437.15) and the Claimants' Statement of Costs of 7 January 2022, p. 2 (i.e. USD 97,155.68).

(Currency: USD)

510.    In addition, the Claimants request interests for the fees and disbursements (specified in the previous paragraph), from the date of the Committee's Decision on Annulment until the date of payment at the same interest rate specified in the Award. [629]

511.    The Claimants also argue that Article 61(2) of the ICSID Convention extends to ICSID *ad hoc* committees. They cite that "*both sides have claimed that costs should be awarded to them as the prevailing party*". [630] They note that "[p]*rior annulment committees have attached importance to any such common position. Article 61(2) also expressly recognises the deference that should be given to any party agreement on costs*". [631] They advocate the 'cost follows the event' approach should be followed as it is "*well-settled in ICSID arbitration*". [632]

512.    While a party has a right to seek annulment, such right should not be "*consequence-free*". [633] They assert that "[t]*he applicant for annulment is the only party that stands to gain from filing an annulment application. If the applicant prevails, it reaps a substantial benefit by annulling the award. If the applicant loses, the respondent on annulment gains nothing new*". [634]

513.    They argue that the cost-follows-event principle is "*especially relevant here, where Spain raised 22 claims for annulment (which may be a record number in ICSID arbitration)*". [635] They emphasize that "*Spain should bear the cost consequences that flow from its 'kitchen sink'*" approach. [636] They add that even if Spain were to prevail on any one of its 22 claims, the principle should still warrant awarding them almost all of their costs because they

---

[629] Claimants' Submission on Costs, ¶ 38.i and ii.

[630] Claimants' Submission on Costs, ¶ 3, citing Spain's Reply on Annulment, ¶ 674(d), and NextEra's Rejoinder on Annulment, ¶ 454(c)(iv) and (v) (each seeking full cost recovery).

[631] Claimants' Submission on Costs, ¶ 7.

[632] Claimants' Submission on Costs, ¶ 11.

[633] Claimants' Submission on Costs, ¶ 9.

[634] Claimants' Submission on Costs, ¶ 9.

[635] Claimants' Submission on Costs, ¶ 10.

[636] Claimants' Submission on Costs, ¶ 21.

would have prevailed on the other 21 claims.[637] In addition to the number of claims, the Claimants argue that the following factors increased costs: (1) Spain's re-litigation of issues beyond the limits of annulment review, including a considerable number of new arguments and authorities; (2) the Parties' diverging views on waiver; (3) Spain's arguments based on alleged omission; and (4) Spain's lengthy use of expert evidence.[638]

514.    The Claimants assert that it should be able to claim costs for the numerous procedural applications that Spain lost. This includes Spain's request for a stay of enforcement, two requests for new expert evidence, invocation of criminal law, and application for expert testimony. The Claimants also claimed supplemental costs incurred for responding to Spain's application to introduce the *Moldova v. Komstroy* judgment into the record, commenting on that judgment after its admission into the record, and responding to Spain's application to reopen these proceedings.[639]

515.    They also cite various "*recent committees*" have awarded attorney's fees as part of the "*recent trend in ICSID annulment proceedings towards a 'cost follows the event approach*'".[640] They argue that the "*allocation of attorneys' fees supplements the well-accepted principle that the costs of the annulment proceeding itself (such as the fees of the committee members) should be borne by the unsuccessful applicant, 'unless there are exceptional circumstances which warrant an alternative allocation*'".[641]

516.    The Claimants assert that their costs are reasonable and commensurate with the number of claims that Spain raised in this annulment proceeding. They add that their costs are "*consistent with the costs incurred by both Spain and the investor in the* Eiser *annulment*

---

[637] Claimants' Submission on Costs, ¶ 18.

[638] Claimants' Submission on Costs, ¶ 22.

[639] Claimants' letter of 7 January 2022, pp. 1–2.

[640] Claimants' Submission on Costs, ¶ 14, citing, Bl*usun S.A., Jean-Pierre Lecorcier & Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Decision on Annulment, 13 April 2020, RL-318; *OI European Group B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Decision on Annulment, 6 December 2018, CL-240; *Alapli v. Turkey*, CL-273; *Adem Dogan v. Turkmenistan*, ICSID Case No. ARB/09/9, Decision on Annulment, 15 January 2016, CL-306; *Togo Electricité y GDF-Suez Energie Services v. Republic of Togo*, ICSID Case No. ARB/06/07, Decision on Annulment, 6 September 2011, CL-324; and *Compagnie d'Exploitation du Chemin de Fer Transgabonais v. Republic of Gabon*, ICSID Case No. ARB/04/5, Decision on Annulment, 11 de mayo de 2010, CL-325; ¶ 30 (on recent trends).

[641] Claimants' Submission on Costs, ¶ 15, citing *CEAC v. Montenegro*, ¶ 151.

*proceeding (which is the closest comparator because it is the only other Spanish ECT award that has reached a decision on annulment thus far)*".[642] They cite that *Eiser v. Spain* involved far fewer claims but that Eiser claimed approximately USD 2.9 million in attorney's fees and approximately USD 235,000 in disbursements, which amounted to 2% of the *Eiser v. Spain* award's value. They highlight that their legal costs is commensurate with the value of the Award and amounts to 1% of the sums owed.[643]

517.    They cite that they anticipate that Spain's legal costs will be lower because its State Attorney's Office is handling the case and many of its arguments have been raised in other ECT cases, which allows it to spread its costs.[644] In contrast, the Claimant's counsel is not acting for any other investors against Spain, which does not allow it to similarly spread costs.[645]

## C.    THE COMMITTEE'S DECISION ON COSTS

518.    Art. 61(2) of the ICSID Convention provides:

> *In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

519.    ICSID Arbitration Rule 47(1)(j) provides that an award shall contain "*any decision of the Tribunal regarding the cost of the proceeding*".

520.    Art. 61(2) of the ICSID Convention and Arbitration Rule 47(1)(j) (applied by virtue of Article 52(4) of the ICSID Convention and Arbitration Rule 53) give an *ad hoc* committee discretion to allocate the costs of the proceeding, including attorneys' fees and other costs, between the Parties as it deems appropriate. The Committee notes that Regulation 14(3)(e)

---

[642] Claimants' Submission on Costs, ¶¶ 5, 34–35, 37.
[643] Claimants' Submission on Costs, ¶¶ 34–36.
[644] Claimants' Submission on Costs, ¶ 32.
[645] Claimants' Submission on Costs, ¶ 33.

of the ICSID Administrative and Financial Regulations also recognizes the committee's discretion to allocate the costs of annulment proceedings.

521.   In exercise of its discretion, the Committee considers that the "*costs should follow the event*" principle should apply. An important factor for the Committee to follow this principle is that both Parties agree with its application. Both Parties claim recovery of their costs based on their position prevailing in the case. The Committee further notes the recent practice of committees following this principle.[646] The Committee agrees with *CEAC v Montenegro* that the costs should be borne by the unsuccessful applicant unless there are "*exceptional circumstances which warrant an alternative allocation*".[647]

522.   In view that the Application did not succeed Spain should therefore bear the entire costs of the proceeding, including the fees and expenses of the Members of the Committee. The Committee sees no exceptional circumstances that would warrant a different allocation of costs.

523.   The costs of the proceeding, including the fees and expenses of the Committee, ICSID's administrative fees and direct expenses, amount to (in USD):

|  |  |
|---|---|
| Committee Members' fees and expenses | |
| Joongi Kim (President) | USD 197,279.40 |
| Lawrence Boo | USD 56,038.04 |
| Humberto Sáenz Marinero | USD 156,000.00 |
| ICSID's administrative fees | USD 126,000.00 |
| Direct expenses | USD 47,157.05 |
| **Total** | **USD 528,474.49** |

---

[646] Background Paper, ¶ 65.
[647] Claimants' Submission on Costs, ¶ 15, citing *CEAC v. Montenegro*, ¶ 151.

524.    The above costs have been paid out of the advances made by the Applicant pursuant to Administrative and Financial Regulation 14(3)(e).[648]

525.    In terms of legal fees and other expenses, the Committee finds that the same principle should apply and the costs should be borne by the unsuccessful Applicant. In applying the principle, the Committee takes into consideration the relative success of the Parties' submissions, the particular circumstances of the case, reasonableness of fees and expenses claimed, and the conduct of the Parties.

526.    The Committee first notes that Spain's Application was denied in its entirety.

527.    In terms of the circumstances of the case, Spain raised 22 claims in its Application, all of which were denied in their entirety. Similarly, it did not prevail in most of the procedural applications made during the course of the proceedings, including the request for stay of enforcement, several applications to submit new evidence, and an application to reopen the proceedings. The Committee does not find any exceptional circumstances that would warrant a different allocation.

528.    Given the complexity of the case and the issues argued, the Claimants' attorneys' fees and other expenses such as translations, experts' fees, and miscellaneous fees seem reasonable. The Committee, however, observes that the "*Trial graphics consultant fee*" substantially surpasses even the expert's fees of Prof. Eeckhout and finds it excessive.

529.    The Committee extends its appreciation to both Parties for having conducted themselves in a professional and cooperative manner and considers that neither can be faulted for causing any unwarranted delays. The Committee does not find that either Party committed any misconduct during the annulment proceedings.

530.    Accordingly, taking these factors into consideration, the Committee orders the Applicant to cover USD 3,500,000 of the Claimants' legal fees and other expenses (out of the total amount of USD 3,529,855.95 claimed).

---

[648] The remaining balance will be reimbursed to the Applicant.

531.   The Committee finds that, in the normal course of business, interest should accrue for sums due until payment is made. The Committee notes that Spain requests post-Decision interest at a compound rate to be determined by the Committee. The Respondent requests the same interest rate specified in the Award (i.e. 0.234% compounded monthly).[649] Both Parties requested post-Decision compound interest.

532.   The Committee considers appropriate to apply the same interest rate granted in the Award. Accordingly, Spain shall pay interests on the amount determined in this Decision, at the rate of 0.234% compounded monthly, starting 30 days after the date of the Decision until the date of payment.

*(intentionally left blank)*

---

[649] Award, ¶¶ 18, 37.

## VII.    DECISION

533.    For the reasons set forth above, the Committee unanimously decides that:

(1)    the Application for Annulment of the Award rendered on 31 May 2019 submitted by Spain is dismissed in its entirety;

(2)    the Applicant shall bear all the costs of the proceedings, including the fees and expenses of the Members of the Committee, ICSID's administrative fees, and direct expenses, in the amount of USD 528,474.49; and

(3) the Applicant shall, within 30 days of the dispatch of the Decision on Annulment, pay to the Claimants the sum of USD 3,500,000 in respect of the Claimants' legal fees and expenses, and interests on this amount at the rate of 0.234% compounded monthly, starting 30 days after the date of the Decision until the date of payment.

_____
Mr. Humberto Sáenz-Marinero
Member of the *ad hoc* Committee
Date: 12 March 2022

_____
Prof. Lawrence Boo
Member of the *ad hoc* Committee
Date:

_____
Prof. Joongi Kim
President of the *ad hoc* Committee
Date:

148

_____

Mr. Humberto Sáenz-Marinero
Member of the *ad hoc* Committee
Date:

_____

Prof. Lawrence Boo
Member of the *ad hoc* Committee
Date: 14 March 2022

_____

Prof. Joongi Kim
President of the *ad hoc* Committee
Date:

149

Mr. Humberto Sáenz-Marinero
Member of the *ad hoc* Committee
Date:

Prof. Lawrence Boo
Member of the *ad hoc* Committee
Date:

Prof. Joongi Kim
President of the *ad hoc* Committee
Date: 16 March 2022