# EXHIBIT 5



GOVERNMENT ATTORNEY'S OFFICE
DIRECTORATE FOR STATE LEGAL SERVICES

SUBDIRECTORATE-GENERAL OF LITIGATION SERVICES

**IN THE CASE OF AN ARBITRATION UNDER THE CONVENTION OF 1965 ON THE SETTLEMENT OF INVESTMENT DISPUTES BETWEEN STATES AND NATIONALS OF OTHER STATES (ICSID CONVENTION)**

**AND**

**UNDER THE ENERGY CHARTER TREATY**
**(ICSID ARBITRATION CASE NO. ARB/14/11)**
**BETWEEN:**

**NEXTERA ENERGY GLOBAL HOLDINGS B.V.**
**- and -**
**NEXTERA ENERGY SPAIN HOLDINGS B.V.**

**<u>Claimants</u>**

**- and -**

**THE KINGDOM OF SPAIN**

**<u>Respondent</u>**

---

# REPLY ON PRELIMINARY OBJECTIONS

**ARBITRATORS:**

Professor Donald Mc.Rae

Mr. Yves Fortier

Professor Laurence Boisson de Chazournes

**Submitted in representation**
**of the Respondent by:**

Government Attorney's Office

C/ Ayala, 5

28001 Madrid

Spain

**14 October 2016**

# CONTENTS

I.  LIST OF PRINCIPAL ABBREVIATIONS....................................................... 6

II.  INTRODUCTION ................................................................................... 8

III.  COMMON FACTS DETERMINING THE LACK OF INVESTOR (ART. 1.7 ECT) AND LACK OF DENIAL OF BENEFITS REGARDING ART. 17 OF THE ECT ........... 10

A.  Corporate chain of the Nextera Group: the Dutch shell companies are mere intermediate links ................................................................................. 10

B.  Company object officially declared by the Claimants: holding company that merely holds shares, without economic activity ................................................. 11

C.  Human resources: they have no workers ...................................................... 14

D.  Official Financial Statements: typical information of a pure holding company without any economic activity ........................................................................... 15

E.  Personal appearance of the Notary Public at the alleged registered office: company incubator ................................................................................................ 16

F.  Board of Directors: the Dutch members do not have any representative capacity, nor do they adopt any management decisions. .................................................. 16

G.  Complete lack of footprint ........................................................................ 18

H.  Conclusion ............................................................................................. 18

IV.  PRELIMINARY OBJECTIONS ................................................................ 19

A.  Lack of *ratione personae* and *ratione materiae* jurisdiction of the Arbitral Tribunal given that the Claimants are not investors for the purposes of Article 1(7) of the ECT and consequently they do not have an investment in the Kingdom of Spain in accordance with the provisions of Articles 26 and 1 (6) of the ECT. ................................. 19

(1)  Introduction ........................................................................................ 19

(2)  Neither of the Claimants are investors for the purposes of the ECT. ................... 20

(2.1)  Definition of "Investor" by the ECT in Article 1(7)(a)(ii) ..................... 21

(2.2)  Interpretation of the concept of Investor established in Article 1(7) of the ECT according to Articles 31 to 34 of the Vienna Convention. ................................. 22

(2.3)  The ordinary meaning of the terms ...................................................... 22

(a)  Definition in the dictionary ........................................................... 22

(b)  Definition in the field of economics: the theory of the organisation ............... 23

2

(2.4)    The concept of company in EU law and the domestic law of the Netherlands....... 24

(2.5)    The systematic interpretation of the Treaty: The distinction in the ECT itself between the concepts "legal entity" and "company or other organisation" ...................... 28

(3)    If the Claimants are not "investors", they cannot have an investment according to Article 1(6) of the ECT. ................................................................................................ 30

(4)    Conclusion................................................................................................................ 30

**B.    Lack of jurisdiction *rationae voluntatis* of the Arbitral Tribunal since the Claimant was denied application of Part III of the ECT in concurrence with the circumstances of Article 17 of the ECT ........................................................................................................ 30**

(1)    Introduction ............................................................................................................. 30

(2)    The Denial of Benefits Clause is a matter of jurisdiction: Article 17 of the ECT as a limit of consent granted by the Contracting Parties of the ECT to submit the controversies to the International Arbitral Tribunal ...................................................................................... 31

(3)    The Denial of Benefits Clause was activated by the Kingdom of Spain at the appropriate moment in the proceedings and when the Respondent was able to clearly establish that the three circumstances were met by the Claimants for the ECT to enforce the Denial of Benefits Clause.................................................................................................... 33

(3.1)    Time in which the factual circumstances under Article 17 (1) ECT should concur to the effects of applying the Denial of Benefits Clause ........................................................ 33

(3.2)    Activating the Denial of Benefits Clause in the Counter-Memorial to the Claim... 37

(3.3)    Effects of the activation of the Denial of Benefits Clause ...................................... 40

(4)    Circumstances that led to the activation of the Denial of Benefits Clause. The Claimant does not develop a substantial business in the Netherlands.................................... 42

(5)    Conclusion................................................................................................................ 46

**C.    Lack of jurisdiction of the Arbitral Tribunal *ratione personae* due to the absence of an investor protected under the ECT. The Claimant is not from the area of another Contracting Party as the Netherlands, like the Kingdom of Spain, are Member States of the European Union. The ECT does not apply to disputes relating to Intra-EU disputes . 46**

(1)    Introduction ............................................................................................................. 46

(2)    The Claimants overlook the principle of primacy of EU law in Intra EU relations.... 47

(3)    Regarding the Claimants' observations on the relevance of previous awards and other legal precedents ................................................................................................................ 50

(4)    Regarding comments made by the Claimants on the ordinary sense of the ECT ....... 56

(5)    With regard to "The ECT does not include a disconnection clause, nor is the interpretation of an implied disconnection clause reconcilable with the ordinary meaning of the ECT"........................................................................................................................... 58

(6)    Conclusion................................................................................................................ 59

**D.   Lack of jurisdiction of the Arbitral Tribunal to hear an alleged breach by the Kingdom of Spain of obligations derived from section (1) of Article 10 of the ECT through the introduction of the TVPEE by Act 15/2012: absence of consent from the Kingdom of Spain to submit this issue to arbitration given that, pursuant to Article 21 of the ECT, section (1) of Article 10 of the ECT does not generate obligations regarding taxation measures of the Contracting Parties** ................................................................................................ **59**

(1)    Introduction ............................................................................................ 59

(2)    The provisions relating to the TVPEE of Act 15/2012 are a taxation measure for the purposes of Article 21 of the ECT ........................................................................... 61

(2.1)    Pursuant to Article 21(7) of the ECT, the term taxation measure includes any provision relating to taxes of the domestic Act of the Contracting Party .......................... 61

(2.2)    Act 15/2012 is part of the domestic law of the Kingdom of Spain ....................... 64

(2.3)    The provisions relating to the TVPEE contained in Act 15/2012 are provisions relating to a tax .................................................................................................... 65

(a)    The TVPEE is a tax under the domestic law of the Kingdom of Spain ............. 65

(i)    The Spanish Constitutional Court has ratified the taxation nature of the TVPEE and its conformity with the Spanish Constitution ...................................................... 67

(b)    The TVPEE is a tax under International Law ................................................... 68

(i)    The TVPEE is a tax according to the concept of tax under International Law used by arbitration case-law .................................................................................... 68

(ii)    The European Commission has ratified the taxation nature of the TVPEE and its conformity with EU Law ......................................................................................... 74

(3)    In the hypothetical scenario that the Arbitral Tribunal considered that in order to determine that we stand before a taxation measure for the purposes of the ECT it is necessary to carry out the additional analysis intended by the Claimants, it must be concluded that the TVPEE is, in any case, a *bona fide* taxation measure ............................................... 76

(3.1)    The TVPEE applies to all energy producers, both renewable and conventional .... 78

(3.2)    The TVPEE does not discriminate against renewable producers in terms of repercussion ........................................................................................................ 80

(a)    Act 15/2012 grants the same treatment to all the taxpayers, including in terms of repercussion ........................................................................................................ 81

(b)    The TVPEE is one of the costs that are remunerated to renewable producers through the specific remuneration they receive, and thus the economic impact of the TVPEE on those renewable producers is neutralised ................................................... 81

(3.3)    The objective of the TVPEE is to raise revenue for the Spanish State for public purposes............................................................................................................... 83

(a)    The TVPEE is an income of the Spanish State that is integrated into the General Budgets of the State........................................................................................... 84

(b)    An amount equivalent to the estimated annual collection arising from the taxes included under Act 15/2012, among them the TVPEE, is destined to the promotion of renewable energies ............................................................................................ 84

(4)    Conclusion............................................................................................... 85

**E.    Lack of jurisdiction of the Arbitral Tribunal to hear an alleged breach by the Kingdom of Spain of section (7) of Article 10 of the ECT regarding the TVPEE............... 86**

(1)    Introduction ............................................................................................. 86

(2)    Section (7) of Article 10 of the ECT does not generate obligations regarding the TVPEE ............................................................................................................ 87

(2.1)    According to Article 21(3) of the ECT, section (7) of Article 10 of the ECT does not apply to taxes on income or capital ............................................................... 87

(2.2)    The TVPEE is a tax on income for the purposes of the ECT.................................. 88

(3)    In accordance with Article 21(3) of the ECT, section (7) of Article 10 of the ECT could never be applied in such a way that it imposes most favoured nation obligations as the Claimants intend................................................................................................. 90

(4)    Conclusion............................................................................................... 91

**V.    PETITUM AND RESERVATION OF RIGHTS ........................................................... 92**

I.    LIST OF PRINCIPAL ABBREVIATIONS

"**Intra-EU Dispute**": dispute between an investor of the EU and an EU Member State.

**"ICSID Convention":** Convention on the Settlement of Investment Disputes between States and Nationals of Other States to which this dispute has been subject, and whose jurisdiction requirements must be met to submit a dispute to the Jurisdiction of the Centre. The non-compliance of the Claimants with the jurisdiction requirements set out in Article 25 of the aforementioned Convention shall automatically determine the lack of jurisdiction of the Arbitral Tribunal to hear this dispute submitted by the Claimants.

"**Vienna Convention**": The Vienna Convention on the Act of Treaties, of 23 May 1969.

"**EC**": European Community, now European Union.

"**Respondent**": the Kingdom of Spain.

**"Claimants":** NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V.

"**This arbitration**" or "**the present arbitration**": ICSID Arbitration no. ARB/14/11, formally initiated by NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V., against the Kingdom of Spain.

"**This Memorial**", "**this statement**" or "**the present statement**": Reply to Preliminary Objections of the Kingdom of Spain of 14 October 2016.

"**TVPEE**": Tax on the value of the production of electrical energy. It was created with effect from 1 January 2013 by Act 15/2012 and is regulated in Articles 1 to 11 of such Act 15/2012.

"**Act 15/2012**": Act 15/2012, of 27 December 2012, on fiscal measures for energetic sustainability.

**"Act 24/2013":** Act 24/2013, of 26 December 2013, on the Electricity Sector.

**"Ministerial Order IET/1045/2014":** Ministerial Order IET/1045/2014, of 16 June 2014, adopting the remuneration parameters of standard facilities applicable to given electric energy production plants using renewable energy sources, cogeneration and waste.

**"Ministerial Order IET/1168/2014":** Ministerial Order IET/1168/2014, of 3 July, which determines the date of automatic registration of certain facilities in the specific remuneration system register provided for in Chapter V of Royal Decree 413/2014, of 6 June, which regulates the electric energy production activity from renewable energy sources, cogeneration and waste.

**"Ministerial Order IET/1882/2014":** Ministerial Order IET/1882/2014, of 14 October, which establishes the methodology for calculating electricity attributable to the use of fuels in solar power plants. The Claimants did not inform the Kingdom of Spain of the dispute with regards to this regulation prior to initiating this arbitration with infringement of Article 26 (2) of the ECT.

"**Contracting Party**": State or Regional Economic Integration organization that has consented to be bound by the Energy Charter Treaty and for which it is valid, in accordance with the definition of "Contracting Party" established in article 1(2) of the Energy Charter Treaty.

"**Plants covered by this arbitration**" or **"Plants"**: Planta Termosolar de Extremadura, S.L.U, Planta Solar de Extremadura 2, S.L.U.

 **"Royal Decree 413/2014":** Royal Decree 413/2014, of June 6 2014, which regulates the electric energy production activity from renewable energy sources, cogeneration and waste.

 **"Commission's Request to Intervene":** Request of the European Commission of 12 November 2014 to intervene as a non-disputing party or *amicus curiae* in this proceeding.

**"EU":** European Union

**"BIT":** Bilateral Investment Treaty

**"CJEU":** Court of Justice of the European Union

**"TFEU":** Treaty on the Functioning of the European Union

II.    INTRODUCTION

1.  The Kingdom of Spain submits its Reply to Preliminary Objections in accordance with the schedule agreed in Annex A, scenario 2.2 of Procedural Order No. 1.

2.  The companies NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. (hereinafter the "**Claimants**") maintain that the Kingdom of Spain has breached the obligations undertaken in accordance with the Energy Charter Treaty (henceforth "**ECT**"). They state, in this regard, that Spain has breached the obligations undertaken with the Claimants in accordance with Article 10.1 of Part III of the ECT.

3.  The Kingdom of Spain will request that the Tribunal reject the Claimant's claims in their entirety on their merits and condene them to pay for the costs of this Arbitration. However, and as a prior matter, a series of Objections are submitted to the Honourable Tribunal for analysis that, in the view of this Party, show its lack of Jurisdiction, with due respect, to hear this dispute. They are presented below. These objections were raised in our Memorial on Preliminary Objections and Request for Bifurcation submitted on 9 September 2015. The Claimants submitted their Counter-Memorial on the Preliminary Objections raised by the Kingdom of Spain on 8 August 2016, without the arguments contained therein being able to devalue the Objections raised by the Respondent.

4.  The Respondent states that it has modified the order in which its Objections on Jurisdiction are presented, with the aim of making the presentation of the Memorial more coherent.

5.  In addition, it is stated that, for the purposes of facilitating comprehension of Jurisdictional Objections A and B and avoiding useless repetitions, prior to analysing the legal matters, a section regarding common facts to both objections on jurisdiction has been introduced.

6.  Firstly, as **Jurisdictional Objection A**, the Kingdom of Spain reiterates the lack of jurisdiction of the Arbitral Tribunal both ratione personae and ratione materiae, due to the Claimants not meeting the requirements to be considered investors in accordance with Article 1(7) of the ECT and, hence, not having an investment for the purposes of Article 1(6) of the ECT, which requires that the assets be owned or controlled by an "investor". Therefore and, as we shall see, the Claimants lack the essential elements to be considered investors.

7.  Secondly, as **Jurisdictional Objection B**, the Kingdom of Spain reiterates the lack of jurisdiction *ratione voluntatis* of the Arbitral Tribunal as the Claimants have been denied application of Part III of the ECT given that the circumstances in Article 17 of the ECT concur.

8.  Thirdly, as **Jurisdictional Objection C**, with all due respect, the Kingdom of Spain reiterates the lack of jurisdiction of the Arbitral Tribunal to hear this dispute due to the absence of an investor protected under the ECT. Both the Netherlands, the country in which the Claimants are incorporated, and the Kingdom of Spain are member States of the European Union (hereinafter "**EU**"). The EU is a Contracting Party to the ECT and

hence the Claimants are not from "*another Contracting Party*", as required by Article 26 of the ECT to be able to resort to arbitration. The arbitration dispute resolution mechanism stipulated in Article 26 of the ECT is not applicable to an intra-EU dispute like the present one.

9. Fourthly, as **Jurisdictional Objection D,** the Respondent reiterates, with all due respect, the lack of jurisdiction of the Arbitral Tribunal to hear the claim submitted against the Kingdom of Spain for an alleged breach of Article 10(1) of the ECT, through the introduction of the Tax on the value of the production of electrical energy (hereinafter, "**TVPEE**") by Act 15/2012, of 27 December 2012, on taxation measures for energy sustainability (hereinafter, "**Act 15/2012**"). This is due to the fact that section (1) of Article 10 of the ECT does not generate obligations with respect to taxation measures of the Contracting Parties. The provisions relating to the TVPEE of Act 15/2012 constitute a taxation measure for the purposes of the ECT according to Article 21(7) of the ECT, which provides that the term "taxation measure" includes any provisions relating to taxes of the domestic law of the Contracting Party. In addition, even in the hypothetical case that the Arbitral Tribunal considered that the foregoing is not sufficient to determine that there is a taxation measure for the purposes of the ECT and that the additional analysis of the TVPEE proposed by the Claimants is necessary, which implies examining the economic effects of this tax, the TVPEE is, in any event, a *bona fide* taxation measure.

10. Fifthly and finally, as **Jurisdictional Objection E**, the Respondent reiterates the lack of jurisdiction of the Arbitral Tribunal to hear an alleged breach by the Kingdom of Spain regarding section (7) of Article 10 of the ECT through the TVPEE. This is due to the fact that, according to Article 21(3) of the ECT, section (7) of Article 10 of the ECT does not generate obligations regarding taxes on income such as the TVPEE. Furthermore, even in the merely hypothetical case that section (7) of Article 10 of the ECT was applicable to the TVPEE, said section (7) of Article 10 of the ECT cannot be applied in such a way that it imposes most favoured nation obligations as the Claimants intend, in accordance with Article 21(3)(a) of the ECT.

11. The aforementioned Jurisdictional Objections A, B and C are Objections of total nature, that is, they affect the entirety of the dispute raised by the Claimants. Thus, the upholding of said Objections would entail the exclusion of the entire dispute from the jurisdiction of the Arbitral Tribunal. These Objections are also formulated without prejudice to one another. Jurisdictional Objections D and E are Objections of partial nature, that is, they only affect part of the dispute raised by the Claimant.[1]

12. This Memorial is accompanied by an Accuracy Expert Report dated 14 October 2016, on the lack of economic activity of the Claimants,

---

[1] The Kingdom of Spain renounces Jurisdictional Objection F, contained in section III of the Memorial on Preliminary Objections of 9 September 2015, on the breach of the obligation to submit the dispute over Act 24/2013, Royal Decree 413/2014, Ministerial Order IET/1045/2014 and Ministerial Order IET/1882/2014 to the Kingdom of Spain and regarding the obligation to observe the three-month cooling off period prior to submitting the dispute to arbitration in accordance with Article 26 of the ECT.

III.    COMMON FACTS DETERMINING THE LACK OF INVESTOR (ART. 1.7 ECT)
AND LACK OF DENIAL OF BENEFITS REGARDING ART. 17 OF THE ECT

13.  Before developing the different preliminary objections that are included in this Memorial,
we shall set out a series of determining facts in relation thereto. In particular, some
common facts that provide justification for both the lack of investor as set out in Art. 1.7
ECT and the application of the denial of benefits clause in Art. 17 of the ECT.

14.  These common facts are those that determine that the Claimants do not constitute a
"company or other organisation" nor do they carry out "business activity" in the territory
of the Netherlands, the place where they are incorporated.

15.  In fact, the Claimants do not carry out any economic activity[2]. As can be seen next in the
non-controversial factual elements, the Claimants are mere shell companies without any
economic activity, they are pure holding[3] companies that only serve as a vehicle or
conduit to channel investment between the American Group Nextera and the Spanish
solar thermal power plants.

16.  This section is complemented by a specific Accuracy expert report on the lack of
economic activity of the Claimants, of 14 October 2014, in which the facts that we have
summarised and presented below are developed and justified with documentary evidence.

**A.    Corporate chain of the Nextera Group: the Dutch shell companies are mere
intermediate links**

17.  As can be seen in the following diagram, the Claimants are embedded between Nextera in
the US and the Spanish Solar Thermal Power Plants. The Claimants, Dutch shell
companies, are merely a channel through which the funds flow from the US to Spain,
without contributing any economic value whatsoever.

---

[2] A basic yet full definition of "economic activity" can be seen, for example, in the Business-dictionary:
"Actions that involve the production, distribution and consumption of goods and services at all levels
within a society. Gross domestic product or GDP is one way of assessing economic activity, and the
degree of current economic activity and forecasts for its future level can significantly impact business
activity and profits, as well as inflation and interest rates."

Read            more:            http://www.businessdictionary.com/definition/economic-activity.html
http://www.businessdictionary.com/definition/economic-activity.html  R-0232  o  Cambridge-dictionary:
"the         activity        of        producing,        buying,        or        selling        products        or        services"
http://dictionary.cambridge.org/us/dictionary/english/economic-activity.  R-.0233  Both  definitions  state
the same requirement that all economic activity must consist of the production of goods or provision of
services.
[3] Paragraph 74 of the Statement of Claim.



**Figura 2.1 – Seguimiento de los fondos invertidos en las Plantas**

*Flujo monetario*

*Titularidad o control*

*Fuente: Primer Informe Económico Accuracy*

## B.    Company object officially declared by the Claimants: holding company that merely holds shares, without economic activity

18. The Claimants expressly acknowledge that they are "holding companies", not only through the name of the companies themselves: NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V., but also by how they decided to register themselves in the Dutch Chamber of Commerce.

19. The Claimants indeed defend their Dutch nature given that they were established under the Laws of the Netherlands and are registered there. It is precisely that public declaration in the Dutch Chamber of Commerce what constitutes their admission that they are "pure holding companies".

20. The Claimants each provided their own certificates of registration in the Dutch Chamber of Commerce dated 9 May 2014 (C-002 and C-003). You only need to read these certificates to confirm that both Claimants registered under SBI code: 6420 as "financial holding" companies[4]:

---

[4] C-002 and C-003.

**Establishment**

| | |
|---|---|
| Establishment number | 000019673221 |
| Trade name | NextEra Energy Spain Holdings B.V. |
| Visiting address | Prins Bernhardplein 200, 1097JB Amsterdam |
| Postal address | Postbus 990, 1000AZ Amsterdam |
| Telephone number | +310205214777 |
| Date of incorporation | 07-05-2008 |
| Activities | SBI-code: 6420 - Financial holdings |
| | For further information on activities, see Dutch extract. |
| Employees | 0 |

**Establishment**

| | |
|---|---|
| Establishment number | 0C0017454166 |
| Trade name | NextEra Energy Global Holdings B.V. |
| Visiting address | Prins Bernhardplein 200, 1097JB Amsterdam |
| Telephone number | +310205214777 |
| Date of incorporation | 27-03-2008 |
| Activities | SBI-code: 6420 - Financial holdings |
| | For further information on activities, see Dutch extract. |
| Employees | 0 |

21. This SBI code is: "The Dutch Standaard Bedrijfsindeling (SBI 2008), which is based on the activity classification of the European Union (Nomenclature statistique des activités économiques dans la Communauté Européenne, NACE) and on the classification of the United Nations (International Standard Industrial Classification of All Economic Activities, ISIC)"[5].

22. Every company must register under at least one of these codes, regardless of whether they carry out economic activities or not.

23. In this way, if we observe the EU economic activity classification code (NACE)[6], it can be seen that code 6420, which the Claimants are registered under, is limited exclusively to holding companies that are not engaged in any management, strategic planning or decision-making regarding the companies they holds a stake in.

**Detail**

**Code:** 64.20
**Description:** Activities of holding companies
**Reference to ISIC Rev. 4:** 6420

---

[5] Standard Industrial Classification (Dutch SBI 2008, NACE and ISIC). https://www.cbs.nl/en-gb/our-services/methods/classifications/activiteiten/standard-industrial-classifications--dutch-sbi-2008-nace-and-isic- -R-0234  y  the Structure of the Standard Industrial Classifications 2008-2014. https://www.cbs.nl/en-gb/our-services/methods/classifications/activiteiten/standard-industrial-classifications--dutch-sbi-2008-nace-and-isic--/de-structuur-van-de-sbi-2008-versie-2016/the-structure-of-the-sbi-2008-version-2014  R-0235.
[6] METADATA Statistical Classification of Economic Activities in the European Community, Rev. 2 (2008), code 64.20, http://ec.europa.eu/eurostat/ramon/nomenclatures/index.cfm?TargetUrl=LST_NOM_DTL&StrNom=NACE_REV2&StrLanguageCode=EN&In  R-0236

**This item includes:** This class includes the activities of holding companies, i.e. units that hold the assets (owning controlling-levels of equity) of a group of subsidiary corporations and whose principal activity is owning the group. The holding companies in this class do not provide any other service to the businesses in which the equity is held, i.e. they do not administer or manage other units.

**This item excludes:** This class excludes:
- active management of companies and enterprises, strategic planning and decision making of the company, see 70.10

24.  In fact, it is stated that this code 6420 expressly excludes any entities that have as their object the activities in the 7010 group[7], which corresponds to the following category of entities:

**Detail**

**Code:** 70.10

**Description:** Activities of head offices

**Reference to ISIC Rev. 4:** 7010

**This item includes:** This class includes the overseeing and managing of other units of the company or enterprise; undertaking the strategic or organisational planning and decision making role of the company or enterprise; exercising operational control and managing the day-to-day operations of their related units.

This class includes activities of:
- head offices
- centralised administrative offices
- corporate offices
- district and regional offices
- subsidiary management offices

**This item excludes:** This class excludes:
- activities of holding companies, not engaged in managing, see 64.20

25.  Thus, categories 6420 and 7010 mutually exclude the each other. Determining what is included in these categories as well as what is expressly excluded is of great importance. In this way, the Claimants have expressly admitted that they do not perform management, decision-making or administrative tasks.

26.  In particular, it is worth noting, and fundamental, that they do not carry out "regional offices" activity.

27.  They could not acknowledge the fact that they are a pure shell companies without any management, administration, planning or decision-making activity in a clearer or more direct way. The Claimants themselves state that they are holding companies that do not perform: "the overseeing and managing of other units of the company or enterprise;

---

[7]

METADATA Statistical Classification of Economic Activities in the European Community, Rev. 2 (2008), code 70.10, http://ec.europa.eu/eurostat/ramon/nomenclatures/index.cfm?TargetUrl=DSP_NOM_DTL_VIEW&StrNom=NACE_REV2&StrLanguageCode=EN&IntPcKey=18517034&IntKey=18517064&StrLayoutCode=HIERARCHIC&IntCurrentPage=1 R-0237

13

undertaking the strategic or organisational planning and decision making role of the company or enterprise; exercising operational control and managing the day-to-day operations of their related units".

28. The Claimants acknowledge, plainly and simply, that their line of business is: "This class includes the activities of holding companies, i.e. units that hold the assets (owning controlling-levels of equity) of a group of subsidiary corporations and whose principal activity is to own the group. The holding companies in this class do not provide any other service to the businesses in which the equity is held, i.e. they do not administer or manage other units".

29. After this acknowledgement by the Claimants, we shall merely cite evidence showing that the Claimants are indeed consistent with their declaration: they describe themselves as "pure holding companies" and act as such.

## C.      Human resources: they have no workers

30. Neither of the Claimants have any workers.

31. This lack of workers appears in the Claimants' Financial Statements (NEGH and NESH Abbreviated Financial Statements closed on 31 December 2008, 2009, 2010, 2011, 2012, 2013 and 2014)[8].

32.  This lack of workers is also acknowledged in the Dutch Chamber of Commerce[9].

33. Regarding NESH, its complete lack of workers is registered in the Chamber of Commerce:

**Establishment**

| | |
|---|---|
| Establishment number | 000019673221 |
| Trade name | NextEra Energy Spain Holdings B.V. |
| Visiting address | Prins Bernhardplein 200, 1097JB Amsterdam |
| Postal address | Postbus 990, 1000AZ Amsterdam |
| Telephone number | +310205214777 |
| Date of incorporation | 07-05-2008 |
| Activities | SBI-code: 6420 - Financial holdings |
| | For further information on activities, see Dutch extract. |
| Employees | 0 |

34. Likewise, regarding NECH, its complete lack of workers is also registered:

---

[8] Annexes ACQ -005 and ACQ-0006.
[9] C-002 and C-003.

**Establishment**

| | |
|---|---|
| Establishment number | 0C0017454166 |
| Trade name | NextEra Energy Global Holdings B.V. |
| Visiting address | Prins Bernhardplein 200, 1097JB Amsterdam |
| Telephone number | +310205214777 |
| Date of incorporation | 27-03-2008 |
| Activities | SBI-code: 6420 - Financial holdings |
| | For further information on activities, see Dutch extract. |
| Employees | 0 |

35. We understand that it would be difficult to carry out any economic activity, or even establish an organisation, without one single employee.

**D.    Official Financial Statements: typical information of a pure holding company without any economic activity**

36. The economic information included in the official Financial Statements filed in the Dutch Chamber of Commerce states the following:

   • The Financial Statements consist of six pages only.

   • The Financial Statements are not audited.

   • The Financial Statements do not include a management report or a report by the Board of Directors on the intended activity.

   • The total assets on the Claimants' balance sheet consist of financial holdings in subsidiaries of the Nextera Group. Thus, on their balance sheet we do not see the assets considered essential for economic activity, such as: property, machinery, IT equipment, IT applications, land, office material, patents, brands, licenses, clients, etc.

   • In the same way, its liabilities are limited to reflecting its condition as a mere conduit company between the US and Spain, for the purposes at hand. Again, we do not see any debts with third parties outside of the group, debts with banks, debts with suppliers, etc.

   • The level of information provided is so low that the documents do not even include an Income Statement. Furthermore, there is not even attached a cash flow statement for the companies.

37. To face the Respondent's Objections, the Claimants have provided "alleged internal accounting records". From the review of the documents that the Claimants intended to provide to this arbitration as alleged "Management Accounts" after having the Respondent raised the objections on jurisdiction, the Experts observe the following:

   • They are private documents without a confirmed date.

   • They are still very abbreviated documents (barely 10 pages per year), with very little detail.

- • They do not include a cash flow statement.

- • The alleged Income Statement provided ex novo confirms its nature as a mere financial holding company without any economic activity, given that it does not receive any income that does not derive from mere financial holdings, nor does it incur in any costs beyond those required for its mere legal-formal appearance as a company.

- • They are not audited.

## E.    Personal appearance of the Notary Public at the alleged registered office: company incubator

38. The Kingdom of Spain hired the services of a Dutch Notary Public to pay a personal visit to the alleged registered office stated by the Claimants.

39. This is stated in the notarial deed issued on 8 September 2015 by Mr. J. Orsel, Notary Public                              in                    the                    Netherlands[10]:

> 6.    **Site visit**
> On September 2, 2015 I visited Prins Bernhardplein 200, 1097 JB Amsterdam (the address where NextEra is located) to see if there are any signs or labels related to NextEra at the adress of NextEra. As shown on the pictures taken that day there are no signs related to NextEra in the main entrance of the office of the address of NextEra Also the name NextEra is not mentioned on the shields at the front of the building. As a conclusion, there is not any footprint or sign of business activity of NextEra (or related entities) at this adderss. Appendix (6)
>
> At the office address of NextEra there are signs that only refer to Intertrust. There are no references of any kind to NextEra.
> From the any entties according to the Annual report related to NextEra are also no signs or labels visible at the address of Intertrust.

40. The outcome of this visit could not be any clearer: as the graphic documents and the photographs taken show, it is not a registered company office but a mailbox at the registered address of a company incubator, Intertrust. There is no sign whatsoever of any presence of the Claimants at the alleged registered office, where they are formally domiciled, along with another 1,493 companies.

## F.    Board of Directors: the Dutch members do not have any representative capacity, nor do they adopt any management decisions.

41. As seen in the Accuracy Expert Report and expressly acknowledged by Mr. Nicolai, the Board of Directors of the Claimants comprises two American A Directors, and three Dutch B Directors.

---

[10] Notarial deed on the Claimants by Mr. J. Orsel issued on 8 September 2015. R-0023.

16

42. This distinction between categories and nationalities of Directors is not trivial, given that it is precisely the American A Directors who from Nextera US make decisions regarding the daily management and strategy planning decisions for the holdings in the Spanish Solar Thermal Plants, with the Dutch B Directors lacking even the most basic powers to represent the Claimants.

43. This lack of representative and management capacity of the B Directors regarding the Claimants is expressly stated in the articles of association of the entities in question, as set out by the Notary Public in his deed[11]:

> **The board**
>
> 2. The board of NextEra consists of five (5) members: Mr. Mark Raymond Sorensen and Mr. Brain Murphy, are board members A and Mrs. Eveline Sonja van Dalen, mr. George Frederik Nilolai and Mextrust B.V. are board members B.
> The board can represent NextEra. NextEra can also be represented by one (1) board menber A acting jointly with one (1) board member B. (artcle 19 of the articles of association).
> All board members have the same voting right. (article 18 of the articles of association)
>
> The board Members B of NextEra are also related to Intertrust (see below). Mextrust B.V. is board member with Intertrust Corporate Services B.V. and Mrs. Van Dalen and Mr. Nicolai are proxy holder of Intertrust (Netherlands) B.V. (**"Intertrust"**)

44. Furthermore Mr. Nicolai, witness called by the Claimants with the unsuccessful intention of accrediting their activity in the Netherlands, expressly acknowledges that the management and decision-making corresponds to the American A Directors:

> *"The A Directors are senior NextEra officials and, in the case of the Spanish investments, it is primarily their job to develop and propose the Claimants' investment strategies and to deal with the day-to-day running of those business through NEE España"[12].*

45. And that its role is simply to confirm compliance with the regulations and accounting principles of the Netherlands[13]: *"The primary role of the B Directors is to ensure that the Board acts in compliance with Dutch Law and accounting rules (...) and that the Claimants take decisions which are rational and in conformity with Dutch Law".*

46. It is clear that the alleged B Directors are no more than mere "straw men" to give the appearance of something that is not real.

---

[11]  Notarial deed on the Claimants by Mr. J. Orsel issued on 8 September 2015. R-0023.
[12] Witness Statement of George Frederik Nicolai, Para. 27.
[13] Witness Statement de George Frederik Nicolai, para. 27.

**G.    Complete lack of footprint**

47. As can be seen in the Accuracy Expert Report[14], the Claimants do not leave any trace, not even online.

48. Nor do they appear in the information provided by the Nextera Group to the SEC, thus, their presence is hidden from the shareholders of the Nextera Group themselves and from the supervisory body of the main international stock exchange. Nonetheless, in this same information, the Solar Thermal Power Plants in Spain are mentioned on 33 occasions[15]:

**Figura 3.14 – Referencias a las Plantas ante la SEC en 2015**



*Fuente: Nextera Energy, Inc. 2015 Annual Report, Form 10-k. Sitio web: http://www.nexteraenergy.com/pdf/annual.pdf*

49. The complete absence of the Claimants in the information provided by the Nextera Group to the SEC makes sense, as the Claimants are irrelevant "shell companies" without any economic substance.

**H.    Conclusion**

50. Nextera Energy Global Holdings B.V. and Nextera Energy Spain Holdings B.V. do not carry out any business activity in the Netherlands or in any other country. In the same way, the Claimants do not constitute a company or any other organisation, as they lack human and material resources for producing goods or providing services.

51. In short, the Claimants:

    a.    Acknowledge that they are mere holding companies without economic activity in accordance with section B of this paragraph.

    b.    Do not have any workers, as is proven in section C.

    c.    Prepare and record their own Financial Statements for a holding company without activity, which were analysed in section D.

---

[14] Accuracy Expert Report of 14 October 2016, section 3.4.
[15] Accuracy Expert Report of 14 October 2016, section 3.4.

    d.  Mr. Olsen, Dutch Notary Public, has confirmed the lack of presence of the Claimants in the Netherlands.

    e.  The American Directors are the ones who make the decisions regarding the Solar Thermal Power Plants in Spain.

    f.  The Claimants do not have a footprint online or on the SEC.

## IV.    PRELIMINARY OBJECTIONS

**A.    Lack of *ratione personae* and *ratione materiae* jurisdiction of the Arbitral Tribunal given that the Claimants are not investors for the purposes of Article 1(7) of the ECT and consequently they do not have an investment in the Kingdom of Spain in accordance with the provisions of Articles 26 and 1 (6) of the ECT.**

**(1)    Introduction**

52. Article 26 of the ECT governs the consent of the Contracting Parties to the arbitration. Under this precept, for the Arbitral Tribunal to have jurisdiction, the existence of an "investment" of an "investor" of a Contracting Party is necessary in the area of another Contracting Party.

53. The ECT requires that the following stipulations be met in order to determine the existence of an investment:

    i.   The existence of an investment in an objective or ordinary sense.

    ii.  That this investment activity in an objective or ordinary sense is materialised in relation to any kind of asset, within the broad list quoted by Article 1(6) of the ECT.

    iii. That this asset is related to an Economic Activity in the Energy Sector.

    iv.  That this asset is owned or controlled directly or indirectly by an <u>investor</u>.

54. The failure to meet any of these requirements means that an investment does not exist according to Article 1(6) of the ECT and therefore the Arbitral Tribunal does not have jurisdiction *ratione materiae* according to the aforementioned Article 26 of the ECT.

55. In our Memorial on Preliminary Objections and Request for Bifurcation, we object that there is no investment, in the terms set out in Article 1(6) of the ECT, since the assets in which this materialised were not owned or controlled, either directly or indirectly, by the Claimants. After analysing the documents provided by the Claimants in the document production phase, the Respondent was able to effectively confirm that by means of certain internal asset transfer operations, the Claimants currently, formally and indirectly,

19

"own" the shares in the Termosol Power Plants.[16] Therefore, this party shall not, in its Reply, maintain that the Claimants do not "own" the assets.

56. However, the concept of investment in Article 1(6) of the ECT is not fulfilled due to the mere fact that an entity indirectly owns an asset. Said entity must also meet the requirements for the nature of investor in accordance with the ECT. According to Article 1(6), investment is "every kind of asset owned or controlled directly or indirectly by an investor". Therefore, if there is no investor, there is no investment.

57. In our Memorial on Preliminary Objections and Request for Bifurcation, paragraph 150, we opposed that any of the Claimants could be considered an "investor" in the sense of "company or other organization organized in accordance with the law applicable in that Contracting Party" as established in Article 1(7. a. ii) of the ECT. The statement of facts contained in this reply makes this circumstance evident, the reason why this party reinforces the claims made in its previous memorials with the grounds stated below.

**(2)    Neither of the Claimants are investors for the purposes of the ECT.**

58. Investment as defined by the ECT is that which materialises in assets that are owned or controlled either directly or indirectly by an "investor". Therefore, being an "investor" in the terms set out by the ECT is a requirement in order to have an "investment" and benefit from the arbitration regulated in Article 26 of the ECT.

59. The importance of the notion of "investor" in the respective treaty for the purpose of establishing the jurisdiction of the Arbitral Tribunal is reflected, inter alia, in the Partial Award of the case of *Saluka Investments B.V. v the Czech Republic*[17] which notes that:

> "[…] *the predominant factor which must guide the Tribunal's exercise of its functions is the terms in which the parties to the Treaty now in question have agreed to establish the Tribunal's jurisdiction. In the present context, that means the terms in which they have agreed upon who is an investor who may become a claimant entitled to invoke the Treaty's arbitration procedures. The parties had complete freedom of choice in this matter, and they chose to limit entitled "investors" to those satisfying the definition set out in Article 1 of the Treaty. The Tribunal cannot in effect impose upon the parties a definition of "investor" other than that which they themselves agreed. That agreed definition required only that the claimant-investor should be constituted under the laws of (in the present case) The Netherlands, and it is not open to the Tribunal to add other requirements which the parties could themselves have added but which they omitted to add". (Emphasis added).*

---

[16] Decision by BDO regarding FLP Global Asset International Inc dated 27 March 2008 to transfer all of its holdings in Tall Pines International Limited and all of its holdings in Canada Wind to FPL Global Asset Holding BV (first Claimant), in exchange for one more share from the first Claimant for each contribution (R-0238); change of sole shareholder in Planta Termosolar de Extremadura S.L. as a consequence of the transfer by Tall Pines International of all of its holdings in Planta Termosolar de Extremadura S.L. and Planta Termosolar de Extremadura 2 S.L. to Spanish company FPLE Solar Assets, dated 5 May 2008 (R-0239 and R-0240).

[17] *Saluka Investments B.V. v the Czech Republic*, UNCITRAL. Partial Award of 17 March 2006, paragraph 241. RL-0098.

60. Indeed, not all investment treaties contain the same concept of "investor". Thus, in the BIT between the Netherlands and Czech Republic (to which the Saluka case refers) the "*investor*" is defined as "*an incorporated legal person…*" On the other hand, the ECT uses a different concept and defines "*investor*" as a "*company or other organization…*".

61. This different determination of the concept of investor in the ECT is not coincidental but rather desired by its signatories.

## (2.1)    Definition of "Investor" by the ECT in Article 1(7)(a)(ii)

62. Article 1 of the ECT, entitled "*DEFINITIONS*", offers the relevant definition of "Investor" in section (7):

> "*As used in this Treaty, (…)*
>
> *7) "Investor" means:*
>
> *(a) with respect to a Contracting Party:*
>
> *i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;*
>
> *(ii) a company or other organization organized in accordance with the law applicable in that Contracting Party;*
>
> *(b) with respect to a "third state", a natural person, <u>company or other organization</u> which fulfils, mutatis mutandis, the conditions specified in subparagraph (a) for a Contracting Party". (Emphasis added).*

63. It should be noted that, despite the fact that in section a) i) the expression "*natural person*" is used, the ECT in section a) ii) intentionally avoids the use of the expression "*legal person*" or even "*enterprise*". It uses the denomination "*company or other organization*".

64. The use of the terms "*company*" and "*organization*" in Article 1(7) of the ECT is not only produced in the Spanish version of the ECT. It also appears, for example, and with a cacophonous wording, in the English[18] and French[19] versions of the ECT.

65. Therefore, according to Article 1(7) of the ECT, besides a natural person, a "company or other organization" can only be an Investor.

---

[18] "*Investor" means: (a) (ii)* **a company or other organization organized** *in accordance with the law applicable in that Contracting Party.*
A legal Framework for International Energy Cooperation, Energy Charter Secretariat pag 42 http://www.encharter.org/fileadmin/user_upload/document/EN.pdf RL-0020.
[19] "*Investisseur" désigne: a) ii)* **toute entreprise ou autre organisation organisée** *conformément à la legislation applicable sur le territoire de cette partie contractante*;
Le Traite sur la Charte de l`Eenergie et documents connexes pag 25 http://www.encharter.org/fileadmin/user_upload/Publications/FR.pdf RL-0101.

66. We will hereinafter refer to the concept of investor that is not a natural person of the ECT.

**(2.2)    Interpretation of the concept of Investor established in Article 1(7) of the ECT according to Articles 31 to 34 of the Vienna Convention.**

67. Each time the ECT does not expressly define what is to be understood by "company" or "organisation", we must use the rules for interpretation contained in Articles 31 to 34 of the Vienna Convention on the Law of Treaties.

68. In accordance with the criteria established in these provisions, in order to analyse the meaning of the terms "company or other organisation" we shall use a series of points, all of which lead us to the same conclusions: "legal entity" (or "legal person") is a very different term to "company" and "organisation". The elements that unequivocally and necessarily lead to said conclusion are as follows:

    a)   The ordinary meaning of the terms "company" and "organisation" (definition in the dictionary and in economics)

    b)   The concept of company in EU law and the domestic law of the Netherlands.

    c)   The systematic interpretation of the Treaty: the distinction in the ECT between the concepts "legal entity" and "company or other organisation".

**(2.3)    The ordinary meaning of the terms**

**(a)      Definition in the dictionary**

69. The dictionary of the Spanish language (DRAE), deemed to be the most important authoritative dictionary of the Spanish language, a lexicographic work par excellence, defines the terms "*company*" and "*organization*" as follows:

    *"company.*

    *(From the Italian impresa).*

    *1. fem. Action or task that involves difficulty and whose implementation requires determination and effort.*

    *2. fem. Profit-making unit of organization dedicated to industrial or commercial activities or the provision of services.*

    *3. fem. <u>Place in which</u> these activities are carried out.*

    *4. fem. Attempt or plan to do something.*

*5. fem. Symbol or figure that alludes to what is trying to be achieved or denotes a garment on display, often accompanied by a word or nickname".[20]*

*"organization.*

*1. fem. Action and <u>effect of organising</u> or being organised.*

*2. fem. Disposition of the organs of life, or way in which the animal or vegetable body is organised.*

*3. fem. Association of persons regulated by a set of rules according to certain purposes.*

*4. fem. Disposition, arrangement, order".[21]*

*"organise.*

*1. tr. Establish or reform something as a means to an end, by coordinating people and the appropriate resources. U. t. c. prnl.*

*2. tr. Put something in order.*

*3. tr. <u>Do or produce something.</u> They organised a fight. U. t. c. prnl.*

*4. tr. desus. Arrange the organ so that it is consistent and warm.*

*5. prnl. Of a person: Arrange one's activities or divide one's time".[22]   (Emphasis added)*

70. The transcribed definitions of the terms "*company*" and "*organization*" clearly show that both concepts coincide with their functional and final nature. They are therefore associations established according to, or for the performance of, an end or purpose. They require the disposition or order of personal and material resources in order to achieve an end. The relationship between both concepts relates to the kind and sort: the company is a form of organization geared towards the production of goods or provision of services on the market.

**(b)    Definition in the field of economics: the theory of the organisation**

71. To finish analysing the concept of "company or other organisation", we must analyse the definition of "organisation" from an economic point of view.

72. Management theory has recognised a series of elements necessary for all organisations. To this effect, Porter, Lawler and Hackman (Behaviour in organizations, 1975), identify the following:

   -   They are made up of individuals and groups.

---

[20] Definition of the word "company" according to the DRAE. R-0241.
[21] Definition of the word "organization" according to the DRAE. R-0242.
[22] Definition of the word "organize" according to the DRAE. R-0243.

- They exist to achieve certain objectives and goals.

- They entail specialisation and require planning, coordination and control.

- They have some degree of permanence.

73. This idea of organisation does not exist for either of the Claimants, who do not have workers, material or technical resources as is highlighted in the facts in section II and in the Accuracy report. The Claimants are pure holding companies without any type of activity to plan, coordinate or control.

**(2.4)    The concept of company in EU law and the domestic law of the Netherlands.**

74. The facts shown in section II of this Memorial prove that the Claimants cannot be considered a company or organisation in accordance with the ordinary meaning of these terms. Nor do they fulfil the other requirement stipulated in Article 1(7) of the ECT: that they must be a "*company*" or "*organisation*" in accordance with the law applicable in the country where they are established.

75. In relation to this objection, the Claimants merely indicate[23] that it is proven that they are limited liability companies with headquarters in Amsterdam and that they are established in accordance with the regulations of the Netherlands. Nonetheless, and unlike what they maintain, this circumstance alone does not resolve this objection on jurisdiction.

76. In the Netherlands, as an EU Member State, EU Law is applicable; this law also prevails over the internal law of the Member States, as is explained in the Intra-EU objection.

77. Furthermore, EU Law is International Law that must apply under Article 26(6) of the ECT.

78. Further still, it must be taken into account that when EU Law does not apply as International Law, it must be considered, at any rate, as the national Law of the Member State. As was stated in the award for Electrabel S.A v. Hungary[24]:

> "4,127. (v) EU Law as Fact: In the Tribunal's view, when it is not applied as international rules under the ECT, EU law must in any event be considered as part of the Respondent's national legal order, i.e. to be treated as a "fact" before this international tribunal.
>
> (...)
>
> 4,129. Accordingly, where a binding decision of the European Commission is concerned, even when not applied as EU law or international law, EU law may have to be taken into account as a rule to be applied as part of a national legal order, as a fact".

---

[23] Paragraph 11 of the Counter-Memorial on Jurisdiction by the Claimants, of 8 August 2016.
[24] *Electrabel S.A v. Hungary,* ICSID Case no. ARB/07/19, Decision on jurisdiction, applicable Law and liability, of 30 November 2012 (original version in English) Paragraph 4127 and 4129. RL-0001.

79. Therefore, the concept of company in EU Law is decisive for the purposes of ascertaining when a company or organization has been incorporated[25] pursuant to the legislation of an EU Member State.

80. In addition, it does not seem logical that the EU would want to use the ECT to protect "*companies*" that were not companies under community law. Particularly when the ECT and EU Law share the objective of creating a market where prices are set in accordance with market forces and, consequently, they share the same objectives regarding combating anticompetitive practices.[26]

81. The concept of company, key subject of numerous European policies, has been addressed by European institutions in various fields: in the area of regulating small and medium sized enterprises[27], in the area of Tax Law[28], in Competition Law and in matters of State aid[29]. In all these fields, there is a synchronous concept of company.

82. The Case-law of the Court of Justice of the European Union has issued opinions, since the inception of the EU and on a repeated basis, on the concept of "company", requiring that it concern "*any entity engaged in an economic activity*" considering as such "*providing goods or services in a specific market*". Thus, citing the judgements of 18

---

[25] Or "organized" in the English version of the ECT. RL-0001.

[26] Regarding the common objective of creating a market, we are referring to what was stated in objection A, paragraphs 101 to 110. Also the Award of Case *Electrabel S.A v. Hungary*. Paragraph 4,139. RL-0001

[27] The European Commission Recommendation (2003/36/EC), of 06 May 2003, on the definition of micro enterprises, small and medium sized enterprises, published in the Official Journal of the EU on 20 May 2003 includes the following definition of a company in Article 1 of its Annex: ***"An enterprise is considered to be any entity engaged in an economic activity, irrespective of its legal form."*** (Emphasis added). *"An enterprise is considered to be any entity engaged in an economic activity, irrespective of its legal form. This includes, in particular, self-employed persons and family businesses engaged in craft or other activities, and partnerships or associations regularly engaged in an economic activity"* (Emphasis added) R-0244 (English version).

[28] Fundamentally, as regards VAT.

[29] In the Commission Communication (2012/C8/02) relating to the application of European Union State aid rules to compensation granted for the provision of services of general economic interest, published in the Official Journal of the European Union of 11 January 2012, including the case-law of the Court of Justice of the European Union, the following is stated:

> *"Two separate legal entities may be considered to form one economic unit for the purposes of the application of State aid rules. That economic unit is then considered to be the relevant undertaking. In this respect, the Court of Justice looks at the existence of a controlling share or functional, economic and organic links. On the other hand, <u>an entity that in itself does not provide goods or services on a market is not an undertaking for the simple fact of holding shares</u>, even a majority shareholding, when the shareholding gives rise only to the exercise of the rights attached to the status of shareholder or member as well as, if appropriate, the receipt of dividends, which are merely the fruits of the ownership of an asset**."** "(Emphasis added and footnotes omitted). "Two separate legal entities may be considered to form one economic unit for the purposes of the application of State aid rules. That economic unit is then considered to be the relevant undertaking. In this respect, the Court of Justice looks at the existence of a controlling share or functional, economic and organic links. On the other hand, <u>an entity that in itself does not provide goods or services on a market is not an undertaking for the simple fact of holding shares</u>, even a majority shareholding, when the shareholding gives rise only to the exercise of the rights attached to the status of shareholder or member as well as, if appropriate, the receipt of dividends, which are merely the fruits of the ownership of an asset"* (Emphasis added and footnotes omitted). R-0245. (English version).

June 1998 (Commission/Italy, C-35/96, Rec. p. I-3851, section 36), and 12 September 2000 (Pavlov and other, accumulated cases C-180/98 to C-184/98, Rec. p. I-6451, section 75), it states:

> *"The economic activity is normally carried out directly on the market. However, it should not be excluded that it may be carried out jointly by an operator in direct contact with the market and, indirectly, by another entity that controls this operator, by forming an economic union with it. In this regard, it should be highlighted that merely holding stakes, even if they are controlling stakes, is not enough to characterise an economic activity of the entity that owns them when this circumstance only involves the exercise of the rights related to the capacity of shareholder and, as applicable, the collection of dividends, which are merely the product of owning an asset. On the other hand, it should be considered that an entity that has control of a company and effectively exercises this control by playing a direct or indirect role in the management of the company, contributes to the economic activity carried out by the controlled company" (Emphasis added).*[30]

83. This concept of company is reflected in the VAT regulations of the Netherlands[31], interpreted in accordance with CJEU jurisprudence. According to Article 1 the Law:

> *"Under the heading "turnover tax", a tax shall be levied in respect of:*
>
> *supplies of goods and services made for consideration within the Netherlands by entrepreneurs acting as such;*
>
> *intra-community acquisitions of goods effected for consideration within the Netherlands by entrepreneurs acting as such and by legal persons other than entrepreneurs".*

84. There are, therefore, legal persons who are not "entrepreneurs", among which are the Claimants. The concept of "entrepreneur" set out in Article 7, which states that *"An entrepreneur shall be any person who carries on a business independently. Where this Act speaks of a business, this shall also be taken to mean: profession; exploitation of an asset for the purpose of obtaining income therefrom on a continuing basis"*

85. This definition of a taxable person reflects that included in Sixth Council Directive 77/388/EEC of 17 May 1977, on the harmonization of the laws of the Member States

---

[30] Judgement of the Court of Justice of the European Union, of 23 March 2006, Case C-237/04 Enirisorse SpA. paragraph 28.
http://curia.europa.eu/juris/showPdf.jsf?text=&docid=57831&pageIndex=0&doclang=EN&mode=lst&dir=&occ=first&part=1&cid=86277
*"In that regard, it must be observed that, according to settled case-law, in the field of competition law the concept of an 'undertaking' covers any entity engaged in an economic activity, regardless of its legal status and the way in which it is financed (see, in particular, Case C-41/90 Höfner and Elser [1991] ECR I-1979, paragraph 21; Case C-67/96 Albany [1999] ECR I-5751, paragraph 77; Joined Cases C-180/98 toC-184/98 Pavlov and Others [2000] ECR I-6451, paragraph 74; and Case C-222/04 Cassa di Risparmio di Firenze and Others [2006] ECR I-289, paragraph 107)."* R-0246 (English version).
[31] Wet van 28 juni 1968, houdende vervanging van de bestaande omzetbelasting door een omzetbelasting volgens het stelsel van heffing over de toegevoegde waarde (available at: http://www.belastingtips.nl/files/omzetbelasting_wet_op_de_omzetbelasting_1968.pdf ) (In Dutch). The relevant translation is provided. R-0247 (IN FILE on documents to be provided Turnover Tax Act 1968)

relating to turnover taxes - Common system of value added tax: uniform basis of assessment. According to Article 4 of Directive 77/388:

> *"1. 'Taxable person' shall mean any person who independently carries out in any place any economic activity specified in paragraph 2, whatever the purpose or results of that activity.*
>
> *2. The economic activities referred to in paragraph 1 shall comprise all activities of producers, traders and persons supplying services including mining and agricultural activities and activities of the professions. The exploitation of tangible or intangible property for the purpose of obtaining income therefrom on a continuing basis shall also be considered an economic activity".[32]*

86. Therefore, for the purposes of Article 4 of the Sixth Council Directive, CJEU jurisprudence has excluded from the consideration of the taxable person holding companies whose sole purpose is to acquire shares in other entities, without being involved in their management. The TFEU thus stated:

> *"In that regard, it should be noted, in the first place, that a holding company whose sole purpose is to acquire shares in other undertakings and which does not involve itself directly or indirectly in the management of those undertakings, without prejudice to its rights as a shareholder, does not have either the status of taxable person, within the meaning of Article 4 of the Sixth Directive (EC Law 1977, 138), or the right to deduct tax under Article 17 of that directive (see, inter alia, judgments in Cibo Participations [CJEU 2001, 250], C-16/00, EU:C:2001:495, paragraph 18, and Portugal Telecom [JUR 2012, 293518], C-496/11, EU:C:2012:557, paragraph 31).*
>
> *The mere acquisition and holding of shares in a company is not to be regarded as an economic activity, within the meaning of the Sixth Directive, conferring on the holder the status of a taxable person. The mere acquisition of financial holdings in other undertakings does not amount to the exploitation of property for the purpose of obtaining income therefrom on a continuing basis because any dividend yielded by that holding is merely the result of ownership of the property (see, inter alia, judgments in Cibo Participations (CJEU 2001, 250), C-16/00, EU:C:2001:495 paragraph 19, and Portugal Telecom (JUR 2012, 293518), C-496/11, EU:C:2012:557, paragraph 32)."[33]. (Emphasis added).*

87. Therefore, for an entity to be a company under EU Law, there must be an organisation whose purpose is to provide services or produce goods on the market. And an entity that simply has shares or stakes in other companies is not a company. EU Law does not accept that *shell companies* are undertakings. Therefore, the Claimants are not a company or other organisation established under the applicable law.

---

[32] Sixth Council Directive 77/388/EEC of 17 May 1977. RL-0102
[33] Judgement of the Court of Justice of the European Union of 16 July 2015, Preliminary Ruling C. 109/2014, case Beteiligungsgesellschaft Larentia + Minerva mbH & Co. KG and Other versus Finanzamt Nordenham and Other. Paragraphs 18 and 19.
http://curia.europa.eu/juris/document/document.jsf;jsessionid=9ea7d2dc30d5ccbaeedb902e4589b4df9ffa00474333.e34KaxiLc3qMb40Rch0SaxyKahj0?text=&docid=165920&pageIndex=0&doclang=en&mode=lst&dir=&occ=first&part=1&cid=451671 . R-0248

**(2.5)    The systematic interpretation of the Treaty: The distinction in the ECT itself between the concepts "legal entity" and "company or other organisation"**

88. A systematic interpretation of the ECT itself makes it also possible to argue that it is not enough to be a legal entity incorporated under the law of a Contracting Party to be an "investor". The Treaty clearly distinguishes between "company" or "organization" and mere "legal entity" or "enterprise", with the status of Investor being granted solely to the former in its Article 1(7).

89. In Article 17 of the ECT entitled "NON-APPLICATION OF PART III IN CERTAIN CIRCUMSTANCES", there is no mention of "company or other organization" but instead the expression "legal entity" is deliberately used which allows the State in receipt of the investment to deny the advantages of the treaty to any "legal entity" that is owned or controlled by citizens or nationals of a third State when it "has no <u>substantial business activities</u>". (Emphasis added).

90. If, according to the ECT, all legal entities could have been an "Investor", the wording of Article 17(1) might have read as follows:

> *"any Investor legal entity [34] when citizens or nationals of a third State own or control this entity and when this Investor has no substantial business activities in the Area of the Contracting Party in which it is organized, or (...).*

91. The systematic interpretation of Article 1(7)(b) alongside Article 26(7), both of the ECT, leads us to the idea that the concept of "*Investor*" that is not a natural person (or, for our purposes, *"Investor")* of the ECT is not limited to a simple legally incorporated legal person. Far from it: this systematic interpretation adds weight to the idea that the ECT includes a material concept of *"Investor"* which centres around the idea of organization.

92. Article 26.7 of the ECT establishes that:

> *"<u>An Investor other than a natural person</u> which has the nationality of a Contracting Party to the dispute (...) controlled by Investors of another Contracting Party, shall <u>for the purpose of article 25(2)(b) of the ICSID Convention</u> be treated as a "national of another Contracting State" and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a "national of another State". (Emphasis added)*

93. As for Article 25(2)(b) of the ICSID Convention, it establishes that:

> *(2) "National of another Contracting State" means: (...)*
>
> *(b) Any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration and any juridical person which had the*

---

[34] Or, more specifically, we could say "***Investor that is not a natural person****", as literally expressed in Article 26 of the ECT. We understand that it would not be easy to consider a natural person in Art. 17.1 ECT (owned or controlled...). Therefore, in a bid to simplify matters, we will use the plain expression "Investor" in this section.

*nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention". (Emphasis added)*

94. Note the linguistic turn to which the ECT has to resort in its Article 26.7 so as not to use the expression *"legal persons"* which is actually used in Article 25(2)(b) of the ICSID Convention that it claims to incorporate. This is because the ECT considers that an investor other than a natural person must, at any rate, be a *"company or organization"* whether or not it has legal personality.

95. An interpretation of Article 1(7) of the ECT, according to its terms, in keeping with its purpose and context, makes it possible to argue that the terms used by the Treaty to define *"Investor"* are not arbitrary but, on the contrary, have a clear purpose. These terms certainly imply the existence of a "*company or other organization*" meaning that we can talk about an "*Investor*".

96. "*Company or other organization*" is different from a legal person or *"legal entity"*. There can be an organization without any legal personality (e.g. a joint venture or a limited partnership); and there can be a legal person without an organisation (e.g. a *mailbox company,* a conduit company or a *shell company*).

97. The concept of organization (company would be the kind with a profit-making purpose) and, therefore, of Investor, must imply the disposition of human (subjective) and material resources (objective element) for the achievement of a purpose (theological element) which, in this case, must be the provision of services or the production of goods on the market. The Claimants do not meet these requirements.

98. The Claimants defend that this interpretation of Article 1(7) of the ECT has been rejected by Arbitral Tribunals. Nonetheless, the two awards that they cite[35] (one of which, Yukos, has recently been invalidated) do not directly address the concept of investor, rather they do so for the purposes of analysing Article 17 of the ECT.

99. Lastly, a teleological interpretation of the ECT reaches the same conclusion. According to Article 2 of the Treaty, it is aimed at establishing "*a legal framework in order to promote long-term co-operation in the energy field, based on the complementarities and mutual benefits, in accordance with the objectives and principles of the Charter."*

100. The Charter's objectives are *to promote the development of an efficient energy market throughout Europe, and a better functioning global market, in both cases based on the principle of non-discrimination and on market-oriented price formation, taking due account of environmental concerns. They are determined to create a climate favourable to the operation of enterprises and to the flow of investments and technologies by implementing market principles in the field of energy*". These objectives are achieved, according to the Charter, by "*recognising the role of entrepreneurs, operating within a*

---

[35] Paragraph 10 of the Counter-Memorial on Jurisdiction by the Claimants, of 8 August 2016.

*transparent and equitable legal framework, in promoting cooperation under this Charter*". (Emphasis added in both cases).[36]

101.   A pure *shell company* is not an "enterprise" nor can it be considered an "entrepreneur operating" on the market. Both the Charter and the ECT aspire to promote the investment activity of companies that are actively involved in the energy market, which cannot be achieved by means of mere holding companies.

102.   The facts stated in section II of this Memorial and the Accuracy report, to which the reader is referred, prove that neither Claimant can be considered an "organisation" for the purposes of Article 1(7) of the ECT.

**(3)     If the Claimants are not "investors", they cannot have an investment according to Article 1(6) of the ECT.**

103.   As a result of the foregoing, it is impossible to sustain that the Claimants have an investment in accordance with Article 1(6) of the ECT, which requires that the asset invested in be "owned or controlled by an **investor**".

**(4)     Conclusion**

104.   The Claimants do not have an *"investment"* according to the ECT as they are not classed as *"investors"* under the terms of Article 1(7). Therefore, the Arbitral Tribunal lacks both *ratione personae* and *ratione materiae* jurisdiction to rule on this arbitration.

**B.     Lack of jurisdiction *ratione voluntatis* of the Arbitral Tribunal since the Claimant was denied application of Part III of the ECT in concurrence with the circumstances of Article 17 of the ECT**

**(1)     Introduction**

105.   In its Memorial on Preliminary Objections and Request for Bifurcation, the Kingdom of Spain made use of its power under Article 17 ECT to deny the Claimants the benefits of Part III of the ECT. Specifically, that statement stated that:

> *"When these circumstances concur, the Kingdom of Spain shall deny the benefits of the ECT to the Claimants as set out under Article 17 of the ECT. Denial that, to all intents, is realised in this Counter-Memorial on Jurisdiction."[37]*

106.   Please note that what is set out in this paragraph bears no similarity to the way in which the Respondent allegedly activated its denial of benefits clause in the case of Plama versus Bulgaria.[38]

---

[36] European Energy Charter, 1991. RL-0020
[37] Memorial on Preliminary Objections and Request for Bifurcation, Para. 134.
[38] In this case, the Respondent simply sent a letter to the Secretary-General of ICSID stating that "*The application of ECT shall be denied to the claimant since Plama Holding Limited [sic] has not provided any evidence that the ultimate owners of its shares are nationals or citizens of a Contracting State to ECT and that it has any substantial business activities in the Area of the Contracting Party in which it is*

107. The Claimants, both in their Observations in the Request for Bifurcation[39] and in their Counter-Memorial on the Preliminary Objections[40], maintain that: (i) the right to denial of benefits is not a matter of jurisdiction, and in any case, it has not been exercised in time and correctly by the Kingdom of Spain (ii) the Kingdom of Spain was aware of the corporate structure of the Claimants, (iii) the Claimants carry out a "substantial" business activity in the Netherlands, and (iv) the Claimants are indeed owned and controlled by Dutch entities.

108. As discussed below, these arguments made by the Claimants must be rejected. Following the order of our Memorial on Preliminary Objections and Request for Bifurcation, we will address the following issues:

- The Denial of Benefits Clause is a matter of jurisdiction as it relates to the consent given by the ECT Contracting Parties to go to arbitration.

- The Denial of Benefits Clause was activated at the appropriate moment in the proceedings and when the Kingdom of Spain was able to shed light on the opacity of the business structure of the Claimants by studying the Statement of Claim.

- NextEra Energy, Inc., an entity incorporated in the US, real investor that exercises de facto control of investments, uses Dutch shell companies to benefit from the ECT.

- The Claimants do not have a substantial economic activity in the Netherlands. We will analyse how the objective requirements determining the application of Article 17 of the ECT stated in our Memorial on Preliminary Objections and Request for Bifurcation are met by the Claimants, since there is de facto control by NextEra Energy Inc. from the United States.

**(2)    The Denial of Benefits Clause is a matter of jurisdiction: Article 17 of the ECT as a limit of consent granted by the Contracting Parties of the ECT to submit the controversies to the International Arbitral Tribunal**

109. As was explained in our Memorial on Objections on Jurisdiction and Request for Bifurcation[41], the denial of benefits clause and its effects is an issue that affects the jurisdiction of the Arbitral Tribunals. This is founded on the literal wording of Article 26 of the ECT itself. It must not be forgotten that the literal wording is set as the first

---

*organised, namely Cyprus." In a subsequent letter, the Respondent stated that "… the clear and unambiguous wording of Article 17 of the ECT leaves no doubt that each [Contracting Party] has reserved this right with the conclusion of the ECT and that no prior or subsequent reservation is needed for its exercise … Consequently, Article 17 of the ECT confers on each [Contracting Party] a direct and unconditional right of denial which may be exercised at any time and in any manner." Therefore, the Tribunal considered this notice to be insufficient. Plama Consortium Limited v. Bulgaria. ICSID Case No. ARB/03/24, para.144. RL-0008*

[39] Claimant Objections in the Request for Bifurcation. Para. 56

[40] Counter-Memorial on the Preliminary Objections by the Claimants, 8 August 2016, part II, section (12).

[41] Memorial on Jurisdiction, paragraphs 84-140.

criterion of interpretation of all Treaties in accordance with Article 31 of the Vienna Convention.

110.   Essentially, what Article 17(1) of the ECT does is exclude the "free-riders", that is to say, those who wish to enjoy the advantages and benefits of the ECT without the State they belong to taking on any obligation under the same Treaty. And in this regard, Article 17(1) of the ECT must be interpreted as, otherwise, what it would be stating is that an investor from a State that does not form part of the ECT as a multilateral treaty could benefit from the protection of the Treaty without their State of residence undertaking to protect the Contracting Parties. This would mean stating the breakdown of reciprocal protection between the Contracting Parties as well as of the objectives of the ECT itself, Article 2 of which expressly requires the existence of "mutual benefits". In addition, as is stated by the Tribunal in the Amto versus Ukraine Case:

> *"As the purpose of the ECT is to establish a legal framework 'in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits...' then the potential exclusion of foreign owned entities from ECT investment protection under Article 17 is readily comprehensible. 'Long term economic cooperation', 'complementarities' or 'mutual benefits' are unlikely to materialise for the host State with a State that serves as a nationality of convenience devoid of economic substance for an investment vehicle, or a State with which it does not enjoy normal diplomatic or economic relations."[42]*

111.   The ECT Contracting Parties, determining the matters on which its consent to arbitration is granted, established two important limitations in Article 26 of the ECT:

- That the dispute must be one *"which concern an Alleged breach of an obligation of the former [Contracting Party] under Part III"* of the ECT.

- That this allegedly incomplete obligation should be "under Part III" of the ECT.

112.   Thus, the Contracting Parties restricted their consent to arbitration, granting it only for those disputes concerning *"an Alleged breach of an obligation of the former [Contracting Party] under Part III"* of it. Any other subject remains excluded from the arbitral clause of Article 26 (1) of ECT.

113.   Furthermore, Article 26(1) of the ECT provides that the allegedly breached obligations must be one of the obligations "under Part III" of the ECT.

114.   Through Article 26 of the ECT's requirement that the obligations must arise from Part III, it is demanding that Party III is applied in its entirety. It is not enough that the obligation brings its origin as stated in Articles 10, 11, 12, 13, 14 and 15 of the ECT. It is also necessary that this obligation keeps on subsisting after applying Part III in its entirety. Specifically, after application of Article 17 of the ECT.

---

[42] *Limited Liability Company Amto vs. Ukraine*, SCC Case No. 080/2005, Award, 26 March 2008 ("Amto"), para.61. CL-143

115.   The wording of Article 17 of the ECT is fully consistent with the limitations on consent laid down in Article 26 of the ECT. The heading of Article 17 ECT states: "*Non-Application of Part III in Certain Circumstances*". As a consequence, when the "*circumstances*" included in said Article concur, Part III of the ECT will not be applied, so no obligation may be derived this Part of the Treaty.

116.   If Part III of the ECT is not applied as a consequence of the concurrence of the circumstances set out in Article 17 of the ECT, it becomes evident that an "*an obligation of the former [Contracting Party] under Part III*" cannot exist. Consequently, if *"an obligation of the former [Contracting Party] under Part III" does not exist,* the Contracting Parties have not consented to arbitration under Article 26(1) of the ECT and the Arbitral Tribunal shall have no jurisdiction "*ratione voluntatis* ".

**(3)     The Denial of Benefits Clause was activated by the Kingdom of Spain at the appropriate moment in the proceedings and when the Respondent was able to clearly establish that the three circumstances were met by the Claimants for the ECT to enforce the Denial of Benefits Clause.**

**(3.1)   Time in which the factual circumstances under Article 17 (1) ECT should concur to the effects of applying the Denial of Benefits Clause**

117.   The objective circumstances justifying the exercise of the right provided for in Article 17 ECT must be concur at the time the Request for Arbitration is submitted. It is at this time when an investor intends to make use of their rights and, therefore, he may be refused them.

118.   On this question the Arbitral Tribunal ruled on the matter of *Ulysseas, Inc. v. Ecuador, Interim Award, 28 September 2010*[43]. In this award it was noted that the circumstances justifying the application of the denial of benefits clause must be present at the time the notice of arbitration is submitted:

> "*As provided by Procedural Order No. 2 of 10 February 2010 (point 10), the date on which the conditions for a valid and effective denial of advantages <u>are to be met in the instant case is the date of the Notice of Arbitration,</u> i.e. 8 May 2009, this being the date on which Claimant has claimed the BIT's advantages that Respondent intends to deny".(Emphasis added)*

119.   Similarly, the Arbitral Tribunal ruled *on the matter Rurelec v. Bolivia* where it noted:

> "*As a matter of fact, it would be odd for a State to examine whether the requirements of Article XII had been fulfilled in relation to an investor with whom it had no dispute whatsoever. In that case, the notification of the denial of benefits would—per se—be seen as an unfriendly and groundless act, contrary to the promotion of foreign investments. On the other side, the fulfilment of the aforementioned requirements is not static and can change from one day to the next, which means that it is only when a dispute arises that the respondent State will be able to assess*

---

[43] *Ulysseas, Inc. v. Ecuador, Interim Award, UNCITRAL Case*, Interim Award, 28 September 2010. Paragraph 174. RL-0009.

*whether such requirements are met and decide whether it will deny the benefits of the treaty in respect of that particular dispute."[44]*

120.  In the present case, the first *Trigger letter* was received by the Kingdom of Spain on 10 February 2014[45]. Said *Trigger letter* led to the *Request for Arbitration* which was filed on May 12, 2014.

121.  Consequently, the dispute arose during 2014. It is, therefore necessary to establish whether by that date the Claimants had the objective circumstances allowing to activate the Denial of Benefits Clause.

122.  At this point we must note that at the time the first *Trigger letter* and *Request for Arbitration* were submitted, the only information and first communication provided to the Kingdom of Spain on the existence of the Claimants was the letter dated 15 March 2012[46] which the Claimants refer to, and that the only thing it highlights is the opacity in the business structure of the real investor, NextEra Energy Inc, a company registered in the United States, given that as is acknowledged by the Claimants, all investment guidelines were managed from the United States and not from the Netherlands. It is later, when suddenly it seems to be the case that the investments were made using Dutch *shell companies*. The Spanish assets were transferred to the Dutch *shell companies* through private documents, to which this Respondent was only given access in the document production phase.[47]

123.  Based on the foregoing, there is no doubt that the denial of benefits is a right that must be exercised by the respondent Contracting Party at the moment it is made aware of the arbitration and the exact characteristics of the alleged claimant investor. This is acknowledged in Article 17(1) of the ECT.

124.  This right set out under Article 17(1) of the ECT is not subject to a specific moment in time based on the literal wording of the Article, unlike what the Claimants are trying to justify in an arbitral ruling, *Plama Consortium Limited v. Bulgaria*[48].

125.  In effect, and in accordance with the position of the Respondent, Article 17(1) of the ECT is silent regarding how and when the denial of benefits should be exercised. The arbitral Decision the Claimants refer to suggests that it should be exercised with public

---

[44] *Guaracachi America Inc. & Rurelec, Plc. v. Bolivia, PCA Case No. 2011-17*. Award on 31 January 2014. Paragraph 379. RL-0010.
[45] Document C-1.
[46] Letter of J. Ketchum to J.M. Soria López (Minister for Industry) and Fernando Martí. C-0090.
[47]Decision by BDO regarding FLP Global Asset International Inc dated 27 March 2008 to transfer all of its holdings in Tall Pines International Limited and all of its holdings in Canada Wind to FPL Global Asset Holding BV (first Claimant), in exchange for one more share from the first Claimant for each contribution (R-0238); change of sole shareholder in Planta Termosolar de Extremadura S.L. and Planta Termosolar de Extremadura 2 S.L. as a consequence of the transfer by Tall Pines International of all of its holdings in Planta Termosolar de Extremadura S.L. and Planta Termosolar de Extremadura 2 S.L. to Spanish company FPLE Solar Assets, dated 5 May 2008 (R-239 and R-0240).
[48] *Plama Consortium Limited v. Bulgaria*. ICSID Case No. ARB/03/24, Para. 157. The Arbitral Tribunal refers to the notification in the proceedings based on Article 1113 of the NAFTA, using this to interpret Article 17(1) of the ECT. RL-0008

communication and in an effective way so that the investors are made aware. However, the Claimants do not state that the Arbitral Tribunal of *Plama Consortium Limited v. Bulgaria*, uses Article 1113 of the NAFTA in their arguments[49], an Agreement that is not applicable to this arbitration, which is a matter that is not disputed between the Claimants and the Respondent.

126.  Article 17(1) of the ECT does not include any equivalent provision to the NAFTA provision. Therefore, if the Arbitral Tribunal of *Plama Consortium Limited v. Bulgaria* used a Treaty such as NAFTA, which is not applicable to this arbitration, and which expressly provides for a rule on prior communication, similarly what should be interpreted according to Article 31 of the Vienna Convention is that the absence of these requirements in Article 17(1) of the ECT must be understood as the intention of the Contracting Parties of the ECT to increase their prerogatives in relation to the right to the Denial of Benefits in order for this to be exercised *at any time* and at the beginning of the arbitration.

127.  In this sense, unlike other treaties, the ECT does not contain a provision regarding prior publication, notification or consultation in the decision to deny a *mailbox company* the benefits in Part III. This must be placed in contrast with the numerous provisions of the ECT that establish an obligation to provide a mechanism in order for the Contracting Parties of the ECT to issue or publish the prior notices or consultations required regarding foreign investors or other Contracting Parties. By way of example, the following Articles set out the obligations to announce or make public with due notice if a particular right or exclusion is to be exercised:

a)  Article 7(10)(a)(ii), in its analysis of the concept of "transit" sets out that, in relation to transporting energy materials and products through the territory of a Contracting Party, the Contracting Parties may exclude themselves from Annex N if they jointly give notification thereof in writing to the Secretary, who shall then in turn notify the other Contracting Parties. This exclusion shall take effect four weeks after the first notification.

b)  Article 26(3)(b)(i), which addresses whether a Contracting Party is to provide their consent to arbitrate differences when the investor has already submitted the dispute to the local courts, sets out that said Contracting Parties must notify beforehand if they invoke the exclusion with regards to Annex ID of the ECT.

c)  Article 26(3)(c), which addresses whether a Contracting Party is to provide their consent for arbitration with respect to the so-called "umbrella clause", sets out that the Contracting Parties must notify beforehand if they invoke the exclusion with regards to Annex IA of the ECT.

---

[49] Article 1113 NAFTA: Denial of Benefits.
1. [...]. 2. Subject to prior notification and consultation in accordance with Articles 1803 (Notification and Provision of Information) and 2006 (Consultations), a Party may deny the benefits of this Chapter to an investor of another Party that is an enterprise of such Party and to investments of such investors if investors of a non-Party own or control the enterprise and the enterprise has no substantial business activities in the territory of the Party under whose law it is constituted or organized. RL-01043

d) Article 45(3)(c), regarding provisional application of the ECT, sets out that the Contracting Parties who do not accept the provisional application of the ECT must make an express statement regarding their wish to be excluded from Annex PA.

128. In short, when it was the will of the ECT to establish the obligation for prior notification to be given in advance by the Contracting Parties according to the situation, this was then agreed. Therefore, and bearing in mind that it is not disputed between the Claimants and the Respondent that if something is not included in the ECT, it is because it was the will of the Contracting Parties[50], if in Article 17(1) of the ECT there is no provision whatsoever included regarding the time and form of the communication of the Denial of Benefits, it is because it was agreed in this way and it was the express intention of the signatories of the ECT.

129. In a similar way to the provisions analysed, nor does the ECT offer a similar Annex that gathers the positions adopted by the governments of certain Contracting Parties at the time it was signed or thereafter with regards to the Denial of Benefits Clause in Article 17 of the ECT. Consequently, it can be clearly seen that the authors of the ECT (and the Contracting Parties) did not choose to impose a requirement regarding prior notification with regards to Article 17(1) of the ECT.

130. The foregoing is supported by the positions that were maintained by the different States during the negotiation of the ECT. In effect, as the possible Denial of Benefits Clause was being drawn up, Norway suggested that denial of the advantages in Part III of the ECT should be a matter of "pre-investment". This meant that *shell companies* were automatically excluded. This proposal was subject to a notification and exclusion protocol, which implied an administrative burden and restriction to market access potentially contradicting the purpose of the ECT.

131. Nevertheless, this proposal by Norway was not chosen and, instead, other proposals such as those by the United States prevailed. The minutes of the ECT negotiation sessions highlight that the United States reserved the right to deny the benefits in Part III of the ECT at the time of the arbitration:

> *"...the US, without excluding any coverage in advance, would reserve the right to disallow protection at some stage on an exceptional basis such as by denying the right to Basic Agreement [i.e. ECT] dispute resolution if it decided at that time that the 'brass plate'(shell companies) situation existed and was objectionable."[51]*

132. This position is that maintained by the United States, not only in the negotiation of the ECT but also in the other BITs signed.

133. In conclusion, all of the previously stated arguments, both from the perspective of the literal interpretation of the ECT and based on the systematic and historical interpretation

---

[50] This, at least, is the position that the Claimant party upholds in relation to the non-inclusion in the ECT of a disconnection clause that expressly prevents it from being applied to Intra-EU relations.
[51] Memorandum dated 20 November 1992 on the 12-16 November Meetings of Working Group II on the Basic Agreement under the ECT, p. 6. *"Investment protection and the Energy Charter Treaty"*, Graham Coop and Clarisse Ribeiro, Ed. Har /Cdr, 30 December 2008. Page 35. RL-0104.

of the ECT and all other treaties for dispute resolution regarding investments, lead the Kingdom of Spain to assert with confidence that the Denial of Benefits Clause in Part III of the ECT is put together as a prerogative in favour of the Contracting Parties and may be exercised from the moment there is knowledge of the dispute being submitted, without any prior obligation to communicate said denial at the beginning of the arbitration or at the time of pre-investment.

134.   This has forced the Kingdom of Spain not to exercise their right to denial of benefits until submission of the Memorial on Objections and Request for Bifurcation, as otherwise provided for by ICSID rules and the arbitration doctrine, as we shall discuss later.

**(3.2)    Activating the Denial of Benefits Clause in the Counter-Memorial to the Claim**

135.   The Kingdom of Spain used the power provided by Article 17 of the ECT in its Memorial on Objections on Jurisdiction and Request for Bifurcation. Specifically, that statement stated that:

> *"When these circumstances concur, the Kingdom of Spain shall deny the benefits of the ECT to the Claimants as set out under Article 17 of the ECT. Denial that, to all intents, is realised in this Counter-Memorial on Jurisdiction."[52]*

136.   The forcefulness of this sentence cannot be compared to the ambiguity of the terms with which the Respondent denied the Claimant the benefits in Part III of the ECT in the Plama case.

137.   This arbitration must be processed in accordance with the ICSID Arbitration Rules. These rules are clear about the time of submission for different jurisdictional objections. Specifically, both Article 41 (1) of the ICSID Convention and Rule 41(1) of the ICSID Rules of Arbitration point out:

> *"Any objection that the dispute or any ancillary claim is not within the jurisdiction of the Centre or, for other reasons, is not within the competence of the Tribunal shall be made as early as possible. A party shall file the objection with the Secretary-General no later than the expiration of the time limit fixed for the filing of the counter memorial, or, if the objection relates to an ancillary claim, for the filing of the rejoinder—unless the facts on which the objection is based are unknown to the party at that time." [53]*

138.   As was already explained in the Memorial on Preliminary Objections and Request for Bifurcation:

> *"the Kingdom of Spain has only been able to verify the concurrence of the circumstances established in Article 17 of the ECT after examining in detail the Claimants' Memorial, the documents attached to it and other documentation obtained by this party at the time of the dispute."[54]*

---

[52] Counter-Memorial on the Merits and Memorial on Jurisdiction, of 09 September 2015, para. 134.
[53] ICSID Arbitration Rules, Rule 41 (1).
[54] Memorial on Preliminary Objections and Request for Bifurcation, of 9 September 2015, paragraph 89.

139. Thus, the Kingdom of Spain simply complied with these applicable Rules of procedure by submitting their objection to the proceedings at the appropriate moment.

140. This correct compliance is confirmed in the following awards issued according to the UNCITRAL and ICSID Rules, which are subject to invocation in this Arbitration insofar as the Rules of procedure applied are similar, despite being denied by the Claimants. Hence, the Court of case *Ulysseas, Inc* regarding this same issue said that the Denial of Benefits Clause can be articulated with the response to the claim:

> *"The first question concerns whether there is a time-limit for the exercise by the State of the right to deny the BIT's advantages. In the Tribunal's view, since such advantages include BIT arbitration, a valid exercise of the right would have the effect of depriving the Tribunal of jurisdiction under the BIT. According to the UNCITRAL Rules, a jurisdictional objection must be raised not later than in the statement of defence (Article 21(3)). By exercising the right to deny Claimant the BIT's advantages in the Answer, Respondent has complied with the time limit prescribed by the UNCITRAL Rules. Nothing in Article I(2) of the BIT excludes that the right to deny the BIT's advantages be exercised by the State at the time when such advantages are sought by the investor through a request for arbitration".[55]*

141. In the same vein, the ICSID Court of the case *of Empresa Eléctrica del Ecuador, Inc* said:

> *"What Ecuador did was to invoke a clause in the Treaty, by which both the United States and Ecuador reserved "the right to deny to any company the advantages" of the Treaty "if nationals of any third country control such company and, in the case of a company of the other Party, that company has no substantial business activities in the territory of the other Party or is controlled by nationals of a third state with which the denying Party does not maintain normal economic relations" (Article I (2) of the BIT). Since EMELEC is a "company of the other Party," Ecuador has the power to deny it the advantages of the BIT if the company has no substantial business activities in the United States. The Tribunal considers that Ecuador announced the denial of benefits to EMELEC at the proper stage of the proceedings, i.e. upon raising its objections on jurisdiction. If the Tribunal should agree to hear the merits of the present case, only then would it be appropriate to examine the substantive requirements for the denial of benefits, i.e. the determination of whether EMELEC has substantial business activities in the territory of the United States." (emphasis added)[56]*

142. The UNCITRAL Court of the Case *Guaracachi & Rurelec v. Bolivia* also had an opportunity to rule on this issue. This award states:

> *"On the contrary, the Tribunal agrees that the denial can and usually will be used whenever an investor decides to invoke one of the benefits of the BIT. It will be on that occasion that the respondent State will analyse whether the objective conditions*

---

[55] *Ulysseas, Inc. v. Ecuador, Interim Award, UNCITRAL Case, Interim Award, 28 September 2010*. Paragraph 172. RL-0009.

[56] *Empresa Eléctrica del Ecuador, Inc. v. Republic of Ecuador, ICSID Case No. ARB/05/9*, Award, 2 June 2009. Paragraph 71. RL-0104

> *for the denial are met and, if so, decide on whether to exercise its right to deny the benefits contained in the BIT, up to the submission of its statement of defence."[57]*

143.   Therefore, we must not forget the conclusions reached by the ICSID Tribunal in the case *Pac Rim Cayman LLC. v. The Republic of El Salvador*:

> *"Under ICSID Arbitration Rule 41, any objection by a respondent that the dispute is not within the jurisdiction of the Centre, or, for other reasons, is not within the competence of the tribunal "shall be made as early as possible" and "no later than the expiration of the time limit fixed for the filing of the counter-memorial". [...] In the Tribunal´s view, the Respondent has respected the time-limit imposed by ICSID Arbitration Rule 41."[58]*

144.   It is also appropriate to mention the thoughts of Graham Coop and Clarisse Ribeiro:

> *"A plain Reading of Article 17(1) indicates that a Contracting Party to the ECT can exercise its Article 17(1) right to deny at any time and, most obviously, it ought to be entitled to exercise that right at the time the investor actually brings a claim to enforce the protections (or "advantages") of Part III of the treaty. Before that moment, a State will almost certainly have had no cause, nor any opportunity [...] even to consider the status of any particular investor, nor their underlying ownership or control structure, or the extent of their business activities in the territory in which they are incorporated"[59].*

145.   The same authors go further and, in relation to the prior obligation analysis in the *Plama* case, they state:

> *"By insisting that the host State must notify the investor prior to its investment that it will exercise the right to deny advantages, the Tribunal in Plama appears to have placed a considerable burden on the host State. The effect of the decision means that the Tribunal has taken "something that the investor can know quite readily, i.e. ownership, control, citizenship, and nationality, and placed the burden of knowledge on the regulator, which can make such determinations only with some difficulty. "Some difficulty" may be an understatement."[60]*

146.   Consequently, the possibility of activating the Denial of Benefits Clause in the Memorial on Preliminary Objections and Request for Bifurcation is allowed by the rules governing this arbitration (ICSID Arbitration Rules) and supported by the arbitral doctrine.

147.   Moreover, the activation of the Denial of Benefits Clause requires it done giving reasons. At this point, as stated above, the Kingdom of Spain did not have the information to determine the application of Article 17 of the ECT until all documentation pertaining to the Claimant's Memorial had been correctly studied. The right was

---

[57] *Guaracachi America Inc. & Rurelec, Plc. v. Bolivia,* PCA Case No. 2011-17. Award on 31 January 2014. Paragraph 378. RL-0010.
[58] *Pac Rim Cayman LLC. v. The Republic of El Salvador, ICSID Case No. ARB/09/12*, *Decision on the Respondent's Jurisdictional Objections*. Paragraph 4.85. CL-0120
[59] *"Investment protection and the Energy Charter Treaty"*, Graham Coop and Clarisse Ribeiro, Ed. Har /Cdr, 30 December 2008. Page 35. RL-0105.
[60]   Ibid. Page 41.

exercised in the Memorial on Preliminary Objections and Request for Bifurcation for three fundamental reasons:

a.  Firstly, a right can only be denied when it is known that it is invoked and exercised by a certain investor within the ECT, as has already been stated. And the Kingdom of Spain only became aware of this knowledge after carefully studying the Claimants' Memorial, which shed light on the obscurity of the corporate structure of NextEra Inc., an American company belonging to a non-signatory State of the ECT.

b.  Secondly, because up until the time of the letter dated 15 March 2012, NextEra Energy Inc. always acted under its American nationality, processing all directives and communications from the United States, which (i) were signed by their directors domiciled at the company established in that country, and (ii) these notifications were consequently also communicated to the American diplomatic authorities in Spain. It wasn't until that moment that the use of Dutch *shell companies* by NextEra Energy Inc. became surprisingly clear, which highlights the opacity of the Claimants' action. Therefore, the Kingdom of Spain's corresponding wait for the Request for Arbitration in order to set their procedural position in the possible proceedings, so as to have correct knowledge of the company network used by NextEra Energy Inc., is in accordance with the ICSID Rules and those of good faith.

c.  Thirdly, as is set out in the Accuracy reports, it was only from the time the Claimants' Memorial was drawn up that it became clear, based on the extensive investigation work with regards to the Claimants, that they are mere "mailbox companies" who do not have any "substantial" business activity in the Netherlands for the purposes of Article 17 of the ECT, as is stated in section 4. Rather, as we have previously stated, there are documents that we have only been able to gain access to in the document production phase.[61]

**(3.3)    Effects of the activation of the Denial of Benefits Clause**

148.  As already stated, the ECT establishes a direct connection between Article 17 and Article 26 of the ECT. From this connection it is clear that the ECT Contracting Parties have only consented to arbitration regarding *"an Alleged breach of an obligation of the former [Contracting Party] under Part III"*.

149.  If as a result of the application of Part III of the ECT, where Article 17 is found, the application of Part III does not take place, no regulated obligation can be derived from said Part III. Therefore, if no obligation can be derived from Part III, the Arbitral Tribunals shall have no jurisdiction to hear the case due lack of consent from the Contracting Parties.

150.  The terms in which Articles 17 and 26 of the ECT have been drafted are attributed to an Arbitral Tribunal to review whether the circumstances that enable the application of Article 17 concur in a particular case. However, if the Arbitral Tribunal were to conclude

---

[61] Paragraph X of this memorial.

that the circumstances of Article 17 ECT concur, they should determine its lack of jurisdiction to hear the case "rationis voluntatis".

151.   The Tribunal shall apply the will of the Contracting Parties to the Treaty without being able to introduce additional requirements to that will. In this regard, Graham Coop and Clarisse Ribeiro state:

> *"The express limits imposed on the State's discretion ought not to go beyond the requirements enunciated in Article 17 (1)"*[62]

152.   If the application of Article 17 was projected only to the future, as requested by the Claimant, it would be introducing an additional limitation not provided for in the wording of Article 17 ECT.

153.   If the ECT signatory Parties had wished that this effect should occur, they had multiple opportunities to have implemented it, among others: (i) avoid referring to "Part III" in Article 26; (ii) expressly list Articles 10, 11, 12, 13 and 14 of the ECT in Article 26; extract Articles 16 and 17 from Part III; or even expressly state in Article 17, 26, or both, the corresponding limitation on the projection of the purposes of Article 17. But none of this was done.

154.   In this regard, the Tribunal on the matter *Ulysseas, Inc* pointed out that:

> *"A further question is whether the denial of advantages should apply only prospectively, as argued by Claimant, or may also have retrospective effects, as contended by Respondent. The Tribunal sees no valid reasons to exclude retrospective effects. In reply to Claimant's argument that this would cause uncertainties as to the legal relations under the BIT, it may be noted that since the possibility for the host State to exercise the right in question is known to the investor from the time when it made its the investment, it may be concluded that the protection afforded by the BIT is subject during the life of the investment to the possibility of a denial of the BIT's advantages by the host State"*[63]

155.   Along the same lines that the Tribunal pointed out on the *Guaracachi* case when stating that:

> *"The same must be said in relation to the supposedly retroactive application of the clause. The Tribunal cannot agree with the Claimants when they argue that the Respondent is precluded from applying the denial of benefits clause retroactively. The very purpose of the denial of benefits is to give the Respondent the possibility of withdrawing the benefits granted under the BIT to investors who invoke those benefits. As such, it is proper that the denial is "activated" when the benefits are being claimed".*[64]

---

[62] *"Investment protection and the Energy Charter Treaty"*, Graham Coop and Clarisse Ribeiro, Ed. Har /Cdr, 30 December 2008. Page 35. RL-0106.

[63] *Ulysseas, Inc. v. Ecuador, Interim Award, UNCITRAL Case, Interim Award of 28 September 2010.* Paragraph 173. RL-0009.

[64] *Guaracachi America Inc. & Rurelec, Plc. v. Bolivia, PCA Case No. 2011-17.* Award on 31 January 2014. Paragraph 376. RL-0010.

156.   In view of the foregoing, activating the Denial of Benefits Clause cannot have a simple prospective effect as the Claimant points out.

157.   Therefore, the Claimants turn to *Plama Consortium Limited v. Bulgaria* to argue the prospective effect of activating the Denial of Benefits Clause. In effect, the *Plama* Tribunal concluded by means of studying Article 2 of the ECT that the purpose of the ECT was to ensure:

> *"a legal framework in order to promote long-term cooperation in the energy field… in accordance with the objectives and principles of the Charter"*

158.   However, inexplicably, the *Plama* Tribunal omitted an important point contained in Article 2 of the ECT which states that this cooperation must be "*based on complementarities and mutual benefits*".

159.   Interpreting Article 2 of the ECT without considering what is stated previously in paragraph 51 would be tantamount to placing the investor above other important considerations in the framework of correct and long-term cooperation in the energy market under the provisions of the ECT. In the Kingdom of Spain's view, application of Article 17 of the ECT should be interpreted with retroactive effect, precisely to protect this *long-term purpose*.

160.   In short, in view of the foregoing, it must be concluded that the Kingdom of Spain has successfully activated the Denial of Benefits Clause provided for in Article 17 of the ECT in this case.

**(4)    Circumstances that led to the activation of the Denial of Benefits Clause. The Claimant does not develop a substantial business in the Netherlands**

161.   As is known, the circumstances required by Article 17(1) of the ECT to deny the benefits of Part III of the ECT is that we are dealing with: i) a legal entity, (ii) when citizens or nationals of a third state own or control such entity and (iii) when they do not carry out substantial business activities in the territory of the Contracting Party in which it is established.

162.   In their Counter-Memorial on the Preliminary Objections, the Claimants argue that, despite being Dutch holding companies, (i) they do carry out substantial economic activity, and (ii) they are not entities owned or controlled by a third-country national.

163.   Firstly, regarding the concept of "*substantial economic activity*", the Claimants invoke the Case Award for Amto versus Ukraine to defend that when Article 17 of the ECT requires the economic activity to be "substantial" (in English), it does not mean from a quantitative point of view, but rather a qualitative one.[65] Thus, the Claimants implicitly accept that their activity is not quantitatively substantial. Nonetheless, their argument would be hard-pressed to be in line with the Spanish version of Article 17 of the ECT,

---

[65] *Pac Rim Cayman LLC. v. The Republic of El Salvador, ICSID Case No. ARB/09/12*, *Decision on the Respondent's Jurisdictional Objections*. Paragraph 4.75. CL-0120

which uses the term "important". Important, in Spanish, is something of great relevance. Thus, the argument of the Claimants and the Amto Tribunal with regards this aspect, with all due respect, is not convincing for the Kingdom of Spain. The Tribunal of the Plama Case focused on considering that the adjective "substantial" (in English) was also a quantitative term.[66]

164.  Furthermore, economic activity in economics is always measured in quantitative parameters (i.e. per capita income, gross domestic product, etc.), in which case the ordinary sense of "important economic activity" requires us to understand that it refers to quantitatively relevant activity.

165.  In any case, the Amto Case Tribunal understood that substantial activity (from a qualitative and not quantitative point of view) existed because the Claimant had proven that: a) they had two permanent full-time employees, b) an office permanently leased at the place it was established, and c) they made investments in other countries following the instructions that were given from within the country. The Tribunal did not consider holding a bank account to be a determining factor as "*this bank statement provides no evidence of payments in respect of day-to-day business activities*[67]". In this present case, neither Claimant meets the requirements set by Amto to be considered as carrying out "materially" substantial activity, as is clearly stated in the account of the facts in this memorial and in the Accuracy report accompanying it.

166.  In terms of the requirement regarding ownership and control by nationals of a third state, the Claimants uphold that these requirements are cumulative and that as the first Claimant, registered in the Netherlands, holds 100% of controlling interest in the second Claimant, the requirements would not be met with regards to the second Claimant, given that it is wholly owned by a national of a country that forms part of the ECT. The same would be the case with the first Claimant, which is owned by a Dutch cooperative. This ownership would imply control of both companies. Therefore, according to the Claimants, the cumulative requirements in accordance with Article 17 are not met in order to apply the denial of benefits.[68]

167.  However, the Claimants overlook that control and ownership do not have to coincide in a cumulative manner, rather it is sufficient that one of the two circumstances are fulfilled; either the entity is owned or controlled by nationals or citizens of a third state, in order for the denial of benefits clause in Article 17 of the ECT to be applied.

168.  The Claimants also overlook a very important part of the literal text of Article 17 when they build their arguments. Article 17 expressly refers to "*citizens or nationals of a third state*". Thus, Article 17(1) is looking for the natural persons who really own or control the legal person. These natural persons are the only ones who can be considered as "citizens" or "nationals". In short, Article 17 is looking for the "ultimate" or "beneficial

---

[66] *Plama Consortium Limited v. the Republic of Bulgaria, ICSID Case No. ARB/03/24,* Award on Jurisdiction 8 February 2005. Para.169. RL-0008.
[67] *Limited Liability Company Amto vs. Ukraine*, SCC Case No. 080/2005, Award, 26 March 2008 ("Amto"), para.68. CL-143
[68] Counter-Memorial by the Claimants dated 8 August 2016, paragraphs 79 to 81.

owner" when it mentions ownership. In this case, the citizens or nationals who own and control the Claimants are not in the Netherlands but rather in the United States, which is not a contracting part of the ECT. The award for the Amto case, invoked by the Claimants, involved having to determine the citizens who ultimately owned the Claimant.[69] The same was carried out by the Tribunal of the Plama case, as we shall see.

169.  With regards to the concept of control, unlike other treaties, the ECT does indeed include a concept of control. Thus, the doctrine included in awards, such as that for Aguas del Tunari, invoked by the Claimants[70], is not applicable when the definition of what is to be understood by control is found in the ECT itself. In effect, in accordance with Article 1(6) of the ECT, the following is to be understood by investment: "*every kind of asset, owned or controlled directly or indirectly by an investor*". However, the concept of "*direct or indirect control*" in Article 1(6) of the ECT is explained in Understanding 3, stating that "*control of an Investment means control in fact, determined after an examination of the actual circumstances in each situation*".

170.  Article 17 of the ECT, which is inserted in Part III of the ECT under the rubric of Protection, repeatedly refers to investors "controlled" by nationals of third states. So, what does Article 17 means when it uses the word "control"? The Kingdom of Spain, in line with the opinion of Loukas A. Mistelis and Crina Mihaela Baltag in their article "*Denial of Benefits and Article 17 of the Energy Charter Treaty*"[71], understands that the notion of "control" in Article 17 of the ECT is to be interpreted with the literal meaning in Understanding 3 of the ECT when it refers to "control in fact", thus, in order for the concept of investment to exist for the purposes of Article 1(6) of the ECT there must be real and effective control. In effect, a correct systematic interpretation of the ECT leads us to affirm that the Contracting Parties never had the intention of extending the benefits stated in Part III of the ECT to investors from non-signatory third countries and regarding which there was no reciprocal protection.

171.  The Tribunal of the Plama Case declared in line with this Respondent:

*"Under Article 17(1)'s first limb, the question is whether the Claimant is a legal entity owned or controlled "by citizens or nationals of a third state." A "third state" being a non-Contracting State under the ECT, it would not include France (as a Contracting State); and if a national of France "owned" and "controlled" the Claimant at all material times, it would follow that Article 17(1)'s first limb would not be satisfied in the present case. In the Tribunal's view, the word "or" signifies that ownership and control are alternatives: in other words, only one need to be met for the first limb to be satisfied, as the Claimant rightly conceded at the September Hearing [D2.37]. Also, in the Tribunal's view, ownership includes indirect and beneficial ownership; and control includes control in fact, including an ability to*

---

[69] *Limited Liability Company Amto vs. Ukraine*, SCC Case No. 080/2005, Award, 26 March 2008 ("Amto"), para. 66 and 67. CL-143.
[70] *Aguas del Tunari, S.A. v. The Republic of Bolivia*, ICSID Case No. ARB/02/3, Decision on the Respondent's Objections to Jurisdiction 21 October 2005 ("Aguas del Tunari"), para. 245. CL-121.
[71] Denial of Benefits and Article 17 of the Energy Charter Treaty. Loukas A. Mistelis and Crina Mihaela Baltag, available at:
http://pennstatelawreview.org/articles/113%20Penn%20St.%20L.%20Rev.%201301.pdf. RL-0004

> *exercise substantial influence over the legal entity's management, operation and the selection of members of its board of directors or any other managing body."[72] (Emphasis added)*

172.   Lastly, it should be noted that the burden of proof as to whether or not control exists does not fall upon the Respondent, but rather the Claimants. This was stated by the ruling for *Plama Consortium Limited v. Bulgaria* when it notes that "*the burden of proof to establish ownership and control (of the claimant) is on the claimant*"[73]. The Claimants simply attribute control of the second Claimant to the first and that of the first to the Dutch cooperative solely by virtue of its ownership. However, the concept of control in the ECT refers to control in fact.

173.   In any case, it has been proven that American citizens are those controlling the Claimants, in fact and in law. In this case, all documents held in the reord prove that if anyone controls the Claimants it is NextEra Energy Inc, from the United States, along with the staff in the companies in its group NextEra in the United States.

174.   As can be seen in the Accuracy report, the witness statement of Mr. Nicolaï, employee of INTERTRUST, confirms that control of the Claimants does indeed correspond to American citizens. In fact, Nicolaï clarifies that the role of the three B Directors (Dutch nationals from Intertrust) on the board of NEG Coöperatieve – owner and administrator of the Claimants – merely ensures compliance of the legal and accounting regulations in the Netherlands.

175.   Neither Mr. Nicolaï nor any other B Directors make decisions regarding business in the Plants. Mr. Nicolaï acknowledges that he has been an employee and non-executive director of Intertrust for 36 years, a Dutch trust company that provides services to a total of 1,493 entities. The Accuracy expert report confirms that Mr. Nicolaï provides or has provided advisory services (A, B or other Director) to almost 100 companies since 1989. The wide range of sectors (media, oil & gas, construction etc.) and geographical areas (China, Pakistan, Mexico, Libya, etc.) are of note. This proves that his real expertise lies in providing trust services. He is not and has never been an employee of the Claimants.

176.   The Accuracy expert report also states that Mr. Nicolaï only joined as Director of the Claimants in November 2012, when the Termosol Plants were already under construction and therefore he was not involved in the investment process in Spain.

177.   There is no evidence whatsoever regarding Mr. Nicolaï's alleged experience in the renewable energy sector. Although he claims to have experience, what is certainly true is that his role has never been related to the business but rather to the mere compliance of the Dutch legal and accounting regulations, as he himself admits.[74] According to the Accuracy report, Mr. Nicolaï "*does not provide any evidence whatsoever of having taken*

---

[72] *Plama Consortium Limited v. the Republic of Bulgaria, ICSID Case No. ARB/03/24,* Award on Jurisdiction 8 February 2005. Para. 170 RL-0008.
[73] *Plama Consortium Limited v. the Republic of Bulgaria, ICSID Case No. ARB/03/24,* Award on Jurisdiction 8 February 2005, para. 89. RL-0008.
[74] Witness statement of Mr. Nicolaï, paragraph 27

> *strategy or operation-related decisions in the business of the Plants. In any case, neither the brief introductory CV on the Intertrust page nor his witness statement provide any evidence whatsoever that he is an expert in renewable energy.*"

178.  The Accuracy report also notes that the other B Director mentioned by Mr. Nicolaï, Ms. Eveline Van Dalen, is also an employee of Intertrust and introduces herself as a tax specialist (not a specialist in renewable energy).

179.  Therefore, the Dutch directors do not exercise any type of strategic control over the investments of the Dutch holding companies, rather this control corresponds to the A directors, American citizens, such as Mr. Sorensen:

> *"The A Directors are senior NextEra officials and, in the case of the Spanish investments, it is primarily their job to develop and propose the Claimants' investment strategies and to deal with the day-to-day running of those business through NEE España "[75]. (Emphasis added).*

180.  It is to be added to the foregoing that all letters that the Claimants invoke as determinants of their alleged legitimate expectations were not even exchanged among the directors of the Claimants (Dutch or American), but rather among the senior management of NextEra in the US (Mr. David Mitchel or Mr. Ketchum) with officials of the Government of Spain.

181.  Thus, it is unquestionable that control of the Claimants falls upon American citizens. Fulfilment of this requirement is not cumulative with that of ownership, rather it is sufficient for one of them to be fulfilled to activate the clause in Article 17 of the ECT.

**(5)    Conclusion**

182.  In view of the above and where all the requirements established in Article 17 of the ECT are met, the Arbitral Tribunal is requested once again to declare its lack of jurisdiction to hear this dispute by virtue of the activation of the denial of benefits clause by the Kingdom of Spain under Article 17 of the ECT.

**C.    Lack of jurisdiction of the Arbitral Tribunal *ratione personae* due to the absence of an investor protected under the ECT. The Claimant is not from the area of another Contracting Party as the Netherlands, like the Kingdom of Spain, are Member States of the European Union. The ECT does not apply to disputes relating to Intra-EU disputes**

**(1)    Introduction**

183.  In the event that the Claimants are deemed investors, it shall be maintained that, as the Kingdom of Spain explained in its Memorial on Jurisdiction,[76] the Arbitral Tribunal, with all due respect, lacks jurisdiction to rule on the intra-EU dispute posed in this arbitration by companies from the Netherlands against the Kingdom of Spain.

---

[75] Ibid.

[76] Memorial on Jurisdiction, 16 September 2015, section III.A, paragraphs 26 to 83.

184.   The Netherlands and Spain are member States of the EU, and therefore the requirement is not met that is foreseen in Article 26(1) of the ECT which states that to access arbitration the dispute must be between a Contracting Party and investors from different Contracting Parties.

185.   The Claimants, both in their observations on the Request for Bifurcation[77] and in their Counter-Memorial on Jurisdiction[78], reject the arguments of Spain in this regard. However, the reasons given do not invalidate the objection to the jurisdiction of the Arbitral Tribunal raised by the Kingdom of Spain, as shown below. This is said without prejudice to the explanations given in our Memorial on Jurisdiction, to which reference is made in order to avoid unnecessary repetition.

186.   The fact that the Respondent maintains this objection cannot be considered trivial or temerarious. It must be taken into account that, on the one hand, the European Commission (Guardian of the Treaties in the EU) emphasized the incompatibility of the Investment Treaties signed between EU Member States and EU Law[79]. Along the same lines, the Commission, in its intervention as "Amicus Curiae", emphasized the incompatibility between the arbitration conceived in the ECT and EU Law, when it is intended to be applied to intra-EU disputes.[80] On the other hand, there are two pending cases put before the Court of Justice of the EU regarding the compatibility between the BITs and EU Law[81]. Until the CJEU makes a decision on these matters (also on the compatibility between the arbitration of the ECT for intra-EU relations and EU Law), the Respondent shall maintain its objection by virtue of the principle of institutional loyalty which is derived from Article 4 of the EU Treaty.[82]

**(2)      The Claimants overlook the principle of primacy of EU law in Intra EU relations**

187.   In its claims, the Claimant party forgets the essential principle which the objection to the Arbitral Tribunal jurisdiction raised by the Kingdom of Spain rests upon: the principle of primacy of EU law.

188.   The CJEU established the principle of primacy in the judgment in *Costa v. ENEL* of 15 July 1964[83]. In it, the CJEU protected the rights of an investor in the common electricity

---

[77] Observations on the Request for Arbitration, 2 October 2015, paragraphs 23 to 55.
[78]  Counter-Memorial on Jurisdiction, 8 August 2016, paragraphs 17 to 46.
[79] "Commission asks Member States to terminate their intra-EU bilateral investment treaties" European Commission-Press release, Brussels, 18 June 2015. (English original version). R-0012
[80]  Submission by the European Commission dated 5 September 2016. Its position is summarised in paragraph 8: "*The Commission will show, first, that under international law, the offer for entering into arbitration made by Spain when ratifying the ECT has been limited to investors from contracting parties that were at the time not Member States of the European Communities (2.). It will then set out that even if the offer was made also to EU investors, quod non, such an offer is, under international law, not a valid offer.*"
[81]  Preliminary Ruling C-284/16 (Achmea Case) on the compatibility between the BIT signed in 1991 by the Netherlands and Slovakia (EC-13) and Case T-624/15 relating to the application for annulment of the European Commission decision of 30 March 2015 in case SA 38517 (Arbitral Award of Case Micula v. Romania, 11 December 2013).
[82] Treaty on European Union. RL-0021.
[83] CJEU Judgment of 15 July 1964, in case 6/64, *Flaminio Costa v. ENEL*. R-.0249.

market, with regards to the nationalisation of the sector practised by Italy. According to the CJEU, *"unlike ordinary International Treaties, the EEC Treaty established an integrated legal system of the Member States since the entry into force of the Treaty and linking their own law courts. By creating an unlimited duration community, having its own Institutions, personality, legal capacity, capacity for international representation, and more particularly, real powers stemming from a limitation of competition or a transfer of powers from the States to the Community, they have limited their sovereign rights and have thus created a regulatory body applicable to their national regulations and themselves, which takes precedence over national rights."*[84]

189.  Preferential treatment means, thus, that EU Law is applied to intra-community relations in preference to or prevailing over any other law, displacing any other national or international provision. The preference given to community law does not admit comparisons with other laws. It does not demand that it be proven that other laws are more or less favourable. Simply put, EU Law is given preference over any other dealing with regulating internal EU relations.

190.  The principle of primacy of EU law in Intra EU relations has an explicit recognition in the ECT, as stated in Article 25 that:

> *(1) The provisions of this Treaty shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement (hereinafter referred to as "EIA") to extend, by means of most favoured nation treatment, to another Contracting Party which is not a party to that EIA, any <u>preferential treatment applicable between the parties to that EIA</u> as a result of their being parties thereto.*

> *(2) For the purposes of paragraph (1), "EIA" means an agreement substantially liberalizing, inter alia, trade and investment, by providing for the absence or elimination of substantially all discrimination between or among parties thereto through the elimination of existing discriminatory measures and/or the prohibition of new or more discriminatory measures, either at the entry into force of that agreement or on the basis of a reasonable time frame."*[85] *(Emphasis added)*

191.  That Article 25 of the ECT refers to EU law is not questionable. In fact, the only Declaration contained in the ECT in relation to this Article is the one made by the European Communities and its Member States to say:

> *"(...) the application of Article 25 of the Energy Charter Treaty will allow only those derogations necessary to safeguard the preferential treatment resulting from the <u>wider process of economic integration resulting from the Treaties establishing the European Communities</u>".*[86] *(Emphasis added)*

192.  The Claimants in relation to Article 25 of the ECT merely state that "*is not intended to redefine the application of the ECT to intra-EU disputes, but simply to prevent the extension of benefits of EU membership to non-EU member States and their nationals: a*

---

[84] Ibid. on the interpretation of Article 102 of the EEC Treaty.
[85] The Energy Charter Treaty, article 25. RL-0020
[86] Ibid.

*routine provision in investment treaties"*.[87] But in any case, Article 25 expressly states that a *"preferential treatment"*[88], is applied to the parties of the Agreement for Economic Integration, that is, in the relations between states of the EU, the EU Law prevails over any other Law.

193.  In addition to enshrine the principle of primacy of EU law, the CJEU ruling of 15 July 1964, issued in the case *Costa v. ENEL* ruled on issues of EU law that are also transcendent for the resolution of these proceedings, which undoubtedly affects Community law. In this regard, it should be remembered that what the Claimant party is requesting from the Arbitral Tribunal is that it ensures that companies producing solar thermal energy in which it invested in Spain receive, throughout their respective useful life, a specific and unchanging amount of state aid, even if it could thereby distort competition in the Common Electricity Market. As we noted in our Jurisdiction Memorial[89], following the CJEU ruling on the ELCOGAS Case, there is no doubt that *"the amounts financed by all end users of electricity established in the country and distributed to companies in the power sector by a public body under predetermined legal criteria"* constitute state aid.[90]

194.  Well, the judgment by the CJEU in the *Costa v. ENEL* Case has already warned that the European Commission had to be informed promptly of any plans to grant or alter aid[91]. In this case, the aid received by companies producing renewable energy, although initially allowed by the EU, should be granted by the States taking into account the Guidelines on State aid for environmental protection and energy 2014-2020, approved by European Commission Communication 2014/C 200/01, as well as those repealed by these (European Commission Communication 2008/C 82/01).[92] The purpose of these subsidies is *to* ensure that renewable energy producers are placed in a *level playing field.* Granting these producers aid which distorts competition on the market in their favour would therefore be contrary to EU law. Any decision that is made in relation to the right of the Claimants to receive that particular amount of aid will affect, as such, an essential pillar of the EU: the right of competition.

195.  Renewable energy companies in Spain have invoked the EU Law and not the ECT to protect their interests in light of the regulatory measures adopted by the Government of Spain. The claims made the Spanish Wind Association (hereinafter the "AEE") should be highlighted in this regard, which were filed during the processing of RD 1614/2010,

---

[87] Counter-Memorial on Jurisdiction, 8 August 2016, paragraph 27.
[88] Definition of the word preferential in the Dictionary of the Spanish Royal Academy (RAE). R-0250.
[89] Memorial on Jurisdiction, 9 September 2015, paragraphs 79 to 82.
[90] Order of the Court of Justice of the European Union laid down regarding the preliminary ruling C-275/13, ELCOGAS, on 22 October 2014. (English version). R-0013.
[91] CJEU Judgment of 15 July 1964, in case 6/64, *Flaiminio Costa v. ENEL*, interpretation of Article 93 of the ECT. R-0249.
[92] Guidelines on State Aid for environmental protection and energy 2014-2020, approved by European Commission Communication 2014/C 200/01 (R-0048) and Guidelines on State Aid for environmental protection and energy approved by European Commission Communication 2008/C 82/01. R-0047.

before the proposal to introduce a provision in the Regulation that would restrict the *"changes of ownership and the right transmission (Eighth additional provision)."[93]*

196. The AEE considered that proposal unacceptable for being contrary to Directive 2009/28/EC and because:

> *"(...) Restricts the free circulation of capital expressed in Article 63 (previously, Article 56) of the current Treaty on the Functioning of the European Union (TFEU). (...) The Court of Justice of the European Union has stated <u>that movements of capital protects 'direct' investments in particular, namely investments in the form of participation in a company through the ownership of shares which confers the possibility to participate effectively in its management and control, as well as 'portfolio' investments,</u> namely investments in the form of acquisition of shares on the capital market solely with the intention of making a financial investment without any intention to influence the management and control of the company (see Case Commission/Netherlands, cited above, paragraph 19 and the case laws cited therein)."[94] (Emphasis added).*

197. This dispute therefore affects essential elements of EU law (state aid and competition law, free movement of capital and freedom of establishment), which affect the basic pillars of the EU, which prevents the Arbitral Tribunal ruling on it, as this power is reserved to the EU's own judicial system presided over by the CJEU. The latter emphasized this in its Opinion 1/91.[95] In this sense, the argument of the Claimants regarding the existence of judicial instances other than the judicial system of the EU which rule on a daily basis on EU Law, is invalid. These judicial instances are accepted by the CJEU insofar as they do not rule on the essential pillars of EU Law. Furthermore, as the European Commission highlights in its Amicus Curiae submission, commercial arbitration is a private law mechanism which cannot be, in any way, compared to the international investment arbitration which confronts the sovereign State with the private investor.[96]

198. In short, under the principle of primacy, it is the right of the EU and not the ECT which must be applied to resolve this dispute. The Claimants, allegedly of Dutch origin, whose national treatment regarding state aid is not guaranteed by the ECT, do have the full protection of EU law both at the time of the investment and in its subsequent management. The fact is that the Claimants have carried out their entire investment under the norms of EU Law and protected by them, and they have only had recourse to the ECT and international arbitration because they are aware that the claim they have brought here would be rejected by the EU courts of justice.[97]

**(3)    Regarding the Claimants' observations on the relevance of previous awards and other legal precedents**

---

[93] Submissions from the AEE concerning the proposal of RD 1614/2010. R-0251.
[94] Ibid.
[95] Opinion 1/91 on 14 December 1991 issued by the Court of Justice of the European Union regarding the "Agreement to Create a European Economic Area" (EEA) (original version in Spanish).  R-0011
[96] Submision of the European Commission dated 5 September 2016, paragraphs 114 to 117.
[97] Opinion 1/91 on 14 December 1991 issued by the Court of Justice of the European Union regarding the "Agreement to Create a European Economic Area" (EEA) (original version in Spanish).  R-0011

199.   Although what was indicated above would suffice to justify the lack of jurisdiction of the Arbitral Tribunal to hear this dispute, the arguments raised by the Claimants both in their Observations on the Request for Bifurcation and their Counter-Memorial on Jurisdiction shall be referred to.

200.   The Claimants insist on the fact that all the Arbitral Tribunals that have ruled on the so-called intra-community objection have rejected it. However, with the exception of the awards relating to Spain, the other awards do not resolve issues which fully coincide with the present case for the following reasons: a) they either refer to Bilateral Investment Treaties which have nothing to do with a multilateral and mixed treaty promoted and signed by the EU; b) or because when referring to the ECT, they regulate the maintenance of the obligations assumed by states that were not yet members of the EU when they signed the ECT. Regarding the awards in the cases relating to Spain and their obligations under the ECT, with all due respect, these awards omit an appropriate analysis of the principle of primacy specifically invoked in this arbitration.

201.   Hence, the *Eureko v. Slovakia* award, on which the Claimants base several of their arguments[98], expressly recognises the impossibility of extrapolating its conclusions to Treaties like the ECT and to intra-community disputes after the Treaty of Lisbon of 2007 went into effect:

> *"This award is thus necessarily confined to the specific circumstances of the present case; and the Tribunal does not here intend to decide any general principles for other cases, however ostensibly analogous to this case the might be. For example, this case arises from a BIT concluded in 1991 before the CSFR Association Agreement, the Association Agreement and the Accession Treaty; it does not arise from a multi-lateral treaty or a treaty to which the EU is a party or signatory; and, moreover, these arbitration proceedings were instituted in 2008 before the Lisbon Treaty came into force, amending the EU Treaty and the EC Treaty (now the TFEU)."[99]*

202.   But also, there is a new item on this matter which require the Arbitral Tribunal 's attention. The Federal Supreme Court of Germany has raised Preliminary Ruling to the CJEU regarding compatibility with EU law of intra-EU arbitrations.[100]

203.   In regards to the Jurisdiction Award of *Electrabel v. Hungary*, it should be emphasized that Hungry signed the ECT when it had not yet joined the EU. Therefore, Hungary, unlike Spain and the Netherlands, was able to contract obligations under Part III of the ECT.

---

[98] Observations on the Request for Arbitration, paragraphs 30, 32, 34 and 35.
[99] *Achmea B.V. (formerly Eureko B. V.) versus the Slovak Republic, PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010 ("Eureko v. the Slovak Republic"),* paragraph 218. CL-73
[100] Preliminary Ruling C-284/16 (Achmea Case) son the compatibility between the BIT signed in 1991 by the Netherlands and Slovakia (EC-13)

204.  At any case, if we apply, in theory, to the current case the arguments that both the awards referring to BITS and the *Electrabel* award have applied, we would come to the undoubted conclusion that EU Law is the one that must be applied.[101]

205.  The objective of the ECT is indicated in Article 2 thereof:

> *"This Treaty establishes a legal framework in order to promote long-term co-operation in the energy field, based on the complementarities and mutual benefits, in accordance with the objectives and principles of the Charter."[102]*

206.  Therefore, the objectives of the ECT should be integrated with the objectives of the European Energy Charter by imperative of Article 2 of the ECT. The European Energy Charter Treaty states its objective in Article 2 as follows:

> *"Resolved to promote a new model for energy co-operation in the long term in Europe and globally within the framework of a <u>market economy</u> <u>and based on mutual assistance and the principle of non-discrimination.</u>" "<u>persuaded that broader energy co-operation among signatories is essential for economic progress and more generally for social development and better quality of life.</u>" "Within the framework of State sovereignty and sovereign rights over energy resources and in a spirit of political and economic co-operation, they undertake <u>to promote the development of an efficient energy market throughout Europe, and a better functioning global market, in both cases based on the principle of non-discrimination and on market-oriented price formation, taking due account of environmental concerns.</u> They are determined to create a climate favourable to the operation of enterprises and to the flow of investments and technologies by implementing market principles in the field of energy."[103](Emphasis added)*

207.  Furthermore, the objectives of the Treaties constituting the European Communities are established in Article 2 of each one of those Treaties. So, Article 2 of the Treaty of Paris of 1951 established that the objective of the European Coal and Steel Community (ECSC) was:

> *"to contribute, through the common market for coal and steel, to economic expansion, growth of employment and a rising standard of living."[104]*

208.  And Article 2 of the Treaty of Rome of 1957 established the following with regard to the objective of the European Economic Community:

> *"The Community shall have as its task, by establishing a common market and progressively approximating the economic policies of Member States, to promote throughout the Community a harmonious development of economic activities, a continuous and balanced expansion, an increase in stability, an accelerated raising of the standard of living and closer relations between the States belonging to it."[105]*

---

[101] The European Commission reaches this same conclusion in its submission dated 5 September 2016, paragraphs 137 to 145.
[102] ECT, Article 2. RL-0020
[103] European Energy Charter, Article 2. RL-0020
[104] ECSC Treaty, Paris 1951. RL-0099.
[105] EEC Treaty, Rome 1957. RL-0100.

209.    The Treaties constituting the European Communities were signed 43 years (in the case of the Treating Constituting the European Coal and Steel Community, which is an energy agreement) and 37 years (in the case of the Treaties Constituting the European Economic Community and EURATOM) before the ECT (1994). These Treaties had the aim of creating, within their respective scopes, a common market based on the principles of non-discrimination and market-oriented price formation.

210.    That is, the Treaties establishing the European Communities not only shared but exceeded the objectives of the ECT, which does not guarantee non-discrimination in the so called *"making investment process"* nor on public aid to foreign investment[106]. Both in the former and in the latter, the aim, by means of the creation of that common market, is to improve the quality of life of the citizens of the States that are parties to those Treaties.

211.    The signatories to the European Energy Charter were perfectly aware that the European Communities were in a process of integration which was much more advanced than the one that the ECT sought to promote. That is why they expressly stated that in order to achieve that objective "*they relied on the support of the European Communities by means of the creation of their internal market.*"[107]

212.    Actually, the doctrine does not hesitate to recognise that the ECT was promoted by the European Communities themselves as a step toward including the former Soviet socialist republics into the EU. In this regard, Wälde states:

> *"The ECT is largely a product of EU external, political, economic and energy policy. It is meant to integrate the formerly Communist countries, provides an ante-chamber and preparation area for EU accession for many of them".[108]*

213.    As seen before, that process of superior economic integration is recognised in the text itself of the ECT: in Article 25 and in the Declaration that the European Communities and their Member States included in relation to that precept in the ECT. That economic integration process had been being perfected until reaching the current statute of the European Union and the signing of the Treaty of Lisbon in 2007.

214.    In short, if we carry out an exercise of comparing the aim and purpose of the ECT with the aim and purpose of the EU Treaties, and even more so as of the Treaty of Lisbon, we will reach the conclusion that, by virtue of Articles 30 and 59 of the CVDT, the EU Treaties should prevail. The foregoing conclusion is a result of an exercise that this party proposes for merely dialectical purposes and to counter the Claimants' allegations. The Claimants are the ones invoking the awards concerning BITs and the *Electrabel* case to support their theory, and not Spain. It has been shown that the application of the reasoning in the aforementioned awards to this case would lead to sustain the prevalence of EU law over the ECT, something unquestionable, especially after the signing of the Treaty of Lisbon in 2007, which even expressly gathers competence in favour of the EU

---

[106] The Energy Charter Treaty, article 10 (2), (3), (4) and (8). RL-0020
[107] European Energy Charter, 1991. RL-0020
[108] *"T W Wälde, "Investment Arbitration Under the Energy Charter Treaty: From Dispute Settlement to Treaty Implementation" (1996)* 12 Transnational Dispute Management 4. RL-0050

over foreign investment. In view of this last treaty, it is unquestionable that by virtue of the *lex porterior* principle enshrined in Article 59 of the VCLT, EU Law shall prevail over the ECT, as the Tribunal in the Eureko case sensed.

215.   On the othter hand, the argument contained in some awards regarding BITs, stating that the rights that the Treaty in question gives Intra-EU investors are different or superior to those granted to them by EU Law, is not applicable to this case either. To this effect, let us recall, with Wälde and Bamberger, what protection the ECT gives investors in comparison with EU Law:

> *"EC law and legislative and policy debate have certainly influenced the overall Energy Charter process, and several provisions specifically, but the important EC rules on transparent and non-discriminatory free and open access to foreign investors have found only a relatively weak echo in the Treaty".[109]*

> *"the ECT in effect imports –directly or at least or in addition by an indirect interpretative effect- the law of the EU- as it relates to investor treatment. [...] Such an import –directly by Article 10 (1) –most favoured treaty treatment – or indirectly –by interpretative guidance and by specification of what the standards of "fair and equitable", "no unreasonable impairment" and "constant protection and security" mean, is arguably also mandated for the "unwritten rules and principles" developed by the CJEU for European law: legal certainty, protection of investment-backed legitimate expectation, proportionality and least-restrictiveness"[110]*

> *"To anyone with a competition or energy law background, it is clear that we are now very close to the competition rules under primary EU law (Art.82, 86), the EU energy directives, the guidelines on third-party access by the Madrid and Florence EU regulators forums and national implementing law. The discrimination obligation on States obliges them to enact and apply what in effect is the competition law of the EU. It is therefore natural –but not yet tested- that one would look for precedent not only, and perhaps even less, to the WTO national treatment practice, as rather in the practice of the ECJ and the EU Commission on third-party access and of abuse of a dominant position"[111]*

216.   Therefore, it is impossible to uphold the fact that the rights that the ECT grants investors in Article 10 (1) are in addition to those that EU Law grants them.

217.   Really, the only recourse that the Claimant party has is to claim, by invoking the awards relating to BITs, that the ECT offers the investor a right that EU Law does not grant them, which is the possibility to resort to arbitration to defend their rights. However, firstly they forget that Article 26 of the ECT also foresees national courts as suitable procedural mean (on an equal footing to arbitration) for resolving disputes concerning Part III of the ECT. Secondly, the Claimants consider a priori that, when compared to the EU judicial system, arbitration is better. The Claimants not only do not

---

[109] T. W. Wälde, The Energy Charter Treaty, an East-West Gateway for Investment and Trade, pag.259. RL-0046

[110] T. W. Wälde, "Investment Arbitration Under the Energy Charter Treaty: From Dispute Settlement to Treaty Implementation" (1996) 12 Transnational Dispute Management 4, page 259. RL- 0050

[111] T. W. Wälde, "Arbitration in the Oil, Gas and Energy Field: Emerging Energy Charter Treaty Practice" (2004) 1 Transnational Dispute Management 2. RL-0056.

prove this contrary conclusion to the literal text of the ECT but, moreover, this statement is based on an objective lack of confidence in the EU judicial system, incompatible with EU Law.

218.  Perhaps the Claimants uphold this idea because in Spain, both the Supreme Court and the Constitutional Court have, in multiple judgements, rejected claims similar to that which the Claimants are raising in this arbitration. However, it should be taken into consideration that every Arbitral Tribunal of those which have ruled on the expectations that a renewable energy producer could have under RD 661/2007, has also rejected the claimant party's claim.

219.  The Claimants advocate the inapplicability of Article 344 of the TFEU to this case.[112] Yet again, the Claimants do not understand the meaning of our objection. The issue submitted to this Tribunal affects the essential pillars of EU Law and Spain cannot be submitted to any other system than the EU judicial system in relation to this matter. This is what the European Commission clearly reasoned in its Amicus Curiae submission.[113]

220.  Finally, with regard to the awards of *PV Investors v. Spain, Charanne v. Spain* and *RREEF v. Spain*,[114] they fail to consider the principle of primacy of EU law in Intra-EU relations. That principle is precisely invoked by this party as an essential element of its objection, so we request the Arbitral Tribunal an express ruling on its validity and application in this case. In this regard, the Respondent recalls that the award of the Electrabel Case clearly stated that:

> *"if the ECT and EU law remained incompatible notwithstanding all efforts at harmonisation, that EU law would prevail over the ECT's substantive protections and that the ECT could not apply inconsistently with EU law to such a national's claim against an EU Member State"[115]*

221.  Even when the Award of the Electrabel Case did not see any type of inconsistency between the ECT and EU Law, the Respondent understands that such inconsistency arises if it is interpreted that the consent of the signatory states, which were members of the EU, stated in Article 26 of the ECT, is also extended to Intra-EU disputes. This impairment to EU Law is more serious when it comes to arbitrations under the ICSID system, where there is no possibility that, by appealing against the award rendered by the Tribunal, the CJEU could rule on matters within its strict powers. This is what the European Commission also understood in its intervention as Amicus Curiae.[116]

---

[112] Ibid. paragraph 533 to 536.
[113] Submisiono of the European Commission dated 5 September 2016, paragraphs 111 to 126.
[114] *Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain* (SCC v. 062/2012), Final Award, 21 January 2016, and dissenting vote, para. RL-0088 (Spanish).
[115] Electrabel S.A v. Hungary, ICSID Case no. ARB/07/19, Decision on jurisdiction, applicable Law and liability, of 30 November 2012 (original version in English) Paragraph 4178 to 4189. RL-0001.
[116] Submisiono of the European Commission dated 5 September 2016, paragraphs 107 to 129.

**(4)      Regarding comments made by the Claimants on the ordinary sense of the ECT**

222.   The Claimants, in their Jurisdiction Counter-memorial allege that the articles of the ECT invoked by the Kingdom of Spain to support this objection to the jurisdiction of the Arbitral Tribunal in any way impede the arbitration mechanism for resolving Intra EU disputes. To do this, they are carrying out a literal and completely out of context interpretation of each of the provisions invoked by the Respondent (Articles 26, 1(2), 1(3), 1(10), 16, 36 (7) and 26(6) of the ECT) which under no circumstances can be admitted.

223.   As a starting point, it would be appropriate to begin by recalling that, as stated by the *Poštová Banka, A.S. and Istrokapital SE v Hellenic Republic award* (ICSID Case No. ARB/13/8) of 9 April 2015, the interpretation of the Treaty must conform to the *"principle of effectiveness"*. In this sense, it notes that:

> *"Interpretation of a treaty in good faith, considering not only the text but also the context, requires that the interpreter provide some meaning to the examples and to the content of such examples as part of the context of the treaty. <u>The interpretation in good faith, be it considered alone or in conjunction with the object and purpose of the treaty, embodies the principle of effectiveness</u> (ut res magis valeat quem pererat). Preference should be given to an interpretation that provides meaning to all the terms of the treaty as opposed to one that does not. As indicated by the Appellate Body of the WTO:*

> *"We have also recognized, on several occasions, the principle of effectiveness in the interpretation of treaties (ut res magis valeat quem pererat) which requires that a treaty interpreter: '...must give meaning and effect to all the terms of the treaty. An interpreter is not free to adopt a reading that would result in reducing whole clauses or paragraphs of a treaty to redundancy or inutility'. <u>In light of the interpretative principle of effectiveness, it is the duty of any treaty interpreter to 'read all applicable provisions of a treaty in a way that gives meaning to all of them, harmoniously'. An important corollary of this principle is that a treaty should be interpreted as a whole, and, in particular, its sections and parts should be read as a whole."[117]</u>* (emphasis added) (footnotes omitted).*

224.   An effective interpretation of the ECT articles invoked by the Respondent, provides evidence about how the ECT itself is aware of the EU law role and its primacy in Intra-EU relations, excluding arbitration as a mechanism for dispute resolution.

225.   In the first place, Article 26 introduces a model of consent to restricted arbitration. It should be remembered that the ECT has 50 articles. However, the conflict resolution mechanisms that are introduced by Article 26 of the ECT only refer to disputes regarding alleged breaches of obligations derived from Part III of the Treaty regarding investor and investment protection. It does not apply to other parts of the Treaty. If, as Spain maintains, the member States of the EU could not obligate themselves under Part III of the ECT, it is clear that, consequently, the dispute resolution mechanisms laid down in the cited precept does not apply to intra-community disputes.

---

[117] *Poštová Banka, A.S. and Istrokapital SE v Hellenic Republic* (ICSID Case No. ARB/13/8) Award of 9 April 2015. RL-0090.

226.   Neither Spain nor the Netherlands could obligate themselves under Part III of the ECT when they signed it because they no longer had the competence to do so. In fact, neither Spain nor the Netherlands could incur obligations regarding the treatment they would give to each other's investors and investments because that power had been given by both countries to the European Communities, as we have seen when analysing the judgment of the CJEU case *Costa v. ENEL*. And the best example of this is that not a single BIT can be cited that was signed by EU members after their entry into the European Communities. They could not be bound under the ECT Treaty concerning investors and investments because it would have meant to consider that a Dutch investor in Spain is a "foreign investor". And in the EU, the only foreign investors are those that come from countries that are not Member States of the EU. This reality is shared by the European Commission in the detailed analysis it carries out in its Amicus Curiae submission.[118]

227.   Besides, this reality is included in the ECT itself. Thus, the ECT defines the Contracting Party in Article 1(2) as *"a state or Regional Economic Integration Organisation which has consented to be bound by this Treaty and for which the Treaty is in force"*. That is to say, the Contracting Parties have to have agreed to be bound with the each other and neither Spain nor the Netherlands could be bound with the each other under Part III of the ECT.

228.   Moreover, Article 1(3) of the ECT defines Regional Economic Integration Organisation (ORIE) as an "*organisation constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters.*"

229.   That is, the ECT expressly recognises that there are matters governed by the ECT that should be negotiated by the EU because its Member States do not have the competence over them. That competence had been given to the then-European Community, the sole ORIE that has signed the ECT.

230.   And this idea is reaffirmed in Article 36(7) of the ECT, where it regulates voting rights and stipulates that:

> *"A Regional Economic Integration Organisation shall, when voting, have a number of votes equal to the number of its member states which are Contracting Parties to this Treaty; provided that such an Organisation shall not exercise its right to vote if its member states exercise theirs, and vice versa."*

231.   That is to say, the EU and its Member States may not vote simultaneously. Each one will vote within the scope of their respective competences. This means that in some areas covered by the ECT the Contracting Party is the EU and in others its member states.

---

[118] Submission of the European Commission dated 5 September 2016, paragraphs 14 to 45 and 59 to 96.

232.  The decision of who is the Competent Contracting Party in each subject is not for the Arbitral Tribunal to decide but the CJEU, as shown in its Opinion 1/91.[119]

233.  In the second place, Article 26 of the ECT does not stipulate arbitration as the only dispute resolution mechanism but rather also introduces other mechanisms. It provides for the possibility of having recourse to international conciliation or to the ordinary or administrative Tribunals of the Contracting Party involved in the dispute.

234.  In the third place, and in relation to the foregoing, Article 26 of the ECT, when it cites these dispute resolution mechanisms, does not establish an order of preference. It does not tell us which is better or worse. It does not say that arbitration is "more favourable for the investor or investment" than the other mechanisms it cites, which include the investor's guarantee of being able to have recourse to the domestic tribunals of the State hosting their investment.

235.  Moreover, Article 26(6) of the ECT makes it obligatory to resolve disputes in line with the ECT and other principles and rules of International Law. The Claimants have never denied (they could not do so) that EU Law is international law. It is hardly debatable, then, that the tribunals must apply EU Law and the ECT under equal conditions. What happens is that any hypothetical conflict of those international rules is resolved in Article 25 of the ECT when it recognises the principle of primacy of EU law in Intra-EU relations and prevents that, under the most favoured nation clause, said right, is to be extended to nationals of ECT signatory states that are not members of the EU. Thus, Article 25 also recognises that the process of economic integration of the EU is more advanced than the ECT and, ultimately, more favourable for the investor.

236.  Ultimately, an effective interpretation of ECT leads to sustain the inapplicability of arbitration as a mechanism for Intra EU dispute resolution: a) because EU member states could not be linked to each other under Part III of the ECT[120] and b) because the ECT itself recognises in Article 25 the principle of primacy of EU law.

**(5)       With regard to "The ECT does not include a disconnection clause, nor is the interpretation of an implied disconnection clause reconcilable with the ordinary meaning of the ECT"**

---

[119] Opinion 1/91 on 14 December 1991 issued by the Court of Justice of the European Union regarding the "Agreement to Create a European Economic Area" (EEA): "*when a dispute relating to the interpretation or application of one or more provisions of the agreement is brought before it, the EEA Court may be called upon to interpret the expression 'Contracting Party', within the meaning of Article 2(c) of the agreement, in order to determine whether, for the purposes of the provision at issue, the expression 'Contracting Party' means the Community, the Community and the Member States, or simply the Member States. Consequently, the EEA Court will have to rule on the respective competences of the Community and the Member States as regards the matters governed by the provisions of the agreement.*
*[] It follows that the jurisdiction conferred on the EEA Court under Article 2(c), Article 96(1) (a) and Article 117(1) of the agreement is likely adversely to affect the allocation of responsibilities defined in the Treaties and, hence, the autonomy of the Community legal order, respect for which must be assured by the Court of Justice pursuant to Article 164 of the EEC Treaty*".  R-0011
[120] Therefore, our attention is drawn to the explanation in the submission from the Commission dated 5 September 2016 regarding the origins of the ECT and how it was negotiated in its entirety by the European Communities and their Member States, paragraphs 34 to 45.

237.   Finally, on this issue we shall simply clarify that the Respondent does not hold to the existence of an express or implied disconnection clause.

238.   We simply recall the words of the Commission:

> "The Commission questions the need for a clause intended to regulate the relationship between regulations laid-down by a Community regime and an international agreement intended to extend that regime to non-member countries, which should not affect ipso facto the existing Community Law. In its view, given that the agreement envisaged covers areas for which a complete harmonisation has been carried out, the existence of a disconnection clause is entirely without relevance."[121]

239.   The very arguments that the Commission has included in its Amicus Curie statement must be added to the foregoing as a more authoritative voice to interpret how and why the European Union has introduced and introduces disconnection clauses in International Treaties.[122]

**(6)    Conclusion**

240.   In view of the above, with all due respect, we reiterate our request that the Arbitral Tribunal declares a lack of jurisdiction to hear this intra-EU dispute raised by investors from the Netherlands against the Kingdom of Spain. The Netherlands and Spain were EU member States when the ECT went into effect. Hence, the Claimants fail to comply with the requirement foreseen in Article 26(1) of the ECT establishing that to access arbitration the dispute must be between a Contracting Party and investors from different Contracting Parties.

**D.    Lack of jurisdiction of the Arbitral Tribunal to hear an alleged breach by the Kingdom of Spain of obligations derived from section (1) of Article 10 of the ECT through the introduction of the TVPEE by Act 15/2012: absence of consent from the Kingdom of Spain to submit this issue to arbitration given that, pursuant to Article 21 of the ECT, section (1) of Article 10 of the ECT does not generate obligations regarding taxation measures of the Contracting Parties**

**(1)    Introduction**

241.   In their Statement of Claim[123], the Claimants contended that the Kingdom of Spain has allegedly breached obligations derived from section (1) of Article 10 of the ECT through the introduction of the Tax on the value of the production of electrical energy (TVPEE)

---

[121] Opinion 1/03 of the Court of Justice of the European Union (Full Court) of 7 February 2006 on "Community competence to conclude the new Lugano Convention on jurisdiction and the recognition and enforcement of judgements in civil and commercial matters", paragraphs 83 and 84. R- 0252.
[122] Submission of the European Commission dated 5 September 2016, paragraphs 46 to 51.
[123] Statement of Claim, of 22 May 2015, paras 11, 181 to 183, 276 to 279 and 314(2).

by Act 15/2012, of 27 December 2012, on tax measures for energy sustainability ("Act 15/2012").[124]

242.   In the Memorial on Preliminary Objections[125], the Kingdom of Spain states that, with all due respect, the Arbitral Tribunal lacks jurisdiction to hear this dispute. This is because section (1) of Article 10 of the ECT does not apply to taxation measures of the Contracting Parties in accordance with Article 21 of the ECT. Therefore, the Kingdom of Spain has not provided its consent to submitting this dispute to arbitration.

243.   Specifically, the main arguments made by the Kingdom of Spain in this regard in the aforementioned Memorial were, in short, the following:

-   In accordance with Article 26 of the ECT, the Kingdom of Spain has only provided its consent to submit to arbitration disputes related to alleged breaches of obligations derived from Part III of the ECT.[126]

-   In accordance with Article 21 of the ECT, section (1) of Article 10 of the ECT, invoked by the Claimants, although located in Part III of the ECT, does not generate obligations regarding taxation measures of the Contracting Parties.

In this regard, under Article 21 of the ECT on taxation, taxation measures are excluded from the scope of application the ECT (*"taxation carve-out")* with certain exceptions (*"claw-backs")* stated in the aforementioned Article 21. Article 10 (1) of the ECT is not found among those exceptions.[127]

---

[124] Please note that the Claimants indicated the following in paragraph 107 of their Observations on the Request for Arbitration, dated 2 October 2015 that: "The Claimants also note that their claim for damages does not include any damages arising out of the "green-cent" tax introduced by Art. 28 of Act 15/2012". Consequently, the Kingdom of Spain understands that the Claimants consider that the modification of the "green-cent" tax operated by Article 28 of Act 15/2012 does not form part of the disputed measures, and thus, the Claimants do not claim that this tax measure entails a breach of the ECT and do not include it in their claim for damages. In the event that the Claimants stated that this understanding is not correct, the Kingdom of Spain reserves the right to formulate the appropriate allegations.

[125] Memorial on Preliminary Objections and Request for Bifurcation, of 9 September 2015, section III.D, paragraphs 171 to 209.

[126] ECT, Article 26:

*"Article 26. Settlement of disputes between an investor and a Contracting Party.*

*1. Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former,* <u>*which concern an alleged breach of an* **obligation of the former under Part III**</u> *shall, if possible, be settled amicably.*

*2. If such disputes cannot be settled in accordance with the provisions of section 1 within three months from the date on which either party to the dispute requested an amicable settlement, the investor concerned may choose to submit a dispute for settlement:*

*[…] or*

*c) In accordance with the following sections of this Article.* [referred to international conciliation or arbitration] *[...]."* (emphasis added) RL-0020

[127] ECT, Article 21:

*"Article 21. Taxation.*

*1.* <u>*Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties.*</u> *In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.*

- The provisions relating to the TVPEE of Act 15/2012 are a taxation measure for the purposes of the ECT. Under Article 21(7) of the ECT, for the purposes of the aforementioned Article 21, the term "taxation measure" includes any provision relating to taxes of the domestic law of the Contracting Party. In this case, the matter concerns provisions regarding a tax -TVPEE- of the domestic law of the Kingdom of Spain -Act 15/2012-.

244.  In their Counter-Memorial on Preliminary Objections[128], the Claimants acknowledge that Article 21 of the ECT, on taxation, affects the scope of the obligations undertaken by the Kingdom of Spain under Part III of the ECT[129]. Consequently, they acknowledge that Article 21 affects the scope of the consent from the Kingdom of Spain to resort to arbitration under Article 26 of the ECT, which only permits resorting to arbitration to resolve disputes regarding alleged breaches of obligations pertaining to Part III of the ECT. Furthermore, the Claimants acknowledge that said Article 21 does not include taxation measures in the scope of application of Article 10(1) of the ECT[130].

245.  In their Counter-Memorial on Jurisdiction[131], the Claimants try to avoid the *taxation carve-out* laid-down by Article 21 of the ECT with respect to section (1) of Article 10 of the ECT, reiterating that the TVPEE is allegedly not a taxation measure for the purposes of the ECT. To do so, the Claimants insist on trying to argue that the TVPEE is allegedly not a *bona fide* taxation measure.

246.  In view of the foregoing, the fundamental issue is, therefore, to determine whether the provisions relating to the TVPEE of Act 15/2012 are a taxation measure for the purposes of the ECT, because if they are, they are excluded from the scope of application of section (1) of Article 10 of the ECT invoked by the Claimants.

247.  As the Kingdom of Spain has already stated in its Memorial on Preliminary Objections and as we will develop further below, the provisions relating to the TVPEE of Act 15/2012 are, in any case, a taxation measure for the purposes of the ECT.

**(2)    The provisions relating to the TVPEE of Act 15/2012 are a taxation measure for the purposes of Article 21 of the ECT**

**(2.1)  Pursuant to Article 21(7) of the ECT, the term taxation measure includes any provision relating to taxes of the domestic Act of the Contracting Party**

---

*2. Article 7(3) shall apply to Taxation Measures other than those on income or on capital, except that such provision shall not apply to: [...]*
*3. Article 10 (2) and (7) shall apply to Taxation Measures of the Contracting Parties other than those on income or on capital, except that such provisions shall not apply to:[...]*
*4. Article 29(2) to (6) shall apply to Taxation Measures other than those on income or on capital.*
*5. a) Article 13 shall apply to taxes. [...]"* (Emphasis added). RL-0020
[128] Counter-Memorial on Preliminary Objections, 8 August 2016, Part IV, paragraphs 83 to 91.
[129] Counter-Memorial on Preliminary objections, 8 August 2016, paragraph 83: "Art. 21 goes to the scope of Spain's obligations assumed under Part III of the ECT."
[130] Statement of Claim, of 22 May 2015, paragraph 278: "The Claimants acknowledge that Article 21 of the ECT does not directly include "Taxation Measures" within the scope of Article 10(1) of the ECT."
[131] Counter-Memorial on Preliminary objections, 8 August 2016, paragraphs 83 to 91.

248.  As the Kingdom of Spain has already stated in its Memorial on Preliminary Objections, Article 21 itself of the ECT, on taxation, makes reference to what should be understood as a "taxation measure" for the purposes of said Article 21. In this regard, section (7)(a)(i) of Article 21 of the ECT provides that the term "taxation measure" includes any provisions relating to taxes of the domestic law of the Contracting Party:

> *"7. For the purposes of this Article:*
>
> *a) The term "taxation measure" includes:*
>
> *i) Any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and;*
>
> *ii) any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound."[132] (emphasis added)*

249.  In view of the aforementioned Article 21(7)(a)(i) of the ECT, the following question must be made: what is the applicable law to determine whether we are dealing with provisions relating to taxes? Given this question, there are two possible interpretations: to understand that the applicable Law to determine whether we are dealing with provisions relating to taxes should be the domestic Law of the Contracting Party or to understand that it should be International Law.

250.  Regarding the first interpretation, there are several reasons to believe that the law governing the determination of whether certain provisions are provisions relating to taxes should be the domestic law of the Contracting Party.

251.  The first reason is the wording of Article 21(7)(a)(i) of the ECT itself. From the ordinary meaning of its terms it is clear that the Article contains a reference to the domestic law of the Contracting Party for the purpose of determining when we are dealing with provisions relating to taxes:

> *"i) The tax provisions of the national law of the Contracting Party, [...]"[133] (emphasis added)*

252.  The arbitration case law has acknowledged the possibility that in international investment treaties a particular term be defined by reference to the domestic law of a Contracting Party. In this sense, we can cite the Arbitral Tribunal of the case *Saipem v. Bangladesh,* which recognizes such a possibility, although it did not occur in that case:

> *"in the absence of any indication that the contracting states intended to refer to 'property' as a notion of Bangladeshi law, the Tribunal cannot depart from the*

---

[132] Article 21 (7)(a) of the ECT. RL-0020
[133] ECT, Article 21(7)(a). RL-0020

*general rule that treaties are to be interpreted by reference to international law."[134]*
*(emphasis added)*

253.  *The Oxford Handbook of International Investment Law* also recognises the possibility that international treaties can contain an explicit reference to national law:

> *"While treaty claims are obviously to be decided on the basis of international law, national law still has a role to play. [...] Some of the facts on the basis of which to resolve international claims have been produced by, and may only be assessed by applying, national law [...]. Examples of such 'preliminary' or 'incidental' questions governed by national law are whether an investment is valid, or a contract has been concluded [...]. Further examples may, depending on the exact claim, comprise such issues as [...] taxation, [...]. Also, a treaty may make express reference to national law."[135] (emphasis added) (footnotes omitted)*

254.  Another reason to interpret that Article 21(7)(a)(i) ECT refers to domestic law to determine whether we are dealing with provisions relating to taxes is the reference to domestic law contained in the agreement to avoid double taxation between Spain and the Netherlands, the country of the Claimants. Thus, that agreement to avoid double taxation provides in Article 3 that:

> *"2. For a State to implement this Agreement, any expression not defined in another way shall, unless the context requires a different interpretation, have the meaning that the law of that State gives it relating to the taxes which are subject to this Agreement."[136] (emphasis added)*

255.  It should be noted that the Agreement to avoid double taxation between Spain and the Netherlands is an international treaty between the Respondent and the State where the Claimants are established. Therefore, such an Agreement must be taken into account in accordance with Article 31(3)(c) of the Vienna Convention, which states with regard to the interpretation of international treaties that:

> *"3. Together with the context, the following shall be taken into account: [...] c) any relevant rules of international law applicable in relations between the parties."[137]*

256.  Finally, it should be borne in mind that in the context of international treaties on investment other than the ECT it may be necessary to resort to International Law to define the concept of taxation measure because the Treaties themselves do not include a provision such as that contained in Article 21(7)(a)(i) of the ECT. For example, Article 2103 of the NAFTA[138] also includes a general *taxation carve-out* (with certain

---

[134] *Saipem S.p.A. v. The People's Republic of Bangladesh,* ICSID Case No. ARB/05/07, Decision on Jurisdiction and Recommendation on Provisional Measures, of 21 March 2007, para. 82. RL-0034
[135] *The Oxford Handbook of International Investment Law,* Muchlinski, Ortino y Schreuer, Oxford University Press, pages 110, 111 and 112. RL-0106.
[136] Agreement between the Government of Spain and the Government of the Kingdom of the Netherlands to avoid double taxation with regards taxes on income and on capital, entered into in Madrid on 16 June 1971. Article 3 (2). R-0253.
[137] Vienna Convention. RL-0023
[138] NAFTA, Article 2103. https://www.nafta-sec-alena.org/Home/Legal-Texts/North-American-Free-Trade-Agreement. RL-0103.

exceptions) for taxation measures, but said Treaty does not refer to what is meant by taxation measure, as does the ECT.

257.   Moreover, a second interpretation of Article 21(7)(a)(i) of the ECT implies understanding that in order to consider that we are dealing with provisions relating to taxes, it is necessary to resort to International Law. This can be argued based on what is stated in Article 26(6) ECT, which provides that:

> *"A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of International Law."*[139]

258.   The Kingdom of Spain particularly shares the first interpretation of Article 21(7)(a)(i) of the ECT mentioned. However, to the extent relevant for this arbitration, either of the two interpretations of Article 21 (7)(a)(i) ECT indicated lead us to conclude that the TVPEE is a tax.

259.   As stated in the Memorial on Preliminary Objections and as we will further examine below, there is no doubt that the provisions relating to the TVPEE of Act 15/2012 are provisions relating to a tax of the domestic law of a Contracting Party given that: i) Act 15/2012 is part of the domestic law of the Kingdom of Spain, and ii) the provisions relating to the TVPEE contained in Act 15/2012 are provisions relating to a tax, both if we use the concept of tax under Spanish Law or the concept of tax under International Law.

260.   Therefore, there is no doubt that the provisions on the TVPEE of Act 15/2012 are a taxation measure for the purposes of the ECT.

**(2.2)    Act 15/2012 is part of the domestic law of the Kingdom of Spain**

261.   As already stated in the Memorial on Preliminary Objections[140], Act 15/2012 is a domestic law of the Kingdom of Spain. Act 15/2012 was passed by the Parliament of the Kingdom of Spain (comprised of the Congress of Deputies and the Senate) in accordance with the corresponding ordinary legislative procedure, regulated under Spanish Law[141]. Act 15/2012 was passed in exercise of the legislative authority and primary power to impose taxes through legislation that the Spanish Constitution grants the Spanish State[142].

---

[139] Article 26(6) of the ECT. RL-0020
[140] Memorial on Preliminary Objections and Request for Bifurcation, of 9 September 2015, paragraphs 202 to 205.
[141] The procedure of processing and approval of Act 15/2012 by the Spanish Congress of Deputies and the Senate is public and can be consulted in detail on the website of the Congress of Deputies and of the Senate. R-0026
[142] Spanish Constitution, Article 66:
"*1. The Parliament represents the Spanish people and shall consist of the Congress of Deputies and the Senate.*
*2. The Parliament exercises the legislative power of the State, [...].*". R-0027
Spanish Constitution, Article 133:
"*1. The primary power to raise taxes is vested exclusively in the State by means of law.*". R-0027

**(2.3)    The provisions relating to the TVPEE contained in Act 15/2012 are provisions relating to a tax**

262.    The provisions of Act 15/2012 relating to the TVPEE are provisions relating to taxes, given that the TVPEE is a tax both under the domestic Law of the Kingdom of Spain as well as under international Law.

**(a)    The TVPEE is a tax under the domestic law of the Kingdom of Spain**

263.    From the perspective of the domestic Law of the Kingdom of Spain, there is no doubt that the TVPEE is a tax. The Spanish Constitutional Court itself has ratified the taxation nature of the TVPEE and its conformity with the Spanish Constitution.

264.    In this respect, Act 15/2012 is clear about the taxation nature of the TVPEE. According to Act 15/2012, the TVPEE is a direct tax on the performance of the activities of production and incorporation into the electrical system of electrical energy in the Spanish electrical system. In this regard, Article 1 of Act 15/2012 provides the following:

> *"Article 1 Nature*
>
> <u>*The Tax on the value of the production of electrical energy is a tax of a direct*</u> *and real nature which is levied on the performing of activities of production and incorporation into the electricity system of electric energy, measured in busbars, through each one of the facilities indicated in article 4 of this Act."[143] (emphasis added)*

265.    The concept of taxations and its different types (taxes, fees and special contributions) under Spanish Law is set out in Article 2 of Act 58/2003, of 17 December, on General Taxation:

> *"Article 2 Concept, purposes and types of taxations*
>
> *1. Taxations are public incomes that consist of monetary contributions required by a public Administration as a consequence of the performance of an act to which the Act connects the duty to contribute, with the primary purpose of obtaining the necessary income to support public spending.*
>
> *As well as being a means to obtain the resources needed to support public spending, taxations may also serve as instruments of general economic policy and attend to the compliance with the principles and purposes contained in the Constitution.*
>
> *2. Taxations, whatever their denomination, are classified in fees, special contributions and taxes: [...]*
>
> *c) Taxes are taxations required without compensation, whose taxable event is made up of deals, acts or events that show the economic capacity of the taxpayer."[144]*

---

[143] Act 15/2012, Article 1. R-0024
[144] Act 58/2003, of 17 December, on General Taxation, Article 2. R-0028

266.   As already stated in the Memorial on Preliminary Objections[145], the TVPEE is a tax of general application, that is, it applies to the production of all generation facilities, both renewable and ordinary. The tax base of the TVPEE consists of the total amount that the taxpayer is to receive for the production of electrical energy and its incorporation into the electricity system, measured in power plant busbars, at each facility, in the taxable period. The applicable tax rate is 7%. The taxable period will generally coincide with the natural year and the TVPEE is accrued on the last day of the taxable period.

267.   The self-assessment and payment to the Public Treasury of the TVPEE is made through Form 583 "Tax on the value of the production of electrical energy. Self-assessment and instalment payments".[146] Said Form 583 was approved by Ministerial Order HAP/703/2013, of 29 April 2013, which also establishes the manner and procedure for its presentation.[147]

268.   It should also be noted that the Spanish National Court has declared that Ministerial Order HAP/703/2013 is in conformity with the Law.[148]

269.   The taxation nature of the TVPEE has also been recognised by organizations such as the Institute of Accounting and Auditing (ICAC)[149], which when analysing the accounting treatment of the TVPEE established in an enquiry in June 2013 that:

> *"The Tax on the value of the production of electrical energy is a tax of direct character and real nature [...] having to be recorded as an expense in the profit and loss account; account 631 Other Taxes may be used for such purpose"[150]*

270.   In addition, it must be borne in mind that, according to Spanish Law, the TVPEE is a deductible expense on the Corporations Tax of the TVPEE taxpayers.

271.   In this regard, as the aforementioned ICAC states, taxpayers must register the TVPEE as an expense in their accounts. That accounting expense corresponding to the TVPEE is

---

[145] Memorial on Preliminary Objections and Request for Bifurcation, of 9 September 2015, paragraph 175 a).

[146] Website of the State Tax Administration Agency where information is provided about Model 583 and where it can be submitted electronically. R-0254.

https://www.agenciatributaria.gob.es/AEAT.sede/procedimientoini/DR01.shtml

[147] Ministerial Order HAP/703/2013, of 29 April, which approves Form 583 "Tax on the value of the production of electrical energy. Self-assessment and Instalments Payments", and establishing the way and procedure for its submission. R-0255.

[148] The Spanish High Court has dismissed various contentious-administrative appeals brought against Ministerial Order HAP/703/2013, of 29 April 2013, and has declared that this Order corresponds to the Act. In this regard, the following Judgements of the High Court may be cited: i) Judgement of the High Court, of 2 June 2014, dismissing contentious-administrative appeal 297/2013 (R-0256), ii) Judgement of the High Court, of 2 June 2014, dismissing contentious-administrative appeal 298/2013 (R-0257), and iii) Judgement of the High Court, of 30 June 2014, dismissing contentious-administrative appeal 296/2013 (R-0258).

[149] The Institute of Accounting and Auditing (ICAC) is an Autonomous Body of the Spanish State Administration, affiliated with the Ministry of Economy and Competitiveness. Among its functions is the answer to the queries put to it regarding the application of the rules contained in the applicable regulatory framework on financial reporting and the regulations of the audit activity. R-0259.

[150] Consultation 1, no. BOICAC 94/June 2013. R-0260.

tax deductible on the Corporations Tax of those taxpayers. In this regard, Article 15 of Act 27/2014, of 27 November, on the Corporations Tax includes the expenses that are not considered tax deductible expenses. The expense corresponding to the TVPEE does not fit into any of the categories of non-deductible expenses and, therefore, it is deemed a tax deductible expense on the Corporations Tax.[151]

272.  This tax deductibility of the accounting expense of the TVPEE according to Spanish Law has been confirmed by the General Directorate of Taxation[152] of the Kingdom of Spain. Thus, in an answer of 23 December 2014 to a written tax consultation received, the General Directorate of Taxation stated:

> *"The taxpayer making the inquiry asks whether the amount self-assessed as "Tax on the value of the production of electrical energy" through the filing of Form 583 is regarded as a fiscally deductible expense, in electrical energy production activity (heading 151.4), both for the Corporations Tax taxpayer as well as when calculating the income from activity in direct estimation for taxpayers of the Personal Income Tax. [...] to the extent that the regulations on corporate income tax do not include any specific provision regarding the Tax on the value of the production of electrical energy, we shall focus on its accounting treatment, [...] In conclusion, the taxpayer of the Tax on the value of the production of electrical energy must register in its accounts an expense thereof, in the month of November each year, an expense that will be tax deductible in the tax accounting period. [...]"[153] (emphasis added)*

**(i)    The Spanish Constitutional Court has ratified the taxation nature of the TVPEE and its conformity with the Spanish Constitution**

273.  In addition, the Spanish Constitutional Court has ratified the taxation nature and the legality of the TVPEE.

274.  In this respect, the Spanish Constitutional Court, supreme interpreter of the Spanish Constitution[154], through a Judgment of 6 November 2014, dismissed unconstitutionality appeal No. 1780-2013 filed before it against the TVPEE, in particular against Articles 4, 5 and 8 of Act 15/2012, concerning the taxable event, the taxpayers and the tax rate of the TVPEE.

---

[151] Act 27/2014, of 27 November, on the Corporations Tax, Consolidated text, Article 15. R-0261.

[152] The General Directorate of Taxation is a body of the Ministry of Finance and Public Administration of the Kingdom of Spain which has among its functions the interpretation of tax regulations, among other methods, by answering written tax queries received. Webpage of the Ministry of Finance and Public Administration on structure and functions of the Directorate-General for Taxation. R-0262.

[153] General Directorate of Taxation's reply, of 23 December 2014, to the Tax Consultation in effect V3371-14. R-0263.

[154] Organic Act 2/1979, of 3 October, regarding the Constitutional Court:

*"First Article*

*1. The Constitutional Court, as supreme interpreter of the Constitution, is independent of the other constitutional bodies and is subject only to the Constitution and the present Organic Act.*

*2. Its order is unique and its jurisdiction reaches all national territory."* R-0030

275.  In said Judgment of 6 November 2014, the Spanish Constitutional Court has ruled that the aforementioned regulation of the TVPEE contained in Act 15/2012 is perfectly valid and in accordance with the Spanish Constitution.[155]

276.  Thus, there is no doubt that the TVPEE is a tax under Spanish Law.

277.  The relevance of all the pronouncements of Courts, organs and organisms mentioned above is indisputable. As stated by the *ad hoc* Committee in the decision on the application for the annulment of the award in the case *Hussein Nuaman Soufraki v. United Arab Emirates:*

> *"It is the view of the Committee that the Tribunal had to strive to apply the law as interpreted by the State's highest court, and in harmony with its interpretative (that is, its executive and administrative) authorities."[156]*

**(b)    The TVPEE is a tax under International Law**

278.  In addition, there is no doubt that the TVPEE is a tax from the perspective of International Law.

279.  In this respect, as well shall see below, the TVPEE is a tax according to the concept of tax under International Law used by arbitration case-law. Moreover, the European Commission has ratified the taxation nature of the TVPEE and its conformity with EU Law.

**(i)    The TVPEE is a tax according to the concept of tax under International Law used by arbitration case-law**

280.  If we resort to a concept of "tax" of International Law, especially the concept that the Arbitral Tribunals have repeatedly used, it can be seen that the TVPEE is a tax.

281.  El *Black´s Law Dictionary* includes the following definition of tax:

> *"**tax**, n. (14c) A charge, usu. monetary, imposed by the government on persons, entities, transactions, or property to yield public revenue. [...]"[157]*

282.  It should be noted that this ordinary concept of tax is substantially similar to that included in Spanish Law in Article 2 of Act 58/2003, of 17 December, on General Taxation -in essence, a mandatory contribution to the Public Treasury-.[158]

---

[155]  Judgment 183/2014, from 6 November 2014 issued by the Constitutional Court Plenary in unconstitutionality appeal number 1780-2013 promoted by the Cabinet of the Andalusian Regional Government with regard to Articles 4, 5 and 8 of Act No. 15/2012 (and other regulations), published in the BOE (Official State Gazette) on 4 December 2014. R-0264.

[156] Decision of 5 June 2007 of the Ad Hoc Committee on the application for the annulment of the award in the case *Hussein Nuaman Soufraki v. United Arab Emirates*, ICSID Case No. ARB/02/7 para. 97. RL-0107.

[157] *Black´s Law Dictionary,* Ninth Edition, Bryan A. Garner Editor in Chief, page 1594. RL-0108.

[158] Article 2 of Act 58/2003, of 17 December, on General Taxation:
*"Article 2 Concept, purposes and types of taxations*

283.  Along the same lines as *Black´s Law Dictionary*, the Arbitral Tribunals have repeatedly issued opinions.

284.  The Arbitral Tribunal of *EnCana v. Ecuador* referred to the meaning of the term "taxation measures", which was not defined in the Canada-Ecuador BIT applicable in that case, by providing the following:

> *"It is in the nature of a tax that it is imposed by law.[...]The question whether something is a tax measure is primarily a question of its legal operation, not its economic effect. A taxation law is one which imposes a liability on classes of persons to pay money to the State for public purposes. The economic impacts or effects of tax measures may be unclear and debatable; nonetheless a measure is a taxation measure if it is part of the regime for the imposition of a tax."[159] (emphasis added)*

285.  The opinion of that Arbitral Tribunal was upheld by Arbitral Tribunal of *Duke Energy v. Ecuador,* which when referring to the concept of "matters of taxation" mentioned in Article X of the US-Ecuador BIT and not defined by it, stated:

> *"The Treaty does not define the term "matters of taxation". In seeking to elucidate its meaning, the ruling in EnCana v. Ecuador appears to be of particular relevance."[160]*

286.  Following this line, the Arbitral Tribunal of *Burlington Resources v. Ecuador,* when also referring to the concept of "matters of taxation", provided the following:

> *"To answer the question whether Law 42 is a tax for purposes of Article X of the Treaty under international law, the Tribunal finds that the EnCana and Duke Energy decisions are indeed apposite. In EnCana, the tribunal held that a "tax" is "imposed by law" and that this "taxation law is one which imposes a liability on classes of persons to pay money to the State for public purposes." In Duke Energy, the tribunal, dealing with the Treaty applicable to this dispute, held that "the ruling in EnCana v. Ecuador appears to be of particular relevance" to elucidate the meaning of "matters of taxation" under Article X of the Treaty.*

> *Building on EnCana's ruling, Duke Energy stands for the proposition that there is a "tax" under Article X of the Treaty if the following four requirements are met: (i) there is a law (ii) that imposes a liability on classes of persons (iii) to pay money to*

---

*1. Taxations are public incomes that consist of monetary contributions required by a public Administration as a consequence of the performance of an act to which the Act connects the duty to contribute, with the primary purpose of obtaining the necessary income to support public spending.*
*As well as being a means to obtain the resources needed to support public spending, taxations may also serve as instruments of general economic policy and attend to the compliance with the principles and purposes contained in the Constitution.*
*2. Taxations, whatever their denomination, are classified in fees, special contributions and taxes:*
*[...]*
*c) Taxes are taxations required without compensation, whose taxable event is made up of deals, acts or events that show the economic capacity of the taxpayer."* R-0028
[159] *EnCana Corporation v. Republic of Ecuador,* LCIA Case No. UN 3481, Award of 3 February 2006, para 142. RL-0035.
[160] *Duke Energy Electroquil Partners & Electroquil S.A. v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award 18 August 2008, para 174. RL-0036.

> *the State (iv) for public purposes. Under this definition, the Tribunal is of the view that Law 42 is a tax."[161] (emphasis added)*

287.   In view of all the above decisions, the concept of tax in International Law that the Arbitral Tribunals have repeatedly used has a number of defining characteristics that can be summarized as follows:

- That the tax is established by Law,
- That such Law imposes an obligation on a class of people, and
- That such obligation implies paying money to the State for public purposes.

288.   As we shall see below, in this case all these defining characteristics are met in relation to the TVPEE, so there is no doubt that this is a tax from the perspective of International Law.

<u>The TVPEE is established by Law</u>

289.   Firstly, as already discussed, the TVPEE was established by Law: Act 15/2012. Act 15/2012 was passed by the Parliament of the Kingdom of Spain (Congress of Deputies and Senate) in accordance with Article 133 of the Spanish Constitution, which states that the primary power to set taxes is vested exclusively in the State by law.

<u>That such Law imposes an obligation on a class of people</u>

290.   Secondly, Act 15/2012 which regulates the TVPEE imposes the obligation to pay this tax on a class of people. Specifically, as already discussed, according to Act 15/2012, the TVPEE is applied to anyone that performs the activities of production and incorporation of electrical energy into the Spanish electricity system, whether the electricity production facilities use renewable energy or conventional energy.

<u>That such obligation involves paying money to the State for public purposes</u>

291.   Thirdly, Act 15/2012 imposes on taxpayers of the TVPEE the obligation to pay money to the State for public purposes.

292.   In this regard, TVPEE taxpayers are required to make the payments relating to this tax to the State in accordance with Article 10 of Act 15/2012 on assessment and payment of the tax,[162] and Ministerial Order HAP/703/2013, of 29 April, approving Form 583 "Tax on the value of the production of electrical energy. Self-assessment and Divided Payments", and establishes the form and procedure for its submission.[163]

---

[161] *Burlington Resources Inv. v. Republic of Ecuador, ICSID Case No. ARB/08/5,* Decision on Jurisdiction, of 2 June 2010, paras 164 and 165. RL-0037.
[162] Act 15/2012, Article 10. R-0024
[163] Ministerial Order HAP/703/2013, of 29 April, which approves Form 583 "Tax on the value of the production of electrical energy. Self-assessment and Instalments Payments", and establishing the way and procedure for its submission. R-0265

293.   The TVPEE is an income of the Spanish State. The revenue corresponding to the TVPEE is public revenue that is included in the Spanish General Budgets of the State. This can be clearly seen in the Spanish General Budgets of the State for 2013 -the first year the TVPEE was in force-, 2014, 2015 and 2016.

294.   Thus, in the Spanish General State Budget for 2016, the latest Budgets approved, it can be seen that the revenue from the TVPEE is included in these General Budgets in Section *"State Income"* (Section 98), Chapter *"Direct taxes and social contributions"* (Chapter 1) and, within the latter, under "*Taxes on production and storage of electricity and fuel*" (item 13), sub-heading "*On the value of the production of electric power*" (sub-heading 130)[164]:

---

[164] Excerpt from the Spanish General State Budget for 2016. R-0266
Spanish version published at the State Secretariat for Budget and Expenditure of the Ministry of Finance and Public Authorities:
http://www.sepg.pap.minhap.gob.es/Presup/PGE2016Ley/MaestroDocumentos/PGE-ROM/doc/1/2/1/2/1/N_16_E_R_2_101_1_2_198_1_101_1.PDF



**STATE GENERAL  BUDGET**
**STATE**

Section: 98 STATE INCOME
Service: 01 STATE INCOME

| BUDGETARY EXERCISE |
|---|
| 2016 |

(Thousands of Euros)

| Economic | Explanation | | Total |
|---|---|---|---|
| 1 | **DIRECT TAXES AND SOCIAL CONTRIBUTIONS** | | |
| 10 | **On income** | | **66,466,000.00** |
| 100 | De fas physical persons | | 39,610,000.00 |
| 10000 | Tax on the Income of Physical Persons | 39,854,000.00 | |
| 10099 | Assignment from taxation of the Catholic Church | -244,000.00 | |
| 101 | Corporations | | 24,868,000.00 |
| 10100 | corporations Tax | 24,868,000.00 | |
| 102 | Non-residents | | |
| | | | 1,988,000.00 |
| 10200 | Tax on the Income of Non-residents | 1,988,000.0 0 | |
| 11 | **On capital** | | **151,000.00** |
| 119 | Other Taxes on capital | | 151,000.00 |
| 11900 | General Tax on Inheritance and Donations. | 113,000.00 | |
| 11901 | Corporations Tax Property | 38,000.00 | |
| 12 | **Social Contributions** | | **923,000.00** |
| 120 | Contributions of special regimes of civil servants | | 923,000.00 |
| 12000 | Quotas on Liabilities | 923,000.00 | |
| 13 | **Taxes on the production and storage of electrical energy and fuel** | | **1,864,000.00** |
| 130 | Tax value of production of electricity | | 1,627,000.00 |
| 131 | On the production of spent nuclear fuel and radioactive waste resulting from the generation of nucleoelectric energy | | 230,000.00 |
| 132 | On the storage of spent nuclear fuel and radioactive waste in centralised installations | | 7,000.00 |
| | TOTAL DIRECT TAXES AND SOCIAL CONTRIBUTIONS | | 69,404,000.00 |
| | | | |
| 2 | **INDIRECT TAXES:** | | |
| 21 | **On Added Value** | | **31,334,000.00** |
| 210 | Tax on Added Value | | 31,334,000.00 |
| 21000 | VAT on imports | 5,965,000.0 0 | |
| 21001 | VAT on Internal operations | 25,369,000. 00 | |
| 22 | **On specific consumption** | | **7,923,000.00** |
| 220 | Special Taxes | | 7,923,000.00 |
| 22000 | On alcohol and derived beverages | 361,000.00 | |
| 22001 | On beer | 126,000.00 | |
| 22003 | On tobacco products | 3,236,000.0 0 | |

295.  Similarly, in the Spanish General State Budget for 2013, 2014 and 2015, the revenue
from the TVPEE is also collected as State revenue in the same sections as just indicated
for the 2016 Budget.[165]

---

[165] Excerpt from the Spanish General State Budget for 2013. R-0267.
Spanish version published at the State Secretariat for Budget and Expenditure of the Ministry of Finance
and Public Authorities:
http://www.sepg.pap.minhap.gob.es/Presup/PGE2013Ley/MaestroDocumentos/PGE-
ROM/doc/1/2/1/2/1/N_13_E_R_2_101_1_2_198_1_101_1.PDF
Excerpt from the Spanish General State Budget for 2014. R-0268.
 Spanish version published at the State Secretariat for Budget and Expenditure of the Ministry of Finance
and Public Authorities:
http://www.sepg.pap.minhap.gob.es/Presup/PGE2014Ley/MaestroDocumentos/PGE-
ROM/doc/1/2/1/2/1/N_14_E_R_2_101_1_2_198_1_101_1.PDF
Excerpt from the Spanish General State Budget for 2015. R-0269.

296. Thus, the TVPEE is a public income which, together with the other State revenue, contributes to form the State's resources with which public expenditures are financed.

297. It is worth adding that the second additional provision of Act 15/2012 provides that an amount equivalent to the estimated annual collection of the State arising from the taxes included in Act 15/2012, including the TVPEE, will be allocated each year in the Acts on the Spanish General State Budgets to finance the costs of the electricity sector:

> *"Additional provision two. Costs of the electricity system.*
>
> *In the General State Budgets Acts of each year <u>an amount equivalent to</u> the sum of the following will be used to finance the costs of the electricity system provided for in Article 13 of the Electricity Sector Act:*
>
> *a) <u>The estimate of the annual collection derived from taxes and fees included in this Act.</u>*
>
> *b) The estimated revenue from the auctioning of emission rights for greenhouse gases, with a maximum of € 500 million."[166] (emphasis added)*

298. This second additional provision was complemented and made concrete by the fifth additional provision of Act 17/2012, of 27 December, on the General State Budget for 2013. Said Fifth Additional Provision of Act 17/2012 establishes that an amount equivalent to the estimated annual collection arising from the taxes included in Act 15/2012, including the TVPEE, will be allocated to finance, among the costs of the electricity system provided by the Electricity Sector Act, specifically those relating to the promotion of renewable energy:

> *"Five Contributions to the Financing of the Electricity Sector*
>
> *1. In the General State Budget Laws for each year, in order to finance the costs of the electricity system stipulated in the Electricity Sector Act <u>**referring to promoting renewable energy**</u>, <u>an amount equivalent to</u> the sum of the following shall be allocated:*
>
> *a) <u>The estimate of the annual collection deriving from taxes included in the Act on tax measures for energy sustainability</u> [Act 15/2012].*
>
> *b) 90 per cent of the estimated revenue from the auctioning of emission rights for greenhouse gases, with a maximum of € 450 million.*
>
> *2. 10 per cent of the estimated revenue from the auction of emission rights for greenhouse gases, with a maximum of € 50 million, is set aside for the policy of combating climate change."[167] (emphasis added)*

---

Spanish version published at the State Secretariat for Budget and Expenditure of the Ministry of Finance and Public Authorities:

http://www.sepg.pap.minhap.gob.es/Presup/PGE2015Ley/MaestroDocumentos/PGE-ROM/doc/1/2/1/2/1/N_15_E_R_2_101_1_2_198_1_101_1.PDF

[166] Act 15/2012, second additional provision. R-0024

299. It must not be forgotten that among the taxes included in Act 15/2012 to which such fifth additional provision refers there is not only the TVPEE. Act 15/2012 not only creates the TVPEE but it also creates three other new taxes: i) the tax on the production of spent nuclear fuel and radioactive waste from nuclear power generation, ii) the tax on the storage of spent nuclear fuel and radioactive waste in centralised facilities and iii) the levy on use of continental waters for electrical energy production.

300. Note also that Act 47/2003, of 26 November, on General Budgets, provides the following:

> *"Article 27 Principles and rules of budgetary management*
>
> *1. The public sector is managed by an annual budget system which is approved by the Parliament and framed within the limits of a multi-year scenario. [...]*
>
> *3. <u>The resources of the State,</u> those of each of its autonomous bodies and those of entities of the state public sector with budget limitations <u>will be destined to pay all of their respective obligations, unless their allocation for specific purposes is established by Act</u>"[168] (emphasis added)*

301. In short, as has been stated, the TVPEE was established by Act 15/2012 which imposed on a particular class of people the obligation to pay money to the State for public purposes.

302. Therefore, the TVPEE is a tax according to the concept of tax under International Law that Arbitral Tribunals have repeatedly applied.

**(ii)    The European Commission has ratified the taxation nature of the TVPEE and its conformity with EU Law**

303. In addition, further proof that the TVPEE is a tax under International Law is the fact that the European Commission itself has ratified the taxation nature of the TVPEE and the conformity of this tax with EU Law by closing EU Pilot procedure 5526/13/TAXU as it considered that the TVPEE is in accordance with EU Law.

304. It should be noted that an *EU Pilot* procedure is a process of exchange of information between the European Commission and a Member State of the EU in order to analyse whether a particular measure of that Member State complies with EU Law. The *EU Pilot* procedure is a preliminary phase, if the case, to an EU Law infringement proceeding, governed by Article 258 of the TFEU.

305. Thus, in particular, when a complaint by citizens or companies is presented claiming that a measure of a Member State allegedly violates EU Law (or when the European Commission identifies *ex officio* a possible infringement of EU Law), the European Commission begins an *EU Pilot* procedure. By means of this *EU Pilot* procedure, the

---

[167] Act 17/2012 of 27 December, on the General Budgets of the State for 2013, Fifth Additional Provision. R-0229
[168] Act 47/2003, of 26 December, on General Budgets, Article 27. R-0270.

European Commission requests information from the Member State concerned regarding the measure of that State in question.

306.  In view of the information and comments submitted by the Member State in the appropriate *EU Pilot* procedure, if the European Commission considers that there are grounds to understand that there has been an infringement of EU Law, it formally initiates an EU Law infringement proceeding, regulated in Article 258 of the TFEU. On the contrary, as has occurred in relation to the TVPEE, if the European Commission considers that there is no reason to deem that there has been an infringement of EU Law, the *EU Pilot* procedure is closed and therefore no EU Law infringement proceeding is commenced.

307.  This is explained on the website of the European Commission itself:

> *"Further to an enquiry or a complaint (by citizens, businesses and organisations), or on their own initiative, the Commission's services might need to gather additional factual or legal information for a full understanding of an issue concerning the correct application of EU law or the conformity of the national law with EU law. In such cases, the Commission's services submit a query to the Member State concerned via EU Pilot. Member States normally have 10 weeks to respond and the Commission's services, in turn, also have 10 weeks to assess the response (if the response is not satisfactory, the Commission will normally launch infringement proceedings by sending a letter of formal notice to the Member State concerned)."[169]*

308.  Regarding the TVPEE, in 2013 the European Commission commenced an information request procedure with the Kingdom of Spain to verify the conformity of the TVPEE with EU Law *(EU Pilot* procedure 5526/13/TAXU).

309.  That *EU Pilot* procedure to request information from the Kingdom of Spain was not commenced at the initiative of the European Commission but was initiated following a complaint lodged with the European Commission by individuals claiming an alleged infringement by the TVPEE of EU Law.

310.  After receiving the complaint, the European Commission requested information from the Kingdom of Spain in relation to this issue. The Kingdom of Spain provided the European Commission the information it had requested.

311.  After receiving the information provided by the Kingdom of Spain, the European Commission concluded that there were no grounds for considering that the TVPEE infringed EU Law and therefore found no reason to initiate an EU Law infringement proceeding, governed by Article 258 of the TFEU. Consequently, on 8 September 2014

---

[169]    European    Commission    website    regarding    "EU    Pilot"    Procedures. http://ec.europa.eu/internal_market/scoreboard/performance_by_governance_tool/eu_pilot/index_en.htm. R-0271.

the European Commission closed the aforementioned Pilot Project as it considered that the TVPEE is in accordance with EU Law.[170]

312. In short, as we have seen, the European Commission not only has not questioned at any time that the TVPEE was a tax but has also ratified the conformity of this tax with EU Law.

313. In summary, in view of the above considerations, there is no doubt that the TVPEE is a tax both from the perspective of Spanish domestic Law as well as from the perspective of International Law and that it has been established by a domestic Law of the Kingdom of Spain: Act 15/2012.

314. In other words, both from the point of view of domestic Law as well as from that of International Law, the provisions relating to the TVPEE of Act 15/2012 are provisions relating to taxes of the domestic Law of the Kingdom of Spain.

315. Consequently, in accordance with the aforementioned Article 21 (7)(a)(i) of the ECT[171], this is a taxation measure for the purposes of Article 21 of the ECT.

**(3)    In the hypothetical scenario that the Arbitral Tribunal considered that in order to determine that we stand before a taxation measure for the purposes of the ECT it is necessary to carry out the additional analysis intended by the Claimants, it must be concluded that the TVPEE is, in any case, a *bona fide* taxation measure**

316. As we have analysed, the provisions relating to the TVPEE of Act 15/2012 are a taxation measure for the purposes of the ECT in accordance with Article 21 (7)(a)(i) of the ECT.

317. However, the Claimants consider that, in order to determine that we stand before a taxation measure for the purposes of the ECT, the above is not enough and that it is necessary to carry out an additional analysis of the TVPEE, which involves examining the economic effect of this tax.

---

[170] Case file of the procedure EU Pilot 5526/13/TAXU relating to the TVPEE, which records the closure thereof by the European Commission given that there is no evidence that there is an infringement of EU Law by the TVPEE. R-0272. We warn that the aforementioned document is confidential and that the European Commission has only given its consent for its use in this arbitration. The identity of officials has been redacted ("deleted") for reasons of data protection.
European Commission's email to the Spanish Ministry of Foreign Affairs informing on the closing of EU-Pilot Project 5526/13/TAXU. R-0273.
[171] ECT, Article 21(7)(a)(i):
"*7. For the purposes of this Article:*
*a) The term "taxation measure" includes:*
*i) <u>Any provision relating to taxes of the domestic law of the Contracting Party</u> or of a political subdivision thereof or a local authority therein; and;*
*ii) any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound."* (emphasis added)
RL-0020

318.  As we shall see, it is not appropriate to carry out the additional examination of the TVPEE that the Claimants are seeking in order to determine that be stand before a taxation measure for the purposes of the ECT.

319.  Firstly, in order to carry out the additional examination of this taxation measure, the Claimants could presumably cite the award of *Yukos v. the Russian Federation*. Such award has been recently quashed. In any case, the good faith analysis of the taxation measures conducted in the *Yukos v. Russian Federation* case is not applicable in the present case. The Arbitral Tribunal for the cited *Yukos v. Russian Federation* case, made it clear that there were *"extraordinary circumstances"* in that case that are not present in this case. In this regard, said Arbitral Tribunal considered as extraordinary circumstances that the taxation measures pursue a purpose that is "*entirely unrelated*" to the purpose of raising revenue for the State, such as the destruction of a company or the elimination of a political opponent:

> *"Secondly, the Tribunal finds that, in any event, the carve-out of Article 21(1) can apply only to <u>bona fide taxation actions, i.e., actions that are motivated by the purpose of raising general revenue for the State</u>. By contrast, <u>actions that are taken only under the guise of taxation</u>, but in reality aim to achieve an <u>**entirely unrelated purpose** (such as the **destruction of a company or the elimination of a political opponent**)</u> cannot qualify for exemption from the protection standards of the ECT under the taxation carve-out in Article 21(1). As a consequence, the Tribunal finds that it does indeed have "direct" jurisdiction over claims under Article 13 (as well as Article 10) <u>**in the extraordinary circumstances of this case**</u>."[172] (Emphasis added)*

320.  In addition, the additional analysis of the good faith of the TVPEE intended by the Claimants implies examining the economic effects of this tax. In this regard, we should remember what the Arbitral Tribunal stated in the case *EnCana v. Ecuador*:

> *"<u>**The question whether something is a tax measure is primarily a question of its legal operation, not its economic effect.**</u> […] The economic impacts or effects of tax measures may be unclear and debatable; nonetheless a measure is a taxation measure if it is part of the regime for the imposition of a tax."[173] (Emphasis added)*

321.  As we have stated, there is no doubt that, in this case, we stand before a taxation measure in view of its legal operation. Therefore, in order to determine that we stand before a taxation measure for the purposes of the ECT it is not appropriate to examine the economic effect of the TVPEE, as the Claimants are seeking.

322.  In any case, even in the hypothetical event that the Arbitral Tribunal considered that, in order to determine that we stand before a taxation measure for the purposes of the ECT, an analysis must be conducted of the TVPEE such as that intended by the Claimants, it must be concluded that the TVPEE is, in any case, a *bona fide* taxation measure.

---

[172] *Yukos Universal Limited (Isle of Man) v. Russian Federation*, PCA Case No. AA 227, Final Award of 18 July 2014, para 1407. RL-0109.
[173] *EnCana Corporation v. Republic of Ecuador,* LCIA Case No. UN 3481, Award of 3 February 2006, para 142. RL-0035

323. According to the Claimants[174], the TVPEE is allegedly not a *bona fide* taxation measure basically because the TVPEE is allegedly discriminatory against renewable producers in comparison with conventional producers, due to the former being unable to pass on at least part of the cost of the tax to consumers, and because the TVPEE allegedly constitutes a disguised tariff cut for renewable producers.

324. As we shall see below, these arguments by the Claimants are totally without merit.

**(3.1)    The TVPEE applies to all energy producers, both renewable and conventional**

325. The TVPEE is, as has already been stated, a tax of general application. That is, it applies to all energy production facilities, both renewable as well as conventional.

326. In addition, Act 15/2012 grants exactly the same treatment to all TVPEE taxpayers, whether they are renewable or conventional producers.

327. The general application of the TVPEE is a legitimate option of the State legislator, as recognised by the Spanish Constitutional Court itself, and linked to the environmental nature of the TVPEE.

328. In this sense, we must remember that the Spanish Constitution grants the State the primary power to raise taxes:

> *"The primary power to raise taxes is vested exclusively in the State by means of law."[175]*

329. When raising taxes, the State must respect a number of principles also enshrined in the Spanish Constitution. One of these principles is the principle of generality, according to which everyone must contribute to sustaining public expenditure:

> *"Everyone shall contribute to sustain public expenditure according to their economic capacity [...]"[176]*

330. This principle of generality does not mean that exemptions, reductions, deductions or other tax benefits cannot be established in the configuration of a tax. However, the decision as to whether or not to establish such tax benefits is a choice made by the Spanish legislator, always in accordance with applicable law.

331. Act 15/2012 grants the same treatment to all those obliged to pay the TVPEE, without including tax benefits for renewable energy producers. The Spanish Constitutional Court itself has pointed out that this constitutes a legitimate option of the Spanish State lesgislator.

---

[174] Statement of Claim, of 22 May 2015, paragraphs 181 to 183 and 276 to 279 and Counter-Memorial on Preliminary objections, of 8 August 2016, paragraphs 83 to 91.
[175] Spanish Constitution of 1978, Article 133(1). R-0027
[176] Spanish Constitution of 1978, Article 31(1). R-0027

332.   Thus, in its Judgement of 6 November 2014, the Spanish Constitutional Court, supreme interpreter of the Spanish Constitution, stated that the Spanish Constitution does not grant a right to unequal regulatory treatment and that the general application of the TVPEE corresponds to a choice made by the legislator, which has a wide margin for establishing and configuring the tax:

*"[...] we shall begin by passing judgement on Arts. 4, 5 and 8 of Act 15/2012, which respectively regulate the taxable event, the taxpayers and the tax rate of the value of the production of electrical energy, direct and real taxation that taxes activities concerning the production and incorporation of electric power into the electricity system, measured at power station busbars, through any type of generation facilities.*

*The Counsel for the Regional Government of Andalusia has no objection to the establishment by the State of this tax figure. What is questioned is that the tax does not establish differences between the different electric power producers, specifically, between those that use renewable energy sources and those that do not [...]*

*[...] what is questioned is that the new tax regime worsens the situation of renewable energy producers, due to not discriminating on the basis of the sources used for the production of electric power.*

*As we shall see, such complaint, under the terms in which it is made, cannot be addressed. Firstly, because it refers to a complaint of unconstitutionality due to un-differentiation, when it is the view of this Court that Art. 14 SC [[177]] is limited to prohibiting discriminatory or unfounded distinctions, but it does not enshrine a right to unequal treatment, nor does it cover the lack of distinction between unequal cases, there being no subjective right to unequal regulatory treatment (STC 38/2014, of 11 March, FJ 6 with quote from STC 198/2012, of 6 November FJ 13). Secondly, the contested provisions do not exceed the freedom of configuration granted to the legislator, to which nothing prevents the use of taxes as an instrument of economic policy on a particular sector (STC 7/2010, of 27 April, FJ 5), that is, with non-tax or management purposes [STC 53/2014, of 10 April, FJ 6 c)]. The generalised application of the tax in question corresponds to a choice made by the legislature, which, while respecting constitutional principles, has a wide margin for establishing and configuring the tax. This margin cannot be constrained by a demand for differentiation that is not constitutionally required, even if it seems advisable or appropriate to the appellant [...]"[178]*

333.   In addition, the fact that Act 15/2012 establishes the TVPEE for all electric power production facilities, whatever the technology used, is linked to the environmental nature of the tax.

334.   All facilities for electric power generation, whatever the technology used in the power production, entail two kinds of environmental effects: on the one hand, the very existence of the facilities involves environmental effects and, on the other hand, the electrical

---

[177] Article 14 of the Spanish Constitution of 1978: *"Spaniards are equal before the law and may not in any way be discriminated against on account of birth, race, sex, religion, opinion or any other personal or social condition or circumstance."* R-0027

[178] Judgment 183/2014, from 6 November 2014 issued by the Constitutional Court Plenary which rejects unconstitutionality appeal number 1780-2013 promoted by the Cabinet of the Andalusian Regional Government with regard to articles 4, 5 and 8 of Act No. 15/2012 (and other regulations). R-0264.

energy transport and distribution networks which allow to evacuate and distribute the electric energy produced in the facilities also entail environmental effects. It is, therefore, consistent that the TVPEE is applied with respect to all production facilities.

335.   This is expressly laid-down in the Preamble to Act 15/2012 referring to the TVPEE:

> *"This tax shall be levied on the economic capacity of the electric power producers whose <u>facilities</u> lead to significant investments in electric energy transmission and distribution grids to be able to discharge the energy flowing to them, and that <u>involve, by themselves or as a result of the existence and development of such grids, undoubted environmental effects</u>, as well as the generation of highly relevant costs required for maintaining a guaranteed power supply. The tax shall be applied to the production of all generation facilities."[179] (emphasis added)*

336.   In short, the TVPEE is a tax of general application, applicable to both conventional and renewable producers, and Act 15/2012 grants the same treatment to all taxpayers regardless of whether they are conventional or renewable producers.

**(3.2)    The TVPEE does not discriminate against renewable producers in terms of repercussion**

337.   The repercussion of a tax can be defined as the transfer of the amount of the tax in question by the payer of the tax to another person.

338.   In general, a tax can have two kinds of repercussion: legal repercussion and economic repercussion. The difference between them is as follows:

   a)   Legal repercussion is that which occurs because the law requires it. Legal repercussion is not inherent to direct taxes, i.e. taxes levied on direct manifestations of economic capacity, such as the obtention of income or the ownership of capital. This is reflected in *Black's Law Dictionary*: "***direct tax.** [...] A direct tax is presumed to be borne by the person upon whom it is assessed, and not "passed on" to some other person.*"[180]. In contrast, legal repercussion is typical of indirect taxes, i.e. taxes levied on indirect manifestations of economic capacity, as is consumption. This is also reflected in *Black's Law Dictionary:* "***indirect tax.** [...] An indirect tax is often presumed to be partly or wholly passed on from the nominal taxpayer to another person.*"[181]

   b)   Economic repercussion depends on the will of the businessperson, who decides whether or not to pass on the tax via the price, depending on his/her cost policy and structure.

---

[179] Act 15/2012, of 27 December, on tax measures for energy sustainability, published in the Official State Gazette of 28 December 2012, Preamble. R-0024
[180] *Black´s Law Dictionary*, Ninth Edition, Bryan Garner (Editor in Chief), page 1595. RL-0110.
[181] *Black's Law Dictionary,* Ninth Edition, Bryan Garner (Editor in Chief), page 1596. RL-0111.
An example of an indirect tax is the Value Added Tax, mainly regulated in Spain by Act 37/1992, of 28 December, on Value Added Tax. R-0274.

339.  As we shall see, the TVPEE does not discriminate against renewable producers from either the perspective of legal repercussion or from the perspective of economic repercussion.

**(a)    Act 15/2012 grants the same treatment to all the taxpayers, including in terms of repercussion**

340.  Firstly, there is no discrimination against renewable producers from the perspective of legal repercussion.

341.  This is because Act 15/2012 grants the same treatment to all TVPEE taxpayers, whether they are renewable or conventional producers. Such equal treatment is also given in terms of repercussion.

342.  The TVPEE is a direct tax, levying a direct manifestation of the economic capacity of those obliged to pay it, as is the obtention of income.[182]

343.  Given the nature of direct tax of the TVPEE, and being typical of direct taxes the absence of legal repercussion of their amount as we have seen, Act 15/2012 does not establish the repercussion of the amount of the TVPEE by any of the TVPEE taxpayers - whether they be conventional producers or renewable producers - to other persons.

**(b)    The TVPEE is one of the costs that are remunerated to renewable producers through the specific remuneration they receive, and thus the economic impact of the TVPEE on those renewable producers is neutralised**

344.  Secondly, there is also no discrimination against renewable producers from the perspective of economic repercussion.

345.  The TVPEE is one of the costs that are remunerated to renewable producers through the regulated regime applicable to them. Thus, the economic effect of the TVPEE on renewable producers is neutralised.

---

[182] Articles 1 and 6 of Act 15/2012:

*"Article 1 Nature*

*The Tax on the value of the production of electrical energy is a tax of a* <u>*direct character*</u> *and real nature which is levied on the performance of the activities of production and incorporation into the electricity system of electric energy, measured in busbars, through each one of the facilities indicated in article 4 of this Act."* (emphasis added)

*"Article 6 Tax base*

*1. The tax base consists of the total amount that the taxpayer is to receive for the production of electrical energy and its incorporation into the electricity system, measured in power plant busbars, at each facility, in the taxable period. [...]"*. R-0024

346.  That is to say, the specific remuneration received by renewable producers allows them, in addition to obtaining reasonable return, to recover certain costs which, unlike with the conventional technologies, they cannot recover on the market. The TVPEE is precisely one of those costs.

347.  In this regard, the Explanatory Memorandum of Royal Decree-Act 9/2013 is clear in stating that the aforementioned remuneration received by renewable facilities allows these to cover the costs necessary to compete in the market on an equal footing with conventional producers, as well as to continue to obtain reasonable return:

>  *"This framework shall articulate remuneration which will allow renewable facilities, those for cogeneration and for waste, to cover the costs necessary to compete in the market on an equal footing with the other technologies and to obtain Reasonable Rate of Return."[183] [184]*

348.  Act 24/2013 also states in its Explanatory Memorandum that the specific remuneration for renewable producers allows them to recover certain costs which, unlike the conventional technologies, they cannot recover on the market, as well as to continue to obtain a reasonable return:

>  *"The remuneration regime for renewable, cogeneration and waste-source energies shall be based on the necessary market share of these facilities, supplementing market income with specific regulated remuneration that allows these technologies*

---

[183]  Royal Decree-Act 9/2013 of 12 July 2013, establishing urgent measures to ensure the financial stability of the electricity system, Explanatory Memorandum. R-0113

[184]  Royal Decree-Law 9/2013, of 12 July, on measures to ensure budget stability and promote competitiveness, in Article 1 (Two), performed the amendment of Article 30.4 of Act 54/1997, making said Article 30.4 read as follows:

*"Additionally, and under the terms by Royal Decree of the Spanish Cabinet Meeting it is legally determined, regarding the remuneration for the sale of energy generated valued at market price, the facilities may receive specific remuneration composed of a stipulation per unit of installed capacity, covering, where appropriate, the investment costs for an installation type that cannot be recovered from the sale of energy and a stipulation for the operation covering, where appropriate, the difference between the operating costs and the revenue from participation in the market of such installation type. For the calculation of such specific remuneration, for a installation type, throughout its regulatory service life and referring to the activity carried out by an efficient and well-managed company, the following shall be considered:*

*a) Standard income from the sale of the energy generated valued at the production market price.*

*b) Standard operating costs.*

*c) The standard value of the initial investment.*

*For these purposes, under no circumstances shall any costs or investments that are determined by administrative acts or regulations that do not apply in the territory of Spain be taken into consideration. Similarly, only those costs and investments that correspond exclusively to the electric power production activity shall be taken into account.*

*As a result of the unique characteristics of the island and non-Spanish mainland electricity systems, specific installation types may be exceptionally defined for each one.*

*This remuneration regime shall not exceed the minimum level necessary to cover the costs that allow the facilities to compete on an equal footing with the other technologies on the market and that allow Reasonable Rate of Return to be obtained by reference to the installation types applicable in each case. Notwithstanding the foregoing, exceptionally, the remuneration regime may also incorporate an incentive to investment and implementation within a certain period of time, when such installation would involve a significant reduction in costs in the island and non-Spanish mainland systems."* R-0113

> *to compete on an equal footing with the other technologies on the market. <u>This specific complementary remuneration will be sufficient to reach the minimum level necessary to cover the costs which, unlike with the conventional technologies, they cannot recover on the market</u> and to allow them to obtain adequate return with reference to the installation types applicable in each case."[185] (emphasis added)*

349.  As we have mentioned, the TVPEE is specifically included among the operating costs of renewable producers that are taken into account to calculate the specific remuneration for those renewable producers. This is laid-down in Order IET/1045/2014:

> *"On the other hand, <u>the operating costs</u>, which are variable depending on the standard facilities' production, <u>include but are not limited to</u> the following: insurance costs, administrative expenses and other general expenses, market representation expenses, fees for accessing the transmission and distribution grids that must be paid by the producers of electric power, operation and maintenance (both preventive as well as corrective) costs, <u>Tax on the value of the production of electrical energy established by Act 15/2012, of 27 December, on tax measures for energy sustainability</u> as well as the other taxes regulated by this Act. Where appropriate, auxiliary consumption (water, gas etc.) and fuel costs associated with the operation of the standard facilities have also been considered."[186] (emphasis added)*

350.  The Claimants themselves acknowledge that the TVPEE is one of the costs that renewable energy producers recover by means of the specific remuneration they receive. Therefore, the Claimants themselves acknowledge that the alleged losses they are claiming in this arbitration do not arise from this tax. Thus, in their Counter-Memorial on Preliminary objections, the Claimants state the following:

> *"As Spain notes in its Counter-Memorial, the 7% levy of Law 15/2012 is included amongst the permitted operating costs that renewable energy producers can recover under Regulatory Framework III. Thus, the Claimants' losses under Regulatory Framework III do not stem from the 7% levy but from the other aspects of the new legislation."[187] (footnote omitted)*

351.  Therefore, in light of the foregoing, it must be concluded that there is no discrimination against renewable energy producers in terms of  repercussion in connection with the TVPEE.

**(3.3)   The objective of the TVPEE is to raise revenue for the Spanish State for public purposes**

352.  As we have already detailed when analysing why the TVPEE meets the definition of tax under International Law that has been used by Arbitral Tribunals, and as we shall recall below, the purpose of the TVPEE is to raise revenue for the Spanish State for public purposes.

---

[185] Act 24/2013, of 26 December 2013, on the Electricity Sector. R-0037
[186] Order IET/1045/2014, dated 16 June, approving those compensation parameters for standard energy facilities applicable to certain electric power production facilities from energy renewable energy sources, cogeneration and waste, Explanatory Memorandum III. R-0122
[187] Counter-Memorial on Preliminary objections, 8 August 2016, paragraph 85.

**(a)    The TVPEE is an income of the Spanish State that is integrated into the General Budgets of the State**

353.    As we have discussed above, the revenue corresponding to the TVPEE is public Spanish State revenue that is included in the General Budgets of the State. This can be clearly seen in the Spanish General Budgets of the State for 2013, the first year of the TVPEE, 2014, 2015 and 2016, the most recent Budgets approved.[188] Thus, the TVPEE, together with the other State revenue, helps conform the State's resources with which public expenditures are financed.

**(b)    An amount equivalent to the estimated annual collection arising from the taxes included under Act 15/2012, among them the TVPEE, is destined to the promotion of renewable energies**

354.    In addition, as we have also already stated, the Fifth Additional Provision of Act 17/2012[189] provides that an amount equivalent to the estimated annual collection arising from the taxes included in Act 15/2012[190], among them the TVPEE, will be allocated to finance the costs of the electricity system concerning the promotion of renewable energies.

355.    Therefore, the Spanish Minister for Industry stated in an interview given to the newspaper La Gaceta, mentioned by the Claimants, that the taxation measures adopted ultimately seek to *"defend the general interest, which is to have an electricity system that is sustainable from an environmental, economical and financial point of view".*[191] Thus, guaranteeing the sustainability of the Spanish Electricity System was the objective of the taxation measures adopted, according to the own words of the Minister, who has never at any time said that the objective was to indirectly cut tariffs for renewable energy producers, as alleged by the Claimants in seeking to create confusion.

356.    In short, as we have analysed, the TVPEE does not seek to carry out a disguised tariff cut for renewable producers. The Claimants' argument that the TVPEE was deliberately

---

[188] Extracts of the General Budgets of the Spanish State for 2013 -the first year of the TVPEE-, 2014, 2015 and 2016. R-0267, R-0268, R-0269 and R-0266.
[189] Additional fifth provision of Act 17/2012, of 27 December, on the General State Budget for 2013:
*"Five Contributions to the Financing of the Electricity Sector*
*1. In the General State Budget Laws for each year, in order to finance the costs of the electricity system stipulated in the Electricity Sector Act **referring to promoting renewable energy**, an amount equivalent to the sum of the following shall be allocated:*
*a) The estimate of the annual collection derived from taxes included in the Act of fiscal measures for energy sustainability* [Act 15/2012].
*b) 90 per cent of the estimated revenue from the auctioning of emission rights for greenhouse gases, with a maximum of € 450 million.*
*2. 10 per cent of the estimated revenue from the auction of emission rights for greenhouse gases, with a maximum of € 50 million, is set aside for the policy of combating climate change."* (emphasis added). R-0229
[190] It should be remembered that Act 15/2012 (R-0024) does not only create the TVPEE. Act 15/2012 also creates other taxes as the tax on the production of spent nuclear fuel and radioactive waste from nuclear power generation, the tax on the storage of spent nuclear fuel and radioactive waste in centralised facilities and the levy for use of inland waters for electric power production.
[191] C-0136

designed to carry out such disguised cut lacks any foundation, taking into account also that, as has been explained, the economic effect of TVPEE on renewable producers as those subject to this arbitration has been neutralised. The purpose of the TVPEE is to raise revenue for the Spanish State with a public purpose.

**(4)      Conclusion**

357.    In view of the foregoing, stated briefly, the following can be concluded:

i.      The Kingdom of Spain introduced the TVPEE through Act 15/2012, passed by its Parliament (Congress of Deputies and Senate).

The provisions relating to the TVPEE of Act 15/2012 are a taxation measure for the purposes of the ECT. Article 21(7)(a)(i) of the ECT provides that the term taxation measure includes any provisions relating to taxes of the domestic law of the Contracting Party. The provisions on the TVPEE of Act 15/2012 are, both under Spanish domestic law and under International Law, provisions relating to a tax of the domestic law of the Kingdom of Spain.

Even in the hypothetical event that the Arbitral Tribunal considered that, in order to determine that we stand before a taxation measure for the purposes of the ECT, the foregoing were not enough and that an additional analysis of the TVPEE as that intended by the Claimants had to be conducted, which implies examining the economic effects of the TVPEE, the TVPEE is, in any case, a *bona fide* taxation measure.

ii.     The Kingdom of Spain has only provided its consent to submit to investment arbitration disputes related to alleged breaches of obligations derived from Part III of the ECT (Article 26 of the ECT).

iii.    The Claimant alleges a supposed breach by the Kingdom of Spain of obligations arising from section (1) of Article 10 of the ECT -an Article included in Part III of the ECT- through the introduction of the TVPEE by Act 15/2012.

iv.     However, Article 10(1) of the ECT does not generate obligations with respect to taxation measures for the Contracting Parties (Article 21 of the ECT).

v.      Thus, there is no obligation arising from section (1) of Article 10 of the ECT that could have been allegedly breached by the Kingdom of Spain through the introduction of the TVPEE by Act 15/2012.

vi.     Therefore, the Kingdom of Spain has not provided its consent to submitting the dispute stated in section iii. above to arbitration and, therefore, said with all due respect, the Arbitral Tribunal has no jurisdiction to hear the same.

358.    Due to all of the above, the Kingdom of Spain reiterates its request to the hourable Arbitral Tribunal to declare its lack of jurisdiction to hear the dispute on the alleged breach by the Kingdom of Spain of obligations arising from section (1) of Article 10 of the ECT through the introduction of the TVPEE by Act 15/2012.

**E.      Lack of jurisdiction of the Arbitral Tribunal to hear an alleged breach by the Kingdom of Spain of section (7) of Article 10 of the ECT regarding the TVPEE**

**(1)      Introduction**

359.  In their Statement of Claim[192], the Claimants contended that the Kingdom of Spain has allegedly breached section (7) of Article 10 of the ECT on non-discrimination between national and foreign investments[193], through the introduction of the Tax on the value of the production of electrical energy (TVPEE) by Act 15/2012, of 27 December 2012, on taxation measures for energy sustainability (Act 15/2012)

360.  In their Counter-Memorial on Preliminary Objections[194], the Claimants again state that the TVPEE allegedly violates section (7) of Article 10 of the ECT as it allegedly discriminates against foreign investors with regards to domestic ones.

361.  Notwithstanding the fact that the Kingdom of Spain firmly denies that the TVPEE discriminates against foreign investors in any way, the Kingdom of Spain reiterates that the Arbitral Tribunal, with all due respect, lacks the jurisdiction to hear this dispute.

362.  In this regard, in the Memorial on Preliminary Objections[195], the Kingdom of Spain explained that this lack of jurisdiction is due to the fact that section (7) of Article 10 of the ECT does not generate obligations regarding the TVPEE. According to Article 21(3) of the ECT, section (7) of Article 10 of the ECT does not apply to taxes on income or capital and the TVPEE is a tax on income.

363.  As we already set out in the Memorial on Preliminary Objections[196], in accordance with Article 26 of the ECT, the Kingdom of Spain only consented to submit to arbitration disputes relating to the alleged breaches of obligations deriving from Part III of the ECT. As there are no obligations deriving from section (7) of Article 10 of the ECT (included in Part III) regarding the TVPEE, there cannot be an alleged breach of obligations and, thus, there is no consent from the Kingdom of Spain to submit the dispute to arbitration, with the Arbitral Tribunal lacking the jurisdiction to hear the case.

364.  In their Counter-Memorial on Preliminary Objections[197], the Claimants allege that the TVPEE is not a tax on income and seek application of section (7) of Article 10 of the

---

[192] Statement of Claim, of 22 May 2015, paras 11, 181 to 183, 276 to 279 and 314(2).
[193] ECT, Article 10(7), which refers to the non-discrimination of investments with regards to the State of the investors:
"*Each Contracting Party shall accord to Investments in its Area of Investors of other Contracting Parties, and their related activities including management, maintenance, use, enjoyment or disposal, treatment no less favourable than that which it accords to Investments of its own Investors or of the Investors of any other Contracting Party or any third state and their related activities including management, maintenance, use, enjoyment or disposal, whichever is the most favourable.* (emphasis added) RL-0020
[194] Counter-Memorial on Preliminary objections, 8 August 2016, paragraph 90.
[195] Memorial on Preliminary Objections and Request for Bifurcation, of 9 September 2015, section III.E, paragraphs 210 to 221.
[196] Memorial on Preliminary Objections and Request for Bifurcation, of 9 September 2015, paragraphs 178 to 185.
[197] Counter-Memorial on Preliminary Objections, 8 August 2016, Part IV, paragraphs 83 to 91.

ECT regarding the TVPEE. As we will show in this Memorial, this argument by the Claimants lacks any foundation.

365.  In addition, the Claimants seek application of section (7) of Article 10 of the ECT in such a way that it imposes most favoured nation obligations and the Fair and Equitable Treatment standard is applied to taxes. As the Kingdom of Spain already explained, section (7) of Article 10 of the ECT does not apply to taxes on income such as the TVPEE. In any case, even by doing a merely theoretical exercise, in the hypothetical case that section (7) of Article 10 of the ECT was applicable to the TVPEE, which we firmly deny, said section (7) of Article 10 of the ECT could not be applied in such a way that it imposes most favoured nation obligations as the Claimants intend, in accordance with Article 21(3)(a) of the ECT.

366.  Below we will expound in depth the reasons why the arguments of the Claimants in their Counter-Memorial on Preliminary Objections are unsubstantiated.

**(2)    Section (7) of Article 10 of the ECT does not generate obligations regarding the TVPEE**

**(2.1)    According to Article 21(3) of the ECT, section (7) of Article 10 of the ECT does not apply to taxes on income or capital**

367.  As we have already shown on various occasions, under Article 21 of the ECT on taxation, taxation measures are excluded from the scope of application of the ECT ("taxation carve-out") with certain exceptions ("claw-backs") stated in the very same Article 21 of the ECT. One of these exceptions ("claw-backs") specifically refers to section (7) of Article 10 of the ECT.

368.  In this sense, Article 21 of the ECT states:

> *"1. Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.[...]*
>
> *3. <u>Article 10 (2) and (7)</u> shall apply to Taxation Measures of the Contracting Parties other than those on income or on capital, except that such provisions shall not apply to:*
>
> *a) Impose most favoured nation obligations with respect to advantages accorded by a Contracting Party pursuant to the tax provisions of any convention, agreement or arrangement described in subparagraph (7)(a)(ii) or resulting from membership of any Regional Economic Integration Organisation; [...]"[198] (emphasis added)*

369.  Thus, according to the above-mentioned Article 21(3) of the ECT, section (7) of Article 10 of the ECT does apply to the taxation measures of the Contracting Parties, but

---

[198] Sections 1 and 3 of Article 21 of the ECT. RL-0020

with certain limitations. One of these limitations is that section (7) of Article 10 of the ECT does not apply to taxes on income or capital (i.e. it does not apply to direct taxes).

370. As stated in the above-mentioned Article 21(3) of the ECT, section (7) of Article 10 of the ECT only applies to "*Taxation Measures of the Contracting Parties other than those on income or on capital*". In other words, section (7) of Article 10 of the ECT only applies in relation to indirect taxes, as indicated by the Energy Charter Treaty Secretariat in its document "*The Energy Charter Treaty. A Reader´s Guide*":

> "*According to Article 21 (2),(3), the principle of non-discrimination in transit and investment matters shall apply to taxation measures other than those on income and capital. This means that this principle remains, in general, applicable with regard to indirect taxes in these two areas.*"[199]  (emphasis added)

371. We must remember that among the different classifications for taxes that exist, the one probably most used is that which distinguishes between direct and indirect taxes. Direct taxes can be defined as taxes levying direct manifestations of the economic capacity of taxpayers, such as the obtention of income or the ownership of capital. Therefore, direct taxes cannot be legally passed-on (repercutted) by the taxpayer to another person. In other words, the person obligated to pay a direct tax does not have the legal right to recover the amount of the tax through the repercussion of the amount of the tax to another person. On the other hand, indirect taxes can be defined as those levying indirect manifestations of the economic capacity of taxpayers, such as consumption. Thus, indirect taxes are legally passed-on to another person. In other words, the tax legislation grants the taxpayer of an indirect tax the power to recover the amount of the tax through its repercussion to another person.[200]

372. The principle of economic capacity is a fundamental principle of the tax system which is set out in the Spanish Constitution, Article 31(1) of which states that "*Everyone shall contribute to sustain public expenditure according to their economic capacity*".[201] This economic capacity of each taxpayer manifests itself in different ways: either through the revenue they obtain (income), through the wealth they possess (capital) or through their expenditure (consumption). Thus, the different taxes that exist are levied upon one of these three manifestations of the taxpayer's capacity to pay.

373. In short, as we have seen, according to Article 21(3) of the ECT, section (7) of Article 10 of the ECT does not apply to direct taxes (i.e. taxes on income or capital). It only applies to indirect taxes (i.e. taxes on consumption).

**(2.2)   The TVPEE is a tax on income for the purposes of the ECT**

---

[199] "The Energy Charter Treaty. A Reader's Guide", The Energy Charter Treaty Secretariat, page 39. RL-0007
[200] "Lecciones de Derecho Financiero [Lessons in Financial Law]", Fernando Sainz de Bujanda, Complutense University of Madrid, 1979, page 125. R-0275.
Website of the State Tax Administration Agency (AEAT) where information can be found on types of taxes. R-0276.
[201] Spanish Constitution of 1978, Article 31(1). R-0027

374.   As we already explained in the Memorial on Preliminary Objections, the TVPEE is a "tax on income" for the purposes of the ECT and, therefore, section (7) of Article 10 of the ECT is not applicable to it.

375.   We should remember that the TVPEE is a direct tax and, specifically, a tax on income. The TVPEE levies a direct manifestation of the economic capacity of electricity producers: income obtained by said producers for production and incorporation into the electricity system of electrical energy in the Spanish electricity system.[202]

376.   Thus, the tax base of the TVPEE consists of the income that electricity producers receive for said production and incorporation into the electricity system of electrical energy. In this sense, according to Article 6 of Act 15/2012, the tax base of the TVPEE is "*the total amount that the taxpayer is to receive for the production of electrical energy and its incorporation into the electricity system, measured in power plant busbars, at each facility, in the taxable period.*"[203]

377.   In their Counter-Memorial on Preliminary Objections[204], the Claimants insist in their argument that the TVPEE is allegedly not an income tax because it is levied on gross income[205], not net income[206].

378.   The fact that the TVPEE is levied on the gross income does not prevent the TVPEE being considered a tax on income for the purposes of the ECT, given that the definition of tax on income stated in the ECT itself does not state that it must specifically be a tax on net income. In this sense, section (7)(b) of Article 21 of the ECT establishes that:

> "*7. <u>For the purposes of this Article:</u> […]*
>
> *b) <u>There shall be regarded as taxes on income</u> or on capital <u>all taxes imposed on total income</u>, on total capital <u>or on elements of income</u> or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts*

---

[202] Act 15/2012, Article 1: *The Tax on the value of the production of electrical energy is a <u>tax of a direct and real nature which is levied on the performance of activities of production and incorporation into the electricity system of electric energy, measured in busbars, through each one of the facilities indicated in article 4 of this Act.</u>* (emphasis added) R-0024
Law 15/2012, Article 4: *The <u>taxable event</u> is comprised of <u>the production and incorporation into the electricity system of electrical energy</u> measured in busbars, including the mainland, the non-mainland and the island territories electricity systems, in any of the installations referred to in Title IV of Act 54/1997, of 27 November, of the Electricity Sector.* (emphasis added) R-0024
[203] Law 15/2012, Article 6:
*The tax base consists of the <u>total amount that the taxpayer is to receive for the production of electrical energy and its incorporation into the electricity system</u>, measured in power plant busbars, at each facility, in the taxable period. […]*" (emphasis added) R-0024.
[204] Counter-Memorial on Preliminary objections, 8 August 2016, paragraphs 86 to 89.
[205] Income before deduction of expenses.
[206] Income after deduction of expenses.

*of wages or salaries paid by enterprises, as well as taxes on capital appreciation.*"[207] *(emphasis added)*

379.    Thus, the ECT, when defining the concept of tax on income for the purposes of the Treaty, does not limit the concept of taxes on income to taxes on net income. The ECT itself considers taxes on income both those that are levied on gross income and those that are levied on net income. The Claimants cannot expect to rewrite the wording of the ECT for their own convenience.

380.    Furthermore, as we have seen, the Energy Charter Treaty Secretariat makes it clear that section (7) of Article 21 of the ECT can only be applied to indirect taxes. It is absolutely clear that the TVPEE is not an indirect tax. As we have previously stated in this Memorial[208], both the Spanish Constitutional Court and the European Commission have ratified the nature and legality of this direct tax.

381.    In conclusion, given that Article 21(3) of the ECT states that section (7) of Article 10 of the ECT does not apply to taxes on income and given that the TVPEE is a tax on income for the purposes of the ECT, section (7) of Article 10 of the ECT does not generate obligations for the Kingdom of Spain regarding the TVPEE.

**(3)    In accordance with Article 21(3) of the ECT, section (7) of Article 10 of the ECT could never be applied in such a way that it imposes most favoured nation obligations as the Claimants intend**

382.    However, the Claimants seek application of section (7) of Article 10 of the ECT in such a way that it imposes most favoured nation obligations and the Fair and Equitable Treatment standard is applied to taxes.

383.    As the Kingdom of Spain has already stated, section (7) of Article 10 of the ECT does not apply to taxes on income such as the TVPEE.

384.    In any case, even in the merely hypothetical case that section (7) of Article 10 of the ECT was applicable to the TVPEE, which we firmly deny, said section (7) could not be applied in such a way that it imposes most favoured nation obligations as the Claimants intend, in accordance with Article 21(3)(a) of the ECT.

385.    In this sense, Article 21 of the ECT states:

*"1. Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.[...]*

---

[207] ECT, Article 21(7)(b). RL-0020
[208] Section III.D(2.3)(a)(i) and Section III.D(2.3)(b)(ii) of this Memorial.

*3. Article 10(2) and (7) shall apply to Taxation Measures of the Contracting Parties other than those on income or on capital, except <u>that such provisions shall not apply to</u>:*

*a) <u>Impose most favoured nation obligations</u> with respect to advantages accorded by a Contracting Party pursuant to the tax provisions of any convention, agreement or arrangement described in subparagraph (7)(a)(ii) or resulting from membership of any Regional Economic Integration Organisation; [...]"[209] (emphasis added)*

386.  Moreover, subsection (7)(a)(ii) of Article 21 of the ECT refers to "any provision relating to taxes of any convention for the avoidance of double taxation or of <u>any other international agreement or arrangement by which the Contracting Party is bound</u>." (emphasis added).

387.  The Spain-Uruguay BIT is an international agreement to which the Kingdom of Spain is bound. In addition, the provisions of said BIT through which the Fair and Equitable Treatment standard is extended to the taxes are, by simple logic, provisions relating to taxes. If this was not the case, it would not make sense for the Claimants to invoke them for their intended purposes.

388.  In conclusion, even in the merely hypothetical and theoretical case that section (7) of Article 10 of the ECT was applicable to the TVPEE, which we firmly deny since the TVPEE is a tax on income, said section (7) of Article 10 of the ECT could not be applied in such a way that it imposes most favoured nation obligations as the Claimants intend.

**(4)     Conclusion**

389.   As we have shown, section (7) of Article 10 of the ECT does not generate obligations regarding the TVPEE. This is due to the fact that, according to Article 21(3) of the ECT, section (7) of Article 10 of the ECT does not apply to taxes on income or capital and the TVPEE is a tax on income for the purposes of the ECT.

390.  Furthermore, even in the merely hypothetical case that section (7) of Article 10 of the ECT was applicable to the TVPEE, which we firmly deny, in accordance with Article 21(3)(a) of the ECT, section (7) of Article 10 of the ECT cannot be applied in such a way that it imposes most favoured nation obligations as the Claimants intend.

391.  In light of the foregoing, we reiterate our request to the Arbitral Tribunal to declare its lack of jurisdiction to hear the dispute on the alleged breach by the Kingdom of Spain of section (7) of Article 10 of the ECT in relation to the TVPEE.

---

[209] ECT, Article 21(3). RL-0020

V.     PETITUM AND RESERVATION OF RIGHTS

392.   In light of the arguments expressed herein, the Kingdom of Spain respectfully requests the Arbitral Tribunal to:

   a) declare its lacks of jurisdiction to hear the claims of the Claimants, or if applicable their inadmissibility, in accordance with what is set forth in Section III of this Memorial, referring to Jurisdictional Objections; and

   d) Sentence the Claimants to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees, and the fees of the legal representatives of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred and the date of their actual payment.

393.   The Kingdom of Spain reserves the right to supplement, modify or complement these pleadings and present any and all additional arguments that may be necessary in accordance with the ICSID Convention, the ICSID rules of arbitration, procedural orders and the directives of the Arbitral Tribunal in order to respond to all allegations made by the Claimant with regard to this matter.

Madrid, 14 October 2016

Respectfully submitted,

Mónica Moraleda Saceda        Diego Santacruz  Descartin