**EXHIBIT 15**

excluded from review by the Court when hearing an application for a preliminary ruling.[1]

3. The European Economic Community constitutes a new legal order of international law for the benefit of which the states have limited their sovereign rights, albeit within limited fields, and the subjects of which comprise not only the Member States but also their nationals.

 Independently of the legislation of Member States, Community law not only imposes obligations on individuals but is also intended to confer upon them rights which become part of their legal heritage. These rights arise not only where they are expressly granted by the Treaty but also by reason of obligations which the Treaty imposes in a clearly defined way upon individuals as well as upon the Member States and upon the institutions of the Community.

4. The fact that Articles 169 and 170 of the EEC Treaty enable the Commission and the Member States to bring before the Court a State which has not fulfilled its obligations does not deprive individuals of the right to plead the same obligations, should the occasion arise, before a national court.

5. According to the spirit, the general scheme and the wording of the EEC Treaty, Article 12 must be interpreted as producing direct effects and creating individual rights which national courts must protect.

6. It follows from the wording and the general scheme of Article 12 of the Treaty that, in order to ascertain whether customs duties and charges having equivalent effect have been increased contrary to the prohibition contained in the said Article, regard must be had to the customs duties and charges actually applied by Member States at the date of the entry into force of the Treaty.[2]

7. Where, after the entry into force of the Treaty, the same product is charged with a higher rate of duty, irrespective of whether this increase arises from an actual increase of the rate of customs duty or from a rearrangement of the tariff resulting in the classification of the product under a more highly taxed heading, such increase is illegal under Article 12 of the EEC Treaty.

In Case 26/62

Reference to the Court under subparagraph (a) of the first paragraph and under the third paragraph of Article 177 of the Treaty establishing the European Economic Community by the Tariefcommissie, a Netherlands administrative tribunal having final jurisdiction in revenue cases, for a preliminary ruling in the action pending before that court between

N.V. ALGEMENE TRANSPORT- EN EXPEDITIE ONDERNEMING VAN GEND & LOOS, having its registered office at Utrecht, represented by H.G. Stibbe and L.F.D. ter Kuile, both Advocates of Amsterdam, with an address for

---

1 — Cf. Paragraph No 4 of Summary of Judgment in Case 13/61, Rec. 1962., p. 94.
2 — Cf. Paragraph No 1 of Summary of Judgment in Case 10/61, Rec. 1962., p. 5.

service in Luxembourg at the Consulate-General of the Kingdom of the Netherlands

and

NEDERLANDSE ADMINISTRATIE DER BELASTINGEN (NETHERLANDS INLAND REVENUE ADMINISTRATION), represented by the Inspector of Customs and Excise at Zaandam, with an address for service in Luxembourg at the Netherlands Embassy,

on the following questions:

1. Whether Article 12 of the EEC Treaty has direct application within the territory of a Member State, in other words, whether nationals of such a State can, on the basis of the Article in question, lay claim to individual rights which the courts must protect;

2. In the event of an affirmative reply, whether the application of an import duty of 8% to the import into the Netherlands by the applicant in the main action of ureaformaldehyde originating in the Federal Republic of Germany represented an unlawful increase within the meaning of Article 12 of the EEC Treaty or whether it was in this case a reasonable alteration of the duty applicable before 1 March 1960, an alteration which, although amounting to an increase from the arithmetical point of view, is nevertheless not to be regarded as prohibited under the terms of Article 12;

THE COURT

composed of: A. M. Donner, President, L. Delvaux and R. Rossi (Presidents of Chambers), O. Riese, Ch. L. Hammes (Rapporteur), A. Trabucchi and R. Lecourt, Judges,

Advocate-General: K. Roemer
Registrar: A. Van Houtte

gives the following

3

# JUDGMENT

## Issues of fact and of law

I — Facts and procedure

The facts and the procedure may be summarized as follows:

1. On 9 September 1960 the company N. V. Algemene Transport- en Expeditie Onderneming van Gend en Loos (hereinafter called 'Van Gend & Loos'), according to a customs declaration of 8 September on form D.5061, imported into the Netherlands from the Federal Republic of Germany a quantity of ureaformaldehyde, described in the import document as 'Harnstoffharz (U.F. resin) 70, aqueous emulsion of ureaformaldehyde'.

2. On the date of importation, the product in question was classified in heading 39.01-a-1 of the tariff of import duties listed in the 'Tariefbesluit' which entered into force on 1 March 1960. The nomenclature of the 'Tariefbesluit' is taken from the protocol concluded between the Kingdom of Belgium, the Grand Duchy of Luxembourg and the Kingdom of the Netherlands at Brussels on 25 July 1958, ratified in the Netherlands by the Law of 16 December 1959.

3. The wording of heading 39.01-a-1 was as follows:

'Products of condensation, poly-condensation and poly-addition, whether modified or not, polymerized, or linear (phenoplasts, aminoplasts, alkyds, allylic polyesters and other non-saturated polyesters, silicones etc. . . .):
(a) Liquid or paste products, including emulsions, dispersions and solutions:

| | Duties applicable | |
|---|---|---|
| | gen. % | spec. % |
| 1. Aminoplasts in aqueous emulsions, dispersions or solutions | 10% | 8%' |

4. On this basis, the Dutch revenue authorities applied an *ad valorem* import duty of 8% to the importation in question.

5. On 20 September 1960 Van Gend & Loos lodged an objection with the Inspector of Customs and Excise at Zaandam against the application of this duty in the present case. The company put forward in particular the following arguments:
On 1 January 1958, the date on which the EEC Treaty entered into force, aminoplasts in emulsion were classified under heading 279-a-2 of the tariff in the 'Tariefbesluit' of 1947, and charged with an *ad valorem* import duty of 3%.
In the 'Tariefbesluit' which entered into force on 1 March 1960, heading 279-a-2 was replaced by heading 39.01-a.
Instead of applying, in respect of intra-Community trade, an import duty of 3% uniformly to all products under the old heading 279-a-2, a sub-division was created: 39.01-a-1, which contained only aminoplasts in aqueous emulsions, dispersions or solutions, and in respect of which import duty was fixed at 8%. For the other products in heading 39.01-a, which also had been included in the old heading 279-a-2, the import duty of 3% applied on 1 January 1958 was maintained.
By thus increasing the import duty on the product in question after the entry

into force of the EEC Treaty, the Dutch Government infringed Article 12 of that Treaty, which provides that Member States shall refrain from introducing between themselves any new customs duties on imports or exports or any charges having equivalent effect, and from increasing those which they already apply in their trade with each other.

6. The objection of Van Gend & Loos was dismissed on 6 March 1961 by the Inspector of Customs and Excise at Zaandam on the ground of inadmissibility, because it was not directed against the actual application of the tariff but against the rate.

7. Van Gend & Loos appealed against this decision to the Tariefcommissie, Amsterdam, on 4 April 1961.

8. The case was heard by the Tariefcommissie on 21 May 1962. In support of its application for the annulment of the contested decision Van Gend & Loos put forward the arguments already submitted in its objection of 20 September 1960. The Nederlandse administratie der belastingen replied in particular that when the EEC Treaty entered into force the product in question was not charged under the heading 279-a-2 with a duty of only 3% but, because of its composition and intended application, was classified under heading 332 bis ('synthetic and other adhesives, not stated or included elsewhere') and charged with a duty of 10% so that there had not in fact been any increase.

9. The Tariefcommissie, without giving a formal decision on the question whether the product in question fell within heading 332 bis or heading 279-a-2 of the 1947 'Tariefbesluit', took the view that the arguments of the parties raised a question concerning the interpretation of the EEC Treaty. It therefore suspended the proceedings and, in conformity with the third paragraph of Article 177 of the Treaty, referred to the Court of Justice on 16 August 1962, for a preliminary ruling the two questions set out above.

10. The decision of the Tariefcommissie was notified on 23 August 1962 by the Registrar of the Court to the parties to the action, to the Member States and to the Commission of the EEC.

11. Pursuant to Article 20 of the Protocol on the Statute of the Court of Justice of the EEC written observations were submitted to the Court by the parties to the main action, by the Government of the Kingdom of Belgium, the Government of the Federal Republic of Germany, the Commission of the EEC and the Government of the Kingdom of the Netherlands.

12. At the public hearing the Court on 29 November 1962, the oral submissions of the plaintiff in the main action and of the Commission of the EEC were heard. At the same hearing questions were put to them by the Court. Written replies to these were supplied within the prescribed time.

13. The Advocate-General gave his reasoned oral opinion at the hearing on 12 December 1962, in which he proposed that the Court should in its judgment only answer the first question referred to it and hold that Article 12 of the EEC Treaty imposes a duty only on Member States.

II — Arguments and observations

The arguments contained in the observations submitted in accordance with the second paragraph of Article 20 of the Protocol on the Statute of the Court of Justice of the European Economic Community by the parties to the main action, the Member States and the Commission may be summarized as follows:

A—*The first question*

Admissibility

The *Netherlands Government,* the

5

*Belgian Government* and the *Nederlandse administratie der belastingen* (which in its statement of case declared that it was in complete agreement with the observations submitted by the Netherlands Government) confirm that the main complaint of Van Gend & Loos against the Governments of the Benelux countries is that by the Brussels Protocol of 25 July 1958 they infringed Article 12 of the EEC Treaty by increasing after its entry into force a customs duty applied in their trade with other Member States of the Communities.

The *Netherlands Government* disputes whether an alleged infringement of the Treaty by a Member State can be submitted to the judgment of the Court by a procedure other than that laid down by Article 169 or 170, that is to say on the initiative of another Member State or of the Commission. It maintains in particular that the matter cannot be brought before the Court by means of the procedure of reference for a preliminary ruling under Article 177.

The Court, according to the Netherlands Government, cannot, in the context of the present proceedings, decide a problem of this nature, since it does not relate to the interpretation but to the application of the Treaty in a specific case.

The *Belgian Government* maintains that the first question is a reference to the Court of a problem of constitutional law, which falls exclusively within the jurisdiction of the Netherlands court.

That court is confronted with two international treaties both of which are part of the national law. It must decide under national law—assuming that they are in fact contradictory—which treaty prevails over the other or more exactly whether a prior national law of ratification prevails over a subsequent one.

This is a typical question of national constitutional law which has nothing to do with the interpretation of an Article of the EEC Treaty and is within the exclusive jurisdiction of the Netherlands court, because it can only be answered according to the constitutional principles and jurisprudence of the national law of the Netherlands.

The Belgian Government also points out that a decision on the first question referred to the Court is not only unnecessary to enable the Tariefcommissie to give its judgment but cannot even have any influence on the solution to the actual problem which it is asked to resolve.

In fact, whatever answer the Court may give, the Tariefcommissie has to solve the same problem: Has it the right to ignore the law of 16 December 1959 ratifying the Brussels Protocol, because it conflicts with an earlier law of 5 December 1957 ratifying the Treaty establishing the EEC?

The question raised is not therefore an appropriate question for a preliminary ruling, since its answer cannot enable the court which has to adjudicate upon the merits of the main action to make a final decision in the proceedings pending before it.

The *Commission of the EEC,* on the other hand, observes that the effect of the provisions of the Treaty on the national law of Member States cannot be determined by the actual national law of each of them but by the Treaty itself. The problem is therefore without doubt one of interpretation of the Treaty.

Further the Commission calls attention to the fact that a finding of inadmissibility would have the paradoxical and shocking result that the rights of individuals would be protected in all cases of infringement of Community law except in the case of an infringement by a Member State.

On the substance

*Van Gend & Loos* answers in the affirmative the question whether the Article has internal effect.

It maintains in particular that:
— Article 12 is applicable without any preliminary incorporation in the national legislation of Member States, since it only imposes a negative obligation;
— it has direct effect without any further measures of implementation under Community legislation, as all the customs duties applied by Member States in their trade with each other were bound on 1 January 1957 (Article 14 of the Treaty);
— although the Article does not directly refer to the nationals of Member States but to the national authorities, infringement of it adversely affects the fundamental principles of the Community, and individuals as well as the Community must be protected against such infringements;
— it is particularly well adapted for direct application by the national court which must set aside the application of customs duties introduced or increased in breach of its provisions.

The *Commission* emphasizes the importance of the Court's answer to the first question. It will have an effect not only on the interpretation of the provision at issue in a specific case and on the effect which will be attributed to it in the legal systems of Member States but also on certain other provisions of the Treaty which are as clear and complete as Article 12.

According to the Commission an analysis of the legal structure of the Treaty and of the legal system which it establishes shows on the one hand that the Member States did not only intend to undertake mutual commitments but to establish a system of Community law, and on the other hand that they did not wish to withdraw the application of this law from the ordinary jurisdiction of the national courts of law.

However, Community law must be effectively and uniformly applied throughout the whole of the Community.

The result is first that the effect of Community law on the internal law of Member States cannot be determined by this internal law but only by Community law, further that the national courts are bound to apply directly the rules of Community law and finally that the national court is bound to ensure that the rules of Community law prevail over conflicting national laws even if they are passed later.

The Commission observes in this context that the fact that a Community rule is, as regards its form, directed to the states does not of itself take away from individuals who have an interest in it the right to require it to be applied in the national courts.

As regards more particularly the question referred to the Court, the Commission is of the opinion that Article 12 contains a rule of law capable of being effectively applied by the national court.

It is a provision which is perfectly clear in the sense that it creates for Member States a specific unambiguous obligation relating to the extension of their internal law in a matter which directly affects their nationals and it is not affected or qualified by any other provision of the Treaty.

It is also a complete and self-sufficient provision in that it does not require on a Community level any new measure to give concrete form to the obligation which it defines.

The *Netherlands Government* draws a distinction between the question of the internal effect and that of the direct effect (or direct applicability), the first, according to it, being a pre-condition of the second.

It considers that the question whether a particular provision of the Treaty has an internal effect can only be answered in the affirmative, if all the essential elements, namely the intention of the contracting parties and the material

terms of the provision under consideration, allows such a conclusion.

With regard to the intention of the parties to the Treaty the Netherlands Government maintains that an examination of the actual wording is sufficient to establish that Article 12 only places an obligation on Member States, who are free to decide how they intend to fulfil this obligation. A comparison with other provisions of the Treaty confirms this finding.

As Article 12 does not have internal effect it cannot, *a fortiori*, have direct effect.

Even if the fact that Article 12 places an obligation on Member States were to be considered as an internal effect, it cannot have direct effect in the sense that it permits the nationals of Member States to assert subjective rights which the courts must protect.

Alternatively the Netherlands Government argues that, so far as the necessary conditions for its direct application are concerned, the EEC Treaty does not differ from a standard international treaty. The conclusive factors in this respect are the intention of the parties and the provisions of the Treaty.

However the question whether under Netherlands constitutional law Article 12 is directly applicable is one concerning the interpretation of Netherlands law and does not come within the jurisdiction of the Court of Justice.

Finally the Netherlands Government indicates what the effect would be, in its view, of an affirmative answer to the first question put by the Tariefcommissie:

— it would upset the system which the authors of the Treaty intended to establish;
— it would create, with regard to the many provisions in Community regulations which expressly impose obligations on Member States, an uncertainty in the law of a kind which could call in question the readiness of these States to cooperate in the future;
— it would put in issue the responsibility of States by means of a procedure which was not designed for this purpose.

The *Belgian Government* maintains that Article 12 is not one of the provisions — which are the exception in the Treaty — having direct internal effect.

Article 12 does not constitute a rule of law of general application providing that any introduction of a new customs duty or any increase in an existing duty is automatically without effect or is absolutely void. It merely obliges Member States to refrain from taking such measures.

It does not create therefore a directly applicable right which nationals could invoke and enforce. It requires from Governments action at a later date to attain the objective fixed by the Treaty. A national court cannot be asked to enforce compliance with this obligation.

The *German Government* is also of the opinion that Article 12 of the EEC Treaty does not constitute a legal provision which is directly applicable in all Member States. It imposes on them an international obligation (in the field of customs policy) which must be implemented by national authorities endowed with legislative powers.

Customs duties applicable to a citizen of a Member State of the Community, at least during the transitional period, thus do not derive from the EEC Treaty or the legal measures taken by the institutions, but from legal measures enacted by Member States. Article 12 only lays down the provisions with which they must comply in their customs legislation.

Moreover the obligation laid down only applies to the other contracting Member States.

In German law a legal provision which laid down a customs duty contrary to the provisions of Article 12 would be perfectly valid.

Within the framework of the EEC Treaty the legal protection of nationals of Member States is secured, by provisions derogating from their national constitutional system, only in respect of those measures taken by the institutions of the Community which are of direct and individual concern to such nationals.

B—*The second question*

Admissibility

The *Netherlands* and *Belgian Governments* are of the opinion that the second as well as the first question is inadmissible.
According to them the answer to the question whether in fact the Brussels Protocol of 1958 represents a failure by those states who are signatories to fulfil the obligations laid down in Article 12 of the EEC Treaty cannot be given in the context of a preliminary ruling, because the issue is the application of the Treaty and not its interpretation. Moreover such an answer presupposes a careful study and a specific evaluation of the facts and circumstances peculiar to a given situation, and this is also inadmissible under Article 177.
The *Netherlands Government* emphasizes, furthermore, that if a failure by a state to fulfil its Community obligations could be brought before the Court by a procedure other than those under Articles 169 and 170 the legal protection of that state would be considerably diminished.
The *German Government*, without making a formal objection of inadmissibility, maintains that Article 12 only imposes an international obligation on states and that the question whether national rules enacted for its implementation do not comply with this obligation cannot depend upon a decision of the Court under Article 177 since it does not involve the interpretation of the Treaty.
*Van Gend & Loos* also considers that direct form of the second question would necessitate an examination of the facts for which the Court has no jurisdiction when it makes a ruling under Article 177. The real question for interpretation according to it could be worded as follows:
Is it possible for a derogation from the rules applied before 1 March 1960 (or more accurately, before 1 January 1958) not to be in the nature of an increase prohibited by Article 12 of the Treaty, even though this derogation arithmetically represents an increase?

On the substance

*Van Gend & Loos* repeats in detail the history of the classification of aminoplasts in the successive tariffs to show that the company was charged with a duty of 8% instead of 3% intentionally and not because of the inevitable effect of adapting the old tariff to the new. The Netherlands Government was therefore in breach of Article 12 of the EEC Treaty when it increased a customs duty applied in its trade with other Member States.
The *Netherlands* and *Belgian Governments* reply that, before the modification of the Benelux Tariff of 1958, ureaformaldehyde was not subject to an import duty of 3% laid down for heading 279-a-2 of the 'Tariefbesluit' of 1947, but to an import duty of 10% laid down for heading 332 bis (adhesives).
In fact experience showed that the goods in question were usually used as glue and that as a general rule they could be used as such. Therefore the ministries concerned decided that the product in question was always to be taxed as glue and was to be included under heading 332 bis.
Although, when the intended appli-

cation of the product in dispute was not sufficiently specified, the Tariefcommissie in certain cases classified it under heading 279-a-2, the authorities of the Benelux States charged it with an import duty of 10% from the date of the entry into force of the Brussels nomenclature, which put an end to any possible argument.

There can be no question, therefore, in this case, of an increase of a customs duty or of a derogation from the provisions of Article 12 of the Treaty.

*Van Gend & Loos* replies that only aqueous solutions of aminoplasts to which fillers or binders had been added and which only required the addition of a hardener to make an effective adhesive, that is to say, solutions which could be considered as raw materials, could be classified under heading 332 bis.

The *Commission of the EEC* is of the opinion first that the prohibition in Article 12 relates to all goods which are capable of being the subject matter of trade between Member States (to the extent to which such trade relates to products complying with the conditions of Article 9(2)).

Article 12 not only aims at the general maintenance of customs duties applied by the various Member States in their relations with each other but also relates to each individual product. It allows no exception even partial or provisional.

The Commission then points out that, in the context of Article 12, regard must be had to the duty actually applied when the Treaty entered into force. This duty results from the whole of the provisions and customary practice of administrative law.

However, an isolated classification under another tariff heading is in itself insufficient proof that the duty of 10% chargeable under heading 332 bis is not in fact applied to aminoplasts.

In this case it is necessary to recognize a concept of *prima facie* legality: when there is an official interpretation by the competent administration and instructions in conformity with this interpretation have been given to executive officers to fix the detailed rules for levying a duty, that is the 'duty applied' within the meaning of Article 12 of the Treaty.

The Commission, therefore, considers the duty of 10% as the duty applied on the entry into force of the Treaty. There has not therefore been in this case any increase contrary to Article 12.

## Grounds of judgment

### I — Procedure

No objection has been raised concerning the procedural validity of the reference to the Court under Article 177 of the EEC Treaty by the Tariefcommissie, a court or tribunal within the meaning of that Article. Further, no grounds exist for the Court to raise the matter of its own motion.

### II — The first question

#### A — *Jurisdiction of the Court*

The Government of the Netherlands and the Belgian Government challenge the jurisdiction of the Court on the ground that the reference relates not to the interpretation but to the application of the Treaty in the context of

the constitutional law of the Netherlands, and that in particular the Court has no jurisdiction to decide, should the occasion arise, whether the provisions of the EEC Treaty prevail over Netherlands legislation or over other agreements entered into by the Netherlands and incorporated into Dutch national law. The solution of such a problem, it is claimed, falls within the exclusive jurisdiction of the national courts, subject to an application in accordance with the provisions laid down by Articles 169 and 170 of the Treaty.

However in this case the Court is not asked to adjudicate upon the application of the Treaty according to the principles of the national law of the Netherlands, which remains the concern of the national courts, but is asked, in conformity with subparagraph (a) of the first paragraph of Article 177 of the Treaty, only to interpret the scope of Article 12 of the said Treaty within the context of Community law and with reference to its effect on individuals. This argument has therefore no legal foundation.

The Belgian Government further argues that the Court has no jurisdiction on the ground that no answer which the Court could give to the first question of the Tariefcommissie would have any bearing on the result of the proceedings brought in that court.

However, in order to confer jurisdiction on the Court in the present case it is necessary only that the question raised should clearly be concerned with the interpretation of the Treaty. The considerations which may have led a national court or tribunal to its choice of questions as well as the relevance which it attributes to such questions in the context of a case before it are excluded from review by the Court of Justice.

It appears from the wording of the questions referred that they relate to the interpretation of the Treaty. The Court therefore has the jurisdiction to answer them.

This argument, too, is therefore unfounded.

B—*On the substance of the Case*

The first question of the Tariefcommissie is whether Article 12 of the Treaty has direct application in national law in the sense that nationals of Member States may on the basis of this Article lay claim to rights which the national court must protect.

11

To ascertain whether the provisions of an international treaty extend so far in their effects it is necessary to consider the spirit, the general scheme and the wording of those provisions.

The objective of the EEC Treaty, which is to establish a Common Market, the functioning of which is of direct concern to interested parties in the Community, implies that this Treaty is more than an agreement which merely creates mutual obligations between the contracting states. This view is confirmed by the preamble to the Treaty which refers not only to governments but to peoples. It is also confirmed more specifically by the establishment of institutions endowed with sovereign rights, the exercise of which affects Member States and also their citizens. Furthermore, it must be noted that the nationals of the states brought together in the Community are called upon to cooperate in the functioning of this Community through the intermediary of the European Parliament and the Economic and Social Committee.

In addition the task assigned to the Court of Justice under Article 177, the object of which is to secure uniform interpretation of the Treaty by national courts and tribunals, confirms that the states have acknowledged that Community law has an authority which can be invoked by their nationals before those courts and tribunals.

The conclusion to be drawn from this is that the Community constitutes a new legal order of international law for the benefit of which the states have limited their sovereign rights, albeit within limited fields, and the subjects of which comprise not only Member States but also their nationals. Independently of the legislation of Member States, Community law therefore not only imposes obligations on individuals but is also intended to confer upon them rights which become part of their legal heritage. These rights arise not only where they are expressly granted by the Treaty, but also by reason of obligations which the Treaty imposes in a clearly defined way upon individuals as well as upon the Member States and upon the institutions of the Community.

With regard to the general scheme of the Treaty as it relates to customs duties and charges having equivalent effect it must be emphasized that Article 9, which bases the Community upon a customs union, includes as an essential provision the prohibition of these customs duties and charges. This provision is found at the beginning of the part of the Treaty which defines the 'Foundations of the Community'. It is applied and explained by Article 12.

The wording of Article 12 contains a clear and unconditional prohibition which is not a positive but a negative obligation. This obligation, moreover, is not qualified by any reservation on the part of states which would make its implementation conditional upon a positive legislative measure enacted under national law. The very nature of this prohibition makes it ideally adapted to produce direct effects in the legal relationship between Member States and their subjects.

The implementation of Article 12 does not require any legislative intervention on the part of the states. The fact that under this Article it is the Member States who are made the subject of the negative obligation does not imply that their nationals cannot benefit from this obligation.

In addition the argument based on Articles 169 and 170 of the Treaty put forward by the three Governments which have submitted observations to the Court in their statements of case is misconceived. The fact that these Articles of the Treaty enable the Commission and the Member States to bring before the Court a State which has not fulfilled its obligations does not mean that individuals cannot plead these obligations, should the occasion arise, before a national court, any more than the fact that the Treaty places at the disposal of the Commission ways of ensuring that obligations imposed upon those subject to the Treaty are observed, precludes the possibility, in actions between individuals before a national court, of pleading infringements of these obligations.

A restriction of the guarantees against an infringement of Article 12 by Member States to the procedures under Article 169 and 170 would remove all direct legal protection of the individual rights of their nationals. There is the risk that recourse to the procedure under these Articles would be ineffective if it were to occur after the implementation of a national decision taken contrary to the provisions of the Treaty.

The vigilance of individuals concerned to protect their rights amounts to an effective supervision in addition to the supervision entrusted by Articles 169 and 170 to the diligence of the Commission and of the Member States.

It follows from the foregoing considerations that, according to the spirit, the general scheme and the wording of the Treaty, Article 12 must be interpreted as producing direct effects and creating individual rights which national courts must protect.

13

III — The second question

A — *The jurisdiction of the Court*

According to the observations of the Belgian and Netherlands Governments, the wording of this question appears to require, before it can be answered, an examination by the Court of the tariff classification of ureaformaldehyde imported into the Netherlands, a classification on which Van Gend & Loos and the Inspector of Customs and Excise at Zaandam hold different opinions with regard to the 'Tariefbesluit' of 1947. The question clearly does not call for an interpretation of the Treaty but concerns the application of Netherlands customs legislation to the classification of aminoplasts, which is outside the jurisdiction conferred upon the Court of Justice of the European Communities by subparagraph (a) of the first paragraph of Article 177.

The Court has therefore no jurisdiction to consider the reference made by the Tariefcommissie.

However, the real meaning of the question put by the Tariefcommissie is whether, in law, an effective increase in customs duties charged on a given product as a result not of an increase in the rate but of a new classification of the product arising from a change of its tariff description contravenes the prohibition in Article 12 of the Treaty.

Viewed in this way the question put is concerned with an interpretation of this provision of the Treaty and more particularly of the meaning which should be given to the concept of duties applied before the Treaty entered into force.

Therefore the Court has jurisdiction to give a ruling on this question.

B — *On the substance*

It follows from the wording and the general scheme of Article 12 of the Treaty that, in order to ascertain whether customs duties or charges having equivalent effect have been increased contrary to the prohibition contained in the said Article, regard must be had to the customs duties and charges actually applied at the date of the entry into force of the Treaty.

Further, with regard to the prohibition in Article 12 of the Treaty, such an illegal increase may arise from a re-arrangement of the tariff resulting in the

14

classification of the product under a more highly taxed heading and from an actual increase in the rate of customs duty.

It is of little importance how the increase in customs duties occurred when, after the Treaty entered into force, the same product in the same Member State was subjected to a higher rate of duty.

The application of Article 12, in accordance with the interpretation given above, comes within the jurisdiction of the national court which must enquire whether the dutiable product, in this case ureaformaldehyde originating in the Federal Republic of Germany, is charged under the customs measures brought into force in the Netherlands with an import duty higher than that with which it was charged on 1 January 1958.

The Court has no jurisdiction to check the validity of the conflicting views on this subject which have been submitted to it during the proceedings but must leave them to be determined by the national courts.

IV — Costs

The costs incurred by the Commission of the EEC and the Member States which have submitted their observations to the Court are not recoverable, and as these proceedings are, in so far as the parties to the main action are concerned, a step in the action pending before the Tariefcommissie, the decision as to costs is a matter for that court.

On those grounds,

Upon reading the pleadings;
Upon hearing the report of the Judge-Rapporteur;
Upon hearing the parties;
Upon hearing the opinion of the Advocate-General;
Having regard to Articles 9, 12, 14, 169, 170 and 177 of the Treaty establishing the European Economic Community;
Having regard to the Protocol on the Statute of the Court of Justice of the European Economic Community;
Having regard to the Rules of Procedure of the Court of Justice of the European Communities;

15

THE COURT

in answer to the questions referred to it for a preliminary ruling by the Tariefcommissie by decision of 16 August 1962, hereby rules:

1. Article 12 of the Treaty establishing the European Economic Community produces direct effects and creates individual rights which national courts must protect.

2. In order to ascertain whether customs duties or charges having equivalent effect have been increased contrary to the prohibition contained in Article 12 of the Treaty, regard must be had to the duties and charges actually applied by the Member State in question at the date of the entry into force of the Treaty.
Such an increase can arise both from a re-arrangement of the tariff resulting in the classification of the product under a more highly taxed heading and from an increase in the rate of customs duty applied.

3. The decision as to costs in these proceedings is a matter for the Tariefcommissie.

       Donner                           Delvaux                         Rossi

Riese                  Hammes               Trabucchi             Lecourt

Delivered in open court in Luxembourg on 5 February 1963.

A. Van Houtte                                                           A. M. Donner

Registrar                                                                                       President

## OPINION OF MR ADVOCATE-GENERAL KARL ROEMER
## DELIVERED ON 12 DECEMBER 1962[1]

*Mr President,*

*Members of the Court,*

The present proceedings originate in an action before the Tariefcommissie, a Dutch administrative court. This action is for the annulment of a decision of the Nederlandse administratie der belastingen (the Netherlands Inland Revenue Administration) of 6 March 1961 concerning the application of a particular customs duty to the import of urea-formaldehyde from the Federal Republic of Germany. The decision is based on

---

1 — Translated from the German.