# EXHIBIT 16

COSTA v ENEL

seeing that the Member States respect those obligations which have been imposed upon them by the Treaty and which bind them as States without creating individual rights, but this obligation on the part of the Commission does not give individuals the right to allege, in Community law or under Article 177, either failure by the State concerned to fulfil any of its obligations or breach of duty on the part of the Commission.

5. Article 102 of the EEC Treaty contains no provisions which are capable of creating individual rights which national courts must protect.

6. Article 93 of the EEC Treaty contains no provisions which are capable of creating individual rights which national courts must protect.

7. A Member State's obligation under the EEC Treaty, which is neither subject to any conditions nor, as regards its execution or effect, to the adoption of any measure either by the States or by the Commission, is legally complete and consequently capable of producing direct effects on the relations between Member States and individuals. Such an obligation becomes an integral part of the legal system of the Member States, and thus forms part of their own law, and directly concerns their nationals in whose favour it has created individual rights which national courts must protect.

8. Article 53 of the EEC Treaty constitutes a Community rule capable of creating individual rights

which national courts must protect.

9. Article 53 of the EEC Treaty is satisfied so long as no new measure subjects the establishment of nationals of other Member States to more severe rules than those prescribed for nationals of the country of establishment, whatever the legal system governing the undertakings.

10. Article 37 (2) of the EEC Treaty constitutes in all its provisions a rule of Community law capable of creating individual rights which national courts must protect.

11. The provisions of Article 37 (2) of the EEC Treaty have as their object the prohibition of any new measure contrary to the principles of Article 37 (1), that is any measure having as its object or effect a new discrimination between nationals of Member States regarding the conditions in which goods are procured and marketed, by means of monopolies or bodies which must, first, have as their object transactions regarding a commercial product capable of being the subject of competition and trade between Member States, and secondly must play an effective part in such trade.
It is a matter for the court dealing with the main action to assess in each case whether the economic activity under review relates to such a product which, by virtue of its nature and the technical or international conditions to which it is subject, is capable of playing such a part in imports or exports between nationals of the Member States.

In Case 6/64

Reference to the Court under Article 177 of the EEC Treaty by the Giudice Conciliatore, Milan, for a preliminary ruling in the action pending before that court between

JUDGMENT OF 15.7.1964 — CASE 6/64

FLAMINIO COSTA

and

ENEL (Ente Nazionale Energia Elettrica (National Electricity Board), formerly the Edison Volta undertaking)

on the interpretation of Articles 102, 93, 53 and 37 of the said Treaty

THE COURT

composed of: A. M. Donner, President, Ch. L. Hammes and A. Trabucchi, Presidents of Chambers, L. Delvaux, R. Rossi, R. Lecourt (Rapporteur) and W. Strauß, Judges,

Advocate-General: M. Lagrange
Registrar: A. Van Houtte

gives the following

# JUDGMENT

## Issues of fact and of law

### I — Facts and procedure

By Law No 1643 of 6 December 1962 and subsequent decrees the Italian Republic nationalized the production and distribution of electric energy and created an organization, the Ente Nazionale Energia Elettrica (or ENEL) (National Electricity Board) to which the assets of the electricity undertakings were transferred.

In proceedings about the payment of an invoice for electricity between Flaminio Costa and ENEL, before the Giudice Conciliatore, Milan, Mr Costa, as a shareholder of Edison Volta, a company affected by the nationalization, and as an electricity consumer, requested the court to apply Article 177 of the EEC Treaty so as to obtain an interpretation of Articles 102, 93, 53 and 37 of the said Treaty, which Articles, he alleged, had been infringed by the Law of 6 December 1962. The Giudice Conciliatore, by

order of 16 January 1964 acceding to this request, decided as follows:
'Having regard to Article 177 of the Treaty of 25 March 1957 establishing the EEC, incorporated into Italian law by Law No 1203 of 14 October 1957, and having regard to the allegation that Law No 1643 of 6 December 1962 and the presidential decrees issued in execution of that Law (No 1670 of 15 December 1962, No 36 of 4 February 1963, No 138 of 25 February 1963 and No 219 of 14 March 1963) infringe Articles 102, 93, 53 and 37 of the aforementioned Treaty, the Court hereby stays the proceedings and orders that a certified copy of the file be transmitted to the Court of Justice of the European Economic Community in Luxembourg.'
This application for a preliminary ruling was transmitted by the Registrar of the Giudice Conciliatore to the Court and was received in the Court Registry on

COSTA v ENEL

20 February 1964.

Mr Costa set out his observations in his written statement of case lodged on 15 May 1964. He asked the Court 'for an interpretation of the Treaty, in particular of Articles 102, 93, 53 and 37'.

In its statement of case lodged on 23 May 1964, the Italian Government submitted that the application for a preliminary ruling was 'absolutely inadmissible' and that there were no grounds for raising the questions referred. ENEL, in its statement of case lodged on the same day, also submitted that there were no grounds for raising these questions.

In its statement of case dated 23 May 1964, the EEC Commission made its observations both on the relevance of the questions put and on the interpretation of the abovementioned Articles.

The Court also received an 'application to intervene', filed in the Registry on 20 May 1964, which was declared inadmissible by order of 3 June 1964.

## II — Observations submitted under Article 20 of the Statute of the Court

### On the admissibility of the reference for a preliminary ruling

The *Italian Government* complains that the Giudice Conciliatore did not restrict itself to asking the Court to interpret the Treaty but also asked it to declare whether the Italian law in dispute was in conformity with the Treaty, and that because of this the preliminary ruling is inadmissible.

A national court, it is claimed, cannot have recourse to this procedure when, for the purposes of deciding a dispute it has only to apply a domestic law and not a provision of the Treaty. Article 177 cannot be used as a means of allowing a national court, on the initiative of a national of a Member State, to subject a law of that State to the procedure for a preliminary ruling for infringement of the obligations of the Treaty. The only procedure possible is that under Articles 169 and 170 and consequently the present proceedings before the Court of Justice are 'absolutely inadmissible'.

*Mr Costa* claims on the other hand that by the Treaty the jurisdiction of the Court depends on the mere existence of a request within the meaning of Article 177 and it appears from the question submitted that it involves a case of interpretation of the Treaty; it is not for the Court of Justice to judge the facts or the considerations which may have led the national court to make its choice of questions.

Finally the *Commission* raises the point that the Court's examination cannot concern itself with the reasons which led the national court to adopt its questions or with their importance for the solution of the dispute. In this case their wording seems to bear a resemblance to an action for failure to fulfil a Community obligation as envisaged under Articles 169 and 170 and as such is inadmissible. It is however for the Court to decide from the questions referred those relating solely to the subject of interpretation as permitted by Article 177.

Finally the Commission points out that in a judgment dated 7 March 1964 the Italian constitutional court failed to apply this Article in a similar case and thus took a decision involving certain repercussions on the future of Community law as a whole.

### On the interpretation of Article 102

As to the interpretation of Article 102, *Mr Costa* suggests that prior consultation with the Commission should be regarded as an obligation for the Member State in question and not as a mere right. Any other interpretation of Article 102 would deprive it of its purpose. Failure to consult the Commission, when faced with the existence of a potential danger of distortion, consti-

589

tutes an irregularity. A Member State cannot itself appreciate the likelihood of distortion without unilaterally assuming a power which has not been conferred on it.

The *Commission* denies the existence of a distortion. It seems to state however that, if there is any doubt as to its existence, then there would be grounds for consulting the Commission and that, at the time when the disputed law concerning nationalization was adopted, the Italian Republic did not respect the rule of procedure applicable in this case. The *Italian Government* points out that the Commission, when informed by a written question submitted by a German deputy, accepted nationalization in this case and referred to Article 222. There is no distortion within the meaning of Article 102 as long as it is a question of setting up a public service intended to achieve the objectives of public utility indicated in Article 43 of the Italian constitution and as long as the conditions of competition are not adversely affected.

ENEL puts forward similar arguments and points out that the establishment of a public service applies equally to all those coming under the scheme.

### On the interpretation of Article 93

With regard to the interpretation of Article 93, *Mr Costa* considers that the nationalization of an economic activity automatically results in the creation of a system in which hidden aid is granted to the nationalized sector. The Commission must accordingly intervene in accordance with the procedure prescribed by Article 93.

The *Commission* considers that Member States which do not respect the provisions of Article 93 (3) are committing a procedural infringement which itself suffices to entitle the Commission to take action under Article 169. The Commission nevertheless retains the power to bring the matter before the Court of Justice in cases where the material incompatibility of the aid in dispute is accompanied by infringement of the procedural rule under consideration.

The Commission has studied the draft law in dispute but without coming to the conclusion that it is incompatible with the Common Market. In the Commission's opinion the only question relates to the matter of procedure and concerns the failure to notify. The Commission reserves the right to take action if the aid in question proves to be incompatible with the Treaty.

The *Italian Government* and *ENEL* point out that the facts show that there is no incompatibility between the Law on nationalization and Article 93.

The establishment of ENEL has nothing to do with Community law.

### On the interpretation of Article 53

With regard to the interpretation of Article 53 which prohibits States from introducing any new restrictions on the right of establishment in their territories, *Mr Costa* claims to see in the nationalization of a sector of the economy a measure incompatible with the above Article. Article 222 cannot justify the legality of every conceivable system of property ownership and the abolition of private property is contrary to the above Article. No rule exempts a nationalized sector from the application of Article 53. Nationalization constitutes a denial of a Community system and is the method best calculated to prevent the freedom of establishment enshrined by the said Article with regard to nationals both of other Member States and of the nationalizing state.

Finally, Article 55 cannot be considered as derogating from Article 53, as the former is exclusively concerned with exempting from the ambit of the latter the official powers of the State and not the power to pursue an economic activity.

COSTA v ENEL

The *Italian Government* objects to this interpretation on the ground that Article 53 does not apply where the Member State concerned leaves to free private enterprise (without any distinction as to nationality) that part of the economy which is not reserved to the public authorities.

In support of the same interpretation *ENEL* suggests that Article 53 should be regarded as intended to place foreigners on the same footing as nationals as regards the exercise of a productive activity.

This principle is not infringed if a law instituting a public service reserves to the State the relevant sector of the economy, by the same token excluding nationals and foreigners alike from this sector.

The *Commission* considers that, when regarded in the light of Article 222, nationailzation is not inconsistent with the Treaty. Articles 5 and 90 are aimed at alleviating the consequences resulting from the operation of nationalizing sectors of the economy. Article 53 however applies to possible restrictions on the right of establishment of nationals of other States which might result from a case of nationalization, such restrictions not being justified by technical requirements in the sector in question.

*On the interpretation of Article 37*

In respect of the requirements of Article 37 to the effect that Member States shall progressively adjust any State monopolies of a commercial character so as to avoid all discrimination between naᵗionals of Member States regarding the conditions under which goods are procured and marketed, *Mr Costa* asks the Court to interpret this provision very widely in such a way that it refers to every measure by which a State confers either on itself or on a body subject to it a monopoly which is by its very nature commercial.

The said Article applies, he claims, not only to actual cases of discrimination but also to potential discrimination and it would have no effect if its only purpose were to eliminate existing cases of discrimination whilst allowing the establishment of new ones. The consequences of nationalization are identical to those of a legal monopoly, in other words the sole power of management, the binding and ineluctable character of its decisions, the power in reaching those decisions to adopt criteria outside the field of economics and the exclusion of competition. Therefore, the result of such a monopoly is to render the importation of similar goods produced by foreign undertakings difficult if not impossible.

By creating a commercial monopoly, nationalization has the same restrictive effect on imports as protective duties or quantitative restrictions.

Rebutting this interpretation the *Italian Government* submits that Article 37 can have nothing to do with the operation of a public service nor with an article whose production depends on limited natural sources (themselves subject to a public concession) which can only be used by a necessarily limited number of producers. The rules of the Treaty safeguarding a free market cannot be concerned with the system of public services.

Moreover, as Article 222 in no way prejudices the rules in Member States governing the system of property ownership, it is possible for the constitutional authorities in each to prescribe the goods and services capable of being considered as public property and which, on the basis of objective decisions, remain outside any rule on competition. Consequently, the exclusion of exports and imports in such a sector must be considered not in terms of a commercial activity but rather of the exercise of a public service.

In support of this interpretation and by reference to the position of Article 37 in the Treaty, *ENEL* considers the 'commercial monopolies' specified in the said Article to be public or private

organizations aiming, as institutions, to make a concentration of exports and imports calculated to disturb the free movement of goods. That could never be the objective of a public service; moreover international trade in a particular article depends on international agreements and complex administrative procedures and is by its very nature outside the requirements of Article 37 and any provision relating to competition.

The *Commission* finally considers that Article 37 should be applied whenever a State establishes an exclusive right to import or export. To fall within the prohibitions in Article 37 the impugned measure must be intended to operate in the field of the circulation of goods or services. Although nationalization may be considered as permissible under Article 222, the creation of a new monopoly cannot.

However, a factual estimate of the trade in existence between Member States in respect of the commodity in question must be taken into consideration.

There is no need to inquire whether the creation of a monopoly of a commercial character is inconsistent with Article 37 (2), where the importation and exportation of the said commodity are not subject to the discretionary power of the administering body.

## Grounds of judgment

By Order dated 16 January 1964, duly sent to the Court, the Giudice Conciliatore of Milan, 'having regard to Article 177 of the Treaty of 25 March 1957 establishing the EEC, incorporated into Italian law by Law No 1203 of 14 October 1957, and having regard to the allegation that Law No 1643 of 6 December 1962 and the presidential decrees issued in execution of that Law . . . infringe Articles 102, 93, 53 and 37 of the aforementioned Treaty', stayed the proceedings and ordered that the file be transmitted to the Court of Justice.

On the application of Article 177

*On the submission regarding the working of the question*

The complaint is made that the intention behind the question posed was to obtain, by means of Article 177, a ruling on the compatibility of a national law with the Treaty.

By the terms of this Article, however, national courts against whose decisions, as in the present case, there is no judicial remedy, must refer the matter to the Court of Justice so that a preliminary ruling may be given upon the 'interpretation of the Treaty' whenever a question of interpretation is raised before them. This provision gives the Court no jurisdiction either to apply the Treaty to a specific case or to decide upon the validity of a provision of

COSTA v ENEL

domestic law in relation to the Treaty, as it would be possible for it to do under Article 169.

Nevertheless, the Court has power to extract from a question imperfectly formulated by the national court those questions which alone pertain to the interpretation of the Treaty. Consequently a decision should be given by the Court not upon the validity of an Italian law in relation to the Treaty, but only upon the interpretation of the abovementioned Articles in the context of the points of law stated by the Giudice Conciliatore.

*On the submission that an interpretation is not necessary*

The complaint is made that the Milan court has requested an interpretation of the Treaty which was not necessary for the solution of the dispute before it.

Since, however, Article 177 is based upon a clear separation of functions between national courts and the Court of Justice, it cannot empower the latter either to investigate the facts of the case or to criticize the grounds and purpose of the request for interpretation.

*On the submission that the court was obliged to apply the national law*

The Italian Government submits that the request of the Giudice Conciliatore is 'absolutely inadmissible', inasmuch as a national court which is obliged to apply a national law cannot avail itself of Article 177.

By contrast with ordinary international treaties, the EEC Treaty has created its own legal system which, on the entry into force of the Treaty, became an integral part of the legal systems of the Member States and which their courts are bound to apply.

By creating a Community of unlimited duration, having its own institutions, its own personality, its own legal capacity and capacity of representation on the international plane and, more particularly, real powers stemming from a limitation of sovereignty or a transfer of powers from the States to the Community, the Member States have limited their sovereign rights, albeit within limited fields, and have thus created a body of law which binds both their nationals and themselves.

The integration into the laws of each Member State of provisions which derive from the Community, and more generally the terms and the spirit of the Treaty, make it impossible for the States, as a corollary, to accord

precedence to a unilateral and subsequent measure over a legal system accepted by them on a basis of reciprocity. Such a measure cannot therefore be inconsistent with that legal system. The executive force of Community law cannot vary from one State to another in deference to subsequent domestic laws, without jeopardizing the attainment of the objectives of the Treaty set out in Article 5 (2) and giving rise to the discrimination prohibited by Article 7.

The obligations undertaken under the Treaty establishing the Community would not be unconditional, but merely contingent, if they could be called in question by subsequent legislative acts of the signatories. Wherever the Treaty grants the States the right to act unilaterally, it does this by clear and precise provisions (for example Articles 15, 93 (3), 223, 224 and 225). Applications, by Member States for authority to derogate from the Treaty are subject to a special authorization procedure (for example Articles 8 (4), 17 (4), 25, 26, 73, the third subparagraph of Article 93 (2), and 226) which would lose their purpose if the Member States could renounce their obligations by means of an ordinary law.

The precedence of Community law is confirmed by Article 189, whereby a regulation 'shall be binding' and 'directly applicable in all Member States'. This provision, which is subject to no reservation, would be quite meaningless if a State could unilaterally nullify its effects by means of a legislative measure which could prevail over Community law.

It follows from all these observations that the law stemming from the Treaty, an independent source of law, could not, because of its special and original nature, be overridden by domestic legal provisions, however framed, without being deprived of its character as Community law and without the legal basis of the Community itself being called into question.

The transfer by the States from their domestic legal system to the Community legal system of the rights and obligations arising under the Treaty carries with it a permanent limitation of their sovereign rights, against which a subsequent unilateral act incompatible with the concept of the Community cannot prevail. Consequently Article 177 is to be applied regardless of any domestic law, whenever questions relating to the interpretation of the Treaty arise.

The questions put by the Giudice Conciliatore regarding Articles 102, 93, 53, and 37 are directed first to enquiring whether these provisions produce direct effects and create individual rights which national courts must protect, and, if so, what their meaning is.

COSTA v ENEL

On the interpretation of Article 102

Article 102 provides that, where 'there is reason to fear' that a provision laid down by law may cause 'distortion', the Member State desiring to proceed therewith shall 'consult the Commission'; the Commission has power to recommend to the Member States the adoption of suitable measures to avoid the distortion feared.

This Article, placed in the chapter devoted to the 'Approximation of Laws', is designed to prevent the differences between the legislation of the different nations with regard to the objectives of the Treaty from becoming more pronounced. By virtue of this provision, Member States have limited their freedom of initiative by agreeing to submit to an appropriate procedure of consultation. By binding themselves unambiguously to prior consultation with the Commission in all those cases where their projected legislation might create a risk, however slight, of a possible distortion, the States have undertaken an obligation to the Community which binds them as States, but which does not create individual rights which national courts must protect. For its part, the Commission is bound to ensure respect for the provisions of this Article, but this obligation does not give individuals the right to allege, within the framework of Community law and by means of Article 177 either failure by the State concerned to fulfil any of its obligations or breach of duty on the part of the Commission.

On the interpretation of Article 93

Under Article 93 (1) and (2), the Commission, in cooperation with Member States, is to 'keep under constant review all systems of aid existing in those States' with a view to the adoption of appropriate measures required by the functioning of the Common Market.

By virtue of Article 93 (3), the Commission is to be informed, in sufficient time, of any plans to grant or alter aid, the Member State concerned not being entitled to put its proposed measures into effect until the Community procedure, and, if necessary, any proceedings before the Court of Justice, have been completed.

These provisions, contained in the section of the Treaty headed 'Aids granted by States', are designed, on the one hand, to eliminate progressively existing aids and, on the other hand, to prevent the individual States in the conduct of their internal affairs from introducing new aids 'in any form whatsoever'

595

which are likely directly or indirectly to favour certain undertakings or products in an appreciable way, and which threaten, even potentially, to distort competition. By virtue of Article 92, the Member States have acknowledged that such aids are incompatible with the Common Market and have thus implicitly undertaken not to create any more, save as otherwise provided in the Treaty; in Article 93, on the other hand, they have merely agreed to submit themselves to appropriate procedures for the abolition of existing aids and the introduction of new ones.

By so expressly undertaking to inform the Commission 'in sufficient time' of any plans for aid, and by accepting the procedures laid down in Article 93, the States have entered into an obligation with the Community, which binds them as States but creates no individual rights except in the case of the final provision of Article 93 (3), which is not in question in the present case.

For its part, the Commission is bound to ensure respect for the provisions of this Article, and is required, in cooperation with Member States, to keep under constant review existing systems of aids. This obligation does not, however, give individuals the right to plead, within the framework of Community law and by means of Article 177, either failure by the State concerned to fulfil any of its obligations or breach of duty on the part of the Commission.

On the interpretation of Article 53

By Article 53 the Member States undertake not to introduce any new restrictions on the right of establishment in their territories of nationals of other Member States, save as otherwise provided in the Treaty. The obligation thus entered into by the States simply amounts legally to a duty not to act, which is neither subject to any conditions, nor, as regards its execution or effect, to the adoption of any measure either by the States or by the Commission. It is therefore legally complete in itself and is consequently capable of producing direct effects on the relations between Member States and individuals. Such an express prohibition which came into force with the Treaty throughout the Community, and thus became an integral part of the legal system of the Member States, forms part of the law of those States and directly concerns their nationals, in whose favour it has created individual rights which national courts must protect.

The interpretation of Article 53 which is sought requires that it be considered in the context of the Chapter relating to the right of establishment in which it occurs. After enacting in Article 52 that 'restrictions on the freedom of establishment of nationals of a Member State in the territory of another

596

COSTA v ENEL

Member State shall be abolished by progressive stages', this chapter goes on in Article 53 to provide that 'Member States shall not introduce any new restrictions on the right of establishment in their territories of nationals of other Member States'. The question is, therefore, on what conditions the nationals of other Member States have a right of establishment. This is dealt with by the second paragraph of Article 52, where it is stated that freedom of establishment shall include the right to take up and pursue activities as self-employed persons and to set up and manage undertakings 'under the conditions laid down for its own nationals by the law of the country where such establishment is effected'.

Article 53 is therefore satisfied so long as no new measure subjects the establishment of nationals of other Member States to more severe rules than those prescribed for nationals of the country of establishment, whatever the legal system governing the undertaking.

On the interpretation of Article 37

Article 37 (1) provides that Member States shall progressively adjust any 'State monopolies of a commercial character' so as to ensure that no discrimination regarding the conditions under which goods are procured and marketed exists between nationals of Member States. By Article 37 (2), the Member States are under an obligation to refrain from introducing any new measure which is contrary to the principles laid down in Article 37 (1).

Thus, Member States have undertaken a dual obligation: in the first place, an active one to adjust State monopolies, in the second place, a passive one to avoid any new measures. The interpretation requested is of the second obligation together with any aspects of the first necessary for this interpretation.

Article 37 (2) contains an absolute prohibition: not an obligation to do something but an obligation to refrain from doing something. This obligation is not accompanied by any reservation which might make its implementation subject to any positive act of national law. This prohibition is essentially one which is capable of producing direct effects on the legal relations between Member States and their nationals.

Such a clearly expressed prohibition which came into force with the Treaty throughout the Community, and so became an integral part of the legal system of the Member States, forms part of the law of those States and directly concerns their nationals, in whose favour it creates individual rights which

national courts must protect. By reason of the complexity of the wording and the fact that Articles 37 (1) and 37 (2) overlap, the interpretation requested makes it necessary to examine them as a part of the Chapter in which they occur. This Chapter deals with the 'elimination of quantitative restrictions between Member States'. The object of the reference in Article 37 (2) to 'the principles laid down in paragraph (1)' is thus to prevent the establishment of any new 'discrimination regarding the conditions under which goods are procured and marketed . . . between nationals of Member States'. Having specified the objective in this way, Article 37 (1) sets out the ways in which this objective might be thwarted in order to prohibit them.

Thus, by the reference in Article 37 (2), any new monopolies or bodies specified in Article 37 (1) are prohibited in so far as they tend to introduce new cases of discrimination regarding the conditions under which goods are procured and marketed. It is therefore a matter for the court dealing with the main action first to examine whether this objective is being hampered, that is whether any new discrimination between nationals of Member States regarding the conditions under which goods are procured and marketed results from the disputed measure itself or will be the consequence thereof.

There remain to be considered the means envisaged by Article 37 (1). It does not prohibit the creation of any State monopolies, but merely those 'of a commercial character', and then only in so far as they tend to introduce the cases of discrimination referred to. To fall under this prohibition the State monopolies and bodies in question must, first, have as their object transactions regarding a commercial product capable of being the subject of competition and trade between Member States, and secondly must play an effective part in such trade.

It is a matter for the court dealing with the main action to assess in each case whether the economic activity under review relates to such a product which, by virtue of its nature and the technical or international conditions to which it is subject, is capable of playing an effective part in imports or exports between nationals of the Member States.

Costs

The costs incurred by the Commission of the European Economic Community and the Italian Government, which have submitted observations to the Court, are not recoverable and as these proceedings are, in so far as the parties to the main action are concerned, a step in the action pending before the Giudice Conciliatore, Milan, the decision on costs is a matter for that court.

COSTA v ENEL

On those grounds,

Upon reading the pleadings;
Upon hearing the report of the Judge-Rapporteur;
Upon hearing the observations of the parties to the main action, the Commission of the European Economic Community and the Italian Government;
Upon hearing the opinion of the Advocate-General;
Having regard to Articles 37, 53, 93, 102 and 177 of the Treaty establishing the European Economic Community;
Having regard to the Protocol on the Statute of the Court of Justice of the European Economic Community;
Having regard to the Rules of Procedure of the Court of Justice of the European Communities;

THE COURT

Ruling upon the plea of inadmissibility based on Article 177 hereby declares:

**As a subsequent unilateral measure cannot take precedence over Community law, the questions put by the Giudice Conciliatore, Milan, are admissible in so far as they relate in this case to the interpretation of provisions of the EEC Treaty;**

and also rules:

1. **Article 102 contains no provisions which are capable of creating individual rights which national courts must protect;**

2. **Those individual portions of Article 93 to which the question relates equally contain no such provisions;**

3. **Article 53 constitutes a Community rule capable of creating individual rights which national courts must protect. It prohibits any new measure which subjects the establishment of nationals of other Member States to more severe rules than those prescribed for nationals of the country of establishment, whatever the legal system governing the undertakings.**

4. **Article 37 (2) is in all its provisions a rule of Community law**

599

**capable of creating individual rights which national courts must protect. In so far as the question put to the Court is concerned, it prohibits the introduction of any new measure contrary to the principles of Article 37 (1), that is, any measure having as its object or effect a new discrimination between nationals of Member States regading the conditions in which goods are procured and marketed, by means of monopolies or bodies which must, first, have as their object transactions regarding a commercial product capable of being the subject of competition and trade between Member States, and secondly must play an effective part in such trade;**

and further declares:

**The decision on the costs of the present action is a matter for the Guidice Conciliatore, Milan.**

Donner        Hammes        Trabucchi

Delvaux        Rossi        Lecourt        Strauβ

Delivered in open court in Luxembourg on 15 July 1964.

A. Van Houtte
Registrar

A. M. Donner
President

# OPINION OF MR ADVOCATE-GENERAL LAGRANGE
## DELIVERED ON 25 JUNE 1964[1]

*Mr President,*
*Members of the Court,*

The preliminary question upon which you have to give a ruling under Article 177 of the EEC Treaty does not, for once, come from a Netherlands court, but from an Italian one, and it is no longer a question of social security or of Regulation No 3, but rather of a certain number of provisions of the Treaty itself, in respect of which your interpretation is requested in circumstances that are such as to bring in issue the constitutional relations between the European Economic Community and its Member States. This highlights the importance of the judgment you are called upon to pronounce in this case. The facts are known to you: Mr Costa, a lawyer practising in Milan, claims that he is not under an obligation to pay an invoice amounting to 1925 lire demanded of him in respect of the supply of electricity by the 'Ente Nazionale per l'Energia Elettrica (ENEL)'. He objected to this

1—Translated from the French.