# EXHIBIT 20

DEUTSCHE MILCHKONTOR v GERMANY

5. Member States must verify by means of appropriate controls that skimmed-milk powder complies with the relevant Community rules so as to ensure that Community aids are not paid in respect of products for which they ought not to be granted. It is for the national court to determine the controls necessary for this purpose having regard in particular to the circumstances and techniques available.

It is for the national court to determine the consequences of any failure to fulfil that duty on the basis of the relevant national law.

In Joined Cases 205 to 215/82

REFERENCE to the Court under Article 177 of the EEC Treaty by the Verwaltungsgericht [Administrative Court] Frankfurt am Main, for a preliminary ruling in the proceedings pending before that court between

DEUTSCHE MILCHKONTOR GMBH (205/82),

E. KAMPFFMEYER (206/82),

SCHWARZWALDMILCH GMBH (207/82),

INNTALER MISCHFUTTER GMBH & CO. KG (208/82),

HELMUT BECKER GMBH & CO. KG (209/82),

PLANGE KRAFTFUTTERWERKE GMBH & CO. KG (210/82),

JOSERA-WERK (211/82),

FRISCHLI-MILCHWERKE HOLTORF + SCHÄKEL KG (212/82),

HEMO MOHR KG (213/82),

DENKAVIT FUTTERMILCH GMBH (214/82),

DMV LAGEREI- UND VERWALTUNGSGESELLSCHAFT MBH (215/82)

and

FEDERAL REPUBLIC OF GERMANY, represented by the Bundesamt für Ernährung und Forstwirtschaft [Federal Office for Food and Forestry],

on the interpretation of various principles of Community law relating to claims for the recovery of aids unduly granted for skimmed-milk powder which has been processed into animal feed,

2635

THE COURT (Fifth Chamber)

composed of: U. Everling, President of Chamber, Lord Mackenzie Stuart, O. Due, Y. Galmot and C. Kakouris, Judges,

Advocate General: P. VerLoren van Themaat
Registrar: H. A. Rühl, Principal Administrator

gives the following

# JUDGMENT

## Facts and Issues

The facts of the case, the course of the procedure and the observations submitted under Article 20 of the Protocol on the Statute of the Court of Justice of the European Economic Community may be summarized as follows:

### I — Facts and written procedure

#### 1. Aids for skimmed-milk powder

Article 10 (1) of Regulation (EEC) No 804/68 of the Council of 27 June 1968 on the common organization of the market in milk and milk products (Official Journal, English Special Edition, 1968 (I), p. 176) provides, within the context of the intervention system, that "aid shall be granted for skimmed milk and skimmed-milk powder which are produced in the Community and are for use as feedingstuffs if these products reach certain standards".

Under Article 1 of Regulation (EEC) No 986/68 of the Council of 15 July 1968

laying down general rules for granting aid for skimmed milk and skimmed-milk powder for use as feed (Official Journal, English Special Edition, 1968 (I), p. 260) as amended by Regulation (EEC) No 472/75 of 27 February 1975 (Official Journal 1975, L 52, p. 22) and by Regulation (EEC) No 876/77 of 26 April 1977 (Official Journal 1977, L 106, p. 24), for the purposes of that regulation:

"(a) 'Milk' means the milk-yield of one or more cows, to which nothing has been added and which has, at the most, been only partially skimmed;

(b) 'Buttermilk' . . .;

(c) 'Skimmed milk' means milk or buttermilk with a maximum fat content of 1%;

(d) 'Skimmed-milk powder' means: powdered milk and buttermilk with a maximum fat content of 11% and a moisture content not exceeding a maximum to be fixed unless such

skimmed-milk powder comes from public stocks. This moisture content shall apply at a stage and in conditions to be defined."

Under Article 2 (1) (c) of that regulation the use of the skimmed-milk powder in the manufacture of compound feeding-stuffs is a precondition for the grant of aid for skimmed-milk powder. Under Article 3 (2) of that regulation aid is to be paid only when proof of such use has been given.

At the material time the preconditions for the grant of aid were laid down in detail in Regulation (EEC) No 990/72 of the Commission of 15 May 1972 on detailed rules for granting aid for skimmed milk processed into compound feedingstuffs and for skimmed-milk powder for use as feed (Official Journal, English Special Edition, 1972 (II), p. 428). One of those preconditions is that the compound feedingstuffs must contain at least 60% by weight of skimmed-milk powder. An undertaking manufacturing compound feedingstuffs will be granted the aid only if it is authorized in that behalf by the competent authority of the Member State on whose territory the manufacture is carried out and satisfies certain conditions. Under Commission Regulation (EEC) No 1624/76 of 2 July 1976 concerning special arrangements for the payment of aid for skimmed-milk powder denatured or processed into compound feedingstuffs in the territory of another Member State, the aid may also exceptionally be granted for skimmed-milk powder which is de-spatched from one Member State to Italy provided that its use there in the manufacture of compound feedingstuffs is guaranteed.

Article 10 of Regulation (EEC) No 990/72 of the Commission contained the following provision:

"Member States shall take all measures necessary to ensure that the provisions

laid down in this regulation are complied with."

Aids for the processing of skimmed-milk powder into compound feedingstuffs are paid in the Federal Republic of Germany by the Bundesamt für Ernährung und Forstwirtschaft (hereinafter referred to as "the Federal Office"), the defendant in the action before the national court. As part of the intervention system for regulating agricultural markets, the aids are paid by the Guarantee Section of the European Agricultural Guidance and Guarantee Fund in accordance with Regulation (EEC) No 729/70 of the Council of 21 April 1970 on the financing of the common agricultural policy (Official Journal, English Special Edition, 1970 (I), p. 218).

Article 8 of that regulation contains the following provisions:

"(1) The Member States in accordance with national provisions laid down by law, regulation or administrative action shall take the measures necessary to:

Satisfy themselves that transactions financed by the Fund are actually carried out and are executed correctly;

Prevent and deal with irregularities;

Recover sums lost as a result of irregularities or negligence.

The Member States shall inform the Commission of the measures taken for those purposes and in particular of the state of the administrative and judicial procedures.

(2) In the absence of total recovery, the financial consequences of irregularities or negligence shall be borne by the Community, with the exception of the consequences of irregularities or negligence attri-

butable to administrative authorities or other bodies of the Member States.

The sums recovered shall be paid to the paying authorities or bodies and deducted by them from the expenditure financed by the Fund."

## 2. *The facts underlying the action before the national court*

The plaintiff undertakings in the main actions are partly manufacturers of compound feedingstuffs which use skimmed-milk powder in the manufacture of compound feedingstuffs, partly trading companies which, under the terms of Commission Regulation No 1624/76, exported to Italy for the manufacture of compound feedingstuffs skimmed-milk powder which they themselves obtained from other undertakings. From the end of 1977 until the middle of 1979 the plaintiffs received from the Bundesamt für Ernährung und Forstwirtschaft in pursuance of the Community provisions set out above aids for skimmed-milk powder for use as feed.

Some of the plaintiffs obtained from the manufacturing company Auetal-Beyer KG (hereinafter referred to as "Auetal") the so-called "spray-dried skimmed-milk powder" which qualifies for aid. In other cases the plaintiffs obtained skimmed-milk powder for their use from trading companies which in their turn had obtained skimmed-milk powder from Auetal. In the proceedings before the national court it is however specifically contested whether and to what extent the skimmed-milk powder obtained by the plaintiffs did in fact come from Auetal or from other manufacturers. In

some of the cases it is also uncertain whether in fact skimmed-milk powder from Auetal ever reached the plaintiffs.

In July 1978 during inquiries at Auetal by one of the defendant's inspectors, suspicions were for the first time aroused that Auetal was not using skimmed milk alone in the manufacture of spray-dried skimmed-milk powder. The inspector was struck by the regular purchase of a product described as "dried-milk product", an expression which is not in common use in the trade, and certain peculiarities in the production methods employed by Auetal. He therefore proposed in his inspection report that inquiry should be made of the supplier of the "dried-milk product", which however was not done. Samples, which the inspector had taken, were examined by the Hessische landwirtschaftliche Untersuchungsanstalt [Institute for Agricultural Analysis, Hesse] in Kassel, but no peculiarities were found.

Not until May 1979 were inquiries started into the provenance of the "dried-milk product". Thereupon the German prosecuting authorities discovered that Auetal, in addition to normal spray-dried skimmed-milk powder, had, since the end of 1977, also been producing in considerable quantities, by means of a special process, a powder (hereinafter referred to as "Auetal powder") and selling it under the description "spray-dried skimmed-milk powder" although in fact it consisted only as to 38.4% of skimmed-milk powder within the meaning of the term as understood in the trade. As to the rest, the Auetal powder consisted of the so-called "dried-milk product" obtained from third parties which contained as to 56% powdered whey, as to 31% sodium caseinate and as to 13% lactose. After the "dried-milk product" had been dissolved in skimmed milk and once

DEUTSCHE MILCHKONTOR v GERMANY

again evaporated into powder, the Auetal powder revealed the same composition, as regards its content of protein, sugar, carbohydrates and the like, as pure skimmed-milk powder.

At that time there was no generally recognized method of chemical analysis by which the presence of whey in skimmed-milk powder could have been ascertained. In so far as any method of analysis for that purpose was known at the material time, it could only be carried out in a very few specially-equipped laboratories. Examinations of the Auetal powder, by the use of the methods which were current at the material time in the trade and also in national research institutes, could discover no differences between Auetal powder and normal spray-dried skimmed-milk powder.

Therefore, the plaintiffs, to the extent to which they had received Auetal powder, were unable to ascertain that in fact the powder brought into circulation under the description spray-dried skimmed-milk powder was not normal spray-dried skimmed-milk powder.

Whether and, if so, to what extent the plaintiffs had received and used normal spray-dried skimmed-milk powder or Auetal powder is not clear.

After the questionable operations carried out by Auetal had been uncovered the defendant cancelled the notices granting the plaintiffs the aid for skimmed-milk powder and demanded repayment of the aid on the ground that the conditions for its grant had not been satisfied because the plaintiffs had used Auetal powder which did not attract aid. The defendant relied upon Paragraph 9 of the German regulation relating to the grant of aids for skimmed milk, skimmed-milk powder, casein and caseinates (BGBl I,

p. 792) according to which, even after the receipt of the aid, the recipient continues to bear the burden of proof of the existence of the preconditions for the grant of aid until the third year after its receipt and any aids unduly received must be paid back.

### 3. The requests for a preliminary ruling

After unsuccessfully lodging an objection the plaintiffs in the 11 actions before the national court brought proceedings before the Verwaltungsgericht Frankfurt am Main against the notices claiming repayment. In particular they placed reliance on the provisions relating to the protection of legitimate expectation and loss of unjustified enrichment contained in Paragraph 48 of the Verwaltungsverfahrensgesetz [Law on Administrative Procedure] of 25 May 1976 (BGBl I, p. 1253), claiming that the defendant was responsible for the irregularities in the manufacture of the skimmed-milk powder because, by not promptly drawing the necessary conclusions from the report on the inquiries of July 1978 it had failed to fulfil its duty of supervision over Auetal's operations.

The Verwaltungsgericht Frankfurt am Main took the view that in the light of Community law the legal position was not free from doubt. By orders in the same terms dated 3 June 1982 it therefore referred the following questions to the Court of Justice for a preliminary ruling pursuant to Article 177 of the EEC Treaty:

"1. Does a product consisting of a spray-dried mixture of skimmed milk and a dried-milk product come within the definition of skimmed-milk powder laid down in Article 1 (c) of Regulation (EEC) No 986/68 of the Council of 15 July 1968

2639

(Official Journal, English Special Edition 1968 (I), p. 260) if that end product reveals the same composition (protein, carbohydrate etc.) as skimmed-milk powder derived directly from cow's milk?

2. Does Article 10 of Regulation (EEC) No 990/72 of the Commission of 15 May 1972 (Official Journal, English Special Edition 1972 (II), p. 428) found an obligation on the part of the authorities of the Member States to supervise the production of skimmed-milk powder on the producer's premises?

3. Does Article 10 of the last aforementioned regulation enure for the benefit of the recipients of aid as third parties, that is, may they invoke failings of the authorities in that respect so as to preclude a demand for repayment?

4. Does Community law, in particular Article 8 (1) of Regulation (EEC) No 729/70 of the Council of 21 April 1970 (Official Journal, English Special Edition 1970 (I), p. 218), contain rules governing the substantive burden of proof or are these rules determined by national law as regards the question whether, in a given case, aids for skimmed milk and skimmed-milk powder for use as feed under Regulation No 986/68 of the Council, and Commission regulations adopted in implementation thereof, have been unlawfully granted? If Community law contains rules governing the burden of proof: What are those rules?

5. Does Article 8 (1) of Regulation No 729/70 of the Council of 21 April 1970 provide a direct legal basis upon which national authorities may demand reimbursement of aid

granted unlawfully with the result that the factual preconditions to be satisfied for such a demand are definitively laid down in that provision?

6. If the fifth question is answered in the affirmative: Within what provisions, if appropriate supplemented by unwritten legal principles of Community law, is the expectation of the recipient of aid protected and if so under what conditions and to what extent? May the recipient of aid in particular under certain circumstances plead loss of enrichment and is there such a loss where the recipient of aid has passed the aid on in the selling price? Is recovery precluded where the authority knew, or did not know as a result of gross negligence, that it was granting the aid unlawfully?

7. If the fifth question is answered in the negative: Is it compatible with Community law for national law to preclude a demand for repayment of aid granted unlawfully:

Where the beneficiary relied upon the notice granting aid being maintained in force and that expectation, weighed against the public interest in revocation, is worthy of protection (Paragraph 48 (2)), first to third sentences, of the Verwaltungsverfahrensgesetz [Law on Administrative Procedure] of 25 May 1976 — (BGBl I, p. 1253);

Where the beneficiary can plead loss of enrichment unless he knew, or did not know as a result of gross negligence, the circumstances leading to the illegality of the notice granting the aid (seventh sentence of Paragraph 48 (2) of the Verwaltungsverfahrensgesetz);

DEUTSCHE MILCHKONTOR v GERMANY

Where a period of one year has elapsed beginning with the point in time at which the authority received knowledge of facts justifying the revocation of an unlawful notice granting aid, irrespective of whether the person concerned knew that such facts had come to the notice of the authority (Paragraph 48 (4) of the Verwaltungsverfahrensgesetz);

Where the authority knew, or did not know as a result of gross negligence, that it was granting the aid unlawfully (sixth sentence of Paragraph 48 (2) of the Verwaltungsverfahrensgesetz in conjunction with Paragraph 814 of the Bürgerliches Gesetzbuch [German Civil Code]?"

In the grounds of its orders for reference the Verwaltungsgericht Frankfurt am Main stated, *inter alia*, the following:

First question:

Article 1 of Regulation (EEC) No 986/68 may be construed either as laying down conditions governing the production of skimmed-milk powder or in such a way that skimmed-milk powder must have a certain material composition. In favour of the latter interpretation is the fact that, at the time of the adoption of the regulation, no method of analysis had yet been developed by which it would have been possible to verify the production process on the basis of the end product. It does not appear sensible to give the regulation an interpretation which would mean that legal consequences are made dependent upon preconditions which cannot be empirically ascertained or verified.

Second question:

A decision in the main proceedings depends on the extent of the defendant's supervisory duties, in view of the fact that possible failings of the defendant might have been causally responsible for the unjustified grant of aid, and that the defendant may be liable. Since some 85% of total skimmed-milk powder production in the Federal Republic of Germany is the subject of Community subsidies in some form or other it was the defendant's duty to supervise the manufacture of skimmed-milk powder as well. The supervision of production by observation of the production process was the only practicable means, at the material time, of preventing improper operations.

Third question:

The question therefore arises whether, owing to defects in the production of the skimmed-milk powder, the aid may be claimed back, where the authority neglected to carry out the necessary checks and therefore bore part of the responsibility for the grant of the aid. Such contributory responsibility would in any event be attributable to the defendant if, in carrying out the checks, it was at least also performing duties of care in favour of the recipients of aid, that is to say if the supervisory duties were not merely in the public interest but also in the legal interest of the recipients of the aid. This seems to be the case particularly because the defendant alone, and not Auetal's purchasers, was in a position legally and in fact to supervise Auetal's production process.

Fourth question:

Since it is not clear to whom Auetal sold genuine skimmed-mild powder and to whom the adulterated powder, or whether it mixed both powders together, it is not inconceivable that the plaintiffs received, in whole or in part, exclusively

pure skimmed-milk powder from Auetal. Since it is no longer possible, or is only partly possible, to clarify that matter the question arises as to the burden of proof. It is however unclear whether the rules for determining the burden of proof in this case should be those of national law or of Community law. Presumably, however, the principle of the rule of law dictates that, even if the question of the burden of proof is to be determined according to Community law, where there are no special written rules, the inability to prove a fact must go against the party seeking to derive from it a legal consequence which is favourable to him.

Fifth question:

From previous cases decided by the Court of Justice it had been assumed that it was a matter for the Member States to lay down detailed provisions for claims for repayment of sums unduly paid out of the European Agricultural Guidance and Guarantee Fund and, in particular, that it was for them to take into account, if appropriate, considerations relating to the protection of legitimate expectation. The judgment of the Court of 6 May 1982 in Joined Cases 146, 192 and 193/81 *BayWa AG* v *Bundesanstalt für landwirtschaftliche Marktordnung* [1982] ECR 1503 has however given rise to certain doubts. It is true that that judgment may be interpreted as meaning that Article 8 (1) of Regulation (EEC) No 729/70 is a reference to those rules which lay down under what conditions national authorities may claim back a payment of money made under public law, but not as a reference to national rules laying down whether and to what extent authorities may at their discretion waive claims for recovery out of mere considerations of expediency. It might however also be concluded that the reference to national law is not to be understood as a reference to substantive provisions forming the legal basis for claims for recovery but rather as a reference to provisions governing formal requirements and matters of jurisdiction with the result that the Member States may not set up any rules relating to the substantive conditions for recovery.

Sixth question:

The Court has acknowledged that the principle of the protection of legitimate expectation is recognized also by Community law. It has, however, not hitherto defined the general criteria for the application of that principle. In order to apply that principle of Community law to a given case the national court requires criteria capable of being summarized under general rules. As regards the secondary question whether enrichment has ceased to subsist where the amount of aid has been passed on to a purchaser in the recipient's accounting, it is doubtful in the present case whether, following a decision of the Bundesverwaltungsgericht [Federal Administrative Court] (of 17 March 1977 — VII C 64.75 — *Gasöl Betriebsbeihilfe),* it would be possible to deny that there had been a loss of enrichment by pointing to a continuing competitive advantage over competitors since there are presumably no competitors manufacturing cattle feed without aids for skimmed-milk powder. As to the secondary question whether recovery is precluded if the authority knew, or did not know as a result of gross negligence, that it was granting the aid improperly, in the present case it is not inconceivable that, following the report of the inquiries of July 1978, failure to know of the adulterations carried out at Auetal was in any event grossly negligent with the result that the principle of good faith, to the extent to which it is recognized in Community law, might preclude a claim for recovery.

DEUTSCHE MILCHKONTOR v GERMANY

Seventh question:

The national court takes the view that, as a result of considerations founded on German constitutional law, the claim for recovery must, if national law were applied, be governed by Paragraph 48 of the Verwaltungsverfahrensgesetz, contrary to the opinion of the defendant which had founded its claim for recovery on Paragraph 9 of the German regulation governing the grant of aids for skimmed milk, skimmed-milk powder, caseine and caseinates dated 31 May 1977. The wording of Paragraph 48 is as follows:

"(1) An unlawful administrative measure, even after it is no longer open to challenge, may be revoked, wholly or in part, with prospective or retrospective effect. An administrative measure which has founded or confirmed a right or a legally material advantage (administrative measure granting a benefit) may be revoked only subject to the restrictions of subparagraphs (2) and (4) hereof.

(2) An unlawful administrative measure which grants a non-recurring or continuous monetary payment or a divisible payment in kind or forms the basis thereof, may not be revoked, in so far as the beneficiary has relied upon the administrative measure's being maintained in force and that expectation, weighed against the public interest in revocation, is worthy of protection.

Expectation is in general worthy of protection, where the beneficiary has used the benefits granted or has made some disposition of them affecting his resources which he either cannot reverse or can reverse only by incurring unreasonable disadvantages. The beneficiary cannot rely on expectation, where he

1. Has secured the administrative measure by intentional deception, threats or corrupt practices;

2. Has secured the administrative measure by giving information which was incorrect or incomplete in a material respect;

3. Knew, or did not know as a result of gross negligence, that the administrative measure was unlawful.

In the circumstances referred to in sub-subparagraph 3 hereof the administrative measure shall in general be revoked with retroactive effect. In so far as the administrative measure has been revoked, payments already made thereunder shall be reimbursed. As to the amount of restitution the provisions of the Bürgerliches Gesetzbuch [Civil Code] relating to the restitution of unjustified enrichment shall apply so far as relevant. If the conditions mentioned in sub-subparagraph 3 hereof are satisfied the person liable to make the restitution cannot plead loss of the enrichment if he knew, or did not know as a result of gross negligence, the circumstances leading to the illegality of the administrative measure. The amount of restitution shall be determined by the authority at the time of the revocation of the administrative measure.

(3) . . .

(4) If the authority receives knowledge of facts justifying the revocation of an unlawful administrative measure, revocation shall be permissible only within a period of one year from the time at which such facts came to its notice, save in the circumstances referred to in the third sentence of subparagraph (2) hereof, sub-subparagraph 1."

2643

JUDGMENT OF 21. 9. 1983 — JOINED CASES 205 TO 215/82

Under that provision a claim for recovery of a sum of money unduly paid is conditional first upon revocation of the administrative measure by which the aid was granted, which is only possible if the expectation of the beneficiary of retaining the payment is not worthy of protection in the specific case. That has to be decided by a process, which is open to full judicial review, of weighing the protection of legitimate expectation with the public interest in the revocation of the administrative measure whereby, as regards the public interest, other than purely fiscal considerations must be taken into account. If the administrative measure is revoked the authority must claim back the aid for the payment of which there is no longer any legal justification. Recovery is however excluded if the recipient of the payment from public funds is no longer enriched, unless the recipient knew, or did not know as a result of gross negligence, the circumstances leading to the illegality of the administrative measure. Finally, regard must also be had to the principle of good faith which finds recognition in the rule contained in Paragraph 814 of the Bürgerliches Gesetzbuch [Civil Code] to which the sixth sentence of Paragraph 48 (2) of the Verwaltungsverfahrensgesetz refers. That provision is as follows:

"A benefit provided in order to fulfil an obligation may not be claimed back if the person providing the benefit knew that he was not obliged to provide it."

Furthermore, Paragraph 48 (4) of the Verwaltungsverfahrensgesetz sets up an additional legal obstacle to a claim for restitution in the form of a limitation period. The question arises whether that provision relating to the claim for recovery of aids unduly paid is compatible with Community law.

## 4. *The procedure before the Court of Justice*

The orders for reference were lodged at the Court Registry on 11 August 1982.

By order of 22 September 1982 the Court joined the present cases for the purposes of the procedure and the decision.

In pursuance of Article 20 of the Protocol on the Statute of the Court of Justice of the EEC written observations were submitted to the Court by the following: Deutsche Milchkontor GmbH, represented by Karsten H. Festge, Rechtsanwalt, Hamburg; Firma E. Kampffmeyer, Schwarzwaldmilch GmbH and Inntaler Mischfutter GmbH & Co. KG, represented by Fritz Modest, Rechtsanwalt, Hamburg; Helmut Becker GmbH & Co. KG, Plange Kraftfutterwerke GmbH & Co. KG, Firma Josera-Werk and Hemo Mohr KG, represented by Volker Schiller, Rechtsanwalt, Cologne; Denkavit Futtermittel GmbH, represented by Dietrich Ehle, Rechtsanwalt, Cologne; Frischli-Milchwerke Holtorf + Schäkel KG, represented by Paul Bornemann, Rechtsanwalt, Munich; DMV Lagerei- und Verwaltungsgesellschaft mbH, represented by Helmut Grzebatzki, Rechtsanwalt, Duisburg; the Government of the Federal Republic of Germany, represented by Martin Seidel and Ernst Röder, acting as Agents; the Government of the United Kingdom, represented by R. N. Ricks of the Treasury Solicitor's Department, acting as Agent; and the Commission of the European Communities, represented by Jörn Sack, a member of its Legal Department.

Upon hearing the report of the Judge-Rapporteur and the views of the Advocate General the Court, by order of 23 February 1983, decided to assign the cases to the Fifth Chamber pursuant to

DEUTSCHE MILCHKONTOR v GERMANY

Article 95 of the Rules of Procedure and to open the oral procedure without any preparatory inquiry.

## II — Written observations

### 1. The facts

Firma E. Kampffmeyer, Inntaler Misch-futter GmbH & Co. KG, Schwarz-waldmilch GmbH, Helmut Becker GmbH & Co. KG, Plange Kraftfutterwerke GmbH & Co. KG, Firma Josera-Werk, Hemo Mohr KG and Denkavit Fut-termittel GmbH first highlight the difficulty in proving that milk powder has been adulterated with whey. The fact that, certainly at the material time, there were as yet no practicable methods of examination to ascertain additions of whey to skimmed-mild powder is borne out by the fact that the Commission first attempted by means of Regulation (EEC) No 625/78 of 30 March 1978 on detailed rules of application for public storage of skimmed-milk powder (Official Journal 1978, L 84, p. 19), to apply as yet untested methods of examin-ation to discover such adulterations at the time of purchases of skimmed-milk powder within the intervention system. Not until the adoption of Commission Regulation (EEC) No 2188/81 of 28 July 1981 amending Regulation (EEC) No 625/78 (Official Journal 1981, L 213, p. 1) was one of the possible methods of examination generally pre-scribed. Firma E. Kampffmeyer, Inntaler Mischfutter GmbH & Co. KG and Schwarzwaldmilch GmbH point out however that, irrespective of the fact that this could not be detected by the usual

methods of examination, the Auetal powder did not have the same charac-teristics and quality as unadulterated skimmed-milk powder because the caseinate contained in the Auetal powder is not capable of curdling and therefore has a lower nutritional value for calves.

The inspector appointed by the Federal Office did not exercise due care at the time of the inspection in July 1978. Following that inspection the defendant did not take the steps necessary to clarify the facts despite several alarming findings in the report. Inquiries into the origin of the so-called "dried-milk product" were started only many months after the inspection although these could and should have been made no later than July 1978. Although the plaintiffs were repeatedly inspected by the Federal Office without those inspections giving cause for any complaints the Federal Office was grossly negligent in failing to provide the Auetal undertaking with adequate supervision, which would have been essential to avoid adulterations. The defendant was therefore itself responsible for the illegality of the contested administrative measures.

The Commission explains that the financial attraction in producing Auetal powder and selling it as skimmed-mild powder lies in the fact that the price for the components of the "dried-milk product" is considerably lower than that of a comparable amount of milk since in milk processing large quantities of whey are produced and a Community aid is paid for caseinates.

As regards proving the existence of whey in skimmed-milk powder the period until 1 January 1982 may be said to have been

JUDGMENT OF 21. 9. 1983 — JOINED CASES 205 TO 215/82

an experimental phase. However, later than the beginning of 1978 the method by which the existence of whey in skimmed-milk powder could be proven became general knowledge. It was only because of the lack of practical experience that there was no method of analysis regarded at Community level as the best method which could therefore be laid down as mandatory for all Member States.

## 2. First question

The plaintiff *Frischli-Milchwerke Holtorf + Schäkel KG* is of the opinion that the first question referred to the Court by the Verwaltungsgericht Frankfurt am Main should be answered in the affirmative. Under German municipal law (cf. regulation relating to milk products of 15 July 1970, BGBl. I, p. 1150, last amended by regulation of 22 December 1981, BGBl I, p. 1667), the determining factor in the case of dried-milk products is the material composition and not the method of production. There was therefore no objection under national law to the production method practised by Auetal. In a way that procedure could be regarded as a reconstituting process because a milk product within the meaning of the aforementioned national regulation was produced from separated components of milk. In fact, however, all manufacture of milk products is a reconstituting process since, in accordance with the practice of dairies, which has been followed for decades, all milk delivered to them is first separated, that is to say divided into skimmed milk and cream, is stored in separate tanks and is only later reconstituted according to the particular production requirements. The lawfulness of reconstituting the different components of milk into a single milk product is tacitly acknowledged both by national and Community law. Since Regulation (EEC) No 986/68 contains no separate provisions relating to the

production of skimmed-milk powder, all skimmed-milk powder which may be described as such attracts aid. Therefore even skimmed-milk powder which is produced by reconstitution is capable of attracting aid.

*Deutsche Milchkontor GmbH, Firma E. Kampffmeyer, Schwarzwaldmilch GmbH, Inntaler Mischfutter GmbH & Co. KG, Denkavit Futtermittel GmbH, DMV Lagerei- und Verwaltungsgesellschaft mbH, the Federal Republic of Germany* and the *Commission of the European Communities* take the view that the first question referred to the Court should be answered in the negative.

The *plaintiffs mentioned in the preceding paragraph* reach that conclusion from the wording and meaning of the definitions in Article 1 of Regulation (EEC) No 986/68. It is plain from the clear and unequivocal wording of that provision that skimmed-milk powder may only be produced from pure milk. That provision forms part of the intervention system in favour of milk producers whom it is intended by means of the aid to assist in disposing of surplus milk production on the market for feedingstuffs. It would be absurd to pay aids for a mixture consisting of powdered whey which does not qualify for aid and caseinate which will have either already received a subsidy or have been imported from non-member countries at world-market prices.

The *Federal Republic of Germany* takes the view that the definition of milk contained in Article 1 of Regulation (EEC) No 986/68 relates solely to the method of obtaining milk and not to the material composition of the end product. That corresponds to the meaning of the term "milk" in tariff heading 04.01 of the Common Customs Tariff and Article 3 (1) (a) of Regulation (EEC) No 1411/71 of the Council of 29 June 1971

DEUTSCHE MILCHKONTOR v GERMANY

laying down additional rules on the common organization of the market in milk and milk products for products falling within tariff heading 04.01 (Official Journal, English Special Edition 1971 (II), p. 412) and must likewise apply to the definition of skimmed-milk powder.

The *Commission* argues that Auetal powder is not skimmed-milk powder because foreign matter is added to the skimmed milk used. Skimmed-milk powder differs from skimmed milk only inasmuch as water and if appropriate also a part of the fat content have been removed from it. No other substance such as "dried-milk product" may, however, be added to it as happened in the case of Auetal powder. Contrary to the assumption of the Verwaltungsgericht there were at the material time generally known methods of analysis for proving the existence of improper operations of the kind in question. There is nothing to suggest that the regulation was intended to be valid only in so far as its observance could be ensured by means of chemical analysis of the products. What is important above all is supervision on the premises. Any other interpretation would run counter to the meaning of the provision since the effectiveness of the system of aids would be considerably reduced if aids were also paid for product components which are not the subject of intervention in the milk sector. The aid provisions are not intended to guarantee a certain quality of feedingstuffs but rather to remove from the market for human consumption skimmed-milk powder as a product subject to intervention which is available in surplus. Article 1 of Regulation (EEC) No 986/68 relates solely to the complete milk-yield of the cow and not to substances derived from it, so that the admixture to milk of individual substances previously removed from it is excluded.

The *United Kingdom* and the plaintiffs *Helmut Becker GmbH & Co. KG, Plange Kraftfutterwerke GmbH & Co. KG, Firma Josera-Werk* and *Hemo Mohr KG* express no views on the first question. The last-mentioned plaintiffs, however, submit that in interpreting Article 1 (d) of Regulation (EEC) No 986/68 care should be taken to ensure that no unreasonable risks, which may escape control, arise for Community citizens. If such risks were not prevented by an interpretation of that provision as relating merely to a given material composition of the final product that may be achieved by excluding such risks in the context of the claim for recovery.

*3. Second question*

The *plaintiffs in the main action* and the *Commission* take the view that the second question should be answered in the affirmative. An obligation exists on the part of Member States to supervise the production of skimmed-milk powder.

*Deutsche Milchkontor GmbH* is, however, of the opinion that that obligation is founded not on Article 10 of Regulation (EEC) No 990/72 but on Article 8 of Regulation (EEC) No 729/70 pursuant to which Member States must take the measures necessary "to prevent ... irregularities".

*Firma E. Kampffmeyer, Schwarzwaldmilch GmbH* and *Inntaler Mischfutter GmbH & Co. KG* submit that, according to the spirit and intendment of Article 10 of

2647

Regulation (EEC) No 990/72 and Article 8 of Regulation (EEC) No 729/70, the Member States are required the check whether the skimmed-milk powder was produced in the Community and whether it has been used for the purpose for which it was intended. No given method is laid down for the first requirement. It is for the Member States to choose the method. If appropriate, inspections must be carried out on the premises of the skimmed-milk manufacturers since aids and other subsidies are taken up in respect of some 90% of skimmed-milk powder produced. By analogy with the provisions of Article 3 of Regulation (EEC) No 990/72 relating to the supervision of denaturing, regular inspections of undertakings must be carried out at short intervals and unannounced since that is in practice the only appropriate means of avoiding adulterations.

with Article 8 (1) of Regulation (EEC) No 729/70 that irregularities and improper operations should be made impossible from the start by means of comprehensive and continous supervision of the skimmed-milk powder production plants. To that extent the Community and national authorities have a duty of care towards producers of feedingstuffs who are brought within the Community system of aid without any advantage to them. An obligation to supervise the production process is also in line with the decision of the Court of 11 July 1973 in Case 3/73 *Hessische Mehlindustrie Karl Schöttler* [1973] ECR 745 and that of 6 May 1982 in the *BayWa* case mentioned above. The Federal Office did in fact effect such supervision even though it failed to exercise the necessary care in the case of Auetal.

*Helmut Becker GmbH & Co. KG, Plange Kraftfutterwerke GmbH & Co. KG, Firma Josera-Werk* and *Hemo Mohr KG* point out that, by its very wording, Article 10 of Regulation (EEC) No 990/72 is not restricted to the supervision of manufacturers of feedingstuffs. Only by inspections of the manufacturers of skimmed-milk powder is it possible to ensure that aids are paid only for genuine skimmed-milk powder and that an aid is not "paid more than once for one and the same product", a danger referred to in the third recital in the preamble to Regulation (EEC) No 990/72. It is impossible for manufacturers of feedingstuffs to verify whether skimmed-milk powder is eligible for aid. That can be done only by supervision of the production of skimmed-milk powder and inspection of the production process in the production plant. It also accords

*Frischli-Milchwerke Holtorf + Schäkel KG* submits above all that skimmed-milk powder is almost exclusively used in the subsidized sector and that supervision of production at least at the material time was the only practicable method of avoiding improper operations.

*Denkavit Futtermittel GmbH* and *DMV Lagerei- und Verwaltungsgesellschaft mbH* emphasize that only the competent authority and not the producers of feedingstuffs is authorized and in a position to supervise the production of skimmed-milk powder on the premises and in that way to prevent improper

DEUTSCHE MILCHKONTOR v GERMANY

operations. Furthermore in the present case major factors gave rise to the suspicion that adulterations were being carried out at Auetal.

In the *Commission's* view the wording of Regulation (EEC) No 990/72 gives little guidance on the question whether and to what extent the authorities of the Member States have an obligation to supervise the production of skimmed-milk powder in the manufacturing plants. That regulation contains specific provision for supervisory controls only in respect of checks as to the manufacturer of compound feedingstuffs who is entitled to the aid (Articles 4 to 8). Article 4 (2) of Regulation (EEC) No 986/68 as amended by Regulation (EEC) No 1038/72 of the Council of 18 May 1972 (Official Journal, English Special Edition 1972 (II), p. 456) demonstrates beyond any doubt that national authorities also have the power to supervise the production plants for skimmed-milk powder. The Member States are of course obliged, at any rate where there are any suspicious circumstances, to carry out such checks in order to ensure that the provisions of the regulation are observed.

The *Federal Republic of Germany* and the *United Kingdom* are of the opinion that the second question should be answered in the negative.

The *Federal Republic of Germany* takes the view that the content of Regulation (EEC) No 990/72 is confined to the matter stated in the title of the regulation, that is to say to the denaturing of skimmed-milk powder and its processing into compound feedingstuffs. That regulation is therefore not concerned in any way with the composition of skimmed-milk powder. Accordingly, the duty

imposed on Member States by Article 10 of the regulation does not include the duty of supervising the production of skimmed-milk powder in the production plant.

The *United Kingdom* submits that, contrary to the supervision of denaturing provided for by Article 3 (1), Regulation No 990/72 contains no provision for supervision of the production of skimmed-milk powder on the premises. It is clear from the eighth recital in the preamble and from Article 8 of Regulation No 990/72 that the provision of adequate guarantees, the approval of the processing undertaking and the introduction of an accounting system adapted to the special requirements of the aid arrangements are all considered necessary to ensure effective supervision but not inspections on the premises. An obligation to supervise the production of skimmed-milk powder would go beyond the scope of the provisions of Regulation No 990/72. Moreover it is left to the Member States to decide what form of supervision they consider necessary under Article 10.

4. *Third question*

*Deutsche Milchkontor GmbH, Firma E. Kampffmeyer, Schwarzwaldmilch GmbH, Inntaler Mischfutter GmbH & Co. KG, Helmut Becker GmbH & Co. KG, Plange Kraftfutterwerke GmbH & Co. KG, Firma Josera-Werk, Hemo Mohr KG, Denkavit Futtermittel GmbH* and *DMV Lagerei- und Verwaltungsgesellschaft mbH* contend first that the third question submitted by the Verwaltungsgericht consists of two part-questions namely, first, whether the duty to supervise the manufacturer of skimmed-milk powder applies also in respect of manufacturers of feedingstuffs and secondly whether

JUDGMENT OF 21. 9. 1983 — JOINED CASES 205 TO 215/82

failure to fulfil that duty precludes the recovery from recipients in good faith of aids unduly paid.

The first part-question as to whether the duty of supervision enures for the benefit of third parties must be seen against the background of German law on public liability and the answer must have due regard to the position of manufacturers of feedingstuffs within the aid system. In the context of the intervention system set up in the public interest, manufacturers of feedingstuffs are used to a certain extent as a channel of communication, because although the aid is paid to them in the first instance it has to be passed on to their customers and they therefore obtain no benefit from it. In fact it is the milk producers who benefit from the aid since their products are thereby made marketable. Manufacturers of feedingstuffs in such a situation are in need of protection because they themselves are not in a position to ensure the proper manufacture of the skimmed-milk powder and because, in view of the amount of the aid, they are unable to bear the risk of a claim for recovery of aid which might threaten their existence. Moreover, the principle of equal treatment requires that all manufacturers of feedingstuffs as a result of their incorporation into the intervention system should receive equal treatment and that only ascertainable and calculable risks should be imposed on them.

As to the second part-question as to the consequences flowing from a breach of that duty of care *Deutsche Milchkontor GmbH, Helmut Becker GmbH & Co. KG, Plange Kraftfutterwerke GmbH & Co. KG, Firma Josera-Werk, Hemo Mohr KG, Denkavit Futtermittel GmbH* and *DMV Lagerei- und Verwaltungsgesellschaft mbH* submit that, if that duty to protect the feedingstuffs industry is breached, it follows from the national law on public liability, from the second paragraph of Article 215 of the EEC Treaty and from the principles of good faith and the rule of law which are common to all the Member States that a claim for recovery of unduly paid aids is excluded. A claim for damages may be made by the recipient of aid by means of an objection — to some extent as in German law by way of set-off — if a claim for recovery is made against him.

The plaintiffs *Denkavit Futtermittel GmbH* and *DMV Lagerei- und Verwaltungsgesellschaft mbH* add that where appropriate it is for the Community and the Member State concerned, within the context of the so-called "balancing of accounts" to agree on the legal consequences flowing from the inability to claim recovery. In no event ought such a burden to be imposed upon third parties who are not involved.

*Firma E. Kampffmeyer, Schwarzwaldmilch GmbH* and *Inntaler Mischfutter GmbH & Co. KG* state that in the regulation of the milk market responsibility for the sale of surplus milk has been taken away from the milk producer by the authorities. Therefore the risk of the improper production of skimmed-milk powder should fall solely on the supervising authorities. A claim for recovery of unduly paid aids from recipients of aid in good faith is therefore also precluded even where the authorities are guilty of no fault. If negligent conduct on the part of the authority is required then it is clear from the judgment of the Court of 5 March 1980 in Case 265/78 *Ferwerda* [1980] ECR 617 that there is nothing in Community law to make it unlawful to preclude a claim for recovery of aids paid without legal foundation in such cases.

*Frischli-Milchwerke Holtorf + Schäkel KG* takes the view that the reply to be

DEUTSCHE MILCHKONTOR v GERMANY

given to the third question is that, if a Member State does not carry out the control measures necessary under Article 10 of Regulation (EEC) No 990/72, it cannot rely for its claim for recovery on the fact that the user did not carry out his own inspections, if at the time of the grant of the aid such inspections were not possible.

The *Federal Republic of Germany and the United Kingdom* are of the opinion that the third question should be answered in the negative since no duty to supervise the production of skimmed-milk powder exists.

The *United Kingdom* adds that Article 10 of Regulation No 990/72 merely concerns the relations between the Member States and the Community and confers no rights on individuals. The latter must ensure that the preconditions for aid are satisfied and, if appropriate, protect themselves against any deficiency in the quality of the skimmed-milk powder by contractual arrangements with third parties. That conclusion is confirmed by Article 8 (1) of Regulation No 729/70 which provides for amounts improperly paid to be claimed back.

As to the third question the *Commission* in substance refers to its statements on the fifth and seventh questions and is of the opinion that the recipient of aid may not derive any rights from a breach of the duty of supervision so as to preclude the recovery of unduly paid aids which the Member States are obliged by Article 8 of Regulation No 729/70 to ensure.

## 5. Fourth question

As a preliminary, *Denkavit Futtermittel GmbH, DMV Lagerei- und Verwaltungs-*

*gesellschaft mbH* and the *Commission* submit generally on the fourth, fifth, sixth and seventh questions that Community law contains no provision relating to the repayment of unduly paid aids and that under the case-law of the Court (cf. the *Ferwerda* and *BayWa* cases, already referred to) the claim for recovery of such amounts must be made both as to procedure and substance under municipal law which must of course keep within the limits laid down by Community law.

*Deutsche Milchkontor GmbH, Firma E. Kampffmeyer, Schwarzwaldmilch GmbH* and *Inntaler Mischfutter GmbH & Co. KG* submit that Community law contains no general or special written provision governing the burden of proof, in particular as regards the question whether in fact skimmed-milk powder satisfies the requirements of Regulation No 986/68. However, just as in German law, there are certain rules governing the burden of proof in Community law which are derived from the principle of the rule of law. Thus a person seeking to derive rights from a certain set of facts must prove those facts. Furthermore the burden of proof is reversed if proof is made impossible for one party by the fact that the other party is in breach of its duties. That is the case here, since it would have been possible to adduce evidence if the Federal Office had properly performed its duty of supervision of Auetal.

In the special case governed by Regulation No 1624/76 (exports to Italy) the question of proof is specifically provided for in that regulation. Even if aids have been paid for skimmed-milk powder which is denatured or processed in Italy the preconditions for the grant of the aid

are entirely satisfied only if and in so far as the skimmed-milk powder has in fact been processed, which in that regulation is guaranteed by a provision for security. That security is released when proof is given that the relevant amount of skimmed-milk powder has been processed. Once the processing undertakings supplied in Italy have given the necessary evidence to the Italian authorities that is accepted as evidence that the relevant skimmed-milk powder was not adulterated. If that proof given to the Italian authorities is adequate it must be available too to the German exporter as against the Federal Office.

provision of national law of that kind is to be found in Paragraph 9 (1) of the German regulation relating to the grant of aids for skimmed milk, skimmed-milk powder, caseine and caseinates of 31 May 1977 which provides that the recipient of aid shall, even after receipt of payment of the aid, bear the burden of proof of the existence of the preconditions for the grant of aid until the expiry of the third calendar year after the year in which the aid was paid.

*Helmut Becker GmbH & Co. KG; Plange Kraftfutterwerke GmbH & Co. KG; Firma Josera-Werk; Hemo Mohr KG; Denkavit Futtermittel GmbH, Frischli-Milchwerke Holtorf + Schäkel KG; DMV Lagerei- und Verwaltungsgesellschaft mbH* and the *United Kingdom* are of the opinion that the burden of proof is a matter which under the case-law of the Court is exclusively left to national law. Community law contains no provisions in that connection. The prohibition of discrimination may however be regarded as a limit set by Community law to the application of national law. The application of national law may not lead to less favourable rules being applied to the recovery of Community aids than to similar national procedures.

The *Federal Republic of Germany* is also of the opinion that Community law leaves the question of the substantive burden of proof to national law. A

The *Commission* submits first that national law is in principle applicable to the question of the burden of proof. That does not however mean that there are not certain requirements arising from Article 8 of Regulation No 729/70 which national law must comply with. However, it is only in the few cases in which it is not possible to clarify the facts using all the available possibilities that the question of the burden of proof arises. In the present state of Community law there is nothing to prevent the application in such a case of national provisions under which the burden of proving the justification for a claim for the recovery of payments made without legal basis is imposed upon the party claiming that there was no legal basis for the payment, namely the authority. The provisions laying down the preconditions for the grant of aid may not be invoked for the purpose of the burden of proof after the payment has been made. The concept *interest reipublicae ut sit finis litium,* which is also applicable under Community law, precludes any requirement that a recipient of aid in good faith ought subsequently be called upon to prove his entitlement to receive the aid, all the more so where the proof he first had to give was thorough. Certainly in

DEUTSCHE MILCHKONTOR v GERMANY

the present cases there are arguments in favour of a continuing burden of proof on the recipient of aid. Thus the provisions of Community law applicable at the material time provided for a combination of checks on the processing in the plants with *ex post facto* accounting checks and the business records were to be kept for at least three years. Furthermore in practice manufacturers in Germany make monthly applications for aid which are often decided by the authorities before all the results of checks are available. Nevertheless, it cannot be assumed that the Community legislature ought to adopt any provisions governing the burden of proof.

In the application of national law relating to the burden of proof regard must be had to the matter highlighted by the Court in its judgment of 27 May 1982 in Case 113/81 Reichelt [1982] ECR 1957 that the recovery of payments financed by the Community must not be more difficult to enforce than the recovery of payments which are financed by the Member State concerned. In that connection the Commission submits that to the best of its knowledge exactly the contrary is the case here since the German authorities continued to impose upon the recipient of aid even after receipt of the payment the burden of proving that the preconditions for the claim for aid were satisfied. Whilst it is for the German courts to establish whether those provisions are lawful under German law, in the Commission's view such provisions would be entirely compatible with Community law.

### 6. Fifth question

The *plaintiffs in the main actions, the Federal Republic of Germany, the United*

*Kingdom* and the *Commission* all take the view that, in accordance with the case-law of the Court, Article 8 of Regulation No 729/70 does not provide any legal basis for claims by national authorities against the recipients of aids unduly paid. Such claims are governed by national law alone.

The *plaintiffs in the main actions* state in that connection that Article 8 founds not only a power but also the duty to recover amounts unduly paid and precludes any considerations of expediency on the part of national authorities in deciding whether to claim recovery or not. The substantive preconditions for a claim for recovery under national law, in particular superior principles of law such as legal certainty and the protection of legitimate expectation are however not affected by Article 8 of Regulation No 729/70.

*Frischli-Milchwerke Holtorf + Schäkel KG* additionally submits that a claim for recovery under that provision is permissible only in so far as the payment of aids is brought about by irregularities. However, since it also received unadulterated skimmed-milk powder the claim for recovery of the aids in its case goes beyond that limit.

In the *United Kingdom's* view the Member States are not obliged under Article 8 of Regulation No 729/70 to take steps to recover amounts if it is clear that the applicable provisions of national law preclude such recovery.

The *Commission* states that it is clear from the whole structure of Regulation No 729/70 and from Article 8 in particular that that regulation governs relations between the Community and the Member States. Article 8 (1) of Regulation No 729/70 obliges the Member States, where appropriate, to adopt national provisions enabling amounts unduly paid to be recovered. Whether they are effective and comply with Community law is for the Commission to examine.

### 7. Sixth question

*Deutsche Milchkontor GmbH, Helmut Becker GmbH & Co. KG, Plange Kraftfutterwerke GmbH & Co. KG, Firma Josera-Werk, Hemo Mohr KG, Denkavit Futtermittel GmbH, Frischli-Milchwerke Holtorf + Schäkel KG, DMV Lagerei- und Verwaltungsgesellschaft mbH, the Federal Republic of Germany, the United Kingdom* and *the Commission of the European Communities* all agree that no reply need be given to the sixth question because the fifth question cannot be answered in the affirmative and the conditions under which a claim may be brought for the recovery of aids unduly paid is a matter governed solely by national law.

*Helmut Becker GmbH & Co. KG, Plange Kraftfutterwerke GmbH & Co. KG, Firma Josera-Werk* and *Hemo Mohr* KG additionally submit *ex abundanti cautela* that the protection of legitimate expectation is one of the fundamental principles of Community law and that the principles known to Community law of proportionality and the prohibition of excessive requirements also preclude the imposition of an unlimited risk which threatens the existence of undertakings and cannot be avoided by them. The

principle regarding the loss of enrichment, being a limb of the principle of good faith, is a component part of the principle of the rule of law and is recognized in all the legal systems of the Member States with the result that it forms part of Community law.

*Firma E. Kampffmeyer, Schwarzwaldmilch GmbH* and *Inntaler Mischfutter GmbH & Co. KG* take the view that a reply to the sixth question has partly been given by the judgment of the Court in *Ferwerda,* already referred to, as regards the protection of legitimate expectation and the consequences of knowledge on the part of the authority or grossly negligent breach by it of supervisory duties. Moreover, it is not contrary to Community law for Member States and their national courts to preclude claims for recovery of aids granted improperly if a recipient in good faith has ceased to be enriched or the authority would enrich itself by the recovery at the cost of a recipient in good faith. That would be so in the present cases since aids would also be recovered which were paid for pure skimmed-milk powder if the manufacturer of feedingstuffs mixed skimmed-milk powder with Auetal powder before processing and thereby caused the required proportion of genuine skimmed-milk powder in the feedingstuffs to fall below the percentage stipulated.

### 8. Seventh question

The *plaintiffs in the main actions* take the view that there are no objections under Community law to the provisions of Paragraph 48 of the Verwaltungsverfahrensgesetz [Law on administrative procedure] in its various component parts.

DEUTSCHE MILCHKONTOR v GERMANY

*Firma E. Kampffmeyer, Schwarzwaldmilch GmbH* and *Inntaler Mischfutter GmbH & Co. KG* explain in that connection that subquestions 1, 2 and 4 (protection of legitimate expectation, loss of enrichment and knowledge or lack of knowledge as a result of gross negligence on the part of the authority of the absence of legal justification) have already been answered in connection with the preceding questions. A reply remains to be given to subquestion 3 which relates to the preclusive period of one year contained in Paragraph 48 (4) of the Verwaltungsverfahrensgesetz. In that connection it is clear from the judgment of the Court of 12 June 1980 in Joined Cases 119 and 126/79 *Lippische Hauptgenossenschaft* [1980] ECR 1863 that limitation periods and preclusive periods in respect of claims for recovery are to be governed by national law provided that it is applied without distinction or discrimination.

*Helmut Becker GmbH & Co. KG, Plange Kraftfutterwerke GmbH & Co. KG, Firma Josera-Werk, Hemo Mohr KG* and *Denkavit Futtermittel GmbH* essentially state the following:

The question raised in subquestion 1 as to the permissibility of national provisions governing the protection of legitimate expectation was given an affirmative reply in the judgment of the Court of 5 March 1980 in the *Ferwerda* case, previously cited. Furthermore, it accords with principles of Community law that a claim for recovery should be precluded in such cases.

The question raised by subquestion 2 as to the permissibility of national provisions relating to loss of enrichment may also be answered in the affirmative under the principles laid down by the above-mentioned judgment. Moreover, such provisions are actually required by Community law. In that connection it is not possible to find that a recipient of

aid has been enriched because he enjoys a competitive advantage over his competitors. The purpose of the aid is not to provide a subsidy but a price corrective which is a component part of the intervention system and is intended in the public interest, to make the sale of skimmed-milk powder possible at all. It confers no advantage on the manufacturers of feedingstuffs since they could also use other raw materials at a reasonable and competitive price.

The preclusive period of one year mentioned in subquestion 3 governing claims for recovery of payments made without legal basis does not give rise to any reservations under Community law. Such a time limit is in accordance with the principle of legal certainty, treats all those concerned in the same way and gives the authority no discretion.

The question raised in the fourth subquestion as to the exclusion under Paragraph 814 of the Bürgerliches Gesetzbuch [Civil Code] of a claim for recovery where the authority knew or, as a result of the lack of legal justification is closely allied with the question as to the consequences flowing from a breach of the duty of supervision under Article 10 of Regulation (EEC) No 990/72 by the authority. In the case of such a breach of duty the national authority is responsible to the Community in the context of the balancing of accounts for the financial consequences of irregularities and negligence. On the other hand to lay the burden of those consequences on the manufacturers of feedingstuffs would offend against elementary principles of justice. In the view of *Denkavit Futtermittel GmbH* the duty imposed on national authorities to avoid any diminution of the effectiveness of Community law implies that a claim for recovery must be regarded as unacceptable even in the case of ordinary negligence by the authority in not

2655

knowing that the grant of aid was unlawful.

The *Federal Republic of Germany* contends first that in its view cases of this kind are to be dealt with under German law not on the basis of Paragraph 48 of the Verwaltungsverfahrensgesetz but under special provisions which provide for an unlimited duty to repay because the Member States are acting on behalf of the Community.

As to the applicability of national law the Court expressed its opinion *inter alia* in the judgments of 12 June 1980 in Case 130/79 *Express Dairy Foods* [1980] ECR 1887 and 6 May 1982 in the *BayWa* case, already cited. However, the precise definition of the limits set by Community law in practice raises insuperable problems. In so far as the Court in a given case has no opportunity of expressing its view on a decision by the implementing authority or by the national court a Member State bears the financial risk that the decision may not be regarded as being in conformity with Community law when a decision is taken about the clearance of accounts by the Community in which case financing by the Community is refused.

The grounds on which, pursuant to Paragraph 48 of the Verwaltungsverfahrensgesetz, a claim for recovery is precluded correspond to generally recognized principles. However, there is no provision corresponding to that article at Community level. Nor is it clear specifically how the Court intends to ensure the equal treatment of traders in the different Member States required by its judgment of 6 May 1982 in the *BayWa* case and the most uniform

application possible of Community law in the whole Community.

In any event the Federal Republic of Germany makes the assumption that, in cases where under rules of national law which are compatible with Community law a claim for recovery is not possible, the Community must bear the financial loss in so far as the second subparagraph of Article 8 (2) of Regulation No 729/70 does not come into play.

The *United Kingdom* confines itself to the observation that a national legal provision such as the one in the present case must be tested for its compatibility with the two requirements under Community law that it may neither discriminate nor prejudice the attainment of the objectives of Community law.

The *Commission* first submits that the four separate aspects of the seventh question all relate to the concept of the protection of legitimate expectation in claims for recovery of payments made without justification from public funds and demonstrate how well developed that principle has become particularly in German administrative procedure. That it must be possible for national laws in laying down rules governing claims for recovery made by authorities to have regard to the principle of the protection of legitimate expectation flows from the validity of that principle in Community law itself, as has been recognized by the Court of Justice. However, Community law does not allow Member States an unlimited margin of discretion. The efficacy of Article 8 of Regulation No 729/70 may not be frustrated by national measures. The requirement made by Community law that national measures governing claims for recovery must be

DEUTSCHE MILCHKONTOR v GERMANY

effective is based not merely on the financial interests of the European Agricultural Guidance and Guarantee Fund but also on the principle of the equal treatment of the traders concerned in the whole Community. That means that even in cases where in the end no burden is placed on the Community budget an aid unduly granted must be claimed back so as not to distort market conditions within the Community.

Such considerations would preclude for example a duty to claim recovery exercisable within too short a period under national law. Were inactivity over a period of time on the part of national authorities sufficient to preclude a claim for recovery under the principle of the protection of legitimate expectation then it would be, in the last resort, in the discretion of the authority whether it wished to enforce the claim or not. The preclusive period of one year contained in Paragraph 48 of the Verwaltungsverfahrensgesetz is in the Commission's view the absolute minimum period which would be compatible with the objective of effectiveness required by Article 8 of Regulation No 729/70.

For the same reasons it does not accord with Community law for a Member State not to make a claim for recovery of an aid granted without legal basis simply on the ground that its authorities knew or ought to have known that there was no entitlement to the aid. If it were otherwise Member States would be able definitively to distort market conditions by conduct incompatible with the Community. In such cases it is not merely the interests of the citizen and the Member States which have to be weighed the one against the other: regard must also be had to the special interest of the Community in the recovery. Article 8 (2) of Regulation No 729/70 may be construed only as meaning that even in cases where the national administration

has acted negligently a claim for recovery is still necessary, since that provision lays down who has to bear the financial consequences if it is not possible to recover the amounts paid. Since reference is also made to cases in which the national authority is responsible for the erroneous payment recovery is also in principle required in such cases. If it were otherwise there would be a danger that the number of disputes between the Commission and Member States as to whether a national authority was at fault in not acting quickly enough would increase considerably.

In connection with the extent to which a loss of enrichment in the context of provisions relating to the protection of legitimate expectation must be taken into account, regard should be had to the question whether any degree of negligence at all on the part of the recipient of aid in question may not overcome that objection. If the concept of efficacy is logically taken a step further there seems to be no reason why negligence on the part of the person concerned ought to lead to unjustified financial payments and to the distortion of market conditions. However, it would have been for the Community legislature to lay down clear criteria under Community law in that connection. Therefore, in adopting provisions in implementation of Article 8 of Regulation No 729/70 the Member States enjoy a certain margin of discretion which must not be too closely circumscribed.

In view of the multiplicity of conceivable cases in the field of the protection of legitimate expectation and the above-mentioned margin of discretion on the part of the national legislature, a general clause such as the one contained in the first sentence of Paragraph 48 (2) of the German Verwaltungsverfahrensgesetz is not prohibited. However, it must be ensured that in weighing the public

interest in recovery of the payment specific considerations of Community law may be sufficiently taken into account.

## III — Oral procedure

At the hearing on 4 May 1983 oral argument was presented by the following: Karsten H. Festge, Hamburg, for Deutsche Milchkontor GmbH; Fritz Modest and Jürgen Gündisch, Hamburg, for Firma E. Kampffmeyer, Schwarzwaldmilch GmbH and Inntaler Misch-

futter GmbH & Co. KG; Dietrich Ehle, Cologne, for Helmut Becker GmbH & Co. KG and Plange Kraftfutterwerke GmbH & Co. KG; Paul Bornemann, Munich, for Frischli-Milchwerke Holtorf + Schäkel KG; Helmut Grzebatzki, Duisburg, for DMV Lagerei- und Verwaltungsgesellschaft mbH; Arved Deringer, Cologne, for the Federal Republic of Germany and Jörn Sack, a member of the Commission's legal department, for the Commission of the Europan Communities.

The Advocate General delivered his opinion at the sitting on 8 June 1983.

# Decision

1    By 11 orders dated 3 June 1982, which were received at the Court on 11 August 1982, the Verwaltungsgericht [Administrative Court] Frankfurt am Main referred to the Court for a preliminary ruling under Article 177 of the EEC Treaty questions as to the interpretation of various provisions of Regulation (EEC) No 986/68 of the Council of 15 July 1968 laying down general rules for granting aid for skimmed milk and skimmed-milk powder for use as feed (Official Journal, English Special Edition 1968 (I), p. 260), Regulation (EEC) No 990/72 of the Commission of 15 May 1972 on detailed rules for granting aid for skimmed milk processed into compound feedingstuffs and for skimmed-milk powder for use as feed (Official Journal, English Special Edition 1972 (II), p. 428) and Regulation (EEC) No 729/70 of the Council of 21 April 1970 on the financing of the common agricultural policy (Official Journal, English Special Edition 1970 (I), p. 218), and as to the principles of Community law regarding the recovery of unduly-paid aids.

2    Those questions were raised in disputes pending before the Verwaltungsgericht [Administrative Court] Frankfurt am Main between the Bundesamt für Ernährung und Forstwirtschaft [Federal Office for Food and Forestry],

DEUTSCHE MILCHKONTOR v GERMANY

the competent authority for paying aids for the processing of skimmed-milk powder in the Federal Republic of Germany, and a number of undertakings which make compound feedingstuffs and trade in milk products. The undertakings asked the Verwaltungsgericht to annul decisions of the Bundesamt für Ernährung und Forstwirtschaft requiring them to repay sums granted to them for skimmed-milk powder pursuant to Article 10 (1) of Regulation (EEC) No 804/68 of the Council of 27 June 1968 on the common organization of the market in milk and milk products (Official Journal, English Special Edition 1968 (I), p. 176), Regulations Nos 986/68 of the Council and 990/72 of the Commission, referred to above, and Commission Regulation (EEC) No 1624/76 of 2 July 1976 concerning special arrangements for the payment of aid for skimmed-milk powder denatured or processed into compound feedingstuffs in the territory of another Member State (Official Journal 1976, L 180, p. 9).

3    Pursuant to the aforesaid provisions the plaintiff undertakings in the main proceedings received the aids for skimmed-milk powder either for the processing of skimmed-milk powder into compound feedingstuffs or for the exportation of skimmed-milk powder to Italy for the purpose of such processing. In the main proceedings the Bundesamt für Ernährung und Forstwirtschaft contends that the skimmed-milk powder for which the plaintiffs received the aids did not satisfy the conditions laid down by the Community regulations in so far as the powder came from the undertaking Milchwerke Auetal-Beyer KG (hereinafter referred to as "Auetal").

4    In 1978 and 1979 Auetal used, besides skimmed milk, large quantities of a product composed of 56% powdered whey, 31% sodium caseinate and 13% lactose to make skimmed-milk powder. As regards its content of protein, carbohydrates and so forth, the composition of the powder made in that way was the same as that of skimmed-milk powder made from fresh skimmed milk. The issue in the main proceedings is, depending on the case, whether and to what extent the plaintiffs received and used for the processing and exportation of the skimmed-milk powder in question normal skimmed-milk powder supplied by Auetal or another supplier or powder made by Auetal using the particular method described above and put on the market as skimmed-milk powder.

2659

JUDGMENT OF 21. 9. 1983 — JOINED CASES 205 TO 215/82

5    The Verwaltungsgericht found that at the material time neither the under-
takings in the milk product industry nor the public laboratories were able,
using the methods of chemical analysis habitually employed at that time, to
detect any difference between skimmed-milk powder made from fresh
skimmed milk and the powder made by Auetal using the particular method
in question. The plaintiffs in the main proceedings therefore argue that they
could not tell whether or not they were receiving and using a product other
than skimmed-milk powder made from fresh skimmed milk.

6    The use of that particular manufacturing method by Auetal was discovered
by the competent German authorities in May 1979. The parties to the main
proceedings are at odds on the question whether its use might and ought to
have been discovered earlier as some evidence of unusual manufacturing
processes had previously been found. Following the discovery the Bundesamt
für Ernährung und Forstwirtschaft decided to cancel the notices granting aid
and to demand repayment of the sums unduly paid under those notices on
the ground that the conditions for the grant of aids, namely the use of
skimmed-milk powder in the prescribed quantity at least, were not fulfilled
because the plaintiff undertakings had used, at least in part, powder made by
Auetal.

7    In the proceedings before the Verwaltungsgericht Frankfurt the plaintiffs
contest those decisions of the Bundesamt für Ernährung und Forstwirtschaft
on the ground that the conditions laid down by Article 48 of the Verwal-
tungsverfahrensgesetz [Law on Administrative Procedure] of 25 May 1976
(Bundesgesetzblatt I, p. 1253) on which an administrative decision granting a
pecuniary advantage may be revoked and sums paid pursuant to such a
decision recovered are not fulfilled in the present case.

8    The national court considered that the disputes raised a number of questions
concerning the interpretation of Community law. It therefore submitted the
following questions to the Court for a preliminary ruling:

"1. Does a product consisting of a spray-dried mixture of skimmed milk and
a dried-milk product come within the definition of skimmed-milk

DEUTSCHE MILCHKONTOR v GERMANY

powder laid down in Article 1 (c) of Regulation (EEC) No 986/68 of
the Council of 15 July 1968 if that end product reveals the same
composition (protein, carbohydrate etc.) as skimmed-milk powder
derived directly from cow's milk?

2. Does Article 10 of Regulation (EEC) No 990/72 of the Commission of
15 May 1972 found an obligation on the part of the authorities of the
Member States to supervise the production of skimmed-milk powder on
the producer's premises?

3. Does Article 10 of the last aforementioned regulation enure for the
benefit of the recipients of aid as third parties, that is, may they invoke
failings of the authorities in that respect so as to preclude a demand for
repayment?

4. Does Community law, in particular Article 8 (1) of Regulation (EEC)
No 729/70 of the Council of 21 April 1970, contain rules governing the
substantive burden of proof or are those rules determined by national
law as regards the question whether, in a given case, aids for skimmed
milk and skimmed-milk powder for use as feed under Regulation No
986/68 of the Council, and Commission regulations adopted in
implementation thereof, have been unlawfully granted? If Community
law contains rules governing the burden of proof: What are those rules?

5. Does Article 8 (1) of Regulation No 729/70 of the Council of 21 April
1970 provide a direct legal basis upon which national authorities may
demand reimbursement of aid granted unlawfully with the result that the
factual preconditions to be satisfied for such a demand are definitively
laid down in that provision?

6. If the fifth question is answered in the affirmative: Within what
provisions, if appropriate supplemented by unwritten legal principles of
Community law, is the expectation of the recipient of aid protected and
if so under what conditions and to what extent? May the recipient of aid
in particular under certain circumstances plead loss of enrichment and is
there such a loss where the recipient of aid has passed the aid on in the
selling price? Is recovery precluded where the authority knew, or did not
know as a result of gross negligence, that it was granting the aid
unlawfully?

7. If the fifth question is answered in the negative: Is it compatible with Community law for national law to preclude a demand for repayment of aid granted unlawfully:

Where the beneficiary relied upon the notice granting aid being maintained in force and that expectation, weighed against the public interest in revocation, is worthy of protection (Paragraph 48 (2), first to third sentences, of the Verwaltungsverfahrensgesetz [Law on Administrative Procedure] of 25 May 1976 — BGBl I p. 1253);

Where the beneficiary can plead loss of enrichment unless he knew, or did not know as a result of gross negligence, the circumstances leading to the illegality of the notice granting the aid (seventh sentence of Paragraph 48 (2) of the Verwaltungsverfahrensgesetz);

Where a period of one year has elapsed beginning with the point in time at which the authority received knowledge of facts justifying the revocation of an unlawful notice granting aid, irrespective of whether the person concerned knew that such facts had come to the notice of the authority (Paragraph 48 (4) of the Verwaltungsverfahrensgesetz);

Where the authority knew, or did not know as a result of gross negligence, that it was granting the aid unlawfully (sixth sentence of Paragraph 48 (2) of the Verwaltungsverfahrensgesetz in conjunction with Paragraph 814 of the Bürgerliches Gesetzbuch [German Civil Code])?"

9    The first of those questions concerns the conditions upon which aids are granted whilst the second to seventh questions are concerned with various aspects of the recovery of aids by national authorities where they have been paid without the conditions for their grant having been fulfilled. To make it easier to formulate the relevant principles with the aid of which the national court should be able to decide the cases before it the questions submitted will be rearranged and dealt with in the following order:

The conditions upon which aids are granted (first question);

The extent to which Community law and national law apply to the question of the recovery of unduly-paid aids (fifth and sixth questions);

DEUTSCHE MILCHKONTOR v GERMANY

The protection of legitimate expectation and assurance of legal certainty in the recovery of unduly-paid aids (seventh question);

The burden of proof in the recovery of unduly-paid aids (fourth question);

The obligation to monitor the manufacture of skimmed-milk powder at the manufacturer's premises (second and third questions).

The conditions upon which aids are granted

10    By its first question the national court wishes to know how it must interpret the term "skimmed-milk powder" used in the Community regulations on aids for skimmed-milk powder and, more specifically, Article 1 of Regulation No 986/68 of the Council in order to decide whether or not a powder such as that made by Auetal meets the conditions for the grant of aids.

11    In its observations to the Court the plaintiff Frischli-Milchwerke Holtorf + Schaekel KG takes the view that it is the physical composition and not the manufacturing process which is determinative as regards the definition of skimmed-milk powder, especially as the reconstitution of milk products from their previously separated constituents is the usual and accepted practice in Community dairies.

12    The point to be made in this regard is that Article 1 (d) of Regulation No 986/68 of the Council defines skimmed-milk powder as "powdered milk" and also specifies its fat and moisture content. Milk itself is defined in Article 1 (a) as "the milk-yield of one or more cows, to which nothing has been added and which has, at the most, been only partially skimmed". It is clear from those definitions that a product for the manufacture of which substances other than the milk-yield of one or more cows have been used cannot attract aids under the intervention machinery referred to above, regardless of the chemical composition of the final product obtained in that way.

13    The literal interpretation is supported by the purpose of the system of aids in question, which, under the intervention system established by Regulation No 804/68 of the Council, is to enable milk to be disposed of at the price

2663

fixed within the common organization of the market in milk and milk products. It would be contrary to that objective for aids for skimmed-milk powder to be attracted by a product made from substances no longer on the milk market or in respect of which similar aids have already been granted when they were manufactured, as is the case where skimmed milk is processed into casein and caseinate in accordance with Article 11 of Regulation No 804/68 of the Council.

14    The answer to the first question must therefore be that a product consisting of a spray-dried mixture of skimmed milk and a powder composed of whey, sodium caseinate and lactose is not skimmed-milk powder for the purposes of the Community regulations governing aid for skimmed-milk powder and, more particularly, of Article 1 of Regulation (EEC) No 986/68 of the Council of 15 July 1968 even if its composition is the same as that of skimmed-milk powder made from cow's milk.

The extent to which Community law and national law apply to the question of the recovery of unduly-paid aids

15    According to the explanations provided by the national court, its fifth question is in substance whether Community law and in particular Article 8 (1) of Regulation No 729/70 of the Council of 21 April 1970 directly authorizes the competent national authorities to demand repayment of aids unduly paid, so that the substantive conditions for a right of recovery are exhaustively set out in that provision, or whether recovery is governed by the rules and procedures laid down by national legislation; if it is, the court wishes to know what limits are placed on the application of national law.

16    In order to answer that question it is necessary to recall first the relevant rules and general principles of Community law evolved by the Court in its decisions.

2664

DEUTSCHE MILCHKONTOR v GERMANY

17   According to the general principles on which the institutional system of the Community is based and which govern the relations between the Community and the Member States, it is for the Member States, by virtue of Article 5 of the Treaty, to ensure that Community regulations, particularly those concerning the common agricultural policy, are implemented within their territory. In so far as Community law, including its general principles, does not include common rules to this effect, the national authorities when implementing Community regulations act in accordance with the procedural and substantive rules of their own national law; however, as the Court stated in its judgment of 6 June 1972 in Case 94/71 *(Schlüter & Maack v Hauptzollamt Hamburg-Jonas* [1972] ECR 307), this rule must be reconciled with the need to apply Community law uniformly so as to avoid unequal treatment of producers and traders.

18   It is in this context, then, that Article 8 (1) of Regulation No 729/70 of the Council provides that "in accordance with national provisions laid down by law, regulation or administrative action" Member States must take the measures necessary to prevent and deal with irregularities affecting the operations of the European Agricultural Guidance and Guarantee Fund and to recover sums lost as a result of irregularities or negligence. Consequently the competent national authorities are bound to exercise all the supervision necessary to ensure that aids are granted only upon the conditions laid down by the Community regulations and that any infringement of the rules of Community law is appropriately penalized. At its present stage of development Community law does not include any specific provisions relating to the exercise of that supervision by the competent national authorities.

19   In accordance with those principles the Court has repeatedly held (on 5 March 1980 in Case 265/78 *H. Ferwerda BV v Produktschap voor Vee en Vlees* [1980] ECR 617, on 12 June 1980 in Joined Cases 119 and 126/79 *Lippische Hauptgenossenschaft eG and Another v Bundesanstalt für landwirtschaftliche Marktordnung* [1980] ECR 1863 and on 6 May 1982 in Case 54/81 *Firma Wilhelm Fromme v Bundesanstalt für landwirtschaftliche Marktordnung* [1982] ECR 1449 and Joined Case 146, 192 and 193/81 *BayWa AG and Others v Bundesanstalt für landwirtschaftliche Marktordnung* [1982] ECR 1503) that in the absence of provisions of Community law disputes concerning the recovery of amounts unduly paid under Community law must be decided by national courts pursuant to their own national law subject to the

2665

limits imposed by Community law inasmuch as the rules and procedures laid down by national law must not have the effect of making it virtually impossible to implement Community regulations and national legislation must be applied in a manner which is not discriminatory compared to procedures for deciding similar but purely national disputes.

20    If follows that Article 8 (1) of Regulation No 729/70 does not govern the relations between the intervention agencies and the traders concerned and in particular it does not constitute a legal basis authorizing the national authorities to bring actions to recover unduly-paid aids from their recipients; such actions are governed by national law.

21    Although as a result of such reliance on national law the conditions for the recovery of unduly-paid aids may vary to some extent from one Member State to another, the effect of such differences, which moreover in the present state of development of Community law are inevitable, is reduced by the limits to which the Court has subjected the application of national law in the decisions cited above.

22    In the first place the application of national law must not affect the scope and effectiveness of Community law. That would be the case in particular if the application of national law made it impossible in practice to recover sums irregularly granted. Furthermore, the exercise of any discretion to decide whether or not it would be expedient to demand repayment of Community funds unduly or irregularly granted would be inconsistent with the duty to recover such sums which Article 8 (1) of Regulation No 729/70 imposes on the national administration.

23    Secondly, national law must be applied in a manner which is not discriminatory compared to procedures for deciding similar but purely national disputes. This means first that in such cases the national authorities must act with the same degree of care as in comparable cases concerning solely the application of corresponding national legislation and in accordance with rules and procedures which do not make the recovery of the sums in

question more difficult. Secondly, notwithstanding the principle referred to above that the exercise of any discretion to decide whether or not it is expedient to demand repayment is ruled out, the obligations imposed by national legislation on undertakings wrongly granted pecuniary advantages based on Community law must be no more stringent than those imposed on undertakings which have wrongly received similar advantages based on national law, provided that the two groups of recipients are in comparable situations and therefore different treatment is objectively unjustifiable.

24    However, if disparities in the legislation of Member States proved to be such as to compromise the equal treatment of producers and traders in different Member States or distort or impair the functioning of the common market, it would be for the competent Community institutions to adopt the provisions needed to remedy such disparities.

25    The answer to the fifth question of the Verwaltungsgericht Frankfurt am Main must therefore be that in the present state of Community law sums unduly paid by way of aids under the Community regulations are recovered by the national authorities according to the rules and procedures laid down by national legislation subject to the limits imposed by Community law on such an application of national law.

26    In view of that answer to the fifth question, the sixth question, which is subject to the premise that the recovery of unduly-granted aids is governed by rules and procedures laid down by Community law, has no purpose.

The protection of legitimate expectation and assurance of legal certainty in the recovery of unduly-paid aids

27    The national court's seventh question is in substance whether the restrictions which Community law places on the application of national law may exclude consideration of the protection of legitimate expectation and assurance of legal certainty in the recovery of aids unduly paid.

28    It is clear from the orders for reference that the Verwaltungsgericht Frankfurt am Main has asked this question in order to enable it to decide whether the application of Paragraph 48 of the Verwaltungsverfahrensgesetz to a case like this is consistent with the aforementioned principles of Community law. To take account of the principles of the protection of legitimate expectation and assurance of legal uncertainty that paragraph provides in particular that:

An unlawful administrative decision granting a pecuniary benefit may not be revoked in so far as the beneficiary has relied upon the decision and his expectation, weighed against the public interest in revoking the decision, merits protection;

The recipient of such a benefit may plead loss of enrichment in accordance with the relevant rules of civil law unless he knew, or was unaware of owing to gross negligence on his part, the circumstances which made the grant of the benefit unlawful;

Unless obtained by fraud, duress or bribery, an unlawful administrative decision must be revoked within one year from the time when the administration became aware of the facts in question;

The amount unduly paid cannot be recovered where the authority knew, or was unaware owing to gross negligence on its part, that it was granting the benefit unlawfully.

29    In the Commission's view, the application of at least some of the criteria laid down by Paragraph 48 of the Verwaltungsverfassungsgesetz for the exclusion of recovery of aids unduly paid might conflict with the principle that the application of national law must not affect the scope and effectiveness of Community law. This would be the case in particular if the period in which the right of recovery had to be exercised were too short or if knowledge or negligence on the part of the national authority were sufficient to preclude the recovery of aids unduly paid.

DEUTSCHE MILCHKONTOR v GERMANY

30  The first point to be made in this regard is that the principles of the
protection of legitimate expectation and assurance of legal certainty are part
of the legal order of the Community. The fact that national legislation
provides for the same principles to be observed in a matter such as the
recovery of unduly-paid Community aids cannot, therefore, be considered
contrary to that same legal order. Moreover, it is clear from a study of the
national laws of the Member States regarding the revocation of
administrative decisions and the recovery of financial benefits which have
been unduly paid by public authorities that the concern to strike a balance,
albeit in different ways, between the principle of legality on the one hand
and the principles of legal certainty and the protection of legitimate
expectation on the other is common the laws of the Member States.

31  Where the rules and procedures applied by the national authorities in the
recovery of Community aids are the same as those which they apply in
comparable cases concerning purely national financial benefits, there is in
principle no reason to assume that those rules and procedures are contrary to
the national authorities' duty under Article 8 of Regulation No 729/70 to
recover sums irregularly granted and that consequently they reduce the
effectiveness of Community law. This applies in particular to grounds for
excluding recovery where these are related to the administration's own
conduct and it can therefore prevent them from occurring.

32  It should be added, however, that the principle that national legislation must
be applied without discrimination compared to purely national procedures of
the same kind requires the interests of the Community to be taken fully into
consideration in the application of a provision which, like the first sentence
of Paragraph 48 (2) of the Verwaltungsverfahrensgesetz, requires the various
interests in question, namely on the one hand the public interest in the
revocation of the measure and on the other hand the protection of the
legitimate expectation of the person to whom it is addressed, to be weighed
up against one another before the decision is revoked.

33  The answer to the seventh question must therefore be that Community law
does not prevent national law from having regard, in exluding the recovery
of unduly-paid aids, to such considerations as the protection of legitimate

2669

expectation, the loss of unjustified enrichment, the passing of a time-limit or the fact that the administration knew, or was unaware owing to gross negligence on its part, that it was wrong in granting the aids in question, provided however that the conditions laid down are the same as for the recovery of purely national financial benefits and the interests of the Community are taken fully into account.

## The burden of proof in the recovery of unduly-paid aids

34    By its fourth question the Verwaltungsgericht Frankfurt am Main seeks to ascertain the rules regarding the burden of proof in cases where unduly-paid aids are recovered.

35    As the Commission points out in its observations in a context such as the present case the question of the burden of proof arises only to a limited extent. First, it is for the national authorities to exhaust as a matter of course all the possible means of establishing the facts on which the application of the Community provisions depends in any specific case. Only where it is impossible to verify those facts may the question arise as to who bears the burden of that circumstance, and whether the national authorities may still bring proceedings against the undertaking concerned.

36    As regards the law applicable for this purpose, it must be observed that in referring to national law as regards the recovery, of aids unduly paid Article 8 (1) of Regulation No 729/70 makes no distinction between the substantive conditions for their recovery and the rules of procedure and form which must be followed in recovering them. Those conditions and rules, including those allocating the burden of proof, are therefore all determined by national law, subject to the restrictions referred to above which may derive from Community law in this regard. The information given in the orders for reference as to the exact terms of the relevant rules of national law does not enable the Court to formulate any further guidelines for the interpretation of Community law in this regard.

DEUTSCHE MILCHKONTOR v GERMANY

37    However, the plaintiffs Deutsche Milchkontor GmbH, Firma E. Kampff-meyer, Schwarzwaldmilch GmbH and Inntaler Mischfutter GmbH & Co. KG further contend that Community law is applicable, in the case of exports of skimmed-milk powder to Italy under the provisions of Commission Regulation No 1624/76, as regards the proof that the exported product met the requirements of the Community regulations. They argue that such proof is provided by the fact that the Italian consignees submitted the necessary evidence to the Italian authorities in order to obtain the release of the security required by that regulation.

38    The point to be made with regard to that argument is that the evidence submitted in accordance with Regulation No 1624/76 to the authorities in the Member States of destination relates to the denaturing or processing of the skimmed-milk powder by the importer, its purpose being to obtain the release of the security held by the authorities of that Member State. It does not relate to the question whether the skimmed-milk powder exported for the purposes of denaturing or processing met the conditions laid down by Regulation No 986/68 for the grant of aids in the exporting Member State.

39    The answer to the fourth question asked by the Verwaltungsgericht Frankfurt am Main must therefore be that the burden of proof in the recovery of aids unduly paid is determined by national law subject to any restrictions which derive from Community law in this regard.

The obligation to monitor the manufacture of skimmed-milk powder at the manufacturer's premises

40    Lastly, by its second and third questions the Verwaltungsgericht Frankfurt am Main asks whether the national authorities are under a duty to monitor the manufacture of skimmed-milk powder at the manufacturer's premises and if so whether a failure to fulfil that duty may bar the recovery of the aids unduly paid.

41    The Federal Republic of Germany and the United Kingdom contend that no such duty exists. They argue that Regulation No 990/72 of the Commission, to Article 10 of which the Verwaltungsgericht Frankfurt am Main refers in its questions, concerns only the denaturing of skimmed-milk powder and its processing into compound feedingstuffs and not its manufacture.

2671

42   It should be noted that the various provisions requiring national authorities to exercise a certain amount of supervision to ensure that the relevant provisions of Community law, such as Article 10 of Regulation No 990/72 of the Commission and Article 8 of Regulation No 729/70 of the Council, are observed merely expressly confirm a duty which Member States already have by virtue of the principle of cooperation laid down in Article 5 of the Treaty.

43   Consequently, Member States must verify by means of appropriate controls that skimmed-milk powder complies with the relevant Community rules so as to ensure that Community aids are not paid in respect of products for which they ought not to be granted. It is for the national court to determine the controls necessary for this purpose having regard in particular to the circumstances of the case and the techniques available at the time.

44   As regards the consequences of a failure to exercise such supervision for the recovery of sums unduly paid and in particular the question whether the recipients of the aids may rely on the failure as a defence to an action for recovery, it follows from the foregoing statements regarding the extent to which Community law and national law are applicable to the question of the recovery of unduly-paid aids and from the principles of the protection of legitimate expectation and assurance of legal certainty that in the present state of development of Community law those consequences are determined by national law and not by Community law. It is therefore likewise the task of the national courts to determine them on the basis of the relevant national law.

45   The answer to the second and third questions must therefore be that the national authorities must monitor the manufacture of skimmed-milk powder by conducting inspections at the manufacturer's premises if this is necessary to ensure that the Community rules are observed. It is for the national court to determine the consequences of any failure to fulfil that duty on the basis of the relevant national law.

Costs

46   The costs incurred by the Federal Republic of Germany, the United Kingdom and the Commission of the European Communities, which have

DEUTSCHE MILCHKONTOR v GERMANY

submitted observations to the Court, are not recoverable. Since these proceedings are, in so far as the parties to the main actions are concerned, in the nature of a step in the actions pending before the national court, the decision on costs is a matter for that court.

On those grounds,

THE COURT (Fifth Chamber),

in answer to the questions submitted to it by the Verwaltungsgericht Frankfurt am Main by orders of 3 June 1982, hereby rules:

1. A product consisting of a spray-dried mixture of skimmed milk and a powder composed of whey, sodium caseinate and lactose is not skimmed-milk powder for the purposes of the Community regulations governing aid for skimmed-milk powder and, more particularly, of Article 1 of Regulation (EEC) No 986/68 of the Council of 15 July 1968 even if its composition is the same as that of skimmed-milk powder made from cow's milk.

2. In the present state of Community law sums unduly paid by way of aids under the Community regulations are recovered by the national authorities according to the rules and procedures laid down by national legislation subject to the limits imposed by Community law on such an application of national law.

3. Community law does not prevent national law from having regard, in excluding the recovery of unduly-paid aids, to such considerations as the protection of legitimate expectation, the loss of unjustified enrichment, the passing of a time-limit or the fact that the administration knew, or was unaware owing to gross negligence on its part, that it was wrong in granting the aids in question, provided however that the conditions laid down are the same as for the recovery of purely national financial benefits and the interests of the Community are taken fully into account.

4. The burden of proof in the recovery of aids unduly paid is determined by national law subject to any restrictions which may derive from Community law in this regard.

2673

5. **The national authorities must monitor the manufacture of skimmed-milk powder by conducting inspections at the manufacturer's premises if this is necessary to ensure that the Community rules are observed. It is for the national court to determine the consequences of any failure to fulfil that duty on the basis of the relevant national law.**

Everling                    Mackenzie Stuart

Due                    Galmot                    Kakouris

Delivered in open court in Luxembourg on 21 September 1983.

For the Registrar

H. A. Rühl                                        U. Everling

Principal Administrator                    President of the Fifth Chamber

# OPINION OF MR ADVOCATE GENERAL
# VERLOREN VAN THEMAAT
# DELIVERED ON 8 JUNE 1983 [1]

*Mr President,*
*Members of the Court,*

## 1. Introduction

*1.1. Summary of previous decisions*

In Joined Cases 205 to 215/82 the Court is once again confronted with a number of legal issues concerning the obligation laid down in Article 8 of Regulation (EEC) No 729/70 of the Council of 21 April 1970 (Official Journal, English Special Edition 1970 (I), p. 218) requiring Member States *inter alia* to "recover sums lost as a result of irregularities or negligence" in connection with the financing of the common agricultural policy. In my Opinion in Case 54/81 *Fromme* [1982] ECR 1449 at p. 1466.

1 — Translated from the Dutch.