# EXHIBIT 23

FRANCOVICH AND OTHERS

# JUDGMENT OF THE COURT
19 November 1991 *

In Joined Cases C-6/90 and C-9/90,

REFERENCE to the Court under Article 177 of the EEC Treaty by the Pretura di Vicenza (Italy) (in Case C-6/90) and by the Pretura di Bassano del Grappa (Italy) (in Case C-9/90) for a preliminary ruling in the proceedings pending before those courts between

**Andrea Francovich**

and

**Italian Republic**

and between

**Danila Bonifaci and Others**

and

**Italian Republic**

on the interpretation of the third paragraph of Article 189 of the EEC Treaty and Council Directive 80/987/EEC of 20 October 1980 on the approximation of the laws of the Member States relating to the protection of employees in the event of the insolvency of the employer (Official Journal 1980 L 283, p. 23),

* Language of the case: Italian.

JUDGMENT OF 19. 11. 1991 — JOINED CASES C-6/90 AND C-9/90

THE COURT,

composed of: O. Due, President, Sir Gordon Slynn, R. Joliet, F. A. Schockweiler, F. Grévisse and P. J. G. Kapteyn (Presidents of Chambers), G. F. Mancini, J. C. Moitinho de Almeida, G. C. Rodríguez Iglesias, M. Díez de Velasco and M. Zuleeg, Judges,

Advocate General: J. Mischo,
Registrar: D. Louterman, Principal Administrator,

after considering the written observations submitted on behalf of

— Andrea Francovich and Danila Bonifaci and Others by Claudio Mondin, Aldo Campesan and Alberto dal Ferro, of the Vicenza Bar,

— the Italian Government by Oscar Fiumara, Avvocato dello Stato, acting as Agent,

— the Government of the Netherlands by B. R. Bot, Secretary-General at the Ministry of Foreign Affairs, acting as Agent,

— the United Kingdom by J. E. Collins, of the Treasury Solicitor's Department, acting as Agent, assisted by Richard Plender QC,

— the Commission of the European Communities by Giuliano Marenco and Karen Banks, members of its Legal Service, acting as Agents,

having regard to the Report for the Hearing,

after hearing oral argument on behalf of Andrea Francovich and Danila Bonifaci, the Italian Government, the United Kingdom, the German Government, represented by Jochim Sedemund, Rechtsanwalt, Cologne, acting as Agent, and the Commission at the hearing on 27 February 1991,

I - 5404

after hearing the Opinion of the Advocate General at the sitting on 28 May 1991,

gives the following

## Judgment

1   By orders of 9 July and 30 December 1989, which were received at the Court on 8 January and 15 January 1990 respectively, the Pretura di Vicenza (in Case C-6/90) and the Pretura di Bassano del Grappa (in Case C-9/90) referred to the Court for a preliminary ruling under Article 177 of the EEC Treaty a number of questions on the interpretation of the third paragraph of Article 189 of the EEC Treaty and Council Directive 80/987/EEC of 20 October 1980 on the approximation of the laws of the Member States relating to the protection of employees in the event of the insolvency of their employer (Official Journal 1980 L 283, p. 23).

2   Those questions were raised in the course of proceedings brought by Andrea Francovich and by Danila Bonifaci and Others (hereinafter referred to as 'the plaintiffs') against the Italian Republic.

3   Directive 80/987 is intended to guarantee employees a minimum level of protection under Community law in the event of the insolvency of their employer, without prejudice to more favourable provisions existing in the Member States. In particular it provides for specific guarantees of payment of unpaid wage claims.

4   Under Article 11 the Member States were required to bring into force the laws, regulations and administrative provisions necessary to comply with the directive within a period which expired on 23 October 1983. The Italian Republic failed to fulfil that obligation, and its default was recorded by the Court in its judgment in Case 22/87 *Commission* v *Italy* [(1989] ECR 143).

JUDGMENT OF 19. 11. 1991 — JOINED CASES C-6/90 AND C-9/90

5   Mr Francovich, a party to the main proceedings in Case C-6/90, had worked for CDN Elettronica SnC in Vicenza but had received only sporadic payments on account of his wages. He therefore brought proceedings before the Pretura di Vicenza, which ordered the defendant to pay approximately LIT 6 million. In attempting to enforce that judgment the bailiff attached to the Tribunale di Vicenza was obliged to submit a negative return. Mr Francovich then claimed to be entitled to obtain from the Italian State the guarantees provided for in Directive 80/987 or, in the alternative, compensation.

6   In Case C-9/90 Danila Bonifaci and 33 other employees brought proceedings before the Pretura di Bassano del Grappa, stating that they had been employed by Gaia Confezioni Srl, which was declared insolvent on 5 April 1985. When the employment relationships were discontinued, the plaintiffs were owed more than LIT 253 million, which was proved as a debt in the company's insolvency. More than five years after the insolvency they had been paid nothing, and the receiver had told them that even a partial distribution in their favour was entirely improbable. Consequently, the plaintiffs brought proceedings against the Italian Republic in which they claimed that, in view of its obligation to implement Directive 80/987 with effect from 23 October 1983, it should be ordered to pay them their arrears of wages, at least for the last three months, or in the alternative to pay compensation.

7   It was in those circumstances that the national courts referred the following questions, which are identical in both cases, to the Court for a preliminary ruling:

'(1) Under the system of Community law in force, is a private individual who has been adversely affected by the failure of a Member State to implement Directive 80/897 — a failure confirmed by a judgment of the Court of Justice — entitled to require the State itself to give effect to those provisions of that directive which are sufficiently precise and unconditional, by directly invoking the Community legislation against the Member State in default so as to obtain the guarantees which that State itself should have provided and in any event to claim reparation of the loss and damage sustained in relation to provisions to which that right does not apply?

(2) Are the combined provisions of Articles 3 and 4 of Council Directive 80/987 to be interpreted as meaning that where the State has not availed itself of the option of laying down limits under Article 4, the State itself is obliged to pay the claims of employees in accordance with Article 3?

(3) If the answer to Question 2 is in the negative, the Court is asked to state what the minimum guarantee is that the State must provide pursuant to Directive 80/987 to an entitled employee so as to ensure that the share of pay payable to that employee may be regarded as giving effect to the directive.'

8   Reference is made to the Report for the Hearing for a fuller account of the facts of the main proceedings, the procedure and the written observations submitted to the Court, which are mentioned or discussed hereinafter only in so far as is necessary for the reasoning of the Court.

9   The first question submitted by the national courts raises two issues, which should be considered separately. It concerns, first, the direct effect of the provisions of the directive which determine the rights of employees and, secondly, the existence and scope of State liability for damage resulting from breach of its obligations under Community law.

**The direct effect of the provisions of the directive which determine the rights of employees**

10  The first part of the first question submitted by the national courts seeks to determine whether the provisions of the directive which determine the rights of employees must be interpreted as meaning that the persons concerned can enforce those rights against the State in the national courts in the absence of implementing measures adopted within the prescribed period.

11  As the Court has consistently held, a Member State which has not adopted the implementing measures required by a directive within the prescribed period may not, against individuals, plead its own failure to perform the obligations which the directive entails. Thus wherever the provisions of a directive appear, as far as their subject-matter is concerned, to be unconditional and sufficiently precise, those provisions may, in the absence of implementing measures adopted within the prescribed period, be relied upon as against any national provision which is incompatible with the directive or in so far as the provisions of the directive define rights which individuals are able to assert against the State (judgment in Case 8/81 *Becker* v *Finanzamt Münster-Innenstadt* [1982] ECR 53).

12  It is therefore necessary to see whether the provisions of Directive 80/987 which determine the rights of employees are unconditional and sufficiently precise. There are three points to be considered: the identity of the persons entitled to the guarantee provided, the content of that guarantee and the identity of the person liable to provide the guarantee. In that regard, the question arises in particular whether a State can be held liable to provide the guarantee on the ground that it did not take the necessary implementing measures within the prescribed period.

13  With regard first of all to the identity of the persons entitled to the guarantee, it is to be noted that, according to Article 1(1), the directive applies to employees' claims arising from contracts of employment or employment relationships and existing against employers who are in a state of insolvency within the meaning of Article 2(1), the latter provision defining the circumstances in which an employer must be deemed to be in a state of insolvency. Article 2(2) refers to national law for the definition of the concepts of 'employee' and 'employer'. Finally, Article 1(2) provides that the Member States may, by way of exception and under certain conditions, exclude claims by certain categories of employees listed in the annex to the directive.

14  Those provisions are sufficiently precise and unconditional to enable the national court to determine whether or not a person should be regarded as a person intended to benefit under the directive. A national court need only verify whether

the person concerned is an employed person under national law and whether he is excluded from the scope of the directive in accordance with Article 1(2) and Annex 1 (as to the necessary conditions for such exclusion, see the judgments in Case 22/87 *Commission* v *Italy*, cited above, paragraphs 18 to 23, and Case C-53/88 *Commission* v *Greece* [1990] ECR I-3917, paragraphs 11 to 26), and then ascertain whether one of the situations of insolvency provided for in Article 2 of the directive exists.

15  With regard to the content of the guarantee, Article 3 of the directive provides that measures must be taken to ensure the payment of outstanding claims resulting from contracts of employment or employment relationships and relating to pay for the period prior to a date determined by the Member State, which may choose one of three possibilities: (a) the date of the onset of the employer's insolvency; (b) that of the notice of dismissal issued to the employee concerned on account of the employer's insolvency; (c) that of the onset of the employer's insolvency or that on which the contract of employment or the employment relationship with the employee concerned was discontinued on account of the employer's insolvency.

16  Depending on the choice it makes, the Member State has the option, under Article 4(1) and (2), to restrict liability to periods of three months or eight weeks respectively, calculated in accordance with detailed rules laid down in that article. Finally, Article 4(3) provides that the Member States may set a ceiling on liability, in order to avoid the payment of sums going beyond the social objective of the directive. Where they exercise that option, the Member States must inform the Commission of the methods used to set the ceiling. In addition, Article 10 provides that the directive does not affect the option of Member States to take the measures necessary to avoid abuses and in particular to refuse or reduce liability in certain circumstances.

17  Article 3 of the directive thus leaves the Member State a discretion in determining the date from which payment of claims must be ensured. However, as is already implicit in the Court's case-law (see the judgments in Case 71/85 *Netherlands* v *FNV* [1986] ECR 3855 and Case 286/85 *McDermott and Cotter* v *Minister for*

*Social Welfare and Attorney General* [1987] ECR 1453, paragraph 15), the right of a State to choose among several possible means of achieving the result required by a directive does not preclude the possibility for individuals of enforcing before the national courts rights whose content can be determined sufficiently precisely on the basis of the provisions of the directive alone.

18   In this case, the result required by the directive in question is a guarantee that the outstanding claims of employees will be paid in the event of the insolvency of their employer. The fact that Articles 3 and 4(1) and (2) give the Member States some discretion as regards the means of establishing that guarantee and the restriction of its amount do not affect the precise and unconditional nature of the result required.

19   As the Commission and the plaintiffs have pointed out, it is possible to determine the minimum guarantee provided for by the directive by taking the date whose choice entails the least liability for the guarantee institution. That date is that of the onset of the employer's insolvency, since the two other dates, that of the notice of dismissal issued to the employee and that on which the contract of employment or the employment relationship was discontinued, are, according to the conditions laid down in Article 3, necessarily subsequent to the onset of the insolvency and thus define a longer period in respect of which the payment of claims must be ensured.

20   The possibility under Article 4(2) of limiting the guarantee does not make it impossible to determine the minimum guarantee. It follows from the wording of that article that the Member States have the option of limiting the guarantees granted to employees to certain periods prior to the date referred to in Article 3. Those periods are fixed in relation to each of the three dates provided for in Article 3, so that it is always possible to determine to what extent the Member State could have reduced the guarantee provided for by the directive depending on the date which it would have chosen if it had transposed the directive.

21  As regards Article 4(3), according to which the Member States may set a ceiling on liability in order to avoid the payment of sums going beyond the social objective of the directive, and Article 10, which states that the directive does not affect the option of Member States to take the measures necessary to avoid abuses, it should be observed that a Member State which has failed to fulfil its obligations to transpose a directive cannot defeat the rights which the directive creates for the benefit of individuals by relying on the option of limiting the amount of the guarantee which it could have exercised if it had taken the measures necessary to implement the directive (see, in relation to an analogous option concerning the prevention of abuse in fiscal matters, the judgment in Case 8/81 *Becker* v *Finanzamt Münster-Innenstadt* [1982] ECR 53, paragraph 34).

22  It must therefore be held that the provisions in question are unconditional and sufficiently precise as regards the content of the guarantee.

23  Finally, as regards the identity of the person liable to provide the guarantee, Article 5 of the directive provides that:

'Member States shall lay down detailed rules for the organization, financing and operation of the guarantee institutions, complying with the following principles in particular:

(a) the assets of the institutions shall be independent of the employers' operating capital and be inaccessible to proceedings for insolvency;

(b) employers shall contribute to financing, unless it is fully covered by the public authorities;

(c) the institutions' liabilities shall not depend on whether or not obligations to contribute to financing have been fulfilled.'

24  It has been submitted that since the directive provides for the possibility that the guarantee institutions may be financed entirely by the public authorities, it is unacceptable that a Member State may thwart the effects of the directive by asserting that it could have required other persons to bear part or all of the financial burden resting upon it.

25  That argument cannot be upheld. It follows from the terms of the directive that the Member State is required to organize an appropriate institutional guarantee system. Under Article 5, the Member State has a broad discretion with regard to the organization, operation and financing of the guarantee institutions. The fact, referred to by the Commission, that the directive envisages as one possibility among others that such a system may be financed entirely by the public authorities cannot mean that the State can be identified as the person liable for unpaid claims. The payment obligation lies with the guarantee institutions, and it is only in exercising its power to organize the guarantee system that the State may provide that the guarantee institutions are to be financed entirely by the public authorities. In those circumstances the State takes on an obligation which in principle is not its own.

26  Accordingly, even though the provisions of the directive in question are sufficiently precise and unconditional as regards the determination of the persons entitled to the guarantee and as regards the content of that guarantee, those elements are not sufficient to enable individuals to rely on those provisions before the national courts. Those provisions do not identify the person liable to provide the guarantee, and the State cannot be considered liable on the sole ground that it has failed to take transposition measures within the prescribed period.

27  The answer to the first part of the first question must therefore be that the provisions of Directive 80/987 which determine the rights of employees must be

interpreted as meaning that the persons concerned cannot enforce those rights against the State before the national courts where no implementing measures are adopted within the prescribed period.

**Liability of the State for loss and damage resulting from breach of its obligations under Community law**

28  In the second part of the first question the national court seeks to determine whether a Member State is obliged to make good loss and damage suffered by individuals as a result of the failure to transpose Directive 80/987.

29  The national court thus raises the issue of the existence and scope of a State's liability for loss and damage resulting from breach of its obligations under Community law.

30  That issue must be considered in the light of the general system of the Treaty and its fundamental principles.

(a) *The existence of State liability as a matter of principle*

31  It should be borne in mind at the outset that the EEC Treaty has created its own legal system, which is integrated into the legal systems of the Member States and which their courts are bound to apply. The subjects of that legal system are not only the Member States but also their nationals. Just as it imposes burdens on individuals, Community law is also intended to give rise to rights which become part of their legal patrimony. Those rights arise not only where they are expressly granted by the Treaty but also by virtue of obligations which the Treaty imposes in a clearly defined manner both on individuals and on the Member States and the Community institutions (see the judgments in Case 26/62 *Van Gend en Loos* [1963] ECR 1 and Case 6/64 *Costa* v *ENEL* [1964] ECR 585).

32  Furthermore, it has been consistently held that the national courts whose task it is to apply the provisions of Community law in areas within their jurisdiction must ensure that those rules take full effect and must protect the rights which they confer on individuals (see in particular the judgments in Case 106/77 *Amministrazione delle Finanze dello Stato* v *Simmenthal* [1978] ECR 629, paragraph 16, and Case C-213/89 *Factortame* [1990] ECR I-2433, paragraph 19).

33  The full effectiveness of Community rules would be impaired and the protection of the rights which they grant would be weakened if individuals were unable to obtain redress when their rights are infringed by a breach of Community law for which a Member State can be held responsible.

34  The possibility of obtaining redress from the Member State is particularly indispensable where, as in this case, the full effectiveness of Community rules is subject to prior action on the part of the State and where, consequently, in the absence of such action, individuals cannot enforce before the national courts the rights conferred upon them by Community law.

35  It follows that the principle whereby a State must be liable for loss and damage caused to individuals as a result of breaches of Community law for which the State can be held responsible is inherent in the system of the Treaty.

36  A further basis for the obligation of Member States to make good such loss and damage is to be found in Article 5 of the Treaty, under which the Member States are required to take all appropriate measures, whether general or particular, to ensure fulfilment of their obligations under Community law. Among these is the obligation to nullify the unlawful consequences of a breach of Community law (see, in relation to the analogous provision of Article 86 of the ECSC Treaty, the judgment in Case 6/60 *Humblet* v *Belgium* [1960] ECR 559).

FRANCOVICH AND OTHERS

37   It follows from all the foregoing that it is a principle of Community law that the Member States are obliged to make good loss and damage caused to individuals by breaches of Community law for which they can be held responsible.

(b) *The conditions for State liability*

38   Although State liability is thus required by Community law, the conditions under which that liability gives rise to a right to reparation depend on the nature of the breach of Community law giving rise to the loss and damage.

39   Where, as in this case, a Member State fails to fulfil its obligation under the third paragraph of Article 189 of the Treaty to take all the measures necessary to achieve the result prescribed by a directive, the full effectiveness of that rule of Community law requires that there should be a right to reparation provided that three conditions are fulfilled.

40   The first of those conditions is that the result prescribed by the directive should entail the grant of rights to individuals. The second condition is that it should be possible to identify the content of those rights on the basis of the provisions of the directive. Finally, the third condition is the existence of a causal link between the breach of the State's obligation and the loss and damage suffered by the injured parties.

41   Those conditions are sufficient to give rise to a right on the part of individuals to obtain reparation, a right founded directly on Community law.

42   Subject to that reservation, it is on the basis of the rules of national law on liability that the State must make reparation for the consequences of the loss and damage

caused. In the absence of Community legislation, it is for the internal legal order of each Member State to designate the competent courts and lay down the detailed procedural rules for legal proceedings intended fully to safeguard the rights which individuals derive from Community law (see the judgments in Case 60/75 *Russo* v *AIMA* [1976] ECR 45, Case 33/76 *Rewe* v *Landwirtschaftskammer Saarland* [1976] ECR 1989 and Case 158/80 *Rewe* v *Hauptzollamt Kiel* [1981] ECR 1805).

43  Further, the substantive and procedural conditions for reparation of loss and damage laid down by the national law of the Member States must not be less favourable than those relating to similar domestic claims and must not be so framed as to make it virtually impossible or excessively difficult to obtain reparation (see, in relation to the analogous issue of the repayment of taxes levied in breach of Community law, *inter alia* the judgment in Case 199/82 *Amministrazione delle Finanze dello Stato* v *San Giorgio* [1983] ECR 3595).

44  In this case, the breach of Community law by a Member State by virtue of its failure to transpose Directive 80/987 within the prescribed period has been confirmed by a judgment of the Court. The result required by that directive entails the grant to employees of a right to a guarantee of payment of their unpaid wage claims. As is clear from the examination of the first part of the first question, the content of that right can be identified on the basis of the provisions of the directive.

45  Consequently, the national court must, in accordance with the national rules on liability, uphold the right of employees to obtain reparation of loss and damage caused to them as a result of failure to transpose the directive.

46  The answer to be given to the national court must therefore be that a Member State is required to make good loss and damage caused to individuals by failure to transpose Directive 80/987.

**The second and third questions**

47  In view of the reply to the first question referred by the national court, there is no need to rule on the second and third questions.

**Costs**

48  The costs incurred by the Italian Government, the United Kingdom and the Netherlands and German Governments and by the Commission of the European Communities, which submitted observations to the Court, are not recoverable. Since these proceedings are, in so far as the parties to the main proceedings are concerned, in the nature of a step in the action before the national court, the decision on costs is a matter for that court.

On those grounds,

THE COURT,

in answer to the questions submitted to it by the Pretura di Vicenza (in Case C-6/90) and the Pretura di Bassano del Grappa (in Case C-9/90), by orders of 9 July 1989 and 30 December 1989 respectively, hereby rules:

1. The provisions of Council Directive 80/987/EEC of 20 October 1980 on the approximation of the laws of the Member States relating to the protection of employees in the event of the insolvency of their employer which determine the rights of employees must be interpreted as meaning that the persons concerned cannot enforce those rights against the State before the national courts where no implementing measures are adopted within the prescribed period;

2. A Member State is required to make good loss and damage caused to individuals by failure to transpose Directive 80/987/EEC.

| Due | Slynn | Joliet | Schockweiler |
| Grévisse | | Kapteyn | Mancini |
| Moitinho de Almeida | Rodríguez Iglesias | Díez de Velasco | Zuleeg |

Delivered in open court in Luxembourg on 19 November 1991.

J.-G. Giraud                                                                                          O. Due

Registrar                                                                                             President

I - 5418