# EXHIBIT 27

JUDGMENT OF THE COURT OF FIRST INSTANCE (Fourth Chamber)

22 January 1997 *

In Case T-115/94,

**Opel Austria GmbH,** formerly General Motors Austria GmbH, a company incorporated under the laws of Austria, whose registered office is in Vienna, Austria, represented by Dirk Vandermeersch, of the Brussels Bar, and Till Müller-Ibold, Rechtsanwalt, Frankfurt am Main, with an address for service in Luxembourg at the Chambers of Arendt and Medernach, 8-10 Rue Mathias Hardt,

applicant,

supported by

**Republic of Austria,** represented initially by Irène Janisch, Kommissärin, of the Ministry of Economic Affairs, subsequently by Beatrix Matousek-Horak, Rätin, of the same Ministry, acting as Agents, assisted by Christian Kremer, of the Luxembourg Bar, with an address for service in Luxembourg at the Austrian Embassy, 3 Rue des Bains,

intervener,

---

* Language of the case: English.

JUDGMENT OF 22. 1. 1997 — CASE T-115/94

v

**Council of the European Union,** represented by Bjarne Hoff-Nielsen, Legal Adviser, acting as Agent, and Hans-Jürgen Rabe and Georg M. Berrisch, Rechtsanwälte, Hamburg and Brussels, with an address for service in Luxembourg at the office of Bruno Eynard, Manager of the Legal Directorate of the European Investment Bank, 100 Boulevard Konrad Adenauer,

defendant,

supported by

**Commission of the European Communities,** represented by John Forman, Legal Adviser, Eric White and Theofanis Christoforou, of its Legal Service, acting as Agents, with an address for service in Luxembourg at the office of Carlos Gómez de la Cruz, of its Legal Service, Wagner Centre, Kirchberg,

intervener,

APPLICATION for annulment of Council Regulation (EC) No 3697/93 of 20 December 1993 withdrawing tariff concessions in accordance with Article 23(2) and Article 27(3)(a) of the Free Trade Agreement between the Community and Austria (General Motors Austria) (OJ 1993 L 343, p. 1),

OPEL AUSTRIA v COUNCIL

THE COURT OF FIRST INSTANCE
OF THE EUROPEAN COMMUNITIES (Fourth Chamber),

composed of: K. Lenaerts, President, P. Lindh and J. D. Cooke, Judges,

Registrar: H. Jung,

having regard to the written procedure and further to the hearing on 19 September 1996,

gives the following

## Judgment

### Relevant legislation and the facts of the case

1    This action seeks the annulment of Council Regulation (EC) No 3697/93 of 20 December 1993 withdrawing tariff concessions in accordance with Article 23(2) and Article 27(3)(a) of the Free Trade Agreement between the Community and Austria (General Motors Austria) (OJ 1993 L 343, p. 1; hereinafter the 'contested regulation'). That regulation was adopted on the basis of Article 113 of the EC Treaty and the provisions of Council Regulation (EEC) No 2837/72 of 19 December 1972 on the safeguard measures provided for in the Agreement between the European Economic Community and the Republic of Austria (OJ, English Special Edition 1972 (31 December), p. 96), as amended by Council Regulation (EEC) No 638/90 of 5 March 1990 (OJ 1990 L 74, p. 1).

2    Article 1 of the contested regulation provides as follows:

'A 4.9% duty is hereby introduced for F-15 car gearboxes produced by General Motors Austria falling within ex CN code 8708 40 10 (Taric additional code 8996; other: Taric additional code 8997) and originating in Austria within the meaning of Protocol 3 to the Free Trade Agreement between the Community and Austria.

This 4.9% duty shall apply for a period equivalent to the average fiscal depreciation period or until such earlier time as the Council, on the basis of a Commission proposal, concludes that the aids in question are no longer having a distortive effect on competition and trade.'

3    The applicant, Opel Austria GmbH, formerly General Motors Austria GmbH, a company incorporated under the laws of Austria, is a wholly-owned subsidiary of General Motors Corporation, Detroit, a company incorporated under US law. It is the sole producer of F-15 gearboxes. It has exported them to the Community since 1993.

4    Between 1989 and 1990 the General Motors group, which includes the applicant, came to the view that it needed to create manufacturing capacity for cylinder heads, cam shafts and manual gearboxes to be used in new engines in order to be able to meet requirements at its European manufacturing locations.

5    In the course of the plant site evaluation process, during which General Motors' locations in Japan, Brazil, Hungary and Austria were considered, as well as a location in Czechoslovakia, the Austrian authorities indicated that they would consider making public aid available to the applicant, provided that the investment satisfied certain conditions set by Austrian law.

OPEL AUSTRIA v COUNCIL

6    In March 1991 the Republic of Austria and the applicant informed the Commission of the Austrian Government's intention to grant aid to the applicant for investment to expand the manufacture of gearboxes, cam shafts and cylinder heads at the applicant's facilities at Aspern/Vienna.

7    On 19 March 1991 an informal meeting took place at the Commission between representatives of the Austrian Government and of the applicant and officials from the Commission's Competition Directorate (DG IV). During that meeting the applicant's planned investment and the aid proposed to be granted to it by the Republic of Austria were explained. The officials from DG IV then put a number of questions to the Austrian Government and to the applicant. The Austrian Government answered those questions by fax on 20 March 1991 and the applicant by fax on 21 March 1991.

8    In mid-April 1991 telephone conversations took place between DG IV and the Austrian Government and between DG IV and the applicant.

9    On 26 April 1991 the Austrian Government indicated to the applicant that the aid would be forthcoming and that it considered it to be compatible with Articles 23 and 27 of the Free Trade Agreement between Austria and the Community (hereinafter 'the FTA'), concluded pursuant to Council Regulation (EEC) No 2836/72 of 19 December 1972 concluding an Agreement between the European Economic Community and the Republic of Austria and adopting provisions for [its] implementation (OJ, English Special Edition 1972 (31 December), p. 3). It authorized the applicant to commence the investment even though the aid agreements with the Government had not been formally executed.

10    According to the Council, at a meeting in Brussels on 22 July 1991 between the Vice-President of the Commission, Sir Leon Brittan, and representatives of an Austrian political party concerning the accession of the Republic of Austria to the European Union, Sir Leon commented in passing to the Austrian Ambassador on the aid granted to the applicant.

JUDGMENT OF 22. 1. 1997 — CASE T-115/94

11   The foundation works for the construction of the applicant's new plant at Aspern/
     Vienna started on 27 July 1991.

12   The Commission adopted its Opinion on Austria's application for membership
     (SEC (91) 1590 final) on 1 August 1991. In that opinion, which was published in
     *Bulletin of the European Communities — Supplement 4/92*, the Commission
     stated, in regard to State aid, that although the volume of State aid in Austria had
     declined over recent years, the application of Community rules should result in
     significant changes in the system which obtained there. In that regard, it stated in
     particular that: 'recent examples of aid for the car industry show that, even though
     there is no sectoral aid scheme for that industry, the use of facilities such as the
     Financial Guarantee Act (General Motors) ... makes it essential to keep a close
     watch on the sectoral impact of Austrian aid'.

13   On 21 July 1992 the applicant concluded an agreement with the Finanzierungsga-
     rantiegesellschaft whereby it was granted 10% aid up to a ceiling of 450 million
     Austrian schillings for investment totalling a maximum amount eligible for aid of
     4.5 billion Austrian schillings. On 1 December 1992 the applicant concluded a
     similar agreement with the City of Vienna by which it was granted aid of an addi-
     tional 5% up to a ceiling of 225 million Austrian schillings.

14   In October 1992 the Commission indicated orally to the Austrian authorities that
     the General Motors project might create a problem which it wished to raise.

15   On 21 December 1992 the Director General of the Commission's Directorate-
     General for External Economic Relations (DG I) sent a letter to the Austrian
     Ambassador in Brussels informing him that the competent Commission depart-
     ments considered that the investment by General Motors at Aspern was not in
     conformity with the provisions of the FTA and asking him to request the Austrian
     authorities to take a position in that regard before the Commission formally sub-
     mitted the matter to the FTA Joint Committee.

OPEL AUSTRIA v COUNCIL

16    The Commission referred the matter to the FTA Joint Committee at the meeting of that committee held on 25 February 1993. At that meeting it communicated to the Austrian Government questionnaires dated 17 and 24 February 1993 and an information note dated 17 February 1993 summarizing its position on the General Motors project at Aspern.

17    Subsequently, technical meetings between the Commission and the Republic of Austria took place on 16 March and 15 April 1993. At the later of those two meetings, representatives of the applicant, who took part at the invitation of the Austrian Government, presented to the Commission a memorandum on the compatibility with the FTA of the aid granted by the Republic of Austria.

18    At a further meeting held between the Commission and the Republic of Austria on 21 June 1993, the Austrian Government provided the Commission with a memorandum on the intensity of the aid.

19    On 29 June 1993 the Commission summarized its position in an internal note. That note was communicated to the applicant on 29 November 1993.

20    A third memorandum of the applicant, explaining the policy considerations relating to the aid, was submitted to the Commission on 15 July 1993.

21    On 22 July 1993 the Commission adopted the proposal for the contested regulation.

II - 49

22    A meeting took place on 22 November 1993 between Commission officials and representatives of the Republic of Austria and of the applicant, the applicant's representatives having been invited by the Republic of Austria. At that meeting the Commission officials reaffirmed that in their view the aid was not justified either under the FTA or under Community law. Nevertheless, according to the applicant, they asked whether certain components of the aid had been granted for the purposes of environment protection, research and development, or training.

23    By Decision 94/1/ECSC, EC of the Council and the Commission of 13 December 1993 on the conclusion of the Agreement on the European Economic Area between the European Communities, their Member States and the Republic of Austria, the Republic of Finland, the Republic of Iceland, the Principality of Liechtenstein, the Kingdom of Norway, the Kingdom of Sweden and the Swiss Confederation (OJ 1994 L 1, p. 1; hereinafter 'Decision 94/1') and Decision 94/2/ECSC, EC of the Council and the Commission of the same date on the conclusion of the Protocol adjusting the Agreement on the European Economic Area between the European Communities, their Member States and the Republic of Austria, the Republic of Finland, the Republic of Iceland, the Principality of Liechtenstein, the Kingdom of Norway and the Kingdom of Sweden (OJ 1994 L 1, p. 571; hereinafter 'Decision 94/2'), the Council and the Commission approved, on behalf of the European Community and the European Coal and Steel Community, the Agreement on the European Economic Area (hereinafter 'the EEA Agreement' or 'the Agreement') and the Protocol adjusting the EEA Agreement (hereinafter 'the Adjustment Protocol'). On the same day, the Communities, as the last contracting parties, deposited their instruments of approval (see information concerning the date of entry into force of the EEA Agreement and of the Adjustment Protocol, OJ 1994 L 1, p. 606).

24    By letter of 14 December 1993 the applicant sent to the Commission a memorandum on the compatibility of the aid with the Community's internal rules regarding State aid on environment protection, research and development, and training. On 15 December 1993 the Commission prepared an information note containing comments on that memorandum. That note was communicated to the applicant by letter of 1 February 1994.

OPEL AUSTRIA v COUNCIL

25 On 20 December 1993 the Council adopted the contested regulation.

26 The EEA Agreement entered into force on 1 January 1994.

**Procedure**

27 By application lodged at the Court Registry on 21 March 1994, the applicant brought these proceedings.

28 The President of the Court assigned the case to the Second Chamber. On 7 July 1994 the Court decided to assign the case to a chamber composed of three judges. By decision of 23 January 1995 the case was assigned to the Fourth Chamber.

29 By application lodged at the Court Registry on 12 August 1994, the Commission sought leave to intervene in support of the form of order sought by the defendant. By application lodged at the Court Registry on 26 August 1994, the Republic of Austria sought leave to intervene in support of the form of order sought by the applicant. Leave was granted to the Commission and the Republic of Austria to intervene by orders of the President of the Second Chamber of 7 October 1994 and 20 October 1994, respectively.

30 Upon hearing the Report of the Judge-Rapporteur, the Court (Fourth Chamber) decided to open the oral procedure without any preparatory inquiry. However, the Court put written questions to the Council and to the Office for Official Publications of the European Communities (hereinafter 'the Publications Office'). Replies were received by letters lodged at the Registry on 20 August 1996 and 26 July 1996 respectively.

31    The hearing took place on 19 September 1996. The parties' representatives presented oral arguments and answered questions put by the Court.

**Forms of order sought**

32    Opel Austria GmbH, as applicant, claims that the Court should:

— annul the contested regulation in its entirety;

— in the alternative, annul it in so far as it applies to the applicant or in so far as the duties exceed 1.23%;

— order the Council to pay the costs.

33    The Republic of Austria, intervening, claims that the Court should:

— grant the relief sought by the applicant;

— order the Council to pay Austria's costs under the second subparagraph of Article 87(4) of the Rules of Procedure or, in the alternative, order the Council to pay the costs incurred by Austria which were incurred or relate to a time prior to its becoming a Member State.

34    The Council, as defendant, claims that the Court should:

— dismiss the application;

— order the applicant to pay the costs.

35    The Commission, as intervener, claims that the Court should dismiss the application.

**Substance**

36    The applicant raises 10 pleas in support of its claim for annulment, which allege essentially:

— infringement of Articles 10, 26 and 62 of the EEA Agreement;

— infringement of the Interim Arrangement to prepare for the orderly entry into force of the EEA Agreement and of the obligation under public international law not to defeat the object and purpose of a treaty before its entry into force;

— misuse of power in that the Council applied FTA procedures in withdrawing tariff concessions granted under the EEA Agreement;

— infringement of Article VI of the General Agreement on Tariffs and Trade (hereinafter 'GATT') and the Agreement on the Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement on Tariffs and Trade (done at Geneva on 12 April 1979; BISD, 26th Supplement (1980), p. 56);

— infringement of the consultation and dispute resolution procedures of the FTA and application *mala fide* of the FTA;

— infringement of Articles 23 and 27 of the FTA;

— infringement of Council Regulation (EEC) No 2423/88 of 11 July 1988 on protection against dumped or subsidized exports from countries not members of the European Economic Community (OJ 1988 L 209, p. 1) and of Regulation No 2837/72;

— infringement of the applicant's fundamental rights;

— compatibility of the aid with Articles 92 and 93 of the EC Treaty;

— inadequate statement of the reasons of the contested regulation or manifest errors of assessment.

37  Since the first plea and the second part of the second plea are connected, they can be considered together.

*First plea and second limb of the second plea considered together: infringement of Articles 10, 26 and 62 of the EEA Agreement and of the obligation under public international law not to defeat the object and purpose of a treaty before its entry into force*

38  These joined pleas have several limbs. The first alleges that the Council deliberately backdated the issue of the *Official Journal of the European Communities* in which the contested regulation was published. The second, third and fourth pleas

II - 54

allege infringement of Articles 10, 26 and 62, respectively, of the EEA Agreement. The fifth plea alleges infringement of the obligation under public international law not to defeat the object and purpose of a Treaty before its entry into force.

## Arguments of the parties

39  In general, the applicant and the Republic of Austria maintain that the contested regulation entered into force after the date of entry into force of the EEA Agreement (see paragraphs 41 and 42 of this judgment) and that it must therefore be compatible with that Agreement. The applicant alleges that, since it is incompatible with the EEA Agreement, it must be declared void *ab initio*.

40  The Council and the Commission contend that the decisive date for assessing the validity of the contested regulation is the date of its adoption. Since it was adopted before the EEA entered into force, the latter agreement cannot be applicable to the present case.

— The alleged backdating of the issue of the Official Journal in which the contested regulation was published

41  The applicant observes that Article 2 of the contested regulation specifies that it is to enter into force on 'the day of its publication in the Official Journal'. Referring to the judgments in Case 88/76 *Société pour l'Exportation des Sucres* v *Commission* [1977] ECR 709, paragraph 14 et seq., and Case 98/78 *Racke* v *Hauptzollamt Mainz* [1979] ECR 69, paragraph 15, it points out that the Official Journal is deemed to have been published on the date it bears, but that any party may prove that it was in fact published on a later date.

42    The applicant maintains that, although the issue of the Official Journal in which the contested regulation was published (OJ L 343) is dated 31 December 1993, it was in fact published on 11 or 12 January 1994. In support of that claim, it refers to a letter from the Publications Office and the formal findings of a Luxembourg court bailiff. The regulation therefore entered into force on 11 January 1994 at the earliest.

43    The applicant admits that until now the Court of Justice has held that errors as to the publication date printed on the Official Journal do not invalidate the measure published therein (see *Société pour l'Exportation des Sucres*, paragraph 14 et seq., and *Racke*, paragraph 15). However, those judgments were only concerned with errors on the part of the Publications Office of one working day only. By contrast, since in this case the Council deliberately backdated the issue of the Official Journal publishing the contested regulation, the Court of First Instance should annul it on that ground alone. Since the Council's action was intended to create the impression that the regulation entered into force before the EEA Agreement, it is in breach of the principle of sound administration and upsets public trust in the authenticity of the Official Journal. Such action was particularly inappropriate because the legal framework on 31 December 1993 was quite different from that on 11 January 1994. The Council transmitted the original version of the contested regulation to the Publications Office in January 1994, yet nevertheless instructed it to publish the regulation in the 1993 Official Journal.

44    The applicant further asserts that the explanation given by the Council to the effect that the delay was due to a backlog of work at the end of the year does not excuse the Publications Office from its obligation correctly to indicate the date of actual publication on the Official Journal. Moreover, the procedure adopted by the Council is neither usual nor necessary. Three other measures adopted in December 1993 were published in the Official Journal in 1994. The Council therefore deliberately sought to publish the contested regulation in an Official Journal of the 1993 series.

OPEL AUSTRIA v COUNCIL

45    The Republic of Austria considers that, irrespective of whether the Official Journal was deliberately backdated, compliance with the conditions for publication in the Official Journal is an essential procedural requirement. It adds that the date of entry into force of the contested regulation has a bearing on the appraisal of its legality, because the EEA Agreement prohibits the introduction of new customs duties after its entry into force.

46    The Council confirms that the contested regulation was published on 11 January 1994 in an issue of the Official Journal dated 31 December 1993 and that the contested regulation therefore entered into force on 11 January 1994. Nevertheless, that does not render the regulation invalid. According to the case-law of the Court of Justice (*Société pour l'Exportation des Sucres*, paragraph 14 et seq., and *Racke*, paragraph 15), an error regarding the date of publication printed in the Official Journal does not render a Community act invalid. The accidental or deliberate backdating of an issue of the Official Journal can cause a Community act to be invalid only where the date of entry into force of the act is relevant to its legality, which is not so in this case.

47    The Council contests the claim that it deliberately backdated publication in the Official Journal. The reason for the late availability of Official Journal L 343 lies in the large number of acts adopted by the institutions at the end of December which have to be published at the end of each calender year. Furthermore, the Council never claimed that the contested regulation entered into force before the actual date of its publication.

— The alleged infringement of Article 10 of the EEA Agreement

48    The applicant submits that, by providing that 'a 4.9% duty is hereby reintroduced', the contested regulation has contravened Article 10 of the EEA Agreement since that Agreement entered into force.

II - 57

49    It is clear from the case-law of the Court of Justice that the provisions of the EEA Agreement constitute an integral part of Community law (see Case 181/73 *Haegeman* v *Belgium* [1974] ECR 449, paragraphs 3, 4 and 5). Article 10 of the Agreement, which prohibits customs duties on imports and any charges having equivalent effect between the Contracting Parties, corresponds to Articles 12, 13, 16 and 17 of the EC Treaty. It is identical in substance to internal Community law and should therefore be analysed, in accordance with Article 6 of the EEA Agreement, in the light of the case-law of the Court of Justice regarding provisions of the EC Treaty which are identical in substance.

50    In that connection, Article 12 of the EC Treaty is the parallel provision to Article 10 of the EEA Agreement as far as import duties are concerned. The Court of Justice has held in regard to Article 12 of the EC Treaty that 'customs duties are prohibited independently of any consideration of the purpose for which they were introduced and the destination of the revenue obtained therefrom' (see Joined Cases 2/69 and 3/69 *Sociaal Fonds voor de Diamantarbeiders* v *Brachfeld* [1969] ECR 211, paragraph 11/14; see also Case 26/62 *Van Gend en Loos* [1963] ECR 1). The Court of Justice indicated that that provision plays a central role in the set of rules aimed at ensuring the free movement of goods. Free movement of goods is not only a central aim of the EC Treaty, but also one of the principal objectives of the EEA Agreement. The Court of Justice has held in the Community context that any exception to that essential rule must be clearly stated in the Treaty and would receive a strict interpretation (see Joined Cases 90/63 and 91/63 *Commission* v *Luxembourg and Belgium* [1964] ECR 625 and Joined Cases 80/77 and 81/77 *Commissionnaires Réunis* v *Receveur des Douanes* [1978] ECR 927).

51    The applicant concludes that, in accordance with Article 6 of the EEA Agreement, Article 10 must be construed as meaning that 'customs duties are prohibited independently of any consideration of the purpose for which they were introduced', that is to say, as a general and comprehensive prohibition.

52    The EEA Agreement prohibits the continued application and, *a fortiori*, the intro-
duction of customs duties. By adopting the contested regulation, the Community
introduced a new customs duty which took effect after the EEA Agreement
entered into force.

53    As for the differences between the EC Treaty and the EEA Agreement which the
Council raises in order to argue that Article 10 of the EEA Agreement has to be
interpreted differently from Article 12 of the EC Treaty, the applicant observes
that those differences were known to the draftsmen of the EEA Agreement, who
nonetheless adopted Article 6 of the EEA Agreement.

54    The importance of a homogeneous interpretation of the EEA Agreement and the
Community rules is evidenced by the Agreement itself, in particular Article 1 and
the fourth and 15th recitals in the preamble.

55    As for the Council's argument that the EC is a customs union and the EEA is a
free-trade area, the applicant asserts that that difference has no impact on the duty-
free treatment of products originating in Contracting Parties.

56    Similarly, in reply to the Council's argument that the safeguard clauses in the EEA
Agreement have no parallels in the EC Treaty, the applicant observes that, during
the transitional period, safeguard clauses did exist in Community law, and that in
*Sociaal Fonds voor de Diamantarbeiders* v *Brachfeld* it was precisely duties
imposed during the transitional period which the Court of Justice held to be
unlawful. The Court therefore established an unconditional prohibition of customs
duties in spite of the right of Member States to resort to safeguard measures in cer-
tain circumstances.

57    As for the Commission's argument that Article 10 of the EEA Agreement and the equivalent provisions of the EC Treaty are not identical in substance, the applicant observes that the EEA Agreement does provide for a few rare exceptions to the rule that all duties must be abolished, but that each exception is narrowly defined and, in addition, accompanied by an express statement prohibiting extension of the exception beyond the scope of its express terms. Thus, the second sentence of Article 10 of the EEA Agreement provides that customs duties of a fiscal nature are prohibited, except for those mentioned in Protocol 5; and Article 26 of the Agreement provides that countervailing duties and other commercial policy measures are prohibited, except for those permitted pursuant to Protocol 13. Likewise, duties adopted pursuant to Article 64 of the Agreement may be adopted because that article is an exception to Article 10 of the Agreement.

58    It is irrelevant to this case for the Commission to argue that the FTA continues to be the only law applicable on the ground that the EEA Agreement is not intended to remedy the distorting effects on competition and trade caused by existing aid of the type at issue. The prohibition of customs duties is governed by the EEA Agreement irrespective of whether or not the State aid rules apply to the aid.

59    The applicant also rejects the Council's argument that the duty reintroduced by the contested regulation is a *sui generis* duty. It observes that the EEA Agreement contains a general prohibition of customs duties subject to very few, narrow exceptions. There cannot therefore be any other unwritten, unspecified exception to that rule for *sui generis* duties, since, according to the generally accepted canons of interpretation, exceptions to general rules must be based on express statutory provisions, which, in turn, must be narrowly construed. It adds that even if the duty introduced by the contested regulation had to be distinguished from other customs duties on the ground that it constituted withdrawal of an advantage granted under the FTA, that would not change its character. Customs duties remain customs duties irrespective of the Council's reason for imposing them.

OPEL AUSTRIA v COUNCIL

60    Finally, the applicant asserts that, by virtue of Article 120 of the EEA Agreement, that Agreement prevails over the FTA, since the EEA Agreement deals with an area generally and, in the field in question in this case, the two Agreements cover the 'same subject-matter'. It is obvious that the EEA Agreement deals with the abolition of customs duties on industrial products amongst the parties, restrictions on the grant of State aid and preconditions for the adoption of protective measures. Moreover, the aims of the EEA Agreement are broader than those of the FTA.

61    The Republic of Austria argues that, in accordance with Article 6 of the EEA Agreement, Article 10 of that Agreement must be analysed in the light of the case-law of the Court of Justice relating to the corresponding provisions of the EC Treaty. As regards the differences between the EC Treaty and the EEA Agreement, it observes that in spite of those differences the EFTA Court impliedly held, in its judgment of 16 December 1994 in Case E-1/94 *Restamark*, Report of the EFTA Court, 1 January 1994 — 30 June 1995, p. 15, paragraphs 32, 33, 34, 46, 56, 63 and 64, that articles of the EEA Agreement which are identical in substance must be interpreted in accordance with the relevant case-law of the Court of Justice and the Court of First Instance. The Republic of Austria also submits that both the EEA Agreement and the FTA provide for the duty-free treatment of industrial products, including the product in issue and that by virtue of Article 120 of the EEA Agreement, the FTA has ceased to be applicable since 1 January 1994.

62    The Council argues that the contested regulation is compatible with Article 10 of the EEA Agreement. In that regard, it argues that even though under Article 6 of the EEA Agreement Article 10 must, in principle, be interpreted in the light of the case-law of the Court of Justice on the corresponding provisions of the EC Treaty, and especially Article 12, it cannot be interpreted as meaning that it prohibits 'customs duties ... independently of any consideration of the purpose for which they were introduced' (*Sociaal Fonds voor de Diamantarbeiders* v *Brachfeld*, paragraph 13). In the Council's view, there are major differences between the EC Treaty and the EEA Agreement (see Opinion 1/91 of the Court of Justice on the EEA Agreement [1991] ECR I-6079, paragraphs 13 to 22) which require Article 10 of the EEA Agreement to be interpreted differently. Thus, the EEA Agreement does not aim at establishing a single market without internal borders and its provisions on

the free movement of goods apply only to products originating in the Contracting Parties. The EC Treaty, for its part, constitutes a constitutional charter and creates a new legal order, and the provisions of the EC Treaty on free movement and competition are not an end in themselves, but a means of attaining the objectives of economic integration, the establishment of a common market and an economic and monetary union contributing together to making concrete progress towards European unity.

63    Moreover, unlike the EC Treaty, which after the end of the transitional period does not allow the Member States to adopt safeguard measures, Article 64 of the EEA Agreement contains provisions enabling the Contracting Parties to adopt measures in order to remedy a distortion of competition resulting from State aids granted by a Contracting Party or State monopolies. Moreover, Article 26, in conjunction with Protocol 13, contains provisions authorizing the imposition of countervailing duties in cases where the *acquis communautaire* is not fully integrated into the EEA Agreement. Unlike the clauses of the EEA Agreement, the safeguard clauses of the EC Treaty to which the applicant refers do not allow the adoption of autonomous measures, but provide for the adoption of measures by the Council or the Commission or by a Member State upon specific authorization by the Commission.

64    In reply to the applicant's argument that the fact that the EC is a customs union and the EEA a free-trade area has no impact on the duty-free treatment of products originating in Contracting Parties, the Council states that within the Community there are no longer any border controls on products originating in the Member States or on products from non-member States which are in free circulation. In contrast, in the EEA even products originating in the Contracting Parties are still subject to controls at the borders of either the Community or the other Contracting Parties.

65    The Council concludes that the Contracting Parties may, to a limited extent, impose and/or maintain duties as safeguard measures which are designed to remedy certain distortions of competition affecting their trade.

OPEL AUSTRIA v COUNCIL

66   It adds that the duty reintroduced by the contested regulation is not a normal customs duty, but a safeguard measure adopted pursuant to the provisions of the FTA. As a *sui generis* duty it does not fall within Article 10 of the EEA Agreement, even if that provision were to be interpreted as the applicant suggests. First, the contested regulation does not impose a duty, but withdraws a tariff concession through the reintroduction of a duty. Secondly, the duty does not have general effect, since it applies only to a specific type of gearbox produced by a specific manufacturer in a specific country. Thirdly, the duty was reintroduced for a specific purpose, namely to remedy the distorting effects of the aid granted by the Republic of Austria, which did not disappear when the EEA Agreement entered into force. Fourthly, the duty was reintroduced only for a specific, limited time.

67   Finally, as regards Article 120 of the EEA Agreement, customs duties between the Community and the Republic of Austria were removed by Article 3 of the FTA. The EEA Agreement merely preserved such tariff concessions as were given under the FTA, but did not truly provide for tariff concessions. The provisions of the FTA relating to tariff concessions therefore did not cease to apply and, under Article 120 of the EEA Agreement, customs duties introduced legally under the FTA could therefore be maintained after the entry into force of the EEA Agreement, whether or not they were in accordance with Article 10 of that Agreement. The situation is clearly different from the situation when Austria joined the European Union. The regulation then ceased to apply because the FTA also ceased to apply to it.

68   The Commission argues that Article 10 of the EEA Agreement and the corresponding provisions of the EC Treaty are not identical in substance, and that Article 6 of the Agreement is therefore not applicable. It follows from Article 10 that customs duties of a fiscal nature are not considered to fall *per se* under the notion of customs duties on imports and exports and charges having equivalent effect. The situation is the same in regard to customs duties of a safeguard nature, since they too do not form part of the general policy on tariffs, but fulfil a distinct purpose. If Article 10 had to be interpreted in the way the applicant claims, it would be impossible to enforce Article 64 of the Agreement. Moreover, if that

JUDGMENT OF 22. 1. 1997 — CASE T-115/94

were the case, Article 26 of the Agreement would not be necessary. Since the EEA Agreement is not intended to provide a remedy for the distorting effects on competition and trade caused by existing aids of the kind involved in this case, the FTA remains the only applicable law. The Commission stresses that Article 120 of the EEA Agreement provides that it is to prevail over the FTA only to the extent that it covers the same subject-matter. Consequently, it leaves open the continued application of certain provisions of the FTA, such as those applied by the Community in this case.

— Alleged infringement of Article 26 of the EEA Agreement

69    The applicant claims that the measure introduced by the regulation constitutes a countervailing duty, referring in support of its claim, *inter alia*, to the definition set out in the last sentence of Article VI(3) of the GATT, according to which a countervailing duty is 'a special duty levied for the purpose of offsetting any bounty or subsidy bestowed, directly or indirectly, upon the manufacture, production or export of any merchandise'. Consequently, the contested regulation also infringes Article 26 of the EEA Agreement, which, since it is a specific confirmation of the general principle set out in Article 10 of the Agreement, prohibits countervailing duties as between the Contracting Parties, unless otherwise specified in the Agreement.

70    It follows from the provisions of Protocol 13 to the Agreement, relating to the non-application of anti-dumping measures and countervailing duties, that in order for there to be an exception in this case to the prohibition laid down by Article 26, it would be necessary for the *acquis communautaire* as regards trade in automotive parts not to have been fully integrated into the EEA Agreement, and that is not the case. All the rules on State aid applicable to the automotive sector are expressly mentioned in Annex XV to the EEA Agreement. The products manufactured by the applicant are of Austrian origin and fall within Chapters 25 to 97 of the Harmonized Commodity Description and Coding System (see Article 8(2) and (3)(a) of the EEA Agreement).

II - 64

OPEL AUSTRIA v COUNCIL

71    The Republic of Austria maintains that the contested regulation is contrary to Article 26 of the EEA Agreement. The title given by the Council to the duty in question is irrelevant; it is the duty's true purpose and effect which determine its nature, namely, that of a countervailing duty.

72    The Council argues that the contested regulation does not impose a countervailing duty, but, on the basis of Articles 23 and 27(3)(a) of the FTA, withdraws a tariff concession which had been granted to the Republic of Austria pursuant to that Agreement. It cannot therefore constitute a breach of Article 26 of the EEA Agreement.

73    The Commission maintains that the contested regulation does not impose a countervailing duty, but constitutes a *sui generis* safeguard measure, by withdrawing a tariff concession under Article 113 of the EC Treaty, as expressly envisaged by the FTA in the case of an unresolved dispute concerning the State-aid rules contained in that Agreement.

— Alleged infringement of Article 62 of the EEA Agreement

74    The applicant claims that Article 62 of the EEA Agreement clearly indicates that, as regards State aid, the Community's competence is limited to aid granted by its Member States. It therefore considers that on 1 January 1994 the Community lost its jurisdiction in regard to State-aid measures in EFTA countries. Consequently, the entry into force of the contested regulation after that date is incompatible with Article 62 of the EEA Agreement. By arguing that it could have adopted the contested regulation as a safeguard measure pursuant to Article 64 of the EEA Agreement, the Council admits that it did not follow the procedures required by that article.

75  The Council first observes that the contested regulation was not adopted pursuant to the EEA Agreement but pursuant to the FTA. Secondly, it did not declare the aid void or incompatible with the functioning of the EEA Agreement, something which could have been done only by the EFTA Surveillance Authority. Had it been adopted under the EEA Agreement, the safeguard measure adopted by the Council would have been of a type compatible with Article 64 of that Agreement.

— Alleged infringement of the obligation under public international law not to defeat the object and purpose of a treaty before its entry into force

76  The applicant points out that Article 18 of the Vienna Convention on the Law of Treaties of 23 May 1969 (United Nations Treaty Series, Vol. 788, p. 354; hereinafter 'the First Vienna Convention'), and Article 18 of the Vienna Convention on the Law of Treaties between States and International Organizations or between International Organizations of 21 March 1986 (UN General Assembly Document A/Conf. 129/15 of 20 March 1986; hereinafter 'the Second Vienna Convention') prohibit circumvention by any State or international organization of the binding nature of international agreements by means of acts which are incompatible with the basic principles of the agreement taken immediately prior to its entry into force. It states that those rules provide, in particular, that during the period between the signature of the international agreement and its entry into force, a State 'is obliged to refrain from acts which would defeat the object and purpose' of that agreement.

77  It is generally recognized that the First Vienna Convention codifies certain universally binding rules of customary international law and that hence the Community is bound by the rules codified by the Convention. This is confirmed by the fact that on several occasions the Court of Justice has relied upon provisions of the Convention when interpreting international agreements concluded by the Community, including the FTA (see, for instance, Opinion 1/91, cited above, paragraph 14, and the judgment in Case C-312/91 *Metalsa* [1993] ECR I-3751, paragraph 12).

78    Moreover, Article 18 of the First Vienna Convention and Article 18 of the Second Vienna Convention constitute an expression of the general principle of protection of legitimate expectations in public international law, according to which a subject of international law may, under certain conditions, be bound by the expectations created by its acts in other subjects of international law.

79    The applicant rejects the Council's argument that Article 18 of the First Vienna Convention is not capable of conferring on individuals rights which they may invoke before the Court. First, the argument based on lack of direct effect is not relevant in proceedings brought under Article 173 of the EC Treaty. International agreements are an integral part of the Community legal order and it is the task of the Community institutions, including the Court of First Instance and the Court of Justice, to ensure that they are observed. The fact that certain international agreements are not directly applicable does not in any way affect the Community's obligation to ensure that they are observed (see the judgments in Case 126/83 *STS* v *Commission* [1984] ECR 2769; Case 70/87 *Fediol* v *Commission* [1989] ECR 1781, paragraph 20; Case C-69/89 *Nakajima* v *Council* [1991] ECR I-2069, paragraph 31; the Opinion of Advocate General Lenz in *Nakajima* v *Council*, section 53, and the Opinion of Advocate General Gulmann in Case C-280/93 *Germany* v *Council* [1994] ECR I-4973, sections 135 and 137). Secondly, Article 18 of the First Vienna Convention contains an unambiguous, unconditional prohibition of acts that are incompatible with the aims and objects of international agreements.

80    It follows that between the signature of the EEA Agreement and its entry into force the Community was bound to refrain from taking any measure which might jeopardize the attainment of the object and purpose of the Agreement. That obligation should have played an even more important role after all the Contracting Parties had ratified the Agreement.

81    In that connection, the applicant observes that the ratification process was completed on 13 December 1993, when the Council and the Commission jointly

II - 67

adopted Decision 94/1 and certified copies of the ratification instruments together with notice that the EEA Agreement would enter into force on 1 January 1994 were communicated to the Contracting Parties. When the contested regulation was adopted on 20 December 1993, the Council was therefore well aware that the EEA Agreement would enter into force a few days later. Since the abolition of customs duties as between Contracting Parties was one of the major aims of the EEA Agreement, the Community jeopardized the attainment of the EEA Agreement's object and purpose by adopting the contested regulation after the end of the ratification period.

82    The Republic of Austria states that, by adopting the contested regulation before the EEA Agreement entered into force but after it had been ratified by all the Contracting Parties, the Council infringed the rights of the Republic of Austria and its citizens. The Council acted in breach of a general principle of law common to the Member States, namely the mutual duty of good faith between contracting parties prior to the entry into force of an agreement which is recognized as a principle of public international law by Article 18 of the First Vienna Convention.

83    In addition, referring to Italian, German, Belgian, Spanish and English law, the Republic of Austria argues that there is also a general principle of law common to the legal systems of the Member States to the effect that a party to a binding agreement must act in good faith to safeguard the interests of other parties to or beneficiaries of the agreement during a period in which the operation of the agreement is suspended. That principle is the corollary of the principle of protection of legitimate expectations. The Court should therefore recognize it as a general principle of Community law. That principle too was infringed by the adoption of the contested regulation. The Republic of Austria considers that the applicant, as a beneficiary of the EEA Agreement, must be entitled to rely on that principle.

84    The Council does not take issue with the applicant's statement that Article 18 of the First Vienna Convention and Article 18 of the Second Vienna Convention codify rules of customary international law which are binding on the Community.

OPEL AUSTRIA v COUNCIL

85   Nevertheless, it submits, in the first place, that it did not infringe those rules, since the contested regulation is fully compatible with the EEA Agreement. It therefore does not constitute an act which defeats the object and purpose of the Agreement and does not frustrate the legitimate expectations of the Republic of Austria.

86   Secondly, it maintains that the rules on which the applicant relies form part of the law of treaties, a field of international law which concerns only the rights of sovereign States and international organizations and relations between them. Such rules cannot confer on individuals rights which they may invoke before the Court. Moreover, the provision concerned is not sufficiently precise to be directly applicable, and the principle of protection of legitimate expectations even less so.

Findings of the Court

87   In the context of an application for annulment under Article 173 of the Treaty the legality of the contested measure must be assessed on the basis of the facts and the law as they stood at the time when the measure was adopted (see Joined Cases 15/76 and 16/76 *France* v *Commission* [1979] ECR 321, paragraph 7, and Joined Cases T-79/95 and T-80/95 *SNCF and British Railways* v *Commission* [1996] ECR II-1491, paragraph 48).

88   The applicant's argument that the legality of the contested regulation must be assessed at the time when it entered into force must therefore be rejected.

89   The applicant further claims that the EEA Agreement was part of the factual and legal situation existing at the time when the contested regulation was adopted on 20 December 1993 and that, by adopting that regulation a few days before the EEA Agreement entered into force, the Council infringed the principle of public

international law ('the principle of good faith') according to which, pending the entry into force of an international agreement, the signatories to an international agreement may not adopt measures which would defeat its object and purpose.

90    The Court holds in this connection, first, that the principle of good faith is a rule of customary international law whose existence is recognized by the International Court of Justice (see the judgment of 25 May 1926, *German interests in Polish Upper Silesia*, CPJI, Series A, No 7, pp. 30 and 39) and is therefore binding on the Community.

91    That principle has been codified by Article 18 of the first Vienna Convention, which provides as follows:

'A State is obliged to refrain from acts which would defeat the object and purpose of a treaty when:

(a)  it has signed the treaty or has exchanged instruments constituting the treaty subject to ratification, acceptance or approval, until it shall have made its intention clear not to become a party to the treaty; or

(b)  it has expressed its consent to be bound by the treaty, pending the entry into force of the treaty and provided that such entry into force is not unduly delayed.'

92    In this case, the Council adopted the contested regulation on 20 December 1993, that is to say, seven days after the Communities, as the last Contracting Parties, had approved the EEA Agreement and deposited their instruments of approval (see paragraph 23 of this judgment). Accordingly, as from 13 December 1993 the Communities were aware of the date on which the EEA Agreement would enter

into force. According to Article 129(3) of the EEA Agreement (as replaced by Article 6 of the Adjustment Protocol) and Articles 1(1) and 22(3) of the Adjustment Protocol, the EEA Agreement was to enter into force on the first day of the month following the last deposit of ratification or approval.

93   Secondly, the principle of good faith is the corollary in public international law of the principle of protection of legitimate expectations which, according to the case-law, forms part of the Community legal order (see Case 112/77 *Töpfer* v *Commission* [1978] ECR 1019, paragraph 19). Any economic operator to whom an institution has given justified hopes may rely on the principle of protection of legitimate expectations (see, *inter alia,* Joined Cases T-466/93, T-469/93, T-473/93, T-474/93 and T-477/93 *O'Dwyer and Others* v *Council* [1995] ECR II-2071, paragraph 48).

94   In a situation where the Communities have deposited their instruments of approval of an international agreement and the date of entry into force of that agreement is known, traders may rely on the principle of protection of legitimate expectations in order to challenge the adoption by the institutions, during the period preceding the entry into force of that agreement, of any measure contrary to the provisions of that agreement which will have direct effect on them after it has entered into force.

95   Consequently, the applicant is entitled to require a review of the legality of the contested regulation in the light of the provisions of the EEA Agreement which have direct effect after its entry into force.

96   However, before considering the various arguments raised by the applicant in that regard, it must first be established whether and to what extent the provisions of

the EEA Agreement take the place of the provisions of the FTA and whether the EEA Agreement is applicable to the products at issue in this case.

97   The FTA, which was applicable at the material time and was the basis on which the contested regulation was adopted, was not abrogated or suspended when the EEA Agreement entered into force. According to Article 120 of the EEA Agreement, however, the application of the provisions of that Agreement prevail over provisions of the FTA 'to the extent that the same subject-matter is governed' by the EEA Agreement. The provisions of the EEA Agreement concerned in this case govern the same subject-matter as the relevant articles of the FTA. Article 10 of the EEA Agreement governs the same subject-matter as Articles 3 and 6 of the FTA, namely customs duties on imports and charges having equivalent effect. Article 61 of the EEA Agreement, relating to State aids, is more specific than, and its scope as wide as, Article 23(1)(iii) of the FTA; it is almost identical to Article 92 of the EC Treaty. Moreover, the specific provisions applicable to State aid within the Community are taken up in Annex XV to the EEA Agreement. As for the procedures provided for in Article 27(2) and (3)(a) of the FTA, it should be noted that, pursuant to Article 108 of the EEA Agreement, the EFTA States are to establish an EFTA Surveillance Authority and an EFTA Court. Those two institutions are accorded, particularly in the fields of competition and State aid, powers and procedures analogous to those existing in the Community in the same fields. The allocation of competence and cooperation between the EFTA Surveillance Authority and the Commission in the field of State aid are governed by Article 62 of the EEA Agreement. Consequently, following the entry into force of the EEA Agreement, the application of those provisions of the Agreement prevails over that of the relevant provisions of the FTA.

98   In that context, without ruling on the compatibility of the aid granted by the Republic of Austria with the FTA or the EEA Agreement, the Court notes that the Council complied with the procedure provided for in the State-aid provisions of the FTA before it adopted the contested regulation. However, as appears from the previous paragraph, after the EEA Agreement entered into force the application of the State-aid provisions of that Agreement prevailed over the application of the corresponding provisions of the FTA. In that regard, the EEA Agreement contains its own rules and procedures allowing the Contracting Parties to abolish State aid which is incompatible with the functioning of the Agreement.

OPEL AUSTRIA v COUNCIL

99    As to the question whether the Agreement is applicable to the products referred to in the contested regulation, it is not disputed that those products originated in Contracting Parties of the EEA Agreement and that they fall within Chapters 25 to 97 of the Harmonized Commodity Description and Coding System. Consequently, by virtue of Article 8(2) and (3)(a) of the EEA Agreement, that agreement is applicable to those products with effect from its entry into force.

100    Secondly, it is necessary to consider whether Article 10 of the EEA Agreement is capable of having direct effect following the entry into force of that agreement.

101    As appears from Article 228(7) of the EC Treaty, international agreements concluded by the Community in conformity with the Treaty are binding on the institutions and the Member States. It is settled case-law that the provisions of such an agreement form an integral part of the Community legal order once the agreement has entered into force (see *Haegeman*, cited above, paragraph 5). It is also settled case-law that the provisions of such an agreement may have direct effect if they are unconditional and sufficiently precise (see, for example, Case 87/75 *Bresciani* [1976] ECR 129, paragraph 25, and Case 104/81 *Hauptzollamt Mainz* v *Kupferberg* [1982] ECR 3641, paragraph 23).

102    In that regard, the Court observes that nothing in the case-file suggests that the EEA Agreement, which was concluded by the Community on the basis of Article 238 of the EC Treaty, was not concluded in conformity with the Treaty. It follows that since the Agreement entered into force on 1 January 1994 the provisions of the Agreement form an integral part of the Community legal order. It should also be borne in mind that the first sentence of Article 10 of the EEA Agreement provides that customs duties on imports and exports and any charges having equivalent effect are prohibited between the Contracting Parties. The second sentence of that article provides that, without prejudice to the arrangements set out in

Protocol 5, customs duties of a fiscal nature are likewise prohibited. Article 10 thus lays down an unconditional and precise rule, subject to a single exception which is itself unconditional and precise. It follows that ever since the EEA Agreement entered into force Article 10 has had direct effect.

103    Thirdly, it is necessary to decide whether, by reintroducing a duty of 4.9%, the contested regulation infringed Article 10 of the EEA Agreement.

104    Article 6 of the EEA Agreement provides:

'Without prejudice to future developments of case-law, the provisions of this Agreement, in so far as they are identical in substance to corresponding rules of the Treaty establishing the European Economic Community and the Treaty establishing the European Coal and Steel Community and to acts adopted in application of these two Treaties, shall, in their implementation and application, be interpreted in conformity with the relevant rulings of the Court of Justice of the European Communities given prior to the date of signature of this Agreement.'

105    The Council contends that, notwithstanding that provision, Article 10 of the EEA Agreement should not be interpreted in the same way as the corresponding provisions of the EC Treaty, because there are major differences between the EC Treaty and the EEA Agreement (see paragraph 62 of this judgment).

106    That argument cannot be accepted. It is clear from the case-law that in order to determine whether the interpretation of a provision contained in the EC Treaty must be extended to an identical provision contained in an agreement such as the

EEA Agreement, that provision should be analysed in the light of both the purpose and the objective of the Agreement and in its context (see Case 270/80 *Polydor* v *Harlequin* [1982] ECR 329, paragraph 8, and C-163/90 *Administration des Douanes et Droits Indirects* v *Legros and Others* [1992] ECR I-4625, paragraph 23). According to Article 1(1) of the EEA Agreement, the aim of that agreement is to promote a continuous and balanced strengthening of trade and economic relations between the Contracting Parties with equal conditions of competition, and the respect of the same rules, with a view to creating a homogeneous European Economic Area. To that end, the Contracting Parties decided to eliminate virtually all trade barriers, in conformity with the provisions of the GATT on the establishment of free-trade areas.

107   In that context, the EEA Agreement involves a high degree of integration, with objectives which exceed those of a mere free-trade agreement. Thus, as is clear from Article 1(2), the EEA involves, *inter alia*, the free movement of goods, persons, services and capital and the setting up of a system ensuring that competition is not distorted and that the rules relating thereto are equally respected. The rules applicable to relations between the Contracting Parties in the fields covered by the Agreement essentially correspond to the parallel provisions of the EC and ECSC Treaties and the measures adopted in pursuance of those treaties. The EEA Agreement also aims to extend to the EEA future Community law in the fields covered by the Agreement as it is created, develops or changes and a decision-making procedure is provided to that end. The Agreement further provides that the EFTA States are to set up a surveillance authority, the EFTA Surveillance Authority, with equivalent powers and similar functions to those of the Commission, and a court of justice, the EFTA Court. Article 109 of the EEA Agreement provides that, on the one hand, the EFTA Surveillance Authority and, on the other, the Commission acting in conformity with the EC Treaty, the ECSC Treaty and the Agreement, are to monitor the fulfilment of the obligations under the EEA Agreement. According to Article 108(2) of the EEA Agreement and the Agreement between the EFTA States of 2 May 1992 on the establishment of a Surveillance Authority and a Court of Justice (OJ 1994 L 344, p. 1; hereinafter 'the EFTA Surveillance Agreement'), the EFTA Court has jurisdiction similar to that of the Court of Justice and the Court of First Instance.

108   Thus, by establishing an EFTA Surveillance Authority and an EFTA Court with powers and jurisdiction similar to those of the Commission and the Court of

Justice, a two-pillar system has been created in which the EFTA Surveillance Authority and the EFTA Court monitor the application of the Agreement on the part of the EFTA States, while the Commission, the Court of Justice and the Court of First Instance do so on the part of the Community. That system is reinforced by a large number of factors intended to make sure that it is homogeneous. They include, in addition to the similarity between the terms of the various provisions of the Agreement and the EC and ECSC Treaties, the fourth and 15th recitals in the preamble to the Agreement and Article 6 thereof, as well as, *inter alia*, Article 3 of the EFTA Surveillance Agreement. In particular, by virtue of the fourth recital in the preamble to the Agreement, the Contracting Parties' objective is '[to establish] a dynamic and homogeneous European Economic Area, based on common rules and equal conditions of competition and providing for the adequate means of enforcement including at the judicial level, and achieved on the basis of equality and reciprocity and of an overall balance of benefits, rights and obligations for the Contracting Parties'. The 15th recital in the preamble — added by the Contracting Parties after the Court of Justice had held in Opinion 1/91, cited above, that the judicial system in the first version of the Agreement, providing for a Court of Justice of the European Economic Area, was incompatible with the EEC Treaty — stipulates further that 'in full deference to the independence of the courts, the objective of the Contracting Parties is to arrive at, and maintain, a uniform interpretation and application of this Agreement and those provisions of Community legislation which are substantially reproduced in this Agreement and to arrive at an equal treatment of individuals and economic operators as regards the four freedoms and the conditions of competition'. As recalled in paragraph 104 of this judgment, Article 6 of the EEA Agreement provides that the provisions of the EEA Agreement which are identical in substance to the Community rules are to be interpreted in conformity with the rulings of the Court of Justice and of the Court of First Instance given prior to the date of signature of the Agreement. Finally, it is clear from Article 3(2) of the EFTA Surveillance Agreement that, when interpreting and applying the EEA Agreement, the EFTA Surveillance Authority and the EFTA Court are to pay due account to the principles laid down by the relevant rulings by the Court of Justice and the Court of First Instance given after the date of signature of the EEA Agreement (see the judgments of the EFTA Court in *Restamark*, cited above, paragraphs 24, 33 and 34, and in *Scottish Salmon Growers Association* v *EFTA Surveillance Authority*, E-2/94, Report of the EFTA Court, 1 January 1994 — 30 June 1995, p. 59, paragraphs 11 and 13).

109    Contrary to the Council's contention, the significance in regard to the interpretation and application of the Agreement of the Contracting Parties' objective of

OPEL AUSTRIA v COUNCIL

establishing a dynamic and homogeneous EEA has not been diminished by the Court of Justice in Opinion 1/91, cited above. When the Court held that the divergences existing between the aims and context of the Agreement, on the one hand, and the aims and context of Community law on the other, stood in the way of the achievement of the objective of homogeneity in the interpretation and application of the law in the EEA, it was considering the judicial system contemplated by the EEA Agreement for the purposes of ascertaining whether that system might jeopardize the autonomy of the Community legal order in pursuing its own objectives; and not a specific case in which it is necessary to determine whether a provision of the EEA Agreement identical in substance to a provision of Community law must be interpreted in conformity with the rulings of the Court of Justice and the Court of First Instance.

110   It follows from those findings that Article 6 of the EEA Agreement must be interpreted as meaning that where a provision of the EEA Agreement is identical in substance to corresponding rules of the EC and ECSC Treaties and to the acts adopted in application of those two treaties it must be interpreted in conformity with the relevant rulings of the Court of Justice and of the Court of First Instance given prior to the date of signature of the EEA Agreement.

111   The Court further finds that Article 10 of the EEA Agreement is identical in substance to Articles 12, 13, 16 and 17 of the EC Treaty which, with effect from the end of the transitional period, prohibit customs duties on imports or exports and any charges having equivalent effect between the Member States. Consequently, by virtue of Article 6 of the EEA Agreement, Article 10 must be interpreted in conformity with the relevant rulings of the Court of Justice and the Court of First Instance prior to the date of signature of the Agreement.

112   In this regard it is necessary, first, to reject the Commission's argument to the effect that, since it appears from Article 10 of the EEA Agreement that customs duties of a fiscal nature are not regarded as necessarily covered by the notion of customs duties on imports and exports and charges having equivalent effect, that

II - 77

JUDGMENT OF 22. 1. 1997 — CASE T-115/94

article and the corresponding provisions of the EC Treaty are not identical in sub-stance. Suffice it to say that the EC Treaty contains a corresponding provision, namely Article 17 of the Treaty, which makes it clear that the prohibitions set out in Article 9 of the Treaty are to apply even if the customs duties are of a fiscal nature, and is intended to prevent circumvention of the prohibition on customs duties on imports and exports and any charges having equivalent effect (see *Sociaal Fonds voor de Diamantarbeiders* v *Brachfeld*, cited above, paragraph 7/10).

113  Secondly, contrary to the Commission's submission, the interpretation of Article 10 of the EEA Agreement proposed by the applicant does not make it impossible to apply Article 64 of the EEA Agreement. In the field of State aid, Article 64 authorizes the competent authority of the Contracting Party affected by a distor-tion of competition to adopt measures, subject to certain conditions, in order to offset the effects of the distortion. Since it constitutes an exception to the other provisions of the EEA Agreement, Article 64 may therefore be applied notwith-standing the other provisions of the Agreement. However, before measures are adopted, the procedure provided for in Article 64 of the EEA Agreement must have been carried out and the conditions which it lays down must have been com-plied with.

114  Thirdly, the various safeguard clauses in the EEA Agreement allowing the Con-tracting Parties to derogate from its provisions may be used only in particular cir-cumstances and, as a general rule, following consideration of the arguments for and against in the EEA Joint Committee. Outside the specific situations which may give rise to their application, those clauses have no impact on the objective pursued by Article 10 in the context of the EEA Agreement or, consequently, on the inter-pretation to be given to that article. That conclusion is confirmed in particular by the fact that until the Treaty on European Union entered into force, Article 115 of the EEC Treaty allowed the Member States themselves to take the necessary mea-sures in case of urgency during the transitional period and that, as the applicant has correctly observed, in *Sociaal Fonds voor de Diamantarbeiders* v *Brachfeld* the Court of Justice specifically declared pecuniary charges levied during the transi-tional period unlawful.

II - 78

OPEL AUSTRIA v COUNCIL

115   Fourthly, the Commission's argument that Article 26 of the EEA Agreement would be unnecessary if Article 10 had to be interpreted in conformity with the rulings of the Court of Justice must also be rejected. Article 26 of the EEA Agreement provides that anti-dumping measures, countervailing duties and measures against illicit commercial practices attributable to third countries are not to be applied in relations between the Contracting Parties unless otherwise specified in the EEA Agreement. The first paragraph of Protocol 13 states that the application of Article 26 is limited to the areas covered by the provisions of the Agreement in which the *acquis communautaire* is fully integrated into the Agreement. It follows from the second paragraph of that protocol that Article 26 does not apply in situations where one Contracting Party introduces measures directed at third countries that are intended to avoid circumvention of anti-dumping measures, countervailing duties or measures against illicit commercial practices attributable to third countries.

116   Article 26, in conjunction with Protocol 13 of the Agreement, must therefore be interpreted as governing situations in which anti-dumping measures, countervailing duties or measures against illicit commercial practices attributable to third countries may be introduced by the Contracting Parties as between themselves, notwithstanding the other provisions of the EEA Agreement. Moreover, Article 26 applies not only to measures adopted in the form of duties but also to any other measures, no matter what form they take, including undertakings accepted by Commission decisions in dumping cases. Consequently, Article 26 of the EEA Agreement has its own justification, which is independent of that of Article 10 of the EEA Agreement.

117   In any event, the contested regulation was not adopted in order to prevent circumvention of anti-dumping measures, countervailing duties or illicit commercial practices attributable to third countries. What is more, the field of State aid comes under Articles 61 to 64 of the EEA Agreement. Furthermore, the whole of the *acquis communautaire* in this field, in particular the Community Framework on State Aid to the Motor Vehicle Industry (89/C 123/03; OJ 1989 C 123, p. 3) has been integrated into the Agreement. Consequently, such measures cannot be

II - 79

authorized under Article 26 of the EEA Agreement either and it is unnecessary to make a determination as to whether the measures established by the contested regulation must be regarded as countervailing duties.

118    It should be noted for completeness' sake that, in regard to free-trade agreements with the EFTA countries, whose subject-matter is much more limited than that of the EEA Agreement, the Court of Justice held in *Legros and Others*, cited above (paragraph 26), which was concerned with Article 6 of the Agreement between the Community and the Kingdom of Sweden [Council Regulation (EEC) No 2838/72 of 19 December 1972 concluding an Agreement between the European Economic Community and the Kingdom of Sweden (OJ 1972 L 300, p. 96)], relating to charges having equivalent effect, that, in the context of the objective of eliminating trade barriers, the elimination of customs duties on imports was of prime importance, as was the elimination of charges having equivalent effect, which, according to the case-law of the Court of Justice, are closely linked to customs charges *stricto sensu* (see, in particular, Joined Cases 37/73 and 38/73 *Sociaal Fonds voor de Diamantarbeiders* v *Indiamex* [1973] ECR 1609, paragraphs 12 and 13, and Case C-260/90 *Leplat* [1992] ECR I-643, paragraph 15). The Court of Justice concluded that the free-trade agreement would be deprived of much of its effectiveness if the term 'charge having equivalent effect' contained in Article 6 of the Agreement were to be interpreted as having more limited scope than the same term appearing in the EEC Treaty.

119    In view of all these factors, it is accordingly necessary to consider whether, following the entry into force of the EEA Agreement, the contested regulation is contrary to Article 10 of that agreement when interpreted, pursuant to Article 6, in conformity with the relevant rulings of the Court of Justice and the Court of First Instance prior to the date of signature of the EEA Agreement.

120    In that regard it is necessary to reject the Council's argument that the measure introduced by the contested regulation does not constitute a duty but a *sui generis* safeguard measure which, as such, does not come under Article 10 of the EEA Agreement. The very title of the contested regulation refers to 'withdrawing tariff concessions'. Furthermore, Article 1 of the regulation provides that 'a 4.9% duty is hereby reintroduced for F-15 car gearboxes produced by General Motors Austria'

and the 23rd recital in its preamble refers to 'the introduction of duties at a level equal to the level of customs duties which would have prevailed if the [FTA] had not entered into force'. Finally, at the hearing, the Council's representative accepted, in replying to a question put by the Court, that the characterization of the measure is of little significance, since, whether it be characterized as an anti-dumping duty, a countervailing duty, the withdrawal of a tariff concession, the introduction of a duty or a *sui generis* safeguard measure, its effect is identical.

121   In addition, it is settled case-law that 'any pecuniary charge, however small and whatever its designation and mode of application, which is imposed unilaterally on domestic or foreign goods by reason of the fact that they cross a frontier, and which is not a customs duty in the strict sense, constitutes a charge having equivalent effect within the meaning of Articles 9 and 12 of the Treaty, even if it is not imposed for the benefit of the State, is not discriminatory or protective in effect or if the product on which the charge is imposed is not in competition with any domestic product' (*Sociaal Fonds voor de Diamantarbeiders* v *Brachfeld*, paragraph 15/18).

122   The measure introduced by the contested regulation constitutes a pecuniary charge imposed unilaterally by the Community on F-15 gearboxes by reason of the fact that they cross a frontier. Consequently, it must be held that the measure constitutes, at the very least, a charge having equivalent effect within the meaning of Article 10 of the EEA Agreement and it is unnecessary to determine whether it must be regarded as a customs duty on imports in the strict sense. It is therefore clear that, following the entry into force of the EEA Agreement, the contested regulation was contrary to that article.

123   It follows that, by adopting the contested regulation in the period preceding the entry into force of the EEA Agreement after the Communities had deposited their instruments of approval, the Council infringed the applicant's legitimate expectations.

124    According to the case-law, moreover, Community legislation must be certain and its application foreseeable by individuals. The principle of legal certainty requires that every measure of the institutions having legal effects must be clear and precise and must be brought to the notice of the person concerned in such a way that he can ascertain exactly the time at which the measure comes into being and starts to have legal effects. That requirement of legal certainty must be observed all the more strictly in the case of a measure liable to have financial consequences in order that those concerned may know precisely the extent of the obligations which it imposes on them (see Case 169/80 *Administration des Douanes* v *Gondrand Frères and Garancini* [1981] ECR 1931, paragraph 17; Case 70/83 *Kloppenburg* v *Finanzamt Leer* [1984] ECR 1075, paragraph 11; Case 325/85 *Ireland* v *Commission* [1987] ECR 5041, paragraph 18; Joined Cases T-18/89 and T-24/89 *Tagaras* v *Court of Justice* [1991] ECR II-53, paragraph 40).

125    By adopting the contested regulation on 20 December 1993 when it knew with certainty that the EEA Agreement would enter into force on 1 January 1994, the Council knowingly created a situation in which, with effect from January 1994, two contradictory rules of law would co-exist, namely the contested regulation, which is directly applicable in the national legal systems and re-establishes a 4.9% import duty on F-15 gearboxes produced by the applicant; and Article 10 of the EEA Agreement, which has direct effect and prohibits customs duties on imports and any charges having equivalent effect. Consequently, the contested regulation cannot be regarded as Community legislation which is certain and its operation/application cannot be regarded as foreseeable by those subject to it. It follows that the Council also infringed the principle of legal certainty.

126    Although those two infringements of general legal principles must be regarded as being in themselves sufficiently serious to warrant the annulment of the contested regulation, it should also be established whether, as the applicant alleges, the Council deliberately backdated the issue of the Official Journal in which the regulation was published.

OPEL AUSTRIA v COUNCIL

127   The issue of the Official Journal in which the contested regulation was published is dated 31 December 1993. According to Article 2, the regulation is to enter into force on the day of its publication in the Official Journal. However, according to written replies from the Publications Office to questions put by the Court, the Official Journal of 31 December 1993 was not made available to the public at the head office of the Publications Office in all the official languages of the Community until 4.45 pm on 11 January 1994. According to the case-law, although there is a presumption that the date of publication is the date actually appearing on each issue of the Official Journal, should evidence to the contrary be produced regard must be had to the date of actual publication (*Racke*, paragraph 15). It follows that the actual date of publication of the issue of the Official Journal in question in the present case is 11 January 1994 and that the regulation did not enter into force until that date.

128   Moreover, it emerges from the case file, the documents produced by the Council at the request of the Court and the written replies of the Council and the Publications Office to questions put by the Court, that the Council sent the contested regulation to the Publications Office on 3 or 4 January 1994; that the covering letter instructed the Publications Office to publish the regulation in the Official Journal for 1993; that the Council confirmed that instruction when telephoned by the Publications Office and that the latter received the full regulation by fax on 6 January 1994.

129   At the hearing, in reply to questions put by the Court, the Council explained that it never claimed that the regulation at issue was intended to enter into force before it was published. At the time, even though it was aware of the case-law concerning the actual publication date of the Official Journal (see paragraph 127 of this judgment) the practice of the administration of the Council was to instruct the Publications Office to publish measures adopted in a particular year in the edition of the Official Journal for that year. That practice has, however, since been changed.

130  However, without ruling on the legality of that practice, which must be regarded as dubious at the very least, the Court observes that, contrary to that practice, several measures adopted by the Council in December 1993 were published in the 1994 edition of the Official Journal. Those measures include Decisions 94/1 and 94/2, which were adopted on 13 December 1993 but published in OJ 1994 L 1 dated 3 January 1994, and Council Regulation (EC) No 5/94 of 22 December 1993 on the suspension of the anti-dumping measures against EFTA countries, which was published in OJ 1994 L 3 dated 5 January 1994.

131  Consequently, the Council deliberately backdated the issue of the Official Journal in which the contested regulation was published.

132  In acting in that way, it again infringed the principle of legal certainty, which, according to the case-law referred to in paragraph 124 of this judgment, requires that any measure of the institutions having legal effects must not only be clear and precise, but also be brought to the notice of the person concerned in such a way that he can ascertain exactly the time at which the measure comes into being and starts to have legal effects.

133  The conduct of the Council's administration must therefore be regarded as particularly serious, since it is contrary to the Council's own formal instructions to the Publications Office 'intended to ensure that the date of publication borne by each issue of the Official Journal corresponds to the date on which that issue is in fact available to the public in all the languages at the said office' (*Racke*, paragraph 15). Furthermore, as the applicant has correctly observed, the legal framework which existed on 31 December 1993 was different from that which existed after 1 January 1994, the date on which the EEA Agreement entered into force.

134  It follows from the foregoing that the first plea and the second part of the second plea considered in conjunction are well founded.

OPEL AUSTRIA v COUNCIL

135    Consequently, the regulation at issue must be annulled, without its being necessary to rule on the other arguments and pleas raised by the applicant.

**Costs**

136    Under Article 87(2) of the Rules of Procedure, the unsuccessful party is to be ordered to pay the costs if they have been asked for in the successful party's pleadings. Since the Council has been unsuccessful and the applicant applied for costs, the Council must be ordered to pay the costs incurred by the applicant in addition to its own.

137    Article 87(4) of the Rules of Procedure provides that institutions which have intervened in the proceedings shall bear their own costs. The Commission must therefore bear its own costs.

138    The Republic of Austria was given leave to intervene, not on the basis of the second paragraph of Article 37 of the EC Statute of the Court of Justice, but in accordance with the Community's undertaking contained in the Declaration 'on the rights for the EFTA States before the EC Court of Justice' annexed to the EEA Agreement, which is intended to make it possible for EFTA States and the EFTA Surveillance Authority to intervene in proceedings brought before the Court of Justice under Article 37 of the Statute of the Court of Justice 'in order to reinforce the legal homogeneity within the EEA' (see the order of 20 October 1994 in Case T-115/94 *Opel Austria* v *Council*, not published in the ECR). That declaration must be interpreted as meaning that the Community has undertaken to extend the same possibilities for intervention to EFTA States and the EFTA Surveillance Authority as those enjoyed by Member States and the Community institutions. It follows that they must enjoy the same rights and be subject to the same obligations. Article 87(4) of the Rules of Procedure provides that Member States which have intervened in the proceedings are to bear their own costs. Consequently, the Republic of Austria must bear its own costs.

JUDGMENT OF 22. 1. 1997 — CASE T-115/94

On those grounds,


THE COURT OF FIRST INSTANCE (Fourth Chamber)


hereby:


1. **Annuls Council Regulation (EC) No 3697/93 of 20 December 1993 withdrawing tariff concessions in accordance with Article 23(2) and Article 27(3)(a) of the Free Trade Agreement between the Community and Austria (General Motors Austria);**


2. **Orders the Council to bear its own costs and pay the applicant's costs;**


3. **Orders the Commission and the Republic of Austria to bear their own costs.**


Lenaerts                    Lindh                    Cooke


Delivered in open court in Luxembourg on 22 January 1997.


H. Jung                                                      K. Lenaerts

Registrar                                                    President

II - 86