# EXHIBIT 29

JUDGMENT OF THE COURT (Sixth Chamber)

7 March 2002 *

In Case C-310/99,

**Italian Republic,** represented by U. Leanza, acting as Agent, assisted by O. Fiumara, vice avvocato generale dello Stato, with an address for service in Luxembourg,

applicant,

v

**Commission of the European Communities,** represented initially by G. Rozet and P. Stancanelli, then by G. Rozet and V. Di Bucci, acting as Agents, with an address for service in Luxembourg,

defendant,

---

* Language of the case: Italian.

APPLICATION for annulment of Commission Decision 2000/128/EC of 11 May 1999 concerning aid granted by Italy to promote employment (OJ 2000 L 42, p. 1),

THE COURT (Sixth Chamber),

composed of: N. Colneric (Rapporteur), President of the Second Chamber, acting for the President of the Sixth Chamber, C. Gulmann, R. Schintgen, V. Skouris and J.N. Cunha Rodrigues, Judges,

Advocate General: D. Ruiz-Jarabo Colomer,
Registrar: L. Hewlett, Administrator,

having regard to the Report for the Hearing,

after hearing oral argument from the parties at the hearing on 4 April 2001,

after hearing the Opinion of the Advocate General at the sitting on 17 May 2001,

I - 2317

gives the following

## Judgment

1   By application lodged at the Court Registry on 13 August 1999, the Italian Republic brought an action under the first paragraph of Article 230 EC for annulment of Commission Decision 2000/128/EC of 11 May 1999 concerning aid granted by Italy to promote employment (OJ 2000 L 42, p.1; hereinafter 'the contested decision'), and, in the alternative, for annulment of that decision in so far as it provides for the recovery of sums comprising aid which is incompatible with the common market.

## Community law

2   Paragraphs (1) and (3) of Article 87 EC provide, as did paragraphs (1) and (3) of the former Article 92 of the EC Treaty:

'1. Save as otherwise provided in this Treaty, any aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the common market.

...

3. The following may be considered to be compatible with the common market:

(a) aid to promote the economic development of areas where the standard of living is abnormally low or where there is serious underemployment;

...'

3    The first subparagraph of Article 88(2) EC provides:

'If, after giving notice to the parties concerned to submit their comments, the Commission finds that aid granted by a State or through State resources is not compatible with the common market having regard to Article 87, or that such aid is being misused, it shall decide that the State concerned shall abolish or alter such aid within a period of time to be determined by the Commission.'

**Commission publications**

*Guidelines on aid to employment*

4    In 1995 the Commission published guidelines concerning aid to employment (OJ 1995 C 334, p. 4; hereinafter the 'guidelines on aid to employment'). Point 2

Case 1:19-cv-01618-TSC    Document 62-30    Filed 05/02/22    Page 6 of 41

JUDGMENT OF 7. 3. 2002 — CASE C-310/99

thereof makes clear that stepping up measures to promote the employment of underprivileged groups in the labour market, such as the long-term unemployed, young people and older workers, ranks among the priority areas defined by the Member States in their employment policy. At point 3 it is stated that measures intended to improve the situation of workers on the labour market must not adversely affect the Commission's parallel efforts to reduce artificial distortions of competition under Article 92 of the EC Treaty (now, after amendment, Article 87 EC) and Article 93 of the EC Treaty (now Article 88 EC).

5    It is also stated, at point 5 of the guidelines on aid to employment, that their objective is to clarify the interpretation of Articles 92 and 93 of the Treaty with regard to State aid in the field of employment in order to ensure greater transparency of notification decisions under Article 93 of the Treaty.

6    Points 16 and 17 of the guidelines on aid to employment read as follows:

'16.    Aid to maintain jobs means support given to a firm to persuade it not to lay off its workers, with the subsidy usually being calculated on the basis of the number of employees at the time the aid is granted.

17.    Aid to create jobs, on the other hand, provides employment for workers who have never had a job or who have lost their previous job, and is calculated on the basis of the number of jobs created. It should be made clear that job creation refers to net job creation, i.e. the creation of an additional job in relation to the (average) workforce (over a period of

I - 2320

time) of the firm concerned. Simply replacing a worker without actually increasing the workforce, and hence without creating new jobs, does not constitute genuine job creation.'

7    At point 21 of the guidelines on aid to employment it is stated as follows:

'In assessing employment aid, the Commission will apply the following criteria:

— It will be favourably disposed towards aid to create new jobs in small and medium-sized enterprises and in regions eligible for regional aid... Outside these two categories, it will also look favourably upon aid to encourage firms to take on certain groups of workers experiencing particular difficulties entering or re-entering the labour market. In the latter case, there is no need for net job creation, provided that the post falls vacant following voluntary departure and not redundancy.

...

— For aid in the preceding categories to be viewed favourably, the Commission will also scrutinise the terms of the employment contract, in particular compliance with the obligation to hire workers for an indefinite period and to maintain newly created jobs for a minimum period, conditions which

ensure that the job created is a stable one. Any other guarantee of the permanence of new jobs, particularly the arrangements for payment of the aid, will also be taken into account.

— The Commission will make sure that the level of aid does not exceed that which is necessary to provide an incentive to create jobs, taking account, where appropriate, of any difficulties facing small and medium-sized enterprises and/or disadvantages affecting the region concerned. The aid must be temporary.

— If the creation of jobs for which aid is granted is combined with the training or retraining of the workers concerned, this will make a particularly positive contribution to a favourable assessment by the Commission.'

8    In addition, at point 22 of the guidelines on aid to employment, it is provided that:

'[a]id to maintain jobs, which is similar to operating aid, will be authorised only under the following conditions:

...

Under certain conditions, aid to maintain jobs may also be authorised in regions eligible for the derogation under Article 92(3)(a) of the EC Treaty concerning the economic development of areas where the standard of living is abnormally low or where there is serious underemployment.

...'

*Guidelines on national regional aid*

9    In 1998 the Commission also published guidelines on national regional aid (OJ 1998 C 74, p. 9; hereinafter the 'guidelines on national regional aid'), which provide as follows at points 3.5 and 4.17:

'3.5    Article 92(3)(a) provides that aid to promote the economic development of areas where the standard of living is abnormally low or where there is serious underemployment may be considered compatible with the common market. As the Court of Justice of the European Communities has held, "the use of the words 'abnormally' and 'serious' in the exemption contained in Article 92(3)(a) shows that it concerns only areas where the economic situation is extremely unfavourable in relation to the Community as a whole...".

...

4.17    ... operating aid must be both limited in time and progressively reduced. In addition, operating aid intended to promote exports between Member States is ruled out.'

*The Commission notice on the* de minimis *rule for State aid*

10  In its 1996 notice on the *de minimis* rule for State aid (OJ 1996 C 68, p. 9), the Commission stated that although any financial assistance given by the State to one firm may distort competition, not all aid, however, has an appreciable effect on trade and competition between Member States and that this is particularly true of the small amounts of aid which, in the majority of cases, are granted to small and medium-sized enterprises. In an effort to reduce the administrative burden and simplify matters for small and medium-sized enterprises, it introduced what is known as a *de minimis* rule, which sets a threshold figure below which Article 92(1) of the Treaty can be deemed not to apply and the aid can be deemed exempt from the requirement for prior notification.

11  For the *de minimis* rule to apply, the following conditions must be complied with:

    '— the ceiling for aid covered by the *de minimis* rule will now be ECU 100 000 over a three-year period beginning when the first *de minimis* aid is granted;

    — the ceiling will apply to the total of all public assistance considered to be *de minimis* aid and will not affect the possibility of the recipient obtaining other aid under schemes approved by the Commission;

    — the ceiling will apply to aid of all kinds, irrespective of the form it takes or the objective pursued, with the exception of export aid, which is excluded from the benefit of the *de minimis* rule.

ITALY v COMMISSION

The public assistance which is allowed up to the ECU 100 000 ceiling comprises all aid granted by the national, regional or local authorities, regardless of whether the resources are provided from domestic sources or whether the measures are part-financed by the Community from the Structural Funds...'.

## National legislation

12    By Law No 863/84 of 19 December 1984 (GURI No 351 of 22 December 1984, p. 10691, 'Law No 863/84'), the Italian Republic introduced training and work experience contracts (hereinafter 'TWEC'). These were fixed-term contracts, including a period of training, for the employment of unemployed persons of up to 29 years of age. Employers were exempt from paying social security contributions for a two-year period in respect of persons employed under this type of contract. The reduction was applied in a generalised, automatic, indiscriminate and uniform manner throughout the country.

13    The implementation arrangements for TWECs were changed by, successively, Law No 407/90 of 29 December 1990 (GURI No 303 of 31 December 1990, p. 3; 'Law No 407/90'), which introduced a regional variation in the aid, Law No 169/91 of 1 June 1991 (GURI No 129 of 4 June 1991, p. 4; 'Law No 169/91'), which raised the maximum age of eligible employees to 32, and Law No 451/94 of 19 July 1994 (GURI No 167 of 19 July 1994, p. 3; 'Law No 451/94'), which introduced the one-year TWEC and set a compulsory minimum number of training hours.

14    Under those laws, a TWEC may be described as a fixed-term contract for the employment of young people aged between 16 and 32. The age-limit may be raised at the discretion of the regional authorities. The authorities raised the

I - 2325

age-limit to 35 in Lazio, 38 in Calabria, 40 in Campania, Abruzzo and Sardinia and 45 in Basilicata, Molise, Apulia and Sicily.

15    There are two types of TWEC:

— the first type concerns jobs requiring a high level of training. The contract has a maximum duration of 24 months and must provide for at least 80 to 130 hours of training to be given at the workplace for the full period of the contract;

— the second type must last no more than 12 months and include 20 hours of training.

16    The main feature of the TWEC is that it provides the employee with a training programme conferring a specific qualification.

17    If people are employed under a TWEC, social security contributions are reduced throughout the period of the contract. The reductions are as follows:

— a reduction of 25% of the contributions normally due, for firms located in areas other than the Mezzogiorno;

I - 2326

— a reduction of 40% of those contributions for firms in the commercial and tourism sector, with fewer than 15 employees, established in areas other than the Mezzogiorno;

— total exemption from those contributions for craft firms and firms in areas where the level of unemployment is above the national average.

18    In order to qualify for those reductions, the employer must not have reduced staff numbers in the previous 12 months, except where he is taking on employees with a different qualification. In addition, the employer must also have kept on, under an open-ended contract, at least 60% of employees whose TWEC expired in the previous 24 months.

19    For TWECs of the second type, which last one year, those reductions are also subject to the condition that the fixed-term contract is converted into an open-ended contract. The reductions apply only after conversion and for a period equal to the period covered by the TWEC.

20    Article 15 of Law No 196/97 of 24 June 1997 making provision for the promotion of employment (GURI No 154 of 1997; 'Law No 196/97') provides that firms in Objective 1 areas, which, on their expiry, convert TWECs of the first type (lasting two years) into open-ended contracts, are to enjoy exemption from social security contributions for a further year. Article 15 lays down a requirement that any aid received must be repaid if the employee is dismissed within 12 months of the end of the reference period for the aid.

The procedure culminating in the contested decision

21    On 7 May 1997 the Italian authorities notified the Commission, in accordance with Article 93(3) of the Treaty, of a draft law concerning State aid, which was subsequently approved by Parliament as Law No 196/97. The draft law was duly entered in the register of notified aid under number N 338/97.

22    On the basis of information provided by the Italian authorities, the Commission examined other related aid schemes, namely Laws Nos 863/84, 407/90, 169/91 and 451/94. Since those laws already applied, they were entered in the register of non-notified aid under NN 164/97.

23    By letter of 17 August 1998, published in the *Official Journal of the European Communities* (OJ 1998 C 384, p. 11), the Commission informed the Italian Government of its decision to initiate the procedure prescribed by Article 93(2) of the Treaty in respect of aid provided for by Laws Nos 863/84, 407/90, 169/91 and 451/94 to promote employment through fixed-term TWECs and granted since November 1995. In the same letter the Commission also informed the Italian Government of its decision to initiate the same procedure in respect of aid for converting TWECs into open-ended contracts under Article 15 of Law No 196/97.

24    The Italian Government set out its observations in a letter dated 4 November 1998 and, in response to a request from the Commission, provided further more specific information by letter dated 5 March 1999.

25     On conclusion of the examination procedure, the Commission adopted the contested decision. It duly notified the Italian Government thereof by note No SG(99) D/4068 of 4 June 1999.

**The contested decision**

26     The contested decision examines separately, first, the substance of Laws Nos 863/84, 407/90, 169/91 and 451/94, which were not notified, and, second, that of Law No 196/97, which was properly notified prior to enactment.

27     Article 1 of the contested decision provides as follows in relation to the aid schemes set up by the first four laws:

'1. The aid granted unlawfully by Italy since November 1995 for employment under the training and work experience contracts provided for in Laws Nos 863/84, 407/90, 169/91 and 451/94 is compatible with the common market and the EEA Agreement provided that it concerns:

—     the creation of jobs in the recipient firm for persons who have not yet found employment or have lost their previous employment within the meaning of the guidelines on aid to employment,

— the employment of workers experiencing particular difficulties in entering or re-entering the labour market. For the purposes of this Decision, "workers experiencing particular difficulties in entering or re-entering the labour market" shall mean young persons under the age of 25, [university graduates] up to the age of 29 and the long-term unemployed, i.e. out of employment for more than one year.

2. Aid for training and work experience contracts which does not satisfy the conditions set out in paragraph 1 is incompatible with the common market.'

28    As regards the aid scheme established by Law No 196/97, Article 2 of the contested decision provides as follows:

'1. The aid granted by Italy under Article 15 of Law No 196/97 for the conversion of training and work experience contracts into open-ended contracts is compatible with the common market and the EEA Agreement provided that it complies with the net job creation requirement as defined in the Community guidelines on aid to employment.

The workforce employed by a firm shall be calculated without taking account of jobs resulting from the conversion and jobs created through fixed-term contracts or not guaranteeing sufficiently stable employment.

I - 2330

2. Aid for the conversion of training and work experience contracts into open-ended contracts which does not satisfy the requirement laid down in paragraph 1 is incompatible with the common market.'

29    Article 3 of the contested decision provides:

'Italy shall take all necessary measures to recover from the recipients the aid which does not satisfy the conditions of Articles 1 and 2 and has already been unlawfully paid.

Repayment shall be made in accordance with the procedures of Italian law. The amounts to be repaid shall bear interest from the date on which the aid was paid until the date on which it is effectively recovered. The interest shall be calculated on the basis of the reference rate used to calculate the net grant equivalent of regional aid.'

30    At points 62 and 63 of the contested decision, the Commission concluded that TWECs, as regulated by Law No 863/84, did not constitute aid within the meaning of Article 87(1) EC but were a general measure. Law No 407/90, however, changed the nature of the provisions relating to TWECs, by varying the reductions by reference to the location of the recipient firm and the sector to which it belonged.

31    At points 64 to 66 of the contested decision it is stated as follows:

'(64)    Selective reductions which favour certain firms in a particular Member State, whether the selectivity operates at individual, regional or sectoral

level, constitute, for the differential part of the reduction, State aid within the meaning of Article 87(1) of the Treaty, i.e. aid which distorts competition and could affect trade between Member States.

This differential benefits firms which operate in particular areas of Italy as the aid was not granted to firms in other areas.

(65)    The aid distorts competition in so far as it strengthens the financial position and opportunities of the recipient firms with respect to competitors who do not receive the aid. Whenever this effect extends to intra-Community trade, the latter is impaired by the aid.

(66)    In particular, such aid distorts competition and affects trade between Member States where the recipient firms export some of their products to other Member States; equally, even where such firms do not export their goods, national production is favoured because firms established in other Member States have less chance of exporting their products to the Italian market...'

32    Having found that the measures at issue amounted to State aid for the purposes of Article 87(1) EC, the Commission then considered, at point 70 et seq. of the contested decision, whether they could be declared compatible with the common market under Article 87(2) or (3) EC.

33  In that regard, the Commission observed at point 71 of the contested decision that '[t]he guidelines on aid to employment... specify that the Commission is normally favourably disposed towards aid:

— for the unemployed,

and

— to create new jobs (net creation) in SMEs [small and medium-sized enterprises] and in regions eligible for regional aid,

or

— to encourage firms to take on certain groups of workers experiencing particular difficulties entering or re-entering the labour market, at national level; in this case there is no need for net job creation, provided that the post falls vacant following voluntary departure and not redundancy.'

34  At point 72 of the contested decision, the Commission stated that '[t]he guidelines also stipulate that the Commission must make sure that "the level of aid does not exceed that which is necessary to provide an incentive to create jobs" and that the job is a stable one'.

35    On the basis of its analysis, the Commission noted, at point 91 of the contested decision, that total aid did not exceed the amount that was needed to promote the creation of new jobs solely as regards the aid to encourage the use of TWECs for workers with particular difficulties in entering or re-entering the labour market, namely young people under 25, young graduates up to the age of 29 and the long-term unemployed (persons who have been unemployed for more than a year), or the aid intended to create new jobs.

36    At points 93 to 96 of the contested decision, the Commission examined aid to maintain employment and listed the conditions in which such aid could be authorised.

37    The Commission explained at points 97 and 98 of the contested decision that the measures concerning the conversion of TWECs into open-ended contracts fell within the scope of Article 87(1) EC and Article 62(1) of the Agreement on the European Economic Area of 2 May 1992 (OJ 1994 L 1, p. 3: 'the EEA Agreement').

38    As regards the question whether those measures were compatible with the common market, the Commission found at points 99 to 111 of the contested decision that only aid for the conversion of TWECs into open-ended contracts which complied with the obligation to increase the number of jobs in relation to existing jobs in the firm, calculated on the basis of an average over a period preceding the conversion, complied with the guidelines on aid to employment and hence qualified for the exemption prescribed for that type of aid.

39    The Commission also stated, at point 115 of the contested decision, that measures which complied with the *de minimis* rule did not fall within the scope of

Article 87 EC. It explained that, under that rule, the total amount of aid granted to firms employing persons on TWECs was not to exceed EUR 100 000 over a three-year period.

**The action**

40    The Italian Republic has brought an action for annulment of the contested decision and, in the alternative, for annulment of Article 3 thereof.

41    In support of its action, the Italian Government argues generally that the Commission had regard only to economic considerations when it adopted the contested decision and did not take account of the value of TWECs as an instrument for intervention in the labour market.

42    It also puts forward eight specific pleas in law in support of its action:

— abuse of power and inadequate statement of reasons as regards the definition of the category, 'young persons';

— infringement of Community law, misuse of powers and inadequate statement of reasons in relation to the determination of that part of the aid considered lawful;

— inadequate statement of reasons in relation to the determination of that part of the aid considered unlawful;

— infringement of Community law, misuse of powers and inadequate statement of reasons so far as the conversion of TWECs into open-ended contracts is concerned;

— infringement and misapplication of Article 87(3)(a) EC and inadequate statement of reasons;

— infringement of Article 87 EC or, in any event, inadequate statement of reasons as regards the effect of the aid deemed incompatible upon trade within the Community or on competition;

— misapplication of the *de minimis* rule;

— inadequate statement of reasons as regards the necessity for, or, at the least, the appropriateness of, recovering aid deemed incompatible.

43    The Commission contends that the action should be dismissed as unfounded.

ITALY v COMMISSION

**The pleas raised by the Italian Republic and the findings of the Court**

*Preliminary observations*

44    Since several of the pleas raised by the Italian Government refer to a misuse of powers and an inadequate statement of reasons, it is appropriate to recall, *in limine*, certain rules of general application in that regard.

45    First, it must be observed that the Commission, for the purposes of applying Article 87(3) EC, enjoys a wide discretion, the exercise of which involves assessments of an economic and social nature which must be made within a Community context (see, *inter alia*, Case C-303/88 *Italy* v *Commission* [1991] ECR I-1433, paragraph 34, and Case C-156/98 *Germany* v *Commission* [2000] ECR I-6857, paragraph 67).

46    Second, where the Commission enjoys substantial freedom of assessment, as it does when applying Article 87 EC, the Court, in reviewing whether that freedom was lawfully exercised, cannot substitute its own assessment for that of the competent authority but must restrict itself to examining whether that authority's assessment is vitiated by a manifest error or misuse of powers (see, in particular, Case C-169/95 *Spain* v *Commission* [1997] ECR I-135, paragraph 34, and Case C-288/96 *Germany* v *Commission* [2000] ECR I-8237, paragraph 26).

47    Third, concerning misuse of powers, it should be borne in mind that the Court has consistently held (see, *inter alia*, Case C-84/94 *United Kingdom* v *Council* [1996] ECR I-5755, paragraph 69, and Case C-48/96 P *Windpark Groothusen* v *Commission* [1998] ECR I-2873, paragraph 52) that there is a misuse of powers

I - 2337

where a Community institution adopts a measure with the exclusive or main purpose of achieving an end other than that stated or evading a procedure specifically prescribed by the Treaty for dealing with the circumstances of the case.

48    Fourth, concerning the question whether the Commission failed to comply with its obligation to state reasons, it must be made clear that that obligation is an essential procedural requirement, as distinct from the question whether the reasons given are correct, which goes to the substantive legality of the contested measure. The statement of reasons required by Article 253 EC must be appropriate to the act at issue and must disclose in a clear and unequivocal fashion the reasoning followed by the institution which adopted the measure in question in such a way as to enable the persons concerned to ascertain the reasons for the measure and to enable the competent court to exercise its power of review. That requirement must be appraised by reference to the circumstances of each case, in particular the content of the measure in question, the nature of the reasons given and the interest which the addressees of the measure, or other parties to whom it is of direct and individual concern, may have in obtaining explanations. It is not necessary for the reasoning to go into all the relevant facts and points of law, since the question whether the statement of reasons meets the requirements of Article 253 EC must be assessed with regard not only to its wording but also to its context and to all the legal rules governing the matter in question (see, in particular, Case C-17/99 *France* v *Commission* [2001] ECR I-2481, paragraphs 35 and 36).

*The general plea: failure to take account of the value of TWECs as an instrument of intervention in the labour market*

49    The Italian Government argues, *in limine*, that the Commission was not entitled to assess the measure at issue solely in the abstract from a purely economic perspective. It should also have assessed it from the point of view of employment policy, looking at it as an instrument enabling effective action to be taken in the

areas of training and job promotion simultaneously, for the benefit of young persons experiencing particular difficulties on the labour market.

50    It should be observed in that regard that the social character of State intervention is not sufficient to exclude it outright from being categorised as aid for the purposes of Article 87 EC.

51    According to settled case-law, the concept of aid encompasses advantages granted by public authorities which, in various forms, mitigate the charges which are normally included in the budget of an undertaking. A partial reduction of social security contributions devolving upon undertakings of a particular industrial sector constitutes aid within the meaning of Article 87(1) EC if that measure is intended partially to exempt those undertakings from the financial charges arising from the normal application of the general social security system, without there being any justification for that exemption on the basis of the nature or general scheme of that system (see, in particular, Case C-251/97 *France* v *Commission* [1999] ECR I-6639, paragraphs 35 to 37).

52    The conditions with which aid must comply in order to be compatible with the common market are spelled out in the exceptions laid down in Article 87(2) and (3) EC. In that connection, it should be borne in mind that the Commission may adopt a policy as to how it will exercise its discretion in the form of measures such as guidelines, in so far as those measures contain rules indicating the approach which the institution is to take and do not depart from the rules of the Treaty (see, in particular, Case C-288/96 *Germany* v *Commission* [2000] ECR I-8237, paragraph 62; see also, to that effect, Case C-313/90 *CIRFS and Others* v *Commission* [1993] ECR I-1125, paragraphs 34 and 36, and *France* v *Commission*, cited above, paragraph 45). It follows that, although those rules, setting out the approach which the Commission proposes to follow, certainly help to ensure that it acts in a manner which is transparent, foreseeable and consistent with legal certainty, they cannot bind the Court. However, they may form a useful point of reference (see, to that effect, Case C-387/97 *Commission* v *Greece* [2000] ECR I-5047, paragraphs 87 and 89).

53    The Italian Government has neither contested nor questioned the compatibility of the guidelines on aid to employment with Article 87 EC.

54    Those guidelines set out the instruments which, in the Commission's submission, are particularly effective for promoting employment at the level of Member State policy. There is nothing to suggest that the Commission's assessment in this regard is vitiated by manifest error or misuse of powers.

55    Therefore, the general plea cannot be upheld.

*The first specific plea: abuse of power and inadequate statement of reasons as regards the definition of the category, 'young persons'*

56    The Italian Government argues that the definition of 'young persons' in the contested decision is *ultra vires* and is vitiated by defective reasoning inasmuch as it is illogical. Although the decision reproduces the Italian authorities' statistical information and observations, which confirm that, given the specific features of youth unemployment in Italy and the Mezzogiorno in particular, youth unemployment affects persons of up to 32 years of age, the Commission instead concluded that 'young persons' could include only persons under 25 or, in the case of graduates, under 29 years of age. In the Italian Government's submission, the Commission's categoric and sweeping affirmation of that criterion injects an element of inflexibility into the concept of 'young persons'. The guidelines on aid to employment do not set any limit. It is obvious that they were intentionally kept general precisely because the age-limit for that category varies by reference to the particular features of the various labour markets. It has been established that in Italy and more particularly in southern Italy, for various, specifically social and economic, reasons there is no doubt that the upper age-limit for the category of young persons is higher than the ceiling of 25 set by the Commission.

57    In that connection, as noted in paragraph 45 above, the Court has pointed out in a line of decisions that the Commission's assessments of an economic and social nature must be made within a Community context.

58    It follows that the criteria for the exceptions to the incompatibility defined by Article 87(1) EC must be formulated, interpreted and applied in as uniform a way as possible in order to maintain consistency and ensure equality of treatment as regards State aid.

59    The guidelines on aid to employment mention the category 'young persons' but do not define it with any precision. The Commission was entitled to interpret that term when exercising its discretion. It used an interpretation of universal application, drawing, in doing so, on findings made in youth schemes at both Community and Member State level and on documents of the International Labour Office, in particular the report drawn up by the Office for the Conference of Ministers responsible for youth, which took place in Lisbon (Portugal) between 8 and 12 August 1998. There is, therefore, nothing to suggest that the Commission acted *ultra vires* or misused its powers.

60    So far as the duty to state reasons is concerned, the Advocate General has pointed out in paragraphs 23 and 24 of his Opinion that, in the contested decision, the Commission set out very thoroughly the criteria which it employed in fixing the age-limit for the category of 'young persons' at 25 or, in the case of university graduates, at 29 years of age. The contested decision is not therefore vitiated in this respect by an inadequate statement of reasons.

61    Consequently, the first specific plea must be rejected.

*The second and third specific pleas: infringement of Community law and misuse of powers in relation to the determination of that part of the aid regarded as lawful and inadequate statement of reasons in relation to the determination of that part of the aid regarded as lawful and the part thereof regarded as unlawful*

62    It is appropriate to consider the second and third specific pleas together.

63    By its second specific plea, the Italian Government claims that the contested decision (i) is based on assertions presented as self-evident and, as a result, infringes Community law, (ii) constitutes a misuse of powers and (iii) fails adequately to state reasons when it defines that part of the aid found to be lawful, stating at point 91 that 'solely as regards the aid to encourage the use of training and work experience contracts for workers with particular difficulties in entering or re-entering the labour market, i.e. young people under 25, young graduates up to the age of 29 and the long-term unemployed (out of work for more than a year) or the aid intended to create new jobs, total aid does not exceed the amount needed to promote the creation of new jobs...'.

64    By its third specific plea, the Italian Government argues that the Commission's approach was inconsistent and open to criticism inasmuch as it did not draw on clear criteria in its assessment of the ways in which employment was promoted and maintained. The Commission refused, save in some restrictively defined cases, to classify TWECs as measures intended to create new jobs and, having reached that conclusion, found there to be incompatibility with the system for aid to employment. However, at point 86 of the contested decision, the Commission acknowledged that the condition to which the exemption from social security contributions was subject — namely retention in employment of at least 60% of workers whose TWECs expired in the preceding two years — '... is apparently intended as a further incentive to firms to maintain the jobs for longer'.

65    In that regard, it must be observed that the contested decision, to the extent to which it concerns the part of the aid held to be compatible, does not, as such, adversely affect the Italian Republic. However, since the part held to be compatible is merely a pendant to the part deemed incompatible, the second specific plea must be held admissible and it is appropriate to consider it together with the third specific plea.

66    The criteria employed by the Commission at point 91 of the contested decision in order to reach its conclusion are set out at point 71 thereof, which refers, for its part, to the guidelines on aid to employment.

67    It is the criteria contained in the guidelines that underpin the contested decision. In that regard, the Commission has neither infringed Community law nor misused its powers.

68    At points 71 to 90 of the contested decision, the Commission, relying on various factors, set out in detail the elements which enabled it to determine the part of the aid considered lawful. It must be held that its reasoning is entirely consistent with the Court's case-law (see, in that regard, the decision mentioned in paragraph 48 of this judgment).

69    The same is true of the statement of reasons relating to that part of the aid considered not permissible, which comprises, first, the considerations relating to the part of the aid considered lawful and, second, additional explanation set out at points 93 to 96 of the contested decision.

70    More specifically, point 86 of the contested decision does not inject any inconsistency into the statement of reasons. There, the Commission notes, as a

positive element, that one of the conditions for the scheme at issue is apparently intended as a further incentive to firms to maintain the jobs for longer. However, that does not imply that the scheme at issue has been categorised generally as intervention intended to create and maintain new jobs.

71    It follows that the second and third specific pleas must be rejected.

*The fourth specific plea: infringement of Community law, misuse of powers and inadequate statement of reasons as regards the conversion of TWECs into open-ended contracts*

72    The Italian Government also maintains that the contested decision infringes Community law, constitutes a misuse of powers and is inadequately reasoned when it states at point 103 in relation to the measures prescribed by Article 15 of Law No 196/97 that: '[t]he conversion of fixed-term training and work experience contracts into open-ended contracts does not create new jobs as these jobs already exist; they are not, however, stable jobs'. In the Italian Government's submission, the scheme at issue creates a chain reaction: it seeks to ensure that workers are engaged under TWECs by providing an additional temporary incentive for the employment relationship to be continued in the form of an open-ended contract, which encourages firms to create new posts under TWECs and subsequently to convert them into open-ended contracts.

73    In that connection, it must be observed that the Commission added, at points 104 to 109 of the contested decision, that it takes a favourable view of aid to convert fixed-term jobs into open-ended ones, provided that it entails 'a net creation of

stable jobs which did not previously exist'. In this respect the Commission has neither infringed Community law nor misused its powers.

74    Nor has there been a failure to state reasons. At points 97 to 110 of the contested decision, the Commission set out in detail the reasons underlying its approach in the decision as regards aid for the conversion of TWECs into open-ended contracts.

75    It follows that the fourth specific plea must also be rejected.

*The fifth specific plea: infringement and misapplication of Article 87(3)(a) EC and inadequate statement of reasons*

76    The Italian Government submits that, in the context of aid to maintain jobs, the Commission failed to examine in any detail whether the aid at issue was capable, under Article 87(3)(a) EC, of being regarded as compatible with the common market, in so far as it promoted the economic development of areas where the standard of living was abnormally low or where there was serious under-employment. The Commission confined itself, at point 96 of the contested decision, to making general statements on that issue. However, it cannot simply state that the beneficial effects of the measure extended to the country as a whole and were not confined to the areas liable to benefit from the exception in the relevant provision of the Treaty, for example, the Mezzogiorno. The Commission should have analysed the specific aid measure in order to assess whether it was compatible with the common market and should not have automatically declared it incompatible as 'aid to maintain employment'.

I - 2345

77    In that regard, it must be borne in mind that, according to the case-law of the Court, the use of the terms 'abnormally' and 'serious' in the exception laid down in Article 87(3)(a) EC shows that it concerns only areas where the economic situation is extremely unfavourable in relation to the Community as a whole (Case 248/84 *Germany* v *Commission* [1987] ECR 4013, paragraph 19).

78    In the light of that case-law, the Commission's assessment at points 95 and 96 of the contested decision, which is also consistent with point 22 of the guidelines on aid to employment and points 3.5 and 4.17 of the guidelines on national regional aid, is not contrary to the letter or spirit of Article 87(3)(a) EC and thus does not err in law. The Commission was right in finding that aid to maintain employment, which is comparable to operating aid, is as a general rule prohibited and may be authorised only in exceptional cases for regions fulfilling certain requirements. It was also right to point out that such aid must be progressively reduced and limited in time.

79    In the present case, as the Advocate General has pointed out in paragraph 45 of his Opinion, it is clear that the aid provided for by Italian legislation is not confined to areas which may benefit from the aforesaid exception. Furthermore, that aid was neither degressive nor limited in time. As a result, the aid granted in areas that may benefit from regional aid is also unlawful.

80    Nor is the statement of reasons for the contested decision inadequate. In accordance with the case-law of the Court cited in paragraph 48 above, whether the obligation to state reasons has been complied with must be assessed with regard not only to the wording of the contested measure but also to its context and to all the legal rules governing the matter in question. In the present case, the Commission adequately spelled out — in its reasoning at points 93 to 96 of the

contested decision — the considerations on which it based itself in determining whether the aid to maintain employment provided for by Italian legislation was compatible with the common market.

81    It follows that the fifth specific plea must also be rejected.

*The sixth specific plea: infringement of Article 87 EC or, in any event, inadequate statement of reasons as regards the effect of the aid held to be incompatible on trade within the Community and on competition*

82    The Italian Government submits that the contested decision infringed Article 87 EC and that, in any event, it is inadequately reasoned, in so far as it does not take into account the effect of the aid held to be incompatible on trade within the Community and on competition.

83    In its submission, since the sole aim of the aid scheme at issue is to promote employment and thereby help to solve a very serious problem, which is central to the concerns of the Community and all the Member States, at least a few words of the contested decision should have been devoted to explaining the specific reasons underlying the Commission's findings concerning the actual effect of the scheme on Community trade and its potential effect on competition.

84    In that regard, it is clear from the case-law of the Court that when aid granted by the State strengthens the position of an undertaking *vis-à-vis* other undertakings competing in intra-Community trade the latter must be regarded as affected by that aid. For that purpose, it is not necessary for the recipient undertaking itself to

export its products. Where a Member State grants aid to an undertaking, domestic production may for that reason be maintained or increased with the result that undertakings established in other Member States have less chance of exporting their products to the market in that Member State (Joined Cases C-278/92, C-279/92 and C-280/92 *Spain* v *Commission* [1994] ECR I-4103, paragraph 40).

85    Similarly, where a Member State grants aid to undertakings operating in the service and distribution industries, it is not necessary for the recipient undertakings themselves to carry on their business outside the Member State for the aid to have an effect on Community trade, especially in the case of undertakings established close to the frontier between two Member States.

86    The relatively small amount of aid, or the relatively small size of the undertaking which receives it, does not as such exclude the possibility that intra-Community trade might be affected (*Spain* v *Commission*, cited above, paragraph 42).

87    Therefore, the contested decision does not infringe Article 87 EC.

88    So far as the obligation to state reasons is concerned, the Commission explained in general terms at point 65 of the contested decision that the aid distorted competition and that in so far as that effect extended to intra-Community trade, the latter was affected by the aid. At point 66, the Commission illustrated that proposition, taking as an example production industries. At point 97, dealing with the conversion of TWECs into open-ended contracts, the Commission referred to that analysis and explained why it was even more relevant to the measures prescribed for such conversion.

89    The Commission was not required to go into any more detail in that regard. In the case of an aid programme, the Commission may confine itself to examining the characteristics of the programme in question in order to determine, in the grounds of its decision, whether, by reason of the terms of the programme, it gives an appreciable advantage to recipients in relation to their competitors and is likely to benefit in particular undertakings engaged in trade between Member States (see, *inter alia*, *Germany* v *Commission*, cited above, paragraph 18).

90    In the present case, the Italian laws on TWECs amount to an aid programme. The contested decision contains the requisite analysis of the programme and its effects.

91    There was no need for the contested decision to include an analysis of the aid granted in individual cases on the basis of the scheme. It is only at the stage of recovery of the aid that it is necessary to look at the individual situation of each undertaking concerned.

92    It follows that the sixth specific plea must also be rejected.

*The seventh specific plea: misapplication of the* 'de minimis' *rule*

93    The Italian Government submits that, since the scheme concerned has been deemed only partially incompatible with the common market and the EEA Agreement, the Commission was not entitled to take into account, for the

purposes of applying the *de minimis* rule, all the measures taken in favour of firms which engaged workers under TWECs. The limit of EUR 100 000 by firm over a three-year period should, on the contrary, have been imposed only in respect of the part of the reductions held to be incompatible.

94    In that regard, it should be borne in mind that the *de minimis* rule is intended to reduce the administrative burden on both the Member States and the Commission, which must be able to concentrate its resources on cases that are genuinely important at Community level. If, for the purposes of applying the *de minimis* rule, it were necessary to assess on each occasion whether the aid was compatible, the burden on the Member States, which must notify aid programmes, and on the Commission, which must examine them, would in no way be reduced.

95    Therefore, for the purposes of applying the *de minimis* rule, the Commission was right not to draw any distinction between that part of the relevant aid scheme deemed compatible and the part deemed incompatible.

96    It follows that the seventh specific plea must also be rejected.

*The eighth plea: inadequate statement of reasons as regards the necessity for, or at least the appropriateness of, effecting recovery of the aid held incompatible*

97    In the alternative, the Italian Government claims that in the present case, all the conditions for non-repayment of the sums which firms have received under the

scheme in question in the form of reductions in social security contributions are satisfied. First, the scheme introduced and regulated a mechanism of employment law of general application and not a mechanism of intervention for economic and sectorial reasons. From the viewpoint of the principle of protection of the legitimate expectations of economic operators, it is to be observed, secondly, that the Community guidelines on employment aid have not always been marked by a concern for clarity. Third, the scheme at issue has been in force under Italian law for a long time and, as a consequence, has produced effects which have become consolidated over time and the elimination of which appears to be extremely complicated and hard to verify, despite the temporal restriction imposed by the Commission precisely on account of the aspects related to the particular circumstances of each of the recipient undertakings. Fourth, the scheme has always been very wide-reaching, inasmuch as it has concerned the whole fabric of national production industries, especially in southern Italy, which would now be the most affected by the requests for repayment.

98    In that regard, it must be borne in mind that the abolition, by means of recovery, of State aid which has been unlawfully granted is the logical consequence of a finding that it is unlawful (Case C-142/87 *Belgium* v *Commission* ('*Tubemeuse*') [1990] ECR I-959, paragraph 66) and that the aim of obliging the State concerned to abolish aid found by the Commission to be incompatible with the common market is to restore the previous situation (Case C-350/93 *Commission* v *Italy* [1995] ECR I-699, paragraph 21, and Case C-75/97 *Belgium* v *Commission* [1999] ECR I-3671, paragraph 64).

99    By repaying the aid, the recipient forfeits the advantage which it had enjoyed over its competitors on the market, and the situation prior to payment of the aid is restored (*Commission* v *Italy*, cited above, paragraph 22). It also follows from that function of repayment of aid that, as a general rule, the Commission will not, save in exceptional circumstances, exceed the bounds of its discretion, recognised

by the case-law of the Court, if it asks the Member State to recover the sums granted by way of unlawful aid, since it is only restoring the previous situation (*Belgium* v *Commission*, cited above, paragraph 66).

100    In the present case, there is nothing to suggest that there are exceptional circumstances justifying a different result.

101    As regards the argument that the scheme at issue introduced and regulated a mechanism of employment law, it is appropriate to refer to the case-law of the Court, already mentioned at paragraph 51 of this judgment. Just as the social character of State intervention is not sufficient to exclude it outright from being categorised as aid, so the argument that what is concerned is a 'mechanism of employment law' does not amount to an exceptional case in which there might be grounds for excluding repayment.

102    As to the principle of legitimate expectations, it must be borne in mind that, by a communication published in the *Official Journal of the European Communities* (OJ 1983 C 318, p. 3), the Commission informed potential recipients of State aid of the risk attaching to any aid granted to them unlawfully, in that they might have to refund the aid (Case C-5/89 *Commission* v *Germany* [1990] ECR I-3437, paragraph 15).

103    It is true that a recipient of unlawfully granted aid is not precluded from relying on exceptional circumstances on the basis of which it had legitimately assumed

the aid to be lawful and thus declining to refund that aid. If such a case is brought before a national court, it is for that court to assess the material circumstances, if necessary after obtaining a preliminary ruling on interpretation from the Court of Justice (*Commission* v *Germany*, cited above, paragraph 16).

104   However, a Member State whose authorities have granted aid contrary to the procedural rules laid down in Article 88 EC may not plead the legitimate expectations of recipients in order to justify a failure to comply with the obligation to take the steps necessary to implement a Commission decision instructing it to recover the aid. If it could do so, Articles 87 and 88 EC would be deprived of all practical force, since national authorities would thus be able to rely on their own unlawful conduct in order to render decisions taken by the Commission under those provisions of the Treaty ineffectual (*Commission* v *Germany*, cited above, paragraph 17).

105   As to the argument that repayment would be complicated and hard to verify and the argument concerning the wide reach of the aid scheme across the fabric of national production industry, it is sufficient to point out, in accordance with the case-law of the Court, that apprehension of even insuperable internal difficulties cannot justify a failure by a Member State to fulfil its obligations under Community law (see, in particular, Case C-404/97 *Commission* v *Portugal* [2000] ECR I-4897, paragraph 52). In this case, since the Italian Government has made no attempt to recover the aid in question, implementation of the decision to effect recovery cannot be shown to be impossible (Case C-6/97 *Italy* v *Commission* [1999] ECR I-2981, paragraph 34).

106   So far as the obligation to state reasons is concerned, it is clear from the case-law of the Court that, in the matter of State aid, where, contrary to the provisions of

Article 88(3) EC, the proposed aid has already been granted, the Commission, which has the power to require the national authorities to order its repayment, is not obliged to provide specific reasons in order to justify the exercise of that power (see *Spain* v *Commission*, cited above, paragraph 78, and *Belgium* v *Commission*, cited above, paragraph 82). However, at paragaphs 120 and 121 of the contested decision, the Commission explained why it was requiring repayment. Therefore it must be found that the contested decision is not vitiated in that regard by an inadequate statement of reasons.

107    It follows that the eighth specific plea must also be rejected.

108    In view of all the foregoing considerations, the application must be dismissed.

Costs

109    Under Article 69(2) of the Rules of Procedure, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. Since the Commission has applied for costs and the Italian Republic has been unsuccessful, the latter must be ordered to pay the costs.

ITALY v COMMISSION

On those grounds,

THE COURT (Sixth Chamber)

hereby:

1.  **Dismisses the application;**

2.  **Orders the Italian Republic to pay the costs.**

Colneric          Gulmann          Schintgen

Skouris          Cunha Rodrigues

Delivered in open court in Luxembourg on 7 March 2002.

R. Grass                                                      F. Macken

Registrar                                            President of the Sixth Chamber