# EXHIBIT 30

## OPINION 1/00 OF THE COURT
### 18 April 2002

(Opinion pursuant to Article 300(6) EC — Proposed agreement between the European Community and non-Member States on the establishment of a European Common Aviation Area)

The Court of Justice has received a request for an opinion, lodged at the Court Registry on 13 October 2000 by the Commission of the European Communities pursuant to Article 300(6) EC, which provides:

'The Council, the Commission or a Member State may obtain the opinion of the Court of Justice as to whether an agreement envisaged is compatible with the provisions of this Treaty. Where the opinion of the Court of Justice is adverse, the agreement may enter into force only in accordance with Article 48 of the Treaty on European Union.'

## I — Background to the request for an opinion

The Commission is seeking the opinion of the Court on the compatibility with the provisions of the EC Treaty of a proposed agreement on the establishment of a European Common Aviation Area (the 'ECAA Agreement') to be concluded between the Republic of Bulgaria, the Czech Republic, the Republic of Estonia, the European Community, the Republic of Hungary, the Republic of Iceland, the Republic of Latvia, the Republic of Lithuania, the Kingdom of Norway, the Republic of Poland, Romania, the Slovak Republic and the Republic of Slovenia ('the Contracting Parties'), and particularly of the system of legal supervision provided for therein.

At its meeting on 3 October 1996, the Council authorised the Commission to enter into negotiations with a view to concluding one or more agreements for access to the air transport markets between the Republic of Bulgaria, the Republic of Estonia, the Republic of Hungary, the Republic of Latvia, the Republic of Lithuania, the Republic of Poland, Romania, the Slovak Republic, the Republic of Slovenia, the Czech Republic ('the Associated States') and the Community. It had been made clear at that time that any opening of the Community air transport market should be undertaken in parallel with alignment of the legislation of the Associated States with the *acquis communautaire* in the aviation sector, with liberalisation and harmonisation moving forward together.

ing a multilateral meeting in June 1999, which was also attended by the Kingdom of Norway and the Republic of Iceland, and bilateral meetings held in the second half of 1999. Those two States and the Associated States (together 'the States Parties') expressed their general support for the proposed agreement.

On 6 April 2000 that version of the proposed agreement was sent to the States Parties. According to the Commission, only technical issues relating to the draft bilateral protocols concerning the Republic of Poland and the Republic of Hungary remain outstanding.

A version of the ECAA Agreement ('the proposed agreement' or 'the proposed ECAA Agreement') was produced following a

The request for an opinion concerns that version of the proposed agreement.

## II — Procedure

In accordance with Article 107(1) of the Rules of Procedure of the Court of Justice, the request for an opinion lodged by the Commission, represented by F. Benyon and M.-J. Jonczy, acting as Agents, was served on the Council, the European Parliament and the Member States.

Written observations were submitted by:

— the Danish Government, represented by J. Molde, acting as Agent,

— the Greek Government, represented by A. Samoni-Rantou, S. Chala and G. Karipsiadis, acting as Agents,

— the European Parliament, represented by R. Passos and A. Caiola, acting as Agents,

— the Spanish Government, represented by R. Silva de Lapuerta, acting as Agent,

— the Council of the European Union, represented by J.-P. Jacqué and R. Gosalbo Bono, acting as Agents.

— the Italian Government, represented by U. Leanza, acting as Agent, and L. Daniele, avvocato,

— the United Kingdom Government, represented by J.E. Collins, acting as Agent, and D. Wyatt QC,

The Advocates General were heard by the Court in closed session, as provided for in Article 108(2) of the Rules of Procedure, on 23 November 2001.

## III — Analysis of the proposed ECAA Agreement

The aim of the ECAA Agreement is to make access to the air transport markets of the Contracting Parties subject to a single set of rules based on the relevant legislation in force in the Community and relating to free market access, freedom of establishment, equal conditions of competition, safety and the environment.

OPINION PURSUANT TO ARTICLE 300(6) EC

Article 1(1) of the proposed ECAA Agreement provides that the rules applicable as between the Contracting Parties are to include the provisions of Community legislation specified in Annex I to the proposed agreement.

Articles 6 to 9 of the proposed agreement concern the right of establishment. Article 6 prohibits any restriction on the freedom of establishment of nationals of Member States or States Parties. Article 7 provides for companies or firms to be treated in the same way as nationals. Article 8 provides for exceptions to Articles 6 and 7. Article 9 prohibits quantitative restrictions on transfers of equipment and materials needed for the provision of air transport services.

Article 10 of the proposed agreement enables the Contracting Parties to take action, by suspending or varying an operating authorisation, in case of doubt as to an airline's operating safety.

As regards the competition rules, Article 12 of the proposed agreement prohibits agreements between undertakings, decisions by associations of undertakings and concerted practices which adversely affect competition, whilst Article 13 prohibits any abuse of a dominant position. Article 14 concerns merger operations and Article 15 deals with public undertakings or undertakings

to which special or exclusive rights have been granted and undertakings entrusted with the operation of services of general economic interest or having the character of a revenue-producing monopoly. Article 16 provides that State aid is incompatible with the ECAA Agreement, subject to certain exceptions.

Articles 17 to 22 of the proposed agreement deal with its enforcement.

Article 17 requires the Contracting Parties to ensure that rights derived from the ECAA Agreement, including the legislative provisions referred to in Annex I thereto, may be invoked before the national courts. It provides that '[i]n cases which may affect actual or potential air services to be authorised under this Agreement, the Community institutions shall enjoy the powers specifically granted to them under the provisions of the acts referred to or contained in Annex I to this Agreement'.

Article 17 also confers exclusive jurisdiction on the Court to review the legality of decisions taken by Community institutions under the ECAA Agreement.

Articles 19 to 22 make the competent Community authorities responsible for

enforcing Articles 12 and 13 of the agreement where trade with the Community is affected and for the controls provided for in Articles 14 to 16.

Article 23 sets out the rules of interpretation. For the purposes of this Opinion, it should be cited in full:

'1. In so far as the provisions of this Agreement and the provisions of the acts specified in Annex I are identical in substance to corresponding rules of the EC Treaty and to acts adopted in application of the EC Treaty, those provisions shall, in their implementation and application, be interpreted in conformity with the relevant rulings and decisions of the Court of Justice and the Commission of the European Communities given prior to the date of signature of this Agreement. The rulings and decisions given after the date of signature of this Agreement shall be communicated to the other Contracting Parties. At the request of one of the Contracting Parties, the implications of such later rulings and decisions shall be determined by the Joint Committee in view of ensuring [*sic*] the proper functioning of this Agreement. Existing interpretations shall be communicated prior to the date of signature of the Agreement to the State Parties to this Agreement. Decisions taken by the Joint Committee under this procedure shall be in conformity with the case-

law of the Court of Justice of the European Communities.

2. When a question of interpretation of this Agreement, the provisions of the acts specified in Annex I or of acts adopted in pursuance thereof identical in substance to corresponding rules of the EC Treaty and to acts adopted in application of that Treaty, arises in a case pending before a court or tribunal of a State Party, the court or tribunal asks, if it considers this necessary to enable it to give a judgment and in accordance with Protocol IV, the Court of Justice of the European Communities to decide on the question. A State Party may, by decision and in accordance with Protocol IV, stipulate as to what extent and according to what modalities its courts and tribunals shall apply this provision. Such a decision shall be notified to the depositary and the Court of Justice of the European Communities. The depositary shall inform the other Contracting Parties.

3. Where, in accordance with the provisions of the paragraph above, a court of a Contracting Party against whose decisions there is no judicial remedy under national law is not able to make a reference to the Court of Justice of the European Communities, any judgment of such court shall be transmitted by such a Contracting Party to the Joint Committee which shall act so as to preserve the homogeneous interpre-

OPINION PURSUANT TO ARTICLE 300(6) EC

tation of this Agreement. If the Joint Committee, within two months after a difference between the case-law of the Court of Justice of the European Communities and a judgment of a court of such a Contracting Party has been brought before it, has not succeeded to preserve [sic] the homogeneous interpretation of the Agreement, the procedures laid down in Article 27 may be applied.'

Dispute resolution is dealt with in Article 27 of the proposed agreement, which provides:

'1. A Contracting Party may bring a matter under dispute which concerns the application of this Agreement before the Joint Committee, except where specific procedures are set out in this Agreement and in particular in Articles 17(2) and (3), 19, 20, 22(1) to (4), 23(2) and (3).

Article 24 of the proposed agreement specifies that the agreement 'shall be without prejudice to the right of each Contracting Party, subject to compliance with the principle of non-discrimination... unilaterally to amend its legislation on a point regulated by this Agreement'. It provides that the Joint Committee is to be informed if a Contracting Party makes such an amendment.

2. When a dispute has been brought before the Joint Committee under paragraph 1, immediate consultations shall be held between the parties to the dispute. In cases where the Community is not a party to the dispute, a Community representative may be invited in [sic] the consultations by one of those parties. The parties to the dispute may draw up a proposed solution which shall immediately be submitted to the Joint Committee. Decisions taken by the Joint Committee under this procedure shall not affect the case-law of the Court of Justice of the European Communities.

The operation of the Joint Committee is governed by Articles 25 and 26 of the proposed agreement. The Joint Committee consists of representatives of the Contracting Parties, the Community having as many representatives as the number of its Member States. As a general rule, its decisions must be unanimous. They are binding on the Contracting Parties.

3. If the Joint Committee after three months from the date when the matter has been brought before it has not succeeded to take [sic] a decision resolving the dispute, the parties to the dispute may refer the dispute to the Court of Justice of the European Com-

I - 3503

OPINION 1/00 OF 18. 4. 2002

munities whose decision thereon shall be final and binding. The modalities according to which such referrals may be made to the Court of Justice of the European Communities are set out in Protocol IV.

ship of the ECAA Agreement with bilateral air transport agreements and arrangements. Articles 37 to 42, the final clauses, provide *inter alia* that the ECAA Agreement is to enter into force on the first day of the sixth month following the date of deposit of the instruments of ratification or approval by the Community and three other signatories.

4. If the Joint Committee does not take a decision on an issue which has been referred to it within three months, the Contracting Parties may take appropriate safeguard measures in accordance with Articles 28 and 29 of this Agreement for a period not exceeding six months. After this period each Contracting Party may denounce the Agreement with immediate effect. A Contracting Party shall not take safeguard measures on a matter which has been referred to the Court of Justice of the European Communities in accordance with this Agreement, except in cases defined in Article 10(2), or in compliance with mechanisms provided for in individual acts specified in Annex I.'

Annex I to the proposed agreement specifies the rules applicable to civil aviation binding on the Contracting Parties and Annex II thereto lists the competition rules in the Europe Agreements entered into by the Community and each of the Associated States. Annexes III, IV and V list respectively the Contracting Parties' competent authorities for competition matters, their official gazettes and their competent authorities for air safety matters.

Articles 28 and 29 of the proposed agreement deal with safeguard measures, their scope and the procedure to be adopted in such cases with regard to the other Contracting Parties.

Protocol I to the proposed agreement deals with the 'horizontal adaptations' to be applied, for the purposes of the ECAA Agreement, to all the legislation referred to in Annex I thereto.

Article 30 concerns disclosure of information. Articles 31 to 34 relate to third countries and international organisations. Article 35 contains transitional arrangements and Article 36 governs the relation-

Protocol II deals with the implementation of the competition rules applicable to undertakings.

I - 3504

OPINION PURSUANT TO ARTICLE 300(6) EC

Protocol III deals with cooperation between the competition authorities for the enforcement of the competition rules applicable to undertakings.

Protocol IV deals with referrals to the Court. It provides in Part 1 that where the Court has jurisdiction by reason of Article 23(2) the procedures established for referrals for preliminary rulings within the European Community are to apply and the States Parties are to have the same right to submit observations as the Member States. Part 2 of Protocol IV provides that States Parties may decide either (i) that courts or tribunals of last instance are to request the Court to give a preliminary ruling on questions of interpretation or validity where a decision on the question is necessary to enable them to give a judgment, or (ii) that any court or tribunal may refer such questions to the Court, or (iii) to combine the two options. Part 3 of this Protocol provides that referrals to the Court pursuant to Article 27 of the ECAA Agreement are to be treated in the same manner as disputes submitted to the Court under Article 239 EC. Part 4 of the Protocol governs the languages to be used in referrals to the Court.

Protocols V to XIV to the proposed agreement lay down the transitional arrangements applying to relations between the Community and each of the Associated States.

## IV — Summary of the written observations submitted by the Community institutions and the Governments of the Member States

The Commission describes the development of the Community rules in the air transport sector, culminating in the liberalisation epitomised by the 'third package' in the single air transport market. It mentions in particular Council Regulation (EEC) No 2407/92 of 23 July 1992 on licensing of air carriers (OJ 1992 L 240, p. 1), Council Regulation (EEC) No 2408/92 of 23 July 1992 on access for Community air carriers to intra-Community air routes (OJ 1992 L 240, p. 8) and Council Regulation (EEC) No 2409/92 of 23 July 1992 on fares and rates for air services (OJ 1992 L 240, p. 15), as well as a number of other measures. There has been standardisation at Community level of various other matters (in particular technical, safety and social matters). The relevant measures are referred to in Annex I

I - 3505

to the proposed agreement. In addition, the Treaty rules on competition and their implementing rules also form part of the *acquis communautaire* in the sector.

The Commission's request for an opinion goes on to analyse the provisions of the proposed agreement relating to the competition rules, uniform enforcement and interpretation of the ECAA Agreement and the resolution of disputes.

The Commission observes that the proposed agreement takes account of the 'Europe Agreements' entered into between the Communities, the Member States and each of the ten central and eastern European countries. Those bilateral agreements, which exclude air transport from the right of establishment and provide for the conclusion of separate agreements on access to air transport markets, do not contain any uniform implementing procedures which would have made it possible to create a multilateral European Common Aviation Area ('ECAA') on the existing bases.

The Commission observes that the Court has recognised that international agreements may be concluded by the Community in the field of competition law (Opinion 1/92, cited above, paragraph 40) and submits that the allocation of powers within the Community is not affected by the proposed agreement. The Commission's powers are simply extended to cover trade with States Parties.

The Commission states that it negotiated the proposed agreement on the basis of the principles set out in Opinion 1/92 ([1992] ECR I-2821) concerning a proposed agreement relating to the creation of the European Economic Area ('EEA') and the negotiating directives laid down by the Council. In view of both the intention of each of the Associated States to become a Member of the Community and the absence of any institutional links similar to those created for the purposes of the European Free Trade Association ('EFTA') it was not realistic, in the Commission's submission, to envisage a separate supervisory or jurisdictional structure to be set up on the lines of the 'twin pillars' of the EEA.

Thus, uniform application of the provisions of the ECAA Agreement and of the Community rules is ensured by a 'single pillar' structure, whereby responsibility for applying the rules of the agreement and its annexes is given to a single body, the Commission, whose powers with regard to application of the competition rules and the other rules concerning air transport will be of the same scope in relation to States Parties as they are in relation to Member States.

In addition, the Court has exclusive jurisdiction, under Article 17(3) of the proposed agreement, to review the legality of decisions taken by Community institutions under the ECAA Agreement. The Court has

OPINION PURSUANT TO ARTICLE 300(6) EC

accepted that an agreement may confer new powers on it, provided that those powers do not alter the nature of its function as conceived in the Treaty (Opinion 1/92, paragraph 32). Its function would not be altered by expanding the power of review, since the Court has already recognised that it is competent to hear and determine an application for the annulment of any measure adopted by an institution and intended to have legal effects, regardless of the provision on which it is based (Case C-316/91 *Parliament* v *Council* [1994] ECR I-625, paragraphs 8 and 9).

In areas in which the ECAA Agreement does not confer decision-making powers on the Community institutions, Article 23 of the proposed agreement is intended to ensure uniform interpretation of the relevant provisions of the agreement and the Community rules.

Article 23(1) of the proposed agreement preserves the autonomy of the Community legal order by requiring the ECAA Agreement to be interpreted in conformity with decisions of the Commission and rulings of the Court given prior to the date of signature of the agreement and by requiring the Joint Committee to determine the implications of decisions and rulings given after that date in conformity with the case-law of the Court.

Article 23(2) of the proposed agreement enables the courts of the States Parties to ask the Court 'to decide' questions in a procedure comparable to that provided for in Article 234 EC. That provision of the proposed agreement, which is consonant with the pre-accession approach adopted towards the Associated States, also takes account of paragraph 33 of Opinion 1/92, according to which interpretations given by the Court must be binding.

Under Protocol IV to the proposed agreement, the States Parties may make referral to the Court either mandatory or optional, but the Court found that there was no objection of principle to giving such a choice (Opinion 1/91 [1991] ECR I-6079, paragraph 60). Furthermore, Contracting Parties must notify the Joint Committee of all judgments of last instance by a court which has been precluded from making a reference to the Court and the Committee must then act in such a way as to ensure uniform interpretation of the ECAA Agreement.

Thus, the Commission considers that the 'single pillar' structure and the interpretative jurisdiction conferred on the Court reduce the risk of dispute as to implementation of the ECAA Agreement. However, in the event of disputes arising, Article 27 of the proposed agreement provides for their resolution in a manner consistent with paragraphs 23 and 24 of Opinion 1/92. Any decision taken by the Joint Committee in this context is in no way to affect the case-law of the Court. Furthermore, if the dispute is not resolved, the parties may appeal to the Court, whose decision is, in the words of the proposed agreement, final and binding.

I - 3507

The Commission submits consequently that the three roles conferred on the Court by the proposed agreement, namely review of legality, interpretation and dispute resolution, remove all scope for divergence or conflict between the case-law of the Court and the interpretation of the ECAA Agreement. However, to avoid any lack of legal certainty and in deference to the role of the Court, the Commission has lodged a request for an opinion as to the compatibility with the Treaty of the system of legal supervision provided for by the proposed agreement, in particular by Article 23(2) and (3) thereof.

The Danish Government submits that the system of supervision put forward in the proposed agreement does not give rise to problems of Community law. It nevertheless challenges the Commission's depiction of the degree of harmonisation achieved in the air transport sector, referring to the so-called 'Open skies' cases which are currently before the Court. It considers that complete harmonisation has not been achieved in this area and expresses the hope that, in its response to the request for an opinion, the Court will not prejudge the outcome of those cases.

The Greek Government expresses its approval of the arrangements as to jurisdiction set up by the proposed agreement but considers that some of the relevant provisions are too vague or are capable of masking conflict with the Treaty. Referring to Opinions 1/91 and 1/92, it argues that two criteria determine whether that aspect of the proposed agreement is compatible with the Treaty: the autonomy of the Community legal order must not be undermined and the nature of the Court's function, which is to take binding decisions, must not be altered.

The pivotal role in ensuring uniform application of the ECAA Agreement is held by the Joint Committee. Essentially, what needs to be considered therefore is whether the decisions of the Committee satisfy those two conditions.

So far as Article 23(1) of the proposed agreement is concerned, the autonomy of the Community legal order is safeguarded as regards potential decisions of the Joint Committee to determine the implications of later Court decisions, since the Committee is specifically required to act in conformity with the decisions of the Court. The only potential problem arises from the fact that under that provision the Joint Committee may act only on the request of one of the Contracting Parties, and that in such a case it is likely that the Committee will not be able to reach the agreement necessary for a decision. The proposed agreement makes no provision for such a case, apart from the general procedure for dispute resolution. A specific reference similar to that in Article 23(3) of the proposed agreement or in Article 105 of the Agreement of 2 May 1992 on the European Economic Area (OJ 1994 L 1, p. 3; 'the EEA Agreement') could be considered.

OPINION PURSUANT TO ARTICLE 300(6) EC

In relation to the procedure for preliminary rulings laid down by Article 23(2) and (3) of the proposed agreement, the Greek Government submits that the discretion given to States Parties as regards referrals to the Court by their national courts is comparable to the power conferred by Article 107 of the EEA Agreement, which the Court found to be consistent with the Treaty. By referring to Protocol IV to the proposed agreement, however, Article 23(2) imposes restrictions on the freedom of the State Party. Although that does not at first glance give rise to issues of compatibility, the choice provided for in Article 23(2) of, and Protocol IV to, the proposed agreement does not allow the States Parties to make it compulsory for their courts, or some of them, to make a reference since in all cases those courts are bound to refer to the Court only if they consider a decision by the latter to be necessary to enable them to give judgment. Thus, provision is made only for an optional reference. That does not give rise to incompatibility, since the answers of the Court are binding, but it might be appropriate to complete the list of options available to States Parties.

Furthermore, that mechanism would allow conflicting case-law to develop through national courts which had felt it unnecessary to refer a question to the Court. The obligation under Article 23(3) of the proposed agreement to send judgments to the Joint Committee applies only in the case of courts of final instance which are 'not able to make a reference to the Court', which clearly does not include courts which have decided not to exercise their option to make a reference to the Court. That case is not apt to be covered by other provisions and should be included in paragraph (3).

In addition, the Greek Government submits that the relationship between the procedure for references to the Joint Committee laid down in Article 23(3) and the procedure laid down in Article 27 lacks clarity, in particular as regards the point at which time starts to run for the purposes of the time-limit referred to in those two provisions.

It also considers that the principle that the Court's case-law must not be affected should, as a general provision, be stated in Article 27(1) of the proposed agreement, and not in the paragraphs of that article relating to procedural steps. The jurisdiction conferred on the Court for resolving disputes pursuant to Article 27(3) of the proposed agreement is consistent with Article 234 EC read in conjunction with Article 239 EC, even if the parties to the dispute are not members of the Community, since the decisions taken are binding.

The Spanish Government takes the view that Article 23(2) and (3) of the proposed agreement may be considered to be compatible with the Treaty.

I - 3509

The combined provisions of Article 23(2) of, and Protocol IV to, the proposed agreement set up a procedure for references for preliminary rulings which is by nature optional but which makes it obligatory for the national court to apply the case-law of the Court. However, there is a contradiction, which it would be appropriate to rectify, between Article 23(2) of, and Protocol IV to, the proposed agreement, since the former refers only to the possibility of referring questions of interpretation, whilst Protocol IV also mentions questions of validity.

clarity and could be improved in one respect. Article 23(3) of the proposed agreement does not specify that, in the case considered, the Joint Committee must act in conformity with the decisions of the Court. It is only in a case in which the Joint Committee fails to find a solution that Article 27 of the proposed agreement may be applied and only that provision provides that decisions of the Joint Committee are not to affect the case-law of the Court. In the interests of clarity, it should also be stated in Article 23(3) of the proposed agreement that, where a difference has been brought before the Joint Committee, the latter's decision must be consonant with the case-law of the Court.

The possibility of allowing the courts of States which are not members of the Community to refer questions to the Court has already been found to be compatible with the Treaty by the Court in Opinions 1/91 and 1/92, as has allowing the Contracting Parties to decide whether or not to permit their courts to make references to the Court. However, the Court's answers should be binding, something which is guaranteed in the present case by Part 1, paragraph 1, of Protocol IV.

The Italian Government challenges the Commission's claim that since the EEA Agreement served as a model for Articles 23 and 27 of the proposed agreement the latter must necessarily be compatible with the Treaty. It points out that the Court accepted the model used in the EEA Agreement only after some hesitation and in view of the particular circumstances, which differ from those of the proposed agreement.

As regards Article 23(3) of the proposed agreement, which concerns the case where there is discrepancy between a decision of a court of final instance of a State Party and the case-law of the Court and which must be read in conjunction with Article 27 of the proposed agreement, to which it refers, the Spanish Government considers that its wording can be regarded, as it stands, as compatible with the Treaty but that it lacks

The proposed agreement provides for a form of control of application of the ECAA Agreement which is exclusively political and not judicial. The Joint Committee's role is one of diplomacy: it is responsible for determining the implications of the Court's decisions, for ensuring uniform interpretation of the agreement and for resolving disputes. The exercise of those

OPINION PURSUANT TO ARTICLE 300(6) EC

powers is not subject to control of any sort and the relevant procedures are not adequately defined. Simply mentioning the Committee's obligation to act in conformity with the case-law of the Court has no more effect than a declaration.

The Court's powers of review are, by contrast, limited, with the exception of its power to review the legality of decisions of Community institutions taken under the ECAA Agreement. Only judgments given prior to the date of signature of the agreement are binding. Its jurisdiction in relation to preliminary rulings is wholly dependent on the will of the States Parties and, contrary to the Commission's assertion, the authority of judgments delivered by it in accordance with that procedure is not made clear. Although the Court's interpretation is binding on the referring court, it cannot be binding on the courts of States Parties who do not accept the jurisdiction of the Court to give preliminary rulings other than in the event of the Joint Committee having acted — unlike the case in which rulings are given pursuant to Article 234 EC.

In the Italian Government's submission, the control procedures are outmoded and alien to what is now well-established Community tradition.

It challenges three aspects of the proposed agreement in particular.

First, Article 23(1) of the proposed agreement is confined to providing that decisions of the Joint Committee determining the implications of rulings and decisions given after signature of the ECAA Agreement must be in conformity with the case-law of the Court. However, the Court expressed reservations as to the corresponding provisions of the EEA Agreement, in particular as to the distinction between existing and subsequent case-law (Opinion 1/91, paragraph 26) and compliance with certain essential elements of the case-law (Opinion 1/91, paragraph 28). Similarly, the Court overcame its reservations concerning the provisions of Article 105 of the EEA Agreement, which was introduced in the wake of Opinion 1/91 and which made a committee responsible for preserving the uniform interpretation of that agreement, only because of the inclusion of the 'procès-verbal agréé ad article 105', which makes it a requirement that decisions of the committee are not to affect the case-law of the Court (Opinion 1/92, paragraphs 22 to 25).

The circumstances in which the Joint Committee may take action, prescribed by Article 23(1) of the proposed agreement, are imprecise and ill-defined, since the Committee acts at the request of a Contracting Party, the use of the word 'implications' confers on it what amounts almost to a discretion as to whether to act, and the requirement of unanimity renders exercise of its powers difficult. However, the fact that the Committee may take preventive action amounts to an effective safeguard.

Second, Article 23(2) of the Italian version of the proposed agreement is curiously

I - 3511

worded as regards the binding nature of the Court's rulings when a question is referred. Opinion 1/91 held to be incompatible with the Treaty the fact that the Court could be asked to 'express itself' ('di pronunciarsi') on questions of interpretation; Opinion 1/92 recognised, however, the binding effect where the Court is asked 'to decide' ('decisione'). However, the Italian version of the proposed agreement employs, not the word 'decisione', but the expression 'di pronunciarsi'.

Lastly, the procedures laid down in Article 23(3) and Article 27 of the proposed agreement, which deal with the role of the Joint Committee, are very similar to those contained in Articles 105 and 111 of the EEA Agreement, which the Court found to be compatible with the Treaty in Opinion 1/92. However, it is not clear why Article 27(2) of the proposed agreement provides that decisions of the Committee 'shall not affect the case-law of the Court', whilst Article 23(1) of the proposed agreement imposes the stricter requirement that decisions are to be taken 'in conformity with the case-law of the Court'. The wording of the first expression safeguards only the autonomy of Community law. The second ensures that the decisions of the Court are authoritative, and should be employed in both cases.

The United Kingdom Government states that the system of judicial supervision and dispute resolution envisaged by the proposed agreement, including Article 23(2) and (3) thereof, appears to it to be com-

patible with the Treaty as interpreted by the Court in Opinions 1/91 and 1/92.

The Commission's role in implementing the rules on competition and other matters prescribed by the ECAA Agreement is consistent with the principle expounded by the Court in paragraphs 40 and 41 of Opinion 1/92, according to which an international agreement may confer powers on the Community and its institutions in the field of competition, provided that the powers so conferred do not change the nature of the powers laid down in the Treaty. The rules in the ECAA Agreement, which it would fall to the Commission to apply, are identical to those found in primary and secondary Community legislation.

Furthermore, judicial scrutiny of acts carried out by the Commission on that basis is reserved to the Court. The effect of that is not so much to confer on the Court powers that it already enjoys but rather to prevent any other judicial body of a Contracting Party from becoming involved in such scrutiny. The competent Community institutions are thus subject to the same degree of judicial scrutiny while implementing the rules of the ECAA Agreement as would be the case were they implementing the corresponding Community rules.

The fact that the decisions of the Commission and the rulings of the Court given prior to the date of signature of the ECAA Agreement are, under Article 23(1) of the

OPINION PURSUANT TO ARTICLE 300(6) EC

proposed agreement, automatically binding for the purposes of interpreting and applying the ECAA Agreement is a necessary, but not sufficient, requirement to ensure concordance between the two bodies of rules.

The fact that the Joint Committee must determine the implications of decisions and rulings given after the date of signature in conformity with the case-law of the Court, a stricter requirement than that arising under Article 105 of the EEA Agreement, will ensure concordance in the evolution of those two bodies of rules and is thus compatible with the Treaty.

No objection can be made in respect of the jurisdiction conferred by Article 23(2) of the proposed agreement on the Court to give a ruling on questions posed by the courts or tribunals of a State Party, since, first, it is clear that the ruling by which the Court 'decides on the question' in this respect is binding (see Opinion 1/92, paragraph 37) and, second, exception cannot be taken in principle to allowing States Parties to decide whether or not to permit their courts and tribunals to refer questions to the Court (Opinion 1/91, paragraph 60).

As regards the power conferred on the Joint Committee by Article 23(3) to act 'so as to preserve the homogeneous interpretation' of the ECAA Agreement where a judgment of a Contracting Party differs from the case-law of the Court, the United Kingdom

Government submits that, since the possibility that there may be conflicting decisions is not such as to render an agreement incompatible with the Treaty (Opinion 1/91, paragraph 60), the same is true, *a fortiori*, of provisions designed to rectify the consequences of such a possibility. Furthermore, if account is taken of Article 23(1) of the proposed agreement, the duty of the Joint Committee to act 'so as to preserve the homogeneous interpretation' of the ECAA Agreement can only be interpreted as requiring any action of the Committee to be in conformity with the case-law of the Court. Article 23(3) of the proposed agreement is thus compatible with the Treaty.

As regards dispute resolution, the provisions of Article 27 of the proposed agreement concerning the Joint Committee are comparable to those of Article 111 of the EEA Agreement which, according to the Court, 'do not call in question the binding nature of the Court's case-law or the autonomy of the Community legal order' (Opinion 1/92, paragraph 29). The provisions of Article 27 conferring jurisdiction on the Court are also compatible with the Treaty, as the Court has already recognised in respect of comparable provisions (Opinion 1/92, paragraphs 33 and 35).

The Parliament considers the system of legal supervision provided for by the proposed agreement to be compatible with the Treaty.

I - 3513

Under the proposed agreement, it is possible that national courts and tribunals of last instance will not be obliged to refer a question to the Court for a preliminary ruling, even where what is at issue is the validity of an act adopted on the basis of provisions identical in substance to Community rules. There is thus a theoretical risk of conflicting interpretations.

Court' (Article 27(2) of the proposed agreement), (iii) if a dispute is referred to the Court, its decision is final and binding (Article 27(3) of the proposed agreement) and (iv) the dispute resolution procedure may include the adoption of safeguard measures where the court or tribunal of a State Party upholds its divergent interpretation (Article 27(4) of the proposed agreement).

However, the purpose of this request for an opinion is merely to ascertain whether that scheme is compatible with the Treaty. For the purposes of that assessment, the essential criterion is whether the system 'may undermine the autonomy of the Community legal order in pursuing its own particular objectives' (Opinion 1/91, paragraph 30). The Court found, as regards the EEA Agreement, that the fact that there was no obligation on the part of certain courts and tribunals to make a reference to the Court did not pose a threat to the autonomy of the Community legal order.

The role of the Joint Committee of ensuring uniform interpretation of the ECAA Agreement is comparable to that of the committee set up by the EEA Agreement. The Parliament raised questions, in relation to the EEA Agreement, regarding the ability of an 'administrative body' to resolve in an appropriate fashion disputes stemming from differences in case-law. However, the Court accepted that conferring such a power on that committee was compatible with the Treaty, provided that the committee was obliged, by a provision binding on the Contracting Parties, not to disregard the binding nature of the decisions of the Court within the Community legal order.

The Court also stated that preliminary rulings were to be binding (Opinion 1/91, paragraph 61). The Parliament submits that the proposed agreement guarantees the binding nature of preliminary rulings, since (i) a preliminary ruling is described as a 'decision' (Article 23(2) of the proposed agreement) to be applied (Protocol IV to the proposed agreement), (ii) decisions taken by the Joint Committee, where cases of conflicting case-law are brought before it, 'shall not affect the case-law of the

The Parliament considers that the power conferred by the proposed agreement on the Joint Committee does not adversely affect either the binding nature of the decisions of the Court or the autonomy of the Community legal order, since (i) decisions taken by the Committee when interpreting the ECAA Agreement must be in conformity with the case-law of the Court (Article 23(1) of the proposed agreement), (ii) such decisions are binding upon

OPINION PURSUANT TO ARTICLE 300(6) EC

the Contracting Parties (Article 26(1) of the proposed agreement), (iii) decisions taken by the Committee under the dispute resolution procedure are not to affect the case-law of the Court (Article 27(2) of the proposed agreement), (iv) the Court's decisions are, under Article 27(3) of the proposed agreement, final and binding and (v) where it is not possible to resolve the dispute, denunciation of the ECAA Agreement is possible (Article 27(4) of the proposed agreement).

The Council believes that the request for an opinion is admissible as regards the two questions of substance raised, namely the general question concerning the compatibility of the proposed agreement with the requirements of the Community legal order and the specific question of the compatibility with the Treaty of the arrangements for supervision laid down by the proposed agreement. The proposed agreement contains, first, common rules, the aim of which is to create a common aviation area by integrating the air transport markets of all the Contracting Parties, including the Community, and, second, provisions intended to guarantee uniform implementation and interpretation of those rules.

It is necessary to examine what guarantees of true legal homogeneity in the ECAA are provided by the proposed agreement. The Council submits in that regard that, as was the case with the creation of the EEA, homogeneity of the rules of law in that area is not secured by the fact that the provisions of Community law in the matter of air transport and the corresponding provisions of the proposed agreement are identical as to their content or wording (Opinion

1/91, paragraph 22). In the Council's submission, Community law, the aim of which is integration, and the ECAA, the basis for which is cooperation, belong to different legal orders.

The question must therefore be asked whether the convergence mechanisms set up by the proposed agreement are capable of compensating for that structural difference in the light of Opinions 1/91 and 1/92. The mechanism for integrating new legislation of the Contracting Parties (Article 24 of the proposed agreement), the method of integration reproducing the distinction between regulations and directives (Article 2 of the proposed agreement) and the binding nature of Community acts (Article 2 of the proposed agreement), together with the fact that they may be relied on before national courts (Article 17 of the proposed agreement), are aimed at strengthening the homogeneity of the legislative rules using Article 249 EC as a model. However, those provisions are not sufficient to secure that homogeneity, which is also dependent on there being adequate judicial mechanisms for interpretation and enforcement.

The Court has recognised that an international agreement may provide for the establishment of a separate judicial system to which the Community submits. However, in the case of an agreement which, as in this instance, restates the fundamental provisions of the Community legal order and seeks to ensure uniform application of those provisions, the judicial mechanism must comply with Article 220 EC, which confers exclusive jurisdiction on the Court, in order to ensure that in the interpretation and application of the Treaty the law is observed.

I - 3515

OPINION 1/00 OF 18. 4. 2002

In that regard, the Council observes that the proposed agreement does not create a specific court or tribunal, that as regards rules of Community law predating signature of the agreement, it provides for a procedure for references to the Court which is different from the requirement in the third paragraph of Article 234 EC to bring matters before the Court, and that it makes the Joint Committee responsible for determining the implications of later rules of Community law.

Nor will the Joint Committee's role as dispute resolution body alter the nature of the function of the Court, since decisions taken by the Committee under Article 27(2) of the proposed agreement are not to affect the case-law of the Court, a decision of the Court, where a dispute which the Committee has not succeeded in resolving is referred to it, is final and binding and if the dispute is not referred to the Court, the Community may denounce the ECAA Agreement with immediate effect.

There can be no objection of principle to allowing States Parties to decide whether to make it optional for their courts to refer questions to the Court. As to observance of the binding nature of the Court's decisions and of the autonomy of the Community legal order, although Article 23 does not make it clear whether it refers to the Court's case-law in its entirety, it is adequate in the light of Article 1(3) of the proposed agreement, which safeguards the powers of the Community.

The Council examines the allocation of powers in the field of competition and the system of supervision in that area and takes the view that the proposed agreement does not alter the nature of the powers of the Community, since it reproduces the relevant Community provisions and extends them to the States Parties. However, the fact that the wording is the same is not enough to satisfy the requirements of the Court, since there must also be no alteration of the nature of the powers of the Community institutions in the field of competition.

Furthermore, the powers conferred on the Joint Committee cannot undermine the binding effect of the Court's decisions, since, first, any decision that it takes under Article 23(1) of the proposed agreement must be in conformity with the case-law of the Court, second, where matters are brought before it under paragraph (3) of that article, it is to secure the uniform interpretation of the ECAA Agreement in the light of the case-law of the Court and, third, decisions of the Committee are binding upon the Contracting Parties under Article 26 of the proposed agreement.

The Council observes in that regard that Community law in the area of competition and State aid is based on the principle of decentralisation, with powers being exercised by both the Commission and national authorities, subject to review by the Court. The provisions of the proposed ECAA Agreement do not call in question that allocation of powers.

OPINION PURSUANT TO ARTICLE 300(6) EC

## Opinion of the Court

1   According to some of the language versions of point 15 of the request for an opinion, the Court is asked to rule on the compatibility with the provisions of the Treaty of the system of 'judicial' supervision provided for by the proposed agreement (for example 'gerichtliche Kontrolle' in the German version, 'judicial supervision' in the English version and 'controllo giurisdizionale' in the Italian version). However, it is clear from other language versions of the request for an opinion that it concerns the system of 'legal' supervision envisaged by the proposed agreement (for example 'surveillance juridique' in the French version and 'vigilancia jurídica' in the Spanish version). Likewise, it is apparent from the request for an opinion as a whole, and specifically from the statement in which the Commission raises the issue of the compatibility with the Treaty of 'in particular' Article 23(2) and (3) of the proposed agreement, that the request concerns not only the compatibility of the mechanisms of a judicial nature provided for by the proposed agreement but also that of all the provisions thereof which seek to ensure uniform implementation and interpretation of the ECAA Agreement and the annexes thereto and to avoid or resolve disputes. Accordingly, the request for an opinion concerns Articles 17, 23 and 27 of, and Protocol IV to, the agreement. It does not deal with the issue of the extent of the Community's external competence. The ECAA Agreement will be concluded, as the Commission points out in its request for an opinion, between the Community and the States Parties, namely States which are not members of the Community.

2   The purpose of the ECAA Agreement is, according to Article 1 of the proposed agreement, 'the creation of a European Common Aviation Area... based on free market access, freedom of establishment, equal conditions of competition and common rules — including in the safety and environment areas'. The preamble to the agreement begins by recognising the 'integrated character of international civil aviation' and affirms that the ECAA is based on 'respect [for] the same rules', those of 'the relevant legislation in force within the European Community'. It states that the Contracting Parties bear in mind 'the commitment of each of the Associated States in the Europe Agreements to make its laws compatible with those of the Community'. The Contracting Parties are therefore seeking a high

level of integration which entails, as the Commission makes clear in its request for an opinion, the establishment of mechanisms which effectively ensure that the provisions of the ECAA Agreement and the fundamental rules to which its annexes refer are applied and interpreted in a uniform manner.

3   The proposed agreement is inspired by aims similar to those of the EEA Agreement, two versions of which were the subject of Opinions 1/91 and 1/92, cited above. Although the proposed agreement, unlike the EEA Agreement, is limited to one sector, air transport, its aim, like that of the EEA Agreement, is to extend the *acquis communautaire* to new States, by implementing in a larger geographical area rules which are essentially those of Community law.

4   The Contracting Parties have also set themselves the task, in particular in order to avoid any distortion of the rules of competition, of implementing and complying with those common rules as uniformly as possible, endeavouring to cooperate in good faith. That is how the provisions of the ECAA Agreement relating to legal supervision, the wording of which is, on many points, directly inspired by that of the EEA Agreement, are to be understood.

5   The endeavour to achieve uniform interpretation and application of those rules might, in certain circumstances, affect the powers of the Community and its institutions, or the canons of interpretation of Community law, to such an extent as to alter their essential character. An agreement which had such an effect on the Community legal order could not be adopted solely on the basis of Article 300 EC, in that it would undermine the foundations of the Community and hence the Treaty itself. The Court held therefore that the first version of the agreement relating to the creation of the EEA, on which its opinion had been requested, undermined the autonomy of the Community legal order and was, accordingly, incompatible with the Treaty, inasmuch as, in view of the concern for homogeneity expressed by its authors, it was proposed *inter alia* to entrust final decisions on interpretation of the rules of that agreement, in substance identical to those of Community law, to an EEA Court, which could, moreover, have found it necessary to rule on the distribution of powers between the Community and the Member States (Opinion 1/91, paragraphs 30 to 46).

I - 3518

OPINION PURSUANT TO ARTICLE 300(6) EC

6    Conversely, where an agreement more clearly separates the Community from the other Contracting Parties from an institutional point of view and no longer affects either the exercise by the Community and its institutions of their powers by changing the nature of those powers, or the interpretation of Community law, the autonomy of the Community legal order can be considered to be secure. In particular, the risk that the foundations of the Community might be affected as a result of implementation of an agreement is even lower where the States Parties to that agreement are members of a single organisation, which has its own judicial body and surveillance authority, distinct from the Community institutions. That was the position in the case of the second version of the agreement relating to the creation of the EEA submitted to the Court for an opinion, which the Court found to be compatible with the Treaty in view of the different framework: the proposal for an EEA Court had been abandoned, the EFTA Court had been created and decisions taken by the committee responsible for resolving differences between the Community and the EFTA States and for ensuring uniform interpretation as regards the EEA rules could in no circumstances affect the case-law of the Court (Opinion 1/92, paragraphs 18 to 35).

7    The proposed ECAA Agreement has objectives comparable to those of the EEA Agreement but a different institutional structure. Whilst the EEA Agreement is based on the 'twin pillar' of the Communities on the one hand and the EFTA on the other, the proposed agreement provides for the ECAA to be founded on a 'single pillar', a solution which is made possible and necessary by the absence of pre-existing institutional links between the States Parties in the area of air transport. Where Community legislation provides that the Community institutions, in particular the Commission, are competent, the same institutions are in many cases competent as regards the competition rules for the purpose of applying the corresponding provisions referred to in the proposed agreement throughout the ECAA. In areas in which neither the competition rules nor the secondary legislation mentioned in Annex I to the proposed agreement confer power on the Community institutions, the States Parties are responsible for applying the provisions of the ECAA Agreement. Dispute resolution and the task of ensuring uniform implementation of the provisions concerned are entrusted to the Joint Committee set up by Article 25 of the proposed agreement. Furthermore, the proposed agreement gives States Parties the option of permitting their courts or tribunals to refer questions to the Court for a preliminary ruling, an option which, in this case, is of particular significance given that those States do not have a common judicial body capable of securing, outside Community

territory, a degree of uniformity in the interpretation of the rules of the ECAA Agreement.

8    The proposed agreement therefore extends the powers of the Commission, making it responsible for ensuring that the competition rules of the ECAA are complied with throughout that area. It also confers on the Joint Committee of the ECAA responsibilities which may prove to be more far-reaching than those entrusted to the EEA Joint Committee. Cases liable to come before the ECAA Committee involving divergent interpretation or implementation of the rules of the ECAA Agreement could be more numerous as a result of the fact that the States Parties have neither a specific umbrella organisation comparable to the EFTA nor a common judicial body.

9    The fact that a 'single-pillar' structure has been selected, in which the Commission, in particular, is to perform a new regulatory function, may help to ensure the high level of integration in the various air transport markets sought by the Contracting Parties. Similarly, the fact that the wording of the proposed agreement and the corresponding provisions of Community law are largely identical is likely to promote compliance with the common rules applying within the ECAA as regards competition, safety, the environment and social matters, making it easier for the Commission to carry out its new functions. It constitutes the main guarantee that conditions of market access will be the same for operators and nationals of States Parties or States covered by the ECAA Agreement.

10    However, the effect of the policies thus reflected in the proposed agreement is, first, to bring about the juxtaposition within a single geographical area (that of the ECAA) of rules of Community law and rules replicating them, which will not be applied or interpreted systematically by the same authorities or bodies. That might give rise to differences prejudicial to the operation of the ECAA Agreement. Another consequence of those policies is that the Commission is made responsible for applying a number of rules in that agreement outside the Community, thereby creating specific relations between the Community and the States Parties.

OPINION PURSUANT TO ARTICLE 300(6) EC

11    In that context, with a large number of the rules of the ECAA Agreement being essentially rules of Community law, it is incumbent on the Court to ascertain whether the agreement before it includes adequate measures, at least comparable to those laid down by the EEA Agreement, to guarantee that neither the endeavour to ensure uniform interpretation of those rules nor the new institutional links established by the ECAA Agreement between the Community and the States Parties affect the autonomy of the Community legal order. It is particularly important that the mechanisms in the agreement should prevent the Community, in the event of a dispute with a State Party, from being bound by a particular interpretation of the rules of Community law referred to in the agreement. Thus, the agreement must make it possible to anticipate and prevent any such undermining of the objective enshrined in Article 220 EC that Community law should be interpreted uniformly and of the Court's function of reviewing the legality of the acts of the Community institutions (see, to that effect, Opinion 1/91, paragraphs 41 to 46).

12    Preservation of the autonomy of the Community legal order requires therefore, first, that the essential character of the powers of the Community and its institutions as conceived in the Treaty remain unaltered (Opinion 1/91, paragraphs 61 to 65, and 1/92, paragraphs 32 and 41).

13    Second, it requires that the procedures for ensuring uniform interpretation of the rules of the ECAA Agreement and for resolving disputes will not have the effect of binding the Community and its institutions, in the exercise of their internal powers, to a particular interpretation of the rules of Community law referred to in that agreement (Opinions 1/91 and 1/92).

14    The proposed ECAA Agreement does not affect the essential character of the powers of the Community and its institutions to such an extent that it must be declared to be incompatible with the Treaty.

I - 3521

15   First, the ECAA Agreement will not affect the allocation of powers between the Community and the Member States.

16   The Member States will not be parties to the ECAA Agreement. Thus, there is no risk of the Joint Committee, or a court seised of a dispute concerning the interpretation of certain provisions of the agreement, applying or interpreting 'Contracting Party' in such a way as to define the respective powers of the Member States and the Community (see, to that effect, reaching the opposite conclusion, Opinion 1/91, paragraphs 31 to 36).

17   Furthermore, the fact that the Member States are not parties to the ECAA Agreement ensures that disputes between the Member States, or between those States and the Community institutions, concerning interpretation of the rules of Community law applicable to air transport will continue to be dealt with exclusively by the machinery provided for by the Treaty. The procedure for dispute resolution by the Joint Committee set up by Article 27 of the proposed agreement concerns only disputes between the States Parties or disputes between those States, or one of them, and the Community. Consequently, it does not conflict with Article 292 EC, under which 'Member States undertake not to submit a dispute concerning the interpretation or application of this Treaty to any method of settlement other than those provided for therein'.

18   Nor does the extension of the powers of the Community institutions envisaged in the proposed agreement affect the essential character of those powers.

OPINION PURSUANT TO ARTICLE 300(6) EC

19  Several provisions of the proposed agreement, in particular Articles 19 to 22, confer on the Community institutions powers *vis-à-vis* States Parties which are not members of the Community. That is particularly true of the Commission, under the provisions on competition in Articles 11 to 16 of the proposed agreement and on the application of the ECAA Agreement in Articles 17 to 22 of the proposed agreement, but it is also true of the Court, which may, under Article 23(2) of, and Protocol IV to, the proposed agreement, decide on questions referred for a preliminary ruling by the courts of States Parties and, under Article 27(3) of the proposed agreement, resolve differences which the Contracting Parties have decided to bring before it where the procedure before the Joint Committee has failed.

20  The Court has already recognised that an international agreement entered into by the Community with non-Member States may affect the powers of the Community institutions, without, however, being regarded as incompatible with the Treaty. As it found in its Opinions on the draft agreements relating to the creation of the EEA, such an agreement is regarded as compatible with the Treaty provided it does not alter the essential character of the powers conferred on the Community institutions by the Treaty (see, in particular, Opinion 1/92, paragraphs 32 and 41).

21  Although the proposed ECAA Agreement affects the powers of the Community institutions, it does not alter the essential character of those powers and, accordingly, does not undermine the autonomy of the Community legal order.

22  So far as the Commission is concerned, the provisions of the proposed agreement are directly inspired by the provisions of the Treaty defining its responsibilities in the field of competition with regard to the Member States. The fact that the basic rules of the ECAA Agreement to be implemented by the Commission together with the States Parties are identical to those of Community law, and the choice of the 'single-pillar' structure, must also be regarded as guarantees that the essential character of the powers of the Community institutions will remain unchanged.

I - 3523

23    As regards the Court, the indispensable conditions for safeguarding the essential character of its powers are satisfied by the provisions of the proposed ECAA Agreement.

24    First, Article 17(3) of the proposed agreement makes the Court responsible for ruling on '[a]ll questions concerning the legality of decisions taken by Community institutions under this Agreement'. Thus, the Court's exclusive task of reviewing the legality of acts of the Community institutions, whether the latter are acting under the Treaty or under another international instrument, conferred on it by *inter alia* Articles 230 EC and 234 EC, is not called in question.

25    Second, contrary to the concerns expressed in that regard by the Italian Government in its observations, in every case where the proposed agreement confers powers on the Court, the binding nature of the latter's decisions is safeguarded (see Opinion 1/91, paragraphs 59 to 65). That is true both of the procedures for references for preliminary rulings provided for in Article 23(2) of, and Protocol IV to, the proposed agreement and of the dispute resolution procedures laid down in Article 27(3), which provides that '[the Court's] decision... shall be final and binding'.

26    In those circumstances, the provisions of the proposed ECAA Agreement do not alter the essential character of the powers of the Community and its institutions and thus to that extent do not adversely affect the autonomy of the Community legal order. They may, therefore, be regarded as compatible with the Treaty.

27    Having analysed the effect of the proposed agreement on the powers of the Community and its institutions, it is appropriate to consider the operation of the mechanisms in the proposed agreement for ensuring uniform interpretation of the

rules of the ECAA Agreement and the resolution of disputes. As stated in paragraph 13 of this Opinion, the autonomy of the Community legal order will not be safeguarded if those mechanisms have the effect of binding the Community and its institutions, in the exercise of their internal powers, to a particular interpretation of the rules of Community law referred to in the ECAA Agreement.

28    In that regard, separate consideration must be given to the provisions determining the nature of the rules of the ECAA Agreement, the procedures concerning references for preliminary rulings, the provisions of Article 23(1) of the proposed agreement and those of Article 23(3) relating to the interpretation of those rules and the procedures for dispute resolution.

29    First, the proposed agreement provides that the rules of the ECAA Agreement will, in accordance with the intention of the Contracting Parties, retain the general characteristics of Community law. The preamble to the agreement thus restates 'the commitment of each of the Associated States in the Europe Agreements to make its laws compatible with those of the Community'. Article 2 of the proposed agreement states, in the same way as Article 249 EC, that an act referred to in Annex I thereto and corresponding to an EC regulation is 'as such [to] be made part of the internal legal order of the Contracting Parties' and that an act corresponding to a Community directive is to 'leave to the authorities of the Contracting Parties the choice of form and method of implementation'. Article 17(1) of the proposed agreement further provides that the Contracting Parties are to ensure that rights derived from the ECAA Agreement may 'be invoked before national courts'. Taken together, those provisions show that the essential characteristics of Community law will be respected in the endeavour to ensure uniform implementation of the rules of the ECAA Agreement.

30    Second, the procedures for preliminary references provided for in Article 23(2) of, and Protocol IV to, the proposed agreement, which give the States Parties the power to authorise their courts to make references to the Court, may be considered to be compatible with the Treaty.

I - 3525

31    Those provisions are certainly not intended to enable courts of States Parties to bring matters before the Court as of right. Protocol IV to the proposed agreement provides that the options which it puts forward for making referrals for preliminary rulings are available to each State Party 'when [it] adopts a decision on... the modalities of [application of Article 23(2) of the proposed agreement]'. That interpretation is borne out by Article 23(3) of the proposed agreement, which envisages a situation in which a court of a State Party 'is not able to make a reference to the Court'.

32    However, the Court has already acknowledged, as regards the equivalent provisions of the EEA Agreement, that States may be allowed to decide whether or not to permit their courts and tribunals to make referrals to the Court (Opinion 1/91, paragraph 60).

33    In the same Opinion, the Court also found that courts or tribunals other than those of Member States could refer questions to it for a preliminary ruling, provided that the answers given by it were binding on the referring courts (Opinion 1/91, paragraphs 59 and 61 to 65). That is certainly the case in the proposed ECAA Agreement, as already indicated, since referrals made to the Court under Article 23(2) thereof, the procedures for which are laid down in the various options provided for in Protocol IV, will enable it, in accordance with the terms of the Protocol, to give binding rulings on the interpretation and validity of the rules of the ECAA Agreement.

34    Third, the mechanisms in Article 23(1) of the proposed agreement relating to the interpretation of provisions of the ECAA Agreement which are identical in substance to provisions of Community law ensure that the case-law of the Court will be adequately taken into account by the Contracting Parties.

OPINION PURSUANT TO ARTICLE 300(6) EC

35    Article 23(1) of the proposed agreement requires the basic provisions of the ECAA Agreement to be interpreted, in their implementation and application, in conformity with the decisions of the Commission and the rulings of the Court relating to the corresponding provisions of Community law.

36    Although recognition of the binding authority of the decisions of the Commission and the case-law of the Court is restricted by that provision to decisions and rulings given prior to the date of signature of the ECAA Agreement, that fact does not, of itself, give rise to incompatibility with the Treaty, since adequate procedures are put in place to ensure that the Court's later case-law will not be affected, thus guaranteeing uniform interpretation of the rules of Community law (Opinion 1/92, paragraphs 21 to 23).

37    In Opinion 1/92 concerning a proposed agreement relating to the creation of the EEA, the Court found that the procedures for its case-law to be taken into account were sufficient. The mechanisms put in place by that agreement were the following. First, the EEA Joint Committee was to be sent the judgments and decisions of the Court and of the EFTA Court and was to keep the development of their case-law under constant review in order to preserve the uniform interpretation of the agreement concerned. Second, decisions of the Committee, whether they related to the implications to be drawn from the development of the Court's case-law or to the resolution of disputes on the interpretation of the agreement, were taken by a 'commonly acceptable solution' and 'were not to affect the case-law of the Court'. Furthermore, in paragraph 24 of Opinion 1/92, the Court described that last precept as 'an essential safeguard which is indispensable for the autonomy of the Community legal order'.

38    The proposed ECAA Agreement, without being identical to the EEA Agreement, contains broadly comparable safeguards.

I - 3527

OPINION 1/00 OF 18. 4. 2002

39    First, Article 23(1) of the proposed agreement specifically requires, in such a way as to be binding on the Contracting Parties, decisions of the Joint Committee to 'be in conformity with the case-law of the Court', even though the Committee is not charged with keeping the case-law of the Court and the courts and tribunals of the States Parties constantly under review. The Joint Committee, whose role when matters are referred to it by one of the Contracting Parties is to ensure the 'proper functioning' of the ECAA Agreement, cannot therefore oblige representatives of the Community who sit on it to accept an interpretation of the rules of the agreement which conflicts with the case-law of the Court. Nor does the wording of the proposed agreement preclude the position adopted by the Community in the Joint Committee from being referred to the Court, where appropriate, by means of the actions provided for by the Treaty.

40    Further, it is true that the requirement laid down in Article 25(3) of the proposed agreement that decisions of the Committee must be unanimous may prove prejudicial to the proper functioning of the ECAA Agreement in that it may not allow completely homogeneous interpretation of its rules. It must, however, be regarded as a further guarantee that the Community will not, in its relations with Member States or Community nationals, be bound by an interpretation which is at variance with Community case-law.

41    Finally, the fact that Article 23(1) of the proposed agreement does not specifically set up any means of legal redress for cases in which the Joint Committee fails to reach a decision is liable to have adverse effects only on the proper functioning of the ECAA Agreement. Any divergences in the interpretation of the rules of the ECAA Agreement which may arise as between the Community and the States Parties as a result of that lacuna will not, in themselves, have any impact on the Community legal order, whose rules, which are identical as to substance but distinct as to form, will continue to be interpreted autonomously.

OPINION PURSUANT TO ARTICLE 300(6) EC

42    Fourth, no objection can be taken to Article 23(3) of the proposed agreement. It governs cases in which a court of a Contracting Party, giving judgment at last instance, 'is not able to make a reference to the Court', and provides for any judgment of such a court to be sent to the Joint Committee, which then acts so as to preserve the homogeneous interpretation of the ECAA Agreement.

43    Although paragraph (3) does not reiterate the rule in Article 23(1) of the proposed agreement that decisions of the Joint Committee 'shall be in conformity with the case-law of the Court', the objective of any action taken by the Committee in that context is, like the more general one of Article 23(1) of the proposed agreement, to ensure uniform application of the rules of the ECAA Agreement. The requirement that decisions of the Joint Committee be in conformity with the case-law of the Court thus applies in all cases in which the Committee is seeking to attain that objective, whether under paragraph (1) or under paragraph (3) of Article 23.

44    Lastly, the mechanism for resolving disputes established by Article 27 of the proposed agreement, a procedure to which Article 23(3) refers, is based on the procedures provided for by the EEA Agreement, which the Court found to be compatible with the Treaty, and is presented in the proposed agreement in a more restrictive form. Thus, first, it is stated in the proposed agreement itself that decisions of the Joint Committee taken in that context 'shall not affect the case-law of the Court'. Second, the Court's analysis of the provisions of Article 23(1) of the proposed agreement as regards the effects of the rule of unanimity can be applied in its entirety in this instance. Furthermore, any disputes which the Joint Committee does not succeed in resolving may be referred to the Court, whose decision will be 'final and binding'. Although under part 3 of Protocol IV to the proposed agreement disputes may be referred to the Court only 'in the same manner as those submitted to [it] in accordance with Article 239 of the EC Treaty', that is to say pursuant to an agreement entered into by the parties to the dispute, the effect of the provision will be to limit the cases in which the

Court will have to give a ruling, but it will not oblige the Community's representatives on the Joint Committee to apply rules that conflict with Community law.

45    Therefore, the mechanisms for ensuring uniform interpretation of the rules of the ECAA Agreement and for resolving disputes will not have the effect of binding the Community and its institutions, in the exercise of their internal powers, to a particular interpretation of the rules of Community law incorporated in the agreement.

46    Accordingly, the provisions of Articles 17, 23 and 27 of, and of Protocol IV to, the version of the ECAA Agreement submitted to the Court do not affect the autonomy of the Community legal order. In those circumstances, the system of legal supervision which the agreement proposes to set up by means of the provisions referred to above must be declared compatible with the Treaty.

In conclusion,

THE COURT,

composed of: G.C. Rodríguez Iglesias, President, P. Jann, F. Macken, N. Colneric and S. von Bahr (Presidents of Chambers), C. Gulmann, D.A.O. Edward, J.-P. Puissochet, M. Wathelet, R. Schintgen, V. Skouris, J.N. Cunha Rodrigues and C.W.A. Timmermans, Judges,

OPINION PURSUANT TO ARTICLE 300(6) EC

after hearing S. Alber, First Advocate General, F.G. Jacobs, P. Léger, D. Ruiz-Jarabo Colomer, J. Mischo, A. Tizzano, L.A. Geelhoed and C. Stix-Hackl, Advocates General,

gives the following Opinion:

**The system of legal supervision proposed by the Agreement on the establishment of a European Common Aviation Area in Articles 17, 23 and 27 and Protocol IV is compatible with the EC Treaty.**

|  |  |  |
|---|---|---|
| Rodríguez Iglesias | Jann | Macken |
| Colneric | von Bahr | Gulmann |
| Edward | Puissochet | Wathelet |
| Schintgen | | Skouris |
| Cunha Rodrigues | | Timmermans |

Luxembourg, 18 April 2002.

R. Grass                                                          G.C. Rodríguez Iglesias

Registrar                                                                            President