# EXHIBIT 35

## JUDGMENT OF THE COURT (First Chamber)

21 June 2007 *

In Joined Cases C-231/06 to C-233/06,

REFERENCES for a preliminary ruling under Article 234 EC from the Cour du travail de Brussels (Belgium), made by decision of 10 May 2006, received at the Court on 22 May 2006, in the proceedings

**National Pensions Office**

v

**Emilienne Jonkman** (C-231/06),

**Hélène Vercheval** (C-232/06),

and

**Noëlle Permesaen** (C-233/06)

v

**National Pensions Office**,

* Language of the case: French.

I - 5172

THE COURT (First Chamber),

composed of P. Jann, President of the Chamber, R. Schintgen, A. Borg Barthet, M. Ilešič (Rapporteur) and E. Levits, Judges,

Advocate General: J. Kokott,
Registrar: C. Strömholm, Administrator,

having regard to the written procedure and further to the hearing on 1 March 2007,

after considering the observations submitted on behalf of:

— Jonkman, Vercheval and Permesaen, by J. Heynderickx, avocat,

— the National Pensions Office, by R. Dupont and M. Willemet, avocats,

— the Italian Government, by I. M. Braguglia, acting as Agent, assisted by W. Ferrante, avvocato dello Stato,

— the Commission of the European Communities, by G. Rozet and M. van Beek, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 29 March 2007

gives the following

# Judgment

1   The references for a preliminary ruling concern Council Directive 79/7/EEC of 19 December 1978 on the progressive implementation of the principle of equal treatment for men and women in matters of social security (OJ 1979 L 6, p. 24).

2   Those references were submitted in the context of proceedings between Ms Jonkman, Ms Vercheval and Ms Permesaen and the National Pensions Office (the 'NPO').

**The disputes in the main proceedings and the questions referred for a preliminary ruling**

3   Ms Jonkman, Ms Vercheval and Ms Permesaen, after having worked as air hostesses for Sabena SA, a Belgian airlines company, brought a claim for a retirement pension as civil aviation air crew. They brought those claims in 1992, 1995 and 1996, in order to claim their pension rights from 1 March 1993, 1 July 1996 and 1 February 1997 respectively.

4   The NPO granted them a pension. However, Ms Jonkman, Ms Vercheval and Ms Permesaen disputed the decisions of the NPO before the Tribunal de travail de

Bruxelles (Brussels Labour Court), in the case of Ms Jonkman, and before the Nivelles Labour Court in the other cases, arguing that the calculation of their pensions was based on discriminatory provisions and that they should receive a pension calculated under the same rules as those applicable to male cabin crew.

5   Specifically, it followed from a comparison of the notes on the calculation in their pensions that the amounts of remuneration taken into account by the NPO were, in respect of the period from 1 January 1964 to 31 December 1980, significantly less for air hostesses than for air stewards, despite the fact that their basic remuneration was equal.

6   That was explained by a difference in treatment during the abovementioned period between, on the one hand, the air hostesses and, on the other hand, the other cabin crew members. In fact, by a Royal Decree of 10 January 1964 determining the contributions intended for the financing of the retirement and survivors pension scheme for civil aviation air crew, and the detailed rules for their payment (*Moniteur belge* of 17 January 1964, p. 464), which entered into force on 1 January 1964, a special retirement pension scheme was introduced for the benefit of civil aviation air crew, from which air hostesses were nevertheless excluded. The latter remained subject to the general retirement pension scheme applicable to employed persons, which was characterised by account being taken, in respect of the collection of contributions and the calculation of the pension, of a smaller percentage of remuneration than that which served as the basis for the calculation in the special scheme for civil aviation air crew.

7   The reason for the exclusion of air hostesses from entitlement to that special retirement pension scheme lay in the impossibility for them at that time to continue their career as members of an air crew beyond the age of 40. They could not therefore complete a full career. On those grounds the Kingdom of Belgium decided not to include them in the special scheme established.

8   The problem of careers at Sabena SA and the air hostess pension scheme has been the subject of several disputes before the Belgian courts, some of which have been resolved by a judgment given by the Court after a reference for a preliminary ruling (Case 80/70 *Defrenne* [1971] ECR 445; Case 43/75 *Defrenne* [1976] ECR 455, and Case 149/77 *Defrenne* [1978] ECR 1365). By a Royal Decree of 27 June 1980 amending the Royal Decree of 3 November 1969 determining, in respect of civil aviation air crew, the special rules on eligibility for a pension and the special rules for the application of Royal Decree No 50 of 24 October 1967 concerning retirement and survivor's pensions for employed persons (*Moniteur belge* of 23 August 1980, p. 9700), which came into force on 1 January 1981, the air hostesses were finally integrated into the special scheme for civil aviation air crew. Subsequently, the Belgian legislature, by a Royal Decree of 28 March 1984 with the same title as the preceding decree (*Moniteur belge* of 3 April 1984, p. 4100), introduced an adjustment for air hostesses in respect of the period from 1 January 1964 to 31 December 1980. That Royal Decree having been annulled by a judgment of the Conseil d'Etat (Council of State) of 7 September 1987, a new Royal Decree, also with the same title, was adopted on 25 June 1997 (*Moniteur belge* of 31 July 1997, p. 19635, 'the Royal Decree of 25 June 1997'), in order to remedy the difference in treatment between air hostesses and stewards during the period from 1 January 1964 to 31 December 1980.

9   Under the Royal Decree of 25 June 1997, air hostesses who had been employed as such during the period from 1 January 1964 to 31 December 1980 now had the right to a retirement pension under the same rules as those applicable to stewards, subject to a single payment of adjustment contributions, together with interest at the annual rate of 10%. Those adjustment contributions essentially consist of the difference between the contributions paid by the air hostesses during the period from 1 January 1964 to 31 December 1980 and the higher contributions paid by the stewards during the same period.

10   Ms Jonkman, Ms Vercheval and Ms Permesaen are of the opinion that the adjustment provided for by the Royal Decree of 25 June 1997 does not completely eliminate any discrimination between the air hostesses and the stewards.

11   By judgments of 17 November 1997 and 9 January 1998, given by the Brussels Labour Court and by the Nivelles Labour Court respectively, the actions brought by Ms Jonkman and Vercheval were allowed, on the ground that the methods for calculating their pensions are discriminatory.

12   In the case of Ms Permesaen, the Nivelles Labour Court, by a judgment of 26 December 2003, upheld the NPO's arguments in part. It found that making the grant of a pension identical to that of male workers subject to payment of the contributions which would have had to have been paid had the worker been affiliated to that scheme during her professional career was not discriminatory. By contrast, it did consider interest at an annual rate of 10% to be discriminatory.

13   The NPO appealed against the judgments of 17 November 1997 and 9 January 1998 to the Cour du travail de Bruxelles (Brussels Higher Labour Court). Ms Permesaen appealed to that same court against the judgment of 26 December 2003.

14   The Brussels Labour Court takes the view that the way in which the adjustment system introduced by the Royal Decree of 25 June 1997 is to be applied may be discriminatory. It notes in that regard that the single payment of a very large capital sum represents, for a pensioner, a considerable obstacle. It also draws attention to the tax aspect of that adjustment system, namely that at the material time the adjustments were deductible for tax purposes with regard to the stewards, which is not the case for the air hostesses. It observes lastly that the rate of interest applied is higher than the statutory rate for damages and default interest, and higher than the banking rate.

15   The Brussels Labour Court takes the view that the resolution of the disputes in the main proceedings is dependent on the interpretation of Directive 79/7. It has therefore decided to stay the proceedings and to refer the following questions to the Court of Justice for a preliminary ruling:

'(1) Is Directive 79/7/EEC of 19 December 1978 to be interpreted as meaning that it authorises a Member State to adopt rules intended to allow a category of persons of a particular sex, originally discriminated against, to become eligible for the pension scheme applicable to the category of persons of the opposite sex by making retroactive payment (a single payment of a very large sum) of contributions, recovery of which would be time-barred under the legislation applicable in that State in the case of the latter category of persons?

If so, is not Directive 79/7/EEC of 19 December 1978 to be interpreted as requiring a Member State to amend legislation contrary to that provision as soon as a judgment of the Court of Justice of the European Communities rules that there is a conflict of norms and, at the very least, within the applicable time-limit for recovery of the contributions which have become payable by virtue of the adoption of those rules?

(2) Is Directive 79/7/EEC of 19 December 1978 to be interpreted as meaning that it authorises a Member State to adopt rules intended to allow a category of persons of a particular sex, originally discriminated against, to become eligible for the pension scheme applicable to the category of persons of the opposite sex by making payment of a large amount of late payment interest, recovery of which would be time-barred under the legislation applicable in that State in the case of the latter category of persons?

If so, is not Directive 79/7/EEC of 19 December 1978 to be interpreted as requiring a Member State to amend legislation contrary to that provision as soon as a judgment of the Court of Justice of the European Communities rules that there is a conflict of norms and, at the very least, within the applicable time-limit for recovery of late payment interest due as a result of the adoption of those rules?'

I - 5178

**On the questions referred for a preliminary ruling**

*Preliminary considerations*

16   It should first of all be noted that the parties to the main proceedings do not dispute that the initial exclusion of the air hostesses from the special scheme for civil aviation air crew was discriminatory.

17   Moreover, it should be noted that Article 141(1) and (2) EC, on the principle of equal pay for male and female workers, is not applicable in the present case, since that article only applies to occupational pension schemes and not to statutory pension schemes (Case 80/70 *Defrenne*, paragraphs 10 to 13; Case C-109/91 *Ten Oever* [1993] ECR I-4879, paragraph 9, and Case C-207/04 *Vergani* [2005] ECR I-7453, paragraphs 22 and 23).

18   The referring court is therefore correct in asking its questions with regard to Directive 79/7, which applies to statutory schemes on social security, including statutory pension schemes (Case C-154/92 *van Cant* [1993] ECR I-3811, paragraphs 10 and 11).

19   Article 4(1) of that directive prohibits any 'discrimination whatsoever on ground of sex … in particular as concerns … the scope of the schemes and the conditions of access …, the obligation to contribute and the calculation of contributions [and] the calculation of benefits'. That provision can be relied upon by an individual before national courts in order to have any national provision not in conformity with that article disapplied (Case C-102/88 *Ruzius-Wilbrink* [1989] ECR 4311, paragraph 19, and Case C-337/91 *van Gemert-Derks* [1993] ECR I-5435, paragraph 31).

*The requirement to pay adjustment contributions*

20. By the first part of its questions, the referring court is essentially asking whether Directive 79/7 precludes a Member State, when it adopts rules intended to allow a category of persons of a particular sex, originally discriminated against, to become eligible for the pension scheme applicable to the category of persons of the opposite sex, from making such membership conditional on payment, in a single sum and together with interest at the annual rate of 10%, of adjustment contributions consisting of the difference between the contributions paid by the persons originally discriminated against during the period over which the discrimination took place and the higher contributions paid by the other category of persons during the same period.

21. It follows from the observations lodged before the Court that the parties to the main proceedings, the Commission of the European Communities and the Italian Government are all of the opinion that the main condition imposed on the air hostesses by the Royal Decree of 25 June 1997 in order that their professional activity during the period from 1 January 1964 to 31 December 1980 be taken into account in the same way as that of stewards, that is the payment of a sum representing the difference between the contributions they paid during that period and the higher contributions paid by the stewards during the same period, is not in itself discriminatory.

22. That view is correct. As the Court has already held in the context of disputes relating to occupational pension schemes, the fact that a worker can claim retroactively to join such a scheme does not allow him to avoid paying the contributions relating to the period of membership concerned (Case C-128/93 *Fisscher* [1994] ECR I-4583, paragraph 37; Case C-435/93 *Dietz* [1996] ECR I-5223, paragraph 34, and Case C-78/98 *Preston and Others* [2000] ECR I-3201, paragraph 39).

I - 5180

23   Where such discrimination has been suffered, equal treatment is to be achieved by placing the worker discriminated against in the same situation as that of workers of the other sex. Consequently, the worker cannot claim more favourable treatment, particularly in financial terms, than he would have had if he had been duly accepted as a member (see *Fisscher*, paragraphs 35 and 36, and *Preston and Others*, paragraph 38).

24   Clearly that case-law is applicable by analogy to membership of a statutory pension scheme. It follows that a Member State, when it adopts rules intended to allow a persons of a particular sex, originally discriminated against, to become eligible for the pension scheme applicable to persons of the opposite sex, can choose to restore equal treatment by requiring the payment of a sum representing the difference between the contributions paid by the persons originally discriminated against during the period in which the discrimination took place and the higher contributions paid by the other category of persons during the same period. The fact that the latter category of persons benefit in the meantime from limitation of an action for payment of contributions cannot prevent adjustment as described above, on the condition however, as the Advocate General pointed out in point 70 of her Opinion, that a similar limitation period is set with regard to the new members.

25   In addition, in order to prevent any reverse discrimination, the adjustment contributions can be increased by interest intended to compensate for inflation. As the Advocate General observed in point 38 of her Opinion, and subject to the condition in point 39 thereof, such an increase ensures that the contributions paid by the new members are not in real terms lower than those paid by the workers who have been members since the pension scheme was established.

26   For the reasons set out by the Advocate General in points 64 and 65 of her Opinion, the foregoing considerations are limited to the case where the adjustment of pension rights is effective from the date on which the worker is entitled to retire. Adjustment offered to persons who have already retired, and which requires the payment of a

sum representing the difference between the contributions paid by those persons in the period during which they were discriminated against and the higher contributions paid by the other category of persons during the same period, does not end the discriminatory treatment unless it results in the same calculation of pension rights throughout the retirement of each of the interested parties.

27  It follows from the foregoing that Directive 79/7 does not preclude a Member State, when it adopts rules intended to allow persons of a particular sex, originally discriminated against, to be eligible throughout their retirement for the pension scheme applicable to persons of the other sex, from making such membership dependent upon the payment of adjustment contributions consisting of the difference between the contributions paid by the persons originally discriminated against in the period during which the discrimination took place and the higher contributions paid by the other category of persons during the same period, together with interest to compensate for inflation.

*The method of paying the adjustment contributions*

28  In so far as the referring court seeks to ascertain whether the Member State can require that the payment of adjustment contributions is made by a single payment together with interest at an annual rate of 10%, it should be noted that any measure taken by a Member State in order to comply with the norms of Community law, such as the principle of equal treatment between men and women, must be effective (see, to that effect *Fisscher*, paragraph 31; *Preston and Others*, paragraphs 40 to 42; Case C-187/00 *Kutz-Bauer* [2003] ECR I-2741, paragraph 57, and Case C-212/04 *Adeneler and Others* [2006] ECR I-6057, paragraph 95). Consequently, it was for the Belgian legislature, when it adopted the Royal Decree of 25 June 1997 in order to put the air hostesses in the same position as that of stewards, to fix the method of the adjustment in such a way that it would not be impossible or excessively difficult in practice.

I - 5182

29  It is apparent from the observations lodged before the Court that, having regard to the long period over which the discrimination took place, which ran from 1 January 1964 to 31 December 1980, and the many years which had passed between the end of that period and the adoption of the Royal Decree of 25 June 1997 establishing an adjustment (1981 to 1997), the adjustment contributions are of a particularly large amount. As the Advocate General has observed in point 49 of her Opinion, that sum may even exceed the annual pension of the persons to whom the adjustment is offered. As Ms Jonkman, Ms Vercheval and Ms Permesaen have pointed out, without being contradicted on this issue by the NPO, the single payment of such a sum may be impossible, or else require a loan from a financial organisation which will in turn demand the payment of interest.

30  It is furthermore apparent from the Royal Decree of 25 June 1997 that that decree makes provision, in exceptional circumstances which are not applicable in this instance, for spreading the payments of adjustment contributions, in the form of the payment of annual instalments.

31  In the light of the facts set out above, it must be held that the obligation imposed on the interested parties to make the adjustment payments in a single payment has made the adjustment of the air hostesses' pension rights excessively difficult.

32  As regards interest at an annual rate of 10%, the parties to the main proceedings, the Commission and the Italian government have all stated or admitted that that rate is exceptionally high. When questioned on that subject at the hearing, the NPO was not able to explain why the Royal Decree of 25 June 1997 had set an interest rate exceeding the rate of inflation.

33  In any event, it is common ground that the effect of setting an interest rate which exceeds that necessary to compensate for inflation is that the contributions paid by

the new members are in real terms higher than those paid by the workers which have been members since the pension scheme was established. Therefore, far from putting the air hostesses in the same position as the stewards, that interest rate has allowed the unequal treatment of the air hostesses to continue.

34  It is, however, for the referring court, which is the only court to have full knowledge of national law, to ascertain what percentage of the annual interest rate of 10% laid down by the Royal Decree of 25 June 1997 could be intended to compensate for inflation.

35  It follows from all the foregoing considerations that Directive 79/7 precludes a Member State, when it adopts rules intended to allow persons of a particular sex, originally discriminated against, to become eligible for the pension scheme applicable to persons of the other sex, from requiring the payment of adjustment contributions to be made together with interest other than that to compensate for inflation. That directive also precludes a requirement that that payment be made as a single sum, where that condition makes the adjustment concerned impossible or excessively difficult in practice. That is the case in particular where the sum to be paid exceeds the annual pension of the interested party.

*The obligations on a Member State stemming from a judgment given on an order for reference*

36  By the second part of its questions, read in the context of the disputes in the main proceedings, the referring court is essentially asking whether a Member State is obliged to adapt its legislation following a judgment given by the Court on an order for reference from which it is apparent that that legislation is incompatible with Community law.

37  In that regard, it should be recalled that, under the principle of cooperation in good faith laid down in Article 10 EC, the Member States are required to nullify the unlawful consequences of a breach of Community law (Case C-201/02 *Wells* [2004] ECR I-723, paragraph 64, and the case-law cited).

38  Therefore, following a judgment given by the Court on an order for reference from which it is apparent that national legislation is incompatible with Community law, it is for the authorities of the Member State concerned to take the general or particular measures necessary to ensure that Community law is complied within that state (see, to that effect, *Wells*, paragraphs 64 and 65, and Case C-495/00 *Azienda Agricola Giorgio, Giovanni e Luciano Visentin and Others* [2004] ECR I-2993, paragraph 39). While they retain the choice of the measures to be taken, those authorities must in particular ensure that national law is changed so as to comply with Community law as soon as possible and that the rights which individuals derive from Community law are given full effect.

39  In addition, as the Court has repeatedly held in situations of discrimination contrary to Community law, for as long as measures reinstating equal treatment have not been adopted, observance of the principle of equality can be ensured only by granting to persons within the disadvantaged category the same advantages as those enjoyed by persons within the favoured category. In such a situation, a national court must set aside any discriminatory provision of national law, without having to request or await its prior removal by the legislature, and apply to members of the disadvantaged group the same arrangements as those enjoyed by the persons in the other category (Case C-408/92 *Avdel Systems* [1994] ECR I-4435, paragraphs 16 and 17; Case C-442/00 *Rodríguez Caballero* [2002] ECR I-11915, paragraphs 42 and 43, and Case C-81/05 *Cordero Alonso* [2006] ECR I-7569, paragraphs 45 and 46).

40    A Member State is, moreover, required to make reparation for loss and damage caused to individuals as a result of breaches of Community law. Where the conditions for State liability are fulfilled, it is for the national court to apply that principle (see, inter alia, Case C-66/95 *Sutton* [1997] ECR I-2163, paragraph 35, and Case C-224/01 *Köbler* [2003] ECR I-10239, paragraphs 51 and 52).

41    In the light of the foregoing, the answer to the second part of the questions referred is that, following a judgment given by the Court on an order for reference from which it is apparent that the national legislation is incompatible with Community law, it is for the authorities of the Member State concerned to take the general or particular measures necessary to ensure that Community law is complied with, by ensuring in particular that national law is changed so as to comply with Community law as soon as possible and that the rights which individuals derive from Community law are given full effect. Where discrimination infringing Community law has been found, for as long as measures reinstating equal treatment have not been adopted, the national court must set aside any discriminatory provision of national law, without having to request or await its prior removal by the legislature, and apply to members of the disadvantaged group the same arrangements as those enjoyed by the persons in the other category.

**Costs**

42    Since these proceedings are, for the parties to the main proceedings, a step in the action pending before the national court, the decision on costs is a matter for that court. Costs incurred in submitting observations to the Court, other than the costs of those parties, are not recoverable.

I - 5186

On those grounds, the Court (First Chamber) hereby rules:

1. When a Member State adopts rules intended to allow persons of a particular sex, originally discriminated against, to become eligible throughout their retirement for the pension scheme applicable to persons of the other sex, Council Directive 79/7/EEC of 19 December 1978 on the progressive implementation of the principle of equal treatment for men and women in matters of social security:

— does not preclude that Member State from making such membership dependent upon the payment of adjustment contributions consisting of the difference between the contributions paid by the persons originally discriminated against in the period during which the discrimination took place and the higher contributions paid by the other category of persons during the same period, together with interest to compensate for inflation,

— does preclude, by contrast, that Member State from requiring that payment of adjustment contributions to be made together with interest other than that to compensate for inflation,

— also precludes a requirement that that payment be made as a single sum, where that condition makes the adjustment concerned impossible or excessively difficult in practice. That is the case in particular where the sum to be paid exceeds the annual pension of the interested party.

2.  Following a judgment given by the Court on an order for reference from which it is apparent that the national legislation is incompatible with Community law, it is for the authorities of the Member State concerned to take the general or particular measures necessary to ensure that Community law is complied with, by ensuring in particular that national law is changed so as to comply with Community law as soon as possible and that the rights which individuals derive from Community law are given full effect.

3.  Where discrimination infringing Community law has been found, for as long as measures reinstating equal treatment have not been adopted, the national court must set aside any discriminatory provision of national law, without having to request or await its prior removal by the legislature, and apply to members of the disadvantaged group the same arrangements as those enjoyed by the persons in the other category.

[Signatures]