# EXHIBIT 42



# Reports of Cases

OPINION 2/13 OF THE COURT (Full Court)
18 December 2014

Table of contents

I –    The request for an Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

II –    The institutional framework and the European Convention for the Protection of Human Rights
and Fundamental Freedoms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

A –    The Council of Europe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

B –    The European Convention for the Protection of Human Rights and Fundamental Freedoms    6

1.    Section I of the ECHR, entitled 'Rights and freedoms', and the substantive provisions
thereof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

2.    Section II of the ECHR and the control mechanisms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

a)    The ECtHR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

b)    The functioning of the Committee of Ministers in the exercise of its powers to
supervise the execution of the judgments of the ECtHR . . . . . . . . . . . . . . . . . . . . . . . . .    8

3.    Section III of the ECHR, entitled 'Miscellaneous provisions' . . . . . . . . . . . . . . . . . . . . . . . . .    9

4.    The Protocols to the ECHR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

III –    The relationship between the EU and the ECHR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

IV –    The process of accession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

V –    The draft agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

A –    The provisions governing accession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

B –    The other provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

VI –    The Commission's assessment in its request for an Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

A –    Admissibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

B –    Substance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

1.    Article 1(a) of Protocol No 8 EU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17



OPINION 2/13 OF 18. 12. 2014
OPINION PURSUANT TO ARTICLE 218(11) TFEU

2. Article 1(b) of Protocol No 8 EU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

3. The second sentence of Article 6(2) TEU and the first sentence of Article 2 of Protocol No 8 EU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

4. Article 1(b) and the first sentence of Article 2 of Protocol No 8 EU . . . . . . . . . . . . . . . . . .    19

5. The second sentence of Article 2 of Protocol No 8 EU . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

6. Article 3 of Protocol No 8 EU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

VII – Summary of the main observations submitted to the Court of Justice . . . . . . . . . . . . . . . . . . . . . . . . .    24

   A – Admissibility of the request for an Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

   B – Substance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

      1. Article 1(a) of Protocol No 8 EU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

      2. Article 1(b) of Protocol No 8 EU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26

      3. Article 6(2) TEU and the first sentence of Article 2 of Protocol No 8 EU . . . . . . . . . . . . .    27

      4. Article 1(b) and the first sentence of Article 2 of Protocol No 8 EU . . . . . . . . . . . . . . . . . .    27

      5. Second sentence of Article 2 of Protocol No 8 EU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30

      6. Article 3 of Protocol No 8 EU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30

VIII – Position of the Court of Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31

   A – Admissibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31

   B – Substance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32

      1. Preliminary considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32

      2. The compatibility of the agreement envisaged with EU primary law . . . . . . . . . . . . . . . . . .    34

         a) The specific characteristics and the autonomy of EU law . . . . . . . . . . . . . . . . . . . . . . . . . .    34

         b) Article 344 TFEU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    37

         c) The co-respondent mechanism . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    38

         d) The procedure for the prior involvement of the Court of Justice . . . . . . . . . . . . . . . . . .    40

         e) The specific characteristics of EU law as regards judicial review in CFSP matters . . .    41

(Opinion pursuant to Article 218(11) TFEU — Draft international agreement — Accession of the European Union to the European Convention for the Protection of Human Rights and Fundamental Freedoms — Compatibility of the draft agreement with the EU and FEU Treaties)

ECLI:EU:C:2014:2454

In Opinion 2/13,

REQUEST for an Opinion pursuant to Article 218(11) TFEU, made on 4 July 2013 by the European Commission,

THE COURT (Full Court)

composed of V. Skouris, President, K. Lenaerts, Vice-President, A. Tizzano (Rapporteur), R. Silva de Lapuerta, M. Ilešič, L. Bay Larsen, T. von Danwitz, A. Ó Caoimh, J.-C. Bonichot, C. Vajda and S. Rodin, Presidents of Chambers, E. Juhász, A. Borg Barthet, J. Malenovský, E. Levits, A. Arabadjiev, C. Toader, M. Safjan, D. Šváby, M. Berger, A. Prechal, E. Jarašiūnas, C.G. Fernlund, J.L. da Cruz Vilaça and F. Biltgen, Judges,

Advocate General: J. Kokott,

Registrars: A. Calot Escobar and M.-A. Gaudissart, Head of Unit,

having regard to the written procedure and further to the hearing on 5 and 6 May 2014,

after considering the observations submitted on behalf of:

— the European Commission, by L. Romero Requena, H. Krämer, C. Ladenburger and B. Smulders, acting as Agents,

— the Belgian Government, by M. Jacobs and C. Pochet, acting as Agents,

— the Bulgarian Government, by E. Petranova and D. Drambozova, acting as Agents,

— the Czech Government, by M. Smolek, E. Ruffer and J. Králová, acting as Agents,

— the Danish Government, by C. Thorning and M. Wolff, acting as Agents,

— the German Government, by T. Henze and J. Kemper, acting as Agents,

— the Estonian Government, by K. Kraavi-Käerdi, acting as Agent,

— Ireland, by E. Creedon, A. Joyce and E. McPhillips, acting as Agents, and by E. Regan SC, C. Toland, Barrister-at-Law, and C. Daly, Advisory Council,

— the Greek Government, by A. Samoni-Rantou, E.-M. Mamouna and K. Boskovits, acting as Agents,

— the Spanish Government, by M.A. Sampol Pucurull and N. Díaz Abad, acting as Agents,

— the French Government, by E. Belliard, N. Rouam, G. de Bergues and D. Colas, acting as Agents,

— the Italian Government, by G. Albenzio, avvocato dello Stato,

— the Cypriot Government, by K. Lykourgos, K. Kompos and N. Kyriakou, acting as Agents,

— the Latvian Government, by I. Kalniņš and D. Pelše, acting as Agents,

— the Lithuanian Government, by D. Kriaučiūnas, R. Krasuckaitė and A. Svinkūnaitė, acting as Agents,

OPINION 2/13 OF 18. 12. 2014
OPINION PURSUANT TO ARTICLE 218(11) TFEU

— the Hungarian Government, by M.Z. Fehér, acting as Agent,

— the Netherlands Government, by M.K. Bulterman and J. Langer, acting as Agents,

— the Austrian Government, by A. Posch and C. Pesendorfer, acting as Agents,

— the Polish Government, by B. Majczyna, acting as Agent,

— the Portuguese Government, by L. Inez Fernandes and M.L. Duarte, acting as Agents,

— the Romanian Government, by R.H. Radu, V. Angelescu and A.-G. Văcaru, acting as Agents,

— the Slovak Government, by B. Ricziová, acting as Agent,

— the Finnish Government, by J. Heliskoski and H. Leppo, acting as Agents,

— the Swedish Government, by A. Falk and M. Rhodin, acting as Agents,

— the United Kingdom Government, by S. Behzadi-Spencer, acting as Agent, and by D. Beard QC,

— the European Parliament, by R. Passos, P. Schonard and E. Waldherr, acting as Agents,

— the Council of the European Union, by H. Legal, F. Naert, T. Blanchet and P. Plaza García, acting as Agents,

after hearing the Advocate General,

gives the following

## Opinion

### I – The request for an Opinion

1. The request for an Opinion submitted to the Court of Justice of the European Union by the European Commission is worded as follows:

'Is the draft agreement providing for the accession of the European Union to the Convention for the Protection of Human Rights and Fundamental Freedoms[, signed in Rome on 4 November 1950 ("the ECHR"),] compatible with the Treaties?'

2. The following documents were sent by the Commission to the Court as annexes to its request:

— the draft revised agreement on the accession of the European Union ('EU') to the Convention for the Protection of Human Rights and Fundamental Freedoms ('the draft agreement');

— the draft declaration by the EU to be made at the time of signature of the Accession Agreement ('the draft declaration');

— the draft rule to be added to the Rules of the Committee of Ministers for the supervision of the execution of judgments and of the terms of friendly settlements in cases to which the EU is a party ('draft Rule 18');

— the draft model of memorandum of understanding between the EU and X [State which is not a member of the EU]; and

— the draft explanatory report to the Agreement on the Accession of the EU to the Convention for the Protection of Human Rights and Fundamental Freedoms ('the draft explanatory report', and, together with the other instruments referred to above, 'the draft accession instruments' or 'the agreement envisaged').

## II – The institutional framework and the European Convention for the Protection of Human Rights and Fundamental Freedoms

### A – The Council of Europe

3. By an international agreement signed in London on 5 May 1949, which entered into force on 3 August 1949 ('the Statute of the Council of Europe'), a group of 10 European States created the Council of Europe in order to achieve a greater unity between its members for the purpose of safeguarding and realising the ideals and principles of their common heritage and facilitating economic and social progress in Europe. At present, 47 European States are members of the Council of Europe, including the 28 Member States of the EU ('the Member States').

4. According to that statute, the organs of the Council of Europe are the Committee of representatives of governments ('the Committee of Ministers') and the Parliamentary Assembly ('the Assembly'), which are served by the Secretariat of the Council of Europe.

5. In accordance with Article 14 of the Statute of the Council of Europe, the Committee of Ministers is composed of one representative for each member, each representative being entitled to one vote.

6. Under Article 15.a of the Statute of the Council of Europe, '[o]n the recommendation of the [Assembly] or on its own initiative, the Committee of Ministers shall consider the action required to further the aim of the Council of Europe, including the conclusion of conventions or agreements and the adoption by governments of a common policy with regard to particular matters. …'. The same article states, in the first part of paragraph b, that, '[i]n appropriate cases, the conclusions of the Committee [of Ministers] may take the form of recommendations to the governments of members'.

7. Article 20 of the Statute of the Council of Europe governs the quorums required for the adoption of decisions by the Committee of Ministers. It is worded as follows:

'a.  Resolutions of the Committee of Ministers relating to the following important matters, namely:

   i.   recommendations under Article 15.b;

   …

   v.   recommendations for the amendment of Articles … 15 [and] 20 …; and

   vi.  any other question which the Committee may, by a resolution passed under d below, decide should be subject to a unanimous vote on account of its importance,

   require the unanimous vote of the representatives casting a vote, and of a majority of the representatives entitled to sit on the Committee.

…

d.  All other resolutions of the Committee … require a two-thirds majority of the representatives casting a vote and of a majority of the representatives entitled to sit on the Committee.'

8.  According to Article 25 of the Statute of the Council of Europe, the Assembly is to consist of representatives of each member of the Council of Europe, elected by its parliament from among the members thereof, or appointed from among the members of that national parliament, in such manner as it shall decide. Each member is to be entitled to a number of representatives determined by Article 26 of that statute. The highest number of representatives is 18.

B – *The European Convention for the Protection of Human Rights and Fundamental Freedoms*

9.  The ECHR is a multilateral international agreement concluded in the Council of Europe, which entered into force on 3 September 1953. All the members of the Council of Europe are among the High Contracting Parties to that Convention ('the Contracting Parties').

10.  The ECHR is in three sections.

1.  1. Section I of the ECHR, entitled 'Rights and freedoms', and the substantive provisions thereof

11.  Section I of the ECHR defines the rights and freedoms which the Contracting Parties, in accordance with Article 1 of the ECHR, 'shall secure to everyone within their jurisdiction'. There is no provision for any derogation from that commitment other than that contained in Article 15 of the ECHR, '[i]n time of war or other public emergency threatening the life of the nation'. In particular, in no circumstances can any derogation be made from the obligations set out in Article 2 (right to life, save in the case of deprivation of life resulting from the necessary use of force), Article 3 (prohibition of torture), Article 4(1) (prohibition of slavery) and Article 7 (no punishment without law).

12.  Article 6 of the ECHR, headed 'Right to a fair trial', states:

'1. In the determination of his civil rights and obligations or of any criminal charge against him, everyone is entitled to a fair and public hearing within a reasonable time by an independent and impartial tribunal established by law. Judgment shall be pronounced publicly but the press and public may be excluded from all or part of the trial in the interests of morals, public order or national security in a democratic society, where the interests of juveniles or the protection of the private life of the parties so require, or to the extent strictly necessary in the opinion of the court in special circumstances where publicity would prejudice the interests of justice.

2. Everyone charged with a criminal offence shall be presumed innocent until proved guilty according to law.

3. Everyone charged with a criminal offence has the following minimum rights:

(a)  to be informed promptly, in a language which he understands and in detail, of the nature and cause of the accusation against him;

(b)  to have adequate time and facilities for the preparation of his defence;

(c)  to defend himself in person or through legal assistance of his own choosing or, if he has not sufficient means to pay for legal assistance, to be given it free when the interests of justice so require;

(d)  to examine or have examined witnesses against him and to obtain the attendance and examination of witnesses on his behalf under the same conditions as witnesses against him;

(e)  to have the free assistance of an interpreter if he cannot understand or speak the language used in court.'

13. Article 13 of the ECHR, headed 'Right to an effective remedy', is worded as follows:

'Everyone whose rights and freedoms as set forth in [the ECHR] are violated shall have an effective remedy before a national authority notwithstanding that the violation has been committed by persons acting in an official capacity.'

2. 2. Section II of the ECHR and the control mechanisms

14. Section II of the ECHR governs the mechanisms for controlling the Contracting Parties' compliance with their commitments in accordance with Article 1 thereof. That section includes, in particular, Article 19 of the ECHR, which establishes the European Court of Human Rights ('the ECtHR'), and Article 46, which confers on the Committee of Ministers powers of supervision of the execution of judgments of the ECtHR.

a) The ECtHR

15. In accordance with Articles 20 and 22 of the ECHR, the Judges of the ECtHR, the number of which is equal to that of the Contracting Parties, are to be elected by the Assembly with respect to each Contracting Party from a list of three candidates nominated by that contracting party.

16. Article 32 of the ECHR confers on the ECtHR jurisdiction to interpret and apply the ECHR as provided, inter alia, in Articles 33 and 34 thereof.

17. Under Article 33 of the ECHR (Inter-State cases), the ECtHR may receive an application from a Contracting Party alleging breach of the provisions of the ECHR and of the protocols thereto by one (or more) other Contracting Parties.

18. In accordance with the first sentence of Article 34 of the ECHR, the ECtHR 'may receive applications from any person, nongovernmental organisation or group of individuals claiming to be the victim of a violation by one of the [Contracting Parties] of the rights set forth in the Convention or the Protocols thereto'.

19. The ECHR makes the admissibility of an individual application subject, in particular, to the following four criteria: First, under Article 34 of the ECHR, the applicant must be able to claim to be the victim of a violation of the rights set forth in the ECHR or the protocols thereto. Secondly, in accordance with Article 35(1) of the ECHR, the applicant must have exhausted all 'domestic' remedies, that is to say, those that exist in the legal order of the Contracting Party against which the application is brought. That admissibility criterion reflects the principle that the control mechanism established by the ECHR is subsidiary to the machinery of human rights protection that exists within the Contracting Parties (judgments of the ECtHR in Akdivar and Others v. Turkey, 16 September 1996, §§ 65 and 66, Reports of Judgments and Decisions 1996-IV, and in Burden v. the United Kingdom [GC], no. 13378/05, § 42, ECHR 2008). Thirdly, under the same provision, the application must be brought within a period of six months from the date on which the final decision was taken. Fourthly, under Article 35(2)(b) of the ECHR, the admissibility of an application is subject to the application not being 'substantially the same as a matter that has already been examined by the [ECtHR] or has already been submitted to another procedure of international investigation or settlement', unless it contains relevant new information.

20. Proceedings before the ECtHR culminate either in a decision or judgment by which the ECtHR finds that the application is inadmissible or that the ECHR has not been violated, or in a judgment finding a violation of the ECHR. That judgment is declaratory and does not affect the validity of the relevant acts of the Contracting Party.

21. A judgment of the ECtHR delivered by the Grand Chamber is final, in accordance with Article 44(1) of the ECHR. It follows from Article 43, read in conjunction with Article 44(2) of the ECHR, that a judgment delivered by a Chamber of the ECtHR becomes final when the parties declare that they will not request that the case be referred to the Grand Chamber, or when such a request has been rejected by the panel of the Grand Chamber, or three months after the date of the judgment if no request has been made for the case to be referred to the Grand Chamber.

22. Under Article 46(1) of the ECHR, the Contracting Parties are obliged to abide by the final judgment of the ECtHR in any case to which they are parties. In accordance with that provision, a Contracting Party is obliged to take, so far as concerns the applicant, all individual measures applicable under domestic law in order to eliminate the consequences of the violation established in the judgment of the ECtHR (restitutio in integrum). If the domestic law of the Contracting Party concerned allows only partial reparation to be made, Article 41 of the ECHR provides that the ECtHR is to afford 'just satisfaction' to the applicant. Moreover, a Contracting Party is obliged to adopt general measures, such as the amendment of domestic law, changes in interpretation by the courts or other types of measures, in order to prevent further violations similar to those found by the ECtHR, or to put an end to the violations subsisting in domestic law.

b) The functioning of the Committee of Ministers in the exercise of its powers to supervise the execution of the judgments of the ECtHR

23. Article 46(2) of the ECHR confers on the Committee of Ministers responsibility for supervising the execution of the final judgments of the ECtHR. Similarly, under Article 39(4) of the ECHR, the Committee of Ministers is to supervise the execution of the terms of a friendly settlement of a case, as provided for in paragraph 1 of that article.

24. Pursuant to those powers, the Committee of Ministers examines, in essence, whether the Contracting Party has taken all the necessary measures to abide by the final judgment of the ECtHR or, where appropriate, to execute the terms of a friendly settlement. The exercise of those powers is governed by the 'Rules of the Committee of Ministers for the supervision of the execution of judgments and of the terms of friendly settlements' ('the Rules for the supervision of execution').

25. According to Rule 17 of the Rules for the supervision of execution, the Committee of Ministers is to adopt a 'final resolution' if it establishes that the Contracting Party has taken all the necessary measures to abide by the final judgment of the ECtHR or, where appropriate, that the terms of a friendly settlement have been executed. In accordance with Rule 16 of those rules, the Committee of Ministers may adopt 'interim resolutions', notably in order to 'provide information on the state of progress of the execution or, where appropriate, to express concern and/or to make suggestions with respect to the execution'. In order for both types of resolution to be adopted, the quorum laid down in Article 20.d of the Statute of the Council of Europe must be satisfied.

26. According to Article 46(3) and (4) of the ECHR, the Committee of Ministers may, by a majority vote of two thirds of the representatives entitled to sit on that committee, if it considers that the supervision of the execution of a final judgment is hindered by a problem of interpretation of that judgment, submit a request for interpretation to the ECtHR. Moreover, if that committee considers that a Contracting Party is refusing to abide by a final judgment in a case to which it is a party, it may refer to the ECtHR the question whether that party has failed to fulfil its obligation under Article 46(1). If the ECtHR finds that that obligation has been violated, it is to refer the case to the Committee of Ministers for consideration of the measures to be taken. If no violation is found, the case is to be referred to the Committee of Ministers, which is to close its examination of the case, in accordance with Article 46(5).

OPINION 2/13 OF 18. 12. 2014
OPINION PURSUANT TO ARTICLE 218(11) TFEU

27. The ECHR also confers certain other powers on the Committee of Ministers. Thus, in accordance with Article 26(2) thereof, it may, at the request of the plenary Court of the ECtHR, by a unanimous decision and for a fixed period reduce from seven to five the number of Judges of the Chambers, and, on the basis of Article 47 of the ECHR, request an advisory opinion of the ECtHR on legal questions concerning the interpretation of the ECHR and the protocols thereto.

28. Lastly, under Article 50 of the ECHR, the expenditure on the ECtHR is to be borne by the Council of Europe.

3. 3. Section III of the ECHR, entitled 'Miscellaneous provisions'

29. In accordance with Article 53 of the ECHR, nothing in the ECHR is to be construed as limiting or derogating from any of the human rights and fundamental freedoms which may be ensured under the laws of any Contracting Party or under any other agreement to which it is a party.

30. Under Article 55 of the ECHR, the Contracting Parties agree that, except by special agreement, they will not submit a dispute arising out of the interpretation or application of the ECHR to a means of settlement other than those provided for in the ECHR.

31. Article 57(1) of the ECHR allows the Contracting Parties, when signing that Convention or when depositing the instrument of ratification, to 'make a reservation in respect of any particular provision of the Convention to the extent that any law then in force in its territory is not in conformity with the provision', but prohibits '[r]eservations of a general character'.

4. 4. The Protocols to the ECHR

32. The ECHR is supplemented by a series of 14 protocols.

33. A first group of protocols, comprising the Protocol to the Convention for the Protection of Human Rights and Fundamental Freedoms ('the Protocol') and Protocols No 4, No 6, No 7, No 12 and No 13, supplements the content of the ECHR by establishing additional fundamental rights. All the Member States are Contracting Parties to the Protocol and to Protocol No 6 to the Convention for the Protection of Human Rights and Fundamental Freedoms concerning the Abolition of the Death Penalty ('Protocol No 6'). By contrast, each of the other protocols has only a limited number of Member States among its Contracting Parties.

34. A second group of protocols, including Protocols No 2, No 3, No 5, Nos 8 to 11 and No 14, merely amends the ECHR and these protocols have no autonomous content. Moreover, most of them have been repealed or have become devoid of purpose.

35. Of the protocols in the second group, the most relevant for the purposes of the present request for an Opinion is Protocol No 14 to the Convention for the Protection of Human Rights and Fundamental Freedoms, amending the control system of the Convention, which was adopted on 13 May 2004 and entered into force on 1 June 2010. By Article 17 of that protocol, Article 59(2) of the ECHR was amended to lay down the very principle of the EU's accession to that Convention. That provision now reads as follows:

'The [EU] may accede to [the ECHR].'

36. Lastly, two additional protocols are open for signature and are not yet in force. These are Protocol No 15 amending the Convention for the Protection of Human Rights and Fundamental Freedoms, which amends the ECHR in relatively minor respects, and Protocol No 16 to the Convention for the Protection of Human Rights and Fundamental Freedoms, signed on 2 October 2013 ('Protocol

No 16'), which provides, in Article 1(1), for the highest courts and tribunals of the Contracting Parties to be able to request the ECtHR to give advisory opinions on questions of principle relating to the interpretation or application of the rights and freedoms defined in the ECHR or the protocols thereto.

## III – The relationship between the EU and the ECHR

37.  According to well-established case-law of the Court of Justice, fundamental rights form an integral part of the general principles of EU law. For that purpose, the Court of Justice draws inspiration from the constitutional traditions common to the Member States and from the guidelines supplied by international treaties for the protection of human rights on which the Member States have collaborated or of which they are signatories (judgments in Internationale Handelsgesellschaft, 11/70, EU:C:1970:114, paragraph 4, and Nold v Commission, 4/73, EU:C:1974:51, paragraph 13). In that context, the Court of Justice has stated that the ECHR has special significance (see, in particular, judgments in ERT, C‑260/89, EU:C:1991:254, paragraph 41, and Kadi and Al Barakaat International Foundation v Council and Commission, C‑402/05 P and C‑415/05 P, EU:C:2008:461, paragraph 283). Article F(2) of the Treaty on European Union (which became, after amendment, Article 6(2) EU) codified that case-law.

38.  In paragraphs 34 and 35 of its Opinion 2/94 (EU:C:1996:140), the Court of Justice considered that, as Community law stood at the time, the European Community had no competence to accede to the ECHR. Such accession would have entailed a substantial change in the existing Community system for the protection of human rights in that it would have entailed the entry of the Community into a distinct international institutional system as well as integration of all the provisions of that Convention into the Community legal order. Such a modification of the system for the protection of human rights in the Community, with equally fundamental institutional implications for the Community and for the Member States, would have been of constitutional significance and would therefore have been such as to go beyond the scope of Article 235 of the EC Treaty (which became Article 308 EC), a provision now contained in Article 352(1) TFEU, which could have been brought about only by way of amendment of that Treaty.

39.  Subsequently, on 7 December 2000, the European Parliament, the Council of the European Union and the Commission proclaimed the Charter of Fundamental Rights of the European Union in Nice (OJ 2000 C 364, p. 1; 'the Charter'). The Charter, which at that time was not a legally binding instrument, has the principal aim, as is apparent from the preamble thereto, of reaffirming 'the rights as they result, in particular, from the constitutional traditions and international obligations common to the Member States, the Treaty on European Union, the Community Treaties, the [ECHR], the Social Charters adopted by the Community and by the Council of Europe and the case-law of the [Court of Justice] and of the [ECtHR]' (see, to that effect, judgment in Parliament v Council, C‑540/03, EU:C:2006:429, paragraph 38).

40.  The Treaty of Lisbon, which entered into force on 1 December 2009, amended Article 6 EU. As amended, that provision, which is now Article 6 TEU, is worded as follows:

'1. The Union recognises the rights, freedoms and principles set out in the [Charter], which shall have the same legal value as the Treaties.

The provisions of the Charter shall not extend in any way the competences of the Union as defined in the Treaties.

The rights, freedoms and principles in the Charter shall be interpreted in accordance with the general provisions in Title VII of the Charter governing its interpretation and application and with due regard to the explanations referred to in the Charter, that set out the sources of those provisions.

2. The Union shall accede to the [ECHR]. Such accession shall not affect the Union's competences as defined in the Treaties.

3. Fundamental rights, as guaranteed by the [ECHR] and as they result from the constitutional traditions common to the Member States, shall constitute general principles of the Union's law.'

41. In that regard, Article 218(6)(a)(ii) TFEU provides that the Council is to adopt the decision concluding the agreement on EU accession to the ECHR ('the accession agreement') after obtaining the consent of the Parliament. In addition, Article 218(8) states that, for that purpose, the Council is to act unanimously and that its decision is to enter into force after it has been approved by the Member States in accordance with their respective constitutional requirements.

42. The protocols to the EU and FEU Treaties, which, according to Article 51 TEU, form an integral part of those Treaties, include Protocol (No 8) relating to Article 6(2) of the Treaty on European Union on the accession of the Union to the European Convention on the Protection of Human Rights and Fundamental Freedoms ('Protocol No 8 EU'). This protocol consists of three articles, which are worded as follows:'Article 1The [accession agreement] provided for in Article 6(2) [TEU] shall make provision for preserving the specific characteristics of the Union and Union law, in particular with regard to:

(a) the specific arrangements for the Union's possible participation in the control bodies of the [ECHR];

(b) the mechanisms necessary to ensure that proceedings by non-Member States and individual applications are correctly addressed to Member States and/or the Union as appropriate.Article 2

The agreement referred to in Article 1 shall ensure that accession of the Union shall not affect the competences of the Union or the powers of its institutions. It shall ensure that nothing therein affects the situation of Member States in relation to the [ECHR], in particular in relation to the Protocols thereto, measures taken by Member States derogating from the [ECHR] in accordance with Article 15 thereof and reservations to the [ECHR] made by Member States in accordance with Article 57 thereof. Article 3

Nothing in the agreement referred to in Article 1 shall affect [Article 344 TFEU].'

43. The Declaration on Article 6(2) of the Treaty on European Union, annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon, is worded as follows:

'The Conference agrees that the Union's accession to the [ECHR] should be arranged in such a way as to preserve the specific features of Union law. In this connection, the Conference notes the existence of a regular dialogue between the [Court of Justice] and the [ECtHR]; such dialogue could be reinforced when the Union accedes to that Convention.'

44. Article 52(3) of the Charter states:

'In so far as this Charter contains rights which correspond to rights guaranteed by the [ECHR], the meaning and scope of those rights shall be the same as those laid down by the said Convention. This provision shall not prevent Union law providing more extensive protection.'

45. Lastly, according to Article 53 of the Charter:

'Nothing in this Charter shall be interpreted as restricting or adversely affecting human rights and fundamental freedoms as recognised, in their respective fields of application, by Union law and international law and by international agreements to which the Union or all the Member States are party, including the [ECHR], and by the Member States' constitutions.'

## IV – The process of accession

46. Upon the recommendation of the Commission of 17 March 2010, the Council adopted a decision on 4 June 2010 authorising the opening of negotiations in relation to the accession agreement, and designated the Commission as negotiator.

47. A supplementary annex to the Council's mandate for the negotiation of 26 and 27 April 2012 sets out the principles which will have to be covered by the EU's internal rules, the adoption of which is necessary in order to make the EU's accession to the ECHR effective ('the internal rules'). According to that document, the internal rules will deal in particular with the representation of the EU before the ECtHR, the triggering of the co-respondent mechanism before the ECtHR and coordination rules for the purpose of the conduct of the procedure before the ECtHR by the respondent and the co-respondent, the selection of three candidates for the office of Judge in the ECtHR, the prior involvement of the Court of Justice, and the circumstances in which the EU will agree a position and those in which the Member States will remain free to speak and act as they choose, both in the ECtHR and in the Committee of Ministers.

48. On 5 April 2013, the negotiations resulted in agreement among the negotiators on the draft accession instruments. The negotiators agreed that all those instruments constitute a package and that they are all equally necessary for the accession of the EU to the ECHR.

## V – The draft agreement

49. The draft agreement contains the provisions considered necessary to allow for the EU's accession to the ECHR. A first group of these provisions relates to accession proper and introduces the procedural mechanisms necessary in order for such accession to be effective. A second group of those provisions, of a purely technical nature, sets out, first, the amendments to the ECHR that are required having regard to the fact that the ECHR was drawn up to apply to the member States of the Council of Europe, whereas the EU is neither a State nor a member of that international organisation. Secondly, provisions are laid down relating to other instruments linked to the ECHR and the final clauses concerning entry into force and the notification of instruments of ratification or accession.

A – The provisions governing accession

50. Taking account of Article 59(2) of the ECHR, Article 1(1) of the draft agreement provides that, by that agreement, the EU accedes to the ECHR, to the Protocol and to Protocol No 6, that is to say, to the two protocols to which all the Member States are already parties.

51. Article 1(2) of the draft agreement amends Article 59(2) of the ECHR so as, first, to enable the EU to accede to other protocols at a later stage, such accession continuing to be governed, mutatis mutandis, by the relevant provisions of each protocol, and, secondly, to make clear that the accession agreement 'constitutes an integral part of [the ECHR]'.

52. According to Article 2(1) of the draft agreement, the EU may, when signing or expressing its consent to be bound by the provisions of the accession agreement in accordance with Article 10 thereof, make reservations to the ECHR and to the Protocol in accordance with Article 57 of the ECHR. Article 4 of Protocol No 6 provides, however, that no reservation may be made in respect of that protocol. In

addition, Article 2(2) of the draft agreement inserts a new sentence into Article 57 of the ECHR, according to which the EU 'may, when acceding to [the ECHR], make a reservation in respect of any particular provision of the Convention to the extent that any law of the [EU] then in force is not in conformity with the provision'. Article 11 of the draft agreement states, moreover, that no reservation may be made in respect of the provisions of that agreement.

53. According to Article 1(3) of the draft agreement, accession to the ECHR and the protocols thereto is to impose on the EU obligations with regard only to acts, measures or omissions of its institutions, bodies, offices or agencies, or of persons acting on their behalf. Moreover, nothing in the ECHR or the protocols thereto is to require the EU to perform an act or adopt a measure for which it has no competence under EU law.

54. Conversely, the first sentence of Article 1(4) of the draft agreement makes clear that, for the purposes of the ECHR, of the protocols thereto and of the accession agreement itself, an act, measure or omission of organs of a Member State of the EU or of persons acting on its behalf is to be attributed to that State, even if such act, measure or omission occurs when the State implements the law of the EU, including decisions taken under the EU and FEU Treaties. The second sentence in the same paragraph makes clear that this is not to preclude the EU from being responsible as a co-respondent for a violation resulting from such an act, measure or omission, in accordance with, in particular, Article 3 of the draft agreement.

55. The aforementioned Article 3 introduces the co-respondent mechanism. Article 3(1) amends Article 36 of the ECHR by adding a paragraph 4 which provides that the EU or a Member State may become a co-respondent to proceedings before the ECtHR in the circumstances set out, in essence, in Article 3(2) to (8), and, moreover, that the co-respondent is a party to the case.

56. Article 3(2) to (8) of the draft agreement is worded as follows:

'2. Where an application is directed against one or more member States of the [EU], the [EU] may become a co-respondent to the proceedings in respect of an alleged violation notified by the [ECtHR] if it appears that such allegation calls into question the compatibility with the rights at issue defined in the [ECHR] or in the protocols to which the [EU] has acceded of a provision of [EU] law, including decisions taken under the [EU Treaty] and under the [FEU Treaty], notably where that violation could have been avoided only by disregarding an obligation under [EU] law.

3. Where an application is directed against the [EU], the [Member States] may become co-respondents to the proceedings in respect of an alleged violation notified by the [ECtHR] if it appears that such allegation calls into question the compatibility with the rights at issue defined in the [ECHR] or in the protocols to which the [EU] has acceded of a provision of the [EU Treaty], the [FEU Treaty] or any other provision having the same legal value pursuant to those instruments, notably where that violation could have been avoided only by disregarding an obligation under those instruments.

4. Where an application is directed against and notified to both the [EU] and one or more of [the] Member States, the status of any respondent may be changed to that of a co-respondent if the conditions in paragraph 2 or paragraph 3 of this article are met.

5. A [Contracting Party] shall become a co-respondent either by accepting an invitation from the [ECtHR] or by decision of the [ECtHR] upon the request of that [Contracting Party]. When inviting a [Contracting Party] to become co-respondent, and when deciding upon a request to that effect, the [ECtHR] shall seek the views of all parties to the proceedings. When deciding upon such a request, the [ECtHR] shall assess whether, in the light of the reasons given by the [Contracting Party] concerned, it is plausible that the conditions in paragraph 2 or paragraph 3 of this article are met.

6. In proceedings to which the [EU] is a co-respondent, if the [Court of Justice] has not yet assessed the compatibility with the rights at issue defined in the [ECHR] or in the protocols to which the [EU] has acceded of the provision of [EU] law as under paragraph 2 of this article, sufficient time shall be afforded for the [Court of Justice] to make such an assessment, and thereafter for the parties to make observations to the [ECtHR]. The [EU] shall ensure that such assessment is made quickly so that the proceedings before the [ECtHR] are not unduly delayed. The provisions of this paragraph shall not affect the powers of the [ECtHR].

7. If the violation in respect of which a [Contracting Party] is a co-respondent to the proceedings is established, the respondent and the co-respondent shall be jointly responsible for that violation, unless the [ECtHR], on the basis of the reasons given by the respondent and the co-respondent, and having sought the views of the applicant, decides that only one of them be held responsible.

8. This article shall apply to applications submitted from the date of entry into force of [the accession agreement].'

57. Lastly, Article 5 of the draft agreement states that proceedings before the Court of Justice are to be understood as constituting neither procedures of international investigation or settlement within the meaning of Article 35, paragraph 2.b, of the ECHR, nor means of dispute settlement within the meaning of Article 55 of the ECHR.

B – *The other provisions*

58. In the first place, one set of provisions is intended, first of all, to modify the provisions of the ECHR or of the protocols thereto which refer to the Contracting Parties as 'States' or to matters covered by the concept of 'State'.

59. Accordingly, Article 1(5) of the draft agreement contains an interpretation clause according to which any of the terms 'State', 'States', 'States Parties', 'national law', 'administration of the State', 'national laws', 'national authority', 'domestic', 'national security', 'economic well-being of the country', 'territorial integrity', 'life of the nation', which appear in various provisions of the ECHR and in some of the protocols thereto, are to be understood after accession as referring also, mutatis mutandis, to the EU as a Contracting Party.

60. As regards the territorial aspects more specifically, as provided in Article 1(6) of the draft agreement, the expression 'everyone within their jurisdiction' appearing in Article 1 of the ECHR is to be understood, with regard to the EU, as referring to persons within the territories of the Member States to which the EU and FEU Treaties apply. In so far as that expression refers to persons outside the territory of a Contracting Party, it is to be understood as referring to persons who, if the alleged violation had been attributable to a Contracting Party which is a State, would have been within the jurisdiction of that Contracting Party. In addition, Article 1(7) provides that, with regard to the EU, the terms 'country' and 'territory of a State' appearing in various provisions of the ECHR and in some of the protocols thereto are to mean each of the territories of the Member States to which the EU and FEU Treaties apply.

61. Next, Article 1(8) of the draft agreement amends Article 59(5) of the ECHR so as to provide that the Secretary-General of the Council of Europe is henceforth to notify the EU also of the entry into force of the ECHR, the names of the Contracting Parties who have ratified it or acceded to it, and the deposit of all instruments of ratification or accession which may be effected subsequently.

62. Lastly, Article 4 of the draft agreement amends the first sentence of Article 29(2) of the ECHR and the heading of Article 33 thereof by replacing the terms 'inter-State applications' and 'inter-State cases' with the terms 'inter-Party applications' and 'inter-Party cases', respectively.

63. In the second place, certain amendments of the ECHR were considered necessary on account of the fact that the EU is not a member of the Council of Europe.

64. Article 6(1) of the draft agreement provides that a delegation of the European Parliament is to be entitled to participate, with the right to vote, in the sittings of the Assembly whenever the Assembly exercises its functions related to the election of Judges to the ECtHR. The delegation is to have the same number of representatives as the delegation of the member State of the Council of Europe which is entitled to the highest number of representatives. According to Article 6(2), '[t]he modalities of the participation of representatives of the European Parliament in the sittings of the [Assembly] and its relevant bodies shall be defined by the [Assembly], in co-operation with the European Parliament'.

65. As regards the Committee of Ministers, first of all, Article 7(1) of the draft agreement is to amend Article 54 of the ECHR by adding a new paragraph 1, according to which '[p]rotocols to [the] Convention are adopted by the Committee of Ministers'. Next, according to Article 7(2), the EU is to be entitled to participate in the meetings of the Committee of Ministers, with the right to vote, when the latter takes decisions under certain provisions of the ECHR, namely Articles 26(2) (reduction of the number of Judges of the Chambers), 39(4) (supervision of the execution of a friendly settlement), 46(2) to (5) (execution of the judgments of the ECtHR), 47 (requests for advisory opinions) and 54(1) (powers of the Committee of Ministers). In addition, Article 7(3) provides that, before the adoption of any text relating to the ECHR or to any protocol to the ECHR to which the EU has become a party, to decisions by the Committee of Ministers under the provisions mentioned in paragraph 2 of that article, or to the selection of candidates for election of Judges by the Assembly, the EU is to be consulted within that Committee, which must take due account of the position expressed by the EU. Lastly, the first sentence of Article 7(4) of the draft agreement sets out the principle that the exercise of the right to vote by the EU and its Member States is not to prejudice the effective exercise by the Committee of Ministers of its supervisory functions under Articles 39 and 46 of the ECHR (execution of friendly settlements and of the judgments of the ECtHR). More specifically, Article 7(4)(a) states that, 'in relation to cases where the Committee of Ministers supervises the fulfilment of obligations either by the [EU] alone, or by the [EU] and one or more of its [M]ember States jointly, it derives from the [EU Treaties] that the [EU] and its [M]ember States express positions and vote in a co-ordinated manner', before going on to provide that the rules for the supervision of the execution of judgments and the terms of friendly settlements 'shall be adapted to ensure that the Committee of Ministers effectively exercises its functions in those circumstances'. By contrast, in the words of Article 7(4)(b), 'where the Committee of Ministers otherwise [than in the cases referred to in subparagraph (a)] supervises the fulfilment of obligations by a [Contracting Party] other than the [EU], the [Member States] are free under the [EU Treaties] to express their own position and exercise their right to vote'.

66. It was precisely in response to the abovementioned Article 7(4)(a) that the negotiators agreed to add to the Rules for the supervision of execution a Rule 18, headed 'Judgments and friendly settlements in cases to which the [EU] is a party'. The wording of that new Rule 18 is as follows:

'1. Decisions by the Committee of Ministers under Rule 17 (Final Resolution) of the present rules shall be considered as adopted if a majority of four fifths of the representatives casting a vote and a majority of two thirds of the representatives entitled to sit on the Committee of Ministers are in favour.

2. Decisions by the Committee of Ministers under Rule 10 (Referral to the [ECtHR] for interpretation of a judgment) and under Rule 11 (Infringement proceedings) of the present rules shall be considered as adopted if one fourth of the representatives entitled to sit on the Committee of Ministers is in favour.

3. Decisions on procedural issues or merely requesting information shall be considered as adopted if one fifth of the representatives entitled to sit on the Committee of Ministers is in favour.

4. Amendments to the provisions of this rule shall require consensus by all [Contracting Parties] to the [ECHR].'

67. As regards participation in the expenditure related to the ECHR, Article 8 of the draft agreement provides that the EU is to pay into the budget of the Council of Europe an annual contribution dedicated to the expenditure related to the functioning of the ECHR, and that that contribution is to be in addition to contributions made by the other Contracting Parties.

68. In the third place, the draft agreement includes a provision concerning relations between the ECHR and other agreements concluded in the Council of Europe that are related to the ECHR. Thus, under Article 9(1) of the draft agreement, the EU is, within the limits of its competences, to respect Articles 1 to 6 of the European Agreement relating to Persons Participating in Proceedings of the European Court of Human Rights, concluded in Strasbourg on 5 March 1996; Articles 1 to 19 of the General Agreement on Privileges and Immunities of the Council of Europe, concluded in Paris on 2 September 1949; Articles 2 to 6 of the Protocol to the General Agreement on Privileges and Immunities of the Council of Europe, concluded in Strasbourg on 6 November 1952; and Articles 1 to 6 of the Sixth Protocol to the General Agreement on Privileges and Immunities of the Council of Europe, signed in Strasbourg on 5 March 1996. In addition, Article 9(2) of the draft agreement provides that, for the purpose of the application of those instruments, the Contracting Parties to each of them are to treat the EU as if it were a Contracting Party. Paragraphs 3 and 4 of the same article provide, respectively, for the EU to be consulted when those instruments are amended and for it to be notified of events such as signature, deposit, date of entry into force or any other act relating to them.

69. Lastly, Articles 10 and 12 of the draft agreement, headed 'Signature and entry into force' and 'Notifications', respectively, contain the final clauses.

70. It should also be noted that, in accordance with the terms of the draft declaration, at paragraph (a), '[u]pon its accession to the [ECHR], the [EU] will ensure that … it will request to become a co-respondent to the proceedings before the [ECtHR] or accept an invitation by the [ECtHR] to that effect, where the conditions set out in Article 3, paragraph 2, of the Accession Agreement are met …'.

## VI – **The Commission's assessment in its request for an Opinion**

### A – Admissibility

71. According to the Commission, its request for an Opinion is admissible, given that the information available to the Court of Justice is sufficient for it to consider whether the draft agreement is compatible with the Treaties and that, moreover, the draft accession instruments agreed by the negotiators are sufficiently advanced to be regarded as an 'agreement envisaged' within the meaning of Article 218(11) TFEU. Furthermore, the fact that internal rules have yet to be adopted should not have any bearing on the admissibility of the request for an Opinion, given that those rules cannot be adopted until the accession agreement has been concluded.

### B – *Substance*

72. As regards the substance, the Commission analyses the conformity of the draft agreement with the various requirements set out in Article 6(2) TEU and Protocol No 8 EU. Furthermore, it also puts forward arguments to establish that the agreement envisaged respects the autonomy of the legal order of the EU in pursuing its own particular objectives. According to the Commission, it is necessary to avoid a situation in which the ECtHR or the Committee of Ministers could, when a dispute relating to the interpretation or application of one or more provisions of the ECHR or of the accession agreement is brought before them, be called upon, in the exercise of their powers under the ECHR, to interpret concepts in those instruments in a manner that might require them to rule on the respective competences of the EU and its Member States.

73. At the end of its analysis, the Commission concludes that the accession agreement is compatible with the Treaties.

1.  1. Article 1(a) of Protocol No 8 EU

74. According to the Commission, the purpose of the requirement in Article 1(a) of Protocol No 8 EU to preserve the specific characteristics of the EU and EU law with regard to the specific arrangements for the EU's possible participation in the control bodies of the ECHR is to ensure that the EU participates on the same footing as any other Contracting Party in the control bodies of the ECHR, that is to say, the ECtHR, the Assembly and the Committee of Ministers.

75. The Commission submits that the draft agreement ensures such participation in those control bodies.

76. As regards the ECtHR, there is, it is argued, no need to amend the ECHR in order to allow the presence of a Judge elected in respect of the EU, since Article 22 of the ECHR provides that a Judge is to be elected in respect of each Contracting Party. As regards the election of Judges to the ECtHR by the Assembly, Article 6(1) of the draft agreement provides that a delegation of the European Parliament is to participate, with the right to vote, in the relevant sittings of the Assembly. As to the Committee of Ministers, Article 7(2) of the draft agreement provides that the EU is to be entitled to participate, with the right to vote, in the meetings of that Committee when it takes decisions in the exercise of the powers conferred on it by the ECHR. The EU is to have one vote, like the 47 other Contracting Parties.

77. The Commission notes that the obligation of sincere cooperation requires the EU and the Member States to act in a coordinated manner when they express their views or cast their votes on the execution of a judgment of the ECtHR delivered against the EU or against a Member State establishing a violation of the ECHR in proceedings to which the EU was a co-respondent. According to the Commission, it follows from this that, after accession, the EU and the Member States will together hold 29 votes out of a total number of 48 in the Committee of Ministers, and will, by themselves, hold a large majority within that Committee. Accordingly, in order to preserve both the effectiveness of the control machinery and the substantive equality of the Contracting Parties, the second sentence of Article 7(4)(a) of the draft agreement provides that the Rules for the supervision of execution are to be adapted to enable the Committee of Ministers to exercise its functions effectively. To that end, special voting rules are laid down in draft Rule 18. According to paragraph 4 of that draft rule, any amendment of those rules is to require consensus by all Contracting Parties.

78. Lastly, when the Committee of Ministers adopts instruments or texts without binding legal effect on the basis of its general competence under Article 15 of the Statute of the Council of Europe, it would not be possible for the EU, not being a member of that international organisation, to participate, with the right to vote, in the adoption of such decisions. Article 7(3) of the draft agreement therefore requires the EU to be consulted before the adoption of such texts or instruments and makes clear that the Committee of Ministers is to take due account of the position expressed by the EU.

2.  2. Article 1(b) of Protocol No 8 EU

79. As regards the requirement in Article 1(b) of Protocol No 8 EU to preserve the specific characteristics of the EU and EU law with regard to the mechanisms necessary to ensure that proceedings by non-Member States and individual applications are correctly addressed to Member States and/or the EU as appropriate, the Commission notes that, where a violation of the ECHR alleged before the ECtHR in relation to an act or omission on the part of a Contracting Party is linked to another legal provision, the compatibility of that provision with the ECHR is called into question, with the result that the review exercised by the ECHR bodies will necessarily be concerned with that provision. However, unlike the position in the case of any other Contracting Party which is simultaneously responsible for the act and for the provision on which that act is based, where a violation alleged

before the ECtHR — in relation to an act of a Member State — is linked to a provision of EU law, the EU, as the Contracting Party to which that provision pertains, would not be a party to the proceedings before the ECtHR. The same applies to the Member States, taken together, where a violation alleged before the ECtHR in relation to an act or omission on the part of an institution, body, office or agency of the EU is linked to a provision of the Treaties, for which the Member States alone are responsible.

80. In the Commission's submission, in order to ensure that, in both situations, the Contracting Party that adopted the provision in question is not prevented either from taking part in the proceedings before the ECtHR or from being bound, as the case may be, by the obligations under Article 46(1) of the ECHR regarding the possible amendment or repeal of that provision, the draft agreement lays down specific procedural rules introducing the co-respondent mechanism. In particular, Article 3 of the draft agreement would, on the one hand, allow the EU to become a co-respondent in the case of an allegation of a violation calling into question the compatibility with the ECHR of a provision of EU law, and, on the other, allow Member States to become co-respondents in the case of an allegation of a violation calling into question the compatibility with the ECHR of a provision laid down in the Treaties.

81. The Commission points out that the new Article 36(4) of the ECHR, added by Article 3(1) of the draft agreement, states in the second sentence that '[a] co-respondent is a party to the case'. Thus, the co-respondent would enjoy all the procedural rights available to the parties and would not, therefore, be regarded merely as a third-party intervener. In addition, if a judgment of the ECtHR should find a violation of the ECHR, thus also calling into question a provision of EU law, the co-respondent would be obliged to remedy that violation so as to abide by the judgment, either by amending that provision or by repealing it.

82. According to the Commission, the provisions mentioned in the three preceding paragraphs of this Opinion preserve the autonomy of the EU legal order with regard to the decisions which the ECtHR may be called upon to take in respect of the EU and the Member States. In the first place, in accordance with Article 3(5) of the draft agreement, the status of co-respondent would be acquired either by accepting an invitation to that effect from the ECtHR, or by a decision of the ECtHR on the basis of the plausibility of the reasons given in the request from the Contracting Party concerned. Thus, the ECtHR would not be called upon to interpret EU law incidentally in order to establish whether an allegation of a violation of the ECHR called into question the compatibility with the ECHR of a provision of EU law. In the second place, Article 3(7) lays down the rule that the respondent and co-respondent are to be jointly responsible for any violation of the ECHR in proceedings to which a Contracting Party is a co-respondent. Consequently, in such cases, the ECtHR would confine itself to finding that the violation had taken place. By contrast, it would not be required to rule directly on the nature of the parts played in the violation by the EU and the Member State concerned, or their shares in it, or, therefore, to rule indirectly on their respective obligations with regard to the execution of the judgment and in particular any individual or general measures to be taken in that respect. Furthermore, in accordance with the second part of Article 3(7), only on the basis of any reasons given jointly by the respondent and the co-respondent could the ECtHR decide that only one of them should be held responsible.

83. The Commission further takes the view that the draft agreement also ensures that a judgment of the ECtHR delivered in proceedings to which the EU is a co-respondent cannot affect the competences of the EU. Such a judgment cannot impose on the EU obligations that go beyond those it is required to fulfil under the competences conferred on it in the Treaties.

84. Specifically, according to the Commission, the EU ought to join the proceedings as a co-respondent automatically whenever it is alleged that the ECHR has been violated by an act on the part of a Member State that is applying a provision of EU law in such a way that the allegation calls into question the compatibility of that provision with the ECHR. The Commission argues that the draft

agreement makes it possible to achieve that result. It submits that, under Article 3(5) of the draft agreement, when the ECtHR is ruling on a request by a Contracting Party asking to become a co-respondent, the ECtHR is to assess whether, in the light of the reasons given by that party, it is plausible that the conditions in Article 3(2) or (3) of the ECHR are met. Those considerations also apply, mutatis mutandis, to the Member States when a violation of the ECHR by an act on the part of the EU calls into question the compatibility of the Treaties with the ECHR. The Commission adds, however, that in such cases fulfilment of the obligation of sincere cooperation requires that the Member States be represented before the ECtHR by a single agent, a requirement which should be included in the internal rules.

3.    3. The second sentence of Article 6(2) TEU and the first sentence of Article 2 of Protocol No 8 EU

85.    As regards the requirement set out in the second sentence of Article 6(2) TEU and the first sentence of Article 2 of Protocol No 8 EU, according to which accession must not affect the EU's competences as defined in the Treaties, the Commission notes that accession will impose an obligation on the EU to respect the rights guaranteed by the ECHR. In so far as that obligation entails an obligation to refrain from adopting any measure that might violate those rights, the EU, in acceding to the ECHR, would merely be accepting limits on the exercise of the competences conferred on it by the Member States in the Treaties. Moreover, in so far as that obligation on the part of the EU entails an obligation to adopt specific measures, the second sentence of Article 1(3) of the draft agreement provides that nothing in the ECHR or the protocols thereto is to require the EU to perform an act or adopt a measure for which it has no competence under EU law. Consequently, the commitments made by the EU when acceding to the ECHR would not in any way affect its competences.

86.    Similarly, the competences of the EU would not be affected by the draft agreement's providing for the EU to accede not only to the ECHR but also to the Protocol and to Protocol No 6 and, moreover, for the possibility of acceding to the other existing protocols. Principally, the Commission takes the view that Article 6(2) TEU confers a competence on the EU to accede to all the existing protocols, irrespective of whether or not all the Member States are parties to them. If it were otherwise, the rule in the second sentence of Article 2 of Protocol No 8 EU, according to which the accession agreement is to ensure that the situation of the Member States in relation to the protocols is not affected by the accession of the EU, would be meaningless. Furthermore, those protocols are merely accessory to the ECHR. Thus, the EU would have the competence, if necessary, to enter into any new protocols or to accede to them at a later stage, provided they too are accessory to the ECHR.

4.    4. Article 1(b) and the first sentence of Article 2 of Protocol No 8 EU

87.    According to the Commission, the powers of the EU institutions other than the Court of Justice are not affected by accession. Those institutions would have to exercise their powers with regard to the ECHR and its control bodies in the same way as they are required to do with regard to any other international agreement and the bodies set up or given decision-making powers by such an agreement. In particular, it follows, both from Article 335 TFEU and from paragraph 94 of the judgment in Reynolds Tobacco and Others v Commission (C-131/03 P, EU:C:2006:541) that the Commission represents the EU before courts other than those of the Member States. In the present case, the Commission would be required to represent the EU before the ECtHR, but, in accordance with the principle of sincere cooperation between institutions, if a provision of EU law laid down in an act of an institution other than the Commission were called into question in proceedings before the ECtHR, the powers of that other institution would be preserved if that institution were involved in the preparation of the procedural acts to be addressed to the ECtHR. In addition, when the Committee of Ministers is called upon to adopt acts having legal effects, the procedure provided for in Article 218(9) TFEU will apply ipso jure.

88. As regards the Court of Justice and, more generally, the preservation of the specific characteristics of the EU and of EU law with regard to the system of judicial protection, the Commission's assessment in that regard relates, in essence, to three issues: the exhaustion of domestic remedies, the effectiveness of judicial protection, particularly having regard to the common foreign and security policy ('the CFSP'), and the powers of the Court of Justice under Articles 258 TFEU, 260 TFEU and 263 TFEU. The first two issues arise in the light of Articles 6, 13 and 35(1) of the ECHR, according to which there must be an effective remedy before a domestic authority against any act on the part of a Contracting Party and, moreover, an individual application brought before the ECtHR is admissible only after all domestic remedies have been exhausted.

89. With regard, first of all, to the prior exhaustion of domestic remedies, the Commission maintains that the draft agreement guarantees that remedies before the Courts of the EU must be exhausted before an application against an act on the part of the EU can be validly brought before the ECtHR. In the Commission's submission, the second indent in Article 1(5) of the draft agreement states that the term 'domestic' in Article 35(1) of the ECHR is to be understood as relating also, mutatis mutandis, to the internal legal order of the EU. Moreover, Article 5 of the draft agreement clearly states that proceedings before the Courts of the EU are not to be understood as constituting procedures of international investigation or settlement. Therefore, the fact that a matter had been submitted to those Courts would not make an application before the ECtHR inadmissible under Article 35(2)(b) of the ECHR.

90. Furthermore, in introducing the procedure for the prior involvement of the Court of Justice, the Commission emphasises that there is a possibility that a court of a Member State may find that an act or omission on the part of that Member State infringes a fundamental right that is guaranteed at EU level and which corresponds to a right guaranteed by the ECHR, and that that violation is linked to a provision of EU secondary law. In such a case, the national court is not itself entitled to find, incidentally, that the EU act containing that provision is invalid and to decline to apply it, since the Court of Justice alone, on a request for a preliminary ruling, can declare that act invalid (judgment in Foto-Frost, 314/85, EU:C:1987:452, paragraphs 11 to 20). If it were subsequently alleged before the ECtHR that the same act or omission violated the same fundamental right as guaranteed by the ECHR, and if, therefore, that allegation called into question the compatibility with the ECHR of the provision of EU law in question, the EU would become co-respondent and its institutions, including the Court of Justice, would be bound by the judgment of the ECtHR finding a violation of the ECHR. That situation could arise even though the Court of Justice would not yet have had the opportunity to consider the validity of the EU act at issue in the light of the fundamental right in question the violation of which was being alleged before the ECtHR. In that context, a reference to the Court of Justice for a preliminary ruling under point (b) in the first paragraph of Article 267 TFEU could not be regarded as a 'domestic remedy' which the applicant should have exhausted before bringing an application before the ECtHR, since the parties have no control over whether or not such a reference is made and, therefore, the omission of such a reference would not mean that an application to the ECtHR was inadmissible. That conclusion is all the more compelling given that the powers of the Court of Justice include the jurisdiction to declare an EU act invalid. According to the Commission, in order to preserve those powers, it is necessary to provide for the Court of Justice to be able to consider the compatibility of a provision of EU law with the ECHR in connection with proceedings in the ECtHR to which the EU is a co-respondent. That opportunity should, moreover, arise before the ECtHR rules on the merits of the allegation raised before it and, therefore, indirectly, on the compatibility of that provision with the fundamental right in question. Furthermore, the necessity of prior consideration by the Court of Justice of the provision in question follows also from the fact that the control machinery established by the ECHR is subsidiary to the mechanisms that safeguard human rights at the level of the Contracting Parties.

91. It is, the Commission submits, to meet those needs that the first sentence of Article 3(6) of the draft agreement provides that, in such circumstances, sufficient time is to be afforded for the Court of Justice to make an assessment of the provision at issue in the context of the procedure for the prior

involvement of that court. The second sentence of Article 3(6) states that that assessment must be made quickly so that the proceedings before the ECtHR are not unduly delayed. The ECtHR would not be bound by the assessment of the Court of Justice, as is apparent from the last sentence of that provision.

92. The Commission does add that Article 3(6) of the draft agreement must be accompanied by internal EU rules governing the procedure for the prior involvement of the Court of Justice. The draft agreement does not contain such rules. However, they should not be included in an international agreement, but should be laid down independently at EU level, since their purpose is to regulate an internal EU procedure. Nor would it be necessary or indeed appropriate to insert those procedural rules in the Treaties. The Treaties already impose an obligation on the EU institutions and on the Member States to ensure that the EU accedes to the ECHR and provide, moreover, that the powers of the Court of Justice are not to be affected by that accession. In that regard, the Commission takes the view that it is more appropriate for the rules laying down the principle of a procedure for the prior involvement of the Court of Justice, designating the bodies having the authority to initiate it, and defining the standards governing the examination of compatibility, to be included within the Council decision concluding the accession agreement pursuant to Article 218(6)(a)(ii) TFEU. As regards the content of the internal rules governing the procedure for the prior involvement of the Court of Justice, first of all, the power to make applications to the Court of Justice initiating that procedure should be exercised by the Commission and by the Member State to which the application to the ECtHR is addressed. Furthermore, the Court of Justice should be able to give its ruling before the EU and the Member State concerned present their views to the ECtHR. Next, since the prior involvement procedure has certain structural similarities with the preliminary ruling procedure, the rules concerning the entitlement to participate in it should be similar to those in Article 23 of the Statute of the Court of Justice of the European Union. Lastly, the requirements for speed could be met by applying the expedited procedure referred to in Article 23a of that statute.

93. As regards, secondly, the effectiveness of judicial protection, according to the Commission it is important that, when an act has to be attributed to the EU or indeed to a Member State in order to determine responsibility under the ECHR, this be done in accordance with the same criteria as those that apply within the EU. It is submitted that this requirement is met by the first sentence of Article 1(4) of the draft agreement, which provides that, for the purposes of the ECHR, a measure of a Member State is to be attributed to that State, even if that measure occurs when the State implements the law of the EU, including decisions taken under the EU and FEU Treaties. The effectiveness of the remedy would therefore be assured, given that, in accordance with the second subparagraph of Article 19(1) TEU, it is for the courts of that Member State to guarantee legal protection with regard to acts on the part of that State.

94. However, it is submitted that particular questions with regard to effective judicial protection arise in relation to the area of the CFSP, EU law having two specific characteristics in that respect.

95. In the first place, as regards the attributability of acts, military operations in application of the CFSP are conducted by the Member States, in accordance with the fourth sentence of the second subparagraph of Article 24(1) TEU and Articles 28(1) TEU, 29 TEU and 42(3) TEU. The Commission states that, in order to take account of that characteristic, Article 1(4) of the draft agreement provides that, even with respect to operations conducted in the framework of the CFSP, the acts of the Member States are to be attributed to the Member State in question and not to the EU. That clarification should preclude the possibility that the case-law of the ECtHR — whereby the ECtHR has ruled on the responsibility of an international organisation in relation to acts performed by a Contracting Party for the purpose of implementing a resolution of that organisation (decision of the ECtHR in Behrami and Behrami v. France and Saramati v. France, Germany and Norway, nos 71412/01 and 78166/01, § 122, 2 May 2007, and judgment of the ECtHR in Al-Jedda v. the United Kingdom [GC], no. 27021/08, ECHR 2011) — might be applied to relations between the EU and its Member States. As

stated, moreover, in paragraph 24 of the draft explanatory report, in the cases giving rise to that case-law there was no specific rule on the attribution of acts, such as that provided for by Article 1(4) of the draft agreement.

96. In the second place, as regards the effectiveness of review by the EU judicature in the area of the CFSP, that review is limited, according to the Commission, both by the last sentence of the second subparagraph of Article 24(1) TEU and by the second paragraph of Article 275 TFEU. It follows, in essence, from those provisions that the Court of Justice is not to have jurisdiction with respect to the provisions relating to the CFSP or with respect to acts adopted on the basis of those provisions. It is to have jurisdiction only to monitor compliance with Article 40 TEU and to rule on actions, brought in accordance with the conditions laid down in the fourth paragraph of Article 263 TFEU, for a review of the legality of decisions providing for 'restrictive measures' against natural or legal persons adopted by the Council on the basis of Chapter 2 of Title V of the EU Treaty. The question could therefore arise as to whether the EU provides effective internal remedies in relation to the CFSP.

97. The Commission points out in that regard that, in order for an application to the ECtHR to be admissible, the applicant must be able to claim to be a victim of a violation of the rights set forth in the ECHR or the protocols thereto, and must therefore be directly affected by the act or omission at issue.

98. On the one hand, when a CFSP act on the part of a Member State affects a person directly and may therefore be the subject of an application to the ECtHR, judicial protection with regard to the act is a matter for the courts of the Member States. Where, in exceptional cases, such an act is based on a provision of a Council decision adopted pursuant to Article 28(1) TEU, the compatibility of that provision with the ECHR could be called into question. According to the Commission, in such a case, the Council decision itself constitutes a 'restrictive measure' within the meaning of the second paragraph of Article 275 TFEU, with the result that, although that provision expressly recognises the jurisdiction of the Court of Justice only in respect of actions for annulment 'brought in accordance with the conditions laid down in the fourth paragraph of Article 263 [TFEU]', such provisions could nevertheless be the subject of a reference for a preliminary ruling, including as regards their validity. The Commission relies in that regard in particular on the judgment in Segi and Others v Council (C-355/04 P, EU:C:2007:116), in which, despite the fact that Article 35(1) of the EU Treaty, as amended by the Treaty of Nice, excluded 'common positions' from the jurisdiction of the Court of Justice to give preliminary rulings, the Court of Justice held that national courts could ask it to deliver preliminary rulings on questions relating to a common position which, owing to its content, did of itself produce legal effects in relation to third parties, and consequently had a scope going beyond that assigned by the EU Treaty to that kind of act. In such circumstances, moreover, the procedure for the prior involvement of the Court of Justice should also apply.

99. On the other hand, where CFSP acts are performed by EU institutions, a distinction should be made between acts that have binding legal effects and those that do not. Acts that have binding legal effects are, in so far as they are capable of violating fundamental rights, 'restrictive measures' within the meaning of the second paragraph of Article 275 TFEU and could, therefore, be the subject of an action for annulment before the EU judicature. By contrast, acts that do not produce such effects could not by their nature be the subject of an action for annulment or of a reference for a preliminary ruling. The only remedy available within the EU against such acts would be an action for damages pursuant to Article 340 TFEU, since such an action is not, in the Commission's submission, excluded by the first paragraph of Article 275 TFEU.

100. Thus, in the Commission's view, the combined effect of Article 1(4) of the draft agreement, the first subparagraph of Article 19(1) TEU and Articles 275 TFEU and 340 TFEU is that all acts and measures on the part of the EU and of the Member States in the area of the CFSP, in respect of which a person may claim to be a victim of a violation of the rights set forth in the ECHR, have an effective remedy before the EU judicature or the courts of the Member States.

101. Thirdly, according to the Commission, the draft agreement does not affect the powers of the Court of Justice under Articles 258 TFEU, 260 TFEU and 263 TFEU either. Article 5 of the draft agreement contains an interpretation clause according to which '[p]roceedings before the [Court of Justice] shall [not] be understood as constituting means of dispute settlement within the meaning of Article 55 of the [ECHR]'. Thus, the possibility is expressly preserved that disputes regarding the interpretation and application of the ECHR, or indeed of fundamental rights as defined at EU level and, in particular, in the Charter, may be brought before the Court of Justice.

102. With regard, in particular, to actions for failure to fulfil obligations, the Commission notes that it follows from Article 1(3) of the draft agreement that no obligation is imposed on the Member States, under EU law, with regard to the ECHR and the protocols thereto. Consequently, an action for failure to fulfil obligations could not, by definition, concern the failure of a Member State to fulfil its obligations under the ECHR. Nevertheless, the reference to Article 55 of the ECHR in Article 5 of the draft agreement serves a purpose as regards the requirement that accession should have no effect on the powers of the Court of Justice. The Member States are, under Article 51(1) of the Charter, bound by the fundamental rights defined at EU level when they are implementing EU law. In so far as the prohibition in Article 55 of the ECHR might be understood to refer also to disputes between Contracting Parties regarding the interpretation or application of provisions of an international instrument (such as, in the case of the Member States, the Treaties and the Charter) that has the same content as the provisions of the ECHR, Article 5 of the draft agreement has the effect that that interpretation cannot be relied upon against the EU.

103. Moreover, the ECtHR has specified that the exercise by the Commission of its powers under Article 258 TFEU does not correspond to resorting to procedures of international investigation or settlement within the meaning of Article 35(2)(b) of the ECHR (judgment of the ECtHR in Karoussiotis v. Portugal, no. 23205/08, §§ 75 and 76, ECHR 2011 (extracts)).

104. The Commission states that it is not necessary for the draft agreement to make provision for a specific objection of inadmissibility in the case of applications brought before the ECtHR, under Article 33 of the ECHR, by the EU against a Member State or, conversely, by a Member State against the EU in a dispute regarding the interpretation or application of the ECHR, given that such applications would be manifestly contrary to EU law. Not only would they constitute a circumvention of Article 258 TFEU, but the decision to make such an application could be challenged by an action for annulment under Article 263 TFEU. In addition, an application brought by a Member State against the EU would constitute a circumvention of Article 263 TFEU or, as the case may be, of Article 265 TFEU, which would be subject under EU law to the infringement procedure.

5.  5. The second sentence of Article 2 of Protocol No 8 EU

105. As regards the requirement, set out in the second sentence of Article 2 of Protocol No 8 EU, that accession must not affect the situation of Member States in relation to the ECHR, in particular in relation to the protocols thereto, measures taken by Member States derogating from the ECHR in accordance with Article 15 thereof and reservations to the ECHR made by Member States in accordance with Article 57 thereof, the Commission submits that, in accordance with the first sentence of Article 1(3) of the draft agreement, the scope of the EU's commitments is limited ratione personae to the EU alone, as a party governed by public international law which is distinct from the Member States. Therefore, the accession of the EU to the ECHR does not affect the legal situation of a Member State which, under Article 57 of the ECHR, has made a reservation in respect of a provision of the ECHR or of one of the protocols to which the EU is acceding, or which has taken measures derogating from the ECHR under Article 15 thereof, or which is not a party to one of the protocols to which the EU might accede in the future. It also follows from this that, even though under Article 216(2) TFEU agreements concluded by the EU are binding upon the institutions of the EU and on the Member States, the draft agreement does not impose any obligation on them, under EU law, in respect of the ECHR and the protocols thereto.

6.     6. Article 3 of Protocol No 8 EU

106.   As regards, lastly, the requirement, set out in Article 3 of Protocol No 8 EU, that accession must not affect Article 344 TFEU, the Commission submits that another consequence of the fact that, in accordance with Article 1(3) of the draft agreement, the accession of the EU to the ECHR does not impose any obligation on the Member States, under EU law, in respect of the ECHR and the protocols thereto is that a dispute between Member States regarding the interpretation or application of the ECHR is not strictly speaking a dispute regarding the interpretation or application of the Treaties, of the kind referred to in Article 344 TFEU.

107.   However, the reference to Article 55 of the ECHR in Article 5 of the draft agreement serves a purpose as regards that requirement also. In so far as the prohibition in Article 55 might be understood to refer also to disputes between Contracting Parties regarding the interpretation or application of provisions of an international instrument (such as, in the case of the Member States, the Treaties and the Charter) that has the same content as the provisions of the ECHR, Article 5 of the draft agreement has the effect that that interpretation cannot be relied upon against the Member States. The Commission adds that there is no need for a rule that an application brought before the ECtHR by one Member State against another in a dispute regarding the interpretation or application of provisions of EU law that have the same content as those of the ECHR, in particular provisions of the Charter, is to be inadmissible. The bringing of such an application would itself constitute an infringement of Article 344 TFEU and would be subject, at EU level, to the proceedings referred to in Articles 258 TFEU to 260 TFEU.

VII – **Summary of the main observations submitted to the Court of Justice**

108.   In the context of the present request for an Opinion, observations were submitted to the Court in writing or orally at the hearing by the Belgian, Bulgarian, Czech, Danish, German and Estonian Governments, Ireland, the Greek, Spanish, French, Italian, Cypriot, Latvian, Lithuanian, Hungarian, Netherlands, Austrian, Polish, Portuguese, Romanian, Slovak, Finnish, Swedish and United Kingdom Governments, and by the Parliament and the Council.

109.   All the Member States and institutions mentioned above conclude, in essence, that the draft agreement is compatible with the Treaties, and largely endorse the Commission's assessment. However, their assessments differ from that of the Commission in a number of respects.

A – Admissibility of the request for an Opinion

110.   As regards the admissibility of the request for an Opinion, it is essentially common ground that the subject-matter of the request is indeed an 'agreement envisaged' within the meaning of Article 218(11) TFEU, and that the Court of Justice has all the information necessary to assess the compatibility of that agreement with the Treaties, as the Court of Justice requires (Opinion 2/94, EU:C:1996:140, paragraphs 20 and 21).

111.   By contrast, the Commission's assessment regarding the internal rules has given rise to very different positions.

112.   According to the Bulgarian and Danish Governments, Ireland, the French, Hungarian, Portuguese, Finnish, Swedish and United Kingdom Governments, as well as the Parliament and the Council, the fact that those rules have not yet been adopted does indeed not affect the admissibility of the request. That is particularly so since, as the Estonian and Latvian Governments note, such rules would have consequences only for the EU and could not affect the international aspects of the draft agreement and, moreover, as the Polish and Swedish Governments essentially emphasise, those rules must also

be compatible with the Treaties, such compatibility being subject to review, if necessary, according to the Cypriot, Swedish and United Kingdom Governments, by the Court of Justice in accordance with Article 263 TFEU.

113. However, it is submitted that the Commission ought not to have initiated a discussion of such rules before the Court of Justice in the present Opinion procedure. It is impossible for the Court of Justice to express a view on such internal rules either, according to the Greek and Netherlands Governments, because of their hypothetical nature or, according to the French, Cypriot and Lithuanian Governments and the Council, because there is insufficient information regarding their content, or indeed, in the opinion of the Czech, Estonian, French, Cypriot, Lithuanian, Netherlands, Portuguese, Slovak and Swedish Governments, in the light of the fact that they are extraneous to the international agreement at issue, that agreement alone being capable of forming the subject-matter of a request for an Opinion within the meaning of Article 218(11) TFEU. Furthermore, for the Court of Justice to be required to express a view on the content of rules that have not yet been adopted by the EU legislature would, according to the Estonian and United Kingdom Governments and the Council, be to encroach upon the competences of the EU legislature, contrary to Article 13 TEU, or, according to the Estonian Government, be in breach of the principle of the division of powers set out in Article 5(1) and (2) TEU.

114. It is argued that it follows from this that the request for an Opinion is admissible only in so far as it concerns the agreement envisaged, whereas, so far as concerns the internal rules, either, according to the French and Cypriot Governments, the Court of Justice has no jurisdiction, or, according to the Czech, Estonian and French Governments, the request is inadmissible, or, according to the Lithuanian Government, it is not necessary for the Court of Justice to express a view.

115. Should, however, an analysis of the internal rules be necessary for the purposes of assessing whether the draft agreement is consistent with the Treaties — a point which, according to the Greek Government, is for the Court of Justice to determine — then either, according to the Polish Government, the Court of Justice must make its Opinion regarding the compatibility of that draft with the Treaties conditional on the internal rules also being compatible with the Treaties or, in the view of the Romanian Government, with the draft declaration; or, according to the Estonian Government and the Council, the procedure must be stayed until those rules become available; or, according to the Greek Government and the Council, the request must be declared inadmissible in its entirety or, in the Spanish Government's view, be declared inadmissible in respect of those aspects of the draft agreement which have yet to be detailed in those internal rules, namely those concerning the issues of the EU's representation before the ECtHR, the prior involvement of the Court of Justice, the procedures to be followed in drawing up the list of three candidates for the position of Judge and the EU's participation in the Assembly or in the Committee of Ministers, and the new voting rules set out in draft Rule 18.

116. In the alternative, in the event that the Court of Justice should decide to express a view on the internal rules, observations were submitted with regard to the main rules.

B – Substance

1. 1. Article 1(a) of Protocol No 8 EU

117. All the Member States and institutions which submitted observations agree on the essence of the Commission's assessment in concluding that the draft agreement preserves the specific characteristics of the EU and EU law with regard to the specific arrangements for the EU's participation in the control bodies of the ECHR.

2.    2. Article 1(b) of Protocol No 8 EU

118.    Those Member States and institutions also consider that the co-respondent mechanism broadly enables the specific characteristics of the EU and EU law to be preserved by ensuring that proceedings by non-Member States and individual applications are correctly addressed to Member States and/or the EU as appropriate.

119.    Nevertheless, certain Member States take the view that the Commission's assessment requires adjustment or clarification.

120.    First of all, according to the Austrian Government, the co-respondent mechanism must be capable of being triggered not only where the violation of the ECHR 'could have been avoided only by disregarding an obligation under EU law', but also where such a violation is attributable to a Member State in the context of the implementation of EU law, and even though EU law accords that Member State a certain degree of autonomy. If the alleged violation is linked to an act transposing a directive, it might be in the EU's interest to defend the legality of that directive before the ECtHR, even if the directive does not compel the Member State concerned to adopt the act but merely authorises it to do so. Furthermore, it might be difficult to know in advance the extent of the margin of discretion to be given to the Member States in connection with the transposition of a directive.

121.    Next, the Bulgarian Government takes the view that the fact that the co-respondent mechanism is optional means that it is open to potential co-respondents to escape their responsibilities under Article 46 of the ECHR. In that regard, the Austrian Government adds that the compatibility of that mechanism with the requirements of Article 1(b) of Protocol No 8 EU depends on there being an internal provision in EU law compelling the institutions of the EU, in proceedings against one or more Member States, to request that the EU be admitted as a co-respondent where it is alleged that the ECHR has been violated and the allegation calls into question the compatibility of EU law with the ECHR. Even though such an internal obligation is already envisaged in paragraph (a) of the draft declaration, it is none the less necessary for that obligation to be regulated in a binding manner, so that a failure to make such a request or a refusal to participate in proceedings upon being invited to do so by the ECtHR pursuant to Article 3(5) of the draft agreement constitutes a failure to act for the purposes of Article 265 TFEU. Furthermore, according to the Romanian Government, it follows from that draft declaration that although the EU's intervention as co-respondent is envisaged as a possibility by the draft agreement, the EU undertakes to establish rules internally that will make it possible to determine which alleged violation of the provisions of the ECHR are related to EU law and the amount of leeway available to the Member State concerned.

122.    In addition, according to the French Government, in order to avoid the ECtHR ruling on issues relating to EU law, such as the division of responsibilities in the context of a violation established following proceedings to which a Contracting Party is a co-respondent, Article 3(7) of the draft agreement would certainly have to be interpreted as meaning that the ECtHR can decide on the sharing of responsibility between respondent and co-respondent only on the basis of the reasons they give in their joint request.

123.    Lastly, the United Kingdom Government states that, contrary to the Commission's suggestion that the co-respondent will have an obligation under Article 46(1) of the ECHR to remedy a violation of the ECHR so as to abide by a judgment of the ECtHR, in fact that obligation must be shared. If such a judgment were to be given jointly against the EU and one or more of its Member States, it would not in itself give rise to a power for any of the EU institutions, in particular the Commission, to act in order to ensure its proper execution, which would have to be effected through the normal legislative processes of the EU.

3.  3. Article 6(2) TEU and the first sentence of Article 2 of Protocol No 8 EU

124.  The Commission's assessment with regard to the requirement that accession to the ECHR does not affect the EU's competences is largely shared by the Member States that submitted observations to the Court of Justice, save as regards the question of the competence of the EU to accede to protocols other than those to which the EU is to accede pursuant to Article 1 of the draft agreement, that is the Protocol and Protocol No 6.

125.  In particular, according to the German Government, the considerations included in the request for an Opinion regarding possible accession to protocols other than the Protocol and Protocol No 6 are inadmissible, since there is no 'agreement envisaged' in that respect.

126.  As to the substance, the Slovak Government maintains that the EU currently has competence to accede only to the two protocols mentioned in the preceding paragraph, while, in the Danish Government's view, the EU does not have competence to accede to existing protocols to which the Member States are not already parties.

127.  By contrast, the Latvian, Netherlands and Polish Governments take the view that the EU could, in theory, have competence to accede to the latter protocols also. However, it is submitted that that is not a decisive factor. According to the Netherlands Government, in the light of the procedure laid down in Article 218(6)(a)(ii) and the second subparagraph of Article 218(8) TFEU, which prescribes unanimity for the conclusion of an agreement within the meaning of that article and its approval by all the Member States in accordance with their respective constitutional requirements, it is unlikely that the EU would be able to obtain Member States' approval for accession to protocols to which they are not parties. In any event, at present, the EU would not be able to accede to protocols other than those mentioned in Article 1 of the draft agreement without, according to the Latvian Government, the Council having approved a specific mandate in that regard, or, according to the Polish Government, without regard to the will of the Member States. Lastly, the German Government adds that that competence must be exercised in accordance with the second sentence of Article 2 of Protocol No 8 EU, which states that the accession agreement must not affect the situation of Member States in relation to the ECHR, in particular in relation to the protocols thereto. Immediate accession to the protocols to which not all the Member States are parties would infringe that provision or, according to the Greek Government, would be in breach of the principle of sincere cooperation.

4.  4. Article 1(b) and the first sentence of Article 2 of Protocol No 8 EU

128.  As regards the question of the effectiveness of the remedies provided for by the Treaties in the area of the CFSP, and as regards in particular the Commission's assessment in relation to the attributability of acts adopted under that policy, that assessment was considered unnecessary by the United Kingdom Government on the ground that the ECtHR has never applied to the EU its case-law concerning the attributability to international organisations of acts of the Contracting Parties. In any event, according to the German Government, the rule laid down in Article 1(4) of the draft agreement, as explained in paragraphs 22 to 26 of the draft explanatory report, is to apply only for the purposes of the EU's accession to the ECHR and must not affect the general principles of international law in relation to the attributability of acts to international organisations.

129.  The positions of the Member States on the limitations which the Treaties impose on the jurisdiction of the Court of Justice in the area of the CFSP are more nuanced.

130.  First of all, according to the Greek and United Kingdom Governments, it is not necessary for the Court of Justice to interpret Article 275 TFEU and to express a view on its possible jurisdiction in respect of, inter alia, references for preliminary rulings in that area.

131. In any event, the United Kingdom Government adds that the broad interpretation of that article advocated by the Commission, according to which the jurisdiction of the Court of Justice under Article 267 TFEU extends also to acts falling within the CFSP, is incorrect and is based on the judgments in Gestoras Pro Amnistía and Others v Council (C-354/04 P, EU:C:2007:115) and Segi and Others v Council (EU:C:2007:116), that is to say, on case-law that predates the Treaty of Lisbon. However, as the Spanish and Finnish Governments also note, that Treaty, through Article 275 TFEU, specifically limited reviews of the validity of acts covered by the CFSP to actions for annulment only, thereby excluding references for preliminary rulings on validity. According to those two governments, Article 275 TFEU must be interpreted narrowly, not only because of the fact that, in this area, the lack of jurisdiction of the Court of Justice is the rule, and its jurisdiction merely the exception, as the French and Polish Governments and the Council submit, but also because of the fact, highlighted by the Spanish and Polish Governments, that a broad interpretation expanding the jurisdiction of the Court of Justice in CFSP matters does not accord with the requirements of Article 2 of Protocol No 8 EU. The Netherlands Government submits, moreover, that such a broad interpretation creates uncertainty as to the criteria for the admissibility of actions for annulment of such acts. The Courts of the EU have jurisdiction only to rule, on the basis of the fourth paragraph of Article 263 TFEU, on decisions providing for restrictive measures against natural or legal persons adopted by the Council on the basis of Chapter 2 of Title V of the EU Treaty. According to the French Government, a broad interpretation of 'restrictive measure' has consequences as regards the interpretation of the criteria for the admissibility of actions for annulment and of actions based on a plea of illegality provided for in Article 277 TFEU. Lastly, according to the French Government and the Council, such an expansion is, moreover, likely to extend also to the procedure for the prior involvement of the Court of Justice. That procedure could in fact be triggered only where the allegation before the ECtHR is that there has been a violation of the ECHR linked to a restrictive measure; if it were otherwise the jurisdiction of the Court of Justice would be extended.

132. Next, in the submission of the French Government and of the Council, the distinction made by the Commission between measures that have binding effect and those that do not is unfounded, since what matters is only whether it is a 'restrictive measure' within the meaning of Article 275 TFEU. The meaning of 'restrictive measure' cannot depend simply on the fact that a measure is capable of infringing the fundamental rights of individuals, since such a definition goes beyond the letter of Article 215(2) TFEU and renders the first paragraph of Article 275 TFEU redundant.

133. Consequently, according to the Council, while the Court of Justice continues to have jurisdiction over pleas of illegality in accordance with Article 277 TFEU, it does not, according to the Polish Government, have jurisdiction over the validity of measures other than restrictive measures by means of a reference for a preliminary ruling, nor, according to the French Government and the Council, does it have jurisdiction to rule on claims in non-contractual liability in which compensation is sought for damage resulting from a CFSP act or measure. According to the French and Netherlands Governments and the Council, the concept of restrictive measures includes only 'decisions imposing sanctions' on natural or legal persons which are intended to limit their entry into the territory of the Member States and to freeze their funds and economic resources, which thus concerns both basic acts under Article 31(1) TEU and implementing acts adopted on the basis of Article 31(2) TEU.

134. In that regard, the French Government states that the judgment in Segi and Others v Council (EU:C:2007:116) concerning the admissibility of references for a preliminary ruling in the context of the former 'third pillar' cannot be applied to the present case, since, unlike Article 35(1) EU, Article 275 TFEU does not confer on the Court of Justice any jurisdiction to give preliminary rulings.

135. Lastly, according to the French Government, the fact that that interpretation of Article 275 TFEU is likely to deprive individuals of effective judicial protection against certain acts falling within the CFSP cannot be sufficient to confer on the Court of Justice a jurisdiction not provided for by the Treaties. According to the French, Polish, Finnish and Swedish Governments, it is precisely in order to avoid the EU being systematically censured for violation of Articles 6 and 13 of the ECHR that Article 1(4)

of the draft agreement and paragraphs 23 and 24 of the draft explanatory report make clear that it is for the Member States to guarantee protection of the right to obtain a judicial determination and of the right to an effective judicial remedy, particularly as, according to the Council, the EU does not enjoy any immunity from legal proceedings, in accordance with Protocol (No 7) on the privileges and immunities of the European Union annexed to the EU, FEU and EAEC Treaties, and can therefore be sued for compensation in the national courts. Moreover, according to the Council, the question whether the system of judicial protection in relation to the CFSP is in conformity with Articles 6 and 13 of the ECHR is relevant only in respect of CFSP acts attributable to the EU, as regards both military and civilian operations, given that it is for the courts of the Member States to guarantee the effectiveness of such protection in respect of any such acts attributable to the Member States.

136. As regards the procedure for the prior involvement of the Court of Justice, it is, first of all, maintained by the United Kingdom Government that that procedure is not necessary in order for the draft agreement to be considered compatible with the Treaties: given their declaratory nature, decisions of the ECtHR have no effect on the validity of EU law. In any event, according to the Bulgarian Government, it is not necessary to initiate that procedure where the Court of Justice has already ruled on the validity of the act concerned in the light of the corresponding fundamental right in the Charter, in view of Article 52(3) of the Charter and of the presumption, according to the case-law of the ECtHR, that EU law offers equivalent protection (judgment of the ECtHR in Bosphorus Hava Yolları Turizm ve Ticaret Anonim Şirketi v. Ireland [GC], no. 45036/98, § 155, ECHR 2005-VI).

137. Next, according to the Czech Government, Ireland and the Greek, Spanish and United Kingdom Governments, although the prior involvement procedure confers additional functions on the Court of Justice over and above those already given to it by the Treaties, that none the less does not mean that the powers of the Court of Justice are being extended by the draft agreement, since those additional functions do not alter the essential character of the Court's present powers (Opinions 1/92, EU:C:1992:189, paragraph 32; 1/00, EU:C:2002:231, paragraphs 21, 23 and 26; and 1/09, EU:C:2011:123, paragraph 75). In addition, according to the Danish and Hungarian Governments, the ability of the Court of Justice to adjudicate in the context of the prior involvement procedure flows naturally and necessarily from the Treaties themselves and, in particular, from Article 6(2) TEU. Thus, while no amendment of the Treaties is necessary, according to the French and Austrian Governments, a Council decision pursuant to Article 218(8) TFEU is, according to the Danish, German and Austrian Governments, sufficient to confer that new function on the Court of Justice, since such a decision requires approval by all the Member States in accordance with their respective constitutional requirements. In that regard, however, the Parliament also submits that, since the Council's decisions on the conclusion of international agreements in principle merely give legal force to an agreement concluded by the EU, it is doubtful whether such decisions can have a normative content of their own, particularly as they are not 'subject to amendment by the Parliament'.

138. In the light of respect for the powers of the institutions, but without coming to the conclusion that the procedure for the prior involvement of the Court of Justice is contrary to the requirements of Protocol No 8 EU, the Polish Government argues that to acknowledge that the Commission is entitled to bring before the Court of Justice requests for decisions regarding the validity and interpretation of provisions of EU legal acts outwith Articles 263 TFEU and 267 TFEU could ultimately alter the essential character of the powers of the institutions, both of the Commission and of the Court of Justice itself, and result in circumvention of the admissibility criteria laid down by those provisions. For example, in accordance with the sixth paragraph of Article 263 TFEU, an action for annulment of an EU act could be brought by an institution within two months of the publication of the measure or of its notification to the plaintiff. However, where the Commission had not brought an action for annulment within that period, it could obtain the annulment of a measure by means of the prior involvement procedure, and thus circumvent compliance with that time-limit. Similarly, the powers of the Court of Justice would be likely to undergo significant changes, given that, while Article 267 TFEU currently reserves to the courts or tribunals of Member States alone the possibility of submitting a request for a preliminary ruling, after accession, the Court of Justice would be interpreting EU law at the request also of the

Commission. Yet, just like the other EU institutions, the Court of Justice does not have general powers, and its jurisdiction is limited to the cases brought before it. Consequently, the possibility of the Court of Justice ruling on issues submitted by the Commission would have to have a specific basis in the Treaty, which is not the case at present.

139. Furthermore, according to the Netherlands and Austrian Governments, even though the procedure for the prior involvement of the Court of Justice has to take account of the imperatives of speed, that procedure must be more comprehensive than the present urgent preliminary ruling procedure provided for in Article 23a of the Statute of the Court of Justice and allow all the Member States to submit written observations. In any event, according to the Netherlands Government, that procedure must be governed not by particular provisions of the Council decision concluding the accession agreement, but directly by the Statute of the Court of Justice and its rules of procedure.

140. Lastly, the Council argues that the scope of the jurisdiction of the Court of Justice to adjudicate, prior to the ECtHR, on whether acts directly or indirectly attributable to the EU in the area of the CFSP comply with fundamental rights must be the same as its internal jurisdiction in that area. Thus, the Court of Justice would be called upon to give a prior ruling in a case that is brought against one or more Member States and in which the EU is co-respondent concerning an act of a Member State implementing an EU act adopted in the area of the CFSP where the criteria laid down in Article 275 TFEU are met. Should the Court of Justice decide that the limits set out in Article 40 TEU have not in fact been observed and the act at issue ought not to have been adopted on the basis of the chapter of the EU Treaty relating to the CFSP, it would then have jurisdiction to rule both on the interpretation and the validity of the act in question, as it would not be an act falling within the CFSP. The fact that EU acts in the area of the CFSP which do not affect persons directly cannot be annulled by a judicial body within the EU's system of judicial protection would not mean that that system violates the ECHR.

5. 5. Second sentence of Article 2 of Protocol No 8 EU

141. Some Member States contend that the accession of the EU to the ECHR and, possibly, to protocols thereto which have not yet been ratified by all the Member States does, contrary to what the Commission maintains, involve obligations on the part of the Member States under Article 216 TFEU. While, in the view of the German Government, that means that accession to those protocols infringes the second sentence of Article 2 of Protocol No 8 EU, the Czech Government comes to the opposite conclusion, given that the source of those obligations is Article 216(2) TFEU and not the ECHR itself. In any event, according to the Czech Government, accession to those protocols could proceed only in accordance with the procedure laid down in Article 218 TFEU, which means that the Opinion of the Court of Justice can be obtained if necessary.

142. In addition, according to the Polish Government, on the assumption that the EU has the competence to conclude protocols which have not yet been ratified by all the Member States, it is not inconceivable that, in the event of accession to one of those protocols, a Member State which had not ratified that protocol could, within the Council, express its agreement to be bound through the EU and accordingly 'approve' the decision to be bound by that protocol in that way. That State would then be bound by that protocol only in the field of the EU's competence. That solution would raise doubts, however, particularly in the light of the need to apply the law in a consistent, transparent and uniform manner. Those doubts would be particularly significant as regards the protocols relating to matters covered by shared competences.

6. 6. Article 3 of Protocol No 8 EU

143. As regards compliance with Article 344 TFEU, the Greek Government takes the view that it is pointless to provide that an action between Member States before the ECtHR is to be inadmissible, given that such an action is already prohibited by Article 344 TFEU; nevertheless the French

Government states that it must still remain possible for a Member State to appear as a third-party intervener in support of one or more of its nationals in a case against another Member State that is brought before the ECtHR, even where that other Member State is acting in the context of the implementation of EU law.

VIII – **Position of the Court of Justice**

A – Admissibility

144. Certain Member States that participated in the present procedure have expressed doubts as to the admissibility of the Commission's request for an Opinion in so far as it contains an assessment relating to the internal rules.

145. It must be borne in mind in that regard that, under Article 218(11) TFEU, the Parliament, the Council, the Commission or a Member State may obtain the Opinion of the Court of Justice as to whether an envisaged agreement is compatible with the provisions of the Treaties. That provision has the aim of forestalling complications which would result from legal disputes concerning the compatibility with the Treaties of international agreements binding upon the EU (see Opinions 2/94, EU:C:1996:140, paragraph 3; 1/08, EU:C:2009:739, paragraph 107; and 1/09, EU:C:2011:123, paragraph 47).

146. A possible decision of the Court of Justice, after the conclusion of an international agreement binding upon the EU, to the effect that such an agreement is, by reason either of its content or of the procedure adopted for its conclusion, incompatible with the provisions of the Treaties could not fail to provoke, not only in the internal EU context, but also in that of international relations, serious difficulties and might give rise to adverse consequences for all interested parties, including third countries (see Opinions 3/94, EU:C:1995:436, paragraph 17, and 1/09, EU:C:2011:123, paragraph 48).

147. In order to enable the Court of Justice to rule on the compatibility of the provisions of an envisaged agreement with the rules of the Treaties, the Court must have sufficient information on the actual content of that agreement (see Opinions 2/94, EU:C:1996:140, paragraphs 20 to 22, and 1/09, EU:C:2011:123, paragraph 49).

148. In this instance, the Commission has submitted to the Court of Justice the draft accession instruments on which the negotiators have already reached agreement in principle. All those instruments together constitute a sufficiently comprehensive and precise framework for the arrangements in accordance with which the envisaged accession should take place, and thus enable the Court to assess the compatibility of those drafts with the Treaties.

149. By contrast, since the internal rules have not yet been adopted, their content is merely hypothetical, and, in any event, the fact that they constitute internal EU law precludes them from forming the subject-matter of the present Opinion procedure, which can only relate to international agreements which the EU is proposing to conclude.

150. Moreover, the review which the Court of Justice is called upon to carry out in the context of the Opinion procedure, and which can take place regardless of the future content of the internal rules that will have to be adopted, is closely circumscribed by the Treaties; therefore, if it is not to encroach on the competences of the other institutions responsible for drawing up the internal rules necessary in order to make the accession agreement operational, the Court must confine itself to examining the compatibility of that agreement with the Treaties and satisfy itself not only that it does not infringe any provision of primary law but also that it contains every provision that primary law may require.

151. It follows from this that the assessments relating to those internal rules put forward both by the Commission and by the Member States and the other institutions that have submitted observations to the Court are irrelevant to the examination of the present request for an Opinion and, consequently, do not call into question the admissibility of that request.

152. Accordingly, the present request for an Opinion is admissible.

B – Substance

1. 1. Preliminary considerations

153. Before any analysis of the Commission's request can be undertaken, it must be noted as a preliminary point that, unlike the position under Community law in force when the Court delivered Opinion 2/94 (EU:C:1996:140), the accession of the EU to the ECHR has, since the entry into force of the Treaty of Lisbon, had a specific legal basis in the form of Article 6 TEU.

154. That accession would, however, still be characterised by significant distinctive features.

155. Ever since the adoption of the ECHR, it has only been possible for State entities to be parties to it, which explains why, to date, it has been binding only on States. This is also confirmed by the fact that, to enable the accession of the EU to proceed, not only has Article 59 of the ECHR been amended, but the agreement envisaged itself contains a series of amendments of the ECHR that are to make accession operational within the system established by the ECHR itself.

156. Those amendments are warranted precisely because, unlike any other Contracting Party, the EU is, under international law, precluded by its very nature from being considered a State.

157. As the Court of Justice has repeatedly held, the founding treaties of the EU, unlike ordinary international treaties, established a new legal order, possessing its own institutions, for the benefit of which the Member States thereof have limited their sovereign rights, in ever wider fields, and the subjects of which comprise not only those States but also their nationals (see, in particular, judgments in van Gend & Loos, 26/62, EU:C:1963:1, p. 12, and Costa, 6/64, EU:C:1964:66, p. 593, and Opinion 1/09, EU:C:2011:123, paragraph 65).

158. The fact that the EU has a new kind of legal order, the nature of which is peculiar to the EU, its own constitutional framework and founding principles, a particularly sophisticated institutional structure and a full set of legal rules to ensure its operation, has consequences as regards the procedure for and conditions of accession to the ECHR.

159. It is precisely in order to ensure that that situation is taken into account that the Treaties make accession subject to compliance with various conditions.

160. Thus, first of all, having provided that the EU is to accede to the ECHR, Article 6(2) TEU makes clear at the outset, in the second sentence, that '[s]uch accession shall not affect the Union's competences as defined in the Treaties'.

161. Next, Protocol No 8 EU, which has the same legal value as the Treaties, provides in particular that the accession agreement is to make provision for preserving the specific characteristics of the EU and EU law and ensure that accession does not affect the competences of the EU or the powers of its institutions, or the situation of Member States in relation to the ECHR, or indeed Article 344 TFEU.

162. Lastly, by the Declaration on Article 6(2) of the Treaty on European Union, the Intergovernmental Conference which adopted the Treaty of Lisbon agreed that accession must be arranged in such a way as to preserve the specific features of EU law.

163. In performing the task conferred on it by the first subparagraph of Article 19(1) TEU, the Court of Justice must review, in the light, in particular, of those provisions, whether the legal arrangements proposed in respect of the EU's accession to the ECHR are in conformity with the requirements laid down and, more generally, with the basic constitutional charter, the Treaties (judgment in Les Verts v Parliament, 294/83, EU:C:1986:166, paragraph 23).

164. For the purposes of that review, it must be noted that, as is apparent from paragraphs 160 to 162 above, the conditions to which accession is subject under the Treaties are intended, particularly, to ensure that accession does not affect the specific characteristics of the EU and EU law.

165. It should be borne in mind that these characteristics include those relating to the constitutional structure of the EU, which is seen in the principle of conferral of powers referred to in Articles 4(1) TEU and 5(1) and (2) TEU, and in the institutional framework established in Articles 13 TEU to 19 TEU.

166. To these must be added the specific characteristics arising from the very nature of EU law. In particular, as the Court of Justice has noted many times, EU law is characterised by the fact that it stems from an independent source of law, the Treaties, by its primacy over the laws of the Member States (see, to that effect, judgments in Costa, EU:C:1964:66, p. 594, and Internationale Handelsgesellschaft, EU:C:1970:114, paragraph 3; Opinions 1/91, EU:C:1991:490, paragraph 21, and 1/09, EU:C:2011:123, paragraph 65; and judgment in Melloni, C-399/11, EU:C:2013:107, paragraph 59), and by the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves (judgment in van Gend & Loos, EU:C:1963:1, p. 12, and Opinion 1/09, EU:C:2011:123, paragraph 65).

167. These essential characteristics of EU law have given rise to a structured network of principles, rules and mutually interdependent legal relations linking the EU and its Member States, and its Member States with each other, which are now engaged, as is recalled in the second paragraph of Article 1 TEU, in a 'process of creating an ever closer union among the peoples of Europe'.

168. This legal structure is based on the fundamental premiss that each Member State shares with all the other Member States, and recognises that they share with it, a set of common values on which the EU is founded, as stated in Article 2 TEU. That premiss implies and justifies the existence of mutual trust between the Member States that those values will be recognised and, therefore, that the law of the EU that implements them will be respected.

169. Also at the heart of that legal structure are the fundamental rights recognised by the Charter (which, under Article 6(1) TEU, has the same legal value as the Treaties), respect for those rights being a condition of the lawfulness of EU acts, so that measures incompatible with those rights are not acceptable in the EU (see judgments in ERT, C-260/89, EU:C:1991:254, paragraph 41; Kremzow, C-299/95, EU:C:1997:254, paragraph 14; Schmidberger, C-112/00, EU:C:2003:333, paragraph 73; and Kadi and Al Barakaat International Foundation v Council and Commission, EU:C:2008:461, paragraphs 283 and 284).

170. The autonomy enjoyed by EU law in relation to the laws of the Member States and in relation to international law requires that the interpretation of those fundamental rights be ensured within the framework of the structure and objectives of the EU (see, to that effect, judgments in Internationale Handelsgesellschaft, EU:C:1970:114, paragraph 4, and Kadi and Al Barakaat International Foundation v Council and Commission, EU:C:2008:461, paragraphs 281 to 285).

171. As regards the structure of the EU, it must be emphasised that not only are the institutions, bodies, offices and agencies of the EU required to respect the Charter but so too are the Member States when they are implementing EU law (see, to that effect, judgment in Åkerberg Fransson, C-617/10, EU:C:2013:105, paragraphs 17 to 21).

172. The pursuit of the EU's objectives, as set out in Article 3 TEU, is entrusted to a series of fundamental provisions, such as those providing for the free movement of goods, services, capital and persons, citizenship of the Union, the area of freedom, security and justice, and competition policy. Those provisions, which are part of the framework of a system that is specific to the EU, are structured in such a way as to contribute — each within its specific field and with its own particular characteristics — to the implementation of the process of integration that is the raison d'être of the EU itself.

173. Similarly, the Member States are obliged, by reason, inter alia, of the principle of sincere cooperation set out in the first subparagraph of Article 4(3) TEU, to ensure, in their respective territories, the application of and respect for EU law. In addition, pursuant to the second subparagraph of Article 4(3) TEU, the Member States are to take any appropriate measure, general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the EU (Opinion 1/09, EU:C:2011:123, paragraph 68 and the case-law cited).

174. In order to ensure that the specific characteristics and the autonomy of that legal order are preserved, the Treaties have established a judicial system intended to ensure consistency and uniformity in the interpretation of EU law.

175. In that context, it is for the national courts and tribunals and for the Court of Justice to ensure the full application of EU law in all Member States and to ensure judicial protection of an individual's rights under that law (Opinion 1/09, EU:C:2011:123, paragraph 68 and the case-law cited).

176. In particular, the judicial system as thus conceived has as its keystone the preliminary ruling procedure provided for in Article 267 TFEU, which, by setting up a dialogue between one court and another, specifically between the Court of Justice and the courts and tribunals of the Member States, has the object of securing uniform interpretation of EU law (see, to that effect, judgment in van Gend & Loos, EU:C:1963:1, p. 12), thereby serving to ensure its consistency, its full effect and its autonomy as well as, ultimately, the particular nature of the law established by the Treaties (see, to that effect, Opinion 1/09, EU:C:2011:123, paragraphs 67 and 83).

177. Fundamental rights, as recognised in particular by the Charter, must therefore be interpreted and applied within the EU in accordance with the constitutional framework referred to in paragraphs 155 to 176 above.

2. 2. The compatibility of the agreement envisaged with EU primary law

178. In order to take a position on the Commission's request for an Opinion, it is important (i) to ascertain whether the agreement envisaged is liable adversely to affect the specific characteristics of EU law just outlined and, as the Commission itself has emphasised, the autonomy of EU law in the interpretation and application of fundamental rights, as recognised by EU law and notably by the Charter, and (ii) to consider whether the institutional and procedural machinery envisaged by that agreement ensures that the conditions in the Treaties for the EU's accession to the ECHR are complied with.

a) The specific characteristics and the autonomy of EU law

179. It must be borne in mind that, in accordance with Article 6(3) TEU, fundamental rights, as guaranteed by the ECHR, constitute general principles of the EU's law. However, as the EU has not acceded to the ECHR, the latter does not constitute a legal instrument which has been formally incorporated into the legal order of the EU (see, to that effect, judgments in Kamberaj, C-571/10, EU:C:2012:233, paragraph 60, and Åkerberg Fransson, EU:C:2013:105, paragraph 44).

180. By contrast, as a result of the EU's accession the ECHR, like any other international agreement concluded by the EU, would, by virtue of Article 216(2) TFEU, be binding upon the institutions of the EU and on its Member States, and would therefore form an integral part of EU law (judgment in Haegeman, 181/73, EU:C:1974:41, paragraph 5; Opinion 1/91, EU:C:1991:490, paragraph 37; judgments in IATA and ELFAA, C‑344/04, EU:C:2006:10, paragraph 36, and Air Transport Association of America and Others, C‑366/10, EU:C:2011:864, paragraph 73).

181. Accordingly, the EU, like any other Contracting Party, would be subject to external control to ensure the observance of the rights and freedoms the EU would undertake to respect in accordance with Article 1 of the ECHR. In that context, the EU and its institutions, including the Court of Justice, would be subject to the control mechanisms provided for by the ECHR and, in particular, to the decisions and the judgments of the ECtHR.

182. The Court of Justice has admittedly already stated in that regard that an international agreement providing for the creation of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not, in principle, incompatible with EU law; that is particularly the case where, as in this instance, the conclusion of such an agreement is provided for by the Treaties themselves. The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions (see Opinions 1/91, EU:C:1991:490, paragraphs 40 and 70, and 1/09, EU:C:2011:123, paragraph 74).

183. Nevertheless, the Court of Justice has also declared that an international agreement may affect its own powers only if the indispensable conditions for safeguarding the essential character of those powers are satisfied and, consequently, there is no adverse effect on the autonomy of the EU legal order (see Opinions 1/00, EU:C:2002:231, paragraphs 21, 23 and 26, and 1/09, EU:C:2011:123, paragraph 76; see also, to that effect, judgment in Kadi and Al Barakaat International Foundation v Council and Commission, EU:C:2008:461, paragraph 282).

184. In particular, any action by the bodies given decision-making powers by the ECHR, as provided for in the agreement envisaged, must not have the effect of binding the EU and its institutions, in the exercise of their internal powers, to a particular interpretation of the rules of EU law (see Opinions 1/91, EU:C:1991:490, paragraphs 30 to 35, and 1/00, EU:C:2002:231, paragraph 13).

185. It is admittedly inherent in the very concept of external control that, on the one hand, the interpretation of the ECHR provided by the ECtHR would, under international law, be binding on the EU and its institutions, including the Court of Justice, and that, on the other, the interpretation by the Court of Justice of a right recognised by the ECHR would not be binding on the control mechanisms provided for by the ECHR, particularly the ECtHR, as Article 3(6) of the draft agreement provides and as is stated in paragraph 68 of the draft explanatory report.

186. The same would not apply, however, with regard to the interpretation by the Court of Justice of EU law, including the Charter. In particular, it should not be possible for the ECtHR to call into question the Court's findings in relation to the scope ratione materiae of EU law, for the purposes, in particular, of determining whether a Member State is bound by fundamental rights of the EU.

187. In that regard, it must be borne in mind, in the first place, that Article 53 of the Charter provides that nothing therein is to be interpreted as restricting or adversely affecting fundamental rights as recognised, in their respective fields of application, by EU law and international law and by international agreements to which the EU or all the Member States are party, including the ECHR, and by the Member States' constitutions.

188. The Court of Justice has interpreted that provision as meaning that the application of national standards of protection of fundamental rights must not compromise the level of protection provided for by the Charter or the primacy, unity and effectiveness of EU law (judgment in Melloni, EU:C:2013:107, paragraph 60).

189. In so far as Article 53 of the ECHR essentially reserves the power of the Contracting Parties to lay down higher standards of protection of fundamental rights than those guaranteed by the ECHR, that provision should be coordinated with Article 53 of the Charter, as interpreted by the Court of Justice, so that the power granted to Member States by Article 53 of the ECHR is limited — with respect to the rights recognised by the Charter that correspond to those guaranteed by the ECHR — to that which is necessary to ensure that the level of protection provided for by the Charter and the primacy, unity and effectiveness of EU law are not compromised.

190. However, there is no provision in the agreement envisaged to ensure such coordination.

191. In the second place, it should be noted that the principle of mutual trust between the Member States is of fundamental importance in EU law, given that it allows an area without internal borders to be created and maintained. That principle requires, particularly with regard to the area of freedom, security and justice, each of those States, save in exceptional circumstances, to consider all the other Member States to be complying with EU law and particularly with the fundamental rights recognised by EU law (see, to that effect, judgments in N. S. and Others, C-411/10 and C-493/10, EU:C:2011:865, paragraphs 78 to 80, and Melloni, EU:C:2013:107, paragraphs 37 and 63).

192. Thus, when implementing EU law, the Member States may, under EU law, be required to presume that fundamental rights have been observed by the other Member States, so that not only may they not demand a higher level of national protection of fundamental rights from another Member State than that provided by EU law but, save in exceptional cases, they may not check whether that other Member State has actually, in a specific case, observed the fundamental rights guaranteed by the EU.

193. The approach adopted in the agreement envisaged, which is to treat the EU as a State and to give it a role identical in every respect to that of any other Contracting Party, specifically disregards the intrinsic nature of the EU and, in particular, fails to take into consideration the fact that the Member States have, by reason of their membership of the EU, accepted that relations between them as regards the matters covered by the transfer of powers from the Member States to the EU are governed by EU law to the exclusion, if EU law so requires, of any other law.

194. In so far as the ECHR would, in requiring the EU and the Member States to be considered Contracting Parties not only in their relations with Contracting Parties which are not Member States of the EU but also in their relations with each other, including where such relations are governed by EU law, require a Member State to check that another Member State has observed fundamental rights, even though EU law imposes an obligation of mutual trust between those Member States, accession is liable to upset the underlying balance of the EU and undermine the autonomy of EU law.

195. However, the agreement envisaged contains no provision to prevent such a development.

196. In the third place, it must be pointed out that Protocol No 16 permits the highest courts and tribunals of the Member States to request the ECtHR to give advisory opinions on questions of principle relating to the interpretation or application of the rights and freedoms guaranteed by the ECHR or the protocols thereto, even though EU law requires those same courts or tribunals to submit a request to that end to the Court of Justice for a preliminary ruling under Article 267 TFEU.

197. It is indeed the case that the agreement envisaged does not provide for the accession of the EU as such to Protocol No 16 and that the latter was signed on 2 October 2013, that is to say, after the agreement reached by the negotiators in relation to the draft accession instruments, namely on 5 April 2013;

nevertheless, since the ECHR would form an integral part of EU law, the mechanism established by that protocol could — notably where the issue concerns rights guaranteed by the Charter corresponding to those secured by the ECHR — affect the autonomy and effectiveness of the preliminary ruling procedure provided for in Article 267 TFEU.

198. In particular, it cannot be ruled out that a request for an advisory opinion made pursuant to Protocol No 16 by a court or tribunal of a Member State that has acceded to that protocol could trigger the procedure for the prior involvement of the Court of Justice, thus creating a risk that the preliminary ruling procedure provided for in Article 267 TFEU might be circumvented, a procedure which, as has been noted in paragraph 176 of this Opinion, is the keystone of the judicial system established by the Treaties.

199. By failing to make any provision in respect of the relationship between the mechanism established by Protocol No 16 and the preliminary ruling procedure provided for in Article 267 TFEU, the agreement envisaged is liable adversely to affect the autonomy and effectiveness of the latter procedure.

200. Having regard to the foregoing, it must be held that the accession of the EU to the ECHR as envisaged by the draft agreement is liable adversely to affect the specific characteristics of EU law and its autonomy.

b) Article 344 TFEU

201. The Court has consistently held that an international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the Court. That principle is notably enshrined in Article 344 TFEU, according to which Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein (see, to that effect, Opinions 1/91, EU:C:1991:490, paragraph 35, and 1/00, EU:C:2002:231, paragraphs 11 and 12; judgments in Commission v Ireland, C‑459/03, EU:C:2006:345, paragraphs 123 and 136, and Kadi and Al Barakaat International Foundation v Council and Commission, EU:C:2008:461, paragraph 282).

202. Furthermore, the obligation of Member States to have recourse to the procedures for settling disputes established by EU law — and, in particular, to respect the jurisdiction of the Court of Justice, which is a fundamental feature of the EU system — must be understood as a specific expression of Member States' more general duty of loyalty resulting from Article 4(3) TEU (see, to that effect, judgment in Commission v Ireland, EU:C:2006:345, paragraph 169), it being understood that, under that provision, the obligation is equally applicable to relations between Member States and the EU.

203. It is precisely in view of these considerations that Article 3 of Protocol No 8 EU expressly provides that the accession agreement must not affect Article 344 TFEU.

204. However, as explained in paragraph 180 of this Opinion, as a result of accession, the ECHR would form an integral part of EU law. Consequently, where EU law is at issue, the Court of Justice has exclusive jurisdiction in any dispute between the Member States and between those Member States and the EU regarding compliance with the ECHR.

205. Unlike the international convention at issue in the case giving rise to the judgment in Commission v Ireland (EU:C:2006:345, paragraphs 124 and 125), which expressly provided that the system for the resolution of disputes set out in EU law must in principle take precedence over that established by that convention, the procedure for the resolution of disputes provided for in Article 33 of the ECHR could apply to any Contracting Party and, therefore, also to disputes between the Member States, or between those Member States and the EU, even though it is EU law that is in issue.

OPINION 2/13 OF 18. 12. 2014
OPINION PURSUANT TO ARTICLE 218(11) TFEU

206. In that regard, contrary to what is maintained in some of the observations submitted to the Court of Justice in the present procedure, the fact that Article 5 of the draft agreement provides that proceedings before the Court of Justice are not to be regarded as a means of dispute settlement which the Contracting Parties have agreed to forgo in accordance with Article 55 of the ECHR is not sufficient to preserve the exclusive jurisdiction of the Court of Justice.

207. Article 5 of the draft agreement merely reduces the scope of the obligation laid down by Article 55 of the ECHR, but still allows for the possibility that the EU or Member States might submit an application to the ECtHR, under Article 33 of the ECHR, concerning an alleged violation thereof by a Member State or the EU, respectively, in conjunction with EU law.

208. The very existence of such a possibility undermines the requirement set out in Article 344 TFEU.

209. This is particularly so since, if the EU or Member States did in fact have to bring a dispute between them before the ECtHR, the latter would, pursuant to Article 33 of the ECHR, find itself seised of such a dispute.

210. Contrary to the provisions of the Treaties governing the EU's various internal judicial procedures, which have objectives peculiar to them, Article 344 TFEU is specifically intended to preserve the exclusive nature of the procedure for settling those disputes within the EU, and in particular of the jurisdiction of the Court of Justice in that respect, and thus precludes any prior or subsequent external control.

211. Moreover, Article 1(b) of Protocol No 8 EU itself refers only to the mechanisms necessary to ensure that proceedings brought before the ECtHR by non-Member States are correctly addressed to Member States and/or to the EU as appropriate.

212. Consequently, the fact that Member States or the EU are able to submit an application to the ECtHR is liable in itself to undermine the objective of Article 344 TFEU and, moreover, goes against the very nature of EU law, which, as noted in paragraph 193 of this Opinion, requires that relations between the Member States be governed by EU law to the exclusion, if EU law so requires, of any other law.

213. In those circumstances, only the express exclusion of the ECtHR's jurisdiction under Article 33 of the ECHR over disputes between Member States or between Member States and the EU in relation to the application of the ECHR within the scope ratione materiae of EU law would be compatible with Article 344 TFEU.

214. In the light of the foregoing, it must be held that the agreement envisaged is liable to affect Article 344 TFEU.

c) The co-respondent mechanism

215. The co-respondent mechanism has been introduced, as is apparent from paragraph 39 of the draft explanatory report, in order to 'avoid gaps in participation, accountability and enforceability in the [ECHR] system', gaps which, owing to the specific characteristics of the EU, might result from its accession to the ECHR.

216. In addition, that mechanism also has the aim of ensuring that, in accordance with the requirements of Article 1(b) of Protocol No 8 EU, proceedings by non-Member States and individual applications are correctly addressed to Member States and/or the EU as appropriate.

217. However, those objectives must be pursued in such a way as to be compatible with the requirement of ensuring that the specific characteristics of EU law are preserved, as required by Article 1 of that protocol.

OPINION 2/13 OF 18. 12. 2014
OPINION PURSUANT TO ARTICLE 218(11) TFEU

218. Yet, first, Article 3(5) of the draft agreement provides that a Contracting Party is to become a co-respondent either by accepting an invitation from the ECtHR or by decision of the ECtHR upon the request of that Contracting Party.

219. When the ECtHR invites a Contracting Party to become co-respondent, that invitation is not binding, as is expressly stated in paragraph 53 of the draft explanatory report.

220. This lack of compulsion reflects not only, as paragraph 53 of the draft explanatory report indicates, the fact that the initial application has not been brought against the potential co-respondent and that no Contracting Party can be forced to become a party to a case where it was not named in the application initiating proceedings, but also, above all, the fact that the EU and Member States must remain free to assess whether the material conditions for applying the co-respondent mechanism are met.

221. Given that those conditions result, in essence, from the rules of EU law concerning the division of powers between the EU and its Member States and the criteria governing the attributability of an act or omission that may constitute a violation of the ECHR, the decision as to whether those conditions are met in a particular case necessarily presupposes an assessment of EU law.

222. While the draft agreement duly takes those considerations into account as regards the procedure in accordance with which the ECHR may invite a Contracting Party to become co-respondent, the same cannot be said in the case of a request to that effect from a Contracting Party.

223. As Article 3(5) of the draft agreement provides, if the EU or Member States request leave to intervene as co-respondents in a case before the ECtHR, they must give reasons from which it can be established that the conditions for their participation in the procedure are met, and the ECtHR is to decide on that request in the light of the plausibility of those reasons.

224. Admittedly, in carrying out such a review, the ECtHR is to ascertain whether, in the light of those reasons, it is plausible that the conditions set out in paragraphs 2 and 3 of Article 3 are met, and that review does not relate to the merits of those reasons. However, the fact remains that, in carrying out that review, the ECtHR would be required to assess the rules of EU law governing the division of powers between the EU and its Member States as well as the criteria for the attribution of their acts or omissions, in order to adopt a final decision in that regard which would be binding both on the Member States and on the EU.

225. Such a review would be liable to interfere with the division of powers between the EU and its Member States.

226. Secondly, Article 3(7) of the draft agreement provides that if the violation in respect of which a Contracting Party is a co-respondent to the proceedings is established, the respondent and the co-respondent are to be jointly responsible for that violation.

227. That provision does not preclude a Member State from being held responsible, together with the EU, for the violation of a provision of the ECHR in respect of which that Member State may have made a reservation in accordance with Article 57 of the ECHR.

228. Such a consequence of Article 3(7) of the draft agreement is at odds with Article 2 of Protocol No 8 EU, according to which the accession agreement is to ensure that nothing therein affects the situation of Member States in relation to the ECHR, in particular in relation to reservations thereto.

229. Thirdly, there is provision at the end of Article 3(7) of the draft agreement for an exception to the general rule that the respondent and co-respondent are to be jointly responsible for a violation established. The ECtHR may decide, on the basis of the reasons given by the respondent and the co-respondent, and having sought the views of the applicant, that only one of them is to be held responsible for that violation.

230. A decision on the apportionment as between the EU and its Member States of responsibility for an act or omission constituting a violation of the ECHR established by the ECtHR is also one that is based on an assessment of the rules of EU law governing the division of powers between the EU and its Member States and the attributability of that act or omission.

231. Accordingly, to permit the ECtHR to adopt such a decision would also risk adversely affecting the division of powers between the EU and its Member States.

232. That conclusion is not affected by the fact that the ECtHR would have to give its decision solely on the basis of the reasons given by the respondent and the co-respondent.

233. Contrary to the submissions of some of the Member States that participated in the present procedure and of the Commission, it is not clear from reading Article 3(7) of the draft agreement and paragraph 62 of the draft explanatory report that the reasons to be given by the respondent and co-respondent must be given by them jointly.

234. In any event, even it is assumed that a request for the apportionment of responsibility is based on an agreement between the co-respondent and the respondent, that in itself would not be sufficient to rule out any adverse effect on the autonomy of EU law. The question of the apportionment of responsibility must be resolved solely in accordance with the relevant rules of EU law and be subject to review, if necessary, by the Court of Justice, which has exclusive jurisdiction to ensure that any agreement between co-respondent and respondent respects those rules. To permit the ECtHR to confirm any agreement that may exist between the EU and its Member States on the sharing of responsibility would be tantamount to allowing it to take the place of the Court of Justice in order to settle a question that falls within the latter's exclusive jurisdiction.

235. Having regard to the foregoing, it must be held that the arrangements for the operation of the co-respondent mechanism laid down by the agreement envisaged do not ensure that the specific characteristics of the EU and EU law are preserved.

    d) The procedure for the prior involvement of the Court of Justice

236. It is true that the necessity for the procedure for the prior involvement of the Court of Justice is, as paragraph 65 of the draft explanatory report shows, linked to respect for the subsidiary nature of the control mechanism established by the ECHR, as referred to in paragraph 19 of this Opinion. Nevertheless, it should equally be noted that that procedure is also necessary for the purpose of ensuring the proper functioning of the judicial system of the EU.

237. In that context, the necessity for the prior involvement of the Court of Justice in a case brought before the ECtHR in which EU law is at issue satisfies the requirement that the competences of the EU and the powers of its institutions, notably the Court of Justice, be preserved, as required by Article 2 of Protocol No 8 EU.

238. Accordingly, to that end it is necessary, in the first place, for the question whether the Court of Justice has already given a ruling on the same question of law as that at issue in the proceedings before the ECtHR to be resolved only by the competent EU institution, whose decision should bind the ECtHR.

239. To permit the ECtHR to rule on such a question would be tantamount to conferring on it jurisdiction to interpret the case-law of the Court of Justice.

240. Yet neither Article 3(6) of the draft agreement nor paragraphs 65 and 66 of the draft explanatory report contain anything to suggest that that possibility is excluded.

241. Consequently, the prior involvement procedure should be set up in such a way as to ensure that, in any case pending before the ECtHR, the EU is fully and systematically informed, so that the competent EU institution is able to assess whether the Court of Justice has already given a ruling on the question at issue in that case and, if it has not, to arrange for the prior involvement procedure to be initiated.

242. In the second place, it should be noted that the procedure described in Article 3(6) of the draft agreement is intended to enable the Court of Justice to examine the compatibility of the provision of EU law concerned with the relevant rights guaranteed by the ECHR or by the protocols to which the EU may have acceded. Paragraph 66 of the draft explanatory report explains that the words '[a]ssessing the compatibility of the provision' mean, in essence, to rule on the validity of a legal provision contained in secondary law or on the interpretation of a provision of primary law.

243. It follows from this that the agreement envisaged excludes the possibility of bringing a matter before the Court of Justice in order for it to rule on a question of interpretation of secondary law by means of the prior involvement procedure.

244. However, it must be noted that, just as the prior interpretation of primary law is necessary in order for the Court of Justice to be able to rule on whether that law is consistent with the EU's commitments resulting from its accession to the ECHR, it should be possible for secondary law to be subject to such interpretation for the same purpose.

245. The interpretation of a provision of EU law, including of secondary law, requires, in principle, a decision of the Court of Justice where that provision is open to more than one plausible interpretation.

246. If the Court of Justice were not allowed to provide the definitive interpretation of secondary law, and if the ECtHR, in considering whether that law is consistent with the ECHR, had itself to provide a particular interpretation from among the plausible options, there would most certainly be a breach of the principle that the Court of Justice has exclusive jurisdiction over the definitive interpretation of EU law.

247. Accordingly, limiting the scope of the prior involvement procedure, in the case of secondary law, solely to questions of validity adversely affects the competences of the EU and the powers of the Court of Justice in that it does not allow the Court to provide a definitive interpretation of secondary law in the light of the rights guaranteed by the ECHR.

248. Having regard to the foregoing, it must be held that the arrangements for the operation of the procedure for the prior involvement of the Court of Justice provided for by the agreement envisaged do not enable the specific characteristics of the EU and EU law to be preserved.

e) The specific characteristics of EU law as regards judicial review in CFSP matters

249. It is evident from the second subparagraph of Article 24(1) TEU that, as regards the provisions of the Treaties that govern the CFSP, the Court of Justice has jurisdiction only to monitor compliance with Article 40 TEU and to review the legality of certain decisions as provided for by the second paragraph of Article 275 TFEU.

250. According to the latter provision, the Court of Justice is to have jurisdiction, in particular, to rule on proceedings, brought in accordance with the conditions laid down in the fourth paragraph of Article 263 TFEU, reviewing the legality of decisions providing for restrictive measures against natural or legal persons adopted by the Council on the basis of Chapter 2 of Title V of the EU Treaty.

251. Notwithstanding the Commission's systematic interpretation of those provisions in its request for an Opinion — with which some of the Member States that submitted observations to the Court have taken issue — essentially seeking to define the scope of the Court's judicial review in this area as being sufficiently broad to encompass any situation that could be covered by an application to the ECtHR, it must be noted that the Court has not yet had the opportunity to define the extent to which its jurisdiction is limited in CFSP matters as a result of those provisions.

252. However, for the purpose of adopting a position on the present request for an Opinion, it is sufficient to declare that, as EU law now stands, certain acts adopted in the context of the CFSP fall outside the ambit of judicial review by the Court of Justice.

253. That situation is inherent to the way in which the Court's powers are structured by the Treaties, and, as such, can only be explained by reference to EU law alone.

254. Nevertheless, on the basis of accession as provided for by the agreement envisaged, the ECtHR would be empowered to rule on the compatibility with the ECHR of certain acts, actions or omissions performed in the context of the CFSP, and notably of those whose legality the Court of Justice cannot, for want of jurisdiction, review in the light of fundamental rights.

255. Such a situation would effectively entrust the judicial review of those acts, actions or omissions on the part of the EU exclusively to a non-EU body, albeit that any such review would be limited to compliance with the rights guaranteed by the ECHR.

256. The Court has already had occasion to find that jurisdiction to carry out a judicial review of acts, actions or omissions on the part of the EU, including in the light of fundamental rights, cannot be conferred exclusively on an international court which is outside the institutional and judicial framework of the EU (see, to that effect, Opinion 1/09, EU:C:2011:123, paragraphs 78, 80 and 89).

257. Therefore, although that is a consequence of the way in which the Court's powers are structured at present, the fact remains that the agreement envisaged fails to have regard to the specific characteristics of EU law with regard to the judicial review of acts, actions or omissions on the part of the EU in CFSP matters.

258. In the light of all the foregoing considerations, it must be held that the agreement envisaged is not compatible with Article 6(2) TEU or with Protocol No 8 EU in that:

— it is liable adversely to affect the specific characteristics and the autonomy of EU law in so far it does not ensure coordination between Article 53 of the ECHR and Article 53 of the Charter, does not avert the risk that the principle of Member States' mutual trust under EU law may be undermined, and makes no provision in respect of the relationship between the mechanism established by Protocol No 16 and the preliminary ruling procedure provided for in Article 267 TFEU;

— it is liable to affect Article 344 TFEU in so far as it does not preclude the possibility of disputes between Member States or between Member States and the EU concerning the application of the ECHR within the scope ratione materiae of EU law being brought before the ECtHR;

— it does not lay down arrangements for the operation of the co-respondent mechanism and the procedure for the prior involvement of the Court of Justice that enable the specific characteristics of the EU and EU law to be preserved; and

— it fails to have regard to the specific characteristics of EU law with regard to the judicial review of acts, actions or omissions on the part of the EU in CFSP matters in that it entrusts the judicial review of some of those acts, actions or omissions exclusively to a non-EU body.

Consequently, the Court (Full Court) gives the following Opinion:

**The agreement on the accession of the European Union to the European Convention for the Protection of Human Rights and Fundamental Freedoms is not compatible with Article 6(2) TEU or with Protocol (No 8) relating to Article 6(2) of the Treaty on European Union on the accession of the Union to the European Convention on the Protection of Human Rights and Fundamental Freedoms.**

[Signatures]