# EXHIBIT 48

4.9.2015          EN          Official Journal of the European Union          L 232/43

COMMISSION DECISION (EU) 2015/1470

of 30 March 2015

on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania — Arbitral award Micula v Romania of 11 December 2013

*(notified under document C(2015) 2112)*

**(Only the Romanian text is authentic)**

**(Text with EEA relevance)**

THE EUROPEAN COMMISSION,

Having regard to the Treaty on the Functioning of the European Union, and in particular the first subparagraph of Article 108(2) thereof [1],

Having regard to the Agreement on the European Economic Area, and in particular Article 62(1)(a) thereof,

Having called on interested parties to submit their comments pursuant to the provision(s) cited above [2] and having regard to their comments,

Whereas:

## 1. PROCEDURE

(1)    By award of 11 December 2013 ('the Award'), an arbitration tribunal ('the Tribunal') established under the auspices of the International Center for Settlement of Investment Disputes ('ICSID') in the case *Micula a.o.* v *Romania* [3] awarded compensation in favour of the five claimants (the brothers Viorel and Ioan Micula and the companies S.C. European Food SA, S.C. Starmill S.R.L., and S.C. Multipack, all owned by the Micula brothers; collectively, 'the claimants') against Romania in the amount of RON 376 433 229 (ca. EUR 82 million [4]) for Romania's failure to ensure a fair and equitable treatment of the claimants' investments, which amounted to a violation by Romania of Article 2(3) of the Agreement between the Government of the Kingdom of Sweden and the Government of Romania on the Promotion and Reciprocal Protection of Investments ('the BIT') [5]. In addition, the Tribunal decided that interest should accrue on that sum until Romania's full implementation of the Award. By 11 December 2013, the total amount thus owed by Romania to the claimants amounted to RON 791 882 452 (ca. EUR 178 million [6]).

(2)    By letter of 31 January 2014, the Commission services informed the Romanian authorities that any implementation or execution of the Award would constitute new aid and would have to be notified to the Commission.

(3)    On 20 February 2014, the Romanian authorities informed the Commission services that they had partially implemented the Award by offsetting a portion of the compensation awarded to the claimants by the Tribunal against taxes owed by one of the claimants, namely S.C. European Food SA, to the Romanian authorities. The tax debt that was thus offset amounted to RON 337 492 864 (ca. EUR 76 million [7]). Romania further sought clarification from the Commission services as to the possibility of paying the outstanding amount to a natural person (the brothers Viorel and Ioan Micula or any other natural person to whom the claim may be assigned).

(4)    On 12 March 2014, the Commission services requested further information from Romania regarding the envisaged further implementation or execution of the Award, which Romania provided by letter of 26 March 2014.

---

[1]    With effect from 1 December 2009, Articles 87, and 88 of the EC Treaty have become Articles 107 and 108, respectively, of the Treaty. The two sets of Articles are in substance identical. For the purposes of this Decision references to Articles 107 and 108 of the Treaty should be understood as references to Articles 87 and 88 of the EC Treaty when appropriate. The Treaty also introduced certain changes in terminology, such as the replacement of 'Community' by 'Union' and 'common market' by 'internal market'. The terminology of the Treaty will be used throughout this Decision.

[2]    OJ C 393, 7.11.2014, p. 27.

[3]    ICSID Case No ARB/05/20, *Ioan Micula, Viorel Micula, SC European Food SA, SC Starmill SRL, SC Multipack SRL* v *Romania*, final award of 11 December 2013.

[4]    Reference exchange rate of the European Central Bank on 11 December 2013: 1 EUR = 4,45 RON.

[5]    The BIT entered into force on 1 April 2003.

[6]    See footnote 4.

[7]    Reference exchange rate of the European Central Bank on 15 January 2014: 1 EUR = 4,52 RON.

(5) On 1 April 2014, the Commission services alerted the Romanian authorities as to the possibility of issuing a suspension injunction to ensure that no further incompatible State aid would be paid out and sought Romania's comments thereon. By letter of 7 April 2014, Romania declared that it did not wish to comment on the possibility of the Commission issuing a suspension injunction.

(6) By letter of 26 May 2014, the Commission informed Romania of its decision to issue a suspension injunction ('the suspension injunction') pursuant to Article 11(1) of Council Regulation (EC) No 659/1999 (8), obliging Romania to suspend any action which may lead to the implementation or execution of the part of the Award that had not yet been paid, as that would constitute payment of unlawful State aid, until the Commission has taken a final decision on the compatibility of that State aid with the internal market.

(7) By letter dated 1 October 2014, the Commission informed Romania that it had decided to initiate the procedure laid down in Article 108(2) of the Treaty ('the opening decision') in respect of the partial implementation of the Award by Romania that took place in early 2014 (9) as well as in respect of any further implementation or execution of the Award.

(8) The Commission decision to initiate the procedure was published in the *Official Journal of the European Union* (10) on 7 November 2014. By that decision, the Commission invited interested parties to submit their comments.

(9) Romania submitted its comments on the opening decision on 26 November 2014. The claimants submitted comments as an interested party on 8 December 2014, after the rejection, by the Commission, of their request to have a longer period of time available for submitting their comments. The claimants' comments were forwarded to Romania, which was given the opportunity to react; Romania's observations on the claimants' comments were received on 27 January 2015.

(10) The claimants also requested access to all written correspondence between the Commission and Romania contained in the case file. The request was rejected on 19 December 2014 and the rejection was affirmed on 2 March 2015.

(11) By letters of 9 and 11 March 2015 the Romanian authorities informed the Commission that in the period 5 February to 25 February 2015, the court-appointed executor seized an additional amount of RON 9 197 482 from the Ministry of Finance and that a voluntary payment of the remaining amount (i.e. RON 466 760 066) (11) was made by the Ministry of Finance into a blocked account opened in the name of the five claimants.

## 2. BACKGROUND

*The State aid law applicable in Romania before its accession to the Union*

(12) On 1 February 1995, the Europe Agreement ('EA') between the European Community (the 'Community') and its Member States, on the one hand, and Romania, on the other hand, entered into force (12). The aim of the EA was to prepare Romania for accession to the Union. Article 64(1)(iii) of the EA declared incompatible with the proper functioning of the EA any public aid which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods in so far as they may affect trade between the Union and Romania. According to Article 64(2) EA, any practices contrary to this Article had to be assessed 'on the basis of criteria arising from the application of the rules of Articles 85, 86 and 92 of the Treaty establishing the European Economic Community' (now Articles 101, 102 and 107 of the Treaty). This dynamic reference to 'criteria arising from the application of the rules' refers to all Union rules on State aid, including those governing the grant of regional State aid (13). In addition to the substantive obligation to comply with Union State aid law,

---

(8) Council Regulation (EC) No 659/1999 of 22 March 1999 laying down detailed rules for the application of Article 108 of the Treaty on the Functioning of the European Union (OJ L 83, 27.3.1999, p. 1).
(9) See recital 3.
(10) See footnote 2.
(11) An additional RON 6 028 608 have been transferred on the blocked account as compensation for the execution costs.
(12) OJ L 357, 31.12.1994, p. 2.
(13) See also Article 2 of the Implementing Rules to Decision No 4/2000 of the EU-Romania Association Council of 10 April 2001 adopting the implementing rules for the application of the provisions on State aid referred to in Articles 64(1)(iii) and (2) pursuant to Article 64(3) of the Europe Agreement establishing an association between the European Communities and their Member States, of the one part, and Romania, of the other part, and in Article 9(1)(iii) and (2) of Protocol 2 on European Coal and Steel Community (ECSC) products to that Agreement (OJ L 138, 22.5.2001, p. 16).

Articles 69 and 71 of the EA obliged Romania to harmonise its domestic legislation with the *acquis communautaire*, expressly mentioning Union competition law and thus Union State aid law which forms part thereof. Accordingly, the EA obliged Romania, and Romania committed, to comply with the entire corpus of Union State aid law. Furthermore, the EA has been part of the domestic legal order after been ratified by law 20/1993 by the national Parliament and published in the national Official Journal on 12 April 1993 ([14]).

(13)    In order to comply with its harmonisation obligation under the EA, Romania passed Law No 143/1999 on State aid ('State aid law') in 1999, which entered into force on 1 January 2000. That law included the same definition of State aid as that contained in Article 64 of the EA and under Union law. That law also designated the Romanian Competition Council ([15]) and the Romanian Competition Office ([16]) as its national State aid surveillance authorities competent for assessing the compatibility of State aid granted by Romania to undertakings ([17]) and laid down the procedure to be followed for the notification and authorisation of State aid which was modelled on Article 108 of the Treaty.

*The investment incentives scheme*

(14)    On 2 October 1998, Romania enacted Emergency Government Ordinance 24/1998 ('EGO 24'), granting certain investors in disfavoured regions a series of incentives, inter alia:

— Article 6(1)(a): an exemption from payment of custom duties and value added tax on machinery, tools, installations, equipment, means of transportation, other goods subject to depreciation which are imported or manufactured domestically with the purpose of making investments in that region ('Machinery Facility'),

— Article 6(1)(b): refunds of customs duties on raw materials, spare parts and/or components necessary for achieving the investor's own production in that region ('Raw Materials Facility'),

— Article 6(1)(c): an exemption from payment of profit tax during the period for which the relevant area is designated as a disfavoured region ('Profit Tax Facility').

(15)    The Romanian Government determined which regions should be designated as disfavoured and for how long, up to a maximum of 10 years. By decision of 25 March 1999, the Government declared the mining area of Ștei-Nucet, Bihor county, to be a disfavoured region for 10 years, effective on 1 April 1999.

(16)    On 15 May 2000, the Romanian Competition Council adopted Decision No 244/2000, in which it found that several of the incentives offered under EGO 24 distorted competition. It considered that '[e]xemption from customs duty on raw materials are deemed State aid for operating purposes … leading to distortion of competition' and decided that 'the reimbursement of customs duties on imported raw materials, spare parts and/or components necessary for own production purposes within an area … shall be deleted'. That decision was adopted as a result of the notification by the national agency for regional development (the aid grantor under EGO 24) to the Competition Council, in accordance with Law No 143/1999, of envisaged modifications to EGO 24 included in the draft Emergency Government Ordinance 75/2000 ('EGO 75'). Amongst other modifications notified, the Romanian legislator envisaged replacing the reimbursement of custom duties under Article 6(1)(b) of EGO 24 (the Raw Materials Facility) with an exemption from custom duties on imported raw materials, spare parts and/or components necessary for own production purposes. In Decision No 244/2000, the Competition Council granted conditional authorisation to draft EGO 75, provided the following conditions were complied with: (i) the facilities under Article 6(1)(b) of EGO 24 should be repealed and the envisaged amendment to replace the reimbursement of custom duties with an exemption from custom duties should be withdrawn; and (ii) the envisaged amendments to Article 6(1)(c) of the EGO 24 (the Profit Tax Facility) would be limited only to the profit that is reinvested.

([14])    *Monitorul Oficial*, first part, No 73 of 12 April 1993.
([15])    The Competition Council was and is an autonomous administrative authority in the field of competition law and State aid law with regulatory and investigative powers, similar to the European Commission in the field of competition and State aid law.
([16])    The Competition Office was a specialised authority subordinate to the government. The main responsibilities of the Office were: (i) to carry out investigations and to survey the effective enforcement of legal provisions and the decisions of the Competition Council; (ii) to supervise the setting of prices by public entities and public companies; and (iii) to ensure transparency of State aid, and to monitor and report State aid expenditure.
([17])    By Article 1 of the implementing rules to Decision No 4/2000 the EU-Romania Association Council designated the Competition Council and Competition Office as the Romanian entities responsible for surveying and assessing the compatibility of State aid with the 1995 Europe Agreement.

(17) On 1 July 2000, EGO 75 entered into force. EGO 75, as adopted, did not, however, comply with the Competition Council's conditions to repeal the Raw Materials Facility and withdraw the envisaged amendment thereto. Instead, it amended Article 6(1)(b) of EGO 24 by replacing the refund on customs duties under the Raw Materials Facility with an exemption on customs duties on imported raw materials in direct contravention of Decision No 244/2000.

(18) The Competition Council challenged the failure to implement its decision before the Bucharest Court of Appeal, which however dismissed the application on 26 January 2001 as inadmissible ([18]). The inadmissibility was grounded on the fact that EGO 75 was considered a legislative, not an administrative measure, the legality of which the Competition Council could not contest under Law No 143/1999 and that any conflicts between legal provisions had to be resolved by the government and parliament without interference from the courts. The High Court of Cassation of Justice of Romania rejected the Competition Council's appeal against the Court of Appeal's decision on 19 February 2002 as inadmissible on similar grounds ([19]).

(19) In February 2000, Romania began accession talks to the Union. Competition policy, including compliance with Union State aid rules, formed part of those negotiations. In the context of those negotiations, the Union Common Position of 21 November 2001 noted that 'there are a number of existing as well as new incompatible aid schemes which have not been brought into line with the acquis', including 'facilities provided under [EGO 24 and EGO 75]' ([20]).

(20) On 31 August 2004, Romania repealed all the incentives provided under EGO 24, as amended by EGO 75, except the Profit Tax Facility. The revocation of the EGO 24 incentives took effect on 22 February 2005. The report accompanying the act repealing EGO 24, as amended by EGO 75, explained: 'In order to meet the criteria in the Community rules on State aid, and also to complete the negotiations under Chapter No 6 — Competition Policy it is necessary to eliminate all forms of State aid in national legislation incompatible with the acquis communautaire in this area and, in this respect, it is proposed to repeal […] the provisions of Article 6 paragraph (1), letter (b), letter (d) and letter (e) of the Emergency Government Ordinance No 24/1998 on the disadvantaged areas […] ([21]).'

*The claimants' investments and ICSID arbitration proceedings*

(21) The claimants made certain investments in area of Ştei-Nucet, Bihor County, Romania, in the early 2000s. On 1 June 2000, S.C. European Food SA obtained a permanent investor certificate, while S.C. Starmill S.R.L. and S.C. Multipack obtained their permanent investor certificates ('PICs') on 17 May 2002, thereby making those companies eligible to benefit from the scheme set up by EGO 24, as amended by EGO 75, for investments made by them from those dates onwards in the region of Ştei-Nucet, Bihor county, Romania.

(22) In 2003, Romania and Sweden concluded the BIT, which granted each country's investors (including for investments entered into prior to the entry into force of the BIT ([22])) certain protections when investing in the other country. The BIT guaranteed, inter alia, the covered investments' fair and equitable treatment in the host state, which was interpreted to also include a protection of the investors' legitimate expectations. It also allowed the investors to institute proceedings before an international arbitration tribunal in case they believed their rights under the BIT were violated by the host state. As the Micula brothers hold Swedish citizenship, they claimed that their investments in Romania were covered by the BIT.

(23) On 28 July 2005, and in reaction to the revocation of the investment incentives under EGO 24, the claimants requested the establishment of an arbitration tribunal pursuant to the dispute settlement provisions of the BIT. By decision of 24 September 2008, the Tribunal found that the claimants' claims were admissible. The claimants had initially requested the re-establishment of the EGO 24 investment incentives that had been revoked as of 22 February 2005. However, during the proceedings, the claimants partially withdrew their claim in 2009 and instead requested compensation for damages resulting from the revocation of the EGO 24 incentives. The

---

([18]) Civil Decision No 26; see Award, paragraph 219.
([19]) See Award, paragraph 224.
([20]) European Union Common Position of 21 November 2001, CONF-RO 43/01, p. 4. During the accession process of an applicant country, the Commission regularly proposes and the Council adopts so-called common positions, in which the progress of the candidate country towards compliance with the accession criteria is evaluated.
([21]) Substantiation Report accompanying EGO 94/2004, 26 August 2004, pp. 12-13.
([22]) Article 9(1) of the BIT.

claimants alleged that by revoking the incentives, Romania had infringed their legitimate expectations that those incentives would be available, in substance, until 1 April 2009. Thus, according to the claimants, Romania had violated its obligation of fair and equitable treatment owed to them as Swedish investors under Article 2(3) of the BIT.

(24)    In the course of the arbitration proceedings, the Commission intervened as *amicus curiae*. In its intervention, submitted on 20 July 2009, the Commission explained that the EGO 24 incentives were: 'incompatible with the Community rules on regional aid. In particular, the incentives did not respect the requirements of Community law as regards eligible costs and aid intensities. Moreover, the facilities constituted operating aid, which is proscribed under regional aid rules'.

(25)    The Commission also observed that '[a]ny ruling reinstating the privileges abolished by Romania, or compensating the claimants for the loss of these privileges, would lead to the granting of new aid which would not be compatible with the EC Treaty'. It also advised the Tribunal that the 'execution of [any award requiring Romania to re-establish investment schemes which have been found incompatible with the internal market during accession negotiations] can thus not take place if it would contradict the rules of EU State aid policy'.

(26)    In the Award of 11 December 2013, the Tribunal found that by revoking the EGO 24 incentives, Romania 'violated the Claimants' legitimate expectations with respect to the availability of the EGO 24 incentives' until 1 April 2009 ($^{23}$). The Tribunal further concluded that, with the exception of maintaining the investors' obligations under EGO 24 after revocation of the relevant incentives, 'Romania's repeal of the incentives was a reasonable action in pursuit of a rational policy.' ($^{24}$) However, the Tribunal went on to state that ($^{25}$): '[T]his conclusion does not detract from the Tribunal's holding […] above that Romania undermined the Claimants' legitimate expectations with respect to the continued availability of the incentives until 1 April 2009. As a result, Romania's actions, although for the most part appropriately and narrowly tailored in pursuit of a rational policy, were unfair or inequitable vis-à-vis the Claimants'.

The Tribunal concluded its analysis by stating that ($^{26}$): '[B]y repealing the EGO 24 incentives prior to 1 April 2009, Romania did not act unreasonably or in bad faith (except that [Romania] acted unreasonably by maintaining investors' obligations after terminating the incentives). The Tribunal, however, concludes by majority that Romania violated the Claimants' legitimate expectations that those incentives would be available, in substantially the same form, until 1 April 2009. Romania also failed to act transparently by failing to inform the Claimants in a timely manner that the regime would be terminated prior to its stated date of expiration. As a result, the Tribunal finds that Romania failed to "ensure fair and equitable treatment of the investments" of the Claimants in the meaning of Article 2(3) of the BIT'.

(27)    The Tribunal further decided that Romania had to pay damages to the claimants ($^{27}$). In total, the Tribunal awarded the claimants RON 376 433 229 plus interest. The damages are made up as follows: the Tribunal found that Romania had to pay the claimants RON 85,1 million ($^{28}$) in damages for the increased cost of sugar (for the import of which the claimants had to pay customs duties after the revocation of the Raw Materials Facility), RON 17,5 million ($^{29}$) in damages for the increased cost of raw materials other than sugar and PET ($^{30}$), RON 18,1 million ($^{31}$) in damages for the loss of the ability to stockpile sugar at lower prices, and RON 255,7 million ($^{32}$) in damages for lost profit deriving from lost sales of finished goods. In addition, the Tribunal ordered Romania to pay

($^{23}$) Award, paragraph 725.
($^{24}$) Award, paragraph 827.
($^{25}$) See footnote 24.
($^{26}$) Award, paragraph 872.
($^{27}$) Award, paragraphs 875 et seq.
($^{28}$) This amount is calculated for imports made during 22 February 2005 and 31 March 2009.
($^{29}$) See footnote 28.
($^{30}$) The claimants asked for compensation for the increased cost of PET. However, the Tribunal rejected this claims on the basis that the claimants had never in fact benefited from the Raw Materials Facility with respect to PET imports.
($^{31}$) This amount is calculated on the basis of custom duties charged on imported sugar and that would have been avoided, if the claimant had had the opportunity to stockpile sugar before the envisaged expiry of the EGO (i.e. 1 April 2009). The benchmark is based on stockpiles in 2004/2005.
($^{32}$) Lost profits are calculated over the period 2004-2008 for loss of market shares of soft drinks and other products that did contain sugar. The claim is that after the revocation of the EGO incentives, the costs increased leading to higher prices and thus to lower market shares.

interest (ROBOR plus 5 %), calculated from 1 March 2007 with respect to the increased cost of sugar and other raw materials, from 1 November 2009 with respect to loss of ability to stockpile sugar, and from 1 May 2008 with respect to lost profits. On the date of the Award, the principal and interest due to the claimants amounted to RON 791 882 452, as illustrated in the table.

**Damages and interest as awarded to the claimants by the Award**

| Damages awarded | Amount (in RON) | Interest calculated from |
|---|---|---|
| Increased cost of sugar | 85 100 000 | 1 March 2007 |
| Increased cost of raw materials other than sugar or PET | 17 500 000 | 1 March 2007 |
| Lost opportunity to stockpile sugar | 18 133 229 | 1 November 2009 |
| Lost profits on the sale of finished goods | 255 700 000 | 1 May 2008 |
|  |  | Total including interest on 11 December 2013: |
| **TOTAL** | **376 433 229** | **RON 791 882 452** |

*The ICSID annulment proceedings*

(28) On 18 April 2014, Romania filed an application for the annulment of the Award on the basis of Article 52 of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States of 18 March 1965 ('ICSID Convention') before an ad hoc committee. Due to the procedural rules applicable to those proceedings, Romania has not provided the Commission with its application. However, it has become clear that in its application, Romania also requested the ad hoc committee to order a stay of enforcement of the Award until the committee had ruled on the application for annulment. By letter of 18 August 2014, Romania informed the Commission that by order of 7 August 2014, the ad hoc committee granted a stay of enforcement of the Award under the condition that Romania deposit, within one month, the following assurances: 'Romania commits itself subject to no conditions whatsoever (including those related to [EU] Law or decisions) to effect the full payment of its pecuniary obligation imposed by the Award in ICSID Case No ARB/05/20 — and owed to Claimants — to the extent that the Award is not annulled — following the notification of the Decision on annulment'.

(29) At the request of Romania, the Commission explained to Romania that it could not provide the unconditional commitment that it would pay the compensation awarded under the Award to the claimants even if that entailed a violation of its obligations under Union law and regardless of any decision of the Commission. Romania replied accordingly to the ad hoc committee which lifted the stay of enforcement of the Award as of 7 September 2014.

(30) On 15 October 2014, the Commission submitted an application to the ad hoc committee for leave to intervene as a non-disputing party in the annulment proceedings. Leave to intervene was granted by the ad hoc committee on 4 December 2014 and the Commission submitted its *amicus curiae* brief in those proceedings on 9 January 2015.

*The claimants' actions for recognition and execution of the Award in Romanian and US courts*

(31) The Romanian authorities further informed the Commission services about the national proceedings introduced by the claimants to enforce the award. In February 2014, Viorel Micula introduced first the court proceedings with a view to recognise the award on the basis of the New Procedural Civil Code (Articles 1124-1132) ([33]). On 7 May 2014, the Commission intervened in those proceedings pursuant to Article 23a(2) of Regulation (EC) No 659/1999. However, Viorel Micula withdrew his action on 28 May 2014 and therefore no judgement has been rendered. Separately, on 18 March 2014 the other four claimants (S.C. European Food SA, S.C. Starmill S.R.L., S.C. Multipack, and Mr Ion Micula) initiated court proceedings in Romania with a view to enforcing the Award pursuant to Article 54 of the ICSID Convention requesting the payment of 80 % of the outstanding amount (i.e. RON 301 146 583) and the corresponding interest.

---

([33]) Case No 3456/3/2014, Bucharest Tribunal.

(32)　On 24 March 2014, the Bucharest Tribunal allowed the execution of the Award as requested by the four claimants considering that, on the basis of Article 54 of the ICSID Convention which has been ratified by Romania and is part of the domestic legal order, the Award is a directly enforceable act and must be treated as a final domestic judgment, thus obviating the procedure to recognise the Award on the basis of the Romanian New Procedural Civil Code (Articles 1123-1132) [34]. On 30 March 2014, an executor started the enforcement procedure by setting the Romanian Ministry of Finance a deadline of 6 months to pay to the four claimants 80 % of the Award plus the interests and other costs.

(33)　Romania challenged the execution of the Award before the Bucharest Tribunal and asked for interim measures, i.e. a temporary suspension of execution until the case had been decided on the merits [35]. On 14 May 2014, the Bucharest Court temporarily suspended the execution of the Award until a decision on the merits of Romania's challenge and request to suspend the execution had been taken. On 26 May 2014, the Commission intervened in those proceedings pursuant to Article 23a(2) of Regulation (EC) No 659/1999. The Commission invited the Bucharest Tribunal to suspend and annul the forced execution of the Award. In the alternative, the Commission invited the Bucharest Tribunal to refer a preliminary question to the Court of Justice of the European Union ('CJEU').

(34)　On 23 September 2014, the Bucharest Tribunal, in the interim measure case, lifted the suspension and rejected Romania's request for a suspension of the execution of the Award. The primary reason for that rejection was the lifting of the stay of enforcement of the Award by the ICSID ad hoc committee on 7 September 2014 (see recital 29). On 30 September 2014, Romania decided to appeal the decision of Bucharest Tribunal of 23 September 2014 [36]. On 13 October 2014, the Bucharest Tribunal rejected the request to send preliminary questions to the CJEU on the basis of Article 267 of the Treaty. On 17 October 2014, against the backdrop of the Commission decision of 1 October 2014 to open the formal investigation procedure, in the context of the case No 15755/3/2014 before the Bucharest Tribunal, Romania again requested interim measures in the form of the suspension of the forced execution of the Award.

(35)　Despite the obligation of all Romanian authorities, including the judiciary, to comply with the Commission decisions of 26 May 2014 and 1 October 2014, the executor appointed by the Bucharest Tribunal issued orders on 31 October 2014 to seize the accounts of Romania's Ministry of Finance and seek the execution of 80 % of the Award. As a result of the letters of attachment issued by the executor, some parts of the Ministry of Finance's state treasury and bank accounts are currently frozen.

(36)　On 24 November 2014, the Bucharest Tribunal also rejected Romania's main action against the execution order of 24 March 2014, including the request for interim measures of 17 October 2014. On 14 January 2015, Romania has appealed the decision of the Bucharest Tribunal [37]. On 24 February 2015, the Bucharest Court of Appeal lifted the decision of the Bucharest Tribunal of 23 September 2014 and suspended the forced execution until the appeal against the decision of Bucharest Tribunal of 24 November 2014 is decided. The Commission has decided to seek leave to intervene in those appeal proceedings on the basis of Article 23a(2) of Regulation (EC) No 659/1999.

(37)　On 5 January 2015, the court-appointed executor seized RON 36 484 232 (ca. EUR 8,1 million [38]) from Romania's Ministry of Finance. Of this sum, the executor subsequently transferred RON 34 004 232 (ca. EUR 7,56 million) in equal parts to three of the five claimants, and kept the remainder as compensation for execution costs. Between 5 February and 25 February 2015, the court-appointed executor seized an additional RON 9 197 482 (ca. EUR 2 million) [39] from the Ministry of Finance. On 9 March 2015 the Ministry of Finance voluntarily transferred the remaining amount of RON 472 788 675 (ca. EUR 106,5 million [40]) (including the costs of court appointed executor of RON 6 028 608) into a blocked account in the name of the five claimants in order to implement the Award. However, the five claimants can withdraw the money only if the Commission decides that the State aid granted on the basis of the Award is compatible with the internal market.

[34]　Order issued by Bucharest Tribunal in Case No 9261/3/2014, Section IV Civil.
[35]　Case No 15755/3/2014, Bucharest Tribunal, Section III Civil.
[36]　Case No 15755/3/2014/a1, Bucharest Court of Appeal, Section IV Civil.
[37]　See footnote 36.
[38]　Reference exchange rate of the European Central Bank on 5 January 2015: 1 EUR = 4,49 RON.
[39]　See footnote 38.
[40]　Reference exchange rate of the European Central Bank on 9 March 2015: 1 EUR = 4,44 RON.

L 232/50          EN          Official Journal of the European Union          4.9.2015

(38) The Commission has furthermore discovered that Mr Viorel Micula also initiated an action for enforcement against Romania before the United States District Court for the District of Columbia ([41]). That case is pending. The Commission intends to apply for leave to file an *amicus curiae* brief in those proceedings. Mr Viorel Micula also initiated further enforcement proceedings against Romania before the Romanian courts on 3 October 2014, but that claim was rejected by the Bucharest Tribunal on 3 November 2014.

## 3. DESCRIPTION OF THE MEASURE AND GROUNDS FOR INITIATING THE PROCEDURE

*Description of the measure*

(39) The measure under assessment is the payment of the compensation awarded to the claimants by the Tribunal by virtue of the Award, whether by implementation or execution of that Award, plus the interest that has accrued since the Award was issued.

(40) As noted in recital 3, Romania already partially paid out that compensation in early 2014 by offsetting tax debts owed by one of the claimants, S.C. European Food SA, to the Romanian State. The tax debts thus offset amount to RON 337 492 864 (ca. EUR 76 million ([42])).

(41) As noted in recital 37, the court-appointed executor seized RON 45 681 714 (ca. EUR 10,17 million ([43])) from Romania's Ministry of Finance in order to execute the Award. Furthermore, the Romanian authorities have transferred the remaining amount of RON 472 788 675 (ca. EUR 106,5 million ([44])) (including the costs of court appointed executor of RON 6 028 608) into a blocked account in the name of the five claimants.

(42) According to the Romanian authorities the arbitration award has been fully implemented.

*Grounds for initiating the formal investigation procedure*

(43) In the opening decision, the Commission reached the preliminary conclusion that payment of the compensation awarded by the Tribunal to the claimants through the implementation or execution of the Award constitutes State aid within the meaning of Article 107(1) of the Treaty. This preliminary conclusion rests on the preliminary findings that:

— the five claimants constitute one economic unit that must be qualified as an undertaking,

— payment of the awarded compensation would grant the claimants an economic advantage not otherwise available on the market,

— the presence of an advantage is not precluded by the fact that the compensation awarded by the Tribunal is designated as compensation for damages, since the Award does not fall within the scope of the *Asteris* case-law distinguishing damages from State aid,

— the advantage granted is selective, since only the claimants would benefit from the measure,

— the advantage is granted from state resources, since the relevant payments would be made from the state budget, and the decision to grant the advantage is imputable to Romania, regardless of whether Romania implemented the Award voluntarily or on the order of a court,

— payment of the compensation awarded to the claimants distorts competition and affects trade between Member States.

(44) The Commission then determined that the application of the State aid rules in this case does not affect rights and obligations protected by Article 351 of the Treaty. The Commission further found that payment of the compensation awarded to the claimants would constitute new aid, since the implementation or execution of the Award would take place after Romania's accession to the Union, and that it did not matter that some of the costs which the measure would *de facto* reimburse were incurred by the claimants before accession. Finally, the Commission reached the preliminary conclusion that the payment of the compensation awarded by the Tribunal to the claimants through the implementation or execution of the Award would not be compatible with the internal market, since it would not fulfil the applicable compatibility conditions for regional aid.

---

[41] Case No 1-14-cv-600 Viorel Micula v Government of Romania in the United States District Court for the District of Columbia — Petition to confirm ICSID award and enter judgment.
[42] See footnote 7.
[43] See footnote 38.
[44] See footnote 40.

#### 4. COMMENTS FROM ROMANIA

(45) Romania points out, first, that under Article 54(1) of the ICSID Convention, to which Romania became a party in 1975, each state party 'shall recognise an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that state'. Romania argues that the consequence of this clause is that every state party has an obligation to recognise and enforce an ICSID arbitral award the execution of which has not been stayed in accordance with the rules under the ICSID Convention, with there being no possibility of appeal against such an award before the national courts.

(46) Second, Romania stresses that the Romanian government is bound to comply with the Romanian constitution, which bars it from unduly influencing national judges as regards the question of whether or not to enforce the Award. It stresses that the national court autonomously decided that the various acts issued by the Commission in 2014 could not suspend the enforcement of the Award under Romanian law. Romania argues further that, while according to the Romanian constitution Union law generally takes precedence over (ordinary) Romanian national law, Union law could not overrule the Romanian constitution itself.

(47) Third, Romania submits that the compensation awarded to the claimants by the Tribunal should not be treated as new incompatible aid, but as compensation for damages within the meaning of the *Asteris* case-law. Romania objects, in particular, to the application of the *Lucchini* case-law to the present case, arguing that the factual background distinguishes the present case from that adjudicated upon by the CJEU in *Lucchini* ([45]).

(48) Finally, Romania repeatedly stresses the conflict borne out in the present case between Romania's obligations under the ICSID Convention and under Union law. It submits that until it has been determined at ICSID level whether the ICSID Convention or Union law should take precedence, the implementation or execution of an ICSID award should not be considered to constitute illegal State aid.

#### 5. COMMENTS FROM INTERESTED PARTIES

(49) The only interested party to submit observations on the opening decision was the claimants in the arbitration proceedings giving rise to the Award. The claimants contest the preliminary findings contained in the opening decision. In particular, they make observations regarding (i) the background of the case; and (ii) the allegedly incorrect description of the measure; they argue that (iii) there is no conflict between Union State aid rules and intra-EU BITs; they submit that (iv) the implementation or execution of the Award does not constitute State aid; or (v) at least new aid; they assert that (vi) the implementation or execution of the Award would be compatible aid; they maintain that (vii) the protection of legitimate expectations precludes the Commission from adopting a negative decision; and finally they argue that (viii) the Commission must take steps to properly involve the claimants in the investigation procedure.

*Regarding the background of the case*

(50) The claimants explain that after the collapse of the communist regime in 1989, Romania found itself in a state of dire economic deprivation. The situation was such that when Romania started the accession process to the European Union in 1995, it was far from meeting the Union's accession criteria. In order to accelerate economic development and reduce regional disparities, the Romanian government established a framework for regional development and shortly thereafter adopted EGO 24 to incentivise private sector investments in disfavoured regions. The EGO 24 incentives were aimed solely at investors creating jobs in the most disadvantaged regions in one of the poorest countries in Europe. In this context, the claimants stress in particular that EGO 24 did not only provide advantages to investors, but also imposed obligations, such as the duty to create jobs and employ previously unemployed workers, develop and produce new materials in a disfavoured region, maintain the head office of the newly established companies in the disfavoured region, and the obligation to apply for and receive a PIC.

(51) The claimants further explain that their companies obtained PICs between 2000 and 2002 for investing in Bihor County. Under the terms of those PICs, which were valid until 1 April 2009, the claimants committed to maintaining their investments for 'twice the period of time in which [the claimants] enjoyed the advantages' put in place by EGO 24. Through their investments, the claimants claim to have created approximately 9 000 new jobs, of which 7 000 continue to exist to this day. The claimants further assert that their investments led to

---

([45]) See opening decision, recital 39.

significant spillover effects in the region. The conclusion that the claimants draw from these observations is that through their investments they contributed to alleviating the hardship brought about by the dire economic conditions in the Bihor County region and have improved the quality of life in that region.

(52) With respect to the State aid laws in place in Romania prior to Romania's accession to the Union, the claimants argue that since EGO 24 was set up before Law No 143/1999 entered into force, EGO 24 was existing aid for the purpose of that law and did not have to be authorised by the Competition Council. The claimants also recall that while the Competition Council attempted to challenge EGO 75 in Romania's courts, it did not contest the compatibility of EGO 24 with Law No 143/1999. The claimants also recall that, with the exception of the EU Common Position of 21 November 2001, no statement issued by the Union in the course of the accession process specifically identified EGO 24 as being problematic from a State aid perspective.

(53) Finally, the claimants state that any failure to fully implement the Award, or the recovery of the part that has already been implemented by means of setting of the claimant's tax debts against the compensation owed, would be disastrous for the claimants and the region, jeopardising thousands of jobs and reversing the economic development that took place in the region.

*Regarding the description of the measure*

(54) The claimants argue that the opening decision is not consistent when it comes to identifying the relevant measure. Referring to recitals 25 and 26 of the opening decision, the claimants stress that while the Commission claims to be investigating only the implementation or execution of the Award, in reality it is challenging the underlying EGO 24 scheme. The claimants also assert that, in any event, it has never been validly established that EGO 24 amounted to incompatible State aid.

(55) Asserting further that the opening decision mischaracterises the Award, the claimants argue that the Award exclusively grants compensation for damages arising from Romania's violation of the BIT and does not replicate the EGO 24 benefits. Indeed, according to the claimants the Tribunal did not award compensation for the premature revocation of EGO 24 incentives per se, but rather that the measures found to be in breach of the BIT are that Romania acted unreasonably by: (i) maintaining as a whole the investor's obligation under EGO 24 despite having revoked virtually all the benefits thereunder; (ii) by undermining the claimants' legitimate expectations with respect to the continued availability of the EGO 24 incentives; and (iii) by being insufficiently transparent with the claimants.

(56) The claimants furthermore put forward that the opening decision is based on the presumption that EGO 24 constituted incompatible aid, and that this presumption is flawed because EGO 24's compatibility as regional aid has never been validly determined.

*Regarding the lack of conflict between the Union State aid rules and intra-EU BITs*

(57) Referring to recitals 51 to 55 of the opening decision, the claimants assert that provisions of Union law dealing with international law obligations of Member States are irrelevant in this case, as there is no conflict between Union State aid law and the BIT. Centrally, the claimants argue that any conflict is excluded by the fact that the arbitral proceedings in question were initiated before Romania acceded to the Union. Romania's obligation to implement the Award is said to stem from the point in time at which the alleged violation of the BIT occurred, i.e. before Romania's accession to the Union, and is thus unaffected by Union law.

*Regarding the characterisation of the implementation/execution of the Award as State aid*

(58) The claimants submit that the implementation or execution of the Award by Romania does not constitute State aid within the meaning of Article 107(1) of the Treaty.

(59) First, while they do not dispute the qualification of S.C. European Food SA, S.C. Starmill S.R.L., and S.C. Multipack as undertakings, the claimants assert that Ioan and Viorel Micula cannot themselves be said to be engaged in economic activities. Particularly, the fact that the Micula brothers hold shares in various undertakings is said to be insufficient to qualify them as undertakings themselves. The claimants also maintain that the three aforementioned companies and the Micula brothers cannot be treated as a single economic unit, as the brothers' interests are not identical to those of the companies.

(60) Second, the claimants emphasise that implementing the Award does not confer an advantage upon them. They argue that measures which serve to fulfil legal obligations, such as the payment of compensation for damages, do not constitute preferential treatment of undertakings. In this context, the claimants assert that the Commission cannot rely on Advocate-General Colomer's statement in *Atzeni*, since that case related to damages paid to a beneficiary in compensation for the recovery of incompatible aid that had already been paid out. The claimants

maintain that, in contrast, in the present case no State aid — much less unlawful State aid — had been paid out to them, thus distinguishing it from *Atzeni*. Similarly, the claimants maintain that the present case cannot be equated with the cases cited in the opening decision in which contract clauses indemnifying beneficiaries for recovery of incompatible State were judged to constitute State aid themselves.

(61) The claimants further maintain that the implementation or execution of the Award would fall squarely under the *Asteris* case-law. They argue that the rationale behind the *Asteris* case-law, as well as such cases as *Denkavit* [(46)] and *ThyssenKrupp* [(47)], is that payment of damages is not within the discretion of Member States, so that it cannot qualify as State aid. Romania's commitments under the BIT are further claimed to be an expression of general rules of liability to which the *Asteris* case-law applies. Regarding the Commission's argument that *Asteris* does not apply to damages awarded on the basis of intra-EU BITs considered incompatible with Union law, the claimants maintain that any such incompatibility would not render the Award granted on the basis of such a BIT void. Implementation or execution of the Award could furthermore not be seen as granting State aid 'by the back door', as the Award does not reinstate the abolished EGO 24 scheme; rather, the Award is said to grant damages for Romania's autonomous decision to, inter alia, maintain an unreasonable burden imposed on the claimants.

(62) The claimants further assert that the Commission's arguments regarding the incompatibility of the BIT with Union law are irrelevant, since the dispute leading to the arbitral proceedings and ultimately the Award arose before Romania's accession to the Union. Arguing that the Commission's argumentation in the opening decision is based on mistakenly linking the implementation/execution of the Award with the incompatibility of the EGO 24 scheme, the claimants reassert that in any event the Award did not grant damages on the basis of Romania's decision to comply with Union State aid rules.

(63) The claimants further dispute that the CJEU's decision in *Lucchini*, which the Commission referred to in the opening decision, has any relevance for the present case. In their view, *Lucchini* establishes only that provisions of national law cannot frustrate the recovery of incompatible aid, and has no bearing on the implementation/execution of an arbitral award granting damages for the breach of a BIT.

(64) Third, as regards the imputability of the implementation/execution of the Award to Romania, the claimants argue that the Commission's assessment cannot rely on the imputability of EGO 24 itself. They maintain further that the implementation/execution of an ICSID award is an automatic and involuntary consequence of Romania's obligations under the ICSID Convention. Any involuntary act is, according to the claimants, not imputable to the state and cannot constitute State aid. They stress further that ICSID awards are not open to review by national courts and their enforcement cannot be blocked for reasons of domestic *ordre public* or incompatibility with Union law.

(65) The claimants further argue that Romania's obligations under the ICSID Convention were not affected by Romania's subsequent membership to the Union. They explain that since the alleged breach of the BIT and the institution of proceedings occurred before Romania acceded to the Union, EU law is not applicable to the present case.

(66) Fourth, with respect to selectivity, the claimants claim that implementation/execution of the Award is not selective, since BITs and the ICSID Convention establish a system of general liability that is equally applicable to any investor. Damages awarded under this system are, accordingly, not selective. In this context, the claimants also quote a statement allegedly made by the Commission that 'BITs, although conferring a benefit by securing property rights abroad, technically cannot qualify as [S]tate aid prohibited by Article 107(1) [of the Treaty] since the benefit does not favour certain undertakings or the production of certain goods but is granted generally to all investors irrespective of the sector they operate in.'

(67) Finally, the claimants deny that implementing the Award would be liable to distort competition and affect trade between Member States. They claim that the reasoning contained in the opening decision cannot apply to the Micula brothers, who are allegedly not engaged in any economic activity, with the consequence that any payments to them cannot distort competition or affect trade between Member States. More generally, the claimants argue that implementing the Award would not grant the claimants an advantage, so that any effect on competition or trade can be excluded.

---

[(46)] Case 61/79 *Amministrazione delle finanze dello Stato v Denkavit italiana* EU:C:1980:100.
[(47)] Commission Decision 2008/408/EC of 20 November 2007 on the State aid C 36/A/06 (ex NN 38/06) implemented by Italy in favour of ThyssenKrupp, Cementir and Nuove Terni Industrie Chimiche (OJ L 144, 4.6.2008, p. 37).

*Regarding the characterisation of the implementation/execution of the Award as new aid*

(68) The claimants further take issue with the characterisation of the implementation/execution of the Award as new aid. They note that the only events that took place after Romania's accession were the adoption of the Award itself and the execution thereof. Romania's execution in particular is said to be a mere automatic consequence of the Award, rather than the result of a distinct decision. The relevant points in time were, according to the claimants, the enactment of EGO 24, the issuance of PICs to the claimants, or at the latest the conclusion of the BIT. The claimants also rely on case-law and Commission practice on state guarantees (according to which the relevant point in time is when the guarantee is given, not when it is invoked or payments issued) to argue that where compensation is paid based on a commitment included in an international agreement, the date of the conclusion of that agreement should be considered decisive.

*Regarding the compatibility of the implementation/execution of the Award*

(69) The claimants first claim that where the Commission is investigating non-notified aid, and the Member State concerned fails to bring forward any compatibility argument whatsoever, the Commission is under a duty to consider whether the aid may be compatible under any applicable rules or guidelines, if necessary by requesting further information from the Member State or the beneficiary.

(70) As regards the preliminary compatibility analysis contained in the opening decision, the claimants maintain that it is conceptually flawed since it applies the current Regional Aid Guidelines ('RAG') to the implementation/execution of the Award, even though it is plainly obvious that the implementation/execution of the Award is not motivated by any regional development objective. In the claimants' opinion, and stressing again that the opening decision wrongly assumes that implementing the Award would retroactively reinstate EGO 24, the only aid that could have been granted were the benefits under the EGO 24 scheme. The EGO 24 should then have been assessed under the 1998 RAG, under which they should have been found compatible.

(71) The claimants next assert that there has never been a valid formal decision establishing that EGO 24 constitutes incompatible State aid. The decision of the Romanian Competition Council (Decision No 244) denouncing EGO 24 was, according to the claimants, defective, as it did not assess compatibility and failed to provide reasoning for its findings. In addition, the claimants argued that the adoption of EGO 75, which reaffirmed EGO 24, by the Romanian Government overrode the Competition Council's decision. They further argue that the rejection of the Competition Council's challenges against EGO 75 before Romanian courts is further proof that EGO 24 and EGO 75 took precedence over the Competition Council's decision.

(72) The claimants further assert that the Commission had and has no competence to review EGO 24, even incidentally. The relevant parts of EGO 24 were revoked before Romania's accession to the Union. In so far as the Award is seen as reinstating aid granted under EGO 24, the claimants thus assert that the Commission has no competence of review. In this context, they refer also to the Commission decision in State aid case N 380/2004, where the Commission found that implementing an arbitral award after accession which had been rendered before accession and related entirely to periods before accession did not constitute new aid.

(73) Finally, the claimants argue that EGO 24 and individual incentives under EGO 24 were compatible with the internal market pursuant to the applicable 1998 RAG, given that all the compatibility conditions were fulfilled. In this context, they assert, first, that EGO 24 can in fact be seen as compatible investment aid, rather than operating aid, and, second, that even if perceived as operating aid, EGO 24 was still compatible.

*Regarding legitimate expectations*

(74) The claimants claim that a Commission decision finding that the implementation or execution of the Award contravenes State aid rules would violate the claimants' legitimate expectations. They argue that the Union expressly encouraged Romania to conclude BITs with Member States prior to Romania's accession; that the Commission continues to support the conclusion of BITs; that the claimants relied on their expectation that the arbitral proceedings would allow them to receive compensation for the damage caused by Romania's decision to maintain all the investors' obligations under EGO 24; and that there is no overriding public interest in setting aside the claimants' legitimate expectations.

4.9.2015     EN     Official Journal of the European Union     L 232/55

*Regarding the claimants' procedural rights*

(75) Finally, the claimants assert that according to case-law interested parties 'have the right to be involved in the administrative procedure to the extent appropriate in the light of the circumstances of the case' ([48]). Arguing that Romania has failed to properly involve the claimants in the State aid procedure, which allegedly placed the claimants at a particular disadvantage, the claimants warn that failure on the part of the Commission to enable the claimants to properly defend their interests by involving them more fully in the procedure could vitiate the Commission's final decision. The claimants conclude by noting that the Commission's practice in State aid cases in general does not sufficiently safeguard the alleged beneficiaries' procedural rights, and is, by failing to provide an effective remedy, contrary to Article 6(1) of the European Convention on Human Rights and Article 47 of the EU's Charter of Fundamental Rights.

## 6. COMMENTS FROM ROMANIA ON THIRD PARTY COMMENTS

(76) In its response to the comments submitted by the claimants, Romania first rejects the claim that Ioan and Viorel Micula could not themselves be considered to constitute undertakings for the purpose of the application of EU State aid law. Romania argues that the five claimants should rather be regarded as one economic unit, since the Micula brothers exert direct or indirect control over the corporate claimants. To underpin this assertion, Romania explains, inter alia, that during the negotiations between Romania and the claimants that took place after the Award was issued the Micula brothers took formal decision on behalf of the three corporate claimants.

(77) Second, Romania rebuts the claimants' attempt to deny the connection between the revocation of the EGO 24 incentives and the granting of damages under the Award. It maintains that it is clear from the Award that the value of the damages was established by the Tribunal on the basis of the economic advantages that the claimants would have obtained if the incentives had been maintained.

(78) Third, as regards the claimants' assertion that they had not been and are not being properly involved in the State aid investigation, Romania denies that it failed to immediately forward the opening decision to the claimants. It further asserts that Romania is under no legal obligation to involve the claimants more fully than is and has been the case.

## 7. ASSESSMENT

### 7.1. Existence of aid

(79) Article 107(1) of the Treaty provides that 'aid granted by a Member State or through state resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the internal market'. Accordingly, a measure constitutes State aid if the following four cumulative conditions are met:

— the measure must confer a selective economic advantage upon an undertaking,

— the measure must be imputable to the state and financed through state resources,

— the measure must distort or threaten to distort competition,

— the measure must have the potential to affect trade between Member States.

(80) The Commission stresses that the notion of State aid is an objective and legal concept defined directly by the Treaty. To establish whether a particular measure constitutes State aid depends not on the intentions or justifications of the Member States when granting it, but on the effects of the measure in question ([49]).

*Undertaking*

(81) The CJEU has consistently defined undertakings as entities engaged in an economic activity, regardless of their legal status and the way in which they are financed ([50]). The classification of a particular entity thus depends entirely on the nature of its activities.

([48]) Referring to Case T-68/03 *Olympiaki Aeroporia Ypiresies*, EU:T:2007:253, paragraph 42.
([49]) Case C-487/06 P *British Aggregates v Commission* EU:C:2008:757, paragraphs 85 and 89 and the case-law cited, and Case C-279/08 P *Commission v Netherlands (NOx)* EU:C:2011:551, paragraph 51.
([50]) Joined Cases C-180/98 to C-184/98 *Pavlov and Others* EU:C:2000:428, paragraph 74.

L 232/56    EN    Official Journal of the European Union    4.9.2015

(82) Separate legal entities may be considered to form one economic unit for the purpose of the application of State aid rules. That economic unit is then considered to be the relevant undertaking. As the CJEU has previously held, '[i]n competition law, the term "undertaking" must be understood as designating an economic unit […] even if in law that economic unit consists of several persons, natural or legal.' ($^{51}$) To determine whether several entities form an economic unit, the CJEU looks at the existence of a controlling share or functional, economic or organic links ($^{52}$).

(83) The claimants in the arbitration proceedings giving rise to the Award are the brothers Ioan Micula and Viorel Micula and three companies owned by them (S.C. European Food SA, S.C. Starmill S.R.L., and S.C. Multipack). It is clear that the three companies are engaged in economic activities, as they specialise in industrial manufacturing of food products, milling products, and plastic packaging, respectively. The three companies therefore constitute undertakings. This characterisation is not disputed by the claimants.

(84) The claimants maintain, however, that the Micula brothers themselves cannot, as natural persons, be considered to constitute undertakings for the purposes of Article 107(1) of the Treaty, and that accordingly funds paid out to them in implementation or execution of the Award would not constitute State aid. In particular, the interests of the Micula brothers are said not to coincide with those of the three corporate claimants.

(85) The Commission finds, however, that the three companies and the Micula brothers together constitute a single economic unit for the purpose of the application of the State aid rules. This economic unit is therefore considered the relevant undertaking.

(86) This finding relies, first, on the fact that the Micula brothers have, directly or indirectly, virtually exclusive ownership of the three corporate claimants, thus demonstrating a controlling interest over those companies.

(87) Second, this finding takes into account that the corporate claimants form part of a larger group of companies, the European Food and Drinks Group ('EFDG'). During the arbitral proceedings, the Micula brothers also claimed compensation for other companies forming part of EFDG that allegedly suffered losses as a result of Romania's actions giving rise to the proceedings. In fact, rather than claiming and quantifying separate losses for each corporate claimant and the two individual claimants, the claimants based their application for compensation on the losses allegedly suffered by EFDG as a whole. After examining the ownership structure of EFDG and determining that the Micula brothers, directly or indirectly, owned at least 99,96 % of the all companies in EFDG for which the Micula brothers claimed damages (these are European Drinks SA, Rieni Drinks SA, Scandic Distilleries SA, Transilvania General Import-Export S.R.L., West Leasing S.R.L), the Tribunal accepted this approach and allowed the claimants to seek compensation for the losses of EFDG as a whole ($^{53}$). This behaviour of the claimants during the arbitral proceedings and the corresponding determinations of the Tribunal demonstrate that the Micula brothers and the three corporate claimants, as well as the aforementioned companies forming part of EFDG, form a single economic unit with a single economic interest.

(88) Third, the characterisation of the Micula brothers and their companies as one economic unit is further reinforced by how the Award eventually awarded compensation to them. Rather than apportioning compensation individually to each of the five claimants, the Award awarded the compensation to them 'collectively' on the basis of a 'common entitlement'. The fact that the five claimants together (i.e., including the corporate claimants) asked the Tribunal to award all compensation only to the Micula brothers shows that the corporate claimants have no autonomy vis-à-vis the Micula brothers. The Tribunal finally allowed each claimant to recover the entire amount of compensation awarded, and then to allocate that compensation among the claimants however they deem fit, regardless of the damages actually sustained by each claimant.

(89) The foregoing conclusion is not affected by the claimants' argument that the present case must be distinguished from the *Hydrotherm* judgment, as the natural person in that case was a partner personally liable for the financial obligations of the various companies with which he was considered to constitute a single economic unit, whereas the Micula brothers are not so personally liable. In response, the Commission recalls that in the relevant paragraphs of its *Hydrotherm* judgment the CJEU did not mention the personal liability of the natural person in question at all; rather, the CJEU limited itself to pointing out that the natural person in question 'has complete

---

($^{51}$) Case C-170/83 *Hydrotherm* EU:C:1984:271, paragraph 11. See also Case T-137/02 *Pollmeier Malchow v Commission* EU:T:2004:304, paragraph 50.
($^{52}$) Case C-480/09 P *Acea Electrabel Produzione SpA v Commission* EU:C:2010:787 paragraphs 47 to 55; Case C-222/04 *Cassa di Risparmio di Firenze SpA and Others* EU:C:2006:8, paragraph 112.
($^{53}$) See Award, paragraphs 935-936 and 943.

control' of the companies in question ([54]). As already mentioned, by virtue of their ownership the Micula brothers similarly have complete control over the corporate claimants, and in fact the other relevant EFDG companies.

(90) The Commission also considers, contrary to the assertions of the claimants, that the logic underpinning the *Cassa di Risparmio di Firenze* judgment is equally applicable in this case. In that judgment, the CJEU recognised that an economic activity can be exercised by an entity directly or indirectly, through controlling an operator as part of an economic unit which they form together. Although the CJEU acknowledges that the mere fact of holding shares, even controlling shareholdings, is insufficient to characterise as economic an activity of the entity holding those shares when it gives rise only to the exercise of the rights attached to the status of shareholder or member, as well as the receipt of dividends, which are merely the fruits of the ownership of an asset, it is clear that the present situation is different. Indeed, according to the CJEU 'an entity which, owning controlling shareholdings in a company, actually exercises that control by involving itself directly or indirectly in the management thereof must be regarded as taking part in the economic activity carried on by the controlled undertaking.' ([55]) The CJEU was also concerned to point out that 'simple separation of an undertaking into two different entities' cannot be sufficient to circumvent State aid rules ([56]). This rationale also applies where one of the two entities concerned is a natural person. Otherwise granting aid to a natural person who is the controlling shareholder of an undertaking would not be considered to constitute State aid, even though the natural person could use that aid for the benefit of the undertakings which it controls. Indeed, in the present case, it cannot make any difference for the purposes of applying the State aid rules whether the compensation collectively awarded to all five claimants by the Tribunal is paid out to the Micula brothers or to the companies owned by them.

(91) In conclusion, the Commission finds that the Micula brothers and the three corporate claimants together form a single economic unit that constitutes an undertaking for the purpose of applying Article 107(1) of the Treaty. The other EFDG companies for whose alleged losses the Micula brothers were awarded compensation by virtue of the Award (European Drinks SA, Rieni Drinks SA, Scandic Distilleries SA, Transilvania General Import-Export S.R.L., West Leasing S.R.L) ([57]) likewise form part of this single economic unit. The final beneficiary of the aid measure is this single economic unit, made up of the five claimants and those EFDG companies.

*Economic advantage (1)*

(92) An advantage, as required by Article 107(1) of the Treaty, is any economic benefit which an undertaking would not have obtained under normal market conditions, i.e. in the absence of the state intervention ([58]). The precise form of the measure is irrelevant for establishing whether it confers an economic advantage on the undertaking. The notion of advantage includes, for example, all situations where undertakings are relieved of inherent costs of their economic activities.

(93) By the Award, the Tribunal has awarded the claimants compensation of RON 376 433 229 plus interest against Romania. To fully understand why the implementation or execution of the Award grants the claimants an economic advantage, it is first instructive to examine on which basis the Tribunal determined that compensation should be paid out to the claimants in that Award.

(94) After it had decided that Romania had breached the BIT, the Tribunal explained that damages had to be awarded on the basis of the principle that 'the claimant must be placed back in the position it would have been "in all probability" but for the international wrong' ([59]). It further explained that only losses that are causally linked to the act constituting the international wrong could be compensated by means of damages, and that 'all of the violations of the BIT alleged by the Claimants arise from the same fact: the premature revocation of the [EGO 24] incentives or in direct connection with that premature revocation' ([60]). In assessing the precise compensation due to the claimants, the Tribunal took into account whether losses were in reality incurred and whether they were directly related to the revocation of the incentive scheme. For instance, with regard to the damages awarded for the

([54]) Case C-170/83 *Hydrotherm* EU:C:1984:271, paragraph 10.
([55]) Case C-222/04 *Cassa di Risparmio di Firenze SpA and Others* EU:C:2006:8, paragraph 112.
([56]) Case C-222/04 *Cassa di Risparmio di Firenze SpA and Others* EU:C:2006:8, paragraph 114.
([57]) See recitals 87 and 88.
([58]) Case C-39/94 *SFEI and Others* EU:C:1996:285, paragraph 60; Case C-342/96 *Spain v Commission* EU:C:1999:210, paragraph 41.
([59]) Award, paragraph 917.
([60]) Award, paragraph 928.

increased price of sugar, the Tribunal held ([61]): 'Both the existence of the damage and the causal link between the revocation of the incentives and the damage suffered have been adequately proved. There is no dispute that, as a result of the revocation of the Raw Materials Incentive, the Claimants were required to pay an increased amount for the sugar they purchased after February 2005'.

(95)    In light of these considerations, it is clear that through the implementation or execution of the Award, Romania grants the claimants an amount corresponding exactly to the advantages foreseen under the abolished EGO 24 scheme from the moment it was repealed (22 February 2005) until its scheduled expiry (1 April 2009). More precisely, implementing or executing the Award *de facto* reimburses customs duties charged on imported sugar and other raw materials between 22 February 2005 and 31 March 2009, as well as the customs duties charged on imported sugar that the claimants would have avoided if they had had the opportunity to stockpile sugar before the schedule expiration of the EGO 24 facilities on 31 March 2009. In addition, to ensure that the claimants fully benefit from an amount corresponding to that of the abolished scheme and are 'placed back in the position it would have been "in all probability" ', the Tribunal also awarded interest and compensation for the allegedly lost opportunity and lost profit ([62]). In effect, the implementation or execution of the Award re-establishes the situation the claimants would have, in all likelihood, found themselves in if the EGO 24 scheme had never been repealed.

(96)    Accordingly, the implementation or execution of the Award grants the claimants an economic advantage not otherwise available on the market. First, the costs of raw materials, as inputs for final products, constitute ordinary operating expenses of undertakings, and relieving them of a part of their ordinary operating expenses grants them a distinct advantage. Second, granting the claimants compensation for lost profits because they had to bear their own operating expenses themselves constitutes an economic advantage not available under normal market conditions and in absence of the Award; under normal market conditions, the undertaking would have had to bear itself the costs inherent in its economic activity and would therefore not have generated these profits. Third, paying interest to the claimants on payments that were allegedly due in the past, but which themselves must be qualified as conferring an advantage, confers a separate and additional advantage. Again, under normal market conditions and in the absence of the Award, the undertaking would have had to bear its ordinary operating expenses, would have not generated the allegedly lost profits, and would therefore not have been able to draw an interest on this capital. In fact, by repealing the EGO 24 scheme, Romania re-established normal conditions of competition on the market on which the claimants operate, and any attempt to compensate the claimants for the consequences of the revocation of the EGO 24 incentives grants an advantage not available under those normal market conditions.

(97)    The claimants' attempts to separate the award of compensation from the revocation of the EGO 24 incentives are unconvincing. The claimants argue: '[I]n the present case the ICSID Tribunal concluded that the decision to comply with EU State aid rules complied with Romania's obligations under the BIT and did not award damages to the Claimants on this basis. Instead, the ICSID Tribunal awarded damages for the Romanian state's wrongdoing consisting in maintaining obligations imposed in relation to EGO 24 after the withdrawal of the scheme and non-transparent behaviour towards the investors'.

(98)    This description of the Award is inaccurate and in any event fails to consider the effects of implementing/executing the Award. It has been already pointed out that the Tribunal considered that the alleged breaches of the BIT all resulted from 'the premature revocation of the incentives or in direct connection with that premature revocation' ([63]), and awarded damages for losses resulting directly from the revocation of the incentive scheme. The Tribunal was also already quoted as stating that ([64]): '[B]y repealing the EGO 24 incentives prior to 1 April 2009, Romania did not act unreasonably or in bad faith (except that [Romania] acted unreasonably by maintaining investors' obligations after terminating the incentives). The Tribunal, however, concludes by majority that Romania violated the Claimants' legitimate expectations that those incentives would be available, in substantially the same form, until 1 April 2009. Romania also failed to act transparently by failing to inform the Claimants in a timely manner that the regime would be terminated prior to its stated date of expiration. As a result, the Tribunal finds that Romania failed to "ensure fair and equitable treatment of the investments" of the Claimants in the meaning of Article 2(3) of the BIT'.

---

([61])  Award, paragraph 953.
([62])  See recital 27 for the description of the amounts due under the arbitration award.
([63])  Award, paragraph 928.
([64])  Award, paragraph 872.

(99) In light of this conclusion, it cannot be maintained, as the claimants do, that the Tribunal found Romania's decision to comply with Union State aid rules by revoking EGO 24 not to have been in breach of the BIT, or that it did not award damages on that basis [65]. The Commission notes that in justifying its decision to award compensation for increased prices and the loss of the ability to stockpile, as well as lost profits, the Tribunal referred only to damages incurred by the claimants as a result of the revocation of the EGO 24 incentives [66]. Notably, the Tribunal did not refer to, or award additional damages on the basis of, its finding that Romania acted unreasonably in maintaining the investors' obligations under EGO 24 and failed to act transparently.

*Economic advantage (2): damages and State aid*

(100) The presence of an advantage is, contrary to the submission of the claimants, furthermore not precluded by the fact that the payment of the compensation awarded to the complainants by the Tribunal through the implementation or execution of the Award entails a payment of compensation for damages. The central question in this regard is whether the principles laid down in the CJEU's *Asteris* [67] judgment are applicable to the case at hand. In its judgment in *Asteris*, the CJEU set out that State aid 'is fundamentally different in its legal nature from damages which the competent national authorities may be ordered to pay to individuals in compensation for the damage they have caused to those individuals.' [68] The claimants argue that the present case falls squarely under this case-law, and that any attempt by the Commission to distinguish the *Asteris* case from the one at hand is unconvincing. The Commission disagrees with this position.

(101) The Commission observes, first, that the *Asteris* case arose out of a very different context than the present case. In the former case, the CJEU rendered a judgment in response to a reference for a preliminary ruling by a Greek court by which the CJEU was asked to pronounce itself on the jurisdiction of the courts of the Member States to entertain claims for damages brought by individuals against national authorities in respect of non-payment of aid under the Union's common agricultural policy. The non-payment of aid was not the result of a broken promise by the Greek authorities to grant that aid, but rather the consequence of the inclusion of technical errors by the Commission in a regulation. The affected undertakings had already brought an action for damages against the Commission before the CJEU, which had rejected it as unfounded. In response to the reference for a preliminary ruling, the CJEU specified in its judgment that since it had previously dismissed the action for damages against the Commission, any action for damages against the Greek state would have to be on different grounds from the action against the Commission it dismissed, that is to say a wrongful act of the Greek authorities themselves. Notably, the CJEU did not state that an award of damages equal to an amount of illegal State aid promised but not paid out would not amount to State aid itself. Thus, it does not follow from the *Asteris* judgment that every award of damages is automatically outside the scope of Union State aid law, as the claimants seem to argue. Rather, in cases of liability based on the wrongful conduct of national authorities, no advantage is granted to an undertaking where such liability merely ensures that the damaged party is given what it is entitled to, just as any other undertaking would be, under the general rules of civil liability in that Member State. Compensation granted under those general rules of civil liability differ from State aid to the extent that they cannot result in the damaged individual being better off after receiving compensation.

(102) Second, for compensation to fall outside the Union State aid rules under the *Asteris* case-law it must be based on a general rule of compensation [69]. In the present case, the compensation has been awarded to the claimants on the basis of an intra-EU BIT which the Commission considers invalid as of Romania's accession to the Union. The Commission has consistently taken the view that intra-EU BITs, such as the BIT upon which the claimants base their claim [70], are contrary to Union law since they are incompatible with provisions of the Union Treaties and

---

[65] The Tribunal concluded that the revocation of the EGO 24 incentives violated the claimants' legitimate expectations before it even considered the reasonableness or transparency of Romania's actions (Award, paragraphs 725, 726; reasonableness and transparency were only considered in paragraphs 727 et seq. and 837 et seq., respectively). There is thus no basis for maintaining, as the claimants suggest, that the Tribunal's finding of a breach of the BIT was conditioned on the unreasonableness of keeping in place the investors' obligations under EGO 24 or on the insufficient transparency of Romania's actions.

[66] Award, paragraphs 953, 961, 971, 984, 1 016, 1 020, 1 136.

[67] Joined Cases 106/87 to 120/87 *Asteris* EU:C:1988:457.

[68] Joined Cases 106/87 to 120/87 *Asteris* EU:C:1988:457, paragraph 23.

[69] See Commission Decision of 16 June 2004 on Dutch aid in favour of Akzo-Nobel in order to minimise chlorine transports (Case N 304/2003), summary notice in OJ C 81, 2.4.2005, p. 4; see also Commission Decision of 20 December 2006 on Dutch aid for relocation of car dismantling company Steenbergen (Case N 575/05), summary notice in OJ C 80, 13.4.2007, p. 1.

[70] For the same reasons, the Commission would also consider invalid the intra-EU BITs at the basis of the arbitral proceedings listed in footnote 53 of the application.

L 232/60          EN          Official Journal of the European Union          4.9.2015

should therefore be considered invalid ([71]). The Commission has repeatedly made this view known to the Member States, including the Member States in question.

(103) Third, the Commission notes that the purpose of the Award is to compensate the applicants for the incentives which Romania had promised them under EGO 24 (modified by EGO 75) but had been required to abolish by the Union to complete the negotiation process for its accession to the Union. Thus, in contrast to the *Asteris* case, the reason the applicants claim compensation in this case is because they were denied the incentives Romania promised to grant them in violation of its obligations under Article 64 of the Europe Agreement and Law No 143/1999 as interpreted by Decision No 244/2000 of the Romanian Competition Council not to grant unlawful State aid. However, as Advocate-General Ruiz-Jarabo Colomer has explained ([72]), an award of damages equal to the sum of the amounts of aid that were envisaged to be granted would constitute an indirect grant of State aid found to be illegal and incompatible with the internal market. Following that line, the General Court has considered indemnification clauses for the recovery of State aid to constitute State aid ([73]). Moreover, in the judgment in *Lucchini*, the CJEU held that a national court was prevented from applying national law where the application of that law would have the effect to 'frustrate the application of Community law in so far as it would make it impossible to recover State aid that was granted in breach of Community law' ([74]).

(104) The attempts by the claimants to distinguish those cases from the present case are unconvincing. What matters is not that the precise facts underlying those cases differ from those of the present case, but the principle informing those cases, which is that national law, including liability arrangements under national law, cannot be applied where doing so would frustrate the application of Union State aid law and thus ultimately result in the grant of illegal State aid. In this light, the *Asteris* case does not exempt damages awarded as compensation for the recovery of illegal State aid or the failure to recover illegal State aid. The Commission considers that same principle to apply where the liability flows from an international law treaty concluded between two Member States (such as an intra-EU BIT) the application of which gives rise to the grant of State aid. Where giving effect to an intra-EU treaty by a Member State would frustrate the application of Union law, that Member State must uphold Union law since Union primary law, such as Articles 107 and 108 of the Treaty, takes precedence over that Member State's international obligations.

(105) The claimants' contention that there has never been a valid formal decision establishing that EGO 24 constitutes illegal State aid nor that those incentives were incompatible with the internal market is irrelevant in this respect, since it is the implementation/execution of the Award and not the investment incentives promised under EGO 24 which constitute the contested measure and form the basis of the present Decision. Indeed, considering EGO 24 was abolished on 22 February 2005 and no aid was disbursed under that legislation after that date, neither the Romanian Competition Council nor the Commission could conclude in a formal decision that EGO 24 gave rise to incompatible State aid in the period 22 February 2005 to 1 April 2009, which is the period for the which the Award grants compensation to the claimants.

(106) For that very reason, there is also no need for the Commission to adopt a formal decision finding the existence of State aid in cases where a national court or an arbitral tribunal awards compensation against a Member State for the withdrawal of an aid measure. Article 107(1) of the Treaty contains a general prohibition on the grant of State aid 'in any form whatsoever'. The precise form of the measure is thus irrelevant in establishing whether it confers an economic advantage on the undertaking ([75]). Thus, if the State aid is granted through the implementation or execution of a judgment or an award, which the Commission considers to be the case in relation to the Award, it

---

([71]) See response of Commissioner De Gucht to Parliamentary oral Question O-000043/2013/rev.1 in which he stated *'The Commission agrees that bilateral and investment treaties (BITS) between EU Member States do not comply with EU law'*, debate of the plenary of 22 May 2013. See, further, Commission Staff Working Document of 3 February 2012 on capital movements and investments in the EU — Commission Services' Paper on Market Monitoring, SWD(2012)6 final, page 13. See also, Commission Staff Working Document of 15 April 2013 on the free movement of capital in the EU, SWD(2013)146 final, pages 11 and 14; Commission Staff Working Document of 18 March 2014 on the free movement of capital in the EU, SWD(2014)115 final, page 12; and European Commission, Monitoring activities and analysis, Bilateral Investment Treaties between EU Member States (intra-EU BITs) 2012; available at: http://ec.europa.eu/internal_market/capital/analysis/monitoring_activities_and_analysis/index_en.htm

([72]) Opinion of 28 April 2005 in Joined Cases C-346/03 and C-529/03 *Atzori* ECLI:EU:C:2005:256, paragraph 198.

([73]) Case T-384/08 *Elliniki Nafpigokataskevastiki AE Chartofylakeiou v Commission* EU:T:2011:650, and Case T-565/08 *Corsica Ferries v Commission* EU:T:2012:415, paragraphs 23, 114 and 120 to 131. See also, by analogy, Case C-111/10 *Commission v Council* EU:C:2013:785, paragraph 44.

([74]) Case C-119/05 *Lucchini* EU:C:2007:434, paragraph 59.

([75]) Case C-280/00 *Altmark Trans* EU:C:2003:415, paragraph 84.

EN

is in relation to that implementation or execution that the Commission must show that the cumulative conditions of Article 107(1) of the Treaty are fulfilled and that that aid is incompatible with the internal market.

(107)  In any event, the Commission recalls that the Romanian Competition Council, several Union Common Positions and the Romanian Government upon repealing EGO 24 all concluded that EGO 24 gave rise to unlawful State aid under the Europe Agreement, Decision No 4/2000 of the EU-Romania Association Council, Law No 143/99 and the *acquis communautaire*. Moreover, Decision No 244/2000 of the Romanian Competition Council has never been challenged nor annulled, but only ignored by the Romanian legislator through the adoption of EGO 75 contrary to the provisions of Law No 143/1999 on State aid and thus in violation of its obligations under the European Agreement and Decision No 4/2000 of the EU-Romania Association Council. The Union then insisted Romania comply with that decision, its obligations under Europe Agreement and the *acquis communautaire* in the context of the accession negotiations, which the latter did by repealing EGO 24.

(108)  For the foregoing reasons, the Commission concludes that payment of the compensation awarded to the claimants by the Tribunal through the implementation or execution of the Award constitutes an economic advantage in favour of the claimants that they would not have obtained under normal market conditions.

*Selectivity*

(109)  Not all measures which grant an undertaking an economic advantage constitute State aid, but only those which confer an economic advantage in a selective manner upon certain undertakings or categories of undertakings or to certain economic sectors.

(110)  The Award awards compensation only to the claimants. Therefore by paying that compensation, either through the implementation or execution of the Award, Romania grants an advantage only to the claimants. The measure is thus selective.

(111)  Moreover, as follows from the *Asteris* judgment, compensation for damages will not selectively benefit an individual undertaking only insofar as that compensation follows from the application of a general rule of law for government liability which every individual can invoke, so that it excludes that any compensation granted confers a selective benefit on certain groups in society. The contested measure, which follows from the application of the provisions of the BIT, does not comply with this requirement for all of the reasons in the present case.

(112)  First, the BIT only confers this right of compensation to a certain group of investors, that is, to investors of the two Member States covered by the intra-EU BIT, i.e. Sweden and Romania. Accordingly, not every similarly situated Union investor could rely on that BIT to claim damages corresponding to the incentives promised under the abolished EGO 24 aid scheme, but only investors of a certain nationality. Thus, to the extent that paying compensation awarded to an investor pursuant to a BIT amounts to granting an advantage, the advantage is selective. As regards the claimants' contention that the general character of the benefits provided by BITs has previously been recognised by the Commission (see recital 66), the statement cited by the claimants in support of that claim is not in fact a Commission statement at all, but an excerpt from a study prepared by an external contractor for the Policy Department of the European Parliament's Directorate-General for External Policies. Secondly, in order to discard any doubts about the ownership of the opinions expressed in this study, it contains a disclaimer specifying that the author bears the sole responsibility for them and that they do not reflect the official position of the European Parliament. The statement made in this report cannot be imputed to the Commission and is irrelevant for the case at hand.

(113)  Second, the contested measure compensates the applicants for the repeal of investment incentives which themselves are selective in nature. Indeed, the incentives offered under EGO 24 were only available to undertakings investing in certain regions. Accordingly, the compensation awarded to the complainants by the Tribunal should in themselves be considered selective since they correspond to the advantages promised under the abolished EGO 24.

(114)  In any event, the Commission considers the BIT upon which the Tribunal awarded compensation to the claimants to have been rendered invalid upon Romania's accession to the Union, so that it cannot be considered to form the basis for a general rule of law for government liability which every investor can rely upon.

(115)  For all of the above reasons, the Commission concludes that the implementation or execution of the Award grants the claimants a selective advantage.

*State resources*

(116) Only advantages granted directly or indirectly through state resources can constitute State aid within the meaning of Article 107(1) of the Treaty. In the present case, Romania has already partially implemented the Award by setting it off part of the compensation awarded to the claimants by the Tribunal against taxes owed by one of the claimants to the Romanian State. The court-appointed executor has furthermore seized funds from state accounts to satisfy the claimants' outstanding claims under the Award. Direct payments from the state budget, the foregoing of state income by writing off taxes owed, or the transfer of other state assets (such as shares in other undertakings or the transfer of seized assets) to the claimants, whether made voluntarily or through court-ordered execution, are all to be regarded as measures financed through state resources.

*Imputability*

(117) For a selective advantage to constitute aid within the meaning of Article 107(1) of the Treaty, it must, inter alia, be imputable to the state ([76]). In the present case, the claimants maintain that since the implementation of the Award is 'an automatic and involuntary consequence of Romania's obligations under the ICSID Convention, it is clearly not imputable to the State, and thus cannot constitute State aid'. The main thrust of the claimants' argument is that since Romania is under an international law obligation to implement the Award, doing so is not imputable to the State. The Commission disagrees with this line of reasoning and considers the measure imputable to Romania for the following reasons.

(118) The Commission notes at the outset that the voluntary agreement of Romania to enter into the BIT, in particular Article 7 thereof, created the conditions for the selective advantage resulting from the Award as explained in recitals 110 et seq.

(119) Moreover, if Romania voluntarily implements the Award by paying out the compensation awarded to the claimants by the Tribunal, there is no question that that action is imputable to the Romanian state. That is, in any event, the case for the portion of the compensation awarded to the claimants by the Award which Romania offset against taxes owed by one of the claimants, namely S.C. European Food SA, to the Romanian authorities. That is also the case when Romania decided to voluntarily pay out the outstanding compensation awarded by the Tribunal.

(120) Finally, every act of Romania's state organs is imputable to Romania. Those state organs include the Member State's government and other public authorities. Notably, also domestic courts of a state and court-appointed executors and bailiffs are to be considered organs of that state and are thus bound under Article 4(3) of the Treaty on European Union by their duty of sincere cooperation vis-à-vis the Union. Accordingly, the actions of domestic courts and court-appointed executors and bailiffs are imputable to the Romanian state, so that if Romania is compelled to compensate the claimants under the Award by the action of its courts or court-appointed executors and bailiffs, that action is also imputable to the Romanian state. Union law recognises only a narrow exemption from this general principle of imputability: a measure is not imputable to a Member State if that Member State is under an obligation under Union law to implement that measure without any discretion. In that case, the measure stems from an act of the Union legislature and is not imputable to the State. It is, however, undisputed that Romania is not obliged by Union law to implement the Award. Any decision to implement or execute the Award, whether taken by the Romanian government or Romania's domestic courts, is thus imputable to the Romanian State

(121) In light of the above, the Commission concludes that the measure is imputable to Romania.

*Distortion of competition and effect on trade*

(122) A measure granted by the state is considered to distort or threaten to distort competition when it is liable to improve the competitive position of the recipient compared to other undertakings with which it competes ([77]). For all practical purposes, a distortion of competition within the meaning of Article 107 of the Treaty is thus assumed as soon as the state grants a financial advantage to an undertaking in a liberalised sector where there is, or could be, competition. An advantage granted to an undertaking that distorts competition will normally also be liable to affect trade between Member States. Trade between Member States is affected where a measure strengthens the competitive position of the beneficiary undertaking as compared with other undertakings competing in intra-Community trade ([78]).

([76]) Case T-351/02 *Deutsche Bahn AG v Commission* EU:T:2006:104, paragraph 101.
([77]) Case 730/79 *Phillip Morris* EU:C:1980:209, paragraph 11. Joined Cases T-298/97, T-312/97 etc. *Alzetta* EU:T:2000:151, paragraph 80.
([78]) Case T-288/97 *Friulia Venezia Giulia* EU:T:2001:115, paragraph 41.

(123) The Commission already concluded (see recitals 81 et seq.) that the claimants jointly form a single economic unit, which in turn constitute the relevant undertaking for the purpose of the application of Union State aid rules. That undertaking is active on a liberalised market, competing with other undertakings. The Commission has also concluded that payment of compensation to the claimants, whether by implementing or executing the Award, would improve their competitive position as compared to other undertakings with which they compete, who have not received similar compensation for the withdrawal of unlawful State aid. The compensation provided for by the Award is based on an amount corresponding to the customs duties charged on raw materials, lost profits and interest on the total sum of damages awarded. The costs of raw materials, as inputs for final products, constitute ordinary operating expenses of undertakings. Relieving the applicants of a part of their ordinary operating expenses grants them a distinct competitive advantage, as does compensating the applicants for lost profits and the payment of interest. The claimants are engaged in manufacturing food products, milling products, and plastic packaging. A liberalised market exists for all those products, so that any advantage granted to the claimants is liable to distort competition. Considering that the products primarily produced by the claimants can and indeed are widely traded between Member States, it is clear that any advantage granted to the claimants is also liable to affect trade between Member States.

(124) The Commission notes that the claimants' arguments denying a distortion of competition merely repeat the assertions that the Micula brothers cannot be considered as undertakings and that the implementation of the Award would not grant the claimants any advantage. Both assertions were already extensively addressed above (see recitals 81 et seq. and 92 et seq.) and require no further comments.

*Conclusion*

(125) For the foregoing reasons, the Commission considers that the payment of the compensation awarded to the claimants by the Tribunal amounts to State aid for the purposes of Article 107(1) of the Treaty.

7.2. **The application of the State aid rules does not affect rights and obligations protected by Article 351 of the Treaty**

(126) Article 351 of the Treaty provides that '[t]he rights and obligations arising from agreements concluded […] for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties'. In the present case, the rights and obligations on which the claimants rely are those arising from the BIT.

(127) It is clear from the wording of Article 351 of the Treaty that it does not apply in the present case, since the BIT is a treaty concluded between two Member States of the Union, Sweden and Romania, and not a treaty 'between one or more Member States on the one hand, and one or more third countries on the other'. Accordingly, the application of State aid law in the present case does not affect rights and obligation protected under Article 351 of the Treaty.

(128) In this context, the Commission recalls that different rules apply under Union law to intra-EU BITs, on the one hand, and BITs concluded between a Member State of the Union and a third country, on the other. In the case of intra-EU BITs, the Commission takes the view that such agreements are contrary to Union law, incompatible with provisions of the Union Treaties and should therefore be considered invalid. By contrast, BITs concluded between a Member State of the Union and a third country are governed by Regulation (EU) No 1219/2012 of the European Parliament and of the Council (⁷⁹) which establishes transitional arrangements for bilateral investment agreements between Member States and third countries until those agreements are progressively replaced by agreements of the Union relating to the same subject matter, in light of the Union's exclusive competence with respect to the common commercial policy under which foreign direct investment falls (⁸⁰).

(129) Romania is also a party to the multilateral ICSID Convention, to which it has acceded prior to its accession to the Union. However, because no third country Contracting Party to the ICSID Convention is party to the BIT involved in the present proceedings, Article 351 is not relevant for this case.

(⁷⁹) Regulation (EU) No 1219/2012 of the European Parliament and of the Council of 12 December 2012 establishing transitional arrangements for bilateral investment agreements between Member States and third countries (OJ L 351, 20.12.2012, p. 40).
(⁸⁰) Article 3(1)(e) of the Treaty.

### 7.3. **New aid**

(130) Article 107(1) of the Treaty provides that State aid is, in principle, incompatible with the internal market. Unless an aid measure is declared to be compatible with the internal market by the Commission, the Member States are prohibited from putting State aid measures into effect. Under Article 108(3) of the Treaty, a Member State must notify any plans to alter or grant aid to the Commission and shall not put its proposed measure into effect until the Commission has taken a final decision on that measure's compatibility with the internal market.

(131) The obligation not to put into effect any aid measure without a final decision from the Commission on the compatibility of that aid measure only applies, of course, to aid measures put into effect after the entry into force of the Treaty for the Member State concerned. For Romania, the Treaty entered into force on 1 January 2007.

(132) The claimants dispute that the implementation or execution of the Award would constitute 'new aid' within the meaning of Article 1(c) of Regulation (EC) No 659/1999. They maintain that even if the Commission's assessment is correct *quod non* and the implementation or execution of the Award would constitute aid, the date of the grant of that aid would be the initial granting of benefits under EGO 24 to the claimants, which took place in 2000 and 2002 and thus before Romania's accession to the Union. According to the claimants, the very latest point in time which could be considered the granting date is the entry into force of the BIT, on which the Award is based, and which entered into force in 2003.

(133) The Commission disagrees with the claimants and considers that payment of the compensation awarded to the claimants by the Tribunal, whether through the implementation or execution of the Award, amounts to new aid and is thus subject to the full State aid control mechanism set out in Articles 107 and 108 of the Treaty. According to the case-law of the CJEU, aid must be considered to be granted at the time that an unconditional right to receive it is conferred on the beneficiary under the applicable national rules [81]. Neither the adoption of EGO 24 on 2 October 1998, nor the designation of Ştei-Nucet, Bihor county, as a disfavoured region for 10 years (effective on 1 April 1999), nor the grant of permanent investor certificates to S.C. European Food SA (on 1 June 2000) and S.C. Starmill S.R.L. and S.C. Multipack (on 17 May 2002) conferred on the claimants an unconditional right to obtain the Raw Material Facility until 1 April 2009. Rather, a right to that Facility was only obtained by a company eligible for aid under the scheme set up by EGO 24:

— under the initial scheme set up by EGO 24: when the regional development agency approved the company's production sales documents attesting that an import of raw materials intended for integration into internal production had taken place, giving right to a reimbursement of customs duties paid [82], and

— after the Raw Material Facility of EGO 24 was transformed into an exemption from customs duties under EGO 75: when a company eligible for aid under that scheme imported raw materials for integration into internal production and requested the exemption from the border control authorities on the basis of duly justified documents.

(134) Since the scheme set up by EGO 24, as modified by EGO 75, was revoked on 22 February 2005, no right to aid could be obtained by any company after that date under the national regulatory framework by importing raw materials into Romania for integration into internal production. Thus, the applicants' claim for compensation from the Romanian state derives only from the Award in conjunction with Romanian domestic law giving it legal effect in Romania's domestic legal order. As the Award was rendered and risks being implemented or executed after Romania acceded to the Union, the unconditional right under Romanian domestic law to receive the compensation awarded by the Tribunal, arising from the ratification of the ISCID Convention integrating it in Romania's domestic legal order and thus giving the Award legal effect in Romania's domestic legal, was conferred on the claimants only after Romania's accession to the Union.

---

[81] Case C-129/12 *Magdeburger Mühlenwerke* EU:C:2013:200, paragraph 40.

[82] An English-language translation of the initial provision providing for the Raw Materials Facility (which is the investment incentive the revocation of which led to damages being awarded to the applicants under the Award) can be found at paragraph 148 of the Award. According to that translation, Article 6(1)(b) provides that 'Privately held companies, Romanian legal entities, as well as small or family business, authorised pursuant to the Decree-Law No 54/1990 concerning the organisation and operation of free initiative-based economic activities that are headquartered and conduct business within the disadvantaged region, will be granted the following advantages for their new investments in the these regions: […] refunds of customs duties on raw materials, spare parts and/or components necessary of achieving the investor's own production in that region. The refunds will be made based on the approval by the regional development agencies of the companies' production sales documents. The funds necessary for the refund of the customs duties will be provided to the Agency for Regional Development from the Regional development Fund. In case of unprivileged regions belonging to two or more administrative-territorial units, the funds necessary for the refund of the customs duties will be provided by the National Agency for Regional Development from the National Development Fund [the "**Raw Materials Incentive**" or "**Raw Materials Facility**"]'.

(135) It is also important to note in this regard that the Award grants to the claimants compensation in an amount corresponding to the advantages foreseen under the abolished Raw Materials Facility of the EGO 24 scheme from the moment that that legislation was repealed (22 February 2005) until its alleged scheduled expiry (1 April 2009). That period comprises a little over 49 months, during the majority of which (27 months) Romania was a full member of the Union directly subjected to the State aid discipline laid down in the Treaty. In addition, the Award grants to the claimants compensation for the lost opportunity to stockpile sugar in 2009, assuming that the connected losses were incurred between 31 March 2009 and 1 July 2010. These alleged losses were thus incurred entirely after Romania had acceded to the Union in 2007. Finally, the Tribunal awarded compensation for lost profits, taking into account claimed losses incurred between 1 January 2005 and 31 August 2011. That period comprises 80 months, during the vast majority of which (56 months) Romania was a full member of the Union directly subjected to the State aid discipline laid down in the Treaty.

(136) Finally, the EGO 24 incentive scheme is not mentioned in Annex V, chapter 2, n.1 of the Act of Accession of Romania to the Union which exhaustively lists the State aid measures which would be considered existing aid upon Romania's accession to the Union ([83]) ([84]).

(137) The fact that neither the Act of Accession nor the Treaty were applicable to Romania at the time when Romania allegedly breached its obligations under the BIT by revoking the aid scheme established by EGO 24 or when the claimants brought their claims under the BIT before the Tribunal is irrelevant. At neither point did the claimants obtain an unconditional right to the payment of the compensation awarded by the Tribunal, which is the measure under consideration. It is only when the Tribunal established that there was a breach of Article 2(3) of the BIT by rendering the Award on 11 December 2013, in conjunction with Romanian domestic law giving legal effect in Romania's domestic legal order to the Award, that the claimants received an unconditional right to that compensation which they could enforce against Romania. That date was after Romania's accession to the European Union.

(138) The claimants' case therefore is not comparable to the Commission's decision in Case N 380/04 to which they refer. Case N 380/04 concerned a contract concluded between the company Latvijas Gāze ('LG') and Latvia in 1997. When a dispute arose between LG and Latvia over the latter's obligations under the contract, commercial arbitration proceedings were initiated in Stockholm under Uncitral rules. The arbitration tribunal established for those proceedings decided, on 19 June 2003, that Latvia owed LG compensation for the period 10 January 2001 until 10 March 2003. Latvia did not comply with the arbitral award before it acceded to the Union on 1 May 2004 and notified the envisaged implementation of that award to the Commission after accession. In its decision, the Commission observed that the compensation obligation arose on the basis of the 1997 contract, that the compensation awarded by the arbitration tribunal related in its entirety to a period before Latvia's accession, and that the arbitral award itself was issued before Latvia's accession to the Union. On this basis, the Commission concluded that 'the payment [...] of the damages awarded by the Tribunal [...] constitute a mere act of implementation of a measure that crystallised entirely before accession' and that implementing the 2003 arbitral award could not be regarded as constituting 'new aid'. Furthermore, the Commission's decision in Case N 380/04 itself points out that it did not prejudge the analysis of possible future payments under the contract that related to periods after accession, thus narrowly limiting the approach chosen to the specific facts notified by Latvia.

(139) By contrast, in the present case the compensation obligation arises from the Award, which was rendered in 2013, the compensation awarded to the claimants by the Tribunal relates for the most part to the period after Romania acceded to the Union and the Award itself was issued almost seven years after Romania acceded to the Union. Finally, the decision in Case N 380/04 differs most starkly to the present case in that there was no indication in the former case that by implementing or executing the 2003 arbitral award LG would obtain unlawful State aid which Latvia had promised to grant contrary to its State aid obligations as a candidate country acceding to the Union.

---

([83]) The three categories of existing aid mentioned in the Act of Accession are:
  — aid measures put into effect before 10 December 1994,
  — aid measures listed in the Appendix to this Annex,
  — aid measures which prior to the date of accession were assessed by the State aid monitoring authority of the new Member State and found to be compatible with the *acquis*, and to which the Commission did not raise an objection on the ground of serious doubts as to the compatibility of the measure with the common market, pursuant to the procedure set out in paragraph 2.
  Any decision to execute the Award is not covered by any of these three categories. Even if it were considered that implementation of the Award merely reinstates the claimants' rights pursuant to EGO 24 as if the relevant incentives thereunder had not been repealed before their scheduled expiration, that retroactive reinstatement would still need to be considered as 'new aid' as of the accession of Romania to the Union.
([84]) See also Joint Cases T-80/06 and T-182/09 *Budapesti Erömü* EU:T:2012:65, paragraph 54.

(140) The Commission therefore finds that the payment of the compensation awarded by the Tribunal to the claimants constitutes new aid and that that measure can only be put into effect if and after the Commission has authorised it under the State aid rules.

### 7.4. Illegality under Article 108(3) of the Treaty

(141) The compensation awarded by the Tribunal has already been partially paid out by Romania to the claimants through the offsetting of certain tax debts owed by one of the claimants, S.C. European Food SA, to the Romanian state. Since that partial implementation of the Award was not notified to the Commission by Romania, the measure has unlawfully been put into effect in violation of Article 108(3) of the Treaty. Any further payment of the compensation awarded by the Tribunal, whether by implementation or execution of the Award, that the Commission is either unaware of or that might occur after the adoption of this Decision would, for the same reasons, also constitute a violation of Romania's obligation to comply with Article 108(3) of the Treaty.

### 7.5. Compatibility with the internal market

(142) At the outset, the Commission recalls that when assessing the compatibility of a measure with the internal market under Articles 107(2) and 107(3) of the Treaty, the burden of proof is the principal responsibility of the Member State [85]. In this context, the Commission also recalls that a State aid measure cannot be declared compatible with the internal market, if it entails a non-severable violation of other specific provisions of the Treaty [86]. At present, Romania has presented no arguments that could justify the measure under Articles 107(2) and 107(3) of the Treaty. Nevertheless, for the sake of completeness, the Commission considers it appropriate to undertake a compatibility assessment of its own motion.

(143) The claimants contend that the measure constitutes compatible regional aid. On the basis of Article 107(3)(a) and 107(3)(c) of the Treaty, the Commission may consider compatible with the internal market State aid to promote the economic development of certain disadvantaged areas within the Union. The conditions under which aid to promote regional development can be considered compatible with the internal market are set out in the Guidelines on regional State aid for 2014–2020 ('RAG 2014'). Recital 188 of those Guidelines explains that they apply for assessing the compatibility of all regional aid intended to be awarded after 30 June 2014. This means that regional aid awarded unlawfully or regional aid intended to be awarded before 1 July 2014 are to be assessed in accordance with the Guidelines on national regional aid for 2007-2013 [87] ('RAG 2007').

(144) As explained in recital 134, an unconditional right to the aid was granted to the claimants when the Award was issued on 11 December 2013, in conjunction with Romanian domestic law giving legal effect in Romania's domestic legal order to the Award, that is, before the entry into force of the RAG 2014. Therefore, the payment of the compensation awarded by the Tribunal to the claimants should be assessed under the RAG 2007.

(145) In those guidelines, the Commission sets out that regional aid aimed at reducing the current expenses of an undertaking constitutes operating aid and will not be regarded as compatible with the internal market, unless it is awarded in exceptional circumstances to tackle specific handicaps faced by undertakings in disadvantaged regions falling within the scope of Article 107(3)(a) of the of the Treaty [88].

(146) In the present case, the compensation awarded to the claimants by the Tribunal refers to the losses directly linked to the revocation of the EGO 24 incentives and are aimed at placing the beneficiary in the position in which it would 'in all probability' have found itself in had the EGO 24 incentives had not been revoked. In effect, the implementation of the award re-establishes the situation in which the claimants would have, in all likelihood, found themselves if EGO 24 had never been repealed by Romania. As the advantages granted under EGO 24 were connected to the recurrent costs of the claimants and were not linked to an initial investment, those advantages constituted operating aid. Therefore, placing the beneficiary in the position in which it would have been if the EGO 24 incentives had not been revoked and thus compensating the losses linked to this revocation constitutes operating aid. As explained in recitals 92 et seq., payment of the compensation awarded to the claimants by the Tribunal in reality retroactively reduces the operating expenses incurred by them pursuing their economic activity under normal market conditions.

[85] Case T-68/03 *Olympiaki Aeroporia Ypiresies AE v Commission* EU:T:2007:253, paragraph 34.
[86] Case C-225/91 *Matra v Commission* EU:C:1993:239, paragraph 41.
[87] Guidelines on national regional aid for 2007-2013 (OJ C 54, 4.3.2006, p. 13).
[88] RAG 2007, point 76.

(147) According to points 76, 77 and 79 of the RAG 2007, operating aid is normally prohibited, and can be granted only exceptionally in Article 107(3)(a) regions provided that:

— it is justified in terms of its contribution to regional development (targeted),

— its nature and its level is proportional to the handicaps it seeks to alleviate,

— it is temporary and reduced over time, and should be phased out when the regions concerned achieve real convergence with the wealthier areas of the EU,

— in principle it is granted in respect of a predefined set of eligible expenditures or costs and limited to a certain proportion of those costs,

— the Member State has committed itself to respect detailed reporting rules, as laid down in point 83 of the RAG 2007.

(148) The economic activities benefitting from the implementation of the Award are located in an area falling within the scope of Article 107(3)(a) of the of the Treaty, as established by the Commission in the decision of the regional aid map for Romania for 2007-2013 [89] and for 2014-2020 [90].

(149) However, the Commission fails to see how the payment of the compensation awarded to the claimants is justified in terms of its contribution to the regional development of the areas concerned. The operating aid resulting from that payment is not aimed at contributing to the common equity objective as required under Article 107(3)(a) of the Treaty, but merely at compensating the beneficiary for the losses incurred from the revocation of EGO 24 before its envisaged expiry date. This results in free money for the claimants without any positive impact on the development of the region.

(150) It is not sufficient that the economic activity is located in 'an area' to assume that the measure is proportional to the handicaps it seeks to alleviate, since it must first be demonstrated what these handicaps are and, second, how they create an obstacle to the development of the region concerned. In the absence of any proof, the Commission could not identify the specific handicaps the aid measures would seek to alleviate.

(151) The payment of the compensation awarded to the claimants by the Tribunal is temporary in nature, as it has no effects after the implementation or execution of the Award is completed. However, it is not limited to a certain portion of predefined costs, since that compensation is aimed at ensuring that all losses incurred by the claimants are covered.

(152) In view of the above, the Commission considers that the payment of the compensation awarded to the claimants by the Tribunal does not comply with the RAG 2007 and can therefore not be declared compatible with the internal market. As no other basis of compatibility is otherwise applicable, the Commission considers that the compatibility of the aid measure has not been established.

### 7.6. Conclusion on the assessment of the aid measure

(153) The foregoing analysis indicates that the payment of the compensation awarded by the Tribunal to the claimants amounts to the granting of incompatible new aid which is incompatible with the Treaty. The Commission regrets that Romania has already partially paid out that compensation by offsetting tax debts owed by one of the claimants, S.C. European Food SA, to the Romanian state against part of that compensation, as well as by the action taken by the court-appointed executor.

### 8. RECOVERY

(154) In accordance with the Treaty and the CJEU's established case-law, the Commission is competent to decide that the Member State concerned must abolish or alter aid when it has found that it is incompatible with the internal market [91]. The Court has also consistently held that the obligation on a Member State to abolish aid regarded by the Commission as being incompatible with the internal market is designed to re-establish the previously existing situation [92]. In this context, the Court has stated that that objective is attained once the recipient has repaid the amounts granted by way of unlawful aid, thus forfeiting the advantage which it had enjoyed over its competitors

[89] Commission Decision N 2/07, summary notice in OJ C 73, 30.3.2007, p. 15.
[90] Commission Decision SA 38364, summary notice in OJ C 233, 18.7.2014, p. 1.
[91] Case C-70/72 Commission v Germany EU:C:1973:87, paragraph 13.
[92] Joined cases C-278/92, C-279/92 and C-280/92 Spain v Commission EU:C:1994:325, paragraph 75.

on the market, and the situation prior to the payment of the aid is restored ([93]). Following that case-law, Article 14(1) of Regulation (EC) No 659/1999 provides that 'where negative decisions are taken in respect of unlawful aid, the Commission shall decide that the Member State concerned shall take all necessary measures to recover the aid from the beneficiary […].'

(155) The claimants contend that they had a legitimate expectation that the incentives granted under EGO 24 were lawful and that they could benefit from those incentives until their scheduled expiry on 1 April 2009. The Commission observes, in that regard, that Article 14(1) of Regulation (EC) No 659/1999 further specifies that '[t]he Commission shall not require recovery of the aid if this would be contrary to a general principle of [Union] law.' The principle of the protection of legitimate expectations has been recognised by the CJEU to constitute such a general principle of Union law. The Commission does not consider, however, that the claimants can claim such a legitimate expectation.

(156) According to the case-law of the CJEU, save in exceptional circumstances, undertakings to which an aid has been granted may not, in principle, entertain a legitimate expectation that the aid is lawful unless it has been granted in compliance with the procedure laid down in Article 108(3) of the Treaty. The CJEU, in its more recent case-law, has declared that in the absence of sufficiently precise assurances arising from a positive action taken by the Commission, which has the exclusive competence to authorise the grant of State aid by the Member States of the Union, that lead the beneficiary to believe that the measure does not constitute State aid, no exceptional circumstances can warrant the application of the principle of the protection of legitimate expectations to prevent recovery if that aid measure was not notified to the Commission ([94]). Indeed, it is long-standing case-law that the principle of the protection of legitimate expectations cannot be relied upon against a precise provision of Union law and that the conduct of a national authority responsible for applying Union law, which acts in breach of that law, cannot give rise to legitimate expectations on the part of an economic operator that he will benefit from treatment which is contrary to that law ([95]). A diligent economic operator must be assumed to be able to determine whether that procedure has been followed ([96]).

(157) The Commission notes that, as regards the compensation awarded by the Tribunal to the claimants, it should have been clear without any doubt to the claimants even before that aid was granted to them through the adoption of the Award, in conjunction with Romanian domestic law giving legal effect in Romania's domestic legal order to the Award, that the Commission considered payment of that compensation to give rise to unlawful and incompatible State aid. That position was expressly communicated to the Tribunal on 20 July 2009 and communicated to the claimants.

(158) As regards the claimants' claim that they had a legitimate expectation that the EGO 24 were lawful and would remain in place until 1 April 2009, the Commission recalls, as a preliminary matter, that it is the payment of compensation awarded to the claimants by the Tribunal and not EGO 24 that form the basis for this Decision. Nevertheless, the Commission adds, for the sake of completeness, that the claimants cannot justifiably claim a legitimate expectation as to the validity and continued existence of that scheme until 1 April 2009. As regards that scheme, it was not the Commission, but the Romanian Competition Council, which, by virtue of Decision No 4/2000 of the EU-Romania Association Council and Romanian Law No 143/1999 on State aid, was responsible for the monitoring and authorisation of the grant of State aid prior to Romania's accession to the Union. The Commission notes in that regard that EGO 24 was notified to the Romanian Competition Council in light of the modifications envisaged by EGO 75 and that the Romanian Competition Council, by its Decision No 244/2000 of 15 May 2000, found those incentives to constitute incompatible State aid. It was after the adoption of that decision, on 1 June 2000, that S.C. European Food SA obtained its PIC, which made it eligible to obtain State aid under the scheme set up by EGO 24 as explained in recital 133. However, that does not mean the aid was granted on that date, as explained in recital 134.

(159) It follows from that at the time S.C. European Food SA was granted the unlawful State aid provided by EGO 24, which is in any event after 1 June 2000, it must have been fully aware of the Romanian Competition Council's decision of 15 May 2000 declaring the EGO 24 incentives to be incompatible State aid. Moreover, it must also have been aware of the Europe Agreement, which entered into force on 1 January 1995, and Romanian Law No 143/1999 on State aid, which entered into force on 1 January 2000, both of which prohibited Romania from granting State aid and conferred the power on the Romanian Competition Council to authorise the grant of new State aid. Absent such an authorisation from the Competition Council and in line with the case-law of the CJEU, which applied by virtue of the Article 64 of the 1995 Europe Agreement, Article 1 of the Implementing Rules to Decision No 4/2000 of the EU-Romanian Association Council and the *acquis communautaire*, S.C. European Food

---

([93]) Case C-75/97 *Belgium* v *Commission* EU:C:1999:311, paragraphs 64-65.
([94]) Case C-148/04 *Unicredito Italiano* EU:C:2005:774, paragraphs 104 to 111.
([95]) Judgment in Case C-217/06 *Commission* v *Italy* EU:C:2007:580, point 23 and the case-law cited.
([96]) Case C-5/89 *Commission* v *Germany* EU:C:1990:320, paragraph 14.

SA could never have entertained a legitimate expectation that the incentives granted under EGO 24 constituted compatible State aid, regardless of the subsequent actions of the Romanian Government after Decision No 244/2000 was adopted. The same reasoning obviously applies to Multipack and Starmill, which only obtained their PICs on 17 May 2002, two years after Decision No 244/2000 was adopted. Thus, the claimants cannot even validly claim a legitimate expectation that the EGO 24 scheme constituted lawful State aid, which the Commission considers irrelevant for the purposes of the present Decision.

(160) Therefore, any payment of the compensation awarded to the claimants by the Tribunal must be recovered by Romania since that payment constitutes unlawful and incompatible State aid. As the five claimants, together with the other relevant EFDG companies constitute a single economic unit (see recital 91), the five claimants and the other relevant EFDG companies shall be jointly liable to repay the State aid received by any one of them to the Romanian state. According to Article 14(2) of Regulation (EC) No 659/1999 the aid to be recovered pursuant to a recovery decision shall include interest at an appropriate rate fixed by the Commission. Interest shall be payable from the date on which the unlawful aid was at the disposal of the beneficiary until the date of its recovery. Article 14(3) of Regulation (EC) No 659/1999 provides that recovery shall be effected without delay and in accordance with the procedures under the national law of the Member State concerned, provided that they allow the immediate and effective execution of the Commission's decision. To this effect and in the event of a procedure before national courts, the Member States concerned shall take all necessary steps which are available in their respective legal systems, including provisional measures, without prejudice to Union law.

(161) The Commission observes in this respect that Romania has already offset the amount of RON 337 492 864 (ca. EUR 76 million [97]) against tax debts owed by one of the claimants, S.C. European Food SA. The Commission further observes that on 5 January 2015 the court-appointed executor seized RON 36 484 232 (ca. EUR 8,1 million [98]) from Romania's Ministry of Finance and subsequently transferred RON 34 004 232 (ca. EUR 7,56 million) in equal parts to three of the five claimants, and kept the remainder as compensation for execution costs. Between 5 February and 25 February 2015, the court-appointed executor seized a further RON 9 197 482 (ca. EUR 2 million) [99] from the bank accounts of the Ministry of Finance. In addition, the Commission takes note of the fact that the Romanian authorities have voluntarily transferred RON 472 788 675 (ca. EUR 106,5 million [100]) (including the costs of court appointed executor of RON 6 028 608) into a blocked account in the name of the five claimants. Those sums, as well as any further payments to the claimants in fulfilment of the Award which have taken or will take place, must be recovered by Romania. Accordingly, the Commission,

HAS ADOPTED THIS DECISION:

## Article 1

The payment of the compensation awarded by the arbitral tribunal established under the auspices of the International Center for Settlement of Investment Disputes (ICSID) by award of 11 December 2013 in Case No ARB/05/20 *Micula a.o. v Romania* [101]) to the single economic unit comprising Viorel Micula, Ioan Micula, S.C. European Food SA, S.C. Starmill S.R.L., S.C. Multipack, European Drinks SA, Rieni Drinks SA, Scandic Distilleries SA, Transilvania General Import-Export S.R.L., and West Leasing S.R.L constitutes State aid within the meaning of Article 107(1) of the Treaty which is incompatible with the internal market.

## Article 2

1.    Romania shall not pay out any incompatible aid referred to in Article 1 and shall recover any incompatible aid referred to in Article 1 which has already been paid out to any one of the entities constituting the single economic unit benefiting from that aid in partial implementation or execution of the arbitral award of 11 December 2013, as well as any aid paid out to any one of the entities constituting the single economic unit benefiting from that aid in further implementation of the arbitral award of 11 December 2013 that the Commission has not been made aware of or that is paid out after the date of this Decision.

2.    Viorel Micula, Ioan Micula, S.C. European Food SA, S.C. Starmill S.R.L., S.C. Multipack, European Drinks SA, Rieni Drinks SA, Scandic Distilleries SA, Transilvania General Import-Export S.R.L., and West Leasing S.R.L shall be jointly liable to repay the State aid received by any one of them.

[97]  See footnote 7.
[98]  See footnote 38.
[99]  See footnote 38.
[100] See footnote 40.
[101] ICSID Case No ARB/05/20, *Ioan Micula, Viorel Micula, SC European Food SA, SC Starmill SRl, SC Multipack SRL v Romania*, Final Award of 11 December 2013.

Official Journal of the European Union

3.    The sums to be recovered are those resulting from the implementation or execution of the award of 11 December 2013 (principal and interest).

4.    The sums to be recovered shall bear interest from the date on which they were put at the disposal of the beneficiaries until their actual recovery.

5.    Romania shall provide the exact dates on which the aid provided by the state was put at the disposal of the respective beneficiaries.

6.    The interest shall be calculated on a compound basis in accordance with Chapter V of Commission Regulation (EC) No 794/2004 ([102]).

7.    Romania shall ensure that no further payments of the aid referred to in Article 1 shall be effected with effect from the date of adoption of this Decision.

*Article 3*

1.    Recovery of the aid referred to in Article 1 shall be immediate and effective.

2.    Romania shall ensure that this Decision is implemented within four months following the date of notification of this Decision.

*Article 4*

1.    Within two months following notification of this Decision, Romania shall submit the following information:

(a) the total amount of aid received by each entity mentioned in Article 1 of this Decision;

(b) a detailed description of the measures already taken and planned to comply with this Decision;

(c) documents demonstrating that the beneficiaries have been ordered to repay the aid.

2.    Romania shall keep the Commission informed of the progress of the national measures taken to implement this Decision until recovery of the aid referred to in Article 1 has been completed. It shall immediately submit, on simple request by the Commission, information on the measures already taken and planned to comply with this Decision. It shall also provide detailed information concerning the amounts of aid and recovery interest already recovered from the beneficiaries.

*Article 5*

This Decision is addressed to Romania.

Done at Brussels, 30 March 2015.

*For the Commission*
Margrethe VESTAGER
*Member of the Commission*

_____

([102]) Commission Regulation (EC) No 794/2004 of 21 April 2004 implementing Council Regulation (EC) No 659/1999 laying down detailed rules for the application of Article 93 of the EC Treaty (OJ L 140, 30.4.2004, p. 1).