**UNITED
NATIONS**



**A**

---



# General Assembly

Distr.
LIMITED

A/CN.4/L.682
13 April 2006

Original:  ENGLISH

---

INTERNATIONAL LAW COMMISSION
Fifty-eighth session
Geneva, 1 May-9 June and 3 July-11 August 2006

**FRAGMENTATION OF INTERNATIONAL LAW:  DIFFICULTIES
ARISING FROM THE DIVERSIFICATION AND EXPANSION OF
INTERNATIONAL LAW**

**Report of the Study Group of the International Law Commission**

**Finalized by Martti Koskenniemi***

---

*  The Chairman gratefully acknowledges the help of a number of colleagues who have commented on the topic and provided advice and assistance on particular questions.  Special mention should, among them, be made of Professor Campbell McLachlan, Dr. Anders Fischer-Lescano, Professor Gunther Teubner, Professor Emmanuelle Jouannet, Professor Pierre Marie Dupuy and Ms. Isabelle Van Damme.  Several NYU interns provided assistance during the Study Group meetings and collecting background materials on particular items.  They include Gita Kothari**,** Cade Mosley, Peter Prows, and Olivia Maloney.  Anna Huilaja, Ilona Nieminen and Varro Vooglaid at the Erik Castrén Institute of International Law and Human Rights in Helsinki provided much appreciated help in research.  Last but not least, the assistance throughout the years of Ms. Anja Lindroos from the University of Helsinki needs to be recognized.  Without her careful notes of the Study Group meetings and her background research this Report would never have materialized.  Nevertheless, the contents of this report - including any opinions therein - remain the sole responsibility of its author.

GE.06-61077  (E)    090506

# CONTENTS

|  |  | *Paragraphs* | *Page* |
|---|---|---|---|
| A. | INTRODUCTION ........................................... | 1 - 4 | 7 |
| B. | FRAGMENTATION AS A PHENOMENON ............................ | 5 - 45 | 10 |
|  | 1.  The background ........................................ | 5 - 20 | 10 |
|  | 2.  What is a conflict? ................................... | 21 - 26 | 17 |
|  | 3.  The approach of this Study:  seeking relationships ................. | 27 - 36 | 20 |
|  | 4.  Harmonization - systemic integration ....................... | 37 - 43 | 25 |
|  | 5.  Jurisdiction vs. applicable law .................................. | 44 - 45 | 28 |
| C. | CONFLICTS BETWEEN SPECIAL LAW AND GENERAL LAW (*lex specialis derogare lege generali*) .................................. | 46 - 222 | 30 |
|  | 1.  Introduction ......................................... | 47 - 55 | 30 |
|  |  (a)  Fragmentation through conflicting interpretations of general law .......................................... | 49 - 52 | 31 |
|  |  (b)  Fragmentation through the emergence of special law as exception to the general law ........................ | 53 - 54 | 33 |
|  |  (c)  Fragmentation as differentiation between types of special law ........................................ | 55 | 34 |
|  | 2.  The function and scope of the *lex specialis* maxim ................. | 56 - 122 | 34 |
|  |  (a)  *Lex specialis* in international law ..................... | 56 - 87 | 34 |
|  |  (i)  Legal doctrine ....................................... | 56 - 67 | 34 |
|  |  (ii)  Case law ............................................. | 68 - 84 | 40 |
|  |  (iii)  An informal hierarchy:  the point of *lex specialis* .......................................... | 85 - 87 | 47 |
|  |  (b)  The two types of *lex specialis* reference .......................... | 88 - 107 | 49 |
|  |  (i)  *Lex specialis* as an application of *lege generali* .... | 98 - 102 | 54 |
|  |  (ii)  *Lex specialis* as an exception to the general rule ... | 103 - 107 | 56 |

## CONTENTS (*continued*)

|  |  |  | *Paragraphs* | *Page* |
|---|---|---|---|---|
| (c) | Prohibited *lex specialis* | | 108 - 110 | 59 |
| (d) | The relational character of the general/special distinction | | 111 - 118 | 60 |
| | (i) | Speciality in regard to parties | 113 - 115 | 61 |
| | (ii) | Speciality in regard to "subject-matter" | 116 - 118 | 62 |
| (e) | Conclusion for *lex specialis*: the omnipresence of "general law" | | 119 - 122 | 64 |
| 3. | Self-contained (special) regimes | | 123 - 190 | 65 |
| (a) | What are self-contained regimes? | | 123 - 137 | 65 |
| (b) | Self-contained regimes and the ILC work on State responsibility | | 138 - 152 | 74 |
| (c) | The relationship between self-contained regimes outside State responsibility and general international law | | 153 - 190 | 83 |
| | (i) | Establishment of self-contained (special) regimes | 154 - 158 | 83 |
| | (ii) | The relationship of the self-contained (special) regime vis-à-vis general international law under normal circumstances | 159 - 185 | 85 |
| | | (1) Example: human rights regimes | 161 - 164 | 85 |
| | | (2) Example: WTO law | 165 - 171 | 87 |
| | | (3) Conclusions on the relationship of self-contained (special) regimes vis-à-vis general international law under normal circumstances | 172 - 185 | 91 |
| | (iii) | Fall-back onto general rules due to the failure of self-contained regimes | 186 - 190 | 97 |
| 4. | Conclusions on self-contained regimes | | 191 - 194 | 99 |

A/CN.4/L.682
page 4

## CONTENTS (*continued*)

| | | | Paragraphs | Page |
|---|---|---|---|---|
| 5. | | Regionalism ........................................................ | 195 - 219 | 102 |
| | (a) | What is "regionalism"? .................................... | 195 - 198 | 102 |
| | (b) | "Regionalism" as a set of approaches and methods for examining international law ........................ | 199 - 204 | 103 |
| | (c) | "Regionalism" as a technique for international law-making ..................................................... | 205 - 210 | 106 |
| | (d) | "Regionalism" as the pursuit of geographical exceptions to universal international law rules ............... | 211 - 217 | 108 |
| | (e) | European integration ......................................... | 218 - 219 | 112 |
| 6. | | Conclusion on conflicts between special law and general law ..................................................... | 220 - 222 | 114 |
| D. | | CONFLICTS BETWEEN SUCCESSIVE NORMS ...................... | 223 - 323 | 115 |
| 1. | | General law on conflicts between earlier and later treaties ...... | 228 - 250 | 118 |
| | (a) | Conflict between treaties with identical parties .............. | 229 - 233 | 118 |
| | (b) | Conflict between treaties with non-identical parties ........ | 234 - 250 | 121 |
| | (i) | *Lex prior* ................................................ | 236 - 242 | 122 |
| | (ii) | *Lex posterior* .......................................... | 243 - 250 | 125 |
| 2. | | Article 30 VCLT: from invalidity to responsibility ................ | 251 - 266 | 128 |
| | (a) | The question of "same subject-matter" ........................... | 253 - 256 | 129 |
| | (b) | The ILC debates ................................................ | 257 - 266 | 131 |
| 3. | | Special clauses ....................................................... | 267 - 294 | 135 |
| | (a) | A typology of conflict clauses ........................... | 268 - 271 | 135 |
| | (b) | Relations within and across regimes: environmental treaties ....................................................... | 272 - 282 | 138 |
| | (c) | Conflict clause in the EC Treaty ...................... | 283 - 288 | 143 |
| | (d) | Disconnection clauses ...................................... | 289 - 294 | 147 |

## CONTENTS (*continued*)

|  |  |  | *Paragraphs* | *Page* |
|---|---|---|---|---|
| 4. | *Inter se* agreements ...................................... | | 295 - 323 | 151 |
| | (a) | The conditions applicable to the conclusion of *inter se* agreements .......................................... | 304 - 315 | 156 |
| | | (i) Preservation of the rights and interests of the parties to the original treaty ..................................... | 305 - 308 | 157 |
| | | (ii) Preservation of the object and purpose of the multilateral treaty ..................................... | 309 - 313 | 159 |
| | | (iii) Other situations ....................................... | 314 - 315 | 161 |
| | (b) | Notification to the other parties and their reaction .......... | 316 - 318 | 162 |
| | (c) | Consequences for breach of the multilateral treaty by parties to an *inter se* agreement ........................ | 319 | 164 |
| | (d) | Conclusion on successive agreements ............................. | 320 - 323 | 165 |
| E. | RELATIONS OF IMPORTANCE:  ARTICLE 103 OF THE CHARTER OF THE UNITED NATIONS, *JUS COGENS* AND OBLIGATIONS *ERGA* OMNES AS CONFLICT RULES ................................. | | 324 - 409 | 166 |
| | 1. | Article 103 of the Charter of the United Nations ..................... | 328 - 360 | 168 |
| | | (a) What are the prevailing obligations? ................................ | 331 - 332 | 168 |
| | | (b) What does it mean for an obligation to prevail over another? ............................................................ | 333 - 340 | 170 |
| | | (c) Special cases ....................................... | 341 - 350 | 173 |
| | | (i) Conflicts with treaties between United Nations Member States and Non-Members ......................... | 341 - 343 | 173 |
| | | (ii) Conflicts with norms of customary international law of a non-peremptory character ......................... | 344 - 345 | 175 |
| | | (iii) Conflicts with norms of *jus cogens* ........................ | 346 - 350 | 176 |
| | | (d) Application ........................................ | 351 - 360 | 178 |

## CONTENTS (*continued*)

|  |  |  | *Paragraphs* | *Page* |
|---|---|---|---|---|
| 2. | | *Jus cogens* ................................................ | 361 - 379 | 181 |
| | (a) | The effect of *jus cogens*:  invalidity of the conflicting norm ................................................ | 365 - 373 | 184 |
| | (b) | The content of *jus cogens* ................................ | 374 - 376 | 188 |
| | (c) | Case law ................................ | 377 - 379 | 190 |
| 3. | | Obligations *erga omnes* ................................ | 380 - 409 | 193 |
| | (a) | From bilateral obligations to obligations *erga omnes* owed to "the international community as a whole" ........ | 382 - 390 | 193 |
| | (b) | To whom are obligations *erga omnes* owed? .................. | 391 - 398 | 198 |
| | (c) | Obligations *erga omnes partes* ........................ | 399 - 403 | 201 |
| | (d) | The relationship between *jus cogens* and *erga omnes* obligations ........................ | 404 - 406 | 204 |
| | (e) | Conclusion ........................ | 407 - 409 | 205 |
| F. | SYSTEMIC INTEGRATION AND ARTICLE 31 (3) (c) OF THE VCLT ........................ | | 410 - 480 | 206 |
| 1. | Introduction:  the "principle of systemic integration" ............. | | 410 - 423 | 206 |
| 2. | Article 31 (3) (c) of the VCLT ................................ | | 424 - 432 | 213 |
| | (a) | Construction ........................ | 424 - 428 | 213 |
| | (b) | The ILC debates ........................ | 429 - 432 | 216 |
| 3. | Case law ................................ | | 433 - 460 | 218 |
| | (a) | Iran-US Claims Tribunal ................................ | 434 | 218 |
| | (b) | European Court of Human Rights ........................ | 435 - 438 | 219 |
| | (c) | Mox Plant/OSPAR Arbitration ........................ | 439 - 442 | 221 |
| | (d) | WTO ................................ | 443 - 450 | 223 |
| | (e) | International Court of Justice ........................ | 451 - 460 | 228 |

# CONTENTS (*continued*)

|  |  |  | *Paragraphs* | *Page* |
|---|---|---|---|---|
| 4. | Special questions | | 461 - 480 | 232 |
| | (a) | The rules to be "taken into account" | 462 - 472 | 233 |
| | | (i) Customary law and general principles | 463 - 469 | 233 |
| | | (ii) Other applicable conventional international law | 470 - 472 | 237 |
| | (b) | The weight of the obligations to be taken into account | 473 - 474 | 239 |
| | (c) | Inter-temporality and general developments in international law | 475 - 478 | 240 |
| | (d) | Conclusion | 479 - 480 | 243 |
| G. | GENERAL CONCLUSIONS | | 481 - 493 | 244 |
| 1. | The nature of fragmentation | | 481 - 483 | 244 |
| 2. | The perspective of this Study | | 484 - 490 | 245 |
| 3. | Between coherence and pluralism: suggestions for further work | | 491 - 493 | 248 |

Appendix

Draft Conclusions of the Work of the Study Group
(see document A/CN.4/L.682/Add.1)

A/CN.4/L.682
page 8

## A. INTRODUCTION

1.      At its fifty-second session in 2000, the International Law Commission decided to include the topic "Risks ensuing from the fragmentation of international law" into its long-term programme of work.[1]  In the following year, the General Assembly requested the Commission to give further consideration to the topics in that long-term programme.  At its fifty-fourth session in 2002 the Commission decided to include the topic, renamed "Fragmentation of international law:  difficulties arising from the diversification and expansion of international law", in its current work programme and to establish a Study Group.[2]  The Study Group adopted a number of recommendations on topics to be dealt with and requested its then Chairman, Mr. Bruno Simma to prepare a study on the "Function and scope of the *lex specialis* rule and the question of 'self-contained regimes'".[3]  At its fifty-fifth session in 2003, the Commission appointed Mr. Martti Koskenniemi as Chairman of the Study Group.  The Group also set a tentative schedule for its work, distributed the studies decided in the previous year among its members and decided upon a methodology to be adopted for that work.[4]

2.      In 2004 the Chairman of the Study Group produced an outline for a study "Function and scope of the *lex specialis* rule and the question of 'self-contained regimes'" to the Group.  After a preliminary debate on that outline, concentrating on substantive and methodological issues, the definitive study on that item was distributed to the Commission in the following year.[5]  In

---

[1]  *Official Records of the General Assembly, Fifty-fifth Session*, *Supplement No. 10* (A/55/10), chap. IX.A.1, para. 729.  See also the study by Gerhard Hafner, "Risks Ensuing from Fragmentation of International Law", ibid, Annex, p. 321.

[2]  Ibid., *Fifty-seventh Session*, *Supplement No. 10* (A/57/10), chap. IX.A, paras. 492-494, 511.

[3]  Ibid., para. 512.  The five topics were:  (a) The function and scope of the *lex specialis* rule and the question of "self-contained regimes"; (b) the interpretation of treaties in the light of "any relevant rules of international law applicable in the relations between the parties" (article 31 (3) (c) of the Vienna Convention on the Law of Treaties), in the context of general developments in international law and concerns of the international community; (c) the application of successive treaties relating to the same subject matter (article 30 of the Vienna Convention on the Law of Treaties); (d) the modification of multilateral treaties between certain of the parties only (article 41 of the Vienna Convention on the Law of Treaties); (e) hierarchy in international law:  *jus cogens*, obligations *erga omnes*, Article 103 of the Charter of the United Nations, as conflict rules.

[4]  *Official Records of the General Assembly, Fifty-eighth Session*, *Supplement No. 10* (A/58/10), chap. X, para. 413, 424-435.

[5]  Ibid., *Fifty-ninth Session*, *Supplement No. 10* (A/59/10), chap. X, paras. 298-358.

addition to that study, the Study Group had in 2004 also before it the outlines produced by the members of the Study Group on the four remaining items.  It held an in-depth discussion of the Chairman's report and gave some indications to the other members of the Commission in regard to the preparation of their reports.  In addition, it commenced the discussion of the tentative "Conclusions" it might draw on the basis of its debates.[6]

3.      In 2005 the Commission heard a briefing by the Chairman of the Study Group on the status of the work of the Study Group, and held an exchange of views on the topic.  The Study Group considered the memorandum on "Regionalism", prepared by its Chairman, and received definitive reports on "the Interpretation of Treaties in the light of any relevant rules of international law applicable in relations between parties" (article 31 (3) (c) of the Vienna Convention on the Law of Treaties); "the modification of multilateral treaties between certain of the parties only (article 41 of the Vienna Convention on the Law of Treaties) as well as the final report on "Hierarchy in International Law:  *jus cogens*, obligations *erga omnes*, Article 103 of the Charter of the United Nations, as conflict rules".  In addition, the Study Group also received an informal paper from one of its members on the "Disconnection clause".  The Study Group envisaged that it would be in a position to submit a consolidated study, as well as a set of conclusions, guidelines or principles to the fifty-eighth session of the Commission in 2006.[7]

4**.**      This is the consolidated report of the Study Group.  It has been composed by its Chairman on the basis of outlines and reports produced in the course of four years of work by himself (on "Function and Scope of the *lex specialis* rule and the question of 'self-contained' regimes") and by Mr. Riad Daoudi ("the modification of multilateral treaties between certain of the parties only (article 41 of the Vienna Convention on the Law of Treaties"); Mr. Zdzislaw Galicki ("Hierarchy in International Law:  *jus cogens*, obligations *erga omnes*, Article 103 of the Charter of the United Nations, as conflict rules"); Mr. William Mansfield ("The Interpretation of Treaties in the light of 'any relevant rules of international law applicable in relations between parties' (article 31 (3) (c) of the Vienna Convention on the Law of Treaties"), and Mr. Teodor Melescanu ("Application of Successive Treaties relating to the

---

[6]  Ibid.

[7]  Ibid., *Sixtieth Session*, *Supplement No. 10* (A/60/10), chap. XI, paras. 445-493.

A/CN.4/L.682
page 10

Same Subject-Matter").  Several other Commission members took part in the deliberations
of the Study Group during the sessions and their special knowledge greatly facilitated the
discussion of particular topics.  In addition, this Report is complemented by an APPENDIX that
contains the proposed set of draft conclusions to be adopted by the Study Group and to be
forwarded to the Commission in 2006 for appropriate action.

## B.  FRAGMENTATION AS A PHENOMENON

### 1.  The background

5.      The background of fragmentation was sketched already half a century ago by
Wilfred Jenks, drawing attention in particular to two phenomena.  On the one hand, the
international world lacked a general legislative body.  Thus:

> … law-making treaties are tending to develop in a number of historical, functional and
> regional groups which are separate from each other and whose mutual relationships are
> in some respects analogous to those of separate systems of municipal law.[8]

6.      Very presciently, Jenks envisaged the need for a close analogy with conflict of laws to
deal with this type of fragmentation.  This would be a law regulating not conflicts between
territorial legal systems, but conflicts between treaty regimes.  A second reason for the
phenomenon he found within the law itself.

> One of the most serious sources of conflict between law-making treaties is the important
> development of the law governing the revision of multilateral instruments and defining
> the legal effects of revision.[9]

7.      There is little to be added to that analysis today.  Of course, the volume of multilateral -
"legislative" - treaty activity has grown manifold in the past fifty years.[10]  It has also been
accompanied by various more or less formal regulatory regimes not all which share the public

---

[8]  C. Wilfried Jenks, "The Conflict of Law-Making Treaties", BYBIL vol. 30, (1953) p. 403.

[9]  Ibid.

[10]  Over 50,000 treaties are registered in the United Nations system.  See Christopher J. Borgen, "Resolving Treaty Conflicts", George Washington International Law Review, vol. 37 (2005) pp. 57.  In the twentieth century, about 6,000 multilateral treaties were concluded of which around 30 per cent were general treaties, open for all States to participate.  Charlotte Ku, *Global Governance and the Changing Face of International Law* (ACUNS Keynote Paper 2001/2) p. 45.

A/CN.4/L.682
page 11

law orientation of multilateral diplomacy.[11]  One of the features of late international modernity has been what sociologists have called "functional differentiation", the increasing specialization of parts of society and the related autonomization of those parts.  This takes place nationally as well as internationally.  It is a well-known paradox of globalization that while it has led to increasing uniformization of social life around the world, it has also lead to its increasing fragmentation - that is, to the emergence of specialized and relatively autonomous spheres of social action and structure.

8.      The fragmentation of the international social world has attained legal significance especially as it has been accompanied by the emergence of specialized and (relatively) autonomous rules or rule-complexes, legal institutions and spheres of legal practice.[12] What once appeared to be governed by "general international law" has become the field of operation for such specialist systems as "trade law", "human rights law", "environmental law", "law of the sea", "European law" and even such exotic and highly specialized knowledges as "investment law" or "international refugee law" etc. - each possessing their own principles and institutions.  The problem, as lawyers have seen it, is that such specialized law-making and institution-building tends to take place with relative ignorance of legislative and institutional activities in the adjoining fields and of the general principles and practices of international law. The result is conflicts between rules or rule-systems, deviating institutional practices and, possibly, the loss of an overall perspective on the law.[13]

---

[11]  Out of the various collections that discuss the diversification of the sources of international regulation particularly useful are Eric Loquin & Catherine Kessedjian (eds.), *La mondialisation du droit* (Paris:  Litec, 2000); and Paul Schiff Berman, *The Globalization of International Law* (Aldershot:  Ashgate, 2005).  The activity of traditional organizations is examined in José Alvarez, *International Organizations as Law-Makers* ( Oxford: Oxford University Press, 2005).  Different  perspectives of non-treaty law-making today are also presented in Rüdiger Wolfrum & Volker Röben (eds.), *Developments of International Law in Treaty-making* ( Berlin:  Springer, 2005) pp. 417-586 and Ronnie Lipschutz & Cathleen Vogel, "Regulation for the Rest of Us?  Global Civil Society and the Privatization of Transnational Regulation", in R.R. Hall & T.J. Bierstaker, *The Emergence of Private Authority in Global Governance* (Cambridge:  Cambridge University Press, 2002) pp. 115-140.

[12]  See especially Andreas Fisher-Lescano & Günther Teubner, "Regime-Collisions:  The Vain Search for Legal Unity in the Fragmentation of Global Law", Mich. J. Int'l L., vol. 25 (2004) pp. 999-1046.  The matter was, however, discussed already in great detail in L.A.N. M. Barnhoorn & Karel Wellens (eds.), *Diversity in Secondary Rules and the Unity of International Law* (The Hague:  Nijhoff, 1995).

[13]  It should not be forgotten that the tradition of legal pluralism seeks precisely to deal with such problems.  So far, however, pluralism has concentrated on the study of the coexistence of indigenous and Western law in old colonial territories as well as the emergence of types of private law in domestic societies.  For a famous statement, see

A/CN.4/L.682
page 12

9.      While the reality and importance of fragmentation, both in its legislative and institutional form, cannot be doubted, international lawyers have been divided in their assessment of the phenomenon.  Some commentators have been highly critical of what they have seen as the erosion of general international law, emergence of conflicting jurisprudence, forum-shopping and loss of legal security.  Others have seen here a merely technical problem that has emerged naturally with the increase of international legal activity may be controlled by the use of technical streamlining and coordination.[14]

10.      Without going into details of the sociological or political background that has led to the emergence of special or specialist rule-systems and institutions, the nature of the legal problem may perhaps best be illustrated by reference to a practical example.  The question of the possible environmental effects of the operation of the "MOX Plant" nuclear facility at Sellafield, United Kingdom, has recently been raised at three different institutional procedures:  an Arbitral Tribunal set up under Annex VII of the United Nations Convention on the Law of the Sea (UNCLOS), the compulsory dispute settlement procedure under the Convention on the Protection of the Marine Environment of the North-East Atlantic (OSPAR Convention) as well as under the European Community and Euratom Treaties within the European Court of Justice (ECJ).  Three rule-complexes all appear to address the same facts:  the (universal) rules of the UNCLOS, the (regional) rules of the OSPAR Convention, and the (regional) rules of EC/EURATOM.  Which should be determinative?  Is the problem principally about the law of the sea, about (possible) pollution of the North Sea, or about inter-EC relationships?

---

Sally Engel Merry, "Legal Pluralism", Law & Soc. Rev., vol. 22 (1988) pp. 869-896 and more recently (and critically), Simon Roberts, "After Government?  On Representing Law without the State", Modern Law Review, vol. 68 (2005) pp. 1-24.

[14] "Fragmentation" is a very frequently treated topic of academic writings and conferences today.  Apart from the sources in note 11 above, see also "Symposium:  The Proliferation of International Tribunals:  Piecing together the Puzzle", New York Journal of International Law and Politics, vol. 31 (1999) pp. 679-993; Andreas Zimmermann & Reiner Hoffmann, with assisting editor Hanna Goeters, *Unity and Diversity of International Law* (Berlin:  Duncker & Humblot, 2006); Karel Wellens & Rosario Huesa Vinaixa (eds.), *L'influence des sources sur l'unité et la fragmentation du droit international* (Brussels:  Bruylant, 2006 forthcoming).  A strong plea for unity is contained in Pierre Marie Dupuy, "L'unité de l'ordre juridique internationale.  Cours général de droit international public", *Recueil des Cours …,* vol. 297 (2002).  For more references, see Martti Koskenniemi & Päivi Leino, "Fragmentation of International Law.  Postmodern Anxieties?". Leiden Journal of International Law, vol. 15 (2002) pp. 553-579.

A/CN.4/L.682
page 13

Already to pose such questions points to the difficulty of providing an answer. How do such rule-complexes link to each other, if at all? What principles should be used in order to decide a potential conflict between them?

11.    Yet the problem is even more difficult. Discussing the British objection to its jurisdiction on account of the same matter being also pending before an OSPAR arbitral tribunal and the ECJ, the Arbitral Tribunal set up under Annex VII UNCLOS observed:

> even if the OSPAR Convention, the EC Treaty and the Euratom treaty contain rights or obligations similar to or identical with the rights set out in [the UNCLOS], the rights and obligations under these agreements have a separate existence from those under [the UNCLOS].**[15]**

12.    The Tribunal held that the application of even the same rules by different institutions might be different owing to the "differences in the respective context, object and purposed, subsequent practice of parties and *travaux preparatoires*".**[16]** The UNCLOS Arbitral tribunal recognized that the meaning of legal rules and principles is dependent on the context in which they are applied. If the context, including the normative environment, is different, then even identical provisions may appear differently. But what does this do to the objectives of legal certainty and the equality of legal subjects?

13.    The previous paragraph raises both institutional and substantive problems. The former have to do with the competence of various institutions applying international legal rules and their hierarchical relations *inter se*. The Commission decided to leave this question aside. The issue of institutional competencies is best dealt with by the institutions themselves. The Commission has instead wished to focus on the substantive question - the splitting up of the law into highly specialized "boxes" that claim relative autonomy from each other and from the general law.

---

**[15]** *MOX Plant* case, *Request for Provisional Measures Order* (*Ireland* v. *the United Kingdom*) (3 December 2001) International Tribunal for the Law of the Sea, ILR vol. 126 (2005) p. 273, para. 50.

**[16]** Ibid., pp. 273-274, para. 51.

A/CN.4/L.682
page 14

What are the substantive effects of such specialization?  How should the relationship between such "boxes" be conceived?  In terms of the above example:  what is the relationship between the UNCLOS, an environmental treaty, and a regional integration instrument?

14.    The Commission has understood the subject to have both positive and negative sides, as attested to by its reformulation of the title of the topic:  "Fragmentation of international law: Difficulties arising from the diversification and expansion of international law".  On the one hand, fragmentation does create the danger of conflicting and incompatible rules, principles, rule-systems and institutional practices.  On the other hand, it reflects the rapid expansion of international legal activity into various new fields and the diversification of its objects and techniques.  The title seems to suggest that although there are "problems", they are neither altogether new nor of such nature that they could not be dealt with through techniques international lawyers have used to deal with the normative conflicts that may have arisen in the past.

15.    The rationale for the Commission's treatment of fragmentation is that the emergence of new and special types of law, "self-contained regimes" and geographically or functionally limited treaty-systems creates problems of coherence in international law.  New types of specialized law do not emerge accidentally but seek to respond to new technical and functional requirements.  The emergence of "environmental law" is a response to growing concern over the state of the international environment.  "Trade law" develops as an instrument to regulate international economic relations.  "Human rights law" aims to protect the interests of individuals and "international criminal law" gives legal expression to the "fight against impunity".  Each rule-complex or "regime" comes with its own principles, its own form of expertise and its own "ethos", not necessarily identical to the ethos of neighbouring specialization.  "Trade law" and "environmental law", for example, have highly specific objectives and rely on principles that may often point in different directions.  In order for the new law to be efficient, it often includes new types of treaty clauses or practices that may not be compatible with old general law or the law of some other specialized branch.  Very often new rules or regimes develop precisely in order to deviate from what was earlier provided by the general law.  When such deviations or become general and frequent, the unity of the law suffers.

16.    Such deviations should not be understood as legal-technical "mistakes".  They reflect the differing pursuits and preferences that actors in a pluralistic (global) society have.  In conditions of social complexity, it is pointless to insist on formal unity.  A law that would fail to articulate the experienced differences between fact-situations or between the interests or values that appear relevant in particular problem-areas would seem altogether unacceptable, utopian and authoritarian simultaneously.[17]  But if fragmentation is in this regard a "natural" development (indeed, international law was always relatively "fragmented" due to the diversity of national legal systems that participated in it) then it is not obvious why the Commission should deal with it.

17.    The starting-point of this report is that it is desirable to provide a conceptual frame within which what is perhaps inevitable can be grasped, assessed, and managed in a legal-professional way.  That frame is provided by the Vienna Convention on the Law of Treaties of 1969 (VCLT).  One aspect that does seem to unite most of the new regimes is that they claim binding force from and are understood by their practitioners to be covered by the law of treaties.  As the organ that had once prepared the Vienna Convention, the Commission is in a good position to analyse international law's alleged fragmentation from that perspective.  It is useful to note what is implicated here.  This is that although, sociologically speaking, present fragmentation contains many new features, and its intensity differs from analogous phenomena in the past, it is nevertheless an incident of the diversity of the international social world - a quality that has always marked the international system, contrasting it to the (relatively) more homogenous domestic context.  The fragmentation of the international legal system into technical "regimes", when examined from the point of view of the law of treaties, is not too different from its traditional fragmentation into more or less autonomous territorial regimes called "national legal systems".

18.    This is why it is useful to have regard to the wealth of techniques in the traditional law for dealing with tensions or conflicts between legal rules and principles.  What is common to

---

[17]  The emergence of an international legal pluralism has been given an ambitious overview in Boaventura de Sousa Santos, *Toward a New Common Sense.  Law, Science and Politics in the Age of the Paradigmatic Transition* (New York:  Routledge, 1995) especially p. 114 et seq.

A/CN.4/L.682
page 16

these techniques is that they seek to establish meaningful relationships between such rules and principles so as to determine how they should be used in any particular dispute or conflict.  This Report discusses four types of relationships that lawyers have traditionally understood to be implicated in normative conflicts:

  (a)  Relations between special and general law (section C);

  (b)  Relations between prior and subsequent law (section D);

  (c)  Relations between laws at different hierarchical levels (section E); and

  (d)  Relations of law to its "normative environment" more generally (section F).

19.  Such relations may be conceived in varying ways.  At one end of the spectrum is the case where one law (norm, rule, principle, rule-complex) simply invalidates the other law.  This takes place only in hierarchical relations involving *jus cogens*.  Much more often, priority is "relative". The "other law" is set aside only temporarily and may often be allowed to influence "from the background" the interpretation and application of the prioritized law.  Then there is the case where the two norms are held to act concurrently, mutually supporting each other.  And at this end of the spectrum is the case where, finally, there appears to be no conflict or divergence at all. The laws are in harmony.

20.  This Report will discuss such relations especially by reference to the practice of international courts and tribunals.  The assumption is that international law's traditional "fragmentation" has already equipped practitioners with techniques to deal with rules and rule-systems that point in different directions.  This does not mean to cancel out the importance of the recent push towards functional specialization of regulatory regimes.  But it does suggest that these factual developments are of relatively minor significance to the operation of legal reasoning.  In an important sense, "fragmentation" and "coherence" are not aspects of the world but lie in the eye of the beholder.  What is new and unfamiliar, will (by definition) challenge accustomed ways of thinking and organizing the world.  Novelty presents itself as "fragmentation" of the old world.  In such case, it is the task of reasoning to make the unfamiliar familiar by integrating it into received patterns of thought or by amending those patterns so

that the new phenomenon can be accommodated.  Of course, there will always remain some "cognitive dissonance" between the familiar conceptual system and the new information we receive from the world.  The problems of coherence raised by the MOX plant case, for example, have not *already* been resolved in some juristic heaven so that the only task would be to try to find that pre-existing solution.  But the fact that the potential overlap or conflict between the rules of the UNCLOS, the OSPAR Convention and EC law cannot be immediately resolved does not mean that it could not be brought under familiar patterns of legal reasoning.  This report is about legal reasoning.  Although it does not purport to give ready-made solutions to a problem such as the MOX plant it does provide a toolbox with the help of which lawyers dealing with that problem (or any other comparable issue) may be able to proceed to a reasoned decision.

### 2.  What is a "conflict"?

21.    This report examines techniques to deal with conflicts (or prima facie conflicts) in the substance of international law.  This raises the question of what is a "conflict"?  This question may be approached from two perspectives:  the subject-matter of the relevant rules or the legal subjects bound by it.  Article 30 VCLT, for example, appears to adopt the former perspective. It suggests techniques for dealing with successive treaties relating to the "same subject-matter". It is sometimes suggested that this removes the applicability of article 30 when a conflict emerges for example between a trade treaty and an environmental treaty because those deal with *different* subjects.[18]  But this cannot be so inasmuch as the characterizations ("trade law", "environmental law") have no normative value per se.  They are only informal labels that describe the instruments from the perspective of different interests or different policy objectives. Most international instruments may be described from various perspectives:  a treaty dealing with trade may have significant human rights and environmental implications and vice versa. A treaty on, say, maritime transport of chemicals, relates at least to the law of the sea, environmental law, trade law, and the law of maritime transport.  The characterizations have less to do with the "nature" of the instrument than the interest from which it is described.

---

[18]  Borgen, "Resolving Treaty Conflicts", supra, note 10, pp. 603-604.

22.    If conflict were to exist only between rules that deal with the "same" subject-matter, then the way a treaty is applied would become crucially dependent on how it would classify under some (presumably) pre-existing classification scheme of different subjects.  But there are no such classification schemes.  Everything would be in fact dependent on argumentative success in pigeon-holing legal instruments as having to do with "trade", instead of "environment", "refugee law" instead of "human rights law", "investment law" instead of "law of development". Think again about the example of maritime carriage of chemical substances.  If there are no definite rules on such classification, and any classification relates to the interest from which the instrument is described, then it might be possible to avoid the appearance of conflict by what seems like a wholly arbitrary choice between what interests are relevant and what are not:  from the perspective of marine insurers, say, the case would be predominantly about carriage while, from the perspective of an environmental organization, the predominant aspect of it would be environmental.  The criterion of "subject-matter" leads to a *reductio ad absurdum*.  Therefore, it cannot be decisive in the determination of whether or not there is a conflict.[19]  As pointed out by Vierdag in his discussion of this criterion in regard to subsequent agreements under article 30 VCLT:

> the requirement that the instruments must relate to the same subject-matter seems to raise extremely difficult problems in theory, but may turn out not to be so very difficult in practice.  If an attempted simultaneous application of two rules to one set of facts or actions leads to incompatible results it can safely be assumed that the test of sameness is satisfied.[20]

23.    This seems right.  The criterion of "same subject-matter" seems already fulfilled if two different rules or sets of rules are invoked in regard to the same matter, or if, in other words, as a result of interpretation, the relevant treaties seem to point to different directions in their application by a party.

---

[19]  This is not to say that the fact that two treaties may or may not belong to the same "regime" is irrelevant for the way their relationship is conceived.  See further specially section D.3. (a). below.

[20]  E.W. Vierdag, "The Time of the 'Conclusion' of a Multilateral Treaty:  Article 30 of the Vienna Convention on the Law of Treaties and Related Provisions", BYBIL vol. 59 (1988) p. 100.

24.      This is not the end of the matter, however.  What does "pointing in different direction" mean?  A strict notion would presume that conflict exists if it is possible for a party to two treaties to comply with one rule only by thereby failing to comply with another rule.  This is the basic situation of incompatibility.  An obligation may be fulfilled only by thereby failing to fulfil another obligation.  However, there are other, looser understandings of conflict as well.[21] A treaty may sometimes frustrate the goals of another treaty without there being any strict incompatibility between their provisions.  Two treaties or sets of rules may possess different background justifications or emerge from different legislative policies or aim at divergent ends. The law of State immunity and the law of human rights, for example, illustrate two sets of rules that have very different objectives.  Trade law and environmental law, too, emerge from different types of policy and that fact may have an effect on how the relevant rules are interpreted or applied.  While such "policy-conflicts" do not lead into logical incompatibilities between obligations upon a single party, they may nevertheless also be relevant for fragmentation.[22]

25.      This Report adopts a wide notion of conflict as a situation where two rules or principles suggest different ways of dealing with a problem.  Focusing on a mere logical incompatibility mischaracterizes legal reasoning as logical subsumption.  In fact, any decision will involve interpretation and choice between alternative rule-formulations and meanings that cannot be pressed within the model of logical reasoning.

---

[21]  The most in-depth discussion is in Joost Pauwelyn, *Conflict of Norms in Public International Law.  How WTO Law Relates to Other Rules of International Law*, Cambridge Studies in International and Comparative Law, (Cambridge:  Cambridge University Press:  2003) pp. 164-200 (noting the way the WTO bodies have used a narrow understanding of "conflict" as incompatibility).  See also the distinction made by Jenks between "conflicts" and "divergences", "The Conflict of Law-Making …", supra note 8, pp. 425-427 and for a rather strict definition of "conflict", Jan B. Mus, "Conflicts between Treaties in International Law", Netherlands International Law Review, vol. XLV (1998) pp. 214-217; Seyed Ali Sadat-Akhavi, *Methods of Resolving Conflicts between Treaties* (Leiden:  Nijhoff, 2003) pp. 5-7.

[22]  For a discussion, see Rüdiger Wolfrum & Nele Matz, *Conflicts in International Environmental Law* (Berlin:  Springer, 2003) pp. 6-13 and Nele Matz, *Wege zur Koordinierung völkerrechtlicher Verträge. Völkervertragsrechtliche und institutionelle Ansätze* (Berlin:  Springer, 2005) pp. 8-18 (a categorization of conflict-types from logical incompatibility to political conflicts and overlaps of regulatory scope).

A/CN.4/L.682
page 20

26.    Conflicts between rules are a phenomenon in every legal order.  Every legal order is also familiar with ways to deal with them.  Maxims such as *lex specialis* or *lex posterior* are known to most legal systems, and, as will be explained in much more detail below, to international law. Domestic legal orders also have robust hierarchical relations between rules and rule-systems (in addition to hierarchical institutions to decide rule-conflicts).  In international law, however, as will also be discussed in section E below, there are much fewer and much less robust hierarchies.  And there are many types of interpretative principles that purport to help out in conflict-resolution.  Nevertheless, it is useful to agree with Jenks:

> Assuming, as it is submitted we must, that a coherent body of principles on the subject is not merely desirable but necessary, we shall be constrained to recognize that, useful and indeed essential as such principles may be to guide us to reasonable conclusions in particular cases, they have no absolute validity.[23]

### 3. The approach of this Study:  seeking relationships

27.    Conflict-ascertainment and conflict-resolution are a part of *legal reasoning,* that is, of the pragmatic process through which lawyers go about interpreting and applying formal law**.**  In this process, legal rules rarely if ever appear alone, without relationship to other rules.  Typically, even single (primary) rules that lay down individual rights and obligations presuppose the existence of (secondary) rules that provide for the powers of legislative agencies to enact, modify and terminate such rules and for the competence of law-applying bodies to interpret and apply them.

28.    But even substantive primary rules usually appear in clusters, together with exceptions, provisions for technical implementation and larger interpretative principles. The commonplace distinction between "rules" and "principles" captures one set of typical relationships, namely those between norms of a lower and higher degree of abstraction.  A "rule" may thus sometimes be seen as a specific application of a "principle" and understood as *lex specialis* or *lex posterior* in regard to it, and become applicable in its stead.  In such case,

---

[23]  Jenks, "The Conflict of Law-Making …" supra note 8, p. 407.

the special/general or prior/subsequent distinction does not work as a conflict-solution technique but as an interpretative guideline indicating that one rule should be interpreted in view of the other of which it is only an instance or an elaboration.[24]

29.      Alternatively, the general or earlier principle may be understood to articulate a rationale or a purpose to the specific (or later) rule.  Thus, for instance, the fisheries provisions in the United Nations Convention on the Law of the Sea may be seen as background principles of which any particular treaties concerning fishery resources could be seen as instances or elaborations.[25]

30.      For example, in the *Southern Bluefin Tuna* case (2000), Japan had argued inter alia that the 1993 Convention on the Conservation of the Southern Bluefin Tuna (CCSBT) applied to the case both as *lex specialis* and *lex posterior,* excluding the application of the 1982 UNCLOS.[26] The Arbitration Tribunal, however, held that both the 1982 as well as the 1993 instrument were applicable.  The Tribunal recognized that:

> … it is a commonplace of international law and State practice for more than one treaty to bear upon a particular dispute.  There is no reason why a given act of a State may not violate its obligations under more than one treaty.  There is frequently a parallelism of treaties, both in their substantive content and in their provisions for settlement of disputes arising thereunder.  The current range of international legal obligations benefits from a process of accretion and cumulation; in the practice of States, the conclusion of an implementing convention does not necessarily vacate the obligations imposed by the framework convention upon the parties to the implementing convention.  The broad provision for the promotion of universal respect for and observance of human rights,

---

[24]  See Neil McCormick, *Legal Reasoning and Legal Theory* (Oxford:  Clarendon, 1978) p. 156 and generally pp. 152-194.  There are many understandings of the nature of the difference between "rules" and "principles". For these, see Martti Koskenniemi, "General Principles:  Reflections on Constructivist Thinking in International Law", in Martti Koskenniemi, *Sources of International Law* (London Ashgate, 2000) pp. 359-402.  For a recent discussion of the operation of the rule/principle dichotomy in international law (of self-determination), see Karen Knop, *Diversity and Self-Determination* (Cambridge:  Cambridge University Press, 2002) pp. 20-39.

[25]  This seems also affirmed in article 87 of the United Nations Convention on the Law of the Sea, United Nations, *Treaty Series* vol. 1834, p. 396.

[26]  *Southern Bluefin Tuna* case (*Australia and New Zealand/Japan)* Award of 4 August 2000 (Jurisdiction and admissibility) UNRIAA vol. XXIII (2004) p. 23, para. 38 (c).

A/CN.4/L.682
page 22

> and the international obligation to co-operate for the achievement of those
> purposes, found in the Articles 1, 55 and 56 of the Charter of the United Nations,
> have not been discharged for States Parties by their ratification of Human Rights
> Covenants and other human rights treaties … Nor is it clear that the particular
> provisions of the 1993 Convention exhaust the extent of the relevant obligations
> of UNCLOS. In some respects, UNCLOS may be viewed as extending beyond the
> reach of the CCSBT.[27]

31.     This is quite an appropriate description of a number of situations that may arise between a general multilateral treaty and specific bilateral or regional treaties. In such cases, the characterization of the latter as *lex specialis* or *lex posterior* may not all lead to the setting aside of the general treaty. Instead, that earlier and general instrument remains "in the background", controlling the way the later and more specific rules are being interpreted and applied.[28] Whether this relationship is then conceived in terms of an (informal) hierarchy or a division of labour seems beside the point. However, none of this takes away the difficulty of appreciating what it means that the later or more specific instrument involves a "development" or "application" of a more general instrument and when it is intended to be an exception or a limitation thereto. Any technical rule that purports to "develop" the freedom of the high seas is also a limitation of that freedom to the extent that it lays down specific conditions and institutional modalities that must be met in its exercise.

32.     The Commission has traditionally been aware of the difficulty to make a clear distinction between "progressive development" and "codification". An analogous difficulty affects any attempt to distinguish clearly between "application" of a general rule and "limitation" or "deviation" from it. All this is dependent on how one interprets the general law to which the specific or later instrument seeks to add something. Care should thus be taken not to infer

---

[27]  Ibid., pp. 40-41 para. 52.

[28]  Thus for example, article 4 of the United Nations Fish Stocks Agreement provides that it "shall be interpreted and applied in the context of and in a manner consistent with the [UNCLOS]", Agreement for the Implementation of Provisions of the United Nations Convention on the Law of the Sea of 10 December 1982 relating to the Conservation and Management of Straddling Fish Stocks and High Seas Migratory Fish Stocks, United Nations, *Treaty Series* vol. 2167, p.3.

that a special law need automatically be interpreted "widely" or "narrowly". Whichever way interpretation goes depends on how the relationship between the general and the special law is conceived ("application" or "exception"?). This, again, requires seeing the relationship as part of some "system".

33.    It is often said that law is a "system". By this, no more need be meant than that the various decisions, rules and principles of which the law consists do not appear not randomly related to each other.[29]  Although there may be disagreement among lawyers about just how the systemic relationship between the various decisions, rules and principles should be conceived, there is seldom disagreement that it is one of the tasks of legal reasoning to establish it.

34.    This cannot be understood as reaffirming something that already "exists" before the systemic effort itself. There is no single legislative will behind international law. Treaties and custom come about as a result of conflicting motives and objectives - they are "bargains" and "package-deals" and often result from spontaneous reactions to events in the environment. But if legal reasoning is understood as a *purposive* activity, then it follows that it should be seen not merely as a mechanic application of apparently random rules, decisions or behavioural patterns but as the operation of a whole that is directed toward some human objective. Again, lawyers may disagree about what the objective of a rule or a behaviour is. But it does not follow that no such objective at all can be envisaged. Much legal interpretation is geared to linking an unclear rule to a purpose and thus, by showing its position within some system, to providing a justification for applying it in one way rather than in another. Thus, while the conclusion of a general treaty may sometimes be intended to set aside previously existing scattered provisions in some area - for example, the 1982 United Nations Convention on the Law of the Sea explicitly set aside the 1958 Law of the Sea conventions[30] - sometimes no such intention can be inferred.

---

[29]  The view that holds international law a "primitive" structure bases itself on the claim that the rules of international law do not form a "system" but merely an aggregate of (primary) rules that States have contracted. See H.L.A Hart, *The Concept of Law* (Oxford:  Clarendon Press, 1961) pp. 208-231.

[30]  See article 311 of the United Nations Convention on the Law of the Sea.

A/CN.4/L.682
page 24

The adoption in 1966 of the two universal human rights covenants (the Covenants for Civil and Political Rights and for Economic, Social and Cultural Rights) did not imply any setting aside or overriding of the (more specific) provisions of the 1951 European Convention on Human Rights and Fundamental Freedoms.[31]  Whether the later regulation intends to preserve or push aside previous legislation cannot, again, be decided *in abstracto*.  This can only be decided through interpretation.

35.    Legal interpretation, and thus legal reasoning, builds systemic relationships between rules and principles by envisaging them as parts of some human effort or purpose.  Far from being merely an "academic" aspect of the legal craft, systemic thinking penetrates all legal reasoning, including the practice of law-application by judges and administrators.[32]  This results precisely from the "clustered" nature in which legal rules and principles appear.  But it may also be rationalized in terms of a *political obligation* on law-appliers to make their decisions cohere with the preferences and expectations of the community whose law they administer.[33]

36.    It is a preliminary step to any act of applying the law that a prima facie view of the matter is formed.  This includes, among other things, an initial assessment of what might be the applicable rules and principles.  The result will often be that a number of standards may seem prima facie relevant.  A choice is needed, and a justification for having recourse to one instead of another.  Moving from the prima facie view to a conclusion, legal reasoning will either have to seek to harmonize the apparently conflicting standards through interpretation

---

[31]  See article 44 of the International Covenant on Civil and Political Rights.  United Nations, *Treaty Series,* vol. 99, p. 171 and comment in Karl Zemanek, "General Course on Public International Law", *Recueil des Cours …* vol. 266 (1977) pp. 227-8.  See also Sadat-Akhavi, *Methods of Resolving Conflicts …* supra note 20, pp. 120-124.

[32]  For "systematization" - that is, the establishment of systemic relationships between legal rules - as a key aspect of legal reasoning.  See e.g. Aulis Aarnio, *Denkweisen der Rechtswissenschaft* (New York Springer, 1979) pp. 50-77 and generally Joseph Raz, *The Concept of a Legal System* (Oxford: Clarendon Press, 1979).  For a treatment of international law through a sociologically oriented ("Luhmannian") systems theory, see Andreas Fischer-Lescano, "Die Emergenz von Globalverfassung", *ZaÖRV* vol. 63 (2003) pp. 717-760.

[33]  This view is famously articulated in Ronald Dworkin, *Taking Rights Seriously* (Harvard:  Harvard University Press, 1977).

or, if that seems implausible, to establish definite relationships of priority between them. Here interpretative maxims and conflict-solution techniques such as the *lex specialis, lex posterior* or *lex superior* become useful. They enable seeing a systemic relationship between two or more rules, and may thus justify a particular choice of the applicable standards, and a particular conclusion. They do not do this mechanically, however, but rather as "guidelines",[34] suggesting a pertinent relationship between the relevant rules in view of the need for consistency of the conclusion with the perceived purposes or functions of the legal system as a whole.[35] The fact that this takes place in an indeterminate setting takes nothing away from its importance. Through it, the legal profession articulates, and gives shape and direction to law. Instead of a random collection of directives, the law begins to assume the shape of a purposive (legal) system.

### 4. Harmonization - systemic integration

37.     In international law, there is a strong presumption against normative conflict. Treaty interpretation is diplomacy, and it is the business of diplomacy to avoid or mitigate conflict. This extends to adjudication as well. As Rousseau puts the duties of a judge in one of the earlier but still more useful discussions of treaty conflict:

> … lorsqu'il est en presence de deux accords de volontés divergentes, il doit être tout naturellement porté a rechercher leur coordination plutôt qu'à consacrer à leur antagonisme.[36]

---

[34] As suggested by the United States comments to the Waldock draft of what became articles 30 and 31 VCLT. See Sir Humphrey Waldock, Sixth Report on the Law of Treaties, *Yearbook of the International Law Commission* (1966) vol. II, Part two, p. 94.

[35] For the techniques of "second order justification" that enable the solution of hard cases (i.e. cases where no "automatic" decisions are possible) and that look either to the consequences of one's decision or to the systemic coherence and consistency of the decision with the legal system (seen as a purposive system), see McCormick, *Legal Reasoning …* supra note 24, pp 100-128.

[36] Charles Rousseau, "De la compatibilité des normes juridiques contradictoires dans l'ordre international", RGDIP vol. 39 (1932), p. 153.

A/CN.4/L.682
page 26

38.     This has emerged into a widely accepted principle of interpretation and it may be

formulated in many ways.  It may appear as the thumb-rule that when creating new obligations,

States are assumed not to derogate from their obligations.  Jennings and Watts, for example, note

the presence of a:

> presumption that the parties intend something not inconsistent with generally
> recognized principles of international law, or with previous treaty obligations
> towards third States.[37]

39.     As the International Court of Justice stated in the *Right of Passage* case:

> it is a rule of interpretation that a text emanating from a Government must, in principle,
> be interpreted as producing and intended to produce effects in accordance with existing
> law and not in violation of it.[38]

40.     There are other reasons, too, for which one might wish to avoid formal statements

confirming incompatibility.  As noted above, this may often be a matter of political assessment.

In the controversial *Austro-German Customs Union* case from 1931, for example, the

Permanent Court of International Justice observed that the projected Union with Germany

violated the obligation Austria had undertaken in the Versailles Treaty and the Protocol of

Saint Germain not to alienate its independence.  As Judge Anzilotti pointed out, the Court was

here invited to decide a wholly political question.  What legal standards were there to instruct

on whether a customs union between Austria and Germany, with all the history of their

relationship and its linkage to European problems, would encroach on Austria's independence?

In this regard, a treaty with Germany was of a completely different nature than a treaty with, say,

Czechoslovakia.[39]  The potential "fragmentation" at issue in the Austro-German case highlights

---

[37]  Sir Robert Jennings and Sir Arthur Watts (eds.), *Oppenheim's International Law* ( London:  Longman,1992)
(9th ed), p. 1275.  For the wide acceptance of the presumption against conflict - that is the suggestion of harmony -
see also see Pauwelyn, *Conflict of Norm ...* supra note 21, pp. 240-244.

[38]  *Case concerning the Right of Passage over Indian Territory (Preliminary Objections) (Portugal v. India)
I.C.J. Reports 1957* p. 142.

[39]  As pointed out in Rousseau, "De la compatibilité des norms …", supra note 36, pp. 187-8.

A/CN.4/L.682
page 27

the linkage of the legal problem of compatibility with the preferences of the actors and the need for some subtlety in coping with them.  A straightforward statement of incompatibility might sometimes be strictly inadvisable.

41.    There is relatively little - in fact, until recently, astonishingly little - judicial or arbitral practice on normative conflicts.  As Borgen suggests, this must result in part from the wish of States parties to negotiate issues of apparent conflict between themselves and not to give the power to outsiders to decide on what may appear as coordinating difficulties that may have their roots already in the heterogeneous interests represented in national administrations.  And negotiation is rarely about the "application" of conflict-rules rather than trying to find a pragmatic solution that could re-establish the disturbed harmony.  Although it might be interesting to discuss the way States have resolved such problems by negotiation, the fact that any results attained have come about through contextual bargaining make it difficult to use their results as basis for some customary rule or other.[40]

42.    However, although harmonization often provides an acceptable outcome for normative conflict, there is a definite limit to harmonization:  "it may resolve apparent conflicts; it cannot resolve genuine conflicts".[41]  This does not mean that there are normative conflicts whose intrinsic nature renders them unsuitable for harmonization.  Between the parties, anything may be harmonized as long as the will to harmonization is present.  Sometimes, however, that will may not be present, perhaps because the positions of the parties are so wide apart from each other - something that may ensue from the importance of the clash of interests or preferences that is expressed in the normative conflict, or from the sense that the harmonizing solution would sacrifice the interests of the party in a weaker negotiation position.  In this respect, there is a limit to which a "coordinating" solution may be applied to resolve normative conflicts.  Especially where a treaty lays out clearly formulated rights or obligations to legal subjects, care must be taken so as not to see these merely as negotiating chips in the process of reaching a coordinating solution.

---

[40]  Borgen, "Resolving Treaty Conflicts", supra note 10, pp. 605-606 (but see also his discussion of diplomatic practice, 606-610).

[41]  Ibid., p. 640.

A/CN.4/L.682
page 28

43.    When normative conflicts come to be settled by third parties the pull of harmonization remains strong though perhaps not as compelling as between the parties themselves.  Because already the ascertainment of the presence of a conflict requires interpretation, it may often be possible to deal with potential conflicts by simply ignoring them, especially if none of the parties have raised the question.  But when a party raises a point about conflict and about the precedence of one obligation over another, then a stand must be taken.  Of course in such case, it is still possible to reach the conclusion that although the two norms seemed to point in diverging directions, after some adjustment, it is still possible to apply or understand them in such way that no overlap or conflict will remain.  This may sometimes call for the application of the kinds of conflict-solution rules which the bulk of this Report will deal with.  But it may also take place through an attempt to reach a resolution that integrates the conflicting obligations in some optimal way in the general context of international law.  Inasmuch as the question of conflict arises regarding the fulfilment of the *objectives* (instead of the obligations) of the different instruments, little may be done by the relevant body.  In any case, the third party settlement body is always limited in its jurisdiction.

## 5. Jurisdiction vs. applicable law

44.    In debates about fragmentation and normative conflict, the suggestion is sometimes made that whatever the relations between legal rules and principles as conceived under *general international law*, those relations cannot be applied as such by treaty bodies or dispute-settlement organs whose jurisdiction is limited to or by the constituting instrument.  A human rights body, for example, should have no business to apply a WTO covered agreement.  This suggestion, which in essence is merely an argument about the self-contained nature of some regimes, will be discussed in detail in section C.3 below.  Thus, only a few remarks here will suffice.

45.    The jurisdiction of most international tribunals is limited to particular types of disputes or disputes arising under particular treaties.  A limited jurisdiction does not, however, imply a limitation of the scope of the law applicable in the interpretation and application of those treaties.  Particularly in the WTO context a distinction has been made between two notions, jurisdiction

and applicable law.[42]  While the WTO Dispute Settlement Understanding limits the jurisdiction to claims which arise under the WTO covered agreements only, there is no explicit provision identifying the scope of applicable law.[43]  By contrast, for example article 38 of the Statute of the International Court of Justice listing the sources that the International Court of Justice should apply in deciding cases does identify the law applicable by the Court.[44]  Similarly, the UNCLOS provides that the LOS Tribunal has "jurisdiction over any dispute concerning the interpretation and application of this Convention" and when deciding the cases, it "shall apply this Convention and other rules of international law not incompatible with this Convention".[45]  As no such explicit provision exist in the Dispute Settlement Understanding, the question of the scope of applicable law has seemed problematic.  However, the WTO is certainly not the only context in which a treaty body has been set up without expressly mentioning that it should apply international law.  As will be argued in length especially in section C and F below, WTO covered treaties are creations of and constantly interact with other norms of international law.[46]  As the Appellate Body stated in its very first case, 'the General Agreement [GATT] is not to be

---

[42]  Lorand Bartels, "Applicable Law in WTO Dispute Settlement Proceedings", Journal of World Trade, vol. 35 (2001) pp. 501-502; David Palmenter and Petros C. Mavroidis, "The WTO Legal System:  Sources of Law", AJIL vol. 92 (1998), pp. 398-399; Joost Pauwelyn, "The Role of Public International Law in the WTO:  How Far Can We Go?"AJIL vol. 95 (2001), pp. 554-566; Gabrielle Marceau, "WTO Dispute Settlement and Human Rights", EJIL vol. 13 (2002), pp. 757-779; Anja Lindroos and Michael Mehling, "Dispelling the Chimera of 'Self-Contained Regimes' International Law and the WTO", EJIL vol. 16 (2005) pp. 860-866.

[43]  Articles 1.1, 3.2, 7, 11, and 19.2 of the Dispute Settlement Understanding, ILM vol. 33 (1994) 1144, has been used to argue both in for and against a more extensive scope of applicable law in the WTO dispute settlement. See e.g. Bartels, "Applicable Law in WTO …" ibid., pp. 502-509; Lindroos and Mehling, "Dispelling the Chimera 'Self-Contained Regimes'", ibid., pp. 873-875 and *Korea-Measures Affecting Government Procuremen*t, 1 May 2000, WT/DS163/R, para. 7.101, note 755.

[44]  See e.g. Bartels, "Applicable Law in WTO …", ibid., pp. 501-502 and Palmenter and Mavroidis, "The WTO Legal System:  Sources of Law", supra note 42, pp. 398-399.

[45]  Articles 288 (1) and 293 (1) of the UNCLOS.

[46]  For instance, Palmenter and Mavroidis, "The WTO Legal System: Sources of Law", pp. 398-399; Joel P. Trachtman, "The Domain of WTO Dispute Resolution", Harvard International Law Journal vol. 40 (1999) pp. 333-377; Bartels, "Applicable Law in WTO …", supra note 42, pp. 501-502; Pauwelyn, "The Role of Public International Law in the WTO …", supra note 42, pp. 554-566; Pauwelyn, *Conflict of Norms in Public International Law* … supra note 21, *Law;* Marceau, "WTO Dispute Settlement and Human Rights" … supra note 42 pp. 757-779; Lindroos and Mehling, "Dispelling the Chimera …", supra note 42, pp. 860-866.

read in clinical isolation from public international law".[47]  What this means in practice is by no means straightforward.  But it states what has never been seriously doubted by any international tribunal or treaty-body, namely that even as the jurisdiction of a body is limited (as it always - even in the case of the International Court of Justice - is), its exercise of that jurisdiction is controlled by the normative environment.

## C.  CONFLICTS BETWEEN SPECIAL LAW AND GENERAL LAW

46.    This section deals with the issue where a normative conflict is characterized through the relationship of speciality vs. generality between the conflicting norms.  The section is in four parts.  Section C.1 provides a framework for the discussion of conflicts where the "speciality" or "generality" of conflicting norms becomes an issue.  Section C.2 outlines the role and nature of the *lex specialis* rule as a pragmatic mechanism for dealing with situations where two rules of international law that are both valid and applicable deal with the same subject-matter differently.[48]  Section C.3 is an overview of the case-law and academic discussion on "self-contained regimes".  Section C.4 is a brief discussion of regionalism in international law.

### 1.  Introduction

47.    One of the most well-known techniques of analysis of normative conflicts focuses on the generality vs. the particularity of the conflicting norms.  In this regard, it is possible to distinguish between three types of conflict, namely:

(a)    Conflicts between  general law and a particular, unorthodox interpretation of general law;

---

[47]  In the *United States - Standards for Reformulated and Conventional Gasoline*, 29 April 1996, WT/DS2/AB/R, p. 17.  Similarly, e.g., in the *Korea - Measures Affecting Government Procurement*, 1 May 2000, WT/DS163/R, para. 7.96, the panel stated that "customary international law applies generally to the economic relations between the WTO Members.  Such international law applies to the extent that the WTO treaty agreements do not 'contract out' from it".

[48]  To say that a rule is "valid" is to point to its being a part of the ("valid") legal order.  To say it is applicable means that it provides rights, obligations or powers to a legal subject in a particular situation.

A/CN.4/L.682
page 31

(b)    Conflicts between general law and a particular rule that claims to exist as an exception to it; and

(c)    Conflicts between two types of special law.

48.    Fragmentation appears differently in each of such three types of conflict.  While the first type is really about the effects of differing legal interpretations in a complex institutional environment, and therefore falls strictly speaking outside the Commission study, the latter two denote genuine types of conflict where the law itself (in contrast to some putative interpretation of it) appears differently depending on which normative framework is used to examine it.[49] Each of the three types of conflict is illustrated briefly below.

**(a)    Fragmentation through conflicting interpretations of general law**

49.    In the *Tadic* case in 1999, the Appeals Chamber of the International Criminal Tribunal of the former Yugoslavia (ICTY) considered the responsibility of Serbia-Montenegro over the acts of Bosnian Serb militia in the conflict in the former Yugoslavia.  For this purpose it examined the jurisprudence of the International Court of Justice in the *Nicaragua* case of 1986.  In that latter case, the United States had not been held responsible for the acts of the Nicaraguan *contras* merely on account of organizing, financing, training and equipping them.  Such involvement failed to meet the test of "effective control".[50]  The ICTY, for its part, concluded that "effective control" set too high a threshold for holding an outside power legally accountable for domestic unrest.  It was sufficient that the power have "a role in organizing, coordinating, or planning the military actions of the military group", that is to say that it exercised "overall control" over them for the conflict to be an "international armed conflict".[51]

---

[49]  I have discussed the dependence of normative conflict of different conceptual frameworks in Martti Koskenniemi & Päivi Leino, "Fragmentation of International Law? …" supra note 14, pp. 553-579.

[50]  *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America) (Merits) I.C.J. Reports 1986* pp. 64-65, para. 115.

[51]  See *Prosecutor* v. *Dusko Tadic*, Judgment of 15 July 1999, Case No. IT-94-1-A, A.Ch.  See also ILM vol. 38 (1999) pp. 1540-1546, paras. 115, 116-145.

A/CN.4/L.682
page 32

50.     The contrast between *Nicaragua* and *Tadic* is an example of a normative conflict between an earlier and a later interpretation of a rule of general international law.**52** *Tadic* does not suggest "overall control" to exist alongside "effective control" either as an exception to the general law or as a special (local) regime governing the Yugoslav conflict.  It seeks to *replace* that standard altogether.

51.     The point is not to take a stand in favour of either *Tadic* or *Nicaragua*, only to illustrate the type of normative conflict where two institutions faced with analogous facts interpret the law in differing ways.  This is a common occurrence in any legal system.  But its consequences for the international legal system which lacks a proper institutional hierarchy might seem particularly problematic.  Imagine, for example, a case where two institutions interpret the general (and largely uncodified) law concerning title to territory differently.  For one institution, State A has validly acquired title to a piece of territory that another institution regards as part of State B.  In the absence of a superior institution that could decide such conflict, States A and B could not undertake official acts with regard to the territory in question with confidence that those acts would be given legal effect by outside powers or institutions.  Similar problems would emerge in regard to any conflicting interpretations concerning a general law providing legal status.

52.     Differing views about the content of general law create two types of problem.  First, they diminish legal security.  Legal subjects are no longer able to predict the reaction of official institutions to their behaviour and to plan their activity accordingly.  Second, they put legal subjects in an unequal position vis-à-vis each other.  The rights they enjoy depend on which jurisdiction is seized to enforce them.  Most domestic laws deal with these problems through the instrumentality of the appeal.  An authority (usually a court) at a higher hierarchical level will

---

**52** This need not be the only - nor indeed the correct - interpretation of the contrast between the two cases.  As some commentators have suggested, the cases can also be distinguished from each other on the basis of their facts.  In this case, there would be no normative conflict.  Whichever view seems more well-founded, the point of principle remains, namely that it cannot be excluded that two tribunals faced with similar facts may interpret the applicable law differently.

provide a formally authoritative ruling.[53]  Such authority is not normally present in international law.  To the extent that such conflicts emerge, and are considered a problem (which need not always be the case), they can only be dealt with through legislative or administrative means. Either States adopt a *new law* that settles the conflict.  Or then the institutions will seek to coordinate their jurisprudence in the future.

**(b)    Fragmentation through the emergence of special law as exception to the general law**

53.    A different case is one where an institution makes a decision that deviates from how situations of a similar type have been decided in the past because the new case is held to come not under the general rule but to form an *exception* to it.  This may be illustrated by the treatment of reservations by human rights organs.  In the 1988 *Belilos* case the European Court of Human Rights viewed a declaration made by Switzerland in its instrument of ratification as in fact a reservation, struck it down as incompatible with the object and purpose of the Convention, and held Switzerland bound by the Convention "irrespective of the validity of the declaration".[54]  In subsequent cases, the European Court has pointed out that the normal rules on reservations to treaties do not as such apply to human rights law.  In the Court's view:

> … a fundamental difference in the role and purpose of the respective tribunals
> [i.e. of the ICJ and the ECHR], coupled with the existence of a practice of unconditional
> acceptance […] provides a compelling basis for distinguishing Convention practice
> from that of the International Court.[55]

54.    Again, the point is neither to endorse nor to criticize the European Court of Human Rights but to point to a phenomenon which, whatever one may think about it, has to do with

---

[53] From a systems-theoretical perspective, the position of courts is absolutely central in managing the functional differentiation - i.e. fragmentation - within the law.  Coherence here is based on the duty to decide even "hard cases".  See in this regard especially Niklas Luhmann, *Law as a Social System* (transl. by K.A. Zeigert, ed. by F. Kastner, R. Nobles, D. Schiff and R. Zeigert) (Oxford:  Oxford University Press 2004) especially pp. 284-296.

[54] *Belilos* v. *Switzerland*, Judgment of 29 April 1988, ECHR Series A (1988) No. 132, p. 28, para. 60.

[55] *Loizidou* v. *Turkey*, Preliminary Objections, Judgment of 23 March 1995, ECHR Series A (1995) No. 310, p. 29, para. 67.

A/CN.4/L.682
page 34

the emergence of exceptions or patterns of exception in regard to some subject-matter, that deviate from the general law and that are justified because of the special properties of that subject-matter.

**(c)      Fragmentation as differentiation between types of special law**

55.      Finally, a third case is a conflict between different types of special law.  This may be illustrated by reference to debates on trade and environment.  In the 1998 *Beef Hormones* case, the Appellate Body of the World Trade Organization (WTO) considered the status of the so-called "precautionary principle" under the WTO covered treaties, especially the Agreement on Sanitary and Phytosanitary Substances (SPS Agreement).  It concluded that whatever the status of that principle "under international environmental law", it had not become binding for the WTO.[56]  This approach suggests that "environmental law" and "trade law" might be governed by different principles.  Which rule to apply would then depend on how a case would be qualified in this regard.  This might seem problematic as denominations such as "trade law" or "environmental law" have no clear boundaries.  For example, maritime transport of oil links to both trade and environment, as well as to the rules on the law of the sea.  Should the obligations of a ship owner in regard to the technical particularities of a ship, for instance, be determined by reference to what is reasonable from the perspective of oil transport considered as a commercial activity or as an environmentally dangerous activity?  The responses are bound to vary depending on which one chooses as the relevant frame of legal interpretation.

### 2. The function and scope of the *lex specialis* maxim

**(a)      *Lex specialis* in international law**

**(i)      Legal doctrine**

56.      The principle that special law derogates from general law is a widely accepted maxim of legal interpretation and technique for the resolution of normative conflicts.[57]  It suggests that if a

---

[56]  European Communities - Measures Concerning Meat and Meat Products (Hormones) 13 February 1998, WT/DS26/AB/R, WT/DS48/AB/R, paras. 123-125.

[57]  The principle *lex specialis derogat lege generali* has a long history.  The principle was included in the Corpus Iuris Civilis.  See Papinian, Dig. 48, 19,41 and Dig. 50, 17,80.  The latter states:  "in toto iure generi per speciem

matter is being regulated by a general standard as well as a more specific rule, then the latter should take precedence over the former.  The relationship between the general standard and the specific rule may, however, be conceived in two ways.  One is the case where the specific rule should be read and understood within the confines or against the background of the general standard, typically as an elaboration, updating or a technical specification of the latter.[58]  The specific and the general point, as it were, in the same direction.

57.      Sometimes *lex specialis* is, however, understood more narrowly to cover the case where two legal provisions that are both valid and applicable, are in no express hierarchical relationship, and provide incompatible direction on how to deal with the same set of facts.  In such case, *lex specialis* appears as a conflict-solution technique.  It suggests that instead of the (general) rule, one should apply the (specific) exception.[59]  In both cases, however, priority falls on the provision which is "special", that is, the rule with a more precisely delimited scope of application.[60]

58.      Nonetheless, the maxim does not admit of automatic application.  In particular two sets of difficulties may be highlighted.  First, it is often hard to distinguish what is "general" and what is "particular" and paying attention to the substantive coverage of a provision or to the number of legal subjects to whom it is directed one may arrive at different conclusions.  An

---

derogatur et illud potissimum habetur, quod ad speciem derectum est" (Transl. "in the whole of law, special takes precedence over genus, and anything that relates species is regarded as most important").  The Digest of Justinian vol. IV, (Philadelphia:  University of Pennsylvania Press, 1985) Latin text ed. by T. Mommsen and P. Kruger). Some of its alternative formulations are "*Generalibus specialia derogant*", "*Generi per speciem derogatur*", "*specialia generalibus, non generalia specialibus*".  This report does not deal with another, close variant, namely the *ejusdem generis* rule, that is the rule of interpretation according to which special words control the meaning of general ones.  For a discussion, see Lord A.D. McNair, *The Law of Treaties* (Oxford:  Clarendon Press, 1961) 2nd ed, pp. 393-399.

[58]  This understanding appears e.g. in Jan B. Mus, "Conflicts between Treaties … supra note 21, p. 218. Fitzmaurice, too, thinks there is *lex specialis* when "a specific provision … is thereby taken out of the scope of a general provision", Sir Gerald Fitzmaurice, "The Law and Procedure of the International Court of Justice 1951-4: Treaty Interpretation and other Treaty Points", BYBIL, vol. 33 (1957) p. 236.

[59]  Alexander Peczenik, *Juridikens metodproblem* (Stockholm:  Gebers, 1980) p. 106.

[60]  That is, when the description of the scope of application in one provision contains at least one quality that is not singled out in the other. Karl Larenz, *Methodenlehre der Rechtswissenschaft* ( Berlin: Springer, 1975) pp. 251-252.

A/CN.4/L.682
page 36

example would be provided by a relationship between a territorially limited general regime and a universal treaty on some specific subject.[61]  Second, the principle also has an unclear relationship to other maxims of interpretation or conflict-solution techniques such as, for instance, the principle *lex posterior derogat legi priori* (later law overrides prior law) and may be offset by normative hierarchies or informal views about "relevance" or "importance".[62]

59.     The idea that special enjoys priority over general has a long pedigree in international jurisprudence as well.  Its rationale is well expressed already by Grotius:

> *What rules ought to be observed in such cases* [i.e. where parts of a document are in conflict].  Among agreements which are equal … that should be given preference which is most specific and approaches most nearly to the subject in hand, for special provisions are ordinarily more effective than those that are general.[63]

60.     This passage refers to two reasons why the *lex specialis* rule is so widely accepted.  A special rule is more to the point ("approaches most nearly to the subject in hand") than a general one and it regulates the matter more effectively ("are ordinarily more effective") than general rules.  This could also be expressed by saying that special rules are better able to take account of particular circumstances.  The need to comply with them is felt more acutely than is the case with general rules.[64]  They have greater clarity and definiteness and are thus often felt "harder"

---

[61]  Such conflicts, Jenks suggests, can only be decided on their merits.  See C. Wilfried Jenks, "The Conflict of Law-Making …", supra note 8, p. 447.

[62]  For different possibilities, see Hannu T. Klami, "Legal Heuristics: A Theoretical Skeleton", *Oikeustiede-Jurisprudentia* 1982, pp. 46-53.  See also Seyed Ali Sadat-Akhavi, *Methods of Resolving Conflicts …* supra note 21, pp. 189-191.  For examples of cases where a more general treaty overrides a more specific one because of its "relevance" or "overriding character", see ibid. pp. 114-125 and 125-131 and passim.  Ian Sinclair speaks of a mixture of techniques and maxims in Ian Sinclair, *The Vienna Convention on the Law of Treaties* (Manchester:  Manchester University Press, 1984), 2nd ed, pp. 95-98.

[63]  Hugo Grotius, *De Jure belli ac pacis.  Libri Tres*, Edited by James Brown Scott, The Classics of International Law (Oxford:  Clarendon Press, 1925) Book II, Chap. XVI, Sect. XXIX, p. 428.

[64]  For the reasoning behind the need to prefer "special" over "general", see also Pierre Marie Dupuy, "L'unité de l'ordre juridique internationale …", supra note 14, pp. 428-9.

or more "binding" than general rules which may stay in the background and be applied only rarely.  Moreover, *lex specialis* may also seem useful as it may provide better access to what the parties may have willed.[65]

61.      It is therefore no wonder that literature generally accepts the *lex specialis* as a valid maxim of interpretation or conflict-solution technique in public international law, too, although it is seldom given lengthy treatment.  The classical writers (Pufendorf, Vattel) accepted it among other techniques as a matter of course.[66]  Anzilotti gave it a rather absolute formulation: "*in toto jure genus per speciem derogatur*; la norme de droit particulière l'emporte sur la norme générale".  As was consistent with his voluntarism, a treaty between two States would prevail over a multilateral treaty just like the latter would have priority over customary law.[67]  For him as, for example, for Charles Rousseau, the power of the *lex specialis* maxim lay in the way in which it seemed to realize party will.[68]  For Georges Scelle, by contrast, a special rule would only rarely be allowed to override what he called "l'économie d'ensemble" of the general law.  It followed from his sociological anti-voluntarism that general regulation, expressive of an objective sociological interest would always prevent contracting out by individual States.[69]

62.      It seems clear, however, that both approaches are too absolute - either too respectful of the wills of individual States or then not respectful enough of the need to deviate from abstract

---

[65]   See also Joost Pauwelyn, *Conflict of Norms ...* supra note 21 p. 388.  For the voluntarist understanding of *lex specialis*, rebuttable in view of other evidence, see Nancy Kontou, *The Termination of Treaties in Light of New Customary International Law* (Oxford:  Clarendon Press, 1994) p. 142 and the references therein.

[66]   Samuel Pufendorf, Le droit de la nature et des gens ou système général des principes les plus importants de la morale, de la jurisprudence, et de la politique, Transl. by J. Barbeyrac (Basle:  Thourneisen, 1732), Bk. V, Ch. XII, pp.138-140; Emmerich de Vattel, Le droit des gens ou principes de la Loi Naturelle, appliqués à la conduite et aux affaires des nations et des Souverains (2 vols, Londres, 1758), Tome I, Livre II, Ch. XVII, p. 511, para. 316.

[67]   Dionisio Anzilotti, *Cours de droit international*, tôme I (transl. by Gilbert Gidel) (Paris: Sirey, 1929) p. 103.

[68]   Charles Rousseau, "De la compatibilité des norms …", supra note 36, p. 177.

[69]   Georges Scelle, *Cours de droit international public* (Paris:  Domat-Montchrestien, 1948) p. 642.

A/CN.4/L.682
page 38

maxims. Later lawyers stress the relativity of the *lex specialis* principle, the need to balance it with the *lex posterior* as well as the hierarchical status that the more general provision may enjoy.[70]

63.    The International Law Commission has outlined its application in some length in the commentary to article 55 of the Draft articles on responsibility of States for internationally wrongful acts:

### Article 55

### *Lex specialis*

These articles do not apply where and to the extent that the conditions for the existence of an internationally wrongful act or the content or implementation of the international responsibility of a State are governed by special rules of international law.

64.    This provision establishes a normative priority for any special rules in its field of application. Or, as the Commission explains in the Commentary, it means "that the present articles operate in a residual way".[71] The provision expresses clearly the wish of the Commission to allow States to develop, apply and to derogate from the general rules of State responsibility by agreements between themselves. Yet, of course, such power cannot be unlimited: the rules that derogate must have at least the same rank as those they derogate from. It is hard to see how States could, for example, derogate from those aspects of the general law on State responsibility that define the conditions of operation of "serious breaches of obligations under peremptory norms of general international law".[72]

65.    In doctrine, *lex specialis* is usually discussed as one factor among others in treaty interpretation (articles 31-33 VCLT) or in dealing with the question of successive treaties

---

[70]  See e.g. Arrigo Cavaglieri, "Régles générales de droit de la paix", *Recueil des Cours* … vol. 26 (1929-I) p. 334; Gerald Eulalio do Nascimento e Silva, "Le facteur temps et les traités", *Recueil des Cours ...* vol. 154 (1977-I) p. 246.

[71]  Draft Articles on State Responsibility, Commentary on Article 55, para. 2 *in Official Records of the General Assembly, Fifty-third Session*, *Supplement No. 10* (A/56/10) p. 356.

[72]  Draft Articles on State Responsibility, Commentaries on Articles 40-41 and 48 in ibid., pp. 282-292, 318-324.

(article 30 VCLT, especially in relation to the principle of *lex posterior*).[73]  Although the principle did not find its way into the text of the VCLT, it was still observed during its drafting process that among the techniques of resolving conflicts between treaties it was useful to pay attention to the extent to which a treaty might be "special" in relation to another treaty.[74]

66.     But there is no reason to limit the operation of *lex specialis* to relationships between treaties.  Jennings and Watts, for instance, indicate that the principle "has sometimes been applied to resolve apparent conflicts between two differing and potentially applicable rules" and specifically point out that its scope of application is not limited to treaty law.  Like many others, they stress its indicative role as a "discretionary aide" that is "expressive of common sense and normal grammatical usage".[75]  As such, it is often held to regulate the relationship between treaty (as *lex specialis*) and custom (as "general law").[76]

67.     Uncertainties about the nature of legal interpretation are equally applicable to the role of the *lex specialis*.  As O'Connell has put it:  "Writers have divided into those who believe it is possible to formulate definite rules for interpretation and those who believe that this is a

---

[73]  In addition to sources already cited, see e.g. Charles Rousseau, "De la compatibilité des normes …" supra note 36, pp. 133-192, especially pp. 177-8, 188-9; Jenks, "The Conflict of Law-Making …", supra note 8, pp. 401-453, especially pp. 446-447; Manfred Zuleeg, "Vertragskonkurrenz im Völkerrecht. teil I:  Verträge zwischen souveränen Staaten", GYBIL vol 20 (1977) pp. 246-276, especially pp. 256-259; V. Czaplinski & G. Danilenko, "Conflict of Norms in International Law", *Netherlands Yearbook of International Law*, vol. XXI (1990) pp. 20-21; Kontou, *The Termination of Treaties* … supra note 65, pp. 141-144; Malgosia Fitzmaurice & Olufemi Elias, *Contemporary Issues in the Law of Treaties* (Utrecht: Eleven International Publishing, 2005) especially pp. 314-348.  See also Myres S. McDougal, Harold D. Lasswell & James C. Miller, *The Interpretation of International Agreements and World Public Order:  principles of content and procedure* (New Haven and Martinus Nijhoff Publishers Dordrecht: New Haven Press, 1994) pp. 199-206; Sinclair, *The Vienna Convention* … supra note 62, p. 98; Anthony Aust, *Modern Treaty Law and Practice* ( Cambridge: Cambridge University Press, 2000) p. 201.  See also Patrick Daillier and Alain Pellet, *Droit international public* (Paris:  Librairie générale de droit et de jurisprudence: 2002) 7th ed., p. 271 (discussing *lex specialis* in the context of article 30 (3) of the VCLT). Very few commentators expressly reject the principle.  See, however, Ulf Linderfalk, *Om tolkning av traktater* (Lund:  Lunds universitet, 2001) pp. 353-4 (thinking it is covered by some techniques, overridden by others).

[74]  Statement of the Expert Consultant (Waldock), United Nations Conference on the Law of Treaties, Second Session, Vienna 9 April-22 May 1969, *Official Records* (The United Nations, New York, 1970) p. 270.  See also Paul Reuter, *Introduction au droit des traités* (Paris:  Presses Universitaires de France, 1985) 2nd edn, p. 112.

[75]  Sir Robert Jennings & Sir Arthur Watts, *Oppenheim's* … supra note 37 vol. I, pp. 1270, 1280.

[76]  See e.g. Mark E. Villiger, *Customary International Law and Treaties:  a study of their interactions and interrelations with special consideration of the 1969 Vienna Convention on the Law of Treaties* (Dordrecht: Nijhoff, 1985) p. 161.

A/CN.4/L.682
page 40

delusion".[77]  This is probably why a number of manuals do not mention the principle at all.  If one thinks that legal interpretation is rather "art than a science", then, of course, there seems little point to tie it down to technical rules or maxims.[78]  Nevertheless, dismissing the principle may follow from an excessive expectation of the normative power of interpretative guidelines.  The merits that lead interpreters to prefer special law to general law, outlined by Grotius above, provide a reason to include it among the pragmatic considerations that lawyers should take account.  With good reason, Schwarzenberger sees this whole branch of the law - namely interpretation - as an aspect of what he calls *jus aequum* - i.e. the rule that "enjoins the parties to apply each treaty in a spirit of reasonableness and good faith".[79]  As an interpretative guideline, *lex specialis* does articulate  important concerns:  the need to ensure the practical relevancy and effectiveness of the standard as well as to preserve what is often a useful guide to party intentions.  These need, of course, to be balanced against countervailing ones:  the hierarchical position of the relevant standard and other evidences of State intent.  But however the "balance" is conceived, all of this takes place within an argumentative practice that seeks to justify its outcomes less in terms of technical applications than as contributions to a purposive system of law.

### (ii)    Case law

68.    Also international case-law appears to accept the *lex specialis* maxim although again normally without great elaboration.  Four different situations may be distinguished.  The maxim may operate (a) within a single instrument; (b) between two different instruments; (c) between a treaty and a non-treaty standard and (d) between two non-treaty standards.

69.    The *Beagle Channel Arbitration* had to do with the relation of articles II and III of a Boundary Treaty of 1881 both of which dealt with the drawing of the borders.  According to the Arbitral tribunal, article II did not specify in detail the delimitation of the *Tierra del Fuego*

---

[77]  D.P. O'Connell, *International Law* (London:  Stevens and Sons, 1970), vol. I, p. 253.

[78]  See Martti Koskenniemi, *From Apology to Utopia.  The Structure of International Legal Argument* (Reissue with a new Epilogue, Cambridge: Cambridge University Press, 2005) p. 338-339.

[79]  Georg Schwarzenberger, *International Law* (London: Stevens and Sons, 1957) 3rd ed., vol, I, pp. 474, 477 et seq. See also Pauwelyn, *Conflict of Norms …*, supra note 21, p. 388.

and of certain disputed islands. Instead, this was left for article III. While the two articles dealt with the same territories, they did not duplicate each other or create anomalies or redundancies:[80]

> … all conflicts or anomalies can be disposed of by applying the rule *generalia specialibus non derogant*, on which basis Article II (*generalia*) would give way to Article III (*specialia*), the latter prevailing; …[81]

70.     This is the standard case where *lex specialis* appears within one and the same instrument, regulating the relations between two of its provisions.[82] The rationale for its use may be received alternatively from the principle of "normal meaning" in article 31 (1) VCLT or then from the need to respect party intention.

71.     The European Court of Human Rights has frequently applied *lex specialis* in articulating the nature of the relationship between provisions in the European Convention of Human Rights. The Court has for instance, considered the relation between article 13 that provides a right for an "effective remedy before a national authority" and article 5 (4) that stipulates that anyone deprived of his liberty shall "be entitled to take proceedings by which the lawfulness of his detention shall be decided speedily by a court and his release ordered if the detention is not lawful". It has seemed to follow that:

> since the requirements of Article 13 are less strict than those of Article 5 para. 4, [the latter] must be regarded as the *lex specialis* in respect of complaints under Article 5.[83]

---

[80]  *Beagle Channel Arbitration (Argentina v. Chile)* ILR vol. 52 (1979) p. 141, paras. 36, 38.

[81]  Ibid., p. 142, para. 39.

[82]  See also the discussion of the European Court of Justice, of the relationship of articles 5 (1) and 13 of the Brussels Convention of 1968 on Jurisdiction and Enforcement of Judgements in Civil and Commercial Matters. As the former provision related to "contractual matters in general" and the latter "specifically cover[ed] various types of contracts concluded by consumers", the latter constituted *lex specialis* in regard to the former, and it was sufficient to apply that provision, if it was applicable. In such case it became "unnecessary to examine whether [the claim] is covered by article 5(1)". Case C-96/00, *Rudolf Gabriel*, Judgment of 11 July 2002, ECR (2002) I-06367, pp. 6398-6399, paras. 35-36 and p. 6404, para. 59.

[83]  *Brannigan and McBride v. the United Kingdom*, Judgment of 28 May 1993, ECHR Series A (1993) No. 258, p. 57, para. 76. See also *De Jong, Baljet and van den Brink v. the Netherlands*, Judgment of 22 May 1984, ECHR Series A (1984) No. 77, p. 27, para. 60; *Murray v. the United Kingdom*, Judgment of 28 October 1994, ECHR Series A (1994) No. 300, p. 37, para. 98 and *Nikolova v. Bulgaria*, Judgment of 25 March 1999, ECHR 1999-II, p. 25, para. 69.

72.     Likewise, the European Court of Human Rights has considered article 6 of the Convention, providing a right to fair trial, as *lex specialis* in relation to the provision for "effective remedy" in article 13.[84]  And it has held that article 11 granting freedom of assembly and association may take precedence as *lex specialis* over freedom of expression provided in article 10.[85]

73.     These articles are not necessarily always in strict conflict and it might be possible to apply them concurrently.  In fact, article 5 (4) may also be seen as an *application* of article 13 in a particular case.  This is also true when two provisions are closely connected as is the case of freedom of expression and freedom of assembly.  Sometimes freedom of assembly may appear as *lex specialis* in relation to freedom of expression.  But the relationship may also be reversed. There is no reason why article 10 providing freedom of expression may be seen as *lex specialis* in relation to article 11 granting freedom of peaceful assembly.

74.     A second case is where *lex specialis* regulates the relationship between *different* instruments.  In the *Mavrommatis Palestine Concessions* case, the Permanent Court of International Justice was faced with two instruments that had a bearing on its jurisdiction, the 1922 Mandate for Palestine and the 1923 Protocol XII of the Treaty of Lausanne.  The Court concluded that "in cases of doubt, the Protocol, being a special and more recent agreement, should prevail".[86]  That view seemed to endorse both the *lex posterior* and the *lex specialis* maxims without entering into the question of their relationship.

75.     This matter has been treated in a general way within the World Trade Organization where Panels and the Appellate Body have occasionally resorted to *lex specialis* in the interpretation of

---

[84] *Yankov v. Bulgaria,* Judgment of 11 December 2003, ECHR 2003-XII, para. 150.  See also *Brualla Cómez de la Torre v. Spain,* Judgment of 19 December 1997, ECHR 1997-VIII, p. 2957, para. 41*; Vasilescu v. Romania,* Judgment of 22 May 1998, ECHR 1998-III, p. 1076, para. 43. Cf. *Kudla v. Poland,* Judgment of 26 October 2000, ECHR 2000-XI, p. 234-236, paras. 164-148.

[85] *Ezelin v. France,* Judgment of 26 April 1991, ECHR Series A (1991) No. 202, p. 20, para. 35 and *Djavit An v. Turkey,* Judgment of 20 February 2003, ECHR 2003-III, p. 251, para. 39.

[86] *Mavrommatis Palestine Concessions case, P.C.I.J. Series A*, No. 2 (1924) p. 31.

the covered treaties.[87]  In the *Turkey - Restrictions on Imports of Textile and Clothing Products* the panel emphasized that WTO Agreement is a "Single Undertaking" and the obligations of the members are cumulative.  Thus a special provision may only prevail over another provision if it is impossible to apply these two provisions simultaneously.[88]  In *Indonesia - Certain Measures Affecting the Automobile Industry* the panel similarly explained that there is a presumption against conflicts and for a conflict to exist, it must be between the same parties, deal with the same subject matter and the provisions must be mutually exclusive.[89]  In the WTO, *lex specialis* appears to have a limited role as a subsidiary means in conflict resolution.[90]

76.    When *lex specialis* is applied in a particular institutional context (within a "regime" in the language of section D below), then of course it is affected by the relevant (though not necessarily formal) institutional hierarchy.  The Court of First Instance of the EU was in 2000 called upon to determine the relationship between a regulation from 1981 that treated information obtained in customs investigations as confidential and a Commission decision of 1994 that provided public access to Commission documents.  The Court observed that the regulation

> … as far as it is to be applied as a *lex specialis*, cannot be interpreted in a sense contrary to [the decision] whose fundamental objective is to give citizens the opportunity to monitor more effectively the lawfulness of the exercise of public powers …[91]

---

[87]  These interpretations have taken place both between provisions in single instruments as well as between provisions in two different "covered treaties".  There appear to have been no cases of *lex specialis* reference between a WTO and a non-WTO treaty.  See *Brazil - Export Financing Programme for Aircraft,* 14 April 1999, WT/DS46/R, para. 7.40; *Turkey - Restrictions on Imports of Textile and Clothing Products,* 31 May 1999, WTO/DS34/R, para. 9.92 and *Indonesia - Certain Measures Affecting the Automobile Industry,* 2 July 1998, WT/DS54/, WT/DS55/R, WT/DS59/R, WT/DS64/R, paras. 14.28-14.34.

[88]  *Turkey - Restrictions on Imports of Textile and Clothing Products,* 31 May 1999, WT/DS34/R, para. 9.92.

[89]  *Indonesia - Certain Measures Affecting the Automobile Industry,* 2 July 1998, WT/DS54/, WT/DS55/R, WT/DS59/R, WT/DS64/R, para. 14.28.

[90]  *India - Quantitative Restrictions on Imports of Agricultural, Textile and Industrial Products,* 6 April 1999, WT/DS90/R, para. 4.20.

[91]  Case T-123/99, *JT's Corporation Ltd v. Commission of the European Communities,* Judgment of the Court of First Instance of 12 October 2000, ECR (2000) II-3269, p. 3292, para. 50.

A/CN.4/L.682
page 44

77.     The normative hierarchy between the earlier Council Regulation and the later Commission decision that incorporated a Code of Conduct concerning public access to Commission and Council documents may not have been quite clear.  Nonetheless, in this case, the Court interpreted a prior *lex specialis* which, if anything, was at least not of inferior status than the subsequent Commission decision, so as to be in conformity with the latter.[92]  It is not difficult to understand why considerations of transparency might in 1999 be overriding against a Regulation from 1981.  But this relationship was neither an "automatic" result of a formal hierarchy nor of *lex specialis* as a conflict-solution rule.

78.     A third case is the one where the *lex specialis* is resorted to in order to privilege a treaty standard to a non-treaty standard.  In the *INA Corporation v. Government of the Islamic Republic of Iran,* the corporation sought compensation for the expropriation of its 20 per cent share in an Iranian insurance company.  The claimant argued that on the basis of international law and the Iran-United States Treaty of Amity (1955), compensation should be "prompt, adequate and effective".  The respondent held that the compensation was to be calculated on the basis of the net book value of the nationalized shares.  The Tribunal considered that in cases of large-scale lawful nationalizations general international law no longer provided for full compensation.  It did not, however, attempt to establish the exact content of the customary norm as it considered that for the purposes of the case:

> we are in the presence of a *lex speciali*s in the form of the Treaty of Amity, which in principle prevails over general rules.[93]

---

[92]  A similar type of argument was employed in a recent case that dealt with the relationship between two directives, one dealing with waste (75/442 EEC of 15 July 1975) and the other, much more recent one, with packaging of waste (94/62 EC of 20 December 1994).  The provisions of the latter were identified by the ECJ as *lex specialis* vis-à-vis the former "so that its provisions prevail over" those if that earlier directives "in situations which it specifically seeks to regulate".  No full setting aside was involved however:  "Nevertheless", the Judgement reads, "Directive 75/442 remains very important for the interpretation and application of Directive 94/62".  Case C-444/00, *The Queen, on the application of Mayer Parry Recycling Ltd, v. Environment Agency and Secretary of State for the Environment, Transport and the Regions, and Corus (UK) Ltd and Allied Steel and Wire Ltd (ASW)*, Judgment of 19 June 2003, ECR (2003) I-06163, pp. 6228-6229, paras. 57 and 52.

[93]  *INA Corporation v. Iran,* Iran-US C.T.R. vol. 8, 1985-I, p. 378.

79.     That treaty rules enjoy priority over custom is merely an incident of the fact that most of general international law is *jus dispositivum* so that parties are entitled to derogate from it by establishing specific rights or obligations to govern their behaviour.  As the International Court of Justice has pointed out "it is well understood that, in practice, rules of [general] international law can, by agreement, be derogated from in particular cases or as between particular parties".[94] This approach, together with the practical priority of treaty over custom was also affirmed by the Court in the *Nicaragua* case:

> In general, treaty rules being *lex specialis*, it would not be appropriate that a State should bring a claim based on a customary-law rule if it has by treaty already provided means for settlement of a such a claim.[95]

80.     In the *Continental Shelf (Tunisia/Libyan Arab Jamahiriya)* case, the Court suggested that States might be able to opt out from the development of general law by this means.  It had been authorized by the Special Agreement to take into the "new accepted trends" in the Third United Nations Law of the Sea Conference.  In this regard, the Court noted that:

> it would no doubt have been possible for the Parties to identify in the Special Agreement certain specific developments in the law of the sea […], and to have declared that in their bilateral relations in the particular case such rules should be binding as *lex specialis*.[96]

81.     In these cases the Court accepted that general international law may be subject to derogation by agreement and that such agreement may be rationalized as *lex specialis*.  These cases illustrate the practice of international tribunals to give precedence to treaty law in matters where there is customary law as well - a practice that highlights the dispositive nature of custom

---

[94]  *North Sea Continental Shelf cases (Federal Republic of Germany/Denmark; Federal Republic of Germany/Netherlands) I.C.J. Reports 1969* p. 42, para. 72.  See, however, also pp. 38-39, paras. 61-65, ("general customary law rules and obligations … by their very nature, must have equal force for all members of the international community").

[95]  *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America) (Merits) I.C.J. Reports 1986* p. 137, para. 274.

[96]  *Case concerning the Continental Shelf (Tunisia/Libyan Arab Jamahiriya) (Judgment) I.C.J. Reports 1982* p. 38, para. 24.

A/CN.4/L.682
page 46

and the tribunals' deference to agreements as the "hardest" and presumably most legitimate basis on which their decisions can be based.  Thirlway summarizes the jurisprudence as follows:

> It is universally accepted that - consideration of *jus cogens* apart - a treaty as *lex specialis* is law between the parties to it in derogation of the general customary law which would otherwise have governed their relations.[97]

82.    None of this means that the general customary law would become thereby extinguished. It will continue to apply in the background and become fully applicable for instance when the treaty no longer is in force or, as in the *Nicaragua* case, if the jurisdiction of the relevant law-applying organ fails to cover the treaty.[98]

83.    An untypical use of *lex specialis* may be found in a case from 1981 in which the Iran-United States Claims Tribunal concluded that "it is a well-recognized and universal principle of interpretation that a special provision overrides a general provision".  The Tribunal here invoked *lex specialis* so as to argue that "the terms of the Claims Settlement Declaration are so detailed and so clear that they must necessarily prevail over the purported intentions of the parties, whatever they could have been".[99]  As such, the principle seems to have coalesced with the rule in favour of the "ordinary" meaning under article 31 (1) VCLT.

84.    A fourth case is where the same reasoning - though not necessarily the expression *lex specialis* - is applied to two non-treaty standards.  This was so in the *Right of Passage* case. After having determined that the practice which had been accepted by the States concerned (India and Britain/Portugal), established a right of transit over Indian territory, the Court no longer felt it necessary to investigate what the content of general law on transit passage may have been.  For it was evident to the Court that in any case "such a particular practice must prevail over any general rules".[100]  Though express practice is not abundant, it is hard to see

---

[97]  Hugh Thirlway, "The Law and procedure of the International Court of Justice", BYBIL vol. 60,  (1989) p. 147. Similarly for example Alfred Verdross & Bruno Simma, *Universelles Völkerrecht* (Berlin:  Duncker & Humblot, 1984) 3rd ed. pp. 414, 415.

[98]  See *Nicaragua* case, p. 96, para. 179.

[99]  *Case No. A/2*, Iran-US C.T.R. vol. 1, 1981-1982, p. 104.

[100]  *Case concerning the Right of Passage over Indian Territory (Portugal v. India) (Merits) I.C.J. Reports 1960* p. 44.

why *lex specialis* - or at least the reasoning behind it - would not be applicable to the relations between general and special custom. What is interesting in *Right of Passage* is the Court's use of what Thirlway calls the "perfectly recognized and respectable judicial technique" of setting aside any examination of the content of the general law once the special custom had been found in a way that leaves open whether the special rule was an elaboration or an exception to that general law or whether there was any general law in the matter in the first place.[101]

### (iii)    An informal hierarchy:  the point of *lex specialis*

85.    There is no formal hierarchy between the sources of international law.  A number of writers have - correctly, it is submitted - nonetheless suggested that there is a kind of informal hierarchy between them.  Inasmuch as "general law" does not have the status of *jus cogens,* treaties generally enjoy priority over custom and particular treaties over general treaties.[102] In the same vein, it may be assumed (as is indeed suggested by the *Right of Passage* case) that local customs (if proven) have primacy over general customary law and, perhaps, the body of customary law has primacy over the general principles of law under article 38 (1) (c) of the ICJ Statute.[103]  This informal hierarchy follows from no legislative enactment but, emerges as a "forensic"[104] or a "natural"[105] aspect of legal reasoning.  Any court or lawyer will first look at treaties, then custom and then the general principles of law for an answer to a normative problem.  "Empirically", Serge Sur writes, "the Court has given precedence to rules that have

---

[101]  Hugh Thirlway, "The Law and Procedure of the International Court of Justice 1960-1989", BYBIL vol. 61 (1990), pp. 104-106.

[102]  Verdross & Simma, *Universelles Völkerrecht,* supra note 97, pp. 413, 414; Thirlway, "The Law and procedure of the International Court of Justice", supra note 97, pp. 143-144.

[103]  In French doctrine, this result is sometimes achieved by distinguishing between *acte* and *norme,* or formal source and the (substantive) rule encompassed by it so that while there may be no hierarchy between the former, there must be rules for solving overlaps and conflicts between the latter.  See e.g. Daillier and  Pellet, *Droit international public*, supra note 73, pp. 114-116; Georges Abi-Saab, "Cours général de droit international public", *Recueil des Cours ...* vol. 207 (1999) p. 188.

[104]  Jennings & Watts, *Oppenheim's ...* supra note 37, p. 26, note 2.

[105]  Villiger, *Customary International Law* … supra note 76, p. 161.  Likewise, Hersch Lauterpacht, *International Law.  The Collected papers of Sir Hersch Lauterpacht,* Ed. by Eli Lauterpacht (Cambridge:  Cambridge University Press, 1970-1978) vol. I, pp. 86-88.

the highest degree of specialty, and the clearest and most objective manifestation".[106]  The secondary source is not extinguished thereby but plays a "residual part" in directing the interpretation of that special law and becoming applicable in its stead where the former cannot, for one reason or another, be applied.[107]

86.     Such informal hierarchy is an aspect of the pragmatics of legal reasoning that makes a difference between "easy" and "hard" cases.  As the special law's speciality reflects its relevance to context and its status as evidence of party will, its application seems often self-evident.  In such "easy" case, the speciality of the standard or instrument does not even emerge as an object of argument.  The need to look "behind" or "around" the prima facie standard or instrument arises only in "hard" cases, when its application is contested and another standard or instrument is invoked in its stead.  Only then the *lex specialis* maxim receives express relevance but even then it does so only in relation to countervailing constructions about how the context should be understood (e.g. is the case one of "integral" or "interdependent" obligation), deviating evidence of party intention (e.g. *lex posterior*) or hierarchy (e.g. *jus cogens*).

87.     When a "hard" case does emerge, then it is the role of *lex specialis* to point to a set of considerations with practical relevance:  the immediate accessibility and contextual sensitivity of the standard.  Now these may not be decisive considerations.  They may be overweighed by countervailing ones.  Reasoning about such considerations, though impossible to condense in determining rules or techniques, should not, however, be understood as arbitrary.[108]  The reasoning may be the object of criticism and whether it prevails will depend on how it succeeds in condensing what may be called, for instance, the "genuine shared expectations of the parties,

---

[106]  Serge Sur, *L'interpretation en droit international public* (Paris: LGDJ, 1974) p. 164.  Czaplinski and Danilenko speak of "priority of obligation", Czaplinski & Danilenko, "Conflict of Norms …", supra note 73, p. 8.

[107]  See e.g. the discussion by Rousseau of the *Polish Postal Service in Danzig* case, Advisory opinion, *P.C.I.J. Series B,* No. 11 (1925) in which the Versailles Treaty was to be complemented by bilateral talks between Danzig and Poland, "De la compatibilité des normes juridiques contradictoires dans l'ordre international", as well as the discussion of the and *Jurisdiction of the European commission of the Danube between Galatz and Braila*, Advisory opinion, *P.C.I.J. Series B,* No. 14 (1927), p. 177.

[108]  Pace strict positivists such as Kelsen.  See Hans Kelsen, *Introduction to Problems of Legal Theory,* Intr. and ed. by Paulson & Paulson, (Oxford, Clarendon Press, 1992)) pp. 81-84.

within the limits established by overriding community objectives",[109] as reflected and
tested against the various sources mentioned in article 38 (1) of the Statute of the ICJ, legal
precedent and doctrine.  In such debates, all parties assume that the justifiability of what they
say depends on how it links to such larger views about the purposes of the international legal
system.

**(b)      The two types of *lex specialis* reference**

88.      There are two ways in which law may take account of the relationship of a particular rule
to general one.  A particular rule may be considered an *application* of a general standard in a
given circumstance.  The special relates to the general as does administrative regulation to law in
domestic legal order.[110]  Or it may be considered as a *modification, overruling* or a *setting aside*
of the latter.[111]  The first case is sometimes seen as not a situation of normative conflict at all
but is taken to involve the *simultaneous* application of the special and the general standard.[112]
Thus, only the latter is thought to involve the application of a genuine *lex specialis*.  This seems
to be the position within the Dispute Settlement Body of the World Trade Organization.  While
there appears to be a strong emphasis on interpreting WTO obligations so that there would be
no conflict between them, the *lex specialis* principle is assumed to apply if "harmonious
interpretation" turns out to be impossible, that is, to overrule a general standard by a conflicting
special one.[113]

---

[109]  McDougal, Lasswell & Miller, *The Interpretation of International Agreements* …, supra note 73, p. 83.

[110]  This is how Scelle describes the functioning of *lex specialis* in international law, Scelle, *Cours de droit ...* supra note 69, p. 642.

[111]  Jenks distinguishes between "conflict" and "divergence", Jenks, "The Conflict of Law-Making …", supra note 8, p. 425-7.  Likewise, Pauwelyn, *Conflict of Norms* ..., supra note 21, p. 6.

[112]  This appears to be the way Pauwelyn treats the matter.  While he accepts that it may not be easy to appreciate whether a case belongs to one or the other of the two categories, he holds to the analytical distinction and deals with the *lex specialis* only "as a rule to resolve conflict in the applicable law", ibid., p. 386.

[113]  See *Turkey - Restrictions on Imports of Textile and Clothing Products*, WT/DS34/R, 31 May 1999, paras. 9.92-9.96.  On the presumption against conflict in WTO law generally, see Pauwelyn, *Conflict of Norms* …, supra note 21, pp. 240-244.

A/CN.4/L.682
page 50

89.    Something like this may have been the assumption within the International Law Commission during the drafting of article 55 of the draft articles on responsibility of States for internationally wrongful acts.  In the Commentary, the Commission explained that:

> (4)    For the *lex specialis* principle to apply it is not enough that the same subject matter is dealt with by two provisions; there must be some actual inconsistency between them, or else a discernible intention that one provision is to exclude the other.

90.    The Commission supported its view by reference to the *Neumeister* case from the European Court of Human Rights.  In that case the Court had observed that the provision on compensation in case of unlawful arrest in article 5 (5) of the Convention was not *lex specialis* in relation to the general rule on compensation in article 50.  The former did not set aside the latter.  Instead, the two provisions worked concurrently.  The latter was to be "taken into account" when applying the former.[114]  More recently, however, the Court has frequently characterized similar cases as *lex specialis*.  Thus in the cases referred to in paragraph 71 that juxtapose the "effective remedy" rule of article 13 of the European Convention with the right to have one's detention speedily dealt with by a court under article 5 (4) have been dealt with by reference to *lex specialis*:

> According to the Court's established case-law, Article 5 (4) of the Convention constitutes a *lex specialis* in relation to the more general requirements of Article 13.  In the present case the facts underlying the applicant's complaint under Article 13 of the Convention are the same as those examined under Article 5 (4).  Accordingly, the Court need not examine the allegation of a violation of Article 13 in the view of its finding a violation of Article 5 (4).[115]

91.    In these as well as in many other cases the European Court of Human Rights has thought the *lex specialis* applicable even in the absence of direct conflict between two provisions and where it might be said that both apply concurrently.[116]  This is the proper approach.  There are

---

[114]  *Neumeister v. Austria (article 50)* Judgment of 7 May 1974, ECHR Series A (1974) No. 17, p. 13, para. 29.

[115]  *Nikolova v. Bulgaria*, Judgment of 25 March 1999, ECHR 1999-II, p. 25, para. 69.

[116]  See in this regard also Hans Aufricht, "Supersession of Treaties in International Law", Cornell Legal Quarterly vol. 37 (1951-52) p. 698 (special law being "supplementary" while the general law remains "controlling").

two reasons for why it is useful to consider the case of "application" in connection with the case where the *lex specialis* sets up an exception or involves a "setting aside".  First, it follows from the definition of the *lex specialis* adopted above that this case is also included:  the norm of application is more specific because it contains the general rule itself as one element in the definition of its scope of application.  Second, and more important, though the distinction is analytically sound, it is in practice seldom clear-cut.  It may often be difficult to say whether a rule "applies" a standard, "modifies" it or "derogates from" it.  An "application" or "modification" involves also a degree of "derogation" and "setting aside".  To decide which expression is appropriate requires an interpretation of both rules, and such interpretation, as follows from articles 31 and 32 VCLT, may also reach beyond a scrutiny of the expressions used in those rules.  This ambivalence was evident in the *Gabcíkovo-Nagymaros Project* case.  Here the International Court of Justice referred to *lex specialis* in the following way:

> … it is of cardinal importance that the Court has found that the 1977 Treaty is still in force and consequently governs the relationship between the Parties.  That relationship is also determined by the rules of other relevant conventions to which the two States are party, by the rules of general international law and, in this particular case, by the rules of State responsibility; but it is governed above all by the applicable rules of the 1977 Treaty as a *lex specialis*.[117]

92.    In this case, the Court left open what the relationship between the *lex specialis* - the 1977 Treaty - and the rest of the law might have been.  Whether or not that general law might have provided for a similar or a different directive was immaterial.  It sufficed to apply the treaty.  In the language adopted here:  the informally superior position of the 1977 Treaty led to its *setting aside* every other treaty and the general law without there ever having been a determination of any "conflict".  In this as well as in innumerable other cases there is no need (indeed, no possibility) to decide whether the *lex specialis* is used as an "interpretative maxim" or a "conflict-solution technique", whether it merely "applies" some more general standard or derogates from it.[118]  Indeed, even to ask this question may be beside the point.  In accordance

---

[117]  *Case concerning the Gabcíkovo-Nagymaros Project (Hungary/Slovakia) I.C.J. Reports 1997* p. 76, para. 132.

[118]  For discussion, see Jenks, "The Conflict of Law-Making …", supra note 8, pp. 408-420.

A/CN.4/L.682
page 52

with the informal hierarchy discussed above, the relevant special law applies, and that is all - unless another party raises the question of *jus cogens* or a prior obligation that might enjoy precedence for example under articles 30 or 41 VCLT.

93.     Sometimes a *lex specialis* relationship has been identified between two norms which, far from being in conflict with each other, point in the same direction while the relation "special"/"general" is associated with that of "means"/"ends".  As noted above, the European Court of Human Rights characterized the relation between article 10 of the European Convention on the freedom of expression and article 11 dealing with the freedom of assembly and movement by conceiving the latter as *lex specialis* in relation to the former:

> The Court notes that the issues of freedom of expression cannot in the present case be separated from that of freedom of assembly.  The protection of personal opinions, secured by Article 10 of the Convention, is one of the objectives of the freedom of peaceful assembly as enshrined in Article 11 of the Convention …  Thus, observing that the applicant's grievances relate mainly to alleged refusals of the "TRNC" authorities to grant him permits to cross over the "green line" and meet with Greek Cypriots, the Court considers that Article 11 of the Convention takes precedence as the *lex specialis* for assemblies, so that it is unnecessary to examine the issue under Article 10 separately.  The Court will, however, have regard to Article 10 when examining and interpreting Article 11.[119]

94.     There not only is no "conflict" between articles 10 and 11 but both point in the same direction:  their relationship is one of means/ends.  Yet why would "expression" be the purpose of "assemblies"; might not meaningful "assemblies" (as expression of democracy and self-government, for example) rather sometimes be understood as the purpose towards which a right of expression is only a means?  The relation of general and particular may often be complex and two-sided so that even as the particular sets aside the general, the latter - as the Court has noted - will continue to provide interpretative direction to the former.

95.     This example shows that fixing a definite relationship between two standards one which should be seen either as an application or an exception to the other may often be quite impossible.  It might, for example, be said that the "inherent right of self-defence" in Article 51

---

[119]  *Djavit An v. Turkey*, Judgment of 20 February 2003, ECHR 2003-III, p. 251, para. 39.

of the Charter of the United Nations is *lex specialis* in relation to the principle of non-use of force in Article 2 (4). The two rules have a very similar (though not identical) scope of application (they apply to inter-State use of armed force). Because Article 51 is more specific than Article 2 (4), it is applicable when its conditions are fulfilled. In this sense, Article 51 may sometimes "replace" or "set aside" the prohibition in Article 2 (4). But Article 51 may also be seen as an "application" of Article 2 (4) inasmuch as self-defence covers action against a State that has *violated* 2 (4). In this case, Article 51 strengthens and supports 2 (4) and provides instructions on what to do in some cases (namely those involving "armed attack") in case of breach of Article 2 (4). Both rules are now rationalized under the same purpose - the protection of the territorial integrity and political independence of States - of which they appear as particular applications. Article 51 now appears not so much an exception as a supplement to Article 2 (4).

96.    Or what to say of the place of *lex specialis* in the *Legality of the Threat or Use of Nuclear Weapons* case (1996)? Here the ICJ observed that both human rights law (namely the International Covenant on Civil and Political Rights) and the laws of armed conflict both applied "in times of war". Nevertheless, when it came to determine what was an "arbitrary deprivation of life" under Article 6 (1) of the Covenant, this fell "to be determined by the applicable *lex specialis*, namely the law applicable to armed conflict".[120] In this respect, the two fields of law applied concurrently, or within each other. From another perspective, however, the law of armed conflict - and in particular its more relaxed standard of killing - set aside whatever standard might have been provided under the practice of the Covenant.

97.    It follows that whether a rule is seen as an "application", "modification" or "exception" to another rule, depends on how we view those rules in the environment in which they are applied, including what we see as their object and purpose. Because separating "application" from "setting aside" would be artificial and distort the context in which the question of *lex specialis* emerges, it is proposed to include all of these questions under the *lex specialis* study.

---

[120] *Legality of the Threat or Use of Nuclear Weapons, Advisory opinion, I.C.J. Reports 1996* p. 240, para. 25.

A/CN.4/L.682
page 54

### (i)   *Lex specialis* **as an application or elaboration of** *lege generali*

98.    A rule may thus be *lex specialis* in regard to another rule as an application, updating or development thereof, or, which amounts to the same, as a supplement, a provider of instructions on what a general rule requires in some particular case.  A regional instrument may thus be *lex specialis* in regard to a universal one, and an agreement on technical implementation *lex specialis* in regard to a general "framework" instrument.[121]  Despite the way the particular rule now "applies" the general rule, it also sets aside the latter in a way that is not devoid of normative consequences.

99.    For example, many provisions in the 1987 Montreal Protocol on Substances that Deplete the Ozone Layer are special law in relation to the 1985 Vienna Convention on the Protection of the Ozone Layer.[122]  When States apply the emission reduction schedule in article 2 of the Montreal Protocol, they give concrete meaning to the general principles in the Vienna Convention.  Though it may be said that in such case they apply *both* the Protocol *and* the Convention, there is a sense in which the Protocol has now set aside the Convention.  In case of a dispute of what the relevant obligations are, the starting-point and focus of interpretation will now be the wording of the Protocol, and no longer of the Convention.  The special rule in the Protocol has become an independent and authoritative representative of what the Convention *means* in terms of the obligations it provides.  And yet, the Convention continues to express the

---

[121]  Examples of such relationships are included in Jenks, "The Conflict of Law-Making …", supra note 8 p. 408-420 and Sadat-Akhavi, *Methods of Resolving Conflicts* …., supra note 21, pp. 189-191 passim.  See also the Arbitral Tribunal in the *Southern Bluefin Tuna* case, where the Tribunal noted the frequent parallelism between treaties and that "the conclusion of an implementing convention does not necessarily vacate the obligations imposed by the framework convention upon parties to the implementation convention", ILM vol. 39  (2000) p. 1388, para. 52.  The Tribunal did not state whether this was a special application of the *lex specialis* or a setting aside of *lex specialis* because Japan had argued it replaced the obligations of the framework convention by those of the implementing convention fully.

[122]  Vienna Convention for the Protection of the Ozone Layer, 22 March 1985, United Nations,  *Treaty Series*, vol. 1513, p. 293; Montreal Protocol on Substances that Deplete Ozone Layer, 16 September 1987, United Nations, *Treaty Series*, vol. 1522, p.3; Adjustments to the Montreal Protocol on Substances that Deplete Ozone Layer, 29 June 1990, Annex II of the Report of the Second Meeting (UNEP/OzL.Pro.2/3); and depositary notification C.N.133.1991.TREATIES-3/2 of 27 August 1991 (rectification of the Spanish authentic text of the adjustments and amendment).  See also  ILM vol 30. (1991) p. 539 and Amendment to the Montreal Protocol on Substances that Deplete Ozone Layer, 29 June 1990, Annex II of the Report of the Second Meeting (UNEP/OzL.Pro.2/3); and depositary notification C.N.133.1991.TREATIES-3/2 of 27 August 1991 (rectification of the Spanish authentic text of the adjustments and amendment).  See also ILM vol 30. p. 541.

principles and purposes that also affect the interpretation and application of the Protocol. In other words, in "easy" cases, the Protocol is applied without controversy about how this should be done while in "hard" cases, a dispute about the Protocol's interpretation and application arises and will need to be resolved by recourse to, inter alia, the standards of the Convention.

100.    Similar thinking applies even if the special law is intended completely to replace the general law. As the Iran-US Claims Tribunal stated in the *Amoco International Finance Corporation v. Iran*:

> As a *lex specialis* in the relations between the two countries, the Treaty supersedes the *lex generalis*, namely customary international law. This does not mean, however, that the latter is irrelevant in the instant Case. On the contrary, the rules of customary law may be useful in order to fill in possible *lacunae* of the Treaty, to ascertain the meaning of undefined terms in its text or, more generally, to aid interpretation and implementation of its provision.[123]

101.    This is no different from the above-mentioned *Neumeister* case where the European Court of Human Rights refused to hold article 5 (5) of the Convention as *lex specialis* in regard to article 50 because of its *a priori* view that *lex specialis* must involve a conflict. The Court distinguished the two provisions by the fact that article 5 (5) was a rule of "substance" while article 50 dealt with the competence of the Court. The latter was nonetheless to be "taken into consideration" when applying the former.[124] Though the Court here refrained from invoking *lex specialis*, in its later jurisprudence, it has done this.[125]

---

[123] *Amoco International Finance Corporation v. Iran*, Iran-US. C.T.R., vol. 15 1987-II, p. 222.

[124] *Neumeister v. Austria*, Judgment of 7 May 1974, ECHR Series A (1974) No. 17, p. 13, para 30.

[125] Somewhat parallel was the situation of a United Nations Tribunal in Libya which, in 1955, faced a challenge to its jurisdiction under articles VII and X of its founding General Assembly resolution (388 (V) of 15 December 1950). It was stated by Libya that as the question of confiscation had been dealt with under the former article, and not in the latter which provided for the Tribunal's jurisdiction, such jurisdiction did not cover it. Libya formulated this point as follows "[I]l est un principe juridique universel, en matière d'interprétation, qu'en cas de conflit entre un texte général et un texte spécial, c'est le dernier qui doit l'emporter". The Tribunal rejected this objection, stating that article VII merely "specified" the fact that the Tribunal would have jurisdiction - which it exercised generally under article X - also in regard to confiscated properties. See Décision rendue le 27 juin 1955 dans l'affaire relative aux institutions, sociétés et associations visées à l'article 5 de l'accord conclu, en date du 28 juin 1951, entre les gouvernements Britannique et Italien, concernant la disposition de certains biens Italiens en Libye, UNRIAA, vol. XII, p. 388.

102.    In both cases - that is, either as an application of or a derogation from the general law - the point of the *lex specialis* rule is to indicate which rule should be applied.  In both cases, the special, as it were, steps in to become applicable instead of the general.  Such replacement remains, however, always only partial.  The more general rule remains in the background providing interpretative direction to the special one.  Thus, in the recent *Oil Platforms* case, the general law concerning the use of force was applied to give meaning to a wide standard of "necessity" in the relevant *lex specialis*, the 1955 Treaty of Amity between Iran and the United States.  It was not that a particularly important *lex generalis* would have set aside *lex specialis* but that the latter received its meaning from the former.[126]

### (ii)    *Lex specialis* as an exception to the general rule

103.    As pointed out above, most of general international law is dispositive and can be derogated from by way of exception.  But an "exception", too, works only in a relative sense so that whatever is being "set aside" will continue to have an effect on the interpretation and application of the exception.  It is often stated that the laws of war are *lex specialis* in relation to rules laying out the peace-time norms relating to the same subjects.[127]  In the *Legality of the Threat or Use of Nuclear Weapons* case, the ICJ discussed the relationship between the International Covenant on Civil and Political Rights and the laws applicable in armed conflict. Article 6 (1) of the Covenant established the right not arbitrarily to be deprived of one's life. This right, the Court pointed out, applies also in hostilities.  However:

> The test of what is an arbitrary deprivation of life, however, then falls to be determined by the applicable *lex specialis*, namely, the law applicable in armed conflict which is designed to regulate the conduct of hostilities.[128]

---

[126]  As suggested by Emmanuel Jouannet, "Le juge international face auc problèmes de l'incoherence et d'instabilité de droit international.  Quelques reflexions à propos de l'arrêt CIJ du 6.11.2003", RGDIP vol. 108 (2004), p. 933, 936.

[127]  E.g. Jenks, "The Conflict of Law-Making …", supra note 8, p. 446; Wolfram Karl, "Treaties, Conflicts between", in *Encyclopaedia of Public International Law* (Amsterdam: Elsevier, 2000) vol. I, p. 937.

[128]  *Legality of the Threat or Use of Nuclear Weapons, Advisory opinion, I.C.J. Reports 1996* p. 240, para. 25.

104.    The example of the laws of war focuses on a case where the rule itself identifies the conditions in which it is to apply, namely the presence of an "armed conflict".  Owing to that condition, the rule appears more "special" than if no such condition had been identified.  To regard this as a situation of *lex specialis* draws attention to an important aspect of the operation of the principle.  Even as it works so as to justify recourse to an exception, what is being set aside does not vanish altogether.[129]  The Court was careful to point out that human rights law *continued to apply* within armed conflict.  The exception - humanitarian law - only affected one (albeit important) aspect of it, namely the relative assessment of "arbitrariness".  Humanitarian law as *lex specialis* did not suggest that human rights were abolished in war.  It did not function in a formal or absolute way but as an aspect of the pragmatics of the Court's reasoning. However desirable it might be to discard the difference between peace and armed conflict, the exception that war continues to be to the normality of peace could not be simply overlooked when determining what standards should be used to judge behaviour in those (exceptional) circumstances.  *Legality of Nuclear Weapons* was a "hard case" to the extent that a choice had to be made by the Court between different sets of rules none of which could fully extinguish the others.  *Lex specialis* did hardly more than indicate that though it might have been desirable to apply only human rights, such a solution would have been too idealistic, bearing in mind the speciality and persistence of armed conflict.  So the Court created a systemic view of the law in which the two sets of rules related to each other as today's reality and tomorrow's promise, with a view to the overriding need to ensure "the survival of a State".[130]

105.    The important point to retain here is that when *lex specialis* is invoked as an exception to the general law then what is being suggested is that the special nature of the facts justifies a deviation from what otherwise would be the "normal" course of action.  This highlights again the operation of *lex specialis* as an aspect making pragmatic judgements about relative "generality" and "speciality", about what is "normal" and what "exceptional".  Sometimes these distinctions

---

[129]  Though the marginal role left for human rights law in the opinion is perceptively criticized in Vera Gowlland-Debbas, "The Right to Life and Genocide:  The Court and International Public Policy", in Laurence Boisson de Chazournes & Philippe Sands (eds.) *International Law, the International Court of Justice and Nuclear Weapons* (Cambridge:  Cambridge University Press, 1999) pp. 321-326.

[130]  *Legality of the Threat or Use of Nuclear Weapons, Advisory opinion, I.C.J. Reports 1996* p. 267, para. 105 E.

A/CN.4/L.682
page 58

are made in an instrument itself.  Thus, article 4 of the International Covenant on Civil and
Political Rights provides for a right to derogate from certain clauses in the Covenant "[i]n time
of public emergency which threatens the life of the nation".  When that fact-condition is fulfilled,
a situation emerges that is not unlike the "armed conflict" that justified the application of laws of
war as referred to by the ICJ in the *Legality of Nuclear Weapons* opinion.  And like in the latter,
in times of public emergency, either a modicum of legality will continue to apply or what takes
its place is in fact a wholly unconstitutional legal vacuum.

106.    Often the fact-condition that makes a case "special" is not laid out in a treaty, however
but must be ascertained through the normal means through which the presence of a tacit
agreement, estoppel, effectivités, historic title, *rebus sic stantibus*, or, say, local custom
(*Right of Passage* case) is identified.  That assessment is dependent on and makes constant
reference to evaluative judgements of what is central and what marginal to a case, what
aspects of it should be singled out and what aspects may be glossed over.  Do *effectivités* or
"historical consolidation", for instance ground a kind of exception that is prior to formal "title",
or vice versa?  Sometimes (as in the *Pulau Ligitan and Pulau Sipadan* case) *effectivités* may
in fact ground title, sometimes a pre-existing title may turn any *effectivités* into an illegality
(*Bakassi Peninsula* case).  No *a priori* solution seems available.[131]

107.    Arguments from *effectivités*, like those from e.g. estoppel (*Temple of Preah Vihear*) and
historical title (*Anglo-Norwegian Fisheries*) resemble *lex specialis*.[132]  They, too, seek to make
the law responsive to particular situations.  They, too, create informal hierarchies that seek to
distinguish the special case from its general (and formal) background by pointing to a relevant
fact.  What they leave open, like the opinion in the *Legality of Nuclear Weapons* case, is on what

---

[131]  See *Case concerning Sovereignty over Pulau Ligitan and Pulau Sipadan (Indonesia/Malaysia)
I.C.J. Reports 2002* p. 682, para. 134 and p. 684, para. 145 (effectivités as basis of Malaysia's title) and
*Case concerning the Land and Maritime Boundary between Cameroon and Nigeria (Cameroon v. Nigeria:
Equatorial Guinea intervening) I.C.J. Reports 2002* p. 112, para. 223 and pp. 44-46, paras. 52, 54-55
(effectivités illegal).  See also *Case concerning the Frontier Dispute (Burkina Faso/Republic of Mali)
I.C.J. Reports 1986* p. 564, para. 18 ("in fact the concept of title may also, and more generally, comprehend
any evidence that may establish the existence of a right, and the actual source of that right").

[132]  *Case concerning the Temple of Preah Vihear (Cambodia v. Thailand) (Merits) I.C.J. Reports 1962 p. 23;
Fisheries Case (United Kingdom v. Norway) I.C.J. Reports 1951* pp. 130-131.

basis the relevant facts are singled out, what justifies the choice of the interpretative framework. To what extent does fact-description "armed conflict" influence the sense of the expression "arbitrary deprivation of life" in article 6 of the International Covenant on Civil and Political Rights? Here there is no single formula.[133] A weighing of different considerations must take place and if that weighing is to be something else than the expression of a preference, then it must seek reference from what may be argued as the systemic objectives of the law, providing its interpretative basis and *milieu*.

**(c)    Prohibited *lex specialis***

108.    Most of general international law may be derogated from by *lex specialis*. But sometimes a deviation is either prohibited expressly or may be derived from the nature of the general law. The case of *jus cogens* will be dealt with in section E below. In the recent *OSPAR* dispute (*Ireland v. the United Kingdom*), for example, the Arbitral Tribunal held it self-evident that its task was to apply, alongside the OSPAR Convention itself, also international custom and general principles of law to the extent they were not overridden by the Convention as *lex specialis*, adding however, that "[e]ven then, it must defer to then relevant *jus cogens* with which the parties' *lex specialis* may be inconsistent".[134] But aside from *jus cogens*, there may be other types of general law that may not permit derogation. In regard to conflicts between human rights norms, for instance, the one that is more favourable to the protected interest is usually held overriding.[135] At least derogation to the detriment of the beneficiaries would seem precluded.

109.    Whether derogation by way of *lex specialis* is permitted will remain a matter of interpreting the general law. Concerns that may seem pertinent include at least the following: the normative status of the general law (is it *jus cogens*?), who the beneficiaries of the

---

[133] As stressed e.g. by McDougal, Lasswell & Miller, *The Interpretation of International Agreements* … supra note 73, p. 206.

[134] Dispute Concerning Access to Information under Article 9 of the OSPAR Convention (Final Award, 2 July 2003) ILR vol. 126, (2005,) p. 364, para. 84.

[135] Karl, "Treaties, Conflicts between" … supra note 127, p. 939; Sadat-Akhavi, *Methods of Resolving Conflicts …,* supra note 21, p. 213-231. See also the Separate Opinion of Judges Eysinga and Schücking in *Oscar Chinn* case, *P.C.I.J. Series* A/B, No. 63 (1934) pp. 132-135, 149.

A/CN.4/L.682
page 60

obligations are (prohibition to deviate from law benefiting third parties, including individuals or non-State entities); whether non-derogation may be otherwise inferred from the terms of the general rule (for instance its "integral" or "interdependent" nature, its *erga omnes* character, or subsequent practice creating an expectation of non-derogation).[136]  Sometimes derogation - but equally application or modification - may be forbidden as it were to "disrupt the balance established under the general treaty between the rights and obligations of States parties thereto".[137]  Apart from treaties of a public law nature (however that category is defined), this would apply to constituent instruments of international organizations.[138]

110.    In practice, these considerations may sometimes raise a question about what is "derogation" in contrast to "application", "updating" or "modification".  Views on this may differ in a way reflecting divergent understandings of the general law.  Does a technical application threaten a fragile package-deal, for example?  Such problems cannot be resolved by looking at the special law alone but only in forming a view of the nature and reasonable purposes of the general law.

**(d)        The relational character of the general/special distinction**

111.    One of the difficulties in the *lex specialis* rule follows from the absence of clarity about the distinction between "general" and "special".  For every general rule is particular, too, in the sense that it deals with some particular substance, that is, includes a certain fact-description as a *general* condition of its application.  For example, the Convention on Anti-Personnel Landmines (Ottawa Treaty) lays down general law on the use of landmines.[139]  Yet this is also a "special"

---

[136]  For the distinction between normal ("reciprocal") and "integral" and "interdependent" obligations, see G.G. Fitzmaurice, Third Report on the law of treaties, *Yearbook ...1958* vol. II, p. 40, para. 76.  For the treatment of the distinction at the last stages of the State Responsibility project within the ILC, see James Crawford, Third Report on State Responsibility, document A/CN.4/507/Add.4 (2000) pp. 44-48, paras. 99-108.  See further section E below.

[137]  Sadat-Akhavi, *Methods of Resolving Conflicts* …, supra note 21, p. 131.

[138]  See e.g. Ignaz Seidl-Hohenveldern, "Hierarchy of Treaties", in Jan Klabbers & René Lefeber, *Essays on the Law of Treaties.  A Collection of Essays in Honour of Bert Vierdag* (The Hague:  Nijhoff, 1998) pp. 15-16; Karl, "Treaties, Conflicts between", supra note 127, p. 940.

[139]  Convention on the Prohibition of the Use, Stockpiling, Production and Transfer of Anti-Personnel Mines and on Their Destruction, 18 September 1997, United Nations, *Treaty Series*, vol. 2056, p. 211.

aspect of the general rules of humanitarian law.  On the other hand, all special law is general as it is a characteristic of rules that they apply to a class "generally".   Every rule may be expressed in the following format:  "for every p, it is true that the rule q applies". No rule applies to a single case.  Even where the occasions for the application of a rule are few, in order for the standard to be a *rule* (instead of an *order* to somebody) it must be generally defined.  This is reflected in the distinction made by many domestic laws between laws and acts, or *loi* and *acte*, *Gesetz* and *Massnahme.*

112.    Generality and speciality are thus relational.  A rule is never "general" or "special" in the abstract but in relation to some other rule.  This relationality functions in two registers.  A rule may be general or special in regard to its *subject-matter* (fact-description) or in regard to the *number of actors* whose behaviour is regulated by it.[140]  Thus, the use of anti-personnel mines is a *special subject* within the *general subject* of humanitarian law.  The distinction between general and local custom, again, provides an example of the register of number of actors covered.  The registers may overlap.  Thus, there may be a rule that is general in subject-matter (such as a good neighbourliness treaty) but valid for only in a special relationship between a limited number (two) of States.

### (i)    Speciality in regard to parties

113.    In considering *lex specialis* as a conflict-solution technique it is necessary to distinguish between cases where differing obligations are valid and applicable between the *same States* (A/B + A/B) and cases where the fulfilment of an obligation in one relationship (A/B) makes it impossible to fulfil an obligation in another relationship (A/C).  These cases are usually discussed in terms of successive treaties (article 30 VCLT) and though that set of issues will be the topic of section D of this Report, it may still be useful to say how, if at all, *lex specialis* functions in these relationships.

114.    In the first case (A/B + A/B) *lex specialis* does have a narrow field of application, A and B being entitled to amend their prior treaty or deviate from most general law as they wish.

---

[140]  Villiger, *Customary International Law* ..., supra note 76, p. 36; Kontou, *The Termination of Treaties* …, supra note 65,  pp. 19-20.

However, it cannot be automatically excluded that when two States conclude a generally worded treaty, for example, they thereby wish to abolish a prior, more specific treaty.  In such cases, *lex specialis* may have some value as an indication of party will:[141]  the *lex posterior* will not abrogate a prior treaty obligation if the speciality of that prior obligation may be taken as indication that the parties did not envisage this outcome.  The case where a limited number of parties to a multilateral treaty establish a special regime among themselves is, again, regulated as "modification" under article 41 of the VCLT and cannot be discussed here in any detail.

115.    The hard case is the one where a State (A) has undertaken conflicting obligations in regard to two (or more) different States (B and C) and the question arises which of the obligations shall prevail.  Here the *lex specialis* appears largely irrelevant.  Each bilateral (treaty) relationship is governed by *pacta sunt servanda* with effect towards third parties excluded.  Such conflict remains unregulated by article 30 of the VCLT.[142]  The State that is party to the conflicting instruments is in practice called upon to choose which treaty it will perform and which it will breach, with the consequence of State responsibility for the latter.[143]

### (ii)    Speciality in regard to "subject-matter"

116.    As pointed out above, whether a rule is "special" or "general" requires a relational assessment:  Special *in what sense*?  General *in what regard*?  Because only those that are in some respect similar can be compared - and indeed can enter into conflict - it must be assumed,

---

[141]  As observed by Rousseau, "De la compatibilité des normes …", supra note 36, p. 177; Manfred Zuleeg, "Vertragskonkurrenz im Völkerrecht. teil I:  Verträge zwischen souveränen Staaten)", GYBIL vol 20 (1977) pp. 246-276, p. 256.  See further McNair, *The Law of Treaties,* supra note 57, pp. 219-220.  This corresponds to article 30 (4) of the VCLT.  See also Mus, "Conflicts between Treaties …", supra note 21, pp. 217-219.

[142]  Lauterpacht originally proposed that the later treaty should be held void unless it possessed "a degree of generality which imputes to [it] the character of legislative enactment[ ]", Report on the Law of Treaties, *Yearbook … 1953* vol. II, pp. 156-159.  Later Special Rapporteurs (Fitzmaurice and Waldock), however, thought that this set the innocent party to the latter treaty at an unjustified disadvantage.

[143]  Zuleeg calls this the "principle of political freedom", "Vertragskonkurrenz im Völkerrecht ...", supra note 141, pp. 267-268.  See also Mus, "Conflicts between Treaties …", supra note 21, pp. 227-231.  The genesis and critique of article 30 of the VCLT is well expressed in Sur, *L'interpretation en droit ...,* supra note 106, pp. 167-171 and Sadat-Akhavi, *Methods of Resolving Conflicts ...,* supra note 21, pp. 59-84.  The most comprehensive discussion of the matter is Gyuora Binder, *Treaty Conflict and Political Contradiction. the Dialectic of Duplicity* (New York: Praeger, 1988).

together with Fitzmaurice, that *lex specialis* "can only apply where both the specific and general provisions concerned deal with the same substantive matter".[144]  Also the commentary to article 55 of the Draft articles on responsibility of States for internationally wrongful acts requires that for *lex specialis* to apply, the rules must deal with the same subject matter.[145]

117.    However, as noted in section B.2. above, the criterion of the "same subject-matter" as a condition for applying a conflict rule is too unspecific to be useful.  Different situations may be characterized differently depending on what regulatory purpose one has in mind.  In a sense, most activities in the international world relate to the "environment" - so is every issue an "environmental" issue to dealt with by environmental rules?  But most forms of international behaviour also have some bearing on "human rights" or "security".  These denominations are not about what rules should apply but how to characterize the relevant features of a state of affairs.

118.    The example given above was that of maritime carriage of hazardous substances. Depending on what the interpreter sees as the relevant consideration, the case comes under one or another set of rules as *lex specialis*:  is the point of the law to advance trade, flag or coastal State jurisdiction, or environmental protection?  None these perspectives enjoys intrinsic priority over the others.  This is why, in a hard case, a justifiable decision would have to take all of these into account by articulating some systemic relationship between them.  None can be simply brushed aside for the same reason that the ICJ in the *Legality of the Threat or Use of Nuclear Weapons* case did not brush aside human rights law or any of the other branches of the law (environmental law, humanitarian law, the law on the use of force) that had been invoked.  They were all in some regard *lex specialis*.  This does not mean that its decision - that it "cannot conclude definitively whether the threat or use of nuclear weapons would be lawful or unlawful in an extreme circumstance of self-defence, in which the very survival of a State would be at stake"[146] - would have been beyond reproach.  Perhaps the systemic unity that the Court

---

[144]  Sir Gerald Fitzmaurice, "The Law and Procedure of the International Court of Justice 1951-4:  Treaty Interpretation and Other Treaty Points", BYBIL vol. 33,  (1957) p. 237.

[145]  Draft Articles on State Responsibility, Commentary on Article 55, paras. 4-5 in *Official Records of the General Assembly, Fifty-sixth Session*, *Supplement No. 10* (A/56/10), 2001) p. 358-359.

[146]  *Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, I.C.J. Reports 1996* p. 266, para. 105 E (dispositif).

A/CN.4/L.682
page 64

canvassed and that peaked in the ultimate value of the "very survival of a State" could be submitted to critique. But the point is not whether this decision was correct but that in arriving to it none of the laws were "automatically" set aside. They all contributed to bringing relevant considerations into the advisory opinion whose authority lies precisely in the plausibility of what it then came to suggest as the law's determining purpose.

(e)    **Conclusion for *lex specialis*:  the omnipresence of "general law"**

119.    *Lex specialis derogat lege generali* refers to a standard technique of legal reasoning, operative in international law as in other fields of law understood as systems.  Its power is entirely dependent on the normative considerations for which it provides articulation:  sensitivity to context, capacity to reflect State will, concreteness, clarity, definiteness.  Its functioning cannot be assessed independently of the role of considerations of the latter type in specific context of legal reasoning.  How does a particular agreement relate to the general law around it? Does it implement or support the latter, or does it perhaps deviate from it?  Is the deviation tolerable or not?  *No general, context-independent answers can be given to such questions*.  In this sense, the *lex specialis* maxim cannot be meaningfully codified.

120.    The role of *lex specialis* cannot be dissociated from assessments about the nature and purposes of the general law that it proposes to modify, replace, update or deviate from.  This highlights the systemic nature of the reasoning of which arguments from "special law" are an inextricable part.  No rule, treaty, or custom, however special its subject-matter or limited the number of the States concerned by it, applies in a vacuum.  Its normative environment includes - as will be elaborated in more detail in section F below - not only whatever general law there may be on that very topic, but also principles that determine the relevant legal subjects, their basic rights and duties, and the forms through which those rights and duties may be supplemented, modified or extinguished.  Principles such as "sovereignty", "non-intervention", "self-determination", "sovereign equality", "non-use of force", *audiatur et altera pars,* "no one may prohibit from his wrong", and so on, as well as interpretative maxims such as *lex specialis* and *lex posterior*, together with a host of other techniques of legal reasoning all are part of this framework.

121.    The relationship between general law and particular rules is ubiquitous.  One can always ask of a particular rule of international law how it relates to its normative environment.  This may not always be visible.  States sometimes create particular rights and obligations where there appears to be no general law on the matter at all.  In such cases, these rights and obligations do not seem, on the face of them, to have the character of *leges speciales*.  They are not contrasted to anything more "general".  The normative area "around" such rules appears to remain a zone of no-law, just like the matter they now cover used to be before such new regulation entered into force.

122.    The foregoing reflections suggest, however, that whatever logical, conceptual or political problems there are around the old problem of "gaps" in international law,[147] there is at least one sense in which the idea of a zone of no-law as regards *lex specialis* is a conceptual *impossibility*.  If a legal subject invokes a right based on "special law", then the validity of that claim can only be decided by reference to the whole background of a legal system that tells how "special laws" are enacted, what is "special" about them, how they are implemented, modified and terminated.  It is impossible to make legal claims only in a limited sense, to opt for a part of the law, while leaving the rest out.  For legal reason works in a closed and circular system in which every recognition or non-recognition of a legal claim can only be decided by recognizing the correctness of other legal claims.  This can be illustrated in the matter of so-called "self-contained regimes".

### 3.  Self-contained (special) regimes

### (a)    What are self-contained regimes?

123.    The Commentary to article 55 (*lex specialis*) of the Commission's draft articles on responsibility of States for internationally wrongful acts makes a distinction between "weaker forms of *lex specialis*, such as specific treaty provisions on a single point" and "strong forms of *lex specialis,* including what are often referred to as self-contained regimes".  Though the

---

[147]  The present discussion is not intended to take sides in the debate about the permissibility or desirability of "*non liquet*", as discussed between Hersch Lauterpacht and Julius Stone and elaborated in the writings of Lucien Siorat, Gerald Fitzmaurice, or Ulrich Fastenrath, among others.

commentary refrains from defining what that "strong form" is, it gives two examples:  the judgment by the Permanent Court of International Justice in the *S.S. Wimbledon* case (1923) and that of the International Court of Justice in the *Hostages* case (1980).[148]

124.    This approach is not free of ambiguity.  The Commission recognized and defined self-contained regimes as a subcategory (namely a "strong form") of *lex specialis* within the law of State responsibility.  As such, it appears to cover the case where a special set of secondary rules claims priority over the secondary rules in the general law of State responsibility.  Such a definition closely follows the use of the term by the International Court of Justice in the *Hostages* case where the Court identified diplomatic law as a self-contained regime precisely by reference to the way it had set up its own "internal" system for reacting to breaches:

> The rules of diplomatic law, in short, constitute a self-contained regime which, on the one hand, lays down the receiving State's obligations regarding the facilities, privileges and immunities to be accorded to diplomatic missions and, on the other, foresees their possible abuse by members of the mission and specifies the means at the disposal of the receiving States to counter any such abuse.[149]

125.    In other words, no reciprocal breach of diplomatic immunity is permissible; the receiving State may only resort to remedies in diplomatic law which, the Court presumed, were "entirely efficacious".  In *Nicaragua*, the Court viewed human rights law somewhat analogously:  the relevant treaties had their own regime of accountability that made other ways of reaction inappropriate.[150]

126.    The judgment by the Permanent Court of International Justice in the *S.S. Wimbledon* case, however, uses a broader notion of a self-contained regime.  At issue here was the status of the Kiel Canal which was covered both by the general law on internal waterways as well as the

---

[148]  Draft Articles on State Responsibility, Commentary on Article 55, para. 5 in *Official Records of the General Assembly, Fifty-sixth Session*, *Supplement No. 10* (A/56/10), 2001) pp. 358-359.

[149]  *Case concerning the United States Diplomatic and Consular Staff in Tehran (United States of America v. Iran) I.C.J. Reports 1980* p. 41, para. 86.

[150]  The Court noted that the use of force was not "the appropriate method to ensure respect of human rights", for "when human rights are protected by international conventions, that protection takes the form of such arrangements for monitoring or ensuring respect for human rights as are provided in the conventions themselves.  *Nicaragua* case, paras. 267-8.

special rules on the Canal as laid down in the Treaty of Versailles of 1919.  Here is how the Court characterized the law applicable:

> Although the Kiel Canal, having been constructed by Germany in German territory, was, until 1919, an internal waterway of the State holding both banks, the Treaty [of Versailles] has taken care not to assimilate it to the other internal navigable waterways of the German Empire.  A special section has been created at the end of the Part XII … and in this section rules exclusively designed for the Kiel Canal have been inserted; these rules differ on more than one point from those to which other internal navigable waterways of the Empire are subjected …  The difference appears more specifically from the fact that the Kiel Canal is open to the war vessels and transit traffic of all nations at peace with Germany, whereas free access to the other German navigable waterways … is limited to the Allied and Associated Powers alone …  The provisions of the Kiel Canal are therefore self-contained.  The idea which underlies [them] is not to be sought by drawing an analogy from [provisions on other waterways] but rather by arguing *a contrario*, a method of argument which excludes them.[151]

127.    Now here the notion of a "self-contained regime" is not limited to a special set of secondary rules.  The "special" nature of the Kiel Canal regime appears instead to follow rather from the speciality of the relevant primary rules - especially obligations on Germany - laid down in the appropriate sections of the Treaty of Versailles than of any special rules concerning their breach.  Though the Court here used the expression "self-contained", it is hard to say whether it meant more than that where there were conventional rules on a problem, those rules would have priority over any external ones.  This is clearly the sense of that expression it employed in a 1925 opinion where it held that in order to interpret certain expressions in a treaty, it was unnecessary to refer to external sources:  "Everything therefore seems to indicate that, in regard to this point, the Convention is self-contained and that … the natural meaning of the words [should be employed]."[152]  This is of course a very common judicial technique and corresponds to the principle, stated in section C above, concerning the pragmatic priority of treaty rules over general law.[153]

---

[151]  *Case of the S.S. "Wimbledon", P.C.I.J. Series A,* No. 1 (1923) pp. 23-4.

[152]  *Exchange of Greek and Turkish Populations, Advisory opinion, P.C.I.J. Series B,* No. 10 (1925) p. 20.

[153]  This is frequently seen in territorial disputes.  If a treaty determines a territorial boundary, then there is no need to discuss *uti possidetis*, intertemporal law of the relevant *effectivités*.  See e.g. *Case concerning the Territorial Dispute (Libyan Arab Jamahiriya/Chad) I.C.J. Reports 1994* pp. 38-39, paras. 75-76.

A/CN.4/L.682
page 68

128.    Thus, provisionally, it is possible to distinguish between two uses for the notion of "self-contained regime".  In a narrow sense, the term is used to denote a special set of secondary rules under the law of State responsibility that claims primacy to the general rules concerning consequences of a violation.  In a broader sense, the term is used to refer to interrelated wholes of primary and secondary rules, sometimes also referred to as "systems" or "subsystems" of rules that cover some particular problem differently from the way it would be covered under general law.  That set of rules may either be a very limited one - for example, the regime of judicial cooperation between the International Criminal Court and States Parties under the Rome Statute[154] - or then it may be rather wide - such as, for instance, the technique of interpreting the European Convention on Human Rights as "an instrument of European public order (*ordre public*) for the protection of individual human beings".[155]  In this wider sense, self-containedness fuses with international law's contractual bias:  where a matter is regulated by a treaty, there is normally no reason to have recourse to other sources.

129.    But an occasional use of the notion of "self-contained regime" extends it even further than the *S.S. Wimbledon* case.  Sometimes whole fields of functional specialization, of diplomatic and academic expertise, are described as self-contained (whether or not that word is used) in the sense that special rules and techniques of interpretation and administration are thought to apply.[156]  For instance, fields such as "human rights law", "WTO law", "European law/EU law", "humanitarian law", "space law", among others, are often identified as "special" in the sense that rules of general international law are assumed to be modified or even excluded in their administration.  One often speaks of "principles of international environmental law", or "principles of international human rights law" with the assumption that in some way those principles differ from what the general law provides for analogous situations.

---

[154] For this suggestion, see Göran Sluiter, "The Surrender of War Criminals to the International Criminal Court", Loyola of Los Angeles International and Comparative Law Review, vol. 25 (2003) p. 629.

[155] *Cyprus v. Turkey*, Judgment of 10 May 2001, ECHR 2001-IV, p. 25, para. 78.

[156] This is implied in many of the essays in L.A.N.M. Barnhoorn & K.C. Wellens (eds.), *Diversity in Secondary Rules ...* supra note 12.

130.    For instance, the principle of "dynamic" or teleological interpretation is much more deeply embedded in human rights law than in general international law.[157]  In the view of the European Court of Human Rights, as is well-known, in applying a "normative treaty", one should look for its object and purpose and not to that interpretation that would provide the most limited understanding of the obligations of States parties.[158]  Making the contrast to general law even sharper, it has stated that:

> … unlike international treaties of the classic kind, the [European] Convention comprises more than merely reciprocal engagements between Contracting States.  It creates, over and above a network of mutual, bilateral relationships, objective obligations.[159]

131.    In comparing itself to the International Court of Justice, the European Court has found "such a fundamental difference in the role and purpose of the separate tribunals [which] provides a compelling basis for distinguishing Convention practice from that of the International Court".[160]  That this is not an idiosyncratic aspect of the European Convention, is suggested by the parallel attitudes within the Inter-American Court of Human Rights and the Human Rights Committee.[161]

---

[157]  For the role of "dynamic" or "teleological" interpretation in human rights law, see Patrick Wachsmann, "Les methodes de l'intérpretation des conventions à la protection des droits de l'homme", in:  SFDI, *La protection des droits de l'homme et l'évolution du droit international, Coll. 1998* (Paris: Pedone, 1998) pp. 188-193.  See also Lucius Caflisch & Antonio Cancado Trindade, "Les conventions americaine et européenne des droits de l'homme et le droit international général", 108 RGDIP vol. 108, (2004) pp. 11-22.

[158]  *Wemhoff v. FRG,* Judgment of 27 June 1968, ECHR (1968) Series A, No. 7, p. 23, para. 8.

[159]  *Ireland v. the United Kingdom*, Judgment of 18 January 1978, ECHR (1978) Series A, No. 25, p. 90, para. 239.  Likewise *The Effect of Reservations*, OC-2/82, Int-Am CHR Series A, No. 2, pp. 14-16, paras. 29-33 and *Restrictions to the Death Penalty,* OC-3/83, Int-Am CHR Series A, No. 3, pp. 76-77, para. 50.

[160]  *Loizidou v. Turkey* (Preliminary Objections) Judgment of 23 March 1995, ECHR (1995) Series A, No. 310, pp. 26-27, paras. 70-72 and p. 29, paras. 84-85.

[161]  Invoking the practice of the European Court, the Inter-American Court has identified as part of the "corpus juris of human rights law" the principle that "human rights treaties are living instruments whose interpreters must consider changes over time and present-day conditions", *Consular Assistance,* Advisory opinion of 1 October 1999, Int-Am CHR Series A, No. 16, pp. 256-7, paras. 114-115.  In its controversial General Comment No. 24 the United Nations Human Rights Committee stated that the provisions of the Vienna Convention on the Law of Treaties were "inappropriate to address the problem of reservations to human rights treaties.  Such treaties, and the Covenant in particular, are not a web of inter-State exchanges of mutual obligations.  They concern the endowment of individuals with rights.  The principle of inter-State reciprocity has no place …", General comment on issues

132.    A self-contained regime in this third sense has effect predominantly through providing interpretative guidance and direction that in some way deviates from the rules of general law.  It covers a very wide set of differently interrelated rule-systems and the degree to which general law is assumed to be affected varies extensively.  What, indeed, may be the normative sense of the division of international law into 17 different "topics" or "branches" in a 1971 Report to the Commission by the United Nations Secretariat?[162]  Even as it may be argued that such a classification is merely "relative" and serves principally didactic purposes, it is still common to link to the branches or subsystems thus identified with special legal principles concerning the administration of the relevant rules.[163]

133.    None of this is to say that the effect of a self-contained regime in this third sense would be clear or straightforward.  Indeed, writers such as Brownlie or Pellet have been quite critical of giving too much emphasis on the speciality of something like "human rights law".[164]  Likewise, the question whether "international environmental law" designates a special branch of international law within which apply other interpretative principles than apply generally, or merely an aggregate of treaty and customary rules dealing with the environment, may perhaps seem altogether too abstract to be of much relevance.[165]  The standard designation of the laws of armed conflict, for instance, as *lex specialis* and a self-contained regime - or even "a deviant body of rules of public international law"[166] - leaves it wide open to which extent the general

---

relating to reservations made upon ratification or accession to the Covenant of the Optional Protocols thereto, or in relation to declarations under article 41 of the Covenant, document CCPR/21/Rev.1/Add.6 (1994), see also ILM vol. 35 (1995) p. 839, para. 17.

[162]  Survey of International Law, Working Paper Prepared by the Secretary-General, *Yearbook ... 1971* vol. II, Part one, pp. 1-99.

[163]  See e.g. the discussion in Peter Malanczuk, "Space Law as a Branch of International Law" in Barnhoorn & Wellens, *Diversity in Secondary Rules ...* supra note 12 pp. 144-146.

[164]  See Ian Brownlie, *Principles of Public International Law* (Oxford:  Oxford University Press, 2003) 6th ed., pp. 529-530 (a criticism of the speciality of human rights law); Alain Pellet, "Droit de l'hommisme et droit international", Gilberto Amado Memorial Lecture, 18 July 2000 (United Nations 2000).

[165]  This issue is at the heart of Tuomas Kuokkanen, *International Law and the Environment.  Variations on a Theme* (The Hague:  Kluwer, 2002) (tracing a history of international lawyers' treatment of environmental problems from rather straightforward application of traditional rules to a complex management of resource regimes).

[166]  H.H.G. Post, "Some Curiosities in the Sources of the Law of Armed Conflict Conceived in a General International Legal Perspective" in Barnhoorn & Wellens, *Diversity in Secondary Rules ...*, supra note 12, p. 96.

rules of, say, the law of treaties are affected.[167]  But however doubtful international law "generalists" may be of the normative nature of such designations, specialists in such fields regularly hold them important.  Functionally oriented as such regimes are, they also serve to identify and articulate interests that serve to direct the administration of the relevant rules.[168]

134.    This may be illustrated by the debate over the role of general international law in trade law.  There is no doubt that the WTO dispute settlement system is a self-contained regime in the sense that article 23 of the Dispute Settlement Understanding (DSU) excludes unilateral determinations of breach or countermeasures outside the "specific subsystem" of the WTO-regime.[169]  It is sometimes argued that general international law should not be applied in the administration of WTO treaties as the latter differ fundamentally in their general orientation from the orientation of regular public international law:  where the latter is based on State sovereignty, the former derives its justification from the theory of comparative advantage.  Principles of interpretation inspired by the latter may often be in complete contrast with those inspired by the former.[170]  It is true that by now, WTO Dispute Settlement organs have used international customary law and general principles very widely to interpret WTO treaties.[171]  Few lawyers would persist to hold the WTO covered treaties, whatever their nature, as fully

---

[167]  The potential conflict between the need to uphold the binding force of peace treaties and the principle laid down in Article 52 of the Vienna Convention on the Law of Treaties ("invalidity in case of coercion of a State by the threat of force") for example, may not be soluble within the confines of the Vienna Convention at all.

[168]  In a sociological sense, they may even be said to express different social rationalities:  a clash between them would appear as a clash of rationalities - for example, environmental rationality against trade rationality, human rights rationality against the rationality of diplomatic intercourse.  Thus described, fragmentation of international law would articulate a rather fundamental aspect of globalized social reality itself - the replacement of territoriality as the principle of social differentiation by (non-territorial) functionality.  See further Martti Koskenniemi & Päivi Leino, "Fragmentation of International Law? …", supra note 14, pp. 553-579 and Andreas Fischer-Lescano & Gunther Teubner, "Regime-Kollisionen:  Kompatibilität durch vernetzung Statt Rechsteinheit", to be published.

[169]  The term "specific subsystem" is used in Gabrielle Marceau, "WTO Dispute Settlement …" supra note 42, p. 755, pp. 766-779.

[170]  Jeffrey Dunoff, "The WTO in Transition:  Of Constituents, Competence and Coherence", George Washington International Law Review, vol. 33 (2001) pp. 991-2.

[171]  See generally James & Kevin R. Gray, "Principles of International law in the WTO Dispute Settlement Body", ICLQ, vol. 50 (2001) pp. 249-298 and Eric Canal-Forgues, "Sur l'interprétation dans le droit de l'OMC", RGDIP, vol. 105 (2001) pp. 1-24.

A/CN.4/L.682
page 72

closed to public international law.[172]  The question remains, however, that trade rationality may occasionally - perhaps often - be at odds with the rationality of protecting the sovereign and that when a choice has to be made, the general objectives and "principles" of trade law - however that is understood - will seem more plausible to trade institutions and experts than traditional interpretative techniques.

135.    The three notions of "self-contained regime" are not clearly distinguished from each other.  A special system of secondary rules - the main case covered by article 55 of the draft articles on responsibility of States for internationally wrongful acts - is usually the creation of a single treaty or very closely related set of treaties.  An example might be the "non-compliance system" under the 1985 Vienna Convention on the Protection of the Ozone Layer and the related 1987 Montreal Protocol that has priority over the standard dispute settlement clause in the Vienna Treaty.[173]  A special regime on some (territorial, functional) problem-area - the *S.S. Wimbledon* case - may cover several instruments and practices, united by their orientation towards a single problem - establishment of a free trade area, say, or a universal trade regime such as the one administered under the WTO.  It goes without saying that a treaty-regime may be both special in the first and the second sense, that is as a self-contained regime of remedies (State responsibility) and a set of special rules on adoption, modification, administration or termination of the relevant obligations.

136.    The widest notion covers a whole area of functional specialization or teleological orientation at a universal scale:  the laws of armed conflict, for instance, identified as *leges speciales* by the International Court of Justice in the *Legality of the Threat or Use of Nuclear Weapons* case, or environmental law, often thought to be accompanied with special principles, such as the principle of precaution, "polluter pays" and "sustainable development" that seek to direct the administration of environmental matters.[174]  We can see the significance

---

[172]  See further section C.3. (c) (ii) (2) below.

[173]  See Article 8 of the Montreal Protocol on Substances that Deplete the Ozone Layer and comments in Martti Koskenniemi, "Breach of Treaty or Non-Compliance. Reflections on the Enforcement of the Montreal protocol", YBIEL vol. 3 (1992) pp. 123-162.

[174]  See e.g. Brownlie, *Principles ...* supra note 164, pp. 274-281.  See also case details Legality of the Threat or Use of Nuclear Weapons, Advisory opinion, *I.C.J. Reports 1996* p. 226 passim.

of such speciality in situations such as the *Beef Hormones* case where the European Community argued within the WTO that the precautionary principle that had been included in the 1992 Rio Declaration should influence the assessment of the justifiability of the EC prohibition of the importation of certain meat and meat products. The Appellate Body, however, stated that while it may have "crystallized into a general principle of customary environmental law", it was not clear that it had become a part of general customary law.[175]  Cantoning the principle as one of "customary environmental law" left it open, of course, under what circumstances it might have become applicable under "international trade law".

137.    It often seems that "much of the action in international law [has] shifted to specialized regimes".[176]  At least as concerns State responsibility, this has been the price to pay for a uniform regime.  To succeed in devising a single set of secondary rules (and this was a focus of some disagreement among the Special Rapporteurs) they needed to be of such general nature that when States then adopt primary rules on some subject they are naturally tempted to adopt also secondary rules tailored for precisely the breach of those primary rules.  The turn from formal dispute settlement to "softer", non-adversarial forms of accountability under environmental treaties ("non-compliance mechanisms") may serve as an example.  Such variation need not be overly problematic.  As Crawford has observed, there never was any assumption in the Commission that its system of responsibility would be a "one-size-fits all".  Whether States would wish to follow the general law or opt out from it was both a "political question and (in relation to existing regimes) a question of interpretation".[177]  But if instead of enhancing the effectiveness of the relevant obligations the regime serves to dilute existing standards - a problem identified years ago famously by Prosper Weil[178] - then the need of a residual application, or a "fall-back" onto the general law of State responsibility may seem called for.

---

[175]  *European Communities - Measures Concerning Meat and Meat Products (Hormones)* (16 January 1998) WT/DS26/AB/R, DSR 1998:I, p. 180-181, para. 123-125.  For the "precautionary principle" in environmental law, see Patrick Daillier & Alain Pellet, *Droit international ...* supra note 73, 2002) pp. 1307-1310.

[176]  Daniel Bodansky & John R. Crook, "Introduction and Overview to Symposium:  The ILC's State Responsibility Articles", AJIL vol. 96 (2002) p. 774.

[177]  James Crawford, "The ILC's Articles on Responsibility of States for Internationally Wrongful Acts:  A Retrospect", AJIL vol. 96 (2002), p. 880.

[178]  Prosper Weil, "Towards Relative Normativity in International Law", AJIL vol. 77 (1983) pp. 413-442.

A/CN.4/L.682
page 74

**(b)     Self-contained regimes and the ILC work on State responsibility**

138.     Special Rapporteur Roberto Ago came to the question in connection with his discussion of the "source" and "content" of the international obligation breached.[179]  Does the identity of the norm that has been breached affect the type of responsibility that follows?  As is well-known, Ago discussed this question predominantly in terms of the gradation of State responsibility through the distinction between international "crimes" and "simple breaches".[180]  There is no need to embark upon that question here.  Nevertheless, it is useful to note that apart from that distinction, Ago did not see a need for classifying different consequences by reference to the source or the content of the obligation breached.  What he aimed at, and achieved, was a single, generally applicable set of rules about wrongfulness that could cover the breach of any primary rules.  As a counterpart to that generality, he accepted that States were at liberty to provide for special consequences for the breach of particular types of primary rules:

> In the text of a particular treaty concluded between them, some States may well provide for a special regime of responsibility for the breach of obligations for which the treaty makes special provision.[181]

139.     The matter of how these special treaty-regimes would relate to the general rules was not pursued by Ago but was taken up at great length by Special Rapporteur Riphagen in 1982 in connection with his discussion of what he called the "general problem underlying the drafting of Part 2 of State responsibility".  What for Ago had been a matter of taking note of the self-evident competence of States to set up by treaty special systems of State responsibility appeared to become quite central, and rather problematic, for the drafting of part 2.  In Riphagen's words:

> International law as it stands today is not modelled on one system only, but on a variety of international sub-systems within each of which the so-called 'primary rules' and the so-called 'secondary rules' are closely intertwined - indeed, inseparable.[182]

---

[179]  See especially Roberto Ago, Fifth Report on State Responsibility, *Yearbook ... 1976* vol. II, Part one, p. 6, paras. 12-15.

[180]  Ago, Fifth Report, ibid., p. 26, para. 80.

[181]  Ago, Fifth Report, ibid., p. 6, para. 14.  See also Draft Article 17, Ago, Fifth Report, ibid., p. 24, para. 71.

[182]  Willem Riphagen, Third Report on State Responsibility, *Yearbook ... 1982* vol. II, Part one, p. 28, para. 35.

140.    As Riphagen saw it, the presence of such "subsystems" (which he also sometimes termed "regimes"), that is, interrelated systems of primary and secondary rules as well as procedures for realizing responsibility,[183] was a very common occurrence:  when States elaborated primary rules, the question what to do if these were violated emerged almost automatically.  And in such case, the States would often provide for some special rules on the content, degree and forms of State responsibility.  Though the main case seemed to be the one where a special regime was provided by treaty, Riphagen, in apparent contrast to Ago, also assumed that the content of a particular primary rule might justify supplementing it by special secondary rules.  The attempt to construct such linkages became quite central for Riphagen who, for this purpose, discussed aggression and other breaches of international peace and security, as well as countermeasures in connection with a wide definition of objective regimes.  Apart from the question of international "crimes", the discussion did not proceed towards the identification of other specific types of relationships between particular primary rules and the consequences of their violation.[184]

141.    Riphagen's approach was inspired by a "functional analysis" of three different types of rules of international law:  those seeking to keep States separate, those that reflected what he called a "common substratum" and those that sought to organize parallel exercises of State sovereignty.[185]  Whatever its sociological merits, the analysis failed to convince the Commission which did not integrate his "systems" or "subsystems" into the draft articles.  Also his attempt to depart from Ago by classifying the consequences of the breach of obligations by the source or content of those obligations (general custom - conventional international law - judicial, quasi-judicial and other institutional decisions) never ended up in the draft.[186]  This did not mean that the Commission wished to exclude tailoring the consequences of a breach to the nature of the primary rule violated - only that it felt it sufficient to deal with this by a savings clause the formulations of which finally ended up in what became article 55.

---

[183]  Riphagen, Third Report, ibid., p. 28, para. 38.

[184]  Willem Riphagen, Fourth Report, *Yearbook ... 1983* vol. II, Part one, pp. 8-24, paras. 31-130.

[185]  Riphagen, Third Report, supra note 182 pp. 28-30, paras. 39-53.

[186]  For the proposal, see Willem Riphagen, Third Report, ibid., pp. 40-44, paras. 106-128.

A/CN.4/L.682
page 76

142.    It was, in other words, accepted that the articles had residual nature, and that special regimes of responsibility could be adopted by States.  What was the relationship of such regimes to the general law?  Even though Riphagen used the term "self-contained", and foresaw a "theoretical" possibility that the relevant set of conduct rules, procedural rules, and status provisions [might form] a closed legal circuit,[187] in fact he never wanted to say they were completely isolated:

> "This does not mean that the existence of the subsystem excludes permanently the application of any general rules of customary international law relating to the legal consequences of wrongful acts … [T]he subsystem itself as a whole may fail, in which case a fall-back on another subsystem may be unavoidable".[188]

143.    This seems evident.  Two observations are in place, however.  First, though Riphagen only speaks of "failure" of a subsystem, it must be assumed that the same consequence may also follow from the simple silence of the subsystem.  On the other hand, although Riphagen only speaks of a fall-back on other "subsystems", it is hard to see why he would wish to exclude fall-back on the general rules of State responsibility - as indeed he elsewhere specifically says:

> Every one of the many different régimes (or subsystems) of State responsibility … is in present-day international law subject to the universal system of the United Nations Charter, including its elaboration in unanimously adopted declarations ...[189]

144.    Riphagen did not elaborate on the nature or scope of this "universal system" - apart from noting that it also included *jus cogens*.  That question was in due course completely absorbed by the question of "crimes".[190]

145.    Despite the terminology used by Riphagen, the substance of his arguments is relatively uncontroversial and does little than recapitulate points made in the first part of this study concerning the relationship between special and general law and the pragmatic need to prioritize

---

[187]   Willem Riphagen, Introduction, *Yearbook ... 1982* vol. I, p. 202, para. 16.

[188]   Willem Riphagen, Third Report, supra note 182, p. 30, para. 54.

[189]   Riphagen, Third Report, ibid., p. 39, para. 104.

[190]   Riphagen, Third Report, ibid., p. 39, paras. 104-105.

the former to the latter.  The draft articles, Riphagen noted, "cannot exhaustively deal with the legal consequences of any and every breach of any and every legal obligation".[191]  Thus, although he had described the question of subsystems as a "general problem underlying the drafting of part 2", Riphagen felt it could still be resolved in a relatively simple and uncontroversial way by a general savings clause.[192]  The result was then that the provisions of the draft itself became "no more than rebuttable presumptions as to the legal consequences of internationally wrongful acts".[193]

146.    At this stage, Riphagen noted the possibility that there might be violation of rules under two subsystems providing for parallel or differing consequences (e.g. countermeasures might be allowed under one subsystem but prohibited under another).  While the *lex specialis* rule might resolve some such problems, it could not automatically resolve a possible conflict where the object and purpose of the subsystems might differ - an example might concern the application of principles of environmental law within the administration of a trade instrument.  For this purpose Riphagen suggested that "it would still seem necessary to draw up a catalogue of possible legal consequences in a certain order of gravity, and to indicate the principal legal circumstances precluding one or more legal consequences in a general way".[194]  This led him to a discussion of the hierarchy of legal consequences - a discussion that peaked in, and in the end was exhausted

---

[191]  Riphagen, Third Report, ibid., p. 31, para. 55.

[192]  The original form of that clause in 1982 was as follows:

Article 3

The provisions of this part apply to every breach by a State of an international obligation, except to the extent that the legal consequences of such a breach are prescribed by the rule or rules of international law establishing the obligation or by other applicable rules of international law.

Riphagen, Third Report, ibid., p. 47.  The effect of this was to provide for the application of the ILC draft "*unless otherwise provided for*".  See also Riphagen, Riphagen, Third Report, ibid., p. 39, para. 103.  The Commission agreed.  In 1983, it adopted the following savings clause (article 2):  "… the provisions of this part govern the legal consequences of any internationally wrongful act of a State, except where and to the extent that those legal consequences have been determined by other rules of international law relating specifically to the internationally wrongful act in question".  *Yearbook ... 1983* vol. II, Part two, p. 42, para. 113.

[193]  Riphagen, Third Report, ibid., p. 31, para. 57.

[194]  Riphagen, Third Report, ibid., p. 34, para. 77.

A/CN.4/L.682
page 78

by, the discussion of international crimes.[195]  In the end, the only hierarchy proposed by Riphagen were two limitations to the savings clause.  A self-contained regime could not deviate from rules of *jus cogens* nor from "the provisions and procedures of the Charter of the United Nations relating to the maintenance of international peace and security".[196]

147.    Like Riphagen, his follower Arangio-Ruiz accepted the "presence of those treaty-based systems or combinations of systems which tend to address, within their own contractual or special framework, the legal regime governing a considerable number of relationships among States parties, including in particular the consequences of any breaches of the obligations of the States parties under the system".[197]  Within such a broad, systemic view, he noted that "some legal scholars" had identified a category of "self-contained regimes" that affected "the *faculté* of States parties to resort to the remedial measures that are open to them under general law".[198] Arangio-Ruiz made express the difference between the broader view that spoke in terms of systems or subsystems of rules in general and the narrower view which he identified with Bruno Simma's influential 1985 article, focusing on subsystems that intended:

> to exclude more or less totally the application of the general legal consequences of wrongful acts, in particular the application of the countermeasures normally at the disposal of an injured party.[199]

148.    Arangio-Ruiz himself appeared initially to adhere to the wider notion, noting as examples of self-contained regimes such as the "system" set up by the treaties establishing the EC, human rights treaties in addition to diplomatic law as stated by the ICJ in the *Hostages* case. Developing his argument, however, he focused on the narrower problem, namely whether the remedial measures - especially countermeasures - in such regimes "affect[ed] to any degree the

---

[195]  For Willem Riphagen, "crimes" denoted one special subsystem of international law that provided a special set of consequences.  See Riphagen, Third Report, ibid., pp. 44-46, paras. 130-143.

[196]  Willem Riphagen, Introduction to draft article 2, *Yearbook ... 1984* vol. I, p. 261, paras. 4, 6-9.

[197]  Gaetano Arangio-Ruiz, Third Report on State Responsibility, *Yearbook ... 1991* vol. II, Part one, p. 25, para. 84.

[198]  Arangio-Ruiz, Third Report, ibid., p. 25, para. 84.

[199]  Arangio-Ruiz, Third Report, ibid., pp. 25-26, para. 84, quoting Bruno Simma, "Self-Contained Regimes", *Netherlands Yearbook of International Law*, vol. XVI (1985), pp. 115-116.

possibility for legal recourse by States parties to the measures provided for, or otherwise lawful, under general international law".[200]  Consequently, most of Arangio-Ruiz's treatment of self-contained regimes - in particular his discussion of the relevant State practice - sought an answer to the question whether such regimes were fully isolated from general law ("formed closed legal circuits") or, in other words, excluded future recourse to the remedies in the general law of State responsibility.  His answer to that question was an emphatic no.  Because he defined self-contained regimes as sets of rules that were hermetically isolated from general law he found no such regimes in practice:  "… none of the supposedly self-contained regimes seems to materialize *in concreto*".[201]

149.    Arangio-Ruiz did not oppose the establishment of special treaty-based regimes.  They were needed "to achieve, by means of ad hoc machinery, a more effective organized monitoring of violations and responses thereto".  But he rejected the conclusion that this would bar them from ever resorting to general law.[202]  Fall-back to general remedies was needed at least if the State failed to receive effective reparation or where the unlawful act persisted while the procedures in the special regime are in progress.[203]  He admitted that derogations or "fall-backs" should only take place in "extreme cases".  A special regime was, after all, a multilateral bargain from which each party received some benefits for submitting to the common procedure.  Nonetheless, his main point concerned the openness of allegedly "closed" regimes.  The priority of the special regime followed from the general rules of international law and treaty interpretation.  But it did not entail a presumption of abandonment of the guarantees of general law - this is how Arangio-Ruiz read the clause concerning the residual nature of the draft articles n the (then) article 2.  It would fail to correspond to the intent of the States wishing to strengthen (instead of to derogate from) the ordinary rules on State responsibility.[204]

---

[200]  Arangio-Ruiz, Third Report, ibid., p. 26, paras. 85-86.  Likewise Gaetano Arangio-Ruiz, Fourth Report, *Yearbook … 1992* vol. II, Part one, p. 35, para. 97.

[201]  Arangio-Ruiz, Fourth Report, ibid., p. 40, para. 112.

[202]  Arangio-Ruiz, Fourth Report, ibid., p. 40, paras. 112 and 114.

[203]  Arangio-Ruiz, Fourth Report, ibid., pp. 40-41, para. 115.

[204]  Arangio-Ruiz, Fourth Report, ibid., p. 42, paras. 123-124.

A/CN.4/L.682
page 80

150.    Special Rapporteur James Crawford came to self-contained regimes in 2000 in connection with draft articles 37-39 that dealt with the relationship between the draft of the Commission and the law outside it.  Article 37 contained the general clause on the residual role of the draft:  special rules would be allowed.  Crawford refrained from responding in general terms to the question whether such special rules were also exclusive.  This was "always a question of interpretation in each case".[205]  As an example of the case where the self-contained regime was "exclusive", Crawford referred to the WTO remedies system.  As a case where the special regime only modified some aspect of the general law, he referred to article 41 of the European Convention on Human Rights.  Crawford left open, however, whether "exclusivity" here meant exclusive and *final* replacement of the general law or merely its substitution at an initial stage with the possibility of "fall-back" if the self-contained regime had, as Riphagen had put it, "failed".  The two examples survive in the Commentary to the draft articles.

151.    In this connection, article 37 was lifted from part 2 into part 4 ("General Provisions") where it became article 55, was titled *lex specialis* and came to cover all of the draft, both conditions of existence of a wrongful act as well as the content and implementation of State responsibility.[206]  As pointed out at the beginning of this Report, the Commission did not mean thereby that every deviation under article 55 would have the nature of a "self-contained regime". It distinguished between what it called a "strong" and a "weak" form of *lex specialis* and labelled only the former "self-contained".  Why it used the terminology of "strong"/"weak" is far from clear, however, and possibly a source of confusion.  The operative distinction in the Commentary is not between provisions that are normatively "stronger" and those that are normatively "weaker" but that between "specific treaty provisions on a single point" (regular *lex specialis* - the Commission's "weak" form) and whatever could be extracted from the *S.S. Wimbledon* and *Hostages* cases (the Commission's "strong" form).  Because the Commission only defined

---

[205]  James Crawford, Third Report on State Responsibility, document A/CN.4/507/Add.4 (2001) p. 27, para. 420.

[206]  Article 55 (*Lex specialis*) reads:

> These articles do not apply where and to the extent that the conditions for the existence of an internationally wrongful act or the content or implementation of the international responsibility of a State are governed by special rules of international law.

"self-contained regimes" by reference to the examples of the two cases, it thereby imported, as we have seen, two different meanings into the draft:  (1) the view of a self-contained regime as a special set of consequences for wrongfulness (*Hostages*) and (2) the view of a self-contained regime as a set of primary and secondary rules governing the administration of a problem (*S.S. Wimbledon*).  Neither of these is necessarily any "stronger" (at least "stronger" in the sense of more binding, or less amenable to derogation) than a "specific treaty provision [ ] on a single point".

152.    The following conclusions may be made of the treatment of "self-contained regimes" by the Commission in the context of State responsibility:

(1)    *Definition*.  The concept of "self-contained regimes" was constantly used by the Special Rapporteurs in a narrow and a wide sense and both were imported into the Commission's commentary on article 55.  As a self-contained regime qualifies (a) a special set of secondary rules that determine the consequences of a breach of certain primary rules (including the procedures of such determination) as well as (b) any interrelated cluster (set, regime, subsystem) of rules on a limited problem together with the rules for the creation, interpretation, application, modification, or termination - in a word, administration - of those rules.  In addition, academic commentary and practice make constant reference to a third notion - "branches of international law" - that are also assumed to function in the manner of self-contained regimes, claiming to be regulated by their own principles;

(2)    *Establishment*.  States are entitled to set up self-contained regimes that have priority over the general rules in the draft articles.  The only limits to this entitlement are the same that apply to *lex specialis*.  This means, among other things, that "States cannot, even as between themselves, provide for legal consequences of a breach of their mutual obligations which would authorize acts contrary to peremptory norms of general international law … the special rules in question [must] have at least the same legal rank as those expressed in the articles";[207]

---

[207] Draft Articles on State Responsibility, Commentary on Article 55, para. 2 in *Official Records of the General Assembly, Fifty-sixth Session*, *Supplement No. 10* (A/56/10), p. 357.

(3)     *Relationship between self-contained regime and general law under normal circumstances*.  The relationship between a self-contained regime and the general law on State responsibility should be determined principally by interpreting the instrument(s) that established the regime.  However, no self-contained regime is a "closed legal circuit".  While a special/treaty regime has (as *lex specialis*) priority in its sphere of application, that sphere should normally be interpreted in the way exceptions are, that is, in a limited way.  In any case, the rules of the general law on State responsibility - like the rest of general international law - supplement it to the extent that no special derogation is provided or can be inferred from the instrument(s) constituting the regime;

(4)     *Failure of the self-contained regime*.  The question of residual application of the general rules in situations not expressly covered by the "self-contained regime" or possible "fall-back" to the general rules of State responsibility in case of the failure of that regime is not expressly treated in the draft or in the commentary.  However, it is dealt with by Special Rapporteurs Riphagen and Arangio-Ruiz both of whom hold it self-evident that once a self-contained regime fails, recourse to general law must be allowed.  What such failure might consist in has not been explicitly treated by the Commission.  However, an analogy could be received from the conditions under which the exhaustion of local remedies rule need not be followed.  These would be cases where the remedy would be manifestly unavailable or ineffective or where it would be otherwise unreasonable to expect recourse to it;

(5)     *Inappropriateness of the term "self-contained"*.  None of the Special Rapporteurs and none of the cases discussed by them implies the idea of special systems or regimes that would be fully isolated from general international law.  To this extent, the notion of a "self-contained regime" is simply misleading.  Although the degree to which a regime or responsibility, a set of rules on a problem or a branch of international law needs to be supplemented by general law varies, there is no support for the view that anywhere general law would be fully excluded.  As will become apparent below, such exclusion may not be even conceptually possible.  Hence, it is suggested that the term "self-contained regime" be replaced by "special regime".

**(c)    The relationship between self-contained regimes outside State responsibility and general international law**

153.    In regard to fragmentation, the main questions of interest concern the relations between the self-contained (special) regime in each of its three meanings, as discussed above, and general law, namely (a) the conditions for the establishment of a special regime; (b) the scope of application of the regime vis-à-vis general international law under normal circumstances; and (c) conditions of "fall-back" to general rules owing to the regime's failure.

**(i)    Establishment of self-contained (special) regimes**

154.    As to the first question, there is little doubt that most international law - and not only the law of State responsibility - is dispositive and that contracting out by establishing a regime is possible and limited only to the extent that such limitation may be received from the *jus cogens* nature or otherwise compelling character of general law.  Aside from peremptory norms, at least the following limitations should be considered:

(1)    The regime may not deviate from the law benefiting third parties, including individuals and non-State entities;

(2)    The regime may not deviate from general law if the obligations of general law are of "integral" or "interdependent" nature, have *erga omnes* character or practice has created a legitimate expectation of non-derogation;[208]

(3)    The regime may not deviate from treaties that have a public law nature or which are constituent instruments of international organizations.[209]

155.    However, different considerations may apply to the establishment of self-contained (special) regimes in each of the three senses of that expression.

156.    Setting up a special regime of State responsibility - that is, special consequences for breach - is normally possible only by treaty that identifies the primary rules to which it applies,

---

[208]    See the discussion on *erga omnes* obligations in section E below.

[209]    See the section on *lex specialis* above.

A/CN.4/L.682
page 84

the nature, content and form of the (special) responsibility, and the institutions that are to apply it. Though it is not conceptually inconceivable that such regime might emerge tacitly, or by way of custom (e.g. a regime of collective countermeasures by non-injured States as foreseen under article 56 of the draft articles on responsibility of States for internationally wrongful acts), this would seem exceptional.

157.    The establishment of a special regime in the wider sense (*S.S. Wimbledon*, any interlinked sets of rules, both primary and secondary) would also normally take place by treaty or several treaties (e.g. the WTO "covered treaties").  However, it may also occur that a set of treaty provisions develops over time, without conscious decision by States parties, perhaps through the activity of an implementing organ, into a regime with its own rules of regime-administration, modification and termination.  It took until 1963 before the European Court of Justice defined the (then) European Economic Community as a "new legal order of international law".[210]  The development of European law into a self-contained regime has to a very large extent - including the principles of direct effect, supremacy and the doctrine of fundamental rights - taken place through the interpretative activity of the European Court of Justice, and not always with the full support of all Member States.  As we have seen, the same is largely (though in a much narrower sense) true of human rights law as well.  Though the States Parties have, of course, established the implementing organs, and thus taken the first step towards self-containedness, the extent of the autonomy of the regimes has been largely determined by those organs.  The standard example here is the development of a doctrine on the separability of reservations to the European Convention on Human Rights.[211]

158.    The widest of special regimes - denominations such as "international criminal law", "humanitarian law", "trade law", "environmental law" and so on - emerge from the informal activity of lawyers, diplomats, pressure groups, more through shifts in legal culture and in response to practical needs of specialization than as conscious acts of regime-creation.  Such

---

[210]  Case 26/62, *NV Algemene Transport- en Expeditie Onderneming van Gend & Loos v. Netherlands Inland Revenue Administration*, Judgment of 5 February 1963, ECR, English special edition, p. 2.

[211]  See *Belilos v. Switzerland*, Judgment of 29 April 1988, ECHR (1988) Series A, No. 132, p. 24, para. 50 and p. 28, para. 60.

notions mirror the functional diversification of the international society or, more prosaically, the activities of particular caucuses seeking to articulate or strengthen preferences and orientations that seem not to have received sufficient attention under the general law. The application of special "principles" by specialized implementation organs is a visible feature of such regimes.

### (ii) The relationship of the self-contained (special) regime vis-à-vis general international law under normal circumstances

159.    The relationship between the special regime and the general law - that is to say, the degree to which a regime is self-contained in the first place - will be predominantly a matter of interpreting the treaties that form the regime. To what extent does a general law come in to fill the gaps or to assist in the interpretation of application - that is, in the administration - of the regime? Once it is clear that no regime is completely isolated from general law, the question emerges as to their relationship *inter se*.

160.    It is possible to illustrate the linkages in practice by reference to the operation of the supervisory bodies in human rights and trade law, two regimes specifically mentioned in the Commission's Commentary to article 55 of the draft articles on responsibility of States for internationally wrongful acts.

### (1) Example: human rights regimes

161.    Human rights organs such as the European and the Inter-American Courts of Human Rights regularly refer to rules and principles of general international law concerning not only treaty interpretation but matters such as statehood, jurisdiction and immunity as well as a wide variety of principles of procedural propriety.[212] The Inter-American Court has used its wide advisory jurisdiction to interpret not only other human rights instruments (such as the European Convention or the 1966 International Covenants) but also instruments such as the Vienna Convention on Consular Relations of 1963.[213] In an opinion from 1988 it expressly referred to

---

[212] See on this especially the review by Caflisch and Cancado Trindade, "Les conventions americaine et européenne des droits de l'homme et le droit international général".

[213] See "*Other Treaties" Subject to the Consultative Jurisdiction of the Court*, Judgment of 24 September 1982, OC-1/82, Int-Am CHR Series A, No. 1.

A/CN.4/L.682
page 86

the international law principle of continuity of the State according to which State responsibility persists despite changes of government.[214]   In a series of recent cases, the European Court of Human Rights has clarified the relationship between the rights in the European Convention and State immunities recognizing the validity of the latter for instance, over the right of access to courts under article 6 (1) of the European Convention.  In particular, it has pointed out that:

> [t]he Convention … cannot be interpreted in a vacuum.  The Court must be mindful of the Convention's special character as a human rights treaty, and it must take the relevant rules of international law into account.  The Convention should so far as possible be interpreted in harmony with other rules of international law of which it forms a part, including those relating to the grant of State immunity.[215]

162.    There was no *a priori* assumption that the rules of the Convention would override those of general law.  On the contrary, the Court assumed the priority of the general law on immunity, making the point that:

> measures taken by a High Contracting Party which reflect recognized rules of public international law on State immunity cannot in principle be regarded as imposing a disproportionate restriction on the right to access to a court as embodied in Article 6 (1).  Just as the right of access to court is an inherent part of the fair trial guarantee in that Article, so some restrictions on access must likewise be regarded as inherent, an example being those limitations generally accepted by the community of nations as part of the doctrine of State immunity.[216]

163.    That the Convention should not be treated as if it existed in a legal vacuum has also been affirmed by the Court in regard to the rules of State jurisdiction and State responsibility.  In the *Bankovic* case (1999), it made this point:

> the Court recalls that the principles underlying the Convention cannot be interpreted and applied in a vacuum.  The Court must also take into account any relevant rules of international law when examining questions concerning its jurisdiction and, consequently, determine State responsibility in conformity with the governing

---

[214] *Velásquez Rodríquez* case, Judgment of 29 July 1988, OC-4/88, *Inter-American Yearbook on Human Rights* (1988) p. 990, para. 184.

[215] *McElhinney v. Ireland,* Judgment of 21 November 2001, ECHR 2001-XI, para. 36.  Similarly, *Al-Adsani v. the United Kingdom,* Judgment of 21 November 2001, ECHR 2001-XI, p. 100, para. 55.

[216] *Fogarty v. the United Kingdom,* Judgment of 21 November 2001, ECHR 2001-XI, para. 36.

principles of international law, although it must remain mindful of the Convention's special character as a human rights treaty. The Convention should be interpreted as far as possible in harmony with other principles of international law of which it forms part.[217]

164.    In other words, the European Convention on Human Rights is not, and has not been conceived as a self-contained regime in the sense that recourse to general law would have been prevented. On the contrary, the Court makes constant use of general international law with the presumption that the Convention rights should be read in harmony with that general law and without an *a priori* assumption that Convention rights would be overriding.

   *(2)    Example:  WTO law*

165.    Though perhaps more controversial, the matter in the WTO system is not significantly different. Although, as we have seen, it has sometimes been suggested that the WTO covered treaties formed a closed system, this position has been rejected by the Appellate Body in terms that resemble the language of the European Court of Human Rights, noting that WTO agreements should not be read "in clinical isolation from public international law".[218] Since then, the Appellate Body has frequently sought "additional interpretative guidance, as appropriate, from the general principles of international law".[219] More recently a WTO panel has had occasion to specify this as follows:

> We take note that Article 3 (2) of the DSU requires that we seek within the context of a particular dispute to clarify the existing provisions of the WTO agreements in accordance with customary international law rules of interpretation of public international law. However, the relationship of the WTO agreements to customary international law is broader than this. Customary international law applies generally to the economic relations between WTO members. Such international law applies to the extent that the WTO treaty agreements do not 'contract out' from it. To put it another way, to the extent

---

[217] *Bankovic v. Belgium and others,* Decision of 12 December 2001, Admissibility, ECHR 2001-XII, p. 351, para. 57 (references omitted).

[218] *United States - Standards of Reformulated and Conventional Gasoline* (20 May 1996) WT/DS2/AB/R, DSR 1996:I, p. 16.

[219] *United States - Import Prohibition of Certain Shrimp and Shrimp Products* (6 November 1998) WT/DS58/AB/R, DSR 1998:1, p. 2755, para. 151.

A/CN.4/L.682
page 88

that there is no conflict or inconsistency, or an expression in a covered WTO agreement that applies differently, we are of the view that the customary rules of international law apply to the WTO treaties and to the process of treaty formation under the WTO.[220]

166.    Nonetheless, academic opinion is divided as to how far this actually goes, with focus especially on the use by WTO organs of law from other special regimes, especially environmental law, or under non-WTO treaties.  But whatever view one takes on the *competence* of WTO panels and the Appellate Body, that position is neither identical to nor determinative of the question of whether "WTO law" (or more exactly, "WTO covered agreements") is also *substantively* self-contained.[221]

167.    The starting-point of analysis are usually articles 3 (2) and 19 (2) of the Dispute Settlement Understanding (DSU) according to which WTO dispute-settlement is intended to preserve the rights and obligations of Members under the covered agreements.[222]  This has been sometimes interpreted to mean that non-WTO law cannot be used in any way to effect whatever "rights and obligations" are provided under WTO law.[223]  An extreme interpretation might view this as a complete setting aside of all non-WTO law.  However, this is countered by the further language of article 3 (2) DSU according to which the panels and the AB are to apply the "customary rules of interpretation of public international law" - a provision that incorporates

---

[220] *Korea - Measures Affecting Government Procurement* (19 January 2000) WT/DS163/R, para. 7.96.

[221] This point is made with emphasis in Joost Pauwelyn, *Conflict of Norms ...* supra note 21, pp. 460-463.

[222] Article 3 (2) provides:

> "recommendations and rulings of the DSB cannot add to or diminish the rights and obligations provided in the covered agreements"

Article 19 (2) provides that:

> "In their findings and recommendations panels and the Appellate Body cannot add to or diminish the rights and obligations provided in the covered agreements".

[223] Thus Joel Trachtman has argued that "WTO dispute resolution panels and the Appellate Body are limited to the application of substantive WTO law and are not authorized to apply general substantive international law or other conventional law", Joel Trachtman, "The Domain of WTO Dispute Resolution", supra note 46 p. 342.  Trachtman allows, of course, the application of the Vienna Convention rules of interpretation as well as any other rules specifically incorporated.  These, he understands, would mainly deal with procedural, not substantive law.

not only the Vienna Convention on the Law of Treaties but, through its articles 31-32 any other rules of treaty interpretation including, for example, article 31 (3) (c) under which an interpretation should take into account "any relevant rules of international law applicable in the relations between the parties".[224]

168.    The VCLT rules on treaty interpretation - articles 31 and 32 - are recognized as customary law and widely applied in the WTO system.[225]  But the Appellate Body has frequently discussed and applied also other public international law standards.  There has been considerable debate on the relation between the WTO covered treaties and environmental agreements.[226]  The Panel in the *Shrimp-Turtle* case (1998) had defined the notion of "exhaustible natural resources" in article XX (g) of GATT so as to include only "finite resources such as minerals, rather than biological or renewable resources".  The Appellate Body did not share this view.  The notion needed to be interpreted in view of recent developments:  "the generic term 'natural resources' in article XX (g) is not 'static' in its construct but is rather 'by definition evolutionary'".  In order to seek such an up-date meaning, it referred, among other instruments, to the 1992 Rio Declaration and Agenda 21, the Biodiversity Convention of 1992, and the United Nations Convention on the Law of the Sea and thereby reached the interpretation that all natural resources, living and non-living were included.[227]

---

[224]  See section F below.

[225]  In noting this, the AB used the ICJ as authority for determining the customary law nature of the VCLT rules on interpretation.  See *United States - Standards of Reformulated Gasoline* (20 May 1996) WT/DS2/AB/R, DSR 1996:I,  pp. 15-16.  The customary law nature of article 32 is affirmed in *Japan - Taxes on Alcoholic Beverages* (4 October 1996) WT/DS8/AB/R, DSR 1996:I, p. 104.  For further discussion, see Anja Lindroos and Michael Mehling, "Dispelling the Chimera …", supra note 42, pp. 857-877.

[226]  See J. Cameron & J. Robinson, "The Use of Trade Provisions in International Environmental Agreements and the Compatibility with GATT", YBIEL  vol. 2 (1991) p. 3.  For a good overview of the case-law until *Shrimp/Turtle* (1998), see Michael J. Trebilcock & Robert Howse, *The Regulation of International Trade* ( London:  Routledge, 1999) 2nd ed. pp. 397-420.  See further Gabrielle Marceau, "Conflicts of Norms and Conflicts of Jurisdictions:  The Relationship between the WTO Agreement and MEAS and other Treaties", Journal of World Trade vol. 35 (2001) pp. 1081-1131.

[227]  *United States - Import Prohibition of Certain Shrimp and Shrimp Products* (6 November 1998) WT/DS58/AB/R, DSR 1998:VII, pp. 2794-2797, paras. 127-131.  Also, it viewed their exhaustibility by reference to the fact that all seven sea turtles were listed in Appendix 1 of the CITES Convention, *United States - Import Prohibition of Certain Shrimp and Shrimp Products* (6 November 1998) WT/DS58/AB/R, DSR 1998:VII, pp. 2797-8, paras. 132-3.

A/CN.4/L.682
page 90

169.     Though many views have been taken in the question concerning applicable law within the WTO, two major positions seem to have emerged.  One holds the WTO as part of international law, operating within the general system of international law rules and principles.  This position may be rationalized, for example, by presuming that when the States adopted the Marrakesh agreements they were doing that in accordance with and under the rules and principles of international law and that there was no reason to assume - absent express agreements to the contrary - that these rules and principles would not continue to govern the administration of those agreements.  The other position focuses on the provisions in the DSU that require that the panels and the AB neither add to nor diminish the obligations under the covered treaties.  In practice, however, the two positions may not be altogether difficult to reconcile with almost any practice under the WTO.  The latter view may accept even a wide use of international customary law and other treaties by viewing them as incorporated into the WTO either specifically (through article 3 (2) DSU) or implicitly by reference to the context in which the WTO agreements were made.  In any case, both positions can accommodate a very wide-ranging practice (somewhat like the "monist" and "dualist" positions within domestic law), including statements such as that by the Panel in the 2000 *Korea - Measures Affecting Government Procurement* case quoted above.  There seems, thus, little reason of principle to depart from the view that general international law supplements WTO law unless it has been specifically excluded and that so do other treaties which should, preferably, be read in harmony with the WTO covered treaties.[228]

170.     This does not exclude the emergence of a specific "WTO ethos" in the interpretation of the WTO agreements - just like it is possible to discern a "human rights ethos" in the work of the human rights treaty bodies.  Nor does it prevent the setting aside of normal State responsibility rules in the government of the WTO treaties.  Indeed, this was the *raison d'être* of the WTO system and receives normative force from the *lex specialis* rules of general law itself.  Even as it is clear that the competence of WTO bodies is limited to consideration of claims under the covered agreements (and not, for example, under environmental or human rights treaties), when

---

[228]  A recent work taking the latter position is Pauwelyn, *Conflict of Norms* … supra note 21.

elucidating the content of the relevant rights and obligations, WTO bodies must situate those rights and obligations within the overall context of general international law (including the relevant environmental and human rights treaties).

171.    Nor is this any idiosyncrasy of the WTO but extends to the practices under regional trade agreements.  For example, in *Feldman v. Mexico*, a NAFTA Arbitration Tribunal needed to determine the meaning of the expression "expropriation" under article 1110 of the NAFTA. The Tribunal found that the article was "of such generality as to be difficult to apply in specific cases".  Accordingly, it read it against the "principles of customary international law" in order to clarify whether it applied to State action against grey market cigarette exports.[229]

### (3)    Conclusions on the relationship of the self-contained (special) regimes vis-à-vis general international law under normal circumstances

172.    None of the treaty-regimes in existence today is self-contained in the sense that the application of general international law would be generally excluded.  On the contrary, treaty bodies in human rights and trade law, for example, make constant use of general international law in the administration of their special regimes.  Though States have the *faculté* to set aside much of the general law by special systems of responsibility or rule-administration, what conclusions should be drawn from this depends somewhat on the normative coverage or "thickness" of the regime.  The scope of a special State responsibility regime is normally defined by the relevant treaty.  No assumption is entailed that general law would not apply outside of the special provisions.  In the case of interlocked set of rules on regime-creation, administration, amendment and termination, general law may have been excluded in a more extensive way.  The very set of rules may be governed by special principles of interpretation, reflecting the object and purpose of the regime.  This may affect in particular the competence of the interpreting organs tasked to advance the purposes of the regime.

173.    Finally, the widest of a self-contained regime - "environmental law", "space law" etc. - interacts with other such denominations or clusters indicating special principles that should be

---

[229] *Feldman v. United Mexican States*, Award of 16 December 2002, ICSID Case No. ARB(AF)/99/1, ILR vol. 126 (2003) pp. 58, 65, para. 98.

taken account of.  It is typical of this third sense that it has neither clear boundaries nor a strictly determined normative force.  It brings to legal decision-making considerations and elements that claim relevance and need to be balanced against other considerations.  No firm exclusion is implied; the significance of this being that it points to factors and practices that may have more or less relevance depending on how the problem at issue is described (is it a "trade law" problem; it is a problem in "humanitarian law" or in "human rights law"?).

174.    As Bruno Simma has suggested in his leading article on the question of self-contained regimes, the main question of interest here is "*Under what circumstance, if any, can there be a fall-back on the general legal consequences of internationally wrongful acts*".[230]  As pointed out above, the Special Rapporteurs never considered self-contained regimes or subsystems as "closed legal circuits" in the sense that they would completely and finally exclude the application of the general law.  A minimal conclusion that one can draw from practice and literature is that articles 31 and 32 of the VCLT are always applicable unless specifically set aside by other principles of interpretation.  This has been affirmed by practically all existing international law-applying bodies.[231]  Because these articles - and in particular article 31 (3) (c) - already situate treaty interpretation within the general context of the rights and obligations of the parties, the question of the application of general international law (that is, general customary law and general principles of law) may seem to become somewhat academic.  That they are always applicable is very strongly suggested by practice and doctrine alike - but especially

---

[230]  Simma, "Self-Contained Regimes", supra note 199, p. 118, italics in original.

[231]  For some recent affirmations, see *Case concerning Sovereignty over Pulau Ligitan and Pulau Sipadan (Indonesia/Malaysia) I.C.J. Reports 2002* p. 645-646, para. 37 (with a list of references to the Court's previous affirmations of the same).  For similar recent affirmations by other tribunals, see e.g. *Japan - Taxes on Alcoholic Beverages* (4 October 1996) WT/DS8/AB/R, point D, DSR 1996:I, pp. 104-6; *Restriction of the Death Penalty*, Judgment of September 8, 1983, OC-3/83, Int-Am. CHR Series A, No. 3, p. 76; *Ethyl Corp. v. Canada* (28 November 1997) NAFTA Arbitral Tribunal, ILR vol. 122 (2002) pp. 278-9, paras. 50-52 (noting that also the United States had accepted their status as custom); *Waste Management Inc. v. Mexico* (2 June 2000) ICSID, ILR vol. 121 (2002) p. 51, note 2.  The European Court of Human rights has also stated, already early on, that it was "prepared to consider … that it should be guided by Articles 31 to 33 of the Vienna Convention", *Golder v. the United Kingdom,* Judgment of 21 February 1975, ECHR Series A, No. 18, p. 14, para. 29.  It affirmed this recently ("the Convention must be interpreted in light of the rules set out in the Vienna Convention …") in *Bankovic v. Belgium and others*, Decision of 12 December 2001, Admissibility, ECHR 2001-XII, p. 350-351, para. 55.  For the rather wider formulation of the Iran-US Claims Tribunal ("the task of the Tribunal is to interpret the relevant provisions of the Algiers Accord on the basis of then Vienna Convention on the Law of Treaties") see *Sedco, Inc. v. NIOC*, Iran-US C.T.R., vol. 9, 1985-I, p. 256 (with references to earlier formulations of the same).

A/CN.4/L.682
page 93

by writings of public international law generalists.[232]  The position recently taken by Antonio Cassese is representative.  Discussing the special procedures inscribed in human rights treaties to supervise the administration of the relevant treaties and reacting to breaches, he points out:

> It would be contrary to the spirit of the whole body of international law on human rights to suggest that the monitoring systems envisaged in the Covenant and the Protocol should bar States parties from 'leaving' the self-contained regime contemplated in the Covenant and falling back on the customary law system of resort to peaceful countermeasures.[233]

175.    The same position is taken in numerous academic writings in regard to human rights treaties.  Pauwelyn summarizes the position succinctly:

> [I]n their treaty relations states can "contract out" of one, more or, in theory, all rules of international law (other than those of *jus cogens*), but they cannot contract out of the *system* of international law.[234]

176.    There are, as Pauwelyn notes, policy reasons for this.  But there is also a logical point to make.  States cannot contract out from the *pacta sunt servanda* principle - unless the speciality of the regime is thought to lie in that it creates no obligations at all (and even then it would seem hard to see where the binding force of such an agreement would lie).  Overall, the claim (almost never heard) that self-contained regimes are completely cocooned outside international law resembles the views by late-nineteenth century lawyers about the (dualist) relation between national and international law.[235]

177.    Under this view, general international law would be applicable only if specifically incorporated as part of the special regime.  Whatever the validity of this view under national

---

[232]  For review of positions, see Arangio-Ruiz, Fourth Report, supra note  200, pp. 36-38, paras. 99-106.

[233]  Antonio Cassese, *International Law* (Oxford:  Oxford University Press, 2001) p. 208.

[234]  Pauwelyn, Conflict of Norms … supra note 21, p. 37.

[235]  In fact, this analogy is made in Joel Trachtman, "Institutional Linkage:  Transcending Trade and …",  AJIL vol. 96 (2002) pp. 89-91.

A/CN.4/L.682
page 94

law, it is very hard to see how it could be applied to relations between international legal "regimes" and general international law.  In the first place, the regime undoubtedly receives - or possibly fails to receive - binding force under general international law.  The conditions of validity and invalidity of regime-establishment acts are assessed by general law.  But this means also that most of the VCLT - at least its customary law parts - including above all articles 31 and 32 - automatically, and without incorporation, *is* a part of the regime:  indeed, it is only by virtue of the VCLT that the regime may be identified as such and delimited against the rest of international law.  Thus, in a recent case, the International Court of Justice held that a provision in a *compromis* where it was authorized to apply the "rules and principles of international law" was superfluous if principles of treaty interpretation were meant:

> … the Court would in any event have been entitled to apply the general rules of treaty interpretation for the purpose of interpreting the [relevant] treaty.[236]

178.    In fact, there is no evidence of *any* rule-regime that would claim to be valid or operative independently of the VCLT.

179.    In the second place, and unlike national law, international law regimes are always partial in the sense that they regulate only some aspects of State behaviour while presuming the presence of a large number of other rules in order to function at all.  They are always situated in a "systemic" environment.  That, after all, is the *very meaning of the generality* of certain customary law rules of general principles of law.  As the Permanent Court of Arbitration pointed out in the *Georges Pinson* case:

> Toute convention internationale doit être repute s'en référer tacitement au droit international commun, pour toutes les questions qu'elle ne résout pas elle-même en termes exprès et d'une façon differente.[237]

---

[236]  *Case concerning Kasikili/Sedudu Island (Botswana/Namibia) I.C.J. Reports 1999* p. 1102, para. 93.

[237]  "Every international convention must be deemed tacitly to refer to general principles of international law for all the questions which it does not itself resolve in express terms and in a different way."  *Georges Pinson* case (*France/United Mexican States*) Award of 13 April 1928, UNRIAA, vol. V, p. 422.

180.    Or, as stated more recently by the OSPAR Arbitral tribunal:

> Our first duty is to apply the OSPAR Convention.  An international Tribunal will also
> apply customary international law and general principles unless and to the extent that the
> parties have created a *lex specialis*.[238]

181.    This is also reflected in the wide-ranging jurisprudence concerning State contracts.
Initially, there may have been a sense that these existed in a legal vacuum.  However, since
the *Saudi Arabia v. ARAMCO* award (1958), it has become a standard practice to refer to
international law as the governing legal order.  The Tribunal stated there as follows:

> It is obvious that no contract can exist *in vacuo*, without being based on a legal system.
> The conclusion of a contract is not left to the unfettered discretion of the parties.  It is
> necessarily related to some positive law which gives legal effect to the reciprocal and
> concordant manifestations of intent made by the parties.[239]

182.    Even as the proper legal order for such contracts may remain a matter of
some controversy, most lawyers would accept the statement of the sole arbitrator in
*TOPCO/CALASIATIC* (1977) that this is "a particular branch of international law:  the
international law of contract".[240]  The consequences of this were, again, stated as follows
by the Iran-US Claims Tribunal:

> As a *lex specialis*, in relations between the two countries, the treaty supersedes the
> *lex generalis*, namely customary international law … however … the rules of customary
> international law may be useful in order to fill in possible lacunae of the law of the
> Treaty, to ascertain the meaning of undefined terms in its text or, more generally, to aid
> interpretation and implementation of its provisions.[241]

---

[238] Dispute Concerning Access to Information under Article 9 of the OSPAR Convention (Final Award 2 July 2003) para. 84, ILR vol. 126 (2005) p. 364.

[239] *Saudi Arabia v. ARAMCO*, ILR vol. 27 (1963) p. 165.

[240] *Dispute Between Texaco Overseas Petroleum Company/California Asiatic Oil Company v. Libya*, ILM vol. 17 (1978) p. 13, para. 32.  For an overview of the development and present status of the "international law of investment", see e.g. Andreas Lowenfeld, *International Economic Law* (Oxford:  Oxford University Press, 2002) pp. 387-493.

[241] *Amoco International Finance Corporation v. Iran*, Iran-US C.T.R, vol. 15, 1987-II, p. 222, para. 112.  I am grateful to Carlos Lopez Hurtado for this and some other references and arguments.

A/CN.4/L.682
page 96

183.    These rules and principles include at least those concerning statehood, jurisdiction, State representation, State succession, creation and transfer of sovereignty, privileges and immunities of diplomats, territorial status (e.g. freedom of the High Seas), rules on nationality, concept of "crimes against humanity", not to mention of all the various rules that not only become applicable but are hierarchically superior to the regime-rules by virtue of Article 103 of the Charter of the United Nations.  In their review of the practice of the European and Inter-American Courts of Human Rights, a member of the former and the President of the latter highlighted in detail the use of international law of State responsibility, immunity, jurisdiction and the "general principles of law recognized by civilized nations" (not always distinguished from general principles of *international law*) by their treaty bodies.  They concluded that:

> les systèmes en cause font partie intégrante du droit international général et conventionnel.  Cela signifie que l'idée du fractionnement du droit international … n'a guère de pertinence pour les systémes internationaux de protection des droits de l'homme.[242]

184.    To press upon a perhaps self-evident point, there is no special "WTO rule" on statehood, or a "human rights notion" of transit passage, as little as there is a special rule about State immunities within the European Court of Human Rights or a WTO-specific notion of "exhaustible resources".  Moreover, the general rules operate unless their operation has been expressly excluded.  This was the view of the Chamber of the ICJ concerning the applicability of the local remedies rule in the *ELSI* case.  It had no doubt that:

> … the parties to a treaty can therein either agree that the local remedies rule should apply to claims based on alleged breaches of that treaty; or confirm that it shall apply. Yet the Chamber finds itself unable to accept that an important principle of customary international law could be held to have been tacitly dispensed with, in the absence of any words making clear the intention to do so.[243]

185.    It is in the nature of "general law to apply generally" - namely inasmuch as it has not been specifically excluded.  It cannot plausibly be claimed that these parts of the law - "important principles" as the Court put it - have validity only as they have been "incorporated"

---

[242] Caflisch & Cancado Trindade, "Les conventions americaine et européenne des droits de l'homme …", supra note 157, pp. 60-61.

[243] Elettronica Sicula S.p.A. (ELSI) (*United States of America v*. Italy) *I.C.J. Reports 1989* p. 42, para. 50.

into the relevant regimes.  There never has been any act of incorporation.  But more relevantly, it is hard to see how regime-builders might have agreed *not* to incorporate (that is, opt out from) such general principles.  The debate about new states' competence to pick and choose the customary law they wish to apply ended after decolonization without there having been much "rejection" of old custom.  Few actors would care to establish relations with a special regime that claimed a blanket rejection of all general international law.  Why, in such case, would anyone (including the regime's establishing members) take the regime's engagements seriously?

### (iii)      Fall-back onto general rules due to the failure of self-contained regimes

186.    The third case - the "failure" of the self-contained regime - is one that most commentators would agree brings the general law into operation.  However, it is far from clear what may count as "failure".  In assessing this, the nature of the regime must clearly be taken into account.[244]  For most special regimes, their *raison d'être* is to strengthen the law on a particular subject-matter, to provide a more effective protection for certain interests or to create a more context-sensitive (and in this sense, more "just") regulation of a matter than what is offered under the general law.  Reporting and individual applications to human rights treaty-bodies as well as the non-compliance mechanisms under environmental treaties clearly seek to attain precisely this.  The same is true of the rapid and effective WTO dispute settlement system.

187.    Now sometimes the risk may emerge that the special regime in fact waters down the relevant obligations.  This may be caused, for instance, by the accumulation of an excessive backlog in the treatment of individual applications, a non-professional or biased discussion of national reports, or any other intentional or non-intentional malfunction in the institutions of the regime.  A dispute-settlement mechanism under the regime may function so slowly or so

---

[244]  See e.g. Arangio-Ruiz, Fourth Report, supra note 200, pp. 40-41, paras. 115-116; Simma, "Self-Contained Regimes", supra note 199, pp. 111-131; Denis Alland, *Justice privée et ordre juridique international.  Etude théorique des contre-mesures en droit international public* (Paris:  Pedone, 1994) pp. 278-291; Christian Sano Homsi, "Self-Contained Regimes - No Cop-out for North Korea", Suffolk Transnational Law Review, vol. 24 (2000) pp. 99-123 and the various essays in Barnhoorn & Wellens, *Diversity in Secondary Rules …* supra note 12.  The idea that a special regime such as the WTO legal order "falls back" on general international law while the degree of "contracting out" remains a matter of interpretation, is also usefully discussed in Pauwelyn, *Conflict of Norms,* supra note 21, pp. 205-236.

A/CN.4/L.682
page 98

inefficiently that damage continues to be caused without a reasonable prospect of a just settlement in sight. At some such point the regime will have "failed" - and at that point it must become open for the beneficiaries of the relevant rights to turn to the institutions and mechanisms of general international law.

188.    No general criteria can be set up to determine what counts as "regime failure". The failure might be either substantive or procedural. A substantive failure takes place if the regime completely fails to attain the purpose for which it was created - members of a free trade regime persist in their protectionist practices, pollution of a watercourse continues unabated despite pledges by riparian States parties to a local environmental treaty. Inasmuch as the failure can be articulated as a "material breach" under article 60 of the VCLT, then the avenues indicated in that article should be open to the members of the regime. It cannot be excluded, either, that the facts relating to regime failure may be invoked as a "fundamental change of circumstances" under article 62 of the VCLT.

189.    The other alternative is a procedural failure - the institutions of the regime fail to function in the way they should. For instance, they have provided for a reparation but that reparation is not forthcoming.[245] When it is a question about how far must the States parties to the special regime continue to have resort to the special procedures, analogous considerations would seem relevant as in the context of the requirement of exhaustion of local remedies in the law of diplomatic protection. In this regard, the main principles are enunciated in draft articles 8 to 10 of the Commission's present draft on Diplomatic Protection. According to article 10, local remedies need not be exhausted when:

(a)    The local remedies provide no reasonable possibility of an effective redress;
(b) There is undue delay in the remedial process which is attributable to [the State alleged to be responsible].[246]

---

[245]  This is the example mentioned in Arangio-Ruiz, Fourth Report, supra note 200, p. 40, para. 115a.

[246]  *Official Records of the General Assembly, Fifty-eighth Session, Supplement No. 10* (A/58/10) Article 10 [14], p. 84.

190.    This would seem to apply when the State suffering the damage is itself a member in the regime.  For regime-outsiders, of course, general law continues to prevail.  But what might be the situation in cases where the injury is not suffered by a formal member of the regime - but the regime nonetheless fails to bring about the objective set.  For instance, the non-compliance mechanism under article 8 of the Montreal Protocol on Substances that Deplete the Ozone Layer fails to bring any of the parties in routine breach of their emission reduction obligations under article 2 of the Protocol into order.  A number of States parties to the 1966 Covenant on Civil and Political Rights continue to engage in massive human rights violations irrespective of the Human Rights Committee's opinions and conclusions.  When may the other parties take countermeasures against the State in breach of its obligations under articles 49 or 54 of the draft articles of State responsibility for internationally wrongful acts?  There are no clear answers to these questions but it seems evident that at some point there must be a "fall-back" on general rules of State responsibility, including countermeasures and general mechanisms of dispute settlement (e.g. recourse to the International Court of Justice under a compulsory jurisdiction declaration made by two members of the special regime).[247]

## 4.  Conclusions on self-contained regimes

191.    The rationale of special regimes is the same as that of *lex specialis*.  They take better account of the particularities of the subject-matter to which they relate; they regulate it more effectively than general law and follow closely the preferences of their members.  Where the application of the general law concerning reactions to breaches (especially countermeasures) might be inappropriate or counterproductive, a self-contained regime such as, for instance, the system of *persona non grata* under diplomatic law, may be better suited to deal with such breaches.  However, as the Commission observes, it is equally clear that if the general law

---

[247]  See further Simma, "Self-Contained Regimes", supra note 199, pp. 118-135 and Alland, *Justice privée et ordre juridique* ... supra note 244, pp. 290-291.  This would also seem to apply to the failure of the special regime of the EU.  See also Laurence Boisson de Chazournes, *Les contre-mesures dans les relations economiques internationales* (Geneve:  Pedone, 1992) p. 185.

has the character of *jus cogens*, then no derogation is permitted.  In fact, the assumption seems to be that in order to justify derogation, the special rules "have at least the same legal status as those expressed in this article".[248]

192.    But no regime is self-contained.  Even in the case of well-developed regimes, general law has at least two types of function.  First, it provides the normative background that comes in to fulfil aspects of its operation not specifically provided by it.  In case of dissolution of a State party to a dispute within the WTO dispute settlement system, for instance, general rules of State succession will determine the fate of any claims reciprocally made by and as against the dissolved State.  This report has illustrated some of the ways in which this supplementing takes place.  Second, the rules of general law also come to operate if the special regime fails to function properly.  Such failure might be substantive or procedural, and at least some of the avenues open to regime members in such cases are outlined in the Vienna Convention itself.  Also the rules on State responsibility might be relevant in such situations.

193.    Third, the term "self-contained regime" is a misnomer.  No legal regime is isolated from general international law.  It is doubtful whether such isolation is even possible:  a regime can receive (or fail to receive) legally binding force ("validity") only by reference to (valid and binding) rules or principles *outside it*.  In previous debates within the Commission over "self-contained regimes", "regimes" and "subsystems", there never was any assumption that they would be hermetically isolated from the general law.  It is useful to note that article 42 of the VCLT contains a "Münchausen-provision" that is directly relevant here for it expressly situates every legal regime within its framework.  According to it:

## Article 42

### Validity and continuance in force of treaties

1.    The validity of a treaty or of the consent of a State to be bound by a treaty may be impeached only through the application of the present Convention.

---

[248] Draft Articles on State Responsibility, Commentary on Article 55, para. 2 in *Official Records of the General Assembly, Fifty-sixth Session*, *Supplement No. 10* (A/56/10) p. 357.

194. This, it could be said, is the "minimum-level" at which the Vienna Convention regulates everything that happens in the world of regime-building and regime-administration. Through it - as well as through the reasoning above - every special regime links up with general international law in three ways:

(1) The conditions of validity of a special regime, including the validity of its establishment, are determined by principles of general international law;

(2) Because a special regime is "special", it does not provide all the conditions of its operation. General law provides resources for this purpose. This is not a matter of general law having been incorporated into the special regime but follows from the "generality" of that general law - or in other words, from international law's systemic nature. General international law influences the operation of a special regime above all in three distinct ways:

(a) General international law (that is, general custom and general principles of law) fulfils gaps in the special regime and provides interpretative direction for its operation;

(b) Most of the VCLT (including, above all, article 31 and 32) is valid as customary law and applicable in the sense referred to in (a);

(c) General international law contains principles of hierarchy that control the operation of the special regime above all in determining the peremptory norms of international law but also in providing resources for determining in case of conflict what regime should be given priority or, at least, what consequences follow from the breach of the requirements of one regime by deferring to another (usually State responsibility);

(3) Finally, general international law provides the consequences of the "failure" of the special regime. When a special regime "fails" cannot always be determined from within that regime, however. Inability to attain an authoritative determination of failure may be precisely one aspect of such failure - e.g. when a special dispute settlement system ceases to function.

## 5.  Regionalism

**(a)      What is "regionalism"?**

195.    "Regionalism" does not figure predominantly in international law treaties and when it does, it rarely takes the shape of a "rule" or a "principle".  It does not denote any substantive area of the law, either, on a par with "human rights" or "trade law".  When the question of regionalism is raised this is usually done in order to discuss the question of the universality of international law, its historical development or the varying influences behind its substantive parts.  Only rarely it appears in an openly normative shape, as a kind of regional *lex specialis* that is either intended as an application of modification of a general rule or, perhaps in particular, as a deviation of such a rule.

196.    Regionalism is a well-established theme of foreign policy debates.  Discussions about the best approaches for regulating matters of, say, economic policy or collective security habitually take up the advantages of institutional frames that are narrower than the universal.  As the United Nations were being debated between the Great Powers at the end of the Second World War, the choice between regionalism and universalism weighted heavily on the planning of the post-war collective security system.  Churchill, for example, originally preferred a set of regional systems - "a Council of Europe and a Council of Africa under the common roof of the world organization".[249]  As debates turned to prefer a single system under the supervision of the Security Council, concern was expressed in San Francisco over the way this opened the door for intervention by outside powers in the management of regional security (especially in Latin America).[250]

197.    Sometimes particular orientations of legal method - for example an "Anglo-American approach" - or policies adopted by or typical to particular groups of States - say, "third world approaches" **-** also raise questions of regionalism.  Debates over human rights and cultural

---

[249] W.G. Grewe, "The History of the United Nations" in Bruno Simma (ed.), *The Charter of the United Nations. A Commentary* (Oxford:  Oxford University Press, 1995) p. 7.

[250] See e.g. Ruth Russell and Jeannette E Muther, *A History of the United Nations Charter.  The Role of the United States 1940-1945* (Washington: Brookings, 1958) pp. 688-712.  Stephen C. Schlesinger, *Act of Creation. The Founding of the United Nations* (Boulder:  Westview, 2003) pp. 175-192.

relativism, too, occasionally highlight those tensions.  In such debates, the focus is on the question whether some rules or principles - including notions of human right - should automatically be applied in a universal fashion.  What is the scope of regional variation in a system intended as universal?

198.    The varying uses of the expression "regionalism" as part of legal and political rhetoric call for an analysis of the actual impact of that notion for the question of fragmentation of international law now under study within the Commission.  For that purpose, it is suggested that there are at least three distinct meanings for "regionalism" that refer specifically to international law and that should be taken account of.

**(b)    "Regionalism" as a set of approaches and methods for examining international law**

199.    A first - and the most general - use of the term refers to particular orientations of legal thought and culture.  It is, for example, sometimes said that there is an "Anglo-American" or "continental" tradition of international law - although frequently the distinctiveness of such traditions is denied.[251]  More recently, it has been habitual to claim that there are distinct "Soviet" doctrines or "Third World Approaches" to international law.[252]  To some extent, the notion of different legal cultures has been enshrined, for example, in the Statute of the International Law Commission itself as Article 8 of the Statute requires "that in the Commission as a whole representation of the main forms of civilization and of the principal legal systems of the world should be assured". The composition of many other international law bodies is also expected to conform to this pattern reflected in the standard - though usually informal - practice in United Nations elections to follow the principle of "equitable geographical distribution".  The United Nations General Assembly has occasionally highlighted the importance of this principle -

---

[251]  See especially, Hersch Lauterpacht, "The So-Called Anglo-American and Continental Schools of Thought in International Law", BYBIL vol. 12 (1931) pp. 31-62. See also e.g. Edwin D. Dickinson, "L'interprétation et l'application du droit international dans les pays anglo-américains", *Recueil des cours* … vol. 129 (1970) pp. 305-395.

[252]  Antony Anghie & B.S. Chimni, "Third World Approaches to International law and Individual responsibility in International Conflicts" in Steven R. Ratner & Anne-Marie Slaughter, *The Methods of International Law* (Washington:  ASIL, 2004) pp. 185-210.  On "Soviet" and "Russian" doctrines, see K. Gryzbowski, *Soviet Public International law:  Doctrines and Diplomatic Practice* (Leiden:  Sijthoff, 1970); Tarja Långström, *Transformation in Russia and International Law* (The Hague:  Nijhoff, 2002).

A/CN.4/L.682
page 104

for example in 2002 as it "*encourage[d]* States parties to the United Nations human rights instruments to establish quota distribution systems by geographical region for the election of the members of the treaty bodies".[253]

200.    No doubt, there have always existed regional and local approaches to or even "cultures" of international law, and much of the relevant literature traces their influence on general international law.  Thus, for instance, there is today again much talk about the role of a "European tradition" of international law.[254]  Historical studies also canvass the "American Tradition of International Law"[255] and debate the role of Africa or Asia to the development of international law.[256]  Since the nineteenth century, the special nature and influence of Latin America on international law has often been stressed.[257]

201.    It is no doubt possible to trace the sociological, cultural and political influence that particular regions have had on international law.  However, these studies do not really address the issue of fragmentation.  They do not claim that some rules should be read or used in a special way because of their having emerged as a result of "regional" inspiration.  On the contrary, these regional influences appear significant precisely because they have lost their originally geographically limited character and have come to contribute to the development of universal international law.  They remain historical or cultural sources or more or less continuing political influences behind international law.

---

[253]  See A/RES/56/146 (2002).

[254]  See especially the series of Symposia on the "European Tradition in International Law" in the EJIL since 1990.

[255]  See e.g. Mark W. Janis, *The American Tradition of International Law* (Oxford:  Oxford University Press, 2004).

[256]  See T.O. Elias, *Africa and the Development of International Law* (Leiden: Sijthoff, 1972); R.P. Anand, "The Role of Asian States in the Development of International Law" in R-J. Dupuy (ed.), *The Future of International Law in a Multicultural World* (The Hague:  Nijhoff, 1983) p. 105.  Many articles in the *Journal of the History of International Law,* published since 1999, have been geared to examining regional influences and developments in a historical way.

[257]  See *Asylum* case (*Colombia/Peru*) *I.C.J. Reports 1950* (dissenting opinion of Judge Alvarez) pp. 293-294. For an overview of the nineteenth century debates, see Hector Gros Espiel, "La doctrine du Droit international en Amérique Latine avant la première conférence panaméricaine", Journal of the History of International Law, vol. 3 (2001) pp. 1-17.  See also Liliana Obregón, *Completing Civilization:  Nineteenth Century Criollo Interventions in International Law* (SJD Diss. Harvard, mimeo, on file with author).  The main advocate of this idea in the twentieth century was undoubtedly Alejandro Alvarez.  See e.g. his "Latin America and International law", AJIL vol. 3 (1909) pp. 269-353.

202.    There is a very strong presumption among international lawyers that notwithstanding such influences, the law itself should be read in a universal fashion.  As Sir Robert Jennings pointed out in 1987:

> … the first and essential general principle of public international law is its quality of universality; that is to say, that it be recognized as valid and applicable in *all* countries, whatever their cultural, economic, socio-political, or religious histories and traditions.[258]

203.    And yet, as Jennings himself notes,

> … this is not to say, of course, that there is no room for regional variation, perhaps even in matters of principle …  Universality does not mean uniformity.  It does mean, however, that such a regional international law, however variant, is part of the system as a whole, and not a separate system, and it ultimately derives its validity from the system as a whole.[259]

204.    If regionalism itself thus is not automatically of normative import, its significance is highlighted as it mixes with functional differentiation.  That is to say, where previously the moving forces behind international law may have been geographical regions, today those forces are often particular interests that are globally diversified:  trade interests, globalization lobbies, environmentalist or human rights groups and so on.  The language of the "Third World" already reflected this change.  Although the States in this group are sometimes identified in geographic terms - e.g. as "the South" - this is not intended to refer to a special geographical property (such as climate for example) they share but to a certain homogeneity based on a convergence of interests, values or political objectives.  Functional differentiation - the emergence of special types of law that seek to respond to special types of ("functional") concern such as "human rights law" or "environmental law" etc. - is certainly at the (sociological) root of the phenomenon of fragmentation and diversification of international law.  This is, however, treated in the other parts of this report and need not be specifically discussed here.

---

[258]  Robert Jennings, "Universal International law in a Multicultural World" in Maarten Bos & Ian Brownlie, *Liber Amicorum for Lord Wilberforce* (Oxford:  Oxford University Press, 1987) also published in *Collected Essays of Sir Robert Jennings* (The Hague:  Kluwer, 1998) p. 341.

[259]  Jennings, ibid., p. 342.

A/CN.4/L.682
page 106

**(c)    "Regionalism" as a technique for international law-making**

205.    A second sense for regionalism is that of a privileged forum for international law-making.  It is often assumed that international law is or should be developed in a regional context because the relative homogeneity of the interests or outlooks of actors will then ensure a more efficient or equitable implementation of the relevant norms.  The presence of a thick cultural community better ensures the legitimacy of the regulations and that they are understood and applied in a coherent way.  This is probably the reason for why human rights regimes and free trade regimes have always been commenced in a regional context - despite the universalist claims of ideas about human rights or commodity markets.

206.    This is an aspect of the general argument in favour of contextualization and has already been discussed in the section on *lex specialis* above:  closeness to context better reflects the interests and consent of the relevant parties.  As a matter of legal policy, it may often be more efficient to proceed by way of taking a regional approach.[260]  Both human rights and economic integration constitute examples of this type of reasoning.  More broadly, regionalism emerges sometimes in connection with sociological theories about international law, especially views that emphasize a natural tendency of development from States to larger units of international government.

207.    In the sociological ("objectivist") theory of international law presented by Georges Scelle, for example, regionalism appears as an incident of what he called the "federal phenomenon", a process leading from the individual State to larger normative units gradually and in successive stages as a result of expanding circles of "solidarity".  This may happen, he wrote, as a result of natural affinities between neighbouring States (common history, language, religion etc.) but also through the need for division of labour (as in regional economic integration) or in view of a common threat (as through the development of systems of

---

[260]  For one rather thorough overview of regional cooperation between African, American, former socialist and West European States, together with a discussion of the regional commissions of the United Nations and regional development banks, see Rudolf Bernhardt (ed.), *Encyclopaedia of International Law* (Amsterdam:  Elsevier, 2000) vol. IV, pp. 100-161.

regional security).[261]  More recently, theories of interdependence and international regimes in international relations studies as well the sociology of globalization point to the advantages of governance through units wider than States, including regional units.

208.    Such studies have given rise to varying political assessments.  Hedley Bull, for instance, points to the attractions of Third World regionalism:  it has the advantages of functionality and solidarity for weak States and it may be used to avoid the danger of great power domination that may result from participating in global or otherwise wider spheres of cooperation.[262]  Other theorists, for their part, have taken the exactly opposite view and have seen regionalism is an instrument of hegemony.  Under this view, regionalism would often signify the creation of large spaces or hegemonic "blocks" - the Monroe doctrine might perhaps serve as an example - by a great power in order to ensure supremacy or to redress the balance of power disturbed by the activities of another power elsewhere in the world.[263]

209.    There is of course an enormous amount of writing on the nature, advantages and disadvantages of regionalism as an instrument of the politics of cooperation and hegemony.[264]  It is, however, doubtful whether such sociological views and historical speculations - whatever their merits - have much to contribute to an examination of the fragmentation of international law.  They, too, tend to see regional cooperation from a functional perspective, as a particular

---

[261]  Scelle, Cours de droit … supra note 69, p. 253.

[262]  Hedley Bull, *The Anarchical Society.  A Study of Order in World Politics* (London: Macmillan, 1977) pp. 305-6.  For a consideration of the advantages and disadvantages of regional security "complexes", situated in a mid-level between States and global security systems, see e.g. Barry Buzan, *People, States, & Fear.  An Agenda for International Security Studies in the Post-Cold War Era* (New York, Harvester, 1991) 2nd ed. pp. 186-229.  For the mutually reinforcing but also challenging forces of economic globalization and regionalization, see e.g. Charles Oman, "Globalization, Regionalization and Inequality" in Andrew Hurrell & Ngaire Woods (eds.), *Inequality, Globalization, and World Politics* (Oxford:  Oxford University Press, 2000) pp. 36-65.

[263]  See in particular, Carl Schmitt, *Der nomos der Erde im Völkerrecht des Jus Publicum Europaeum* (Berlin: Duncker & Humblot1950).  To the same effect, see Wilhelm Grewe, *The Epochs of International Law* (Berlin: De Gruyter, 2000) pp. 458 et seq.

[264]  See e.g. Richard Falk & Saul Mendlowitz (eds.), *Regional Politics and World Order* (San Francisco: Freeman, 1973); Winfried Lang, *Die internationale Regionalismus* (Springer:  Wien, 1982) and the essays collected in Joseph S. Nye, *International Regionalism.  Readings* (Boston:  Little & Brown 1968).

A/CN.4/L.682
page 108

case of the more general need for States either to collaborate for the attainment of common aims or to enlist partners so as to create, maintain or oppose hegemony.  As an incident of theories about the logic of cooperation and rational choice, regionalism loses its specificity as a problem and should be rather dealt with in connection the functional diversification of the international society in general, in particular the problem of special regimes, dealt with in the previous section of this report.

210.    Nevertheless, one aspect deserves mention here, namely regionalism in regard to trade law.  Despite the strong pull for a global trade regime within the GATT/WTO system, the conclusion of Regional Trade Agreements (RTAs) has not diminished, on the contrary.  During the last stages of the Uruguay Round, in 1990-1994, for example, 33 RTAs were notified to the GATT Secretariat while in the period between January 2004 and February 2005 altogether 43 RTAs were notified - "making it the most prolific RTA period in recorded history".[265] Technically speaking, while such agreements obviously liberate trade between their partners, they also limit trade to the outside world.  The specific justification for RTAs is found in article XXIV GATT and although there has been endemic controversy about the scope of the provision the (understandable) view within the WTO system, as articulated by the Appellate Body, has been to interpret it restrictively.[266]  Nevertheless, in view of the difficulties and controversies in developing the universal trade system, there appears presently to be no end in sight to the conclusion of RTAs.

**(d)    "Regionalism" as the pursuit of geographical exceptions to universal international law rules**

211.    But regionalism might have a stronger sense if it is meant to connote a rule or a principle with a regional sphere of validity or a regional *limitation* to the sphere of validity of a universal rule or principle.  In the former (positive) sense, the rule or principle would be binding only on

---

[265] Friedl Weiss, "Coalitions of the Willing:  The Case for Multilateralism vs. Regional and Bi-lateral Arrangements in World Trade" in C. Calliess, G. Nolte & P-T. Stoll, *Coalitions of the Willing. Avant-garde or Threat* (Cambridge: Cambridge University Press, 2006, forthcoming).  See also section D. 4. (a) (i) below.

[266] See *Turkey - Restrictions on Imports of Textile and Clothing Products*, 31 May 1999, WTO/DS34/R, para. 9.92.

States identified as members of a particular region.[267]  In the latter (negative) sense, regionalism would exempt States within a certain geographical area from the binding force of an otherwise universal rule or principle.

212.    There are many problems in such suggestions, not the least of which is the identification of the relevant "region" and especially the imposition of that identification on a State not sharing it.  For *normative* regionalism must be clearly distinguished from the regular case of a multilateral treaty between States in a region or a set of converging practices among States that amount to a regional custom.  In the latter two cases the conventional or customary rule becomes binding on the relevant States on the basis of their consent to it.  The fact that the States come from the same region is only a factual ingredient of their relationship and of no greater consequence to the binding force or interpretation of that rule than their ethnic composition or economic system.[268]  Instead of illustrating the independently normative power of regional linkages, these cases come under the discussion of *lex specialis* above.[269]

213.    A separate, much more difficult case is the one where it is alleged that a regional rule (either on the basis of treaty practice or custom) is binding on a State even when the State has not specifically adopted or accepted it.  This is the claim dealt with (albeit inconclusively) by the International Court of Justice in the *Asylum* (1950) and *Haya de la Torre* (1951) cases.  Here, Colombia argued inter alia that there had emerged an "American" or a "Latin-American" law concerning the matter of diplomatic asylum.[270]  According to Judge Alvarez, this had been based

---

[267]  This is the understanding in e.g. Dietrich Schindler, "Regional International Law", in Bernhardt, Rudolf Bernhardt (ed.), *Encyclopaedia of International Law* (Amsterdam:  Elsevier, 2000) vol. IV, pp. 161, 161-165.

[268]  This does not of course mean that it would be of no consequence at all.  In the *Haya de la Torre* case, for instance, the International Court of Justice felt entitled to interpret Article 2 of the relevant (Havana) Convention "in conformity with the Latin American tradition in regard to asylum", *Haya de la Torre* case *(Colombia v. Peru) I.C.J. Reports 1951* p. 81.

[269]  Many regional organizations are like this.  Their "regional" character does not distinguish them from other multilateral organizations.  This means, for instance, that not all of the States of the relevant region always participate in them and that their competence does not even in such case extend to the non-participating ones.  Schindler, "Regional International Law", p. 161.

[270]  See especially the "Observations du gouvernement du Colombie sur l'existence du droit international américain. Réplique de gouvernement Colombien (20 IV 50) ICJ, *Asylum* case *(Colombia/Peru) Pleadings* vol. I, pp. 330-334.

A/CN.4/L.682
page 110

on the "wish" of Latin American States "since their independence" to "modify the law in order
to bring it to harmony with the interests and aspirations of their continent".[271] Here both the
purpose and the justification of regionalism are clearly outlined: the purpose is to *deviate* from
the general law while the justification for this is received in part from consent ("wish"), in part
on a sociological argument about regional appropriateness. The normative force of this law was
as clear to Colombia as it was to Alvarez. A regional law was applicable in the Colombian view
even on States of the region that did not accept it.[272] Alvarez, too, argued not only that it was
"binding upon all States of the New World" as well as on all other States "in matters affecting
America",[273] but also that it was "binding upon all the states of the New World" though it "need
not be accepted by all [of them]".[274]

214.    The question of regionalism has often arisen in connection with rules alleged to have a
specifically South American origin or sphere of applicability, such as the famous Calvo, Drago
and Tobar doctrines.[275] Nevertheless, none of these doctrines has ever received general

---

[271] *Asylum* case (*Colombia/Peru*) *I.C.J. Reports 1950* (dissenting opinion of Judge Alvarez) p. 293. Likewise,
Judge Read pointed to the existence of a "body of conventional and customary law, complementary to universal
international law, and governing inter-state relations in the Pan-American world", *Asylum* case (*Colombia/Peru*)
*ICJ Reports 1950* (dissenting opinion of Judge Read) p. 316.

[272] "Mémoire du Gouvernement Colombien", *Haya de la Torre* case *(Colombia v. Peru) Pleadings 1951* pp. 25-27.

[273] "Universal international law finds itself to-day within the framework of continental and regional law, and
all such systems adopt new trends in accordance with those indicated in the Preamble and Chapter I of the
United Nations Charter; such trends reflect entirely American, international spirit", *Asylum* case (*Colombia/Peru*)
*I.C.J. Reports 1950* (dissenting opinion of Judge Alvarez) p. 294.

[274] *Asylum* case (*Colombia/Peru*) *I.C.J. Reports 1950* (dissenting opinion of Judge Alvarez) p. 294.

[275] Under one version of the Calvo Doctrine, international liability with respect to contracts entered into with alien
private contractors by the State party is excluded. Another formulation describes it as a stipulation in a contract in
which "an alien agrees not to call upon his state of nationality in any issues arising out of the contract". This used
to be inserted (or suggested) as a clause in investment contracts but has also been argued as a specific rule of
South American regional law. See e.g. D. P. O'Connell, *International Law,* supra note 77, vol. II, pp. 1059-1066
and Eduardo Jiménez de Aréchaga, "International Responsibility" in Max Sorensen, *Manual of Public International
Law* (London: Macmillan, 1968) pp. 590-593. For its (contested) relevance today, see Christopher K. Dalrymple,
"Politics and Foreign Investment: The Multilateral Investment Guarantee and the Calvo Clause", Cornell
International Law Journal vol. 29 (1996) p. 161 and Denise Manning-Cabrol, "The Imminent Death of the Calvo
Clause and the Rebirth of the Calvo Principle: Equality of Foreign and National Investors", Law & Policy in
International Business, vol. 26 (1995) p. 1169. The Drago doctrine sought to exempt State loans from general rules
of State responsibility, O'Connell*, International Law,* supra note 77, vol. II, pp. 1003-4. The Tobar doctrine, again,
has to do with the alleged duty of non-recognition of governments that have arisen to power by non-constitutional
means. O'Connell, supra note 77*,* vol. I, p. 137.

endorsement and their importance today seems doubtful. In the *Asylum* case, the Court itself did not specifically pronounce on the conceptual possibility of there being specifically regional rules of international law in the above, strong sense (i.e. rules binding automatically on States of a region and binding others in their relationship with those States).[276] It merely stated that the cases cited by Colombia in favour of the existence of a regional rule of diplomatic asylum may have been prompted by considerations of convenience or political expediency. No evidence had been produced that they would have arisen out of a feeling of legal obligation.[277] The more important point, however, is perhaps that the Court treated the Colombian claim as a claim about customary law and dismissed it in view of Colombia's failure to produce the required evidence. There was, in other words, no express discussion of "regionalism" in the judgment and even less an endorsement of the strong sense of regionalism as outlined above.

215.    In fact, there is very little support for the suggestion that regionalism would have a normative basis on anything else apart from regional customary behaviour, accompanied, of course, with the required *opinio juris* on the part of the relevant States. In such case, States outside the region would not be automatically bound by the relevant regional custom unless there is specific indication that they may have accepted this either expressly or tacitly (or perhaps by way of absence of protest). This would also render any specific normative (in contrast to historical, sociological or legislative-technical) debate about regionalism superfluous. However, two specific issues might still require being singled out.

216.    One is the question of the universalism vs. regionalism opposition in human rights law. Although this goes deep into the philosophical question of cultural relativism - and as such falls outside the ILC project on fragmentation - one approach to it might be noted. This is to think of "regionalist challenges" not in terms of exceptions in universal norms but, as Andrew Hurrell has put it "principally in terms of implementation".[278] This would mean understanding regional

---

[276] Though it did hint in this direction by referring to "one of the most firmly established traditions of Latin America, namely non-intervention, *Asylum* case (*Colombia/Peru*) *I.C.J. Reports 1950* p. 285.

[277] *Asylum case (Colombia/Peru) I.C.J. Reports 1950* pp. 276-277.

[278] Andrew Hurrell, "Power, Principles and Prudence: Protecting Human Rights in a Deeply Divided World" in Tim Dunne & Nicholas J. Wheeler (eds.), *Human Rights in Global Politics* (Cambridge: Cambridge University Press, 1999) pp. 294-297.

A/CN.4/L.682
page 112

variety not in terms of exceptions but the varying, context-sensitive implementation and application of shared standards.  If so, then this matter, too, would fall under the more general question of the relationship between general and special law, no different from the general problem of the applicability and limits of *lex specialis*.

217.    Another instance concerns the question of the relationship between universalism and regionalism within the collective security system of the United Nations or, in other words, the relations between Chapters VII and VIII of the Charter.  Here, open questions have included the definition of what may count as regional "arrangements" or "agencies" as well as when may action be "appropriate" under Article 52 (1).  The most important question, however, appears to concern the priority of competence between regional agencies and arrangements to take enforcement action and the Security Council.[279]  Under Article 52 (2) the members of regional agencies or arrangements shall make every effort to settle their disputes before submitting them to the Council.  Whatever the disagreements over the right marching order here, it seems evident that action by a regional agency or arrangement cannot be considered an "exception" to the competence of the Security Council which at all times may be seized of an issue in case it feels it appropriate to do so because, for example, the regional action has not been or is not likely to be "appropriate" or effective.  In this regard, Chapter VIII should be seen as a set of functional provisions that seek the most appropriate level for dealing with particular issues with due regard to issues of "subsidiarity".[280]

**(e)    European integration**

218.    A brief mention should finally be made of the European Union.  As is well-known, the EU began as a customs union with the conclusion in 1957 of the Treaty of Rome on the European Economic Community.  Since then, the founding treaties have been amended several times so that the instrument presently in force - The Treaty on the European Union (done at Maastricht in 1992 and amended in Amsterdam in 1997 and Nice 2001) - goes way beyond an

---

[279]  For a useful overview, see Hummer & Schweitzer, "Article 52", in Bruno Simma (ed.), *The Charter of the United Nations.  A Commentary* (Oxford:  Oxford University Press 1995) pp. 683-722.

[280]  Ibid., pp. 709-710.

economic arrangement. The Union's activities are said to consist of three "pillars", one dealing with the most heavily supranational rules on "Community" activities, the other two more "intergovernmental" fields of common foreign and security policy (CFSP) and Co-operation in justice and internal affairs. European integration has profoundly transformed the nature of the legal relations between EU members. As the European Court of Justice famously pointed out, the founding treaties are more than international agreements - they are a kind of "constitutional charter" of the EU.[281] They have set up a special kind of legal order between the Member States and thus they are interpreted and applied in a manner that does not necessarily correspond to the way "ordinary" agreements are interpreted and applied.

219.    There is no reason to dwell into the special nature of the legal relations between EU members. One phenomenon that does contribute to fragmentation is the way the Union as an international actor is present in a number of different roles on the international scene. First, the European Community, acting under the "first pillar" of EU competencies is a subject of international law and for practical purposes may be treated towards the outside world as an intergovernmental organization, with whatever modification its specific nature brings to that characterization.[282] At the same time, especially when dealing with foreign policy matters as well as cooperation in justice and home affairs, the EC acts alongside its Member States. The distinction between matters of exclusive EC competence and shared competencies between the EU and Member States is an intricate part of EC law that is often very difficult to grasp. This is particularly so in regard to the "mixed agreements" in which both the Community and the Member States are parties but in which their respective competencies develop as a function of the development of (internal) EC law.[283] It has of course been stressed on the part of the EU that none of this will have any effect on the rights of third States - and indeed, no such effect could ensue from legal developments that from the perspective of the latter are strictly *inter alios acta*.

---

[281] Case 294/83, *Parti écologiste* "*Les Verts*" *v. European Parliament,* Judgment of 23 April 1986, ECR (1986) 01339, p. 1365, para. 23.

[282] See Jan Klabbers, "Presumptive Personality: The European Union in International Law" in Martti Koskenniemi, *International Law Aspects of the European Union* (The Hague: Nijhoff, 1997) pp. 231-254.

[283] For useful analysis, see Joni Heliskoski, *Mixed Agreements as a Technique for Organizing the International Relations of the European Community and Its Member States* (The Hague: Brill, 2001).

A/CN.4/L.682
page 114

Nevertheless, the question of divided competences remains a matter of some concern from the perspective of the coherence treaty rights and obligations - including the responsibility for any breach that may occur.  A particular aspect of EC action - the so-called "disconnection clauses" - bears a direct linkage to the Vienna Convention and will therefore be discussed separately in section D below.

### 6.  Conclusion on conflicts between special law and general law

220.    All legal systems are composed of rules and principles with greater and lesser generality and speciality in regard to their subject-matter and sphere of applicability.  Sometimes they will point in different direction and if they do, it is the task of legal reasoning to establish meaningful relationships between them so as to determine whether they could be applied in a mutually supportive way or whether one rule or principle should have definite priority over the other. This is what in section F below will be called "systemic integration".

221.    Many rule-systems contain, in addition to special primary rules, also special secondary rules having to do with responsibility or settlement of disputes.  Although these institutions are sometimes called "self-contained", they are never "clinically isolated" from the rest of the law. In fact, as we have seen, they owe their validity, receive their limits and are constantly complemented by legal rules and principles neither established by nor incorporated by any specific acts into them.  Nor has the sociological phenomenon of "regionalism" meant the emergence of isolated legal systems on a regional basis.  What role specialized or regional rule-complexes enjoy is a factual and historical matter that can only be ascertained on a case-by-case basis, again by bearing in mind the "systemic" nature of the law of which they all form a part.

222.    This section has highlighted the pragmatic role of the "speciality" and the "generality" of normative standards in the process of legal reasoning.  It has stressed the *relational* character of these attributes and the way in which their specific operation is always dependent on the context in which they are applied.  *To make or defend a claim of "speciality" is only possible in "general" terms.*  In this regard, the fragmentation of the substance of international law - the object of this study - does not pose any very serious danger to legal practice.  It is as normal a part of legal reasoning to link rules and rule-systems to each other, as it is to separate them and

to establish relations of priority and hierarchy among them. The emergence of new "branches" of the law, novel types of treaties or clusters of treaties is a feature of the social complexity of a globalizing world. If lawyers feel unable to deal with this complexity, this is not a reflection of problems in their "tool-box" but in their imagination about how to use it.

## D. CONFLICTS BETWEEN SUCCESSIVE NORMS

223. The relationship between special law and general law is often cut across by another relationship, namely that between prior and subsequent law, and it may in such cases be hard to say whether this modifies the operation of the *lex specialis* principle in any of its many permutations. Generally speaking, it may often be the case that when States enact a subsequent general law, this is intended to set aside the prior law even if the latter were in some sense more "special". Again, it seems inadvisable to lay down any general rule in regard to how to manage the two types of relationship.

224. The most basic case is the adoption of a treaty in an area that was previously covered by customary law: "it is well understood that, in practice, rules of [general] international law can, by agreement, be derogated from in particular cases or as between particular parties".[284] However, as explained in section C above, this does not automatically mean the full extinction of that prior customary law.[285] It will normally remain valid for those States that have not become parties to the (codifying) treaty and may occasionally be applicable also between treaty partners if, for one reason or another, the treaty remains inapplicable or covers the subject-matter only partially.[286] Nor does the fact that agreements often set aside prior customary law translate into

---

[284] *North Sea Continental Shelf cases (Federal Republic of Germany/Denmark; Federal Republic of Germany/Netherlands) I.C.J. Reports 1969* p. 42, para. 72. See also *Case Concerning the Continental Shelf (Tunisia/Libyan Arab Jamahiriya) (Merits) I.C.J. Reports 1982* p. 38, para. 24.

[285] See especially Hugh Thirlway, *International Customary law and Codification* (Leiden: Sijthoff, 1972) pp. 95-108. See also Karl Zemanek, "The Legal Foundations of the International Legal System …" supra note 31, pp. 220-221.

[286] In the words of the International Court of Justice, "customary international law continues to exist and to apply, separately from international treaty law, even where the two categories of law have an identical content", *Nicaragua case* p. 96, para. 179. This situation is also presupposed by article 43 of the VCLT that provides that a denunciation of a treaty has no effect on the obligation that is binding on the State "independently of the treaty". Again, it is dangerous to generalize, however. The situation cannot be a priori excluded where it is the intention of the parties to a convention specifically to abrogate the prior custom in their relations *inter se*. Vienna Convention on the Law of Treaties, United Nations, *Treaty series*, vol. 1155 p. 331.

A/CN.4/L.682
page 116

any automatic presumption in favour of later law. In fact it would be wrong to assume that there is a stark opposition between custom and treaty. On the one hand, treaties may be a part of the process of the creation of customary law.[287] On the other hand, customary behaviour undoubtedly affects the interpretation and application of treaties and may, in some cases, modify treaty law.[288] Because, as explained above, there is no general hierarchy of sources in international law, the relationship between a particular treaty and a particular customary norm will always remain to be decided on a case-by-case basis.[289]

225.    Nevertheless, alongside the *lex specialis* maxim, the principle that "later law supersedes earlier law" or *lex posterior derogat lege priori* has been often listed as a principle of interpretation or conflict-solution in international law.[290] The maxim has its roots in Roman law and is recognized by various early writers (e.g. Grotius and Vattel).[291] It has sometimes been

---

[287] *North Sea Continental Shelf cases (Federal Republic of Germany/Denmark; Federal Republic of Germany/Netherlands) I.C.J. Reports 1969* p. 41, para. 71.

[288] This case is presumed in a minimal way by Article 31 (3) (b) that obliges the interpreter to have regard to the subsequent practice of treaty parties. Another case is that of inter-temporal law (see Chapter 6 below) in which subsequent custom affects the interpretation of the open-ended or "mobile" terms of the treaty. See further Michael Byers, *Custom, Power, and the Power of Rules* (Cambridge: Cambridge University Press, 1999) pp. 172-180; M. E. Villiger, *Customary International Law ...* supra note 76, pp. 295-297.

[289] This means, among other things, that even as treaty and custom may often link to each as "special" and "general", this may not always be so. A particular (or bilateral) custom may of course be *in that respect* more particular than a multilateral treaty. Michael Akehurst, "The Hierarchy of Sources of International Law", BYBIL vol. 47 (1974-1975), p. 275.

[290] Quincy Wright, "Conflict between International Law and Treaties", AJIL vol. 11 (1917) No. 3, p. 579; Charles Rousseau, "De la compatibilité des norms ... supra note 36 (1932) p. 150; C. Wilfred Jenks, "The Conflict of Law-Making Treaties", supra note 8, pp. 445-446; Akehurst, "The Hierarchy of Sources ... ibid., p. 273; W. Czaplinski & G. Danilenko, "Conflict of Norms in International Law", supra note 73, pp. 19-22; Ian Sinclair, *The Vienna Convention on the Law of Treaties...* note 62, p. 98; Wolfram Karl, "Treaties, Conflicts between", supra note 127, vol. IV, pp. 937-938; Anthony Aust, *Modern Treaty Law...* supra note 73, p. 201; Joost Pauwelyn, *Conflict of Norms ...*, supra note 21, pp. 335-363; Patrick Daillier and Alain Pellet, *Droit international public,* supra note 73. p. 270; Rüdiger Wolfrum & Nele Matz, *Conflicts in International Environmental Law,* supra note 22, pp. 152-158.

[291] Papinian Digest 50, 17,80; Paul. Digest 32, 66,5 and Dig. 1, 4,1, The Digest of Justinian vol. IV, Latin text eds. T. Mommsen and P. Kruger (Philadelphia: University of Pennsylvania Press, 1985); Hugo Grotius, *De Jure belli ac pacis ...* supra note 63, Book II, Ch. XVI, Sect. XXIX, p. 428; Emmerich de Vattel, *Law of Nations; Principles of the Law of Nature applied to the Conduct and Affairs of Nations and Sovereigns* (New York: AMS Press, 1982) Book II, Ch. XVII, p. 272, para. 315.

regarded as a "general principle of law recognized by civilized nations" under article 38 (1) (c) of the Statute of the International Court of Justice,[292] sometimes as a customary law principle of interpretation.[293]  Occasionally it has been envisaged as a technique that the legal mind is drawn to in its search for domestic analogies in legal procedure.[294]  And yet often, like *lex specialis*, caution has been voiced against any assumption that it could be applied in an automatic way.  Schwarzenberger describes it as a non-normative "maxim" that points to one result achieved through the normal interpretation of two treaties - in particular that the subsequent (or prior) treaty is held to prevail over its rival because that is what the parties had intended.[295]

226.    As with the *lex specialis*, it is easy to accept the pragmatic rationale of *lex posterior*, irrespective of its formal status.  Preferring today over yesterday, it reflects more concretely present circumstances and the present will of the relevant actors.  And yet, of course, it cannot claim absolute priority.  Notwithstanding any issue of *jus cogens*, it may often seem unacceptable to allow later commitments to override earlier ones - especially if those later commitments are to different parties or have different beneficiaries than the early commitments.[296]  Here as elsewhere the tendency to pragmatism, ad hoc decision and harmonization prevails.[297]

---

[292]  See e.g. Hans Aufricht, "Supersession of Treaties …", supra note 116, p. 655.

[293]  Malgosia Fitzmaurice & Olufemi Elias, *Contemporary Issues …* supra note 73, p. 322.

[294]  The domestic analogy is expressly drawn e.g. in Suzanne Bastid, *Les traités dans la vie internationale. Conclusion et effets* ( Paris Econimica, 1985) p. 161.  Likewise, Czaplinski & Danilenko, "Conflict of Norms in International Law"*,* supra note 73, p. 21.

[295]  Georg Schwarzenberger, *International Law*, supra note 79, p. 473.

[296]  The concurrent pragmatic validity of both the *lex posterior* and the *lex prior* maxims may follow from the way the two derive from different domestic analogies.  Where *lex posterior* projects international rules as analogous to domestic legislation (later laws regularly overruling earlier ones), the *lex prior* suggests an analogy to domestic contracts (as expressly suggested by Lauterpacht).  See also Christopher J. Borgen, "Resolving Treaty Conflicts", supra note 10, pp. 620-639.

[297]  Charles Rousseau, "De la compatibilité des normes", supra note 36, p. 153.

A/CN.4/L.682
page 118

227.    Perhaps this is why abstract or doctrinal treatments of successive treaties tend to regard it as a "particularly obscure aspect of the law of treaties".[298]  The problems are not diminished by the scarcity of judicial or arbitral practice, the tendency to resolve treaty conflicts by diplomatic negotiations.[299]  The obscurities relate both to the normative import of the principle - how powerful is it? - as well as its consequences - what happens when it purports to override another rule?  Sometimes it may be frankly overridden by its contrary - the *lex prior*.  As will be seen below, these obscurities did not disappear by the adoption of article 30 VCLT.  Trying to clarify the matter is important as conflicts between earlier and later treaties gain importance with the constant increase of multilateral treaty-law often of a quasi-legislative character for example in the environmental sphere.[300]

### 1.  General law on conflicts between earlier and later treaties

228.    The question of conflicts between earlier and later treaties is today covered by articles 30 and 41 VCLT.  However, as will be seen later, the convention leaves many questions open and frequently only refers to the general law.  In any case, the rules now enshrined in the VCLT largely codify the approaches of general law that existed anterior to the Convention and that continue to provide the rationale and the perspective from which those conventional provisions are applied.  It is therefore useful to deal with the general law of conflict between earlier and subsequent treaties separately.  Here two basic situations should be distinguished, the one in which there are identical parties in the two treaties and the situation where there are non-identical parties.

### (a)    Conflict between treaties with identical parties

229.    When two States have concluded two treaties on the same subject-matter, but have said nothing of their mutual relationship, it is usual to first try to read them as

---

[298]  Sinclair, The Vienna Convention on the Law of Treaties, supra note 62, p. 93.

[299]  Guyora Binder, *Treaty Conflict and Political Contradiction ….*, supra note 143, p. 17; Borgen, "Resolving Treaty Conflicts", supra note 10, pp. 591-600, 609-620.

[300]  See especially Wolfrum & Matz, Conflicts in International Environmental Law, supra note 22, pp. 1-13; Nele Matz, Wege zur Koordinierung völkerrechtlicher Verträge … supra note 22, pp. 53-73; Fitzmaurice & Elias, Contemporary Issues … supra note 73, pp. 321-348.

compatible (the principle of harmonization).[301]  This may often be undertaken by a simple examination of party intent, drawn from the various available readings of the treaty text.[302]

230.    In case no such harmonizing intent may be gleaned from the texts, the *lex posterior* maxim may be turned to as a presumption of intent to derogate from the earlier agreement.[303]  This may be the case for example when the treaties deal with wholly different topics and were negotiated by officials from different administrations.[304]  Yet of course, the presumption is rebuttable so that if interpretation really indicates that the parties did not wish to derogate from the earlier agreement, then that intent should prevail over the maxim.  In the treatment of the matter by the Commission, for example, it was clear that in the absence of a conflict clause, the issue of priority was to be resolved by interpreting the will of the parties:  had they intended that the latter treaty should supplement or derogate from the earlier?[305]

231.    The same considerations apply also to the relationship between multilateral treaties with identical parties.  That is to say, there is an effort at harmonization through interpretation unless it appears that the parties have wanted to replace the earlier treaty by the latter.  Article 59 VCLT expressly provides that:

> "A treaty shall be considered as terminated if all the parties to it conclude a later treaty relating to the same subject-matter and:

---

[301]  Czaplinski-Danilenko, "Conflict of Norms in International Law", supra note 73, p. 13; Schwarzenberger, *International Law,* supra note 79, p. 474; Aust, *Modern Treaty Law*, supra note 73, p. 174; Pauwelyn, *Conflict of Norms* … supra note 21, pp. 240-244.  See also Jenks, "The Conflict of Law-Making Treaties", supra note 8, pp. 427-729.

[302]  See also Borgen, "Resolving Treaty Conflicts", supra note 10, p. 583.

[303]  Rousseau, "De la compatibilité des normes …", supra note 36, pp. 188-190; Aufricht, "Supersession of Treaties …", supra note 116, p. 657; Mus, "Conflicts between Treaties …", supra note 21, p. 220; Aust, *Modern Treaty Law* … supra note 73, p. 174.

[304]  Borgen, "Resolving Treaty Conflicts", supra note 10, p. 583.

[305]  See the discussion in Mus, ibid., pp. 217-218; Fitzmaurice & Elias, *Contemporary Issues ...* supra note 73, pp. 321-322.

(a)    It appears from the later treaty or is otherwise established that the parties intended that the matter should be governed by that treaty; or

(b)    The provisions of the later treaty are so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time".

232.    However, though the case of two treaties with identical parties is in principle easy, there might still be complications.  For instance, there is the question of which of the agreements is the earlier one.  Many authors, including the expert-consultant at the Vienna Conference, Humphrey Waldock, argue that the critical date for the determination of the time-point (earlier/subsequent) is that of the date of the adoption of the treaty and not, for example, its ratification or entry into force, at least unless nothing else appears from the context.[306]  A minority opinion supports the date of the entry into force or drawing this from the intention of the parties.[307]  A further complication is caused by the possibility that the matter is resolved differently in regard to different States.  For instance, State A might have concluded treaty X before treaty Y while State B, for its part, might have become party to Y only after having ratified X.[308]

233.    Also, there is the question of the relationship between *lex posterior* and *lex specialis*.  Jenks has pointed out that neither of these principles "can be regarded as of absolute validity.  There are number of principles which must be weighed and reconciled in the light of the circumstances of the particular case".[309]  In the *Mavrommatis Palestine Concessions* case (1924) the Permanent Court of International Justice applied both *lex specialis* and *lex posterior* together

---

[306]  Mus, ibid., pp. 220-222; Aust, *Modern Treaty Law ...* supra note 73, p. 183; Seyed Ali Sadat-Akhavi, *Methods of Resolving Conflicts ...* supra note 21, pp. 75-78 and for special cases see also pp. 78-82.

[307]  For the former, see Max Sorensen, "Le problème dit du droit intertemporel dans l'ordre international", *Annuaire* vol. 55, (1973) p. 54.  For the latter proposal, see Czaplinski-Danilenko, "Conflict of Norms in International Law", supra note 73, p. 19.

[308]  E.W. Vierdag, "The Time of the 'Conclusion' of a Multilateral Treaty: ..., supra note 20, p. 102; Sadat-Akhavi, *Methods of Resolving Conflicts ...*, supra note 21, pp. 75-82.

[309]  Jenks, "The Conflict of Law-Making Treaties", supra note 8, p. 407; Sinclair, *The Vienna Convention on the Law of* Treaties, supra note 62, p. 96.

without establishing a hierarchy between them.  On the issue of the relationship between the Mandate Treaty for Palestine of 1922 and Protocol XII of the Peace Treaty of Lausanne of 1923, the Court merely stated that:  "in cases of doubt, the Protocol, being a special and a more recent agreement, should prevail".[310]  The question boils down to an assessment of which aspect - "speciality" or "temporality" - seems more important in this connection.  Sometimes it may not be at all necessary to take a stand on this and Tribunals have occasionally ignored both principles.[311]

**(b)    Conflict between treaties with non-identical parties**

234.    This is the really problematic aspect of this matter, not least because it often involves matters of great importance - the breaking of political or military alliances, the conclusion of separate peace treaties etc.[312]  Rousseau, for example, begins his 1932 discussion of treaty conflict by noting that there was no more pressing legal question than that at the time.  He was thinking about the relationship between the League Covenant and the 1928 Pact of Paris, the neutrality agreements of League members as well as the then recent decision by the PCIJ in the controversial *Austro-German Customs Union* case where the Court had with a narrow margin concluded that the projected union was incompatible with Austria's obligations under the 1922 Protocol of Saint-Germain.[313]  The school example discussed by classical lawyers (Gentili, Grotius, Vattel) was that of a war between two parties in a three-party alliance - which of the two belligerents should the third assist?  During the Cold War, members of the two blocks occasionally accused each other of such violations.[314]

---

[310]  *Mavrommatis Palestine Concessions* case, P.C.I.J. Series A, No. 2 (1924) p. 31.

[311]  See e.g. the discussion of the Gorham claim (1930) case from the US-Mexican General Claims Commission in Schwarzenberger, *International Law*, supra note 79, pp. 479-80.

[312]  This is the perspective in Binder, Treaty Conflict and Political Contradiction … supra note 143.

[313]  Rousseau, "De la compatibilité des normes …", supra note 36, pp. 133-134 and 178-187.  See also *Customs regime between Germany and Austria,* Advisory Opinion, *P.C.I.J. Series A/B,* No. 41 (1931) p. 35.

[314]  See in particular Binder, Treaty Conflict and Political Contradiction. … supra note 143, pp. 24-25, 40-42. See also the examples in Bastid, Les traités dans la vie internationale …, supra note 294, pp. 162, 164.

A/CN.4/L.682
page 122

235.    More recently, the question of relationship between earlier and later treaties has arisen in the context of what Sir Humphrey Waldock called "chains of multilateral treaties dealing with the same subject-matter".[315]  The very wide scope of legislative activity by global and regional organizations has led to the emergence of clusters of treaty law on particular topics with complex relationships between particular treaties within the clusters and beyond such clusters (or "regimes").  These relationships could only with difficulty be treated in terms of clear-cut rules.  This is why "modern international law … does not approach the problem from the point of view of the validity of treaties".[316]  Instead, as we will see, the matter has been treated from the perspective of relative "priority" between the treaties with the sanction of responsibility for any obligation breached.

(i)    *Lex prior*

236.    Nevertheless, it has sometimes been suggested that even without going into the question of *jus cogens* either the earlier or the latter treaty might enjoy some kind of general superiority.  The superiority of the *earlier* treaty was often suggested by early natural lawyers.  If a treaty was understood to have alienated the power of the State to dispose of something, then the later inconsistent treaty became automatically void owing to lack of competence.  In the matter of military alliances, Grotius, Pufendorf and Vattel all preferred to give precedence to the most ancient ally.  This seems natural in a system in which no obligation is "merely" a matter of reciprocal will but sanctioned by an overriding objective legal system.[317]

237.    More recently, the *a priori* superiority of the earlier treaty was hinted to by the International Court of Justice in the *Reservations* case (1951), as it stated that it was a:

---

[315]  Sir Humphrey Waldock, Third report, *Yearbook ... 1964* vol. II, p. 43, para. 32.

[316]  Czaplinski-Danilenko, "Conflict of Norms in International Law", supra note 73, p. 20.

[317]  See Binder, Treaty Conflict and Political Contradiction … supra note 143, pp. 40-42.

… generally recognized principle that a multilateral convention is the result of an agreement freely concluded upon its clauses and that consequently none of the contracting parties is entitled to frustrate or impair, by means of unilateral decisions or particular agreements, the purpose and raison d'être of the convention.[318]

238.    It is a bit difficult to interpret the meaning of this passage.  To the extent that it deals with the permissibility of *inter se* agreements, the matter will be discussed below in section D.4.  In general terms, it seems to indicate nothing more than the self-evidence captured by *pacta sunt servanda*.  It certainly implies nothing about the validity of either the Genocide Convention or the incompatible "particular agreements".  Perhaps two considerations may be offered here.  First, the statement may simply be a reminder to parties that breach will follow up by State responsibility.  Second, especially in the context where it was made, it may be intended to underline the exceptional importance of the subject-matter of the Convention and the seriousness of the duty to comply.[319]  In such case, the argument would go some way towards suggesting the *jus cogens* or otherwise "objective" nature of the Genocide Convention.

239.    The cases often mentioned in support of the *lex prior* come from the beginning of the twentieth century and from the Central American Court of Justice.  Costa Rica and Salvador complained that by concluding with the United States a treaty relating to the Panama Canal, Nicaragua had breached treaties it had earlier made with them on the same subject.  The Court noted the incompatibility of the treaties and the violation of its obligations by Nicaragua but refrained from declaring its later treaty with the US void because the US was not a party to the cases before it and it could not pronounce on its rights.[320]

240.    Another case of apparent application of *lex prior* might relate to objective territorial regimes.  This is suggested for example by the Permanent Court's treatment of the

---

[318]  Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide case, Advisory Opinion, *I.C.J. Reports 1951* p. 21.

[319]  See also the discussion in Schwarzenberger, *International Law*, supra note 79, pp. 483-484.

[320]  *Costa Rica v. Nicaragua*, AJIL vol. 11 (1917) No. 1, p. 228.  See also *El Salvador v. Nicaragua*, AJIL vol. 11, (1917) No. 3, p. 674.  For a detailed discussion, see e.g. Borgen, "Resolving Treaty Conflicts", supra note 10, pp. 591-594.

A/CN.4/L.682
page 124

*Austro-German Customs Union* case (1931) in which the Court determined - by a 8-7 vote - that the planned customs union treaty would have been incompatible with Austria's obligation under the Treaties of Versailles and Saint-Germain of 1919 as well as a related Protocol of 1922 "to abstain from any act which might directly or indirectly or by any means whatever compromise her independence".[321]  Nevertheless, the Court did not spell out the consequences that might have followed from the conclusion of the planned customs union.  Another case sometimes cited in this connection is the *Oscar Chinn* case (1934) in which two of the dissenting judges (Eysinga and Schücking) suggested that the Treaty of Saint-Germain of 1919 or the 1922 Protocol might be void to the extent that some of its provisions deviated from the 1885 Berlin Act as the latter had set up something like an objective regime.[322]  This was a minority opinion, however.  The question of the validity of the 1919 Treaty or the 1922 Protocol had not been raised by the parties and by remaining silent on the issue the Court seemed to accept that the Berlin Act could be subjected to *inter se* modification.[323]

241.    The *lex prior* principle is supported especially by an analogy with domestic contract law ("illegality of a contract to break a contract").[324]  Hersch Lauterpacht in his Report on the Law of Treaties to the ILC started from this position.  Nevertheless, he accepted that it might in some cases lead to absurd results, in particular when the later law would pertain to general application.[325] But if the *lex prior* has general application in contract law, *lex posterior* has in public law and legislative enactments.  So the relationship between the two reflects on the way

---

[321]  *Customs regime between Germany and Austria,* Advisory opinion, *P.C.I.J. Series A/B*, No. 41 (1931), p. 42, Article 88 of the Treaty of Saint-Germain.

[322]  See Aufricht, "Supersession of Treaties …", supra note 116, p. 672. *Oscar Chinn* case, *P.C.I.J. Series A/B*, No. 63 (1934) (separate opinion of Judge Eysinga) p. 131 and (separate opinion of Judge Schücking) p. 148.

[323]  *Oscar Chinn* case.  See also the discussion in Schwarzenberger, *International Law,* supra note 79, p. 485; Sir Humphrey Waldock, Second Report, *Yearbook ... 1963* vol. II, p. 57, para. 15.  See also *Jurisdiction of the European commission of the Danube between Galatz and Braila* case, Advisory Opinion, *P.C.I.J. Series B*, No. 14 (1927) p. 23 (*inter se* agreement).

[324]  C. Wilfried Jenks, "The Conflict of Law-Making Treaties", supra note 8, p. 442.

[325]  H. Lauterpacht, Report, *Yearbook ... 1953* vol. II, pp. 156-159.

A/CN.4/L.682
page 125

one views the nature of treaties.  Both analogies, however, have their problems.  As will be stressed frequently in the course of this report, the fact that the VCLT treats all treaties alike obscures the many differences that actual treaties have.[326]

242.    There may also be cases where a subsequent treaty affects the provisions of an earlier treaty by increasing the rights or benefits of a party thereto, typically in the case of the most-favoured nation clause.  In case of such clauses, subsequent treaties in which a party promises a benefit to the party to that subsequent treaty will also be extended to the party of the earlier treaty.[327]

### (ii)    *Lex posterior*

243.    As observed above, the principle that *lex posterior derogat lege prior* is well-embedded in domestic jurisprudence and often cited in an international law context as well.  Nevertheless, there are few cases where it would have been applied as such.  It may often be more useful to refer directly to the will of the parties than to the *lex posterior* principle for which, as also noted above, it may simply give expression.  Inasmuch as it is a question of parties to the later treaty being *different* from parties to the earlier treaty, it is doubtful whether any meaningful role is left to the *lex posterior*.

244.    There may, however, be rare cases in which the later treaty, concluded by parties different from those of the earlier treaty abrogate that earlier treaty.  This is of course a violation of the principle that third States are not affected by something that remains *res inter alios acta*.  As Aufricht points out, this is a case of unequal (subsequent) treaty in which the inequality might relate, for example, to the Great Power Status of the parties to the later treaty.[328]

---

[326] Rousseau, "De la compatibilité des normes juridiques contradictoires dans l'ordre international", pp. 150-151; Borgen, "Resolving Treaty Conflicts", p. 599.

[327] Aufricht, "Supersession of Treaties …", supra note 116, pp. 679-682.

[328] Ibid., pp. 673-674.

A/CN.4/L.682
page 126

245.    Might there be legislative treaties of this type, overriding previous treaties irrespective of any question of *jus cogens*?  The *lex posterior* is clearly applicable in the case of instruments of revision.  It is also the case of *inter se* agreements as provided under article 41 VCLT of which more later in section D.4.  But what about the case where the parties of the two treaties are different?  Wilfred Jenks suggests that:

> there may be advantages in providing for the full application of the principle in certain fields of legislative action by conferring the necessary powers on the appropriate international bodies.[329]

246.    This matter links again to the special character of certain multilateral treaties.  In an important case, the ECHR held that the European Convention on Human Rights controlled the content and/or application of an earlier bilateral treaty, or at least determined how the latter was to be interpreted and applied by the national authorities.  The issue here concerned the application of a Russian-Latvian Treaty of 1994 as far as it concerned the deportation of certain former members of the Soviet army and their families from Latvian territory.  The court examined the rights of the concerned individuals on the basis of the European Convention, to which Latvia had acceded at a later date, and concluded that:

> … the [Russian-Latvian] treaty cannot serve as a valid basis for depriving the Court of its power to review whether there was interference with the applicant's rights and freedoms and, if so, whether such interference was justified.[330]

247.    That view was based on an earlier admissibility decision in which the Court had specifically noted as follows:

> It follows from the text of Article 57 (1) of the [European Convention on Human Rights], read in conjunction with Article 1, that ratification of the Convention by a State presupposes that any law then in force in its territory should be in conformity with the Convention.

---

[329]  Jenks, "The Conflict of Law-Making Treaties", supra note 8, p. 446.

[330]  *Slivenko v. Latvia,* Judgment of 9 October 2003, ECHR 2003-X, p. 265, para. 120.

In the Court's opinion, the same principles must apply as regards any provisions of international treaties which a Contracting State has concluded prior to the ratification of the Convention and which might be at variance with certain of its provisions.[331]

248.    This is an important statement of principle.  Under it, it seems difficult to deny that if the *lex posterior* should be read in favour of the European Convention on Human Rights, it should also favour any other later human rights treaties, if not any other later multilateral legislative treaties.  Again, we are in presence of a hierarchy that seems best dealt with by the notion of special "integral" obligations - such as obligations in human rights treaties - that enjoy some kind of a precedence to merely transactional bilateral instruments.  It is hard to say, however, if this is a case of *lex specialis*, *lex posterior* or *lex superior* and also to an extent irrelevant.  The important point is that the bilateral treaty did not have a life that would be independent from its normative environment, at the time of application.  The construction of the bilateral treaty by reference to the later multilateral treaty was reasonable, and little else seems pertinent.

249.    Yet it is hard to generalize from this case.  It highlights the normative force of human rights treaties (perhaps as "integral" or "absolute" treaties) but probably does not resolve the general question of primacy, and certainly cannot be cited as a blanket endorsement of *lex posterior*.  Also the fact that the case comes from the European Court of Human Rights, specifically assigned to apply the European Convention on Human Rights, is not irrelevant - even as it may be hard to square with the Court's willingness to yield in favour of an earlier customary rule of State immunity in the *Al-Adsani* case.[332]

250.    In fact, irrespective of whatever normative power the *lex posterior* rule may enjoy (as pointed out above, that power is much greater in a legislative than in a contractual system), just like the *lex specialis,* it fails to render itself applicable in any mechanical way.  Depending

---

[331]  *Slivenko and others v. Latvia* (Decision as to the admissibility of 23 January 2002) ECHR 2002-II, pp. 482-483, paras. 60-61.  For a critical discussion, see further, Ineta Ziemele, "Case-Law of the European Court of Human Rights and Integrity of International law", in Karel Wellens & Charo Huesa (eds.), *L'influence des sources sur ...* supra note 14, pp. 201-212.

[332]  *Al-Adsani v. the United Kingdom*, Judgment of 21 November 2001, ECHR 2001-XI, p. 79.

A/CN.4/L.682
page 128

on the case, many other considerations may be relevant as well, including the simultaneous applicability of the "special law"/"general law" and "superior law"/"inferior law" distinctions.  It is best to discuss these problems in connection with the ILC debates on article 30 of the VCLT.

## 2.  Article 30 VCLT:  from invalidity to responsibility

251.    The general law on conflict of successive treaties fails, as we have seen, to provide definite resolution to the most important problems - at least most important problems of *theory* - regarding the case where the parties to the latter treaty are not identical with parties to the earlier one.  It was clear that something needed to be said about the matter in the Vienna Convention on the Law of Treaties.  The matter is dealt with in article 30 of the VCLT which, however, is only residuary.[333]

### Article 30 of the VCLT

### Application of successive treaties relating to the same subject-matter

1.    Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs.

2.    When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.

3.    When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the latter treaty.

4.    When the parties to the later treaty do not include all the parties to the earlier one:

   (a)    As between States parties to both treaties the same rule applies as in paragraph 3;

   (b)    As between a State party to both treaties and a State party to only one of the treaties, the treaty to which both States are parties governs their mutual rights and obligations.

---

[333]  Sinclair, *The Vienna Convention on the Law of Treaties,* supra note 62, p. 97; Anthony Aust, *Modern Treaty Law …*, supra note 73, p. 174.

> 5.      Paragraph 4 is without prejudice to article 41, or to any question of the termination or suspension of the operation of a treaty under article 60 or to any question of responsibility which may arise for a State from the conclusion or application of a treaty the provisions of which are incompatible with its obligations towards another State under another treaty.

252.    Much of this text is relatively uncontroversial and/or captures the state of general law as represented above.  This is so especially concerning the reference to Article 103 in paragraph 1 and to conflict clauses in paragraph 2.  Paragraph 3 "effectively codifies the *lex posterior* rule".[334]  This concerns the situation where there are either identical parties in the later treaty or, in addition to all the parties of the earlier treaty, also some new parties.  As under the traditional standard, too, the *lex posterior* applies only if nothing else follows from party intent.

**(a)      The question of "same subject-matter"**

253.    Article 30 deals with the issue of conflict between prior and subsequent treaties.  As many commentators have noted, however, it does not appear to do so very successfully.[335]  One of the problems is that the title of the article (and paragraph 1) seems to limit it to a conflict between treaties "relating to the same subject-matter".  If that limitation is interpreted strictly, then it seems to lift most of the important cases - for example conflicts between environmental and trade treaties, or conflicts between human rights and humanitarian law treaties - outside its scope.[336]  However, as pointed out in section B above, this is neither a necessary nor a reasonable interpretation of the expression "same subject-matter".

254.    Terms such as "human rights law", "trade law" or "environmental law" and so on are arbitrary labels on forms of professional specialization.  There are no rules on how to qualify particular treaty regimes and most regimes could be qualified from a number of such

---

[334]  Borgen, "Resolving Treaty Conflicts", supra note 10, p. 603; Mus, "Conflicts between Treaties …", supra note 21, pp. 219-220.

[335]  Vierdag, "The Time of the 'Conclusion' of a Multilateral Treaty …", supra note 308, pp. 92-108; Sadat-Akhavi, *Methods of Resolving Conflicts …*, supra note 21, pp. 70-84; Borgen, "Resolving Treaty Conflicts", ibid., p. 603; Fitzmaurice & Elias, *Contemporary Issues …*, supra note 73, pp. 314-331; Sinclair, *The Vienna Convention on the Law of Treaties,* supra note 62, p. 98.

[336]  This is suggested most recently by Borgen, ibid., pp. 611-615.  Cf. Sinclair, ibid., p. 98.

A/CN.4/L.682
page 130

perspectives.  Human rights treaties, for example, are often used to further environmental objectives and trade regimes presuppose and are built upon the protection of human rights (in particular the right to property).  The qualifications do not link to the *nature of the instrument* but to the *interest* from the perspective of which the instrument is assessed by the observer. To limit the application of article 30 to treaties "dealing with the same subject" would allow States to deviate from their obligations simply by qualifying a novel treaty in terms of a novel "subject".  They might for example derogate from their obligations under refugee instruments simply by concluding an instrument in an allegedly novel subject of "the law of human movement".[337]  As pointed out above, the test of whether two treaties deal with the "same subject matter" is resolved through the assessment of whether the fulfilment of the obligation under one treaty affects the fulfilment of the obligation of another.  This "affecting" might then take place either as strictly preventing the fulfilment of the other obligation or undermining its object and purpose in one or another way.

255.    Nevertheless, it will also be argued below that the question of the relationship between two treaties cannot be resolved completely in abstraction from any institutional relationship between them.  The way a WTO treaty links with a human rights treaty, for example, is not identical to the way a framework treaty on an environmental matter relates to a regional implementation instrument.  It may not be possible to determine in an abstract way when two instruments deal with the "same subject-matter".  But this does not mean that it would be impossible to establish an institutional connection between "chains" or clusters of treaties that are linked institutionally and that States parties envisage as part of the same concerted effort. The significance of identifying such "treaty regimes" lies in the way it seems relatively less complicated to establish a relationship between two instruments *within* one such regime than between two instruments *across* different regimes.  For example, the argument from *lex posterior* or *lex specialis* seems clearly more powerful between treaties within a regime than between treaties in different regimes.  In the former case, the legislative analogy seems less improper than in the case of two treaties concluded with no conscious sense that they are part of the "same project".

---

[337]  Some of the debate about a new "terrorism law" exemplify this concern.

256.    The distinction between treaties dealing with the "same subject-matter" and treaties within the same "regime" may appear slight, but it constitutes an important practical shift of perspective.  In the former case, focus is on the object that is being regulated while in the latter case, focus is on the intent of the States parties and the institutions they have established.  The former is dependent on an abstract characterization of an issue as a "human rights issue", an "environmental problem" or a "trade question" - and meets with the difficulty that often many characterizations may be applied to a single problem and different actors may have an interest to characterize the problem in different ways so as ensure that their preferred rule-systems will be applied.  By contrast, the notion of a "regime" points to the institutional arrangements that may have been established to link sets of treaties to each other.  Treaties may of course enter into conflict both within and across regimes.  To make that distinction is merely to point out that the task of settling the conflict - for example, by seeking a "mutually supportive solution" - may be much easier or more straightforward in the former than in the latter situation where at issue is often a conflict of wider objectives or values underlying the very regimes themselves.

**(b)    The ILC debates**

257.    If much of article 30 was uncontroversial, this was not so in regard to paragraph 4, that is to say, the situation where the later treaty does not include as parties all the States that are parties to the earlier treaty.  Unsurprisingly, this was the question on which most of the debates in the ILC focused.  Two questions were highlighted:  whether the relationship between incompatible treaties should be thought in terms of "validity" or "priority" between them and whether there was reason to single out special groups of treaties for separate treatment.  There was general agreement (and thus less discussion) on the fact that the provisions would need to reflect the priority to be accorded to *jus cogens* and to the United Nations Charter as provided under Article 103 of the Charter.[338]  There was also no disagreement that in case of subsequent bilateral or multilateral treaties with identical membership, the latter treaty would generally prevail - the

---

[338]  G.G. Fitzmaurice, Third Report, *Yearbook ... 1958* vol. II, p. 27, 41 (Draft Article 18 (1)); Waldock, Second Report, *Yearbook ... 1963* vol. II, pp. 54, 61 (Draft Article 14 (3) and 14 (4)).  The question whether conflict with *jus cogens* or Article 103 of the Charter leads invariably to the invalidity of the conflicting rule will be discussed in Chapter 6 below.

A/CN.4/L.682
page 132

parties being always entitled to terminate the prior treaty by a subsequent one (apart from the question of peremptory norms).  The most important question was the treatment of the situation where not all of the parties to the prior treaty were parties to the latter treaty and where there were States that were parties to the latter but not to the prior treaty.  The discussions have been frequently summarized in literature so a brief exposé will be sufficient.[339]

258.    The first Special Rapporteur, Lauterpacht, conceived of treaty conflict in terms of validity and advocated the *lex prior* rule - the invalidity of the latter treaty.[340]  It was qualified by two conditions, however.  First, invalidity (of the latter treaty) would follow only

> if the departure from the terms of the prior treaty is such as to interfere seriously with the interests of the other parties to that treaty or seriously impair the original purpose of the treaty.

259.    The second exception concerned:

> multilateral treaties such as the Charter of the United Nations, partaking of a degree of generality which imparts to them the character of legislative enactments properly affecting all members of the international community or which must be deemed to have been concluded in the international interest.[341]

260.    In this latter case, the subsequent treaty would override the prior treaty.  These provisions express Lauterpacht's effort to think of treaties in the image of domestic law and especially multilateral treaties as functional equivalents to domestic legislation within a robust system of international legality.  While he thought the first qualification already as *de lege lata*, he felt the latter would involve progressive development.[342]

---

[339]  See e.g. Binder, *Treaty Conflict and Political Contradiction...* supra note 143, pp. 49-65; Mus, "Conflicts between Treaties …", supra note 21, pp. 222-227.

[340]  See Lauterpacht, (First) Report, *Yearbook ... 1953* vol. II, pp. 156-159.  In accordance with his consistent application of the domestic analogy, he insisted that international tribunals should have jurisdiction to declare the nullity of the latter treaty as well as provide for damages for any resulting loss to the party of the later treaty that had been unaware of the prior treaty, Lauterpacht, (First) Report, p. 156.

[341]  Draft Article 16, Lauterpacht, ibid., p. 156.

[342]  Ibid., p. 157, paras. 5 and 6.

A/CN.4/L.682
page 133

261.    The second Special Rapporteur, Fitzmaurice, rejected invalidity as the proper consequence of treaty conflict.  There were so many treaties and States were generally so ignorant about each other's commitments that it would be unfair to the innocent party if conflict were to occasion automatic invalidity.[343]  Besides, Fitzmaurice held, there was practically no support from international practice for such a drastic consequence.  Therefore, he preferred the solution that had already been proposed by the Harvard Research in 1935 that would provide, as the main rule, for the "priority" of the earlier - a position that that would not invalidate the later treaty nor even prohibit entering into incompatible treaties.[344]  The practical problem would be resolved by liability to the innocent party.  It remained in practice (although Fitzmaurice was clearly unhappy about this) for the State having undertaken the incompatible obligations to choose which of the agreements it would fulfil.[345]

262.    Like Lauterpacht, Fitzmaurice felt a need to qualify the priority of the earlier treaty by taking into account the case of treaties that involved "a more absolute type of obligation" than ordinary treaties building on reciprocal promises or benefits between parties.  He defined two types of such treaties, namely "integral" and "interdependent" ones.  Treaties of the former group were such that the performance of the obligation was altogether independent of the performance by others - such as humanitarian or human rights conventions.  In the latter case, - typically disarmament treaties - the obligation of each party was "dependent on a corresponding performance by *all* the parties".  Treaties conflicting with these would be sanctioned by invalidity.  In other words, Fitzmaurice preserved Lauterpacht's solution for this special type of ("objective", "legislative") treaties.[346]

---

[343]  Fitzmaurice, Third Report, *Yearbook ... 1958* vol. II, pp. 41-42, para. 83.

[344]  The Draft Convention on the Law of Treaties, Harvard Research in International Law, AJIL vol. 29, Supplement (1935) pp. 1024-1025.

[345]  He conceded that although there was no "right of election", there was nonetheless a "power of election", Fitzmaurice, Third Report, p. 42, para. 85.

[346]  G.G. Fitzmaurice, Second Report, *Yearbook ... 1957* vol. II, pp. 54, paras. 124-126; Fitzmaurice, ibid., p. 44, para. 91.

A/CN.4/L.682
page 134

263.    The third Special Rapporteur, Waldock, maintained and extended the move from invalidity to priority.  He stressed the need to treat with extreme caution suggestions that treaties among sovereign States could face the sanction of invalidity.  Potential conflicts needed to be dealt with first by interpretation and seeking to make them coherent.  If it were impossible to reconcile the treaties, then the States would have to agree on priority with liability to the innocent party.

264.    Unlike his predecessors, Waldock did not reserve special treatment for legislative or "objective" treaties.  There was, he felt, no support for this in international practice.[347]  The nature and importance of the provisions in such treaties were anyway so heterogeneous that a general rule was out of place.  In case some treaties - such as those on the laws of war - contained especially important provisions, they were protected by their *jus cogens* character. But because the treaties preserved the right of unilateral denunciation, it seemed illogical to exclude the possibility of giving effect to subsequent treaties that in fact implied such a denunciation.[348]

265.    Waldock's solution was to relativize the problem.  For States that were parties to the first but not the second treaty, the first enjoyed priority.  If all parties to the second were also parties to the first treaty, then this was an *inter se* agreement whose permissibility would have to be resolved by interpreting the first treaty.[349]

266.    In the course of the discussion, an important distinction emerged between two types of cases where the group of parties to the later multilateral treaty was not identical with the group of parties to the earlier treaty:  (a) cases where some States were parties to the later treaty that were not parties to the earlier one and (b) cases where *all* parties to the later treaty were also parties to the earlier treaty.  The latter case dealt with what was subsequently called *inter se* modification of the treaty and was separately dealt with under article 41 (see section D.4 below).

---

[347]  Waldock, ibid., p. 58, para. 20.

[348]  Ibid., pp. 59-60, paras. 25-30.

[349]  Ibid., p. 60, para. 31.

### 3. Special clauses

267.    Owing to the inconclusive nature of the general law on conflicts between successive norms as well as the generally open-ended formulations of article 30 VCLT, it seems important that States include in the treaties themselves direction as to what to do with subsequent or prior conflicting treaties.  The following sections will contain (a) a brief typology of conflict clauses; (b) a discussion of conflict-clauses between and across "regimes"; (c) the conflict clauses incorporated in the EC treaty, and (d) the practice of the so-called "disconnection clause".

**(a)    A typology of conflict clauses**

268.    Among the various categories of conflict-clauses at least the following may be distinguished:[350]

> (1)    *Clauses that prohibit the conclusion of incompatible subsequent treaties*.  This is an express exception to the *lex posterior* rule, designed to guarantee the normative power of the earlier treaty.  For example, under article 8 of the NATO Treaty "Each Party declares that none of the international engagements now in force between it and any other of the parties or any third States is in conflict with the provisions of this treaty, and undertakes not to enter any international engagement in conflict with this Treaty".[351]

> (2)    *Clauses that expressly permit subsequent "compatible" treaties*.  One example might be article 311 (3) UNCLOS that provides as follows:  Two or more States Parties may conclude agreements modifying or suspending the operation of provisions of this Convention, applicable solely to the relations between them, provided that such agreements do not relate to a provision derogation from which is incompatible with the effective execution of the object and purpose of this Convention, and provided further

---

[350]  See Rousseau, "De la compatibilité des normes ", supra note 36, pp. 154-164; Czaplinski-Danilenko, "Conflict of Norms", supra note 73, pp. 14; Jan B. Mus, "Conflicts between Treaties", supra note 21, pp. 214-217; Aust, *Modern Treaty Law ...,* supra note 73,pp. 174-181; Sadat-Akhavi, *Methods of Resolving Conflicts ...,* supra note 21, pp. 86-97; Fitzmaurice & Elias, *Contemporary Issues ...* supra note 73, pp. 323-325; Patrick Daillier and Alain Pellet, *Droit international public*, supra note 73, pp. 268-271; Borgen, "Resolving Treaty Conflicts", supra note 10, pp. 584-587.

[351]  See Aufricht, "Supersession of Treaties ...", supra note 116, pp. 666-667.

that such agreements shall not affect the application of the basic principles embodied herein, and that the provisions of such agreements do not affect the enjoyment by other States Parties of their rights or the performance of their obligations under this Convention.

(3)    *Clauses in the subsequent treaty providing that it "shall not affect" the earlier treaty*.  One example would be article 30 of the Geneva Convention on the High Seas according to which provides:

> "The provisions of this Convention shall not affect conventions or other international agreements already in force, as between States parties to them".

This provides for a also rebuttable presumption of harmony between the earlier and the subsequent treaty.[352]

(4)    *Clauses in the subsequent treaty that provide that among the parties, it overrides earlier treaty*.  This is really one case of "modification" of an agreement by an *inter se* agreement and will be treated at more length in section D.4. below.

(5)    *Clauses in the subsequent treaty that expressly abrogate the earlier treaty*.[353]  An example would be article 311 (1) UNCLOS according to which between parties to it and to the 1958 law of the sea conventions the former shall prevail.

(6)    *Clauses in the subsequent treaties that expressly maintain earlier compatible treaties*.  One example would be article 311 (2) UNCLOS according to which "this convention shall not alter the rights and obligations of States parties which arise from other agreements compatible with this convention and which do not affect the enjoyment by other States parties of their rights or the performance of their obligations under this Convention".

---

[352]  Geneva Convention on the High Seas, AJIL vol. 52, (1958) p. 842.  See also Borgen "Resolving Treaty Conflicts", supra note 10, p. 586; Aufricht, ibid., p. 669

[353]  Aufricht, ibid., pp. 661-663.

(7)    *Clauses that promise that future agreements will abrogate earlier treaties*.  This is a kind of *pactum contrahendo*.  One example is 307 of the EU Treaty (article 234 EC) providing that the rights and obligations of members ensuing from treaties concluded before membership are not affected.  The members, however, commit to take action so as to abrogate those treaties (see further section D.3 (c) below).

269.    Although such clauses are undoubtedly useful, there is a limit to what they can achieve.  They cannot, for instance, affect the rights of third parties or interfere with the operation of *jus cogens* or other hierarchical principles (such as those having to do with integral or interdependent obligations).[354]

270.    But even as there are conflict clauses, their meaning or effect may sometimes be obscure.  An example is provided by article 22 of the 1992 Convention on Biodiversity:

> 1.    The provisions of this Convention shall not affect the rights and obligations of any Contracting Parties deriving from any existing international agreement, except when the exercise of those rights and obligations would cause serious damage or threat to biological diversity.
>
> 2.    Contracting Parties shall implement this Convention consistently with the rights and obligations of States under the law of the sea.

271.    It seems unclear what is in fact being overridden by what by these formulations.  Of course, the provision may be read as an exhortation that the relevant instruments should always be read as compatible with each other (i.e. the principle of systemic integration - see section F below) within an overall obligation to cooperate.[355]  Sometimes this objective is in fact written into the relevant conflict clause.[356]  But where a party claims a right on the basis of the

---

[354]  Waldock, Third report, *Yearbook ... 1958* vol. II, p. 38, para. 15.

[355]  As suggested in Wolfrum & Matz, Conflicts in International Environmental Law, supra note 22, p. 125; Matz, Wege zur Koordinierung völkerrechtlicher Verträge ... supra note 22, pp. 191-194 et seq.; Fitzmaurice & Elias, Contemporary Issues ... supra note 73, p. 333.  For a useful discussion of the ambiguities of the conflict clause in the Biosafety protocol, see Sabrina Safrin, "Treaties in Collision?  The Biosafety Protocol and the World Trade Organization Agreements", AJIL vol. 96 (2002) pp. 606-628.

[356]  Article 237 (2) UNCLOS for example yields to specific environmental treaties provided these are implemented "in a manner consistent with the general principles and objectives of the [UNCLOS]".  See further Fitzmaurice & Elias, ibid., pp. 334-336.

A/CN.4/L.682
page 138

Biodiversity Convention or some other treaty, it would seem difficult to *deny* such right by interpretation or "coordination". Besides, sometimes conflict clauses may themselves conflict or cancel each other out.[357]  In such cases, recourse must be had to general principles of conflict resolution.

**(b)     Relations within and across regimes:  environmental treaties**

272.    As the previous considerations have shown, article 30 VCLT has its limits.  It works best when it deals with a relationship between two treaties between identical parties on a related topic.  It is then fair to assume that the latter treaty expresses a more recent party will, and should therefore be given effect to.  When the parties are non-identical, article 30 allows the State having concluded incompatible obligations to choose which of them it will observe.  Confronted with relations *between* treaty regimes such as those habitually understood to exist in trade law, human rights law, or environmental law, article 30 remains equally disappointing.  A straightforward priority of one treaty over another (that is in fact, of one regime over another) cannot be reasonably assumed on a merely chronological basis.  There is need for a more nuanced approach.  It is unlikely, however, that such an approach might be developed within dispute-settlement that will perforce be limited to ad hoc considerations.  Instead, it might be facilitated through the adoption of appropriate conflict clauses.  Two types of such clauses may be distinguished.  A first type might follow article 30 VCLT and seek resolution by establishing a firm priority between two treaties.  A second type, discussed in this section, avoids a straightforward priority and instead seeks to coordinate the simultaneous application of the two treaties as far as possible.

273.    The relationship between treaties that belong to different regimes is a general problem. Its most acute manifestation has concerned relations between instruments forming part of trade and environmental regimes.[358]  Although negotiators appear increasingly aware of the problem,

---

[357]  This is the case of Article 311 (3) UNCLOS and 22 (1) of the Convention of Biological Diversity.  For a discussion, see Fitzmaurice & Elias, ibid., p. 334.

[358]  For instance, Sadat-Akhavi, *Methods of Resolving Conflicts ...* supra note 21*,* pp. 213-247 has dealt with specific conflict resolution techniques for different types of treaties, e.g. human rights treaties and the principle of "more favorable provision"; Joost Pauwelyn, *Conflict of Norms in ...* supra note 21, pp. 345-361 has dealt with the conflict clauses in the WTO treaty; Deborah E. Siegel, "Legal Aspects of the IMF/WTO Relationship:  The Fund's Articles of Agreement and the WTO Agreement", AJIL*,* vol. 96 (2002) pp. 561-599; Anja Lindroos, "Addressing Norm

A/CN.4/L.682
page 139

practice has so far developed in an incoherent manner. For instance, in the negotiations on the Cartagena Protocol on Biosafety to the Convention on Biological Diversity (2000) the relationship of the Protocol to the obligations of the parties under the WTO covered agreements was extensively debated. As a result, the Protocol includes provision concerning its relationship with the trade instruments, but leaves many other important treaty relations unaddressed. These include its relationship e.g. to the International Plant Protection Convention, the Chemical Weapons Convention and the Biological Weapons Convention.[359]

274.    The final wording of the relevant preambular passages in the Biosafety Protocol illustrates current problems:

> Recognizing that trade and environment agreements should be mutually supportive with a view to achieving sustainable development,
>
> Emphasizing that this Protocol shall not be interpreted as implying a change in the rights and obligations of a Party under any existing international agreements,
>
> Understanding that the above recital is not intended to subordinate this Protocol to other international agreements.[360]

275.    The negotiators have been reluctant to decide how, exactly, environmental and trade agreements should be related to each other or to any other further agreement.[361] The only thing

---

Conflicts in a Fragmented Legal System: The Doctrine of *Lex Specialis*", Nordic Journal of International Law (2005) vol. 74, pp. 30-34, 60-64; Wolfrum & Matz, *Conflicts in International Environmental Law,* supra note 22, have extensively dealt with conflicts between environmental and other treaties. The fact that environmental treaties have particularly wide potential of conflict with other treaties as most matters bear a relationship to the environment is stressed in Matz, *Wege zur Koordinierung völkerrechtliche Verträge. ...* supra note 22, pp. 53-73. The WHO has considered the issue in the context of international health regulations, *Review and Approval of Proposed Amendments to the International Health Regulations: Relations with Other International Instruments*, WHO Doc. A/IHR/IGWG/INF.DOC./1, 30 September 2004, pp. 1-10.

[359] Safrin, "Treaties in Collision? …" supra note 355, p. 617.

[360] Cartagena Protocol on Biosafety on the Convention on Biological Diversity, Depositary notification C.N.251.2000.TREATIES-1 of 27 April 2000; C.N. 1471.2003.TREATIES-41 of 22 December 2003 (Proposal of corrections to the Arabic text of the Protocol) and C.N.291.2004.TREATIES-11 of 26 March 2004 (Rectification of the Arabic text of the Protocol and transmission of the relevant Procès-Verbal). See also ILM vol. 39 (2000), p. 1027.

[361] Safrin, "Treaties in Collision? …" supra note 355, pp. 618-621 and Borgen, "Resolving Treaty Conflicts", supra note 10, p. 614.

A/CN.4/L.682
page 140

they appear to have agreed is that the Biosafety Protocol should be seen as no less important than any other agreements. Similar clauses may be found in other treaties. For example, the Preamble to the International Treaty on Plant Genetic Resources for Food and Agriculture (2002) provides that it should not be interpreted as "implying in any way a change in the rights and obligations of parties under other international treaties". It then expresses the understanding that this principle "is not intended to create a hierarchy between this Treaty and other international agreements".[362]

276.    Such formulations do imply a willingness to acknowledge the existence of parallel and potentially conflicting treaty obligations. But they fall short of indicating clearly what should be done in case conflicts emerge. Instead, recourse is to compromise formulas that push, as it were, the resolution of problems to the future. The first paragraph of the conflict clause in the Biosafety Protocol, for example, provides that "trade and environment agreements should be mutually supportive with a view to achieving sustainable development". The assumption is that conflicts may and should be resolved between the treaty partners as they arise and with a view to mutual accommodation.[363] Likewise, the above-mentioned International Treaty on Plant Genetic Resources for Food and Agriculture recognizes "that this Treaty and other international agreements relevant to this Treaty should be mutually supportive with the view to sustainable agriculture and food security". Other treaties include conditional conflict clauses that also leave much room for appreciation and negotiation. For instance, the Basel Convention on the Transboundary Trade in Hazardous Waste (1989) allows parties to enter into other agreements "provided that such agreements or arrangements do not derogate from the environmentally sound management of hazardous wastes and other wastes as required by this Convention".[364]

---

[362]  Preamble International Treaty on Plant Genetic Resources for Food and Agriculture, 6 November 2002, ftp://ext-ftp.fao.org/ag/cgrfa/it/ITPGRe.pdf (last visited 28 March 2006).

[363]  The content and form of this "obligation to co-ordinate" is discussed at length in Matz, Wege zur Koordinierung völkerrechtlicher Verträge … supra note 22, pp 233-390.

[364]  Article 11 Basel Convention on the Control of Transboundary Movements of Hazardous Wastes and Their Disposal, 28 United Nations, *Treaty Series*, vol. 1673, p. 57.

A/CN.4/L.682
page 141

And the 1992 Biodiversity Convention states that "the provisions of this Convention shall not affect the rights and obligations of any Contracting Party deriving from any existing international agreement, except where the exercise of those rights and obligations would cause a serious damage or threat to biological diversity".[365]

277.    Such clauses give recognition to the fact that that it seems inadvisable to produce a general rule on treaty priority.  For this, the treaties and the situations that may arise are too heterogeneous.  Instead, the parties appeal to each other's sense of accommodation and willingness to envisage a "mutually supporting" role for their instruments.  This is simply another way to emphasize the importance of harmonizing interpretation.  This may work well between treaties that are part of the same regime and share a similar object and purpose or carry a parallel "ethos" - e.g. between several environmental or trade instruments *inter se*.  But it cannot be assumed *a priori* that a similar readiness exists as between parties to treaties across regimes, treaties that seek to achieve physically incompatible solutions, or are inspired by very different (perhaps opposite) objectives in situations experienced as zero-sum games.  In such cases, at the end of the day, one treaty must be preferred over the other.  At that point, focus shifts from coordination to rights and obligations.  Even as open-ended or programmatic provisions are easily amenable to accommodation, this cannot be said of provisions laying out (subjective) rights or obligations.  For giving effect to them, it remains important that the possibility of recourse to regime-independent dispute-settlement is provided.

278.    Mutual accommodation is easiest between two instruments within a regime, especially between a framework agreement and a more specific (implementation) agreement.[366]  For example, many of the conflict clauses in the UNCLOS are quite open-ended and refrain from setting up neat priorities.  This is understandable.  There is often reason to encourage further

---

[365]  Article 22 The Convention on Biological Diversity, United Nations, *Treaty Series*, vol. 1760, p. 79.

[366]  Wolfrum & Matz, *Conflicts in International Environmental Law*, supra note 22, p. 121. The relation of the UNCLOS as an umbrella convention to an implementing agreement in relation to dispute settlement system was raised in the *Southern Bluefin Tuna* case (*Australia and New Zealand/Japan)* Award of 4 August 2000 (Jurisdiction and admissibility) UNRIAA vol. XXII (2004) pp. 1-57.

A/CN.4/L.682
page 142

specific regulation.  The implementation agreement will then prevail as *lex specialis*, while the framework instrument remains "in the background" as *lex generalis* as pointed out in section C above.  Article 311 (2) UNCLOS allows States to conclude modifying agreements:

> … provided that such agreements do not relate to a provision derogation from which is incompatible with the effective execution of the object and purpose of this Convention, and provided further that such agreements shall not affect the application of the basic principles embodied herein, and that the provisions of such agreements do not affect the enjoyment by other States Parties of their rights or the performance of their obligations under this Convention.

279.    Here "compatibility" has been formulated rather loosely.  Parties are given a wide latitude to conclude agreements on topics dealt with by the UNCLOS with only the caveat that this should not "affect the application of basic principles" or the "rights" and "obligations" of the parties.  Although there is room to interpret the expressions "rights" and "obligations" either more or less strictly, the thrust of the provision lies in a search for reasonable accommodation. Like the environmental treaties discussed above, it seems to look for a "mutually supporting" role for the UNCLOS and those particular instruments.  What this means in case an agreement seems in outright conflict with it remains unclear.[367]

280.    The weakness of the strategy of seeking a "mutually supportive" interpretation lies in its open-endedness.  By concluding this type of conflict clause, States parties transfer their competence to decide on what should be done in case of conflicts to the law-applier.  This may work well in case the two treaties are part of the same regime.  But if the conflict is between treaties across two regimes, then the solution works only if the law-applier is an impartial third party that approaches the conflicting instruments from beyond the regimes of which the treaties are a part.  It might happen, however, that the law-applier will be a body or an administrator closely linked to one or another of the (conflicting) regimes.  In such case, an open-ended conflict clause will come to support the primacy of the treaty that is part of the law-applier's regime.

---

[367] Fitzmaurice & Elias, *Contemporary Issues* …, supra note 73 p. 335 and Wolfrum & Matz, *Conflicts in International Environmental Law*, supra note 22, pp. 15-31.

281.    Conflict clauses referring to the fundamental purpose of the treaty are in line with the language in article 41 (b) of the VCLT which requires that the *inter se* agreements should not frustrate the object and purpose of the original treaty.  Often the clauses also support the idea of interpreting the treaties in manner which preserves the rights and obligations under both treaties in a maximal way.  A harmonizing approach ("mutually supportive") fits best with the aim of efficient management.

282.    Nevertheless, the resulting interpretative openness creates a danger of "structural bias" - namely that what is understood as a "mutually supportive" solution is determined in accordance with the priorities of the body whose task it is to interpret the conflict clause.  To prevent this, it is still advisable to write the key provisions in multilateral treaties -and especially provisions that have to do with the substantive rights and obligations of the parties - with sufficient clarity so that they are not compromised at the stage of application.

**(c)    Conflict clause in the EC Treaty**

283.    Agreements establishing international organizations often contain a conflict clause.  The best known example is Article 103 the United Nations Charter (see further section E below).  Likewise, article 307 (previously art. 234) of the Treaty establishing the European Community (EC Treaty) sets up a conflict rule for agreements between member States and third parties.[368]  The EC Treaty takes absolute precedence over agreements that Member States have concluded between each other.  In relation to third States, however, article 307 stipulates:

---

[368]  I. MacLeod, I.D. Hendry, and Stephen Hyett, *The External Relations of the European Communities* (Oxford: Clarendon Press, 1996) p. 229 and Piet Eeckhout, *External Relations of the European Union.  Legal and Constitutional Foundations* (Oxford:  Oxford University Press, 2004) p. 334.  See also, e.g. Jan. Klabbers, "Re-Inventing the Law of Treaties:  the Contribution of the EC Courts", Netherlands Yearbook of International Law vol. XXX (1999) p. 45-74; Jan Klabbers, "Moribund on the Fourth of July?  The Court of Justice on Prior Agreements of the Member States", European Law Review, vol. 26, (2001) pp. 187-197; Christian N.K. Franklin, "Flexibility vs. Legal Certainty, Article 307 EC and Other Issues in the Aftermath of the Open Skies Cases", European Foreign Affairs Review, vol. 10 (2005) pp. 79-115; P.J. Kuijper, "The Court and the Tribunal of the EC and the Vienna Convention on the Law of Treaties", Legal Issues of European Integration, vol. 25, (1998) No. 1, pp. 1-23; F.E. Dowrick, "Overlapping International and European Laws", ICLQ, vol. 27 (1978) p. 629-60.

A/CN.4/L.682
page 144

> The rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of this Treaty.
>
> To the extent that such agreements are not compatible with this Treaty, the Member State or States concerned shall take all appropriate steps to eliminate the incompatibilities established.  Member States shall, where necessary, assist each other to this end and shall, where appropriate, adopt a common attitude.
>
> In applying the agreements referred to in the first paragraph, Member States shall take into account the fact that the advantages accorded under this Treaty by each Member State form an integral part of the establishment of the Community and are thereby inseparably linked with the creation of common institutions, the conferring of powers upon them and the granting of the same advantages by all the other Member States.

284.    This article gives priority to treaties that a Member State has concluded with third States before the entry into force of the EC treaties in regard to it.[369]  The Court of Justice of the European Communities (ECJ) has frequently clarified the scope of article 307.[370]  In the *Burgoa* case*,* the ECJ confirmed that article 307 "is of general scope and it applies to any international agreement, irrespective of subject-matter, which is capable of affecting the application of the treaty".[371]  Neither the wording of the article nor subsequent case-law accepts the extension of the provision to agreements concluded by member States after accession.[372]  According to the leading case, the provision covers the rights of the third parties and the obligations of the Member States:

> The applicant replies that the terms 'rights and obligations' in Article 234 refer, as regards the 'rights', to the rights of third countries and, as regards the 'obligations', to the obligations of Member States and that, by virtue of the principles of international law, by

---

[369]  Klabbers, "Moribund on the Fourth of July? …", ibid., pp. 187-188.

[370]  Eeckhout, *External Relations of the European Union* … supra note 368, p. 334.

[371]  Case C-812/79, *Attorney General v. Juan C. Burgoa*, Judgment of 14 October 1980, ECR (1980) 2787, pp. 2802, para. 6.

[372]  Eeckhout, External Relations of the European Union … supra note 368, p. 335.

A/CN.4/L.682
page 145

assuming a new obligation which is incompatible with rights held under a prior treaty a State *ipso facto* gives up the exercise of these rights to the extent necessary for the performance of its new obligations.[373]

The applicant's interpretation is well founded and the objections raised by the defence must be dismissed.[374]

285.    The distinction between the *rights* of third States and the *obligations* of Member State relates to the question whether a Member State can claim that it cannot fulfil its obligations under Community law toward other Member States owing to a treaty it has made with third States.  In the aforementioned case the Italian Government had argued that it could not fulfil its obligations of intra-Community trade due its GATT commitments.  This was quickly dispelled by the Court:  "in matters governed by the EEC Treaty, that Treaty takes precedence over agreements concluded between Member States before its entry into force, including agreements made within the framework of GATT".[375]  Article 307 cannot therefore be relied upon in relations of members to justify trade restrictions within the Community.[376]  Yet the division of rights and obligations is not unproblematic.[377]  As pointed out by Klabbers, article 307 is clearly applicable to bilateral treaties as well as "bilateralizable" multilateral treaties.  In respect of other kinds of multilateral treaties, article 307 has only a limited applicability.[378]

286.    Article 307 places no obligations on the Community itself.  However, as stated by the ECJ in the *Burgoa* case:

---

[373] Case 10/61, *Commission of the European Economic Community v. Italy*, Judgment of 27 February 1962, ECR 1, para. II B 3.  See also MacLeod et al., *The External Relations of the European Communities*, supra note 368, p. 230 and Eeckhout, *External Relations of the European Union* ... ibid, pp. 337-338.

[374] Case 10/61, *Commission of the European Economic Community v. Italy*, Judgment of 27 February 1962, ECR 1, para. II B 4.

[375] Ibid., para. II B 5.

[376] MacLeod et al., *The External Relations of the European Communities*, supra note 368, p. 230.  This was confirmed in the Case 121/85, *Conegate Limited v. HM Customs & Excise,* Judgment of 11 March 1986, ECR (1986) 1007, p. 1024.

[377] Klabbers, "Re-Inventing the Law of Treaties …", supra note 368, p. 63.

[378] Ibid., p. 64-65.

Although the first paragraph of Article 234 makes mention only of the obligations of the Member States, it would not achieve its purpose if it did not imply a duty on the part of the institution of the Community not to impede the performance of the obligations of Member States which stem fro a prior agreement. However, that duty of the Community institutions is directed only to permitting the Member State concerned to perform its obligations under the prior agreement and does not bind the Community as regards to non-member country in question.[379]

287.    Under article 307 of the EC treaty, Member States are allowed to carry out their earlier agreements with third States and the Community is under an obligation not to impede this. Nevertheless, Member States are also obliged to take all appropriate steps to eliminate the incompatibilities between their Community obligations and these previous treaties.[380] As the ECJ has pointed out, this involves a duty to work actively so as to bring external obligations in line with Community obligations:

… although, in the context of Article 234 of the Treaty, the Member States have a choice as to the appropriate steps to be taken, they are nevertheless under an obligation to eliminate any incompatibilities existing between a pre-Community convention and the EC Treaty. If a Member State encounters difficulties which make adjustment of an agreement impossible, an obligation to denounce that agreement cannot therefore be excluded.[381]

As regards the argument that such denunciation would involve a disproportionate disregard of foreign-policy interests […] as compared with the Community interest, it must pointed out that the balance between the foreign-policy interests of a Member State and the Community interest is already incorporated in Article 234 of the Treaty, in that it allows a Member State not to apply a Community provision in order to respect the rights of third countries deriving from a prior agreement and to perform its obligations thereunder. That Article also allows them to choose the appropriate means of rendering the agreement concerned compatible with Community law.[382]

---

[379] Case C-812/79, *Attorney General v. Juan C. Burgoa*, Judgment of 14 October 1980, ECR (1980) 2787, pp. 2803, para. 9.

[380] Ibid, pp. 2807-2809, paras 23-26 and Jan Klabbers, "Moribund on the Fourth of July? ...", supra note 368, pp. 188-189.

[381] C-62/98, *Commission of the European Communities v. Portugal,* Judgment of 4 July 2000, ECR (2000) I-05171, pp. 5211-5212, para. 49.

[382] Ibid., pp. 5212, para 50.

288.    The position of the ECJ is that the requirement under article 307 "to eliminate any incompatibilities" is rather strict.[383]  The Court appears willing to accept that a Member State may face difficulties in bringing its external commitments in line with EC law.  This may sometimes involve a duty to denounce such commitments.  In other words, as pointed out by Eeckhout, "[f]oreign-policy interests of the Member States cannot override that obligation, and a Member State cannot in principle argue that denunciation would be to harmful to those interests".[384]  He also remarks that "there is no suggestion that there may ever be cases where the Community itself is required to act so as to remove incompatibilities, e.g., modify Community law".[385]

**(d)    Disconnection clauses**

289.    One practice that may be appropriate to discuss here is the expansion of the so-called "disconnection clause" in multilateral agreements to which the European Community is a party. There are presently at least 17 multilateral treaties, having as parties members and non-members of the European Community (and in some cases, also the European Community), that contain this clause.[386]  The purpose of the clause is, according to the European Commission, to ensure

---

[383]  Klabbers, "Moribund on the Fourth of July? ….", supra note 368, pp. 195-196.

[384]  Eeckhout, *External Relations of the European Union …* supra note 368, p. 342.

[385]  Ibid.

[386]  Council of Europe Convention on Laundering, Search, Seizure and Confiscation of the Proceeds from Crime and the Financing of Terrorism, 16 May 2005 Warsaw, Article 52 (4); Council of Europe Convention on Action Against Trafficking of Human Beings 16 May 2005 Warsaw, Article 40 (3); Council of Europe Convention on the Prevention on Terrorism 16 May 2005 Warsaw, Article 26 (3); Council of Europe Convention on Contracts Concerning Children 15 May 2003 Strasbourg, Article 20 (3); European Convention for the Protection of Audiovisual Heritage 8 November 2001 Strasbourg, Article 21; European Convention on the Legal Protection of Services Based on, or Consisting of, Conditional Access 24 January 2001 Strasbourg, Article 11 (4); European Convention on the Promotion of a Transnational Long-Term Voluntary Service for Young People 11 May 2000 Strasbourg, Article 19 (2); Agreement on Illicit Traffic by Sea, implementing Article 17 of the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances 31.1.1995 Strasbourg, Article 30 (3); European Convention Relating to Questions on Copyright Law and Neighbouring Rights in the Framework of - Transfrontier Broadcasting by Satellite 11 May 1994 Strasbourg, Article 9 (1); Convention on Civil Liability for Damage Resulting from Activities Dangerous to the Environment 21 June 1993 Lugano, Article 25 (2); European Convention on Certain International Aspects of Bankruptcy 5 June 1990 Istanbul, Article 38 (2); Protocol to the Convention on Insider Trading 11 September 1989 Strasbourg, Article 1; European Convention on Transfrontier Television 5 May 1989 Strasbourg, Article 27 (1); European Convention on Insider Trading 20 April 1989 Strasbourg, Article 16 bis; The Council of Europe/OECD Convention on Mutual Administrative Assistance in Tax Matters 25 January 1988 Strasbourg, Article 27 (2); Protocol on Civil Liability

A/CN.4/L.682
page 148

the continuing application of Community rules between EC member States without any intent to affect the obligations between member States and other parties to treaties.[387]  The exact formulation of these clauses differs from one convention to another but the core substance is captured in article 27 of the Convention on Mutual Administrative Assistance in Tax Matters of 1988:

> Notwithstanding the rules of the present Convention, those Parties which are members of the European Economic Community shall apply in their mutual relations the common rules in force in that Community.

290.    Some disconnection clauses are general and cover the whole of a treaty.  Other clauses are only partial or qualified.[388]  The clause in the article 20 (2) of the Protocol on Civil Liability and Compensation for Damage Caused by the Transboundary Effects of Industrial Accidents on Transboundary Waters is an example of a partial disconnection clause, aiming to replace only

---

and Compensation for Damage Caused by the Transboundary Effects of Industrial Accidents on Transboundary Waters 21 May 2003 Kiev, Article 20(2); UNIDROIT Convention on Stolen or Illegally Exported Cultural Objects 24 June 1995 Rome, Article 13 (3).

[387]  The European Community/European Union and its Members States have also included the following declaration in the Explanatory Report of the 2005 Council of Europe Convention on Terrorism :  "The European Community/European Union and its Member States reaffirm that their objective in requesting the inclusion of a 'disconnection clause' is to take account of the institutional structure of the Union when acceding to international conventions, in particular in case of transfer of sovereign powers from the Member States to the Community.  This clause is not aimed at reducing the rights or increasing the obligations of a non-European Union Party vis-à-vis the European Community/European Union and its Member States, inasmuch as the latter are also parties to this Convention.  The disconnection clause is necessary for those parts of the Convention which fall within the competence of the Community/Union, in order to indicate that European Union Member States cannot invoke and apply the rights and obligations deriving from the Convention directly among themselves (or between themselves and the European Community/Union).  This does not detract from the fact that the Convention applies fully between the European Community/European Union and its Member States on the one hand, and the other Parties to the Convention, on the other; the Community and the European Union Members States will be bound by the Convention and will apply it like any Party to the Convention, if necessary, through Community/Union legislation.  They will thus guarantee the full respect of the Convention's provisions vis-à-vis non-European Union Parties."  As an instrument made in connection with the conclusion of a treaty, within the meaning of article 31, para. 2 (b) of the Vienna Convention on the Law of Treaties, this declaration forms part of the "context" of the Convention.  *European Treaty Series*, No. 196, para. 272.  See also Loïc Azoulai, "The Acquis of the European Union and International Organizations", European Law Journal, vol. 11, (2005) especially p. 211; and Andrea Schulz, "The Relationship between the judgments project and other international instruments", Preliminary document No. 24 of December 2003, Hague Conference on Private International Law, http://www.hcch.net/upload/wop/genaff_pd19e.pdf (last visited 31 March 2006).

[388]  For a typology, see Constantin P. Economidès & Alexandros G. Kolliopoulous, "La clause de déconnexion en faveur du droit communataure:  une pratique critiquable", RGDIP (2006, forthcoming).

certain articles of the original treaty.[389]  As an example of a conditional disconnection clause mention could be made of article 26 (3) of the Council of Europe Convention on the Prevention of Terrorism that refers to EC rules "without prejudice to the object and purpose of the present Convention and without prejudice to its full application with other Parties". Another, perhaps equally ambiguous condition, is written into article 30 of the Agreement on Illicit Traffic by Sea, implementing article 17 of the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances which  stipulates that "If two or more Parties have already concluded an agreement or treaty in respect of a subject dealt with in this Agreement or have otherwise established their relations in respect of that subject, they may agree to apply that agreement or treaty or to regulate those relations accordingly, in lieu of the present Agreement, if it facilitates international cooperation".[390]

291.    In all cases the rules of the treaty are replaced in whole or in part in the relations between EC members, by EC rules.  The obligations between EC members and other treaty parties remain, however, fully governed by the treaty.  The inclusion of such clauses to multilateral treaties has given some cause to concern.  It has seemed difficult to classify them by reference to provisions in the Vienna Convention and the effect of the proliferation of such clauses to the coherence of the original treaty has seemed problematic.[391]

292.    Article 30 (2) of the VCLT provides that "when a treaty specifies that it is subject to, or that it is not be considered as incompatible with, an earlier or later treaty, the provision of that other treaty will prevail".[392]  This formulation covers also disconnection clauses.  They are thus best analyzed as conflict clauses added to treaties with the view to regulating potential conflicts between Community law and the treaty.  What may seem disturbing about such clauses is that they are open to only  some parties to the original treaty and the content of the Community law

---

[389]  Ibid.

[390]  Ibid.

[391]  Ibid.

[392]  Article 30 (2) of the VCLT.

A/CN.4/L.682
page 150

to which they refer may be both uncertain and subject to change.  Nevertheless, this is scarcely different from regular *inter se* amendments  that also apply between some parties only and that may be subject to future modification.

293.    Under what conditions is this type of clause be permissible?  The starting-point is, of course, that the clause is agreed to by all the parties, so that no question of validity will rise.  Nevertheless, it cannot be excluded that the other parties might not know of the real import of the disconnection clause because the rules referred to therein (the relevant EC rules) have been obscure, or modified or interpreted in a new way.  In this case, the EC rules begin to resemble a new, successive treaty, covered by article 30 (4) VCLT.  According to article 30 (5) VCLT "paragraph 4 [of article 30] is without prejudice to article 41".[393]  Through this means, an open-ended disconnection clause would become *also* conditioned by the requirements of article 41.  During the preparatory work for the VCLT, the Chairman of the ILC confirmed that a right to an *inter se* modification should not be unlimited but that any modification would need to respect the object and purpose of the treaty.[394]  A similar position was taken by Pellet in context of reservations as he explained that an expressly authorized unspecified reservation must also fulfil the object and purpose test.[395]  Thus, while the scope and content of the disconnection clause is normally covered by the original consent, in case the regulation referred to in that clause will be modified, such modification may only be allowed to the extent that it does not "affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations [or] relate to a provision derogation of which is incompatible with the effective execution of the object and purpose of the treaty as a whole" as stipulated by article 41 (1) of the VCLT.

294.    Like *inter se* modification, a disconnection clause makes it possible for a limited group of parties to enhance the objectives of the treaty by taking measures that correspond to their special circumstances.  But just like *inter se* agreements, this practice creates the possibility of

---

[393]  The drafting process of the two articles overlapped considerably.  See sections D.2.(b) and D.4.

[394]  The 876th ILC Meeting of 22 June 1966, *Yearbook … 1966* vol. I, Part Two, p. 219.

[395]  Alain Pellet, Tenth Report on Reservations to Treaties, document A/CN.4/558/Add.1 (2005) pp. 3-4.

A/CN.4/L.682
page 151

undermining the original treaty regime. The actual effect of a disconnection clause depends on its specific wording. Their common point, however, is that they seek to replace a treaty in whole or in part with a different regime that should between applicable between certain parties only. The real substance of clause is not apparent on its surface, but lies in the regime referred to in the clause. It is the conformity of the substance of that regime with the treaty itself where the real point of concern lies. From the perspective of other treaty parties, the use of disconnection clause might create double standards, be politically incorrect or just confusing.[396] To alleviate such concerns, some disconnection clauses are worded so as to be "without prejudice to the object and purpose of the present Convention". Nevertheless, even if they did not contain such a reference, the condition of conformity with object and purpose may, as pointed out above, derive from those laid down for the *inter se* modification. In assessing such conformity, two concerns seem relevant. First, a disconnection clause is agreed to by all the parties of the treaty. From this perspective, the practice seems unproblematic. The validity of a disconnection clause flows from party consent. On the other hand, it is not obvious that parties are always well-informed of the content of the regime to which the clause refers and that regime may change independently of the will or even knowledge of the other parties. In such cases, the criterion concerning conformity with object and purpose will provide the relevant standard for assessing the practice of the treaty parties. Like elsewhere, the consideration of whether the provisions to which the treaty refers are what Fitzmaurice called "integral" or "interdependent" provisions that cannot be separated from the treaty, seems relevant.

### 4. *Inter se* agreements

295.    As pointed out above, during the debates in the ILC on treaty conflict a distinction was constantly made between subsequent agreements between some of the treaty parties to *modify*

---

[396] See, for example, the speech of Serhiy Holotavy, Chairperson of the Parliamentary Assembly of the Council of Europe, 7 April 2005 at the 26th Conference of European Ministers of Justice in Helsinki, http://www.coe.int/T/E/Com/Files/Ministerial-Conferences/2005-Helsinki/disc_holovaty.asp (last visited 31 March 2006); Report for debate in the Standing Committee under urgent procedure by Rapporteuse Mrs. Ruth-Gaby Vermot-Mangold concerning Draft Council of Europe Convention on action against trafficking of human beings 15 March 2005, http://assembly.coe.int/Documents/WorkingDocs/Doc05/EDOC10474.htm (last visited 31 March 2006); Peter J. Kuijper: "The Conclusion and Implementation of the Uruguay Rounds results by the European Community", EJIL, vol. 6, (1995) pp. 223-224,; Interim Health Protection Agency operational statement on the International Health Regulations, 12 May 2004, http://www.hpa.org.uk/hpa/international/IHR_statement.htm (last visited 31 March 2006).

A/CN.4/L.682
page 152

the application of the treaty in their relations *inter se* and subsequent treaties in which, in addition to parties to the earlier treaty, also other States participated.  The former situation (*inter se* agreements) is now covered in article 41 of the VCLT.

296.    The Special Rapporteurs of the Commission emphasized the practical importance of *inter se* modifications to multilateral treaties.  Lauterpacht pointed out that these were a much used technique whereby treaties could be developed so as to apply better in the relations between some parties, the only question being whether such an agreement might affect the rights of the other parties of the treaty to the extent to invalidate it.[397]  Fitzmaurice described the *inter se* treaty as "one of the chief instruments, increasingly in use today, whereby a given treaty situation can be changed in a necessary and perhaps desirable manner".[398]  Waldock agreed that practice confirmed *inter se* agreements as "a normal method of revising general multilateral treaties":[399]

> Thus, in 1906 Geneva Convention of 1864 for the Amelioration of the Condition of Wounded in Armies in the Field was revised by a new Convention which expressly provided that, when duly ratified, it should supersede the 1864 Convention in relations between the contracting States, but that the 1864 Convention should remain in force in the relations of parties to that Convention who did not ratify the new Convention.  A similar provision was inserted in the Hague Conventions of 1907 on the Laws and Customs of War on Land which revised the earlier Convention of 1899.[400]

297.    Indeed, the conclusion of agreements between a limited number of parties to a multilateral treaty is an old practice, often provided for by the final clauses of a treaty itself.[401]  Such *inter se* agreements do not necessarily derogate from the treaty.  Instead, they serve to implement, update and strengthen the treaty in the relations between the parties to the modifying treaty.  There is no reason in such cases not to allow them full effect.

---

[397]  H. Lauterpacht, Second Report, *Yearbook .... 1954* vol. II, p. 136.

[398]  Fitzmaurice, Third Report, ibid, *1958* vol. II, p. 43, para. 89 (commentary on Draft article 18 (8)).

[399]  Waldock, Third Report, ibid., *1964* vol. II, p. 49.

[400]  Ibid.

[401]  For a discussion of typical cases where multilateral treaties have been updated and improved by later "special" (*inter se*) agreements, see Sadat-Akhavi, *Methods of Resolving Conflicts ...* supra note 21, pp. 114-119.

298.    For example, the 1961 Vienna Convention on Diplomatic Relations as well as the 1963 Vienna Convention on Consular relations both allow the conclusion of agreements on their respective subject-matters that provide more favourable treatment or confirm, supplement, extending or amplify their relevant provisions.[402]  An example relating to the latter would be the agreement concluded between Czechoslovakia and Austria on 14 March 1979 in which the two States wish "to confirm, supplement and amplify the provisions of that Convention [the Vienna Convention on Consular Relations] in accordance with its article 73, paragraph 2, and thereby also contribute to the further development of friendly relations between the two States in conformity with the provisions of the Final Act of the Conference on Security and Cooperation in Europe".[403]  Another example would be the European Convention on Consular Functions of 11 December 1967 where States members of the Council of Europe, parties to the Vienna Convention on Consular Relations, extended the relevant privileges beyond what had been granted by the Vienna Convention, noting that these special rules had been established by virtue of the close cooperation between them.[404]

299.    An example of a treaty expressly encouraging parties to conclude agreements that implement or extend their provisions further is provided by the Treaty on the Non-Proliferation of Nuclear Weapons of 1 July 1968, article 7 of which provides that "nothing in this Treaty affects the right of any group of States to conclude regional treaties in order to assure the total

---

[402]  Article 47 of the 1961 Vienna Convention on Diplomatic Relations, United Nations *Treaty series,* vol. 500, p. 95 and Articles 72 and 73 (2) of the 1963 Vienna Convention on Consular Relations, United Nations *Treaty series,* vol. 596, p. 261.

[403]  This agreement adds, inter alia, "member of the family" to the categories of persons defined in article 1 of the 1963 Convention and expands the consular functions defined in the various paragraphs of article 5 of the Convention. See United Nations *Treaty series,* vol. 1224, p. 21.

[404]  Preamble, *European Treaty Series* (Council of Europe: Strasbourg, 1993) vol. II, No. 61, p. 274.  States members of the Council of Europe have concluded many *inter se* agreements that introduce more advanced special regimes into their relations than the general regimes of multilateral treaties that have their basis in the aim of the Council of Europe, which is "to achieve a greater unity between its members … [with a view to] facilitating their economic and social progress … by agreements and common action in economic, social, cultural, scientific, legal and administrative matters".  See, for example, the European Convention relating to the Formalities Required for Patent Applications of 11 December 1953 and the Convention on the Unification of Certain Points of Substantive Law on Patents for Invention of 27 November 1963, concluded on the basis of article 15 of the Paris Convention for the Protection of Industrial Property of 20 March 1883, as revised in 1934.  For the texts, see United Nations *Treaty series,* vol. 218, p. 27; United Nations *Treaty series,* vol. 1249, p. 369.

A/CN.4/L.682
page 154

absence of nuclear weapons in their respective territories". As a consequence, several regional agreements reinforcing the prohibition of nuclear weapons at the regional level have in fact been concluded.[405]

300.    Although all the Special Rapporteurs agreed that the faculty of concluding *inter se* agreements could not be unlimited, initially the emphasis was on the need to act in good faith in consultation with other parties.[406]  The Commission focused on the process of notifying the other parties of an intended *inter se* agreement.[407]  A separate draft (draft article 69) on this issue emerged from the Commission debates in 1964.[408]  Much of the debate was still about notification although Bartos paid attention to the case where *inter se* agreements "might also have an indirect effect on the interests of the parties to the original treaty".[409]  In his sixth report, Waldock presented draft article 67 that dealt with "Agreements to modify multilateral treaties between certain parties only".[410]  This article was generally accepted by Governments and in discussion in the Commission in 1966 Reuter observed that it constituted an ingenious compromise between the need to recognize the rights of the parties to a treaty in its initial form

---

[405]  See e.g. the Treaty on the Southeast Asia Nuclear Weapon-Free Zone of 15 December 1995 (the Bangkok Treaty); the South Pacific Nuclear Free Zone Treaty of 6 August 1985 (the Treaty of Rarotonga) between the States of the South Pacific (Australia, New Zealand and the island States of the region); and the African Nuclear-Weapon-Free Zone Treaty of 11 April 1996 (the Treaty of Pelindaba) establishing nuclear-weapon-free zones in, respectively, South-East Asia, the Pacific (where a protocol expressly prohibits nuclear testing) and Africa. For the texts, see United Nations *Treaty series,* vol. 729 p. 169; ILM*,* vol. 36, p. 635; ILM*,* vol. 24, p. 1440; ILM, vol. 35, p. 698.

[406]  Waldock, Third Report, *Yearbook ... 1964* vol. II, p. 47.

[407]  The ILC 745th Meeting on the 15 June 1964, *Yearbook ...1964* vol. I, p. 141.

[408]  The ILC 745th Meeting on the 15 June 1964, ibid., p. 143, see also pp. 141-152.

[409]  The ILC 764th Meeting on the 13 July 1964, ibid., p. 272.

[410]  Sir Humphrey Waldock, Sixth Report, *Yearbook ... 1966* vol. II, p. 47. Article 67 (*Agreements to modify multilateral treaties between certain parties only)* reads:  "Two or more of the parties to the multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:  (a)The possibility of such a modification is provided for by the treaty; or (b) The modification in question:  (i) Does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their rights under the treaty or the performance of their obligations; (ii) Does not relate to a provision derogation from which is incompatible with the effective execution of the objects and purposes of the treaty as a whole; and (iii) is not prohibited by the treaty."

and the need to permit the modification of the treaty in order to take account of certain international requirements.[411]  This was the basis on which the Vienna Conference adopted what then became article 41.

### Article 41 of the VCLT

#### Agreements to modify multilateral treaties between certain of the parties only

1.    Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:

   (a)    The possibility of such a modification is provided for by the treaty; or

   (b)    The modification in question is not prohibited by the treaty and:

   (i)    Does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;

   (ii)    Does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.

2.    Unless in a case falling under paragraph 1 (a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.[412]

301.    *Inter se* agreements give rise to two types of legal relations:  the "general" relations that apply between all the parties to the original treaty and the "special" relations that apply between the States parties to the *inter se* agreement.  Situations of this kind are not, however, peculiar to *inter se* agreements.  For example, the option to object to or accept reservations can lead to a multilateral treaty having on the one hand comprehensive validity among parties at large and restricted validity between these and the reserving States.[413]

---

[411]  The 876th ILC Meeting of 23 June 1966, *Yearbook ... 1966* vol. I, Part 2, p. 219.

[412]  A similar provision is also included in Article 41 of the 1986 Vienna Convention on the Law of Treaties between States and International Organizations or between International Organizations, document A/CONF.129/15.  See also ILM vol. 25 (1986) p. 543.  They deal with the case of agreement between two or more parties to a multilateral treaty to modify the treaty as between themselves only.  Such *inter se* agreements may be rationalized both as a case of *lex posterior* as well as *lex specialis.*  Whichever rationale is used, however, the provision operates similarly.

[413]  See Paul Reuter, *Introduction au droit des traités*, revised by Philippe Cahier, (Paris:  PUF, 1995) 3rd ed. p. 76.

302.    An analogous situation may also arise in the process of treaty amendment when some of the parties undertake to revise the treaty but not all parties agree to the revision.  In such case, the treaty remains in force in its original form for the parties that do not participate in the amendment.[414]  The same is true in regard to parties that do not ratify amendments:  the original treaty remains in force between them whereas the amended treaty enters into force for the others.[415]  The difference between "amendment" and *inter se* agreements under article 41 is that the purpose of the latter is not to revise the original treaty, merely to modify its application in relations between the certain parties.[416]  Article 41 is intended to cover only the latter case.[417]

303.    Article 41 seeks a compromise between two requirements, that of meeting the needs of a limited number of parties wishing to regulate their relations by *inter se* rules and that of allowing the other parties to continue applying the treaty regime in its initial form.  It recognizes the right of parties to a multilateral treaty to create through an *inter se* agreement a special regime but, by placing strict conditions on the exercise of that right, seeks to protect the general regime of the treaty.

(a)    **The conditions applicable to the conclusion of *inter se* agreements**

304.    A treaty may of course either expressly allow or expressly prohibit the conclusion of *inter se* agreements either wholly or in part.  When a treaty is silent, or to the extent that it is so, the question of their permissibility emerges.  There may be cases where a modification might

---

[414]  See the statement by Mr. Yasseen at the 746th meeting of the Commission, *Yearbook ... 1964* vol. I, p. 151, para. 51.

[415]  See the statement by Mr. Castrén at the 752nd meeting of the Commission, ibid., p. 190, para. 67.

[416]  The Commission has rejected the use of the term "revision" because of its political connotation and opted for the term "amendment" to denote alteration of a multilateral treaty by all the parties and "modification" to denote alteration of a multilateral treaty by an *inter se* agreement, an event dealt with in a separate article.  See the discussion at the 747th meeting of the Commission, ibid., pp. 152-157.

[417]  The Commission nonetheless felt it necessary to spell out the distinction in its report to the General Assembly by saying:  "... there is an essential difference between amending agreements designed to amend a treaty between the parties generally and agreements designed *ab initio* to modify the operation of the treaty as between certain of the parties only, that is, as *inter se* agreements.  Although an amending instrument may equally turn out to operate only between certain of the parties, the Commission considered that a clear-cut distinction must be made between the amendment process *stricto sensu* and *inter se* agreements modifying the operation of the treaty between a restricted circle of the parties".  *Yearbook ... 1964* vol. II, pp. 195-196, para. 9.

affect the interests or rights of the other parties to the treaty or the execution of the object and purpose of the treaty.  For those reasons, article 41 VCLT subjects the conclusion of *inter se* agreements to strict conditions.[418]  An *inter se* agreement is permissible when it:

> "(i)    Does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;
>
> (ii)   Does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole".

### (i)    Preservation of the rights and interests of the parties to the original treaty

305.    Article 41 (1) (b) (i) sets out the first of the conditions that an *inter se* agreement must satisfy, namely that the agreement must not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations.  This seems natural.[419]  The legal effects of an *inter se* agreement are limited to its parties.  They remain bound by the original treaty and must continue to observe it in their relations with the other parties as if the *inter se* agreement did not exist.  However, in some cases the drafters of the original treaty may have expressly foreseen and permitted particular types of *inter se* deviation.  For example, article XXIV of the General Agreement on Tariffs and Trade (GATT) provides for the formation and maintenance of "customs unions" and "free-trade areas" on condition that the conditions of commerce under them "on the whole [must not] be higher or more restrictive than the general

---

[418]  See the statement by Sir Humphrey Waldock at the 860th meeting of the Commission:  "However, the Commission attached importance to article 67 and, by specifying fairly strict conditions in paragraph 1, had recognized that *inter se* agreements could represent potential threats to the interests of other parties to the original agreement."  *Yearbook ... 1966* vol. I, Part two, p. 128, para. 88.  Article 22 (b) of the Draft Convention on the Law of Treaties laid down similar conditions for the inter se agreements in the Harvard Research in International Law, AJIL, vol. 29, Supplement (1935) pp. 1016-1024.  See also Francesco Capotorti, "L'extinction et la suspension des traits", Recueil des cours … vol. 134 (1971) p. 509; Sadat-Akhavi, *Methods of Resolving Conflicts ...*, supra note 21 pp. 57-59.

[419]  That the *inter se* agreement must not add to ("affect") the performance of their obligations by the other parties was incorporated in article 41 in response to a statement by Mr. Paredes.  Mr. Paredes remarked that it was essential that an *inter se* agreement should not impose on them greater obligations or burdens.  He gave the example that an *inter se* agreement might make provision for navigation by vessels of deeper draught or for navigation at other periods of the year than those specified in the original treaty and so impose greater obligations or burdens on other parties to the original treaty that were not parties to the *inter se* agreement.  764th meeting, *Yearbook ... 1964* vol. I, p. 272, para. 79.  See also the commentary of article 22 (b) of the Draft Convention on the Law of Treaties, Harvard Research in International Law, AJIL, vol. 29, Supplement (1935) pp. 1016-1024.

incidence" of such duties and regulations before formation of the union.[420]  The assumption here is, clearly, that regional trade agreements (RTAs) do not generally undermine the multilateral free trade system.  Nonetheless, they may also create vested interests and counteract any wider trade harmonization.  In any case, such agreements have been frequently referred to in the WTO dispute settlement system and there has certainly not been any suggestion that they would have been made a priori in violation of the GATT.[421]

306.    On the other hand, the GATT treaty contains no rules that would apply should two or more members wish to conclude an *inter se* agreement to *restrict* trade between themselves.  In the absence of such rules, there appears to be nothing to prevent members from concluding an *inter se* agreement to the effect that in their dealings with each other they will not invoke, say, articles III and XI of the GATT [422] with respect to what they feel to be justified trade restrictions. Such an agreement would affect the rights and obligations of the other members of WTO but as it would do so beneficially, the condition set in article 41 would be satisfied.[423]

307.    Sometimes an *inter se* agreement might not directly infringe the rights of the other parties though it may nevertheless have the potential for damaging their interests.[424]  It is generally assumed, however, that participation in a multilateral treaty creates a community of interests and a solidarity implying an entitlement for the parties to express their views on the compatibility of special arrangements concluded between some of them with the overall regime of the treaty.

---

[420]  Article XXIV, General Agreement on Tariffs and Trade, United Nations, *Treaty series*, vol. 55, p. 187.

[421]  See e.g. *Turkey - Restrictions on Imports of Textile and Clothing Products,* 31 May 1999, WTO/DS34/R, para. 9.97 ("we are well aware that regional trade agreements have greatly increased in number and importance since the establishment of GATT 1947 and today cover a significant portion of world trade").  As of January 2005, 312 RTAs had been notified to the WTO of which 170 remained then in force.  See Isabelle van Damme, "What Role is There for Regional International Law in the Interpretation of WTO Agreements", in Lorans Bartels & Frederico Ortino (eds.), *Regional Trade Agreements and the WTO Legal System* ( Oxford:  Oxford University Press, 2006, forthcoming).

[422]  These articles respectively proscribe discrimination against imported products in favour of domestic products and the application of quantitative restrictions at frontiers.

[423]  See Joost Pauwelyn, "The Role of Public International Law in the WTO, …", supra note 42, pp. 548-549.

[424]  See the statements by Mr. Verdross and Mr. Castrén at the 860th meeting of the Commission, *Yearbook … 1966* vol. I, Part two, p. 139, paras. 58 and 59.

This is particularly the case of treaties aimed at unifying the rules of law in specific domains. This idea is reflected in article 311 (3) UNCLOS, which provides that *inter se* agreements applicable to relations between parties to the Convention must not affect the "*application of the [Convention's] basic principles* or the other States parties' enjoyment of their rights or performance of their obligations under the Convention".[425]

308.    What does the "obligation of solidarity" amount to, is of course difficult to say *in abstracto*.  In most cases, this is likely to be covered by the second condition laid out in article 41 according to which an *inter se* agreement may not "relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole".

### (ii)    Preservation of the object and purpose of the multilateral treaty

309.    The concept of incompatibility with the object and purpose of a treaty was first set forth by the ICJ in the *Reservations* case (1951) and has been increasingly accepted and applied in particular to reservations.  The same concept has also a prominent place in the articles of VCLT, namely in articles 18 (obligation not to defeat the object and purpose), 19 (reservations), 31 (interpretation), 41 (*inter se* agreements), 58 (termination and suspension of an *inter se* agreements) and 60 (material breach).  The concept of object and purpose has received little systematic treatment in the literature until the ILC reports on the reservations addressed the questions in depth.[426]  The concerns expressed in those debates are not essentially different from concerns that seem relevant also for deciding the permissibility of *inter se* agreements under article 41 as well as article 58 (1) (b) (ii) dealing with the suspension of the operation of a multilateral treaty.[427]

---

[425]  Emphasis added.

[426]  For a recent exposé and discussion, see Alain Pellet, Tenth Report, document A/CN.4/558/Add.1 (2005).  See also, Isabelle Buffard and Karl Zemanek, "'Object and Purpose' of a treaty:  an enigma?" Austrian Review of International and European Law, vol. 3 (1998), pp. 311-343 and Jan Klabbers, "Some Problems Regarding the Object and Purpose of Treaties", The Finnish Yearbook of International Law, vol. VIII (1997), pp. 138-160.

[427]  See article 57 (article 58 of the VCLT) of the VCLT, Draft Articles on the Law of Treaties with Commentaries, *Yearbook ... 1966* vol. II, Part two, pp. 253-255.

A/CN.4/L.682
page 160

310.    During the preparatory work of the VCLT, the debates in the ILC focused on a distinction between treaties containing (merely) reciprocal obligations and treaties whose obligations were non-reciprocal - that is to say, of a "more absolute type".  In the former case, *inter se* agreements did not pose any grave problems.  Their permissibility followed from the fact that they normally only affected bilateral relationships or, if their effects went further, were positive from the perspective of the other parties.[428]  The *inter se* agreement could be seen as a development of the treaty, fully in line with its ethos and its object and purpose.

311.    However, in the case of obligations that could not be broken down into bilateral relationships, an *inter se* agreement might more easily be understood to be contrary to the object and purpose of the treaty.  During the ILC discussions, non-reciprocal treaties were characterized in terms of the "absolute", "integral" or "interdependent" nature of their obligations.[429] Although none of this language ("absolute", "integral", "interdependent") found its way to article 41, there has been wide agreement that not all treaties have the same character in this regard.  Thus, for example, article 60 (2) (c) VCLT provides a special rule on invoking breach where "the treaty is of such a character that a material breach of its provisions by one party radically changes the position of every other party in respect to the further performance of its obligations under the treaty".  Likewise, article 42 (b) (ii) of the ILC Draft articles on State Responsibility (2001) makes reference to what the Commentary calls "interdependent obligations" - namely obligations the breach of which "is of such a character as radically to change the position of all the other States to which the obligation is owed".[430]

312.    There is no doubt about the relevance of the distinction between the two groups of treaties.  The 1961 Vienna Convention on the Law of Treaties and the 1963 Vienna Convention on Consular Relations are examples of treaties containing essentially reciprocal obligations.  The

---

[428]  See e.g. Fitzmaurice, Third Report, *Yearbook ... 1958* vol. II, pp. 43-44, paras. 88-89.

[429]  See generally Fitzmaurice, ibid., pp. 41-45, paras. 77-94; *Yearbook ... 1964* vol. II, p. 55, para. 10. Third Report, p. 39, para. 17.  See also paras. 109 and 262 above.

[430]  See Draft Articles on State Responsibility, Commentary on Article 42, para. 13 in *Official Records of the General Assembly, Fifth-sixth Session) Supplement No. 10* (A/56/10)  The examples mentioned are those of "disarmament treaty, a nuclear zone free treaty or any other treaty where each parties' performance is effectively conditioned upon and requires the performance of each of the others".

parties may at will derogate from those obligations in their relations *inter se*. This is not so in regard to a disarmament treaty, for example, where the performance by one party of its obligations is a prerequisite for the performance by the other parties of theirs. A breach by one party is in effect a breach vis-à-vis all the other parties.[431] A human rights convention, for its part, is an absolute or "integral" treaty. The obligations it imposes are independent of any expectation of reciprocity or performance on the part of other parties of their obligations.

313.    It is above all *inter se* agreements modifying treaties containing such non-reciprocal (i.e. "integral", "interdependent" or "absolute") obligations that are likely to affect the execution of the object and purpose of the treaties and that are, thus, prohibited under article 41 (1) (b) (ii) VCLT. Nevertheless, the question of the procedure through which "incompatibility" is determined, will remain. According to the main rule set out by the Court in the *Reservations* opinion, each State will appraise for itself whether or not a reservation made by a State is compatible with the object and purpose of the treaty and decides what action it should take regarding the reservation.[432] The matter is left to the discretion of the parties - although the use of that discretion is, of course, subjected to the duty of good faith.[433] There is no evidence that the situation as regards *inter se* agreements is any different: it is open to any party to a multilateral treaty to object to the conclusion of an *inter se* agreement on the ground that the agreement is likely to frustrate execution of the object and purpose of the treaty.[434]

### (iii)    Other situations

314.    There may of course be situations where the drafters of a multilateral treaty, motivated by a desire to uphold and consolidate its rules, may insert clauses that prohibit the parties from concluding agreements that derogate from them or insert clauses guaranteeing the primacy

---

[431]  For the example, see also *Yearbook ... 1966* vol. II, p. 255, para. 8. See also commentary to Article 42 (b) (ii) of the Commission's Draft Articles on State Responsibility (especially para. 13), *Official Records of the General Assembly, Fifth-sixth Session) Supplement No. 10* (A/56/10).

[432]  *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide case, Advisory Opinion*, *I.C.J. Reports 1951* p.26.

[433]  See Paul Reuter, *Introduction au droit des traits,* supra note 74, pp. 74-75.

[434]  See D.N. Hutchinson, "Solidarity and Breaches of Multilateral Treaties", BYBIL vol. 59 (1989) p. 190.

A/CN.4/L.682
page 162

of the rule contained in the multilateral treaty over a rule contained in a special agreement, thereby establishing a hierarchy of treaty rules.  The UNCLOS 1982 is an example of this.  Its article 311 (6) provides that "States Parties agree that there shall be no amendments to the basic principle relating to the common heritage of mankind set forth in article 136 and that they shall not be party to any agreement in derogation thereof".[435]

315.    Another conflict clause might allow the parties to conclude *inter se* agreements provided that they do not contravene the rules established by the original treaty.  This is the case, for example, with article 19 of the Paris Convention for the Protection of Industrial Property of 1979.[436]  However, in most cases treaties do not contain clauses permitting or prohibiting *inter se* agreements.  In such case, the faculty of the parties to conclude *inter se* agreements will have to be determined in accordance with the criteria in article 41 the point of which is to allow modification when and to the extent that this does not undermine the unity or effectiveness of the treaty regime.

**(b)     Notification to the other parties and their reaction**

316.    According to article 41 (2) VCLT an *inter se* agreement must be notified to the other parties and the notification must be given in time for those parties to react.[437]  In 1964 the Commission was of the view that notification should be given of every proposal to conclude an *inter se* agreement, but subsequently, following comments from the Government of the Netherlands, it decided that the requirement should be to notify the other parties of every

---

[435]  For the text, see UNCLOS, *21 ILM (1982)* p. 1261; see the commentary on art. 311, para. 6, in M. Nordquist (ed.), *United Nations Convention on the Law of the Sea 1982:  A Commentary* (Dordrecht: Martinus Nijhoff Publishers, 1989) vol. V, pp. 241 ff.

[436]  Paris Convention for the Protection of Industrial Property, United Nations, *Treaty series*, p. 305.

[437]  This provision was, at the time of its adoption, an example of the progressive development of international law rather than of codification.  See the statement by Sir Humphrey Waldock at the 764th meeting of the Commission, *Yearbook ... 1964* vol. I, p. 274, para. 102.  This view is borne out by the fact that, when the Commission discussed notification, some members opined that notification was necessary only in the case of *inter se* agreements not provided for in multilateral treaties while others considered it necessary only in the case of a multilateral treaty concluded between a small number of States.  See the statements by Mr. Ago at the 745th meeting of the Commission, *Yearbook ... 1964* vol. I, p. 203, para. 85 and by Mr. Tunkin at the 764th meeting of the Commission, *Yearbook ... 1964* vol. I, p. 273, para. 97.

A/CN.4/L.682
page 163

intention to conclude an *inter se* agreement, except when the treaty itself made provision for the conclusion of such agreements.[438]  In the latter instance, the treaty may require notification both of an *inter se* agreement and of the termination of such an agreement.  For example, the European Convention on Recognition and Enforcement of Decisions concerning Custody of Children and on Restoration of Custody of Children of 20 May 1980 provides, in article 20 (2) that when two or more contracting States have by some means, including an agreement between themselves, created a special system of recognition or enforcement, they may apply that system in place of the Convention or of any part of it.  Parties to the Convention that wish to take that step must "notify their decision to the Secretary-General of the Council of Europe" and "any alteration or revocation of [their] decision must also be notified".[439]

317.    Article 41 (2) provides that parties wishing to conclude an *inter se* agreement ("the parties in question") must notify the other parties of their intention.  While notification may be given by one of the "parties in question", a treaty may provide that it be given through the medium of the depositary of the treaty.[440]  Although notification is usually given by States or the depositaries of treaties, cases have arisen in practice where notification can be considered to have been given because the intention to modify is universally apparent from the object of the *inter se* agreement.

318.    If a notification is to protect the interests of the other parties, it must reach them in time.  Some Commission members were of the opinion that the other parties should be informed immediately of the intention to conclude an *inter se* agreement.[441]  Others felt that, quite apart from the difficulty of communicating an intention, information should be provided once the

---

[438]  *Yearbook ... 1966* vol. II, p. 87, para. 3.

[439]  European Convention on Recognition and Enforcement of Decisions concerning Custody of Children and on Restoration of Custody of Children, *European Treaty Series* (Council of Europe: Strasbourg, 1983) vol. IV, No. 105, p. 211.

[440]  See the commentary to article 311, paragraph 4, of the 1982 United Nations Convention on the Law of the Sea in Nordquist (ed.), *United Nations Convention on the Law of the Sea 1982 ...*, supra note 435, p. 240.

[441]  See the version of draft article 41 proposed by Sir Humphrey Waldock at the 860th meeting of the Commission, *Yearbook ...1966* vol. I, Part two, p. 123.

A/CN.4/L.682
page 164

agreement had been concluded and published.[442]  The Commission decided that the parties should be given time to react and that that could only be done if concrete proposals were communicated to them, whence the wording in paragraph 2 to the effect that the other parties must be informed of the "modification to the treaty for which it [the agreement] provides".  In other words, notification must be given at a relatively advanced stage in the negotiation of the *inter se* agreement but nevertheless sufficiently prior to its conclusion so as to enable a meaningful reaction.

**(c)    Consequences for breach of the multilateral treaty by parties to an *inter se* agreement**

319.    The text of article 41 leaves two questions open.  The first is that of the legal effect of a conclusion of an *inter se* agreement in violation of article 41(1) VCLT constituting a material breach of the treaty; the second was that of the legal effect of an objection made after notification had been given under article 41, paragraph 2.[443]  However, it seems clear that the *inter se* agreement concluded in deviation from the original agreement is not thereby invalidated.  It would seem to follow from the considerations set out above regarding a conflict of treaties with non-identical parties that it should depend on an interpretation of the original treaty as to what consequences should follow.  In addition, the consequences of breach of treaty are dealt with in article 60 VCLT, and through the regime of State responsibility.  This is not the place to deal with these issues.  Nevertheless, two comments may be in order.  First, the collective termination or suspension of the original treaty make take place through the unanimous agreement of those parties to the original treaty that are not parties to the modification in case the latter constitutes a material breach - i.e. relates to a provision that is essential to its execution.  Second, individual decisions to suspend the operation of a treaty in whole or in part are permitted in two cases.  A party that is especially affected by the (illegal) modification may suspend the operation of the

---

[442]  See the statement by Mr. Reuter at the 754th meeting of the Commission, *Yearbook ... 1964* vol. I, p. 201, para. 51.

[443]  See the statement by Mr. Briggs at the 860th meeting of the Commission, *Yearbook ... 1966* vol. I, Part two, p. 126, paras. 71 ff.

treaty in the relations between itself and the parties to the offending *inter se* agreement. And when a material breach constituted by the modification radically changes the position of every other party with respect to the performance of its obligations under the treaty, any of the affected parties may similarly suspend the operation of the treaty with respect to itself.[444]

**(d)    Conclusion on successive agreements**

320.    The law on conflicts between successive agreements is largely based on presumptions about party intent and the object and purpose of treaties. Conflict-solution here is inextricable from treaty interpretation. Neither the earlier nor the later treaty enjoys automatic preference. It is by now well settled that in cases of conflict, the issue is not with invalidity but relative priority between treaties. That approach is also reflected in article 30 VCLT which, while largely codifying an open-ended earlier practice, leaves open some of the most difficult questions. For example, it is clearly unsatisfactory that the party that has concluded incompatible agreements will have a right of election as to which agreement it will fulfil and which of its parties will have to satisfy itself with State responsibility.

321.    The question of special types of treaties that might enjoy priority owing to their nature was also left open by the Vienna Convention. While Lauterpacht and Fitzmaurice both felt that there was reason to assume the existence of such categories - those labelled by the latter "integral" or "interdependent" treaties - article 30 refrains from mentioning them - perhaps as Waldock assumed (wrongly) that the problem would be taken care of by the provision on *jus cogens*. In any case, this does not accord with some of the practice in regard to human rights treaties. However, something of this debate was reflected in the limits that article 41 poses for *inter se* modification - limits which apply by virtue of article 30 (5) also to other subsequent treaties and which might also have some relevance (as suggested above) in the discussion of disconnection clauses.

322.    The faculty of concluding *inter se* agreements is an important and widely accepted instrument through which a limited number of parties to a treaty may seek to guarantee the

---

[444]    Article 60 (2) VCLT. See also e.g. Reuter, *Introduction au droit des traités,* supra note 74, pp. 161-162.

most appropriate and effective implementation of the original treaty between themselves. Nevertheless article 41 VCLT also limits the faculty to conclude *inter se* agreements, especially this would go too firmly against the object and purpose of the original treaty.

323.    Much of the law is open to ad hoc regulation by the adoption of specific conflict clauses. In practice, however, States have often been reluctant to establish clear hierarchies in this way. The turn to "coordination" in the application of several treaties may seem a practical way to proceed especially when the treaties form part of what has been called a "regime" - that is, are institutionally linked and intended to realize parallel objectives.  However, such coordination is problematic across regimes - that is to say where a "legislative" approach to treaty conflict seems least pertinent.  Those are also situations where the *lex posterior* rule has least application.  In such situations, emphasis should be on guaranteeing the rights set up in the relevant conventions. If a right should be overruled because of its incompatibility with the other treaty, then State responsibility should follow.  It is uncertain whether this is a realistic expectation within regime-specific treaty "management".  For the settlement of conflicts across regimes and even *inside* regimes when the treaties have established clearly specified (subjective) rights, recourse to general dispute-settlement organs would seem the best alternative.

### E.    RELATIONS OF IMPORTANCE:  ARTICLE 103 OF THE CHARTER OF THE UNITED NATIONS, *JUS COGENS*, AND OBLIGATIONS *ERGA OMNES* AS CONFLICT RULES

324.    Much of the concern over the fragmentation of international law emerges from the awareness of the "horizontal" nature of the international legal system.  The rules and principles of international law are not in a hierarchical relationship to each other.  Nor are the different sources (treaty, custom, general principles of law) ranked in any general order of priority.  This is a key difference between international and domestic legal systems.  Whereas domestic law is organized in a strictly hierarchical way, with the constitution regulating the operation of the system at the highest level, there is no such formal constitution in international law and, consequently, no *general* order of precedence between international legal rules.

325.    Nevertheless, this has never meant that one could not, in particular cases, decide on an order of precedence among conflicting rules.  In the previous sections we have seen how relations of speciality vs. generality or those of temporal succession are sometimes used as

criteria on the basis of which one rule may be preferred over another.  Nevertheless, we also saw how the operation of those relationships cannot be determined abstractly.  The applicability of *lex specialis* or *lex posterior* depended on a prior assessment of the relevance of a particular criterion.  This reflected the pragmatic sense that some criteria are, in particular contexts, more important than others - for example because they better secure important interests or protect important values.

326.    There has never been any doubt about the fact that some considerations in the international world are more important than others, and must be legally recognized as such - although how that sense of importance could be articulated has been the subject of lasting academic controversy.  Here it is not suggested to take a position on that controversy - for example, on the role of natural law or political justice in international law or on whether or to what extent international law might be in a process of "constitutionalization".  Irrespective of the difficulty of finding a general vocabulary that would express the role of the sense of importance of particular norms, the practice of international law has always recognized the presence of some norms that are superior to other norms and must therefore be given effect.  It is not without significance that the International Court of Justice could, in the *Corfu Channel* case (1949), limit State sovereignty by what it called "elementary considerations of humanity" and in the *Legality of the Threat and Use of Nuclear Weapons* case (1996) presume the existence of "intransgressible principles of international customary law" without this having raised fundamental objections.[445]

327.    There is an important practice that gives effect to the informal sense that some norms are more important than other norms and that in cases of conflict, those important norms should be given effect to.  In the absence of a general theory about where to derive this sense of importance, practice has developed a vocabulary that gives expression to something like an informal hierarchy in international law.  This section  deals with three aspects of that vocabulary, namely Article 103 of the United Nations Charter, the concepts of peremptory norms (*jus cogens*) and obligations *erga omnes*.

---

[445] *Corfu Channel* case (*the United Kingdom v. Albania*) *I.C.J. Reports 1949* p. 22; *Legality of the Threat or Use of Nuclear Weapons* case, Advisory Opinion, *I.C.J. Reports 1996* p. 257, para. 79.

A/CN.4/L.682
page 168

## 1.  Article 103 of the Charter of the United Nations

328.    Already the Covenant of the League of Nations contained a provision that suggested that the Covenant itself was "higher law" in respect to other international obligations.[446]  Article 20 of the Covenant was drafted as follows:

> The Members of the League severally agree that this Covenant is accepted as abrogating all obligations or understandings *inter se* which are inconsistent with the terms thereof, and solemnly undertake that they will not hereafter enter into any engagements inconsistent with the terms thereof.

> In case any Member of the League shall, before becoming a Member of the League, have undertaken any obligations inconsistent with the terms of this Covenant, it shall be the duty of such Member to take immediate steps to procure its release from such obligations.

329.    This provision was the starting point of drafting Article 103 of the United Nations Charter.  At San Francisco there was already a general understanding that obligations under the Charter should prevail over the Members' other treaty commitments.[447]  After minor disagreements over the formulation of this principle, the present text was unanimously adopted and reads as follows:

> "In the event of a conflict between the obligations of the Members of the United Nations under the present Charter and their obligations under any other international agreement, their obligations under the present Charter shall prevail".

330.    Unlike the Covenant, Article 103 extends the priority of the Charter provisions also over Members' future agreements as well as to their agreements with non-United Nations members.

## (a)    What are the prevailing obligations?

331.    Article 103 does not say that the *Charter* prevails, but refers to *obligations under the Charter*.  Apart from the rights and obligations in the Charter itself, this also covers duties based

---

[446]  See especially Hersch Lauterpacht, "The Covenant as the Higher Law", BYBIL vol. 17 (1936), pp. 54-65.

[447]  Rudolf Bernhardt, "Article 103" in Bruno Simma (ed.), *The Charter of the United Nations:  A Commentary* (New York:  Oxford University Press, 2002) p. 1293.

on binding decisions by United Nations bodies. The most important case is that of Article 25 that obliges Member States to accept and carry out resolutions of the Security Council that have been adopted under Chapter VII of the Charter. Even if the primacy of Security Council decisions under Article 103 is not expressly spelled out in the Charter, it has been widely accepted in practice as well as in doctrine.[448] The question has sometimes been raised whether also Council resolutions adopted *ultra vires* prevail by virtue of Article 103.[449] Since obligations for Member States of the United Nations can only derive out of such resolutions that are taken within the limits of its powers, decisions *ultra vires* do not give rise to any obligations to begin with. Hence no conflict exists. The issue is similar with regard to non-binding resolutions adopted by United Nations organs, including the Security Council. These are not covered by Article 103.[450]

332.    Finally, the Security Council often suggests that its resolutions prevail not only over other international obligations but also private law contracts, licences, permits and the like.[451] In principle, there is nothing troubling in viewing agreements between States subjected to

---

[448] To use the words of Bernhardt, "[a]s far as members of the UN are bound by Art. 25 'to accept and carry out the decisions of the Security Council in accordance with the present Charter', they are also bound, according to Art. 103, to give these obligations priority over any other commitments". Bernhardt, "Article 103", in ibid., p. 1295. See further e.g. Pierre-Marie Dupuy, "L'unité de l'ordre juridique international", supra note 14, p. 240; Karl Zemanek, "The Legal Foundations of the International System …", supra note 31, p. 230. For an alternative view see Derek Bowett, "The Impact of Security Council Decisions to Dispute Settlement Procedures", EJIL vol. 5 (1994) p. 92: "[a] Council decision is *not* a treaty obligation. The obligation to comply may be, but the decision *per se* is not." (italics in the original).

[449] Susan Lamb, "Legal Limits to United Nations Security Council Powers" in Guy S. Goodwin-Gill et al. (eds.), *The Reality of International Law: Essays in Honour of Ian Brownlie* (Oxford: Clarendon Press, 1999) p. 361; Erika De Wet, *The Chapter VII powers of the United Nations Security Council* (Oxford: Hart, 2005); Niels Blokker, "Is the authorization authorized? Powers and Practice of the UN Security Council to Authorize the Use of Force by 'Coalitions of the Able and Willing'", EJIL, vol. 11 (2000) p. 541; Georg Nolte, "The limits of the Security Council's Powers and its Functions in the International Legal System: Some Reflections" in Michael Byers (ed.), *The Role of Law in International Politics. Essays in international relations and international law* (Oxford: Oxford University Press, 2000) p. 315.

[450] For a discussion see Robert Kolb, "Does Article 103 of the Charter of the United Nations Apply only to Decisions or also to Authorizations Adopted by the Security Council?", ZaöRV, vol. 64 (2004) p. 21.

[451] See e.g. SC Res. 1160 (1998), SC Res. 1127 (1997), SC Res. 1173 (1998), SC Res. 1267 (1999), SC Res. 1298 (2000).

A/CN.4/L.682
page 170

municipal law as international agreements for present purposes.  But as regards the effect of
Security Council resolutions on pure private law instruments, the assumption must be that
they are not automatically invalidated but that the obligation is on States not to give effect
to such contracts.  This may give rise to difficult issues of liability and compensation for
non-performance, but here it is not necessary to enter that set of problems.

**(b)     What does it mean for an obligation to prevail over another?**

333.     What happens to the obligation over which Article 103 establishes precedence?  Most
commentators agree that the question here is not of validity but of priority.  The lower-ranking
rule is merely set aside to the extent that it conflicts with the obligation under Article 103.[452]
This was how Waldock saw the matter during the ILC debates on article 30 VCLT:  "[T]he
very language of Article 103 makes it clear that it presumes the *priority* of the Charter, not the
*invalidity* of treaties conflicting with it."[453]

334.     A small number of authors have received a more extensive view of the effects of
Article 103 - namely the invalidity of the conflicting treaty or obligation - on the basis of the
view of the Charter as a "constitution".[454]  A clear-cut answer to this question (priority or
invalidity?) cannot be received from the text of Article 103.  Yet the word "prevail" does not
grammatically imply that the lower-ranking provision would become automatically null and
void, or even suspended.  The State is merely prohibited from fulfilling an obligation arising
under that other norm.  Article 103 says literally that in case of a conflict, the State in question
should fulfil its obligation under the Charter and perform its duties under other agreements in as

---

[452] See e.g. Dupuy, "L'unité de l'ordre juridique international …" supra note 14, p. 243; Zemanek, "The Legal
Foundations of the International System …" supra note 31, p. 230.

[453] Sir Humphrey Waldock, Third Report, *Yearbook …1964* vol. II, p. 36.

[454] See Bernhardt, "Article 103", supra 447, p. 1297.  Another commentator has argued that conflicts of obligations
under treaties with obligations under the Charter lead to the same result as conflicts with *jus cogens* - invalidity.
See Bardo Fassbender, "The United Nations Charter as Constitution of the International Community", Columbia
Journal of Transnational Law, vol. 36 (1998) p. 590.  See also A. D. McNair, *The Law of Treaties*, supra note 57,
p. 217.

far as compatible with obligations under the Charter.[455]  This also accords with the drafting
materials of the Charter, which state that:

> it would be enough that the conflict should arise from the carrying out of an obligation
> under the Charter.  It is immaterial whether the conflict arises because of intrinsic
> inconsistency between the two categories of obligations or as the result of the application
> of the provisions of the Charter under given circumstances.[456]

335.    A conflict between an obligation under the Charter and some other obligation may arise
in a purely ad hoc manner.  This is what happened with the Montreal Convention in the
*Lockerbie* case, for example.[457]  It is hard to see how the drafters could have intended that such a
conflict would render null and void the conflicting treaty - in the *Lockerbie* case the whole of the
Montreal Convention.[458]  This would be senseless.  Also from a teleological perspective a better
view is to see Article 103 as a means for securing that Charter obligations can be performed
effectively and not as abolishing other treaty regimes however incidental the conflict might be.

336.    In another recent case, the High Court of Justice in Britain delivered its judgment
affirming the superiority of Security Council resolutions over Britain's human rights
obligations.[459]  The claimant - a dual citizen of Iraq and Britain - had been detained by British
forces in Iraq for 10 months without being charged.  He contended that the detention was in
breach of his rights under the Human Rights Act of 1998.  From the viewpoint of normative

---

[455]  See further Elena Sciso, "On Article 103 of the Charter of the United Nations in the Light of the Vienna
Convention on the Law of Treaties", Österreichische Zeitschrift für Öffentliches Recht und Völkerrecht, vol. 38
(1987) pp. 169-170; Pierre-Marie Dupuy, "The Constitutional Dimension of the Charter of the United Nations
Revisited", Max Planck Yearbook of United Nations Law, vol. 1 (1997) pp. 13-15.  Goodrich and Hambro conclude
that "[i]t is to be noted that this Article [103] does not provide for the automatic abrogation of obligations
inconsistent with the terms of the Charter.  The rule is put in such form as to be operative only when there is an
actual conflict".  See Leland M. Goodrich and Edvard Hambro, *Charter of the United Nations:  Commentary and
Documents* (, London: Stevens & Sons Limited:, 1949) 2nd and revised edition p. 519.

[456]  The United Nations Conference on International Organizations, Report of the Rapporteur of Committee IV/2,
Doc. 933, IV/2/42 (2) (Documents, XIII, p. 703), as quoted in Goodrich & Hambro, ibid., p. 519.

[457]  See section E.1 (d) below, especially the *Lockerbie* case.

[458]  Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, United Nations *Treaty
series* vol. 974, p. 177.

[459]  *The Queen (on the application of Hilal Abdul-Razzaq Ali Al-Jedda) v. Secretary of State for Defence*, Judgment
of 12 August 2005, Case No. CO/3673/2005, [2005] EWHC 1809 (Admin).

A/CN.4/L.682
page 172

conflicts, the judgment is particularly relevant in two regards.  Firstly, the Court tested the legality of the claimant's detention against what it called "the context of international human rights law".[460]  However, the Court read the detention itself as a human rights measure in a way that enabled it to bypass the question of conflict:

> The Security Council, charged as it is with primary responsibility for maintaining international peace and security, has itself determined that a multinational force is required.  Its objective is to restore such security as will provide effective protection for human rights for those within Iraq.  Those who choose to assist the Security Council in that purpose are authorized to take those steps, which include detention, necessary for its achievement.[461]

337.    The Court added, nevertheless, that a hierarchy was also implicated:

> [f]or the purposes of restoring and maintaining that peace and security without which there can be no human rights within Iraq, the Security Council has authorized such detention as is necessary for imperative reasons of security in accordance with Article 78 of Geneva IV.[462]

It may be noteworthy that in "testing the legality of the detention", the Court never took up the question of possible *jus cogens*.[463]

338.    Secondly, the Court, discussing the relationship between the Charter of the United Nations and all other treaty obligations, concluded that Article 103 of the Charter of the United Nations embraces also resolutions of the Security Council and that actions taken in pursuance of them prevail other treaty obligations - even of human rights character - such as those deriving from the European Convention of Human Rights.[464]  Thus, the Court did not find a violation of the claimant's rights.

---

[460]  Ibid., see paras. 94 et seq. of the judgment.

[461]  Ibid., para. 104.

[462]  Ibid., para. 108.

[463]  Nevertheless, Mr. Al Jedda was granted permission to appeal and the case was heard by the Court of Appeal in January 2006.

[464]  Para. 112 of the judgment in *The Queen (on the application of Hilal Abdul-Razzaq Ali Al-Jedda) v. Secretary of State for Defence*, supra note 459

339.    Finally, the primacy of Article 103 is expressly mentioned under article 30 (1) VCLT:

> Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs.

340.    The context of this provision is informative.  As discussed in section D above, article 30 - which deals with the "[a]pplication of successive treaties relating to the same subject-matter" - does not presume that the treaty being set aside under it would be invalid, but merely set aside in order to apply the higher-ranking treaty and to the extent that this is necessary.  In fact, to say this is simply to point to the manner in which the hierarchical effect of obligations under the Charter differs from *jus cogens*, conflict with which renders other norms invalid or terminates them.[465]

**(c)    Special cases**

**(i)    Conflicts with treaties between United Nations Member States and Non-Members**

341.    Conflicts between obligations under the Charter and treaties concluded between Member States and non-member States of the United Nations give rise to difficult legal questions.[466]  To use the words of the ILC itself, "[t]he precise effect of the provision in the relations between Members of the United Nations and non-member States may not be entirely clear".[467]  Indeed, the text of Article 103 does not differentiate between obligations incurred among United Nations Member States and obligations of and towards non-member

---

[465] It has also been argued that "[a] clear solution to the problem of conflicting obligations appears possible where a Charter provision reflects a norm of *jus cogens*.  ...  In this case, conflicting obligations are and remain invalid".  Bernhardt, "Article 103", supra note 447, p. 1298.  Nevertheless the source of invalidity in such a situation is not the United Nations Charter, but the rule which states that all agreements incompatible with *jus cogens* are invalid.

[466] Admittedly, due to the fact that very few States remain outside the circle of members of the United Nations those questions are more theoretical than practical.

[467] Draft Articles on the Law of Treaties, *Yearbook ... 1966* vol. II, p. 214.

A/CN.4/L.682
page 174

States.  Inasmuch as one reads the Charter as a "constitutional" document, then there is of course no problem. For example Bernhardt solves the question in a straightforward manner:

> [T]here are good reasons for assuming that treaties concluded with third States that are in clear or at least apparent contradiction to the Charter are not only unenforceable but also invalid with respect to such States.  The Charter has become the 'constitution' of the international community, and third States must, in their treaty relations and otherwise, respect the obligations arising under the Charter for UN members.[468]

342.    In the same vein, Goodrich and Hambro wrote in their early commentary to the Charter:

> The Charter … assumes the character of basic law of the international community. Non-members, while they have not formally accepted it, are nevertheless expected to recognize this law as one of the facts of international life and to adjust themselves to it.[469]

343.    Yet it remains the case that non-members are formally not bound by the Charter which for them remains *res inter alios acta*.[470]  In the normal course of events, Member States should not be able to rid themselves of the duty to perform their treaty obligations towards non-member States by reliance on Article 103.[471]  Nevertheless, a strong doctrinal opinion tends to affirm, at least for United Nations Members, the absolute primacy of Charter obligations over conflicting

---

[468]  Bernhardt, "Article 103", supra note 447, p. 1298.  See also e.g. Fassbender, "The United Nations Charter as Constitution of the International Community", supra note 454 p. 532; but for an alternative view see also Jean-Marc Thouvenin, "Article 103" in Jean-Pierre Cot et al. (eds.), *La Charte des Nations Unies: Commentaire article par article* ( Paris:  Economica, 2005) 3rd edn, pp. 2136-2139 and especially p. 2146:  "[i]l ne saurait alors être considéré, en lui-même, comme l'élément clé permettant de reconnaître à la Charte des Nations Unies les qualités d'une constitution de la communauté internationale."

[469]  Goodrich & Hambro, *Charter of the United Nations* … supra note 455, p. 519.

[470]  See article 34 of the VCLT.  Lord McNair also confirms that even the Charter of the United Nations does not have the power to make rules contained therein binding upon non-members.  See McNair, *The Law of Treaties,* supra note 57, p. 218.

[471]  For further discussion see Sciso, "On Article 103 of the Charter of the United Nations …", supra note 455, pp. 167 et seq.

obligations with non-United Nations members.[472]  This may perhaps be rationalized by reference to article 30 (1) VCLT that may be read as an acceptance by the parties to the Vienna Convention of the Charter's pre-eminence.[473]  In any case, this leaves open any responsibility that will occur towards non-members as a result of the application of Article 103.

### (ii)    Conflicts with norms of customary international law of a non-peremptory character

344.    The wording of Article 103, reading "obligations under any other international agreement", implies that only conventional obligations are targeted by that provision.  Opinions on whether also customary law is covered are split, however. During the drafting of the Charter a formula according to which *all* other commitments, including those arising under customary law, were to be superseded by the Charter, was ultimately omitted from the final text.[474]  This suggests the conclusion that at least for the drafters, Article 103 covered only other treaties.  This does not, however, exclude the possibility of later developments in the law. Indeed, at least those who uphold the "constitutional" vision claim that Article 103 extends to conflicting customary law as well:

> [I]t would not be correct to assume that obligations under the Charter do not also prevail in relation to these other [including customary law based] obligations. Article 103 must be seen in connection with Art. 25 and with the character of the Charter as the basic document and 'constitution' of the international community.  Therefore, the ideas underlying Art. 103 are also valid in case of conflict between Charter obligations and obligations other than those contained in treaties.[475]

---

[472]  See e.g. Patric Daillier & Alain Pellet, *Droit international public*, supra note 73,Dupuy, "L'unité de l'ordre juridique international …", supra note 14, p. 241; Andreas Paulus, *Die internationale Gemeinschaft im Völkerrecht. Eine Untersuchung zur Entwicklung des Völkerrechts im Zeitalter der Globalisierung* (Munich: Beck, 2001) p. 113.

[473]  The extent to which the VCLT codifies customary international law is also relevant for present purposes.

[474]  Jean Combacau, *Le pouvoir de sanction de l'ONU: étude théorique de la coercition non militaire* (Paris:  Pedone, 1974) p. 282.  An early commentary of the Charter also confirms that the possibility of Charter obligations' pre-eminence over customary law obligations was not even considered as a question to be answered. See Goodrich & Hambro, *Charter of the United Nations …*, supra note 455, pp. 517-518.

[475]  Bernhardt, "Article 103", supra note 447,pp. 1298-1299.

A/CN.4/L.682
page 176

345.    While some have supported this view[476], others have doubted whether Article 103 elevates the Charter above customary law.[477]  Perhaps two considerations might be relevant here. First, a literal interpretation renders a clear result.  However expansively one interprets "international agreements", it does not cover international custom.  Second, however, and as pointed out in section C above, as *lex generalis,* customary law normally yields to treaties as *leges speciali* - including, one would suppose, treaties establishing an international organization such as the United Nations.  In any case, the practice of the Security Council has continuously been grounded on an understanding that Security Council resolutions override conflicting customary law.  As the Security Council is a creation of the Charter, it would be odd if the prevailing effect of Security Council resolutions would not extend to the Charter itself. Therefore it seems sound to join the prevailing opinion that Article 103 should be read extensively - so as to affirm that charter obligations prevail also over United Nations Member States' customary law obligations.[478]

(iii)    **Conflicts with norms of *jus cogens***

346.    If United Nations Member States are unable to draw up valid agreements in dissonance with *jus cogens*, they must also be unable to vest an international organization with the power to go against peremptory norms.  Indeed both doctrine and practice unequivocally confirm that conflicts between the United Nations Charter and norms of *jus cogens* result not in the Charter obligations' pre-eminence, but their invalidity.[479]  In this sense, the United Nations Charter is an

---

[476]  See, e.g., Alina Kaczorowska, *Public International Law* (London: Old Bailey Press2002) p. 21, where she states that "[a] number of commentators have suggested that this provision would apply equally to inconsistent customary law".  Unfortunately, no references are provided.

[477]  See, e.g., Nigel D. White & Ademola Abass, "Countermeasures and Sanctions" in Malcolm D. Evans (ed.), *International Law* (Oxford: Oxford University Press, 2003) p. 518, who argue that "[a]rticle 103 gives obligations arising out of the UN Charter pre-eminence over obligations arising under any other international treaty, though it is not clear that this affects member States' customary rights".

[478]  See e.g. *Case Concerning Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia Herzegovina v. Yugoslavia (Serbia and Montenegro))* Order of 13 September 1993 *I.C.J. Reports 1993* (separate opinion of Judge Lauterpacht) p. 440, para. 110.

[479]  See e.g. Fassbender, "The United Nations Charter as Constitution of the International Community", supra note 454, pp. 590 et seq.

international agreement as any other treaty.  This is particularly relevant in relation to resolutions of the Security Council, which has more than once been accused of going against peremptory norms.[480]

347.    This matter came up in September 2005 in the Court of First Instance of the EC.[481] The cases concerned the freezing of assets of individuals and entities suspected of having links to terrorists by the Council of the EU on the basis of resolutions adopted by the Security Council.  The Court decided that the EC was competent to order the measures.  For the most part, they also fell outside the scope of judicial review.  The judgment is noteworthy in two aspects.

348.    Firstly, the Court found that, according to international law, the obligations of United Nations Member States under the Charter prevail over any other obligation, including those under the European Convention of Human Rights and the EC Treaty.  This paramountcy extended to decisions of the Security Council:

> [T]he resolutions of the Security Council at issue fall, in principle, outside the ambit of the Court's judicial review and … the Court has no authority to call in question, even indirectly, their lawfulness in the light of Community law.  On the contrary, the Court is bound, so far as possible, to interpret and apply that law in a manner compatible with the obligations of Member States under the Charter of the United Nations.[482]

349.    Secondly, however, this paramountcy was not absolute.  In the words of the Court:

> International law […] permits the inference that there exists one limit to the principle that resolutions of the Security Council have binding effect:  namely, that they must

---

[480]  See e.g. Zemanek, "The Legal Foundations of the International System ….", supra note 31, p. 231 and the Chapter for *jus cogens*.

[481]  Judgments in two cases:  Judgments of the Court of First Instance of 21 September 2005 in Case T-306/01, *Ahmed Ali Yusuf and Al Barakaat International Foundation v. Council of the European Union and Commission of the European Communities and Case T-315/01, Yassin Abdullah Kadi v. Council of the European Union and Commission of the European Communitie*s, to be published.

[482]  Ibid., Case T-306/01, Ahmed Ali Yusuf and Al Barakaat International Foundation, para. 276.  The Court also added that although it is not a member of the United Nations, the Community must also be considered to be bound by the obligations flowing from the Charter of the United Nations, in the same way as are its Member States, by virtue of the Treaty establishing it.  See para. 210 of the judgment.

A/CN.4/L.682
page 178

observe the fundamental peremptory provisions of *jus cogens*. If they fail to do so, however improbable that may be, they would bind neither the Member States of the United Nations nor, in consequence, the Community.**483**

350.    In its subsequent analysis over the question whether the freezing of applicants' rights constituted a breach of *jus cogens*, the Court found in the negative.

**(d)    Application**

351.    Not surprisingly, Article 103 has most frequently been invoked in the practice of United Nations organs, especially in connection with binding decisions of the Security Council taken under Chapter VII. Although direct references to Article 103 are not very frequent, its substance appears more often.

352.    As from the beginning of the 1990s many Security Council resolutions made under Chapter VII (i.e. resolutions creating obligations) have underlined their priority in relation to any other obligations. A famous reference to Article 103 is to be found in resolution 670 (1990), in which the Council decided on measures against Iraq. The resolution reads:

> [r]ecalling the provisions of Article 103 of the Charter of the United Nations, [a]cting under Chapter VII of the Charter of the United Nations, … [c]alls upon all States to carry out their obligations to ensure strict and complete compliance with resolution 661 (1990) …**484**

353.    Only a year later, the crisis on the territory of the former Yugoslavia led to numerous Security Council resolutions imposing an embargo, many of which emphasize expressly or implicitly on their and prior resolutions' priority in relation to any other commitments.**485** Resolution 748 (1992) concerning Libya - to which the ICJ referred in its Order of 14 April 1992 (see below) - stated in paragraph 7:

---

**483**  Ibid., Case T-306/01, para. 281.

**484**  SC Res. 670 (1990).

**485**  See SC Res. 713 (1991), SC Res. 724 (1991), SC Res. 727 (1992), SC Res. 743 (1992), SC Res. 757 (1992), SC Res. 787 (1992), SC Res. 820 (1993).

A/CN.4/L.682
page 179

> Calls upon all States, including States not Members of the United Nations, and all international organizations, to act strictly in accordance with the provisions of the present resolution, notwithstanding the existence of any rights or obligations conferred or imposed by any international agreement …[486]

354.    In its subsequent practice the Security Council has started using a standard clause which can be found, with minor modifications, in a number of resolutions adopted under Chapter VII. For example resolution 1267 (1999) states the following:

> [The SC] Calls upon all States and all international and regional organizations to act strictly in conformity with this resolution, notwithstanding the existence of any rights granted or obligations conferred or imposed by any international agreement or of any contract entered into or any licence or permit granted prior to the entry into force of the measures imposed [by the Council] …[487]

355.    Although this clause does not expressly mention Article 103, it receives its legal force from that provision.  Hence it does not address only United Nations Members, but all States, and international and regional organizations.  It covers rights and obligations based not only on treaties, but also private contracts, licences and permits.  This is natural as it is the very rationale of sanctions regimes to influence private transactions between entities in the target-State and the outside world.  As pointed out above, however, this leaves the issues of private liability unanswered.

356.    In separate opinions, members of the ICJ have occasionally mentioned Article 103.[488] Before 1992, however, the Court itself had discussed it in only one decision.  Yet already then,

---

[486] SC Res. 748 (1992). See also similar decisions in respect of Somalia (SC Res. 733 (1992)) and Liberia (SC Res. 788 (1992)).

[487] SC Res. 1267 (1999). See e.g. SC Res. 1127 (1997), SC Res. 1173 (1998), SC Res. 1132 (1997) and SC Res. 1298 (2000).

[488] See e.g. *Case Concerning the Application of the Convention of 1902 Governing the Guardianship of Infants (the Netherlands v. Sweden) I.C.J. Reports 1958* (separate opinion of Judge Moreno Quintana) p. 107; *South West Africa cases (Ethiopia v. South Africa; Liberia v. South Africa) (Preliminary Objections) I.C.J. Reports 1962* (separate opinion of Judge Jessup) p. 407; *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970), Advisory Opinion, I.C.J. Reports 1971* (separate opinion of Judge Ammoun) p. 99; *Application for Revision and Interpretation of the Judgment of 24 February 1982 in the case concerning the Continental Shelf (Tunisia/Libyan Arab Jamahiriya) (Tunisia v. Libyan Arab Jamahiriya) I.C.J. Reports 1985* (separate opinion of Judge Ruda) pp. 232-233.

A/CN.4/L.682
page 180

in the *Nicaragua* case in 1984, the Court underlined the priority of obligations under the Charter over other treaty obligations.[489]  Article 103 was given full attention in the *Lockerbie* case (1992).[490]  The Governments of the United Kingdom and the United States had requested Libya to surrender certain individuals in connection with the investigations into the destruction of an airplane over the village of Lockerbie in Scotland.  The Council, acting under Chapter VII of the Charter, supported the measures to be taken against Libya, which in turn considered the requests of the two above-mentioned Governments incompatible with the Montreal Convention of 1971 for the Suppression of Unlawful Acts against the Safety of Civil Aviation, and submitted the dispute to the ICJ.

357.    At first, Libya asked the Court to indicate provisional measures, whereas the respondents argued that a binding decision of the Security Council did not permit such an indication.  In its Orders of 14 April 1992 the ICJ stated:

> 39.    Whereas both Libya and the United States, as Members of the United Nations, are obliged to accept and carry out the decisions of the Security Council in accordance with Article 25 of the Charter; whereas the Court, which is at the stage of proceedings on provisional measures, considers that prima facie this obligation extends to the decision contained in resolution 748 (1992); and whereas, in accordance with Article 103 of the Charter, the obligations of the Parties in that respect prevail over their obligations under any other international agreement, including the Montreal Convention;

> 40.    Whereas the Court, while thus not at this stage called upon to determine definitively the legal effect of Security Council resolution 748 (1992), considers that, whatever the situation previous to the adoption of that resolution, the rights claimed by Libya under the Montreal Convention cannot now be regarded as appropriate for protection by the indication of provisional measures.[491]

---

[489]  See *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America), (Jurisdiction and Admissibility) I.C.J. Reports 1984* p. 440, para. 107.

[490]  *Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya v. United States of America) (Preliminary Objections) I.C.J. Reports 1998* p. 8.

[491]  *Case concerning Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya v. the United Kingdom) (Provisional Measures) I.C.J. Reports 1992* p. 15, paras. 39-40.

358.    Several judges confirmed in their separate and dissenting opinions the same line of argumentation.[492]  It is noteworthy that the Court as well as individual judges refer merely to the enforceability, not invalidity or suspension of conflicting treaty obligations.

359.    Judge Lauterpacht, in his separate opinion to the order of the ICJ in the *Application of the Genocide Convention* case discussed the relationship between Article 103 and *jus cogens*:

> The concept of *jus cogens* operates as a concept superior to both customary international law and treaty.  The relief which Article 103 of the Charter may give the Security Council in case of conflict between one of its decisions and an operative treaty obligation cannot - as a matter of simple hierarchy of norms - extend to a conflict between the Security Council resolution and *jus cogens*.  Indeed, one only has to state the opposite proposition thus - that a Security Council resolution may even require participation in genocide - for its unacceptability to be apparent.[493]

360.    This seems natural.  If (as pointed out above), the United Nations Charter is not above *jus cogens*, then it also cannot transfer a power to contradict *jus cogens* to bodies that receive their jurisdiction from the Charter.

## 2.  *Jus cogens*

361.    The view that some norms are of a higher legal rank than others has found its expression in one way or another in all legal systems.[494]  Also in international law propositions have consistently been made that there is a category of norms that are so fundamental that derogation

---

[492]  For example Judge Shahabuddeen wrote in his separate opinion that "[a]rticle 25 of the Charter of the United Nations obliges Libya to comply with the decision set out in the resolution [748 (1992)] ... By virtue of Article 103 of the Charter, that obligation prevails over any conflicting treaty obligation which Libya may have … Treaty obligations can be overridden by a decision of the Security Council imposing sanctions … Hence, assuming that Libya has the rights which it claims, *prima facie* they could not be enforced during the life of the resolution". *Questions of Interpretation and Application of the 1971 Montreal Convention arising from the Aerial Incident at Lockerbie* (*Libyan Arab Jamahiriya v. United States of America*) (*Provisional Measures*) (separate opinion of Judge Shahabuddeen) *I.C.J. Reports 1992* p. 28.

[493]  *Case Concerning Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia Herzegovina v. Yugoslavia (Serbia and Montenegro)) Order of 13 September 1993* (separate opinion of Judge Lauterpacht) *I.C.J. Reports 1993* p. 440, para. 110.

[494]  "[I]t is difficult to imagine any society, whether of individuals or of States, whose law sets no limit whatever to freedom of contract".  McNair, *The Law of Treaties,* supra note 57, pp. 213-214.

A/CN.4/L.682
page 182

from them can never be allowed.  No doubt, the idea of peremptory norms (*jus cogens*) is older than modern international law itself.  Commentators often point to the Roman law distinction between *jus strictum* and *jus dispositivum*,[495] and the maxim *jus publicum privatorum pactis mutari non potest*.[496]  Seventeenth and eighteenth century natural lawyers had no doubt whatsoever that certain norms exist timelessly and above the will of States, limiting what could lawfully be agreed by secular rulers or their communities.[497]  In addition, the development of the international law notion of *jus cogens* has undoubtedly been influenced by domestic laws that provide for the nullity of agreements conflicting with *ordre public* or public policy objectives.[498]  The background, nature and effects of *jus cogens* were summarized by the International Criminal Tribunal for the former Yugoslavia (ICTY):

> Because of the importance of the values it [the prohibition of torture] protects, this principle has evolved into a peremptory norm or *jus cogens*, that is, a norm that enjoys a higher rank in the international hierarchy than treaty law and even "ordinary" customary rules.  The most conspicuous consequence of this higher rank is that the principle at issue cannot be derogated from by States through international treaties or local or special customs or even general customary rules not endowed with the same normative force.[499]

---

[495]  Jochen Frowein, "Jus Cogens", in Rudolf Berhardt (ed.), *Encyclopaedia of Public International Law* (Amsterdam:  Elsevier, 1997) vol. 3, p. 65.

[496]  Ian Sinclair, *The Vienna Convention on the Law of Treaties*, supra note 62, p. 110.  See also Dinah Shelton, "International Law and Relative Normativity" in Evans, *International Law,* supra note 477, p. 151.  Nevertheless, the term *jus cogens* itself is said not to have been used in ancient law. See Manfred Lachs, "The Development and General Trends of International Law in Our Time", *Recueil des Cours ...* vol. 169, (1980/IV) p. 202.

[497]  Emmerich de Vattel provided what has become a classical formulation as follows:  "Since (...) the necessary law of nations consists in the application of the law of nature to states - which law is immutable, as being founded on the nature of things, and particularly on the nature of man, - it follows that the *Necessary* law of nations is *immutable*. Whence, as this law is immutable, and the obligations that arise from it necessary and indispensable, nations can neither make any changes in it by their conventions, dispense with it in their own conduct, nor reciprocally release each other from the observance of it.  This is the principle by which we may distinguish lawful conventions of treaties from those that are not lawful, and innocent and rational customs from those that are unjust or censurable." See his *The Law of Nations, or, Principles of the Law of Nature Applied to the Conduct and Affairs of Nations and Sovereigns*, translated from French by Joseph Chitty, original 1855 (New York AMS Press, 1982) p. 55 (italics in the original).

[498]  Article 6 of the Code Napoléon provides for a good example:  "On ne peut déroger, par des conventions particulières, aux lois qui intéressent l'ordre public et les bonnes moeurs."

[499]  *Prosecutor v. Anto Furundžija*, Judgment of 10 December 1998, Case No. IT-95-17/1, Trial Chamber II, see also ILR vol. 121 (2002) p. 260, para. 153.

362.    *Jus cogens* found its way into positive international law during the preparations for the Vienna Convention on the Law of Treaties.  The ILC presented it in articles 50 and 61 of the final draft on the law of treaties in 1966.[500]  In Vienna, the concept was moulded into articles 53 and 64 in the following format:

### Article 53

A treaty is void if, at the time of its conclusion, it conflicts with a peremptory norm of general international law.  For the purposes of the present Convention, a peremptory norm of general international law is a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.

### Article 64

If a new peremptory norm of general international law emerges, any existing treaty which is in conflict with that norm becomes void and terminates.[501]

363.    In academic literature, the concept has been the object of a sizable volume of attention - especially since its incorporation into the Vienna Convention.[502]  Over the years most of the initial scepticism around the notion itself has tended to vanish.  As the ILC recently remarked:  "[t]he concept of peremptory norms of general international law is recognized in international practice, in the jurisprudence of international and national courts and tribunals and in legal doctrine".[503]  However, disagreement about its theoretical underpinnings,

---

[500]  Article 50:  A treaty is void if it conflicts with a peremptory norm of general international law from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character; Article 61:  If a new peremptory norm of general international law of the kind referred to in article 50 is established, any existing treaty which is in conflict with that norm becomes void and terminates.  See Draft Articles on the Law of Treaties, Report of the International Law Commission on the work of its eighteenth session, *Yearbook ...* 1966 vol. II, p. 247.

[501]  VCLT, articles 53 and 64.

[502]  Nevertheless, the term *jus cogens* was used, although not extensively, already prior to its implementation by the International Law Commission. See generally Jerzy Sztucki, *Jus Cogens and the Vienna Convention on the Law of Treaties* (Vienna: Springer-Verlag, 1974).  Cassese views it especially a result of developments in the 1960s.  See Antonio Cassese, *International Law* (Oxford:  Oxford University Press, 2005) 2nd ed. p. 199-200.

[503]  ILC, Commentaries to the Draft Articles on Responsibility of States for Internationally Wrongful Acts, *Yearbook ... 2001* vol. II, Part Two, p. 282.

A/CN.4/L.682
page 184

scope of application and content remains as ripe as ever. As Anthony Aust has put it: "[t]he concept *was one controversial*. Now it is more its scope and applicability that is unclear".[504]

364. Two aspects require discussion: the effects of *jus cogens* and its content.

**(a)    The effect of *jus cogens*:  invalidity of the conflicting norm**

365. Article 53 of the Vienna Convention provides for the invalidity of treaties which, at the time of their conclusion, are in conflict with a peremptory norm of general international law. Thus, and unlike the mere "priority" provided under article 31 VCLT, what the concept of *jus cogens* encapsulates is a rule of hierarchy *senso strictu*, not simply a rule of precedence.[505] Hence, the result of conflicts between treaties and *jus cogens* is that the former shall not only be non-applicable, but wholly void, giving rise to no legal consequences whatsoever.[506] This entails a further consequence written into article 71 (1) VCLT:

> In the case of a treaty which is void under article 53 the parties shall (a) eliminate as far possible the consequences of any act performed in reliance on any provision which conflicts with the peremptory norm of general international law; and (b) bring their mutual relations into conformity with the peremptory norm of general international law.

366. This has to be understood in context with article 64 VCLT, making it clear that the hierarchically higher status of *jus cogens* norms does not have a retroactive character.[507] If the

---

[504] Anthony Aust, *Handbook of International Law* (Cambridge: Cambridge University Press, 2005) p. 11 (emphasis added). Likewise, *Sosa v. Alvarez-Machain et al.*, US District Court of Appeals (3 June 2003) ILR vol. 127 (2005) p. 705. Michael Byers, e.g. has written that "[t]oday there is widespread acceptance among international lawyers of the concept of *jus cogens*". See Michael Byers, *Custom, Power and the Power of Rules: International Relations and Customary International Law*, supra note 288, p. 184. For a famous sceptical appraisal, see Prosper Weil, "Towards Relative Normativity in International Law?", AJIL vol. 77 (1983) p. 413, who believes that any trend toward recognition of the distinction between peremptory norms and "merely binding norms" contributes to a "dilution" of normativity itself and fosters the development of pathology in the international system.

[505] There is wide agreement on this. See e.g. Jean Combacau & Serge Sur, *Droit international public* (Paris: Montchrestien 2004) p. 157.

[506] It is not necessary, however, that this would lead to the invalidation of the whole treaty. Clauses that do not conflict with *jus cogens* and are separable from those that do, may remain valid. Cassese, *International Law,* supra note 502, p. 206.

[507] In the words of the International Law Commission itself, there was no question of what was to become article 53 of the Vienna Convention having retroactive effect. See Draft Articles on the Law of Treaties, *Yearbook ... 1966* vol. II, p. 248.

A/CN.4/L.682
page 185

coming into being of a peremptory norm of general international law is subsequent to the conclusion of a treaty, the treaty itself terminates but the rights and obligations based on it shall only become void inasmuch as they are themselves contrary to the (new) *jus cogens*.  This structure is written in article 71 (2) of the Vienna Convention which states that:

> In the case of a treaty which becomes void and terminates under article 64, the termination of the treaty (a) releases the parties from any obligation further to perform the treaty [and] (b) does not affect any right, obligation or legal situation of the parties created through the execution of the treaty prior to its termination, provided that those rights, obligations or situations may thereafter be maintained only to the extent that their maintenance is not in itself in conflict with the new peremptory norm of general international law.

367.    Three types of conflict situation may be envisaged.  A norm of *jus cogens* might conflict with a regular treaty, a rule of (general) customary international law, and with another norm of *jus cogens*.  The first situation is the simplest.  Conflict of a treaty with *jus cogens* renders the treaty - or a separable provision thereof - invalid.  It makes no difference whether the treaty is bilateral or multilateral.  As pointed out above, the Charter of the United Nations constitutes no exception.[508]  The same goes for resolutions of international organizations.  The same logic applies to a conflict between *jus cogens* and (general) customary law.  A conflict between them renders the latter invalid.  The question concerning the relationships between conflicting *jus cogens* norms - for example the question of the right to use force in order to realize the right of self-determination - is much more difficult.  At this stage, it cannot be presumed that the doctrine of *jus cogens* could itself resolve such conflicts:  there is no hierarchy between *jus cogens* norms *inter se*.

368.    Already during the discussions in the International Law Commission, and also at Vienna, several delegates expressed their concern that introducing the concept of *jus cogens* into positive law might result in the destabilization of treaty-relations.  It was feared that States might start

---

[508]  Since the Charter was adopted years before the entry into force of the Vienna Convention, the relationship between the Charter and *jus cogens* cannot be dealt with on the basis of the latter, but instead under the framework of customary international law.

A/CN.4/L.682
page 186

using *jus cogens* based arguments to justify non-performance of treaty obligations.[509]  To prevent or minimize such occasions, a mechanism was written into the Vienna Convention according to which parties to a dispute concerning the validity of a treaty need to seek a solution through peaceful means listed in the Charter of the United Nations and if they fail to reach one, then:

> any one of the parties to a dispute concerning the application or the interpretation of articles 53 or 64 may, by a written application, submit it to the International Court of Justice for a decision unless the parties by common consent agree to submit the dispute to arbitration.[510]

369.    No cases have been brought to the ICJ under this article to date.

370.    The most significant use of *jus cogens* as a conflict norm has been by the British House of Lords in the *Pinochet* case.[511]  Here, as is well-known, the question arose whether immunity of a former Head of State could be upheld against an accusation of his having committed torture while in office.  Referring to relevant passages in the *Furundžija* case,[512] the Lords held that "the *jus cogens* nature of the international crime of torture justifies states in taking universal jurisdiction over torture wherever committed".[513]  As the condition of "double criminality" was fulfilled, Pinochet could not plead immunity against a request for extradition to Spain.  To use the words of Lord Millett:

> International law cannot be supposed to have established a crime having the character of a jus cogens and at the same time to have provided an immunity which is co-extensive with the obligation it seeks to impose.[514]

---

[509]  For a famous sceptical appraisal, see Weil, "Towards Relative Normativity …", supra note 504, p. 413, arguing that any distinction between peremptory norms and "ordinary" norms contributes to a "dilution" of normativity itself and fosters the erosion of the international system.

[510]  See articles 65 (3) and 66 (a) of the Vienna Convention.

[511]  *Regina v. Street Metropolitan Stipendiary Magistrate, ex parte Pinochet Ugarte (No. 3)*, 24 March 1999, House of Lords, 119 ILR, p. 136.

[512]  *Prosecutor v. Anto Furundžija*, Judgment of 10 December 1998, Case No. IT-95-17/1, Trial Chamber II, 121 *ILR* (2002) p. 260, para. 153.

[513]  *Regina v. Street Metropolitan Stipendiary Magistrate, ex parte Pinochet Ugarte (No. 3)*, supra note 511.

[514]  Ibid., p. 232.

371.    The Pinochet litigation turned out to have historic consequences not that much to Senator Pinochet personally, but rather in the sense that for the first time a local domestic court denied immunity to a former Head of State on the grounds that there cannot be any immunity against prosecution for breach of *jus cogens*.

372.    That it is the point of *jus cogens* to invalidate the inferior norm does not mean that *jus cogens* would provide automatic access to justice irrespective of procedural obstacles for punishing individuals or, for example, concerning relief in civil matters.  In *Al-Adsani*, the European Court of Human Rights was called upon to adjudge whether Britain had violated the European Convention on Human Rights as British Courts had upheld the immunity of the State of Kuwait in a civil matter that concerned liability that it was alleged to owe to a person (Al-Adsani) who had been tortured by Kuwaiti agents.[515]  The Court held the prohibition of torture as part of *jus cogens*, but did not find a violation of articles 1 and 3 of the ECHR in the way UK Courts had been applying the State Immunity Act 1978.  The Court stated that while it accepts

> that the prohibition of torture has achieved the status of a peremptory norm in
> international law, it observes that the present case concerns not, as in *Furundžija* and
> *Pinochet*, the criminal liability of an individual for alleged acts of torture, but the
> immunity of a State in a civil suit for damages in respect of acts of torture within the
> territory of that State.  Notwithstanding the special character of the prohibition of torture
> in international law, the Court is unable to discern in the international instruments,
> judicial authorities or other materials before it any firm basis for concluding that, as a
> matter of international law, a State no longer enjoys immunity from civil suit in the
> courts of another State where acts of torture are alleged.[516]

373.    Thus, the Court, while noting the growing recognition of the prohibition of torture as part of *jus cogens*, did not find it established that there was yet acceptance in international law of the proposition that States are not entitled to immunity in respect of civil claims for damages for

---

[515]  *Al-Adsani v. the United Kingdom*, Judgment of 21 November 2001, ECHR 2001-XI, p. 79.

[516]  Ibid., pp. 101-102, para. 61.

A/CN.4/L.682
page 188

alleged torture committed outside the forum State.  By finding as it did, the Court did not afford a norm of *jus cogens* an effect which would override the rights of States under customary international law.[517]

**(b)    The content of *jus cogens***

374.    In its final draft of the law of treaties the International Law Commission deliberately dispensed with listing concrete examples of *jus cogens* norms.[518]  It did so because, as it put the matter, "there is no simple criterion by which to identify a general rule of international law as having the character of *jus cogens*".[519]  The adoption of the Vienna Convention was then predictably followed by an extensive debate about precisely this matter.  There are today a number of pronouncements from various judicial or diplomatic organs that give an idea of what might count as *jus cogens* norms.  In its Commentary to the Draft Articles on State Responsibility in 2001 the ILC gave as examples of *jus cogens* the prohibition of aggression, slavery and slave trade, genocide, racial discrimination and apartheid, torture (as defined in the Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment, adopted 10 December 1984), basic rules of international humanitarian law applicable in armed

---

[517]  In his dissenting opinion in the *Al-Adsani* case, started by words "[w]hat a pity!", Judge Ferrari Bravo expressed deep disappointment in the outcome of the case:  "The Court … had a golden opportunity to issue a clear and forceful condemnation of all acts of torture.  To do so, it need only have upheld the thrust of the House of Lords' judgment in *Regina v. Bow Street Metropolitan Stipendiary and Others, ex parte Pinochet Ugarte (No. 3)* … to the effect that the prohibition of torture is now *jus cogens*, so that torture is a crime under international law.  It follows that every State has a duty to *contribute* to the punishment of torture and cannot hide behind formalist arguments to avoid having to give judgment.  But it is precisely one of those old formalist arguments which the Court endorsed when it said … that it was unable to discern any rules of international law requiring it not to apply the rule of immunity from civil suit where acts of torture were alleged. … There will be other such cases, but the Court has unfortunately missed a very good opportunity to deliver a courageous judgment".  Ibid., Dissenting opinion of Judge Ferrari Bravo) p. 14.

[518]  See Draft Articles on the Law of Treaties, Report of the International Law Commission on the work of its eighteenth session, *Yearbook …* 1966 vol. II, p. 248.

[519]  Ibid., pp. 247-248. Lord McNair has elegantly expressed the same idea by writing that "it is easier to illustrate these rules [*jus cogens*] than to define them".  See A.D. McNair, *The Law of Treaties*, supra note 57, p. 215. Likewise e.g. Aust, *Handbook of International Law,* supra note 504, p. 11; Shelton, "International Law and Relative Normativity", supra note 496, p. 151.

conflict, and the right to self-determination.[520]  In the *Furundžija* case, the International Criminal Tribunal for the former Yugoslavia defined torture as both a peremptory norm and an obligation *erga omnes*.[521]  Overall, the most frequently cited candidates for the status of *jus cogens* include: (a) the prohibition of aggressive use of force; (b) the right to self-defence; (c) the prohibition of genocide; (d) the prohibition of torture; (e) crimes against humanity; (f) the prohibition of slavery and slave trade; (g) the prohibition of piracy; (h) the prohibition of racial discrimination and *apartheid*, and (i) the prohibition of hostilities directed at civilian population ("basic rules of international humanitarian law").[522]

375.    The problem of how to identify *jus cogens* is not easy to resolve *in abstracto*.  As most commentators point out, it is not only that there is no single authoritative list of *jus cogens*

---

[520]  Draft Articles on State Responsibility, Commentary on Article 40, paras. 4-6 in *Official Records of the General Assembly, Fifth-sixth Session* (A/56/10) pp. 283-284.

[521]  *Prosecutor v. Anto Furundžija*, Judgment of 10 December 1998, Case No. IT-95-17/1, Trial Chamber II, 121 *ILR* (2002) pp. 260-262, paras. 151-157.

[522]  Brownlie lists as the least controversial examples of the class the prohibition of the use of force, the law of genocide, the principle of racial non-discrimination, crimes against humanity, and the rules prohibiting trade in slaves and piracy. Ian Brownlie, *Principles of Public International Law*, supra note 164, p. 515; Aust sees as perhaps the only generally accepted examples the prohibition on the use of force (as laid down in the United Nations Charter) and on genocide, slavery and torture. Aust, *Handbook of International Law*, supra note 504, p. 11; Rosalyn Higgins mentions as examples the prohibition of genocide, torture and killing of prisoners of war. See Rosalyn Higgins, *Problems and Process: International Law and How We Use It* (Oxford: Oxford University Press, 1994) pp. 21-22.  Also the examples of obligations articulated by the ICJ in the *Barcelona Traction* case - prohibition of aggression, genocide, breaches of rules concerning the basic rights of the human person, including protection from slavery and racial discrimination - are often cited as examples of *jus cogens*.  See the *Case Concerning the Barcelona Traction, Light and Power Company, Limited* (*Belgium v. Spain*) (*Second Phase*) *I.C.J. Reports 1970* p. 32.  For rules described as "fundamental" in ICJ practice, see Vera Gowlland-Debbas, "Judicial Insights into Fundamental Values and Interests of the International Community", in A.S. Muller et al (eds.), *The International Court of Justice. Its Future Role after Fifty Years* (The Hague Kluwer, 1997) pp. 335-342. For lists, see also Jarna Petman, "Panglossian Views to the New World Order. Review of Cassese, International Law (2001)", Finnish Yearbook of International Law, vol. 13 (2002) pp. 337-8; Daillier & Pellet, *Droit international public*, supra note 73, pp. 206-207.  Some commentators have proposed that *jus cogens* encompasses also the freedom of the high seas (see Jochen Frowein, "Jus Cogens" supra note 495, p. 67), yet the view of the International Law Commission seems to have always been different.  The Commission has stated continuously that it is not the universal acceptance that elevates a norm to the status of *jus cogens*, but its content.  In the words of the Commission, "[i]t is not the form of a general rule of international law but the particular nature of the subject-matter with which it deals that may, in the opinion of the Commission, give it the character of *jus cogens*".  Following the same line, the Commission has added only recently that obligations under peremptory norms of international law "arise from those substantive rules of conduct that prohibit what has come to be seen as intolerable because of the threat it presents to the survival of States and their peoples and the most basic human values".  See Draft Articles on State Responsibility, Commentary on Article 40, para. 3 in *Official Records of the General Assembly, Fifth-sixth Session* (A/56/10) p. 283.

A/CN.4/L.682
page 190

norms, there is no agreement about the criteria for inclusion on that list. The starting-point must be the formulation of article 53 itself, identifying *jus cogens* by reference to what is "accepted and recognized by the international community of States as a whole". Although that formulation itself is not free from controversy (especially references to a community of "*States*" and to the meaning of the requirement "*as a whole*"),[523] there is also a disturbing circularity about it. If it is the point of *jus cogens* to limit what may be lawfully agreed by States - can its content simultaneously be made dependent on what is agreed between States?[524] The historical background of *jus cogens* lies in an anti-voluntarist, often religiously inclined natural law, the presumption of the existence of "absolute" norms on human conduct. While most people (and States) still hold it important - indeed very important - that such norms exist, the vocabularies of present-day diplomacy and law seem unable to produce a plausible justification for them. Any "criterion" that one might wish to invoke so as to support any particular norm as *jus cogens* would seem to infect that putative norm with all the uncertainties and vulnerabilities that relate to that criterion.

376.    Instead of trying to determine the content of *jus cogens* through abstract definitions, it is better to follow the path chosen by the ILC in 1966 as it "considered the right course to be to provide in general terms that a treaty is void if it conflicts with a rule of *jus cogens* and to leave the full content of this rule to be worked out in State practice and in the jurisprudence of international tribunals".[525] That seems still the right way to proceed.

**(c)    Case law**

377.    The extent of case-law on *jus cogens* is vast. Many courts and tribunals, both international and domestic, have used *jus cogens* based arguments in substantiating their

---

[523] See e.g. Cassese, *International Law*, supra note 502, p. 201 ("most important and representative states") and the discussion in Jean Combacau & Serge Sur, *Droit international public*, supra note 505, pp. 158-160.

[524] See Martti Koskenniemi, *From Apology to utopia …,* supra note 78, pp. 323-325.

[525] Draft Articles on the Law of Treaties, *Yearbook … 1966* vol. II, p. 248.

decisions and judgments.[526]  Yet the number of cases in which *jus cogens* has appeared from the viewpoint of norm conflict is considerably more limited.  As noted by Antonio Cassese:

> … no dispute has arisen between States as to the *jus cogens* nature of a specific rule.  Nor have one or more States insisted on the peremptory nature of a rule in dispute with other States, accompanied by either acquiescence by other States or contested by them.  Nor has any international tribunal, let alone the ICJ, settled any dispute revolving around the question of whether or not a specific rule must be regarded as belonging to the corpus of norms under discussion.[527]

378.    The ICJ has been reluctant to refer to *jus cogens* in its decisions.  An explicit mention of the term can only be found in very few cases.  An example may be given by the decision of the ICJ most often referred to in relation to *jus cogens*, in the *Nicaragua* case in 1986.[528]  Nevertheless, more has been perhaps read into the decision than is warranted:  the Court only mentions the words *jus cogens* by quoting (although apparently with approval) the ILC and the representatives of both parties to the dispute - it never picked up the vocabulary as part of its own language.[529]

---

[526] For an overview of references to fundamental norms in the judicial pronouncements of the ICJ and its predecessor, see Vera Gowlland-Debbas, "Judicial Insights into Fundamental Values and Interests ...", supra note 522, pp. 332-342.  For other bodies, see e.g. *Prosecutor v. Kupreskic*, Judgment of 14 January 2000, Case No. IT-95-16, ICTY Trial Chamber II, p. 203, para. 520, http://www.un.org/icty/kupreskic/trialc2/judgement/kup-tj000114e.pdf (last visited 31 March 2006) which states that "most norms of international humanitarian law, in particular those prohibiting war crimes, crimes against humanity and genocide, are also peremptory norms of international law or *jus cogens*, i.e. of a non-derogable and overriding character".  See the case-law section for further examples of occasions where the concept has been endorsed by various judicial authorities.

[527] Cassese, *International Law,* supra note 502, p. 202.

[528] *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America) (Merits) I.C.J. Reports 1986* pp. 100-101, para. 190.

[529] The only format in which the term *jus cogens* has really been put to use in the ICJ comprises of separate and dissenting opinions of individual judges of the Court.  Actually already in 1934, Judge Schücking of the Permanent Court of International Justice referred in his separate opinion to the possibility of creation of *jus cogens* in the form of agreements between States.  See the *Oscar Chinn* case, *P.C.I.J. Series A/B*, No. 63 (1934) (separate opinion of Judge Schücking) p. 149.  Throughout following years, numerous references have been made to peremptory norms in this format.  See, e.g., *Case Concerning the Application of the Convention of 1902 Governing the Guardianship of Infants (the Netherlands v. Sweden) I.C.J. Reports 1958* (separate opinion of Judge Moreno Quintana) pp. 106 et seq.; *North Sea Continental Shelf (Federal Republic of Germany/Denmark; Federal Republic of Germany/Netherlands) I.C.J. Reports 1969* (separate opinion of Judges Padilla Nervo and Sörensen) pp. 97 and 248; *North Sea Continental Shelf (Federal Republic of Germany/Denmark; Federal Republic of Germany/Netherlands) I.C.J. Reports 1969* (dissenting opinion of Judge Tanaka) p. 182; *Case Concerning the Barcelona Traction, Light and Power Company, Limited (Belgium v. Spain) (Second Phase) I.C.J. Reports 1970* (separate opinion of

A/CN.4/L.682
page 192

379.    Yet the fact that the Court has repeatedly referred to general and fundamental principles which lie beyond contractual treaty-relations allows assuming that the Court has, in substance, affirmed the concept.  Already in its first case, it pointed out that the obligations of States do not necessarily have to have a conventional nature, but instead may also be founded on certain general and well-recognized principles, among which are "elementary considerations of humanity".[530]  Just a year later the Court gave one of its most famous advisory opinions, in which it stated that "the principles underlying the Convention are principles which are recognized by civilized nations as binding on States, even without any conventional obligation".[531]  In the same vein, an advisory opinion of 1996 contained a reference to "intransgressible principles of international customary law".[532]  These lines and also the reasoning in the *Barcelona Traction* case display that the Court has, from the very beginning, deemed it necessary to highlight the existence of particularly important norms in international law, although it has been less than clear about their status or operation.[533]

---

Judge Ammoun) p. 304; *Military and Paramilitary Activities in and against Nicaragua* (Nicaragua *v.* United States of America) *I.C.J. Reports 1986* (separate opinion of President Nagendra Singh) p. 153; *Military and Paramilitary Activities in and against Nicaragua* (*Nicaragua v. United States of America*) *I.C.J. Reports 1986* (separate opinion of Judge Sette-Camara) pp. 199 et seq; *Case Concerning Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia Herzegovina v. Yugoslavia (Serbia and Montenegro))* Order of 13 September 1993 *I.C.J. Reports 1993* (separate opinion of Judge Lauterpacht) p. 440; *Legality of Use of Force (Yugoslavia v. United States of America)* Request for the Indication of Provisional Measures, Order of 2 June 1999, *I.C.J. Reports 1999* (dissenting opinion of judge *ad hoc* Kreca) pp. 53-61, paras. 10-17; *Case Concerning the Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belgium) I.C.J. Reports 2002* (dissenting opinion of Judge Al-Khasawneh) p. 95, para. 3; *Oil Platforms (Islamic Republic of Iran v. United States of America) I.C.J. Reports 2003* (separate opinion of Judge Buergenthal *I.C.J. Reports 2003*, para. 23.

[530]  *Corfu Channel case (the United Kingdom v. Albania) (Merits) I.C.J. Reports 1949* p. 22.

[531]  *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide, Advisory Opinion, I.C.J. Reports 1951* p. 24.

[532]  *Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, I.C.J. Reports 1996* p. 226, para. 79.  The same was confirmed by the Court in the latest advisory opinion to date, the *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, Advisory Opinion, reproduced in document A/ES-10/273 and Corr.1.  See also ILM vol. 43 (2004) p. 1009.

[533]  See *Case Concerning the Barcelona Traction, Light and Power Company, Limited (Belgium v. Spain) (Second Phase) I.C.J. Reports 1970* p. 32.

### 3. Obligations *erga omnes*

380.    Obligations *erga omnes* are different from Article 103 of the United Nations Charter and *jus cogens*.  Whereas the latter are distinguished by their normative power - their ability to override a conflicting norm - obligations *erga omnes* designate the *scope of application* of the relevant law, and the procedural consequences that follow from this.  A norm which is creative of obligations *erga omnes* is owed to the "international community as a whole" and all States - irrespective of their particular interest in the matter - are entitled to invoke State responsibility in case of breach.  The *erga omnes* nature of an obligation, however, indicates no clear superiority of that obligation over other obligations.  Although in practice norms recognized as having an *erga omnes* validity set up undoubtedly important obligations, this importance does not translate into a hierarchical superiority similar to that of Article 103 and *jus cogens*.

381.    It may be true that "[t]he question as to the legal significance of the category of State obligations *erga omnes* has been hotly contested among scholars and lawyers and remains stubbornly unsettled within international legal literature and practice".[534]  Yet although this may apply to the particular understandings (and listings) of *erga omnes* obligations, the concept itself - the idea of *erga omnes* applicability of certain rules of international law - has been deeply rooted in international practice.

### (a)    From bilateral obligations to obligations *erga omnes* owed to "the international community as a whole"

382.    The bulk of international law emerges from contractual relations between individual States and remains in this sense "bilateralist".[535]  Obligations are owed by States to each other, and each is only individually entitled to invoke a breach as a basis for State responsibility.

---

[534]  Ian D. Seiderman, *Hierarchy in International La : The Human Rights Dimension* (Antwerpen:  Intersentia, 2001) p. 123.

[535]  See especially Bruno Simma, "From Bilateralism to Community Interest in International Law", *Recueil des Cours ...* vol. 250 (1994) pp. 230 et seq.  This term was first used by Special Rapporteur Willem Riphagen, Third Report, *Yearbook ... 1982* vol. II, Part one, p. 36.  As pointed by Simma, the term "bilateralist" grasps the essence of international law more precisely and is less prone to misunderstandings than the adjectives "relative" or "relational".  Simma, "From Bilateralism to Community Interest …", pp. 230 et seq.

A/CN.4/L.682
page 194

International law's special nature is well captured by Professor Allott who has described it as "the minimal law necessary to enable state-societies to act as closed systems internally and to act as territory owners in relation to each other".[536]  Or in the words of Simma:

> [T]raditional international law was left entirely at the hands of sovereign States, predicated on their bilateral legal relations, on the intrinsically bilateral character of legal accountability …  As to the substance built upon such a bilateralist grounding, international law had, in the course of centuries, developed into a system delimiting the spheres of sovereignty of States in space and in time, as well as with regard to persons and certain jurisdictional matters respectively.  In essence, these rules obliged States from interfering into areas so demarcated.  In addition, international law provided a reciprocity-based framework for legal transactions in the form of treaties …[537]

383.    The bilateralism of international law means that international law obliges States reciprocally in their relations *inter se* and not towards each other as members of some more or less general idea of an international public realm.  The bilateralist mode of operation is particularly important in the law of State responsibility that may be characterized in terms "private justice" or an "every-man-for-himself doctrine":

> For a State to enjoy a right implies its possession of legal standing to claim performance of the corresponding obligation and, in default, to bring to book the person or persons owing that obligation.  …  In sum, no obligations *erga omnes*, traditionally, exist:  it is up to each State to protect its own rights; it is up to none to champion the rights of others.[538]

384.    This view was expressed by the ICJ in its *Reparation for Injuries* opinion, when it held that "only the party to whom an international obligation is due can bring a claim in respect of its breach".[539]

---

[536]  Philip Allott, *Eunomia.  New Order for a New World* (Oxford:  Oxford University Press, 1990) p. 324.

[537]  Simma, "From Bilateralism to Community Interest …", supra note 535, p. 229.

[538]  Weil, "Towards Relative Normativity ...", supra note 504, p. 431.  Likewise, Denys Alland, *Justice privée et ordre juridique ...* supra note 244.  For another argument suggesting that the concept of obligations *erga omnes* is not viable as a matter of law, see Jan Klabbers, "The Scope of International Law:  *Erga Omnes* Obligations and the Turn to Morality" in Matti Tupamäki (ed.), *Liber Amicorum Bengt Broms:  Celebrating His 70th Birthday* (Finnish Branch of the International Law Association:  Helsinki, 1999) p. 177.

[539]  *Reparations for Injuries suffered in the Service of the United Nations, Advisory Opinion, I.C.J. Reports 1949* pp. 181-182.

385.    Contemporary international law has, however, moved well beyond bilateralism.  Already in the ILC debates on the Vienna Convention, the Special Rapporteurs made a distinction between treaties creating obligations that were owed by States to each other in a network of reciprocal relationships and treaties creating what Fitzmaurice called "a more absolute type of obligation" - that is, an obligation of an "integral" or "interdependent" character.  As examples of these categories he gave disarmament and humanitarian law conventions.  The obligations in such conventions could not be meaningfully reduced into reciprocal State-to-State relationships.[540]  In that context, the interest of the distinction lay in the manner that conflicts between treaties were to be dealt with - the "more absolute" type of obligation being less easily derogated from by "modification" or *lex posterior*.

386.    The case most frequently mentioned in the early debates concerned the prohibition of genocide.  According to the reasoning by the ICJ in the *Reservations to the Genocide Convention* case, classical treaties were about individual advantages and disadvantages to States, or about the maintenance of a contractual balance.[541]  Yet under conventions such as the Genocide Convention States were not pursuing their national, individual interests.  Instead, they had a "common interest, namely, the accomplishment of those high purposes which are the *raison d'être* of the convention" and "[c]onsequently, in a convention of this type one cannot talk of individual advantages or disadvantages to States, or of the maintenance of a perfect contractual balance between rights and duties".[542]  Since that case, it has become common for scholars - but also tribunals, international and domestic - to refer to "certain overriding universal values"[543] and shared interests or preferences upon which a distinction is made between contract-type norms and those of a more public law character.

---

[540]  Fitzmaurice, Third Report, *Yearbook ... 1958* vol. II, p. 44, para. 91.

[541]  *Reservations to the Convention on the Prevention of the Crime of Genocide, Advisory Opinion, I.C.J. Reports 1951* p. 23.

[542]  Ibid.

[543]  Gowlland-Debbas, "Judicial Insights into Fundamental Values and Interests ...", supra note 522, p. 328. See further Christian J. Tams, *Enforcing Obligations Erga Omnes in International Law* (Cambridge:  Cambridge University Press, 2005) pp. 2-3 and passim.

A/CN.4/L.682
page 196

387.    The *locus classicus* here is, of course, the statement by the Court in the *Barcelona Traction* case that may have received inspiration from the debates under way since the adoption of the Vienna Convention concerning the nature and role of "fundamental norms" that could not be reduced to the regulation of bilateral State-to-State relations.[544]  Here the term "*erga omnes*" (which is a Latin equivalent to "towards everyone/all") received major public attention for the first time.[545]  As is well known, the Court held that Belgium did not possess legal standing to act on behalf of Belgian shareholders in a Canadian Company against Spain.  In a famous *obiter dictum*, the Court stated the following:

> … an essential distinction should be drawn between the obligations of a State towards the international community as a whole, and those arising *vis-à-vis* another State in the field of diplomatic protection.  By their very nature, the former are the concern of all States.  In view of the importance of the rights involved, all States can be held to have a legal interest in their protection; they are obligations *erga omnes*.
>
>         Such obligations derive, for example, in contemporary international law, from the outlawing of acts of aggression, and of genocide, as also from the principles and rules concerning the basic rights of the human person, including protection from slavery and racial discrimination.  Some of the corresponding rights of protection have entered into the body of general international law … others are conferred by international instruments of a universal or quasi-universal character.[546]

388.    The significance of these passages lies foremost in outlining that there are indeed different types of obligations in international law.  On the one hand there are obligations of a traditional type that exist towards another particular State or States on a bilateralist basis - and then obligations which are the concern of all States and for the protection of which all States have a legal interest.

---

[544]  Jochen Frowein, "Obligations *Erga Omnes*", in Rudolf Bernhardt (ed.), *Encyclopaedia of International Law* (Amsterdam:  Elsevier, 1997) vol. III, p. 757.

[545]  *Case concerning the Barcelona Traction, Light and Power Company, Limited (Belgium v. Spain) (Second Phase) I.C.J. Reports 1970* p. 32, para. 33.  For support to the concept of obligations erga omnes, see Oscar Schachter, *International Law in Theory and Practice* (Dordrecht:  Nijhoff, 1991) pp. 343-344; Claudia Annacker, "The Legal Régime of Erga Omnes Obligations in International Law", Austrian Journal of Public International Law, vol. 46 (1994) p. 131.  For criticism, see Weil, "Towards Relative Normativity …", supra note 504, p. 413.

[546]  *Case concerning the Barcelona Traction, Light and Power Company, Limited (Belgium v. Spain) (Second Phase) I.C.J. Reports 1970* p. 32.

389.    Although the examples given by the ICJ of obligations *erga omnes* may also have the nature of *jus cogens*, the Court did not seek to emphasize their non-derogability.  Instead, it wanted to point to the fact that there were some rules that gave rise to a generality of standing to make claims in the event of a violation.[547]  *Erga omnes* norms were not necessarily distinguished by the importance of their substance.  They were norms with certain procedural features - namely the feature that a breach of them can be invoked by any State and not just by individual beneficiaries.  These were obligations that were about secondary, not primary rules.[548]  The ILC itself has confirmed the doctrine of obligations *erga omnes*.  Even as the idea of some violations constituting such grave offences against the international public order as a whole so as to be labelled "crimes" was finally omitted from the Commission's Draft Articles on State Responsibility (2001), article 48 of the final text was, as part of the resulting compromise, drafted so as to recognize the possibility of an invocation of responsibility by a State other than an injured State:

> 1.    Any State other than an injured State is entitled to invoke the responsibility of another … if:
>
> (a)    The obligation breached is owed to a group of States including that State, and is established for the protection of a collective interest of the group; or
>
> (b)    The obligation breached is owed to the international community as a whole.[549]

390.    In its Commentary, the Commission makes it clear that this provision is intended to deal with obligations of the kind referred to in the *Barcelona Traction* case.  And although the language is different, the provision also takes up the cases that Fitzmaurice dealt with under the

---

[547]  See Michael Byers, "Conceptualising the Relationship between *Jus Cogens* and *Erga Omnes* Rules", Nordic Journal of International Law, vol. 66 (1997) 211, p. 230.

[548]  See also Gaetano Arangio-Ruiz, Fourth Report, *Yearbook ... 1992* vol. II, Part 1, p. 34, para. 92:  "the concept of *erga omnes* obligations is not characterized by the importance of the interest protected by the norms - this aspect being typical of *jus cogens* - but rather by the "legal indivisibility" of the content of the obligation, namely by the fact that the rule in question provides for obligations which bind simultaneously each and every addressee with respect to all others.  This legal structure is typical not only of peremptory norms, but also of other norms of general international law and of a number of multilateral treaty rules (*erga omnes partes* obligations)".

[549]  Article 48, Draft Articles on State Responsibility in *Official Records of the General Assembly, Fifth-sixth Session* (A/56/10) p. 56.

vocabulary of treaties establishing "integral" and "interdependent" obligations.  The first subparagraph, in particular, deals with what the commentary addresses as "obligations *erga omnes partes*" - that is to say, obligations arising out of a treaty and designed to protect the "collective interests" of the treaty parties.[550]  The second paragraph deals with obligations *erga omnes* proper, that is, obligations in the general law whose implementation is the concern of "the international community as a whole".

**(b)      To whom are obligations *erga omnes* owed?**

391.    Most (though not all) *erga omnes* obligations have emerged in the field of human rights and humanitarian law.  In these fields, the law does not create reciprocal obligations between States in the bilateralist manner.  An obligation to respect the right to freedom of speech in a State's territory, for example, is not directed towards any particular States or the citizens of particular States.  Rather, under such a norm a State assumes a responsibility in relation to all persons under its jurisdiction.  There is no *quid pro quo* in such relations.  A State is obliged to respect that right irrespectively how other States may have behaved.[551]

392.    This raises the question about who are the beneficiaries of the *erga omnes* obligations and whether one's status as an immediate beneficiary has any bearing to the capacity to react to violations.  It may, from an academic perspective, be quite correct to state that *erga omnes* obligations "are grounded not in an exchange of rights and duties but in an adherence to a normative system".[552]  Yet it is far from clear what this means in terms of the procedural rights triggered by any actual violation.

---

[550]  Ibid., Commentary to draft article 48.  The examples given by the Commission concern treaties that have to with the environment or the security of a region or a regional system of protection of human rights.

[551]  As noted by Simma, human rights treaties are among those agreements in regard to which obligations do not run between the States parties at all but rather oblige the contracting States to adopt a certain "parallel" conduct within their jurisdiction which does not manifest itself as any tangible exchange or interaction between the parties.  See Bruno Simma, "Bilateralism and Community Interest in the Law of State Responsibility" in Yoram Dinstein (ed.), *International Law at a Time of Perplexity:  Essays in Honour of Shabtai Rosenne* ( Dordrecht:  Nijhoff, 1988) p. 823 (emphasis in the original).

[552]  See René Provost, "Reciprocity in Human Rights and Humanitarian Law", BYBIL vol. 65 (1994) p. 386.

393.    If a State is responsible for torturing its own citizens, no single State suffers any direct harm.  Apart from the individual or individuals directly concerned, any harm attributed to anyone else is purely notional, that is, constructed on the basis of the assumption that such action violates some values or interests of "all", or in the vocabulary of the *Barcelona Traction* case, the "international community as a whole".  Although the State committing torture has breached its obligations, under bilateralism, there would be no injured State and thus no State in possession of a claim right.[553]  But of course, the International Law Commission has now accepted that there may be situations where also non-injured States may be entitled to reach to breaches and that those are precisely the kinds of situations where the violations concerned the "international community as a whole" and where all States had a legal interest.[554]  The case of *erga omnes partes* that is dealt with in article 48 (1) (a) deals with the situation where a collective interest of treaty parties has been violated and where, consequently, it is reasonable to entitle all the parties to invoke the breach.  Article 48 (1) (b) deals with general *erga omnes* obligations that establish a right for all States - that is to say, in their capacity as members of the "international community" - to invoke the breach.[555]

394.    Again, a good summary can be found from the *Furundžija* judgment of the ICTY. Having stated that the prohibition of torture was *jus cogens* norm, it also defined it establishing an *erga omnes* obligation, as follows:

---

[553]  Seiderman goes so far as to assert that "it is inappropriate to divide human rights norms into those which entail obligations *erga omnes* and those which do not".  See Seiderman, *Hierarchy in International Law ...* supra note 534, p. 124.  For an alternative view see Byers, "Conceptualising the Relationship between *Jus Cogens* and *Erga Omnes* Rules", supra note 547, p. 232.  Byers sees obligations *erga omnes* still within the bilateralist paradigm, suggesting that "an *erga omnes* rule might be considered to involve a series of identical bilateral relationships between every possible pair of States" plus the characteristic that every State has the right to present a claim, whoever suffers the direct loss from a breach of such obligations.  Inspiration for such treatment of the doctrine might be based on what the ICJ stated in 1973 in the *Nuclear Tests* case.  In its decision the Court held that "[t]he unilateral statements of the French authorities were made outside the Court, publicly and *erga omnes* …  The objects of these statements are clear and they were addressed to the international community as a whole, and the Court holds that they constitute an undertaking possessing legal effect".  *Nuclear Tests Case* (*Australia v. France*) *I.C.J. Reports 1974* p. 269, paras. 50-51.  According to the argumentation of this early opinion, obligations *erga omnes* would really be no more than obligations a State has taken in relation to all the States of the international community.

[554]  Article 42 (b), Draft Articles on Responsibility of States for Internationally Wrongful Acts, in *Official Records of the General Assembly, Fifth-sixth Session* (A/56/10) p. 53.

[555]  Ibid., Commentary to draft article 48

A/CN.4/L.682
page 200

> Furthermore, the prohibition of torture imposes upon States obligations *erga omnes*, that is, obligations owed towards all the other members of the international community, each of which then has a correlative right.  In addition, the violation of such an obligation simultaneously constitutes a breach of the correlative right of all members of the international community and gives rise to a claim for compliance accruing to each and every member, which then has the right to insist on fulfilment of the obligation or in any case to call for the breach to be discontinued.[556]

395.    The distinction between "bilateral" and *erga omnes* obligations seems analogous to the domestic distinction between contracts and public law obligations.  In the latter, the relationship is between the legal subject and then public power.  Even if a breach of the latter may violate an individual interest, the capacity to react (as in most criminal law) lies in the hands of public power.

396.    This does not, however, mean that States could only react through a collective process.  Indeed, if that were the case, the absence of general collective reaction procedures - apart from those under Chapter VII of the United Nations Charter - would render the provision on *erga omnes* practically meaningless.  As pointed out by Gaja in his report to the *Institut de Droit International,* a collective reaction involving all States "is in practice impossible".  Therefore it must be concluded that an obligation owed to the "international community as a whole" is also owed to each State individually and without any specific interest on that State's part and that each of them has the capacity of react in case of breach.  Whether also other subjects - individuals, groups of individuals or organizations - might be entitled to react depends on the content of the relevant norm and whether suitable avenues for such reaction are present.[557]

397.    It has also been suggested that the fact that an obligation is owed *erga omnes* is relevant to the determination of the consequences of its breach.  In particular, it may involve the obligation of non-recognition.  Considering the legality of the security barrier built by Israel partly on the occupied territory of Palestine, the ICJ stated the following:

---

[556] *Prosecutor v. Anto Furundžija*, Judgment of 10 December 1998, Case No. IT-95-17/1, Trial Chamber II, 121 *ILR* (2002) p. 260, para. 151.

[557] Giorgio Gaja, "Obligations and Rights Erga Omnes in International Law", *Annuaire ...* vol. 71.Part one, p. 126.

The obligations *erga omnes* violated by Israel are the obligation to respect the right of the Palestinian people to self-determination, and certain of its obligations under international humanitarian law. … Given the character and the importance of the rights and obligations involved, the Court is of the view that all States are under an obligation not to recognize the illegal situation resulting from the construction of the wall …[558]

398.    The Court specified this by holding that:

[t]hey are also under an obligation not to render aid or assistance in maintaining the situation created by such construction. It is also for all States, while respecting the United Nations Charter and international law, to see to it that any impediment, resulting from the construction of the wall, to the exercise by the Palestinian people of its right to self-determination is brought to an end. In addition, all the States parties to the Geneva Convention relative to the Protection of Civilian Persons in Time of War of 12 August 1949 are under an obligation, while respecting the United Nations Charter and international law, to ensure compliance by Israel with international humanitarian law as embodied in that Convention.[559]

**(c)    Obligations *erga omnes partes***

399.    The judgment of the ICJ in the *Wall* case contains a statement to the effect that "the instruments which embody human rights do not confer on States the capacity to protect the victims of infringements of such rights irrespective of their nationality". These lines may be taken to mean that obligations *erga omnes* cannot be based on treaty-law. This, however, cannot have been the Court's meaning. A better view seems to be that the Court wished to say that specific agreements may channel legal standing into appropriate procedures. In other words, the statement would not relate to the sources of obligations *erga omnes*, but to the technical

---

[558] *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory, Advisory Opinion*, reproduced in document A/ES-10/273 and Corr.1. See also ILM vol. 43 (2004) p. 1009, paras. 155 and 159.

[559] Ibid., p. 1009, paras. 155 and 159. This did not, however, go uncontested by the other judges. Thus Judge Higgins in her separate opinion stated that "[u]nlike the Court" [she did] not think that the specified consequence of the identified violations of international law have anything to do with the concept of *erga omnes* … The Court's celebrated dictum in *Barcelona Traction* … is frequently invoked for more than it can bear. Regrettably, this is now done also in this Opinion … That dictum was directed to a very specific issue of jurisdictional *locus standi*. … It has nothing to do with imposing substantive obligations on third parties to a case." She added: "That an illegal situation is not to be recognized or assisted by third parties is self-evident, requiring no invocation of the uncertain concept of *'erga omnes'*. … The obligation upon United Nations Members of non-recognition and non-assistance does not rest on the notion of *erga omnes*." Ibid., p. 1009 (separate opinion of Judge Higgins) paras. 37 and 38.

A/CN.4/L.682
page 202

particularities of human rights treaties.  As Ian Seiderman has stated "in order to institute an *actio populari*, a State or other subject of international law would need both standing and a forum.  *Erga omnes* addresses itself only to the former requirement".[560]

400.    Yet not too much should be made of the distinction (standing and jurisdiction).  In the case of State responsibility - the principal field of *erga omnes* obligations - the absence of jurisdiction does not extinguish the claim.  In the human rights field, for instance, the general law of State responsibility becomes fully available for actors representing the "international community as a whole" even where an "actio populari" might remain beyond possibilities offered by the particular forum.[561]

401.    This logic was expressed in regard to the European Convention on Human Rights already long ago.  In the *Pfunders* case in 1961[562] the Austrian Government alleged that criminal proceedings in Italian courts had been carried out in conflict with article 6 of the European Convention.  The Italian Government objected that the treaty bodies lacked competence *ratione temporis* to entertain the case, since Austria had not ratified the Convention at the time of the disputed events and was thus not empowered to bring the claim.  However, the European Commission of Human Rights rejected this argument with the famous statement that the purpose of the High Contracting Parties in concluding the Convention had not been to concede to each other reciprocal rights and obligations in pursuance of their individual national interest, but to

---

[560]  See Seiderman, *Hierarchy in International Law ...* supra note 534, pp. 136-137 .  Likewise, in the *East Timor case,* the ICJ held that:  "the *erga omnes* character of a norm and the rule of consent to jurisdiction are two different things.  Whatever the nature of the obligation invoked, the Court could not rule on the lawfulness of the conduct of a State when its judgment would imply an evaluation of the lawfulness of the conduct of another State which is not a party to the case.  Where this is so, the Court cannot act, even if the right in question is a right *erga omnes.*"  See *Case Concerning East Timor* (*Portugal v. Australia*) *I.C.J. Reports 1995* p. 102, para. 29.  See also *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, Advisory Opinion, ILM vol. 43 (2004) p. 1009 (separate Opinion of Judge Higgins) para. 37, where she states that the *dictum* in *Barcelona Traction* was directed to a very specific issue of jurisdictional *locus standi.*

[561]  For the suggestion to use the *erga omnes* concept to empower non-State actors, see e.g. Hilary Charlesworth & Christine Chinkin, *The Boundaries of International Law.  A Feminist Analysis* (Manchester:  Manchester University Press, 2000) pp. 94-95.

[562]  *Austria v. Italy*, 11 January 1961, YBECHR vol. 4, p.116.

realize the aims and ideals of the Council of Europe, as expressed in its Statute, and to establish a common public order of the free democracies of Europe with the object of safeguarding their common heritage of political traditions, ideals, freedom and the rule of law:

> [T]he obligations undertaken by the High Contracting Parties in the European Convention are essentially of an objective character being designed rather to protect the fundamental rights of individual human beings from infringement by any of the High Contracting Parties than to create subjective and reciprocal rights for the High Contracting Parties themselves.[563]

402.    Hence it has to be concluded that the source of a norm cannot be said to be decisive on whether that norm does give rise to obligations *erga omnes* or not.[564]  It is rather the character of primary norms which determines the nature of secondary rules.

403.    That obligations *erga omnes* can indeed be based on treaty norms has also been confirmed by the *Institut de Droit International*.  The resolution entitled *Obligations and Rights Erga Omnes in International Law*, adopted in 2005, defines an obligation *erga omnes* as:

> (a)    An obligation under general international law that a State owes in any given case to the international community, in view of its common values and its concern for compliance, so that a breach of that obligation enables all States to take action; or

> (b)    An obligation *under a multilateral treaty* that a State party to the treaty owes in any given case to all the other States parties to the same treaty, in view of their common values and concern for compliance, so that a breach of that obligation enables all these States to take action.[565]

---

[563]  Ibid., p. 138.

[564]  See also Annacker, "The Legal Regime of *Erga Omnes* Obligations …", supra note 545, p. 136, who argues that "[t]he source of a norm by itself does not allow any conclusions regarding the structure of the obligations imposed and the rights concerned by the primary norm of the regime of responsibility (secondary norms)."

[565]  *Obligations and Rights Erga Omnes in International Law,* Institut de Droit International, the Krakow Session, *Annuaire de l'Institut de Droit International* (2005) Article 1, emphasis added.  See Gaetano Arangio-Ruiz, Fourth Report, *Yearbook … 1992* vol. II, Part one, p. 34, para. 92 stating that "[t]his legal structure [obligations *erga omnes*] is typical not only of peremptory norms, but also of other norms of general international law and of a number of multilateral treaty rules (*erga omnes partes* obligations)".

A/CN.4/L.682
page 204

**(d)   The relationship between *jus cogens* and *erga omnes* obligations**

404.    The close relationship between *jus cogens* and the notion of *erga omnes* obligations is a constant source of confusion.  *Jus cogens* norms are particularly important norms that are distinguished by their non-derogability.  A norm that conflicts with them is, as we have seen, null and void.  Obligations *erga omnes* are obligations in the fulfilment of which every State ("the international community as a whole") has a legal interest.  It is likely that all States have a legal interest in the observance of rules from which no derogation is permitted.  In this sense, it is plausible to assume that all *jus cogens* norms constitute *erga omnes* obligations.  But the equation does not work the other way around.  From the fact that all States have an interest in the fulfilment of an obligation it does not necessarily follow that those norms are peremptory - that is to say, they do not necessarily render conflicting obligations null and void.

405.    In the commentary to the Draft Articles, the ILC elaborated the relationship between *jus cogens* and obligations *erga omnes* as follows:

> While peremptory norms of general international law focus on the scope and priority to be given to a certain number of fundamental obligations, the focus of obligations to the international community as a whole is essentially on the legal interest of all States in compliance - i.e., in terms of the present Articles, in being entitled to invoke the responsibility of any State in breach.  Consistently with the difference in their focus, it is appropriate to reflect the consequences of the two concepts in two distinct ways.  First, serious breaches of obligations arising under peremptory norms of general international law can attract additional consequences, not only for the responsible State but for all other States.  Secondly, all States are entitled to invoke responsibility for breaches of obligations to the international community as a whole.[566]

406.    In the *Furundžija* case, the ICTY made clear the relationship between the procedural thrust of *erga omnes* obligations and the linkage of *jus cogens* to normative hierarchy:

---

[566] Commentaries to the Draft Articles on Responsibility of States for Internationally Wrongful Acts, *Yearbook ... 2001* vol. II, Part Two, pp. 281-282.  Michael Byers has depicted the same relationship in the following terms:  "*Jus cogens* rules, otherwise known as 'peremptory rules', are non-derogable rules of international 'public policy'.  They render void other, non-peremptory rules which are in conflict with them.  *Erga omnes* rules, on the other hand, are rules which, if violated, give rise to a general right of standing - amongst all States subject to those rules - to make claims."  See Byers, "Conceptualising the Relationship between *Jus Cogens* and *Erga Omnes* Rules", supra note 547, p. 211.

"While the *erga omnes* nature just mentioned appertains to the area of international enforcement (lato sensu), the other major feature of the principle proscribing torture relates to the hierarchy of rules in the international normative order".[567]

### (e)    Conclusion

407.    The discussion of hierarchy confirms the conclusion already received at the end of the foregoing sections.  Although there is no single, fixed set of hierarchical relationships between the rules, principles and obligations of international law, this does not mean that relations of superiority and inferiority would be non-existent, only that what they are, cannot be determined in an abstract way, irrespective of the contexts in which some norms (rules, principles) are invoked against countervailing considerations.  Although it is customary to deal with hierarchy in international law in terms of *jus cogens* norms and *erga omnes* obligations, it is not clear that those are the only - or indeed the practically most relevant - cases.  As we have seen in sections C and D, there are other important rules - for example treaty rules of "integral" and "interdependent" nature, "intransgressible principles", "elementary considerations of humanity" and  treaty clauses that cannot be violated without simultaneously undermining the object and purpose of the treaty - that play a more significant role in the practice of legal reasoning.  It may be that focus on the well-known Latin maxims has diverted attention from those more mundane types of relationships of importance.

408.    However, this section  has emphasized the clear difference that exists between *jus cogens* norms and obligations as *erga omnes*.  The former have to do with the normative "weight" of a norm, the latter with its procedural "scope".  While a *jus cogens* norm has necessarily an *erga omnes* scope, not all *erga omnes* obligations have weight as *jus cogens*.  And while it is true that which norms belong to these classes remains to be argued each time separately, a solid professional consensus has been building in the 1990s on the nature of at least some prohibitions as having a *jus cogens* nature and the violation of some obligations as providing a standing for non-injured States.  If the categories nevertheless remain fluid, this does not mean that they are

---

[567] *Prosecutor v. Anto Furundžija*, Judgment of 10 December 1998, Case No. IT-95-17/1, Trial Chamber II, 121 *ILR* (2002) p. 260, para. 153.

A/CN.4/L.682
page 206

meaningless.  On the contrary, their relative openness allows their reasonable use in particular situations of normative conflict (*jus cogens*) or when having to decide on standing in regard to some obligations (obligations *erga omnes*).

409.    But law is a systematic craft and debates on superior and inferior norms remains a fertile ground for deliberating "constitutionalization" and fragmentation.  Article 103 of the United Nations Charter certainly suggests the hierarchically higher status of the Charter over other parts of international law while the very idea of a *jus cogens* suggests that even United Nations politics may meet with a "constitutional" limit.  Of course, there no longer persists a meaningful challenge to the notion of *jus cogens*.  Any actual disputes relate to the determination of its content, in particular in respect to the characterization of some action or event.  Here, everything depends on the development of political preferences.[568]  Nevertheless, the importance of the notion - like the importance of *erga omnes* obligations - may lie less in the way the concepts are actually "applied" than as signals of argumentative possibilities and boundaries for institutional decision-making.  To that extent, the notions alleviate the extent to which international law's fragmentation may seem problematic.

### F.  SYSTEMIC INTEGRATION AND ARTICLE 31 (3) (c) OF THE VCLT

#### 1.  Introduction - the "principle of systematic integration"

410.    The previous sections dealt with three types of relationship between rules and principles (norms) of international law:  relations between special and general norms, between prior and subsequent norms, and with rules and principles with different normative power.  In each

---

[568]  In this regard, particularly important are the deliberations of the Court of First Instance of the EC in Case T-306/01, *Ahmed Ali Yusuf and Al Barakaat International Foundation v. Council of the European Union and Commission of the European Communities*.  As pointed out above, the Court stated that it had the competence to examine the conformity of United Nations Security Council decisions with jus cogens.  At one point it speculated about "fundamental rights of the human person falling within the ambit of jus cogens", indicating that not all "fundamental rights" were by the same token jus cogens, para. 286.  However, in a later passage the Court went on to assess "whether the freezing of funds … infringes the applicants' fundamental rights", thus in fact conflating the two categories - "fundamental rights" and "jus cogens".  See para. 288.  Such a wide understanding of jus cogens surfaces also in the Court's view that an "arbitrary deprivation" of the right to property "might, in any case, be regarded as contrary to jus cogens", para. 293.  Also of interest is the Court's view that while the right of access to the courts did possess jus cogens status, this did not mean that it was unlimited.  On the contrary, its limitation by action taken in pursuit of Article 103 of the Charter appeared to be "inherent in that right as it is guaranteed by jus cogens", para. 343.

section, the argument was that legal technique was perfectly capable of resolving normative conflicts or overlaps by putting the rules and principles in a determinate relationship with each other. The sections highlighted that there was nothing automatic or mechanical about this process. The way the relevant techniques (*lex specialis; lex posterior; lex superior*) operated was dependent on what should be considered as the relevant aspects of each case. Whether a rule's speciality or generality should be decisive, or whether priority should be given to the earlier or to the later rule depended on such aspects as the will of the parties, the nature of the instruments and their object and purpose as well as what would be a reasonable way to apply them with minimal disturbance to the operation of the legal system.

411.    Alongside contextuality, another conspicuous feature in the preceding surveys of international practice has been the effort to avoid invalidating the norm that will be set aside - with only the abstract and so far substantially quite thin doctrine of *jus cogens* as an exception. In other words, care has been taken so as not to suggest that a treaty duly adopted or a custom followed by States would become in some respect altogether without legal effect. This has been achieved in particular through two techniques. First is the effort to harmonize the apparently conflicting norms by interpreting them so as to render them compatible. Second is the technique whereby the question of validity has been replaced by a question of priority. The norm that will be set aside will remain as it were "in the background", continuing to influence the interpretation and application of the norm to which priority has been given.

412.    It follows that, contrary to what is sometimes suggested, conflict-resolution and interpretation cannot be distinguished from each other. Whether there is a conflict and what can be done with prima facie conflicts depends on the way the relevant rules are interpreted. This cannot be stressed too much. Interpretation does not intervene only once it has already been ascertained that there is a conflict. Rules appear to be compatible or in conflict *as a result of interpretation*. Sometimes it may be useful to stress the conflicting nature of two rules or sets of rules so as to point to the need for legislative intervention. Often, however, it seems more appropriate to play down that sense of conflict and to read the relevant materials from the perspective of their contribution to some generally shared - "systemic" - objective. Of this, the technique of "mutual supportiveness" provided an example. But whichever way one goes, the

A/CN.4/L.682
page 208

process of reasoning follows well-worn legal pathways: references to normal meaning, party will, legitimate expectations, good faith, and subsequent practice, as well as the "object and purpose" and the principle of effectiveness. And finally, if a definite priority must be established, this may, as we have seen above, be achieved through three criteria: (a) specificity (*lex specialis*); (b) temporality (*lex posterior*), and (c) status (*jus cogens*, obligations *erga omnes* and Article 103 United Nations Charter).

413.    It is therefore not a surprise that the Vienna Convention on the Law of Treaties deals with the plurality of rules and principles in the context of treaty interpretation. In particular article 31 (3) (c) may be taken to express what may be called the principle of "systemic integration",[569] the process surveyed all along this report whereby international obligations are interpreted by reference to their normative environment ("system"). Article 31 (3) (c) VCLT provides:

> There shall be taken into account, together with the context:

> … (c) any relevant rules of international law applicable in the relations between the parties.

414.    The rationale for such a principle is understandable. All treaty provisions receive their force and validity from general law, and set up rights and obligations that exist alongside rights and obligations established by other treaty provisions and rules of customary international law. None of such rights or obligations has any *intrinsic* priority against the others. The question of their relationship can only be approached through a process of reasoning that makes them appear as parts of some coherent and meaningful whole. This is why, as pointed out by McNair, they must also be "applied and interpreted against the background of the general principles of international law".[570] Or, as the Arbitral Tribunal in the *Georges Pinson* case noted, a treaty must be deemed "to refer to such principles for all questions which it does not itself resolve

---

[569]  Jean Combacau & Serge Sur, "Principe d'intégration" in *Droit international public,* supra note 505, p. 175 and in much more detail Campbell McLachlan, "The Principle of Systemic Integration and Article 31 (3) (c) of the Vienna Convention", ICLQ vol. 54 (2005) pp. 279-320.

[570]  A.D. McNair, *The Law of Treaties,* supra note 57, p. 466.

expressly and in a different way".[571]  Reference to general rules of international law in the course of interpreting a treaty is an everyday, often unconscious part of the interpretation process. We have surveyed how this takes place in connection with the operation of special (and not "self-contained") regimes in section C above.  In the activity of specialized treaty bodies, a thick legal background is constantly presumed in a non-controversial way.  No tribunal will ask for evidence for the rule of "*audiatur et altera pars*" or put to question the nature of a United Nations Member as a "State".  These matters are taken as given and if a party challenges the relevance of any such procedural standard or public law status, then it is up to that party to justify its (unorthodox) case.

415.    But the principle of systemic integration goes further than merely restate the applicability of general international law in the operation of particular treaties.  It points to a need to take into account the normative environment more widely.  Nor is this anything new.  Thus, for example, the Arbitral Tribunal in a Franco-Belgian case from 1937 was able to hold as follows, without any further explanation:

> [A]bstraction faite de l'interprétation grammaticale et logique, il faut tenir compte du fait qu'il faut placer et interpréter l'accord Tardieu-Jaspar dans le cadre des accords de La Haye de janvier 1930, c'est-à-dire dans le cadre du Plan Young qui détermine soigneusement par quelle méthode les 'paiements allemands' et les 'transferts allemands' s'effectueront.[572]

416.    In this case, one treaty was interpreted by reference to another treaty.  It was obvious that the Franco-Belgian issue had a relationship to the overall effort to settle the German reparations problem and that this fact - the linkage of the treaty to that general settlement - could not be ignored in the interpretation of the agreement.  More generally, if it is indeed the point of international law to coordinate the relations between States, then it follows that specific norms must be read against other norms bearing upon those same facts as the treaty under interpretation.  A case in point are what Fitzmaurice called "chains" of treaties that grapple with

---

[571]  *Georges Pinson* case (*France/United Mexican States*) Award of 13 April 1928, UNRIAA, vol. V, p. 422.

[572]  *Différend concernant l'accord Tardieu-Jaspar (Belgium/France)* Award of 1 March 1937, UNRIAA, vol. III, p. 1713.

A/CN.4/L.682
page 210

the same type of problem at different levels or from particular (technical, geographical) points of view.[573]  As the Arbitral Tribunal in the *Southern Bluefin Tuna* case (2000) put the point:

> … it is a commonplace of international law and State practice for more than one treaty to bear upon a particular dispute …  There is frequently a parallelism of treaties …  The universal range of international legal obligations benefits from a process of accretion and accumulation …[574]

417.    In the era of framework treaties and implementation treaties, this seems self-evident. The doctrine of "treaty parallelism" addresses precisely the need to coordinate the reading of particular instruments or to see them in a "mutually supportive" light.  At issue in the *Southern Bluefin Tuna* case was the relationship between the 1982 UNCLOS and a fisheries treaty concluded for the implementation of the former.  It would have been awkward, and certainly not in accord with the intent of the parties, to read those instruments independently from each other. Although how that relationship should be conceived - where they part of what in section D.2 (a) was called a "regime" or were they not? - may remain the subject of some debate (particularly in view of the overlapping provisions on dispute-settlement), the Tribunal itself fully realized that it could not ignore the fact that the problem arose under both treaties.[575]

418.    Yet the problem is not limited to relationships between framework treaties and implementation treaties (after all, these characterizations have no determined content).  Surely it cannot be dependent on how a State chooses to characterize a problem that decides which treaty is applicable or how a tribunal's jurisdiction it delimited.  Daillier and Pellet make the general point clearly:

---

[573]  G.G. Fitzmaurice, Third Report, *Yearbook … 1958* vol. II, p. 44, para. 89 (b).

[574]  *Southern Bluefin Tuna* case, ILM vol. 39 (2000) p. 1388, para. 52.

[575]  For the debate concerning the problems that emerge as a result of the Tribunal's preferring the dispute settlement provisions of the regional treaty (Convention for the Conservation of Southern Bluefin Tuna) to the (compulsory) provisions of Part XV UNCLOS, Jacqueline Peel, "A Paper Umbrella Which Dissolves in the Rain?  The Future for Resolving Fisheries Disputes under UNCLOS in the Aftermath of the Southern Bluefin Tuna Arbitration", Melbourne Journal of International Law, vol. 3 (2002) pp. 53-78 and Barbara Kwiatkowska, "*The Ireland v. United Kingdom (Mox Plant)* Case:  Applying the Doctrine of Treaty Parallelism", International Journal of Marine & Coastal Law, vol. 18 (2003) p. 52 and notes therein.

Un traité ne peut être considéré isolement. Non seulement il est encré dans les réalités sociales, mais encore ses dispositions doivent être confrontées avec d'autres normes juridiques avec lesquelles elles peuvent entrer en concurrence.[576]

419.    None of this predetermines what it means to "confront" a norm with another or how they might enter into "concurrence". These matters must be left to the interpreter to decide in view of the situation. The point is only - but it is a key point - that the normative environment cannot be ignored and that when interpreting the treaties, the principle of integration should be borne in mind. This points to the need to carry out the interpretation so as to see the rules in view of some comprehensible and coherent objective, to prioritize concerns that are more important at the cost of less important objectives. This is all that article 31 (3) (c) requires; the integration into the process of legal reasoning - including reasoning by courts and tribunals - of a sense of coherence and meaningfulness. Success of failure here is measured by how the legal world will view the outcome.

420.    This section may be understood as an elucidation of the place and operation of article 31 (3) (c) VCLT but also as a summary for much of what has been said in the previous sections. The systemic nature of international law has received clearest formal expression in that article. As was suggested by Ms. Xue Hanqin during the debates in the ILC on the significance of article 31 (3) (c), the provision operates like a "master key" to the house of international law. In case there is a systemic problem - an inconsistency, a conflict, an overlap between two or more norms - and no other interpretative means provides a resolution, then recourse may always be had to that article in order to proceed in a reasoned way.

421.    It may of course often be the case that no formal reference to article 31 (3) (c) is needed because other techniques provide sufficiently the need to take into account the normative environment. As we have seen, customary law, general principles of law and general treaty provisions form the interpretative background for specific treaty provisions and it often suffices to refer to them to attain systemic integration. Sometimes article 31 (3) (c) is taken as merely confirming this. For example, in the recent *Affaire concernant l'apurement des comptes*

---

[576]  Daillier & Pellet, *Droit international public*, supra note 73, p. 266.

A/CN.4/L.682
page 212

(*the Netherlands v. France*, 2004) the Tribunal was requested to apply article 31 (3) (c) by one of the parties in support of its contention that the "polluter pays principle" might be applicable in the affair.  The Tribunal examined this contention noting then as follows:

> le principe figure dans certains instruments, tant bilatéraux que multilatéraux, et se situe à des niveaux d'effectivité variable.  Sans nier son importance en droit conventionnel, le Tribunal ne pense pas que ce principe fasse partie du droit international général.[577]

422.    But if that were all article 31 (3) (c) covered, it would have been unnecessary.  Its wording, however, is not restricted to "general international law" but extends to "any relevant rules of international law applicable in the relations between the parties".  Adding the word "general" was proposed in the Commission but was not included.  The predominant, though not exclusive, references in the Commission were other treaty rules.  Whether, in case of multilateral treaties, this requires that all parties to the treaty to be interpreted are parties also to those other treaties "to be taken into account" will be discussed below.[578]

423.    It is sometimes suggested that international tribunals or law-applying (treaty) bodies are not entitled to apply the law that goes "beyond" the four corners of the constituting instrument or that when arbitral bodies deliberate the award, they ought not to take into account rules or principles that are not incorporated in the treaty under dispute or the relevant *compromis*.  But if, as discussed in section B.5 above, all international law exists in systemic relationship with other law, no such application can take place without situating the relevant jurisdiction-endowing instrument in its normative environment.[579]  This means that although a tribunal may only have jurisdiction in regard to a particular instrument, it must always *interpret* and *apply* that instrument in its relationship to its normative environment - that is to say "other" international

---

[577] *Affaire concernant l'apurement des comptes entre le Royaume des Pays-Bas et la République Française en application du Protocole du 25 septembre 1991 additionnel à la Convention relative à la protection du Rhin contre la pollution par les chlorures du 3 décembre 1976 (the Netherlands/France)* Award of 12 March 2004, UNRIAA, vol. XXV, p. 312, para. 103.

[578] The (very limitative) suggestion that they should, was recently made by a WTO Panel in *EC - Measures Affecting the Approval and Marketing of Biotech Products* (7 February 2006) WT/DS291-293/INTERIM, pp. 300-301, paras. 7.70-7.72.

[579] See in this regard also Joost Pauwelyn, *Conflict of Norms ...* supra note 21, pp. 460-463 and passim.

law.[580]  This is the principle of systemic integration to which article 31 (3) (c) VCLT gives expression.  It is true that the formulation of article 31 (3) (c) has been criticized as unclear both in its substantive and temporal scope and its normative force:  How widely should "other law" be taken into account?  What about prior or later law?  And what does "taking into account" really mean?  As Judge Weeramantry noted in the *Gabčíkovo-Nagymaros* case, the provision "scarcely covers this aspect with the degree of clarity requisite to so important a matter".[581]  Thirlway even doubts "… whether this sub-paragraph will be of any assistance in the task of treaty interpretation".[582]  But if the article is merely the expression of a larger principle - that of "systemic integration" - and if that principle, again, expresses a reasonable or even necessary aspect of the practice of legal reasoning, then a discussion of its actual and potential uses would constitute a useful contribution to the study of the alleged fragmentation (or diversification) of international law.

## 2.  Article 31 (3) (c) of the VCLT

### (a)    Construction

424.    Article 31 (3) (c) is placed within Part III Section 3 of the Vienna Convention that deals with the interpretation of treaties.  Article 31 provides the "General Rule of Interpretation" in the following terms:

> 1.      A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

> 2.      The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

---

[580]  This is not to say that it would in practice be easy - or even possible - to distinguish these aspects from each other.  Indeed the impossibility to do this was a key reason for why the ILC refrained from adopting any rule on inter-temporal law (see below section 6.4.3).  The point is conceptual and refers to the way any right or obligation is double-sided - a creation of a treaty that is "applicable" and in substance determined through "interpretation".

[581]  *Case concerning the Gabčíkovo-Nagymaros Project (Hungary/Slovakia) I.C.J. Reports 1997* (separate opinion of Judge Weeramantry) p. 114.

[582]  Hugh Thirlway, "The Law and Procedure of the International Court of Justice 1960-1989", Part III, BYBIL vol. 62 (1991) No. 1, p. 58.

A/CN.4/L.682
page 214

(a)    Any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;

(b)    Any instrument which was made by one or more of the parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3.    There shall be taken into account, together with the context:

(a)    Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

(b)    Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

(c)    Any relevant rules of international law applicable in the relations between the parties.

4.    A special meaning shall be given to a term if it is established that the parties so intended.

425.    According to paragraph 3, three matters, not ranked in any particular order of priority, should be taken into account in treaty interpretation in addition to the context.  The third of them are "any relevant rules of international law applicable in the relations between the parties". The provisions are a mandatory part of the interpretation process.  Unlike the provision of article 32 on *travaux préparatoires* as a "supplementary means of interpretation" they are to be referred where the meaning of treaty terms is ambiguous, obscure, absurd or unreasonable.[583]

426.    Textual analysis of article 31 (3) (c) reveals a number of aspects of the rule which deserve emphasis:

(a)    It refers to "rules of international law" - thus emphasizing that the reference for interpretation purposes must be to rules of law, and not to broader principles or considerations which may not be firmly established as rules;

---

[583]  This was confirmed also by the WTO Panel in *EC - Measures Affecting the Approval and Marketing of Biotech Products* (7 February 2006) WT/DS291-293/INTERIM, p. 300, para. 7.69.

(b)    The formulation refers to rules of international law in general.  The words cover all the sources of international law, including custom, general principles, and, where applicable, other treaties;

(c)    Those rules must be both relevant and "applicable in the relations between the parties".  The sub-paragraph does not specify whether, in determining relevance and applicability one must have regard to all parties to the treaty in question, or merely to those in dispute;

(d)    The sub-paragraph contains no temporal provision.  It does not state whether the applicable rules of international law are to be determined as at the date on which the treaty was concluded, or at the date on which the dispute arises.

427.    Articles 31 and 32 VCLT are, of course, widely assumed to reflect customary international law.[584]  Their appeal may be attributable to the fact that they adopt a set of practical considerations that are familiar from the national context and at the same time general and flexible enough to provide a reasonable response to most interpretative problems.  The Convention avoids taking a stand on any of the great doctrinal debates on interpretation.  The articles adopt both an "ordinary meaning" and a "purposive" approach; they look for party consent as well what is in accordance with good faith.  It is in fact hard to think of any approach to interpretation that would be excluded from articles 31-32.[585]  Yet the Convention does not purport to be an exhaustive statement of interpretive techniques - there is no mention, for example, of *lex specialis* or *lex posterio*r.

---

[584]  See the summary of state practice, jurisprudence and doctrinal writings in Mark E. Villiger Customary International Law … supra note 76, pp. 334-343.  Of more recent practice, see *Territorial Dispute case (Libyan Arab Jamahiriya/Chad) I.C.J. Reports 1994* p. 6; *Kasikili/Sedudu Island case (Botswana/Namibia) I.C.J. Reports 1999* p. 1059; *LaGrand case (Germany v. United States of America) I.C.J. Reports 2001* p. 501, para. 99.  See also *Golder v. the United Kingdom,* Judgment of 21 February 1975, ECHR Series A (1975) No. 18, p. 14, para. 2+ 9; *Restrictions to the Death Penalty Cases*, Judgment of 8 September 1983, Advisory opinion, Int-Am CHR, OC-3/83, ILR, vol. 70 p. 449 and e.g. *United States - Standards for Reformulated and Conventional Gasoline* (29 April 1996) WT/DS2/AB/R, DSR 1996:I, p. 16.

[585]  That the interpretative techniques cannot be firmly prioritized is discussed in Martti Koskenniemi, *From Apology to Utopia* supra note 78, pp. 333-345.

428.    In State practice, and the practice of international tribunals, particular approaches to interpretation have of course developed.  Thus it has become a practice of human rights bodies to adopt readings of human rights conventions that look for their *effet utile* to an extent perhaps wider than regular treaties.  Certain treaties establishing international institutions have become interpreted in "constitutional" terms.  The recent experience in the WTO, where the Appellate Body has been insisting that panels take the Convention's rules seriously, shows just how exacting a proper application of the principles may be.[586]  Although the Convention does not require the interpreter to apply its process in the order listed in articles 31-32, in fact that order is intuitively likely to represent an effective sequence in which to approach the task.  But there is no reason to separate these techniques too sharply from each others.  As will be seen below, sometimes external sources mat usefully clarify the ordinary meaning of treaty words, or their object and purpose.

**(b)    The ILC debates**

429.    The text of what now is article 31 (3) (c) VCLT arose in the ILC from drafts dealing with the interpretation of treaties.  Draft article 70 (1) (b) proposed by Waldock to the Commission in 1964 suggested that:

> the terms of the treaty shall be interpreted in good faith in accordance with the natural and ordinary meaning to be given to each term - … [and]
>
>      (b)    in the context of the rules of international law in force at the time of the conclusion of the treaty.[587]

430.    The provision had two parts.  One was the expression of the principle of systemic integration - namely that treaties should be interpreted "in the context of the rules of international law".  Throughout the ensuing discussion, this principle was taken for granted.  Nobody challenged the idea that treaties were to be read in the context of their normative environment.

---

[586]  See the cases discussed below, and, more generally, James Cameron & Kevin R. Gray, "Principles of International law in the WTO Dispute Settlement Body", supra note 171, p. 248.

[587]  Waldock, Third Report, *Yearbook … 1964* vol. II, p. 55, para. 10.

Some members did suggest that the reference therein might be to "principles" rather than "rules" or speculated about the addition of the word "general" ("general rules" or "general principles").[588]  In the end, however, none of these suggestions found their way into the text.

431.    All the discussion and controversy in the Commission was addressed to the second part of the provision - namely the suggestion that the normative environment should be constructed on the basis of the law in force at the moment of the conclusion of the treaty.  This was the problem of inter-temporal law.  In this regard, the provision was a synthesis between a resolution of the *Institut de Droit International* which called for interpretation "in the light of the principles of international law",[589] and a formulation by Fitzmaurice which emphasized the principle of contemporaneity.[590]  In Waldock's original proposal, an additional rule (draft article 56, ultimately omitted from the convention) dealt specifically with inter-temporal law as follows:[591]

(1)      A treaty is to be interpreted in the light of the law in force at the time when the treaty was drawn up.

(2)      Subject to paragraph 1, the application of a treaty shall be governed by the rules of international law in force when the treaty is applied.

432.    Although the proposal to incorporate a provision on inter-temporal law did not find favour with the Commission in 1964, the issue continued to provoke controversy in the context of the provision of treaty interpretation.  As a result, the ILC Commentary confines its discussion on the meaning and application of what is now article 31 (3) (c) to an account of the discussion

---

[588]  See especially Mr. Tunkin, ILC 756th meeting (14 July 1964), *Yearbook ... 1964* vol. I, p. 278, para. 49.

[589]  *Annuaire ...* 1956 pp. 364-5.  Inclusion of this reference in the resolution of the Institut had had a controversial history.  It did not appear in Lauterpacht's original scheme in 1950 (*Annuaire* 1950-I, p. 433).  A reference to the interpretive role of general principles of customary international law was subsequently added by him in 1952 (*Annuaire...* 1952-I, p. 223).  It faced considerable opposition on grounds of uncertainty, and inconsistency with the Institut's codification role (*Annuaire ...* 1952-II, pp. 384-6, remarks of Guggenheim and Rolin *Annuaire...* 1954-I, p. 228).  When Fitzmaurice was appointed to replace Lauterpacht as rapporteur, there was no reference of this kind in his draft (*Annuaire...* 1956, pp. 337-8).  It was only added in the course of the debate, following an intervention of Basedevant (*Annuaire ...* 1958, p. 344).

[590]  Sir Gerald Fitzmaurice, *The Law and Procedure of the International Court of Justice*, vol. 1 (Grotius Publications Limited:  Cambridge, 1986) p. 369.

[591]  Waldock, Third report, *Yearbook ... 1964* vol. II pp. 8-9.

A/CN.4/L.682
page 218

on inter-temporality.[592]  Nevertheless, it is useful to note here what is presumed in this discussion as well as in the whole doctrine of inter-temporality.  This is the view that the interpretation and application of a treaty takes always place by reference to other rules of international law and the only question is should those "other rules" be conceived in terms of the normative situation at the conclusion of the treaty or at the moment of its application.[593]  As some Commission members observed, this followed from the very objective of tracing party intent - for that intent was certainly influenced by the rules in force at the time when the treaty was negotiated and adopted but developed in the course of the treaty's life-span.[594]

### 3.  Case law

433.    Until recently, there have been few references to article 31 (3) (c) in judicial or State practice.

#### (a)  Iran-US Claims Tribunal

434.    The Tribunal has always found customary international law applicable.  In an early case, it expressly confirmed that:  "… the rules of customary law may be useful in order to fill in possible lacunae of the Treaty, to ascertain the meaning of undefined terms in its text or, more generally, to aid interpretation and implementation of its provisions".[595]  The issue which prompted a specific reference to article 31 (3) (c) was the determination of the nationality requirements imposed by the Algiers Accords in order to determine who might bring a claim before the Tribunal.  Thus, in *Esphahanian* v. *Bank Tejarat* the question arose whether a

---

[592] Articles on the Law of Treaties with commentaries adopted by the International Law Commission, *United Nations Conference on the Law of Treaties, Official records, Documents of the Conference,* First and second sessions, Vienna, 26 March-24 May 1968 and 9 April-22 May 1969 (United Nations: New York, 1971) pp. 42-3.

[593] See Waldock, Third report, *Yearbook ... 1964* vol. II, p. 8-10 and the debate within the ILC in *Yearbook ... 1964* vol. I, pp. 33-40.

[594] See e.g. Mr. Paredes, ILC 728th meeting (21 May 1964), *Yearbook ... 1964* vol. I, p. 34, para. 12.

[595] *Amoco International Finance Corporation v. Iran,* Iran-US C.T.R., vol. 15, 1987-II, p. 222, para. 112.

claimant who had dual Iran/US nationality might bring a claim before the Tribunal.[596]  The Tribunal expressly deployed article 31 (3) (c) of the Vienna Convention in order to justify reference to a wide range of materials on the law of diplomatic protection in international law.[597] These materials supported the Tribunal's conclusion that the applicable rule of international law was that of dominant and effective nationality.[598]

### (b)    European Court of Human Rights

435.    As pointed out in section C above, the ECHR has routinely applied general international law.  It has made specific reference to article 31 (3) (c), however, in construing the scope of the right to a fair trial protected by article 6 of the European Convention on Human Rights.  In *Golder v. United Kingdom* the Court referred to article 31 (3) (c) where it had to determine whether article 6 guaranteed a right of access to the courts for every person wishing to commence an action in order to have his civil rights and obligations determined.[599]  Through that route, the Court referred in turn to article 38 (1) (c) of the Statute of the International Court of Justice as recognizing that the rules of international law included "general principles of law recognized by civilized nations".[600]  It found that a right of access to the civil courts was such a general principle of law, and that this could be relied upon in interpreting the meaning of article 6.

436.    In *Loizidou* v. *Turkey*, the Court had to decide whether to recognize as valid certain acts of the Turkish Republic of Northern Cyprus ("TRNC").[601]  It invoked article 31 (3) (c) as a basis

---

[596]  *Esphahanian v. Bank Tejarat*, Iran-US C.T.R., vol. 2, 1983-I, p. 157.

[597]  Ibid., p. 161.

[598]  See also, to like effect, Case No. A/18, Iran-US C.T.R., vol. 5 1984-I, p. 260.  The provision was also relied upon on a dissent in *Grimm v. Iran*, Iran-US C.T.R., vol. 2 1983-I, Dissenting opinion of Howard M. Holtzmann, p. 82 on the question of whether a failure by Iran to protect an individual could constitute a measure "affecting property rights" of his wife.

[599]  *Golder v. the United Kingdom*, Judgment 21 February 1975, ECHR Series A (1975) No. 18, p. 13-14, paras. 27-31.

[600]  Ibid., p. 17-18, para. 35.

[601]  *Loizidou v. Turkey* (*Merits*) Judgment of 18 December 1996, ECHR 1996-VI, p. 2231, para. 44.

A/CN.4/L.682
page 220

for reference to United Nations Security Council resolutions and evidence of State practice
supporting the proposition that the TRNC was not regarded as a state under international law.[602]
The Republic of Cyprus remained the sole legitimate Government in Cyprus and acts of the
TRNC were not to be treated as valid.

437.    In a trio of landmark decisions in 2001, the ECHR utilized article 31 (3) (c) in order to
decide whether the rules of State immunity might conflict with the right of access to court under
article 6 (1) of the European Convention.[603]    In each case, the Court decided by majority to give
effect to State immunity.    The right of access to the courts was not absolute.    It could be subject
to restrictions, provided that they were proportionate and pursued a legitimate aim.    In making
that assessment, the Court reasoned as follows:

> … the Convention has to be interpreted in the light of the rules set out in the
> Vienna Convention … and … Article 31 (3) (c) … indicates that account is to be
> taken of "any relevant rules of international law applicable in the relations between
> the parties".  The Convention, including Article 6, cannot be interpreted in a vacuum.
> The Court must be mindful of the Convention's special character as a human rights
> treaty, and it must also take the relevant rules of international law into account …
> The Convention should so far as possible be interpreted in harmony with other rules of
> international law of which it forms part, including to those relating to the grant of State
> immunity.
>
> It follows that measures taken by a High Contracting Party which reflect generally
> recognized rules of public international law on State immunity cannot in principle be
> regarded as imposing a disproportionate restriction on the right of access to court as
> embodied in Article 6 (1).[604]

---

[602] Ibid., p. 2231, para. 44.

[603] *Al-Adsani v. the United Kingdom,* Judgment of 21 November 2001, ECHR 2001-XI, p. 79; *Fogarty v. the United Kingdom,* Judgment of 21 November 2001, ECHR 2001-XI, p. 157; and *McElhinney v. Ireland,* Judgment of 21 November 2001, ECHR 2001-XI, p. 37.  The ECHR also referred to article 31 (3) (c) in *Banković v. Belgium and others*, Decision of 12 December 2001, Admissibility, ECHR 2001-XII, p. 351, para. 57.  For a critique of the Court's approach see Alexander Orakhelashvili, "Restrictive Interpretation of Human Rights Treaties in the Recent Jurisprudence of the European Court of Human Rights", EJIL vol. 14 (2003) No. 3, p. 529.

[604] *Al-Adsani v. the United Kingdom,* Judgment of 21 November 2001, ECHR 2001-XI, p. 100, paras. 55-6; see also *Fogarty v. the United Kingdom,* Judgment of 21 November 2001, ECHR 2001-XI, paras. 35-6; *McElhinney v. Ireland,* Judgment of 21 November 2001, ECHR 2001-XI, paras. 36-7.

438.    It is useful to note that here the Court might have simply brushed aside State immunity as not relevant to the application of the Convention.  But it did not do so.  The conflict between article 6 and rules of customary international law on State immunity emerged only because the Court decided to integrate article 6 in its normative environment (doubtless because that is what was claimed by the respondent).  The right provided under the European Convention was weighed against the general interest in the maintenance of the system of State immunity.  In the end, the Court used article 31 (3) (c) so as to set aside, in this case, the rules of the Convention.[605]

**(c)     Mox Plant/OSPAR Arbitration**

439.    As noted in section B above, this was part of the series of cases brought by Ireland against the United Kingdom concerning the operation of the nuclear reprocessing plant at Sellafield.[606]  The award was rendered under the 1992 Convention for the Protection of the Marine Environment of the North East Atlantic ("OSPAR Convention"), in proceedings dealing with access to information concerning the operation of the Mox Plant.  Ireland contended that a reference to other rules of international law would affect the construction of the parties' obligations under the OSPAR Convention in two ways.

440.    First, Ireland submitted that the provision in article 9 (3) (d) of the OSPAR Convention which referred to "applicable international regulations" entailed a reference to international law

---

[605]  The decision did not go unchallenged.  The dissenting judges did not claim that State immunity was irrelevant or should be excluded from consideration in what was a "pure article 6 matter".  Rather, they found that State immunity should, as a matter of international law, cede precedence to what they saw as a peremptory rule of international law (*jus cogens*) prohibiting torture.  *Al-Adsani v. the United Kingdom,* Judgment of 21 November 2001, ECHR 2001-XI, pp. 111-113, Joint dissenting opinion of Judges Rozakis and Caflisch, joined by Judges Wildhaber, Costa, Cabral Barreto and Vajić.  Other dissenters wished to admit of an exception for torts committed on the territory of the state.  *McElhinney v. Ireland,* Judgment of 21 November 2001, ECHR 2001-XI, p. 51-54, Joint dissenting opinion of Judges Caflisch, Cabral Barreto and Vajić.

[606]  Dispute Concerning Access to Information Under Article 9 of the OSPAR Convention, Final Award (*Ireland v. the United Kingdom*) (2 July 2003) Permanent Court of Arbitration, ILM vol. 42 (2003) p. 1118.  The other cases are:  *the MOX Plant case*, *Request for Provisional Measures Order (Ireland v. the United Kingdom)* (3 December 2001) International Tribunal for the Law of the Sea, ILM vol. 41 (2002) p. 405; the MOX Plant case, Order No. 3 (*Ireland v. the United Kingdom*) (24 June 2003) Permanent Court of Arbitration, ILM vol. 42 (2003) p. 1187.

A/CN.4/L.682
page 222

and practice.  This, Ireland alleged, included the 1992 Declaration of the United Nations
Conference on Environment and Development (Rio Declaration) and the 2001 Aarhus
Convention on Access to Information, Public Participation in Decision-Making, and Access to
Justice in Environmental Matters.[607]  The United Kingdom replied that the Rio Declaration was
not a treaty, and that the Aarhus Convention had not yet been ratified by either Ireland or the
United Kingdom.

441.    The Tribunal accepted that it was entitled to draw upon current international law and
practice in construing this treaty obligation and in so doing made an express reference to
article 31 (3) (c).  However, it held that neither of the instruments referred to by Ireland were in
fact "rules of law applicable between the parties".  They were only "evolving international law"
that, absent a specific authorization, a Tribunal could not apply.[608]  One of the arbitrators,
Gavan Griffith QC, dissented on this point.[609]  He pointed out that the Aarhus Convention was in
force, and that it had been signed by both Ireland and the United Kingdom.  The latter had
publicly stated its intention to ratify that Convention as soon as possible.  At the least, this
entitled the Tribunal to treat the Aarhus Convention as evidence of the common views of the two
parties on the definition of environmental information.

442.    Second, the United Kingdom had submitted that its only obligation under the OSPAR
Convention had been discharged by its application of European Community Directive 90/313
having to do with the same subject-matter.  The Tribunal did not, however, consider that

---

[607]  Rio Declaration on Environment and Development, *Report of the United Nations Conference on Environment and Development,* Rio de Janeiro, 3-14 June 1992 (United Nations publication, Sales No. E.93.I.8 and corrigenda), vol. I:  *Resolutions adopted by the Conference*, resolution 1, annex I.  Convention on Access to Information, Public Participation in Decision-Making and Access to Justice in Environmental Matters, United Nations, *Treaty series*, vol. 2161, p. 450.

[608]  Dispute Concerning Access to Information Under Article 9 of the OSPAR Convention, Final Award (*Ireland v. the United Kingdom*) (2 July 2003) Permanent Court of Arbitration, ILM vol. 42 (2003) pp. 1137-1138, paras. 99, 101-105.

[609]  Dispute Concerning Access to Information Under Article 9 of the OSPAR Convention, Final Award (Ireland *v.* the United Kingdom) (2 July 2003) Permanent Court of Arbitration, ILM vol. 42 (2003) pp. 1161-5.

following the European Community regulation would have constituted a bar for the procedure under OSPAR.  Both regimes could coexist, even if they were enforcing identical legal obligations.[610]  It observed:

> The primary purpose of employing the similar language is to create uniform and consistent legal standards in the field of the protection of the marine environment, and not to create precedence of one set of legal remedies over the other.[611]

**(d)    WTO**

443.    As explained in detail in section C above, several decisions of the Appellate Body of the WTO have considered the application of principles of customary and general international law in the interpretation of the WTO covered agreements.  In the *Shrimp-Turtle* case, for example, the Appellate Body made extensive reference to international environmental law texts.[612]  It found that the terms "natural resources" and "exhaustible" in paragraph (g) of article XX were "by definition evolutionary" and took account, therefore, of article 56 UNCLOS in support of the proposition that natural resources could include both living and non-living resources.[613]  The AB also referred in support of this construction to Agenda 21[614] and to the resolution on assistance of developing countries adopted in conjunction with the Convention on the Conservation of

---

[610]  The President of the Tribunal, Professor Michael Reisman, dissented on this issue:  *Dispute Concerning Access to Information Under Article 9 of the OSPAR Convention, Final Award* (*Ireland v. the United Kingdom*) (2 July 2003) Permanent Court of Arbitration, ILM vol. 42 (2003) pp. 1157-1160.

[611]  Dispute Concerning Access to Information Under Article 9 of the OSPAR Convention, Final Award (*Ireland v. the United Kingdom*) (2 July 2003) Permanent Court of Arbitration, ILM vol. 42 (2003) p. 1144, para. 143.

[612]  *United States - Import Prohibition of Certain Shrimp and Shrimp Products* (12 October 1998) WT/DS58/AB/R, DSR 1998:VII, p. 2793-2798, paras. 126-134.

[613]  Ibid., p. 2795-2796, para. 130 citing *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970), Advisory Opinion, I.C.J. Reports 1971* p. 31.  The Tribunal noted that although the Complainant States had ratified UNCLOS, the United States had not done so, but had accepted during the course of the hearing that the fisheries law provisions of UNCLOS for the most part reflected international customary law.

[614]  Adopted by the United Nations Conference on Environment and Development, 14 June 1992, *Report of the United Nations Conference on Environment and Development,* Rio de Janeiro, 3-14 June 1992 (United Nations publication, Sales No. E. 93.I.8 and Corrigenda).

A/CN.4/L.682
page 224

Migratory Species of Wild Animals.[615]  In so doing, it emphasized that the chapeau of article XX was "but one expression of the principle of good faith", which it found to be a general principle of international law.[616]  "Our task here", said the Tribunal expressly relying on article 31 (3) (c), "is to interpret the language of the chapeau, seeking interpretative guidance, as appropriate, from the general principles of international law".[617]  In deciding the question whether sea-turtles were "exhaustible", the Appellate Body referred to the fact that all of the seven recognized species of sea-turtles were listed in Appendix 1 of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES").

444.    The relations between the WTO covered treaties and multilateral environmental agreements (MEAs) and human rights instruments are now the subject of a growing scholarly literature.[618]  The Appellate Body has always accepted that the requirement in article 3 (2) DSU that panels apply "customary rules of interpretation of public international law" requires rigorous application of articles 31-32 VCLT to the issues before it.  It has not hesitated to reverse panel decisions on the ground that they have failed to do so.[619]  In carrying out its interpretative function it has made extensive reference to other rules of international law.  But it has never found that those other rules would have overridden anything under the covered agreements of the WTO - although they have influenced the interpretation and application of those agreements.

445.    For example, the WTO bodies have frequently taken account of regional trade agreements (RTAs) and bilateral trade agreements (BTAs).  In the *US-FSC (article 21.5-EC)*

---

[615]  Final Act of the Conference to Conclude a Convention on the Conservation of Migratory Species of Wild Animals, ILM vol. 19 (1980) p. 11 and the Convention on the Conservation of Migratory Species of Wild Animals, p. 15.

[616]  *United States - Import Prohibition of Certain Shrimp and Shrimp Prod*ucts (12 October 1998) WT/DS58/AB/R, DSR 1998:VII, p. 2807, para. 158.

[617]  Ibid., p. 2807, para. 158.

[618]  See e.g. Joost Pauwelyn, "The Role of Public International Law …", supra note 42, p. 535; Gabrielle Marceau, "WTO Dispute Settlement and Human Rights", supra note 42, Andreas F. Lowenfeld, *International Economic Law*, supra note 240, pp. 314-339; and Pauwelyn, *Conflict of Norms …* supra note 21.

[619]  *United States - Standards for Reformulated and Conventional Gasoline* (29 April 1996) WT/DS2/AB/R, DSR 1996:I, p. 15-17.

case (2002*)*, the AB referred to a wide range of RTAs and BTAs and found that they shared

what it chose to call a "widely accepted common element" in their definition of the term

"foreign-source income" that it then used in order to interpret that expression in the context

of the SCM agreement.[620]  In *EC-Poultry* (1998), the AB explained its recourse to the

1994 Oilseeds Agreement as a "supplementary means of interpretation [of the relevant WTO

commitment] pursuant to article 32 of the Vienna Convention, as it is part of the historical

background of the concessions of the European Communities …"[621]  In the *Korea-Beef* case

(2000), again a Panel made reference to various BTAs entered into by Korea "not with a view to

'enforcing' the content of those bilateral agreements but strictly for the purpose of interpreting

an ambiguous WTO provision".[622]  It may be argued that these agreements have been used only

as a "supplementary means of interpretation" and not by virtue of article 31 (3) (c).[623]  Such

recourse has often been rationalized as providing evidence of the intent of the parties or of the

"ordinary meaning" of the treaty words.

446.    Yet there is no reason not to search the legal basis for the "taking account" of such

extraneous agreements precisely from that article - and especially in case such "taking account"

reaches beyond a mere footnote reference.  This would appear to be reasonable for example in

cases such as the *Chile-Price Band* case (2002) where the Panel both interpreted and *applied* the

Agreement between Chile and Mercosur in a way that excluded its consideration in the present

case.  The Panel referred to the Preamble and article 24 of that instrument (the so-called ECA 35

Agreement), noting that it suggested that the Parties (Chile and Mercosur) had not intended to

exclude the possibility that different rules might be applicable in other international agreements -

i.e. the WTO agreements.  The Panel, in other words, applied a non-WTO treaty in order to

---

[620] *United States - Tax Treatment for "Foreign Sales Corporations" (Article 21.5 - EC)* (14 January 2002) WT/DS108/AB/RW, paras. 141-145 (especially footnote 123).

[621] *EC - Measures Affecting the Importation of Certain Poultry Products* (23 July 1998) WT/DS69/AB/R, DSR 1998:V, p. 2060, para. 83 and generally pp. 2057-2060, paras. 77-85.

[622] *Korea - Measures Affecting Imports of Fresh, Chilled and Frozen Beef* (10 January 2000) WT/DS161/R, WT/DS161/AB/R, DSR 2001:I, p. 59, para. 539.

[623] See Isabelle Van Damme, "What Role is there for Regional International Law in the Interpretation of the WTO Agreements?", supra note 421.

operate a *renvoi* - by interpreting it so as to allow a treatment in a WTO context that would not have been allowed under it (thus creating the presumption that had the ECA 35 Agreement not been interpreted in such a way, then the WTO standard would have been inapplicable).[624]

447.    One sometimes hears the claim that this might not even be permissible in view of the express prohibition in the DSU according to which the "[r]ecommendations and rulings of the DSB cannot add to or diminish the rights and obligations provided in the covered agreements" (DSU 3:2 *in fine*).  Such a view would, however, presume that the covered agreements are "clinically isolated" precisely in the way the AB has denied.  Two considerations are relevant here.  First, when article 31 (3) (c) VCLT is used, it is used with the specific authorization of the DSU itself.  But second, and more important, interpretation does not "add" anything to the instrument that is being interpreted.  It constructs the meaning of the instrument by a legal technique (a technique specifically approved by the DSU) that involves taking account of its normative environment.  Here it appears immaterial whether recourse to other agreements is had under article 31 (3) (c), as supplementary means of interpretation, as evidence of party intent or of ordinary meaning or good faith (the presumption that States do not enter agreements with the view of breaching obligations).  The rationale remains that of seeing States when they are acting within the WTO system as identical with themselves as they act in other institutional and normative contexts.  Interpretation *does not add or diminish rights or obligations* that would exist in some lawyers' heaven where they could be ascertained "automatically" and independently of interpretation.  All instruments receive meaning through interpretation - even the conclusion that a meaning is "ordinary" is an effect of interpretation that cannot have *a priori* precedence over other interpretations.

448.    Finally, significant, though limited use of article 31 (3) (c) was made by a WTO Panel in the recent *EC - Biotechnical Products* case (2006).  Here the European Community had argued that its ban on the importation of genetically modified organisms (GMOs) could be justified, inter alia, by certain non-WTO rules.  It had argued, in particular, that account should be taken of the 1992 Convention on Biological Diversity and the related Biosafety Protocol of 2000.  Having

---

[624] *Chile - Price Band System and Safeguard Measures Relating to Certain Agricultural Products* (3 May 2002) WT/DS207/R, paras. 7.81-7.86.  Likewise in *EC-Regime for the Importation, Sale and Distribution of Bananas* (25 September 1997) WT/DS27/AB/R, DSR 1997:II, p. 661, para. 167.

first determined that the two instruments indeed established "rules of international law", the Panel then considered whether they were also "applicable in the relations between the parties". It found that the expression "party" there to mean "a State which has consented to be bound by the treaty and for which the treaty is in force".[625]  It dismissed the view that the reference to "parties" in article 31 (3) (c) would have meant (merely) parties to the dispute.  All the parties to the treaty to be interpreted needed to have become parties to that other treaty.  The Panel, in other words, read the WTO treaty in a *non-bilateral* way so as to "ensure[ ] or enhance[ ] the consistency of the rules of international law applicable to these States and contribute[ ] to avoiding conflicts between the relevant rules".[626]  Because the United States had not become a party to either one of these treaties (although it had signed the Biodiversity Convention), they could not be "taken into account".

449.    The Panel also considered the argument by the EC that the precautionary principle might, since 1998 when the argument had been made in the *EC-Hormones* case, have been established as a general principle of international law (the Panel's language here is slightly unclear, however, occasional reference being made to "general principles of law").  The Panel approved that would this be the case, it would then become relevant under article 31 (3) (c).  It found, however, though in a somewhat obscure way, both that the "legal status of the precautionary principle remains unsettled" and it "need not take a position on whether or not the precautionary principle is a recognized principle of general or customary international law".[627]

450.    Two aspects of this case are important.  First, the Panel accepted that article 31 (3) (c) applied to general international law and other treaties.  Second, it interpreted article 31 (3) (c) so that the treaty to be taken account of must be one to which all parties to the relevant WTO treaty are parties.  This latter contention makes it practically impossible ever to find a multilateral context where reference to other multilateral treaties as aids to interpretation under article 31 (3) (c) would be allowed.  The panel buys what it calls the "consistency" of its

---

[625] *EC - Measures Affecting the Approval and Marketing of Biotech Products* (7 February 2006) WT/DS291-293/INTERIM, p. 299 para. 7.68.

[626] Ibid., p. 300, para. 7.70.

[627] Ibid., p. 307, para. 7.89.

A/CN.4/L.682
page 228

interpretation of the WTO Treaty at the cost of the consistency of the multilateral treaty system as a whole. It aims to mitigate this consequence by accepting that other treaties may nevertheless be taken into account as facts elucidating the ordinary meaning of certain terms in the relevant WTO treaty. This is of course always possible and, as pointed out above, has been done in the past as well. However, taking "other treaties" into account as evidence of "ordinary meaning" appears a rather contrived way of preventing the "clinical isolation" as emphasized by the Appellate Body.

**(e)    International Court of Justice**

451.    Very significant use of article (31) (3) (c) was made by the International Court of Justice in the *Oil Platforms* case (*Iran v. United States of America*).[628] Here the Court was called upon to interpret two provisions of the 1955 Treaty of Amity, Economic Relations and Consular Rights between Iran and the United States. It was requested to determine whether actions by Iran which were alleged to imperil neutral commercial shipping in the Iran/Iraq war, and the subsequent destruction by the United States Navy of three Iranian oil platforms in the Persian Gulf, were breaches of the Treaty. The Court's jurisdiction was limited to disputes arising as to the interpretation or application of the Treaty. It had no other basis for jurisdiction which might have provided an independent ground for the application of customary international law.[629] One of the operative provisions of the Treaty provided that:

> The present Treaty shall not preclude the application of measures:
>
> … (d) necessary to fulfil the obligations of a High Contracting Party for the maintenance or restoration of international peace and security, or necessary to protect its essential security interests.[630]

---

[628] *Oil Platforms* case *(Iran v. United States of America) (Merits) I.C.J. Reports 2003*, p. 161, para. 41.

[629] Cf. the position in *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America) I.C.J. Reports 1986* p. 14, in which the Court was asked to interpret very similar treaty language, but also had an additional basis for its jurisdiction as a result of unilateral declarations made by both parties under Article 36, para. 2 of its Statute.

[630] Article XX, para. 1 (d) of the Treaty of Amity, Economic Relations and Consular Rights between the United States and Iran, *Oil Platforms* case *(Iran v. United States of America)* (*Merits*) *I.C.J. Reports 2003*, para. 32.

452.    According to the United States this provision was intended simply to exclude from the scope of the treaty all such measures.  It should be interpreted in accordance with its ordinary meaning, leaving a wide margin of appreciation for each State to determine its essential security interests.[631]  It submitted that there was no place to read into the treaty rules derived from the customary international law on the use of force (as Iran had argued), and that to do so would violate the limits on the Court's jurisdiction.

453.    The Court approached the question of interpretation rather differently.  It asked first whether such necessary measures could include a use of armed force, and, if so, whether the conditions under which such force could be used under international law (including any conditions of legitimate self-defence) applied.[632]  Having referred to other aids to interpretation, the Court then reasoned:

> Moreover, under the general rules of treaty interpretation, as reflected in the 1969 Vienna Convention on the Law of Treaties, interpretation must take into account 'any relevant rules of international law applicable in the relations between the parties' (Article 31, paragraph 3(c)).  The Court cannot accept that Article XX, paragraph 1(d), of the 1955 Treaty was intended to operate wholly independently of the relevant rules of international law on the use of force, so as to be capable of being successfully invoked, even in the limited context of a claim for breach of the Treaty, in relation to an unlawful use of force.  The application of the relevant rules of international law relating to this question thus forms an integral part of the task of interpretation entrusted to the Court by … the 1955 Treaty.[633]

454.    The Court then proceeded to apply those general rules of international law to the conduct of the United States.  It concluded that the measures could not be justified as necessary under the Treaty "since those actions constituted recourse to armed force not qualifying,

---

[631]  *Oil Platforms* case (*Iran v. United States of America*) International Court of Justice, Rejoinder of the United States, 23 March 2001, Part IV, pp. 139-140, http://www.icj-cij.org/icjwww/idocket/iop/ioppleadings/ iop_ipleadings_20010323_rejoinder_us_04.pdf (last visited 23 March 2006).

[632]  *Oil Platforms* case (*Iran v. United States of America*) (*Merits*) International Court of Justice, *I.C.J. Reports 2003*, para. 40.

[633]  Ibid., para. 41.

under international law on the question, as acts of self-defence, and thus did not fall within the category of measures contemplated, upon its correct interpretation, by that provision of the Treaty".[634]

455.    The Court's judgment on the merits was supported by a large majority of the judges. Different views on the question of the proper approach to interpretation were, however, expressed in the separate opinions.[635]  The narrowest view on article 31 (3) (c) was taken by Judge Buergenthal according to whom the Court's jurisdiction was limited to only those matters which the parties had agreed to entrust to it, and opined that this also limited the extent to which the Court could refer to other sources of law in interpreting the treaty before it.  In his view, this limitation excluded reliance on other rules of international law, whether customary or conventional, and even if found in the United Nations Charter.[636]  This would in practice nullify the meaning of article 31 (3) (c) and go against a wide international judicial and arbitral practice. Moreover, it would suggest arbitrarily that a treaty's meaning to its parties is independent of the normative environment in which the parties have agreed to conclude it.

456.    The opposite position was taken by Judge Simma who considered that the Court might have taken the opportunity to declare the customary international law on the use of force, and the importance of the Charter even more firmly than it had.[637]  Following a position earlier taken by Lauterpacht and others, he advocated a wide use of general international law and other treaty rules applicable to the parties, and held that this could be justified under article 31 (3) (c).[638] Judge Higgins was much more critical of the Court's use of article 31 (3) (c).[639]  She pointed to

---

[634]  Ibid., para. 78.

[635]  The Court entered judgment by 14 votes to 2 declining to uphold Iran's claim (Judges Al-Khasawneh and Elaraby dissenting) and by 15 votes to 1 declining to uphold the United States' counterclaim (Judge Simma dissenting).

[636]  *Oil Platforms* case (*Iran v. United States of America*) (*Merits) I.C.J. Reports 2003* (separate opinion of Judge Buergenthal), paras. 22-3.

[637]  Ibid. (separate opinion of Judge Simma) International Court of Justice, paras. 5-16.

[638]  Ibid., para. 9.

[639]  Ibid. (separate opinion of Judge Higgins), paras. 40-54.

the need to interpret article XX para. 1 (d) in accordance with the ordinary meaning of its terms and in its context, as part of an economic treaty.  She considered that the provision was not one that "on the face of it envisages incorporating the entire substance of international law on a topic not mentioned in the clause - at least not without more explanation than the Court provides".[640]

457.    The position of Judge Kooijmans was situated somewhere in the middle.  He suggested that the Court should have begun with an analysis of the text of the 1955 Treaty itself.  But in order to determine whether a particular measure involving the use of force was "necessary" under that Treaty, the Court had "no choice but to rely for this purpose on the body of general international law".[641]  Even as the Court had no jurisdiction under the Charter, recourse to the concept of self-defence under "general international law" could not be avoided in order to give a meaning to the treaty over which it did have jurisdiction.[642]  This is, in fact, to say no more than what has been affirmed throughout this Report:  general international law provides the background for all application of special law.  At the same time, a wide number of rules about statehood, maritime passage, representation and responsibility underlay the *Oil Platforms* case and was unproblematically presumed as applicable by all parties.

458.    The *Oil Platforms* case represents a bold application by the ICJ of article 31 (3) (c) in order to move from a technical treaty provision to what it saw as the real heart of the matter - the use of force.[643]  The Court imports into its treaty analysis a substantial body of general international law, including the United Nations Charter.  The conduct of the State in question was then assessed by reference to the position under general international law, which in turn was applied to assess its position under the Treaty.  The Court for the first time acknowledged the pivotal role of article 31 (3) (c) in this process, but did not give further guidance as to when and how it should be applied.

---

[640]  Ibid., para. 46.

[641]  Ibid. (separate opinion of Judge Kooijmans) p. 1401, para. 48.

[642]  Ibid., para. 52.

[643]  As highlighted in Emmanuel Jouannet, "Le juge international face aux problèmes d' incoherence et d'instabilité du droit international .… ", supra note 126.  The case has inspired varied reactions.  For those who celebrate the Court's bold view of Article 31 (3) (c), see Pierre-Marie Dupuy, *Droit international public* (Paris:  Dalloz, 2004) 7th edn pp. 314-315.

A/CN.4/L.682
page 232

459.    Recourse by the Court to article 31 (3) (c) VCLT inasmuch as it was to *general international law* may in fact have been unnecessary.  The Treaty provision at issue contained the open-ended clause "necessary" that required interpretation.  Absent the possibility of using a documented party intent to elucidate it, the Court could simply have turned to what "general international law" said on the content of that standard.  The rationale for this was stated by the ICJ in the *North Sea Continental Shelf* cases (1969).  General customary law

> by its very nature must have equal validity for all members of the international community, and cannot therefore be the subject of any right of unilateral exclusion.[644]

460.    To assume that a tribunal may not be entitled to apply general international law in the interpretation of a treaty is to hold that once States conclude a bilateral treaty, they create a vacuum that consists precisely of this type of exclusion.  As we have seen in section C above, no support may be found from international practice for such a contention.  On the contrary, an enormous amount of materials support the applicability of general international law in order to interpret any particular legal relationship, whether also addressed by a bilateral treaty, a local custom, or a series of informal exchanges amounting  to binding rules through acquiescence or estoppel.

### 4. Special questions

461.    Three special questions relate to the application of article 31 (3) (c).  One concerns the extent of the reference therein.  What are the "rules of international law applicable in the relations between the parties" to which the provision refers?  The second problem concerns the normative weight of the reference.  What does it mean that those rules "shall be taken into account, together with the context"?  The third is the question of inter-temporality:  what is the critical date for the rules to be taken into account -  the date of the conclusion of the treaty or the law in force at the moment of its application?

---

[644] *North Sea Continental Shelf cases (Federal Republic of Germany/Denmark; Federal Republic of Germany/Netherlands) I.C.J. Reports 1969* pp. 38-39, para. 63.

**(a)    The rules to be "taken into account"**

462.    That international tribunals have, until recently, rarely made any specific use of article 31 (3) (c) is not to say that they would not have referred to law external to the treaty to be applied.  By their very nature, customary law and general principles of law (and general principles of *international* law) exist as *lex generalis* in relation to any particular agreements. They are fully applicable and often applied alongside particular treaties.  Reference to article 31 (3) (c) has normally concerned the possibility and extent of recourse to rules that exist at the same level of generality and binding force as the treaty to be interpreted (usually other treaties) but where they might seem to conflict with it or put forward considerations that otherwise seem unorthodox in the context.

### (i)    Customary law and general principles

463.    As explained in section C above, although there is no official hierarchy between the sources of international law, there is, nonetheless, an informal hierarchy that results from the procedure through which lawyers approach applicable law, proceeding from the *lex specialis* to the *lege generali*, or from the more specific to the more general - that is to say usually from the treaty text to customary law and general principles of law.  Max Huber once put this illuminatingly in terms of a progression of legal reasoning through concentric circles, each one constituting a field of reference of potential assistance in treaty interpretation:

> Il faut donc chercher la volonté des parties dans le texte conventionnel, d'abord dans les clauses relatives à la contestation, ensuite dans l'ensemble de la convention, ensuite dans le droit international général, et enfin dans les principes généraux de droit reconnus par les nations civilisées.  C'est par cet encirclement concentrique que le juge arrivera dans beaucoup de cas à établir la volonté présumptive des parties 'conformément aux exigencies fondamentales de la plenitude du droit et de la justice internationale'.  Ainsi que le rapporteur formule admirablement la tâche du juge.[645]

464.    Article 31 (3) (c) is only part of the larger interpretation process, in which the interpreter must first consider the plain meaning of the words in a treaty, if any, proceeding therefrom to the context and to considerations relating to object and purpose, subsequent practice and, eventually,

---

[645]  *Annuaire* … 1952-I, pp. 200-1.

*travaux preparatoires*.  This is not meant as an actual description of a psychological process.  The practice of interpretation cannot be captured in such neatly rational terms.[646]  As Waldock himself noted, in a characteristically careful fashion:  "interpretation of documents is to some extent an art, and not an exact science".[647]  But it is an apt account of competent public reasoning by lawyers and tribunals.  In the *Oil Platforms* case, for example, the Court started with an analysis of the text of article XX (1) (d) of the 1955 Treaty of Amity and proceeded from there to the intention of the parties that, again, pointed to the need to consider the state of the general law on the use of force.  The starting-point is the treaty itself, with interpretation proceeding from the more concrete and obvious (dictionary, context), to the less tangible and less obvious (object and purpose, analogous treaties etc.) in order to give the text a justifiable meaning.

465.    To examine the interpretative process not as a psychological (thought-) process but as an exercise in competent legal argument inevitably portrays it as an effort at "systemic integration" - namely integration in the system of principles and presumptions that underlie the idea of an inter-State legal order and provide its argumentative materials.  Among them, mention should be made of two presumptions, one positive, the other negative:

    (a)    According to the *positive presumption,* parties are taken "to refer to general principles of international law for all questions which [the treaty] does not itself resolve in express terms or in a different way";[648]

    (b)    According to the *negative presumption*, in entering into treaty obligations, the parties intend not to act inconsistently with generally recognized principles of international law or with previous treaty obligations towards third States.[649]

---

[646]  One of the best analyses of the interpretative process in an international law context remains Max Sorensen, *Les sources du droit international.  Etude sur la jurisprudence de la Cour permanente de justice internationale* (Copenhagen:  Munksgaard, 1946) especially pp. 210-236.

[647]  Waldock, Third Report, *Yearbook ... 1964* vol. II, p. 54, para 6.

[648]  *Georges Pinson* case (France/United Mexican States) Award of 13 April 1928, UNRIAA, vol. V, p. 422.

[649]  *Case concerning the Right of Passage over Indian Territory (Portugal v. India) (Preliminary Objections) I.C.J. Reports 1957* p. 142; Sir Robert Jennings and Sir Arthur Watts (eds.), Oppenheim's … supra note 37, p. 1275.

466.    In accordance with these presumptions, an especially significant role for customary international law and general principles of law opens.  As a WTO Panel recently put it:

> … the relationship of the WTO Agreements to customary international law is broader than [the reference in article 3.2 [re:  customary rules of interpretation].  Customary international law applies generally to the economic relations between WTO Members.  Such international law applies to the extent that the WTO treaty agreements do not 'contract out' from it.  To put it another way, to the extent that there is no conflict or inconsistency, or an expression in a covered WTO agreement that implies differently, we are of the view that the customary rules of international law apply to the WTO treaties and to the process of treaty formation under the WTO.[650]

467.    Most of the cases considered above have involved the assertion and application of principles of customary international law.  This has been typically done where the treaty rule is unclear or open-textured and its meaning is determined by reference to a developed body of international law (as in the issue of double nationality dealt with by the Iran-US Claims Tribunal in *Esphahanian* v. *Bank Tejarat* or in the construction of article XX of the GATT discussed in the connection with *Shrimp-Turtle*), or the terms used in the treaty have a recognized meaning in customary international law, to which the parties can therefore be taken to have intended to refer.  This was found to be the case, for example, in the construction of the terms "fair and equitable treatment" and  "full protection and security," interpreted by the NAFTA Free Trade Commission in *Pope & Talbot Inc v. Canada*.[651]

468.    Here it is really immaterial whether or not a tribunal expressly chooses to invoke article 31 (3) (c).  These general rules and principles are applicable as a function of their mere "generality" and their validity is based on nothing grander than their having passed what Thomas Franck calls the "but of course test" - a more or less unstable "common sense

---

[650]  *Korea - Measures Affecting Government Procurement* (1 May 2000) WT/DS163/R, p. 183, para. 7.96.

[651]  *Pope & Talbot Inc v. Canada* (31 May 2002) NAFTA Arbitral Tribunal, ILM vol. 41 (2002) p. 1347, citing the Interpretation of the NAFTA Free Trade Commission.

A/CN.4/L.682
page 236

of the international community (Governments, judges, scholars)".[652]  No special reference
was needed by the Permanent Court of International Justice, for example, when in the
*Chorzów Factory* case, it made the point that:

> … it is a principle of international law, and even a general principle of law that any
> breach of an engagement involves an obligation to make reparation.[653]

469.    The same concerns many principles identified by the ICJ, such as freedom of maritime
communication,[654] "good faith",[655] "estoppel",[656] *ex injuria non jus oritur*,[657] and so on.
Further examples include the criteria of statehood (*Loizidou*); the law of State responsibility
(which has influenced both the reach of human rights obligations[658] and the law of economic
counter-measures in the WTO); the law of State immunity; the use of force; and the principle
of good faith.[659]  The general principles of law recognized by civilized nations perform a
rather similar task in locating the treaty provision within a principled framework (as was done
in determining the scope of the fair trial right in *Golder*).  Pauwelyn lists among procedural
principles regularly used by the Appellate Body of the WTO those of "burden of proof,
standing, due process, good faith, representation before panels, the retroactive force of
treaties or error in treaty formation".[660]  These are not "enacted" by positive acts of States

---

[652] Thomas M. Franck, "Non-Treaty Law-making:  When, What and How?" in Rüdiger Wolfrum & Volker Röben,
*Development of International Law in Treaty-making,* supra note 10, p. 423.

[653] *Case concerning the Factory at Chorzów (Merits) P.C.I.J. Series A*, No. 17 (1928) p. 29.

[654] *Corfu Channel* case *(the United Kingdom v. Albania) (Merits) I.C.J. Reports 1949* p. 22.

[655] *Nuclear Tests* case (*Australia v. France*) *I.C.J. Reports 1974* p. 268, para. 46.

[656] *Case concerning the Temple of Preah Vihear (Cambodia v. Thailand) (Merits) I.C.J. Reports 1962* pp. 31-32.

[657] *Legal Consequences for States of the Continued Presence of South Africa in Namibia notwithstanding
Security Council Resolution 276 (1970), Advisory Opinion, I.C.J. Reports 1971* p. 299.

[658] See e.g. *Loizidou v. Turkey* (Preliminary Objections) Judgment of 23 March 1995, ECHR Series A (1995)
No. 310, para. 57-64. See also the reliance on the public international law rules of jurisdiction in *Banković v.
Belgium and others*, Decision of 12 December 2001, Admissibility, ECHR 2001-XII, pp. 351-352, paras. 59-60.

[659] See Pauwelyn, Conflict of Norms … supra note 21, p. 271.

[660] Joost Pauwelyn, "The World Trade Organization" in Charo Huesa and Karel Wellens, *L'influence des
sources sur, …* supra note 14, pp. 225-226 and notes therein.

(although they may well be traceable back to State will) but parts of the general frame of international law or - what amounts to the same - aspects of the legal craft of justifying decisions to legal disputes.[661]

### (ii)    Other applicable conventional international law

470.    As pointed out above, article 31 (3) (c) goes beyond the truism that "general international law" is applied generally and foresees the eventuality that another rule of *conventional* international law is applicable in the relations between the parties.  The main problem is this: is it necessary that *all* the parties to the treaty being interpreted are also parties to the treaty relied upon as the other source of international law for interpretation purposes?

471.    The problem is particularly acute where the treaty under interpretation is a multilateral treaty of very general acceptation (such as the WTO covered agreements).  As we saw, the Panel in *EC-Biotech Products* concluded that only agreements to which *all* WTO members were parties could be taken into account under article 31 (3) (c) in the interpretation of WTO agreements.[662]  Bearing in mind the unlikeliness of a precise congruence in the membership of most important multilateral conventions, it would become unlikely that *any* use of conventional international law could be made in the interpretation of such conventions.  This would have the ironic effect that the more the membership of a multilateral treaty such as the WTO covered agreements expanded, the more those treaties would be cut off from the rest of international law.[663]  In practice, the result would be the isolation of multilateral agreements as "islands" permitting no references *inter se* in their application.  It would also prohibit any use of regional or other particular implementation agreements - including *inter se* agreements - that may have been concluded under a framework treaty, as interpretative aids to the latter.  This would seem

---

[661]  See further Martti Koskenniemi, "General Principles. Reflections on Constructivist Thinking in International Law", in Martti Koskenniemi (ed.), *Sources of International Law,* supra note 24, pp. 359-399.

[662]  *EC - Measures Affecting the Approval and Marketing of Biotech Products* (7 February 2006) WT/DS291-293/INTERIM, pp. 299-300, paras. 7.68-7.70.

[663]  Marceau, "WTO Dispute Settlement and Human Rights", supra note 42, p. 781.

A/CN.4/L.682
page 238

contrary to the legislative ethos behind most of multilateral treaty-making and, presumably, with the intent of most treaty-makers.  Now of course some of this might be mitigated by requiring a finding that, insofar as the treaty were not in force between all members to the treaty under interpretation, the rule contained in it was treated as customary international law.**664**  This approach would maintain the "generality" of at least some multilateral treaties.  But it would have an inappropriately restrictive effect in two situations:

(a)     It could preclude reference to treaties which have very wide acceptance in the international community (including by the disputing States) but which are nevertheless not universally ratified and which are not accepted in all respects as stating customary international law (such as UNCLOS);

(b)     It could also preclude reference to treaties which represent the most important elaboration of the content of international law on a specialist subject matter, on the basis that they have not been ratified by all the parties to the treaty under interpretation.

472.    A better solution is to permit reference to another treaty provided that the *parties in dispute* are also parties to that other treaty.  Although this creates the possibility of eventually divergent interpretations (depending on which States parties are also parties to the dispute), that would simply reflect the need to respect (inherently divergent) party will as elucidated by reference to those other treaties as well as the bilateralist character of most treaties underpinned by the practices regarding reservations, *inter se* modification and successive treaties, for example.**665**  The risk of divergence - a commonplace in treaty law - would be mitigated by making the distinction between "reciprocal" or "synallagmatic" treaties (in which case mere "divergence" in interpretation creates no problem) and "integral" or "interdependent" treaties

---

**664** See, e.g., the emphasis placed in *Shrimp-Turtle* on the fact that, although the United States had not ratified the UNCLOS, it had accepted during the course of argument that the relevant provisions for the most part reflected international customary law, *United States - Import Prohibition of Certain Shrimp and Shrimp Products* (12 October 1998) WT/DS58/AB/R, DSR 1998:VII,p. 2814, para. 171, note 174.

**665** It cannot be too much emphasized that this risk of "divergence" is no greater than on *any* interpretation of a multilateral treaty by reference to party will.

(or treaties concluded *erga omnes partes*) where the use of that other treaty in interpretation should not be allowed to threaten the coherence of the treaty to be interpreted.[666] This would also respond to the precise concern of the WTO Panel in *EC-Biotech Products* about consistency in treaty interpretation.[667]  In addition, it might also be useful to take into account the extent to which that other treaty relied upon can be said to have been "implicitly" accepted or at least tolerated by the other parties "in the sense that it can reasonably be considered to express the common intentions or understanding of all members as to the meaning of the … term concerned".[668]  This approach has in fact been adopted in some of the decisions of the WTO Appellate Body.[669]  It gives effect to the sense in which certain multilateral treaty notions or concepts, though perhaps not found in treaties with identical membership, are adopted nevertheless widely enough so as to give a good sense of a "common understanding" or a "state of the art" in a particular technical field without necessarily reflecting formal customary law.

**(b)      The weight of the obligations to be taken into account**

473.      The above considerations have also answered the question of the *weight* to be given to the law - the rights and obligations - that is to be taken account of under article 31 (3) (c).  The importance of those rights and obligations does not reside in their overriding character. As we have seen, this function is reserved by international law to *jus cogens*.  An approach which gave excessive weight to the normative environment over particular treaties would - like a generalized presumption about the precedence of *lex generalis* over *lex specialis* - stifle treaty-making:  the need to react to new circumstances and to give effect to interests or needs that for one reason or

---

[666] For a recent exploration of this idea in the context of the WTO Covered Agreements, see Pauwelyn, *Conflict of Norms ...* supra note 21, pp. 440-486 and Joost Pauwelyn, "A Typology of Multilateral Treaty Obligations:  Are WTO Obligations Bilateral or Collective in Nature?", EJIL vol. 14 (2003) p. 907.

[667] *EC - Measures Affecting the Approval and Marketing of Biotech Products* (7 February 2006) WT/DS291-293/INTERIM, p. 300, para. 7.70.

[668] Pauwelyn, *Conflict of Norms* … supra note 21, pp. 257-263 supports this approach in the case of the WTO Covered Agreements.

[669] See, e.g., the sources relied upon by the Appellate Body in *United States - Import Prohibition of Certain Shrimp and Shrimp Products* (12 October 1998) WT/DS58/AB/R, DSR 1998:VII, p. 2795-2796, para. 130.

A/CN.4/L.682
page 240

another have been underrepresented in traditional law.  Rather, the significance of the need to "take into account" lies in its performance of a systemic function in the international legal order, linking specialized parts to each other and to universal principles.[670]

474.    The question of the normative weight to be given to particular rights and obligations at the moment they appear to clash with other rights and obligations can only be argued on a case-by-case basis.  There is little to be added in this regard to what Judges Higgins, Buergenthal and Kooijmans observed, in considering the balance to be struck between the conflicting dictates of the rule or State immunity on the one hand and liability for international crimes on the other:

> International law seeks the accommodation of this value [the prevention of unwarranted outside interference in the domestic affairs of States] with the fight against impunity, and not the triumph of one norm over another.[671]

**(c)    Inter-temporality and general developments in international law**

475.    The third general issue - and the one that raised most of the discussion in the Commission itself - is the question of inter-temporal law, or in other words, the question of what should be the right moment in time (critical date) for the assessment of the rules that should be "taken into account" under article 31 (3) (c)?  The traditional rule,[672] and the one proposed to the Commission by Waldock consisted of two parts:  one affirming "contemporaneity", the other allowing the changes in the law to be taken into account. According to the former aspect, a

---

[670]  For an early elaboration, see especially Hersch Lauterpacht, *Private Law Sources and Analogies of International Law* (Longman's:  London, 1927) (highlighting the role of principles of private law in the construction of international legal relationships).

[671]  *Case concerning the Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belgium) I.C.J. Reports 2002* (Joint separate opinion of Judges Higgins, Kooijmans and Buergenthal) pp. 86-87, para. 79.

[672]  That rule was stated by Judge Huber in the context of territorial claims and its two parts are as follows: "… a juridical fact must be appreciated in the light of the law contemporary with it, and not the law in force at the time when a dispute arises" ("contemporaneity") and "The same principle which subjects the act creative of a right to the law in force at the time the right arises, demands that the existence of the right, in other words, its continued manifestations, shall follow the conditions required by the evolution of law".  *Island of Palmas* case (*the Netherlands/United States of America*) Award of 4 April 1928, UNRIAA, vol. II, pp. 845 and 839.

treaty was to be interpreted "in the light of the law in force at the time when the treaty was drawn up".[673]  The latter aspect required, however, that "the application of a treaty shall be governed by the rules of international law in force at the time when the treaty is applied".[674]

476.    The rationale of the two parts of the principle is clear, and difficult to contest.  On the one hand, when States create a legal relationship, they undoubtedly do this bearing in mind the normative environment as it existed at the moment when the relationship was formed.  Or in other words, deference to the law in force at the time when a treaty is concluded takes best account of the intent of the parties.  Nevertheless, no legal relationship can remain unaffected by time.  This is confirmed already by the need to take into account the subsequent practice of the parties.  In a similar way, the views of the parties about the meaning and application of the treaty develop in accordance with the passing of time, the accumulation of experience and new information and novel circumstances.

477.    The doctrine of inter-temporal law is essentially a reminder of these two rationales, one pointing to the past as a guide for finding party intent, the other pointing to the present for the exactly same reason.  As pointed out by Jiménez de Aréchaga in the Commission in 1964:

> The intention of the parties should be controlling, and there seemed to be two possibilities so far as that intention was concerned:  either they had meant to incorporate in the treaty some legal concept that would remain unchanged, or, if they had no such intention, the legal concepts might be subject to change and would then have to be interpreted not only in the context of the instrument, but also within the framework of the entire legal order to which they belong.  The free operation of the will of the parties should not be prevented by crystallizing every concept as it had been at the time when the treaty was drawn up.[675]

---

[673]  Draft article 56 (1), Waldock, Third report, *Yearbook ... 1964* vol. II, p. 8.

[674]  Draft article 56 (2), ibid., p. 9.

[675]  Mr. Jiménez de Aréchaga, 728th meeting (21 May 1964) *Yearbook ... 1964* vol. I, p. 34, para. 10 suggests a rather qualified version of the doctrine:  "Provided that, where it can be established that it was the intention of the parties that the meaning or scope of a term or expression used in the treaty should follow the development of the law, the treaty must be interpreted so as to give effect to that intention."  Thirlway, "The Law and Procedure of the International Court of Justice 1960-1989", Part III, supra note 582, p. 57.  See also:  Hugh Thirlway, "The Law and Procedure of the International Court of Justice 1960-1989", Part I, supra note 97, pp. 135-143 and Rosalyn Higgins, "Time and the Law:  International Perspectives on an Old Problem", ICLQ vol.46 (1997) pp. 515-9.

A/CN.4/L.682
page 242

478.    Because it seems pointless to try to set any general and abstract preference between the past and the present,[676] it is best, once again, to merely single out some considerations that may be relevant when deciding whether to apply article 31 (3) (c) so as to "take account" of those "other obligations" as they existed when the treaty was concluded or as they exist when it is being applied.  The starting-point must be, again, the fact that deciding this issue is a matter of interpreting the treaty itself.  Does the language used give any indication?  The starting-point of the argument might plausibly be the "principle of contemporaneity" - with regard to the normative environment as it existed at the moment when the obligation entered into force for a relevant party.[677]  When might the treaty language itself, in its context, provide for the taking account of future developments?  Examples of when this might be a reasonable assumption include at least:

(a)    Use of a term in the treaty which is "not static but evolutionary".[678]  This is the case where the parties by their choice of language intend to key into that evolving meaning without adopting their own idiosyncratic definition (for example, use of terms such as "expropriation" or "continental shelf" in the relevant treaty).[679]  This may also be the case where, by reading that language against its object and purpose, it appears that the parties have committed themselves to a programme of progressive development;[680]

---

[676]  This was, after all, the very reason for the failure of the Commission to come up with an article on this question.

[677]  This expresses the "primary necessity of interpreting an instrument in accordance with the intentions of the parties at the time of its conclusion", *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970),* Advisory Opinion, *I.C.J. Reports 1971* p. 31.

[678]  Jennings & Watts, *Oppenheim's …* supra note 37, p. 1282.  The standard example is the use of the notion of "sacred trust of civilization" as part of the League's mandates regime.  See *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970),* Advisory Opinion, *I.C.J. Reports 1971* p. 31, para. 53.

[679]  Thus in the *Aegean Sea Continental Shelf* case, the ICJ applied the presumption according to which a generic term is "intended to follow the evolution of the law and to correspond with the meaning attached to the expression by the law in force at any given time", *I.C.J. Reports 1978* p. 32.

[680]  This was the situation in the *Gabčikovo-Nagymaros* case in the ICJ.  "[T]he Court wishes to point out that newly developed norms of environmental law are relevant for the implementation of the Treaty and that the parties could, by agreement, incorporate them … [in] … the Treaty.  These articles do not contain specific obligations of performance but require the parties, in carrying out their obligations to ensure that the quality of water in the Danube is not impaired and that nature is protected, to take new environmental norms into consideration when agreeing upon the means to be specified in the Joint Contractual Plan.  By inserting these evolving provisions in

(b)      The description of obligations in very general terms, thus operating a kind of *renvoi* to the state of the law at the time of its application.  Thus, the general exceptions in the GATT article XX, discussed in *Shrimp-Turtle*, in permitting measures "necessary to protect human, animal or plant life or health" or "relating to the conservation of exhaustible natural resources", are intended to adjust to the situation as it develops over time.**681**  For example, the measures necessary to protect shrimp evolve depending upon the extent to which the survival of the shrimp population is threatened.  Although the broad meaning of article XX may remain the same, its actual content will change over time.  In that context, reference to "other rules of international law", such as multilateral environment treaties, becomes a form of secondary evidence supporting the enquiry into science and community values and expectations, which the ordinary meaning of the words, and their object and purpose, invites.

**(d)      Conclusion**

479.    Article 31 (3) (c) VCLT and the "principle of systemic integration" for which it gives expression summarize the results of the previous sections.  They call upon a dispute-settlement body - or a lawyer seeking to find out "what the law is" - to situate the rules that are being invoked by those concerned in the context of other rules and principles that might have bearing upon a case.  In this process the more concrete or immediately available sources are read against each other and against the general law "in the background".  What such reading rules "against each other" might mean cannot be stated in the abstract.  But what the outcome of that specific reading is may, from the perspective of article 31 (3) (c) in fact be less important than that whatever the outcome, its justification refers back to the wider legal environment, indeed the "system" of international law as a whole.

---

the Treaty, the parties recognized the potential necessity to adapt the Project.  Consequently, the Treaty is not static, and is open to adapt to emerging norms of international law".  *Case concerning the Gabčíkovo-Nagymaros Project (Hungary/Slovakia) I.C.J. Reports 1997* pp. 76-80, paras. 132-147.  See also the Separate Opinion of Judge Weeramantry, *Case concerning the Gabčíkovo-Nagymaros Project (Hungary/Slovakia), I.C.J. Reports 1997* (separate opinion of Judge Weeramantry) pp. 113-115.

**681** From the perspective embodied in the preamble of the WTO Agreement, we note that the generic term "natural resources" in Article XX (g) is not "static" in its content or reference but is rather "by definition, evolutionary".  *United States - Import Prohibition of Certain Shrimp and Shrimp Products* (12 October 1998) WT/DS58/AB/R, DSR 1998:VII, p. 2795-2796, para. 130.

A/CN.4/L.682
page 244

480.    The way in which "other law" is "taken into account" is quite crucial to the parties and to
the outcome of any single case.  The principle of systemic integration, however, looks beyond
the individual case.  By making sure that the outcome is linked to the legal environment, and that
adjoining rules are considered - perhaps applied, perhaps invalidated, perhaps momentarily set
aside - any decision also articulates the legal-institutional  environment in view of substantive
preferences, distributionary choices and political objectives.  This articulation is quite important
in a decentralized and spontaneous institutional world whose priorities and objectives are often
poorly expressed.  It is also important for the critical and constructive development of
international institutions, especially institutions with law-applying tasks.  To hold those
institutions as fully isolated from each other and as only paying attention to their own objectives
and preferences is to think of law only as an instrument for attaining regime-objectives.  But law
is also about protecting rights and enforcing obligations, above all rights and obligations that
have a backing in something like a general, public interest.  Without the principle of "systemic
integration" it would be impossible to give expression to and to keep alive, any sense of the
common good of humankind, not reducible to the good of any particular institution or "regime".

## G.  GENERAL CONCLUSIONS

### 1.  The nature of  fragmentation

481.    One aspect of globalization is the emergence of technically specialized cooperation
networks with a global scope:  trade, environment, human rights, diplomacy, communications,
medicine, crime prevention, energy production, security, indigenous cooperation and so on -
spheres of life and expert cooperation that transgress national boundaries and are difficult to
regulate through traditional international law.  National laws seem insufficient owing to the
transnational nature of the networks while international law only inadequately takes account of
their specialized objectives and needs.

482.    As a result, the networks tend to develop their own rules and rule-systems.  This takes
place sometimes informally, through the adoption by leading actors of forms of behaviour or
standardized solutions that create expectations or are copied by others.  Sometimes coordination
is achieved through the harmonization of national or regional laws and regulations, for example,
through increasing standardization of contract forms or liability rules.  But frequently specialized

rules and rule-systems also emerge through intergovernmental cooperation and in particular with the assistance of (specialized) intergovernmental organizations. The result is the emergence of regimes of international law that have their basis in multilateral treaties and acts of international organizations, specialized treaties and customary patterns that are tailored to the needs and interests of each network but rarely take account of the outside world.

483.    This is the background to the concern about fragmentation of international law: the rise of specialized rules and rule-systems that have no clear relationship to each other. Answers to legal questions become dependent on whom you ask, what rule-system is your focus on. Accordingly, this study has sought answers to questions that, though they seem quite elementary, have not been often addressed: What is the nature of specialized rule-systems? How should their relations *inter se* be conceived? Which rules should govern their conflicts?

## 2.  The perspective of this Study

484.    This study has not aimed to set up definite relationships of priority between international law's different rules or rule-systems. To that extent, its results may seem unsatisfactory or at least inconclusive. However, such priorities cannot be justifiably attained by what is merely an elucidation of the process of legal reasoning. They should reflect the (political) preferences of international actors, above all States. Normative conflicts do not arise as technical "mistakes" that could be "avoided" by a more sophisticated way of legal reasoning. New rules and legal regimes emerge as responses to new preferences, and sometimes out of conscious effort to deviate from preferences as they existed under old regimes. They require a legislative, not a legal-technical response.

485.    But the absence of general hierarchies in international law does not mean that normative conflicts would lead to legal paralysis. The relevant hierarchies must only be established ad hoc and with a view to resolving particular problems as they arise. This is where the articles of the Vienna Convention on the Law of Treaties (VCLT) have their relevance and where a study conducted within the confines of the International Law Commission can make a constructive contribution. The idea has been to illustrate by examples, drawn from the practice of international courts and tribunals, techniques available for lawyers as they approach problems that appear to involve conflicts between rules or rule-systems.

486.    A key point made in this study is that normative conflict is endemic to international law.  Because of the spontaneous, decentralized and unhierarchical nature of international law-making - law-making by custom and by treaty - lawyers have always had to deal with heterogeneous materials at different levels of generality and with different normative force.  In its very first case, the Permanent Court of International Justice was, as we have seen, faced with having to resolve the question of the conflict or overlap between two sets of rules - the Versailles Peace Treaty and the right of a neutral power in time of war to control access to belligerent territory.  Nevertheless, by an interpretation of German sovereignty and the invocation of precedent (Panama and Suez canals), the Court was able to establish the priority of the Versailles treaty.[682]  Since then, it has been routine for international tribunals to establish the rights and duties of States or of other subjects by reference to many types of legal materials that are applicable, as part of the work that they are called upon to do.

487.    But in addressing the problems at this level - conflicts as they arise - will mean that they are addressed in a formal and open-ended way, as matters of legal technique rather than substantive (legal-political) preference.  The report has, in a way, bought its acceptability by its substantive emptiness.  Yet this "formalism" is not without its own agenda.  The very effort to canvass a coherent legal-professional technique on a fragmented world expresses the conviction that conflicts between specialized regimes may be overcome by law, even as the law may not go much further than require a willingness to listen to others, take their points of view into account and to find a reasoned resolution at the end.  Yet this may simply express the very point for which international law has always exited.  The move from a world fragmented into sovereign States to a world fragmented into specialized "regimes" may in fact not at all require a fundamental transformation of public international law - though it may call for imaginative uses of its traditional techniques.  There were always States that regarded international law as incompatible with their sovereignty.  Similarly, there may today exist global regimes or rule-complexes that feel international law an alien intrusion.  There is as little reason to concede to the logic of "clinical isolation" in the latter case as there was in the former.  If the view of a State cannot be the last word on the international lawfulness of its activities, nor can the view-point of a rule or a regime alone determine what its international legal implications are.  If international

---

[682]  *Case of the SS Wimbledon*, *P.C.I.J. Series. A*. No. 1, pp. 25, 28-30.

law is needed as a structure for coordination and cooperation between (sovereign) States, it is no less needed in order to coordinate and organize the cooperation of (autonomous) rule-complexes and institutions.

488.    Special rules and rule-complexes are undoubtedly necessary - somewhat in the sense that different sovereignties are.  The world is irreducibly pluralistic.  The law cannot resolve in an abstract way any possible conflict that may arise between economic and environmental regimes, between human rights and diplomatic immunity or between a universal law of the sea regime and a regional fisheries treaty.  Each has its experts and its ethos, its priorities and preferences, its structural bias.  Such regimes are institutionally "programmed" to prioritize particular concerns over others.  The concern over fragmentation has been about the continued viability of traditional international law - including the techniques of legal reasoning that it imports - in the conditions of specialization.  Do Latin maxims (*lex specialis*, *lex posterior*, *lex superior*) still have relevance in the resolution of conflicts produced in a situation of economic and technological complexity?  Although this report answers this question in the positive, it also highlights the limits of the response.  Public international law does not contain rules in which a global society's problems are, as it were, already resolved.  Developing these is a political task.

489.    Concern over the fragmentation of international law has an institutional and a substantive aspect.  At an institutional level, the proliferation of implementation organs - often courts and tribunals - for specific treaty-regimes has given rise to a concern over deviating jurisprudence and forum-shopping.  The rights and obligations of legal subjects may depend on which body is seized to recognize them.  Following the decision by the Commission in 2002 and 2003, this report set aside the institutional aspects of fragmentation.  Instead, it focused on substantive problems, the emergence of "special laws", treaty-regimes, and functional clusters of rules and specialized branches of international law and on their relationship *inter se* and to general international law.  Particular attention has been given to the application of the *lex specialis* and *lex posterior* maxims, and to relationships of importance and "system" in international law.  The focus has been throughout provided by the VCLT with the conscious effort, nonetheless, to read that treaty itself in its systemic environment, consisting in part of the practices of international tribunals and other law-applying bodies and in part of the general international law of which it forms a part.  The draft operative conclusions of the work of the Study Group are set out in detail in the APPENDIX to this report.

490.    Not all substantive problems have been treated.  For example, questions about "soft law"
as special type of law with its idiosyncratic ("soft") enforcement and dispute-settlement
mechanisms has not been subjected to discussion.  Nevertheless, to the extent that soft law
claims to exist "in clinical isolation" from "hard law", much of what has said about the relations
of special and general law in section C applies to it.  Likewise, questions having to do with the
emergence of  patterns of constraint out of private or combined public-private activities -
including *lex mercatoria* or other types of informal regulation of transnational activities - and
their effects on traditional law-making have been left outside this study.  A discussion of the
extent to which new types of "global law" might be emerging outside the scope of traditional,
State-centric international law would require quite a different type of exercise.  This is not to say,
however, that the Vienna Convention or indeed international law could not be used so as to
channel and control these patterns of informal, often private interest-drawn types of regulation as
well.  The more complex and flexible the ways in which treaty law allows the use of framework
treaties, of clusters of treaties and regimes consisting of many types of normative materials, the
more such decentralized, private regulation may be grasped within the scope of international law.

### 3.  Between coherence and pluralism:  suggestions for further work

491.    Fragmentation puts to question the coherence of international law.  Coherence is valued
positively owing to the connection it has with predictability and legal security.  Moreover, only a
coherent legal system treats legal subjects equally.  Coherence is, however, a formal and abstract
virtue.  For a legal system that is regarded in some respects as unjust or unworkable, no added
value is brought by the fact of its being coherently so.  Therefore, alongside coherence, pluralism
should be understood as a constitutive value of the system.  Indeed, in a world of plural
sovereignties, this has always been so.

492.    Even as international law's diversification may threaten its coherence, it does this by
increasing its responsiveness to the regulatory context.  Fragmentation moves international law
in the direction of legal pluralism but does this, as the present report has sought to emphasize, by
constantly using the resources of general international law, especially the rules of the VCLT,
customary law and "general principles of law recognized by civilized nations".  *One principal
conclusion of this report has been that the emergence of special treaty-regimes (which should
not be called "self-contained") has not seriously undermined legal security, predictability or*

*the equality of legal subjects.* The techniques of *lex specialis* and *lex posterior*, of *inter se* agreements and of the superior position given to peremptory norms and the (so far under-elaborated) notion of "obligations owed to the international community as a whole" provide a basic professional tool-box that is able to respond in a flexible way to most substantive fragmentation problems. They can be used so as to give expression to concerns (e.g. economic development, human rights, environmental protection, security) that are legitimate and strongly felt.

493.    The international legal system has never enjoyed the kind of coherence that may have characterized the legal orders of States. Nonetheless, the deepening complexity of late modern societies, tolerance and encouragement of conflicting traditions and social objectives within national societies, and the needs of technical specialization, have all undermined also the homogeneity of the nation-State. Today, the law of late modern States emerges from several quasi-autonomous normative sources, both internal and external. If this may have undermined the constitutional coherence of national law, it has been counterbalanced by the contextual responsiveness and functionality of the emerging (moderate) pluralism. In an analogous fashion, the emergence of conflicting rules and overlapping legal regimes will undoubtedly create problems of coordination at the international level. But - and this is the second main conclusion of this report - *no homogenous, hierarchical meta-system is realistically available to do away with such problems.* International law will need to operate within an area where the demands of coherence and reasonable pluralism will point in different directions. In order for it to do this successfully, *increasing attention will have to be given to the collision of norms and regimes and the rules, methods and techniques for dealing with such collisions.* How this might be done is set out in detail in the proposal for the conclusions of the Study Group as set out in the Appendix. In addition, this might require at least three efforts:

(a)    Attention to the role of the VCLT as the basis of an "International law of conflicts";

(b)    Attention to the notion and operation of "regimes";

(c)    Examination of the notion of "general international law".

A/CN.4/L.682
page 250

**(1)    The VCLT as a basis of an "international law of conflicts"**

The Commission decided to situate its work in this matter within the confines of the Vienna Convention.  This report suggests that this decision was well-founded.  As has been explained in detail, the VCLT provides the normative basis - the "tool-box" - for dealing with fragmentation.  There is no reason why it should not also provide the basis for the further development of an "International Law of Conflicts".  Conflicts between treaties, treaty regimes and treaties and other legal sources will inevitably emerge also in the future, perhaps increasingly.  In the absence fixed hierarchies, such conflicts can only be resolved by "collision-rules" that take account both of the needs of coherence and contextual sensitivity. When developing such collision-rules, several aspects of the VCLT might be subjected to closer scrutiny.

For example, the treatment by the Convention of bilateral and multilateral treaties through identical rules seems unsatisfactory .  The problems that emerge are different and should be dealt with through different techniques.  In the interpretation of bilateral treaties, for example, party intent is relatively easy to identify whereas multilateral treaties emerge as package deals or bargains and seldom have a single, clearly defined party intent.  Also, there is presently no recognition of the special nature of "framework treaties" and "implementation treaties" while much of this report has suggested that such treaties have special types of relations that cannot be identified with relations between just any treaties.  Moreover, nothing has undermined Fitzmaurice's original point that for example, human rights and humanitarian law treaties, (as well as for example environmental treaties) form a special class of non-bilateral ("integral" or "interdependent") instruments that cannot be operated through the same techniques as "ordinary" treaties creating bilateral relationships.  Throughout this report we have seen how the nature of a treaty - including its object and purpose - has limited the freedom of treaty parties to deviate by way of *lex specialis* or *inter se* agreement.  But in fact already the conventional priority accorded to special law over general law, and the equally conventional techniques of overruling that priority are aspects of an informal treaty hierarchy that has been often overshadowed by attention to the formal hierarchy expressed in the language of *jus cogens* or Article 103 of the United Nations Charter.

In general, the VCLT gives insufficient recognition to special types of treaties and the special rules that might go to interpret and apply them. More work here seems necessary. *It is proposed to give guidelines on how the Vienna Convention provisions might give recognition to the wide variation of treaty types and normative implications of such types and whether it might be possible to set up informal guidelines on how to deal with treaty conflicts. At least the following themes might be part of such an effort:*

(a)    The difference between bilateral and multilateral treaty-relations should be given greater recognition;

(b)    The process of international "legislation" through multilateral treaties adopted in order to realize specific, technical rules should be further examined. This could involve establishing a typology of treaty provisions amenable for different treatment. These typologies might contrast, for example "programmatic" provisions with provisions that set up subjective rights and "hard law" provisions associated with formal responsibility with "soft law" provisions under special "soft responsibility" regimes;

(c)    The notions of a "framework treaty" and an "implementation treaty" should be further elaborated, especially with a view to highlighting the special (hierarchical) relations between them and between the institutions set up in them;

(d)    Greater recognition should be given to the distinction between multilateral conventions whose provisions are "bilateralizable" and those that are not (i.e. so-called "integral" treaties or treaties setting out "interdependent" or otherwise "absolute" obligations);

(e)    What it means for obligations to be owed "to the international community as a whole" (*erga omnes* obligations) or to the "community of States parties as a whole" (obligations *erga omnes partes*) should be further elaborated;

(f)    Recent practice has developed a wide range of models for "conflict clauses" that seek to eliminate or deal with potential conflicts between treaties. Often those clauses are unclear or ambivalent, however. What does it mean, for example, that two treaties should be understood in a "mutually supportive" way?

A/CN.4/L.682
page 252

**(2)    Into a law of regimes**

Much of this study has pointed to the increasing importance of chains or clusters of treaties, including relationships between framework treaties and implementation treaties.  In practice, fragmentation takes place by the development of networks of international rules and instruments that for all practical purposes - including for the purpose if interpretation - are treated as a single "wholes" or "regimes".  This study has identified three types of special regime:

(a)    Special sets of secondary rules of State responsibility;

(b)    Special sets of rules and principles on the administration of a determined problem;

(c)    Special branches of international law with their own principles, institutions and teleology.

Neither the VCLT nor international arbitral or judicial practice has so far given any developed articulation to those special kinds of wholes.  From this study it transpires, however, that a "regime" may be function within a formal treaty, a set of formal treaties and institutions, or in more broadly "cultural" ways.  Conflicts between rules *within* a regime appear differently and should probably be treated differently from conflicts *across* regimes.  "Regimes" may also have non-governmental participants and represent non-governmental interests in a fashion that might influence their interpretation and operation.  Often regimes operate on the basis of administrative coordination and "mutual supportiveness" the point of which is to seek regime-optimal outcomes.  While this is clearly appropriate in regard to treaty provisions that are framed in general or "programmatory" terms, it seems less proper in regard to provisions establishing subjective rights or obligations whose purpose it is to guarantee such rights.  Disputes concerning the operation of the regimes may not always be properly dealt with by the same organs that have to deal with the recognition of claims of rights.  Likewise, when conflicts emerge between treaty provisions that have their home in different regimes, care should be taken so as to guarantee that any settlement is not dictated by organs exclusively linked with one of the other of the conflicting regimes.

It is suggested that the Commission could outline the roles of special regimes in some or several of the three senses. For this purpose, it could examine:

(a)    The types of international and transnational regimes that have come to existence as a result of the process of globalization;

(b)    The manner of the autonomous operation of regimes. This could involve questions such as the formation and operation of internal regime-hierarchies, the principles of interpretation applicable to regime-instruments, the specific types of rules or institutions needed to enable the coherent operation of regimes and so on;

(c)    The role of general (public) international law in regimes, including in the solution of interpretative conflicts and providing for responsibility for any violation of regime-rules. The relations of public and private law, including soft law and other non-binding instruments in such regimes could be examined;

(d)    Many provisions in technical treaty-regimes have an exhortatory, procedural or "programmatic" character. Such provisions contrast sharply with provisions providing subjective rights or obligations. While the former may easily be adjusted in case of conflicts (or, for example, lack of resources), the latter are not so easily "balanced" or "coordinated". Any study of regime-rules should take into account such contrast in the normative power of particular regime-rules.

(e)    The conditions and consequences of regime failure. What counts as "regime failure" in the first place? When do the procedural means of redress of general law, normally suspended, become applicable?

(f)    The whole complex of inter-regime relations is presently a legal black hole. What principles of conflict-solution might be used for dealing with conflicts between two regimes or between instruments across regimes?

(g)    The settlement of disputes within regimes may not be subject to the same rules or procedures as settlement of disputes across regimes. For the latter case, there is a particular need to ensure that impartial settlement mechanisms are available.

A/CN.4/L.682
page 254

**(3)    The nature and operation of "general international law"?**

As we have seen throughout this study, fragmentation takes place against the background and often by express reference to not only the VCLT but to something called "general international law". However, there is no well-articulated or uniform understanding of what this might mean. "General international law" clearly refers to general customary law as well as "general principles of law recognized by civilized nations" under article 38 (1) (c) of the Statute of the International Court of Justice. But it might also refer to principles of international law proper and to analogies from domestic laws, especially principles of the legal process (*audiatur et altera pars*, *in dubio mitius,* estoppel and so on). In the practice of international tribunals, including the Appellate Body of the WTO or the European and Inter-American Courts of Human Rights reference is constantly made to various kinds of "principles" sometimes drawn from domestic law, sometimes from international practice but often in a way that leaves their authority unspecified.

Much of the substance of "general international law" was canvassed in the study commissioned by the United Nations Secretary-General in 1948 from Hersch Lauterpacht so as to start off the work of the International Law Commission for the codification and progressive development of international law.[683] In 1996, the Commission analysed the scope for progressive development and codification after nearly fifty years of work and, in order to provide a global review of the main fields of general public international law, set up a general scheme of topics of international law classified under thirteen main fields.[684] Whatever the prospects of "codification and progressive development" today, it seems clear that most of the development of international law will take place within specialized lawmaking conferences and organizations

---

[683]  Survey of International Law in Relation to the Work of Codification of the International Law Commission document A/CN.4/1 (United Nations publication, Sales No. 48.V.1) reissued under the symbol A/CN.4/1/Rev.1 (United Nations publication, Sales No. 48.V.1(1)), also published in *International Law.  Being the Collected Papers of Sir Hersch Lauterpacht*, Vol I (ed. by Elihu Lauterpacht, Cambridge University Press:  Cambridge, 1970), p. 445-530.

[684]  *Yearbook ... 1996*, vol. II (Part Two), paras. 246-248 and annex II.

on the basis of specialist preparatory work and will lead up to complex treaty-regimes with their own institutional provisions and procedures. This is indeed part of the background from which the concern about fragmentation once arose.

In an increasingly specialized legal environment, few institutions are left to speak the language of general international law, with the aim to regulate, at a universal level, relationships that cannot be reduced to the realization of special interests and that go further than technical coordination.. The International Law Commission is one such institution. The work for codification and development it has carried out has been precisely about elucidating the content of "general international law" as an aspect of what can only be understood as a kind of an international public realm. The fact that it has been possible in this study to develop an overarching standpoint by taking the perspective of the Vienna Convention has shown that general international law speaks to present concerns not so much in terms of substantive rules and principles - after all, a large part of those has already been codified - but as a formal argumentative technique. In an important sense, it is that technique that represents what is "general" in a world of proliferating technical particularisms.

The turn to specialized treaty-making and the diminishing of subjects on the agenda of the International Law Commission demonstrate that there is a limit to what can be attained in terms codification and progressive development of universal rules. At some point, the threshold is crossed at which the necessary generality and abstraction that is the price to be paid for the universal scope of treaty law becomes unnecessarily high. Under the frame of "universal" rules, what in fact often takes place is specialist rule-making through what formally appears as only implementation of the general (but completely indeterminate) standards at a local or technically specialized level. At that point, it becomes useful to draw attention to the way "general international law" appears constantly in the practice of regional and specialized institutions. It is that general international law that provides the rudiments of an international public realm from the perspective of which the specialized pursuits and technical operations carried out under specific treaty-regimes may be evaluated.

A/CN.4/L.682
page 256

Thus, it is proposed that the Commission should increasingly look for the avenue of "restatement" of general international law in forms other than codification and progressive development - not as a substitute but as a supplement to the latter.  Such work of restatement might focus e.g. on the following:

(a)    What sources are covered by the reference to "general international law"?

(b)    How does "general international law" appear in international treaty law, and in the practice of international and domestic courts and tribunals as well as in other international law-applying bodies?

(c)    To what extent successful "codification and progressive development" today might necessitate in fact studies - properly carried out by the ILC - on the emergence and spontaneous operation of general international law.

-----