# EXHIBIT 57

M. M. Schwartz 228

COPIE

Arrêt N° 71/18 – VII – REF

**Audience publique du 21 mars deux mille dix-huit**



Numéro 45337 du rôle.

Composition:

Astrid MAAS, président de chambre;
Marie-Laure MEYER, premier conseiller;
Monique HENTGEN, premier conseiller;
Daniel SCHROEDER, greffier.

E n t r e :

**l'Etat de Roumanie**, représenté par son organe représentatif en justice, avec pour adresse 17, rue Apolodor, secteur 5, 050741 Bucarest (Roumanie),

appelant aux termes d'un exploit de l'huissier de justice Geoffrey GALLE de Luxembourg en date du 3 octobre 2017,

comparant par Maître Donald VENKATAPEN, avocat à la Cour, demeurant à Luxembourg,

e t :

**1. Viorel MICULA**, demeurant en Roumanie, 48, rue Colinelor, ORADEA, département de BIHOR, (Roumanie), élisant domicile aux fins de la signification de l'acte d'appel en l'étude de Maître Fabio TREVISAN, avocat à la Cour, demeurant à L-2370 Howald, 2, rue Peternelchen, Immeuble C2,

intimé aux fins du susdit exploit GALLE du 3 octobre 2017,

comparant par Maître Fabio TREVISAN, avocat à la Cour, demeurant à Luxembourg ;


**2. la COMMISSION EUROPEENNE**, dont le siège se situe à B-1049 Bruxelles, rue de la Loi, élisant domicile aux fins de la signification de l'acte d'appel en l'étude de Maître Michel SCHWARTZ, avocat à la Cour, demeurant à L-2155 Luxembourg, 70-72, Muehlenweg,

intimée aux fins du susdit exploit GALLE du 3 octobre 2017,

comparant par Maître Michel SCHWARTZ, avocat à la Cour, demeurant à Luxembourg ;


**3. la société anonyme RBC Investor Services Bank S.A.**, établie et ayant son siège social à L-4360 Esch/Alzette, 14, Porte de France, représentée par son conseil d'administration,

intimée aux fins du susdit exploit GALLE du 3 octobre 2017,

comparant par Maître Franck GREFF, avocat à la Cour, demeurant à Luxembourg ;


**4. la société anonyme Natixis Bank**, établie et ayant son siège social à L-1855 Luxembourg, 51, avenue J.F. Kennedy, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 32160 ;

intimée aux fins du susdit exploit GALLE du 3 octobre 2017,

comparant par Maître Alain LORANG, avocat à la Cour, demeurant à Luxembourg ;


**5. l'établissement public autonome créé selon la loi du 24 mars 1989, Banque et Caisse d'Epargne de l'Etat Luxembourg**, établie et ayant son siège social à L-2954 Luxembourg, 1, Place de Metz, représentée par son comité de direction et conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 30.775 ;


**6. la société ABN AMRO Bank (Luxembourg) S.A.**, établie et ayant son siège social à L-1855 Luxembourg, 46, avenue J.F. Kennedyreprésentée

par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 19116 ;

**7. la société anonyme BLLUX Company S.A.,** établie et ayant son siège social à L-2633 Senningerberg, 6d, route de Trèves, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 49124 ;

**8. la société BANQUE BCP S.A.,** établie et ayant son siège social à L-8070 Bertrange, 5, rue Des Mérovingiens - Op Bourmicht, représentée par son comité de direction, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 7648 ;

**9. la société anonyme BANQUE CARNEGIE Luxembourg S.A.,** établie et ayant son siège social à L-1229 Luxembourg, 15, rue Bender, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 43.569 ;

**10. la société anonyme BANQUE DE LUXEMBOURG S.A.,** établie et ayant son siège social à L-2449 Luxembourg, 14, boulevard Royal, représentée par son comité de direction, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 5310 ;

**11. la société anonyme BANQUE DEGROOF PETERCAM LUXEMBOURG S.A.,** anc. Banque Degroof, établie et ayant son siège social à L-2453 Luxembourg, 12, rue Eugène Ruppert, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 25459 ;

**12. la société anonyme BANQUE HAPOALIM Luxembourg S.A.,** établie et ayant son siège social à L-1325 Luxembourg, 7, rue de la Chapelle, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 37622 ;

**13. la société anonyme Banque Internationale à Luxembourg S.A, en abrégé BIL,** établie et ayant son siège social à L-2953 Luxembourg, 69, route d'Esch, représentée par son conseil d'administration, inscrite au

Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 6307 ;

**14. la société anonyme BANQUE TRANSATLANTIQUE Luxembourg**, établie et ayant son siège social à L-1450 Luxembourg, 17, Côte d'Eich, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 31730 ;

**15. la société anonyme BGL BNP Paribas**, établie et ayant son siège social à L-2951 Luxembourg, 50, avenue J.F. Kennedy, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 6481 ;

**16. la société anonyme CACEIS Bank Luxembourg**, en abrégé CACEIS BL, établie et ayant son siège social à L-2520 Luxembourg, 5, Allée Scheffer, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 91985 ;

**17. la société anonyme CATELLA BANK S.A.**, établie et ayant son siège social à L-8308 Capellen, 38, rue Pafebruch, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 29962 ;

**18. la société anonyme Compagnie de Banque Privée Quilvest S.A., en abrégé CBP Quilvest S.A.**, établie et ayant son siège social à L-2134 Luxembourg, 48, rue Charles Martel, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 117963 ;

**19. la société anonyme CA INDOSUEZ WEALTH (EUROPE)**, anc. Crédit Agricole Luxembourg, établie et ayant son siège social à L-2520 Luxembourg, 39, Allée Scheffer, représentée par son conseil d'administration actuellement en fonctions, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 91986 ;

**20. la société anonyme CREDIT SUISSE (LUXEMBOURG) S.A.,** établie et ayant son siège social à L-2180 Luxembourg, 5, rue Jean Monnet, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 11756 ;

**21. la société anonyme DANSKE BANK INTERNATIONAL S.A.,** établie et ayant son siège social à L-2011 Luxembourg, 13, rue Edward Steichen, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 14101 ;

**22. la société anonyme DekaBank Deutsche Girozentrale Luxembourg S.A.,** établie et ayant son siège social à L-1748 Luxembourg-Findel, 6, rue Lou Hemmer, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 9462 ;

**23. la société anonyme DNB Luxembourg S.A.,** établie et ayant son siège social à L-1637 Luxembourg, 13, rue Goethe, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 22374 ;

**24. la société anonyme EAST-WEST UNITED BANK S.A.,** établie et ayant son siège social à L-1840 Luxembourg, 10, boulevard Joseph II, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 12.049 ;

**25. la société anonyme EDMOND DE ROTHSCHILD (EUROPE) S.A.,** établie et ayant son siège social à L-2535 Luxembourg, 20, boulevard Emmanuel Servais, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 19194 ;

**26. la société anonyme Freie Internationale Sparkasse S.A.,** établie et ayant son siège social à L-2227 Luxembourg, 13, avenue de la Porte-Neuve, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 79983 ;

**27. la société anonyme HSBC Private Bank (Luxembourg) S.A.,** établie et ayant son siège social à L-1160 Luxembourg, 16, boulevard d'Avranches, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 52461 ;

**28. la société anonyme HSH Nordbank Securities S.A.,** établie et ayant son siège social à L-2180 Luxembourg, 2, rue Jean Monnet, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 14784 ;

**29. la société anonyme ING Luxembourg S.A.,** établie et ayant son siège social à L-1616 Luxembourg, 26, Place de la Gare, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 6041 ;

**30. la société anonyme J.P. Morgan Bank Luxembourg S.A.,** établie et ayant son siège social à L-2633 Senningerberg, 6, route de Trèves, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 10958 ;

**31. la société anonyme KBL EUROPEAN PRIVATE BANKERS S.A.,** établie et ayant son siège social à L-2955 Luxembourg, 43, boulevard Royal, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 6395 ;

**32. la société anonyme Lombard Odier (Europe) S.A.,** établie et ayant son siège social à L-1150 Luxembourg, 291, route d'Arlon, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 169907 ;

**33. la société anonyme M.M. Warburg & CO Luxembourg S.A.,** en abrégé M.M. Warburg Bank Luxembourg, établie et ayant son siège social à L-1413 Luxembourg 2, Place François-Joseph Dargent, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 10700 ;

**34. la société anonyme Nordea Bank S.A.**, établie et ayant son siège social à L-2220 Luxembourg, 562, rue de Neudorf, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 14157 ;

**35. la société anonyme Pictet & Cie (Europe) S.A.**, établie et ayant son siège social à L-1855 Luxembourg, 15A, avenue J.F. Kennedy, représentée par son conseil d'administration, inscrite au Registre de Commerce et des sociétés de Luxembourg sous le numéro B 32060 ;

**36. la société anonyme Sal. Oppenheim jr. & Cie. Luxembourg S.A.**, établie et ayant son siège social à L-5365 Munsbach, 18-20, rue Gabriel Lippmann, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 110890 ;

**37. la société anonyme Skandinaviska Enskilda Banken S.A.**, établie et ayant son siège social à L-2370 Howald, 4, rue Peterneichen, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 10831 ;

**38. la société anonyme INTESA SANPAOLO BANK Luxembourg**, anc. Société Européenne De Banque S.A., établie et ayant son siège social à L-1724 Luxembourg, 19-21, boulevard Prince Henri, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 13859 ;

**39. la société anonyme Société Générale Financing and Distribution**, en abrégé «SGFD », établie et ayant son siège social à L-1724 Luxembourg, 33, Boulevard Prince Henri, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 170794 ;

**40. la société anonyme SOCIETE GENERALE CAPITAL MARKET FINANCE**, en abrégé«SGCMF », établie et ayant son siège social à L-1724 Luxembourg, 33, Boulevard Prince Henri, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 180290 ;

**41. la société anonyme SOCIETE GENERALE BANK & TRUST**, en abrégé S.G.B.T., établie et ayant son siège social à L-2420 Luxembourg, 11, Avenue Emile Reuter représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 6061 ;

**42. La société en commandite par actions State Street Bank Luxembourg S.C.A.**, établie et ayant son siège social à L-1855 Luxembourg, 49, avenue J.F. Kennedy, représentée par ses organes statutaires, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 32771 ;

**43. la société anonyme INTERNAXX BANK S.A.**, anc. TD Bank International S.A., en abrégé TD BANK INTERNATIONAL, établie et ayant son siège social à L-1855 Luxembourg, 46A, avenue J.F. Kennedy, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 78729 ;

**44. la société anonyme The Bank of New York Mellon (Luxembourg) S.A.**, établie et ayant son siège social à L-2453 Luxembourg, 2-4, rue Eugène Ruppert, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 67654 ;

**45. la société anonyme UBI Banca International S.A.**, établie et ayant son siège social à L-1855 Luxembourg, 37A, avenue J.F. Kennedy, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 61018 ;

**46. la société anonyme UBS (Luxembourg) S.A.**, établie et ayant son siège social à L-1855 Luxembourg, 33A, avenue J.F. Kennedy, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 11142 ;

**47. la société anonyme UniCredit International Bank (Luxembourg) S.A.**, établie et ayant son siège social à L-2180 Luxembourg, 8-10, rue Jean Monnet, représentée par son conseil

d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 103341 ;

**48. la société anonyme UniCredit Luxembourg S.A.**, établie et ayant son siège social à L-2180 Luxembourg, 8-10, rue Jean Monnet, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 9989 ;

**49. la société anonyme Union Bancaire Privée (Europe) S.A.**, établie et ayant son siège social à L-1150 Luxembourg, 287-289, route d'Arlon, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 9471 ;

**50. la société anonyme VP Bank (Luxembourg) S.A.**, établie et ayant son siège social à L-1930 Luxembourg, 26, avenue de la Liberté, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 29509 ;

**51. la société en commandite par actions BROWN BROTHERS HARRIMAN Luxembourg S.C.A.**, établie et ayant son siège social à L-1470 Luxembourg, 80, route d'Esch, représentée par ses organes statutaires, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 29923 ;

**52. la société coopérative BANQUE RAIFFEISEN**, établie et ayant son siège social à L-3372 Leudelange, 4, rue Léon Laval, représentée par son conseil d'administration, sinon par son comité de direction, sinon par son représentant légal, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 20128 ;

**53. la société BNP Paribas Securities Services - Succursale de Luxembourg, Succursale luxembourgeoise de BNP Paribas Securities Services (France)**, établie et ayant son siège social à L-1855 Luxembourg, 60, avenue Kennedy, représentée par ses organes statutaires, sinon par son mandataire général, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 86862 ;

**54.    Commerzbank    Aktiengesellschaft,    Filiale    Luxemburg,** **succursale    luxembourgeoise    de    COMMERZBANK** **AKTIENGESELLSCHAFT (DEUTSCHLAND)**, établie et ayant son siège social à L-2540 Luxembourg, 25, rue Edward Steichen, représentée par son conseil d'administration, sinon par son mandataire général, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 119317 ;

**55. BNP PARIBAS -Succursale luxembourgeoise de BNP PARIBAS** **S.A. (France)**, établie et ayant son siège social à L-2951 Luxembourg, 50, avenue J.F. Kennedy, représentée par ses organes statutaires, sinon par son mandataire général, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 23968 ;

**56. Crédit Agricole Corporate and Investment Bank Luxembourg** **Branch**, en abrégé Crédit Agricole CIB, Luxembourg Branch CACIB, Luxembourg Branch, succursale luxembourgeoise de la société anonyme CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK (France), établie et ayant son siège social à L-2520 Luxembourg, 39, Allée Scheffer, représentée par ses organes statutaires, sinon par son mandataire général, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 35216 ;

**57. la société anonyme DEUTSCHE BANK LUXEMBOURG S.A.,** établie et ayant son siège social à L-1115 Luxembourg, 2, boulevard Konrad Adenauer, représentée par son conseil d'administration, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 9164 ;

**58.    HSBC    BANK    PLC,    Luxembourg    Branch,    succursale** **luxembourgeoise de HSBC BANK PLC (Royaume-Uni)**, établie et ayant son siège social à L-1160 Luxembourg, 16, Boulevard d'Avranches, représentée par ses organes statutaires, sinon par son mandataire général, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 178455 ;

**59. State Street Bank International GmbH**, Zweigniederlassung Luxemburg, succursale luxembourgeoise de State Street Bank GmbH (DEUTSCHLAND), établie et ayant son siège social à L-1855 Luxembourg, 49, avenue J.F. Kennedy, représentée par le(s) gérant(s),

inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 148186 ;

**60. SVENSKA HANDELSBANKEN AB (publ) Luxembourg BRANCH, succursale luxembourgeoise de Svenska Handelsbanken AB (publ)**, établie et ayant son siège social à L-1229 Luxembourg, 15, rue Bender, représentée par ses organes statuaires, sinon par son mandataire général, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 39099 ;

**61. Swedbank AB (publ) Luxembourg Brandi, succursale luxembourgeoise de SWEDBANK AB (publ) (Suède)**, établie et ayant son siège social à L-1331 Luxembourg, 65, boulevard Grande-Duchesse Charlotte, représentée par ses organes statutaires, sinon par son mandataire général, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 168008 ;

**62. The Bank of New York Mellon SA/NV, Luxembourg Branch, enseigne commerciale BNY Mellon Asset Servicing, succursale luxembourgeoise de THE BANK OF NEW YORK MELLON (Belgique)**, établie et ayant son siège social à Vertigo Building – Polaris à L-2453 Luxembourg, 2-4, rue Eugène Ruppert, représentée par ses organes statutaires, sinon par son mandataire général, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 105087 ;

**63. The Bank of New York Mellon (International) Limited, Luxembourg BRANCH, succursale luxembourgeoise de The Bank of New York Mellon (International) Limited (Royaume-Uni)**, établie et ayant son siège social à Vertigo Building -Polaris, à L-2453 Luxembourg, 2-4, rue Eugène Ruppert, représentée par ses organes statutaires, sinon par son mandataire général, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 58377 ;

les parties sub 7), 8), 24), 27), 41), 42), 44), 48), 51), 58), 59), 62) et 63) intimées aux fins du susdit exploit GALLE du 3 octobre 2017, **défaillantes** ;

les parties sub 5), 6), 9) à 23), 25) à 26), 28) à 40), 43), 45) à 47), 49) à 50), 52) à 57) et 60) à 61), **ne comparant pas**.

## LA COUR D'APPEL :

Par ordonnance de référé du 10 mai 2017, un vice-président du tribunal d'arrondissement de Luxembourg, en remplacement du Président dudit tribunal, a :

- reçu les demandes de l'Etat de Roumanie tendant à la nullité et à la mainlevée de la saisie-arrêt pratiquée les 28 et 29 juillet 2015 par Viorel MICULA auprès de 61 établissements bancaires de la place financière luxembourgeoise en la forme ;
- reçu l'intervention volontaire de la Commission Européenne en la forme ;
- s'est déclaré compétent pour connaître de la demande principale et de l'intervention volontaire;
- déclaré les demandes de l'Etat de Roumanie irrecevables tant sur base de l'article 933 alinéa 1 que sur base de l'article 932 alinéa 1 du NCPC ;
- rejeté la demande de l'Etat de Roumanie sur base de l'article 240 du NCPC ;
- rejeté la demande de l'Etat de Roumanie sur base de l'article 6-1 du code civil;
- condamné l'Etat de Roumanie à payer à Viorel MICULA la somme de 3.000 euros à titre d'indemnité de procédure sur base de l'article 240 du NCPC ;
- laissé les frais et dépens de l'instance à charge de l'Etat de Roumanie ;
- déclaré l'ordonnance commune aux tiers-saisis ; et
- ordonné l'exécution provisoire de l'ordonnance nonobstant appel et sans caution.

Par exploit d'huissier du 3 octobre 2017, l'Etat de Roumanie a relevé appel de cette ordonnance qui des dires des parties ne lui a pas été signifiée.

L'appelant demande à la Cour, par réformation de l'ordonnance,

- principalement, et par application de l'article 933 alinéa 1 du NCPC, de prononcer la nullité sinon la mainlevée de la saisie-arrêt pratiquée par Viorel MICULA en date des 28 et 29 juillet 2015 du fait :

- de l'absence de titre autorisant la partie saisissante à procéder à une saisie-arrêt conservatoire conformément à l'article 693 du NCPC, sinon
- d'une exécution contraire à l'ordre public et de l'application du droit communautaire, sinon

- de l'extinction de la créance affirmée,

• à titre subsidiaire, et par application de l'article 932 alinéa 1 du NCPC, d'ordonner la mainlevée pure et simple de la saisie-arrêt pratiquée par Viorel MICULA en date des 28 et 29 juillet 2015 en raison de la durée excessive de la mesure conservatoire eu égard à la procédure d'appel en cours, et

• en tout état de cause, de décharger l'appelant de la condamnation prononcée à son encontre sur base de l'article 240 du NCPC.

L'appelant conclut encore, par réformation de l'ordonnance, à se voir allouer le montant de 15.000 euros du chef de procédure abusive et vexatoire sur base de l'article 6-1 du code civil et une indemnité de procédure de 30.000 euros pour la première instance et de 20.000 euros pour l'instance d'appel.

A l'appui de son appel, l'Etat de Roumanie reprend les moyens en droit développés dans son assignation du 13 septembre 2016 et lors des plaidoiries en première instance qui ont été exposés par le premier juge dans son ordonnance et qui sont censés être reproduits ici. Le mandataire de la partie appelante renvoie ensuite à sa note de plaidoiries déposée en première instance.

La Roumanie expose que la saisie-arrêt n'a en l'occurrence pas été pratiquée sur base d'un titre et que Viorel MICULA savait au moment où il faisait pratiquer saisie-arrêt qu'une demande en suspension et en annulation contre la sentence arbitrale (ci-après la Sentence) rendue le 11 décembre 2013 par le Centre International pour le Règlement des Différends relatifs aux Investissements (ci-après CIRDI) était pendante tout comme il savait que la décision (UE) 2015/1470 du 30 mars 2015 de la Commission (ci-après la Décision) interdisait à la Roumanie d'exécuter la Sentence. Selon la Roumanie, la saisie-arrêt a donc été initiée dans des conditions illégales et constitue un trouble manifestement illicite.

La partie appelante explique encore qu'actuellement la Sentence ne peut plus être exécutée du fait de l'existence de la Décision qui fait partie du droit national et qui s'impose dans chaque Etat membre. La Décision a un effet contraignant à son encontre ; elle lui interdit de s'exécuter volontairement et lui ordonne de récupérer les montants déjà payés. La Roumanie précise que la Sentence heurte l'ordre public international au vu de la Décision qui est un acte exécutoire, alors que le recours à l'encontre de la Décision n'a pas d'effet suspensif. La Roumanie fait valoir que Viorel MICULA ne disposait donc pas de titre ayant force exécutoire au moment où il a pratiqué la saisie-arrêt.

La partie appelante affirme encore que la créance de Viorel MICULA a été apurée par une compensation avec les obligations fiscales de la société EUROPEAN FOOD SA, par une exécution forcée partielle sur le compte du Ministère des finances publiques roumain et par le paiement par consignation sur un compte séquestre ouvert au nom des demandeurs auprès de la Trésorerie nationale (roumaine). Au vu de cet apurement de la créance de Viorel MICULA, la Roumanie fait valoir que la saisie-arrêt constitue une atteinte intolérable à ses droits de pouvoir disposer de ses avoirs.

Finalement, la Roumanie donne à considérer que la Sentence est contraire à l'ordre public luxembourgeois en raison de l'existence de la Décision dont l'article 2 dispose qu'une exécution de la Sentence constitue une violation évidente du droit de l'UE par la Roumanie. Afin d'étayer son moyen que le juge national est tenu d'examiner d'office la conformité d'une sentence arbitrale à l'ordre public, la partie appelante cite l'arrêt Asturcom Telecommunicaciones (C-40/08) du 6 octobre 2009 dans lequel la Cour de l'UE, saisie d'une demande de décision préjudicielle portant sur l'interprétation de la directive 93/13/CEE du Conseil, du 5 avril 1993, présentée dans le cadre d'un recours en exécution forcée d'une sentence arbitrale devenue définitive, a dit que « *une juridiction nationale saisie d'un recours en exécution forcée d'une sentence arbitrale ayant acquis la force de chose jugée, rendue sans comparution du consommateur, est tenue, dès qu'elle dispose des éléments de droit et de fait nécessaires à cet effet, d'apprécier d'office le caractère abusif de la clause d'arbitrage contenue dans un contrat conclu entre un professionnel et un consommateur, dans la mesure où, selon les règles de procédure nationales, elle peut procéder à une telle appréciation dans le cadre de recours similaires de nature interne. Si tel est le cas, il incombe à cette juridiction de tirer toutes les conséquences qui en découlent selon le droit national afin de s'assurer que ce consommateur n'est pas lié par ladite clause* ».

L'intimé Viorel MICULA rappelle que l'Etat de Roumanie a, bien avant sa demande d'adhésion à l'Union Européenne, pris des engagements fermes notamment à son égard et il lui reproche d'avoir en 2005 décidé, probablement sur initiative de la Commission, d'abroger de manière abrupte les incitations accordées aux investissements dont il bénéficiait. Comme l'Etat de Roumanie aurait ainsi rompu la confiance des investisseurs, ceux-ci ont introduit un recours devant le CIRDI en réclamant l'indemnisation du préjudice causé par la suppression des incitations prévues par l'ordonnance d'urgence du Gouvernement (OUG) n° 24/1998 (qui auraient dû subsister jusqu'au 1er avril 2009).

Dans sa Sentence rendue le 11 décembre 2013, le tribunal arbitral aurait retenu que la Roumanie a porté atteinte à la confiance légitime des

requérants et a décidé que la Roumanie devait leur verser des dommages et intérêts pour un montant de 376.433.229 RON plus les intérêts.

Viorel MICULA rappelle qu'il disposait au moment de pratiquer saisie-arrêt d'une créance certaine, liquide et exigible, confirmée par une sentence arbitrale coulée en force de chose jugée et immédiatement exécutoire sur le territoire luxembourgeois ; que sa créance n'est pas apurée et que la Sentence n'est pas contraire à l'ordre public.

Soutenant que la Commission n'aurait en tant qu'organe exécutif pas lieu d'intervenir dans le litige l'opposant à la Roumanie, Viorel MICULA fait encore valoir que la décision de la Commission du 30 mars 2015, qualifiant les versements des dommages et intérêts auxquels la Roumanie a été condamnée d'aide d'Etat illégale et ayant interdit à la Roumanie de procéder volontairement au versement de sommes à Viorel MICULA, ne s'adresserait qu'à son destinataire, l'Etat de Roumanie. Il en déduit que la Décision ne s'appliquerait dès lors « certainement pas au Luxembourg » et rappelle qu'elle a fait l'objet d'un recours en annulation devant le tribunal de l'UE.

Finalement, il affirme que les dommages et intérêts lui alloués par le tribunal arbitral ne sauraient être qualifiés d'aide d'Etat et renvoie notamment à l'arrêt Asteris c/ Grèce n° 106/87 du 27 septembre 1988 de la CJUE.

Le mandataire de Viorel MICULA renvoie ensuite à ses deux notes de plaidoiries déposées en première instance.

L'intimé MICULA conclut au rejet des demandes de l'appelant sur toutes les bases invoquées et sollicite une indemnité de procédure de 3.000 euros pour l'instance d'appel.

La Commission, qui était intervenue volontairement en première instance (sur base de l'article 29, paragraphe 2, du Règlement (UE) 2015/1589 du Conseil du 13 juillet 2015) afin de faire valoir ses observations et pour faire respecter le droit de l'Union, donne à considérer que le droit communautaire s'oppose très clairement à ce que la Sentence arbitrale reçoive une quelconque exécution. Elle souligne que la mesure de recouvrement initiée par Viorel MICULA sur le territoire luxembourgeois est contraire au droit communautaire et donc au droit luxembourgeois de sorte qu'elle constitue un trouble manifestement illicite qu'il importe de faire cesser. La Commission précise qu'il n'est ni pertinent, ni concluant d'examiner les moyens soulevés par l'appelant (tels que ceux relatifs à la qualité de la Commission d'intervenir, quant à la régularité de la Décision ou quant à l'antériorité de la Sentence à la Décision) motif pris qu'il est

incontournable que la Décision, qui est un acte communautaire, est exécutoire et s'impose actuellement dans tous les Etats membres. Il en découlerait que le juge des référés luxembourgeois serait tenu d'ordonner la mainlevée de la saisie.

Par courrier du 27 février 2018, NATIXIS BANK SA demande à la Cour de lui donner acte « *qu'elle ne détient aucun compte pour l'Etat de Roumanie* ».

Il y a lieu de faire droit à cette demande conformément au dispositif ci-dessous.

La société anonyme RBC Investor Services Bank SA s'est rapportée à prudence de justice.

Appréciation

La Cour renvoie en ce qui concerne les faits et rétroactes aux développements exhaustifs du premier juge lesquels sont censés être reproduits ici.

Quant à la recevabilité des demandes en nullité et en mainlevée, qui est contestée, la doctrine retient que dans le cadre de l'article 933 alinéa 1 du NCPC, « *le juge des référés est compétent à tout stade de la procédure (de saisie-arrêt) lorsqu'il s'agit de faire cesser un trouble manifestement illicite ou une voie de fait résultant de ce que la procédure de saisie-arrêt n'a pas été poursuivie régulièrement. Lorsqu'il constate une nullité apparente ou manifeste, il peut prononcer la nullité de la saisie et ordonner la mainlevée* » (cf. Th. HOSCHEIT, La saisie-arrêt de droit commun, Pas, 29.p. 72).

Toutefois, la Cour, siégeant en matière de référé, a nuancé ces propos en décidant que « *si pour faire cesser le trouble, le juge des référés peut dans le cadre du référé-sauvegarde ordonner des mesures conservatoires, voire de remise en état, il ne peut pas pour autant instituer des mesures irréversibles. Il ne saurait partant pas prononcer la nullité de la saisie-arrêt, ses pouvoirs se limitant à en donner mainlevée* » (Cour d'appel, 8 févr. 2006, Pas. 33, p.134).

Au vu de l'absence en l'espèce de preuve d'une nullité apparente et manifeste, la demande principale en nullité est irrecevable.

L'appel n'est donc pas fondé de ce chef.

En ce qui concerne la demande en mainlevée de la saisie-arrêt sur base de l'article 933 alinéa 1 du NCPC, la Cour analysera, pour des raisons de logique juridique, en premier lieu s'il y a, tel que l'affirme l'appelant, trouble manifestement illicite en raison de l'impact de la Décision et de la primauté du droit communautaire.

Le trouble manifestement illicite consiste en « *toute perturbation résultant d'un fait matériel ou juridique qui, directement ou indirectement, constitue une violation évidente de la règle de droit* « (cf. Solus & Perrot, Droit judiciaire privé, Sirey, T. III, n° 1289).

Il est établi que la saisie-arrêt a été pratiquée sur base de la Sentence dûment revêtue de la formule exécutoire, qui en vertu de l'article 54[1] de la Convention de Washington, impose la reconnaissance et l'exécution des sentences arbitrales à chaque Etat contractant, tel que le Luxembourg. La saisie-arrêt a donc été pratiquée sur base d'un titre, qui même en étant frappé d'un recours, était en l'occurrence exécutoire en application des articles 53 et 54 de la Convention de Washington.

La décision en ce sens du premier juge est donc à confirmer de sorte que les moyens de Viorel MICULA consistant notamment à soulever (i) l'absence de titre respectivement (ii) à dire que dans le cas de saisie-arrêt pratiquée sur base d'un titre, le juge des référés ne serait pas compétent pour examiner s'il y a trouble manifestement illicite, tombent à faux.

Pour être complet, la Cour précise que les deux arrêts cités à ce sujet par Viorel MICULA ne sont pas transposables au cas d'espèce. Dans l'arrêt du 20 mars 1989 (rôle 10915) la Cour a dit que « *lorsque la saisie-arrêt a été pratiquée en vertu de la permission du président du tribunal (…) et à défaut de preuve par la [société appelante] qu'un acte manifestement illégal ait été commis par la [société intimée], on ne saurait reprocher à cette dernière un tel acte, étant donné qu'elle a agi dans les formes de la loi* »

---

[1] Art. 54

(1) Chaque Etat contractant reconnaît toute sentence rendue dans le cadre de la présente Convention comme obligatoire et assure l'exécution sur son territoire des obligations pécuniaires que la sentence impose comme s'il s'agissait d'un jugement définitif d'un tribunal fonctionnant sur le territoire dudit Etat. Un Etat contractant ayant une constitution fédérale peut assurer l'exécution de la sentence par l'entremise de ses tribunaux fédéraux et prévoir que ceux-ci devront considérer une telle sentence comme un jugement définitif des tribunaux de l'un des Etats fédérés.

(2) Pour obtenir la reconnaissance et l'exécution d'une sentence sur le territoire d'un Etat contractant, la partie intéressée doit en présenter copie certifiée conforme par le Secrétaire Général au tribunal national compétent ou à toute autre autorité que ledit Etat contractant aura désigné à cet effet. Chaque Etat contractant fait savoir au Secrétaire Général le tribunal compétent ou les autorités qu'il désigne à cet effet et le tient informé des changements éventuels.

(3) L'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder.

tandis que dans le cas d'espèce, la saisie-arrêt n'a pas été pratiquée sur autorisation du président mais sur base d'un titre.

Dans l'arrêt du 17 février 1986 (rôle 8972), la Cour avait retenu que lorsque la saisie-arrêt a été pratiquée en vertu d'une autorisation du président du tribunal, le saisi peut demander en référé la rétractation de cette ordonnance mais que la juridiction des référés devient incompétente pour statuer sur une demande de rétractation de l'ordonnance présidentielle accordant l'autorisation de saisir-arrêter lorsque le tribunal est saisi de l'instance en validité.  Cette affaire n'est donc également pas assimilable au cas d'espèce.

L'appel n'est pas fondé sur ce point.

Quant à l'impact de la Décision, la partie appelante a exposé à bon droit que celle-ci est obligatoire dans tous les Etats membres en vertu de l'article $288^2$ du Traité (TFUE) et que même si elle fait l'objet d'un recours en annulation, ce recours n'est pas suspensif.

La Décision contient une interdiction absolue faite à l'encontre de la Roumanie de verser à Viorel MICULA les dommages et intérêts que celui-ci réclame sur base de la Sentence.

La partie appelante reproche encore au premier juge d'avoir, en procédant à une division entre la phase conservatoire et la phase exécutoire de la saisie-arrêt, refusé d'examiner la question de l'impact de la Décision sur le titre sur base duquel la saisie-arrêt a été pratiquée.

Selon la Roumanie, la saisie-arrêt pratiquée sur ses comptes bancaires violerait un acte communautaire exécutoire sur tout le territoire communautaire et constituerait donc un trouble manifestement illicite.

Elle conclut qu'une sentence arbitrale ayant autorité définitive de chose jugée peut perdre son caractère exécutoire en raison de la survenance d'un élément nouveau.

---

[2] article 288 TFUE :
Pour exercer les compétences de l'Union, les institutions adoptent des règlements, des directives, des décisions, des recommandations et des avis.
Le règlement a une portée générale. Il est obligatoire dans tous ses éléments et il est directement applicable dans tout État membre.
La directive lie tout État membre destinataire quant au résultat à atteindre, tout en laissant aux instances nationales la compétence quant à la forme et aux moyens.
La décision est obligatoire dans tous ses éléments. Lorsqu'elle désigne des destinataires, elle n'est obligatoire que pour ceux-ci.
Les recommandations et les avis ne lient pas.

Il faudrait donc s'attacher à la notion d'actualité ou d'efficacité du titre et le juge des référés devrait, même durant la phase conservatoire, se soucier de l'actualité et de l'efficacité dans le temps du titre ayant servi de base à la saisie-arrêt.

Le CIRDI a été institué par la Convention pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, conclue à Washington le 18 mars 1965 et est entrée en vigueur le 14 octobre 1966. La Convention de Washington, qui a été signée par le Luxembourg le 28 septembre 1965 et ratifiée par la loi du 8 avril 1970, est donc pleinement applicable au Luxembourg.

La Décision (UE) 2015/1470 de la Commission du 30 mars 2015 dispose notamment que :

• le versement des dommages et intérêts accordés par le tribunal arbitral, constitué sous l'égide du CIRDI par la sentence rendue le 11 décembre 2013 dans l'affaire MICULA e.a. / Roumanie, constitue une aide d'Etat au sens de l'article 107, paragraphe 1, du traité, qui est incompatible avec le marché intérieur (article 1$^{er}$) ;
• la Roumanie ne verse aucune aide incompatible visée à l'article 1$^{er}$ et récupère toutes les aides incompatibles versées à l'article 1$^{er}$ qui ont déjà été versées aux entités, quelles qu'elles soient, (….)
• Viorel MICULA, (….) et [ses co-requérants] sont solidairement responsables du remboursement de l'aide d'Etat qu'ils ont reçue (article 2) ;
• la récupération de l'aide visée à l'article 1$^{er}$ est immédiate et effective (article 3), et
• la Roumanie veille à ce qu'aucun autre versement de l'aide visée à l'article 1$^{er}$ ne soit effectué à partir de la date d'adoption de la présente décision.

La Décision interdit donc à la Roumanie d'exécuter la Sentence arbitrale et lui ordonne de récupérer les montants déjà payés ; elle a un caractère contraignant et Viorel MICULA ne pouvait pas ignorer qu'il ne pouvait plus utiliser la Sentence comme titre lui permettant de diligenter une saisie-arrêt conservatoire motif pris que la Décision, postérieure à la Sentence, dit pour droit que la condamnation aux dommages et intérêts à payer par la Roumanie est contraire au droit communautaire.

Selon l'intimé MICULA, cette Décision ne s'impose qu'à la Roumanie mais non pas au Luxembourg de sorte qu'elle n'empêcherait pas la poursuite de l'exécution de la mesure conservatoire.

S'il est exact que l'article 5 de la Décision stipule que « *La Roumanie est destinataire de la présente décision* » et que l'article 288 du TFUE dispose que « *La décision est obligatoire dans tous ses éléments. Lorsqu'elle désigne des destinataires, elle n'est obligatoire que pour ceux-ci* », il tombe sous le sens, au vu des développements ci-dessus, que la Décision s'impose dans tous les Etats membres où Viorel MICULA entame des procédures d'exécution pour obtenir le paiement des dommages et intérêts lui accordés par le tribunal arbitral, par la Sentence rendue le 11 décembre 2013.

Ce moyen n'est donc pas fondé.

Si a priori le caractère certain, liquide et exigible de la créance de Viorel MICULA découle du titre exécutoire, il convient toutefois d'examiner la viabilité de ce titre sous l'angle du contentieux de son actualité ou de son efficacité.

Un titre n'est en effet pas éternel et il est possible qu'une saisie-arrêt réalisée sur base d'un titre n'ait plus lieu d'être ou que l'exécution du titre sur base duquel elle fut pratiquée n'est plus efficace en raison de la survenance de faits nouveaux tel que l'extinction de l'obligation constatée dans le titre (par paiement, compensation ou novation), la prescription de l'*actio iudicati*, voire les incidences d'une nouvelle loi ou des conventions.

Contrairement aux développements de la partie appelante, le juge des référés n'est pas compétent pour décider si Viorel MICULA ne dispose plus d'un titre ayant force exécutoire pour pratiquer saisie-arrêt mais il est compétent pour constater qu'en l'espèce il existe des contestations sérieuses qui imposent la mainlevée de la saisie-arrêt pratiquée les 28 et 29 juillet 2015. Une saisie-arrêt pratiquée sur base d'un titre ayant perdu de son actualité et efficacité cause un trouble manifestement illicite au débiteur saisi.

En l'espèce, la Décision de la Commission du 30 mars 2015 est exécutoire et elle entrave l'exécution du titre constitué par la Sentence arbitrale. Elle est obligatoire dans tous ses éléments et dans tous les Etats membres en vertu de l'article 288 du TFUE et même si elle fait actuellement l'objet d'un recours devant les juridictions communautaires, ce recours n'est pas suspensif en vertu de l'article 278 du TFUE.

La Décision interdit que la saisie-arrêt soit validée au fond par une juridiction luxembourgeoise étant donné que (i) le droit des aides d'Etat, qui fait partie de l'ordre public, doit prévaloir sur le droit national et (ii) la Sentence arbitrale est contraire à l'ordre public communautaire et donc luxembourgeois (cf. arrêt Lucchini, CJUE 18.07.2007, C-119/05 dans

lequel il a été décidé que le principe de la primauté du droit communautaire exige que le juge national doive laisser inappliquée toute disposition susceptible de mettre en cause la compétence exclusive de la Commission pour statuer sur la compatibilité d'une aide d'État avec le marché commun, y compris une disposition nationale mettant en œuvre le principe de l'autorité de la chose jugée, qui contrarierait dans le cas d'espèce la récupération d'une aide déclarée incompatible par la Commission européenne ; arrêt Klausner CJUE, 11.11.2015, C-505/14 dans lequel la CJUE a dit pour droit que le principe d'effectivité s'oppose à une règle nationale qui empêche le juge national de tirer toutes les conséquences de la violation de l'article 108 TFUE en raison de l'autorité de la chose jugée d'une décision juridictionnelle nationale rendue à propos d'un litige étranger au contrôle des aides d'État).

L'arrêt Asturacom Telecommunicaciones (CJUE, 6 oct. 2009, C-40-8) cité par la Commission et mentionné ci-dessus retient que le juge national doit « *selon les règles de procédures internes, apprécier d'office la contrariété entre une clause arbitrale et les règles nationales d'ordre public* », lesquelles intègrent également l'ordre public tel que défini par le droit de l'Union.

Par ailleurs, la CJUE a dans l'arrêt Deutsche Lufthansa (C-284/12) du 21 novembre 2013 rappelé « *qu'il importe également de souligner que l'application des règles de l'Union en matière d'aides d'État repose sur une obligation de coopération loyale entre, d'une part, les juridictions nationales et, d'autre part, la Commission et les juridictions de l'Union, dans le cadre de laquelle chacun agit en fonction du rôle qui lui est assigné par le traité. Dans le cadre de cette coopération, les juridictions nationales doivent prendre toutes mesures générales ou particulières propres à assurer l'exécution des obligations découlant du droit de l'Union et de s'abstenir de celles qui sont susceptibles de mettre en péril la réalisation des buts du traité, ainsi qu'il découle de l'article 4, paragraphe 3, TUE. Ainsi, les juridictions nationales doivent, en particulier, s'abstenir de prendre des décisions allant à l'encontre d'une décision de la Commission, même si elle revêt un caractère provisoire* ».

Au vu de ce qui précède, c'est à tort que le juge de première instance a retenu que « *les contestations précitées... ne sauraient entraîner dans le chef de Viorel MICULA, postérieurement à l'exercice de la mesure conservatoire en vertu d'un titre définitif et valable, la commission d'un acte manifestement illicite portant préjudice aux droits de l'Etat de Roumanie* ».

Dans la mesure où la Décision a fait perdre à la Sentence son actualité et son efficacité et donc son caractère exécutable, la créance de Viorel

MICULA n'est plus exigible. Il y a donc lieu de faire droit à la demande de l'Etat de Roumanie et d'ordonner la mainlevée de la saisie-arrêt pratiquée.

L'appel est fondé.

La partie appelante conclut encore par réformation de l'ordonnance à la condamnation de Viorel MICULA à lui payer une indemnité à hauteur de 15.000 euros pour procédure abusive et vexatoire sur base de l'article 6-1 du code civil. A l'appui de cette demande, la Roumanie expose que Viorel MICULA a commis une faute lourde, équipollente au dol en pratiquant en date des 28 et 29 juillet 2015 une saisie-arrêt auprès d'une soixantaine d'établissements bancaires au Luxembourg, tout en ayant connaissance de l'existence de la Décision du 30 mars 2015.

Le juge des référés étant sans pouvoir pour dire le droit et trancher le fond du litige, il ne saurait allouer des dommages et intérêts, même ceux sollicités pour procédure abusive et vexatoire.

L'appel n'est donc pas fondé sur ce point.

Finalement, la Roumanie demande à la Cour de réformer l'ordonnance entreprise en ce qu'elle a été condamnée en première instance à payer à Viorel MICULA une indemnité de procédure de 3.000 euros et en ce qu'il n'a pas été fait droit à sa demande sur base de l'article 240 du NCPC. Elle réclame une indemnité de procédure de 30.000 pour la première instance et de 20.000 euros pour l'instance d'appel.

Au vu du sort réservé à son appel, il y a lieu de décharger l'Etat de Roumanie de la condamnation prononcée à son encontre sur base de l'article 240 du NCPC par les premiers juges. Comme il paraît inéquitable de laisser à sa charge l'intégralité des frais irrépétibles qu'elle a dû débourser pour faire valoir ses droits, il y a lieu de lui accorder une indemnité de procédure de 2.000 euros pour la première instance et de 3.000 euros pour l'instance d'appel.

L'intimé MICULA est, en tant que partie succombante dans la présente instance, à débouter de sa demande en allocation d'une indemnité de procédure.

A l'exception des tiers saisis BLLUX Company SA, Banque BCP SA, CATELLA BANK SA, EAST-WEST UNITED BANK SA, HSBC Private Bank SA, SOCIETE GENERALE BANK & TRUST an abrégé S.G.B.T., State Street Bank S.C.A., The Bank of New York Mellon (Luxembourg) SA, UniCredit Luxembourg SA, Brown Brothers Harriman Luxembourg S.C.A., HSBC Bank plc, Luxembourg Branch, succursale luxembourgeoise

de HSBC BANK PLC (Royaume UNI), State Street Bank International GmbH, The Bank of New York Mellon SA/NV et The Bank of New York Mellon (International) Limited Luxemburg Branch, qui ont été touchés à domicile, les autres tiers saisis ont été touchés à personne par l'acte d'appel du 3 octobre 2017.

Tel que l'a relevé à bon droit le juge de première instance il n'y a en l'occurrence pas lieu à application de l'article 84 du NCPC étant donné que les tiers saisis ont été assignés aux fins de déclaration d'arrêt commun de sorte qu'il n'y a pas de risque de contrariété de décision en ce qui les concerne.

Il y a donc lieu de statuer par défaut à l'égard des sociétés BLLUX Company SA, Banque BCP SA, CATELLA BANK SA, EAST-WEST UNITED BANK SA, HSBC Private Bank SA, SOCIETE GENERALE BANK & TRUST an abrégé S.G.B.T., State Street Bank S.C.A., The Bank of New York Mellon (Luxembourg) SA, UniCredit Luxembourg SA, Brown Brothers Harriman Luxembourg S.C.A., HSBC Bank plc, Luxembourg Branch, succursale luxembourgeoise de HSBC BANK PLC (Royaume UNI), State Street Bank International GmbH, The Bank of New York Mellon SA/NV et The Bank of New York Mellon (International) Limited Luxemburg Branch,  avec effet contradictoire à l'encontre des autres tiers saisis, à l'exception de la société RBC INVESTOR SERVICES BANK SA et de la NATIXIS BANK, et contradictoirement à l'égard de l'Etat de Roumanie, de Viorel MICULA, de la Commission Européenne et de la société RBC INVESTOR SERVICES BANK SA et de la société anonyme NATIXIS BANK

## PAR CES MOTIFS :

La Cour d'appel, septième chambre, siégeant en matière d'appel de référé, statuant contradictoirement à l'égard de Viorel MICULA, de l'Etat de Roumanie, de la Commission Européenne, de la société RBC INVESTOR SERVICES BANK SA et de la société anonyme NATIXIS BANK, par défaut à l'égard des sociétés BLLUX Company SA, Banque BCP SA, CATELLA BANK SA, EAST-WEST UNITED BANK SA, HSBC Private Bank SA, SOCIETE GENERALE BANK & TRUST an abrégé S.G.B.T., State Street Bank S.C.A., The Bank of New York Mellon (Luxembourg) SA, UniCredit Luxembourg SA, Brown Brothers Harriman Luxembourg S.C.A., HSBC Bank plc, Luxembourg Branch, succursale luxembourgeoise de HSBC BANK PLC (Royaume UNI), State Street Bank International GmbH, The Bank of New York Mellon SA/NV et The Bank

of New York Mellon (International) Limited Luxemburg Branch, et avec effet contradictoire à l'égard des autres parties tierces saisies,

reçoit l'appel en la forme ;

le déclare partiellement fondé ;

par réformation de l'ordonnance n° 272/2017 du 10 mai 2017,

déclare la demande de l'Etat de Roumanie en mainlevée de la saisie-arrêt recevable et fondée sur base de l'article 933 alinéa 1er du NCPC ;

ordonne la mainlevée de la saisie-arrêt pratiquée les 28 et 29 juillet 2015 ;

décharge l'Etat de Roumanie de la condamnation prononcée à son encontre sur base de l'article 240 du NCPC ;

confirme l'ordonnance en ce qu'elle a rejeté la demande de l'Etat de Roumanie sur base de l'article 6-1 du code civil ;

condamne Viorel MICULA à payer à l'Etat de Roumanie une indemnité de procédure de 2.000 euros pour la première instance et de 3.000 euros pour l'instance d'appel ;

donne acte à la société anonyme NATIXIS BANK SA qu'elle ne détient aucun compte pour l'Etat de Roumanie ;

fait masse des frais des deux instances et les impose à Viorel MICULA.

**TARGEM**
**TRANSLATIONS**

☎ 718 384 8040
🖷 718 388 3516
✉ info@targemtranslations.com
🆆 TargemTranslations.com

## CERTIFIED TRANSLATION

I, Wolf Markowitz, Manager at Targem Translations, Inc., located at 143 Rodney Street in Brooklyn, New York, a language service firm with a track record of providing expert language services to the business and legal community of more than 50 years, do hereby certify that our team of translators, editors and proofreaders are professionally trained and vastly experienced in providing professional translations, from French to English and vice versa; and they have professionally translated the document referenced as **"Micula - Luxembourg"** from French to English, faithfully, accurately and completely, to the best of their expertise and experience.

Date: December 11, 2018

_____
Wolf Markowitz

_____
Signature of Notary

ROCHAL WEISS
NOTARY PUBLIC-STATE OF NEW YORK
No  01WE6293785
Qualified in Kings County
My Commission Expires 12-16-2021

**TARGEM TRANSLATIONS | Headquarters**
143 Rodney Street, Brooklyn, NY 11211

**OFFICES |** New York, California, and Asia



# **Appendix 2**

[Handwritten N.N. Schwartz 224]

COPY

Judgment No. 71/18-VII-REF

**Public hearing on March 21, Two Thousand Eighteen**

Number 45337 of the list.

Composition:

[STAMP]

Superior Court
of Justice/Grand
Duchy of
Luxembourg

Astrid Maas, President of the Chamber;
Marie-Laure Meyer, Senior Adviser;
Monique Hentgen, Senior Adviser;
Daniel Schroeder, Clerk.

Between:

**The Romanian government,** represented by its legal representation, with the address 17 Apolodor St., Sector 5, 050741 Bucharest (Romania),

appellant under the terms of a court bailiff's writ, Geoffrey GALLE of Luxembourg on October 3, 2017,

represented by Mr. Donald VENKATAPEN, attorney-at-law, residing in Luxembourg;

and:

**1. Viorel MICULA,** residing in Romania, 48, Colinelor St., ORADEA, BIHOR Department (Romania), electing the firm of Mr. Fabio TREVISAN, attorney-at-law, residing at L-2370 Howald, 2, Peternelchen St., Building C2, as domicile for the purposes of serving the notice of appeal.

respondent for the purpose of the aforementioned GALLE writ dated October 3, 2017,

represented by Mr. Fabio TREVISAN, attorney-at-law, residing in Luxembourg;

**2. the EUROPEAN COMMISSION,** with headquarters located at B-1049 Bruxelles, rue de la Loi, electing the firm of Mr. Michel SCHWARTZ, residing at L-2155 Luxembourg, 70-72, Muehlenweg, as domicile for the purposes of serving the notice of appeal.

respondent for the purpose of the aforementioned GALLE writ dated October 3, 2017,

represented by Mr. Michel SCHWARTZ, attorney-at-law, residing in Luxembourg;

**3. the société anonyme (limited liability company) RBC Investor Services Bank S.A.,** established with its company headquarters at L-4360 Esch/Alzette, 14, Porte de France, represented by its Board of Directors,

respondent for the purpose of the aforementioned GALLE writ dated October 3, 2017,

represented by Mr. Franck GREFF, attorney-at-law, residing in Luxembourg;

**4. the société anonyme (limited liability company) Natixis Bank,** established with its company headquarters at L-1855 Luxembourg, 51, avenue J.F. Kennedy, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 32160;

respondent for the purpose of the aforementioned GALLE writ dated October 3, 2017,

represented by Mr. Alain LORANG, attorney-at-law, residing in Luxembourg;

**5. the government-owned corporation created according to the law dated March 24, 1989, Banque et Caisse d'Epargne de l'Etat Luxembourg,** established with its company headquarters at L-2954 Luxembourg, 1, Place de Metz, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 30.775;

**6. ABN AMRO Bank (Luxembourg) S.A.,** established with its company headquarters at L-1855 Luxembourg, 46, avenue J.F. Kennedy, represented

by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 19116;

**7. the société anonyme (limited liability company) BLLUX Company S.A.,** established with its company headquarters at L-2633 Senningerberg, 6d, route de Trêves, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 49124;

**8. the société anonyme (limited liability company) BANQUE BCP S.A.,** established with its company headquarters at L- 8070 Bertrange, 5, rue Des Mérovingiens - Op Bourmicht, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 7648;

**9. the société anonyme (limited liability company) BANQUE CARNEGIE Luxembourg S.A.,** established with its company headquarters at L-1229 Luxembourg, 15, rue Bender, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 43.569;

**10. the société anonyme (limited liability company) BANQUE DE LUXEMBOURG S.A.,** established with its company headquarters at L-2449 Luxembourg, 14, boulevard Royal, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 5310;

**11. the société anonyme (limited liability company) BANQUE DEGROOF PETERCAM LUXEMBOURG S.A.,** formerly Banque Degroof, established with its company headquarters at L-2453 Luxembourg, 12, rue Eugène Ruppert, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 25459;

**12. the société anonyme (limited liability company) BANQUE HAPOALIM Luxembourg S.A.,** established with its company headquarters at L-1325 Luxembourg, 7, rue de la Chapelle, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 37622;

**13. the société anonyme (limited liability company) Banque Internationale of Luxembourg S.A, abbreviated BIL,** established with its company headquarters at L-2953 Luxembourg, 69, route d'Esch, represented by its Board of Directors, registered in the

Luxembourg Trade and Companies Register under number B 6307;

**14.     the société anonyme (limited liability company) BANQUE TRANSATLANTIQUE Luxembourg,** established with its company headquarters at L-1450 Luxembourg, 17, Côte d'Eich, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 31730;

**15. the société anonyme (limited liability company) BGL BNP Paribas,** established with its company headquarters at L-2951 Luxembourg, 50, avenue J.F. Kennedy, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 6481;

**16. the société anonyme (limited liability company) CACEIS Bank Luxembourg,** abbreviated CACEIS BL, established with its company headquarters at L-2520 Luxembourg, 5, Allée Scheffer, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 91985;

**17. the société anonyme (limited liability company) CATELLA BANK S.A.,** established with its company headquarters at L-8308 Capellen, 38, rue Pafebruch, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 29962;

**18. the société anonyme (limited liability company) Compagnie de Banque Privée Quilvest S.A., abbreviated CBP Quilvest S.A.,** established with its company headquarters at L-2134 Luxembourg, 48, rue Charles Martel, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 117963;

**19. the société anonyme (limited liability company) CA INDOSUEZ WEALTH (EUROPE),** formerly Crédit Agricole Luxembourg, established with its company headquarters at L-2520 Luxembourg, 39, Allée Scheffer, represented by its current Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 91986;

**20. the société anonyme (limited liability company) CREDIT SUISSE (LUXEMBOURG) S.A.,** established with its company headquarters at L-2180 Luxembourg, 5, rue Jean Monnet, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 11756;

**21. the société anonyme (limited liability company) DANSKE BANK INTERNATIONAL S.A.,** established with its company headquarters at L-2011 Luxembourg, 13, rue Edward Steichen, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 14101;

**22. the société anonyme (limited liability company) DekaBank Deutsche Girozentrale Luxembourg S.A.,** established with its company headquarters at L-1748 Luxembourg- Findel, 6, rue Lou Hemmer, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 9462;

**23. the société anonyme (limited liability company) DNB Luxembourg S.A.,** established with its company headquarters at L-1637 Luxembourg, 13, rue Goethe, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 22374;

**24. the société anonyme (limited liability company) EAST-WEST UNITED BANK S.A.,** established with its company headquarters at L-1840 Luxembourg, 10, boulevard Joseph II, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 12.049;

**25. the société anonyme (limited liability company) EDMOND DE ROTHSCHILD (EUROPE) S.A.,** established with its company headquarters at L-2535 Luxembourg, 20, boulevard Emmanuel Servais, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 19194;

**26. the société anonyme (limited liability company) Freie Internationale Sparkasse S.A.,** established with its company headquarters at L-2227 Luxembourg, 13, avenue de la Porte- Neuve, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 79983;

27. **the société anonyme (limited liability company) HSBC Private Bank (Luxembourg) S.A.,** established with its company headquarters at L-1160 Luxembourg, 16, boulevard d'Avranches, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 52461;

28. **the société anonyme (limited liability company) HSH Nordbank Securities S.A.,** established with its company headquarters at L-2180 Luxembourg, 2, rue Jean Monnet, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 14784;

29. **the société anonyme (limited liability company) ING Luxembourg S.A.,** established with its company headquarters at L-1616 Luxembourg, 26, Place de la Gare, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 6041;

30. **the société anonyme (limited liability company) J.P. Morgan Bank Luxembourg S.A.,** established with its company headquarters at L-2633 Senningerberg, 6, route de Trèves, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 10958;

31. **the société anonyme (limited liability company) KBL EUROPEAN PRIVATE BANKERS S.A.,** established with its company headquarters at L-2955 Luxembourg, 43, boulevard Royal, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 6395;

32. **the société anonyme (limited liability company) Lombard Odier (Europe) S.A.,** established with its company headquarters at L-1150 Luxembourg, 291, route d'Arlon, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 169907;

33. **the société anonyme (limited liability company) M.M. Warburg & CO Luxembourg S.A.,** abbreviated M.M. Warburg Bank Luxembourg, established with its company headquarters at L-1413 Luxembourg, 2, Place François-Joseph Dargent, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 10700;

**34. the société anonyme (limited liability company) Nordea Bank S.A.,** established with its company headquarters at L-2220 Luxembourg, 562, rue de Neudorf, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 14157;

**35. the société anonyme (limited liability company) Pictet & Cie (Europe) S.A.,** established with its company headquarters at L-1855 Luxembourg, 15A, avenue J.F. Kennedy, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 32060;

**36. the société anonyme (limited liability company) Sal. Oppenheim jr. & Cie. Luxembourg S.A.,** established with its company headquarters at L-5365 Luxembourg,18-20, rue Gabriel Lippmann, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 110890;

**37. the société anonyme (limited liability company) Skandinaviska Enskilda Banken S.A.,** established with its company headquarters at L-2370 Howald, 4, rue Peterneichen, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 10831;

**38. the société anonyme (limited liability company) INTESA SANPAOLO BANK Luxembourg,** formerly Société Européenne De Banque S.A., established with its company headquarters at L-1724 Luxembourg, 19-21, boulevard Prince Henri, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 13859;

**39. the société anonyme (limited liability company) Société Générale Financing and Distribution**, abbreviated "SGFD," established with its company headquarters at L-1724 Luxembourg, 33, Boulevard Prince Henri, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 170794;

**40. the société anonyme (limited liability company) SOCIETE GENERALE CAPITAL MARKET FINANCE,** abbreviated "SGCMF," established with its company headquarters at L-1724 Luxembourg, 33, Boulevard Prince Henri, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 180290;

**41.  the société anonyme (limited liability company) SOCIETE GENERALE BANK & TRUST,** abbreviated S.G.B.T., established with its company headquarters at L-2420 Luxembourg, 11, Avenue Emile Reuter, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 6061;

**42.  the société en commandite par actions (limited equity partnership) State Street Bank Luxembourg S.C.A.,** established with its company headquarters at L-1855 Luxembourg, 49, avenue J.F. Kennedy, represented by its statutory bodies, registered in the Luxembourg Trade and Companies Register under number B 32771;

**43.  the société anonyme (limited liability company) IINTERNAXX BANK S.A.,** formerly TD Bank International S.A., abbreviated TD BANK INTERNATIONAL, established with its company headquarters at L-1855 Luxembourg, 46A, avenue J.F. Kennedy, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 78729;

**44.  the société anonyme (limited liability company) The Bank of New York Mellon (Luxembourg) S.A.,** established with its company headquarters at L-2453 Luxembourg, 2-4, rue Eugène Ruppert, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 67654;

**45.  the société anonyme (limited liability company) UBI Banca International S.A.,** established with its company headquarters at L-1855 Luxembourg, 37A, avenue J.F. Kennedy, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 61018;

**46.  the société anonyme (limited liability company) UBS (Luxembourg) S.A.,** established with its company headquarters at L-1855 Luxembourg, 33A, avenue J.F. Kennedy, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 11142;

**47.  the société anonyme (limited liability company) UniCredit International Bank (Luxembourg) S.A**., established with its company headquarters at L-2180 Luxembourg, 8-10, rue Jean Monnet, represented by its Board

of Directors, registered in the Luxembourg Trade and Companies Register under number B 103341;

**48. the société anonyme (limited liability company) UniCredit Luxembourg S.A.,** established with its company headquarters at L-2180 Luxembourg, 8-10, rue Jean Monnet, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 9989;

**49. the société anonyme (limited liability company) Union Bancaire Privée (Europe) S.A.,** established with its company headquarters at L-1150 Luxembourg, 287-289, route d'Arlon, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 9471;

**50. the société anonyme (limited liability company) VP Bank (Luxembourg) S.A.,** established with its company headquarters at L-1930 Luxembourg, 26, avenue de la Liberté, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 29509;

**51. the société en commandite par actions (limited equity partnership) BROWN BROTHERS HARRIMAN Luxembourg S.C.A.,** established with its company headquarters at L-1470 Luxembourg, 80, route d'Esch, represented by its statutory bodies, registered in the Luxembourg Trade and Companies Register under number B 29923;

**52. the société coopérative (public limited company) BANQUE RAIFFEISEN,** established with its company headquarters at L-3372 Leudelange, 4, rue Léon Laval, represented by its Board of Directors or authorized agent, registered in the Luxembourg Trade and Companies Register under number B 20128;

**53. BNP Paribas Securities Services - Luxembourg Branch, Luxembourg subsidiary of BNP Paribas Securities Services (France),** established with its company headquarters at L-1855 Luxembourg, 60, avenue Kennedy, represented by its statutory bodies or authorized agent, registered in the Luxembourg Trade and Companies Register under number B 86862;

54. **Commerzbank Aktiengesellschaft, Luxembourg Branch, Luxembourg subsidiary of COMMERZBANK AKTIENGESELLSCHAFT (DEUTSCHLAND),** established with its company headquarters at L-2540 Luxembourg, 25, rue Edward Steichen, represented by its Board of Directors or authorized agent, registered in the Luxembourg Trade and Companies Register under number B 119317;

55. **BNP PARIBAS -Luxembourg subsidiary of BNP PARIBAS S.A. (France),** established with its company headquarters at L-2951 Luxembourg, 50, avenue J.F. Kennedy, represented by its statutory bodies or authorized agent, registered in the Luxembourg Trade and Companies Register under number B 23968;

56. **Crédit Agricole Corporate and Investment Bank Luxembourg Branch,** abbreviated Crédit Agricole CIB, Luxembourg Branch CACIB, Luxembourg Branch, Luxembourg branch of the société anonyme (limited liability company) CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK (France), established with its company headquarters at L-2520 Luxembourg, 39, Allée Scheffer, represented by its statutory bodies or authorized agent, registered in the Luxembourg Trade and Companies Register under number B 35216;

57. **the société anonyme (limited liability company) DEUTSCHE BANK LUXEMBOURG S.A.,** established with its company headquarters at L-1115 Luxembourg, 2, boulevard Konrad Adenauer, represented by its Board of Directors, registered in the Luxembourg Trade and Companies Register under number B 9164;

58. **HSBC BANK PLC, Luxembourg Branch, Luxembourg subsidiary of HSBC BANK PLC (UK),** established with its company headquarters at L-1160 Luxembourg, 16, Boulevard d'Avranches, represented by its statutory bodies or authorized agent, registered in the Luxembourg Trade and Companies Register under number B 178455;

59. **State Street Bank International GmbH,** Zweigniederlassung Luxemburg, Luxembourg branch of State Street Bank GmbH (DEUTSCHLAND), established with its company headquarters at L-1855 Luxembourg, 49, avenue J.F. Kennedy, represented by its manager(s),

registered in the Luxembourg Trade and Companies Register under number B 148186;

60. **SVENSKA HANDELSBANKEN AB (publ) Luxembourg BRANCH, Luxembourg subsidiary of Svenska Handelsbanken AB (publ),** established with its company headquarters at L-1229 Luxembourg, 15, rue Bender, represented by its statutory bodies or authorized agent, registered in the Luxembourg Trade and Companies Register under number B 39099;

61. **Swedbank AB (publ) Luxembourg Branch**, **Luxembourg subsidiary of SWEDBANK AB (publ) (Sweden),** established with its company headquarters at L-1331 Luxembourg, 65, boulevard Grande-Duchesse Charlotte, represented by its statutory bodies or authorized agent, registered in the Luxembourg Trade and Companies Register under number B 168008;

62. **The Bank of New York Mellon SA/NV, Luxembourg Branch, commercial name of BNY Mellon Asset Servicing, Luxembourg subsidiary of THE BANK OF NEW YORK MELLON (Belgium),** established with its company headquarters at Vertigo Building - Polaris at L-2453 Luxembourg, 2-4, rue Eugène Ruppert, represented by its statutory bodies or authorized agent, registered in the Luxembourg Trade and Companies Register under number B 105087;

63. **The Bank of New York Mellon (International) Limited, Luxembourg BRANCH, Luxembourg subsidiary of The Bank of New York Mellon (International) Limited (UK),** established with its company headquarters at Vertigo Building -Polaris, at L-2453 Luxembourg, 2-4, rue Eugène Ruppert, represented by its statutory bodies or authorized agent, registered in the Luxembourg Trade and Companies Register under number B 58377;

the sub-parties 7), 8), 24), 27), 41), 42), 44), 48), 51), 58), 59), 62) and 63) respondents for the purpose of the aforementioned GALLE writ dated October 3, 2017, **non-respondents;**

sub-parties 5), 6), 9) to 23), 25) to 26), 28) to 40), 43), 45) to 47), 49) to 50), 52) to 57) and 60) to 61), **not represented.**

## THE COURT OF APPEALS:

By summary judgment on May 10, 2017, a vice-president of the Luxembourg District Court, taking the place of the presiding judge of this court:

•received the Government of Romania pleas for abatement and release of the attachment order carried out on July 28 and 29, 2015 by Viorel MICULA at 61 banking institutions in Luxembourg's financial center in due form;

•received the voluntary joinder of the European Commission in due form;

•held that it had jurisdiction to hear the main claim and voluntary joinder;

•declared that Romania's claims were inadmissible on the basis of Article 933 line 1 and Article 932 line1 of the NCPC (New Civil Procedure Code);

•rejected Romania's claim on the basis of Article 240 of the NCPC;

•rejected Romania's claim on the basis of Article 6-1 of the Civil Procedure Code;

•ordered Romania to pay Viorel MICULA 3,000 euros as compensation for the proceedings on the basis of Article 240 of the NCPC;

•left Romania responsible for paying the costs of the proceedings;

•declared the joint order binding to third parties; and

•ordered provisional enforcement of the order notwithstanding the appeal and without surety.

By bailiff's writ on October 3, 2017, Romania filed an appeal of this order, which according to the parties, it had not been served.

The appellant requested the Court, by reversing the order,

•primarily, and pursuant to Article 933, line 1 of the NCPC, to give a ruling on the abatement if not release of the attachment order performed by Viorel MICULA on July 28 and 29 2015 as a result of:

- the absence of a right authorizing the seizing party to carry out a preventive attachment order in accordance with Article 693 of the NCPC, if not
- of enforcement contrary to the public order and application of European Community law, otherwise

- extinguishment of the debt claimed,

•secondly, and pursuant to Article 932 line 1 of the NCPC, order the simple release of the attachment order performed by Viorel MICULA on July 28 on 29, 2015 due to the excessive duration of the protective measure with regard to the ongoing appeal, and

•in any event, release the appellant from the ruling against it on the basis of Article 240 of the NCPC.

The appellant further concludes, by reversing the order, to allocate 15,000 euros from the leader of the frivolous and vexatious proceedings on the basis of Article 6-1 of the Civil Code and compensation for proceedings of 30,000 euros for the lower court and 20,000 euros for the appeal.

In support of its appeal, Romania summarized the legal arguments developed in its summons of September 13, 2013 and during the lower court arguments, which were set forth by the previous judge in its order and which intended to be reproduced here. The appellant's attorney then returned to their written submissions filed in the lower court.

Romania explained that, in this case, the attachment order had not been carried out on the basis of a right and that Viorel MICULA knew at the time the attachment order was carried out that a request for stay and annulment against the arbitration award (hereinafter the Award) issued on December 11, 2013 by the International Centre for Settlement of Investment Disputes (hereinafter ICSID) was pending while he knew that the Commission's Decision (hereinafter the Decision) (EU) 2015/1470 on March 30, 2015 forbade Romania from enforcing the Award. According to Romania, the attachment order was therefore initiated under illegal conditions and constitutes a manifestly unlawful disturbance.

The appellant further explains that the Award can no longer be enforced at this time due to the existence of the Decision which is a matter of national law and imposed in each Member State. The Decision had a constraining effect against it; it forbade it from voluntary enforcement and ordered it to recover the amounts already paid. Romania declared that the Award was contrary to international public order as the Decision is an enforceable action, while the appeal against the Decision does not have suspensive effect. Romania claimed that Viorel MICULA therefore did not have an enforceable right at the time it carried out the attachment order.

The appellant further states that Viorel MICULA's debt was offset by the tax obligations of EUROPEAN FOOD SA, by a partial forced enforcement on behalf of the Romanian Ministry of Public Finance and by consignment payment on an escrow account opened in the plaintiff's name with the (Romanian) National Treasury. In light of the clearance of Viorel MICULA's debt, Romania claims that the attachment order constitutes an intolerable violation of its rights over disposal of its assets.

Finally, Romania suggests that the Award is contrary to public order in Luxembourg due to the existence of the Decision set forth in Article 2 that enforcement of the Award constitutes a clear violation of EU rights by Romania. In order to support its plea that the national judge is required to examine the compliance of an arbitration award with the public order on its own, the appellant cited the Asturcom Telecommunicaciones judgment (C-40/08) dated October 6, 2009 in which the EU Court, received a reference for a preliminary ruling concerning the interpretation of Council Directive 93/13/EEC, dated April 5, 1993, presented as part of hearing on enforcement of an arbitration award that had become final, said that "a *national jurisdiction hearing an appeal of enforcement of an arbitration award that has acquired res judicata, served in the absence of the consumer, is required, as soon as it has the matters of law and fact required for this, to assess the abusive nature of the arbitration clause contained in a contract concluded between a professional and consumer, on its own motion, insofar as, according to the national rules of procedure, it can perform such an assessment in the context of a similar internal appeal. If this is the case, this jurisdiction is required to establish all consequences that would arise according to national law to ensure that this consumer is not bound by said clause."*

Respondent Viorel MICULA, notes that Romania, well before its application for European Union membership, made firm commitments, regarding him in particular, and in 2005, criticized it for having decided, likely on the Commission's initiative, to abruptly revoke the incentives awarded to investments benefiting him. As Romania had therefore undermined investor confidence, they had filed an appeal before the ICSID, claiming compensation for the loss claimed by the elimination of incentives set forth by Government Emergency Ordinance (OUG) no. 24/1998 (which would have lasted until April 1, 2009).

In the Award issued on December 11, 2013, the arbitration tribunal would hold that Romania had infringed the legitimate expectations

of the claimants and decided that Romania should pay damages in the amount of 376,433,229 RON plus interest.

Viorel MICULA noted at the time the seizure of a certain, liquid, and payable debt was carried out, it was confirmed by an arbitration award with the force of res judicata, immediately enforceable in Luxembourg, this debt was not cleared and the Award was not contrary to the public order.

Arguing that the Commission, as an executive body, would not have intervened in the dispute opposing Romania, Viorel MICULA further submits that the Commission decision on March 30, 2015, describing the payment of damages to which Romania was convicted of illegal State aid and having forbade Romania from voluntarily carrying out payment of amounts to Viorel MICULA, only addressed its recipient, the Government of Romania. He therefore claims that the Award would not apply henceforth "certainly not to Luxembourg" and notes that it was the subject of an appeal before the EU court.

Finally, he states that the damages awarded to him by the arbitration tribunal would not have been classified as State aid and specifically refers to the Asteris v. Greece ECJ judgment no. 106/87 dated September 27, 1988.

Viorel MICULA's attorney then returned to his two written submissions filed in the lower court.

Respondent MICULA concludes by dismissing the appellant's claims for all the reasons given and requests compensation for proceedings in the amount of 3,000 euros for the appeals court.

The Commission, which intervened voluntarily in the lower court (on the basis of Article 29, paragraph 2 of (EU) Council Regulation 2015/1589 dated July 13, 2015) to make its views known and uphold European Union law, suggests that European Community law very clearly opposes any enforcement of the arbitration Awards whatsoever. It emphasized that the recovery measure initiated by Viorel MICULA in Luxembourg territory is contrary to European Community law and therefore Luxembourg law so that it constitutes a manifestly illegal disturbance that it is important to bring to an end. The Commission states that it is neither relevant nor decisive to examine the pleas raised by the appellant (such as those relating to the Commission's standing to intervene, regarding the regularity of the Award or the precedence of the Award to the Decision) on the grounds used that it is

essential that the Decision, which is a European Community action, is currently binding and enforceable in all Member States. It would follow that the Luxembourg summary judge would be required to order the release of the attachment.

In a letter dated February 27, 2018, NATIXIS BANK SA asked the Court to formally acknowledge "*that it has taken no account of the Government of Romania*."

It is appropriate to grant this request in accordance with the provision below.

RBC Investor Services Bank SA left the matter to jurisprudence.

Assessment

The Court refers, with regard to the facts and as background to the comprehensive developments of the previous judge, which are intended to be reproduced here.

As for the admissibility of the pleas for abatement and release, which is contested, the legal theory holds that under Article 933, line 1 of the NCPC, "*the summary judge is competent at this stage of the proceedings (of the attachment order) when he or she puts an end to a manifestly unlawful disturbance or assault resulting from the attachment order proceedings not being carried out in a proper manner. When the judge declares a clear or obvious invalidity, he or she can rule on the nullity of the seizure and order its release*" (see Th. HOSCHEIT, La saisie-arrêt de droit commun (Common law attachment orders), Pas, 29.p. 72).

However, the Court, ruling in summary proceedings, qualified these statements by deciding that "*if done to stop the disturbance, the summary judge may, as an interim safeguard, order protective measures, or even restoration, it cannot however institute irreversible measures. It should not depart from ruling on the nullity of the seizure, its powers being limited to granting release*" (Appeals Court, Feb 8, 2006, Pas. 33, p. 134).

In light of the absence of proof of clear and obvious nullity, the main plea for abatement is inadmissible.

There is no merit for the appeal under this heading.

With regards to the plea for release of the attachment on the basis of Article 933, line 1 of the NCPC, for the purposes of legal logic, the Court will first analyze if there is, as the appellant claims, a manifestly unlawful disturbance due to the impact of the Decision and the primacy of European Community law.

Manifestly unlawful disturbances are *"any disruption resulting from a physical or legal fact which, directly or indirectly, constitutes a clear violation of the rule of law"* (see Solus & Perrot, Droit judiciaire privé [Private Judicial Law], Sirey, V. III, no. 1289).

It is recognized that the attachment order was carried out on the basis of an Award duly apposing an enforcement formula, which by virtue of Article 54[1] of the Washington Convention, requires recognition and enforcement of arbitration awards on each contracting Member State, such as Luxembourg. The attachment order was therefore carried out on the basis of a right, which although struck by an appeal, was enforceable at the time pursuant to Articles 53 and 54 of the Washington Convention.

The decision by the previous judge in this respect is therefore to confirm that Viorel MICULA's pleas are specifically to raise, (i) respectively, the absence of law, and (ii) to say that in the case of the attachment order carried out on the basis of a right, the summary judge not being competent to examine if there was a manifestly unlawful disturbance, made an error.

For the sake of completeness, the Court specifies that the two seizures cited on this subject by Viorel MICULA are not transposable in the case in question. In the ruling on March 20, 1989 (list 10915), the Court said that "*when the attachment order was carried out on the basis of permission granted by the chief judge (...) and lacking proof from the [appellant company] that a manifestly unlawful act was committed by the [respondent company], cannot blame the latter for such act, given that it acted in accordance with the law*"

---

[1] Art. 54

(1)  Each contracting Member State acknowledges that any award issued as part of this Convention as mandatory and ensures enforcement within its territory of the pecuniary obligations imposed by the award as were a final judgement of a court in that State. A contracting Member State with a federal constitution may enforce such an award through its federal courts and may provide that they consider such an award as a final judgement of the courts in one of its Federate States.

(2)  To obtain acknowledgment that an award has been enforced in the territory of a contracting State, the party concerned must present a copy certified as correct by the Secretary-General to the competent national court or any other authority that said contracting State has designated for this purpose Each contracting state informs the Secretary-General regarding the competent court or authorities that it designates for this purposes and keeps it informed of any changes.

(3)  Enforcement is governed by the legislation concerning enforcement of judgments in effect in the State in the territory in the territory where the enforcement is to be done.

while in this case, the attachment order was not carried out on the authorization of the chief judge, but on the basis of a right.

In the ruling dated February 17, 1986 (list 8972) the Court had held that when the attachment order was carried out pursuant to authorization by the presiding judge, the distrainee may request summary retraction of this order but that the summary jurisdiction is no longer competent to rule on a withdrawal request of the order by the presiding judge granting authorization of the garnishment when the court has the validity case before it. This matter is therefore also not comparable to the case at hand.

There is no merit for the appeal on this point.

With regard to the impact of the Decision, the appellant has rightly presented that it is mandatory in all Member States pursuant to Article 288[2] of the Treaty (TFUE) and that even if it was the subject of an action for annulment, this appeal is not suspensive.

The Decision contains an absolute prohibition against Romania paying Viorel MICULA the damages that it claims on the basis of the Award.

The appellant again criticized the previous judge for having, while proceeding with a separation between the protective phase and the enforcement phase of the attachment order, refused to review the issue of the impact of the Decision on the right on the basis of which the attachment order was performed.

According to Romania, the attachment order carried out on the bank accounts violated an enforceable community act throughout the European Community territory and would therefore constitute a manifestly unlawful disturbance.

It concluded that an arbitration award with final res judicata authority can lose its enforceability due to the existence of a new element.

---

[2] Article 288 TFUE (Rome Treaty):
To exercise the Union's competences, the institutions adopt regulations, directives, decisions, recommendations, and advice.
The regulation has a broad scope. It is binding in its entirety and directly applicable in every Member State.
The directive binds all receiving Member States as to the results to expect, while leaving the form and methods to the national courts.
The decision is binding in its entirety. When it designates recipients, it is only mandatory for them.
The recommendations and opinions are not binding.

We should therefore connect the idea of relevance and effectiveness of the right and the summary judge should, even during the protective phase, consider the relevance and effectiveness over time of the right that is the basis of the attachment order.

The ICSID was established by the Convention to settle disputes concerning investments between States and nationals of other States, concluded in Washington on March 18, 1965 and entered into effect on October 14, 1966. The Washington Convention, which was signed by Luxembourg on September 28, 1965 and ratified by the law of April 8, 1970 is therefore clearly applicable to Luxembourg.

(EU) Commission Decision 2015/1470 dated March 30, 2015 specifically stipulates that:

•payment of damages awarded by the arbitration tribunal, established under the auspices of the ICSID through the award issued on December 11, 2013 in the MICULA e.a. /Romania case, constitutes State aid within the meaning of Article 107, paragraph 1, of the treaty, which is incompatible with the internal market (Article 1);
•Romania does not pay any incompatible aid referred to in Article 1 and recovers all incompatible aid payable under Article 1 which was already paid to any entities whatsoever (...)
•Viorel MICULA, (....) and [his co-claimants] are jointly and severally liable for repayment of State aid that they received (Article 2);
•recovery of the aid listed in Article 1 is immediate and effective (Article 3), and
•Romania ensures that no other payment of aid referred to in Article 1 was made after the adoption date of this decision.

The Decision therefore forbids Romania from enforcing the Arbitration Award and orders it to recover the amounts already paid; it has a binding nature and Viorel MICULA could not have been unaware that he could no longer use the Award as right to expedite a preventive attachment order because the Decision, subsequent to the Award, ruled that the judgement for payment of damages by Romania is contrary to European Community law.

According to respondent MICULA, this Decision only applies to Romania, but not Luxembourg, in such a manner that it would not prevent further enforcement of the protective measure.

While is true that Article 5 of the Decision specifies that "*Romania is the recipient of this decision*" and that Article 288 of the TFUE provides that "*The decision is binding in its entirety. When it designates recipients, it is only binding on them,*" it is only common sense that, in light of the developments above, the Decision is imposed in all Member States where Viorel MICULA initiated enforcement proceedings to obtain payment for damages awarded him by the arbitration tribunal, through the Award issued on December 11, 2013.

Therefore, there is no merit for this plea.

If, on the face of it, the certain, liquid, and payable nature of Viorel MICULA's debt arises from the enforcement order, it is however necessary to review the viability of this right from the perspective of its relevance and efficacy.

A right is not, in fact, eternal and it is possible that an attachment carried out on the basis of a right is no longer appropriate or enforcement of the right on the basis of which it was performed is no longer effective due to the existence of new facts such as the extinction of the obligation recognized by the right (by payment, compensation, or conversion), expiration of the action at law for judgement, or even new laws or agreements.

Contrary to the appellant's developments, the summary judge does not have jurisdiction to decide if Viorel MICULA no longer has an enforceable right to attach assets, but he or she is competent to find that there are serious disputes in this case, which require the release of the attachment order performed on July 28 and 29, 2015. An order of attachment performed on the basis of a right that has lost its relevance and efficacy causes a manifestly unlawful disruption to the distrainee debtor.

In this case, the Commission's Decision on March 30, 2015 is enforceable and hinders implementation of the right established by the arbitration Award. It is binding in its entirety and in all Member States pursuant to Article 288 of the TFUE and even if it is currently the subject of a claim in European Community jurisdictions, this appeal is not suspensive pursuant to Article 278 of the TFUE.

The Decision forbids the attachment order from being validated in substance by a Luxembourg jurisdiction given that (i) the right of State aid, which is part of the public order, must prevail over national law and (ii) the Arbitration Award is contrary to European Community public order and therefore that of Luxembourg (see Lucchini judgment, ECJ 07/18/2007, C-119/05,

in which it was decided that the principle of primacy of European Community law requires that the national judge must leave unapplied any provision likely to call into question the exclusive jurisdiction of the Commission to rule on the compatibility of State aid with the common market, including a national provision implementing the principle of res judicata, which, in this case, would hamper the recovery of aid declared incompatible by the European Commission; Klausner judgment ECJ, 11/11/2015, C-505/14, in which the ECJ ruled that the principle of effectiveness precludes a national rule which hinders the national judge from drawing all consequences from the violation of Article 108 TFUE due to res judicata of a decision issued by national courts concerning a foreign dispute to control State aid).

Asturacom Telecommunicaciones judgment (ECJ, Oct 6, 2009, C-40-8) cited by the Commission and mentioned above holds that that national judge must "*according to rules for internal procedures, assess of its own motion, the conflict between an arbitration clause and national rules of public order,*" which also include public order as defined by Union law.

Furthermore, in a Deutsche Lufthansa judgment (C-284/12) dated November 21, 2013, the ECJ noted "*that it is also important to emphasize that the application of the European Union rules on the subject of State aid relies on an obligation for honest cooperation between, on one hand, the national jurisdictions, and on the other, the Commission and European Union jurisdictions, in a setting where each acts according to the role assigned to them by treaty. In the context of this cooperation, national jurisdictions must take any general or specific measures to ensure the fulfillment of obligations arising from European Union law and abstain from those likely to imperil the realization of treaty objectives, as well as those that arise from Article 4, paragraph 3, TEU. Therefore, national jurisdictions must, in particular, refrain from making decisions that go against a Commission decision, even if of a provisional nature.*"

In view of the above, the lower court judge was wrong to hold that "*the aforementioned disputes... must not result, on the part of Viorel MICULA, subsequent to the exercise of the protective measure, pursuant to a definitive and valid right, in the commission of a manifestly unlawful act that undermines Romania's rights.*"

Insofar as the Decision resulted in the Award losing its relevance and efficacy and therefore its enforceability, Viorel

MICULA's debt is no longer due and payable. It is therefore appropriate to grant Romania's request and order the release of the attachment order performed.

The appeal has merit.

The appellant further concludes by amendment of the ruling sentencing Viorel MICULA to pay compensation in the amount of 15,000 euros for frivolous and abusive proceedings on the basis of Article 6-1 of the Civil Code. In support of this request, Romania states that Viorel MICULA committed gross misconduct, equivalent to willful misconduct by carrying out an attachment order on July 28 and 29, 2015 at around sixty banks in Luxembourg, while being fully aware of the existence of the March 30, 2015 decision.

The summary judge being unable to uphold the law and rule on the merits of the case, he or she cannot award damages, even those sought for frivolous and abusive proceedings.

Therefore, there is no merit for the appeal on this point.

Finally, Romania asks the Court to amend the contested order as it was sentenced by the lower court to pay Viorel MICULA 3,000 euros in compensation for proceedings and as this request was not granted on the basis of Article 240 of the NCPC. It claims compensation for proceedings in the amount of 30,000 euros for the lower court and 20,000 for the appeals court;

Given the decision concerning its appeal, it is advisable to release Romania from the ruling against it by the previous judges on the basis of Article 240 of the NCPC. As it seems unfair to leave it responsible for all of the irrecoverable expenses that it had to pay to assert its rights, it is appropriate to grant it compensation for proceedings of 2,000 for the lower court and 3,000 for the appeals court.

As the unsuccessful party in this case, respondent MICULA's request to be allocated compensation for proceedings is dismissed.

With the exception of the garnishees, BLLUX Company SA, Banque BCP SA, CATELLA BANK SA, EAST-WEST UNITED BANK SA, HSBC Private Bank SA, SOCIETE GENERALE BANK & TRUST abbreviated S.G.B.T., State Street Bank S.C.A., The Bank of New York Mellon (Luxembourg) SA, UniCredit Luxembourg SA, Brown Brothers Harriman Luxembourg S.C.A., HSBC Bank plc, Luxembourg Branch, Luxembourg subsidiary

of HSBC BANK PLC (UK), State Street Bank International GmbH, The Bank of New York Mellon SA/NV, and The Bank of New York Mellon (International) Limited Luxemburg Branch, which were reached at their domiciles, the other garnishees were contacted personally by the appeal dated October 3, 2017.

As correctly stated by the lower court judge, this is not an occasion to apply Article 84 of the NCPC, given that the garnishees were summoned for the purpose of making a joint declaration such that there was no risk of divergent decisions concerning them.

It is therefore appropriate to rule by default on BLLUX Company SA, Banque BCP SA, CATELLA BANK SA, EAST-WEST UNITED BANK SA, HSBC Private Bank SA, SOCIETE GENERALE BANK & TRUST abbreviated S.G.B.T., State Street Bank S.C.A., The Bank of New York Mellon (Luxembourg) SA, UniCredit Luxembourg SA, Brown Brothers Harriman Luxembourg S.C.A., HSBC Bank plc, Luxembourg Branch, Luxembourg subsidiary of HSBC BANK PLC (UK), State Street Bank International GmbH, The Bank of New York Mellon SA/NV, and The Bank of New York Mellon (International) Limited Luxemburg Branch, with adversarial effect against other garnishees, with the exception of RBC INVESTOR SERVICES BANK SA and NATIXIS BANK, and after duly hearing from Romania, Viorel MICULA, the European Commission, RBC INVESTOR SERVICES BANK SA and société anonyme NATIXIS BANK

**ON THESE GROUNDS:**

The Court of Appeals, seventh chamber, acting in summary proceedings, ruling after duly hearing from Viorel MICULA, the Government of Romania, the European Commission, RBC INVESTOR SERVICES BANK SA and société anonyme NATIXIS BANK, by default with respect to BLLUX Company SA, Banque BCP SA, CATELLA BANK SA, EAST-WEST UNITED BANK SA, HSBC Private Bank SA, SOCIETE GENERALE BANK & TRUST abbreviated S.G.B.T., State Street Bank S.C.A., The Bank of New York Mellon (Luxembourg) SA, UniCredit Luxembourg SA, Brown Brothers Harriman Luxembourg S.C.A., HSBC Bank plc, Luxembourg Branch, Luxembourg subsidiary of HSBC BANK PLC (UK), State Street Bank International GmbH, The Bank of New York Mellon SA/NV and The Bank

of New York Mellon (International) Limited Luxemburg Branch, and with adversarial effect with regard to other garnishees,

received the request in due form;

declared it partially supported;

by reversing order no. 272/2017 dated May 10, 2017,

declares Romania's request to release the attachment order admissible and made based on Article 933, line 1 of the NCPC;

orders the lifting of the attachment order performed on July 28 and 29, 2015;

releases Romania from the ruling against it on the basis of Article 240 of the NCPC.

confirms the order and rejects Romania's claim on the basis of Article 6-1 of the Civil Code;

orders Viorel MICULA to pay Romania compensation for proceedings in the amount of 2,000 euros for the lower court and 3,000 for the appeals court;

acknowledges that NATIXIS BANK SA does not hold any accounts for Romania;

combines the costs for both trials and imposes them on Viorel MICULA.