# EXHIBIT 58

Nachschlagewerk:    ja

BGHZ:    nein

BGHR:    ja

Eingegangen

0 8. Nov. 2018

v. Plenwe & Schäfer
Rechtsanwälte beim Bundesgerichtshof

ZPO § 1059 Abs. 2 Nr. 1 Buchst. a

a)  Bei der Anwendung von § 1059 Abs. 2 Nr. 1 Buchst. a ZPO steht das Feh-
    len einer Schiedsvereinbarung ihrer Ungültigkeit gleich.

b)  In bilateralen Investitionsschutzabkommen ("BIT") zwischen Mitgliedstaaten
    der Europäischen Union sind Schiedsklauseln unanwendbar, nach denen
    ein Investor eines dieser Mitgliedstaaten im Fall einer Streitigkeit über In-
    vestitionen in dem anderen Mitgliedstaat gegen diesen ein Verfahren vor
    einem Schiedsgericht einleiten darf.

BGH, Beschluss vom 31. Oktober 2018 - I ZB 2/15 - OLG Frankfurt am Main





Eingegangen

[ 2. Nov. 2018

v. Plehwe & Schäfer
Rechtsanwälte beim Bundesgerichtshof

# BUNDESGERICHTSHOF

## BESCHLUSS

I ZB 2/15

vom

31. Oktober 2018

in dem Verfahren

auf Aufhebung eines inländischen Schiedsspruchs

Slowakische Republik, vertreten durch das Finanzministerium der Slowakischen Republik, dieses vertreten durch den Finanzminister Ing. Peter Kažimír, Štefanovicova 5, Bratislava, Slowakische Republik,

Antragstellerin und Rechtsbeschwerdeführerin,

- Verfahrensbevollmächtigte:   Rechtsanwälte Dr. v. Plehwe und Schäfer -


gegen

Achmea B.V., vertreten durch den Vorstand Wilhelm A. J. van Duin, Handelsweg 2, Zeist, Niederlande,

Antragsgegnerin und Rechtsbeschwerdegegnerin,

- Verfahrensbevollmächtigter:  Rechtsanwalt Prof. Raeschke-Kessler -

ECLI:DE:BGH:2018:311018BIZB2.15.0

- 2 -

Der I. Zivilsenat des Bundesgerichtshofs hat am 31. Oktober 2018 durch den Vorsitzenden Richter Prof. Dr. Koch, die Richter Prof. Dr. Schaffert, Prof. Dr. Kirchhoff, Feddersen und die Richterin Dr. Schmaltz

beschlossen:

Auf die Rechtsbeschwerde der Antragstellerin wird der Beschluss des Oberlandesgerichts Frankfurt am Main - 26. Zivilsenat - vom 18. Dezember 2014 aufgehoben.

Der Schiedsspruch (Final Award) im Schiedsverfahren PCA Fall Nr. 2008/-13 vom 7. Dezember 2012 wird aufgehoben.

Die Kosten des Verfahrens trägt die Antragsgegnerin.

Gegenstandswert: 22.100.000 Euro

- 3 -

Gründe:

1        A. Die Antragstellerin, die Slowakische Republik, ist Rechtsnachfolgerin der Tschechischen und Slowakischen Föderativen Republik (im Folgenden: Tschechoslowakei). Die Antragsgegnerin ist eine niederländische Versicherungsgruppe.

2        Im Jahr 1991 schlossen die Tschechoslowakei und das Königreich der Niederlande (im Folgenden: Niederlande) mit Wirkung zum 1. Oktober 1992 ein Abkommen über die Förderung und den gegenseitigen Schutz von Investitionen ("Bilateral Investment Treaty", im Folgenden: BIT). In Art. 3 Abs. 1 BIT sicherten die Vertragsparteien zu, die Investitionen von Investoren der anderen Vertragspartei fair und gerecht zu behandeln sowie deren Betrieb, Verwaltung, Erhaltung, Nutzung, Genuss oder Veräußerung durch diese Investoren nicht durch unbillige oder diskriminierende Maßnahmen zu beeinträchtigen. Nach Art. 4 BIT gewährleistete jede Vertragspartei den freien Transfer von Zahlungen, die mit einer Investition im Zusammenhang stehen, wie insbesondere Gewinnen, Zinsen und Dividenden, in frei konvertierbarer Währung und ohne unangemessene Beschränkung oder Verzögerung.

3        Art. 8 BIT enthält - in deutscher Übersetzung - folgende Regelung:

1. Alle Streitigkeiten zwischen einer Vertragspartei und einem Investor der anderen Vertragspartei bezüglich einer Investition der letzteren sind, falls möglich, gütlich beizulegen.

2. Jede Vertragspartei stimmt hiermit zu, dass eine in Absatz (1) dieses Artikels genannte Streitigkeit einem Schiedsgericht vorgetragen wird, falls die Streitigkeit innerhalb eines Zeitraums von sechs Monaten ab dem Datum, an dem eine Partei der Streitigkeit die gütliche Beilegung gewünscht hat, nicht gütlich beigelegt ist.

3. Das in Absatz (2) dieses Artikels genannte Schiedsgericht wird für jeden einzelnen Fall in der folgenden Weise gebildet: Jede Partei der Streitigkeit ernennt ein Mitglied des Schiedsgerichts und die beiden derartig ernannten Mitglieder wählen einen Angehörigen eines Drittstaats als Vorsitzenden des Schiedsgerichts. ...

- 4 -

...

5. Das Schiedsgericht wird sein eigenes Verfahren unter Anwendung der Schiedsordnung der Kommission für Internationales Handelsrecht der Vereinten Nationen (UNCITRAL) festlegen.

6. Das Schiedsgericht hat auf der Grundlage des Rechts zu entscheiden und dabei insbesondere, aber nicht ausschließlich zu berücksichtigen:

   • das geltende Recht der betroffenen Vertragspartei;

   • die Bestimmungen dieses Abkommens und anderer erheblicher Abkommen zwischen den Vertragsparteien;

   • die Bestimmungen besonderer Vereinbarungen in Bezug auf die Investition;

   • die allgemeinen Grundsätze des internationalen Rechts.

...

4    Die Antragstellerin trat als Rechtsnachfolgerin der Tschechoslowakei am 1. Januar 1993 in deren Rechte und Pflichten aus dem BIT ein. Mit Wirkung zum 1. Mai 2004 wurde sie Mitglied der Europäischen Union.

5    Im Zuge einer Reform des Gesundheitswesens öffnete die Antragstellerin im Jahr 2004 den slowakischen Markt für in- und ausländische Anbieter von privaten Krankenversicherungen. Daraufhin wurde die Antragsgegnerin in der Slowakei als Krankenversicherer zugelassen. Sie gründete dort die Union Krankenversicherung AG, in die sie nach ihren Angaben im Laufe des Jahres 2006 umgerechnet etwa 72 Millionen Euro als Bareinlage einbrachte und über die sie private Krankenversicherungen anbot. Nach einem Regierungswechsel im Jahr 2006 machte die Antragstellerin die Liberalisierung des Krankenversicherungsmarkts teilweise rückgängig. Sie verbot mit Gesetz vom 12. Dezember 2006 den Einsatz von Versicherungsmaklern, mit Gesetz vom 25. Oktober 2007 die Ausschüttung von Gewinnen aus dem Krankenversicherungsgeschäft und mit Gesetz vom 28. April 2009 die Veräußerung von Versicherungsportfolios. Mit Urteil vom 26. Januar 2011 stellte das slowakische Verfassungsgericht fest, dass das gesetzliche Verbot von Gewinnausschüttungen verfassungswidrig

- 5 -

war. Die Antragstellerin ließ mit der am 1. August 2011 in Kraft getretenen ge-
setzlichen Neuregelung des Krankenversicherungswesens Gewinnausschüt-
tungen wieder zu.

6          Die Antragsgegnerin hat geltend gemacht, aufgrund der gesetzlichen
Regulierungsmaßnahmen der Antragstellerin sei ihr ein Schaden in zweistelli-
ger Millionenhöhe entstanden. Sie hat im Oktober 2008 ein Schiedsverfahren
gegen die Antragstellerin eingeleitet, in dem sie diese wegen der Verletzung
ihrer Rechte aus dem BIT auf Schadensersatz in Anspruch genommen hat. Im
Schiedsverfahren ist in Abstimmung mit den Parteien Frankfurt am Main als Ort
des Verfahrens festgelegt worden.

7          Die Antragstellerin hat im Schiedsverfahren die Unzuständigkeit des
Schiedsgerichts gerügt. Sie hat angeführt, mit ihrem Beitritt zur Europäischen
Union sei das in Art. 8 Abs. 2 BIT enthaltene Angebot zum Abschluss einer
Schiedsvereinbarung unwirksam geworden, weil es mit dem Unionsrecht nicht
vereinbar und deshalb unanwendbar sei. Das Schiedsgericht hat mit Zwischen-
entscheid vom 26. Oktober 2010 seine Zuständigkeit bejaht. Den dagegen ge-
richteten Antrag der Antragstellerin auf Feststellung der Unzuständigkeit des
Schiedsgerichts hat das Oberlandesgericht mit Beschluss vom 10. Mai 2012
zurückgewiesen. Die dagegen gerichtete Rechtsbeschwerde der Antragstellerin
ist mit der Maßgabe erfolglos geblieben, dass der Bundesgerichtshof den ge-
gen den Zwischenentscheid gerichteten Antrag nach Erlass des Schieds-
spruchs in der Hauptsache als unzulässig zurückgewiesen hat (BGH, Be-
schluss vom 30. April 2014 - III ZB 37/12, SchiedsVZ 2014, 200).

8          Mit Schiedsspruch vom 7. Dezember 2012 hat das Schiedsgericht die
Antragstellerin zur Zahlung von 22,1 Millionen Euro nebst Zinsen verurteilt. Die
Antragstellerin hat beim Oberlandesgericht die Aufhebung des Schiedsspruchs
beantragt. Das Oberlandesgericht hat den Antrag zurückgewiesen (OLG Frank-
furt am Main, Beschluss vom 18. Dezember 2014 - 26 Sch 3/13, juris). Dage-

- 6 -

gen richtet sich die Rechtsbeschwerde der Antragstellerin, mit der sie ihren Antrag auf Aufhebung des Schiedsspruchs weiterverfolgt. Die Antragsgegnerin hat beantragt, die Rechtsbeschwerde zurückzuweisen.

9      Der Senat hat mit Beschluss vom 3. März 2016 dem Gerichtshof der Europäischen Union folgende Fragen zur Vorabentscheidung vorgelegt (BGH, SchiedsVZ 2016, 328):

> 1.  Steht Art. 344 AEUV der Anwendung einer Regelung in einem bilateralen Investitionsschutzabkommen zwischen Mitgliedstaaten der Union (einem sogenannten unionsinternen BIT) entgegen, nach der ein Investor eines Vertragsstaats bei einer Streitigkeit über Investitionen in dem anderen Vertragsstaat gegen letzteren ein Verfahren vor einem anderen Schiedsgericht einleiten darf, wenn das Investitionsschutzabkommen vor dem Beitritt eines der Vertragsstaaten zur Union abgeschlossen worden ist, das Schiedsgerichtsverfahren aber erst danach eingeleitet werden soll?

> Falls Frage 1 zu verneinen ist:

> 2.  Steht Art. 267 AEUV der Anwendung einer solchen Regelung entgegen?

> Falls die Fragen 1 und 2 zu verneinen sind:

> 3.  Steht Art. 18 Abs. 1 AEUV unter den in Frage 1 beschriebenen Umständen der Anwendung einer solchen Regelung entgegen?

10      Der Gerichtshof der Europäischen Union hat diese Fragen mit Urteil vom 6. März 2018 - C-284/16 wie folgt entschieden (EuGH, SchiedsVZ 2018, 186 - Achmea):

> Die Art. 267 und 344 AEUV sind dahin auszulegen, dass sie einer Bestimmung in einer internationalen Übereinkunft zwischen den Mitgliedstaaten wie Art. 8 des Abkommens zwischen dem Königreich der Niederlande und der Tschechischen und Slowakischen Föderativen Republik über die Förderung und den gegenseitigen Schutz von Investitionen entgegenstehen, nach der ein Investor eines dieser Mitgliedstaaten im Fall einer Streitigkeit über Investitionen in dem anderen Mitgliedstaat gegen diesen ein Verfahren vor einem Schiedsgericht einleiten darf, dessen Gerichtsbarkeit sich dieser Mitgliedstaat unterworfen hat.

11      B. Das Oberlandesgericht hat keinen Grund zur Aufhebung des Schiedsspruchs erkannt. Dazu hat es ausgeführt:

- 7 -

12          Die Schiedsklausel in Art. 8 Abs. 2 BIT sei gültig, weil sie mit dem Uni-
onsrecht vereinbar sei. Sie verstoße nicht gegen die in Art. 344 AEUV vorgese-
hene Ausschließlichkeit der unionsrechtlichen Streitbeilegungsmechanismen,
weil die Unionsverträge für Streitigkeiten zwischen einem privaten Investor und
einem Mitgliedstaat kein spezifisches Gerichtsverfahren vorsähen. Art. 344
AEUV stelle keine allgemeine "Kompetenzabsicherungsregel" für den Gerichts-
hof der Europäischen Union dar. Mit Art. 267 AEUV sei die Schiedsklausel
ebenfalls vereinbar. Dem Schiedsgericht sei zwar bei entscheidungserheblichen
Fragen über die Auslegung oder Anwendung von Unionsrecht keine Vorlage an
den Gerichtshof der Europäischen Union möglich. Nach der Rechtsprechung
des Gerichtshofs genüge aber die Überprüfung eines Schiedsspruchs durch die
staatlichen Gerichte anhand des im nationalen Recht für seine Aufhebung oder
die Versagung seiner Anerkennung vorgesehenen eingeschränkten Kontroll-
maßstabs, um die einheitliche Auslegung und Anwendung des Unionsrechts in
den Mitgliedstaaten - gegebenenfalls mithilfe eines Vorabentscheidungsersu-
chens der staatlichen Gerichte an den Gerichtshof - sicherzustellen.

13          Der Schiedsspruch sei auch nicht wegen Verstoßes gegen zum ordre
public gehörende unionsrechtliche Bestimmungen aufzuheben.

14          C. Die Rechtsbeschwerde ist statthaft (§ 574 Abs. 1 Satz 1 Nr. 1 ZPO in
Verbindung mit § 1065 Abs. 1 Satz 1, § 1062 Abs. 1 Nr. 4 Fall 1 ZPO) und auch
im Übrigen zulässig (§ 574 Abs. 2 Nr. 1 ZPO). Sie erweist sich zudem als be-
gründet. Nach der auf Vorlage des Senats ergangenen Entscheidung des Ge-
richtshofs der Europäischen Union fehlt es im Verhältnis der Parteien an einer
Schiedsvereinbarung. Der Schiedsspruch ist deshalb aufzuheben (§ 1059
Abs. 2 Nr. 1 Buchst. a ZPO).

15          I. Gemäß § 1059 Abs. 2 Nr. 1 Buchst. a ZPO kann ein Schiedsspruch
aufgehoben werden, wenn der Antragsteller begründet geltend macht, dass die
Schiedsvereinbarung nach dem Recht, dem die Parteien sie unterstellt haben

- 8 -

oder, falls die Parteien nichts hierüber bestimmt haben, nach deutschem Recht ungültig ist. Dabei steht das Fehlen einer Schiedsvereinbarung ihrer Ungültigkeit gleich (vgl. Schwab/Walter, Schiedsgerichtsbarkeit, 7. Aufl., Kap. 24 Rn. 7; Lachmann, Handbuch für die Schiedsgerichtspraxis, 3. Aufl., Rn. 2184).

16          1. Die Bestimmung des § 1059 ZPO ist im Streitfall anwendbar. Bei der Entscheidung des Schiedsgerichts vom 7. Dezember 2012 handelt es sich um einen inländischen Schiedsspruch. Nach § 1025 Abs. 1 ZPO sind die Vorschriften der §§ 1025 bis 1066 ZPO anzuwenden, wenn der Ort des Schiedsverfahrens im Sinne des § 1043 Abs. 1 ZPO in Deutschland liegt. Die Parteien haben gemäß § 1043 Abs. 1 Satz 1 ZPO Frankfurt am Main als Ort des schiedsrichterlichen Verfahrens festgelegt.

17          2. Die Schiedsvereinbarung hätte vorliegend allein durch den Antrag der Antragsgegnerin auf Einleitung des Schiedsverfahrens vom 1. Oktober 2008 in Verbindung mit Art. 8 Abs. 2 BIT abgeschlossen werden können. Die Bestimmung des Art. 8 Abs. 2 BIT stellt eine Vereinbarung zugunsten der Investoren der beteiligten Vertragsstaaten dar, die diesen die Wahlmöglichkeit eröffnen soll, ob sie bei einer Investitionsstreitigkeit gegen den anderen Vertragsstaat ein Schiedsverfahren oder ein Verfahren vor einem staatlichen Gericht einleiten (vgl. OLG Düsseldorf, SchiedsVZ 2006, 331, 333 [juris Rn. 28]; OLG Frankfurt am Main, SchiedsVZ 2013, 119, 122 [juris Rn. 17]). Art. 8 Abs. 2 BIT enthält damit ein Angebot der Vertragsstaaten zum Abschluss von Schiedsvereinbarungen mit den Investoren des anderen Vertragsstaats, das der jeweilige Investor ausdrücklich oder konkludent annehmen kann (vgl. OLG Düsseldorf, SchiedsVZ 2006, 331, 333 f. [juris Rn. 28]; Happ, IStR 2006, 649, 650; Markert, Streitschlichtungsklauseln in Investitionsschutzabkommen, 2010, S. 120). Dieses Angebot hat die Antragsgegnerin, wie das Oberlandesgericht in seinem Beschluss vom 10. Mai 2012 zutreffend erkannt hat, durch Einleitung des

- 9 -

Schiedsverfahrens angenommen (vgl. OLG Frankfurt am Main, SchiedsVZ 2013, 119, 122 [juris Rn. 73]).

18        3. Nachdem sich das Schiedsgericht erst nach dem Beitritt der Antragstellerin zur Europäischen Union konstituiert hat, ist nach Art. 8 Abs. 6 BIT für das Schiedsverfahren als geltendes Recht der Antragstellerin insbesondere das auf ihrem Gebiet vorrangig geltende Unionsrecht maßgeblich. Das gilt auch für die Beurteilung der Frage, ob die Zuständigkeit des Schiedsgerichts durch die Schiedsvereinbarung wirksam begründet werden konnte oder ob die Schiedsvereinbarung wegen Verstoßes gegen das Unionsrecht unwirksam ist.

19        II. Mit Erfolg rügt die Rechtsbeschwerde, die Möglichkeit der Antragstellerin, eine Investitionsstreitigkeit mit der Antragsgegnerin nach Art. 8 Abs. 2 BIT von einem Schiedsgericht klären zu lassen, sei mit dem in Art. 344 und 267 AEUV verankerten Rechtsschutzsystem der Europäischen Union unvereinbar.

20        1. Seit dem Beitritt der Antragstellerin zur Europäischen Union mit Wirkung zum 1. Mai 2004 stellt das BIT ein unionsinternes Abkommen zwischen Mitgliedstaaten dar. Nach der Rechtsprechung des Gerichtshofs der Europäischen Union gehen die unionsrechtlichen Bestimmungen auf den von ihnen geregelten Gebieten den vor ihrem Inkrafttreten vereinbarten Regelungen in anderen Abkommen zwischen den Mitgliedstaaten im Kollisionsfall vor (vgl. EuGH, Urteil vom 27. September 1988 - 235/87, Slg. 1988, 5589 Rn. 22 - Matteucci, mwN). Ein von einem Mitgliedstaat mit einem anderen Staat geschlossenes Abkommen kann nach Beitritt des zweiten Staats zur Europäischen Union im Verhältnis zwischen diesen Staaten keine Anwendung mehr finden, soweit es dem Unionsrecht widerspricht (vgl. EuGH, Urteil vom 10. November 1992 - C-3/91, Slg. 1992, I-5529 = GRUR Int. 1993, 76 Rn. 8 - Exportur; Urteil vom 8. September 2009 - C-478/07, Slg. 2009, I-7721 = GRUR 2010, 143 Rn. 98 - American Bud II; Urteil vom 21. Januar 2010 - C-546/07, Slg. 2010, I-439 = EuZW 2010, 217 Rn. 44 - Kommission/Deutschland).

- 10 -

21          2. Der Gerichtshof der Europäischen Union hat auf die Vorlagefragen des Senats ausgeführt:

22          Wie sich insbesondere aus Art. 344 AEUV ergebe, dürfe eine internationale Übereinkunft die Autonomie des Rechtssystems der Union nicht beeinträchtigen. Um sicherzustellen, dass die besonderen Merkmale und die Autonomie der Rechtsordnung der Union erhalten blieben, sei durch die Verträge ein Gerichtssystem geschaffen worden, das zur Gewährleistung der Kohärenz und der Einheitlichkeit bei der Auslegung des Unionsrechts diene. Das Schlüsselelement dieses Gerichtssystems sei das in Art. 267 AEUV vorgesehene Vorabentscheidungsverfahren, das die einheitliche Auslegung des Unionsrechts gewährleiste (EuGH, SchiedsVZ 2018, 186 Rn. 32, 35, 37 - Achmea).

23          Als Teil des Rechts der Antragstellerin habe das Schiedsgericht nach Art. 8 Abs. 6 BIT gegebenenfalls das Unionsrecht, insbesondere die Bestimmungen über die Niederlassungsfreiheit und die Kapitalverkehrsfreiheit, auszulegen oder sogar anzuwenden (EuGH, SchiedsVZ 2018, 186 Rn. 39 bis 42 - Achmea), sei aber kein zur Vorlage an den Gerichtshof gemäß Art. 267 AEUV berechtigtes Gericht (EuGH, SchiedsVZ 2018, 186 Rn. 43 bis 49 - Achmea). Der Schiedsspruch des Schiedsgerichts unterliege auch keiner Kontrolle durch ein Gericht eines Mitgliedstaats, die gewährleiste, dass die unionsrechtlichen Fragen, die das Schiedsgericht zu behandeln haben könnte, im Wege eines Vorabentscheidungsersuchens dem Gerichtshof vorgelegt werden könnten. Nach Art. 8 Abs. 5 BIT wähle das Schiedsgericht seinen Sitz und damit das Recht, das für das Verfahren zur gerichtlichen Überprüfung der Gültigkeit des Schiedsspruchs gelte. Zudem könne der Schiedsspruch durch das Gericht eines Mitgliedstaats nur überprüft werden, soweit das nationale Recht dies gestatte. § 1059 Abs. 2 ZPO sehe indes nur eine beschränkte Überprüfung vor, die sich unter anderem auf die Gültigkeit der Schiedsvereinbarung nach dem anwendbaren Recht und auf die Frage beziehe, ob die Anerkennung und Voll-

- 11 -

streckung des Schiedsspruchs die öffentliche Ordnung wahre (EuGH, SchiedsVZ 2018, 186 Rn. 50 bis 53 - Achmea).

24          Zwar habe der Gerichtshof für die Handelsschiedsgerichtsbarkeit entschieden, dass die Erfordernisse der Wirksamkeit des Schiedsverfahrens es rechtfertigten, Schiedssprüche durch die Gerichte der Mitgliedstaaten nur in beschränktem Umfang zu überprüfen, soweit die grundlegenden Bestimmungen des Unionsrechts im Rahmen dieser Kontrolle geprüft und gegebenenfalls zum Gegenstand eines Vorabentscheidungsverfahrens beim Gerichtshof gemacht werden könnten. Das Schiedsverfahren in Art. 8 BIT unterscheide sich jedoch von einem Handelsschiedsverfahren, weil es nicht auf der Parteiautonomie beruhe, sondern sich aus einem Vertrag herleite, in dem Mitgliedstaaten übereingekommen sein, der Zuständigkeit ihrer eigenen Gerichte Rechtsstreitigkeiten zu entziehen, die die Anwendung und Auslegung des Unionsrechts betreffen könnten. Die Erwägungen, die eine lediglich beschränkte Überprüfung von Schiedssprüchen der Handelsschiedsgerichtsbarkeit durch mitgliedstaatliche Gerichte rechtfertigten, ließen sich deshalb nicht auf das Schiedsverfahren gemäß Art. 8 BIT übertragen (EuGH, SchiedsVZ 2018, 186 Rn. 54 f. - Achmea). Anders als in den Fällen des EWR-Abkommens, des Übereinkommens zur Schaffung eines einheitlichen Patentgerichtssystems sowie des Beitritts der Union zur EMRK beruhe die Zuweisung der von Art. 8 BIT erfassten Streitigkeiten an ein Schiedsgericht auf einer Vereinbarung, die nicht von der Union, sondern von den Mitgliedstaaten geschlossen worden sei. Art. 8 BIT sei geeignet, neben dem Grundsatz des gegenseitigen Vertrauens zwischen den Mitgliedstaaten die durch Art. 267 AEUV gewährleistete Autonomie des Unionsrechts in Frage zu stellen, und sei daher mit der unionsrechtlichen Verpflichtung zur loyalen Zusammenarbeit der Mitgliedstaaten unvereinbar (EuGH, SchiedsVZ 2018, 186 Rn. 57 und 58 - Achmea).

- 12 -

25      3. Widerspricht danach Art. 8 Abs. 2 BIT den Art. 267 und Art. 344 AEUV, so ist diese Bestimmung nicht anwendbar (vgl. EuGH, Slg. 1988, 5589 Rn. 22 - Matteucci; GRUR Int. 1993, 76 Rn. 8 - Exportur; GRUR 2010, 143 Rn. 98 - American Bud II; EuZW 2010, 217 Rn. 44 - Kommission/Deutschland) und keine wirksame Schiedsvereinbarung zwischen den Parteien abgeschlossen.

26      a) Zwar ist Art. 8 Abs. 2 BIT aufgrund des bilateralen Charakters des BIT mit Beitritt der Antragstellerin zur Europäischen Union nur im Verhältnis zwischen der Slowakischen Republik und den Niederlanden unanwendbar. Damit konnte sich aber keine der Vertragsparteien gegenüber der anderen Vertragspartei in Art. 8 Abs. 2 BIT wirksam verpflichten, der Entscheidung der von Art. 8 Abs. 1 BIT erfassten Streitigkeiten durch ein Schiedsgericht zuzustimmen. Damit fehlte es an einem Angebot der Antragstellerin zum Abschluss einer Schiedsvereinbarung mit Investoren aus den Niederlanden, das die Antragsgegnerin annehmen konnte.

27      b) Infolgedessen konnte entgegen der Ansicht des Oberlandesgerichts im Beschluss vom 10. Mai 2012 eine Schiedsvereinbarung zwischen den Parteien nicht dadurch abgeschlossen werden, dass die Antragsgegnerin das Schiedsverfahren eingeleitet und einen Schiedsrichter benannt hat. Fehlt es an der erforderlichen Einwilligung der Antragstellerin in das Schiedsverfahren, so ist der im vorliegenden Verfahren ergangene Schiedsspruch gemäß § 1059 Abs. 2 Nr. 1 Buchst. a ZPO aufzuheben, weil keine Schiedsvereinbarung zwischen den Parteien besteht.

28      c) Die Antragsgegnerin macht zwar zutreffend geltend, die Entscheidung des Gerichtshofs der Europäischen Union betreffe allein den Inhalt des BIT zwischen der Antragstellerin und den Niederlanden und nicht die Frage, ob die Parteien eine wirksame Schiedsvereinbarung abgeschlossen haben. Im vorlie-

- 13 -

genden Fall ist jedoch das BIT untrennbar mit der Schiedsvereinbarung ver-
bunden. Als Angebot der Antragstellerin auf Abschluss einer Schiedsvereinba-
rung mit der Antragsgegnerin kommt allein die Erklärung gegenüber den Nie-
derlanden gemäß Art. 8 Abs. 2 BIT in Betracht. Diese Erklärung kann jedoch
nach der Entscheidung des Gerichtshofs der Europäischen Union keine Wir-
kung haben. Damit fehlt es an einem Angebot zum Abschluss einer Schieds-
vereinbarung mit der Antragsgegnerin.

29          4. Die von der Antragsgegnerin nach der Entscheidung des Gerichtshofs
der Europäischen Union vorgebrachten Einwände gegen eine Aufhebung des
Schiedsspruchs haben keinen Erfolg.

30          a) Ohne Erfolg macht die Antragsgegnerin geltend, der Umstand, dass
der Gerichtshof der Europäischen Union die Regelung zum vom Schiedsgericht
anzuwendenden Recht gemäß Art. 8 Abs. 6 BIT beanstandet habe, lasse die
Wirksamkeit der Schiedsvereinbarung nach Art. 8 Abs. 2 BIT unberührt.

31          Der Gerichtshof hat den Verstoß gegen Unionsrecht darin erkannt, dass
ein Investor einer der Vertragsparteien im Fall einer Streitigkeit über Investitio-
nen im Gebiet der anderen Vertragspartei gegen diese ein Verfahren vor einem
Schiedsgericht einleiten darf (EuGH, SchiedsVZ 2018, 186 Rn. 60 - Achmea).
Diese Aussage bezieht sich eindeutig auf die in Art. 8 Abs. 2 BIT enthaltene
Zustimmung zur Streitbeilegung durch ein Schiedsgericht. Art. 8 Abs. 6 BIT wird
in der Entscheidung des Gerichtshofs dagegen nur insoweit angesprochen, als
sich die Notwendigkeit für das Schiedsgericht, gegebenenfalls Unionsrecht an-
zuwenden, auch aus seiner Pflicht ergibt, das Unionsrecht als geltendes Recht
der betroffenen Vertragspartei zu berücksichtigen.

32          b) Anders als die Antragsgegnerin meint, kommt es nicht darauf an, ob
das Schiedsgericht im Streitfall tatsächlich kein Unionsrecht angewendet hat
und es auch nicht anwenden musste. Für die Frage, ob zwischen den Parteien

- 14 -

eine Schiedsvereinbarung besteht, ist allein maßgeblich, ob die Antragstellerin in Art. 8 Abs. 2 BIT ein wirksames Angebot zum Abschluss einer Schiedsvereinbarung gegenüber der Antragsgegnerin abgeben konnte. Das war nach der Entscheidung des Gerichtshofs der Europäischen Union nicht der Fall, unabhängig davon, ob das Schiedsgericht im Streitfall Unionsrecht anzuwenden hatte oder nicht.

33        c) Der Entscheidung des Gerichtshofs der Europäischen Union liegt kein fehlerhaftes Verständnis des deutschen Schiedsverfahrensrechts zugrunde.

34        aa) Dabei kann dahinstehen, ob der Senat in Rn. 52 seines Vorlagebeschlusses (SchiedsVZ 2016, 328) zutreffend angenommen hat, die Verweisung auf die UNCITRAL in Art. 8 Abs. 5 BIT schließe es aus, dass ein Schiedsgericht ein deutsches Gericht gemäß § 1050 Satz 1 ZPO ersuchen könne, dem Gerichtshof der Europäischen Union eine im Schiedsverfahren für erheblich gehaltene Frage über die Auslegung des Unionsrechts vorzulegen. Die Antragsgegnerin macht geltend, es sei zwischen der Schiedsordnung der UNCITRAL (UNCITRAL-SchiedsO) und dem UNCITRAL-Modellgesetz zu unterscheiden. Während nach Art. 27 UNCITRAL-Modellgesetz ein Schiedsgericht ein staatliches Gericht lediglich um Unterstützung bei der Beweisaufnahme ersuchen könne, enthalte die UNCITRAL-SchiedsO dazu keine Regelungen, so dass die Zivilprozessordnung mit der Vorlagemöglichkeit über § 1050 ZPO Anwendung finde. Darauf kommt es nicht an, weil dieser Gesichtspunkt für die Entscheidung des Gerichtshofs ohne Bedeutung ist.

35        bb) Für den Gerichtshof der Europäischen Union ist zunächst maßgeblich, dass das Schiedsgericht im Streitfall kein Teil des in den Niederlanden und in der Slowakei bestehenden Gerichtssystems ist und nicht als Gericht "eines Mitgliedstaats" im Sinne von Art. 267 AEUV eingestuft werden kann (EuGH, SchiedsVZ 2018, 186 Rn. 45 f., 49 - Achmea). Der Gerichtshof prüft sodann, ob der Schiedsspruch der Kontrolle durch ein Gericht eines Mitgliedstaats unter-

- 15 -

liegt, die eine Möglichkeit zur Klärung unionsrechtlicher Fragen im Vorabent-
scheidungsverfahren des Art. 267 AEUV gewährleistet. Er stellt fest, erst die
Wahl von Frankfurt am Main als Schiedsort habe der Antragstellerin erlaubt, ein
deutsches Gericht zur Überprüfung des Schiedsspruchs anzurufen. Eine ge-
richtliche Überprüfung könne nur erfolgen, soweit das nationale Recht sie ge-
statte; § 1059 Abs. 2 ZPO sehe nur eine beschränkte Überprüfung vor (EuGH,
SchiedsVZ 2018, 186 Rn. 50 bis 53 - Achmea). Soweit der Gerichtshof im Be-
reich der Handelsschiedsgerichtsbarkeit eine beschränkte Überprüfbarkeit von
Schiedssprüchen für ausreichend erachtet habe, ließen sich diese Überlegun-
gen auf Schiedsverfahren nach Art. 8 BIT nicht übertragen (EuGH, SchiedsVZ
2018, 186 Rn. 54 f. - Achmea).

36          Die Frage, ob das nach Art. 8 BIT gebildete Schiedsgericht im konkreten
Fall befugt ist, über ein staatliches Gericht ein Vorabentscheidungsersuchen an
den Gerichtshof der Europäischen Union zu richten, findet in der Begründung
des Urteils des Gerichtshofs keine Erwähnung. Vielmehr erachtet der Gerichts-
hof es nicht als ausreichend, dass eine gerichtliche Überprüfung nur vorge-
nommen werden kann, soweit das nationale Recht sie im konkreten Fall gestat-
tet. Danach ist unerheblich, ob das Schiedsgericht nach dem im vorliegenden
Fall aufgrund der Wahl des Schiedsorts Frankfurt am Main anwendbaren deut-
schen Recht dem Gerichtshof der Europäischen Union eine im Schiedsverfah-
ren für erheblich gehaltene Frage über die Auslegung des Unionsrechts über
ein deutsches Gericht hätte vorlegen können.

37          d) Anders als die Antragsgegnerin meint, kommt es im Streitfall nicht da-
rauf an, ob Art. 267 und Art. 344 AEUV Verbotsgesetze im Sinne von § 134
BGB sind. In Rede steht nicht die Unwirksamkeit eines von zwei Parteien abge-
schlossenen Vertrags, sondern die Frage, ob eine Partei überhaupt ein Angebot
zum Abschluss einer Schiedsvereinbarung unterbreitet hat. Daran war die An-

- 16 -

tragstellerin aus unionsrechtlichen Gründen gehindert. Damit fehlt es bereits an einem Rechtsgeschäft, das gemäß § 134 BGB nichtig sein könnte.

38          e) Entgegen der Darlegung der Antragsgegnerin ist unerheblich, dass die von ihr behauptete Schiedsvereinbarung privatrechtliche Natur hätte und ob das Schiedsgericht ein Handelsschiedsverfahren durchgeführt hat.

39          Der Gerichtshof der Europäischen Union hat nicht auf den Charakter des vom Schiedsgericht nach seiner Bildung durchgeführten Verfahrens abgestellt, sondern darauf, dass die zur Bildung des Schiedsgerichts führende Schiedsvereinbarung in einem Handelsschiedsverfahren auf Parteiautonomie beruht, während im Fall des BIT zwei Mitgliedstaaten als Vertragsparteien übereingekommen seien, der Zuständigkeit ihrer Gerichte bestimmte Rechtsstreitigkeiten zu entziehen, die die Anwendung und Auslegung des Unionsrechts betreffen könnten. Die vom Gerichtshof anerkannten Grundsätze für eine wirksame Vereinbarung von Schiedsverfahren der Handelsschiedsgerichtsbarkeit könnten deshalb nicht auf Schiedsverfahren gemäß Art. 8 BIT übertragen werden (EuGH, SchiedsVZ 2018, 186 Rn. 55 - Achmea).

40          f) Vergeblich macht die Antragsgegnerin geltend, die Entscheidung des Gerichtshofs der Europäischen Union lasse die völkerrechtliche Wirksamkeit des BIT im Verhältnis zwischen der Antragstellerin und den Niederlanden unberührt, so dass mangels einer Kündigung des BIT auch die Schiedsklausel zwischen den Parteien wirksam bleibe.

41          Wie der Senat bereits in seinem Vorlagebeschluss ausgeführt hat (BGH, SchiedsVZ 2016, 328 Rn. 85), haben die Mitgliedstaaten durch den Beitritt zur Union ihre völkerrechtliche Dispositionsbefugnis beschränkt und untereinander auf die Ausübung mit dem Unionsrecht kollidierender völkervertraglicher Rechte verzichtet (vgl. EuGH, Urteil vom 12. Februar 2009 - C-45/07, Slg. 2009, I-701 Rn. 17 - Kommission/Griechenland). Im Hinblick darauf hat der Vorrang der

- 17 -

unionsrechtlichen Bestimmungen zur Folge, dass eine mit ihnen unvereinbare Regelung in einem unionsinternen Abkommen der Mitgliedstaaten auch als völkervertragliche Regelung unanwendbar ist (vgl. Tietje, KSzW 2011, 128, 130 f.; Lavranos in von der Groeben/Schwarze/Hatje, Europäisches Unionsrecht, 7. Aufl., Art. 351 AEUV Rn. 7; Schmalenbach in Calliess/Ruffert, EUV/AEUV, 5. Aufl., Art. 351 AEUV Rn. 9; aA Lock, Das Verhältnis zwischen dem EuGH und internationalen Gerichten, 2010, S. 205 f.). Die Angehörigen der beteiligten Mitgliedstaaten können sich daher nicht auf ältere völkerrechtliche Verpflichtungen der Mitgliedstaaten berufen, die im Widerspruch zum Unionsrecht stehen (vgl. EuGH, Urteil vom 8. Dezember 1981 - 180/80 und 266/80, Slg. 1981, 2997 Rn. 20 - Crujeiras Tome und Yurrita).

42    III. Die Antragstellerin ist nicht nach Treu und Glauben (§ 242 BGB) daran gehindert, sich auf die Unwirksamkeit der Schiedsabrede zu berufen. Dabei kann zugunsten der Antragsgegnerin unterstellt werden, dass auf den Einwand fehlender Schiedsvereinbarung im vorliegenden Fall § 242 BGB jedenfalls als Teil des verfahrensrechtlichen ordre public anzuwenden wäre.

43    1. Allerdings kann nach deutschem Recht eine Partei dadurch gegen Treu und Glauben verstoßen, dass sie sich vorprozessual nachdrücklich und uneingeschränkt auf einen angeblich geschlossenen Schiedsvertrag beruft, ihren Vertragspartner dadurch zur Erhebung einer Schiedsklage veranlasst, dann aber im Schiedsverfahren und im gerichtlichen Verfahren zur Vollstreckbarerklärung eines ihr nachteiligen Schiedsspruchs geltend macht, ein gültiger Schiedsvertrag sei nicht zustande gekommen (BGH, Urteil vom 2. April 1987 - III ZR 76/86, NJW-RR 1987, 1194, 1195 [juris Rn. 13]; Beschluss vom 16. März 2017 - I ZB 49/16, SchiedsVZ 2018, 37 Rn. 32 f.). Der Streitfall entspricht indes weder dieser Fallgestaltung noch ist er damit wertungsmäßig vergleichbar. Es kann deshalb offen bleiben, ob dem auf Treu und Glauben gestützten Einwand der Antragsgegnerin schon deshalb der Erfolg versagt bleiben

- 18 -

müsste, weil seine Anerkennung mit der Verpflichtung der Mitgliedstaaten zur effektiven Anwendung des Unionsrechts unvereinbar wäre, da sich dann die unionsrechtswidrige Zuweisung von Streitigkeiten an ein Schiedsgericht in einem BIT zugunsten der Investoren zumindest in weitem Umfang als faktisch wirksam erweisen würde.

44      2. Einen Vertrauenstatbestand, auf den sich die Antragsgegnerin nach Treu und Glauben berufen könnte, hat die Antragstellerin nicht geschaffen.

45      a) Das BIT zwischen der Antragstellerin und den Niederlanden ist am 1. Oktober 1992 in Kraft getreten. Die Wirksamkeit der Schiedsklausel in Art. 8 Abs. 2 BIT konnte erst ab 1. Mai 2004 mit dem Beitritt der Antragstellerin zur Europäischen Union fraglich werden. Die Investitionen der Antragsgegnerin sind erst nach dem Beitritt erfolgt. Wie der Senat bereits in Rn. 76 seines Vorlagebeschlusses ausgeführt hatte (BGH, SchiedsVZ 2016, 328), musste die Antragsgegnerin in Erwägung ziehen, dass das im Verhältnis der Vertragsparteien nunmehr vorrangig geltende Unionsrecht Einfluss auf die Regelungen des BIT haben konnte.

46      b) Die Antragsgegnerin legt auch nicht dar, dass die Antragstellerin nach ihrem Beitritt zur Union einen Schutz von Investoren nach Maßgabe der Schiedsklausel des BIT allgemein oder konkret gegenüber der Antragsgegnerin in Aussicht gestellt hat.

47      Der Umstand, dass die Kommission die beim Beitritt der neuen Mitgliedstaaten bestehenden BIT unbeanstandet gelassen hat (vgl. Schlussantrag von Generalanwalt Wathelet in EuGH - C-284/16 Rn. 40 bis 43 - Achmea), konnte keinen der Antragstellerin zurechenbaren Vertrauenstatbestand für die Antragsgegnerin schaffen.

48

- 19 -

Ebenso wenig ergibt sich ein solcher Vertrauenstatbestand daraus, dass die Antragstellerin nach ihrem Beitritt zur Union keine Zweifel an der Wirksamkeit der BIT geäußert hat.

49    Ferner erlaubt die Schaffung eines investitionsfreundlichen Umfelds nach dem Unionsbeitritt keinen Rückschluss auf eine ausdrückliche Anerkennung der Schiedsklausel durch die Antragstellerin. Insbesondere kann eine zu Investitionen ermunternde Politik ohne weiteres Folge des Unionsbeitritts sein, von dem sich ein neuer Mitgliedstaat regelmäßig wirtschaftsfördernde Impulse verspre- chen wird.

50    Aus der Aufnahme des BIT in die Liste bestehender Verträge der Antrag- stellerin auch noch nach Beitritt zur Union kann die Antragsgegnerin ebenfalls keinen Vertrauenstatbestand im Hinblick auf eine Anerkennung der Schieds- klausel durch die Antragstellerin ableiten. Eine konkrete Aussage zur Gültigkeit der Schiedsklausel ist mit der Aufnahme in diese Liste nicht verbunden, dies umso weniger, als das BIT bei Wegfall der Schiedsklausel nicht zwangsläufig und offensichtlich insgesamt unwirksam werden muss.

51    Kein auf die Schiedsklausel bezogener Vertrauenstatbestand für die An- tragsgegnerin ergibt sich aus der bisher fehlenden Kündigung des BIT durch die Antragstellerin. Die Antragstellerin war und ist nicht daran gehindert, den Rechtsstandpunkt einzunehmen, das BIT sei mit Ausnahme der Schiedsklausel weiterhin gültig.

52    Entgegen dem Vortrag der Antragsgegnerin ist dem Schreiben des da- maligen Finanzministers der Antragstellerin vom 14. April 2008 keine ausdrück- liche Anerkennung des Schiedsverfahrens für den vorliegenden Streit zu ent- nehmen. Das Schreiben drückt lediglich den Wunsch des damaligen Finanzmi- nisters nach einer freundschaftlichen Beilegung des Streits im Sinne von Art. 8 Abs. 1 BIT aus, es enthält jedoch keine Anerkennung der Zuständigkeit des

- 20 -

Schiedsgerichts oder der Zulässigkeit eines Schiedsverfahrens gemäß Art. 8 Abs. 2 BIT.

53        Schließlich konnte der Umstand, dass die Antragstellerin in Verhandlungen mit der Antragsgegnerin zur gütlichen Beilegung des Streits eingetreten ist, für diese keinen Vertrauenstatbestand hinsichtlich der Anerkennung der Schiedsklausel durch die Antragstellerin schaffen. Zu Verhandlungen zur gütlichen Streitbeilegung mit dem Investor war die Antragstellerin bereits nach Art. 8 Abs. 1 BIT verpflichtet. Die Gültigkeit dieser Bestimmung wird nicht in Frage gestellt, wenn die Art. 8 Abs. 1 BIT nachfolgenden Bestimmungen, und insbesondere Art. 8 Abs. 2 BIT aus unionsrechtlichen Gründen unanwendbar sind.

54        3. Ein widersprüchliches Verhalten, das den Antragsteller nach Treu und Glauben daran hindern würde, sich auf das Fehlen einer Schiedsvereinbarung zu berufen, hat die Antragsgegnerin ebenfalls nicht dargelegt.

55        a) Widersprüchliches Verhalten einer Partei ist grundsätzlich zulässig. Es wird nur dann rechtsmissbräuchlich, wenn für den anderen Teil ein Vertrauenstatbestand geschaffen worden ist oder wenn andere besondere Umstände die Rechtsausübung als treuwidrig erscheinen lassen. Eine Rechtsausübung kann unzulässig sein, wenn sich objektiv das Gesamtbild eines widersprüchlichen Verhaltens ergibt, weil das frühere Verhalten mit dem späteren sachlich unvereinbar ist und die Interessen der Gegenpartei im Hinblick hierauf vorrangig schutzwürdig erscheinen (BGH, Urteil vom 15. November 2012 - IX ZR 103/11, NJW-RR 2013, 757 Rn. 12). Dabei ist zu beachten, dass es sich um einen engen Ausnahmetatbestand handelt (BGH, NJW-RR 2013, 757 Rn. 13).

56        b) Im Streitfall wurde für die Antragsgegnerin kein Vertrauenstatbestand geschaffen (vgl. Rn. 44 bis 53). Es liegen auch keine besonderen Umstände vor, die die Rechtsausübung als treuwidrig erscheinen ließen.

- 21 -

57         aa) Soweit sich die Antragstellerin in Streitigkeiten mit anderen Investoren nicht auf die Unanwendbarkeit der Schiedsklausel wegen eines Verstoßes gegen Unionsrecht berufen haben sollte, folgt daraus kein treuwidriges widersprüchliches Verhalten gegenüber der Antragsgegnerin. Es steht einer Partei grundsätzlich frei, in Auseinandersetzungen mit verschiedenen Gegnern unterschiedliche Strategien zu verfolgen. In den von beiden Parteien angeführten Fällen Austrian Airlines und HICEE haben sich die Schiedsgerichte zudem für unzuständig erklärt, weil die dort jeweils in Rede stehenden Ansprüche inhaltlich nicht von der Schiedsklausel des BIT erfasst wurden. Damit bestand kein Anlass, die unionsrechtliche Unwirksamkeit der Schiedsklauseln geltend zu machen.

58         bb) Im vorliegenden Schiedsverfahren hat die Antragstellerin nach Einreichung der Schiedsklage im Oktober 2008 sogleich die Unzuständigkeit des Schiedsgerichts gerügt, weil Art. 8 Abs. 2 BIT mit dem Beitritt der Antragstellerin zur Union unwirksam geworden sei. Sie hat an dieser Auffassung sodann unverändert festgehalten. Wie dargelegt (vgl. Rn. 48 bis 53), hat die Antragstellerin in dem insoweit allein maßgeblichen Zeitraum zwischen ihrem Beitritt zur Union und der Erhebung der Schiedsklage im vorliegenden Verfahren zu keinem Zeitpunkt durch ihr Verhalten ein berechtigtes Vertrauen der Antragsgegnerin dahingehend begründet, sie werde die Schiedsvereinbarung als wirksam anerkennen.

59         4. Ohne Erfolg macht die Antragsgegnerin geltend, die Antragstellerin habe ihre Rechtsposition rechtsmissbräuchlich erworben. Die für sie bestehende Möglichkeit, sich erfolgreich auf das Fehlen einer Schiedsvereinbarung zu berufen, ist Folge der vom Gerichtshof der Europäischen Union im vorliegenden Verfahren für richtig erachteten Auslegung des Unionsrechts. Darin liegt kein Rechtsmissbrauch.

60

- 22 -

IV. Entgegen der Anregung der Antragsgegnerin in den Schriftsätzen vom 14. September und vom 29. Oktober 2018 kommt für den Senat nicht in Betracht, dem Bundesverfassungsgericht die Entscheidung des Gerichtshofs der Europäischen Union vom 6. März 2018 - C-284/16 nach Art. 100 Abs. 1 GG oder Abs. 2 GG vorzulegen, um sie für unanwendbar erklären zu lassen.

61          1. Eine direkte Anwendung von Art. 100 Abs. 1 GG auf Entscheidungen des Gerichtshofs der Europäischen Union ist nach dem Wortlaut der Norm ausgeschlossen. Danach ist nur ein Gesetz tauglicher Vorlagegegenstand. Ob und unter welchen Voraussetzungen in engen Ausnahmefällen eine analoge Anwendung von Art. 100 Abs. 1 GG für eine Ultra-vires-Kontrolle in Betracht gezogen werden könnte (vgl. BVerfGE 123, 267, 354 f. [juris Rn. 241]), bedarf im Streitfall keiner Entscheidung.

62          2. Der Gerichtshof hat mit seiner Entscheidung nicht ultra vires gehandelt, sondern im Einklang mit der Kompetenzverteilung zwischen ihm und den nationalen Gerichten gemäß Art. 267 AEUV die Vorlagefragen des Bundesgerichtshofs beantwortet, soweit dies aus seiner Sicht erforderlich war.

63          a) Bei der Ultra-vires-Kontrolle wird geprüft, ob Rechtsakte der europäischen Organe und Einrichtungen sich unter Wahrung des unionsrechtlichen Subsidiaritätsprinzips (Art. 5 Abs. 1 Satz 2 und Abs. 3 EUV) in den Grenzen der ihnen im Wege der begrenzten Einzelermächtigung eingeräumten Hoheitsrechte halten. Darüber hinaus wird im Rahmen der Identitätskontrolle geprüft, ob der unantastbare Kerngehalt der Verfassungsidentität des Grundgesetzes nach Art. 23 Abs. 1 Satz 3 in Verbindung mit Art. 79 Abs. 3 GG gewahrt ist (vgl. BVerfGE 123, 267, 353 f. [juris Rn. 240]; 142, 123, 203 Rn. 153).

64          Ultra-Vires- wie auch Identitätskontrolle kommen nur bei "hinreichend qualifizierten" Verstößen in Betracht. Dafür muss das kompetenzwidrige Handeln offensichtlich sein und der angegriffene Akt im Kompetenzgefüge zwischen

- 23 -

Mitgliedsstaaten und Union im Hinblick auf das Prinzip der begrenzten Einzelermächtigung und die rechtsstaatliche Gesetzesbindung erheblich ins Gewicht fallen (vgl. BVerfGE 126, 286, 304 [juris Rn. 61]; 142, 123, 200 Rn. 147). Bezogen auf den Gerichtshof der Europäischen Union wäre dies erst der Fall, wenn eine Entscheidung die Willkürgrenze bei der Auslegung der Verträge überschritte (vgl. BVerfGE 126, 286, 307 [juris Rn. 66]; 142, 123, 200 f. Rn. 147, 149 f.).

65       b) Nach diesen Grundsätzen besteht im Streitfall kein Anlass für eine Ultra-vires-Kontrolle durch das Bundesverfassungsgericht. Die Entscheidung des Gerichtshofs beruht auf einer jedenfalls nicht willkürlichen Auslegung der Art. 267 und 344 AEUV. Sie ist im Rahmen eines Vorabentscheidungsverfahrens nach Art. 267 AEUV ergangen und hält sich damit im Rahmen der dem Gerichtshof der Europäischen Union nach Art. 23 Abs. 1 Satz 2 GG übertragenen Zuständigkeiten.

66       3. Es ist nicht ersichtlich, dass der Gerichtshof die vom Senat und von Generalanwalt Wathelet vorgetragenen Argumente bei seiner Beurteilung unberücksichtigt gelassen hat. Er hat sich ihnen lediglich nicht angeschlossen. Zudem bliebe die Entscheidungskompetenz des Gerichtshofs als solche unberührt, selbst wenn er Argumente unberücksichtigt gelassen hätte. Sollte der Senat der Auffassung sein, seine Argumente hätten beim Gerichtshof kein Gehör gefunden, wäre ein erneutes Vorabentscheidungsersuchen zu erwägen. Ein Ultra-vires-Handeln des Gerichtshofs stünde aber nicht in Rede. Für ein erneutes Vorabentscheidungsersuchen im Streitfall sieht der Senat keinen Anlass.

67       4. Entgegen der Ansicht der Antragsgegnerin handelt es sich bei dem Urteil des Gerichtshofs vom 6. März 2018 (SchiedsVZ 2018, 186 - Achmea) nicht um eine allgemeine Regel des Völkerrechts, die als Bestandteil des Bundesrechts gemäß Art. 100 Abs. 2 GG Gegenstand einer Vorlage an das Bundesverfassungsgericht sein könnte.

- 24 -

68       a) Der verfassungsrechtliche Begriff "allgemeine Regeln des Völker-
rechts" umfasst die Normen des universellen Völkergewohnheitsrechts, mithin
diejenigen Normen des Völkerrechts, die aufgrund einer allgemeinen Praxis und
korrespondierenden Rechtsüberzeugung für die überwiegende Mehrheit der
Staaten verbindlich sind, sowie die das Völkergewohnheitsrecht ergänzenden
allgemeinen Rechtsgrundsätze (vgl. BVerfGE 15, 25, 32 f. [juris Rn. 37]). An die
Feststellung einer allgemeinen Regel des Völkerrechts sind wegen der darin
zum Ausdruck kommenden grundsätzlichen Verpflichtung aller Staaten hohe
Anforderungen zu stellen (BVerfGE 118, 124, 137 [juris Rn. 30 f.]; Heintschel
von Heinegg in BeckOKGG, 38. Ed., Art. 25 GG Rn. 19). Einer Entscheidung
des Gerichtshofs der Europäischen Union kommt diese universelle Qualität
schon aufgrund ihrer territorial auf das Gebiet der Union beschränkten Wirkung
nicht zu. Vielmehr legen die Urteile des Gerichtshofs der Europäischen Union
das Unionsrecht aus, das begrenzt auf das Territorium der Gemeinschaft eine
im Verhältnis zum nationalen Recht autonome Rechtsordnung geschaffen ha-
ben.

69       b) Aus dem Vortrag der Antragsgegnerin zur Entscheidung des ICSID-
Schiedsgerichts im Fall ARB 12/12 - Vattenfall u.a./Bundesrepublik Deutschland
vom 29. August 2018 und den darin wiedergegebenen Stellungnahmen der
Bundesrepublik Deutschland und der Europäischen Kommission ergibt sich
nichts anderes. Die Kommission begründet in ihrem in Rn. 84 jener Entschei-
dung wiedergegebenen Vortrag die Bedeutung der Entscheidung des Gerichts-
hofs der Europäischen Union in der Sache C-284/16 (SchiedsVZ 2018, 186
- Achmea) für das Verfahren Vattenfall mit der Autonomie der Rechtsordnung
der Union. Die Bundesregierung hat laut Rn. 10 im Verfahren "Vattenfall" aus-
geführt, das ICSID-Schiedsgericht entscheide den Streit in Übereinstimmung
mit dem Energie-Chartavertrag und den geltenden Regeln und Grundsätzen
des Völkerrechts, wozu auch das Unionsrecht und die Entscheidung des Ge-
richtshofs der Europäischen Union in der Sache C-284/16 (SchiedsVZ 2018,

- 25 -

186 - Achmea) zählten. Dem hat sich das ICSID-Schiedsgericht in Rn. 150 der Entscheidung angeschlossen.

70      Daraus folgt nicht, dass es sich bei Urteilen des Gerichtshofs der Europäischen Union um geeignete Vorlagegegenstände nach Art. 100 Abs. 2 GG handelt. Diese Norm lässt nach der Systematik des Grundgesetzes und der Entscheidungspraxis des Bundesverfassungsgerichts eine Vorlage nur zu, wenn ernsthafte Zweifel an der Bedeutung oder der Tragweite einer allgemeinen Regel des Völkerrechts bestehen (BVerfG [Kammer], EuGRZ 2016, 54, 60 Rn. 53; NJW 2012, 293, 295 [juris Rn. 27], jeweils mwN). Aus der ausdrücklichen Bezugnahme auf Art. 25 GG in Art. 100 Abs. 2 GG ergibt sich eindeutig, dass Vorlagegegenstand lediglich Fragen zu den allgemeinen Regeln des Völkerrechts sein können, die Bestandteil des Bundesrechts sind (vgl. Dederer in Maunz/Dürig, GG, Stand April 2018, Art. 100 Rn. 292). Vom Gerichtshof der Europäischen Union eigenständig vorgenommene Auslegungen des Unionsrechts stellen schon aufgrund ihres Charakters als Einzelfallentscheidungen keine allgemeinen Regeln des Völkerrechts dar.

71      c) Eine Erstreckung der Vorlagemöglichkeit nach Art. 100 Abs. 2 GG auf Fragen zur Bedeutung oder Tragweite von Entscheidungen des Gerichtshofs der Europäischen Union würde zudem eine mit dem Vorrang des Unionsrechts unvereinbare, sehr weitgehende Erweiterung der auf die Wahrung der grundlegenden Verfassungsprinzipien der Bundesrepublik Deutschland beschränkten Prüfungsbefugnis des Bundesverfassungsgerichts bei Handlungen der Organe der Europäischen Union bedeuten (vgl. dazu BVerfGE 142, 123 Rn. 115 ff.).

72      V. Schließlich wird der Antragsgegnerin durch die Entscheidung des Gerichtshofs der Europäischen Union vom 6. März 2018 nicht effektiver Rechtsschutz verwehrt. Das Urteil des Gerichtshofs ist von der Auffassung getragen, im Hinblick auf den Grundsatz des gegenseitigen Vertrauens zwischen den Mitgliedstaaten hinsichtlich der Anerkennung der gemeinsamen Werte der Union

- 26 -

(Art. 2 EUV) und der Beachtung des Unionsrechts (vgl. EuGH, SchiedsVZ 2018, 186 Rn. 34 - Achmea) könne die Antragsgegnerin als Investorin effektiven Rechtsschutz vor den Gerichten der Slowakei erhalten. Eine Aberkennung materieller Ansprüche der Antragsgegnerin ist mit der Entscheidung des Gerichtshofs und der sich darauf ergebenden Aufhebung des Schiedsspruchs im Streitfall nicht verbunden. Der Antragsgegnerin wird infolge der Aufhebung des Schiedsspruchs auch keine Vermögensposition entzogen.

73      D. Die Entscheidung des Senats ergeht ohne mündliche Verhandlung. Zwar eröffnet § 128 Abs. 4 ZPO bei Rechtsbeschwerden nach § 1065 Abs. 1, § 577 Abs. 6 Satz 1 ZPO grundsätzlich die Möglichkeit, mündlich zu verhandeln. Nach der Vorabentscheidung des Gerichtshofs der Europäischen Union bestand dafür jedoch kein Anlass.

74      E. Die Kostenentscheidung beruht auf § 91 Abs. 1 ZPO.

Koch                          Schaffert                          Kirchhoff

            Feddersen                          Schmaltz

Vorinstanz:
OLG Frankfurt am Main, Entscheidung vom 18.12.2014 - 26 Sch 3/13 -

**TARGEM**
**TRANSLATIONS**

T 718 384 8040
F 718 388 3516
E info@targemtranslations.com
W TargemTranslations.com

## CERTIFIED TRANSLATION

I, Wolf Markowitz, Manager at Targem Translations, Inc., located at 143 Rodney Street in Brooklyn, New York, a language service firm with a track record of providing expert language services to the business and legal community of more than 50 years, do hereby certify that our team of translators, editors and proofreaders are professionally trained and vastly experienced in providing professional translations, from German to English and vice versa; and they have professionally translated the document referenced as **"Germany Achmea Decision"** from German to English, faithfully, accurately and completely, to the best of their expertise and experience.

Date: November 19, 2018

_____
Wolf Markowitz

_____
Signature of Notary

ROCHAL WEISS
NOTARY PUBLIC-STATE OF NEW YORK
No  01WE6293785
Qualified in Kings County
My Commission Expires 12-16-2021

**TARGEM TRANSLATIONS | Headquarters**
143 Rodney Street, Brooklyn, NY 11211

**OFFICES |** New York, California, and Asia



Received

November 8, 2018

v. Plehwe R Schafer
Attorneys at the Federal Court of Justice

Reference:                yes

German Federal Court
of Justice–Civil Matter:      no

German Federal Court
of Justice Report:            yes

ZPO [German Code of Civil Procedure] Section 1059 (2) (1) (a)

a)  When Section 1059 (2)(1)(a) ZPO is applied, the absence of an arbitration
    agreement is equivalent to its invalidity.

b)  In bilateral investment treaties ("BITs") between Member States of the
    European Union, arbitration clauses are inapplicable if, under them, an
    investor of one of these Member States may initiate proceedings before
    an arbitration tribunal against the other Member State in the event of a
    dispute over investments in that other Member State.

    German Federal Court of Justice, decision dated October 31, 2018 – I ZB
    2/15 – Frankfurt am Main Higher Regional Court



Received
November 8, 2018
von Plehwe & Schafer
attorneys at the Federal Court of Justice

# FEDERAL COURT OF JUSTICE

## RULING

I ZB 2/15

of

October 31, 2018

in proceedings

to overturn a domestic arbitral award

The Slovak Republic, represented by the Ministry of Finance of the Slovak Republic, in turn represented by the Minister of Finance Eng. Peter Kazimir, Stefanovicova 5, Bratislava, Slovak Republic,

Petitioner and Appellant,

- Legal representative: Dr. von Plehwe und Schafer, Attorneys at Law -

v.

Achmea B.V., represented by its Chairman Willem A. J. van Duin, Handelsweg 2, Zeist, the Netherlands,

Respondent and Appellee,

- Legal representative: Prof Raeschke-Kessler, Attorney at Law -

ECLI:DE:BGH:2018:311018BIZB2. 15.0

- 2 -

On October 31, 2018, via Presiding Judge Prof Koch and Judges Prof Schaffert, Prof Kirchhoff, Feddersen, and Dr Schmaltz, the First Civil Senate of the German Federal Court of Justice

ruled:

Following the Petitioner's appeal, the decision of the Higher Regional Court of Frankfurt am Main – 26th Civil Senate – of December 18, 2014 is overturned.

The arbitral award in arbitration PCA Case No. 2008-13 of December 7, 2012 (hereinafter referred to as the "Final Award") is overturned.

The costs of the proceedings shall be borne by the Respondent.

Amount at issue: EUR 22,100,000

- 3 -

<u>Grounds:</u>

1    A. The Petitioner, the Slovak Republic, is a legal successor to the Czech and Slovak Federative Republic (hereinafter referred to as "Czechoslovakia"). The Respondent is a Dutch insurance group.

2    In 1991, Czechoslovakia and the Kingdom of the Netherlands (hereinafter referred to as the "Netherlands") concluded a Bilateral Investment Treaty (hereinafter referred to as the "BIT") with effect from October 1, 1992. In Article 3 (1) BIT, the contracting parties assured that they would treat the investments of investors of the other contracting party fairly and equitably and would not impair the operation, administration, maintenance, use, enjoyment, or sale of investments by these investors via unfair or discriminatory measures. Under Article 4 BIT, each contracting party ensured the free transfer of payments related to investments, such as, in particular, profits, interest, and dividends, in freely convertible currency and without undue restriction or delay.

3    Article 8 BIT—in German translation—contains the following provisions:

1. All disputes between a contracting party and an investor of the other contracting party regarding an investment of the latter shall, if possible, be settled amicably.

2. Each party hereby agrees that a dispute referred to in Paragraph (1) of this Article shall be submitted to arbitration if it is not settled amicably within a period of six months from the date on which either party to the dispute requested an amicable settlement.

3. The arbitration tribunal referred to in Paragraph (2) of this Article shall be constituted for each individual case in the following manner: each party to the dispute shall appoint a member of the arbitration tribunal and the two members so appointed shall elect a citizen of a third state to chair the arbitration tribunal.

- 4 -

…

5. The arbitration tribunal shall determine its own procedure by applying the Rules of Arbitration of the United Nations Commission on International Trade Law (UNCITRAL).

6. The arbitration tribunal shall decide on the basis of the law, taking the following, in particular but not exclusively, into account:

- the applicable law of the contracting party concerned;
- the provisions of this treaty and other significant treaties between the contracting parties;
- the provisions of special agreements regarding the investment;
- the general principles of international law.

...

4    As a legal successor to Czechoslovakia, the Petitioner entered into its rights and obligations under the BIT on January 1, 1993. It became a member of the European Union with effect from May 1, 2004.

5    In 2004, as part of a reform of its health care system, the Petitioner opened the Slovakian market to domestic and foreign providers of private health insurance. As a result, the Respondent was admitted as a health insurer in Slovakia and established Union Krankenversicherung AG there, to which, according to information it has provided, it contributed the equivalent of EUR 72 million in cash over the course of 2006 and via which it offered private health insurance. Following a change in government in 2006, the Petitioner partially reversed the liberalisation of the health insurance market. In an act dated December 12, 2006, it prohibited the use of insurance brokers; in an act dated October 25, 2007, it prohibited the distribution of profits from health insurance business; and in an act dated April 28, 2009, it prohibited the sale of insurance portfolios. In a decision dated January 26, 2011, the Constitutional Court of the Slovak Republic ruled that the legal prohibition of the distribution of profits was unconstitutional.

- 5 -

The Petitioner permitted profit distributions again with the new statutory health insurance regulation that came into force on August 1, 2011.

6          The Respondent asserted that the Petitioner's statutory regulatory measures caused it to suffer losses in the two-digit millions. In October 2008, it initiated arbitration proceedings against the Petitioner, in which it asserted a claim for damages against the latter for violation of its rights under the BIT. In the arbitration proceedings, in consultation with the parties, Frankfurt am Main was determined as the place of the proceedings.

7          In the arbitration proceedings, the Petitioner objected that the arbitration tribunal lacked jurisdiction. It argued that, when it joined the European Union, the offer to conclude an arbitration agreement contained in Article 8 (2) BIT had become invalid since it was incompatible with European Union law and therefore inapplicable. In an interim ruling dated October 26, 2010, the arbitration tribunal affirmed that it had jurisdiction. In a ruling dated May 10, 2012, the Higher Regional Court rejected the Petitioner's request for a finding that the arbitration tribunal did not have jurisdiction. The Petitioner's appeal of that decision was rejected, with the proviso that the German Federal Court of Justice rejected the petition against the interim decision as inadmissible after the Final Award had been issued in the main action (Federal Court of Justice, decision dated April 30, 2014 – III ZB 37/12, SchiedsVZ [*Zeitschrift für Schiedsverfahren*] 2014, 200).

8          In its Final Award dated December 7, 2012, the arbitration tribunal ordered the Petitioner to pay EUR 22.1 million plus interest. The Petitioner petitioned the Higher Regional Court to overturn the Final Award. The Higher Regional Court rejected the petition (Frankfurt am Main Higher Regional Court, decision dated December 18, 2014 – 26 Sch 3/13, juris). In this appeal,

- 6 -

the Petitioner is challenging this ruling and continuing to petition for the Final Award to be overturned. The Respondent petitions that the appeal be rejected.

9          In a decision dated March 3, 2016, the Senate referred the following questions to the European Court of Justice for a preliminary ruling (Federal Court of Justice, SchiedsVZ 2016, 328):

> 1. Does Article 344 TFEU preclude the application of a regulation in a bilateral investment protection agreement between Member States of the European Union (a so-called intra-EU BIT), under which an investor of a signatory state may, in the event of a dispute concerning investments in the other signatory state, initiate proceedings against that other signatory state if the investment protection agreement was concluded before one of the signatory states joined the European Union but the arbitration proceedings are to be initiated only thereafter?
>
> If the answer to Question 1 is no:
>
> 2. Does Article 267 TFEU preclude the application of such a regulation?
>
> If the answers to Questions 1 and 2 are both no:
>
> 3. Does Article 18 (1) TFEU preclude the application of such a regulation in the circumstances described in Question 1?

10          The European Court of Justice decided these questions in its ruling of March 6, 2018 – C-284/16 as follows (ECJ, SchiedsVZ 2018, 186 – Achmea):

> Articles 267 and 344 of the TFEU must be interpreted as precluding a provision in an international agreement between the Member States, such as Article 8 of the Bilateral Investment Treaty between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against that other Member State before an arbitration tribunal to whose jurisdiction that Member State has subjected itself.

11          B. The Higher Regional Court found no reason to overturn the Final Award. Its reasons were as follows:

- 7 -

12          The arbitration clause in Article 8(2) BIT is valid because it is compatible with European Union law. It does not violate the exclusive nature of the dispute settlement mechanisms under European Union law provided for in Article 344 TFEU, since European Union treaties do not provide for specific legal proceedings for disputes between a private investor and a Member State. Article 344 TFEU does not constitute a general "guarantee of jurisdiction" for the European Court of Justice. The arbitration clause is also compatible with Article 267 TFEU. It is true that the arbitration tribunal is not entitled to refer questions of relevance to a decision regarding the interpretation or application of European Union law to the European Court of Justice. However, according to the case law of the European Court of Justice, the review of an arbitral award by national courts, on the basis of the limited standard of review laid down by national law for its annulment or a refusal to recognise it, is sufficient to ensure the uniform interpretation and application of European Union law in the Member States—if appropriate with the assistance of a request for a preliminary ruling from the national courts to the European Court of Justice.

13          The Final Award should also not be overturned on the grounds that it violates provisions of European Union law forming part of public policy (*l'ordre public*).

14          C. The appeal is permissible (Section 574 (1) Sentence 1 No. 1 ZPO in conjunction with Section 1065 (1) Sentence 1, Section 1062 (1) No. 4 Case 1 ZPO) and also admissible in other respects (Section 574 (2) No.1 ZPO). It is also well-founded. According to the decision of the European Court of Justice, issued in response to a referral by the Senate, the relationship between the parties does not include an arbitration agreement. The Final Award must therefore be overturned (Section 1059 (2) No.1 (a) ZPO).

15          I. Pursuant to Section 1059 (2) No. 1 (a) ZPO, an arbitral award may be overturned if the claimant justifiably asserts that the arbitration agreement is invalid under the law to which the parties have subordinated it

- 8 -

or, if the parties have reached no agreement on this, under German law. In this context, the absence of an arbitration agreement is equivalent to its invalidity (cf. Schwab/Walter, *Schiedsgerichtsbarkeit* [Arbitration], 7th Edition, Chapter 24, Marginal No. 7; Lachmann, *Handbuch für die Schiedsgerichtspraxis* [Handbook of Arbitration Practice], 3rd Edition, Marginal No. 2184).

16      1. Section 1059 ZPO applies in this case. The decision of the arbitration tribunal of December 7, 2012 is a domestic arbitral award. According to Section 1025 (1) ZPO, the provisions of Sections 1025 to 1066 ZPO apply if the place of arbitration as defined by Section 1043 (1) ZPO is in Germany. Pursuant to Section 1043 (1) Sentence 1 ZPO, the parties have designated Frankfurt am Main as the place of the arbitration proceedings.

17      2. In this case, the arbitration agreement could only have been concluded via the petition of the Respondent to initiate arbitration proceedings dated October 1, 2008 in conjunction with Article 8 (2) BIT. Article 8 (2) BIT constitutes an agreement in favour of the investors of the participating signatory states, which is intended to give them the choice between initiating arbitration proceedings or proceedings before a state court in the event of an investment dispute with the other signatory state (cf. OLG [Higher Regional Court] Dusseldorf, SchiedsVZ 2006, 331, 333 [juris Marginal No. 28]; OLG Frankfurt am Main, SchiedsVZ 2013, 119, 122 [juris Marginal No. 17]). Article 8 (2) BIT thus contains an offer by the signatory states to conclude arbitration agreements with the investors of the other signatory state, which the respective investors can accept expressly or implicitly (cf. OLG Dusseldorf, SchiedsVZ 2006, 331, 333 et seq. [juris Marginal No. 28]); Happ, *IStR* [*Internationales Steurrecht*] 2006, 649, 650; Markert, *Streitschlichtungsklauseln* [Dispute Settlement Clauses] in *Investitionsschutzabkommen* [International Investment Treaties], 2010, p. 120). As the Higher Regional Court correctly recognised in its decision dated May 10, 2012, the Respondent accepted this offer by initiating

- 9 -

arbitration proceedings (cf. OLG Frankfurt, SchiedsVZ 2013, 119, 122 [juris Marginal No. 73]).

18          3. Since the arbitration tribunal was constituted only after the Petitioner's accession to the European Union, the applicable law for the arbitration proceedings according to Article 8 (6) BIT is the law applicable to the Petitioner, i.e. European Union law, which has priority in its territory. This also applies to assessment of the issue of whether the jurisdiction of the arbitration tribunal could be validly established via the arbitration agreement or whether the arbitration agreement is invalid due to a violation of European Union law.

19          II. The appeal correctly objects that the Petitioner's possibility of having an investment dispute with the Respondent resolved via an arbitration tribunal in accordance with Article 8 (2) BIT is incompatible with the legal system of the European Union as enshrined in Articles 344 and 267 TFEU.

20          1. Since the Petitioner's accession to the European Union with effect from May 1, 2004, the BIT has been an internal agreement between Member States. According to the case law of the European Court of Justice, in the event of a conflict, the provisions of European Union law take precedence, in the fields governed by them, over provisions stipulated in other agreements between Member States before the European Union provisions entered into force (cf. the ECJ decision dated September 27, 1988 – 235/87, Collection 1988, 5589, Marginal No. 22 – Matteucci, which incorporates further references). An agreement concluded by a Member State with another state cannot, after the accession of the second state to the European Union, be applied to the relationship between these states if this would contradict European Union law (cf. the ECJ decisions dated November 10, 1992 – C-3/91, Collection 1992, I-5529 = GRUR [*Gewerblicher Rechtsschutz und Urheberrecht*], International Section, 1993, 76, Marginal No. 8 – Exportur; September 8, 2009 – C-478/07, Collection 2009, I-7721 = GRUR 2010, 143, Marginal No. 98 – American Bud II; and January 21, 2010 – C-546/07, Collection 2010, I-439 = EuZW [*Europäische Zeitschrift für Wirtschaftsrecht*] 2010, 217, Marginal No. 44 – Commission/Germany).

21          2. The European Court of Justice answered the questions referred to it by the Senate:

22          As results in particular from Article 344 TFEU, an international agreement must not affect the autonomy of the European Union's legal system. To ensure that the specific characteristics and autonomy of the European Union's legal system are preserved, a judicial system designed to ensure coherence and uniformity in the interpretation of European Union law was created via treaties. The key element of this judicial system is the preliminary ruling procedure specified in Article 267 TFEU, which ensures the uniform interpretation of European Union law (ECJ, SchiedsVZ 2018, 186, Marginal Nos. 32, 35, and 37 – Achmea).

23          As part of the Petitioner's right, the arbitration tribunal is required under Article 8 (6) BIT, when it is appropriate, to interpret or even apply European Union law, in particular the provisions relating to the free movement of persons and capital (ECJ, SchiedsVZ 2018, 186, Marginal Nos. 39 to 42 – Achmea), but it is not a court entitled to make a referral to the European Court of Justice pursuant to Article 267 TFEU (ECJ, SchiedsVZ 2018, 186, Marginal Nos. 43 to 49 – Achmea). An award by an arbitration tribunal is also not subject to review by a court of a Member State, which ensures that the European Union law questions an arbitration tribunal may have to consider can be referred to the European Court of Justice for a preliminary ruling. Pursuant to Article 8 (5) BIT, the arbitration tribunal chooses its seat and thus the law applicable to the proceedings for the judicial review of the validity of the award. Moreover, the award can only be reviewed by the court of a Member State if the relevant national law so permits. However, Section 1059 (2) ZPO provides only for a limited review which, inter alia, regards the validity of the arbitration agreement under the applicable law and the question of whether the recognition and

- 11 -

enforcement of the award preserves public policy (ECJ, SchiedsVZ 2018, 186, Marginal Nos. 50 to 53 – Achmea).

24        It is true that, with regard to commercial arbitration, the European Court of Justice has held that the requirements for the effectiveness of arbitration justify only a limited review of arbitral awards by Member States courts, if the fundamental provisions of Union law can be examined in the course of that review and, if appropriate, referred to the European Court of Justice for a preliminary ruling. However, the arbitration proceedings in Article 8 BIT differ from commercial arbitration proceedings because they are not based on the autonomy of the parties but rather derive from a treaty in which Member States have agreed to deny their own courts' jurisdiction over disputes that could regard the application and interpretation of European Union law. The considerations justifying a merely limited review of commercial arbitral awards by Member State courts can therefore not be transferred to arbitration proceedings under Art. 8 BIT (ECJ, SchiedsVZ 2018, 186, Marginal Nos. 54 et seq. – Achmea). In contrast to cases covered by the EEA Treaty, the treaty establishing a unitary patent court system, and the accession of the European Union to the ECHR, the allocation of disputes covered by Article 8 BIT to an arbitration tribunal is based on an agreement that has not been entered into by the European Union but rather by Member States. In addition to the principle of mutual trust between the Member States, Article 8 BIT is suited to call into question the autonomy of European Union law guaranteed by Article 267 TFEU and is therefore incompatible with Member States' obligation under European Union law to cooperate in good faith (ECJ, SchiedsVZ 2018, 186, Marginal Nos. 57 and 58 – Achmea).

-12 -

25        3. If Article 8 (2) BIT contradicts Articles 267 and 344 TFEU, it is not applicable (cf. ECJ, Collection 1988, 5589, Marginal No. 22 – Matteucci; GRUR, International Section, 1993, 76, Marginal No. 8 – Exportur; GRUR 2010, 143, Marginal No. 98 - American Bud II; EuZW 2010, 217, Marginal No. 44 - Commission/Germany) and no effective arbitration agreement has been concluded between the parties.

26        a) It is true that, after the Petitioner acceded to the European Union, given the bilateral nature of the BIT, Article 8 (2) BIT is only inapplicable between the Slovak Republic and the Netherlands. However, this meant that none of the contracting parties could effectively commit to the other contracting party in Article 8 (2) BIT to agree to have an arbitration tribunal rule on disputes covered by Article 8 (1) BIT. Thus, there was no offer by the Petitioner to conclude an arbitration agreement with investors from the Netherlands which the Respondent could accept.

27        b) Consequently, contrary to the opinion of the Higher Regional Court in its decision dated May 10, 2012, an arbitration agreement between the parties could not be concluded by having the Respondent initiate arbitration proceedings and appoint an arbitrator. If the necessary consent of the Petitioner to the arbitration proceedings is lacking, the Final Award made in these proceedings must be overturned pursuant to Section 1059 (2) No.1 (a) ZPO since no arbitration agreement between the parties exists.

28        c) The Respondent correctly claims that the decision of the European Court of Justice regards only the content of the BIT between the Petitioner and the Netherlands and not the issue of whether the parties have concluded an effective arbitration agreement. In this

case, however, the BIT is inextricably linked to the arbitration agreement. Only the declaration to the Netherlands pursuant to Article 8 (2) BIT could be considered an offer by the Petitioner to conclude an arbitration agreement with the Respondent. However, the decision of the European Court of Justice indicates that this declaration cannot have any effect. There is therefore no offer to conclude an arbitration agreement with the Respondent.

29        4. The Respondent's objections against the Final Award being overturned, which were made following the decision of the European Court of Justice, must be rejected.

30        a) The Respondent's claim—that the fact that the European Court of Justice challenged the arrangements regarding the law to be applied by the arbitration tribunal pursuant to Article 8 (6) BIT does not affect the validity of the arbitration agreement pursuant to Article 8 (2) BIT—must be rejected.

31        The European Court of Justice held that the violation of European Union law consisted in the fact that, in the event of a dispute regarding investments in the territory of the other contracting party, an investor from one of the contracting parties could institute proceedings against that other contracting party before an arbitration tribunal (ECJ, SchiedsVZ 2018, 186, Marginal No. 60 – Achmea). This statement clearly refers to the agreement embodied in Article 8 (2) BIT to settle disputes via an arbitration tribunal. Article 8 (6) BIT, on the other hand, is addressed in the European Court of Justice's decision only to the extent that the necessity for the arbitration tribunal to apply European Union law where appropriate also arises from its obligation to take European Union law into account as the applicable law of the contracting party concerned.

32        b) In contrast to the Respondent's opinion, it does not matter whether the arbitration tribunal in fact did not apply and did not have to apply European Union law in this case. To determine whether an arbitration

- 14 -

agreement exists between the parties, the only relevant issue is whether the Petitioner was able to make an effective offer to the Respondent to conclude an arbitration agreement under Article 8 (2) BIT. The decision of the European Court of Justice indicates that this was not the case, irrespective of whether the arbitration tribunal had to apply European Union law in this case.

33        c) The European Court of Justice's decision is not based on an erroneous understanding of German arbitration law.

34        aa) It is irrelevant whether the Senate correctly assumed in Marginal No. 52 of its referral decision (SchiedsVZ 2016, 328) that the reference to UNCITRAL in Article 8 (5) BIT precludes an arbitration tribunal from requesting a German court, pursuant to Section 1050 (1) ZPO, to refer to the European Court of Justice a question regarding the interpretation of European Union law considered significant in the arbitration proceedings. The Respondent asserts that a distinction must be made between the UNCITRAL Arbitration Rules and the UNCITRAL Model Law. Whereas, according to Article 27 of the UNCITRAL Model Law, an arbitration tribunal may only request a state court for assistance in the taking of evidence, the UNCITRAL Arbitration Rules do not contain any regulations in this respect, which means that the Code of Civil Procedure, with its referral option in Section 1050 ZPO, is applicable. This is, however, not relevant since it has no bearing on the European Court of Justice's decision.

35        bb) The initial decisive factor for the European Court of Justice is that the arbitration tribunal in this case is not part of the existing judicial system in either the Netherlands or Slovakia and cannot be classified as a court of "a Member State" as defined by Article 267 TFEU (ECJ, SchiedsVZ 2018, 186, Marginal Nos. 45 et seq. and 49 – Achmea). The European Court of Justice next examines whether the Final Award is subject to review by a court of a Member State,

- 15 -

which ensures the possibility of clarifying European Union law issues during the preliminary ruling procedure provided for in Article 267 TFEU. It first determines that it was only the choice of Frankfurt am Main as the place of arbitration that allowed the Petitioner to appeal to a German court to review the Final Award. The European Court of Justice holds that a judicial review can only take place if one is permitted by the relevant national law, and that Section 1059 (2) ZPO only provides for a limited review (ECJ, SchiedsVZ 2018, 186, Marginal Nos. 50 to 53 – Achmea). Although the European Court of Justice considers a limited reviewability of Final Awards sufficient for commercial arbitration, these considerations do not apply to arbitration proceedings under Article 8 BIT (ECJ, SchiedsVZ 2018, 186, Marginal Nos. 54 et seq. – Achmea).

36        The question as to whether the arbitration tribunal constituted under Article 8 BIT is in this case authorised, via a national court, to request the European Court of Justice to make a preliminary ruling is not addressed in the grounds the European Court of Justice gives for its decision. On the contrary, the European Court of Justice does not consider it sufficient that a judicial review may only be carried out if the national law in question permits one in a particular case. It is therefore irrelevant whether, under German law, which is applicable in this case since Frankfurt am Main was chosen as the place of arbitration, the arbitration tribunal could have referred, via a German court, a question considered to be significant for the interpretation of European Union law to the European Court of Justice.

37        d) In contrast to the Respondent's view, in this case it does not matter whether Articles 267 and 344 TFEU are prohibition laws as defined by Section 134 of the German Civil Code. The issue is not the invalidity of an agreement concluded by two parties but rather whether one party ever made an offer to conclude an arbitration agreement. The Petitioner

- 16 -

was prevented from doing this by European Union law. Thus, from the start, there is no legal transaction that could be null and void under Section 134 of the German Civil Code.

38        e) Contrary to the Respondent's assertion, it is irrelevant whether the arbitration agreement it alleges was of a private law nature or whether the arbitration tribunal conducted commercial arbitration proceedings.

39        The European Court of Justice did rely on the nature of the procedure carried out by the arbitration tribunal after it was constituted but rather on the fact that arbitration agreement that led to the formation of the arbitration tribunal is based on the autonomy of the parties in a commercial arbitration, whereas, in the case of the BIT, two Member States, as contracting parties, agreed to deny their own courts' jurisdiction over certain disputes that could regard the application and interpretation of Union law. The principles recognised by the European Court of Justice for an effective commercial arbitration agreement could therefore not be applied to arbitration proceedings pursuant to Article 8 BIT (ECJ, SchiedsVZ 2018, 186, Marginal No. 55 – Achmea).

40        f) The Respondent alleges in vain that the decision of the European Court of Justice does not affect the validity of the BIT under international law for the relationship between the Petitioner and the Netherlands, which means that, if the BIT is not terminated, the arbitration clause remains valid between the parties.

41        As the Senate already stated in its referral decision (Federal Court of Justice, SchiedsVZ 2016, 328, Marginal No. 85), by acceding to the European Union, the Member States have limited their power of disposition under international law and have mutually agreed to waive the exercise of international rights that conflict with European Union law (cf. the ECJ decision dated February 12, 2009 – C-45/07, Collection 2009, I-701, Marginal No. 17 – Commission/Greece). In this regard, the primacy of

- 17 -

European Union law provisions means that a regulation incompatible with them in an intra-European Union agreement between Member States is also inapplicable as an international contractual regulation (cf. Tietje, *KSzW* [*Kölner Schrift zum Wirtschaftsrecht*] 2011, 128, 130 f.; Lavranos in von der Groeben/Schwarze/Hatje, *Europäisches Unionsrecht* [European Union Law], 7th Edition, Article 351 TFEU, Marginal No. 7; Schmalenbach in Calliess/Ruffert, *EUV/AEUV* [TEU/TFEU], 5th Edition, Article 351 TFEU, Marginal No. 9; aA Lock, *Das Verhältnis zwischen dem EuGH und internationalen Gerichten* [The ECJ's Relationship with International Courts], 2010, pp. 205 et seq.). Citizens of the Member States concerned may therefore not rely on earlier international obligations of the Member States that are in conflict with European Union law (cf. the ECJ decision dated December 8, 1981 – 180/80 and 266180, Collection 1981, 2997, Marginal No. 20 – Crujeiras Tome and Yurrita).

42      III. The Petitioner is not prevented from invoking the invalidity of the arbitration agreement in good faith (Section 242 of the German Civil Code). It can be assumed in favour of the Respondent that, in this case, Section 242 of the German Civil Code would be applicable to the objection as to the lack of an arbitration agreement, at least as part of public policy (*l'ordre public*) under procedural law.

43      1. However, under German law, a party may violate the principle of good faith by, prior to the proceedings, expressly and unreservedly invoking an allegedly executed arbitration agreement, thereby causing its contractual partner to file an arbitration action, but then asserting in the arbitration proceedings, and in the court proceedings for a declaration of the enforceability of an arbitral award to its detriment, that a valid arbitration agreement had not been concluded (Federal Court of Justice decisions dated April 2, 1987 – III ZR 76/86, NJW-RR [*Neue Juristische Wochenschrift – Rechtsprechungsreport*] 1987, 1194, 1195 [juris Marginal No. 13]; and March 16, 2017 – I ZB 49/16, SchiedsVZ 2018, 37, Marginal Nos. 32 et seq.). The structure of that case does not match that of the one in question here and is also not comparable to it in value. It therefore doesn't matter whether the Respondent's objection based on good faith must be dismissed for that reason alone.

- 18 -

This is so since admission of the objection would be incompatible with the obligation of Member States to apply European Union law effectively in that allocation of disputes to an arbitration tribunal in a BIT in favour of investors and contrary to European Union law would then prove to be de facto effective, at least to a large extent.

44          2. The Petitioner did not create a trusting environment on which the Respondent could rely in good faith.

45          a) The BIT between the Petitioner and the Netherlands entered into force on October 1, 1992. The effectiveness of the arbitration clause in Article 8 (2) BIT could only become questionable from May 1, 2004, when the Petitioner acceded to the European Union. The Respondent's investments were not made until after accession. As the Senate had already stated in Marginal No. 76 of its referral decision (Federal Court of Justice, SchiedsVZ 2016, 328), the Respondent had to consider that European Union law, which from that point on took precedence in the relationship between the contracting parties, could affect the provisions of the BIT.

46          b) The Respondent also does not demonstrate that, after its accession to the European Union, the Petitioner made it a general or specific promise to protect investors under the BIT arbitration clause.

47          The fact that the European Commission left BITs in place unchallenged when new Member States joined (cf. the Concluding Opinion of Advocate-General Wathelet in ECJ – C-284/16 Marginal Nos. 40 to 43 – Achmea), could not create any environment of trust attributable to the Petitioner.

- 19 -

48        Nor does the fact that the Petitioner did not express any doubts as to the effectiveness of the BIT after its accession to the European Union give rise to such an environment of trust.

49        Furthermore, the creation of an investment-friendly environment after accession to the European Union does not allow any conclusion to be drawn regarding explicit recognition of the arbitration clause by the Petitioner. In particular, a policy to encourage investment can clearly be a consequence of accession to the European Union, which a new Member State would normally expect to stimulate its economy.

50        Likewise, the inclusion of the BIT in the Petitioner's list of existing contracts, even after accession to the European Union, doesn't mean that the Respondent can trust that the Petitioner will recognise the arbitration clause. A concrete statement regarding the validity of the arbitration clause is not connected with inclusion in this list, all the less so as the BIT need not necessarily or obviously become wholly invalid if the arbitration clause ceases to apply.

51        The fact that the BIT has not yet been terminated by the Petitioner does not allow the Respondent to rely on the arbitration clause. The Petitioner was and is not prevented from taking the legal view that the BIT remains valid with the exception of the arbitration clause.

52        Contrary to what the Respondent has argued, the letter of April 14, 2008 from the Petitioner's former Minister of Finance does not expressly acknowledge the arbitration proceedings in question. The letter merely expresses the then Minister of Finance's desire for an amicable settlement of the dispute in accordance with Article 8 (1) BIT, but it does not constitute recognition of the jurisdiction of the arbitration

- 20 -

tribunal or of the admissibility of arbitration proceedings pursuant to Article 8 (2) BIT.

53        Finally, the fact that the Petitioner entered into negotiations with the Respondent to reach an amicable settlement of the dispute could not allow the Respondent to trust that the Petitioner would recognise the arbitration clause. The Petitioner was already obligated under Article 8 (1) BIT to negotiate a settlement of the dispute with the investor. The validity of this provision will not be called into question if the provisions that follow Article 8 (1) BIT, and in particular Article 8 (2) BIT, are inapplicable for reasons of European Union law.

54        3. The Respondent has also not demonstrated any contradictory conduct which could, in good faith, prevent the Petitioner from invoking the absence of an arbitration agreement.

55        a) Contradictory conduct by a party is in principle admissible. It only becomes abuse of a right if an environment of trust has been created for the other party or if other special circumstances make exercise of the right appear to be in bad faith. The exercise of a right may be inadmissible if, regarded objectively, the conduct appears contradictory overall because the previous conduct is in fact incompatible with the subsequent conduct and the interests of the other party in this regard appear more worthy of protection (Federal Court of Justice, decision dated November 15, 2012 – IX ZR 103/11, NJW-RR 2013, 757, Marginal No. 12). It should be noted here that this is an exceptional case of narrow application (Federal Court of Justice, NJW-RR 2013, 757, Marginal No. 13).

56        b) In the present case, no environment of trust was created for the Respondent (cf. Marginal Nos. 44 to 53). There are also no special circumstances that would make exercise of the right appear to be in bad faith.

-21 -

57          aa) If, in disputes with other investors, the Petitioner has not invoked the inapplicability of the arbitration clause due to a violation of European Union law, it does not mean that the Petitioner has, in bad faith, exhibited contradictory conduct with respect to the Respondent. A party is in principle free to pursue different strategies in disputes with different opponents. In addition, in the Austrian Airlines and HICEE cases cited by both parties, the arbitration tribunals in question declared themselves incompetent because the content of the claims in question did not fall under the arbitration clauses of the BITs in question. There was therefore no reason to invoke the invalidity of the arbitration clauses under European Union law.

58          bb) In the current arbitration proceedings, after the arbitration complaint was filed in October 2008, the Petitioner immediately complained that the arbitration tribunal did not have jurisdiction since Article 8 (2) BIT had become ineffective with the Petitioner's accession to the European Union. It then adhered to this view without change. As explained above (cf. Marginal Nos. 48 to 53), at no time in the only relevant period, i.e. that between the Petitioner's accession to the European Union and the filing of the complaint in the current arbitration proceedings, did the Petitioner's conduct allow the Respondent to legitimately trust that the Petitioner would recognise the validity of the arbitration agreement.

59          4. The Respondent's claim that the Petitioner acquired its legal position via abuse of a right must be rejected. The possibility for the Petitioner to successfully claim the absence of an arbitration agreement is a consequence of an interpretation of European Union law the European Court of Justice has considered to be correct in these proceedings. This does not constitute abuse of a right.

- 22 -

60          IV. Contrary to the Respondent's proposal in its pleadings dated September 14, and October 29, 2018, the Senate cannot consider referring the decision of the European Court of Justice of March 6, 2018 – C-284/16 to the German Federal Constitutional Court pursuant to Article 100 (1) or Article 100 (2) of the Basic Law for the Federal Republic of Germany (hereinafter referred to as the "Basic Law") in order to have it declared inapplicable.

61          1. Direct application of Article 100 (1) of the Basic Law to decisions of the European Court of Justice is excluded by the wording of the statute. It states that only a law may be so referred. In this case, a decision regarding whether and under which conditions an analogous application of Article 100 (1) of the Basic Law could be considered for an ultra vires review in restricted, exceptional cases (cf. BVerfGE [Decisions of the German Federal Constitutional Court] 123, 267, 354 et seq. [juris Marginal No. 241]) is not required.

62          2. In its decision, the European Court of Justice did not commit an ultra vires act but rather, to the extent it deemed necessary, it answered the questions referred to it by the German Federal Court of Justice in harmony with the allocation of competence between itself and the national courts pursuant to Article 267 TFEU.

63          a) Ultra vires reviews are carried out to ascertain whether the legal acts of European bodies and institutions comply with the principle of subsidiarity under European Union law (Article 5 (1), Sentence 2, and (3) TEU) within the limits of the sovereign rights granted them under the principle of conferral. In addition, identity reviews are carried out to determine whether the inviolable core content of the constitutional identity of the Basic Law is respected pursuant to Article 23 (1) Sentence 3 in conjunction with Article 79 (3) of the Basic Law (cf. BVerfGE 123, 267, 353 et seq. [juris Marginal No. 240]; 142, 123, 203, Marginal No. 153).

64          Ultra vires and identity reviews are only considered in the case of "sufficiently qualified" violations. This means that the act in violation of competences must be manifest and the impugned act must be highly significant within the structure of competences

- 23 -

between the Member States and the European Union as regards the principle of conferral and the binding nature of the stature under the rule of law (cf. BVerfGE 126, 286, 304 [juris Marginal No. 61]; 142, 123, 200, Marginal No. 147). As regards the European Court of Justice, this would only be the case if, in issuing a decision, it arbitrarily interpreted treaties (cf. BVerfGE 126, 286, 307 [juris Marginal No. 66]; 142, 123, 200 et seq., Marginal Nos. 147 and 149 et seq.).

65        b) Under these principles, there is no reason for the German Federal Constitutional Court to carry out an ultra vires review in this case. The European Court of Justice's decision is based on an interpretation of Articles 267 and 344 TFEU that is in any event not arbitrary. It was issued as part of a preliminary ruling procedure under Article 267 TFEU and thus remains within the scope of the competences transferred to the European Court of Justice under Article 23 (1) Sentence 2 of the Basic Law.

66        3. It is not apparent that, in its assessment, the European Court of Justice did not take into account the arguments put forward by the Senate and Advocate-General Wathelet. It simply did not concur with them. In addition, the European Court of Justice's decision-making competence as such would remain unaffected even if it did not consider certain arguments. If the Senate were to take the view that its arguments had not been heard by the European Court of Justice, it should consider requesting another preliminary ruling. However, the European Court of Justice clearly did not act ultra vires. The Senate sees no reason to request another preliminary ruling in this case.

67        4. Contrary to the view of the Respondent, the European Court of Justice's decision dated March 6, 2018 (SchiedsVZ 2018, 186 – Achmea) is not a general rule of international law which, as a component of German federal law pursuant to Article 100 (2) of the Basic Law, could be subject to referral to the German Federal Constitutional Court.

-24-

68          a) The constitutional term "general rules of international law" includes the norms of universal customary international law, i.e. those norms of international law which, on the basis of general practice and a corresponding opinion of law (*opinio juris*), are binding on the vast majority of states, as well as the general principles of law that supplement customary international law (cf. BVerfGE 15, 25, 32 et seq. [juris Marginal No. 37]). Stringent requirements must be placed on the establishment of a general rule of international law because of the fundamental obligation of all states expressed therein (BVerfGE 118, 124, 137 [juris Marginal Nos. 30 et seq.]; Heintschel von Heinegg in *BeckOKGG* [Beck Online Commentary on the Basic Law], 38th Edition, Article 25 of the Basic Law, Marginal No. 19). A decision of the European Court of Justice is not entitled to this universal quality since its effect is limited to the territory of the European Union. On the contrary, the rulings of the European Court of Justice interpret Union law, and, limited to the territory of the Community, have created a legal order that is autonomous in relation to national law.

69          b) The Respondent's argument regarding the decision of the ICSID arbitration tribunal in Case ARB 12/12 – *Vattenfall et al. v Federal Republic of Germany*, dated August 29, 2018, and the comments of the Federal Republic of Germany and the European Commission reproduced therein, do not lead to any other conclusion. In its argument, which is reproduced in Marginal No. 84 of that decision, the European Commission justifies the importance of the decision of the European Court of Justice in Case C-284/16 (SchiedsVZ 2018, 186 – Achmea) for the Vattenfall proceedings with the autonomy of the legal order of the European Union. According to Marginal No. 10, the German Federal Government stated in the Vattenfall proceedings that the ICSID arbitration tribunal decided the dispute in accordance with the Energy Charter Treaty and the applicable rules and principles of international law, which include European Union law and the decision of the European Court of Justice in Case C-284/16 (SchiedsVZ 2018,

-25-

186 – Achmea). The ICSID arbitration court agreed with this opinion in Marginal No. 150 of the decision.

70        It does not follow from this that rulings by the European Court of Justice are suitable to be treated as referrals under Article 100 (2) of the Basic Law. According to the systematics of the Basic Law and the decision-making practice of the German Federal Constitutional Court, this provision only permits a referral if there are serious doubts as to the meaning or scope of a general rule of international law (Federal Constitutional Court [Chamber], EuGRZ [*Europäische Grundrechte-Zeitschrift*] 2016, 54, 60, Marginal No. 53; NJW [*Neue Juristische Wochenschrift*] 2012, 293, 295 [juris Marginal No. 27], each of which incorporate further references). It is clear from the express reference to Article 25 of the Basic Law in Article 100 (2) of the Basic Law that the only questions subject to referral are those relating to general rules of international law that have also been incorporated into German federal law (cf. Dederer in Maunz/Duerig, GG [Basic Law], April 2018, Article 100, Marginal No. 292). The very fact that interpretations of European Union law undertaken independently by the European Court of Justice are by nature decisions regarding individual cases means that they are not general rules of international law.

71        c) Extending the possibility of making referrals under Article 100 (2) of the Basic Law to questions concerning the meaning or scope of decisions of the European Court of Justice would also entail a very extensive expansion—one incompatible with the primacy of European Union law—of the power of the German Federal Constitutional Court to review acts of the bodies of the European Union, which power is now limited to preserving the fundamental constitutional principles of the Federal Republic of Germany (cf. BVerfGE 142, 123, Marginal Nos. 115 et seq.).

72        V. Finally, the decision of the European Court of Justice of March 6, 2018 does not deny the Respondent effective legal protection. Its ruling is based on the view that, in light of the principle of mutual trust between Member States with regard to recognition of the common values of the European Union

- 26 -

(Article 2 TEU) and compliance with European Union law (cf. ECJ, SchiedsVZ 2018, 186, Marginal No. 34 – Achmea), the Respondent can, as an investor, obtain effective legal protection before the courts of Slovakia. A denial of material claims by the Respondent is not connected with the decision of the European Court of Justice or the subsequent overturning of the Final Award in this case. The Respondent will also not be deprived of any asset items as a result of the Final Award being overturned.

73          D. The Senate issues this decision without an oral hearing. Although Section 128 (4) ZPO in principle allows the possibility of an oral hearing in the case of legal complaints pursuant to Section 1065 (1), Section 577 (6) Sentence 1 ZPO, there was no need for one after the European Court of Justice issued its preliminary ruling.

74          E. The decision on costs is based on Section 91 (1) ZPO.

Koch                          Schaffert                          Kirchhoff

          Feddersen                          Schmaltz

Previous instance:
Frankfurt am Main Higher Regional Court, decision dated 12.18.2014 – 26 Sch 3/13 –