# EXHIBIT 59

Délivrée à: me. COLIN Nathalie
art. 792 C.J.
Exempt du droit de greffe - art. 280,2° C.Enr.

**Expédition**

| Délivrée à | Délivrée à | Délivrée à |
|---|---|---|
| le | le | le |
| € | € | € |
| CIV | CIV | CIV |

**Numéro du répertoire**

**2019 /** 2134

**Date du prononcé**

**12 mars 2019**

**Numéro du rôle**

**2016/AR/393   joint   avec 2016/AR/394**

☐ Non communicable au receveur

# Cour d'appel

# Bruxelles

# Arrêt

## 17e chambre
## affaires civiles

Présenté le

Non enregistrable

**R.G. : 2016/AR/393**

Monsieur **Viorel MICULA**, né le 8 avril 1957 en Roumanie, de nationalité suédoise, domicilié à Oradea, Strada Libertăţii n° 14-16, Comté de Bihor, Roumanie, faisant élection de domicile au cabinet de ses conseils aux fins de la présente procédure ;

parie appelante,

représentée par Maître Hakim BOULARBAH et Nicolas ANGELET, avocats à 1000 Bruxelles, boulevard de l'Empereur, 3 ;

contre

1. **ROMANIAN AIR TRAFFIC SERVICES ADMINISTRATION** – Régie autonome (en abrégé « **ROMATSA** ») personne morale de droit roumain, dont le siège social est établi Bulevardul Ion Ionescu de la Brad 10, Bucureşti 013813, Roumanie, et inscrite au Bureau du registre du commerce n° J40/1012/1991, code fiscal n° RO 1589932, élisant, pour les besoins de la procédure, domicile au cabinet de ses avocats.

Partie intimée,

représentée par Maître RENARD Jean-Pierre, Maître GHILAIN Thierry et Maître TAMINIAU Sarah, avocats à 1160 BRUXELLES, rue Jules Cockx 8-10 ;

2. **La ROUMANIE**, représentée par son Ministre des Finances Publiques,

dont les bureaux sont établis à RO-050471, Bucarest / Roumanie, Strada Apolodor nr. 17, sector 5;

Partie intimée,

représentée par  Maître BERTOUILLE Stéphane et Maître KALENGA Lucien, avocat à 1050 Bruxelles, avenue Louise 283/19 ;

3. **La COMMISSION EUROPEENNE,** dont le siège est sis à 1049 Bruxelles, rue de la Loi, 200,

Partie intimée et intervenante volontaire,

Représentée par Maître GROGNARD Xavier, avocat à 1040 BRUXELLES, avenue de Tervueren 51 bte 4 ;

4. **L'ORGANISATION EUROPÉENNE POUR LA SÉCURITÉ DE LA NAVIGATION AÉRIENNE (EUROCONTROL)**, inscrite à la Banque Carrefour des Entreprises sous le n° 0923.980.032, dont le siège est établi à 1130 Bruxelles, rue de la Fusée 96,

Partie intimée,

représentée par Maître DE MAEYER Patrik et Maître HENNEBICQ, avocats à 1160 BRUXELLES, avenue Tedesco 7 ;

5.

    1.      Monsieur **Ioan MICULA**, domicilié rue Colinelor, N°. 13-15, Oradea, Bihor County, Roumanie,

    2.      **S.C. EUROPEAN FOOD S.A.**, dont le siège social est sis Pantasesti N°. 41, Bihor County, Draganesti, 417256, Roumanie,

    3.      **S.C. STARMILL S.R.L.**, dont le siège social est sis Pantasesti N°. 41, Bihor County, Draganesti, 417256, Roumanie,

    4.      **S.C. MULTIPACK S.R.L.**, dont le siège social est sis Pantasesti N°. 41, Bihor County, Draganesti, 417256, Roumanie,

Partie intimées et parties intervenantes volontaires,

Représentées par Nathalie COLIN, avocat à 1040 Bruxelles, rue de la Loi, 62, où il a été fait élection de domicile ;

**ET R.G. : 2016/AR/394**

1.

    1.      Monsieur **Ioan MICULA**, domicilié rue Colinelor, N°. 13-15, Oradea, Bihor County, Roumanie,

    2.      **S.C. EUROPEAN FOOD S.A.**, dont le siège social est sis Pantasesti N°. 41, Bihor County, Draganesti, 417256, Roumanie,

    3.      **S.C. STARMILL S.R.L.**, dont le siège social est sis Pantasesti N°. 41, Bihor County, Draganesti, 417256, Roumanie,

4.    **S.C. MULTIPACK S.R.L.,** dont le siège social est sis Pantasesti N°. 41, Bihor County, Draganesti, 417256, Roumanie,

Parties appelantes,

Représentées par Nathalie COLIN, avocat, dont les bureaux sont sis à 1040 Bruxelles, rue de la Loi, 62, où il a été fait élection de domicile ;

contre

1. **ROMANIAN AIR TRAFFIC SERVICES ADMINISTRATION** – Régie autonome (en abrégé « **ROMATSA** ») personne morale de droit roumain, dont le siège social est établi Bulevardul Ion Ionescu de la Brad 10, București 013813, Roumanie, et inscrite au Bureau du registre du commerce n° J40/1012/1991, code fiscal n° RO 1589932, élisant, pour les besoins de la procédure, domicile au cabinet de ses avocats.

Parie intimée,

Représentée par Maître RENARD Jean-Pierre, Maître Thierry GHILAIN et Maître TAMINIAU Sarah, avocats à 1160 BRUXELLES, rue Jules Cockx 8-10 ;

2. **La ROUMANIE**, représentée par son Ministre des Finances Publiques, dont les bureaux sont établis à RO-050471 Bucarest / Roumanie, Strada Apolodor nr. 17, sector 5;

Partie intimée,

Représentée par Maître BERTOUILLE Stéphane et Maître KALENGA Lucien, avocats à 1050 Bruxelles, avenue Louise 283/19 ;

3. Monsieur **Viorel MICULA**, né le 8 avril 1957 en Roumanie, de nationalité suédoise, domicilié à Oradea, Strada Libertății n° 14-16, Comté de Bihor, Roumanie, faisant élection de domicile au cabinet de ses conseils aux fins de la présente procédure ;

Partie intimée,

Représentée par Maître Hakim BOULARBAH et Maître Nicolas ANGELET, avocat à 1000 Bruxelles, boulevard de l'Empereur, 3 ;

4. **La COMMSSISSION EUROPENNE,** dont le siège est sis à 1049 Bruxelles, rue de la Loi, 200,

Partie intimée et intervenante volontaire,

Représentée par Maître GROGNARD Xavier, avocat à 1040 BRUXELLES, avenue de Tervueren 51 bte 4 ;

5. L'ORGANISATION EUROPÉENNE POUR LA SÉCURITÉ DE LA NAVIGATION AÉRIENNE (EUROCONTROL), inscrite à la Banque Carrefour des Entreprises sous le n° 0923.980.032, dont le siège est établi à 1130 Bruxelles, rue de la Fusée 96,

Partie intimée,

Représentée par Maître DE MAEYER Patrik et Maître HENNEBICQ, avocats à 1160 BRUXELLES, avenue Tedesco 7 ;

**********

Vu les pièces de la procédure, et en particulier:
- la citation en opposition à saisie-arrêt-exécution du  23 septembre 2015, signifiée à la requête de Romanian Air Traffic Services Administration, en abrégé Romatsa,  à charge de M. Micula Viorel;
- la citation en opposition à saisie-arrêt-exécution du 24 septembre 2015, signifiée à la requête de l'Etat de Roumanie, ci-après également la Roumanie, à charge de M. Micula Voirel;
- les interventions volontaires dans la cause connue sous le numéro de rôle 15/A/ 7241/A, de la part de :
L'Etat de Roumanie, la Commission Européenne, ci-après également la CE,  l'Organisation Européenne pour la Sécurité de la Navigation Aérienne (Eurocontrol), ci-après également 'Eurocontrol', M. Micula Ioan, la sa S.C. European Food, ci-après également EFood, la srl S.C. Starmill, ci-après également Starmill, la srl S.C. Multipack, ci- après également Multipack;
- les interventions volontaires dans la cause connue sous le numéro de rôle 15/ 7242/ A, de la part de: Romanian Air Traffic Services Administration, la Commission Européenne, l'Organisation Européenne pour la Sécurité de la Navigation Aérienne (Eurocontrol), M. Micula Ioan, la sa S.C. European Food, la srl S.C. Starmill et la sa S.C. Multipack;
- le jugement a quo rendu par le tribunal de première instance francophone de Bruxelles, chambre des saisies, en date du 25 janvier 2016 qui a décidé comme suit:

*'Joignons les causes inscrites au rôle général sous les numéros 15/7241/A et 15/7242/A.*

*Rejetons du délibéré le courrier du SYNDICAT DES SERVICES DE TRAFIC AÉRIEN DE ROUMANIE - ATSR, et ses annexes, reçu au greffe le 12 janvier 2016.*

*Déclarons les interventions volontaires de Monsieur Ioan MICULA et des S.C. EUROPEAN FOOD S.A., STARMILL S.R.L. et MULTIPACK S.R.L. irrecevables.*

*Déclarons les actions recevables et les demandes fondées dans la mesure suivante:*

Cour d'appel Bruxelles – 2016/AR/393 joint avec 2016/AR/394 – p. 6

*Ordonnons à Monsieur Viorel MICULA de donner mainlevée de la saisie-arrêt exécution qu'il a fait pratiquer le 9 septembre 2015 à charge de l'ÉTAT DE ROUMANIE, entre les mains de L'ORGANISATION EUROPÉENNE POUR LA SÉCURITÉ DE LA NAVIGATION AÉRIENNE, et ce dans les cinq jours de la signification du présent jugement, à défaut de quoi celui-ci en tiendra lieu.*

*Condamnons Monsieur Viorel MICULA à payer à la régie autonome ROMANIAN AIR TRAFFIC SERVICES ADMINISTRATION une somme de 3.000 € à titre d'indemnité pour dommage moral.*

*Le condamnons à payer à l'ÉTAT DE ROUMANIE une somme de 5.000 € à titre d'indemnité pour dommage moral.*

*Le condamnons aux dépens, liquidés à 378,58 € (citation et mise au rôle) et 16.500 € (IP) pour la régie autonome ROMANIAN AIR TRAFFIC SERVICES ADMINISTRATION, non liquidés à défaut de relevé pour l'ÉTAT DE ROUMANIE.*

*Déclarons le présent jugement exécutoire par provision nonobstant tout recours.'*

- la signification du jugement a quo en date des premier et 2 février 2016;
- la requête d'appel déposée le 29 février 2016 par M. Micula Viorel dans la cause 2016 AR 393;
- la requête d'appel déposée le 29 février 2016 par M. Micula Ioan, S.C. European Food sa, S.C. Starmill srl, S.C. Multipack srl dans la cause 2016 AR 394;
- les dernières conclusions des parties, déposées:
le 17 décembre  2018 par la Commission Européenne (troisièmes conclusions additionnelles et de synthèse), le 17 décembre 2018 par Eurocontrol (secondes conclusions additionnelles et de synthèse d'appel), le 17 décembre 2018 par l'Etat de Roumanie (quatrièmes conclusions additionnelles et de synthèse), le 17 décembre 2018 par Romatsa (quatrièmes conclusions additionnelles et de synthèse), le 23 octobre 2018 par M. Micula Ioan, S.C. European Food sa, S.C. Starmill srl, S.C. Multipack srl (troisièmes conclusions de synthèse d'appel et requête en intervention volontaire), le 23 octobre 2018 par M. Micula Viorel (troisièmes conclusions additionnelles et de synthèse);

Vu les pièces déposées;

**I. La procédure devant le premier juge et la procédure d'annulation de la sentence arbitrale**

Après avoir joint les deux causes et avoir déclaré irrecevable l'intervention volontaire de M. Ioan Micula, EFood, Starmill et Multipack irrecevable, le premier juge a résumé l'objet des actions comme suit:

**'IV. Objet des actions**

*1. ROMATSA et l'ÉTAT DE ROUMANIE voudraient faire lever la saisie-arrêt exécution qui a été pratiquée le 9 septembre 2015 à la requête de Monsieur Viorel MICULA, entre les mains d'EUROCONTROL, sur « toutes sommes, deniers, valeurs ou objets généralement quelconques*
*ou autres créances, en ce compris toutes créances à terme, conditionnelles ou litigieuses » qu'elle « a, aura, doit ou devra à LA REPUBLIQUE DE ROUMANIE représentée par son Ministre des Finances*

Publiques (...) ou par l'intermédiaire de l'entreprise d'Etat roumaine pour le trafic aérien, ROMATSA (...) à quelque titre ou pour quelque cause que ce soit ».

ROMATSA sollicite également la condamnation de Monsieur Viorel MICULA à lui payer:
- une indemnité de 1.000.000 € pour préjudice matériel,
- une indemnité de 15.000 € pour préjudice moral,
- les dépens,
et de déclarer le jugement exécutoire par provision, nonobstant tout recours et sans caution ni cantonnement.

L'ÉTAT DE ROUMANIE sollicite quant à lui la condamnation de Monsieur Viorel MICULA à lui payer:
- « la somme provisionnelle de 1 EUR sur un dommage provisoirement évalué à 10.000.000 EUR à titre de dommages et intérêts »,
- « la somme de 50.000 EUR à titre de dommages et intérêts pour saisie téméraire et vexatoire »,
- les dépens,
et de déclarer le jugement exécutoire par provision, nonobstant tout recours et sans caution ni cantonnement.

2. Monsieur Viorel MICULA conclut au non-fondement de ces demandes.

A titre subsidiaire, il estime que, « dans, l'attente d'un arrêt de la Cour de Justice de l'Union européenne dans la procédure d'appel de la décision de la Commission du 30 mars 2015 », il y a lieu de surseoir à statuer et d'ordonner « le cantonnement des créances saisies et des prochaines échéances de redevances de route sur un compte à la Caisse des Dépôts et Consignations dès lors que celles-ci constituent un revenu périodique touché par la saisie pratiquée le 9 septembre 2015 ».

Il postule la condamnation de ROMATSA et de l'ÉTAT DE ROUMANIE aux dépens et de déclarer le jugement exécutoire par provision.

3. La COMMISSION EUROPÉENNE intervient volontairement aux fins de:
- « Déclarer les présentes interventions volontaires de la Commission européenne sur pied de l'article 23bis du Règlement (CE) n° 659/1999 du Conseil du 22 mars 1999 portant modalités d'application de l'article 108 TFUE dans les causes portant les numéros de rôle général 15-7241-A et 15-7242-A, recevables et fondées.
- Faire droit aux oppositions mues respectivement par l'Etat de Roumanie et ROMATSA et, partant, ordonner la mainlevée de la saisie-arrêt exécution pratiquée à leur encontre le 9 septembre 2015 à l'initiative de M. Viorel Micula entre les mains d'Eurocontrol.
- Rejeter les demandes principale et subsidiaire de M. Viorel Micula comme étant non fondées.
- Dépens comme de droit ».

EUROCONTROL intervient volontairement aux fins de « prendre acte que:
1. Comme explicitement reconnu par la Cour de Justice, EUROCONTROL est une organisation internationale de droit public qui exerce des prérogatives relatives au contrôle et à la police de l'espace aérien qui relèvent des prérogatives de la puissance publique;
2. EUROCONTROL se réfère à la sagesse du Juge des saisies en ce qui concerne les demandes respectives de ROMATSA et de la Roumanie tout en lui demandant de prendre acte du fait que la saisie-arrêt

exécutoire pratiquée risque de mettre en péril la sécurité de la navigation aérienne et le bon déroulement du trafic aérien paneuropéen et que, pour cette raison, il y aurait lieu de donner mainlevée de la saisie-arrêt exécutoire;

3. En toute hypothèse et aux cas où le Juge des saisies considérerait, quod non, que la concluante revêt la qualité de partie au litige en tant que défenderesse, l'action doit être déclarée irrecevable en raison de l'immunité de juridiction dont elle bénéficie et ce faisant condamner les parties demanderesses aux dépens, en ce compris l'indemnité de procédure ».'

Le premier juge a résumé les antécédents du litige comme suit:

' *V. Antécédents*

*1. Par une sentence du 11 décembre 2013, un tribunal arbitral constitué dans le cadre de la convention du 18 mars 1965 pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats (ci-après « la Convention du CIRDI ») a condamné l'ÉTAT DE ROUMANIE à payer à Messieurs Viorel et Ioan MICULA et aux S.C. EUROPEAN FOOD S.A., STARMILL S.R.L. et MULTIPACK S.R.L. des dommages et intérêts pour un montant s'élevant en principal à 376.433.229 RON, à majorer d'intérêts.*

*Le 18 avril 2014, l'ÉTAT DE ROUMANIE a introduit un recours en annulation à l'encontre de cette sentence devant le Comité ad hoc du Centre international pour le règlement des différends relatifs aux investissements. Ce recours est actuellement pendant.*

*2. Par décision (UE) 2015/1470 du 30 mars 2015 « concernant l'aide d'ÉTAT SA.38517 (2014/C) (ex 2014/NN) mise en oeuvre par la Roumanie - Sentence arbitrale dans l'affaire Micula/Roumanie du 11 décembre 2013 », la COMMISSION EUROPÉENNE a décidé que:*

*« Article premier*

*Le versement des dommages et intérêts accordés par le tribunal arbitral (...) par la sentence arbitrale rendue le 11 décembre 2013 (...), à l'unité économique composée par Viorel Micula, Ioan Micula, S.C. European Food S.A., S.C. Starmill S.R.L, S.C. Multipack, European Drinks S.A., Rieni Drinks S.A., Scandic Distilleries S.A., Transilvania General Import-Export S.R.L. et West Leasing S.R.L. constitue une aide d'État au sens de l'article 107, paragraphe 1, du traité, qui est incompatible avec le marché intérieur.*

*Article 2*

*1. La Roumanie ne verse aucune aide incompatible visée à l'article 1er et récupère toutes les aides incompatibles visées à l'article 1er qui ont déjà été versées aux entités, quelles qu'elles soient, qui composent l'unité économique unique qui a bénéficié de cette aide à la suite de la mise en oeuvre ou à l'exécution partielle de la sentence arbitrale du 11 décembre 2013, ainsi que toute aide versée aux entités, quelles qu'elles soient, qui composent l'unité économique unique qui a bénéficié de cette aide à la suite d'une mise en œuvre ultérieure de la sentence arbitrale du 11 décembre 2013 qui n'a pas été notifiée à la Commission ou toute aide versée après la date de l'adoption de la présente décision.*

*2. Viorel Micula, Ioan Micula, S.C. European Food S.A., S.C. Starmill S.R.L, S.C. Multipack, European Drinks S.A., Rieni Drinks S.A., Scandic Distilleries S.A., Transilvania General Import-Export S.R.L. et West Leasing S.R.L. sont solidairement responsables du remboursement de l'aide d'État qu'ils ont reçue.*

*3. Les montants à récupérer sont ceux découlant de la mise en œuvre ou de l'exécution de la sentence arbitrale du 11 décembre 2013 (montant principal et intérêts).*

*4. Les montants à récupérer produisent des intérêts à partir de la date à laquelle ils ont été mis à disposition des bénéficiaires, jusqu'à leur récupération effective.*

*(...)*

*7. La Roumanie veille à ce qu'aucun autre versement de l'aide visée à l'article 1er ne soit effectué à partir de la date d'adoption de la présente décision.*

*Article 3*

*1. La récupération de l'aide visée à l'article 1er est immédiate et effective.*

*2. La Roumanie veille à ce que la présente décision soit exécutée dans un délai de quatre mois à compter de sa notification.*

*Article 4*

*1. Dans les deux mois qui suivent la notification de la présente décision, la Roumanie communique les informations suivantes:*

*a) le montant total de l'aide reçue par chaque entité mentionnée à l'article 1er de la présente décision;*

*b) une description détaillée des mesures déjà prises ou des mesures prévues pour se conformer à la présente décision;*

*c) les documents démontrant que les bénéficiaires ont été mis en demeure de rembourser l'aide.*

*2. La Roumanie informe la Commission de l'avancement des mesures prises au niveau national pour exécuter la présente décision jusqu'à la récupération complète de l'aide visée à l'article 1er. La Roumanie présente sans délai, sur simple demande de la Commission, des informations relatives aux mesures déjà prises et aux mesures prévues pour se conformer à la présente décision. Elle fournit aussi des informations détaillées concernant les montants de l'aide et des intérêts correspondants déjà récupérés auprès des bénéficiaires.*

*Article 5*

*La Roumanie est destinataire de la présente décision ».*

*3. Le 2 juillet 2015, le greffier en chef de la cour d'appel de Bruxelles a revêtu la sentence arbitrale de la formule exécutoire, conformément à ce que prévoit la loi du 17 juillet 1970 portant approbation de la Convention du CIRDI.*

*Le 19 août 2015, Monsieur Viorel MICULA a fait signifier la sentence ainsi exequaturée à l'ÉTAT DE ROUMANIE.*

*Le 9 septembre 2015, il a fait pratiquer une saisie-arrêt exécution entre les mains d'EUROCONTROL sur « toutes sommes, deniers, valeurs ou objets généralement quelconques ou autres créances, en ce compris toutes créances à terme, conditionnelles ou litigieuses » qu'elle « a, aura, doit ou devra à LA REPUBLIQUE DE ROUMANIE représentée par son Ministre des Finances Publiques (...) ou par l'intermédiaire de l'entreprise d'Etat roumaine pour le trafic aérien, ROMATSA (...) à quelque titre ou pour quelque cause que ce soit », et ce aux fins d'obtenir paiement d'un montant total de 85.066.428,42 €.*

*Le 24 septembre 2015, EUROCONTROL a fait sa déclaration de tiers saisi, y indiquant « sous toute réserve et sans aucune reconnaissance préjudiciable à quelque titre que ce soit (...) qu'à la date du 12 septembre 2015 elle ne devait verser aucune somme à l'entreprise ROMATSA et qu'à la date d'aujourd'hui, les sommes à verser par elle à l'entreprise ROMATSA s'élèvent à EUR 15.226.643,41 ».*

*4. Le 6 novembre 2015, les S.C. EUROPEAN FOOD S.A., STARMILL S.R.L. et MULTIPACK S.R.L ont introduit un recours en annulation devant les juridictions communautaires contre la décision de la COMMISSION EUROPÉENNE du 30 mars 2015.*

*Il a été précisé à l'audience que Messieurs Viorel et Ioan MICULA ont également introduit un tel recours.'*

La décision du premier juge est citée plus haut.

Par décision du 26 février 2016 le recours en annulation de la sentence arbitrale de la Roumanie a été rejeté.

**II. Les demandes des parties en degré d'appel**

M. Viorel Micula demande de:

- *'Déclarer le présent appel recevable et fondé ;*

- *Joindre les causes portent les numéros de rôle 2016/AR/393 et 2016/AR/394 pour connexité ;*

- *Réformer le jugement entrepris en ce qu 'il a déclaré les demandes de ROMATSA et de la Roumanie partiellement fondées at a, partant, ordonné la mainlevée de la saisie-arrêt exécution du 9 septembre 2015 et condamné Viorel Micula à payer la somme de 5.000 EUR à la Roumanie et de 3.000 EUR à ROMATSA ainsi que les dépens de l'instance liquidés dans le chef de ROMATSA à l'indemnité de procédure s'élevant à 16.500 EUR;*

— En conséquence et faisant ce que le Juge des saisies aurait dû faire:

  • déclarer non fondées les demandes de ROMATSA et de la Roumanie de
    prononcer la mainlevée de la saisie-arrêt exécution du 9 septembre 2015 et
    les en débouter ;

  • pour autant que de besoin, á titre principal, ordonner le rétablissement de
    cette saisie-arrêt exécution à dater du prononcé de l'arrêt à intervenir et,
    partant, ordonner à Eurocontrol de bloquer !es sommes dues á la Roumanie
    directement ou indirectement, conformément á l'exploit de l'huissier de
    justice Piet De Smet du 9 septembre 2015, à compter de l'arrêt à intervenir ;

  • á titre subsidiaire, autoriser Viorel Micula à pratiquer une saisie-arrêt
    exécution, sur pied de l'article 1412quinquies. §2, 3°, du Code judiciaire, sur
    toutes sommes, deniers, valeurs ou objets généralement quelconques ou
    autres créances, en ce compris toutes créances á terme, conditionnelles ou
    litigieuses qu'Eurocontrol a ou aura, doit ou devra á la Roumanie, ou par
    l'intermédiaire de ROMATSA, à quelque titre ou pour quelque raison que ce
    soit, notamment du chef des salaires, appointements, commissions,
    remises ou décomptes, at ce à concurrence d'une somma, sous réserve de
    revalorisation, de 281.718.067,10 EUR;

  • déclarer non fondées les demandes de ROMATSA et de la Roumanie de
    condamner Viorel Micula au paiement de dommages at intérêts et les en
    débouter ;

  • condamner ROMATSA et la Roumanie aux frais et dépens de première
    Instance et d'appel, en ce compris l'indemnité de procédure á son montant
    de base pour les affaires non évaluables en argent.'


M. Ioan Micula, EFood, Starmill et Multipack demandent (en résumé):
- De joindre les deux causes ;
- à titre principal
De déclarer leur appel recevable et fondé;
De déclarer leurs interventions volontaires recevables et fondées;
De dire pour droit que les demandes de M. Viorel Micula sont fondées;
De dire pour droit que la saisie-arrêt exécution pratiquée par M. Viorel Micula en date du 9 septembre
2015 entre les mains de Eurocontrol est recevable et fondée;
De déclarer, si recevables, non fondées les oppositions de l'Etat de Roumanie et de Romatsa;
Pour autant que de besoin d'ordonner le rétablissement de la saisie et d'ordonner Eurocontrol à
bloquer les sommes dues à l'Etat de Roumanie, conformément à l'exploit de saisie à compter de l'arrêt;
- à titre subsidiaire et en tout cas:
De déclarer leur intervention volontaire en appel recevable et fondée;
De dire pour droit que les demandes de M. Viorel Micula sont fondées;

De dire pour droit que la saisie-arrêt exécution pratiquée par M. Viorel Micula en date du 9 septembre 2015 entre les mains de Eurocontrol est recevable et fondée;
De déclarer, si recevables, non fondées les oppositions de l'Etat de Roumanie et de Romatsa;
Pour autant que de besoin d'ordonner le rétablissement de la saisie et d'ordonner Eurocontrol à bloquer les sommes dues à l'Etat de Roumanie, conformément à l'exploit de saisie à compter de l'arrêt.

Eurocontrol, tiers saisi, demande de prendre acte de ce que (en résumé):
1) elle est une organisation internationale de droit public *qui exerce des prérogatives relatives au contrôle et à la police de l'espace aérien qui relèvent des prérogatives de la puissance publique'*,
2) en ce qui concerne les demandes de Romatsa et de la Roumanie, elle se réfère à la sagesse de la cour tout en demandant de prendre acte du fait que la saisie- arrêt contestée risque de mettre en péril la sécurité de la navigation aérienne et le bon déroulement du trafic aérien paneuropéen et que, pour cette raison, il y a lieu de confirmer la mainlevée de la saisie querellée,
3) en toute hypothèse et au cas où il serait considéré qu'elle revêt la qualité de partie défenderesse, l'action doit être déclarée irrecevable à son égard avec condamnation des parties demanderesses aux dépens, en ce compris l'indemnité de procédure.

La CE demande de déclarer non fondés les appels et de statuer comme de droit quant aux dépens.

Romatsa demande de joindre les deux causes et ensuite *'à titre principal, subsidiaire et éminemment subsidiaire'* de:
- déclarer l'appel de M. Ioan Micula, de EFood, de Starmill et de Multipack irrecevable, à tout le moins non fondé,
- déclarer non fondé l'appel de M. Viorel Micula,
- constater la nullité de la saisie et à défaut confirmer le jugement a quo,
- condamner M. Viorel Micula au paiement d'une indemnité du chef de procédure téméraire et vexatoire à concurrence de 15.000 euros,
- condamner les appelants solidairement, in solidum ou l'un à défaut de l'autre aux dépens, en ce compris l'indemnité de procédure maximale évaluée à 16.800 euros.

L'Etat de Roumanie demande:
- à titre principal:
De déclarer l'appel de M. Viorel Micula irrecevable en ce qui concerne la demande tendant à condamner Eurocontrol à bloquer les sommes dues à la Roumanie, et en toute hypothèse, non fondée dans son intégralité;
De condamner M. Viorel Micula au paiement de la somme provisionnelle de 50.000 euros à titre de dommage matériel sur un dommage provisoirement évalué à 500.000 euros;
De condamner M. Viorel Micula au paiement de la somme de 100.000 euros à titre de dommage moral;
De condamner M. Viorel Micula aux dépens en ce compris l'indemnité de procédure;
De déclarer l'appel de M. Ioan Micula, de EFood, Starmill et Multipack, si recevable, non fondé;
De déclarer l'intervention volontaire en appel des derniers irrecevable, à tout le moins non fondée;
- à titre subsidiaire:
De surseoir à statuer dans l'attente de la décision de la Cour de Justice de l'Union Européenne relative au recours introduit  contre la décision du 30 mars 2015 de la Commission Européenne par M. Viorel Micula, M. Ioan Micula, EFood, Starmill et Multipack.

**III. Quant à la jonction des causes RG 2016 AR 393 et 2016 AR 394**

M. Viorel Micula a interjeté appel du jugement rendu le 25 janvier 2016 par le tribunal de première instance francophone de Bruxelles (chambre des saisies) dans la cause (après jonction ) connue sous les numéros de rôle 15/7241/A et 15/7242/A.

L'appel de M. Ioan Micula, EFood, Starmill et Multipack est dirigé contre le même jugement.

Les parties appelantes demandent toutes de réformer le jugement a quo et veulent entendre déclarer valable la saisie-arrêt exécution pratiquée par M. Viorel Micula le 9 septembre 2015 entre les mains de Eurocontrol.

Tant les parties appelantes que Romatsa postulent la jonction pour cause de connexité des causes portant les numéros de rôle 2016 AR 393 et 2016 AR 394 en vertu de l'article 30 C.jud.

Aucune des parties ne s'y oppose.

Toutes les parties ont déposées des conclusions traitant les deux causes ensemble.

Dans ces circonstances il convient de joindre les causes portant les numéros de rôle 2016 AR 393 et 2016 AR 394 pour cause de connexité.


**III.bis  Au préalable**

A l 'audience du 26 février 2019 le conseil de M. Ioan Micula, de Starmill, de Multipack et de EFood a déposé une nouvelle pièce.

Romatsa, l'Etat de Roumanie et la Commission Européenne s'opposent à ce dépôt.

Dans ces circonstances, cette nouvelle pièce qui n'a pas été communiquée aux parties dans les délais, est écartée du débat.


**IV. Quant à la recevabilité  de l'appel et de l'intervention volontaire de M. Ioan Micula, de EFood, de Starmill et de Multipack**

IV. 1. Romatsa demande de déclarer irrecevable l'appel de M. Ioan Micula, de EFood, de Starmill et de Multipack.

Romatsa ne expose pas de moyens d'irrecevabilité de cet appel.

L'appel de ces parties est régulier.

Il tend à la réformation du jugement a quo qui a déclaré irrecevable leur  intervention volontaire.

Il est recevable.

IV.2. L'Etat de Roumanie et Romatsa contestent la recevabilité de l'intervention volontaire originaire de M. Ioan Micula, de Starmill, de EFood et de Multipack.

L'intervention volontaire de M. Ioan Micula, de Starmill, de EFood et de Multipack devant le premier juge date du vendredi 27 novembre 2015, soit la veille du weekend precédant l'audience de plaidoirie fixée le lundi 30 novembre 2015 à 8h.45.

Le premier juge a déclaré irrecevable l'intervention volontaire de ces parties sur la base des motifs suivants:

*'Monsieur Ioan MICULA et les S.C. EUROPEAN FOOD S.A., STARMILL S.R.L et MULTIPACK S.R.L. ont déposé des requêtes en intervention volontaire dans chacune des deux causes en date du 27 novembre 2015.*

*A l'audience du 30 novembre 2015, l'ÉTAT DE ROUMANIE a soulevé oralement l'irrecevabilité de cette intervention, arguant de sa tardiveté.*

*L'article 814 du Code judiciaire dispose que « L'intervention ne peut retarder le jugement de la cause principale », sans préciser la sanction applicable à une intervention tardive.*

*Suivant les travaux préparatoires, et plus spécialement le Rapport de C. Van Reepinghen sur le projet de loi instituant le Code judiciaire, « l'article 814 tend à éviter les procédures dilatoires. Il appartient au juge de décider si l'intervention est de nature à retarder le jugement de la cause principale; il l'écartera s'il estime qu'il s'agit d'une mesure dilatoire.*
*Normalement, dans l'intérêt même des parties, le juge accordera la remise qui permettra d'instruire la demande en intervention, lorsqu'il y a lieu de craindre qu'en rejetant celle-ci, les parties ne soient exposées à une tierce opposition » (c. VAN REEPINGHEN, Rapport sur la réforme judiciaire, Sénat, sess. 1963-1964, n° 3/60-1, p. 331, cité par J.-F. VAN DROOGHENBROECK et B. DE CONINCK, « Les sanctions d'une intervention tardive. Commentaire de l'article 814 du Code judiciaire » IN Liber Amicorum François Glansdorff et Pierre Legros, Bruxelles, Bruylant, 2014, p. 748).*

*Les requêtes en intervention volontaire ont été déposées après l'échéance de tous les délais fixés par les ordonnances rendues en application de l'article 747 du Code judiciaire et, en outre, le dernier jour ouvrable avant l'audience de plaidoiries. Il était dès lors impossible de réaménager les calendriers d'échange de conclusions tout en maintenant la date d'audience.*

*L'intervention était donc incontestablement tardive et de nature à retarder le jugement de la cause principale.*

*Certes, le greffe était fermé du lundi 23 au jeudi 26 novembre 2015, le niveau d'alerte terroriste ayant été fixé au niveau maximum en Région bruxelloise. Cette circonstance est toutefois sans incidence car des actes ou pièces urgents pouvaient toujours être déposés par l'entremise du Président du tribunal.*

*Par ailleurs, et quoi qu'il en soit, la saisie litigieuse a été opérée le 9 septembre 2015, les citations en opposition ont été signifiées les 23 et 24 septembre 2015 et l'audience d'introduction a eu lieu le 5*

*octobre 2015. Monsieur Ioan MICULA et les S.C. EUROPEAN FOOD S.A., STARMILL S.R.L. et MULTIPACK S.R.L, qui devaient être au courant de cette procédure, ne font état d'aucune circonstance permettant d'expliquer pour quelle raison ils ne sont pas intervenus plus tôt, à tout le moins dans un délai qui aurait laissé la possibilité aux autres parties de répondre à leurs arguments.*

*Ils se contentent d'affirmer que « dans ses dernières conclusions, pour la première fois, la Roumanie soutient que la Saisie-arrêt ne serait pas valable au motif que M. Viorel Micula ne serait pas le créancier de la totalité de la condamnation prononcée par la Sentence. Cet argument n'est pas fondé et les Quatre Requérants ont intérêt à faire valoir leur réponse à cet égard ».*

*Mais l'ÉTAT DE ROUMANIE avait déjà invoqué ce moyen dans ses premières conclusions du 3 novembre 2015 (page 16, §16). De plus, la saisie-arrêt ayant été opérée par Monsieur Viorel MICULA seul, c'est à lui qu'il appartient de la défendre. Il ne peut être admis que des créanciers intéressés par la répartition de son produit agissent ainsi en dernière minute, animés d'un souci de solidarité, et ce quand bien même ils auraient « des moyens à faire valoir à l'encontre des autres arguments formulés par les parties adverses ».*

*Dans ces conditions, la tardiveté de l'intervention volontaire de Monsieur Ioan MICULA et des S.C. EUROPEAN FOOD S.A., STARMILL S.R.L. et MULTIPACK S.R.L doit être considérée comme le résultat, si pas d'une manœuvre dilatoire, en tout cas d'une négligence coupable: ils auraient pu, ou raisonnablement dû, intervenir plus tôt.*

*Elle doit être sanctionnée par une déclaration d'irrecevabilité.'*

*Une intervention volontaire manifestement tardive qui risque de retarder le jugement de la cause principale ou dilatoire peut être déclarée irrecevable.*

Le juge peut qualifier de déloyale une intervention manifestement tardive et / ou dilatoire et peut en conclure de ne pas avoir égard à une telle requête en intervention volontaire.

Voir dans ce sens:
Mons, 7 mai 2012, J.T. 2012, 551-552;
J.P. Braine l'Alleud, 28 juin 2016, J.T. 2016, 635;
de Leval, G., Manuel de procédure civile, T.II, 2015, 184.

Il découle des éléments du dossier que:
- la saisie querellée date du 9 septembre 2015;
- les citations en opposition datent des (respectivement) 23 et 24 septembre 2015;
- les interventions volontaires de la Commission européenne et d'Eurocontrol datent (respectivement) des 2 octobre et 5 octobre 2015;
- l'ordonnance prononcée en application de l'article 747 C.jud. date du 5 octobre 2015;
- toutes les parties à la cause ont conclu (respectivement) les 3,17 et 24 novembre 2015, l'appelant Viorel Micula ayant conclu en dernier;
- il ne restait plus de délai pour conclure au moment du dépôt de l'intervention volontaire de M. Ioan Micula et autres (EFood, Starmill et Multipack) de sorte que leur intervention volontaire devait entraîner  sans doute le retardement du jugement de la cause.

Le retard dans le jugement de la cause  s'est d'ailleurs produit, le temps de plaidoirie prévu ne permettant pas de discuter sur (la recevabilité de ) cette nouvelle intervention volontaire à la dernière minute.

Il est démontré à suffisance de droit que les intervenants volontaires M. Ioan Micula, EFood, Starmill et Multipack ne pouvaient ignorer (l'opposition à) la saisie depuis bien avant le 27 septembre 2015 puisque dans leur requête d'appel et dans leurs  conclusions devant la cour (p. 11, point 21) ils affirment en termes clairs que les frères Micula et les sociétés *se partagent les procédures d'exécution'*, ce qui implique la connaissance des procédures d'exécution en cours.

Vu ce qui précède l'intervention volontaire de M. Ioan Micula, de Starmill, de EFood et de  Multipack devant le premier juge est irrecevable.

IV.3. Quant à l'intervention volontaire de M. Ioan Micula, de Starmill, de EFood et de Multipack en degré d'appel

La partie qui fait une  intervention volontaire à titre purement conservatoire, peut intervenir à la cause même pour la première fois en degré d'appel.

Voir dans ce sens:
Cass. 7 février 1998, C.940282.N, www.cass.be;
Cass. 15 mars 2001, Pas, 2001,I,420.

Une intervention volontaire conservatoire tend à la sauvegarde des intérêts de la partie intervenante qui veut éviter le prononcé d'un jugement qui porterait atteinte à ses droits.

L'intervenant volontaire ne prétend pas à un droit propre. Il appuie les prétentions d'une autre partie à la cause.

Il lie son sort à ce dernier. Son initiative a un caractère défensif.

La cour tient compte des demandes des parties telles  que formulées en dernières conclusions.

Quant à l'intervention volontaire en degré d'appel des parties M. Ioan Micula, EFood, Starmill et Multipack,  son caractère conservatoire est contesté.

L'Etat de Roumanie invoque d'abord la violation de son immulité de juridiction.

L'immunité de juridiction de l'Etat de Roumanie ne remet pas en question la recevabilité de l'intervention volontaire de M. Ioan Micula, de Starmill, de Efood et de Multipack.

L'immunité de juridiction invoquée par un Etat dans le cadre d'une procédure introduite devant le tribunal d'un autre Etat porte sur le litige à trancher dans sa globalité.

Elle ne se limite pas à  une action spécifique ou à une partie spécifique et ne peut être opposée avec succès à l'intervenant volontaire conservatoire qui ne demande pas pour lui- même mais se borne à se rallier à la thèse d'une autre partie à la cause.

En l'espèce, le litige a été soumis à l'appréciation du juge des saisies et de la cour de céans à l'initiative de l'Etat de Roumanie même qui de ce fait a accepté de faire juger le différend par les juges belges, renonçant ainsi à son immunité de juridiction, dont il n'a apparemment pas été question devant le premier juge.

L'Etat de Roumanie :
- a accepté la procédure d'arbitrage,
- a fait tierce-opposition à une saisie pratiquée sur la base d'une sentence arbitrale exécutoire.

Il s'ensuit que la décision de l'Etat de Roumanie de soumettre le litige aux juridictions belges vaut tant pour les parties défenderesses initiales que pour les intervenants volontaires conservatoires.

Ce moyen n'est pas fondé.

L'Etat de Roumanie renvoie ensuite aux conclusions et requête en intervention volontaire déposées par M. Ioan Micula, EFood, Starmill et Multipack en date du 31 mars 2017.

Il est constant que cet acte de procédure n'est pas uniquement un acte en intervention volontaire: il contient également la motivation et les demandes de cette partie en degré d'appel en vue d'obtenir la réformation du jugement a quo.

Cela n'empêche que cette partie pouvait, par le même acte, faire une intervention volontaire en degré d'appel de caractère purement conservatoire.

Pour autant que cet acte de procédure intitulé 'Conclusions et requête en intervention volontaire' constitue une (nouvelle) intervention volontaire, il est affirmé en termes clairs que les requérants *'interviennent uniquement pour soutenir la position de M. Viorel Micula'* (voir le point 43 des conclusions et acte en intervention volontaire de M. Ioan Micula, de Starmill, de EFood et de Multipack du 31 mars 2017).

Aux termes de leurs troisièmes conclusions de synthèse et requête en intervention volontaire, M. Ioan Micula, EFood, Starmill et Multipack réaffirment que, par leur intervention volontaire faite devant la cour d'appel, ils ne sollicitent aucune demande à leur propre bénéfice (voir le point 47 de ces conclusions et requête en intervention volontaire).

Quant à l'intérêt à intervenir purement conservatoirement de ces parties intervenantes, qui peut consister en la sauvegarde d'un droit éventuel ou conditionnel:
Il découle du caractère collectif de la saisie que les parties intervenantes M. Ioan Micula, Starmill, EFood, Multipack qui sont, eux aussi, créanciers du débiteur saisi auxquels peut bénéficier le produit de la saisie qui reste le gage de tous les créanciers, la saisie ne conférant pas de privilège au (premier) saisissant.

Voir à ce sujet et dans le même sens:
de Leval, G., Manuel de procédure civile, 2015, T.2, 1229;
Frankignoul,L, 'La saisie-arrêt' in Droit judiciaire. Commentaire pratique, 2015,XII.4-6.

La demande en intervention volontaire de M. Ioan Micula, de Starmill, de EFood et de Multipack formulée pour la première fois en degré d'appel est recevable.

**V. Quant à la recevabilité de l'appel de M. Viorel Micula *'en ce qui concerne la demande tendant à condamner Eurocontrol à bloquer les sommes dues à la Roumanie'* et quant à la demande d'ordonner que Eurocontrol bloque les sommes dues à l'Etat de Roumanie, directement ou indirectement, conformément à l'exploit de l'huissier de justice Piet De Smet du 9 septembre 2015, à compter de l'arrêt**

Il découle de l'examen du dossier qu'une telle demande n'a pas été formée devant le premier juge.

Il s'agit d'une demande nouvelle en degré d'appel.

L'éventuelle irrecevabilité de cette demande ne peut conduire à l'irrecevabilité de l'appel de M. Viorel Micula.

A l'heure actuelle (voir plus loin) et vu ce qui précède, la cour constate que l'examen de cette nouvelle demande est prématuré.

**VI. Quant à la saisie-arrêt exécution du 9 septembre 2015**

La saisie querellée est fondée sur une sentence arbitrale du 11 décembre 2013 rendue dans le cadre de la Convention CIRDI (Centre International pour le Règlement des Différends relatifs aux Investissements) condamnant l'Etat de Roumanie au paiement aux parties appelantes d'un montant en principal de 376.433.229 RON, revêtue de la formule exécutoire avec signification du 19 août 2015 et ce par voie diplomatique à la requête de M. Viorel Micula à l'Etat de Roumanie.

Elle est pratiquée entre les mains de Eurocontrol le 9 septembre 2015 pour sûreté et obtenir paiement d'un montant de 85.066.428,42 euros.

Par décision du 26 février 2016 la demande en annulation de la sentence arbitrale de l'Etat de Roumanie est rejetée.

La procédure en annulation n'a en elle-même pas de caractère suspensif.
Elle n'empêche pas le titulaire d'une créance qui répond aux qualités requises de prendre des mesures d'exécution, fût-ce qu'il agit alors à son propre risque.
Une telle action n'est pas prématurée.

La demande en annulation n'a pas abouti.

La sentence est définitive. Elle n'est plus susceptible de recours.

La sentence arbitrale fonde la créance du débiteur saisissant, bénéficiaire parmi d'autres de ladite sentence, M. Viorel Micula, créance dont le règlement (intégral) n'est pas prouvé.

Elle constitue un titre exécutoire régulier en soi.

La saisie-arrêt a été pratiquée sur la base d'une sentence dûment revêtue de la formule exécutoire, qui en vertu de l'article 54 de la Convention de Washington, impose la reconnaissance et l'exécution des sentences arbitrales à chaque Etat contractant, ainsi à la Belgique.

La saisie-arrêt querellée a donc été pratiquée sur la base d'un titre qui, même en étant frappé d'un recours, était exécutoire en application des articles 53 et 54 de la Convention de Washington.

**VII. Quant au fait du prince**

Le fait du prince constitue une cause étrangère, libératoire qui peut justifier qu'un débiteur, agissant comme toute personne normalement prudente et raisonnable placée dans la même situation, ne paie pas son créancier muni d'un titre exécutoire régulier.

En l'espèce la Décision de la Commission européenne est présentée apparemment comme un obstacle majeur à l'exécution de la sentence arbitrale.

La Décision de la Commission du 30 mars 2015 crée un conflit entre l'obligation de respecter une sentence CIRDI exécutoire et celle de se conformer à une Décision de la Commission européenne.

La sentence arbitrale en vertu de laquelle la saisie litigieuse a été pratiquée a été prononcée dans le cadre de la Convention de Washington du 18 mars 1965 'pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats'. Elle est applicable en Belgique.

Cette convention dispose en ses articles 53 et 54:

*'Article 53 :*
*« (1) La sentence est obligatoire à l'égard des parties et ne peut être l'objet d'aucun appel ou autre recours, à l'exception de ceux prévus à la présente Convention. Chaque partie doit donner effet à la sentence conformément à ses termes, sauf si l'exécution en est suspendue en vertu des dispositions de la présente Convention. (...) ».*

*Article 54 :*

*« (1) Chaque Etat contractant reconnaît toute sentence rendue dans le cadre de la présente Convention comme obligatoire et assure l'exécution sur son territoire des obligations pécuniaires que la sentence impose comme s'il s'agissait d'un jugement définitif d'un tribunal fonctionnant sur le territoire dudit Etat. Un Etat contractant ayant une constitution fédérale peut assurer l'exécution de la sentence par l'entremise de ses tribunaux fédéraux et prévoir que ceux-ci devront considérer une telle sentence comme un jugement définitif des tribunaux de l'un des États fédérés.*

*(...)*

*(3) L'exécution est régie par la législation concernant l'exécution des jugements en vigueur dans l'Etat sur le territoire duquel on cherche à y procéder ».'*

Par décision (EU) 2015/ 1470 du 30 mars 2015 la Commission européenne, qui était intervenue comme *'amicus curiae'* dans la procédure devant le tribunal arbitral et qui avait adopté la décision C (2014) 3192 enjoignant l'Etat de Roumanie de ne pas exécuter la sentence jusqu'à la conclusion de l'analyse de la Commission en vue de vérifier si l'exécution de ladite sentence constitue une aide d'Etat au sens de l'article 107,par. 1 TFEU, a

- interdit à l'Etat de Roumanie le versement aux bénéficiaires des sommes dues en exécution de ladite sentence arbitrale, ce versement étant considéré comme une aide d'Etat au sens de l'article 107, par. 2 TFUE incompatible avec le marché intérieur,

- enjoint l'Etat de Roumanie de récupérer les aides incompatibles déjà versées en ces termes:

### Article premier

*Le versement des dommages et intérêts accordés par le tribunal arbitral, constitué sous l'égide du Centre international pour le règlement des différends relatifs aux investissements (CIRDI) par la sentence arbitrale rendue le 11 décembre 2013 dans l'affaire n° ARB/05/20 Micula e.a./Roumanie (l 0 1), à l'unité économique unique composée par Viorel Micula, Ioan Micula, S.C. European Food S.A., S.C. Starmill S.R.L., S.C, Multipack, European Drinks S.A., Rieni Drinks S.A., Scandic Distilleries S.A., Transilvania General Import-Export S.R.L. et West Leasing S.R.L constitue une aide d'État au sens de l'article 107, paragraphe 1, du traité, qui est incompatible avec le marché intérieur.*

### Article 2

*1. La Roumanie ne verse aucune aide incompatible visée à l'article 1er et récupère toutes les aides incompatibles visées à l'article 1er qui ont déjà été versées aux entités, quelles qu'elles soient, qui composent l'unité économique unique qui a bénéficié de cette aide à la suite de la mise en œuvre ou à l'exécution partielle de la sentence arbitrale du 11 décembre 2013, ainsi que toute aide versée aux entités, quelles qu'elles soient, qui composent l'unité économique unique qui a bénéficié de cette aide à la suite d'une mise en œuvre ultérieure de la sentence arbitrale du 11 décembre 2013 qui n'a pas été notifiée à la Commission ou toute aide versée après la date de l'adoption de la présente décision.*

*2. Viorel Micula, Ioan Micula, S.C. European Food S.A., S.C. Starmill S.R.L., S.C. Multipack, European Drinks S.A., Rieni Drinks S.A., Scandic Distilleries S.A., Transilvania General Import-Export S.R.L. et West Leasing S.R.L sont solidairement responsables du remboursement de l'aide d'État qu'ils ont reçue.*

*3. Les montants à récupérer sont ceux découlant de la mise en œuvre ou de l'exécution de la sentence arbitrale du 11 décembre 2013 (montant principal et intérêts).*

*4. Les montants à récupérer produisent des intérêts à partir de la date à laquelle ils ont été mis à la disposition des bénéficiaires, jusqu'à leur récupération effective.*

*5. La Roumanie doit communiquer les dates exactes à partir desquelles les aides d'État ont été mises à la disposition des bénéficiaires visés.*

*6. Les taux d'intérêt sont calculés sur une base composée conformément aux dispositions du chapitre V du règlement (CE) n° 794/2004 de la Commission.*

*7. La Roumanie veille à ce qu'aucun autre versement de l'aide visée à l'article 1e r ne soit effectué à partir de la date d'adoption de la présente décision.*

*Article 3*

*1. La récupération de l'aide visée à l'article 1er est immédiate et effective.*

*2. La Roumanie veille à ce que la présente décision soit exécutée dans un délai de quatre mois à compter de sa notification.*

*Article 4*

*1. Dans les deux mois qui suivent la notification de la présente décision, la Roumanie communique les informations suivantes:*

*a) le montant total de l'aide reçue par chaque entité mentionnée à l'article 1er de la présente décision;*

*b) une description détaillée des mesures déjà prises ou des mesures prévues pour se conformer à la présente décision;*

*c) les documents démontrant que les bénéficiaires ont été mis en demeure de rembourser l'aide.*

*2. La Roumanie informe la Commission de l'avancement des mesures prises au niveau national pour exécuter la présente décision jusqu'à la récupération complète de l'aide visée à l'article 1$^{er}$. La Roumanie présente sans délai, sur simple demande de la Commission, des informations relatives aux mesures déjà prises et aux mesures prévues pour se conformer à la présente décision. Elle fournit aussi des informations détaillées concernant les montants de l'aide et des intérêts correspondants déjà récupérés auprès des bénéficiaires.*

*Article 5*

*La Roumanie est destinataire de la présente décision.'*

En vertu de l'article 288 TFEU cette décision est obligatoire dans tous les Etats membres:
*'Pour exercer les compétences de l'Union, les institutions adoptent des règlements, des directives, des décisions, des recommandations et des avis.*
*Le règlement a une portée générale. Ill est obligatoire dans tous ses éléments et il est directement applicable dans tout Etat membre.*
*La directive lie tout État membre destinataire quant au résultat à atteindre, tout en laissant aux instances nationales la compétence quant à la forme et aux moyens. La décision est obligatoire dans tous ses éléments. Lorsqu'elle désigne des destinataires, elle n'est obligatoire que pour ceux-ci.*
*Les recommandations et les avis ne lient pas.'*

La Décision  de la Commission du 30 mars 2015 interdit à l'Etat de Roumanie d'exécuter la sentence arbitrale.

Cette Décision n'existait pas au moment où le tribunal arbitral a rendu la sentence qui constitue le titre exécutoire.

La Décision du 30 mars 2015 fait l'objet d'un recours devant les juridictions communautaires.

Actuellement il existe un risque réel de conflit entre une décision d'une juridiction nationale, ainsi du juge des saisies et de la cour statuant en degré d'appel en matière de saisie et celle de l'UE, la Décision de la Commission invoquée comme 'fait du prince' dans le cadre du litige portant sur l'exécution forcée d'une sentence arbitrale CIRDI.

M. Viorel Micula invoque que la Décision de Commission Européenne n'interdit pas, en tant que telle, une exécution forcée de la sentence en Belgique.

Il expose notamment :

'        *a) La notion d'imputabilité*

**177.** *Pour que des avantages soient qualifiés d'aides d'Etat au sens de l'article 107 du TFUE, la CJUE considère qu'ils doivent, d'une part, être accordés directement ou indirectement au moyen de ressources d'Etat <u>et</u>, d'autre part, être imputables à l'Etat112.*

*Cette jurisprudence établit clairement que le seul transfert de ressources d'Etat est insuffisant pour permettre la qualification d'une aide d'Etat. Le critère de l'imputabilité est un critère à part entière.*

**178.** *D'après la CJUE, il y a aide d'Etat lorsqu'un Etat membre : « en vue de la poursuite d'objectifs économiques et sociaux qui leur sont propres, mettent, par des décisions unilatérales et autonomes à ta disposition des entreprises ou d'autres sujets de droit, des ressources ou leur procurent des avantages destinés à favoriser la réalisation des objectifs économiques ou sociaux recherchés » (Viorel Micula souligne)113.*

*La CJUE a également mis en exergue non seulement le besoin de transfert de ressources publiques, ou un contrôle général par l'Etat de l'entreprise mais également les implications concrètes de l'Etat dans l'adoption des mesures contestées114.*

*b) L'exécution forcée en Belgique n'est pas imputable à la Roumanie, ce qui est confirmé par la Décision de la Commission*

**179.** *Selon l'article 1er de la Décision de la Commission, le versement des dommages et intérêts accordés par la Sentence constitue une aide d'Etat au sens de l'article 107, §1er , du TFUE.*

*Il est tout simplement inexact de prétendre que tant le corps de la Décision de la Commission que ses considérants interdisent ou s'appliquent aussi lorsqu'il s'agit d'une exécution forcée ordonnée par des juridictions qui ne sont pas roumaines.*

*112 CJUE, France c. Commission, 16 mai 2002, C-482/99, §24 ; Belgique & Forum 187 c. Commission, 22 juillet 2006. C-182/03 et C-217/03, §127.*
*113 CJUE, Amministrazione délie finanze deilo Stato c. Denkavit italiana, 27 mars 1980, C-61/79, §31.*
*114 CJUE, France c. Commission, 16 mai 2002, C-482/99, §52. A titre illustratif, voy. la Décision (UE) 2017/501 de la Commission du 12 juin 2015 dans laquelle la Commission européenne a elle-même conclu que des contrats d'approvisionnement en électricité à des prix présumés inférieurs au niveau du marché ne constituent pas une aide d'État au sens de l'article 107, paragraphe 1 w , du TFUE, à défaut d'avoir pu établir l'imputabilité à l'État roumain des décisions commerciales du fournisseur d'électricité, Hidroelectrica (§§128-150).*

**180.** *Au paragraphe 117 et suivants de sa Décision, la Commission européenne rappelle la notion d'imputabilité de cette aide d'État et précise explicitement la portée de sa décision. La Commission européenne énonce ainsi aux paragraphes 117,119 et 120 de sa Décision que :*

> *«(117) Pour qu'un avantage sélectif <u>puisse constituer une aide d'Etat</u> (...), il doit. notamment, <u>être imputable à l'Etat</u> (...).*
> *(119) (...) si la Roumanie <u>met en œuvre la sentence de manière volontaire</u> en versant les dommages et intérêts accordés aux requérants par te tribunal, il ne fait aucun doute que cette action est <u>imputable à l'État roumain</u> (...).*
> *(120) (...) <u>chaque action des organismes d'État roumains</u> est <u>imputable</u> à la Roumanie. Ces organismes d'État incluent le gouvernement de l'État membre concerné et d'autres autorités publiques. En particulier, il convient de considérer que les juridictions nationales d'un État et les huissiers de justice désignés par les juridictions sont, eux aussi, des organismes de l'État concerné {...}. Par conséquent, <u>les actions des juridictions et des huissiers de justice nationaux sont imputables</u> à l'Etat roumain. Donc, si la Roumanie est tenue de dédommager les requérants en vertu de la sentence à la suite de la démarche entreprise par les juridictions et les huissiers de justice nationaux, l'action afférente est également imputable à l'État roumain (...) » (Viorel Micula souligne).*

*A contrario, si la Roumanie est contrainte et forcée à mettre en oeuvre la Sentence, cette action ne lui est pas imputable et elle ne viole donc pas la Décision de la Commission. C'est d'ailleurs ce que soutient Viorel Micula dans le cadre de son recours en annulation pendant devant le Tribunal de l'Union européenne. Viorel Micula conteste en effet l'imputabilité de la Décision de la Commission à ia Roumanie dès lors que celle-ci ne dispose d'aucune autonomie de décision, en vertu de l'application des dispositions pertinentes de la Convention CIRDI.*

*Concernant l'exécution volontaire, la Commission européenne considère aussi que « chaque action des organismes d'Etat roumains est imputable à la Roumanie. Ces organismes d'Etat incluent le gouvernement de l'État membre concerné et d'autres autorités publiques. En particulier, i! convient de considérer <u>les juridictions nationales d'un Etat et les huissiers de justice désignés par les juridictions sont, eux aussi</u>, des organismes de l'État concerné (...) » (Viorel Micula souligne - §120 de la Pièce n° 6).*

*Il ressort ainsi clairement du texte de la Décision de la Commission qu'une exécution de la Sentence ne constitue une aide d'État que si pareille action est « imputable à la Roumanie », c'est-à-dire si la Roumanie exécute volontairement la Sentence étant entendu que les décisions des juridictions roumaines constituent aussi une exécution volontaire de la Sentence imputable à la Roumanie selon la Décision de la Commission.'*

Ce point de vue est sérieusement contesté.

Dans ces circonstances il y a lieu de surseoir à statuer :
dans l'attente de la réponse de la Cour de Justice de l'Union européenne aux questions préjudicielles formulées dans le dispositif de cet arrêt
et - dans un souci du respect de la sécurité juridique et du droit communautaire et des décisions rendues par les juridictions européennes et agissant dans un esprit de coopération loyale entre les juridictions de l'Union européenne et les juridictions nationales et en vue d'éviter le risque de décisions incohérentes-
dans l'attente d'une décision <u>définitive</u> des juridictions européennes sur les recours en annulation de la Décision du 30 mars 2015.

Vu ce qui précède la cour réserve à statuer pour le surplus.

**PAR CES MOTIFS**

**LA COUR**

Statuant contradictoirement;

Vu la loi du 15 juin 1935;

Joint les causes connues sous les numéros de rôle 2016 AR 393 et 2016 AR 394;

Ecarte du débat la pièce déposée par M. Ioan Micula, Starmill, Multipack et EFood à l'audience du 26 février 2019 ;

Déclare recevable l'appel de Viorel Micula qui vise la réformation du jugement a quo ;

Déclare recevable l'appel de M. Ioan Micula, de Starmill, de EFood et de Multipack qui  vise la réformation du jugement a quo;

Déclare irrecevable l'intervention volontaire originaire de M. Ioan Micula, de Starmill, de EFood et de Multipack;

Déclare recevable l'intervention volontaire de M. Ioan Micula, Starmill, EFood et Multipack en degré d'appel;

Pour le surplus:

Réserve à statuer dans l'attente

1) de la réponse de la Cour de Justice de l'Union Européenne aux questions préjudicielles suivantes :

   '1. Est-ce que la décision (UE) 2015/1470 de la Commission européenne du 30 mars 2015

*concernant l'aide d'État SA.38517 (2014/C) (ex 2014/NN) doit être comprise comme visant les paiements dus par la Roumaine même dans le cas où les paiements seront recouvrés à son encontre à la suite d'une procédure d'exécution forcée de la sentence arbitrale CIRDI du 11 décembre 2013, entamée devant les juridictions d'un Etat-membre autre que la Roumanie?*

*2. Est-ce que le droit de l'Union exige en soi et d'office qu'une juridiction d'un Etat-membre (autre que la Roumanie), saisie d'un recours à l'encontre d'une procédure d'exécution forcée d'une sentence arbitrale CIRDI qui a force de chose jugée selon les règles de procédure nationales propres à cet Etat-membre, écarte cette sentence, au seul motif qu'une décision non définitive de la Commission européenne adoptée postérieurement à la sentence considère que cette exécution forcée de la sentence est contraire au régime européen des aides d'État ?*

*3. Est-ce que le droit de l'Union, notamment le principe de coopération loyale ou le principe d'autorité de chose jugée, permet qu'une juridiction nationale d'un Etat-membre (autre que la Roumanie) ne respecte pas ses obligations internationales découlant de la Convention du CIRD dans l'hypothèse où la Commission européenne a adopté une décision postérieurement à la sentence, qui considère que l'exécution forcée de la sentence serait contraire au régime européen des aides d'État et ce même si la Commission européenne a participé à la procédure d'arbitrage (en ce compris le recours en annulation à l'encontre de la sentence) et a fait valoir ses moyens relatifs au régime européen des aides d'État ?'*

2) d'une décision <u>définitive</u> prise par les juridictions européennes sur les recours en annulation contre la Décision de la Commission du 30 mars 2015.

Cet arrêt a été prononcé à l'audience publique du 12 mars 2019 par
D. DEGREEF        Conseiller
B. HEYMANS        Greffier

B. HEYMANS                D. DEGREEF



translations@geotext.com
www.geotext.com

STATE OF NEW YORK          )
                          )
                          )    ss
COUNTY OF NEW YORK         )


**CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from French into English of the attached Judgment, dated March 12, 2019.


Kristen Duffy, Senior Managing Editor
Geotext Translations, Inc.


Sworn to and subscribed before me

this __9__ day of __April__, 20 __19__.


JEFFREY AARON CURETON
NOTARY PUBLIC-STATE OF NEW YORK
No. 01CU6169789
Qualified in New York County
My Commission Expires September 23, 2019

New York
t: +1.212.631.7432
London
t: +44.20.7553.4100

Washington, D.C.
t: +1.202.828.1267
Paris
t: +33.1.42.68.51.47

Chicago
t: +1.312.242.3756
Stockholm
t: +46.8.463.11.87

Houston
t: +1.713.353.3909
Frankfurt
t: +49.69.7593.8434

San Francisco
t: +1.415.576.9500
Hong Kong
t: +852.2159.9143

Copy
Issued to: Atty. COLIN, Nathalie
Art. 792 C.J.
Exempt from Court Registry fees – Art. 280.2 C.Enr

[stamp:] 00011

[initials]



| Directory number | Copy | | |
|---|---|---|---|
| **2019/** *2134* | Issued on | Issued on | Issued on |
| Issue date | | | |
| **March 12, 2019** | the [date] | the [date] | the [date] |
| | EUR | EUR | EUR |
| | CIV | CIV | CIV |
| Docket number | | | |
| **2016/AR/393 joinder with 2016/AR/394** | | | |

☐ not transferable to the receiver

[illegible handwriting]

# **Brussels**
# **Court of Appeal**

# **Judgment**

# 17th Chamber
# Civil Affairs

| presented on |
|---|
| not recordable |

*792*[illegible handwriting]

[stamp:] 000131

[...]

**VII. As to an Act of Government**

An act of government constitutes a foreign, liberating case, which may justify that a debtor, acting like any normally prudent and reasonable person placed in the same situation, not pay his creditor who has a legitimate enforceable title.

In this case, the European Commission's decision is apparently presented as a major obstacle to the enforcement of the arbitral award.

The Commission's Decision of March 30, 2015 creates a conflict between the obligation to comply with an enforceable ICSID award and that of complying with a decision from the European Commission.

The arbitral award under which the contested seizure was made was issued as a part of the Washington Convention of March 18, 1965 "on The Settlement of Investment Disputes between States and Nationals of Other States." It is applicable in Belgium.

This Convention states in its Articles 53 and 54:

*"Article 53*

*'(1) The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention. (…)'*

*Article 54:*

*'(1) Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.*

*(…)*

*(3) Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought.'"*

**[stamp:] 000132**

By (EU) decision 2015/1470 of March 30, 2015, the European Commission, which had intervened as an "*amicus curiae*" in the proceedings before the arbitral tribunal and which had adopted decision C (2014) 3192 enjoining the State of Romania to not enforce the award until the conclusion of the analysis by the Commission with a view to verifying whether the enforcement of said award constitutes State aid within the meaning of Article 107, par. 1 TFEU,

- prohibited the State of Romania from paying to the beneficiaries the amounts due as a part of the enforcement of said arbitral award, this payment being regarded as State aid within the meaning of Article 107, par. 2, TFEU, incompatible with domestic markets,

- enjoined the State of Romania to recover the incompatible aid already paid in these terms:

*"Article 1*

*The payment of the compensation awarded by the arbitral tribunal established under the auspices of the International Center for Settlement of Investment Disputes (ICSID) by award of 11 December 2013 in Case No ARB/05/20 Micula a.o. v Romania  (101) to the single economic unit comprising Viorel Micula, Ioan Micula, S.C. European Food SA, S.C. Starmill S.R.L., S.C. Multipack, European Drinks SA, Rieni Drinks SA, Scandic Distilleries SA, Transilvania General Import-Export S.R.L., and West Leasing S.R.L constitutes State aid within the meaning of Article 107(1) of the Treaty which is incompatible with the internal market.*

*Article 2*

*1.   Romania shall not pay out any incompatible aid referred to in Article 1 and shall recover any incompatible aid referred to in Article 1 which has already been paid out to any one of the entities constituting the single economic unit benefiting from that aid in partial implementation or execution of the arbitral award of 11 December 2013, as well as any aid paid out to any one of the entities constituting the single economic unit benefiting from that aid in further implementation of the arbitral award of 11 December 2013 that the Commission has not been made aware of or that is paid out after the date of this Decision.*

*2.   Viorel Micula, Ioan Micula, S.C. European Food SA, S.C. Starmill S.R.L., S.C. Multipack, European Drinks SA, Rieni Drinks SA, Scandic Distilleries SA, Transilvania General Import-Export S.R.L., and West Leasing S.R.L shall be jointly liable to repay the State aid received by any one of them.*

*3.   The sums to be recovered are those resulting from the implementation or execution of the award of 11 December 2013 (principal and interest).*

*4.   The sums to be recovered shall bear interest from the date on which they were put at the disposal of the beneficiaries until their actual recovery.*

*5.   Romania shall provide the exact dates on which the aid provided by the state was put at the disposal of the respective beneficiaries.*

*6.   The interest shall be calculated on a compound basis in accordance with Chapter V of Commission Regulation (EC) No 794/2004 (102).*

**[stamp:] 000133**

*7.   Romania shall ensure that no further payments of the aid referred to in Article 1 shall be effected with effect from the date of adoption of this Decision.*

*Article 3*

*1.   Recovery of the aid referred to in Article 1 shall be immediate and effective.*

*2.   Romania shall ensure that this Decision is implemented within four months following the date of notification of this Decision.*

*Article 4*

*1.   Within two months following notification of this Decision, Romania shall submit the following information:*

*(a)    the total amount of aid received by each entity mentioned in Article 1 of this Decision;*

*(b)    a detailed description of the measures already taken and planned to comply with this Decision;*

*(c)    documents demonstrating that the beneficiaries have been ordered to repay the aid.*

*2.   Romania shall keep the Commission informed of the progress of the national measures taken to implement this Decision until recovery of the aid referred to in Article 1 has been completed. It shall immediately submit, on simple request by the Commission, information on the measures already taken and planned to comply with this Decision. It shall also provide detailed information concerning the amounts of aid and recovery interest already recovered from the beneficiaries.*

*Article 5*

*This Decision is addressed to Romania."*

Pursuant to Article 288 TFEU, this decision is binding in all of the Member States:
*"To exercise the Union's competences, the institutions shall adopt regulations, directives, decisions, recommendations and opinions.*
*A regulation shall have general application. It shall be binding in its entirety and directly applicable in all Member States.*
*A directive shall be binding, as to the result to be achieved, upon each Member State to which it is addressed, but shall leave to the national authorities the choice of form and methods.*
*A decision shall be binding in its entirety. A decision which specifies those to whom it is addressed shall be binding only on them.*
*Recommendations and opinions shall have no binding force."*

The Commission's decision of March 30, 2015 prohibits the State of Romania from enforcing the arbitral award.

This decision did not exist at the time when the arbitral tribunal rendered the award that constitutes the enforceable title.

The Decision of March 30, 2015 is the subject of an appeal before the Community Courts.

At present, there is a real risk of conflict between a decision from a national court, as well as from the enforcement judge and the court ruling on the degree of appeal in matters of seizures and that of the EU, the Commission's Decision invoked as an "act of government" as a part of the litigation relating to the forced enforcement of an ICSID arbitral award.

Mr. Viorel Micula submits that the European Commission's Decision does not prohibit, as such, a forced enforcement of the award in Belgium.

It notes, in particular:

### a) The Notion of Attribution

*177. In order for benefits to qualify as State aid within the meaning of Article 107 of the TFEU, the ECJ considers that they must, firstly, be granted directly or indirectly through State resources and, secondly, be attributable to the State.112*

*This case law clearly establishes that the sole transfer of State resources is insufficient to qualify as State aid. The criterion of attribution is a criterion in its own right.*

*178. According to the ECJ, it qualifies as State aid when a Member State: "with a view to pursuing its own economic and social objectives, by unilateral and autonomous decisions, provides resources or benefits to enterprises or other legal entities intended to promote the achievement of the economic or social objectives sought" (Viorel Micula underlining).113*

*The ECJ also highlighted not only the need for the transfer of public resources, or a general control by the State over the company, but also the concrete involvement of the State in the adoption of the contested measures.114*

### b) The Forced Enforcement in Belgium is not attributable to Romania, which is confirmed by the Commission's Decision

*179. According to Article 1 of the Commission's Decision, the payment of damages and interest granted by the Award constitutes State aid within the meaning of Article 107, §1, of the TFEU.*

*It is simply incorrect to claim that both the body of the Commission's Decision and its recitals prohibit or also apply in the case of forced enforcement ordered by courts that are not Romanian.*

*112 ECJ, France v. Commission, May 16, 2002, C-482/99, § 24; Belgium & Forum 187 v. Commission, July 22, 2006. C-182/03 and C-217/03, §127.*
*113 ECJ, Amministrazione délie finanze delio Stato v. Denkavit italiana, March 27, 1980, C-61/79 §31.*
*114 ECJ, France v. Commission, May 16, 2002, C-482/99, §52. For illustrative purposes, see Decision (EU) 2017/501 of the Commission of June 12, 2015 in which the European Commission itself concluded that contracts for the supply of electricity at prices presumed to be lower than the market price did not constitute State aid within the meaning of Article 107, paragraph 1 w, of the TFEU, for failure to establish that the commercial decisions of the electricity provider, Hidroelectrica, are attributable to the Romanian State, (§§128-150).*

**180.** *In paragraph 117 et seq. of its Decision, the European Commission recalls the notion of attribution of this State aid and explicitly specifies the scope of its decision. The European Commission thus states in paragraphs 117, 119, and 120 of its Decision that:*

> *"(117) For a selective advantage <u>to be considered State aid</u> (…), it must, in particular, <u>be attributable to the state</u> (…).*
> *(119) (…) if Romania <u>voluntarily enforces the award</u> by paying the damages and interests awarded to the claimants by the court, there is no doubt that this action is <u>attributable</u> to the Romanian State (…).*
> *(120) (…) <u>every action by the bodies of the Romanian State is <u>attributable</u> to Romania. These State bodies include the government of the Member State concerned and other public authorities. In particular, it should be considered that the national courts of a State and the judicial officers appointed by the courts are, themselves, also bodies of the State concerned (…). As a result, <u>the actions of the courts and national judicial bailiffs are attributable</u> to the Romanian state. Therefore, if Romania is required to compensate the claimants in accordance with the award following the action taken by the national courts and the judicial bailiffs, the related action is also attributable to the Romanian State (…)" (Viorel Micula underlining).*

*On the contrary, if Romania is compelled and forced to implement the Award, this action is not attributable to it and it does therefore not violate the Commission's Decision. This is, moreover, what Viorel Micula maintains as a part of his action for annulment pending before the General Court of the European Union. Viorel Micula in fact contests the attribution of the Commission's Decision to Romania since it has no decision-making autonomy, in accordance with the relevant provisions of the ICSID Convention.*

*With regard to voluntary enforcement, the European Commission also considers that "each action by the Romanian State bodies is attributable to Romania. These State bodies include the Member State concerned and other public authorities. In particular, it should be considered that <u>the national courts of a State and the judicial bailiffs appointed by the courts are, also themselves,</u> bodies of the State concerned (…)" (Viorel Micula underlining - §120 of Exhibit No. 6).*

*It is thus clear from the text of the Commission's Decision that an enforcement of the Award only constitutes State aid if such action is "attributable to Romania," that is to say if Romania voluntarily enforces the award, it being understood that the decisions of the Romanian courts also constitute a voluntary enforcement of the award attributable to Romania according to the Commission's Decision."*

[stamp:] 000136

This point of view is seriously disputed.

Under these circumstances, it is necessary to stay the proceedings:
pending the response from the European Court of Justice Union to the questions  for preliminary ruling formulated in the operative part of this Judgment
and – with a view to ensuring the respect for legal certainty and for Community law and the decisions rendered by the European courts and acting in a spirit of fair cooperation between the courts of the European Union and the national courts and in order to avoid the risks of inconsistent decisions –
pending a <u>final</u> decision by the European courts on the action for annulment of the March 30, 2015 Decision.

In view of the foregoing, the Court reserves ruling on the remainder.

**ON THESE GROUNDS**

**THE COURT**

Ruling in the presence of all parties;

Having regard to the Law of June 15, 1935;

Joins the cases heard under docket numbers 2016 AR 393 and 2016 AR 394;

Dismisses from the debates the exhibit filed by Mr. Ioan Micula, Starmill, Multipack and EFood during the Hearing of February 26, 2019;

Declares admissible Viorel Micula's appeal, which seeks the reversal of the judgment a quo;

Declares admissible the appeal of Mr. Ioan Micula, Starmill, EFood and Multipack, which seeks the reversal of the judgment a quo;

Declares inadmissible the voluntary intervention of Mr. Ioan Micula, of Starmill, of EFood and of Multipack;

Declares admissible the voluntary intervention of Mr. Ioan Micula, Starmill, EFood and Multipack in degree of appeal;

For the remainder:

Reserves ruling pending

1)      the response from the European Court of Justice to the following questions referred for preliminary ruling:

        "*1. Must the Decision (EU) 2015/1470 of the European Commission of March 30, 2015 concerning State*

*aid SA.38517 (2014/C) (ex 2014/NN) be understood as covering the payments due by Romania, even in the event that the payments will be recovered against it following a proceeding for forced enforcement of the ICSID Arbitral Award of December 11, 2013, brought before the courts of a Member State other than Romania?*

*2. Does the law of the Union require in and of itself that a court of a Member State (other than Romania), hearing an appeal against a procedure of the forced enforcement of a ICSID arbitral award res judicata according to the national rules of procedure of that Member State, dismiss this award, on the sole ground that a non-final decision of the European Commission adopted after the award considers that this forced enforcement is contrary to the European system of state aid?*

*3. Does EU law, in particular the principle of fair cooperation or the principle of res judicata, allow a national court of a Member State (other than Romania) not to comply with its international obligations resulting from the ICSID Convention under the assumption that the European Commission adopted a decision after the award, which considers that the forced enforcement of the award would be contrary to the European system of State aid even if the European Commission participated in the arbitration proceeding (including the action for the annulment of the award) and argued its case against the European system of State aid?"*

2.     a <u>final</u> decision made by the European courts on the action for annulment of the Commission's Decision of March 30, 2015.

This Judgment was ruled in a Public Hearing of March 12, 2019 by
D. DEGREEF Counsellor
B. HEYMANS Clerk

[signature]                    [signature]
B. HEYMANS                    D. DEGREEF