# EXHIBIT 61

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ | ) |
| EISER INFRASTRUCTURE LIMITED and | ) |
| ENERGIA SOLAR LUXEMBOURG S.A R.L., | ) |
| | ) |
| *Petitioners*, | ) |
| | ) |
| v. | ) Civil Action No. 1:18-cv-1686 |
| | ) |
| THE KINGDOM OF SPAIN, | ) |
| | ) |
| *Respondent*. | ) |
| | ) |
| _____ | ) |

## PROPOSED BRIEF OF THE EUROPEAN COMMISSION
## ON BEHALF OF THE EUROPEAN UNION AS *AMICUS CURIAE*
## IN SUPPORT OF THE KINGDOM OF SPAIN

R. Stanton Jones (D.C. Bar No. 987088)
Sally L. Pei (D.C. Bar No. 1030194)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
T: (202) 942-5000
stanton.jones@arnoldporter.com

Dmitri Evseev (D.C. Bar No. 487747)
*Pro hac vice* application to be filed
ARNOLD & PORTER
  KAYE SCHOLER LLP
Tower 42
25 Old Broad Street
London EC2N 1HQ
UNITED KINGDOM
T: +44 (0)20 7786 6100
dmitri.evseev@arnoldporter.com

*Counsel for Proposed Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTEREST OF AMICUS CURIAE ...................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................... 2

RELEVANT LEGAL BACKGROUND ............................................................................... 4

     A.     The nature and special characteristics of the EU legal order ................................... 4

     B.     The Energy Charter Treaty ("ECT") ........................................................................ 6

     C.     The *Achmea* Judgment ............................................................................................. 9

     D.     EU Member States' declarations on the legal consequences of the *Achmea* Judgment ................................................................................................................. 11

ARGUMENT ..................................................................................................................... 12

I.     The Energy Charter Treaty, properly interpreted under the rules of customary international law on treaty interpretation, does not apply intra-EU ................................ 12

II.     The EU Treaties preclude Member States from offering to arbitrate intra-EU disputes under the Energy Charter Treaty ........................................................................ 14

     A.     Intra-EU arbitration under Article 26 conflicts with the EU Treaties and fundamental principles of EU law ........................................................................ 14

     B.     The conflict between ECT Article 26 and the EU Treaties must be resolved in favor of EU law .................................................................................................... 19

III.     At a minimum, international comity favors allowing the compatibility of intra-EU arbitration under the ECT to be decided within the EU judicial system. ......................... 23

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Mujica v. AirScan Inc.*,
    771 F.3d 580 (9th Cir. 2014) ................................................... 23

*Sumitomo Shoji Am., Inc. v. Avagliano*,
    457 U.S. 176 (1982) ............................................................... 13

*Ungaro-Benages v. Dresdner Bank AG*,
    379 F.3d 1227 (11th Cir. 2004) .............................................. 23

**Statutes**

22 U.S.C. § 1650a ......................................................................... 2

**Treaties and International Agreements**

Concluding Document of the Hague Conference on the European Energy Charter,
    17 Dec. 1991. ......................................................................... 8

Energy Charter Treaty and its Protocol on Energy Efficiency and Related Environmental
    Aspects, *adopted* Dec. 17, 1994, *entered into force* April 16, 1998,
    2080 U.N.T.S 95 (1995) ................................................. *passim*

Treaty on European Union, Oct. 26, 2012,
    2012 O.J. (C 326) 13 .......................................................... 1, 4

Treaty on the Functioning of the European Union, Oct. 26 2012,
    2012 O.J. (C 326) 47 ...................................................... *passim*

Vienna Convention on the Law of Treaties, *opened for signature* May 23, 1969,
    1155 U.N.T.S. 331 ............................................................ 12, 19

**European Union Authorities**

*Bundesgerichtshof* Order, *Slovak Republic v. Achmea B.V.*
    (Oct. 31, 2018), I ZB 2/15 .................................................... 20

Case 3/91, *Exportur v. LOR*,
    [1992] E.C.R. I-05529, EU:C:1992:420 ................................. 19

Case 10-61, *Commission v. Italy*,
    [1962] E.C.R. 1 ................................................................ 19, 21

Case 26-62, *Van Gend & Loos v. Netherlands Inland Revenu Administration*,
[1963] E.C.R. 1 ........................................................................................................3

Case 121/85, *Conegate Ltd. v. HM Customs & Excise*,
[1986] E.C.R. 01007, EU:C:1986:114......................................................................19

Case 147/03, *Commission v. Austria*,
[2005] E.C.R. I-5969 ...............................................................................................21

Case 235/87, *Annunziata Matteucci v Communauté française de Belgique*,
[1988] E.C.R. 05589, EU:C:1988:460......................................................................19

Case 262/12, *Vent de Colère!*,
19 Dec. 2013, ECLI:EU:C:2013:851.......................................................................18

Case 286/86, *Ministère Public v. Deserbais*,
[1988] E.C.R. 4907 ..................................................................................................21

Case 478/07, *Budějovický Budvar v. Rudolf Ammersin GmbH*,
[2009] E.C.R. I-07721 .............................................................................................19

Case C-66/13, *Green Network SpA v. Autorità per l'energia elettrica e il gas*,
26 Nov. 2014, EU:C:2014:2399 ................................................................................8

Case C-275/13, *Elcogás SA v. Administración del Estado*,
22 Oct. 2014, EU:C:2014:2314 ...............................................................................16

Case C-284/16, *Slovak Republic v. Achmea B.V.*,
6 March 2018, ECLI:EU:C:2018:158........................................................... *passim*

Case C-301/08, *Bogiatzi v. Deutscher Luftpool et al.*,
[2009] E.C.R. I-10185 .............................................................................................21

Case C-459/03, *Commission v. Ireland* ("*Mox Plant*"),
30 May 2006, ECLI:EU:C:2006:345........................................................................22

Cases C-241/91 P and C-242/91 P, *RTE and ITP v. Commission*,
[1995] E.C.R. I-743 .................................................................................................21

Cases T-125/97 and T-127/97, *Coca-Cola v. Commission*,
[2000] E.C.R. II-1733 ..............................................................................................25

Case T-674/11, *TV2 (Danmark) v. Commission*,
24 Sept. 2015, ECLI:EU:T:2015:684 ......................................................................25

Court of Justice Opinion 2/13, 18 December 2014 (ECLI:EU:C:2014:2454)................5

Commission Communication to the European Parliament and Council on
Protection of intra-EU investment (July 19, 2018), COM(2018) 547 ......................5

iv

Commission Decision on State Aid, SA.40348, slip op. (Nov. 10, 2017)...............................16, 24

Declaration of the Government of Hungary, of 16 January 2019, on the Legal
    Consequences of the Judgment of the Court of Justice in *Achmea* and on
    Investment Protection in the European Union ............................................................................11

Declaration of the Representatives of the Governments of the Member States, of
    15 January 2019, on the Legal Consequences of the Judgment of the Court of
    Justice in *Achmea* and on Investment Protection in the European Union ..............................11

Declaration of the Representatives of the Governments of the Member States, of
    16 January on the Enforcement of the Judgment of the Court of Justice in
    *Achmea* and on Investment Protection in the European Union ..............................................11

Final Act of the Intergovernmental Conference which Adopted the Treaty of
    Lisbon signed on 13 December 2007, 2008 O.J. C115/335 ....................................................20

Opinion of Advocate General Bot, Court of Justice Opinion 1/17, Request for an
    opinion by the Kingdom of Belgium (ECLI:EU:C:2019:72) .....................................14, 15, 22

Opinion of Advocate General Mazák, *Bogiatzi v. Deutscher Luftpool et al.*,
    Case C-301/08, [2009] E.C.R. I-10185.................................................................................20

Statement submitted by the European Communities to the Secretariat of the
    Energy Charter Treaty pursuant to Article 26(3)(b)(iii) of the Energy Charter
    Treaty, [1998] O.J. L69/115 ...............................................................................................13

**Other Authorities**

*Electrabel SA v. Republic of Hungary*,
    ICSID Case No. ARB/07/19, Award, Nov. 25, 2015 ............................................................20

J. Pauwelyn, *Conflict of Norms in Public International Law: How WTO Law
    Relates to Other Rules of International Law* (2003)..............................................................19

M. Cremona, *Disconnection Clauses in EU Law and Practice*, in *Mixed
    Agreements Revisited: The EU and its Member States in the World* (Hillion &
    Koutrakos eds. 2010) .............................................................................................................9

Marcus Klamert, *The Principle of Loyalty in EU Law* (2014) ....................................................20

O. Dörr & K. Schmalenbach, *Vienna Convention on the Law of Treaties: A
    Commentary* (2012) ..............................................................................................................19

Order No. 3, *Ireland v. United Kingdom* ("*Mox Plant*"),
    UNCLOS Arbitral Tribunal, June 23, 2003.............................................................................3

Report of the Study Group of the International Law Commission, *Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law*, UN Doc. No. A/CN.4/L.682 (2006) ............................19, 20

Sir Humphrey Waldock (Special Rapporteur on the Law of Treaties), *Sixth Report on the Law of Treaties*, UN Doc. A/CN.4/186 and Add.1-7, [1966] 2 Y.B. Int'l L. Comm'n, 95 & 219 ......................................................................................................12

**INTEREST OF AMICUS CURIAE**

The European Commission is an institution of the European Union (the "EU" or "Union"), a treaty-based international organization composed of 28 Member States.[1]  Known also as the "Guardian of the Treaties," the Commission is responsible, inter alia, for ensuring the proper application of the EU treaties—including the Treaty on European Union ("TEU"), and the Treaty on the Functioning of the European Union ("TFEU")—and of measures EU institutions adopt under those treaties.  The Commission is also tasked with representing the EU in legal proceedings.  The Commission is an independent institution and acts in the interests of the Union as a whole, rather than individual Member States.   The Commission submits this amicus brief on behalf of the European Union.

The Union has a substantial interest in this case.  Petitioners Eiser Infrastructure Limited and Energia Solar Luxembourg S.A.R.L., respectively a United Kingdom and a Luxembourg entity, and hence EU companies, seek enforcement of an investment arbitration award they have obtained against Spain, an EU Member State, on the basis of the Energy Charter Treaty, a multilateral investment protection treaty negotiated and signed in the 1990s to govern the EU's external energy policy.  This investment award is premised on a fundamental misinterpretation of the Energy Charter Treaty and a disregard for the EU laws that form part of the international obligations of Spain, the United Kingdom, and Luxembourg and that should have governed the dispute.

The EU has a critical interest in ensuring that this Court proceeds based on a correct understanding of the principles and questions of EU law that are at stake.  Accordingly, the

---

[1] These Member States are Austria, Belgium, Bulgaria, Croatia, Cyprus, the Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, the Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden, and the United Kingdom.

Commission submits this amicus brief to explain the official and binding position of the EU that the Energy Charter Treaty does not have intra-EU application.[2]  In any event, EU law precludes investor-State arbitration for intra-EU disputes, because such arbitration is contrary to Articles 267 and 344 of the TFEU and the fundamental principles of autonomy, full effectiveness, and mutual trust, which constitute the cornerstones of the EU legal order, as the Court of Justice of the European Union ("Court of Justice") confirmed in the judgment in *Slovak Republic v. Achmea B.V.*, Case C-284/16, 6 March 2018, ECLI:EU:C:2018:158.  As a result, even if— contrary to the view taken in this brief—the Energy Charter Treaty were to be interpreted as applying intra-EU, its investor-State arbitration provision (and hence any arbitration award issued under that provision) would violate higher-ranking norms of EU law in force between EU Member States, and therefore would be invalid under EU law and inapplicable as between those Member States.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Commission understands Spain's position in these proceedings to be that any standing offer of arbitration contained in Article 26 is invalid as a matter of prevailing EU law. That conclusion deprives this Court of subject-matter jurisdiction under the Foreign Sovereign Immunities Act, and dismissal for lack of jurisdiction would be consistent with the United States' obligations under ICSID Convention.  The Commission agrees that jurisdiction is lacking, for three reasons.

---

[2] The Council of the EU—a legislative body composed of government ministers from each EU Member State— when expressing its unanimous agreement with the Commission's intention to file an amicus curiae brief, has endorsed the Commission's view as the official position of the European Union on the matter.  Six Member States— Finland, Hungary, Malta, Luxembourg, Slovenia, and Sweden—did so while referring to their declaration of 16 January 2019 on the enforcement of the judgement of the Court of Justice in *Achmea* and investment protection in the EU.  *See infra* n.10 and accompanying text.  The position expressed in this brief is hence the official position of the EU on the issues addressed herein.

*First*, the proper application of customary international law rules of treaty interpretation compels the conclusion that the Energy Charter Treaty (including Article 26, its dispute-settlement provision) does not apply intra-EU.

*Second*, alternatively, even if it were possible to interpret Article 26 to encompass intra-EU disputes, such an interpretation would conflict with the EU Treaties, and that conflict—as a matter of international law—must be resolved in favor of EU law.  Because EU law is part of public international law binding on all EU Member States,[3] the inapplicability of Article 26 as a matter of EU law means that Spain has made no valid offer for arbitration to investors from other EU Member States, and no valid arbitration agreement exists between Petitioners and Spain.

*Third*, principles of international comity and due respect for foreign sovereigns counsel in favor of dismissal.  This dispute has no connection with the United States, and the United States therefore has no interest in the adjudication of this controversy in its courts.  By contrast, the EU has an overwhelming interest in this dispute and the fundamental structural questions of EU law that it raises.

That is particularly so because the European Commission, exercising its authority to enforce EU competition law, has issued a binding decision regarding Spain's EU law obligations in relation to this dispute.  The Commission observed that the ECT does not apply intra-EU and that, in any event, Spain has a legal obligation not to pay the arbitration award until the

---

[3] It cannot seriously be disputed that the EU legal order derives from international treaties that create binding obligations between their Member States on the international plane. While the Court of Justice has treated the EU legal order as "special" given the ambitious and far-reaching goals of the treaties, it has always confirmed its *international* character.  *See, e.g.*, Case 26-62, *Van Gend & Loos v. Netherlands Inland Revenue Administration*, [1963] E.C.R. 1, 12 (referring to the EU as a "new legal of *international law*") (emphasis added); *Achmea*, ¶ 41 (confirming that EU law must be treated as "deriving from an international agreement between the Member States"). International courts and tribunals have consistently confirmed the legal character of EU law as international law applicable between EU Member States was also consistently confirmed by international courts and tribunals. *See, e.g.*, Order No. 3, *Ireland v. United Kingdom* ("*Mox Plant*"), UNCLOS Arbitral Tribunal, June 23, 2003, ¶ 28 (confirming that EU law constitutes "obligations between … States") [hereinafter "*Mox Plant* Arbitration"].

Commission decides, based on its EU competition law powers, whether or not to authorize such payment. Petitioners could have challenged that decision in the European courts, but decided not to do so. Petitioners are now bound to respect the Commission's decision and Spain is precluded as a matter of EU law from implementing the award.

Rather than insert itself into the internal affairs of the EU, this Court should permit the issues of compatibility of intra-EU investor-State arbitration with the EU Treaties, and of the lawfulness of the payment of arbitration awards that may implicate EU competition law, to be decided within the EU judicial system, which offers a complete and effective system of judicial redress before an international court—i.e., the Court of Justice.

## RELEVANT LEGAL BACKGROUND

### A.     The nature and special characteristics of the EU legal order

The EU is a treaty-based regional international organization of 28 Member States. At present, the EU Treaties are the Treaty on the Functioning of the European Union ("TFEU"), Oct. 26, 2012, 2012 O.J. (C 326) 47 and the Treaty on European Union ("TEU"), Oct. 26, 2012, 2012 O.J. (C 326) 13 (collectively, the "EU Treaties"). While the EU retains an international character—the 28 Member States remain the "masters of the Treaties" and the terms of their membership in the Union—the EU also represents the most ambitious project of economic, political, and social integration hitherto known in international law. Under the EU Treaties, the EU Member States have, in stages, transferred legislative, regulatory, and enforcement competences in a large number of fields to the Union and its institutions. EU Member States owe each other and the Union expansive duties of loyalty and mutual trust, and the process of European integration under the EU Treaties has "given rise to a structured network of principles, rules and mutually interdependent legal relations binding the EU and its Member States reciprocally and binding its Member States to each other." Court of Justice Opinion 2/13

("Accession of the European Union to the European Convention on Human Rights"), 18

December 2014 (ECLI:EU:C:2014:2454), ¶ 167, https://bit.ly/2SouafF; *Achmea*, ¶ 33.

      One of the original and central purposes of the EU Treaties is the establishment and

proper functioning of the "internal market," defined in the TFEU as "an area without internal

frontiers in which the free movement of goods, persons, services and capital is ensured." TFEU

art. 26(2). The EU's internal market rules are contained in the Treaties, EU legislation and the

case law of the Court of Justice. These rules cover all cross-border economic activities in the

EU, including investment activities. Internal market rules secure to EU investors fundamental

and directly enforceable rights throughout the investment cycle, but also impose obligations,

including the obligation to comply with EU competition law and various regulatory standards

that are designed to ensure that the internal market functions as a level, integrated playing field.[4]

Importantly for present purposes, the EU Treaties charge the Commission with the enforcement

of EU competition law, including the investigation and control of any publicly funded support

and/or subsidy schemes introduced by Member States (known as "State aid") that distort or

threaten to distort competition in the internal market. TFEU arts. 107 & 108.

      The integrity of the EU legal order (including the internal market) is safeguarded by the

EU judicial system, which consists of Member State courts and the Court of Justice. *See*

*Protection of intra-EU investment*, at 20–26. The keystone of that judicial system is the

preliminary ruling procedure provided for in Article 267 of the TFEU, whereby national courts

may (and, where they are courts of final instance, must) refer any relevant question of

interpretation and application of EU law raised in proceedings before them to the Court of

---

[4] For an overview of the EU internal market rules, see Commission Communication to the European Parliament and Council on Protection of intra-EU investment (July 19, 2018), COM(2018) 547, at 3–4, https://bit.ly/2XtniBb [hereinafter "*Protection of intra-EU investment*"].

Justice for a preliminary ruling.  In addition, Article 344 of the TFEU prohibits Member States from creating dispute settlement mechanisms other than those set out in the EU Treaties on any matters implicating EU law.  These two fundamental provisions provide the Court of Justice with exclusive jurisdiction to issue final and binding interpretations of EU law and thus guarantee the correct and uniform application of EU law in all the numerous areas in which it is applicable.  In this manner, Articles 267 and 344 of the TFEU "ensure that the specific characteristics and the autonomy of the EU legal order are preserved."  Opinion 2/13, ¶ 174; *Achmea*, ¶ 35.

In accordance with the doctrines established by the Court of Justice as far back as the 1960s, EU law enjoys primacy over any competing rules generated by EU Member States, whether by domestic legislation or international treaty.  The primacy of EU law, recognized and accepted by all Member States, is fundamental to the achievement of the ambitious goals set out in the EU Treaties.  Permitting Member States to deviate from the Treaties through conflicting domestic measures or *inter se* international agreements would severely undermine those goals.  In other words, EU law has a mandatory character for EU Member States and (where applicable) their nationals, and can only be changed in the manner set forth in the EU Treaties.

Finally, the relations between EU Member States are governed by the principle of "mutual trust," including the trust in each others' judiciaries, which, in the words of the Court of Justice, is what "allows an area without internal borders to be created and maintained."  Opinion 2/13, ¶ 191.  The principles of autonomy, primacy, effective implementation of EU law, and mutual trust are central to a proper understanding of the issues in dispute in this case.

### B.    The Energy Charter Treaty ("ECT")

As set out in great detail in the Commission's *amicus curiae* brief submitted in the *Eiser* annulment proceedings, *see* Decl. of Miriam Harwood, Ex. 3, ¶¶ 85–89, ECF No. 16-3 ("COM

*Eiser* amicus"), the ECT[5] was essentially the brainchild of the EU.  The ECT was concluded on the initiative of the EU, based on the European Energy Charter prepared by the EU, at an energy conference convened and funded by the EU.

The purpose of the ECT was to create a framework for energy cooperation between, on the one hand, the EU, and, on the other, the former communist countries of Central and Eastern Europe.  That cooperation framework was intended to facilitate those countries' transition to the market economy, to prepare them for eventual accession to the EU and to enhance energy security, efficiency and cooperation throughout the continent of Europe and its immediate vicinity by extending the free-market principles of the EU's existing internal market and energy policy beyond the Union's borders.

The ECT was thus an instrument of the EU's external energy policy, in which the EU and its Member States acted as a single block.[6]  However, the EU and its Member States never intended the ECT to affect intra-EU relations.  The EU's internal energy policy consists of an elaborate system of rules based on the EU Treaties and EU legislation designed to ensure the achievement of a single internal market for energy, including full protection for energy investors under the EU's internal market rules.  The elaboration of those rules had begun before the negotiation of the ECT—as recognized in the objectives of the European Energy Charter, the precursor to the ECT and to which the ECT refers.[7]

---

[5] Energy Charter Treaty and its Protocol on Energy Efficiency and Related Environmental Aspects, *adopted* Dec. 17, 1994, *entered into force* April 16, 1998, 2080 U.N.T.S 95 (1995) ("ECT").

[6] The ECT was signed by the EU as well as its Member States because at the time, the EU did not possess full external competence over all matters  to which the ECT applied.

[7] The preamble to the European Energy Charter, a nonbinding declaration now signed by 66 countries, states that the parties adopting the declaration are: "Assured of support from the European Community, particularly through completion of its internal energy market; Aware of the obligations under major relevant multilateral agreements, of the wide range of international energy cooperation, and of the extensive activities by existing international organisations in the energy field and willing to take full advantage of the expertise of these organisations in

EU law does not permit EU Member States (or, indeed, the EU itself) to modify or replace those rules by an international treaty such as the ECT; nor was it ever the Member States' intention to do so.  On the contrary, the ECT makes clear that acts of EU law are binding on EU Member States as a matter not only of EU law, but also of the ECT itself.  Specifically, Article 1(3) of the ECT recognizes that certain contracting states have "transferred competence" to a "Regional Economic Integration Organization" such as the EU, "over certain matters a number of which are governed by [the ECT], including the authority to take decisions binding on them in respect of those matters."  Art. 1(3).  In other words, it was clear from the outset that EU Member States had already delegated authority to the EU to regulate the internal energy market, as well as competition law and "State aid" control (i.e., the regulation of Member States' provision of subsidies or other forms of government support to selected companies).[8]

Article 1(3) also recognizes the dynamic nature of contracting states' transfer of competences and decision-making to regional organizations like the EU.  EU Member States are subject to and bound by an evolving body of EU law.  In this regard, it bears noting that the Court of Justice has recognized that, as a result of the Renewable Energy Directive—Spain's implementation of which forms the basis of the arbitration underlying this case—the EU has exclusive external competence for renewable energy policy.  Case C-66/13, *Green Network SpA v. Autorità per l'energia elettrica e il gas*, 26 Nov. 2014, EU:C:2014:2399, ¶ 65.

In sum, it was always understood that the ECT would create rights and obligations vis-à-vis third countries, not within the internal energy market, which remains governed by the EU

---

furthering the objectives of the Charter."  Concluding Document of the Hague Conference on the European Energy Charter, 17 Dec. 1991.  Article 2 of the ECT specifically acknowledges the relevance of the European Energy Charter: "This Treaty [the ECT] establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the [European Energy] Charter."

[8] For more on State aid, see *infra* p.16.

Treaties.[9]

## C.     The *Achmea* Judgment

Intra-EU investor-state arbitration is a relatively recent phenomenon that arose as a result of the 2004 accession to the Union of ten Central and Eastern European States that had bilateral investment treaties ("BITs") with existing EU Member States—as well as certain EU investors' ability to convince arbitral tribunals that investor-State arbitration provisions like Article 26 of the ECT entitled them to initiate such arbitration against other EU Member States.  From the outset, the Commission took the position that the EU Treaties precluded intra-EU investment treaties in general as well as intra-EU investment arbitration in particular, and intervened in numerous intra-EU investment proceedings arguing accordingly.

One such proceeding was *Achmea B.V. v. Slovak Republic*, an arbitration brought on the basis of a BIT between the Slovak Republic and the Netherlands.  In that case, both the Slovak Republic and the Commission argued that arbitration under the BIT contravened several fundamental principles derived from the EU Treaties, and, in particular, undermined the integrity of the EU's judicial system secured in Articles 267 and 344 of the TFEU, and thus the effectiveness and mandatory nature of the EU Treaties. However, the *Achmea* arbitral tribunal rejected those arguments and adopted its own interpretation of the EU Treaties, which denied the existence of any conflict between the EU Treaties and the BIT.  Consequently, the *Achmea* arbitral tribunal exercised jurisdiction and proceeded to issue an award in the investor's favor.

---

[9] That the ECT does not specifically provide that Article 26 is inapplicable to intra-EU disputes (by means of a so-called "disconnection clause") is irrelevant.  Disconnection clauses serve to notify non-EU Member States that are parties to a multilateral treaty that EU law will apply as between EU Member States that are also parties to the treaty.  They have no bearing on intra-EU relations.  As one commentator has put it, the "failure to [include a disconnection clause in a multilateral treaty] would not alter the Union law obligation whereby Union law takes precedence as regards Member States' relations *inter se*."  M. Cremona, *Disconnection Clauses in EU Law and Practice*, in *Mixed Agreements Revisited: The EU and its Member States in the World* 166 (Hillion & Koutrakos eds. 2010); *see also* Reply Decl. of Steffen Hindelang, ¶¶ 29–33, ECF No. 25-3.

The Slovak Republic sought to set aside the award in Germany, where the arbitration was seated. Pursuant to Article 267 of the TFEU, the *Bundesgerichtshof* (Federal Court of Justice, the highest civil court in Germany) sought a preliminary ruling from the EU Court of Justice clarifying whether Articles 267 and 344 of the TFEU precluded the application of the arbitration provision at issue.

The EU Court of Justice, sitting as a Grand Chamber of fifteen distinguished judges—a configuration reserved for matters of high precedential importance—answered that question in the affirmative. Drawing on consistent prior case law and the general principles of autonomy and mutual trust discussed above, the Court concluded that disputes before intra-EU investor-state tribunals may well give rise to questions of EU law. However, because such tribunals are deliberately placed outside the EU judicial system—and thus unable to refer any questions of EU law that may arise to the Court of Justice—there is no mechanism to ensure that the disputes brought before them will be "resolved in a manner that ensures the full effectiveness of EU law." *Achmea*, ¶ 56. Accordingly, the Court of Justice held that Articles 267 and 344 of the TFEU "must be interpreted as precluding a provision in an international agreement concluded between Member States" that permits "an investor from one of those Member States … in the event of a dispute concerning investments in the other Member States, [t]o bring proceedings against the latter Member State before an arbitral tribunal … ." *Achmea*, ¶ 60. In other words, the *Achmea* judgment confirmed that the TFEU had always prohibited EU Member States from offering to resolve intra-EU investor-State disputes before international arbitral tribunals.

Following the *Achmea* judgment, the German *Bundesgerichtshof* duly annulled the underlying *Achmea* award at its seat, on the grounds that no valid arbitration agreement existed.

**D.    EU Member States' declarations on the legal consequences of the *Achmea* Judgment**

On January 15 and 16, 2019, all EU Member States issued, in substance, the same declaration setting forth the EU's position on the legal consequences of the *Achmea* judgment as regards intra-EU BITs.  In particular, they confirmed the long-standing principle of primacy of EU law over intra-EU agreements and explained that "all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to Union law and thus inapplicable. ... An arbitral tribunal established on the basis of such investor-State arbitration clauses lacks jurisdiction, due to a lack of a valid offer to arbitrate by the Member State party to the underlying bilateral investment treaty."  Ex. A; *see also* Exs. B & C.[10]

The vast majority of the Member States (22 out of 28) further noted that "[a]rbitral tribunals have interpreted the [ECT] as also containing an investor-State arbitration clause applicable between Member States.  Interpreted in such a manner, that clause would be incompatible with the [EU] Treaties and thus would have to be disapplied."  Ex. A.  The Member States thus undertook, among other things, to inform investment tribunals about the legal consequences of the *Achmea* judgment in all pending intra-EU investment arbitrations (whether based on BITs or the ECT), and to request all state courts—including courts outside the EU—to set aside or decline to enforce any intra-EU investment arbitration awards due to lack of valid consent to arbitration.  Ex. A.

Five Member States issued a separate declaration in which they refrained from taking a

---

[10] Attached as Exhibits A, B, and C are true and correct copies of the Declaration of the Representatives of the Governments of the Member States, of 15 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, https://bit.ly/2QXx36m; the Declaration of the Representatives of the Governments of the Member States, of 16 January on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, https://bit.ly/2Xi4C7H; and the Declaration of the Government of Hungary, of 16 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, https://bit.ly/2Et8wTD.

position on the status of the ECT, given that the issue was being litigated in national courts in the EU.  Ex. B.  One Member State (Hungary) issued an individual declaration opining that "the *Achmea* judgment concerns only intra-EU bilateral investment treaties" and "is silent on the investor-state arbitration clause in" the ECT.  Ex. C.  Notably, no Member State took the view that intra-EU ECT arbitration was compatible with, and permitted under, the international obligations incumbent upon Member States under the EU Treaties.

## ARGUMENT

I.     **The Energy Charter Treaty, properly interpreted under the rules of customary international law on treaty interpretation, does not apply intra-EU.**

Customary international law requires the ECT to be "interpreted in good faith, in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."  Vienna Convention on the Law of Treaties art. 31(1), *opened for signature* May 23, 1969, 1155 U.N.T.S. 331 ("VCLT").  Furthermore, the law *requires* the interpreter to take into account (i.e., prohibits the interpreter to disregard) "any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty" and "any relevant rules of international law applicable in the relations between the parties."  *Id.* art. 31(3)(c).  Any remaining ambiguities or obscurities in the meaning of the treaty may be resolved by recourse to, inter alia, the circumstances of the treaty's conclusion.  *Id.* art. 32.  Treaty interpretation is a "single combined operation" without any hierarchy between interpretative elements.  Sir Humphrey Waldock (Special Rapporteur on the Law of Treaties), *Sixth Report on the Law of Treaties*, UN Doc. A/CN.4/186 and Add.1-7, [1966] 2 Y.B. Int'l L. Comm'n, 95 & 219.

As set out *supra* pp. 6–7 (and in much greater detail in the Commission's *amicus curiae* submission in the *Eiser* annulment proceedings, ECF No. 16-3), the historical context in which

the ECT came about clearly indicates that it was not intended to bind EU Member States *inter se*. This also follows from the text of the ECT's provisions, which, among other things, acknowledge the EU's powers to make binding decisions in respect of its Member States, ECT art. 1(3), and provide that the EU and its Member States shall vote at the Energy Charter Conference as a single block, *id.* art. 36(7). *See supra* pp. 8–9. Furthermore, with specific regard to investor-State arbitration under the ECT, the EU and its Member States submitted a declaration showing that they envisaged that provision to be used for claims by *third-country* investors (in which case, the EU and the Member States reserved the right to designate the proper respondent, depending on the internal division of competences between the Member States and the Union). Statement submitted by the European Communities to the Secretariat of the Energy Charter Treaty pursuant to Article 26(3)(b)(iii) of the Energy Charter Treaty, [1998] O.J. L69/115. The vast majority of the Member States reconfirmed this position in the declarations issued on 15 and 16 January 2019, *see supra* n.10, as did the Council of the EU when authorizing the filing of this brief, *see supra* n.2. The Contracting Parties' post-ratification interpretations of an international treaty are entitled to deference. *See Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982).[11]

Article 26 of the ECT creates investor-state jurisdiction in "Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former." The terms "Investor," "Contracting Party" and "Area" are, in turn, defined in Article 1 of the ECT. In light of the context, the object and purpose of the ECT as an instrument of the EU's external policy, and the circumstances of the ECT's conclusion as

---

[11] That the ECT, properly interpreted, does not apply intra-EU disposes of any perceived incongruity in the fact that the Commission has not commenced any proceedings charging that Member States that refuse to withdraw from the ECT are in violation of EU law. *See* Pet'rs' Resp. to Spain's Mot. to Dismiss ("Resp."), at 29, ECF No. 23. Such proceedings are not necessary because, properly interpreted, the ECT presents no conflict with EU law.

set out *supra* pp. 6–9, the ordinary meaning of these provisions must be understood as excluding EU "Investors" investing in the "Area" of the EU.  Such investors are not "Investor[s] of another Contracting Party" in relation to EU Member States. Rather, they are "Investors" of one "Contracting Party" (the EU), making investments in the "Area" of that same Contracting Party. Such investors thus invest in "their own economic area," Opinion of Advocate General Bot, Court of Justice Opinion 1/17 ("EU-Canada Comprehensive Economic and Trade Agreement"), Request for an opinion by the Kingdom of Belgium (ECLI:EU:C:2019:72), ¶ 207, https://bit.ly/2BPbyA0, and are not "foreign" investors for whom the investor-State mechanism in the ECT was intended.[12]

## II.     The EU Treaties preclude Member States from offering to arbitrate intra-EU disputes under the Energy Charter Treaty

In the alternative, even assuming the ECT could be interpreted to apply intra-EU, the application of Article 26 of the ECT to intra-EU disputes would be contrary to the TFEU as interpreted by the Court of Justice in *Achmea*.  Given the prevalence of the TFEU over all other international agreements between EU Member States, any offer of intra-EU arbitration contained in the ECT is therefore invalid and ineffective and cannot have given rise to a valid arbitration agreement.

### A.     Intra-EU arbitration under Article 26 conflicts with the EU Treaties and fundamental principles of EU law

Contrary to Petitioners' arguments, the *Achmea* judgment is not "limited" to the bilateral investment treaty at issue in the *Achmea* dispute, or, indeed, any specific treaty.  Resp. 7.  In accordance with its mandate under Article 267 of the TFEU, the Court of Justice in *Achmea* was only concerned with the interpretation of *EU law*—specifically, Articles 267 and 344 of the

---

[12] The Advocate General's duty is to provide impartial, independent submissions on certain cases brought before the Court of Justice in order to assist the Court in its judicial task.

TFEU).  That binding interpretation is not (and cannot, as matter of EU law) be "limited" to the particular facts in the case which gave rise to it.  It applies *erga omnes*, and the manner in which affects a particular set of factual circumstances—including a particular treaty at issue in a given case—is a matter for the adjudicator of fact.

In this case, the interpretation of Article 267 and 344 of the TFEU adopted in *Achmea* applies to intra-EU investor-State arbitration under the ECT with at least the same force as it does to intra-EU investor-state arbitration under a BIT.

As pointed out in a recent opinion by the Court of Justice Advocate General, the *Achmea* judgment is primarily based on "the idea that the judicial system of the European Union, in so far as it is based on mutual trust and sincere cooperation between Member States, is inherently incompatible with the possibility of Member States establishing, in their bilateral relations, a parallel dispute settlement mechanism which may concern the interpretation and application of EU law."  Bot, Opinion 1/17, ¶ 105.

Just as in investment disputes arising out of intra-EU investments under a BIT, disputes arising out of intra-EU investments under the ECT "are liable to relate to the interpretation or application of EU law."  *Achmea*, ¶ 39.  But arbitral tribunals convened under the ECT are no more a part of the EU judicial system than are arbitral tribunals convened under BITs.  Like the arbitral tribunal in *Achmea*, an investor-State arbitral tribunal constituted under the ECT lies beyond the supervision and control of the EU system, and thus its pronouncements on matters of EU law pose a threat to the integrity of the EU legal order and the principles of sincere cooperation and mutual trust applicable between the EU and its Member States.

The *Eiser* dispute itself is a case in point.  *First*, Petitioners' claims in the underlying arbitration concerned Spanish measures to support renewable energy, which were intended to

achieve the renewable energy targets laid down in the EU's Renewable Energy Directive, which is part of the EU's internal market energy legislation. Petitioners' complaint under the ECT was that Spain "unfairly and inequitably" denied them a level of support to which they claimed to be entitled.[13] However, in order to ensure fair competition in the internal market, Article 107 of the TFEU prohibits Member States from providing undertakings with *any* public support (known as "State aid"), unless such support was first notified to the Commission and specifically approved by it on defined public policy grounds and in strict compliance with the principles of necessity and proportionality. In its capacity as the Union's State aid regulator, the Commission investigates potential State aid measures and renders legally binding decisions for Member States and investors based on the provisions of the EU Treaties.

The Court of Justice, in line with the Commission's consistent administrative practice, has held that the Spanish support scheme at issue in the underlying arbitration constitutes State aid, which cannot lawfully be granted without the Commission's approval. *See* Case C-275/13, *Elcogás SA v. Administración del Estado*, 22 Oct. 2014, EU:C:2014:2314; *see also, e.g.*, Commission Decision on State Aid, SA.40348, slip op. (Nov. 10, 2017)[14]; Commission Decision on State Aid, SA.38517, 2015 O.J. (L 232) 43 (same with respect to intra-EU arbitral award issued against Romania); Commission Decision on State Aid, SA.40171, slip op. (Nov. 28, 2016). Spain drew the *Eiser* arbitral tribunal's attention to this rule, and the Commission sought leave to file an amicus brief before the arbitral tribunal, requesting that the tribunal take it into account as a matter of binding international law applicable in the dispute under Article 26(6) of the ECT. Award, ¶ 173 (ECF No. 1-1); COM *Eiser* amicus, ECF No. 16-3, at ¶ 96. However,

---

[13] Petitioners' claims are based on Article 10 of the ECT, which provides that Contracting Parties shall accord "fair and equitable treatment" to investments of investors of other Contracting Parties.

[14] A copy of this decision is attached as Exhibit F.

the arbitral tribunal denied the Commission leave to submit its amicus brief, Award, ¶ 70, and—beyond a brief mention in a single sentence—disregarded the arguments about EU State aid law put forward by Spain, Award, ¶ 173.

Having thus ignored binding EU law, which is also binding under Article 1(3) of the ECT, the arbitral tribunal proceeded to order Spain to pay Petitioners compensation for the subsidies Petitioners had claimed.  As a result of Petitioners' request for enforcement in this Court, Spain is now faced with extra-EU judicial proceedings to enforce the *Eiser* arbitral tribunal's award—which could place Spain in the impossible position of having to choose between complying with the order of an enforcing court or violating legally binding fundamental principles, legally binding treaty provisions, and legally binding decisions of EU law.

*Second*, Spain argued before the *Eiser* arbitral tribunal that EU law deprived the tribunal of jurisdiction, because the fundamental conflict between the investment arbitration mechanism contained in Article 26 of the ECT (when applied intra-EU) and Article 344 of the TFEU had to be resolved in favor of EU law.  In response to that argument, the arbitral tribunal proceeded to interpret Article 344 of the TFEU in a manner that led it to conclude that the provision was "not implicated here" and that there was "no rule of EU law preventing EU Member States to submit to arbitration their disputes with investors of other Member States."  Award, ¶ 204.  But as the Court of Justice—the ultimate authority on matters of EU law—later confirmed in the *Achmea* judgment, Article 344 was *very much* "implicated" in matters of intra-EU investor-State arbitration.  Indeed, Article 344 itself constitutes the very rule of EU law whose existence the *Eiser* arbitral tribunal denied.  *Achmea*, ¶ 62.

The *Eiser* arbitral tribunal has thus both disregarded and manifestly misinterpreted binding rules of EU law.  Given the impossibility of having this failure rectified by the EU's

judicial system, this outcome constitutes the precise challenge to the autonomy and effectiveness of EU law that the Court of Justice in the *Achmea* judgment sought to prevent.

Allowing enforcement of awards like the one in this case would enable both EU Member States and their investors to escape otherwise binding, mandatory, and applicable rules of EU law by convincing private international arbitral tribunals positioned outside the EU's judicial system that such rules are not actually "implicated." That result would render EU law—and, in particular, EU competition law—a dead letter, providing a clear practical illustration of the reasons why the *Achmea* judgment is squarely applicable to—and, indeed, intended for—cases, such as the present one.

Questions of retroactivity present no obstacle to applying *Achmea*'s reasoning here. As a matter of EU law, the judgments of the Court of Justice generally apply *ex tunc*. As the Court has explained, "the interpretation which … the Court gives to a rule of European Union law clarifies and defines the meaning and scope of that rule as it must be, or ought to have been, understood and applied from the time of its coming into force. It follows that the rule as thus interpreted may, and must, be applied by the courts to legal relationships arising and established before the judgment ruling on the request for interpretation … ." Case 262/12, *Vent de Colère!*, 19 Dec. 2013, ECLI:EU:C:2013:851, ¶ 39. Only in "exceptional[]" circumstances will the Court impose temporal limitations on an interpretation of EU law, *id.* ¶ 40, and the Court found no such circumstances in the *Achmea* case.[15]

---

[15] The government of one Member State had, indeed, sought the imposition of such a limitation in the *Achmea* proceedings, but the Court of Justice did not grant that request.

**B.      The conflict between ECT Article 26 and the EU Treaties must be resolved in favor of EU law.**

The issue of treaty conflict is an issue of international law.  Where two or more treaties impose conflicting obligations, customary international law governs the resolution of those conflicts.  While customary international law provides residual rules for the resolution of treaty conflict, *see* VCLT arts. 30 & 59, it is well recognized that that sovereign States may regulate the relationship between present and future international treaties between those same States by special rules, including by entering into a treaty that takes precedence over all others.[16]

EU Member States have done precisely that by means of the EU Treaties, which establish the primacy of EU law over Member States' other international obligations *inter se*.  In other words, primacy of EU law is a special rule of conflict pursuant to international law.  As explained *supra* p.6, the principle of primacy of EU law applies equally to domestic law and intra-EU international treaties: a rule derived inter alia from Article 351 of the TFEU.[17]  Indeed, for that purpose, "rules resulting from international agreements by which the Member State concerned is bound" form part of "domestic law."  *See, e.g.*, Opinion of Advocate General Mazák, *Bogiatzi v. Deutscher Luftpool et al.*, Case C-301/08, [2009] E.C.R. I-10185, ¶ 55; Marcus Klamert, *The Principle of Loyalty in EU Law* 180 (2014).  And in Declaration No. 17 to

---

[16] *See, e.g.*, Report of the Study Group of the Int'l Law Comm'n, *Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law*, UN Doc. No. A/CN.4/L.682 (2006), ¶ 470 (referring to the "truism that 'general international law' is applied generally and foresees the eventuality that another rule of conventional international law is applicable in the relations between the parties"); O. Dörr & K. Schmalenbach, *Vienna Convention on the Law of Treaties: A Commentary* 546 (2012); J. Pauwelyn, *Conflict of Norms in Public International Law: How WTO Law Relates to Other Rules of International Law* 363 (2003).

[17] As confirmed in consistent Court of Justice case law, Article 351 of the TFEU, which safeguards the effects of international obligations of EU Member States vis-à-vis third countries where such obligations predate the entry into force of the EU Treaties, necessarily means that international obligations of EU Member States *inter se* are not protected from the effects of the EU Treaties and are subject to their primacy. *See infra* pp. 20-22 (discussing *Commission v. Italy* and subsequent cases); *see also, e.g.*, Case 478/07, *Budějovický Budvar v. Rudolf Ammersin GmBH*, [2009] E.C.R. I-07721, ¶¶ 97–99; Case 121/85, *Conegate Ltd. v. HM Customs & Excise*, [1986] E.C.R. 01007, EU:C:1986:114, ¶ 25; Case 235/87, *Annunziata Matteucci v Communauté française de Belgique*, [1988] E.C.R. 05589, EU:C:1988:460, ¶ 22; Case 3/91, *Exportur v. LOR*, [1992] E.C.R. I-05529, EU:C:1992:420, ¶ 8.

the 2007 Lisbon Treaty (amending the EU Treaties) the Member States expressly confirmed the primacy of Union law over "domestic legal provisions, *however framed.*" Ex. D.[18]

This rule resolving conflicts in favor of the TFEU over other international agreements between Member States is uncontroversial. The International Law Commission acknowledged the rule in its Report on Fragmentation of International Law, which unequivocally recognized the "absolute precedence" of the TFEU over any intra-EU international agreements. UN Doc. No. A/CN.4/L.682 (2006), ¶ 283. The German Federal Supreme Court was likewise clear in its recent order setting aside the arbitral award in the *Achmea* case:

> [B]y acceding to the EU the Member States have limited their discretionary powers under international law and have mutually agreed to renounce the exercise of any international treaty rights which conflict with EU law. In view of this, the primacy of the provisions of EU law has the consequence that a rule in an intra-EU agreement between Member States which is incompatible with EU law is also inapplicable as a rule in an international treaty. The nationals of the Member States concerned cannot rely on the Member States' prior international law obligations that are contrary to EU law.

Ex. E, ¶ 41.[19] The tribunal in *Electrabel v. Hungary* (to the Commission's knowledge, the only investor-State tribunal to have engaged in a detailed and comprehensive analysis of the issue) likewise concluded that EU-inconsistent treaties "do not survive" within the EU. *Electrabel SA v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, Nov. 25, 2015, ¶ 4.183.

It is important to emphasize that the principle of primacy of EU law also extends to any intra-EU application of multilateral treaties, even where third countries are also parties to those treaties. Based on Article 351 of the TFEU, the Court of Justice has held in a number of judgments—beginning with the 1962 case of *Commission v. Italy*, Case 10-61, [1962] E.C.R. 1—that such treaties do not apply within the EU if they are contrary to any rule of EU

---

[18] This declaration is attached as Exhibit D. Declarations Annexed to the Final Act of the Intergovernmental Conference which Adopted the Treaty of Lisbon signed on 13 December 2007, 2008 O.J. C115/335, at 344.

[19] *Bundesgerichtshof* Order, *Slovak Republic v. Achmea B.V.* (Oct. 31, 2018), I ZB 2/15 (English translation).

law, unless they affect the rights of third countries.

*Commission v. Italy* itself concerned the General Agreement on Tariffs and Trade ("GATT"), a multilateral treaty to which non-EU Member States were also party. In later cases, the Court applied the rule set forth in *Commission v. Italy* to numerous other multilateral treaties, such as the Stresa Convention on Cheeses, *see* Case 286/86, *Ministère Public v. Deserbais*, [1988] E.C.R. 4907; the Berne Convention for the Protection of Literary and Artistic Works, *see* Joined Cases C-241/91 P and C-242/91 P, *RTE and ITP v. Commission*, [1995] E.C.R. I-743; the Council of Europe Convention on the Equivalence of Diplomas, *see* Case 147/03, *Commission v. Austria*, [2005] E.C.R. I-5969; and the Warsaw Convention on International Carriage by Air, *see* Case C-301/08, *Bogiatzi v. Deutscher Luftpool et al.*, [2009] E.C.R. I-10185. All obligations contained in these treaties, to the extent they conflicted with the EU Treaties, were not applicable and had to be set aside within the EU.

There is no reason to treat the ECT as an exception to this rule. Indeed, the *Achmea* judgment expressly applies to "international agreements concluded between the Member States" —the exact same term that was used in *Commission v. Italy* to refer to the intra-EU application of GATT. *Compare Achmea* ¶ 62 *with Commission v. Italy*, [1962] E.C.R. at 10. Multilateral treaties providing for intra-EU investment arbitration such as the ECT are thus clearly within the scope of the *Achmea* judgment, for the purposes of which they are no different from purely bilateral agreements.[20] For the same reason, EU law would, if necessary, also prevail over the ICSID Convention as applied among EU Member States.

---

[20] It is irrelevant that EU Member States could "collectively consent" to arbitration under the ECT. Resp. 26. Such "collective consent" is addressed to third countries and their investors, which are not at issue here. By contrast, intra-EU applications of the ECT by definition involve the consent of individual Member States, not their "collective consent" vis-à-vis third parties. Regardless, collective consent would likewise be subject to the principle of the autonomy of EU law and would require safeguards against the international tribunal interpreting EU law in a manner that could bind the EU and its Member States. *See Achmea* ¶ 57; *see also* Bot, Opinion 1/17, ¶ 113.

The fact that the EU itself is a party to the ECT (whereas the BIT in *Achmea* involved only individual Member States) does not obviate the conflict between EU law and the ECT or render the reasoning of *Achmea* inapposite.  The best example is the judgment of the Court of Justice in Case C-459/03, *Commission v. Ireland* ("*Mox Plant*"), 30 May 2006, ECLI:EU:C:2006:345, where the Court held that an inter-State arbitration provision contained in the UN Convention on the Law of the Sea could not be applied in a dispute between two EU Member States, given that (as in *Achmea*) such application would violate Article 344 of the TFEU and the principle of autonomy of EU law.  The fact that the EU was party to UNCLOS (in the same way as it is party to the ECT) did not remove the incompatibility.

In short, as regards intra-EU relations, the TFEU (as interpreted authoritatively by the Court of Justice) unequivocally regulates its relationship with *inter se* international obligations of EU Member States in favor of the absolute precedence of EU law in case of any conflict.  This includes Member States' obligations under multilateral treaties (to the extent the rights of non-Member States remain unaffected), and therefore includes their obligations under the ECT.

It follows from the *Achmea* judgment that any international treaty provision permitting intra-EU investment arbitration is contrary to the TFEU. Article 26 of the ECT is precisely such a provision. Therefore, pursuant to the conflict rule inherent in the TFEU, Article 26 of the ECT cannot apply in intra-EU relations.  The *Eiser* dispute concerns purely intra-EU relations and does not concern any third countries or their investors.  It follows that, in accordance with the well-established conflict rules that apply as between EU Member States, Article 26 of the ECT is inapplicable in this matter and therefore cannot have given rise to a valid arbitration agreement.

III.    **At a minimum, international comity favors allowing the compatibility of intra-EU arbitration under the ECT to be decided within the EU judicial system.**

As the above makes clear, whether intra-EU arbitration pursuant to Article 26 of the ECT is compatible with the EU Treaties raises significant questions that implicate not simply EU law but also the very structure of the EU legal order.  The doctrine of international comity—which permits U.S. courts to dismiss or stay domestic action based on the interests of the United States, the foreign government, and the international community in the resolution of a dispute in a foreign forum—strongly favors permitting these questions to be addressed within the EU judicial system.  *See, e.g.*, *Mujica v. AirScan Inc.*, 771 F.3d 580, 599 (9th Cir. 2014); *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004); *cf., e.g.*, *Mox Plant* Arbitration, ¶¶ 21–28 (declining to rule on matters of EU law, which are "to be decided within the institutions of the European Communities, and particularly by the European Court of Justice").

The EU's position is that intra-EU investment arbitration under the ECT is fundamentally incompatible with EU law—a conclusion that clearly follows from the Court of Justice's recent pronouncement in *Achmea*.  Nevertheless, controversy over this conclusion remains, within academic circles as well as in arbitral practice, as this case shows.  Resolving that controversy touches on matters of vital importance to the EU, including the role and jurisdiction of EU courts, the interpretation and application of EU law by non-EU adjudicatory bodies, and the future of investor-State arbitration within the EU.

These questions are best decided by EU courts, within the EU judicial system.  Proper respect for foreign sovereigns counsels strongly in favor of permitting the enforceability of the Award to be debated and decided by the courts of the EU Member States and ultimately the Court of Justice of the EU.  Indeed, questions about the enforceability of an award rendered by an intra-EU ECT tribunal are already percolating through the EU judicial system.  Thus, in

23

*Novenergia II – Energy & Environment (SCA) v. Spain*, for example, the Swedish courts (the seat of the arbitration in that case) have already suspended enforcement of the arbitral award. Ex. G.[21]  Spain requested that the Swedish court set aside the *Novenergia* award and refer the matter to the Court of Justice for a preliminary ruling.  *Id.*  If that request is granted, the Court of Justice will soon be in a position to provide an authoritative, final and specific decision on the compatibility of intra-EU arbitrations under the ECT with EU law.

In addition, shortly after the *Eiser* award, the Commission issued a decision in the field of State aid, determining that intra-EU investment arbitration under the ECT is precluded and that, as a matter of EU competition law, Spain has a legal obligation not to pay the compensation awarded by any ECT investment tribunal unless and until the Commission authorizes such payment in accordance with the applicable State aid rules.  Commission Decision on State Aid, SA.40348, slip op. (Nov. 10, 2017); *see also* Commission Decision on State Aid, SA.38517, 2015 O.J. (L 232) 43 (same with respect to Romania); Commission Decision on State Aid, SA.40171, slip op. (Nov. 28, 2016) (same with respect to Czech Republic).  This conclusion flows from the Commission's assessment that the payment of the arbitral award against Spain would constitute State aid, combined with the operation of TFEU art. 108(3), which requires a State refrain from implementing any State aid measures pending a final ruling by the Commission.  Petitioners could have challenged that decision in the European courts and could have brought the question of the intra-EU applicability of the ECT swiftly before the forum best placed to deal with it, but chose not to do so.[22]  As a result, Petitioners must respect that decision,

---

[21] Attached as Exhibit G are copies of Spain's request that the Swedish court set aside the award and refer the matter to the Court of Justice for a preliminary ruling (Ex. 1), and the court's decision suspending enforcement of the arbitral award (Ex. 2).

[22] Petitioners are wrong to assert that the Commission's conclusion lacks legal force because it is not contained in the decision's operative part.  Resp. 24 n.39.  In fact, an annulment action would lie against the decision insofar as it

and Spain is precluded as a matter of EU law from implementing the award, absent authorization from the Commission. *See* TFEU art. 108(3). Spain has notified the *Eiser* award to the Commission. The Commission is currently examining that notification, and has reminded Spain of its obligation not to pay out the award prior to authorization by the Commission. *See* Harwood Decl., Ex. 4, ECF No. 16-3. If the Commission refuses authorization, Petitioners may seek redress in EU courts.

While the EU's interests in these issues are immense, the United States has no interest in the answers to these questions, nor even in the outcome of individual intra-EU investor-State disputes. None of the parties to the underlying dispute between Petitioners and Spain are U.S. citizens, no U.S. property is at issue, and none of the underlying events took place on U.S. territory. U.S. law is only implicated to the extent that the Petitioners have asserted jurisdiction under the Foreign Sovereign Immunities Act and seek to enforce the award in the United States under the ICSID Convention and 22 U.S.C. § 1650a. Rather than embroil itself in the EU's internal affairs, this Court should dismiss the petition—or, at a minimum, stay enforcement proceedings pending the resolution of the proceedings before the Swedish courts—so that the questions implicated by this dispute may be decided by the courts of the Member States and the EU Court of Justice, all of which have an infinitely greater stake in these issues than U.S. courts.

## CONCLUSION

For the foregoing reasons and those set forth in Respondent's submissions, the Court should grant the Kingdom of Spain's motion to dismiss the petition for lack of subject-matter jurisdiction.

---

finds the arbitral award constitutes State aid. *Cf., e.g.*, Case T-674/11, *TV2 (Danmark) v. Commission*, 24 Sept. 2015, ECLI:EU:T:2015:684, ¶¶ 32–40 ; Joined Cases T-125/97 and T-127/97, *Coca-Cola v. Commission*, [2000] E.C.R. II-1733 ¶¶ 73–93.

Dated: March 13, 2019                          Respectfully submitted,

                                               */s/ R. Stanton Jones*
                                               R. Stanton Jones (D.C. Bar No. 987088)
                                               Sally L. Pei (D.C. Bar No. 1030194)
                                               ARNOLD & PORTER
                                                 KAYE SCHOLER LLP
                                               601 Massachusetts Ave., NW
                                               Washington, DC  20001-3743
                                               T: (202) 942-5000
                                               stanton.jones@arnoldporter.com

                                               Dmitri Evseev (D.C. Bar No. 487747)
                                               *Pro hac vice* application to be filed
                                               ARNOLD & PORTER
                                                 KAYE SCHOLER LLP
                                               Tower 42
                                               25 Old Broad Street
                                               London EC2N 1HQ
                                               UNITED KINGDOM
                                               T: +44 (0)20 7786 6100
                                               dmitri.evseev@arnoldporter.com

                                  *Counsel for Proposed Amicus Curiae*