# EXHIBIT 63



# Steiner & Woods
# EU Law

THIRTEENTH EDITION

Lorna Woods

Philippa Watson

Marios Costa



OXFORD
UNIVERSITY PRESS

## OXFORD
### UNIVERSITY PRESS

Great Clarendon Street, Oxford, OX2 6DP,
United Kingdom

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide. Oxford is a registered trade mark of
Oxford University Press in the UK and in certain other countries

© Lorna Woods, Philippa Watson and Marios Costa 2017

The moral rights of the authors have been asserted

Tenth edition 2009
Eleventh edition 2012
Twelfth edition 2014

Impression: 1

All rights reserved. No part of this publication may be reproduced, stored in
a retrieval system, or transmitted, in any form or by any means, without the
prior permission in writing of Oxford University Press, or as expressly permitted
by law, by licence or under terms agreed with the appropriate reprographics
rights organization. Enquiries concerning reproduction outside the scope of the
above should be sent to the Rights Department, Oxford University Press, at the
address above

You must not circulate this work in any other form
and you must impose this same condition on any acquirer

Public sector information reproduced under Open Government Licence v3.0
(http://www.nationalarchives.gov.uk/doc/open-government-licence/open-government-licence.htm)

Published in the United States of America by Oxford University Press
198 Madison Avenue, New York, NY 10016, United States of America

British Library Cataloguing in Publication Data
Data available

Library of Congress Control Number: 2017933152

ISBN 978-0-19-879561-2

Printed in Great Britain by
Bell & Bain Ltd., Glasgow

Links to third party websites are provided by Oxford in good faith and
for information only. Oxford disclaims any responsibility for the materials
contained in any third party website referenced in this work.

# Outline contents

Abbreviations                                                        xxi
Table of cases                                                       xxv
Table of legislation                                                lxxix

**PART I**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**1  From EEC to EU: a brief history of the development of the Union**        3
**2  Institutions of the Union: composition and powers**            25
**3  Scope of the EU Treaty: laws and lawmaking**                   55
**4  Principle of supremacy of EU law**                             92
**5  Principles of direct applicability and direct effects**       113
**6  General principles of law**                                   146

**PART II**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**7   Framework for enforcement**                                  185
**8   Remedies in national courts**                                192
**9   State liability**                                            211
**10  The preliminary rulings procedure**                          225
**11  Enforcement actions**                                        250
**12  Direct action for annulment**                                266
**13  Action for failure to act**                                  294
**14  Union liability in tort: action for damages**                303

**PART III**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**15  Introduction to the internal market**                        323
**16  Harmonisation**                                              335
**17  Customs union**                                              353
**18  Free movement of goods**                                     370

| 19 | Derogation from the free movement of goods | 399 |
| 20 | Free movement of payments and capital | 416 |
| 21 | Citizenship: rights of free movement and residence | 435 |
| 22 | Economic rights: workers, establishment and services | 469 |
| 23 | Free movement: social rights | 505 |
| 24 | Right to receive services | 527 |
| 25 | Free movement of persons: limitations on grounds of public policy, public security or public health | 537 |
| 26 | The Area of Freedom, Security and Justice: EU justice and home affairs law and policy | 554 |
| 27 | Discrimination | 577 |
| 28 | Introduction to EU competition policy | 628 |
| 29 | EU competition law | 638 |
| | Further reading | 683 |
| | Index | 689 |



# From EEC to EU:
# a brief history of the
# development of the Union

| | | |
|---|---|---|
| 1.1 | Introduction | 3 |
| 1.2 | Development prior to the Single European Act | 4 |
| 1.3 | Enlargement | 4 |
| 1.4 | Kick-starting the internal market: the Single European Act | 6 |
| 1.5 | Wider or deeper? Treaty on European Union | 6 |
| 1.6 | Impact of the Treaty of Amsterdam | 8 |
| 1.7 | Preparations for enlargement: Treaty of Nice | 10 |
| 1.8 | Doomed: Treaty establishing a Constitution for Europe | 11 |
| 1.9 | Democracy and effectiveness? Treaty of Lisbon | 13 |
| 1.10 | Withdrawal under Article 50 TEU and Brexit | 17 |
| 1.11 | Theories of integration | 20 |
| 1.12 | Conflicting attitudes towards the Union | 21 |
| 1.13 | Conclusions: the future | 22 |

## 1.1 Introduction

The European Union (EU) is no ordinary international law organisation. It is unique but its extra-ordinary success has led it to be a model for regional trading organisations across the globe. The purpose of this chapter is to provide a brief overview of how the European Economic Community (EEC) developed into the European Union, identifying key points. The development of the organisation will be traced chronologically, by reference to the main treaties amending the original Treaty of Rome (1957): the Single European Act (1987); the Maastricht Treaty (1993); the Amsterdam Treaty (1999); the Nice Treaty (2003); and, most recently, the Lisbon Treaty (2009). Certain underlying themes and tensions will be identified, as well as the theories that have been used to explain the development of the EU. There are three vectors of development:

- enlargement;
- substantive scope of the EU's activities;
- the nature of the EU and the way it works.

It is these perennial issues, or the way the Union institutions and the Member States choose to deal with them, that have shaped the way the EU works and, indeed, will shape the future of the EU.

## 1.2  Development prior to the Single European Act

The EEC came into existence following the signing of the Treaty of Rome in 1957 by the six original Member States: France, Germany, Italy, Belgium, The Netherlands and Luxembourg. A second Rome Treaty signed by the same six states created the European Atomic Energy Community (Euratom) on the same day. These treaties, but particularly the EEC Treaty, represented the culmination of a movement towards international cooperation, which had been growing throughout the twentieth century, and which was given particular impetus in Europe following the devastation inflicted by the Second World War.

The institutional model for the EEC had already been provided by the European Coal and Steel Community (ECSC) set up in 1951 with the Treaty of Paris by the same six states. However, the substantive scope of the EEC was altogether wider. The ECSC was concerned only with creating a single market in coal and steel; the EEC was designed to create an economic community. Although its aims were primarily economic, to create a single 'common' market in Europe, they were not exclusively so. The founder members of the EEC were fired by ideals as well as economic practicalities. As stated in the preamble to the EEC Treaty, its signatories were 'Determined to lay the foundations of an ever closer union among the peoples of Europe', and 'Resolved by thus pooling their resources to preserve and strengthen peace and liberty'.

Although the institutional framework of the EEC, as of Euratom, was modelled on that of the ECSC, the three communities at the outset held only two institutions in common: the Assembly (subsequently renamed the Parliament) and the European Court of Justice (ECJ). It was not until the Merger Treaty 1965 that the other two main institutions merged. The High Authority, the executive body of the ECSC, merged with the EEC and Euratom Commission to form what is now the Commission and the Council of Ministers of the ECSC, with that of the EEC and Euratom to become a single Council. Thereafter the three communities continued to function as separate entities, but with shared institutions. The roles and powers of the institutions are discussed in Chapter 2.

In addition to the EU Treaties, there is another agreement, the European Economic Area (EEA) Agreement. It is an agreement providing for a single market between the EU Member States and Iceland, Liechtenstein and Norway. While some EU law applies as a result of the EEA Agreement, its substantive scope is narrower than that of the EU Treaties.

## 1.3  Enlargement

### 1.3.1  Current membership

The UK, Denmark and the Republic of Ireland were the first additional states to join the Communities in 1973. (Norway joined at the same time but subsequently withdrew following a referendum which came out against membership.) This accession was the first of many, which has led the size of the EU to more than quadruple: from 6 to 28, with more states seeking to join.

In 1979 Greece, and in 1986 Spain and Portugal, signed acts of accession bringing the then total membership to 12. Membership increased again with the accession of Austria, Finland and Sweden on 1 January 1995. Norway held a second referendum, which again resulted in a vote against membership. Expansion continued with the largest number of countries joining what had become the EU in one go, ten, acceding in 2004. These new Member States, sometimes referred to as the EU10, are, in alphabetical order: Cyprus, Czech Republic, Estonia, Hungary, Latvia, Lithuania, Malta, Poland, Slovakia and Slovenia, resulting in an EU of 25. Two more Member States joined on 1 January 2007, Bulgaria and Romania, despite some concerns about compliance with the Union *acquis* (see COM(2006) 549 final). Most recently, Croatia became a Member State on 1 July 2013. While further

countries seek to join the EU, there are questions about existing Member States. Notably, the UK held a referendum in which approximately 52 per cent of those voting were in favour of the UK leaving the EU (see 1.10).

### 1.3.2 **Process for joining the EU**

The process of joining the EU involves several stages. Typically, before a country even applies for accession to the EU, it will sign an association agreement, as for some countries being ready to apply for membership itself requires preparation. The aim of the association agreement is to help the would-be candidate country adapt to meet the conditions of EU membership (see 1.3.3). Given the recent history in the Western Balkans, a special process, the Stabilisation and Association Process, has been introduced to deal with the circumstances there. When a country finally formally applies for membership, the Commission prepares an opinion on the country's readiness to begin negoti-ations, which is then presented to the Council. This process of assessing a would-be Member State's progress continues: during the accession period, the Commission will review progress of the country and publish its views on that progress. Assuming a positive decision is made in Council on the coun-try's readiness to join the EU, the applicant country will then be recognised as a candidate country, at which point formal negotiations are opened between the candidate country and the EU. The nego-tiations have the aim of concluding an accession treaty. After the signing of the accession treaty, there is usually a period before the treaty comes into force to allow, inter alia, the acceding state time to complete any internal steps (eg, holding a referendum) necessary for it to accede to the EU.

### 1.3.3 **Conditions for membership**

Before a country can accede to the EU, it must satisfy the terms of Article 49 of the Treaty on European Union (TEU), Article 6 TEU and the Copenhagen Criteria. Article 49 requires that a state be European; Article 6 requires respect for democracy, the rule of law, and respect for human rights. The Copenhagen criteria are the:

- political criterion (respect for democracy and human rights);
- economic criterion (the need for viable market economies and the capacity to cope with competitive pressure and market forces within the EU);
- ability to adopt the Union *acquis* (ie the current body of EU law).

In 1995, the Madrid European Council added a further practical requirement: that the candidate country must adjust its administrative structures and practices so as to ensure the effective imple-mentation of the EU *acquis* in practice. More recently, there has been recognition that the EU itself must be able to cope with continued enlargement.

### 1.3.4 **Beyond enlargement: EU Neighbourhood Policy**

In addition to the interventions and negotiations as part of the EU enlargement, the EU also engages in what is called the European Neighbourhood Policy (ENP). This development is part of the increasing geographic influence of the EU, which extends more broadly than the territories of the Member States. The ENP was originally developed following the European Commission com-munication, 'Wider Europe' (COM(2003) 104 final) and a subsequent communication 'European Neighbourhood Policy: strategy paper' (COM(2004) 373 final) in 2004. It had the aim of preventing divisions occurring between new Member States and their neighbour countries by building upon common values: democracy and human rights; rule of law; good governance; market economy

principles; and sustainable development. There seems to be a double objective. Firstly, it aims to assist the spread of EU values beyond the EU in the interests of creating a wider area of stability and security. The attainment of this area of stability and security is the second objective. The ENP builds on existing agreements and operates through action plans agreed between the EU and individual neighbouring countries. The system works on the basis that the relevant neighbour country agrees to undertake reforms in areas relevant to the 'common values' in return for incentives, including funding and increased access to markets. Progress is monitored.

Finally, it should be noted that the Lisbon Treaty provides a new legal and institutional framework for EU foreign policy (see 1.9.2) and, in particular, provides in Article 8 TEU for the development of a 'special relationship' with neighbouring countries. Whether the objectives of the spread of EU values pulls in the same direction as the EU's security objectives or, rather, is in tension with it, remains to be seen.

## 1.4 Kick-starting the internal market: the Single European Act

An important step in the development of both the EU's institutional processes and its substantive scope took place in 1986 with the signing by the then 12 Member States of the Single European Act (SEA). A White Paper issued by the Commission in 1985 had revealed that many barriers still existed to the achievement of the single internal market. The result was a new treaty, the SEA. The principal purpose of the SEA was to eliminate the remaining barriers to the single internal market within the deadline of 31 December 1992, to be achieved by a massive programme of harmonisation of legislation (see Chapter 16). In addition, the SEA extended the sphere of what was at that stage Community competence and introduced a number of procedural changes designed to accelerate the Community decision-making process (see Chapter 3). The SEA undoubtedly injected a new dynamism. By February 1992, 218 of the 282 proposals, forming the entire programme for the completion of the internal market, had been adopted. Although the 1992 programme reached its termination date, it is important to remember that the provisions the SEA introduced remain and are still used as a basis for legislation (see Chapter 16), as barriers to the internal remain even now (see, eg, the Services Directive, discussed in Chapter 22).

## 1.5 Wider or deeper? Treaty on European Union

The late 1980s saw a growing movement within the Community towards closer European union. In December 1989, two intergovernmental conferences were convened pursuant to cooperation procedures introduced by the SEA to consider the questions of (1) economic and monetary union and (2) political union. The conferences, which lasted for a year, resulted in the signing of the Treaty of Maastricht on 7 February 1992. The Maastricht Treaty is significant in terms of two out of the three vectors identified in 1.1: (1) the increase in the substantive scope of EU competence; and (2) the nature of the EU.

The Maastricht Treaty had the effect of amending the treaty that had established the EEC (Treaty of Rome—the EEC Treaty). It comprised two distinct parts. One part (at that time, Article G), consisting of 86 paragraphs, introduced substantial amendments to the former EEC Treaty, and renamed it the European Community (EC) Treaty. This change of name reflected the Treaty's wider purposes. It was subsequently renamed again by the Treaty of Lisbon (see 1.9).

The second part of the Maastricht Treaty stood as a separate treaty establishing the European Union (Article 1 TEU). It set out a number of general principles and provided specifically for



# Institutions of the Union: composition and powers

| 2.1 | Introduction | 25 |
|-----|------------|-----|
| 2.2 | The institutions | 26 |
| 2.3 | European Parliament (Article 14 TEU; Articles 223–34 TFEU) | 27 |
| 2.4 | European Council (Article 15 TEU; Articles 235–6 TFEU) | 33 |
| 2.5 | Council (Article 16 TEU; Articles 237–43 TFEU) | 34 |
| 2.6 | Commission (Article 17 TEU; Articles 244–50 TFEU) | 38 |
| 2.7 | Economic and Social Committee (Articles 301–4 TFEU) | 43 |
| 2.8 | Committee of the Regions | 44 |
| 2.9 | Budgetary procedures (Articles 313–16 TFEU) | 44 |
| 2.10 | Court of Auditors (Articles 285–7 TFEU) | 44 |
| 2.11 | Court of Justice of the European Union (Article 19 TEU; Articles 251–81 TFEU) | 45 |
| 2.12 | Lisbon Treaty | 49 |
| 2.13 | EU Institutions outside the EU Framework | 50 |
| 2.14 | Conclusions | 52 |

## 2.1 Introduction

One of the defining features of the Union is the scope and level of power given to its institutions. Its objectives and the way the institutions fulfil those objectives affect the nature of the EU itself and the scope and content of EU law. Chapter 2 outlines the composition and powers of the institutions and the relationship between them.

In considering the institutions and the way they work, there are a number of underlying points. First, it is the different powers ascribed to the institutions and the way they have to work together that provide the 'checks and balances' within the Union legal order, the so-called 'institutional balance'. This point is implied in the wording of Article 13(2) TEU, which states:

> Each institution shall act within the limits of the powers conferred upon it in the Treaties, and in conformity with the procedures, conditions and objectives set out in them.

It is important to note that we should not approach a review of the institutions from the perspective of traditional notions of governmental functions: legislative, executive, administrative and judicial. It is the institutional balance that prevents one institutional actor from becoming too powerful, rather than the more traditional notion of 'separation of the powers'. Another key point in this area is that the powers of the respective institutions have evolved over time. The

institutional balance is not a static notion. It reflects the development of the Union—and our expectations of it in terms of effectiveness, responsibility and accountability. The institutional balance is not just about limiting the power of the institutions, but has a positive side in that the political institutions at least must cooperate to achieve anything at all, though the nature of the relationship between the individual institutions has varied. It is possible to see some of the institutions representing various interests: the Commission as supranational and integrationist, the Council as intergovernmental and incorporating the individual state interests, though to categorise any one institution as *entirely* intergovernmental or supranational is to overstate the position. The institutional balance has also been affected by the emergence of other actors of various sorts which do not fall within the definition of 'institution' for the purposes of the Treaty, yet these bodies also have a role in policymaking and its implementation and enforcement. Finally, we should note that the powers of the institutions vary depending on the different areas of competence, although with the changes introduced by Lisbon many of these differences have been reduced or eradicated. Nonetheless, the ways in which these different fields of competence interrelate also affect the institutional balance. This latter issue is discussed further in Chapter 3.

## 2.2  The institutions

A preliminary question is 'What are the institutions?' While the term can be used generically to refer to bodies involved generally in the governance of the EU, it has a specific meaning within the Treaties.

The original list of institutions has expanded over the successive Treaty amendments. Article 13 TEU currently provides that the institutions are:

- the European Parliament;
- the Council;
- the European Council;
- the Commission;
- the Court of Justice;
- the European Central Bank;
- the Court of Auditors.

Note that it is in the post-Lisbon TEU that we find the first explicit reference to the European Council as an institution, although it has existed for rather longer. Article 13(4) TEU identifies two more bodies, which are not technically institutions: the Economic and Social Committee, and the Committee of the Regions. Lisbon also formalised the role of national parliaments in the EU legislative process, specifically as regards the scrutiny of proposals to ensure respect for the principles of subsidiarity and proportionality (see 3.5.3).

The original institutions operated only within the EEC. When Maastricht introduced the pillar structure (see Chapter 1), the institutions were given roles and responsibilities in the other pillars too. This was the idea of institutional unity within the Union. In the former second and third pillars, however, the roles of some of the institutions (eg, the European Parliament) were more limited than in the former Community pillar. With the Lisbon Treaty, the three-pillar structure was abandoned. The consequence of this 'depillarisation' was that most of these limitations and differences in the roles of the institutions died away. The main responsibilities of the various institutions are set out in Articles 14–19 TEU.

the Commission. Its annual report is published in the *Official Journal*. It must provide both the Parliament and the Council with a statement of assurance as to the reliability of the Union accounts and the legality of the underlying transactions (Article 287(1) TFEU) which, since Amsterdam, has been published in the *Official Journal*. Article 287 TFEU also requires the Court of Auditors to report any cases of irregularity. It is, however, limited in its effectiveness because there seems to be no one conception amongst the Member States of what it is intended to do. Secondly, there is no one body to respond to the Court of Auditors' reports to ensure that the Union is getting value for the money it spends. This is worrying in a time where there is increased public concern about the amounts of public spending and potential fraud within the Union. Indeed, the Court of Auditors has refused to sign off the budget for the past 11 years, although 'significant improvements' in budgetary controls compared to previous years were noticed.

## 2.11  Court of Justice of the European Union (Article 19 TEU; Articles 251–81 TFEU)

Article 19(1) TEU describes the courts that together make up the Court of Justice of the European Union (CJEU):

> The Court of Justice of the European Union shall include the Court of Justice, the General Court and specialised courts.

Each of the courts making up the CJEU has its own jurisdiction and judicial personnel.

All cases before the CJEU are allocated a number, the last two digits of which refer to the year in which the action was started. Since the setting up of the General Court (GC) (formerly Court of First Instance) in 1988, all Court of Justice (CJ) (formerly European Court of Justice) cases start with the letter 'C'; all cases before the General Court have the prefix 'T-'. Cases with the suffix 'P' are appeals from the GC, and those followed by 'R' are applications for interim relief. 'PPU' indicates the urgent preliminary reference procedures.

### 2.11.1  Appointment

There is currently one judge from each Member State (Article 19(2) TEU), chosen 'by common accord of the governments of the Member States' (Article 253 TFEU). The inclusion of judges from all the Member States allows the various national legal traditions to be reflected. The judges have a variety of backgrounds within the legal sphere, but are not appointed to represent the political interests of their 'home' Member State. All must be 'persons whose independence is beyond doubt' (Article 253 TFEU).

As the appointment of judges proposed by Member States occurred without the possibility of challenge, the Lisbon Treaty introduced a novelty in the appointment of judges and advocates-general aimed at securing the quality of the CJEU and its judgments. Article 255 TFEU establishes a panel to give an opinion on the suitability of candidates proposed by the Member States, which itself is made up of senior lawyers, mainly judges. This also reflects moves to greater transparency in the appointment process, although the system may still be criticised. The Member States nominate only one candidate at a time and so there is no choice between candidates who may have different strengths (particularly as to the substantive areas of their expertise); the panel may say merely 'yes' or 'no'. The panel can only react to Member States' choices and so cannot choose new appointments on the basis of what the CJEU might need in terms of different areas of expertise. Finally, there

is no possibility of reviewing the decision by a Member State not to re-nominate a judge who has come to the end of his or her tenure. The threat of not being reselected has the potential to undermine judicial independence, especially where politically sensitive cases are in issue.

Judges are appointed for a six-year term, as are the judges of the General Court. They are eligible for reappointment, but there is no express guarantee that they could not be removed during their term. Appointments are staggered so that not all judges are replaced at the same time, thus building some continuity into decision-making from one rotation of judges to the next. In practice, some of the judges and advocates-general have had a long term of office: Jacobs, a former British advocate-general, was at the Court from 1988 to 2006.

The judges of the CJ are assisted by the advocates-general. Advocates-general are appointed on the same basis as the judges, and have the same term of office: six years.

### 2.11.2 **Composition**

There are currently 28 judges. Although it could sit with all 28 members, given its increasing workload, the court may sit in chambers of three or five judges, or a Grand Chamber of 15 judges (Article 16 Statute of the Court of Justice). The CJ will now only sit with all members in the small instances specified in Article 16 of its Statute (including proceedings to dismiss the European Ombudsman or a Member of the European Commission who has failed to fulfil his or her obligations) and where the Court considers that a case is of exceptional importance. The case of *Thomas Pringle v Government of Ireland* (case C-370/12) is an example of a case on which the CJ sat as a full court. Whereas a Member State could previously request a hearing before a full court, it will now only be possible to insist on a hearing before the Grand Chamber. Grand Chamber hearings are also held when an institution is a party to the proceedings or when the matter is important or complex. The CJ is currently assisted by eight advocates-general. Five of the eight advocates-general are nominated as of right by the five 'big' Member States: Germany, France, the United Kingdom, Italy and Spain, with the remaining three slots being allocated to the remaining Member States on an alphabetical basis. The boundary between the 'big' Member States and the others may hark back to a smaller EU. It certainly looks odd where Poland, which is only slightly smaller than Spain, has no permanent advocate-general. The number of advocates-general may be increased to 11 at the request of the CJEU, six of which would be held permanently, allowing Poland a permanent advocate-general, the remaining five being rotated between the other Member States. At the time of writing, no such request has been made.

The CJEU may face further reform due to the pressures of enlargement. More Member States mean more judges, more different languages and a wider range of legal traditions. It remains to be seen how the Court will cope with these pressures in terms of working method. The CJEU has commented that increasing the number of judges would mean the CJEU 'would cross the invisible boundary between a collegiate court and a deliberative assembly'. The use of chambers or a devolved system of justice, however, may cause problems in ensuring uniformity between the different chambers, especially given the different legal traditions in which each judge will be grounded.

### 2.11.3 **Functions**

The task of the CJEU is to 'ensure that in the interpretation and application of this Treaty the law is observed' (Article 19(1) TEU). It is the supreme authority on all matters of Union law, and in this capacity may be required to decide matters of constitutional law (see, eg, Chapters 4 and 6), administrative law (see Chapters 12 and 13), social law (Chapter 27) and economic law (Chapter 29) in matters brought directly before it or on application from national courts. Its jurisdiction is principally over

the acts of the institutions and Member States within the Union's sphere of activity. Prior to Lisbon, there were consequently limitations on the CJEU's jurisdiction: the European Council lay outside its powers of review (*Roujansky v Council* (case T-584/93)); the majority of the TEU (including CFSP) provisions were likewise excluded from its jurisdiction (former Article 46 TEU), although the CJEU did have the power to police the boundaries between what lay within its jurisdiction and what lay outside.

The position changed radically with the Lisbon Treaty. With the incorporation of what were JHA provisions in TFEU, limitations on the CJEU's jurisdiction regarding these provisions have been removed. Post-Lisbon, the CJEU still has no jurisdiction with regard to the CFSP provisions, however (Article 275 TFEU), although it may rule on the boundary between Union law and the CFSP provisions, (Article 40 TEU) to ensure that there is no encroachment upon the *acquis communautaire*. The relevant provisions defining the scope of the Court's jurisdiction with regard to CFSP are now Articles 24(1) and 40 TFEU, as well as the first paragraph of Article 275 TFEU. Article 24(1) TEU excludes the Court's jurisdiction with the exception of the circumstances identified in Article 40 TEU and Article 275 TFEU.

### Article 40

The implementation of the common foreign and security policy shall not affect the application of the procedures and the extent of the powers of the institutions laid down by the Treaties for the exercise of the Union competences referred to in Articles 3 to 6 of the Treaty on the Functioning of the European Union.

Similarly, the implementation of the policies listed in those Articles shall not affect the application of the procedures and the extent of the powers of the institutions laid down by the Treaties for the exercise of the Union competences under this Chapter.

While the scope of the CJEU's powers with regard to CFSP have not been exhaustively delineated, it is clear at least some aspects of the CFSP must lie outside its jurisdiction, as otherwise there would be no need for the boundary process envisaged in Article 40 TEU (a point recognised by the Full Court in Opinion 2/13 at paras 249–52). The scope of Article 40 TEU was considered in *H v Council* (case C-455/14P).

### *H v Council*

This case concerned the appeal of a person seconded to the European Union Police Mission (EUPM) in Bosnia and Herzegovina. H brought an action for annulment of a EUPM decision and a claim for compensation before the General Court, but that Court held that it did not have jurisdiction because of Article 24(1) TEU. The matter was appealed to the Court of Justice.

The Court confirmed that the effect of Article 24(1) TEU was that it did not have jurisdiction with respect to the provisions relating to the CFSP or with respect to acts adopted on the basis of those provisions. Referring to earlier judgments on this point (*Parliament v Council* (case C-658/11) and *Elitaliana v Eulex Kosovo* (case C-439/13P)), it stated that:

the aforementioned provisions introduce a derogation from the rule of general jurisdiction which Article 19 TEU confers on the Court to ensure that in the interpretation and application of the Treaties the law is observed, and they must, therefore, be interpreted narrowly [para 40].

The Court continued, not by reference to the need to ensure the effectiveness of Union law, but to the fact that the Union:

> is founded, in particular, on the values of equality and the rule of law. The very existence of effective judicial review designed to ensure compliance with provisions of EU law is inherent in the existence of the rule of law [para 41, citations omitted].

So, while the end point—a reasonably wide interpretation of the jurisdiction of the European courts—may seem similar to the pre-Lisbon wording of the Treaties, the reasoning now emphasises the EU as being based on the rule of law.

The Lisbon Treaty also gave the Charter of Fundamental Rights legal force, a charter which lies within the CJEU's jurisdiction, potentially adding to the CJEU's powers of review (see Chapter 6).

An advocate-general's function is to assist the Court by presenting his 'submissions'—a detailed analysis of all the relevant issues of fact and law together with his recommendations to the Court. Under the current Statute of the Court, Article 20 permits the Court to decide not to have a submission from the advocate-general if the case raises no new point of law. This possibility has already been used extensively.

Although the advocate-general's recommendations are not always followed, where they are they are useful as a means of ascertaining the reasoning behind the Court's decision. The judgment itself, which is a single collegiate decision, is, to common law eyes, sometimes terse, cryptic, with little indication of the reasoning on which it is based. Even where the advocate-general's recommendations are not followed they may still be invoked as persuasive authority in a subsequent case.

In its practices and procedures the CJEU draws on continental models; in developing the substantive law it draws on principles and traditions from all the Member States. The judgments from both the CJ and GC are given in the name of the entire chamber; there is no room for dissenting opinions, which may adversely affect the reasoning in the judgment as finally agreed. Although the CJEU seeks to achieve consistency in its judgments, its precedents are not binding in the English sense; it always remains free to depart from previous decisions in the light of new facts. An example of the CJ expressly, and somewhat abruptly, departing from previous jurisprudence on the scope of Article 34 TFEU can be found in the infamous cases of *Bernard Keck and Daniel Mithouard* (cases C-267 and 268/91), in which the CJ stated 'contrary to what has previously been decided'. This judgment has been the subject of some criticism, as the CJ never precisely identified which previous case law it overturned (see further Chapter 18). Similarly, the judgment of the ECJ in *Mettock and Others v Ireland* (case C-127/08) suggested that *Secretary of State for the Home Department v Akrich* (case C-109/01) should be 'reconsidered'.

As the TFEU is a framework treaty the CJEU has been extremely influential in 'filling the gaps', and in doing so has created law in bold, and, to those accustomed to English methods of interpretation, often surprising ways. As Lord Diplock pointed out in *R v Henn and Darby* [1981] AC 850:

> The European Court, in contrast to English courts, applies teleological rather than historical methods to the interpretation of the Treaties and other [Union] legislation. It seeks to give effect to what it conceives to be the spirit rather than the letter of the Treaties; sometimes, indeed, to an English judge, it may seem to the exclusion of the letter. It views the [Union] as a living and expanding [organism] and the interpretation of the provisions of the Treaties as changing to match [its] growth.

The CJEU (particularly the CJ) has, on occasion, been criticised for its activism in its constitutional development of the Union legal order and more recently in the context of European citizenship. It has been this dynamism, or the consequences thereof, which led to the suggestion that the jurisdiction of the CJEU be limited by the 1996 IGC. This suggestion was not taken up. Indeed, the reverse seems the case: the Court's jurisdiction was extended, as we have noted with the changes introduced by Lisbon. Thus the CJEU remains a powerful, nearly omnipresent, actor in the EU.

### 2.11.4 General Court

In 1986 the SEA provided for the setting up of a new tribunal, then called the 'Court of First Instance' (CFI) which forms part of the CJEU (Article 19(1) TEU). It is now the General Court (GC). Approval for this court was obtained in October 1988 ([1989] OJ C215/1). Originally, there was one judge per Member State. Following the 2015 revision to the Statute of the CJEU, there will be two judges per Member State (Regulation 2015/2422 on Statute of CJEU ([2015] OJ L341/14)). They, as in the CJ, may sit in chambers. There are no advocates-general. Its jurisdiction includes applications for judicial review and damages by 'natural and legal persons', under Articles 263 and 265 TFEU, respectively. A number of specialised tribunals and offices, such as the European Union Civil Service Tribunal, the Community Plant Variety Office or the European Chemicals Agency, have been introduced and the GC may hear actions against their decisions. There is a right of appeal on matters of law from this court to the CJ. An applicant cannot appeal against a decision of the GC unless new facts come to light (*ISAE/VP v Commission* (case C-130/91); see further Chapters 7 and 11).

The GC's jurisdiction can be extended under provisions introduced by the Treaty of Nice and now found in Article 256 TFEU. Crucially, it will have jurisdiction to hear preliminary references 'in specific areas laid down by the Statute [of the Court]', although to date no areas have been allocated to the GC. Article 257 TFEU provides for the possibility for some areas, such as staff cases, to be dealt with by judicial panel.

## 2.12 Lisbon Treaty

In the preceding sections, we noted the impact of the Lisbon Treaty on existing institutions and bodies. In addition, there are two further significant developments:

- the creation of the separate office of 'European Council President';
- the establishment of a 'High Representative of the Union for Foreign Affairs and Security Policy'.

Both developments have parallels with similar proposals found in the Constitution which sparked considerable controversy, because the existence of a political figurehead and of a foreign minister might be seen as a further step towards a European state. However, on closer examination, these fears were overstated, and both positions are a development of existing roles.

### 2.12.1 Council President

Article 15(5) TEU established a European Council President, elected by the European Council, for a period of two-and-a-half years, renewable once. The Council President is not a current head of state or government, or entitled to hold any other national office (Article 15(6) TEU). He or she is responsible for chairing the European Council and managing its work, endeavouring to facilitate cohesion and consensus within the European Council and representing the Union externally on



# 3

# Scope of the EU Treaty: laws and lawmaking

| 3.1 | Introduction | 55 |
|---|---|---|
| 3.2 | Conferred competence | 55 |
| 3.3 | The scope of EU competence | 57 |
| 3.4 | Types of competence | 62 |
| 3.5 | Subsidiarity | 64 |
| 3.6 | Basis for Union action | 67 |
| 3.7 | Union acts | 69 |
| 3.8 | Lawmaking process | 74 |
| 3.9 | Problems in the lawmaking process—democracy, transparency and efficiency | 84 |
| 3.10 | Sources of EU law | 88 |
| 3.11 | Conclusions | 89 |

## 3.1 **Introduction**

The EU would be nothing if it had no powers to enact legislation to take forward the obligations contained in the Treaties. Given the supremacy of the resulting EU law, we must question the scope, the nature and source of those powers, and how the EU and its institutions exercise them. This chapter therefore considers, first, the scope of the Treaties and the type of competence that the EU may exercise in relation to the different policy areas (3.2–3.4, 3.10). It secondly investigates the question of when the EU should exercise those powers, and how, through the doctrines of subsidiarity and proportionality (3.5–3.6). Thirdly, and developing from issues flagged in Chapter 2, it looks at legislative procedures and whether there is sufficient transparency in and democratic control over EU lawmaking (3.7–3.8). In this analysis, transparency may be adversely affected by the complexity, as well as by the degree of openness, of lawmaking procedures. Democracy has links to the EU institutional balance in that the institutions' respective democratic credentials vary. So, we must also consider the changes that the various Treaties have effected and the consequences those changes have had on the institutions' respective policy and lawmaking roles (3.9).

## 3.2 **Conferred competence**

It is an underlying principle that the EU may only act in the policy fields which the Member States have conferred upon it; this is the 'principle of conferral' and what we mean by 'attributed competence'. This point is made in Article 5 TEU and is re-affirmed by the statement in Article 13(1) TEU, that the institutions may only act within their powers. While these principles have been long

established in the Treaties, there are two aspects which had not been explicitly stated before Lisbon. First, it is the Member States that confer the powers on the EU (through the Treaties); the Member States remain 'masters of the Treaties'. This point can be seen in the text of Article 1 TEU which reads:

> By this Treaty, the high contracting parties establish among themselves a *European Union*, hereinafter called 'the Union', on which the Member States confer competences to attain objectives they have in common.

Secondly, those powers which are not conferred on the EU remain with the Member States (Article 4(1) TEU and Article 5(2) TEU; Declaration in relation to the delimitation of competences). The use of the word 'conferral' implies that the relationship between the Member States and the Union is one of delegation.

These changes may have been introduced in response to a concern that the EU was exhibiting 'mission creep', that is, accumulating more and more powers at the expense of the Member States, and that it was therefore necessary to reaffirm the nature and source of the EU's powers. We noted in Chapter 1 that successive Treaty amendments saw the cumulative expansion of EU competence resulting in a Union with a broad sphere of action. This, together with the fact that the Member States are under an obligation to 'take any appropriate measure, general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the Union' (Article 4(3) TEU), meant the impact of the EU on national legislative choices was huge. It is not surprising that Lord Denning MR was moved to say, even in the relatively early years, in *HP Bulmer Ltd v J Bollinger SA* ([1974] Ch 401), 'the Treaty is like an incoming tide. It flows into the estuaries and up the rivers. It cannot be held back'.

The concerns about the impact of expanded EU competence on Member States can also be seen in the landmark decision of the German Federal Constitutional Court (FCC) in *Brunner*. The case concerned a challenge to the German ratification of the Maastricht Treaty. Although the FCC upheld the powers of the German Parliament to ratify the Maastricht Treaty, it sounded a number of warnings about the powers of the Union and its institutions. Effectively, any further transfer of powers to Union level would need express democratic approval to be binding. The FCC argued (at para 33):

> Because the principle of limited powers is adhered to, no power to extend its powers is conferred on the European Union . . . and the claiming of further functions and powers by the European Union . . . is made dependent on supplementation and amendment of the Treaty and is therefore subject to the affirmative decision of the national parliaments.

Despite this affirmation, the introduction of the principle of subsidiarity by the Maastricht Treaty (see 3.5) and the changes introduced by Lisbon, it seems that national constitutional courts remain concerned about 'mission creep'. When the question of the acceptability of the Lisbon Treaty was referred to the Czech constitutional court, it approved the Lisbon Treaty, but the enabling Czech legislation was subject to a requirement that no further competence could be transferred without the express consent of the Czech Parliament. In its decision on the Lisbon Treaty, the FCC made a similar point. It emphasised the principle of 'conferral' and the obligation in EU law 'to respect the constituent power of the Member States as masters of the Treaties'. This issue of respect is one the FCC has the power to review. The question of the boundary between national and Union competence is an ongoing issue, as can be seen from the continuing stream of cases concerning EU competence, which continue to appear before the national constitutional courts. (See Chapter 4 for more detail.)

## 3.3 The scope of EU competence

The Treaties have always contained provisions identifying the general objectives of the Union and then introducing more specific tasks to achieve those objectives; the list has been amended, elaborated and lengthened over successive Treaty amendments. These provisions describe the areas in which the EU may act and for which purpose. The objectives are currently found in Article 3 TEU (with the more specific tasks found in Article 3(3) and (4) TEU). Article 3 TEU states:

1. The Union's aim is to promote peace, its values and the well-being of its peoples;

2. The Union shall offer its citizens an area of freedom, security and justice without internal frontiers, in which the free movement of persons is ensured in conjunction with appropriate measures with respect to external border controls, asylum, immigration and the prevention and combating of crime;

3. The Union shall establish an internal market. It shall work for the sustainable development of Europe based on balanced economic growth and price stability, a highly competitive social market economy, aiming at full employment and social progress, and a high level of protection and improvement of the quality of the environment. It shall promote scientific and technological advance.

   It shall combat social exclusion and discrimination, and shall promote social justice and protection, equality between women and men, solidarity between generations and protection of the rights of the child.
   It shall promote economic, social and territorial cohesion, and solidarity among Member States.
   It shall respect its rich cultural and linguistic diversity, and shall ensure that Europe's cultural heritage is safeguarded and enhanced;

4. The Union shall establish an economic and monetary union whose currency is the euro;

5. In its relations with the wider world, the Union shall uphold and promote its values and interests and contribute to the protection of its citizens. It shall contribute to peace, security, the sustainable development of the Earth, solidarity and mutual respect among peoples, free and fair trade, eradication of poverty and the protection of human rights, in particular the rights of the child, as well as to the strict observance and the development of international law, including respect for the principles of the United Nations Charter.

While the current version of these objectives is similar to its predecessor provisions, the Lisbon Treaty made some changes of note to these general provisions. The Union always had a range of socio-economic objectives as its goals, but these were based on the creation of a common market and—latterly—an economic and monetary union. While the internal market and the economic and monetary union remain, Lisbon changed the emphasis: the starting point is peace and the well-being of the Union's peoples, as well as respect for the Union's values.

The Union's values are described in Article 2 TEU and, again, are not focused on the economic. Article 2 TEU provides:

The Union is founded on the values of respect for human dignity, freedom, democracy, equality, the rule of law and respect for human rights, including the rights of persons belonging to minorities. These values are common to the Member States in a society in which pluralism, non-discrimination, tolerance, justice, solidarity and equality between women and men prevail.

It is only when we get to para 3 of Article 3 TEU that we see the first reference to the creation of the internal market, but even here there are changes post-Lisbon. Notably, Article 3(3) TEU now

refers to 'a highly competitive social market economy, aiming at full employment and social progress'. Previously there had been a reference to 'a harmonious, balanced and sustainable development of economic activities, a high level of employment and social protection' (former Article 2 TEC), and former Article 4 TEC had referred to an 'open market economy'. Additionally, there are some new objectives, such as 'solidarity between generations and protection of the rights of the child'. Interestingly, there is now no reference to free competition being an objective of the Union, though the more detailed provisions on competition law in TFEU have not been amended (Chapters 1, 28 and 29). The French government requested the change to the text to make the point that free competition is a means to an end, not the objective itself. There is, in general, a greater emphasis on human values and the well-being of people than previously. Article 2 TEU does not provide legally binding rights. Nonetheless, it is a significant provision. It describes the underlying spirit of the Union in that it states the common values on which the Union is founded. There have been suggestions from both the European Parliament and the European Commission concerning the possibility of monitoring— and possibly enforcing—Member States' compliance with these values (see, eg: strong resolutions on Hungary and European complicity in the CIA rendition/secret detention; Council Conclusions, June 2013; Commissioner Reding, SPEECH/13/677). (On human rights see further Chapter 6.)

Article 3 TEU describes the main objectives of the Union but does not itself impose specific legal obligations on the Member States. The detailed obligations are found, in the main, in TFEU (the exception is CFSP). Article 1(1) TFEU states:

> This Treaty organises the functioning of the Union and determines the areas of, delimitation of, and arrangements for exercising its competences.

The provisions of the TFEU delineate the scope of the various Union policies, as well as the steps that may or must be taken for their implementation. Some examples of Union policy areas are found in Box 3.1. Although Article 3 TEU does not have direct legal impact, it has interpretative value; it may be used to clarify the scope of the more precise Treaty obligations.

---

**Box 3.1    Examples of Union policies**

agriculture

economic and monetary affairs

employment and social affairs

environment

foreign and security policy

internal market

justice, freedom and security

public health

sport

transport

---

### 3.3.1  General principles

In addition to the goals and tasks enunciated in Articles 2–3 TEU, the Treaties contain other provisions laying down principles underlying the Union. This list of principles has been expanded by the



# Introduction to the internal market

| 15.1 | Introduction | 323 |
|------|--------------|-----|
| 15.2 | Overview of the four freedoms | 323 |
| 15.3 | Common themes in the free movement provisions | 326 |
| 15.4 | Relationship between the freedoms | 330 |
| 15.5 | The social dimension | 332 |
| 15.6 | Completion of the internal market: an Area of Freedom, Security and Justice | 332 |
| 15.7 | Conclusions | 333 |

## 15.1 Introduction

The creation of the internal market is one of the central purposes of the European Union (Article 3(3) TEU). So while the TEU refers to sustainable development and a social market economy, this is within the context of the creation of 'an area without internal frontiers in which the free movement of goods, persons, services and capital is ensured in accordance with the provisions of the Treaty' (Article 26(2) TFEU).

Prior to Lisbon, the Treaties also contained references to the 'common market', which includes, in addition to the four freedoms, common commercial policy—commercial relations with third countries—and competition policy. On this basis, it could be argued that the term 'common market' was slightly wider than 'internal market'. The CJ tended not to distinguish between the terms. Following Lisbon, all references to the 'common market' were replaced with the words 'internal market', removing the concept of the common market from the Union. However we refer to the objectives of the EU, the creation of the internal market is an essential and distinctive part of EU law. This chapter identifies certain common themes affecting those four freedoms which constitute the internal market: subsequent chapters look at the detail of these provisions.

## 15.2 Overview of the four freedoms

### 15.2.1 Free movement of goods

The principle of freedom of movement of goods has been described as a fundamental freedom, the 'cornerstone' of the internal market. For many Member States the opportunity of access for their goods to a single, European-wide market was, and remains, a primary reason for membership. The free play of market forces within that larger market would increase economic efficiency, widen consumer choice and enhance the Union's competitiveness in world markets. However, since the principle of freedom of movement was intended to apply to all goods, including goods imported from outside the Union, it was necessary to eliminate distortions of competition resulting from different national rules regulating trade with third countries by presenting a common commercial front to the outside world. To achieve these goals:

(1) the TFEU establishes a customs union which involves (Article 28 TFEU) (see Chapter 17):

    (a) 'the prohibition between Member States of customs duties on imports and exports and of all charges having equivalent effect' (Article 30 TFEU), and

    (b) 'the adoption of a common customs tariff in their relations with third countries'.

    This aspect of the free movement of goods falls within exclusive Union competence (Article 3 TFEU);

(2) the TFEU also seeks the elimination of quantitative restrictions on imports and exports and all measures having equivalent effect (Articles 34–5 TFEU);

(3) in addition states were required to adjust any state monopolies of a commercial character so as 'to ensure that . . . no discrimination regarding the conditions under which goods are procured and marketed exists between nationals of Member States' (Article 37 TFEU).

The provisions relating to the free movement of goods apply to both industrial and agricultural products—save, where agriculture is concerned, as otherwise provided in Articles 39–44 TFEU (Article 38 TFEU)—whether originating in Member States or coming from third countries which are in free circulation in Member States.

### 15.2.2 **Free movement of people**

The basic principles relating to the free movement of persons are contained in Articles 45–8 TFEU (workers), and Articles 49–54 TFEU (freedom of establishment). The freedom to provide services is often seen as providing for the free movement of people although it is identified separately within the four freedoms (see 15.2.3). These freedoms have been further substantiated by secondary legislation. The rules apply throughout the territories of the Member States of the Union.

The basic rights enshrined in these provisions, granted to EU nationals (defined according to the law of each Member State) and companies and firms formed in accordance with the law of one of the Member States (Article 54 TFEU), comprise the right freely to leave, or enter and reside in a Member State for the purposes of work or establishment (or the provision of services) and the right to be treated in the host Member State free from discrimination on the grounds of nationality. As we shall see later, the CJ has—at least as regards individuals—interpreted these provisions to a large extent in parallel, a process which has been reinforced by the introduction of European citizenship. The fact that there is such a large degree of similarity led to the restructuring of the chapters on free movement of people. Whereas early editions dealt with this topic by looking at the Treaty articles on workers, establishment, services and citizenship individually, this edition (as has its immediate predecessors) takes a horizontal approach, looking at each of the rights accorded to migrant EU nationals (access to the territory, economic rights and social rights), so commonalities and differences can be more easily seen, and duplication avoided.

These rights are not absolute; not even citizenship rights are absolute. Rights of entry and residence are subject to derogation on the grounds of public policy, public security and public health (Articles 45 and 52 TFEU; Directive 2004/38). Exceptions from the non-discrimination principle are provided for 'employment in the public service' (Article 45) and 'activities connected with the exercise of official authority' (Article 51 TFEU).

One of the key questions to be asked, in relation to free movement of people, is whether individuals claiming the rights fall within the scope of the Treaty. In this, we can see a broadening of protection in two ways: judicial and legislative. As regards the judicial activity, although the rights contained in the Treaty were originally expressed to be limited to those who are economically active—that is, workers or persons, natural or legal, exercising rights of establishment or providing services in the host state—broad definitions of the relevant terms, in particular the definition of

worker, and generous interpretation on the part of the Court, have extended the scope of their protection in terms of people within the ambit of EU law. Furthermore, secondary legislation extended these rights to the families of economically active EU migrants, irrespective of their nationality (see Chapter 21). Legislative action also extended similar rights to a wider category of persons who were not economically active. This trend was then given Treaty recognition by the introduction of citizenship rights under Articles 21–5 TFEU, introduced by Maastricht. These rights have been consolidated and updated by the introduction of another directive, sometimes called the 'Citizenship Rights Directive' (Directive 2004/38). A separate regime applies to third-country nationals (see Chapter 26).

A second central question relates to the scope of the rights granted. While more detail on the scope of rights was expressly set out in secondary legislation, such as Regulation 492/2011 (former Regulation 1612/68) regarding workers, these rights have been supported by an extensive interpretation by the CJ. The CJ developed in many cases a discrimination-based argument so that with the expanded interpretation as to when free movement rights had been affected, and a broader scope to the Treaties themselves, the scope of rights available are broad, covering rights to education, the rights to war compensation and even the right to name your child in a certain way (see Chapter 23).

With this expansive interpretation, the focus shifts to questions of infringement and justification. In many cases involving social and ancillary rights in particular, infringement is clear to see on the basis of indirect discrimination (eg, residency clauses, and see further 15.3.3). Where measures do not directly discriminate, they may be justified. An increasingly common argument being used by the Member States is that the migrant claiming the right does not have sufficient connection with the host Member State; that there is no 'real link'. In principle it seems this argument can be used in relation to cases brought under an economic free movement right (eg, Article 45 TFEU) or under the citizenship provisions (*R, on the application of Dany Bidar v London borough of Ealing and Secretary of State for Education and Skills* (case C-209/03)), although whether it means the same thing in all circumstances is still not yet clear.

Citizenship rights, set out in Articles 21–5 TFEU, comprise the right 'to move and reside freely within the territory of the Member States', the right to stand and vote in municipal and European Parliament elections, and the right to petition the ombudsman and the European Parliament. We have noted that as regards the right of free movement, the CJ has interpreted the rights of citizens in line with the other free movement rights. Significantly, however, recent case law on citizenship has indicated that individuals who are EU citizens may claim rights in a very broad range of circumstances (see Chapter 21). The introduction of the concept of citizenship also raised questions as to what rights citizens should expect, and has fuelled the debate on whether the Union should do more to protect the individual citizen. Despite the opportunity to amend the citizenship provisions that successive Treaty revision provided, nothing was done expressly to expand the rights attaching to citizenship. Lisbon again rejected the possibility of adding to the citizenship provisions in the TFEU, though the existing provisions are more explicitly linked to the principle of non-discrimination and the provisions on the area of freedom, security and justice were strengthened (Chapter 26).

### 15.2.3 **Freedom to provide services**

The freedom to provide services is found in Articles 56–62 TFEU. In this book the freedom to provide services is treated as part of the free movement of people. When someone provides a service, it may also involve that person moving, even if temporarily, to the Member State where the service is received. However, it should be noted that services themselves can move, without necessarily requiring that a person also moves to provide the service. Examples of this principle can be seen in sectors such as broadcasting or insurance. Nonetheless, the same provisions of Article 56 TFEU *et seq* apply in this

context as apply in relation to the provision of services where a person moves, although it may be that a difference in the way the provisions are interpreted can be seen in the two types of circumstance. The fundamental right comprises the freedom to access both the territory and market of other Member States and to be treated on the same basis as the nationals of the host Member State. A further significant development can be seen in relation to the right to receive services, especially as regards public service provided by the individual Member States. Jurisprudence of the CJ is eroding Member States' ability to control individuals' access to public services in other Member States. It has given rise to debate as to whether this case law allows for the most efficient use of such services across Europe or merely constitutes an unjustified erosion of national solidarity. This area is discussed in Chapter 24.

### 15.2.4  **Free movement of capital**

The provisions on capital and payments, substantially amended by Maastricht, are found in Articles 63–6 TFEU. In its post-Maastricht form, the central provision bears a resemblance to the approach taken in relation to the free movement of goods. Recent case law suggests that the CJ's approach has paralleled that taken in respect of the other three freedoms.

There are nonetheless, distinctive features relating to the provisions on capital. It should be noted that the TFEU distinguishes between payments and capital movements between Member States themselves and between Member States and third countries. In the latter situation the Council may, in limited circumstances, take measures limiting the movement of capital and payments from third countries (Article 75 TFEU).

Article 65 TFEU deals with tax, and permitted distinctions based on place of residence, as well as public-policy exceptions to the free movement of capital. Despite these provisions, it will be seen in the chapter on economic rights (Chapter 22) that Member States' freedom in the field of taxation has been curtailed. Article 65(2) TFEU provides that the provisions relating to capital are to operate without prejudice to the operation of restrictions on the freedom of establishment that are compatible with the TFEU. Effectively, this means that a person cannot seek to evade a legitimate restriction on establishment via the capital provisions. It seems, however, that the reverse might be true. The relationship between capital and the other provisions is discussed at 15.4 (see also Chapter 20).

Finally, Article 65(3) TFEU provides that any national measures taken on the basis of Article 65(1) are 'not to constitute a means of arbitrary discrimination or a disguised restriction on the free movement of capital'. This wording parallels that used in relation to the derogation from the free movement of goods found in Article 36 TFEU (see further Chapter 20).

## 15.3  **Common themes in the free movement provisions**

Although the terms of the freedoms are each worded slightly differently, certain common elements must be shown before a case for the application of one of the freedoms can be made. In all cases it seems that there must be both an economic element and an interstate factor to bring the situation within the scope of any of the freedoms. Note also that, although citizenship does not require an economic element, it does require some connection with another Member State to be shown. It has also been argued that a convergence can be seen in the approach taken to identifying the trigger for a finding of breach of the freedoms.

### 15.3.1  **Economic activity**

In the earlier years of the Union, to invoke the non-discrimination principle it was necessary for the migrant claimant to be or have been engaged in some form of economic activity in the host



# Free movement of payments and capital

| 20.1 | Introduction | 416 |
|------|--------------|-----|
| 20.2 | Outline of provisions relating to the free movement of capital | 416 |
| 20.3 | Scope of the free movement of capital | 417 |
| 20.4 | Exceptions to the free movement of capital | 421 |
| 20.5 | Relationship with other freedoms | 426 |
| 20.6 | Restrictions on free movement of capital between Member States and third countries | 428 |
| 20.7 | Power to legislate in the field of free movement of capital | 429 |
| 20.8 | Economic and monetary union (EMU) | 429 |
| 20.9 | Conclusions | 433 |

## 20.1 Introduction

The free movement of capital is one of the four freedoms listed in Article 26(2) TFEU. Yet, its treatment had been somewhat different from the liberal approach taken both in the secondary legislation and by the CJ regarding the free movement of persons, services and goods. Indeed, in striking contrast to its approach to these freedoms, the CJ ruled that the original pre-Maastricht capital provisions did not have direct effect (*Casati* (case 203/80)) and could therefore not be relied on before domestic courts (see Chapter 5). The changes introduced by the Treaty of Maastricht changed the position significantly. The relevant provisions are now Articles 63–6 and 75 TFEU.

This chapter will cover the scope of the provisions of the free movement of capital and payments as well as their derogations and the relationship with the other freedoms. For the sake of completeness, given the relationship between movement of capital and monetary union, there will be a brief introduction to the euro and monetary union. A full discussion of this topic, however, lies outside the scope of this book.

## 20.2 Outline of provisions relating to the free movement of capital

The 'fourth' freedom, capital, can be broken down into two linked elements:

- capital;
- payments.

Article 63 TFEU prohibits all restrictions on the free movement of capital and payments, whether between Member States or between Member States and third countries. Derogations are found in the Treaty and through the development of a rule of reason. In this parallels can be drawn with the other freedoms. There are, however, some aspects which are specific to the free movement of

capital, such as the difference in treatment between TCNs and EU nationals, as well as the distinction between Eurozone members and non-members.

## 20.3  Scope of the free movement of capital

### 20.3.1  Who can rely on the free movement of capital?

Union nationals, both natural and legal persons, may rely on this freedom. Like the provisions relating to the free movement of goods, and in contrast with the provisions relating to services and people, the capital provisions may be relied on by TCNs. The situation is the same whether the capital movement is intra-Union, or between a third country and the Union.

### 20.3.2  Direct effect

Article 63 TFEU is directly effective: see *Bordessa* and *Sanz de Lera and Others* (cases C-163, 165 and 250/94). This is the case whether we are considering prohibitions on restrictions on capital movements between Member States or between Member States and third countries and irrespective of the type of capital in issue. Nevertheless, case law suggests that Article 63 TFEU has no horizontal direct effect (*Commission v Germany (Volkswagen)* (case C-112/05); *Federconsumatori v Commune di Milano* (case C-463/04), see also Chapter 5; but note *Commission v Belgium (Eurobonds)* (case C-478/98), discussed in 20.3.3). Issues such as capital restrictions naturally involve the state and so in general give rise to vertical relationships, so the issue of the horizontal effect of that provision will rarely arise. Yet, it is possible to envisage a situation falling within the scope of capital in which private actors are involved. Imagine, for example, a bank or a building society, which offered different mortgage rates depending on whether or not the borrower was resident in the Member State of its operations.

### 20.3.3  Types of act caught

The CJ has taken a broad approach to the types of act caught by the prohibition in Article 63 TFEU. This was the case even before the Maastricht amendments to the capital provisions. In *Brugnoni and Ruffinengo v Cassa di Risparmio di Genova e Imperia* (case 157/85), the CJ accepted that 'restriction' covered more than just legislative acts, and also covered administrative obstacles to free movement. Equally, it seems not to matter in which capacity a government is acting when a potential restriction under Article 63 TFEU is in issue. This can be seen in the context of the *Eurobonds* case.

> ### Eurobonds
>
> Here, the case related to a prohibition on Belgian residents subscribing to securities issued abroad (Eurobonds). The Belgian government argued that it was acting not in its capacity as public authority but on the same terms as a private borrower when it adopted the restriction. The CJ rejected this argument on the facts of the case, although the status of measures not dependent on public powers remains open.

Finally, a regulation which implements economic sanctions as part of the fight against terrorism and prohibits the transfer of economic resources to individuals in third countries, does not fall within the ambit of the provisions on free movement of capital and payments (*Kadi*, para 188, discussed in Chapter 4).

### 20.3.4 **Meaning of capital**

The prohibition operates on both capital movements and those relating to payments. This could suggest that the two concepts are different, and indeed, early case law, *Luisi and Carbone v Ministero del Tesoro* (case 286/82), distinguished between the two. The need to distinguish between the two has effectively been removed.

Neither term is defined in Article 63 TFEU, although Article 64 TFEU lists some types of capital, such as direct investments and the provision of financial services. This provision has not, however, been referred to by the CJ in determining the scope of 'capital'. In terms of defining capital, the CJ held in *Trummer v Mayer* (case C-222/97) that the prohibition on the creation of a mortgage in a foreign currency under Directive 88/361 ([1988] OJ L178/5), passed before the changes brought in by Maastricht, remained relevant in terms of identifying what constitutes capital. An annex to this Directive contains an indicative 'nomenclature' (a list of categories), listed under 13 headings (eg, property investment, mortgages, administration of real property, sale of real property, inheritances, banknotes and coins, gifts in money, granting credit). As the CJ made clear, this list is not exhaustive. This point is illustrated in the case of *Staatssecretaris Van Financiën v Verkooijen* (case C-35/98).

> ### *Verkooijen*
>
> Here, the case related to the exemption from direct taxation of the share of dividends. The CJ ruled that the receipt of dividends from investments abroad, a category not listed in the nomenclature, was inextricable from a capital movement and therefore fell within the scope of Article 63 TFEU. Further, it has also held that an inheritance, whether of money, or immovable or movable property, is a movement of capital for the purposes of Article 63 TFEU. Of course, real property cannot move; what is changing is the ownership of that property.

Potentially the scope of Article 63 TFEU *et seq* is wide, especially as the nomenclature in Directive 88/361 includes not only the capital movement itself but also the underlying transaction (see, eg, heading VIII 'Financial Loans and Credits'). This approach opens up the possibility of overlap between the free movement of capital and the freedom to provide services, affecting particularly financial services (see further 20.5).

### 20.3.5 **Test for application of free movement of capital**

The concept of a 'restriction on the free movement of capital' has been interpreted broadly. It operates to eliminate measures which effectively prevent an individual being able to use a currency of another Member State, such as in *Trummer* and it applies to less stringent measures, such as the requirement for prior authorisation of currency transactions.

The CJ has described the scope of the prohibition in Article 63 in *Festersen* (case C-370/05) as:

> restrictions on the movement of capital, include those which are likely to discourage non-residents from making investments in a Member State or to discourage that Member State's residents to do so in other States [para 24].

Nonetheless, the CJ has not always distinguished clearly between restrictions and discrimination when handing down its judgments. This can be seen in *Commission v Portugal (Portuguese golden shares)* (case C-367/98).

> ### Portuguese Golden Shares
>
> Here, the CJ accepted that the Portuguese national rules precluding investors from other states from acquiring more than a specified number of shares in certain newly privatised companies constituted 'unequal treatment of nationals of other Member States and restricts the free movement of capital' [para 40].

This is a case of direct discrimination. Similarly, in *Konle*, an Austrian rule, which in the interests of planning control exempted Austrian nationals only from having to obtain authorisation before acquiring a plot of land was seen as creating a discriminatory restriction against nationals of other Member States. Even in this case, however, the CJ linked the existence of discrimination to the creation of a restriction. In other cases the CJ has used terms such as 'obstacles' or 'liable to dissuade' (*Trummer*). These phrases seem similar to the approach taken in relation to the freedom to provide services (see Chapter 22). In the British *golden shares* case (regarding the UK government's 'Special Share' in BAA plc), the CJ noted that even rules which apply without distinction to non-nationals and nationals alike can 'deter investors from other Member States from making such investments and, consequently, affect access to the market' (*Commission v United Kingdom* (*golden shares*) (case C-98/01), para 47). In *Commission v Portugal* (*second Portuguese golden shares*) (case C-543/08) (shares in privatised energy company), the CJ elaborated:

> national measures must be regarded as 'restrictions' within the meaning of Article [63(1) TFEU] if they are liable to prevent or limit the acquisition of shares in the undertakings concerned or to deter investors of other Member States from investing in their capital [para 47].

This phraseology has been repeated in *Van Hilten-van der Heijden v Inspecteur van de Belastingdienst/Particulieren/Ondernemingen buitenland te Heerlen* (case C-513/03), para 44.

> ### Van Hilten-van der Heijden
>
> Here, the case related to national rules creating the legal fiction that a national of a Member State who dies within ten years of ceasing to reside in that Member State is deemed to have been resident there at the time of his death. The CJ ruled that this was not contrary to Article 63 TFEU).

In *Festersen*, the CJ ruled that a requirement that someone who acquires agricultural property must take up residence on it was contrary to Article 63 TFEU. Nevertheless, in *Skatteverket v A* (case C-101/05), the CJ found that the exemption from income tax in respect of dividends conditional on the company making the distribution being established in a state within the EEA or a state with which a taxation convention providing for the exchange of information had been concluded is not contrary to Article 63 TFEU. The CJ noted that it is irrelevant whether the restriction affects the movement of capital between Member States themselves, or between a Member State and a third country. It seems that the Court moved away from a discrimination-based approach and considered the impact on the market of the rule in issue. Certainly, in the *Portuguese golden shares* case, the CJ commented that Article 63 TFEU:

> goes beyond the mere elimination of unequal treatment, on grounds of nationality, as between operators on the financial markets [para 44].

The UK government in the British *golden shares* case suggested that the principle in *Keck* (see chapter 18) should apply to Article 63 TFEU. It argued that the rules in issue had an impact on the market which was too indirect to fall within the scope of the prohibition. This approach, indeed, had been suggested by the Advocate-General in the earlier case of *ED Srl* (discussed in Chapter 18), but the CJ did not address the point here. The relevance of *Keck* was raised again in the *second Portuguese golden shares* case. While the CJ held that the restrictions in this case were not analogous to selling arrangements within *Keck*, its reasoning suggests that as a matter of principle, the *Keck* approach could be used in the context of free movement of capital.

The purpose behind a national rule is not determinative, although the CJ will sometimes consider it if a protectionist motive is alleged. It is the effect that is crucial and, as with the other freedoms, there is no *de minimis* exception. The CJ also does not seem to require proof of an actual effect, but accepts the supposition that certain rules could have the claimed dissuasive effect (see, eg, the *second Portuguese golden shares* case).

### 20.3.6  Internal situations

Article 63 TFEU may not be relied on in internal situations. It cannot therefore be used to challenge Member States rules' regarding, for example, the acquisition of property on national territory. However, the CJ has given a restrictive interpretation of what constitutes an internal situation. This can be seen in the case of *Reisch v Burgermeister der Landeshauptstadt Salzburg* (cases C-515, 519–40/99).

---

### *Reisch*

Under Austrian law, transfer of ownership of land is only confirmed when certain administrative procedures have been completed. These include the making of a declaration to the effect that the purchaser is an Austrian national, or a national of another Member State exercising one of the four freedoms; and that the land will be used as the purchaser's principal residence or to meet a commercial need. Use of the land as a secondary residence would be permitted only if the land was already used for that purpose before 1 March 1993 or if it is located in an area in which secondary residences are permitted. The relevant national authorities may attach conditions and requirements to its authorisation in order to ensure that the acquirer of title uses the land for the stated purpose, in particular by requiring security in an amount not exceeding the purchase price or the value of the land, or by imposing fines for non-compliance with the rules.

The applicants in *Reisch* had variously been refused permission, been required to provide security or had fines imposed and they sought to challenge these decisions arguing that the rules were incompatible with the TFEU. The applicants were Austrian.

The CJ noted:

National legislation such as the SGVG, which applies without distinction to Austrian nationals and to nationals of Member States . . ., may generally fall within the scope of the provisions on the fundamental freedoms established by the Treaty only to the extent that it applies to situations related to intra-[Union] trade.

---

This suggests that there will be few circumstances in which an interpretation of EU law will not be relevant and that, as a corollary, internal situations will be few.



**22**

# Economic rights:
# workers, establishment
# and services

| 22.1 | Introduction | 469 |
|------|-------------|-----|
| 22.2 | Overview and Treaty provisions | 470 |
| 22.3 | Right of access to the market | 471 |
| 22.4 | Test for the application of Articles 45, 49 and 56 TFEU | 478 |
| 22.5 | Limitations on the application of Articles 45, 49 and 56 TFEU | 485 |
| 22.6 | A rule of reason? | 486 |
| 22.7 | Harmonisation | 487 |
| 22.8 | The Services Directive (Directive 2006/123) | 488 |
| 22.9 | Professional qualifications | 492 |
| 22.10 | Establishment, services and companies | 497 |
| 22.11 | Conclusions | 503 |

## 22.1 **Introduction**

The four freedoms are fundamental to the creation of the internal market and as such have been interpreted broadly. We have noted that the rights granted by the freedoms relating to people and legal entities have different aspects: a territorial aspect (discussed in Chapter 21); an economic aspect; and a social aspect (discussed in Chapter 23). This chapter will focus on the second aspect: the right to the job market or the right to trade as self-employed.

This chapter begins by reviewing the relevant Treaty provisions and, crucially, the changing approach to the CJEU's interpretation of the Treaty freedoms and the consequent impact on Member States' ability to regulate within their own territory. The case law considered in this chapter raises issues about regulatory competition and the deregulatory impact of the freedom to provide services, as with the other freedoms. This chapter focuses in particular on certain problem areas, such as qualifications (now subject to harmonisation) and the abuse of Union-law rights to evade national regulation, as well as the position regarding companies. We also consider the position of services, where services are provided cross-border without anyone physically moving (eg, broadcasting). Services in this context may be provided in more than one Member State simultaneously, raising questions not only about which Member State should have the right or responsibility to regulate the service provider, but also about the dangers of abuse of Union-law rights to avoid national regulation. These questions have a greater significance with the introduction of the Services Directive (Directive 2006/123 ([2006] OJ L376/36)).

## 22.2  Overview and Treaty provisions

In their economic aspects, the free movement of workers, the right of establishment and the free-dom to provide services, probably show the greatest similarity to the other freedoms (goods and capital). Similar themes can be identified in these freedoms, in particular a broad interpretation of the rights. Furthermore, there has been a move from a discrimination-based test for the applica-tion of the article to one based on the notion of an obstacle to the exercise of the right (see also Chapter 17). When we look at economic rights, however, there might be different policy issues in play in different circumstances. To what extent should there be a difference in approach with regard to rules which operate to deter individuals and companies from moving in the first place, those that affect access to the market, and the rules that come into play when running a business? Equally, we might consider whether the same approach is desirable with regard to individuals (who might benefit from citizenship rights) and legal entities which will not have the same social needs.

### 22.2.1  The free movement of workers

The principal Treaty provision governing the free movement of workers is Article 45 TFEU. As regards the economic aspect of the workers' rights it provides:

> (2) Such freedom of movement shall entail the abolition of any discrimination based on nationality between workers of the Member States as regards employment, remuneration and other conditions of work and employment;
>
> (3) It shall entail the right, subject to limitations justified on grounds of public policy, public security or public health:
>
>     (a)  to accept offers of employment actually made; . . .

### 22.2.2  Freedom of establishment

Article 49 TFEU now provides:

> Within the framework of the provisions set out below, restrictions on the freedom of establishment of nationals of a Member State in the territory of another Member State shall be prohibited. Such prohibition shall also apply to restrictions on the setting up of agencies, branches or subsidiaries by nationals of any Member State established in the territory of any Member State.
>
>     Freedom of establishment shall include the right to take up and pursue activities as self-employed persons and to set up and manage undertakings, in particular companies and firms within the meaning of the second paragraph of Article 54, under the conditions laid down for its own nationals by the law of the country where such establishment is effected, subject to the provisions of the Chapter relating to capital.

### 22.2.3  The freedom to provide services

Articles 56 and 57(3) TFEU provide:

> Within the framework of the provisions set out below, restrictions on freedom to provide services within the Union shall be prohibited in respect of nationals of Member States who are established in a State of the Union other than that of the person for whom the services are intended.

Without prejudice to the provisions of the Chapter relating to the right of establishment, the person providing a service may, in order to do so, temporarily pursue his activity in the State where the service is provided, under the same conditions as are imposed by that State on its own nationals.

### 22.2.4 **Public service**

The Treaty limits the right of access to jobs in the public sector. Article 45(4) TFEU specifies that '[t]he provisions of this Article shall not apply to employment in the public service'. Similar provisions apply to establishment and services. Article 51 TFEU provides that '[t]he provisions of this Chapter [establishment] shall not apply, so far as any given Member State is concerned, to activities which in that State are connected, even occasionally, with the exercise of official authority'. Finally, according to Article 62 TFEU, the terms of Article 51 TFEU also apply to services.

## 22.3  **Right of access to the market**

### 22.3.1 **Workers**

Regulation 1612/68 was passed to implement Articles 45(2) and 45(3)(a) and (b) TFEU. As it was amended several times over the years, the changes have been brought together in a new, codified version: Regulation 492/2011 ([2011] OJ L141/1). As stated in the preamble of Regulation 492/2011, the attainment of the objective of freedom of movement for workers requires:

the abolition of any discrimination based on nationality between workers of the Member States as regards employment, remuneration and other conditions of work and employment.

Regulation 492/2011 requires, in order for the right of freedom of movement to be exercised 'in freedom and dignity', equality of treatment in 'all matters relating to the actual pursuit of activities as employed persons'. Regulation 492/2011 contains specific provisions (Articles 1–9) dealing with eligibility for employment as well as the terms of employment. Article 45 TFEU was expressed in terms of a prohibition on discrimination, whether direct or indirect. In *Hartmann v Freistaat Bayern* (case C-212/05) (Grand Chamber), the CJ restated that the prohibition relates not only to discrimination on grounds of nationality but to the 'application of other criteria of differentiation' which would have the same effect. These principles are now reflected in Regulation 492/2011. In particular, Article 1 provides that:

Any national of a Member State shall, irrespective of his place of residence, have the right to take up an activity as an employed person, and to pursue such activity, within the territory of another Member State in accordance with the provisions laid down by law, regulation or administrative action governing the employment of nationals of that State.

Additionally, a Member State may not discriminate, overtly or covertly, against non-nationals, by prioritising the employment of nationals (Article 1(2)), limiting applications and offers of employment (Article 3(1)), or by prescribing special recruitment procedures or limiting advertising or in any other way impeding recruitment of non-resident workers (Article 3(2), Member States must not restrict by number or percentage the number of foreign nationals to be employed in any activity or area of activity (Article 4; see the *French merchant seamen* case—ratio of three French to one

non-French imposed under Code du Travail Maritime 1926 on crew of French merchant ships held in breach of EU law).

Member States must offer non-national applicants the same assistance in seeking employment as are available to nationals (Article 5). A worker who is a national of a Member State may not, in the territory of another Member State, be treated differently from national workers by reason of his nationality in respect of any conditions of employment and work, in particular as regards remuneration, dismissal and, should he become unemployed, reinstatement or re-employment (Article 7(1)). In *Württembergische Milchverwertung-Südmilch AG v Salvatore Ugliola* (case 15/69) a condition whereby a German employer took into account, for the purposes of calculating seniority, employees' periods of national service *in Germany*, thereby prejudicing an employee such as Ugliola, who was required to perform his national service in Italy, was held unlawful under Article 7(1). Similarly, in *Sotgiu*, the German post office's decision to pay increased separation allowances only to workers living away from home in Germany was held to be *capable* of breaching Article 7(1). In *Schöning-Kougebetopoulou*, the CJ held that a collective wage agreement which provided for promotion on grounds of seniority after eight years' employment in any given group, excluding periods of comparable employment in the public service of another Member State, was contrary to the Treaty. The terms of the agreement manifestly worked to the disadvantage of migrant workers as they are less likely, or it is harder for them, to satisfy the eight-year rule.

Workers are also entitled to social and tax advantages (Article 7(2)); these are discussed in Chapter 23.

Article 7(4) of Regulation 492/2011 deals with collective and individual agreements relating to eligibility for work, as well as terms and conditions of work, remuneration and conditions of dismissal. Any such conditions shall be null and void insofar as they are discriminatory in respect of workers from other Member States. Note that, as can be seen in *Merida v Bundesrepublik Deutschland* (case C-400/02), measures which are indirectly discriminatory may be capable of being justified.

### Merida

Here, a collective agreement applicable to civilians employed by foreign armed forces in Germany was in issue. It provided for 'interim assistance' to workers where their contracts were terminated. The payment was subject to the deduction of the German income tax. Merida was a French national. Due to a taxation treaty between France and Germany, Merida's tax should have been calculated on the basis of the country of residence, at that time France, rather than in Germany at the German rate. Merida brought an action arguing that this was contrary to what is now Article 45 TFEU and Article 7(4) of Regulation 492/2011. Although the terms of Article 7(4) do not refer to the possibility of justification, the CJ did note the possibility that indirectly discriminatory measures (such as this one) could be justified in the public interest provided it was proportionate to its aim. The CJ rejected the German government's justifications based on simplified administration and limitation of financial charges.

Under Article 8 of Regulation 492/2011 a migrant worker is entitled to equality of treatment as regards 'membership of trade unions and the exercise of rights attaching thereto, including the right to vote and to be eligible for the administration or management posts of a trade union'.

The precise relationship between trade union and collective action rights and free movement rights is not clear, especially when the exercise of collective-action rights operates to limit employers' rights under Article 49 or 56 TFEU. In *Laval*, the blockade of a building site to prevent the construction company using foreign labourers who were not covered by a collective agreement and were not therefore entitled to the same level of pay as Swedish workers fell in principle within Article 56 TFEU. (Re Article 49 TFEU, see *Viking*, concerning an attempt to reflag a ship to take the

seamen outside the protection of a collective agreement.) *Laval* has been criticised for failing to give adequate protection to social rights.

### 22.3.2  Establishment

Central to the rights in Article 49 TFEU is the right to carry on business in another Member State, whether as a primary business (ie moving and setting up your business entirely within the host Member State), or as a secondary establishment (ie maintaining an establishment in one Member State and having other offices, whatever their legal form, in other Member States). Article 49 TFEU applies not just to the market, but also to the terms under which business may be carried on. For example, the recognition of qualifications (now harmonised, see 22.9) might be seen as affecting the right to enter a profession or business in the first place; codes of conduct control the way businesses are run as an on-going obligation. The central element of these rights is to be subject to the same conditions that apply to nationals of the host Member State.

Article 49 TFEU, together with Article 18 TFEU, may be invoked to challenge a national rule which is discriminatory. For example, in an enforcement case against Italy (the *freedom of estab-lishment* case), the CJ confirmed that rules which required Italian nationality as a precondition for the exercise of certain activities—operation of pharmacies and journalism—were contrary to Article 49 TFEU. As with Article 45 TFEU, this prohibition applies to both direct and indirect discrimination.

The scope of carrying on business for the purposes of Article 49 TFEU is broad, as can be seen in *Steinhauser*.

#### Steinhauser

Steinhauser, a German national, was a professional artist resident in Biarritz. He applied to the Biarritz authorities to rent a *crampotte*, a fisherman's hut of a type used locally for the exhibition and sale of works of art. He was refused on the grounds of his nationality; under the city's regulations *crampottes* could only be rented by persons of French nationality. He challenged that decision, and the CJ held that freedom of establishment provided under Article 49 TFEU related not only to the taking up of an activity as a self-employed person but also to the pursuit of that activity in the widest sense to include, inter alia, the right to rent premises, to tender and to qualify for licences and concessions.

The breadth of the potential scope of Article 49 TFEU was reiterated in *SEVIC Systems AG v Amtsgericht Neuwied* (case C-411/03).

#### SEVIC

SEVIC Systems AG was a company registered in Germany. It merged with a company established in Luxembourg. SEVIC applied for registration in the commercial register after the merger, but the local authorities refused on the ground that the relevant German law provided only for mergers between companies established in Germany.

There, the CJ held that:

the right of establishment covers all measures which permit or even merely facilitate access to another Member State and the pursuit of an economic activity in that State . . . [para 18].

Clearly, this approach will have relevance for social rights, discussed further in Chapter 23. It also suggests that Article 49 TFEU is likely to cover similar issues as are dealt with by Regulation 492/2011 with regard to workers; for example, arrangements for the payment of taxes or the right to join a trade association.

Finally, note that Article 49 TFEU will catch rules which prevent persons from seeking to exercise their rights, whether those rules are imposed by the host or the home Member State (see Box 22.1).

---

### Box 22.1  Examples of rules falling with Article 49 TFEU

Rules relating to treatment of company following cross-border merger:
   *SEVIC*.
Prohibition on more than one place of establishment:
   *Ordre des Avocats v Klopp* (case 107/83).
Tax treatment of losses incurred by a permanent establishment situated in a Member State of the EEA and belonging to a company having its seat in a Member State of the European Union:
   *Finanzamt für Körperschaften III in Berlin v Krankenheim Ruhesitz am Wannsee-Seniorenheimstatt GmbH* (case C-157/07).
Advance on costs for registration of company documents:
   *Innoventif Limited* (case C-453/04).
Rules restricting profession of architect to possession of a diploma or professional qualification:
   *Conseil National de l'Ordre des Architectes v Dreessen* (case C-31/00),
Renewal of 329 horse-race betting licences without inviting competing bids:
   *Commission v Italy* (case C-260/04).

---

### 22.3.3 Services

As with Article 49 TFEU, Article 56 TFEU grants the right to carry on business in another Member State. Again, the core element is equal treatment, that is, to be subject to the same conditions as apply to nationals of the host Member State.

Article 56 TFEU, together with Article 18 TFEU, may be invoked to challenge a national rule which is in some way discriminatory, whether directly or indirectly. Article 56 TFEU addresses discrimination arising not only to the taking up of an activity (access to the profession), but to pursuit of that activity (rules relating to the running of a business). Cases concerning the recognition of qualifications (discussed in more detail at ⌐   ⌐ relate to the taking up of an activity. By contrast, *van Binsbergen* was a case relating to the Dutch rule which required representatives before tribunals to be resident in the Netherlands. *Gouda v Commissariaat voor de Media* (case C-288/89) concerned Dutch rules limiting the carrying of advertising on television channels. Both these cases dealt with regulations on the running of a business. This latter category of restrictions must be viewed in the widest sense. It has caught prohibitions on lotteries, access to museums and rules regulating broadcasting, to name but a few (see Box 22.2) and certainly includes access to public services (see Chapter 24).

- research for non-military purposes in public establishments;
- public bodies responsible for administering commercial services.

The Commission has brought enforcement actions against certain Member States for failure to take action following the communication (eg, *Commission v Belgium* (case C-173/94); *Commission v Greece* (case C-290/94); *Commission v Luxembourg* (case C-473/93)). In its judgments given on the same day, the CJ confirmed the Commission's approach of identifying types of work which would rarely fall within Article 45(4) TFEU. In these circumstances, it is still open to the national authorities to show, on a functional basis, that specified jobs within such sections do fall within the public service exception.

## 22.4  Test for the application of Articles 45, 49 and 56 TFEU

### 22.4.1  Discrimination

The jurisprudence of the early years shows a test based on discrimination. This is not surprising as the terms of Article 45(2) TFEU refer expressly to the abolition of discrimination on the grounds of nationality, whether arising from legislation, regulation or administrative practice. Article 45 TFEU is in this context a specific form of the general prohibition on discrimination on the grounds of nationality found in Article 18 TFEU. Although the wording in Articles 49 and 56 TFEU does not refer expressly to a prohibition on discrimination, the CJ took a similar approach in respect of these two provisions. In *Reyners*, the applicant was a Dutch national residing in Belgium. He had the necessary Belgian qualification in law for admission as an *avocat*, but was refused admission purely because he did not have Belgian nationality. This constituted discrimination contrary to Article 49 TFEU.

Discrimination includes those rules which, although not distinguishing on the face of it, are harder to satisfy for non-nationals (eg, language or residence requirements), disadvantage them (eg, rules about length of service in the host Member State), or put them under a dual burden (ie, non-recognition of qualifications). In *O'Flynn* (see Chapter 15) the CJ made clear that it was not necessary to prove that a national measure in practice affected a higher proportion of foreign workers, but that the measure was intrinsically liable to affect migrants more than nationals of the host Member State.

As in relation to the free movement of goods (and now capital), indirect discrimination is capable of being 'objectively justified'. Direct discrimination as, for example, established in relation to Article 56 TFEU in *Bond van Adverteerders*, could only be justified under Article 52 TFEU, which was strictly construed. (See further 22.6.)

### 22.4.2  Beyond discrimination

As with the free movement of goods, the CJ has moved to an approach which went beyond a discrimination-based test. It was thought initially that national regulatory rules and professional practices which were not discriminatory, which applied 'without distinction' to all persons working, providing services or established in a particular Member State, and which clearly served a useful purpose, could not be challenged under the Treaty. The rights granted to EU nationals under Articles 49 and 56 TFEU were to provide services in other Member States 'under the same conditions' as applied to the state's own nationals (see also Regulation 492/2011, Article 1(1)). Although national regulatory rules might create barriers to the free movement of services and freedom of