# EXHIBIT 66

JUDGMENT OF THE COURT (Grand Chamber)

2 September 2021 ([*](#))

(Reference for a preliminary ruling – Energy Charter Treaty – Article 26 – Inapplicability between Member States – Arbitration Award – Judicial review – Jurisdiction of a court of a Member State – Dispute between a third-State operator and a third State – Jurisdiction of the Court – Article 1(6) of the Energy Charter Treaty – Concept of 'investment')

In Case C-741/19,

REQUEST for a preliminary ruling under Article 267 TFEU from the cour d'appel de Paris (France), made by decision of 24 September 2019, received at the Court on 8 October 2019, in the proceedings

**Republic of Moldova**

v

**Komstroy LLC,** successor in law to the company Energoalians,

THE COURT (Grand Chamber),

composed of K. Lenaerts, President, R. Silva de Lapuerta, Vice-President, A. Prechal, M. Vilaras, E. Regan, L. Bay Larsen, N. Piçarra and A. Kumin, Presidents of Chambers, T. von Danwitz, M. Safjan, D. Šváby, C. Lycourgos, P.G. Xuereb, L.S. Rossi (Rapporteur) and I. Jarukaitis, Judges,

Advocate General: M. Szpunar,

Registrar: M. Krausenböck, Administrator,

having regard to the written procedure and further to the hearing on 17 November 2020,

after considering the observations submitted on behalf of:

–   the Republic of Moldova, by M. Boccon Gibod, M. Ostrove, T. Naud and S. Salem, avocats,

–    Komstroy LLC, successor in law to the company Energoalians, by A. Lazimi, S. Nadeau Seguin, B. Le Bars and R. Kaminsky, avocats,

–   the French Government, by A. Daniel, acting as Agent,

–   the German Government, by J. Möller and D. Klebs, acting as Agents,

–   the Spanish Government, by M.J. Ruiz Sánchez and S. Centeno Huerta, acting as Agents,

–   the Italian Government, by G. Aiello, acting as Agent,

–   the Hungarian Government, by M.Z. Fehér, acting as Agent,

–   the Netherlands Government, by J.M. Hoogveld, acting as Agent,

–   the Polish Government, by B. Majczyna, acting as Agent,

–   the Finnish Government, by H. Leppo, acting as Agent,

–        the Swedish Government, by C. Meyer-Seitz, A. Runeskjöld, M. Salborn Hodgson, H. Shev, H. Eklinder, R. Shahsavan Eriksson, O. Simonsson and J. Lundberg, acting as Agents,

–        the Council of the European Union, by B. Driessen and A. Lo Monaco, acting as Agents,

–        the European Commission, by R. Vidal Puig, A. Biolan, T. Maxian Rusche and O. Beynet, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 3 March 2021,

gives the following

## Judgment

1   This request for a preliminary ruling concerns the interpretation of Article 1(6) and Article 26(1) of the Energy Charter Treaty, signed at Lisbon on 17 December 1994 (OJ 1994 L 380, p. 24; 'the ECT') approved on behalf of the European Communities by Council and Commission Decision 98/181/EC, ECSC, Euratom of 23 September 1997 (OJ 1998 L 69, p. 1).

2   The request has been made in proceedings between the Republic of Moldova and Komstroy LLC, concerning the jurisdiction of an arbitral tribunal that made an award in Paris (France) on 25 October 2013.

### Legal context

#### *European Union law*

3   The ECT is comprised of a preamble and eight parts, included amongst which is Part I, entitled 'Definitions and Purpose', containing Articles 1 and 2 of that treaty; Part II, entitled 'Commerce', containing Articles 3 to 9 of the treaty; Part III, entitled 'Investment Promotion and Protection', containing Articles 10 to 17 thereof; and Part V, entitled 'Dispute Settlement', containing Articles 26 to 28 of the treaty.

4   According to the preamble to the ECT, the contracting parties concluded that treaty, inter alia, 'wishing to implement the basic concept of the European Energy Charter initiative which is to catalyse economic growth by means of measures to liberalise investment and trade in energy'.

5   Article 1 ECT, entitled 'Definitions', provides:

'As used in this Treaty:

…

   5.   "Economic activity in the energy sector" means an economic activity concerning the exploration, extraction, refining, production, storage, land transport, transmission, distribution, trade, marketing, or sale of energy materials and products except those included in Annex NI, or concerning the distribution of heat to multiple premises.

   6.   "Investment" means every kind of asset, owned or controlled directly or indirectly by an investor and includes:

       (a)   tangible and intangible, and movable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;

    (b)    a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;

    (c)    claims to money and claims to performance pursuant to [a] contract having an economic value and associated with an investment;

    (d)    intellectual property;

    (e)    returns;

    (f)    any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any economic activity in the energy sector.

A change in the form in which assets are invested does not affect their character as investments and the term "investment" includes all investments, whether existing at or made after the later of the date of entry into force of this Treaty for the Contracting Party of the investor making the investment and that for the Contracting Party in the area of which the investment is made (hereinafter referred to as the "effective date") provided that the Treaty shall only apply to matters affecting such investments after the effective date.

"Investment" refers to any investment associated with an economic activity in the energy sector and to investments or classes of investments designated by a Contracting Party in its area as "Charter efficiency projects" and so notified to the Secretariat.

    7.    "Investor" means:

    (a)    with respect to a Contracting Party:

        (i)    a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;

        (ii)    a company or other organisation organised in accordance with the law applicable in that Contracting Party;

    (b)    with respect to a "third State", a natural person, company or other organisation which fulfils, *mutatis mutandis*, the conditions specified in subparagraph (a) for a Contracting Party.'

6    Article 26 ECT, entitled 'Settlement of disputes between an investor and a Contracting Party', provides:

'1.    Disputes between a Contracting Party and an investor of another Contracting Party relating to an investment of the latter in the area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

2.    If such disputes can not be settled according to the provisions of paragraph 1 within a period of three months from the date on which either party to the dispute requested amicable settlement, the investor party to the dispute may choose to submit it for resolution:

(a)    to the courts or administrative tribunals of the Contracting Party to the dispute;

[or]

(b)    in accordance with any applicable, previously agreed dispute settlement procedure;

or

(c)    in accordance with the following paragraphs of this Article.

3. (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

…

…

4. In the event that an investor chooses to submit the dispute for resolution under subparagraph (2)(c), the investor shall further provide its consent in writing for the dispute to be submitted to:

(a) (i) the International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "Icsid Convention"), if the Contracting Party of the investor and the Contracting Party party to the dispute are both parties to the Icsid Convention;

  or

  (ii) the International Centre for Settlement of Investment Disputes, established pursuant to the Convention referred to in subparagraph (a)(i), under the rules governing the Additional Facility for the Administration of Proceedings by the Secretariat of the Centre … if the Contracting Party of the investor or the Contracting Party to the dispute, but not both, is a party to the Icsid Convention;

(b) a sole arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (hereinafter referred to as "Uncitral");

or

(c) an arbitral proceeding under the Arbitration Institute of the Stockholm [(Sweden)] Chamber of Commerce.

…

6. A tribunal established pursuant to paragraph 4 shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.

…

8. The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute. …'

*French law*

7   Article 1520 of the French code de procédure civile (Code of Civil Procedure) lays down the conditions for bringing an action for annulment against an arbitral award handed down in France. It provides as follows:

'An action for annulment is available only in the following cases:

1°   Where the arbitral tribunal wrongly declared itself to have or not to have jurisdiction, or

2°   Where the arbitral tribunal was improperly constituted, or

3°   Where the arbitral tribunal issued a ruling without fulfilling the mandate entrusted to it, or

4°   Where the adversarial principle was not observed or

5°   Where the recognition or enforcement of the award is contrary to international public policy.'

**The dispute in the main proceedings and the questions referred for a preliminary ruling**

8   In performance of a series of contracts concluded in 1999, Ukrenergo, a Ukrainian producer, sold electricity to Energoalians, a Ukrainian distributor, which resold that electricity to Derimen, a company registered in the British Virgin Islands, which in turn resold that electricity to Moldtranselectro, a Moldovan public undertaking with a view to exporting it to Moldova. The volumes of electricity to be supplied were agreed each month directly between Moldtranselectro and Ukrenergo. The same electricity was thus supplied by Ukrenergo to Moldtranselectro over the course of 1999 and 2000, with the exception of the months May to July 1999, in accordance with the 'DAF Incoterms 1990' conditions, that is to say, to the border between Ukraine and the Republic of Moldova, on the Ukrainian side.

9   Derimen paid Energoalians the full amounts due for the electricity purchased, whilst Moldtranselectro only partially settled the amounts due to Derimen for that electricity.

10   On 30 May 2000, Derimen assigned to Energoalians the claim that it had against Moldtranselectro.

11   Moldtranselectro settled its debt to Energoalians in part, by assigning to it claims that it held. Energoalians attempted unsuccessfully to obtain payment of the remainder of that debt, a sum of 16 287 185.94 United States dollars (USD) (approximately EUR 13 735 000), by bringing proceedings before the Moldovan courts and subsequently the Ukrainian courts.

12   Taking the view that certain conduct by the Republic of Moldova in that context constituted serious breaches of the undertakings made under the ECT, Energoalians initiated the ad hoc arbitration procedure provided for in Article 26(4)(b) of that treaty.

13   By an award delivered in Paris on 25 October 2013, the ad hoc arbitral tribunal constituted in order to resolve that dispute held that it had jurisdiction and, considering that the Republic of Moldova had failed to comply with its international undertakings, ordered it to pay a sum of money to Energoalians on the basis of the ECT.

14   On 25 November 2013, the Republic of Moldova brought an action for annulment before the cour d'appel de Paris (Court of Appeal, Paris, France) against that decision, invoking a breach of a compulsory public policy provision, namely that regarding the jurisdiction of that arbitral tribunal, in accordance with Article 1520 of the Code of Civil Procedure.

15   By judgment of 12 April 2016, the cour d'appel de Paris (Court of Appeal, Paris) annulled the arbitral award on the ground that the arbitral tribunal had wrongly declared that it had jurisdiction. In fact, according to that court, the dispute between Energoalians and the Republic of Moldova concerned a claim, assigned by Derimen to Energoalians, the sole subject matter of which was the sale of electricity. In the absence of any economic contribution made by Ergoalians in Moldova, such a claim could not be regarded as an 'investment', within the meaning of the ECT, upon which the jurisdiction of that arbitral tribunal could be based.

16   On an appeal on a point of law lodged by Komstroy, the successor in law to Energoalians since 6 October 2014, the Cour de cassation (Court of Cassation, France), by judgment of 28 March 2018, set aside the judgment of the cour d'appel de Paris (Court of Appeal, Paris) of 12 April 2016, on the ground that that court had interpreted the concept of 'investment' by adding a condition to it which was not provided for in the ECT, and referred the parties back to the cour d'appel de Paris (Court of Appeal, Paris) sitting in a different composition.

17      Before the cour d'appel de Paris (Court of Appeal, Paris), the Republic of Moldova submitted that the arbitral tribunal should have declined jurisdiction. It submits that, first of all, the claim acquired by Energoalians from Derimen, which arose from a contract for the sale of electricity, is not an 'investment', within the meaning of Article 26(1) ECT, read in the light of Article 1(6) of that treaty, and could not therefore be the subject matter of arbitration proceedings, the latter only being provided for in the context of Part III ECT, regarding, specifically, investments. Next, even if that claim could constitute an 'investment', within the meaning of those provisions, it was not an investment 'of' a company of a State that is a Contracting Party to the ECT, Derimen being a company registered in the British Virgin Islands. Finally, that claim allegedly relates to a transaction, for the sale of electricity, that was not made in the 'area' of Moldova, as the electricity was sold and transported only to the border between Ukraine and the Republic of Moldova, on the Ukrainian side.

18      Komstroy submits, on the other hand, that the same arbitral tribunal had jurisdiction, in accordance with Article 26 ECT, since all of the conditions laid down in that article as regards its jurisdiction were satisfied.

19      The referring court considers that, in order to decide the dispute before it regarding the jurisdiction of the arbitral tribunal, it is necessary for it to decide whether the dispute between the Republic of Moldova and Energoalians concerns an investment within the meaning of the ECT and, if so, whether that investment was made by Energoalians and whether it was made in the 'area' of Moldova.

20      In those circumstances, the cour d'appel de Paris (Court of Appeal, Paris) decided to stay the proceedings and refer the following questions to the Court of Justice for a preliminary ruling:

'[(1)] Must [Article 1(6) ECT] be interpreted as meaning that a claim which arose from a contract for the sale of electricity and which did not involve any economic contribution on the part of the investor in the host State can constitute an "investment" within the meaning of that article?

[(2)] Must [Article 26(1) ECT] be interpreted as meaning that the acquisition, by an investor of a Contracting Party, of a claim established by an economic operator which is not from one of the States that are Contracting Parties to that treaty constitutes an investment?

[(3)] Must [Article 26(1) ECT] be interpreted as meaning that a claim held by an investor, which arose from a contract for the sale of electricity supplied at the border of the host State, can constitute an investment made in the area of another Contracting Party, in the case where the investor does not carry out any economic activity in the territory of that latter Contracting Party?'

**The jurisdiction of the Court**

21      The Council of the European Union, the Hungarian, Finnish and Swedish Governments and Komstroy are, in essence, of the view that the Court does not have jurisdiction to provide answers to the questions referred because EU law is inapplicable to the dispute at issue in the main proceedings as the parties to that dispute are external to the European Union.

22      In that regard, it should be recalled that, in accordance with Article 267 TFEU, the Court has jurisdiction to interpret the acts of the institutions, bodies, offices or agencies of the European Union.

23      It is apparent from the Court's settled case-law that an agreement concluded by the Council, pursuant to Articles 217 and 218 TFEU constitutes, as regards the European Union, an act of one of its institutions, that the provisions of such an agreement form an integral part of the legal order of the European Union from the time it enters into force and that, in the context of that legal order the Court has jurisdiction to give a preliminary ruling on the interpretation of that agreement (judgments of 30 April 1974, *Haegeman*, 181/73, EU:C:1974:41, paragraphs 3 to 6; of 8 March 2011, *Lesoochranárske zoskupenie*, C-240/09,

EU:C:2011:125, paragraph 30; and of 22 November 2017, *Aebtri*, C-224/16, EU:C:2017:880, paragraph 50).

24   The fact that the agreement concerned is a mixed agreement, concluded by the European Union and by a large number of Member States, cannot, as such, exclude the jurisdiction of the Court to give a ruling in the present case.

25   It should be noted that the questions referred concern the concept of 'investment' within the meaning of the ECT.

26   Since the entry into force of the Treaty of Lisbon, the European Union has exclusive competence, as regards foreign direct investment, pursuant to Article 207 TFEU and, as regards investments that are not direct, it has shared competence (Opinion 2/15 *(EU-Singapore Free Trade Agreement)*, of 16 May 2017, EU:C:2017:376, paragraphs 82, 238 and 243).

27   In those circumstances, the Court has jurisdiction to interpret the ECT, in particular, as has been pointed out in paragraph 23 of this judgment, in the context of a reference for a preliminary ruling.

28   It is true that the Court does not, in principle, have jurisdiction to interpret an international agreement as regards its application in the context of a dispute not covered by EU law. That is the case in particular where such a dispute is between an investor of a non-member State and another non-member State.

29   However, first, the Court has held that, where a provision of an international agreement can apply both to situations falling within the scope of EU law and to situations not covered by that law, it is clearly in the interest of the European Union that, in order to forestall future differences of interpretation, that provision should be interpreted uniformly, whatever the circumstances in which it is to apply (see to that effect, judgments of 17 July 1997, *Giloy*, C-130/95, EU:C:1997:372, paragraphs 23 to 28; of 16 June 1998, *Hermès*, C-53/96, EU:C:1998:292, paragraph 32; and of 14 December 2000, *Dior and Others*, C-300/98 and C-392/98, EU:C:2000:688, paragraph 35).

30   In view of what has been set out in paragraphs 25 and 26 of this judgment, that is true of both Article 1(6) ECT and Article 26(1) ECT, the interpretation of which is sought by the referring court.

31   In particular, it should be noted in that regard that that court could find it necessary, in a case falling directly within the scope of EU law, such as an action concerning a dispute between an operator of a third country and a Member State, to rule on the interpretation of those same provisions of the ECT. That would be possible not only, as in the present case, in the context of an application to set aside an arbitral award made by an arbitral tribunal which has its seat in the territory of a Member State, but also where proceedings have been brought before the courts of the defendant Member State in accordance with Article 26(2)(a) ECT.

32   Second, and in any event, it should be noted that the parties to the dispute in the main proceedings chose, in accordance with Article 26(4)(b) ECT, to submit that dispute to an ad hoc arbitral tribunal established on the basis of the Uncitral arbitration rules and agreed, in accordance with those arbitration rules, that the seat of the arbitration should be established in Paris.

33   That choice, made freely by those parties, has the effect of rendering applicable French law as the *lex fori* to the dispute in the main proceedings under the conditions and within the limits laid down by that law. In particular, under Article 1520 of the Code of Civil Procedure, the French courts have jurisdiction to hear actions to set aside an arbitral award made in France for lack of jurisdiction of the arbitral tribunal. EU law forms part of the law in force in every Member State (judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraph 41).

34   Consequently, the establishment of the seat of arbitration on the territory of a Member State, in this case France, entails, for the purposes of the proceedings brought in that Member State, the application of EU

law, compliance with which the court hearing the case is obliged to ensure in accordance with Article 19 TEU.

35    In the context of the cooperation between the Court and the national courts provided for in Article 267 TFEU, it is solely for the national court before which the dispute has been brought, and which must assume responsibility for the subsequent judicial decision, to determine, in the light of the particular circumstances of the case in the main action, both the need for a preliminary ruling in order to enable it to deliver judgment and the relevance of the questions which it submits to the Court. Consequently, where the questions submitted concern the interpretation of EU law, the Court is in principle required to give a ruling (judgments of 24 November 2020, *Openbaar Ministerie (Forgery of documents)*, C-510/19, EU:C:2020:953, paragraph 25, and of 15 April 2021, *Belgian State (Circumstances subsequent to the transfer decision)*, C-194/19, EU:C:2021:270, paragraph 22).

36    It is true that, in the judgments of 15 June 1999, *Andersson and Wåkerås-Andersson* (C-321/97, EU:C:1999:307, paragraphs 28 to 32), and of 15 May 2003, *Salzmann* (C-300/01, EU:C:2003:283, paragraphs 66 to 70), the Court held that the fact that the question referred for a preliminary ruling emanates from a court or tribunal of a Member State was insufficient justification for it to have jurisdiction to interpret the Agreement on the European Economic Area of 2 May 1992 (OJ 1994 L 1, p. 3; 'the EEA Agreement').

37    However, in the cases that gave rise to those judgments, the referring courts had to apply the EEA Agreement to situations that did not fall within the EU legal order in so far as, unlike the situation at issue in the main proceedings, those situations related to a period prior to the accession to the European Union of the States in which those courts were located. The Court has stated that its jurisdiction to interpret EU law, of which the EEA Agreement forms an integral part, concerned the application of that law in the new Member States only with effect from the date of their accession (see, to that effect, judgments of 15 June 1999, *Andersson and Wåkerås-Andersson*, C-321/97, EU:C:1999:307, paragraph 31, and of 15 May 2003, *Salzmann*, C-300/01, EU:C:2003:283, paragraph 69).

38    In the light of the foregoing considerations, it must be held that the Court has jurisdiction to provide answers to the questions referred.

**Consideration of the questions referred**

*The first question*

39    By its first question, which must be considered having regard to the subject matter of the dispute in the main proceedings relating to the jurisdiction of the ad hoc arbitral tribunal which made the award referred to in paragraph 13 of the present judgment, the referring court asks, in essence, whether Article 1(6) and Article 26(1) ECT must be interpreted as meaning that the acquisition, by an undertaking of a contracting party to that treaty, of a claim arising from a contract for the supply of electricity, which is not associated with an investment, held by an undertaking of a third State to that treaty against a public undertaking of another Contracting Party to the same treaty, may constitute an 'investment', within the meaning of those provisions, even though that claim did not involve any economic contribution on the part of the acquirer in the area of the host Contracting Party.

40    In order to answer that question, it is necessary, first of all, as several Member States which have participated in the proceedings have observed, to specify which disputes between one Contracting Party and an investor of another Contracting Party concerning an investment made by the latter in the area of the former may be brought before an arbitral tribunal pursuant to Article 26 ECT.

41    In that regard, it must be stated that, although the fact that the dispute at issue in the main proceedings, based on Article 26(2)(c) ECT, is between an operator from one third State and another third State does not preclude, for the reasons stated in paragraphs 22 to 38 of the present judgment, the Court's jurisdiction to

answer those questions, it cannot be inferred that that provision of the ECT also applies to a dispute between an operator from one Member State and another Member State.

42  The Court has consistently held that an international agreement cannot affect the allocation of powers laid down by the Treaties and, hence, the autonomy of the EU legal system, observance of which is ensured by the Court. That principle is enshrined in particular in Article 344 TFEU, under which the Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties (judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraph 32 and the case-law cited).

43  According to further settled case-law of the Court, the autonomy of EU law with respect both to the law of the Member States and to international law is justified by the essential characteristics of the European Union and its law, relating in particular to the constitutional structure of the European Union and the very nature of that law. EU law is characterised by the fact that it stems from an independent source of law, the Treaties, by its primacy over the laws of the Member States, and by the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves. Those characteristics have given rise to a structured network of principles, rules and mutually interdependent legal relations binding the European Union and its Member States reciprocally and binding its Member States to each other (judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraph 33 and the case-law cited, and Opinion 1/17 *(EU-Canada CET Agreement)*, of 30 April 2019, EU:C:2019:341, paragraph 109 and the case-law cited).

44  That autonomy accordingly flows from the fact that the European Union possesses a constitutional framework that is unique to it. That framework covers, inter alia, the provisions of the EU and FEU Treaties, which include, in particular, rules on the conferral and division of powers, rules governing how the EU institutions and its judicial system are to operate, and fundamental rules in specific areas, structured in such a way as to contribute to the implementation of the process of integration described in the second paragraph of Article 1 TEU (see, to that effect, Opinion 1/17 *(EU-Canada CET Agreement)*, of 30 April 2019, EU:C:2019:341, paragraph 110 and the case-law cited).

45  In order to ensure that those specific characteristics and the autonomy of the legal order thus created are preserved, the Treaties have established a judicial system intended to ensure consistency and uniformity in the interpretation of EU law. In accordance with Article 19 TEU, it is for the national courts and tribunals and the Court to ensure the full application of that law in all the Member States and to ensure effective judicial protection of the rights of individuals under that law, the Court having exclusive jurisdiction to give the definitive interpretation of that law. To that end, that system includes, in particular, the preliminary ruling procedure provided for in Article 267 TFEU (judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraphs 35 and 36 and the case-law cited, and Opinion 1/17 *(EU-Canada CET Agreement)*, of 30 April 2019, EU:C:2019:341, paragraph 111 and the case-law cited).

46  By setting up a dialogue between one court and another, specifically between the Court of Justice and the courts and tribunals of the Member States, that procedure, which is the keystone of the judicial system as thus conceived, has the objective of securing the uniform interpretation of EU law, thereby ensuring its consistency, its full effect and its autonomy as well as, ultimately, the particular nature of the law established by the Treaties (judgment of 6 March 2018, Achmea, C-284/16, EU:C:2018:158, paragraph 37 and the case-law cited).

47  It is in the light of the foregoing considerations that the question whether a dispute between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State may be subject to arbitration proceedings under Article 26(2)(c) ECT must be examined.

48  To that end, in the first place, it should be noted that, in accordance with Article 26(6) ECT, the arbitral tribunal provided for in paragraph 4 of that article is to rule on the issues in dispute in accordance with the ECT and with the applicable rules and principles of international law.

49    As stated in paragraph 23 of this judgment, the ECT itself is an act of EU law.

50    It follows that an arbitral tribunal such as that referred to in Article 26(6) ECT is required to interpret, and even apply, EU law.

51    It must therefore be ascertained, in the second place, whether such an arbitral tribunal is situated within the judicial system of the European Union, and in particular whether it can be regarded as a court or tribunal of a Member State within the meaning of Article 267 TFEU. The consequence of a tribunal set up by Member States being situated within the EU judicial system is that its decisions are subject to mechanisms capable of ensuring the full effectiveness of the rules of the European Union (judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraph 43 and the case-law cited).

52    In the precisely same way as the arbitral tribunal at issue in the case giving rise to the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158, paragraph 45), an ad hoc arbitral tribunal, such as that referred to in Article 26(6) ECT, does not constitute a component of the judicial system of a Member State, in this case the French Republic. Indeed it is precisely the exceptional nature of that court's jurisdiction, by comparison with that of the courts of the contracting parties to the ECT, which is one of the main reasons for the existence of Article 26(2)(c) and (4) of that treaty. That is all the more so given that, if the arbitral tribunal concerned were one of the courts of a Contracting Party to that treaty, it would be included amongst the courts referred to in Article 26(2)(a) ECT and thus Article 26(2)(c) ECT would lose any effectiveness.

53    That characteristic of such an arbitral tribunal means that it cannot, in any event, be classified as a court or tribunal 'of a Member State' within the meaning of Article 267 TFEU, and is not therefore entitled to make a reference to the Court for a preliminary ruling (see, by analogy, judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraphs 46 and 49).

54    In those circumstances, it remains to be ascertained, in the third place, whether an arbitral award made by such a tribunal is, in accordance with Article 19 TEU in particular, subject to review by a court of a Member State and whether that review is capable of ensuring full compliance with EU law guaranteeing that questions of EU law which the tribunal may have to address can, if necessary, be submitted to the Court by means of a reference for a preliminary ruling.

55    To that end, it should be noted that, under Article 26(8) ECT, arbitral awards are final and binding on the parties to the dispute concerned. In addition, by application of Article 26(4) ECT, a dispute, such as that at issue in the main proceedings, may be brought before an ad hoc arbitration tribunal on the basis of the Uncitral arbitration rules, with that arbitral tribunal determining its own procedural rules in accordance with those arbitration rules.

56    In the present case, as has been recalled in paragraph 32 of the present judgment, the parties to the dispute at issue in the main proceedings chose, in accordance with Article 26(4)(b) ECT, to submit that dispute to an ad hoc arbitration tribunal, established on the basis of the Uncitral arbitration rules, and thus accepted, in accordance with those arbitration rules, that the seat of the arbitration tribunal should be established in Paris, which made French law applicable to the proceedings before the referring court, whose purpose was the judicial review of the arbitration award made by that tribunal.

57    However, such judicial review can be carried out by the referring court only in so far as the domestic law of its Member State so permits. Article 1520 of the Code of Civil Procedure provides only for limited review concerning, in particular, the jurisdiction of the arbitral tribunal.

58    It is true that, in relation to commercial arbitration, the Court has held that the requirements of efficient arbitration proceedings justify the review of arbitral awards by the courts of the Member States being limited in scope, provided that the fundamental provisions of EU law can be examined in the course of that review and they can, if necessary, be the subject of a reference to the Court for a preliminary ruling (judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraph 54 and the case-law cited).

59      However, arbitration proceedings such as those referred to in Article 26 ECT are different from commercial arbitration proceedings. While the latter originate in the freely expressed wishes of the parties concerned, the former derives from a treaty whereby, in accordance with Article 26(3)(a) ECT, Member States agree to remove from the jurisdiction of their own courts and, hence, from the system of judicial remedies which the second subparagraph of Article 19(1) TEU requires them to establish in the fields covered by EU law (see, to that effect, judgment of 27 February 2018, *Associação Sindical dos Juízes Portugueses*, C-64/16, EU:C:2018:117, paragraph 34), disputes which may concern the application or interpretation of that law. In those circumstances, the considerations set out in the preceding paragraph relating to commercial arbitration do not apply to arbitration proceedings such as those referred to in Article 26(2(c) ECT (see, to that effect, judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraph 55).

60     Having regard to all the characteristics of the arbitral tribunal set out in paragraphs 48 to 59 of the present judgment, it must be considered that, if the provisions of Article 26 ECT allowing such a tribunal to be entrusted with the resolution of a dispute were to apply as between an investor of one Member State and another Member State, it would mean that, by concluding the ECT, the European Union and the Member States which are parties to it established a mechanism for settling such a dispute that could exclude the possibility that that dispute, notwithstanding the fact that it concerns the interpretation or application of EU law, would be resolved in a manner that guarantees the full effectiveness of that law (see, by analogy, judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraph 56).

61     It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the EU institutions, including the Court of Justice of the European Union, is not in principle incompatible with EU law. The competence of the European Union in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the European Union and its legal order is respected (judgment of 6 March 2018, *Achmea*, C-284/16, EU:C:2018:158, paragraph 57 and the case-law cited).

62     However, the exercise of the European Union's competence in international matters cannot extend to permitting, in an international agreement, a provision according to which a dispute between an investor of one Member State and another Member State concerning EU law may be removed from the judicial system of the European Union such that the full effectiveness of that law is not guaranteed.

63     Such a possibility would, as the Court held in the case giving rise to the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158, paragraph 58) and as the Advocate General observed in essence in point 83 of his Opinion, call into question the preservation of the autonomy and of the particular nature of the law established by the Treaties, ensured in particular by the preliminary ruling procedure provided for in Article 267 TFEU.

64     It should be noted in that regard that, despite the multilateral nature of the international agreement of which it forms part, a provision such as Article 26 ECT is intended, in reality, to govern bilateral relations between two of the Contracting Parties, in an analogous way to the provision of the bilateral investment treaty at issue in the case giving rise to the judgment of 6 March 2018, *Achmea* (C-284/16, EU:C:2018:158, paragraph 58).

65     It follows that, although the ECT may require Member States to comply with the arbitral mechanisms for which it provides in their relations with investors from third States who are also Contracting Parties to that treaty as regards investments made by the latter in those Member States, preservation of the autonomy and of the particular nature of EU law precludes the same obligations under the ECT from being imposed on Member States as between themselves.

66   In the light of the foregoing, it must be concluded that Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State.

67   Next, it should be noted that, under the first subparagraph of Article 1(6) ECT, the concept of 'investment' 'means every kind of asset, owned or controlled directly or indirectly by an investor', and includes one of the elements mentioned in points (a) to (f) of that provision. Furthermore, the third subparagraph of Article 1(6) ECT states, inter alia, that the term 'investment' means 'any investment associated with an economic activity in the energy sector'. It follows that the first subparagraph of that provision defines the concept of 'investment' itself, whereas the third subparagraph of that provision clarifies that not all investments which correspond to the definition given in the first subparagraph fall within the scope of the ECT, since it covers only those investments associated with an economic activity in the energy sector.

68   Therefore, it is necessary, first of all, to ascertain whether the claim arising from a contract for the supply of electricity falls within the concept of 'investment' referred to in the first subparagraph of Article 1(6) ECT, before seeking to ascertain, if it does so, whether such an investment is associated with an economic activity in the energy sector within the meaning of the third subparagraph of that provision.

69   As regards the concept of 'investment' referred to in the first subparagraph of Article 1(6) ECT, it must be held that that concept is defined by two cumulative conditions. First, it must concern an asset of a type owned or controlled directly or indirectly by an investor and, second, that asset must include at least one of the elements referred to in points (a) to (f) of that provision.

70   As regards the first condition, it must be observed that this is satisfied in the present case. A claim arising from a contract for the supply of electricity constitutes an asset held directly by an investor, it being specified that the term 'investor', defined in Article 1(7) ECT and used in particular in Article 26(1) ECT, designates, inter alia, as regards a Contracting Party such as Ukraine, any undertaking organised in accordance with the legislation applicable in the territory of that Contracting Party. Consequently, Komstroy must be regarded as an investor that directly owns an asset in the form of a claim arising from a contract for the supply of electricity. It should be stated in that regard that the fact that Komstroy acquired the claim from an undertaking of a third State to the ECT cannot call into question its status as an 'investor', within the meaning of the ECT, since, as the Advocate General observed in point 138 of his Opinion, an investment may, by virtue of Article 1(7) ECT, be made by an economic operator of a third State to the ECT.

71   As regards the second condition, it must be held that a debt arising under a contract for the supply of electricity could in principle fall within the scope of both point (c) of the first subparagraph of Article 1(6) ECT and point (f) of the first subparagraph of Article 1(6) ECT.

72   As regards, first, point (f) of the first subparagraph of Article 1(6) ECT, 'investment' within the meaning of that provision includes 'any right conferred by … contract … to undertake any economic activity in the energy sector'. A claim may be regarded as a 'right conferred by … contract'. However, as the Advocate General noted, in essence, in point 122 of his Opinion, a claim arising from a mere contract for the sale of electricity cannot, in itself, be regarded as having been granted in order to undertake an economic activity in the energy sector.

73   As regards, secondly, point (c) of the first subparagraph of Article 1(6) ECT, that provision states that the concept of 'investment' includes 'claims to money and claims to performance pursuant to [a] contract having an economic value and associated with an investment'. It must therefore be ascertained whether a claim arising from a contract for the supply of electricity can amount to such a claim.

74   In that regard, in the first place, it should be noted that the claim at issue in the main proceedings is of a fixed amount in so far as it is apparent from the request for a preliminary ruling that it constitutes a claim

for a sum of money and that its cash value amounts to USD 16 287 185.94, as has been recalled in paragraph 11 of the present judgment.

75   In the second place, that claim arises from a contract, namely the contract for the supply of electricity concluded between Moldtranselectro and Derimen, which has an economic value since that supply was granted in return for payment of a sum of money.

76   It thus remains to be determined, in the third place, whether that claim arises from a contract connected with an investment.

77   In that regard, there is nothing in the case file before the Court that makes it possible to find that the contract for the supply of electricity concluded between Moldtranselectro and Derimen is connected with any other transaction, whether or not that transaction constitutes an investment.

78   The contractual relationship between Moldtranselectro and Derimen concerned only the supply of electricity, which was generated by other Ukrainian operators that merely sold it to Derimen.

79   Against that background, it must be held that a mere supply contract is a commercial transaction which cannot, in itself, constitute an 'investment' within the meaning of Article 1(6) ECT, irrespective of whether an economic contribution is necessary in order for a given transaction to constitute an investment.

80   Any other interpretation of that provision would amount to depriving the clear distinction made by the ECT between trade, governed by Part II of that treaty, and investments, governed by Part III thereof, of its effectiveness.

81   Such a distinction reflects the objective of the ECT, as set out in its preamble, which is to 'catalyse economic growth by means of measures to liberalise investment and trade in energy'. Those two categories of measure are reflected in the structure of the treaty, which governs investments, on the one hand, and trade on the other hand.

82   It should be pointed out in that regard that Article 26 ECT applies to disputes relating to presumed infringements of the obligations arising under Part III of that treaty, concerning the promotion and protection of investments, and not under Part II thereof, which relates to trade. That distinction reflects one of the main reasons for the existence of protective rules specific to foreign investors, arising from the fact that investment transactions involve the immobilisation of resources abroad which, in general, cannot easily be repatriated in the event of a dispute.

83   In the present case, no factor has been brought to the attention of the Court that makes it possible to rule out the possibility that the supply of electricity to Moldtranselectro might have been redirected by Derimen and offered to other operators, especially since, in any event, the very generation of that electricity was dependent upon orders which Moldtranselectro made directly with Ukrenergo, whereas the latter sold that electricity to Energoalians, which resold it to Derimen. In those circumstances, Derimen could have interrupted or reduced the supply of electricity to Moldtranselectro without that resulting in the immobilisation of its resources in Moldova.

84   Since the claim at issue in the main proceedings does not constitute an 'investment' within the meaning of the first subparagraph of Article 1(6) ECT, it is not necessary to determine whether the condition referred to in the third subparagraph of that provision and set out in paragraphs 67 and 68 above is satisfied.

85   In the light of the foregoing considerations, the answer to the first question referred is that Article 1(6) and Article 26(1) ECT must be interpreted as meaning that the acquisition, by an undertaking of a Contracting Party to that treaty, of a claim arising from a contract for the supply of electricity, which is not connected with an investment, held by an undertaking of a third State against a public undertaking of another Contracting Party to that treaty, does not constitute an 'investment' within the meaning of those provisions.

*The second and third questions*

86  In view of the answer given to the first question referred, there is no need to answer the second and third questions.

**Costs**

87  Since these proceedings are, for the parties to the main proceedings, a step in the action pending before the national court, the decision on costs is a matter for that court. Costs incurred in submitting observations to the Court, other than the costs of those parties, are not recoverable.

On those grounds, the Court (Grand Chamber) hereby rules:

**Article 1(6) and Article 26(1) of the Energy Charter Treaty, signed at Lisbon on 17 December 1994, approved on behalf of the European Communities by Council and Commission Decision 98/181/EC, ECSC, Euratom of 23 September 1997, must be interpreted as meaning that the acquisition, by an undertaking of a Contracting Party to that treaty, of a claim arising from a contract for the supply of electricity, which is not connected with an investment, held by an undertaking of a third State against a public undertaking of another Contracting Party to that treaty, does not constitute an 'investment' within the meaning of those provisions.**

[Signatures]

---

\*   Language of the case: French.