# EXHIBIT 69

JUDGMENT OF THE COURT (Grand Chamber)

24 June 2008 [*]

In Case C-188/07,

REFERENCE for a preliminary ruling under Article 234 EC from the Cour de cassation (France), made by decision of 28 March 2007, received at the Court on 3 April 2007, in the proceedings

**Commune de Mesquer**

v

**Total France SA,**

**Total International Ltd,**

THE COURT (Grand Chamber),

composed of C.W.A. Timmermans, President of the Second Chamber, acting as President, A. Rosas, K. Lenaerts and L. Bay Larsen, Presidents of Chambers,

---

[*] Language of the case: French.

R. Silva de Lapuerta, K. Schiemann, P. Kūris, E. Levits, A. Ó Caoimh, P. Lindh, J.-C. Bonichot, T. von Danwitz and C. Toader (Rapporteur), Judges,

Advocate General: J. Kokott,
Registrar: M.-A. Gaudissart, head of unit,

having regard to the written procedure and further to the hearing on 22 January 2008,

after considering the observations submitted on behalf of:

— Commune de Mesquer, by C. Lepage and A. Moustardier, avocats,

— Total France SA and Total International Ltd, by J.-P. Hordies, C. Smits, M. Memlouk, J. Boivin, E. Fontaine and F.-H. Briard, avocats,

— the French Government, by G. de Bergues and A.-L. During, acting as Agents,

— the Belgian Government, by L. Van den Broeck, acting as Agent,

— the Italian Government, by I.M. Braguglia, acting as Agent, assisted by D. Del Gaizo, avvocato dello Stato,

— the United Kingdom Government, by C. Gibbs and I. Rao, acting as Agents, assisted by J. Maurici, barrister,

— the Commission of the European Communities, by M. Konstantinidis, J.-B. Laignelot and G. Valero Jordana, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 13 March 2008,

gives the following

## Judgment

1   This reference for a preliminary ruling concerns the interpretation of Articles 1 and 15 of and Annex I to Council Directive 75/442/EEC of 15 July 1975 on waste (OJ 1975 L 194, p. 39), as amended by Commission Decision 96/350/EC of 24 May 1996 (OJ 1996 L 135, p. 32) ('Directive 75/442').

2   The reference was made in the course of proceedings between the Commune de Mesquer (municipality of Mesquer) and Total France SA and Total International Ltd ('the Total companies') concerning compensation for the damage caused by the waste spread on the territory of that municipality following the sinking of the oil tanker Erika.

**Legal context**

*International law*

3    The International Convention on Civil Liability for Oil Pollution Damage adopted at Brussels on 29 November 1969, as amended by the Protocol signed in London on 27 November 1992 (OJ 2004 L 78, p. 32) ('the Liability Convention'), governs the liability of shipowners for damage caused by the spillage of persistent oil from oil tankers. It introduces the principle of strict liability on their part, limited to an amount calculated by reference to the tonnage of the ship, and establishes a system of compulsory liability insurance.

4    Under Article II(a) of the Liability Convention, the Convention applies to pollution damage caused in the territory, including the territorial sea, of a Contracting State, and in the exclusive economic zone of a Contracting State established in accordance with international law or, as the case may be, in an area beyond and adjacent to the territorial sea of that State determined by that State in accordance with maritime law and extending not more than 200 nautical miles from the baselines from which the breadth of its territorial sea is measured.

5    Under Article III(4) of the Liability Convention, 'no claim for compensation for pollution damage under this Convention or otherwise may be made against … any charterer (howsoever described, including a bareboat charterer), manager or operator of the ship … unless the damage resulted from their personal act or omission, commit-

JUDGMENT OF 24. 6. 2008 — CASE C-188/07

ted with the intent to cause such damage, or recklessly and with knowledge that such damage would probably result'.

6    The International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage adopted at Brussels on 18 December 1971, as amended by the Protocol signed in London on 27 November 1992 (OJ 2004 L 78, p. 40) ('the Fund Convention') complements the Liability Convention by establishing a system for compensating victims.

7    The International Oil Pollution Compensation Fund ('the Fund'), which is financed by contributions from the oil industry, can cover up to 135 million SDR (special drawing rights) for an incident before 2003. Under Article 4 of the Fund Convention, victims may bring claims for compensation before the courts of the Contracting State where the damage has been caused, in particular where the Liability Convention does not provide for any liability for the damage in question or where the shipowner is insolvent or released from liability under that Convention.

8    The Protocol of 2003 to the International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage, 1992, (OJ 2004 L 78, p. 24) establishes an international supplementary fund for compensation for oil pollution damage, to be named 'The International Oil Pollution Compensation Supplementary Fund, 2003', which together with the Fund makes it possible to cover up to 750 million units of account in respect of any one incident after 1 November 2003.

*Community law*

Directive 75/442

9    According to the third recital in the preamble to Directive 75/442, the essential objective of all provisions relating to waste disposal must be the protection of human health and the environment against harmful effects caused by the collection, transport, treatment, storage and tipping of waste.

10    Article 1 of Directive 75/442 provides:

'For the purposes of this Directive:

(a) "waste" shall mean any substance or object in the categories set out in Annex I which the holder discards or intends or is required to discard.

The Commission … will draw up … a list of wastes belonging to the categories listed in Annex I …

(b) "producer" shall mean anyone whose activities produce waste ("original pro-

I - 4543

ducer") and/or anyone who carries out pre-processing, mixing or other operations resulting in a change in the nature or composition of this waste;

(c)  "holder" shall mean the producer of the waste or the natural or legal person who is in possession of it;

…

(e)  "disposal" shall mean any of the operations provided for in Annex II, A;

(f)  "recovery" shall mean any of the operations provided for in Annex II, B;

(g)  "collection" shall mean the gathering, sorting and/or mixing of waste for the purpose of transport.'

11    Article 8 of Directive 75/442 provides:

'Member States shall take the necessary measures to ensure that any holder of waste:

— has it handled by a private or public waste collector or by an undertaking which carries out the operations listed in Annex II A or B,

or

— recovers or disposes of it himself in accordance with the provisions of this Directive.'

12    Article 15 of Directive 75/442 provides:

'In accordance with the "polluter pays" principle, the cost of disposing of waste must be borne by:

— the holder who has waste handled by a waste collector or by an undertaking as referred to in Article 9,

and/or

— the previous holders or the producer of the product from which the waste came.'

13    Categories Q4, Q11, Q13 and Q16 in Annex I to Directive 75/442, 'Categories of waste', read as follows:

'Q4 Materials spilled, lost or having undergone other mishap, including any materials, equipment, etc., contaminated as a result of the mishap

...

Q11 Residues from raw materials extraction and processing (e.g. mining residues oil field slops, etc.)

...

Q13 Any materials, substances or products whose use has been banned by law

...

Q16 Any materials, substances or products which are not contained in the above categories.'

14    Annex II A to the directive, 'Disposal operations', is intended to list disposal operations such as they occur in practice, while Annex II B, 'Recovery operations', is intended to list recovery operations in the same way.

15    Directive 2006/12/EC of the European Parliament and of the Council of 5 April 2006 on waste (OJ 2006 L 114, p. 9), which draws up a codification of Directive 75/442 in order to clarify matters, repeats the above provisions in Articles 1 and 15 and Annexes I, II A and II B. Directive 2006/12 was not adopted until after the events that are the subject of the main proceedings, however, so that it does not affect those proceedings.

Directive 68/414/EEC

16    Article 2 of Council Directive 68/414/EEC of 20 December 1968 imposing an obliga-
tion on Member States of the EEC to maintain minimum stocks of crude oil and/
or petroleum products (OJ, English Special Edition 1968(II), p. 586), as amended by
Council Directive 98/93/EC of 14 December 1998 (OJ 1998 L 358, p. 100), which lays
down such an obligation inter alia to cope with any shortages or supply crises, treats
fuel oils as a category of petroleum products.

Directive 2004/35/EC

17    Recital 10 in the preamble to Directive 2004/35/EC of the European Parliament and
of the Council of 21 April 2004 on environmental liability with regard to the preven-
tion and remedying of environmental damage (OJ 2004 L 143, p. 56) reads as follows:

'Express account should be taken of the Euratom Treaty and relevant international
conventions and of Community legislation regulating more comprehensively and
more stringently the operation of any of the activities falling under the scope of this
Directive. …'

18    Article 4(2) of Directive 2004/35 provides:

'This Directive shall not apply to environmental damage or to any imminent threat of
such damage arising from an incident in respect of which liability or compensation

falls within the scope of any of the International Conventions listed in Annex IV, including any future amendments thereof, which is in force in the Member State concerned.'

19    Annex IV to Directive 2004/35 reads as follows:

'INTERNATIONAL CONVENTIONS REFERRED TO IN ARTICLE 4(2)

(a)  the International Convention of 27 November 1992 on Civil Liability for Oil Pollution Damage;

(b)  the International Convention of 27 November 1992 on the Establishment of an International Fund for Compensation for Oil Pollution Damage;

…'

Decision 2004/246/EC

20    On 2 March 2004 the Council adopted Decision 2004/246/EC authorising the Member States to sign, ratify or accede to, in the interest of the European Community, the Protocol of 2003 to the International Convention on the Establishment of an

International Fund for Compensation for Oil Pollution Damage, 1992, and authorising Austria and Luxembourg, in the interest of the European Community, to accede to the underlying instruments (OJ 2004 L 78, p. 22).

21    Recital 4 in the preamble to Decision 2004/246 reads as follows:

'Pursuant to the Supplementary Fund Protocol, only sovereign States may be party to it; it is not therefore possible for the Community to ratify or accede to the Protocol, nor is there a prospect that it will be able to do so in the near future.'

22    Articles 1(1) and 4 of Decision 2004/246 read as follows:

'*Article 1*

1. The Member States are hereby authorised to sign, ratify or accede to, in the interest of the European Community, the Protocol of 2003 to the International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage, 1992, (the Supplementary Fund Protocol) subject to the conditions set out in the following Articles.

…

*Article 4*

Member States shall, at the earliest opportunity, use their best endeavours to ensure that the Supplementary Fund Protocol, and the underlying instruments, are amended in order to allow the Community to become a Contracting Party to them.'

*National law*

23    Article 2 of Loi n° 75-633 relative à l'élimination des déchets et à la récupération des matériaux (Law No 75-633 on the disposal of waste and the recovery of materials) of 15 July 1975 (JORF, 16 July 1975, p. 7279), now Article L. 541-2 of the Code de l'environnement (Code of the Environment), provides:

'Any person who produces or holds waste under conditions likely to produce harmful effects on soils, flora and fauna, to damage sites or landscapes, to pollute the air or water, to cause noise and odours and, in general, to harm human health or the environment, is obliged to dispose of it or have it disposed of in accordance with the provisions of this Chapter, under the conditions required to avoid the above effects.

The disposal of waste includes the operations of collection, transport, storage, sorting and treatment required for the recovery of reusable elements and materials or energy, and for the deposit or discharge into the natural environment of all other products under the conditions required to avoid the harmful effects mentioned in the previous paragraph.'

COMMUNE DE MESQUER

**The dispute in the main proceedings and the reference for a preliminary ruling**

24    On 12 December 1999 the oil tanker Erika, flying the Maltese flag and chartered by Total International Ltd, sank about 35 nautical miles south-west of the Pointe de Penmarc'h (Finistère, France), spilling part of her cargo and oil from her bunkers at sea and causing pollution of the Atlantic coast of France.

25    It appears from the order for reference and the observations submitted to the Court that the Italian company ENEL concluded a contract with Total International Ltd for the delivery of heavy fuel oil intended to be used as fuel for electricity production. In order to carry out the contract, Total raffinage distribution, now Total France SA, sold the heavy fuel oil to Total International Ltd, which chartered the vessel Erika to carry it from Dunkirk (France) to Milazzo (Italy).

26    On 9 June 2000 the Commune de Mesquer brought proceedings against the Total companies in the Tribunal de commerce de Saint-Nazaire (Commercial Court, Saint-Nazaire), seeking inter alia a ruling that the companies should, pursuant to Law No 75-633, be liable for the consequences of the damage caused by the waste spread on the territory of the municipality and be ordered jointly and severally to pay the costs incurred by the municipality for cleaning and anti-pollution measures, namely EUR 69 232.42.

27    The action was unsuccessful, and the Commune de Mesquer appealed to the Cour d'appel de Rennes (Court of Appeal, Rennes), which by judgment of 13 February 2002 confirmed the decision at first instance, taking the view that the heavy fuel oil did not in this case constitute waste but was a combustible material for energy production manufactured for a specific use. The Cour d'appel de Rennes accepted that the heavy fuel oil thus spilled and mixed with water and sand formed waste, but nevertheless considered that there was no provision under which the Total companies could be held liable, since they could not be regarded as producers or holders of that waste. The municipality appealed on a point of law to the Cour de cassation (Court of Cassation).

28    Since it considered that the case raised a serious problem of interpretation of Directive 75/442, the Cour de cassation decided to stay the proceedings and refer the following questions to the Court for a preliminary ruling:

‘1.   Can heavy fuel oil, as the product of a refining process, meeting the user's specifications and intended by the producer to be sold as a combustible fuel, and referred to in [Directive 68/414] be treated as waste within the meaning of Article 1 of [Directive 75/442] as … codified by [Directive 2006/12]?

2.   Does a cargo of heavy fuel oil, transported by a ship and accidentally spilled into the sea, constitute — either in itself or on account of being mixed with water and sediment — waste falling within category Q4 in Annex I to [Directive 2006/12]?

3.   If the first question is answered in the negative and the second in the affirmative, can the producer of the heavy fuel oil (Total raffinage [distribution]) and/or the seller and carrier (Total International Ltd) be regarded as the producer and/or holder of waste within the meaning of Article 1(b) and (c) of [Directive 2006/12] and for the purposes of applying Article 15 of that directive, even though at the time of the accident which transformed it into waste the product was being transported by a third party?’

**The questions referred for a preliminary ruling**

*Admissibility*

29   The Total companies submit that the reference for a preliminary ruling must be declared inadmissible in so far as the Commune de Mesquer has already received compensation from the Fund and consequently has no legal interest in bringing proceedings. In those circumstances the request for a preliminary ruling is hypothetical.

30   It is settled case-law that questions on the interpretation of Community law referred by a national court, in the factual and legislative context which that court is responsible for defining and the accuracy of which is not a matter for the Court to determine, enjoy a presumption of relevance. The Court may refuse to rule on a question referred by a national court only where it is quite obvious that the interpretation of Community law that is sought bears no relation to the actual facts of the main action or its purpose, where the problem is hypothetical, or where the Court does not have before it the factual or legal material necessary to give a useful answer to the questions submitted to it (see, to that effect, Joined Cases C-222/05 to C-225/05 *Van der Weerd and Others* [2007] ECR I-4233, paragraph 22 and the case-law cited).

31   Moreover, according to settled case-law, it is for the national court hearing a dispute to determine both the need for a preliminary ruling in order to enable it to deliver judgment and the relevance of the questions which it submits to the Court (Joined Cases C-393/04 and C-41/05 *Air Liquide Industries Belgium* [2006] ECR I-5293, paragraph 24 and the case-law cited).

32    It may be seen from the documents in the case that the Commune de Mesquer has indeed received payments from the Fund, made following the claim for compensation it brought against inter alia the owner of the Erika and the Fund. Those payments were the subject of settlements by which the municipality expressly agreed not to bring any actions or proceedings, on pain of having to repay the sums paid.

33    It is apparent that the Cour de cassation had that information before it, but none the less did not consider that the dispute in the main proceedings had ceased or that the Commune de Mesquer had lost its legal interest in bringing proceedings, and did not decide not to refer its questions to the Court for a preliminary ruling.

34    In those circumstances the questions put by the Cour de cassation must be answered.

*The first question*

35    By its first question, the referring court seeks to know whether heavy fuel oil sold as a combustible fuel may be classified as waste within the meaning of Article 1(a) of Directive 75/442.

36    The Total companies, the Member States which have submitted observations, and the Commission take the view that the question should be answered in the negative. Only the Commune de Mesquer submits that such heavy fuel oil is to be classified as waste and that the substance in question falls, moreover, within the category of dangerous and illegal products.

COMMUNE DE MESQUER

37    It should be recalled that under Article 1(a) of Directive 75/442 any substance or object in the categories set out in Annex I to the directive which the holder discards or intends or is required to discard is to be regarded as waste.

38    Thus, in the context of that directive, the scope of the term 'waste' turns on the meaning of the term 'discard' (Case C-129/96 *Inter-Environnement Wallonie* [1997] ECR I-7411, paragraph 26), and consequently, in accordance with the Court's case-law, those terms must be interpreted in the light of the aim of the directive (Joined Cases C-418/97 and C-419/97 *ARCO Chemie Nederland and Others* [2000] ECR I-4475, paragraph 37), which, in the words of the third recital in the preamble to the directive, consists in the protection of human health and the environment against harmful effects caused by the collection, transport, treatment, storage and tipping of waste, having regard to Article 174(2) EC, which provides that Community policy on the environment is to aim at a high level of protection and is to be based, in particular, on the precautionary principle and the principle that preventive action should be taken (see Case C-457/02 *Niselli* [2004] ECR I-10853, paragraph 33).

39    The Court has also held that, in view of the aim pursued by Directive 75/442, the concept of waste cannot be interpreted restrictively (see *ARCO Chemie Nederland*, paragraph 40).

40    That concept can cover all objects and substances discarded by their owner, even if they have a commercial value and are collected on a commercial basis for recycling, reclamation or reuse (see, in particular, Case C-9/00 *Palin Granit and Vehmassalon kansanterveystyön kuntayhtymän hallitus* [2002] ECR I-3533, paragraph 29 and the case-law cited).

41    In this respect, certain circumstances may constitute evidence that a substance or object has been discarded or of an intention or requirement to discard it within the meaning of Article 1(a) of Directive 75/442. That will be the case in particular where the substance used is a production residue, that is to say, a product not sought as

such (*ARCO Chemie Nederland*, paragraphs 83 and 84). The Court has thus said that leftover stone from extraction processes of a granite quarry which is not the product primarily sought by the operator in principle constitutes waste (*Palin Granit*, paragraphs 32 and 33).

42    However, goods, materials or raw materials resulting from a manufacturing or extraction process which is not primarily intended to produce that item may constitute not a residue but a by-product which the undertaking does not wish to discard but intends to exploit or market on economically advantageous terms in a subsequent process without prior processing (see *Palin Granit*, paragraph 34, and order in Case C-235/02 *Saetti and Frediani* [2004] ECR I-1005, paragraph 35).

43    There is no reason to apply the provisions of Directive 75/442 to goods, materials or raw materials which have an economic value as products regardless of any form of processing and which, as such, are subject to the legislation applicable to those products (see *Palin Granit*, paragraph 35, and order in *Saetti and Frediani*, paragraph 35).

44    However, having regard to the obligation to interpret the concept of waste widely in order to limit its inherent nuisance and harmful effects, the reasoning concerning by-products should be confined to situations in which the reuse of goods, materials or raw materials is not a mere possibility but a certainty, without prior processing and as an integral part of the production process (*Palin Granit*, paragraph 36, and order in *Saetti and Frediani*, paragraph 36).

45    In addition to the criterion of whether a substance constitutes a production residue, a second relevant criterion for determining whether or not the substance is waste within the meaning of Directive 75/442 is thus the degree of likelihood that the substance will be reused without prior processing. If, in addition to the mere possibility of reusing the substance, there is also an economic advantage to the holder in so

doing, the likelihood of such reuse is high. In that case, the substance in question can no longer be considered a substance which its holder seeks to 'discard' and must be regarded as a genuine product (see *Palin Granit*, paragraph 37).

46    In the case at issue in the main proceedings, it appears that the substance in question is obtained as a result of the process of refining oil.

47    However, this residual substance is capable of being exploited commercially on economically advantageous terms, as is confirmed by the fact that it was the subject of a commercial transaction and meets the buyer's specifications, as the referring court points out.

48    The answer to the first question must therefore be that a substance such as that at issue in the main proceedings, namely heavy fuel oil sold as a combustible fuel, does not constitute waste within the meaning of Directive 75/442, where it is exploited or marketed on economically advantageous terms and is capable of actually being used as a fuel without requiring prior processing.

*The second question*

49    By its second question the referring court seeks essentially to know whether heavy fuel oil that is accidentally spilled into the sea following a shipwreck must in such circumstances be classified as waste within the meaning of category Q4 in Annex I to Directive 75/442.

Observations submitted to the Court

50    The Commune de Mesquer, with which the French and Italian Governments and the Commission substantially agree, takes the view that where such hydrocarbons are discharged into the sea, and all the more so if they are mixed with water and sediment, they must be classified as waste within the meaning of Directive 75/442.

51    The Total companies submit that the mixture consisting of hydrocarbons, water and sediment from the coast constitutes waste only if there is an obligation to dispose of or recover accidentally spilled hydrocarbons as such and they are indissolubly mixed with the water and sediment.

52    The Belgian Government submits that the products thus spilled at sea should be classified not as waste within the meaning of Directive 75/442 but as heavy hydrocarbons within the meaning of the Liability Convention and the Fund Convention. The United Kingdom Government, while accepting that such hydrocarbons may be classified as waste within the meaning of that directive, considers it preferable for the accidental spillage of hydrocarbons at sea to be covered exclusively by the Liability Convention and the Fund Convention, so that Directive 75/442 does not apply in such circumstances.

Findings of the Court

53    It should be noted, to begin with, that Annex I to Directive 75/442 provides lists of substances and objects that may be classified as waste. However, the lists are only intended as guidance, and the classification of waste is to be inferred primarily from the holder's actions and the meaning of the term 'discard' (see Case C-1/03 *Van de Walle and Others* [2004] ECR I-7613, paragraph 42).

54    The fact that Annex I to Directive 75/442, entitled 'Categories of waste', refers in point Q4 to 'Materials spilled, lost or having undergone other mishap, including any materials, equipment, etc., contaminated as a result of the mishap' thus merely indicates that such materials may fall within the scope of waste. It cannot therefore suffice to classify as waste hydrocarbons which are accidentally spilled at sea and cause pollution of the territorial waters and then the coastline of a Member State (see, to that effect, *Van de Walle*, paragraph 43).

55    In those circumstances, it must be examined whether such an accidental spillage of hydrocarbons is an act by which the holder discards them within the meaning of Article 1(a) of Directive 75/442 (see, to that effect, *Van de Walle*, paragraph 44).

56    Where the substance or object in question is a production residue, that is to say, a product which is not itself wanted for subsequent use and which the holder cannot reuse on economically advantageous terms without prior processing, it must be regarded as a burden which the holder 'discards' (see *Palin Granit*, paragraphs 32 to 37, and *Van de Walle*, paragraph 46).

57    In the case of hydrocarbons which are accidentally spilled and cause soil and ground-water contamination, the Court has held that they do not constitute a product which can be reused without prior processing (see *Van der Walle*, paragraph 47).

58    The same conclusion must be reached in the case of hydrocarbons which are accidentally spilled at sea and cause pollution of the territorial waters and then the coastline of a Member State.

59    It is common ground that the exploiting or marketing of such hydrocarbons, spread or forming an emulsion in the water or agglomerated with sediment, is very uncertain or even hypothetical. It is also agreed that, even assuming that it is technically possible, such exploiting or marketing would in any event imply prior processing operations which, far from being economically advantageous for the holder of the substance, would in fact be a significant financial burden. It follows that such hydrocarbons accidentally spilled at sea are to be regarded as substances which the holder did not intend to produce and which he 'discards', albeit involuntarily, while they are being transported, so that they must be classified as waste within the meaning of Directive 75/442 (see, to that effect, *Van der Walle*, paragraphs 47 and 50).

60    Moreover, the applicability of that directive is not called into question by the fact that the accidental spillage of hydrocarbons took place not on the land territory of a Member State but in its exclusive economic zone.

61    Without there being any need to rule on the applicability of the directive at the place where the ship sank, it suffices to observe that the hydrocarbons thus accidentally spilled drifted along the coast until they were washed up on it, so being discharged on the Member State's land territory.

62    It follows that, in the circumstances of the sinking of an oil tanker such as those at issue in the main proceedings, Directive 75/442 applies *ratione loci*.

63    Consequently, the answer to the second question must be that hydrocarbons accidentally spilled at sea following a shipwreck, mixed with water and sediment and drifting along the coast of a Member State until being washed up on that coast, constitute waste within the meaning of Article 1(a) of Directive 75/442, where they are no longer capable of being exploited or marketed without prior processing.

*The third question*

64  By its third question the referring court seeks to know whether, in the event of the sinking of an oil tanker, the producer of the heavy fuel oil spilled at sea and/or the seller of the fuel and charterer of the ship carrying the fuel may be required to bear the cost of disposing of the waste thus generated, even though the substance spilled at sea was transported by a third party, in this case a carrier by sea.

Observations submitted to the Court

65  The Commune de Mesquer submits that in the main proceedings, for the purposes of the application of Article 15 of Directive 75/442, the producer of the heavy fuel oil and the seller of that fuel oil and charterer of the ship carrying it must be regarded as producers and holders, within the meaning of Article 1(b) and (c) of that directive, of the waste resulting from the spillage into the sea of that substance.

66  According to the Total companies, in circumstances such as those at issue in the main proceedings, Article 15 of Directive 75/442 does not apply to the producer of the heavy fuel oil or to the seller of the oil and charterer of the ship carrying that substance, in that, at the time of the accident which converted the substance into waste, it was being carried by a third party. Furthermore, that provision also does not apply to the producer of the heavy fuel oil simply because he produced the product from which the waste came.

67  The French Government, with which the Italian Government and the Commission agree in part, takes the view that the producer of the heavy fuel oil and/or the

seller of the oil and charterer of the ship carrying that substance may be regarded as producers and/or holders of the waste resulting from the spillage at sea of that substance only if the shipwreck that converted the cargo of heavy fuel oil into waste was attributable to various actions capable of making them liable. The Commission adds, however, that the producer of a product such as heavy fuel oil may not, merely because of that activity, be regarded as a 'producer' and/or 'holder' within the meaning of Article 1(b) and (c) of Directive 75/442 of the waste generated by that product on the occasion of an accident during transport. He is none the less obliged under the second indent of Article 15 of that directive to bear the cost of disposing of the waste, in his capacity as 'producer of the product from which the waste came'.

68    According to the Belgian Government, the application of Directive 75/442 is excluded because the Liability Convention applies. Similarly, the United Kingdom Government considers that the Court should not answer this question, in that the case at issue in the main proceedings relates to issues of liability for the spillage of heavy fuel oil at sea.

Findings of the Court

69    In circumstances such as those of the main proceedings, having regard to the aim of Directive 75/442 as stated in the third recital in the preamble to the directive, the second indent of Article 15 of the directive provides that, in accordance with the 'polluter pays' principle, the cost of disposing of the waste is to be borne by the previous holders or the producer of the product from which the waste came.

70    Under Article 8 of Directive 75/442, any 'holder of waste' is obliged to have it handled by a private or public waste collector or by an undertaking which carries out the operations listed in Annex II A or B to the directive, or to recover or dispose of it himself in accordance with the provisions of the directive (Case C-494/01 *Commission* v *Ireland* [2005] ECR I-3331, paragraph 179).

71    It follows from those provisions that Directive 75/442 distinguishes the actual recovery or disposal operations, which it makes the responsibility of any 'holder of waste', whether producer or possessor, from the financial burden of those operations, which, in accordance with the 'polluter pays' principle, it imposes on the persons who cause the waste, whether they are holders or former holders of the waste or even producers of the product from which the waste came (*Van de Walle*, paragraph 58).

72    The application of the 'polluter pays' principle within the meaning of the second sentence of the first subparagraph of Article 174(2) EC and Article 15 of Directive 75/442 would be frustrated if such persons involved in causing waste escaped their financial obligations as provided for by that directive, even though the origin of the hydrocarbons which were spilled at sea, albeit unintentionally, and caused pollution of the coastal territory of a Member State was clearly established.

— The terms 'holder' and 'previous holders'

73    The Court has held, in the case of hydrocarbons spilled by accident as the result of a leak from a service station's storage facilities which had been bought by that service station to meet its operating needs, that those hydrocarbons were in fact in the possession of the service station's manager. The Court thus found that, in that context, the person who, for the purpose of his activity, had the hydrocarbons in stock when they became waste could be regarded as the person who 'produced' them within the meaning of Article 1(b) of Directive 75/442. Since he is at once the possessor and the producer of that waste, such a service station manager must be regarded as its holder within the meaning of Article 1(c) of that directive (see, to that effect, *Van de Walle*, paragraph 59).

74    In the same way, in the case of hydrocarbons spilled by accident at sea, it must be held that the owner of the ship carrying those hydrocarbons is in fact in possession of them immediately before they become waste. In those circumstances, the ship-owner may thus be regarded as having produced that waste within the meaning of Article 1(b) of Directive 75/442, and on that basis be categorised as a 'holder' within the meaning of Article 1(c) of that directive.

75    However, that directive does not rule out the possibility that, in certain cases, the cost of disposing of waste is to be borne by one or more previous holders (*Van de Walle*, paragraph 57).

— Determination of the persons liable to bear the cost of disposing of the waste

76    In the main proceedings, the question which arises is whether the person who sold the goods to the final consignee and for that purpose chartered the ship which sank may also be regarded as a 'holder', a 'previous' one, of the waste thus spilled. The referring court is also uncertain whether the producer of the product from which the waste came may also be responsible for bearing the cost of disposing of the waste thus produced.

77    On this point, Article 15 of Directive 75/442 provides that certain categories of persons, in this case the 'previous holders' or the 'producer of the product from which the waste came', may, in accordance with the 'polluter pays' principle, be responsible for bearing the cost of disposing of waste. That financial obligation is thus imposed on them because of their contribution to the creation of the waste and, in certain cases, to the consequent risk of pollution.

78    In the case of hydrocarbons accidentally spilled at sea following the sinking of an oil tanker, the national court may therefore consider that the seller of the hydrocarbons and charterer of the ship carrying them has 'produced' waste, if that court, in the light of the elements which it alone is in a position to assess, reaches the conclusion that that seller-charterer contributed to the risk that the pollution caused by the shipwreck would occur, in particular if he failed to take measures to prevent such an incident, such as measures concerning the choice of ship. In such circumstances, it will be possible to regard the seller-charterer as a previous holder of the waste for the purposes of applying the first part of the second indent of Article 15 of Directive 75/442.

79    As noted in paragraph 69 above, in circumstances such as those of the main proceedings, the second indent of Article 15 of Directive 75/442 provides, by using the conjunction 'or', that the cost of disposing of the waste is to be borne either by the 'previous holders' or by the 'producer of the product from which' the waste in question came.

80    In this regard, in accordance with Article 249 EC, while the Member States as the addressees of Directive 75/442 have the choice of form and methods, they are bound as to the result to be achieved in terms of financial liability for the cost of disposing of waste. They are therefore obliged to ensure that their national law allows that cost to be allocated either to the previous holders or to the producer of the product from which the waste came.

81    As the Advocate General observes in point 135 of her Opinion, Article 15 of Directive 75/442 does not preclude the Member States from laying down, pursuant to their relevant international commitments such as the Liability Convention and the Fund Convention, that the shipowner and the charterer can be liable for the damage caused by the discharge of hydrocarbons at sea only up to maximum amounts depending on the tonnage of the vessel and/or in particular circumstances linked to their negligent conduct. That provision also does not preclude a compensation fund such as the Fund with resources limited to a maximum amount for each accident from assuming liability, pursuant to those international commitments, in place of the 'holders' within the meaning of Article 1(c) of Directive 75/442, for the cost of disposal of the waste resulting from hydrocarbons accidentally spilled at sea.

82    However, if it happens that the cost of disposal of the waste produced by an accidental spillage of hydrocarbons at sea is not borne by that fund, or cannot be borne because the ceiling for compensation for that accident has been reached, and that, in accordance with the limitations and/or exemptions of liability laid down, the national law of a Member State, including the law derived from international agreements, prevents that cost from being borne by the shipowner and/or the charterer, even though they are to be regarded as 'holders' within the meaning of Article 1(c) of Directive 75/442, such a national law will then, in order to ensure that Article 15 of that directive is correctly transposed, have to make provision for that cost to be borne by the producer of the product from which the waste thus spread came. In accordance with the 'polluter pays' principle, however, such a producer cannot be liable to bear that cost unless he has contributed by his conduct to the risk that the pollution caused by the shipwreck will occur.

83    The obligation of a Member State to take all the measures necessary to achieve the result prescribed by a directive is a binding obligation imposed by the third paragraph of Article 249 EC and by the directive itself. That duty to take all appropriate measures, whether general or particular, is binding on all the authorities of the Member States including, for matters within their jurisdiction, the courts (see Case C-106/89 *Marleasing* [1990] ECR I-4135, paragraph 8, and *Inter-Environnement Wallonie*, paragraph 40).

84    It follows that, in applying national law, whether the provisions in question were adopted before or after the directive or derive from international agreements entered into by the Member State, the national court called on to interpret that law is required to do so, as far as possible, in the light of the wording and the purpose of the directive, in order to achieve the result pursued by the directive and thereby comply with the third paragraph of Article 249 EC (see, to that effect, *Marleasing*, paragraph 8).

85    Moreover, contrary to the arguments put forward by the Total companies at the hearing, the Community is not bound by the Liability Convention or the Fund Convention. In the first place, the Community has not acceded to those international instruments and, in the second place, it cannot be regarded as having taken the place

of its Member States, if only because not all of them are parties to those conventions (see, by analogy, Case C-379/92 *Peralta* [1994] ECR I-3453, paragraph 16, and Case C-308/06 *Intertanko and Others* [2008] ECR I-4057, paragraph 47), or as being indirectly bound by those conventions as a result of Article 235 of the United Nations Convention on the Law of the Sea, signed at Montego Bay on 10 December 1982, which entered into force on 16 November 1994 and was approved by Council Decision 98/392/EC of 23 March 1998 (OJ 1998 L 179, p. 1), paragraph 3 of which confines itself, as the French Government pointed out at the hearing, to establishing a general obligation of cooperation between the parties to the convention.

86    Furthermore, as regards Decision 2004/246 authorising the Member States to sign, ratify or accede to, in the interest of the Community, the Protocol of 2003 to the Fund Convention, it suffices to state that that decision and the Protocol of 1993 cannot apply to the facts at issue in the main proceedings.

87    It is true that Directive 2004/35 expressly provides in Article 4(2) that it is not to apply to an incident or activity in respect of which liability or compensation falls within the scope of any of the international conventions listed in Annex IV, which mentions the Liability Convention and the Fund Convention. The Community legislature, as stated in recital 10 in the preamble to that directive, found it necessary to take express account of the relevant international conventions regulating more comprehensively and more stringently the operation of any of the activities within the scope of that directive.

88    However, Directive 75/442 does not contain a similar provision, even in the codified version resulting from Directive 2006/12.

89    In the light of the above considerations, the answer to the third question must be that, for the purposes of applying Article 15 of Directive 75/442 to the accidental spillage of hydrocarbons at sea causing pollution of the coastline of a Member State:

— the national court may regard the seller of those hydrocarbons and charterer of the ship carrying them as a producer of that waste within the meaning of Article 1(b) of Directive 75/442, and thereby as a 'previous holder' for the purposes of applying the first part of the second indent of Article 15 of that directive, if that court, in the light of the elements which it alone is in a position to assess, reaches the conclusion that that seller-charterer contributed to the risk that the pollution caused by the shipwreck would occur, in particular if he failed to take measures to prevent such an incident, such as measures concerning the choice of ship;

— if it happens that the cost of disposing of the waste produced by an accidental spillage of hydrocarbons at sea is not borne by the Fund, or cannot be borne because the ceiling for compensation for that accident has been reached, and that, in accordance with the limitations and/or exemptions of liability laid down, the national law of a Member State, including the law derived from international agreements, prevents that cost from being borne by the shipowner and/or the charterer, even though they are to be regarded as 'holders' within the meaning of Article 1(c) of Directive 75/442, such a national law will then, in order to ensure that Article 15 of that directive is correctly transposed, have to make provision for that cost to be borne by the producer of the product from which the waste thus spread came. In accordance with the 'polluter pays' principle, however, such a producer cannot be liable to bear that cost unless he has contributed by his conduct to the risk that the pollution caused by the shipwreck will occur.

**Costs**

90    Since these proceedings are, for the parties to the main proceedings, a step in the action pending before the national court, the decision on costs is a matter for that court. Costs incurred in submitting observations to the Court, other than the costs of those parties, are not recoverable.

On those grounds, the Court (Grand Chamber) hereby rules:

1. **A substance such as that at issue in the main proceedings, namely heavy fuel oil sold as a combustible fuel, does not constitute waste within the meaning of Council Directive 75/442/EEC of 15 July 1975 on waste, as amended by Commission Decision 96/350/EC of 24 May 1996, where it is exploited or marketed on economically advantageous terms and is capable of actually being used as a fuel without requiring prior processing.**

2. **Hydrocarbons accidentally spilled at sea following a shipwreck, mixed with water and sediment and drifting along the coast of a Member State until being washed up on that coast, constitute waste within the meaning of Article 1(a) of Directive 75/442, as amended by Decision 96/350, where they are no longer capable of being exploited or marketed without prior processing.**

3. **For the purposes of applying Article 15 of Directive 75/442, as amended by Decision 96/350, to the accidental spillage of hydrocarbons at sea causing pollution of the coastline of a Member State:**

   — **the national court may regard the seller of those hydrocarbons and charterer of the ship carrying them as a producer of that waste within the meaning of Article 1(b) of Directive 75/442, as amended by Decision 96/350, and thereby as a 'previous holder' for the purposes of applying the first part of the second indent of Article 15 of that directive, if that court, in the light of the elements which it alone is in a position to assess, reaches the conclusion that that seller-charterer contributed to the risk that the pollution caused by the shipwreck would occur, in particular if he failed to take measures to prevent such an incident, such as measures concerning the choice of ship;**

— **if it happens that the cost of disposing of the waste produced by an accidental spillage of hydrocarbons at sea is not borne by the International Oil Pollution Compensation Fund, or cannot be borne because the ceiling for compensation for that accident has been reached, and that, in accordance with the limitations and/or exemptions of liability laid down, the national law of a Member State, including the law derived from international agreements, prevents that cost from being borne by the shipowner and/or the charterer, even though they are to be regarded as 'holders' within the meaning of Article 1(c) of Directive 75/442, as amended by Decision 96/350, such a national law will then, in order to ensure that Article 15 of that directive is correctly transposed, have to make provision for that cost to be borne by the producer of the product from which the waste thus spread came. In accordance with the 'polluter pays' principle, however, such a producer cannot be liable to bear that cost unless he has contributed by his conduct to the risk that the pollution caused by the shipwreck will occur.**

[Signatures]