# EXHIBIT 75

*Unofficial Translation*

Preliminary version

OPINION OF THE ADVOCATE GENERAL
MACIEJ SZPUNAR
of March 3, 2021 ( 1 )


**Case C - 741/19**


**Republic of Moldova
against
Komstroy company, legal successor to Energoalians company**


(Request for a preliminary ruling from the Cour d'appel de Paris [France])

"Reference for a preliminary ruling - Energy Charter Treaty - Concept of investment - Disputes between an investor and a contracting party - Facts completely outside the Union legal order - Competence of the Court of Justice"

I.    **Introduction**

1.      The provisions of the Energy Charter Treaty ( 2 ) (hereinafter: ECV) have only been the subject of questions twice since it was signed by the European Union almost 30 years ago, including this case ( 3 ). This case is therefore unique, first of all because it gives the Court of Justice a welcome opportunity to express its opinion on the importance of provisions which to this day have not yet been interpreted.

2.      Next, neither the Union nor the Member States are involved in the dispute, in the context of which these questions for a preliminary ruling, are involved: in it the Republic of Moldova and a Ukrainian company face each other, so that at first sight it is not entitled to anything with the Union seems to have to do.

3.      Finally, according to my analysis, the present case should induce the Court of Justice to comment on an important issue, namely the compatibility of the dispute settlement mechanism established by the ECV with Union law, along the lines outlined by the Court of Justice in Achmea ( 4 ).

II.   **Legal framework**

A.     **ECV**

4.      The ECV was signed by the Union on December 17, 1994 and approved by Decision 98/181 on behalf of the Union. The Member States, with the exception of the Italian Republic, are all parties to the ECV, as are 28 third countries.

5.        The preamble to the ECV states:

"THE CONTRACTING PARTIES TO THIS AGREEMENT -

...

HAVING REGARD to the European Energy Charter adopted in the final document of the Hague Conference on the European Energy Charter, signed in The Hague on December 17, 1991;

...

DRIVEN BY THE DESIRE to implement the basic idea of the European Energy Charter Initiative, which is to catalyze economic growth through measures to liberalize investment and trade in energy products;

... "

6.        The ECV consists of a preamble and eight parts. Parts I, II, III and V are headed "Definitions and Purpose", "Trade", "Promotion and Protection of Investments" and "Dispute Resolution", respectively.

7.    Art. 1 ("Definitions") ECV provides:

"For the purposes of this contract

...

6. 'Investment' means any type of asset owned or controlled, directly or indirectly, by an investor and which includes:

...

c) Monetary claims and claims to contractually justified monetary benefits associated with an investment,

...

f) any right to exercise an economic activity in the energy sector granted by virtue of a contract under private law.

...

"Investment" refers to any investment related to an economic activity in the energy sector and to investments or classes of investments designated by a Party in its territory as "Charter Efficiency Projects" and as such notified to the Secretariat;

7. means 'investor'

a) in relation to a contracting party

i) a natural person who, according to the laws of the contracting party, is a national of that contracting party or who has their permanent residence there;

ii) a company or other organization incorporated in accordance with the law of this Contracting Party;

b) with regard to a 'third country', a natural person, company or other organization which, mutatis mutandis, fulfills the requirements specified under letter a) for a contracting party;

8. "Investing" means making new investments, acquiring all or part of existing investments, or relocating investing elsewhere;

...

10. 'Territory' means in relation to a State that is a Party to

a) the territory under its sovereignty, the territory being understood to include the land, internal waters and territorial sea; and

b) Subject to and in accordance with international law of the sea, the sea, the seabed and its subsoil over which the Contracting Party exercises sovereign rights and powers.

In relation to a regional economic integration organization to which it is a Party, "Territory" means the individual territories of the Member States of that Organization, in accordance with the provisions of the Convention establishing the Organization;

... "

8.    Article 26 ("Settlement of disputes between an investor and a contracting party") ECV states:

"(1) Disputes between a contracting party and an investor of another contracting party regarding an investment by the latter in the territory of the former, which relate to an alleged violation of the former contracting party against an obligation under Part III, are to be settled amicably if possible.

(2) If such disputes cannot be resolved within three months of the time at which one of the disputing parties requested an amicable settlement in accordance with paragraph 1, the investor, as the party to the dispute, may have the dispute resolved in the following manner:

a) by the civil or administrative courts of the contracting party involved in the dispute,

b) in accordance with an applicable pre-agreed dispute resolution process; or

c) in accordance with the following paragraphs.

...

(6) An arbitration tribunal formed in accordance with Paragraph 4 shall decide on the disputed questions in accordance with this Treaty and the applicable rules and principles of international law.

... "

B.    **French law**

9.    Under Article 1520 of the French Code de procédure civile (Code of Civil Procedure), the action for the annulment of an arbitration award made in France is, inter alia, only possible if the arbitral tribunal has wrongly declared that it is responsible or inconsistent.

III. **The facts of the main dispute, questions referred and proceedings before the Court of Justice**

10.    In fulfillment of two contracts signed on February 1 and 24, 1999, Ukrenergo, a Ukrainian electricity producer, sold electricity to Energoalians, a Ukrainian electricity distributor, which subsequently sold it to Derimen Properties Limited ('Derimen'), a company based in the British Virgin Islands, which in turn sold it to Moldtranselectro, a public Moldovan company. The amount of electricity to be supplied was determined every month directly between Moldtranselectro and Ukrenergo, who supply this electricity under the conditions of "DAF Incoterms 1990", i.e. H. to the border between Ukraine and Moldova on the Ukrainian side.

11.    Electricity was supplied during 1999 and 2000 with the exception of May to July 1999. For each month of delivery, Energoalians should be paid by Derimen, which itself should receive payment from Moldtranselectro. The prices applicable to the payments were determined by

supplementary agreements to the contract dated February 24, 1999, according to which the price paid by Moldtranselectro to Derimen was approximately twice the price paid by Derimen to Energoalians.

12.      Derimen paid Energoalians the price for all electricity purchased, while Moldtranselectro Derimen only paid part of it.

13.      With a contract dated May 30, 2000, Derimen ceded its claim against Moldtranselectro to Energoalians.

14.      Moldtranselectro partially paid its debts by assigning several claims to Energoalians. The latter then tried in vain to obtain payment of the remaining claim by calling the Moldovan and then the Ukrainian courts.

15.      Since Energoalians was of the opinion that certain actions of the Republic of Moldova constituted serious violations of the obligations entered into under the ECV, they initiated the arbitration procedure provided for in Art. 26 of this Treaty.

16.      With an arbitration award given by a majority in Paris on October 25, 2013, the *ad hoc* arbitration tribunal declared that it had jurisdiction, found that the Republic of Moldova had breached its obligations under the ECV and condemned it, on the basis of this agreement, to make a certain decision Amount to be paid to Energoalians. The chairman of the *ad hoc* arbitral tribunal expressed a different opinion on the jurisdiction of the arbitral tribunal.

17.      The Republic of Moldova brought an action for the annulment of this award under Article 1520 of the French Code of Civil Procedure, alleging an infringement of an overriding rule, namely the rule on the jurisdiction of the *ad hoc* arbitral tribunal.

18.      By judgment of April 12, 2016, the Cour d'appel de Paris (France) set aside the award because the arbitral tribunal wrongly declared that it had jurisdiction. It ruled that the dispute between Energoalians and the Republic of Moldova related to a claim assigned by Derimen, the sole object of which was the sale of electricity. Since there was no contribution, such a claim could not be regarded as an investment within the meaning of the ECV and therefore not justify the jurisdiction of the arbitral tribunal.

19.      Following an appeal lodged by Komstroy, who entered into the rights of Energoalians by means of a deed of 6 October 2014, the Cour de cassation (France) overturned the judgment of April 12, 2016 by judgment of March 28, 2018 in full And referred the parties back to the Cour d'appel de Paris in a different composition.

20th       Before this, the Republic of Moldova submits that the arbitral tribunal should have declared itself incompetent in the absence of an investment "made" by a company of a contracting party to the ECV "in the territory of" Moldova within the meaning of the ECV. The claim acquired by Energoalians from Derimen is not an "investment" within the meaning of Art. 26 Para. 1 ECV, interpreted in the light of Art. 1 No. 6 thereof, and can therefore not be the subject of arbitration, as this only applies to Part III of the ECV, which currently concerns investments. Even if it is assumed that the aforementioned claim could constitute an investment, this was then not "made" by a company of one of the contracting parties, since Derimen is a company in the British Virgin Islands.

21.      Komstroy, on the other hand, takes the view that the arbitral tribunal has jurisdiction under Article 26 of the ECV, since all the prerequisites set out in that provision are met and, in particular, an investment made in Moldova is at stake.

22.      In the light of the above, the Cour d'appel de Paris decided to stay the proceedings and refer the following questions to the Court of Justice for a preliminary ruling:

1. Is [Art. 1 No. 6 ECV] to be interpreted as meaning that a claim arising from an electricity sales contract that did not result in a contribution by the investor in the receiving country can constitute an

"investment" within the meaning of this article?

2. Is [Art. 26 para. 1 ECV] to be interpreted as meaning that the acquisition of a claim of an economic operator other than the contracting states by an investor of a contracting party constitutes an investment?

3. Is [Art. 26 para. 1 ECV] to be interpreted as meaning that a claim to which an investor is entitled from a sales contract for electricity that is delivered to the border of the receiving state can constitute an investment made in the territory of another contracting party if the investor has no economic activity in their territory has exercised?

23.        The Republic of Moldova, the German, Spanish and Polish governments and the European Commission have submitted written observations.

24.        At the meeting of 17 November 2020, on behalf of the Republic of Moldova, von Komstroy, the French, German, Spanish, Italian, Hungarian, Dutch, Polish, Finnish and Swedish governments and the Council oral opinions have been given to the European Union and the Commission.

IV.    **Appreciation**

25.        The present case is novel. On the one hand, the referring court's questions for a preliminary ruling concern the interpretation of certain provisions of the ECV on which the Court of Justice has never had to rule to this day. On the other hand, a country not belonging to the Union, the Republic of Moldova, and a company from another third country, Ukraine, are facing each other in the main dispute.

26.        The jurisdiction of the Court of Justice to answer the questions posed could therefore be disputed, since what is at issue is the interpretation of an international convention in the context of a dispute which - at least at first glance - has the characteristics of what is called a 'pure external "matter.

27.        Before I deal with the questions referred on the merits (B), I must therefore examine whether the Court of Justice has jurisdiction (A).

A.      **Jurisdiction of the Court of Justice**

28.        It should be pointed out at the outset that the Court of Justice, pursuant to Article 267 TFEU, gives preliminary rulings on the interpretation of the acts of the Union institutions, an international agreement concluded by the Council under Articles 217 and 218 TFEU constituting such an act. Since the provisions of such an agreement, the entry form an integral part of the Union legal order, the Court has jurisdiction to give a preliminary ruling on the interpretation of this Agreement ( 5 ).

29.        Since the ECV was signed by the Union and approved on its behalf, this Agreement must be viewed as an act by the Union institutions within the meaning of Article 267 TFEU. At first sight, the Court of Justice is therefore empowered to rule on the provisions of the ECV.

30.        However, such a finding is not sufficient to ensure that the Court of Justice has jurisdiction. Neither the Union nor the Member States are involved in the main proceedings. It must therefore be examined whether that factor might affect the Court's jurisdiction to answer the questions referred.

1.      *Case law on the interpretation of the provisions of an international agreement with a view to their application outside the Union legal order*

31.        The case-law has made some clarifications as to the jurisdiction of the Court of Justice to interpret an international agreement. In particular in the judgments Andersson and Wåkerås-Andersson ( 6 ) and Salzmann ( 7 ) the Court of Justice ruled in relation to the provisions of the Agreement on the European Economic Area of 2 May 1992 (OJ 1994, L 1, p. 3, hereinafter : EEA

Agreement) decided that it is not empowered to interpret an agreement with regard to its application in third countries.

32.      Applied to the main case, that case-law would lead the Court of Justice to deny its jurisdiction to rule on the interpretation of the ECV in a dispute between a company in a third country and another third country. However, I do not believe that such a solution is necessary in the present case.

33.      The conclusion reached by the Court in Andersson and Wåkerås-Andersson ( 8 ) and Salzmann ( 9 ), namely that it is not empowered to interpret the provisions of the EEA Agreement, can be isolated - without one Examining the reasons that led to this result - do not understand. The reasoning of the Court is based on two elements.

34.      On the one set out by the Court that it had jurisdiction to interpret the provisions of European Union law applies only to the Union ( 10 ). In other words, the Court of Justice does not recognize its jurisdiction to interpret provisions intended to apply outside the Union legal order.

35.      On the other hand, the lack of jurisdiction of the Court of Justice is also based on the fact that jurisdiction for the interpretation of the provisions of the EEA Agreement with regard to its application outside the legal order of the Union is transferred to the Court of Justice of the European Free Trade Association (EFTA) according to the wording of the Agreement will ( 11 ), while ensuring that such an interpretation is consistent with the case law of the Court of Justice. Because of the close links between the EEA Agreement and the Union legal order, it follows from the provisions of that Agreement that, to the extent that they are essentially identical to the corresponding provisions of the Treaties and the implementing acts, they must be interpreted in accordance with the case law of the Court of Justice ( 12 ).

36.      The reasoning of the Court of Justice in the judgments Andersson and Wåkerås-Andersson ( 13 ) and Salzmann ( 14 ) therefore seems to me to be guided by the aim of the preliminary ruling mechanism provided for in Article 267 TFEU, which precisely prevents different interpretations of EU law within the EU legal order should ( 15 ).

37.      Such an aim could also justify the jurisdiction of the Court of Justice to interpret the provisions of Union law in the context of legal disputes which, strictly speaking, do not come under the Union legal order. In particular, in the Hermès judgment, the Court of Justice ruled that if a provision is applicable to both facts and circumstances not governed by Union law, there is a clear interest on the part of the Union in that that provision should be applied regardless of the conditions under which it is to be applied , is interpreted uniformly in order to prevent deviating interpretations in the future. It is therefore responsible for interpreting the provisions of an international agreement to which the Union is a party, 16 ).

38.      In those circumstances, the Andersson and Wåkerås-Andersson ( 17 ) and Salzmann ( 18 ) judgments can not systematically exclude the Court's jurisdiction to interpret the provisions of EU law in disputes outside the EU legal order. That jurisdiction is generally recognized if the provision, the interpretation of which is requested, is intended to apply both to facts which are subject to Union law and to facts which are not subject to it.

2.     ***Special features of the ECV and their significance for the transfer of the relevant case law to the present case***

39.      The ECV also has certain peculiarities in two respects, so that it cannot simply be equated with the EEA Agreement, which has been examined in the case-law to which I refer.

40.      First, the ECV does not set up a court with jurisdiction to ensure a uniform interpretation of its provisions in accordance with the interpretation given by the Court of Justice within its legal system. The ECV is only intended to be interpreted when disputes are settled by different courts - arbitral tribunals or state courts - of the contracting parties, which consequently cannot prevent different interpretations ( 19 ).

41.     Secondly, as the German Government in its written observations and the Commission have noted at the hearing, the ECV, although he is a multilateral agreement, bilateral from a number obligations between the parties, to which the Union and the Member States ( 20 ) belong. The obligations introduced by the ECV mainly enable the protection of investments made by investors in one contracting party in another contracting party ( 21 ). The violation of these obligations thus does not cause that always all parties can seek redress for them, because the obligations mentioned only bilaterally - between two parties - apply ( 22 ).

42.     The ECV therefore introduces a number of bilateral obligations which, in the area covered by it, are to apply to relations between the contracting parties, on the one hand, and the investors of a contracting party and the contracting party in whose territory the investments have been made, on the other. Consequently, these obligations could theoretically also apply to relations between the Member States - even within the Union - and thus apply in the Union legal order.

43.     These two special features of the ECV in relation to the EEA Agreement therefore limit the possibility of the solution developed in the Andersson and Wåkerås-Andersson ( 23 ) and Salzmann ( 24 ) judgments with regard to the Court's lack of jurisdiction to interpret an international one To transfer the agreement in matters outside of the Union legal order.

44.     In the present case, the referring court is asking the Court of Justice to interpret provisions of an international agreement which, in disputes outside the Union, are not interpreted uniformly and in accordance with the case-law of the Court of Justice and which, in principle, also apply to situations within the Union legal order could.

45.     In these circumstances, in my opinion, it cannot be ruled out that the Union may have an interest in a uniform interpretation of the provisions of the ECV. I therefore conclude that, in the circumstances mentioned, the Court of Justice's jurisdiction to answer the questions referred for a preliminary ruling in the present case should be affirmed.

3.     ***Doubts about the applicability of the provisions of the ECV in the Union legal order***

46.     The above statement needs to be weakened at this point. Such a conclusion is only necessary on the condition that the provisions whose interpretation is requested are actually applicable in the Union legal order. If this is not the case, there would be a lack of interest in the Union in its uniform interpretation and in the jurisdiction of the Court of Justice to give that interpretation.

47.     On the one hand, Art. 26 ECV introduces a mechanism for the settlement of disputes between investors of a contracting party and a contracting party, which allows recourse to arbitration. In Achmea, ( 25 ) the Court of Justice ruled in this connection that recourse to arbitration proceedings established on the basis of a treaty for the protection and promotion of investments concluded between two Member States is not permitted under the EU legal order. Therefore, the judgment mentioned seems to me to indicate that Article 26 ECV is never applicable in the Union legal order, so that the Court of Justice does not have jurisdiction to interpret this provision.

48.     However, the ECV is not completely the same as the bilateral investment protection agreement examined in the Achmea judgment (hereinafter: BIT) and has certain special features that must be taken into account in order to be able to provide a comprehensive answer to the question of whether the one it has created Dispute settlement mechanism is compatible with Union law. I therefore propose that the Court seize the opportunity to examine the implications of the said judgment on the applicability of Article 26 ECV, since such an analysis is necessary in order to determine whether the Court of Justice is to answer the question on the interpretation of this provision related questions is authorized.

49.     Second, the Achmea judgment did not address the more general question of whether the substantive provisions of the Treaties on the protection and promotion of investment are compatible with EU law if they are to apply to relations between the Member States. In that case, however, the difficulties associated with the existence of such agreements in use in the EU have become significantly more ( 26). The question arises as to whether substantive provisions can be

invoked in a dispute between an investor in one Member State and another Member State before the courts of that Member State. It is therefore necessary to check whether the substantive provisions of the ECV in the line of the Achmea judgment are to be regarded as incompatible with EU law and thus inapplicable in the EU legal order.

50.    Such reviews will reveal the Union's interest in a uniform interpretation of the provisions of the ECV and the competence of the Court of Justice to answer these questions for a preliminary ruling.

a)    ***Applicability of the dispute settlement mechanism created by Art. 26 Para. 1 ECV in the Union legal order***

51.    The question of whether dispute settlement mechanisms in conventional legal instruments binding on the Member States of the Union are compatible with Union law has been the focus of lively debates in teaching ( 27 ) and in practice ( 28 ) for several years .

52.    The case in which the judgment Achmea has been issued is likely to have reflected these debates and illustrated - if necessary - the conflictual relations between the Union law and the law of the Investment Arbitration ( 29 ).

1)    *Achmea judgment*

53.    As the Court of Justice ruled in Achmea, ( 30 ) Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement between the Member States under which an investor in one of those Member States in the event of a dispute over Investments in the other Member State may initiate proceedings against them before an arbitration tribunal to whose jurisdiction this Member State has submitted.

54.    In other words, the Court of Justice found a dispute settlement clause in a BIT between two Member States to be incompatible with EU law.

55.    In that judgment, the Court of Justice based its reasoning on indisputable fundamental principles of EU law. He first pointed out that an international agreement must not impair the specified in the contracts of responsibilities and the autonomy of the legal system of the Union ( 31 ). He pointed out that the autonomy of Union law is justified by the essential features of the Union and their rights relating to the constitutional structure of the Union and the essence of this right ( 32 ) which inter alia.. is characterized by its autonomous source, the treaties, its primacy and its immediate effect ( 33 ).

56.    The Court then made it clear that EU law is thus based on the fundamental premise that each Member State shares with all the other Member States - and recognizes that they share them with it - on which the Union is founded. He has found that beyond this premise the existence of mutual trust between Member States in the recognition of these values and thus in compliance with Union law with which they are implemented implies and justifies ( 34 ).

57.    Finally, the Court of Justice has pointed out that, in order to ensure that the specific characteristics and autonomy of the Union legal order are preserved, the Treaties created a judicial system designed to ensure consistency and uniformity in the interpretation of Union law ( 35 ). He further stated that the key element of this system is the preliminary ruling procedure provided for in Article 267 TFEU, which is intended to ensure the uniform interpretation of Union law and thus to ensure its coherence, its full applicability and its autonomy and, ultimately, the specific nature of the Contracts created law enables ( 36 ).

58.    Based on these principles, the Court firstly noted that this has to be interpreted based on the provisions of the arbitration used in speech standing BIT Union law and even to apply ( 37 ). On the other hand, it ruled that the arbitration tribunal in question does not belong to the judicial system of the Union, so that the dispute settlement mechanism created by the BIT can rule out that disputes, although they could affect the interpretation or application of Union law, are decided in a way that ensures the full effectiveness of Union law ( 38 ).

59.    The Court has found that this is the case even where the law of the Member States allows national courts to review the award, since such review is limited and can only be carried out to the extent that national law allows it allowed. In this sense, in the Achmea judgment, he made a distinction between a dispute settlement mechanism in an agreement between two member states and commercial arbitration, which has just been considered to be compatible with Union law, insofar as the fundamental provisions of Union law are examined in the context of the review of arbitration awards by the national courts and may be the subject of a reference for a preliminary ruling ( 39 ).

60    There is a fundamental difference between these two mechanisms. Commercial arbitration requires each party to exercise its autonomy. It includes the conclusion of an arbitration agreement, be it at the same time as the conclusion of the contract for which the related disputes are to be submitted to arbitration, or after the dispute has arisen. In other words, the jurisdiction of a court in commercial arbitration always arises from an arbitration agreement that relates to a dispute as precisely defined in this agreement. It cannot be assumed that the jurisdiction of such an arbitral tribunal falls under the system of judicial protection granted by the state.40 ). Indeed, it is this autonomy that allows the parties to choose to resolve disputes through recourse to commercial arbitration.

61.    By contrast, the dispute settlement mechanism contained in an international agreement follows a different logic ( 41 ). Based on the above assumption, it represents a general and permanent offer of arbitration that the other party can accept or reject. In other words, with this mechanism, the state foregoes the possibility of having a dispute between itself and an investor from another Member State that falls within the scope of the aforementioned agreement decided by the state courts. The waiver has a systemic character, as it can affect all disputes that fall within the scope of the agreement. In this way, the state creates a judicial mechanism for legal protection outside of the court system it provides.

62.    It is precisely this aspect of the arbitration mechanisms in investment disputes provided for in agreements between Member States that the Court of Justice focuses on in the Achmea judgment: it is not permissible for the Member States to be able to systematically evade a series of disputes from the judicial system of the Union by means of an international obligation relate to the interpretation or application of Union law.

63.    Accordingly, the Court of Justice ruled that the dispute settlement mechanism in question is capable of, in addition to the principle of mutual trust between the Member States, preserving the specific character of the law established by the Treaties, which is guaranteed by the preliminary ruling procedure provided for in Article 267 TFEU Question and is therefore incompatible with the obligation to cooperate in good faith ( 42 ). In his view, the result is that the dispute resolution mechanism contained in the respective BIT, after any investor may initiate a Member State against another member state a method to arbitration, the autonomy of Union law affected ( 43 ).

64.    Ultimately, the above solution is an exact expression of the autonomy of Union law ( 44 ), which is itself based on the existence of mutual trust between the Member States which share a number of values and which recognize that they are in fact shared. Therefore, apart from exceptional circumstances, the member states are obliged to assume that all other member states of the Union comply with Union law, including fundamental rights, in particular the right to an effective remedy before an independent court laid down in Article 47 of the Charter of Fundamental Rights of the European Union ( 45 ).

In    other words, precisely because the legal order of the Union recognizes and affirms that Member States respect a number of values and rights, including the rule of law and the established right to an effective remedy, it also ensures that investors of the Member States will certainly be sufficiently protected in the Union legal order ( 46 ) so that there is no need to fall back on a system outside the judicial systems of the Member States ( 47 ).

66.    The Court of Justice also draws attention to the importance of those values, in particular the rule of law, in various cases ( 48 ) which stress the role of the Union institutions responsible for enforcing them, in particular that of the Commission.

67.    The Achmea judgment therefore answered questions relating to the relationship between EU law and the dispute settlement mechanisms contained in BTI between two Member States.

68.    Almost all the Member States later took note of that decision by making various declarations ( 49 ) expressing their intention to denounce the BITs that existed between the Member States. After making the above-mentioned declarations, on May 5, 2020, 23 member states concluded an agreement to terminate bilateral investment protection treaties between the member states of the Union ( 50 ).

69.    I must also make it clear that the incompatibility of an arbitration mechanism provided for in an international agreement in investment disputes with EU law follows directly from the principle of the primacy of EU law. This results in its indefinite inapplicability in the legal order of the Union, so that the jurisdiction of an arbitral tribunal cannot be recognized on this basis.

2)    *Significance of the Achmea judgment for the ECV*

70.    However, the Achmea judgment does not regulate all questions relating to the relationship between investment arbitration and European Union law. In particular, that case concerned a bilateral treaty to which two Member States were parties. The ECV, although it provides for a dispute settlement mechanism comparable to that at issue in Achmea in that it allows recourse to arbitration, is itself a multilateral treaty to which the Union and the Member States are parties.

71.    These differences have restricted the automatic transfer of the solution developed for BIT to the dispute settlement mechanism provided for in Art. 26 ECV. The subsequent declarations of the Member States in this regard illustrate the existing differences with regard to the possibility of extending the scope of the Achmea judgment to the dispute settlement mechanism provided for in the ECV ( 51 ) and, more fundamentally, with regard to the compatibility of Article 26 ECV with Union law.

72. It must    therefore be determined whether the reasoning of the Court of Justice in the Achmea judgment can apply to the compatibility of the dispute settlement mechanism provided for in Article 26 ECV. In this context, the French, German, Spanish, Italian, Dutch and Polish governments and the Commission submitted that such a solution should be chosen and that the incompatibility of Article 26 ECV with EU law renders this article inapplicable the legal order of the Union with it. For their part, the Hungarian, Finnish and Swedish governments took the view at the hearing that the solution developed in the Achmea judgment could not be applied to the dispute settlement mechanism created by Article 26 ECV.

73. In    my opinion, the dispute settlement mechanism provided for in Article 26 ECV, insofar as it allows recourse to arbitration, will undoubtedly lead to a result comparable to the dispute settlement mechanism at issue in the Achmea judgment and considered to be incompatible with EU law.

74.    First, Article 26 ECV, like the dispute settlement mechanism at issue in Achmea, enables disputes which might relate to the interpretation of EU law to be referred to an investment arbitration tribunal.

75.    Article 26 (6) ECV provides that the arbitral tribunal shall decide on the disputed questions in accordance with the ECV and the "applicable rules and principles of international law". However, contrary to the submissions of the Swedish and Finnish Governments and the findings of the Court of Justice in Achmea, ( 52 ) Union law, by its very nature and characteristics, arose both as part of the law in force in each Member State and as an international agreement between the Member States to watch. Therefore, an arbitration tribunal established in accordance with Art. 26 ECV may have to interpret and even apply Union law.

76.    Second, include a under Article 26 ECV inserted arbitration -. Also in a dispute which is operated by an investor of a Member State against another Member State - not to the judicial system of the Union ( 53 ).

77.      That arbitral tribunal is not part of the judicial system of the Member States, and it is precisely this exceptional nature that justifies the existence of such a dispute settlement mechanism. It is also not a common court of several Member States, as it has no connection with the judicial systems of the Member States.

78.      In these circumstances, an arbitral tribunal set up under Article 26 ECV is not to be regarded as a "court of a Member State" within the meaning of Article 267 TFEU and is not entitled to request a preliminary ruling from the Court of Justice. The decisions of such court hence not subject to mechanisms that would be appropriate, the full effectiveness of European Union law actually to ensure ( 54 ).

79.      As a result, Article 26 ECV, in so far as it allows recourse to arbitration, such as the dispute settlement mechanism, which in Achmea was regarded as incompatible with EU law, affects the autonomy of EU law in my opinion and is therefore also incompatible with EU law.

80.      Neither the specifics of the ECV, which gave rise to doubts as to the application of the Achmea judgment to the dispute settlement mechanism provided for in it, nor the more recent case law of the Court of Justice, which, inter alia, do not support this finding cited by the Hungarian, Finnish and Swedish governments at the hearing.

i)   *The special features of the ECV do not affect a BIT*

81.      It is true that, unlike a BIT like the one mentioned in the Achmea judgment, the Union is itself a party to the ECV and is therefore bound to it. Furthermore, in that judgment, the Court of Justice expressly emphasized that the dispute settlement mechanism is provided for in an agreement which was concluded 'not by the Union, but by the Member States' ( 55 ). Does that inevitably mean that the same could not apply to an international agreement concluded by the Member States *and* the Union? I do not think so.

82. In that      regard, it is common ground that an international agreement which provides for the creation of a court to interpret its provisions, the decisions of which are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law. The Union's competence in the field of external relations and its capacity to conclude international agreements include namely necessarily the way to the decisions of a set up by such agreements or certain Court regarding the interpretation and application of its provisions to subject ( 56 ).

83.      Nevertheless, such a possibility is permitted only under the condition that the autonomy of the Union and its legal system is maintained ( 57 ). As I pointed out in points 78 and 79 of this Opinion, the dispute settlement mechanism provided for in Article 26 ECV, insofar as it allows the use of an arbitrator, affects precisely the autonomy of Union law. Therefore, the fact that the Union is also a party to the ECV cannot affect this finding.

ii)   *Difference to expert opinion 1/17*

84.      Finally, the Hungarian, Finnish and Swedish Governments argued at the hearing that Opinion 1/17 (CETA EU-Canada) ( 58 ) introduced a new analytical scheme for dispute settlement mechanisms outside the judicial system of the Union. Such a mechanism is not per se incompatible with Union law, provided that it does not permit the interpretation or application of the provisions of Union law by a court outside the judicial system of the Union and that the judgments of that court do not prevent the Union's institutions from functioning in accordance with its constitutional framework .

85. However, that      argument is unconvincing. On the one hand, as stated in points 74 and 75 of this Opinion, I am of the opinion that Article 26 ECV allows the provisions of Union law to be interpreted or applied by an arbitral tribunal outside the judicial system of the Union. Art. 26 ECV also differs from the dispute settlement mechanism in the comprehensive economic and trade agreement between Canada, on the one hand, and the European Union and its member states, on the other hand (hereinafter: CETA), as this provides for an express reservation for the interpretation of Union law ( 59 ), while such a reservation according to Art. 26 ECV does not exist.

86.    Secondly, and above all, the statements of the Court of Justice with regard to the dispute settlement mechanism contained in the CETA in Opinion 1/17 (CETA EU-Canada) ( 60 ) cannot influence the analysis of Article 26 ECV. As the Court of Justice observed in that Opinion, the question of whether the establishment or maintenance of an investment protection court by means of an agreement binding on the Member States is compatible with Union law is different from the question of whether the establishment of such a court by means of an agreement between the Union and third countries is compatible with EU law ( 61 ). The arguments put forward by the Hungarian, Finnish and Swedish governments could therefore only be successful if the ECV merely regulated relations between the Union and third countries.

87.    While the Member States are obliged to respect the principle of mutual trust, such a principle does not apply in relations between the Union and third countries. More precisely, relations with third countries are not based on the fundamental premise that each Member State shares a set of common values with all other Member States and recognizes that they share them with it and thus respect the Union law by which they are implemented. As Advocate General Bot noted in the context of an agreement with third countries, not each of the contracting parties necessarily has confidence that the other party's judicial system will ensure compliance with the provisions of the agreement ( 62 ). The lack of mutual trust, as it exists within the Union, is precisely the reason why the contracting parties decide to agree on a neutral dispute settlement mechanism ( 63 ). Such a mechanism outside the two parties enables the parties to maintain their confidence in the application of the Agreement without confusing that confidence with the mutual trust that structures relations within the Union legal order.

88.    Therefore, Opinion 1/17 (CETA EU-Canada) ( 64 ) does not affect the analysis of the dispute settlement mechanism provided for in Art. 26 ECV in the light of the principles developed in the Achmea judgment, insofar as it allows recourse to arbitration, because this agreement regulates the relations between the member states.

3)    *Result on the applicability of Art. 26 ECV in the Union legal order*

89.    In view of all of the foregoing, the dispute settlement mechanism provided for in Art. 26 ECV is, in my opinion, incompatible with Union law insofar as it allows an arbitration tribunal outside the judicial system of the Union to interpret Union law in a legal dispute between an investor in a Member State and another Member State, or apply, thereby calling into question both the principle of mutual trust between the Member States and the preservation of the individual character of the law established by the Treaties, as well as undermining the autonomy of Union law. Art. 26 ECV should therefore not apply within the legal order of the Union.

90.    Apart from that, the fact that an investor in a Member State cannot have recourse to an arbitrator in a legal dispute between himself and another Member State does not mean that Article 26 ECV would never apply within the EU legal order. Investors in one Member State could, in principle, always bring proceedings before the courts of another Member State in the face of a dispute referred to in this provision ( 65 ). Such a possibility, however, depends on the question of whether the substantive provisions of the ECV can justify such claims, i.e. whether they are themselves applicable in the Union legal order. I will now examine this question.

b)    **Applicability of Art. 1 No. 6 ECV in the Union legal order**

91.    Art. 1 No. 6 ECV defines the term "investment" as it is used in the provisions of the ECV and can be found in the first part of the ECV entitled "Definitions and Purpose". This provision is therefore one of the introductory provisions of the ECV, which are intended to generally define the scope and subject matter of the legal act and to define the terms used in its provisions.

92. In    other words, Article 1 No. 6 ECV, insofar as it specifies its material scope, also means that the substantive protective provisions of the ECV apply.

93.    The applicability of that provision in the legal order of the Union therefore depends mainly on the question whether the substantive norms to which it gives effect are also applicable in the EU legal order, with the result that investors in one Member State can bring an action against another Member State whose courts can appeal to them.

94.    Although the judgment Achmea has not regulated this question, it does leave some doubt on whether the substantive provisions of the treaties can be applied for the promotion and protection of investments in general and the ECV in particular within the Union ( 66 ) .

95. However,    I do not believe that, in the context of the present case, and in purely theoretical terms, it is possible to answer the question with any certainty. This would namely the implementation of an abstract and exhaustive analysis assume all possible overlap between Union law and ECV ( 67 ). However, it does not seem appropriate to me to undertake such an analysis at the stage of examining the jurisdiction of the Court of Justice to answer the questions referred and in the context of the present case. It should also be emphasized that this question was not discussed between the parties ( 68 ).

96.    Furthermore, in the present case only the Italian Government and the Commission put forward a concisely worded argument concerning the incompatibility of the substantive provisions of the ECV with Union law, based on the fact that Union law provides for investment protection instruments that are similar to those of the ECV are equivalent. Why this equivalent protection per se should be incompatible with EU law is not entirely clear to me at first glance.

97.    Therefore, the question of whether the substantive provisions of the ECV, including Article 1 (6) thereof, are compatible with Union law can, in my opinion, neither be answered with certainty nor in the affirmative at this point. It can therefore be assumed that the provisions mentioned are intended to apply within the legal order of the Union.

4.    *Result on the jurisdiction of the Court of Justice*

98. In    my opinion, Article 26 ECV is incompatible with EU law in that it provides for recourse to arbitration, so that such a dispute settlement mechanism cannot apply within the legal order of the EU.

99.    Since it cannot be ruled out at this point that the substantive provisions of the ECV, including Article 1 no. 6 thereof, may be applicable in the legal order of the Union, it is nevertheless to be assumed that the said provisions are made by investors from a Member State on the occasion of a dispute referred to in Art. 26 ECV with another member state before its courts. Accordingly, both Art. 1 No. 6 ECV and Art. 26 ECV are to be regarded as possibly applicable within the Union legal order.

100. It follows that there is a certain interest on the part of the Union in a uniform interpretation of the provisions, so that the Court of Justice should be competent to answer all the questions referred.

B.    **Justification**

1.    *First question referred: the term "investment" within the meaning of Art. 1 No. 6 ECV*

101.  By its first question, the referring court essentially seeks to know whether Article 1 (6) ECV is to be interpreted as meaning that a claim arising from an electricity contract which has not resulted in a contribution from the investor in the receiving State is a Can represent investment.

102.  At the hearing, Komstroy submitted that the term "investment" was defined in the ECV and that this definition was self-sufficient, although it was supported by a non-exhaustive list of examples of assets that constitute an investment within the meaning of the ECV. In addition, the actual meaning of the terms in Art. 1 No. 6 ECV is clear, so that neither an interpretation nor reference needs to be made to criteria outside the given definition. Finally, Art. 1 No. 6 ECV itself provides that a contractual claim is to be regarded as an investment, since in letters c and f of this number of "monetary claims" or "any [m] granted by virtue of a private law contract. Right "is the issue.

103. The Republic of Moldova, the Spanish, Dutch and Polish governments and the Commission submit that a claim arising from a sales contract cannot constitute an investment within the meaning of Article 1 No. 6 ECV. Letter c of that point provides that a monetary claim constitutes an

investment, but only on the condition that this claim is "related to an investment". However, a claim arising from a sales contract should not be regarded as "related to an investment". The Republic of Moldova also emphasizes that reference should be made to the normal meaning of the term "investment", which presupposes an injection of capital, which is not the case with a contractual claim.

104.  Art. 1 No. 6 ECV defines an investment as "any type of asset that is directly or indirectly owned or controlled by an investor". The ECV thus provides an imprecise definition which, at first glance, appears to be limited only by the object of the activity to which this investment is related. The aforementioned regulation adds that an investment within the meaning of the ECV must be related to an economic activity in the energy sector.

105.  The above definition is supplemented by a non-exhaustive list of specific examples of investments within the meaning of the regulation. How Komstroy argues, the result is that when the asset in question clearly falls within Art. 1 no. 6 ECV investments explicitly mentioned in one of the, basically no interpretation of that provision needs to be made ( 69 ).

106.  Contractual claims could fall under the definition of Article 1 No. 6 ECV, both under letter c and letter f of this number. Indeed, it mentions 'pecuniary claims ... connected with an investment' ( 70 ) and 'any right to pursue an economic activity in the energy sector conferred by ... a private contract' ( 71 ).

107.  Even if both provisions provide examples of investments within the meaning of the ECV, they also add additional requirements for the classification of investments. On the one hand, Art. 1 No. 6 Letter c ECV provides that a monetary claim is an investment if it results from a contract that is itself connected to an investment. On the other hand, Article 1 no. 6 letter f ECV stipulates that a right granted by virtue of a contract under private law is an investment if it was granted for the exercise of an economic activity in the energy sector. In other words, a requirement arising from a contract is not automatically an investment in the sense of the ECV, as this legal act imposes certain restrictions.

108.  The addition of the aforementioned requirements makes it difficult or even impossible to clearly link contractual claims with one or the other form of investment within the meaning of Art. 1 No. 6 ECV. A contractual claim - especially if it arises from an electricity sales contract - cannot be subsumed under Art. 1 No. 6 Letter c or f ECV without any doubt without first having established what the additional provisions mentioned in these regulations are Conditions mean.

109.  An interpretation of the two provisions must therefore be made, which, pursuant to Article 31 (1) of the Vienna Convention, ( 72 ) "in good faith, in accordance with the normal meaning attached to the provisions of the Treaty in their context, and in the light of the aim and purpose of the contract ".

a)    *Art. 1 No. 6 letter c ECV*

110.  Article 1 no. 6 letter c ECV, which provides that a claim must arise from a contract related to an investment, is in a way ambiguous. Because this regulation defines monetary claims that can be viewed as an investment, with reference to the investment term. In other words, the term investment is both the defined term and the term used to define it. Art. 1 no. 6 letter c ECV contains a circular argument in this sense ( 73 ).

111.  In order to break this circular argument, the term "investment" mentioned in Art. 1 No. 6 (c) ECV can therefore only be understood in a sense that differs from the meaning to which this provision is based. As the Polish government notes, a monetary claim is only an investment if it is made under a contract, even with another investment within the meaning of this contract that does not fall within the scope of Art. 1 No. 6 (c) ECV related.

112.  None of the other investments mentioned in Art. 1 No. 6 ECV can, however, be understood to include an electricity supply that is the subject of the contract from which the pecuniary claim under investigation arises. None of the paragraphs of that provision relates to a simple commercial transaction ( 74 ). Therefore, it follows from a literal interpretation of the text of Art. 1 No. 6 ECV

that a claim that arises from an electricity supply contract and has not resulted in a contribution is not a monetary claim from an investment-related contract.

113.  The literal interpretation of Art. 1 no. 6 letter. C ECV is then confirmed by a recourse to the ordinary meaning of the term referred to in this specification "investment" ( [75] ).

114.  In common parlance, the term commonly referred to as the Republic of Moldova and the Commission claim, a process that sheltering from a financial, applied for a certain duration and a risk contribution is ( [76] ).

115.  In the same sense, the arbitration courts have also gradually an objective definition of "investment" developed, according to which an investment requires that three elements are present: A contribution by the investor, a certain maturity and a share of the business risks ( [77] ) .

116.  Although this definition was developed in the context of the term investment in the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, signed in Washington on March 18, 1965, it seems to me to contain the essential elements of what constitutes an investment can represent, and in this sense is often used in the literature when it comes to suggesting a general definition of the term ( [78] ).

117.  According to the understanding of the term "investment" described above, a monetary claim is therefore an investment within the meaning of Art. 1 No. 6 ECV, insofar as it has arisen from a contract, which leads to a contribution by the alleged investor and the hope of a profit which is not guaranteed. This understanding of the term "investment" within the meaning of Art. 1 No. 6 Letter c ECV can also be found in the arbitration case law ( [79] ) as well as in the literature ( [80] ).

118.  However, an electricity supply contract is a simple commercial transaction which cannot be covered by the definition of investment, since this contract does not lead to a contribution ( [81] ) or to the expectation of contributory income. Therefore, I am of the opinion that a claim arising from an electricity supply contract is neither related to an investment nor does it meet the requirement set out in Art. 1 No. 6 (c) ECV.

119.  Last but not least, such an interpretation of the term "investment" within the meaning of Article 1 (6) (c) of the ECV is underpinned by an examination of the overall logic of the ECV and the investment protection system that has been introduced. As the Commission points out, the ECV distinguishes between the trade-related rules in Part II and the rules for promoting and protecting investments in Part III. A simple commercial transaction as such is therefore not to be equated with an investment, if the existing distinction between what is to be ascribed to trade and what belongs to an investment is not to become completely nonsensical, which is why this distinction requires special protection ( [82] ).

120.  The term "investment" within the meaning of Art. 1 No. 6 Letter c ECV must therefore not be confused with a simple business activity, so that a monetary claim that results from an electricity supply contract, which is neither a contribution nor a profit expectations that depend on this contribution cannot be included.

b)  *Art. 1 No. 6 letter f ECV*

121.  Art. 1 no. 6 letter f ECV refers to "any right to pursue an economic activity in the energy sector conferred by virtue of… a contract under private law". In this respect, it should be remembered that Art. 1 No. 6 ECV already provides in general that an investment within the meaning of the ECV must be related to an economic activity in the energy sector. Therefore, the condition imposed by Art. 1 No. 6 (f) ECV is not to be understood in the same way, otherwise this clarification would lose its meaning.

122.  Art. 1 no. 6 letter f ECV thus does not refer to every contractual right in connection with an economic activity in the energy sector, but adds an additional requirement for the classification of a contractual right as a protected investment within the meaning of the ECV. This is already evident from the formulation of this provision. For example, the use of the term "to exercise" in conjunction with the reference to the verb "to lend" indicates that the contractual right in question must have

been granted *for the purpose of carrying* out an economic activity in the energy sector ( [83] ). Contractual law must enable economic activity in the energy sector to be carried out which the beneficiary would not be able to carry out without such a right. In other words, has the contractual right permit the exercise of that activity and the conditions for creating ( [84] ).

123.    Even if a contractual claim is indeed a right conferred by a private contract, it cannot, however, be regarded as permitting the pursuit of an economic activity in the energy sector if it is acquired from the original owner *after* it has arisen. In these circumstances, the claim does not give its holder the right to pursue an economic activity in the energy sector, only the right to request payment of the claim.

124.    Furthermore, in my opinion, the same result would be achieved even if the basis for the claim, namely the electricity supply contract, were to be taken into account, which is not the case. While an electricity sales contract between two companies allows one of them to supply electricity to the other, it is not this contract that allows economic activity in the energy sector to be carried out. The electricity-supplying company can already supply the electricity in question to its contractual partner, so that the contract in no way contains a permit or a right to carry out economic activity in the energy sector in the host country.

125. In  my opinion, such a requirement is therefore not covered by Article 1 (6) (f) ECV.

126.    It follows from the foregoing that neither Art. 1 No. 6 (c) nor Art. 1 No. 6 (f) ECV can be interpreted as meaning that a claim arising from an electricity supply contract and not as a contribution is an investment within the meaning of these regulations.

c)    ***General definition of the term "investment" in Art. 1 No. 6 ECV***

127.    The fact remains that Article 1 No. 6 ECV also provides a general, albeit vague, definition of the term "investment" and the list of investments it provides is not exhaustive. It could therefore be argued that a claim that is not covered by Art. 1 No. 6 Letters c and f ECV could nonetheless constitute an investment within the meaning of Art. 1 No. 6 ECV, insofar as it relates to it an "asset which, directly or indirectly, belongs or is controlled by an investor".

128.    Such an argument is unconvincing. As I have pointed out ( [85] ), contractual claims are the only assets for which Art. 1 No. 6 ECV expressly restricts their recognition as an investment. Reference can therefore only be made to the general definition of the term "investment" with the aim of avoiding the restrictions nevertheless envisaged in Art. 1 No. 6 Letters c and f ECV, if the existence of these precise provisions is not denied and an interpretation is not denied contra legem of the term "investment" in the sense of the ECV should be made.

129.    I therefore propose that the answer to the first question referred is that Article 1 (6) ECV must be interpreted as meaning that a claim arising from an electricity supply contract which did not result in a contribution is not an investment within the meaning of that contract Represents regulation.

C.    **Second question**

130.    By its second question, the referring court essentially seeks to know whether Article 26 (1) ECV is to be interpreted as meaning that the acquisition of a claim from an economic operator in a non-ECV state by an undertaking of a contracting party constitutes an investment.

131. In  this regard, I would remind you that the claim in question arises from a contractual relationship between Moldtranselectro and Derimen, the latter company having its registered office in the British Virgin Islands, that is to say in a state that does not belong to the ECV.

132.    Art. 26 (1) ECV allows the settlement of disputes between a contracting party and an investor of another contracting party if the dispute relates to an *investment made by this investor* . The referring court asks whether the basis of a claim that was originally made by an economic operator from a non-ECV state is its classification as an "investment" within the meaning of Art. 26

(1) ECV, according to which such an investment must have been made by an investor of a contracting party.

133. As an introduction, I state that, taking into account my proposal for an answer to the first question, it is not necessary to answer the second question, since, given the negative of the first question, it is not necessary to determine whether the basis of the claim is based on it their recognition as an investment by an investor of a contracting party within the meaning of Art. 26 Para. 1 ECV.

134. For the sake of completeness - in the event that the Court does not agree with my analysis of the first question - I will nevertheless examine the second question, assuming that such a claim constitutes an investment within the meaning of Article 1 No. 6 ECV can represent.

135. As the referring court observes and the Republic of Moldova points out, in order to determine whether an investment has been "made by an investor from a Contracting Party", reference must be made to Article 1 (8) ECV, which defines the expression "make investments" . This provision provides, inter alia. suggest that an investment can be made by acquiring all or part of existing investments. However, it does not stipulate that the existing investment in question was originally ordered in a state belonging to the ECV.

136. However, the Republic of Moldova submits that such a requirement exists. The phrase "existing investment" is to be understood in accordance with the definition of an "investment" in Art. 1 No. 6 ECV, which provides that an investment must "belong directly or indirectly to an investor or be controlled by him". Art. 1 No. 7 ECV for its part defines the term "investor", among other things. as "a company or other organization incorporated in accordance with the law of [a] Contracting Party". Since the economic operator who was originally the owner of the claim in question was a provider from a country not belonging to the ECV, he could not be regarded as an investor within the meaning of Art. 1 No. 7 ECV,

137. Such an argument is unconvincing. It is true that the statements of the Republic of Moldova, according to which the definition of what the phrase "investment of" includes should be based on Art. 1 Nos. 6 to 8 ECV, is to be agreed with, but the conclusion it comes to is based on one incomplete reading of this article.

138. It is not only that, as I have observed ( 86 ), Article 1 (8) of the ECV does not impose any condition relating to the geographical origin of the existing investment; the regulations examined also expressly provide that such an investment can be made by an economic operator from a country not belonging to the ECV. Art. 1 No. 7 ECV defines the term "investor" both in relation to the contracting parties and in relation to third countries. It is thus clearly recognized that an investor can come from a country not belonging to the ECV; However, this does not mean that the investments made by him are not existing investments within the meaning of the ECV ( 87 ).

139. Therefore, the fact that the claim was made by an economic operator from a non-ECV country does not affect its classification as an "existing investment", since, according to the wording of the ECV, that participant is also to be regarded as an investor.

140. Consequently, the acquisition of a claim by an economic operator from a non-ECV state by a provider of a contracting party is considered to be an acquisition of an existing investment and thus an investment by an investor of a contracting party within the meaning of the ECV.

141. However, the Republic of Moldova, Komstroy and the Commission have expressed a reservation that such circumstances could lead to abuse of rights. It cannot be ruled out that an investment by a provider from a country not belonging to the ECV is acquired by an investor from a contracting party only with the aim of benefiting from the protection granted by the ECV, in particular Article 26 (1) To apply the ECV and to sue a contracting party who otherwise could not have been sued.

142. It is true that such a possibility exists; however, it cannot be sufficient to automatically exclude an investment acquired from a provider of a country that does not belong to the ECV from

claiming the investment protection conferred by recourse to dispute resolution. Such an interpretation not only seems to me to be incompatible with the previously examined provisions of the ECV, it would also mean that no investment acquired from a foreign investor would ever be protected under the ECV.

143.   Under these circumstances, the existence of an abuse of rights can only be taken into account in individual cases and a principle according to which an investment acquired by an investor of a contracting party from an investor of a non-ECV state is not considered an investment by the former within the meaning of Art. 26 para. 1 ECV does not justify it. The referring court will therefore have to examine why Komstroy acquired the claim in question in order to be able to determine whether that acquisition was for the sole purpose of bringing an action against the Republic of Moldova in accordance with the ECV.

144.   Consequently, in the event that the Court of Justice does not share my analysis in relation to the first question, I propose that the answer to the second question should be that Article 26 (1) ECV should be interpreted as meaning that the acquisition of a to an investor of a state not belonging to the ECV represents an investment within the meaning of this provision, unless the sole purpose of such an acquisition was to benefit from the protection granted by the provisions of the ECV, in particular to enable it to sue a contracting party in an arbitration tribunal, which the referring court will have to examine.

D.     **Third question**

145.   By its third question, the referring court essentially seeks to know whether Article 26 (1) ECV is to be interpreted as meaning that a claim to which an investor is entitled under a sales contract for electricity delivered to the border of the receiving State is in the territory may constitute an investment made by another contracting party if the investor has not carried out any economic activity in the territory of that state.

146.   Here, too, it should be noted that the third question is of a subsidiary nature. If the answer to the first question referred is that a claim arising from an electricity supply contract does not constitute an investment, there is no need to determine whether this claim has been realized *in the territory* of another contracting party.

147. For  the sake of completeness - in the event that the Court does not share my analysis of the first and second questions - I will, however, answer the third question, assuming that a claim arising from an electricity supply contract represents an investment in the sense of the ECV, which is not the case.

148.    The Republic of Moldova, supported in this by the Spanish Government and the Commission, contends that no investment has been made in its territory since the electricity supplied under the contract from which the claim arises only extends to the border between Ukraine and Moldova on the Ukrainian side.

149.   This line of reasoning is based on an interpretation of Article 1 (6) (c) ECV, which provides that a monetary claim constitutes an investment if it was made under a contract which itself is linked to an investment. However, it seems to me to be neglecting an essential element. Even if the examination of the investment with which the contract from which the claim in question arises is relevant for the classification of the claim as an 'investment', that investment exists once that element has been identified, namely only from the claim, without having to refer to the associated investment again later.

150.   The investment that is the subject of the legal dispute and must therefore be examined in the light of Art. 26 Para. 1 ECV is therefore not the electricity supply that is provided for in the contract from which the claim arises, It is about the claim itself. It is therefore only a question of deciding whether the acquisition of such a claim is to be regarded as an investment in the Moldova region, without having to determine whether the contract on the basis of which this claim was established is also involved related to an investment that is being made in said area itself.

151.   The investment in question, i. H. the claim, in the present case, belongs to a Ukrainian investor and exists vis-à-vis a company based in Moldova. Art. 1 No. 10 ECV defines the term "territory" simply as "the territory under [the] sovereignty [of a state that is a contracting party]". It follows that a claim against a company with its registered office in Moldovan territory is to be regarded as an investment in the territory of that contracting party, the whereabouts of the debtor of the claim being sufficient to prove it.

152.   In any event, the same result would be achieved if the Republic of Moldova's argument that it was necessary to examine the area in which the investment was made, with which the contract giving rise to the claim was linked, would also have to be taken into account.

153.   Formally, the electricity is actually delivered to the border with Moldova. If an overly formalistic solution is not to be chosen, the electricity will ultimately be fed into the Moldovan network, and this is the main problem. The question of whether it was supplied by a provider on one side or the other of the border must not affect this result ( 88 ). In reality, the electricity supplied is always intended for distribution in Moldovan territory, and therefore in that Contracting Party ( 89 ).

154.   Consequently, in the event that the Court of Justice does not share my analysis in connection with the first and second questions, I propose that the answer to the third question should be that Article 26 (1) ECV is to be interpreted as meaning that a A claim to which an investor of one contracting party is entitled against a provider of another contracting party constitutes an investment by the former in the territory of the latter.

V.    **Result**

155.   In the light of the foregoing, I propose that the Court answer the questions referred by the Cour d'appel de Paris (France) as follows:

Art. 1 No. 6 of the Energy Charter Treaty, which was signed in Lisbon on December 17, 1994 and adopted by Decision 98/181 / EC, ECSC, Euratom of the Council and the Commission of September 23, 1997 on the conclusion of the Treaty the Energy Charter and the Energy Charter Protocol on energy efficiency and related environmental aspects have been approved by the European Communities on behalf of the European Union, is to be interpreted as meaning that a claim arising from an electricity supply contract that did not result in a contribution is not an investment in the sense of this of this regulation.

---

1    Original language: French.

---

2     Signed in Lisbon on December 17, 1994 (OJ 1994, L 380, p. 24) and approved on behalf of the European Union by Decision 98/181 / EC, ECSC, Euratom of the Council and the Commission of September 23, 1997 on the conclusion of the Energy Charter Treaty and the Energy Charter Protocol on Energy Efficiency and Associated Environmental Aspects by the European Communities (OJ 1998, L 69, p. 1).

---

3     The other cases concerning the interpretation of the ECV are the joined cases currently pending before the Court of Justice Federazione nazionale delle imprese elettrotecniche ed elettroniche (Anie) and Others. (C - 798/18 and C - 799/18).

---

4    Judgment of 6 March 2018 (C - 284/16, hereinafter: Achmea, EU: C: 2018: 158).

---

5    judgments of April 30, 1974, Haegeman (181/73, EU: C: 1974: 41, paras. 2 and 4), of June 15, 1999, Andersson and Wåkerås-Andersson (C - 321/97, EU: C : 1999: 307, Rn. 26), as well as of June 7, 2018, KP (C - 83/17, EU: C: 2018: 408, Rn. 24).

---

6    Judgment of 15 June 1999 (C - 321/97, EU: C: 1999: 307, paragraph 28).

7     Judgment of 15 May 2003 (C - 300/01, EU: C: 2003: 283, paragraph 66).

8     Judgment of June 15, 1999 (C - 321/97, EU: C: 1999: 307).

9     Judgment of 15 May 2003 (C - 300/01, EU: C: 2003: 283).

10     judgments of June 15, 1999, Andersson and Wåkerås-Andersson (C - 321/97, EU: C: 1999: 307, para. 28), and of May 15, 2003, Salzmann (C - 300/01, EU: C: 2003: 283, para. 66).

11     judgments of June 15, 1999, Andersson and Wåkerås-Andersson (C - 321/97, EU: C: 1999: 307, para. 29), and of May 15, 2003, Salzmann (C - 300/01, EU: C: 2003: 283, para. 67).

12     See Art. 6 of the EEA Agreement and Paragraph 15 of the Preamble to this Agreement. On this point, see also Baudenbacher, C., "The Relationship Between the EFTA Court and the Court of Justice of the European Union", in Baudenbacher, C. (Ed.), *The Handbook of EEA Law* , Springer, 2016, p 179 to 194.

13     Judgment of 15 June 1999 (C - 321/97, EU: C: 1999: 307).

14     Judgment of 15 May 2003 (C - 300/01, EU: C: 2003: 283).

15     judgments of June 12, 2008, Gourmet Classic (C - 458/06, EU: C: 2008: 338, paragraph 20), and of July 21, 2011, Kelly (C - 104/10, EU: C: 2011 : 506, para. 60), as well as expert opinion 1/09 of March 8, 2011 (EU: C: 2011: 123, para. 83)

16     Judgment of 16 June 1998, Hermès (C - 53/96, EU: C: 1998: 292, paragraph 32).

17     Judgment of 15 June 1999 (C - 321/97, EU: C: 1999: 307).

18     Judgment of 15 May 2003 (C - 300/01, EU: C: 2003: 283).

19     This is borne out by the controversies that exist in the arbitration case law regarding the interpretation of the term 'investment' to which the present preliminary ruling questions refer.

20     Which, with the exception of the Italian Republic, are parties to the ECV.

21     Cf. for example Art. 10 Para. 1 ECV: "Each contracting party promotes and creates ... permanent, fair, favorable and transparent conditions for investors of other contracting parties to make investments in their area."

22     On the existence of bilateral obligations in multilateral agreements, see judgment of the International Court of Justice of February 5, 1970, Barcelona Traction, Light, and Power Company, Limited (Belgium / Spain), C. I. J. Recueil 1970, p. 3, paras. 33 and 35.

23     Judgment of 15 June 1999 (C - 321/97, EU: C: 1999: 307, paragraph 28).

24     Judgment of 15 May 2003 (C - 300/01, EU: C: 2003: 283, paragraph 66).

25     para. 60 and the operative part.

26     See communication from the Commission to the European Parliament and the Council of 19 July 2018 on the protection of intra-EU investments (COM [2018] 547 final).

27   Cf. inter alia. - As regards the literature from the time before the Achmea judgment was issued - Eilmansberger, T., "Bilateral investment Treaties and EU Law", *Common Market Law Review* , 2009, Vol. 46, No. 2, pp. 383 to 429, Hindelang , S., "Circumventing Primacy of EU Law and the CJEU's Judicial Monopoly by Resorting to Dispute Resolution Mechanisms Provided for in Inter-se Treaties? The Case of Intra-EU Investment Arbitration ", *Legal Issues of Economic Integration* , 2012, Vol. 39, No. 2, pp. 179 to 206, and Miron, S.," The Last Bite of the BITs - Supremacy of EU Law versus Investment Treaty Arbitration ", *European Law Journal* , 2013, Vol. 20, No. 3, pp. 332 to 345.

28   See Vattenfall AB et al. / Germany (ICSID case no. ARB / 12/12), decision on Achmea of August 31, 2018, Masdar Solar & Wind Cooperatief UA / Kingdom of Spain (ICSID case no. ARB / 14/1 ), Award of May 16, 2018, Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR / Kingdom of Spain (SCC Case No. 2015/063), Award of February 15, 2018.

29   Cf. inter alia. Gaillard., E., "L'affaire Achmea ou les conflits de logiques", *Revue critique de droit international privé* , 2018, No. 3, p. 616, Hess, B., "The Fate of Investment Dispute Resolution after the Achmea Decision of the European Court of Justice ", Max Planck Institute Luxembourg for Procedural Law Research Paper Series, 2018, No. 3, p. 8, and Basedow, J.," Achmea judgment and the applicability of the Energy Charter Treaty in Intra- EU Investment Arbitration ", *Journal of international economic Law* , 2020, Vol. 23, No. 1, pp. 271 to 292.

30   para. 60 and the operative part.

31   Achmea judgment, para. 32.See also Opinion 2/13 of December 18, 2014 (EU: C: 2014: 2454, para. 201 and the case law cited there).

32   Achmea judgment, paragraph 33.

33   Achmea judgment, paragraph 33.

34   Achmea judgment, para. 34.See also Expert Opinion 2/13 of December 18, 2014 (EU: C: 2014: 2454, para. 168 and 173 and the case law cited there).

35   Achmea judgment, para. 35.See also Opinion 2/13 of December 18, 2014 (EU: C: 2014: 2454, para. 174 and the case law cited there).

36   Achmea judgment, para. 37.See also Opinion 2/13 of December 18, 2014 (EU: C: 2014: 2454, para. 176 and the case law cited there).

37   Achmea judgment, paragraphs 39 to 42.

38   Achmea judgment, paragraphs 43 to 56.

39   Achmea judgment, paragraphs 45 and 55.

40   Cf. in this sense Basedow, J., "EU Law in International Arbitration: Referrals to the European Court of Justice", *Journal of International Arbitration* , 2015, Vol. 32, No. 4, pp. 367 to 386, in particular p 370.

41   On the originality of the mechanism, see Kessedjian, C., and Pironon, V., *Droit du commerce international* , 2nd ed., Thémis, PUF, 2020, p. 209.

42   Achmea judgment, paragraph 58.

43   Achmea judgment, paragraph 59.

44    Hess, B., loc. a. Cit., P. 8.

45    Opinion 1/17 (CETA EU-Canada) of April 30, 2019 (EU: C: 2019: 341, Rn. 128 and the case law cited there).

46    Communication from the Commission to the European Parliament and the Council of 19 July 2018 on protecting intra-EU investments (COM [2018] 547 final).

47    The point here is not to deny that the arbitration tribunals have contributed to the observance of the rule of law in investment law (cf. in this regard Sadowski, W., "Protection of the rule of law in the European Union through investment treaty arbitration: Is judicial monopolism the right response to illiberal tendencies in Europe? ", *Common Market Law Review* , 2018, No. 55, pp. 1025 to 1060). However, such a contribution cannot be compared with the assurance given between the Member States of the Union that they recognize and respect the fundamental values on which the Union is based, including respect for the rule of law and the right to an effective remedy before an independent court.

48    I am thinking in particular of the judgments of February 27, 2018, Associação Sindical dos Juízes Portugueses (C - 64/16, EU: C: 2018: 117, paras. 32 and 33), of June 24, 2019, Commission / Poland (Independence of the Supreme Court) (C - 619/18, EU: C: 2019: 531, paras. 43 and 47), and of 5 November 2019, Commission / Poland (independence of the ordinary courts) (C - 192/18 , EU: C: 2019: 924, Rn. 98).

49    Statements by the representatives of the governments of the member states of 15 and 16 January 2019 on the legal consequences of the Achmea judgment of the Court of Justice and on investment protection in the European Union, https://ec.europa.eu/info/sites/info/files /business_economy_euro/banking_and_finance/documents/190117-bilateral-investment-treaties_en.pdf, https://2015-2019.kormany.hu/download/5/1b/81000/Hungarys%20Declaration%20on%20Achmea.pdf and https: / /www.regeringen.se/48ee19/contentassets/d759689c0c804a9ea7af6b2de7327320/achmea-declaration.pdf.

50    Convention on the termination of bilateral investment protection agreements between the member states of the European Union (OJ 2020, L 169, p. 1). The Convention has been concluded by all Member States with the exception of Ireland, the Republic of Austria, the Republic of Finland and the Kingdom of Sweden.

51    the Republic of Finland and the Kingdom of Sweden expressly expressed a reservation regarding the possibility of transferring the solution developed in that judgment to the dispute settlement mechanism of the ECV. Hungary, in turn, has stated that, in its opinion, this solution cannot apply to the dispute settlement mechanism of Art. 26 ECV. See statements by the representatives of the governments of the member states of January 15 and 16, 2019 on the legal consequences of the Achmea judgment of the Court of Justice and on investment protection in the European Union, https://ec.europa.eu/info/sites/info/ files / business_economy_euro / banking_and_finance / documents / 190117-bilateral-investment-treaties_en.pdf, https://2015-2019.kormany.hu/download/5/1b/81000/Hungarys%20Declaration%20on%20Achmea.pdf and https: //www.regeringen.

52    para. 41.

53    Even if I did not rule out the contrary view from the outset in connection with my academic activities before the Achmea judgment was delivered, I am now following the reasoning of the Court in that regard. See Szpunar, M., "Referrals of Preliminary Questions by Arbitral Tribunals to the CJEU", in Ferrari, F. (Ed.), *The Impact of EU Law on International Commercial Arbitration* , Juris, 2017, pp. 85 to 124.

54    Judgment in Achmea, paragraph 43 and the case-law cited.

55   Achmea judgment, paragraph 58.

56   Opinion 1/91 (EEA Agreement - I) of December 14, 1991 (EU: C: 1991: 490, marginal numbers 40 and 70), Opinion 1/09 of March 8, 2011 (EU: C: 2011: 123 , Marginal numbers 74 and 76) and expert opinion 2/13 of December 18, 2014 (EU: C: 2014: 2454, marginal numbers 182 and 183).

57   Opinion 2/13 of December 18, 2014 (EU: C: 2014: 2454, para. 183) and Achmea judgment, para. 57.

58   Opinion of April 30, 2019 (EU: C: 2019: 341).

59   Opinion 1/17 (CETA EU-Canada) of April 30, 2019 (EU: C: 2019: 341, Rn. 131).

60   Opinion of April 30, 2019 (EU: C: 2019: 341).

61   Opinion 1/17 (CETA EU-Canada) of April 30, 2019 (EU: C: 2019: 341, Rn. 127).

62   Opinion of Advocate General Bot in Opinion 1/17 (CETA EU-Canada, EU: C: 2019: 72, No. 84).

63   Opinion of Advocate General Bot in Opinion 1/17 (CETA EU-Canada, EU: C: 2019: 72, No. 84). On this point see also Lenaerts, K., "Upholding the Rule of Law through Judicial Dialogue", *Yearbook of European Law* , 2019, vol. 38, p. 12.

64   Opinion of April 30, 2019 (EU: C: 2019: 341).

65   In addition, it cannot be ruled out that an interpretation of Article 26 ECV by the Court of Justice may be necessary if the national courts of the Member States render an arbitration award in the context of a dispute between an investor from a third country and a Member State that is an interpretation of Union law which may involve referees to review.

66   See communication from the Commission to the European Parliament and the Council of 19 July 2018 on the protection of intra-EU investments (COM [2018] 547 final).

67   For an example of possible overlaps between a treaty protecting and promoting investment between two Member States and Union law, see the Opinion of Advocate General Wathelet in Achmea (C - 284/16, EU: C: 2017: 699).

68   Although the parties were questioned at the hearing about the effects of the Achmea judgment, the discussion only related to the effects of this judgment on the compatibility of the dispute settlement mechanism provided for in Article 26 ECV with Union law. I would like to emphasize that the aforementioned judgment does not actually concern the compatibility of the substantive rules, but exclusively the question of whether a similar mechanism created by a BIT is compatible with Union law.

69   See on this point in the arbitration case law *Anatolie Stati, Gabriel Stati, Ascom Group SA and Terra Raf Trans Traiding Ltd / Kazakhstan* (Stockholm Chamber of Commerce [CSS] case no. V 116/2010), award of December 19, 2013, para . 806, and in the literature Gaillard, E., *Journal du droit international (Clunet)* , 2019, note 6, p. 160.

70   Art. 1 No. 6 letter c ECV.

71   Art. 1 No. 6 letter f ECV.

72   Convention on the Law of Treaties ( *United Nations Treaty Series* , vol. 1155, p. 331), concluded on May 23, 1969 in Vienna; *https://treaties.un.org/doc/Publication/UNTS/Volume%201155/volume-1155-I-*

*18232-French.pdf* .

---

73    On the circular connection of the investment *definition* see Pyka, M., *Pojęcie inwestycji w międzynarodowym arbitrażu inwestycyjnym* , CH Beck, Warsaw, 2018, pp. 43 and 44.

---

74    Doubts could arise with regard to the possibility of taking the view that Article 1 No. 6 (f) ECV, which relates to "any right to exercise an economic activity in the energy sector granted by virtue of ... a private contract ...", covers electricity supplies will. Such an argumentation was chosen in the arbitration case law (cf. *Petrobart Limited / Kyrgyz Republic* [CSS case no. 126/2003], arbitration award of March 29, 2005, p. 72). In view of the interpretation that I propose to make of Art. 1 No. 6 (f) ECV, such a possibility should nonetheless be ruled out. See points 121 et seq. Of this Opinion.

---

75    The literature takes the view that the definition of the term "investment" in Art. 1 No. 6 Letter c ECV should be based solely on the usual meaning of this term. As the Polish government submits in its written observations, the English language version of the ECV makes a distinction between the English term "investment" in the sense of the ECV, which is marked with a capital letter, and the English term "investment" without capital letters, this time in the ordinary meaning of the term. "Investments" without capital letters, which therefore differ from the "investments" protected by the ECV with capital letters, have an objective meaning, to which reference should be made in paragraphs 114 to 116 of this Opinion. Since a claim according to Art. 1 no. 6 letter c ECV had to result from an "investment-related" contract, the term "investment" in this case should consequently only be understood objectively - with reference to the usual meaning of the term. See Baltag, C.,*The Energy Charter Treaty: The Notion of Investor* , Kluwer Law International, Alphen am Rhein, 2012, p. 174. From this argument, which is based only on the typography of the text, which, by the way, cannot be found in all language versions of the ECV, I am not entirely convinced, however.

---

76    Among other things, the term "investment" is defined in French as "investment of assets to generate income" ( *Dictionnaire de l'Académie française* , 9th edition). In English, "investment" is defined as "the act of putting money ... into something to make a profit". For the development of the definition of this term see Gilles, A., *La définition de l'investissement international* , Larcier, Brussels, 2012, p. 16 f.

---

77    Cf. Salini Costruttori S. p. A. and Italstrade S. p. A./Kingreich Morocco (ICSID case no. ARB / 00/4), arbitration award of July 23, 2001, 129 Journal du droit international 196 (2002), marginal number 52. For an analysis of this case law, see Pyka, M., op . a. O., pp. 63 to 111, and Jeżewski, M., *Międzynarodowe prawo inwestycyjne* , CH Beck, Warsaw, 2019, pp. 127 to 134.

---

78    See Baltag, C., op. a. O., pp. 167 to 183, as well as Kessedjian, C., and Pironon, V., op. a. Cit., P. 206.

---

79    Cf. inter alia. *Masdar Solar & Wind Cooperatief U.A./Königreich Spanien* (ICSID Case No. ARB / 14/1), arbitration award of May 16, 2018, § 195 f., And *Isolux Netherlands BV / Kingdom of Spain* (SCC Case No. V 2013/153) , Arbitration award of July 17, 2016, § 683 f.

---

80    See Baltag, C., op. a. *Cit* ., P. 178 f., As well as Audit, M., *Journal de droit international (Clunet)* , 2020, No. 3, p. 16.

---

81    Komstroy asserted at the hearing that the contribution consisted of the supply of electricity. However, such an argument cannot suffice to classify the electricity supply contract as "an investment-related contract" as it does not mean that there is a risk with regard to the expected returns as a result of such a contribution.

---

82    In particular through the dispute settlement mechanism provided for in Art. 26 ECV. Even if certain commercial transactions sometimes have characteristics that justify their classification as an "investment" (cf. on this point Pyka, M., op. Cit., Pp. 175 to 181). I do not think that such an analysis can be made here.

83     Such an interpretation is, moreover, even more clearly from the English language version of the ECV out: "any right conferred ... by contract ... *to undertake* any economic activity in the energy sector" (each force ... a private contract ... granted right *to receive* economic activity in the Energy range) (emphasis only here).

---

84 A     typical example of such a contractual right would be a concession for the operation of an infrastructure in the territory of the contracting party.

---

85     See point 107 of this Opinion.

---

86     See point 135 of this Opinion.

---

87     I would like to make it clear that investments by an investor from a non-ECV state are indeed investments within the meaning of the ECV, but they are nevertheless not investments *protected* by this treaty , since the material provisions for the promotion and protection of Investments expressly and exclusively refer to investments by investors of the contracting parties. See, inter alia. Art. 10 ECV: "Each contracting party promotes and creates ... permanent, fair, favorable and transparent conditions *for investors of other contracting parties* to make investments in their area. These conditions include the obligation to *invest by investors from other contracting parties* to always grant fair and equitable treatment. "(emphasis only here)

---

88     Audit, M., op. a. O.

---

89     This is all the more true as the idea of delivery to the limit for electricity is purely fictitious. As is apparent from the order for reference, the electricity networks of Ukraine and Moldova are interconnected, so that the view that electricity is delivered up to point A and stored at the same point pending its retrieval by the recipient is erroneous.