**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NEXTERA ENERGY GLOBAL HOLDINGS B.V. *and* NEXTERA ENERGY SPAIN HOLDINGS B.V., <br><br>       Petitioners, <br><br>     v. <br><br> KINGDOM OF SPAIN, <br><br>       Respondent. | No. 19-cv-01618-TSC |

**THE KINGDOM OF SPAIN'S MEMORANDUM OF LAW IN SUPPORT OF**
**<u>MOTION TO DISMISS THE PETITION</u>**

## CONTENTS

INTRODUCTION ........................................................................................................... 1

**BACKGROUND** ......................................................................................................... 5

   **I.**    **Summary Of Background Facts** ..................................................................... 5

       A.    Petitioners Invest In Spain And Are Subject To EU Law and Spain's Legal And Regulatory Regime .......................................................... 5

       B.    Petitioners Obtain An ICSID Award Over Spain's Jurisdictional Objection.............. 6

       C.    Spain Files Its Application To Annul The Award And Enforcement of the Award is Stayed ........................................................................ 7

       D.    The Committee Denies Spain's Annulment Application ............................. 8

   **II.**   **Summary of Laws, Treaties, and Relevant CJEU Decisions**...................... 8

       A.    The Foreign Sovereign Immunities Act ...................................................... 8

       B.    The ICSID Convention............................................................................... 10

       C.    The Energy Charter Treaty ........................................................................ 11

       D.    The Treaty on the Functioning of the European Union.............................. 11

       *E.*    *Slovack Republic v. Achmea B.V.* ............................................................. 12

       F.    The Application Of Achmea In The EU, The European Commission's Position, And The Joint Declaration........................................................ 14

       *G.*    *Republic of Moldova v. Komstroy* ........................................................... 15

**ARGUMENT** ............................................................................................................ 16

   **I.**    **The Court Does Not Have Jurisdiction Under The Foreign Sovereign Immunities Act Unless An Agreement To Arbitrate Exists Between Spain And Petitioners**.... 16

   **II.**   **This Court Must Determine *De Novo* Whether An Arbitration Agreement Exists**18

   **III.**   **The Court Can And Should Dismiss The Petition *Forum Non Conveniens* Before Ruling On Its Jurisdiction Under The Foreign Sovereign Immunities Act**........... 22

       A.    *Forum Non Conveniens* Co-Exists With The FSIA .................................. 24

       B.    No Special Rule Should Apply To The Arbitration Exception .................. 25

       C.    The *Forum Non Conveniens* Factors Favor Dismissal ............................. 28

   **IV.**   **If The Court Rules On Its Jurisdiction, The Petition Should Be Dismissed Because Neither Exception To Sovereign Immunity Applies** .............................. 32

       A.    No FSIA Exception Exists Because There Was Never A Valid Agreement To Arbitrate......................................................................... 34

       B.    The Award Is Not Be Entitled To Full Faith And Credit ........................... 40

       C.    The Award Cannot Be Valid Pursuant To The Foreign Sovereign Compulsion Doctrine And Act of State Doctrine ...................................... 44

**CONCLUSION** ......................................................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Abbott*,
 560 U.S. 1 (2010) ................................................................................................35

*In re Air Crash Over Southern Indian Ocean*,
 946 F.3d 607 (D.C. Cir. 2020) .................................................................24, 27, 29

*Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*,
 138 S. Ct. 1865 (2018) ........................................................................................35

*Azima v. RAK Investment Authority*
 926 F.3d 870 (D.C. Cir. 2019) .............................................................................25

*Bao Ge v. Li Peng*,
 201 F. Supp. 2d 14 (D.D.C. 2000) .........................................................................9

*BG Group PLC v. Republic of Argentina*,
 572 U.S. 25 (2014) ..............................................................................................21

*Blue Ridge Investments, LLC v. Republic of Argentina*,
 735 F.3d 72 (2d Cir. 2013) ...................................................................................39

*Brice v. Haynes Investments, LLC*,
 13 4th 823, 827-28 (9th Cir. 2021) ......................................................................21

*Buckeye Check Cashing Inc. v. Cardegna*,
 546 U.S. 440 (2006) ............................................................................................20

*Met. Life Ins. Co. v. Bucsek*,
 919 F.3d 184 (2d Cir. 2019) .................................................................................20

*Process and Industrial Developments Ltd. v. Federal Republic of Nigeria*,
 962 F.3d 576 (D.C. Cir. 2020) .............................................................................28

*Creighton Ltd. v. Gov't of State of Qatar*,
 181 F.3d 118 (D.C. Cir. 1999) .......................................................................16, 39

*Croesus EMTR Master Fund LP v. Federative Republic of Brazil*,
 212 F. Supp. 3d 30 (D.D.C. 2002) .......................................................................27

*Dahman v. Embassy of Qatar*
 364 F. Supp. 3d 1 (D.D.C. 2019) ....................................................................24, 25

*Dennis v. Edwards*,
    831 A.2d 1006 (D.C. Cir. 2003) .............................................................29, 30

*Eastern Airlines, Inc. v. Floyd*,
    499 U.S. 530 (1991).............................................................................35

*El Al Isr. Airlines, Ltd. v. Tseng*,
    525 U.S. 155 (1999).............................................................................35

*Eric T. v. National Medical Enterprises, Inc*.,
    700 A.2d 749 ..................................................................................31

*European Cmty. v. RJR Nabisco Inc.*,
    764 F.3d 129 (2d Cir. 2014), *rev'd on other grounds* 136 S. Ct. 2090 (2016) .......................45

*Fitsock v. Kaiser Foundation Health Plan of Mid-States Inc*.,
    1990 WL 179942 (D.D.C. Oct. 30, 1990) ...........................................31

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
    905 F.2d 438 (D.C. Cir. 1990).............................................................39

*Friends of All Children, Inc. v. Lockheed Aircraft Corp*.,
    717 F.2d 602 (D.C. Cir. 1983).............................................................30

*FTC v. Compagnie de Saint-Gobain-Pont-A-Mousson*,
    636 F.2d 1300 (D.C. Cir. 1980).............................................................45

*Gulf Restoration Network v. Jewell*
    87 F. Supp. 3d 303 (D.D.C. 2015).........................................................30

*Hengle v. Treppa*,
    19 4th 324, 335 (4th Cir. 2021).............................................................21

*Henry Schein, Inc. v. Archer and White Sales, Inc*.,
    139 S.Ct. 524 (2019)......................................................20, 21, 39, 40

*Irwin v. World Wildlife Fund, Inc.*,
    448 F. Supp. 2d 29 (D.D.C. 2006).........................................................30

*Kaplan v. First Options of Chicago, Inc.*,
    19 F.3d 1503 (3d Cir. 1994), *aff'd* 514 U.S. 938 (1995) ......................................22

*Keeton v. Wells Fargo Corp*.
    987 A.2d 1118 (D.C. 2010) ...............................................................20

*Law Firm of LarJack, PLLC v. Citibank, N.A.*,
    2021 WL 4192030 (D.D.C. Sept. 15, 2021) ...........................................20

*LLC SPC Stileks v. Rep. of Moldova*,
    2021 WL 137251 (D.C. Cir. Jan. 15, 2021) (aff'd by 985 F.3d 871 (D.C. Cir.
    2021)) .................................................................................................................18

*LLC SPC Stileks v. Republic of Moldova*,
    985 F.3d 871 (D.C. Cir. 2021) ................................................................23, 26

*Lloyds Syndicate 457 v. FloaTEC LLC*,
    921 F.3d 508 (5th Cir. 2019) ...............................................................................20

*Maritime Int'l Nominees Establishment v. Republic of Guinea*,
    693 F.2d 1094 (D.C. Cir. 1982) ...........................................................................40

*MBI Grp. INc. v. Credit Foncier du Cameroun*,
    558 F. Supp. 2d 21 (D.D.C. 2008) *aff'd* 616 F.3d 568 (D.C. Cir. 2010) ............27, 31

*Micula v. Government of Romania*,
    404 F. Supp. 3d 265 (D.D.C. 2019), aff'd 805 Fed App'x 1 (D.C. Cir 2020) ...............19

*Mobil Cero Negro Ltd. v. Bolivarian Republic of Venuz.*,
    863 F.3d 99 (2d Cir. 2017) ...................................................................................18

*MZM Constr. Co. Inc. v. N.J. Building Laborers Statewide Benefit Fund*,
    974 F.3d 386 (3d Cir. 2020) ................................................................................20

*Nat. Ass'n of Broadcast Employees and Technicians v. Am. Broadcasting Co.*,
    140 F.3d 459 (2d Cir. 1998) ................................................................................22

*North Jersey Interiors LLC v. N.J. Regional Council of Carpenters*,
    2012 WL 84431 (D.N.J. Jan. 10, 2012) ..................................................................21

*Nygard v. DiPaolo*,
    753 F. App'x 716 (11th Cir. 2018) ........................................................................32

*O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana S.A.*,
    830 F.2d 449 (2d Cir. 1987) ................................................................................44

*OI Eur. Grp. B.V. v. Bolivarian Rep. of Venezuela*,
    No. 16-1533, 2019 WL 2185040 (D.D.C. May 21, 2019) .........................................18

*Osvatics v. Lyft, Inc.*,
    535 F. Supp. 3d 1 (D.D.C. 2021) ..........................................................................20

*In re Papandreou*,
    139 F.3d 247 (D.C. Cir. 1998) .............................................................................28

*Phoenix Consulting Inc. v. Republic of Angola*,
    216 F.3d 36 (D.C. Cir. 2000) ...............................................................................16

*In re Picard, Trustee for Liquidation of Bernard L. Madoff Investment Securities LLC,*
    917 F.3d 85 (2d Cir. 2019).................................................................................31

*Piper Aircraft Co. v. Reyno,*
    454 U.S. 235 (1981).......................................................................................30

*Process and Industrial Developments Ltd. v. Federal Republic of Nigeria*
    27 F.4th 771 (D.C. Cir.2022).........................................................................17

*Puligiencia Facility Esco SpA (PFE) v. Airgest SpA,*
    Case C-689/13 (Apr. 5, 2016)........................................................................12

*RDP Techs., Inc. v. Cambi AS,*
    800 F. Supp. 2d 127 (D.D.C. 2011)...............................................................20

*Republic of Moldova v. Komstroy,*
    Case C-741/19.............................................................................................2, 29

*Royal Wulff Ventures LLC v. Primero Mining Corp.,*
    No. 17-56367, 2019 WL 4419677 (9th Cir. Sept. 17, 2019) .....................46, 47

*Rubin v. Islamic Republic of Iran,*
    138 S. Ct. 816 (2018).......................................................................................9

*In re Sealed Case,*
    825 F.2d 494 (D.C. Cir. 1987).......................................................................45

*Simon v. Republic of Hungary,*
    911 F.3d 1172 (D.C. Cir. 2018)..................................................................24, 27

*Sinochem Int'l Co. v. Malaysia In'l Shipping Co.,*
    549 U.S. 422 (2007).....................................................................................4, 22

*Slovak Republic v. Achmea B.V.,*
    Case C-284/16............................................................................................2, 15

*Slovak Republic v. Achmea B.V.,*
    Case No. C-284/16 (Mar. 6, 2018) ................................................................12

*Stati v. Republic of Kazakhstan,*
    199 F. Supp. 3d 179 (D.D.C. 2016)..................................................16, 17, 37, 38

*Stromberg v. Marriot Intern., Inc.,*
    474 F. Supp. 2d 57 (D.D.C. 2007)..................................................................31

*Sumitomo Shoji Am., Inc. v. Avagliano,*
    457 U.S. 176 (1982).......................................................................................35

v

*Taftnet v. Ukraine*,
    301 F. Supp. 3d 175 (D.D.C. 2018) ...................................................................39

*Tatneft v. Ukraine*,
    21 F.4th 829 (D.C. Cir. 2021) ..........................................................................26

*TECO Guat. Holdings, LLC v. Republic of Guatemala*,
    No. CV 17-102 (RDM), 2018 WL 4705794 (D.D.C. Sept. 30, 2018) ....................18

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
    411 F.3d 296 (D.C. Cir. 2005) .............................................................23, 25, 26

*Turan Petroleum, Inc. v. Ministry of Oil and Gas of Kazakhstan*,
    406 F. Supp. 3d 1 (D.D.C. 2019) ......................................................................16

*Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar.
    Ass'n*,
    455 U.S. 691 (1982) .....................................................................................40, 41

*V.L. vs. E.L.*,
    136 S. Ct. 1017 (2016) .....................................................................................41

*Van Cauwenberghe v. Biard*,
    486 U.S. 517 (1988) .........................................................................................30

*In re West Caribbean Crew Members*,
    2008 WL 11331752 (S.D. Fla. Oct. 1, 2008) .....................................................12

*World Wide Minerals, LTD v. Republic of Kazakhstan*,
    296 F.3d 1154 (D.C. Cir. 2002) ....................................................................38, 46

## INTRODUCTION

Petitioners ask this Court to exercise jurisdiction over the Kingdom of Spain, a foreign sovereign.  In order for the Court to do so, Petitioners must establish that an exception applies under the Foreign Sovereign Immunities Act (the "**FSIA**").  Petitioners allege two alternative exceptions.  First, they allege jurisdiction under 28 U.S.C. 1605(a)(6), which provides that a foreign state shall not be immune in cases to confirm awards based on valid agreements to arbitrate where the agreement is governed by an international treaty (the "**Arbitration Exception**"). Second, they allege jurisdiction under 28 U.S.C. 1605(a)(1), which provides that subject matter jurisdiction exists where the foreign state has waived its immunity, either explicitly or by implication (the "**Waiver Exception**").

Petitioners point to the same underlying facts in support of both exceptions.  On May 31, 2019, Petitioners obtained an arbitral award issued under the auspices of an international treaty, the 1965 Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "**ICSID Convention**").  To the extent that a valid agreement to arbitrate exists between Spain and Petitioners, then Petitioners would be correct that the Arbitration Exception, and possibly the Waiver Exception, apply to the enforcement of an award arising out of that agreement to arbitrate.

But it is irrefutable as a matter of European Union ("**EU**") Law that no such agreement to arbitrate exists.  The purported arbitration agreement relied upon by Petitioners is contained in the Energy Charter Treaty ("**ECT**"), a multilateral investment treaty between Spain, the Netherlands (of which Petitioners are nationals), and several other nations.  As detailed below and in detail in the Declaration of Prof. Dr. Steffen Hindelang submitted herewith, on March 8, 2018, the EU's highest court, the Court of Justice of the European Union (the "**CJEU**") issued a seminal

opinion in *Slovak Republic v. Achmea B.V.*, Case C-284/16.   Achmea, ¶ 55.   *See* Declaration of Prof Dr Steffen Hindelang dated May 2, 2022 ("**Hindelang Decl.**"), Ex. 46.   The CJEU ruled that any arbitration clause contained in intra-EU bilateral investment treaties were invalid on their face due to the fundamental principles of autonomy and primacy of EU law, as set out in the EU Treaties: A Member State may not enter into a "treaty by which [it] agree[s] to remove from the jurisdiction of [its] own courts . . . disputes which may concern the application or interpretation of EU law." *Id.*, ¶ 55.   Such agreement would be incompatible with EU law as expressing in the foundational EU Treaties in that agreeing to such a process by which an arbitral tribunal may render an unreviewable interpretation of EU violates "the autonomy of the EU and its legal order," which the EU Member States obligated themselves to uphold when they acceded to the EU.   *Id.*, ¶ 57.

Spain and most other states within the EU, including the Netherlands, interpreted *Achmea* as applying with equal force to intra-EU disputes involving multilateral investment treaties, including the Energy Charter Treaty.   Many investors, including Petitioners, challenged that interpretation and purported to limit *Achmea*'s application to bilateral treaties as opposed to multilateral treaties like the ECT.   The ICSID tribunal agreed with Petitioners – over Spain's well-preserved jurisdictional objection (which cannot be waived in any event, as discussed by Dr. Hindelang in his declaration), the tribunal ruled that a valid agreement existed, and therefore that it had jurisdiction to resolve the underlying dispute between Spain and Petitioners.   However, the CJEU conclusively resolved that disagreement on September 2, 2021 in *Republic of Moldova v. Komstroy*, Case C-741/19.   Hindelang Decl., Ex. 66.   In *Komstroy*, the CJEU expressly and unequivocally stated that the agreement to arbitrate in the Energy Charter Treaty also runs afoul of the principles set out in *Achmea*, and is incompatible with EU law and therefore null: "In the

precisely same way as the arbitral tribunal at issue in the case giving rise to the judgment [in…] *Achmea*," Article 26 of the ECT, "according to which a dispute between an investor of one Member State and another Member State concerning EU law may be removed from the judicial system of the European Union," would "call into question the preservation of the autonomy and of the particular nature of the law established by the Treaties, ensured in particular by the preliminary ruling procedure provided for in Article 267 TFEU."  *Id*., ¶¶ 52, 62, 63.

That brings us to this motion.  Petitioners attempt to present this dispute as straightforward: Spain signed the ECT, which contains in its Article 26 an offer to arbitrate with investors from the Netherlands, and Petitioners accepted that offer by commencing ICSID arbitration.  Because that arbitration resulted in a determination that a valid agreement to arbitrate exists, Petitioners contend that this Court must accept that determination and find jurisdiction under the Foreign Sovereign Immunities Act.  But that oversimplification fails on every level.  In reality, this dispute implicates numerous complex and significant issues of EU and US law, and requires a multi-step analysis that inevitably leads to the conclusion that this action must be dismissed.

First, the Court cannot exercise jurisdiction under the Arbitration Exception **or** the Waiver Exception without satisfying itself that an agreement to arbitrate exists.  To be sure, a sovereign that agrees to arbitrate under the ICSID Convention is subject to the Court's jurisdiction as to any award arising out of a valid agreement to arbitrate (which is not the case here, as discussed below). But it is equally clear that Spain's accession to the ICSID Convention does not constitute a waiver of immunity with respect to **all** disputes, especially and including disputes that do not trace to a valid agreement to arbitrate. Simply put, if no valid agreement to arbitrate exists between Spain and Petitioners, then no jurisdiction exists over Spain.

Second, this dispute implicates the "who decides" question. Because jurisdiction rises and falls depending on whether an agreement to arbitrate exists, this Court must determine who makes that determination, the ICSID tribunal or this Court. As a matter of US law, that threshold question as to whether any agreement exists *at all* cannot be delegated, and must be decided by this Court.

Third, this Court cannot rightly determine whether an agreement to arbitrate exists, and therefore cannot determine whether jurisdiction under the Foreign Sovereign Immunities Act ("FSIA") exists, without wading into complex questions of European and international law. In particular, the Court would need to resolve an issue of first impression in the United States as to the implications of *Achmea* and *Komstroy* on enforcement actions over foreign sovereigns in the United States. Under those circumstances, where jurisdiction under the FSIA is uncertain and unestablished, the Court can and should dismiss the Petition pursuant to *forum non conveniens*. While the D.C. Circuit has held that *forum non conveniens* is not available to foreign sovereigns opposing petitions to confirm arbitral awards, that holding occurred *only after* the court determined that jurisdiction existed under the FSIA. The D.C. Circuit has never held that a district court has an obligation to rule on jurisdiction before considering a *forum non conveniens* motion, nor could it, as any such holding would be inconsistent with longstanding D.C. Circuit precedent as to the relationship between *forum non conveniens* and the FISA. Such an approach would also be inconsistent with the Supreme Court's ruling in *Sinochem Int'l Co. v. Malaysia In'l Shipping Co.*, 549 U.S. 422 (2007).

Finally, in the event that the Court decides to rule on its own jurisdiction, it should determine that none exists. As a matter of EU law, the law to which Spain and Petitioners are both subject, no arbitration agreement exists between Spain and Petitioners because any such

agreement would violate core tenets of EU sovereignty as set out in the EU Treaties. Europe's highest court, the CJEU, has expressly stated as much, in particular in the *Achmea* and *Komstroy* decisions. There is no basis, and it would be at the very least extraordinarily inappropriate, for this Court to find that an arbitration agreement does exists between Spain and Petitioners, contrary to EU law and the rulings of the CJEU. But as noted above, the Court does not even have to get to that question, and may dismiss on the basis of *forum non conveniens* alone.

## BACKGROUND

### I.    Summary Of Background Facts

#### A.    Petitioners Invest In Spain And Are Subject To EU Law and Spain's Legal And Regulatory Regime

Spain has long been committed to the development of renewable energy production in accordance with both its national interest and the EU's binding objectives to produce clean energy and reduce greenhouse gasses. For example, Spain is a signatory to the 1992 Framework on Climate Change and the 1997 Kyoto Protocol, and has enacted national and regulatory regimes for its electricity sector to further those objectives. Award (D.E. 1-4), ¶ 100. As Nextera concedes, "the Spanish system is formed by different types of instruments, namely, the Spanish Constitution, Organic Laws, Ordinary Laws, Royal Decree-Laws ("**RDL**"), Royal-Decrees ("**RD**"), Ministerial Orders and Resolutions." *Id.*, ¶ 99.

In that context, on November 27, 1998, Spain enacted Law 54/1997 on the Electricity Sector (the "**Electricity Law**"), which required, among other things, that "in order for renewable energy sources to cover at least 12% of Spain's total energy demand by the year 2010, a plan should be drawn up to promote renewable energies and whose objectives shall be taken into account in the setting of premiums." *Id.*, ¶¶ 102, 107 (citation omitted). "The Electricity Law also required that every year, or when required by special circumstances, the Government would

approve or amend a reference or average electricity tariff through a Royal Decree." *Id.* ¶ 109; *see also id.,* ¶¶ 110-67 (summarizing the complex legal and regulatory framework governing renewable energy under Spanish law).

Petitioners' involvement began in 2007, when a subsidiary of Petitioners (*based in the Netherlands*) entered into a series of agreements "relating to land easements, water rights, and the development of up to four 49.9 MW CSP plants in Extremadura." *Id.*, ¶ 168.  To be clear, the only reason that Petitioners benefit from the ECT is because of their Dutch nationality.  The United States is not a party to the ECT.

Shortly thereafter, following the implementation of RD 661/2007 and in parallel with the international financial crisis that began in 2008, Spain diligently evaluated the relationship between the income generated from granting access to electricity grids and the costs of the grids that the income was supposed to cover.  *See id.*, ¶ 118.  Similarly, on April 30, 2009, Spain adopted RDL 6/2009, the Preamble of which "observed . . . the growing tariff deficit in Spain" and explicitly stated its objective to "control costs and reduce the deficit." *Id.,* ¶ 128.  Spain enacted various legislation and regulation from 2009 forward to facilitate that objective. *Id.*, ¶¶ 130-61. Petitioner alleges that these laws and regulations negatively and unfairly impacted Petitioners' business and violated the ECT, and in 2015 Petitioners were placed in mandatory liquidation. *Id.*, ¶¶ 179-80.

### B.  Petitioners Obtain An ICSID Award Over Spain's Jurisdictional Objection

On May 12, 2014, Petitioners initiated an ICSID arbitration.   Therein, Petitioners alleged that (1) Article 10.1 of the ECT imposed an obligation on Spain to protect Petitioners' legitimate and reasonable expectations, maintain reasonable stability in its legal framework, act in good faith, act proportionately, and respect due process; (2) Spain's revisions to its electricity regime violated

those obligations; and (3) Article 26 of the ECT contains an offer to arbitrate between Spain and Petitioners. *Id.*, ¶¶ 6, 393, 412-54. On September 9, 2015, Spain submitted a Memorial on Jurisdiction and Request for Bifurcation, arguing that the Tribunal lacked jurisdiction because, among other reasons, there was no agreement to arbitrate between Spain and Petitioners. *See id.*, ¶ 15.

On November 14, 2014, the European Commission (the "EC") filed an application for Leave to Intervene as a Non-Disputing Party. *Id.*, ¶ 54. The requested leave was granted, and the EC submitted its written submission on September 5, 2016. *Id.*, ¶ 65.

Then, on May 16, 2018, "the EC submitted a communication stating that in case the Tribunal would deem that useful for its deliberations, the Commission would be available to update its written observations in light of the recent judgment of the European Court of Justice in Case C-284/16 *Achmea v. Slovak Republic*, and in particular to set out its view of the consequences of that judgment for pending arbitration cases based on the Energy Charter Treaty." *Id.*, ¶ 87 (emphasis omitted). However, the Tribunal refused to accept a submission from the EC on the significance of *Achmea. Id.*, ¶ 89.

On March 12, 2019, the Tribunal denied Spain's request for bifurcation, issued a decision on jurisdiction and liability, and ruled in Petitioners' favor in both regards. *See id.*

C. Spain Files Its Application To Annul The Award And Enforcement of the Award is Stayed

On September 26, 2019 Spain filed a timely application to annul the Award before an ICSID *ad hoc* Committee pursuant to Article 52(1)(b) of the ICSID Convention. Among other things, Spain argued that the Award should be annulled because the Tribunal manifestly exceeded its powers because no jurisdiction existed.

Specifically, Spain challenged the Tribunal's jurisdiction for several reasons, most

important among them implicating the core issue that this Court would need to resolve if it reached the question of its own jurisdiction: there is no valid arbitration agreement between Spain and Petitioners, the so-called "intra-EU" objection.   Notably, Spain objected to the Award as it is not based upon a correct application of public international law, focused on a myopic application of pure treaty law rather than a proper application of customary international law rules of treaty interpretation, and in any event, even if Article 26 of the ECT would be interpreted to encompass intra-EU disputes, the Award does not address the conflict between such an interpretation and the EU Treaties (EU law).   As Spain pointed out, the interpretation of Article 26 advanced by Petitioners would undermine the principle of the primacy of EU law, *i.e.*, the very foundation of the validity of the EU.   During the final stages of the annulment proceedings, after briefing had been completed, the CJEU further clarified EU law on these issues with the issuance of the *Komstroy* decision.

     D.   <u>The Committee Denies Spain's Annulment Application</u>

As the parties jointly informed the Court on April 25, 2022, the ICSID Committee denied Spain's Application to Annul the Award on March 18, 2022.   *See* Further Joint Statute Report (D.E. 59).

## II.    Summary of Laws, Treaties, and Relevant CJEU Decisions

Petitioners seek to enforce an ICSID Award issued pursuant to a purported arbitration agreement in the ECT.   Spain now moves to dismiss the Petition as, among other deficiencies, it is subject to dismissal pursuant to *forum non conveniens* and otherwise the Court lacks jurisdiction under the FSIA pursuant to numerous applicable authorities of EU law.   These various legal regimes are summarized briefly below.

     A.   <u>The Foreign Sovereign Immunities Act</u>

1.  Codified Presumption Of Immunity

"Prior to 1952, the State Department generally held the position that foreign states enjoyed absolute immunity from all actions in the United States."  *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018).   As foreign states became more involved in commercial activity in the United States, the State Department recognized that such participation "makes necessary a practice which will enable persons doing business with them to have their rights determined in the courts."   J. Tate, Changed Policy Concerning the Granting of Sovereign Immunity to Foreign Governments, 26 Dept. State Bull. 984, 985 (1952).   "In 1976, Congress enacted the FSIA in an effort to codify this careful balance between respecting the immunity historically afforded to foreign sovereigns and holding them accountable, in certain circumstances, for their action."  *Rubin*, 138 S. Ct. at 822.

Under the FSIA, a foreign state is presumptively immune from the jurisdiction of the United States courts, and unless a specified exception applies, the federal court lacks subject matter jurisdiction over a claim against a foreign state."  *Bao Ge v. Li Peng*, 201 F. Supp. 2d 14, 23 (D.D.C. 2000) (citations omitted); *see also* H.R.Rep. No. 94–1487, p. 12 (1976) (H.R.Rep.); S.Rep. No. 94–1310, pp. 11–12 (1976) (S.Rep.), U.S.Code Cong. & Admin.News 1976, pp. 6604, 6610 (FSIA "sets forth the sole and exclusive standards to be used in resolving questions of sovereign immunity raised by sovereign states before Federal and State courts in the United States," and "prescribes ... the jurisdiction of U.S. district courts in cases involving foreign states").

Both before and after the enactment of the FSIA, the Supreme Court "consistently has recognized that foreign sovereign immunity is a matter of grace and comity on the part of the United States."  *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018).

2. Narrow Exceptions

The FSIA enumerates seven exceptions to a sovereign's immunity, only two of which are invoked by Petitioner. First, Petitioners attempt to invoke 28 U.S.C. § 1605(a)(6), which provides:

> A foreign state shall not be immune from jurisdiction of courts of the United States or of the States in any case . . . in which the action is brought . . . to confirm an award made pursuant to an **agreement to arbitrate** if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards.

*See* Petition, ¶ 13 (emphasis added) (D.E. 1).

Second, Petitioners reference 28 U.S.C. § 1605(a)(1), which provides:

> A foreign state shall not be immune from jurisdiction of courts of the United States or of the States in any case . . . in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the waiver.

*See id.*, ¶ 12.

B.  The ICSID Convention

The ICSID Convention is an international treaty establishing a mechanism for resolving investment disputes and creating a self-contained arbitration regime separate and apart from the regimes which govern other international arbitration agreements and awards. *See* Christoph Schreuer, The ICSID Convention: A Commentary, 1103, 1154 (2d Ed. 2009). While Article 54 of the ICSID Convention prohibits contracting states from reviewing awards on the merits, Article 55 unequivocally states that "nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to the immunity of that State or of any foreign State from execution." This commitment to sovereign immunity was a key consideration during the enactment of ICSID; indeed, during congressional hearings for the enactment of the ICSID Convention, a member of the United States delegation testified:

10

> As to whether [a district court] has jurisdiction over a party, **there is nothing in the convention that will change the defense of sovereign immunity.** If somebody wants to sue Jersey Standard in the United States, on an award, no problem. If somebody wants to sue Peru or the Peruvian Oil Institute, [] it would depend on whether in the particular case that entity would or would not be entitled to sovereign immunity.

*Convention on the Settlement of Investment Disputes: Hearing on S. 3498 Before the Subcomm. on Int'l Orgs. & Movement of the H. Comm. On Foreign Affairs, Hearing of the House Subcomm.,* 89th Cong. 18 (Jan 15, 1966) (emphasis added). Accordingly, the FSIA and the ICSID Convention co-exist and both remain relevant to this dispute.

### C. The Energy Charter Treaty

Petitioners purport to invoke the ICSID Convention by alleging that an agreement to arbitrate between Spain and Petitioners arises out of the ECT. Pursuant to its Article 2, the purpose of the ECT is to "establish[] a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits." Article 26 of the ECT, in turn, provides for the resolution of disputes between investors of one contracting party, on the one hand, and another contracting party, on the other, before an ICSID tribunal through an arbitral process that is subject to certain conditions. Article 26(6) provides one such condition and requires that the tribunal be bound by "all applicable rules and principles of international law." Because EU law is a product of international treaties among EU Member States, and because EU law governs the relationship between Spain and Petitioners, the "applicable rules and principles" under Article 26(6) must include and incorporate EU law. *See* Hindelang Decl., ¶¶ 11-14.

### D. The Treaty on the Functioning of the European Union

The EU law at issue in this dispute relates to the interpretation of the Treaty on the Functioning of the European Union ("**TFEU**"), the significance of which cannot be overstated. *Id.*, ¶ 12. The TFEU, among other things, establishes the CJEU, which, "pursuant to several

11

treaties executed by the Member States, is the highest court in the EU." *In re West Caribbean Crew Members*, 2008 WL 11331752, at *4 (S.D. Fla. Oct. 1, 2008).   Generally, EU law and the CJEU's interpretations of EU law have supremacy over the Member States' law. *Id.*; Hindelang Decl., ¶¶ 11-13.

Pursuant to Article 267 of the TFEU, the highest court of each EU Member State is required to refer questions of EU law to the CJEU for a preliminary ruling.   A "judgment in which the [CJEU] gives a preliminary ruling is binding," and national courts are "required to do everything necessary to ensure that interpretation of EU law is applied." *Puligiencia Facility Esco SpA (PFE) v. Airgest SpA*, Case C-689/13 (Apr. 5, 2016); Hindelang Decl., ¶ 35, Ex. 44.   Likewise, Article 344 explicitly provides that "Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein."   In other words, **Member States are expressly prohibited from submitting disputes to arbitral tribunals that might interpret or otherwise apply EU law outside of the EU judicial system**.   Hindelang Decl.*, ¶¶ 31-38.

### E.   *Slovack Republic v. Achmea B.V.*

In 2018, the CJEU issued a ruling as to whether an investment treaty between the Netherlands and the Slovak Republic contained a valid agreement to arbitrate and, as a result, whether a valid arbitration agreement existed between a Member State of the EU (Slovakia) and Achmea, a company incorporated under the laws of another Member State (The Netherlands). *Slovak Republic v. Achmea B.V.*, Case No. C-284/16 (Mar. 6, 2018); Hindelang Decl., Ex. 58. Under Article 8 of the relevant investment treaty, each contracting state consented to arbitration with investors of the other contracting state, and called upon the arbitral tribunal to rely on the law in force of the Contracting State concerned; the provisions of this Agreement, and other relevant

agreements between the contracting parties; the provisions of special agreements relating to the investments; and "general principles of international law." *Id.*, ¶ 4. The tribunal rejected Slovakia's jurisdictional objection and issued an award in favor of Achmea. *Id.*, ¶ 12. Slovakia applied to have the award set aside by German courts on the ground that the alleged arbitration agreement between Slovakia and Achmea was incompatible with Articles 267 and 344 of the TFEU. *Id.*, ¶¶ 5, 12, 14. After the case reached Germany's highest court of civil jurisdiction on appeal, that court referred the matter to the CJEU for a preliminary ruling as to whether Articles 267 and 344 of the TFEU precluded the enforcement of an arbitration agreement between an EU Member State, on the one hand, and the investor of an EU Member State, on the other. *Id.*, ¶ 23.

The CJEU began its analysis by emphasizing that "according to settled case-law of the [CJEU], an international agreement cannot affect the allocation of powers fixed by the [EU] Treaties or, consequently, the autonomy of the EU legal system." *Id.*, ¶ 32 (citations omitted). Likewise, "the autonomy of EU law with respect both to the Member States and to international law" is justified by EU law's "primacy over the laws of the Member States, and by the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves." *Id.,* ¶ 33.

Accordingly, the CJEU held that "it is for the national courts and tribunals and the [CJEU] to ensure the full application of EU law in all Member States and to ensure judicial protection of the rights of individuals under that law." *Id.*, ¶ 36. Crucially, the CJEU further held that the arbitral tribunal constituted pursuant to an investment treaty involving a Member State was required to interpret and apply EU law,[1] but as it was not part of the EU judicial system, it was

---

[1] Due to the nature of EU law, the CJEU found that for disputes the arbitral tribunal was called on to resolve under the BIT, it was liable to relate to the interpretation or application of EU law

prohibited from interpreting and applying EU law in a binding fashion.  *Id.*, ¶¶ 45-46, 48-49;

Hindelang Decl., ¶ 35.   As such, the CJEU concluded:

> Articles 267 and 344 [of the] TFEU must be interpreted **as precluding** a provision
> in an international agreement concluded between Member States . . . under which
> an investor from one of those Member States may, in the event of a dispute
> concerning investments in the other Member State, bring proceedings against the
> latter Member State before an arbitral tribunal whose jurisdiction that Member State
> has undertaken to accept.

*Id.*, ¶ 62 (emphasis added).   The CJEU thus held that such purported arbitration agreements

**between EU Member States and nationals of other EU Member States** are unenforceable, and

thus, that no valid arbitration agreement exists between those parties (i.e., intra-EU disputes).

    F.   The Application Of Achmea In The EU, The European Commission's Position, And
        The Joint Declaration

Following the *Achmea* Judgment, the European Commission explicitly acknowledged that

investors in Member States may not "have recourse to arbitration tribunals established … under

the Energy Charter Treaty." *Communication from the Commission to the European Parliament

and the Council*: *Protection of intra-EU investment* at 26, COM (2018) 547 final (July 19, 2018)

("**EC Communication 547**"); Hindelang Decl., ¶ 58.

Moreover, twenty-two Members of the EU, including Spain and the Netherlands

(Petitioners' home State), confirmed that an arbitration agreement cannot be formed under Article

26 of the ECT between an EU Member State and a national of another Member State.  *See

Declaration of the Representatives of the Governments of the Member States on the Enforcement

of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European

Union* (Jan. 15, 2019) ("Joint Declaration") at 1; Hindelang Decl., Ex. 53).   In reaching this

---

because it would need to take account in particular of the law in force of the contracting party
concerned and other relevant agreements between the contracting parties.  *Id.*, ¶¶ 39-42.

conclusion, the EU Member States explicitly explained in the Joint Declaration: "For the Energy Charter Treaty, its systemic interpretation in conformity with the [EU] Treaties precludes intra-EU investor-State arbitration."   *Id*., n.2.

### G.  *Republic of Moldova v. Komstroy*

Further, since this action was first filed, during the stay ordered by this Court, the CJEU as anticipated reconfirmed that the principles set out in Achmea do apply to the ECT.  "In the precisely same way as the arbitral tribunal at issue in the case giving rise to the judgment [in…] *Achmea*," Article 26 of the ECT, "according to which a dispute between an investor of one Member State and another Member State concerning EU law may be removed from the judicial system of the European Union," would "call into question the preservation of the autonomy and of the particular nature of the law established by the Treaties, ensured in particular by the preliminary ruling procedure provided for in Article 267 TFEU."   Thus, there can now be no doubt that the reasoning in *Achmea* applied analogously to the ECT, and therefore this present case.

### H.  Subsequent Rulings By European Courts

Various courts in European have implemented and followed the rulings of the CJEU in *Achmea* and *Komstroy*, as they are required to do under EU law.   For example, on November 17, 2021, in *Republik Kroatien (Republic of Croatia) v. Raiffeisen Bank International AG und die Raiffeisen Bank Austria d.d.*, the German Supreme Court rejected an appeal and found that disputes submitted to arbitration persuading to a purported arbitration agreement in the Austria-Croatia BIT could involve the interpretation or application of EU law, and was invalid under EU law pursuant to *Achmea* and *PL Holdings*.   In addition, *Slot Group v. Poland* and *Strabag v. Poland*, the Cour d'appel (court of appeal) de Paris has also applied the reasoning of *Achmea* in order to annul the relevant awards due to lack of jurisdiction.

## ARGUMENT

**I.    The Court Does Not Have Jurisdiction Under The Foreign Sovereign Immunities Act Unless An Agreement To Arbitrate Exists Between Spain And Petitioners**

Petitioners allege jurisdiction under both the Arbitration Exception and the Waiver Exception.  *See* Petition, ¶¶ 7-8.   Under this theory, the existence of the ECT and Spain's accession to the ICSID Convention end the inquiry, precluding any analysis as to whether the ECT (to which Petitioners are not signatories) creates a valid agreement to arbitrate between Spain and Petitioners.   No court has ever held as much, nor should the court do so here.

As to the Arbitration Exception, courts follow a two-step burden shifting framework. First, the petitioner must "make a prima facie showing that there was an arbitration agreement by producing the treaty and the notice of arbitration."   *Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 188 (D.D.C. 2016) (citation omitted).   "Once petitioner makes this showing, the burden shifts to the respondent to demonstrate by a preponderance of the evidence that the treaty and the notice to arbitrate did not constitute a valid arbitration agreement between the parties."   *Id.* (citation omitted).   "By moving to dismiss, the defendant may challenge either the legal sufficiency or the factual underpinning of an exception . . . ." *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000).   Pursuant to this two-step framework, the Court cannot exercise jurisdiction under the Arbitration Exception unless and until it is satisfied that a **valid** arbitration agreement exists between Spain and Petitioners.

As to the Waiver Exception, the D.C. Circuit has "followed the 'virtually unanimous' precedents construing the implied waiver provision narrowly."   *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 124 (D.C. Cir. 1999).   Accordingly, "courts have found that a foreign sovereign has implicitly waived the defense of immunity if the sovereign has: (1) filed a responsive pleading without raising the defense of sovereign immunity; 2) **agreed to arbitrate**; or 3) agreed

to adopt a particular choice of law." *Turan Petroleum, Inc. v. Ministry of Oil and Gas of Kazakhstan*, 406 F. Supp. 3d 1, 11 (D.D.C. 2019) (citations omitted) (emphasis added).   In *Creighton*, the D.C. Circuit limited the reach of the "agreement to arbitrate" waiver by noting that agreeing to arbitrate in one foreign country did not constitute a waiver of sovereign immunity in all countries.   181 F.3d at 122.   Only if a sovereign ratified a convention (such as the ICSID Convention) would its agreement to arbitrate outside of the United States constitute a waiver of sovereign immunity in the United States.   *Id.* at 123.   Crucially, however, "the mere fact that [a sovereign] is a signatory to the [ICSID Convention] does not permit [suits that do not arise out of a valid agreement to arbitrate]."   *Turan*, 406 F. Supp. 3d at 12.   Another court in this District likewise recently confirmed that a valid arbitration agreement is necessary before any waiver can be deemed to exist.   *See Stati v. Republic of Kazakhstan,* 199 F. Supp. 3d 179, 188 (D.D.C. 2016).   In *Stati*, the court explained:

> The Court of Appeals has found implied waivers of foreign sovereign immunity in three circumstances: when (1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that the law of a particular country governs a contract; or (3) a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity. . . In evaluating whether a waiver existed, the court explicitly stated that the "question of whether Kazakhstan agreed to arbitrate [was] central to the parties' dispute in this case.

In other words, despite the fact that Kazakhstan is generally a signatory to the New York Convention, the Court held that it nevertheless must establish an agreement to arbitrate with the petitioner before finding a waiver to sovereign immunity.   *Id*.   Indeed, it is well-settled that mere signing of the ICSID Convention does not constitute an agreement to arbitrate a dispute in an ICSID arbitration, and rather a separate consent to arbitrate a specific dispute at ICSID is required. *See* ICSID Convention, Preamble ("Declaring that no Contracting State shall by the mere fact of its ratification, acceptance or approval of this Convention and without its consent be deemed to be

under any obligation to submit any particular dispute to conciliation or arbitration.") Hence, enforcement through the ICSID Convention is wholly dependent upon the existence of a separate consent in writing to arbitrate a particular dispute. No court has held to the contrary. Simply put, the Waiver Exception, like the Arbitration Exception, does not apply without a valid agreement to arbitrate.[2]

The jurisdictional task before this Court, therefore, is to determine whether the ECT and Petitioners' notice to arbitrate constitutes a valid arbitration agreement.

## II.    This Court Must Determine *De Novo* Whether An Arbitration Agreement Exists

The Award that Petitioners seek to enforce included a ruling by the ICSID Tribunal that a valid agreement to arbitrate exists between Spain and Petitioners. *See* Hindelang Decl., Ex. 7. Petitioners contend that Spain cannot challenge that ruling, citing to a Second Circuit case for the proposition that, with respect to an ICSID award, courts "cannot examine its merits, its compliance with international law, or the ICSID tribunal's jurisdiction to render the award." Petition, ¶ 24 (citing *Mobil Cero Negro Ltd. v. Bolivarian Republic of Venuz.*, 863 F.3d 99, 102 (2d Cir. 2017)).[3]

This misses the mark. The *Mobil Cerro* court itself went on to consider, and explicitly reject, the petitioners' argument that "ICSID award recognition [should] be automatic and not

---

[2] The applicability of the Waiver Exception is an open question in this Circuit. In *Process and Industrial Developments Ltd. v. Federal Republic of Nigeria*, the D.C. Circuit declined to rule as to whether a sovereign waives its immunity **even where a valid agreement to arbitrate exists.** 27 F.4th 771, 775 (D.C. Cir. 2022). The United States submitted an *amicus* brief and stated that such an "application of the waiver exception to the FSIA may have implications for the treatment of the United States in foreign courts and for our relations with foreign states." *Id.*, n. 3 (internal quotations omitted). This Court need not "wade into the murky waters of the waiver exception," *id.*, because under any theory the Waiver Exception only applies if a valid agreement to arbitrate exists.

[3] Petitioners also cite to *OI Eur. Grp. B.V. v. Bolivarian Rep. of Venezuela*, No. 16-1533, 2019 WL 2185040, at *4 (D.D.C. May 21, 2019) in support of this position. But *OI Eur.* merely quotes *TECO Guat. Holdings, LLC v. Republic of Guatemala*, No. CV 17-102 (RDM), 2018 WL 4705794, at *2 (D.D.C. Sept. 30, 2018), and TECO quotes *Mobil Cerro.*

subject to contest." *Mobil Cerro*, 863 F.3d at 116 (citations omitted).   Instead, the court found

that the FSIA's legislative history "highlights that full faith and credit, as used in Section 1650a,

meant something less than automatic recognition and conversion of the award into a federal

judgment." *Id.* at 123 (emphasis added).   *Mobil Cerro* is fully aligned with D.C. law: a court must

determine jurisdiction under the FSIA before confirming an award, and the mere existence of an

ICSID award does not authorize automatic recognition or conversion.

In that regard, Petitioners' position has been rejected, on multiple occasions, in this Circuit.

*See, e.g., LLC SPC Stileks v. Rep. of Moldova,* 2021 WL 137251, at *3 (D.C. Cir. Jan. 15, 2021)

("In *Chevron Corp. v. Republic of Ecuad*or, we clarified that jurisdiction under the arbitration

exception requires more than a claim invoking an arbitration award.   Rather, **the existence of an

arbitration agreement**, an arbitration award and a treaty governing the award are all jurisdictional

facts that must be established.") (citations omitted) (emphasis added) (aff'd by 985 F.3d 871 (D.C.

Cir. 2021))[4]; *Micula v. Government of Romania*, 404 F. Supp. 3d 265 (D.D.C. 2019), aff'd 805

Fed App'x 1 (D.C. Cir 2020) (finding that the Arbitration Exception applied only after having

determined whether a valid agreement to arbitrate existed as a result).

There is no meaningful argument that Petitioners' allegation of an arbitration agreement

---

4 In affirming, the D.C. Circuit explicitly stated that "[i]t makes no difference that *Henry Schein* dealt with a domestic, commercial contract and the ECT is an international treaty.   A treaty is a contract, though between nations.   Its interpretation normally is, like a contract's interpretation, a matter of determining the parties' intent."   *Id.*, at 879 (citations omitted).   In *Moldova*, and as required by *Henry Schein*, the D.C. Circuit began its analysis by determining whether an agreement to arbitrate, and an agreement to delegate questions as to what falls within that agreement to arbitrate, existed.   *Id.* at 878 ("Moldova agreed to assign arbitrability determinations to the tribunal…Moldova's only counterargument is that the ECT is not applicable to the dispute.   In other words, the ECT's [delegation] is not controlling because the [petitioners'] claim does not fall within the ECT."   *Id.* at 878-79.   Here, Petitioners cannot get past the initial threshold inquiry: the ECT does not create a valid agreement to arbitrate between Petitioners and Spain, nor can it (and nor does it) delegate the question of whether a valid agreement to arbitrate exists to an arbitrator.

ends the inquiry; D.C. law is clear that the existence of that agreement is a jurisdictional fact that must be established.   Petitioners, however, contend that said jurisdictional fact **was** established, before the ICSID Tribunal, such that this Court must accept the Tribunal's ruling.   This, too, is incompatible with well-established U.S. law.

While the Supreme Court has recognized parties' rights to delegate questions of arbitrability to the arbitrator, it has never gone so far as to delegate the **existence of an agreement to arbitrate**.   To the contrary, in a seminal case fortifying the right to delegate, the Supreme Court emphasized that "[t]o be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."   *Henry Schein, Inc. v. Archer and White Sales, Inc*., 139 S.Ct. 524, 530 (2019).   Contrary to questions as to whether certain disputes fall within a valid agreement to arbitrate, the core question as to whether two parties agreed to arbitrate at all cannot be delegated, even when an agreement attempts to do so explicitly.   *See, e.g., MZM Constr. Co. Inc. v. N.J. Building Laborers Statewide Benefit Fund*, 974 F.3d 386, (3d Cir. 2020) (joining several sister circuits in declining "to enforce delegation provision when the formation or existence of the container contract was at issue"); *Lloyds Syndicate 457 v. FloaTEC LLC*, 921 F.3d 508, 514 (5th Cir. 2019) (explaining that, even post-*Henry Schein*, "the court must determine whether the parties *entered into any arbitration agreement at all*") (emphasis in original) (citations omitted); *c.f. Met. Life Ins. Co. v. Bucsek,* 919 F.3d 184 (2d Cir. 2019) ("It is a fundamental tenet of law that only by agreeing to arbitrate does a person surrender the right of access to a court for a resolution of a legal dispute that is subject to adjudication.")

"To be sure," then, *Henry Schein* does not overrule the well-established severability doctrine, which provides that challenges to the validity of an agreement to arbitrate are reserved for courts.   *See, e.g., Law Firm of LarJack, PLLC v. Citibank, N.A.,* 2021 WL 4192030, at *3

(D.D.C. Sept. 15, 2021) ("The first step in deciding a motion to compel arbitration is determining whether a valid arbitration agreement has been created.") (citing *Henry Schein,* 139 S. Ct. at 530); *Osvatics v. Lyft, Inc.,* 535 F. Supp. 3d 1, 10 (D.D.C. 2021) ("Because arbitration is a matter of contract, the threshold issue for a court faced with a motion to compel arbitration is whether the parties entered into a valid and binding arbitration agreement.") (citations omitted); *Buckeye Check Cashing Inc. v. Cardegna,* 546 U.S. 440 (2006); *RDP Techs., Inc. v. Cambi AS*, 800 F. Supp. 2d 127 (D.D.C. 2011) ("[O]f course, [the arbitration] clause is without force and effect if the parties never agreed to it in the first place"); *Keeton v. Wells Fargo Corp.* 987 A.2d 1118 (D.C. 2010) (explaining the difference between arbitrability disputes, which concern what the parties have agreed to arbitrate, and disputes regarding the validity of the arbitration clauses, which are for courts, not arbitrators, to adjudicate); *North Jersey Interiors LLC v. N.J. Regional Council of Carpenters*, 2012 WL 84431 (D.N.J. Jan. 10, 2012) ("[A] compulsory submission to arbitration cannot precede judicial determination that the [agreement in question] does in fact create such a duty.").

On top of that, even if questions as to the existence of an arbitration agreement could be delegated to an arbitrator, Petitioners fails to show that the ECT validity delegated those questions by clear and unmistakable evidence. *See, e.g., Henry Schein*, 139 S.Ct. at 531. At most, Petitioners points to Article 26(4)(a) of the ECT, which provides that the parties "consent" to ICSID jurisdiction. This ignores entirely the fact that the Supreme Court expressly declined the invitation to grant such sweeping significance to the word "consent." *BG Group PLC v. Republic of Argentina*, 572 U.S. 25, 38 (2014). To the extent that Petitioners rely on Spain's ratification of ICSID as clear and unmistakable evidence of delegation, it misses the mark even wider. The ICSID Preamble unambiguously declares "shall by the mere fact of its ratification, acceptance or

approval of this Convention and without its consent be deemed to be under any obligation to submit any particular dispute to conciliation or arbitration." On top of **that**, even if there were clear and unmistakable evidence of an attempt to delegate, the attempted delegation would be invalid on its face as a matter of EU law for all of the same reasons that as purported agreement to arbitrate itself. *See, e.g., Hengle v. Treppa*, 19 4th 324, 335 (4th Cir. 2021) ("As with any other agreement to arbitrate, when a party challenges a delegation clause specifically, the court must evaluate the validity of the delegation before ordering compliance with the clause.") (citations omitted); *Brice v. Haynes Investments, LLC*, 13 4th 823, 827-28 (9th Cir. 2021) ("[Supreme Court precedent] contemplates that a delegation provision may be unenforceable for the same reason as the broader arbitration agreement.").

That core doctrine is unaffected by the fact that Spain presents the dispute to the Court after the issuance of an award rather than before. *See Nat. Ass'n of Broadcast Employees and Technicians v. Am. Broadcasting Co.*, 140 F.3d 459 (2d Cir. 1998) (rejecting the argument that a judicial determination of arbitrability must, as a matter of law, precede arbitration whenever arbitrability is disputed); *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1510 (3d Cir. 1994), *aff'd* 514 U.S. 938 (1995) ("A party does not have to try and enjoin or stay an arbitration proceeding in order to preserve its objection to jurisdiction…A jurisdictional objection, once stated, remains preserved for judicial review absent a clear and unequivocal waiver.").

As such, the Court cannot exercise jurisdiction over Spain unless a valid agreement to arbitrate between Spain and Petitioners existed, and the Court must determine whether such an agreement exists.

III. **The Court Can And Should Dismiss The Petition *Forum Non Conveniens* Before Ruling On Its Jurisdiction Under The Foreign Sovereign Immunities Act**

As a general matter, it is undisputed that courts can dismiss actions *forum non conveniens*

prior to ruling on their own jurisdiction.   This principle is codified by *Sinochem Intern. Co. v. Malaysia Intern. Shipping Co*., 549 U.S. 422 (2007).   The Court explained:

> We hold that a district court has discretion to respond at once to a defendant's *forum non conveniens* plea, and need not take up first any other threshold objection. In particular, a court need not resolve whether it has authority to adjudicate the cause (subject-matter jurisdiction) or personal jurisdiction over the defendant if it determines that, in any event, a foreign tribunal is plainly the more suitable arbiter of the merits of the case.

*Id.* at 422.

This should be straightforward: as with any other challenge to subject matter jurisdiction, courts can dismiss for *forum non conveniens* without resolving whether it has authority to adjudicate the case under the FSIA.   However, the landscape was complicated by an unpublished D.C. Circuit opinion in *TMR Energy Ltd. v. State Prop. Fund of Ukraine,* 411 F.3d 296 (D.C. Cir. 2005).   There, the Court noted that a plaintiff establishing jurisdiction under the FSIA could attach assets in the United States, and therefore held that because "there is no other forum in which TMR could reach [the sovereign's] property, if any, in the United States, we affirm the district court's refusal to dismiss this action based on the doctrine of forum non conveniens."   *Id.* at 303-304. More recently, in a published opinion, the D.C. Circuit went further and declared that *forum non conveniens* is not available in proceedings to confirm a foreign arbitral award because only U.S. courts can attach foreign commercial assets found within the United States."   *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 876 n.1 (D.C. Cir. 2021).

However, the district courts in *TMR, Moldova*, and the even more recent *Tatneft* decision, all determined that jurisdiction existed under the Arbitration Exception **before** ruling on the *forum non conveniens* motions.   That is consistent with courts' prerogatives and with *Sinochem*. Crucially, as a result, none of those cases stand for the proposition that a special rule should exist for petitions **alleging** jurisdiction under the Arbitration Exception, such that a court has an

obligation (contrary to *Sinochem*) to rule on jurisdiction prior to *forum non conveniens*.

Against that backdrop, dismissal pursuant to *forum non conveniens* is appropriate for three reasons.   First, as the D.C. Circuit has reiterated on several occasions (before and after *TMR*), *forum non conveniens* co-exists with the FSIA, and courts can and do dismiss actions even where the plaintiff, should it establish jurisdiction and prevail on the merits, could attach assets in the United States.   Second, no special rule should apply to the Arbitration Exception.   There is absolutely no authority, in the text of the FSIA or elsewhere, supporting the notion that a sovereign defending against an arbitral enforcement action has less immunity than a sovereign defending against some other action.   Third, because the court can consider *forum non conveniens*, it should dismiss the Petition on that basis.

### A.   *Forum Non Conveniens* Co-Exists With The FSIA

As the D.C. Circuit explained in 2018 (13 years after *TMR*), "*[f]orum non conveniens* predates the FSIA by centuries, and it was an embedded principle of the common-law jurisprudential backdrop against which the FSIA was written." *Simon v. Republic of Hungary*, 911 F.3d 1172, 1182 (D.C. Cir. 2018) (overruled on other grounds).   The *Simon* plaintiff alleged, among other things, violations of international law, which would provide both a FSIA jurisdictional exception and FSIA attachment exception.   *See id. at 1178-79*.   As with the *TMR* plaintiff, if the *Simon* plaintiff established jurisdiction under an FSIA exception, it could attach Hungary's assets located in the United States.   Nevertheless, the D.C. Circuit affirmed that a court could dismiss on *forum non conveniens* grounds before ruling on jurisdiction under FSIA.   *See id*. at 1181-82.   Then, in 2020, the D.C. Circuit court reiterated that "[n]othing . . . requires district courts to conclusively determine whether a defendant enjoys sovereign immunity before considering immunity as a relevant factor in its forum non conveniens analysis." *In re Air Crash*

*Over Southern Indian Ocean*, 946 F.3d 607 (D.C. Cir. 2020).  The court noted that the parties raised complex arguments regarding immunity, and then held that "it was entirely proper for the district court to recognize that serious jurisdictional questions exist and weigh that as a factor in favor of dismissal."  *Id*. at 615.  Most importantly, the court found Malaysia to be an adequate forum, despite the fact that the plaintiffs would not be able to attach assets located in the United States.  *Id*.

Accordingly, in *Dahman v. Embassy of Qatar*, the court dismissed an action pursuant to *forum non conveniens* before ruling on whether jurisdiction existed under an FSIA exception.  364 F. Supp. 3d 1, 4 (D.D.C. 2019).  In so doing, the court explained that dismissal before ruling on jurisdiction was appropriate because the "forum non conveniens considerations do weigh heavily in favor of dismissal, while the jurisdictional question—namely, whether an exception to the Foreign Sovereign Immunities Act applies here to allow the suit to proceed—is a much closer question."  *Id*.  Likewise, in *Azima v. RAK Investment Authority*, the D.C. Circuit felt that dismissal under *forum non conveniens* was so appropriate that it dismissed the case without remanding it to the District Court and without opining on whether jurisdiction existed under the FSIA.  926 F.3d 870, 880 (D.C. Cir. 2019).

B.  No Special Rule Should Apply To The Arbitration Exception

As noted, on three separate occasions the D.C. Circuit has used language that suggests that *forum non conveniens* is unavailable in any action that alleges jurisdiction under the Arbitration Exception, regardless of whether such jurisdiction ultimately exists.  In reality, though, none of the cases stand for that proposition.

Starting with *TMR*, the district court held that no other forum was adequate in such an enforcement action because only a United States court may attach the commercial property of a

25

foreign nation located in the United States pursuant to 28 U.S.C. § 1610.  *TMR Energy Ltd. v. State Prop. Fund of Ukraine,* 411 F.3d 296, 304 (D.C. Cir. 2005).   Specifically, Section 1610(a)(6) permits the attachment of the property of a foreign state upon a judgment confirming an arbitral award.  *Id*.   But, as the Circuit Court explicitly noted, the sovereign in *TMR* did "not dispute that this case comes within 28 U.S.C. § 1605(a)(6)(B), the exception to immunity for any action brought to confirm an arbitration award that "is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards."   In *TMR*, then, the district court: 1) elected to rule on its jurisdiction under the FSIA prior to resolving the *forum non conveniens* motion; 2) determined that the Arbitration Exception applied; 3) noted that, in light of the applicability of the Arbitration Exception, the petitioner could attach assets located in the United States; 4) acknowledged that no other forum could grant that relief; and thus 5) denied the *forum non conveniens* motion.

The case proceeded in the same order in *Moldova*.  As the Circuit Court explained, the "district court determined that it had jurisdiction under the so-called arbitration exception."  *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877 (D.C. Cir. 2021).  The Circuit Court therefore identified its "first task" as determining whether that exception applies.  Only after doing so did the court dispense with the *forum non conveniens* argument pursuant to *TMR*.  *Id.*, n. 1.  Moreover, Moldova did not ask the court to resolve its *forum non conveniens* motion prior to ruling on jurisdiction under the FSIA; instead, Moldova asked the court to "reconsider *TMR Energy* in light of the Second Circuit's reasoning that the adequacy of the alternative forum depends on whether there are *some assets* of the defendant in the alternative forum, not whether the *precise asset* located here can be executed upon here."  *Id.* (citations omitted) (emphasis in original).

The same is true of *Tatneft.*   As with *TMR* and *Moldova*, *Tatneft* dealt with a specific type of *forum non conveniens* posture, one where the sovereign seeks "a determination that the merits should be adjudicated elsewhere **even when jurisdiction is otherwise authorized.**"   *Tatneft v. Ukraine*, 21 F.4th 829, 840 (D.C. Cir. 2021) (citations omitted) (emphasis added).   More specifically, district court ruled that the Arbitration Exception applied **and then** held that *forum non conveniens* was unavailable because no alternative forum exists.   *Id.* at 834 (citing 301 F. Supp. 3d 175, 190 (D.D.C. 2018).[5]

In each case, the court determined that it had jurisdiction under the FSIA before addressing the *forum non conveniens* motion.   Spain respectfully submits that this Court must reject a more expansive reading of the *TMR* rule, which would preclude a foreign sovereign from seeking dismissal *forum non conveniens* any time a party alleged that the Arbitration Exception applied.   Such a rule, which would apply regardless of how frivolous the claim under the Arbitration Exception may be, would force the sovereign to adjudicate, and the court to rule, on the jurisdictional question before dismissing *forum non conveniens.*   This would violate the core principle of *Sinochem*, and it would create an extratextual distinction between the Arbitration Exception and the other exceptions.   *See, e.g., Croesus EMTR Master Fund LP v. Federative Republic of Brazil*, 212 F. Supp. 3d 30 (D.D.C. 2002) (finding "compelling grounds for dismissal under the doctrine of *forum non conveniens* and explaining that D.C. law "clearly permit[s] court to consider *forum non conveniens* as a basis for dismissal where the FSIA applies."); *MBI Grp.*

---

[5] Petitioners will no doubt point to language in *Tatneft* where the D.C. Circuit appears to dismiss any contradiction between the *TMR* rule and *Sinochem*.   However, Ukraine pointed to *Sinochem* because it was an attachment case, and therefore evidence that *forum non conveniens* has continued application in international attachment cases.   Indeed, Ukraine stated in its papers that "[i]t makes no difference whether *Sinochem* … addressed whether the district court must establish its own jurisdiction before entertaining the *forum non conveniens* inquiry.   USCA Case #20-7091, Doc. #1905596, p. 30.

*INc. v. Credit Foncier du Cameroun,* 558 F. Supp. 2d 21 (D.D.C. 2008) ("[A] court may dismiss a case [against a foreign sovereign] on the basis of *forum non conveniens* in lieu of addressing questions of subject matter and personal jurisdiction…") *aff'd* 616 F.3d 568 (D.C. Cir. 2010); *Simon v. Republic of Hungary,* 911 F.3d 1172, 1182 (D.C. Cir. 2018) (reiterating that a court can rule on *forum non conveniens* grounds before ruling on jurisdiction under the FSIA) (vacated on other grounds); *In re Air Crash Over Southern Indian Ocean* 946 F.3d 607 (D.C. Cir. 2020) ("[N]othing . . . requires district courts to conclusively determine whether a defendant enjoys sovereign immunity before considering immunity as a relevant factor in its forum non conveniens analysis.").   It would also inherently undercut sovereign immunity in a way that Congress never intended.   *See, e.g., In re Papandreou*, 139 F.3d 247, 256 (D.C. Cir. 1998) (superseded on other grounds) ("It would be bizarre if an assertion of immunity worked to increase litigation costs … to the neglect of swifter routes to dismissal."); *c.f. Process and Industrial Developments Ltd. v. Federal Republic of Nigeria*, 962 F.3d 576 (D.C. Cir. 2020) ("It is axiomatic that foreign sovereigns enjoy immunity from litigation burdens as well as from the entry of adverse judgments.").   The Court should not extend *TMR* beyond its holding, and should exercise its authority under *Sinochem* to rule on *forum non conveniens* before determining whether an exception to the FSIA applies.

C.  The *Forum Non Conveniens* Factors Favor Dismissal

Despite the CJEU's ruling in *Achmea* and *Komstroy* (and *PL Holdings*), and the reaction to those cases by various European courts and institutions and the EU Member States, Petitioners (EU legal persons) nevertheless seek to enforce an award premised on the notion that an EU Member State can validly arbitrate a dispute with an investor from a different Member State under Article 26 of the ECT.   As a result, Petitioners ask this Court to evaluate complex issues of foreign

law, as well as the relationship between that law, international treaties, and the FSIA, and reach a conclusion implicating the governing documents of the EU and the fundamental principles of primary and autonomy of EU law, all without any legitimate connection to this forum. Spain respectfully submits that this Court should decline that invitation, and dismiss this action on *forum non conveniens* grounds. There is nothing preventing Petitioners from seeking to enforce the Award in Europe before the European Courts that both Spain and Petitioners are subject to, who can interpret the EU Law that applies to Spain and Petitioners.

To dismiss based on *forum non conveniens,* "[t]he movant bears the burden of showing that (1) there is an available and adequate forum, and (2) the balance of the various public and private interest factors indicates that maintaining the case in the current forum is comparatively inconvenient." *Southern Indian Ocean*, 352 F. Supp. 3d at 35. As to the first requirement, a "foreign forum is available and adequate when it provides the plaintiff with some remedy, even if the damages available to the plaintiff would be less than those available in the United States, and even if certain theories of liability are not recognized." *Id.* at 36.[6] Here, Petitioners cannot allege any shortage of available and adequate forums because Article 54 of the ICSID Convention provides that an ICSID Award can be confirmed by any Contracting State. Such Contracting States include, but are not limited to, the country where the events occurred (Spain) and the country in which Petitioners are based (the Netherlands).

As to the balance of public and private factors:

[T]he public interest factors for consideration include: (1) administrative difficulties caused by local court dockets congested with foreign litigation; (2) the

---

[6] "On the other hand, where the forum could not award any relief to a plaintiff at all, courts will not find that the forum is adequate." *Id.* However, it would take remarkable mental gymnastics for Petitioners to argue that no adequate forum exists because all other forums would correctly apply EU law and rule that no valid arbitration agreement exists, only to then argue that this Court has jurisdiction pursuant to an FSIA exception because a valid arbitration agreement does exist.

> local interest in having localized controversies decided at home; (3) the unfairness
> of imposing the burden of jury duty on citizens of the forum having no relation to
> the litigation; and (4) the avoidance of unnecessary problems in conflict of laws in
> the interpretation of the laws of another jurisdiction.

*Dennis v. Edwards*, 831 A.2d 1006, 1010-11 (D.C. Cir. 2003).   The private interest factors

include:

> (1) the relative ease of access to proof; (2) the availability of compulsory process
> to secure the attendance of unwilling witnesses and the cost of securing the
> attendance of willing witnesses; (3) other practical problems related to the ease,
> expense, and expedition of trial; (4) any evidence that the choice of forum was
> made to harass defendant; and (5) the relative advantages or disadvantages to a fair
> trial.

*Id*., at 1013. In balancing these factors, "the district court is accorded substantial flexibility in

evaluating a forum non conveniens motion, and each case turns on its facts." *Van Cauwenberghe*

*v. Biard*, 486 U.S. 517, 529 (1988).

In weighing those factors, four considerations are paramount.   First, Petitioners are foreign

parties with no connection to this District, and as such the presumption in favor of their selected

forum is significantly diminished.   *See, e.g., Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255

(1981).   Accordingly, in *Gulf Restoration Network v. Jewell*, the plaintiff's "choice of forum

[was] afforded some deference because of the District of Columbia's meaningful ties to the Project,

but not 'substantial deference' because [Plaintiff] is not a resident in this forum."   87 F. Supp. 3d

303, 312 (D.D.C. 2015) (emphasis in original).   The Court then dismissed the case pursuant to

*forum non conveniens*.   Here, Petitioners are neither residents in this forum nor able to point to

any meaningful ties to the forum, and minimal weight should be afforded to their arbitrary choice

of forum.   *Id.; see also Friends of All Children, Inc. v. Lockheed Aircraft Corp*., 717 F.2d 602,

605 (D.C. Cir. 1983) (noting that "the district court was mistaken in supposing that a foreign

plaintiff's choice of a United States forum is entitled to so much deference"); *Irwin v. World*

30

*Wildlife Fund, Inc.*, 448 F. Supp. 2d 29, 33 (D.D.C. 2006) ("[P]laintiff's choice of forum . . . is entitled to less deference if she is a citizen and resident of a foreign state.").

Second, "[t]he doctrine of forum non conveniens . . . is designed in part to help courts avoid conducting complex exercises in comparative law." *Piper Aircraft Co.*, 454 U.S. at 251. "As [the Supreme Court] stated in *Gilbert*, the public interest factors point towards dismissal where the court would be required to 'untangle problems in conflict of laws, and in law foreign to itself.'" *Id.* (quoting *Gulf Oil Court v. Gilbe*rt, 330 U.S. 501, 509 (1947)). Accordingly, in *MBI Grp. Inc. v. Credit Foncier du Cameroun*, the Court explained that "significantly, this Court's lack of familiarity with Cameroonian law, and other issues involved with the application of foreign law, weighs heavily in favor of dismissal." 558 F. Supp. 2d 21, 35 (D.D.C. 2008) (emphasis added). Likewise, in *Stromberg v. Marriot Intern., Inc.*, the court dismissed pursuant to *forum non conveniens* because the "court [was] aware that its counterparts in Mexico [were] far better suited to apply their own laws than it [was], and the court [was] sensitive to the desirability of avoiding the unnecessary review of foreign disputes." 474 F. Supp. 2d 57, 62 (D.D.C. 2007).

Here, determining whether Spain and Petitioners agreed to arbitrate this dispute in the ECT (in order to determine whether the Court has jurisdiction under an FSIA exception) would require the Court to untangle treaty obligations (including the supreme EU Treaties fundamental to the foundation and working of the EU), other EU law, several CJEU opinions, particularly the *Achmea* and *Komstroy* decisions, and various other foreign legal concepts with which this Court lacks familiarity and which the Court's counterparts in the EU are far better suited to interpret (especially when such interpretation involves their own citizens and Member States.

Third, courts routinely use *forum non conveniens* to prevent the naked forum shopping that Petitioners employ here. *See, e.g., Fitsock v. Kaiser Foundation Health Plan of Mid-States Inc*.,

1990 WL 179942 (D.D.C. Oct. 30, 1990) (transferring a case in part in recognition of the public interest "in the prevention of forum shopping") (citing cases); *Eric T. v. National Medical Enterprises, Inc.*, 700 A.2d 749, 755 ("One of the purposes of the doctrine of forum non conveniens is to avoid forum shopping.").

Finally, principles of comity weigh heavily in favor of dismissal. Comity "may be viewed as a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state, the so-called comity among courts." *In re Picard, Trustee for Liquidation of Bernard L. Madoff Investment Securities LLC*, 917 F.3d 85, 103 (2d Cir. 2019). Accordingly, "the possibility of inconsistent rulings with foreign countries raises international comity concerns that should be considered in the forum non conveniens analysis." *Nygard v. DiPaolo*, 753 F. App'x 716, 728 (11th Cir. 2018) (affirming the district court's decision to dismiss for *forum non conveniens*). Both the CJEU and Germany's high court have ruled that no valid arbitration agreement exists under a BIT; twenty-two EU Member States have declared in the Joint Declaration that the same result holds for multilateral investment treaties such as the ECT; and the CJEU in *Komstroy* has confirmed that no valid arbitration agreement exists in the ECT and that the principles of *Achmea* apply equally to the ECT. The Court should deny this attempt by Petitioners (who are EU citizens) to obtain an inconsistent ruling from this Court on a case that is properly adjudicated in the EU.

## IV. If The Court Rules On Its Jurisdiction, The Petition Should Be Dismissed Because Neither Exception To Sovereign Immunity Applies

For the reasons stated above, Spain submits that this Court should not reach the question of its jurisdiction, and should instead dismiss the action pursuant to *forum non conveniens*. However, in the event the Court does reach the question of its jurisdiction, the ultimate outcome should be the same: dismissal of the Petition.

Petitioners ask this Court to enforce the award even though (1) the Treaty of Lisbon (amending the EU Treaties after the ECT) reiterates the principle of primacy of EU law for intra-EU affairs and attributes the competences on foreign investments, of which investor-state dispute settlement ("**ISDS**") is an essential part, to the EU,[7] (2) the CJEU ruled in *Achmea* that the EU Treaties preclude arbitration provisions between EU Member States and citizens of other EU Member States, like the situation in this case,[8] (3) Germany's highest court applied *Achmea* to annul an award that was premised on such an arbitration provision; (4) the Joint Declaration explicitly set out the consensus position that *Achmea* applies to the ECT, and is itself a disconnection from the ECT; and, importantly, (5) the CJEU has now confirmed in *Komstroy* that the principles of *Achmea* apply equally to the ECT and that there is no valid arbitration agreement in the ECT between EU Member States and citizens of other EU Member States.   With that in mind, the Court should deny Petitioners' request for three reasons.

First, the arbitration provision in the ECT was void *ab initio*, rendering the alleged exceptions to Spain's sovereign immunity inapplicable.   Because no exception to the FSIA exists, no jurisdiction exists.

Second, even if jurisdiction did exist under the FSIA, enforcement would be precluded by the express terms of the ICSID implementing statute.   That statute expressly requires that ICSID awards be treated as state court judgments, and thus enforced subject to the limitations on full faith and credit.   One such limitation, universally recognized by federal courts, is that a judgment

---

[7] Thus, arguably, the Member States explicitly do not have the authority to act in the area of intra-EU ISDS mechanisms, such as that contained in the ECT, and disconnection was obtained through the Lisbon Treaty.

[8] That is, even if the Member States had the authority to act in the area of ISDS mechanisms, principle of primacy of EU law as a conflict rule would render void the ISDS mechanism in the ECT as between Petitioners and Spain (as an *ultra vires* act).

rendered by a state court that lacked jurisdiction is void and not entitled to enforcement.

Finally, this Court cannot find jurisdiction here due to the foreign sovereign compulsion doctrine and the act of state doctrine. As to the former, a finding of jurisdiction (and thus enforcement of the award) would violate the foreign sovereign compulsion doctrine because Spain is bound by a Decision of the European Commission prohibiting Spain from paying the pecuniary obligations that the Award imposes. Similarly, as to the latter, this Court cannot determine that it has jurisdiction without violating the "act of state" doctrine. Specifically, in order for the Court to determine that a valid agreement to arbitrate exists, the Court would have to effectively declare invalid the principles set out in *Achmea*, the Joint Declaration of twenty-two EU Member States, and indeed the EU Treaties, which taken together preclude the formation of agreement to arbitration under the ECT between Spain and the Petitioners.

### A. No FSIA Exception Exists Because There Was Never A Valid Agreement To Arbitrate

#### i. There Is No 1605(a)(6) Exception Because There Is No Agreement To Arbitrate

The primary exception upon which Petitioners purport to rely is 28 U.S.C. § 1605(a)(6), which provides that immunity shall not exist in a case "to confirm an award based on an **agreement to arbitrate** where the agreement or award is or may be governed by treaty . . ." Petition, ¶ 7 (emphasis added). Therefore, under Petitioners' own framework, without an agreement to arbitrate, there is no exception under Section 1605(a)(6).

Article 26(6) of the ECT provides: "A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law." ECT, Article 26(6). The "applicable rules and principles of international law" include the EU Treaties, as authoritatively interpreted by the CJEU. It is axiomatic that the

EU Treaties constitute rules of international law. *See, e.g.*, Cong. Research Serv., 106th Cong., *Treaties and Other International Agreements: The Role of the United States Senate: A Study Prepared for the Committee on Foreign Relations* 1 ("Internationally, once in force, treaties are binding on the parties and become part of international law.").   Thus, any dispute resolved under Article 26(6) of the ECT, including a dispute on the existence or validity of the arbitration agreement, must be decided in accordance with EU law, giving priority to the EU Treaties.   *See* Hindelang Decl., ¶¶ 49-53.

As noted above, the CJEU, *i.e.*, the highest authority on EU law, unambiguously held in *Achmea* that a BIT did not and cannot contain an offer to arbitrate between Member States and investor-citizens of other Member States (intra-EU disputes) where a tribunal constituted thereunder may be called upon to interpret EU law.   Further, the CJEU has now also found in *Komstroy* that this logic and analysis applies equally to multilateral investment treaties, including the ECT.   Hindelang Decl., ¶ 59.   The significance of this cannot be overstated.   As the Supreme Court explained long ago, where parties to a treaty "agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, [a court] must, absent extraordinarily strong contrary evidence, defer to that interpretation."   *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982).   And, as the Supreme Court recently affirmed, courts must grant deference to a foreign sovereign's interpretation of its own laws.   *Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018); *Abbott v. Abbott*, 560 U.S. 1, 16–19 (2010) (citing decisions by courts of England, Israel, Austria, South Africa, Germany, Canada, and France, all parties to the treaty at issue); *El Al Isr. Airlines, Ltd. v. Tseng*, 525 U.S. 155, 175 (1999) (citing judicial decision by the British House of Lords); *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 550–51 (1991) (citing the Supreme Court of Israel).   This must be especially true in cases,

like this one, where Petitioners and the Respondents are both subject to the same "sovereign" framework created by the EU Treaties, as well as the interpretation of those treaties by the highest court in the EU, the CJEU, to which they are both subject.

Moreover, even if this Court granted no deference to the EU's interpretation of its own laws (or to Spain's interpretation (and twenty-two Member States' interpretation) of those same laws), there is no colorable basis for distinguishing between the *Achmea* rule as applied to tribunals formed under the ECT. *Achmea* found, and *Komstroy* confirmed, that no arbitration agreement can exist here because: (1) tribunals formed under the BIT or the ECT are not courts or tribunals within the EU legal system; (2) those tribunals may be called upon to interpret and apply EU law; and (3) those tribunals cannot refer those questions of EU law to the CJEU under Article 267 of the TFEU. *See* Hindelang Decl., ¶ 64.

Here, in particular, tribunals formed under Article 26 of the ECT are neither courts nor tribunals within the EU legal system, and they therefore lack the requisite "links with the judicial systems of the Member States." *Achmea Judgment*, ¶ 48.

Likewise, ECT tribunals are required to "decide the dispute in accordance with this Treaty and applicable rules and principles of international law. Hindelang Decl., ¶ 51. As explained by Prof. Dr. Hindelang, EU law is public international law, and "the applicable rules and principles of international law" between EU Member States therefore comprise the entire EU legal order, which includes the EU Treaties, as interpreted by the CJEU, and specifically the principles of primacy and autonomy as reflected in Articles 267 and 344 of the TFEU. Hindelang Decl., ¶ 52. Further, EU Member States cannot derogate from EU law by simply agreeing to an international agreement to not apply EU law among each other, and thus in intra-EU matters, every judicial authority created by the EU Member States must (also) apply EU law – no matter whether there

was no explicit reference to EU law or even if explicitly excluded in an international agreement to which the Member States are a party to. Hindelang Decl., ¶ 53. Therefore, a tribunal purportedly constituted under Article 26 of the ECT in an intra-EU dispute is therefore required to apply and duly observe the rules of EU law that limit or conflict with its own jurisdiction. Hindelang Decl., ¶ 53. Indeed, this is self-evident here since the tribunal in *Nextera Energy v. Spain* sought to determine whether a valid arbitration existed by reference to the EU Treaties and the *Achmea* decision.

Finally, ECT tribunals, like the tribunal at issue in *Achmea*, cannot refer questions of EU law to the CJEU under Article 267 of the TFEU. They therefore cannot avail themselves of the procedural mechanism established by the TFEU to ensure the uniform application of EU law. *See Achmea* Judgment ¶¶ 42-49, 50-56; *see also* Hindelang Decl., ¶ 56. As a result, an ECT tribunal's "pronouncements on EU law (or failure to take EU law into account) threaten the integrity of the EU legal order and the principles of sincere cooperate and mutual trust between EU and its Member States" in the same way as the BIT tribunal at issue in *Achmea*. Hindelang Decl., ¶ 57. And this was explicitly confirmed by the CJEU in *Komstroy*.

       ii.    *Spain Did Not Waive Its Immunity Under Section 1605(a)(1)*

Petitioners offer an alternative basis for jurisdiction by alleging that "Spain's accession to the ICSID Convention operates to waive immunity from an action to recognize an award governed by the ICSID Convention." In so doing, Petitioners appear to argue that: (1) Spain agreed that valid arbitration awards, rendered by duly constituted tribunals with proper jurisdiction, would be enforceable under the ICSID Convention; so (2) Spain waived its sovereign immunity in any action where the petitioner **alleges** the existence of a valid agreement to arbitrate. Such an argument is expressly rejected by the plain language of the ICSID Convention itself, guidance from this

district, and precedent regarding the very exception that Petitioners purport to invoke.

It is beyond dispute that the mere ratification of the ICSID Convention is not an agreement to arbitrate a dispute in accordance with the ICSID Convention.[9]   Thus, Petitioners' request that Spain be deemed to have waived jurisdiction under the FSIA flies in the face of this express language, and puts the horse before the cart.

Another court in this District likewise recently confirmed that a valid arbitration agreement is necessary before any waiver can be deemed to exist.   *See Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 188 (D.D.C. 2016).   In *Stati*, the court explained:

> The Court of Appeals has found implied waivers of foreign sovereign immunity in three circumstances: when (1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that the law of a particular country governs a contract; or (3) a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity.

*Id.*   In evaluating whether a waiver existed, the court explicitly stated that the "question of whether *Kazakhstan* agreed to arbitrate [was] central to the parties' dispute in this case."   *Id.*   In other words, despite the fact that Kazakhstan is generally a signatory to the New York Convention, the Court held that it nevertheless must establish an agreement to arbitrate with the petitioner before finding a waiver to sovereign immunity.   *Id.*   Indeed, it is well-settled that mere signing of the ICSID Convention does not constitute an agreement to arbitrate a dispute in an ICSID arbitration, and rather a separate consent to arbitrate a specific dispute at ICSID is required.   *See* ICSID Convention, Preamble ("Declaring that no Contracting State shall by the mere fact of its ratification, acceptance or approval of this Convention and without its consent be deemed to be under any obligation to submit any particular dispute to conciliation or arbitration.")   Hence,

---

[9] *See, e.g.*, ICSID Convention, Preamble ("[N]o Contracting State shall by the mere fact of its ratification, acceptance or approval of this Convention and without its consent be deemed to be under any obligation to submit any particular dispute to conciliation or arbitration.").

enforcement through the ICSID Convention is wholly dependent upon the existence of a separate consent in writing to arbitrate a particular dispute.

With that in mind, the weight of authority establishes that Spain did not waive its immunity "explicitly or by implication" as required by Section 1605(a)(1). "An express waiver under section 1605(a)(1) must give a clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity." *World Wide Minerals, LTD v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002). Spain's "accession" to the ICSID Convention contains the exact opposite of an unmistakable manifestation to waive immunity: the signatories to that Convention unequivocally disclaimed any such intention.[10]

Petitioners' reference to an implied waiver fares no better. There is "virtually unanimous" consensus that the FSIA's "implied waiver provision" must be construed "narrowly." *Creighton Ltd. v. Government of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999) (quoting *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991)); *see also Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990) (observing that "cases involving arbitration clauses illustrate that provisions allegedly waiving sovereign immunity are narrowly construed") (citations omitted). Crucially, the D.C. Circuit has held that, in the context of actions to enforce arbitral awards, a purported waiver requires an affirmative indication that the foreign sovereign intended to waive its immunity with respect to the particular dispute being arbitrated. *Creighton*, 181 F.3d at 122.

Moreover, Petitioners' citation to *Blue Ridge Investments, LLC v. Republic of Argentina*

---

[10] As noted above, the United States similarly rejected a theory that signing ICSID would itself constitute a wavier of sovereign immunity. The United States, like all signatories, intended for ICSID and sovereign immunity to co-exist, and Petitioners' proffered reading would destroy that goal.

does not change the analysis.   735 F.3d 72 (2d Cir. 2013).   Both the District Court and the Second Circuit evaluated the waiver question in the context of a **valid agreement to arbitrate between the petitioner and the respondent,** and then held that the waiver exception applied.   *See id.* (finding that both the implied waiver exception and the arbitral award exception applied).   The holding in *Tatneft v. Ukraine* similarly depends on a valid arbitration agreement.   *See* 771 F. App'x 9 (D.C. Cir. 2019).   Both cases reflect the conventional wisdom that "it is up to the parties to determine whether a particular matter is primarily for arbitrators or for courts to decide," and thus that foreign sovereigns should not sidestep a contractually agreed-upon delegation via the FSIA.   *Taftnet v. Ukraine*, 301 F. Supp. 3d 175, 190 (D.D.C. 2018).   The Supreme Court recently affirmed that questions of arbitrability can be delegated to arbitrators in *Henry Schein, Inc. v. Archer and White Sales, Inc.,* 139 S. Ct. 524 (2019).   In so doing, however, the Court also reiterated that "[t]o be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."   *Id.*, at 530.   Thus, without a valid arbitration agreement, the logic underpinning the *Blue Ridge* and *Taftnet* holdings evaporates.

  B.  <u>The Award Is Not Be Entitled To Full Faith And Credit</u>

  Additionally, the Petition should be dismissed for lack of jurisdiction because the Award is not entitled to full faith and credit.   Congress implemented the ICSID Convention by enacting 22 U.S.C. § 1650a, which provides that:

> An award of an arbitral tribunal rendered pursuant to chapter IV of the [ICSID Convention] shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the **same full faith and credit** as if the award were a final judgment of a court of general jurisdiction of one of the several States.

22 U.S.C. § 1650a(a) (emphasis added)

  Enforcement of an ICSID award's pecuniary obligations is thus subject to the same full

faith and credit principles applicable to a final state court judgment. *Maritime Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1103 n.14 (D.C. Cir. 1982) ("ICSID arbitrations are to be enforced as judgments of sister states.").

As detailed below, two limitations on full faith and credit bar the Award's enforcement here. First, the Award is void because Spain did not enter an arbitration agreement with Petitioners and therefore the Tribunal lacked jurisdiction to issue any award. Second, the Award is void because the Tribunal exceeded its jurisdiction by issuing state aid.

    i.    *The Absence of A Valid Arbitration Agreement Renders The Award Void*

The Supreme Court has emphasized there are "basic limitations on the full-faith-and- credit principles." *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691, 704 (1982). "Chief among these limitations is the caveat, consistently recognized by this Court, that a judgment of a court in one State is conclusive upon the merits in another State **only if the court in the first State had power to pass on the merits – had jurisdiction, that is, to render the judgment.**" *Id.* (citations omitted) (emphasis added). "Consequently, before a court is bound by the judgment rendered in another State, it may inquire into the jurisdictional basis of the foreign court's decree. If that court did not have jurisdiction over the subject matter or the relevant parties, full faith and credit need not be given." *Id.; see also V.L. vs. E.L.*, 136 S. Ct. 1017, 1020 (2016) (holding only final judgments "rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment" qualify for full faith and credit).

The Supreme Court has explained:

This limitation flows directly from the principles underlying the Full Faith and Credit Clause. It is axiomatic that a judgment must be supported by a proper showing of jurisdiction over the subject matter and over the relevant parties. One State's refusal to enforce a judgment rendered in another State when the judgment

is void for lack of jurisdiction merely gives to that judgment the same "credit, validity, and effect" that it would receive in a court of the rendering State.

*Underwriters Nat'l Assurance*, 455 U.S. at 704 n.10.

Accordingly, the award cannot be given full faith and credit because Spain has "disproved" the existence of the putative arbitration agreement upon which the Tribunal purported to exercise jurisdiction.    *V.L.*, 136 S. Ct. at 1020.    Specifically, and for the reasons set forth above, any offer by Spain to arbitrate with investors from other EU Member States would violate EU law and would therefore be void *ab initio.*    Consequently, Petitioner could not have accepted any such offer and no arbitration agreement could have been concluded.    In the absence of an arbitration agreement, the Tribunal lacked jurisdiction, and no award rendered by it is entitled to full faith and credit.

> ii.  *The Award Is Not Entitled To Full Faith And Credit Because The Tribunal Exceeded Whatever Jurisdiction It Might Have Had*

Assuming *arguendo* that the Tribunal was properly constituted pursuant to a valid arbitration agreement between Spain and Petitioners—despite all of the evidence to the contrary set forth above—the award would **still** not be entitled to full faith and credit.    Article 26 of the ECT limits the scope of tribunals' jurisdiction by mandating that tribunals must "decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law." As there is no meaningful dispute that EU law forms a part of those applicable rules and principles of international law, ECT tribunals' jurisdiction can be, and is, limited by EU law.

Specifically, EU law provides that only the European Commission may authorize Member States to provide state aid (*i.e.*, granting any subsidies to private actors).    TFEU, Articles 107(1), 108(3); Hindelang Decl., ¶ 76.    In other words, European law explicitly prohibits arbitral tribunals from doing so.    TFEU, Articles 108(2)-(3).    More importantly, the European Commission's November 10, 2017 Decision regarding Spain determined that "any compensation which an

Arbitral Tribunal were to grant to an investor" would be unauthorized state aid that Spain is prohibited from paying. European Commission Decision 2017/7384 ¶ 165. The EU thus explains: "Spain has a legal obligation not to pay the compensation awarded by any ECT investment tribunal unless and until the Commission authorizes such payment in accordance with the applicable State aid rules." *Masdar Solar & Wind Cooperatief U.A. v. The Kingdom of Spain*, EU Amicus Brief, No. 1:18-cv-2254, ECF No. 20 at 24. As a result, "Spain is precluded as a matter of EU law from implementing the award, absent authorization from the Commission." *Id.* at 25; Hindelang Decl. ¶ 62-63.

The relationship between European Commission Decisions and enforcement is well recognized throughout the EU, as evidenced by a recent decision where the European Commission explicitly addressed the legality of ICSID Awards against Member States that purport to give state aid. *See* European Commission Decision 2015/1470; Hindelang Decl. ¶ 79. There, the European Commission evaluated an ICSID arbitral award where the tribunal awarded compensation to five claimants for Romania's alleged failure to provide fair and equitable treatment under a bilateral investment treaty between Romania and Sweden. European Commission Decision 2015/1470, ¶ 1(1). The European Commission ultimately determined that "payment of the compensation awarded by the Tribunal to the claimants amounts to the granting of incompatible new aid which is incompatible with the Treaty." *Id.* ¶ 153. The Commission therefore ordered that "any payment of the compensation awarded to the claimants by the Tribunal must be recovered by Romania … without delay." *Id.* ¶ 160; *see also* Hindelang Decl., ¶ 79.

The claimants nevertheless sought to enforce the award. When they tried to do so in Luxembourg, however, the Luxembourg Court of Appeal explained that the European Commission's Decision "is binding in its entirety" and therefore "resulted in the Award losing its

relevancy and efficacy and therefore its enforceability."  Cour Supérieure de Justice [Superior Court of Justice], Cour d'Appel [Court of Appeal], Mar. 21, 2018, No. 81/18 – VII – REF, *State of Romania v. Viorel Micula* at 20 (Lux.); Hindelang Decl., ¶ 84 (citing Exs. 57, 59, and 65). Similarly, in Sweden, another court in which enforcement was sought, ruled: "[T]here is no doubt … that enforcement in Sweden would mean that Romania… would be forced to pay, and would therefore be in breach of the Commission's prohibition on payment."  Nacka Tingsrätt [NTR] [Nacka District Court] 2019-01-23 Ä 2550-1 at 12 (Swed.); Hindelang Decl., ¶ 84 (citing Exs. 57, 59, and 65).

The same claimants' enforcement efforts in Belgium have been rebuffed there as well. *See* Tribunal de première instance francophone de Bruxelles [French-speaking Tribunal of First Instance of Brussels], Section Civile, ch. des saisies, Jan. 25, 2016, Nos. 15/7241/A and 15/7242/A at 16 (Belg.) ("[T]he decision of the European Commission – as it remains – justifies non-compliance with this award and thus makes it lose its relevance and, consequently, its enforceability. It therefore renders its execution illegal.").[11]

Notwithstanding this restriction on the Tribunal's jurisdiction, the award ordered Spain to pay compensation to Petitioner that constitutes unauthorized state aid.   By ignoring, and usurping, the Commission's exclusive jurisdiction, the Tribunal's *ultra vires* award exceeds any jurisdiction it could have under Article 26 of the ECT.   The Award is therefore void and not entitled to full faith and credit.

C.  The Award Cannot Be Valid Pursuant To The Foreign Sovereign Compulsion Doctrine And Act of State Doctrine

---

[11] The questions of EU law that form the basis for the claimants' appeal of that decision to the Brussels Court of Appeal have been referred to the CJEU. Cour d'appel Bruxelles [Court of Appeal of Brussels], 17e ch. des affaires civiles, Mar. 12, 2019, Nos. 2016/AR/393 and 2016/AR/394, *State of Romania v. Viorel Micula* (Belg.) Hindelang Decl., ¶ 84.

Even if the Court had jurisdiction and the Award was entitled to full faith and credit, the Petition must still be dismissed for yet another reason: finding jurisdiction would violate the foreign sovereign compulsion doctrine and the act of state doctrine.

The foreign sovereign compulsion doctrine provides a complete defense where the judgment of a United States court would conflict with a defendant's legal obligations elsewhere. *See, e.g., O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana S.A.*, 830 F.2d 449, 453 (2d Cir. 1987). Specifically, it provides foreign sovereigns with "protection from being caught between the jaws of [a U.S. court] judgment and the operation of laws in foreign countries." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 441 (Am.Law Inst. 1987), reporter's notes 1. This is fully consistent with the well-established principle that courts make every effort to "not take action that may cause the violation of another nation's laws." *FTC v. Compagnie de Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300, 1327 n.150 (D.C. Cir. 1980).

For the purposes of this doctrine, the EU is the equivalent of a foreign state. *See European Cmty. v. RJR Nabisco Inc.*, 764 F.3d 129, 143-47 (2d Cir. 2014), *rev'd on other grounds* 136 S. Ct. 2090 (2016). The European Commission, as the enforcement arm of that foreign state, has rendered a legally binding Decision that prohibits Spain from paying the award because doing so would violate the EU Treaties. European Commission Decision 2017/7384 ¶ 165. Granting the Petition would therefore contradict—and compel Spain to violate—the legal obligations to which it is subject under EU law.

As the D.C. Circuit has ruled, it would cause "considerable discomfort to think that a court of law should order a violation of law, particularly on the territory of the sovereign whose law is in question." *In re Sealed Case*, 825 F.2d 494, 498 (D.C. Cir. 1987). Here, the "discomfort" is exacerbated considerably by the fact that Spain is, itself, a foreign sovereign, and the relief

Petitioners seek would order that foreign sovereign to violate its own laws and international treaties.

Likewise, and as discussed above, in order for the Court to determine that it possesses jurisdiction based on the FSIA exception relied on by Petitioners, the Court would first have to find that an agreement to arbitrate existed under the ECT between Spain and Petitioners. Such a determination by the Court, however, would necessarily violate the act of state doctrine, as it would effectively declare invalid *Achmea*, the Joint Declaration, and the European Commission's official position.

The act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002) (quoting *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401, 84 S.Ct. 923, 926, 11 L.Ed.2d 804 (1964)). "In its modern formulation, the doctrine bars suit where (1) there is an official act of a foreign sovereign performed within its own territory; and (2) the relief sought or the defense interposed [in the action would require] a court in the United States to declare invalid the [foreign sovereign's] official act." *Royal Wulff Ventures LLC v. Primero Mining Corp.*, No. 17-56367, 2019 WL 4419677, at *5 (9th Cir. Sept. 17, 2019) (internal quotations omitted) (alterations in original).

Twenty-two Member States of the EU, including Spain and the Netherlands (Petitioners' home State), have issued a Joint Declaration confirming that an arbitration agreement cannot be formed under Article 26 of the ECT between an EU Member State and a national of another Member State. The Joint Declaration is based upon the *Achmea* Decision, rendered by the EU's highest court, and is in accord with the official submissions of the European Commission. In fact,

in *Komstroy*, the CJEU explicitly confirmed that *Achmea* and its reasoning apply to the ECT. Thus, in order for this Court to determine that a valid arbitration agreement did, in fact, exist for purposes of FSIA jurisdiction the Court would be required to invalidate the Joint Declaration of these twenty-two Member States, as well as the *Achmea* decision which the Joint Declaration is based upon, **as well as the *Komstroy* decision** which explicitly addressed this issue in Spain favor. Indeed, it would require this Court to effectively declare invalid the very EU Treaties as interpreted and applied by the CJEU and the European Commission.   Accordingly, the act of state doctrine bars this Court from determining that jurisdiction exists on the basis of the existence of a valid arbitration agreement.  *See World Wide Minerals*, 296 F.3d at 1164-67 (dismissing claims under the act of state doctrine because the relief sought required the court to question the legality of Kazakhstan's denial of the export license); *Oceanic Expl. Co.*, 2006 WL 2711527, at *5-*8 (dismissing claims under act of state doctrine where relief sought required the court to invalidate government agency's contract awards); *Royal Wulff Ventures*, 2019 WL 4419677, at *5-*7 (holding claims barred by act of state doctrine because they required the court to determine whether Mexican Tax authority's ruling was properly issued).

In sum, Spain respectfully submits that there is unambiguously no arbitration agreement between Spain and Petitioners, and therefore no jurisdiction under the FSIA and no entitlement to full faith and credit.   However, to the extent that there is any ambiguity, the Court should resolve that ambiguity in a manner that does not violate the foreign sovereign compulsion doctrine, the act of state doctrine, and all other principles of international comity.

## CONCLUSION

Spain requests that this Court decline the invitation to wade into a thorny dispute requiring resolution of a multilateral treaty that does not involve the United States and a recent CJEU

opinions that courts in the EU are better equipped to understand and enforce.   Insofar as the Court chooses not to apply *forum non conveniens*, and instead opts to rule on its own jurisdiction, this petition should be dismissed because no such jurisdiction exists.   Article 26 of the ECT upon which Petitioners rely cannot constitute an agreement to arbitrate between Spain and Petitioners as a matter of law.   Without a valid agreement to arbitrate, no exception to the FSIA applies, and there no subject matter jurisdiction attaches.   Moreover, even if Petitioners' jurisdictional arguments were not fatally flawed, the absence of a valid arbitration agreement would strip the award of any full faith and credit to which it would otherwise be entitled.   Therefore, and for the reasons set forth in detail above, Spain requests that this action be dismissed on the basis of forum non conveniens, or for lack of jurisdiction, and reserves its other arguments.[12]

Dated:  May 2, 2022

Respectfully submitted,

By:      /s/ Matthew J. Weldon

Matthew J. Weldon
Luke Steinberger
New York Bar Number 4832408
599 Lexington Avenue
New York, New York 10022
(212) 536-4042
Matthew.Weldon@klgates.com

Brian D. Koosed
D.C. Bar Number 1034733
K&L GATES LLP
1601 K Street, N.W.

---

[12] Spain reserves the right to present any and all defenses as to the merits of the Petition in the event that the Court declines to dismiss *forum non conveniens* and determines that an exception applies under the FSIA, including without limitation that the award was illegally procured by Petitioners false representations.   As the D.C. Circuit recognized in *Process and Industrial Developments,* an order requiring a foreign sovereign to present a complete merits defense before its colorable immunity assertion has been resolved "abrogate[s] the entirety of [the sovereign's] immunity from having to defend its case."   962 F.3d at 586.

Washington, D.C. 20006
(202) 778-9204
Brian.Koosed@klgates.com

Michael DeMarco (*pro hac vice*)
New York Bar Number 4142477
1 Lincoln St.
Boston, MA 02111
(617) 951-9111
Michael.DeMarco@klgates.com

*Counsel for Respondent Kingdom of Spain*

## **CERTIFICATE OF SERVICE**

I certify that on May 2, 2022, I caused a true and correct copy of the foregoing

Memorandum of Law to be filed using the Court's Electronic Case Filing System ("ECF").   The

document is available for review and downloading via the ECF system, and will be served by

operation of the ECF system upon all counsel of record.


/s/ Matthew J. Weldon
Matthew J. Weldon