# Exhibit B



EUROPEAN COMMISSION

Brussels, 19.7.2021
C(2021) 5405 final

**SENSITIVE**[*]: *COMP Operations*

Subject:         **State Aid SA.54155 (2021/NN) – Arbitration award to Antin – Spain**

Excellency,

The Commission wishes to inform Spain that, having examined the information supplied by your authorities on the measure referred to above, it has decided to initiate the procedure laid down in Article 108(2) of the Treaty on the Functioning of the European Union ("TFEU").

## 1.    THE PROCEDURE

(1)    By electronic notification of 17 April 2019, Spain notified the above-mentioned measure, pursuant to Article 108(3) of the TFEU. The notified measure is the arbitration award issued on 15 June 2018 by the Arbitration Tribunal ("the tribunal"), established under the auspices of the International Center for Settlement of Investment Disputes ("ICSID"), in the context of the arbitration proceedings Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. (together "Antin") *vs* Spain[1] The award, as amended on 29 January 2019, grants to Antin a compensation of EUR 101 million, together with interest on this sum and contribution to the costs of the arbitration proceedings, to be paid by Spain due to Spain's breach of the Energy Charter Treaty (the "award" or "the measure").[2] By notifying the

---

[*]    Distribution only on a 'Need to know' basis - Do not read or carry openly in public places. Must be stored securely and encrypted in storage and transmission. Destroy copies by shredding or secure deletion. Full handling instructions: https://europa.eu/!db43PX

[1]    ICSID Case No ARB/13/31. Details available here: https://icsid.worldbank.org/cases/case-database/case-detail?CaseNo=ARB/13/31.

[2]    The Energy Charter Treaty is a multilateral agreement applicable to the energy sector. It was signed by the EU in December 1994 and entered into force for the EU in April 1998. Its key provisions concern

Excma. Sr.D.ª Arancha González Laya
Ministra de Asuntos Exteriores y de Cooperación
Plaza de la Provincia, 1
28012 MADRID
ESPAÑA

award, Spain acted following its EU law obligation mentioned in the Commission Decision of 2017 in SA.40348 (the "2017 Commission Decision"[3]), at recital (165).

(2) The Commission requested additional information on 20 November 2020. The Spanish authorities submitted responses by letter of 28 January 2021. The responses did not contain all of the requested data. The Commission sent a reminder regarding the outstanding information on 25 February 2021. Spain has not submitted the outstanding information.

(3) Spain exceptionally agrees to waive its rights deriving from Article 342 of the TFEU, in conjunction with Article 3 of Regulation 1/1958[4] and to have this Decision adopted and notified in English.

## 2. BACKGROUND REGARDING INTRA-EU ARBITRATION[5]

(4) The EU considers that the Energy Charter Treaty ("ECT") does not apply intra-EU, but only in the relations between the EU and its Member States, on the one hand, and third countries, on the other hand.[6] As a result, there can be no agreement to arbitrate between two Member States and the arbitration proceedings leading to the notified award lack any legal basis. This position is contested and the question of the correct interpretation of the ECT is currently pending before the Court of Justice.[7]

(5) In any event, the Commission has consistently taken the view that, even if the ECT was to apply intra-EU, intra-EU investor-State arbitration is contrary to the EU Treaties.

(6) In June 2015, the Commission initiated infringement proceedings against certain Member States requesting them to terminate intra-EU Bilateral Investment Treaties ("BITs") between them.[8]

---

the protection of investment, trade in energy materials and products, transit and dispute settlement. The ECT is currently under modernisation process.

[3]  Commission Decision of 10 November 2017 in State aid SA.40348 (2015/NN) – Spain - Support for electricity generation from renewable energy sources, cogeneration and waste (JOCE C/442/2017).

[4]  Regulation No 1 determining the languages to be used by the European Economic Community (OJ 17, 6.10.1958, p. 385).

[5]  See also 2017 Commission Decision, section 3.5.3.

[6]  *Amicus curiae* briefs submitted by the European Union in several proceedings before the U.S. Courts, including in Civil Action No. 18-1753 Antin v Spain; the text of those *amicus curiae* briefs is available at https://ec.europa.eu/competition-policy/state-aid/national-courts/observations-other-courts_en; see also the relevant Council document ST 6146 2019, endorsing the filing of this *amicus curiae* brief, available at https://data.consilium.europa.eu/doc/document/ST-6146-2019-INIT/fr/pdf. See also Communication from the Commission to the European Parliament and the Council on "Protection of intra-EU investment" of 19 July 2018 (COM (2018) 547 final), page 3-4.

[7]  Case A 1/20, Request for an opinion by Belgium, and Case C-155/21, *Athena Investment v Spain*.

[8]  http://europa.eu/rapid/press-release_IP-15-5198_en.htm. The Commission notes that on 5 May 2020, 23 Member States signed an agreement for the termination of intra-EU BITs. That agreement implements the *Achmea* judgment and entered into force on 29 August 2020.

(7)    On 6 March 2018, the Court of Justice found in its *Achmea* judgment that investor-State arbitration clauses in intra-EU BITs are incompatible with the EU Treaties, and in particular with Articles 267 and 344 TFEU, because such clauses undermine the principle of autonomy of the EU legal order.[9]

(8)    The Commission's view is that the *Achmea* reasoning is applicable also to the intra-EU application of investors' protection clauses in multilateral agreements, such as the ECT.[10] As Advocate General Szpunar has explained, the ECT creates a bundle of bilateral obligations between the Contracting Parties. If, contrary to the view set out above in recital (4), the EU, on the one hand, and its Member States, on the other hand, had become Contracting Parties each of them on their own, and not as one single entity of public international law, then the ECT would thus have created bilateral obligations between the Member States, which are exactly identical to the bilateral obligations by intra-EU BITs, such as the BIT at stake in *Achmea*. As a result, the conflict between the ECT and the EU Treaties would have to be solved based on the principle of primacy of EU law, as it has been done for other comparable multilateral treaties.[11]

(9)    With the EU signing the ECT, this became, in accordance with Article 216 TFEU, part of the EU legal order. As consistently held by the Court of Justice[12], an agreement such as the ECT cannot affect the allocation of responsibilities defined in the Treaties, including the exclusive jurisdiction of the EU courts (Article 344 TFEU). Therefore, national courts are under the obligation to set aside any arbitration award rendered on that basis and to refuse to enforce it.[13]

---

[9]    Judgment of the Court of Justice of 6 March 2018, Case C-284/16, *Slowakische Republik v Achmea BV*, ECLI:EU:C:2018:158.

[10]    This interpretation was confirmed by the Advocate General Szpunar Opinion of 3 March 2021 in Case C- 741/19, *République de Moldavie*, ECLI:EU:C:2021:164, see in particular paragraphs 70-80 and 89-90; see also the Advocate General Saugmandsgaard Øe Opinion of 29 October 2020 in Joined Cases C- 798/18 and C- 799/18, *Federazione nazionale delle imprese elettrotecniche ed elettroniche (Anie) and Others*, ECLI:EU:C:2020:876, paragraph 92 and footnote 55.

[11]    Judgment in *Commission* v *Italy*, 10/61, EU:C:1962:2, page 10: "*In matters governed by the EEC treaty, that treaty takes precedence over agreements concluded between the Member States before its entry into force.*" This principle has been confirmed many times thereafter both for multilateral agreements and bilateral agreements, see for example judgments in *Conegate*, 121/85, EU:C:1986:114, paragraph 25; in *Matteucci* v *Communauté française de Belgique*, C-235/87, EU:C:1988:460, paragraph 22; in *Exportur*, C-3/91, EU:C:1992:420, paragraph 8, in *Commission* v *Luxembourg*, C-473/93, EU:C:1996:263, paragraph 40; in *Commission* v *Austria*, C-147/03, EU:C:2005:427, paragraph 58; in *Budějovický Budvar*, C-478/07, EU:C:2009:521, paragraphs 97 to 99; and in *Commission* v *Slovakia*, C-264/09, EU:C:2011:580, paragraph 41.

[12]    See, for instance, Judgment of the Court of Justice of 30 May 2006, Case C-459/03, *Commission v Ireland*, ECLI:EU:C:2006:345; Opinion 2/13 paragraph 180.

[13]    See in this regard i) Communication from the Commission to the European Parliament and the Council on "Protection of intra-EU investment" of 19 July 2018 (COM (2018) 547 final), page 3-4; and ii) Declaration of the Representations of the Governments of the Member States of 15 January 2019 on the legal consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union, page 2. Judgment of the Court of Justice of 6 March 2018, Case C-284/16, *Slowakische Republik v Achmea BV*, ECLI:EU:C:2018:158.

3.    DESCRIPTION OF THE MEASURE

(10)    The notified measure, i.e. the award granted by the tribunal, is an individual aid. However, before describing the award, the Commission considers appropriate to provide by way of background a short description of the Spanish renewables schemes that led to the arbitration proceedings.

### 3.1.    The Spanish renewables schemes

(11)    In 2007, Spain put in place a premium economic scheme aimed at fostering electricity production from renewable energy sources ("RES"), which was governed by Royal Decrees 661/2007, 1578/2008 and 6/2009 (the "2007 scheme"). Spain did so in order to transpose the first EU renewable energy directive 2001/77/EC[14]. This scheme was not notified to the Commission or assessed under State aid rules, despite recital 12 of that directive, which stated that "*Articles 87 and 88 [of the Treaty, now Articles 107 and 108 TFEU], will continue to apply to such public support*". That recital made it clear that Member States continued to be obliged to notify their State aid schemes adopted to transpose that directive. This shows that in spite of how Member States may have interpreted the ruling of the Court of Justice in *PreussenElektra*[15], which predates the adoption of Directive 2001/77/EC, those support schemes in principle constitute State aid.

(12)    In 2013, Spain amended the 2007 scheme, within the framework of the second EU renewable energy directive 2009/28/EC[16], which recalled the obligation to notify support schemes in its Article 3(3). The amended scheme is governed by Royal Decree-Law 9/2013, Law 24/2013, Royal Decree 413/2014 and Orders IET/1045/2014 and IET/1459/2014 (the "2013 scheme"). The 2013 scheme applies a different methodology for the calculation of the remuneration to renewables installations compared to the 2007 scheme. The 2013 scheme received State aid clearance in 2017 with the 2017 Commission Decision under the guidelines on State aid for environmental protection and energy 2014-2020 ("EEAG")[17].

#### 3.1.1.    The 2007 scheme

(13)    In 1997, Spain adopted the Electricity Sector Law 54/1997 with a view to promote the generation of electricity from RES driven by Spain's need to comply with Directive 96/92/CE[18]. The 1997 Electricity Sector Law merely

---

[14]    Directive 2001/77/EC of the European Parliament and of the Council of 27 September 2001 on the promotion of electricity produced from renewable energy sources in the internal electricity market (OJ L 283, 27.10.2001, p. 33–40).

[15]    Judgment of the Court of 13 March 2001 in C-379/98, *PreussenElektra*, ECLI:EU:C:2001:160.

[16]    Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC (OJ L 140, 5.6.2009, p. 16–62).

[17]    Communication from the Commission - Guidelines on State aid for environmental protection and energy 2014-2020 (OJ C 200, 28.6.2014, p. 1–55).

[18]    Directive 96/92/EC of the European Parliament and of the Council of 19 December 1996 concerning common rules for the internal market in electricity (OJ L 27, 30.1.1997, p. 20–29).

set out the overall structure of the renewables support regime, which was to be supplemented with Royal Decrees laying down the elements necessary for the framework to function in practice.

(14)    In 2007, 2008 and 2009, Spain adopted Royal Decrees 661/2007, 1578/2008, and 6/2009, which put in place the 2007 scheme. Renewables generators could choose between two options to benefit for support under the scheme. The first option consisted in receiving a fixed tariff per kWh of energy produced (feed-in-tariff option), updated annually by reference to the consumer price index. The second option consisted in selling electricity on the market and receiving a premium per kWh of electricity sold on top of the market price (premium option).

(15)    Both the tariff and the premium were calculated on the basis of typical costs and revenues of standard renewables installations. The Spanish authorities estimated both the initial investment costs and the operating and maintenance costs of the standard installations, as well as the market price.

(16)    The profitability for solar-thermoelectric was set to up to 8% for facilities that chose tariffs and between 7% and 11% return for those participating in the wholesale market and getting a premium.[19]

(17)    Furthermore, concentrated solar power ("CSP") installations were entitled to receive the tariff / premium under the 2007 scheme also for the electricity generated from fossil fuels/natural gas, when used in combination with RES in order to ensure stable production and supply, as long as the share of such electricity did not exceed 12% of the total electricity produced in case of the tariff and 15% of the total electricity produced in case of the premium.[20]

(18)    In order to obtain the support under the 2007 scheme, potential beneficiaries had to submit an application to the Spanish Directorate General of Energy Policy and Mining. The installations that satisfied the eligibility criteria were enrolled in a register on a first come – first served basis. The installations in the register were therefore allowed to receive the support.

(19)    The scheme was financed through network access charges imposed on electricity consumers and network users by the Electricity Sector Law 54/1997 (amended in 2013 by Law 24/2013) and Royal Decree 2017/1979.

(20)    In particular, Article 17, paragraphs (1) and (3), of Law 54/1997 provided that the government adopts the provisions necessary for the implementation of the system of the network access charges. The charges are fixed based on the costs of the system's regulated activities. These include the permanent costs of the electricity system and the costs of diversification and security of supply. The government establishes the methodology for the calculation of the charges. Article 4.g.1 of Royal Decree 2017/1997 includes among the costs of diversification and security of supply those arising from the 2007 scheme.

---

[19]    Antin award, paragraph 91.

[20]    See Article 2 (1) of Royal Decree 661/2007.

(21)   Royal Decree 2017/1997 entrusted the Comisión Nacional de Energía (National Energy Commission), a State body which has been incorporated into the National Commission of Markets and Competition ("CNMC,") to transfer to the relevant beneficiaries, by means of subsequent settlements, the funds collected for the purposes of covering the permanent costs of the electricity system and the costs of diversifications and security of supply. The annexes to the decree also defined the beneficiaries of the settlements, the applicable mathematic formulas and regulated the settlement procedure itself, according to predetermined objective parameters.

(22)   The legal basis of the financing mechanism of the 2007 scheme is the same as the one assessed by the Court in the *Elcogás* case[21] and the financing mechanism of the two schemes is essentially the same.

### 3.1.2.   The 2013 scheme

(23)   As mentioned above, as of 2012, Spain introduced several legal acts that amended the 2007 scheme.

(24)   First, Law 15/2012 eliminated the remuneration for electricity generated with natural gas. Then, Royal Decree Law no. 2/2013 of 1 February 2013, which, inter alia, cancelled the mechanism for updating the feed-in tariffs in accordance with the consumer price index, by replacing it with a lower index.

(25)   Subsequently, Spain adopted the following legal acts that established the 2013 scheme[22]: Royal Decree-Law 9/2013 of 12 July 2013, Law 24/2013 of 26 December 2013 on the electricity sector, Royal Decree 413/2014 of 6 June 2014 and Orders IET/1045/2014 and IET/1459/2014.

(26)   The 2013 scheme is organised in six-year regulatory periods. The first regulatory period ran from 14 July 2013 to 31 December 2019. The second started on 1 January 2020.

(27)   The 2013 scheme provides support to i) co-generation installations, ii) renewables installations, and iii) other installations using at least 70% of a waste to energy sources and black liquor.[23]

(28)   Two types of facilities are eligible for support under the 2013 scheme:

---

[21]   Order of the Court of 22 October 2014 in Case C-275/13 *Elcogas*. The Court found that the compensation mechanism was imputable to the State, since it was established and regulated by Law 54/1997 and Royal Decree 2017/1997. Relying on those provisions, the Court also concluded that the compensation mechanism for extra costs was financed through State resources. In particular, the Court observed that a Ministerial Decree fixed annually the amount of the network access charges, that the latter were imposed on all domestic final consumers and network users. Moreover, the National Energy Commission, a State body, administered the funds thus collected and did not enjoy any discretion in that regard.

[22]   For an exhaustive list of the scheme's legal basis, see Section 2.1 of the 2017 Commission Decision.

[23]   For details on the eligible technologies, see recital 14 of the 2017 Commission Decision.

(a)    Facilities that are awarded aid under this scheme following the entry into force of Royal Decree 413/2014 on 11 June 2014 ("new facilities"); and

(b)    Facilities that were already entitled to or were already receiving support from the 2007 scheme when Royal Decree-Law 9/2013 entered into force on 14 July 2013 ("existing facilities").

(29)    The aid is granted in the form of a premium in addition to income generated from the market. It aims at helping the technologies supported to compete on an equal footing with other technologies on the market at a reasonable rate of return, which was calculated at 7.398% for existing facilities[24]. The premium is made up of two components: compensation for investments and, if applicable, compensation for operations.

(30)    In order to determine the amount of aid to be paid, facilities are classified under one of the various types of standard facilities on the basis of their individual characteristics. The compensation benchmarks applicable to each standard facility are established by ministerial order and include: type of technology, power generation capacity, start date of operation, lifetime, electricity system/location of the facility, standard revenue generated by selling the electricity in the market, standard operating costs required to carry out the activity and hours of operation (with a minimum and maximum value). The compensation to which an individual facility is entitled to is calculated on the basis of the standard facility's compensation benchmarks and the features of the individual facility itself (e.g. the real number of running hours).

(31)    The scheme is partly financed from the general State budget and partly from the network access tariffs and charges imposed on electricity consumers, also called 'electricity system revenues'. This financing mechanism was introduced by Laws 15/2012, 17/2012, and 24/2013.

(32)    The main differences between the 2007 and the 2013 schemes can be summarised as follows:

(a)    under the 2013 scheme, renewable energy producers are entitled to obtain a premium in addition to the market price of the electricity produced by them, rather than being able to choose between a tariff or a premium as under the 2007 scheme.

(b)    the 2013 scheme eliminated the right to receive remuneration to the electricity produced using fossil fuels/natural gas, starting as of 1 January 2013;[25]

(c)    the number of standard facilities is higher in the 2013 scheme than in the 2007 one. Only one standard facility (Caso Tipo (CT)) was

---

[24]    This rate was applicable to the first regulatory period (2014-2019). From the second regulatory period onwards, the rate is 7.09 %, if no use is made of the second additional provision of Royal Decree-Law 17/2019, to maintain the profitability of the previous period.

[25]    Antin award, paragraph 139-140.

foreseen in RD 661/2007 versus 21 standard facilities (Instalaciones Tipo (IT)) identified by RD 413/2014. Unlike the 2007 scheme, the 2013 one takes into account the differences between various technologies as well the year when the plants started to operate, as described in recital (30) above.

(d)     under the 2013 scheme, any compensation parameters of those described in recital (30) above may be reviewed every six years (each regulatory period), including the reasonable return for the remaining lifetime of the standard facilities, while under the 2007 scheme they were set once for all and only indexed to the consumer price index;

(e)     under both schemes, the support is proportionate to the amount of electricity generated. However, while under the 2007 scheme it is directly proportionate, the 2013 scheme establishes a number of equivalent operating hours according to the capacity of the installation. Only those hours are remunerated.

### 3.1.3.   The 2017 Commission Decision

(33)   As mentioned in recital (12), the Commission approved the 2013 scheme as compatible with the internal market.

(34)   All facilities that originally benefitted from the 2007 scheme were automatically registered under the 2013 scheme. When assessing the compatibility of the scheme, the Commission took into account the sum of payments made to existing facilities under the 2007 and the 2013 schemes in order to verify the absence of overcompensation.

(35)   More specifically, the proportionality of the aid granted to existing facilities was assessed under paragraph 131(a) of the EEAG based on the cash flow calculations of 21 standard facilities. Those include past sales income (including those deriving from the 2007 scheme for existing facilities), the expected future sales income, the initial investment costs, the operating costs and the compensation to be granted to each facility both for operations and for investments. For all examples provided, the Commission verified that the aid did not exceed what is required to recover the initial investment costs and the relevant operational costs, plus a margin of reasonable return, based on the past and estimated costs and market prices (7.503 % before tax for new facilities and 7.398 % for existing facilities). The 2017 Commission Decision concluded that those rates of return were in line with those applicable to similar measures the Commission had approved and did not lead to overcompensation. The same conclusion was reached concerning future revision of the compensation parameters as future payments would be calculated to keep the net present value of the investment at zero.[26]

---

[26]   See 2017 Commission Decision, recital 120.

### 3.2. The Antin award

#### 3.2.1. The Andasol plants

(36)    The Andasol-1 plant and Andasol-2 plant are two CSP installations of capacity 49.9 MW each, located in Granada, southern Spain (together, "Andasol plants"). They are owned and operated by Andasol-1 Central Termosolar UNO S.A. and Andasol-2 Central Termosolar DOS (together, "Andasol companies").

(37)    The construction of the Andasol plants was completed in 2008 and 2009. The Andasol 1 plant received its final commissioning certificate on 25 November 2008 and registered in the administrative register of electricity production facilities on 24 April 2009, while the Andasol 2 plant received its commissioning certificate on 5 June 2009 and entered the administrative register on 22 December 2009.[27]

(38)    The Andasol plants were initially benefitting from the 2007 scheme. According to data provided by Spain, the Andasol plants received a premium from their launch until the end of 2010 and again in year 2012, while in 2011 and in 2013 they received support through a tariff.

(39)    The Andasol plants were also equipped with three heaters and a liquefied natural gas reservoir to allow them to use natural gas in their electricity production and thereby increase their solar-to-electric conversion efficiency and the reliability of their production.[28] As such, they were entitled to receive the tariff / premium under the 2007 scheme also for the electricity generated using natural gas. In fact, Spain submitted that the Andasol plants benefitted from the support for electricity produced with natural gas from 2009 to 2012.

(40)    Furthermore, Spain explained that the Andasol plants continued to produce electricity and to receive support also under the 2013 scheme and up until to date. The Andasol plants were automatically registered under the 2013 scheme as existing facilities, as happened with all facilities that originally benefitted from the 2007 scheme. The remuneration was based on the standard installation IT-00606 for Andasol 1 and IT-00607 for Andasol 2.

(41)    Spain calculated the gross income that the Andasol plants would have received as support under the 2007 scheme and compared it with the support received by the plants between 2014 and 2020 under the 2013 scheme. Table 1 below shows the differences. The positive values reflect higher income under Royal Decree 413/2014 than the income that would have been obtained under Royal Decree 661/2007.

*Table 1 – Difference in revenue additional to market between the 2007 and 2013 schemes*

| | Difference in revenue additional to market (EUR) | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
| **Andasol 1** | -1.897.238 | 5.913.023 | 34.962 | -225.050 | 4.697.699 | -489.111 | 7.748.070 |

---

[27]    Antin award, paragraph 110.

[28]    Antin award, paragraphs 70, 72.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| (IT-00606) | | | | | | | |
| **Andasol 2** (IT-00607) | -5.373.361 | 2.680.200 | -3.420.635 | -4.243.563 | 355.343 | 284.299 | -1.769.847 |

Source: Spanish authorities

(42)    The table shows that, in the period from 2014 to 2020, the Andasol 1 plant received approximately EUR 15 million more than it would have obtained under the 2007 scheme, whereas Andasol 2 plant received EUR 11 million less.

(43)    The calculations are based on the actual production of the Andasol plants between 2014 and 2020, according to the CNMC.

(44)    Spain submitted that the Andasol plants are operating with a volume of energy in line with their production capacity. The following table includes the generation data for both plants, between 1 November 2009 and 31 December 2020, as submitted by Spain:

*Table 2 - Annual energy discharged from the Andasol 1 and Andasol 2 plants*

| | **Andasol 1 (GWh)** | **Andasol 2 (GWh)** |
|---|---|---|
| 2009[29] | 9,6 | 7,8 |
| 2010 | 127,3 | 123,4 |
| 2011 | 155,6 | 157,9 |
| 2012 | 141,3 | 160,7 |
| 2013 | 134,1 | 132,1 |
| 2014 | 150,5 | 146,5 |
| 2015 | 118,6 | 113,7 |
| 2016 | 138,9 | 135,0 |
| 2017 | 147,7 | 146,2 |
| 2018 | 123,7 | 124,1 |
| 2019 | 148,3 | 124,0 |
| 2020 | 103,6[30] | 128,8 |

Source: Spanish authorities based on information from the CNMC

---

[29]    Data are only available for November and December 2009, and the reported energy input corresponds only to this period.

[30]    Spain explained that this reduction is due to a smaller generation in the period March-June 2020, which corresponds to the lockdown due to COVID-19 crisis and that in the third and fourth quarters of 2020 production recovered to normal levels, even exceeding those of the previous year.

### 3.2.2.  Antin's investment

(45)  The applicants in the arbitration proceedings are Antin Infrastructure Services Luxembourg S.à.r.l., established on 22 March 2011 in Luxembourg, and Antin Energia Termosolar B.V., established on 27 June 2011 in the Netherlands, and wholly owned by the former. Both were the vehicles used for the investment in Spain of Antin Infrastructure Partners, a private venture capital fund established in France.

(46)  In 2011, Antin invested in the acquisition of a 45% shareholding of the Andasol companies. More specifically, at the time, Antin Luxembourg owned 100% of the shares in Antin Termosolar, which in turn owned 45% of the shares in each of the two Andasol companies. RREEF (45%) and ACS (10%) owned the remainder of the shareholdings of the Andasol companies.[31]

(47)  In the arbitration proceedings, Antin claimed that it invested approximately EUR 139.5 million, based on the expectation that the Andasol plants would generate regular and sustainable income that would allow Antin to service its debt and obtain a return on its investment.[32] At the time of Antin's investment, the Andasol plants were benefitting from the 2007 scheme.

(48)  In August 2017, Antin sold its investment in the Andasol plants to Cubico Sustainable Investments Limited at a price of EUR 75.2 million.[33]

### 3.2.3.  Initiation of arbitration proceedings

(49)  According to Antin, the changes in the Spanish legal framework applicable to CSP plants, in which Antin had invested, caused serious and substantial damages to its investments and were contrary to Spain's obligations under the ECT, in particular the principle of fair and equitable treatment under Article 10(1) ECT. Hence, in November 2013, Antin brought an action against Spain before the ICSID arbitration tribunal.

(50)  In the arbitration proceedings, Spain raised the lack of jurisdiction of the tribunal to hear a dispute between an investor of a Member State of the EU and another Member State, *inter alia*, on the ground that exclusive jurisdiction to hear the dispute in question fell to the courts of the judicial system of the EU under, *inter alia*, Articles 267 and 344 TFEU.

(51)  Spain also argued to the tribunal that Antin Termosolar owns the shares in the Andasol companies as well as the loans granted to these companies, but it does not have direct ownership over the interests in the plants and claims to money, returns and rights conferred by law, since said assets are owned by the Andasol companies themselves.[34]

---

[31]  Antin award, paragraph 261.

[32]  Antin award, paragraph 359.

[33]  Antin award, paragraph 46.

[34]  Antin award, paragraph 236.

(52)   In November 2014 and in December 2015, the Commission filed applications to intervene to the arbitration proceedings as a non-disputing party. In its decision on the application, the tribunal asked the Commission to provide a costs undertaking, i.e. a written undertaking that it would comply with any decision on costs ordered by the tribunal. The Commission informed the tribunal that it was not in a position to provide such costs undertaking and therefore that it would not file a written submission.[35]

(53)   The tribunal also rejected Spain's requests to submit to the arbitration proceedings i) the judgment of the Court of Justice of 6 March 2018 in Case C-284/16 - Slowakische Republik v Achmea BV and ii) the 2017 Commission Decision.[36]

### 3.2.4.   Tribunal's findings in the award

(54)   The tribunal concluded that Spain breached Article 10(1) of the ECT by failing to accord fair and equitable treatment to Antin's investments. This is due to the regulatory changes to the remuneration scheme for renewable installations that were brought about by legal acts that Spain adopted since July 2013, i.e. Royal Decree-Law 9/2013, Law 24/2013, Royal Decree 413/2014 and Order IET 1045/2014, compared to the remuneration scheme that was in force at the time of Antin's investment, i.e. Law 54/1997 and Royal Decree 661/2007.[37]

(55)   Due to this breach, the tribunal awarded to Antin a compensation of EUR 112 million to be paid by Spain. On 24 July 2018, Spain submitted a request for rectification of the award to the Secretary-General of ICSID. Following this, on 29 January 2019, the tribunal issued a new decision rectifying the amount of the awarded compensation from EUR 112 to 101 million.

(56)   Spain shall also pay interest on this compensation from 20 June 2014 to the date of the award (i.e. 15 June 2018) at the rate of 2.07%, compounded monthly, and interest from the date of the award to the date of payment at the rate of 2.07%, compounded monthly. In addition, Spain shall pay to Antin EUR 563 256.17 (USD 635 431.70) as a contribution to the payment of their share of the costs of the proceedings and EUR 2 840 661.41 (GBP 2 447 008.61) as a contribution to the payment of their legal representation costs and expenses.[38]

(57)   Antin had requested a damages compensation resulting from the breach of the ECT. More specifically, Antin argued that even though the Andasol plants continue producing cash flows, it is far less than what they expected on the basis of the 2007 scheme. Antin claimed the amount of EUR 148 million.[39] This was calculated by Antin's economic consultants using a

---

[35]   Antin award, paragraphs 59-68.

[36]   Antin award, paragraphs 51-53, 56-58.

[37]   Antin award, paragraphs 572-573.

[38]   Antin award, paragraph 748.

[39]   Antin award, paragraph 640.

discounted cash flow ("DCF") analysis. The consultants compared two scenarios: the "But For" scenario, in which the 2013 scheme was never implemented (i.e. premiums under the 2007 scheme were applied for 40 years), and the "Actual" scenario, which took into account the full effect of the 2013 scheme (i.e. premiums under 2013 scheme were applied for 25 years). This comprised lost cash flows, both historical and future. The amount of damages due to Antin was calculated as the difference in the net present value between Antin's cash flows with and without the 2013 scheme[40].

(58)    The tribunal considered as follows regarding the calculation of the compensation:

(a)    <u>Historical damages</u>[41]: Given that Spain's violation of the ECT results from the entire elimination and replacement of the 2007 scheme and not from the elimination or modification of certain features of the 2007 scheme, Antin's damages claim for the historic losses occurring prior to June 2014 must fail.

(b)    <u>The tax gross-up claim</u>[42]: As the tribunal is not in a position to determine whether there would be a specific tax impact that requires a tax gross-up like the one claimed by Antin, this portion of Antin's damages claim must fail.

(c)    <u>Damages for loss of future cash flows (i.e. after June 2014)</u>[43]: The tribunal considered the DCF approach adopted by Antin and its experts to be appropriate. Concerning the operational life of the Andasol plants, the tribunal deemed that, for purposes of the calculation of damages, the useful life of the Andasol plants shall be 25 years. The tribunal thus deducted from the EUR 137 million claimed for these losses the amount of EUR 36 million corresponding to the difference between the operational life claimed by Antin (35-40 years) and the life that the tribunal found acceptable (25 years), and concluded that the remaining EUR 101 million was a fair compensation.

### 3.2.5.    Beneficiary, legal basis and objective

(59)    The beneficiary of the measure is the recipient of the award compensation. As mentioned above, Antin sold to Cubico its shares in the Andasol companies (see recital (48)), but it appears that it has not sold the award to Cubico. As such, Antin should be considered the beneficiary of the measure in the present case.

---

[40]    Antin award, paragraph 587.

[41]    Antin award, paragraph 667.

[42]    Antin award, paragraph 673.

[43]    Antin award, paragraph 691, 714, 725 (as amended by the tribunal's rectification decision of 29 January 2019).

(60)    Spain submitted that there is no record of an outstanding recovery order against Antin and that, even if there were, Spain would still be required to comply with the award and could not suspend the payment of the sum recognised therein, as this is an obligation under Article 26 of the ECT, to which Spain is a party.

(61)    Spain signed the ECT on 17 December 1994, ratified it on 11 December 1997, and the ECT entered into force with respect to Spain on 16 April 1998. Spain explained that in accordance with Article 96(1) of the Spanish Constitution, "*International treaties validly concluded, once officially published in Spain, shall form part of the internal legal order.*" It further informed that the "*Instrument of ratification of the Energy Charter Treaty and the Energy Charter Protocol on Energy Efficiency and Related Environmental Aspects, done in Lisbon on 17 December 1994*", was published in the Official State Gazette of 17 March 1998 (BOE no. 65).

(62)    The Spanish authorities submitted that the sole objective of the measure is to comply with an enforceable and binding arbitral award. They also submitted that the measure has no incentive effect and that the State intervention is mandatory in so far as compliance with the award is binding on Spain and the award upholds the form of order sought by Antin by granting it compensation to be paid by Spain, as provided for in paragraph 748 of the award.

### 3.2.6.    Form of support, budget and financing

(63)    The form of support will consist in a one-off payment of the total amount calculated as the arbitration award, the pre-award interests, as well as the post-award interests, which will have to be recalculated on the basis of the date of actual payment (see recitals (55)-(56) above).

(64)    At the time of notification, Spain estimated the total amount at EUR 114 900 983. Of which, EUR 101 000 000 corresponds to the amount recognised by the award; EUR 8 686 086 is pre-award interest (for the period 20 June 2014-15 June 2018); EUR 1 810 978 is the post-award interest (for the period 15 June 2018-31 March 2019); EUR 563 256 is the contribution to the costs of the proceedings and EUR 2 840 661 is the contribution to Antin's legal costs.

(65)    There is no possibility of instalments or deferment foreseen in the award. The award also does not contain a stand-still clause whereby the granting authority can only grant the measure after the Commission's authorisation.

(66)    The Spanish authorities explained that the payment will be financed by the general budget of the Spanish State. The payment will not be directly charged to the costs of the electricity system and therefore will not fall directly on the electricity end consumers through the electricity bill.

### 3.2.7.    Cumulation

(67)    Spain submitted that the Andasol plants continue to receive support under the 2013 scheme. In fact, Spain calculated the possible impact that the award

will have on the profitability achieved by the Andasol plants, based on the following parameters:

*Table 3 - Simulation parameters for which 45 % of Antin ownership is applied*

|  | **Total investment** | **Antin's investment (45%)** | **Lifetime** | **Revenue 2009/10-2020** | **Revenue 2021-2037** | **Expenditure 2009/10-2037** |
|---|---|---|---|---|---|---|
|  | EUR | EUR | Years | EUR | EUR | EUR |
| **Andasol 1** | 318.126.771 | 143.157.047 | 25 | Actual* | IT-0606/20606 | IT-0606/20606 |
| **Andasol 2** | 318.126.771 | 143.157.047 | 25 | Actual | IT-0607/20607 | IT-0607/20607 |

Source: Spanish authorities.
*Actual data based on CNMC information

*Table 4 - Impact of the award on 45 % of Andasol plants*

| **IRR** | **Antin's investment (45%)** | **Without award** | **With award, without interest** | **With award, with interest** |
|---|---|---|---|---|
|  | EUR | IRR | IRR | IRR |
| **Andasol 1** | 143.157.047 | 7,44% | 8,84% | 9,03% |
| **Andasol 2** | 143.157.047 | 7,27% | 8,96% | 9,18% |

Source: Spanish authorities

(68)    Spain explained that the use of actual income values for both plants explains why the internal rate of return ("IRR") is different from the return of 7.398 %, which was deemed reasonable by the 2017 Commission Decision for the existing facilities.

### 3.2.8.    Enforcement of the award

(69)    At the time Spain notified the award to the Commission, it was fully enforceable and was the subject of an application for recognition and enforcement made by Antin to the United States district court for the District of Columbia (Civil Action No. 1:18-cv-1753 (EGS)). This proceeding was stayed by order of 28 August 2019 pending the outcome of the annulment proceeding of the award initiated by Spain before the ICSID. In those proceedings, on 22 March 2019, the EU was granted leave to intervene as *amicus curiae*, where it emphasised that the ECT did not apply intra-EU, and that in any event, these arbitration proceedings lacked an essential pre-requisite, i.e. a valid agreement to arbitrate, because the agreement upon which Antin was relying was incompatible with EU law, which takes precedence over the ECT in an intra-EU context, due to the principle of primacy of EU law.

(70)    Antin has made efforts to enforce the award also in Australia. On 25 June 2021, the Full Federal court recognised the award as binding on Spain. It also rejected a request by the EU to intervene into those proceedings as *amicus curiae*. Spain may seek leave to appeal that recognition in front of the High Court of Australia, the highest Australian court. Spain noted that when enforced, Spain will be under the obligations set out under Articles 54-55 of the Convention on the Settlement of Investment Disputes between

States and Nationals of Other States ("ICSID Convention"). Spain signed the ICSID Convention on 21 March 1994 and ratified it on 17 September 1994.

## 4. ASSESSMENT OF THE MEASURE

### 4.1. Existence of aid

(71)  Article 107(1) of the TFEU provides that "*aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the internal market*".

(72)  The Commission recalls the assessment made in section 3.5.3 in the 2017 Commission Decision that any compensation, which an arbitration tribunal grants to an investor on the basis that Spain has modified the 2007 scheme by the 2013 scheme, such as the one in the present case, constitutes in and of itself State aid.[44]

#### 4.1.1.  Advantage and selectivity

(73)  An advantage, as required by Article 107(1) of the TFEU, is any economic benefit which an undertaking would not have obtained under normal market conditions, i.e. in the absence of the State intervention.[45] The precise form of the measure is irrelevant for establishing whether it confers an economic advantage on the undertaking.

(74)  According to established case-law, State aid "*is fundamentally different in its legal nature from damages which the competent national authorities may be ordered to pay to individuals in compensation for the damage they have caused to those individuals*".[46]

(75)  The General Court recalled in the *Micula* judgment that "*compensation for damage suffered cannot be regarded as aid unless it has the effect of compensating for the withdrawal of unlawful or incompatible aid*".[47] In addition, just as in *Micula*, the rules of the ECT are outside the general national rules on civil liability of the Member States.[48]

---

[44]  See 2017 Commission Decision, recital 165. This view has been confirmed in the Opinion of Advocate General Szpunar of 1 July 2021 in Case C-638/19 P, *Commission* v *European Food and Others.*

[45]  Judgment of the Court of 11 July 1996, Case C-39/94, *SFEI and Others*, ECLI:EU:C:1996:285, paragraph 60; Judgment of the Court of Justice of 29 April 1999, Case C-342/96, *Spain v Commission*, ECLI:EU:C:1999:210, paragraph 41.

[46]  Judgment of the Court of Justice of 27 September 1988, Joined Cases 106/87 to 120/87, *Asteris and Others v Greece and EEC*, ECLI:EU:C:1988:457, paragraph 23.

[47]  Judgment of the General Court of 18 June 2019, Case T-624/15, *European Food and Others v Commission*, ECLI:EU:T:2019:423, paragraph 103.

[48]  See recitals 101 and 102 of Commission Decision (EU) 2015/1470 of 30 March 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) implemented by Romania – Arbitral award Micula v Romania of 11 December 2013 (OJ 2015 L 232, p. 43).

(76)    Therefore, it is first necessary to assess whether the 2007 scheme constitutes unlawful aid. The Commission considers that this is the case in view of the following:

    (a)    Beneficiaries are compensated at a rate exceeding the returns that they would normally have received from the market in the absence of the scheme. The scheme therefore provides an advantage.

    (b)    The scheme favours the generation of electricity from renewable sources, high efficiency cogeneration and waste by the selected beneficiaries. The measure is therefore selective.

    (c)    Support under the scheme is imputable to the State as it has been established by law and implementing decrees.

    (d)    The financing mechanism of the scheme (see recitals (19)-(22)) involves State resources. As Spain noted, the financing mechanism is essentially the same as the one assessed by the Court of Justice in the *Elcogas* case, which was found to amount to State resources. Therefore, the same considerations put forward in the *Elcogas* order apply to the present case. It is the State that adopts the necessary provisions for the implementation of the system of the network access charges and that sets the methodology for the calculation of the charges, which are borne by all electricity consumers and network users. In addition, the charges system is managed by a State body, the Spanish regulator CNMC. The State also defines the beneficiaries of the settlements, the applicable mathematic formulas and regulate the settlement procedure itself, according to predetermined objective parameters.

    (e)    Electricity is widely traded between Member States. The scheme is therefore likely to distort competition on the electricity market and affect trade between Member States.

    (f)    The scheme has not been notified to, and authorized by, the Commission.

(77)    The compensation awarded to Antin is calculated as the present value of all the cash flows that the investor would have received during the lifetime of the plant, had the 2007 scheme not been revoked. The award has thus the effect of compensating for the withdrawal of unlawful aid, i.e. of the old, non-notified, scheme. Therefore, it grants an advantage to the beneficiary.[49]

(78)    As regards selectivity, the Commission notes that not all measures that grant an undertaking an economic advantage fall under the notion of State aid, but only those which confer an economic advantage in a selective way upon

---

[49]    Advocate General Ruiz-Jarabo Colomer has explained that the award of damages equal to the sum of the amounts of aid that were envisaged to be granted would constitute an indirect grant of the aid found to be illegal and incompatible with the common market (Opinion of 28 April 2005, Joined Cases C-346/03 and C-529/03, *Atzeni and Others*, ECLI:EU:C:2005:256, paragraph 198).

certain undertakings or categories of undertakings or to certain economic sectors.

(79)   In the present case, the award grants a compensation only to Antin. Hence, the advantage is granted exclusively (and thereby selectively) to Antin.

### 4.1.2.   *Imputability and State resources*

(80)   Only advantages granted directly or indirectly through State resources can constitute State aid within the meaning of Article 107(1) of the TFEU.

(81)   The Commission considers that the award can be considered imputable to the State in three ways.

(82)   First, the tribunal found that Spain breached Article 10(1) of the ECT by failing to accord fair and equitable treatment to Antin's investments and thus awarded a compensation to Antin on that basis. As Spain voluntarily agreed to enter the ICSID Convention and the ECT, and incorporated it in its national law, the payment of the compensation on the basis of the award would be imputable to Spain.

(83)   Second, the payment of the award may require a decision to be taken by Spain.

(84)   Third, the Commission notes that, in the *Micula* judgment, the General Court found that the granting moment of the aid was the repeal of the original scheme, as this was the event that gave rise to the applicants' right to receive the compensation[50]. Applying this reasoning to the present case, the measure would still be imputable to the State, as the modifications to the 2007 scheme, which gave rise to the arbitration proceedings, were decided by the Spanish authorities and implemented by various legal acts. For the sake of completeness, the Commission observes that Advocate General Szpunar considers that this view is tainted by an error in law.

(85)   As the compensation would be paid from the State budget, the Commission considers that also the State resources criterion is met.

### 4.1.3.   *Distortions of competition and effect on trade*

(86)   As mentioned in recital (48), Antin is no longer a shareholder of the Andasol companies since 2017. However, it was still a shareholder of the Andasol companies when the 2007 scheme was modified. Furthermore, it is still engaged in other infrastructure investments in energy and environment. As a liberalised market exists for these products, any advantage granted to Antin is liable to distort competition.

---

[50]   Judgment of the General Court of 18 June 2019, Case T-624/15, *European Food and Others v Commission*, ECLI:EU:T:2019:423, paragraph 78. The appeal proceedings before the Court of Justice are ongoing: C-638/19 P, *Commission v European Food and Others*. The Advocate General Szpunar considered in his Opinion, delivered on 1 July 2021, that the General Court erred in law as regards the moment at which the aid was granted (ECLI:EU:C:2021:529, paragraphs 125, 128-129, 133-135).

(87)    Furthermore, the compensation could likely affect trade between Member States as it would strengthen the competitive position of Antin undertaking as compared with other undertakings competing in intra-Union trade.

*4.1.4.    Conclusion on existence of aid*

(88)    In view of the above, the Commission considers, at this stage, that the notified award to Antin constitutes aid because it has the effect of compensating for the withdrawal of unlawful aid, i.e. of the 2007 scheme; it is only granted to one undertaking and therefore selective; it can be considered imputable to the State either because Spain entered the ECT and is bound by its rules or because Spain adopted the 2013 scheme; it is granted through State resources and it is likely to distort competition and trade.

## 4.2.  Legality of aid

(89)    Article 108(3) TFEU requires that the Member State concerned shall not put its proposed measure into effect until the Commission procedure has resulted in a final decision.

(90)    An arbitration tribunal is not competent to declare a State aid measure compatible with the internal market. This is an exclusive competence of the Commission. Therefore, this compensation is subject to the standstill obligation, i.e. it cannot be put into effect until the Commission's investigation has resulted in a final decision declaring the compatibility of the measure. The Commission considers that this also means that the ad hoc committee, which is currently hearing annulment proceedings brought by Spain, is obliged, as a matter of public international law, unless it declines jurisdiction, to suspend proceedings until the Commission has taken a final decision in this case. That is because Antin and all Member States involved are bound by EU law, and in particular the stand still provision pursuant to Article 108(3) TFEU. The Commission regrets that neither the arbitral tribunal, nor the ad hoc committee have, at this stage, complied with their obligations under public international law. That violation of their obligations has led to the granting of unlawful State aid.

(91)    In the Commission's view, in arbitration cases, the relevant granting moment would be the adoption or execution of the award. However, as mentioned in recital (84), the General Court considered in the *Micula* judgment that the relevant granting moment was the moment of repeal of the original scheme. In the present case, this would be the moment of the modification of the 2007 scheme by the 2013 scheme.[51]

(92)    Spain notified the award on 17 April 2019.

(93)    Based on the above and the information currently available, the Commission considers that, in case the granting moment is the modification of the 2007 scheme or the adoption of the award, the aid is unlawful.

---

[51]    See footnote 52 above.

### 4.3.   Compatibility of aid

(94)   The Commission recalls that when assessing the compatibility of a measure with the internal market according to Articles 107(2) and 107(3) of the TFEU, the burden of proof is the responsibility of the Member State[52]. In the present case, Spain has not presented arguments that could justify the measure under Articles 107(2) and/or 107(3) of the TFEU. Nevertheless, the Commission considers it appropriate to set out below its preliminary doubts on the compatibility of the award with the internal market.

(95)   The Commission's preliminary doubts relate to (i) a possible breach of EU Treaties by the aid measure, and (ii) the non-compliance of the aid measure with the compatibility criteria under the State aid guidelines applicable to operating aid to energy from renewable sources.

#### 4.3.1.   Possible breach of EU Treaties

(96)   The Commission notes that the Court of Justice found in its *Hinkley Point C* judgment that "*State aid which contravenes provisions or general principles of EU law cannot be declared compatible with the internal market*"[53]. In the present case, the preliminary opinion of the Commission is that the Antin award may violate other provisions of the Treaties.

##### 4.3.1.1.   Investor-State arbitration intra-EU violates Article 19(1) TEU, Articles 267 and 344 TFEU and the general principles of EU law of mutual trust and autonomy

(97)   The Commission recalls its assessment in the 2017 Commission Decision[54], and in particular recitals (159)-(166). The Commission considered that any arbitration clause that provides for investor-State arbitration between two Member States is contrary to the EU Treaties, in particular to Article 19(1) TEU, Article 267 and Article 344 TFEU, and the general principles of EU law of mutual trust and autonomy, and that the ECT does not apply to investors from Member States initiating disputes against another Member State. This view has been endorsed in the meantime by the Council as well as by Advocates General Saugmandsgaard Øe and Szpunar (see recital 8). A judgment of the Court of Justice on this question is expected soon.[55]

(98)   Furthermore, as mentioned in recital (8), the Commission considers that the Court's reasoning in the *Achmea* judgment[56] applies also to the ECT and

---

[52]   Judgment of the Court of First Instance of 12 September 2007, Case T-68/03, *Olympiaki Aeroporia Ypiresies v Commission*, ECLI:EU:T:2007:253, paragraph 34.

[53]   Judgment of the Court of Justice of 22 September 2020, Case C-594/18 P, *Austria v Commission (Hinkley Point C)*, ECLI:EU:C:2020:742, paragraph 44.

[54]   See 2017 Commission Decision, recitals 159-166.

[55]   Either on 2 September 2021 in case C-741/19 Republic of Moldova, or in opinion 1/20 or in case C-155/21, which should be decided within the next 18 months.

[56]   Judgment of the Court of Justice of 6 March 2018, Case C-284/16, *Slowakische Republik v Achmea BV*, ECLI:EU:C:2018:158.

therefore national courts shall be under the obligation to set aside any arbitration award rendered on that basis and to refuse to enforce it[57].

(99) The Antin award was adopted based on the investor-State arbitration mechanism laid down in Article 26 of the ECT. In view of the above, the Commission, at this stage, takes the view that the Antin award could contravene Article 19(1) TEU, Articles 267 and 344 TFEU, and the general principles of EU law of mutual trust and autonomy.

(100) If that is confirmed by the Court of Justice, the Commission could not authorize the aid, because it contravenes provisions and general principles of the EU Treaties.

### 4.3.1.2.   Discrimination

(101) All investors in the Union shall benefit from the same protection thanks to the Union rules. However, not all investors that benefitted from the 2007 scheme have access to international arbitration to claim damages under the ECT, as Antin. This is in particular the case for Spanish investors, which are excluded from such possibility. Therefore, the Antin award seems to introduce a discrimination - based on nationality - among the 2007 scheme investors based on their ability to access international arbitration or not. Such discrimination based on nationality is incompatible with Union law, in particular with Article 18 TFEU.

(102) In view of the above, the Commission has doubts on the Antin award's compatibility with the internal market as it could create a discrimination.

### 4.3.2.   Compatibility with the relevant State aid guidelines

### 4.3.2.1.   Legal basis for assessment

(103) The granting moment of the aid is relevant in order to establish under which State aid guidelines the aid has to be assessed.[58] According to settled case-law, State aid must be considered to be granted at the time when the right to receive it is conferred on the beneficiary under the applicable national rules[59], taking into account all the conditions laid down by national law for obtaining such aid.

---

[57] See in this regard i) Communication from the Commission to the European Parliament and the Council on "Protection of intra-EU investment" of 19.7.2018 (COM (2018) 547 final), page 3-4; and ii) Declaration of the Representations of the Governments of the Member States of 15 January 2019 on the legal consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union, page 2.

[58] The Commission shall assess the compatibility of unlawful State aid with the internal market in accordance with the substantive criteria set out in any instrument in force at the time when the aid was granted. See Commission notice on the determination of the applicable rules for the assessment of unlawful State aid (notified under document number C(2002) 458) (OJ C 119, 22.5.2002, p. 22–22).

[59] Judgment of the Court of 19 December 2019, Case C-385/18, *Arriva Italia and Others,* ECLI:EU:C:2019:1121, paragraph 36.

(104)   The only precedent to define the granting moment of the aid in case of an arbitration award is the *Micula* case[60]. In that case, the General Court found that the granting moment was when Romania repealed the original scheme, as this was the event that gave rise to the applicants' right to receive the compensation granted with the award. Following this reasoning, the Antin award would be assessed under the 2008 State aid guidelines for environmental protection (the "EAG")[61], which were applicable when the 2007 scheme was modified by the 2013 scheme (see section 4.3.2.2. below).

(105)   In the ongoing *Micula* appeal proceedings, the Commission's view remains that the granting moment is the adoption or execution of the award. Following the Commission's view, the granting moment in the present case would be the date of adoption of the Antin award or of its execution and thus the award would need to be assessed under the EEAG.

(106)   The applicable case-law at this moment is the General Court's judgment in the *Micula* case[62]. However, in the alternative, i.e. in case the Commission's appeal is successful and the Court of Justice concludes that the granting moment is the adoption or execution of the award, the Commission also assesses the compatibility of the Antin award in view of the EEAG (see section 4.3.2.3 below).

(107)   The compatibility criteria applicable to this case, both under the EAG (section 3.1.6) and the EEAG (section 3.3) are the rules regarding aid to energy from renewable sources, as this is the activity that gave rise to the arbitration proceedings leading to the award.

### 4.3.2.2.   Assessment under the EAG

*a)   Development of an economic activity*

(108)   In accordance with Article 107(3)(c) TFEU, compatible aid under that provision of the Treaty must facilitate the development of certain economic activities.[63]

(109)   Spain is required to pay the compensation awarded by the tribunal to Antin. It appears that the sole contribution of the award is for Spain to comply with its obligations under the ECT and the ICSID Convention, rather than contributing to the development of an economic activity. The Commission has doubts whether a retroactive compensation of lost future cash flows and

---

[60]   Commission decision of 30 March 2015 in State aid SA.38517 Micula v Romania (ICSID arbitration award). The Commission decision was annulled by the Judgment of the General Court of 18 June 2019, Case T-624/15, *European Food and Others v Commission*, ECLI:EU:T:2019:423. The appeal proceedings before the Court of Justice are ongoing (C-638/19 P, *Commission v European Food and Others*).

[61]   Community guidelines on State aid for environmental protection (OJ C 82, 1.4.2008, p. 1–33).

[62]   See footnote 52 above.

[63]   As confirmed by the Judgment of the Court of Justice of 22 September 2020, Case C-594/18 P, *Austria v Commission (Hinkley Point* C), ECLI:EU:C:2020:742.

interest on these amounts can be qualified as contributing to the development of an economic activity or as having an incentive effect.

(110)  Even if considered to contribute to the development of an economic activity, the aid measure would seem unlikely to induce additional activity of Antin (see also section (b) below).

(111)  As noted in recital (45) above, the beneficiary of the award is Antin, a private equity investor which does not operate directly in the electricity market.

(112)  At the time the aid was granted, Antin held 45% shares in each of the Andasol plants. However, on the basis of the information provided by Spain, it is not possible to assess whether Antin and the Andasol companies constituted a single undertaking[64]. In particular, it cannot be ascertained that Antin exercised control over the Andasol companies by involving itself directly or indirectly in the management of the installations.

(113)  Even assuming that Antin and the Andasol companies constituted a single economic entity, the award has the effect of compensating Antin also for the aid it would have received under the 2007 scheme for the production of electricity from natural gas used as an ancillary fuel (see recital (17) above). However, according to point 70(9) of the EAG "energy from renewable energy sources" means energy produced by plants using only renewable energy sources, as well as the share in terms of calorific value of energy produced from renewable energy sources in hybrid plants which also use conventional energy sources. Therefore, the energy sources for which compatible State aid can be granted do not include natural gas. In any case, given the limited positive effects for the environment by the production of electricity from natural gas compared to renewable sources, the Commission doubts whether there are positive effects from that aid that could counter-balance its negative effects on competition and trade (see section (d) below).

(114)  For these reasons, the Commission has doubts that the aid supports the development of an economic activity within the meaning of Article 107(3)(c) TFEU, and in particular the economic activity of producing electricity from renewable sources.

  b)  *Incentive effect and necessity of the aid*

(115)  Sections 1.3.4 and 3.2 of the EAG set forth the conditions under which the aid can be deemed to be necessary and have an incentive effect. They provide, inter alia, that:

  (a)    State aid for environmental protection must result in the recipient of the aid changing its behaviour so that the level of environmental protection will be higher than if the aid had not been granted;

---

[64]  The Court of Justice has established the criteria to define an economic unit in its Judgment of 10 January 2006, C-222/04, *Cassa di Risparmio di Firenze and Others*, ECLI:EU:C:2006:8, paragraph 109-125.

(b)     the incentive effect is identified through counterfactual analysis, comparing the levels of intended activity with aid and without aid. The correct identification of the counterfactual scenario is key to determining whether or not State aid has an incentive effect;

(c)     the Member State concerned must provide information demonstrating that the counterfactual scenario is credible and that the investment would not be sufficiently profitable without aid.

(116)   The data submitted by the Spanish authorities show that the Andasol plants continued to operate in the market for the production of electricity after the modification of the 2007 scheme. In fact, the amounts of electricity they produced under the 2007 and the 2013 schemes are comparable (see recital (44) above).

(117)   Furthermore, also in view of the reasons explained in section (c) below, the Commission has doubts that the Andasol plants would not be sufficiently profitable without the aid.

(118)   In light of the above, even in case Antin and the Andasol plants were to constitute a single undertaking, which cannot be ascertained (see recital (112) above), the Commission has doubts that the aid has an incentive effect and is necessary in order to develop the economic activity of producing electricity from renewable sources. In particular, it is doubtful that the aid would increase the level of environmental protection and that it would be necessary to ensure the profitability of the investment.

   *c)  Proportionality*

(119)   Sections 1.3.5 and 3.1.6.2 of the EAG set forth the conditions under which operating aid for the production of electricity from renewable sources is considered proportionate.

(120)   As a general principle, that is the case only if the same result could not be achieved with less aid. In addition, proportionality may also depend on the degree of selectivity of a measure. In particular, the aid amount must be limited to the minimum needed to achieve the environmental protection sought.

(121)   The EAG envisage three ways in which Member States can grant proportionate aid for the production of renewable energy (paragraphs 108-111).

(122)   Under Option 1, Member States may grant operating aid to compensate for the difference between the cost of producing energy from renewable sources, including depreciation of extra investments for environmental protection, and the market price of the form of energy concerned. Operating aid may then be granted until the plant has been fully depreciated according to normal accounting rules. Any further energy produced by the plan will not qualify for any assistance. However, the aid may also cover a normal return on capital. Investment aid must be deducted from production costs when determining the amount of operating aid.

(123)  The Spanish authorities noted that under the 2013 scheme the Andasol plants are entitled to receive a remuneration on top of the market price so that, at the end of their regulatory useful life, the installations are able to recover their investment (CAPEX), their operating costs (OPEX) and obtain a reasonable return (see recital (29) above). The reasonable return was set for the first regulatory period (2014-2019) at 7.398 % and, from the second regulatory period onwards, at 7.09 %. The 2017 Commission Decision found that this methodology and the rates of return did not entail overcompensation.[65]

(124)  Therefore, adding the aid stemming from the award to the aid received under the 2013 scheme, and assuming that each of the Andasol plants would receive 50 % of the aid, the rate of return would increase above the levels approved in the 2017 Commission Decision. This could lead to the payment of aid which is not kept to the minimum necessary to achieve the environmental purpose sought.

(125)  The Spanish authorities were not able to provide an *ex ante* business plan for the Andasol plants that would allow the Commission to assess proportionality.

(126)  In light of the above, the Commission has doubts that the aid is proportionate.

   *d)  Avoidance of undue negative effects on competition and trade between Member States*

(127)  According to point 36 of the EAG, it is crucial that environmental State aid measures are well targeted. In cases where the aid is not necessary or proportionate to achieve its intended objective, it will harm competition.

(128)  As mentioned above, the Commission doubts whether the aid is necessary and proportionate and therefore doubts whether undue negative effects on competition and trade are avoided.

(129)  The Antin award has the effect of compensating one sole investor for the modification of the unlawful 2007 scheme. The compensation granted to a single investor, which benefited from the 2007 scheme and continues benefiting from the 2013 scheme, confers on Antin an additional benefit to that received by its competitors.

(130)  On the other hand, all other installations classified with the same type or parameter receive only the amount provided for under the approved 2013 scheme. Even if these other installations were investors with access to arbitration proceedings, which is not the case for all of them (see recital (101) above), initiating such proceedings would not necessarily guarantee them the adoption of an award in their favour or of an award which grants a compensation equivalent to that granted to Antin.

---

[65]   See 2017 Commission Decision, recital 120.

(131) In light of the above, the Commission has doubts that the aid does not unduly distort competition and trade between Member States.

### 4.3.2.3.    Assessment under the EEAG

(132) In the alternative State aid is granted by the adoption or execution of the Antin award, the award falls under the definition of individual aid in point 19(19) of the EEAG and is subject to the compatibility provisions established therein for individually notifiable aid. The Commission has doubts that the award would fulfil the compatibility criteria set out in the EEAG, and in particular the following:

*a)  Development of an economic activity*

(133) In accordance with Article 107(3)(c) TFEU, compatible aid under that provision of the Treaty must facilitate the development of certain economic activities.[66]

(134) As of 1 August 2017, Antin no longer holds shares in the Andasol companies. Therefore, it is not possible to establish which economic activity is supported by the aid.

(135) Furthermore, the payment of the award would have the effect of compensating Antin also for the aid the Andasol plants would have received under the 2007 scheme for the production of electricity from natural gas (see recital (39) above), which is not a renewable energy source according to point 19(11) of the EEAG. Given the limited positive effects for the environment by the production of electricity from natural gas compared to renewable sources, the Commission doubts whether there are positive effects from that aid that could counter-balance its negative effects on competition and trade (see section 4.3.2.3 d) below).

(136) For these reasons, the Commission has doubts that the aid develops an economic activity, and, in particular, the economic activity of producing electricity from renewable sources.

*b)  Incentive effect and necessity of the aid*

(137) Section 3.2.2 of the 2014 EEAG provides that the Commission will consider that aid is needed if the Member State demonstrates that the aid effectively targets a market failure which is not addressed. In case of individual aid, the Commission will assess the specific need for the case at hand. It is for the Member State to demonstrate that there is a market failure which is still not addressed with regards to the specific activity supported by the aid (see point 38 of the EEAG).

(138) Section 3.2.4 of the EEAG provides that environmental and energy aid can be found compatible with the internal market if it has an incentive effect. The latter occurs when the aid induces the beneficiary to change its

---

[66]    As confirmed by the recent Judgment of the Court of Justice of 22 September 2020, Case C-594/18 P, *Austria v Commission (Hinkley Point C)*, ECLI:EU:C:2020:742.

behaviour to increase the level of environmental protection, a change which it would not have undertaken without the aid. The aid must not subsidise the costs of an activity that an undertaking would anyhow incur. In case of individual aid, Section 3.2.4.2. of the EEAG applies. The Member State must fully demonstrate to the Commission the incentive effect of the aid and must provide not only information concerning the aided project but also a comprehensive description of the counterfactual scenario, comparing the levels of intended activity with aid and without aid.

(139)    Spain has not argued that the aid granted by the Antin award is necessary to address a market failure neither in relation to Antin nor in relation to the Andasol plants. However, even if the aid could be considered granted indirectly to the Andasol plants (as a mean to ensure the implementation and maintenance of the project –quod non-), it is not possible to assess the profitability of the Andasol plants with and without the aid, in accordance with points 61 and 62 of the EEAG, as Spain was not able to submit an *ex ante* business plan for those projects.

(140)    On the contrary, the data submitted by the Spanish authorities show that the production of electricity by the Andasol plants remained largely comparable since their start of operation (see recital (44) above).

(141)    In light of the above, the Commission has doubts that the aid has an incentive effect and is necessary in order to develop the economic activity of producing electricity from renewable sources.

*c) Proportionality*

(142)    According to point 69 of the EEAG, aid is considered to be proportionate if the aid amount per beneficiary is limited to the minimum needed to achieve the objective. Section 3.3.2.1 of the EEAG establishes detailed rules for operating aid granted to energy from renewable sources, while Section 3.2.5.3 lays down additional conditions for individually notifiable aid.

(143)    First, the Commission notes that aid must be granted as a premium in addition to the market price (see point 124 (a) of the EEAG). In the present case, the remuneration stemming from the award would not be granted as a premium per unit of energy produced.

(144)    Second, from 1 January 2017, aid must be granted in a competitive bidding process. In the present case, Antin was not selected through such a process. In the absence of a competitive bidding process, point 128 EEAG stipulates that the aid is considered to be proportional if the conditions of point 131 EEAG are applicable. The latter states that the aid per unit of energy must not exceed the difference between the levelised costs of energy ("LCOE") and the market price of the relevant technology. Point 131(b) EEAG allows a normal return on capital to be included in the LCOE.

(145)    For individual aid, the Commission will verify whether the aid amount exceeds the minimum necessary to make the aided project sufficiently profitable. To that purpose, the Commission may use the rates of return commonly observed in the industry concerned.

(146)   In the 2017 Commission Decision, the proportionality analysis of the aid to existing installations, such as the Andasol plants, under the 2013 scheme was based on the LCOE methodology under paragraph 131 of the EEAG.[67]

(147)   As noted in recital (124) above, adding the aid stemming from the award to the aid received under the 2013 scheme, and assuming that each of the Andasol plants would receive 50 % of the aid, the rate of return would increase above the levels mentioned in recital (123) above, i.e. above the levels commonly observed in the industry concerned and considered proportionate by the Commission[68].

(148)   The Spanish authorities were not able to provide an *ex ante* business plan for the Andasol plants that would allow the Commission to assess proportionality.

(149)   If the aid could be considered granted indirectly to the Andasol plants (as a mean to ensure the implementation and maintenance of the project –quod non-), and in light of the considerations above, the Commission has doubts that the aid is proportionate.

   d)   *Avoidance of undue negative effects on competition and trade between Member States*

(150)   According to point 126 of the EEAG, if the aid is granted through a competitive bidding process open to all generators producing electricity from renewable energy sources on a non-discriminatory basis, the Commission will presume that the aid is proportionate and does not distort competition to an extent contrary to the internal market. As in the present case, the aid to Antin is not granted through a tender and also the Commission has doubts about its proportionality, the presumption does not seem to apply.

(151)   The Antin award has the effect of compensating one sole investor for the modification of the unlawful 2007 scheme. The compensation granted to a single investor, which benefited from the 2007 scheme and continues benefiting from the 2013 scheme, confers on Antin an additional benefit to that received by its competitors.

(152)   On the other hand, all other installations classified with the same type or parameter will receive only the amount provided for under the approved 2013 scheme. Even if these other installations were investors with access to arbitration proceedings, initiating such proceedings would not necessarily guarantee them the adoption of an award in their favour or of an award which grants a compensation equivalent to that granted to Antin.

(153)   In light of the above, the Commission has doubts that the aid does not unduly distort competition and trade between Member States.

---

[67]   See 2017 Commission Decision, recitals 119-124.

[68]   See 2017 Commission Decision, recital 120.

### 4.3.3.    Conclusion on compatibility

(154)    In view of the above, the Commission has doubts that the measure can be declared compatible with the internal market on the basis of two independent grounds: the first relate to a possible breach of EU Treaties, and the second, to the compatibility with the criteria laid down in the EAG or the EEAG. As no other basis of compatibility seems to be applicable either and has not been invoked by Spain, the Commission has doubts that any compatibility can be established.

## 4.4.    The application of the State aid rules does not affect rights and obligations protected by Article 351 of the TFEU

(155)    Article 351 of the TFEU provides that *"[t]he rights and obligations arising from agreements concluded [...] for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties"*.

(156)    It is clear from the wording of Article 351 of the TFEU that it does not apply in the present case, for two distinct reasons.

(157)    First, Spain acceded to the EU before it acceded to the ECT and the ICSID Convention.

(158)    Second, as set out by Advocate General Szpunar (see recital (8) above), the ECT creates a bundle of bilateral international obligations between its contracting parties. As a result, no rights of third countries are affected by applying EU law to the granting of State aid by an arbitration tribunal established under the ECT.

(159)    The same reasoning applies to the ICSID Convention. It only creates a bundle of bilateral obligations between the home State of the investor and the host state. Any modification of those obligations as a result of the application of EU law only affects rights and obligations of the home State of the investor and the host State, all of which are EU Member States.

(160)    Accordingly, the application of State aid law in the present case does not affect rights and obligation protected under Article 351 of the TFEU.

In the light of the foregoing considerations, the Commission, acting under the procedure laid down in Article 108(2) of the TFEU, requests Spain to submit its comments and to provide all such information as may help to assess the measure, within one month of the date of receipt of this letter. It requests your authorities to forward a copy of this letter to the potential recipient of the aid immediately.

The Commission wishes to remind Spain that Article 108(3) of the TFEU has suspensory effect, and would draw your attention to Article 16 of Council Regulation (EU) 2015/1589, which provides that all unlawful aid may be recovered from the recipient.

In this regard, the Commission wishes to underline Spain's obligation not to pay the compensation pending the Commission's formal investigation on the present measure. The Commission recalls that this obligation applies irrespective of Articles 53 to 55 of the ICSID Convention. When interpreted in conformity with EU law, those provisions do not oblige Spain to pay the award, because such payment would violate rules of international law, to which the EU Member States and the companies established within them have accorded primacy, i.e. the EU Treaties.

The Commission warns Spain that it will inform interested parties by publishing this letter and a meaningful summary of it in the Official Journal of the European Union. It will also inform interested parties in the EFTA countries which are signatories to the EEA Agreement, by publication of a notice in the EEA Supplement to the Official Journal of the European Union and will inform the EFTA Surveillance Authority by sending a copy of this letter. All such interested parties will be invited to submit their comments within one month of the date of such publication.

If this letter contains confidential information which should not be published, please inform the Commission within fifteen working days of the date of receipt. If the Commission does not receive a reasoned request by that deadline, you will be deemed to agree to publication of the full text of this letter.

Your request should be sent electronically to the following address:

European Commission,
Directorate-General Competition
State Aid Greffe
B-1049 Brussels
Stateaidgreffe@ec.europa.eu

Yours faithfully,

For the Commission

Margrethe VESTAGER
Executive Vice-President

CERTIFIED COPY
For the Secretary-General

Martine DEPREZ
Director
Decision-making & Collegiality
EUROPEAN COMMISSION