# EXHIBIT 1

# THE ICSID CONVENTION:
## A COMMENTARY

A Commentary on the Convention on the Settlement of Investment Disputes between States and Nationals of Other States

SECOND EDITION

CHRISTOPH H. SCHREUER
with
LORETTA MALINTOPPI
AUGUST REINISCH
ANTHONY SINCLAIR



CAMBRIDGE
UNIVERSITY PRESS

CAMBRIDGE UNIVERSITY PRESS
Cambridge, New York, Melbourne, Madrid, Cape Town, Singapore, São Paulo,
Delhi, Dubai, Tokyo, Mexico City

Cambridge University Press
The Edinburgh Building, Cambridge CB2 8RU, UK

Published in the United States of America by Cambridge University Press, New York

www.cambridge.org
Information on this title: www.cambridge.org/9780521885591

© Christoph H. Schreuer, Loretta Malintoppi, August Reinisch and Anthony Sinclair 2009

This publication is in copyright. Subject to statutory exception
and to the provisions of relevant collective licensing agreements,
no reproduction of any part may take place without
the written permission of Cambridge University Press.

First published 2001
Reprinted 2005
Second edition 2009
3rd printing 2011

Printed in the United Kingdom at the University Press, Cambridge

*A catalogue record for this publication is available from the British Library*

ISBN 978-0-521-88559-1 Hardback

Cambridge University Press has no responsibility for the persistence or
accuracy of URLs for external or third-party internet websites referred to
in this publication, and does not guarantee that any content on such
websites is, or will remain, accurate or appropriate.

annulment. But parties have argued, not always with success, that a failure to deal with every question in the sense of Art. 48(3) constitutes either a serious departure from a fundamental rule of procedure or a failure to state the reasons for the award (see paras. 300, 399–434, 513 *infra*).[156]

### 3. Use of Multiple Grounds

111   Art. 52(1) states that a request for annulment may be based on *one or more* of the grounds listed there. One of the most widely accepted strategic principles of litigation is to seek a remedy not by a single shot method but by a shrapnel tactic whereby a multitude of arguments is fired off simultaneously in the hope that at least one of them will score a hit. Although one of the grounds listed in Art. 52(1) would be sufficient to cause the award's annulment, the applicants typically list several of them.

112   Of the five grounds for annulment, two have not been used in any of the published decisions on annulment. They are improper constitution of the tribunal (see paras. 118–129 *infra*) and corruption on the part of a member of the tribunal (see paras. 271–277 *infra*). The first of these has been raised by Argentina in pending annulment proceedings, but no decision has yet been published on this ground at the time of writing.[157] As illustrated in the table above (see after para. 28 *supra*) the other three grounds have been invoked in most cases to cover a large variety of perceived shortcomings in the awards under scrutiny (see also paras. 524–530 *infra*).

### 4. Classification of Grounds

113   The fact that the different grounds for annulment do not constitute neatly distinguishable categories was already apparent during the Convention's drafting. There was some debate on whether failure by a tribunal to decide all matters submitted to it would constitute an excess of powers or a serious departure from a fundamental rule of procedure (History, Vol. II, pp. 342, 848/9). There was also some uncertainty as to whether failure to state reasons was a serious departure from a fundamental rule of procedure (at p. 851) or a separate ground for annulment (see paras. 105, 106 *supra*).

114   Practice has demonstrated not only that a wide array of perceived flaws are subsumed under the three frequently used grounds in Art. 52(1) but also that the same set of facts is often seen to amount to different grounds for annulment simultaneously (see also paras. 516–523 *infra*). Not infrequently, it is argued that one and the same aspect of an award constitutes a manifest excess of powers, a serious departure from a fundamental rule of procedure and a failure to state reasons or, at least, falls under two of these grounds. In *Lucchetti v. Peru*, the

---

156   See also *Reisman*, The Breakdown, pp. 763 *et seq.*, 788 *et seq.*; *Reisman*, Repairing ICSID's Control System, pp. 202 *et seq.*
157   See *Azurix v. Argentina*, Decision on Continued Stay of Enforcement, 28 December 2007, para. 2.

572   The reference to Chapter VI means that the Convention's provisions on the cost of proceedings extend to annulment proceedings. The decision on cost is part of the decision on annulment. *Ad hoc* committees have, in fact, made decisions on cost as part of their decisions on annulment (see Art. 61, paras. 4, 39, 40, 57, 58, 61).

573   The reference to Chapter VII means that the place of annulment proceedings is the seat of the Centre unless the parties agree otherwise (see Art. 62, paras. 6, 20). Hearings may and do take place at such other venues as the parties and the Centre may agree.

Q.   "(5) The Committee may, if it considers that the circumstances so require, stay enforcement of the award pending its decision. If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Committee rules on such request."

### 1. History and Introduction

574   The drafting of what eventually became Art. 52 was inspired by the International Law Commission's 1958 Model Rules on Arbitral Procedure.[830] The ILC's Model Rules provide for a discretionary power of the International Court of Justice to grant a stay of execution pending a final decision on an application for annulment.[831] The Preliminary Draft to the Convention contained a similar provision for the stay of execution pending the decision of the *ad hoc* committee. It added the possibility for the *ad hoc* committee to recommend any provisional measures necessary for the protection of the rights of the parties (History, Vol. I, p. 238). The clause on provisional measures does not appear in subsequent drafts (at p. 240). A suggestion to give an *ad hoc* committee the power to continue or revive provisional measures recommended by the tribunal was rejected. The idea to give the *ad hoc* committee the formal power to recommend provisional measures was also rejected in a formal vote (History, Vol. II, p. 856) and does not appear in the Convention (but see paras. 627–648 *infra*).

575   All drafts as well as the Convention itself use permissive language in relation to the *ad hoc* committee's power to stay enforcement of the award (History, Vol. I, pp. 238, 240). The *ad hoc* committee may, but need not, take this step. A proposal to couch the "stay enforcement" provision in mandatory rather than discretionary terms was defeated in a vote (History, Vol. II, p. 849).

576   The drafts did not contain a provision to cover the period between the filing of an application for annulment and the constitution of the *ad hoc* committee. In view of the comparatively simple procedure for constitution, this period is typically

---

830   YBILC 86 (1958-II).
831   ILC Model Rules, Art. 36: 3. The Court may, at the request of the interested party, and if circumstances so require, grant a stay of execution pending the final decision on the application for annulment.

(see paras. 50–63 *infra*, esp. para. 57), the forum State was neither the host State nor the investor's home State.

Failure of a State party to the Convention to recognize and enforce an award would be a breach of a treaty obligation. This obligation is reinforced by Art. 69 which contains an obligation to take legislative and other measures necessary to make the Convention effective. Non-compliance with Art. 54, whether on the basis of local law or not, would carry the usual consequences of State responsibility, including diplomatic protection. The State of the nationality of an investor who has prevailed in an ICSID arbitration could bring an international claim against a State that was not a party to the arbitration but whose court and authorities have failed to recognize and enforce the award in violation of Art. 54. This would include the right to refer the dispute to the International Court of Justice in accordance with Art. 64.[31] In the case of a victorious host State, failure by the investor's State of nationality or by any other State party to the Convention to recognize and enforce the award would have the same consequence.   28

Recognition and enforcement may also be sought through the courts and authorities of the State that was a party to the arbitration proceedings. Of course, the obligation to comply with the award exists independently of any enforcement measures. The need to resort to enforcement would be a consequence of non-compliance in violation of Art. 53. If recognition and enforcement of the award is sought against the State through its own courts and authorities but fails, the consequence would be twofold. The State in question would be in violation of its obligation under Art. 53 to abide by and comply with the award. Additionally, it would be in violation of the separate obligation under Art. 54 to recognize and enforce the award (see also Art. 55, paras. 112–114).   29

### B. "...shall recognize an award rendered pursuant to this Convention as binding..."

#### 1. Awards Rendered Pursuant to the Convention

##### a) What Constitutes an Award?

Only final awards under the Convention (see Art. 48, paras. 22–30) are subject to recognition and enforcement. Decisions preliminary to awards such as decisions upholding jurisdiction under Art. 41, decisions recommending provisional measures under Art. 47[32] and procedural orders under Arts. 43 and 44 are not awards. They are not by themselves subject to recognition and enforcement. But to the extent that these preliminary decisions are eventually incorporated into awards or are reflected in awards (see Art. 41, paras. 70, 78), they are subject to recognition and enforcement (see also Art. 52, paras. 62–64).   30

---

31   See also *Giardina*, L'exécution, p. 293.
32   The parties may agree on binding provisional measures by the tribunal (see Art. 47, paras. 8, 9), on provisional measures by domestic courts (see Art. 26, paras. 181–183) or on a combination of both. But such a procedure would be outside Art. 54.

to an ICSID arbitration may find it useful to rely on the New York Convention where Art. 54 of the ICSID Convention is of no avail because the award imposes a non-pecuniary obligation.[86]

### D. "... as if it were a final judgment of a court in that State."

#### 1. Finality and Nonreviewability

Art. 53(1) provides that the award shall not be subject to any appeal or to any other remedy except those provided for in the Convention (see Art. 53, paras. 18–22). Art. 26 expresses the exclusive remedy rule in more general terms. The Convention provides for a number of remedies and review procedures in Arts. 49(2) (supplementation and rectification), 50 (interpretation), 51 (revision) and 52 (annulment). The system of review under the Convention is self-contained and does not permit any external review. This principle also extends to the stage of recognition and enforcement of ICSID awards. A domestic court or authority before which recognition and enforcement is sought is restricted to ascertaining the award's authenticity. It may not re-examine the ICSID tribunal's jurisdiction. It may not re-examine the award on the merits. Nor may it examine the fairness and propriety of the proceedings before the ICSID tribunal. This is in contrast to non-ICSID awards, including Additional Facility awards, which may be reviewed under domestic law and applicable treaties. In particular, the New York Convention gives a detailed list of grounds on which recognition and enforcement may be refused[87] (see paras. 12–22 *supra*). **81**

During the Convention's preparation, the principle of finality of awards in the context of their enforcement was by no means uncontested and gave rise **82**

---

86 *Cane, G.*, The Enforcement of ICSID Awards: Revolutionary or Ineffective?, 15 American Review of International Arbitration 439 (2004).
87 See in general *Carias-Borjas*, Recognition and Enforcement, p. 365; *Delaume, G. R.*, State Contracts and Transnational Arbitration, 75 AJIL 784, 815 (1981); *Delaume, G. R.*, Le Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI), 109 Journal du Droit International 775, 838 (1982); *Giardina*, L'exécution, pp. 277, 281, 284; *Giardina, A.*, The International Centre for Settlement of Investment Disputes between States and Nationals of Other States (ICSID), *in*: Essays on International Commercial Arbitration (*Sarcevic, P.* ed.) 214, 218, 220 (1989); *Kahn, P.*, Le contrôle des sentences arbitrales rendues par un Tribunal CIRDI 379 (1986); *Lauterpacht, E.*, The World Bank Convention on the Settlement of International Investment Disputes, *in*: Recueil d'études de droit international en hommage à Paul Guggenheim 642, 651 (1968); *Pirrwitz, B.*, Annulment of Arbitral Awards Under Article 52 of the Washington Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, 23 Texas International Law Journal 73, 82 (1988); *Schmidt, J. T.*, Arbitration under the Auspices of the International Centre for Settlement of Investment Disputes (ICSID), Implications of the Decision on Jurisdiction in Alcoa Minerals of Jamaica Inc. v. Government of Jamaica, 17 Harvard International Law Journal 90, 104/5 (1976); *Shihata, I. F. I.*, Towards a Greater Depoliticization of Investment Disputes: The Roles of ICSID and MIGA, 1 ICSID Review – FILJ 1, 8/9 (1986); *Toope, S. J.*, Mixed International Arbitration. Studies in Arbitration Between States and Private Persons 245/6 (1990). For a critical evaluation see *West, L. C.*, Award Enforcement Provisions of the World Bank Convention, 23 Arbitration Journal 38, 45 *et seq.* (1968).