# EXHIBIT 2

Wolters Kluwer                                                    Kluwer**Arbitration**

Document information

# Publication

- ICSID Review - Foreign Investment Law Journal

# Organization

- International Centre for Settlement of Investment Disputes

# Topics

- Investment Arbitration

# Bibliographic reference

George A. Bermann, 'Understanding ICSID Article 54', in Meg Kinnear and Campbell McLachlan (eds), ICSID Review - Foreign Investment Law Journal, (© The Author(s); Oxford University Press 2020, Volume 35 Issue 2) pp. 311 - 344

## *Understanding ICSID Article 54*

George A. Bermann

(1)

**Abstract**—To the surprise of many, questions have recently arisen over the scope of inquiry, if any, that a national court may, consistent with Article 54 of the ICSID Convention, make in connection with the enforcement of an ICSID award. It has long been assumed in many, if not most, quarters that a national court is privileged to condition enforcement of an ICSID Convention award on a single simple requirement, viz. that the award be certified by the Secretary-General of ICSID. Until recently, doubts over whether that is so have been raised in a very small number of jurisdictions. But the Commission of the European Union has taken the view that an ICSID Convention award may be denied enforcement if it is contrary to a principle of "autonomy" of EU law and, based on its judgment in *Achmea* case in connection with non-ICSID awards, the European Court of Justice most likely takes the same view. This suggests that the European Union regards violation of EU public policy, more generally, as a defense to enforcement of an ICSID award. Based on text, object and purpose, legislative history, and predominant state practice, this position appears to run seriously afoul of the ICSID Convention. At the same time, some meaning must be given to the language in Article 54 according to which an ICSID award must be enforced by a national court "as if it were a final judgment of a court" of the enforcing State. The author finds that the understanding of Article 54 that best reflects all pertinent considerations is that it imposes on courts the modest requirement that they subject the enforcement of ICSID awards to no more restrictive or onerous procedures than they impose on the enforcement of national judgments.

# I. INTRODUCTION

It has been practically an article of faith that awards issued under the aegis of the International Centre for Settlement of Investment Disputes (ICSID) are insulated from national court review, not only in the form of annulment proceedings but also on the occasion of their recognition and enforcement. Commentators consider these to be two of the most fundamental manifestations of ICSID's deliberate self-contained character, and both the academic and professional literature, [2] as well as ICSID jurisprudence, [3] so suggest.

However, while the insulation of ICSID awards from *annulment* by national courts is fully intact, the same can no longer be said of their insulation from judicial review when they remain unpaid and require *enforcement* by national courts. Perhaps naively, the drafters of the ICSID Convention [4] anticipated full compliance by States with ICSID awards issued against them. [5] Indeed, at the outset States had an excellent record in this regard, [6] although that record has not been entirely maintained. [7] Similarly, in the rare circumstance in which a respondent State fails to satisfy an ICSID award and enforcement became necessary, the award has typically been judicially enforced. Commentators writing in 2006—50 years after the ICSID Convention came into force—observed that, as of that time, no Contracting State court had ever denied enforcement of an ICSID award. [8] But that record, too, is being called into question.

As a result of certain recent developments, judicial enforcement of ICSID awards—and, more particularly, the grounds upon which a court might deny their enforcement—is becoming of increased concern, and differences of view that have somewhat unexpectedly emerged have heightened that concern. In some quarters—notably, but not only, the European Union—the view has emerged that States may withhold enforcement of ICSID awards if, in their judgment, enforcing those awards would offend a fundamental principle on which their legal order is based, eg, public policy. As will be shown, in the EU, a principle that has come conspicuously to the fore in this respect is what the Court of Justice of the (ECJ) has termed the 'autonomy' of EU law and the EU legal order. For many, any such assertion runs seriously afoul of a settled understanding that ICSID awards are fully shielded from review when they come before a national court for enforcement. The fact that the EU is not itself an ICSID Contracting State is of little consequence in this regard. All the EU Member States are themselves ICSID Contracting States and feel constrained to take positions vis-à-vis ICSID awards that are consonant with those of the EU.

Given the present challenge to what has been a fundamental tenet of the ICSID regime, it will no longer suffice to proceed on the basis of simple assumptions—notably an assumption that ICSID awards will escape all substantial scrutiny on the occasion of their enforcement.

Achieving a common understanding on a matter as consequential as the workings of Article 54 of

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

the ICSID Convention, the primary provision concerning enforcement of awards, is critical to the Convention's functionality. The enforceability, and more broadly the finality, of ICSID awards lies at the heart of the Convention's *raison d'être*, enforcement being the Contracting States' most fundamental treaty obligation and self-containment being among the Convention's most basic aspirations. [9] The time has come for a truly definitive understanding of Article 54's purpose and functions.

The present article accordingly examines and evaluates the various positions that courts and commentators have taken on the susceptibility of ICSID awards to judicial review by national courts at the enforcement stage. Following this Introduction, Section II elaborates on the uncertainty surrounding Article 54 of the ICSID Convention. In the succeeding two sections, I look to the usual sources of guidance on the interpretation of treaties as suggested by the Vienna Convention on the Law of Treaties (VCLT). [10] These sources are treaty text in light of the Convention's object and purpose (Section III) and negotiation history (Section IV). Because the evidence is not entirely conclusive, I turn for further guidance to State practice insofar as it can be gauged (Section V). Predictably, the EU figures prominently in Section V's account of State practice. But practice in other Contracting States, including notably the United States, will also be considered.

Section VI traces briefly the several positions to which these sources, taken together, may be deemed to lend support, assessing their strengths and weaknesses. I then seek to identify the understanding of Article 54 that best accommodates the various considerations that are animating the current debate, while remaining faithful to the fundamental purposes that the ICSID Convention was meant to achieve. Section VII presents my conclusions.

For reasons to be explained, I conclude that those courts and commentators favoring the subjection of ICSID awards to review on jurisdictional, procedural or substantive grounds, including the grounds provided for by the New York Convention, [11] notably the public policy of the enforcing State, have had too little regard for the ICSID Convention's text and context, negotiation history and State practice and, in so doing, given insufficient weight to the Convention's basic purposes. Prominent among these courts are those of the EU and its Member States. I find that inquiries into the jurisdictional, procedural or substantive dimensions of ICSID awards should be regarded as off limits. [12]

On the other hand, it is difficult, in light of the specific language of Article 54, and Article 54(1) in particular, to maintain that an enforcing court has absolutely no role whatsoever at the enforcement stage beyond verifying the authenticity of the award that it is asked to enforce—the latter itself specifically required by Article 54(2). [13] Thus, to describe the enforcement of ICSID awards as 'automatic', as some commentators have done, [14] goes a step too far. But the inquiry that may properly be made pursuant to Article 54 should be strictly limited to the procedure by which enforcement is achieved. Under Article 54, a national court before which an ICSID award is brought for enforcement is expected to impose only the procedural requirements that it analogously imposes on the enforcement of court judgments rendered in that jurisdiction. In other words, national courts may not subject enforcement of ICSID awards to any requirements of a procedural order more onerous than those to which they subject enforcement of local judgments.

# II. THE ARTICLE 54 CHALLENGE

It is apparent from the face of Article 54 that the Convention drafters did not undertake to unify the grounds, if any, upon which Contracting States could avoid enforcing ICSID awards. In that respect, the ICSID Convention differs importantly from the New York Convention, which enumerates the grounds—and the only grounds—on which a Convention award may be denied enforcement. It is telling that the drafters of the ICSID Convention, for whom production of the New York Convention was a very recent memory, were silent on a matter that loomed so large in the context of the latter Convention.

Though the ICSID Convention does not unify the objections, if any, to enforcement of ICSID awards that a State may raise, it did include in Article 54(1) language directing the courts of a Contracting State to enforce an ICSID award '*as if it were a final judgment of a court in that State*'. In other words, it assimilated the enforcement of ICSID awards in national courts to the enforcement of local judgments. As a result, Contracting States were to follow an approach akin to 'national treatment'. They could not impose on the enforcement of ICSID awards any conditions that they do not impose on the enforcement of domestic judgments. Knowing full well that States enforce local judgments differently, the drafters necessarily anticipated that States would, by analogy, enforce ICSID awards somewhat differently as well. [15]

To fully appreciate the import of Article 54(1), it is important not only to respect its text, but also to place the provision in context. Important to that context are the provisions adjacent to Article 54(1). The relevant provisions are these:

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Article 54(1):

> Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State.

Article 54(2):

> A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General.

Article 54(3):

> Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought.

Article 55:

> Nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution.

The problem that the present article addresses is the potential for these seemingly straightforward provisions to be read differently, producing divergent understandings of the conditions to which Contracting States may subject the enforcement of ICSID awards. As noted, it is only in recent years, and chiefly through the EU, that differences in the understanding of Article 54 have come to the surface, despite the fact that the text of the Convention has remained unchanged since the very start. To be sure, the magnitude of the problem, at least as it currently stands, should not be exaggerated. The fact is that only a small number of Contracting States have thus far even had an occasion to address the question, [16] much less disagree over it. Nevertheless, enough of a divergence among these States has now emerged, and the stakes going forward are sufficiently great, to warrant taking a closer and more deliberate look at the workings of Article 54 than they have received thus far. [17]

The point was forcefully brought home by a 2018 judgment of a Stockholm District Court in the well-publicized *Micula v Romania* case. [18] Due to the singular importance of *Micula* in the current debates, it is useful to set out early what that case entails. In *Micula*, an ICSID Convention case, Romania had withdrawn certain investment incentives granted to two Swedish nationals, the Micula brothers, prior to Romania's accession to the EU. The incentives were subsequently withdrawn under compulsion of the European Commission, on the ground that these incentives represented illegal State aid under EU law. [19] Unsurprisingly, the withdrawal precipitated an investor–State dispute under the Swedish–Romanian bilateral investment treaty (BIT), eventually resulting in an award in the Miculas' favor in the amount of 178 million euros (*Micula* award). [20] At that point, the European Commission, which had unsuccessfully intervened as *amicus curiae* in the proceedings in support of Romania, [21] issued an injunction barring Romania from paying any portion of the award, [22] characterizing any such payment as in itself an instance of illegal State aid. The *Micula* award then made its way for enforcement to a number of national courts, among them the Swedish court, which denied enforcement of the award in deference to the Commission's position in that case. However, not all national courts have followed that course. Disparities in the treatment that the *Micula* award received among national courts lie at the heart of the present inquiry.

## III. TREATY TEXT

As is customary in interpreting a treaty, we begin with the VCLT. Article 31 provides that '[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose'. To the extent that further guidance is required, '[r]ecourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion'. [23]

However, before inquiring into how the text of Article 54, in light of its object and purpose, is best understood, it is necessary to acknowledge certain semantic difficulties that the wording of that

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

provision presents.

## A. Semantic Difficulties

For two particular reasons, making sense of Article 54 is more complicated than one might expect. Both reasons are essentially semantic.

A first difficulty relates to the ambiguity that surrounds the terms 'enforcement' and 'execution'. In the United States and other jurisdictions—particularly common law—the term 'enforcement' carries a very particular meaning, denoting the reduction of an arbitral award, whether domestic or foreign, to a local judgment. (It similarly denotes the means by which foreign country judgments are reduced to local judgments.) The underlying idea is that neither an arbitral award nor a foreign judgment may be given effect unless and until it is transformed into a local judgment. In these legal systems, a different term, 'execution', is used to signify the subsequent step of coercive measures by which a judgment of enforcement, so understood, is actually put into effect, as through the attachment of assets.

The *Restatement of the US Law of International Commercial and Investor–State Arbitration* defines the terms enforcement' and 'execution' precisely in this fashion:

> 'Enforcement' is the reduction to a judgment of an international arbitral award …
>
> 'Execution' is the means by which a judgment enforcing an international arbitral award is given effect. [24]

The wording of the ICSID Convention in its English language version supports this distinction, since Articles 54(1) and (2) use the term 'enforce' and 'enforcement' respectively, whereas Article 54(3), [25] as well as Article 55, [26] use the term 'execution'. The difference in usage must be understood as deliberate. One can only assume that when the drafters provided in Articles 54(1) and (2) for *enforcement* of an ICSID award 'as if it were a final judgment of a court in that State', they had in mind the specific process by which, at least in common law terms, an award becomes 'reduced' to a local judgment, and not the process by which the relief that the tribunal awarded is given actual effect. In their commentary on the Convention, representatives of ICSID themselves acknowledge the distinction:

> The recognition and *enforcement stage* offers no possibility of review of the award or its enforceability. However, the ensuing *execution process* is governed by the laws of the state where execution is sought. [27]

Yet, in many languages other than English, a single term is used to denote both enforcement and execution, as those terms are understood in US law. This is the case, for example, in both the French (*exécution*) and Spanish (*ejecución*) versions of the ICSID Convention. It may therefore be difficult to know, in any given circumstance, which of those meanings the term '*execution*' carries. This is not to say that in those jurisdictions the operational difference between enforcement and execution is not appreciated. Even jurisdictions that use the same term for enforcement and execution recognize that the two processes are distinctive. [28] Based on the above, we can presume that it is enforcement, in the sense of putting the award in a form that allows it eventually to be executed, to which Article 54(1) is addressed.

A greater semantic difficulty—particularly in jurisdictions that define enforcement of an award as its reduction to judgment—arises directly out of Article 54(1)'s requirement that, in any given jurisdiction, ICSID awards be *enforced* as if they were judgments of a local court. If the term 'enforcement' in Article 54(1) means reduction to judgment, as it does in the United States, the analogy between enforcement of awards and enforcement of local judgments that that provision establishes is puzzling. It seems redundant, if not meaningless, to reduce a local judgment to another local judgment. After all, a local judgment is by definition already a judgment and should not require a further reduction to judgment. If anything further is required of a local judgment, it is execution, and yet we have just concluded that Article 54(1) is not concerned with execution.

The United States found a way to escape the apparent redundancy that inheres in reducing to local judgment that which is already a local judgment. At its urging during the negotiations, a second sentence was added to Article 54(1) providing that '[a] Contracting State with a federal constitution may … treat [an ICSID award] as if it were a final judgment of the courts of a constituent state'. In implementing the ICSID Convention, the United States used comparable language:

> The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

> of a court of general jurisdiction of one of the several States. [(29)]

Under this formulation, the court whose judgment is to be enforced and the court that is asked to enforce it may be courts of the same jurisdiction, but nevertheless of different units within it—in the case of the United States, the states. Thus, according to what appears to be the prevailing view in the United States, the term 'full faith and credit' as used in the ICSID implementing legislation, and in US law generally, refers principally to the treatment that a court of one US state accords to a judgment of a court of another, ie, a 'sister-state' judgment. Under the relevant clause of the US Constitution:

> Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof. [(30)]

As has long been understood by the Supreme Court, [(31)] a judgment of a court of one state is presumptively entitled to recognition and enforcement in the courts of the other states, largely without further questions asked. [(32)] Even violation of the public policy of the enforcement state is no excuse for its denying full faith and credit to a sister-state judgment. [(33)] According to the sole recognized exception, recognition and enforcement may be denied if the rendering court lacked personal or subject-matter jurisdiction. [(34)] But even lack of personal or subject-matter jurisdiction may be invoked to defeat enforcement of a sister-state judgment only if the party resisting enforcement had no opportunity to contest personal or subject-matter jurisdiction in the rendering court. [(35)] As a practical matter, a party resisting enforcement must have completely defaulted before the rendering court in order to preserve the right to contest that court's personal or subject-matter jurisdiction in the enforcing court. [(36)]

My focus here on States, such as the United States, that define enforcement as a reduction to judgment, must not obscure the fact that reduction to judgment is *not* the sole means by which a State may enforce an award or foreign judgment. [(37)] Enforcement may be—and is—achieved differently in other jurisdictions. There are in fact, among the 163 ICSID Signatory States, a variety of ways in which a judgment or arbitral award may be enforced, many far simpler than reduction to judgment. The ICSID Convention is an international instrument whose text must accommodate a large number of legal systems each of which may operationalize 'enforcement' as it sees fit. In some jurisdictions, for example, all that enforcement entails is simple non-adversarial review by a court or an administrative body designated for that purpose. [(38)]

Precisely in order to accommodate the range of methods across jurisdictions by which a judgment or award may be enforced, I propose that enforcement under Article 54—and indeed enforcement generally—be conceived of more broadly than is customary, focusing less on the *form* that enforcement takes in any given jurisdiction and more on the *function* that enforcement is meant to perform, thereby highlighting what the different means by which judgments or awards are enforced across jurisdictions have in common.

I suggest that enforcement, within the meaning of Article 54(1), should be understood simply as a determination, through one formal means or another, that a judgment or an award is 'worthy of execution'. A determination of 'execution-worthiness' may then be viewed basically as an intermediate litigation step, taken *after* an award or a judgment has been rendered and *before* it is actually executed. Reduction of an award to judgment is only one among many procedures by which the 'execution-worthiness' of a judgment or an award may be ascertained.

In sum, understanding the import of Article 54(1) is aided by: (i) appreciating that the ICSID Convention distinguishes between enforcement and execution and that its focus is enforcement, even though, in certain languages, the same term may be used for both; and (ii) understanding enforcement of an award or a judgment as a determination, whether through reduction to judgment or some other means, that an award or a judgment is execution-worthy.

## B. Language of Article 54

I turn now to a first source under the VCLT for understanding the meaning of Article 54, namely its text, in light of the Convention's object and purpose. By its terms, Article 54 imposes on a Contracting State an obligation to enforce an ICSID award 'as if it were a final judgment of a court in that State'. As noted, within this seemingly straightforward formula lurk important ambiguities. [(39)] More specifically, different views have been taken on the types of inquiry, if any, that Article 54(1) allows national authorities to conduct in deciding whether to grant or withhold enforcement of an ICSID award.

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

As will be more fully explored below, [40] according to a widely held view, national authorities are bound to enforce an ICSID award on the sole condition that it has been authenticated by the ICSID Secretary-General, as specifically provided for by Article 54(2). [41] So viewed, the enforcement process has come to be described in many circles as effectively 'automatic'.

Despite its currency, this view is being challenged. In some jurisdictions, of which the EU and its Member States are the prime examples, Article 54(1) appears to be understood as allowing enforcement authorities in Contracting States to examine awards from at least a number of perspectives, including a substantive perspective, before enforcing them. Certainly the European Commission is taking that position, as did the Swedish court in denying enforcement of the *Micula* award on the ground that enforcement would violate EU State aid policy. [42] The courts of a few Contracting States outside the EU, while not yet acting on it, have expressed a similar view. [43] Nor have scholars uniformly ruled out the possibility that ICSID awards may be subject to review of that kind. [44]

Similarly, before enforcing an ICSID award, a court may choose to examine an award from not only a substantive point of view, but also a jurisdictional or procedural one. Thus, a court may question whether the parties to an award in fact ever agreed to submit the underlying claim to arbitration, thereby subjecting themselves to the authority of an ICSID tribunal. As we shall see from the ECJ's *Achmea* judgment, discussed fully below, [45] the ECJ has in effect directed Member State courts to make that very inquiry if the matter is raised. Under this view, before enforcing an ICSID award, a national court may, for example, ask whether the investor satisfied one or more preconditions to arbitration, such as mediation, prescribed by the parties' arbitration agreement and, if it did not, whether its failure to do so was excusable. By way of extension, one might even imagine allowing a court to revisit the question whether the claimant in an ICSID proceeding was an investor and made an investment on the ground that these likewise are matters of arbitral jurisdiction. A State might conceivably also resist enforcement of an ICSID award on essentially procedural grounds, arguing, for example, that the tribunal violated its right to a fair hearing, in which case the enforcing court may be led to inquire whether the respondent State was afforded an adequate opportunity to be heard.

Article 54(1) lends itself to still a third interpretation, precluding enforcement on the basis of jurisdictional, procedural or substantive aspects of the arbitral proceeding or arbitral award, while still requiring that, in enforcing an ICSID award, a national court must follow the same procedures it follows in enforcing local judgments. Under this view, Article 54(1)'s phrase '*enforce as if [...]*' should be understood as essentially meaning '*enforce in the same manner as if* [...]'. As will be shown, there is a great deal to be said, in light of Article 54's object and purpose, in favor of this interpretation.

This discussion shows dramatically the extent to which the degree of finality of ICSID awards may vary considerably according to the meaning that a national court ascribes to the notion of enforcing an ICSID award as if it were a final judgment of a court in the forum State. The more that a court subjects an ICSID award under Article 54(1) to jurisdictional, procedural or substantive requirements under national law, the greater the satisfaction of the policies underlying those requirements, but also the greater the prejudice to an award's finality, to the detriment of Article 54's object and purpose.

# IV. NEGOTIATION HISTORY

In the event of ambiguity in treaty text, the VCLT provides for resort to negotiation history. [46] In fact, the negotiation history of the ICSID Convention is well documented. [47] That history shows that, over the course of the negotiations leading up to Article 54 as we know it today, delegates advanced a range of views on the conditions to which enforcement of ICSID awards should or should not be subjected.

The working paper on the basis of which the drafters began their work favored giving ICSID awards in any given State the most favorable treatment afforded under either domestic law, the Geneva Convention of 1927 or the then recently signed New York Convention. [48] This proposal did not receive a great deal of attention at the time. The focus was not on possible defenses to enforcement, but rather on whether all Convention States would have an obligation to enforce an award, even if they were not parties to the underlying proceedings, whether as the respondent State or the State of the claimant's nationality. [49] The version of the draft that followed used language highly resonant of, though not identical to, the language ultimately adopted in Article 54(1). It provided that '[e]ach Contracting State shall recognize an award of the Tribunal as binding and enforce it within its territories as if it were a final judgment of the courts of that State'. [50]

When the drafters later returned to the question, they expressly abandoned the idea of subjecting enforcement of ICSID awards to the New York Convention defenses, but neither did they make Contracting States unconditionally obligated to enforce them. Instead, as under the previous draft,

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

each State would treat enforcement of ICSID awards no less favorably than they treated judgments of their own courts. [51] The explanatory comment accompanying the draft stated that Contracting States were obligated to recognize and enforce ICSID awards as if a national judgment and 'irrespective of the treatment under its law of other arbitral awards'. [52] At the 1963 Meeting of Legal Experts in Santiago that followed, some delegates, particularly from Latin America, expressed concern over whether the ICSID Convention's enforcement obligation might be incompatible with their domestic legal systems, especially inasmuch as in those systems certain domestic law principles, including constitutional law principles, prevailed over international obligations. The Venezuelan delegate observed that an international arbitral award would be considered invalid and unenforceable if contrary to 'public interest or good morals'. Thus, '[f]oreign judicial decisions, including arbitral awards, could not be enforced if they contained provisions contrary to public policy or the national public law of Venezuela'. [53] The Guatemalan delegate seconded this position, but went on to opine that States would have an obligation under the Convention to bring their laws into conformity with their enforcement obligations. [54] These concerns led to the suggestion that a public policy exception be inserted into Article 54, which, at the very least, could be invoked by Convention States other than the State party to the particular award at issue or the State of the claimant's nationality. [55]

At this stage, Aron Broches, general counsel of the World Bank, who spearheaded the negotiations from the start, specifically sought to allay these concerns. At ICSID's February 1964 Regional Meeting in Geneva, which had a preliminary draft of the Convention before it, he explained that, for enforcement purposes, ICSID awards would be placed on the '*same footing*' as a final judgment of a national court, so that '[i]f such judgement could be enforced under the domestic law in question, so could the award; if that judgment could not be so enforced, neither could the award'. [56] Although Mr Broches' intervention appeared to echo the prevailing sentiment, it did not put matters to rest.

While positing that ICSID awards would receive the same treatment as local judgments, he repeatedly depicted the preliminary draft formulation as imposing on Contracting States what appeared to be an unqualified enforcement obligation, stating, for example, that enforcement should not be 'subject to undue delays and [be] met by defenses based on local laws'. [57] Delegates continued to press for other solutions, ranging from subjecting ICSID awards to review of awards under domestic law to replicating the New York Convention grounds. [58]

It is fair to say that, even at this advanced stage, disagreement remained over the scope of Contracting States' enforcement obligations. Matters had not come to rest. Some States argued that the ICSID Convention's enforcement obligation should be seen as 'a new departure' from existing treaty regimes and a 'bold innovation'. [59] Yet others maintained that the very existence of ICSID's annulment procedure meant that enforcement obligations under the Convention should be no greater than those applicable to enforcement under the New York Convention. [60] In September 1964, after further consultation, a new first draft was circulated by the President of the World Bank. [61] This draft retained the provision requiring a State to enforce an ICSID Convention award as if it were a final judgment of a court of that State. However, it expressly added several new obligations in regard to enforcement. An applicant for enforcement was required to furnish to the domestic authorities charged with enforcement a duly authenticated original award or a duly certified copy thereof. [62] It specified that execution, as distinct from enforcement, of an ICSID award was to be governed by the rules of civil procedure in force in the State where execution was sought, on the understanding that a writ of execution should issue without any review other than verification of the award's authenticity. At the same time, a provision was inserted expressly providing that enforcement obligations under the Convention would not affect national laws in respect of sovereign immunity. [63] All these provisions made their way into the Convention as it reads today. The draft additionally required that all Contracting States take whatever action was necessary to enable them to carry out their enforcement obligations under this article. [64]

Notwithstanding these attempts at clarification, uncertainty continued to surround the scope of Contracting States' enforcement obligations under the Convention. The draft presented to the pre-plenary session working group that followed sought to achieve a compromise, at least so far as the availability of a public policy defense to enforcement was concerned. It provided that although third States could invoke public policy to avoid enforcement of an ICSID award, States involved in the dispute, either a disputing or non-disputing State, could not. [65]

That is where discussions of what would become Article 54 stood when, in December 1964, the World Bank Secretariat presented the draft for review by the World Bank legal committee, consisting of representatives of all interested States, then 61 in number. Once again, divergent voices were heard. While some delegates supported retaining only the public policy exception, [66] others urged a wider set of allowable defenses, one delegate returning to the position that each State should be permitted to refuse enforcement on any ground on which it could refuse enforcement of an arbitral award under the domestic law of that State. [67] Ultimately, the only action the committee took was to vote, by a margin of 25 to nine, to reject any public policy defense to

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

enforcement, even in courts of third Contracting States. [68]

Even so, not every delegate read the result in the same fashion. Thus, the French delegation agreed to the deletion of the public policy defense on the assumption that that defense nevertheless remained due to the language of Article 54(3), according to which execution of an ICSID award would be governed by national law. [69] It took this view, even though Article 54(3) governed execution and not enforcement. In response, Mr Broches simply reiterated that the purpose of Article 54 was to ensure that ICSID awards were afforded the maximum level of enforceability possible under national law, by putting them on the same footing as national court judgments. [70]

The draft that emerged from the World Bank legal committee read largely, though not exactly, as Article 54 now reads. Paragraph One provided for enforcement of an ICSID award 'as if it were a final judgment of a court in that State'. [71] Paragraph Two required a party seeking enforcement to furnish the competent authority of the State where enforcement was sought 'a copy of the award certified by the Secretary-General'. [72] Paragraph Three left execution of an award to 'the laws concerning the execution of judgments in force in the State in whose territories such execution is sought'. [73] The accompanying report made clear that the draft prescribed no specific enforcement mechanism, thus leaving States free to apply their own distinctive method of enforcement, provided that they did in fact meet their obligation to enforce. [74] Moreover, no reference was made in the report to any exception to Contracting States' enforcement obligations, whether on the basis of public policy or any other ground.

The draft still needed one final approval, namely by the World Bank Committee of the Whole meeting in February 1965. [75] On this occasion, Otto Donner, West Germany's representative to the World Bank, specifically urged that a public policy defense to enforcement be restored. [76] However, a majority of representatives rejected the proposal as weakening the Contracting States' enforcement obligation under the Convention. [77] At that juncture, Mr Broches proposed a novel compromise, namely that States' enforcement obligations would be exclusively pecuniary, [78] ie, that although a tribunal could order specific performance, issue injunctions, or award some other form of non-monetary relief, only a duty to compensate in damages would be judicially enforceable. [79] In other words, any exception on the basis of public policy was supplanted by a carve-out for non-pecuniary awards. This proposal was adopted. [80] Then, in March 1965, the executive directors of the World Bank approved the draft as it then stood, followed in October 1966 by signature of all World Bank member governments.

Clearly, the negotiation history is a checkered one, at least so far as the specific contours of Contracting States' enforcement obligations are concerned. Discussion of that issue was anything but linear, in the sense of pointing in a single direction. The sequence of drafts suggests that, at intervals, the drafters toyed with the idea of borrowing the New York Convention grounds for denying enforcement of awards, treating ICSID awards in the same manner as domestic awards, as well as making only a self-standing defense of public policy available to Contracting States, whether all of them or only those involved in the award at hand. At the same time, Mr Broches' interventions suggest that enforcement should be as unconditional as possible.

What can be said with confidence is this. First, the drafters discussed but ultimately rejected the idea of importing into the ICSID Convention the New York Convention's grounds for denying enforcement of awards or the grounds on which any other award could be denied enforcement. They also chose not to establish a self-standing public policy defense to the enforcement of ICSID awards. On the other hand, the notion of assimilating ICSID awards to local judgments for enforcement purposes was largely a constant, especially as negotiations progressed. The language 'enforce as if […]' emerged relatively early, and survived.

Considering the importance of the availability or non-availability of grounds for denying enforcement under the Convention, it is regrettable that the Convention's negotiating history, like the Convention text itself, falls so short of providing as conclusive a body of evidence of Article 54's meaning as one might like. Again, this may be due in part to the widely held assumption at the time that Contracting States would invariably meet their enforcement obligations, thus mostly obviating any necessity of judicial recourse. [81] In short, the negotiating history has not put to rest as clearly as one might hope the questions that have lately come to the fore and inspired the present inquiry, although it did rather clearly exclude the New York Convention defenses, the defenses to enforcement of other awards, and the public policy defense in particular, from available defenses to enforcement of ICSID awards.

# V. STATE PRACTICE

It may finally be instructive to examine State practice under the ICSID Convention, even though it is not a source of interpretation to which the VCLT points. National courts are the arenas in which enforcement of ICSID awards may be sought and in which questions of the import of Article 54

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

accordingly arise. However, because many ICSID claims either fail or are settled or, if not, are voluntarily paid, there are relatively few instances in which a national court has been called upon to enforce ICSID awards. Thus, a remarkable number of Contracting States—a large majority—report having seen no actions in their courts for the enforcement of an ICSID award. [82] The position that courts in those jurisdictions will take can be, at best, a matter of surmise—albeit informed surmise—on the part of commentators. Accordingly, State practice sheds limited light on the matter.

An important exception must of course be made with respect to sovereign immunity. As noted, [83] Article 55 of the ICSID Convention explicitly reserves to Contracting States authority to determine the extent, if any, to which States may invoke sovereign immunity as a defense to execution. In fact, most States do recognize, to one extent or another, sovereign immunity to enforcement and/or execution. On numerous occasions, national courts have entertained that defense under national law. Upon examination, some of these cases deal with what amounts to immunity from enforcement, as that term is used in this article. [84] Others appear to deal, instead, with immunity from execution. [85] But due to the Convention's express authorization to States to impose a sovereign immunity defense to the execution of ICSID awards [86] and to govern execution more broadly, [87] State practice in regard to sovereign immunity, in particular, lies outside the scope of the present article.

In the subsections that follow, I describe the positions taken by courts, such as they are, on the availability of defenses to the enforcement of ICSID awards. Due to the paucity of cases in most jurisdictions, we can do no better than consider predictions by commentators of how national courts are apt to confront the matter, if and when required to do so. I turn first to courts of the EU Member States, where the challenge to conventional understandings of Article 54 has most sharply arisen. I then turn to the United States, where the question has also lately arisen. I finally turn to the much more tentative indications that we have from other Contracting States.

## A. Article 54 in EU Member State Courts

Until recently, courts of the EU Member States appear to have viewed ICSID awards as wholly unreviewable on the occasion of their enforcement. [88] ICSID awards are described by German commentators as 'self-executing' and 'automatic'. [89] More particularly, the higher regional court in Frankfurt ruled that ICSID awards are not subject in Germany to the several defenses to enforcement applicable either to foreign judgments, as codified in Section 328 of the German Code of Civil Procedure (ZPO), [90] or to New York Convention awards. [91] French courts have spoken even more categorically. In the first ICSID enforcement action in France, *Benvenuti & Bonfant v Congo*, the court acknowledged that its authority was 'limited to ensuring that the award […] was authentic and properly certified by the Secretary-General of ICSID'. [92] In the later case of *SOABI v Senegal*, [93] the Paris Court of Appeal denied enforcement of an ICSID award on the ground of public policy, but the Court of Cassation reversed. According to the Court, '[t]he ICSID Convention had in its Articles 53 and 54 created an autonomous and simplified regime for recognition and execution which excluded the otherwise applicable provisions of the Code of Civil Procedure and the remedies provided therein'. Much the same may be said of the position taken in the Netherlands, [94] in Sweden [95] (apart from *Micula*) and the United Kingdom. [96] Under Dutch law, for example:

> A party wishing to obtain leave for enforcement of an ICSID award […] need only present a copy of the award, certified by the secretary general of ICSID, to the president of the District Court of the Hague. The President must grant exequatur as a matter of right, as the ICSID Convention does not allow national courts to refuse recognition and enforcement. [97]

Such was the apparent position of the EU Member State courts until recently.

However, the situation has indeed changed, at least in cases implicating EU law, largely due to the positions taken by the EU institutions, notably the European Commission and the ECJ. As noted above, [98] although the European Commission had enjoined Romania from paying the *Micula* award on the ground that payment would constitute illegal aid under EU State aid law, the Miculas sought enforcement in a number of EU jurisdictions, notably Belgium, Luxembourg, Sweden, the United Kingdom and even Romania itself. Largely in deference to the European Commission's order, the courts in Belgium, [99] Luxembourg, [100] Romania [101] and Sweden [102] refused enforcement. However, in the Miculas' appeal from the Belgian decision, the Brussels Appeals Court stayed enforcement, making a reference to the ECJ for a preliminary ruling on whether enforcement of the *Micula* award would violate EU law. [103]

Although all these courts denied enforcement of the *Micula* award, the Swedish judgment is most pertinent because it relied most specifically on Article 54(1) of the ICSID Convention. However, before addressing the central question, the Swedish court confronted the European Commission's

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

novel proposition that the ICSID Convention imposes an enforcement obligation *only* on the State against which the award was rendered, ie, the host State, and on no other Contracting State where the award might be brought for enforcement. [104] But this position runs counter not only to the wording of Article 54(1) of the ICSID Convention ('*Each Contracting State* shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award' (emphasis added)), but also to the ICSID Convention's underlying *raison d'être*, namely, to ensure the full mobility of ICSID awards among Contracting States. The Swedish court rightly rejected the argument. It held that, while the European Commission injunction was indeed addressed to Romania only, and not to any other EU Member State, all EU Member State courts are duty bound to deny enforcement of the award, since otherwise they 'would contribute to side-stepping the Commission's decision'. [105] The court specifically invoked the EU law principle of 'sincere cooperation' according to which all EU Member States, including their courts, are required to support and assist the EU institutions in the implementation of EU law. [106]

Then, turning to the heart of the matter, the Court held that, under the logic of Article 54, it had no choice but to deny enforcement of the *Micula* award. The judgment is brief and practically syllogistic, observing that: (i) under Article 54, a court denies enforcement of an ICSID award if it would deny enforcement of a hypothetical analogous judgment; (ii) the court would deny enforcement of a domestic judgment ordering Romania to compensate the Miculas for withdrawing an illegal State aid; hence (iii) the court should deny enforcement of an ICSID award ordering Romania to compensate the Miculas for withdrawing an illegal State aid. Accordingly, the Court ruled in favor of Romania, assessing the litigation costs against the Miculas.

The Swedish judgment may be the European judgment that most clearly put the meaning of Article 54(1) in the spotlight. It was read as confirming that, if the Commission regards EU State aid law as EU public policy, [107] the Swedish court was obligated to do so as well, thus denying enforcement of the *Micula* award on public policy grounds. The readiness of the Swedish court, as well as the courts of other EU Member States, to deny enforcement of an ICSID award on essentially substantive grounds came in many international arbitration circles as a rude awakening. [108] Ironically, the EU court of first instance, the General Court, subsequently overturned the injunction that the European Commission had addressed to Romania prohibiting it from paying the *Micula* award. [109] But it did so on the ground that Romania had not in fact violated EU State aid rules, since it granted the incentives to the Miculas before it had acceded to the EU and became bound by those rules. The General Court judgment is, as of this writing, on appeal to the ECJ. [110]

The outlier among the then-EU Member States is the United Kingdom. Initially, the UK Supreme Court, rather than deny enforcement, stayed the enforcement action pending the outcome of the Miculas' challenge in the then-pending action in the General Court to the Commission injunction forbidding Romania from paying the award. [111] However, in February 2020, in the wake of that ruling, the UK Supreme Court revisited the case and decided to allow enforcement to proceed. [112]

Interestingly, the Court did not apparently rely on the General Court judgment to justify its ruling. (Nor did it invoke Brexit, as the UK remained bound by EU law during the transition period. [113] ) Rather, the Court invoked other grounds. The Court first cited Article 351 of the Treaty on the Functioning of the European Union (TFEU), according to which:

> the rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties.

As the UK had joined and implemented the ICSID Convention before its accession to the EU, its ICSID obligations remained intact, so that the duty of sincere co-operation under EU law could not justify a UK court in denying enforcement of an ICSID award under Article 54 of the Convention. [114]

Secondly, and more generally, the UK Supreme Court invoked both the structure of the ICSID Convention and the *travaux préparatoires* to underscore the firm enforcement obligations imposed by Article 54. [115] In effect, the Court viewed EU Member State courts as bound to enforce an ICSID award, the Commission's objection to enforcement, even on public policy grounds, notwithstanding. [116] The Court went so far as to criticize the very issuance of the initial stay, holding that the courts had improperly 'made use of powers to stay execution granted by domestic law in order to thwart enforcement of an award which had become enforceable under the ICSID Convention'. [117] The Court acknowledged that the Commission might bring an infringement action against the UK on account of its enforcement of the *Micula* award, but considered, rightly or wrongly, that there would be 'no realistic prospect of success in disputing the existence' of the obligations owed by the UK to non-Member States under Article 351. [118]

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

The disparate fate of the *Micula* award in the courts of EU Member States necessarily forces the issue of whether the ICSID Convention allows a national court, consistent with Article 54 of the Convention, to deny enforcement of an ICSID award and, if so, under what circumstances.

In the equation, there now importantly figures a much-publicized March 2018 judgment of the ECJ, which, while not arising under the ICSID Convention, [119] has broader implications. In *Achmea v Slovak Republic*, [120] on a reference from the German Supreme Court, the ECJ ruled that investment disputes arising under a BIT between an EU Member State and a national of another EU Member State (known as 'intra-EU disputes') cannot validly be adjudicated through arbitration because the 'autonomy of the EU legal order' requires that such disputes be adjudicated exclusively by national courts and tribunals capable of making preliminary references to the ECJ on questions of EU law. [121] In the Court's view, the efficacy of EU law required its uniform understanding, a value threatened by the adjudication of intra-EU disputes by bodies, such as ICSID tribunals, incapable of invoking the preliminary ruling jurisdiction of the ECJ. The Court further reasoned that, since the agreements on which arbitral proceedings in intra-EU disputes are based are for that reason invalid, the tribunals hearing those cases lack jurisdiction and their awards may not be given effect. [122] The 'autonomy of the EU legal order' may fairly be regarded as in itself an expression of EU public policy. On remand in *Achmea*, the German Supreme Court immediately complied, denying enforcement of the *Achmea* award. [123]

Tribunals adjudicating intra-EU disputes governed by the ICSID Convention have since largely held that the *Achmea* ruling is inapplicable to ICSID awards, due to the very nature of ICSID. [124] That, however, is not the Commission's view. In its *amicus* brief in the recent *Micula* case in the U.S. District Court for the District of Columbia, [125] the Commission explicitly relied on the *Achmea* ruling in support of its argument that the award in *Micula*—an ICSID award—must be denied enforcement by Member State courts. [126] It can fairly be assumed that if the ECJ rules that enforcement of intra-EU ICSID awards by Member States violates EU law, courts in all EU Member States will comply by withholding enforcement of those awards, just as they did in *Micula*, Article 54 notwithstanding. The position of the ECJ on that matter remains to be seen, but extension of the Court's ruling in *Achmea* to ICSID awards seems highly likely.

## B. Article 54 in US Courts

Thus far, US courts have shown no hesitation in enforcing ICSID awards and given no indication that they would fail to do so on account of US law or public policy. In addition to providing that the pecuniary obligations imposed by ICSID awards 'shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States', [127] the US implementing statute declares that '[t]he Federal Arbitration Act [FAA] shall not apply to enforcement of awards rendered pursuant to the [C]onvention'. Since the New York Convention is codified in FAA Chapter Two, this provision means that the grounds for denying enforcement of awards under the New York Convention, presumably including violation of public policy, have no application to the enforcement of ICSID awards. [128] Upon enactment of the US implementing legislation, the US Department of State affirmed its understanding that enforcement of an ICSID Convention is guaranteed once its authenticity is established. [129] Commentators on US law similarly describe ICSID awards, unlike New York Convention awards, as 'self-enforcing'. [130]

In the majority of ICSID enforcement actions to date in the United States, the issue preoccupying the courts was a distinctly procedural one, namely whether ICSID awards could be enforced in US courts on an *ex parte* basis, ie, without prior notice to the defendant State, or instead enforced only through a plenary proceeding in which the defendant State is formally notified and appears. In the several cases coming before it, including the enforcement action in *Micula*, the US District Court for the Southern District of New York ruled that ICSID enforcement actions could be conducted through *ex parte* proceedings. [131] In reaching this conclusion, the Court first asked itself how, under full faith and credit, a state court sitting in New York would go about enforcing a sister-state judgment. Concluding that New York law permitted courts of that state to enforce sister-state judgments on an *ex parte* basis, [132] the Court held that it could enforce ICSID awards on that basis as well. In so ruling, the Court knowingly gave effect to the requirement in Article 54(1) that courts of Contracting States enforce an ICSID award 'as if it were a final judgment of a court in that State' (as formulated by the Convention) and the requirement in the ICSID implementing statute that an ICSID award 'be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States' (as formulated by the US implementing statute). In short, and in keeping with the logic of Article 54, if sister-state judgments could be enforced in New York courts on an *ex parte* basis, then, under Article 54(1) ICSID, awards could be enforced in those courts on an *ex parte* basis as well. [133]

As it turns out, the US Court of Appeals for the Second Circuit reversed the Southern District's

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

enforcement of the *Micula* award on the basis of a prior ruling of its own in the case of *Mobil Cerro Negro v Venezuela,* [134] holding that the ICSID implementing statute was in fact overridden by the federal Foreign Sovereign Immunities Act (FSIA), [135] which requires that foreign States be given prior notice of actions against them and an opportunity to be heard in plenary proceedings, and also required, as a matter of venue, that the action be heard only in a court of the District of Columbia. As a result, the Miculas reinstituted suit in Washington DC, giving notice to Romania and proceeding via a plenary action. Thus, the Second Circuit's reversal in *Micula* rested on the notice issue and, despite the European Commission's forceful *amicus* brief, had nothing whatsoever to do with objections under EU law.

The unavailability of either jurisdictional or substantive review of ICSID awards in US law was subsequently confirmed by a ruling in the re-filed action in the US District Court in Washington DC, which finally enforced the *Micula* award. [136] In that proceeding, Romania, with the Commission's support as *amicus curiae*, contested the Tribunal's jurisdiction under *Achmea*, while at the same time also invoking the act of State doctrine and foreign sovereign compulsion as grounds for denying enforcement. It even challenged the jurisdiction of the court itself on grounds of sovereign immunity, arguing that the FSIA's arbitration exception is unavailable to overcome immunity unless the arbitration agreement and arbitral award are valid which, under *Achmea*, they are not.

After affirming that it had subject-matter jurisdiction to hear the case, Romania's assertion of sovereign immunity notwithstanding, [137] the Court turned to the merits. It rejected all of Romania's defenses to enforcement, relying heavily on the abovementioned ruling of the EU General Court that the incentives that Romania had given to the Miculas were not invalid under EU State aid law, because given prior to Romania's accession to the EU. [138]

However, most pertinent for present purposes is the District Court's express conclusion that the ICSID Convention and the US implementing statute strictly disallow any substantive or jurisdictional review in a proceeding to enforce an ICSID award:

> A federal court's role in enforcing an ICSID award is limited. … A federal court is 'not permitted to examine an ICSID award's merits, its compliance with international law, or the ICSID tribunal's jurisdiction to render the award.' … Instead, the court 'may do no more than examine the judgment's authenticity and enforce the obligations imposed by the award.' [139]

Although in so ruling the District Court cited the US implementing statute, it was also effectively interpreting the ICSID Convention itself, and Article 54(1) more specifically.

The Court finally turned to Romania's arguments based on the doctrines of act of State and foreign sovereign compulsion. The Court did not broach the question whether these grounds for denying enforcement of an ICSID award are available to a State under Article 54(1) of the Convention, but simply rejected them on the merits. In its view, due to the EU General Court's ruling that the Commission lacked authority under EU law to condemn Romania for its grant of aid to the Miculas, [140] the Commission measures could not in any event qualify as acts of State. [141] The Court did not address Romania's foreign sovereign compulsion doctrine, most likely because its reasoning in regard to the act of State doctrine would clearly apply equally to it. In fact, the Court should not have entertained either argument. Both act of State and foreign sovereign compulsion are substantive matters. However, not much significance should be given to the fact that the Court entertained the arguments. First, the Miculas apparently did not object to the court's consideration of them, as they could have; the Court accordingly had no reason to address any such objection. Secondly, the Court was clearly poised, once again thanks to the EU General Court's ruling, to reject Romania's invocation of act of State and foreign sovereign compulsion on the merits, as it did. [142] As those arguments necessarily failed, the court had no reason to inquire into whether they were properly raised. [143]

The Court of Appeals for the DC Circuit affirmed the lower court's enforcement of the award in a judgment that is remarkable for its brevity. [144] In its two-page judgment, the Court declined to accept either of Romania's arguments, which in the Court's view 'boil[ed] down to two procedural points', or the Commission's usual argument, which Romania interestingly did not itself advance, that, under *Achmea*, the tribunal lacked jurisdiction and the award was therefore invalid and unenforceable. [145] Romania's first unavailing procedural contention was that the district court improperly resolved disputes of material fact. The Court disagreed, finding that the district court had addressed questions of law only, properly applying foreign law *qua* law, as required by Rule 44.1 of the Federal Rules of Civil Procedure. [146] The Court also rejected Romania's complaint that the district court committed an abuse of discretion in denying a last-minute request by Romania to extend the deadline to respond to a dispositive motion. As for the Commission's argument, the Court replied in a single sentence: '[A]s the district court carefully explained, Romania did not join

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

the EU until after the underlying events here, so the arbitration agreement applied.' [147] Significantly, the Court stated that the issues that had been raised did not warrant a published opinion. [148] The Court did not specifically take issue with the district court's conclusion that the ICSID Convention and the US implementing statute disallow any substantive or jurisdictional review in a proceeding to enforce an ICSID award. [149]

Much can be learned from the *Micula* case about the US courts' understanding of Article 54(1) and the scope of inquiry that they may conduct in connection with actions to enforce ICSID awards. As noted, [150] the Federal District Court expressly held that it was 'not permitted to examine an ICSID award's merits, its compliance with international law, or the ICSID tribunal's jurisdiction to render the award'. As for the federal courts in New York, the issue on which the courts in the Federal District Court for the Southern District of New York initially focused was, as noted, [151] the quintessentially procedural one—namely, whether ICSID enforcement actions could be conducted on an *ex parte* basis. In keeping with Article 54, the courts in those cases specifically rested their finding on the analogy between enforcement of ICSID awards and the enforcement of local judgments, as prescribed by Article 54(1) and the U.S. implementing legislation. As noted above, [152] if New York courts in a judgment enforcement action would proceed on an *ex parte* basis, and could do so in conformity with full faith and credit, then it could handle an ICSID award enforcement action on an *ex parte* basis as well. In one such early case, the District Court framed its application of Article 54(1) and the implementing statute in distinctly procedural terms:

> [I]t is ordered that the annexed arbitral award … be docketed and filed by the Clerk of this Court in the same manner and with the same force and effect as if it were a final judgment of this Court. [153]

While the District Court ruling was, as noted, [154] reversed on appeal strictly on the basis of the FSIA, the Court of Appeals did not contest the District Court's reasoning.

Article 54 of the ICSID Convention will certainly continue to arise in connection with US actions to enforce ICSID awards. At the time of writing, several actions to enforce ICSID awards rendered against Spain are pending in the US District Court for the District of Columbia. [155] In those actions, Spain maintains that the tribunals that rendered the ICSID awards lacked jurisdiction to entertain the underlying disputes. [156] In support of that argument, it argues that sister-state judgments are not enforceable under the full faith and credit clause if rendered in the absence of jurisdiction, [157] and therefore that, if the tribunals lacked jurisdiction over the underlying disputes, then under Article 54(1) their awards are not enforceable either. As expected, Spain traces the tribunals' asserted lack of jurisdiction to the ECJ's *Achmea* judgment. The Court's treatment of Spain's objections in those cases stands to inform us further about the workings of Article 54(1) in US courts. But all indications thus far, without exception, suggest that in an ICSID enforcement action a US court makes no jurisdictional or substantive inquiry of any kind into the arbitral procedure or arbitral award. As the Second Circuit itself squarely stated in *Mobil Cerro Negro*, a court 'may do no more than examine the judgment's authenticity and enforce the obligations imposed by the award'. [158]

## C. Article 54 in Other Jurisdictions

As indicated above, [159] the prevailing view among the reported cases and commentary is that ICSID awards are absolutely entitled to enforcement, provided the plaintiff presents the court with a copy of the award duly authenticated by the Secretary-General of ICSID, and that review of ICSID awards in enforcement actions on grounds of a jurisdictional, procedural or substantive nature, including public policy, is impermissible.

While there is apparently no court decision on point, commentators in China [160] and Korea, [161] for example, affirm that violation of public policy is not a ground for denying enforcement of awards under the ICSID Convention, even though it is a ground for denial of enforcement under the New York Convention. Similarly, commentators report that no substantive grounds may be raised to defeat enforcement of ICSID awards in Egypt, [162] Nigeria, [163] Singapore [164] and Turkey. [165]

According to commentators, Australian courts may not deny enforcement of such awards either on substantive grounds or for procedural irregularity, even though they may do so in enforcement pursuant to the New York Convention. [166] Indeed, an Australian court recently enforced two awards arising out of the Spanish solar cases, reasoning that the 'clear distinction' between enforcement and execution in the ICSID Convention meant that Spain's arguments sounding in sovereign immunity against enforcement (as opposed to execution) were unavailing. [167]

However, we have what appear to be isolated examples of national governments reserving the right in ICSID enforcement actions to review awards on the basis of certain public law principles of a broadly substantive character, and to refuse enforcement upon a finding that any such principle has

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

been violated. In one case, an Argentine court specifically stated, albeit in *dictum*, that it would be prepared to deny enforcement of an ICSID award if such enforcement were found to violate Argentine public policy. [168] An Argentine commentator reports that, on the occasion of their enforcement, ICSID awards do in fact risk being subjected to review on public policy grounds. [169] There is some reason to suppose that this is the approach that will be taken in certain other Latin American jurisdictions.

In a noted Bolivian case, [170] the plaintiff challenged the constitutionality of the legislation by which Bolivia ratified the ICSID Convention, as well as a number of BITs. That legislation allegedly violated Articles 135 and 228 of the Bolivian Constitution reserving to State authorities disputes over the conduct of business by Bolivian enterprises. The tribunal ruled that the government had constitutional authority to ratify the ICSID Convention, but expressly left over the question whether the Convention itself offended the Constitution, suggesting that if the Convention were to produce results contrary to Bolivian constitutional principles, Bolivia would necessarily have recourse to denunciation or termination of the Convention. On this basis, although no case has actually so held, Bolivian commentators maintain that ICSID awards, like domestic judgments, are subject to review by the Bolivian Constitutional Tribunal on public policy grounds. [171]

Also troubling are decisions coming out of Venezuela. In a 2003 Supreme Court judgment, [172] the Court stated:

> [As] arbitral awards … constituted by virtue of the [ICSID] Convention … are enforced within the national territory, and according to enforcement rules of the losing State, such enforcement cannot collide with constitutional norms and, therefore, [an arbitral tribunal's] ruling is non-enforceable…. [A]ccording to this Chamber, an award that violates the Bolivarian Republic of Venezuela's Constitution is unenforceable within the country.
>
> …
>
> [I]f judgments of supranational or transnational justices are to be executed within the State, they shall adapt to [its] Constitution. To maintain the contrary would be Venezuela resigning to its sovereignty.
>
> …
>
> [D]ecisions of …existing international judicial organs, institutional or ad hoc … cannot without impunity disregard national sovereignty when being enforced in the designated State. This means that, for such decisions to be enforced, they must go through the domestic legal system, which could proceed to comply only in the case that such decision does not violate constitutional norms and principles.

Further, in a 2008 case, [173] plaintiffs sought an interpretation of Article 22 of the Venezuelan Law on Promotion and Protection of Investments, which provided, among other things, for the resolution of foreign investment disputes by arbitration under the ICSID Convention. The Supreme Court stated, albeit in passing, that an arbitral award contrary to Venezuelan constitutional law cannot be enforced in Venezuela. 'While it is possible for the State to validly submit to an international jurisdiction, in the event that the decision of the corresponding organ violates the internal constitutional legal system, such decision is non-enforceable in the Republic.' Thus far, no Venezuelan court has actually refused to enforce an ICSID award, though this may be largely attributed to the fact that award creditors rarely seek to enforce awards against Venezuela in the courts of that country. [174]

In sum, subject to an exceedingly small number of exceptions, national court judgments and national commentary strongly favor the view that ICSID awards are not subject to jurisdictional, procedural or substantive review on the occasion of their enforcement.

# VI. OPTIONS

On the basis of all the sources canvassed—text, negotiation history and State practice—there emerge the three basic positions outlined earlier [175] on the extent of the freedom, if any, of Contracting States to impose conditions on the enforcement of ICSID awards. I delineate them here with a view to gauging their strength and weaknesses.

## A. Allowing Jurisdictional, Procedural or Substantive Review

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

According to a first position, a Contracting State is free under Article 54(1)'s 'enforce as if … ' formulation to impose on the enforcement of ICSID awards certain conditions, including conditions of a jurisdictional, procedural or substantive character, provided of course that those conditions are no more restrictive or onerous than the conditions that the Contracting State imposes on the enforcement of local judgments. Based on the Swedish court's analysis in the *Micula* case, this appears to be the view of that court, and likely the courts of most EU Member States, at least insofar as a particular condition is mandated as a matter of EU public policy.

The difficulties with this first position are both textual and contextual. Among the textual problems are the following. First, the ICSID Convention does not specify any grounds upon which enforcement of an ICSID award may be denied, though it would have been easy for it to do so. Given the obvious importance in international arbitration of defenses that could defeat enforcement of an award, one would normally expect them to be identified rather than established through terms as oblique and uninformative as 'enforce as if […]'. The consequence of reading Article 54(1) that way would be to subject the ICSID Convention's core enforcement obligation to disparate different jurisdictional, procedural and substantive limitations depending on the jurisdiction in which an ICSID award happens to be brought for enforcement. This also does not square well with the ICSID Convention's object and purpose.

Since context also matters, one should take a look at provisions of the ICSID Convention that are adjacent to Article 54(1). These include, first and foremost, Articles 54(3) and 55. Article 54(3) expressly provides that '[e]xecution of [an ICSID] award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought'. The drafters plainly chose to leave the rules governing execution of ICSID awards to the law of individual Contracting States, while doing no such thing in regard to their enforcement. Similarly, Article 55 of the ICSID Convention states that '[n]othing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution', a prerogative of which, as noted, [176] several States have taken advantage. Here too, the ICSID Convention drafters left no doubt that the question of sovereign immunity was left to the law of the State where execution is sought. [177] In sum, when the drafters of the ICSID Convention sought to limit importantly Contracting States' obligations under the Convention by virtue of national law, they did so expressly and in no uncertain terms.

Then, too, the Convention drafters emphatically posited the importance of ensuring the finality of ICSID awards. The Convention stipulates in Article 53 that '[t]he award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention'. The sole recourse provided for in the ICSID Convention is the annulment procedure provided for by the Convention and internal to it. The question then arises whether seeking to defeat enforcement of an award in a national court on the basis of that jurisdiction's own jurisdictional, procedural or substantive norms amounts to a 'remedy' within the meaning of Article 53. To be sure, opposing enforcement of an award does not represent as direct a challenge to an award as an application for annulment. By definition, it is a defense to a cause of action, rather than a cause of action itself. Also, while the effect of annulment is to pronounce an award null and void, the effect of a denial of enforcement is merely to deprive the award of legal effect in the particular jurisdiction where enforcement was sought. But that said, refusal to enforce an award is, for all practical purposes, a remedy against the award, for it substantially lessens the award's effectiveness—all the more so since the principal obligation that the ICSID Convention imposes on courts of Contracting States, as stated in Article 54, is precisely enforcement of ICSID awards. It is difficult to view a party's effort to defeat enforcement of an ICSID award as anything other than a form of recourse against it. [178]

More generally, much of the impetus behind the ICSID Convention was to minimize the role of courts at the post-award stage. True, the drafters expressly foreclosed national courts from entertaining actions to annul ICSID awards, without depriving them of any role in the enforcement of ICSID awards. But given that ICSID could not possibly assign itself responsibility for enforcing ICSID awards, it is unsurprising that it left that function to national courts. But this does not mean that the drafters were oblivious to the fact that national courts could frustrate the ICSID system not only through annulment of awards but also through denials of enforcement.

As discussed, the ICSID Convention's negotiating history is not fully illuminating. The question of the scope of review, if any, of ICSID awards on the occasion of their enforcement remained unsettled for most of the negotiation period, with a variety of approaches being repeatedly placed on the table. In the end, however, a decision was reached, and it does not favor this first position. Irrespective of what the scope of review in the enforcement of local judgments in any jurisdiction might be, ICSID awards were not to be subject to review on grounds of public policy or indeed any of the New York Convention's grounds. [179] If Contracting States foreswore the right to reject ICSID awards not only on such fundamental grounds as those embodied in the New York Convention, but also on grounds of public policy standing alone, it is difficult to see on what substantive grounds they

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

are nevertheless privileged to reject them. It defies logic to suppose that the Contracting States relinquished their all-important public policy defense to their enforcement obligations, but nevertheless reserved the right to deny enforcement of ICSID awards on other grounds.

Finally, there is scant evidence that courts in Contracting States are prepared to subject ICSID awards to public policy review in the course of enforcement proceedings, and US case law strongly supports this conclusion. Although courts in the vast majority of Contracting States have had no occasion to rule on the matter, commentators on national practice under the Convention overwhelmingly support it as well. The jurisdictions in which national courts have actually conducted such review appear to be exclusively EU Member States, although, at least thus far solely on EU public policy grounds. The courts of a few Latin American jurisdictions appear to reserve the right to deny enforcement of ICSID awards on constitutional grounds, but none has actually done so.

## B. Authenticating Awards

According to a second view, the only requirement that Contracting States are permitted to impose on the enforcement of ICSID awards is that set out in Article 54(2), which is to 'furnish to a competent court or other authority [of the enforcing State] a copy of the award certified by the Secretary-General', [180] thereby verifying the award's authenticity. Under this view, once an award is duly authenticated, enforcement becomes immediate or, as one commentator put it, 'automatic'. [181] This is the view that appears to prevail among both courts and commentators, while finding some support in the Convention's negotiating history. It is also the dominant understanding within the international arbitration community as a whole, largely because it is maximally consistent with the presumed 'self-contained' character of ICSID arbitration.

The chief, and non-negligible, difficulty with this otherwise highly plausible reading of the Convention is that it effectively deprives the language of Article 54(1), and its express assimilation of award enforcement to judgment enforcement, of any meaning. It is axiomatic that the ICSID Convention must be interpreted in such a way as to attribute some meaning to every one of its provisions. [182] By their inclusion of Article 54(1) in the Convention, as worded, the drafters must have contemplated that enforcement of ICSID awards would be subject to at least some condition applicable to the enforcement of local judgments, however modest it might be. Some effort must be made to assign meaning to the language of Article 54(1).

## C. Borrowing Procedures for Judgment Enforcement

This brings one to the third and ultimately most convincing understanding of Article 54(1), namely that it requires courts of Contracting States to subject enforcement of ICSID awards to no more onerous procedures than they follow in enforcing local judgments.

First, the Convention drafters imposed on the courts of Contracting States the all-important obligation to enforce ICSID awards, but prescribed no particular means by which they were to do so. With that in mind, it makes perfect sense to view the drafters as having coupled in a single provision both a statement of the obligation to enforce and a reference to 'how' enforcement is to be accomplished, if only by borrowing the judgment enforcement procedures of the enforcing State. The best textual interpretation of Article 54(1)—and one that would still give meaning to that provision's 'enforce as if […]' language—is one that requires a national court to impose no greater procedural burdens on the enforcement of ICSID awards than it imposes on the enforcement of local judgments. In sum, Article 54(1) essentially performs the function of filling the ICSID Convention's enforcement procedure gap.

In so doing, Article 54(1) does for enforcement of ICSID Convention awards exactly what article III of the New York Convention does for enforcement of New York Convention awards—namely, prescribe that, in the latter Convention's terms, awards be enforced 'in accordance with the rules of procedure of the territory where the award is relied upon'. Such is the most common-sense meaning that can be given to the 'enforce as if […]' language of Article 54(1). All that is required to reach this result is to understand the locution 'enforce as if […]' as if it said 'enforce in accordance with the procedures applicable to […]'. This is not much of a leap. It is much less of a leap than reading 'enforce as if […]' as if it said 'enforce, subject to jurisdictional, procedural or substantive defenses under national law'.

Moreover, this is a meaning that can be ascribed to Article 54(1) that avoids disregarding the many indications from the Convention text, in light of the Convention's object and purpose, negotiating history, case law and commentary that Contracting State courts were to refrain from conducting jurisdictional, procedural or substantive, including public policy, review of ICSID awards before enforcing them. At the same time, confining our understanding of Article 54(1) in this way avoids extremely serious jeopardy to the self-contained character of ICSID arbitration.

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

# VII. CONCLUSION

Somewhat unexpectedly, serious divergences have recently arisen over the exact import of the ICSID Convention provisions on the enforcement of ICSID awards, and Article 54(1) in particular. It is therefore no longer sufficient to proceed solely on the basis of prior assumptions. Arriving at a firmer understanding of these provisions requires a look at all relevant interpretive sources, including text and negotiation history, as suggested by the VCLT, but also State practice to the extent that we know it.

Both the text, viewed in light of the Convention's object and purpose, and the context of the ICSID Convention support the view that jurisdictional, procedural and substantive review of ICSID awards on the occasion of their enforcement is foreclosed. More particularly, the Convention's express reservation to States of authority over the execution of ICSID awards and the availability of a sovereign immunity defense to enforcement are revealing. Nor can Article 54(1) be interpreted in isolation from the Convention's negotiation history. Case and commentary point in the same direction.

At the same time, Article 54(1)'s proviso that ICSID awards be enforced as if local judgments cannot be ignored; it must be assigned some meaning beyond a requirement that awards be authenticated by the Secretary-General, a requirement already separately impose by Article 54(2). But the meaning attributed to Article 54(1) cannot be one that ignores virtually all relevant indications. Finally, sight must not be lost of the ICSID Convention's strong and general commitment to operating on a self-contained basis.

There are few solutions to the questions surrounding Article 54 that allow us to give all relevant considerations their due. The understanding that most commends itself is one that confines the scope of Article 54(1) to the manner in which ICSID awards are enforced, ensuring that the procedural requirements to which a national court subjects the enforcement of ICSID awards are no less favorable to enforcement than the manner in which it enforces its own judgments. Arriving at a consensus over the import of Article 54 is critical to accomplishing the mission of the ICSID Convention, but so too is privileging the understanding that most favors the accomplishment of that mission.

References

[1]

George A. Bermann, Professor of Law and Director of the Center for International Commercial and Investment Arbitration, Columbia Law School. The author gratefully acknowledges the assistance of Jack Busby, Andrew T. Connery, Craig D. Gaver and Florence Humblet.

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

2)

See, eg., Aron Broches, 'The Convention on the Settlement of Investment Disputes between States and Nationals of Other States' (1972-II) 136 Recueil des Cours 331, 401ff; Chittaranjan Amerasinghe, 'The International Centre for Settlement of Investment Disputes and Development through the Multinational Corporation' (1976) 9 Vand J Transnatl. L 793, 815; Richard Coll, 'United States Enforcement of Arbitral Awards Against Sovereign States: Implications of the ICSID Convention' (1976) 17 Harv Intl LJ 401, 404–405; Andrea Giardana, 'L'execution des Sentences du Centre International pour le reglement des differends relatifs aux investissements' (1982) 71 Revue Critique de Droit International Prive 273, 278; Aron Broches, 'Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution' (1987) 2 ICSID Review—FILJ 287, 308–309, 311; Albert Van den Berg, 'Recent Enforcement Problems Under the New York Convention and ICSID Conventions' (1989) 5 Arb Intl L 2, 4, 8; Susan Choi, 'Judicial Enforcement of Arbitration Awards under the ICSID and New York Conventions' (1995) 28 NYU. J Intl L Pol 175; Georges Delaume, 'Reflections on the Effectiveness of International Arbitral Awards' (1995) 12 J Intl Arb 5, 17.
ICSID authorities write:

> The drafters of the ICSID Convention could have made ICSID 'awards subject to the enforcement mechanism in the New York Convention in those countries bound by it'. However, [they] chose a more innovative path. They created a system insulated from domestic laws and court involvement: an entirely self-contained treaty … ICSID Convention arbitration is exclusive of any other remedy and any recourse against an award can be brought only before a tribunal or committee established under the [C]onvention, outside the purview of domestic courts.

Ruqiya BH Musa and Martina Polasek, 'The Origins and Specificities of the ICSID Enforcement Mechanism' in Julien Fouret (ed), *Enforcement of Investment Treaty Arbitration Awards: A Global Guide* (Global Law and Business 2015) 13 (*Global Guide*).

3)

In *Vivendi v Argentina* (II), the Tribunal remarked that 'one of the fundamental issues which the drafters of the ICSID Convention were keen to achieve was a total divorce from the recognition and enforcement system which prevailed under domestic laws or under the 1958 New York Convention governing commercial arbitration in the Member States': *Compañía de Aguas del Aconquija SA & Vivendi Universal SA v Argentine Republic*, Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award Rendered on August 20, 2007, ICSID Case No ARB/97/3 (Annulment Proceeding), 4 November 2008 para 35.

4)

Convention on the Settlement of Investment Disputes between States and Nationals of Other States (opened for signature 18 March 1965, entered into force 14 October 1966) (ICSID Convention).

5)

According to Christoph Schreuer:

> During the Convention's drafting there was a general expectation that compliance by the host State with ICSID awards would not be a practical problem and that voluntary compliance would be a natural consequence of the treaty obligation expressed in Art. 53.

Christoph Schreuer, *The ICSID Convention: A Commentary* (CUP 2001). In fact, one of the principal drafters of the Convention, World Bank General Counsel and ICSID Secretary-General Aron Broches, admitted in hindsight that he 'may have been overly sanguine as to compliance by governments with awards rendered against them': Aron Broches, 'Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution' (1987) 2 ICSID Rev 289, 302.

6)

Anna Joubin-Bret, 'The Effectiveness of the ICSID Mechanism regarding the Enforcement of Arbitral Awards' in *Global Guide* (n 2) 102; Isuru Devendra and others, 'Australia' in *Global Guide* (n 2) 139.

7)

Joubin-Bret (n 6) 102.

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

8)

Edward Baldwin, Mark Kantor and Michael Nolan, 'Limits to Enforcement of ICSID Awards' (2006) 23 J Intl Arb 1.

9)

ICSID Secretary-General Meg Kinnear has written:

> There is […] an important policy reason to care about the enforcement of investment awards: if the investment arbitration system is to contribute to promoting FDI, enhancing investor confidence, increasing access to capital, and encouraging the retention of existing investment, it must be effective. Put plainly, the goal is not only to produce an award, but also to deter breaches and to resolve and remedy disputes that do arise.

Meg Kinnear, 'Foreword' in *Global Guide* (n 2) 7.

10)

Vienna Convention on the Law of Treaties (opened for signature 23 May 1969, entered into force 27 January 1980), 1155 UNTS 331 (VCLT).

11)

Convention on the Recognition and Enforcement of Foreign Arbitral Awards (opened for signature 10 June 1958, entered into force 7 June 1959), 330 UNTS 3 (New York Convention). The grounds provided by the New York Convention for denial of enforcement, set out in art V of the Convention, include instances when: '[t]he parties to the [arbitration] agreement … were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made' (art V(1)(a)); '[t]he party against whom the award is invoked was not given proper notice of the appointment of the arbitration or of the arbitration proceedings or was otherwise unable to present his case' (art V(1)(b)); '[t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration …, ' (art V(1)(c)); '[t]he composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties …, ' (art V(1)(d)); '[t]he award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made' (art V(1)(e)); '[t]he subject matter of the difference is not capable of settlement by arbitration under the law of that country' (art V(2)(a)); or '[t]he recognition or enforcement of the award would be contrary to the public policy of that country' (art V(2)(b)).

12)

This is the view of virtually all commentators addressing the issue. See eg, Graham Coop, Alvaro Nistal and Robert G Volterra, 'Sovereign Immunities and Investor-State Awards: Specificities of Enforcing Awards Based on Investment Treaties' *Global Guide* (n 2) 71 ('The domestic courts of ICSID contracting states cannot question the jurisdiction of the arbitral tribunal that rendered an ICSID award').

13)

'A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General. Each Contracting State shall notify the Secretary-General of the designation of the competent court or other authority for this purpose and of any subsequent change in such designation.' (art 54(2)).

14)

See eg, Julien Fouret, 'Introduction' in *Global Guide* (n 2) 10 ('Article 54a sort of 'automatic' enforcement provision—is one of the distinctive features of the [C]onvention').

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

15)

States do in fact differ among themselves over the requirements for the enforcement of local judgments. In Argentina, an ICSID award must be submitted to the Federal Administrative Court of Appeals, which determines randomly the court of first instance that is empowered to direct the executive to order payment of the award: Ignacio J Minorini Lima, 'Argentina' in *Global Guide* (n 2) 121, 131. In Bolivia, an ICSID Convention award is submitted directly for execution to the Bolivian civil court that would have heard the dispute if it had been heard in a Bolivian court: Noiana Marigo and Lindsay Sykes, 'Bolivia' in *Global Guide* (n 2) 155, 161. In China, an award creditor applies to the intermediate court of the place where the party subject to execution is domiciled or where the relevant property is located: Chad Catterwell, Brenda Horrigan and James MacKinnon, 'China' in *Global Guide* (n 2) 181, 191. In Egypt, a certified copy of an ICSID award must be submitted to the Ministry of Justice to certify the award's authenticity: Mohammed S Abdel Wahab, 'Egypt' in *Global Guide* (n 2) 201, 212. In Jordan, a certified copy of the award is submitted to the Prime Minister, who then orders execution: Omar MH Aljazy, 'Jordan' in *Global Guide* (n 2) 289, 295. In the Netherlands, a party seeking enforcement presents a certified copy of the award to the president of the District Court of The Hague: Maria Castro Granja and Annet van Hooft, 'Netherlands' in *Global Guide* (n 2) 323, 331. In Tunisia, an application for enforcement of an ICSID award is made before any court of first instance in which assets are to be attached: Walid Ben Hamida, 'Tunisia' in *Global Guide* (n 2) 439, 447. In the United Kingdom, r 62.21 of the Civil Procedure Rules requires a certified copy of the award, coupled with a statement that the enforcement of the award has not been stayed pursuant to the terms of the ICSID Convention and that no stay application is pending: Christopher Harris and Paul Choon Kiat Wee, 'United Kingdom' in *Global Guide* (n 2) 481, 485.

16)

For example, Italy and South Korea: Valentine Chessa, Antonio Musella and Julian Fouret, 'Italy' in *Global Guide* (n 2) 263, 264, 268); Sy Nae Kim, Young Seok Lee and Marieke Minkkinen, 'Korea' in *Global Guide* (n 2) 299, 300.

17)

There is evidence to suggest that the drafters were keen on minimizing uncertainty as to how, under the Convention, ICSID awards might be enforced: Sylvia T Tonova and Baiju S Vasani, 'Enforcement of Investment Treaty Awards against Assets of States, State Entities and State-owned Companies' in *Global Guide* (n 2) 83, 86.

18)

*Nacka Tingsrätt, Micula et al v Romania*, Judgment, Case No A 2550-1, 23 January 2019.

19)

See *Ioan Micula, Viorel Micula, SC European Food SA, SC Starmill SRL and SC Multipack SRL v Romania*, Final Award, ICSID Case No ARB/05/20 (11 December 2013), paras 250–283, which provides a short summary of the arguments advanced by both parties.

20)

ibid paras 727–754, 872 (setting out Romania's arguments as to the reasonableness of its actions).

21)

ibid paras 334–336, 340–341. The Tribunal chose not to address the arguments as to enforcement, instead concluding, 'it is not desirable to embark upon predictions as to the possible conduct of various persons or authorities after the Award has been rendered, especially but not exclusively when it comes to enforcement matters. It is thus inappropriate for the Tribunal to base its decisions in this case on matters of EU law that may come to apply after the award has been rendered'.

22)

Commission decision (EU) 2014/3192 of 26 May 2014 in State Aid Case S.A.38517 (2014/C) (ex 2014/NN) implemented by Romania—Arbitral Award *Micula v Romania* of 11 December 2013, not published in the *Official Journal*. In addition, the European Commission subsequently formally opened State aid proceedings against Romania in relation to its implementation of the Micula Award: Commission decision (EU) 2014/3192 of 26 May 2014 in State Aid Case S.A.38517 implemented by Romania—Arbitral award *Micula v Romania* of 11 December 2013 [2014] OJ C393/27 (Summary Notice).

23)

VCLT (n 10) art 32.

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

24)

American Law Institute, *Restatement of the US Law of International Commercial and Investor–State Arbitration* (proposed final draft, 24 April 2019), s 1.1(m), (n).

See also Tonova and Vasani (n 17) 84–85. For a US decision clearly distinguishing enforcement from execution, see *Liberian Eastern Timber v Republic of Liberia*, 650 F Supp 73, 76–77 (SDNY 1986). There the Court found that Liberia had waived its immunity to *enforcement* of an award, but could still invoke its immunity to *execution* of the judgment of enforcement. A report by the New York City Bar Association specifically sought to clarify those terms as they relate to ICSID award proceedings in US courts:

> This Committee views recognition, enforcement and execution in the ICSID award context as points progressing along a single continuum as follows: (1) 'recognition' refers to confirmation or certification of an ICSID award as a final and binding disposition of claims, with res judicata effect; (2) 'enforcement' refers to converting the ICSID award into a judicial judgment that orders an award debtor to comply with the award, including paying any monetary sum due; and (3) 'execution' refers to coercive measures that an award creditor may take when an award debtor refuses to pay the converted award voluntarily.

Committee on International Commercial Disputes of the New York City Bar Association, 'Recommended Procedures for Recognition and Enforcement of International Arbitration Awards Rendered under the ICSID Convention' (2012) 27 ICSID Rev 207, 213.

25)

'Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such *execution* is sought.' (emphasis added.)

26)

'Nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution.'

27)

Musa and Polasek (n 2) 14 (emphasis added).

28)

For example, in partially reversing the decision of the court of first instance, the Paris Court of Appeal stated that '[lower court], acting on a request pursuant to Article 54 of the [ICSID] Convention […] could not […] without exceeding his competence, become involved in the second stage, that of execution, to which the question of immunity from execution of foreign States relates' (Schreuer (n 5) 1130 (citing Cour d'appel, Paris, 26 June 1981, [1981] 1 ICSID Rep 369, 371; (1981) 108 J Droit Intl 843, 845); *SOABI v Senegal*, ICSID Case No ARB/82/1.

29)

22 USC § 1650(a).

30)

US Constitution art IV, s 1. Some commentators have argued that traditional arguments against full faith and credit in the domestic context might have purchase in the context of ICSID enforcement actions. See Baldwin, Kantor, and Nolan (n 6). However, that does not appear to have occurred.

31)

*Mills v Duryee*, 11 U.S. (7 Cranch) 481 (1813).

32)

But see Baldwin, Kantor, and Nolan, 'Limits to Enforcement of ICSID Awards' (n 8) 12–13, identifying attacks on full faith and credit under US domestic law.

33)

*Fauntleroy v Lum*, 210 US 230 (1908).

34)

*Matsushita Elec Indus Co v Epstein*, 516 US 367, 386 (1996); *Underwriters Natl Assurance Co v NC Life & Accident & Health Ins Guar Assn*, 455 US 691, 692–693 (1982).

35)

See *Durfee v Duke*, 375 US 106, 111 (1963) ('[A] judgment is entitled to full faith and credit—even as to questions of jurisdiction—when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment.')

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

36)

See Restatement 2d of Judgments s 81: 'A judgment rendered in one state and relied upon as the basis of a claim or defense in a subsequent action in another state may be avoided in the subsequent action on the ground that the judgment was rendered without compliance with the requirements stated in § 1, i.e., that the court rendering the judgment have had territorial jurisdiction and jurisdiction of the subject matter of the action, and that adequate notice have been afforded. … *In practical effect, the rule of this Section rarely applies except when the judgment in question is a default judgment.* The rule cannot have application to contested judgments whose validity is attacked on the ground of lack of territorial jurisdiction or inadequacy of notice. This results from the fact that if the original judgment was contested, the questions of territorial jurisdiction and of adequacy of notice necessarily must have been resolved in the original action.' (ibid cmt a (emphasis added)).

37)

In Korea, for example, it is not necessary to reduce an award to a judgment of any kind in order to proceed directly to execution: Kim, Lee and Minkkinen (n 16) 305.

38)

In Argentina, an ICSID award must be submitted to the Federal Administrative Court of Appeals, which determines randomly the court of first instance that is empowered to direct the executive to order payment of the award: Minorini Lima (n 15) 121, 131.

39)

Allowing a court to impose the same conditions on the enforcement of ICSID awards as it does on the enforcement of local judgments, as art 54(1) provides, is not without its problems. For example, a commentator on Swiss law has left open the possibility that an ICSID award could be denied enforcement in Switzerland if it has no connection with Switzerland—because enforcement of final judgments of Swiss courts against foreign States requires a connection to Switzerland: Noradèle Radjai, 'Switzerland' in *Global Guide* (n 2) 429, 437. Such a national law limitation on the enforcement of ICSID awards would run at cross-purposes with the basic purpose of the Convention. The dissonance can be avoided by understanding the term 'enforcement' in this context as meaning 'execution', which seems highly likely from the context. As noted, the ICSID Convention (see n 15 and accompanying text), leaves the execution of ICSID awards to national law. See Michael E Schneider and Joachim Kroll, 'Enforcement of Foreign Arbitral Awards against Sovereigns—Switzerland' in R Doak Bishop (ed), *Enforcement of Arbitral Awards against Sovereigns* (JurisNet 2009) 344–345; F Knoepfler, 'L'immunité d'exécution contre les états: Les états dans le contentieux économique international' [2003] Rev Arb 1041–2.

40)

See nn 180–182 and the accompanying text.

41)

See n 180 and the accompanying text.

42)

See nn 104–108 and the accompanying text.

43)

See nn 168–174 and the accompanying text.

44)

See eg, Christian Tietje and Clemens Wackernagel, 'Enforcement of Intra-EU ICSID Awards: Multilevel Governance, Investment Tribunals and the Lost Opportunity of the Micula Arbitration' (2015) 16 JWIT 205–247.

45)

See nn 119–123 and the accompanying text.

46)

Article 32 of the VCLT provides that: '[r]ecourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of Article 31, or to determine the meaning when the interpretation according to Article 31…[l]eaves the meaning ambiguous or obscure'.

47)

See ICSID, *History of the ICSID Convention: Documents Concerning the Origin and the Formulation of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States* vols I–IV (1970) (*History*).

48)

See Robert Briner and Virginia Hamilton, 'The History and General Purpose of the Convention: The Creation of an International Standard to Ensure the Effectiveness of Arbitration and Foreign Arbitral Awards' in E Gaillard and D Di Pietro (eds), *Enforcement of Arbitration Agreements and International Arbitral Awards* (Cameron May 2009) 3–38. See also Schreuer (n 5) 1128; *History* (n 47) vol II, 46.

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

49)

*History* (n 47) vol II, 60, 644. The justification given for extending the enforcement obligation to all Convention States was to ensure equality between respondent States and claimant investors. It was argued that investors had an unfair advantage because if a State failed to comply with an award, investors could invoke diplomatic protection (ibid 58–60). Yet respondent States that successfully obtained an award against an investor had no similar mechanism at its disposal, and would therefore be left with no remedy if the investor had no assets in its territory (ibid 59–60). An obligation for all Convention States to enforce awards was therefore paramount in ensuring that successful States had an effective means of enforcing their awards.

50)

ICSID, First Preliminary Draft of a Convention on the Settlement of Investment Disputes between States and Nationals of Other States (1963) art IV, s 15; Broches (n 2) 300; *History,* (n 47) vol II, 161; see also *History* (n 47) vol II, 424, in which Mr Broches observed that: 'Section 15 was necessary to give a State the means of enforcing an award in its favor against an individual. The article had been included with a view to meeting the possible needs of developing countries in disputes with private investors. It was not intended to affect the domestic law of States with regard to forced execution of awards against a State'.

51)

*History* (n 47) vol II, 162. Mr Broches later wrote that he decided to insert this provision into the preliminary draft in response to the 'equality' concerns raised at the previous meeting (Broches (n 2) 301).

52)

*History* (n 47) vol II, 162; Broches (n 2) 301.

53)

*History* (n 47) vol II, 309.

54)

ibid 347.

55)

ibid 346.

56)

ibid 372.

57)

ibid 425.

58)

ibid 426-429.

59)

ibid 427 (United Kingdom and Norway).

60)

ibid 426 (Denmark).

61)

ibid 609.

62)

ibid 636–637.

63)

ibid 575.

64)

ibid 636–637.

65)

ibid 658, 671, 884–885, 889, 893, 901, 903. Paragraph 5 of the redraft read in part:

> Recognition and enforcement of an arbitral award [in a Contracting State other than the State party to the proceedings and the State whose national was a party to the proceedings] may … be refused if the competent authority of the State in which recognition and enforcement are sought finds that such recognition or enforcement would be contrary to the public policy of that State.

Under the redraft, enforcement of an award would have to be denied if it had been annulled within the ICSID system. Enforcement could also be refused if enforcement had been stayed pursuant to a provision of the Convention, but only for the duration of the stay.

66)

ibid 889–890.

67)

ibid 888–890.

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

68)

ibid 901.

69)

ibid 903.

70)

ibid 904.

71)

ibid 928.

72)

ibid.

73)

ibid.

74)

ibid 963.

75)

ibid 989; Broches, (n 2) 315.

76)

*History* (n 47) vol II, 989.

77)

ibid.

78)

ibid 990–1, 1018. See Schreuer (n 5) 1115.

79)

*History* (n 47) vol II, 990–991.

80)

ibid 1019.

81)

Musa and Polasek (n 2) 30.

82)

Devendra and others (n 6) 153–154.

83)

See n 26.

84)

See eg, *AIG Capital Partners, Inc v Republic of Kazakhstan* [2005] EWHC 2239 (Comm), [2006] WLR 1420 (High Court, Queen's Bench, 20 October 2005).

85)

See eg, *Société Ouest Africaine des Bétons Industriels (SOABI) v Senegal*, 118 J du droit intl 1005 (Cour de Cass, 11 June 1991); *SARL Benvenuti & Bonfant v Republic of the Congo*, 108 J du droit intl 843, 845 (Ct App 26 June 1981); *Liberian Eastern Timber v Republic of Liberia*, 650 F Supp 73 (SDNY 1986).

86)

art 55.

87)

art 54(3).

88)

In other Member States, the situation remains to be clarified. For example, it is reported that in Spain:

> an ICSID award does not need an *exequatur* to be obtained prior to the execution in Spain of the pecuniary obligations imposed by that award. The role of the Superior chamber of the National Court in that phase of the enforcement of an ICSID award is unclear. It should therefore be clarified in order to avoid misunderstandings about the Superior Chamber's lack of powers over the award during that phase.

Pedro Claros Alegría and José 'Angel Rueda García, 'Spain' in *Global Guide* (n 2) 412–413.

89)

Richard Kreindler and Andreas Kulick, 'Germany' in *Global Guide* (n 2) 242. According to these authorities, only purely formal requirements are in place (ibid 243).

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

90)

Under ZPO Section 328(1), recognition of a foreign judgment may be refused if:

1. The courts of the state to which the foreign court belongs do not have jurisdiction according to German law;

2. The defendant, who has not entered an appearance in the proceedings and who takes recourse to this fact, has not duly been served the document by which the proceedings were initiated, or not in such time to allow him to defend himself;

3. The judgment is incompatible with a judgment delivered in Germany, or with an earlier judgment handed down abroad that is to be recognized, or if the proceedings on which such judgment is based are incompatible with proceedings that have become pending earlier in Germany;

4. The recognition of the judgment would lead to a result that is obviously incompatible with essential principles of German law, and in particular if the recognition is not compatible with fundamental rights; or

5. Reciprocity has not been granted.

91)

See Kreindler and Kulick, 'Germany' (n 89) 244 (citing *Ionnias Kardasspolous v Republic of Georgia*, Higher Regional Court of Frankfurt, Decision of 20 November 2012, 18 W 59/12).

92)

*Benvenuti & Bonfant Co v People's Republic of the Congo*, ICSID Case No ARB/77/2, Award (8 August 1980), [1993] 1 ICSID Rep 330, translated in 21 Intl Legal Materials 740; Tribunal de grande instance Paris (13 January 1981), (1981) 108 Journal du droit international 365; Alan S Alexandroff and Ian A Laird, 'Chapter 29: Compliance and Enforcement' in Peter Muchlinski and others (eds), *The Oxford Handbook of International Investment Law* (2008) 1178.

93)

*Société Ouest Africaine des Bétons Industriels (SOABI) v Sénégal*, ICSID Case No ARB/82/1, Award (25 February 1988), [1994] 2 ICSID Rep 114, (1991) 6 ICSID Rev—FILJ. 125 (Fr); Cour d'appel [CA] [regional court of appeal] Paris (5 December 1989), translated in (1990) 5 ICSID Rev —FILJ 135.

94)

Castro Granja and van Hooft (n 15) 323, 331.

95)

'[A]n ICSID award does not need to undergo an exequatur process.' (Mattias Rosengren and Jeremy Zell, 'Sweden' in *Global Guide* (n 2) 424). According to the authors, it is most likely not even necessary to submit the award to the Ministry of Foreign Affairs, even though Sweden designated the Ministry as the competent authority for enforcement under the Convention. Thus, an award creditor may proceed directly to Sweden's execution authority.

96)

Harris and Choon Kiat Wee (n 15) 485: '[T]here is no scope for challenging a Washington Convention award before the English courts, although execution of such awards is subject to English principles of sovereign immunity.'

97)

Castro Granja and van Hooft (n 15) 323, 331.

98)

See n 22 and the accompanying text.

99)

Tribunal de première instance francophone de Bruxelles, 15/7241/A and 15/7242/A, 25 January 2016.

100)

Arrêt de la Cour supérieure de justice du Grand-Duché de Luxembourg, 21 March 2018.

101)

See Bucharest Court of Appeal, Order of 3 February 2017, case 15755/3/2014 <http://portal.just.ro/2/SitePages/Dosar.aspx?id_dosar=200000000322044&id_inst=2>.

102)

Nacka Tingsrätt, *Micula et. al v Romania*, Judgment, Case No A2550-1, 23 January 2019, 12. Many national judgments in the Micula award's enforcement can be found at <https://jusmundi.com/fr/document/decision/fr-ioan-micula-viorel-micula-and-others-v-romania-i-jugeme...>.

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

103)

Cour d'appel de Bruxelles, 2016/AR/393 and 2016/AR/394, 12 March 2019. The Brussels Court of Appeal referred to the ECJ the following three preliminary questions (Case C–333/19):

> Is Decision (EU) 2015/1470 of the European Commission of 30 March 2015 on State aid SA.38517 (2014/C) (ex 2014/NN) 1 to be understood as referring to payments due from Romania even in a case where payments are recovered against Romania as a result of proceedings to enforce the ICSID arbitral award of 11 December 2013 brought before the courts of a Member State other than Romania?
>
> Does EU law itself automatically require a court of a Member State (other than Romania), before which an action is brought to oppose proceedings for the enforcement of an ICSID arbitral award which has the force of res judicata according to the national procedural rules of that Member State, to reject that award, for the sole reason that a non-definitive decision of the European Commission adopted after the date of the award considers enforcement of that award to be contrary to the EU State aid regime?
>
> Does EU law, in particular the principle of cooperation in good faith and the principle of res judicata, allow the national court of a Member State (other than Romania) not to comply with its international obligations under the ICSID Convention in a situation where the European Commission has adopted a decision after the date of that award, under which enforcement of the award is regarded as contrary to the EU State aid regime, even when the European Commission participated in the arbitration proceedings (including the action for annulment of the award) and put forward its case in relation to the EU State aid regime?

Shortly thereafter, the General Court of the European Union, which is the EU's court of first instance, ruled, in the Miculas' challenge to the Commission injunction against paying the award, that payment of the award could not be considered an illegal form of State aid, as the Commission had contended, since, at the time that Romania granted the aid, it had not yet acceded to the EU and become subject to EU law. The judgment of the General Court is on appeal before the ECJ.

104)

According to the Commission: 'Article 54 of the Convention obliges Member States that are parties to proceedings to enforce awards in favor of investors of another Member State. Sweden thus does not have an obligation to enforce the award as it is the State of the investor and was not a party to the proceeding.'

105)

Nacka Tingsrätt, *Micula et al v Romania*, Judgment, Case No A 2550-1, 23 Jan 2019, 12.

106)

See Treaty on European Union art 4(3) ('Pursuant to the principle of sincere cooperation, the Union and the Member States shall, in full mutual respect, assist each other in carrying out tasks which flow from the Treaties').

107)

See eg, ECJ Case C–126/97, *Eco Swiss* [1999] ECR I–269, para 39 (the competition law provisions of the EU Treaties 'may be regarded as a matter of public policy').

108)

Tom Jones, 'Micula suffer setback in Sweden', Global Arbitration Review (4 Feb 2019) <https://globalarbitrationreview.com/article/1179932/miculas-suffer-setback-in-sweden> accessed on 20 April 2020.

109)

Judgment of the General Court (Second Chamber, Extended Composition), Cases T–624/15, T–694/15 and T–704/15, Judgment, 18 June 2019, paras 78–79.

110)

Case C–638/19P *Commission v European Food and Others* (filed 27 August 2019).

111)

*Micula and Others v Romania* [2017] EWHC 31 (Comm), Judgment, 20 January 2017.

112)

*Micula and Others v Romania* [2020] UKSC 5, Judgment, 19 February 2020 para 118.

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

113)

See Agreement on the withdrawal of the United Kingdom of Great Britain and Northern Ireland from the European Union and the European Atomic Energy Community (2019/C 384 I/01), 12 November 2019.

114)

*Micula and Others v Romania*, Judgment (n 112) para 101.

115)

ibid paras 104, 107.

116)

Cf VCLT (n 10) art 27.

117)

*Micula and Others v Romania*, Judgment (n 112) 101.

118)

ibid para 116.

119)

The Tribunal in *Achmea* applied the UNCITRAL arbitration rules per art 8(5) of the BIT.

120)

*Slowakische Republik v Achmea BV*, C–284/16, EU:C:2018:158, Judgment, 6 March 2018 para 59. The European Commission has indeed participated as *amicus curiae* in virtually every intra-EU investment arbitration in which it was permitted to do so. See eg, the *amicus* briefs submitted by the European Commission on 2 June 2009 in *Electrabel SA v Republic of Hungary*, ICSID Case No ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability (30 November 2012) paras 4.118–4.122; on 7 July 2010 in *Achmea BV (formely Eureko BV) v Slovak Republic* [I], PCA Case No 2008-13, Award on Jurisdiction, Arbitrability and Suspension (26 October 2010) paras 58–59; on 13 October 2011 in *European American Investment Bank AG (Austria) v Slovak Republic*, PCA Case No 2010-17, Award on Jurisdiction (22 October 2012) para 58; and on 19 January 2015 in *Charanne BV & Construction Investments SARL v Kingdom of Spain*, SCC Case No 062/2012, Final Award (21 January 2016) para 216. The European Commission submitted a brief on 9 January in the *Micula* award annulment proceedings. On 13 January 2006, the Directorate General of EC Internal Market and Services provided an opinion to the Respondents in *Eastern Sugar BV v Czech Republic (Netherlands v Czech Republic)*, SCC Case No 088/2004, Partial Award (27 March 2007), Award para 104, quoted at Award, para 110.

121)

*Slowakische Republik v Achmea* BV (n 120) para. 59.

122)

ibid para 58.

123)

BGH, 31.10.2018.

124)

All the following tribunals rejected *Achmea*-based objections on different grounds: *Vattenfall v Germany*, ICSID Case No ARB/12/12, Decision on the *Achmea* Issue (31 August 2018) para 229 (no primacy of EU law); *Masdar Solar & Wind Cooperatief UA v Kingdom of Spain*, ICSID Case No ARB/14/1, Award (16 May 2018) para 682 ('the *Achmea* Judgment is simply silent on the subject of the ECT'); *Gavrilovic v Republic of Croatia*, ICSID Case No ARB/12/39, Decision on the Respondent's Request of 4 April 2018 (30 April 2018) para 39 (refusal to reopen the arbitration following *Achmea* for being late and refraining from an *ex officio* review of the issue); *UP and C.D. Holding Internationale v Hungary*, ICSID Case No ARB/13/35, Award (9 October 2018) paras 257–260. (Hungary could not escape its international law obligations by invoking EU law under the ICSID Convention).

125)

See n 136.

126)

Brief of *Amicus Curiae*, The European Commission in Support of the Government of Romania, 11 December 2018.

127)

See n 29 and the accompanying text.

128)

Compare 22 USC § 1650a (2018) with 9 USC § 202 (2018); see also Caline Mouawad and Charlene Sun, 'United States' in *Global Guide* (n 2) 503.

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

129)

See Statement of Andreas F Lowenfeld, Deputy Legal Adviser, Department of the State on the US Act Implementing the ICSID Convention, 5 ILM 820, 826 (1966) ('[T]he bill provides that the Federal Arbitration Act shall not apply to enforcement of arbitral awards made under the [C]onvention. The Federal Arbitration Act …permits courts to vacate an award on grounds of corruption, fraud, partiality, misconduct, or other prejudicial conduct of an arbitrator, or where arbitrators exceed their powers. Under Article 52 of the [C]onvention, however, such challenges to an award may be made only through the annulment proceedings provided for in the [C]onvention. Section 3(a) of the bill, therefore, makes clear that the inconsistent provisions of the Federal Arbitration Act will not apply.').

130)

Mouawad and Sun, 'United States' (n 128) 504. However, enforcement of an ICSID Convention award may in principle be challenged on the ground of sovereign immunity under the Foreign Sovereign Immunities Act (FSIA), an assignee's lack of standing to sue, and lapse of the statute of limitations (*Blue Ridge Investments LLC v Argentina*, 902 F Supp 2d 367 (SD.NY 2012)). The availability of these grounds under US law is consistent with art 54 of the ICSID Convention inasmuch as the FSIA's arbitration and waiver exceptions overcome the presumption of State immunity and the other two requirements apply equally to the enforcement of sister-State judgments and thus accord with art 54.

131)

See, eg *Siag v Arab Republic of Egypt*, No M-82, 2009 US Dist. LEXIS 54066, at *6–7 (SDNY 19 June 2009)7); *Enron Corp v Argentina*, No M-82 (SDNY 20 November 2007); *Sempra Energy International v Argentine Republic*, M-82 (SDNY 14 November 2007); *Liberian Eastern Timber Corp v Liberia*, 650 F Supp 73, 75 (SDNY 1986). The courts have held, however, that notice must be given to States within 30 days of entry of judgment against them, thus allowing them to seek vacatur of the judgment of enforcement.

132)

NY Civil Practice Law and Rules ss 5402 (judgments from sister-State courts), 5303 (judgments from foreign courts).

133)

*Grenada v Grynberg*, No 11 Misc 45 (SDNY 29 April 2011); *Siag v Arab Republic of Egypt*, No M-82 (SDNY 19 June 2009); *Enron Corp & Ponderosa Assets LP v Argentine Republic*, No M-82 (SDNY 20 November 2007); *Sempra Energy Int'l v Argentine Republic*, No M-82 (SDNY 14 November 2007) ('The propriety of an *ex parte* recognition proceeding does not appear to have been raised in these matters; indeed, it appears that the award debtor did not object to the entry of any of these judgments.'); *Mobil Cerro Negro, Ltd. v Bolivarian Republic of Venezuela*, 87 F Supp 3d 573 (SDNY 2015), revd *Mobil Cerro Negro, Ltd. v Bolivarian Republic of Venezuela*, 863 F3d 96 (2d Cir 2017).

134)

*Mobil Cerro Negro, Ltd. v Bolivarian Republic of Venezuela*. 863 F3d 96, 99–100 (2d Cir. 2017).

135)

Pub L No 94-583, 90 Stat 2891, codified as amended at 28 USC §§ 1330, 1332, 1391, 1441, 1602–1611 (2018). The FSIA is 'the sole basis for obtaining jurisdiction over a foreign state' in the courts of the United States (*Argentine Republic v Amerada Hess Shipping Corp*, 488 US 428, 443 (1989)).

136)

*Micula v Government of Romania*, 404 F Supp 3d 265 (DDC 2019).

137)

Romania, supported by the European Commission, argued that the Miculas had failed to overcome sovereign immunity under the FSIA and that the court accordingly lacked subject-matter jurisdiction (ibid). The court found that the FSIA's arbitration exception to immunity (28 USC § 1605(a)(6)) applied. It found that ICSID awards fall within the scope of the exception. See also *Blue Ridge Invs, LLC v Republic of Argentina*, 735 F3d 72, 85 (2d Cir 2013) ('[E]very court to consider whether awards issued pursuant to the ICSID Convention fall within the arbitral award exception to the FSIA has concluded that they do'). It further rejected the notion that the arbitration exception could not apply because, in Romania's submission, the BIT under which the *Micula* arbitration was conducted was invalid under *Achmea* (*Micula*, 2019 US Dist. LEXIS 154866 at *17). The court based its ruling on two key considerations. First, unlike the situation in *Achmea*, Romania granted the State aid in question prior to its accession to the EU so that, as the General Court of the EU had held, the grant was not invalid under EU law. Secondly, the dispute in *Micula* did not relate to the interpretation or application of EU law, except as a factual rather than legal matter, so that the concern animating the *Achmea* judgment did not arise.

138)

See nn 109–110 and the accompanying text.

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

139)

*Micula* (n 136) 275–276 (quoting *Mobil Cerro Negro*, 863 F3d at 102, 121). The court in *Mobil Cerro Negro* there stated that the ICSID-award debtor can make 'non-merits challenges' to an award, such as 'the authenticity of the award presented for enforcement, the finality of the award, or the possibility that an offset might apply to the award that would make execution in the full amount improper'. It added that this limited role 'reflects an expectation [under the Convention] that the courts of a member nation will treat the award as final'.

140)

Romania had appealed the decision to the Court of Appeals for the DC Circuit, but subsequently indicated that it might pay out the award. See Jack Ballantyne, 'Romania to pay out on Micula award?', Global Arbitration Review 16 December 2019 <https://globalarbitrationreview.com/article/1212205/romania-to-pay-out-on-micula-award>.

141)

*Micula* (n 136) 282–283.

142)

ibid.

143)

The act of State and foreign sovereign compulsion doctrines are to be distinguished in this regard from Romania's challenge to the subject-matter jurisdiction of the court itself. A US court cannot proceed with a case in the absence of subject-matter jurisdiction. Indeed, US courts are bound to determine their subject-matter jurisdiction even if no party calls it into question.

144)

*Micula v Government of Romania*, No 19-7127, slip op at 1 (DC Cir 19 May 2020).

145)

ibid.

146)

ibid 2.

147)

ibid.

148)

ibid 1.

149)

Significantly, the judgment came just two weeks after the great majority of Member States signed a multilateral treaty agreeing to terminate their intra-EU BITs (Agreement for the Termination of Bilateral Investment Treaties between the Member States of the European Union [2020] A/T/BIT/Annex A). The treaty is meant to 'implement' the *Achmea* judgment. At the time of writing, the Commission has brought infringement proceedings against the United Kingdom and Finland for their failure to sign the termination treaty. See Lisa Bohmer, 'European Commission Initiates Infringement Proceedings Against the United Kingdom and Finland over Failure to Terminate Intra-EU BITs' Investment Arbitration Reporter, 14 May 2020 <https://www.iareporter.com/articles/european-commission-initiates-infringement-proceedings-against-t...>.

150)

See n 139.

151)

See nn 131–133.

152)

ibid.

153)

*LETCO v Liberia*, 650 F Supp 73, 75 (SD NY, 5 September 1986), [1994] ICSID Rep 2 384. Although the award was enforced, execution was denied on the ground that the property sought to be attached was non-commercial in nature. Similarly, in *Enron v Argentina* and *Sempra Energy International v Argentina*, n 135, the court ordered entry of judgment 'in the same manner and with the same force and effect as if the Award were a final judgment of this Court'. Significantly, when the court in *Siag & Vecchi v Egypt* was initially presented with the claimant-creditors' *ex parte* action, the court demurred and ordered the claimants to comply with the procedural requirements of the New York Civil Practice Law and Rules (*Siag v Arab Republic of Egypt*, No M-82, 2009 US Dist. LEXIS 54066, at *6–7 (SDNY 19 June. 2009).

154)

See nn 134–135.

155)

See eg, *Infrastructure Services Luxembourg Sarl & Energia Termosolar BV v. Kingdom of Spain*, ICSID Case No ARB/13/31.

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

156)

Spain predicates its argument that the ICSID tribunal in that case lacked jurisdiction on the *Achmea* judgment of the ECJ, according to which intra-EU BITs are invalid and tribunals empaneled pursuant to such BITS are accordingly lacking in jurisdiction.

157)

It is true that a sister-State judgment may, consistent with the full faith and credit clause, be denied enforcement on the basis of lack of jurisdiction, whether personal or subject-matter jurisdiction. Indeed, that is the only basis on which a sister-state judgment may be denied enforcement. But even then, a party may not defeat enforcement on that ground if it appeared in the first proceeding to contest jurisdiction or otherwise had an opportunity to present its jurisdictional defense. In the *Infrastructure Services* case, Spain did in fact assert its jurisdictional defense in the arbitral proceeding, and energetically so, and therefore cannot now defeat enforcement on jurisdictional grounds.

158)

863 F. 3d at 102.

159)

See n 41 and the accompanying text.

160)

Chad Chatterwell, Brenda Horrigan and James MacKinnon, 'China' in *Global Guide* (n 2) 181, 193.

161)

Kim, Lee and Minkkinen (n 16) 305.

162)

Wahab (n 15) 201, 211.

163)

A commentator on Nigerian law reports that a stay of enforcement of an ICSID Convention award may only be issued through ICSID machinery and rests 'entirely outside the control of any domestic court' (Dorothy Ufot, 'Nigeria' in *Global Guide* (n 2) 339, 345).

164)

Yu-Jin Tay, 'Singapore' in *Global Guide* (n 2) 387, 398. Section 4(1) of the Singapore Arbitration (International Investment Disputes) Act provides that '[a]ny person seeking recognition or enforcement of an award rendered pursuant to the [ICSID] Convention shall be entitled to have the award registered in the High Court subject to proof of any matters that may be prescribed and to the other provisions of this Act' (brackets in original).

165)

Ziya Akinci, 'Turkey' in *Global Guide* (n 2) 455, 459.

166)

Devendra and others (n 6) 140. Australia cannot, at the time of enforcement, review the merits of a New York Convention. See *Uganda Telecom Ltd v Hi-Tech Telecom Pty, Ltd* [2011] FCA 131, para 126 (Fed Ct Austl.).

167)

*Infrastructure Services* (n 155); see also Sebastian Perry, 'Spain solar awards enforced in Australia', *Global Arbitration Review* (24 February 2020) <https://globalarbitrationreview.com/article/1214857/spain-solar-awards-enforced-in-australia>.

168)

*Pedido de Quiebra (Peru) v Compañía de Concesiones de Infraestructura SA* (CCI), in which Peru sought enforcement in an Argentine court of an award granting it costs in the investor's unsuccessful ICSID arbitration. In dictum, the Court stated that, were that award contrary to Argentine public policy, for example for violation of due process, it would have no choice but to deny the award's enforcement.

169)

Minorini Lima (n 15) 131–132. The author writes that Argentina 'does not acknowledge that an ICSID award rendered against it must be complied with voluntarily without requiring any domestic court intervention'.

170)

Judgment 0031/2006 (Constl Ct, 10 May 2006). In a judgment of 22 November 2012, the Constitutional Court annulled an award on non-arbitrability grounds. Although this was not an ICSID case, the Court referred generally to 'the major transcendence in the Bolivian legal system' of non-arbitrability regimes which must be respected as a matter of 'public interest and public order'.

171)

See Marigo and Sykes (n 15) 161–162. As in Venezuela, investors do not turn to Bolivian courts for the enforcement of foreign arbitral awards (ibid 162) ('[A]t the time of writing, the authors are not aware of any application to a Bolivian court for the recognition and enforcement of a foreign arbitral award rendered in an investment treaty arbitration').

172)

Supreme Court of Venezuela (Constitutional Chamber), Judgment No 1942 dated 15 July 2003.

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

173)

Judgment No 1541 (Supreme Ct, Constl Chamber (17 October 2008).

174)

See José Gregorio Torrealba, 'Venezuela' in *Global Guide* (n 2) 513, 524, 527. Rather, parties prevailing against Venezuela often resort directly to US courts to confirm awards. See, eg, Pet to Confirm Arbitration Award, *Rusoro Mining Ltd. v Bolivarian Republic of Venezuela*, No 16-02020 (DDC 10 October 2016), ECF No 1; *OI European Grp. BV v Bolivarian Republic of Venezuela*, No 16-01533 (DDC 2016).

175)

See Section V.

176)

See nn 84–85 and the accompanying text.

177)

According to French case law, State assets used for commercial purposes do not enjoy immunity from execution, but State assets used for public purposes do. See, eg, *République démocratique du Congo v Syndicat des propriétaires de l'immeuble Résidence Antony Châtenay*, Case 03-18.176 (Cour de Cass, 25 January 2005). In the UK, the State has a general immunity from execution except with respect to commercial property, ie property used for a public purpose. State Immunity Act of 1978 ss 1.3(2)–1.3(4). In the United States, under the Foreign Sovereign Immunity Act, State assets are subject to execution on a series of grounds, including where the underlying transaction is based on a commercial activity or an arbitration agreement or award (FSIA ss 1605(a)(1)–(6)).

178)

This view is supported by Christoph Schreuer, according to whom:

> [A] party to ICSID proceedings may not initiate action before a domestic court to seek the annulment or another form of review of an ICSID review. A court of a State that is party to the ICSID Convention would be under an obligation to dismiss such an action…. Therefore, a party that successfully resists enforcement of an award before a court, or another authority of a State in which enforcement is sought, is in violation of its obligation under Art. 53.

Schreuer (n 5) 1107.

179)

See n 68, 77, 81.

180)

See Coop, Nistal and Volterra, 'Sovereign Immunities' (n 12) 70.

181)

Fouret, 'Introduction' (n 14) 10 ('Article 54—a sort of "automatic" enforcement provision—is one of the distinctive features of the [C]onvention'). Such also is the view of art 54 taken by ICSID Secretary-General Kinnear:

> ICSID awards cannot be reviewed by national courts. As a result, such awards are recognised upon mere presentation of the award and are not subject to further review by local courts at the recognition stage. The pecuniary obligations ordered by an ICSID tribunal are directly executable in any of the [then] 150 ICSID member states.

Kinnear (n 9) 7.

182)

Under the principle of effectiveness (*ut res magis valeat quam pereat*), treaties should be interpreted in such a manner to give meaning and effect to its terms as opposed to one that does not. See Richard K Gardiner, *Treaty Interpretation* (OUP 2008) 168–9. 'ICSID tribunals made quite frequent use of *effet utile* arguments. They almost always used such arguments in order to reject interpretations that would make specific provisions or the treaty useless.' (Ole Kristian Fauchald, 'The Legal Reasoning of ICSID Tribunals—An Empirical Analysis' (2008) 19 Eur J Intl L 318).

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.

Kluwer Arbitration is made available for personal use only. All content is protected by copyright and other intellectual property laws. No part of this service or the information contained herein may be reproduced or transmitted in any form or by any means, or used for advertising or promotional purposes, general distribution, creating new collective works, or for resale, without prior written permission of the publisher.

If you would like to know more about this service, visit www.kluwerarbitration.com or contact our Sales staff at lrs-sales@wolterskluwer.com or call +31 (0)172 64 1562.



Kluwer**Arbitration**

© 2022 Kluwer Law International, a Wolters Kluwer Company. All rights reserved.