# EXHIBIT 7

EUROPEAN ENERGY CHARTER

CONFERENCE SECRETARIAT

_____

37/92

BA-15

_____

RESTRICTED

_____

Brussels, 12 August 1992

## NOTE FROM THE SECRETARIAT

Subject: Basic Agreement

Enclosed is an updated version of BA-15. It contains the Chairman's proposal for the definitions related to Investment Promotion and Protection and a Chairman's compromise proposal for Article 14 on Environment. The Chairman also plans to forward a compromise proposal of Article 16 before September 7-11 WG-II meeting.

Furthermore BA-15 contains updated footnotes on all articles.
In particular the new material on Articles 4A, 20, 25, 26, 27, 29, 30 should be noted.

**EUROPEAN ENERGY CHARTER**

**37/92 ANNEX**

**CONFERENCE SECRETARIAT**

**BA−15**

**RESTRICTED**

Brussels,12 August 1992

**DRAFT**

## BASIC AGREEMENT FOR THE EUROPEAN ENERGY CHARTER

**PREAMBLE**

The Parties to this Agreement,

Having regard to the Charter of Paris for a New Europe signed on 21 November 1990,

Having regard to the European Energy Charter signed in the Hague on 17 December 1991,

Aware that all Signatories to the European Energy Charter undertook to agree a Basic Agreement to place the commitments contained in that Charter on a secure and binding international legal basis;

Desiring to establish the structural framework required to implement the principles enunciated in the European Energy Charter;

Having regard to the objective of progressive liberalisation of international trade and to the principle of avoidance of discrimination in international trade,

- 2 -

Having regard to the rights and obligations of certain Contracting Parties who are also parties to the General Agreement on Tariffs and Trade and its related Agreements, as renegotiated from time to time;

Having regard to national competition rules concerning mergers, monopolies, anti-competitive practices and abuse of dominant position where these are already established;

Having regard to the competition rules applicable to member states of the European Community under the Treaty establishing the European Economic Community, the Treaty establishing the European Coal and Steel Community and the Treaty establishing the European Atomic Energy Community;

Having regard to the competition rules applicable to contracting parties to the European Economic Area;

Having regard to the work in the Organisation for Economic Co-operation and Development and the United Nations Conference on Trade and Development to increase co-operation between sovereign states on competition matters;

Having regard to the Treaty on the Non-Proliferation of Nuclear Weapons, the Nuclear Suppliers Guidelines and the obligations of international nuclear safeguards;

Having regard to the increasing urgency of measures to protect the environment, and to the need for internationally agreed objectives and criteria for this purpose;

HAVE AGREED AS FOLLOWS:

- 3 -

PART I

DEFINITIONS AND PRINCIPLES

ARTICLE 1

DEFINITIONS

For the purposes of this Agreement unless the context otherwise requires :

(1) "Charter" means the European Energy Charter;

(2) "Contracting Party" means a party to this Agreement;

(3) [1]"Energy Materials and Products", based on the Harmonised System (HS) of the Customs Cooperation Council and the Combined Nomenclature (CN) of the European Communities, means the following

items of HS or CN:

| | |
|---|---|
| — Nuclear energy[2] | 2612 |
| | [2845 10][3] |
| | 2844 10 – 2844 50 |
| | (uranium, thorium, plutonium and their combinations) |
| — Coal, natural gas, petroleum and petroleum products, electric energy[4] | Chapter 27 (except 2712) |

|  | HS or CN |
|---|---|
| – Acyclic and cyclic<br>hydrocarbons | [2901][3]<br>[[2902][3]][5] |
| – Renewable energy | [2207 20][3][6]<br>[2905 11][3]<br>[4401][3]<br>[4402][3] |

(4) "Investment" means every kind of <u>energy investment owned or controlled, directly or indirectly, by Investors of one Contracting Party</u>. In particular, though not exclusively, it includes any of the following:

    (a) tangible or intangible property and any other related property rights such as mortgages, liens or pledges as well as leases;

    (b) <u>a company or business enterprise or</u> shares in, <u>or</u> stock, bonds <u>or</u> debentures <u>or dept</u> of, <u>or</u> any other form of participation including minority forms in, a company or business enterprise;

    (c) claims to money and claims to performance under contract having a financial value <u>and associated with an Investment</u>;

    (d) Intellectual Property ;

    (e) rights, conferred by law or under contract, to undertake any commercial activity, including <u>consessions or other rights for</u> the search for, or the cultivation, extraction or exploitation of natural resources;

- 5 -

A change in the form in which assets are invested does not affect their character as investments and the term "Investment" includes all investments, whether existing at or made after <u>the later of</u> the dates of entry into force of this Agreement <u>for the Contracting Party of the Investor making the Investment and Contracting Party in which the Investment is made</u> (hereinafter referred to as the "effective date") provided that with respect to investments made before the effective date and continuing after the effective date, this Agreement shall only apply to matters affecting such investments after the effective date.

(5) "Investor" means with regard to a Contracting Party:

    (a) natural persons having the citizenship or nationality of that Contracting Party in accordance with its laws;

    (b) <u>companies or firms constituted under civil or commercial law, including cooperative societies and other legal persons governed by public or private law in force in the territory of that Contracting Party or otheriwise having the nationality of a Contracting Party in accordance with its laws and having its registered office, central administration or principal place of business within the territory of a Contracting Party;</u>

(6) "Make Investments" means establishing a new Investment, acquiring all or part of an existing Investment, expanding an existing Investment, <u>or substantially altering the type or the objective of an existing investment</u>;

(7) "Returns" means the amounts yielded by an Investment in pecuniary form or in kind and in particular, though not exclusively, includes profit, interest, capital gains, dividends, royalties and fees, unspent earnings and other remuneration of personnel engaged from abroad in connection with that Investment.

(8)     "Domain" means in respect of a Contracting Party the territory
        under its sovereignty, it being understood that territory
        includes land, internal waters and the territorial sea, and the
        sea, sea-bed and its subsoil over which that Contracting Party
        exercises, in conformity with international law, sovereign
        rights or jurisdiction. [With respect to a regional economic
        integration organisation which is or becomes a Party to this
        Agreement the term "Agreement Area" shall be construed as
        meaning the respective territories of those member states of
        such organisation which are also Parties to this Agreement, to
        the extent of that organisation's competence in the matters
        which are the subject of this Agreement in those
        territories][7].

(9)     [8]"GATT" means GATT, its related instruments, applicable
        term schedules and relevant jurisprudence including reports of
        dispute settlement Panels, agreements and decisions of the
        Contracting Parties.

(10)    [8]"GATT-related instrument" means an agreement, arrangement,
        decision, understanding, declaration, or other joint action
        pursuant to the General Agreement on Tariffs and Trade.

(11)    ["Intellectual Property" is as defined in Article 2 of the
        Convention establishing the World Intellectual Property
        Organisation, done at Stockholm, July 1967][9].

(12)    "Protocol" means an agreement entered into by any of the
        Contracting Parties under the auspices of the Charter in order
        to complement, supplement, extend or amplify the provisions of
        this Agreement to specific sectors or categories of activity
        comprised within the scope of this Agreement, including areas
        of cooperation referred to in Title III of the Charter.

(13)    "Freely Convertible Currency" means a currency which is widely
        traded in international foreign exchange markets and widely
        used in international transactions.

General comments

Articles 1.4, 1.5, 1.6, 1.7, 1.12 and 1.13 are Chairman's compromise Proposals.

Specific comments

1.1 :  General scrutiny reserve.

1.2 :  CDN suggests inclusion of uranium, ore and concentrates uranium compounds and heavy water only (2612.10, 2844.10 - 2844.50, 2845.10).

1.3 :  J asks for deletion.

1.4 :  CDN wants Petroleum products to include energy products only and not petrochemicals (chapter 27 escept 2107 (destillates from coal tar) up to 27.1113).

1.5 :  CDN scrutiny reserve.

1.6 :  A, CDH and CH asks for deletion.

1.7 :  EC will propose a new text.

1.8 :  References of GATT and GATT-related instruments as currenctly drafted in items (10) and (11) are overlapping and will be reworked after the discussion of trade related Articles.

1.9 :  AUS supported by USA suggests adding : "and shall also include confidential information (including trade secrets and knowhow) circuit layouts and semi-conductor chips and unregistered trade marks".

- 8 -

## ARTICLE 2
### OBJECTIVE OF THE AGREEMENT

The objective of this Agreement is to establish a legal framework in order to promote long-term cooperation in the energy field, based on mutual benefits and complementarities, in accordance with the objectives and the principles of the Charter.

---

Chairman's note

Negotiations finished.

## ARTICLE 3
### PRINCIPLES – Deleted.

## [ARTICLE 4][1]
### SOVEREIGNTY OVER ENERGY RESOURCES

The Contracting Parties recognise state sovereignty and sovereign rights over energy resources. In accordance with and subject to its international legal rights and obligations, each State holds in particular the rights to decide the geographical areas within its Domain to be made available for exploration and development of its energy resources and the optimalisation of their recovery and the rate at which they may be depleted or otherwise exploited, to specify and enjoy any taxes, royalties or other financial payments payable by virtue of such exploration and exploitation and to regulate the environmental and safety aspects of such exploration and development within its Domain.

---

Specific comments

4.1 :    USA reserve.

– 9 –

[ARTICLE 4A][1]

ACCESS TO RESOURCES


The Contracting Parties undertake to facilitate access to and development of energy resources by Investors by formulating transparent rules regarding the acquisition, exploration and development of energy resources. They shall apply such rules [on a non-discriminatory basis][2] in accordance with this Agreement, particularly Article 16, and any relevant Protocol[3].


------------------------------------------------------------------------


General comments

– Finalisation of this Article dependant on satisfactory completion of trade and investment Articles, as well as Articles 26 and 28.

– Since the last meeting of WGII on 15–19 June 1992 N has submitted a new text containing three paragraphs reading:

(1) First sentence of current draft.

(2) The Contracting Parties shall maintain or adopt procedures, which shall not discriminate Investors from other Contracting Parties on grounds of nationality or country of origin, governing acceptance and treatment prior to allocation of applications for authorisations, licences, concessions and contracts to prospect and explore for or to exploit or extract energy resources.

(3) In allocating authorisations, licences, concessions and contracts pursuant to paragraph (2), a Contracting Party shall treat Investors from other Contracting Parties no less favourably than Investors from any other Contracting Party or any third country, whichever is most favourable.

----------------------------------------------------------------------

<u>Specific comments</u>

4A.1:   USA general reserve.

4A.2:   USA scrutiny reserve. Preferentially to be replaced with "on the basis of national treatment".

4A.3:   It is noted that the relevant Protocols would affect the application of such rules by only the Parties to this Protocol.

[ARTICLE 4B][1]

ACCESS TO MARKETS

(1) The Contracting Parties will strongly promote access to
local,export and international markets for the disposal of [Energy
Materials and Products] on commercial terms and undertake to remove
progressively barriers to trade. [Energy Materials and Products]
originating from any Contracting Party shall be given [non-
discriminatory] access to markets in other Contracting Parties in
accordance with this Agreement and any relevant Protocol.
Similarly, and in particular in accordance with Article 16,
Investors of one Contracting Party shall not be excluded or
restricted from entering and operating in the market of another
Contracting Party.

(2) The Contracting Parties agree to work to alleviate market
distortions and barriers to competition in markets in the energy
[sector/cycle/field]. [In general, price formation shall be based
on market principles][2].

---

General comment

Finalisation of this Article dependant on satisfactory completion of
trade and investment Articles, as well as Articles 26 and 28.

---

Specific comments

4B.1:    USA general reserve.

4B.2:    J scrutiny reserve.

– 12 –

PART II

MARKETS

[ARTICLE 5][1]

LIBERALISATION AND NON-DISCRIMINATION

(1)  [2]Contracting Parties undertake to remove progressively the barriers to trade with each other in [Energy Materials and Products] and [related equipment and services][3] in a manner consistent with their other international obligations so as to achieve the [greatest possible degree of][4] liberalisation in the market[5].

(2)  In particular, Contracting Parties [undertake] [6] in relation to [Energy Materials and Products] and [related equipment and services] [3]:

(a) [7]not to [increase] [8] custom duties and other charges nor to introduce new quantitative restrictions or measures having similar effect on imports or exports as [from the date of entry into force] [9] of this Agreement;

(b) [10]not to apply any customs duties, charges or other regulations relating to importation or exportation in a discriminatory manner as between other Contracting Parties, provided that Contracting Parties may take action according to established international criteria against unfair trading practices;

(c) not to apply internal laws, taxes, charges, standards or other regulations in such a manner as to treat domestic products or services more favourably than similar products[11] of other Contracting Parties [11].

General comments

USA will forward a complete alternative text for handling the GATT
issues based on the "Reference approach". The text will be circulated
to delegations during the summer, in good time before the next meeting
of WG II on 7–11 September 1992.

Specific comments

5.1 :    CDN, J, N general reserve on whole Article.

5.2 :    AUS reserve, SF scrutiny reserve.

5.3 :    Subject to Definitions.

5.4 :    N delete.

5.5 :    N supported by RUF asks for adding: "observing in particular
         the principles contained in the Article 11".

5.6 :    Deferred to later discussion.

5.7 :    PL asks for balance by introducing a "restructuring clause"
         permitting to reintroduce tariffs or charges in case of
         restructuring industries or heavy unemployment. Points out that
         transitional arrangements provisions are not clearly sufficient
         here.

5.8 :    N suggests replacing with "institute or maintain".

5.9 :    N asks for similar language as used in Article 16, suggests
         replacing with: "after the signature".

5.10:    PL reserve pending the discussion on Article 27.

5.11:    EC suggests insertion of "or services".

– 14 –

[ARTICLE 6] [1]

PROCUREMENT POLICIES

(1) [6]Each Contracting Party shall ensure that non-governmental entities with exclusive rights and government entities (hereinafter referred to as "Awarding Bodies") responsible for the award of contracts for the supply of works, equipment [or services] with respect to any matter the subject of this Agreement with the exception for energy delivered to energy entities apply criteria in awarding such contracts which are [objective and][2] transparent [and do not discriminate on grounds of nationality][3]. [In particular, the conditions regarding eligibility or invitations to tender for contracts for the supply of works above five million ECU in value and of equipment above 400,000 ECU in value shall not be such as to place suppliers or contractors of one Contracting Party at a disadvantage when compared to suppliers or contractors from any other Contracting Party [including the Contracting Party in whose Domain the contract is to be performed][3]][4]. Except in circumstances which are objectively justifiable, [such][5] contracts shall be awarded on the basis of open competition, to which end each such Awarding Body shall give effective publicity to, and allow such time as is reasonable in the circumstances for the submission of tenders for, such contracts by suppliers or contractors from the other Contracting Parties.

(2) Contracting Parties shall not permit the relevant entities to circumvent this Article by splitting contracts or using special methods of calculating the value of contracts.

---

Note

Subject to USA alternative redraft.

General comments

(USA, J, EC):    Clarification of first sentence needed, in particular
                "non-governmental entity".

(CH):           If services are included a more evolutive clause should
                be adopted.

(USA):          The reference to circumstances which are "objectively
                justifiable" introduces elements of judgement into
                this Article which should be eliminated.  All contracts
                shall be awarded on the basis of open competition. GATT
                Government Procurement Code may apply to parastatals.

---

Specific comments

6.1:    CDN, USA, J, AUS reserved position on whole Article.

6.2:    EC suggests deletion.

6.3:    RUF reserved position.

6.4:    EC suggests deletion.

6.5:    EC  suggests  replacing  with:  "under  national  rules  or
        international obligations, major".

6.6:    Left for later discussion as the procurement policies are still
        under negotiation at the GATT.

[ARTICLE 7][1]

[INTELLECTUAL PROPERTY][2]

(1) [Each Contracting Party shall, subject to paragraphs (2) and (3) below, afford protection under its domestic laws no less favourable than the protection it applies to its own nationals or to the nationals of any [Contracting Party][3] with respect to Intellectual property entailed in or created as a result of all activities carried out pursuant to this Agreement in its Domain by Investors of other Contracting Parties.][4]

(2) [Without prejudice to paragraph (3), Contracting Parties who are not parties to the Paris Convention on the Protection of Industrial Property (1967 Stockholm revision) ("the Paris Convention") or the Berne Convention on the Protection of Literary and Artistic Works (1971 Paris revision) ("the Berne Convention") agree to apply protection equivalent to at least the minimum[5] required by those Conventions to the matters subject of this Agreement.][6]

(3) [In the event of the adoption of an agreement, within the framework of the Uruguay Round of the General Agreement on Tariffs and Trade, on the Trade Related Aspects of Intellectual Property (hereinafter referred to as the "TRIPS Agreement"), the level of protection to be afforded under paragraphs (1) and (2) above shall in the case of Contracting Parties who are signatories of the TRIPS Agreement equal at least the minimum level provided for by this where the TRIPS Agreement provides for a higher minimum level of protection than that afforded under the Paris and Berne Conventions under paragraphs (1) and (2) above. [In the case of Contracting Parties not party to the TRIPS Agreement, proposals shall, in the event of its adoption, be considered for ensuring an equivalent level of protection for Intellectual property covered by the terms of this Article in the Domain of such Contracting Parties][7][8]][9].

(4) Without prejudice to paragraphs (1) to (3) above, in relation to any information of industrial or commercial value, which is secret information, and in respect of which reasonable steps have been taken to maintain such secrecy, each Contracting Party shall ensure that its domestic laws provides means for the natural and legal persons lawfully in control of such information to prevent its disclosure, acquisition or use without their consent in a manner contrary to honest commercial practices.

---

## General comment

J argues that para (3) and (4) should be discussed after the conclusion of TRIPs negotiations. "Secret information" in para (4) should be clarified and defined in the text.

---

## Specific comments

7.1:    CDN general reserve pending review of the relevant conventions to which CDN does not adhere.

7.2 :    EC suggests replacing the whole Article with following shortened text:
         "Each Contracting Party shall ensure effective and adequate protection of intellectual, industrial and commercial property rights according to the applicable international conventions, and particularly the Berne Convention for the protection of literary and artistic works (Paris Act of 24 July 1971) and the Paris Convention for the protection of industrial property (Stockholm Act of 14 July 1967)".

7.3 :    AUS suggests replacing with "other country" to strenghten this non-discrimination clause.

7.4:    USA suggests deletion of para (1).

7.5 :    CH suggests inserting "level".

7.6:    AUS argues that the Paris and Berne Conventions are silent or deficient on some issues which would seem to be important in the Energy Charter context (e.g. patent terms, exclusions from patentability, protection of computer programs and integrated circuits, enforcement of intellectual property rights). This could be addressed in an Annex (max 2 pages) of key standards for the protection of intellectual property (e.g. patents, copyright, incl. computer programs, integrated circuits, designs, trade secrets and trade marks).

7.7:    CH suggests replacing with the following text:
"Contracting Parties who are not party to the TRIPs Agreement shall accord, in the field of intellectual property covered by this Article, a level of protection equivalent to the level provided for by the TRIPs Agreement where it provides for a higher minimum level of protection than that accorded under the Paris and Berne Conventions".

7.8:    AUS suggests replacing with the wording :
"Contracting Parties not party to the TRIPS Agreement shall comply with the substantive provisions of that Agreement".

7.9:    Discussion on para (3) was deferred.  Chairman suggests that the substance might be moved to an accompanying document which could be negotiated by Contracting Parties.

[ARTICLE 8][1]

COMPETITION

(1) The Contracting Parties agree, subject to their existing international rights and obligations, to work to alleviate market distortions and barriers to competition in the extraction, production, conversion, treatment, carriage (including transmission, distribution and marketing) and supply of [Energy Materials and Products] in relevant markets, insofar as they may affect trade between Contracting Parties.

(2) Contracting Parties shall ensure that within their jurisdiction they have and [enforce][2] such laws, as are necessary and appropriate to address unilateral and concerted anti-competitive conduct[3] in the areas covered by this Agreement.

[Where Contracting Parties already have such laws, their scope, interpretation or implementation shall not be affected by this Article][4].

(3) [5] Contracting Parties with experience in applying competition rules shall give full consideration to providing, upon request and within available resources, technical assistance on the development and implementation of competition rules to other Contracting Parties.

(4) Contracting Parties may co-operate in the enforcement of their competition rules by consulting and exchanging information, subject to limitations imposed by laws regarding disclosure of information, confidentiality and business secrecy.

(5) If a Contracting Party considers that any specified anti-competitive practice carried out within the Domain of another Contracting Party is adversely affecting an important interest, the Contracting Party may notify and request consultations with the other Contracting Party. The notifying Contracting Party shall include, in such notices and consultations, sufficient information to permit the other Contracting Party to identify the anti-competitive activities that are the subject of the notification.

Upon receipt of a notification under this Article, a Contracting Party [may consider whether to initiate [6] action within its national jurisdiction including, where appropriate, additional or expanded enforcement activities][7] to remedy the anti-competitive activities identified in the notification.

(6) [The procedures set forth in paragraph 5 above shall be the exclusive means of resolving any disputes that may arise over the implementation of this Article.][8]

----------------------------------------------------------------

## Specific comments

8.1 : N scrutiny reserve on whole Article.

8.2 : USA scrutiny reserve.

8.3 : EC, GB suggest insertion of "and exploitative abuses".

8.4 : Contingency reserve by J and USA. USA is considering, if necessary, to submit a particular wording to the Secretariat.

8.5 : Article 42 could contain an appropriate reference to the notion of paragraph 8.3. To the attention of the Transitional Subgroup.

8.6 :    AUS proposes inserting of "legitimate".

8.7 :    N suggests replacing with "shall seek". EC will propose a
         compromise text incorporating N suggestion and current text.

8.8 :    General scrutiny reserve on new para (6).


## ARTICLE 9

MONOPOLIES – Deleted.

[ARTICLE 10][1]

STATE AID

1) [State aid shall not be granted [to energy industries or through the prices of [Energy Materials and Products] with the object of distorting competition in trade between the Contracting Parties][2]. Aid granted for other purposes should be granted in a manner which minimizes such distortion].[3]

2) The Contracting Parties shall ensure transparency in the area of public aid, inter alia by reporting annually on the total amount and the distribution of the aid given and by providing, upon request, information on aid schemes.

3) [The provision of capital financing by a Contracting Party to enterprises owned in whole or in part by the Government of that Contracting Party shall not constitute subsidisation to the extent that the finance is provided on terms (including return on funds) substantially equivalent to the terms on which the enterprise might reasonably expect to receive capital financing if it were in the private sector].

---

General comments

The further discussion pending a new drafting of the "Reference Approach".

---

Specific comments

10.1: A suggests elimination of this Article and substance to be moved to Article 8. Furthermore the current wording requires redrafting e.g. along the lines of the recent EC and EFTA free trade agreements with some Eastern European countries.

10.2:   N suggests replacing with "when preventing the use of environmentally more benign energy sources".

10.3:   KIR suggests replacing para(1) with :
"State aid to energy industries shall be granted in a manner which minimizes the distortion of competition in trade among the Contracting Parties".

PART III

OTHER PROSPECTIVE

[ARTICLE 11][1]

TRANSPORT AND TRANSIT

(1) Each Contracting Party [shall take the necessary measures to facilitate][2] the transit through its Domain of [Energy Materials and Products] from the Domain of another Contracting Party to the Domain of a third Contracting Party or to or from port facilities in its Domain for loading or unloading, without distinction as to the origin, destination or ownership of such [Energy Materials and Products] or discrimination as to the pricing on the basis of such distinctions, and without imposing any unreasonable delays, restrictions or charges.

(2) [3]Contracting Parties shall encourage relevant entities to cooperate in:

(a) modernising transit networks necessary to the supply of [Energy Materials and Products];

(b) the development and operation of transport infrastructure serving the Domain of more than one Contracting Party;

(c) measures to mitigate the effects of the interruption in the supply of [Energy Materials and Products];

(d) facilitating the connection to high-pressure transmission pipelines and the synchronous interconnection of high-voltage transmission grids.

(3)  (3)(6)Each  Contracting  Party  undertakes  that  its  provisions relating to [transport of [Energy Materials and Products] and the use  of  harbour  facilities][4],  high-pressure  transmission pipelines or high-voltage transmission grids shall treat [Energy Materials and Products] wholly or partly originating in or destined for the Domain of another Contracting Party, in no less favourable a  manner  than  its  provisions  treat  such  materials  and  products wholly or partly originating in or destined for its own Domain, except if otherwise provided for in an existing international [agreement][5].

(4)  (3)In  the  event  that  access  to  existing  [high-pressure transmission  pipelines  or  high-voltage  transmission  grids][7] within a Contracting Party cannot be obtained [on commercial terms for transit of energy from another Contracting Party to a third Contracting  Party,  the  Contracting  Parties  shall  not  place obstacles in the way of establishing financially and economically viable new capacity-subject to their applicable legislation, inter alia on safety, technical standards, environmental protection and land use][8].

(5) A Contracting Party through whose Domain [Energy Materials and Products] transit [through high-pressure transmission pipelines or high-voltage  transmission  grids][9]  from  the  Domain  of  another Contracting Party to the Domain of a third Contracting Party or to or from port facilities in its Domain for loading or unloading shall not in the event of a dispute over the terms and conditions of that transit interrupt nor permit any entity subject to its [jurisdiction][10]  to  interrupt  the  existing  flow  of  [Energy Materials and Products] until after [the dispute has been referred to the Governing Council and the Governing Council has had][11] adequate time to seek conciliation between the parties in dispute.

(6) [3]The provisions of this Article shall not require a Contracting Party to take action [– other than the protection of existing flows – which it demonstrates to the other Contracting Parties concerned would endanger its] [12] [security of] [13] energy supply, quality of service and the most efficient development and operation of all parts of its electricity and gas systems[14].

---

Specific comments

11.1 :   CDN, AUS, N, J and AZB general reserve on whole Article.

11.2 :   USA scrutiny reserve. EC conditional reserve subject to withdrawal of USA reserve.

11.3 :   GR reserve.

11.4 :   USA reserve pending further instructions from capital.

11.5 :   AUS asks for substituting with "law".

11.6 :   EC may prepare additional language reducing any possible doubt that this provision does not require third party access.

11.7 :   AUS asks for replacing with : "facilities for the transport of [Energy Materials and Products] and harbour facilities".

11.8 :   GR suggests substituting with : "for transit of energy from another Contracting Party, the first Contracting Party shall, if requested, attempt to resolve the issue – including if appropriate by considering the possibility of new capacity being established – in accordance with its applicable legislation, inter alia on safety, environmental protection and land use".

11.9:    AUS supported by RUF suggests deletion.

11.10:   SF supported by S and CH requests substituting with "control".

11.11:  General reserve by J, N, USA, AUS and A. Chairman noted that the appropriate form of conciliation procedure could be discussed in the context of Article 29 but asked AUS, USA, RUF to come up with a compromise solution.

11.12:  A suggests replacing with : "which – apart from existing supply flows and contractual relations to be maintained – proves to endanger its own".

11.13:  RUF and AUS reserve.

11.14:  RUF suggests adding the following text :
", subject to the requirement, that the relevant policies, measures and practices in the fields covered by this Article are not applied in a manner which causes disturbances to the principles of the present agreement, would constitute a means of discrimination between the Contracting Parties or its Investors, or cause serious damage to existing contractual relations in the fields covered by this Agreement or to the trade flows, and that such relevant policies, measures and practices shall be discontinued as soon as the conditions giving rise to them have ceased to exit".

---

Chairman's note

Work has been completed on this Article in WGII and is being referred to Plenary.

ARTICLE 12

TRANSFER OF TECHNOLOGY

(1) The Contracting Parties agree to promote in accordance with their laws and regulations access to and transfer of technology on a commercial and non-discriminatory basis to assist effective trade and investment and to implement the objectives of the Charter, subject to the provisions of Article 7.

(2) Accordingly to the extent necessary to give effect to paragraph (1), the Contracting Parties shall eliminate existing and create no new obstacles for transfer of technology, in the field of [Energy Materials and Products] and related equipment and services, subject to non-proliferation and other international obligations.

---

Chairman's note

Negotiations finished.

[ARTICLE 13][1]

ACCESS TO CAPITAL

(1) [Each Contracting Party shall accord to Investors of another Contracting Party access to capital markets no less favourable than that accorded in like situations to its own Investors or to Investors of any other Contracting Party or of any third state with respect to the borrowing of funds and the insurance and sale of equity shares and other securities in connection with extraction, production, conversion, treatment, carriage or supply of [Energy Materials and Products]. Nothing in this Article is intended to impair the ability of financial institutions to establish and apply their own lending practices based on market principles][2].

(2) Each Contracting Party shall provide the fullest possible access to public credits, guarantees and insurance for investors in extraction, production, conversion, treatment, carriage or supply of [Energy Materials and Products].

(3) The Contracting Parties shall seek to the greatest extent possible to take advantage of the expertise and to support the operations of relevant international financial institutions in mobilising private Investments in connection with the subject matter of this Agreement.

---------------------------------------------------------------

Specific comments

13.1:    General scrutiny reserve.

13.2:    J scrutiny reserve on para (1).

## ARTICLE 14

### ENVIRONMENTAL ASPECTS

(1) The Contracting Parties shall strive to minimise harmful effects on the environment of all aspects of the energy cycle in an economically and environmentally sustainable manner. In doing so they shall be guided by the principles that precautionary action should be taken to anticipate, prevent or minimise environmental damage and that the polluter should in principle bear the cost of such damage. Contracting Parties shall accordingly;

(a) take account of environmental considerations throughout the formulation and implementation of their energy policies, including an appropriate mix of policy instruments;

(b) promote market-oriented price-formation including a fuller reflection of environmental cost and benefits; that occur both within and outside their Domains and promote research in appropriate fora on methods to quantify and appropriately recognize environmental costs and benefits.

(c) through cooperation as appropriate, take into account the differences in environmental impacts and abatement costs between Contracting Parties to minimise harmful effects in the most cost-effective way.

(d) promote and implement national energy polities that minimises in an economically acceptable way any negative environmental effects having particular regard to the improvement of energy efficiency and the development and use, of renewable sources;

(e) promote the dissemination of information on environmentally sound <u>and economically efficient</u> energy policies, practices and technologies <u>in order to increase</u> awareness among consumers of the environmental <u>considerations and ways to reduce adverse effects</u> and consult each−other on how to promote such awareness most effectively. Such promotion may include labelling schemes for informing the public about comparative environmental effects of energy consuming products available on the market;

(f) encourage favourable conditions for the transfer and dissemination of technology which will reduce harmful environmental <u>effects, taking account of the need for adequate protection of Intelectual Property</u>.

(g) promote the use of best available technologies not entailing excessive costs <u>for energy efficiency and environmental protection;</u>

(h) promote the transparent assessment of environmental impacts of <u>environmentally significant</u> Investment projects at an early stage and ensure transparency within their legal and administrative <u>framework</u>;

(i) <u>encourage</u> appropriate research and development activities <u>to foster inovation in environmentally sound and economically efficient energy technologies including sources of renewable energy</u>;

(j) promote internationally awareness and information exchange on Contracting Parties' <u>relevant</u> environmental programmes and standards and on the implementation of these programmes and standards.

(2) The Contracting Parties shall ensure consistency between their energy policies and international environmental agreements to which they are parties.

(3) For the purposes of this Article;

    i)  "energy cycle" means the entire energy-chain including prospecting for, <u>exploration</u>, production, conversion, storage, transport, <u>waste disposal</u> and distribution and consumption of the various forms or energy and the decommissioning and treatment of energy-related physical structures.

    ii)  "environmental impacts" means any significant effects on the environment, including human health and safety, flora, fauna, soil, air, water, climate, landscape and historical monuments or other physical structures <u>or the interactions among these factors</u>.

------------------------------------------------------------------------

<u>General comment</u>:

<u>The new text is the chairmans compromise mainly based on contributions recorded in BA-14</u>.

## ARTICLE 15

### TRANSPARENCY

(1) Each Contracting Party undertakes that laws, regulations, judicial decisions and administrative rulings and standards of general application which are made effective by that Contracting Party and which relate to the production, import, export, conversion, distribution or use of [Energy Materials and Products][1] shall be made public promptly in such a manner as to enable other Contracting Parties and Investors to become acquainted with them. Agreements made between governments or governmental agencies of two or more Contracting Parties which affect international trade in [Energy Materials and Products] between Contracting Parties shall also be published.

(2) [The provisions of paragraph (1) above shall not require any Contracting Party to disclose confidential information in such a way as to impede law enforcement or otherwise be contrary to the public interest or to law, or to prejudice the legitimate commercial interests of particular public or private enterprises][2].

(3) Each Contracting Party undertakes to nominate [and publish details concerning a central][3] enquiry point to which requests for information about relevant laws, regulations, judicial decisions and administrative rulings may be addressed and to communicate [these details][4] to the Secretariat established under Article 31, for provision by the Secretariat to any Investor on request.

---

<u>Note</u>

Subject to USA alternative redraft.

---

<u>General comments</u>

USA asks provisionally for including a commitment to provide an opportunity for Investors to comment before the adoption of additional regulations having general effect.

---

<u>Specific comments</u>

15.1    :    USA asks for inserting "and Investment".

15.2    :    CDN would prefer wording closer to GATT provisions if possible.

15.3    :    EC suggests deletion.

15.4    :    EC in relation to footnote 15.3 proposes replacing with "promptly the location of this enquiry point".

PART IV

INVESTMENT PROMOTION AND PROTECTION

[ARTICLE 16] [1]

PROMOTION, PROTECTION AND TREATMENT OF INVESTMENTS

(1) Each Contracting Party shall in accordance with the objectives and principles of the Charter and the provisions of this Agreement encourage and create stable, [equitable][2], favourable and transparent conditions for Investors of [other][2] Contracting Parties to Make Investments in its Domain. Such conditions shall include a commitment to accord at all times to Investments of Investors of [other][2] Contracting Parties fair and equitable treatment. Such Investments shall also enjoy most constant protection and security [and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal][3]. In no case shall such Investments be accorded treatment less than that required by international law, including that Contracting Party's international obligations. [This Part shall not derogate from the duty of each Contracting Party to observe any obligations it may have entered into with regard to Investments of Investors of any other Contracting Party to the extent that they are more favorable than those accorded by this Part][4].

(2) [5]Each Contracting Party shall permit Investors of other Contracting Parties to Make Investments in its Domain[6] on a basis no less favourable than that accorded[7] [to its own Investors][8] or to Investors of any other Contracting Party or any third state, whichever is the most favourable[9] subject to the provisions of paragraphs (3) to (6) below.

(3) [5]Notwithstanding paragraph (2) above Contracting Parties may maintain limited exceptions to the obligations of paragraph (2) which correspond to their domestic legislation [in force on the date of signature of this Agreement][10], provided :

    (a) any exception shall not be a greater departure from the obligations of paragraph (2) than that required by or specified in the relevant [law or regulation][11] ;

    (b) details of the relevant [laws, regulations and policies][11] are available publicly in !ine with Contracting Parties' obligations under Article 15 of this Agreement [and are provided in summary form in Annex [A] hereto attached][12].

[The rights and treatment accorded pursuant to any such exceptions shall be on a most favoured nation basis][13].

(4)[5]For the avoidance of doubt, the provisions of this Article do not affect the application of a Contracting Party's [!aws, regulations and policies][11] as listed in Annex (A) concerning the participation of Investors of another Contracting Party in any particular activity or possible Investment under the terms of this Agreement, whether or not such Investors have already made other Investment in the Domain of that Contracting Party.

[(5)[5]The Contracting Parties agree not to introduce after their signature of this Agreement any changes to measures notified under Annex [A] which would have the effect of adding to any discrimination thereby maintained between the right and ability of their own Investors and Investors of any other Contracting Party or third state, whichever is the most favourable, to make Investments in their Domain. Contracting Parties may, however, add after their signature of this Agreement any relevant measures to Annex [A] [which may result from the ending][14] of any monopolies maintained by them in the field of activities covered by this Agreement. Once notified, any such measures shall also be subject to the other provisions of this paragraph][10][15][16][17].

(6) [5]The Contracting Parties agree [to make every effort][18] to eliminate existing restrictions listed at Annex [A] to this Agreement which affect the ability of Investors of other Contracting Parties to make Investments in their Domain. [The Governing Council shall review progress in this direction periodically and, in the first instance, no later than 3 years following the entry into force of this Agreement][19].

[(7)In addition each Contracting Party shall in its Domain accord to Investments and Activities Associated with Investment of Investors of another Contracting Party treatment no less favourable than that which it accords[7] to Investments and Activities Associated with Investment of [its own Investors or][8] the Investors of any other Contracting Party or any third state, whichever is the most favourable[20]][21].

(8) A Contracting Party shall, subject to its laws and regulations relating to the entry, stay [and work][22] of natural persons:

    (a) [permit][23] Investors[24] of another Contracting Party who have made [Investments in the Domain of the first Contracting Party to employ[25] within][26] its Domain key personnel[27] of their choice regardless of nationality or citizenship;

    [(b)favourably examine requests made by natural persons who are employed by Investors of another Contracting Party to enter and remain in its Domain for the purpose of engaging in activities connected with relevant Investments][28].

(9) [Without prejudice to Article 19, the provisions of this Article shall also apply to Returns][29].

(10)[No Contracting Party shall impose trade-related performance requirements as a condition for the making or the operation of an Investment. Such requirements include commitments to export goods produced, or commitments that goods or services must be purchased locally, or other similar commitments][30].

\

---

General comments

- Chairman plans to propose a compromise text for Article 16 to be circulated some time prior to September meeting of WG-II.

- Norway preferred alternative was based on MFN treatment in the establishment phase. Alternatively, based on National Treatment, the exceptions to Article 16 should be made as formal reservations rather than in an Annex A. If a Contracting Party was not satisfied with the formal reservation of another Contracting Party, it could reciprocate in relation to Investors of the Contracting Party who had made the reservation.

- There was unanimous agreement among delegations that ways be found over time to minimise the exemptions to National Treatment, to be listed in Annex A, or as reservations.

---

Specific comments

16.1 : N, AUS and CDN general reserve on whole Article.

16.2 : U and PL suggest inserting "equitable" after "stable" in line 3, and replacing "other" with "any". There was no opposition to including "equitable".

16.3 : Scrutiny reserve, pending discussion of the definition of Activities Associated with Investments.

16.4 : IR compromise text based on proposal suggested by drafting group consisting of EC, NL, USA, GB, D and SF. Scrutiny reserve by AUS, J, CDN and SF.

16.5 : N reserve.

The Norway proposal, referenced in the General comments above, would either add the following language to or substitute the following language for language in the Articles and paragraphs indicated below :

<u>Article 16, paras (2)-(6) replaced by</u> :

**Alternative A**

(2) Each Contracting Party shall in areas under its jurisdiction as a minimum standard permit Investors of other Contracting Parties to Make Investments on a basis no less favourable than that accorded to Investors of any other Contracting Party or any third state, whichever is most favourable.

**Alternative B**

(2) Each Contracting Party shall in areas under its jurisdiction permit Investors of other Contracting Parties to Make Investments on a basis no less favourable than that accorded to its own Investors or to Investors of any other Contracting Party or any third state, whichever is most favourable.

<u>Article 41</u> :

(1) Notwithstanding the provisions of Article 16, any Contracting Party may upon signing this Agreement reserve its right to apply to Investors of other Contracting Parties Most Favoured Nations treatment as a minimum standard. Such reservation shall be confirmed when ratifying, accepting or approving the Agreement.

(2) The Contracting Parties agree to make every effort to eliminate reservations made pursuant to paragraph (1) which affect the ability of Investors of other Contracting Parties to Make Investments in areas under their jurisdiction.

(3) Any Contracting Party may accord to Investors of any other Contracting Party the same treatment on a reciprocal basis as that Contracting Party pursuant to paragraph (1) accords to Investors from other Contracting Parties.

<u>Article 44, para (2)</u> (Note subparas (2) (a), (b), (c) and (d) remain unchanged)

(2) The Depositary shall inform the Contracting Parties, other states being signatories to the European Energy Charter, and Parties with an Association Agreement pursuant to Article 38, in particular of :

<u>Article 44, para (2) (e) and (f)</u> (Note subpara (2) (e) replaces existing text and subpara (2) (f) is new text).

(e) any reservation pursuant to Article 41;

(f) any other declaration or notification concerning this Agreement.

<u>Article 1, (Addition of following Definition)</u> :

"Most Favoured Nation treatment" means, unless the GATT otherwise entails, that a Contracting Party in laws, regulations, judicial decisions, administrative rulings or general applications may treat its National Investors more favourably than Investors from other Contracting Parties, but all Investors from other Contracting Parties must be treated equally, and no less favourable than Investors from any third state.

16.6 : AUS supported by CDN wishes insertion: "subject to its right to exercise power conferred by its law and investment policies". AUS and CDN are prepared to withdraw their proposal given satisfactory resolution of footnote 16.11. RUF would support insertion unless it is clear that the obligations of this Article are to be implemented through national legislation.

16.7 : USA suggests insertion of "in like circumstances".

16.8 : AUS reserve. AUS is prepared to withdraw its reservation pending the resolution of footnote 16.11.

16.9 :   GB suggests insertion of "and shall not discriminate on the basis of the nationality or citizenship of the Investors" to meet the USA concerns in footnote 16.7.

16.10:   RUF reserve pending the transition arrangement provisions on legislation, because of the need to arrange for exceptions, difficult to anticipate, stemming from legislation under preparation.

16.11:   The precise wording will be defined after completion of Annex A.

16.12:   N reserve subject to their alternative proposal on paras (2) to (6) of this Article based on a reservations rather than an exceptions approach.

16.13:   Deferred to later discussion on issues of reciprocity and MFN.

16.14:   USA suggests replacing with "considered necessary to effect the dissolution". During the discussion at WG II meeting on 2 June 1992 CDN raised a requirement for incorporating not only demonopolization, but also privatisation of state enterprises. To meet this objective GB, CDN and USA propose an alternative text replacing the last two sentences with the following :

"However, a Contracting Party may, after its signature of this Agreement, add any relevant measures to Annex A which are necessary to demonopolisation or privatisation of a monopoly or state enterprise [that existed at the time of signature of this Agreement] provided that the totality of such additional measures taken by a Contracting Party, when considered together with existing measures, are not significant barriers to Investment opportunities in the energy field for Investors of other Contracting Parties. Once notified, any such measures shall also be subject to the other provisions of this paragraph. Nothing in this Article shall prevent a Contracting Party from establishing a monopoly."

CDN maintains a reserve on square bracketed part.

16.15:  AUS reserve.

16.16:  J reserve subject to definition of [Energy Materials and Products].

16.17:  EC scrutiny reserve on para (5).

16.18:  AUS reserve. Chairman stated that para (6) is intended to be a strong political commitment and not subject to Dispute Resolution procedures.

16.19:  Deferred to discussion on Article 29.

16.20:  Modified proposal formulated by the Secretariat based on GB suggestion in footnote 16.9 for adding : "and shall not discriminate against the Investments and Activities Associated with Investment on the basis of the nationality or citizenship of the Investors" to meet USA concerns in footnote 16.7.

16.21:  J and CDN reserve subject to definition of Activities Associated with Investment.

16.22:  USA reserve.

16.23:  J and CDN reserve.

16.24:  USA linguistic concern with use of word "Investors" since "Investors" do not employ.

16.25:  J supported by N requests that the notion of "entry and stay" also be covered.

16.26:  A request replacement with : "or are seeking to make Investments in the Domain of the first Contracting Party to bring in, employ within and take out of".

16.27:  CDN will submit definition of key personnel for potential inclusion in Article 1.

16.28:  A, N and SF reserve.

16.29:  CDN scrutiny reserve.

16.30:  USA proposal subject to later deliberation.

---

Chairman's Summary

Following is the Chairman's summary of the discussion which took place on Article 16 :

The Chairman finalized broad consensus that :

(1) National Treatment should be required for investments once made — he noted the Japanese question about the need for a precise definition of "Make Investments";

(2) Exceptions from National Treatment at the Investment stage should be listed — either in Annexes A or in statements of reservations;

(3) All such exceptions should be on a Most Favoured Nation basis except possibly in relation to reciprocity;

(4) The exceptions should be subject to standstill and rollback.

He saw the Norwegian differences from the Annex A approach as consisting basically of three elements :

(a) The rollback would be subject to the discipline of reciprocity — though the problems of defining reciprocity were not fully explored;

(b) As a consequence there would be no need to judge the "balance" of exceptions before signature;

— 44 —

(c) There would be a simplification in drafting, using the Vienna
    Treaty, in embodying the Norwegian approach.

In discussion most other delegations wished at least to be able to form
a picture of a total array of exceptions before signature. The
following procedure was therefore agreed :

(1) To continue with the collection and analysis of Annex A returns;

(2) For those countries not in the former Soviet Union (FSU), to submit
    their Annex A returns before the end of June;

(3) For those countries in the FSU, to submit provisional Annexes A by
    the end of August;

(4) The Secretariat would consider the procedures for scrutinizing
    Annexes A and come up with proposals;

(5) Possible ways, other than reciprocity as under the Norwegian
    proposal, would be considered for increasing the incentives
    Contracting Parties were under to roll back exceptions.

## ARTICLE 17

### COMPENSATION FOR LOSSES

(1) Investors of any Contracting Party whose Investments in the Domain of another Contracting Party suffer losses owing to any armed conflict, including war, a state of national emergency or civil disturbances or other similar events in the Domain of the latter Contracting Party shall be accorded by the latter Contracting Party treatment, as regards restitution, indemnification, compensation or other settlement, no less favourable than that which the latter Contracting Party accords to its own Investors or the Investors of any other Contracting Party or any third State. Resulting payments shall be made in accordance with Article 19, paragraphs (2) and (3).

(2) Without prejudice to paragraph (1) above Investors of a Contracting Party who, in any of the situations referred to in that paragraph, suffer losses in the Domain of another Contracting Party resulting from

(a) [requisitioning of their property by the latter's forces or authorities, or][1]

(b) destruction of their property by the latter's forces or authorities, which was not caused in combat action [or was not required by the necessity of the situation][2],

shall be accorded restitution and/or prompt, adequate and effective compensation. Resulting payments shall be made in accordance with Article 19, paragraphs (2) and (3).

– 46 –

<u>General comment</u>

N pointed out that the provisions do not cover a conflict situation in which the Investment in the Domain of the aggrieved Contracting Party belongs to the aggressor Contracting Party.

<u>Specific comments</u>

17.1:   A scrutiny reserve.

17.2:   J, A scrutiny reserve as it is too open-ended. The redraft should use a clear legal language.

## ARTICLE 18

### EXPROPRIATION

(1) Investments of Investors of any Contracting Party shall not be nationalised, expropriated or subjected to measures having effect equivalent to nationalisation or expropriation (hereinafter referred to as "expropriation") in the Domain of any other Contracting Party except where such expropriation is:

(a) for a purpose which is in the public interest;

(b) not discriminatory;

(c) carried out under due process of law;

(d) accompanied by the payment of prompt, adequate and effective compensation.

[Such compensation shall amount to the fair market value of the investment expropriated at the time when the expropriation was [officially announced (hereinafter referred to as "the expropriation date"][2]. The fair market value shall be the amount a willing buyer would pay a willing seller for the particular Investment in question. Where no market exists, [3] determination of what constitutes [full][4] compensation in a given case of expropriation shall [5] take into account all factors which in the particular circumstances of the case are relevant to the valuation of the property interests involved][1].

Such compensation shall be made in accordance with Article 19 (2) and (3), shall be calculated on the basis of the prevailing market rate of exchange on the expropriation date[6] and shall include interest at a [commercially reasonable][7] rate[8] from the expropriation date until the date of payment.

(2)  Under the law of the Contracting Party making the expropriation the Investor affected shall have a right to prompt review, by a judicial or other independent competent authority of that Party, of the legal applicability to the Investments of the act of expropriation, of the payment of compensation and of the valuation of its Investment[,][9] in accordance with the principles set out in paragraph (1).

(3)  [Where a Contracting Party expropriates the assets of a company or enterprise which is incorporated or constituted under the law in force in any part of its own Domain, and in which Investors of any other Contracting Party have a shareholding, the provisions of paragraph (1) above shall apply to the extent necessary to guarantee prompt, adequate and effective compensation for those Investors][10].

(4)  [Without prejudice to Article 19, the provisions of this Article shall also apply to Returns.][11]

(5)  [For the purposes of this Article the laws and regulations of a Contracting Party at the time an Investment is made with regards to the reversion of properties and rights for a resource owner in force shall not be regarded as an act of expropriation][12].

(14)

--------------------------------------------------------------------

Specific comments

18.1:  General reserve on new wording proposed by the Chairman as a possible compromise text is pending scrutiny in all respective capitals. In the meantime, footnotes 18.2 to 18.5 have been retained.

18.2:    J suggests replacing with : "publicly announced or when that measure was taken, whichever is the earlier, without reduction in that value due to the prospect of the very seizure which ultimately occurs".

18.3 :   AUS asks for inserting : "or where no fair market value can be ascertained,".

18.4:    USA suggests deletion.

18.5:    USA suggests insertion of "be in accordance with generally recognized principles of valuation including the going concern valuation method,".

18.6:    USA questions whether this should be the same date as that referred to 9 lines above as the "expropriation date".

18.7 :   RUF requests deletion.

18.8 :   RUF suggests adding : "in force in respective Contracting Party".

18.9:    USA reserve.

18.10:   General reserve pending the appropriate definition of Investment.

18.11:   RUF reserve.

18.12:   J sees no need for this para since the rights and obligations in relation to the reversion of property rights may and should be stipulated in the actual Investment contracts. Besides, such provision might allow the recipient countries to pursue arbitrary "reversion", which could result in denying the purpose of this Article.

18.13:  J considers it should be clearly stated that NT and MFN are to be the guiding principles in the exercise of this Article. To meet this point J proposes a new para reading:

"Each Contracting Party shall accord Investors of other Contracting Parties in its Domain treatment no less favourable than that accorded to its own Investors or to Investors of any other Contracting Party or any third state, whichever is the most favourable with respect to the paragraphs (1) to (4) of this Article".

**ARTICLE 19**

TRANSFER OF PAYMENTS RELATED TO INVESTMENTS

(1) Each Contracting Party shall in respect to Investments by Investors of any other Contracting Party[1] in its Domain guarantee the freedom of transfers related to these Investments into[2] and out of its Domain[. In particular[4] such transfers include :][3]

    (a) the initial capital plus any additional capital for the maintenance and development of an Investment;

    (b) Returns;

    (c) payments arising out of the settlement of a dispute;

    (d) payments under a contract, including amortisation of principal and accrued interest payment pursuant to a loan agreement;

    (e) compensation pursuant to Articles 17 and 18;

    (f) proceeds from the sale or liquidation of all or any part of an Investment.

(2) [Transfers under paragraph (1) above shall be effected without [undue][5][6] delay[7] [within such period as is normally required for the completion of transfer formalities][6] and in a [Freely Convertible Currency][8][9].][10]

– 52 –

(3) [Unless otherwise agreed by the Investor with the Contracting Party concerned, transfers shall be made at the rate of exchange applicable on the date of transfer. The rate of exchange shall be either the spot rate or, where there is no such spot rate, shall not substantially differ from the cross rate obtained from those rates which would be applied by the International Monetary Fund on the rate of payment for conversion of the currencies concerned into Special Drawing Rights][11].

(12)(13)

---

Specific comments

19.1:   AUS asks for insertion of "and subject to its right in exceptional balance of payments difficulties to exercise equitably and in good faith powers conferred by its laws".

19.2 :   RUF suggests insertion of : ", subject to terms and conditions of the present Agreement,".

19.3 :   J asks for substituting with ",in particular including the transfer of:".

19.4:   A suggests inserting",though not exclusively."

19.5:   EC, S reserve.

19.6:   USA suggests deletion.

19.7:   USA requests for adding "and be freely transferable".

19.8 :   RUF requests substituting with : "currency, they were obtained or invested".

19.9:   CDN laid its claim for replacing the part of sentence "and be
        freely transferable in a freely convertible currency" after the
        word "delay" in Article 18, para (1), 7th line from the bottom
        of the following:
        "Where the currency of the Contracting Party carrying out the
        expropriation is not freely convertible, the compensation shall
        be freely transferable to a freely convertible currency". With
        respect to transferring this issue to Article 19, the Canadian
        suggestion is registered here and should be expanded to
        transfers generally.

19.10:  RUF, KIR, AZB reserve. The Chairman suggests that the problem
        in which currency the compensation pursuant to Articles 17 to
        19 should be made ought to be addressed by the Transitional
        Subgroup.

19.11:  USA suggests substituting entire para with:
        "Transfers shall be made at the prevailing spot market rate of
        exchange on the date of transfer. In the absence of a market
        for foreign exchange, the rate to be used will be the rate
        applied to inward Investments or the rate applied by the IMF in
        purchasing currencies, whichever is more favourable to the
        Investor".

19.12:  J to the AUS footnote 19.1 points out that though they can
        accept the restriction of transfer of payments related to
        Investments owing to balance of payments difficulties, it is
        necessary to add some conditions by for example referring to
        the obligations of IMF. In this context J proposes new para (4)
        of the following wording:
        "Notwithstanding the provisions of paragraphs (1) to (3) of
        this Article, each Contracting Party may in exceptional
        financial or economic circumstance, impose exchange
        restrictions in accordance with its laws and regulations and in
        conformity with the Agreement of the International Monetary
        Fund".

19.13:   USA, supported by AUS and J, proposes a new para (5) of the following wording : "Notwithstanding the provisions of paragraphs (1) to (3), a Contracting Party may maintain laws and regulations (a) requiring reports of currency transfer; and (b) imposing income taxes by such means as a withholding tax applicable to dividends or other transfers. Furthermore, a Contracting Party may protect the rights of creditors, or ensure the satisfaction of judgements in adjudicatory proceedings, through the equitable, non–discriminatory, and good faith application of its law".

CDN also supports this suggestion with the following amendments: insert words "compliance with laws on the issuing, trading and dealing in securities and" before "the satisfaction" and the words "civil and criminal" before "adjudicatory proceedings".

[ARTICLE 20][1][2]


TAXATION


(1) [3]With respect to taxes, fees, charges, fiscal deductions and
    exemptions, each Contracting Party shall accord in its Domain to
    Investments, Returns and Activities Associated with Investments of
    Investors of any Contracting Party a treatment not less favourable
    than that which would have been accorded to Investments, Returns
    and Activities Associated with Investments of its own Investors or
    to those of any other Contracting Party or third state, whichever
    is more favourable to the Investors concerned.

(2) The provisions of paragraph (1) of this Article shall be without
    prejudice to:

    (a) [4]the right of Contracting States to apply the relevant
        provisions of their tax law which distinguish between
        tax-payers who are not in the same situation with regard to
        their place of residence or with regard to the place where
        their capital is invested,

    (b) any fiscal advantages or privileges which a Contracting Party
        grants or may grant in the future by virtue of [its membership
        to or its association with any existing or future Customs or
        Economic Union or a Free Trade Area or similar international
        agreement, or][5] [any agreement and any equivalent
        arrangement entered into in order to avoid double taxation or
        to facilitate cross-border traffic.][6]

---

General comments

–   The USA position on Article 20 is enclosed. The USA agreed to
    attempt to work its proposal into amendments to the current text
    based on EC-proposal.

– The Chairman appointed a sub-group lead by the Secretariat composed of A, AUS, CDN, CH, EC, N, PL, RUF, S, U and USA. Its first meeting will be held on 11 September. Sub-group meetings are open to all delegations.

The tasks of the sub-group will be to :

i.   Remove potetial doubts in the text regarding the supremacy of bilateral tax agreements and their dispute settlement provisions;

ii.  Secure that "tax-havens" do not create any tax-affects for the Contracting Parties;

iii. Remove doubts about the consequences of more favourable tax-treatment of foreign investments;

iv.  Investigate the potential for a transitional clause for privatisation and/or demonopolisation;

v.   Secure that future bilateral tax-agreements are covered;

vi.  Investigate the potential problems connected with the phrase "fees, charges..." in relation to the term "tax law" in para 2 (a).

vii. Investigate the potential use of the OECD – model text (Chapter 6, Article 24); and

viii. Investigate if the exceptions to "Customs or Economic Union or a Free Trade Area..." can be moved to Art. 27.

---

## Specific comments

20.1:   RUF reserve.

20.2:   A is of the opinion that in the framework of multilateral
        agreements, and therefore also in the Basic Agreement,
        taxation matters should be excluded from the most-favoured
        nation treatment.
        This point of view corresponds to the unanimous position as it
        emerged at the latest meeting of the OECD Fiscal Committee on
        June 22/23, 1992; there the Basic Agreement was explicitly
        mentioned as an example where the principle of MFN-treatment
        should not be applied.

20.3:   AUS and RO reserve on para (1).

20.4:   J supports the idea to admit the difference in treatment
        between residents and non-residents in order to assume an
        equitable or effective imposition or collection of taxes on
        income. The present wording, however, is not clearly formulated
        accordingly, J therefore proposes the following new sub-para.
        "(a) the right of a Contracting Party to take measures in order
        to ensure the equitable or effective imposition or collection
        of taxes on income, which may distinguish between its own
        Investors who are deemed to reside in its Domain and Investors
        of other Contracting Parties who are not deemed to reside in
        its Domain."

20.5:   J reserve.  Would prefer dealing with issue in Article 27.

20.6:   J reserve until term in [ ] is clarified.

## U.S. POSITION ON ARTICLE 20

1.  GENERAL EXCLUSION : INCOME TAX AND RELATED MEASURES.

    Except as provided in paragraph (4) and (5) of this Article [1], nothing in this Agreement shall apply to taxes on income or captial gains or on the taxable capital of corporations.

2.  LIMITATION ON APPLICATION OF AGREEMENT TO TAXES OTHER THAN INCOME TAX AND RELATED MEASURES.

    a)  Except as provided in paragraph (4) or (5) of this Article, with respect to taxes other than those referred to in paragraph 1, nothing in this Agreement shall apply to any measure aimed at ensuring the equitable or effective imposition or collection of taxes.

    b)  With respect to taxes other than those referred to in paragraph (1), the most favoured nation provisions of this Agreement shall not apply to advantages accorded by a Party pursuant to any convention for the avoidance of double taxation ("tax convention") or any other agreement or arrangement relating to taxation.

3.  TAX CONVENTIONS AND AGREEMENTS

    Without limiting the application of paragraphs (1) and (2), nothing in this Agreement shall affect the rights and obligations under a tax convention or other international agreement or arrangement, or domestic legislation implementing such agreement or arrangement, relating to taxes; and, in the event of an inconsistency between the provisions of this Agreement and a tax convention, the provisions of the tax convention shall prevail to the extent of the inconsistency.

4.  APPLICATION OF PROVISIONS RELATING TO TRADE IN GOODS TO INCOME TAX
    RELATED MEASURES

Subject to paragraph (3), provisions of this Agreement
incorporating by reference rights and obligations of the Parties
relating to trade in goods under Article III of The General
Agreement on Tariffs and Trade and such other provisions of this
Agreement as are necessary to give effect to such provisions shall
apply to the taxes referred to in paragraph (1) or paragraph (2).

5.  EXPROPRIATION

A claim by a Party or an Investor of such Party that a tax measure
of another Party constitutes an expropriation shall be resolved
under Article _____ of Part IV (Investment Promotion and
Protection). The issue of whether such tax is discriminatory shall
be referred for resolution to the competent authorities under a tax
convention between the relevant Parties. If the competent
authorities under the tax convention do not agree to consider the
issue, or, having agreed to consider the issue, fail to resolve it
within a reasonable period of time, or if there is no tax
convention between the relevant Parties, the issue of whether such
tax is discriminatory shall resolve, together with all other issues
of the expropriation, under Article _____ of Part IV (Investment
Promotion and Protection), basing such resolution on the concepts
of the non-discrimination provision of the OECD of UN Model Income
Tax Treaty.

6.  WITHHOLDING TAX

Without limiting the application of the foregoing, and for greater
certainty, notwithstanding Article 19 (Repatriation of Investments
and Returns) a Party may impose or collect a tax by withholding or
other means.

USA EXPLANATORY NOTE

USA will develop additional language narrowing the tax exception in paragraphs (1) and (2) if the Basic Agreement is expanded to include provisions affecting services or service providers or to contain provisions limiting the application of performance requirements.

CANADA's POSITION ON ARTICLE 20

1. EC PROPOSAL

The more comprehensive approach incorporated in the EC proposal was a welcome improvement on the draft Art. 20 in document BA.12. However, in our view, the EC proposal suffers from a number of defects:

- paragraph (1) is not required with respect to taxation. These obligations need not be restated, as similar obligations found in Art. 16 (particularly parag. (2) and (7) already apply to all measures of a Party affecting investors, including taxation;

- the imposition of MFN obligations on domestic tax legislation and double taxation agreements (DTA's) last part of paragraph (1) is inappropriate, since it ignores the balance achieved in bilateral DTA's and makes the non-discrimination article they contain irrelevant;

- the carve-out in paragraph (2) is insufficient, since it applies only with respect to paragraph (1) and not with respect to similar obligations found elsewhere (e.g. Article 16) in the Agreement;

- the carve-out found in sub-paragraph (2)(a) is too narrow, as it should permit differential treatment among taxpayers in circumstances other than those listed;

- the reference to "fiscal advantages and privileges" in sub-paragraph (2)(b) is too narrow; all rights and obligations of a DTA should be explicitly protected.

- 62 -

2. U.S. APPROACH

Canada has a strong preference for an approach along the lines
proposed by the United States. The advantages of the approach, in
our view, are the following:

- it distinguishes between income and similar taxes on the one
  hand, and other taxes on the other hand;

- it provides a clear and unconditional carve-out for current and
  future taxes on income, capital gains and taxable capital of
  corporations;

- it provides a complete carve-out for current and future double
  taxation agreements; DTA's would, appropriately so,
  unambiguously prevail over the Agreement;

- in recognition of existing obligations under the GATT, the
  carve-out explicitly excludes from its scope any provision of
  the Agreement implementing obligations with respect to trade in
  goods consistent with Article III of the GATT;

- it addresses the issue of expropriation in the context of
  taxation;

3. CANADIAN AMENDMENT TO U.S. PROPOSAL

Canada supports the latest U.S. draft on July 24 1992, with the
exception of its provisions on expropriation (paragraph 5). The
attached document incorporates CDN's revised version of paragraph
5.

Canada considers that in order to ensure that only genuine expropriatory tax measures are dealt with under Art.18 and 23, it would be desirable that both Parties to the dispute first had the opportunity to determine whether the contentious tax measure is indeed tantamount to expropriation, or else a bona-fide tax measure. In our view, the competent authorities responsible for the application of double taxation agreements should be required to make a determination on the issue before resolution of the dispute is allowed to continue under Art. 23. This would eliminate abusive claims made by investors regarding the expropriatory nature of a given tax measure.

## Article 20

## TAXATION

1.  GENERAL EXCLUSION

Except as provided for in this Article, nothing in this agreement shall apply to taxes of the Contracting Parties. In the event of an ambiguity or conflict between this Article and any other provision of this Agreement, the provisions of this Article shall prevail.

TAX CONVENTIONS

Without limiting the application of paragraph 1, nothing in this Agreement shall affect the rights and obligations under any convention for the avoidance of double taxation (in this Article referred to as a "tax convention") or other international agreement or arrangement, or domestic legislation implementing such agreement, or arrangement related wholly or mainly to taxes, and , in the event of an inconsistency between the provisions of this Agreement and any such convention, agreement, arrangement or legislation, the provisions of the convention, agreement, arrangement or legislation shall prevail to the extent of the inconsistency.

3. APPLICATION OF PROVISIONS RELATING TO TRADE IN GOODS

Provisions of this Agreement restating or incorporating by reference rights and obligations of the Contracting Parties relating to trade in goods under Article III of the General Agreement on Tariffs and Trade, and such other provisions of this Agreement as are necessary to give effect to those provisions, shall apply to the taxes of the Contracting Parties to the same extent as does in Article III of the General Agreement on Tariffs and Trade.

4. APPLICATION OF PROVISIONS RELATING TO INVESTMENT TO TAXES OTHER THAN INCOME AND RELATED TAXES.

Subject to paragraph 2, provisions in Part IV of this Agreement (Investment Promotion and Protection) imposing national treatment obligations or most favoured nation obligations shall apply to taxes, other than taxes on income or capital gains or on the taxable capital of corporations, of the Contracting Parties, except that nothing in that Part shall apply to

(a) impose most favoured nation obligations with respect to advantages accorded by a Contracting Party pursuant to a tax convention or any other agreement or arrangement relating wholly or mainly to taxation; or

(b) any taxation measure aimed at ensuring the equitable and effective imposition or collection of taxes except where the measure arbitrarily discriminates between (investors, goods or services) of the Contracting Parties or arbitrarily restricts benefits accorded under this Agreement.

5. EXPROPRIATION

Provisions of this Agreement relating to expropriation shall apply to a claim by a Contracting Party or an investor of a Contracting Party that a measure expressed as a taxation measure constituted an expropriation or nationalisation except where it has been determined pursuant to this paragraph that a taxation measure of a Contracting Party is a bona-fide tax.Before an investor or a Contracting Party may bring such a claim, however, the issue of whether the measure is a bona-fide tax shall be referred for determination by the competent authorities under the tax convention, if any, between the Contracting Parties involved. If there is no such tax convention or if the competent authorities do not agree to consider the issue or, having agreed to consider it, fail to resolve it within a period of six months after the refferal, or such other period as may be agreed upon by the Contracting Parties involved, the investor or the Contracting Party may bring such a claim under the appropriate dispute settlement provisions of this Agreement[1].

6. WITHHOLDING TAX

Without limiting the application of the foregoing and for greater certainty, notwithstanding Article 19 (Repatriation of Investment and Returns) a Contracting Party may impose or collect a tax by withholding or other means.

---

[1]A cross-reference to this provision may be required in the expropriation provisions of this Agreement.

## ARTICLE 21

### ASSIGNMENT OF RIGHTS

(1)    [1]If a Contracting Party, its designated agency or a company or enterprise incorporated in a Contracting Party other than an Investor (the "Indemnifying Party") makes a payment under an indemnity or guarantee given in respect of an Investment[2] in the Domain of another Contracting Party (the "Host Party") or[3] acquires the rights and claims to such an Investment, [as the result of the complete or partial default of the Investor],[4] the Host Party shall recognise

(a) the assignment to the Indemnifying Party by law or by legal transaction of all the rights and claims resulting from such an Investment, and

(b) that the Indemnifying Party is entitled to exercise such rights and enforce such claims by virtue of subrogation, to the same extent as the original Investor[5].

(2) The Indemnifying Party shall be entitled in all circumstances to

(a) the same treatment in respect of the rights and claims acquired by it by virtue of the assignment referred to in paragraph (1) above, and

(b) any payments received in pursuance of those rights and claims,as the original Investor was entitled to receive by virtue of this Agreement in respect of the Investment concerned and its related Returns.

– 67 –

(3) [Any payments received in non-convertible currency by the Indemnifying Party in pursuance of the rights and claims acquired shall be freely available to the Indemnifying Party for the purpose of meeting any expenditure incurred in the Domain of the Host Party][6].

---

Specific comments

21.1:   A asks for inclusion in para (1) a provision concerning the rights of the Investor in spite of a subrogation.

21.2:   J suggests insertion of "and Returns".

21.3:   EC asks for insertion of "otherwise".

21.4:   CDN requests deletion pointing out that the Canadian Export Development Corporation insures political risks, but not commercial risks.

21.5:   N asks for adding "provided that where initial Investment approval is required any change of ownership of rights held by a foreign Investor shall be approved by the Host Party in the same way as the initial Investment" comprised in BA-6 but not retained here.

21.6:   J can accept this provision since this could be interpreted as a provision which intends to prevent restrictions on expenditure in non-convertible currency. It is necessary, however, to clarify whether the transfer of any payments by the assignment of rights come under Article 19 (1).

[ARTICLE 22][1]

RELATIONSHIP TO OTHER AGREEMENTS

(1) Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part IV and V of this Agreement, the terms of that other international agreement shall prevail between such Contracting Parties to the extent that they are not less favourable to the Investor.

(2) [For the avoidance of doubt, when an Investor chooses to invoke the terms of another international agreement in accordance with paragraph (1) above, Parts IV and V of this Agreement shall not apply to the Investor's activities under that other agreement][2].

---------------------------------------------------------------

Specific comments

22.1:    AUS and CDN reserve.

22.2:    USA scutiny reserve.

## PART V

## DISPUTE SETTLEMENTS

## [ARTICLE 23][1]

SETTLEMENT OF DISPUTES BETWEEN AN INVESTOR AND A CONTRACTING PARTY

(1) Disputes between one Contracting Party and an Investor of another Contracting Party concerning an obligation of the former under Part IV of this Agreement, relating to an Investement of the latter in the Domain of the former[2] shall, if possible, be settled amicably.

(2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date at which either Party to the dispute requested amicable settlement, the dispute shall, subject to paragraph 3 below, at the request of the Investor concerned be submitted to international arbitration or conciliation[3].

(3) [An Investor that has submitted the dispute to the courts or administrative tribunals of the Contracting Party that is a party to the dispute, or that has submitted the dispute for resolution in accordance with any previously agreed dispute settlement procedures, shall not be able to submit the dispute to international arbitration or conciliation in accordance with the terms of this Article][4].

(4) Each Contracting Party which is or has become a member of the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington on 18 March 1965 hereby consents to submit any dispute as defined in paragraph (1) of this Article to the International Centre for Settlement of Investment Disputes for arbitration or conciliation under that Convention.

(5) In case the Contracting Party concerned is not or has not yet become a Contracting State of the Convention referred to in paragraph (4), the dispute may, at the [choice][5] of the Investor concerned, be submitted to:

(a) the International Centre for Settlement of Investment Disputes, established pursuant to the Convention referred to in paragraph (3) under the rules governing the Additional Facility for the Administration of Proceedings by the secretariat of the Centre (Additional Facility Rules); or

(b) an international arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL); or

(c) an arbitral proceedings under the Institute of Arbitration of the International Chamber of Commerce, Stockholm; or

(d) an international arbitrator or ad hoc arbitration tribunal appointed by a special agreement[6].

[In the event that the dispute is submitted to an international arbitrator or ad hoc arbitration tribunal in accordance with subparagraph (d) above and no agreement on the appointment of that international arbitrator or ad hoc arbitration tribunal has been reached within sixty days of the submission of this dispute, the Investor may submit the dispute to (a), (b) or (c) above][7].

(6) [[A legal person][8] which has the nationality of one Contracting Party and which before such a dispute arises is[9] controlled by Investors of another Contracting Party shall for the purpose of article 25 (2)(b) of the Convention referred to in paragraph (5)(a) above be treated as an Investor of that other Contracting Party][10][11].

(7) [Each Contracting Party hereby gives its unconditional consent to the submission of disputes to international arbitration in accordance with the provisions of this Article][12].

− 71 −

(8) The awards of arbitration, which may include an award of interest, shall be final and binding and shall be [enforced in accordance with domestic law][13].

---

## General comments

CDN cannot agree that disputes regarding tax matters be referred to an International tribunal.

In order to assist Canadian authorities in their consideration of Article 23, the Canadian delegation seeks clarification of how Article 23 might be applied. For instance, the Canadian delegation would wish to discuss the following questions:

- Would all matters covered by Part IV be subject to arbitration at the instance of an Investor? For instance, would public measures taken in situations covered by Article 17 (1) be subject to arbitral review?

- In situations involving more than one Investor or potential Investor, there is a possibility of multiple proceedings. How would that eventually be addressed? Will there be provision for the consolidation of proceedings? What would that provisions be like?

- Some measures by Contracting Parties will affect both their own Investors and Investors of other Contracting Parties. That could result in the same measure being challenged before domestic tribunals and before an international arbitrary tribunal. How can the consistency of the findings in the different fora be ensured?

- If the Contracting Party has a counterclaim against an Investor seeking dispute settlement, will the Contracting Party be able to choose the forum in which to bring that counterclaim?

– How will the place of arbitration be choosen? This will be important because, other than arbitration under ICSID, the place of arbitration will determine the law under which judicial control will be exercised over the arbitral proceedings.

– Will an arbitral tribunal be authorized to award the costs of the proceedings? If so, on what basis?

– Would investors with dual nationality of two Contracting Parties be able to choose international arbitration to challenge measures of one or the other of those Contracting Parties?

– How would the Investor/Host Contracting Party dispute settlement apply to sub–national governments in a federal system?

– What remedies will be available pursuant to arbitration under Article 23? In some federations, the national government cannot compel the sub–federal governments to make restitution.

– What will be the relationship between dispute settlement under Article 23 and dispute settlement under Article 24? For instance, will Article 24 dispute settlement be available to determine whether Article 23 dispute settlement is available? What provisions will be made to cover situations where the same measure is challenged or may be challenged under both Articles 23 and 24.

---

Specific comments

23.1:    General reservation by some delegations.

- 73 -

23.2:   USA asks for inserting:",interpretation or application of an Investment agreement between a Contracting Party and an Investor, or the interpretation or application of an Investment authorisation granted by a Contracting Party".
AUS and J do not favour USA suggestion.

23.3:   USA asks for adding:"in accordance with paragraphs (4) and (5)".

23.4:   SF requests deletion. USA supports retention.

23.5:   SF suggests substituting with "request".

23.6:   SF asks for adding a new sentence reading:
"If no agreement on the appointment of that international arbitrator or ad hoc arbitration tribunal has been reached within sixty days of the request for such arbitration, the Investor may submit the dispute to (a), (b), or (c) above".

23.7:   SF suggests deletion in context with footnote 23.6.

23.8:   J asks for replacing with "An Investor other than a natural person".

23.9:   USA suggests insertion of:"owned or".

23.10:  EC doubts on the need for this para. AUS and USA support retention of this para.

23.11:  AUS suggests following wording for this paragraph pending the final draft of the definition of Investor:
"An Investor which is not a natural person is incorporated, constituted or otherwise organised in the Domain of one Contracting Party and which before such dispute arises is controlled by Investors of another Contracting Party shall for the purpose of Article 25 (2) (b) of the Convention referred to in paragraph (4) (a) above be treated as an Investor of the latter Contracting Party".

23.12:  J considers this para to be redundant. USA supports retention of this para.

23.13:  AUS suggests substituting with:"enforceable in the Domain of the Contracting Parties". To this AUS comments that the wording would oblige CPs to make arbitration awards enforceable whereas the present wording makes enforcement of such awards dependent on and subject to domestic law, ie. the enforceability is at the discretion of a CP and an Investor has no guarantee that his awards could be enforced.

[ARTICLE 24]<sup>(1)</sup>

SETTLEMENT OF DISPUTES BETWEEN CONTRACTING PARTIES

(1) Disputes between Contracting Parties concerning the interpretation or application of this Agreement shall, if possible, be settled through diplomatic channels.

(2) If such a dispute can be brought under the provisions of a bilateral agreement between Contracting Parties, those provisions shall prevail in relation to dispute settlement.

(3) Subject to paragraph (2) above, if the dispute cannot be settled in accordance with paragraph (1) above [within 180 days],<sup>(2)</sup> except as otherwise provided in this Agreement, it shall, if one of the parties to the dispute so requests in writing, be submitted to dispute resolution under paragraph (4) below, unless otherwise agreed between such parties.

(4) Where the dispute between the parties has not been settled according to paragraph (1) above, and has not been submitted to dispute resolution within 60 days of the request referred to in paragraph (3) above, it shall be submitted, if one of the parties to the dispute so requests in writing, to an ad hoc arbitral tribunal. Such an ad hoc arbitral tribunal shall be constituted as follows :

   (a)   The party instituting the proceedings shall appoint one member of the Tribunal, who may be its national or citizen;

[ARTICLE 24][1]

SETTLEMENT OF DISPUTES BETWEEN CONTRACTING PARTIES

(1) Disputes between Contracting Parties concerning the interpretation or application of this Agreement shall, if possible, be settled through diplomatic channels.

(2) If such a dispute can be brought under the provisions of a bilateral agreement between Contracting Parties, those provisions shall prevail in relation to dispute settlement.

(3) Subject to paragraph (2) above, if the dispute cannot be settled in accordance with paragraph (1) above [within 180 days],[2] except as otherwise provided in this Agreement, it shall, if one of the parties to the dispute so requests in writing, be submitted to dispute resolution under paragraph (4) below, unless otherwise agreed between such parties.

(4) Where the dispute between the parties has not been settled according to paragraph (1) above, and has not been submitted to dispute resolution within 60 days of the request referred to in paragraph (3) above, it shall be submitted, if one of the parties to the dispute so requests in writing, to an ad hoc arbitral tribunal. Such an ad hoc arbitral tribunal shall be constituted as follows :

   (a)   The party instituting the proceedings shall appoint one member of the Tribunal, who may be its national or citizen;

(b)   Within 30 days of the receipt of notification of that
      appointment, the other party to the dispute shall, in turn,
      appoint one member, who may be its national or citizen. If the
      appointment is not made within the time limit prescribed, the
      Party having instituted the proceedings may, within a further
      period of 30 days request that the appointment be made in
      accordance with sub-paragraph (d) below;

(c)   A third member, who may not be a national or citizen of a party
      to the dispute, shall then be appointed between the parties to
      the dispute. That member shall be the President of the
      Tribunal. If, within 180 days of the receipt of the request
      referred to in paragraph (3) above, the parties are unable to
      agree on the appointment of a third member, that appointment
      shall be made, in accordance with sub-paragraph (d) below, at
      the request of any party submitted within 30 days of the expiry
      of the 180 day period provided for in this paragraph;

(d)   Appointments pursuant to sub-paragraphs (b) or (c) above shall
      be made by the President of the International Court of Justice
      within 30 days of the receipt of a request to do so. If he is
      prevented from discharging this task or is a national or
      citizen of a party to the dispute, the appointments shall be
      made by the Vice-President. If the latter, in turn, is
      prevented from discharging this task or is a national or
      citizen of a party, the appointments shall be made by the most
      senior Judge of the Court who is not a national or citizen of a
      party;

(e)   Appointments made in accordance with sub-paragraphs (a), (b),
      (c) and (d) above shall have regard to the qualifications and
      experience, particularly in matters covered by this Agreement,
      of the members to be appointed;

(f)   The Tribunal shall establish its own rules of procedure, unless
      otherwise agreed by the parties to the dispute, and shall take
      its decisions by a majority vote of its members;

(g)  The arbitral award shall be final and binding upon the parties to the dispute;

(h)  The expenses of the Tribunal, including the remuneration of its members, shall be borne in equal shares by the parties to the dispute.

(5)  [3]Notwithstanding paragraphs (3) and (4) above, in the event of a dispute between Contracting Parties who are also parties to the GATT or a GATT-related instrument, which could also be brought under the provisions of the GATT or the GATT-related instrument concerned, the parties to the dispute, except where they have agreed to an alternative procedure, shall, without prejudice to the initial application of paragraph (1) above, settle the dispute [according to the procedures provided for][4] in the GATT or the GATT-related instrument concerned. Should a Contracting Party who is not a party to the GATT or to a relevant GATT-related instrument but who has made or received a written request under paragraph (3) above become a party to the GATT or that GATT-related instrument, the dispute in question shall be resolved in accordance with paragraph (3) above except where the parties agree to an alternative procedure.

---

General comments

CDN believes that consideration should be given to measures for :

a)  settlement of disputes involving more than one Contracting Party;

b)  intervention in dispute settlement by a Contracting Party not party to the dispute; and

c)  ensuring the consistency of interpretation given to provisions
    of the Basic Agreement in dispute resolution.

The question regarding disputes arising from Protocols is deferred
until discussion of Article 28.

---

Specific comments

24.1:  Subject to scrutiny by all delegations.  CDN scrutiny reserve
       also concerns relationship between this Article and Article 27.

24.2:  EC and RO reserve.

24.3:  Finalisation of this paragraph awaits consideration of the
       trade related provisions.  USA delegation notes that it may be
       preferable to address the trade disputes through a dispute
       settlement procedure as indicated in Room Documeent 18 of 16
       June 1992.

24.4:  AUS asks for deletion.

PART VI

[CONTEXTUAL]

[ARTICLE 25][1]

[GOVERNMENT CONTROLLED ENTITIES][2][3]


Each Contracting Party undertakes that if it establishes or maintains a government-controlled entity wherever located and grants to any such entity formally or in effect, exclusive or special privileges, such entity shall conduct its activities in a manner consistent with this Agreement.

---

Specific comments

25.1:    NL, EC, CDN, USA, RUF scrutiny reserve.

25.2:    EC proposed a new text with changed heading as follows :

"EXCLUSIVE OR SPECIAL PRIVILEGES

Each Contracting Party undertakes that if it grants to any entity exclusive or special privileges, in the field of energy, such entity shall conduct its activities in a manner consistent with this Agreement".

25.3:    N has submitted its suggestion on Article 25, including new heading, which reads:

"GOVERNMENT PARTICIPATION"

Any Contracting Party shal be free to participate in energy activities through direct participation by the Government or through government-controlled Investors. Such Investors may be granted exclusive or special privileges in this respect. In such cases they shall conduct this activities in a manner consistent with this Agreement."

Chairman's conclusion

EC together with AUS and USA prepare a new draft which should be available for delegations in good time before the meeting of WG II on 7–11 September 1992. This draft will be a basis for next negotiation.

[ARTICLE 26]<sup>(1)</sup>

OBSERVANCE BY SUB-FEDERAL AUTHORITIES

Each Contracting Party shall [take measures available to it]<sup>(2)</sup> to ensure observance of the provisions of this Agreement by the regional and local governments and<sup>(3)</sup> authorities within its Domain.

---

Note

New text as suggested by AUS is based on CDN proposal and amended by the Chairman. Original CDN wording read: "Each Contracting Party shall take [such reasonable] measures [as may be] available...".

---

Specific comments

26.1:    USA reserve.

26.2:    EC reserve.

26.3:    EC wants inserted:  other governmental.

– 82 –

[ARTICLE 27][19][20]

EXCEPTIONS

(1) [The provisions of this Agreement shall not preclude any Contracting Party from taking any action [ [which it considers][1] necessary for the purposes of protecting its public order, or [human, animal or plant life or health, [or conservation of exhaustible natural resources][2]][3],or from taking any action in pursuance of][4] its obligations under the United Nations Charter for the maintenance of international peace and security, [or][5] its obligations under the Treaty on the Non-Proliferation of Nuclear Weapons, the Nuclear Suppliers Guidelines and [ [of international nuclear safeguards obligations, provided that such prohibitions][6] shall not constitute disguised restrictions on trade[7] or arbitrary discrimination as between Contracting Parties][8][9].Such actions shall be duly motivated and shall not be disproportionate to this end.][10]

(2) [A Contracting Party shall neither be obliged to supply information nor be precluded from taking such measures as it considers necessary in order to protect its essential [defence][11] interests.][12]

(3) The provisions of this Agreement shall not be construed so as to oblige any one Contracting Party to extend the[13][14] benefit of any treatment, preference or privilege resulting from

   (a) [15]the membership to [or association with][16] any existing [or future][16] customs [or economic][16] union or a free trade area [or similar international agreement][16] to which any of the Contracting Parties concerned is or may become a party, or

(b) [any regulation to facilitate frontier traffic] [17].

(18)

_____

Specific comments

27.1 :  N reserve.

27.2 :  N reserve as paraphrasing of Art. XX  (g) of GATT code is used
        here in a different context.  Should be replaced rather with
        "energy purposes".

27.3 :  CH suggests deletion subject to the purview of Part IV of this
        Agreement. **USA supports deletion.**

27.4 :  EC suggests substituting with: "justified on grounds of public
        morality, public policy or public security, the protection of
        health and life of humans, animals or plants, the protection of
        intellectual,  industrial  and  commercial  property,  or  the
        protection of national treasures, possessing artistic, historic
        or archaeological value,".

27.5 :  EC in context  with footnote 27.4 suggests deletion.

27.6 :  EC  suggests  substituting  with:  "its  international  nuclear
        safeguards obligations or in pursuance of other issues of
        nuclear proliferation. Such actions".

27.7 :  USA asks for adding "and Investment".

27.8 :  J suggests deletion, and replacement with: "obligations under
        other nuclear non–proliferation regimes".

27.9 :  RUF asks for addition of subpara. (j) of Art. XX and Art XII of
        GATT.

27.10:  EC final position reserved on para (1).

27.11:  USA and EC ask for substituting with "security".

27.12:  EC final position reserved on para (2).

27.13:  USA suggests insertion:"most favoured nation".

27.14:  EC suggests insertion:"to another Contracting Party".

27.15:  J reserved position and argued that since this Agreement should be based on the principle of non-discrimination among the Contracting Parties, the provision of exception of MFN treatment with regard to customs union, etc ..., should not be included.

27.16:  Left for later discussion. USA suggests deletion.

27.17:  For consideration at next meeting.

27.18:  EC - a statement in the minutes of the concluding document could substitute, if necessary, the ex-paragraph (4) concerning a Community exception:

(4) In their mutual relations, Contracting Parties which are Members of the European Economic Community shall apply Community rules and shall not therefore apply the rules arising from this Agreement except insofar as there is no Community rule governing the particular subject concerned.

27.19:  CDN believes that substantive and organizational changes are required in Article 27. It proposes the following illustrative text as addressing those needs :

(1) The provisions of this Agreement shall not preclude any Contracting Party from adopting or enforcing any measures :

- 85 -

a) necessary to protect its public [order/morals];

b) necessary to protect human, animal or plant life or health;

c) relating to the conservation of exhaustible energy resources if such measures are made effective in conjunction with restrictions on domestic production or consumption;

d) essential to the acquisition or distribution of [Energy Materials and Products] in general or local short supply, if such measures are consistent with the principle that all Contracting Parties are entitled to an equitable share of the interantional supply of such [Energy Materials and Products] and that any such measures that are inconsistent with this Agreement shall be discontinued as soon as the conditions giving rise to them have ceased to exist; or

e) necessary for prudential, fiduciary or consumer protection reasons;

provided that such measures shall not constitute disguised restrictions on trade or Investment, or arbitrary or unjustifiable discrimination between Contracting Parties or between Investors of Contracting Parties. Such measures shall be duly motivated and shall not be disproportionate to the stated end.

(2) Nothing in this Agreement shall be construed :

a) to require any Contracting Party to furnish any information the disclosure of which it considers contrary to its essential security interests;

b) to prevent any Contracting Party from taking any measure which it considers necessary for the protection of its essential security interests :

i) relating to the supply of [Energy Materials and Products] to a military establishment;

ii) taken in the time of war or other emergency in international relations involving the Contracting Party taking the measure;

iii) relating to its obligations under the Treaty on the Non-Proliferation of Nuclear Weapons or other international nuclear non-proliferation undertakings, or required by national nuclear non-proliferation laws, regulations or policies; or

c) to prevent any Contracting Party from taking any measure in pursuance of its obligations under the United Nations Charter for the maintenance of international peace and security;

provided that any such measure shall not constitute a disguised restrictions on trade or Investment and that any such measure shall be duly motivated.

(3) If a Contracting Party considers that any measure taken by another Contracting Party pursuant to paragraph (2) constitutes a disguised restriction on trade or Investment or otherwise nullifies or inpairs any benefit reasonably expected under this Agreement, it may request consultations with the Contracting Party taking the measure. Such consultations shall be held promptly, and the Contracting Party whose measure is the subject of the consultations shall give full and sympathetic considerations to the views of the other Contracting Party and shall explain, in as much detail as is consistent with its security interests, the reasons for the measure.

(4) No Contracting Party may invoke the provisions of this Article to derogate from the requirements to pay compensation pursuant to Articles 17 and 18 or to permit the transfer of an Investment or Returns in accordance with Article 19.

(5) The provisions of this Agreement shall not be construed so as to oblige any one Contracting Party to extend the benefit of any treatment, preference or privilege resulting from

(a) the membership to or association with any existing or future customs or economic union or a free trade area or similar international agreement to which any of the Contracting Parties concerned is or may become a party, or

(b) any regulation to facilitate frontier traffic.

27.20: N suggests substituting whole Article with the following:

"The provisions of this Agreement shall not be construed so as to oblige any one Contracting Party to extend to another Contracting Party the benefit of any treatment, preference or privilege resulting from the membership to or association with any existing or future customs union or a free trade area or interim agreement leading to the formation of a customs union or a free trade area, unless also that other Contracting Party is or becomes a member to or associated with such customs union, free trade area or interim arrangement; provided that the Contracting Party's membership to or association with the customs union, free trade area or interim arrangement has been duly notified to the other Contracting Parties."

To this N adds that other possible exceptions will have to be considered in view of the outcome of the discussion concerning the handling of trade policy articles (the relationship to GATT).

- 88 -

# PART VII

## STRUCTURAL AND INSTITUTIONAL

### ARTICLE 28

RELATIONSHIP BETWEEN THE AGREEMENT AND ITS PROTOCOLS

(1) The Contracting Parties agree that in order to give further effect in detail to the objectives and principles of the Charter it will be necessary to negotiate some appropriate Protocols to this Agreement, [for adoption by the Governing Council in accordance with Articles 29... and 30....][1] Each Protocol shall only apply to the Contracting Parties which enter into it. Any Contracting Party may participate in negotiations or enter into any Protocol[2].

(2) [In the event of a conflict between the obligations of a Contracting Party under this Agreement and [its][3] obligations[4] under a Protocol, its obligations under this Agreement shall prevail, except as otherwise provided in this Agreement][5][6].

(3) A State or regional economic integration organisation shall not become a Party to a Protocol unless it is, or becomes at the same time, a Party to this Agreement.

---

Chairman's note

The Chairman draws the attention to the fact that not all Articles in a Protocol need to be relevant for all Contracting Parties.

At the Chairman's request the Secretariat will prepare a message to the Plenary summarizing the debate which took place during the discussion in WG II of 19/6/92 of Article 28 concerning the issue of whether and the extent to which Protocols should be legally binding.

General comments

N argues that this Article should specify that the BA, in addition to
being fully applied in Protocols, should also apply equally in areas,
if any, covered by the term [Energy Materials and Products], which are
not explicitly dealt with in any Protocol.

Specific comments

28.1:   Pending  discussion  of  Articles  29  and  30  and  a  clearer
        understanding  of  the  impact  of  portions  of  those  Articles  on
        this Article.

28.2:   RUF requests additional sentence : "The Contracting Parties may
        subsequently increase the number of Protocols concluded as the
        need for them arises".

28.3:   USA requests deletion.

28.4:   USA suggests insertion of : "that may be established".

28.5:   D asks for deletion.

28.6:   EC general reserve.

– 90 –

[ARTICLE 29]<sup>(1)</sup>

GOVERNING COUNCIL

(1) A Governing Council composed of one representative of each
Contracting Party is hereby established. The first meeting of the
Governing Council shall be convened by the Secretariat designated
on an interim basis under Article 31 not later than [one year]<sup>(2)</sup>
after the closing date for signature of this Agreement in
accordance with Article 33. Thereafter, ordinary meetings of the
Governing Council shall be held at [regular] intervals to be
determined by the Council.

(2) Extraordinary meetings of the Governing Council shall be held at
such other times as may be deemed necessary by the Council, or at
the written request of any Contracting Party, provided that, within
six weeks of the request being communicated to them by the
Secretariat, it is supported by at least one-third of the
Contracting Parties.

(3) The Governing Council shall agree upon and adopt rules of procedure
and financial rules for itself [and for any subsidiary bodies it
may establish within the scope of this Agreement]<sup>(3)</sup>, as well as
the staff matters referred to in Article 31 paragraphs (2) and (3)
below and the financial provisions governing the functioning of the
Secretariat.

(4) The Governing Council [,while taking care to]<sup>(4)</sup> avoid
duplication and taking full advantage of the work and expertise of
competent international or other bodies, [shall]<sup>(5)</sup> keep under
continuous review the implementation of the principles of the
Charter, and of the provisions of this Agreement and the Protocols
and, in addition, [shall]<sup>(6)</sup>

– 90 –

[ARTICLE 29] [1]

GOVERNING COUNCIL

(1) A Governing Council composed of one representative of each
Contracting Party is hereby established. The first meeting of the
Governing Council shall be convened by the Secretariat designated
on an interim basis under Article 31 not later than [one year] [2]
after the closing date for signature of this Agreement in
accordance with Article 33. Thereafter, ordinary meetings of the
Governing Council shall be held at [regular] intervals to be
determined by the Council.

(2) Extraordinary meetings of the Governing Council shall be held at
such other times as may be deemed necessary by the Council, or at
the written request of any Contracting Party, provided that, within
six weeks of the request being communicated to them by the
Secretariat, it is supported by at least one-third of the
Contracting Parties.

(3) The Governing Council shall agree upon and adopt rules of procedure
and financial rules for itself [and for any subsidiary bodies it
may establish within the scope of this Agreement] [3], as well as
the staff matters referred to in Article 31 paragraphs (2) and (3)
below and the financial provisions governing the functioning of the
Secretariat.

(4) The Governing Council [,while taking care to] [4] avoid
duplication and taking full advantage of the work and expertise of
competent international or other bodies, [shall] [5] keep under
continuous review the implementation of the principles of the
Charter, and of the provisions of this Agreement and the Protocols
and, in addition, [shall] [6]

(a) promote in accordance with this Agreement and Protocols the [7] coordination of appropriate [policies, strategies and] measures to carry out the principles of the Charter and the provisions of this Agreement and Protocols, and [make recommendations on] [8] any other measures relating to this Agreement and Protocols;

(b) consider and adopt programmes of work to be carried out by the Secretariat, in accordance with this Agreement and Protocols;

(c) [consider and approve annual accounts and budget estimates in respect of administrative costs] [9];

(d) consider and approve the terms of any headquarters agreement, including privileges and immunities necessary for the Secretariat to carry out its functions under this Agreement and Protocols;

(e) encourage joint efforts aimed at facilitating and promoting market oriented reforms and modernization of energy sectors in the countries of Central and Eastern Europe and the [Commonwealth of] Independent States;

(f) monitor the implementation of measures undertaken pursuant to transitional arrangements in accordance with Article 42 with a view to assisting any Contracting Party in meeting its objectives and obligations ;

(g) consider and adopt, as required, in accordance with Article 37 of this Agreement, amendments to this Agreement;

(h) consider and adopt Protocols together with amendments thereto;

(i) [consider and undertake any additional action that may be required for the achievement of the purposes of this Agreement]. [10]

(11)

(5) [In 1999][12] and every 5 years thereafter the Governing Council shall review the functions remaining to it in the light of the extent to which the provisions of this Agreement and Protocols have been implemented. Following each review the function specified in paragraph (4) above may be amended or abolished by the Governing Council [by a vote,][13] in accordance with [Article 30.][14]

---

## General comments

- EC has a general reserve on this Article pending the clarification of the following issues:

    a) the role of the Secretariat and of the Governing Council,

    b) length of life of Governing Council should normally coincide with that of the Secretariat,

    c) need for a sunset clause for both the Governing Council and the Secretariat,

    d) need to clarify the tasks of the Governing Council in relation to Protocols (in particular paragraph 4(h), Article 28(2) and Article 30(4) and (5).

- J asks for clarification on "programmes of work" in (4)(b).

---

## Specific comments

29.1:   AUS, CDN and EC general reserve on whole Article 29.

29.2:   EC suggests substituting with: "three months".

29.3:   J reserve on the grounds that there is no need for subsidiary bodies.
        EC suggests deletion.

29.4:   EC suggests replacing with: "shall".

29.5:   EC suggests, in relation to its footnote 29.4, substituting with "and".

29.6:   EC deletion.

29.7:   EC proposes deletion.

29.8:   EC suggests replacing with: "undertake".

29.9:   EC amends this subpara to read: "in respect of administrative costs, consider and approve annual accounts and, before the beginning of the budget year, budget estimates;"

29.10:  AUS, EC, USA, J, reserve; an open-ended commitment.
        RUF supports retaining this subpara.
        EC suggests deletion.

29.11:  EC proposes adding a new subparagraph which should read: "(j)where appropriate, delegate, if economic and efficient, the tasks of the Secretariat as far as possible to other organisations or institutions on a contractual basis".

29.12:  EC suggests replacing with: "Not later than 5 years after entry into force".

29.13:  EC delete.

29.14:  EC suggests, in the context of footnote 29.13, substituting with: "Article 30(2)".

– 94 –

ARTICLE 30

VOTING

(1) The Contracting Parties shall make every effort to reach agreement by consensus on any matter requiring their decision, adoption or approval under this Agreement.

(2) The adoption of amendments to this Agreement shall be by [consensus][1].

(3) Procedures for adoption of amendments to any Protocol shall be defined in that Protocol.

(4) [Decisions regarding funding principles for the Governing Council, or other budgetary matters of the Council [or the Secretariat][2], shall, subject to paragraph (1) above, be taken by a qualified majority consisting of that proportion of the Contracting Parties which together contribute at least three fourths of the funding to meet the administrative costs of the Council [and the Secretariat][2] under Article 32 below].(3)

(5) In all other cases, unless [a contrary intention appears herein][4], decisions shall be taken by a three fourths majority vote of the Contracting Parties present and voting at the meeting of the Governing Council at which such matters fall to be decided.

(6) For the purposes of this Article, "Contracting Parties present and voting" means Contracting Parties present and casting an affirmative or negative vote.

(7) Subject to paragraph (4) above and paragraph (9) below each Contracting Party shall have one vote.

(8) With the exception of paragraph (4) above, no voting decision shall be valid unless it has positive and expressed support of a majority of all Contracting Parties.

(9) [For the purposes of this Article a regional economic integration organisation shall, when voting, do so in the following manner:

(a) in votes concerning this Agreement such organisation shall have a number of votes equal to the number of its member States which are Parties to this Agreement;

(b) notwithstanding paragraph (3) above, in votes concerning a Protocol such organisation shall have a number of votes equal to the number of its member States which are Parties to that Protocol.

In either case such organisation shall not exercise its right to vote if its member States exercise theirs, and vice versa.][5]

---

General comments

CDN asks how to deal with new and unidentified Protocols.

---

Specific comments

30.1:   J replacing with "3/4 majority vote".

30.2:   AUS wishes to delete.

30.3:   RUF reserved position on para (4).

30.4:   EC suggests replacing with: "otherwise stated".

30.5:   EC reserved position on para (9).

ARTICLE 31

SECRETARIAT

(1) The Secretariat shall be composed of a Secretary General and such staff as the minimum consistent with efficiency.

(2) The Secretary General shall be appointed by the Governing Council, initially for a period of maximum 5 years.

(3) In the performance of their duties under this Agreement the Secretary General and the staff shall be responsible to and report to the Governing Council.

(4) The Governing Council, acting by majority, shall take all decisions necessary for the establishment and the functioning of the Secretariat including the structure , staff levels and standard terms of employment of officials and employees. The Secretariat shall carry out the functions assigned to it in this Agreement or in any Protocol and any other assigned to it by the Governing Council, and shall seek to the extent possible the services of competent international or other bodies.

(5) The Secretariat functions will be carried out on an interim basis by a provisional Secretariat until the entry into force of this Agreement pursuant to Article 39 and the appointment of a permanent Secretariat under this Article.

## ARTICLE 32

### FUNDING PRINCIPLES

(1) Each Contracting Party shall meet its own costs of representation at meetings of the Governing Council.

(2) Expense of meetings of the Governing Council shall be regarded as an administrative cost of the Secretariat.

(3) [The administrative costs][1] of the Secretariat shall be met by the Contracting Parties by contributions payable in the proportion specified in Annex [B].

Note

Consideration will have to be given to Secretariat costs arising from provisions in Protocols, and to the method of updating Annex [B] to allow for changes in membership.

Specific comments

32.1:  RUF reserved position until the structure and nature of administrative costs could be more closely defined.

# PART VIII

## FINAL PROVISIONS

### General comment

AUS, CDN and USA have a general reserve on "Governing Council" and "Protocols" pending completion of the relevant Articles (29, 28 and 1.15).

## ARTICLE 33

### SIGNATURE

This Agreement shall be open for signature by the States and regional economic integration organisations signatory to the Charter at Lisbon from [ ] to [ ].

## ARTICLE 34

### RATIFICATION, ACCEPTANCE OR APPROVAL

This Agreement and any Protocol shall be subject to ratification, acceptance or approval by States and by regional economic integration organisations. Instruments of ratification, acceptance or approval shall be deposited with the Depositary.

[ARTICLE 35][1]

## APPLICATION TO OVERSEAS TERRITORIES

(1) Any State or regional economic integration organization may at the time of signature, ratification, acceptance, approval or accession declare that the Agreement shall extend to all the territories for the international relations of which it is responsible, or to one or more of them. Such declaration shall take effect at the time the Agreement enters into force for that Contracting Party.

(2) Any Contracting Party may at a later date, by a declaration addressed to the Depositary, extend the application of this Agreement to other territory specified in the declaration. In respect of such territory the Agreement shall enter into force on the ninetieth day following the receipt by the Depositary of such declaration.

(3) Any declaration made under the two preceding paragraphs may, in respect of any territory specified in such declaration, be withdrawn by a notification addressed to the Depositary. The withdrawal shall, subject to the applicability of Article 43(3), become effective upon the expiry of one year after the date of receipt of such notification by the Depositary.

---

General comment

AUS might come back to this Article after finalisation of use of the word Domain.

---

Specific comment

35.1:    EC and N scrutiny reserve.

## ARTICLE 36

### ACCESSION

This Agreement and any Protocol shall with the agreement by consensus of the Contracting Parties thereto, be open for accession by States and regional economic integration organisations which have signed the Charter from the date on which the Agreement or the Protocol concerned is closed for signature[1]. The instruments of accession shall be deposited with the Depositary.

---------------------------------------------------------------------

Specific comments

36.1:   EC suggests adding: "according to Article 33".

## ARTICLE 37

### AMENDMENT

(1) Any Contracting Party may propose amendments to this Agreement.

(2) The text of any proposed amendment to this Agreement or to any Protocol shall be communicated to the Contracting Parties by the Secretariat at least three months before the meeting at which it is proposed for adoption.

(3) Amendments to this Agreement which have been adopted by the Contracting Parties shall be submitted by the Depositary to all Contracting Parties for ratification, approval or acceptance.

(4) Ratification, approval or acceptance of amendments to this Agreement shall be notified to the Depositary in writing. Amendments adopted in accordance with this Agreement shall enter into force between Parties having ratified, approved or accepted

them on the ninetieth day after the receipt by the Depositary of notification of their ratification, approval or acceptance by at least three-fourths of the Contracting Parties to this Agreement. Thereafter the amendments shall enter into force for any other Party on the ninetieth day after that Party deposits its instrument of ratification, approval or acceptance of the amendments.[1]

## ARTICLE 38

### ASSOCIATION AGREEMENTS

Where, in order to further the implementation of the objectives and the principles of the Charter or the provisions of this Agreement or any Protocol, it is considered necessary or desirable by the Governing Council referred to in Article 29 to permit a State, international organisation or regional economic integration organisation to associate itself with this Agreement and any Protocol, an Association Agreement shall be submitted to the Governing Council for its consideration. Such Association Agreement shall set out clearly the rights, responsibilities and limitations of associate status for that State or organisation, it being agreed that differing limitations may be applicable to different States or organisations depending upon the number of Protocols with which the State or organisation wishes to be associated, the nature of such Protocols and the level of association envisaged by the associating State or organisation and permitted by the Governing Council.

## ARTICLE 39

### ENTRY INTO FORCE

(1) This Agreement shall enter into force on the ninetieth day after the date of deposit of the thirtieth instrument of ratification, acceptance or approval thereof.

(2) For each Party which ratifies, accepts or approves this Agreement or accedes thereto after the deposit of the thirtieth instrument of ratification, acceptance, approval or accession, it shall enter into force on the ninetieth day after the date of deposit by such Party of its instrument of ratification, acceptance, approval or accession.

(3) For the purposes of paragraph (1) above, any instrument deposited by a regional economic integration organisation shall not be counted as additional to those deposited by member States of such organisation.

## [ARTICLE 40][1]

### PROVISIONAL APPLICATION

[The signatories agree to apply this Agreement and any amendments thereto provisionally following signature, to the extent that such provisional application is not inconsistent with their laws or constitutional requirements pending its entry into force in accordance with Articles 37 or 39][2].

---

Specific comments

40.1:   CDN reserve.
        N scrutiny reserve.

40.2:   J suggests replacing the whole Article with :

        "(1) Any Signatory of this Agreement may notify the Depositary that it will apply this Agreement provisionally to the extent that the obligations of this Agreement are not inconsistent with its national laws and regulations.

        (2) The Depositary shall inform all Contracting Parties and Signatories of the notification made in accordance with paragraph (1) of this Article."

[ARTICLE 41][1]

RESERVATIONS

No reservations may be made to this Agreement.

_____

Specific comments

41.1:    AUS and N reserve pending the outcome of the Norwegian proposal
         of reservations in Article 16.
              CDN reserve subject to finalization of this Agreement.


[ARTICLE 42][1]

TRANSITIONAL ARRANGEMENTS


(1) [It is recognised that due to differences in the way in which
    Contracting Parties have managed the matters [the subject of this
    Agreement][2] some Contracting Parties [will][3] be unable to
    comply with [all the][4] provisions of this Agreement immediately
    upon entry into force thereof][5][6]. [Therefore, a transitional
    period of up to [  ][7][8] years may, subject to approval by the
    Governing Council, be invoked by [any][9] Contracting Party,
    provided that a Note setting out the provisions with which it
    cannot fully comply [together with][10] a timetable for the
    implementation of measures to effect complete compliance is
    deposited with its instrument of ratification, acceptance or
    approval in accordance with Article 34 above][11][12].

(2) A Contracting Party which has invoked a transitional period shall
    notify the Secretariat

    (a) of the implementation of any measures needed to effect
        compliance;

(b) of the need for any revision to the list of measures[13] for which the transitional period has been invoked;

(c) of any application to the Governing Council to extend the timetable for achieving compliance in respect of any particular provision[14].

(3) The Secretariat shall circulate to all Contracting Parties every six months[15] the Notes referred to in para (1) above [revised as appropriate][16] to take account of any notification made under sub-paragraphs (2)(a) and (b) above, and at the same time notify all Contracting Parties of any applications under subparagraph (2) (c).

(4) The Governing Council shall review annually the progress by Contracting Parties towards implementation in accordance with Article 29 (4), at the same time as it reviews progress under[17] Article 16 (6). It may take steps to assist Contracting Parties in facilitating implementation. Applications under subparagraph (2)(c) above shall be subject to approval by the Governing Council.

-------------------------------------------------------------------

## Specific comments

42.1:  J reserved its position and noted that if retained, transitional periods should be kept as short as possible, and that progress toward fulfilment of Charter commitments should be regularly monitored and evaluated.

42.2:  EC suggests replacing with:"to which this Agreement relates".

42.3:  EC asks for substituting with "may".

42.4:  EC asks for substituting with "some".

42.5:   CDN pointed out that first sentence quotes the Charter and
        seems to be redundant.  RUF argues for retaining first sentence
        in the Article.

42.6:   EC requests for adding after thereof:"due to their need to
        adapt their economies to a market system".

42.7:   RUF raises possibility of different durations of transitional
        period for different countries.

42.8 :  USA requests filling in "one" year instead of a blank square-
        bracketed place.

42.9 :  EC suggests substituting with "such".

42.10:  EC asks for replacing with:",the reasons for its inability to
        comply and".

42.11:  RO reserved position with regard to the conditions required for
        approval of a transitional period.

42.12:  USA asks for adding a new sentence:"The Governing Council may
        decide, in acting on a request to invoke transitional
        arrangements, to offer the invoking Contracting Party revised
        terms on the implementation of measures needed to achieve
        compliance with this Agreement".

42.13:  EC asks for inserting:"for the implementation of provisions".

42.14:  EC suggests adding:",subject to the maximum period in paragraph
        (1) above".

42.15:  EC asks for inserting:"revisions to".

42.16:  EC suggests deletion.

42.17:  EC suggests adding: "Article 5 and".

- 106 -

ARTICLE 43

WITHDRAWAL

(1) At any time after five years from the date on which this Agreement has entered into force for a Contracting Party, that Party may withdraw from this Agreement by giving written notification to the Depositary.

(2) Any such withdrawal shall take effect upon expiry of one year after the date of its receipt by the Depositary, or on such later date as may be specified in the notification of the withdrawal.

(3) [The provisions of this Agreement and any relevant Protocol shall continue to apply to Investments made in the Territory of a Contracting Party as of the date when that Party's withdrawal from this Agreement takes effect for a period of twenty years from such date][1].

(4) Any Contracting Party which withdraws from this Agreement shall be considered as also having withdrawn from all Protocols to which it is Party.

---

Specific comments

43.1:    N suggests deleting para (3) pointing out that if a country has taken a step of withdrawing from the Charter system, that country will not consider it of a great importance to see to it that the provisions of the BA and Protocols are adhered to after the withdrawal.

## ARTICLE 44

### DEPOSITARY

(1) The Government of the Portugese Republic shall assume the functions of depositary of this Agreement.

(2) The Depositary shall inform the Contracting Parties, in particular, of:

(a) the signature of this Agreement, or Association Agreement and the deposit of instruments of ratification, acceptance, approval or accession in accordance with Articles 34 and 36;

(b) the date on which the Agreement, or Association Agreement will come into force in accordance with Article 39;

(c) notification of withdrawal made in accordance with Article 43;

(d) amendments adopted with respect to the Agreement, or Association Agreement, their acceptance by the Contracting Parties thereto and their date of entry into force in accordance with Article 37;

(e) any other declaration or notification concerning this Agreement.

– 108 –

ARTICLE 45

AUTHENTIC TEXTS

[The original of this Agreement of which the English, French, German, Italian, Russian and Spanish[1] texts are equally authentic, shall be deposited with <u>the Government of Portugal</u>.][2]

In witness whereof the undersigned, being duly authorised to that effect, have signed this Agreement[3].

Done at [     ] on the [     ] day of [     ].

---

<u>Specific comments</u>

45.1:   J wishes to add Japanese language as the seventh language for the authentic text or, if not accepted, to limit the number to two or three (English, French and Russian).

45.2:   D suggests deletion.

45.3:   D, subject to the footnote 42.2, suggests adding : "in English, French, German, Italian, Russian and Spanish language, of which every text is equally authentic, in one original, which will be deposited with <u>the Government of Portugal</u>."

EUROPEAN ENERGY CHARTER

CONFERENCE SECRETARIAT

_____

**ADDENDUM**
**37/92**
**BA–15**

_____

**RESTRICTED**

_____

Brussels, 28 August 1992

NOTE FROM THE SECRETARIAT

Subject: Basic Agreement Articles 1 and 16(8).

Attached is a proposal from Canada which should have been added to the footnotes to BA–15 circulated as Document 37/92 on 12 August 1992.

---

Canadian Proposal

ARTICLE 16 PARAGRAPH 8 AND RELATED DEFINITION

A.   Further to the undertaking recorded in BA14 Note 16.27 the
     following is a definition for inclusion in Article 1:

     "Key personnel:
     A natural person or natural persons who will:
          (i)   provide advice or key technical services for an
                Investment,

          (ii) establish, develop, or administer an Investment,
     in a capacity that is supervisory, executive or that
     involves special qualifications that are vital to the
     effectiveness of the Investment over and above the
     qualifications required of an ordinary skilled worker.

     The natural person and the Investor who makes or has made
     the Investment may be one and the same."

B.   In the Canadian view, however, Article 16(8) as currently
     proposed, is deficient in that it commits Contracting
     Parties only to allowing employment by the investor. We
     believe there should also be a commitment to allow the entry
     and temporary stay as well as work by key personnel as
     defined in Article 1. That is the purpose of our additional
     wording in 8(a) hereunder. We also consider it important to
     include a commitment not to require labour certification
     tests as in the proposed 8(bis).

(8)  " A Contracting Party shall, subject to its laws and
     regulations relating to the entry, temporary stay [and work]
     of natural persons:

     (a)   [permit] Investors of another Contracting Party who
           have made [Investments in the [Territory] of the first
           Contracting Party to employ within its [Territory] Key
           Personnel of their choice regardless of nationality or
           citizenship; grant entry into its territory, grant
           authorization to temporarily remain and work therein,
           and provide confirming documentation to key personnel
           of an Investor of another Contracting Party that
           commits a substantial amount of capital to an
           investment in its territory;

(8
bis)         A Contracting Party shall not require, as a condition
             for temporary stay and work under paragraph
             8(a), labour certification tests or other procedures of
             similar effect, nor shall a Contracting Party maintain
             or impose numerical restrictions in relation to the
             entry and stay of natural persons under this Article."

Canadian Proposal 16(8)

-2-


Canada would also prefer "examine in good faith" rather than
"favourably examine" and believe that "to enter and remain"
should read "to enter, remain and work temporarily".
Paragraph 8(b) would therefore read as follows:

"(b) examine <u>in good faith</u> requests made by natural persons
    who are employed by Investors of another Contracting
    Party to enter, remain <u>and work temporarily</u> in its
    [Territory] for the purpose of engaging in activities
    connected with relevant Investments."