# EXHIBIT 13

JUDGMENT OF THE COURT (Grand Chamber)3 September 2008 (*)

(Common foreign and security policy (CFSP) – Restrictive measures taken against persons and entities associated with Usama bin Laden, the Al-Qaeda network and the Taliban – United Nations – Security Council – Resolutions adopted under Chapter VII of the Charter of the United Nations – Implementation in the Community – Common Position 2002/402/CFSP – Regulation (EC) No 881/2002 - Measures against persons and entities included in a list drawn up by a body of the United Nations – Freezing of funds and economic resources – Committee of the Security Council created by paragraph 6 of Resolution 1267 (1999) of the Security Council (Sanctions Committee) – Inclusion of those persons and entities in Annex I to Regulation (EC) No 881/2002 – Actions for annulment – Competence of the Community – Joint legal basis of Articles 60 EC, 301 EC and 308 EC – Fundamental rights – Right to respect for property, right to be heard and right to effective judicial review)

In Joined Cases C-402/05 P and C-415/05 P,

TWO APPEALS under Article 56 of the Statute of the Court of Justice, lodged on 17 and 21 November 2005, respectively,

**Yassin Abdullah Kadi,** residing in Jeddah (Saudi Arabia), represented by I. Brownlie QC, D. Anderson QC and P. Saini, Barrister, instructed by G. Martin, Solicitor, with an address for service in Luxembourg,

**Al Barakaat International Foundation,** established in Spånga (Sweden), represented by L. Silbersky and T. Olsson, advokater,

appellants,

the other parties to the proceedings being:

**Council of the European Union,** represented by M. Bishop, E. Finnegan and E. Karlsson, acting as Agents,

defendant at first instance,

supported by

**Kingdom of Spain,** represented by J. Rodríguez Cárcamo, acting as Agent, with an address for service in Luxembourg,

**French Republic,** represented by G. de Bergues, E. Belliard and S. Gasri, acting as Agents,

**Kingdom of the Netherlands,** represented by H.G. Sevenster and M. de Mol, acting as Agents,

interveners on appeal,

**Commission of the European Communities,** represented by C. Brown, J. Enegren and P.J. Kuijper, acting as Agents, with an address for service in Luxembourg,

defendant at first instance,

supported by:

**French Republic,** represented by G. de Bergues, E. Belliard and S. Gasri, acting as Agents,

intervener on appeal,

**United Kingdom of Great Britain and Northern Ireland,** represented by R. Caudwell, E. Jenkinson and S. Behzadi-Spencer, acting as Agents, assisted by C. Greenwood QC and A. Dashwood, Barrister, with an address for service in Luxembourg,

intervener at first instance,

THE COURT (Grand Chamber),

composed of: V. Skouris, President, C.W.A. Timmermans (Rapporteur), A. Rosas and K. Lenaerts, Presidents of Chambers, J.N. Cunha Rodrigues, R. Silva de Lapuerta, K. Schiemann, J. Makarczyk, P. Kūris, P. Lindh, J.-C. Bonichot, T. von Danwitz and A. Arabadjiev, Judges,

Advocate General: M. Poiares Maduro,

Registrar: J. Swedenborg, Administrator,

having regard to the written procedure and further to the hearing on 2 October 2007,

after hearing the Opinion of the Advocate General at the sitting on 16 January 2008 (C-402/05 P) and 23 January 2008 (C-415/05 P),

gives the following

## Judgment

1    By their appeals, Mr Kadi (C-402/05 P) and Al Barakaat International Foundation ('Al Barakaat') (C-415/05 P) seek to have set aside the judgments of the Court of First Instance of the European Communities of 21 September 2005 in Case T-315/01 *Kadi* v *Council and Commission* [2005] ECR II-3649 ('*Kadi*') and Case T-306/01 *Yusuf and Al Barakaat International Foundation* v *Council and Commission* [2005] ECR II-3533 ('*Yusuf and Al Barakaat*') (together, 'the judgments under appeal').

2    By those judgments the Court of First Instance rejected the actions brought by Mr Kadi and Al Barakaat against Council Regulation (EC) No 881/2002 of 27 May 2002 imposing certain specific restrictive measures directed against certain persons and entities associated with Usama bin Laden, the Al-Qaeda network and the Taliban, and repealing Council Regulation (EC) No 467/2001 prohibiting the export of certain goods and services to Afghanistan, strengthening the flight ban and extending the freeze of funds and other financial resources in respect of the Taliban of Afghanistan (OJ 2002 L 139, p. 9, 'the contested regulation'), in so far as that act relates to them.

### Legal context

3    Under Article 1(1) and (3) of the Charter of the United Nations, signed at San Francisco (United States of America) on 26 June 1945, the purposes of the United Nations are inter alia '[t]o maintain international peace and security' and '[t]o achieve international cooperation in solving international problems of an economic, social, cultural, or humanitarian character, and in promoting and encouraging respect for human rights and for fundamental freedoms for all without distinction as to race, sex, language, or religion'.

4    Under Article 24(1) and (2) of the Charter of the United Nations:

'1.    In order to ensure prompt and effective action by the United Nations, its Members confer on the Security Council primary responsibility for the maintenance of international peace and security, and agree

that in carrying out its duties under this responsibility the Security Council acts on their behalf.

2.      In discharging these duties the Security Council shall act in accordance with the Purposes and Principles of the United Nations. The specific powers granted to the Security Council for the discharge of these duties are laid down in Chapters VI, VII, VIII, and XII.'

5      Article 25 of the Charter of the United Nations provides that '[t]he Members of the United Nations agree to accept and carry out the decisions of the Security Council in accordance with the present Charter'.

6      Articles 39, 41 and 48 of the Charter of the United Nations form part of Chapter VII thereof, headed 'Action with respect to threats to the peace, breaches of the peace, and acts of aggression'.

7      In accordance with Article 39 of the Charter of the United Nations:

'The Security Council shall determine the existence of any threat to the peace, breach of the peace, or act of aggression and shall make recommendations, or decide what measures shall be taken in accordance with Articles 41 and 42, to maintain or restore international peace and security.'

8      Article 41 of the Charter of the United Nations is worded as follows:

'The Security Council may decide what measures not involving the use of armed force are to be employed to give effect to its decisions, and it may call upon the Members of the United Nations to apply such measures. These may include complete or partial interruption of economic relations and of rail, sea, air, postal, telegraphic, radio, and other means of communication, and the severance of diplomatic relations.'

9      By virtue of Article 48(2) of the Charter of the United Nations, the decisions of the Security Council for the maintenance of international peace and security 'shall be carried out by the Members of the United Nations directly and through their action in the appropriate international agencies of which they are members'.

10      Article 103 of the Charter of the United Nations states that '[i]n the event of a conflict between the obligations of the Members of the United Nations under the present Charter and their obligations under any other international agreement, their obligations under the present Charter shall prevail'.

## Background to the disputes

11      The background to the disputes has been set out in paragraphs 10 to 36 of *Kadi* and in paragraphs 10 to 41 of *Yusuf and Al Barakaat*.

12      For the purposes of this judgment it may be summarised as follows.

13      On 15 October 1999 the Security Council adopted Resolution 1267 (1999), in which it, inter alia, condemned the fact that Afghan territory continued to be used for the sheltering and training of terrorists and planning of terrorist acts, reaffirmed its conviction that the suppression of international terrorism was essential for the maintenance of international peace and security and deplored the fact that the Taliban continued to provide safe haven to Usama bin Laden and to allow him and others associated with him to operate a network of terrorist training camps from territory held by the Taliban and to use Afghanistan as a base from which to sponsor international terrorist operations.

14      In the second paragraph of the resolution the Security Council demanded that the Taliban should without further delay turn Usama bin Laden over to appropriate authorities in a country where he has been indicted, or to appropriate authorities in a country where he will be arrested and effectively brought to justice. In order to ensure compliance with that demand, paragraph 4(b) of Resolution 1267 (1999) provides that all the States must, in particular, 'freeze funds and other financial resources, including funds derived or generated from property owned or controlled directly or indirectly by the Taliban, or by any

undertaking owned or controlled by the Taliban, as designated by the Committee established by paragraph 6 below, and ensure that neither they nor any other funds or financial resources so designated are made available, by their nationals or by any persons within their territory, to or for the benefit of the Taliban or any undertaking owned or controlled, directly or indirectly, by the Taliban, except as may be authorised by the Committee on a case-by-case basis on the grounds of humanitarian need'.

15    In paragraph 6 of Resolution 1267 (1999), the Security Council decided to establish, in accordance with rule 28 of its provisional rules of procedure, a committee of the Security Council composed of all its members ('the Sanctions Committee'), responsible in particular for ensuring that the States implement the measures imposed by paragraph 4, designating the funds or other financial resources referred to in paragraph 4 and considering requests for exemptions from the measures imposed by paragraph 4.

16    Taking the view that action by the Community was necessary in order to implement Resolution 1267 (1999), on 15 November 1999 the Council adopted Common Position 1999/727/CFSP concerning restrictive measures against the Taliban (OJ 1999 L 294, p. 1).

17    Article 2 of that Common Position prescribes the freezing of funds and other financial resources held abroad by the Taliban under the conditions set out in Security Council Resolution 1267 (1999).

18    On 14 February 2000, on the basis of Articles 60 EC and 301 EC, the Council adopted Regulation (EC) No 337/2000 concerning a flight ban and a freeze of funds and other financial resources in respect of the Taliban of Afghanistan (OJ 2000 L 43, p. 1).

19    On 19 December 2000 the Security Council adopted Resolution 1333 (2000), demanding, inter alia, that the Taliban should comply with Resolution 1267 (1999), and, in particular, that they should cease to provide sanctuary and training for international terrorists and their organisations and turn Usama bin Laden over to appropriate authorities to be brought to justice. The Security Council decided, in particular, to strengthen the flight ban and freezing of funds imposed under Resolution 1267 (1999).

20    Accordingly, paragraph 8(c) of Resolution 1333 (2000) provides that the States are, inter alia, '[t]o freeze without delay funds and other financial assets of Usama bin Laden and individuals and entities associated with him as designated by the [Sanctions Committee], including those in the Al-Qaeda organisation, and including funds derived or generated from property owned or controlled directly or indirectly by Usama bin Laden and individuals and entities associated with him, and to ensure that neither they nor any other funds or financial resources are made available, by their nationals or by any persons within their territory, directly or indirectly for the benefit of Usama bin Laden, his associates or any entities owned or controlled, directly or indirectly, by Usama bin Laden or individuals and entities associated with him including the Al-Qaeda organisation'.

21    In the same provision, the Security Council instructed the Sanctions Committee to maintain an updated list, based on information provided by the States and regional organisations, of the individuals and entities designated as associated with Usama bin Laden, including those in the Al-Qaeda organisation.

22    In paragraph 23 of Resolution 1333 (2000), the Security Council decided that the measures imposed, inter alia, by paragraph 8 were to be established for 12 months and that, at the end of that period, it would decide whether to extend them for a further period on the same conditions.

23    Taking the view that action by the European Community was necessary in order to implement that resolution, on 26 February 2001 the Council adopted Common Position 2001/154/CFSP concerning additional restrictive measures against the Taliban and amending Common Position 96/746/CFSP (OJ 2001 L 57, p. 1).

24    Article 4 of that common position provides:

'Funds and other financial assets of Usama bin Laden and individuals and entities associated with him, as designated by the Sanctions Committee, will be frozen, and funds or other financial resources will not be made available to Usama bin Laden and individuals or entities associated with him as designated by the Sanctions Committee, under the conditions set out in [Resolution 1333 (2000)].'

25    On 6 March 2001, on the basis of Articles 60 EC and 301 EC, the Council adopted Regulation (EC) No 467/2001 prohibiting the export of certain goods and services to Afghanistan, strengthening the flight ban and extending the freeze of funds and other financial resources in respect of the Taliban of Afghanistan, and repealing Regulation No 337/2000 (OJ 2001 L 67, p. 1).

26    The third recital in the preamble to that regulation states that the measures provided for by Resolution 1333 (2000) 'fall under the scope of the Treaty and, therefore, notably with a view to avoiding distortion of competition, Community legislation is necessary to implement the relevant decisions of the Security Council as far as the territory of the Community is concerned'.

27    Article 1 of Regulation No 467/2001 defines what is meant by 'funds' and 'freezing of funds'.

28    Under Article 2 of Regulation No 467/2001:

'1.    All funds and other financial resources belonging to any natural or legal person, entity or body designated by the ... Sanctions Committee and listed in Annex I shall be frozen.

2.    No funds or other financial resources shall be made available, directly or indirectly, to or for the benefit of, persons, entities or bodies designated by the Taliban Sanctions Committee and listed in Annex I.

3.    Paragraphs 1 and 2 shall not apply to funds and financial resources for which the Taliban Sanctions Committee has granted an exemption. Such exemptions shall be obtained through the competent authorities of the Member States listed in Annex II.'

29    Annex I to Regulation No 467/2001 contains the list of persons, entities and bodies affected by the freezing of funds imposed by Article 2. Under Article 10(1) of Regulation No 467/2001, the Commission was empowered to amend or supplement Annex I on the basis of determinations made by either the Security Council or the Sanctions Committee.

30    On 8 March 2001 the Sanctions Committee published a first consolidated list of the entities which and the persons who must be subjected to the freezing of funds pursuant to Security Council Resolutions 1267 (1999) and 1333 (2000) (see the Committee's press release AFG/131 SC/7028 of 8 March 2001). That list has since been amended and supplemented several times. The Commission has in consequence adopted various regulations pursuant to Article 10 of Regulation No 467/2001, in which it has amended or supplemented Annex I to that regulation.

31    On 17 October and 9 November 2001 the Sanctions Committee published two new additions to its summary list, including in particular the names of the following entity and person:

–    'Al-Qadi, Yasin (A.K.A. Kadi, Shaykh Yassin Abdullah; A.K.A. Kahdi, Yasin), Jeddah, Saudi Arabia', and

–    'Barakaat International Foundation, Box 4036, Spånga, Stockholm, Sweden; Rinkebytorget 1, 04, Spånga, Sweden'.

32    By Commission Regulation (EC) No 2062/2001 of 19 October 2001 amending, for the third time, Regulation No 467/2001 (OJ 2001 L 277, p. 25), Mr Kadi's name was added, with others, to Annex I.

33    By Commission Regulation (EC) No 2199/2001 of 12 November 2001 amending, for the fourth time, Regulation No 467/2001 (OJ 2001 L 295, p. 16), the name Al Barakaat was added, with others, to Annex

I.

34    On 16 January 2002 the Security Council adopted Resolution 1390 (2002), which lays down the measures to be directed against Usama bin Laden, members of the Al-Qaeda network and the Taliban and other associated individuals, groups, undertakings and entities. Paragraphs 1 and 2 of that resolution provide, in essence, for the continuance of the measures freezing funds imposed by paragraphs 4(b) of Resolution 1267 (1999) and 8(c) of Resolution 1333 (2000). In accordance with paragraph 3 of Resolution 1390 (2002), those measures were to be reviewed by the Security Council 12 months after their adoption, at the end of which period the Council would either allow those measures to continue or decide to improve them.

35    Taking the view that action by the Community was necessary in order to implement that resolution, on 27 May 2002 the Council adopted Common Position 2002/402/CFSP concerning restrictive measures against Usama bin Laden, members of the Al-Qaeda organisation and the Taliban and other individuals, groups, undertakings and entities associated with them and repealing Common Positions 96/746, 1999/727, 2001/154 and 2001/771/CFSP (OJ 2002 L 139, p. 4). Article 3 of that Common Position prescribes, inter alia, the continuation of the freezing of the funds and other financial assets or economic resources of the individuals, groups, undertakings and entities referred to in the list drawn up by the Sanctions Committee in accordance with Security Council Resolutions 1267 (1999) and 1333 (2000).

36    On 27 May 2002 the Council adopted the contested regulation on the basis of Articles 60 EC, 301 EC and 308 EC.

37    According to the fourth recital in the preamble to that regulation, the measures laid down by, inter alia, Resolution 1390 (2002) fall within the scope of the Treaty and, 'therefore, notably with a view to avoiding distortion of competition, Community legislation is necessary to implement the relevant decisions of the Security Council as far as the territory of the Community is concerned'.

38    Article 1 of Regulation No 881/2002 defines 'funds' and 'freezing of funds' in terms which are essentially identical to those used in Article 1 of Regulation No 467/2001.

39    Under Article 2 of Regulation No 881/2002:

'1.    All funds and economic resources belonging to, or owned or held by, a natural or legal person, group or entity designated by the Sanctions Committee and listed in Annex I shall be frozen.

2.    No funds shall be made available, directly or indirectly, to, or for the benefit of, a natural or legal person, group or entity designated by the Sanctions Committee and listed in Annex I.

3.    No economic resources shall be made available, directly or indirectly, to, or for the benefit of, a natural or legal person, group or entity designated by the Sanctions Committee and listed in Annex I, so as to enable that person, group or entity to obtain funds, goods or services.'

40    Annex I to the contested regulation contains the list of persons, groups and entities affected by the freezing of funds imposed by Article 2 of that regulation. That list includes, inter alia, the names of the following entity and persons:

–    'Al Barakaat International Foundation; Box 4036, Spånga, Stockholm, Sweden; Rinkebytorget 1, 04, Spånga, Sweden', and

–    'Al-Qadi, Yasin (alias KADI, Shaykh Yassin Abdullah; alias KAHDI, Yasin), Jeddah, Saudi Arabia'.

41    On 20 December 2002 the Security Council adopted Resolution 1452 (2002), intended to facilitate the implementation of counter-terrorism obligations. Paragraph 1 of that resolution provides for a number of derogations from and exceptions to the freezing of funds and economic resources imposed by Resolutions

1267 (1999) and 1390 (2002) which may be granted by the Member States on humanitarian grounds, on condition that the Sanctions Committee gives its consent.

42     On 17 January 2003 the Security Council adopted Resolution 1455 (2003), intended to improve the implementation of the measures imposed in paragraphs 4(b) of Resolution 1267 (1999), 8(c) of Resolution 1333 (2000) and 1 and 2 of Resolution 1390 (2002). In accordance with paragraph 2 of Resolution 1455 (2003), those measures are again to be improved after 12 months or earlier if necessary.

43     Taking the view that action by the Community was necessary in order to implement Resolution 1452 (2002), on 27 February 2003 the Council adopted Common Position 2003/140/CFSP concerning exceptions to the restrictive measures imposed by Common Position 2002/402 (OJ 2003 L 53, p. 62). Article 1 of Common Position 2003/140 provides that, when implementing the measures set out in Article 3 of Common Position 2002/402, the Community is to provide for the exceptions permitted by that resolution (2002).

44    On 27 March 2003 the Council adopted Regulation (EC) No 561/2003 amending, as regards exceptions to the freezing of funds and economic resources, Regulation (EC) No 881/2002 (OJ 2003 L 82, p. 1). In the fourth recital in the preamble to that regulation, the Council states that it is necessary, in view of Resolution 1452 (2002), to adjust the measures imposed by the Community.

45     In accordance with Article 1 of Regulation No 561/2003, the following article is to be inserted in the contested regulation:

'Article 2a

1.     Article 2 shall not apply to funds or economic resources where:

(a)     any of the competent authorities of the Member States, as listed in Annex II, has determined, upon a request made by an interested natural or legal person, that these funds or economic resources are:

     (i)     necessary to cover basic expenses, including payments for foodstuffs, rent or mortgage, medicines and medical treatment, taxes, insurance premiums, and public utility charges;

     (ii)     intended exclusively for payment of reasonable professional fees and reimbursement of incurred expenses associated with the provision of legal services;

     (iii) intended exclusively for payment of fees or service charges for the routine holding or maintenance of frozen funds or frozen economic resources; or

     (iv)     necessary for extraordinary expenses; and

(b)     such determination has been notified to the Sanctions Committee; and

(c)    (i)     in the case of a determination under point (a)(i), (ii) or (iii), the Sanctions Committee has not objected to the determination within 48 hours of notification; or

     (ii)     in the case of a determination under point (a)(iv), the Sanctions Committee has approved the determination.

2.     Any person wishing to benefit from the provisions referred to in paragraph 1 shall address its request to the relevant competent authority of the Member State as listed in Annex II.

The competent authority listed in Annex II shall promptly notify both the person that made the request, and any other person, body or entity known to be directly concerned, in writing, whether the request has been granted.

The competent authority shall also inform other Member States whether the request for such an exception has been granted.

3.      Funds released and transferred within the Community in order to meet expenses or recognised by virtue of this Article shall not be subject to further restrictive measures pursuant to Article 2.

…'

## The actions before the Court of First Instance and the judgments under appeal

46      By applications lodged at the Registry of the Court of First Instance, Mr Kadi and Al Barakaat both brought actions seeking annulment of Regulation No 467/2001, the former seeking annulment also of Regulation No 2062/2001 and the latter annulment also of Regulation No 2199/2001, in so far as those measures concern them. During the proceedings before the Court of First Instance, the appellants amended their claims and pleas in law, so as to refer thenceforth to the contested regulation, in so far as that measure concerns them.

47      By orders of the President of the First Chamber of the Court of First Instance, the United Kingdom of Great Britain and Northern Ireland was given leave to intervene in support of the forms of order sought by the defendants at first instance.

48      In the judgments under appeal, the Court of First Instance decided as a preliminary point that each action must be regarded as being directed thenceforth against the Council alone, supported by the Commission and the United Kingdom, and the sole object of each must be considered to be a claim for annulment of the contested regulation, in so far as it concerned the respective applicants (*Kadi*, paragraph 58, and *Yusuf and Al Barakaat*, paragraph 77).

49      In support of his claims, Mr Kadi put forward in his application before the Court of First Instance three grounds of annulment alleging, in essence, breaches of his fundamental rights. The first alleges breach of the right to be heard, the second, breach of the right to respect for property and of the principle of proportionality, and the third, breach of the right to effective judicial review.

50      For its part, Al Barakaat based its claims on three grounds of annulment: the first alleges that the Council was incompetent to adopt the contested regulation, the second alleges infringement of Article 249 EC and the third alleges breach of its fundamental rights.

*As regards the Council's competence concerning the adoption of the contested regulation*

51      In the contested judgments, the Court of First Instance first of all considered whether the Council was competent to adopt the contested regulation on the legal basis of Articles 60 EC, 301 EC and 308 EC, taking the view, in paragraph 61 of *Kadi*, that that was a matter of public policy which could therefore be raised by the Community judicature of its own motion.

52      In *Yusuf and Al Barakaat,* the Court of First Instance at the outset dismissed the applicants' claim alleging that there was no legal basis for Regulation No 467/2001.

53      In paragraph 107 of that judgment, the Court of First Instance found it appropriate to take such a step, even though the ground of challenge had become devoid of purpose because of the repeal of that regulation by the contested regulation, for it considered that the grounds on which it dismissed that claim formed part of the premises of its reasoning concerning the legal basis of the latter regulation, thenceforth the sole subject of the action for annulment.

54      In this connection, it first rejected, in *Yusuf and Al Barakaat*, paragraphs 112 to 116, the argument that the acts in question affected individuals, who were moreover nationals of a Member State, whereas Articles 60 EC and 301 EC authorised the Council to take measures against third countries only.

55    In paragraph 115 of that judgment, the Court of First Instance held that, just as economic or financial sanctions may legitimately be directed specifically at the rulers of a third country, rather than at the country as such, they may be directed at the persons or entities associated with those rulers or directly or indirectly controlled by them, wherever they may be.

56    According to paragraph 116, that interpretation, which is not contrary to the letter of Article 60 EC or Article 301 EC, is justified both by considerations of effectiveness and by humanitarian concerns.

57    Next, in *Yusuf and Al Barakaat*, paragraphs 117 to 121, the Court of First Instance rejected the argument that the measures at issue in that case were not intended to interrupt or reduce economic relations with a third country but to combat international terrorism and, more particularly, Usama bin Laden.

58    Finally, in paragraphs 122 and 123 of that judgment, it rejected the argument that those measures were disproportionate to the objective pursued by Articles 60 EC and 301 EC.

59    With regard, next, to the challenge to the legal basis of the contested regulation, the Court of First Instance first held, that, as the Council and the Commission have maintained, Articles 60 EC and 301 EC did not constitute in themselves a sufficient legal basis for that regulation (*Kadi*, paragraphs 92 to 97, and *Yusuf and Al Barakaat*, paragraphs 128 to 133).

60    It found, in particular, that that regulation was intended to enforce what are known as 'smart' sanctions of a new kind, a feature of which is that there is nothing at all to link the sanctions to the territory or the governing regime of a third country, for after the collapse of the Taliban regime the measures at issue, as provided for by Resolution 1390 (2002), were aimed directly at Usama bin Laden, the Al-Qaeda network and the persons and entities associated with them.

61    According to the Court of First Instance, in the light of the wording of Articles 60 EC and 301 EC, and especially of the expressions 'as regards the third countries concerned' and 'with one or more third countries' appearing there, it is not possible to have recourse to those articles to impose that new kind of sanction. They in fact authorise only the adoption of measures against a third country, which may include the rulers of such a country and the individuals and entities associated with them or controlled by them, directly or indirectly. When, however, the regime targeted by those measures has disappeared, there no longer exists a sufficient link between those individuals or entities and the third country concerned.

62    The Court of First Instance held, secondly, that the Council had rightly considered that Article 308 EC did not on its own constitute an adequate legal basis for the adoption of the contested regulation (*Kadi*, paragraphs 98 to 121, and *Yusuf and Al Barakaat*, paragraphs 134 to 157).

63    In that regard it decided that the fight against international terrorism, particularly by the imposition of economic and financial sanctions, such as the freezing of funds, in respect of individuals and entities suspected of contributing to the funding of terrorism, cannot be made to refer to one of the objects which Articles 2 EC and 3 EC expressly entrust to the Community (*Kadi*, paragraph 116, and *Yusuf and Al Barakaat*, paragraph 152).

64    According to the Court of First Instance, the measures provided for by the contested regulation could not be authorised by the object of establishing a common commercial policy (Article 3(1)(b) EC), since the Community's commercial relations with a third country are not at issue in a situation such as that in the cases before it. Nor could the objective of creating a system ensuring that competition in the internal market is not distorted (Article 3(1)(g) EC) be validly relied on, for in any event the elements presented to the Court of First Instance provided no grounds for considering that the contested regulation actually helps to avoid the risk of impediments to the free movement of capital or of appreciable distortion of competition.

65    The Court of First Instance held, thirdly, that the Council was competent to adopt the contested regulation which sets in motion in the Community the economic and financial sanctions provided for by Common

Position 2002/402, on the joint basis of Articles 60 EC, 301 EC and 308 EC (*Kadi*, paragraph 135, and *Yusuf and Al Barakaat*, paragraph 170).

66    On this point, the Court of First Instance considered that account had to be taken of the bridge, explicitly established at the time of the revision caused by the Maastricht Treaty, between Community actions imposing economic sanctions under Articles 60 EC and 301 EC and the objectives of the Treaty on European Union in the sphere of external relations (*Kadi*, paragraph 123, and *Yusuf and Al Barakaat*, paragraph 159).

67    According to the Court of First Instance, Articles 60 EC and 301 EC are wholly special provisions of the EC Treaty, in that they expressly contemplate situations in which action by the Community may prove to be necessary in order to achieve not one of the objects of the Community as fixed by the EC Treaty but rather one of the objectives specifically assigned to the European Union by Article 2 EU, namely, the implementation of a common foreign and security policy ('CFSP') (*Kadi*, paragraph 124, and *Yusuf and Al Barakaat*, paragraph 160).

68    Under Articles 60 EC and 301 EC, action by the Community is in actual fact, according to the Court of First Instance, action by the Union, the implementation of which finds its basis in the Community pillar after the Council has adopted a common position or a joint action under the CFSP (*Kadi*, paragraph 125, and *Yusuf and Al Barakaat*, paragraph 161).

*Observance of Article 249 EC*

69    In *Yusuf and Al Barakaat*, the Court of First Instance then went on to examine a plea raised only in the case giving rise to that judgment, alleging that the contested regulation, in so far as it directly prejudiced the rights of individuals and prescribed the imposition of individual sanctions, had no general application and therefore contravened Article 249 EC. That regulation could not, as a result, be understood to be a regulation, but rather a bundle of individual decisions.

70    In paragraphs 184 to 188 of that judgment the Court of First Instance rejected that plea.

71    In paragraph 186 of that judgment, it held that the contested regulation unarguably had general application within the meaning of the second paragraph of Article 249 EC, since it prohibits anyone to make available funds or economic resources to certain persons.

72    The Court of First Instance added that the fact that those persons are expressly named in Annex I to the regulation, so that they appear to be directly and individually concerned by it, within the meaning of the fourth paragraph of Article 230 EC, in no way affects the general nature of that prohibition which is effective erga omnes, as is made clear, in particular, by Article 11 of the regulation.

*Concerning respect of certain fundamental rights*

73    As regards, last, the pleas alleging, in both cases, breach of the applicants' fundamental rights, the Court of First Instance considered it appropriate to consider, in the first place, the relationship between the international legal order under the United Nations and the domestic or Community legal order, and also the extent to which the exercise by the Community and its Member States of their powers is bound by resolutions of the Security Council adopted under Chapter VII of the Charter of the United Nations. This consideration would effectively determine the scope of the review of lawfulness, particularly having regard to fundamental rights, which that court must carry out in respect of the Community acts giving effect to such resolutions. It is only if it should find that they fall within the scope of its judicial review and that they are capable of leading to annulment of the contested regulation that the Court of First Instance would have to rule on those alleged breaches (*Kadi*, paragraphs 178 to 180, and *Yusuf and Al Barakaat*, paragraphs 228 to 230).

74     Examining first the relationship between the international legal order under the United Nations and the domestic legal orders or the Community legal order, the Court of First Instance ruled that, from the standpoint of international law, the Member States, as Members of the United Nations, are bound to respect the principle of the primacy of their obligations 'under the Charter' of the United Nations, enshrined in Article 103 thereof, which means, in particular, that the obligation, laid down in Article 25 of the Charter, to carry out the decisions of the Security Council prevails over any other obligation they may have entered into under an international agreement (*Kadi*, paragraphs 181 to 184, and *Yusuf and Al Barakaat*, paragraphs 231 to 234).

75     According to the Court of First Instance, that obligation of the Member States to respect the principle of the primacy of obligations undertaken by virtue of the Charter of the United Nations is not affected by the EC Treaty, for it is an obligation arising from an agreement concluded before the Treaty, and so falling within the scope of Article 307 EC. What is more, Article 297 EC is intended to ensure that that principle is observed (*Kadi*, paragraphs 185 to 188, and *Yusuf and Al Barakaat*, paragraphs 235 to 238).

76     The Court of First Instance concluded that resolutions adopted by the Security Council under Chapter VII of the Charter of the United Nations are binding on all the Member States of the Community which must therefore, in that capacity, take all measures necessary to ensure that those resolutions are put into effect and may, and indeed must, leave unapplied any provision of Community law, whether a provision of primary law or a general principle of Community law, that raises any impediment to the proper performance of their obligations under that Charter (*Kadi*, paragraphs 189 and 190, and *Yusuf and Al Barakaat*, paragraphs 239 and 240).

77     However, according to the Court of First Instance, the mandatory nature of those resolutions stemming from an obligation under international law does not bind the Community, for the latter is not, as such, directly bound by the Charter of the United Nations, not being a Member of the United Nations, or an addressee of the resolutions of the Security Council, or the successor to the rights and obligations of the Member States for the purposes of public international law (*Kadi*, paragraph 192, and *Yusuf and Al Barakaat*, paragraph 242).

78     Nevertheless, that mandatory force binds the Community by virtue of Community law (*Kadi*, paragraph 193, and *Yusuf and Al Barakaat*, paragraph 243).

79     In that regard, the Court of First Instance referring, by analogy, to Joined Cases 21/72 to 24/72 *International Fruit Company and Others* [1972] ECR 1219, paragraph 18, in particular, held that, in so far as under the EC Treaty the Community has assumed powers previously exercised by Member States in the area governed by the Charter of the United Nations, the provisions of that Charter have the effect of binding the Community (*Kadi*, paragraph 203, and *Yusuf and Al Barakaat*, paragraph 253).

80     In the following paragraph in those judgments, the Court of First Instance concluded, first, that the Community may not infringe the obligations imposed on its Member States by the Charter of the United Nations or impede their performance and, second, that in the exercise of its powers it is bound, by the very Treaty by which it was established, to adopt all the measures necessary to enable its Member States to fulfil those obligations.

81     Being thus called upon, in the second place, to determine the scope of the review of legality, especially in the light of fundamental rights, that it must carry out concerning Community measures giving effect to resolutions of the Security Council, such as the contested regulation, the Court of First Instance first recalled, in *Kadi*, paragraph 209, and *Yusuf and Al Barakaat*, paragraph 260, that, according to case-law, the European Community is based on the rule of law, inasmuch as neither its Member States nor its institutions can avoid review of the question whether their acts are in conformity with the basic constitutional charter, the EC Treaty, which established a complete system of legal remedies and procedures designed to enable the Court of Justice to review the legality of acts of the institutions.

82      In *Kadi*, paragraph 212, and *Yusuf and Al Barakaat*, paragraph 263, the Court of First Instance considered, however, that the question arising in the cases before it was whether there exist any structural limits, imposed by general international law or by the EC Treaty itself, on that judicial review.

83      In that connection the Court of First Instance recalled, in *Kadi*, paragraph 213, and *Yusuf and Al Barakaat*, paragraph 264, that the contested regulation, adopted in the light of Common Position 2002/402, constitutes the implementation at Community level of the obligation placed on the Member States of the Community, as Members of the United Nations, to give effect, if appropriate by means of a Community act, to the sanctions against Usama bin Laden, members of the Al-Qaeda network and the Taliban and other associated individuals, groups, undertakings and entities, which have been decided and later strengthened by several resolutions of the Security Council adopted under Chapter VII of the Charter of the United Nations.

84      In that situation, the Community acted, according to the Court of First Instance, under circumscribed powers leaving it no autonomous discretion in their exercise, so that it could, in particular, neither directly alter the content of the resolutions at issue nor set up any mechanism capable of giving rise to such alteration (*Kadi*, paragraph 214, and *Yusuf and Al Barakaat*, paragraph 265).

85      The Court of First Instance inferred therefrom that the applicants' challenging of the internal lawfulness of the contested regulation implied that the Court of First Instance should undertake a review, direct or indirect, of the lawfulness of the resolutions put into effect by that regulation in the light of fundamental rights as protected by the Community legal order (*Kadi*, paragraphs 215 and 216, and *Yusuf and Al Barakaat*, paragraphs 266 and 267).

86      In paragraphs 217 to 225 of *Kadi*, drawn up in terms identical to those of paragraphs 268 to 276 of *Yusuf and Al Barakaat*, the Court of First Instance held as follows:

'217      The institutions and the United Kingdom ask the Court as a matter of principle to decline all jurisdiction to undertake such indirect review of the lawfulness of those resolutions which, as rules of international law binding on the Member States of the Community, are mandatory for the Court as they are for all the Community institutions. Those parties are of the view, essentially, that the Court's review ought to be confined, on the one hand, to ascertaining whether the rules on formal and procedural requirements and jurisdiction imposed in this case on the Community institutions were observed and, on the other hand, to ascertaining whether the Community measures at issue were appropriate and proportionate in relation to the resolutions of the Security Council which they put into effect.

218      It must be recognised that such a limitation of jurisdiction is necessary as a corollary to the principles identified above, in the Court's examination of the relationship between the international legal order under the United Nations and the Community legal order.

219      As has already been explained, the resolutions of the Security Council at issue were adopted under Chapter VII of the Charter of the United Nations. In these circumstances, determining what constitutes a threat to international peace and security and the measures required to maintain or re-establish them is the responsibility of the Security Council alone and, as such, escapes the jurisdiction of national or Community authorities and courts, subject only to the inherent right of individual or collective self-defence mentioned in Article 51 of the Charter.

220      Where, acting pursuant to Chapter VII of the Charter of the United Nations, the Security Council, through its Sanctions Committee, decides that the funds of certain individuals or entities must be frozen, its decision is binding on the members of the United Nations, in accordance with Article 48 of the Charter.

221      In light of the considerations set out in paragraphs 193 to 204 above, the claim that the Court of First Instance has jurisdiction to review indirectly the lawfulness of such a decision according to the

standard of protection of fundamental rights as recognised by the Community legal order, cannot be justified either on the basis of international law or on the basis of Community law.

222    First, such jurisdiction would be incompatible with the undertakings of the Member States under the Charter of the United Nations, especially Articles 25, 48 and 103 thereof, and also with Article 27 of the Vienna Convention on the Law of Treaties [concluded in Vienna on 25 May 1969].

223    Second, such jurisdiction would be contrary to provisions both of the EC Treaty, especially Articles 5 EC, 10 EC, 297 EC and the first paragraph of Article 307 EC, and of the Treaty on European Union, in particular Article 5 EU, in accordance with which the Community judicature is to exercise its powers on the conditions and for the purposes provided for by the provisions of the EC Treaty and the Treaty on European Union. It would, what is more, be incompatible with the principle that the Community's powers and, therefore, those of the Court of First Instance, must be exercised in compliance with international law (Case C-286/90 *Poulsen and Diva Navigation* [1992] ECR I-6019, paragraph 9, and Case C-162/96 *Racke* [1998] ECR I-3655, paragraph 45).

224    It has to be added that, with particular regard to Article 307 EC and to Article 103 of the Charter of the United Nations, reference to infringements either of fundamental rights as protected by the Community legal order or of the principles of that legal order cannot affect the validity of a Security Council measure or its effect in the territory of the Community (see, by analogy, Case 11/70 *Internationale Handelsgesellschaft* [1970] ECR 1125, paragraph 3; Case 234/85 *Keller* [1986] ECR 2897, paragraph 7, and Joined Cases 97/87 to 99/87 *Dow Chemical Ibérica and Others* v *Commission* [1989] ECR 3165, paragraph 38).

225    It must therefore be considered that the resolutions of the Security Council at issue fall, in principle, outside the ambit of the Court's judicial review and that the Court has no authority to call in question, even indirectly, their lawfulness in the light of Community law. On the contrary, the Court is bound, so far as possible, to interpret and apply that law in a manner compatible with the obligations of the Member States under the Charter of the United Nations.'

87    In *Kadi*, paragraph 226, and *Yusuf and Al Barakaat*, paragraph 277, the Court of First Instance found that it was, none the less, empowered to check, indirectly, the lawfulness of the resolutions of the Security Council in question with regard to jus cogens, understood as a body of higher rules of public international law binding on all subjects of international law, including the bodies of the United Nations, and from which no derogation is possible.

88    In paragraphs 227 to 231 of *Kadi*, drawn up in terms identical to those of paragraphs 278 to 282 of *Yusuf and Al Barakaat*, the Court of First Instance held as follows:

'227    In this connection, it must be noted that the Vienna Convention on the Law of Treaties, which consolidates the customary international law and Article 5 of which provides that it is to apply "to any treaty which is the constituent instrument of an international organisation or to any treaty adopted within an international organisation", provides in Article 53 for a treaty to be void if it conflicts with a peremptory norm of general international law (jus cogens), defined as "a norm accepted and recognised by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character". Similarly, Article 64 of the Vienna Convention provides that: "If a new peremptory norm of general international law emerges, any existing treaty which is in conflict with that norm becomes void and terminates".

228    Furthermore, the Charter of the United Nations itself presupposes the existence of mandatory principles of international law, in particular, the protection of the fundamental rights of the human person. In the preamble to the Charter, the peoples of the United Nations declared themselves determined to "reaffirm faith in fundamental human rights, in the dignity and worth of the human person". In addition, it is apparent from Chapter I of the Charter, headed "Purposes and Principles",

that one of the purposes of the United Nations is to encourage respect for human rights and for fundamental freedoms.

229    Those principles are binding on the Members of the United Nations as well as on its bodies. Thus, under Article 24(2) of the Charter of the United Nations, the Security Council, in discharging its duties under its primary responsibility for the maintenance of international peace and security, is to act "in accordance with the Purposes and Principles of the United Nations". The Security Council's powers of sanction in the exercise of that responsibility must therefore be wielded in compliance with international law, particularly with the purposes and principles of the United Nations.

230    International law thus permits the inference that there exists one limit to the principle that resolutions of the Security Council have binding effect: namely, that they must observe the fundamental peremptory provisions of jus cogens. If they fail to do so, however improbable that may be, they would bind neither the Member States of the United Nations nor, in consequence, the Community.

231    The indirect judicial review carried out by the Court in connection with an action for annulment of a Community act adopted, where no discretion whatsoever may be exercised, with a view to putting into effect a resolution of the Security Council may therefore, highly exceptionally, extend to determining whether the superior rules of international law falling within the ambit of jus cogens have been observed, in particular, the mandatory provisions concerning the universal protection of human rights, from which neither the Member States nor the bodies of the United Nations may derogate because they constitute "intransgressible principles of international customary law" (Advisory Opinion of the International Court of Justice of 8 July 1996, The Legality of the Threat or Use of Nuclear Weapons, Reports 1996, p. 226, paragraph 79; see also, to that effect, Advocate General Jacobs's Opinion in Case C-84/95 *Bosphorus* [1996] ECR I-3953, paragraph 65).'

89    Firstly, with particular regard to the alleged breach of the fundamental right to respect for property, the Court of First Instance considered, in *Kadi*, paragraph 237, and *Yusuf and Al Barakaat*, paragraph 288, that it fell to be assessed whether the freezing of funds provided for by the contested regulation, as amended by Regulation No 561/2003, and, indirectly, by the resolutions of the Security Council put into effect by those regulations, infringed the applicant's fundamental rights.

90    In *Kadi*, paragraph 238, and *Yusuf and Al Barakaat*, paragraph 289, the Court of First Instance decided that such was not the case, measured by the standard of universal protection of the fundamental rights of the human person covered by jus cogens.

91    In *Kadi*, paragraphs 239 and 240, and *Yusuf and Al Barakaat*, paragraphs 290 and 291, the Court of First Instance held that the exemptions to and derogations from the obligation to freeze funds provided for in the contested regulation as a result of its amendment by Regulation No 561/2003, itself putting into effect Resolution 1452 (2002), show that it is neither the purpose nor the effect of that measure to submit the persons entered in the summary list to inhuman or degrading treatment.

92    In *Kadi*, paragraphs 243 to 251, and *Yusuf and Al Barakaat*, paragraphs 294 to 302, the Court of First Instance held, in addition, that the freezing of funds did not constitute an arbitrary, inappropriate or disproportionate interference with the right to private property of the persons concerned and could not, therefore, be regarded as contrary to jus cogens, having regard to the following facts:

–    the measures in question pursue an objective of fundamental public interest for the international community, that is to say, the campaign against international terrorism, and the United Nations are entitled to undertake protective action against the activities of terrorist organisations;

–    freezing of funds is a temporary precautionary measure which, unlike confiscation, does not affect the very substance of the right of the persons concerned to property in their financial assets but only the use thereof;

– the resolutions of the Security Council at issue provide for a means of reviewing, after certain periods, the overall system of sanctions;

– those resolutions set up a procedure enabling the persons concerned to present their case at any time to the Sanctions Committee for review, through the Member State of their nationality or that of their residence.

93      As regards, secondly, the alleged breach of the right to be heard, and more particularly, first, the applicants' alleged right to be heard by the Community institutions before the contested regulation had been adopted, the Court of First Instance held as follows in paragraph 258 of *Kadi*, to which paragraph 328 of *Yusuf and Al Barakaat* corresponds, mutatis mutandis:

'In this instance, as is apparent from the preliminary observations above on the relationship between the international legal order under the United Nations and the Community legal order, the Community institutions were required to transpose into the Community legal order resolutions of the Security Council and decisions of the Sanctions Committee that in no way authorised them, at the time of actual implementation, to provide for any Community mechanism whatsoever for the examination or re-examination of individual situations, since both the substance of the measures in question and the mechanisms for re-examination (see paragraphs 262 et seq. …) fell wholly within the purview of the Security Council and its Sanctions Committee. As a result, the Community institutions had no power of investigation, no opportunity to check the matters taken to be facts by the Security Council and the Sanctions Committee, no discretion with regard to those matters and no discretion either as to whether it was appropriate to adopt sanctions vis-à-vis the applicants. The principle of Community law relating to the right to be heard cannot apply in such circumstances, where to hear the person concerned could not in any case lead the institution to review its position.'

94      The Court of First Instance concluded in *Kadi*, paragraph 259, that the Council was not obliged to hear the applicant on the subject of his inclusion in the list of persons and entities affected by the sanctions, in the context of the adoption and implementation of the contested regulation and, in *Yusuf and Al Barakaat*, paragraph 329, that the Council was not obliged to hear the applicants before the contested regulation was adopted.

95      With regard, second, to breach of the applicants' alleged right to be heard by the Sanctions Committee in connection with their inclusion in the summary list, the Court of First Instance held in paragraph 261 of *Kadi* and paragraph 306 of *Yusuf and Al Barakaat* that no such right was provided for by the Security Council's resolutions at issue.

96      It further held in *Yusuf and Al Barakaat*, paragraph 307, that no mandatory rule of public international law requires a prior hearing for the persons concerned in circumstances such as those of the case in point.

97      The Court of First Instance observed, moreover, that although the resolutions of the Security Council concerned and the subsequent regulations that put them into effect in the Community do not provide for any right of audience for individual persons, they nevertheless set up a mechanism for the re-examination of individual cases, by providing that the persons concerned may address a request to the Sanctions Committee, through their national authorities, in order either to be removed from the summary list or to obtain exemption from the freezing of funds (*Kadi*, paragraph 262, and *Yusuf and Al Barakaat*, paragraph 309).

98      Referring, in *Kadi*, paragraph 264, and in *Yusuf and Al Barakaat*, paragraph 311, to the 'Guidelines of the [Sanctions] Committee for the conduct of its work', as adopted by that committee on 7 November 2002 and amended on 10 April 2003 ('the Sanctions Committee's Guidelines'), and, in *Kadi*, paragraph 266, and *Yusuf and Al Barakaat*, paragraph 313, to various resolutions of the Security Council, the Court of First Instance noted, in those paragraphs, the importance attached by the Security Council, in so far as possible, to the fundamental rights of the persons entered in the list, and especially to their right to be heard.

99    In *Kadi*, paragraph 268, and in *Yusuf and Al Barakaat*, paragraph 315, the Court of First Instance found that the fact, noted in the previous paragraph of both judgments, that the re-examination procedure confers no right directly on the persons concerned themselves to be heard by the Sanctions Committee - the only authority competent to give a decision, on a State's petition, on the re-examination of their case - with the result that those persons are dependent, essentially, on the diplomatic protection afforded by the States to their nationals, is not to be deemed improper in the light of the mandatory prescriptions of the public international order.

100    The Court of First Instance added that it is open to the persons involved to bring an action for judicial review based on domestic law, indeed even directly on the contested regulation and the relevant resolutions of the Security Council which it puts into effect, against any wrongful refusal by the competent national authority to submit their cases to the Sanctions Committee for re-examination (*Kadi*, paragraph 270, and *Yusuf and Al Barakaat*, paragraph 317).

101    The Court of First Instance held, in addition, that in circumstances such as those of the cases in point, in which what is at issue is a temporary precautionary measure restricting the availability of the applicants' property, observance of the fundamental rights of the persons concerned does not require the facts and evidence adduced against them to be communicated to them, once the Security Council or its Sanctions Committee is of the view that there are grounds concerning the international community's security that militate against it (*Kadi*, paragraph 274, and *Yusuf and Al Barakaat*, paragraph 320).

102    Having regard to those considerations, the Court of First Instance held in *Kadi*, paragraph 276, and *Yusuf and Al Barakaat*, paragraph 330, that the applicants' plea alleging breach of the right to be heard must be rejected.

103    Lastly, with regard to the plea alleging breach of the right to effective judicial review, the Court of First Instance found as follows in paragraphs 278 to 285 of *Kadi*, drawn up in terms essentially identical to those of paragraphs 333 to 340 of *Yusuf and Al Barakaat*:

'278    In the circumstances of this case, the applicant has been able to bring an action for annulment before the Court of First Instance under Article 230 EC.

279    In dealing with that action, the Court carries out a complete review of the lawfulness of the contested regulation with regard to observance by the institutions of the rules of jurisdiction and the rules of external lawfulness and the essential procedural requirements which bind their actions.

280    The Court also reviews the lawfulness of the contested regulation having regard to the Security Council's regulations which that act is supposed to put into effect, in particular from the viewpoints of procedural and substantive appropriateness, internal consistency and whether the regulation is proportionate to the resolutions.

281    Giving a decision pursuant to that review, the Court finds that it is not disputed that the applicant is indeed one of the natural persons entered in the summary list on 19 October 2001.

282    In this action for annulment, the Court has moreover held that it has jurisdiction to review the lawfulness of the contested regulation and, indirectly, the lawfulness of the resolutions of the Security Council at issue, in the light of the higher rules of international law falling within the ambit of jus cogens, in particular the mandatory prescriptions concerning the universal protection of the rights of the human person.

283    On the other hand, as has already been observed in paragraph 225 above, it is not for the Court to review indirectly whether the Security Council's resolutions in question are themselves compatible with fundamental rights as protected by the Community legal order.

284    Nor does it fall to the Court to verify that there has been no error of assessment of the facts and evidence relied on by the Security Council in support of the measures it has taken or, subject to the limited extent defined in paragraph 282 above, to check indirectly the appropriateness and proportionality of those measures. It would be impossible to carry out such a check without trespassing on the Security Council's prerogatives under Chapter VII of the Charter of the United Nations in relation to determining, first, whether there exists a threat to international peace and security and, second, the appropriate measures for confronting or settling such a threat. Moreover, the question whether an individual or organisation poses a threat to international peace and security, like the question of what measures must be adopted vis-à-vis the persons concerned in order to frustrate that threat, entails a political assessment and value judgments which in principle fall within the exclusive competence of the authority to which the international community has entrusted primary responsibility for the maintenance of international peace and security.

285    It must thus be concluded that, to the extent set out in paragraph 284 above, there is no judicial remedy available to the applicant, the Security Council not having thought it advisable to establish an independent international court responsible for ruling, in law and on the facts, in actions brought against individual decisions taken by the Sanctions Committee.'

104   In *Kadi*, paragraph 268, and *Yusuf and Al Barakaat*, paragraph 315, the Court of First Instance held that any such lacuna in the judicial protection available to the applicant is not in itself contrary to jus cogens.

105   In this respect, the Court of First Instance found as follows in paragraphs 288 to 290 of *Kadi*, drawn up in terms essentially identical to those of paragraphs 343 to 345 of *Yusuf and Al Barakaat*:

'288    In this instance, the Court considers that the limitation of the applicant's right of access to a court, as a result of the immunity from jurisdiction enjoyed as a rule, in the domestic legal order of the Member States of the United Nations, by resolutions of the Security Council adopted under Chapter VII of the Charter of the United Nations, in accordance with the relevant principles of international law (in particular Articles 25 and 103 of [that] Charter), is inherent in that right as it is guaranteed by jus cogens.

289    Such a limitation is justified both by the nature of the decisions that the Security Council is led to take under Chapter VII of the Charter of the United Nations and by the legitimate objective pursued. In the circumstances of this case, the applicant's interest in having a court hear his case on its merits is not enough to outweigh the essential public interest in the maintenance of international peace and security in the face of a threat clearly identified by the Security Council in accordance with the Charter of the United Nations. In this regard, special significance must attach to the fact that, far from providing for measures for an unlimited period of application, the resolutions successively adopted by the Security Council have always provided a mechanism for re-examining whether it is appropriate to maintain those measures after 12 or 18 months at most have elapsed …

290    Last, the Court considers that, in the absence of an international court having jurisdiction to ascertain whether acts of the Security Council are lawful, the setting-up of a body such as the Sanctions Committee and the opportunity, provided for by the legislation, of applying at any time to that committee in order to have any individual case re-examined, by means of a procedure involving both the "petitioned government" and the "designating government" …, constitute another reasonable method of affording adequate protection of the applicant's fundamental rights as recognised by jus cogens.'

106   Consequently the Court of First Instance dismissed the pleas alleging breach of the right to effective judicial review and, as a result, the actions in their entirety.

**Forms of order sought by the parties to the appeal**

107    By his appeal, Mr Kadi claims that the Court should:

–    set aside in whole the judgment in *Kadi*;

–    declare the contested regulation null and void, and

–    order the Council and/or the Commission to pay the costs in this appeal and those incurred in the proceedings before the Court of First Instance.

108    By its appeal, Al Barakaat claims that the Court should:

–    set aside the judgment in *Yusuf and Al Barakaat*;

–    declare the contested regulation null and void, and

–    order the Council and the Commission to pay the costs relating to the present appeal and to the proceedings before the Court of First Instance.

109    The Council contends in both cases that the Court should reject the appeal and order the appellant to pay the costs.

110    In Case C-402/05 P the Commission contends that the Court should:

–    declare that none of the grounds of appeal put forward by the appellant is capable of impugning the operative part of the judgment in *Kadi*, and replace the grounds of that judgment with those proposed in its response;

–    in consequence, reject the appeal; and

–    order the appellant to pay the costs.

111    In Case C-415/05 P the Commission contends that the Court should:

–    reject the appeal in its entirety, and

–    order the appellant to pay the costs.

112    The United Kingdom has brought a cross-appeal contending that the Court should:

–    dismiss the appeals, and

–    set aside that part of the judgments under appeal which deal with the question of jus cogens, that is to say, paragraphs 226 to 231 of *Kadi* and paragraphs 277 to 281 of *Yusuf and Al Barakaat*.

113    The Kingdom of Spain, granted leave to intervene in support of the forms of order sought by the Council by orders of the President of the Court of 27 April 2006 (Case C-402/05 P) and 15 May 2006 (Case C-415/05 P), contends that the Court should:

–    reject the appellants' appeals in their entirety and uphold in their entirety the judgments under appeal, and

–    order the appellants to pay the costs;

–    dismiss the Commission's contentions in relation to the first ground of each appeal, upholding the judgments under appeal, and

–    order the Commission to pay the costs;

    –    in the alternative, if the Court should set aside the judgment under appeal and, consequently, annul Regulation No 881/2002, order the effects of that regulation to be maintained, pursuant to Article 231 EC, until a new regulation is adopted replacing it.

114   The French Republic, granted leave to intervene in support of the forms of order sought by the Council by orders of the President of the Court of 27 April 2006 (Case C-402/05 P) and 15 May 2006 (Case C-415/05 P), contends that the Court should:

    –    reject the appellants' appeals, allow the cross-appeal of the United Kingdom and carry out a substitution of the grounds as regards the part of the judgments under appeal which concerns jus cogens, and

    –    order the appellants to pay the costs.

115   The Kingdom of the Netherlands, granted leave to intervene in support of the form of order sought by the Council by orders of the President of the Court of 27 April 2006 (Case C-402/05 P) and 15 May 2006 (Case C-415/05 P), contends in both cases that the Court should dismiss the appeal, with the proviso that there should be substitution of the grounds with regard to the scope of the review of legality or, alternatively, to the question whether norms of jus cogens have been infringed.

### The grounds of challenge to the judgments under appeal

116   Mr Kadi puts forward two grounds of appeal, the first alleging lack of any legal basis for the contested regulation and the second concerning breach of several rules of international law by the Court of First Instance and the consequences of that breach as regards the assessment of his arguments relating to the infringement of certain of his fundamental rights which he pleaded before the Court of First Instance.

117   Al Barakaat puts forward three grounds of appeal, the first alleging lack of any legal basis for the contested regulation, the second infringement of Article 249 EC and the third infringement of certain of its fundamental rights.

118   In its cross-appeal the United Kingdom puts forward a single ground relating to the error of law allegedly committed by the Court of First Instance in concluding in the judgments under appeal that it was competent to consider whether the Security Council's resolutions at issue were compatible with the rules of jus cogens.

### Concerning the appeals

119   By order of 13 November 2007 the President of the Court ordered the name of Ahmed Ali Yusuf to be struck from the Court's register in response to his abandonment of the appeal that he had brought jointly with Al Barakaat in Case C-415/05 P.

120   The parties and the Advocate General having been heard in this regard, it is appropriate, on account of the connection between them, to join the present cases for the purposes of the judgment, in accordance with Article 43 of the Rules of Procedure of the Court.

*Concerning the grounds of appeal relating to the legal basis of the contested regulation*

Arguments of the parties

121   By his first ground of appeal Mr Kadi claims that the Court of First Instance erred in law when it held, in paragraph 135 of *Kadi*, that it was possible for the contested regulation to be adopted on the joint basis of Articles 60 EC, 301 EC and 308 EC.

122    That plea falls into three parts.

123    In the first part Mr Kadi maintains that the Court of First Instance erred in law in ruling that Articles 60 EC and 301 EC could be regarded as constituting a partial legal basis for the contested regulation. Furthermore, the Court of First Instance did not explain how those provisions, which can provide a basis only for measures against third countries, could be envisaged, together with Article 308 EC, as the legal basis of the contested regulation, when the latter contains only restrictive measures directed against individuals and non-State entities.

124    In the second part, Mr Kadi asserts that, if Articles 60 EC and 301 EC were nevertheless to be held to constitute a partial legal basis for the contested regulation, the Court of First Instance erred in law because it misconstrued Article 301 EC and its function as a 'bridge', for that article in no circumstances includes the power to take measures intended to attain an objective of the EU Treaty.

125    In the third part, Mr Kadi argues that the Court of First Instance erred in law by interpreting Article 308 EC in such a way that that article might provide a legal basis for legislation for which the necessary powers have not been provided in the EC Treaty and which was not necessary in order to attain one of the Community's objectives. In *Kadi*, paragraphs 122 to 134, the Court of First Instance wrongly assimilated the objectives of the two integrated but separate legal orders constituted by the Union and the Community and thus misinterpreted the limitations of Article 308 EC.

126    Furthermore, such a view is, to his mind, incompatible with the principle of conferred powers laid down in Article 5 EC. It follows from paragraphs 28 to 35 of Opinion 2/94 of 28 March 1996 (ECR I-1759) that the fact that an objective is mentioned in the Treaty on European Union cannot make good the lack of that objective in the list of the objectives of the EC Treaty.

127    The Council and the French Republic contest the first part of Mr Kadi's first ground of appeal, arguing inter alia that the reference to Articles 60 EC and 301 EC in the legal basis of the contested regulation is warranted by the fact that those provisions enact restrictive measures whose ambit was to be extended, by means of recourse to Article 308 EC, to persons or non-State entities that were not, therefore, covered by those two articles.

128    For its part, the United Kingdom maintains that Article 308 EC was used as a means of supplementing the instrumental powers provided for by Articles 60 EC and 301 EC, those articles not constituting, therefore, a partial legal basis for the contested regulation. The Kingdom of Spain raises in essence the same line of argument.

129    With regard to the second part of that ground of appeal, the Council maintains that the raison d'être of the bridge provided for in Article 301 EC is precisely to give it the power to adopt measures intended to attain an objective of the EU Treaty.

130    The Kingdom of Spain, the French Republic and the United Kingdom maintain that it is Article 308 EC, and not Articles 60 EC and 301 EC, that enabled the adoption of restrictive measures aimed at individuals and non-State entities, so enlarging the ambit of those two articles.

131    So far as the third part of Mr Kadi's first ground of appeal is concerned, the Council argues that the whole point of the bridge provided by Article 301 EC is, exceptionally, to use those powers conferred on the Community to impose economic and financial sanctions for the purpose of attaining an objective of the CFSP, and so of the Union, rather than a Community objective.

132    The United Kingdom and the Member States intervening in the appeal broadly support that position.

133    The United Kingdom clarifies its position by stating that, in its view, the action provided for by the contested regulation can be regarded as contributing to the attainment, not of an objective of the Union but of an objective of the Community, namely, the implicit and purely instrumental objective underlying

Articles 60 EC and 301 EC of providing effective means of giving effect, exclusively by way of coercive economic measures, to acts adopted under the power conferred upon the Union by Title V of the EU Treaty.

134    According to that Member State, when attainment of that instrumental objective requires forms of economic coercion going beyond the powers specifically conferred on the Council by Articles 60 EC and 301 EC, it is appropriate to have recourse to Article 308 EC to supplement those powers.

135    The Commission, having declared that it had reconsidered its point of view, argues, primarily, that Articles 60 EC and 301 EC, having regard to their wording and context, constituted in themselves appropriate and sufficient legal bases for the adoption of the contested regulation.

136    In this connection the Commission raises the following arguments:

–    the wording of Article 301 EC is sufficiently broad to cover economic sanctions against individuals – provided that they are present in or otherwise associated with a third country. The expression 'economic relations' covers a vast range of activities. Any economic sanction, even directed at a third country, such as an embargo, directly affects the individuals concerned and the country only indirectly. The wording of Article 301 EC, especially the term 'in part', does not call for a partial measure to be directed against a particular section of the countries in question, such as the government. Allowing, as it does, the Community to break off completely economic relations with all countries, that provision must also authorise it to interrupt economic relations with a limited number of individuals in a limited number of countries;

–    the fact that similar words are used in Article 41 of the Charter of the United Nations and in Article 301 EC shows that the authors of that latter provision clearly intended to provide a platform for the implementation by the Community of all measures adopted by the Security Council that call for action by the Community;

–    Article 301 EC puts in place a procedural bridge between the Community and the Union, but seeks neither to increase nor to reduce the ambit of Community competence. As a result, that provision has to be interpreted as broadly as the relevant Community powers.

137    The Commission maintains that the measures at issue fall within the ambit of the common commercial policy, having regard to the effect on trade of measures prohibiting the movement of economic resources, and even that those measures constitute provisions relating to the free movement of capital, since they involve the prohibition of transferring economic resources to individuals in third countries.

138    The Commission also argues that it is clear from Article 56(1) and (2) EC that movements of capital and payments between the Community and third countries fall within Community competence, the Member States being able to adopt sanction measures only within the framework of Article 60(2) EC and not of Article 58(1)(b) EC.

139    In consequence, the Commission believes that recourse may not be had to Article 308 EC for the adoption of the contested regulation, since power to act is provided for in Articles 60 EC and 301 EC. The Commission, referring in particular to Case C-94/03 *Commission* v *Council* [2006] ECR I-1, paragraph 35, argues that those articles provide the basis for the main or predominant component of the contested regulation, in relation to which other components such as the freezing of the assets of persons who are both nationals of Member States of the Union and associated with a foreign terrorist group are merely secondary.

140    Alternatively, the Commission contends that, before resorting to Article 308 EC, it is necessary to examine the applicability of the articles of the EC Treaty dealing with the common commercial policy and the free movement of capital and payments.

141    In the further alternative, it maintains that, if Article 308 EC were to be held to be the legal basis of the contested regulation, it would be the sole legal basis, for recourse to that provision must be based on the consideration that action by the Community is necessary in order to attain one of the objectives of the Community and not, as the Court of First Instance held, the objectives of the EU Treaty in the sphere of external relations, in this case the CFSP.

142    The Community objectives involved in this instance are the common commercial policy, mentioned in Article 3(1)(b) EC, and the free movement of capital, referred to by implication in Article 3(1)(c) EC, read in conjunction with the relevant provisions of the EC Treaty, namely those contained in Article 56 EC relating to the free movement of capital to and from third countries. The measures at issue, producing effects on trade, regardless of the fact that they were adopted in pursuit of foreign policy objectives, fall within the ambit of those Community objectives.

143    Mr Kadi, the Kingdom of Spain, the French Republic and the United Kingdom, contest the view principally put forward by the Commission, objecting as follows:

–    it is an extensive interpretation of Articles 60 EC and 301 EC misconstruing the radically different and new nature of what are known as the 'smart' sanctions in question, in that they are no longer linked to any third country, and a hazardous interpretation, for those articles were introduced at a time when such a link was a feature of sanctions;

–    unlike the 'smart' sanctions in question, a total embargo is essentially directed against the rulers of a third country on whom such a measure is designed to exert pressure, and only indirectly against economic operators in the country concerned, so that it cannot be argued that all sanctions, including embargoes, are primarily directed at individuals;

–    unlike Article 41 of the Charter of the United Nations, Article 301 EC is specifically concerned with the interruption of economic relations 'with one or more third countries', with the result that no argument can be drawn from the similarity of the wording of those two provisions;

–    Article 301 EC is not just a procedural provision. It institutes a specific legal basis and procedure and clearly confers material competence upon the Community;

–    the measures imposed by the contested regulation do not concern commercial relations between the Community and third countries, and cannot, therefore, rely on the objective of the common commercial policy;

–    the Court of First Instance correctly held that those measures do not help to avoid the risk of obstacles to the free movement of capital and that Article 60(2) EC cannot be used as the basis for restrictive measures aimed at individuals or entities. That provision concerning only measures against third countries, the measures at issue could have been adopted only pursuant to Article 58(1)(b) EC.

144    The Commission's alternative argument is also challenged by both Mr Kadi and the Kingdom of Spain and the French Republic.

145    Recourse to Articles 133 EC or 57(2) EC is not permitted, given that the measures laid down by the contested regulation do not concern commercial relations with third countries and do not fall within the category of movements of capital referred to in Article 57(2) EC.

146    Nor can it be argued that the contested regulation is designed to attain any Community objectives within the meaning of Article 308 EC. The objective of the free movement of capital is excluded, for application of the measure freezing funds provided for by that regulation is not capable of giving rise to any credible and serious danger of divergence between Member States. The objective of the common commercial policy is not relevant either, given that the freezing of the funds of an individual in no way linked to the

government of a third country does not concern trade with such a country and does not pursue an objective of commercial policy.

147    If the submission it principally advances should be accepted, the Commission asks the Court, for reasons of legal certainty and for the sake of the proper performance of the obligations undertaken vis-à-vis the United Nations, to consider as definitive the effects of the contested regulation as a whole, pursuant to Article 231 EC.

148    In the same situation, the Kingdom of Spain and the French Republic have also made a request to that effect.

149    In contrast, Mr Kadi objects to those requests, claiming that the contested regulation constitutes a serious breach of fundamental rights. In any case, an exception must be made for persons who, like the applicant, have already brought an action against the regulation.

150    Al Barakaat's first ground of challenge is that the Court of First Instance held in paragraphs 158 to 170 of *Yusuf and Al Barakaat* that it was possible for the contested regulation to be adopted on the joint basis of Articles 60 EC, 301 EC and 308 EC.

151    In its view, the Court of First Instance erred in law when it held, in paragraphs 160 and 164 of that judgment, that Articles 60 EC and 301 EC are not concerned solely with the performance of an action by the Community but may also concern one of the objectives specifically assigned to the Union by Article 2 EU, namely, the implementation of the CFSP.

152    Second, Al Barakaat criticises the Court of First Instance for finding, in paragraphs 112, 113, 115 and 116 of that judgment, that sanctions decided on against individuals for the purpose of influencing economic relations with one or more third countries are covered by the provisions of Articles 60 EC and 301 EC, and that that interpretation is justified both by considerations of effectiveness and by humanitarian concerns.

153    The Council counters that the Court of First Instance was right to rule, in paragraph 161 of *Yusuf and Al Barakaat*, that, by reason of the bridge supplied by Articles 60 EC and 301 EC, sanctions laid down on the basis of those provisions, as a result of the adoption of a common position or of a joint action under the CFSP providing for the interruption or reduction of the economic relations of the Community with one or more third countries, are intended to attain the CFSP objective pursued by those acts of the Union.

154    The Council also argues that the Court of First Instance was entitled to find that recourse to Article 308 EC as an additional legal basis for the contested regulation was justified, given that that article serves only to enable the extension of the economic and financial sanctions already provided for in Articles 60 EC and 301 EC to individuals and entities not sufficiently linked to any given third country.

155    Finally, the Council is of the view that the applicant's complaint concerning the efficiency and proportionality of the sanctions provided for by that regulation is irrelevant to the issue of the appropriateness of the legal basis of the regulation.

156    With regard to that second complaint, the United Kingdom too takes the view that it has no bearing on the appeal brought by Al Barakaat, given that, as held in paragraph 1 of the operative part of the judgment under appeal, the Court of First Instance found that there was no longer any need to adjudicate on the legality of Regulation No 467/2001.

157    As to the rest, the arguments raised by the Kingdom of Spain, the French Republic, the United Kingdom and the Commission, are, in substance, the same as those raised by those parties in connection with Mr Kadi's appeal.

Findings of the Court

158    With regard, first, to the challenges made by Al Barakaat to paragraphs 112, 113, 115 and 116 of *Yusuf and Al Barakaat*, it must be held that those paragraphs relate to the legal basis of Regulation No 467/2001.

159    Now, that regulation has been repealed and replaced by the contested regulation. Moreover, as indicated by the Court of First Instance in *Yusuf and Al Barakaat*, paragraph 77, without challenge from Al Barakaat in its appeal, the sole object of the action before the Court of First Instance, after Al Barakaat had adjusted its claims for relief and pleas in law to the contested regulation, was annulment of that latter regulation, in so far as it concerns that applicant.

160    In those circumstances, those claims cannot in any case lead to the setting aside of that judgment and must therefore be regarded as immaterial.

161    In any event, the considerations of *Yusuf and Al Barakaat* to which those claims relate, treated by the Court of First Instance as premises of its reasoning with regard to the legal basis of the contested regulation, are reproduced in later paragraphs of that judgment and in *Kadi* and will be examined during the assessment of the grounds of appeal challenging those paragraphs.

162    There is, therefore, no reason to examine those heads of claim in so far as they relate to the legal basis of Regulation No 467/2001.

163    It is appropriate to rule in the second place on the merits of the principal argument put forward by the Commission, that Articles 60 EC and 301 EC, in the light of their wording and context, are in themselves an appropriate and sufficient legal base for the contested regulation.

164    That argument is directed against paragraphs 92 to 97 of *Kadi* and paragraphs 128 to 133 of *Yusuf and Al Barakaat*, in which the Court of First Instance ruled to the contrary.

165    That argument must be rejected.

166    The Court of First Instance in fact rightly ruled that, having regard to the wording of Articles 60 EC and 301 EC, especially to the expressions 'as regards the third countries concerned' and 'with one or more third countries' used there, those provisions concern the adoption of measures vis-à-vis third countries, since that concept may include the rulers of such a country and also individuals and entities associated with or controlled, directly or indirectly, by them.

167    The restrictive measures provided for by Resolution 1390 (2002), which the contested regulation was intended to put into effect, are measures notable for the absence of any link to the governing regime of a third country. Following the collapse of the Taliban regime, those measures were aimed directly at Usama bin Laden, the Al-Qaeda network and the persons and entities associated with them, as they appear in the summary list. They do not, therefore, as such, fall within the ambit of Articles 60 EC and 301 EC.

168    To accept the interpretation of Articles 60 EC and 301 EC proposed by the Commission, that it is enough for the restrictive measures at issue to be directed at persons or entities present in a third country or associated with one in some other way, would give those provisions an excessively broad meaning and would fail to take any account at all of the requirement, imposed by their very wording, that the measures decided on the basis of those provisions must be taken against third countries.

169    In addition, the essential purpose and object of the contested regulation is to combat international terrorism, in particular to cut it off from its financial resources by freezing the economic funds and resources of persons or entities suspected of involvement in activities linked to terrorism, and not to affect economic relations between the Community and each of the third countries where those persons or entities are, always supposing, moreover, that their place of residence is known.

170    The restrictive measures provided for by Resolution 1390 (2002) and put into effect by the contested regulation cannot be considered to be measures intended to reduce economic relations with each of those

third countries, or, indeed, with certain Member States of the Community, in which are to be found persons or entities whose names are included in the list reproduced in Annex I to that regulation.

171    Nor can the argument supported by the Commission be justified by the expression 'in part' appearing in Article 301 EC.

172    In point of fact, that expression refers to the possible limitation of the scope *ratione materiae* or *personae* of the measures that might, by definition, be taken under that provision. It has, however, no effect on the necessary status of the persons to whom those measures might be addressed and cannot, therefore, warrant extending the application of the measures to such persons who are in no way linked to the governing regime of a third country and who, by the same token, do not fall within the ambit of that provision.

173    The Commission's argument relating to the similarity of the words used in Article 41 of the Charter of the United Nations and in Article 301 EC, from which it deduces that the latter provision constitutes a platform for the implementation by the Community of all measures adopted by the Security Council that call for action by the Community, cannot succeed either.

174    Article 301 EC specifically refers to the interruption of economic relations 'with one or more third countries', whereas such an expression is not used in Article 41 of the Charter of the United Nations.

175    What is more, in other respects the ambit of Article 41 of the Charter of the United Nations does not coincide with that of Article 301 EC, for the first provision enables the adoption of a series of measures other than those referred to by the second, including measures of a fundamentally different nature from those intended to interrupt or reduce economic relations with third countries, such as the breaking off of diplomatic relations.

176    The Commission's argument that Article 301 EC builds a procedural bridge between the Community and the European Union, so that it must be interpreted as broadly as the relevant Community competences, including those relating to the common commercial policy and the free movement of capital, must also be rejected.

177    That interpretation of Article 301 EC threatens to reduce the ambit and, therefore, the practical effect of that provision, for, having regard to its actual wording, the subject of that provision is the adoption of potentially very diverse measures affecting economic relations with third countries which, therefore, by necessary inference, must not be limited to spheres falling within other material powers of the Community such as those in the domain of the common commercial policy or of the free movement of capital.

178    Moreover, that interpretation finds no support in the wording of Article 301 EC, which confers a material competence on the Community the scope of which is, in theory, autonomous in relation to that of other Community competences.

179    It is necessary to examine in the third place the alternative argument raised by the Commission that, if it was not possible for the contested regulation to be adopted on the sole legal basis of Articles 60 EC and 301 EC, recourse to Article 308 EC would not be justified, for that latter provision is, in particular, applicable only if no other provision of the EC Treaty confers the powers necessary to adopt the measure concerned. The restrictive measures imposed by the contested regulation fall within the Community's powers of action, in particular its powers in the sphere of the common commercial policy and free movement of capital.

180    In this connection, the Court of First Instance held, in paragraphs 100 of *Kadi* and 136 of *Yusuf and Al Barakaat*, that no specific provision of the EC Treaty provides for the adoption of measures of the kind laid down in the contested regulation relating to the campaign against international terrorism and, more particularly, to the imposition of economic and financial sanctions, such as the freezing of funds, in respect of individuals and entities suspected of contributing to the funding of international terrorism, where no

connection whatsoever has been established with the governing regime of a third State, with the result that the first condition for the applicability of Article 301 EC was satisfied in the case in point.

181    That conclusion must be upheld.

182    According to the Court's settled case-law, the choice of legal basis for a Community measure must rest on objective factors which are amenable to judicial review, including, in particular, the aim and the content of the measure (see, inter alia, Case C-440/05 *Commission* v *Council* [2007] ECR I-9097, paragraph 61 and the case-law there cited).

183    A Community measure falls within the competence in the field of the common commercial policy provided for in Article 133 EC only if it relates specifically to international trade in that it is essentially intended to promote, facilitate or govern trade and has direct and immediate effects on trade in the products concerned (see, inter alia, Case C-347/03 *Regione autonoma Friuli-Venezia Giulia andERSA* [2005] ECR I-3785, paragraph 75 and the case-law there cited).

184    With regard to its essential purpose and object, as explained in paragraph 169 above, the contested regulation is intended to combat international terrorism and it provides to that end a series of restrictive measures of an economic and financial kind, such as freezing the economic funds and resources of persons or entities suspected of contributing to the funding of international terrorism.

185    Having regard to that purpose and object, it cannot be considered that the regulation relates specifically to international trade in that it is essentially intended to promote, facilitate or govern trade.

186    Furthermore, although that regulation may indeed produce effects on international trade, it is plainly not its purpose to give rise to direct and immediate effects of that nature.

187    The contested regulation could not, therefore, be based on the powers of the Community in the sphere of the common commercial policy.

188    On the other hand, according to the Commission, in so far as the contested regulation prohibits the transfer of economic resources to individuals in third countries, it falls within the ambit of the provisions of the EC Treaty on free movement of capital and payments.

189    That assertion too must be rejected.

190    With regard, first of all, to Article 57(2) EC, the restrictive measures imposed by the contested regulation do not fall within one of the categories of measures listed in that provision.

191    Nor can Article 60(1) EC furnish the basis for the contested regulation, for its ambit is determined by that of Article 301 EC.

192    As has earlier been held in paragraph 167 above, that latter provision is not concerned with the adoption of restrictive measures such as those at issue, which are notable for the absence of any link to the governing regime of a third country.

193    As regards, finally, Article 60(2) EC, this provision does not include any Community competence to that end, given that it does no more than enable the Member States to take, on certain exceptional grounds, unilateral measures against a third country with regard to capital movements and payments, subject to the power of the Council to require a Member State to amend or abolish such measures.

194    In the fourth place it is appropriate to examine the claims directed by Mr Kadi, in the second and third parts of his first ground of appeal, against paragraphs 122 to 135 of *Kadi*, by Al Barakaat against paragraphs 158 to 170 of *Yusuf and Al Barakaat*, and the Commission's criticisms of those same paragraphs of the judgments under appeal.

195    In those paragraphs, the Court of First Instance ruled that it was possible for the contested regulation to be adopted on the joint basis of Articles 60 EC, 301 EC and 308 EC, on the ground that, by reason of the bridge explicitly established between Community actions imposing economic sanctions under Articles 60 EC and 301 EC, on the one hand, and the objectives of the EU Treaty in the sphere of external relations, on the other, recourse to Article 308 EC in the particular context envisaged by the two former articles is justified in order to attain such objectives, in this instance the objective of the CFSP pursued by the contested regulation, that is to say, the campaign against international terrorism and its funding.

196    In this regard it must be held that the judgments under appeal are indeed vitiated by an error of law.

197    In point of fact, while it is correct to consider, as did the Court of First Instance, that a bridge has been constructed between the actions of the Community involving economic measures under Articles 60 EC and 301 EC and the objectives of the EU Treaty in the sphere of external relations, including the CFSP, neither the wording of the provisions of the EC Treaty nor the structure of the latter provides any foundation for the view that that bridge extends to other provisions of the EC Treaty, in particular to Article 308 EC.

198    With specific regard to Article 308 EC, if the position of the Court of First Instance were to be accepted, that provision would allow, in the special context of Articles 60 EC and 301 EC, the adoption of Community measures concerning not one of the objectives of the Community but one of the objectives under the EU Treaty in the sphere of external relations, including the CFSP.

199    The inevitable conclusion is that such a view runs counter to the very wording of Article 308 EC.

200    Recourse to that provision demands that the action envisaged should, on the one hand, relate to the 'operation of the common market' and, on the other, be intended to attain 'one of the objectives of the Community'.

201    That latter concept, having regard to its clear and precise wording, cannot on any view be regarded as including the objectives of the CFSP.

202    Furthermore, the coexistence of the Union and the Community as integrated but separate legal orders, and the constitutional architecture of the pillars, as intended by the framers of the Treaties now in force, referred to by the Court of First Instance in paragraphs 120 of *Kadi* and 156 of *Yusuf and Al Barakaat*, constitute considerations of an institutional kind militating against any extension of the bridge to articles of the EC Treaty other than those with which it explicitly creates a link.

203    In addition, Article 308 EC, being an integral part of an institutional system based on the principle of conferred powers, cannot serve as a basis for widening the scope of Community powers beyond the general framework created by the provisions of the EC Treaty as a whole and, in particular, by those defining the tasks and the activities of the Community (Opinion 2/94, paragraph 30).

204    Likewise, Article 3 EU, referred to by the Court of First Instance in paragraphs 126 to 128 of *Kadi* and 162 to 164 of *Yusuf and Al Barakaat*, in particular its second paragraph, cannot supply a base for any widening of Community powers beyond the objects of the Community.

205    The effect of that error in law on the validity of the judgments under appeal will be considered later, after the evaluation of the other claims raised against the explanations given in those judgments concerning the possibility of including Article 308 EC in the legal basis of the contested regulation jointly with Articles 60 EC and 301 EC.

206    Those other claims may be divided into two categories.

207    The first category includes, in particular, the first part of Mr Kadi's first ground of appeal, in which he argues that the Court of First Instance erred in law when it accepted that it was possible for Article 308 EC

to supplement the legal basis of the contested regulation formed by Articles 60 EC and 301 EC. In his submission, those two latter articles cannot form the legal basis, even in part, of the contested regulation because, according to the interpretation given by the Court of First Instance itself, measures directed against persons or entities in no way linked to the governing regime of a third country - the only persons to whom the contested regulation is addressed - do not fall within the ambit of those articles.

208    That criticism may be compared with that made by the Commission, to the effect that, if it were to be held that recourse to Article 308 EC could be allowed, it would have to be as the sole legal basis, and not jointly with Articles 60 EC and 301 EC.

209    The second category includes the Commission's criticisms of the Court of First Instance's decision, in paragraphs 116 and 121 of *Kadi* and 152 and 157 of *Yusuf and Al Barakaat*, that, for the purposes of the application of Article 308 EC, the objective of the contested regulation, namely, according to the Court of First Instance, the fight against international terrorism, and more particularly the imposition of economic and financial sanctions, such as the freezing of funds, in respect of individuals and entities suspected of contributing to the funding of terrorism, cannot be made to refer to one of the objects which the EC Treaty entrusts to the Community.

210    The Commission maintains in this respect that the implementing measures imposed by the contested regulation in the area of economic and financial sanctions fall, by their very nature, within the scope of the objects of the Community, that is to say, first, the common commercial policy and, second, the free movement of capital.

211    With regard to that first category of claims, it is to be borne in mind that Article 308 EC is designed to fill the gap where no specific provisions of the Treaty confer on the Community institutions express or implied powers to act, if such powers appear none the less to be necessary to enable the Community to carry out its functions with a view to attaining one of the objectives laid down by the Treaty (Opinion 2/94, paragraph 29).

212    The Court of First Instance correctly held that Article 308 EC could be included in the legal basis of the contested regulation, jointly with Articles 60 EC and 301 EC.

213    The contested regulation, inasmuch as it imposes restrictive measures of an economic and financial nature, plainly falls within the ambit *ratione materiae* of Articles 60 EC and 301 EC.

214    To that extent, the inclusion of those articles in the legal basis of the contested regulation was therefore justified.

215    Furthermore, those provisions are part of the extension of a practice based, before the introduction of Articles 60 EC and 301 EC by the Maastricht Treaty, on Article 113 of the EC Treaty (now, after amendment, Article 133 EC) (see, to that effect, Case C‑70/94 *Werner* [1995] ECR I‑3189, paragraphs 8 to 10, and Case C‑124/95 *Centro-Com* [1997] ECR I‑81, paragraphs 28 and 29), which consisted of entrusting to the Community the implementation of actions decided on in the context of European political cooperation and involving the imposition of restrictive measures of an economic nature in respect of third countries.

216    Since Articles 60 EC and 301 EC do not, however, provide for any express or implied powers of action to impose such measures on addressees in no way linked to the governing regime of a third country such as those to whom the contested regulation applies, that lack of power, attributable to the limited ambit *ratione materiae* of those provisions, could be made good by having recourse to Article 308 EC as a legal basis for that regulation in addition to the first two provisions providing a foundation for that measure from the point of view of its material scope, provided, however, that the other conditions to which the applicability of Article 308 EC is subject had been satisfied.

217    The claims in that first category must therefore be rejected as unfounded.

218    With regard to the other conditions for the applicability of Article 308 EC, the second category of claims will now be considered.

219    The Commission maintains that, although Common Position 2002/402, which the contested regulation is intended to put into effect, pursues the objective of the campaign against international terrorism, an objective covered by the CFSP, that regulation must be considered to lay down an implementing measure intended to impose economic and financial sanctions.

220    That objective falls within the scope of the objectives of the Community for the purpose of Article 308 EC, in particular those relating to the common commercial policy and the free movement of capital.

221    The United Kingdom takes the view that the purely instrumental specific objective of the contested regulation, namely, the introduction of coercive economic measures, must be distinguished from the underlying CFSP objective of maintaining international peace and security. That specific objective contributes to the implicit Community objective underlying Articles 60 EC and 301 EC, which is to supply effective means to put into effect, solely by coercive economic measures, acts adopted under the CFSP.

222    The objective pursued by the contested regulation is immediately to prevent persons associated with Usama bin Laden, the Al-Qaeda network or the Taliban from having at their disposal any financial or economic resources, in order to impede the financing of terrorist activities (Case C-117/06 *Möllendorf and Möllendorf-Niehuus* [2007] ECR I-8361, paragraph 63).

223    Contrary to what the Court of First Instance held in paragraphs 116 of *Kadi* and 152 of *Yusuf and Al Barakaat*, that objective can be made to refer to one of the objects which the EC Treaty entrusts to the Community. The judgments under appeal are therefore vitiated by an error of law on this point also.

224    In this regard it may be recalled that, as explained in paragraph 203 above, Article 308 EC, being an integral part of an institutional system based on the principle of conferred powers, cannot serve as a basis for widening the scope of Community powers beyond the general framework created by the provisions of the EC Treaty as a whole.

225    The objective pursued by the contested regulation may be made to refer to one of the objectives of the Community for the purpose of Article 308 EC, with the result that the adoption of that regulation did not amount to disregard of the scope of Community powers stemming from the provisions of the EC Treaty as a whole.

226    Inasmuch as they provide for Community powers to impose restrictive measures of an economic nature in order to implement actions decided on under the CFSP, Articles 60 EC and 301 EC are the expression of an implicit underlying objective, namely, that of making it possible to adopt such measures through the efficient use of a Community instrument.

227    That objective may be regarded as constituting an objective of the Community for the purpose of Article 308 EC.

228    That interpretation is supported by Article 60(2) EC. Although the first paragraph thereof provides the power, within strict limits, for Member States to take unilateral measures against a third country with regard to capital movements and payments, that power may, as provided for by that paragraph, be exercised only so long as Community measures have not been taken pursuant to paragraph 1 of that article.

229    Implementing restrictive measures of an economic nature through the use of a Community instrument does not go beyond the general framework created by the provisions of the EC Treaty as a whole, because such measures by their very nature offer a link to the operation of the common market, that link constituting another condition for the application of Article 308 EC, as set out in paragraph 200 above.

230   If economic and financial measures such as those imposed by the contested regulation, consisting of the, in principle generalised, freezing of all the funds and other economic resources of the persons and entities concerned, were imposed unilaterally by every Member State, the multiplication of those national measures might well affect the operation of the common market. Such measures could have a particular effect on trade between Member States, especially with regard to the movement of capital and payments, and on the exercise by economic operators of their right of establishment. In addition, they could create distortions of competition, because any differences between the measures unilaterally taken by the Member States could operate to the advantage or disadvantage of the competitive position of certain economic operators although there were no economic reasons for that advantage or disadvantage.

231   The Council's statement in the fourth recital in the preamble to the contested regulation that Community legislation was necessary 'notably with a view to avoiding distortion of competition' is shown, therefore, to be relevant in this connection.

232   At this point it is appropriate to rule on the effect of the errors of law, recorded in paragraphs 196 and 223 above, on the validity of the judgments under appeal.

233   It is to be borne in mind that, according to case-law, if the grounds of a judgment of the Court of First Instance reveal an infringement of Community law but its operative part appears well founded on other legal grounds the appeal must be dismissed (see, in particular, Case C-167/04 P *JCB Service* v *Commission* [2006] ECR I-8935, paragraph 186 and the case-law cited).

234   Clearly the conclusion reached by the Court of First Instance in paragraphs 135 of *Kadi* and 158 of *Yusuf and Al Barakaat* concerning the legal basis of the contested regulation, that is to say, that the Council was competent to adopt that regulation on the joint basis of Articles 60 EC, 301 EC and 308 EC, appears justified on other legal grounds.

235   Although, as held in paragraphs 196 to 204 above, the inclusion of Article 308 EC in the legal basis of the contested regulation cannot be justified by the fact that that measure pursued an objective covered by the CFSP, that provision could nevertheless be held to provide a foundation for the regulation because, as shown in paragraphs 225 to 231 above, that regulation could legitimately be regarded as designed to attain an objective of the Community and as, furthermore, linked to the operation of the common market within the meaning of Article 308 EC. Moreover, adding Article 308 EC to the legal basis of the contested regulation enabled the European Parliament to take part in the decision-making process relating to the measures at issue which are specifically aimed at individuals whereas, under Articles 60 EC and 301 EC, no role is provided for that institution.

236   Accordingly, the grounds of appeal directed against the judgments under appeal inasmuch as by the latter the Court of First Instance decided that Articles 60 EC, 301 EC and 308 EC constituted the legal basis of the contested regulation must be dismissed in their entirety as unfounded.

*Concerning the ground of appeal relating to infringement of Article 249 EC*

Arguments of the parties

237   By its second ground of appeal Al Barakaat complains that the Court of First Instance held, in paragraph 188 of *Yusuf and Al Barakaat*, that the contested regulation satisfies the condition of general application laid down in Article 249 EC, given that it is addressed in a general and abstract manner to all persons who might actually hold funds belonging to one or more persons mentioned in the Annex to the regulation.

238   Al Barakaat maintains that it is wrong not to consider the person whose funds are frozen as the addressee of the act concerned, because the implementation of the decision must reasonably be founded on a legal measure directed against the person in possession of the resources.

239   What is more, according to that appellant, it is contradictory to state, on the one hand, in paragraph 112 of *Yusuf and Al Barakaat*, that the measures at issue were restrictive measures directly affecting individuals or organisations and, on the other, in paragraph 188 of that judgment, that those measures were not addressed to those individuals or organisations, but rather constituted a kind of implementing measure addressed to other persons.

240   The Kingdom of Spain, the United Kingdom, the Council and the Commission broadly endorse the analysis of the Court of First Instance.

Findings of the Court

241   The Court of First Instance rightly held in paragraphs 184 to 188 of *Yusuf and Al Barakaat* that the fact that the persons and entities who are the subject of the restrictive measures imposed by the contested regulation are expressly named in Annex I thereto, so that they appear to be directly and individually concerned by it, within the meaning of the fourth paragraph of Article 230 EC, does not mean that that act is not of general application within the meaning of the second paragraph of Article 249 EC or that it is not to be classified as a regulation.

242   In fact, while it is true that the contested regulation imposes restrictive measures on the persons and entities whose names appear in the exhaustive list that constitutes Annex I thereto, a list which is, moreover, regularly amended by the removal or addition of names, so that it is kept in line with the summary list, the fact remains that the persons to whom it is addressed are determined in a general and abstract manner.

243   The contested regulation, like Resolution 1390 (2002) which it is designed to put into effect, lays down a prohibition, worded exceptionally broadly, of making available funds and economic resources to those persons or entities (see, to that effect, *Möllendorf and Möllendorf-Niehuus*, paragraphs 50 to 55).

244   As the Court of First Instance quite rightly held in paragraphs 186 and 188 of *Yusuf and Al Barakaat*, that prohibition is addressed to whoever might actually hold the funds or economic resources in question.

245   That is how that prohibition falls to be applied in circumstances such as those of the case giving rise to the judgment in *Möllendorf and Möllendorf-Niehuus*, which concerned the question whether the contested regulation forbids the final registration of the transfer of ownership of real property in a land register following the conclusion of a contract of sale if one of the purchasers is a natural person appearing in the list in Annex I to the regulation.

246   In paragraph 60 of that judgment, the Court decided that a transaction such as that registration is prohibited under Article 2(3) of the contested regulation if, in consequence of that transaction, an economic resource would be made available to a person entered in that list, which would enable that person to obtain funds, goods or services.

247   In the light of the foregoing, Al Barakaat's ground of appeal relating to infringement of Article 249 EC must also be dismissed as unfounded.

*Concerning the grounds of appeal relating to infringement of certain fundamental rights*

The heads of claim concerning the part of the judgments under appeal relating to the limits of the review by the Community judicature, in the light of fundamental rights, of the internal lawfulness of the contested regulation

248   In the first part of his second ground of appeal, Mr Kadi maintains that inasmuch as the judgment in *Kadi* takes a view, first, of the relationships between the United Nations and the members of that organisation and, second, of the procedure for the application of resolutions of the Security Council, it is vitiated by errors of law as regards the interpretation of the principles of international law concerned, which gave rise

to other errors of law in the assessment of the pleas in law relating to breach of certain of the applicant's specific fundamental rights.

249    That part contains five claims.

250    By his first claim, Mr Kadi argues that in paragraphs 183 and 184 of the judgment the Court of First Instance erred in law in confusing the question of the primacy of the States' obligations under the Charter of the United Nations, enshrined in Article 103 thereof, with the related but separate question of the binding effect of decisions of the Security Council laid down in Article 25 of that Charter.

251    By his second claim, Mr Kadi complains that the Court of First Instance erred in law when, in paragraphs 217 to 225 of that judgment, it took as its premiss that, like obligations under treaty law, resolutions adopted by virtue of Chapter VII of the Charter of the United Nations must automatically form part of the sphere of law and competence of the members of the United Nations.

252    By the third claim, Mr Kadi alleges that the Court of First Instance erred in law when it held, in paragraphs 212 to 225 and 283 and 284 of that judgment, that it had no power enabling it to review the lawfulness of resolutions of the Security Council adopted by virtue of Chapter VII of the Charter of the United Nations.

253    By the fourth claim, Mr Kadi maintains that the reasoning of the Court of First Instance in paragraphs 225 to 232 of that judgment on the subject of jus cogens displays considerable incoherence, in so far as, if it must prevail, the principle that resolutions of the Security Council may not be the subject of judicial review and in support of this enjoy immunity from jurisdiction would have to apply generally, and the matters covered by jus cogens would not then constitute an exception to that principle.

254    By the fifth claim, Mr Kadi argues that the fact that the Security Council has not established an independent international court responsible for ruling, in law and on the facts, on actions brought against individual decisions taken by the Sanctions Committee, does not mean that the Member States have no lawful power, by adopting reasonable measures, to improve the finding of facts underlying the imposition of sanctions and the identification of the persons affected by them, or that the Member States are prohibited from creating an appropriate legal remedy by reason of the latitude they enjoy in the performance of their obligations.

255    In his reply, referring to *Bosphorus*, Mr Kadi maintains, in addition, that Community law requires all Community legislative measures to be subject to the judicial review carried out by the Court, which also concerns observance of fundamental rights, even if the origin of the measure in question is an act of international law such as a resolution of the Security Council.

256    So long as the law of the United Nations offers no adequate protection for those whose claim that their fundamental rights have been infringed, there must be a review of the measures adopted by the Community in order to give effect to resolutions of the Security Council. According to Mr Kadi, the re-examination procedure before the Sanctions Committee, based on diplomatic protection, does not afford protection of human rights equivalent to that guaranteed by the European Convention for the Protection of Human Rights and Fundamental Freedoms, signed in Rome on 4 November 1950 ('the ECHR'), as demanded by the European Court of Human Rights in *Bosphorus Hava Yolları Turizm ve Ticaret Anonim Şirketi* v. *Ireland* of 30 June 2005, *Reports of Judgments and Decisions* 2005-VI, § 155.

257    Mr Kadi submits that that line of argument, an alternative to the arguments based on international law, is raised in case the Court should hold that there is a conflict between the objectives of faithful implementation of resolutions of the Security Council and the principles of due process or judicial protection.

258    Furthermore, he states that that head of claim is not a new ground of appeal but a development of the fundamental proposition, raised in the notice of appeal, that the Community is bound, when it decides to

act by legislative means to give effect to a resolution of the Security Council, to ensure, as a condition of the lawfulness of the legislation it intends thus to introduce, that that legislation should observe the minimum criteria in the field of human rights.

259    By the first part of its third ground of appeal, Al Barakaat criticises the Court of First Instance's preliminary observations in *Yusuf and Al Barakaat* on the relationship between the international legal order under the United Nations and the domestic legal order or the Community legal order and on the extent of the review of lawfulness which the Court of First Instance had to carry out.

260    A resolution of the Security Council, binding per se in public international law, can have legal effect vis-à-vis persons in a State only if it has been implemented in accordance with the law in force.

261    In this appellant's view, there are no legal grounds for inferring the existence of special treatment or of an exception with regard to implementation of resolutions of the Security Council to the effect that a Community regulation intended to carry out such implementation need not accord with Community rules on the adoption of regulations.

262    Conversely, the French Republic, the Kingdom of the Netherlands, the United Kingdom and the Council approve, in essence, the analysis made in that connection by the Court of First Instance in the judgments under appeal and endorse the conclusion drawn therefrom that, so far as concerns the internal lawfulness of the contested regulation, the latter, inasmuch as it puts into effect resolutions adopted by the Security Council pursuant to Chapter VII of the Charter of the United Nations, in principle escapes all review by the Community judicature, even concerning observance of fundamental rights, and so for that reason enjoys immunity from jurisdiction.

263    However, unlike the Court of First Instance, those parties take the view that no review of the internal lawfulness of resolutions of the Security Council may be carried out by the Community judicature. They therefore complain that the Court of First Instance decided that such review was possible in the light of jus cogens.

264    They argue that the judgments under appeal, by allowing an exception in that regard, but without identifying its legal basis, in particular under the provisions of the Treaty, are inconsistent, inasmuch as the arguments excluding in a general manner the exercise of judicial review by the Community judicature of resolutions of the Security Council also militate against the recognition of powers to carry out such a review solely in the light of jus cogens.

265    Further, the French Republic, the Kingdom of the Netherlands, the United Kingdom and the Commission consider that the Court of First Instance erred in law when it ruled that the fundamental rights at issue in these cases fell within the scope of jus cogens.

266    A norm may be classified as jus cogens only when no derogation from it is possible. The rights invoked in the cases in point – the right to a fair hearing and the fight to respect for property – are, however, subject to limitations and exceptions.

267    The United Kingdom has brought a cross-appeal in this connection, seeking to have set aside the parts of the judgments under appeal dealing with jus cogens, viz., paragraphs 226 to 231 of *Kadi* and 277 to 281 of *Yusuf and Al Barakaat*.

268    For their part, the French Republic and the Kingdom of the Netherlands suggest that the Court should undertake a replacement of grounds, claiming that Mr Kadi's and Al Barakaat's pleas in law relating to jus cogens should be dismissed by reason of the absolute lack of jurisdiction of the Community judicature to carry out any review of resolutions of the Security Council, even in the light of jus cogens.

269    The Commission maintains that two reasons may justify not giving effect to an obligation to implement resolutions of the Security Council such as those at issue, whose strict terms leave the Community

authorities no discretion in their implementation; they are, first, the case in which the resolution concerned is contrary to *jus cogens* and, second, the case in which that resolution falls outside the ambit of or violates the purposes and principles of the United Nations and was therefore adopted *ultra vires*.

270    The Commission takes the view that, given that, according to Article 24(2) of the Charter of the United Nations, the Security Council is bound by the purposes and principles of the United Nations, including, according to Article 1(3) of the Charter, the development of human rights and their promotion, an act adopted by that body in breach of human rights, including the fundamental rights of the individuals at issue, might be regarded as having been adopted *ultra vires* and, therefore, as not binding on the Community.

271    In the Commission's view, however, the Court of First Instance was right to hold that the Community judicature cannot in principle review the validity of a resolution of the Security Council in the light of the purposes and principles of the United Nations.

272   If, nevertheless, the Court were to accept that it could carry out such a review, the Commission argues that the Court, as the judicature of an international organisation other than the United Nations, could express itself on this question only if the breach of human rights was particularly flagrant and glaring, referring here to *Racke*.

273    That is not, in the Commission's view, the case here, owing to the existence of the re-examination procedure before the Sanctions Committee and because it must be supposed that the Security Council had weighed the requirements of international security at issue against the fundamental rights concerned.

274    With regard to the guidance given in *Bosphorus*, the Commission maintains that, in contrast to the case giving rise to that judgment, the question of the lawfulness and possible nullity of the resolution in question could arise with regard to the contested regulation if the Court were to rule that the Community may not implement a binding resolution of the Security Council because the standards applied by that body in the sphere of human rights, especially in respect of the right to be heard, are insufficient.

275    In addition, the United Kingdom is of the view that Mr Kadi's arguments that the lawfulness of any legislation adopted by the Community institutions in order to give effect to a resolution of the Security Council remains subject, by virtue of Community law, to full review by the Court, regardless of its origin, constitute a new ground of appeal because they were put forward for the first time in that appellant's reply. That Member State submits that in accordance with Articles 42(2) and 118 of the Rules of Procedure, those arguments must therefore be rejected.

276    In the alternative, the United Kingdom maintains that the special status of resolutions adopted under Chapter VII of the Charter of the United Nations, as a result of the interaction of Articles 25, 48 and 103 of that Charter, recognised by Article 297 EC, implies that action taken by a Member State to perform its obligations with a view to maintaining international peace and security is protected against any action founded on Community law. The primacy of those obligations clearly extends to principles of Community law of a constitutional nature.

277    That Member State maintains that, in *Bosphorus*, the Court did not declare that it had jurisdiction to determine the validity of a regulation intended to give effect to a resolution of the Security Council adopted under Chapter VII of the Charter of the United Nations, but did no more than interpret the regulation concerned for the purpose of determining whether a measure laid down by that regulation had to be applied by the authorities of a Member State in a given case. The French Republic essentially agrees with that interpretation of *Bosphorus*.

     Findings of the Court

278    Before addressing the substance of the question, the Court finds it necessary to reject the objection of inadmissibility raised by the United Kingdom in respect of the line of argument put forward by Mr Kadi in

his reply, to the effect that the lawfulness of any legislation adopted by the Community institutions, including an act intended to give effect to a resolution of the Security Council remains subject, by virtue of Community law, to full review by the Court, regardless of its origin.

279   In point of fact, as Mr Kadi has stated, that is an additional argument supplementing the ground of appeal set out earlier, at least implicitly, in the notice of appeal and closely connected to that ground, to the effect that the Community, when giving effect to a resolution of the Security Council, was bound to ensure, as a condition of the lawfulness of the legislation it intended thus to introduce, that that legislation should observe the minimum criteria in the field of human rights (see, to that effect, inter alia, the order in Case C-430/00 P *Dürbeck* v *Commission* [2001] ECR I-8547, paragraph 17).

280   The Court will now consider the heads of claim in which the appellants complain that the Court of First Instance, in essence, held that it followed from the principles governing the relationship between the international legal order under the United Nations and the Community legal order that the contested regulation, since it is designed to give effect to a resolution adopted by the Security Council under Chapter VII of the Charter of the United Nations affording no latitude in that respect, could not be subject to judicial review of its internal lawfulness, save with regard to its compatibility with the norms of jus cogens, and therefore to that extent enjoyed immunity from jurisdiction.

281   In this connection it is to be borne in mind that the Community is based on the rule of law, inasmuch as neither its Member States nor its institutions can avoid review of the conformity of their acts with the basic constitutional charter, the EC Treaty, which established a complete system of legal remedies and procedures designed to enable the Court of Justice to review the legality of acts of the institutions (Case 294/83 *Les Verts* v *Parliament* [1986] ECR 1339, paragraph 23).

282   It is also to be recalled that an international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the Community legal system, observance of which is ensured by the Court by virtue of the exclusive jurisdiction conferred on it by Article 220 EC, jurisdiction that the Court has, moreover, already held to form part of the very foundations of the Community (see, to that effect, Opinion 1/91 [1991] ECR I-6079, paragraphs 35 and 71, and Case C-459/03 *Commission* v *Ireland* [2006] ECR I-4635, paragraph 123 and case-law cited).

283   In addition, according to settled case-law, fundamental rights form an integral part of the general principles of law whose observance the Court ensures. For that purpose, the Court draws inspiration from the constitutional traditions common to the Member States and from the guidelines supplied by international instruments for the protection of human rights on which the Member States have collaborated or to which they are signatories. In that regard, the ECHR has special significance (see, inter alia, Case C-305/05 *Ordre des barreaux francophones et germanophone and Others* [2007] ECR I-5305, paragraph 29 and case-law cited).

284   It is also clear from the case-law that respect for human rights is a condition of the lawfulness of Community acts (Opinion 2/94, paragraph 34) and that measures incompatible with respect for human rights are not acceptable in the Community (Case C-112/00 *Schmidberger* [2003] ECR I-5659, paragraph 73 and case-law cited).

285   It follows from all those considerations that the obligations imposed by an international agreement cannot have the effect of prejudicing the constitutional principles of the EC Treaty, which include the principle that all Community acts must respect fundamental rights, that respect constituting a condition of their lawfulness which it is for the Court to review in the framework of the complete system of legal remedies established by the Treaty.

286   In this regard it must be emphasised that, in circumstances such as those of these cases, the review of lawfulness thus to be ensured by the Community judicature applies to the Community act intended to give effect to the international agreement at issue, and not to the latter as such.

287   With more particular regard to a Community act which, like the contested regulation, is intended to give effect to a resolution adopted by the Security Council under Chapter VII of the Charter of the United Nations, it is not, therefore, for the Community judicature, under the exclusive jurisdiction provided for by Article 220 EC, to review the lawfulness of such a resolution adopted by an international body, even if that review were to be limited to examination of the compatibility of that resolution with jus cogens.

288   However, any judgment given by the Community judicature deciding that a Community measure intended to give effect to such a resolution is contrary to a higher rule of law in the Community legal order would not entail any challenge to the primacy of that resolution in international law.

289   The Court has thus previously annulled a decision of the Council approving an international agreement after considering the internal lawfulness of the decision in the light of the agreement in question and finding a breach of a general principle of Community law, in that instance the general principle of non-discrimination (Case C-122/95 *Germany* v *Council* [1998] ECR I-973).

290   It must therefore be considered whether, as the Court of First Instance held, as a result of the principles governing the relationship between the international legal order under the United Nations and the Community legal order, any judicial review of the internal lawfulness of the contested regulation in the light of fundamental freedoms is in principle excluded, notwithstanding the fact that, as is clear from the decisions referred to in paragraphs 281 to 284 above, such review is a constitutional guarantee forming part of the very foundations of the Community.

291   In this respect it is first to be borne in mind that the European Community must respect international law in the exercise of its powers (*Poulsen and Diva Navigation*, paragraph 9, and *Racke*, paragraph 45), the Court having in addition stated, in the same paragraph of the first of those judgments, that a measure adopted by virtue of those powers must be interpreted, and its scope limited, in the light of the relevant rules of international law.

292   Moreover, the Court has held that the powers of the Community provided for by Articles 177 EC to 181 EC in the sphere of cooperation and development must be exercised in observance of the undertakings given in the context of the United Nations and other international organisations (Case C-91/05 *Commission* v *Council* [2008] ECR I-0000, paragraph 65 and case-law cited).

293   Observance of the undertakings given in the context of the United Nations is required just as much in the sphere of the maintenance of international peace and security when the Community gives effect, by means of the adoption of Community measures taken on the basis of Articles 60 EC and 301 EC, to resolutions adopted by the Security Council under Chapter VII of the Charter of the United Nations.

294   In the exercise of that latter power it is necessary for the Community to attach special importance to the fact that, in accordance with Article 24 of the Charter of the United Nations, the adoption by the Security Council of resolutions under Chapter VII of the Charter constitutes the exercise of the primary responsibility with which that international body is invested for the maintenance of peace and security at the global level, a responsibility which, under Chapter VII, includes the power to determine what and who poses a threat to international peace and security and to take the measures necessary to maintain or restore them.

295   Next, it is to be noted that the powers provided for in Articles 60 EC and 301 EC may be exercised only in pursuance of the adoption of a common position or joint action by virtue of the provisions of the EC Treaty relating to the CFSP which provides for action by the Community.

296   Although, because of the adoption of such an act, the Community is bound to take, under the EC Treaty, the measures necessitated by that act, that obligation means, when the object is to implement a resolution of the Security Council adopted under Chapter VII of the Charter of the United Nations, that in drawing up those measures the Community is to take due account of the terms and objectives of the resolution

concerned and of the relevant obligations under the Charter of the United Nations relating to such implementation.

297    Furthermore, the Court has previously held that, for the purposes of the interpretation of the contested regulation, account must also be taken of the wording and purpose of Resolution 1390 (2002) which that regulation, according to the fourth recital in the preamble thereto, is designed to implement (*Möllendorf and Möllendorf-Niehuus*, paragraph 54 and case-law cited).

298    It must however be noted that the Charter of the United Nations does not impose the choice of a particular model for the implementation of resolutions adopted by the Security Council under Chapter VII of the Charter, since they are to be given effect in accordance with the procedure applicable in that respect in the domestic legal order of each Member of the United Nations. The Charter of the United Nations leaves the Members of the United Nations a free choice among the various possible models for transposition of those resolutions into their domestic legal order.

299    It follows from all those considerations that it is not a consequence of the principles governing the international legal order under the United Nations that any judicial review of the internal lawfulness of the contested regulation in the light of fundamental freedoms is excluded by virtue of the fact that that measure is intended to give effect to a resolution of the Security Council adopted under Chapter VII of the Charter of the United Nations.

300    What is more, such immunity from jurisdiction for a Community measure like the contested regulation, as a corollary of the principle of the primacy at the level of international law of obligations under the Charter of the United Nations, especially those relating to the implementation of resolutions of the Security Council adopted under Chapter VII of the Charter, cannot find a basis in the EC Treaty.

301    Admittedly, the Court has previously recognised that Article 234 of the EC Treaty (now, after amendment, Article 307 EC) could, if the conditions for application have been satisfied, allow derogations even from primary law, for example from Article 113 of the EC Treaty on the common commercial policy (see, to that effect, *Centro-Com*, paragraphs 56 to 61).

302    It is true also that Article 297 EC implicitly permits obstacles to the operation of the common market when they are caused by measures taken by a Member State to carry out the international obligations it has accepted for the purpose of maintaining international peace and security.

303    Those provisions cannot, however, be understood to authorise any derogation from the principles of liberty, democracy and respect for human rights and fundamental freedoms enshrined in Article 6(1) EU as a foundation of the Union.

304    Article 307 EC may in no circumstances permit any challenge to the principles that form part of the very foundations of the Community legal order, one of which is the protection of fundamental rights, including the review by the Community judicature of the lawfulness of Community measures as regards their consistency with those fundamental rights.

305    Nor can an immunity from jurisdiction for the contested regulation with regard to the review of its compatibility with fundamental rights, arising from the alleged absolute primacy of the resolutions of the Security Council to which that measure is designed to give effect, find any basis in the place that obligations under the Charter of the United Nations would occupy in the hierarchy of norms within the Community legal order if those obligations were to be classified in that hierarchy.

306    Article 300(7) EC provides that agreements concluded under the conditions set out in that article are to be binding on the institutions of the Community and on Member States.

307    Thus, by virtue of that provision, supposing it to be applicable to the Charter of the United Nations, the latter would have primacy over acts of secondary Community law (see, to that effect, Case C-308/06

*Intertanko and Others* [2008] ECR I-0000, paragraph 42 and case-law cited).

308   That primacy at the level of Community law would not, however, extend to primary law, in particular to the general principles of which fundamental rights form part.

309   That interpretation is supported by Article 300(6) EC, which provides that an international agreement may not enter into force if the Court has delivered an adverse opinion on its compatibility with the EC Treaty, unless the latter has previously been amended.

310   It has however been maintained before the Court, in particular at the hearing, that the Community judicature ought, like the European Court of Human Rights, which in several recent decisions has declined jurisdiction to review the compatibility of certain measures taken in the implementing of resolutions adopted by the Security Council under Chapter VII of the Charter of the United Nations, to refrain from reviewing the lawfulness of the contested regulation in the light of fundamental freedoms, because that regulation is also intended to give effect to such resolutions.

311   In this respect, it is to be found that, as the European Court of Human Rights itself has noted, there exists a fundamental difference between the nature of the measures concerned by those decisions, with regard to which that court declined jurisdiction to carry out a review of consistency with the ECHR, and the nature of other measures with regard to which its jurisdiction would seem to be unquestionable (see *Behrami and Behrami* v. *France* and *Saramati* v. *France, Germany and Norway* of 2 May 2007, not yet published in the *Reports of Judgments and Decisions*, §151).

312   While, in certain cases before it the European Court of Human Rights has declined jurisdiction *ratione personae*, those cases involved actions directly attributable to the United Nations as an organisation of universal jurisdiction fulfilling its imperative collective security objective, in particular actions of a subsidiary organ of the UN created under Chapter VII of the Charter of the United Nations or actions falling within the exercise of powers lawfully delegated by the Security Council pursuant to that chapter, and not actions ascribable to the respondent States before that court, those actions not, moreover, having taken place in the territory of those States and not resulting from any decision of the authorities of those States.

313   By contrast, in paragraph 151 of *Behrami and Behrami* v. *France* and *Saramati* v. *France, Germany and Norway*, the European Court of Human Rights stated that in the case leading to its judgment in *Bosphorus Hava Yolları Turizm ve Ticaret Anonim Şirketi* v. *Ireland*, concerning a seizure measure carried out by the authorities of the respondent State on its territory following a decision by one of its ministers, it had recognised its competence, notably *ratione personae*, vis-à-vis the respondent State, despite the fact that the source of the contested measure was a Community regulation taken, in its turn, pursuant to a resolution of the Security Council.

314   In the instant case it must be declared that the contested regulation cannot be considered to be an act directly attributable to the United Nations as an action of one of its subsidiary organs created under Chapter VII of the Charter of the United Nations or an action falling within the exercise of powers lawfully delegated by the Security Council pursuant to that chapter.

315   In addition and in any event, the question of the Court's jurisdiction to rule on the lawfulness of the contested regulation has arisen in fundamentally different circumstances.

316   As noted above in paragraphs 281 to 284, the review by the Court of the validity of any Community measure in the light of fundamental rights must be considered to be the expression, in a community based on the rule of law, of a constitutional guarantee stemming from the EC Treaty as an autonomous legal system which is not to be prejudiced by an international agreement.

317   The question of the Court's jurisdiction arises in the context of the internal and autonomous legal order of the Community, within whose ambit the contested regulation falls and in which the Court has jurisdiction

to review the validity of Community measures in the light of fundamental rights.

318    It has in addition been maintained that, having regard to the deference required of the Community institutions vis-à-vis the institutions of the United Nations, the Court must forgo the exercise of any review of the lawfulness of the contested regulation in the light of fundamental rights, even if such review were possible, given that, under the system of sanctions set up by the United Nations, having particular regard to the re-examination procedure which has recently been significantly improved by various resolutions of the Security Council, fundamental rights are adequately protected.

319    According to the Commission, so long as under that system of sanctions the individuals or entities concerned have an acceptable opportunity to be heard through a mechanism of administrative review forming part of the United Nations legal system, the Court must not intervene in any way whatsoever.

320    In this connection it may be observed, first of all, that if in fact, as a result of the Security Council's adoption of various resolutions, amendments have been made to the system of restrictive measures set up by the United Nations with regard both to entry in the summary list and to removal from it [see, in particular, Resolutions 1730 (2006) of 19 December 2006, and 1735 (2006) of 22 December 2006], those amendments were made after the contested regulation had been adopted so that, in principle, they cannot be taken into consideration in these appeals.

321    In any event, the existence, within that United Nations system, of the re-examination procedure before the Sanctions Committee, even having regard to the amendments recently made to it, cannot give rise to generalised immunity from jurisdiction within the internal legal order of the Community.

322    Indeed, such immunity, constituting a significant derogation from the scheme of judicial protection of fundamental rights laid down by the EC Treaty, appears unjustified, for clearly that re-examination procedure does not offer the guarantees of judicial protection.

323    In that regard, although it is now open to any person or entity to approach the Sanctions Committee directly, submitting a request to be removed from the summary list at what is called the 'focal' point, the fact remains that the procedure before that Committee is still in essence diplomatic and intergovernmental, the persons or entities concerned having no real opportunity of asserting their rights and that committee taking its decisions by consensus, each of its members having a right of veto.

324    The Guidelines of the Sanctions Committee, as last amended on 12 February 2007, make it plain that an applicant submitting a request for removal from the list may in no way assert his rights himself during the procedure before the Sanctions Committee or be represented for that purpose, the Government of his State of residence or of citizenship alone having the right to submit observations on that request.

325    Moreover, those Guidelines do not require the Sanctions Committee to communicate to the applicant the reasons and evidence justifying his appearance in the summary list or to give him access, even restricted, to that information. Last, if that Committee rejects the request for removal from the list, it is under no obligation to give reasons.

326    It follows from the foregoing that the Community judicature must, in accordance with the powers conferred on it by the EC Treaty, ensure the review, in principle the full review, of the lawfulness of all Community acts in the light of the fundamental rights forming an integral part of the general principles of Community law, including review of Community measures which, like the contested regulation, are designed to give effect to the resolutions adopted by the Security Council under Chapter VII of the Charter of the United Nations.

327    The Court of First Instance erred in law, therefore, when it held, in paragraphs 212 to 231 of *Kadi* and 263 to 282 of *Yusuf and Al Barakaat*, that it followed from the principles governing the relationship between the international legal order under the United Nations and the Community legal order that the contested regulation, since it is designed to give effect to a resolution adopted by the Security Council under Chapter

VII of the Charter of the United Nations affording no latitude in that respect, must enjoy immunity from jurisdiction so far as concerns its internal lawfulness save with regard to its compatibility with the norms of jus cogens.

328    The appellants' grounds of appeal are therefore well founded on that point, with the result that the judgments under appeal must be set aside in this respect.

329    It follows that there is no longer any need to examine the heads of claim directed against that part of the judgments under appeal relating to review of the contested regulation in the light of the rules of international law falling within the ambit of jus cogens and that it is, therefore, no longer necessary to examine the United Kingdom's cross-appeal on this point either.

330    Furthermore, given that in the latter part of the judgments under appeal, relating to the specific fundamental rights invoked by the appellants, the Court of First Instance confined itself to examining the lawfulness of the contested regulation in the light of those rules alone, when it was its duty to carry out an examination, in principle a full examination, in the light of the fundamental rights forming part of the general principles of Community law, the latter part of those judgments must also be set aside.

### Concerning the actions before the Court of First Instance

331    As provided in the second sentence of the first paragraph of Article 61 of the Statute of the Court of Justice, the latter, when it quashes the decision of the Court of First Instance, may give final judgment in the matter where the state of proceedings so permits.

332    In the circumstances, the Court considers that the actions for annulment of the contested regulation brought by the appellants are ready for judgment and that it is necessary to give final judgment in them.

333    It is appropriate to examine, first, the claims made by Mr Kadi and Al Barakaat with regard to the breach of the rights of the defence, in particular the right to be heard, and of the right to effective judicial review, caused by the measures for the freezing of funds as they were imposed on the appellants by the contested regulation.

334    In this regard, in the light of actual circumstances surrounding the inclusion of the appellants' names in the list of persons and entities covered by the restrictive measures contained in Annex I to the contested regulation, it must be held that the rights of the defence, in particular the right to be heard, and the right to effective judicial review of those rights, were patently not respected.

335    According to settled case-law, the principle of effective judicial protection is a general principle of Community law stemming from the constitutional traditions common to the Member States, which has been enshrined in Articles 6 and 13 of the ECHR, this principle having furthermore been reaffirmed by Article 47 of the Charter of fundamental rights of the European Union, proclaimed on 7 December 2000 in Nice (OJ 2000 C 364, p. 1) (see, to this effect, Case C-432/05 *Unibet* [2007] ECR I-2271, paragraph 37).

336    In addition, having regard to the Court's case-law in other fields (see, inter alia, Case 222/86 *Heylens and Others* [1987] ECR 4097, paragraph 15, and Joined Cases C-189/02 P, C-202/02 P, C-205/02 P to C-208/02 P and C-213/02 P *Dansk Rørindustri and Others* v *Commission* [2005] ECR I-5425, paragraphs 462 and 463), it must be held in this instance that the effectiveness of judicial review, which it must be possible to apply to the lawfulness of the grounds on which, in these cases, the name of a person or entity is included in the list forming Annex I to the contested regulation and leading to the imposition on those persons or entities of a body of restrictive measures, means that the Community authority in question is bound to communicate those grounds to the person or entity concerned, so far as possible, either when that inclusion is decided on or, at the very least, as swiftly as possible after that decision in order to enable those persons or entities to exercise, within the periods prescribed, their right to bring an action.

337   Observance of that obligation to communicate the grounds is necessary both to enable the persons to whom restrictive measures are addressed to defend their rights in the best possible conditions and to decide, with full knowledge of the relevant facts, whether there is any point in their applying to the Community judicature (see, to that effect, *Heylens and Others*, paragraph 15), and to put the latter fully in a position in which it may carry out the review of the lawfulness of the Community measure in question which is its duty under the EC Treaty.

338   So far as concerns the rights of the defence, in particular the right to be heard, with regard to restrictive measures such as those imposed by the contested regulation, the Community authorities cannot be required to communicate those grounds before the name of a person or entity is entered in that list for the first time.

339   As the Court of First Instance stated in paragraph 308 of *Yusuf and Al Barakaat*, such prior communication would be liable to jeopardise the effectiveness of the freezing of funds and resources imposed by that regulation.

340   In order to attain the objective pursued by that regulation, such measures must, by their very nature, take advantage of a surprise effect and, as the Court has previously stated, apply with immediate effect (*Möllendorf and Möllendorf-Niehuus*, paragraph 63).

341   Nor were the Community authorities bound to hear the appellants before their names were included for the first time in the list set out in Annex I to that regulation, for reasons also connected to the objective pursued by the contested regulation and to the effectiveness of the measures provided by the latter.

342   In addition, with regard to a Community measure intended to give effect to a resolution adopted by the Security Council in connection with the fight against terrorism, overriding considerations to do with safety or the conduct of the international relations of the Community and of its Member States may militate against the communication of certain matters to the persons concerned and, therefore, against their being heard on those matters.

343   However, that does not mean, with regard to the principle of effective judicial protection, that restrictive measures such as those imposed by the contested regulation escape all review by the Community judicature once it has been claimed that the act laying them down concerns national security and terrorism.

344   In such a case, it is none the less the task of the Community judicature to apply, in the course of the judicial review it carries out, techniques which accommodate, on the one hand, legitimate security concerns about the nature and sources of information taken into account in the adoption of the act concerned and, on the other, the need to accord the individual a sufficient measure of procedural justice (see, to that effect, the judgment of the European Court of Human Rights in *Chahal* v. *United Kingdom* of 15 November 1996, *Reports of Judgments and Decisions* 1996-V, § 131).

345   In the circumstances, the inevitable conclusion is, first of all, that neither the contested regulation nor Common Position 2002/402 to which the former refers provides for a procedure for communicating the evidence justifying the inclusion of the names of the persons concerned in Annex I to that regulation and for hearing those persons, either at the same time as that inclusion or later.

346   It has next to be pointed out that the Council at no time informed the appellants of the evidence adduced against them that allegedly justified the inclusion of their names for the first time in Annex I to the contested regulation and, consequently, the imposition of the restrictive measures laid down by the latter.

347   It is not indeed denied that no information was supplied in that connection to the appellants, whether in Regulation No 467/2001 as amended by Regulations Nos 2062/2001 and 2199/2001, their names being mentioned for the first time in a list of persons, entities or bodies to whom and to which a measure freezing funds applies, in the contested regulation or at some later stage.

348    Because the Council neither communicated to the appellants the evidence used against them to justify the restrictive measures imposed on them nor afforded them the right to be informed of that evidence within a reasonable period after those measures were enacted, the appellants were not in a position to make their point of view in that respect known to advantage. Therefore, the appellants' rights of defence, in particular the right to be heard, were not respected.

349    In addition, given the failure to inform them of the evidence adduced against them and having regard to the relationship, referred to in paragraphs 336 and 337 above, between the rights of the defence and the right to an effective legal remedy, the appellants were also unable to defend their rights with regard to that evidence in satisfactory conditions before the Community judicature, with the result that it must be held that their right to an effective legal remedy has also been infringed.

350    Last, it must be stated that that infringement has not been remedied in the course of these actions. Indeed, given that, according to the fundamental position adopted by the Council, no evidence of that kind may be the subject of investigation by the Community judicature, the Council has adduced no evidence to that effect.

351    The Court cannot, therefore, do other than find that it is not able to undertake the review of the lawfulness of the contested regulation in so far as it concerns the appellants, with the result that it must be held that, for that reason too, the fundamental right to an effective legal remedy which they enjoy has not, in the circumstances, been observed.

352    It must, therefore, be held that the contested regulation, in so far as it concerns the appellants, was adopted without any guarantee being given as to the communication of the inculpatory evidence against them or as to their being heard in that connection, so that it must be found that that regulation was adopted according to a procedure in which the appellants' rights of defence were not observed, which has had the further consequence that the principle of effective judicial protection has been infringed.

353    It follows from all the foregoing considerations that the pleas in law raised by Mr Kadi and Al Barakaat in support of their actions for annulment of the contested regulation and alleging breach of their rights of defence, especially the right to be heard, and of the principle of effective judicial protection, are well founded.

354    Second, the Court will now examine the plea raised by Mr Kadi with regard to breach of the right to respect for property entailed by the freezing measures imposed on him by virtue of the contested regulation.

355    According to settled case-law, the right to property is one of the general principles of Community law. It is not, however, absolute, but must be viewed in relation to its function in society. Consequently, the exercise of the right to property may be restricted, provided that those restrictions in fact correspond to objectives of public interest pursued by the Community and do not constitute, in relation to the aim pursued, a disproportionate and intolerable interference, impairing the very substance of the right so guaranteed (see, in particular, *Regione autonoma Friuli-Venezia Giulia and ERSA*, paragraph 119 and case-law cited; see also, to that effect in the context of a system of restrictive measures, *Bosphorus*, paragraph 21).

356    In order to assess the extent of the fundamental right to respect for property, a general principle of Community law, account is to be taken of, in particular, Article 1 of the First Additional Protocol to the ECHR, which enshrines that right.

357    Next, it falls to be examined whether the freezing measure provided by the contested regulation amounts to disproportionate and intolerable interference impairing the very substance of the fundamental right to respect for the property of persons who, like Mr Kadi, are mentioned in the list set out in Annex I to that regulation.

358     That freezing measure constitutes a temporary precautionary measure which is not supposed to deprive those persons of their property. It does, however, undeniably entail a restriction of the exercise of Mr Kadi's right to property that must, moreover, be classified as considerable, having regard to the general application of the freezing measure and the fact that it has been applied to him since 20 October 2001.

359     The question therefore arises whether that restriction of the exercise of Mr Kadi's right to property can be justified.

360     In this respect, according to the case-law of the European Court of Human Rights, there must also exist a reasonable relationship of proportionality between the means employed and the aim sought to be realised. The Court must determine whether a fair balance has been struck between the demands of the public interest and the interest of the individuals concerned. In so doing, the Court recognises that the legislature enjoys a wide margin of appreciation, with regard both to choosing the means of enforcement and to ascertaining whether the consequences of enforcement are justified in the public interest for the purpose of achieving the object of the law in question [see, to that effect, in particular, European Court of Human Rights, judgment in *J.A. Pye (Oxford) Ltd. and J.A. Pye (Oxford) Land Ltd.* v. *United Kingdom* of 30 August 2007, *Reports of Judgments and Decisions* 2007-0000, §§ 55 and 75].

361     As the Court has already held in connection with another Community system of restrictive measures of an economic nature also giving effect to resolutions adopted by the Security Council under Chapter VII of the Charter of the United Nations, the importance of the aims pursued by a Community act is such as to justify negative consequences, even of a substantial nature, for some operators, including those who are in no way responsible for the situation which led to the adoption of the measures in question, but who find themselves affected, particularly as regards their property rights (see, to that effect, *Bosphorus*, paragraphs 22 and 23).

362     In the case in point, the restrictive measures laid down by the contested regulation contribute to the implementation, at Community level, of the restrictive measures decided on by the Security Council against Usama bin Laden, members of the Al-Qaeda organisation and the Taliban and other individuals, groups, undertakings and entities associated with them.

363     With reference to an objective of general interest as fundamental to the international community as the fight by all means, in accordance with the Charter of the United Nations, against the threats to international peace and security posed by acts of terrorism, the freezing of the funds, financial assets and other economic resources of the persons identified by the Security Council or the Sanctions Committee as being associated with Usama bin Laden, members of the Al-Qaeda organisation and the Taliban cannot per se be regarded as inappropriate or disproportionate (see, to that effect, *Bosphorus*, paragraph 26, and the judgment of the European Court of Human Rights in *Bosphorus Hava Yolları Turizm ve Ticaret Anonim Şirketi* v. *Ireland*, § 167).

364     On this point, it is also to be taken into consideration that the contested regulation, in the version amended by Regulation No 561/2003, adopted following Resolution 1452 (2002), provides, among other derogations and exemptions, that, on a request made by an interested person, and unless the Sanctions Committee expressly objects, the competent national authorities may declare the freezing of funds to be inapplicable to the funds necessary to cover basic expenses, including payments for foodstuffs, rent, medicines and medical treatment, taxes or public utility charges. In addition, funds necessary for any 'extraordinary expense' whatsoever may be unfrozen, on the express authorisation of the Sanctions Committee.

365     It is further to be noted that the resolutions of the Security Council to which the contested regulation is intended to give effect provide for a mechanism for the periodic re-examination of the general system of measures they enact and also for a procedure enabling the persons concerned at any time to submit their case to the Sanctions Committee for re-examination, by means of a request that may now be made direct to the Committee at what is called the 'focal' point.

366    It must therefore be found that the restrictive measures imposed by the contested regulation constitute restrictions of the right to property which might, in principle, be justified.

367    In addition, it must be considered whether, when that regulation was applied to Mr Kadi, his right to property was respected in the circumstances of the case.

368    It is to be borne in mind in this respect that the applicable procedures must also afford the person concerned a reasonable opportunity of putting his case to the competent authorities. In order to ascertain whether this condition, which constitutes a procedural requirement inherent in Article 1 of Protocol No 1 to the ECHR, has been satisfied, a comprehensive view must be taken of the applicable procedures (see, to that effect, the judgment of the European Court of Human Rights in *Jokela* v. *Finland* of 21 May 2002, *Reports of Judgments and Decisions* 2002-IV, § 45 and case-law cited, and § 55).

369    The contested regulation, in so far as it concerns Mr Kadi, was adopted without furnishing any guarantee enabling him to put his case to the competent authorities, in a situation in which the restriction of his property rights must be regarded as significant, having regard to the general application and actual continuation of the freezing measures affecting him.

370    It must therefore be held that, in the circumstances of the case, the imposition of the restrictive measures laid down by the contested regulation in respect of Mr Kadi, by including him in the list contained in Annex I to that regulation, constitutes an unjustified restriction of his right to property.

371    The plea raised by Mr Kadi that his fundamental right to respect for property has been infringed is therefore well founded.

372    It follows from all the foregoing that the contested regulation, so far as it concerns the appellants, must be annulled.

373    However, the annulment to that extent of the contested regulation with immediate effect would be capable of seriously and irreversibly prejudicing the effectiveness of the restrictive measures imposed by the regulation and which the Community is required to implement, because in the interval preceding its replacement by a new regulation Mr Kadi and Al Barakaat might take steps seeking to prevent measures freezing funds from being applied to them again.

374    Furthermore, in so far as it follows from this judgment that the contested regulation must be annulled so far as concerns the appellants, by reason of breach of principles applicable in the procedure followed when the restrictive measures introduced by that regulation were adopted, it cannot be excluded that, on the merits of the case, the imposition of those measures on the appellants may for all that prove to be justified.

375    Having regard to those considerations, the effects of the contested regulation, in so far as it includes the names of the appellants in the list forming Annex I thereto, must, by virtue of Article 231 EC, be maintained for a brief period to be fixed in such a way as to allow the Council to remedy the infringements found, but which also takes due account of the considerable impact of the restrictive measures concerned on the appellants' rights and freedoms.

376    In those circumstances, Article 231 EC will be correctly applied in maintaining the effects of the contested regulation, so far as concerns the appellants, for a period that may not exceed three months running from the date of delivery of this judgment.

## Costs

377    Under the first paragraph of Article 122 of the Rules of Procedure, where the appeal is well founded and the Court of Justice itself gives final judgment in the case, it is to make a decision as to costs. Under Article 69(2) of the Rules of Procedure, applicable to appeal proceedings by virtue of Article 118 thereof,

the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. The first paragraph of Article 69(4) provides that the Member States which have intervened in the proceedings are to bear their own costs.

378    Because Mr Kadi and Al Barakaat's appeals must be upheld and because the contested regulation must be annulled in so far as it concerns the appellants, the Council and the Commission must each be ordered to pay, in addition to their own costs, half of those incurred by Mr Kadi and Al Barakaat, both at first instance and in the present proceedings, in accordance with the forms of order sought to that effect by the appellants.

379    The United Kingdom of Great Britain and Northern Ireland is to bear its own costs both at first instance and in the appeals.

380    The Kingdom of Spain, the French Republic and the Kingdom of the Netherlands are to bear their own costs relating to the appeals.

On those grounds, the Court (Grand Chamber) hereby:

1.    **Sets aside the judgments of the Court of First Instance of the European Communities of 21 September 2005 in Case T-315/01** *Kadi* v *Council and Commission* **and Case T-306/01** *Yusuf and Al Barakaat International Foundation* v *Council and Commission*;

2.    **Annuls Council Regulation (EC) No 881/2002 of 27 May 2002 imposing certain specific restrictive measures directed against certain persons and entities associated with Usama bin Laden, the Al-Qaeda network and the Taliban, and repealing Council Regulation (EC) No 467/2001 prohibiting the export of certain goods and services to Afghanistan, strengthening the flight ban and extending the freeze of funds and other financial resources in respect of the Taliban of Afghanistan, in so far as it concerns Mr Kadi and the Al Barakaat International Foundation;**

3.    **Orders the effects of Regulation No 881/2002 to be maintained, so far as concerns Mr Kadi and the Al Barakaat International Foundation, for a period that may not exceed three months running from the date of delivery of this judgment;**

4.    **Orders the Council of the European Union and the Commission of the European Communities each to pay, in addition to their own costs, half of those incurred by Mr Kadi and Al Barakaat International Foundation both at first instance and in these appeals;**

5.    **Orders the United Kingdom of Great Britain and Northern Ireland to bear its own costs both at first instance and in these appeals;**

6.    **Orders the Kingdom of Spain, the French Republic and the Kingdom of the Netherlands to bear their own costs.**

Signatures

---

* Languages of the case: English and Swedish.