# EXHIBIT 16

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

**MAGYAR FARMING COMPANY LTD,
KINTYRE KFT, AND
INÍCIA ZRT**

*Claimants*

**v.**

**HUNGARY**

*Respondent*

**(ICSID Case No. ARB/17/27)**

---

# AWARD

---

**Members of the Tribunal**
Professor Gabrielle Kaufmann-Kohler, President of the Tribunal
Dr. Stanimir A. Alexandrov, Arbitrator
Dr. Inka Hanefeld, Arbitrator

**Secretary of the Tribunal**
Mr. Francisco Abriani

**Assistant to the Tribunal**
Mr. David Khachvani

*Date of dispatch to the Parties*: 13 November 2019

# REPRESENTATION OF THE PARTIES

*Representing Magyar Farming Company Ltd, Kintyre Kft and Inícia Zrt:*

Zannis Mavrogordato
20 Essex Street
London WC2R 3AL
United Kingdom


and

András Dániel László
LFB - László Fekete Bagaméry
13-15 Kuny Domokos utca
H-1012 Budapest
Hungary

*Representing Hungary*:

Michael Ostrove
Théobald Naud
Maxime Desplats
Clémentine Emery
DLA PIPER FRANCE LLP
27 rue Laffitte
75009 Paris
France


and

András Nemescsói
Dávid Kőhegyi
Zsófia Deli
DLA Piper Posztl, Nemescsói, Györfi-Tóth &
Partners Law Firm
Csörsz u. 49-51.
H-1124 Budapest
Hungary

and

Beatrix Bártfai
András Lovas
Viktória Perényi
Fanni Takács
Sárhegyi & Partners Law Firm
Árvácska u 6.
H-1022 Budapest
Hungary

**TABLE OF CONTENTS**

TABLE OF SELECTED ABBREVIATIONS AND DEFINED TERMS ................................. IV

I.     PRELIMINARY MATTERS.................................................................................. 1

   A.   The Parties .................................................................................................. 1
   B.   The Dispute ................................................................................................. 2
   C.   Requests for Relief ..................................................................................... 4
   D.   The Tribunal ............................................................................................... 6

      (1)   Arbitrator appointed by the Claimants.................................................. 6

      (2)   Arbitrator appointed by the Respondent .............................................. 7

      (3)   Presiding Arbitrator ............................................................................. 7

      (4)   Secretary of the Tribunal ..................................................................... 7

      (5)   Assistant to the Tribunal ...................................................................... 7
   E.   Place of Proceedings.................................................................................. 8
   F.   Applicable Laws ......................................................................................... 8

      (1)   Procedure ............................................................................................. 8

      (2)   Merits ................................................................................................... 8
   G.   Scope of this Award ................................................................................. 10

II.    PROCEDURAL HISTORY................................................................................ 10

III.   FACTUAL BACKGROUND ............................................................................. 23

   A.   Overview of the Agricultural Land Regulation in Hungary...................... 23
   B.   The Claimants' Farming Business in Hungary ......................................... 24
   C.   The Lease Agreement and the Pre-lease Right.......................................... 25
   D.   Background and Adoption of the 2011 Amendment................................. 28
   E.   The 2014 Tenders ..................................................................................... 31
   F.   Domestic Proceedings .............................................................................. 34
   G.   Eviction..................................................................................................... 36
   H.   Settlement Efforts ..................................................................................... 38

IV.    JURISDICTION ............................................................................................... 41

   A.   Intra-EU Objection ................................................................................... 41

      (1)   The Respondent's Position .................................................................. 42

        a.   Article 8 BIT is incompatible with the EU Treaties............................ 42

        b.   The EU Treaties prevail ..................................................................... 44

      (2)   The Claimants' Position....................................................................... 47

        a.   Article 8 BIT is compatible with the EU Treaties .............................. 48

        b.   The EU Treaties do not prevail .......................................................... 49

      (3)   Analysis............................................................................................... 52

        a.   Is the Achmea Decision binding on the Tribunal? ............................. 53

      b.   What is the value of the Member States Declarations? .................................. 55

      c.   Do the EU Treaties preclude the application of Article 8 of the BIT? .......... 60

B.   Subject-Matter Jurisdiction ......................................................................... 67

   (1)  The Respondent's Position ..................................................................... 67

   (2)  The Claimants' Position ......................................................................... 70

   (3)  Analysis ................................................................................................... 73

V.    LIABILITY ......................................................................................................... 77

A.   The Claimants' Position ............................................................................... 77

   (1)  Hungary exercised sovereign powers ..................................................... 77

   (2)  Hungary expropriated the contractual pre-lease right............................ 79

   (3)  Hungary expropriated the statutory pre-lease right ............................... 81

   (4)  Hungary's measures were not a lawful exercise of police powers ...................... 82

B.   The Respondent's Position ........................................................................... 85

   (1)  The Tenders are irrelevant to the expropriation claim ........................... 85

   (2)  Hungary did not expropriate the contractual pre-lease right ................. 87

   (3)  Hungary did not expropriate the statutory pre-lease right .................... 90

   (4)  Hungary exercised police powers ........................................................... 91

C.   Analysis ........................................................................................................ 94

   (1)  Did the 2011 Amendment expropriate the statutory pre-lease right? .................. 95

   (2)  Was the 2011 Amendment a non-compensable regulatory measure? ............... 102

   (3)  Was the expropriation lawful? .............................................................. 104

VI.   QUANTUM ....................................................................................................... 106

A.   The Claimants' Position ............................................................................. 106
B.   The Respondent's Position ......................................................................... 110
C.   Analysis ...................................................................................................... 114

   (1)  Method of valuation............................................................................... 115

   (2)  Contentious points of secondary valuation ........................................... 117

   (3)  Mitigation .............................................................................................. 121

   (4)  Interest ................................................................................................... 123

VII.  COSTS ............................................................................................................... 124

VIII. OPERATIVE PART ......................................................................................... 127

TABLE OF SELECTED ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| **BIT,** the **UK-Hungary BIT** or the **Treaty** | The Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the Hungarian People's Republic for the Promotion and Reciprocal Protection of Investments, dated 9 March 1987 and entered into force on 28 August 1987 (CL-1) |
| **C-** | Claimants' Exhibit |
| **CJEU** | The Court of Justice of the European Union |
| **CL-** | Claimants' Legal Authority |
| **CM** | Claimants' Memorial of 27 April 2018 |
| **Commission** | The European Commission |
| **CPP** | The Code of Civil Procedure of Hungary |
| **C-Rejoinder** | Claimants' Rejoinder on Jurisdiction of 29 April 2019 |
| **C-Reply** | Claimants' Reply on Jurisdiction, the Merits and Quantum of 20 December 2018 |
| **CWS** | Claimants' Witness Statement |
| **DCF** | Discounted cash flows |
| **ECT** | The Energy Charter Treaty |
| **ER** | Expert Report |

iv

| | |
|---|---|
| **EURIBOR** | Euro Interbank Offered Rate |
| **Fidesz** | The Hungarian Civic Alliance, a political party that is and has been in power in Hungary during the adoption of the disputed measures |
| **GBP** | British Pound |
| **Hearing** | The Hearing on Jurisdiction, Liability and Quantum held on 27 to 30 May 2019 |
| **HUF** | Hungarian Forint |
| **ER** | Expert Report |
| **EU** | The European Union |
| **EUR** | Euro |
| **ICSID Convention** or the **Convention** | The Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| **ICSID** or the **Centre** | The International Centre for Settlement of Investment Disputes |
| **ICSID Rules** | The ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| **ILC** | International Law Commission |
| **Kft** | Korlátolt felelősségű társaság, Hungarian equivalent of a limited liability company |
| **LIBOR** | London Interbank Offered Rate |

v

| | |
|---|---|
| **LLP** | Limited liability partnership |
| **LTD** | Limited company |
| **LLC** | Limited liability company |
| **MNV** | Hungarian National Asset Management Agency |
| **NLA** or **NLF** | The National Land Agency also referred to as the National Land Fund, a State-owned agricultural land management agency created under Act CXVI of 1 January 2002 (R-8) |
| **No./Nos.** | Number/Numbers |
| **PO** | Procedural Order |
| **PWC** | PricewaterhouseCoopers |
| **R-** | Respondent's Exhibit |
| **RL-** | Respondent's Legal Authority |
| **RCM** | Respondent's Counter-Memorial on the Merits, Quantum and Objections to Jurisdiction of 7 September 2018 |
| **R-Rejoinder** | Respondent's Rejoinder on the Merits and Quantum and Reply on Jurisdiction of 26 March 2019 |
| **TEU** | The Treaty on the European Union |
| **TFEU** | The Treaty on the Functioning of the European Union |

| | |
|---|---|
| **USD** | United States Dollar |
| **UNCITRAL** | The United Nations Commission on International Trade Law |
| **VCLT** | The Vienna Convention on the Law of Treaties |
| **WS** | Witness Statement |
| **Zrt** | Zártkörűen működő részvénytársaság, Hungarian equivalent of a company limited by shares |

## I.    PRELIMINARY MATTERS

1.    This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Agreement between the United Kingdom of Great Britain and Northern Ireland and the Hungarian People's Republic for the Promotion and Reciprocal Protection of Investments, dated 9 March 1987 (the "**UK-Hungary BIT**" or the "**BIT**" or the "**Treaty**")[1] and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 and became binding on Hungary on 6 March 1987 and on the United Kingdom on 18 January 1967 (the "**ICSID Convention**").

### A.    THE PARTIES

2.    The Claimants (together referred to as the "**Claimants**") are:

   (i)    Magyar Farming Company Ltd ("**Magyar**"), a company incorporated and existing under the laws of the United Kingdom (the "**UK**");[2]

   (ii)    Kintyre Kft ("**Kintyre**"), a company incorporated and existing under the laws of Hungary;[3] and

   (iii)    Inícia Zrt. ("**Inícia**"), a company incorporated and existing under the laws of Hungary.[4]

3.    The Respondent is Hungary ("**Hungary**" or the "**Respondent**"), a sovereign State and a member of the European Union as well as a contracting State to the ICSID Convention and the BIT.

---

[1] UK-Hungary BIT, CL-1.

[2] Certificate of Incorporation of Magyar Farming Company Limited, 15 October 1997, C-26.

[3] Extract from Kintyre Kft's shareholder register, 17 March 2017, C-1.

[4] Extract from Inícia Zrt's shareholder register, 17 March 2017, C-2.

4.     The Claimants and the Respondent are collectively referred to as the "**Parties**". The Parties' representatives and their addresses are listed above on page (i).

## B.     THE DISPUTE

5.     The dispute arises out of Hungary's measures regulating possession and disposal of State-owned agricultural land, which, according to the Claimants, resulted in the expropriation of their leasehold rights to 760 hectares of State-owned land located in Hungary's North-Western region of Ikrény (the "**Land**") and in a diminution of the value of their farming business in Hungary (the "**Farm**").

6.     The Claimants contend that, pursuant to the lease agreement between Inícia and Hungary's State-owned asset management agency, concluded on 25 July 1994[5] and amended and extended in 1999[6] and 2006[7] (the "**Lease Agreement**" or the "**Lease**"), Inícia had a contractual and a statutory pre-lease right to the Land. For the Claimants, this entailed that, if Hungary intended to lease the Land to a third party upon the expiration of the Lease Agreement (in July 2014), it should inform Inícia of any offer from a third party that it intended to accept. The pre-lease right, so say the Claimants, then entitled Inícia to "step in and assume the offer from the third party" and thereby enter into a renewed lease agreement upon the terms of that offer.[8]

7.     The Claimants contend that, in 2011, the Parliament passed an amendment to the land law,[9] which precluded lessees of State-owned agricultural land plots from exercising their statutory pre-lease rights in cases where the National Land Agency (the "**NLA**") leased the land out by way of a tender. According to the Claimants, the Respondent then "orchestrated

---

[5] Lease Agreement of 25 July 1994 between the State Property Agency and Inícia Zrt (the "1994 Lease Agreement"), C-33.

[6] Lease Agreement of 1 November 1999 between State Privatisation and Property Plc and Inícia Zrt (the "1999 Lease Agreement"), C-38.

[7] Lease Agreement of 16 November 2006 between National Land Fund Management Organisation and Inícia Zrt (the "2006 Lease Agreement"), C-40.

[8] CM, ¶ 123.

[9] Act No. LXXXVII of 2010 on the National Land Fund, C-43.

a rigged tender process whereby, despite the Respondent's prior assurances and despite the Claimants' superior bids, the leases were 'won' by third parties in January 2014."[10] As a result, according to the Claimants, security guards acting under the direction of the Respondent, evicted them from the Land in blatant disregard of their pre-lease rights and the interim possessory protection that Inícia had obtained from the local authorities.

8.    The Claimants contend that the Respondent's measures constitute an unlawful expropriation of the Claimants' leasehold rights to the Land contrary to Article 6 of the BIT and request the Tribunal to award full compensation of damages resulting from the Respondent's wrongful conduct.

9.    The Respondent fully rejects these claims. As a preliminary matter, it submits that the Tribunal lacks jurisdiction to resolve the dispute, since the dispute resolution provision of the BIT is inapplicable due to Hungary's accession to the European Union in 2004, and in any event, because the Claimants' alleged rights in relation to which the dispute arises either expired on their own terms or do not constitute an investment for the purposes of the BIT and the ICSID Convention.

10.    On the merits, the Respondent submits that the Claimants held no rights capable of being expropriated at the time of the disputed measures, and in any event, the measures did not constitute a sovereign interference or a taking of the purported pre-lease rights. The Respondent also rejects having expropriated the Claimants' investment as a whole, as the Claimants still continue their farming activity in Hungary at profit.

11.    The Respondent further opposes the Claimants' quantification of the alleged loss as grossly overstated. It submits that any award for damages should be limited to the fair market value of the allegedly expropriated asset and not extend to remote consequential losses as the Claimants claim. In addition, according to the Respondent, the Claimants failed to mitigate their loss, which should result in a further reduction of the claimed compensation.

---

[10] CM, ¶ 235.

Considering these factors, the Respondent offers an alternative valuation of the Claimants' alleged loss.

## C.    REQUESTS FOR RELIEF

12.    The Claimants formulated their request for relief in the Reply[11] as follows:

> [T]he Claimants respectfully invite the Tribunal to render a Final Award:
>
> a.    Declaring that the Respondent has breached the BIT by expropriating the Claimants' investment without complying with the requirements of Article 6 of the BIT, including payment of prompt, adequate and effective compensation;
>
> b.    Ordering the Respondent to pay to the Claimants damages representing full reparation for losses sustained as a result of the expropriation in the sum of €17.9m, plus the costs and expenses of these arbitration proceedings (including lawyers' and experts' fees and expenses, and the fees and expenses of ICSID and the Tribunal), and the costs and expenses of the local court proceedings in Hungary (in the sum of HUF 57,222,236), together with interest compounded semi-annually at the rate of 7.87% until the date of payment;
>
> c.    Alternatively, as regards costs and expenses, ordering the Respondent to pay to the Claimants, as costs, all the costs and expenses of these arbitration proceedings (including lawyers' and experts' fees and expenses, and the fees and expenses of ICSID and the Tribunal), as well as the costs and expenses of the local court proceedings in Hungary (HUF 57,222,236), together with interest compounded semi-annually at the rate of 7.87% until the date of payment.

13.    The Respondent formulated its request for relief in the Rejoinder[12] as follows:

> Respondent respectfully requests the Tribunal to:
>
> –    Declare that it does not have jurisdiction over Claimants' claims;

---

[11] C-Reply, ¶ 372.

[12] R-Rejoinder, ¶ 581.

    – To the extent it decides it has jurisdiction over Claimants' claims, dismiss all of Claimants' claims under Article 6(1) of the BIT;

    – To the extent it declares Respondent to be responsible for a violation of Article 6(1) of the BIT,

        o declare that Claimants failed to mitigate their losses and therefore determine that the amount payable by Respondent as compensation cannot exceed EUR 930,000; or

        o if it determines that Claimants did not fail to mitigate their losses, determine the compensation payable by Respondent in an amount not exceeding the fair market value of Claimants' alleged pre-lease right.

    – Order Claimants to pay Respondent's expenses (including legal and expert fees and disbursements) and all other costs of the arbitration.

14.    Following the Hearing, in its letter of 21 June 2019, the Respondent presented an amended request for relief, which reads as follows:

    Respondent respectfully requests the Tribunal to:

    – Declare that it does not have jurisdiction over Claimants' claims;

    – To the extent it decides it has jurisdiction over Claimants' claims, dismiss all of Claimants' claims under Article 6(1) of the BIT;

    – To the extent it declares Respondent to be responsible for a violation of Article 6(1) of the BIT,

        o declare that Claimants failed to mitigate their losses and therefore determine that the amount payable by Respondent as compensation cannot exceed EUR 930,000; or

        o if it determines that Claimants did not fail to mitigate their losses, determine the compensation payable by Respondent in an amount not exceeding the fair market value of Claimants' alleged pre-lease right; or

     ○  if it determines that the compensation payable by Respondent should be determined by subtracting the Actual Value of the Farm from the But For Value of the Farm:

- direct Claimants to keep Respondent informed of any sale of the Farm; and

- subtract from the compensation payable by Respondent all sums Claimants may receive above the Farm's Actual Value (as determined by the Tribunal) in case they sell the Farm before the Award is paid, or

- order that Claimants shall pay to Respondent all sums Claimants may receive above the Farm's Actual Value (as determined by the Tribunal) in case they sell the Farm after the Award is paid.

    –  Order Claimants to pay Respondent's expenses (including legal and expert fees and disbursements) and all other costs of the arbitration.

15. The Claimants object to the admissibility of the amendment of the Respondent's request for relief.[13]

## D.    THE TRIBUNAL

16. The Tribunal was constituted on 4 January 2018 in accordance with the ICSID Convention and the ICSID Arbitration Rules. The Parties confirmed that the Tribunal was properly constituted and that they have no objection as to the appointment of any member of the Tribunal.[14] The following persons comprise the Tribunal:

### (1)    Arbitrator appointed by the Claimants

Dr. Stanimir A. Alexandrov
Stanimir A. Alexandrov PLLC
1501 K Street, N.W.
Suite C-072

---

[13] Claimants' email of 24 June 2019 to the Tribunal.

[14] See, Procedural Order No. 1, ¶ 2.1, to which the Parties agreed.

Washington D.C. 20005
USA
Tel.: +1 (202) 736 8186

**(2)    Arbitrator appointed by the Respondent**

Dr. Inka Hanefeld
Hanefeld Rechtsanwälte
Brooktorkai 20
Hamburg, 20457
Germany
Tel.: +49 40 180482930

**(3)    Presiding Arbitrator**

Professor Gabrielle Kaufmann-Kohler
Lévy Kaufmann-Kohler
3-5 rue du Conseil-Général
P.O. Box 552
CH-1211 Geneva 4
Switzerland
Tel.: +41 22 809 62 00

**(4)    Secretary of the Tribunal**

17.    The Secretary-General of ICSID has appointed as the Secretary of the Tribunal:

Ms. Laura Bergamini
ICSID
MSN J2-200
1818 H Street, N.W.
Washington, D.C. 20433
USA
Tel.: + 1 (202) 473-6183
Fax: + 1 (202) 522-2615
Email: lbergamini@worldbank.org

**(5)    Assistant to the Tribunal**

18.    With the consent of the Parties, the Tribunal appointed as the Assistant to the Tribunal:

Mr. David Khachvani
3-5 Rue du Conseil-General
P.O. Box 552
CH-1211 Geneva 4
Switzerland
Tel: +41 22 809 6193

7

19.   The functions of the Assistant are set out in the Tribunal's letter of 15 January 2018, which the Parties accepted as recorded at paragraph 8.3 of Procedural Order No. 1.

**E.   PLACE OF PROCEEDINGS**

20.   Pursuant to Article 62 of the ICSID Convention, the place of the proceedings is Washington, D.C. However, as confirmed in ICSID's email of 8 May 2019, the Parties agreed to conduct the Hearing at the World Bank offices in Paris, France.

**F.   APPLICABLE LAWS**

**(1)   Procedure**

21.   Pursuant to Article 44 of the ICSID Convention, the procedure of this arbitration is governed by the following instruments and rules in the following order of precedence:

- Section I of Chapter IV of the ICSID Convention;

- Any rules of procedure agreed upon by the Parties; and

- The ICSID Rules of Procedure for Arbitration Proceedings (the "**ICSID Rules**").

22.   If a question of procedure arises which is not covered by the instruments listed in the preceding paragraph, the Tribunal shall decide the question. Accordingly, the Tribunal has issued multiple procedural directions throughout this arbitration, including, but not limited to, Procedural Orders Nos. 1, 2 and 3.

**(2)   Merits**

23.   Pursuant to Article 42(1) of the ICSID Convention, when resolving the dispute, the Tribunal must primarily apply the law agreed upon by the Parties; in the absence of which, it shall apply the laws of the respondent State and international law as may be applicable:

> The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable.

24.    It is common ground that the Parties have made no explicit choice of law. For the Claimants, however, the merits of the dispute is subject to international law, since the claims are based on the BIT, *i.e.* an international treaty.[15] The Respondent in turn points to the fact that the BIT contains no choice-of-law clause and argues that the choice of international law cannot be implied from the sole fact that the claims may arise out of the BIT.[16]

25.    ICSID jurisprudence supports the approach that, when the disputing parties have made no express choice-of-law, such choice cannot be implied from the mere fact that the claims arise under an international treaty.[17] For instance, according to the tribunal in *Perenco v. Ecuador*, where "the Treaty does not contain an express applicable law clause […] the Tribunal must apply Article 42(1), second sentence, of the ICSID Convention".[18] Prominent commentators of the ICSID Convention also affirm that "an agreement under Art. 42(1) requires an affirmative choice and should be express."[19] In this respect, it is telling that the Claimants themselves rely on Hungarian law when addressing the issues such as the nature and the scope of their alleged leasehold rights.

26.    Therefore, in the absence of a choice-of-law provision in the BIT, or elsewhere for that matter, the default rule of the second sentence of Article 42(1) of the ICSID Convention applies. This provision does not allocate specific matters to either international or domestic law. Instead, it calls for the application of either of these laws "as may be applicable" to a particular issue in dispute.  It is thus for the Tribunal to determine whether a particular

---

[15] C-Reply, ¶¶ 24-32.

[16] R-Rejoinder, ¶¶ 33-44.

[17] *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Liability, 14 December 2012 ("*Burlington v. Ecuador*"), RL-60, ¶ 178; *Perenco Ecuador Limited v. Republic of Ecuador and Empresa Estatal Petróleos del Ecuador*, ICSID Case No. ARB/08/6, Decision on the Remaining Issues of Jurisdiction and on Liability, 12 September 2014 ("*Perenco v. Ecuador*"), RL-46, ¶¶ 532-533.

[18] *Perenco v. Ecuador*, RL-46, ¶¶ 532-533.

[19] Schreuer, Malintoppi, Reinisch and Sinclair, *The ICSID Convention: A Commentary* (2nd edition, Cambridge University Press, 2009), RL-75, Article 42, ¶ 76.

issue is subject to national or international law.[20] In doing so, the Tribunal will be guided primarily by the BIT.

27. When applying the law, whether municipal or international, the Tribunal is not bound by the arguments and sources invoked by the Parties. The principle of *iura novit arbiter* allows the Tribunal to form its own opinion of the meaning of the law, provided that it does not surprise the Parties with a legal theory that was not subject to debate and that the Parties could not anticipate.[21]

### G.    SCOPE OF THIS AWARD

28. Pursuant to the Procedural Calendar established with the agreement of the Parties at the outset of the proceedings,[22] the present award finally resolves the Respondent's preliminary objections as well as the issues of liability and quantum.

## II.    PROCEDURAL HISTORY

29. On 14 July 2017, ICSID received a request for arbitration dated 4 July 2017 from the Claimants against Hungary, together with exhibits C-1 through C-25 and legal authorities CL-1 and CL-2 (the "**Request**").

30. On 1 August 2017, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

---

[20] *Burlington v. Ecuador*, RL-60, ¶ 179.

[21] *Mr. Patrick Mitchell v. The Democratic Republic of Congo*, ICSID Case No. ARB/99/7, Decision on the Application for Annulment of the Award, 1 November 2006, ¶ 57; *Metal-Tech Ltd. v. The Republic of Uzbekistan*, ICSID Case No. ARB/10/3, Award, 4 October 2013, ¶ 287; *Vestey Group Ltd v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/06/4, Award, 15 April 2016, CL-24, ¶ 118; *Bosh International, Inc. and B&P Ltd Foreign Investments Enterprise v. Ukraine*, ICSID Case No. ARB/08/11, Award, 25 October 2012, ¶ 30; *Compañía de Aguas del Aconquija S.A. and Vivendi Universal (formerly Compagnie Générale des Eaux) v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, ¶ 84.

[22] Annex A to Procedural Order No. 1, 14 February 2018.

31.   By emails of 5 September 2017, the Parties agreed to constitute the Tribunal in accordance with Article 37(2)(a) of the ICSID Convention as follows: the Tribunal would consist of three arbitrators, one to be appointed by each Party and the third, the presiding arbitrator, to be appointed by agreement of the Parties.

32.   By letter of 12 September 2017, the Claimants appointed Dr. Stanimir A. Alexandrov, a national of Bulgaria, as arbitrator in this case, who accepted his appointment on 13 September 2017.

33.   By letter of 9 October 2017, the Respondent appointed Dr. Inka Hanefeld, a national of Germany, as arbitrator in this case, who accepted her appointment on 10 October 2019.

34.   By emails of 10 November 2017, the Parties informed the Centre that they had agreed to appoint Professor Dr. Klaus Sachs, a national of Germany, as President of the Tribunal.

35.   By letter of 14 November 2017, the Centre informed the Parties that Professor Dr. Sachs had declined his appointment.

36.   By emails of 17 November 2017, the Parties informed the Centre that they had agreed to request the Chairman of the ICSID Administrative Council to appoint the presiding arbitrator. Accordingly, on 12 December 2017, ICSID sent the Parties a ballot inviting them to consider a list of candidates to act as the presiding arbitrator.

37.   By emails of 21 December 2017, the Parties informed the Centre that they had conferred over the names proposed in the ballot and that they had agreed to appoint Professor Gabrielle Kaufmann-Kohler, a national of Switzerland, as presiding arbitrator.

38.   On 4 January 2018, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules, notified the Parties that Professor Kaufmann-Kohler, Dr. Alexandrov, and Dr. Hanefeld had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Ms. Laura Bergamini, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

39.   By emails of 8 January 2018, the Parties indicated that, unless the Tribunal had a preference for an in-person hearing, they agreed to hold the first session by telephone.

40.     By letter of 15 January 2018, the Tribunal (i) proposed to hold the first session by telephone conference on 26 January 2018 and invited the Parties to confirm their availability; (ii) circulated a draft Procedural Order No. 1 and a draft agenda for the Parties to comment in preparation of the first session; and (iii) proposed the Parties to appoint Mr. David Khachvani, a lawyer from the President's firm, as Assistant to the Tribunal in this case.

41.     By email of 17 January 2018, the Claimants confirmed the Parties' availability for a first session on the proposed date. The Claimants also indicated that:

> [T]he Claimants (who are first, and hopefully last, time users of the ICSID process) are initially uncomfortable with the Tribunal's proposal to delegate many important tasks to an assistant and to add a not inconsiderable costs line for this assistant in the draft procedural order. The Claimants reserve their position on this issue.
>
> In the event that the parties agree to the appointment of an assistant, the parties respectfully propose that the assistant's role in "preparing initial drafts of…awards" should be amended to read "preparing initial drafts of the Procedural Background, Factual Background and Parties' Positions sections of any award".

42.     By email of the same date, the Respondent confirmed its availability on the proposed date for the first session. The Respondent further informed the Tribunal that it had no issue with the proposed appointment of Mr. Khachvani as Assistant to the Tribunal, but indicated that it "would appreciate if the description of the role of the assistant in drafting procedural orders and awards was refined in a way to involve drafting 'appropriate parts' of such documents only."

43.     By letter of 17 January 2018, the Tribunal confirmed that the first session would be held on 26 January 2018 by telephone conference.

44.     On 24 January 2018, the Parties submitted a draft Procedural Order No. 1 containing their consolidated comments, along with their respective proposals for the procedural calendar.

45.     In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 26 January 2018 by telephone conference.

46.     On 2 February 2018, the Tribunal circulated a revised draft Procedural Order No. 1 and informed the Parties that such Procedural Order would become effective on 9 February 2018 unless a party requested the correction of a clerical mistake or raised a substantiated objection to a matter that had not already been the subject of discussion during the first session. The Tribunal also circulated the declaration signed by Mr. Khachvani.

47.     On 9 February 2018, the Parties submitted their joint proposal for a revised draft Procedural Order No. 1.

48.     By letter of 13 February 2018, the Tribunal informed the Parties that it was minded to accept the Parties' revised draft Procedural Order No. 1 subject to certain modifications, to which the Parties agreed by emails of the same date.

49.     On 14 February 2018, the Tribunal issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters. Procedural Order No. 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural language would be English, and that the place of the proceedings would be Washington, D.C., USA. It also establishes the procedural calendar for the proceedings.

50.     By letter of 30 March 2018, the Respondent raised a jurisdictional objection due to the outcome of the case *Slovak Republic v. Achmea* before the Court of Justice of the European Union, and requested that the Tribunal issue a decision to bifurcate the proceedings and hear this jurisdictional objection in a preliminary phase.

51.     By letter of 4 April 2018, the Claimants presented their observations on the Respondent's request of 30 March 2018, as per the Tribunal's instructions.

52.     By email of 5 April 2018, the Tribunal indicated that it understood that the Parties had presented their positions on the Respondent's request of 30 March 2018 and that, consequently, it would proceed with rendering the decision on bifurcation. The Tribunal also indicated that the procedural calendar set out in Annex A to Procedural Order No. 1 remained in force.

53.    On 10 April 2018, the Tribunal decided on the Respondent's request of 30 March 2018 as follows:

> For reasons of efficiency, especially because the agreed calendar which did not provide for bifurcation is already well under way, the Tribunal is of the view that the proceedings should now continue as scheduled. The Achmea defense (and any others) can be addressed in the context of the Counter-Memorial and of the further submissions.

54.    On 27 April 2018, the Claimants filed their Memorial on the Merits, together with the witness statement of Mr. Andrew Alexander Hunter, the expert report of Mr. James Gilbey FCA, the expert opinion of Professor Gábor Halmai, exhibits C-26 through C-131, and legal authorities CL-3 through CL-29.

55.    By email of 4 May 2018, the Tribunal invited the Parties to indicate their preference in respect of the place of the hearing.

56.    By email of the same date, the Claimants indicated their preference for a hearing in Paris, France.

57.    By email of 8 May 2018, the Respondent indicated that, despite its preference to hold the hearing in Washington, D.C., it remained amenable to compromise on the hearing to take place in Paris, France.

58.    On 8 May 2018, the Tribunal confirmed that the hearing would be held at the World Bank offices in Paris, France.

59.    On 22 August 2018, the European Commission filed an application to intervene as a non-disputing party pursuant to ICSID Arbitration Rule 37(2) (the "**Commission's Application**").

60.    On 30 August 2018, the Parties filed their observations on the Commission's Application.

61.    On 5 September 2018, the Tribunal decided that it:

(i) grants the Commission leave to file a written amicus curiae submission by 20 January 2019, limited to the legal consequences of the Achmea Judgment for the present case;

(ii) allows the Commission to access the relevant parts of the Parties' written submissions (excluding evidence) as set out above;

(iii) denies the Commission's request to attend hearings and to present oral arguments.

62.    On 7 September 2018, the Respondent filed its Counter-Memorial on the Merits and Memorial on Jurisdiction, together with the witness statement of Dr. Márton Örs Bitay, the expert opinion of Professor Attila Menyhárd, the expert report of Messrs. Kiran Sequeira and Stuart Dekker of Versant Partners, LLC, exhibits R-1 through R-28, and legal authorities RL-1 through RL-74.

63.    On 21 September 2018, in accordance with the calendar set out in Annex A to Procedural Order No. 1, the Parties exchanged their requests for production of documents.

64.    On 8 October 2018, the Parties voluntarily produced certain documents requested by the other Party and/or submitted their objections to such document production requests.

65.    On 18 October 2018, the Parties submitted their replies to the opposing Party's objections.

66.    On 29 October 2018, the Tribunal issued Procedural Order No. 2 concerning production of documents.

67.    By email of 23 November 2018, the Claimants informed the Tribunal that the Respondent had failed to comply with the Tribunal's Order regarding Request No. 3 of Annex A to Procedural Order No. 2; and requested, *inter alia*, that "the Tribunal order Respondent to produce, within a very short deadline, the documents ordered in Request No. 3 of Annex A to Procedural Order No. 2 or a written explanation of the alleged legal constraints preventing disclosure." The Respondent provided its comments on the Claimants' email on the same date.

68.    By email of 24 November 2018, the Tribunal granted the Respondent until 30 November 2019 noon (CET) to make its best efforts to come forward with a solution or otherwise

provide any relevant explanations with respect to its inability to comply with Request No. 3 of Annex A of Procedural Order No. 2.

69. By email of 30 November 2019, the Claimants requested that the Tribunal take formal note of the Respondent's failure "(i) to comply with the Tribunal's Order regarding Request No. 3 of Annex A to Procedural Order No. 2; (ii) to reveal or explain its non-compliance on 19 November; and (iii) to provide the promised detailed explanation for such non-compliance by noon CET today." The Respondent presented its observations on the Claimants' email on the same date.

70. By email of 4 December 2018, the Claimants provided further comments concerning the Respondent's obligation to produce certain documents pursuant to Procedural Order No. 2.

71. On 11 December 2018, the Tribunal informed the Parties that "if necessary in light of all the circumstances, the Tribunal [would] address the issue of the Respondent's failure to comply with Procedural Order No. 2 and the possible legal consequences at a later stage, most likely in the Award."

72. On 20 December 2018, the Claimants filed their Reply on the Merits and Counter-Memorial on Jurisdiction, along with the second expert opinion of Professor Attila Menyhárd, the second expert opinion of Professor Gábor Halmai, the expert opinion of Professor Dr. Miklós Király, the supplemental independent expert report of Mr. James Gilbey, the second witness statement of Mr. Andrew Alexander Hunter, exhibits C-132 through C-236, and legal authorities CL-30 through CL-68. The Claimants also submitted a redacted version of their Reply on the Merits and Counter-Memorial on Jurisdiction.

73. On 9 January 2019, the Respondent submitted a redacted version of its Counter-Memorial on the Merits and Memorial on Jurisdiction.

74. By letter of 11 January 2019, the Tribunal informed the Commission that the redacted versions of the Parties' first exchange of briefs on jurisdiction were available, and invited the Commission to provide a confidentiality declaration, should it wish to consult them.

75. By email of 14 January 2019, the Commission indicated that:

As set out in the application for leave to intervene, the Commission agents are bound to strict confidentiality on the basis of Article 339 Treaty on Functioning of European Union, […]

The Commission understands that the Arbitral Tribunal considers additional guarantees necessary, but would be thankful for a confirmation that that is indeed the case.

Furthermore, if that is the case, in order to assess whether the Commission can give such an agreement, it would be necessary that the Arbitral Tribunal provides the Commission with "the confidentiality obligations applicable to the participants of these proceedings, including Section 27 of Procedural Order No. 1".

76.   By email of 14 January 2019, the Tribunal informed the Parties that it was "inclined to consider that the explanations given in [the Commission's] email provide sufficient protection of confidentiality for ICSID to give the EU Commission access to the redacted versions of the Counter-Memorial and Reply"; and that if the Parties did not share this view, it would then "seek a formal undertaking and share the content of Section 27.1 of Procedural Order No. 1 with the EU Commission."

77.   By emails of 14 and 16 January 2019, the Respondent and the Claimants, respectively, confirmed that they had no objection to the Tribunal's approach. Accordingly, the Centre transmitted redacted briefs to the Commission, on that same day.

78.   On 20 January 2019, the Commission filed its *Amicus Curiae* Brief, together with Annexes EC01 through EC32.

79.   On 29 January 2019, the Tribunal invited the Parties to comment in their second exchange of written submissions on jurisdiction and, if required, at the oral hearing, on the Declaration of the Representatives of the Governments of the Member States of the European Union of 16 January 2019 on the Enforcement of the Judgment of the Court of Justice in *Achmea* and Hungary's separate declaration of the same date (the "**2019 Declarations**"), which were submitted as annexes EC31 and EC32 by the Commission. The Tribunal also invited the Parties to address the possible effects of the United Kingdom's pending withdrawal from the European Union on this Tribunal's jurisdiction.

80.    By letter of 25 February 2019, the Tribunal proposed that the Parties identify the witnesses and experts to be cross-examined at the hearing on 19 April 2019. The Tribunal also asked the Parties if they could agree to postpone the pre-hearing telephone conference scheduled at 16:00 to 18:30 (CET).

81.    By emails of 28 February 2019, the Parties confirmed that they had no objections to the timing proposed by the Tribunal on 25 February 2019.

82.    By email of the same date, the Tribunal confirmed that the Parties should identify the witnesses and experts to be cross-examined at the hearing by 19 April 2019; and that the pre-hearing telephone conference would be held on 29 April 2019 at 18:30 (CET).

83.    By email of 1 March 2019, the Respondent informed the Tribunal that the Parties conferred and agreed to extend the submission deadline of the Respondent's Rejoinder on the Merits and Quantum (and Reply on Jurisdiction) until 25 March 2019, and the submission deadline of the Claimants' Rejoinder on Jurisdiction until 26 April 2019. The Tribunal approved the extensions on 4 March 2019.

84.    By emails of 24 March 2019, the Parties informed the Tribunal that they conferred and agreed to extend the deadline for the submission of the Respondent's Rejoinder on the Merits and Quantum and Reply on Jurisdiction until 26 March 2019. The Claimants further noted that they did not seek an extension for the filing of their Rejoinder on Jurisdiction at this stage, but reserved their right to do so, if required, upon review of Respondent's Rejoinder.

85.    By email of 25 March 2019, the Tribunal confirmed its agreement with the requested extension of the time limit for filing the Respondent's Rejoinder and took note of the content of the Claimants' email regarding the time limit for filing the Claimants' Rejoinder on Jurisdiction.

86.    On 26 March 2019, the Respondent filed its Rejoinder on the Merits and Quantum and Reply on Jurisdiction, along with the second expert opinion of Professor Attila Menyhárd, the second expert report of Messrs. Kiran Sequeira and Stuart Dekker of Versant Partners, LLC, exhibits R-29 through R-39, and legal authorities RL-75 through RL-111.

87.    On 19 April 2019, each party provided the list of witnesses and experts that it intended to cross-examine at the hearing.

88.    On 24 April 2019, the Tribunal circulated a draft Procedural Order No. 3 in preparation of the pre-hearing organizational meeting scheduled to be held on 29 April 2019.

89.    On 26 April 2019, the Claimants filed their Rejoinder on Jurisdiction, together with exhibits C-237 through C-255, and legal authorities CL-69 through CL-75.

90.    On 29 April 2019, the President of the Tribunal held a pre-hearing organizational meeting with the Parties by telephone conference.

91.    On 2 May 2019, the Tribunal circulated a revised Procedural Order No. 3 and informed the Parties that the draft Procedural Order No. 3 would become effective on 4 May 2019 unless either party raised a serious concern regarding a matter that had not been discussed during the pre-hearing organizational meeting.

92.    By email of the same date, the Claimants requested that a clarification be included to the draft Procedural Order No. 3 circulated that day. The Respondent presented its observations on the Claimants' request on 3 May 2019, as per the Tribunal's instructions. The Claimants provided further comments on 4 May 2019, to which the Respondent responded on 6 May 2019, as per the Tribunal's instructions.

93.    On 10 May 2019, the Tribunal issued Procedural Order No. 3 concerning the organization of the hearing.

94.    By email of 24 May 2019, the Centre informed the Parties that Mr. Francisco Abriani, ICSID Legal Counsel, would attend the hearing on behalf of Ms. Bergamini.

95.    On 26 May 2019, the Respondent provided Professor Menyhárd's CV, as well as complete or supplemented translations of the following exhibits: C-126, C-143 and C-237, C-192, C-246, and C-255, which are respectively named: R-40, R-41, R-42 and R-43. The Respondent submitted new exhibits R-44 and R-45. In agreement with the Claimants, the Respondent further submitted the supplemented translations of exhibits R-34, C-44 and C-114. Both Parties reserved their rights to challenge the correctness of the translations.

19

96.    A hearing on the merits and jurisdiction was held in Paris, France, from 27 to 30 May 2019 (the "**Hearing**"). The following persons were present at the Hearing:

*Tribunal*:
Professor Gabrielle Kaufmann-Kohler          President
Dr. Stanimir A. Alexandrov                   Arbitrator
Dr. Inka Hanefeld                            Arbitrator

Mr. David Khachvani                          Assistant to the Tribunal

*ICSID Secretariat*:
Mr. Francisco Abriani                        Secretary of the Tribunal

*For the Claimants*:
**Counsel:**
Mr. Zannis Mavrogordato                      20 Essex Street Chambers
Dr. András Dániel Lászlo                     LFB

**Parties:**
Mr. Andrew Alexander Hunter                  Managing Director and Shareholder of the Claimants
Mr. David Gunner                             Chairman and Shareholder of Magyar Farming Company
Mr. Nicholas Tapp                            Director and Shareholder of Magyar Farming Company
Mr. Christopher Combe                        Director and Shareholder of Magyar Farming Company
Mr. Simon Weaver                             Director and Shareholder of Magyar Farming Company
Mr. Michael Papworth                         Shareholder of Magyar Farming Company
Mr. Michael Arlington                        Shareholder of Magyar Farming Company
Mr. Paul Findley                             Shareholder of Magyar Farming Company

**Witness:**
Mr. Andrew Alexander Hunter

**Experts:**
Mr. James Gilbey                             Mazars
Mr. Alex Houston                             Mazars
Professor Gábor Halmai
Professor Dr. Miklós Király

*For the Respondent*:
**Counsel:**
Mr. András Nemescsói                         DLA Budapest
Mr. Michael Ostrove                          DLA France

| | |
|---|---|
| Mr. Théobald Naud | DLA France |
| Ms. Clémentine Emery | DLA France |
| Ms. Zsófia Deli | DLA Budapest |
| Ms. Kate Mala | DLA Budapest |
| Mr. Zoltán P. Kovács | KPZ and Partners |
| Mr. András Lovas | Sárhegyi and Partners |
| Ms. Viktória Perényi | Sárhegyi and Partners |
| Mr. Dávid Kőhegyi | DLA Budapest |

*Parties:*

| | |
|---|---|
| Mr. Tamás Andréka | Ministry of Agriculture |

*Witnesses:*

Dr. Márton Örs Bitay (by video-conference)

*Experts:*

| | |
|---|---|
| Professor Attila Menyhárd | Eötvös Loránd University (ELTE) |
| Mr. Kiran Sequeira | Versant Partners |
| Mr. Stuart Dekker | Versant Partners |

*Court Reporter*:

| | |
|---|---|
| Ms. Dawn K. Larson | B&B Reporters |

*Interpreters*:

| | |
|---|---|
| Mr. Sándor Mesterházy | English/Hungarian |
| Mr. Tamás Schild | English/Hungarian |
| Mr. Peter Koczoh | English/Hungarian |

97.    During the Hearing, the following persons were examined:

*On behalf of the Claimants*:
Mr. Andrew Alexander Hunter
Professor Gábor Halmai

| | |
|---|---|
| Mr. James Gilbey | Mazars |

*On behalf of the Respondent*:
Dr. Márton Örs Bitay (by video-conference)

| | |
|---|---|
| Professor Attila Menyhárd | Eötvös Loránd University (ELTE) |
| Mr. Kiran Sequeira | Versant Partners |
| Mr. Stuart Dekker | Versant Partners |

98.    During the Hearing, the Respondent submitted the demonstrative exhibit of Versant Partners (VP-DE-1) as well as an electronic copy of the Respondent's Opening Presentation, while the Claimants submitted the demonstratives used in Mr. Gilbey's presentation.

99.    On 3 June 2019, the Tribunal issued Procedural Order No. 4 concerning post-hearing matters.

100.    By letter of 21 June 2019, further to the Tribunal's instruction during the Hearing, the Respondent submitted a request to amend the request for relief set out in its Rejoinder on the Merits and Quantum and Reply on Jurisdiction at paragraph 581. By email of 24 June 2019, the Claimants objected to Respondent's application to amend its request for relief. By email of 27 June 2019, the Respondent provided its observations on the Claimants' email of 24 June 2019, as per the Tribunal's instructions.

101.    On 28 June 2019, the Parties submitted their agreed corrections to transcripts of the Hearing and requested an extension until 15 July 2019 to revert on the accuracy of the translations filed on 26 May 2019. The Tribunal granted such extension on 30 May 2019.

102.    By letter of 1 July 2019, the Tribunal invited the Parties to address the merits of the Respondent's modification to the request for relief, without prejudice to its admissibility. Accordingly, the Respondent submitted its observations on 15 July 2019 and the Claimants filed their response on 26 July 2019.

103.    On 2 July 2019, the Centre circulated the final version of the Hearing transcripts.

104.    By letter of 8 July 2019, ICSID's Secretary-General informed the Parties that Mr. Abriani would serve as Secretary of the Tribunal during Ms. Bergamini's leave.

105.    On 15 July 2019, the Parties submitted the agreed text for exhibits R-40, R-41, R-43, R-44 and R-45, which were filed on 26 May 2019. On 19 July 2019, the Parties filed their statements of costs.

106.    By letter of 22 August 2019, the Tribunal provided the Parties with an update as to its deliberations and informed them that it expected to be able to indicate in early December when it would render its Award.

107.    The proceeding was closed on 8 November 2019.

## III.    FACTUAL BACKGROUND

108.    The following summary, which does not purport to be exhaustive, aims at providing the general factual background for the Tribunal's analysis. The Tribunal will address the facts relevant to its reasoning in more detail in Sections IV to VI.

### A.    OVERVIEW OF THE AGRICULTURAL LAND REGULATION IN HUNGARY

109.    Following the fall of the communist regime in Hungary in 1989, the Hungarian agriculture industry experienced a profound transformation. From 1990 to 1994, the State privatized a substantial portion of its farmland, dividing it into small individual parcels.[23] At the end of the privatization process, over 85% of the agricultural land was privately owned, less than 15% remaining in State ownership. That being so, the division of land into small parcels stood in the way of mechanization and efficient farming. These factors seriously hampered the productivity of the Hungarian agriculture industry in the years that followed.

110.    To regulate the acquisition and ownership of the newly privatized agricultural land, on 27 June 1994, the Hungarian Parliament enacted the Arable Land Act (the "**1994 Arable Land Act**").[24] Under the new Act, only physical persons of Hungarian nationality were authorized to acquire agricultural land, while domestic and foreign corporations, as well as foreign nationals were barred from such acquisition. The latter were, however, allowed to lease agricultural land from Hungarian nationals or from the State. Leases were limited to a maximum term of 10 years and a maximum surface area of 300 hectares.[25] In addition,

---

[23] RCM, ¶ 31.

[24] The 1994 Arable Land Act, 27 July 1994, R-4.

[25] The 1994 Arable Land Act, 27 July 1994, R-4, Sections 13, 25.

the 1994 Arable Land Act conferred a statutory pre-lease right on lessees of agricultural land in the following terms:

> The ex-lessee shall be entitled to the right of pre-lease for the arable land taken on usufructuary lease, except if the contract of usufructuary lease ceased to exist as a consequence of termination by notice with immediate effect by the lessor.[26]

111.   In spite of the fragmentation of the agricultural land ownership into small parcels, under the new Act, certain large-scale farming enterprises managed to amass considerable portions of arable land by obtaining leases of private and State-owned land. As a result, by the end of the century, "[s]trong disconnection between land use and land ownership became a typical feature of the farming structure" in Hungary.[27]

### B.   THE CLAIMANTS' FARMING BUSINESS IN HUNGARY

112.   It was against this background that, in 1997, a group of British farming professionals led by Mr. Andrew Hunter decided to invest in the agricultural sector in Hungary.[28] A tenant farmer's son from Yorkshire, Mr. Hunter managed a large agricultural enterprise in the UK.[29] Together with his partners, Mr. Simon Weaver and Mr. Michael Papworth, Mr. Hunter travelled to Hungary several times in the summer of 1997 to visit several farms on sale.

113.   After going from farm to farm, Mr. Hunter and his partners came across a livestock farm owned by Inícia in the region of Ikrény, close to the Hungarian border with Austria and Slovakia. The farm had been privatized in 1994 by the statutory transformation of a State farming enterprise into a company limited by shares.[30] It was composed of two livestock units and held a lease for approximately 760 hectares of State-owned land surrounding the

---

[26] The 1994 Arable Land Act, 27 July 1994, R-4, Section 21.

[27] RCM, ¶ 29.

[28] CM, ¶ 2; Hunter First WS, Section 3.

[29] CM, ¶¶ 2, 20; RCM, ¶ 74.

[30] CM, ¶ 23.

livestock units. In addition, it had about 155 hectares of freehold agricultural land and approximately 300-400 hectares of privately leased land.[31]

114.    To facilitate the purchase of the farm, Mr. Hunter and his partners incorporated Magyar Farming Company Ltd as a holding company in the UK[32] and Kintyre Agricultural Trade and Serice Kft as its Hungarian subsidiary. On 13 January 1998, Kintyre acquired 95.13% shares of Inícia for a purchase price of HUF 106.5 million.[33] Mr. Hunter moved to Hungary as the managing director of the farm.

115.    Over the following 16 years, the Claimants transformed what they call "an indebted farm" into a successful agricultural enterprise.[34] In 1998-99, the Claimants imported 696 pregnant heifers from Holland and renovated the existing cow accommodation, building a 304-cow cubicle shed, workshops and tractor sheds as well as a 3,000-ton grain store and straw shed.

116.    Apart from cow farming, the Claimants started producing potatoes and, in 2009, built a new 5,000-ton potato storage and packing facility. In 2011, the Claimants also constructed a 637kW biogas power plant, producing electricity from cow manure and supplying it to the national grid. The farm employed 45 local people and received various certificates of acclaim from local authorities.[35]

## C.    THE LEASE AGREEMENT AND THE PRE-LEASE RIGHT

117.    One of the assets that Inícia held when the Claimants acquired it in 1998 was the Lease.[36] This was a ten-year profit lease (*"haszonbérlet"*) covering 760 hectares of State-owned land. Pursuant to the Civil Code of Hungary, a profit lease entitles the lessee in exchange

---

[31] Hunter First WS, ¶ 15; Minutes of the meeting of Győr-Moson-Sopron County Local Authority, 11 November 1993, C-93.

[32] Certificate of Incorporation for Magyar Farming Company Limited, 15 October 1997, C-26.

[33] Share Sale Purchase Agreement of Inícia dated 13 January 1998, C-34, Section 1, paragraph 1.

[34] CM, ¶ 22; Summary of Inícia's Debt Payments, C-35.

[35] 2005 Best Taxpayer's Certificate issued by Enese Community, C-29; Letter from the Tax Office of 15 September 2014, C-30.

[36] 1994 Lease Agreement, C-33.

of payment "to use and collect the proceeds of a designated parcel of agricultural land or some other profitable thing for a specific time".[37] The lease was concluded in 1994 and was therefore due to expire in 2004. However, it provided for a pre-lease right:

> At the request of the lessor, the tenant shall agree to the extension of the contract term, with the same business, payment and contractual conditions at least. In respect of these plots of land, the lessor grants a pre-lease right to the current tenant.[38]

118.    The Parties agree on the following general description of the pre-lease right under Hungarian law:

> If a person has a pre-lease right over property, and the property owner intends to lease this property, then the owner must inform the holder of the pre-lease right about any offer from a third party that he or she intends to accept. Thereafter, the holder of the pre-lease right, by exercising the pre-lease right by unilateral declaration, may step in and assume the offer from the third party and thereby create a lease contract between the owner and the holder of the pre-lease right upon the terms offered by the third party.[39]
>
> […]
>
> A pre-lease right is not an option to lease. The holder of the pre-lease right cannot oblige the owner to enter into a lease if the property owner does not want to lease out his or her property […] The owner does not have to offer the property first to the pre-lease right holder. The prelease right applies only if an offer has already been made for the lease of the property and the owner accepts such offer.[40]

119.    It is also common ground that a pre-lease right can be statutory or contractual. The former is a right created by law and existing irrespective of the Parties' agreement, while the latter is the result of an agreement and its scope and terms depend on the content of such

---

[37] Extracts from the Civil Code, C-62, Section 452(1).

[38] Lease Agreement, 25 July 1994, C-6.

[39] CM, ¶ 123; RCM, ¶ 70.

[40] CM, ¶ 124; RCM, ¶ 96.

agreement. In addition to the pre-lease provision in the Lease, Inícia had a statutory pre-lease right pursuant to the 1994 Arable Land Act, in the following terms:

> The ex-lessee shall be entitled to the right of pre-lease for the arable land taken on usufructuary lease, except if the contract of usufructuary lease ceased to exist as a consequence of termination by notice with immediate effect by the lessor.[41]

120. In 1999, Inícia and the State Privatization and Property Plc, an agency managing the State property, concluded an amendment to the Lease (the "**1999 Lease Amendment**"), which envisaged the conclusion of the renewed lease over the Land for a period of 10 years starting from 1 July 1999.[42] The effect of the 1999 Lease Amendment was that the Lease, which was previously due to expire in 2004, was extended by five years to 2009. The language of the provision concerning the pre-lease right remained unaltered.

121. In 2002, an amendment to the 1994 Arable Land Act modified the maximum permissible duration of agricultural leases from 10 to 20 years.[43] Three years later, in April 2005, upon a reminder from the State Tenant Association, Inícia requested from the State a modification of the Lease in order to benefit from the new 20-year maximum duration.[44] The NLA informed Inícia that the 20-year lease term would start running from the date of the original conclusion of the Lease in 1994, with the result that the renewed Lease would expire in 2014. Given that the expiry of the Lease was otherwise due in 2009, the proposed amendment would effectively extend the Lease by five more years. Therefore, Inícia went ahead with its request.

122. On 16 November 2006, Inícia and the NLA thus entered into an amendment to the Lease (the "**2006 Lease Amendment**"), under which the Lease was extended to 25 July 2014.[45] In addition, the 2006 Lease Amendment carved out a 75-hectare plot from the scope of the

---

[41] 1994 Arable Land Act, 27 July 1994, R-4, Section 21.

[42] 1999 Lease Agreement, C-38.

[43] Act XXIII of 2002, C-41, Article 22(5).

[44] Letter of 26 April 2005 from AFOSZ to Inícia, C-39.

[45] 2006 Lease Agreement, C-40, Section 4.

Lease.[46] Most importantly, the new agreement modified the previous language of the pre-lease provision to read as follows:

> With regard to the plots of land subject to the lease, the Tenant enjoys a pre-emption right and a pre-lease right that may be exercised in accordance with the applicable laws effective at all times, and which may not be registered in the Land Registry. […] Tenant is not entitled to exercise its pre-lease right, if the lease ceased to exist or was terminated for a cause arising on the side of the Tenant.[47]

123.    The Parties dispute the effect of the new language of the provision. In particular, they diverge on whether the 2006 Lease Amendment extinguished the contractual pre-lease right, leaving Inícia only with the statutory pre-lease right.

## D.    BACKGROUND AND ADOPTION OF THE 2011 AMENDMENT

124.    As described above, as a result of the privatization process, agricultural land in Hungary was fragmented into multiple small parcels owned mainly by private citizens and, in a smaller part, by the State. Large agricultural enterprises, such as Inícia, then leased many of those parcels for farming, given that enterprises were not themselves allowed to own agricultural land.

125.    In 1998, the Hungarian Civic Alliance ("**Fidesz**"), a national-conservative political party, came to power in Hungary. As it was unsatisfied with the established composition of the agricultural sector and, in particular, with the erosion of the rural population, the new government made agricultural land reform one of its main priorities. The reform was primarily aimed at "citizenisation of the countryside" by supporting "family-based agricultural businesses" so that "they c[ould] stay in competition with large companies."[48]

---

[46] Hunter First WS, ¶ 38; 2006 Lease Agreement, C-40.

[47] 2006 Lease Agreement, C-40, Section 5.1.

[48] FIDESZ 1998-2002 Programme, R-7, point 11.

126.   Within the ambit of the reform, the government created the NLA, a management body for the State-owned agricultural land.[49] In 2002, the Hungarian Parliament amended the 1994 Arable Land Act by introducing a ranking system for the exercise of pre-lease rights, granting priority to family farmers and local villagers, while placing former lessees, such as the Claimants, in an inferior position.[50] As described above, this amendment also extended the maximum permissible duration of a lease from 10 to 20 years.

127.   The reform was, however, put on hold due to a change of government in 2002. The new socialist government re-amended the 1994 Arable Land Act to reinstitute the former system, placing former lessees first in the order of priority.[51]

128.   In 2004, Hungary's accession to the European Union further affected Hungarian small farmers, placing them at a competitive disadvantage with the significantly more developed European agriculture industry. This accelerated the ongoing process of erosion of the country's rural population.[52]

129.   Against this backdrop, the Fidesz government returned to power in 2010. It resumed the agricultural reform that was halted in 2002. On 12 August 2010, the Hungarian Parliament enacted the Act on the National Land Agency (the "**2010 Act**"). The 2010 Act mandated the re-distribution of the State-owned agricultural land with the aim of promoting "viable family farms".[53] The implementation decree of the 2010 Act set out a procedure governing the tenders for leasing State-owned agricultural land.[54] The procedure favored local family farms and individuals with professional agricultural credentials over large farming enterprises.

---

[49] Act CXVI of 2001 on the National Land Reserves, 1 January 2002, R-8.

[50] Sections 13 and 21 of the 1994 Arable Land Act, in force from 22 February 2002 to 2 September 2002, C-122.

[51] Section 21 of the 1994 Arable Land Act, in force from 2 September 2002 to 15 December 2013, C-123.

[52] RCM, ¶¶ 50-52.

[53] Act LXXXVII of 2010 on the National Land Fund, 12 August 2010 (the "2010 NLA Act"), R-12, Section 1.

[54] Decree 262/2010 on the Detailed Rules of the Utilization of Land Parcels Assigned to the National Land Fund, 17 November 2010, C-44.

130. At that time, the implementation decree maintained the existing pre-lease rights with the result that, if the winning bidder of the tender was not the same person as the pre-lease right holder, the NLA was to communicate to the pre-lease right holder, by way of public notice, the fact that a winning bid had been filed. If the pre-lease right holder then submitted an identical offer to the winning bid, the NLA would conclude the lease agreement with the pre-lease right holder instead of the winner of the tender.[55]

131. According to the Respondent, the government soon realized that maintaining the pre-lease right for incumbent lessees contradicted the objectives of the land reform. In particular, it did not allow for the redistribution of the land to the favored categories of farmers, such as local, young (less than 40 years old) individuals or family entrepreneurs, holding agricultural qualifications and preferably being at a start-up stage. Even if such individuals managed to win tenders due to the ranking system that was favorable to them, the incumbent lessees with pre-lease rights could defeat the tender results by submitting a matching offer.[56]

132. Therefore, on 9 July 2011, the Parliament amended the 2010 Act (the "**2011 Amendment**"), precluding the exercise of statutory pre-lease rights in cases where State-owned land was leased through a tender:

> In case of leasehold of rural land or farm, a pre-lease right arising from legal regulations may not be exercised.[57]

133. It is undisputed that this provision affected only statutory, as opposed to contractual pre-lease rights.

---

[55] Decree 262/2010 on the Detailed Rules of the Utilization of Land Parcels Assigned to the National Land Fund, 17 November 2010, C-44, Sections 27 and 28.

[56] RCM, ¶¶ 130 and 136; See the Reasoning for Act CI of 2011 on the amendment of certain acts relating to agricultural land, 19 July 2011, C-45.

[57] Act CI of 2011 on the amendment of certain acts relating to agricultural land, 19 July 2011, C-45, Article 11.

## E.    THE 2014 TENDERS

134.   Pursuant to the 2010 Act and its implementing directive, the NLA started organizing tenders for leasing State-owned agricultural land as the existing lease agreements were expiring. The process was named the "Land for Farmers Programme".

135.   The scoring system for the tenders was set out in the Instruction of the Minister of Agriculture.[58] Apart from other criteria, such as the viability of the business plan and environmental conservation, the system favored local family farmers with agricultural diplomas and young farmers:

| | Evaluation criteria | Achieved score | Evaluation weighting value | Cumulated score |
|---|---|---|---|---|
| 1. | **Candidate's economic situation** | | | |
| 1.1. | Legal and structural form of the entity: | | | |
| | Family farmer | 10 | | |
| | Individual agricultural entrepreneur: | 8 | | |
| | Primary poducer (if acquired the title) | 7 | 1 | |
| | Cooperative, company or other commercial entity | 3 | | |
| 1.2. | The ditance between the candidate's residence or seat and the applied plots of land (according to Section 11.2. j) of the Tender Notice) | | 2 | |
| | between 0-10 km | 10 | | |
| | between 10-20 km | 8 | | |
| 1.3. | The candidate obtains a diploma relevant to the duties involved (yes/no): | | | |
| | Yes | 10 | 1 | |
| | No | 1 | | |
| 1.4. | The candidate's relevant farming experience: | | | |
| | between 3-5 years | 3 | | |
| | between 5-10 years | 5 | 1 | |
| | over 10 years | 10 | | |

---

[58] Tender Evaluation Sheet, R-18.

136.    As set out above, the Lease was due to expire on 25 July 2014. Thus, starting from March 2013, the NLA announced a series of tenders for granting new leases over the Land. More precisely, in line with the objectives of promoting small family farms, the NLA divided the Land into 16 plots and announced a separate tender for each of the plots (the "**Tenders**").[59] Pursuant to the 2011 Amendment, the announcement specified that the incumbent lessee could not exercise the pre-emption or pre-lease rights over the land forming the subject of the Tenders.[60]

137.    Concerned with the prospect of losing the Lease, in April 2013, the Claimants wrote to Hungary's Ambassador in London, describing the background of their investment in Hungary and highlighting the importance of stability of the Lease for the continuation of their business.[61] The Embassy responded on 29 May 2013, stating that the problem of the renewal of lease contracts would be "satisfactorily resolved" by "the new Act".[62]

138.    According to the Claimants, the reference to "the new Act" was to the 2013 amendment to the 2010 Act (the "**2013 Amendment**"), which the Parliament had passed on 22 May 2013, a few days before the Embassy's letter. The 2013 Amendment granted the NLA a discretionary power to extend the duration of existing leases for lessees who benefitted from EU or national subsidies until they discharged their subsidy obligations.[63] The Ministry of Rural Development clarified, however, that this possibility did not apply to leases that had already reached the statutory maximum duration of 20 years.[64]

139.    The Claimants attempted to take advantage of the 2013 Amendment by submitting a request to the NLA to renew the Lease for a period of five years, arguing that many national and EU subsidies they had received were contingent upon pursuing their farming activities

---

[59] Call for Tender, 5 April 2013, C-64; CM, ¶ 55; RCM, ¶ 127.

[60] Call for Tender, 5 April 2013, C-64.

[61] Letter of 22 April 2013 from Magyar Farming to Hungarian Embassy, C-12.

[62] Letter of 29 May 2013 from Hungarian Embassy to Magyar Farming, C-13.

[63] Act LXXXVII of 2010 on the National Land Fund, 23 May 2013, R-13, Section 18 (1c).

[64] Ministry of Rural Development, "Framework Programme for the Implementation of the National Rural Development Strategy", August 2013, R-14.

beyond the expiration of the Lease in July 2014. On 9 July 2013, the NLA rejected the Claimants' request, stating that the 2013 Amendment conferred on it a discretion to renew lease agreements and that it was under no obligation to do so.[65]

140.    In addition to the exchanges with the Hungarian Embassy, on 30 May 2013, the Claimants attended a meeting organized by the British Embassy in Hungary. Mr. Hunter made a PowerPoint presentation of the Claimants' farming business in Hungary.[66] The Claimants assert that, after the meeting, the Minister of Agriculture, Dr. Fazekas assured Mr. Hunter that "he could not see anyone entering the tender with a stronger claim, so Inícia just needed to enter the tender and there would be nothing to worry about."[67]

141.    Inícia thus submitted bids for the Tenders in June 2013.[68] In January 2014, the NLA announced the results of the Tenders. All 16 of Inícia's bids were unsuccessful. The plots were awarded to local farmers. The names of the winning bidders were published on the NLA's website.[69] In February 2014, the NLA proceeded to conclude 20-year lease agreements with the winners.[70]

142.    The Parties disagree on the reasons for Inícia's loss. The Claimants contend that the NLA awarded Inícia's bids artificially low scores in the discretionary component of the "professional and commercial well-foundedness of the business plan".[71] The Respondent in turn suggests that Inícia's bids were unsuccessful as they were not overall in line with the policy-related criteria for awarding leases of the State-owned land, including the criteria that favored local and young family farmers. In addition, according to the Respondent, in

---

[65] Letter of 9 July 2013 from the NLA to Inícia Zrt, C-14.

[66] PowerPoint presentation, C-51.

[67] CM, ¶ 54, referring to Hunter First WS, ¶ 45.

[68] CM, ¶ 55; RCM, ¶ 140.

[69] Extract from the Tender Results, C-59.

[70] CM, ¶ 63.

[71] CM, ¶ 210.

five instances Inícia's bids were simply disqualified on the basis that they failed to attach all supporting documents that the tender rules required.[72]

143.   According to the 2015 statistical report of the Ministry of Agriculture, the tenders that the NLA conducted between 2010 and 2015 significantly altered the demographics of the State-owned land holding. Specifically, the number of tenants rose drastically by more than tenfold, from 600 in 2010 to 7500 in 2015. Nearly 85% of the new tenants were natural persons, and 21% of them were young farmers under the age of 40.[73]

## F.   DOMESTIC PROCEEDINGS

144.   On 31 January and 5 February 2014, after the announcement of the results of the Tenders, Inícia wrote to the NLA, affirming the entitlement "to the pre-lease right established in Section 5.1 of the lease agreement concluded with the National Land Agency on 26 November 2006".[74] Inícia also requested the NLA to disclose the content of the winning bids. The NLA did not respond.

145.   In May 2014, a Hungarian court ordered the NLA, upon Inícia's application, to disclose the winning bids,[75] but the NLA failed to comply. After Inícia engaged bailiffs to enforce the court's order, the NLA disclosed the winning bids in March 2017.[76]

146.   In addition, Inícia commenced court proceedings to obtain disclosure of the scoring sheets for the Tenders.[77] The first instance court ordered the NLA to disclose the documents on

---

[72] R-Rejoinder, ¶ 279; See, Point Scoring Sheet, Tender ID Number HU22-10234, C-158; Point Scoring Sheet, Tender ID Number HU22-10235, C-159; Point Scoring Sheet, Tender ID Number HU22-10274, C-160; Point Scoring Sheet, Tender ID Number HU22-10277, C-161; Point Scoring Sheet, Tender ID Number HU22-10278, C-162.

[73] RCM, ¶ 159; Summary of Results of the "Land for Farmers" Programme 2010-2015, R-19, p. 2

[74] Letter of 31 January 2014 from Inícia's lawyers to the NLA, C-16; Letter of 5 February 2014 from PWC to the NLA, C-63.

[75] The Metropolitan Court Order of 13 May 2014, C-17.

[76] CM, ¶ 64.

[77] C-Reply, ¶ 174.

27 October 2017.[78] The second instance court confirmed the order on 31 January 2018.[79] The Respondent requested an *ex parte* extraordinary review of the second instance court decision by the Supreme Court (also referred to as the "**Curia**"), which is still pending. In the meantime, however, the Tribunal ordered the Respondent to disclose the scoring sheets in a document production exercise in this arbitration. The Respondent complied with the order.[80]

147.    Separately, on 29 April 2014, Inícia formally notified the NLA that it exercised the pre-lease rights and requested the NLA to sign lease agreements with Inícia "with the same conditions as were granted to the winning tender applicants".[81] Receiving no response, on 6 June 2014, Inícia filed an action against the NLA and the winners of the Tenders before the first instance court at the Pest district, requesting the judicial recognition of its exercise of the pre-lease right under Section 5.1 of the Lease and enjoinment of the NLA to conclude lease agreements with Inícia upon the terms of the winning bids.

148.    The dispute was entertained at all levels of the Hungarian judiciary and involved the following steps:

- The first instance court of the district of Pest dismissed Inícia's claims on 21 October 2014.[82] The court primarily based its decision on the fact that the winners of the Tenders were acting in good faith, without the knowledge of Inícia's claims in relation to the Land.

- Inícia appealed the first instance court's judgment before the second instance court (also referred to as the "**Metropolitan Court**"). The Metropolitan Court dismissed the appeal on 12 November 2015, finding that the language of the Lease and in particular the new language of the pre-lease clause

---

[78] 1st Instance Court Judgment to disclose documents, 27 October 2017, C-145.

[79] 2nd Instance Court Judgment to disclose documents, 31 January 2018, C-146.

[80] C-Reply, ¶ 175; C-147 to C-162.

[81] Letter of 29 April 2014 from Inícia to the NLA, C-20; CM, ¶ 78.

[82] Judgment of First Instance (No. 25.P.52795/2014/17) 21 October 2014 ("the Inícia Case"), C-115.

introduced by the 2006 Lease Amendment did not grant Inícia a contractual pre-lease right.[83]

▪ Inícia then initiated a review procedure before the Supreme Court. On 25 January 2017, Panel V of the Curia annulled the Metropolitan Court decision due to a lack of sufficient reasoning and remanded the case back to the Metropolitan Court for reconsideration.[84]

▪ On 7 December 2017, the Metropolitan Court once again dismissed Inícia's claims.[85] The court relied on the interpretation of a similar pre-lease provision that another panel of the Curia, Panel VI, gave in a separate case (so-called Szellőhát Case).[86]

▪ Inícia filed a request for extraordinary review with the Curia, which is still pending.[87]

## G.  EVICTION

149. A few days prior to the expiry of the Lease, on 21 July 2014, the NLA wrote to Inícia, expressing the intention to retake the possession of the Land.[88]

150. On 24 July 2014, Inícia obtained an order from the local municipality[89] granting protection against eviction pending resolution of the proceedings that Inícia had started before the District Court of Pest.[90]

151. Nevertheless, on 25 July 2014, two NLA representatives arrived at the farm and invited Inícia to sign a minute recording the takeover of the Land. Mr. Hunter signed the minute with a written reservation that Inícia would not hand over the Land since it had properly

---

[83] Judgment of Second Instance (No. 44. Pf.637.043/2015/9), 12 November 2015 ("the Inícia Case"), C-116.

[84] Order of the Curia (No. Pfv.V.40.438/2016/9), 25 January 2017, C-117.

[85] Judgment of Second Instance (No. 44.Pf.633.704/2017/14), 7 December 2017, C-105.

[86] Judgment of the Curia (No. Pfv.VI.20.073/2017/11), 31 October 2017, C-106.

[87] The Respondent contests this allegation, R-Rejoinder, ¶ 326.

[88] Letter of 21 July 2014 from the NLA to Inícia, C-21.

[89] Local Authority Orders of 24 July, 31 July and 5 August 2014, C-23.

[90] *Supra* ¶ 147.

exercised the pre-lease right and had obtained the protective order from the local municipality the day before.[91]

152.   Inícia subsequently obtained, on 31 July and 5 August 2014, three further orders from the local municipality granting protection against eviction pending the resolution of the court proceedings.[92]

153.   Nevertheless, the NLA purported to transfer physical possession of the land to the winners of the Tenders on 16 October 2014. Inícia refused to leave. The winners started arriving at the Land with their tractors to do seasonal works. This gave rise to a number of unpleasant incidents. According to the Respondent, on one occasion, Mr. Hunter physically assaulted a farmer.[93]

154.   In turn, the Claimants contend that in an attempt to intimidate Mr. Hunter, the Respondent arrested him in February 2015. According to Mr. Hunter's testimony, he was taken to the local police station without any explanation. His request for access to a lawyer was denied. He was released the following morning without charge or any explanation for his detention.[94]

155.   The winners of the Tenders in turn obtained possessory protection against Inícia from local notaries. Inícia sought to overturn the notarial order before the first instance court in Győr. On 21 May 2015, the court dismissed Inícia's request, finding that, "[n]otwithstanding the dispute regarding the pre-lease right […] the claimant [Inícia] has no valid legal title" and thus the NLA "may request [Inícia] to cease the nuisance."[95]

156.   The confrontations between the new lessees and the Claimants lasted for almost a year. Finally, on 14 July 2015, the State Secretary of the Ministry of Agriculture, Dr. Márton

---

[91] Minute of 25 July 2014, C-22.

[92] Local Authority Orders of 24 July, 31 July and 5 August 2014, C-23.

[93] RCM, ¶ 181, referring to video footage R-23.

[94] Hunter First WS, ¶ 70.

[95] Ruling No. P.22.564/2014/12, 21 May 2015, R-21.

Bitay, appeared in the fields with a television crew and armed private security guards. He vowed to "protect the Hungarian agricultural land under all circumstances, not only legally, but physically as well".[96] The security guards remained on the Land to ensure Inícia's eviction and the harvesting of crops by the winners of the Tenders. In the end, Inícia was forced to abandon the Land.

157.   Since the eviction, Inícia continues its farming activities on the remainder of the land that it owned or leased from private owners. The Parties dispute the impact that the eviction from the Land had on the Claimants' farming business in Hungary.

## H.   SETTLEMENT EFFORTS

158.   On 11 February 2014, shortly after the results of the Tenders had been announced, the British Ambassador, Jonathan Knott, met with Dr. Márton Bitay of the Ministry of Agriculture (also referred to as the "**Ministry of Rural Development**") to discuss the position of the British farmers in Hungary in the face of the agricultural reform.[97] In a follow up letter, Dr. Bitay wrote to the Ambassador, pointing out that the farmers had enough time to adjust to the new realities after the 2011 Amendment. Dr. Bitay suggested that if the farmers wished to offer their farms for sale to the Hungarian State, they should have contacted Dr. Sándor Fazekas, Minister of Agriculture Hungary.[98]

159.   Inícia's legal representatives from PricewaterhouseCoopers Legal ("**PWC**") thus wrote to Dr. Fazekas on 10 April 2014 offering to sell Inícia's shares for HUF 4.95 billion (approx. EUR 16 million).[99] On 30 May 2014, Dr. Bitay acknowledged receipt of the Claimants'

---

[96] Video footage and the Ministry of Agriculture Press Release of July 2015, C-24.

[97] British Embassy email Note of Meeting of 11 February 2014, C-74.

[98] Letter of 17 March 2014 from Dr. Bitay to the British Embassy, C-75.

[99] Letter of 10 April 2014 from PWC to Dr. Fazekas, C-76.

offer.[100] After several months of silence, on 16 September 2014, Inícia re-submitted its offer.[101]

160.    On 6 November 2014, the British Ambassador met again with Dr. Bitay. According to the Embassy's notes, Dr. Bitay saw a contradiction in Inícia's actions, as it purported to negotiate with the State, while at the same time litigating before the Hungarian courts.[102]

161.    On 24 November 2014, Dr. Gyula Budai, the State Secretary at the Ministry of Agriculture, wrote to the British Ambassador stating that there was "nothing in the way [of] beginning the acquisition negotiations, however, the documentation provided by Inícia did not contain sufficient information for the evaluation of the business case."[103]

162.    In January 2016, Prime Minister Cameron and Prime Minister Orbán reached a "gentlemen's agreement" that the Respondent would buy the Claimants' farm.[104] In light of this agreement, Dr. Budai met with the British Ambassador on 3 February 2016. At the meeting, Dr. Budai suggested that the Claimants had two courses of action. First, the State could purchase their farm in exchange of compensation. Second, the Claimants could secure new leases for other comparable State-owned land plots, for which Mr. Hunter could participate in auctions announced by the NLA.[105]

163.    However, on 13 April 2017, the Claimants received a letter from the Hungarian National Asset Management Agency ("**MNV**") stating that "the acquisition of ownership in Inícia […] for the benefit of the Hungarian state […] [did] not fit into the government's current strategic plans and goals."[106] On 27 April 2017, the British Ambassador swiftly arranged

---

[100] Letter of 30 May 2014 from Dr. Bitay to the British Ambassador, C-77 (The Ministry appears to have received the PWC offer of 10 April on 15 April 2014).

[101] Letter of 16 September 2014 from PWC to Dr. Fazekas, C-78.

[102] British Embassy email Note of Meeting of 6 November 2014, C-79.

[103] Letter of 24 November 2014 from Dr. Budai to the British Ambassador, C-80.

[104] British Embassy email 12 June 2017, referring to the Cameron-Orban agreement, C-92.

[105] British Embassy email Note of Meeting of 3 February 2016, C-82.

[106] Letter of 13 April 2017 from the MNV to PWC, C-90.

a meeting with Dr. Budai, who assured him that the option of purchasing the Claimants' farm was still on the table.[107]

164.    In the meantime, the Respondent retained KPMG to value the Claimants' Hungarian subsidiaries, Kintyre and Inícia. According to the Respondent, KPMG's highest valuation came to HUF 1.7 billion for the two companies (approximately USD 6.2 million at the rates in effect at the time). According to Mr. Hunter, he was allowed to consult the report on 10 July 2017 upon signing a non-disclosure agreement, and when he asked KPMG why the valuation was so low, he was told that it was due to the farm's shortage of land.[108]

165.    After exchanges spanning over a period of almost three years, on 3 July 2017, the MNV communicated its counter-proposal to purchase the farm for HUF 700 million (EUR 2.2 million) to the Claimants.[109] Given the stark difference between the proposals, the Parties failed to reach an agreement. The Claimants thus initiated the present arbitration on 4 July 2017.

* * *

166.    The Parties dispute the impact of the loss of the Land on the Claimants' farming business. While the Claimants assert that Hungary's measures rendered their farm "unsaleable"[110], the Respondent points to the fact that the Claimants continue to derive profit from their Hungarian farm to this day.[111]

---

[107] British Embassy email Note of Meeting of 27 April 2017, C-91.

[108] Hunter First WS, ¶ 86.

[109] Hunter First WS, ¶ 85; See also, British Embassy email Note of Meeting of 8 June 2017, C-92.

[110] CM, ¶ 112.

[111] RCM, ¶ 198.

## IV.    JURISDICTION

167.    The Respondent raises two jurisdictional objections. First, it contends that its consent to arbitrate contained in the BIT was rendered inapplicable by Hungary's accession to the EU in 2004 and therefore there is no valid arbitration agreement (A). Second, it claims that the present dispute does not arise out of an investment that would be capable of being expropriated and thus the dispute is outside the subject-matter scope of the BIT and the ICSID Convention (B). Beyond those objections, which will be dealt with below, the Parties do not dispute the jurisdiction of the Centre or the competence of the Tribunal, and rightly so.

168.    It is undisputed that the Tribunal has the authority to resolve the objections to its competence and the jurisdiction of the Centre pursuant to Article 41 of the ICSID Convention, which reads as follows:

> (1) The Tribunal shall be the judge of its own competence.
>
> (2) Any objection by a party to the dispute that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Tribunal, shall be considered by the Tribunal which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute.

169.    Accordingly, the Tribunal will deal with each of the Respondent's objections in turn.

## A.    INTRA-EU OBJECTION

170.    It is common ground that Article 8 of the BIT contains Hungary's consent to arbitration.[112] The Parties dispute, however, whether that consent was rendered inapplicable by Hungary's accession to the EU and its consequent ratification of the Treaty on the European Union ("**TEU**") and the Treaty on the Functioning of the European Union ("**TFEU**") (together the "**EU Treaties**").

---

[112] C-Reply, ¶¶ 36-37; R-Rejoinder, ¶ 55.

### (1)    The Respondent's Position

171.    The Respondent submits that the Tribunal lacks jurisdiction since the BIT's offer to arbitrate, which the Claimants purported to accept by their trigger letter of 12 November 2015 and in the Request for Arbitration,[113] had long been extinguished by virtue of Hungary's accession to the EU Treaties in 2004.

### a.    Article 8 BIT is incompatible with the EU Treaties

172.    The Respondent contends that the BIT's dispute resolution provision is incompatible with the EU Treaties. It primarily relies on the decision of the Court of Justice of the European Union (the "**CJEU**") in *Slovak Republic v. Achmea B.V.* (the "**Achmea Decision**"),[114] in which the CJEU determined that the dispute resolution provisions in the investment treaties concluded between the EU Member States were contrary to the EU Treaties:

> Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[115]

173.    According to the Respondent, the Achmea Decision is dispositive of the incompatibility between the BIT's dispute resolution provision and the EU Treaties, since the CJEU decisions have *erga omnes* effect vis-à-vis all EU Member States.[116] This was confirmed by the 2019 Declarations as issued by 23 EU Member States, including Hungary and the UK, affirming that "all investor-State arbitration clauses contained in bilateral investment

---

[113] RfA, ¶ 23.

[114] *Slovak Republic v. Achmea BV*, Case C-284/16, Judgment of the Court (Grand Chamber), 6 March 2018, EU:C:2018:158, RL-12.

[115] *Slovak Republic v. Achmea BV*, Case C-284/16, Judgment of the Court (Grand Chamber), 6 March 2018, EU:C:2018:158, RL-12, ¶ 62.

[116] R-Rejoinder, ¶ 76.

treaties concluded between Member States are contrary to Union law and thus inapplicable."[117] As the PCIJ held in the *Jaworzina* opinion, the treaty-making parties "acting in consensus remain the masters of their treaty and can, therefore, determine its meaning with binding force."[118]

174.  According to Hungary, the Claimants are asking the Tribunal to ignore the authoritative decision of the CJEU and the binding interpretation given by the BIT's Contracting States. This request should be rejected as, contrary to the Claimants' arguments, there is no reason for a different conclusion. More specifically, Hungary makes the following submissions:

- While the Claimants rely on the fact that this is an ICSID arbitration, unlike the one at issue in the Achmea Decision (the "**Achmea Arbitration**"), this is all the more reason to follow the analysis of the Achmea Decision. There, the CJEU reasoned that the courts of the Member States did not retain sufficient control over the Achmea Arbitration in respect of the application of EU law, despite the fact that the arbitration was seated in Frankfurt and that Member State courts had jurisdiction over the ensuing award in set aside and enforcement proceedings. In turn, the Contracting States of the ICSID Convention are arguably under an obligation to enforce ICSID awards without scrutinizing them even for the limited ground of public policy.[119] The absence of substantive review of the application of EU law by courts sitting within the EU system is precisely the reason why the Achmea Decision held that there was an incompatibility between the intra-EU BITs and the EU Treaties. This incompatibility is amplified in the ICSID context.

- The Claimants' contention that the existence of the conflict between Article 8 of the BIT and the EU Treaties should be viewed from the public international law perspective is uncontested but does not change the fact that there is an incompatibility between these successive treaties. As a result of the Achmea Decision, the incompatibility is itself a rule of public international law. In this respect, the Claimants' reliance on pre-Achmea investment awards is misguided, as the value of these awards cannot be

---

[117] Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (15 January 2019), RL-76; Declaration of the Representatives of the Government of Hungary on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (16 January 2019), RL-77.

[118] R-Rejoinder, ¶ 85, citing Dörr, Schmalenbach, *Vienna Convention on the Law of Treaties: A Commentary* (Springer, 2018), RL-19, 570, ¶ 20.

[119] RCM, ¶ 284.

compared with that of a CJEU decision. Again, the CJEU determines the content of the EU Treaties with mandatory and *erga omnes* effect.

- The Claimants' argument that the BIT and the EU Treaties do not regulate the same subject matter and therefore one cannot prevail over the other under Article 30(3) of the Vienna Convention on the Law of Treaties ("**VCLT**") is also unavailing. Scholars suggest that the notion of subject matter must be understood broadly, because a strict interpretation "leads to a *reductio ad absurdum*."[120]

- Similarly, the Claimants' argument that the Achmea Decision was based on a different BIT "in which, unlike the UK-Hungary BIT, the law of an EU Member State was expressly incorporated as part of the governing law"[121] is inapposite. On the basis of Article 42 of the ICSID Convention, in the absence of a choice of law in the treaty, the law of the host State, including EU law applies to the merits of the dispute. This difference between the BIT applicable here and the Slovak-Netherlands BIT at issue in the Achmea Decision is, therefore, immaterial.[122]

175.    For these reasons, according to Hungary, the Claimants' reliance on the pre-*Achmea* decisions of investment tribunals, such as *Electrabel v. Hungary,*[123] and *RREEF Infrastructure v. Spain*[124] is unavailing as those decisions were not informed by the CJEU's authoritative interpretation of the EU Treaties.

### b. The EU Treaties prevail

176.    The Respondent contends that the incompatibility between Article 8 of the BIT and the EU Treaties should be resolved in favor of the EU Treaties, as the CJEU authoritatively determined in the Achmea Decision. More specifically, the EU Treaties are later in time and should prevail pursuant to Article 30(3) of the VCLT, which contains the rule that *lex*

---

[120] Report of the Study Group of the International Law Commission, Fragmentation of International Law – Difficulties Arising from the Diversification and Expansion of International Law, A/CN.4/L.682 (13 April 2006), RL-27, ¶ 22.

[121] C-Reply, ¶ 70(ii).

[122] R-Rejoinder, ¶¶ 33-34.

[123] *Electrabel S. A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 ("*Electrabel v. Hungary*"), RL-6.

[124] *RREEF Infrastructure (G.P.) Limited and REEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016 ("*RREEF Infrastructure v. Spain*"), CL-41.

*posterior derogat priori*. Contrary to the Claimants' assertion, it does not matter that the EU Treaties may have been in effect in some form since the 1957 Treaty of Rome. What matters, according to Hungary, is that it acceded to the EU in 2004 and the EU Treaties then became applicable between Hungary and the UK.[125] Thus, in respect of the BIT, the EU Treaties constitute a *lex posterior*.[126]

177.    Another conflict of treaties rule also speaks in favor of EU Treaties, namely the rule found in Article 30(2) of the VCLT, which reads as follows:

> When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.

178.    Article 351 of the TFEU is precisely the type of rule envisaged by Article 30(2) of the VCLT. It provides that the obligations set out in the EU Treaties prevail over those contained in agreements concluded prior to the accession to the EU.

179.    For the Respondent, the Claimants read Article 351 of the TFEU incorrectly when they argue that it "only applies to agreements between EU Member States and 'third countries'" and not to agreements between EU Member States. That argument is belied by consistent case law of the CJEU.[127] The Claimants' reliance on *Vattenfall v. Germany* is unhelpful. In that case, the ICSID Tribunal found that there was no conflict between the Energy Charter Treaty's dispute resolution provision and the EU Treaties. It was therefore unnecessary to apply Article 351 of the TFEU.

---

[125] Act concerning the conditions of accession of the Czech Republic, the Republic of Estonia, the Republic of Cyprus, the Republic of Latvia, the Republic of Lithuania, the Republic of Hungary, the Republic of Malta, the Republic of Poland, the Republic of Slovenia and the Slovak Republic and the adjustments to the Treaties on which the European Union is founded, AA2003/ACT/en 1 (2003), RL-11.

[126] R-Rejoinder, ¶¶ 150-154.

[127] RCM, ¶¶ 300-308, citing *Commission of the European Economic Community v. Government of Italian Republic*, Case No. 10/61, Judgment of the Court (Grand Chamber) 27 February 1962, ECLI:EU:C:1962:2, p.10, Section B, RL-25; *Annunziata Matteucci v. Communauté française of Belgium and Commissariat general aux relations internationals (Foreign Relations Department) of the Communauté française of Belgium*, Case No. 235/87, Judgment of the Court (Grand Chamber), 27 September 1988, ECLI:EU:C:1988:460, RL-26, ¶ 22; Report of the Study Group of the International Law Commission, Fragmentation of International Law – Difficulties Arising from the Diversification and Expansion of International Law, A/CN.4/L.682 (13 April 2006), RL-27, ¶ 283.

180.     Had the *Vattenfall* tribunal wished to assess the meaning of Article 351 of the TFEU, the Respondent submits that it would have relied on the CJEU's binding interpretation of this provision. Even if the *Vattenfall* tribunal had conducted a full analysis under treaty law, it would have concluded that this provision applies to treaties between EU Member States.

181.     As for the Claimants' argument that it was incumbent upon Hungary and the UK to eliminate any incompatibilities between the BIT and the EU Treaties, the Respondent suggests that there exists no international obligation on States to remedy an incompatibility between successive treaties. Instead, the incompatibility is dealt with by Article 30(3) of the VCLT, which is clear in that the later treaty shall prevail. Therefore, no inferences can be drawn from the fact that the EU Member States have not formally amended or renounced their intra-EU BITs.[128]

182.     Further, for Hungary, the Claimants erroneously invoke Article 11 of the BIT, which provides in relevant part that "[i]f the […] obligations under international law […] contain rules, whether general or specific, entitling investments by investors of the other Contracting Party to a treatment more favourable than is provided for by the present Agreement, such rules shall to the extent that they are more favourable prevail over the present Agreement."[129] The Claimants wrongly suggest that this is a subordination clause of the type contemplated in Article 30(2) of the VCLT. Apart from the fact that Article 11 of the BIT does not at all address a *conflict* with other treaties, it only allows the application of more favorable "treatment" to the "investment". It does not deal with procedural mechanisms. Indeed, access to arbitration does not qualify as "treatment" of an investment but constitutes a procedural right. [130]

183.     In any event, even if Article 11 were deemed a conflict rule, according to the Respondent, it would be in direct contradiction with Article 351 of the TFEU, which is a later conflict rule applicable between Hungary and the United Kingdom.

---

[128] C-Reply, ¶ 73, citing *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* issue, 31 August 2018 ("*Vattenfall v. Germany*"), RL-22, ¶ 208.

[129] UK-Hungary BIT, CL-1.

[130] R-Rejoinder, ¶¶ 133-138.

184.    As to the Tribunal's question on the possible impact of the UK's announced withdrawal from the EU ("**Brexit**") jurisdiction must be assessed, so says Hungary, by reference to the date of the institution of the arbitral proceedings. At that time, the UK was an EU Member. In addition, despite Brexit, the UK subscribed to the 2019 Declarations, vowing to "take the necessary measures to inform [arbitral tribunals]" that "[Article 8 of the BIT is] contrary to Union law and thus inapplicable."[131]

185.    Finally, contrary to the Claimants' contention, the Respondent argues that the principles of good faith and estoppel would not justify upholding jurisdiction in the circumstances of this case. The Claimants' good faith, which is not disputed, is not a reason for the Tribunal to rewrite the law and assume jurisdiction without the Respondent's consent.[132] As for estoppel, under international law a party must make a clear statement or engage in consistent conduct on which the other party relies to its own detriment.[133] The Claimants do not even come close to establishing that Hungary made a statement or engaged in conduct suggesting the compatibility of the BIT with the EU Treaties, and that the Claimants acted in reliance on such conduct.

### (2)    The Claimants' Position

186.    The Claimants submit that there is a valid arbitration agreement between the Parties, as they accepted the Respondent's offer to arbitrate contained in Article 8 of the BIT. Article 8 of the BIT contained a valid offer at the time when it accepted it by a letter of 12 November 2015 and in the Request for Arbitration of 4 July 2017. Indeed, (a) that provision is compatible with the EU Treaties, and (b) in any event, the EU Treaties do not prevail over the BIT.

---

[131] Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, 15 January 2019, RL-76, pp. 1-3.

[132] R-Rejoinder, ¶ 162.

[133] R-Rejoinder, ¶ 157, citing *Case concerning the land and maritime boundary between Cameroon and Nigeria (Cameroon v. Nigeria)*, International Court of Justice, Preliminary Objections, 11 June 1998, RL-88, ¶ 57.

### a. *Article 8 BIT is compatible with the EU Treaties*

187.    The Claimants contend that the Achmea Decision is not binding on this Tribunal, which should conduct an independent inquiry into its own jurisdiction under Article 41(1) of the ICSID Convention. As numerous investment treaty tribunals have made clear, this inquiry must be conducted under public international law and not exclusively under EU law.[134]

188.    It is also well-established in investment treaty jurisprudence that the dispute settlement provisions in investment treaties are easily reconcilable with the EU Treaties,[135] and in particular with Articles 344 and 267 of the TFEU. These provisions read as follows:

> Article 344
>
> Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties.
>
> [...]
>
> Article 267
>
> The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:
>
> (a) the interpretation of the Treaties;
>
> (b) the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union.

189.    In the Claimants' submission, these provisions relate to actions brought by the Member States and say nothing about private parties bringing claims regarding the interpretation and application of a BIT. The test of incompatibility under the VCLT is strict and "the mere fact that there was a difference between the provisions of a later treaty and those of an earlier treaty d[oes] not necessarily mean that there exist[s] an incompatibility".[136]

---

[134] C-Reply, ¶¶ 58-59, *Electrabel v. Hungary*, RL-6, ¶ 4.112; *RREEF Infrastructure v. Spain*, CL-41, ¶¶ 75 and 87.

[135] *Ivan Peter Busta and James Peter Busta v. The Czech Republic*, SCC Case No. V 2015/014, Final Award, 10 March 2017 ("*Busta v. Czech Republic*"), CL-42; *Anglia Auto Accessories Limited v. The Czech Republic,* SCC Case No. V 2014/181, Final Award, 10 March 2017; *Vattenfall v. Germany*, RL-22.

[136] Sinclair, *The Vienna Convention on the Law of Treaties* (2nd edition, 2018), CL-33, 97.

190.    The Claimants further observe that the finding of incompatibility in the Achmea Decision was based on the Netherlands-Slovakia BIT which, different from the UK-Hungary BIT, chose the law of an EU Member State as part of the governing law. Although the Achmea Decision contains general language applying to other investment treaties "such as" the Netherlands-Slovakia BIT, the words "such as" should be construed to refer only to ISDS clauses in investment treaties that contain governing law clauses similar to that of the Netherlands-Slovakia BIT.

### b.   The EU Treaties do not prevail

191.    Even if there were a conflict between Article 8 of the BIT and the EU Treaties, the Claimants submit that the latter would not prevail. The temporal conflicts rule contained in Article 30(3) of the VCLT only applies to successive treaties with the same subject matter. It is well established in public international law that this "expression 'relating to the same subject-matter' must be construed strictly" and that it does "not cover cases where a general treaty impinges indirectly on the content of a particular provision of an earlier treaty."[137] Many tribunals have made the obvious point that the subject matter of investment treaties is different from that of the TFEU, which concerns the functioning of the European Union.[138] Therefore, the EU Treaties would not prevail over the BIT, even if they were in conflict.

192.    Even if Article 30(3) is applied, it is unclear to the Claimants how the EU Treaties can be considered later in time than the BIT. In *Vattenfall v. Germany*, the ICSID tribunal noted that "Articles 267 and 344 TFEU have existed in substantively similar form" as part of the Treaty of Rome of 1957. Hence, for that tribunal "it [was] by no means clear that the EU Treaties [were] the 'later treaty' under Article 30 VCLT."[139]

193.    In addition, the Claimants submit that the BIT should prevail over the EU Treaties pursuant to Article 30(2) of the VCLT. In particular, the Claimants suggest that Article 11 of the

---

[137] Sinclair, *The Vienna Convention on the Law of Treaties* (2nd edition, 2018), CL-33, 98.

[138] *Busta v. Czech Republic*, CL-42, ¶¶ 115-16; *Oostergetel and Theodora Laurentius v. The Slovak Republic*, UNCITRAL, Decision on Jurisdiction, 30 April 2010 ("*Oostergetel v. Slovakia)*, ¶ 75.

[139] *Vattenfall v. Germany*, RL-22, ¶ 218.

BIT is a subordination clause envisaged by Article 30(2) of the VCLT. The relevant part of Article 11 to which the Claimants refer reads as follows:

> If [...] obligations under international law [...] established hereafter between the Contracting Parties in addition to the present Agreement contain rules, whether general or specific, entitling investments by investors of the other Contracting Party to a treatment more favourable than is provided for by the present Agreement, such rules shall to the extent that they are more favourable prevail over the present Agreement. [140]

194.    For the Claimants, the obvious *a contrario* reading of Article 11 is that the parties to the BIT intended the BIT to prevail to the extent that any later treaty offered less favorable treatment to the investments of investors. If the rules of the EU Treaties render Article 8 of the BIT inapplicable, then such rules would clearly result in less favourable treatment for the Claimants, and therefore the BIT terms would prevail.

195.    In this connection, the Claimants consider the Respondent's invocation of Article 351 of the TFEU ill-conceived. As the *Vattenfall v. Germany* tribunal clarified, this provision, which obliges the EU Member States to eliminate incompatibilities with other treaties, applies to the treaties which bind EU Member States to third countries.[141] According to the Claimants, the Respondent admitted as much in the Rejoinder.[142] In any event, Article 351 TFEU does not render incompatible provisions automatically inapplicable, but instead makes it incumbent upon the Member States to remedy such incompatibilities. In the present case, the Respondent has not done so before the Claimants accepted the offer to arbitrate. Given that an arbitration agreement was concluded, it is no longer open to the Respondent to renege on the offer.

196.    The Claimants further reject the Respondent's interpretation of the 2019 Declarations that the EU Member States issued as a result of the Achmea Decision. As a matter of public international law, these declarations are a non-binding expression of the States' intention

---

[140] UK-Hungary BIT, CL-1.

[141] *Vattenfall v. Germany*, RL-22, ¶ 225.

[142] C-Rejoinder, ¶ 14, citing R-Rejoinder, ¶ 109.

to undertake future actions.[143] They do not constitute joint interpretative statements or notes clarifying the meaning of Article 8 of the BIT and can certainly not remove the consent to arbitrate given in an international treaty. Even if the 2019 Declarations were considered to be joint interpretative statements, they would not be binding upon this Tribunal. Such statements are only one of the interpretative tools available under the VCLT. They fall under Article 31(3)(a) of the VCLT which provides that in interpreting a treaty "any subsequent agreement between the parties […] shall be taken into account." However, such interpretative agreements cannot change the plain ordinary meaning of the treaty text.

197.    In connection with the Tribunal's question concerning the UK's withdrawal from the EU, the Claimants agree with the Respondent that jurisdiction must be assessed on the date of the commencement of the present proceedings.[144] That said, they point to the Respondent's "hypocritical" position, which disregards events postdating the commencement of the arbitration, such as Brexit, and at the same time relies on other post-commencement events, such as the Achmea Decision and the 2019 Declarations.[145]

198.    Finally, the Claimants insist that reasons of good faith and justice mandate the Tribunal to assume jurisdiction under Article 8 of the BIT. In particular, by statements (*e.g.*, "the unexpected outcome in the Achmea decision")[146] and conduct (*e.g.*, failing to take any steps to amend, suspend or terminate Article 8 and electing not to file any equivalent jurisdictional objection in the *Accession v. Hungary* case filed in 2011 under the same BIT)[147], the Respondent tacitly accepted that Article 8 of the BIT was still in force on the institution of these proceedings.

---

[143] C-Rejoinder, ¶¶ 21-22, citing, *inter alia*, Shaw, *International Law,* (8th edition, Cambridge), CL-74, p. 88.

[144] C-Rejoinder, ¶ 37.

[145] C-Rejoinder, ¶ 35.

[146] Respondent's letter of 30 March 2018, C-133.

[147] *Accession Mezzanine Capital L.P. and Danubius Kereskedöház Vagyonkezelö Zrt. v. Hungary*, ICSID, Case No. ARB/12/3, Award, 17 April 2015 ("*Accession v. Hungary*"), RL-42.

199.    Thus, so argue the Claimants, it would be manifestly unjust under the present facts if they were deprived of access to arbitral justice due to an alleged incompatibility between EU Treaties and the Respondent's unambiguous expression of consent in Article 8 of the BIT.[148]

**(3)    Analysis**

200.    Article 25 of the ICSID Convention requires *inter alia* that the respondent State and the national of another Contracting State consent in writing to arbitrate their dispute:

> The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, *which the parties to the dispute consent in writing* to submit to the Centre.[149]

201.    When the Claimants served their request for arbitration on 4 July 2017, they purported to accept Hungary's offer to arbitrate which is embodied in Article 8 of the BIT and reads as follows:

> Each Contracting Party hereby consents to submit to the International Centre for the Settlement of Investment Disputes (hereinafter referred to as "the Centre") for the settlement by conciliation or arbitration under the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington on 18 March 1965 any legal dispute arising under Article 6 of this Agreement between that Contracting Party and an investor of the other Contracting Party concerning an investment of the latter in the territory of the former.[150]

202.    Hungary objects that, at the time of the Claimants' acceptance, the offer was no longer valid due to Hungary's accession to the EU Treaties in 2004.

---

[148] C-Reply, ¶ 70.

[149] Emphasis added.

[150] UK-Hungary BIT, CL-1.

203.    The Parties agree that the question whether the EU Treaties override the dispute resolution clause of the BIT must be assessed under international law, and rightly so. Indeed, the BIT's offer to arbitrate is contained in an international treaty, and its validity and interpretation is governed by the VCLT of which Hungary and the UK are both contracting parties. In addition, this arbitration is conducted under the ICSID Convention and, thus, is not subject to a national legal system.  As a result, the validity of the arbitration agreement or arbitrability of the dispute is not governed by a national *lex arbitri*.  Therefore, for the purposes of the present case, the Tribunal does not need to consider the consequences, if any, of the application of a particular national *lex arbitri* to the dispute or the arbitration agreement.

204.    Before analyzing whether the EU Treaties preclude the application of Article 8 of the BIT pursuant to the VCLT (c), the Tribunal will address the Respondent's argument that this Tribunal is bound by the Achmea Decision (a) and the 2019 Declarations (b).

### a.    Is the Achmea Decision binding on the Tribunal?

205.    In its judgment in *Achmea* issued on 6 March 2018, the CJEU held that "Articles 267 and 344 [of the] TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States [...] under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept."[151]

206.    According to Hungary, the Achmea Decision did not change the content of the existing law. Instead, "[t]he Achmea Decision has only said what the law was all along."[152] For the Respondent, since both Hungary and the UK empowered the CJEU to determine the interpretation and application of the EU Treaties and accepted to be bound by such determination, "the Achmea Court's interpretation of Articles 267 and 344 is an

---

[151] *Slovak Republic v. Achmea BV*, Case C-284/16, Judgment of the Court (Grand Chamber), 6 March 2018, EU:C:2018:158, RL-12.

[152] Transcript, Day 1, 24:7-14.

authoritative interpretation", with the result that "as a matter of law, there is no scope for reinterpreting".[153]

207.    The Tribunal is not convinced that it is bound by the CJEU's decision over the conflict between the BIT and the EU Treaties. Under Article 41 of the ICSID Convention, the UK, Hungary and the other 155 contracting States, including non-EU States, agreed that an arbitral tribunal constituted under the ICSID Convention "shall be the judge of its own competence", and that:

> Any objection by a party to the dispute that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Tribunal, *shall be considered* by the Tribunal […].[154]

208.    In other words, the ICSID Convention empowers tribunals acting under its aegis to decide over their own jurisdiction, that is to say that it grants them *Kompetenz-Kompetenz*. In the exercise of such power, the Tribunal must analyze whether there is a valid consent to arbitrate under Article 25 of the ICSID Convention. An ICSID tribunal cannot abandon this mandate and blindly follow the determination of another adjudicatory body. It must carry out its own analysis.

209.    In any event, the CJEU's interpretative authority extends to the interpretation and application of the EU Treaties.[155] The CJEU has no such (arguably) exclusive or ultimate mandate in respect of the interpretation of the BIT or the VCLT rules on treaty conflicts. Yet, in order to determine whether Article 8 of the BIT is precluded by the EU Treaties, it does not suffice to interpret the EU Treaties. This determination requires the interpretation of both the EU Treaties and the BIT, in order to answer crucial questions such as (i) whether the BIT and the EU Treaties govern the same subject matter as provided in Article 30 of

---

[153] Transcript, Day 1, p. 22.

[154] Emphasis added.

[155] *Da Costa en Schaake N.V., Jacob Meijer N.V. and Hoechst-Holland N.V. v Nederlandse Belastingadministratie*, ECJ Cases 28, 29 and 30/62, 27 March 1963, RL-18.

the VCLT and, if so, (ii) whether there is a normative conflict between these treaties as understood under the VCLT.

210.    Not only does the CJEU have no exclusive authority to answer these questions, but it did not even purport to address them in the Achmea Decision. Even a cursory review of that decision reveals that the CJEU did not undertake a conflicts analysis under the VCLT. Thus, even if the Tribunal were willing to pay deference to the CJEU's reasoning, the Achmea Decision would give no guidance on the issues which must be resolved to determine whether the EU Treaties preclude the application of Article 8 of the BIT as a matter of international law. The Tribunal finds confirmation for this observation for instance in *United Utilities v. Estonia*, according to which the Achmea Decision "assume[s] that the issue must be considered through, and only through, the lens of EU law."[156]

211.    For these reasons, the Tribunal is bound to undertake an independent analysis as to whether the EU Treaties override the consent to ICSID arbitration given in the BIT, which analysis is subject to the VCLT.

### b.    What is the value of the Member States Declarations?

212.    In January 2019, 23 EU Member States, including Hungary and the UK, made declarations affirming that "all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to Union law and thus inapplicable."[157] The Parties dispute the legal value of the 2019 Declarations.

213.    The Respondent submits that the Contracting States are the masters of the treaty. In general, the Tribunal agrees with this statement. Indeed, when the Contracting States are in agreement, they may even go as far as to terminate the treaty.[158]  That said, the UK and Hungary have not terminated the BIT pursuant to the rules of Section 3 of the VCLT. Even

---

[156] *United Utilities (Tallinn) B.V. and Aktsiaselts Tallinna Vesi v. Republic of Estonia*, ICSID Case No. ARB/14/24, Award, 21 June 2019 ("*United Utilities v. Estonia*"), ¶ 539.

[157] Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (15 January 2019), RL-76; Declaration of the Representatives of the Government of Hungary on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (16 January 2019), RL-77.

[158] Article 54(b) of the VCLT.

if they had done so by virtue of the 2019 Declarations, however, the Claimants accepted the BIT's offer to arbitrate prior to its purported termination. Pursuant to Article 25 of the ICSID Convention, "[w]hen the parties [i.e. the investor and the State] have given their consent, no party may withdraw its consent unilaterally." Indeed, it is common ground between the Parties that the relevant time for determining jurisdiction is the date of the initiation of the arbitration.

214. Thus, the consent to arbitrate, in the sense of a meeting of the minds, which is perfected by the investor's acceptance of the State's offer to arbitrate expressed in the BIT would not be retroactively invalidated by a subsequent termination of the BIT. In other words, even if the Tribunal were to regard the 2019 Declarations as an agreement to terminate the BIT, *quod non*, that agreement could not have invalidated the consent to arbitrate because it was entered after the consent was formed.

215. The 2019 Declarations might also arguably be viewed as a "subsequent agreement between the parties regarding the interpretation of the treaty", as envisaged by Article 31(3)(a) of the VCLT. This seems to be the Respondent's position, which states that the 2019 Declarations are "a clarification of the meaning and the effect that these [treaties] have always had. It is not a forward-looking policy statement […]. It is a statement of what they understand the law to have been since the treaties came into effect."[159]

216. However, the 2019 Declarations themselves are not clear on whether they purport to offer a joint interpretation of the intra-EU BITs. In pertinent part, their title reads: "Declaration […] on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union."[160] This wording suggests that the Member States seek to explain the legal consequences of the Achmea Decision, rather than to give an interpretation of the meaning of intra-EU investment treaties.

---

[159] Transcript, Day 1, 35:22-36:6.

[160] Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (15 January 2019), RL-76; Declaration of the Representatives of the Government of Hungary on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (16 January 2019), RL-77.

217.    This suggestion is corroborated by the fact that, prior to the Achmea Decision, Hungary participated in an ICSID arbitration under the present BIT without objecting that Article 8 was extinguished due to its accession to the EU.[161] This instance shows that Hungary did not consider that its offer to arbitrate expressed in the BIT had ceased to be effective as a result of its accession to the EU. Instead, as the title of the 2019 Declarations demonstrates, such ineffectiveness or extinguishment is presented as a consequence of the Achmea Decision. Yet, as discussed above, the Claimants accepted Hungary's offer to arbitrate prior to the Achmea Decision. Hence, according to Article 25 of the ICSID Convention, it is no longer open for Hungary to renege on this consent.

218.    Be that as it may, joint interpretative declarations or agreements are not an exclusive and dispositive method of treaty interpretation. Pursuant to Article 31(3) of the VCLT they are but one circumstance that "shall be taken into account, together with the context" of the relevant treaty terms. What is more, context is itself one of the means of interpretation under Article 31(1) of the VCLT, together with the ordinary meaning and object and purpose of the treaty. Thus, an interpretative declaration, as its name indicates, can only interpret the treaty terms; it cannot change their meaning:

> Unlike interpretation, the subsequent modification of a treaty can hardly be left to informal agreements as the amendment must be on the same legal level as the original treaty as foreseen in the treaty.[162]

219.    Here, the provision that is purportedly subject to interpretation is Article 8 of the BIT, which was already quoted and reads as follows:

> Each Contracting Party hereby consents to submit to the International Centre for the Settlement of Investment Disputes (hereinafter referred to as "the Centre") for the settlement by conciliation or arbitration under the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington on 18 March 1965 any legal dispute arising under Article 6 of this Agreement between that

---

[161] *Accession v. Hungary*, RL-42.

[162] Hafner, "Subsequent Agreements and Practice: Between Interpretation, Informal Modification, and Formal Amendment", in Nolte (Ed.) *Treaties and Subsequent Practice* (OUP 2013) 115; See also, Dörr, Schmalenbach, *Vienna Convention on the Law of Treaties: A Commentary* (Springer 2012) 553, ¶ 73.

> Contracting Party and an investor of the other Contracting Party concerning an investment of the latter in the territory of the former.[163]

220.  The ordinary meaning of the language of this provision leaves no doubt that it contains binding consent (in the meaning of offer) to ICSID jurisdiction. The Respondent accepts the binding nature of this offer when it states in so many words that "Hungary never denied that "'consents' means consents"" and that "Hungary obviously intended to and did consent to the submission of disputes to ICSID arbitration when it signed the BIT."[164] If Hungary and the UK intended to modify the words of an international treaty ratified by both of them, issuing an interpretative declaration by representatives of their governments was not a suitable means for achieving that purpose. If it had been their intent to amend the express language of the BIT, the States would have chosen a different course. The Member States obviously acknowledge that they cannot modify existing BITs by mere declarations, when they state in the 2019 Declarations:

> Member States will make best efforts to deposit their instrument of ratification, approval or acceptance […] of any bilateral investment treaty terminating bilateral investment treaties between Member States no later than 6 December 2019.[165]

221.  Had the 2019 Declarations been sufficient to change the BITs, then the termination of such treaties would be superfluous. In this respect, the Tribunal agrees with the ICSID tribunal in *United Utilities v. Estonia* that the language of the 2019 Declarations "necessarily implies […] that the BIT remains in force and that its Article 9 [comparable to Article 8 here] can therefore constitute a valid offer to arbitrate, which Claimants accepted."[166]

---

[163] UK-Hungary BIT, CL-1.

[164] R-Rejoinder, ¶ 55.

[165] Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (15 January 2019), RL-76; Declaration of the Representatives of the Government of Hungary on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union (16 January 2019), RL-77.

[166] *United Utilities v. Estonia*, ¶ 559.

222.   The Tribunal's finding that the 2019 Declarations were not the proper procedure to terminate or amend the BIT is not based on mere formalism. The BIT is an international treaty that confers rights on private parties. While the Contracting States remain the masters of their treaty, their control is limited by the general principles of legal certainty and *res inter alios acta, aliis nec nocet nec prodest*.[167] This is evident for instance from Article 13(3) of the BIT, which grants a guarantee of stability to investors who have made investments in reliance on the BIT:

> In respect of investment made whilst the Agreement is in force, its provisions shall continue in effect with respect to such investments for a period of twenty years after the date of termination and without prejudice to the application thereafter of the rules of general international law.

223.   This provision shows that, even where the Contracting Parties terminate the treaty on mutual consent, they acknowledge that long-term interests of investors who have invested in the host State in reliance on the treaty guarantees must be respected. This is the purpose served by the 20-year sunset provision. If the protection of existing investments outlives an unambiguous termination of the Treaty, then the protection must continue *a fortiori* in respect of a decision of an adjudicatory body constituted under a different treaty or of declarations that purport to clarify the legal consequences of that decision.

224.   For these reasons, the 2019 Declarations cannot retroactively invalidate or render inapplicable the offer to arbitrate that the Claimants accepted through their request for arbitration. That being said, it remains to be seen whether, by the time of the commencement of these proceedings, Article 8 of the BIT had been overridden as a consequence of Hungary's accession to the EU, pursuant to the conflict provisions of Article 30 of the VCLT.

---

[167] Pursuant to Article 31(3)(c) of the VCLT, treaties are to be interpreted in light of other rules of international law applicable between the parties. Pursuant to Article 38(1) of the ICJ Statute, this includes general principles of law; See also, Article 69(2) of the VCLT.

### c. *Do the EU Treaties preclude the application of Article 8 of the BIT?*

225.    In reliance on the conflict rules of Article 30 of the VCLT, the Respondent argues that Articles 267 and 344 of the TFEU override Article 8 of the BIT. The Claimants dispute the applicability of the conflict rules of Article 30 of the VCLT and submit that, even if they were applicable, the terms of the BIT would prevail.

226.    Article 30 of the VCLT sets forth rules to resolve conflicts between successive treaties that govern the same subject matter. In relevant part, it reads as follows:

Article 30

Application of successive treaties
relating to the same subject matter

> 1. Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs.

> 2. When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.

> 3. When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.

> 4. When the parties to the later treaty do not include all the parties to the earlier one:

> (a) as between States parties to both treaties the same rule applies as in paragraph 3;

> (b) as between a State party to both treaties and a State party to only one of the treaties, the treaty to which both States are parties governs their mutual rights and obligations.

227.    In order to determine whether the TFEU prevails over Article 8 of the BIT, the Tribunal must first answer two threshold questions: (i) do the BIT and the TFEU have the same subject matter as required by paragraph 1 of Article 30 of the VCLT and, if in the affirmative, (ii) is Article 8 of the BIT in conflict with Articles 267 and 344 of the TFEU?

### (i)    Same subject matter

228.    The Parties disagree on the interpretation of the same subject-matter requirement under Article 30(1) of the VCLT. According to most prominent commentators, the formulation should be understood widely.[168] That being said, it cannot be reduced to a requirement that the two treaties be potentially applicable to the same set of circumstances. Such a reduction would render the requirement superfluous. Indeed, if two treaties do not apply to the same set of circumstances, they are not in conflict and Article 30 does not come into play.

229.    Therefore, to satisfy the same subject-matter requirement, it does not suffice that the successive treaties potentially govern the same facts. This was the conclusion in *EURAM v. Slovak Republic* for instance:

> Even if two different rules deal with issues arising from the same facts, it does not necessarily mean that they have the same subject matter. This can be seen from a simple example: a treaty on environmental protection and a treaty on trade may both apply to the same factual situation but the subject matter with which they deal is quite different.[169]

230.    Investment treaty tribunals have understood that the subject-matter of a treaty is defined by the matters with which the treaty's constituent provisions deal. In the words of the *Oostergetel* tribunal:

> The requirement […] that the two treaties relate to the "same subject matter" has to be construed in line with the dominant view expressed in scholarly writings to the effect that two treaties can be considered to relate to the "same subject matter" only if the overall objective of these treaties is identical and they share a degree of general comparability.[170]

231.    In respect of the EU Treaties, investment jurisprudence is consistent in holding that investment treaties do not share the subject matter with the EU Treaties. By contrast, the

---

[168] Dörr, Schmalenbach, *Vienna Convention on the Law of Treaties: A Commentary* (Springer, 2012) 510, ¶ 12.

[169] *European American Investment Bank AG (EURAM) v. Slovak Republic,* UNCITRAL, Award on Jurisdiction, 22 October 2012, RL-8, ¶ 169. The tribunal also warned that the ILC's interpretation conflates the same subject-matter requirement with the separate requirement of incompatibility.

[170] *Oostergetel v. Slovakia*, ¶ 79.

Achmea Decision is silent on whether the intra-EU investment treaties and the TFEU govern the same subject matter for the purposes of Article 30 of the VCLT.

232.    Among investment awards, the *Wirtgen* tribunal found it "obvious" that intra-EU investment treaties and the TFEU did not relate to the same subject matter,[171] and noted:

> To take but one example, Article 10 of the Treaty allows an investor to sue a host state. No parallel provision exists in the TFEU. […] Similarly, EU law does not provide a protection similar to the FET found in the BIT.[172]

233.    Earlier, the *Eastern Sugar* tribunal had observed that "the BIT […] provides for a special procedural protection in the form of arbitration between the investor state and the host state and, especially arbitration of a 'mixed' or 'diagonal' type between the investor and the host state". That tribunal thus emphasized that "[f]rom the point of view of the promotion and protection of investments, the arbitration clause is in practice the most essential provision of Bilateral Investment Treaties," and added that "EU law does not provide such a guarantee."[173]

234.    In addition, as the most evident distinction, the application of the BIT is contingent upon an investor of one State making a cross-border investment in the other State. In turn, the EU Treaties provide guarantees for nationals of the EU Member States irrespective of an investment. Due to this crucial distinction, the substantive protections afforded to a foreign investor under the Treaty are unsurprisingly not comparable to, or of the same nature as, those offered to EU nationals under the BIT. By way of an example, as the *Eureko v. Slovakia* tribunal observed, the protections afforded by BITs under the FET standard are not limited to the existing EU law provisions prohibiting discrimination.[174] Similarly, while EU law may condition expropriatory takings upon public interest and fair

---

[171] *Jürgen Wirtgen, Stefan Wirtgen, Gisela Wirtgen and JSW Solar (zwei) GmbH & Co. KG v. Czech Republic,* PCA Case No. 2014-03, Final Award ("*Wirtgen v. Czech Republic*"), 11 October 2017, RL-10, ¶ 253.

[172] *Wirtgen v. Czech Republic*, RL-10, ¶ 253.

[173] *Eastern Sugar B.V. (Netherlands) v. The Czech Republic*, SCC Case No. 088/2004, Partial Award, 27 March 2007, CL-37, ¶¶ 164-165.

[174] *Achmea B.V. v. The Slovak Republic*, UNCITRAL, PCA Case No. 2008-13 (formerly Eureko B.V. v. The Slovak Republic), Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010, RL-9, ¶ 250.

compensation, it has not been established that it offers comparable protections to those available under the Treaty in case of indirect expropriations, or that it applies the protections to "every kind of asset".

235.   The BIT and the EU Treaties also differ in their overarching goals. As the *Oostergetel* tribunal underscored, the EU Treaties' objective is to promote economic integration, including by creating a common market, among the Member States, whereas the objective of BITs (including the Treaty) is to provide for specific guarantees in order to encourage the international flows of investment into particular States.[175]

236.   The Tribunal sees no reason to diverge from the consistent line of investment awards according to which the EU Treaties and investment treaties do not share the same subject matter. Consequently, the conflict rules embodied in Article 30 of the VCLT do not apply to possible conflicts between the BIT and the EU Treaties.

237.   The Parties have not pointed to, and the Tribunal is not aware of the existence of, provisions in the VCLT or of norms of customary international law that would govern the resolution of possible conflicts between successive treaties that *do not* share the same subject matter. Importantly, pursuant to Article 42(1) of the VCLT, "[t]he validity of a treaty or of the consent of a State to be bound by a treaty may be impeached only through the application of the present Convention."

238.   For these reasons, the conclusions that the BIT and the EU Treaties do not have the same subject matter and thus Article 30 of the VCLT does not apply dispose of the question whether the BIT's offer to arbitrate was valid and applicable at the commencement of this arbitration. The analysis could stop here. Yet, because the Parties have extensively briefed these issues, the Tribunal will review the existence of a conflict assuming same subject matter.

---

[175] *Oostergetel v. Slovakia*, ¶ 75.

### (ii)    Conflict

239.    Even if it were considered that the BIT and the EU Treaties share the same subject matter, the BIT's consent to arbitrate would not be precluded by operation of the EU Treaties, since there is no conflict between Article 8 of the BIT and Articles 267 and 344 of the TFEU.

240.    When States subscribe to successive treaties, without thereby terminating or amending any of them, it should be presumed that they did not intend to create a normative contradiction. This presumption of non-conflict derives from the principle of harmonious interpretation of international law:

> There is a general principle under international law whereby the interpreter tries to smooth out or even to avoid conflict by way of "harmonizing interpretation" (presumption of non-conflict). This rule is based on the assumption that when States wanted different rules to be applicable they could not at the same time have wanted normative contradiction. [176]

241.    As a leading commentary to the VCLT suggests, "[i]f apparently conflicting treaty provisions can be interpreted in such a way that they are compatible with each other, this approach is the first to be chosen."[177] This harmonious interpretation should not be understood as a suggestion to ignore outright conflicts. An outright conflict "arises only where a Party to the two treaties cannot simultaneously comply with its obligations under both treaties,"[178] or in different words:

> Treaties are incompatible with each other if their obligations cannot be complied with simultaneously, ie if a State Party to both treaties cannot comply with one of them without breaching the other.[179]

242.    Bearing these explanations in mind, the Tribunal fails to see a conflict between Article 8 of the BIT and Articles 267 and 344 of the TFEU. Article 344 reads as follows:

---

[176] Kolb, *The Law of Treaties: An Introduction* (Elgar, 2016) 183.

[177] Dörr, Schmalenbach, *Vienna Convention on the Law of Treaties: A Commentary* (Springer, 2012) 511, ¶ 13.

[178] Jenks, *The Conflict of Law-Making Treaties* (BYIL, 1951) 403.

[179] Dörr, Schmalenbach, *Vienna Convention on the Law of Treaties: A Commentary* (Springer, 2012) 511, ¶ 13.

> Member States undertake not to submit a dispute concerning the
> interpretation or application of the Treaties to any method of
> settlement other than those provided for [in the Treaties].

243.    The language of this provision does not limit or prohibit the submission of disputes with investors based on an investment treaty to other adjudicatory bodies. Instead, it limits the power of the Member States to litigate (or arbitrate) disputes concerning the interpretation or application of the EU Treaties by means other than those provided in the EU Treaties.

244.    In line with this distinction, Article 8 of the BIT provides for international arbitration of disputes "arising under Article 6 [of the BIT]", not of "a dispute concerning the interpretation or application of the [EU] Treaties". It is true that a dispute arising under Article 6 of the BIT may involve, as preliminary or incidental issues, matters calling for the interpretation or application of the EU Treaties. At most, one might argue that Article 344 of the TFEU carves out from the subject-matter scope of Article 8 of the BIT potential investment disputes that also involve "interpretation or application of the [EU] Treaties". The Tribunal can leave this question open as the present dispute does not call for the interpretation or application of the EU Treaties. Therefore, at the time when the Claimants commenced these proceedings, the BIT's offer to arbitrate was valid in respect of the subject-matter scope of the present dispute.

245.    The next provision that the Respondent considers to be in conflict with Article 8 of the BIT is Article 267 of the TFEU, which reads as follows:

> The Court of Justice of the European Union shall have jurisdiction
> to give preliminary rulings concerning:
>
> (a) the interpretation of the Treaties;
>
> (b) the validity and interpretation of acts of the institutions, bodies,
> offices or agencies of the Union.

246.    Here the potential for a normative conflict is even more remote. This provision confers the power to give preliminary rulings on the CJEU. It is unclear how this power conflicts with the submission of a dispute under a BIT to international arbitration. It is true that an investment treaty tribunal is not empowered to resort to the CJEU for a preliminary ruling. This alone does not give rise to a normative conflict with Article 267. Indeed, the language

of Article 267 does not create an obligation for the Member States to ensure that each and every adjudicatory body potentially applying EU law may seek a preliminary ruling from the CJEU. Even at the level of the domestic courts of the EU Member States, there is no such obligation. In addition, if that were the meaning of Article 267, the Member States would violate Article 267 by allowing commercial arbitration as well as arbitration under extra-EU investment treaties, since arbitral tribunals constituted under these mechanisms may be called upon to apply EU law and have no standing to request preliminary rulings.

247. In any event, as with Article 344, resorting to the principle of harmonious interpretation, Article 267 might at most be understood as a carve out – as opposed to a complete preclusion –- from the subject-matter scope of Article 8 of the BIT in respect of disputes that relate to the interpretation of the EU Treaties, or the validity and interpretation of acts of the EU institutions. Here again, the Tribunal leaves this issue open as the present dispute does not fall in that category.

248. For these reasons, subject to the Respondent's objection to the subject-matter jurisdiction, which will be addressed next, the Tribunal concludes that at the time of the initiation of these proceedings the BIT's offer to arbitrate was standing and that a valid arbitration agreement was formed when the Claimants accepted this offer, thus creating the consent to arbitrate required under Article 25 of the ICSID Convention.

**B.**     **SUBJECT-MATTER JURISDICTION**

249.    It is common ground that the Claimants' farming business in Hungary constitutes an investment within the meaning of the BIT and the ICSID Convention. The Parties disagree, however, on whether the consent to arbitrate "any legal dispute arising under Article 6 [the expropriation provision]" of the BIT extends to the present dispute and, in particular, whether Hungary's measures were capable of constituting an expropriation of the assets constituting an investment.

**(1)     The Respondent's Position**

250.    The Respondent contends that the present dispute does not fall within the subject-matter scope of the BIT's dispute resolution provision, since none of the conduct alleged by the Claimants is capable of constituting an expropriation.

251.    First, although the Claimants' farming business in Hungary indisputably constitutes an investment,[180] the farm as a whole is not the subject of the expropriation claim, since the Claimants continue to derive profit from it.

252.    Second, the Lease cannot be the subject of an expropriation either, because it expired on 25 July 2014 on its own terms.[181] In this respect, the Respondent counters the Claimants' submission that a new lease was formed by virtue of their exercise of the alleged pre-lease right on 29 April 2014. At that time, so says the Respondent, the Claimants no longer possessed a contractual pre-lease right as it was extinguished by the 2006 Lease Amendment.

253.    In any event, as the Respondent's legal expert Professor Menyhárd explains, the exercise of a pre-lease right does not automatically result in the conclusion of a new lease. For that result to ensue two conditions must be met: (i) the lessee who purports to exercise the pre-lease right must demonstrate that he/she is capable of performing the lease under the terms offered by the relevant third party and (ii) no lease contract must yet be concluded with a

---

[180] R-Rejoinder, ¶ 253.

[181] 2006 Lease Agreement, C-40, Section 4.

*bona fide* third party.[182] The Claimants' purported exercise of the pre-lease right on 29 April 2014 met none of these conditions. Thus, at most, Inícia only possessed a right to seek damages from the NLA for breach of contract.[183]

254.    Third, the alleged pre-lease right and right to claim damages for the conduct of the Tenders do not constitute an investment under the BIT and are thus not capable of being expropriated. In particular, pre-lease rights, being non-transferable[184] and lacking intrinsic value, do not constitute "assets" within the meaning of the definition of investment contained in Article 1 of the BIT. In the proper context and in light of the object and purpose of the BIT, the term "asset" should be understood to denote proprietary rights. This understanding is confirmed by the arbitral jurisprudence[185] and legal scholars.[186]

255.    According to Hungary, the Claimants' legal expert Professor Halmai errs when he declares that pre-lease rights are property rights under Hungarian law. The Respondent argues that under Hungarian constitutional law, "a pre-lease right does not belong to the core of the content of a lease contract: it does not provide the right to acquire a lease."[187] Thus, as Professor Menyhárd opines, even if a lease were to enjoy constitutional protection as property under certain circumstances, it does not automatically follow that such protection extends to pre-lease rights.[188]

---

[182] Menyhárd Second ER, ¶¶ 41-50.

[183] R-Rejoinder, ¶ 192.

[184] Section 373(4) of the 1959 Civil Code explicitly renders the transfer of a pre-emption right "null and void". Under, Section 373(5), pre-emption rights, and hence pre-lease rights, "do not pass onto successors". The Parties' experts are in agreement that rules concerning pre-emption rights in the 1959 Civil Code apply *mutatis mutandis* to pre-lease rights. Halmai Second ER, ¶ 16; Menyhárd Second ER, ¶ 35.

[185] *Accession v. Hungary*, RL-42, ¶¶ 154, 156; *Emmis International Holding, B.V., Emmis Radio Operating, B.V., MEM Magyar Electronic Media Kereskedelmi és Szolgáltató Kft. v. The Republic of Hungary*, ICSID Case No. ARB/12/2, Award, 16 April 2014 ("*Emmis v. Hungary*"), RL-37, ¶ 169.

[186] Douglas, *The International Law of Investment Claims* (Cambridge University Press, 2009), RL-4, ¶¶ 434-435.

[187] Rejoinder, para. 213, referring to Constitutional Court 16/2015 (VI.5.) AB hat, 5 June 2015, R-16, ¶ 128.

[188] Menyhárd Second ER, ¶ 9.

256.    In addition, continues the Respondent, the notice for the Tenders expressly stated that "no pre-lease right can be exercised in connection with the tender."[189] By taking part in the Tenders, the Claimants accepted these terms. As the Constitutional Court held in a case involving strikingly similar circumstances, a lease holder's participation in the tender under such terms undermines his alleged "entitlement to property" with respect to the land.[190]

257.    The Respondent further submits that the alleged right to damages arising out of the Tenders does not constitute an asset qualifying as an investment and being susceptible of being expropriated. An unadjudicated claim, even if founded, has no ascertained monetary value and is not transferable. Therefore it does not constitute assets.[191] In *Emmis v. Hungary*, the ICSID tribunal determined that "[i]t is the asset itself – the property interest or chose in action – and not its contractual source that is the subject of the expropriation claim."[192] In any event, the measures complained of are not an expropriation of a damages claim that may result from the Claimants' loss of the Land following the Tenders. Indeed, the Claimants do not allege that Hungary passed legislation preventing them from pursuing their claim for damages. These alleged claims are not therefore in dispute and cannot serve as the basis for the Tribunal's jurisdiction.

258.    Finally, the Respondent argues that the alleged pre-lease rights and the claims arising under the Tenders do not qualify as investments within the meaning of the ICSID Convention, as they do not bear the hallmarks of an investment.[193] They do not involve (i) a commitment of resources, (ii) over a certain duration, (iii) involving a risk and (iv) making a contribution to the host State's economic development. The Claimants' position that the term "investment" has no independent meaning under Article 25 of the ICSID Convention is untenable as demonstrated by a wealth of ICSID awards.

---

[189] R-Rejoinder, ¶ 216.

[190] Ruling no. 3129/2018 (IV. 9.) AB of the Constitutional Court, R-29.

[191] Douglas, *The International Law of Investment Claims*, (Cambridge University Press, 2009), RL-4, ¶¶ 434-435.

[192] *Emmis v. Hungary*, RL-37, ¶ 169.

[193] RCM, ¶¶ 368-369, 381-382.

259.    For these reasons, the Respondent maintains that the Tribunal does not have jurisdiction over the subject matter of the present dispute.

**(2)    The Claimants' Position**

260.    The Claimants assert that the investment for present purposes is constituted of the leasehold rights over the Land, which "comprise a lease (created as a result of the exercise of the contractual pre-lease right on 29 April 2014), a contractual pre-lease right, a statutory pre-lease right and a right to damages arising from the manipulated tender scoring".[194]

261.    First, the Claimants counter the Respondent's argument that the Lease expired on its own terms. According to the Claimants, a new lease was created in April 2014, when Inícia exercised the contractual pre-lease right.[195] The NLA's conclusion of a competing lease with the winners of the Tenders, who were acting in good faith, does not alter the fact that under the rules governing the pre-emption and pre-lease rights, Inícia's exercise of the pre-lease right resulted in a new lease. In such case, as Professor Menyhárd himself explains in his scholarly writings, "the contracts concluded one after the other represent equal ranking obligations."[196] If the obligor chooses to perform one of the conflicting contracts to the detriment of the other, it owes damages to the creditor of the latter contract, being understood that both contracts are valid and enforceable. The Respondent's position that Inícia's exercise of the pre-lease right did not result in the creation of a new lease because of the NLA's choice to lease the Land to others is therefore unsupported by the applicable rules.[197]

262.    Second, the Claimants argue that the definition of "investment" agreed between the parties in the BIT governs as *lex specialis*. This definition, according to the Claimants, "is both the starting and the end point for the Tribunal's determination of what constitutes an

---

[194] C-Reply, ¶ 98.

[195] CM, ¶ 79.

[196] C-Rejoinder, ¶ 48, citing Menyhárd, "Law of things", ELTE Eötvös Kiadó (Budapest, 2014), p. 130, filed as C-137 refiled with completed translation as C-239.

[197] C-Rejoinder, ¶¶ 47-56.

'investment' for the purposes of these proceedings."[198] The ICSID Convention is deliberately silent on the definition of investment, so that the BIT parties could give their own definition.

263.    In any event, the *Salini* criteria to which the Respondent refers should not be regarded as jurisdictional requirements but merely as typical characteristics of investments under the ICSID Convention.

264.    Third, for the Claimants, their leasehold rights fall within the definition of investment in the BIT. In particular, the ordinary meaning of the word "asset" used in Article 1 of the BIT is not limited to rights *in rem*. ICSID tribunals and scholars widely opine that *in personam* rights can also qualify as investments under categories such as "claims to money and other assets or to any performance under contract having a financial value",[199] and thus be expropriated.[200] Indeed, the Claimants' right to use and collect the proceeds of the Land pursuant to the Lease, as it arises from the Hungarian Civil Code,[201] is a claim under a contract having financial value.

265.    In any event, as Professor Halmai observes, the Claimants' leasehold rights are *in rem* rights that attract protection against expropriation under the functional approach to property adopted by Hungarian constitutional law.[202] The Constitutional Court has indeed held that "the lessee's interest in the certain and durable existence of the lease may qualify as a property right under constitutional protection of property."[203] According to the Claimants, it is precisely the constitutional law notion of property, as opposed to the more restrictive civil law definition, that is relevant in the present case, since the function of constitutional

---

[198] C-Reply, ¶ 106.

[199] UK-Hungary BIT, Article 1, CL-1.

[200] *Southern Pacific Properties (Middle East) Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/84/3, Award on the Merits, 20 May 1992, CL-57, ¶ 164; *Bayindir Insaat Turizm Ticaret Ve Sanayi A.Ş. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Decision on Jurisdiction, 14 November 2005, CL-58, ¶ 255; *Consortium RFCC v. Kingdom of Morocco*, ICSID Case No. ARB/00/6, Award, 22 December 2003 ("*RFCC v. Morocco*"), CL-59, ¶ 60.

[201] Extracts from the Civil Code, C-62, Section 452.

[202] Halmai First ER, ¶ 54.

[203] C-Reply, ¶ 133, citing Constitutional Case No. 64/1993 (XII.22), VI. 2. a), cited at fn 106 of C-Reply.

law in the municipal legal system is identical to that of international investment law.[204] For example, as a matter of civil law, licenses or other public law rights could not qualify as property, even though they fulfil the traditional requirements of property. This approach is shared by investment tribunals, which have held that "the notion of property or assets is not to be narrowly circumscribed" and rights that are not traditionally regarded as *in rem* rights should also be "protected from expropriation".[205]

266.  According to the Claimants, their leasehold rights have the functional characteristics of property. First and foremost, they incorporate a right to possession, which is a fundamental component of property opposable to the public as a whole, including the lessor himself.[206] In addition, a lease is transferable, albeit by consent of the lessor.[207] It does not terminate upon the death of the lessee and passes to the heirs.[208] Nor is the lease terminated by a change of lessor.[209] In any event, if the Respondent insists on a narrow category of *in rem* rights, then the Claimants contend that the right to possess the Land that derives from the Lease and the leasehold rights, is the subject of the expropriation claim.[210]

267.  As for the pre-lease rights, the Civil Law Chamber of the Supreme Court[211] as well as Hungarian scholars consider that a "pre-emption right based on statute necessarily has an *in rem* effect, because, as a result of its very nature, it obliges the owner or right holder of the asset at issue at all time."[212] Both the Lease and the pre-lease right contained within the Lease are thus investments capable of expropriation.

---

[204] C-Reply, ¶ 136.

[205] *Emmis v. Hungary*, RL-37, ¶ 163.

[206] CM, ¶ 118, C-Reply, ¶ 151.

[207] C-Reply, ¶ 147, see, fn 120.

[208] C-Reply, ¶ 148.

[209] C-Reply, ¶ 149; Halmai First ER, p. 9.

[210] C-Reply, ¶ 151.

[211] Opinion 2/2009 (VI. 24.) PK, On certain questions of interpretation relating to pre-emption right, C-143.

[212] Balázs Tőkey, Pre-emption right in the Civil Code, C-144.

268.    Fourth, the Claimants oppose the Respondent's reliance on the Constitutional Court ruling No. 3129/2018. In that case, the applicant leaseholder challenged the results of a tender by which it had lost the leased land. The Constitutional Court dismissed the application on the grounds that (i) the previous lease which was for a limited term had expired, (ii) that lease could not have been transformed into a lease for an indefinite term, and (iii) the applicant had no pre-lease right.[213] If anything, this reasoning implies that, had there been a pre-lease right, the applicant would have held a constitutionally protected property right.[214] It is thus unsurprising that the Respondent's own expert does not rely on this decision.

269.    Fifth, the Claimants assert that the pre-lease right is a transferable right that has an intrinsic financial value. In particular, under the Civil Code, a pre-lease right can be transferred by appointment of a third party to exercise the right. Such appointment differs from an assignment, which, as the Respondent points out, is null and void.[215] An appointment does not require the owner's consent, and often third parties are prepared to pay for the appointment allowing them to exercise the pre-emption or pre-lease rights.[216] In addition, a pre-lease right passes on to the legal successors of its holder together with the lease.

270.    Finally, the Claimants' loss of the Land as a result of the manipulated tender scores is actionable under Hungarian law in the form of a damages claim, *i.e.,* a chose-in-action, which is a form of intangible property.[217] This claim is a further right that can be expropriated.

    **(3)    Analysis**

271.    The scope of the Tribunal's jurisdiction is set out in Articles 25 of the ICSID Convention and 8.1 of the BIT, which read as follows:

---

[213] Ruling no. 3129/2018 (IV. 9.) AB of the Constitutional Court, R-29.

[214] C-Rejoinder, ¶ 78.

[215] C-Rejoinder, ¶ 80.

[216] C-Rejoinder, ¶ 81.

[217] C-Reply, ¶ 169.

Article 25

The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre.

[…]

Article 8.1

Each Contracting Party hereby consents to submit to the International Centre for the Settlement of Investment Disputes (hereinafter referred to as "the Centre") for the settlement by conciliation or arbitration under the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington on 18 March 1965 any legal dispute *arising under Article 6* [expropriation provision] of this Agreement between that Contracting Party and an investor of the other Contracting Party *concerning an investment* of the latter in the territory of the former.[218]

272.    Three jurisdictional requirements related to the subject matter of the dispute derive from these provisions:

- The dispute must arise directly out of an investment (Article 25 of the ICSID Convention);

- The dispute must "concern the investment" (Article 8.1 of the BIT);

- The dispute must arise under Article 6, which is the expropriation provision of the BIT (Article 8.1 of the BIT).

273.    The first two requirements appear met. The Parties do not dispute that the Claimants' farm is an investment within the meaning of both the ICSID Convention and the BIT. The present dispute, which concerns the alleged expropriation of the Claimants' leasehold rights, does arise out of that overall investment of the Claimants.

---

[218] UK-Hungary BIT, CL-1, emphases added.

274.   It is well established in the investment treaty jurisprudence that, for purposes of subject-matter jurisdiction, the existence of an investment must be assessed holistically. So, for instance, in the words of the *Holiday Inns v. Morocco* tribunal:

> [I]nvestment is accomplished by a number of juridical acts of all sorts. It would not be consonant either with economic reality or with the intention of the parties to consider each of these acts in complete isolation from the others.[219]

275.   Similarly, in *Inmaris v. Ukraine*, the tribunal held that "[f]or purposes of this Tribunal's jurisdiction […] the Tribunal need only determine the existence of a covered investment in the transaction as a whole."[220] In addition, in *CSOB v. Slovak Republic*, the tribunal found that a dispute related to a loan agreement fell within its jurisdiction, since the loan was part of a broader consolidation transaction, which qualified as an investment.[221] Had the tribunal singled out the loan agreement, it would likely not have deemed it an investment and would have declined jurisdiction.

276.   In other words, the Tribunal should look at the investment as a whole and ascertain whether the dispute has a sufficiently direct link with the overall investment. This is clearly the case here, where the dispute arises directly out of the activities of the Farm.

277.   As for the third requirement, Article 8 of the BIT requires that there be "a legal dispute arising under Article 6". According to the definition given by the PCIJ in *Mavrommatis*, under international law "[a] dispute is a disagreement on a point of law or fact, a conflict of legal views or of interests between two persons."[222] The ICJ also defines a legal dispute

---

[219] *Holiday Inns, Occidental Petroleum and others v. Kingdom of Morocco*, ICSID Case No. ARB/72/1, Decision on Problems Raised with Regard to the Connections between the Basic Agreement and the Loan Contracts, 12 May 1974, p. 3.

[220] *Inmaris Perestroika Sailing Maritime Services GmbH and others v. Ukraine*, ICSID Case No. ARB/08/8, Decision on Jurisdiction, 8 March 2010, CL-52, ¶ 92.

[221] *Ceskoslovenska Obchodni Banka, A.S. v. The Slovak Republic*, ICSID Case No. ARB/97/4, Decision of the Tribunal on Objections to Jurisdiction, 24 May 1999, RL-1.

[222] *Mavrommatis Palestine Concessions (Greece v. Great Britain)*, Judgment of 30 August 1924, 1924 PCIJ Series A, No. 2, p. 11.

broadly as "a situation in which the two sides hold clearly opposite views concerning the question of the performance or non-performance of certain treaty obligations."[223]

278.    Hence, for the Tribunal to have subject-matter jurisdiction under Article 8 of the BIT, it must be satisfied that the Parties are in "disagreement on a point of law or fact" concerning Hungary's performance or non-performance under Article 6 of the BIT. When assessing this requirement, it is not necessary for the Tribunal to establish whether the Claimants' assets have actually been expropriated. It is in the nature of a dispute that it may eventually be decided against the Claimants.

279.    Hungary argues that, by the time of the alleged measures, the Claimants no longer held any leasehold rights capable of being expropriated. The Claimants object that they had leasehold rights, which were in fact expropriated by the Respondent's measures, including the 2011 Amendment. For the purposes of its jurisdictional inquiry, the Tribunal need not go further. This disagreement is precisely a "legal dispute arising under Article 6" over which the Parties conferred jurisdiction to this Tribunal. In other words, the jurisdictional requirement is fulfilled and the Tribunal must decide this dispute on the merits.

280.    The Tribunal recognizes that its jurisdiction pursuant to Article 8 is restricted to reviewing whether there is a breach of Article 6 of the BIT. The Tribunal will not inquire into breaches of other rules of the BIT or international law. In other words, the effect of the subject-matter limitation of Article 8 of the BIT is that the Tribunal will scrutinize the Respondent's measures through narrow lenses that limit its vision to alleged violations of Article 6. In doing so, the Tribunal gives effective meaning to the subject-matter limitation of Article 8 of the BIT.

281.    In conclusion, the disagreement on whether the Claimants held rights capable of being expropriated and whether Hungary's measures were expropriatory constitutes "a legal dispute arising under Article 6" of the BIT. It thus falls within the Tribunal's jurisdiction pursuant to Article 8 of the BIT.

---

[223] *Interpretation of the Peace Treaties with Bulgaria, Hungary and Romania*, Advisory Opinion, 30 March 1950 (first phase), ICJ Reports (1950) 65, at 74.

## V.    LIABILITY

282.    The Parties dispute whether the Respondent's conduct constituted an expropriation of the Claimants' investment. It is the Claimants' position that Hungary acting through the NLA expropriated Inícia's leasehold rights. By contrast, the Respondent submits that the actions of the NLA were not sovereign acts but were contractual in nature, and therefore not treaty violations. It further opposes the expropriation claim on the ground that Inícia did not hold rights capable of being expropriated, and that Hungary's conduct was in any event an exercise of regulatory police powers that is not compensable under international law.

### A.    THE CLAIMANTS' POSITION

283.    The Claimants submit that Hungary's measures were sovereign acts attributable to Hungary (1), which resulted in an expropriation of the Claimants' leasehold rights, including the contractual and statutory pre-lease rights as well as the new 20-year lease that was concluded upon Inícia's exercise of the pre-lease right in April 2014 (2). They object to the Respondent's police powers defense and argue that Hungary's measures were arbitrary and discriminatory, as they were motivated by political favoritism and thinly veiled xenophobia (3).

### (1)    Hungary exercised sovereign powers

284.    The Claimants first point out that one of the key acts which they challenge and which resulted in the expropriation of the statutory pre-lease right was the 2011 Amendment, which is a legislative Act passed by Parliament. As such, it indisputably constitutes sovereign conduct attributable to Hungary.

285.    Similarly, the Claimants' physical eviction from the Land was carried out with direct participation of the State. The contract that the NLA signed with the private security guards shows that the NLA was contracting as a representative of the State.[224] Dr. Bitay, State Secretary at the Ministry of Agriculture, confirmed in his witness statement that he

---

[224] Contract with Private Security Guards, C-181.

personally arranged the physical eviction of the Claimants as the representative of the State.[225] By this admission, the State has embraced the NLA's conduct as its own, pursuant to Article 11 of the ILC Articles on State Responsibility (the "**ILC Articles**").

286.    In addition, as Section 3 of the NLA Act shows, the NLA is nothing but an instrumentality of the Hungarian Minister of Agriculture:

> The minister in charge of the agricultural sector (hereinafter referred to as "minister") shall exercise ownership rights and discharge obligations in connection with the National Land Fund in the name and on behalf of the Hungarian State through the [NLA].[226]

287.    The NLA is set up as a so-called "central budgetary organ", as opposed to a corporation, foundation, association or other civil or corporate law entity.[227] Its officials are public servants who are under a duty to make public disclosure about their finances, which are reviewed by the State audit office.[228]

288.    In addition, Hungary exercises close control over the NLA, which includes the right to issue the Deed of Foundation and the bylaws of the NLA; to approve the bylaws of the Council of the NLA; to appoint the Chairman and, upon the motion of the latter, the Deputy Chairmen of the NLA; to appoint the Chairman and the Members of the NLA Council; to approve the NLA's yearly plan and to submit to the government for approval the NLA's mid-term strategic plan relating to the use and exploitation of the assets of the NLA; and to decide upon the financial appropriations relating to the budget of the NLA. According to the Claimants, there is thus no doubt that the NLA's conduct is attributable to Hungary.

289.    In addition, the Claimants contend that the management of State land is not a commercial activity and that the Respondent itself admits it when arguing that the NLA's conduct was in line with the State's social policy in the field of agriculture.[229] Hungary cannot have it

---

[225] Bitay First WS, ¶ 29.

[226] Act LXXXVII of 2010 on the National Land Fund, 23 May 2013, R-13, Section 3.

[227] Act LXXXVII of 2010 on the National Land Fund, 23 May 2013, R-13, Section 4.1.

[228] Deed of foundation of the NLA, C-187; Bylaws of the NLA, C-188.

[229] Citing RCM, ¶ 510.

both ways. If it intends to defend the NLA's conduct on the basis that it formed part of the implementation of the Respondent's social policies, it cannot at the same time, so say the Claimants, argue that the NLA merely engages in the commercial management of State land. When the NLA defines the tender rules in order to implement the State landholding policies, it exercises public authority and fulfils a public function.[230]

290.    Therefore, in the Claimants' submission, the cancellation of Inícia's statutory pre-lease right, the manipulation of the tender scores, the failure to publish or communicate the winning bids to the Claimants, the purported transfer of possession of the Land in October 2014, and the physical eviction of the Claimants from the Land in July 2015 using private armed security guards are far from being simple contractual breaches as they involve the exercise of sovereign powers.[231]

### (2)    Hungary expropriated the contractual pre-lease right

291.    The Claimants argue that the Respondent's conduct amounted to expropriation of their leasehold rights, including the contractual and statutory pre-lease rights and the renewed 20-year lease which they obtained in July 2014, as well as the statutory pre-lease right, which the 2011 Amendment rendered nugatory.

292.    In respect of the contractual pre-lease right, the Claimants request the Tribunal to discard the Metropolitan Court's decision of 7 December 2017, which erroneously held that the 2006 Lease Amendment granted no contractual pre-lease right to Inícia.

293.    According to the Claimants, the Metropolitan Court's judgment contradicted the practice of other lower courts holding that the standard language of Section 5.1 of the 2006 Lease Amendment did grant contractual pre-lease rights. Panel V of the Curia, Hungary's highest court, had sustained this interpretation in the so called *Gyula* case.[232] This is the same panel that remanded Inícia's case to the Metropolitan Court for lack of sufficient reasons. The Metropolitan Court chose to rely on the interpretation given by another panel of the Curia,

---

[230] C-Reply, ¶ 203.

[231] C-Reply, ¶ 208.

[232] Judgment of the Curia (No. Pfv.V.22.072/2015/6), 2 March 2016 ("the Gyula Case"), C-113.

Panel VI, and to declare that Section 5.1 of the Lease (as amended by the 2006 Lease Amendment) did not provide a contractual pre-lease right. In doing so, the Metropolitan Court failed to address several crucial arguments of Inícia.

294.    In particular, the Metropolitan Court did not apply the rule *contra proferentem* set out in Section 207(2) of the Civil Code. The NLA drafted the disputed pre-lease provision of the 2006 Lease Amendment, which it used as a standard term for numerous leases of State-owned land. Thus, under the principle *contra proferentem*, any ambiguity in the pre-lease provision had to be interpreted against the NLA. The very fact that different courts reached different outcomes when interpreting the pre-lease provision proves the ambiguity. In addition, the provision meets all the criteria for the application of Section 207(2) of the Civil Code as (i) it was defined unilaterally by the NLA as a standard term; (ii) the NLA used the same term for more than one lease agreement with different lessees; and (iii) Inícia has not participated in an individual negotiation of the pre-lease provision.

295.    In respect of the last element, the Claimants clarify that, although Inícia had an opportunity to familiarize itself with the terms of the draft 2006 Lease Amendment, this does not mean that the relevant contractual provisions were not standard terms for the purposes of the *contra proferentem* rule. The requirement that the other party have an opportunity to familiarize itself with the standard term is a condition for the standard term to become part of the parties' agreement (Section 205.B.1 of the Civil Code). It says nothing about whether the term in question is a standard term (Section 205.A.1). A term is standard when it was drafted by one party and not negotiated. This is the test for the application of the *contra proferentem* rule.

296.    In addition, according to the Claimants, if the Respondent is right that the 2006 wording of the pre-lease provision removed the contractual pre-lease right that existed in the 1999 version of the Lease, then this removal must be regarded as a surprise term. According to Section 205.B.2 of the Civil Code, surprise terms do not become part of the contract, unless they have been specifically notified. The Claimants received no such notification. Therefore, the removal of the contractual pre-lease right, if this indeed was the effect of Section 5.1 of the 2006 Lease Amendment, meant that the change never became part of the

agreement, and that the previous version of the contract that included the contractual pre-lease right continued to apply.

297.    Therefore, the Claimants validly exercised their contractual pre-lease right by a notice of 29 April 2014, resulting in the conclusion of a new lease agreement. The Respondent refused to give effect to the valid exercise of the Claimants' rights and eventually physically evicted the Claimants from the Land. These actions constitute an expropriation of the Claimants' contractual pre-lease right and of the new lease that was entered into as a result of the valid exercise of that right.

**(3)    Hungary expropriated the statutory pre-lease right**

298.    In any event, the Claimants argue that, even if they had no contractual pre-lease right, the Respondent expropriated their statutory pre-lease right by passing the 2011 Amendment, which prohibited its exercise in the context of NLA tenders. According to the Claimants, the pre-lease right that the legislation conferred on lessees of agricultural land was a vested right, guaranteeing legal certainty in order to induce investment. According to Professor Halmai, the 2011 Amendment was unconstitutional as it "deprived lessees of their acquired right to renew their leases without appropriate transitory rules or compensation".[233]

299.    The Claimants oppose Professor Menyhárd's interpretation of the Constitutional Court Decision in Case No. 16/2015, where the court held that the 2011 Amendment did not violate the principle of freedom of contract under the Constitution. According to the Claimants, this ruling determined that the 2011 Amendment was not a violation of the right to property, although this issue was not put to the court.[234] The only two judges on the court appointed before Fidesz's return to power issued a joint dissent. They held that the statutory pre-lease rights had been acquired "at the time of the execution of the lease contracts" and that they "had a concrete, quantifiable value", with the result that "depriving the lessees

---

[233] C-Reply, ¶288.

[234] C-Rejoinder, ¶¶ 68-74.

from this right, as an already acquired right, without compensation violates the principle of legal certainty, which is the theoretical basis of the protection of acquired rights".[235]

**(4)    Hungary's measures were not a lawful exercise of police powers**

300.    The Claimants dispute the Respondent's police powers defense. According to them, the doctrine of police powers applies in a limited set of circumstances and only in the context of regulatory expropriation, which is a form of indirect expropriation. Here, the Respondent directly expropriated the Claimants' rights, both by removing the leasehold rights and by physically seizing the Land. Thus, the doctrine of police powers is of no avail to Hungary.

301.    In addition, so say the Claimants, Hungary's measures served none of the grounds justifying the exercise of police powers, as they were not taken to protect public order and morality, human health or the environment. Even if they did, it would not absolve Hungary from the obligation to pay compensation for the expropriation. As the tribunal in *Pope & Talbot v. Canada* observed, "a blanket exception for regulatory measures would create a gaping loophole in international protections against expropriation."

302.    In any event, for the Claimants, the Respondent cannot validly invoke the police powers defense since it expropriated the Claimants' leasehold rights in an arbitrary and discriminatory manner. In particular, the 2011 Amendment nullified the pre-lease rights only in respect of tenders of State-owned land and not private land. If the government really aimed at promoting local and family farms, the policy should have applied to the leases of private land as well. The reason why the Government rid itself of existing acquired rights of incumbent lessees of State-owned land was political favoritism, a phenomenon which the Claimants describe by reference to a book published by Professor József Ángyán, who resigned from the government in protest in 2012. Professor Ángyán writes about what he calls the post-soviet mafia State set up by the Fidesz government. Among other examples, Professor Ángyán mentions that the sister-in-law of the Prime Minister's daughter won each of the tenders in which she bid because she was conveniently awarded much higher "subjective points" than other bidders for her business plan despite her low "objective

---

[235] Constitutional Court Decision 16/2015, C-192.

points", or that the Prime Minister's childhood friend, Mr. Lőrinc Mészáros, a former gas fitter and now Hungary's second richest man, owned no land in 2010 and now owns or leases over 36,000 hectares of agricultural land through family members and related companies.[236]

303.   According to the Claimants, contrary to Hungary's rhetoric that the land reform aimed at making the land available to local family farmers, only a minority of leases were in fact awarded to locals. The Respondent's reliance on the fact that the average surface area of the leases was 24.81 hectares is misleading. Behind this average there is an extremely unequal distribution where the top 1.9% of the winners were awarded 24-25% of the land and the top 0.4% of winners obtained 11% of the land. In addition, a significant portion of the State-owned land was leased to favored individuals without a tender.[237]

304.   The Claimants suggest that the Fidesz government deliberately acted with the covert agenda of political favoritism. When the Parliament passed the 2011 Amendment, the opposition harshly criticized the almost unfettered discretion that the NLA was accorded in distributing State-owned land by using the subjective scoring element for the "professional and commercial well-foundedness of the business plan".[238] Tellingly, the Claimants lost the Tenders precisely due to their low scores in this entirely subjective component of the scoring system.

305.   By contrast, the owner of a sister farm similar to that of the Claimants, Mr. Lorant Szasko, who is a founding member of the Fidesz party, won all 25 tenders that the NLA announced on his land. Were it not for the high subjective scores he received for his business plan, he would have lost 22 out of the 25 tenders.

306.   Dismayed with the public scrutiny, on 25 May 2013, Hungary amended the NLA Decree whereby, after awarding a lease, the NLA returned every bid to the bidders, with the exception of the winning bid, thereby rendering it impossible to make any comparison of

---

[236] C-Reply, ¶ 306; Financial Time Article 21 December 2017, C-194.

[237] Report of Dr. József Ángyán of 1 January 2014, C-67.

[238] C-Reply, ¶ 300.

the scoring of the bids.[239] The Respondent also eliminated the requirement to aggregate the landholdings of family members and related companies when calculating an individual's compliance with the legal maximum landholding, paving the way for the favored families to appropriate large tracts of land.

307.    In this respect, the Claimants allege that they "are aware, from their local knowledge, that several of the 'winners' of their tenders use and/or own large tracts of agricultural land through their families and related companies."[240] In the document production phase, the Tribunal ordered the Respondent to produce extracts from the Land Use Register and the Land Registry showing the total agricultural land used and/or owned by these winners and their families and companies. However, the Respondent failed to comply. According to the Claimants, "[t]he inference to be drawn is obvious".[241]

308.    Furthermore, it is the Claimants' submission that the government officials implementing Hungary's land policies did not veil their xenophobic motives, making statements such as: "we will protect Hungarian agricultural lands"[242] and "ensure that farmland, be it leased or owned, remains with Hungarian people";[243] "whoever owns the land owns the country";[244] and referring to "the battle against foreign penetration".[245]

309.    Nor were the Claimants afforded due process in the course of the expropriation. Besides being denied the opportunity to consult crucial tender documentation until ordered by this Tribunal, the Respondent handled the Claimants' physical eviction from the Land in disregard of its own laws, without giving a fair notice and using private security guards

---

[239] Section 23A of the NLA Tender Decree, C-60.

[240] C-Reply, ¶ 313, citing Hunter Second WS, ¶ 16; Minimum aggregate land holding estimates for certain winners of the tenders, C-197.

[241] C-Reply, ¶ 313; Claimants' email of 4 December 2018.

[242] Video footage and Ministry of Agriculture Press Release of July 2015, C-24.

[243] Public Statement of Dr. Fazekas in February 2014, C-69.

[244] NLA website, Greeting by Dr. Fazekas, July 2015, C-18.

[245] NLA website, Greeting by Dr. Fazekas, July 2015, C-18.

hired by the NLA, all despite the possessory protection orders that the Claimants had obtained from the local courts.

**B.    THE RESPONDENT'S POSITION**

310.    The Respondent opposes the expropriation claim. It submits that one category of the impugned measures – the alleged improper conduct of the Tenders – has no bearing on the expropriation claim as the Claimants had no vested right that was at stake at the time of the Tenders (1). For the Respondent, the expropriation claim also fails in respect of the alleged pre-lease rights, since the contractual pre-lease rights ceased to exist as a result of the 2006 Lease Amendment (2) and the statutory pre-lease rights conferred no vested right subject to expropriation (3). In any event, the Respondent argues that the 2011 Amendment was a lawful exercise of police powers that is not compensable under international law (4).

### (1)    The Tenders are irrelevant to the expropriation claim

311.    The Respondent points out that the manner in which the NLA conducted the Tenders has no connection with the alleged expropriation, since the Claimants cannot seek damages for the expropriation of a lease that Inícia did not hold. The Lease expired in July 2014 and Inícia's participation in the Tenders could thus not lead to the renewal of the Lease, but only to the conclusion of a new lease, which admittedly did not happen. At the time of the alleged "manipulation" of the Tenders, the Claimants neither held a lease; nor could they claim an unconditional right to win the Tenders. Hence, according to the Respondent, even assuming that the Tenders were biased to ensure that the Claimants lost, they could not give rise to an expropriation claim.

312.    In any event, the Respondent rejects the Claimants' allegation that the Tenders were manipulated. It argues that the circumstances on which the Claimants rely are either unsupported by evidence or irrelevant. Specifically, it makes the following submissions:

- The NLA did not communicate the winning bids to Inícia because Inícia had no legal right to receive full details of such bids. Inícia would only have been entitled to communication if it had an exercisable pre-lease right, which it did not. As for other tender documents, such as scoring sheets, Inícia and the NLA were engaged in domestic litigation on Inícia's right to access to that

information. However, as a sign of good faith, the Respondent promptly complied with the Tribunal's order to produce the relevant documents in this arbitration.[246]

▪ The Claimants' contention that they lost 15 out of the 16 Tenders on account of artificially low scores received for its business plan is demonstrably false. Even absent this component, which is worth 30 points out of a possible 105, Inícia would have failed in at least eight tenders. The scoring sheets reveal that in three instances, the winners prevailed against Inícia on all the other scores too.[247] In five further instances, Inícia's bids were simply disqualified as they did not attach all the required documentation.[248]

▪ The Claimants purport to compare their farm with the farm of Mr. Szajko, who won the tenders in respect of the land which his farm was leasing. They suggest that Mr. Szajko's farm was "similar" to theirs in "almost every respect".[249] There is, however, no evidence to support this assertion. In any event, the fact that Mr. Szajko won an unrelated tender says nothing about whether the Claimants lost the Tenders in an unfair manner.

▪ Similarly, the Claimants do not substantiate their allegation that the winners of the Tenders and their families hold large tracts of land. Even if Mr. Hunter's assertion that the winners lease hundreds or in some cases one thousand hectares of land were true, this would not exceed the permitted maximum landholding limit, which is 1,800 hectares.[250]

313. Therefore, the Respondent requests the Tribunal to dismiss the Claimants' submission concerning the conduct of the Tenders, as such conduct cannot constitute an expropriation and the claim is in any event unsupported by evidence.

---

[246] Procedural Order No. 2, Claimants' Requests No. 1 and 2.

[247] Tenders HU22-10197, HU22-10198, HU22-10206. See Point Scoring Sheet, Tender ID Number HU22-10197, C-148, Point Scoring Sheet, Tender ID Number HU22-10198, C-149, Point Scoring Sheet, Tender ID Number HU22-10206, C-153, at the bottom of p. 2, note entitled "Points without business plan".

[248] R-Rejoinder, ¶ 279, citing Point Scoring Sheet, Tender ID Number HU22-10234, C-158; Point Scoring Sheet, Tender ID Number HU22-10235, C-159; Point Scoring Sheet, Tender ID Number HU22-10274, C-160; Point Scoring Sheet, Tender ID Number HU22-10277, C-161; Point Scoring Sheet, Tender ID Number HU22-10278, C-162.

[249] C-Reply, ¶ 182.

[250] Hunter Second WS, ¶ 14.

### (2) Hungary did not expropriate the contractual pre-lease right

314. The Respondent submits that the Claimants had no contractual pre-lease right under the 2006 Lease Amendment and that, even if they had, the NLA's denial of the exercise of that right would constitute a breach of contract, not a violation of international law.

315. According to Hungary, while the 2006 Lease Amendment allowed Inícia to extend the Lease for 10 years, it envisaged that Inícia would give up the contractual pre-lease right that had figured in earlier versions of the Lease. In particular, it removed the language – "[i]n respect of these plots of land the lessor grants a pre-lease right to the current tenant" – present in Section 3.2 of the 1999 Lease Agreement[251] and substituted it with Section 5.1 of the 2006 Lease Amendment, which reads as follows:

> With regard to the plots of land subject to the lease, the Tenant enjoys a pre-emption right and a pre-lease right that may be exercised in accordance with the applicable laws effective at all times, and which may not be registered in the Land Registry.[252]

316. In 2017, the Metropolitan Court – a court with exclusive jurisdiction over disputes arising under the 2006 Amendment[253] – ruled unequivocally, so says the Respondent, that this language did not confer a contractual pre-lease right to Inícia.[254] As a consequence, only circumstances akin to denial of justice could empower the Tribunal to reopen this ruling. The Claimants do not allege such circumstances, but instead re-argue their case before this Tribunal on the ground that the Metropolitan Court's judgment is "not persuasive".[255] A treaty tribunal cannot assume a mandate of a global court of appeal, purporting to correct the local courts' interpretations of municipal law.

---

[251] 1999 Lease Agreement, C-38.

[252] 2006 Lease Agreement, C-40.

[253] Section 7.4 of the 2006 Lease Amendment, C-40 ("*The Parties to the current agricultural land lease contract declare to subject themselves exclusively to the jurisdiction of Pest Central District Court, and if the value of the subject of litigation warrants it, then to the exclusive jurisdiction of the Metropolitan Court, which will have competence regarding the legal relation of the lawsuit.*")

[254] Judgment of Second Instance No. 44.Pf.633.704/2017/14, 7 December 2017, C-105.

[255] C-Reply, ¶ 218.

317.    For the Respondent, the Claimants' unsupported contention that Inícia had filed a request for extraordinary review of the judgment of the Metropolitan Court to the Curia does not alter this analysis. As a matter of Hungarian law, a judgment of the Metropolitan Court is not subject to appeal.[256] While it can be subject to annulment, the annulment proceedings do not stay enforcement of the Metropolitan Court's judgment. As a result, the judgment must be deemed to carry *res judicata* effects.[257]

318.    In any event, so argues the Respondent, the Metropolitan Court's interpretation of Section 5.1 of the 2006 Lease Amendment is fully tenable. The Claimants' contrary arguments based on the rules *contra proferentem* and against surprise terms do not withstand scrutiny. Hungary does not contest that these provisions apply to standard contracts. However, as the opinion PK 2/2011 of the Curia holds, a contract is not a standard contract "if the consumer had a real opportunity to modify the contract term, meaning the party establishing the contract term in advance has actually made it possible for him to consider its content and to enforce his will in this regard."[258]

319.    According to the Respondent, it is undisputed that Inícia received a draft 2006 Lease Amendment in advance of the signature. Yet, it did not use this opportunity to seek changes to the contract, unlike other lessees who concluded their leases contemporaneously. For instance, the lessee involved in the *Gyula* litigation succeeded in including the clause providing for the pre-lease right into the amended lease contract.[259] Consequently, the

---

[256] Pursuant to Section 218 of the 1952 Hungarian Code of Civil Procedure (the "1952 CPP"), a decision that cannot be appealed becomes final upon its publication. Sections 233 and 233A of the 1952 CCP provide an exhaustive list of decisions subject to appeal. This list does not include the judgments of a court of second instance, such as the judgment of 7 December 2017 rendered by the Metropolitan Court (See Extracts from the 1952 Hungarian Code of Civil Procedure, R-33).

[257] Pursuant to Section 275 of the 1952 CPP, extraordinary review by the Curia can lead to the annulment of a final decision. However, Section 273(3) of the 1952 CPP specifies that a petition for review does not have the effect of staying enforcement of the decision subject to review (See Extracts from the 1952 Hungarian Code of Civil Procedure, R-33).

[258] Opinion PK 2/2011 of the Supreme Court, R-34. This decision was rendered by the Court in the context of consumer contracts (private individuals). The rational applies *mutatis mutandis* and, even so more, to contracts concluded with business entities.

[259] RCM, ¶ 448. The relevant provision in the *Gyula* litigation granted the pre-lease right as follows "the lessee acknowledges that the pre-emption and pre-lease right provided under this amendment to the contract, and further by law", See *Gyula* litigation documents: Judgment of First Instance (No. 1.P.20.249/2015/7) dated 16 June 2015, C-

terms of the 2006 Lease Amendments were open to negotiation. The Claimants' reliance on the result of the *Gyula* litigation is misplaced.

320. In any event, the invocation of the rule *contra proferentem* is inapposite for yet another reason. According to the Respondent, this rule applies when contractual terms are ambiguous. Section 5.1 of the 2006 Lease Amendment clearly refers to a pre-lease right that "may be exercised in accordance with the applicable laws effective at all times". These words unambiguously refer to the statutory pre-lease right. The fact that the Parties diverge on the interpretation of the provision is not sufficient to conclude that a provision is ambiguous.

321. Similarly, in respect of the rule on surprise terms embodied in the Civil Code, the Respondent contends that, even if Section 5.1 were to be regarded as a surprise term, the only consequence would be that it would be unenforceable. It would not mean that the pre-lease provision of the 1999 Lease Agreement would be reinstated. And, even if Section 3.2 of the 1999 Lease Agreement were reinstated, that lease and any pre-lease right it established would in any event have expired in 2009, *i.e.* well before Inícia purported to exercise the pre-lease right in 2014.

322. For these reasons, the Respondent requests the Tribunal to reject the Claimants' attempt to re-litigate issues of national law which the Hungarian courts with exclusive jurisdiction have already resolved.

323. Finally, Hungary argues that even if the Tribunal were to find that Inícia was entitled to the contractual pre-lease right, the NLA's refusal to comply with this right would constitute no more than a contractual breach. Hungary has not passed any legislative or administrative measures prohibiting the exercise of a contractual pre-lease right. The Claimants' argument that the NLA had the status and function of a State organ is misconceived. Status and function of a given body can be relied upon to determine whether an entity is an emanation of a State and whether its acts are attributable to the State. However, they cannot establish

---

109; Judgment of Second Instance (No. 9.Pf.25.447/2015/7), 19 October 2015, C-110; Judgment of the Curia (No. Pfv.V.20.054/2016/10), 2 March 2016 ("the Gyula Case"), C-113.

whether the acts complained of in a particular instance were committed in the exercise of sovereign power. Numerous treaty tribunals have clearly stated that a simple denial of a contractual right by a State party amounts to a breach of contract, as opposed to an internationally wrongful act.[260]

324. The NLA's denial of Inícia's alleged contractual pre-lease right arose in the course of ordinary business between a landlord and a tenant. The same observation applies to the alleged "'attempt to take back possession of the land on 25 July 2014,' the purported 'transfer of possession of the land in October 2014' and the 'physical eviction […] using private armed security guards.'"[261] Here too, the NLA acted as an ordinary landlord without resorting to government prerogatives. Its conduct is therefore not subject to scrutiny under the BIT.

### (3)    Hungary did not expropriate the statutory pre-lease right

325. The Respondent further counters the Claimants' allegation that it expropriated Inícia's statutory pre-lease right. It submits that the statutory pre-lease right is not a vested right under international or Hungarian law. Instead, it is a right conferred by general legislation which can change based on policy considerations and bear circumstances. In this context, it is undisputed that the Claimants never received any assurances that the legislation would remain unchanged.

326. The Respondent refers to decisions of investment treaty tribunals, according to which, in the absence of specific assurances, the State retains the power to change its laws.[262] The distinction that the Claimants draw arguing that the present case is a direct not an indirect expropriation is unavailing. The 2011 Amendment did not directly remove the statutory

---

[260] *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, 18 June 2010, RL-98, ¶¶ 190-191; *United Parcel Services of America Inc v. Government of Canada*, Award on the Merits, 24 May 2007, RL-99, ¶¶ 63-78; *Consortium RFCC v. Morocco*, CL-59, ¶¶ 51, 65.

[261] R-Rejoinder, ¶ 379, citing C-Reply, ¶ 208.

[262] *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/8, Award, 11 September 2007, RL-53, ¶ 332.

pre-lease right; it only limited the exercise of that right in connection with the tenders organized by the NLA. Thus, it was not a measure of direct expropriation.

327.     The Constitutional Court of Hungary confirmed that the statutory pre-lease right is not a vested right. It held that statutory pre-lease right holders must consider "that the law may change."[263] The Claimants and their legal expert Professor Halmai purport to rebut this settled law by reference to the principles of "legal certainty" and "lawful expectations" arguing that "the 2011 Amendment was unfair and unjustified (and therefore unconstitutional)."[264] This does little to show that Hungary's measures were expropriatory. The Contracting States to the BIT limited the Tribunal's mandate to deciding disputes exclusively in respect of expropriatory conduct, and the Tribunal ought to respect this undisputed limitation.

### (4)     Hungary exercised police powers

328.     The Respondent contends that the 2011 Amendment was a regulatory measure carried out within the bounds of its police powers. It opposes the Claimants' argument that the doctrine of police powers applies only to indirect expropriations on two grounds. First, numerous tribunals have referred to the police powers doctrine when assessing the existence of a direct expropriation.[265] Second, the 2011 Amendment was not a direct expropriation as it did not remove or invalidate Inícia's statutory pre-lease right. It merely restricted its exercise in the context of NLA tenders. The defense of police powers is therefore available to the Respondent.

---

[263] Constitutional Court 16/2015 (VI.5) AB hat, 5 June 2015, R-16, ¶¶ 130-131.

[264] R-Rejoinder, ¶ 407, citing C-Reply, ¶ 288.

[265] *Burlington v. Ecuador*, RL-60, ¶ 506: "[U]nder the standard applicable to direct expropriation […] a State measure constitutes expropriation under the Treaty if (i) the measure deprives the investor of his investment; (ii) the deprivation is permanent; and (iii) the deprivation finds no justification under the police powers doctrine."; See, also *Quiborax S.A. and Non Metallic Minerals S.A. v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Award, 16 September 2015 ("*Quiborax v. Bolivia*"), CL-15, ¶ 200: "The tribunal in *Burlington* which the Claimants cite, articulated the standard for a direct expropriation as follows: 'a State measure constitutes expropriation under the Treaty if (i) the measure deprives the investor of its investment; (ii) the deprivation is permanent; and (iii) the deprivation finds no justification under the police powers doctrine.' This Tribunal agrees with this enunciation of the relevant standard."

329.    The Respondent strongly denies the Claimants' allegations that Hungary's organs, including the government and the legislature, had ulterior motives of political favoritism and xenophobia with respect to the land reform. When implementing the land reform, Hungary states that it acted in pursuit of the common welfare objective of "promoting the establishment of viable family farms".[266] As the primary means to implement its newly defined landholding policies, Hungary introduced a tender procedure in 2010. The system of statutory pre-lease rights was incompatible with the tender system because it prevented the redistribution of the State-owned land on the basis of the criteria established for the tender. This incompatibility was admitted by Professor Ángyán, the former politician on whose politically-biased 2014 report the Claimants rely.[267] The 2011 Amendment, which proscribed the exercise of statutory pre-lease rights in the context of the NLA tenders, evidently aimed at implementing Hungary's general welfare objectives.

330.    In addition, the Parliament passed the 2011 Amendment in accordance with standard legislative procedures, involving multiple rounds of consultation and the implementation of many of the opposition's comments. As a result, the opposition supported the bill.[268]

331.    For the Respondent, the Claimants' contentions of manipulation of the Tenders are also unfounded. The report of the Supervisory Committee of the NLA, which the Claimants invoke, concluded that the tender evaluation system was in line with Hungarian law and landholding policy.[269]

332.    Professor Ángyán's bold statement that the tenders did not achieve the stated public policy objectives does not help the Claimants' case either. While the land reform may not have been as successful as the government had hoped, it still achieved important results. In particular, the number of tenants rose drastically from 600 in 2010 to 7500 in 2015. Nearly

---

[266] Section 1(3)(a) of the 2010 NLA Act, R-12.

[267] R-Rejoinder, ¶ 420, citing Parliamentary speech of Dr. József Ángyán of 28 May 2013, R-35.

[268] Agricultural Committee Minutes of 28 June 2011, C-47.

[269] R-Rejoinder, paras. 429-432; NLF Supervisory Report of 22 March 2012, R-37 (additional translation of the original text in C-66)

85% of these new tenants were natural persons, and 21% of them were under the age of 40. The average size of the land awarded by tender was 24.81 hectares.[270]

333.    As to the 16 Tenders in which Inícia participated, Inícia's low scores for the subjective business plan element did not determine the outcome. In line with the policy objectives of the land reform, the Land was awarded to 16 farmers all of whom were locals. Six of the winners were family farmers, six were individual entrepreneurs and four were primary producers. Moreover, seven winners were young farmers and five were new entrants.[271] The Claimants supply no evidence that the winners of the Tenders were politically favored individuals affiliated with the Fidesz party or otherwise related to the government.

334.    Similarly unsupported is the Claimants' contention that Hungary abolished the maximum landholding limitation applicable to family members in order to benefit families with connections to politicians. According to the Respondent, this abolishment contributed to the government's aim of keeping local farmers, who often belong to the same family, from migrating to the cities and abandoning the agricultural sector.[272]

335.    The Claimants' allegations of discrimination should also be dismissed, so pleads Hungary. None of their brandish allegations of xenophobic motives relate to the 2011 Amendment. As for the Claimants' assertion that the 2011 Amendment "only applied in the context of tenders for leases of State-owned, and not privately owned, land",[273] the Respondent points out that there are objective differences between State-owned land and leases for privately-owned land, which cannot therefore be compared. In particular, leases of State-owned land can be attributed only by means of a public tender and benefit from significantly lower rental fees.[274]

---

[270] RCM, ¶ 159; Summary of Results of the "Land for Farmers" Programme 2010-2015, R-19, p. 2.

[271] Point Scoring Sheets of NLA, C-147 to C-162.

[272] R-Rejoinder, ¶ 450.

[273] CM, ¶ 268.

[274] R-Rejoinder, ¶ 466.

336.    Finally, Hungary challenges the Claimants' allegation that Inícia's eviction did not follow due process. At the time of the eviction, the Claimants no longer had possessory title to the land. Thus, the NLA acting in its capacity of a landlord secured the eviction after giving multiple notices to Inícia to vacate the Land. As Professor Menyhárd explains, the orders that the Claimants had obtained from local authorities did not create a legal title to possession.[275] In any event, even assuming that the eviction of Inícia had breached these orders, that would at most constitute a violation of a temporary procedural right – not a taking of the leasehold right. In addition, the intervention of the private security guards did not occur until after the Pest District Court had rejected Inícia's claims to the pre-lease rights in their entirety in October 2014.[276] The claim of a breach of due process is therefore without merit.

337.    For these reasons, the Respondent requests the Tribunal to declare that the 2011 Amendment was a valid exercise of police powers and therefore did not constitute a compensable expropriation.

## C.   ANALYSIS

338.    The Claimants allege an expropriation of their leasehold rights. According to them, these rights include the following four categories: (i) the contractual pre-lease right under the Lease, (ii) the renewed lease agreement created by Inícia's exercise of the contractual pre-lease right through its letter of 29 April 2014,[277] (iii) the right to damages arising out of the NLA's manipulation of the Tenders, and (iv) the statutory pre-lease right, the exercise of which was prevented by the 2011 Amendment.

339.    In its analysis of liability, the Tribunal will first review Hungary's measures in terms of expropriation of the statutory pre-lease right (1). Given the conclusion which it will reach, in respect of such right, it will dispense with the analysis of the alleged expropriation of the remaining categories of the purported leasehold rights. Thereafter, the Tribunal will

---

[275] Menyhárd Second ER, ¶¶ 57, 58.

[276] Judgment of First Instance (No. 25.P.52.795/2014) 21 October 2014 ("the Inícia Case"), C-115.

[277] Letter of 29 April 2014 from Inícia to the NLA, C-20; CM, ¶ 78.

assess whether the 2011 Amendment constituted a non-compensable exercise of Hungary's police powers (2). Finally, it will turn to the lawfulness of the expropriation under Article 6 of the BIT (3).

**(1)      Did the 2011 Amendment expropriate the statutory pre-lease right?**

340.    It is common ground between the Parties that the 2011 Amendment prohibited the exercise of statutory pre-lease rights in relation to the NLA tenders. The Parties also agree that, at the time when the statute was passed, Inícia had a valid statutory pre-lease right under Hungarian law. The Respondent argues, however, that such statutory pre-lease right is not capable of being expropriated.

341.    The Parties made it clear in their answers to the Tribunal's questions that international law governs the question whether a particular right can be expropriated.[278] By contrast, the existence and content of the right is subject to national law. Thus, while the expert evidence provided by the Parties in respect of rights capable of being expropriated within the meaning of Hungarian constitutional law may be helpful by analogy, it is not dispositive. The Tribunal must conduct an analysis under the BIT and international law in order to determine what types of rights or interests are protected under Article 6 of the BIT.

342.    Article 6 of the BIT prohibits the expropriation of "the investments of investors", except for a public purpose, with due process, in a non-discriminatory manner and against compensation. Article 1 of the BIT in turn defines the term "investment" as "every kind of asset connected with economic activities which has been acquired since 31 December 1972".[279] In this context, the Respondent argues that "a right that is not vested or acquired as a matter of International Law is not susceptible of expropriation."[280] Be this as it may, at the time of the 2011 Amendment, the Claimants did hold a vested right in the form of the statutory pre-lease right, as will be further addressed below.

---

[278] Transcript, Day 4, 824:13-14, 912:21-913:2.

[279] UK-Hungary BIT, CL-1.

[280] Transcript, Day 4, 913:12-14.

343.    The doctrine of acquired or vested rights is well recognized in international and municipal
laws. In the words of the *Aramco* tribunal:

> The principle of respect of acquired rights is one of the fundamental
> principles both of Public International Law and of the municipal law
> of most civilized States.[281]

344.    The term expropriation used in Article 6 of the BIT should be interpreted in light of this
doctrine as mandated by Article 31(3)(c) of the VCLT. The doctrine suggests that, while
the State may change general statutes based on its policy decisions, where the statute
provided for a possibility of acquiring rights with economic value and a private party
availed itself of this possibility, subsequent regulatory changes must respect that vested
right.[282] As an example, a State can well change the rules applicable to pension
entitlements. However, if an individual has acquired a right to pension entitlements under
the existing statute, *e.g.* because he or she has reached the relevant retirement age, the
detrimental legislative change must comply with this vested right.

345.    *EnCana v. Ecuador*, to which both Parties referred in the closing submissions, is helpful in
this respect. There, the tribunal recognized that, although a State is free to change its laws,
it may be held liable for expropriation if it retrospectively invalidates vested rights:

> In the Tribunal's opinion, a law which cancels a liability the State
> already has to an investor [...] is capable of amounting to
> expropriation. The right under the law of the host State to refunds of
> VAT in respect of the past acquisition of goods and services is a
> material benefit, and it does not matter whether refunds take the
> form of tax credits or rights to actual payment of the amount due.
> There is an important distinction here between a law which changes
> the incidence of taxation in respect of future transactions and one
> which seeks to do so retrospectively. If the State wishes to provide
> by law that in respect of future transactions there is liability to VAT
> and no right to a refund, then *prima facie* at least that falls within

---

[281] *Saudi Arabia v. Aramco*, Award, ILR 1963, at 117 et seq; See also, Permanent Court of International Justice,
German Interests in Polish Upper Silesia (Merits), Judgment of 25 May 1926, 1926 PCIJ Series A, No. 7, p. 22;
German Settlers in Poland, Advisory Opinion of 10 September 1923, 1923 PCIJ Series B, No. 6, p. 362.

[282] Lalive, "The Doctrine of Acquired Rights", in *Rights and Duties of Private Investors Abroad* 145 (1965), RL-52,
165; *EnCana Corporation v. Republic of Ecuador*, LCIA Case No. UN3481, Award, 3 February 2006 ("*EnCana v.
Ecuador*"), ¶ 183.

the scope of its normal prerogative to determine and vary the incidence of a tax. But once a right to a refund has accrued in respect of past transactions (so that all that remains is the question of accounting for receipts and payments) the corresponding right to be paid is capable of falling within the broad scope of "amounts yielded by an investment", and it does not matter that the right arises under the public law of the State concerned.[283]

346.    The *EnCana* tribunal made a crucial distinction between rights (to VAT refunds) that had accrued and rights that had not yet accrued at the time when Ecuador passed the 2004 Act that suppressed these rights. According to the tribunal, "it is for Ecuador to determine for the future the regime of its tax law". However, the "position is different with respect to the period before 2004,"[284] as the rights that accrued prior to the legislative change attracted protection from uncompensated taking.

347.    Throughout its written and oral submissions, Hungary heavily relied on the fact that the statutory pre-lease right was a right provided by general legislation, which the State could modify for policy reasons. The State's power to change its laws based on its policy determinations is unquestioned. This power must, however, be exercised in compliance with the international obligations of the State, including those in the field of the protection of investments. International law, and in particular the non-expropriation standard contained in Article 6 of the BIT, provides a certain degree of protection for vested rights. If a general statute gives private parties a possibility to acquire rights of economic value, changes to that legislation should not affect rights that had already been acquired under the statute. In this sense, the doctrine of vested rights is closely intertwined with the principles of non-retroactivity and legal certainty.

348.    This said, a distinction must be drawn between a statute conferring mere privileges or powers on private parties and the latter's subsequent exercise of these powers by acquiring what can be regarded as a vested right, *i.e.* an entitlement that is correlated with duties of a specific counterpart.

---

[283] *EnCana v. Ecuador*, ¶ 183.

[284] *EnCana v. Ecuador*, ¶¶ 187-188.

349.    The 1994 Arable Land Act provided the right (better termed a power) for any eligible person to enter into a lease agreement and thereby acquire a statutory pre-lease right. This power is not itself a vested right or an asset, and therefore the State could in principle change it without compensation.[285] In turn, once a private party availed itself of this power and entered into a lease agreement, that party will hold a vested right.

350.    Thus, while the Respondent was at liberty to change its laws and remove or otherwise alter the provision allowing to enter into a lease agreement and acquire a statutory pre-lease right, the private parties who had previously availed themselves of this possibility by entering into specific lease agreements had vested rights that ought to have been respected.

351.    It is undisputed that the 2011 Amendment contained no transitory arrangements, nor did it exempt pre-lease rights of incumbent lessees.

352.    The question that remains is whether the statutory pre-lease right was among the vested rights that a lessee acquired by entering into a lease agreement. In the affirmative, the 2011 Amendment would be deemed expropriatory, because it prevented the Claimants from exercising their statutory pre-lease right and failed to exempt vested pre-lease rights under incumbent leases.

353.    The Claimants' legal expert Professor Halmai opined that the statutory pre-lease right was a vested right as of the conclusion of the relevant lease agreement.[286] He explained his opinion in reference to the legislative intent behind the statutory pre-lease right, which was to induce long-term investment in the agricultural sector and, for that purpose, to enhance legal security for the lessees. As for the Respondent's legal expert Professor Menyhárd, he called the pre-lease right a vested right in his expert report.[287] However, at the Hearing, he preferred not to elaborate, given his expertise in private law.[288]

---

[285] Provided that other general limitations, such as non-arbitrariness, non-discrimination and due process are respected.

[286] Transcript, Day 3, 667-668.

[287] Menyhard Second ER, ¶ 19.

[288] Transcript, Day 3, pp. 749-753.

354.    Professor Halmai's opinion is substantiated by the dissenting opinion of a judge of the Constitutional Court, who reasoned that, by passing the 2011 Amendment, "the legislator deprived the above lessees [i.e. the lessees that had lease agreements at the time of the entry into force of the 2011 Amendment] of a right with a property value that they acquired already at the time of the execution of the lease contracts".[289] Notably, the majority of the court did not address whether the 2011 Amendment could amount to an expropriation of vested rights in violation of the right to property, since this question as such was not before the court.

355.    The opinion of Professor Halmai appears convincing. If one bears in mind that enterprises and foreign nationals are barred from owning agricultural land in Hungary, land lease agreements largely fulfil the same functions as property rights. As the Claimants explain, investments in the agricultural sector take time. In order to encourage long-term investments, the 1994 Arable Land Act provided for a pre-lease right, but this right could only induce long-term investments if the lessees could rely on it when entering into lease agreements.

356.    It is certainly true that the exercise of the pre-lease right is subject to conditions. However, as Professor Halmai rightly notes, the conditional nature of a right does not negate its existence or its nature as a vested right.  For instance, as the Respondent observed, when making a long-term investment in reliance on the lease and the pre-lease right, the lessee should consider the possibility that, upon the expiry of the lease, the owner may decide to use the land, in which case the pre-lease right could not be exercised. While this is true, Mr. Hunter correctly remarked that the risk that the State would decide to become a farmer instead of leasing its land was negligible.[290] And indeed, it is not the materialization of this risk that made the exercise of the pre-lease right impossible for Inícia. It was the legislative act that proscribed the exercise of pre-lease rights, without providing exceptions for lessees that had already acquired the pre-lease right under the incumbent lease agreements.

---

[289] Constitutional Court Decision 16/2015, C-192, ¶ 185.

[290] Transcript Day 1, 190:22-191:6.

357.    The Respondent further points to the pre-lease clause in the 2006 Lease Amendment, according to which a pre-lease right "may be exercised in accordance with the applicable laws effective at all times".[291] This language subjects the exercise of the contractual pre-lease right to the applicable law. It has no bearing, however, on the statutory pre-lease right, the exercise of which is restricted by the 2011 Amendment in the following terms:

> In case of leasehold of rural land or farm, a pre-lease right arising from legal regulations may not be exercised.[292]

358.    The nature and scope of the *statutory* pre-lease right must be assessed by reference to the relevant statute, *i.e.* the 1994 Arable Land Act. Pursuant to Section 21 of that Act, a lessee of a usufructuary lease was entitled to a pre-lease right.[293]  As described above, given the purpose and context of this statutory provision, the entitlement to and the reliance on the pre-lease right arose upon the conclusion of a usufructuary lease agreement. Thus, Inícia's entitlement to the statutory pre-lease right existed by virtue of Section 21 of the 1994 Arable Land Act and of the Lease. The contractual pre-lease clause does not alter the nature and scope of the statutory pre-lease right. Indeed, even if the 2006 Lease Amendment contained no pre-lease provision at all, Inícia would still benefit from the statutory pre-lease right under Section 21 of the 1994 Arable Land Act because it had entered into a usufructuary lease agreement.

359.    The Parties have also debated whether the pre-lease right is a right *in rem* or not. That debate seems largely inapposite for the purposes of this analysis. As the Parties' legal experts confirmed, the scope of the rights protected from expropriation is not congruent with the closed list of *in rem* rights in civil law.[294] While the dichotomy between *in rem* and *in personam* rights has its place in determining the rights and obligations of private parties vis-à-vis one another, the prohibition of uncompensated expropriation is a rule restricting the State authority towards private parties. Because of the different legal functions involved, the civil law dichotomy should not be mechanically transposed into

---

[291] 2006 Lease Agreement, C-40, Section 5.1.

[292] Act CI of 2011 on the amendment of certain acts relating to agricultural land, 19 July 2011, C-45, Article 11.

[293] The 1994 Arable Land Act, 27 July 1994, R-4, Section 21.

[294] Transcript, Day 3, 629:20-630:20 (Halmai); Menyhárd Second ER, ¶¶ 11-13.

public law. Indeed, it would be excessively formalistic and not consonant with economic reality, if the BIT protected a usufruct-holder from an uncompensated taking, while at the same time withholding that protection from a lessee with a pre-lease right for the sole fact that such right is not *in rem*.

360. It does not appear disputed that the function of the statutory pre-lease right was to guarantee stability and legal certainty for lessees of agricultural land, and thus induce long-term investments. In a situation where corporations and foreign nationals were barred from owning agricultural land, the pre-lease right brought stability of the lease that was viewed as a functional alternative to ownership. For these reasons, the Tribunal shares Professor Halmai's opinion that, due to the pre-lease right, the lease fulfilled the same function as ownership in terms of the investor's expectations of legal certainty and stability. As a result, the pre-lease right must be deemed to benefit from the protection against uncompensated State interference. In other words, a deprivation of already vested pre-lease rights should have been accompanied by compensation even if the State acted with a legitimate public purpose, evenhandedly and with procedural propriety.

361. Finally, the Parties have discussed whether the statutory pre-lease right has a financial value.[295] It seems evident that a right, albeit a conditional one, to extend a lease agreement has a financial value as the right-holder is in an economically more advantageous position than a lessee without a similar right. The financial value of a pre-lease right can also be seen from the market practice, whereby incumbent lessees sometimes appoint third persons to exercise the pre-lease right in their stead in exchange for consideration.[296] The fact that the value of the pre-lease right may be difficult to quantify does not mean that the right lacks value. The Respondent's own valuation expert sought to convince the Tribunal that the value of the pre-lease right could be established independently by using freehold ownership as a proxy.[297]

---

[295] Under Article 1(1)(iii) of the BIT, one of the examples of an asset constituting and investment is "claims to money and other assets or to any performance under contract having a financial value", CL-1.

[296] Transcript, Day 3, pp. 723-724.

[297] Versant Second ER, ¶¶ 180-181.

362.    For these reasons, while Hungary was at liberty to remove or otherwise alter the statutory pre-lease provision contained in the 1994 Arable Land Act in a prospective manner, such a change should not have applied retrospectively to already vested rights. Or else, the State should have provided compensation. Specifically with respect to the Claimants' investment, the 2011 Amendment resulted in the expropriation of the statutory pre-lease right that Inícia had acquired pursuant to the 1994 Arable Land Act by entering into the Lease.

363.    Having reached this conclusion, the Tribunal dispenses with analyzing whether the Respondent also expropriated Inícia's contractual pre-lease right, or whether such right was extinguished as a result of the 2006 Lease Agreement. Subject to the police powers defense addressed in the next section, the finding that Hungary expropriated Inícia's statutory pre-lease right suffices to hold Hungary liable for the harm caused to the Claimants as a result of the loss of the Lease. Had the 2011 Amendment carved out the pre-lease rights of incumbent lessees, Inícia would in all likelihood have exercised that right and kept its Lease. Therefore, a finding that the contractual pre-lease right was also expropriated would have no impact on the assessment of damages. Nor would the claims concerning the alleged manipulation of tender results have an independent impact on the quantification of the loss. Therefore, for reasons of judicial economy and procedural efficiency, the Tribunal will dispense with addressing these additional issues.

### (2)    Was the 2011 Amendment a non-compensable regulatory measure?

364.    Investment treaty jurisprudence recognizes that, in certain circumstances, a *bona fide* exercise of the State's right to regulate is exempt from the duty to provide compensation.[298] That being said, creating an unqualified exception from the duty of compensation for all regulatory measures would hardly be compatible with the language of non-expropriation

---

[298] *Crompton (Chemtura) Corp. v. Government of Canada*, UNCITRAL Award, 2 August 2010 ("*Chemtura v. Canada*"), ¶ 266; *Philip Morris Brands Sàrl, Philip Morris Products S.A. and Abal Hermanos S.A. v. Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Award, 8 July 2016 ("*Philip Morris v. Uruguay*"), ¶ 305; see also, Harvard Draft Convention on the International Responsibility of States for Injuries to Aliens; Third Restatement of the Foreign Relations Law of the United States (1987); OECD Working Paper on Indirect Expropriation and Right to Regulate.

provisions of investment treaties, such as Article 6 of the BIT, which require compensation for direct and indirect expropriation even if the measures at issue are for a public purpose, non-discriminatory and compatible with due process of law. As the tribunal in *Pope & Talbot v. Canada* warned, such blanket exception "would create a gaping loophole in international protections against expropriation."[299]

365.    There is no comprehensive test that may be used to distinguish regulatory expropriation, for which compensation is required, from an exercise of police or regulatory powers, which does not give rise to a duty of compensation. In the words of *Saluka v. Czech Republic*, "international law has yet to identify in a comprehensive and definitive fashion precisely what regulations are considered 'permissible' and 'commonly accepted' as falling within the police or regulatory power of States and, thus, non-compensable."[300]

366.    This being so, a review of investment awards shows that measures annulling rights of the investor – as in the present case – can be exempt from the otherwise applicable duty of compensation only in a narrow set of circumstances. These circumstances can be categorized in two broad groups:

- First, the exemption from compensation may apply to generally accepted measures of police powers that aim at enforcing existing regulations against the investor's own wrongdoings, such as criminal, tax and administrative sanctions, or revocation of licenses and concessions.[301] It is evident that the 2011 Amendment does not pertain to this group.

- The second group consists of regulatory measures aimed at abating threats that the investor's activities may pose to public health, environment or public

[299] *Pope & Talbot Inc. v. The Government of Canada*, UNCITRAL, Interim Award, 26 June 2000, CL-64/RL-61, ¶ 99; See also, *Marvin Roy Feldman Karpa v. United Mexican States*, ICSID Case No. ARB(AF)/99/1, NAFTA, Award, 16 December 2002, ¶ 105.

[300] *Saluka Investments B.V. v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006 ("*Saluka v. Czech Republic*"), RL-54, ¶ 263.

[301] *Invesmart, B.V. v. Czech Republic*, UNCITRAL, Award (Redacted), 26 June 2009, RL-55; *Tza Yap Shum v. Republic of Peru*, ICSID Case No. ARB/07/6, Award, 7 July 2011; *Saluka v. Czech Republic*, RL-54; *RosInvestCo UK Ltd. v. Russian Federation*, SCC Case No. V079/2005, Final Award, 12 September 2010.

order.[302] This line of case law relates to measures such as the prohibition of harmful substances, tobacco plain packaging, or the imposition of emergency measures in times of political or economic crises. The 2011 Amendment does not fall in this group either.

367.   It rather emerges from the record that the 2011 Amendment was inspired by Hungary's decision to change its agricultural land holding policy. While Hungary was fully entitled to change its policies, in doing so it was required to respect vested rights. In other words, it is not immediately apparent why this policy change - which purportedly benefited Hungarian society as a whole - should have been carried out at the expense of the Claimants' vested rights. Unlike in the above two groups of situations, there is no rationale that would justify exempting Hungary from its duty to pay compensation under Article 6 of the BIT.

### (3)   Was the expropriation lawful?

368.   It is undisputed that Hungary has not compensated the Claimants for the expropriation of their statutory pre-lease right. Thus, the expropriation is unlawful for lack of compensation. Whether an expropriatory measure is unlawful for additional reasons may have an impact on the calculation of damages in certain instances.

369.   Most importantly, a finding that expropriation is unlawful for reasons other than the lack of compensation may entitle a claimant investor to request compensation for the value of the expropriated asset on an *ex post* basis, *i.e.* on the date of the award.[303] Yet, in the present case, the Claimants seek the value of their leasehold rights *ex ante*, *i.e.* as of July 2015, which is the date of their eviction from the Land.

370.   They do so by subtracting the value of the Farm without the Lease from the value of the Farm with the Lease. This approach seems to yield the value of the expropriated pre-lease rights. Indeed, without expropriation of their pre-lease right, the Claimants would in all

---

[302] *Chemtura v. Canada*; *Methanex Corporation v. United States of America*, UNCITRAL, Final Award on Jurisdiction and the Merits, 3 August 2005, RL-109; *AWG Group Ltd. v. The Argentine Republic*, UNCITRAL, Decision on Liability, 30 July 2010; *Philip Morris v. Uruguay*.

[303] See *Quiborax v. Bolivia*, CL-15, ¶¶ 370-383.

likelihood have renewed the lease by matching the offers made by the winners of the Tenders. The Respondent's valuation expert concedes that "the lost value of the leasehold rights could be quantified by comparing the value of the Farm with and without those rights. In other words, the difference in the value of the Farm with and without the leasehold rights is equal to the lost value of those rights."[304] Therefore, the Claimants do not appear to be claiming more than "the fair market value of the investment expropriated immediately before the expropriation", which is the compensation standard for lawful expropriations under Article 6 of the BIT. Thus, in this respect, it makes no practical difference whether the expropriation is unlawful for reasons other than lack of compensation.

371.   Another aspect of the valuation for which a finding of lawfulness may theoretically make a difference is pre- and post-award interest. However, Article 6 of the BIT requires an award of interest "at a normal commercial rate". As explained in the relevant section below, even if the principle of full reparation is applied, the Claimants would not be entitled to more than a normal commercial rate of interest in the circumstances of the present case.

372.   Therefore, the Tribunal comes to a conclusion that it may dispense with determining whether the expropriation was unlawful for reasons other than lack of compensation.

---

[304] Sequeira First ER, ¶ 46.

# VI.    QUANTUM

373.    The Parties are in dispute about the calculation of the damages allegedly suffered by the Claimants as a result of the Respondent's conduct. Each of them relied on a valuation expert to support its position.

## A.    THE CLAIMANTS' POSITION

374.    The Claimants seek compensation for the expropriation of the pre-lease right. They rely on a valuation expert report by Mr. James Gilbey of Mazars LLP, who primarily valued the expropriated leasehold by comparing the actual value of the Farm (without the leasehold rights) with the but-for value of the Farm (with the leasehold rights).[305] More precisely, Mr. Gilbey valued the leasehold rights by reference to the stream of profits that those rights could have been expected to produce for the Claimants' farming business if they had not been expropriated.[306] The but-for scenario thus assumes that the Lease would be renewed for 20 years starting from 2014.[307]

375.    As for the valuation date, Mr. Gilbey considered that the expropriation crystalized in July 2015, which is the time of the physical eviction of the Claimants. He thus took July 2015 as the valuation date.

376.    Further, the Claimants seek to rebut the Respondent's criticism that Mr. Gilbey calculated the but-for value of the Farm on an *ex ante* basis, *i.e.* in July 2015, while he assessed the actual value *ex post*. According to the Claimants, for the actual value, Mr. Gilbey used July 2015 as a valuation date, but he used "actual cash-flows for the years up to and including 2017", instead of projecting hypothetical cash flows from 2015 on.[308] For the event that the Tribunal accepts the Respondent's criticism, Mr. Gilbey prepared a "secondary"

---

[305] C-Reply, ¶ 337; Mazars First ER, ¶¶ 2.2.5-2.2.8.

[306] C-Reply, ¶ 343.

[307] Mazars First ER, ¶ 2.2.7.

[308] Mazars Second ER ¶ 2.3.10.

valuation, which only takes into account *ex ante* data for both the but-for and the actual values of the farm.

377.    The Claimants also reject the Respondent's allegation that they have failed to mitigate the loss. They point out that the burden of proof is on the Respondent to demonstrate that there were reasonable and economically feasible alternative actions available to them.[309] For them, the Respondent failed to discharge this burden, due to the fact that they have in reality engaged in multiple efforts to continue their farming business in Hungary. Yet, despite these efforts, their Farm lost significant value. Specifically, the Claimants stress the following mitigating actions:

- Mr. Hunter described how the Claimants sought to lease replacement land from private individuals by publishing an advertisement and an article in a local newspaper.[310] They only received an offer for 15 hectares of land 50 km away. In any event, the privately-owned land is encumbered by statutory pre-lease rights, meaning that the Claimants would be pre-empted by the incumbent lessees.

- Inícia's employees travelled sometimes hundreds of kilometers to purchase feed for and dispose of digestate from the cows.[311]

- Mr. Hunter personally made efforts in (i) qualifying as a 'local farmer' in 2015 in order to bid at auctions to buy agricultural land for the farm; and (ii) sitting for the examination to become a Hungarian citizen in order to persuade the Respondent to sign the contract with him for the 86-hectare parcel of land that he subsequently won at auction. Despite these efforts, Mr. Hunter was ultimately deprived of this opportunity to mitigate Claimants' losses by Mr. Rácz, the son of a local Fidesz mayor, who exercised his statutory pre-emption right to take over the ownership of this parcel of land in place of Mr. Hunter.[312]

---

[309] C-Reply, 356, citing *Middle East Cement Shipping and Handling Co. S.A. v. Arab Republic of Egypt*, ICSID Case No. ARB/99/6, Award, 12 April 2002, CL-32, ¶ 170.

[310] Hunter First WS, ¶ 98; CM, ¶ 573.

[311] Hunter First WS, ¶¶ 92-94.

[312] Hunter Second WS, ¶¶ 45-47.

- The Claimants obtained temporary and unnotified sublets to the portions of the Land from the winners of the Tenders. In particular, they sub-leased (i) 86 hectares won by Robert Rácz (Tender No. 10213); (ii) 13 hectares from the plot won by Viktor Huszar (Tender No. 10211); and (iii) 8 hectares from the plot won by Zoltan Kovács (Tender No. 10212).[313]

378.    Furthermore, the Claimants argue that the criticism raised by the Respondent's expert at the milk prices, applied in Mr. Gilbey's valuation as equal to EU prices, is also unmeritorious. It fails to consider that Inícia actually achieved to sell milk at EU prices in 2018 and that many of its contracts are pegged to German milk prices, which are even higher than the EU average price.[314]

379.    For the Claimants, the Respondent's criticism of Mr. Gilbey's calculation of the price of calves and in-calf heifers is equally unfounded. While the Respondent is right that the Claimants have historically sold culled cows at a 70% discount, they have never sold cows producing milk or in-calf heifers. Therefore, Mr. Gilbey's assumption that those could be sold at a market value is reasonable.

380.    The Claimants also refute the comments by Respondent's expert Mr. Sequeira according to which Mr. Gilbey assumed that certain costs would remain fixed despite his projection of a significant increase in the size of the herd and the production of milk. As Mr. Hunter explains, "[t]he costs of running the facilities (which can cater for up to 2500 animals) are fixed."[315]

381.    In connection with interest rates, Mr. Gilbey has applied 7.87% by reference to the rate of return on capital that the shareholders of Magyar had realized historically and thus could reasonably have expected to enjoy in the future, but for the expropriation. Contrary to the Respondent's criticism, the "normal commercial rate" of interest envisaged in the BIT's expropriation provision is not applicable here, since this is an unlawful expropriation. Similarly, the Respondent's expert wrongly suggests that Mr. Gilbey's proposal to

---

[313] Hunter Second WS, Section 4.1.3.

[314] Mazars Second ER, ¶ 4.2.8.

[315] Hunter First WS, ¶ 93.

compound interest *semi-annually* is incompatible with his choice of the *annual* rate of return as the interest rate. As Mr. Gilbey explains, when computing the compound interest he did not simply divide 7.87% in two, which would have given 3.94%, but instead reduced the semi-annual rate to 3.86% to take into account that the interest is compounded semi-annually.[316]

382.   Finally, the Claimants also request compensation for the costs of the Hungarian court proceedings. They point to the jurisprudence of investment tribunals, which confirms that such costs are recoverable under the principle of full compensation.[317] Following the Respondent's comment that the supporting invoices included unrelated transactions, the Claimants subtracted three out of five invoices from the claimed amount calculations, as these dealt with costs related to the Claimants' Serbian farm.

383.   With respect to the Respondent's criticism that Mr. Gilbey double-counted the litigation costs, since these costs were already accounted for in the but-for value of the Farm, the Claimants point to the passage of Mr. Gilbey's report, where he explains that, since legal and professional costs were unusually high in the year 2014, he took the average of the prior two years (2012 and 2013) to reflect these costs more accurately.[318] Therefore, the litigation costs are not included in the but-for value of the farm.

384.   For these reasons, the Claimants request the Tribunal to award full compensation for damages resulting from the Respondent's unlawful expropriation of their leasehold rights in the amount of EUR 17,900,000, plus costs and expenses of these proceedings, as well as costs and expenses and of the litigation in Hungary in an amount of HUF 57,222,236, together with interest at 7.87% compounded semi-annually until the payment is made in full.

---

[316] Mazars Second ER, ¶¶ 7.3.2-7.3.3.

[317] *Waguih Elie George Siag and Clorinda Vecchi v. The Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009, CL-68, ¶ 593; *Swisslion DOO Skopje v. The Former Yusgoslav Rpeublic of Macedonia,* ICSID Case No. ARB/09/16, Award, 6 July 2012, RL-111, ¶¶ 344 and 350.

[318] C-Reply, ¶ 370; Mazars First ER, ¶ 3.6.4.

### B.    THE RESPONDENT'S POSITION

385.    The Respondent relies on a valuation report prepared by Mr. Kiran Sequeira of Versant Partners LLC. Mr. Sequeira has estimated the range of the Claimants' loss between EUR 3,400,000 and EUR 5,600,000.

386.    The Respondent first contends that the standard of compensation should be the "fair market value of the investment expropriated", as envisaged by Article 6(1) of the BIT, and not that of consequential loss, as suggested by the Claimants. The BIT standard of compensation for expropriation is entirely in line with the principle of full reparation, since in modern economics the value of an asset captures the expected profits that the asset can generate.[319] Since the value of the expropriated asset already includes all possible future profits, adding further elements to the valuation, as the Claimants and their expert do, results in double-counting and overcompensation.

387.    According to Hungary, Mr. Gilbey did not seek to determine the market value of the expropriated leasehold rights but chose, instead, to value the entire farming business by comparing the actual with the but-for value of the Farm. While Mr. Gilbey suggests that by this method he valued the Claimants' leasehold rights, he does not explain why the result is much higher than the value of the land owned by Inícia. Indeed, on one hand, Mr. Gilbey's documents show that the 105 hectares of land owned by Inícia was worth EUR 6,900 per hectare. On the other hand, Mr. Gilbey values the leasehold rights to the Land at EUR 15,650 to EUR 18,867 per hectare.[320] This is a clear overstatement.

388.    Furthermore, Mr. Gilbey determined the but-for value of the Farm as of July 2015 (*ex ante* basis), while he assessed the actual value of the Farm as at December 2017 (*ex post* basis). Mr. Sequeira explains that this approach is defective as it results in compensating the

---

[319] RCM, ¶¶ 551-553; *Tenaris S.A. and Talta - Trading e Marketing Sociedade Unipessoal Lda. v. Bolivarian Republic of Venezuela II*, ICSID Case No. ARB/12/23, Award, 12 December 2016, RL-104, ¶¶ 396-397.

[320] R-Rejoinder, ¶ 515; Versant Second ER, ¶ 45.

Claimants by an additional EUR 4,100,000 for market factors that impacted the value after the alleged breaches and are wholly unrelated to them.[321]

389.   The Respondent further submits that the Claimants have failed to mitigate the loss by not obtaining a substitute lease for privately owned land. It in particular points to the following contentious facts and evidence:

- Data obtained from the Hungarian Land Use Registry shows that each year between 2011 and 2015, a substantial amount of agricultural leases had been registered in the area surrounding the farm, meaning that agricultural land often changed lessees. In 2015 alone, new leases were registered for a total of more than 166,000 hectares in the area, for a total of 5,923 registration applications.[322]

- The Claimants do not provide evidence that they ever offered a price above market price to secure alternative land. As Mr. Sequeira calculates, even assuming that the Claimants had to pay a 50% premium over their existing rates to secure a substitute rent, the present value of this over-payment for the entire 20-year period of the lease would be EUR 930,000. This is the maximum loss amount that the Claimants may recover.

- While the Claimants assert that they have partly mitigated the loss by sub-leasing the State-owned land from the winners of the Tenders, their expert Mr. Gilbey confirms that he did not include this mitigation in his calculation on the purported basis that these quasi sub-lease arrangements "do not offer security of tenure to Claimants".[323] As Mr. Sequeira notes, this analysis is simply incorrect from an economic perspective and results in overcompensation.[324]

---

[321] Versant Second ER, ¶ 59.

[322] Land Registry data sheet, Exhibit 15 to Versant Second ER; See Versant Second ER, ¶ 67.

[323] Mazars Second ER, ¶ 2.4.5(b).

[324] Versant Second ER, ¶ 69.

390.    In addition, Mr. Gilbey concludes that the but-for value of the Farm as of July 2015 was EUR 17,600,000 (a reduction of EUR 1,300,000 compared to his first report, as he took several criticisms of Mr. Sequeira into account). Yet, Mr. Sequeira shows that Mr. Gilbey's updated calculation of the but-for value of the Farm remains overstated because it fails to rely on available, appropriate and reliable data regarding milk prices, quantity of privately leased land, livestock prices, overhead costs, fixed and variable costs, and discount rate.[325]

391.    As for Mr. Gilbey's calculation of the actual value of the Farm, his estimate is between EUR 5,600,000 and EUR 7,700,000 million depending on which of his three alternative approaches of the actual value of the farm is adopted: (i) December 2017 going concern; (ii) July 2015 going concern and (iii) break up basis. Mr. Sequeira disagrees with each of these three alternative valuations for the following reasons:

   ▪  Mr. Gilbey's projection of the Farm's future potato production is understated and inconsistent with the Farm's actual performance.[326]

   ▪  Mr. Gilbey's assumptions of arable farming costs erroneously excludes the portion of State land that Claimants continue to use to grow crops on a "quasi-subletting" basis.[327]

   ▪  Mr. Gilbey does not adequately support his assumptions regarding which costs are fixed costs.[328]

   ▪  Mr. Gilbey erroneously applies an illiquidity discount to the actual value of the Farm.[329]

392.    As for the Claimants' alleged costs of litigation in Hungary, the Respondent contends that such costs are "too remote to be compensable in this arbitration."[330] More precisely, the Respondent points to the fact that the Claimants do not challenge the Hungarian court proceedings as part of the expropriation claim. In any event, Mr. Gilbey has included the

---

[325] R-Rejoinder, ¶ 541, citing Versant Second ER, ¶¶ 74-106.

[326] Versant Second ER, ¶¶ 112-116.

[327] Versant Second ER, ¶¶ 117-119.

[328] Versant Second ER, ¶¶ 120-122.

[329] Versant Second ER, ¶¶ 123-134.

[330] R-Rejoinder, ¶ 547.

litigation costs in his valuation twice. He has subtracted these costs from the but-for value of the Farm (thus increasing the but-for value) but not from the actual value. Hence, the claimed difference between the but-for and the actual values includes the litigation costs. If these costs are awarded separately on top of the compensation for the loss of the value of the Farm, this will clearly result in double recovery.

393.    The Respondent further contends that the Claimants' proposed interest rate of 7.87% compounded semi-annually is grossly inflated. This historical rate of return is at odds with the BIT's requirement of a "normal commercial rate". Multiple investment tribunals have held that applying a reasonable commercial rate results in full compensation.[331] By applying the commercial return rate, Mr. Gilbey assumed that the Claimants would have invested the compensation amount in a successful venture. He did not account for the risk that the venture may have failed and that the Claimants may have lost the entire amount of the compensation. It is for this reason that valuation theory suggests adopting a risk-free rate for pre-award interest.[332] In any event, the historic returns of the Claimants' shareholders were in Hungarian currency. Applying this HUF-denominated rate to a Euro-denominated claim is an obvious fallacy, for which Mr. Gilbey has no convincing explanation.[333]

394.    For these reasons, the Respondent invites the Tribunal to discard Mr. Gilbey's report and instead rely on Mr. Sequeira's valuation of the Claimants' loss. Mr. Sequeira proposes two alternatives.

395.    First, he follows Mr. Gilbey's approach in that he values the Claimants' loss by subtracting the actual value of the Claimants' farm from its but-for value. Doing so, he corrects the alleged errors and inadequacies in Mr. Gilbey's methodology and arrives at two alternative

---

[331] *BG Group Plc. v. The Republic of Argentina*, UNCITRAL, Award, 24 December 2007, RL-106, ¶ 454; *Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/13, Decision on Liability and the Principles of Quantum, 30 December 2016, RL-107, ¶ 877; *Hrvatska Elektroprivreda d.d. v. Republic of Slovenia*, ICSID Case No. ARB/05/24, Award, 17 December 2015, RL-108, ¶¶ 553-554.

[332] Dolgoff, Duarte-Silva, "Prejudgment Interest: An Economic Review of Alternative Approaches", Journal of International Arbitration (Kluwer Law International, 2016), Vol. 33 Issue 1, p. 113 (Exhibit 6.1 to Mazars First ER).

[333] R-Rejoinder, ¶¶ 568-569.

figures: EUR 5,635,621 if the *ex ante* approach is adopted, with the date of valuation in July 2015,[334] or EUR 4,487,148 if the *ex post* approach is adopted, with the date of valuation in December 2017.[335]

396.    Second, as an alternative approach, Mr. Sequeira calculated the fair market value of the Claimants' alleged leasehold rights, without accounting for other consequential losses. To do so, he (i) took as a proxy the value of 105 hectares of land *owned* by Início, which he then (ii) adjusted to account for the difference between the value of owned land and the value of the leasehold rights. Under this approach, Mr. Sequeira determined the value of leasehold rights and thus the Claimants' loss at a maximum EUR 3,100,000.[336]

397.    The Respondent contends that the second alternative approach should be preferred, since Article 6 of the BIT only requires the State to compensate for the expropriated investment itself and not for remote consequential damages.

C.    ANALYSIS

398.    In the section on liability above, the Tribunal held that Hungary violated Article 6 of the BIT by expropriating the Claimants' vested statutory pre-lease right without compensation. This prevented the Claimants from exercising the pre-lease right in 2014 when the NLA alienated the Land through the Tenders. Had the Claimants exercised the pre-lease right, they would, in all likelihood, have matched the offers made by the winner of the tenders and would thus have obtained a 20-year extension of the Lease. Therefore, the Claimants lost their leasehold entitlement to the Land as a direct consequence of Hungary's expropriatory measure.

399.    The Parties dispute the valuation of that loss. The Tribunal will first select the appropriate method of valuation (1). It will then analyze the divergences between the valuation experts (2). Thereafter, it will address mitigation (3) and interest (4).

---

[334] See the table at R-Rejoinder, para 575.

[335] See the table at R-Rejoinder, para 576.

[336] Versant Second ER, ¶¶ 180-181.

400.    Before doing so, however, the Tribunal notes that the Claimants request compensation jointly, without specifying that compensation should go to one or the other among them. The Respondent has not objected to this formulation of the Claimants' request for relief. In principle, the amount of compensation for the expropriation of the pre-lease right would pertain to the Claimant that held that right, *i.e.* to Inícia Zrt. However, Article 6.2 of the BIT gives the shareholder investors a right to be compensated for the expropriation of the assets of their subsidiaries:

> Where a Contracting Party expropriates the assets of a company which is constituted or incorporated under the law in force in any part of its own territory, and in which investors of the other Contracting Party own shares, it shall ensure that the provisions of paragraph I of this Article [i.e. the provision on expropriation] are applied to the extent necessary to guarantee prompt, adequate and effective compensation in respect of their investment to such investors of the other Contracting Party who are owners of those shares.[337]

401.    For these reasons, the Tribunal will grant compensation to the Claimants jointly. The award will reestablish the Claimants in the position in which they would be had Hungary provided compensation for its expropriatory measure as required by Article 6 of the BIT.

### (1)    Method of valuation

402.    In order to determine the value of the expropriated leasehold rights on the date of the expropriation (*i.e.* the eviction from the Land in July 2015), the Claimants' valuation expert Mr. Gilbey subtracts the value of the Farm without the Lease (actual value) from the value of the Farm with the Lease (but-for value). The Respondent's valuation expert Mr. Sequeira agrees in principle that, "the lost value of the leasehold rights could be quantified by comparing the value of the Farm with and without those rights", adding that "the difference in the value of the Farm with and without the leasehold rights is equal to the lost value of those rights."[338] However, he proposes to value the leasehold right by reference to

---

[337] UK-Hungary BIT, CL-1.

[338] Versant First ER, ¶ 46.

ownership, taking into account that a freehold ownership is in general more valuable than a leasehold.

403.    The Tribunal will start by analyzing Mr. Sequeira's proposed approach using freehold ownership as a proxy to value the lost Lease. While valuation by reference to a proxy can be acceptable in certain circumstances, it is undisputed that enterprises and foreign nationals cannot own agricultural land in Hungary. Thus, the market for freeholds is far more limited than for leaseholds, a factor that Mr. Sequeira ignores.

404.    In addition, Mr. Sequeira's valuation of ownership appears insufficiently substantiated. Indeed, it relies on a single transaction based on a letter of valuation provided in 2018 by Terravost to the Claimants, which referred to a sale of 105 hectares of the Claimants' land. The letter specifies that Terravost "have not had time to investigate other specific comparables".[339] The Tribunal is not convinced that this only transaction is a sufficient comparator to adopt Mr. Sequeira's valuation. Having discarded Mr. Sequeira's approach, the Tribunal must review the Claimants' valuation method. As mentioned earlier, the Claimants' expert Mr. Gilbey presented the Tribunal with three alternative valuations: (i) a DCF valuation on a going concern basis as of July 2015 but using data of December 2017; (ii) a DCF valuation on a going concern basis as of July 2015 with the data available at that time; and (iii) a valuation whereby the Farm's actual value is determined assuming the breakup of the Farm into constituent assets and is then subtracted from the but-for value which is in turn assessed on a going concern basis.

405.    For the first approach, Mr. Gilbey calculated the difference between the but-for and the actual values of the Farm in July 2015. However, instead of projecting the cash flows based on the data forecasts (*e.g.* for milk prices) available at that date, he used the market data that was available in December 2017. At the Hearing, Mr. Gilbey conceded that, while he used the 2017 data for determining the actual value of the Farm, he did not do so with respect to the but-for value.[340] Neither Mr. Gilbey nor the Claimants have offered a plausible explanation for this inconsistency. It is uncontroversial that the fair market value

---

[339] Exhibit 5.1 to Mazars First ER, p. 6.

[340] Transcript, Day 2, 451:12-455:11.

of an asset is a price at which the asset would change hands between a willing seller and a willing buyer in an arm's length transaction. Evidently, the buyer would only have access to the data available as of the valuation date, *i.e.* here July 2015. The use of data from different dates for the but-for and the actual scenarios distorts the computation and risks reaching results that do not correctly reflect the loss sustained. Consequently, the Tribunal cannot follow this approach.

406.    Mr. Gilbey's secondary valuation remedies this inconsistency and uses the data available on the date of valuation for both scenarios. Mr. Sequeira has confirmed that Mr. Gilbey's secondary approach does not contain the contradiction with respect to the choice of the date of the valuation data.[341] As for Mr. Gilbey's third approach, he does not sufficiently explain why the value of the Farm, which is currently operating with profit and has a track record, should be determined on a break-up basis.

407.    For this reason, the Tribunal will take Mr. Gilbey's secondary valuation as a starting point for the assessment of the quantum of the Claimants' loss.

### (2)    Contentious points of secondary valuation

408.    Mr. Sequeira's criticism of Mr. Gilbey's second approach hinges on four points,[342] summarized in Mr. Gilbey's presentation[343] as follows:

---

[341] Transcript, Day 2, 560:7-15.

[342] Versant Second ER, Appendices M and O.

[343] Mazars Hearing Slides, p. 5 (p. 4 in electronic).

**EX-ANTE APPROACH (SECONDARY): VERSANT'S ADJUSTMENTS TO MY CALCULATIONS**

| | But For | Actual | Damages (excluding interest) |
| --- | --- | --- | --- |
| | A | B | C=A-B |
| Mazars | EUR 17,641,701 | EUR 7,704,206 | EUR 9,937,495 |
| Add back liquidity discount | EUR 0 | EUR 2,568,069 | EUR (2,568,069) |
| Subtotal | EUR 17,641,701 | EUR 10,272,275 | EUR 7,369,426 |
| | | | |
| Milk prices | EUR (5,081,302) | EUR (5,081,301) | EUR (1) |
| Amount of privately leased state land | EUR 0 | EUR 0 | EUR 0 |
| Livestock prices | EUR (513,666) | EUR (513,667) | EUR 1 |
| Overhead costs | EUR (179,134) | EUR (179,134) | EUR 0 |
| Fixed and variable costs | EUR 0 | EUR 0 | EUR 0 |
| Discount rate | EUR (1,270,571) | EUR (611,480) | EUR (659,091) |
| | EUR (7,044,673) | EUR (6,385,582) | EUR (659,091) |
| | | | |
| Additional adjustments to actual only | | | |
| Potato production | EUR 0 | EUR 1,495,762 | EUR (1,495,762) |
| Potato energy | EUR 0 | EUR 75,125 | EUR (75,125) |
| | EUR 0 | EUR 1,570,887 | EUR (1,570,887) |
| | | | |
| Impact of adjustments made by Versant | EUR (7,044,673) | EUR (2,246,626) | EUR (4,798,047) |
| Versant | EUR 10,597,028 | EUR 5,457,580 | EUR 5,139,448 |

Source: JG2: Appendix 4.4 and 5.3 and Versant 2: Appendix M and O

> **ONLY FOUR ISSUES DRIVING €4.8m DIFFERENCE IN DAMAGES ASSESSMENT (PRE INTEREST):**
>
> 1. Liquidity discount (EUR 2.5m)
> 2. Discount rate (EUR 0.7m)
> 3. Potato production (EUR 1.5m)
> 4. Potato energy (EUR 0.1m)

409.    The Tribunal will address each of these points in turn. Before doing so, however, it notes that Mr. Sequeira also criticized Mr. Gilbey's use of what he called outdated forecasts of milk and livestock prices. Yet, Mr. Sequeira admitted that, if these forecasts are applied in both the but-for and actual valuations, then this error would correct itself and have a negligible impact on the final damages figure.[344] Since the Tribunal adopted Mr. Gilbey's secondary valuation in which the expert uses the allegedly "wrong" prices in both scenarios with the result that this "mistake" has minimal effect if any, the Tribunal can dispense with determining whether other milk and livestock prices should be used. Instead, it will concentrate on the four contentious points that impact the damages figure.

410.    **Liquidity discount:** Mr. Gilbey applied a 25% discount on the actual value of the Farm to account for an increased exposure of the Farm to risk factors such as the milk price fluctuations. Mr. Sequeira opines that no such discount is warranted, since the loss of the Land did not render the Claimants' business inherently riskier or less liquid. According to him, the Claimants' business has always been heavily reliant on milk prices.

---

[344] Transcript, Day 2, 561-562.

411.    Mr. Sequeira does not appear to dispute that the loss of the Lease increased the Claimants'
costs, in particular the cost of the cattle feed.[345] Since the eviction, the Claimants have no
longer been in a position to produce sufficient quantities of feed to support the Farm and
have thus purchased feed on the market. As a result, they have incurred higher costs. Thus,
Mr. Gilbey's opinion that, compared to the but-for scenario, in the actual scenario it would
take a smaller negative shift in milk or feed prices to put the Claimants out of business
appears plausible. This is consistent with Mr. Hunter's testimony that the Claimants are
"waiting for the inevitable moment when the market prices for milk and feed will turn
against us".[346] Thus, in principle, the application of some increased risk factor to the actual
value of the Farm seems justified.

412.    That being so, Mr. Gilbey conceded at the Hearing that his choice of a 25% discount rate
was not substantiated by evidence or relevant valuation authorities,[347] but was based on his
subjective judgment:

> I think where Versant are correct, at least, is to say that that 25
> percent liquidity discount is a subjective number, and I don't hide
> behind that. It is an area of judgment on my part.[348]

413.    While the Tribunal respects Mr. Gilbey's expertise, it observes that Mr. Sequeira, who is
also a seasoned valuation expert, characterized the 25% liquidity discount as unreasonably
high and considered that any liquidity discount would be "marginal".[349] Based on this
evidence, the Tribunal determines in its discretion that 5% would be an appropriate
measure of discount to reflect the increased liquidity risk that the Farm faces in the actual
scenario.

414.    **Discount rate**: The disagreement leading the experts to adopt different discount rates
hinges on two elements: base risk rate (*i.e.* risk free rate) and equity risk premium. For the

---

[345] Transcript, Day 2, 611:15-19.

[346] Hunter First WS, ¶ 89.

[347] Transcript, Day 2, pp. 445-448.

[348] Transcript, Day 2, 448:13-17.

[349] Transcript, Day 4, 902:15-20.

first element, Mr. Gilbey used the Hungarian Government bonds rate of 3%. However, in July 2015 the rate was 3.5%, which is the rate applied by Mr. Sequeira.[350] As for the second element, Mr. Gilbey used the equity risk premium for Hungary of 8.5%. In doing so, he admitted that he relied on the lower figure of Professor Damodaran's suggested range for Eastern Europe, since he mistakenly thought that the higher figure included the estimate for Russia, which has a higher country risk.[351] Mr. Sequeira in turn took the average of the upper and lower rates proposed by Professor Damodaran as well as the rate suggested by Bloomberg.[352] For these reasons, the Tribunal will apply Mr. Sequeira's suggested discount rate of 9.65%, which it deems better substantiated.

415.    **Potato production**: Mr. Sequeira criticizes Mr. Gilbey's omission from the actual value of the Farm of the value of 3,200 tons of potatoes that the Claimants produced after the eviction on land they managed to sublease from the new lessees.

416.    It is common ground between the experts that Mr. Gilbey's secondary valuation assesses the Claimants' loss on an *ex ante* basis, *i.e.* as of the date when expropriation affected the Claimants (July 2015) and with the data available at that time. If, in the years subsequent to the expropriation, the Claimants managed to grow potatoes on substitute land, this would not affect the value of the expropriated asset at the time of the expropriation. Indeed, a willing buyer would not have factored these revenues in its assessment of the Farm's value in July 2015.

417.    In any event, as Mr. Gilbey rightly points out, the quasi-sublease arrangements do not provide legal security comparable to that of ownership or a lease. It would thus be unreasonable to project that the Claimants will benefit from this arrangement for 20 years. No reasonable buyer would have made such a projection, given the uncertain nature of the sublease.

---

[350] Versant Second ER, ¶¶ 101-106; Versant Hearing Slides, p. 13.

[351] Transcript, Day 2, 524:14-525:4.

[352] Versant Second ER, ¶¶ 101-106; Versant Hearing Slides, p. 14.

418.    For these reasons, the Tribunal does not share Mr. Sequeira's criticism of Mr. Gilbey's secondary valuation in respect of potato production.

419.    **Potato energy:** Mr. Sequeira further criticized Mr. Gilbey's calculation of the actual value of the Farm on the basis that Mr. Gilbey inappropriately assumed that the production costs, such as the costs of the energy for packing the potatoes, would remain fixed, even though the production would decrease. Although he did not elaborate further, because this issue was "less material",[353] Mr. Gilbey acknowledged in his slide presentation that potato energy costs are variable, albeit not in a precise correlation with production levels.[354] Consequently, the Tribunal cannot follow Mr. Gilbey's assumption that the potato energy costs would remain fixed in spite of the decrease in production. It will thus adopt Mr. Sequeira's valuation in this respect.

420.    In summary, Mr. Gilbey's secondary valuation figure of EUR 9,937,495 must be reduced by the amounts resulting from (i) the excess liquidity discount of EUR 2,054,455 (corresponding to 5% instead of the proposed 25% discount), (ii) the discount rate of EUR 659,091 and (iii) the potato energy costs of EUR 75,125, with the result that the damages (corresponding to the fair market value of the expropriated investment) amount to **EUR 7,148,824**.

**(3)    Mitigation**

421.    The Respondent argues that the Claimants failed to mitigate damages and makes the following alternative prayer for relief:

> Declare that Claimants failed to mitigate their losses and therefore determine that the amount payable by Respondent as compensation cannot exceed EUR 930,000.

---

[353] Transcript, Day 2, 459:2-9.

[354] Mazars Hearing Slides, p. 12.

422.    The Tribunal considers that the Claimants' mitigation efforts after the date of valuation are not relevant. As explained above, a valuation cannot take into account facts that occurred after the valuation date, which a hypothetical buyer could not have considered. The Respondent's expert himself criticized Mr. Gilbey's primary valuation on the basis that it took into account events taking place after the valuation date.[355]

423.    At the Hearing, the Respondent linked the obligation to mitigate the loss with an amendment of its request for relief, which it made then asking the Tribunal to:

  ▪  direct Claimants to keep Respondent informed of any sale of the Farm; and

  ▪  subtract from the compensation payable by Respondent all sums Claimants may receive above the Farm's Actual Value (as determined by the Tribunal) in case they sell the Farm before the Award is paid, or

  ▪  order that Claimants shall pay to Respondent all sums Claimants may receive above the Farm's Actual Value (as determined by the Tribunal) in case they sell the Farm after the Award is paid.[356]

424.    On this occasion, Counsel for the Respondent explained as follows:

>   I would just ask you to order them that, if they sell the Farm for more than the Actual Value in the calculation, then they have mitigated their loss by selling for more than what they've submitted the Actual Value of the Farm was, and anything they that they obtain above the Actual Value should be subtracted as further mitigation.[357]

425.    Subject to the admissibility of the amendment by the Respondent of its requests for relief, which can be left open in light of the considerations that follow, these new requests are in any event not well-founded. As set out above, events taking place after the date of valuation are irrelevant. Indeed, a willing buyer of the Farm could not have factored into his/her valuation on July 2015 changes in value due to the Claimants' later failure to mitigate losses.

---

[355] Sequeira Slide Presentation, p. 7.

[356] Respondent's letter of 21 June 2019.

[357] Transcript, Day 4, 963:4-10.

426.    In addition, granting the Respondent's new requests would run counter to the Tribunal's duty under Article 42(1) of the ICSID Convention to decide the dispute, and to do so in a definitive and efficient manner. Ordering the Claimants to keep the Respondent informed of any subsequent sale of the Farm and to refund sales proceeds would not put an end to this dispute. Such an order may give rise to further disagreements over which the Tribunal would arguably have no jurisdiction, it being *functus officio*. It could thus not assist the Parties anymore in resolving these new difficulties. Creating such a situation would be contrary to the Tribunal's duty.

427.    Finally and in any event, the Tribunal notes that the record contains ample evidence of the Claimants' multiple efforts to mitigate the consequences of the loss of access to the land.[358] This is not a surprise as mitigating the loss was primarily in the Claimants' interest. Absent compelling evidence to the contrary, the Tribunal is not prepared to speculate whether the Claimants should have exercised a better business judgment, for instance, by growing certain crops on specific parcels of land.[359]

428.    For these reasons, the Tribunal will not reduce the amount of compensation on the basis of the alleged lack of mitigation, with the result that the relevant requests for relief of the Respondent are dismissed.

**(4)    Interest**

429.    The Claimants seek pre- and post-award interest at the rate of 7.87%, suggested by their expert Mr. Gilbey, while the Respondent's expert, Mr. Sequeira proposes applying LIBOR +2%. For the following reasons, the Tribunal will adopt Mr. Sequeira's rate.

430.    The Tribunal has not heard from the Claimants a convincing response to Mr. Sequeira's criticism that the historic returns of the Claimants' shareholders were in Hungarian currency, and applying this HUF-denominated rate to a Euro-denominated claim would not be appropriate.

---

[358] *Supra* ¶ 376; Hunter First WS, ¶ 92-98.

[359] Transcript, Day 2, 587:22-588:5.

431. As for Mr. Sequeira's proposal of LIBOR +2%, the Tribunal in principle agrees that this corresponds to the time value of money that would compensate the Claimants for their loss. It also constitutes a "normal commercial rate" as envisaged by Article 6 of the BIT. Investment treaty tribunals often use floating interbank offered rates augmented with a certain premium as an accurate indication of the market value of money in a specific currency.[360]

432. That said, as Mr. Sequeira acknowledged in response to the Tribunal's question, LIBOR is likely to be phased out in 2022,[361] with the result that the computation of interest may be rendered impossible beyond that date. For this reason, the Tribunal will instead opt for a comparable rate of 6-month EURIBOR +2%, compounded semi-annually. Interest will run from the date of valuation (July 2015) until the date of the payment. Given that the rate is for a 6-month maturity period, it should be compounded semi-annually.[362]

## VII. COSTS

433. Each Party seeks an award of the entirety of the costs related to this arbitration, including the legal fees and expenses incurred in connection with these proceedings. They do not dispute that the Tribunal enjoys broad discretion to allocate the costs of the arbitration, as it deems appropriate pursuant to Article 61(2) of the ICSID Convention:

> In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.

---

[360] See, e.g., *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Award, 28 September 2007, RL-103, ¶ 486; *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004, CL-31, ¶ 250; *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, 5 September 2008, ¶ 314;

[361] Transcript, Day 2, 616:12-22.

[362] The Respondent has not in principle objected to compounding.

434.    The Tribunal notes that the Claimants' claim was for approximately EUR 17.9 million, out of which the Tribunal awards approximately EUR 7.1 million. Yet, the ratio of 17.9 to 7.1 is only one element to consider. The Respondent also raised preliminary objections, which the Tribunal denied. In addition, the Tribunal upheld the Claimants' claim of expropriation and found the Respondent liable. This outcome shows that the Claimants had no choice but to initiate this arbitration to vindicate their rights under the BIT, a factor that must also be taken into consideration when assessing costs.

435.    At the same time, the Tribunal acknowledges that both Parties and their counsel conducted these proceedings in a professional and efficient manner. The Parties' procedural conduct can thus not influence the allocation of costs.

436.    The costs of the arbitration, including the fees and expenses of the Tribunal and the Tribunal's Assistant, ICSID's administrative fees and direct expenses, amount to (in USD):

| | |
|---|---|
| Arbitrators' fees and expenses | |
| Professor Gabrielle Kaufmann-Kohler | 130,308.53 |
| Dr. Stanimir Alexandrov | 77,891.83 |
| Dr. Inka Hanefeld | 92,845.83 |
| Mr. David Kachvani's fees and expenses | 74,021.05 |
| ICSID's administrative fees | 126,000 |
| Direct expenses (estimated) | 63,381.55 |
| **Total** | **564,448.79** |

437.    The above costs have been paid out of the advances made by the Parties in equal parts.[363] As a result, each Party's share of the costs of arbitration amounts to USD 282,224.40.

438.    Considering the factors mentioned above, in the exercise of its discretion, the Tribunal determines that the Respondent shall reimburse the Claimants for the expended portion of the Claimants' advances to ICSID in the amount of USD 282,224.40, for the ICSID lodging

---

[363] The remaining balance will be reimbursed to the parties in proportion to the payments that they advanced to ICSID.

fee in the amount of USD 25,000 and for 50% of the Claimants' representation costs in the amount of GBP 296,456, EUR 19,473 and HUF 26,495,585.5.[364] The Tribunal notes that the Claimants' costs appear reasonable as they constitute approximately 5% of the amount in dispute and are significantly lower than the Respondent's costs.

439.   This finding does not concern the fees and expenses of the local proceedings in Hungary. The subject matter of those proceedings were not the Claimants' rights under the BIT. In particular, there is no claim of judicial impropriety or denial of justice. Nor did those proceedings concern the validity or lawfulness of the 2011 Amendment, which the Tribunal found to be contrary to the BIT. Instead, those proceedings related to the Claimants' contractual dispute with the NLA. As a result, these costs are not recoverable in this arbitration.

440.   Finally, the Tribunal will give post-award interest on costs, but no pre-award interest. Indeed, costs only become due from the issuance of this award and, hence, it would not be justified to allow for interest to run before that date.

---

[364] Claimants' Statement of Costs.

## VIII.  OPERATIVE PART

441.  For the foregoing reasons, the Tribunal renders the following final award:

    i.    The present dispute is within the jurisdiction of the Center and the competence of the Tribunal;

    ii.    Hungary breached Article 6.1 of the BIT by expropriating the Claimants' investment without compensation;

    iii.    The Respondent shall pay to the Claimants compensation for the expropriation in the amount of **EUR 7,148,824**, plus interest at the rate of 6-month EURIBOR +2% compounded semi-annually, from 1 August 2015 until payment;

    iv.    The Respondent shall reimburse the Claimants for the ICSID and Tribunal costs in the amount of **USD 282,224.40,** for the ICSID lodging fee in the amount of **USD 25,000** and for the Claimants' legal costs in the amount of **GBP 296,456**, **EUR 19,473** and **HUF 26,495,585.5**, which amounts shall bear interest at the rate of 6-month EURIBOR +2% compounded semi-annually, from the date of this Award until payment;

    v.    All other claims and requests for relief are dismissed.

[Signed]

_____
Dr. Stanimir Alexandrov
Arbitrator

Date: 15 October 2019

[Signed]

_____
Dr. Inka Hanefeld
Arbitrator

Date: 16 October 2019

[Signed]

_____
Professor Gabrielle Kaufmann-Kohler
President of the Tribunal

Date: 28 October 2019

128