# EXHIBIT 20

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

BLUSUN S.A., JEAN-PIERRE LECORCIER AND MICHAEL STEIN

Claimants

v.

ITALIAN REPUBLIC

Respondent

**ICSID Case No. ARB/14/3**

---

**AWARD**

---

*Members of the Tribunal*

Judge James Crawford AC, President

Dr. Stanimir Alexandrov, Arbitrator

Professor Pierre-Marie Dupuy, Arbitrator

*Secretary of the Tribunal*

Mr. Francisco Abriani

*Date of dispatch to the Parties:* 27 December 2016

## REPRESENTATION OF THE PARTIES

**Representing Blusun S.A., Jean-Pierre Lecorcier and Michael Stein:**

Mr. Barton Legum
Ms. Anne-Sophie Dufêtre
Mr. Niccolò Castagno
Dentons Europe LLP
5, boulevard Malesherbes
75008 Paris
France

**Representing the Italian Republic:**

Avv. Gabriella Palmieri
Avv. Sergio Fiorentino
Avv. Paolo Grasso
Avv. Giacomo Aiello
Prof. Dr. Maria Chiara Malaguti
Avv. Giuseppe Stuppia
Avvocatura dello Stato
Via dei Portoghesi, 12
00186 Rome
Italy

## ABBREVIATIONS

| | |
|---|---|
| AEEG | Authority for the Electric Energy and Gas |
| AU | *Autorizzazione Unica* (Single Authorisation) |
| DIA | *Denuncia di Inizio Attività* (Declaration of Initiation of Activity) |
| EIA | Environmental Impact Assessment |
| ECT | Energy Charter Treaty |
| EPC | Engineering, Procurement and Construction |
| EU | European Union |
| FET | Fair and Equitable Treatment |
| Fifth Energy Account | *Decreto Ministeriale 5 luglio 2012* (Ministerial Decree of 5 July 2012) |
| First Renewables Directive | European Directive 2001/77/EC |
| FIT | Feed-in Tariffs |
| Fourth Energy Account | *Decreto Ministeriale 5 maggio 2011* (Ministerial Decree of 5 May 2011) |
| GSE | *Gestore dei Servizi Energetici* (Manager of Electricity Services) |
| ICSID | International Centre for Settlement of Investment Disputes |

| | |
|---|---|
| NAFTA | North American Free Trade Agreement |
| PV | Photovoltaic |
| Romani Decree | *Decreto Legislativo 3 marzo 2011, n. 28: Attuazione della direttiva 2009/28/CE sulla promozione dell'uso dell'energia da fonti rinnovabili,recante modifi ca e successiva abrogazione delle direttive 2001/77/CE e 2003/30/CE.*<br><br>(Legislative Decree of 3 March 2011, No. 28: 'Implementation of Directive 2009/28/EC on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC') |
| Second Energy Account | *Decreto Ministeriale 19 febbraio 2007* (Ministerial Decree of 19 February 2007) |
| SIB | Società Interconnessioni Brindisi S.R.L. |
| SPV | Special Purpose Vehicle |
| TEU | Treaty on European Union |
| TFEU | Treaty on the Functioning of the European Union |
| Third Energy Account | *Decreto Ministeriale 6 agosto 2010* (Ministerial Decree of 6 August 2010) |
| VCLT | Vienna Convention on the Law of Treaties |
| WS1 | First Witness Statement |
| WS2 | Second Witness Statement |

TABLE OF CONTENTS

I.      THE PARTIES ........................................................................................................ 1

II.     PROCEDURAL HISTORY ..................................................................................... 1

III.    RELIEF SOUGHT BY THE PARTIES ................................................................. 14

        1.    The Claimants' request for relief .................................................................. 14

        2.    The Respondent's request for relief .............................................................. 15

IV.     FACTUAL BACKGROUND .................................................................................. 16

        A.    The 120 MW project ...................................................................................... 16

        B.    The Claimants' involvement in the Project ................................................... 17

        C.    The Italian legislative and regulatory framework for solar projects as of November 2009
              ......................................................................................................................... 19

              1.    Construction permits .............................................................................. 20

              2.    Permits to connect to the national transmission and local distribution grids ................ 23

              3.    Tariffs ..................................................................................................... 24

        D.    The Claimants' investments .......................................................................... 26

              1.    The two substations ................................................................................ 26

              2.    The local companies and the land ........................................................... 27

              3.    The local grid .......................................................................................... 28

              4.    The construction permits ........................................................................ 29

        E.    The Constitutional Court decision of 2010 and the regulations adopted thereafter ....... 29

        F.    Eskosol's EPC contract with Siemens and contacts with potential investors ................ 31

        G.    The Romani Decree ....................................................................................... 32

        H.    The Fourth Energy Account ........................................................................... 34

        I.    The GSE's lists .............................................................................................. 35

        J.    The project to build 27 plants ........................................................................ 36

        K.    The municipal stop-work order ...................................................................... 37

        L.    Law Decree 1 of 24 January 2012 ................................................................. 39

        M.    Abandonment of the Project by the Claimants .............................................. 41

V.      POSITIONS OF THE PARTIES ON JURISDICTION AND ADMISSIBILITY ........... 41

        A.    The Respondent's position ............................................................................ 41

              1.    The Project was not an investment under the ICSID Convention and the ECT ........... 42

              (a)    The ICSID Convention .......................................................................... 42

(b)   The ECT ............................................................................................ 43

2.    The Project is not a protected investment under the ECT........................... 44

3.    Admissibility ........................................................................................ 46

B.    The Claimants' position ........................................................................ 46

1.    The Claimants' investments under the ECT and the ICSID Convention....................... 47

(a)   The ECT ............................................................................................ 47

(b)   The ICSID Convention......................................................................... 48

2.    Good faith and the Claimants' investments ............................................. 49

3.    The clean hands doctrine....................................................................... 50

VI.    POSITIONS OF THE PARTIES ON LIABILITY .............................................. 51

A.    The Claimants' position ........................................................................ 51

1.    The alleged breach of Article 10(1) of the ECT........................................ 51

(a)   Italy's alleged failure to encourage and create stable, equitable, favorable and transparent conditions................................................................................ 51

(b)   Italy's alleged breach of the fair and equitable treatment standard................ 53

2.    The alleged breach of Article 13 of the ECT ............................................ 55

B.    The Respondent's position .................................................................... 56

1.    The alleged breach of Article 10(1) of the ECT........................................ 56

(a)   Italy's alleged failure to encourage and create stable, equitable, favorable and transparent conditions................................................................................ 56

(b)   Italy's alleged breach of the fair and equitable treatment standard................ 57

2.    The alleged breach of Article 13 of the ECT ............................................ 63

VII.   THE POSITIONS OF THE PARTIES ON QUANTUM .......................................... 63

A.    The Claimants' position ........................................................................ 63

B.    The Respondent's position .................................................................... 66

VIII.  THE EC'S AMICUS CURIAE BRIEF AND THE POSITIONS OF THE PARTIES ON INTER SE APPLICATION OF THE ECT ....................................................... 69

A.    The European Commission's Amicus Brief................................................. 69

1.    The legal order of the EU and investment protection under EU law ............. 70

2.    The lack of inter se obligations under the ECT between Member States ...................... 73

3.    The limited scope of inter se obligations between Member States................ 74

4.    Application of Chapter III and Article 26 ECT under VCLT Article 30 ...................... 75

B.    The Respondent's position .................................................................... 76

1.   Interpretation of the ECT under International Law ................................. 78

2.   The evolution of EU treaties and their impact on the ECT ...................... 80

C.   The Claimants' position .............................................................. 82

1.   The ECT creates *inter se* obligations among all Contracting Parties ............... 83

2.   Transfer of competence does not protect EU Member States from responsibility under the ECT .............................................................................. 84

3.   The inapplicability of the *lex posterior* principle ................................. 85

IX.   ISSUES OF JURISDICTION AND ADMISSIBILITY: THE TRIBUNAL'S CONCLUSIONS ............................................................................. 86

A.   Issues originally raised by the Respondent ......................................... 86

1.   The Claimants' Investment ........................................................ 86

2.   'Clean hands'/Good faith ......................................................... 92

B.   EU Law and the *inter se* issue ..................................................... 94

X.   THE MERITS: THE TRIBUNAL'S APPRECIATION .................................. 107

A.   The Legal Instability Claim: ECT Article 10(1) ................................... 107

1.   The interpretation of Article 10(1) ............................................... 108

2.   The legal instability claim ........................................................ 113

(a)   Decision 119 of 26 March 2010 of the Constitutional Court ..................... 114

(b)   The Romani Decree and the Fourth Energy Account .............................. 117

(c)   The publication of the GSE lists of large plants .................................. 122

(d)   The Brindisi stop-work order ..................................................... 125

B.   Breach of the Fair and Equitable Treatment Standard: ECT Article 10(1), second sentence (legitimate expectations) ............................................... 130

C.   The Issue of Causation in relation to ECT Article 10(1) .......................... 133

1.   The status of the DIAs and the Project as a unified scheme ...................... 135

2.   The failure to obtain project financing ........................................... 137

3.   The evidence underlying the 'legal stability' claim ............................... 138

4.   Conclusion on Causation .......................................................... 141

5.   Overall Conclusions on ECT Article 10(1) ........................................ 142

D.   The Expropriation Claim: ECT Article 13 ......................................... 142

XI.   COSTS .............................................................................. 148

iv

# AWARD

## I.    THE PARTIES

1.    The Claimants are Blusun S.A. ('*Blusun*'), Jean-Pierre Lecorcier and Michael Stein (collectively the '*Claimants*').

2.    Blusun is a company incorporated on 20 December 2009 under the laws of Belgium, with registered offices at Rue Thomas Vinçotte 6, 1030 Schaerbeek, Belgium.[1] Blusun is owned and controlled exclusively by Messrs. Lecorcier and Stein.[2] Blusun, in turn, controls 80% of Eskosol S.p.A. ('*Eskosol*'),[3] and 50% of Società Interconnessioni Brindisi S.R.L. ('*SIB*').[4] Eskosol and SIB are both Italian companies.

3.    Jean-Pierre Lecorcier is a French national. He owns 66% of Blusun.[5]

4.    Michael Stein is a German national who owns 34% of Blusun.[6]

5.    The Respondent is the Italian Republic ('*Italy*' or the '*Respondent*').

## II.    PROCEDURAL HISTORY

6.    On 4 February 2014, Blusun, Jean-Pierre Lecorcier and Michael Stein submitted a Request for Arbitration before the International Centre for Settlement of Investment Disputes ('*ICSID*') (the '*Request*' or '*RFA*'). The Request was submitted pursuant to

---

[1] Blusun, Certificate of Good Standing (updated), 26 September 2013, 4 February 2014, 23 July 2014, Exhibit C-3.

[2] Blusun, Articles of Association (updated), 10 December 2009, 20 December 2009, 11 April 2011, Exhibit C-4, p. 2; Lecorcier WS1, para. 2; and Stein WS1, para. 2.

[3] Notarized Minutes of Eskosol Shareholders, 17 December 2010, Exhibit C-150, p. 3. The Claimants explained that Eskosol was created as an S.R.L. and then transformed into an S.p.A. in December 2010 (see Memorial, para. 178 and Notarized Minutes of Eskosol Board of Directors, 29 December 2010, Exhibit C-154).

[4] SIB, Certificate of Incorporation (*Visura Camerale*), 18 April 2014, Exhibit C-229, p. 5.

[5] Lecorcier WS1, para. 2; Blusun, Articles of Association (updated), 10 December 2009, 20 December 2009, 11 April 2011, Exhibit C-4, p. 2.

[6] Stein WS1, para. 2; Blusun, Articles of Association (updated), 10 December 2009, 20 December 2009, 11 April 2011, Exhibit C-4, p. 2.

Article 26 of the Energy Charter Treaty ('***ECT***' or '***Treaty***').[7] The Claimants allege that their claim arises from a dispute between 'natural person[s] having the citizenship or nationality' of contracting parties to the ECT, with respect to '"Investments" associated with an "Economic activity" in the energy sector in the "Area" of a Contracting Party.'[8] The dispute concerns certain regulatory measures and judicial decisions that allegedly had the effect of frustrating the Claimants' investments in a 120-megawatt ('***MW***') solar energy project in the Puglia region of Italy (hereafter the *Puglia Project*, or *the Project*). The Claimants argue that measures adopted successively by the Italian Constitutional Court, by the Italian Government and by the Commune breached the fair and equitable treatment standard set forth in Article 10(1) of the ECT, and/or constituted measures 'having effect equivalent to nationalization or expropriation' within the meaning of Article 13(1) of the ECT.[9] The Claimants estimate the damages suffered as a result of those measures at some €187.8 million.[10]

7.    On 21 February 2014, ICSID's Secretary-General registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an Arbitral Tribunal as soon as possible in accordance with Rule 7(d) of the Centre's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

8.    The Parties agreed to constitute the Arbitral Tribunal in accordance with Article 37(2)(a) of the ICSID Convention. The Tribunal was to consist of three arbitrators, one appointed by each party and the President of the Tribunal appointed by agreement of the Parties.

9.    On 24 March 2014, the Claimants appointed Dr. Stanimir Alexandrov, a national of Bulgaria, as an arbitrator. On 7 May 2014, the Respondent appointed Professor Pierre-

---

[7] Energy Charter Treaty, 17 December 1994, 2080 UNTS 95, Exhibit CL-1.

[8] Request, paras. 90-105.

[9] Memorial, paras. 411 *et seq.*

[10] Ibid., para. 505(b); Reply, para. 419(b).

2

Marie Dupuy, a national of France, as an arbitrator. On 12 June 2014, the Parties agreed to appoint Judge James Crawford AC, a national of Australia, as President of the Tribunal.

10. On 12 June 2014, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings ('***Arbitration Rules***'), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date, and circulated the arbitrators' declarations under Rule 6(2) of the Arbitration Rules. Mr. Benjamin Garel, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

11. The first session of the Tribunal with representatives of the Parties was held by telephone conference on 28 July 2014. During that conference, the Parties confirmed that the Tribunal was properly constituted and that they had no objection to the appointment of any member of the Tribunal.

12. Also at the first session, it was agreed that this arbitration would be conducted in English and that it would proceed in accordance with the ICSID Arbitration Rules in force as of 10 April 2006. The Tribunal discussed with the Parties a previously circulated provisional agenda and draft procedural order, and established by agreement a timetable for this proceeding that was incorporated in Procedural Order No. 1.

13. Pursuant to the timetable established at the first session (which was amended on 28 July 2015, following letters from the Parties of 16 July 2015 and 22 July 2015), the Parties made the following written submissions:

(a) The Claimants submitted their Memorial on the Merits on 31 July 2014, accompanied by the witness statements of Jean-Pierre Lecorcier and Michael Stein, and by the expert report of Carlos Lapuerta.

(b) The Respondent submitted its Counter-Memorial on the Merits on 19 December 2014.

3

(c)  The Claimants submitted their Reply on the Merits on 8 May 2015, accompanied by the expert report of Paolo Marino, the rebuttal expert report of Carlos Lapuerta, and the second witness statements of Jean-Pierre Lecorcier and Michael Stein.

(d)  The Respondent submitted its Rejoinder on the Merits on 16 October 2015, accompanied by the expert report of Luca Benedetti.

14.  On 22 September 2015, the Secretary-General informed the Parties that Francisco Abriani, ICSID Legal Counsel, would replace Benjamin Garel as Secretary of the Tribunal in this proceeding.

15.  On 23 October 2015, the European Commission (the '*EC*' or '*Commission*') filed an 'Application for Leave to Intervene as a Non-Disputing Party' (the '*Commission's Application*') pursuant to Rule 37 of the ICSID Arbitration Rules.

16.  On 24 October 2015, the Tribunal invited the Parties to submit their observations regarding the Commission's Application by 28 October 2015.

17.  On 28 October 2015, the Respondent submitted the statements of Mr. Benedetti and Mr. Bacchiocchi in their capacity as expert and fact witness, respectively.

18.  On 28 October 2015, the Claimants submitted their observations regarding the Commission's Application, and requested that the application be dismissed.  On the same date, the Respondent submitted its observations regarding the Commission's Application, and requested that it be accepted.

19.  On 30 October 2015, the Tribunal accepted the Commission's Application *de bene esse* and fixed 12 November 2015 for the filing of the Commission's further observations, without deciding at that stage whether the Commission's written submissions would be incorporated into the record.

20.  On the same date, the Claimants filed a request for the Tribunal to decide on the admissibility of new evidence, specifically a further report of 2011 from Watson, Farley and Williams.

4

21. On 4 November 2015, the Respondent filed observations on the Claimants' request of 30 October 2015.

22. On 5 November 2015, the Tribunal ruled that the new evidence was admissible. As a result, on the same date the Claimants filed the Opinion of Eugenio Tranchino, of Watson, Farley and Williams, dated 20 May 2011. This document was submitted as Exhibit C-357.

23. On 12 November 2015, the Commission filed a submission regarding the Tribunal's jurisdiction over the Claimants' claims (the '***Commission's Submission***'), while purportedly reserving 'the right to request leave to intervene also on points of substance' in the event that the Tribunal decided it had jurisdiction.

24. On the same date, the Respondent submitted further observations regarding the Commission's Application. The Respondent requested that the Tribunal 'allow a round of written memoires by the Parties, irrespective of its final decision as for the intervention of the European Commission in the procedure', and that the hearing scheduled to take place between 30 November and 4 December 2015 be postponed.

25. On 13 November 2015, the Parties and the President of the Tribunal held a pre-hearing conference in which they discussed arrangements for the hearing on jurisdiction and merits, and issues arising from the Commission's Application.

26. On 18 November 2015, the Tribunal issued Procedural Order No. 2, deciding to postpone the hearing initially scheduled to take place between 30 November and 4 December 2015, and inviting the Respondent and the Claimants to submit their positions regarding the Commission's Submission by 22 January and 26 February 2016, respectively.

27. On 22 January 2016, the Respondent submitted its 'position on the jurisdiction of the Tribunal over intra-EU disputes', substantially incorporating the EC's views.

28. On 26 February 2016, the Claimants submitted their 'observations on the EC's *amicus curiae* brief', rejecting the Commission's Submission as to the substance.

29. By letter of 10 March 2016, the Respondent requested 'to discuss jurisdictional matters and have a Tribunal decision on these, prior to any discussion on the merits of the case.'

30. By letter of 16 March 2016, the Claimants opposed the Respondent's request of 10 March 2016.

31. On 19 March 2016, the Tribunal issued Procedural Order No. 3, allowing the introduction of the Commission's Submission of 12 November 2015 to the record in this proceeding pursuant to Rule 37(2) of the ICSD Arbitration Rules. In the same order, the Tribunal reserved for a later date its decision regarding the costs incurred as a result of the Commission's application.

32. On the same date, the Tribunal also issued Procedural Order No. 4, rejecting the Respondent's request to bifurcate the proceeding and reserving for a later date its decision regarding the costs incurred as a result of the Respondent's request.

33. A hearing on jurisdiction and the merits was held between 25 and 28 April 2016 at the World Bank in Paris, France. Attending the hearing were:

Tribunal Members

- Judge James Crawford AC, President of the Tribunal
- Dr. Stanimir Alexandrov, Arbitrator

ICSID Secretariat

- Mr. Francisco Abriani, Secretary of the Tribunal

Appearing on behalf of the Claimants:

- Mr. Barton Legum, Dentons Europe LLP
- Ms. Anne-Sophie Dufêtre, Dentons Europe LLP
- Mr. Augustin Barrier, Dentons Europe LLP
- Mr. Niccolò Castagno, Dentons Europe LLP

- Mr. Pierre Esteve, Dentons Europe LLP
- Mr. Louis Helfre-Jaboulay, Dentons Europe LLP
- Mr. Giuseppe Velluto, Gianni, Origoni, Grippo, Cappelli & Partners
- Ms. Valentina Grippa, Gianni, Origoni, Grippo, Cappelli & Partners

Claimants' Witnesses

- Mr. Jean-Pierre Lecorcier
- Mr. Michael Stein

Claimants' Experts

- Mr. Paolo Marino, Pöyry Italy S.r.l. - Business Expert
- Ms. Paola Lualdi, Pöyry Italy S.r.l. - Business Expert
- Mr. Maurizio Parodi, Pöyry Italy S.r.l. - Business Expert
- Mr. Carlos Lapuerta, The Brattle Group, Inc. - Damages Expert
- Mr. Pedro Marin, The Brattle Group, Inc. - Damages Expert
- Mr. Federico Melzani, The Brattle Group, Inc. - Damages Expert

Appearing on behalf of the Respondent:

- Avv. Sergio Fiorentino, Avvocatura dello Stato
- Avv. Paolo Grasso, Avvocatura dello Stato
- Prof. Dr. Maria Chiara Malaguti, External Counsel to the Ministry of Foreign Affairs
- Avv. Giuseppe Stuppia, Legal Service of the Ministry of Foreign Affairs

Respondent's Experts

- Mr. Luca Benedetti, GSE - Gestore Servizi Energetici
- Mr. Daniele Bacchiocchi, GSE - Gestore Servizi Energetici
- Mr. Luca Miragli, GSE - Gestore Servizi Energetici
- Mr. Valerio Venturi, GSE - Gestore Servizi Energetici
- Mr. Francesco Trezza, GSE - Gestore Servizi Energetici

Court Reporter

- Mr. Trevor McGowan

Interpreters

- Ms. Eliza Burnhum
- Ms. Sarah Rossi
- Ms. Anne Verclytte
- Ms. Anna Collins
- Ms. Enrica Dal Santo
- Ms. Delfina Genchi

34.  On 24 April 2016, the Parties were notified that one of the arbitrators, Professor Dupuy, had been admitted to hospital and was accordingly unavailable to attend the rescheduled hearing. At the beginning of the hearing, on 25 April 2016, the Claimants asked the other two members of the Tribunal to go forward with the hearing as planned, noting that the Parties had already given their consent to proceed with the hearing in such circumstances at paragraph 4.1 of Procedural Order No. 1,[11] which provides in relevant part as follows:

> … in the event of unexpected health or other serious issues concerning a Member making him unable to be present, the other two Members shall exercise their judgment as to whether to sit with two Members. The Parties shall be informed of such circumstances beforehand.[12]

35.  The Claimants also noted that this hearing had already been postponed once.[13]

36.  The Respondent, in turn, noted as follows:

> We also know, of course, the text of the Procedural Order No. 1. … in any event, we do recognise that we are in your hands. My only point at this stage would be: we are not speaking about one sitting of the Tribunal; we

---

[11] Transcript, Day 1, 4:18 – 5:14 (Legum).

[12] Procedural Order No. 1, para. 4.1.

[13] Transcript, Day 1, 8:19 – 9:9 (Legum).

8

are speaking of the only hearing that we have, where we discuss everything
at once.  Of course Professor Dupuy can read the transcript, but it's
absolutely not the same thing as being able to dialogue, to see each other in
our eyes, to make questions one after the other, and to interact.  It's not the
same.  And I think arbitration has a characteristic: the extreme relevance of
this phase is especially when you speak with the witnesses and the experts.
So for us, we do not feel that we really can proceed with the hearing without
one of the three members.  It's too important for him to be present to really
understand the way we discuss the case.  So we would really oppose to that.
We are in your hands, so you take the decision of course.[14]

37.    In making a decision, the other two members of the Tribunal also considered the views

of Professor Dupuy, who agreed that pursuant to paragraph 4.1 of Procedural Order

No. 1 the other two members of the Tribunal could proceed with the hearing in his

absence.

38.    Moreover, the Tribunal noted that the Parties' agreement, as expressed in Procedural

Order No. 1, is compatible with Rules 14 and 20(1)(a) of the ICSID Arbitration Rules.

39.    Acting in accordance with paragraph 4.1 of Procedural Order No. 1, and after hearing

the Parties, the other two members decided to proceed with the opening submissions

of the Parties and the hearing of witnesses but to postpone closing submissions until a

date to be fixed, when all members of the Tribunal could be present.  The possibility

was left open that the Tribunal might recall one or more witnesses should Professor

Dupuy, after reading the transcripts, wish to put further questions.  Subsequently, the

Tribunal informed the Parties that this would not be necessary.[15]

40.    The President of the Tribunal communicated the Tribunal's decision to the Parties as

follows:

This is obviously a regrettable situation.  To postpone the hearing at this
stage would be a second postponement, as pointed out, and would involve
extra costs.  On the other hand, the Respondent is in principle entitled,
subject to the rules, to a hearing by the Tribunal.  But there has been
agreement between the parties in a quite carefully worded provision
specifically envisaging a situation in which unexpected health problems

---

[14] Transcript, Day 1, 6:15-16 and 7:2 – 7:19 (Malaguti).

[15] Letter to the Parties dated 13 May 2016.

supervene. One other consideration is that the members of the Tribunal have many commitments, and scheduling another five-day hearing this side of the summer is going to be difficult.

So the Tribunal has decided, in the exercise of the discretion conferred by the rules, to go ahead, but to go ahead as a truncated Tribunal with a truncated hearing. What we propose is that we would have the openings today -- it is traditional in openings that there's not detailed questioning, but questioning more by way of clarification -- to hear the witnesses, and then to adjourn. The hearing would therefore last for three and a half days as scheduled.

We would then reconvene as soon as a date can be found for the closings, which will enable Professor Dupuy to read the transcripts. If there is a compelling case for a witness to return to the chair for questions from Professor Dupuy, that can be done. So there would be a further hearing of a day, or perhaps a day and a half, in which the closings would be conducted in the presence of Professor Dupuy. That would enable him -- especially if we schedule a bit longer for the closing -- to fully participate.

We think that that solution, subject to the comments of the parties, addresses the problems so far as we can do so. It reduces the wasted costs of this hearing. It makes it much easier for us to schedule a resumed hearing in the next couple of months. I don't know when that will be because we haven't been able to get in touch with Professor Dupuy, but obviously we will correspond on that. It enables Professor Dupuy to participate fully in the closing and to ask questions, and if necessary gives him a bit more time to do that. Subject to the comments, that's the Tribunal's decision, unless the parties have compelling reasons not to adopt that.[16]

The Claimants stated that 'the solution that the Tribunal has proposed is a reasonable one and we would endorse it.'[17] Following further exchanges with the Tribunal and counsel for the Claimants, the Respondent stated:

Thank you Mr. President. We can start if you want. We spoke with our principals in Rome; they were not so happy but the decision is taken. So let's go on."[18]

---

[16] Transcript, Day 1, 9:18 – 11:13 (President).

[17] Transcript, Day 1, 15:13-15 (Legum).

[18] Transcript, Day 1, 18:12-15 (Fiorentino).

41. The hearing was resumed on 21 and 22 June in Paris, in the presence of the entire Tribunal, at which the Parties presented their closing arguments and submissions according to an agreed timetable. In doing so they addressed, *inter alia*, a list of questions provided in advance by the Tribunal. Attending the hearing were:

Tribunal Members

- Judge James Crawford AC, President of the Tribunal
- Dr. Stanimir Alexandrov, Arbitrator
- Professor Pierre-Marie Dupuy, Arbitrator

ICSID Secretariat

- Mr. Francisco Abriani, Secretary of the Tribunal

Appearing on behalf of the Claimants:

- Mr. Barton Legum, Dentons Europe LLP
- Ms. Anne-Sophie Dufêtre, Dentons Europe LLP
- Mr. Augustin Barrier, Dentons Europe LLP
- Mr. Niccolò Castagno, Dentons Europe LLP
- Mr. Pierre Esteve, Dentons Europe LLP
- Mr. Jean-Pierre Lecorcier, Claimant
- Mr. Michael Stein, Claimant

Appearing on behalf of the Respondent:

- Avv. Gabriella Palmieri, Avvocatura dello Stato
- Avv. Sergio Fiorentino, Avvocatura dello Stato
- Avv. Paolo Grasso, Avvocatura dello Stato
- Avv. Giacomo Aiello, Avvocatura dello Stato
- Prof. Dr. Maria Chiara Malaguti, External Counsel to the Ministry of Foreign Affairs
- Avv. Giuseppe Stuppia, Legal Service of the Ministry of Foreign Affairs

11

- Mr. Daniele Bacchiocchi, GSE - Gestore Servizi Energetici
- Mr. Luca Benedetti, GSE - Gestore Servizi Energetici
- Ms. Marta Capriulo, GSE - Gestore Servizi Energetici
- Mr. Francesco Trezza, GSE - Gestore Servizi Energetici
- Mr. Valerio Venturi, GSE - Gestore Servizi Energetici

Court Reporter

- Mr. Trevor McGowan

42.   During the evening of 21 June 2016, the Secretary received an application from a subsidiary of Blusun, Eskosol.  Eskosol (now in liquidation and under the control of an Italian liquidator appointed by an Italian court) sought permission to intervene as a non-disputing party under Rule 37(2) of the Arbitration Rules.  Eskosol had previously commenced its own ICSID arbitration, as a subsidiary of Blusun, relying on the same facts against Italy as Blusun has done.  In short, it submitted that this Tribunal lacks jurisdiction and/or the Blusun claim is inadmissible because the Claimants are 'seeking damages to which only Eskosol is entitled, which will cause prejudice to Eskosol, its creditors and the Non-Party Shareholders.'[19]

43.   Having consulted the Parties and received concordant oral and written submissions from them, the Tribunal rejected Eskosol's application, on the following grounds:

   6.   The Tribunal notes that, pursuant to Rule 37(2) of the ICSID Arbitration Rules, it "shall ensure that the non-disputing party submission does not disrupt the proceeding or unduly burden or unfairly prejudice either party."

   7.   The Tribunal also notes that Eskosol's Application was submitted extraordinarily late and that there is no excuse for the lateness.  The existence of this proceeding is public and has been known for a long time.  Moreover, Eskosol itself has been aware of this proceeding for quite some time: it has initiated other ICSID proceedings against the

---

[19] Eskosol S.p.A. (in liquidation), Application under ICSID Arbitration Rule 37(2), 21 June 2016, para. 5.  The Non-Party Shareholders are two Italian nationals together holding 20% of the shares in Eskosol.

same Respondent and, as Respondent stated at the hearing, Respondent offered to Eskosol to consolidate the two cases.

8.    The Tribunal further notes that both parties agree that Eskosol's Application should be rejected on the basis that it would disrupt the proceedings.[20]

The Respondent, in arguing for the rejection of Eskosol's application, added that:

> According to Rule 37(2), a non-disputing party can be admitted if this is not a party to the proceeding, or linked to this.  As the Respondent has stated when justifying its proposal for consolidation to the Counsels of both the Claimants and Eskosol, and as it was reiterated in Italy's letter to the Tribunal of March 17[th] to answer the Claimants' comments to its request for bifurcation and information about request for consolidation, '*Eskosol is that very same company that the Claimants define as their Italian vehicle for the purported investment in Italy*.'  Eskosol could consequently not take advantage of Article 37(2) because it pertains to the same business entity as Blusun.  As for international investment law, Blusun and Eskosol are the same entity.[21]

44.    Neither Party requested post-hearing briefs, nor did the Tribunal see any need for them.

45.    On 18 July 2016, the Claimants submitted an application for leave to introduce to the record the decision on jurisdiction in the case *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain* (ICSID Case No. ARB/13/30), dated 6 June 2016, as a new legal authority.  After having heard the Respondent on the Claimants' request, the Tribunal admitted to the record the new legal authority submitted by the Claimants as Exhibit CL-255 and invited the Parties to submit observations on its content.  The Claimants submitted very brief observations on 18 August 2016.  The Respondent submitted its observations on 5 September 2016.

46.    On 1 August 2016, the Claimants filed their submission on costs.  The Respondent did not make any submission on costs.

---

[20] Procedural Order No. 5, 8 July 2016.

[21] Letter from the Respondent to the Tribunal, 30 June 2016.

13

47.    In the circumstances, the Tribunal believes the Parties have each had a full opportunity to present their case, as they each confirmed at the end of the resumed hearing.[22]

## III.    RELIEF SOUGHT BY THE PARTIES

### 1.    The Claimants' request for relief

48.    In their Reply, the Claimants requested an Award:

    a.    Declaring that the Italian Republic has breached its obligations under Part III of the Energy Charter Treaty;

    b.    Ordering the Italian Republic to pay compensation corresponding to the loss of investment made and to the capital gains that the Claimants were unable to realize on their investments, in an amount to be proven at the hearing but which the Claimants presently estimate to be EUR 187.8 million;

    c.    Ordering the Italian Republic to pay interest on the above sum from the date of the first breach to the date of the award at the rate for three-month Italian bonds, compounded monthly;

    d.    Ordering the Italian Republic to pay the expenses incurred by the Claimants in connection with these proceedings, including professional fees and disbursements, and to pay the fees and expenses of the Members of the Tribunal and the charges for the use of the facilities of the Centre, in accordance with Article 61(2) of the ICSID Convention;

    e.    Ordering the Italian Republic to pay interest on the sums awarded at the rate for three-month Italian bonds, compounded monthly, from the date of the Award until its full discharge by Italy;

    f.    Ordering that all sums awarded be paid to a subaccount established for this case by the Fund for Lawyers' Pecuniary Payments (*Caisse des règlements pécuniaires de la profession d'avocat*) maintained by the Bar of Paris, France (*Ordre des Avocats de Paris*);

    g.    Ordering such other and further relief as the Tribunal deems appropriate in the circumstances.[23]

49.    In closing, the Claimants reaffirmed these submissions:

---

[22] Transcript, Day 6, 97: 5-8 (Legum), 97: 9-16 (Malaguti).

[23] Reply, para. 419.

The purpose of a closing statement is to review the evidence presented at the hearing and to provide the parties' views on the implications of that evidence for the legal issues to be decided. This will be the principal focus of our closing statement this morning. We will generally not repeat today what we said in our opening or in our written submissions, except to respond to statements made during the hearing. The Tribunal should bear in mind, however, that we continue to rely on our prior oral and written submissions.[24]

## 2.     The Respondent's request for relief

50.    In its Rejoinder, the Respondent requested the Tribunal as follows:

   a.  Decline jurisdiction to decide, as the Project does not meet the conditions of an investment that can be protected under the ICSID and the ECT.

   b.  Alternatively, decline jurisdiction to decide, as the alleged investment was created in violation of the national law; of the national and international principles of good faith; of the ECT rules on environmental protection.

   c.  In a further alternative, decline admissibility of protection of the Claimants' alleged interests since these are barred from seeking relief because of their unlawful conduct when constituting the alleged investment.

   d.  Should the Tribunal decide to have jurisdiction on the case, declare, on the merits, that all the claims of the Claimants, both under Article 10(1) and article 13 of the ECT, are unfounded, since there completely lacks any causal link between the challenged Respondent's conduct and the outcomes of the Project; that, in any case, the Respondent's conduct does not constitute a violation of such rules.

   e.  In this context, declare the witness statements as submitted by the Claimants both in the Memorial and the Reply as unfit to prove evidentiary facts since Mr Lecorcier and Mr Stein are party to the arbitral proceedings, and the requests for damages not supported by consistent evidence.

   f.  In the unfortunate event that the Tribunal were to recognize legitimacy to one of the claims of the Claimants and recognize some form of compensation to the Claimants, declare appropriate the calculations of

---

[24] Transcript, Day 5, 3:4-13 (Legum).

15

the damage and the interest proposed by the Respondent, including for calculation of interest.

g. However exclude from the amount of compensation the part of contributory fault attributable to the conduct of the Claimants, whose responsibility in the negative outcomes of the Project is far superior to that in any way attributable to the Respondent.

h. Ordering the Claimants to pay the expenses incurred by the Italian Republic in connection with these proceedings, including professional fees and disbursements, and to pay the fees and expenses of the Members of the Tribunal and the charges for the use of the facilities of the Centre, in accordance with Article 61(2) of the ICSID Convention.[25]

51. In closing, the Respondents reaffirmed these submissions:

Italy firmly believes that this hearing has fully demonstrated the inconsistency of Blusun, Mr Lecorcier and Mr Stein's claims. Therefore, no wrongful acts have been committed by Italy. No violations by Italy of Articles 10 and 13 of the Energy Charter Treaty have been proven. These closing statements will be devoted to summarising what emerged in the last hearing, underlying the reasons why the Respondent has no responsibility for the failure of Claimants' project. In any case, it has to be clearly stated that the Respondent, even if in these closing statements it will not treat each single point of its written submissions, does not renounce to any of its arguments, which are entirely recalled here.[26]

## IV.    FACTUAL BACKGROUND

52. The purpose of this section is to provide a brief account of the factual background to the dispute. There are no major differences between the Parties as to the events described in the section. There are, however, significant differences as to the legal consequences of the actions taken and not taken, as will be seen.

## A.    THE 120 MW PROJECT

53. The dispute concerns a 120-MW energy project in the Region of Puglia, in the municipalities of Brindisi and Mesagne (Province of Brindisi), Italy (hereafter the

---

[25] Rejoinder, para. 285.

[26] Transcript, Day 5, 130:23 – 131:13 (Palmieri).

'*Puglia Project*' or the '*Project*').  According to the Claimants, the Project consisted in joining approximately 120 photovoltaic plants to each other and to two substations for connection to the national grid.[27]  Each of the photovoltaic plants had a capacity of just under 1 MW.[28]  Together, the plants would have generated approximately 120 MW.[29]

54.  The photovoltaic plants included in the Claimants' Project had been initially developed by 12 local companies (special purpose vehicles or '*SPVs*') under the aegis of local investors.  Between 2008 and 2009, these companies had acquired certain rights and permits for the development of the plants.  As explained in more detail below, these were rights over the land where the plants would be built, construction permits, and permits for connecting each plant to the local medium-voltage grid.

**B.    THE CLAIMANTS' INVOLVEMENT IN THE PROJECT**

55.  On 23 September 2009, Jean-Pierre Lecorcier and Michael Stein, through a Swiss company that they own and control named Energy Solution Concept ('*ESCO*'),[30] signed a non-exclusive memorandum of understanding with Oikonomia Dante & Partners ('*Oikonomia*'), an Italian consultancy firm.  The stated purpose of this memorandum was the development of three large scale projects for the production of energy based on photovoltaic modules in Southern Italy.[31]  Messrs. Lecorcier and Stein eventually decided to pursue only one of those projects: the 120 MW project in Puglia.[32]

---

[27] Memorial, paras. 5, 120; Rejoinder, para. 12(a).

[28] Summary Table of DIA Authorizations, Exhibit C-11 and DIA Applications without Correspondence, 2008-2009, Exhibit C-13.

[29] Memorial, para. 120.

[30] Lecorcier WS1, para. 23; Stein WS1, para. 16. See also Memorial, paras. 38, 136.

[31] Memorandum of Understanding between FFA Invest and ESCO, Exhibit C-35, p. 1. See also Memorial, para. 136.

[32] Lecorcier WS1, para. 63; Stein WS1, para. 54. See also Memorial, paras. 137, 168.

56.    In order to do so, the investors had to purchase the SPVs that held the rights and permits for the development of the plants.[33]  They also had to build two substations to connect the solar plants to the national grid, and medium-voltage grids (or 'rings') to connect the solar plants to each other and to the two substations.[34]

57.    On 27 November 2009, Messrs. Lecorcier and Stein signed another memorandum of understanding pursuant to which ESCO would grant a €758,000 loan to Oikonomia in order to make certain down payments to the local developers,[35] and committed funds for future payments.[36]

58.    On 3 December 2009, Oikonomia entered into a series of preliminary share purchase agreements with the local developers who owned the 12 SPVs, and made partial payments pursuant to those agreements with the funds facilitated by ESCO.[37]

59.    For the development of the project, the Claimants established a corporate structure consisting of a Belgian holding company (Blusun) and two Italian subsidiaries: Società Interconnessioni Brindisi S.R.L. (SIB) and Eskosol.

60.    Blusun was established by Messrs. Lecorcier and Stein on 10 December 2009 as a holding company.  The company was registered in Belgium on 20 December 2009.[38]

---

[33] Stein WS1, para. 42. See also Memorial, para. 139.

[34] Stein WS1, para. 27; Lecorcier WS1, para. 46. See also Memorial, paras. 5, 126-127.

[35] Letter from L. Dante to ESCO, attaching Memorandum of Understanding between Oikonomia and ESCO, 27 November 2009, Exhibit C-54. See also Memorial, para. 164.

[36] Letter from L. Dante to ESCO, attaching Memorandum of Understanding between Oikonomia and ESCO, 27 November 2009, Exhibit C-54. See also Memorial, para. 165.

[37] Summary Table of Preliminary Share Purchase Agreements between Oikonomia and the Local Development Companies, 3 December 2009, Exhibit C-59; and Preliminary Share Purchase Agreements between Oikonomia and the Local Development Companies, 3 December 2009, Exhibit C-60, Article 3.01. See also Memorial, para. 166.

[38] Blusun, Certificate of Good Standing (updated), 26 September 2013, 4 February 2014, 23 July 2014, Exhibit C-3.

The sole shareholders of Blusun are Messrs. Lecorcier and Stein.[39]  Mr. Lecorcier holds two-thirds of the shares; Mr. Stein, one third.

61.  SIB was established by Oikonomia on 14 December 2009, and was registered in Rome on 16 December 2009.[40]  Oikonomia transferred the full ownership of SIB to Blusun on 18 December 2009.  However, after a change in SIB's corporate structure, Blusun retained 50% of SIB's shares.[41]  According to the Claimants, SIB's primary role was to build and manage the two substations.[42]

62.  Eskosol was established on 21 December 2009 and registered in Rome on 24 December 2009.  Blusun holds a controlling (80%) interest in Eskosol.[43]  According to the Claimants, Eskosol was established as a holding company for the 12 SPVs; it was also supposed to construct the 120 solar plants and the rings.[44]

C.  THE ITALIAN LEGISLATIVE AND REGULATORY FRAMEWORK FOR SOLAR PROJECTS AS OF NOVEMBER 2009

63.  One of the main legislative sources at the time the Claimants invested in the solar project in Puglia was Legislative Decree 387/2003, dated 31 January 2004, which implemented European Directive 2001/77/EC of 27 September 2001 on the promotion of electricity from renewable energy sources in the EU internal electricity market (the *First Renewables Directive*).[45]

---

[39] Blusun, Articles of Association (updated), 10 December 2009, 20 December 2009, 11 April 2011, Exhibit C-4, p. 2.

[40] SIB, Certificate of Incorporation (*Visura Camerale*), 18 April 2014, Exhibit C-229, p. 1.

[41] Transfer of the Quotas of SRL between J.-P. Lecorcier, L. Dante and Oikonomia, 18 December 2009, 18 December 2009, Exhibit C-64, p. 1; SIB, Certificate of Incorporation (*Visura Camerale*), 18 April 2014, Exhibit C-229, p. 5.

[42] Memorial, para. 172.

[43] Notarized Minutes of Meeting of Eskosol Shareholders, 17 December 2010, Exhibit C-150. See also Memorial, paras. 174-178.

[44] Memorial, para. 173.

[45] *Decreto Legislativo 29 dicembre 2003, n. 387* (Legislative Decree 29 December 2003, No. 387), Exhibit CL-50.

64. The First Renewables Directive was aimed at promoting the development of energy produced from renewable sources. It provided, among other things, that Member States should adopt national indicative targets regarding the consumption of energy produced from renewable sources,[46] publish reports regarding the achievement of the national indicative targets every two years,[47] and simplify the authorisation procedures for renewable energy projects.[48] The European Commission, in turn, would assess the cost-effectiveness of the incentives adopted by the Members States in view of the adoption of a subsequent EU framework on this matter.[49]

65. At the time of the Claimants' initial involvement in the project, solar projects in Italy were subject to national and regional regulations. The regulations cited by the Parties in this proceeding concern (1) construction permits, (2) permits for connecting the plants to the medium- and high-voltage grids, and (3) tariffs.[50] These are briefly described below.

## 1.    Construction permits

66. At the national level, Legislative Decree 387/2003 established a simplified authorisation procedure for the construction of plants powered by renewable sources, according to which renewable energy projects need to obtain only a single authorisation (called '*Autorizzazione Unica*' or '*AU*') granted by a joint conference in which all relevant authorities participate to assess the application.[51] The decree required the AU procedure to be completed within 180 days from the filing of the

---

[46] Directive 2001/77/EC, of the European Parliament and of the Council on the Promotion of Electricity Produced from Renewable Energy Sources in the Internal Electricity Market, 2001 O.J. (L 283) 33, 27 September 2001, Exhibit CL-6, Article 3(2).

[47] Ibid., Article 3(3).

[48] Ibid., Article 6.

[49] Ibid., Article 4.

[50] Memorial, paras. 53-119; Counter-Memorial, paras. 44-113.

[51] *Decreto Legislativo 29 dicembre 2003, n. 387* (Legislative Decree 29 December 2003, No. 387), Exhibit CL-50, Article 12.

application.[52]    Moreover, the AU procedure was subject to existing regulations regarding environmental protection.[53]

67.    Solar plants with capacity below 20 KW were subject to a different, declaratory procedure (the *'Denuncia di Inizio Attività'* or *'DIA'*).    This procedure was established by Decree of the President of the Republic No. 380 of 6 June 2001, which entered into force on 1 January 2002.[54]    The DIA procedure consisted in the presentation of a declaration and supporting documentation by the applicant.  Absent formal objection by the competent authority (i.e. the municipality concerned) within 30 days following the application, the applicant was permitted to begin work.[55]    The DIA authorisation was thus implicit, and the works had to be completed within three years after the expiration of the 30-day period for objection by the municipal authority.[56]

68.    The Puglia region also adopted laws and regulations regarding the construction of solar plants. These included, in particular, Puglia Regional Law 1/2008 of 19 February 2008, and Puglia Regional Law 31/2008 of 21 October 2008.[57]    Both regional laws allowed the use of the DIA procedure for solar plants with a capacity up to 1 MW.[58]    They also contained specific requirements for DIA applicants for solar plants to be built on agricultural land.[59]    Regional Law 31/2008 added some additional requirements for this kind of project: (a) the plot of land on which the plant was located should be at

---

[52] Ibid., Article 12(4). See also Memorial, para. 58.

[53] *Decreto Legislativo 29 dicembre 2003, n. 387* (Legislative Decree 29 December 2003, No. 387), Exhibit CL-50, Article 12(3).

[54] Ibid., Article 12(5).

[55] *Decreto Presidente della Repubblica 6 giugno 2001, n. 380* (Decree of the President of the Republic of 6 June 2001, No. 380), Exhibit CL-59, Article 23(1). See also Memorial, para. 61 and Counter-Memorial, para. 86.

[56] *Decreto Presidente della Repubblica 6 giugno 2001, n. 380* (Decree of the President of the Republic of 6 June 2001, No. 380), Exhibit CL-59, Article 23(2).

[57] *Legge regionale 19 febbraio 2008, n. 1* (Regional Law of 19 February 2008, No. 1), Exhibit CL-70 (*'Regional Law 1/2008'*); and *Legge regionale 21 ottobre 2008, n. 31* (Regional Law of 21 October 2008, No. 31), Exhibit CL-72 (*'Regional Law 31/2008'*).  See also Memorial, para. 66 and Counter-Memorial, para. 88.

[58] Regional Law 1/2008, Exhibit CL-70, Article 27(1); Regional Law 31/2008, Exhibit CL-72, Article 3(1).

[59] Regional Law 1/2008, Exhibit CL-70, Article 27(2); Regional Law 31/2008, Exhibit CL-72, Article 3.

least twice as large as the portion occupied by the plant; and (b) the portion not occupied by the plant should be used exclusively for agricultural activities.[60] Regional Law 31/2008 also provided as follows:

> Plants installed on the ground in an agricultural area which consists of lands belonging to the same owner, or which is made up of several plots resulting from the splitting of an area of greater extension carried out within two years prior to the application, are considered as a single plant for the purposes of calculating the maximum electric power for having recourse to the DIA procedure.[61]

69. The Respondent asserts that 'the use of the DIA for plants of less than 1 MW was excluded by the mentioned regional laws if the plants established on agricultural land belonged to a single owner, or were part of a unitary project.'[62]  It also claims that, even though Regional Law 1/2008 did not include an express provision to this effect, 'this has constantly been interpreted in this way.'[63]

70. The Respondent notes that 'these principles were reiterated in further measures of the Puglia Region',[64] and inserted in the National Guidelines for the authorisation of plants powered by renewable sources.[65]

71. The Parties also refer to Circular 38/8763 of 1 August 2008.  By this circular, the Puglia department of economic development recommended that the municipalities pay attention to possible connections between multiple declarations of the initiation of activity, as oversights on the part of the applicants could have led to the use of the DIA

---

[60] Regional Law 31/2008, Exhibit CL-72, Article 3(1)(b).

[61] Ibid., Article 3(1)(b).

[62] Counter-Memorial, paras. 90-91.

[63] Ibid., para. 92.

[64] Ibid., para. 94. See Regional Government Decree (DGR) no. 3029 of 30 December 2010, Exhibit RL-3, Article 5; and Regional Law 25/2012, Exhibit RL-4, Article 5(10).

[65] Decree 10 September 2010, Guidelines for the authorization of plants powered by renewable sources, OJ 18 September 2010 no. 219, Exhibit RL-1, paragraph 11.6 (as translated at para. 94 of the Counter-Memorial):

> The limits of generation capacity and power … are to be understood as referred to the sum of nominal power, for each source, of each production plant belonging to the same subject or on which the same subject has the dominant decision position, belonging to the same connection point of the power grid.

22

procedure for plants whose overall electric power exceeds the 1 MW limit set forth in Article 27 of Regional Law 1/2008.[66]

**2.    Permits to connect to the national transmission and local distribution grids**

72.    The national transmission grid in Italy is operated by Terna S.p.A. ('***Terna***'). Most of the local distribution grids are operated by Enel.[67]    Connection to the national transmission and local distribution grids is regulated by the Authority for the Electric Energy and Gas (the '***AEEG***').    The Claimants describe the connection procedure by reference to two AEEG Resolutions: AEEG Resolution No. 281/2005 (also called the '***GOAL Resolution***', which was in force between 22 December 2005 and 31 December 2008) and AEEG Resolution No. 99/2008 (also called the '***TICA Resolution***', which has been in force since 1 January 2009 to the present).[68]    Both resolutions addressed interconnections requests for plants of less than 10 MW.[69]

73.    Under the GOAL Resolution, the applicant was required to submit an application and pay a fee to Enel, which in turn would propose a solution to the applicant in order to connect to the grid: this was called the 'general minimum technical solution' ('***Soluzione Tecnica Minima Generale***' or '***STMG***').    The applicant had to accept the STMG within a certain period of time. Following the acceptance of the STMG by the applicant, Enel issued a detailed minimum technical solution ('***Soluzione Tecnica Minima di Dettaglio***' or '***STMD***').[70]

---

[66] *Nota Circolare Regione Puglia 1 agosto 2008, n. 38/8763* (Puglia Circular of 1 August 2008, No. 38/8763), Exhibit CL-74, p. 3. See also Memorial, para. 69; Counter-Memorial, para. 93.

[67] Simone Monesi, Italy, in The Energy Regulation and Markets Review (David L. Schwartz ed., 2012), Exhibit CL-90, p. 147.

[68] Delibera AEEG 19 dicembre 2005, n. 281, in G.U. 11 gennaio 2006, n. 8, last amended by Delibera AEEG 11 dicembre 2008, n. ARG/elt 179/08, in G.U. 4 febbraio 2009, n. 28. (It.), 19 December 2005, Exhibit CL-60; and Delibera AEEG 23 luglio 2008, n. ARG/elt 99/08, Annex A, Art. 3 (It.), 23 July 2008, Exhibit CL-61.

[69] Delibera AEEG 23 luglio 2008, n. ARG/elt 99/08, Annex A, Art. 3 (It.), 23 July 2008, Exhibit CL-61.

[70] Delibera AEEG 19 dicembre 2005, n. 281, in G.U. 11 gennaio 2006, n. 8, last amended by Delibera AEEG 11 dicembre 2008, n. ARG/elt 179/08, in G.U. 4 febbraio 2009, Annex A, Art. 10.6 (It.), 19 December 2005, Exhibit CL-60.

74.  Under the TICA Resolution, a distinction is made between applications to connect to the medium-voltage grid and to the high-voltage grid.  Applicants have to submit their requests to the local grid operator and pay a fee.  For requests concerning connection of plants of between 100 KW and 1 MW to the medium-voltage grid, Enel issues an interconnection estimate ('*preventivo di connessione*') valid for 45 days which the applicant has to accept.  The interconnection estimate also indicates the amount to be paid for connection works.  However, the TICA Resolution permits the interconnection works to be performed by the applicant.[71]

75.  In the case of requests for connection to the high-voltage grid, Enel receives the applications and considers how to connect the plant to the grid operated by Terna.[72] Enel also issues a STMG which the applicant has 60 days to accept.  If the applicant accepts the STMG, Enel issues the STMD and the parties enter a service agreement (the '*regolamento di esercizio*').[73]

### 3.    Tariffs

76.  Legislative Decree 387/2003 foresaw the adoption of decrees that would define 'the criteria for encouraging the production of electricity from solar source.'[74]  It provided that '[f]or the electricity produced by photovoltaic conversion of solar energy, the criteria would provide for a specific incentive tariff by decreasing amount and duration as to ensure a fair remuneration of investment and operating costs.'[75]  The system was subject to periodic reviews in the form of reports that were to be produced for the first time in 2005 and subsequently every two years.[76]

---

[71] Memorial, paras. 91-96.

[72] Ibid., para. 97.

[73] Ibid., paras. 97-99.

[74] *Decreto Legislativo 29 dicembre 2003, n. 387* (Legislative Decree 29 December 2003, No. 387), Exhibit CL-50, Article 7(1).

[75] Ibid., Article 7(2)(d).

[76] Ibid., Article 3(2).

24

77.  Pursuant to Article 7 of Legislative Decree 387/2003, Italy adopted a remuneration system for solar plants based on fixed rates (feed-in tariffs or *'FITs'*).  This remuneration system was first implemented in 2005, through the so-called First Energy Account, and subsequently amended through the Second, Third, Fourth and Fifth Energy Accounts.[77]  These regulations provided that solar plants that became operational by a certain date would receive feed-in tariffs based on the nominal power of the plant, according to a scheme that would be valid for twenty years.[78]

78.  The Energy Accounts in force during the period between 2008 and 2012 were the Second, Third and Fourth Energy Accounts.[79]  These applied to solar plants that entered into operation between certain dates, as follows:

   (a)  Second Energy Account: applied to solar plants that entered into operation on or before 31 December 2010.[80]

   (b)  Third Energy Account: applied to solar plants that entered into operation between 31 December 2010 and 31 December 2013.[81]  Its applicability, however, was subsequently limited by the so-called 'Romani Decree' to solar plants commencing operations before 31 May 2011.[82]

---

[77] *Decreto Ministeriale 28 luglio 2005* (Ministerial Decree of 28 July 2005), Exhibit CL-53 (the *'First Energy Account'*); *Decreto Ministeriale 19 febbraio 2007* (Ministerial Decree of 19 February 2007), Exhibit CL-54 (the *'Second Energy Account'*); *Decreto Ministeriale 6 agosto 2010* (Ministerial Decree of 6 August 2010), Exhibit CL-55 (the *'Third Energy Account'*); *Decreto Ministeriale 5 maggio 2011* (Ministerial Decree of 5 May 2011), Exhibit CL-56 (the *'Fourth Energy Account'*); and *Decreto Ministeriale 5 luglio 2012* (Ministerial Decree of 5 July 2012), Exhibit CL-57 (the *'Fifth Energy Account'*).  See also Memorial, paras. 105 and 109; and Counter-Memorial, paras. 132-195.

[78] See, e.g., Second Energy Account, Exhibit CL-54, Article 6.

[79] The Claimants describe the rates applicable under each one of these Accounts in their Memorial, paras. 109-119.

[80] Second Energy Account, Exhibit CL-54, Article 6.

[81] Third Energy Account, Exhibit CL-55, Article 8.

[82] *Decreto Legislativo 3 marzo 2011, n. 28* (Legislative Decree of 3 March 2011, No. 28), Exhibit CL-51, Article 25(9) (the *'Romani Decree'*).

25

(c)    Fourth Energy Account: applied to solar plants that entered into operation between 1 June 2011 and 31 December 2016.[83]

79.    The entity in charge of regulating the renewable energy sector and purchasing and reselling electricity from renewable energy plants is *Gestore dei Servizi Energetici* ('**GSE**'), a state-owned entity whose sole shareholder is the Italian Ministry of Economy and Finance.[84]

D.    THE CLAIMANTS' INVESTMENTS

80.    The Claimants describe a number of investments made in relation to the construction of the two substations, the acquisition of the 12 local companies and land, and the construction of the local grid.

1.    **The two substations**

81.    Prior to the creation of Blusun, SIB and Eskosol, the 12 local companies had obtained the relevant permits for the connection of the plants to the distribution grid and for the connection of the two substations to the national grid from Enel and Terna, the operators of the distribution and transmission grids.[85]  The applications had been made by Nico Energia S.r.l. ('**Nico**') on behalf of the 12 local development companies.[86]  On 30 November 2009, the province of Brindisi issued two decrees granting Nico two

---

[83] Fourth Energy Account, Exhibit CL-56, Article 4; and GSE website, Fourth Feed-In Scheme – Photovoltaic Plants, 19 March 2012, Exhibit C-213.

[84] GSE website, Mission, 15 March 2012, Exhibit C-212 and GSE website, Our Activities, 6 February 2014, Exhibit C-226. Memorial, para. 108.

[85] Terna/Enel-Nico, Unified STMGs for Maffei and Torre Mozza, 27 October, 30 November 2009, Exhibit C-42; Enel-Nora, Connection Estimate, Exhibit C-25; Nico, Declaration of Initiation of Works (Maffei), 19 November 2009, Exhibit C-50; Nico, Declaration of Initiation of Works (Torre Mozza), 19 November 2009, Exhibit C-51; Terna/Enel-Nico, STMGs for Maffei and Torre Mozza, 22 July 2009, Exhibit C-29; Letter from Province of Brindisi to Nico, 15 June 2009, Exhibit C-27; Letter from Province of Brindisi to Nico, 16 October 2009, Exhibit C-37; and Terna/Enel-Nico, Unified STMGs for Maffei and Torre Mozza, 27 October, 30 November 2009, Exhibit C-42.

[86] Enel-Nico, Unified STMD for Maffei, 30 March 2011, Exhibit C-173; Enel-Nico, Unified STMD for Torre Mozza, 30 March 2011, Exhibit C-174.

single authorisations (AUs) for the construction and operation of the Maffei and Torre Mozza substations.[87]

82.  In December 2009, SIB finalized the acquisition of the land where the two substations would be built.[88]  On 24 February 2010, SIB signed a contract with Ansaldo Sistemi Industriali S.p.A. ('**Ansaldo**') for the construction of the two substations.[89]  On 29 April 2010, SIB signed a financing agreement with UniCredit for a total amount of €6,076,000,[90] and the construction of the two substations was completed on 13 November 2010 (the one located in Torre Mozza) and on 6 January 2011 (the one located in Maffei).[91]

### 2.    The local companies and the land

83.  Blusun completed the acquisition of the 12 local companies through Eskosol between 18 May and 23 July 2010, as Eskosol signed the relevant final share purchase agreements.[92]  Prior to the constitution of Blusun, SIB and Eskosol, the 12 local development companies had obtained land rights through land sale and purchase agreements[93] and through a series of long-term lease agreements with land owners.[94]

---

[87] Province of Brindisi, Decree n. 320/V, 30 November 2009, Exhibit C-55; Province of Brindisi, Decree n. 321/V, 30 November 2009, Exhibit C-56.

[88] Email from L. Dante to M. Stein and J.-P. Lecorcier, 30 December 2009, Exhibit C-69; Memorial, para. 181.

[89] Letter of Intent between SIB and Ansaldo, 31 December 2009, Exhibit C-70, p. 1; Construction Contract between SIB and Ansaldo, 24 February 2010, Exhibit C-93, para. 20.1.

[90] Financing Contract between UniCredit and SIB, 29 April 2010, Exhibit C-110, p. 1.

[91] Letter from Ansaldo to Istria, 18 April 2011, Exhibit C-178, p. 1.

[92] Eskosol, Certificate of Incorporation (*Visura Camerale*), 18 April 2014, Exhibit C-228, pp. 6-7; Final Share Purchase Agreements between Eskosol and the Local Development Companies, 18 May – 23 July 2010, Exhibit C-123.

[93] Summary Table of Preliminary and Final Land Purchase Agreements, 2008-2011, Exhibit C-16; and Preliminary and Final Land Purchase Agreements, 2008-2011, Exhibit C-17.

[94] Summary Table of Agreements for the Acquisition of Surface, Easement and Other Rights, 2008-2010, Exhibit C-14; and Agreements for the Acquisition of Surface, Easement and Other Rights, 2008-2010, Exhibit C-15.

### 3. The local grid

84. From January to May 2010, Nico obtained authorisations from the Municipalities of Brindisi, Mesagne and Cellino San Marco for the works for underground cable connections.[95]

85. In May 2010, Nico requested public easements on privately-owned lands to facilitate the construction of 'electric power lines to connect photovoltaic plants to the distribution grid.'[96] This request was published in *Corriere della Sera* and in *Corriere del Mezzogiorno*, a national and a regional newspaper, on 11 May 2010.[97] On 26 July 2010, the Province of Brindisi granted the requested public easements.[98]

86. On 30 July 2010, Eskosol signed a purchase order for 370 km of medium-voltage underground cables to be provided by Nexans.[99]

87. On 2 November 2010, Eskosol signed contracts with Nuovapanelectric S.R.L. and Convertino S.R.L. for the construction of the rings, and hired EOS as technical supervisor.[100]

88. On 8 November 2010, the Province of Brindisi also issued public easements for excavation works.[101]

---

[95] Municipality of Brindisi, Favorable Ruling (Maffei), 14 January 2010, Exhibit C-75; Municipality of Brindisi, Favorable Ruling (Torre Mozza), 14 January 2010, Exhibit C-76; Municipality of Cellino San Marco, Favorable Ruling, 21 January 2010, Exhibit C-81; Municipality of Mesagne, Favorable Ruling, 21 January 2010, Exhibit C-82; Municipality of Brindisi, Favorable Ruling (Maffei), Exhibit C-99; Municipality of Brindisi, Favorable Ruling (Torre Mozza), 18 March 2010, Exhibit C-100; and Municipality of Mesagne, Favorable Ruling, 22 March 2010, Exhibit C-101.

[96] Request from Nico to Municipality of Brindisi, 4 May 2010, Exhibit C-115.

[97] Corriere del Mezzogiorno, Nico Notice, 11 May 2010, Exhibit C-117.

[98] Province of Brindisi, Decree n. 156/V, 26 July 2010, Exhibit C-128.

[99] Contract to Purchase MV Cables between Eskosol and Nexans, 30 July 2010, Exhibit C-129.

[100] Services Contract for Turnkey Construction between Nico and Convertino, 2 November 2010, Exhibit C-135; Services Contract for Turnkey Construction between Nico and Nuovapanelectric, 2 November 2010, Exhibit C-136; and EOS, Weekly Reports, 29 November 2010 – 24 December 2010, Exhibit C-143.

[101] Province of Brindisi, Decree n. 208/V, 8 November 2010, Exhibit C-137.

### 4.    The construction permits

89.    Between June 2008 and June 2009, the local development companies applied for DIA authorisations for 119 solar plants pursuant to Puglia's regional laws No. 1/2008 and 31/2008.[102]  The Respondent provided a map indicating the location of the plants.[103]

90.    The local development companies obtained 65 certificates of expiry, confirming that the 30-day limit to raise objections had expired,[104] and 53 certificates of conformity,[105] which stated that the construction of the relevant solar plants was in conformity with the procedures set out in Regional Law 31/2008 and with general urban planning instruments.

## E.    THE CONSTITUTIONAL COURT DECISION OF 2010 AND THE REGULATIONS ADOPTED THEREAFTER

91.    In December 2008, the Italian Government sought to challenge the constitutionality of Puglia's Regional Law 31/2008 before the Constitutional Court.  One of the main grounds for the constitutional challenge was that, by permitting recourse to DIA authorisations for solar plants with capacity above the threshold set out in Legislative Decree 387/2003 (i.e., 20 KW), Article 3 of Puglia's Regional Law 31/2008 (which permitted recourse to that procedure for solar plants of up to 1 MW) contradicted Legislative Decree 387/2003.[106]

92.    On 26 March 2010, the Constitutional Court ruled that Article 3, paragraphs 1 and 2, of Puglia's Regional Law 31/2008 were unconstitutional.[107]

---

[102] Summary Table of DIA Authorizations, 2008-2009, Exhibit C-11; and DIA Applications, with Correspondence, 2008-2009, Exhibit C-12.  83 DIAs were granted under Law 31/2008; the remainder under Law 1/2008.

[103] Cadastral Maps of Brindisi Municipality, 17 November 2014, Exhibit R-8; and Cadastral Maps of Mesagne Municipality, 17 November 2014, Exhibit R-9.

[104] DIA Certificates of Expiry, 3 November 2008 – 26 June 2009, Exhibit C-19.

[105] DIA Certificates of Conformity, 5 March 2009 – 21 May 2010, Exhibit C-24.

[106] *Corte Cost., 26 marzo 2010, n. 119* (Constitutional Court, 26 March 2010, No. 119), Exhibit CL-81, p. 3.

[107] Ibid., p. 12.

29

93.    On 13 August 2010, the Italian Government adopted Law 129/2010 (also called the *'Salva-Alcoa law'*), approving Law Decree 105/2010.  Law 129/2010 provided as follows:

> Article 1-*quater* Declarations of initiation of activity regarding the construction of electric power plants based on renewable sources
>
> 1. The effects related to the authorization procedures based on [DIAs] referred to in Articles 22 and 23 of the Consolidated Text set by the Decree of the President of the Republic n. 380 of 6 June 2001, for the construction of plants for the production of electricity from renewable sources, initiated in accordance with regional laws, concerning thresholds exceeding the levels set out in Table A of the Legislative Decree n. 387 of 29 December 2003 [i.e., plants with capacity above 20 kilowatts], are maintained, provided that the operation of the plants starts within one-hundred and fifty days from the date of entry into force of the present Law implementing this decree.[108]

94.    On 25 November 2010, Watson Farley, acting as counsel for Eskosol, sought clarification from the GSE as to the effect of Law 129/2010 on the plants that obtained DIA authorisations between August and September 2008 and, in particular, on their eligibility for feed-in tariffs.[109]  On 3 December 2010, the GSE responded as follows:

> If the plants referred to in the first sentence of paragraph 3 mentioned above, i.e., those authorized between August and September 2008, comply with all the requirements, including with the technical standards resulting from the applicable rules, such as the decisions of the Authority for the Electric Energy and Gas, and unless the competent administrative authorities should rule in a different manner with regard to the interpretation of Article 1-*quater* of the Decree Law 105/2010 approved, with its amendments, by Law 129/2010, it is held that admission to the incentives under the so-called Energy Account is possible, in accordance with the relevant provisions of the applicable legislation.[110]

95.    On 15 December 2010, the Ministry of Economic Development issued a Circular regarding the scope of Law 129/2010.  The Circular stated as follows:

---

[108] *Legge 13 agosto 2010, n. 129* (Law of 13 August 2010, No. 129), Exhibit CL-67, p. 1.

[109] Letter from Watson Farley to GSE, 25 November 2010, Exhibit C-140.

[110] Letter from GSE to Watson Farley, 3 December 2010, Exhibit C-145.

> [T]he provisions of article 1-*quater* are not intended in any way to have effects with respect to so-called 'consolidated' legal relationships, *i.e.,* relating to those DIAs that have become 'final' since no longer subject to challenge due to the expiration of time-limits to file an appeal in courts and/or to submit extraordinary appeals to the President of the Republic. These DIAs are therefore not subject to the time-limit for commencement of operations of plants established by article 1-*quater* above.[111]

According to Claimants, it was only the Circular which finally cleared up the uncertainty arising from the Constitutional Court's decision of 26 March 2010.

F.    **ESKOSOL'S EPC CONTRACT WITH SIEMENS AND CONTACTS WITH POTENTIAL INVESTORS**

96.    On 29 December 2010, Eskosol signed an EPC contract with Siemens for the construction of the plants.[112]  The EPC contract provided that the plants would be built in three phases: 30 MW should be connected by 30 April 2011, an additional 60 MW should be connected by 31 August 2011, and an additional 30 MW should be connected by 15 November 2011.[113]

97.    Under the EPC contract, Eskosol was responsible for: (a) providing the photovoltaic modules,[114] (b) purchasing or leasing the land where the plants would be built,[115] and (c) obtaining and maintaining the relevant permits and grid connection authorisations.[116]  Siemens was allowed to propose amendments to the scope of work in case of change in the applicable permits.[117]  The EPC contract also provided that

---

[111] *Circolare Ministeriale 15 dicembre 2010* (Ministerial Circular of 15 December 2010), Exhibit CL-48, p. 2.

[112] Turnkey Contract for the Construction of a Photovoltaic Project of a 120 MW Solar Plant between Eskosol and Siemens, 29 December 2010, Exhibit C-155 (the '*EPC contract*').

[113] Ibid., Whereas III.

[114] Ibid., Whereas V and Article 2.7.

[115] Ibid., Article 2.13(a)(i).

[116] Ibid., Article 2.13(vii) and Article 5(a).

[117] Ibid., 3.3(a)(iii).

31

Siemens would be subject to the payment of liquidated damages in the event that delays in the completion of the works resulted in Eskosol missing the subsidies.[118]

98. On 29 December 2010, Eskosol also hired Energy One S.R.L. as director of works and safety management for the construction of the 120 solar plants.[119]

99. On 20 January 2011, Eskosol and Siemens agreed to postpone the signature of the annexes to the EPC contract until 28 January 2011, and the date for the first down payment until 28 February 2011.[120] On the same date, Eskosol sent a notice to Siemens requesting it to proceed with the works regarding the first group of plants.[121]

100. On 26 January 2011 and 4 February 2011, Eskosol received letters from financial investors showing interest in the Project and requesting information.[122] No commitments of project financing were, however, obtained at this or any time.

101. On 28 February 2011, Eskosol failed to make the 20% down payment, and on 7 March 2011 Siemens suspended performance of the EPC contract and proposed conditions for the works to resume.[123]

## G.    THE ROMANI DECREE

102. On 3 March 2011, the Italian Government enacted Legislative Decree 28/2011 (the '*Romani Decree*'), which entered into force on 29 March 2011.[124] The stated objective of the Romani Decree was to implement Directive 2009/28/EC on the promotion of

---

[118] Ibid., Article 14.3.

[119] Contract between Eskosol and Energy One, 29 December 2010, Exhibit C-153.

[120] Side Letter to the EPC Contract between Eskosol and Siemens, 20 January 2011, Exhibit C-158.

[121] Notice to Proceed from Eskosol to Siemens, 20 January 2011, Exhibit C-157.

[122] Letter from Vei Capital, Generali Private Equity and UniCredit to HSBC, 26 January 2011, Exhibit C-160; and Letter from Generali Private Equity and UniCredit to Eskosol, 4 February 2011, Exhibit C-161.

[123] Memorial, para. 262; Letter from Siemens to Eskosol, 7 March 2011, Exhibit C-168. Siemens finally terminated the EPC contract on 16 December 2011 (see Exhibit C-207).

[124] Romani Decree, Exhibit CL-51.

the use of energy from renewable sources, and to amend and repeal Directives 2001/77/EC and 2003/30/EC.[125]

103.  Among other reforms, the Romani Decree established that the feed-in tariffs adopted by the Decree of 6 August 2010 (the Third Energy Account) applied only to plants that entered into operation before 31 May 2011[126] (and not, as originally established in the 6 August 2010 Decree, to plants that entered into operation by 31 December 2013).[127]

104.  The Romani Decree also established that any solar plants to be built on agricultural land would be eligible for feed-in tariffs only if the plant had a capacity of less than 1 MW and occupied less than 10% of the parcel on which it was erected.[128]   This limitation, however, did not apply to those plants that entered into operation within one year of the entry into force of the Romani Decree (i.e., by 29 March 2012).[129]

105.  As noted by both Parties, investors in the solar energy industry reacted against the Romani Decree.[130]   The Respondent notes that some investors sought to challenge it by bringing administrative proceedings.  In particular, it cites a decision from a Lazio court which upheld the legality of the Romani Decree on the ground that 'it seems rather to implement a "fine tuning" oriented to proportionality and gradual[ness], in full compliance with the directions of European law.'[131]

---

[125] Ibid., Article 1.

[126] Ibid., Article 25(9).

[127] Third Energy Account, Exhibit CL-55, Article 8.

[128] Romani Decree, Exhibit CL-51, Article 10(4).

[129] Ibid., Article 10(6).

[130] Memorial, para. 283; Counter-Memorial, paras. 170-171. See also *Corriere della Sera*, Photovoltaic Power – Cancelled by Decree, 9 March 2011, Exhibit C-169.

[131] See *TAR Lazio, 4 febbraio 2013, n. 9361* (Regional Administrative Court of Lazio, 4 February 2013, No. 9361), Exhibit RL-9, p. 17 (para. B1).  As to the new restrictions on agricultural land, the Lazio tribunal held that 'the regulatory framework exceeds the evaluation of reasonableness', in particular because of the transitional periods allowed: ibid., p. 24.

H.    THE FOURTH ENERGY ACCOUNT

106.  On 19 April 2011, the Italian Government made public a draft decree containing the key components of the Fourth Energy Account.[132]

107.  The Fourth Energy Account was adopted by Decree of 5 May 2011.[133]  The Claimants highlight three aspects:

(a) First, for the period between 1 June 2011 and 31 December 2012, the Fourth Energy Account limited to specific amounts the incentives available for 'large plants.'[134]

(b) Second, it created an on-line register of plants eligible for feed-in tariffs administered by the GSE.[135]  Large plants that entered into operation on or before 31 August 2011 were automatically eligible for feed-in tariffs, while those entering into operation between 1 September 2011 and 31 December 2012 had to be listed in the register.  Plants listed in the register would receive feed-in tariffs only if the ranking in the register so allowed, based on the costs limits established in Article 4(2).[136]  The deadline for submitting applications to the GSE register, for purposes of eligibility for feed-in tariffs in 2011, was 30 June 2011.[137]

(c) Third, the Fourth Energy Account established that, for the purposes of the allocation of feed-in tariffs, 'several photovoltaic plants belonging, or attributable to, the same responsible entity and located either within the same or within contiguous cadastral parcels of land shall be considered a single plant of a capacity

---

[132] Minister of Economic Development, Draft Decree, 19 April 2011, Exhibit C-179.

[133] Fourth Energy Account, Exhibit CL-56.

[134] Ibid., Article 4.

[135] Ibid., Article 8.

[136] Ibid., Article 6.

[137] Ibid., Article 8(2).

equal to the cumulative capacity of the individual plants.'[138] The plants' capacity, in turn, had an impact on the amount of the feed-in tariffs.[139]

108.  Eskosol submitted all applications for the GSE register by 30 June 2011.[140]

109.  In May 2011, Eskosol hired Capital Système Investissements S.A. ('*Capital Système*'), an investment firm, to prepare a valuation of the Project for presentation to potential investors. According to the valuation prepared by Capital Système on the basis of the Romani Decree and the Fourth Energy Account, the value of the Project was €162,954,000.[141]

## I.  THE GSE'S LISTS

110.  On 15 July 2011, the GSE published a list ranking the solar plants eligible for the 2011 feed-in tariff under the Fourth Energy Account.[142] The list included 115 of the 120 plants in the Claimants' Project.[143]

111.  On 29 July 2011, the GSE published a new list, as the first one contained errors.[144] This list contained 113 of the 120 plants in the Claimants' Project.[145]

---

[138] Ibid., Article 12(5). Under Article 3, the term 'Responsible Entity' was defined as 'the entity responsible for the functioning and maintenance of the plant, and who has the right to request and obtain the feed-in tariffs, as well as the entity that requires inclusion in the registers referred to in Art. 8.'

[139] Ibid., Annex 5.

[140] Lecorcier WS1, para. 111; Stein WS1, para. 149.

[141] Eskosol, Investor Presentation: 120 MW Photovoltaic Power Plant Italy, May 2011, Exhibit C-180, slide 30.

[142] GSE, 'Ranking of plants included within the Register whose status allows satisfaction of cost limits established for the 1 June 2011 - 31 December 2011 period pursuant to the Ministerial Decree of 5.5.2001 [*sic*] (Registrations occurring from 20 May 2011 to 30 June 2011)', 15 July 2011, Exhibit C-191.

[143] Lecorcier WS1, para. 112; Stein WS1, para. 150.

[144] GSE, 'List of plants included within the Register whose status allows for the satisfaction of the cost limits established for the 1 June 2011- 31 December 2011 period pursuant to the Ministerial Decree of 5.5.2011', 29 July 2011, Exhibit C-195. See also Wind Power Monthly, Italy, Market Growth Defies Incentive Uncertainty, Exhibit C-198.

[145] Stein WS1, para. 152.

112. The GSE subsequently published two more rankings, one on 12 August 2011[146] and a final one on 16 September 2011.[147]  As explained by the Claimants, the second list published by the GSE was not final because, pursuant to Article 8(5) of the Fourth Energy Account, solar plants initially included that became operational before 31 August 2011 would be excluded from the list and new ones were going to be added.[148] The number of plants which were part of Blusun's Puglia Project remained throughout at 113.[149]

## J.    THE PROJECT TO BUILD 27 PLANTS

113. According to Messrs. Lecorcier and Stein, in the autumn of 2011, Eskosol was in a difficult financial situation.  This led its shareholders to split the Project and build 27 solar plants (instead of 113) by the 29 March 2012 deadline.  In their view, the sale of those plants would have allowed them to purge Eskosol's and SIB's debt.[150]

114. On 7 October 2011, Eskosol received a preliminary non-binding offer from Euro Catalysts Capital, proposing to purchase the 27 plants for approximately €67 million on the assumption that 11 plants would be connected to the grid by the end of November and that the other 16 would be connected by the end of December 2011.[151] After receiving the non-binding offer, Eskosol negotiated a new EPC contract with

---

[146] GSE, 'List of plants included within the Register whose status allows for the satisfaction of the cost limits established for the 1 June 2011 - 31 December 2011 period pursuant to the Ministerial Decree of 5 May 2011 - Updated on 12 August 2011', 12 August 2011, Exhibit C-196.

[147] GSE, 'List of plants included within the Register whose status allows for the satisfaction of the cost limits established for the 1 June 2011 - 31 December 2011 period pursuant to the Ministerial Decree of 5.5.2001 - Updated on 16 September 2011', 16 September 2011, Exhibit C-200.

[148] Memorial, para 314; and Fourth Energy Account, Exhibit CL-56, Article 8(5).

[149] Stein WS1, para. 152; GSE, 'List of plants included within the Register whose status allows for the satisfaction of the cost limits established for the 1 June 2011 - 31 December 2011 period pursuant to the Ministerial Decree of 5.5.2011', 29 July 2011, Exhibits C-195; and GSE, 'List of plants included within the Register whose status allows for the satisfaction of the cost limits established for the 1 June 2011 - 31 December 2011 period pursuant to the Ministerial Decree of 5 May 2011 - Updated on 12 August 2011', 12 August 2011, C-196. Transcript, Day 5, 87:3-8.

[150] Lecorcier WS1, paras. 117 and 119; Stein WS1, paras. 155-156.

[151] Euro Catalysts Capital, Term Sheet Non Binding for 100% Equity Investing of 27 MW Ground based PV Project, 7 October 2011, Exhibit C-202, pp. 2 and 3.

two local construction companies to construct the 27 solar plants.[152]  This agreement provided that Eskosol assigned to its creditors the price that would be realized on the sale of the 27 plants to a final taker.[153]  In exchange, Eskosol's creditors agreed to waive any claims they had against Eskosol.[154]  Having reached this agreement with its creditors, Eskosol still 'had to convince Euro Catalysts (or other investors) of the feasibility of the 27-plant project, in order to finalize a purchase offer.'[155]

115. Also in November 2011, Eskosol decided to start the construction of two of the solar plants itself,[156] and it obtained a loan for that purpose on 18 November 2011.[157]

## K.    THE MUNICIPAL STOP-WORK ORDER

116. On 17 November 2011, the environmental protection unit of the local police inspected Eskosol's construction sites. On 21 November 2011, the police communicated observations regarding the inspection to the local prosecutor.[158]  On 25 November 2011, the local prosecutor informed the municipality of Brindisi that the situation as observed by the police constituted a criminal offense violating zoning regulations.[159] In his letter, the prosecutor stated as follows:

> [G]iven the contiguity of the planned plants and their connection to a unique centre of interests, it is obvious that the intent of the owners of this business project was to proceed with an artificial division of several plants in order to circumvent the procedure for the issuance of a construction permit by the region.[160]

117. The prosecutor referred to Puglia's Circular of 1 August 2008 and stated that it:

---

[152] Eskosol, Debt Restructuring Agreement, 4 November 2011, Exhibit C-203.

[153] Ibid., Articles 3 and 6.

[154] Ibid., Article 8.

[155] Lecorcier WS1, paras. 122 and 123.

[156] Lecorcier WS1, para. 123; Stein WS1, para. 159.

[157] Debenture Loan Agreement between Blusun and Josebe Trust, Undated, Exhibit C-237.

[158] Order of the Carabinieri for the Protection of the Environment, 21 November 2011, Exhibit C-204.

[159] Letter from the Prosecutor's Office to the Tribunal of Brindisi, 25 November 2011, Exhibit C-206.

[160] Ibid., p. 1.

invited the Municipalities to adopt an attentive surveillance in order to prevent the occurrence of this fraudulent division of a single plant into several plants having an electrical power inferior to 1 MW. In light of the above, I wonder what actions will be undertaken to revoke the DIAs.[161]

In fact, the Circular of 1 August 2008 provided as follows:

In consideration of the aforementioned circumstances, related to the presence of a large number of DIA procedures before the Municipal Authorities, it is recommended to the same to pay the maximum attention to possible connections between multiple *declarations of the initiation of activity.* Application negligence on the part of the applicants, when it is not their unlawful behaviour, could support the application to DIA even in the case of plants whose nominal overall electric power transcend the limits set by article 27 of regional Law n. 1/2008.

…

Therefore, it appears appropriate that the Municipal Authorities pay the maximum attention in verifying the existence of such situations, which for example may be inferred from the significant recurrence of symptomatic elements, such as a single point of connection, the uniqueness of the owner of the areas, the uniqueness of the industrial initiative (derived from the uniqueness of the applicants, or business contacts), and any other useful factual circumstance to be gathered by means of inquiry.[162]

118. On 19 December 2011, the municipality of Brindisi launched self-redress proceedings in order to review the DIA authorisations held by three of the 12 local development companies.[163]

119. On 11 January 2012, the municipality of Brindisi issued a stop-work order preventing any further work on plants in the project under construction.[164] However, on 13 January 2012, the Regional Administrative Court decided to suspend the effects of the

---

[161] Ibid., p. 1.

[162] *Nota Circolare Regione Puglia 1 agosto 2008, n. 38/8763* (Puglia Circular of 1 August 2008, No. 38/8763), Exhibit CL-74, p. 3 (emphasis in the original).

[163] Letter from Municipality of Brindisi to Gamma Service, Aurora Energia, Dada Project and Eskosol, 19 December 2011, Exhibit C-208.

[164] Municipality of Brindisi, 'Decision of suspension of the activity undertaken as a result of the declaration of the initiation of activity (DIA), Prot. N. 87155 of 23 December 2008, 11 January 2012', Exhibit C-211.

stop-work order issued by the municipality of Brindisi,[165] and on 7 March 2012, the Regional Administrative Court annulled for excess of power the decisions of the municipality of Brindisi to initiate self-redress proceedings and to issue a stop-work order. According to the Claimants, this was a Pyrrhic victory, because there was not enough time to build the Project's plants between the decision of the Administrative Court of 7 March 2012 and the expiration of the 29 March 2012 deadline imposed by the Romani Decree.[166] The Regional Administrative Court's decision is discussed in paragraph 356 below: it drew a distinction between 'the conditions stated at the time of the submission of the application or ... the previous two years' and 'the need for the requirement to subsist afterwards' – in effect a distinction between fractionation of holdings at the time of lodging the DIA (prohibited) and subsequent amalgamation of holdings once the DIA procedure was complete (permitted).[167]

## L.    LAW DECREE 1 OF 24 JANUARY 2012

120.    This Law Decree provided that, as from 24 January 2012 (its date of entry into force), solar plants built on agricultural land would no longer benefit from the incentives set out in the Romani Decree. It also provided, however, that plants built on agricultural land could still be eligible if:

(a) a construction permit was issued before 24 January 2012;

(b) the plant started operating by 23 January 2013; and

(c) the plant complied with the conditions set forth in Article 10(4) and (5) of the Romani Decree (i.e., if they had capacity below 1 MW and occupied less than 10%

---

[165] *TAR Puglia, 14 gennaio 2012, nos. 37, 38, 39, 40* (Regional Administrative Court of Puglia, 14 January 2012, Nos. 37, 38, 39, 40, 13 January 2012 (filed at the secretariat on 14 January 2012)), Exhibit RL-10.

[166] Memorial, para. 339. See also Lecorcier WS1, paras. 131-132, where he states that 'the actions of the local authorities ... completely destroyed our project of a first group of 27 solar plants.'

[167] *TAR Puglia, 7 marzo 2012, n. 50* (Regional Administrative Court of Puglia, 7 March 2012, No. 50), Exhibit CL-82.

of the agricultural land on which they were built, and, for plants belonging to the same owner, if they were located at least 2 km away from each other).[168]

121.  The other exception foreseen by Law Decree 1 concerned solar plants installed on top of greenhouses, provided that they occupied less than 50% of the total surface of the rooftop.[169]

122.  The Claimants contend that their plants could not comply with this regulation because they were all built on agricultural land.  Nor did they fall within the exception, as they occupied more than 10% of the land on which they would be built.[170]

123.  Law Decree 1 was subsequently ratified by Law 27 of 24 March 2012, which introduced some changes to Article 65 of Law Decree 1 ('Photovoltaic plants built on agricultural land').[171]

---

[168] *Decreto Legge 24 gennaio 2012, n. 1* (Law Decree 24 January 2012, No. 1) Exhibit CL-52, Article 65(2).

[169] Ibid., Article 65(3).

[170] Memorial, para. 345.

[171] *Legge 24 marzo 2012, n. 27* (Law of 24 March 2012, No. 27), Exhibit CL-68 ('**Law 27/2012**'). Law 27/2012 reads in relevant part as follows:

Article 65 is replaced as follows:

Art. 65 (Photovoltaic plants built on agricultural land). – 1. The solar photovoltaic plants with ground-built modules on agricultural land shall not have access to the state incentives set forth in Legislative Decree 3 March 2011, n. 28.

2. Paragraph 1 does not apply to plants built or to be built on military land and to solar photovoltaic plants with ground-built modules to be constructed on lands classified as agricultural at the effective date of conversion into law of the present decree, provided, in any case, that the plants become operational within one hundred and eighty days from the effective date of conversion into law of the present decree. The said plants shall in any event be in compliance with the conditions set forth in paragraphs 4 and 5 of article 10 of legislative decree 3 March 2011, n. 28. Furthermore, paragraph 6 of article 10 of legislative decree 3 March 2011, n. 28, shall also apply, provided that the plant becomes operational within sixty days from the effective date of conversion into law of the present decree.

3. The Authority for the Energy and the Gas shall ensure, in compliance with EU law, the grid connection priority for a single plant producing electricity from renewable sources not exceeding 200kW for each agricultural business.

4. Paragraphs 4 and 5 of article 10 of Legislative Decree 3 March 2011, n.28, are repealed, subject to what is provided in paragraph 2.

M.   ABANDONMENT OF THE PROJECT BY THE CLAIMANTS

124.  On 5 July 2012, the Italian government adopted the Fifth Energy Account.[172]  Messrs. Lecorcier and Stein explored the possibility of transforming the 120-MW Project into a series of single activities in order to benefit from the feed-in tariffs under the Fifth Energy Account.  They also tried to sell the two substations.  But they eventually decided to abandon the Project.  Their decision was recorded in a resolution of SIB's shareholders at a meeting on 18 December 2012.[173]

## V.   POSITIONS OF THE PARTIES ON JURISDICTION AND ADMISSIBILITY

### A.   The Respondent's position

125.  In its Counter-Memorial, the Respondent raised an objection to the competence of the Tribunal and the jurisdiction of the Centre on two grounds.  First, the Project did not qualify as an investment for purposes of the ICSID Convention or the ECT and instead the Claimants' activities qualified only as pre-investment expenditures of a speculative character.[174]  Second, the Project was not a protected investment under the ECT because it was constituted in violation of Italian law and the principle of good faith.[175]

126.  The Respondent further contends that to the extent the Tribunal upholds its jurisdiction, it should consider the Claimants' claims inadmissible on the ground of unclean hands.[176]

127.  It is to be noted that neither in its Counter-Memorial nor in its Reply did Italy raise any objection based on the law of the European Union or the suggested inapplicability of the ECT in intra-EU disputes.  Those issues arose only following the EU's request to

---

5. Paragraph 4-bis of article 12 of Legislative Decree 29 December 2003, n. 387, introduced by article 27, paragraph 42, of law 23 July 2009, n. 99, shall only refer to the construction of plants fuelled by biomass located in areas classified as agricultural by the urban planning regulations.

[172] Fifth Energy Account, Exhibit CL-57.

[173] Notarized Minutes of Meeting of SIB, 18 December 2012, Exhibit C-220.

[174] Counter-Memorial, para. 274; see also paras. 280-305.

[175] Ibid., paras. 275, 277; see also paras. 306-349.

[176] Ibid., para. 276.

file a non-disputing party brief, and they are dealt with below in that context (see paragraphs 206-260 and 277-309).

### 1. The Project was not an investment under the ICSID Convention and the ECT

#### (a) The ICSID Convention

128. The Respondent refers to the *Salini test*, as the 'most widely invoked' criterion to determine whether there is an investment for purposes of Article 25 of the ICSID Convention.[177] According to the Respondent, the debate as to whether such test should include the original four elements (i.e. a contribution of money or goods, of certain duration, an element of risk and a contribution to the economic development of the State) or whether it has now evolved to only three (contribution, duration and risk), is immaterial for present purposes. The Respondent posits that under both tests, an investment shall be assessed 'within the context and according to the purposes that the [host State] has set for the specific economic activity' and by respecting the spirit and text of its legislation.[178]

129. The Respondent contends that to determine if there is an investment past cases have consistently considered that 'the presence of an economic activity … in the territory of the host State shall be evaluated in the concrete case and in light of the specific context.'[179]

130. Against this background, the Respondent argues that the Claimants' operations cannot be considered an investment because they were not carried out for purposes of building a PV plant benefiting from certain regulatory incentives.[180] Instead, in the Respondent's view, the Claimants' activities 'were carried out with the intent to sell

---

[177] Ibid., para. 281.

[178] Ibid., para. 283, citing *Phoenix Action, Ltd. v. Czech Republic*, ICSID Case No. ARB/06/5, Award, 15 April 2009, Exhibit RL-13 (***Phoenix v. Czech Republic***).

[179] Counter-Memorial, para. 284.

[180] Ibid., paras. 285, 288.

the rights acquired to third parties to realize the investment.'[181]  In particular, it argues that the Claimants attempted to make a 'financial transaction' based on the sale of acquired rights, 'in a sort of "secondary market."'[182]  According to the Respondent, the Claimants alleged 'investment' was speculative in character.[183]

131.  The Respondent also contends that the activities and operations carried out by the Claimants shall be characterized as part of a 'pre-investment' phase.[184]  It alleges that for an investment to be considered as such within the framework of the PV industry incentives, the plants must be built (executed) and the Claimants must have submitted an actual application for such incentives.[185]  However, in this case – the Respondent asserts – the Project never reached the execution phase and the incentives were considered part of the 'hypothetical profitability parameters.'[186]  Therefore, there is no investment under the ICSID Convention.

### (b) The ECT

132.  The Respondent notes that the ECT does not protect any and all investments, but only those associated 'with economic activity in the energy sector' in accordance with Article 1(6).  In particular, the Respondent argues that:

> [a]ccording to the ECT, the investment [must] therefore satisfy two distinct criteria: it shall be an investment according to the common use of the term (and for this the non-exhaustive list applies as indicated in article 1(6), letters (a) to (b)), and it shall be functional to the carrying out of activities in the energy sector as listed.  The genesis of the standard supports such reading.[187]

---

[181] Ibid., para. 285. See also, paras. 286, 289.

[182] Ibid., para. 287.

[183] Ibid., para. 288.

[184] Ibid., paras. 291-296.

[185] Ibid., para. 292.

[186] Ibid., para. 294. The Respondent relies on *Mihaly Int. Corp. v. Sri Lanka*, ICSID Case No. ARB/00/2, Award, 15 March 2002, Exhibit RL-15, paras. 50-51 (*Mihaly v. Sri Lanka*).

[187] Counter-Memorial, para. 301.  See also footnote 77, referring to the ECT versions of 31 October 1991 and 20 January 1992.

133. In the present context, the Respondent alleges that the ECT protects 'investments actually intended for the construction of photovoltaic plants.'[188] It considers that the ECT protects those investments that 'fit directly into the mechanism of production of energy of the host country … immediately contributing … to the increase of plants of alternative sources in the country.'[189]

134. The Respondent further contends that the ECT distinguishes between the pre-investment and the investment phase, and explicitly provides guarantees to investors only for the latter phase.[190] It concludes that the Project does not fall under the definition of investment under either the ICSID Convention or the ECT.

## 2.     The Project is not a protected investment under the ECT

135. The Respondent accepts that the ECT does not contain a clause specifying that investments shall be made in accordance with the rules of the host state.[191] But relying on the *Yukos*, *Phoenix* and *Hamester* decisions, it submits that even without such a clause, the protection of investments under investment treaties, including the ECT, is subject to the legality of the investment itself and the good faith of the investor.[192]

136. The Respondent contends that the alleged investment has been made in violation of Italian law, both national and regional, and that it was made 'in the knowledge of circumventing these rules.'[193] In particular, it argues that the Claimants violated Italian law by artificially splitting the project, interposing 12 SPVs controlled by the same people when having in mind one single project, and presenting one DIA for each plant of less than 1 MW, despite some of the lands on which the plants were built being

---

[188] Ibid., para. 303.

[189] Ibid., para. 303.

[190] Ibid., para. 304.

[191] Ibid., para. 310.

[192] Ibid., paras. 311-315 (quoting *Yukos Universal Limited (Isle of Man) and The Russian Federation*, PCA Case No. AA 227, Final Award, 18 July 2014, Exhibit CL-22, paras. 1349, 1351-1352 (***Yukos v. Russia***); citing *Hamester GmbH v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, 18 June 2010, Exhibit RL-16 (***Hamester v. Ghana***); *Phoenix v. Czech Republic,* Exhibit RL-13, para. 106.

[193] Counter-Memorial, para. 316.

contiguous.[194]  In doing so, the Claimants violated the Single Authorisation procedure and circumvented the applicable rules of environmental protection for plants greater than 1 MW.[195]

137. The Respondent further considers that the Claimants 'distorted the *ratio* of the instrument of the DIA' by not having the financial or other capacity to immediately execute all the necessary work.[196]

138. In addition, the Respondent asserts that, even if one were to allege that the violations were committed by the local developers, since they originally filed the DIAs, the Claimants were fully aware of them.[197]  They contend, *inter alia*, that the Claimants had full knowledge of the illegal acts and misrepresentations and that they should have notified the public administration.[198]  Moreover, relying on the *Yukos* decision, the Respondent argues that, irrespective of who committed the illegal act, the alleged investment itself would be affected by the unlawfulness of the procedures followed to request the authorisations.[199]

139. The Respondent further alleges that even if the Claimants themselves did not commit the above mentioned violations, it remains that they acted in bad faith when the 12 SPVs were acquired by Eskosol and all the DIAs were transferred *en bloc* to a single project owner.[200]  According to the Respondent, the Claimants had full knowledge that this was an obvious violation of the law because the issue had been highlighted in the preliminary due diligence report that Watson, Farley & Williams submitted to the Claimants in January 2009.[201]

---

[194] Ibid., paras. 316, 328.

[195] Ibid., para. 316.

[196] Ibid., para. 317.

[197] Ibid., paras. 318-321.

[198] Ibid., paras. 318-321, 329.

[199] Ibid., paras. 322-325.

[200] Ibid., paras. 326-330.

[201] Ibid., para. 331, citing Memorial, Exhibit C-83.

140. Relying on the *Phoenix* and *Inceysa* decisions, the Respondent asserts that the principle of good faith is recognized under both national and international law.[202] In the Respondent's view, the Claimants infringed the principle of good faith under international investment law by evading their obligation to request an Environmental Impact Assessment (EIA) in violation of Italian law, Article 19 of the ECT and general principles of international law.[203]

141. Finally, the Respondent contends that there has never been acquiescence on the part of the Italian administration, nor would the administration's acceptance be a relevant defence against the Claimants' bad faith.[204]

### 3.     Admissibility

142. The Respondent considers that the arguments summarized in the preceding paragraphs also support its admissibility objection.[205]

## B.     The Claimants' position

143. According to the Claimants, the Respondent has failed to adduce any proof in support of its objection to the Tribunal's jurisdiction *ratione materiae* and contends that Italy has 'ignore[d] evidence directly contradicting its position.'[206] According to the Claimants, it is undisputable that there is an investment in this case. The investment consists of some €40 million invested by Messrs. Lecorcier and Stein, the two substations that Blusun's subsidiaries erected and connected to the national grid, the 250 km of underground cables installed, the direct acquisition of local companies and

---

[202] Counter-Memorial, paras. 332-335, quoting *Phoenix v. Czech Republic*, Exhibit RL-13, paras. 106-107 and *Inceysa Vallisoletana S.L. v. Republic of El Salvador*, ICSID Case No. ARB/03/26, Award, 2 August 2006, Exhibit RL-17, paras. 243, 249 (***Inceysa v. El Salvador***).

[203] Counter-Memorial, paras. 336-340.

[204] Ibid., paras. 345-349.

[205] Ibid., paras. 350-355.

[206] Reply, para. 43.

lands and the indirect holding of project authorisations and permits, as well as related contractual rights.[207]

144.  The Claimants also allege that the record shows no bad faith or illegality, but rather an investment that was made by 'conscientious investors concerned with making a positive impact on the local community.'[208]

145.  In addition, the Claimants reject the Respondent's unclean hands arguments, alleging that they are meritless in fact and law.  They argue that the unclean hands doctrine is neither a rule of customary international law nor a general principle of law, that there is no express reference to it in the ECT, and that, even if it is applicable in law, there is no evidence of it in the record.[209]

### 1. The Claimants' investments under the ECT and the ICSID Convention

#### (a) The ECT

146.  The Claimants contend that Messrs. Lecorcier and Stein indirectly owned and controlled numerous investments within the meaning of Article 1(6) of the ECT in Italy.  These include a controlling stake in Eskosol, 12 local development companies, loans, parcels of land, two substations and rings, authorisations and permits, construction and supply contracts, and the amounts derived from or associated with these investments.[210]

147.  The Claimants further argue that the definition of 'Economic Activity in the Energy Sector' provided by the ECT is not limited to industrial activities, and that their investments fall within that definition.[211]  They assert that, in any event, their investment was a Project 'of an industrial scale in a classic industry: the production of

---

[207] Ibid., para. 45.

[208] Ibid., para. 46.

[209] Ibid., para. 47.

[210] Ibid., para. 52.

[211] Ibid., paras. 55-58.

electricity',[212] and the fact that the Project was not completed due to Italy's wrongful acts does not deprive the investments of protection under the ECT.[213]

(b) The ICSID Convention

148. The Claimants 'do not accept that *Salini* defines the term "investment" where the "consent of the parties" within the meaning of the ICSID Convention defines the term for purposes of the dispute, as the ECT does here.'[214] In any event, the Claimants contend that their investment meets the *Salini* criteria.[215]

149. The Claimants further contend that the Project is not less protected because it was to be substantially financed. They assert that 'ICSID tribunals have recognized that "it is entirely normal for investment projects to be financed by borrowed funds"',[216] and that it is not uncommon for investors to finance construction in whole or in part through loans from investors.[217] The Claimants assert that the record shows that they developed the Project and realized a significant part of it.[218]

150. The Claimants also argue that the Project was not 'speculative.' In their view, the Respondent's position is wrong as a matter of fact and as a matter of law. The Project 'was based on facts, scientifically ascertainable and verifiable.'[219] Also, the Claimants say that, by arguing that speculative investments should not be protected under the ICSID Convention, the Respondent would be asking the Tribunal to adopt a novel approach to the *Salini* test, which includes the element of risk.[220]

---

[212] Ibid., para. 59.

[213] Ibid., para. 60.

[214] Ibid., para. 64.

[215] Ibid., para. 64.

[216] Ibid., para. 66. See also *Sistem Mühendislik İnşaat Sanayi ve Ticaret A.Ş. v. Kyrgyz Republic*, ICSID Case No. ARB(AF)/06/1, Award, 9 September 2009, Exhibit CL-134, para. 35.

[217] Reply, para. 67.

[218] Ibid., paras. 69-71.

[219] Ibid., para. 76.

[220] Ibid., paras. 78-79.

151. The Claimants further contend that their investments were 'established', as they accomplished all of the main Project milestones but for the last one.[221]  In their view, 'the fact that the Claimants' project never reached the exploitation phase offers no valid jurisdictional objection or defense to Italy.'[222]  In making this assertion, the Claimants rely on the decisions rendered in *Gold Reserve* and *PSEG*.[223]

### 2.    Good faith and the Claimants' investments

152. The Claimants assert that the authorities relied upon by the Respondent are inapposite. The decisions in *Phoenix* and *Hamester* addressed the alleged general principle that investments should not violate good faith and the host State laws only *obiter*.[224]  In *Hamester,* the tribunal did not find that the investment had been obtained by fraud.  As to *Phoenix*, the tribunal was concerned with 'the international principle of good faith as applied to the international arbitration mechanism of ICSID.'[225]  In *Inceysa*, in turn, 'there was … "clear and obvious" evidence that the investor had acted fraudulently in order to be awarded the bid and make the investment.'[226]

153. The Claimants also note that there is no evidence in the record showing that they artificially split the Project.  In their view, they did not divide the Project but rather united 120 small solar plants initiated by a dozen local development companies.[227]  The Claimants also contend that the DIA authorisations were obtained in accordance with Italian law, something that was confirmed by the Watson Farley due diligence report and by the Administrative Court in Lecce in March 2012.[228]  The Claimants

---

[221] Ibid., para. 82.

[222] Ibid., para. 83.

[223] Ibid., para. 84. See also *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014, Exhibit CL-113, paras. 570, 590-591 (***Gold Reserve v. Venezuela***); *PSEG Global Inc. v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007, Exhibit CL-125, para. 304 (***PSEG v. Turkey***).

[224] Reply, para. 91.

[225] Ibid., paras. 93-94, citing *Phoenix v. Czech Republic*, paras. 142-144.

[226] Reply, para. 97. See also *Inceysa v. El Salvador*, paras. 109-122.

[227] Reply, para. 100.

[228] Ibid., paras. 103-109.

note, in particular, that under Italian law, works had to be completed before the expiry of the DIA authorisations – not immediately – and that works had to start within one year, which is what the Claimants did.[229]  The Claimants also deny that they failed to comply with the timetable of work, or that they breached the disclosure obligation.[230]

154.  The Claimants assert that the Italian authorities were fully aware of the 120 MW Project and authorized it.  They also authorized the construction of the two substations and the rings, and those authorisations were made public.[231]

155.  With respect to the alleged violation of environmental provisions, the Claimants' arguments are threefold: (a) the Tribunal would have no jurisdiction over an alleged violation of Article 19 of the ECT because it does not fall under Part III of the ECT; (b) neither the ECT nor other sources establish that environmental impact assessment is a requirement of general international law; and (c) the Claimants were not required to obtain an environmental impact assessment, since only plants with capacity above 1 MW are subject to a screening process and may be required to file one.[232]

### 3.    The clean hands doctrine

156.  The Claimants contend that the ECT does not contain any express clean hands requirement, and the *Yukos* decision does not support the Respondent's 'clean hands' objection because the tribunal found that the investors there had clean hands.[233]  Moreover, the Claimants assert that 'clean hands' is neither a rule of customary international law nor a general principle of law.[234]  They finally argue that their hands are clean, as there was no illegality in the acquisition of the 12 local development

---

[229] Ibid., para. 104.

[230] Ibid., paras. 105-106, 110.

[231] Ibid., paras. 112-119.

[232] Ibid., paras. 122-129.

[233] Ibid., paras. 136-139.

[234] Ibid., paras. 140-145.

companies, and there is no evidence of illegality either before or since those acquisitions.[235]

## VI.    POSITIONS OF THE PARTIES ON LIABILITY

157. The Parties' arguments on the merits concern the issue of whether the measures adopted by Italy constitute a breach of the standard of treatment provided for in Article 10(1) of the ECT (requiring 'stable, equitable, favourable and transparent conditions for Investors') or a breach of the expropriation provision in Article 13(1) of the ECT.

### A.    The Claimants' position

#### 1.    The alleged breach of Article 10(1) of the ECT

158. The Claimants contend that Italy breached Article 10(1) of the ECT in two respects. They claim that: (a) Italy failed to create stable, equitable, favorable and transparent conditions in the energy sector in Italy; and (b) Italy frustrated the Claimants' legitimate expectations in breach of the fair and equitable treatment standard.[236] The Claimants rely on the *Plama* award to assert that these standards can be defined autonomously,[237] and they contend that the reference in the first sentence of Article 10(1) to promoting 'stable, equitable, favourable and transparent conditions' creates binding obligations.[238]

> (a) <u>Italy's alleged failure to encourage and create stable, equitable, favorable and transparent conditions</u>

159. The Claimants contend that the first sentence of Article 10(1) of the ECT must be interpreted according to Articles 31 and 32 of the Vienna Convention on the Law of Treaties, that is, in good faith, in accordance with the ordinary meaning to be given to

---

[235] Ibid., paras. 147-159.

[236] Memorial, para. 411.

[237] Ibid., paras. 414-415, citing *Plama Consortium Ltd. v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008 (**Plama v. Bulgaria**), Exhibit CL-20, para. 161.

[238] Reply, paras. 162-172.

51

the terms of the treaty in their context and in the light of its object and purpose.[239] They argue that the words 'encourage' and 'create' imply both an obligation of means and an obligation of result.[240]

160. In particular, the Claimants argue that this obligation must be interpreted in the light of the ECT's object and purpose of 'promoting best possible access to capital', 'formulation of stable and transparent legal frameworks creating conditions for the development of energy resources', and promoting 'use of new and renewable energies and clean technologies.'[241]

161. The Claimants further argue that the obligation established in the first sentence of Article 10(1) applies to all stages of the investment.[242] It also contends that, even on Italy's own case, it would apply to the Claimants' activities as pre-investment matters.[243]

162. In the Claimants' view, the measures adopted by Italy cannot be reconciled with the conditions that Italy 'was obligated to encourage and create under Article 10(1).'[244] The Claimants assert that the events should be considered in the aggregate rather than as isolated acts.[245] They complain specifically about the following measures, which, in their view, 'followed one another in a relatively short timeframe and deeply destabilized the Italian solar market':[246]

(a) the Constitutional Court's decision of March 2010, which failed to specify its effects on pre-existing authorisations. In the Claimants' view, this decision had

---

[239] Memorial, para. 417.

[240] Ibid., para. 418.

[241] Ibid., paras. 426-427; Reply, para. 171.

[242] Reply, paras. 176-198. See *Plama v. Bulgaria*, Exhibit CL-20, para. 172.

[243] Reply, paras. 199-201.

[244] Memorial, para. 428.

[245] Reply, paras. 225-228.

[246] Ibid., para. 231.

a negative effect on potential debt and/or equity investors,[247] as it showed uncertainty as to the decision's impact on DIA authorisations.[248] They contend that if the decision had been clear, there would have been no need for the adoption of Law 129/2010, and that the GSE's response to Watson Farley's request was not clear, so the uncertainty remained until December 2010;[249]

(b)   the Romani Decree, which in the Claimants' view constituted 'a sudden and important change in approach for solar projects in development.'[250]   The Claimants complain about the changes operated by the Romani Decree with respect to the Third Energy Account.  They also allege that the Romani Decree signaled that a new and different energy account would soon come into existence, and that therefore no investor was willing to commit funding until the applicable tariffs were published;[251]

(c)   the Fourth Energy Account, which in the Claimants' view was implemented in a way that prolonged uncertainty due to the publication of several lists, and which disrupted its negotiations with potential investors;[252] and

(d)   the inspections that started in November 2011 and led to the stop-work order of 11 January 2012.[253]

(b)   Italy's alleged breach of the fair and equitable treatment standard

163. The Claimants contend that 'the most important function of the fair and equitable treatment standard is the protection of the investor's reasonable and legitimate

---

[247] Memorial, paras. 429-430; Reply, para. 205.

[248] Reply, para. 233.

[249] Ibid., para. 237.

[250] Memorial, para. 431; Reply, paras. 205 and 242.

[251] Memorial, paras. 431-432; Reply, paras. 205 and 244.

[252] Memorial, paras. 433-434; Reply, paras. 205 and 252-253.

[253] Memorial, para. 436; Reply, paras. 205 and 308-319.

expectations.'[254]  They argue that legitimate expectations are established where the following requirements are met: (a) the authorities of the host State made explicit or implicit representations; (b) such representations were relied upon by the investor in making the investment; and (c) the investor's expectations were legitimate and reasonable in the circumstances of the case.[255]  The Claimants argue that these requirements are met in the present case.

164.  The Claimants also argue that stability and transparency are essential elements of the fair and equitable treatment standard.[256]

165.  The Claimants allege that the Italian Government made multiple representations 'that the construction of specific plants was "in accordance with the procedures set out in Regional Law n. 31/2008 and with general urban planning instruments."'[257]  They also argue that for at least two years after having granted the DIA authorisations, the municipality 'took no step to suggest that it had any doubt about the validity of the authorisations it had granted.'[258]  This, in the Claimants' view, amounted to an implicit representation that gave rise to legitimate expectations.[259]  The Claimants further

---

[254] Memorial, para. 439.

[255] Ibid., paras. 440-444; Reply, para. 302. The Claimants rely on a number of authorities, including *Plama v. Bulgaria*, Exhibit CL-20, paras. 176-177; *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, Exhibit CL-10, paras. 7.74-7.75 (***Electrabel v. Hungary***); *Saluka Investments BV v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, Exhibit CL-39, para. 301 (***Saluka v. Czech Republic***); *AES Summit Generation Ltd. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, Exhibit CL-8, paras. 9.3.8 and 9.3.12; *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan*, SCC Case No. V (064/2008), Partial Award on Jurisdiction and Liability, 2 September 2009, Exhibit CL-16, para. 200; and *Ioannis Kardassopoulos and Ron Fuchs v. Republic of Georgia*, ICSID Case Nos. ARB/05/18 and ARB/07/15, Award, 3 March 2010, Exhibit CL-13, para. 441.

[256] Reply, para. 221.

[257] Memorial, para. 446. See also DIA Certificates of Conformity, 5 March 2009 – 21 May 2010, Exhibit C-24; and DIA Certificates of Expiry, 3 November 2008-26 June 2009, Exhibit C-19.

[258] Memorial, para. 447.

[259] Ibid., para. 447.

contend that Italy represented, in the Second Energy Account, that it would gradually change the level of feed-in tariffs every two years.[260]

166. The Claimants assert that they relied on these representations, as they 'committed the bulk of their funds only after Watson Farley had conducted a due diligence review of the authorizations for the plants.'[261]

167. In the Claimants' view, their expectations were reasonable under the circumstances. They contend that Italy adopted measures that contradicted the representations it had made and frustrated their investments.  In particular, the Claimants assert that the stop-work order 'was contrary to the very regional law with which [the municipality of Brindisi] had previously certified [the construction of the solar plant's] compliance.'[262] The Claimants also argue that by the time the order was annulled by the Regional Administrative Court, 'no part of the project could be completed before the deadline imposed by the Romani Decree of 29 March 2012.'[263]

168. The Claimants also contend that the Romani Decree breached their legitimate expectations by putting a sudden and premature end to the Third Energy Account, which was to apply until 31 December 2013.[264]  In the Claimants' view, the Romani Decree prevented them from securing the additional investment needed.[265]

## 2.    The alleged breach of Article 13 of the ECT

169. The Claimants stress that Article 13(1) of the ECT covers both direct and indirect forms of expropriation, and they assert that their investments were subjected to measures having effect equivalent to nationalization or expropriation within the

---

[260] Ibid., para. 448. See also Second Energy Account, Exhibit CL-54; Third Energy Account, Exhibit CL-55, Article 8.

[261] Memorial, para. 449. See also Watson Farley, Preliminary Due Diligence Report relating to 123 MW Puglia Project, 22 January 2010, Exhibit C-83.

[262] Memorial, para. 451.

[263] Ibid., para. 452.

[264] Ibid., para. 453.

[265] Ibid., para. 453.

meaning of Article 13(1).[266]  They argue that '[f]or purposes of indirect expropriation, what needs to be taken into account is the effect of the measure' on the investor's property.[267]  In their view, it is not necessary to prove that the measure tantamount to expropriation is to the obvious benefit of the host State, as long as it has 'the effect of depriving the owner, in whole or in significant part, of the use or reasonably-to-be-expected economic benefit of property.'[268]

170.  The Claimants contend that the investments they made were acquired for purposes of the 120 MW Project.  They argue that, as a result of the measures adopted by Italy, the land can no longer be used for that purpose, the underground cables connect nothing, the substations are disconnected and serve no purpose, the authorisations are now invalid or useless, and there is no other possible economic use for these assets.[269]  The Claimants note that Eskosol is now the subject of a bankruptcy order and that SIB and the local development companies are in liquidation.[270]  In the Claimants' view, the effect of these measures is 'indistinguishable from that of nationalization or expropriation without compensation.'[271]

**B.      The Respondent's position**

**1.      The alleged breach of Article 10(1) of the ECT**

(a) Italy's alleged failure to encourage and create stable, equitable, favorable and transparent conditions

171.  The Respondent asserts that the first sentence of Article 10(1) of the ECT 'shall be construed ... as having the nature of a framework regulation, as such referable only to

---

[266] Ibid., paras. 457 and 463.

[267] Ibid., paras. 458-459. See also Jan Paulsson and Zachary Douglas, 'Indirect Expropriation in Investment Treaty Arbitration', in Arbitrating Foreign Investment Disputes 145 (Norbert Horn and Stefan Michael Kröll eds., 2004), Exhibit CL-87, p. 148.

[268] Memorial, para. 460, quoting from *Metalclad Corp. v. United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000, Exhibit CL-32, para. 103. See also Memorial, para. 462.

[269] Memorial, paras. 464-465.

[270] Ibid., para. 466.

[271] Ibid., para. 467.

relations between Contracting States and not directly enforceable by investors.'[272] Italy argues that the vagueness of the words 'encourage', 'equitable' and 'favourable' raises doubt on the existence of a specific obligation enforceable by the investor.[273]

172. Italy further contends that the use of the phrase 'to make investments' qualifies and limits the scope of application of the regulation, which would be actually aimed at *attracting investment*.[274] As such, the obligation would be placed 'in a phase preceding the beginning of the foreign investment itself, thus before the same right to act arises for the investor.'[275] In Italy's view, its position would be confirmed by the definition contained in Article 1(8) of the ECT, which provides that '"Make Investments" or "Making of Investments" means establishing new Investments, acquiring all or part of existing Investments or moving into different fields of Investment activity.'[276]

173. The Respondent thus rejects all of the arguments made by the Claimants as to the alleged violation of the first sentence of Article 10(1).[277]

(b) Italy's alleged breach of the fair and equitable treatment standard

174. The Respondent's main argument on the merits is that there is no causal link between the State's conduct and the failure of the Claimants' business initiative, and that therefore any further analysis in terms of legitimate expectations and fair and equitable treatment is 'superfluous.'[278] The Respondent also argues that the expectations alleged

---

[272] Counter-Memorial, para. 365. See also para. 372; Rejoinder, para. 87.

[273] Rejoinder, paras. 89-90.

[274] Ibid., para. 95.

[275] Counter-Memorial, para. 368; Rejoinder, para. 95.

[276] Counter-Memorial, paras. 367-369. Analyzing this provision in its context, the Respondent further argues that '[i]f it is true that the second sentence [of Article 10(1)] is strictly related to the first, this does not prevent the second sentence from having a different normative force, that is being specifically binding and directly enforceable by the investor.' (para. 375). Rejoinder, para. 96.

[277] Counter-Memorial, paras. 379-381; Rejoinder, para. 97.

[278] Counter-Memorial, para. 384; Rejoinder, paras. 132-133.

by the Claimants are not legitimate and that the regulations adopted by the State were reasonable.[279]

        (i)     <u>The absence of a link between the State's conduct and the failure of the Project</u>

175. As a preliminary matter, the Respondent asserts that demonstrating regulatory uncertainty is not enough to prove the existence of that link. In its view, the Claimants would need to show that the alleged regulatory uncertainty is 'indeed likely to discourage investors', and that the State's conduct had a concrete negative impact on the participation of third-party investors.[280]

176. With respect to the Constitutional Court's 26 March 2010 decision, the Respondent notes that it 'did not manifest itself suddenly.'[281] It contends that the alleged situation of legal uncertainty 'should be referred to the date on which the law was challenged.'[282] That date is December 2008, and not 2009 as indicated by the Claimants in the Memorial.[283] The Respondent thus asserts that 'it is not logically possible to argue that third-party investors in 2010 were discouraged by an alleged uncertainty that dated back to the end of 2008.'[284] Furthermore, the Respondent explains that, under Italian law, the declaration of unconstitutionality of a law cannot affect acquired rights, so 'it cannot even be affirmed that after the decision there was a situation of uncertainty regarding these DIAs.'[285]

177. Regarding the alleged uncertainty created by the adoption of the Romani Decree, the Respondent asserts that the Third Energy Account already provided that the objective

---

[279] Counter-Memorial, paras. 440 *et seq.*; Rejoinder, paras. 191, 202.

[280] Counter-Memorial, paras. 391-392; Rejoinder, paras. 174-175.

[281] Counter-Memorial, para. 396.

[282] Ibid., para. 397.

[283] Ibid., para. 397.

[284] Ibid., para. 397; Rejoinder, paras. 177-178.

[285] Counter-Memorial, paras. 399-400.

of cumulative nominal power from solar energy in Italy by 2020 was 8,000 MW.[286] By the end of 2010, that objective 'was almost half reached, thus forcing the government to reduce the incentives provided by the Third Energy Account during 2011.'[287] In the Respondent's view, it was plausible to imagine that the expectation that the Third Energy Account would extend until 2013 'should be balanced with the need to meet that objective.'[288] The Romani Decree was 'merely a way to respect the Italian energy objective' and the new EU Directive.[289]

178. The Respondent also argues that the alleged uncertainty created by the Romani Decree would have lasted less than 50 days, because on 19 April 2011 the Government indicated the salient aspects of the Fourth Energy Account.[290]

179. The Respondent further contends that the restriction regarding the percentage of agricultural land that could be used for solar plants 'connects with the essential *ratio*, required by EU legislation, to reconcile the development of renewable energy with the protection of the environment, territory and landscape, and is combined with the need to gradually reduce the expansive investment trend in photovoltaic, in order to meet the quantitative targets envisaged under the EU scheme.'[291] As a result, Italy argues that the change was expectable and 'cannot be classified as a bearer of instability.'[292] Moreover, the Respondent argues that the Romani Decree foresaw a one-year transitional period to complete the plants for which the relevant authorisations were already in force, such as the Claimants' DIAs.[293]

---

[286] Ibid., para. 404; Rejoinder, para. 179, footnote 77.

[287] Counter-Memorial, para. 405. See also: Exhibit R-14; Third Energy Account, Exhibit CL-55, Article 3; Counter-Memorial, para. 198.

[288] Counter-Memorial, para. 404; Rejoinder, para. 180.

[289] Counter-Memorial, para. 405; Rejoinder, para. 179.

[290] Counter-Memorial, para. 406; Rejoinder, para. 184.

[291] Counter-Memorial, para. 408.

[292] Ibid., para. 408.

[293] Ibid., para. 409; Rejoinder, para. 184.

180. With respect to the adoption of the Fourth Energy Account, the Respondent's argument can be summarized as follows:

(a) The register created by the Fourth Energy Account actually added an essential element of certainty, as acknowledged by the Claimants.[294]

(b) The correction of the lists was not based on a redefinition of the regulatory framework but rather on a correction of material errors, which could not be seen as a situation that could discourage investors with respect to a project solidly founded and developed.[295]

(c) The period of alleged uncertainty would have been limited to 10 days, as the list was corrected on 29 April 2011.[296]

(d) The list published on 15 July 2011 also included almost all the Claimants' projected plants.[297]

(e) More generally, it is unclear why the national and regional regulations worked well for the more than 1,400 plants which were built in the years 2010/2011, while it created unbearable uncertainty for the Claimants.[298]

(f) The Claimants failed to provide concrete evidence that the alleged regulatory uncertainty effectively deterred third-party investors from participating in the initiative, and its arguments are based primarily on the direct testimony of the two Claimants, who the Respondent submits 'are clearly unsuitable to prove the existence of the alleged facts.'[299]

---

[294] Counter-Memorial, para. 411; Rejoinder, para. 186.

[295] Counter-Memorial, para. 417; Rejoinder, paras. 192-193.

[296] Counter-Memorial, para. 418; Rejoinder, para. 193.

[297] Counter-Memorial, para. 421; Rejoinder, para. 192.

[298] Counter-Memorial, paras. 423-424. See also Reply, paras. 255-278, arguing that other projects built in the Puglia region were not comparable.

[299] Counter-Memorial, para. 425. See also Reply, paras. 279-286. Rejoinder, para. 222.

181. The Respondent further contends that the explanation of the failure of the Claimants' Project falls in the category of business risk, as it is the result of the Claimants' decision to try to prepare a mega project on paper in order to attract third-party investors instead of deciding to gradually build the plants.[300]

182. With respect to the stop-work order, the Respondent notes that the Claimants failed to mention that on 13 January 2012, *i.e.* two days after the issuance of the stop-work order by the municipality of Brindisi, the Regional Administrative Tribunal suspended its effects.[301]  The Respondent contends that these two days appear to be 'completely irrelevant to the conclusion of the work by the deadline of 29 February 2012.'[302]

(ii)    The FET standard and legitimate expectations

183. The Respondent contends that the protection of legitimate expectations 'shall be connected with the general principles of good faith and fairness.'[303]  It also argues that 'the assessment of the legitimacy of the expectations is inseparably linked to an assessment of the legitimacy of the State conduct, and in particular to the pursuit of the public interest in the exercise of sovereign prerogatives.'[304]

184. According to the Respondent, the expectations alleged by the Claimants have no legitimacy under international law 'for the simple reason that they are based on the claim, completely unreasonable, that the State cannot evolve its own legislation according to plausible and verifiable objectives of public interest and in accordance

---

[300] Counter-Memorial, para. 430. The Respondent relies on *Plama v. Bulgaria*, Exhibit CL-20, para. 30. See also Reply, paras. 287-297.

[301] Counter-Memorial, para. 435; Rejoinder, paras. 205-208.

[302] Counter-Memorial, para. 436.

[303] Ibid., para. 447.

[304] Ibid., para. 447.

with the fundamental principles of due process, proportionality and non-discrimination.'[305]

185. The Respondent notes that, unlike situations observed in other investment disputes, the decision of the Constitutional Court, the Romani Decree and the Fourth Energy Account are 'forms of exercise of regulatory power in general terms.'[306]   The Respondent also highlights that, unlike other cases, here the Respondent did not make any promises directed to the Claimants concerning the evolution of its legislation on photovoltaic plants.   As a result, the alleged expectations are based solely on the general regulation provided by the Italian State.[307]

186. The Respondent argues that it would be necessary for the Claimants 'to demonstrate the profound irrationality of the evolution of this regulation in the years 2010-2012.'[308] However, in its view, the decision of the Constitutional Court, the Romani Decree and the Fourth Energy Account were reasonable.   The Respondent notes, in particular, the objectives that had been fixed in the Third Energy Account (which would explain the adoption of the Romani Decree and the Fourth Energy Account), and the transitional scheme foreseen in the Fourth Energy Account.[309]

187. The Respondent further argues that the stop-work order could not have infringed the Claimants' legitimate expectations because the 'timely intervention' of the Regional Administrative Court makes the alleged injury to the expectations non-existent.[310]

---

[305] Counter-Memorial, para. 449. The Respondent relies on *Saluka v. Czech Republic*, Exhibit CL-39, para. 305; *Parkerings Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/8, Award, 11 September 2007, Exhibit RL-24, para. 332; and *Electrabel v. Hungary*, Exhibit CL-10.  See Rejoinder, para. 195.

[306] Counter-Memorial, para. 451.

[307] Ibid., paras. 453-454.

[308] Ibid., para. 456.

[309] Ibid., paras. 457-459; Rejoinder, paras. 204-205.

[310] Counter-Memorial, para. 465.

2.      **The alleged breach of Article 13 of the ECT**

188.  The Respondent argues that, to constitute expropriation, the measures shall substantially deprive the investor of the use and enjoyment of the investment. It asserts that, as a result, 'it is necessary that there is an appropriate causal link between interference from State measures and deprivation of the benefits of the investment.'[311]

189.  The Respondent contends that there is no evidence of the causal link required to establish the existence of indirect expropriation,[312] and therefore the existence of expropriation is excluded.[313]

190.  The Respondent further argues that, even if there were evidence of a causal link between the measures and the failure of the fate of the Claimants' Project, the measures adopted by the Italian Government would fall in the category of non-compensable 'regulatory takings',[314] because the measures were adopted in a non-discriminatory manner and aimed at regulating a matter of public interest.[315]

## VII.    THE POSITIONS OF THE PARTIES ON QUANTUM

### A.      The Claimants' position

191.  The Claimants assert that the damages due as a result of Italy's breach of Articles 10(1) and 13 of the ECT must be determined according to customary international law. Relying on the ICJ's Judgment in the *Chorzów Factory* case and on Article 36 of the Draft Articles on State Responsibility, the Claimants argue that reparation must be sufficient to eliminate the consequences of the wrongful acts committed by the State.[316] In their view, compensation is generally assessed by reference to capital value, loss of

---

[311] Ibid., paras. 481-482.

[312] Ibid., paras. 486-488; Rejoinder, paras. 227-228.

[313] Counter-Memorial, para. 493.

[314] Ibid., paras. 494-496; Rejoinder, paras. 231-232 and 239.

[315] Counter-Memorial, paras. 497-501; Rejoinder, paras. 234-235.

[316] Memorial, paras. 472-475 and 484.

profit and incidental expenses.[317]  The Claimants also contend that 'it is … accepted that the risk of wrongful acts by the State must be excluded in assessing damages caused by such wrongful acts.'[318]

192.  The Claimants quantified damages using a discounted cash flow (DCF) analysis, which they claim is 'in line with arbitral case law.'[319]  They offer three alternative valuations based on three different valuation dates:

(a)  €187.8 million taking March 2010 as the valuation date, if the Tribunal considers that the Constitutional Court's decision violated the ECT;[320]

(b)  €229.5 million taking January 2011 as the valuation date, if the Tribunal considers that the Constitutional Court's decision did not violate the ECT but all the other measures did;[321] and

(c)  €133.5 million taking May 2011 as the valuation date, if the Tribunal considers that only the series of administrative errors and the direct interference by the local authority breached the ECT.[322]

193.  The Claimants' calculation of damages is based on the following assumptions:

(a)  the electricity generation estimate used by Capital Système, assuming the entry into operation of 120 MW for the two first valuations, and 113 MW for the May 2011 valuation, given the list published by the GSE in September 2011;[323]

---

[317] Ibid., para. 476.

[318] Ibid., para. 485.

[319] Reply, paras. 343-355.

[320] Memorial, para. 493; Expert Report of Carlos Lapuerta, paras. 20 and 55, and Table 4. This amount corresponds to Blusun's 80% interest in the project, based on a project valuation of €234.7 million.

[321] Memorial, para. 494; Expert Report of Carlos Lapuerta, paras. 21 and 55, and Table 4. This amount corresponds to Blusun's 80% interest in the project, based on a project valuation of €286.9 million.

[322] Memorial, para. 495; Expert Report of Carlos Lapuerta, paras. 22 and 55, and Table 4. This amount corresponds to Blusun's 80% interest in the project, based on a project valuation of €166.9 million.

[323] Expert Report of Carlos Lapuerta, paras. 34-37.

(b)  a 20-year operation period for each plant;[324]

(c)  capital expenses based on the EOS report commissioned by Eskosol and on the Siemens EPC contract;[325]

(d)  a discount rate based on the German Government bonds yield;[326] and

(e)  a liquidity discount of 15%.[327]

194.  To justify the use of a discount rate based on German Government bonds, rather than Italian Government bonds, the Claimants contend that 'using a discount rate that includes the risk of breaching the treaty by the Italian Republic "would be inappropriate."'[328]  Similarly, the Claimants reject the application of a discount rate derived from a sample of companies specialised in renewable energy because it 'would incorporate the same mistrust as reflected in the Italian Government bond yields.'[329]

195.  The Claimants also claim pre- and post-award interest, based on Italian Government bonds.[330]  The prejudgment interest claimed until December 2015 is €6.7 million, assuming that the Tribunal would find that all the measures violated the ECT. [331]

196.  The Claimants finally quantified their capital contributions to the Project, which they allege could serve as the basis for the calculation of reliance damages in the event that

---

[324] Ibid., para. 37.

[325] Ibid., para. 37.

[326] Reply, paras. 399 *et seq.*; Expert Report of Carlos Lapuerta, paras. 46-47 and 49.

[327] Expert Report of Carlos Lapuerta, para. 50.

[328] Reply, para. 400; Expert Report of Carlos Lapuerta, paras. 46-47 and 49. In addition to the damages calculation supported by the Claimants, Mr. Lapuerta calculated the project value using both the Italian and the German bond yields. That calculation, which is not relied upon by the Claimants, results in valuations of €143.8 million, €151.7 million and €82.6 million (for 100% of the project), depending on the valuation date (see Expert Report of Carlos Lapuerta, Table G1.3).

[329] Expert Report of Carlos Lapuerta, paras. 47 and 49.

[330] Memorial, paras. 499-502.

[331] Ibid., paras. 409-503; Expert Report of Carlos Lapuerta, paras. 13 and 55.

the Tribunal does not accept the DCF analysis.[332]  The Claimants estimate their capital contributions to the Project at €35.5 million.[333]

197.  The Claimants reject the adjustments to Mr. Lapuerta's DCF analysis proposed by the Respondent (described below).  They argue that they are intended to reflect events that occurred after Italy's breaches of the ECT.  This, in their view, defeats the purpose of the DCF analysis.[334]

198.  Finally, as to comparative negligence, the Claimants accept that to the extent that the failure of the Project was due conjointly (in whatever proportions) to the fault of the Claimants and the failure of the investors to proceed with the Project, damages should be reduced accordingly.[335]

**B.      The Respondent's position**

199.  The Respondent rejects the application of the DCF method in the instant case on the basis that the 120 MW Project was never a going concern.[336]  The Respondent notes, among other things, that 'several months after the date of May 2011, no construction activity of photovoltaic plants had been made at any of the 120 lots',[337] and that the Project was 'still on paper.'[338]

200.  The Respondent also contends that the application of the DCF method would result in 'unjustified enrichment.'[339]  It highlights that, in the present case, the vast majority of

---

[332] Expert Report of Carlos Lapuerta, para. 12 and Table 17; Rebuttal Expert Report of Carlos Lapuerta, para. 58. See also Carlos Lapuerta power point presentation, April 2016, slide 6.

[333] Ibid. See also Transcript, Day 5, 128:14 – 129:22 (Legum).

[334] Reply, para. 381.

[335] Transcript, Day 6, 37:15-23 (Legum).

[336] Counter-Memorial, paras. 516, 528-534.

[337] Ibid., para. 531.

[338] Ibid., paras. 514 and 532.

[339] Ibid., paras. 522, 525 and 539.

the capital needed was not yet invested and there is no evidence of a contractual or quasi-contractual relationship with one or more potential investors.[340]

201. Furthermore, according to the Respondent, the Articles on State Responsibility require the State's illegal conduct to be not too remotely linked to the damage allegedly caused.[341]   The Respondent claims that the application of the DCF method in the present case would contradict this requirement.   It argues that 'the damage that would be considered refundable is in fact largely constructed on events being completely remote with respect to the Italian conduct in question, and clearly uncertain with regard to their occurrence.'[342]

202. The Respondent finally alleges that the Tribunal should take into account the Claimants' contributory fault in assessing the alleged damages.   In particular, the Respondent highlights: (i) the Claimants' decision to implement a 120 MW unified project instead of developing it gradually; (ii) the Claimants' disregard of the 8,000 MW cap established by the Third Energy Account; (iii) the failure by the Claimants to acquire guarantees from lenders before embarking on the business project; and (iv) the Claimants' overvaluation of the purchased land.[343]

203. Regarding the assumptions considered in the Claimants' DCF analysis, the Respondent contends as follows:

(a) the minimum guaranteed price of electricity (MGP) considered by Mr. Lapuerta (which assumes a constant growth of 0.7% per year) is incorrect, because the MGP constantly decreased since May 2011;[344]

---

[340] Ibid., para. 535.

[341] Ibid., para. 544.

[342] Ibid., para. 545.

[343] Ibid., paras. 558-563.

[344] Expert Report of Luca Benedetti, 27 October 2015, p. 14.

(b) Mr. Lapuerta considered a council tax of 5,000 €/MW, while a realistic assumption is to consider a tax of 15,000 €/MW;[345]

(c) the accounting depreciation period for PV plants in Italy is 25 years – not 15 years as assumed by Mr. Lapuerta;[346]

(d) it is inappropriate to use the German Government bonds yield in order to calculate the discount rate. The Respondent explains that the cost of equity represents the opportunity cost, in terms of perceived risk, of investing capital in a specific business. It is unfounded to use German bond yields to evaluate the equity cash flows of a project like a PV installation in Italy;[347] and

(e) Mr. Lapuerta failed to consider the new regulations adjusting incentive tariffs pursuant to Decree 91 of 2014 (the so-called '*spalma incentivi*').[348]

204. Taking into account these corrections, the Respondent contends that the damages valuation based on a DCF analysis should range between €19.4 million and €32.7 million, depending on which of the three options under the '*spalma incentivi*' regulation is considered, and €40.4 million if the '*spalma incentivi*' regulation is not taken into account.[349]

205. The Respondent also challenges the Claimants' calculation of reliance damages. It contends that the Claimants failed to consider the liquidation value of the land, and that reliance damages should be assessed on the basis of the €13.84 million effectively invested as of May 2011 (*i.e.*, the latter of the dates considered by the Claimants for

---

[345] Ibid., p. 15.

[346] Ibid., p. 15.

[347] Ibid., p. 16.

[348] Ibid., p. 17.

[349] Counter-Memorial, para. 527; Expert Report of Luca Benedetti, 27 October 2015, p. 17.

the DCF analysis), not at the end of 2012.[350]   The Respondent concludes that the maximum possible value of damages refundable to the Claimants is €12.64 million.[351]

## VIII.   THE EC'S AMICUS CURIAE BRIEF AND THE POSITIONS OF THE PARTIES ON *INTER SE* APPLICATION OF THE ECT

### A.    The European Commission's Amicus Brief

206.   The circumstances in which the Tribunal accepted a late-filed EC request to make a non-disputing party submission have already been described (see paragraphs 15 to 31 above).   Given that the Respondent effectively endorsed the EC's request and arguments, the Claimants' otherwise well-founded plea that ICSID Rule 37(2) is expressly limited to the filing by a non-disputing party of 'a written submission … regarding a matter within the scope of the dispute' was rendered effectively moot. Furthermore, the Tribunal has an obligation *ex officio* to ascertain its jurisdiction.[352] The position of the EC and the Parties is set out here and subsequently analysed (see below, paragraphs 211-260 and 277-309).

207.   The EC asserts that the Tribunal does not have jurisdiction under the ECT because Member States have only created obligations regarding investment promotion and protection with respect to third countries.[353]   According to the EC, investors incorporated in a Member State or citizens of a Member State are unable to bring an investment claim against a Member State under Article 26 of the ECT.[354]

---

[350] Counter-Memorial, paras. 549-552; Expert Report of Luca Benedetti, 27 October 2015, p. 5.

[351] Counter-Memorial, para. 552; Expert Report of Luca Benedetti, 27 October 2015, p. 5.

[352] In Procedural Order No. 3, the Tribunal noted that:

> [P]ursuant to Rule 41(2) of the ICSID Arbitration Rules, the Tribunal "may on its own initiative consider, at any stage of the proceeding, whether the dispute … is within the jurisdiction of the Centre and within its own competence." Without making at this stage any determinations as to the weight that it may give to the arguments raised in the Commission's Submission, the Tribunal considers that the character of the arguments advanced in the Submission justifies accepting it into the record.

[353] *Amicus* Brief, paras. 1-3.

[354] Ibid., paras. 3-4.

208. According to the EC, an EU investor's investment in another Member State is governed and protected by EU law.[355]  Article 3(2) of the TFEU prevents Member States from concluding bilateral or multilateral investment agreements that would affect or alter EU law.[356]

209. The EC contends that the Member States did not retain the competence to enter into *inter se* obligations with respect to investment protection at the time they ratified the ECT.[357]  In consequence the relevant Italian court is the appropriate forum for bringing a claim against Italy.[358]

210. The EC refers to the decision in *Electrabel*, which in its view is distinguishable from the present case in that Hungary was not a Member State of the European Communities when it ratified the ECT.[359]  The pivotal issue in that case was whether Hungary's accession to the EU extinguished its international obligations under the ECT or whether they were superseded through Article 351 of the TFEU and Article 30 of the VCLT.[360]  In the present case, the EC submits that there never were *inter se* international obligations between the Member States *ab initio*.[361]  The EC also endorses the relevant legal findings of the tribunal in *Electrabel*.[362]

## 1. The legal order of the EU and investment protection under EU law

### a. The constitutional order of the EU

211. According to the EC, the EU has been established based on the Treaty of the European Union ('***TEU***') and the TFEU, thereby creating a legal order with its own institutions

---

[355] Ibid., para. 7.

[356] Ibid., para. 7.

[357] Ibid., para. 9.

[358] Ibid., paras. 10-11.

[359] Ibid., paras. 13-14.

[360] Ibid., paras. 13-14.

[361] Ibid., paras. 13-14.

[362] Ibid., paras. 15-17.

in exchange for which Member States narrowed their sovereign rights.[363]  In the EC's view, the European Court and Member States' domestic courts guard the legal order of the EU, which is implemented through the preliminary ruling mechanism established under Article 267 of the TFEU.[364]  Furthermore, the EC argues that Member States are bound to ensure compliance with EU law, which also provides remedies for ensuring its application.[365]

### b.    The competences of the EU and its Member States

212.  The EC asserts that competences within the EU are governed by the principle of conferral whereby the EU will act within the limits afforded by the Member States.[366] According to the EC, competences are divided between external and internal.[367]  The latter enables the EC to legislate and adopt binding rules when it has been granted exclusive internal competence, including within the scope of common commercial policy.[368]  In the EC's view, the Treaty of Lisbon extended the scope of commercial policy into the area of foreign direct investment.[369]

213.  According to the EC, it has external competence to conclude international agreements on areas of internal competence, such as investment promotion and protection.[370] Member States are therefore prevented from entering into international commitments outside the framework of the EU, or from concluding any international agreement that might affect common rules or impact their scope.[371]  Furthermore, Member States

---

[363] Ibid., paras. 23-26.

[364] Ibid., para. 27.

[365] Ibid., paras. 28-29.

[366] Ibid., para. 30.

[367] Ibid., paras. 31-32.

[368] Ibid., paras. 32-34.

[369] Ibid., para. 33.

[370] Ibid., paras. 35-38.

[371] Ibid., paras. 38-39.

cannot invoke international agreements as a reason for failing to comply with EU law.[372]

### c.    The internal market rules

214.  The EC explains that it is created around an internal market that represents an area without boundaries and allows the free movement of goods, persons, services and capital.[373]   Provisions on free movement prevent the adoption of discriminatory measures, non-discriminatory restrictions and expropriation by Member States.[374]

215.  The EC explains that restrictions on these freedoms may be justified on the grounds described in Articles 52 and 65 of the TFEU, or by 'overriding requirements in the general interest.'[375]   In the view of the EC, justifications must be interpreted based on the general principles of EU law, especially as enunciated in the Charter of Fundamental Rights.[376]

216.  According to the EC, the protection granted by the freedom of establishment and capital, including the general principles of EU law, extend throughout the lifetime of the investment.[377]   These protections are complemented by provisions on the internal market and measures adopted by the EU's legislature.[378]

### d.    Member States' ability to agree on investment protection rules outside of the EU's legal order

217.  The EC contends that EU law did not, even in 1994, permit Member States to agree on investment protection rules between themselves outside of the EU's legal order for the following reasons.

---

[372] Ibid., para. 40.

[373] Ibid., para. 41.

[374] Ibid., paras. 44-45.

[375] Ibid., paras. 45-46.

[376] Ibid., paras. 47-48.

[377] Ibid., paras. 49-50.

[378] Ibid., para. 50.

218.  First, the EC argues that international commitments on investment protection between Member States might conflict with the scope of the EU's common rules as enunciated from time to time.[379]

219.  Second, the EC considers that the ISDS mechanism is inconsistent with the relationship between Member States because the EU does not permit the settlement of intra-EU disputes outside the framework of the EU.[380]

### 2.  The lack of *inter se* obligations under the ECT between Member States

220.  According to the EC, the ECT must be interpreted in accordance with Articles 31 and 32 of the VCLT, which confirm that the European Communities and its Member States have not created obligations among themselves when entering into the ECT.[381]   On this view, the ECT is a multilateral agreement concluded with third States.[382] It is part of EU law, and the ECJ is competent to determine whether it has direct effect.[383] Additionally, the EC can bring enforcement proceedings against Member States for failure to comply with their obligations under the ECT.[384]

221.  According to the EC, the historical process confirms that the purpose of the ECT was to establish an international framework to cooperate in the energy sector between the European Communities and Eastern Europe, including Russia and the CIS.[385] Furthermore, the ECT was already considered part of the European Communities' external energy policy, as the internal energy market was already under development.[386]

---

[379] Ibid., paras. 53-55.

[380] Ibid., paras. 56-61.

[381] Ibid., para. 62.

[382] Ibid., para. 63.

[383] Ibid., para. 64.

[384] Ibid., para. 65.

[385] Ibid., paras. 74-77.

[386] Ibid., paras. 78-82.

73

222. In the EC's view, Member States became Contracting Parties of the ECT because they retained competence over certain matters, but this arrangement did not create obligations between Member States.[387]  The EC rejects Christian Tietje's position that obligations between Member States in the foregoing context 'are the rule' and that an exception is only applicable when a multilateral agreement contains a disconnection clause.[388]

223. According to the EC, the statement submitted by the European Communities to the ECT Secretariat under Article 26(3)(ii) also confirms that the ECT does not create obligations between Member States.[389]  The tribunal in *Electrabel* confirmed this understanding.[390]

### 3.    The limited scope of *inter se* obligations between Member States

224. The EC submits that even if the ECT created mutual obligations between Member States, they would only extend to areas in which Member States possess external competence.[391]

225. Specifically, the EC considers that Member States are bound by the concept 'liability follows competence' pursuant to Article 64 of the Draft articles on the responsibility of international organizations and the relevant case law, when assessing their international liability.[392]

226. According to the EC, the ECT also recognises in several instances a division of external competence between the EU and its Member States.[393]  In each instance, one

---

[387] Ibid., paras. 83-85.

[388] Ibid., paras. 86-88.

[389] Ibid., paras. 89-90.

[390] Ibid., para. 91.

[391] Ibid., para. 92.

[392] Ibid., paras. 93-98.

[393] Ibid., paras. 99-115.

must determine whether the competence lies with the Member States or the EU.[394] The EC clarified this division of competence through a note submitted to the ECT Secretariat pursuant to Article 26(3)(ii) of the ECT.[395]

227. The EC submits that all provisions within Part III of the ECT fall within the competence of the EU and thus they are binding on the EU[396] and that, as a result, in the event of a dispute between the EU and an investor from a third country, the EU will be internationally responsible for any breach.[397] The EC contends that because the ECT provisions on investment protection only bind the EU, and not the Member States *inter se*, an EU investor cannot bring a claim against a Member State.[398] According to the EC, such a claim would not represent a dispute against another Contracting Party for the purposes of Article 26 of the ECT.[399]

228. Moreover, the EC argues, if the ECT terms are considered ambiguous regarding the mutual obligations between Member States, then the Tribunal should adopt an interpretation that would be consistent with EU law.[400] According to the EC, the proper interpretation is that the ECT is inapplicable between Member States, or at least Article 26 of the ECT does not apply between them.[401]

## 4. Application of Chapter III and Article 26 ECT under VCLT Article 30

229. The EC submits that, for purposes of Article 30 of the VCLT, the ECT and the EU Treaties relate to the same subject matter, namely energy.[402] Accordingly, while the ECT is an earlier treaty compared to the EU Treaties, the ECT only applies to the

---

[394] Ibid., para. 115.

[395] Ibid., paras. 116-117.

[396] Ibid., para. 118.

[397] Ibid., para. 118.

[398] Ibid., para. 118.

[399] Ibid., para. 118.

[400] Ibid., paras. 119-120 (relying upon *Electrabel v. Hungary*, Exhibit CL-10).

[401] Ibid., paras. 120-122.

[402] Ibid., paras. 123-124.

extent that its provisions are not incompatible with the EU treaties.[403]  On that basis, the EC argues that the Tribunal should conclude that Chapter III and Article 26 of the ECT are not applicable between Member States pursuant to Article 30 of the VCLT.[404]

## B.    The Respondent's position

230.  The Respondent endorses, in principle, the conclusions presented by the EC in its *amicus curiae* brief.[405]

231.  According to the Respondent, it did not raise jurisdictional objections based on non-applicability of the ECT between EU investors and EU Member States because it considers that no investment has been concluded under the ECT,[406] or that, even if an investment is found to exist, it was established contrary to law and the principle of good faith.[407]  The Respondent argues that if the Tribunal considers the investment as legitimate, then it would share the EC's conclusion that the ECT is inapplicable within the EU.[408]  The Respondent asserts that it was, in part, due to its awareness of the EU's approach that it denounced the ECT in December 2014.[409]

232.  In the Respondent's view, the main issues in this case are to determine the ECT obligations that are imposed upon it as an EU Member State, the allocation of competences in light of EU treaties and the effects on the Tribunal's jurisdiction.[410]  The Respondent argues that this approach was followed in the *Electrabel* case.[411]

---

[403] Ibid., paras. 125-127.

[404] Ibid., paras. 128-131.

[405] Respondent's Position on Jurisdiction of the Tribunal over Intra-EU Disputes ('***Respondent's Position on Jurisdiction***'), paras. 1-5.

[406] Ibid., para. 6.

[407] Ibid., para. 6.

[408] Ibid., para. 7.

[409] Ibid., paras. 8-10.

[410] Ibid., paras. 11-14.

[411] Ibid., paras. 15-16.

233. The Respondent submits that the *Electrabel* case is relevant as it provides an understanding of EU law in connection with the ECT and for understanding subsequent disputes.[412]  Specifically, the Respondent argues that EU treaties, as international law, must be interpreted subject to the VCLT.[413]  According to the Respondent, EU law being international law, it must also be taken into account by the Tribunal pursuant to Article 26(6) of the ECT and Article 42(1) of the ICSID Convention.[414]  In sum, the Respondent asserts that the jurisdictional issues arising under EU law and raised by the EC fall within the scope of the dispute because EU law impacts the interpretation of the ECT.[415]

234. The Respondent also observes that the Claimants based their Request on their French, German and Belgian nationalities without invoking the Swiss permanent residency acquired by two of the Claimants in 2009 (Lecorcier) and 2011 (Stein).[416]  In addition, the Respondent argues that the Claimants must satisfy the definition of 'Investor' under both the ECT and the ICSID Convention, which does not contemplate the possibility for a permanent resident to be treated as a 'national.'[417]  Even if permanent residents were considered 'investors' under Article 25(2) of the ICSID Convention (which the Respondent denies), the Respondent argues that at the time of its consent to the ECT (i.e. the date of signature), the two Claimants did not benefit from their status of Swiss permanent residents and therefore would not qualify as a protected 'Investor' under the ICSID Convention.[418]

---

[412] Ibid., paras. 20-21.

[413] Ibid., para. 21.

[414] Ibid., para. 22.

[415] Ibid., paras. 23-24.

[416] Ibid., paras. 25-26.

[417] Ibid., paras. 27-28.

[418] Ibid., paras. 29-30.

### 1.    Interpretation of the ECT under International Law

235.   In the Respondent's view, the main issue in this case is the extent to which the EU and its Member States intended to become bound *inter se* by the ECT when they entered into that multilateral treaty.[419]

236.   The Respondent observes that the definition of 'Contracting Party' in the ECT 'include[s] EU Member States, on the one side, and the EU as a regional economic integration organization, on the other.'[420]  It also notes that the definition of 'regional economic integration organization' shows that EU Member States had transferred a number of competences to the EU with respect to which the EU has regulatory power in the whole territory.[421]  In the Respondent's view, the allocation of competences within the EU cannot rely on geographical boundaries but rather on competence by subject matter.  This would be confirmed by the recognition of overlapping territories in the definition of 'Area' in Article 1(10).[422]

237.   The Respondent adds that Article 25 of the ECT seems to specifically recognize that rules of an Economic Integration Agreement prevail and are recognized by the ECT.[423]

238.   According to the Respondent, the declarations and understandings of the Contracting Parties to the ECT also confirm that the ECT does not apply between EU Member States.[424]  Specifically, the Respondent contends that Annex 2 to the Final Act of the ECT Conference[425] shows that the Contracting Parties to the ECT 'had clear in mind the issue of treatment of investors from a country that was a Contracting Party to the

---

[419] Ibid., para. 31.

[420] Ibid., para. 35.

[421] Ibid., para. 35.

[422] Ibid., paras. 37-38.

[423] Ibid., para. 40.

[424] Ibid., para. 44.

[425] The Respondent refers to a decision regarding Articles 24(4)(a) and 25 of the ECT, which stated that '[a]n Investment of an Investor referred to in Article 1(7)(a)(ii), of a Contracting Party which is not a Party to an EIA or a member of a free-trade are or customs union, shall be entitled to treatment accorded under such EIA, free-trade area or customs union', under certain conditions (see Respondent's Position on Jurisdiction, para 45, citing Annex 2 to the Final Act of the European Energy Charter Conference).

ECT but not a member of the EU.'[426]  In the Respondent's view, in order to avoid double protection, an EU investor would not have the right to invoke Article 26 of the ECT for protecting itself, and it would rather need to invoke EU law and seek a method of redress within that context.[427]

239.  The Respondent also highlights the purpose of the ECT and circumstances surrounding its adoption.  It asserts that the historical context underlying the treaty illustrates that it was intended to integrate the energy sectors between the EU and Eastern European States, including Russia, and not to regulate the EU internal energy market which at that time was already under way under its own regulatory system.[428]

240.  The Respondent submits that EU Member States and the EU have consistently followed this approach regarding intra-EU jurisdictional issues.[429]  According to the Respondent, since the *Electrabel* case, the EU and its Member States' judicial practice proves that the ECT was not intended to cover intra-EU relations or situations.[430]

241.  In the Respondent's view, the *Electrabel* case is relevant for current purposes because it restricts the scope of Article 26 of the ECT to extra-EU disputes, whereas internal disputes must be addressed by the Member States' domestic courts and the ECJ.[431]  The Respondent notes, however, that the *Electrabel* case is different because it did not focus on whether the ECT would be applicable in that dispute.[432]  In this case, the Respondent contends that the focus lies on the intent of the Member States when entering into the ECT in light of their obligations under EU treaties.[433]

---

[426] Respondent's Position on Jurisdiction, para. 46.

[427] Ibid., paras. 47-50.

[428] Ibid., paras. 52-53.

[429] Ibid., para. 54.

[430] Ibid., paras. 54-56.

[431] Ibid., paras. 57-58.

[432] Ibid., paras. 59-60.

[433] Ibid., paras. 59-60.

242. According to the Respondent, the absence of a disconnection clause is not decisive as to the issue of *inter se* application. The Member States did enter into *inter se* agreements and their presence cannot be disregarded.[434] The Respondent asserts that 'the ECT contains Article 16, which is a conflict rule that in fact establishes priorities for both prior and subsequent *inter se* agreements.'[435]

243. Based on the foregoing, the Respondent contends that the ECT did not apply *ab initio* to intra-EU situations, as this was not the intention of the Contracting Parties. As a result, Article 26 of the ECT confers no jurisdiction over this dispute.[436]

### 2.    The evolution of EU treaties and their impact on the ECT

244. Alternatively, the Respondent asserts that the present state of the law, especially in light of the Lisbon Treaty, shows that intra-EU disputes are not now included within the scope of the ECT.[437]

245. In the Respondent's view, the main issue – assuming for the sake of argument that the ECT initially had *inter se* effect – is whether the Lisbon Treaty subsequently concluded among some of the ECT's Contracting Parties is consistent with the ECT itself.[438] The Respondent argues that this issue must be assessed in light of Articles 30 and 41 of the VCLT.[439]

246. According to the Respondent, the attribution of competences to the EU is governed by the principle of conferral: the EU acts within the competences that have been granted to it by Member States.[440] The Respondent submits that common commercial policy falls within the EU's exclusive competence, whereas energy remains a shared

---

[434] Ibid., para. 62.

[435] Ibid., para. 62.

[436] Ibid., para. 63.

[437] Ibid., para. 64.

[438] Ibid., para. 66.

[439] Ibid., para. 66.

[440] Ibid., paras. 67-68.

competence.[441]    The Respondent argues that while the EU's competences have evolved, Member States retain a duty to cooperate with the EU and are bound to avoid harming the '*effet utile*' of EU law.[442]

247.  In the Respondent's view, since the Lisbon Treaty and the ECT involve the same subject matter, Article 30 of the VCLT applies to their interplay.[443]  The Respondent also contends that the ECT must derogate from any provision or dispute resolution mechanism of another agreement that is more favourable to the investor or investment, in accordance with Article 16 of the ECT.[444]  The Respondent argues that EU law guarantees better protection to an investor or an investment than the ECT,[445] and therefore the coverage of intra-EU situations regarding FDI by EU law is compatible with the ECT by virtue of Article 16 of the ECT.[446]

248.  According to the Respondent, regardless of Article 16 of the ECT, one would reach the same conclusion by applying Article 30(4) of the VCLT.[447]

249.  Lastly, the Respondent alleges that Article 41(1)(a) of the VCLT allows parties to an agreement to enter into another treaty which modifies the initial agreement among themselves.[448]  According to the Respondent, the Lisbon Treaty respects the spirit of the VCLT because it did not impact the rights of other Contracting Parties or the performance of their obligations under the ECT.[449]  Instead, the Respondent contends

---

[441] Ibid., para. 68.

[442] Ibid., para. 70.

[443] Ibid., paras. 75-80.

[444] Ibid., para. 81.

[445] Ibid., para. 82.

[446] Ibid., para. 83.

[447] Ibid., para. 84.

[448] Ibid., paras. 86-88.

[449] Ibid., paras. 89-90.

that the Lisbon Treaty simply increases economic integration, which favours the execution of the ECT.[450]

### C.    The Claimants' position

250.  In the first place, the Claimants maintain their objection to the admissibility of the EC's brief for three reasons.  First, the Claimants contend that the issues raised by the EC do not fall within the scope of the dispute because the Respondent did not raise it,[451] and that those issues cannot be considered at the Tribunal's own initiative under ICSID Rule 41(2) because it was untimely.[452]

251.  Second, the Claimants submit that even if the EC's objection were well-founded, it would have no bearing on the Tribunal's ability to hear the claims under Article 25 of the ICSID Convention.[453]  It is true that jurisdiction under the ICSID Convention is established in this case through the respective nationality of each Claimant.[454]  But that nationality (which is not in dispute) simply qualifies them to access ICSID arbitration.  Consent to arbitration derives from the ECT, and exists regardless of the EC's position on *inter se* application of the ECT because two of the Claimants are Swiss permanent residents and Switzerland is not an EU Member State.[455]

252.  Third, the Claimants argue that the Respondent is misguided when it claims that two of the Claimants were not Swiss permanent residents when Italy consented to arbitration under the ECT.[456]  In the Claimants' view, the date of consent is when they

---

[450] Ibid., para. 91.

[451] Claimants' Observations on the European Commission's *Amicus Curiae* Brief ('**Claimants' Observations**'), paras. 7-8.

[452] Ibid., para. 9.

[453] Ibid., paras. 10-11.

[454] Ibid., para. 11.

[455] Ibid., para. 11.

[456] Ibid., paras. 12-13.

accepted Italy's offer to arbitrate, at the time the Request was filed.[457]   At that time, both Messrs. Stein and Lecorcier were Swiss permanent residents.

253.   Turning to the merits of the EC's position, the Claimants reject it for two reasons. There is no basis to claim that EU Member States lacked competence, in 1994 or now, to enter into *inter se* obligations with respect to investment protection by EU investors.[458]   EU Member States have full capacity to commit themselves to treaty obligations.[459]   Second, the Claimants contend that the EU and its Member States are Contracting Parties of the ECT.[460]   The main issue is the scope of ECT obligations assumed by the Contracting Parties, which can be determined by applying Articles 31 and 32 of the VCLT.[461]   Applying those provisions there is no ground for denying *inter se* application of the ECT.

### 1.   The ECT creates *inter se* obligations among all Contracting Parties

254.   The Claimants contend that the Member States' lack of competence for entering into *inter se* obligations regarding investment protection under the ECT is inconsistent with the principles of sovereignty and *pacta sunt servanda*.[462]   The question is not their competence to act but whether it was exercised in the given case.

255.   Thus whether Member States entered into *inter se* obligations under the ECT is a matter of treaty interpretation.[463]   While they agree that Articles 31 and 32 of the VCLT provide the rules of interpretation, the Claimants note that the Commission has not conducted a textual analysis of the ECT.[464]   In their view, Article 26 confirms that the ECT applies to disputes between any Contracting Party and an Investor of any other

---

[457] Ibid., paras. 12-13.

[458] Ibid., para. 1.

[459] Ibid., para. 1.

[460] Ibid., para. 2.

[461] Ibid., para. 3.

[462] Ibid., paras. 14-15.

[463] Ibid., para. 15.

[464] Ibid., paras. 16-17.

Contracting Party.[465]  Moreover, Part III on its face entails obligations vis-à-vis each Contracting State's investors or investments without drawing any distinction between EU Member States and other Contracting States.[466]

256.   The Claimants assert that the ECT's preparatory works and the circumstances of its conclusion do not constitute 'context' pursuant to the VCLT.[467]  In the Claimants' view, Articles 24 and 25 of the ECT are the relevant 'context' for the interpretation of Article 26 of the ECT, and they do not support the EC's interpretation.[468]  Recourse to the *travaux préparatoires* is inadmissible when interpretation pursuant to Article 31 VCLT results in a clear and reasonable meaning.  But in any event, the *travaux préparatoires* confirm the interpretation based on the ordinary meaning of the text.[469] The EC had suggested including a 'disconnection clause' within the ECT, but the other negotiating States rejected that proposal.[470]

### 2.    Transfer of competence does not protect EU Member States from responsibility under the ECT

257.   In the Claimants' view, the EC does not interpret the ECT pursuant to the VCLT but based on EU law.[471]  But under public international law, EU Member States may not derogate from their ECT obligations on the basis of their membership in the EU.[472]

258.   The Claimants also submit that the EC has not established that Member States lack competence over investment protection and energy.[473]  In the Claimants' view, the EU does not enjoy exclusive competence in those areas, which are shared competences in

---

[465] Ibid., paras. 20-26.

[466] Ibid., paras. 27-30.

[467] Ibid., paras. 31-32.

[468] Ibid., paras. 33-45.

[469] Ibid., paras. 56-58.

[470] Ibid., paras. 59-73.

[471] Ibid., para. 86.

[472] Ibid., paras. 87-94.

[473] Ibid., para. 95.

the internal market.[474]  According to the Claimants, the Lisbon Treaty's competence over foreign direct investment is only an external competence, which does not affect EU Member States' *inter se* relations.[475]  The Lisbon Treaty has not repealed the ECT, which remains in effect between EU Member States.[476]

259.  According to the Claimants, arbitral tribunals have regularly rejected the so-called 'intra-EU' jurisdictional objection that has been raised by the EC.[477]  No fewer than eleven arbitral tribunals have addressed this argument and it has never been successful.[478]

### 3.    The inapplicability of the *lex posterior* principle

260.  The Claimants submit that the EC and the Respondent wrongly contend that Part III and Article 26 of the ECT are inapplicable between Member States pursuant to Article 30 of the VCLT.[479]  The Claimants' arguments can be summarized as follows:

(a)  The EC has not demonstrated that the ECT's investment protections under Chapter III and Article 26 are incompatible with EU law.[480]

(b)  Article 30 of the VCLT is not applicable because the ECT and the TFEU do not address the same subject matter.[481]  In the Claimants' view, the substantive protections under the ECT and EU law are different as the ECT provides rights and protection that are more extensive than what is offered in the EU's internal market.[482]

---

[474] Ibid., paras. 96-102.

[475] Ibid., para. 103.

[476] Ibid., para. 103.

[477] Ibid., paras. 121-130.

[478] Ibid., para. 131.

[479] Ibid., paras. 133-135.

[480] Ibid., paras. 145, 166.

[481] Ibid., paras. 168-173.

[482] Ibid., para. 174.

(c)  The ECT has primacy over EU law pursuant to Article 216(2) of the TFEU and based on the ECJ's jurisprudence.[483]

(d)  The ECT's provisions are more favourable to investors and investments than EU law; by virtue of Article 16 of the ECT they would take precedence even if they covered the same subject-matter.[484]

(e)  The ECT should also supersede EU law on the basis of Article 30 of the VCLT given its status as *lex specialis* and *lex posterior*.[485]  In the Claimants' view, it is incorrect to say that EU law should apply as *lex posterior* to the ECT.[486]

(f)  The Respondent's reliance on Article 41 of the VCLT is misplaced because it has failed to establish that the Lisbon Treaty is an *inter se* agreement that would enable the EU Member States to derogate from the ECT's obligations.[487]

## IX.    ISSUES OF JURISDICTION AND ADMISSIBILITY: THE TRIBUNAL'S CONCLUSIONS

### A.    Issues originally raised by the Respondent

261.  The Tribunal will first consider the issues of jurisdiction and admissibility raised by the Respondent in its Counter-Memorial and maintained in the Rejoinder.

#### 1.    The Claimants' Investment

262.  As noted (paragraph 125 above), the Respondent denies that the Claimants have a protected investment, whether under the ECT or the ICSID Convention.  It stresses that the Claimants 'never placed themselves in the actual condition of collaborating with the Italian development plan of photovoltaic energy through the construction (even gradual) of plants that could benefit from incentive plans, but they simply

---

[483] Ibid., paras. 175-178.

[484] Ibid., paras. 180-182.

[485] Ibid., paras. 183-191.

[486] Ibid., paras. 185-187.

[487] Ibid., paras. 192-198.

constituted the pre-conditions for the realization of an ambitious project that would produce that effect.'[488]

263.  Turning first to the ECT, Article 1(6) contains a typically broad definition of 'investment' and states that it applies 'to any investment associated with an Economic Activity in the Energy Sector.' Article 1(5) of the ECT defines 'Economic Activity in the Energy Sector' as 'an economic activity concerning the exploration, extraction, refining, production, storage, land transport, transmission, distribution, trade, marketing, or sale of Energy Materials and Products except those included in Annex NI, or concerning the distribution of heat to multiple premises.' An attached understanding lists as 'illustrative of Economic Activity in the Energy Sector' '(ii) construction and operation of power generation facilities, including those powered by wind and other renewable energy sources.' In the Tribunal's view, the words 'construction and operation' do not impose a cumulative requirement; if they did, an investor purchasing an already constructed plant would not be covered. Whatever the position with merely preparatory work, e.g. in the preparation of a tender or the negotiation of a concession,[489] once an active process of construction of an energy project involving substantial resources is commenced, the merely preparatory phase is over and the project qualifies as an investment. There is no doubt that, assuming the Claimants' Project was lawful and not merely speculative, it fell squarely within the terms of Article 1(5) and (6) of the ECT.

264.  As to the lawfulness of the Project, it is true that the ECT does not lay down an explicit requirement of legality, but the Tribunal concludes that it does not cover investments which are actually unlawful under the law of the host state at the time they were made because protection of such investments would be contrary to the international public order. This conclusion is consistent with numerous other decisions and awards.[490] In

---

[488] Rejoinder, para. 38.

[489] Cf. *Mihaly v. Sri Lanka*, Exhibit RL-15.

[490] See e.g. *Yukos v. Russia*, Exhibit CL-22, para. 1352: 'An investor who has obtained an investment in the host State only by acting in bad faith or in violation of the laws of the host state … should not be allowed to benefit from the Treaty.' See also *Plama v. Bulgaria*, Exhibit CL-20, paras. 138, 140 and 143; *World Duty*

particular, the *Plama* tribunal found that because: '… the ECT should be interpreted in a manner consistent with the aim of encouraging respect for the rule of law … the substantive protections of the ECT cannot apply to investments that are made contrary to law.'[491] On the other hand, the mere fact that the Claimants relied on the DIA system of licensing individual plants (a licensing system already employed by the 12 development companies) did not render the Project actually unlawful from its inception. It may or may not have eventually qualified for subsidies, a matter as to which the Claimants took the risk. But they never, insofar as the record shows, misrepresented their Project, and the Respondent, while complaining in general terms of fraud and the like, produces no specific example of conduct by the Claimants which was fraudulent or deceptive, unless it be the subsequent acquisition of multiple plots individually authorised under the DIA procedure. Permits were duly obtained by the 12 development companies under the AU procedure for the sub-stations and the connecting network, and following the acquisition of the companies, Eskosol obtained recognition of the eligibility of almost all the proposed plants (113 of 120) under the Fourth Energy Account (see above, paragraphs 110-112). On the only occasion the Puglia Project was tested at law, before the Regional Administrative Court of Puglia, it survived scrutiny (see above, paragraph 119).

265. In its Rejoinder, the Respondent cites a series of decisions of the *Corte di Cassazione* which, it argues, confirm 'the unlawfulness of obtaining DIAs for individual plants belonging to the same project.'[492]

   (a) In *Cassazione penale* 11981/2014, the scheme was described in the following terms:

---

*Free Company Limited v. Republic of Kenya*, ICSID Case No. ARB/00/7, Award, 4 October 2006, Exhibit RL-19, paras. 157, 188; *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/11/12, Award, Exhibit CL-110, para. 332; *Phoenix v. Czech Republic*, Exhibit RL-13, para. 78; *David Minnotte and Robert Lewis v. Republic of Poland*, ICSID Case No. ARB(AF)/10/1, Award, 16 May 2014, para. 131.

[491] *Plama* v. *Bulgaria*, Exhibit CL-20, para. 139.

[492] Rejoinder, para. 52.

Photovoltaic Park (capacity of about 3 MW) in the three plants, each with power of just under 1 MW (formally registered to three separate companies but attributable to the same property or however, a single center of interests), thus resulting in a building transformation of the land involved in the interventions, in violation of the requirements dictated by the existing planning instruments …[493]

The Court upheld a criminal conviction for fraud, holding that…

… the three photovoltaic plants … although formally registered to three different companies, are attributable to a single center of interests while the reasons for the fractioning is [sic] were only to circumvent the requirements as to the needs of the single regional authorization.[494]

(b) In *Cassazione penale* 40561/2014, the Court held that, given the overall size of the plant, the applicant should have used the AU and not the DIA procedure, and that the use of the latter was unlawful.[495] Moreover, it was unlawful even though the DIAs were obtained by the vendors who subsequently sold the land, with the benefit of the DIAs, to a Spanish group which consolidated them and obtained the relevant incentives.

(c) In *Cassazione penale* 16624/2015 (a case concerning wind power), the Court held that: 'the judges of the review excluded the validity of the simplified authorization procedure followed in this case and highlighted the need of the single regional authorization, prior environmental impact assessment, on the assumption that there was a separation, only formal, among the individual turbines subject to seizure, which constitute, in reality, a single plant. The Court essentially assumes that said formal separation was made in order to keep each plant below the threshold of 60 kW of power, thus benefiting from the simplified authorization procedure and deemed demonstrated the artificial circumvention of the sector rules …'[496] The decision of the Court of Cagliari that the scheme was unlawful was upheld. These

---

[493] *Cassazione penale* 05/02/2014, No. 11981, 5 February 2014, Exhibit RL-36.

[494] Ibid.

[495] *Cassazione penale* 25/06/2014, No. 40561, 25 June 2014, Exhibit RL-37.

[496] *Cassazione penale* 08/04/2015, No. 16624, 8 April 2015, Exhibit RL-38.

(and other lower court decisions cited but not provided to the Tribunal[497]) raise serious concerns about the legality of authorisation of the investment.

266. In their closing submissions,[498] the Claimants relied principally on the decision of the Regional Administrative Court of Puglia, which was the only Italian judicial decision specifically concerning the Project and which was *res judicata* as far as the Municipality was concerned. According to that decision, the Puglia Project did not meet the criteria for a deemed single project under Regional Law 31/1998: the plots had never been under single ownership; various persons applied for DIAs, not a single entrepreneur, and there was no question of 'several plots resulting from the fractioning of an area of greater extent, carried out within the two years preceding the application' (Regional Law 31/1998, Art. 3(1)(b)). In short, this was a case of amalgamation of separate plots covered by DIAs, not fractioning of a single earlier plot.

267. The issue of the domestic legality of the Puglia Project is not an easy one. The Regional Administrative Court's decision concerned a stop-work order, and though it favoured the Claimants and was not appealed, it is by no means clear that it would have withstood subsequent legal action designed to query the provision or level of incentives for this very large project. Nor is it clear that the distinction drawn by the Regional Administrative Court between initial authorisation of plants and their subsequent acquisition would have been maintained (see the later decisions of the *Corte di Cassazione*, summarised in paragraph 265). Moreover, if the position of the project companies was doubtful, it is not clear that Eskosol as purchaser from them would have remained unaffected.

268. Neither Party called expert evidence on the point, in the absence of which the Tribunal can only do its best with the Italian legal materials at its disposal. In the circumstances, the Tribunal considers as crucial the repeated acts of approval by Italian agencies of the Project, notably the authorisations by the AU procedure of the rings and the sub-

---

[497] Rejoinder, para. 52.

[498] Transcript, Day 6, 23:11 – 29:21.

stations and the repeated listings of most of the proposed plants under the Fourth Energy Account, which occurred without any deception or misrepresentation on the part of the Claimants. In the end, the Respondent has not demonstrated the illegality of the Project. But this does not mean that the Project was insulated from market concerns as to its potential illegality – concerns such as those which affected the Project following the Constitutional Court decision, and did so without any fault on the part of the Respondent or any great uncertainty as to the legal position (see paragraph 92). The Project may have been protected by the ECT, but as a matter of fact it was not insulated from market uncertainties inherent in the risk of project design and delayed implementation.

269. As to Respondent's claim that the Claimants had a merely paper project of a speculative character,[499] even if this might have been initially true, it ceased to be true once the Claimants invested substantially through their financing of the sub-stations and the rings. Moreover, while there may be doubt as to the speculative character of an investment at an early stage, once this doubt is resolved by substantial measures of implementation, including assumption of financial risk, it should be presumed that the investment was a genuine one, and was correspondingly treaty-protected, from the outset.[500]

270. In this respect the Claimants point to a number of decisions, under the ECT and BITs, where projects were held to be investments despite never producing nor even being finally licensed to do so.[501]

271. Given that the Project was covered as an investment under Article 1(6) of the ECT, it needs little to show that it was equally covered by the ICSID Convention, which contains no separate definition of 'investment.' Even if, as the Respondent argued,

---

[499] Rejoinder, para 38.

[500] For the 'lifetime' of an investment see *Mondev v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002, Exhibit CL-123, paras. 79-82.

[501] E.g. *PSEG v. Turkey*, Exhibit CL-125; *Gold Reserve v. Venezuela*, Exhibit CL-113; *Churchill Mining Plc v. Republic of Indonesia*, ICSID Case Nos. ARB/12/14 & ARB/12/40, Decision on Jurisdiction, 24 February 2014, Exhibit CL-106.

one were to apply the *Salini* criteria as interpreted in subsequent decisions,[502] the Claimants clearly had an investment for ICSID purposes.

## 2.    'Clean hands'/Good faith

272.  The Respondent also argues for the inadmissibility of the claim on the ground that the Claimants lacked 'clean hands' or were acting in bad faith in pursuing the Project.

273.  This issue has already been substantially treated under the rubric of the legality of the Project.  No evidence has been tendered that Eskosol was guilty of 'deceiving the Energy Services Operator on the actual size and nominal power of the photovoltaic plant', a key basis for the Court of Criminal Cassation decision of 5 February 2014;[503] and in the absence of any such evidence, the 'clean hands' doctrine has nothing to operate on.  It is therefore unnecessary for the Tribunal to decide whether there exists a generic 'clean hands' defence or ground of inadmissibility in international investment law.[504]

274.  Under the 'clean hands' rubric, the Respondent also argues that the Project was not treaty-protected because of the Claimants' failure to conduct an EIA:

> as for the issue of the obligation of the EIA, the abusive conduct by the Claimants appears contrary to the obligation of good faith not only because it is inconsistent with the *rationale* of domestic law, but also because it is in conflict … with international law, and in particular with [Article 19 of] the ECT…[505]

275.  Article 19 of the ECT provides, in so far as relevant:

---

[502] *Salini Costruttori SPA and Italstrade SPA v. Kingdom of Morocco,* ICSID Case No. ARB/00/4, Decision on Jurisdiction, 23 July 2001, Exhibit CL-38, paras. 50–58.  The *Salini* test was applied, e.g., in *LESI-Dipenta v Algeria,* ICSID Case No. ARB/03/08, Award, 10 January 2005, para. II.13(iv); *Bayindir v, Pakistan,* ICSID Case No. ARB/03/29, Decision on Jurisdiction, 14 November 2005, Exhibit RL-35, paras. 131–137; *Victor Pey Casado v. Chile,* ICSID Case No. ARB/98/2, Award, 8 May 2008, para. 233; *Electrabel v. Hungary,* Exhibit CL-10, para. 5.43.

[503] *Cassazione penale* 05/02/2014, No. 11981, 5 February 2014, Exhibit RL-36.

[504] See J. Crawford, Second Report on State Responsibility, *ILC Ybk* 1999 vol II(1) paras. 330-4.

[505] Rejoinder, para. 79.

> ... each Contracting Party shall strive to minimize in an economically efficient manner harmful Environmental Impacts occurring either within or outside its Area from all operations within the Energy Cycle in its Area... Contracting Parties shall accordingly:
>
> (i)    promote the transparent assessment at an early stage and prior to decision, and subsequent monitoring, of Environmental Impacts of environmentally significant energy investment projects[.]

The Claimants object that claims based on Article 19, contained in Part IV of the ECT ('Miscellaneous Provisions'), are beyond the scope of the Tribunal's jurisdiction, which is confined to Part III ('Investment Promotion and Protection'). But the Respondent does not make any affirmative claim or counterclaim based on Article 19, and it is at least arguable that a tribunal constituted under Part III could take into account conduct clearly in breach of other provisions of the ECT insofar as it is relevant to the admissibility of a claim. The key point, however, is that Article 19 operates not at the level of individual investors but at the interstate level, as is equally the case with the developing general international law of EIAs.[506] In so far as there is any requirement for private parties to carry out an EIA for any proposed project, this can only arise under the relevant national law. This is made clear by an Understanding of the Contracting Parties appended to Article 19(1)(i):

> It is for each Contracting Party to decide the extent to which the assessment and monitoring of Environmental Impacts should be subject to legal requirements, the authorities competent to take decisions in relation to such requirements, and the appropriate procedures to be followed.

In accordance with Article 19(1)(i), it is for the law of the host state to determine the existence and extent of EIA requirements binding on private parties, and it is not enough to appeal to 'the *rationale* of domestic law' in the absence of specific legal requirements.

276.    Under Italian law there is no EIA procedure required for small solar power plants. Large solar plants are subject to a screening process as a result of which an EIA may

---

[506] *Pulp Mills on the River Uruguay (Argentina v. Uruguay),* I.C.J. Reports 2010 (I), Exhibit CL-127, pp. 55-56, para. 101. For more recent discussion, see *Construction of a Road in Costa Rica Along the San Juan River (Nicaragua v. Costa Rica)*, Judgment of 16 December 2015, paras. 101, 104.

be imposed. No screening occurred (or seems to have been required) when the project companies obtained approval for the individual plants which would make up the Puglia Project.[507] At most, there may have been some uncertainty as to the applicability of the screening procedure given the 'aggregative' character of the Project. But by the time Eskosol acquired the twelve development companies, the time for an EIA was, by parity of reasoning from the 2012 decision of the Puglia Court, past. At the level of the admissibility of claims, it is too late for Italy now to assert that an EIA was 'really' required.

### B.    EU Law and the *inter se* issue

#### (a)    Admissibility of the *inter se* argument

277. Claimants continue to protest[508] that the Tribunal should not admit this argument, introduced late by the EC in its request to file a non-disputing party submission, and subsequently adopted by the Respondent (paragraphs 23-31 above). But as the Tribunal has already ruled, it has an obligation to determine its jurisdiction, and the rules of EU law relevant in the matter are part of the applicable law for this Tribunal. The procedural barrier arising from the terms of ICSID Rule 37(2) has been effectively overcome by the Respondent's belated endorsement of the EC's position, and any additional costs imposed on the Claimants by this delay on the part of the Respondent can be compensated for in the Tribunal's final award on costs. Accordingly, the *inter se* argument is admissible.

#### (b)    The applicable law

278. The Parties in effect agree that the applicable law in determining this issue is international law, and specifically the relevant provisions of the VCLT. The Tribunal agrees, but would observe that this does not exclude any relevant rule of EU law, which would fall to be applied either as part of international law or as part of the law of Italy.

---

[507] See the account of Italian law in Claimants' Reply, para. 129, not denied in the Rejoinder.
[508] Claimants' Observations, paras. 7-9.

The Tribunal evidently cannot exercise the special jurisdictional powers vested in the European courts, but it can and where relevant should apply European law as such.

### (c)     The original scope of the ECT

279.  As a matter of international law, the first question is whether the ECT applied to relations *inter se* of EU Member States as at the date of its conclusion (December 1994) in accordance with Articles 31-33 of the VCLT.

280.  On its face there is nothing in the text of the ECT that carves out or excludes issues arising between EU Member States.

(1) The preamble to the ECT records that it intends 'to place the commitments contained in [the European Energy Charter] on a secure and binding international legal basis.'  This implies that the scope of the (non-binding) European Energy Charter of 17 December 1991 was replicated in binding form in the ECT.  There is no indication of any *inter se* exclusion in the Charter, which refers to a 'new desire for a European-wide and global co-operation based on mutual respect and confidence', and further refers to the 'support from the European Community, particularly through completion of its internal energy market' (Preamble, paras. 6, 14).  The EC and Euratom were signatories to the Charter.  This was of course before the Treaty of Maastricht, let alone the Lisbon Treaty.

(2) Article 1(2) of the ECT defines 'Contracting Party' as 'a state or Regional Economic Integration Organization which has consented to be bound by this Treaty and for which the Treaty is in force.'[509]  EU Member States and the EU are all Contracting Parties.  *Prima facie* at least, a treaty applies equally between its parties.  It would take an express provision or very clear understanding between the negotiating parties to achieve any other result.   Thus when Great Britain was asserting 'the diplomatic unity of the British Empire', it was argued from time to

---

[509] Art. 1(3) defines 'Regional Economic Integration Organization' as 'an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters.'

time that multilateral treaties to which the Dominions were separately parties had no *inter se* application.  The *inter se* doctrine was not however accepted, being unsupported by express provision or clear understanding to the contrary.[510]

(3) There is no express provision (or 'disconnection clause', to adopt recent parlance) in the ECT.[511]

(4) While the Respondent and the EC relied on the *travaux préparatoires* to justify reading in a disconnection clause, this is not permissible in a context in which the terms of the treaty are clear.[512]  In any case, the *travaux préparatoires* seem to point against implying a disconnection clause: one was proposed during the course of the Energy Charter Treaty negotiations, but was rejected.[513]

281. Neither is there anything in the text to support the EC's argument that the ECT did not give rise to *inter se* obligations because the EU Member States were not competent to enter into such obligations.  The mere fact that the EU is party to the ECT does not mean that the EU Member States did not have competence to enter into *inter se* obligations in the Treaty.  Instead, the ECT seems to contemplate that there would be overlapping competences.  The term 'regional economic integration organization' (or **REIO**) is defined in Article 1(3) of the ECT to mean an 'organization constituted by states to which they have transferred competence over certain matters a number of which are governed by the ECT, including the authority to take decisions binding on them in respect of those matters.'  The Area of the REIO is also defined by Article 1(10) with reference to EU law.  But nothing in Article 1, nor any other provision in

---

[510] See J. Fawcett, *The British Commonwealth in International Law* (1963) 144-94.

[511] For an express provision, compare the United Nations Convention on the Law of the Sea, Montego Bay, 10 December 1982, 1833 UNTS 397, Exhibit CL-189, Art. 35 and Annex IX, esp. Art. 4.  See also Convention on Mutual Administrative Assistance in Tax Matters, European T.S. 127, 25 January 1988, Exhibit CL-178, Art. 27(2).

[512] Vienna Convention on the Law of Treaties, Exhibit CL-5, Article 32.

[513] See: Claimants' Observations, paras. 59-73; Energy Charter Treaty, *Draft Ministerial Declaration to the Energy Charter Treaty*, versions 2-7 (version 7, at 6), 17 March 1994, Exhibit CL-180; and cf. earlier drafts: European Energy Charter Conference Secretariat, *Draft Basic Agreement for the European Energy Charter*, 12 August 1992, Exhibit CL-181, p. 84, para. 27.18.

the ECT, suggests that the EU Member States had then transferred exclusive competence for all matters of investment and dispute resolution to the EU.

282. The EC argues that the 'Member States … are … presumed to be aware of the rules governing the distribution of competences in a supranational organisation they have themselves created.'[514]   But if the Member States thought they did not have competence over the *inter se* obligations in the ECT, this would have been made explicit by including a declaration of competence to set out the internal division of competence between the EC and its Member States, as has been done in many other treaties with mixed membership.[515]   Nothing in the text of the ECT supports the implication of such a declaration of competence.

283. Pursuant to Article 6 of the VCLT, every State possesses capacity to conclude treaties and is bound by those obligations pursuant to the principle of *pacta sunt servanda*.  No limitation on the competence of the EU Member States was communicated at the time that the ECT was signed.  Article 46 of the VCLT provides that a State may not invoke provisions of its internal law regarding competence to conclude treaties to invalidate a treaty unless it was a manifest violation of a rule of fundamental importance.  While EU law operates on both an internal and international plane, a similar principle must apply.  Even if, as a matter of EC law, the EC has exclusive competence over matters of internal investment, the fact is that Member States to the EU signed the ECT without qualification or reservation.  The *inter se* obligations in the ECT are not somehow invalid or inapplicable because of an allocation of competence that the EC says can be inferred from a set of EU laws and regulations dealing with investment.  The more likely explanation, consistent with the text of the ECT, is that, at the time the ECT was signed, the competence was a shared one.

284. The EC relied on its competence argument to argue that there was also no diversity of territory among the investors and the host State as required by Article 26, since both

---

[514] *Amicus* Brief, para. 104.

[515] For example, the European Union made such a declaration when acceding to the Food and Agricultural Organisation, in accordance with Article II of the FAO Constitution.

are part of the same 'Contracting Party' for its purposes.[516]  It is not necessary for the Tribunal to deal with this argument, since it has held that the European Member States remain 'Contracting Parties' and that the ECT does create *inter se* obligations for European Member States.

### (d)     Subsequent modification of the ECT as to *inter se* matters

285.   The Respondent and the EC also argue that, even if the ECT had originally concerned *inter se* matters, this was modified by the fact that the Member States of the EU subsequently entered into other agreements that covered both the investment and dispute resolution aspects of the ECT.  The EC states that subsequent EU treaties, such as the Treaty of Amsterdam, the Treaty of Nice, and the Treaty of Lisbon, implicitly repealed the earlier ECT under the *lex posterior* rule in Article 30 of the VCLT, whereby 'successive treaties relating to the same subject-matter' will prevail over the earlier to the extent that the treaties are not compatible.

286.   Turning first to the substantive investment obligations, it is not clear how these are incompatible with the investment rights protected under European law.  The EC points to the rules establishing the European internal market, with free movement of goods, persons, services and capital.  It states that discriminatory measures or expropriation are not permitted under European law.  But these obligations are arguably broader than those in the ECT, and are complementary to them.  There is no discrimination unless the same benefits are *not* accorded to other EU States, but there is nothing in the ECT that requires such a result.  Were a national of a European State not party to the ECT to bring international arbitration proceedings against a European host State that was a party to the ECT and had breached investment obligations protected under it, that host State would have to determine whether it could, consistent with its EU obligations, decline to consent to such jurisdiction.  Nothing in the ECT would prevent the host State from extending its protections beyond those States that are party to it, if this were

---

[516] *Amicus* Brief, para. 118.

98

required to meet these obligations. As the tribunal found in *Electrabel v. Hungary*, EU law can be presumed not to conflict or otherwise be inconsistent with the ECT.[517]

287. The only example the EC pointed to where an inconsistency might arise between EU and investment law was the award in *Micula v. Romania*.[518] In *Micula*, however, the tribunal concluded that EU law was not applicable to the dispute, as Romania had not yet acceded to the EU at the time the impugned measures were taken (although the EC appears to have taken the view that EU rules on state aid did apply during the accession negotiations).[519] Any conflict thus arose not out of incompatibility of the relevant BIT with EU law, but out of a disagreement on whether EU rules applied prior to accession. After the *Micula* award was issued, the EC notified Romania that it would be in breach of the EU rules on state aid if it complied with its obligation under the award to pay damages to the investors for a breach of the fair and equitable treatment standard.[520] In that context, any conflict related to the implications of enforcement, not to direct contradictions between the substantive rules themselves. This was also the conclusion of both the *Micula* tribunal and the *Micula ad hoc* committee.

288. The Respondent and the EC also argue that the dispute resolution clause, Article 26 of the ECT, is itself incompatible with Article 344 of the TFEU, which provides that 'Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.'

289. In the view of the Tribunal, there is no such incompatibility. The dispute before this Tribunal is not an inter-State dispute. It is a dispute, in the words of Article 26,

---

[517] *Electrabel S.A. v. Republic of Hungary*, Exhibit CL-10, para. 7.79.

[518] *Micula et Ors. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, Exhibit CL-116 ('***Micula Award***'); *Micula et Ors v. Romania*, ICSID Case No. ARB/05/20, Decision on Annulment, 26 February 2016, Exhibit CL-251.

[519] *Micula Award*, Exhibit CL-116, para. 319.

[520] *Amicus* Brief, para. 54, note 59; European Commission Decision of 30 March 2015 on State Aid SA.38517(2014/C) (ex 2014/NN) implemented by Romania.

'between a Contracting Party and an Investor of another Contracting Party.' It is not necessary for this Tribunal to decide whether Article 27, which concerns inter-State disputes, would be incompatible with Article 344 of the TFEU. Even if there were such an inconsistency, this would not also void Article 26, since the later Treaty will supersede the earlier one only to the extent of any incompatibility. To find otherwise would disadvantage investors, who have no ability under European law to protect their investment by suing the host State directly for breaches of the ECT. Neither does anything in European law expressly preclude investor-State arbitration under the ECT and the ICSID Convention.

290. As noted (paragraph 260(e) above), the Claimants also relied on the combined effect of the *lex specialis* and *lex posterior* presumptions, the ECT being both more specific than the EU legal order and subsequent to it. Having concluded that there is no incompatibility between the TFEU and the ECT, the Tribunal does not need to address this argument.

291. For these reasons, the Tribunal holds that the *inter se* obligations in the ECT have not subsequently been modified or superseded by later European law.

### (e)   The state of the authorities

292. The intra-EU issue has been canvassed in greater or lesser depth by previous investment tribunals, which have reached practically common conclusions.

293. The majority of these cases were brought under BITs signed before the respondent State became part of the European Union. The main objection, raised in each case either by the Respondent, or by the EC as intervenor, was that entry into the EU had terminated or partially superseded the relevant BIT. Crucial to determining these objections, whether made under Article 59 or 30 of the VCLT, was the compatibility of the ECT with European Law. As set out in greater detail below, the tribunals in question have consistently rejected these objections.

294.  In *Eastern Sugar B.V. v. Czech Republic*, the tribunal held that:[521]

> Free movement of capital and protection of the investment are different but
> complementary things.  If the EU Treaty gives more rights than it does the
> BIT, then all EU parties, including the Netherlands and Dutch investors,
> may claim those rights.  If the BIT gives rights to the Netherlands and to
> Dutch investors that it does not give other EU countries and investors, it
> will be for those other countries and investors to claim their *equal rights*.
> But the fact that these rights are unequal does not make them incompatible.

295.  It stated that 'the fact that the European Union does not provide for a possibility for an
investor to *sue a host state directly*, and that *in international BIT arbitration* this is an
essential feature of most bilateral investment treaties, is in itself sufficient to reject the
Czech Republic's equivalence argument.'[522]

296.  The tribunal in *Rupert Binder v. Czech Republic* reached the same result just a few
months later, holding that the BIT remained in force notwithstanding that the Czech
Republic was now part of the European Union.[523]  It held that:[524]

> Intra-EU investor-state arbitration is not inconsistent with the EC legal
> order.  Investor-state arbitration is not addressed by EC law, and the EC
> legal order has not offered a substitute for investor-state arbitration.
> … As there is no conflict between the Czech-German BIT and EC law, the
> primacy of EU law is a moot point.

297.  In *Eureko v. Slovakia*, the tribunal also held that there was no inconsistency between
EU law and the BIT.[525]  Rather, 'the BIT establishes extensive legal rights and duties
that are neither duplicated in EU law nor incompatible with EU law.'[526]  The same

---

[521] *Eastern Sugar B.V. v. Czech Republic,* SCC Case No. 088/2004 (Netherlands-Czech Republic BIT), Partial Award, 27 March 2007, Exhibit RL-43, paras. 169-170.

[522] Ibid., para. 180 (emphasis in the original).

[523] *Rupert Binder v. Czech Republic*, Award on Jurisdiction (UNCITRAL Rules), 6 June 2007, Exhibit CL-212.

[524] Ibid., paras. 40, 42.

[525] *Eureko B.V. v. Slovakia*, PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, (UNCITRAL Rules), 26 October 2010, Exhibit RL-44.

[526] Ibid., para. 245.

conclusion was reached in *Micula v. Romania*,[527] in an award that was upheld on annulment.[528]

298. In *Electrabel v. Hungary,* brought pursuant to the ECT,[529] the tribunal held that European law and the ECT 'are not in fact inconsistent or otherwise contradictory', but could be interpreted as being complementary.[530]  While the tribunal went on to consider what would happen if there were a material inconsistency, concluding that in such a case EU law must prevail, this discussion was hypothetical.[531]  The tribunal did not view European law as an obstacle to its jurisdiction.  While the Respondent in this case argues that the award restricts the scope of Article 26 of the ECT to extra-EU disputes, there is nothing in *Electrabel* to support or require that conclusion.[532]

299. The EC argues that it is not appropriate to draw analogies with *Electrabel*, since, like the other authorities discussed above, the host State was not a member of the European Union when it signed the relevant BIT.  This contrasts to the present case, in which the Respondent and the investors' States were each part of the European Union at the time of the signing of the ECT.[533]  But what is significant in *Electrabel* is that the tribunal found that the ECT and European law were complementary; it is irrelevant to this determination that Hungary was not part of the European Union at the time that the ECT was signed, since the question was whether the ECT was partially superseded or terminated subsequently by its entry into the EU.  The same issue arises in the present case in relation to Article 30 of the VCLT.

300. A more recent award on the intra-EU issue, *Charanne v. Spain*, involved a State that was party to the EU at the time that it signed the ECT, which was invoked as the basis

---

[527] *Micula Award*, Exhibit CL-116, para. 319.

[528] *Micula et Ors v. Romania,* ICSID Case No. ARB/05/20, Decision on Annulment, 26 February 2016, Exhibit CL-251.

[529] *Electrabel v. Hungary*, Exhibit CL-10, para. 7.79.

[530] Ibid., para. 4.172.

[531] Ibid., paras. 4.189, 4.191.

[532] Respondent's Position, paras. 57-58.

[533] *Amicus* Brief, para. 13.

of jurisdiction.[534]  The award became available only after most of the written pleadings had been filed in this case, save for the Claimants' Observations on the European Commission's *Amicus* Brief.  However, at the Tribunal's request, it was canvassed thoroughly at the oral hearings.

301.  In *Charanne*, the tribunal considered that the objections made by the EC and the Respondent fell into three categories: (a) no diversity of territories between the investor and the Respondent, since the investor's State and the host State were both part of the European Union; (b) an implicit disconnection clause could be read into the ECT; and (c) that the dispute resolution mechanism in Article 26 is incompatible with EU law.  The tribunal rejected all three arguments.  It held that neither the ECT itself, nor the fact that the EU was a Member State, prevented an EU member State from being sued by an investor of another Member State of the ECT.[535]  There was no lack of diversity, since the investors were of a different nationality to the host State.[536]  Neither was it appropriate to imply a disconnection clause into the ECT.  The text itself was clear and provided no basis for doing so.  Moreover, a distinction was to be made between an inter-State dispute and an investor-State dispute.  Even if Article 267 of the TFEU meant that no intra-EU dispute could be resolved by an *ad hoc* arbitral tribunal under Article 27 of the ECT, that did not preclude the jurisdiction of an investor-State tribunal under Article 26 of the ECT.[537]  Finally, the tribunal held that there was no contradiction between ECT and EU law.[538]  It upheld its jurisdiction over the dispute.

---

[534] *Charanne B.V. Construction Investments S.A.R.L. v. Kingdom of Spain*, SCC Arbitration, 21 January 2016 (***Charanne v. Spain***), Exhibit CL-208.

[535] Ibid., para. 429.

[536] Ibid., para. 432.

[537] Ibid., paras. 434-438.

[538] Ibid., paras. 440-449.

302. Despite the fact that the EC has intervened in many other intra-EU arbitrations, as far as has been publicly reported, no tribunal yet has upheld this objection to jurisdiction.[539]

303. Overall the effect of these decisions is a unanimous rejection of the intra-EU objection to jurisdiction. The tribunal in each case has found that the relevant BIT or the ECT was intended to bring about binding obligations between EU Member States. The tribunals found no contradiction between the substantive provisions of EU law and the substantive or dispute resolution provisions of the BITs. No such system for investor-State arbitration exists in EU law, and it would be incorrect to characterise such disputes as inter-State disputes such that Article 267 of the TFEU could be said to preclude jurisdiction. These conclusions support those adopted by the Tribunal in this case.

(f)    Relevance of the individual Claimants' Swiss permanent residence

304. In the alternative, the two individual Claimants argue that they have standing as 'Investors' under the ECT as Swiss permanent residents, even if Blusun as a Belgian corporation does not. While the Tribunal has ruled that Blusun does have standing under Article 26 of the ECT as an 'investor', it will nevertheless consider the nationality of the other Claimants. The argument arises from the definition of 'Investor' in ECT Article I:

(7) 'Investor' means:

---

[539] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, Exhibit CL-255, para. 89, citing to the parties' submissions and to *Charanne v. Spain*, pp. 116-125, paras. 424-450. See also *PV Investors v. Spain* (UNCITRAL Rules) Award on Jurisdiction, 2016; *EDF v. Hungary* (UNCITRAL Rules), Award on Jurisdiction, 3 December 2014; 'Intra-EU Treaty Claims Controversy: New Decisions and Developments in Claims Brought by EU Investors vs. Spain and Hungary' IAReporter, 24 December 2014: http://www.iareporter.com/articles/intra-eu-treaty-claims-controversy-new-decisions-and-developments-in-claims-brought-by-eu-investors-vs-spain-and-hungary/; *Isolux Infrastructure Netherlands B.V. v. Spain*, July 2016, SCC Award, see also: 'A second arbitral tribunal at Stockholm weighs in with an ECT verdict in a Spanish renewables dispute', IAReporter, 13 July 2016, http://www.iareporter.com/articles/a-second-arbitral-tribunal-at-stockholm-weighs-in-with-an-ect-verdict-in-a-spanish-renewables-dispute/.

> (a) with respect to a Contracting Party:
>
>> (i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law; …

Mr. Lecorcier, the majority shareholder in Blusun, became a Swiss permanent resident in January 2009, thus before the events giving rise to the present claim. Mr. Stein, holding the rest of the shares, only became a Swiss permanent resident in January 2011, at which stage most of those events had occurred and as such could not form the basis of any claim by him.

305. In support of this argument the Claimants rely on the decision in *Feldman v. United Mexican States*.[540]   At stake was an analogous provision concerning permanent residents in NAFTA Article 201. Feldman, a US citizen, was also a permanent resident of Mexico, which argued that as between the two, the dominant status should be treated as effective, by analogy with the principle of dominant nationality in cases of dual nationality. The tribunal rejected that view, holding that 'permanent residents are treated like nationals in a given State Party only if that State is different from the State where the investment is made.'[541]   But it accepted that the investor might be a permanent resident of a third State party to the relevant treaty. Transposed to the present case, this implies that a French national could bring an ECT claim against Italy if that person was also Swiss permanent resident at the relevant times, i.e., at the time of the alleged breach and of the request for arbitration.

306. The EC did not address this issue in its *Amicus* Brief. Its key argument was that 'Union law does not allow Member States to agree investment protection rules *inter se,* outside the Union legal order',[542] but this ignores the point that the relevant agreement for present purposes is between Italy and Switzerland, not an EU Member.

---

[540] *Marvin Roy Feldman Karpa v. United Mexican States* (ICSID Case No. ARB(AF)/99/1), Interim Decision on Preliminary Jurisdictional Issues, 6 December 2000, Exhibit CL-252.

[541] Ibid., para. 34.

[542] *Amicus* Brief, para. 52.

307. In its submission regarding the EC's *Amicus* Brief, the Respondent argued that Mr. Lecorcier was not a Swiss permanent resident at the time of conclusion of the ECT.[543] But it is settled that the relevant time for consent is the date of filing the Application.[544] It also argued that 'Article 25(2)(a) [of the ICSID Convention] is self-standing and cannot be softened by reference to the letter of the ECT: either both treaties are satisfied, and the Claimants are *nationals* of a Contracting State, or they cannot receive protection under an ICSID arbitration.'[545] In its oral argument in closing, Italy took the different point (and took it rather diffidently) that under Article 25 of the ICSID Convention Mr. Lecorcier was appearing as a French national and that he could not thereafter rely on a different status for the purposes of application of substantive law.[546] But under Article 42 of the ICSID Convention there is no necessary identity between the provision conferring jurisdiction (and standing under the Convention), on the one hand, and that determining the substantive law, on the other hand.

308. If it were necessary to do so, the Tribunal would be inclined to uphold Mr. Lecorcier's standing under the ECT as a Swiss permanent resident, though that would be limited to a claim for damages suffered by him personally. But where the primary victim of a breach is a company, any remedy would normally enure to the benefit of the company, avoiding potential difficulties including double recovery.[547] The Claimants made it clear that their primary claim was that of Blusun itself, which on any view is an intra-EU claim.

### (g) Conclusion

309. For these reasons, and in common with the other investment tribunals which have considered the question, the Tribunal rejects the intra-EU objection to its jurisdiction. In its view, the ECT continues to apply *inter se*, as between the member states of the

---

[543] Respondent's Position on Jurisdiction, para. 29.

[544] Claimants' Observations, para. 12, referring to relevant case law.

[545] Respondent's Position on Jurisdiction, para. 30.

[546] Transcript, Day 5, 157:8-12 (Fiorentino).

[547] NAFTA Arts. 1117, 1121 and 1126 partly address this issue. There is no equivalent in the ECT.

EU, under international law. The Tribunal accordingly has jurisdiction over the claims of all three Claimants.

## X.    THE MERITS: THE TRIBUNAL'S APPRECIATION

310. The Claimants' case on the merits is comparatively simple. It was put in opening as follows:

> there was no other large solar project comparable to that of the Claimants' built in Italy in the years 2010 and 2011. This was due to the lack of construction project financing, which in turn was the result of the legal insecurity created by the Italian State. On this record, there is thus a clear causal link between the series of measures adopted by Italy and the project's failure. Because of the persisting legal insecurity created by the state, potential investors were deterred from investing in the project during the period from March 2010 to September 2011. Then the self-redress proceedings and stop-work orders gave the final blow to the project in late 2011/early 2012.[548]

As this passage in effect concedes, the immediate cause of the Project's failure was the absence of construction financing. Lacking completely any revenue and with substantial debts, the insolvency of the project companies was inevitable. Italy is to be held responsible for this failure, according to the Claimants' case theory, because it caused legal insecurity in the relevant period in breach of the ECT, and this was the effective cause of the failure to attract financing.

311. In support of this general claim, the Claimants rely separately on Articles 10(1), first sentence (legal stability), 10(1), second sentence (fair and equitable treatment, with emphasis on legitimate expectations), and 13 (expropriation) of the ECT.[549] These three claims will be taken in turn.

## A.    The Legal Instability Claim: ECT Article 10(1)

312. Article 10(1) of the ECT provides as follows:

---

[548] Transcript, Day 1, 96:12-24 (Dufêtre).
[549] Reply, para. 160.

Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.

## 1.    The interpretation of Article 10(1)

313.  The key obligation on which the Claimants rely for their legal instability claim is the obligation to 'encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area' (Article 10(1), first sentence). Reference should also be made to the following definition in Article 1(8):

> (8) 'Make Investments' or 'Making of Investments' means establishing new Investments, acquiring all or part of existing Investments or moving into different fields of Investment activity.

314.  In *PSEG Global v. Turkey,* the tribunal found a breach of the fair and equitable treatment (FET) standard by reference to what it described as:

> … the 'roller-coaster' effect of the continuing legislative changes. This is particularly the case of the requirements relating, in law or practice, to the continuous change in the conditions governing the corporate status of the Project, and the constant alternation between private law status and administrative concessions that went back and forth.[550]

In the same vein, the tribunal, while emphasising the relevance of the changing attitudes and policies of the administration, concluded that '[s]tability cannot exist in a situation where the law kept changing continuously and endlessly, as did its

---

[550] *PSEG v. Turkey*, Exhibit CL-125, para. 250.

108

interpretation and implementation.'[551]  This was not a decision under the ECT; moreover, the 'roller-coaster' dictum was only one among several reasons the tribunal gave for its finding of breach.  It remains to be seen whether a similar analysis could be applied to Article 10(1) of the ECT.

315.  According to the Respondent, the answer is no, for a variety of reasons.[552]

    (a)    The language of the first sentence is vague and generic, and overlaps with the following sentences, thus favouring 'an interpretation that conceives the first sentence of Art. 10 in terms of general duty, as a chapeau of a legal "container" – the whole Art. 10.1 – which includes specific and binding obligations for states (such as the FET and the principle of non-discrimination).'[553]  But the first sentence is not in merely preambular terms, nor is it (unlike Article 10(2) expressed as a mere aspiration.[554]  Indeed, all five sentences in Article 10(1) are framed as obligations of apparently equal weight, and all use the mandatory 'shall.'  It is true that there is considerable flexibility allowed by terms such as 'encourage', 'favourable' and 'transparent', but the same is true of 'equitable' which, at least in the second sentence in the familiar copula 'fair and equitable', the Respondent acknowledges to have a determinate meaning.  On the footing that the term 'stable' does not mean rigid or unchanging (which the Claimants do not suggest) the first sentence can nonetheless be given due effect.

    (b)    But only in accordance with its actual language; the Respondent emphasises the limited scope of the phrase 'Make investments' when read with the definition in Article 1(8).  Once the Claimants had acquired the lands and rights

---

[551] Ibid., para. 254.

[552] In its Counter-Memorial, paras. 365-366, 378, the Respondent argued that claims under Art.10(1), first sentence, were 'not directly enforceable by investors.'  The argument was not pursued in the Rejoinder or subsequently, and rightly not.

[553] Rejoinder, para. 91.

[554] Art. 10(2) provides that: 'Each Contracting Party shall *endeavour* to accord to Investors of other Contracting Parties, as regards the Making of Investments in its Area, the Treatment described in paragraph (3)' (emphasis added).  Para. (3) describes MFN or national treatment 'as regards the Making of Investments.'

associated with the Project, they had made their investment: thereafter they did not establish new investments, acquire all or part of existing investments or move into different fields of investment activity. The 'stability' element of Article 10(1), first sentence, is thus inapplicable here *in its own terms*.[555]

(c)  In the Tribunal's view, little turns on the interpretive argument based on Article 1(8), because the second sentence of Article 10(1) goes on to stipulate that the stable conditions to be created under the first sentence 'shall include a commitment to accord *at all times* to Investments of Investors of other Contracting Parties fair and equitable treatment' (emphasis added). In effect, as various tribunals have pointed out, the obligation to create stable conditions is conceived as part of the FET standard which is generally applicable to investments by virtue of the second sentence.[556] The Respondent in effect agrees:

> the obligation of FET … already contains the requirements of stability and transparency of the treatment. The FET standard represents the mandatory specification of the general provision contained in the first sentence. On the other hand, it is not clear which state conduct could be considered lawful on the basis of the FET standard and unlawful on the basis of Art. 10.1 first sentence.[557]

316. On the basis that Article 10(1), first and second sentences, of the ECT apply to a 'legal instability' claim said to arise in the course of an existing investment, the next question is the scope of the host state's obligation in that regard. The Claimants referred to a number of cases in which tribunals were supportive of such claims.[558]

317. The decision in *Charanne B.V. Construction Investments S.A.R.L. v. Kingdom of Spain* deserves attention as the first of many pending 'green energy' cases under the ECT to

---

[555] Rejoinder, paras. 92-105.

[556] See e.g. *Plama v. Bulgaria*, Exhibit CL-19, para. 172; *Electrabel v. Hungary*, Exhibit CL-10, para. 7.73.

[557] Rejoinder, para. 116.

[558] See e.g. *Electrabel v. Hungary*, Exhibit CL-10, para. 7.79.

be decided on the merits,[559] and at the Tribunal's request it was the subject of detailed argument in closing. That was not really a 'legal stability' claim, as later developments in Spanish legislation (especially the 2013 Law) were excluded from the tribunal's jurisdiction as a result of the way the claimant framed its case: the effect was to focus on a single law of 2010. The tribunal, having affirmed its jurisdiction, rejected the claim, on the ground that the laws in force were subject to reasonable change consistently with the fair and equitable treatment standard and that there could be no legitimate expectation to the contrary. In particular, the tribunal drew a sharp distinction between a 'regulatory standard' and 'a specific commitment of the state', as in the following passage:

> Although RD 661/2007 and RD 1578/2008 were directed to a limited group of investors, it does not make them to be commitments specifically directed at each investor. The rules at issue do not lose the general nature that characterizes any law or regulation by their specific scope. To convert a regulatory standard into a specific commitment of the state, by the limited character of the persons who may be affected, would constitute an excessive limitation on power of states to regulate the economy in accordance with the public interest.[560]

It concluded:

> under international law … in the absence of a specific commitment toward stability, an investor cannot have a legitimate expectation that a regulatory framework such as that at issue in this arbitration is to not be modified at any time to adapt to the needs of the market and to the public interest.[561]

But this did not mean the ECT imposed no constraint on legislative change:

> an investor has a legitimate expectation that, when modifying the existing regulation based on which the investment was made, the State will not act unreasonably, disproportionately or contrary to the public interest.
>
> …

---

[559] *Charanne v. Spain*, Exhibit CL-208 and Exhibit CL-208-bis.

[560] Ibid., para. 493.

[561] Ibid., para. 510.

111

> As for proportionality, the Arbitral Tribunal considers that this criterion is satisfied as long as the changes are not capricious or unnecessary and do not amount to suddenly and unpredictably eliminat[ing] the essential characteristics of the existing regulatory framework.[562]

The Spanish laws at stake in that case did not breach ECT Article 10 because in the tribunal's view they 'introduce[d] limited amendments to the regulatory framework existing at the time of the investment without eliminating its essential characteristics, in particular the existence of a guaranteed tariff throughout the life of the facility.'[563]

318. Of the three criteria suggested in *Charanne*, 'public interest' is largely indeterminate and is, anyway, a judgement entrusted to the authorities of the host state. Except perhaps in very clear cases, it is not for an investment tribunal to decide, contrary to the considered view of those authorities, the content of the public interest of their state, nor to weigh against it the largely incommensurable public interest of the capital-exporting state. The criterion of 'unreasonableness' can be criticized on similar grounds, as an open-ended mandate to second-guess the host state's policies. By contrast, disproportionality carries in-built limitations and is more determinate. It is a criterion which administrative law courts, and human rights courts, have become accustomed to apply to governmental action.

319. The present Tribunal, on the basis of a balanced interpretation of the text of Article 10 read in the light of its object and purpose, and having due regard to the course of its interpretation so far, would reach the following conclusions:

(1) The five sentences of Article 10(1) embody commitments towards investments, in accordance with their terms. None is merely preambular or hortatory.

(2) The requirement to 'encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make

---

[562] Ibid., paras. 513, 517. In contrast Arbitrator Tawil (dissenting) held that 'when an investor complies with all the requirements established by the legislation in force to be granted a specific and particular benefit, its subsequent ignorance by the host State of the investment violates a legitimate expectation' contrary to ECT Art. 10(1) (dissenting opinion, para. 12).

[563] Ibid., para. 539.

Investments in its Area' is not limited to the initial making of the investment but includes subsequent extensions of the investment as well as changes of form.

(3) But the core commitment is that in the second sentence, expressly included in the first, 'to accord *at all times* to Investments of Investors of other Contracting Parties fair and equitable treatment' (emphasis added).  This incorporates the fair and equitable treatment standard under customary international law and as applied by tribunals.[564]

(4) That standard preserves the regulatory authority of the host state to make and change its laws and regulations to adapt to changing needs, including fiscal needs, subject to respect for specific commitments made.

(5) In the absence of a specific commitment, the state has no obligation to grant subsidies such as feed-in tariffs, or to maintain them unchanged once granted.  But if they are lawfully granted, and if it becomes necessary to modify them, this should be done in a manner which is not disproportionate to the aim of the legislative amendment, and should have due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime.

### 2.    The legal instability claim

320.  The Claimants' case as pleaded largely turns on the claim of legal instability:

> Our claim is not that Italy's legislation had to remain immutable, unchanged, written in stone.  This case is not about regulatory change; it's about regulatory turbulence.  It concerns the fact that during the two years between permissible and legally impossible, the legal framework for the project constantly changed, leaving no period of stability in which the requisite capital investment for a project of this size could be realised.[565]

---

[564] To similar effect, *Plama v. Bulgaria*, Exhibit CL-19, paras. 161-173.

[565] Transcript, Day 1, 23:13-21 (Legum).

321. The Claimants identify four occasions of damaging legal instability in relation to the Puglia Project: (a) the Constitutional Court decision and its aftermath; (b) the Romani Decree and the Fourth Energy Account; (c) the uncertainties associated with the publication of multiple lists of eligible plants by GSE; and (d) the Brindisi stop-work order and related events. They do not, however, suggest that these events were directly linked or that the sequence was the result of any design on the part of the Italian State. This was no conspiracy but a series of disconnected acts of alleged disregard for their rights. Whether there was a breach of Article 10(1), first sentence, of the ECT must therefore fall to be determined, at least in the first instance, by examining each of the state acts complained of against ECT standards.

### (a) Decision 119 of 26 March 2010 of the Constitutional Court

322. In December 2008, the central Government initiated proceedings before Italy's Constitutional Court challenging, *inter alia*, the constitutionality of Article 3 of Puglia's Regional Law 31/2008 which provided for DIA authorisations for plants with electric power capacity between 20 KW and 1 MW. The central Government argued that Article 3 of Puglia's Regional Law 31/2008 infringed Legislative Decree 387/2003 which permitted the application of the simplified DIA procedure only to plants with capacity up to 20 KW whereas the Puglia Region contended that the Regional Law fell within Puglia's concurrent jurisdiction under Article 117 of the Italian Constitution.[566] There was no parallel challenge to Regional Law 1/2008.[567]

323. The Constitutional Court, in March 2010 (a not-unreasonable delay of 15 months), upheld the challenge. In its decision of 26 March 2010, the Constitutional Court found that Article 3(1) and (2) of Regional Law 31/2008 was contrary to Article 12(5) of Legislative Decree 387/2003 and declared it unconstitutional. The Court held:

> … the regional provision is illegal, since higher thresholds of generation capacity and characteristics of the installation sites for which the DIA procedure can be used can be identified only by means of a decree of the

---

[566] *Corte Cost., 26 marzo 2010, n. 119* (Constitutional Court, 26 March 2010, No. 119), Exhibit CL-81.

[567] Some 38 of 120 plants making up the Puglia project were authorized under Regional Law 1/2008 and were unaffected by the decision: Transcript, Day 2, 183:2-10 (Bacchiocchi).

Minister of Economic Development, in consultation with the Minister for the Environment and the Protection of the Territory and Sea, in agreement with the Joint Conference, without the possibility for the Region to identify them on its own...[568]

324. Under Article 136 of the Italian Constitution, a provision that is declared unconstitutional ceases to have effect on the day following the publication of the decision by the Constitutional Court. But according to Italian case law, Constitutional Court's decisions declaring the unconstitutionality of a law have no retroactive effect on 'consolidated relationships' ('*rapporti esauriti*' or '*rapporti consolidate*').[569] 'Consolidated relationships' stem from judgments or administrative acts which are final (i.e. can no longer be challenged).

325. The Government took the position that the DIA status of plots which had been fully processed under Regional Law 31/2008 was 'consolidated' and was thus unaffected by the decision. It responded in these terms to an inquiry on behalf of Eskosol.[570]

326. However, as recounted in paragraphs 93-95 above, the Salva/Alcoa law of 13 August 2010 somewhat muddied the waters: in providing a special 150-day time limit for DIA applications in progress, the Law was taken by some as impliedly abrogating the status of consolidated relationship for other applications.

327. Watson, Farley and Williams acting on behalf of Eskosol sought clarification on this point: in a letter of 3 December 2010, the Department of Legal Affairs of GSE responded as follows:

> If the plants ... authorized between August and September 2008, comply with all the requirements, including with the technical standards resulting from the applicable rules, such as the decisions of the Authority for the Electric Energy and Gas, and unless the competent administrative authorities should rule in a different manner with regard to the interpretation of Article 1 - *quater* of the Decree Law 105/2010 approved, with its

---

[568] *Corte Cost., 26 marzo 2010, n. 119* (Constitutional Court, 26 March 2010, No. 119), Exhibit CL-81, para. 4.2.

[569] *Cass., sez. III, 28 luglio 1997, n. 7057*, 28 July 1997, Exhibit CL-75.

[570] *Circolare Ministeriale 15 dicembre 2010* (Ministerial Circular of 15 December 2010), Exhibit CL-48, p. 2.

amendments, by Law 129/2010, it is held that admission to the incentives under the so-called Energy Account is possible, in accordance with the relevant provisions of the applicable legislation.[571]

328.  Shortly thereafter, the Ministry of Economic Development issued a Circular clarifying the effects of the Constitutional Court's decision.   Reciting that it was based on 'numerous requests for Clarification', the Circular made it clear that the decision had no effect on consolidated relationships, and as to pending DIAs it extended the time limit for connection to the grid to 16 January 2011.[572]   The Circular sought

> to set a regulatory balance between – on the one hand – the protection of the legitimate reliance of operators who have achieved a qualifying title on the basis of regional laws subsequently declared unconstitutional and – on the other hand – not allowing for an indefinite time the entry into operation of plants which do not comply with the prevailing national framework.[573]

329.  The Tribunal would make the following points with respect to this episode:

(a)  The Government's challenge before the Constitutional Court was duly filed and was plainly arguable.

(b)  The challenge was filed well before the Claimants made their investment.   The fact of the challenge was public knowledge and was known to the Claimants.[574]

(c)  The decision did not result in a loss of rights to Blusun or its affiliates.   True, there seems to have been some initial market uncertainty, which the Government might have done more to dispel.   But there was no real doubt about the applicable legal regime in case of a declaration of unconstitutionality, and the Government did not fail to act with due diligence.

(d)  In any event, the content of the public law of the host state (including its process of determining the constitutionality of laws) is a matter on which investors like

---

[571] GSE, fax of 3 December 2010, Exhibit C-145, responding to letter of 25 November 2010, Exhibit C-140.

[572] *Circolare Ministeriale 15 dicembre 2010* (Ministerial Circular of 15 December 2010), Exhibit CL-48.

[573] Ibid.

[574] Lecorcier WS2, para. 47.

anyone else have access to independent advice. If it avoids outright misrepresentation, the Government does not offer warranties in that regard.

(e) To conclude, in proceeding with the Project in full knowledge of the pending constitutional challenge, the Claimants took the risk that the challenge might succeed, and that this might cause delay over the Project and its financing.[575]

330. For these reasons, the Constitutional Court decision and its aftermath did not breach Article 10(1), first sentence, of the ECT.

### (b) The Romani Decree and the Fourth Energy Account

331. EU Directive 2009/28 was implemented in Italy by Legislative Decree 28 of 3 March 2011,[576] also known as the 'Romani Decree' after the name of the new Italian Minister for Economic Development. The Romani Decree gave rise in turn to the Fourth Energy Account. The Tribunal notes that European Directives, while giving States some discretion, impose obligations on them. In the case of EU Directive 2009/28, Member States were required to 'bring into force the laws, regulations and administrative provisions necessary to comply with this Directive by 5 December 2010.'[577]

332. The Romani Decree amended the conditions for access to feed-in tariffs under the Third Energy Account of photovoltaic plants with capacity up to 1 MW. In particular, it sharply limited the applicability of the Third Energy Account (originally covering plants that became operative between 31 December 2010 and 31 December 2013) to photovoltaic plants that commenced operations by 31 May 2011 (Article 25(9)).

---

[575] As the *Saluka* tribunal pointed out in a different context (*Saluka v. Czech Republic*, Exhibit CL-39, para. 360), an investor who is aware of a difficulty at the time of investing can have no expectation of remedial action.

[576] Romani Decree, Exhibit CL-51.

[577] Directive 2009/28/EC, of the European Parliament and of the Council on the Promotion of the Use of Energy from Renewable Sources and Amending and Subsequently Repealing Directives 2001/77/EC and 2003/30/EC, 2009 O.J. (L 140) 16, Exhibit CL-7, Article 27.

333. In addition, the Romani Decree introduced modifications in the criteria for eligibility to the feed-in tariffs of photovoltaic plants installed in agricultural areas. Under Article 10(4) photovoltaic plants located in agricultural areas would be eligible for feed-in tariffs on the condition that their capacity was below 1 MW and they occupied less than 10% of the plot of land where they were installed. Plants belonging to a single owner would additionally have to be located at a distance of at least 2 km from one another. Yet these amended conditions would not be applicable to photovoltaic plants located in agricultural areas which obtained a DIA authorisation prior to the entry into force of the Romani Decree (i.e., 29 March 2011) on condition that the plants came into operation within one year from its entry into force (i.e., 29 March 2012) (Article 10(6)).[578]

334. Finally, Article 25(10) of the Romani Decree contemplated the adoption of a Ministerial Decree that would elaborate on the feed-in tariffs scheme applicable to photovoltaic plants not covered by the Third Energy Account, namely plants that commenced operation subsequent to 31 May 2011. The Romani Decree set specific principles according to which the Ministerial Decree had to be enacted, namely: introduction of an annual maximum limit of cumulative electric power generated by photovoltaic plants that could benefit from feed-in tariffs; determination of feed-in-tariffs considering the decreasing cost of the plants on the one hand and the incentive schemes employed by other EU Member States on the other hand; and application of requirements qualifying persons to benefit from the feed-in tariffs.[579]

335. Against this backdrop, the Fourth Energy Account was adopted by Ministerial Decree of 5 May 2011.[580] The Fourth Energy Account applied to photovoltaic plants that were connected to the grid between 1 June 2011 and 31 December 2016, for an indicative

---

[578] See also Article 10(5) providing that the conditions of Article 10(4) would not apply to land abandoned for at least 5 years.

[579] Romani Decree, Exhibit CL-51, Article 25(10); *Decreto Legislativo 29 dicembre 2003, n. 387* (Legislative Decree 29 December 2003, No. 387), Exhibit CL-50, Article 7.

[580] Fourth Energy Account, Exhibit CL-56. On 19 April 2011, the Italian Government had made public a draft Decree setting out key components of the forthcoming Fourth Energy Account. See Minister of Economic Development, Draft Fourth Energy Account Decree, 19 April 2011, Exhibit C-179.

target of installed power at the national level of about 23,000 MW, corresponding to an indicative annual cumulative cost of incentives estimated to be between EUR 6 and 7 billion (Article 1(2)).

336. The Fourth Energy Account qualified large plants as plants not falling under the category of small plants, the latter being photovoltaic plants with capacity up to 1 MW installed on buildings; other photovoltaic plants with capacity up to 200 KW operating under net metering ('*scambio sul posto*') and photovoltaic plants of any capacity installed on buildings and areas owned by the public administration (Article 3(1)(u) and (v)).  Under Article 4(2), for the period from 1 June 2011 until 31 December 2012, incentives available to large plants would be limited to specific amounts (Article 4(2)). Photovoltaic plants would receive the feed-in tariff in force on the date of their entry into operation (Article 6(4)) which would apply for 20 years (Article 12(2)).

337. The Fourth Energy Account also adopted Article 10(4) of the Romani Decree with regard to the eligibility for feed-in tariffs of photovoltaic plants installed in agricultural areas (Article 11(2)(e)).  Furthermore, Article 12(5) of the Fourth Energy Account provided that:

> For the purposes of the allocation of feed-in tariffs, several photovoltaic plants belonging, or attributable to, the same responsible entity and located either within the same or within contiguous cadastral parcels of land shall be considered a single plant of a capacity equal to the cumulative capacity of the individual plants. …

The 'responsible entity' was defined as the entity in charge of the plant's operation and maintenance, which was entitled to request and access feed-in tariffs and to apply for inclusion in the GSE register (Article 3(1)(s)).

338. The Claimants argue that '[t]he Romani Decree was so drastic that it led to an outcry on the Italian market',[581] and that it was in effect a paradigm of the legal instability at

---

[581] Transcript, Day 6, 25:6-7 (Dufêtre).

119

which Article 10(1) of the ECT is directed: 'it was the legislation that led to the loss of the project.'[582]

339. According to the Respondent, the Romani Decree was an implementation by Italy of EU Directive 2009/28/EC, aimed at achieving the objective of a share of at least 20% of energy from renewable sources on gross final consumption of energy in the EU; its timing was due both to the implementation deadline of the Directive and to the rapid progress being made (with associated expense) in achieving the targets set for the Third Energy Account.[583]  According to Italy, its aim with the adoption of this measure was 'to reconcile the development of renewable energy with the protection of the environment, territory and landscape' and to combine it 'with the need to gradually reduce the expansive investment trend in photovoltaic, in order to meet the quantitative targets envisaged under the EU scheme.'[584]

340. One major aim of the legislation was to impose a cumulative cap on incentives, in view of their success in attracting investment.  The corollary was a reduction in feed-in tariffs, which for the Puglia Project would have been in the order of 13%,[585] a reduction which, while not drastic, was capable of having a serious effect on the economics of the Project.

341. The changes concerning agricultural land – in particular the change from a 50% land ratio allowance for photovoltaic plants to a 10% allowance – had a particular impact on investors, such as the Claimants, who had already acquired the land and who found themselves in the position of having to acquire much more land to support the same size of plant.  'The effect … was that for projects like that of the Claimants, where the

---

[582] Transcript, Day 6, 33:21-22 (Legum).

[583] Counter-Memorial, paras. 159-162.

[584] Ibid., para. 408.

[585] Transcript, Day 6, 28:16-22 (Legum).

land was acquired and there was room only for there to be 50% of the plot taken up by the plants, it simply wasn't viable to go forward …'[586]

342.  In applying to the Romani Decree and the Fourth Energy Account the standard of legal stability incorporated in Article 10(1), first and second sentence, of the ECT (paragraph 319 above), the Tribunal would make the following points:

(a) The reduction in FITs was quite substantial, but was not in itself crippling or disabling.  Moreover, it was a response to a genuine fiscal need, given the large take-up under the earlier Energy Accounts.

(b) The reduction in incentives was proportionately less than the reduction in the cost of photovoltaic technology during 2010, and left Italian subsidy levels higher than those in Germany, France and Spain.[587]

(c) The principle of guaranteed tariffs for a 20-year period was maintained.

(d) So too was the criterion for qualification for FITs, viz., connection to the grid.

(e)  The grace period for grid connection to preserve the pre-existing tariff level, viz., 12 months, was reasonable.

(f) The Fourth Energy Account, applying to photovoltaic plants connected to the grid between 1 June 2011 and 31 December 2016, made some allowance for projects that could not meet the cut-off of 12 months.

(g) Leaving aside questions of administration (dealt with below), the provision for a register of large plants eligible for feed-in tariffs contributed to legal security.

---

[586] Transcript, Day 6, 33:6-10 (Legum).

[587] Overview of EU support policies and PV costs production trend, Undated, Exhibit R-3.

(h) The limits on the use of agricultural land were motivated by valid rural planning concerns, although their specific impact on the Puglia Project is a matter to which the Tribunal will return (see paragraphs 403-408).

343. For these reasons the Tribunal concludes that the Romani Decree and the Fourth Energy Account, taken overall, were not disproportionate, did not violate specific commitments made to the promotors of PV plants, and did not breach Article 10(1), first sentence, of the ECT.

(c) The publication of the GSE lists of large plants

344. As noted, the Fourth Energy Account established a register of large plants eligible for feed-in tariffs ('*registro dei grandi impianti*') which would be administered by the GSE (Article 8(1)). The GSE published technical regulations[588] for the enrolment of large plants to the register (Article 8(9)). The deadline for the submission of enrolment requests to the GSE register for purposes of eligibility for feed-in tariffs in 2011 was 30 June 2011 (Article 8(2)).[589] The GSE was required to publish the list and ranking of photovoltaic plants admitted to the register within 15 days of the enrolment application deadline (Article 8(3)).[590]

345. Under Article 6(2), large plants that came into operation by 31 August 2011 were automatically eligible for feed-in tariffs. Large plants that entered into operation between 1 September 2011 and 31 December 2012 had to be listed in the register and would benefit from feed-in tariffs provided that their ranking on the register so allowed and that their certificate of work completion was sent to the GSE within seven months (or nine months for plants with electric power capacity above 1 MW) from the date of publication of the ranking (Article 6(3) and 8(4)).[591]

---

[588] GSE, 'Technical Regulations for the registration of large photovoltaic plants, pursuant to Ministerial Decree of 5 May 2011', rev. 1, July 2011, Exhibit CL-64.

[589] See also Ibid., p. 12, Table 2.

[590] See also Ibid., p. 19.

[591] See also Ibid., p. 12.

346. The GSE established the ranking of the plants listed in the register according to the following priority criteria:

    a) the date of entry into operation, which had to be prior to the date of application to the GSE register;

    b) the date of completion of construction works, which had to be prior to the date of application to the GSE register;

    c) the precedence of the date of issuance of authorisations;

    d) the lower capacity of the plants;

    e) the precedence of the date of application for enrolment to the GSE registry (Article 8(3)).

347. On 15 July 2011, the GSE published a list ranking the photovoltaic plants eligible for feed-in tariffs under the Fourth Energy Account.[592] The GSE list included 115 of the 120 photovoltaic plants of the Claimants' Project. On 29 July 2011, the GSE published an amended list which included 113 of the 120 photovoltaic plants of the Claimants' Project.[593] The amended list contained a note that inclusion of a plant in the list did not guarantee its access to incentives unless the GSE verified its compliance with all conditions following the commencement of the plant's operations. This can be taken as a representation, albeit conditional, as to qualification for incentives.

348. Article 8(5) of the Fourth Energy Account provided for the removal from the GSE list of listed plants that commenced their operations by 31 August 2011.[594] As some plants were removed from the GSE list pursuant to this provision, the GSE published an

---

[592] GSE, 'Ranking of plants included within the Register whose status allows satisfaction of cost limits established for the 1 June 2011 - 31 December 2011 period pursuant to the Ministerial Decree of 5.5.2001 [sic] (Registrations occurring from 20 May 2011 to 30 June 2011)', 15 July 2011, Exhibit C-191.

[593] GSE, 'List of plants included within the Register whose status allows for the satisfaction of the cost limits established for the 1 June 2011- 31 December 2011 period pursuant to the Ministerial Decree of 5.5.2011', 29 July 2011, Exhibit C-195.

[594] See also Article 6(2) of Fourth Energy Account, Exhibit CL-56.

updated third list on 12 August 2011[595] and a fourth and final list on 16 September 2011.[596]  Again, 113 of the 120 photovoltaic plants of the Claimants' Project were included in the GSE final list of 16 September 2011.

349.  The Claimants argue that:

> One of the main innovations of the Fourth Energy Account was the creation of a register of plants eligible for feed-in tariffs, administered by the GSE, and based on a ranking system.  As noted in the Memorial, no investor would invest before it was confirmed that the project's plants were included in the register and therefore eligible for feed-in tariffs.  As also explained in the Memorial, the GSE published a series of lists of eligible plants between July and September 2011.  The GSE's withdrawal of a list infected with errors and publication of multiple additional lists gave rise to confusion and consternation on the Italian solar market.  It was only with the publication of the final list that investors had certainty on which plants were eligible.[597]

350.  At the time, the Claimants welcomed the GSE listing procedure as providing certainty,[598] although certainty was not in fact achieved for some time.  But almost all the Claimants' plants were included on all the lists,[599] and given the other difficulties Blusun was experiencing in obtaining finance and completing the Project in the now shorter time-scale, the Tribunal has doubts as to the deterrent effect of the delay.  It will return to this issue in its discussion of causation, but for present purposes it is sufficient to hold that Italy acted in good faith in the difficult task of compiling a full list, given the rapidly changing construction scene, and that in doing so it did not breach any applicable standards of due diligence.

---

[595] GSE, 'List of plants included within the Register whose status allows for the satisfaction of the cost limits established for the 1 June 2011 - 31 December 2011 period pursuant to the Ministerial Decree of 5 May 2011 - Updated on 12 August 2011', 12 August 2011, Exhibit C-196.

[596] GSE, 'List of plants included within the Register whose status allows for the satisfaction of the cost limits established for the 1 June 2011 - 31 December 2011 period pursuant to the Ministerial Decree of 5.5.2001 - Updated on 16 September 2011', 16 September 2011, Exhibit C-200.

[597] Reply, para. 244. Also, Transcript, Day 5, 88:3-20 (Barrier).

[598] Transcript, Day 1, 49:10-17 (Legum). The Claimants do not make specific complaint as to the small number of omissions of their proposed plants, which the Respondent attributes to deficiencies in the forms submitted: Transcript, Day 1 50:3-23 (Legum) and 148:10-17 (Malaguti).

[599] Transcript, Day 5, 86:23 – 88:5 (Barrier).

124

(d) <u>The Brindisi stop-work order</u>

351. The Claimants argue that the stop-work order was the final blow to the Project, preventing the construction even of the two projected plants by the deadline laid down in the Fourth Energy Account and thereby ensuring the bankruptcy of the project companies.

352. On 17 November 2011, the environmental protection unit of the local police inspected a construction site of the Claimants' Project and requested the relevant DIA authorisations. On 21 November 2011, the police communicated its inspection observations to the local prosecutor and the Municipality of Brindisi.[600] According to the police observations, no construction works of photovoltaic plants, or even construction of the surrounding fence, took place by the Claimants, contrary to what was stated in three letters of 1 March 2010 notifying the commencement of works.[601] Furthermore, the policy stated that the Claimants' plants were contiguous and were associated to a single developer, namely Eskosol, the owner of the local development companies holding the DIA authorisations for the two plants under construction at the time.

353. On 2 December 2011, the local prosecutor notified the Municipality of Brindisi that the situation as has been observed by the police constituted a criminal offense violating zoning regulations.[602] The local prosecutor was of the opinion that:

> ... the intent of the owners of this business project was to proceed with an artificial division of several plants in order to circumvent the procedure for the issuance of a construction permit by the region.[603]

The local prosecutor referred to Italian case law according to which:

---

[600] Order of the Carabinieri for the Protection of the Environment, 21 November 2011, Exhibit C-204.

[601] Ibid.; Commencement Notice of 1 March 2010, Exhibit R-17.

[602] Letter of the Public Prosecutor's Office to the Tribunal of Brindisi, 2 December 2011, Exhibit C-206, p. 1 (citation omitted).

[603] Ibid.

> In the construction industry, in the event that an operation performed on the basis of a declaration of the initiation of activity (DIA) would not be legally permissible under the legal framework, because it fails to fulfil its requirements, the works shall be considered as abusive and constitute an offence as set forth in art. 44, b) D.P.R. n. 380 of 2001, given the inefficacy of the presented DIA and the eventual expiration of the time limit for the P.A. to adopt injunctive measures.[604]

The local prosecutor further relied upon Circular Note 1/2008 on the mode of calculation of the electric power capacity of plants belonging to a single owner or a unitary industrial project.

354. On 19 December 2011, in response to the local prosecutor's letter, the Municipality of Brindisi launched self-redress proceedings ('*autotutela*') with the view to reviewing DIA authorisations obtained for the construction of the Claimants' Project.[605]  As required by the applicable law, the Municipality of Brindisi requested interested parties to submit written memoranda or other material that would provide clarification on the police findings.[606]

355. On 11 January 2012, the Municipality of Brindisi issued a stop-work order ('*inibizione dell'attività edilizia*') preventing the progress of works on a few of the photovoltaic plants of the Claimants' Project and questioning the validity of the DIA authorisations acquired.[607]  Eskosol suspended the construction works and challenged the municipal order before the competent Administrative Court.

356. On 13 January 2012, the Regional Administrative Court of Puglia – Lecce as a precautionary measure suspended the stop-work order issued by the Municipality of Brindisi.[608]  On 7 March 2012, the Regional Administrative Court annulled for excess

---

[604] Ibid.

[605] Letter of the Municipality of Brindisi to Gamma Service, Aurora Energia, Dada Project and Eskosol, 19 December 2011, Exhibit C-208.

[606] Ibid.  See also Letter of 11 January 2012, Exhibit R-18.

[607] Municipality of Brindisi, 'Decision of suspension of the activity undertaken as a result of the declaration of the initiation of activity (DIA), Prot. N. 87155 of 23 December 2008, 11 January 2012', Exhibit C-211.

[608] *TAR Puglia, 14 gennaio 2012, nos. 37, 38, 39, 40* (Regional Administrative Court of Puglia, 14 January 2012, Nos. 37, 38, 39, 40, 13 January 2012 (filed at the secretariat on 14 January 2012)), Exhibit RL-10.

of power the decisions of the municipality of Brindisi to initiate self-redress proceedings and to issue a stop-work order. The tribunal held that Regional Law 31/1998 'sets the conditions stated at the time of the submission of the application or to the previous two years, so that there is no reference in the law regarding the need for the requirement to subsist afterwards', and noted that the transfer from the SPV to Eskosol took place after the DIA application. It further held that the Municipality's order 'is not expressly related to' the Constitutional Court's decision of 26 March 2010, 'so that the specific situation cannot receive the qualification of "consolidated" and is therefore outside of the ambit of the legal regime created by' that decision.[609] The Municipality of Brindisi did not appeal.

357. The Claimants argue that the stop-work order was the 'final blow to the project.'[610] Its rather rapid suspension by the Regional Administrative Court was irrelevant, given the penalties that could have been imposed had the Municipality's position been upheld by the Court on the merits.[611] By the time the final decision was taken it was too late to meet the shortened deadline for connection laid down in the Fourth Energy Plan.

358. Once again, two separate issues are raised: did the episode involve a breach of the ECT, and what was its effect on the failure of the Project? Only the former question is considered here.[612]

359. There is a certain similarity between the stop-work episode and the takeover of a failing industrial plant by the Mayor of Palermo in the *ELSI* case.[613] At issue in both cases was the implications for the fair and equitable treatment standard of a municipal intervention subsequently held municipally unlawful. In both cases the intervention seems to have triggered insolvency and was held to have been *ultra vires* under Italian

---

[609] *TAR Puglia, 7 marzo 2012, n. 50* (Regional Administrative Court of Puglia, 7 March 2012, No. 50), Exhibit CL-82.

[610] Reply, para. 231.

[611] Transcript, Day 2, 80:4-12 (Lecorcier).

[612] For the issue of causation see below, paragraphs 375-394.

[613] *Elettronica Sicula S.P.A. (ELSI) (United States of America v. Italy)*, Judgment, I.C.J. Reports 1989, p. 15.

law. But that is where the similarity ends. There is a marked difference between the requisitioning of a plant for 6 months and a short-term stop-work order. It was not apparent on what legal basis the Mayor of Palermo intervened to requisition a factory, whereas the Municipality of Brindisi set out a coherent concern about the legality of the works, albeit not one which the Regional Administrative Court was willing to accept. Above all, the Claimants were able to challenge the stop-work order, obtain immediate interim relief and get a final decision in less than two months. By contrast, ELSI's administrative appeal to the Prefect of Palermo took 17 months to be decided. Yet the Chamber held there had been no breach of the FCN treaty in the *ELSI* case.

360. In the Tribunal's view, the stop-work episode did not involve any beach of the ECT. Nor (for that matter) was it a function of 'legal instability.' The order was temporary in effect, was legally motivated, and was dealt with by due process of law and with reasonable promptness. It was not arbitrary or discriminatory, but fell well within the range of legal risk of an industrial enterprise, in particular one based on debatable regulatory grounds (see above, paragraph 268).

    (e)    <u>Cumulative effect of the various episodes</u>

361. Faced with an itemized analysis of the various episodes, the Claimants argue that it is a mistake to look at them separately: it is their cumulative effect in causing the failure of the Project that matters.[614] They cite in support the following passage from *El Paso v. Argentina*:

> Although they may be seen in isolation as reasonable measures to cope with a difficult economic situation, the measures examined can be viewed as cumulative steps which individually do not qualify as violations of FET, as pointed out earlier by the Tribunal, but which amount to a violation if their cumulative effect is considered. It is quite possible to hold that Argentina could pesify, put a cap on the Spot Price, etc., but that

---

[614] See Reply, paras. 230-232.

a combination of all these measures completely altered the overall framework.[615]

In *El Paso*, the tribunal even defined the collection of acts which led to a forced sale of the investor's Argentine shareholdings as a 'composite breach' in the sense of Article 15 of the ILC Articles.[616] But for the purposes of that case it was not necessary to go so far. Article 15 only applies to a breach 'through a series of acts or omissions defined in aggregate as wrongful' – for example, genocide.[617] The first two sentences of ECT Article 10(1) do not define an aggregate of acts as wrongful in the way that Article 1 of the Genocide Convention does.

362. A breach of an obligation to 'encourage and create stable, equitable, favourable and transparent conditions for Investors' including 'to accord at all times … fair and equitable treatment' could be breached by a single transformative act aimed at an investment, or by a program of more minor measures, or by a series of measures taken without plan or coordination but having the prohibited effect.

363. But the fair and equitable treatment standard which, by virtue of the second sentence, is at the core of the obligation of stability under the first sentence has a relatively high threshold. The *El Paso* tribunal spoke of 'a total alteration of the entire legal setup for foreign investments', and added that 'all the different elements and guarantees just mentioned can be analysed as a special commitment of Argentina that such a total alteration would not take place.'[618] The tribunal in *LG&E* spoke of 'completely dismantling the very legal framework constructed to attract investors.'[619] The emphasis is on the subversion of the legal regime.

---

[615] *El Paso Energy International Co v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011, Exhibit CL-109, para. 515 (***El Paso v. Argentina***).

[616] Ibid., para. 516, citing *Société Générale v. Dominican Republic*, LCIA Case No. UN7927, Award on Preliminary Objections to Jurisdiction, 19 September 2008, para. 91.

[617] See Crawford, *State Responsibility. The General Part* (2013) 265-269.

[618] *El Paso v. Argentina*, Exhibit CL-109, para. 517.

[619] *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, Exhibit CL-30, para. 139.

364. In the Tribunal's view, the various acts complained of here do not reach, or breach, this standard in aggregate any more than they do individually. The Constitutional Court proceedings pre-existed the investment and recourse to the Court was itself an integral part of the Italian legal framework, as was the eventual lack of impact of its adverse decision on consolidated relationships. The stop-work order – the only measure taken specifically in relation to the Project – was granted and revoked in a timely manner and in accordance with rule of law standards. Admittedly the Romani Decree and the Fourth Energy Account made substantial changes to the regime of incentives, but they did not abolish incentives for which plant operators had already qualified, and they gave a reasonable period of time (12 months) for prospective operators to qualify (see paragraph 342). With respect to these measures, the case for breach of the stability undertaking in ECT Article 10(1), first sentence, is not materially stronger when the measures are taken in aggregate than separately.

**B.    Breach of the Fair and Equitable Treatment Standard: ECT Article 10(1), second sentence (legitimate expectations)**

365. The Claimants present an alternative formulation of an Article 10(1) claim based essentially on legitimate expectations.[620] In effect it is argued that persons in the Claimants' position had a legitimate expectation that the Third Energy Account would be maintained for the term envisaged:

> the Claimants had legitimate expectations that the Third Energy Account would remain in place for its entire duration according to its terms; that is, until the end of 2013. However, the Romani Decree frustrated the Claimants' legitimate expectations in this respect.[621]

This argument has the effect of treating the law as not a general command but an individual commitment, at least where the law is enacted for the benefit of a determinate class of persons.

---

[620] See Reply, paras. 217, 298-319.

[621] Transcript Day 5, 71:12-17 (Dufêtre).

366. The Claimants' argument raises several issues. The first is its relationship to their avowed main claim of legislative instability based on ECT Article 10(1), first sentence. Evidently if there were 'legitimate expectations that the Third Energy Account would remain in place for its entire duration according to its terms', issues of reasonableness, proportionality and foreseeableness of changes to that Account would not arise: the Romani Decree was a transparent breach of any such expectations. The Claimants' legitimate expectations argument is thus a frank alternative to its more nuanced argument based on degree of legislative change.

367. As such, it faces the second and more fundamental difficulty, which is that tribunals have so far declined to sanctify laws as promises. For example, as noted already (above, paragraph 317), the tribunal in *Charanne* was clear:

> under international law … in the absence of a specific commitment toward stability, an investor cannot have a legitimate expectation that a regulatory framework such as that at issue in this arbitration is to not be modified at any time to adapt to the needs of the market and to the public interest.[622]

368. The *El Paso* tribunal made a similar distinction, as follows:

> Under a FET clause, a foreign investor can expect that the rules will not be changed without justification of an economic, social or other nature. Conversely, it is unthinkable that a State could make a general commitment to all foreign investors never to change its legislation whatever the circumstances, and it would be unreasonable for an investor to rely on such a freeze.[623]

369. As stated by the tribunal in *Philip Morris v. Uruguay*:

> It clearly emerges from the analysis of the FET standard by investment tribunals that legitimate expectations depend on *specific* undertakings and representations made by the host State to induce investors to make an investment. Provisions of *general* legislation applicable to a plurality of persons or of category of persons, do not create legitimate expectations that there will be no change in the law.[624]

---

[622] *Charanne v. Spain*, Exhibit CL-208, para. 510.

[623] *El Paso v. Argentina*, Exhibit CL-109, para. 372.

[624] *Philip Morris SARL v. Oriental Republic of Uruguay,* ICSID Case No. ARB/10/7, Award, 8 July 2016, para. 426.

370. Counsel for the Claimants took exception to this:

> the language [in *Charanne*] that seems to suggest that an investor can't base a legitimate expectation on a provision of law is unfathomable, because the law is the most formal statement on which any investor can base an expectation. How can it possibly be that some kind of representation made informally to an investor is more significant in terms of international law analysis than a representation that is made in the form of a law? [625]

371. It is true that informal representations can present difficulties, which is why tribunals have increasingly insisted on clarity and the appropriate authority to give undertakings binding on the state. It is also true that a representation as to future conduct of the state could be made in the form of a law, sufficiently clearly expressed. But there is still a clear distinction between a law, i.e. a norm of greater or lesser generality creating rights and obligations while it remains in force, and a promise or contractual commitment. There is a further distinction between contractual commitments and expectations underlying a given relationship: however legitimate, the latter are more matters to be taken into account in applying other norms than they are norms in their own right. International law does not make binding that which was not binding in the first place, nor render perpetual what was temporary only. In the present case, the expectations are even less powerful because European law had already lowered them: it was clear that the incentives offered were subject to modification in light, *inter alia*, of changing costs and improved technology.

372. In the absence of a specific commitment, the state has no obligation to grant subsidies such as feed-in tariffs, or to maintain them unchanged once granted. But if they are lawfully granted, and if it becomes necessary to modify them, this should be done in a manner which is not disproportionate to the aim of the legislative amendment, and should have due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime. These considerations apply even more strongly when the context is subsidies or the payment of special benefits for particular economic sectors.

---

[625] Transcript, Day 5, 109:25 – 110:8 (Legum).

373.  Mr. Marino, Claimants' witness as to the viability of the Project, argued that:

> The Claimants, when they entered the Italian market, had reasonable
> expectations to find a stable regulatory environment. Actually at the time
> one energy account, the First Energy Account, had come to its natural end
> in 2007, and the Second Energy Account was going to its natural end in
> 2010. So there was no reason to believe that an incentive system for PVs
> would have come to termination before the date originally planned.[626]

But a reasonable market expectation as to some state of affairs, justified or not, is not
a basis for shifting risks to the public sector, i.e. the state budget.  Circumstances
change and in the absence of specific commitments, the risk of change is for
entrepreneurs to assess and assume.

374.  To conclude, the Respondent made no special commitment to the Claimants with
respect to the extension and operation of FITs, nor did it specifically undertake that
relevant Italian laws would remain unchanged.  For these reasons the Claimants have
not established a breach of Article 10(1), second sentence, of the ECT.

### C.    The Issue of Causation in relation to ECT Article 10(1)

375.  Central to the Claimants' case as pleaded under Article 10(1) is a claim of fact – viz.,
that the real reason for the complete failure of the Project was the legal instability in
Italy arising from a series of events, commencing on 26 March 2010 with the decision
of the Constitutional Court and culminating in January 2012 with the Municipality's
intervention.  The Claimants do not suggest that these events were linked or that the
sequence was the result of any design on the part of the Italian State – quite the reverse.
This was no conspiracy but a series of disconnected acts of alleged disregard for their
rights and for the effective commitments made to investors through the various Energy
Accounts.  But even if all (or some of them) constituted breaches of the ECT, if they
did not cause the failure of the Project, the Claimants cannot recover.[627]

---

[626] Transcript, Day 3, 3:19 – 4:1 (Marino).

[627] For the requirement of causation as a condition for a claim of breach of an obligation, see ILC Articles on
State Responsibility, 2001, Exhibit CL-4, Art. 31 and commentary.

376. Certain features of the Project are barely or not at all in dispute:

(a) It was conceived as an integrated project, linking up to 124 small solar plants together in what would have been, at the time, the largest solar park in Europe.

(b) It relied heavily on the DIA procedure, as made applicable to units with capacity between 20 KW and 1 MW by Puglia Regional Laws 1/2008 and 31/2008. In other words, the legality of the Project from a planning point of view depended on individual approval (under the DIA procedure, deemed approval) of small plants of less than 1 MW. But its economic viability depended on the cumulation of those plants into a large aggregated array of up to 124 MW.[628] Without being aggregated, few if any of the plants could have been individually connected to the grid; their connection depended on their being linked to the two sub-stations by a large regional network, whose construction Blusun funded, and funded in advance.

(c) For Blusun itself to arrange the construction of the rings and sub-stations and their connection to the high-voltage grid was also apparently novel. Earlier projects had been connected by ENEL, the national operator, but this was time-consuming and would itself probably have defeated the plan.

(d) The land was acquired and paid for by the project companies (and thus by Eskosol) at above-market price for agricultural land.[629] In other words, it was acquired on the assumption that the Project would succeed with full fiscal incentives. Yet that was not clear at the time Blusun committed to the Project, in November 2009.

---

[628] As admitted by one of the Claimants in evidence:

you are in the middle of the countryside; … So if you don't have the infrastructure for this 120 times 1-megawatt plants, it makes no sense.

Transcript Day 2, 119:5-8 (Stein).

[629] Memorial, para. 203.

(e)  The Project never obtained the substantial financing required.

(f)  No solar panels were ever installed or (*a fortiori*) connected.

(g)  Work on two plants was commenced, but ceased immediately after the intervention of the Commune and, despite the prompt lifting of the communal ban, was never resumed.  Even if completed, these few plants could not have prevented the collapse of the Project.

377.  It is helpful to consider three of these elements in more detail.

### 1.    The status of the DIAs and the Project as a unified scheme

378.  The key to the commercial success of the Puglia Project was its capacity to function as a unified scheme, attracting FITs for a potential of almost 120 MW while taking advantage of a DIA procedure designed for individual small plants.

379.  The Claimants relied on the DIAs as amounting to a definitive authorisation for the individual plants.  They refer by way of example to a Notice of the Municipality of Mesagne with the notation 'The local development companies obtain the 53d DIA Certificate of Conformity, stating that the construction of the given solar plants was in accordance with the relevant regulations.'[630]  In fact the Notice states in its operative clause that the DIA procedure 'is to be regarded as complete',[631] which is not at all the same thing.

380.  At no stage did the Claimants obtain unconditional assurances from the central Government as to their plants' entitlement to FITs, or to the level of such FITs.  Even if the lists issued by GSE in various versions in July-September 2011 could be considered as conditional assurances, they were subject to compliance with applicable

---

[630] Reply, p. 173.
[631] Notice of 21 January 2010, Exhibit C-24.

terms and conditions, to be assessed as at the date of connection to the grid. Until then they were contingent.

381. Of particular significance was section 31 of Regional Law 31/2008, which provided as follows:

> Plants installed on the ground in an agricultural area which consists of lands belonging to the same owner, or which is made up of several plots resulting from the splitting of an area of greater extension carried out within the two years prior to the application, are considered as a single plant for the purposes of calculating the maximum electric power for having recourse to the DIA procedure.[632]

382. Referring to this provision, the Watson, Farley & Williams Preliminary Due Diligence Report of 27 January 2010 recommended that 'an exhaustive investigation shall be carried out in order to ascertain that the relevant Regional Law has not been breached by the plants developed by Nico Energia.'

383. The Claimants emphasise the due diligence done on the Project, in particular through the Preliminary Due Diligence Report. They go on to assert that '[t]he report identified no particular issue with respect either to the construction and connection authorizations held by the companies ...'[633] But this is not the case: the Preliminary Report focuses perhaps more on this potential problem than any other. Moreover, a due diligence exercise (and this one was avowedly incomplete) is or should be carried out for the client prior to the investment; it does not shift any risk to the state. Nor could it form the basis for a legitimate expectation vis-à-vis the state that the DIA 'authorizations' were secure against challenge.

384. In fact, the 'exhaustive investigation' called for by the Preliminary Due Diligence Report was not finalised until May 2011. It took the form of a careful but not definitive opinion on Italian law by a member of the same firm.[634] It concluded, for example,

---

[632] Regional Law 31/2008, Exhibit CL-72, Article 3(1)(b).

[633] Memorial, para. 196.

[634] Opinion of Eugenio Tranchino, of Watson, Farley and Williams, 20 May 2011, Exhibit C-357. This document was submitted late, by permission of the Tribunal (see paragraph 22 above).

that the use of the 12 SPVs in the DIA process 'does reduce the risk of such plants being found as belonging or attributable to the same responsible entity', thereby acknowledging that the risk existed.[635]  Its overall conclusion was that 'the risk of the DIAs being successfully challenged may be regarded as remote.'[636]

385.  In the Tribunal's view, that conclusion (unsupported by any positive representations made by competent authorities of the Respondent state) significantly under-estimated the level of risk.  There were repeated regulatory warnings in the documentation against aggregation of DIA-authorized small plants,[637] but the economies of scale of the Puglia Project were entirely dependent on aggregation, and the Project was for most of its 'life' conceived and financed as a whole.[638]

386.  To conclude, in the Tribunal's view, the Project ran a significant risk of incurring legal or administrative difficulties, even if these could be (and in the event largely were) overcome.  Its success was by no means certain.[639]

## 2.     The failure to obtain project financing

387.  As has been seen, the Puglia Project depended for its success on substantial and timely project financing which it never obtained.  On the Claimants' own admission, this was the proximate cause of the Project's failure (see paragraph 310 above).

---

[635] Ibid., para. 5.2.

[636] Ibid., para. 4.7.

[637] E.g., DIA Certificates of Expiry, 3 November 2008 – 26 June 2009, Exhibit C-19.

[638] E.g., Letter from L. Dante to ESCO, attaching Memorandum of Understanding between Oikonomia and ESCO, 27 November 2009, Exhibit C-54, Oikonomia's receipt to Esko for down-payment of €758,000 for 'the 120 MW green power rights.'

[639] In this context, it is relevant to note the Parties' extensive debate about other comparable PV schemes in Italy.  The Respondent stressed that many PV plants qualified for FITs, including some large ones.  Challenged to give examples comparable to the Puglia project, the Respondent's witness gave as prime example the 'Blasi-Casignano project': Witness Statement of Daniele Bacchiocchi, pp. 4, 8-11; Transcript, Day 2, 143:7-11 (Bacciocchi).  This was a smaller but still substantial linkage of 71 separately owned plants connected before December 2010 (i.e. under the Third Energy Account).  From the Tribunal's viewpoint, what is most relevant about this scheme was that it too was the subject of criminal proceedings, emphasizing the element of regulatory risk in projects whether under Regional Law 1/2008 or Regional Law 31/2008.

388. In the Tribunal's view, the documentary evidence produced by the Claimants does not reveal anything more than a reluctance by sometimes marginal sources to commit the necessary funds.

389. A revealing document in this regard is an e-mail of 21 January 2011 from HSBC, Blusun's financial adviser, to Mr. Stein. Headed 'Eskosol banks project financing', it reviews the state of financial negotiations with 16 potential sources.[640] It is relatively upbeat and is full of statements such as 'Interested in the project. To contact to discuss new strategy' – a statement which, concerning as it did a major bank, might have given pause for thought, since it implies the lack of success of the existing strategy. What is perhaps more significant, however, is that of six indications given of reasons not to provide finance, only one expressly mentions 'political risk concerns', one mentions withholding tax issues, and four specifically mention uncertainties about DIA authorisation. Replete with references to 'appetite', the document conveys a distinct lack of recent appetite to finance the Project. And so it proved.[641]

390. On 28 February 2011, Eskosol failed to make the 20% down payment for the first tranche of panels and on 7 March 2011, Siemens suspended performance of the EPC contract, which was never reinstated (see paragraph 101 above). Eskosol's failure to pay *predated* the Romani Decree of 3 March 2011.

### 3.    The evidence underlying the 'legal stability' claim

391. It is a paradox of the 'legal stability' claim that with the (brief) exception of the stop-work order, the Respondent never denied the legality of the Puglia Project at the time, or the potential availability of FITs once the plants forming the Project were connected and started generating. Moreover, as the Respondent repeatedly pointed out, many

---

[640] Email chain between HSBC and M. Stein, 21 January 2011, Exhibit C-159; another 7 financiers, mostly banks, are mentioned as 'without concrete follow up.'

[641] A later e-mail from HSBC relating to another source (Exhibit C-164, 3 March 2011) states 'unfortunately it seems they are a cold on the Eskosol project from an authorization standpoint and also due to the current potentially adverse regulatory trend / uncertainty.' This refers to both authorisation and regulatory uncertainty, but in that order.

other PV plants did manage to get connected at the time, and to benefit from the still relatively generous level of FITs.[642]

392. The Claimants repeatedly invoke reactions of 'the market' in general, or particular customers, in support of their claim. In fact, the evidence before the Tribunal of market reactions and their relation to the issue of causation is at best equivocal. This issue was briefly reviewed in paragraph 389 above in the crucial context of financing. Other evidence is to similar effect:

- An e-mail from Blusun to another potential funder stated:

  > We are speaking about 120 x 1 MW projects under a unified Dia authorization (not attached to the actual Dia discussion), because of the start of the work of our substation and the local grid.

  It received the following immediate reply:

  > At this point we are only focused on AU projects given the uncertainty around the legal status of the DIA procedure. But I appreciate the heads up, and will be sure to let you know if our view changes.[643]

- Another similar exchange included the following passage:

  > Regarding the Validity of the DIA, according to our news, DIA Projects are only safe if projects are connected to the grid before January 16th. Otherwise there is a risk that projects could be challenged within 120 days from the end of the works. In principle because of this issues [sic] we are not interested in this opportunity unless there is a way to structure our entrance not taking any DIA nor financing risk.[644]

---

[642] E.g., Transcript, Day 1, 110:18 – 111:2 (Malaguti); 128:13 – 129:1 (Fiorentino); 142:3-6 (Grasso).

[643] E-mail exchange of 29 April 2010, Exhibit C-253.

[644] E-mail exchange of 8 November 2010, Exhibit C-270.

But the Puglia Project combined precisely DIA and financing risk, both on a large scale.

- Still earlier was the following exchange:

     Michael Stein wrote:

          Please find following some additional value of our project which difference our project to 'normal' DIA projects:

          - Conception of cluster site (2 FIT for a project of 120 MW !!!) with the guarantee of an AU infrastructure
          - No loss of production for a site of 20 MW, because of the DIA principle - measure of the production on the site. (ca 300.000 Euros/ 1 MW/ 20 years period)
          - introduction to the local EPC and subcontractor
          - introduction in a ready to go project in the very competitive Italian market, with a very good connection to the local and provincial authorities
          - Already existing legal and technical diligence …

     The response included the following passage:

          By the way, please send us clear idea about DIA and AU.  Kindly find the attached Due Diligence document from WATSON, FARLEY & WILLIAMS mentioning legal and connection risk of DIA.

     Mr. Stein replied:

          We are very surprised in getting no follow up from you regarding our last discussions and mail exchanges. We are going forward on the project and we need to understand your interest on the project.

     The response was as follows:

          I was also surprised when I received your last email regarding our questions in DIA & AU.  I believe [the company] deserves more explanations or additional information but we feel not.  Based upon

all the information, we are not confident to pursue the Brindisi project.[645]

The market was well aware of the distinction between DIA and AU authorisation, a distinction which predated the Project. Moreover, these exchanges suggest that the Puglia Project was already in significant financial difficulty in the first months of 2011, and independently of the Romani Decree.

393. The Claimants place emphasis on the 'rescue' plan for 27 plants proposed at the end of 2011 (see paragraph 113). The documentation provided in support of this was limited to a non-binding term sheet 'for discussion purposes only', and a signed agreement of Eskosol's creditors deferring their claims.[646] As far as appears from the documentary evidence, work on the 27 plants never commenced: Euro Catalysts, the proposed financier, does not appear to have closed with the offer, still less paid the 20% down payment, and the legal and technical due diligence reports envisaged in the term sheet are not in the record. In fact the construction that was interrupted by the municipal stop-work order of 11 January 2012 (see paragraph 119) was a different one, to build a mere two plants, which could not have rescued the Project. By the end of December 2011 (before the Italian legislation of 2012 further affecting agricultural land), the 27 plants envisaged in the Euro Catalysts term sheet should have been completed. None of this last-gasp activity persuades the Tribunal that the failure of the Project was attributable to Italy.

### 4.    Conclusion on Causation

394. In the Tribunal's view, the Claimants have not discharged the onus of proof of establishing that the Italian state's measures were the operative cause of the Puglia Project's failure. Of far greater weight was the continued dependence on project financing, and the failure to obtain it was due both to the size of the Project and to

---

[645] E-mail exchange of 15 June, 7-8 July 2010, Exhibit C-257.

[646] See Euro Catalysts Capital, Term Sheet Non Binding for 100% Equity Investing of 27 MW Ground based PV Project, 7 October 2011, Exhibit C-202; Eskosol, Debt Restructuring Agreement, 4 November 2011, Exhibit C-203.

justified concerns about the scope of DIA authorisation, on which the legality of the Project depended. That being so, the claim under Article 10(1) for loss of the Project would fail in any event.

### 5.    Overall Conclusions on ECT Article 10(1)

395.  For these reasons, the Tribunal concludes that there was no breach of Article 10(1) of the ECT.

### D.  The Expropriation Claim: ECT Article 13

396.  In the further alternative, the Claimants argue that the Italian measures resulted in the indirect expropriation of the investment, given its total loss of value, contrary to Article 13 of the ECT.

397.  Article 13(1) provides in relevant part as follows:

> Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalised, expropriated or subjected to a measure or measures having effect equivalent to nationalisation or expropriation (hereinafter referred to as 'Expropriation') except where such Expropriation is:
>
> (a)    for a purpose which is in the public interest;
>
> (b)    not discriminatory;
>
> (c)    carried out under due process of law; and
>
> (d)    accompanied by the payment of prompt, adequate and effective compensation.

398.  The notion of indirect expropriation has been defined more or less broadly in the decided cases, ranging from the sweeping definition in *Metalclad Corporation v. Mexico*[647] to the careful formulation in *Electrabel v. Hungary*:

---

[647] *Metalclad Corporation v. United Mexican States*, ICISD Case No. ARB(AF)/97/1, Award, 30 August 2000, Exhibit CL-32, para. 103 (*Metalclad v. Mexico*).

As regards indirect expropriation, the Tribunal considers that the wording of Article 13(1) ECT requires Electrabel to establish that the effect of the PPA's termination by Hungary was materially the same as if its investment in Dunamenti had been nationalised or directly expropriated by Hungary. In other words, Electrabel must prove, on the facts of this case, that its investment lost all significant economic value with the PPA's early termination.[648]

In none of the decided cases (so far as the Tribunal is aware) has the winding up of an insolvent company by the investor been treated, in and of itself, as a measure 'having effect equivalent to nationalisation or expropriation', whether under NAFTA, the ECT or otherwise. This is true even if the circumstances leading to insolvency included conduct of the host state in breach of the FET standard.[649]

399. On the other hand, in a number of cases, state measures targeting the company and imposing major liabilities on it have resulted in insolvency, leading to a finding of indirect expropriation. For example, in *Quasar de Valores v. Russian Federation*, the tribunal held that the liquidation auctions in which a major part of the assets was acquired by Rosneft 'were part of the same overall scheme of confiscation.'[650] The facts of that case were, of course, remote from those of the present one.

400. In *Nykomb*, an ECT case, the tribunal in rejecting a claim of indirect expropriation said:

> The Tribunal finds that 'regulatory takings' may under the circumstances amount to expropriation or the equivalent of an expropriation. The decisive factor for drawing the border line towards expropriation must primarily be the degree of possession taking or control over the enterprise the disputed measures entail.[651]

---

[648] *Electrabel v. Hungary*, Exhibit CL-10, para. 6.53.

[649] Cf. *Saluka v. Czech Republic*, Exhibit CL-39, para. 265 (Art. 5); 302-497 (Art. 3).

[650] See *Yukos v. Russia*, Exhibit CL-22, para. 1183, quoting *Quasar de Valores SICAV S.A. et al. v. Russian Federation*, SCC Arbitration, Award, 20 July 2012.

[651] *Nykomb Synergetics Technology Holding AB v. Republic of Latvia*, SCC, Award, 16 December 2003, Exhibit CL-17, para. 4.3.1.

143

That was a case of failure to pay the contractually agreed double tariff, in circumstances where Latvia discriminated in favour of other like-situated generators to whom that tariff was paid. This was in breach of Article 10(1) ECT, but not Article 13 (on which the claimant also relied).

401. In the present case, the Respondent, by non-discriminatory laws ostensibly passed in the public interest, significantly changed the terms laid down in the Third Energy Account for investment in the green energy sector. These changes, combined with operational decisions made by the investors and the lack of prearranged Project financing, meant that the Project remained radically incomplete, never qualified for feed-in tariffs, and inevitably went into liquidation. As a general matter the situation was not analogous, still less tantamount, to expropriation of the Project by Italy.[652]

402. In responding to a question from the Tribunal as to what exactly had been taken for the purposes of the Article 13 claim, counsel for the Claimants initially conceded...

> that there was no taking of the investment. However, there was a succession of events that, taken together and in their natural sequence, deprived them from the benefit of their investment.[653]

The difficulty with this argument lies in its assumption that the Claimants were already entitled to the full benefit of their investment vis-à-vis the Italian Republic – that is, to the full benefit of current FITs – without complying with the conditions consistently imposed on applicants for FITs, i.e. timely completion of the solar panels and their connection to the grid. And this problem apparently remerges, however the Claimants' Article 13 case is put. Senior counsel for the Claimants intervened in closing to put the matter in the following terms:

---

[652] In closing, counsel for the Claimants also cited *Biloune v Ghana* as bearing 'some similarities' to the present case: Transcript, Day 6, 34:8-19 (Barrier), citing *Biloune and Marine Drive Complex Ltd v. Ghana Investments Centre and the Government of Ghana*, UNCITRAL Award on Jurisdiction and Liability, 22 October 1989. Although *Biloune* involved a municipal stop order, what was crucial was the combination of actions taken by various Ghanaian entities – partial demolition of the works, refusal to allow resumption, deportation and refusal of return. The temporary judicial stay here is in obvious contrast.

[653] Transcript, Day 6, 31:21-24 (Barrier).

144

> What we contend was expropriated was the investments which were lost. The value of the investments … was entirely gone or substantially gone. *So the land that was indirectly acquired was worth a fraction of what it was originally worth.* The project companies which we had acquired were worth nothing.  The permits, the authorisations that we had acquired, although we still retained title to them, had no economic value.  And as a result, all of the investments that we acquired, we were substantially deprived of.[654]

The difficulty here lies in the assumption that what the Claimants or their associates paid for the land was 'what it was originally worth.'  But what it was originally worth was its value as agricultural land, and it retained that (low) value after the failure of the Project.  Only if the value of the land as against the Italian Republic is taken to be its value as a completed Project already entitled to the benefit of current FITs does the Claimants' expropriation argument assist.  Of course the Claimants argue that the reason for the failure of the Project, with consequent 'loss of value', was the constant changes in Italian policy and law.  That argument, under ECT Article 10, first sentence, has already been considered.  The essential point does not change by invoking Article 13.

403.  Another possibility concerns the limitations imposed on the use of the agricultural land acquired by Eskosol, Blusun's subsidiary, for the construction of PV arrays.  These limitations have already been analysed (see paragraph 104, 120).  It could be argued that the effect of the 10% requirement imposed by the Fourth Energy Account was to sterilize the land in Blusun's hands, since the planned PV units could not be installed without acquiring substantially more land.  There is good authority for the proposition that the sterilization of property in the hands of an investor, rendering it impossible to use the property for its intended purpose, can amount to indirect expropriation.[655]

---

[654] Transcript, Day 6, 34:25 – 35:10 (Legum) (emphasis added).

[655] In *Metalclad v. Mexico*, Exhibit CL-32, paras. 109-111, the declaration of a nature/reserve over land previously approved for a waste disposal site was held tantamount to expropriation.  See also *Compañía del Desarrollo de Santa Elena, S.A. v. Republic of Costa Rica,* ICSID Case No. ARB/96/1, Award, 17 February 2000, Exhibit CL-26, paras. 76-78.

145

404. But it is very doubtful that the factual predicate for a sterilization case existed here. For one thing, the Claimants, who prior to the insolvency retained full control of their investment, proposed to solve the immediate indebtedness of the Project companies by constructing 27 solar plants; the plan failed, but not because the land was not available. According to their pleaded case, the final blow to the Project came with the municipal stop-work order, which meant that the Fourth Energy Account's deadlines for qualifying for feed-in tariffs could not be met. That order and its judicial sequel have been dealt with already; they did not involve any breach of the ECT, let alone conduct tantamount to expropriation.

405. At one point in its pleadings, the Claimants attributed the failure of the Project, in part at least, to Law Decree 1 of 24 January 2012, Article 65 of which appears to have shortened the 1 year time-limit allowed by the Romani Decree by some two months (see paragraph 120 above).[656] In their Reply and in oral argument the final defeat of the Project was rather attributed to the municipal stop-work order, which has already been dealt with (see paragraph 360 above). But since the point was not formally abandoned, the Tribunal will deal briefly with it.

406. To make their expropriation case on this basis, the Claimants would have to show (a) that but for the one year deadline of the Romani Decree, they would have been expropriated by the change in the land coverage ratio from 50% to 10%; (b) that but for the January 2012 Law they would have met the 29 March 2012 deadline for the Project or a substantial part of it (or alternatively would have sold the Project on to a third party which could have met that deadline), and (c) that they reasonably abandoned the Project between January and March (or lost a credible opportunity to sell it on) because of the abrogation of the deadline by Law Decree 1 of 24 January 2012. But even if point (a) be accepted *arguendo*, the Claimants do not come close to establishing either points (b) or (c), essentially for the reasons already stated (see

---

[656] See Memorial, paras. 340-351; Stein WS1, paras. 169-170. In fact, this is not quite clear, since Law 27/2012 (Exhibit CL-68) appears to have reinstated the exception for plants occupying 50% of agricultural land contained in Art. 10(6) of the Romani Decree, and even extended it slightly to May 2012. The discrepancies associated with the 2012 legislation were not really explored in argument.

paragraph 393). It is significant that Siemens unilaterally suspended the construction contract before the Romani Decree, based on non-payment by Eskosol of the initial deposit, and that it was never reinstated: indeed it was formally terminated by letter of 16 December 2011, before Law Decree 1 of 24 January 2012.[657] As to selling it on, there is no evidence of a credible buyer prepared to take the risk of completion by 29 March 2012. This version of the expropriation case likewise fails.

407. In the circumstances, the Claimants have not established that any part of the investment was subject to expropriation or a situation tantamount thereto, contrary to Article 13 of the ECT. The Claimants never lost title to the land which was *qua* agricultural land an asset of Eskosol's in insolvency. The premium paid for the land was at the Claimants' risk and was not opposable to Italy. In a context in which Blusun's failure to construct the plants or to connect them to the grid was due to its own investment decisions, notably its failure to attract adequate finance, Italy should not be required to pick up the tab for Blusun's failures. To put it in other terms, Blusun had no right or legitimate expectation to the enhanced value of the land on the footing that the Project would succeed. This conclusion makes it unnecessary to determine whether changes in planning regulations involving the use to which agricultural land can be put are merely regulatory in any event.[658]

408. The point can be made in another way. Blusun acquired agricultural land at a substantial overprice. At all times it was aware of what it had to do to unlock the extra value in the land, i.e. to construct the plants and connect them to the grid within applicable time limits. It failed to comply with those conditions. Even if one were to hold, hypothetically, that the reduction of land available for power generation from a ratio of 50% to one of 10% did amount to an indirect expropriation of that fraction of the land thereby rendered useless for the Project, the value to be attributed to the land is the value it continued to have – i.e. the value of unimproved agricultural land as at

---

[657] Letter from Siemens to Eskosol, 16 December 2011, C-207. The letter closes 'We regret for the development of our relationship, born under very different auspices.'

[658] Cf. *Saluka v. Czech Republic*, Exhibit CL-39, paras. 254-265.

the date of the Romani Decree. That value did not change: since any additional losses were at the Claimants' own risk they are not recoverable under Article 13.

409. For these reasons the Tribunal holds (by a majority, Arbitrator Alexandrov dissenting) that the expropriation claim under ECT Article 13 must fail.[659]

## XI.    COSTS

410. In the Reply, the Claimants requested an award in their favour:

> Ordering the Italian Republic to pay the expenses incurred by the Claimants in connection with these proceedings, including professional fees and disbursements, and to pay the fees and expenses of the Members of the Tribunal and the charges for the use of the facilities of the Centre, in accordance with Article 61(2) of the ICSID Convention.[660]

411. In its Rejoinder, the Respondent requested the Tribunal to 'confirm the conclusions of the Respondent ...':

> Ordering the Claimants to pay the expenses incurred by the Italian Republic in connection with these proceedings, including professional fees and disbursements, and to pay the fees and expenses of the Members of the Tribunal and the charges for the use of the facilities of the Centre, in accordance with Article 61(2) of the ICSID Convention.[661]

---

[659] Arbitrator Alexandrov disagrees with that conclusion. Blusun acquired agricultural land at a premium. The value of that land today is much lower, *i.e.*, equal to the value of unimproved agricultural land. This was caused by the restrictions imposed by Respondent. While one might accept the proposition that Blusun could have reasonably expected that the tariff regime would change over time (and thus should have accelerated the construction of the plants), it could not have reasonably expected that the government would impose a restriction on the use of the land. That restriction is therefore expropriatory. The Award assumes that even absent the land use restriction the Project would have failed to proceed because of the tariff-related restrictions and, therefore, the land use restriction alone did not cause any loss of value. This analysis, however, disregards the equally likely possibility that the Project did not proceed *due to* the land use restriction. To state it differently, the Award assumes that the land use restriction had no impact on Blusun's inability to proceed. There is, however, no factual basis for this assumption. The land use restriction may have had an equal, if not greater, impact on the failure of the Project. In that scenario, the damages caused by the land use restriction would have amounted to half, or more, of the value of the Project. Because the land use restriction amounted to an indirect expropriation, damages should follow notwithstanding this uncertainty—at a minimum, in the amount of the lost incremental value of the land.

[660] Reply, para. 419(d).

[661] Rejoinder, para. 285(h).

412.  At the hearing, the Tribunal in consultation with the Parties decided that 'it is sufficient if the costs submissions set out the costs and expenses of the parties.'[662]

413.  The Claimants submitted claims for legal and other costs (excluding advances made to ICSID) in the amount of €3,880,337.92, broken down as follows:

-  €3,343,908.37 in legal fees and expenses; and

-  €536,429.55 in expert fees and expenses.

414.  They also indicated advance on costs and fee payments in the amount of USD449,920.00.

415.  The Respondent did not file a submission on costs.

416.  Article 61(2) of the ICSID Convention provides:

> In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.

417.  This provision gives the Tribunal discretion to allocate all costs of the arbitration, including attorney's fees and other costs, between the Parties as it deems appropriate.

418.  The Tribunal is conscious of Italy's delay in raising the EU issue and the re-scheduling of the hearing on jurisdiction and the merits that became necessary following the EC's application to intervene.  It will be recalled that the serious difficulties with the admissibility of the EC's late application were overcome by the Respondent's endorsement of the application.  The Respondent could have made the EU law argument at an earlier stage, but chose to raise separate issues of jurisdiction and admissibility, which have been rejected.  Moreover, this was a substantial claim, efficiently presented.  In the exercise of its discretion under Article 61(2), the Tribunal

---

[662] Transcript, Day 6, 95:21-23.

has accordingly decided that each party should bear one half of the Tribunal's costs and that each party should bear its own costs.

419. The direct costs of the proceeding include: (i) the fees and expenses of each Member of the Tribunal; (ii) payments made by ICSID for other direct expenses, such as those related to the conduct of hearings (court reporting, audio recording, interpretation, and courier services, as well as estimated charges related to the dispatch of this Award); and (iii) ICSID's administrative fees.

420. These costs amount to (in USD):

| | |
|---|---|
| Arbitrators' fees and expenses | |
|     Judge James Crawford AC | 130,102.07 |
|     Dr. Stanimir Alexandrov | 144,473.98 |
|     Professor Pierre-Marie Dupuy | 135,223.00 |
| Other expenses (estimate) | 78,022.33 |
| ICSID's administrative fees | 96,000 |
| ICISD's lodging fee | 25,000 |
| **Total** | **608,821.38** |

421. The above costs have been paid out of the advances made to ICSID by the Parties. Once the case account balance is final, the ICSID Secretariat will provide the Parties with a detailed financial statement. The remaining balance will be reimbursed to the Parties taking into account the cost allocation decided by the Tribunal, and in proportion to the advances they made. As a result, each Party's share of the direct costs of the proceeding amounts to USD304,410.69.

422. The ICSID Secretariat received the USD25,000 lodging fee and advance payments in the amount of USD424,920 from the Claimants, and advance payments in the amount

of USD275,000 from the Respondent.[663]    Accordingly, the Tribunal orders the Respondent to pay the Claimants USD29,410.69 for the expended portion of the Claimants' advances to ICSID.

---

[663] Letters from ICSID to the Parties dated 25 June 2014, 18 August 2014, 15 January 2015, 27 October 2015, 16 June 2016, 30 June 2016, and 17 August 2016.

## AWARD

423. For these reasons, the Tribunal:

    (a) Holds that it has jurisdiction over the claims brought by the Claimants;

    (b) Dismisses those claims on the merits;

    (c) Orders the Respondent to pay USD29,410.69 to the Claimants as its share of the costs of the proceedings;

    (d) Rejects all other claims for costs.

_____

Dr. Stanimir A. Alexandrov

Arbitrator

Date: 23 December 2016

_____

Professor Pierre-Marie Dupuy

Arbitrator

Date: 3 December 2016

_____

Judge James R. Crawford

President of the Tribunal

Date: 12 December 2016

153