# EXHIBIT 27

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

*RREEF Infrastructure (G.P.) Limited and*
*RREEF Pan-European Infrastructure Two Lux S.à r.l.*

**v.**

*Kingdom of Spain*

**(ICSID Case No. ARB/13/30)**

---

**DECISION ON JURISDICTION**

Professor Alain Pellet, President of the Tribunal
Professor Pedro Nikken, Arbitrator
Professor Robert Volterra, Arbitrator

*Secretary of the Tribunal*
Ms Natalí Sequeira

6 June 2016

TABLE OF CONTENTS

I.    THE PARTIES..........................................................................................................3
   A.    The Claimants ...................................................................................................3
   B.    The Respondent.................................................................................................3
II.   PROCEDURAL HISTORY.......................................................................................4
III.  THE PARTIES' ARGUMENTS.................................................................................6
IV.   THE INTRA-EU OBJECTION .................................................................................7
   A.    The Respondent's Position...............................................................................7
      (1)    The Obligatory Existence of an Investor from "*Another Contracting Party*".........7
      (2)    EU Preferential System – Primacy of EU Law.....................................8
      (3)    Disconnection Clause............................................................................10
      (4)    Relevance of Previous Awards .............................................................11
   B.    The Claimants' Position .................................................................................12
      (1)    One of the Claimants Is Not an EU Member.......................................12
      (2)    EU Preferential System – Primacy of EU Law...................................12
      (3)    Disconnection Clause............................................................................14
      (4)    Relevance of Previous Awards .............................................................15
   C.    Tribunal's Analysis ........................................................................................16
      (1)    General Principles.................................................................................16
      (2)    Application of the General Principles in the Present Case ...................18
V.    THE DAMAGES OBJECTION ...............................................................................23
   A.    The Respondent's Position.............................................................................23
      (1)    Illegitimacy of the Shareholders' Claim to be Compensated for Alleged Damage to the Companies in which Shares are Held (Reflected Loss).........................................23
      (2)    The Jurisdiction of the Tribunal only Extends to the Dispute concerning the Loss of Value of the Shares.........................................................................24
      (3)    "*Two Bites of the Apple*".....................................................................26
   B.    The Claimants' Position .................................................................................26
      (1)    Legitimacy of the Shareholders' Claims...............................................26
      (2)    "*Two Bites of the Apple*".....................................................................28
   C.    Tribunal's Analysis ........................................................................................29
      (1)    On the Shareholders' Right to Bring Claims before the Tribunal .........30
      (2)    On the "*Two Bites of the Apple*" Argument.........................................34
      (3)    Conclusion of the Tribunal on the "*Damages*" Objection ....................35
VI.   THE *RATIONE PERSONAE* AND *RATIONE MATERIAE* OBJECTIONS................35

*A. Ratione personae* ............................................................................................... 35

   (1)  The Respondent's Position ...................................................................... 35

   (2)  The Claimants' Position............................................................................ 37

   (3)  Tribunal's Analysis .................................................................................. 38

*B. Ratione materiae* ............................................................................................... 41

   (1)  The Respondent's position....................................................................... 41

   (2)  The Claimants' Position............................................................................ 41

   (3)  Tribunal's Analysis .................................................................................. 43

VII.   TAX OBJECTION .................................................................................... 45

  A.  The Respondent's Position ............................................................................... 45

   (1)  The Respondent's Consent to Submit to Investment Arbitration is limited to Disputes related to Alleged Breaches of Obligations derived from Part III of the ECT .. 46

   (2)  No Obligations or Rights in the ECT with Respect to Tax Measures ................... 46

   (3)  TVPEE is a Tax Measure for the Purposes of the ECT ....................................... 46

   (4)  Tax Measures Have to be Presumed *Bona Fide* ............................................... 47

   (5)  TVPEE is a *Bona Fide* Tax Measure of General Application ............................ 48

  B.  The Claimants' Position ................................................................................... 49

   (1)  Tax Objection Should be Joined to the Merits.......................................... 49

   (2)  Measures are not Tax Measures Under Article 21 ECT ........................................ 49

   (3)  Taxation Measures Have to be *Bona Fide* .......................................................... 50

   (4)  7% Levy is not a *Bona Fide* Measure but a Tariff Cut........................................ 51

  C.  Tribunal's Analysis ......................................................................................... 51

   (1)  Conclusion on the Tax Objection............................................................ 53

VIII.  THE COOLING OFF OBJECTION ............................................................ 54

  A.  The Respondent's Position ............................................................................... 54

   (1)  The Objection......................................................................................... 54

   (2)  New Measures are not Part of a Single On-Going Dispute ................................. 55

  B.  The Claimants' Position ................................................................................... 56

   (1)  Further Measures are Part of a Single On-Going Dispute ...................................... 56

   (2)  Attempts to Settle would be Futile.......................................................... 58

   (3)  The Objection is a Question of Admissibility, not Jurisdiction............................ 59

  C.  Tribunal's Analysis ......................................................................................... 60

   (1)  Conclusion on the Cooling-off Objection............................................... 64

IX.   DECISION OF THE TRIBUNAL ............................................................... 65

## I.    THE PARTIES

### A.    The Claimants

1.    The Claimants are RREEF Infrastructure (G.P.) Limited ("RREEF Infra" or the "First Claimant") and RREEF Pan-European Infrastructure Two Lux S.à r.l. ("RREEF Pan-European Two" or the "Second Claimant"), jointly referred as the "Claimants".



5.    For purposes of their submissions the Claimants referred to the above entities ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as "RREEF". The Memorial on the Merits explains that "*RREEF specialises in infrastructure investments, with extensive experience across different sectors, including the power generation sector.*

6.    The Claimants are represented in these proceedings by the law firm Allen & Overy.

### B.    The Respondent

7.    The Respondent is the Kingdom of Spain ("Spain" or the "Respondent").

8.    The Respondent is represented in this arbitration by the *Abogacía General del Estado* of the Ministry of Justice.

## II.    PROCEDURAL HISTORY

9.    On October 22, 2013, the Claimants submitted a Request for Arbitration to the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre").

10.    The Request was filed on the basis of Article 26(4)(a)(i) of the Energy Charter Treaty dated 17 December 1994, which entered into force on 16 April 1998 for Luxembourg, the United Kingdom and the Kingdom of Spain (the "ECT"), Article 36 of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "ICSID Convention"), and Article 1 of the of the ICSID Rules of Procedure for the Institution of Conciliation and Arbitration Proceeding (the "ICSID Institution Rules").

11.    On 22 November 2013, the Secretary-General registered the Request for Arbitration.

12.    On February 12, 2014, the Claimants appointed Professor Robert Volterra, a Canadian national, as arbitrator. On February 27, 2014, the Respondent appointed Professor Pedro Nikken, a Venezuelan national, as arbitrator. On July 30, 2014 the Chairman of the Administrative Council appointed Professor Alain Pellet, a French national, as the President of the Tribunal pursuant to Article 38 of the ICSID Convention. All three arbitrators accepted their appointments.

13.    The Tribunal was constituted in accordance with Article 37(2)(b) of the ICSID Convention and the proceedings commenced on July 31, 2014. Further, the Centre designated Ms. Natalí Sequeira as Secretary of the Tribunal.

14.    The Tribunal and the parties held a first procedural session in Paris on 29 September 2014.

15.    On 21 October 2014, the Tribunal issued Procedural Order No. 1 setting forth the matters discussed at the first session with the parties, including the procedural timetable and the agreement that the proceedings were to be conducted in accordance with the ICSID Rules of Procedure for Arbitration Proceedings, in force as of April 10, 2006 ("ICSID Arbitration Rules").

16.     On 14 November 2014, the European Commission ("EC") filed an application to intervene as non-disputing party pursuant to ICSID Arbitration Rule 37(2).

17.     On 21 November 2014, the Claimants filed their Memorial on the Merits.

18.     On 5 and 8 December 2014, the Respondent and the Claimants respectively, filed observations on the non-disputing party's application by the EC.

19.     On 9 January 2015, the Respondent filed a request to bifurcate the proceedings. On 23 January 2015, the Claimants filed observation on the Respondent's request.

20.     On 5 February 2015, the Tribunal issued its Procedural Order No. 2 finding "*that the European Commission's Application for leave to intervene is inadmissible*".

21.     On 7 February 2015 the Tribunal informed the parties that it granted the Respondent's request for bifurcation of the proceedings. Accordingly, the Respondent's objections to jurisdiction would be addressed as a preliminary question and the proceedings on the merits suspended.

22.     On 18 February 2015, the Tribunal issued Procedural Order No. 3, setting forth the reasoning for its decision on bifurcation. On 4 March 2015, the Tribunal issued Procedural Order No. 4 establishing a new procedural calendar.

23.     On 1 April 2015, the Respondent submitted its Memorial on Jurisdiction.

24.     On 13 May 2015, the Claimants submitted their Counter-Memorial on Jurisdiction.

25.     Pursuant to Procedural Order No. 4 and paragraph 15 of Procedural Order No. 1, the Parties exchanged requests for the production of documents on 20 May 2015. On 27 May 2015, the Parties exchanged responses and objections to their respective requests, agreed to the production of some of the documents and objected to others.

26.     On 8 June 2015, the Parties submitted a Joint Document Production Application and Redfern Schedules, in accordance with sections 15.4.3 and 15.7 of Procedural Order No. 1.

27.     On 19 June 2015, the Tribunal issued Procedural Order No. 5 deciding on the Parties' requests for document production.

28.  On 7 July 2015, the Tribunal issued Procedural Order No. 6 concerning a request for confidentiality of certain documents to be produced by the Parties.

29.  On 21 July 2015, the Respondent submitted its Reply on Jurisdiction.[4]

30.  On 8 September 2015, the Claimants submitted their Rejoinder on Jurisdiction.

31.  On December 9, 2015, the EC filed a second application for leave to intervene as a non-disputing party pursuant to ICSID Arbitration Rule 37(2). On December 23, 2015, the Parties filed observations on the EC's second application.

32.  On 14 January 2016, the Tribunal issued Procedural Order No. 7 rejecting the EC's second application to intervene as a non-disputing party.

33.  The hearing on jurisdiction was held on 1st February 2016 at the World Bank offices in Paris.

34.  On 7 March 2016, the Tribunal informed the Parties of its Decision on the Respondent's objections to jurisdiction, rejecting all objections submitted by the Respondent, "*except the one related to Article 10(1) of ECT ("Tax Objection")*", which was joined to the merits.

## III.  THE PARTIES' ARGUMENTS

35.  The Respondent's arguments can be broadly grouped under five headings:

   ▪ *First*, the Respondent considers that the ECT is not applicable to disputes concerning intra-EU investments;

   ▪ *Second*, the Respondent asserts that the claim on the alleged damages to the renewable energy production plants solely pertains to Spanish companies that own the plants and not to the Claimants;

---

[4] The Tribunal notes that while the Spanish version of this Memorial is titled "*Réplica*", the English version submitted by the Respondent refers to it as "*Rejoinder*". For purposes of the English version of the present Decision the Tribunal will refer to this submission as the Respondent's *Reply* on Jurisdiction.

- **_Third_**, the Respondent alleges that the Claimants are not investors for the purposes of the ECT and that the Claimants' investment is not an investment according to the ECT;

- **_Fourth_**, the Respondent considers that pursuant to article 21 of the ECT, tax measures are excluded from the scope of the ECT and that the Tax on the Value of the Production of Electric Energy ("TVPEE") created by Act 15/2012 is such a tax measures;

- **_Fifth_**, the Respondent alleges that the Claimants failed to submit the dispute to amicable settlement and to respect the three-month cooling-off period prior to the arbitration in accordance with Article 26 of the ECT concerning Act 24/2013, Royal Decree 413/2014 and Ministerial Order IET/1045/2014.[5]

36.    The Tribunal will deal hereafter with each of these arguments or series of arguments in turn.

## IV.    THE INTRA-EU OBJECTION

### A.    The Respondent's Position

#### (1)    The obligatory existence of an investor from "another Contracting Party"

37.    The Respondent considers that the Second Claimant (RREEF Pan-European Two), is not a protected investor under the ECT on the basis that it is incorporated in Luxembourg which, like the Kingdom of Spain, is a Member State of the European Union ("EU"). The EU is also a Contracting Party to the ECT.

38.    Thus, the Respondent's argument is that the Second Claimant is not deemed to be of "_another Contracting Party_" as required by Article 26. Therefore, according to the Respondent, the Second Claimant is not authorized to avail itself of arbitration under the ECT as this instrument is not applicable to disputes concerning intra-EU investments.[6]

---

[5] This issue was only discussed in the written exchanges between the Parties, but both referred to their respective positions during the hearing on jurisdiction (see English Hearing Transcript, 1st February 2016, p. 67, 9-12 and p. 177, 8-13).
[6] Respondent's Memorial on Jurisdiction, p. 8, para. 8.

39.   Moreover, the Respondent contends that the EU judicial system has exclusive jurisdiction over investment disputes between investors from an EU Member State ("intra-EU investors") and another EU Member State.[7]

### (2)     EU Preferential System – Primacy of EU Law

40.   According to the Respondent's reasoning, the EU is an economic integration area which includes, in its internal market regulations, a comprehensive system for promoting and protecting intra-EU investments. This, it says, has primacy over that provided by the ECT.

41.   Moreover, the Respondent contends, the EU internal market contains a comprehensive set of protections for fundamental rights which holds Member States liable for any breaches.  Finally, the Respondent asserts that the EU judicial system has a monopoly on the final interpretation of EU Law.[8]

42.   The Respondent points out that jurisprudence from the EU judicial system precludes Member States from restricting EU nationals from enjoying the freedom of establishment provided for in the EU' constituent documents.[9]

43.   The Respondent argues that the system of intra-EU investor protection deriving from EU instruments and judicial decisions takes precedent over or displaces that contained in any other international treaty. The Respondent points for support to the specific nature of the EU and also to specific recognition of this within the ECT itself.[10] The Respondent relies for support in these arguments upon:

   ▪   *Article 1(2) of the ECT*: Definition of the Contracting Parties includes Regional Economic Integration Organisations "REIO". The EU is the only REIO that forms part of the ECT;[11]

   ▪   *Article 1(3) of the ECT*: Defines a REIO as "*an organization constituted by states to which they have transferred competence over certain matters a number*

---

[7] Respondent's Reply on Jurisdiction, p. 10, para. 14.
[8] Respondent's Reply on Jurisdiction, pp. 17-19, paras. 21-28.
[9] CJUE, Judgment, 11 March 2010, *Attanasio Group*, Case C-384/08, *ECR I-2055*, para. 43.
[10] Respondent's Reply on Jurisdiction, p. 19, para. 29.
[11] Respondent's Memorial on Jurisdiction, p. 16, para. 49; Respondent's Reply on Jurisdiction, p. 19, para. 30.

*of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters*";[12]

- *Article 36(7) of the ECT*: Provides that a REIO will have the same number of votes as its Member States who are Contracting Parties;[13]

- *Article 1(10) of the ECT*: Defines the "*Territory*" of the REIO, referring to the provisions of said organisation, *i.e.* the EU;[14]

- *Art 25*: Recognizes the primacy of EU law;[15]

44.    The Respondent argues that in applying international law a tribunal should rely on Article 26(6) of the ECT, which requires the settlement of disputes in "*accordance with the provisions of the Treaty itself and the applicable standards of International Law*". This means that EU law has to be considered equally as any applicable International Law.[16]

45.    In this context the Respondent cites the case of *Electrabel S.A v. The Republic of Hungary*:

> "*"(…) the Tribunal concludes that Article 307 EC precludes inconsistent pre-existing treaty rights of EU Member States and their own nationals against other EU. Member States; and it follows, if the ECT and EU law remained incompatible notwithstanding all efforts at harmonisation, that EU law would prevail over the ECT's substantive protections and that the ECT could not apply inconsistently with EU law to such a national's claim against an EU Member State.*"[17]

46.    The Respondent also refers to Article 344 of the Treaty on the Functioning of the European Union of 17 December 1994 (the "TFEU") which provides that: "*Member States undertake not to submit any disputes about the interpretation or application of Treaties to a settlement procedure other than those foreseen therein.*"

---

[12] Respondent's Reply on Jurisdiction, p. 19, para. 31.
[13] Respondent's Reply on Jurisdiction, p. 19, para. 32.
[14] *Ibid.*, para. 33; see also Respondent's Memorial on Jurisdiction p. 16, para. 50.
[15] Hearing Transcript, 1st February 2016, pp. 66-67, 20-1. See also Respondent's Memorial on Jurisdiction p. 16, para. 48; Respondent's Reply on Jurisdiction, p. 20, para. 35.
[16] Respondent's Reply on Jurisdiction, p. 20, para. 36.
[17] *Ibid.*, para. 37, quoting *Electrabel S.A v. Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, pp. 61-62, para. 4.189.

47.    According to the Respondent, this provision prevents the Kingdom of Spain from submitting any matters concerning the internal electricity market to arbitration.[18] Accepting this possibility would mean that an arbitral tribunal would decide upon the rights of EU investors in the internal market.[19] In this respect, the Respondent notes that the Court of Justice of the European Union ("CJEU") has already ruled that this would be incompatible with EU law, as the CJEU has exclusive jurisdiction to interpret EU law.[20]

48.     The Respondent further argues that its position is supported by EC which is "*one of the most authorised voices to interpret the ECT*",[21] as it was the EC which, upon a proposal by the European Council of Dublin in June 1990, put forward the idea of the European Energy Charter and negotiated its conclusion.

49.    According to the Respondent, Article 26(6) of the ECT directs the Tribunal to apply both the ECT and any other norms and principles stemming from international law including European law, at the same level. As pointed out by the *Electrabel* tribunal, in the event of any contradictions between European law and the ECT, EU law should prevail.

50.    The Respondent submits that any other position would be illogical[22] as the EU and its Member States have promoted the ECT.[23]  Furthermore, the ECT emanates from EU law and they both share the same purpose: to establish a common market on the basis of the principle of non-discrimination.[24] Thus, it would be contrary to EU Law that a Luxembourg citizen would have different rights than a Spanish citizen.[25]

### (3)    *Disconnection Clause*

51.    The Respondent also invokes the irrelevance of the inexistence of an explicit disconnection clause in the ECT:

> "*In this context, the notion that the ECT does not contain a disconnection clause, as is asserted by the Claimants in their*

---

[18] Respondent's Reply on Jurisdiction, p. 21, para. 38.
[19] Respondent's Reply on Jurisdiction, p. 21, para. 39.
[20] *Ibid.*, pp. 21-22, paras. 40-43.
[21] *Ibid.*, p. 23, para. 49.
[22] Hearing Transcript, 1st February 2016, pp. 88-89, 18-6.
[23] Respondent's Memorial on Jurisdiction, pp. 17-18, para. 55; Respondent's Reply on Jurisdiction, pp. 23-24, para. 51; Hearing Transcript, p. 63, 4-15.
[24] Hearing Transcript, 1st February 2016, p. 64, 18-11
[25] *Ibid.*, pp. 64-66, 10-17.

> *comments on the Request for Bifurcation, is meaningless. Obviously, and unlike bilateral treaties, which States can sign on their own behalf, in this case no disconnection clause was needed because the ECT was a multilateral treaty signed by the EU, together with the Member States, and obviously the latter could not subscribe to a treaty that was incompatible with EU law."* [26]

52.    At the hearing, the Respondent addressed a question by one of the members of the Tribunal as to why, if this principle was so vital for the EU, the ECT did not include a reserve or contemporary statement showing that the intention of the EU and its Members States was to formally exclude Part 3 of the ECT for application among EU Members. The Respondent replied that:

> *"So, the Commission asks the Court of Justice if it is adequate to introduce a disconnection clause, and the Court of Justice says no because, if we introduce this kind of provision, we would be admitting implicitly that some parts of the Treaty would bind us, and the ruling said yes, the EU is right, it is useless to introduce a disconnection clause because the Treaty intends to extend this system to other parties or Parties where there is already a harmonization within the European Union."* [27]

### *(4)    Relevance of Previous Awards*

53.    The Claimants argue that they are not aware of any case where the *Intra-EU* objection has been upheld by an arbitral tribunal or a national court [28]. However, the Respondent notes that the cases cited by the Claimants [29] mostly relate to bilateral investment treaties and not ECT, except for *Electrabel v. Hungary.* [30]

54.    However, the circumstances of the *Electrabel* case are different to those of the present proceeding. [31] In particular, the Respondent notes that both Spain and Luxembourg (the alleged State of origin of one of the Claimants in the present case) were *both* Member States of the EU at the time of negotiation and ratification of the ECT, [32] while in the case of *Electrabel*, Hungary was *not* an EU Member State when the ECT was concluded.

---

[26] Respondent's Memorial on Jurisdiction, p. 21, para. 64.
[27] Hearing Transcript, 1st February 2016, pp. 194-195, 14-1.
[28] Claimants' Reply to Respondent's Request for Bifurcation, p. 11, para. 40.
[29] *Ibid.*, para. 40.
[30] Respondent's Reply on Jurisdiction, p. 24, para. 54.
[31] Respondent's Memorial on Jurisdiction, p. 12, para 31.
[32] Respondent's Reply on Jurisdiction, pp. 24-25, paras. 55-60.

55.   Thus, the issue under discussion in *Electrabel* was whether the obligations assumed by Hungary towards the EC and its Member States pursuant to the ECT, should be considered overridden by the EU treaties when Hungary joined the EU, as provided for Articles 30 and 59 of the Vienna Convention. The issue in the present case is different as both States (Spain and Luxembourg) were part of the EC when the ECT was signed.

56.   Concerning the Claimants' reliance on the *PV Investors v. Spain* case, the Respondent noted during the hearing on jurisdiction █████████████████████████████████████ ████████████████████████████████████████████████████████

## B.   The Claimants' Position

### (1)   One of the Claimants Is Not an EU Member

57.   The Claimants submit that the Respondent's objection about the Tribunal's lack of jurisdiction to hear the claims of the Second Claimant does not extend to the First Claimant, as the latter is incorporated in Jersey, which is not part of the EU.[34]

### (2)   EU Preferential System – Primacy of EU Law

58.   The Claimants further argue that the ECT's recognition of the existence of a regional organisation does not deprive Investors of their rights under Article 26 of the ECT.[35] According to the Claimants, the reference to REIOs in Articles 1(2), 1(3) and 1(10) of the ECT serves to ensure that a claim can be brought against a REIO regarding a dispute arising out of an investment made in that area, and it by no means suggests that the multilateral treaty does not apply within the regional organisation absent a disconnection clause.[36]

59.   With respect to Article 1(3) of the ECT in particular, the Claimants submit that the Respondent wrongly interprets this provision to provide for the supremacy of EU law in cases where the EU Members States have transferred their competences to the EU. First, the Claimants clarify that energy is shared competence under EU law and thus, the EU

---

[33] Hearing Transcript, 1st February 2016, pp. 62-63, 20-2.
[34] Claimants' Counter-Memorial on Jurisdiction, p. 7, para. 20; Claimants' Rejoinder on Jurisdiction, p. 7, para. 20.
[35] Claimants' Counter-Memorial on Jurisdiction, pp. 12-14, paras. 38-43.
[36] *Ibid.*, p. 13, para. 41; Claimants' Rejoinder on Jurisdiction, pp. 10-11, para. 32 ███████

does not have exclusive competence on this field.[37] Second, the fact that the European Commission has criticized the measures adopted by the Kingdom of Spain suggests that these were not taken at the direction of the European Commission nor were they required by EU law.[38]

60.    The Claimants additionally contend that no other provisions in ECT could support the Respondent's claim of the EU's preferential investor protection.[39] Article 16 of the ECT provides that other norms can prevail when they are more favourable to the Investor or Investment.[40] In this respect, the substantive protection afforded by the ECT to investors and their investment is broader compared to the one afforded by the EU law, notably in the post-establishment phase.[41] This is also evident in the dispute settlement stage, where the ECT allows investors to bring direct claims against the Contracting Parties before an arbitral tribunal, in contrast to EU law, where the investor has to go through the domestic courts of the State where the investment has been made.[42] Therefore, if the ECT and EU treaties were found to have the same-subject matter, the ECT's more favourable provisions, including the right of investors to initiate arbitral proceedings against a Contracting Party, would take precedence over any conflicting provision of the EU treaties.[43]

61.    In any event, the Claimants assert that the ECT and EU law do not have the same purpose.[44] The ECT is not intended to create any single market,[45] and EU Law does not provide for any mechanism for investors to bring arbitration for a neutral forum.[46]

62.    Article 36(7) of the ECT is not of assistance to the Respondent either. According to the Claimants, the fact that Article 36(7) prevents a REIO from exercising its voting rights when its Member States exercise their own right to vote, confirms the Claimants' position

---

[37] Hearing Transcript, 1st February 2016, p. 232, 13-18.
[38] Hearing Transcript, 1st February 2016, p. 232, 19-22; p. 233, 1-2.
[39] Claimants' Rejoinder on Jurisdiction, pp. 10-13, paras. 32-38.
[40] Hearing Transcript, 1st February 2016, pp. 108-109, 9-22.
[41] Claimants' Counter-Memorial on Jurisdiction, pp. 17-18, paras. 53, 56.
[42] Ibid., paras. 54-56; Hearing Transcript, 1st February 2016, p. 107, 13-17.
[43] Claimants' Counter-Memorial on Jurisdiction, pp. 18-19, para. 56; Claimants' Rejoinder on Jurisdiction, p.12, paras. 34-35.
[44] Claimants' Counter-Memorial on Jurisdiction, p. 17, para 53; Hearing Transcript, 1st February 2016, p. 107, 11-12.
[45] Hearing Transcript, 1st February 2016, p. 235, 1.
[46] Ibid., p. 107, 13-15.

that the EU and its Member States were not intended to be regarded as one Contracting Party.[47]

63.    Furthermore, Article 26(6) of the ECT does not favour an intra-EU objection either. Although the EU Treaties qualify as international law for the purposes of Article 26(6) of the ECT, this is not the case for the EU secondary legislation, which is essentially equivalent to domestic law.[48] Additionally, the Claimants argue that, from a public international law perspective, EU law does not prevail over international law.[49] This is further illustrated in the practice of other ECT tribunals that have ruled on this issue before.[50]

64.    Finally, the Claimants submit that the unilateral interpretation / subjective intention of the European Commission or EU Member States is irrelevant to the interpretation of Article 26 of the ECT.[51] Citing multiple sources, the Claimants argue that "*what matters is the intention of the parties as expressed in the text*".[52] The Claimants submit that the ordinary meaning of Article 26 is clear and unambiguous and thus the Respondent wrongly attempts to resort to supplementary means of interpretation.[53]

### (3)    *Disconnection Clause*

65.    According to the Claimants, the Respondent's allegations that an express disconnection clause was not necessary based on the reasoning that, in a treaty where both the EU and its Member States subscribed, the latter could not have become member of a treaty that was incompatible with EU law, are unfounded.  This submission is not credible given that (i) prior to the conclusion of the ECT, the EU had used disconnection clauses where they were intended to apply;[54] (ii) the ECT contains disconnection clauses where they were intended to apply;[55] and (iii) had it been intended, the inclusion of a disconnection clause

---

[47] Claimants' Rejoinder on Jurisdiction, pp. 12-13, paras. 36-37.
[48] Hearing Transcript, 1st February 2016, p. 235, 9-20.
[49] *Ibid.*, 21-22; p. 236, 1-10.
[50] Claimants' Rejoinder on Jurisdiction, p. 13, para. 38.
[51] Claimants' Counter-Memorial on Jurisdiction, pp. 15-16, paras. 48-51; Claimant's Rejoinder on Jurisdiction, p. 16, paras. 49-52.
[52] Claimants' Counter-Memorial on Jurisdiction, pp. 15-16, paras. 48-49 (citing, I. Brownlie, *Principles of Public International Law* (6th ed., Oxford University Press, 2003), p. 602 (Authority CL-0173); WTO Appellate Body, *EC-Computer Equipment* (WT/DS62/AB/R, WT/DS67/AB/R and WT/DS68/AB/R), 5 June 1998, para. 84) (Authority CL-0130).
[53] Claimants' Counter-Memorial on Jurisdiction, pp. 16-17, paras. 50-51.
[54] *Ibid.*, pp. 19-21, paras. 58-63.
[55] *Ibid.*, pp. 19, 22, paras. 58, 64.

would have been particularly indispensable given the ordinary meaning of Article 26 of the ECT.[56]

66.    Accordingly, the Claimants are of the view that "*the disconnection clause argument is nothing more than an ex post invention of the European Commission*".[57] Whatever the case may be, the Claimants submit that such inconsistent practice clearly is not sufficient to establish the correct interpretation of the ECT.[58]

### (4)    Relevance of Previous Awards

67.    The Claimants further assert that all other tribunals which have considered the intra-EU objection have rejected it.[59]

68.    According to the Claimants, the Respondent's arguments that there are essentially two classes of Contracting Parties under the ECT: the old EU Member States v. the new ones, such as Hungary; and that, accordingly, previous ECT awards since *Electrabel* do not apply because they involved a non-EU Member State at the time, are not supported by the ECT.[60] Old EU Member States were aware at the time they signed the Treaty of both their EU obligations and the obligations they were signing up. They chose not to insert any provision in the Treaty to make it clear that the intra-EU disputes were not to be heard by international tribunals.[61]

69.    It follows from the above that arbitral tribunals can have jurisdiction between EU Member States. This has been confirmed by a number of tribunals and also by courts of the EU Member States, such as the German Courts, which in dealing with the challenge of the *Eureko v. Slovak Republic* award[62] also rejected the Intra-EU objection.[63]

---

[56] *Ibid.*, pp. 19, 21-22, paras. 58, 65-67
[57] Claimants' Rejoinder on Jurisdiction, p. 16, para. 50.
[58] *Ibid.*, para. 50.
[59] Claimants' Counter-Memorial on Jurisdiction, pp. 7-11, paras. 23-34, citing *Eastern Sugar B.V. v The Czech Republic*, SCC Case No. 088/2004, Partial Award, 27 March 2007, para. 180 (Authority CL-0102); *Eureko B.V. v The Slovak Republic*, PCA Case No. 2008-13, UNCITRAL (1976), Decision on Jurisdiction, 26 October 2010, para. 291 (Authority CL-0106); *Jan Oostergetel and Theodora Laurentius v The Slovak Republic*, UNCITRAL (1976), Decision on Jurisdiction, 30 April 2010, para. 109 (Authority CL-0110); and *Electrabel S.A. (Belgium) v The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, 30 November 2012, para. 5.60 (Authority CL-0024).
[60] Hearing Transcript, 1st February 2016, p. 102, 1-21.
[61] *Ibid.*, p. 103, 10-17.
[62] *Eureko B.V. v The Slovak Republic*, PCA Case No. 2008-13, UNCITRAL (1976), Decision on Jurisdiction, 26 October 2010, pp. 73-74, para. 274.
[63] Hearing Transcript, 1st February 2016, p. 97, 15-22.

70.  The Claimants also point to the *PV Investors v. Spain* award which concerned specifically the ECT and is relevant in the present case. This tribunal ████████████████ ████████████ In doing so, it held that ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

## C.  **Tribunal's Analysis**

### *(1)*  *General Principles*

71.  The main issue raised by the objection to the jurisdiction of the Tribunal based on the "*supremacy*" of the EU law is whether such alleged supremacy prevails over norms of international law.

72.  The Tribunal has no doubt that, in the relations between Member States of the EU that fall within the scope of the EU constitutional framework, the principle is that EU law prevails and this holds true for "*primary law*" (treaties) as well as for secondary rules. In this perspective there is no need to differentiate between both – subject however to the hierarchy of norms within the EU legal order in which international agreements concluded by the Union enjoy "*primacy over provisions of secondary Community [or EU] legislation*".[66]

---

[64] Claimants' Rejoinder on Jurisdiction, pp. 7-8, paras. 21-24.

█

████████████████████████████████████████████████████████

[66] CJEC, Judgment, 10 September 1996, *Commission v. Germany*, Case C-61/94, *ECR* I-4020-4021, para. 52. Moreover, by virtue of Article 216(2) TFEU, the EU accepts that the ECT is "*binding upon the institutions of the Union and on its Member State*" thus recognizing that the ECT produces its effects in the European legal order. Generally speaking, "*the European Community must respect international law in the exercise of its powers*" (CJEC, Judgment, 24 November 1992, C-286/90 *Poulsen and Diva Navigation* [1992] ECR I-6019, para. 9, or 16 June 1998, *A. Racke GmbH & Co v. Hauptzollamt Mainz*, Case C-162/96, *ECR* I-3704, para. 45) and the treaties it has ratified or which were previously binding upon Members States form part of the Community legal order and are legally binding for the EU and its Members States. See e.g. among the most emblematic Judgments of the CJEC: 12 December 1972, *International Fruit Company*, Joined Cases 21 to 24/72, ECR I-1227, para. 18; 10 September 1996, *Commission v. Germany*, Case C-61/94, *ECR* I-4020-4021, para. 52; 16 June 1998, *A. Racke GmbH* prec., para. 46; CJUE, Judgment, 19 February 2009, *Mehmet Soysal and Ibrahim Savatli v Bundesrepublik Deutschland*, Case C-228/06, para. 59; CJUE, Judgment, 13 November 2014, *Kingdom of Spain v European Commission*, Case T-481/11, para. 74.

16

73. Nor does the Tribunal question that the EU law as a whole (primary and secondary rules together) must be considered as being part of international law outside the EU legal order.

74. However, this Tribunal has been established by a specific treaty, the ECT, which binds both the EU and its Member States on the one hand and non-EU States on the other hand. As for the latter, EU law is *res inter alios acta* and it cannot be upheld that, by ratifying the ECT, those non-EU States have accepted the EU law as prevailing over the ECT. The ECT is the "*constitution*" of the Tribunal and, to use the terminology of the UNCITRAL tribunal in *PV Investors v. Spain*, ███████████████████████████████ ███████████████████████ This is what the Parties to the ECT agreed amongst themselves; it is not within the jurisdiction of the Tribunal to alter this.

75. Therefore, in case of any contradiction between the ECT and EU law, the Tribunal would have to insure the full application of its "*constitutional*" instrument, upon which its jurisdiction is founded. This conclusion is all the more compelling given that Article 16 of the ECT expressly stipulates the relationship between the ECT and other agreements – from which there is no reason to distinguish EU law. It follows from this that, if there must be a "*hierarchy*" between the norms to be applied by the Tribunal, it must be determined from the perspective of public international law, not of EU law. Therefore, the ECT prevails over any other norm (apart from those of *ius cogens* – but this is not an issue in the present case). In this respect, this Tribunal fully agrees with the position of the tribunal in *Electrabel*.[68]

76. This being said, and contrary to the position of the *Electrabel* tribunal,[69] the present Tribunal is of the opinion that, to the extent possible, in case two treaties are, equally or unequally, applicable, they must be interpreted in such a way as not to contradict each other. Such a cannon of interpretation is not different from that taken by the CJEC, which held that "[w]*hen the wording of secondary Community legislation is open to more than one interpretation, preference should be given as far as possible to the interpretation which renders the provision consistent with the Treaty* [...] *Similarly, the primacy of international agreements concluded by the Community over provisions of secondary*

---

█ ███████████████████████████████████████████████████████████ ██████████████████████████.

[68] *Electrabel S.A v. Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, pp. 35-36, para. 4.112.

[69] *Ibid.*, p. 40, para. 4.130.

*Community legislation means that such provisions must, so far as is possible, be interpreted in a manner that is consistent with those agreements*".[70] Such a harmonious or harmonizing interpretation is all the more compelling in the present case when, as rightly noted by the Respondent,[71] the EU played a predominant role in promoting and negotiating the ECT.[72] As observed by the tribunal in *Electrabel*, "*it would have made no sense for the European Union to promote and subscribe to the ECT if that had meant entering into obligations inconsistent with EU law*".[73] That observation is consistent with Article 207(3) TFEU, which requires the Council and the Commission to ensure that "*the agreements negotiated are compatible with internal Union policies and rules*".

77.    For these reasons, the Tribunal is of the view that such a process of interpretation does no violence to the text or spirit of either the ECT or EU law.

### (2)    *Application of the General Principles in the Present Case*

78.    The main provisions of, respectively, the ECT and EU law that are presented as conflicting with each other by the Parties are as follows:

> <u>*ECT*</u> *Article 26 (Settlement of disputes between an investor and a contracting party)*
>
> *(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.*
>
> *(2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:*
>
> *[…]*
>
> *(c) in accordance with the following paragraphs of this Article.*

---

[70] CJEC, Judgment, 10 September 1996, *Commission v. Germany*, Case C-61/94, *ECR* I-4020-4021, para. 52.
[71] Respondent's Memorial on Jurisdiction, pp. 17-18, para. 55; Respondent's Reply on Jurisdiction, pp. 23-24, para. 51; Hearing Transcript, p. 63, 4-15.
[72] Thomas Wälde, "*Arbitration in the Oil, Gas and Energy Field: Emerging Energy Charter Treaty Practice*" Transnational Dispute Management, 1 May 2004, p. 4.
[73] *Electrabel S.A v. Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, pp. 41-42, para. 4.133.

*[...]*

*(6) A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.*

*TFUE Article 344 (former Article 292 TEC)*

*Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.*

79. A simple reading of these provisions shows that they concern the settlement of two different kinds of disputes. Article 26 ECT is concerned only with the "*Settlement of Disputes between an Investor and a Contacting Party*". For its part, Article 344 TFUE deals with the submission of disputes concerning the interpretation of the EU founding treaties. As noted by the tribunal in *PV Investor*, ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████ In the view of this Tribunal, this difference of subject-matter of the two provisions is dispositive: there is no conflict between them.

80. The settled opinions of other tribunals endorse the view that it cannot be reasonably maintained that Article 344 TFEU sets up an "*interpretative monopoly*" in favour of the EUCJ. International tribunals have convincingly shown that there exist a number of contexts where other judicial or arbitral bodies can and are called upon to interpret and apply EU law.[75] As the EUCJ itself noted:

> "*Nor can the creation of the PC [European and Community Patents Court] be in conflict with Article 344 TFEU [formerly Article 292 EC], given that that article merely prohibits Member States from submitting a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties. The jurisdiction which the*

---

■ ████████████████████████████████████████████ ██████████████████

[75] See e.g.: *Emilio Agustin Maffezini v Kingdom of Spain,* ICSID Case No. ARB/97/7, Award, 13 November 2000, p. 23, para. 69; *Eureko B.V. v The Slovak Republic*, PCA Case No. 2008-13, UNCITRAL, Decision on Jurisdiction, 26 October 2010, p. 75, para. 282; *Electrabel S.A v. Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, p. 46, para. 4.147; *Charanne and Construction Investments v. Kingdom of Spain*, SCC No. 062/2012, Award, 21 January 2016, pp. 122-123, paras. 443-445.

> *draft agreement intends to grant to the PC relates only to disputes between individuals in the field of patents*".[76]

81.  The Tribunal is also not convinced by the Respondent's argument about the existence of an "*implicit disconnection clause*" in Article 26.

82.  The purpose of a disconnection clause is to make clear that EU Member States will apply EU law in their relations *inter se* rather than the convention in which it is inserted.[77] Absent such a clause in a multilateral treaty, it is intended to be integrally applied by the EU and its Member States. It has not been challenged that no such clause has been included in the ECT. According to the Respondent, the inclusion of such a clause would be meaningless when "*the envisaged agreement covers areas in which there has been total harmonisation*".[78] In the Tribunal's view, given that there is no disharmony or conflict between the ECT and EU, as noted above, there was simply no need for a disconnection clause, implicit or explicit.

83.  The Tribunal agrees with the tribunal in the *Charanne* case:

> "*that the Contracting Parties to the ECT had no need to agree on a disconnection clause, be it either implicitly or explicitly. The purpose of a disconnection clause would be to resolve a conflict between the ECT and the TFUE. However, there is no conflict between both treaties. As it stated in previous paragraphs of this award, the Arbitral Tribunal's jurisdiction to decide a complaint filed by an investor of a EU member State against another member State of the EU based on the allegedly illicit character of actions carried out in the exercise of national sovereignty is perfectly compatible with the participation of the EU as REIO in the ECT. And, as explained in subsequent paragraphs of this award, there is no rule of EU law which prevents Member States of the EU to resolve by arbitration their disputes with investors from other Member States. Nor is there any rule of EU law that*

---

[76] ECJ (Full Court), Opinion, 8 March 2011, Request to the Court for an Opinion pursuant to Article 218(11) TFEU, made on 6 July 2009 by the Council of the European Union, Opinion 1/09, para. 63 – emphasis added.

[77] "*The purpose of the clause is, according to the European Commission, to ensure the continuing application of Community rules between EC member States without any intent to affect the obligations between member States and other parties to treaties*" (*Report of the Study Group of the International Law Commission, Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law*, UN doc. A/CN.4/L.682, pp. 147-148, para. 289); "*El objeto de dicha cláusula desvincular los Miembros, en sus relaciones entre ellos, del TCE*" (*Charanne and Construction Investments v. Kingdom of Spain*, SCC No. 062/2012, Award, 21 January 2016, p. 119, para. 433. (Tribunal's translation: "*The purpose of such a clause would be to unbound from the ECT the Member States in their relations between them.*").

[78] See Respondent's Reply on jurisdiction, paras.89-90; Hearing Transcript, 1st February 2016, pp. 194-195, 14-1.

> *prevents an arbitral tribunal to apply EU law to resolve such dispute".* [79] [Tribunal's translation]

84. The decisions of the ECCJ or the EUCJ relied upon by the Respondent in this respect were based on a very narrow definition of the notion of disconnection clause, related only to the issue of the respective competences of the EU and its Members States. This is not at issue in the present case, of course. However, when the very essence of a treaty to which the EU is a party is at issue, such as it would be for the ECT if the interpretation proposed by the Respondent were correct, then precisely because the EU is a party to the treaty a formal warning that EU law would prevail over the treaty, such as that contained in a disconnection clause, would have been required under international law.

85. This follows from the basic public international law principle of *pacta sunt servanda*. If one or more parties to a treaty wish to exclude the application of that treaty in certain respect or circumstances, they must either make a reservation (excluded in the present case by Article 46 of the ECT)[80] or include an unequivocal disconnection clause in the treaty itself. The attempt to construe an implicit clause into Article 26 of the ECT is untenable, given that that article already contains express exceptions to the "*unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article*" that had been agreed amongst the States Party.[81]

---

[79] *Charanne and Construction Investments v. Kingdom of Spain*, SCC No. 062/2012, Award, 21 January 2016, pp. 120-121, para. 438 –; Spanish original: "*En realidad, el Tribunal considera que las Partes Contratantes en el TCE no tenían ninguna necesidad de pactar une cláusula de desconexión, sea implícita o explícita. El papel de una cláusula de desconexión sería, en efecto, el de resolver un conflicto entre el TCE y el TFUE. Sin embargo, no existe ningún conflicto entre los dos tratados. Como se ha dicho en apartados anteriores del presente laudo, la competencia del Tribunal Arbitral para decidir sobre una demanda presentada por un inversor de un país miembro de la UE contra otro país miembro de la UE con base en el carácter supuestamente ilícito de actuaciones realizadas en el ejercicio de su soberanía nacional es perfectamente compatible con la participación de la UE como ORJE en el TCE. Y como veremos en sucesivos apartados del presente laudo, no existe ninguna norma de derecho de la UE que impida a Estados Miembros de la UE que impida a Estados Miembros de la UE resolver mediante arbitraje sus controversias con inversores de otros Estados Miembros. Tampoco existe norma alguna de derecho de la UE que impida a un tribunal arbitral aplicar el derecho de la UE para resolver semejante disputa.*"

[80] The very fact that reservations are excluded by Article 46 tends to confirm the intent of the Contracting Parties to have the ECT unconditionally and integrally applied by all the Parties whether States or regional organisations.

[81] See e.g.: Article 26 (3)(b)(i): "*The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).*" and "*(c) A Contracting Party listed in Annex IA does not give such unconditional consent with respect to a dispute arising under the last sentence of Article 10(1)*". See also the "*Svalbard disconnection clause*" as described by *AES Summit Generation Limited and AES-Tisza EROMU KFT v. The Republic of Hungary*, ICSID Case No. ARB/07/22, p. 28, para. 79: "*This is further corroborated by the fact that the ECT Contracting Parties have provided for a conflict rule, in relation to another treaty, i.e. the treaty concerning Spitsbergen of 1920 (the Svalbard Treaty). Decision 1 with Respect to the ECT (Annex 2 to the Final Act of the European Energy Charter Conference) provides that 'in the event of a conflict between the treaty concerning Spitsbergen ... and the ECT, the treaty of Spitsbergen shall prevail*

86.   Lastly, to recognize the existence of an implicit disconnection clause in Article 26 of the ECT would put into question the function of explicit disconnection clauses when they exist. Moreover, the absence of an explicit disconnection clause in the ECT would naturally lead to the inevitable conclusion that, when negotiating the ECT, the EU considered that there were and would be no inconsistencies between both *juris corpores* and therefore such a clause would have been otiose.[82]

87.   The Tribunal observes, however, that should it ever be determined that there existed an inconsistency between the ECT and EU law – *quod non* in the present case – and absent any possibility to reconcile both rules through interpretation, the unqualified obligation in public international law of any arbitration tribunal constituted under the ECT would be to apply the former. This would be the case even were this to be the source of possible detriment to EU law. EU law does not and cannot "*trump*" public international law.

*(iii) Conclusion of the Tribunal on the "Intra-EU" Objection*

88.   For the foregoing reasons, the Tribunal rejects the Respondent's objection to its jurisdiction based on the intra-EU character of the dispute.

89.   The Tribunal wishes to stress that it has reached this conclusion (and, indeed, all of its conclusions) after careful study of the pleadings of the Parties to this case and without regarding itself as bound by previous awards or decisions rendered by other tribunals on similar arguments. This being said, the Tribunal underlines that in all published or known investment treaty cases in which the intra-EU objection has been invoked by the Respondent, it has been rejected.[83] The present decision on this point therefore falls squarely within the continuity of this consistent pattern of decision-making by international tribunals.

90.   The Tribunal takes note of the Claimants' argument that EU law is not applicable to RREEF Infrastructure (G.P.) Limited, which is incorporated in Jersey. However, since

---

to the extent of the conflict...' No such provision exists regarding conflicts between the ECT and the EC Treaty*"; see also: *Charanne and Construction Investments v. Kingdom of Spain*, SCC No. 062/2012, Award, 21 January 2016,  p. 119, para. 433.

[82] For a similar conclusion, but based on a different reasoning, see: *Charanne and Construction Investments v. Kingdom of Spain*, SCC No. 062/2012, Award, 21 January 2016, pp. 120-121, para. 438.

[83] Claimants' Counter-Memorial on Jurisdiction, pp. 7-8, paras. 23-24; Claimants' Rejoinder on Jurisdiction, pp. 7-8, paras. 22-23. *Adde: Charanne and Construction Investments v. Kingdom of Spain*, SCC No. 062/2012, Award, 21 January 2016, pp. 116-125, paras. 424-450.

the Respondent's objection based on EU law is dismissed in its entirety, it answers the argument. There is thus no need for the Tribunal to address this further.

## V.    THE DAMAGES OBJECTION

### A.    The Respondent's Position

#### (1)    *Illegitimacy of the Shareholders' Claim to be Compensated for Alleged Damage to the Companies in which Shares are Held (Reflected Loss)*

91.    According to the Respondent, the Claimants confound their dispute, investment and possible losses with those of the companies owning the plants. Furthermore, the Claimants attribute to themselves rights to receive an income that in fact belong to such companies.[84]

92.    The Respondent states that while the shareholders have the right to receive returns on their investment in a company through the distribution of profits, they do not have the right to take legal actions for losses suffered by it. Any legal actions should be brought by the company itself. [85]

93.    The Respondent further argues that the general principle of the non-recognition of shareholder claims, known as the "*no reflective loss*" is accepted as customary international law and by all advanced national systems of commercial law. According to this principle, any claim for losses should be made by the company and the shareholder's standing is limited to cases of direct damages to the shareholder's own rights (*i.e.* acts by a State limiting the shareholder's voting rights, rights to profit sharing, etc).[86]

94.    In the field of international law, this principle was first recognised in the *Barcelona Traction* case[87] and ratified by the International Court of Justice ("ICJ"), citing its previous rulings, in the *Diallo* case.[88]

95.    The same principle has been consistently recognised by the European Court of Human Rights  ("ECtHR") (see *i.e.* the *Olczak v. Poland* case)[89] and in arbitration proceedings,

---

[84] Respondent's Memorial on Jurisdiction, p. 35, paras. 137-138.
[85] *Ibid.*, paras. 138 and 141.
[86] Respondent's Memorial on Jurisdiction, p. 36, para. 142.
[87] *Ibid.*, para. 143.
[88] Respondent's Memorial on Jurisdiction, p. 37, para. 144.
[89] *Ibid.*, pp. 37-38, para. 145.

such as *ST-AD GmbH v. Republic of Bulgaria,* in which the Arbitral Tribunal observed that:[90]

> *"[...] It has been repeatedly held by arbitral tribunals that an investor has no enforceable right in arbitration over the assets and contracts belonging to the company in which it owns shares."[91]*

### (2)    The Jurisdiction of the Tribunal only Extends to the Dispute concerning the Loss of Value of the Shares

96.    The Respondent submits that the above does not mean that shareholders do not have legitimacy to submit claims to an arbitral tribunal but such legitimacy only extends to the loss of value of the shares held by the shareholders as result of measures taken by the host State.[92]

97.    The Respondent argues that all advanced systems of commercial law include the principle of non-recognition of shareholders' standing to claim compensation for reflected loss so the principle is widely accepted as part of customary international law. Moreover, both the Luxembourg and the Spanish legal systems, also recognize the distinction between shareholders and companies, and between the separate rights and obligations of each of them.[93] The principle is also reflected in Article 25(1) and 25(2)(b) of the ICSID Convention and Article 26(7) of the ECT.[94]

98.    The Respondent further argues that it is completely different to evaluate damages sustained by a company than to evaluate damages sustained by a shareholder.[95]

> *"In other words, an investor whose investment consists of shares cannot claim, for example, that the assets of the company are its property and ask for compensation for interference with these assets. Such an investor can, however, claim for any loss of value of*

---

[90] *Ibid.*, p. 38, para. 146.

[91] Fn. 70, *ST-AD GmbH v. Republic of Bulgaria*, PCA Case No. 2011-06, UNCITRAL, Award on Jurisdiction, 18 July 2013, para. 278.

[92] Respondent's Memorial on Jurisdiction, p. 38, para. 147

[93] *Ibid.*, fn. 73, referring to the Consolidated Text of the Corporation Act approved by Royal Legislative Decree 1/2010, of 2 July (R-0021), and *Loi du 10 août 1915, concernant les sociétés comerciales* by Luxembourg (R-0022). Spanish and Luxembourg laws expressly and exclusively attribute to company management the capacity to legally represent the company, both in court and outside it (respectively, Articles 233 and 191).

[94] Respondent's Memorial on Jurisdiction, pp. 40-41, paras. 162-168.

[95] Hearing Transcript, 1st February 2016, p. 202, 4-12.

> *its shares resulting from an interference with the assets or contracts*
> *of the company in which it owns the shares [...]."*[96]

99. The Respondent submits that in this case the alleged investment by the two Claimants would be: i) an indirect participation (through Dutch branches) in the shares of Spanish companies owning the plants (Article 1.6 (b) of the ECT); and ii) an indirect shareholding (through its Dutch branches) in the credits of the shareholders in each of the Spanish companies owning the plants (Article 1.6 (b) of the ECT).[97]

100. Thus, according to the Respondent, the alleged investment of the Claimants "*would not affect*":

    (i)      the facilities or the Plants;

    (ii)     the credits of the Spanish companies owning the plants;

    (iii)    the alleged rights granted to the Spanish companies by RD 661/2007; or

    (iv)    income of any nature from the Spanish companies owning the plants.

101. The Claimants state that all of the above are assets belonging to the Spanish companies that own the plants.[98] Instead, according to the Respondent, the sole "incomes" that the Claimants may obtain from their investments are the dividends or benefits generated by their indirect stake in the Spanish companies and the interest on the shareholders' loans.[99]

102. The Respondent further alleges that Claimants have prompted this confusion. On one hand, the Claimants allege that they have incurred in "*substantial indebtedness and stake in the projects*".[100] On the other hand, they define their investment so broadly[101] that they mistake their legal personality with that of the Spanish companies, as if the latter were parties in this arbitration.[102]

---

[96] *ST-AD GmbH v. The Republic of Bulgaria*, PCA Case No. 2011-06, UNCITRAL, Award on Jurisdiction, 18 July 2013, para. 282. Referred to in Respondent's Memorial on Jurisdiction, p. 38, para. 148.
[97] Respondent's Reply on Jurisdiction, pp. 35, para. 111.
[98] *Ibid.*, para. 112.
[99] *Ibid.*, para. 113.
[100] Respondent's Reply on Jurisdiction, fn. 56, referring to para. 81 of the Claimants' Counter-Memorial on Jurisdiction.
[101] *Ibid.*, fn. 57, referring to paras. 96 and 97 of the Claimants' Counter-Memorial on Jurisdiction.
[102] *Ibid.*, p. 38, para. 119.

*(3)*      *"Two Bites of the Apple"*

103. Respondent contends that a claim filled by the plant companies before the Spanish Supreme Court may lead to a double recovery, contrary to good faith.[103]

104. Furthermore, according to the Respondent, in the event that the Constitutional Court annuls the challenged measures, the former economic regime would apply and the plants would continue receiving remuneration pursuant to Royal Decree 661/2007. In this scenario the plants wouldn't have sustained any damages and the Claimants would be able to claim for damages that were never sustained.[104]

105. The Respondent contends that the Tribunal's jurisdiction must be limited solely to considering the possible loss in value of the shares and credits that the Claimants allegedly hold in the Spanish companies. However, before making that determination it would have to be proved that the Claimants are investors with an investment for purposes of the ECT and that the Respondent has breached the ECT. The Respondent rejects all these allegations.[105]

**B.    The Claimants' Position**

*(1)      Legitimacy of the Shareholders' Claims*

106. In response to the Respondent's assertions that the Tribunal has no jurisdiction over claims for "*reflective loss*", the Claimants counter that international investment law permits such claims.[106] According to the Claimants, investment treaty tribunals have consistently recognised the right of a shareholder to bring a claim that is independent from that of the locally incorporated company.[107] The Claimants further submit that the

---

[103] Respondent's Memorial on Jurisdiction, pp. 42-43, paras. 169-172.
[104] Hearing Transcript, 1st February 2016, p. 25, 1-7.
[105] Respondent's Reply on Jurisdiction, p. 39, para. 125.
[106] Claimants' Counter-Memorial on Jurisdiction, pp. 24-30, paras. 72-91.
[107] *Ibid.*, pp. 24-28, paras. 72-84 (citing, *inter alia*, *ST-AD GmbH v Republic of Bulgaria*, PCA Case No. 2011-06, UNCITRAL (2010), Decision on Jurisdiction, 18 July 2013, para. 282 (Exhibit CL-0148); *Suez, Sociedad General de Aguas de Barcelona S.A. & Inter Aguas Servicios Integrales del Agua S.A. v Argentine Republic*, ICSID Case No. ARB/03/17, Decision on Jurisdiction, 16 May 2006, para. 51 (Exhibit CL-0143); *Enron Corp. & Ponderosa Assets, L.P. v Argentine Republic*, ICSID Case No. ARB/01/3, Decision on Jurisdiction (Ancillary Claim), 2 August 2004, paras. 39 and 49 (Exhibit CL-0142); *Lanco International Inc. v Argentine Republic*, ICSID Case No. ARB/97/6, Decision on Jurisdiction, 8 December 1998, paras. 12-14 (Exhibit CL-0144); *CMS Gas Transmission Company v Argentine Republic*, ICSID Case No. ARB/01/8, Decision on Jurisdiction, 17 July 2003, para. 36 (Exhibit CL-0141); *Azurix Corp. v Argentine Republic*, ICSID Case No. ARB/01/12, Decision on Jurisdiction, 8 December 2003, para. 62 (Exhibit CL-0095); *Azurix Corp. v Argentine Republic*, ICSID Case No.

Respondent wrongly relies on the *Barcelona Traction* case, because the latter is relevant only in the context of diplomatic protection and does not extend to treaty-based arbitration.[108] With respect to the Respondent's argument on the application of the principle of separation of legal personality between a company and its shareholders, the Claimants argue that the recognition of this principle in the sphere of national law cannot limit the Claimants' legal rights against Spain under the ECT and international law.[109] This principle only becomes relevant when a shareholder's claim overlaps with a company's claim, which is not the case.[110]

107.  Additionally, the Claimants argue that the ECT and the ICSID Convention do not bar claims for reflective loss.[111] In the Claimants' view, the Respondent's reading of Article 26(7) of the ECT ignores the plain language of Article 26(7) which provides that a locally-incorporated company, controlled by investors of another Contracting Party, shall "*for the purpose of article 25(2)(b) of the ICSID Convention be treated as a 'national of another Contracting State' and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a 'national of another State'*".[112] A good faith interpretation of the ordinary meaning of the terms of Article 26(7) suggests that the latter grants a foreign controlled, locally-incorporated company the possibility to have recourse only to ICSID arbitration or ICSID Additional Facility arbitration, but not to arbitration under the UNCTIRAL or SCC Rules for which no mention is made in the Treaty.[113]

108.  According to the Claimants, it is unquestionable that a foreign shareholder has standing to bring treaty claims in ICSID against the host State for measures affecting or directed at the locally-incorporated entity in which they invested.[114] In support of this proposition, the Claimants rely on several arbitral awards.[115]

---

ARB/01/12, Decision on Annulment, 1 September 2009, para. 108 (CL-0145); *Nykomb Synergetics Technology Holding AB v Republic of Latvia*, SCC, Award, 16 December 2003, para. 9, Section 2.4(a) (Exhibit RL-0033).

[108] Claimants' Counter-Memorial on Jurisdiction, pp. 24, 28-29, paras. 72, 85-88.

[109] *Ibid.*, p.30, para. 90.

[110] *Ibid.*, p. 30, para 91.

[111] *Ibid.*, pp. 30-36, paras. 92-116.

[112] *Ibid.*, p. 33, para. 105; Claimants' Rejoinder on Jurisdiction, p. 23, para. 76 (citing The Energy Charter Secretariat, *The Energy Charter Treaty and Related Documents: A Legal Framework for International Energy Cooperation,* (2004), Article 26(7) Energy Charter Treaty, (Exhibit C-001).

[113] Claimants' Counter-Memorial on Jurisdiction, p. 33, para. 105.

[114] *Ibid.*, p. 34, para. 107.

[115] *Camuzzi International S.A. v. Argentine Republic*, ICSID Case No. ARB/03/2, Decision on Jurisdiction, 11 May 2005, para. 32 (Exhibit CL-0138); *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Decision on Annulment, 25 September 2007, para. 74 (Exhibit CL-0137); *Teinver S.A., Transportes*

109.  The Claimants note that the Respondent's only complaint appears to be that the Claimants consider their investments to include the underlying assets and rights held by the Project Companies.[116] On the contrary, the Respondent does not contest that the Claimants maintain substantial debt and equity interests in the relevant Project Companies, nor does it contest that these assets qualify as the Claimants' investments for the purposes of the ECT or the ICSID Convention.[117] In this regard, the Respondent wrongly submits that the Claimants do not hold qualifying investments in "*the facilities or the Plants*", "*the credits…of the Spanish companies owning the plants*", "*the alleged rights granted by RD 661/2007 to the Spanish companies…*" or "*income of any nature from the Spanish companies*". In arguing so, the Claimants quote Mr Stanimir Alexandrov who states that it is "*beyond doubt that a shareholder's interest in a company includes an interest in the assets of that company, including its licenses, contractual rights, rights under law, claims to money or economic performance …*".[118]

110.  The Claimants also refer to the long-standing practice of ICSID tribunals which deny to distinguish between the shareholders' direct ownership of their shares and their indirect rights in the assets of the local company.[119] The Claimants particularly point to the *Azurix v. Argentina* tribunal[120] which held that the claimant's investment consisted of both its shareholding interest and the rights held by the concessionaire.[121]

### (2)    *"Two Bites of the Apple"*

111.  In response to the Respondent's allegations, the Claimants clarify that only the *Dédalo Companies* have commenced proceedings in Spain, notwithstanding RREEF's vote

---

*de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v. Argentine Republic*, ICSID Case No. ARB/09/1, Decision on Jurisdiction, 21 December 2012, para. 222 (Exhibit CL-0140).

[116] Claimants' Rejoinder on Jurisdiction, pp. 21, para. 70 (citing Respondent's Reply on Jurisdiction, paras. 104-105).

[117] *Ibid.*, p. 22, para. 71.

[118] *Ibid.*, p. 22, para. 72. Fn. 101, Stanimir Alexandrov, "*The Baby Boom' of Treaty-Based Arbitrations and the Jurisdiction of ICSID Tribunals: Shareholders as 'Investors' under Investment Treaties*" (2005), Transnational Dispute Management 5 (2006), pp. 406-407 (Exhibit CL-0191).

[119] Claimants' Rejoinder on Jurisdiction, pp. 22-23, para. 74 (citing *CMS Gas Transmission Company v The Argentine Republic,* ICSID Case No. ARB/01/8, Decision on Application for Annulment, 25 September 2007 (Exhibit-CL-0141); *Camuzzi v The Argentine Republic [1]*, ICSID Case No. ARB/03/2, Decision on Jurisdiction, 11 May 2005 (Exhibit CL-0138); and *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v The Argentine Republic,* ICSID Case No. ARB/09/1, Decision on Jurisdiction, 21 December 2012 (Exhibit CL-0140).

[120] *Azurix Corp. v. The Argentine Republic,* ICSID Case No. ARB/01/12, Decision on Jurisdiction, 8 December 2003, para. 63.

[121] Claimants' Rejoinder on Jurisdiction, pp. 22-23, para. 74.

against this decision.[122] In any event, the Claimants have a separate cause of action under the ECT with respect to their investments, and therefore, their rights can be asserted independently from the rights that the Project Companies have as a matter of Spanish law.[123]

112. Additionally, the Claimants are of the view that this is not a question of jurisdiction, but of computation of damages. However, they hasten to clarify that they do not intend to seek double recovery. Had the Claimants not suffered damages because of the annulment of the decision by the Constitutional Court, they would not seek damages from this Tribunal.[124]

## C.    Tribunal's Analysis

113. Although the Tribunal considers that the present objection is not entirely distinguishable from the one based on the non-existence of an investment, it will examine both in turn since the Parties have discussed them separately.

114. The "*damages objection*" is summarized as follows by the Respondent: "*Lack of jurisdiction ratione personae of the Arbitral Tribunal to hear the claim for alleged damages to renewable-energy plants, since the legitimacy to make such a claim corresponds exclusively to the companies that own these plants, and these companies are not party to the present arbitration*".[125] Under this general heading, the Respondent also complains of the Claimants' "*fraudulent attempt to obtain 'two bites of the apple*'"[126]. Although linked, these are two distinct arguments which must be discussed separately.

---

[122] Claimants' Counter-Memorial on Jurisdiction, p. 37, para. 119.
[123] Claimants Counter-Memorial on Jurisdiction, p. 37, para. 120.
[124] Hearing Transcript, 1st February 2016, p. 121, 8-18.
[125] See Respondent's Memorial on Jurisdiction, p. 32, Section C. But the expression *ratione personae* seems to be a simple drafting or translation mistake since the Spanish text mention "*Falta de jurisdicción ratione materiae*"; in its Rejoinder, the Respondent describes the same objection as being made *rationa materiae*. It is in reality of a mixed nature: the first branch of the objection concerns the holder of the right to claim for reparation (and so does the next objection), while the second branch deals with the very existence of the alleged harm.
[126] Respondent's Memorial on Jurisdiction, pp. 42-46, paras. 169-190; Respondent's Reply on Jurisdiction, p. 38, (4). pp. 38-39, paras. 121-124.

### (1)      On the Shareholders' Right to Bring Claims before the Tribunal

115. The debate between the Parties on the first branch of the objection bears on the most classical question concerning the standing of foreign shareholders to claim compensation.

116. The Respondent's case is straightforward: "*no compensation may be claimed by shareholders of companies for alleged damages to the assets of the same companies*".[127] However, this first statement must be read in conjunction with the one which immediately follows: "*The Kingdom of Spain does not deny that the shareholders of the companies have locus standi to apply to an Arbitral Tribunal for compensation for damages incurred directly to their real investment*".[128] Quoting the ICJ's position in the *Barcelona Traction* case, the Respondent asserts that "[s]*o long as the company is in existence the shareholder has no right to the corporate assets*".[129]

117. However, the Respondent accepts that:

> "*this does not mean that shareholders do not have legitimation to appeal to an Arbitral Tribunal with respect to the case in which an investment has been made. What it means is that in such cases the legitimation of the shareholders and the jurisdiction of the Tribunal only extends to the dispute concerning the loss of value of the shares held by the Claimants as a result of measures taken by the host State with respect to the assets of the company in which the Claimants hold shares*".[130]

> And quoting from the Ruling given in the *ST-AD GmbH v. Republic of Bulgaria* case, the Respondent acknowledges that an investor whose investment consists of shares can claim for any loss of value of its shares resulting from an interference with the assets or contracts of the company in which it owns the shares.[131]

118. In the Tribunal's understanding, the Claimants' position is similar as far as the principles are concerned. Commenting on the above-quoted passages of the Respondent's Memorial

---

[127] Respondent's Memorial on Jurisdiction, p. 33, para. 127.
[128] *Ibid.*, para. 129.
[129] ICJ, Judgment, 5 February 1970, *Barcelona Traction, Light and Power Company, Limited* (Belgium v. Spain) (New Application: 1962), Second Phase, *ICJ Rep.*, p. 34, para. 41, quoted *ibid.* at para. 143.
[130] *Ibid.*, para. 147.
[131] *ST-AD GmbH v. Republic of Bulgaria*, PCA Case No. 2011-06, UNCITRAL, Jurisdiction Award, 18 July 2013, para. 278, quoted in Respondent's Memorial on Jurisdiction, p. 38, para. 148.

on jurisdiction, they explain: "*This is exactly what the Claimants are doing in this case*".[132]

119.  However, the Parties differ as to the relevance of the ICJ's case-law in respect to the issue under review. The Tribunal does not agree with the Claimants' assertion – in line with a probably majority view in the case-law[133] – that the positions taken by the World Court are irrelevant in that they concern diplomatic protection.[134] Indeed they do. But there is no reason to set aside the Court's findings when it comes to the definition and scope of such rights. In reality, the two basic principles resulting from the ICJ's jurisprudence remain fully enlightening and applicable:

   (i)    "*So long as the company is in existence the shareholder has no right to the corporate assets*"[135]; but

   (ii)   "*The situation is different if the act complained of is aimed at the direct rights of the shareholder as such.*"[136]

---

[132] Claimants' Counter-Memorial on Jurisdiction, p. 23, para. 70(a); see also pp. 24-25, para. 74.

[133] See e.g.: *CMS Gas Transmission Company v. The Republic of Argentina*, ICSID Case No. ARB/01/8, Decision on Objections to Jurisdiction, 17 July 2003, para. 42; *LG&E Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Objections to Jurisdiction, 30 April 2004, p. 16, para. 52; *Gami Investments, Inc. v. United Mexican States*, NAFTA & UNCITRAL, Final Award, 15 November 2004, p. 16, para. 31; *Camuzzi International S.A. v. Argentine Republic*, ICSID Case No. ARB/03/2, Decision on Jurisdiction, 11 May 2005, p. 37, paras. 141-142; *Sempra Energy International v. The Argentine Republic*, ICSID Case No. ARB/02/16, Decision on Objections to Jurisdiction, 11 May 2005, pp. 42-43, paras. 152-153; *Suez, Sociedad General de Aguas de Barcelona S.A., and InterAguas Servicios Integrales del Agua S.A. v. The Argentine Republic*, ICSID Case No. ARB/03/17, Decision on Jurisdiction, 16 May 2006, pp. 27-28, paras. 50-51; *El Paso Energy International Company v. The Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011, p. 61, para. 206; *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v. The Argentine Republic,* ICSID Case No. ARB/09/1, Decision on Jurisdiction, 21 December 2012, pp. 49-51, paras. 215-221. For the opposite view, see however: *Société Générale In Respect of DR Energy Holdings Limited and Empresa Distribuidora de Electricidad del Este, S. A. v. The Dominican Republic*, LCIA Case No. UN 7927, UNCITRAL, Award on Preliminary Objections to Jurisdiction, 19 September 2008, p. 34, para. 109: "*109. The fact that such treaties have substituted for diplomatic protection and may even prohibit its exercise by the States that are parties to them, does not mean that the basic principles have also been automatically derogated as it is rather the means for materializing an international claim that have changed but not in all aspects its substantive requirements.*"; for similar views, see also: *Loewen Group Inc. & Roy Loewen v. United States*, ICSID Case No. ARB(AF)98/3, Award, 25 June 2003,  p. 64, para. 226; *Archer Daniels Midland Company and Tate & Lyle Ingredients Americas, Inc. v. The United Mexican States*, ICSID Case No. ARB(AF)/04/05, Award, 21 November 2007, pp. 43-44, para. 119 or  *European American Investment Bank AG v. The Slovak Republic*, PCA Case No. 2010-17, Award on Jurisdiction, 22 October 2012, p. 109, para. 331; or *Yukos Universal Limited (Isle of Man) v The Russian Federation,* PCA Case No. AA 227, Final Award, 18 July 2014, p. 452, para. 1425.

[134] Claimants' Counter-Memorial on Jurisdiction, p. 24, para. 72 and pp. 28-29, paras. 85-88.

[135] ICJ, Judgment, 5 February 1970, *Barcelona Traction, Light and Power Company, Limited* (Belgium v. Spain) (New Application: 1962), Second Phase, *ICJ Rep.*, p. 34, para. 41. See also: ICJ, Judgment, 24 May 2007, *Ahmadou Sadio Diallo* (Republic of Guinea v. Democratic Republic of the Congo), Preliminary Objections, *ICJ Rep. (II)*, p. 606, para. 63. or  ICJ, Judgment, 30 November 2010, *Ahmadou Sadio Diallo* (Republic of Guinea v. Democratic Republic of the Congo), Merits, *ICJ Rep.*, p. 676, para. 105.

[136] *Ibid.*, p. 36, para. 47.See also: ICJ, Judgment, 20 July 1989, *Elettronica Sicula S.p.A. (ELSI)* (United States of America v. Italy), *ICJ Rep.*,e.g. pp. 55, 57, 70, 71 and 81, paras. 83, 89, 118 and 135.

120.  In both *Barcelona Traction* and in *Diallo* the ICJ adopted a restrictive definition of the shareholder's direct rights.[137] This is controversial and has been criticized in the context of the public international law related to investment protection. Thus, as early as 2007, the *ad hoc* committee in the *CMS* case held that: "*whether the locally incorporated company may itself claim for the violation of its rights under contracts, licenses or other instruments, in particular under Article 25(2)(b) of the ICSID Convention, does not affect the right of action of foreign shareholders under the BIT in order to protect their own interests in a qualifying investment, as recognized again in many ICSID awards*".[138] And, even more categorically, the tribunal in the *RosInvestCo v. Russia* case stated unambiguously "*that modern investment treaty arbitration does not require that a shareholder can only claim protection in respect of measures that directly affect shares in their own right, but that the investor can also claim protection for the effect on its shares by measures of the host state taken against the company*".[139] In this perspective, whether the investment treaty is a BIT or the ECT does not change the situation: shareholders have a *jus standi* to act before arbitral tribunals in their character as shareholders.

121.  In this respect, the position of the ECtHR also deserves attention. In the *Olczak v. Poland* case (invoked by the Respondent), the Court found that "*shares in a public company have an economic value and, therefore, are to be regarded as "possessions" within the meaning of Article 1 of Protocol No. 1 to the Convention*" (para. 60). Furthermore, the ECtHR concluded, "*the value of the shares in real terms was very seriously reduced. The applicant undeniably lost his property as a result of these measures*" (para. 61). So "*a shareholder in a public company may claim victim status regarding his complaint under Article 1 of Protocol No. 1*" (para 61). Additionally, the ECtHR has established that,

---

[137] "*So long as the company is in existence the shareholder has no right to the corporate assets*" (ICJ, Judgment, 5 February 1970, *Barcelona Traction, Light and Power Company, Limited* (Belgium v. Spain) (New Application: 1962), Second Phase, *ICJ Rep.*, pp. 34-35, paras. 41-44; "*Therefore, the rights and assets of a company must be distinguished from the rights and assets of an associé*" *in* ICJ, Judgment, 30 November 2010, *Ahmadou Sadio Diallo* (Republic of Guinea v. Democratic Republic of the Congo), Merits, *ICJ Rep.*, p. 689, para. 155.

[138] *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Decision on Annulment, 25 September 2007, para. 74; see also: *CMS Gas Transmission Company v. The Republic of Argentina*, ICSID Case No. ARB/01/8, Decision on Objections to Jurisdiction, 17 July 2003, para. 48: "*The Tribunal therefore finds no bar in current international law to the concept of allowing claims by shareholders independently from those of the corporation concerned*". See also e.g.: *Camuzzi International S.A. v. Argentine Republic*, ICSID Case No. ARB/03/2, Decision on Jurisdiction, 11 May 2005, para. 32; *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v. Argentine Republic*, ICSID Case No. ARB/09/1, Decision on Jurisdiction, 21 December 2012, para. 222.

[139] *RosInvestco UK Ltd. V. The Russian Federation*, SCC Case No. (079/2005), Final Award, 12 September 2010, pp. 251-252, para. 608.

notwithstanding the juridical persons' *ius standi* before it according to Protocol 1, a shareholder in a company may claim in her/his own name to be a victim of the alleged violations of the Convention affecting the rights of the company *"in exceptional circumstances, in particular where it is clearly established that it is impossible for the company to apply to the Court through the organs set up under its articles of incorporation or – in the event of liquidation or bankruptcy – through its liquidators or trustees in bankruptcy"*.[140] In such circumstances, the shareholders obtain compensation proportionally to their participation in the company, on the basis of the full compensation that could be accorded to the company.[141]

122. The Tribunal notes, however, that it would not be uncontroversial to allege that the investment case law is entirely settled in this respect.[142] The formula used by the tribunal in *Poštová Banka v. The Hellenic Republic* reflects a more cautious rule. After a careful review of the case-law – including that discussed by the Parties in the present case –[143] that tribunal stated:

> *"a shareholder of a company incorporated in the host State may assert claims based on measures taken against such company's assets that impair the value of the claimant's shares. However, such claimant has no standing to pursue claims directly over the assets of the local company, as it has no legal right to such assets."*[144]

123. Be that as it may, there is no need for this Tribunal to take position in the abstract on the existence or not of a general rule recognizing the right of action of shareholders, whether generally or conditionally, in contemporary investment law. In the present case, this right stems from Article 1(6) of the ECT, which defines an investment as "*every kind of asset, owned or controlled directly or indirectly by an Investor*" and including "*(b) a company or business enterprise, or shares, stock, or other forms of equity participation in a*

---

[140] ECHR, *Case of Agrotexim and Others v. Greece. (No. 15/1994/462/543)*. Judgment of 26 September 1995, para. 66;[140] Eur, Court H.R., *Case of Lebedev v. Russia. (Application no. 4493/04)*. Partial Decision as to the Admissibility of. Decision of 25 November 2004, para. 8; Eur. Court H.R., *Case of T-2.W. Computeranimation GMBH and Others v. Austria. (Application no. 53818/00)*. Final Decision as to the Admissibility of. Decision of 1 February 2005; Eur Court H.R., *Case of Camberrow MM5 AD v. Bulgaria. (Application no. 50357/94)*. Decision as to Admissibility of. Decision of 1 April 2004, para. 1.

[141] ECHR, *Case of Khamidov v. Russia. (Application no. 72118/01)*. Judgment of 15 November 2007, para 191.

[142] For a very detailed discussion and an indecisive conclusion on this difficult issue, see D. Müller, *La protection de l'actionnaire en droit international. L'héritage de la Barcelona Traction*, Paris, Pedone, 2015, e.g. pp. 359-431.

[143] *Postova Banka, A.S. and Istrokapital SE v. The Hellenic Republic*, ICSID Case No. ARB/13/8, Award, 9 April 2015, pp. 72-76, paras. 232-244.

[144] *Ibid.*, para. 245.

*company or business enterprise, and bonds and other debt of a company or business enterprise*". This formula removes any possible doubt concerning the Claimants' *jus standi* in the present case.[145] As noted by the *ad hoc* Committee in *Azurix*: "*It is the BIT which determines which particular kinds of interests are protected, and it is the BIT and ICSID Convention which determine the persons who may bring proceedings in respect of an alleged violation of the BIT in respect of a particular protected investment*".[146] In the present case, the ECT clearly includes shares among the protected investments.

124. For this reason, the Tribunal cannot uphold the second objection of the Respondent to its jurisdiction. This finding does not, of course, deal with the questions of whether the alleged breaches of the ECT have caused damage to the investment and, if so, what is the proper measure of that damage. The Tribunal reserves these questions for the merits and quantum phase.

### (2)    On the "two bites of the apple" argument

125. The same reasoning and solution apply to the issue discussed by the Parties under the heading "*two bites of the apple*" – that is the reproach made by the Respondent against the Claimants based on the fact that "[t]*he same measures challenged in this arbitration by the Claimants are also being challenged before the Spanish Supreme Court by intermediate companies and/or owners of the plants considered in the present Arbitration*".[147]

126. The avoidance of double recovery or, as the Parties put it, of allowing "*two bites of the apple*" concerns the amount and the modalities of the compensation (in case a breach of the ECT is found). This is a question for quantum, not of jurisdiction. The Parties may properly address the issue during the next phase of the proceeding.

---

[145] See e.g.: *Sempra Energy International v. The Argentine Republic*, ICSID Case No. ARB/02/16, Decision on the Application for Annulment of the Award, p. 18, paras. 102-103; *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Application for Annulment, 1st September 2009, p. 51, para. 102; *Emilio Agustín Maffezini v Kingdom of Spain*, ICSID Case No. ARB/97/7, Decision on Objections to Jurisdiction, 25 January 2000, p. 24, para. 68; *Siemens A.G. v. The Argentine Republic*, ICSID Case No. ARB/02/8, Decision on Jurisdiction, 3 August 2004, p. 56, para. 137; *Suez, Sociedad General de Aguas de Barcelona S.A., and Vivendi Universal S.A et alt. v. The Argentine Republic*, ICSID Case No. ARB/03/19, Decision on Jurisdiction, 27 July 2006, paras. 49-51.
[146] *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Application for Annulment, 1st September 2009, p. 42, para. 81.
[147] Respondent's Memorial on Jurisdiction, sub-section 4, p. 42.

### (3)    Conclusion of the Tribunal on the "Damages" Objection

127.    For the foregoing reasons, the Tribunal rejects the Respondent's objection to its jurisdiction based on the lack of "*legitimation*" of the Claimants to bring before the Tribunal their claims for alleged damages.    The Tribunal expressly reserves for the merits and quantum phase the related questions of whether the Respondent has breached the ECT and, if so, what compensation is due to the Claimants in their character as shareholders.

## VI.    THE *RATIONE PERSONAE* AND *RATIONE MATERIAE* OBJECTIONS

128.    The Claimants argue that the Respondent's objections to jurisdiction *ratione personae* and *ratione materiae* are not admissible because they were made out of time, on the basis that they were not raised in the Request for Bifurcation. It is true that, under the ICSID Convention and Rules, a respondent must raise objections to jurisdiction at the first possible moment and no later than the Counter-Memorial. The Tribunal recognises that a failure to observe the procedural requirements set out in the ICSID Convention and Rules, or indeed the directions of a tribunal, can be fatal to the admissibility of an argument. In the present case, however, it is the Tribunal's view that the dynamics of the proceedings and the directions of the Tribunal have been such that the Respondent's formulation of its objections to jurisdiction *ratione personae* and *ratione materiae* as submitted in its Memorial and Reply on Objections to Jurisdiction are admissible.

### A.    Ratione personae

### (1)    The Respondent's Position

129.    The Respondent's position is that the Claimants are not investors for the purposes of the ECT and the ICSID Convention. The Respondent has presented a number of arguments to support its position:

130.    First, the Respondent points out that for the purpose of the ECT, an investor is a "*company or other organisation*" and this concept "*must imply the arrangement of personal resources (subjective element) and material resources (objective element) to achieve a purpose (theological element) which, in this case, must be the rendering of service or the*

*production of goods on the market*".[148] The First Claimant lacks material resources, human resources, activity and generation of added value and a physical presence or footprint[149] and the Second Claimant lacks material resources, human resources, economic object and a physical presence or footprint.[150]

131. Second, according to the Respondent, there can only be one single "*investor*" for each single "*investment*" under the ECT.[151]

132. Third, the Respondent argues that the First Claimant does not indirectly own the alleged investments as the ownership of the intermediate vehicles or the assets is not shown in its audited accounts.[152] The Second Claimant does not indirectly own the alleged investment as it is merely a link in the chain of ownership between the ultimate owners (the limited partnership) and the assets located in Spain.[153] The ECT protects only the ultimate owner in an ownership chain.

133. Fourth, the Respondent alleges that neither Claimant controls the alleged investment.[154] ECT Understanding 3 deals with Article 1(6) of the ECT. It refers to control in fact, following an examination of all actual circumstances and considering all relevant factors. The circumstances enumerated there to be examined include such things as financial interest, ability to exercise substantial influence over management and operation, ability to exercise substantial influence over the selection of management. The First Claimant does not control the alleged investment because all the control is exercised by the Manager of the limited partnership, which is not a claimant in the proceedings. The Second Claimant does not control the alleged investment because, despite its indirect equity in the form of capital and loans in the Spanish companies that own the assets, there is no evidence that the Second Claimant has control of the alleged investment. The Claimants have therefore not met the burden of proof.

134. Fifth, the Respondent submits that the Claimants are not the limited partnership. Nor can they act on its behalf in this arbitration.[155] They are mere "*shell companies*". The

---

[148] *Ibid.*, p. 68, para. 243.
[149] *Ibid.*, pp. 68-69, paras. 245-249.
[150] *Ibid.*, p. 69, paras. 250-254.
[151] *Ibid.*, pp. 50-54, paras. 181-194.
[152] *Ibid.*, p. 50, para. 178.
[153] *Ibid.*, p. 54, paras. 195-198.
[154] *Ibid.*, pp. 55-60, paras. 199-207.
[155] *Ibid.*, pp. 60-61, paras. 208-214.

definition of investor in the ECT does not require a legal personality. But an investor must be an organisation ("*other organisation organised in accordance with the law applicable in that Contracting Party*"). This requires that such an investor engage in various activities. An entity which simply has stakes or shares in other companies is not a company.[156] The First Claimant lacks material resources, human resources, activity and generation of added value and a physical presence or footprint[157] and the Second Claimant lacks material resources, human resources, economic object and a physical presence or footprint.[158]

### (2)     The Claimants' Position

135.  The Claimants' position is that they are both investors for the purposes of the ECT and the ICSID Convention. The Claimants have presented a number of arguments to support their position, the principal of which are summarized in the paragraphs 136-141 below.

136.  First, the Claimants argue that each of the Claimants satisfy Article 1(7) of the ECT, which merely requires that the companies are "*organized in accordance with the law applicable in* [the] *Contracting Part*[ies]". The Claimants are incorporated under the laws of Jersey and Luxembourg and thus are qualifying investors under the ECT.[159] The Respondent's argument that "*an entity which simply has stakes or shares in other companies is not a company*" has no basis in law.[160]

137.  Second, the Claimants refute the Respondent's argument that there can only be one indirect owner. There is no such limitation in the ECT.[161] The ordinary meaning of Article 1(6) on the protection of indirect owners is clear.[162]

138.  Indirectly controlled funds and the limited partnership are common forms of investment vehicle. As in the present case, they often own and control investments down through a chain of ownership and control through commonplace corporate mechanisms, such as those that apply to all of the entities in the ownership chain in the present case. According

---

[156] *Ibid.*, p. 68, para. 243.
[157] *Ibid.*, pp. 68-69, paras. 245-249.
[158] *Ibid.*, p. 69, paras. 250-254.
[159] Claimants' Rejoinder on Jurisdiction, pp. 56-59, paras 170-179.
[160] *Ibid.*, pp. 53-66, paras 162-203.
[161] *Ibid.*, pp. 39-40, para. 126.
[162] *Ibid.*, p. 41, paras. 130-131.

to the Claimants, the fact that, under municipal accounting principles, the ultimate assets in question are not shown on the First Claimant's balance sheet is irrelevant.[163]

139. The Claimants then move to explain the legal structure of the limited partnership at issue which is an old English and common law form of commercial entity.[164] A limited partnership is controlled by one or more general partners, who, in exchange for losing the limited liability character enjoy the ability to direct the affairs of the limited partnership. A limited partnership can only act through its general partner(s). In the present case, the limited partnership has only one general partner.

140. The Claimants add that the limited partnership deed in the present case permits and even requires the General Partner to appoint a manager to run the affairs of the limited partnership.[165] The Manager holds a contractual position and is appointed and paid by the General Partner. Under the relevant municipal law, as reflected in the relevant contractual arrangements, the General Partner has the ultimate responsibility for managing the Fund. The limited partnership retains control and supervision over the Manager. The Manager therefore has powers that are delegated to it from the General Partner (the First Claimant). According to the Claimants, it is commonplace in the commercial world for entities to be run and themselves to exercise control through the delegation of authority.

141. Finally, in contrast to the Respondent's allegations, the Claimants submit that there is no requirement under the ECT that only an ultimate beneficial owner can be the indirect owner or indirect controller of an investment.[166] The legal authorities cited by the Respondent also fail to support this proposition.[167]

### (3)    *Tribunal's Analysis*

142. Nothing in the ECT says there can only be one single investor for each investment. It cannot be the case that there can only be one single "*investor*" each single "*investment*". The very concept of an indirect investor and an indirect investment contains within it the

---

[163] *Ibid.*, pp. 37-38, paras. 117-118, 120.
[164] Claimants' Counter-Memorial on Jurisdiction, pp. 43-44, paras. 134-137; Claimants' Rejoinder on Jurisdiction, pp.47-53, paras 152-161.
[165] Claimants' Rejoinder on Jurisdiction, pp. 48-51, paras 155-159. See also Exhibit R-0055, Limited partnership Agreement relating to RREEF Pan-European Infrastructure Fund LP (amending and restating a limited partnership agreement dated 9 November 2005), 23 April 2015.
[166] Claimants' Rejoinder on Jurisdiction, pp. 39-40, para. 126.
[167] *Ibid.*, pp. 41-42, para. 132.

concept that there will be a chain of ownership and control that involve more than one entity. Otherwise, there could be no investment that is indirectly owned or controlled. The very concept of indirect ownership or control presupposes that there is interposed between a claimant that is an indirect owner or controller and the investment one or more other owners and controllers through which the claimant owns or controls the investment.

143.  There are many different forms of commercial entities that are created by and exist within municipal legal systems around the world. A company is one of them. So is a partnership. So, too, is a limited partnership. International law looks to municipal law to determine as a question of fact the legitimate constitution of these commercial entities, their ownership, management, control, conduct and so on. As had been noted by the ICJ in *Barcelona Traction*:

> *"In this field international law is called upon to recognize institutions of municipal law that have an important and extensive role in the international field. This does not necessarily imply drawing any analogy between its own institutions and those of municipal law, nor does it amount to making rules of international law dependent upon categories of municipal law. All it means is that international law has had to recognize the corporate entity as an institution created by States in a domain essentially within their domestic jurisdiction. This in turn requires that, whenever legal issues arise concerning the rights of States with regard to the treatment of companies and shareholders, as to which rights international law has not established its own rules, it has to refer to the relevant rules of municipal law. Consequently, in view of the relevance to the present case of the rights of the corporate entity and its shareholders under municipal law, the Court must devote attention to the nature and interrelation of those rights."* [168]

It is not for this Tribunal to second-guess the types of corporate forms that exist under municipal law.

144.  According to the evidence submitted before the Tribunal, under the law applicable to the limited partnership in the present case, its constitution, ownership, management, control and conduct and so on was legitimate. In particular, it appears that the limited partnership deed ("the Deed") in the present case permits the General Partner to appoint the Manager to run the affairs of the limited partnership. The Manager holds a contractual position and

---

[168] ICJ, Judgment, 5 February 1970, *Barcelona Traction, Light and Power Company, Limited* (Belgium v. Spain) (New Application: 1962), Second Phase, *ICJ Rep.*, pp. 33-34, para. 38.

is appointed and paid by the General Partner, who also has "full discretion and authority" to dismiss the Manager. Although, according to the Deed, the Manager has a number of independent functions, it is always under the authority and supervision of General Partner. Under the relevant municipal law, as reflected in the relevant contractual arrangements, the General Partner has the ultimate responsibility for managing the Fund and retains control and supervision over the Manager, which is in fact under the General Partner's control. Therefore, the General Partner (which is the First Claimant) has control over the investment as required in Article 1.6 of ECT and interpreted in Understanding 3. The appointment and functions of the Manager do not undermine the General Partner's control over the investment. On the contrary, they rather confirm that control.

145.  The term "*shell company*" is often used as a short-hand reference to a commercial entity that has little or no activity apart from owning or controlling directly or indirectly assets. Unless there is a reason under the relevant municipal law or investment treaty to conclude otherwise, there is no basis under international law to accord such a commercial entity any less entitlement to the protections afforded under an investment treaty than any other commercial entity. There are examples of investment treaties that include within the definition of investor only commercial entities that can demonstrate certain characteristics or activities.[169] There is no such limitation in the ECT or the ICSID Convention. It would not be proper to read such an artificial limitation into the plain meaning of the ECT, the ICSID Convention or into international law generally.

146.  There is no basis in international law for the proposition that "*an entity which simply has stakes or shares in other companies is not a company*". The Tribunal has been presented with no evidence of any such proposition in any municipal law relevant to the present case.

147.  Therefore, on the evidence in the record before it, the Tribunal concludes that the Claimants meet the definition of investors under the ECT. The First Claimant indirectly controls, and the Second Claimant indirectly owns and controls, the assets in Spain that are the subject of the dispute in question. The Tribunal therefore concludes that it has jurisdiction *ratione personae* and so dismisses the Respondent's objection *ratione personae*.

---

[169] See Claimants' Rejoinder on Jurisdiction, p. 57, para. 172.

*B.*     *Ratione materiae*

*(1)*     *The Respondent's position*

148.  The Respondent argues that the Claimants have not made an investment in Spain within the meaning of the ECT or the ICSID Convention. The Respondent has presented a number of arguments to support its position, the principal of which are summarized in the paragraphs 149-150 below.

149.  In particular, the Respondent contends that the Claimants have not made any investment in the "*ordinary and objective sense*" of this term. According to the Respondent, this is the standard to be applied to the definition of "*investment*" under the ECT and the ICSID Convention.[170] This requires an investor to provide money, assume risks and make the investment for a period of time, amongst other things.[171] In support of its proposition, the Respondent relies on several arbitral awards that have ruled on the ordinary meaning of "*investment*".[172] In the Respondent's view, the Claimants have neither provided the funds nor assumed any risks nor the duration.[173]

150.  In particular, the Respondent submits that the Claimants did not themselves make any contribution of economic resources into Spain. Ultimately, the funds were contributed by the limited partners of the RREEF Pan-European Infrastructure Fund Limited Partnership. According to the Respondent, this is not sufficient to constitute an investment by the Claimants.[174] Accordingly, those who made the contributions of funds are the ones who assumed the risks of the investment, *i.e.* the limited partners.[175]

*(2)*     *The Claimants' Position*

151.  As to the Respondent's objection *ratione materiae,* the Claimants argue that they have made an investment in Spain within the meaning of the ECT and the ICSID Convention.

---

[170] Respondent's Memorial on Jurisdiction, pp. 23-27, paras. 77-92, Respondent's Reply on Jurisdiction, pp. 41-47, paras. 137-167.
[171] Respondent's Memorial on Jurisdiction, pp. 27-30, paras. 93-107.
[172] *Romak v. Republic of Uzbekistan*, PCA Case No. AA 280, Award, 26 November 2009, para. 177; *Saba Fakes v. Republic of Turkey*, ICSID Case No. ARB/07/20, Award, 14 July 2010, para. 110; *Alpha Projektholding GmbH v. Ukraine*, ICSID Case No. ARB/07/16, Award, 8 November 2010; *Toto Costruzioni Generali S.p.A. v. Lebanon*, ICSID Case No. ARB/07/12, Jurisdiction Award, 11 September 2009, para. 84; *KT Asia Investment Group B.V. v. Republic of Kazakhstan*, ICSID Case No. ARB/09/8, Award, 17 October 2013, para. 170
[173] Respondent's Reply on Jurisdiction, pp. 48-49, paras. 168-176.
[174] *Ibid.*, pp. 30-32, paras. 108-124.
[175] *Ibid.*, p. 49, para. 173.

The Claimants have presented a number of arguments to support their position, the principal of which are summarized in paragraphs 152-155 below.

152. The Respondent's principal objection *ratione materiae* is that the First Claimant has not taken on risk and that the limited partners of the RREEF Fund its Manager are the proper claimants. This is merely a reformulation of its objections *ratione personae*. As with the Respondent's arguments in relation to that objection, it reflects a fundamental misunderstanding of the facts and law related to the RREEF Fund.[176]



153. The Claimants recall that the definition of investment is contained in Article 1(6) of the ECT. The definition refers to "*Every kind of asset*" associated with an "*Economic Activity*" in the "*Energy Sector*". The definition is open, general and not restricted.[177] The assets that are the subject of the dispute in the present case fit this definition. The Claimants argue that the criteria identified by the Respondent are additional to the

---

[176] Claimants' Counter-Memorial on Jurisdiction, pp. 43-44, paras. 134-137.
[177] *Ibid.*, p. 45, para. 142.

definition contained in the ECT.[178] They are also additional to Article 25 of the ICSID Convention.[179] The Claimants stress that there is no textual or other basis for adding them.

154.  Additionally, the Claimants contend that there is no requirement under the ECT or the ICSID Convention that any funds used in an investment must be imported from abroad or otherwise.[180] Nowhere is it required that an investor must finance an investment directly from its own direct resources.[181] Therefore, the Respondent's "*mere link in the chain*" argument has no legal basis.

155.  Alternatively, should the Tribunal decide to consider the additional criteria submitted by the Respondent, it would find that they are present in the investments at issue. Accordingly, the Claimants submit that the duration of the investment was for the operational and financing cycle of the project and it was of no less than 10 years in any event.[182] The Claimants also recall that they invested almost EUR 300 million in the Respondent which constitute significant financial contributions.[183] Finally, according to the Claimants, there obviously was commercial risk which is reflected in the structuring of the investment.[184]

### (3)    *Tribunal's Analysis*

156.  The definition of investment in the ECT is contained in Article 1(6). It refers to "*every kind of asset*" associated with an "*Economic Activity*" in the "*Energy Sector*". The definition is open, general and not restricted. The assets that are the subject of the dispute in the present case fit this definition.

157.  The criteria identified by the Respondent are additional to the definition contained in the ECT. They are also additional to the language of Article 25 of the ICSID Convention. There is no textual or other basis for adding them. The definition of investment must be interpreted according to article 31 of the Vienna Convention on the Law of Treaties and not in accordance with tests, criteria or guidelines beyond the terms, the context or the object and purpose of the ECT. There is no test, set of criteria or guidelines that can or

---

[178] *Ibid.*, pp. 45-46, para. 142-145.
[179] *Ibid.*, p. 47-48, para. 150.
[180] *Ibid.*, p. 60, para. 181.
[181] *Ibid.*, pp. 58-62, paras. 174-186.
[182] *Ibid.*, p. 58, para. 173.
[183] *Ibid.*, pp. 55-57, paras. 168-170.
[184] *Ibid.*, p. 57, paras. 171-172.

should be relied upon in international law to restrict or replace the definition that exists in the ECT. There is no reason to place any such test, set of criteria or guidelines on the language of Article 25 of the ICSID Convention.

158.  The Respondent has referred to documents on the record that show there was an assumption of risk in the projects. The Respondent argues that this risk was assumed by the limited partners and not the Claimants. However, as noted in the previous paragraph, there is no requirement for any assumption of risk contained in the ECT or the ICSID Convention just as there is no requirement for funds to be brought into a State from overseas in order for a national of one State to have an investment in another State (for example, a national of one State who merely inherits property in another State nonetheless has an investment in that other State). It would be improper to read such criteria as those proposed by the Respondent into those international instruments. Furthermore, there is always risk of some kind involved in every aspect of participation in business activity. Even the passive holding of an investment, such as ownership of vacant real estate, entails risk.

159.  In terms of ownership or control by the Claimants of an investment, the Tribunal considers that the reasons set forth above in respect to the Respondent's argument *ratione personae*[185] apply *mutatis mutandis ratione materiae:* shares fall within ECT "investment" definition and "indirect investments" are also protected by the Treaty. Given the wide definition contained in Article 1(6) ECT, if participants in an enterprise "*upstream*" own and control an ultimate asset, then necessarily so too do those participants "*downstream*" and to the same degree.

160.  Therefore, on the evidence in the record before it, the Tribunal concludes that the Claimants own or control investments, as that term is defined under the ECT. The Tribunal therefore concludes that it has jurisdiction *ratione materiae* and so the Respondent's objection *ratione materiae* is dismissed.

---

[185] See paras. 137-142.

## VII.    TAX OBJECTION

### A.    The Respondent's Position

161. The Respondent argues that the Tribunal lacks jurisdiction to hear the dispute over the tax measures that the Kingdom of Spain adopted through the enactment of Act 15/2012, which allegedly resulted in the breach of its obligations under Article 10(1) of the ECT.

162. In particular, the Respondent contends that it has not consented to the dispute being arbitrated, as its consent is limited only to potential violations arising from its obligations under Part III of the ECT.[186]

163. The Respondent moves on with a description of the taxes challenged by the Claimants. The Respondent notes that Act 15/2012, in force since 1 January 2013, contains various tax measures relating to the energy sector, including two that are disputed by the Claimants (together referred to as the "*tax measures contained in Act 15/2012*").

164. These new tax measures comprise, first, the Tax on the Value of the Production of Electric Energy ("TVPEE")[187], which is imposed on the generation and incorporation of electrical energy into the Spanish electricity system. The TVPEE is a tax applied to all generation facilities, both renewable and conventional[188] and is calculated on the basis of the total amount paid to the taxpayer for the production of electricity and its incorporation into the electric system during the corresponding taxable period. The applicable tax rate is 7%.[189]

165. The second tax measure that is disputed by the Claimants was introduced pursuant to Article 28 of Act 15/2012, which amended Act 38/1992, on Excise Duties ("Excise Duties Act"). Article 28 of Act 15/2012 introduces modifications on the Tax on Hydrocarbons that affect, among other products, natural gas.[190]

---

[186] Respondent's Memorial on Jurisdiction, pp. 51-70, paras. 216-298.

[187] See Articles 1 to 11 of Act 15/2012.

[188] Respondent's Memorial on Jurisdiction, fn. 113, Article 1 of Act 15/2012 refers to the nature of the TVPEE.

[189] Fn. 115, Article 8 of Act 15/2012 regulates the tax rate of the TVPEER-0006.

[190] Respondent's Memorial on Jurisdiction, pp. 52-53, para. 220. Fn. 117, Excise Duties are mainly regulated within the European Union by *Directive 2008/118/EC of 16 December 2008 on the general regimen of excise duties and which repeals Directive 92/12/EEC (R-0031)* and, in Spain, by *Act 38/1992, of 28 December, on Excise Duties* (R-0032), which transposes the provisions of Directive 2008/118/EC into Spanish law. Fn. 118, This tax measure contained in Article 28 of 15/2012 regarding the amendment to the Excise Duties Act, in particular to the Tax on Hydrocarbons, was mentioned by the Claimants in their Request for Arbitration (paragraphs 76 and 77 of the Request for Arbitration, 17 October 2013). The Claimants do not develop the reference to it in their Statement of Claim but the Regulatory Report of the Brattle Group does mention it as one of the disputed measures (Regulatory Report of the Brattle Group, 21 November 2014, paragraph 100 in the Spanish version, paragraph 103

166. The Respondent makes five different arguments against the jurisdiction of the Tribunal in this matter:

**(1)    *The Respondent's Consent to Submit to Investment Arbitration is limited to Disputes related to Alleged Breaches of Obligations derived from Part III of the ECT*[191]**

167. The Respondent notes that pursuant to Article 26 of the ECT, the jurisdiction of arbitral tribunals is based on the existence of an obligation arising from Part III of the ECT, which a Contracting Party has allegedly breached. According to the Respondent, Part III does not impose any obligations with respect to tax measures adopted by Contracting Parties. Therefore, there can be no breach of obligations under Part III of the ECT with respect to the adoption of tax measures and consequently, the Tribunal lacks jurisdiction as to this issue.[192]

**(2)    *No Obligations or Rights in the ECT with respect to Tax Measures***

168. The Respondent contends that the ECT does not, in general, create rights nor impose obligations regarding Tax Measures, with certain defined exceptions. This is clearly stipulated in Article 21 of the ECT.[193]

169. In view of the above, the Respondent points to the limited exceptions set forth in paragraphs (2) and (5) of Article 21 ECT[194] and notes that paragraph (1) of Article 10 of the ECT, on which the Claimants seek to base their allegations, is not concerned by exceptions.[195]

**(3)    *TVPEE is a Tax Measure for the Purposes of the ECT***

170. The Respondent further argues that the TVPEE's tax nature is evidenced in Article 1 of Act 15/2012:

---

in the English version). Therefore, the Respondent assumes that the Claimants allege that this measure constitutes supposedly a breach of the ECT.
[191] Respondent's Memorial on Jurisdiction, pp. 53-54, para. 223-231.
[192] *Ibid.*, pp. 53-54, para. 223-231.
[193] *Ibid.*, p. 55, para. 232.
[194] *Ibid.*, pp. 55-56, paras. 234-239.
[195] *Ibid.*, p. 57, paras. 240-243.

171. In determining whether a measure is of tax nature, according to the Respondent, a question arises as to the applicable law.[196] In this regard, the Respondent points to the very wording of Article 21(7)(a)(i) of the ECT which refers to "[a]*ny provisions relating to taxes of the national legislation of the Contracting Party* […]".[197] The Respondent argues that arbitral case law has recognised the possibility that in international investment treaties a certain term be defined by reference to the national law of a Contracting Party.[198]

172. According to the Respondent, the fact that domestic law is the applicable law to determine the tax nature of a measure may be further supported, by Article 3 of the double taxation Convention between Spain and Luxembourg[199]

173. The Respondent further argues that, in any event, even if the applicable law were international law, TVPEE is still a tax[200] in accordance with International law.[201] The concept of tax under international law as it has been endorsed by arbitral tribunals requires the presence of three characteristics, namely that the tax is set by law, it imposes an obligation on a class of people and that such obligation is a revenue for the State for public purposes. Accordingly, the Respondent notes that the TVPEE was set by national law,[202] is levied on all entities that produce and incorporate electrical energy into the Spanish electrical system[203] and finally, the revenues from the collection of the TVPEE by the State is intended for public purposes.[204]

### *(4)    Tax Measures have to be Presumed* Bona Fide

174. The Respondent recalls that arbitral tribunals have held that tax measures should be presumed to be *bona fide* unless there is conclusive evidence to the contrary.[205] In

---

[196] Respondent's Reply on Jurisdiction, pp. 72-73, para. 264.
[197] *Ibid.*, p. 73, para. 266.
[198] *Ibid.*, p. 73, para. 267.
[199] *Ibid.*, pp. 73-74, para 269, citing Section 2, article 3 of the Convention between the Kingdom of Spain and the Grand Duchy of Luxembourg to avoid double taxation in terms of income tax and wealth tax and to prevent fraud and tax evasion dated 3 June 1986. R-0067.bis.
[200] Respondent's Reply on Jurisdiction, pp. 74-75, paras. 272-273.
[201] *Ibid.*, pp. 78-86, paras. 292-314.
[202] *Ibid.*, p. 80, para. 301.
[203] *Ibid.*, pp.80-81, para. 302.
[204] *Ibid.*, p. 81, paras. 303-306.
[205] Respondent's Memorial on Jurisdiction, p. 61, para. 256.

support, the Respondent cites several arbitral awards, including the *Yukos v. Russian Federation*.[206]

### (5)    TVPEE is a Bona Fide *Tax Measure of General Application*

175.   The Respondent stresses that the TVPEE is a tax of general application applicable to all energy production facilities. According to the Respondent, the State is not obliged to give preferential treatment to producers of renewable energy in configuring the TVPEE. Therefore, the fact that the TVPEE equally applies to conventional producers of electrical energy as well as to renewable producers is not indicative of the *mala fide* nature of the measure.[207]

176.   Moreover, in response to the Claimants' argument that the TVPEE is discriminatory because renewable producers, as opposed to conventional producers, are unable to pass the tax to the consumer, the Respondent explains that said tax is a direct tax that is not passed on by taxpayers, whether they are producers of renewable or conventional energy.[208]

177.   Finally, the Respondent submits that the appeal of unconstitutionality by the Government of Andalucía against the TVPEE and the relevant inquiry by the European Commission with respect to the compatibility of the said tax with EU law do not cast doubts as to the tax nature of the measure. In particular, the Respondent submits that the Spanish Constitutional Court and the European Commission have ratified the taxation nature and the legality of the TVPEE.[209]

178.   The Respondent also notes that the TVPEE is public revenue of the Kingdom of Spain included in the General State Budget, and that an amount equivalent to the estimated annual collection deriving from the taxes included in Act 15/2012, among them the TVPEE, is destined to the promotion of renewable energies.[210]

---

[206] *Ibid.*, p. 61, para. 259.
[207] *Ibid.*, pp. 62-65, paras. 265-274; Respondent's Reply on Jurisdiction, pp. 89-90, paras. 332-338.
[208] Respondent's Memorial on Jurisdiction, pp.65-68, paras 275-288; Respondent's Reply on Jurisdiction, pp. 90-91, paras. 339-341.
[209] Respondent's Memorial on Jurisdiction, pp. 68-65, paras. 289-296; Respondent's Reply on Jurisdiction, pp. 77-78, paras. 286-289.
[210] Respondent's Reply on Jurisdiction, pp. 91-93, paras. 342-351.

## B.    The Claimants' Position

### (1)    *Tax objection should be joined to the merits*

179.  The Claimants recall that the definition of investment is contained in Article 1(6) of the ECT.  The definition refers to "*Every kind of asset*" associated with an "*Economic Activity*" in the "*Energy Sector*".  The definition is open, general and not restricted.[211] The assets that are the subject of the dispute in the present case fit this definition.  The Claimants argue that the criteria identified by the Respondent are additional to the definition contained in the ECT.[212]  They are also additional to Article 25 of the ICSID Convention.[213] The Claimants stress that there is no textual or other basis for adding them.

180.  Additionally, the Claimants contend that there is no requirement under the ECT or the ICSID Convention that any funds used in an investment must be imported from abroad or otherwise.[214]  Nowhere is it required that an investor must finance an investment directly from its own direct resources.[215]

181.  Alternatively, should the Tribunal decide to consider the additional criteria submitted by the Respondent, it would find that they are present in the investments at issue.  Accordingly, the Claimants submit that the duration of the investment was for the operational and financing cycle of the project and it was of no less than 10 years in any event.[216] The Claimants also recall that they invested almost EUR 300 million in the Respondent which constitute significant financial contributions.[217]  Finally, there obviously was commercial risk which is reflected in the structuring of the investment.[218]

### (2)    *Measures are not Tax Measures under Article 21 ECT*

182.  The Claimants recall that, for the taxation carve-out to apply, a tax must be *bona fide*. According to the Claimants, the 7% levy was "a backdoor tariff cut" formed as a tax to

---

[211] Claimants' Counter-Memorial on Jurisdiction, p. 45, para. 142.
[212] *Ibid.*, pp. 45-46, para. 142-145.
[213] *Ibid.*, p. 47-48, para. 150.
[214] *Ibid.*, p. 60, para. 181.
[215] *Ibid.*, pp. 58-62, paras. 174-186.
[216] *Ibid.*, p. 58, para. 173.
[217] *Ibid.*, pp. 55-57, paras. 168-170.
[218] *Ibid.*, p. 57, paras. 171-172.

strip away and eventually abolish the incentives provided under RD 661/2007.[219] Therefore, the 7% Levy was not a tax implemented in good faith, so the tax carve-out does not apply.[220]

183. According to the Claimants, the fact that the measure at issue is labelled by the Respondent as a tax is not determinative as to the application of the taxation curve-out. This was made very clear in the *Yukos* case.[221] Additionally, the Claimants assert that a State's characterisation of a measure as a tax under its own internal law is in no way determinative as to whether Article 21 of the ECT is applicable.[222]

184. Furthermore, the Claimants contend that the definition of tax under international law is not determinative either as to whether the 7% Levy is *bona fide*.[223] In the Claimants' view, irrespective of whether or not the test advanced by the Respondent correctly reflects the definition of tax under international law, the Respondent's submissions as to whether the measure meets each and every prong of the alleged test are irrelevant to the dispute.[224] Finally, the fact that the European Commission has determined that the 7% levy is compatible with EU law is equally irrelevant.[225]

### (3)    *Taxation Measures have to be Bona Fide*

185. According to the Claimants, the requirement that Taxation measures must be *bona fide* is a consequence of the central principle of good faith that is broadly recognized under international law.[226]

186. Moreover, the Claimants reject the Respondent's assertions that the tax measures "*should be presumed bona fide unless there is conclusive evidence to the contrary*".[227] According to the Claimants, the Tribunal must determine whether a taxation measure is *bona fide* on the balance of probabilities after reviewing the State's conduct in its totality.[228]

---

[219] *Ibid.*, pp. 64-65, para. 192.
[220] *Ibid.*, pp. 70-73, paras. 219-228.
[221] Fn. 391, See Counter-Memorial on Jurisdiction, para. 242.
[222] Claimants' Counter-Memorial on Jurisdiction, pp. 79-80, paras. 240-247; Claimants' Rejoinder on Jurisdiction, p. 73, para. 229.
[223] Claimants' Rejoinder on Jurisdiction, pp. 73-75, paras. 231-235.
[224] *Ibid.*, p. 74, paras. 232-233.
[225] *Ibid.*, pp. 74-75, para. 235.
[226] Claimants' Counter-Memorial on Jurisdiction, pp. 66-67, paras. 196-199.
[227] *Ibid.*, p. 68, para. 204 citing Respondent's Memorial on Jurisdiction, para 256).
[228] Claimants' Counter-Memorial on Jurisdiction, p. 68, para. 204.

187. Accordingly, the Claimants submit that, if there is *prima facie* evidence that the tax measure is not *bona fide*, the burden of proof switches to the other party.[229]

### (4)    7% Levy is not a Bona Fide Measure but a Tariff Cut

188. The Claimants note that the Respondent implemented the 7% Levy amid existing ECT arbitrations, and thus, it must have been aware of its obligations under the Treaty. Accordingly, the inference must be that the 7% tariff cut was labelled as a tax with the intention of avoiding liability for breaching investors' rights under the ECT.[230]

189. That the 7% is not a *bona fide* measure is further evidenced, according to the Claimants, by the fact that the measure doesn't apply equally to everybody. While the conventional producers can pass the extra cost of the tax measure on consumers, since they are free to sell in the open market, the renewable generators have no other option but to absorb it.[231] Therefore, the measure *de facto* affects more the renewable producers.[232]

190. The Claimants further argue that the 7% Levy is part of a scheme intended to deprive the Claimants of their rights under the ECT.[233]

191. The Claimants further describe the 7% Levy as a sham that targets specifically renewable energy installations.[234]

192. Finally, the Claimants argue that the use of the funds from the 7% Levy confirms that it is a tariff cut under the cloak of Taxation.[235]

## C.    Tribunal's Analysis

193. On 27 December 2012, Spain adopted Act 15/2012 "*on taxation measures for energy sustainability*" creating a new tax on the value of the production of electric energy ("TVPEE"). According to the Claimants, such a measure breaches the Respondent's

---

[229] *Ibid.*, pp. 69-70, paras. 206-208 citing, *inter alia*, *Marvin Feldman v Mexico*, ICSID Case No. ARB (AF)/99/1, Award, 16 December 2012, paras. 177-178 (Exhibit CL-0163); United States – Measures Affecting Imports of Woven Wool Shirts and Blouses from India, Adopted 23 May 1997, WT/DS33/AB/R, p. 14 (CL-0165); *Asian Agricultural Products Limited v Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Award, 27 June 1990, para. 56 (CL-0165).
[230] Claimants' Counter-Memorial on Jurisdiction, p. 74, para. 222.
[231] Claimants' Rejoinder on Jurisdiction, p. 69, para. 214.
[232] Claimants' Counter-Memorial on Jurisdiction, pp. 74-76, paras. 225-232.
[233] *Ibid.*, pp. 77-78, paras. 233-239.
[234] *Ibid.*, paras. 225-232; Claimants' Rejoinder on Jurisdiction, p. 75, para. 237.
[235] Claimants' Rejoinder on Jurisdiction, pp. 80-82, para. 249-256.

obligations set out in Article 10(1) ECT.[236] The Respondent objects that taxation measures are excluded from the scope of the ECT by Article 21(1), which reads as follows:

> "Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency."

In the view of the Respondent, the taxes created or modified by Act 15/2012 do not correspond to any of these exceptions and Article 10 ECT is therefore not applicable to these measures.[237]

194. The Parties have debated at length the question whether the measures challenged by the Claimants really qualify as taxes.[238] In reality, the Claimants do not deny that they are taxes; what they question is whether they are *bona fide* taxes; if not "the tax carve-out does *not* apply".[239]

195. This allegation is at the very heart of the case which has been submitted to the Tribunal. The consequence of a finding by the Tribunal that the measures included in Act 15/2012 have not been taken *bona fide* could have two consequences:

- ▪ either the Tribunal would decide that the Respondent cannot avail itself of the exemption provided for in Article 21(1) and find the Application inadmissible in this respect;

- ▪ or it could consider that the institution of the new tax is in violation of the standards guaranteed to the investors under Article 10 of the ECT calling for reparation, as is expressly requested in the Claimants' Memorial.[240]

---

[236] Claimants' Request for Arbitration, pp. 16-18, paras. 70-75 and p. 30, para. 132; Claimants' Memorial, pp. 14-15, para. 53 and paragraph 7.1(b)., Claimants' Counter-Memorial on Jurisdiction, p. 64, para. 191.
[237] See Respondent's Memorial on Jurisdiction, pp. 55-57, paras. 234-243; Respondent's Reply on Jurisdiction, p. 71, para. 259.
[238] See e.g.: Respondent's Memorial on Jurisdiction, pp. 58-60, paras. 244-252; Respondent's Reply on Jurisdiction, pp. 72-88, paras. 263-324; Claimants' Counter-Memorial on Jurisdiction, pp. 79-80, paras. 240-247; Claimants' Rejoinder on Jurisdiction, pp. 70-75, paras. 218-235.
[239] Claimants' Counter-Memorial on Jurisdiction, p. 64, para. 191.
[240] Claimants' Memorial, p. 196, para. 584(a).

196. In both cases, a careful investigation of the circumstances and of the effects of the challenged measures is needed. Such investigation cannot be made at the present preliminary stage.

### (1)        Conclusion on the Tax Objection

197. In view of the foregoing, the Tribunal decides to join the Respondent's objection based on Article 21 ECT to the merits.

198. This decision does not prejudge any position of the Tribunal as to the admissibility of this objection as a preliminary issue or a question of substance.

199. The Tribunal also notes that in its Memorial on Jurisdiction, the Respondent had mentioned the amendment of the Excise Duties Act (Act 38/1992) of 28 December 1992 ("*Excise Duties Act*") by Article 28 of Act 15/2012 and amending a previous Act, Act 38/1992 of 28 December 1992 by introducing modifications concerning the tax on hydrocarbons.[241] In a footnote, the Respondent notes that while this measure was mentioned in the Request for Arbitration (at paras 76 and 77) "[t]*he Claimants do not develop the reference to it in their Memorial on the merits but the Regulatory Report of the Brattle Group does mention it as one of the disputed measures (Regulatory Report of the Brattle Group, 21 November 2014, paragraph 100 in the Spanish version, paragraph 103 in the English version). Therefore, the Respondent assumes that the Claimants allege that this measure constitutes supposedly a breach of the ECT.*"[242]. However, and in a rather contradictory manner, the Respondent also asserts that: "*The Claimants do not allege that the amendment to the Excise Duties Act, in particular to the Tax on Hydrocarbons, contained in Act 15/2012, is not a* bona fide *tax measure. Therefore, the Claimants implicitly acknowledge that it is a* bona fide *tax measure.*"[243]

200. In footnote 252 of their Counter-Memorial on jurisdiction, the Claimants note that "*Spain also refers to the so-called hydrocarbons tax (see footnote 18 of the Memorial on Jurisdiction) but this is not part of the Disputed Measures*". The modification of the tax on hydrocarbons has not been mentioned in the subsequent pleadings, whether in writing

---

[241]Respondent's Memorial on Jurisdiction, p. 52, paras. 220.ii) ; see also p. 58, paras. 244, 249 and p. 59-60, paras. 251-252.
[242] *Ibid.*, pp. 51-52, note 118.
[243] Sub-Section (7.2), paras. 261-262.

or orally. Therefore the Tribunal considers that it is not called to take any position in this respect.

## VIII.     THE COOLING OFF OBJECTION

201.  The Respondent has raised a fifth objection to the jurisdiction of the Tribunal, based on Article 26 ECT.[244]

### A.     The Respondent's Position

#### (1)     *The Objection*

202.  The Respondent contends that the Claimants have not observed the requirements set out in Article 26 ECT regarding the request to the Kingdom of Spain for an amicable solution, nor have they complied with the required three-month cooling off period before submitting to arbitration the dispute related to: i) Act 24/2013, of 26 December 2013, on the Electricity Sector ("Act 24/2013"); ii) Royal Decree 413/2014, of 6 June 2014, regulating the production of electricity from renewable energy sources, by cogeneration and from the use of waste materials ("Royal Decree 413/2014"); and iii) Ministerial Order IET/1045/2014, of 16 June 2014, approving the remuneration parameters for certain standard installations for the production of electricity from renewable energy sources, by cogeneration    and    from    the    use    of    waste    materials    ("Ministerial    Order IET/1045/2014")."[245]

203.  In arguing so, the Respondent relies on a number of arbitral awards, including *Enron Corporation and Ponderosa Assets, L.P v. Republic of Argentina* and on *Guaracachi America, Inc. and Rurelec PLC v. Plurinational State of Bolivia* where the arbitral tribunals noted that "*observance of the cooling off period to seek an amicable solution is a jurisdictional requirement*", in the absence of which a tribunal cannot hear the dispute.[246] The Respondent also quotes The *Oxford Handbook of International*

---

[244] See Respondent's Memorial on Jurisdiction, p. 71, para. 299.
[245] *Ibid.*, p. 71, para. 299.
[246] Respondent's Memorial on Jurisdiction, pp. 72-73, para. 305-306; Respondent's Reply on Jurisdiction, pp. 96-98, paras. 361-363.

*Investment Law*[247] which, with respect to the award rendered in the case *Antoine Goetz et consorts v. Republic of Burundi*,[248] notes that:

> *"The tribunal found that the waiting period had been satisfied with respect to the investor's primary claim, but not with respect to certain supplementary claims put forward by the claimant. For the tribunal, it followed that the supplementary claims were 'not in consequence capable of being decided on, and the dispute on which the Tribunal is called to give an award relates exclusively to the [primary claim]'."*[249]

204. The Respondent argues that no letter has been conveyed to the Kingdom of Spain by the Claimants in order to notify the existence of a dispute or to seek an amicable settlement in relation to the measures incorporated in Act 24/2013, Royal Decree 413/2014 and Ministerial Order IET/1045/2014.[250]

205. Finally, with respect to the Claimants' argument about the futility of any attempts to settle amicably the case, the Respondent argues that the requirements set out in Article 26 of the ECT must be observed irrespective of the other party's or the Tribunal's subjective belief as to whether they are necessary.[251] In support of its proposition, the Respondent relies on several arbitral awards.[252]

### (2)    *New Measures are not Part of a Single On-going Dispute*

206. The Respondent further argues that the New Measures do not form part of a series of measures which fall within a single on-going dispute. According to the Respondent, Act 24/2013 is much broader than RDL 9/2013 and proceeds with a new, complete regulation for the energy sector that replaces the pre-existing old Act 54/1997. Therefore, it is impossible that Act 24/2013 was issued to confirm and develop RDL 9/2013.[253] In turn, Royal Decree 413/2014 and Ministerial Order IET/1045/2015 are governmental regulations which complete and develop Act 24/2013.[254]

---

[247] Respondent's Memorial on Jurisdiction, p. 73, para. 307.
[248] *Antoine Goetz et consorts v. Republic of Burundi*, ICSID Case ARB/95/3, Award, 10 February 1999, pp. 497-498, paras. 90-93.
[249] *The Oxford Handbook of International Investment Law,* Muchlinski, Ortino and Schreuer, Oxford University Press, pp. 845- 846. RL-0008.
[250] Respondent's Memorial on Jurisdiction, pp. 74-75, paras. 316-321.
[251] Respondent's Reply on Jurisdiction, pp. 96-98, paras. 358-365.
[252] *Ibid.*, pp. 96-98, paras. 361-363.
[253] *Ibid.*, pp. 99-100, paras. 369-370.
[254] *Ibid.*, pp. 99-100, paras. 371-372.

207.  In the Respondent's view, the Claimants' assertion that any measure adopted by the Kingdom of Spain, which deviates from the regimen set out in RD 661/2007, forms part of a single arbitration, renders the requirements of Article 26 of the ECT useless on a number of grounds. First, it leaves the object of arbitration indefinitely open; second, it allows the Tribunal to make subjective determinations as to whether subsequent regulatory measures are consistent with the previous regimen; third, it prevents the Arbitral Tribunal from conducting a preliminary analysis of its jurisdiction if it has to consider the content of the regulations; and fourth, it makes the Respondent defenceless, as the Claimants could, at any time, bring new claims against any new measures the Kingdom of Spain may continue to adopt in the regulated electricity sector.[255]

208.  Finally, the Respondent contends that the reservation contained in the Request for Arbitration to introduce claims pertaining to possible new measures does not supersede the requirements set out in Article 26 of the ECT, because those requirements are necessarily prior to the Request for Arbitration.[256]

## B.    The Claimants' Position

### *(1)    Further Measures are Part of a Single On-going Dispute*

209.  The Claimants contend that they have complied with the cooling-off period required under Article 26 of the ECT because all of the Disputed Measures form part of a single on-going dispute between the Parties that was clearly notified to the Respondent.[257]

210.  In particular, while RDL 9/2013 completely withdrew the RD 661/2007 regime, it did not prescribe the specific economic parameters that would apply to the Claimants' investments thereafter. Those parameters would need to be defined in further legislation which, however, was only enacted after the Claimants put the Respondent on notice of the present dispute and after the Claimants had filed their Request for Arbitration.[258]

211.  Moreover, the Claimants made it clear in both correspondence with the Respondent and in their pleadings that they would include in this arbitration any additional measures

---

[255] *Ibid.*, pp. 100-101, para. 374.
[256] *Ibid.*, p. 101, paras. 375-376.
[257] Claimants' Counter-Memorial on Jurisdiction, pp. 82-87, paras. 251-261.
[258] *Ibid.*, p. 83, para. 252.

implemented against the CSP and wind sector relating to the RD 661/2007 regime.[259] In particular, by letter of 26 April 2013, the Claimants requested negotiations under Article 26(1) of the ECT, followed by a second request on 30 July 2013.[260] Additionally, on 17 October 2013, the Claimants expressly provided in their Request for Arbitration that "*[t]he New Regime under RDL 9/2013 is to be implemented by way of several royal decrees and ministerial orders. These implementing measures are currently the subject of legislative debate, and likely to be enacted during the coming months*".[261] Both requests for negotiations expressly concerned measures including *but not limited to* the initial measures. However, the Claimants never received a response to these requests and therefore commenced this arbitration.[262]

212. In support, the Claimants point to an allegedly well-established line of arbitral awards which have held that, where measures introduced by a host State after the investor has requested arbitration are within the scope of the dispute outlined in the request for arbitration, compliance with cooling-off periods is rendered moot.[263]

213. The Claimants particularly rely on the *Enron* tribunal which held that Enron had complied with the cooling-off period in relation to the additional tax assessments, since they, together with the initial tax assessments, formed part of a "*single continuing dispute*' that '[stemmed] *from the same factual background and* [involved] *the same causes of action under the Treaty*".[264] The tribunal commented that Enron had expressly reserved its position in the Request for Arbitration and that "… *the filing of multiple, subsequent and related actions in this case would lead to a superlative degree of inefficiency and inequity*".[265]

---

[259] *Ibid.*, p. 84, para. 255; Claimants' Rejoinder on Jurisdiction, p. 86, para. 266.

[260] Claimant's Counter-Memorial on Jurisdiction, p. 84, para. 255, citing Letter from Allen & Overy to President Mariano Rajoy Brey on behalf of the Claimants, 26 April 2013 (Exhibit C-00012).

[261] Claimants' Counter-Memorial on Jurisdiction, p. 85, para. 257, citing Claimants' Request for Arbitration, paras. 98-99, (emphasis added by the Claimants).

[262] Claimants' Rejoinder on Jurisdiction, p. 86, para. 266.

[263] Claimants' Counter-Memorial on Jurisdiction, p. 86, para. 259, citing *Ethyl Corporation v The Government of Canada*, UNCITRAL (1976), Decision on Jurisdiction, 24 June 1998 (Authority CL-0105); *Pope & Talbot Inc v The Government of Canada*, UNCITRAL (1976), Award, 7 August 2000 (Authority CL-0097); and *Enron Corporation and Ponderosa Assets, L.P. v Argentine Republic*, ICSID Case No. ARB/01/3, Award on Jurisdiction, 14 January 2004 (Authority RL-0039).

[264] Claimants' Counter-Memorial on Jurisdiction, p. 87, paras. 262-263. See also fn. 323, *Enron Corporation and Ponderosa Assets, L.P. v Argentine Republic,* ICSID Case No. ARB/01/3, Award on Jurisdiction, 14 January 2004, para. 83 (Authority RL-0039).

[265] Claimants' Counter-Memorial on Jurisdiction, p. 87, para. 262.

214.  In response to the Respondent's argument that Law 24/2013 was much broader than that of RDL 9/2013 and thus repealed certain aspects of RDL 9/2013, the Claimants argue that the Respondent fails to address the fact that RDL 9/2013 imposed a Transitory Regime on the Claimants' investments which required further implementing measures to define the new economic regime for RE installations.[266] The Claimants further counter the Respondent's allegations that the Claimants' approach would result in an open-ended arbitration, by arguing that there is a clear limit on the type of measures that would be considered 'new elements' to the claim identified in the Request for Arbitration.[267] Given that the Further Measures were already announced in RDL 9/2013, separating them from the Initial Measures would be entirely artificial.[268]

215.  Additionally, the Claimants argue that the long period it took the Respondent to implement the Disputed Measures cannot be a relevant criterion in determining the admissibility of the Claimants' claim.[269] In any case, the Respondent adopted these measures while it was on notice since 26 April 2013 of the Claimants' intention to commence an arbitration under the ECT for the measures that modified the remuneration regime for CSP and wind plants as set out in RD 661/2007.[270] Finally, the Claimants note that the Respondent's argument is absurd insofar as it appears to suggest that the Respondent would prefer the Claimants to commence a new arbitration for each new measure.[271]

### (2)    Attempts to Settle would be Futile

216.  According to the Claimants, tribunals have found that, where negotiations would be futile, even if the cooling-off period has not been observed, a refusal to hear the dispute would not be justified.[272] The Claimants recall that they sent a Request for amicable negotiations on 26 April 2013,[273] and again on 30 July 2013,[274] which however led to no settlement

---

[266] *Ibid.*, p.84, para. 254 Claimants' Rejoinder on Jurisdiction, p. 84, para. 261.
[267] Claimants' Rejoinder on Jurisdiction, p. 84-85, para. 263(a).
[268] *Ibid.*, p. 84-85, para. 263(a).
[269] Claimants' Counter-Memorial on Jurisdiction, para. 254; Claimants' Rejoinder on Jurisdiction, p. 85, para. 263(b).
[270] Claimants' Rejoinder on Jurisdiction, p. 85, para. 263(c); see Exhibit C-0012, Letter from Allen & Overy to President Mariano Rajoy Brey on behalf of the  Claimants, 26 April 2013.
[271] Claimants' Rejoinder on Jurisdiction, p. 84-85, para. 263.
[272] Claimants' Counter-Memorial on Jurisdiction, p. 88, para. 264.
[273] Exhibit C-0012, Letter from Allen & Overy to President Mariano Rajoy Brey on behalf of the Claimants, 26 April 2013.
[274] Exhibit C-0015, Letter from Allen & Overy to President Mariano Rajoy Brey on behalf of the Claimants, 30 July 2013.

of the dispute. In this regard, the Respondent has not shown any willingness to engage in amicable settlement discussions with the Claimants. Instead, it continued to take further harmful measures against the Claimants and their investments.[275]

217.    Moreover, the Claimants argue that the cases cited by the Respondent, which purportedly support that the cooling-off period is a jurisdictional question, do not follow the Respondent's position on the relevance of the futility of negotiations.[276] In particular, the ICS tribunal noted that futility of negotiations could, in some circumstances, be an exception to jurisdictional prerequisites.[277] Similarly, the *Murphy* tribunal also appeared to accept that, in principle, futility of negotiations could be relevant to excusing compliance with a cooling-off period. However, so long as negotiations had never been attempted in the case before it, the *Murphy* tribunal held that it could not conclude whether the negotiations were futile.[278]

### (3)    The Objection is a Question of Admissibility, not Jurisdiction

218.    In any event, the Claimants say, the cooling-off objection goes to the admissibility and not to the Tribunal's jurisdiction over such claims. According to the Claimants, this is confirmed by: (i) the ordinary and natural meaning of Article 25 of the ICSID Convention where the concepts of "*jurisdiction*" and "*competenc*e" clearly do not denote the concept of "*admissibility*"; (ii) numerous investment treaty decisions which consistently have read these clauses to impose procedural rather than jurisdictional requirements; and (iii) the rationale of cooling-off periods, which is to facilitate settlement, not obstruct arbitrations.[279]

219.    The Claimants further argue that none of the authorities which the Respondent relies upon support that the observance of the cooling off period is a question of jurisdiction. *Enron v. Argentine Republic* and *Guaracachi, Rurelec v Bolivia* and *Goetz v Burundi* are

[275] Claimants' Counter-Memorial on Jurisdiction, p. 89, para. 268.

[276] Claimants' Rejoinder on Jurisdiction, p. 90, para 278.

[277] *Ibid.*, p. 90, para. 278; citing *ICS Inspection and Control Services Limited v The Argentine Republic*, ICSID Case No. 2010-90, Award on Jurisdiction, 10 February 2012, para. 265.

[278] Claimants' Rejoinder on Jurisdiction, p. 90, para. 278, citing *Murphy Exploration and Production Company International v The Republic of Ecuador*, ICSID Case No. ARB/08/4, Award on Jurisdiction, 15 December 2010, para. 135 (Authority RL-0058).

[279] Claimants' Counter-Memorial on Jurisdiction, pp. 89-90, para. 271.

isolated, specific decisions, and are not representative of the current state of investment treaty jurisprudence.[280]

220. In arguing that compliance with the cooling-off period is not a pre-condition to consent, the Claimants also point to the language of Article 26(3) which patently does not condition the initiation of an arbitration on the compliance with the cooling-off period.[281] Finally, the Claimants contend that because the cases cited by the Respondent are not ECT decisions, they are not aimed to provide a valid interpretation of Article 26 of the ECT. In any event, they can be distinguished on the facts.[282]

## C.    Tribunal's Analysis

221. Article 26 of the ECT reads, in relevant parts, as follows:

> *"(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.*
>
> *(2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution [... to various means of settlement]."*

222. The Respondent "*notes the Claimants' failure to comply with the obligations contained in Article 26 ECT regarding communication of the dispute to the Kingdom of Spain and the implementation of the three-month cooling off period during which to seek an amicable solution before submitting to arbitration the dispute concerning Act 24/2013, Royal Decree 413/2014 and Ministerial Order IET/1045/2014*".[283]

223. The Tribunal makes three preliminary remarks, set out below.

- ▪ *first*, this objection only concerns the disputes between the Parties concerning three specific measures adopted by the Spanish Government (respectively on 26

---

[280] *Ibid.*, pp. 91-92, para. 275.
[281] Claimants' Rejoinder on Jurisdiction, p. 87, paras. 269-270.
[282] *Ibid.*, pp. 87-88, paras. 271- 276.
[283] Respondent's Memorial on Jurisdiction, Preliminary Objection E, p. 9, para. 16; see also p. 70.

December 2013, 6 June 2014 and 20 June 2014) after the date of the Claimants'
Memorial on the merits (dated 17 October 2013);

▪ *second*, the Respondent does not submit that the Claimants' omission to comply
with the requirements of Article 26 has consequences in respect to the whole
Application: "*...the Arbitral Tribunal lacks jurisdiction to hear a dispute
regarding Act 24/2013, Royal Decree 413/2014 and Ministerial Order
IET/1045/2014*";[284] and

▪ *third*, this objection is based on two different (if complementary) arguments,
even if the Respondent deals with them together: it is reproached to the
Claimants first not to have sought for an amicable settlement of these disputes
and second not to have allowed a three-month cooling off period to elapse in
order to allow for such amicable settlement.

224. The Claimants' main answer to this objection is that "*all of the Disputed Measures
[including those decided by the three concerned instruments] are part of a single on-
going dispute between the parties*".[285]

225. The Claimants stress that this fifth objection "*is a question of admissibility, not
jurisdiction*"[286] and that "[a]*s a question of admissibility, the Tribunal cannot refuse to
exercise jurisdiction on this basis*".[287] The Tribunal agrees on the first proposition: such
an objection bears upon the admissibility of the claim, not on the jurisdiction (or
competence) of the Tribunal to deal with it. However, the consequence of an inadmissible
submission precisely is that the court or tribunal seized cannot exercise jurisdiction in
respect of it – with, it is true, a significant difference when compared with a finding that
it has no jurisdiction: when the circumstances at the origin of the inadmissibility of the
claim have changed, it can be submitted anew and the court or tribunal concerned may
exercise jurisdiction on the new claim. As the *Ethyl Corporation* UNCITRAL (NAFTA)
tribunal put it:

"*It is important to distinguish between jurisdictional provisions,
i.e., the limits set to the authority of this Tribunal to act at all on
the merits of the dispute, and procedural rules that must be*

---

[284] *Ibid.*, paras. 322 and 324.
[285] Claimants' Counter-Memorial on Jurisdiction, p. 82, para. 251.
[286] *Ibid.*, sub-section 6.3.
[287] *Ibid.*, para. 271.

> *satisfied by Claimant, but the failure to satisfy which results not in an absence of jurisdiction ab initio, but rather in a possible delay of proceedings, followed ultimately, should such non-compliance persist, by dismissal of the claim."*[288]

226.  This being said, the Tribunal is of the view that the core issue is whether the additional claims change the character of the case: if yes, then they are not part of the dispute, the new claims must be declared inadmissible and the Tribunal must abstain to exercise jurisdiction. If this is not the case, the objection must be dismissed since (i) it can be admitted that the cooling-off period will have elapsed at the time the Tribunal's decision is taken and (ii) it would be totally artificial and unreasonably heavy to request the Claimant to lodge new applications directed against facts which are but the continuation of those at stake in the initial Application. In this respect, this Tribunal shares the opinion expressed by the *Enron* tribunal: "... *the filing of multiple, subsequent and related actions* [in such cases] *would lead to a superlative degree of inefficiency and inequity.*"[289]

227.  The purpose of the Claimants' claim is summarized in paragraphs 10 and 11 of its Request for Arbitration:

> *"10. However, once Spain had enticed foreign investors (including the Claimants) to invest substantial sums of capital in the Spanish renewable energy sector, Spain reneged on its commitments. Rather than maintaining the long-term, stable and predictable revenue streams provided under the economic regime, Spain passed a series of laws and regulations, which first modified that regime significantly and to the Claimants' detriment and, ultimately, stripped away that regime entirely. These drastic changes did not apply only to new projects. Rather, they also applied retroactively to existing projects, despite Spain's express promise that any adjustments to the economic regime (or any new regime) would not apply to existing projects. These measures, discussed in Section 6 below, thus altered dramatically the regulatory and economic framework applicable*

---

[288] *Ethyl Corporation v. The Government of Canada*, NAFTA/UNCITRAL, Award on Jurisdiction, 24 June 1998, p. 30, para. 58; *SGS Société Générale de Surveillance S.A. v. Republic of the Philippines*, ICSID Case No. ARB/02/6, Decision of the Tribunal on Objections to Jurisdiction, 29 January 2004, p. 59, para. 154; *Hochtief AG v. The Argentine Republic*, ICSID Case No. ARB/07/31, Decision on Jurisdiction, 24 October 2011, p. 23, para. 90; see also, ICJ, Judgment, 6 November 2003, *Oil Platforms* (Islamic Republic of Iran v. United States of America), *ICJ Rep.* p. 177, para. 29.

[289] *Enron Corporation and Ponderosa Assets, L.P. v Argentine Republic*, ICSID Case No. ARB/01/3, Award on Jurisdiction, 14 January 2004, para. 85. See also: *Ethyl Corporation v. The Government of Canada*, NAFTA/UNCITRAL, Award on Jurisdiction, 24 June 1998, p. 41, para. 83; *Metalclad Corporation v. The United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000, p. 20, para. 67.

> *at the time the Claimants made their investments and have caused the Claimants substantial harm.*
>
> *11. In short, Spain is guilty of the classic 'bait and switch'. It enticed substantial investment into its renewable energy sector by providing the economic incentives necessary to make such investments feasible in the first place and, once the investments had been made and Spain received the benefits of those investments, it simply withdrew those economic incentives. Spain's unlawful measures mean that the Claimants are left in a position where the very foundation of their investment decisions has been destroyed. For its part, Spain has received already – and continues to receive – the benefit of the substantial capital invested by the Claimants but, on the other hand, the Claimants are no longer entitled to receive the government-guaranteed economic incentives."*

228. More succinctly, the Claimants assert at paragraph 252 of their Counter-Memorial that "*the dispute between the parties relates to Spain's failure to honour its commitments to the Claimants under RD 661/2007*".

229. The Royal Decree 661/2007, of 25 may 2007, aims at regulating the activity of electricity production under the special regime and contains various incentives to that end in order to encourage foreign investments by "*guaranteeing the owners of facilities under the special regime a reasonable return on their investments...*"[290] For its part, the "*Further Measures*" are summarized as follows by the three instruments enunciating them:[291]

   ▪ the Act 24/2013 of 26 December 2013, on the Electricity Sector, "*sets out to establish the regulation of the Electrical Sector with a view to ensuring the supply of electrical energy and to adapt it to the needs of consumers in terms of safety, quality, efficiency, objectivity, transparency and at the minimum cost*";[292]

   ▪ the Royal Decree 413/2014 of 6 June 2014, regulating the production of electricity from renewable energy sources, cogeneration and wastes, regulates "*the legal and economic regime of the production of electricity from renewable energy sources, cogeneration and wastes*";[293] and

---

[290] Preamble, para. 5.
[291] The two last instruments being mere implementing measures of the first.
[292] Article 1.1 of Act 24/2013 of 26 December 2013 on the Electricity Sector.
[293] Article 1 of Royal Decree 413/2014 of 6 June 2014, regulating the production of electricity from renewable energy sources, cogeneration and wastes.

- the Ministerial Order IET/1045/2014 of 20 June 2014, approves the remuneration parameters of standard installations that apply to specific installations for the production of electricity from renewable energy sources, co-generation, and wastes, which "*establish the remuneration parameters for standard installations corresponding to the installations included within the scope of application of this order for the first regulatory semi-period defined in first additional provision of Royal Decree 413/2014*".[294]

230. The Tribunal considers that these instruments form part of the dispute which is the subject-matter of the Memorial on the merits submitted on 21 November 2014 by the Claimants. The Tribunal therefore has jurisdiction over this part of the dispute. And indeed it would be of no avail and would impose an unreasonable burden on both Parties to oblige the Claimants to request amicable settlement anew and to start new proceedings against the Respondent in relation to these further measures which are a mere factual extension of those initially challenged by the Claimants which announced them.

### (1)    *Conclusion on the Cooling-off Objection*

231. For the foregoing reasons, the Tribunal is of the view that the submissions of the Claimants concerning the measure adopted after their Request for Arbitration are admissible inasmuch since they do not change the general character of the case submitted to the Tribunal. Being mere factual extensions of the same dispute already before the Tribunal, the Tribunal can exercise jurisdiction over them to the same degree.

---

[294] Article 1.1 of Ministerial Order IET/1045/2014 of 20 June 2014, approving the remuneration parameters of standard installations that apply to specific installations for the production of electricity from renewable energy sources, co-generation, and wastes.

## IX.  DECISION OF THE TRIBUNAL

232.  For the foregoing reasons, the Tribunal unanimously decides as follows:

(1) The Tribunal takes note of the Claimants' abandonment of their claim concerning the modification of the Excise Duties Act of 28 December 1992 ("*Excise Duties Act*") by Article 28 of Act 15/2012.

(2) The Respondent's objection based on Article 21 ECT is joined to the merits. This decision does not prejudge any position of the Tribunal as to the admissibility of this objection as a preliminary issue or a question of substance.

(3) The questions of the composition and value of the compensable rights allegedly breached by the Respondent are joined to the merits.

(4) All other objections are rejected and the Tribunal has jurisdiction for deciding on the dispute submitted by RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. on 18 October 2013, subject to paragraph 232 (1) above.

(5) The submissions of the Claimants concerning the measures adopted after their Request for Arbitration are admissible and the Tribunal can exercise jurisdiction over them.

(6) The Tribunal will take the necessary steps for the continuation of the proceedings toward the merits phase.

(7) The decision regarding the costs of arbitration is deferred to the second phase of the arbitration on the merits.

Professor Pedro Nikken
Arbitrator

Professor Robert Volterra
Arbitrator

Professor Alain Pellet
President of the Tribunal