# EXHIBIT 32



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

**RENERGY S.À R.L.**

v.

**KINGDOM OF SPAIN**

**(ICSID CASE NO. ARB/14/18)**

    I hereby certify that the attached documents are true copies of the English and Spanish versions of the Tribunal's Award dated May 6, 2022, and the Dissenting Opinion of Professor Philippe Sands.

Meg Kinnear
Secretary-General

Washington, D.C., May 6, 2022



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceedings between

**RENERGY S.à.r.l.**
Claimant

and

**Kingdom of Spain**
Respondent

**(ICSID Case No. ARB/14/18)**

---

**AWARD**

---

*Members of the Tribunal*
Judge Bruno Simma, President
Professor Christoph Schreuer
Professor Philippe Sands QC

*Assistant to the Tribunal*
Mr. Heiner Kahlert

*Secretary of the Tribunal*
Mr. Francisco Grob

*Date of dispatch to the Parties*: 6 May 2022

**REPRESENTATION OF THE PARTIES**

*Representing RENERGY S.à.r.l.*:

Mr. Alberto Fortún Costea
Mr. Luis Pérez de Ayala
Dr. José Ángel Rueda García
Dr. Miguel Gómez Jene
Mr. Borja Álvarez Sanz
Mr. Antonio Delgado Camprubí (no longer with the firm)
Mr. Antonio María Hierro Viéitez
Mr. Gustavo Mata Morreo
Mr. José Ángel Sánchez Villegas
Ms. Elisa Salcedo Sanchez

*Cuatrecasas, Gonçalves Pereira*
Almagro, 9
28010 Madrid
Spain

*Representing Kingdom of Spain*:

Ms. María del Socorro Garrido Moreno
Ms. Gabriela Cerdeiras Megías
Mr. Pablo Elena Abad
Ms. Ana Fernández-Daza Alvarez
Mr. Antolín Fernández Antuña
Mr. Yago Fernández Badía
Mr. Roberto Fernández Castilla
Ms. Lorena Fatas Perez
Ms. Patricia Froehlingsdorf Nicolás,
Mr. Rafael Gil Nievas
Mr. José Luis Gómara Hernández
Mr. José Manuel Gutiérrez Delgado
Mr. Fernando Irurzun Montoro
Ms. Lourdes Martínez de Victoria Gómez
Ms. Amparo Monterrey Sánchez
Ms. Mónica Moraleda Saceda
Ms. Elena Oñoro Sainz
Mr. Francisco Javier Peñalver Hernández
Ms. Mª José Ruiz Sanchez
Mr. Diego Santacruz Descartín

*Abogacía General del Estado*
Departamento de Arbitrajes Internacionales
c/ Marqués de la Ensenada, 14-16,
2ª planta,
28004, Madrid
Spain

ii

TABLE OF CONTENTS

I.    Introduction ...................................................................................................................... 1

II.   Procedural History ........................................................................................................... 1

  A.  Registration and constitution of the Tribunal .................................................... 1

  B.  First Session ....................................................................................................... 2

  C.  The European Commission's First Application to Intervene .............................. 2

  D.  The Parties' First Round of Written Submissions ............................................. 3

  E.  The European Commission's Second Application to Intervene ......................... 4

  F.  Document Production Requests .......................................................................... 5

  G.  The Parties' Second Round of Written Submissions ......................................... 5

  H.  The Sale of the Claimants' Investments and Postponement of the 2017 Hearing .............. 6

  I.  The European Commission's Third Application to Intervene ............................. 7

  J.  Hearing ............................................................................................................... 8

  K.  Post-hearing Procedures .................................................................................... 11

III.  Factual Background ........................................................................................................ 17

  A.  The Claimant's Investment ............................................................................... 17

    1.  The Wind Farms ..................................................................................... 17

    2.  The CSP Plants ....................................................................................... 18

  B.  Relevant State Agents ....................................................................................... 20

  C.  Basic Features of the Spanish Legal System .................................................... 20

  D.  The Regulatory Framework prior to the Disputed Measures ............................ 21

    1.  Law 54/1997 ........................................................................................... 21

    2.  RD 2818/1998 ......................................................................................... 22

    3.  The PER 2000 ......................................................................................... 23

4. RD 436/2004 ........................................................................................ 24

5. The PER 2005 ...................................................................................... 25

6. December 2005 Supreme Court Judgment ........................................ 26

7. RDL 7/2006 ......................................................................................... 26

8. October 2006 Supreme Court Judgment ........................................... 26

9. RD 661/2007 and March 2007 Supreme Court Judgment .................. 27

10. October 2007 Supreme Court Judgment ........................................... 31

11. RDL 6/2009 ......................................................................................... 31

12. Council of Ministers Resolution of 13 November 2009 ..................... 32

13. December 2009 Supreme Court Judgments ....................................... 32

14. The 2010 Agreements with the Wind and CSP Sectors and RD 1614/2010 ................. 33

15. Waiver Letters and Waiver Acceptance Resolutions ........................ 38

E.  The Disputed Measures ............................................................................ 39

1. Regional Act 1/2012 ........................................................................... 39

2. Regional Act 9/2012 ........................................................................... 39

3. Law 15/2012 ....................................................................................... 39

4. RDL 2/2013 ......................................................................................... 40

5. MO IET/221/2013 .............................................................................. 41

6. RDL 9/2013 ......................................................................................... 41

7. Law 24/2013 ....................................................................................... 42

8. RD 413/2014 ....................................................................................... 43

9. MO IET/1045/2014 ............................................................................ 44

10. MO IET/1168/2014 ............................................................................ 45

11. MO IET/1882/2014 ............................................................................ 46

F.  The Spanish Electricity System (SES) and the Financial and Economic Crisis ............... 46

G.  The State Aid Decision of the European Commission ................................. 49

IV.  The Parties' Requests for Relief ...................................................................... 50

V.  Jurisdiction .................................................................................................... 51

A.  Objection A ............................................................................................... 51

1. The *Achmea* and *Komstroy* Judgments ............................................ 51

iv

2. The Respondent's Principal Arguments ........................................................... 58

    *a. EU Member States as the Same Contracting Party vis-à-vis Each Other* ................ 58

    *b. Applicability of EU Law* ........................................................................... 59

    *c. Primacy of EU Law* ................................................................................. 59

    *d. Inapplicability of Article 26 ECT to Intra-EU Cases* ................................. 60

    *e. Primacy of EU Law as a Conflict Rule and Lex Posterior to Article 26 ECT* .......... 60

    *f. The Achmea Judgment* ............................................................................. 61

    *g. The Komstroy Judgment* ........................................................................... 61

    *h. Lack of a Disconnection Clause* ............................................................... 62

    *i. The EU Member States Declarations* ......................................................... 62

3. The Claimant's Principal Arguments ............................................................. 63

    *a. Intra-EU Effect of the ECT* ...................................................................... 63

    *b. Validity and Binding Effect of the ECT between Luxembourg and Spain* ................ 64

    *c. Inapplicability of EU Law to a Decision on Jurisdiction* ........................... 65

    *d. Irrelevance of the Primacy of EU Law* ...................................................... 65

    *e. Resolution of a Conflict of Laws* ............................................................. 66

    *f. Irrelevance of the Achmea Judgment* ......................................................... 67

    *g. Case Law before and after the Achmea Judgment* ....................................... 68

    *h. Irrelevance of the Komstroy Judgment* ...................................................... 68

    *i. The EU Member States Declarations* ......................................................... 69

    *j. Propriety of Issuing an Award* ................................................................. 70

4. The European Commission's Submission ......................................................... 70

5. The Tribunal's Analysis ............................................................................... 72

    *a. Applicability of EU Law and Consequences Thereof* ................................... 72

      i. Applicability of EU Law ...................................................................... 72

        *(1) Possibility to Apply EU Law* ........................................................ 72

        *(2) No Need to Apply EU Law* .......................................................... 77

      ii. Consequences of Applying EU Law ..................................................... 78

      iii. Resolution of a Conflict of Laws ......................................................... 80

        *(1) Harmonious Interpretation* .......................................................... 81

        *(2) Potential Conflict Rules* .............................................................. 83

          *(a) Article 16 ECT* ................................................................... 83

          *(b) Article 30 and 59 VCLT* ..................................................... 85

(i)     Article 30 VCLT ........................................................................ 85

(ii)    Article 59 VCLT ....................................................................... 86

*(c)     Primacy of EU Law* ....................................................................... 87

b.    *The Respondent and Luxembourg as "other Contracting Parties" vis-à-vis Each Other* ..................................................................................... 89

c.    *Propriety of Issuing an Award* .................................................. 90

d.    *Conclusion* ............................................................................ 91

B.    Objection B ............................................................................... 91

1.    The Respondent's Principal Arguments ................................... 91

2.    The Claimant's Principal Arguments ...................................... 92

3.    The Tribunal's Analysis ......................................................... 93

C.    Objection C ............................................................................... 96

1.    The Respondent's Principal Arguments ................................... 96

2.    The Claimant's Principal Arguments ...................................... 98

3.    The Tribunal's Analysis ........................................................ 101

a.    *TVPEE and TEE as "Taxation Measures"* ........................... 102

b.    *Abuse of rights* ................................................................ 104

c.    *Claw-back of Article 21(3) ECT* ..................................... 107

D.    Objection D ............................................................................ 109

E.    Objection E ............................................................................. 109

1.    The Respondent's Principal Arguments ................................. 109

2.    The Claimant's Principal Arguments .................................... 110

3.    The Tribunal's Analysis ....................................................... 111

F.    Objection F ............................................................................. 112

1.    The Respondent's Principal Arguments ................................. 112

2.    The Claimant's Principal Arguments .................................... 115

3.    The Tribunal's Analysis ....................................................... 118

**VI.    Applicable Law** ..................................................................... **125**

**VII.   Responsibility** ...................................................................... **126**

A.    Fair and Equitable Treatment ......................................................................... 126

  1.    Applicable Standard ................................................................................... 126

    *a.    The Claimant's Principal Arguments* ................................................. 126

    *b.    The Respondent's Principal Arguments* .............................................. 127

    *c.    The Tribunal's Analysis* ................................................................... 128

  2.    Violation of Legitimate Expectations ......................................................... 131

    *a.    Applicable Test* ............................................................................... 131

    *b.    Legitimate Expectations Created by the Respondent* .............................. 132

      i.    The Claimant's Principal Arguments ................................................ 132

      ii.    The Respondent's Principal Arguments ............................................. 136

      iii.    The Tribunal's Analysis ................................................................ 140

        *(1)    Standard for Assessing Legitimate Expectations* ........................ 140

        *(2)    The State Aid Argument* .......................................................... 145

        *(3)    The 50MW Argument* ............................................................. 148

        *(4)    Nature of Legitimate Expectations Created* ................................ 149

          *(a)    RD 661/2007 and the Press Release Accompanying It* ............. 150

          *(b)    The Respondent's Advertising of Its Regulatory Framework to Foreign Investors* ............................................................................... 152

          *(c)    Registration in RAIPRE and the Remuneration Pre-Allocation Registry* . 152

          *(d)    Resolution of the Council of Ministers of 13 November 2009* .................. 153

          *(e)    RD 1614/2010, the 2010 Wind/CSP Agreements and Accompanying Press Releases* ................................................................................. 153

          *(f)    The Waiver Letters and Waiver Acceptance Resolutions* ......................... 154

          *(g)    Conclusion on Legitimate Expectations Created* ..................................... 154

    *c.    Reliance by the Claimant* ................................................................... 158

      i.    The Claimant's Principal Arguments ................................................ 158

      ii.    The Respondent's Principal Arguments ............................................. 159

      iii.    The Tribunal's Analysis ................................................................ 160

    *d.    Frustration of Legitimate Expectations by the Respondent* ...................... 164

      i.    The Claimant's Principal Arguments ................................................ 164

      ii.    The Respondent's Principal Arguments ............................................. 165

      iii.    The Tribunal's Analysis ................................................................ 166

        *(1)    Magnitude of the Change* ........................................................ 166

    (a)    *Level of Remuneration Deemed Reasonable by the Respondent* ............... *167*

        (i)    Positions Taken by the Respondent under RF1 and RF3 ..................... 168

        (ii)   Conversion of RF1 Reference IRR into Pre-tax Numbers .................... 169

        (iii)  Comparison between RF1 and RF3 .................................................... 172

    (b)    *New Remunerative System and the Incentives It Creates for Producers* ... *174*

    (c)    *Introduction of Regulatory Lifespan* ......................................................... *176*

    (d)    *Cap on Annual Operating Hours Qualifying for Feed-in Remuneration* .. *178*

    (e)    *Reduction of CSP Plants' Maximum Energy Production through Back-up Fuel Qualifying for Feed-in Remuneration* ................................................ *179*

    (f)    *Substitution of Index For Inflation Updates to Remuneration Values* ....... *181*

    (g)    *Periodic Review* ........................................................................................ *181*

    (h)    *Other Changes* ........................................................................................... *182*

    (i)    *Conclusion* ................................................................................................. *183*

(2)    *Economic Impact on the Claimant's Facilities* ............................................. *183*

    (a)    *Assumptions Underlying the Economic Analysis* ....................................... *184*

        (i)    Valuation Method ............................................................................. 184

        (ii)   Valuation Date .................................................................................. 187

        (iii)  Inflation ............................................................................................ 187

        (iv)  Feed-in Remuneration in the Actual Scenario ................................. 188

        (v)   Feed-in Remuneration in the But-for Scenario ................................ 189

        (vi)  Pool Prices ........................................................................................ 190

        (vii) Projected Lifetime of the Claimant's Facilities .................................... 191

        (viii) Production Levels ............................................................................. 195

        (ix)  Use of Back-up Fuel ......................................................................... 198

        (x)   Back-up Fuel Prices .......................................................................... 199

        (xi)  O&M Costs ....................................................................................... 199

        (xii) Discount Rate (Not Including Regulatory Risk) ................................ 199

        (xiii) Regulatory Risk ................................................................................ 201

        (xiv) Taxes ................................................................................................ 202

        (xv) Summary ........................................................................................... 203

    (b)    *Analysis of the Economic Impact* .............................................................. *204*

        (i)    Impact on IRRs ................................................................................. 205

        (ii)   Impact on Cash-flows ....................................................................... 207

(iii)    Comparison with Cost of Capital ........................................................ 209

(iv)    Summary .............................................................................................. 212

(3)    *Abruptness of the Change* ........................................................................ 214

(4)    *Change of External Circumstances* .......................................................... 216

(5)    *Public Interests Involved* ......................................................................... 218

(6)    *Prior Legislative Practice* ....................................................................... 219

(7)    *Stability Assurances* ................................................................................ 221

(8)    *Conclusion* ............................................................................................... 222

3.    Lack of Transparency and Due Process .............................................................. 224

a.    *The Claimant's Principal Arguments* ........................................................ 224

b.    *The Respondent's Principal Arguments* .................................................... 225

c.    *The Tribunal's Analysis* ........................................................................... 226

4.    Arbitrariness ........................................................................................................ 228

a.    *The Claimant's Principal Arguments* ........................................................ 228

b.    *The Respondent's Principal Arguments* .................................................... 228

c.    *The Tribunal's Analysis* ........................................................................... 228

B.    Most Constant Protection and Security .................................................................... 229

1.    The Claimant's Principal Arguments .................................................................. 229

2.    The Respondent's Principal Arguments .............................................................. 230

3.    The Tribunal's Analysis ....................................................................................... 230

C.    Non-impairment ......................................................................................................... 231

1.    The Claimant's Principal Arguments .................................................................. 231

2.    The Respondent's Principal Arguments .............................................................. 233

3.    The Tribunal's Analysis ....................................................................................... 234

D.    Umbrella Clause ......................................................................................................... 236

1.    The Claimant's Principal Arguments .................................................................. 236

2.    The Respondent's Principal Arguments .............................................................. 237

3.    The Tribunal's Analysis ....................................................................................... 239

E.    Unlawful Expropriation ............................................................................................. 241

1.    The Claimant's Principal Arguments .................................................................. 241

2. The Respondent's Principal Arguments ........................................................ 242

3. The Tribunal's Analysis ........................................................................... 243

F. Conclusion on Responsibility ......................................................................... 248

**VIII. Damages** ............................................................................................. **248**

A. The Claimant's Principal Arguments ............................................................. 248

B. The Respondent's Principal Arguments ......................................................... 250

C. The Tribunal's Analysis ............................................................................... 252

1. Construction of the Alternative But-for Scenario ........................................ 254

2. Illiquidity Discount ................................................................................. 255

3. Principal Damages .................................................................................. 256

4. Interest ................................................................................................. 258

5. Tax Gross-up .......................................................................................... 258

**IX. Costs** ....................................................................................................... **260**

A. The Claimant's Submission on Costs ............................................................ 260

B. The Respondent's Submission on Costs ......................................................... 261

C. The Tribunal's Decision on Costs ................................................................. 262

**X. Operative Part** ......................................................................................... **264**

## TABLE OF DEFINED TERMS

| 2010 Agreements | 2010 CSP Agreement and 2010 Wind Agreement |
|---|---|
| 2010 CSP Agreement | "Agreement with the Thermosolar Sector" (Exhibit C-0249) |
| 2010 Wind Agreement | "Agreement with the Wind Sector" (Exhibit C-0255) |
| 22 Member States Declaration | "Declaration of the Representatives of the Governments of the Member States, of 15 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union" (C-0851) |
| ABV | Asset-based valuation |
| Accuracy I | "Economic Report on the Plaintiff and its Claim" by Accuracy, dated 12 May 2016 |
| Accuracy II | "Second Economic Report on the Claimant and its Claim" by Accuracy, dated 24 February 2017 |
| AEE | Wind energy association "Asociación Empresarial Eólica" |
| APPA | Association of renewable energy producers "Asociación de Productores de Energías Renovables" |
| ATA CSP Capacity Report | "CSP Plant Installed Capacity Assessment Expert Report" by ATA, dated 17 November 2016 (BQR-98) |
| ATA CSP Lifetime Report | "CSP PT Plant Lifetime Expert Report" by ATA, dated 17 November 2016 (BQR-103) |
| ATA Wind Lifetime Report | "Wind Farm Lifetime Report" by ATA, dated 21 December 2016 (BQR-126) |
| Back-up Fuel | Fuel used by CSP plants |
| BCG | Boston Consulting Group |
| BQR I | "Financial damages to Renergy" by Brattle, dated 23 September 2015 (CER-0002) |
| BQR II | "Rebuttal Report: Financial Damages to Renergy" by Brattle, dated 4 January 2017 (CER-0004) |

| BQR-[#] | Exhibit no. [#] to BQR I / BQR II |
|---|---|
| Brattle | The Brattle Group |
| BRR I | "Changes to the Regulation of Concentrated Solar Power and Wind Installations in Spain" by Brattle, dated 23 September 2015 (CER-0001) |
| BRR II | "Second Report: Changes to the Regulation of Concentrated Solar Power and Wind Installations in Spain" by Brattle, dated 4 January 2017 (CER-0003) |
| BRR-[#] | Exhibit no. [#] to BRR I / BRR II |
| C-[#] | Claimant's exhibit no. [#]. Unless noted otherwise, reference is made to the English version of the relevant exhibit. |
| C-OS | Claimant's powerpoint presentation "Claimant's Opening Statement", as presented at the Hearing |
| C-PHB | Claimant's "Post-Hearing Brief – Claimant's Answers to the Tribunal's Questions in PO 13", dated 1 February 2019 |
| C-SoC | Claimant's "Submission on Costs", dated 24 November 2021 |
| CAPM | Capital Asset Pricing Model |
| Casanova Report | "Expert Witness Report Regarding Installed Capacity of the RENERGY Olivenza 1 and Moron Concentrated Solar Power (CSP) Plants" by Dr. Jesús Casanova Kindelán, dated 22 February 2017 |
| CC on *BayWa* | Claimant's "Comments on the Treatment of the State Aid Issue in the *Baywa v. Spain* Decision and on the European Commission's Communications of March 2020", dated 23 April 2020 |
| CC on EC's Comments on *Achmea* Judgment | Claimant's "Response to the European Commission's Amicus Curiae Brief", dated 16 July 2018 |
| CC on ECT Decisions | Claimant's "Submission on some new ECT Decisions (II) (until January 2020) as well as on the new Royal Decree Law 17/2019 of 22 November 2019 whereby the rate of return is further reduced to Renergy's Investments", dated 14 February 2020 |
| CC on Declarations of EU Member States | Claimant's "Comments on the Declarations by EU Member States of 15-16 January 2019", dated 4 March 2019 |

| | |
|---|---|
| CC on *Komstroy* | Claimant's "Comments to the Judgment rendered by the CJEU in Republic of Moldova v. Komstroy and Reply to Respondent's Comments", dated 15 October 2021 |
| CER-000[#] | Claimant's Expert Report no. 000[#] |
| CJEU | Court of Justice of the European Union |
| CL-[#] | Claimant's legal authority no. [#]. Unless noted otherwise, reference is made to the English version of the relevant legal authority. |
| Claimant | RENERGY S.à.r.l. |
| CMoJ | Claimant's "Counter-Memorial on Jurisdiction", dated 9 January 2017 |
| CMoM | Respondent's "Counter-Memorial on the Merits", dated 12 May 2016 |
| CNE | National Energy Commission |
| CNMC | National Markets and Competition Commission |
| Condeu | Condeu Ltd. |
| Consultant Reports | Reports issued by BCG and Roland Berger to the Respondent in the context of the preparation of MO IET/1045/2014 |
| Contracting Party | A contracting party to the ECT as defined therein. Also referred to as Contracting Party to the ECT. |
| CPI | Consumer price index used in RF1 to index remuneration values to inflation |
| CSP | Concentrated solar power |
| CSP Plants | The CSP plants at issue in this arbitration |
| CSP SPVs | The companies directly owning the CSP Plants (Ibereólica Solar Morón S.L. and Ibereólica Solar Olivenza S.L.) |
| CWS-AC | Witness statement of Mr. José Alberto Ceña Lázaro, dated 18 September 2015 |
| CWS-AC2 | Witness statement of Mr. José Alberto Ceña Lázaro, dated 27 December 2016 |

| | |
|---|---|
| CWS-DG | Witness statement of Mr. Gerardo David Gómez-Sáinz García, dated 22 September 2015 |
| CWS-DG2 | Witness statement of Mr. Gerardo David Gómez-Sáinz García, dated 3 January 2017 |
| CWS-JMR | Witness statement of José Manuel Ramos Pérez-Polo, dated 16 September 2015 |
| CWS-LC | Witness statement of Dr. Luis Crespo Rodríguez, dated 31 July 2015 |
| CWS-LC2 | Witness statement of Dr. Luis Crespo Rodríguez, dated 24 October 2016 |
| Dagosa | Inversiones Dagosa S.L.U. |
| DCF | Discounted cash-flow |
| Disputed Measures | Respondent's legislative and executive measures at issue in this arbitration |
| EC | European Commission |
| EC's First Amicus Curiae Brief | EC's "Amicus Curiae Brief", dated 11 November 2016 |
| EC's Second Amicus Curiae Brief | EC's "Amicus Curiae Brief", dated 22 June 2018 |
| EC Submission on State Aid | EC's unsolicited submission "Legal developments in case ARB/14/18 – Renergy S.à.r.l. v. Kingdom of Spain", dated 13 March 2020 |
| ECT | Energy Charter Treaty |
| ECT Reader's Guide | Energy Charter Secretariat, The Energy Charter Treaty: A Reader's Guide, June 2002 (CL-0025/RL-0067) |
| EPC | Engineering, procurement and construction |
| EU | European Union |
| EU Member State | Member State of the European Union |
| EU Member States Declarations | The 22 Member States Declaration, the Five Member States Declaration, and the "Declaration of the Representative of the Government of Hungary, of 16 January 2019 on the legal |

| | consequences of the judgment of the Court of Justice in *Achmea* and on investment protection in the European Union" (C-0853) |
|---|---|
| EU Treaties | TEU and TFEU |
| Experts | Accuracy and Brattle |
| FET | Fair and equitable treatment |
| Five Member States Declaration | "Declaration of the Representatives of the Governments of the Member States on the Enforcement, of 16 January 2019 of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union" (C-0852) |
| Hearing | Hearing on jurisdiction, responsibility and quantum held on 26-29 November 2019 |
| Hedroso | Wind Farm at the Spanish community of Hedroso-Aciberos |
| HT | Hearing Transcript |
| Ibereólica | Ibereólica S.L. |
| Ibereólica Solar | Ibereólica Solar S.L. |
| ICSID | International Centre for Settlement of Investment Disputes |
| ICSID Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings |
| ICSID Convention | Convention on the Settlement of Investment Disputes between States and Nationals of Other States |
| IDAE | Institute for Diversification and Saving of Energy |
| Intra-EU Objection | Respondent's Preliminary Objection A against the Tribunal's jurisdiction |
| IRR | Internal rate of return |
| Joint Model | Financial model agreed upon by the Experts further to Procedural Order No. 14 and subsequent instructions by the Tribunal, as submitted by the Parties in the form of an excel sheet on 14 June 2021 |
| Law | Act of the Respondent's Parliament |

| | |
|---|---|
| Lubián | Wind Farm at the Spanish community of Lubián |
| Lubián 1 | Phase 1 of Lubián |
| Lubián 2 | Phase 2 of Lubián |
| Lugano Convention | Convention on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters; OJ L 339, 21.12.2007 |
| Maximum Operating Hours | Amount of annual operating hours (introduced by RD 413/2014) above which renewable energy facilities receive no ROp |
| MFN | Most favoured nation |
| Minimum Operating Hours | Amount of annual operating hours (introduced by RD 413/2014) below which the Specific Remuneration of a renewable energy facility is reduced proportionally for the relevant year (provided that the facility remains above the Operating Threshold) |
| Ministry of Energy | Respondent's Ministry in charge of energy matters (Ministry of Economy from 2000 to 2004; Ministry of Industry, Tourism and Commerce (MITYC) from 2004 to 2011; Ministry of Industry, Energy and Tourism from 2011 onwards) |
| MO | Ministerial Order |
| MoM | Claimant's "Memorial on the Merits", dated 25 September 2015 |
| MoPO | Respondent's "Memorial on Preliminary Objections and Request for Bifurcation", dated 3 December 2015 |
| MCPS | Most constant protection and security |
| Morón | CSP Plant at the Spanish community of Morón de la Frontera |
| Mr. Gómez | Mr. Gerardo David Gómez-Sáinz García |
| MST | Minimum standard of treatment of customary international law |
| O&M | Operation and maintenance |
| Olivenza | CSP Plant at the Spanish community of Olivenza |
| Operating Threshold | Amount of annual operating hours (introduced by RD 413/2014) that renewable energy facilities are required to reach, failing which they will not receive any Specific Remuneration for the relevant year |

| Ordinary Regime | Legal regime applicable to electric power production facilities using non-renewable energy sources, as erected by Law 54/1997 |
|---|---|
| Padornelo | Wind Farm at the Spanish community of Padornelo |
| Parties | RENERGY S.á.r.l. and the Kingdom of Spain |
| PER 2000 | "Plan de Fomento de las Energías Renovables en España 2000-2010" (C-0065/R-0218) |
| PER 2005 | "Plan de Energías Renovables en España 2005-2010" (C-0075/R-0119) |
| Pool Price | Market price at the wholesale electricity market |
| Pool Price Plus Premium | Remuneration option (provided for in RD 661/2007) whereby the producer sells energy to the market for the Pool Price, on top of which it receives a premium fixed by the regulator |
| R-[#] | Respondent's exhibit no. [#]. Unless noted otherwise, reference is made to the English version of the relevant exhibit. |
| R-OS (Facts) | Respondent's powerpoint presentation "Fundamental Fact Issues of the Arbitration", as presented at the Hearing |
| R-OS (Jurisdiction) | Respondent's powerpoint presentation "Jurisdictional Objections Raised by the Kingdom of Spain", as presented at the Hearing |
| R-OS (Merits) | Respondent's powerpoint presentation "Respondent's Opening Statements Grounds on the Merits", as presented at the Hearing |
| R-PHB | Respondent's "Answers to the Tribunal's Post-Hearing Questions", dated 1 February 2019 |
| R-SoC | Respondent's "Submission on Costs", dated 3 December 2021 |
| RAIPRE | Administrative registry for producers of electricity in Spain |
| RC on Declarations of EU Member States | Respondent's "Comments on the Declarations of the Representatives of the Governments of the Member States of 15 and 16 January 2019 with regard to the *Achmea* Judgment", dated 4 March 2019 |
| RC on EC's Comments on *Achmea* Judgment | Respondent's "Comments on Commission's Comments on the Ruling of the ECJ on C284/16 (the *Achmea* Case) of 6 March 2017 |

| | |
|---|---|
| | concerning the compatibility between the BIT signed in 1991 by The Netherlands and the Slovak Republic", dated 16 July 2018 |
| RC on *BayWa* | Respondent's "Comments on the European Commission's Communication and the Treatment of the State Aid in the *Baywa v. Spain* Decision", dated 23 April 2020 |
| RC on *Komstroy* | Respondent's "Final comments Komstroy CJEU Decision", dated 1 October 2021 |
| RD | Royal Decree |
| RDL | Royal Decree Law |
| Regional Act 1/2012 | Regional Act 1/2012 adopted on 28 February 2012 by the Respondent's autonomous community Castile and León |
| Regional Act 9/2012 | Regional Act 9/2012 adopted on 21 December 2012 by the Respondent's autonomous community Castile and León |
| Regulated Tariff | Remuneration option whereby the producer receives a fixed tariff set by the regulator for the energy despatched to the grid |
| Regulatory Lifespan | Time period (introduced by RD 413/2014) after the expiry of which period no Specific Remuneration will be paid to the relevant facility |
| REIO | A Regional Economic Integration Organisation as defined in Article 1(3) ECT |
| Remuneration Pre-Allocation Register | Administrative register (introduced by RDL 6/2009) to control and eventually limit the growth of renewable energy capacity in Spain |
| Request | Claimant's "Request for Arbitration", dated 22 July 2014 |
| Respondent | Kingdom of Spain |
| RF1 | Spanish regulatory framework for renewable energy production as erected by Law 54/1997 and as amended prior to Regional Act 1/2012 |
| RF1 Reference IRR | The IRR underlying the remuneration scheme of RF1 |
| RF2 | Spanish regulatory framework for renewable energy production as amended by all Disputed Measures from Regional Act 1/2012 to MO IET/221/2013 |

xviii

| | |
|---|---|
| RF3 | Spanish regulatory framework for renewable energy production as amended by all Disputed Measures from RDL 9/2013 to MO IET/1882/2014 |
| RF3 Target IRR | The target IRR introduced by RF3 |
| RInv | "Return on investment" as provided for in RD 413/2014 |
| RjoJ | Claimant's "Rejoinder on Jurisdiction", dated 24 March 2017 |
| RjoM | Respondent's "Rejoinder on the Merits", dated 24 February 2017 |
| RL-[#] | Respondent's legal authority no. [#]. Unless noted otherwise, reference is made to the English version of the relevant legal authority. |
| ROp | "Return on operation" as provided for in RD 413/2014 |
| RoPO | Respondent's "Reply on Preliminary Objections", dated 24 February 2017 |
| RoM | Claimant's "Reply on the Merits", dated 9 January 2017 |
| RRRE | Register of the specific remuneration scheme (introduced by RDL 9/2013) |
| RWS-CMR | Witness statement of Mr. Carlos Montoya, dated 11 May 2016 |
| RWS-CMR2 | Witness statement of Mr. Carlos Montoya, dated 24 February 2017 |
| Santos Vaquer Opinion | "Opinion on the legal nature and effectiveness of certain acts of the directorate-general for energy policy and mines on solar power facilities" by Prof. Dr. María José Santos Morón and Prof. Dr. Marcos Vaquer Caballería, dated 23 February 2017 |
| Servert Report | "Moron y [sic] Olivenza Parabolic Trough CSP plants – Lifetime analysis" by Dr. Jorge Servert del Río, dated 23 February 2017 |
| SES | Spanish Electricity System |
| Special Regime | Legal regime applicable to electric power production facilities using renewable energy sources, as erected by Law 54/1997 |
| Specific Remuneration | Remuneration of Special Regime facilities in addition to the Pool Price, consisting of RInv and ROp, as provided for in RD 413/2014 |

| | |
|---|---|
| SPVs | CSP SPVs and Wind SPVs |
| Tariff Deficit | Shortfall between the income and the costs of the SES |
| TEE | Tax on the environmental effects caused inter alia by wind farms, as introduced by Regional Act 1/2012 |
| TEU | Treaty on European Union, originally signed at Maastricht on 7 February 1992 |
| TFEU | Treaty on the Functioning of the European Union, originally signed at Rome on 23 March 1957 |
| TMR | Reference electricity tariff to which multiple remuneration values were linked in RD 436/2004 |
| TVPEE | Tax on the value of the elective power generation, as introduced by Law 15/2012 |
| VCLT | Vienna Convention on the Law of Treaties, signed at Vienna on 23 May 1969 (CL-0024/RL-0041) |
| Waiver Acceptance Resolutions | Letters sent by the Ministry of Energy to CSP plant owners in response to their Waiver Letters |
| Waiver Letters | Letters of CSP plant owners to the Ministry of Energy waiving their right to have their CSP plants enter into operation before a certain date |
| Wind Farms | Wind farms at issue in this arbitration |
| Wind SPVs | Companies directly owning the Wind Farms (Ibereólica Hedroso-Aciberos S.A.U., Ibereólica Padornelo S.A.U. and Ibereólica Lubián S.A.U.) |

**TABLE OF ABBREVIATED CASE REFERENCES**

| | |
|---|---|
| *9REN v. Spain* | *9REN Holding S.À.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019 (CL-0303) |
| *Achmea* Judgment | Judgment of the CJEU of 6 March 2018 in *Slovak Republic v. Achmea B.V.*, Case C-284/16 (CL-0278/RL-0135) |
| *ADC v. Hungary* | *ADC Affiliate Limited and ADC & ADMC Management Limited v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006 (CL-0117) |
| *Al-Bahloul v. Tajikistan* | *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan*, SCC Case No. V (064/2008), Partial Award on Jurisdiction and Liability, 2 September 2009 (CL-0037) |
| *Antin v. Spain* | *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 (CL-0281) |
| *AES v. Hungary* | *AES Summit Generation Limited and AES-Tisza Erömü Kft v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010 (CL-0003/CL-0127/RL-0056) |
| *Antaris v. Czech Republic* | *Antaris GmbH and Dr Michael Göde v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018 (CL-0286) |
| *Azurix v. Argentina* | *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006 (CL-0128) |
| *BayWa v. Spain* | *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (CL-0309/RL-0126) |
| *BG v. Argentina* | *BG Group Plc. v. Republic of Argentina*, UNCITRAL, Final Award, 24 December 2007 (CL-0090/RL-0053) |
| *Blusun v. Italy* | *Blusun S.A. et al. v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016 (CL-0277/RL-0115) |
| *Burlington v. Ecuador* | *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/05, Decision on Jurisdiction, 2 June 2010 (RL-0091) |

| | |
|---|---|
| *Casinos Austria v. Argentina* | *Casinos Austria International GmbH and Casinos Austria Aktiengesellschaft v. Argentine Republic*, ICSID Case No. ARB/14/32, Decision on Jurisdiction, 29 June 2018 |
| *Cavalum v. Spain* | *Cavalum SGPS, S.A. v. Kingdom of Spain*, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020 (RL-0168) |
| *Charanne v. Spain* | *Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain*, SCC Arbitration 062/2012, Final Award, 21 January 2016 (CL-0191/RL-0063) |
| *CME v. Czech Republic* | *CME Czech Republic B.V. v. Czech Republic*, UNCITRAL, Partial Award, 13 September 2001 (CL-0041) |
| *CMS v. Argentina* | *CMS Gas Transmission Company v. Republic of Argentina*, ICSID Case No. ARB/01/8, Award, 12 May 2005 (CL-0070) |
| *Continental Casualty v. Argentina I* | *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, Decision on Jurisdiction, 22 February 2006 |
| *Continental Casualty v. Argentina II* | *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, 5 September 2008 (CL-0077) |
| *Cube v. Spain I* | *Cube Infrastructure Fund SICAV and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (RL-0121) |
| *Cube v. Spain II* | *Cube Infrastructure Fund SICAV and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Award, 15 July 2019 (CL-0304) |
| *Duke Energy v. Ecuador* | *Duke Energy Electroquil Partners & Electroquil S.A. v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008 (CL-0113/RL-0090) |
| *Eastern Sugar v. Czech Republic* | *Eastern Sugar B.V. v. Czech Republic*, SCC No. 008/2004, Partial Award, 27 March 2007 (CL-0005) |
| *EDF v. Romania* | *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009 (RL-0055) |
| *Eiser v. Spain* | *Eiser Infrastructure Limited and Energia Solar Luxembourg S.À.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017 (CL-0276/RL-0114) |

xxii

| | |
|---|---|
| *Eiser v. Spain* (annulment) | *Eiser Infrastructure Limited and Energia Solar Luxembourg S.À.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Decision on the Kingdom of Spain's Application for Annulment, 11 June 2020 (RL-0167) |
| *El Paso v. Argentina* | *El Paso Energy International Company v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011 (CL-0020) |
| *Electrabel v. Hungary I* | *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 (CL-0002/CL-0046/RL-0060) |
| *Electrabel v. Hungary II* | *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015 (RL-0062) |
| *Enron v. Argentina* | *Enron Corporation and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/03, Award, 22 May 2007 (CL-0084/RL-0085) |
| *Encana v. Ecuador* | *EnCana Corporation v. Republic of Ecuador*, LCIA Case No. UN 3481, Award, 3 February 2006 (RL-0050) |
| *Eskosol v. Italy* | *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes, 7 May 2019 (CL-0300) |
| *Foresight/Greentech v. Spain* | *Foresight Luxembourg Solar 1 S.À.R.L. et al. v. Kingdom of Spain*, SCC Arbitration V (2015/150), Final Award, 14 November 2018 (CL-0287/CL-0298/RL-0124) |
| *FREIF v. Spain* | *FREIF Eurowind Holdings Ltd. (United Kingdom) v. Kingdom of Spain*, SCC Case V 2017/060, Final Award, 8 March 2021 (RL-0170) |
| *Gold Reserve v. Venezuela* | *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014 (CL-0110) |
| *Greentech v. Italy* | *Greentech Energy Systems A/S et al. v. Italy*, SCC Arbitration V (2015/095), Award, 23 December 2018 |
| *InfraRed v. Spain* | *InfraRed Environmental Infrastructure GP Limited et al. v. Kingdom of Spain*, ICSID Case No. ARB/14/12, Award, 2 August 2019 (CL-0306/RL-0165) |

| | |
|---|---|
| *Invesmart v. Czech Republic* | *Invesmart, B.V. v. Czech Republic*, UNCITRAL, Award, 26 June 2009 (RL-0101) |
| *Isolux v. Spain* | *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain,* SCC Arbitration V 2013/153, Award, 12 July 2016 (CL-0206 /RL-0095) |
| *KT Asia v. Kazakhstan* | *KT Asia Investment Group B.V. v. Republic of Kazakhstan*, ICSID Case No. ARB/09/8, Award, 17 October 2013 (CL-0285) |
| *Komstroy* Judgment | Judgment of the CJEU of 2 September 2021 in *Republic of Moldova v. Komstroy LLC*, Case C-741/19 (RL-0173) |
| *Levy de Levi v. Peru* | *Renée Rose Levy de Levi v. Republic of Peru*, ICSID Case No. ARB/10/17, Award, 26 February 2014 (CL-0130) |
| *LG&E v. Argentina* | *LG&E Energy Corp. et al. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006 (CL-0082) |
| *Liman v. Kazakhstan* | *Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Award, 22 June 2010 (CL-0101) |
| *Masdar v. Spain* | *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 (CL-0280) |
| *Mera v. Serbia* | *Mera Investment Fund Limited v. Republic of Serbia*, ICSID Case No. ARB/17/2, Decision on Jurisdiction, 30 November 2018 |
| *Metalclad v. Mexico* | *Metalclad Corporation v. United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2020 (CL-0065) |
| *Micula v. Romania* | *Ioan Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013 (CL-0111/RL-0111) |
| *Mobil v. Canada* | *Mobil Investments Canada Inc. and Murphy Oil Corporation v. Canada*, ICSID Case No. ARB(AF)/07/04, Decision on Liability and on Principles of Quantum, 22 May 2012 (CL-0289) |
| *National Grid v. Argentina* | *National Grid P.L.C. v. Argentine Republic*, UNCITRAL, Award, 3 November 2008 (CL-0147/RL-0110) |
| *NextEra v. Spain* | *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Quantum Principles, 12 March 2019 (CL-0301) |

| | |
|---|---|
| *Novenergia v. Spain* | *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Spain*, SCC Arbitration (2015/063), Final Arbitral Award, 15 February 2018 (CL-0279) |
| *Nykomb v. Latvia* | *Nykomb Synergetics Technology Holding AB v. Republic of Latvia*, SCC Case No. 118/2001, Arbitral Award, 16 December 2003 (CL-0064/RL-0088) |
| *Operafund v. Spain* | *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Award, 6 September 2019 (CL-0307 resubmitted) |
| *Petzold v. Zimbabwe* | *Bernhard von Pezold and Others v. Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Award, 28 July 2015 (CL-0266) |
| *Philip Morris v. Uruguay* | *Philip Morris Brands Sàrl et al. v. Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Award, 8 July 2016 (CL-0293) |
| *Plama v. Bulgaria* | *Plama Consortium Ltd. v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008 (CL-0026/RL-0054) |
| *Poštová banka v. Hellenic Republic* | *Poštová banka, a.s. and Istrokapital SE v. Hellenic Republic*, ICSID Case No. ARB/13/8, Award, 9 April 2015 (RL-0008) |
| *PSEG Global v. Turkey* | *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Tikaret Limited Sirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007 (CL-0114) |
| *PV Investors v. Spain I* | *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14 (UNCITRAL), Preliminary Award on Jurisdiction, 13 October 2014 (CL-0203) |
| *PV Investors v. Spain II* | *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14 (UNCITRAL), Final Award, 28 February 2020 (RL-0131) |
| *RosInvest v. Russia* | *RosInvestCo UK Ltd. v. Russian Federation*, SCC Arbitration V (079/2005), Final Award, 12 September 2010 (CL-0224) |
| *RREEF v. Spain I* | *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016 (CL-0205) |
| *RREEF v. Spain II* | *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Spain*, ICSID Case No. |

| | |
|---|---|
| | ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (CL-0297/RL-0122) |
| *Rusoro v. Venezuela* | *Rusoro Mining Limited v. Venezuela*, ICSID Case No. ARB(AF)/12/5, Award, 22 August 2016 (CL-0258/RL-0094) |
| *RWE Innogy v. Spain* | *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability, and certain Issues of Quantum, 30 December 2019 (CL-0310/RL-0125) |
| *Salini v. Morocco* | *Salini Costruttori S.P.A. and Italstrade S.P.A. v. Kingdom of Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction, 23 July 2001 |
| *Saluka v. Czech Republic* | *Saluka Investments BV (The Netherlands) v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006 (CL-0121) |
| *Siemens v. Argentina* | *Siemens A.G. v. Argentine Republic*, ICSID Case No. ARB/02/8, Award, 6 February 2007 (CL-0138) |
| *SolEs v. Spain* | *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Award, 31 July 2019 (CL-0305) |
| *ST-AD v. Bulgaria* | *ST-AD (Germany) v. Republic of Bulgaria,* PCA Case No. 2011-06, Award on Jurisdiction, 18 July 2013 (RL-0023) |
| *Stadtwerke München v. Spain* | *Stadtwerke München GmbH et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (CL-0308/RL-0128) |
| *Stati v. Kazakhstan* | *Anatolie Stati et al. v. Republic of Kazakhstan*, SCC Case No. V (116/2010), Award, 19 December 2013 (CL-0030) |
| *Suez v. Argentina* | *Suez, Sociedad General de Aguas de Barcelona S.A., and InterAgua Servicios Integrales del Agua S.A. v. Argentine Republic*, ICSID Case No. ARB/03/17, Decision on Liability, 30 July 2010 |
| *Tecmed v. Mexico* | *Técnicas Medioambientales Tecmed S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003 (CL-0061) |
| *Total v. Argentina* | *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Liability, 27 December 2010 (CL-0115) |

| | |
|---|---|
| *Yukos v. Russia* (Interim Award) | *Yukos Universal Limited (Isle of Man) v. Russian Federation*, PCA Case No. AA 227, Interim Award on Jurisdiction and Admissibility, 30 November 2009 (CL-0042) |
| *Yukos v. Russia* (Final Award) | *Yukos Universal Limited (Isle of Man) v. Russian Federation*, PCA Case No. AA 227, Final Award, 18 July 2014 (CL-0140/RL-0092) |
| *Vattenfall v. Germany* | *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* issue, 31 August 2018 (CL-0283) |
| *Venezuela Holdings v. Venezuela* | *Venezuela Holdings B.V. et al. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Award, 9 October 2014 (CL-0275/RL-0061) |
| *Vestey v. Venezuela* | *Vestey Group Ltd v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/06/4, Award, 15 April 2016 (RL-0106) |
| *Waste Management v. Mexico* | *Waste Management, Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004 (CL-0055) |
| *Watkins v. Spain* | *Watkins Holdings S.à.r.l. et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/44, Award, 21 January 2020 (CL-0311) |
| *Wirtgen v. Czech Republic* | *Mr. Jürgen Wirtgen et al. v. Czech Republic*, PCA Case No. 2014-03, Final Award, 11 October 2017 (RL-0118) |

# I.    INTRODUCTION

1    The Claimant in this arbitration is RENERGY S.à.r.l. (the "**Claimant**"), a limited liability company incorporated under the laws of Luxembourg. The Respondent is the Kingdom of Spain (the "**Respondent**"; the Claimant and the Respondent are hereinafter referred to collectively as the "**Parties**").

2    The present dispute was submitted by the Claimant to the International Centre for Settlement of Investment Disputes ("**ICSID**") on the basis of the Energy Charter Treaty ("**ECT**") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States ("**ICSID Convention**").

3    The dispute relates to the regulatory framework for renewable energy production in Spain, in particular certain measures that the legislative and executive branches of the Respondent and its autonomous community Castile and León took between February 2012 and October 2014 ("**Disputed Measures**"). The Claimant submits that the Disputed Measures violated the ECT and caused significant harm to its investment in certain wind farms and concentrated solar power ("**CSP**") plants.

4    In view of the many other arbitrations concerning some or all of the Disputed Measures, the Tribunal wishes to emphasize that the factual submissions, legal arguments and evidence before the respective tribunals were different in each case. Such differences can result in different outcomes. The Tribunal bases its decision exclusively on the record of this arbitration.

5    Moreover, the Tribunal wishes to stress that its use of one Party's terminology does not in any way reflect the Tribunal's understanding of a particular issue. Similarly, the order in which references are presented is not a reflection of a source's value in the eyes of the Tribunal, and the references do not purport to include all relevant sources from the extensive record in this arbitration.

# II.    PROCEDURAL HISTORY

## A.    Registration and constitution of the Tribunal

6    On 25 July 2014, ICSID received a request for arbitration dated 22 July 2014 from the Claimant against the Respondent ("**Request**").

7    On 1 August 2014, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. The Secretary-General invited the Parties to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

8    On 3 October 2014, the Parties informed the Centre of their agreement as to the number of

arbitrators and the method for the Tribunal's constitution. Pursuant to this agreement, the Tribunal would consist of three arbitrators, one to be appointed by each Party and the third, presiding arbitrator to be appointed by agreement of the Parties.

9       On 9 October 2014, following appointment by the Claimant, Professor Christoph Schreuer, a national of Austria, accepted his appointment as co-arbitrator.

10      On 9 November 2014, following appointment by the Respondent, Professor Philippe Sands QC, a national of Great Britain and France accepted his appointment as co-arbitrator.

11      On 13 February 2015, following the agreement of the Parties, Judge Bruno Simma, a national of Austria and Germany, accepted his appointment as President of the Tribunal.

12      On 13 February 2015, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings ("**ICSID Arbitration Rules**"), notified the Parties that all three arbitrators had accepted their appointments and the Tribunal was therefore deemed to have been constituted on that date. Ms. Anneliese Fleckestein,[1] ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

## B.      First Session

13      In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 29 April 2015, by teleconference.

14      During the first session, the President of the Tribunal proposed that Mr. Heiner Kahlert, an attorney with Martens Rechtsanwälte in Munich, be appointed as his assistant. By letters of 29 May 2015, the Parties confirmed their agreement with the appointment of Mr. Kahlert.

15      Following the first session, on 1 June 2015, the Tribunal issued Procedural Order No. 1 recording the agreements of the Parties on procedural matters and the decisions of the Tribunal. Procedural Order No. 1 provides, inter alia, that the applicable ICSID Arbitration Rules would be those in effect from 10 April 2006, that the procedural language would be English and Spanish, and that the place of proceeding would be Washington D.C., U.S.A. Procedural Order No. 1 also set out the agreed procedural calendar to this arbitration, included as Annex A to that order.

## C.      The European Commission's First Application to Intervene

16      Prior to the Tribunal's constitution, on 14 November 2014, the European Commission ("**EC**") filed an application for leave to intervene as a non-disputing party pursuant to ICSID Arbitration Rule 37(2).

---

[1] On 20 March 2015, ICSID notified the Tribunal and the Parties that Ms. Luisa Fernanda Torres, ICSID Legal Counsel, would serve as Secretary of the Tribunal temporarily while Ms. Anneliese Fleckenstein was on maternity leave.

17    In accordance with Procedural Order No. 1, the Tribunal –once constituted– invited both Parties to file observations on the application. On 30 June 2015, both Parties submitted their observations.

18    On 10 July 2015, the Tribunal issued Procedural Order No. 2. The Tribunal found the Application premature. In the Tribunal's view:

> The jurisdictional question specified in the Application has not been raised by either Party thus far. In fact, the Respondent has not raised any objection to the Tribunal's jurisdiction to date, neither based on the argument outlined in the Application nor on any other ground. Therefore, the matter on which the Applicant seeks to file a written submission is not currently a matter within the scope of the dispute.[2]

19    Accordingly, the Tribunal dismissed the EC's application, without prejudice to any future application.

**D.    The Parties' First Round of Written Submissions**

20    In accordance with Procedural Order No. 1, on 25 September 2015, the Claimant filed a Memorial on the Merits ("**MoM**"). The pleading was accompanied by the witness statements of Mr. José Alberto Ceña Lázaro, dated 18 September 2015 ("**CWS-AC**"), Mr. Gerardo David Gómez-Sáinz García, dated 22 September 2015 ("**CWS-DG**"), Mr. José Manuel Ramos Pérez-Polo, dated 16 September 2015 ("**CWS-JMR**"), and Dr. Luis Crespo Rodríguez, dated 31 July 2015 ("**CWS-LC**"). The pleading was further accompanied by the Brattle Group's ("**Brattle**") regulatory expert report prepared by Dr. José Antonio Garcia and Mr. Carlos Lapuerta, dated 23 September 2015 ("**BRR I**") and Brattle's quantum expert report prepared by Mr. Carlos Lapuerta, Mr. Richard Caldwell and Dr. José Antonio Garcia, dated 23 September 2015 ("**BQR I**").

21    By letter of 27 October 2015, the Respondent notified the Tribunal of its intention to raise preliminary objections together with a request for bifurcation. On 3 December 2015, the Respondent filed its Memorial of Preliminary Objections and Request for Bifurcation ("**MoPO**").

22    On 21 December 2015, the Claimant filed a request with the Tribunal to call upon the Respondent to disclose and produce the award on jurisdiction in *PV Investors v. Kingdom of Spain*.[3] Following an invitation by the Tribunal to comment, the Respondent filed its comments on 30 December 2015. On 4 January 2016, the Tribunal issued Procedural Order No. 3, by which it dismissed the Claimant's request for the Respondent to produce the award on jurisdiction in *PV Investors v. Kingdom of Spain*.

23    On 12 January 2016, the Claimant filed its Observations on the Request for Bifurcation.

---

[2] Procedural Order No. 2, ¶3.5
[3] *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14 (UNCITRAL), Preliminary Award on Jurisdiction, 13 October 2014 (CL-0203) ("***PV Investors v. Spain I***").

24      On 4 February 2016, the Claimant filed a copy of the award in *Charanne v. Spain*,[4] together with a letter commenting on this award. By letter of 5 February 2016, the Respondent replied to the Claimant's letter.

25      On 12 February 2016, the Tribunal issued Procedural Order No. 4. The Tribunal dismissed the Respondent's request for Bbifurcation and joined the Respondent's jurisdictional objections to the merits phase of the proceeding.

26      On 12 May 2016, the Respondent filed its Counter-Memorial on the Merits ("**CMoM**"). The pleading was accompanied by the witness statement of Mr. Carlos Montoya dated 11 May 2016 ("**RWS-CMR**") and the expert report of Accuracy dated 12 May 2016 ("**Accuracy I**").

**E.      The European Commission's Second Application to Intervene**

27      Meanwhile, on 15 December 2015, the EC filed a second application for leave to intervene as a non-disputing party pursuant to ICSID Arbitration Rule 37(2).

28      By letter of 23 December 2015, the Tribunal invited the Parties to submit their observations on the EC's application.

29      On 2 February 2016, the Parties submitted their observations. The Respondent requested that the Tribunal "[g]*rant the Commission's intervention as a non-disputing party in this proceedings* [sic]*; allowing it to submit the statements it considers necessary (under Tribunal's discretion); to have access to all documents needed to comply with its mission and to intervene in the Hearing*". The Claimant requested that the Tribunal "[deny] *the Commission's Re-Application in full*" or, in the alternative, that the EC could file the amicus curiae brief on a set of conditions, such as a limit to the number of written submissions as well as evidence submitted within the scope of the EC's amicus curiae briefs in other ECT cases. Additionally, the Claimant objected to the EC having access to the file or participating in the hearing. The Claimant also urged the Tribunal to order the EC to post a security for cost in an amount of no less than USD 300,000.00.

30      On 16 February 2016, the Tribunal issued Procedural Order No. 5 granting leave to the EC to submit one written submission as a non-disputing party, limited to the question whether the Tribunal should deny jurisdiction based on the fact that the dispute at hand concerns an ECT claim against the Respondent by a legal entity incorporated in Luxembourg. The EC were to bear its own costs for such intervention, and it was not granted access to the case file.

31      On 11 November 2016, the EC filed an amicus curiae brief pursuant to ICSID Arbitration Rule 37(2) ("**EC's First Amicus Curiae Brief**").

---

[4] *Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain*, SCC Arbitration 062/2012, Final Award, 21 January 2016 (CL-0191/RL-0063) ("***Charanne v. Spain***").

## F.    Document Production Requests

32    Pursuant to the timetable annexed to Procedural Order No. 1, on 21 July 2016, the Parties submitted their respective requests for production of documents and the responses and replies thereto.

33    On 6 September 2016, the Tribunal issued Procedural Order No. 6 concerning the Parties' document production requests.

34    Following exchanges between the Parties, on 7 October 2016 the Claimant filed a further request for the Tribunal to decide on production of documents.

35    On 13 October 2016, the Tribunal issued Procedural Order No. 7 concerning this request.

36    On 25 October 2016, the Tribunal issued Procedural Order No. 8 setting out the Tribunal's decision in respect of document production requests not yet resolved by Procedural Orders No. 6 and No. 7.

37    On 1 December 2016, the Tribunal issued Procedural Order No. 9 setting out its decisions on additional document production issues. The Tribunal also fixed new deadlines for the remaining memoranda of the Parties.

38    On 26 December 2016, following exchanges between the Parties, the Tribunal issued Procedural Order No. 10 on related document production issues.

39    Following the explanations provided by the Respondent in its submission of 12 January 2017, on 17 January 2017 the Tribunal issued Procedural Order No. 11, setting out its decisions on the remaining document production issues.

## G.    The Parties' Second Round of Written Submissions

40    On 9 January 2017, the Claimant filed its Counter-Memorial on Jurisdiction ("**CMoJ**") and its Reply on the Merits ("**RoM**"). The pleading was accompanied by the second witness statements of Mr. José Alberto Ceña Lázaro, dated 27 December 2016 ("**CWS-AC2**"), Mr. Gerardo David Gómez-Sáinz García, dated 3 January 2017 ("**CWS-DG2**"), and Dr. Luis Crespo Rodríguez, dated 24 October 2016  ("**CWS-LC2**") as well as by the Brattle's expert regulatory report prepared by Dr. José Antonio Garcia and Mr. Carlos Lapuerta, dated 4 January 2017 ("**BRR II**") and Brattle's expert quantum report prepared by Mr. Carlos Lapuerta, Mr. Richard Caldwell and Dr. José Antonio Garcia, dated 4 January 2017 ("**BQR II**"). Attached to BQR II were technical expert reports by ATA on the installed capacity ("**ATA CSP Capacity Report**", prepared by Mr. Jose Mesa-Díaz[5] and the expected lifetime of the CSP plants subject to this arbitration ("**ATA CSP Lifetime Report**", prepared by Mr. Jose Mesa-Díaz),[6] as well as on the expected lifetime of the wind farms subject to this arbitration ("**ATA Wind Lifetime Report**", prepared by Mr. Iván

---

[5] BQR-98.
[6] BQR-103.

David Fernández García).[7]

41     On 24 February 2017, the Respondent filed its Rejoinder on the Merits ("**RjoM**") and its Reply on Preliminary Objections ("**RoPO**"). The pleading was accompanied by the second witness statement of Mr. Carlos Montoya dated 24 February 2017 ("**RWS-CMR2**") and the expert report of Accuracy dated 24 February 2017 ("**Accuracy II**"), the expert opinion of Prof. Dr. María José Santos Morón and Prof. Dr. Marcos Vaquer Caballería dated 23 February 2017 ("**Santos Vaquer Opinion**"), the expert report of Dr. Jorge Servert del Río dated 23 February 2017 ("**Servert Report**"), and the expert report of Dr. Jesús Casanova Kindelán dated 22 February 2017 ("**Casanova Report**").

42     On 24 March 2017, the Claimant filed its Rejoinder on Jurisdiction ("**RjoJ**").

**H.     The Sale of the Claimants' Investments and Postponement of the 2017 Hearing**

43     On 14 November 2017, the President held a pre-hearing organizational meeting with the Parties by telephone conference. The Hearing was to be held the week of 18-22 December 2017.

44     As agreed in the pre-hearing organizational meeting, on 30 November 2017, each Party filed a request for the Tribunal to admit new documents into the record in preparation for the hearing.

45     On 4 December 2017, the Tribunal granted leave to the Parties to submit the documents included in their respective requests of 27 November 2017, including a decision of the EC on the procedure State Aid SA.40348 ("**EC State Aid Decision**").[8]

46     On 5 December 2017, the Claimant advised that "*a sale of Ibereólica Solar Olivenza, S.L. and Ibereólica Solar Morón, S.L. is likely to happen on the third week of December. Renergy S.à r.l. (the Claimant) is an indirect shareholder of these two companies as it owns 50% of Ibereólica Solar S.L., which in turn holds approximately 36% of shares in Olivenza and 35% in Morón.*" The Claimant added in its letter that regardless of any corporate restructuring, the Claimant would reserve and keep its rights over the claims brought in this arbitration. Through a letter on the same day, the Respondent objected to the Claimant's characterization of this transaction, arguing that such a disclosure two weeks before the hearing had consequences with regard to the calculation of damages, as well as aspects of substantive protections in the dispute. Therefore, the Respondent asked the Tribunal to suspend the hearing.

47     On 6 December 2017, following both Parties' letters of 5 December 2016, the Tribunal invited the Parties to indicate whether they would be willing to agree on a three-day hearing limited to jurisdiction and responsibility, with one on quantum to follow later, if necessary.

48     On 7 December 2017, the Respondent submitted a letter to the Tribunal, objecting to a

---

[7] BQR-126.
[8] State aid decision SA.40348 of 10 November 2017 (RL-0116).

6

hearing on responsibility because of the effects that a potential sale may have on both responsibility and quantum issues. On the same day, the Claimant submitted a letter to the Tribunal, proposing a postponement of the hearing for a maximum of 12 to 14 weeks.

49      On 7 December 2017, the Tribunal warned the Parties that, considering the Tribunal members' availability, postponing the hearing would mean a deferral up until the second half of 2018 and invited the Parties to indicate their views about it.

50      The Respondent submitted a letter on 8 December 2017, claiming that its right of defense requires that the hearing be suspended, regardless of whether that means postponing it until the second half of 2018. On the same day, the Claimant submitted a letter to the Tribunal maintaining that splitting the hearing would give rise to other procedural issues that might require a repetition of the hearing and increase the costs and time. Therefore, the Claimant also asked the Tribunal to postpone the hearing.

51      On 11 December 2017, the Tribunal communicated to the Parties that it had decided to postpone the hearing.

## I.      The European Commission's Third Application to Intervene

52      On 16 May 2018, the EC filed a communication proposing to update its EC's First Amicus Curiae Brief, in light of the judgment of the Court of Justice of the European Union ("**CJEU**") of 6 March 2018 in *Slovak Republic v. Achmea B.V.*, Case C-284/16 ("***Achmea Judgment***").[9]

53      On 31 May 2018, each Party filed its observations on the EC's application pursuant to ICSID Arbitration Rule 37(2). The Claimant objected to the EC's participation whereas the Respondent agreed to it, adding that any such update would provide "*specific expert knowledge to the Tribunal on a basic matter which is within the scope of the present proceeding.*"

54      On 7 June 2018, the Tribunal granted the EC's application and on 22 June 2018, the EC filed its updated amicus curiae brief ("**EC's Second Amicus Curiae Brief**").

55      On 14 June 2018, the Parties and the Tribunal were informed that henceforth Mr. Francisco Grob, ICSID Legal Counsel, would serve as Secretary of the Tribunal.

56      On 11 July 2018, the Respondent submitted its responses to the Claimant's objections to produce certain documents regarding the sale of Claimant's plants in Spain, which the Tribunal decided on 2 August 2018.

57      On 16 July 2018, the Claimant filed its comments on the EC's Second Amicus Curiae Brief ("**CC on EC's Comments on *Achmea* Judgment**"). On the same day, the Respondent filed its own comments ("**RC on EC's Comments on *Achmea* Judgment**").

---

[9] CL-0278/RL-0135.

**J.      Hearing**

58      On 17 July 2018, the Tribunal issued Procedural Order No. 12 concerning the organization of the hearing, which was to take place from 26 to 29 November 2018.

59      On 22 October 2018, the Claimant requested leave to introduce two memoranda prepared by their experts, Brattle, concerning Renergy's "*CSP assets transaction price and potential conclusions with regard to damages valuation*" and "*the corporate restructuring of Renergy's wind assets valuation and potential conclusions with regard to damages valuation*".

60      On 23 October 2018, the Claimant requested permission from the Tribunal to amend BQR II in relation to some errors found in table 4 thereof.

61      As agreed by the Parties, on 25 October 2018, each submitted a request for the Tribunal to admit new documents into the record in preparation for the hearing.

62      By a letter dated 30 October 2018, the Respondent addressed the Claimant's request of 22 and 23 October. The Respondent agreed to let the Claimant's correct the errors found in table 4 of BQR II, but asked the Tribunal "[t]*o reject Claimant's request to introduce the Brattle's memoranda or alternatively if they are allowed to introduce them, to provide Accuracy with exactly the same documents and information that have been provided to Brattle to draft the memoranda and increases the time allocated for Accuracy's presentation and Respondent's cross-examination of Brattle's experts at the hearing in order to properly assess Brattle's memoranda.*"

63      On 31 October 2018, the Claimant responded the Respondent's 30 October letter. By another communication sent the same day, the Claimant stated that it had no comments with regard to the inclusion of the new documents set out by the Respondent in its request dated 25 October 2018.

64      On 5 November 2018, the Respondent submitted its observations on the Claimant's 25 October request to include new documents into the record.

65      By a letter dated 9 November 2018, the Tribunal decided to permit the Claimant to make the proposed corrections to BQR II as per the Claimant's request of 23 October 2018 and its communication of 31 October 2018. It also allowed the Claimant to file the two memoranda prepared by Brattle and offered by the Claimant in its request of 22 October 2018. The Respondent was invited to file two expert memoranda in response thereto. Furthermore, the Tribunal granted in part the Claimant's request of 25 October 2018 for the introduction of new documents and granted in its entirety the Respondent's request of 25 October 2018.

66      A hearing on jurisdiction, responsibility and quantum was held in Madrid from 26-29 November 2018 ("**Hearing**"). The following persons were present at the Hearing:

8

*Tribunal*:

| | |
|---|---|
| Judge Bruno Simma | President |
| Professor Christoph Schreuer | Arbitrator |
| Professor Philippe Sands QC | Arbitrator |
| | |
| Mr. Heiner Kahlert | Assistant to the Tribunal |

*ICSID Secretariat*:

| | |
|---|---|
| Mr. Francisco Grob | Secretary of the Tribunal |

*For the Claimant*:

| | |
|---|---|
| Mr. Alberto Fortún Costea | Cuatrecasas Gonçalves Pereira SLP |
| Mr. Luis Pérez de Ayala Becerril | Cuatrecasas Gonçalves Pereira SLP |
| Mr. Álvaro Mendiola Jiménez | Cuatrecasas Gonçalves Pereira SLP |
| Mr. Pedro Campaña Ávila | Cuatrecasas Gonçalves Pereira SLP |
| Mr. Miguel Gómez Jene | Cuatrecasas Gonçalves Pereira SLP |
| Ms. María Isabel Rodríguez Vargas | Cuatrecasas Gonçalves Pereira SLP |
| Mr. Antonio Delgado Camprubí | Cuatrecasas Gonçalves Pereira SLP |
| Mr. José Ángel Rueda García Villegas | Cuatrecasas Gonçalves Pereira SLP |
| Mr. Borja Álvarez Sanz | Cuatrecasas Gonçalves Pereira SLP |
| Mr. José Angel Sánchez | Cuatrecasas Gonçalves Pereira SLP |
| Mr. Ignacio Frutos Blanco | Cuatrecasas Gonçalves Pereira SLP |
| | |
| Mr. David Rodríguez Soltero | Renergy S.à.r.l. |
| | |
| Mr. Piero Fortino | Brattle |

*For the Respondent*:

| | |
|---|---|
| Ms. Mónica Moraleda Saceda | Abogacía General del Estado |
| Ms. María José Ruiz Sánchez | Abogacía General del Estado |
| Ms. Patricia Elena Fröhlingsdorf Nicolás | Abogacía General del Estado |
| Ms. Elena Oñoro Sainz | Abogacía General del Estado |
| Mr. Yago Fernández Badia | Abogacía General del Estado |
| Mr. Pablo Elena Abad | Abogacía General del Estado |
| Ms. Gloria de la Guardia Limeres | Abogacía General del Estado |
| Ms. Ana González Guerrero | Abogacía General del Estado |
| | |
| Ms. Ana María Rodríguez Esquivias | Abogacía General del Estado |
| Mr. Juan Antonio Quesada Navarro | Abogacía General del Estado |
| Mr. Javier Comerón Herrero | Abogacía General del Estado |
| Ms. Estíbaliz Hernández Marquínez | Abogacía General del Estado |
| | |
| Ms. Raquel Vázquez | IDAE |

| | |
|---|---|
| Ms. Pilar Monjas | IDAE |
| | |
| Ms. Laura Cozar | Accuracy |
| Mr. Cristophe Schmit | Accuracy |
| Mr. Thomas Champy | Accuracy |
| Mr. Alejandro Martin | Accuracy |
| Mr. Alberto Fernandez | Accuracy |
| Ms. Alba Suru | Accuracy |
| Ms. Chloe Pehuet | Accuracy |

*Court Reporter*:

| | |
|---|---|
| Mr. Trevor McGowan | English court reporter |
| Ms. Claire Hill | English court reporter |
| Mr. Dante Rinaldi | Spanish court reporter |
| Mr. Dionisio Rinaldi | Spanish court reporter |

*Interpreters*:

| | |
|---|---|
| Mr. Jesús Getan Born | English-Spanish interpreter |
| Ms. Roxana Dazin | English-Spanish interpreter |
| Ms. Anna Sophia Chapman | English-Spanish interpreter |
| Ms. Amalia Thaler de Klemm | English-Spanish interpreter |

67    During the Hearing, the following persons were examined:

*On behalf of the Claimant*:

| | |
|---|---|
| Mr. Gerardo David Gómez-Sáinz García | Renergy S.à.r.l. |
| Mr. José Manuel Ramos Pérez-Polo | Ibereólica Solar |
| Mr. Alberto Ceña Làzaro | Asociación Empresarial Eólica |
| Dr. Luis Crespo Rodríguez | Protermosolar/ESTELA |
| Mr. José Mesa Diaz | ATA |
| Mr. Iván David Fernàndez García | ATA |
| Mr. Carlos Lapuerta | Brattle |
| Dr. José Antonio García | Brattle |
| Mr. Richard Caldwell | Brattle |

*On behalf of the Respondent*:

| | |
|---|---|
| Mr. Carlos Montoya | IDAE |
| Mr. Santiago Caravantes | Ministerio para la Transición Ecológica |
| Professor Dr. Marcos Vaquer Caballería | Universidad Carlos III de Madrid |
| Professor Dr. María José Santos Morón | Universidad Carlos III de Madrid |
| Mr. Eduard Saura | Accuracy |
| Mr. Stephane Perrotto | Accuracy |
| Dr. Jesús Casanova Kindelán | ETSII - UPM |
| Dr. Jorge Servert | Sta-Solar |

### K.    Post-hearing Procedures

68    On 19 December 2018, the Tribunal issued Procedural Order No. 13, posing certain questions to the Parties pursuant to ICSID Arbitration Rule 19.

69    On 25 January 2019, the Respondent filed a request for leave to file the "*Declaration of the Representatives of the Governments of the Member States, of 15 January 2015 on the legal consequences of the judgment of the Court of Justice in Achmea and on Investment Protection in the European Union*" ("**22 Member States Declaration**")[10] as an additional legal authority.

70    Following the Tribunal's order, on 1 February 2019, both Parties filed simultaneous post-hearing briefs with answers to the questions posed by the Tribunal ("**C-PHB**" and "**R-PHB**", respectively).

71    On 4 February 2019, the Claimant filed observations on the Respondent's request of 25 January 2019.

72    On 19 February 2019, the Tribunal invited the Parties to introduce into the record and to comment on the 22 Member States Declaration, the "*Declaration of the Representatives of the Governments of the Member States on the Enforcement, of 16 January 2019 of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union*" ("**Five Member States Declaration**")[11] and the "*Declaration of the Representative of the Government of Hungary, of 16 January 2019 on the legal consequences of the judgment of the Court of Justice in Achmea and on investment protection in the European Union*"[12] (collectively "**EU Member States Declarations**").

73    On 4 March 2019, the Parties submitted their comments on the EU Member States Declarations ("**CC on Declarations of EU Members States**" and "**RC on Declarations of EU Members States**", respectively).

74    On 8 April 2019, the Respondent filed a request for the Tribunal to decide on the admissibility of a new legal authority, namely the Decision on Responsibility and on the Principles of Quantum rendered in *RREEF v. Spain*.[13]

75    On 15 April 2019, the Claimant filed its observations on the Respondent's request, urging the Tribunal to deny Spain's application on the basis that the request: (i) is "*an eleventh – hour attempt to reopen the debates*"; (ii) "*goes against the principle of procedural economy and efficiency that the Tribunal has at all times tried to protect*"; and (iii) "*fails to meet the substantive requirements under Section 16(3) of Procedural Order No. 1*".

---

[10] C-0851.

[11] C-0852.

[12] C-0853.

[13] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (CL-0297/RL-0122) ("***RREEF v. Spain II***").

76      On 23 April 2019 the Tribunal communicated to the Parties that the Respondent's request to include the above-mentioned new legal authority was granted. The Tribunal also noted the Claimant's assertion that three related additional decisions which were not in the record had surfaced, namely *Foresight/Greentech v. Spain*,[14] *Cube v. Spain* (Decision on Jurisdiction, Liability and Partial Decision on Quantum)[15] and *NextEra v. Spain* (Decision on Jurisdiction, Liability and Quantum Principles)[16]; as such, it invited the Parties to file those decisions into the record and submit their views in relation thereto.

77      Following exchanges between the Parties on issues of confidentiality and the lack of consent from the Claimant on that decision, on 10 May 2019, the Tribunal decided to allow the withdrawal of the *NextEra v. Spain* decision from the record.

78      On 26 November 2019, the Respondent filed another request for the Tribunal to decide on the admissibility of a new legal authority, namely the *Eskosol v. Italy* decision.[17]

79      On 2 December 2019, the Claimant filed its observations to the Respondent's request of 26 November 2019 as well as a new request for the Tribunal to decide on the admissibility of new evidence. More specifically, the Claimant requested that the Tribunal grant leave to introduce into the record Royal Decree-Law 17/2019 of 22 November 2019 along with certain statements released by Spanish authorities after the approval of this Decree, as well as a number of new arbitral decisions on the Respondent's regulatory framework for renewable energy production.

80      Upon the Tribunal's invitation, on 8 January 2020, the Respondent filed its response to the Claimant's observations and request of 2 December 2019, identifying additional arbitral decisions on the same subject-matter that it requested to be admitted to the record.

81      On 23 January 2020, the Claimant filed its response to the Respondent's last observations as well as a request for the Tribunal to decide on the admissibility of a new document, namely the recent Award rendered in *Watkins v. Spain*.[18]

82      On 29 January 2020, the Respondent filed its observations on the Claimant's request of 23 January 2020.

83      Following the Parties' exchanges and submissions, the Tribunal decided on the admissibility of the proposed new documents on 30 January 2020, accepting both Parties'

---

[14] *Foresight Luxembourg Solar 1 S.À.R.L. et al. v. Kingdom of Spain*, SCC Arbitration V (2015/150), Final Award, 14 November 2018 (CL-0287/CL-0298/RL-0124) ("***Foresight/Greentech v. Spain***").

[15] *Cube Infrastructure Fund SICAV and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 (RL-0121) ("***Cube v. Spain I***").

[16] *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Quantum Principles, 12 March 2019 (CL-0301) ("***NextEra v. Spain***").

[17] *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes, 7 May 2019 (CL-0300) ("***Eskosol v. Italy***").

[18] *Watkins Holdings S.à.r.l. et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/44, Award, 21 January 2020 (CL-0311) ("***Watkins v. Spain***").

respective requests and inviting them to submit any comments they may have on those new documents. The Claimant filed its comments on 14 February 2020 ("**CC on ECT Decisions**"). After the Tribunal had granted an extension of the applicable deadline, the Respondent filed its comments on 19 February 2020.

84      On 5 March 2020, the Respondent filed a new request for the Tribunal to decide on the admissibility of a new document, namely the Final Award in *PV Investors v. Spain*.[19] The Claimant submitted its observation on the Respondent's request on 9 March 2020, following which the Tribunal decided on 12 March 2020 to grant the Respondent's request.

85      On 13 March 2020, pursuant to ICSID Arbitration Rule 37(2), the EC filed a letter titled "Legal Developments in case ARB/14/18" ("**EC Submission on State Aid**"), informing the Tribunal of the EC State Aid Decision and of the EC's views on the relevance thereof to this arbitration.

86      On 19 March 2020, the Tribunal invited the EC to submit additional clarifications. The Tribunal sought explanations regarding the timing of EC Submission on State Aid, in light of the fact that the EC State Aid Decision was rendered on 10 November 2017, thus, more than two years before the EC Submission on State Aid and the EC's Second Amicus Curiae Brief of 22 June 2018.

87      On 26 March 2020, the EC filed its responses to the Tribunal's request for clarification, stating that when it requested permission to supplement its brief on intra-EU objection in April 2018, the EC had not also requested to file observations on the State aid objection. Noting its oversight, the Commission added that it deemed it preferable to inform the arbitral Tribunal of the legal consequences of the EC State Aid Decision, despite its belated submission.

88      On 23 April 2020, following the Tribunal's invitation of 8 April 2020, both Parties filed their respective comments on the EC Submission on State Aid as well as on the treatment of the State aid issue in *BayWa v. Spain* ("**CC on BayWa**" and "**RC on BayWa**", respectively).[20]  According to the Claimant, the EC bypassed express procedural rules and requested that the Tribunal strike the EC Submission on State Aid out of the case record. The Respondent submitted that the EC Submission on State Aid would be of assistance to both the Parties and the Tribunal on essential issues on the interface between the ECT and the EU State aid legal framework, which are issues at stake in the present proceeding; therefore, it requested that the Tribunal grant leave to admit the EC Submission on State Aid into the record.

89      On 30 April 2020, the Clamant wrote to the Tribunal to "[complain] *about some*

---

[19] *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14 (UNCITRAL), Final Award, 28 February 2020 (RL-0131) ("**PV Investors v. Spain II**").

[20] *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 (CL-0309/RL-0126) ("**BayWa v. Spain**").

*misrepresentations that the Respondent made*" in its submission of 23 April 2020.

90    On 4 May 2020, the Respondent replied that it was "*surprised by this unsolicited Claimant's letter that implies an unfair attempt of censorship*" and asked the Tribunal to dismiss Claimant's request or, alternatively, to grant Spain leave to respond.

91    On 6 May 2020, the Tribunal decided to disregard the Claimant's 30 April letter and it reminded the Parties to refrain from making unsolicited submissions. The Tribunal observed that the Claimant's letter responded to the Respondent's comments on the *BayWa v. Spain* decision by referring to the arguments that the Claimant has made and developed at length in this arbitration. The Tribunal did not call for this response, nor did the Claimant ask for permission before sending it.

92    On 17 June 2020, the Tribunal issued Procedural Order No. 14 requesting the Parties to submit additional calculations from Brattle respectively Accuracy (jointly "**Experts**"). The Tribunal requested that the Experts calculate the "actual", the "but-for" and an "alternative but-for" discounted cash flow from 1 January 2013 until the end of the lifetime of each CSP plant and wind farm subject to this arbitration, based on the assumptions set out in the Annex of that Order, as well as the Internal Rate of Return ("**IRR**") at a project level expressed both as pre-tax and post-tax numbers.

93    On 23 June 2020, the Respondent sought leave from the Tribunal to submit into the record the Annulment Decision rendered in the *Eiser v. Spain* case.[21] The Claimant responded on 29 June 2020 that it did not have any objections. The Respondent subsequently submitted a copy of the decision into the record.

94    On 5 August 2020, the Parties submitted a joint financial model agreed upon by the Experts in response to Procedural Order No. 14, together with a separate memorandum from each Expert setting out joint and diverging views of the Experts.

95    On 8 September 2020, the Tribunal sent various questions to the Experts in relation to their financial model and memoranda. In response to those questions, the Respondent filed a memorandum by Accuracy on 21 September 2020, while the Claimant filed a memorandum by Brattle the following day.

96    On 7 October 2020, the Claimant filed a further memorandum by Brattle (dated 6 October 2020) in response to the Tribunal's questions of 8 September 2020.

97    On 8 October 2020, the Respondent filed a request for the Tribunal to grant leave to Accuracy to respond to Brattle's latest memorandum. On the same day, the Claimant submitted its comments to the Respondent's request.

98    On 9 October 2020, the Respondent sought leave from the Tribunal to submit into the

---

[21] *Eiser Infrastructure Limited and Energia Solar Luxembourg S.À.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Decision on the Kingdom of Spain's Application for Annulment, 11 June 2020 (RL-0167) ("***Eiser v. Spain* (annulment)**").

record the Decision on Jurisdiction, Liability and Directions on Quantum, and the Dissenting Opinion of Mr. David R. Haigh Q.C., issued in *Cavalum v. Spain*.[22]

99      On 19 October 2020, the Tribunal issued Procedural Order No. 15, dismissing the Respondent's request of 8 October 2020, and inviting the Claimant to submit its comments on the Respondent's request of 9 October 2020. In addition, having considered the submissions by the Experts in response to Procedural Order No. 14 and the Tribunal's questions of 8 September 2020, the Tribunal posed certain follow-up questions in relation to the IRRs in the Expert's joint financial model.

100     On 26 October 2020, the Claimant filed its observations on the Respondent's request of 9 October 2020.

101     On 30 October 2020, the Tribunal decided to grant the Respondent's request and admit into the record the *Cavalum v. Spain* decision and dissenting opinion.

102     On 9 November 2020, the Parties filed a joint memorandum signed by the Experts and an amended joint financial model elaborated by the Experts providing a corrected version of the summary tables reporting the IRRs for the standard installation assigned to the Lubián wind farm subject to this arbitration.

103     On 18 November 2020, the Tribunal sent a list of additional questions to the Parties. The Tribunal requested that the Experts provide an alternative version of the joint financial model that relied on a different production forecast for the wind farms subject to this arbitration. The Experts were also asked to confirm certain effective tax rates.

104     On 18 December 2020, both Parties filed an alternative financial model and joint memorandum prepared by the Experts based on the Tribunal's instructions of 15 December 2020. On the same day, the Claimant filed a request for leave to include into the record a version of the aforementioned joint memorandum that incorporated certain references by Brattle to the 1989 Renewable Energy Plan and to financial models underlying the target returns under the "*Plan de Energías Renovables en España 2005-2010*" ("**PER 2005**").[23]

105     On 23 December 2020, following the Tribunal's instructions of 15 December 2020, the Respondent filed its comments on the Claimant's request of 18 December 2020.

106     On 6 January 2021, the Tribunal decided to dismiss the Claimant's request of 18 December 2020, stating that the Claimant did not establish any exceptional circumstances within the meaning of Section 16.3 of Procedural Order No. 1 to admit the additional references into the record and that, in any event, the Claimant could have submitted those documents together with BQR I.

107     On 14 April 2021, the Respondent submitted a new request for leave to submit into the

---

[22] *Cavalum SGPS, S.A. v. Kingdom of Spain*, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020 (RL-0168) ("***Cavalum v. Spain***").
[23] C-0075/R-0119.

record the decisions in *FREIF v. Spain*[24] and *Eurus v. Spain*[25]. The Claimant submitted its observation to the Respondent's request the following day.

108    On 19 April 2021, the Tribunal decided on the Respondent's request of 14 April 2021 by granting leave for the Respondent to submit the two decisions into the record. At the same time, in view of the Experts' previous submissions, the Tribunal requested the Parties to file an updated joint financial model by their Experts, with modified alternative but-for scenarios. More specifically, the Tribunal requested that the Experts reduce the amount of LNG use to 15,000 thermal MWh p.a. for each of the CSP plants subject to this arbitration, effective from 15 October 2014, and cap, as of 21 June 2014, the post-tax IRRs at 7% for the wind farms and at 8% for CSP plants subject to this arbitration.

109    On 21 May 2021, the Parties filed an updated joint financial model and a joint memorandum, both elaborated and signed by the Experts.

110    On 27 May 2021, in view of certain disagreements by the Experts in the latest joint memorandum, the Tribunal requested the Parties to have their Experts provide further clarifications and an updated joint financial model.

111    On 2 June 2021, following the Tribunal's decision, the Respondent submitted into the record the *FREIF v. Spain* and *Eurus v. Spain* decisions.

112    On 4 June 2021, the Parties filed an updated joint memorandum prepared by the Experts on the Tribunal's understanding of the joint financial model updated as of 21 May 2021.

113    On 7 June 2021, noting disagreements of the Experts on the interpretation of certain results in the Joint Memorandum, the Tribunal requested the Parties to submit an updated joint financial model that reports the exact amounts of the relevant cash-flows.

114    Following the Tribunal's request, on 14 June 2021, the Parties and the Experts filed an updated joint financial model ("**Joint Model**") prepared by the Experts to reflect the damages figures rounded up or down to the next cent under each combination of toggles.

115    On 10 September 2021, the Respondent sought leave from the Tribunal to submit into the record and file observations on the judgment of the CJEU of 2 September 2021 in *Republic of Moldova v. Komstroy LLC*, Case C-741/19 ("**Komstroy** **Judgment**")[26]. On the same day, the Tribunal invited the Claimant to comment on the request by 17 September 2021, which the Claimant did. On 20 September 2021, the Tribunal granted the Respondent's request. Within the time limits set by the Tribunal, the Respondent submitted its comments on the Komstroy Judgment on 1 October 2021 ("**RC on Komstroy**") and the Claimant filed its reply submission on 15 October 2021 ("**CC on Komstroy**").

---

[24] *FREIF Eurowind Holdings Ltd. (United Kingdom) v. Kingdom of Spain*, SCC Case V 2017/060, Final Award, 8 March 2021 (RL-0170) ("***FREIF v. Spain***").
[25] *Eurus Energy Holdings Corporation v. Kingdom of Spain*, ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, 17 March 2021 (RL-0171) ("***Eurus v. Spain***").
[26] RL-0173.

116    On 8 November 2021, the Tribunal declared the proceedings closed in accordance with ICSID Arbitration Rule 38(1). On 12 November 2021, the Tribunal invited the Parties to file their costs submissions by 24 November 2021 in accordance with Arbitration Rule 28(2). The Respondent subsequently requested and the Tribunal granted an extension of this deadline until 3 December 2021. On 24 November 2021 (Claimant) and 3 December 2021 (Respondent), the Parties filed their cost submissions ("**C-SoC**" and "**R-SoC**", respectively).

## III.    FACTUAL BACKGROUND

117    This section provides a non-exhaustive summary only of those facts presented by the Parties that the Tribunal deems helpful to explain its reasoning; however, the Tribunal wishes to emphasize that it has carefully considered all facts relied upon by the Parties, even to the extent that they are not specifically mentioned herein. Additional facts may be set out in the framework of the legal discussion that follows in section V. of this Award.

## A.    The Claimant's Investment

## 1.    The Wind Farms

118    For the purpose of holding investments of Mr. Gerardo David Gómez-Sáinz García ("**Mr. Gómez**") in the renewable energy sector in Spain, the Spanish limited liability company Inversiones Dagosa S.L.U. ("**Dagosa**") was incorporated in 1997.[27] In 1999, Mr. Gómez and a partner decided to start promoting wind farms at the Spanish communities of Hedroso-Aciberos (this wind farm is hereinafter referred to as "**Hedroso**"), Padornelo (this wind farm is hereinafter referred to as "**Padornelo**") and Lubián (this wind farm is hereinafter referred to as "**Lubián**", which is divided into the two phases "**Lubián 1**" and "**Lubián 2**") (jointly "**Wind Farms**"). In this context, the Spanish limited liability company Ibereólica S.L. ("**Ibereólica**") was incorporated, which, in turn, incorporated on 22 March 2000 as its subsidiaries three Spanish limited liability companies, each of which was to hold one of the Wind Farms: Ibereólica Hedroso-Aciberos S.A.U., Ibereólica Padornelo S.A.U. and Ibereólica Lubián S.A.U. (jointly "**Wind SPVs**").[28]

119    Financing agreements with lending banks were concluded by Ibereólica Hedroso-Aciberos S.A.U. and Ibereólica Padornelo S.A.U. on 17 July 2003 (both amended on 23 November 2005 to increase the loan) and by Ibereólica Lubián S.A.U. on 23 July 2004 (amended on 28 July 2006 for the same purpose).[29]

120    In December 2003, Dagosa was purchased by Condeu Ltd. ("**Condeu**"), a limited liability company incorporated by Mr. Gómez under the laws of England and Wales.

---

[27] CWS-DG, ¶15.
[28] MoM, ¶79; CWS-DG, ¶16.
[29] See the respective amendments to the initial loan agreements (C-0360, C-0361, C-0362).

121    On 6 November 2007, the Claimant acquired from Mr. Gómez 100% shareholding interest in Condeu for a price of EUR 72 million.[30] At that time, Condeu was still holding 100% shareholding interest in Dagosa, which in turn was holding a 50% stake in Ibereólica.[31] Accordingly, as a result of this transaction, the Claimant held a 50% indirect shareholding interest in the Wind SPVs, mediated through Condeu, Dagosa and Ibereólica.

122    On 10 September 2009, the Claimant acquired from Condeu as a dividend in kind 100% of interest in Dagosa, valued at approximately EUR 5.43 million. By means of this transaction, Condeu was removed from the ownership chain between the Claimant and the Wind SPVs. However, the Claimant's indirect stake in the Wind SPVs remained unchanged, i.e. at 50%.

123    On 20 December 2011, the share capital of Dagosa was increased by its sole shareholder, the Claimant, by EUR 4.6 million, with an issue premium for the relevant shares of EUR 5 million in total.

124    On 23 December 2015, Ibereólica Lubián S.A.U. agreed with its lenders to restructure its debt, inter alia by increasing the credit amount, the period of repayment and the interest rate, by obliging Ibereólica Lubián S.A.U. to immediately allocate 50% of any "cash excess" to the repayment of the debt, and by prohibiting any distribution of dividends to shareholders of Ibereólica Lubián S.A.U. until certain financial rations were satisfied.[32]

125    On 21 December 2017, Dagosa (still fully owned by the Claimant) transferred to Condeu (still fully owned by Mr. Gómez) its 50% equity interest in Ibereólica, including its shares in the three Wind SPVs, for a price of EUR 9 million. This corresponds to the respective audited accounts of Ibereólica. However, the Claimant retained all of its rights over any ECT claims and actions.[33]

## 2.    The CSP Plants

126    On 21 November 2007, the Claimant purchased from Dagosa a 33.33% shareholding interest in Ibereólica Solar S.L. ("**Ibereólica Solar**"), a limited liability company incorporated under Spanish law, for an amount of EUR 1 million.[34]

127    On 1 July 2008, Ibereólica incorporated two Spanish limited liability companies as its subsidiaries, namely Ibereólica Solar Morón S.L. and Ibereólica Solar Olivenza S.L. ("**CSP SPVs**" and, together with the Wind SPVs, "**SPVs**"). The former was intended to own a CSP plant at the Spanish community of Morón de la Frontera (this CSP plant is hereinafter referred to as "**Morón**"), while the latter was intended to own a CSP plant at the Spanish

---

[30] See the table in C-PHB, p. 14.
[31] MoM, ¶¶77f.
[32] MoM, ¶¶880f.
[33] See the Claimant's letter to the Tribunal of 15 January 2018, p. 1, and the Claimant's letter to the Tribunal of 6 April 2018, p. 3, 7.
[34] Share Purchase Agreement between Dagosa and Renergy, dated 21 November 2007 (Exhibit C-0048).

community of Olivenza (this CSP plant is hereinafter referred to as "**Olivenza**"; Olivenza and Morón are hereinafter referred to collectively as the "**CSP Plants**").[35]

128    On 17 September 2008, the Claimant acquired a further 7.69% of shareholding interest in Ibereólica Solar by means of a capital increase in the amount of EUR 7.7 million.[36]

129    As a result of capital increases at the level of the CSP SPVs on 5 March 2009, 2 April 2009, 14 July 2010 and 19 May 2011, the Claimant held an indirect shareholding of 17% in each of the CSP SPVs.[37]

130    On 14 July 2010 and 19 May 2011, respectively, the CSP SPVs concluded contracts on engineering, procurement and construction ("**EPC**"), operation and maintenance ("**O&M**") and financing.[38]

131    On 26 May 2011, the Claimant purchased from Mr. Gómez and a third party (unrelated to this arbitration) another 8.98% of shareholding interest in Ibereólica Solar for a price of EUR 1.5 million. As a result, the Claimant held 50% of shareholding interest in Ibereólica Solar from that date onwards.

132    On 28 July 2011, 21 December 2012 and 16 December 2013, Ibereólica Solar's shareholding interest in the CSP SPVs changed due to a partial sale of its shares to a third party (unrelated to this arbitration) and two subsequent capital increases at the level of the CSP SPVs. As a result, the Claimant eventually held an indirect shareholding interest in the CSP SPVs of 17.92%.

133    On 7 April 2016 and 15 November 2016, respectively, the CSP SPVs agreed with the lenders to a restructuring of their debts, involving inter alia a prolongation of the duration of the financing agreement, a restructuring of fees, more stringent financial ratios and restrictions on the distribution of dividends to shareholders.[39]

134    On 22 March 2018, Ibereólica Solar sold its shareholding interests in the CSP SPVs to a third party (unrelated to this arbitration), but retained all of its rights over any ECT claims and actions. The purchase price was EUR 11,108,812.20 for Ibereolica Solar Morón S.L. and EUR 9,802,179.21 for Ibereolica Solar Olivenza S.L., plus a potential additional deferred payment of EUR 2,421,055.24 for Ibereolica Solar Morón S.L. and EUR 2,487,588.45 for Ibereolica Solar Olivenza S.L.[40]

---

[35] MoM, ¶ 85.
[36] CWS-DG, ¶77.
[37] See the table in C-PHB, p. 14f.
[38] CWS-DG, ¶67.
[39] Olivenza Refinancing Agreement, dated 7 April 2016 (C-0766); Morón Refinancing Agreement, dated 15 November 2016 (C-0767).
[40] See the Claimant's letter to the Tribunal of 6 April 2018, p. 2, 6.

## B.     Relevant State Agents

135     The Respondent's Ministry in charge of energy matters ("**Ministry of Energy**")[41] is responsible for the government's policies on electricity and regulation of energy matters. It is divided into Secretariats, one of which is the Secretariat of Energy presided over by the State Secretary of Energy.[42]

136     Subordinated to the Secretariat of Energy is the Institute for Diversification and Saving of Energy (known by the Spanish acronym "**IDAE**"). It contributes to the definition of the energy policy, advises on technical and economic issues and prepares national renewable energy plans. It also liaises with the industry. The President of IDAE is the State Secretary for Energy.[43]

137     "Invest in Spain", in turn, is a public agency dependent on the Ministry of Economy and Competitiveness, which promotes foreign investments in Spain.[44]

138     Finally, the National Energy Commission (known by the Spanish acronym "**CNE**"), subsequently integrated into the National Markets and Competition Commission ("**CNMC**"), is tasked inter alia to monitor and control the adequate functioning of the electrical sector, as well as to advise the government and issue non-binding reports.[45]

## C.     Basic Features of the Spanish Legal System

139     The Spanish legal system is characterized by a hierarchical structure, with the Spanish Constitution of 1978 forming the highest level. The next level comprises not only Acts of Parliament (each a "**Law**") but also Royal Decree Laws (each a "**RDL**") adopted by the Council of Ministers (an administrative body that comprises the President, the Prime Minister and individual Ministers). RDLs are intended to respond to emergency situations and have immediate effect but require subsequent parliamentary ratification. The next level of hierarchy is formed by Royal Decrees (each a "**RD**"), which are executive acts promulgated by Ministries in the exercise of regulatory powers provided for in Laws or RDL. Such RDs, in turn, are implemented on the next hierarchical level by Ministerial Orders (each a "**MO**") promulgated by one or more Ministries and, on the lowest hierarchical level, by Resolutions (issued by the relevant body within the competent administration). Finally, Supreme Court case law complements the Spanish normative regime.[46]

---

[41] Ministry of Economy from 2000 to 2004; Ministry of Industry, Tourism and Commerce (MITYC) from 2004 to 2011; Ministry of Industry, Energy and Tourism from 2011 onwards.

[42] See MoM, ¶¶63f.

[43] See MoM, ¶65.

[44] See MoM, ¶65.

[45] MoM, ¶¶66, 256; CMoM, ¶56.

[46] CMoM, ¶¶39f., 45f.; MoM, fn. 85; Spanish Civil Code (C-0518/R-0095), Article 1.7 [not included in the English translation provided by the Claimant].

140     Moreover, as a Member State of the European Union ("**EU Member State**"), the Respondent is bound by EU regulations (which are directly applicable in EU Member States), directives and decisions.[47]

141     In accordance with the principle of legal hierarchy enshrined in the Spanish Constitution,[48] no normative act may be contrary to any normative act on a higher level of hierarchy. If a court seeks to rest its judgment on a Law, but considers that such Law may be contrary to the Constitution, it must put this question to the Spanish Constitutional Court, which may declare the Law unconstitutional and, thus, null and void.[49] By contrast, if a court considers any normative act beneath the rank of a Law to infringe upon a normative act of a higher hierarchical level, the court must refrain from applying the lower-level normative act,[50] which in such case is null and void *de iure* due to the principle of hierarchy.[51]

## D.     The Regulatory Framework prior to the Disputed Measures

## 1.     Law 54/1997

142     On 27 November 1997, the Respondent adopted Law 54/1997. This piece of legislation marked the beginning of the (partial) liberalization of the Spanish energy market.[52]

143     In line with its stated objective of (among others) promoting renewable energy production,[53] Law 54/1997 set specific targets on the production of renewable energy in Spain, in particular that 12% of energy consumption should be from renewables by 2010, which reflected the targets previously set by the European Union.[54] In order to create an environment in which the set targets could be achieved, Law 54/1997 introduced two separate regimes for the production of electric power in Spain: the so-called "**Ordinary Regime**" and "**Special Regime**". To qualify for either regime, facilities were required to enrol in an administrative registry (known by the Spanish acronym "**RAIPRE**").[55]

144     The Ordinary Regime applied mainly to electric power production facilities using non-renewable energy sources. They were required to sell their electricity output in the wholesale electricity market at the market price (so-called "**Pool Price**").

145     By contrast, the Special Regime applied to qualifying electricity generators using renewable energy sources such as wind power or CSP, provided that the installed capacity

---

[47] CMoM, ¶44.
[48] Spanish Constitution (C-0408/R-0035), Articles 9.3, 103.
[49] Organic Law 6/1985 on the Judiciary (R-0066), Article 5(2).
[50] Organic Law 6/1985 on the Judiciary (R-0066), Article 6.
[51] CMoM, ¶42, referring to Law 30/1992 on the Legal Regime of Public Administration and Common Administrative Procedure Law (R-0067), Article 62.2.
[52] CMoM, ¶¶48f.
[53] Law 54/1997 (C-0060/R-0003), Sixteenth Transitional Provision.
[54] Directive 2001/77/EC, on the promotion of electricity produced from renewable energy sources in the internal electricity market (RL-0018), Article 3(4).
[55] Law 54/1997 (C-0060/R-0003), Articles 21(4), 31 [Article 21(4) is not included in the English translation provided by the Claimant].

did not exceed 50 MW.[56] The remuneration payable to Special Regime producers for the electricity delivered into the grid was not limited to the Pool Price. Instead, "*where applicable, a premium shall be determined by the Government [...], in accordance with the provisions of article 30.4*".[57] While said Article 30(4) Law 54/1997 provided that this premium was "*to be developed by implementing regulations*", it did specify that the

> determination of premiums will take account of the voltage level of the delivery of energy to the network, the effective contribution to the improvement of the environment, the primary energy savings and energy efficiency, the production of economically justifiable useful heat and the investment costs incurred, in order to achieve <u>reasonable rates of profitability with reference to the cost of the money on the capital markets</u>.[58] (emphasis added)

## 2.    RD 2818/1998

146    On 23 December 1998, the Respondent adopted RD 2818/1998, which specified the premium payable to Special Regime producers and, as such, acted as "*implementing regulation*" within the meaning of Article 30(4) Law 54/1997. This is the Royal Decree under which the Wind Farms were constructed, commissioned and admitted to the Special Regime.[59]

147    Broadly speaking, RD 2818/1998 classified renewable energy producers into various groups, mainly based on the technologies used,[60] and specified the applicable premium that the producers in the respective categories were entitled to receive on top of the Pool Price for each kWh supplied to the grid.[61] For some of the categories (including wind farms, but not CSP plants), the respective producers were granted the alternative option of receiving a fixed regulated tariff ("**Regulated Tariff**"), instead of receiving the Pool Price plus the applicable premium.[62] Both remuneration options, however, were only available for producers with an installed capacity not exceeding 50 MW.[63]

148    Premiums and tariffs were to be updated each year by the Ministry of Energy, taking into account the variation in the average sales price for electricity.[64] In addition, premiums were to be revised every four years considering the evolution of electricity market price, the

---

[56] Law 54/1997 (C-0060/R-0003), Article 27.
[57] Law 54/1997 (C-0060/R-0003), Article 16(7) [as per the Claimant's translation; the Respondent's translation is identical in substance].
[58] Law 54/1997 (C-0060/R-0003), Article 30(4) [as per the Claimant's translation; the Respondent's translation is identical in substance].
[59] See the respective certificates issued by the Regional Government of Castile and León (C-0093, C-0094, C-0095).
[60] RD 2817/1998 (C-0061), Article 2; by later amendment through RD 841/2002 (C-0062), CSP installations were specifically included as separate from other solar technologies such as photovoltaic.
[61] RD 2818/1998 (C-0061), Articles 26, 28(1), the applicable premium for wind farms being 5.26 pesetas/kWh. The average market price was to be determined in accordance with RD 2818/1998 (C-0061), Article 24.
[62] RD 2818/1998 (C-0061), Article 28(3), the applicable Regulated Tariff for wind farms being 11.02 pesetas/kWh.
[63] RD 2818/1998 (C-0061), Article 23.
[64] RD 2818/1998 (C-0061), Article 28(2) and (3).

installations' demand coverage and the effect on the management of the Spanish Electricity System ("**SES**") as a whole.[65]

149     In addition, RD 2818/1998 provided for a supplement or penalty, depending on the circumstances, for reactive energy. This is a financial bonus or penalty applied to revenue from the sale of energy for maintaining, or failing to maintain, certain power factors required for the well-functioning of the SES. This supplement/penalty applied under RD 2818/1998 and subsequent RDs irrespective of the selected remuneration scheme.

150     Finally, RD 2818/1998 expressly allowed CSP Plants to use fuel ("**Back-up Fuel**") "*to maintain the temperature of their heat accumulator during periods where their electrical generation is interrupted.*"[66]

## 3.     The PER 2000

151     In accordance with Law 54/1997,[67] the Respondent approved in December 1999 a "*Plan de Fomento de las Energías Renovables en España 2000-2010*" ("**PER 2000**")[68], which was prepared by IDAE and set out the government's policy for attaining the renewable energy target of 12% by the year 2010.

152     The PER 2000 explained the methodology used as follows:

> Taking as a baseline the proposed energy targets, the financing requirements have been determined for each technology according to its profitability, defining a range of **standard projects** for the calculation model.
>
> These standard projects have been characterised by technical parameters relating to their size, equivalent operating hours, unit costs, periods of implementation, lifespan, operating and maintenance costs and sale prices per final unit of energy. Similarly, some financing assumptions have been applied, as well as a series of measures or financial aid.[69] (bold original)

---

[65] RD 2818/1998 (C-0061), Article 32.
[66] RD 2818/1998 (C-0061), Article 2(1)(b), sub-group b.1.2.
[67] See Law 54/1997 (C-0060/R-0003), Twenty-fifth Additional Provision and Sixteenth Transitory Provision.
[68] C-0065/R-0281.
[69] PER 2000 (C-0065/R-0118), Chapter 6, Section 2 [as per the Respondent's translation on p. 11 of the PDF; not included in the Claimant's translation].

153    As regards profitability, the PER 2000 made reference to a

> [s]tandard project profitability: calculated on the basis of maintaining an Internal Rate of Return (IRR), measured in current pesetas and for each standard project, at a <u>minimum of 7%</u>, with own capital, <u>before financing and after tax</u>.[70] (emphasis added)

## 4.    RD 436/2004

154    On 12 March 2004, the Respondent enacted RD 436/2004, which repealed RD 2818/1998[71] and, as per its preamble, served to ensure that the renewable energy targets set by Law 54/1997 and the PER 2000 were achieved.[72]

155    While maintaining many aspects of the feed-in remuneration mechanism provided for by RD 2818/1998, the Tribunal finds it appropriate to highlight the following two changes regarding the remuneration parameters:

(i)    Instead of obtaining the Regulated Tariff, renewable energy producers still had the alternative option of selling their net output freely on the market and receiving a subsidy on top of the Pool Price. However, the subsidy now consisted not only of a premium, but also of an additional incentive for participating in the market.[73]

(ii)    The Regulated Tariff, the premium, the incentive and the reactive energy supplement/penalty were all expressed as fixed percentages of the reference electricity tariff (known by the Spanish acronym "**TMR**").[74]

156    Moreover, Article 40(1) RD 436/2004 contemplated revisions to the Regulated Tariff, premiums and incentives every four years starting from 2006.

157    In addition, Article 40(3) RD 436/2004, the meaning of which is heavily disputed between the Parties, provided as follows:

> The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the facilities that commence operations subsequent to the date of the entry into force referred to in the section [apartado] above and shall not be effective retroactively on any previous tariffs and premiums.[75]

158    Also, RD 436/2004 provided as follows regarding the use of Back-up Fuel by CSP plants:

---

[70] PER 2000 (C-0065/R-0118), Chapter 6, Section 2.1, p. 182 [as per the Respondent's translation on p. 12 of the PDF; not included in the Claimant's translation].

[71] RD 436/2004 (C-0063/R-0099), Sole Repeal Provision.

[72] See RD 436/2004 (C-0063/R-0099), Preamble [p. 2f. of the PDF in the Claimant's translation, p. 11f. of the PDF in the Respondent's translation].

[73] See RD 436/2004 (C-0063/R-0099), Article 22(1)(b).

[74] RD 436/2004 (R-0099), Article 23(1); the methodology for determining the TMR had been introduced with RD 1432/2002 (R-0098).

[75] RD 436/2004 (C-0063/R-0099), Art. 40(3) [as per the Claimant's translation; while, in this context, the more appropriate translation of the term "apartado" seems to be "paragraph" (as per the Respondent's translation), the Tribunal considers that nothing turns on the different translations].

> In these installations, equipment may be used which uses a fuel to maintain the temperature of the hot transmission fluid to compensate the lack of solar irradiation which may affect the expected delivery of energy. Electricity production from the aforementioned fuel, annually, must be less than 12% of total electricity production if the facility sells its energy [under the Regulated Tariff]. The aforementioned percentage may reach 15% if the facility sells its energy [under the Pool Price plus Premium and Incentive option].[76]

159    Finally, installations subject to RD 2818/1998 that had already obtained final registration in the RAIPRE were granted a transitional period during which they could choose between remaining subject to RD 2818/1998 for a limited time or switching to RD 436/2004 immediately.[77]

160    While RD 436/2004 was in force, the Wind Farms were granted final commissioning certificates, chose the option to sell their energy on the market in exchange for the Pool Price plus premium and incentive, obtained final registration in RAIPRE and started operating (with the exception of Lubián 2, which obtained final registration and started operating only after RD 661/2007 had entered into force).[78]

## 5.    The PER 2005

161    On 26 August 2005, the Respondent approved the PER 2005.

162    The PER 2005 observed that only 28.4% of the renewable energy target set for 2010 had been achieved thus far. While noting that at the end of 2004, wind energy had already reached 91% of the capacity set for 2010,[79] the PER 2005 found that solar energy had been "*developing notably below the rhythm necessary to achieve the final objectives.*"[80] However, the PER 2005 concluded that, in order to achieve the targets for 2010, no change was required to the remuneration regime as regards CSP[81] and wind energy[82]. Instead, one of the changes proposed was a more ambitious target for wind energy for 2010.[83]

163    Calculations on the costs of achieving the set targets were, as in the PER 2000, predicated upon "*technical-economic parameters*" for "*standard projects*",[84] including an IRR estimated "*around 7% on equity (before any financing) and after tax*".[85] At the same time, the plan estimated that around 77% of the investment in renewables would likely be debt-

---

[76] RD 436/2004 (C-0063/R-0099), Article 2(1)(b), sub-group b.1.2. [as per the Claimant's translation; the Respondent's translation is identical in substance].

[77] RD 436/2004 (C-0063/R-0099), Second Transitional Provision.

[78] MoM, ¶¶190, 278; RoM, fn. 261.

[79] PER 2005 (C-0075/R-0119), Section 3.1.2.1.

[80] PER 2005 (C-0075/R-0019), Section 2.2 [as per the Claimant's translation on p. 19 of the PDF; the Respondent's translation is identical in substance].

[81] PER 2005 (C-0075/R-0019), Section 3.4.3.

[82] PER 2005 (C-0075/R-0019), Section 3.1.1 (with the exception of a proposed elimination of penalties that applied under RD 436/2004 in case of deviations in the output of facilities subject to the Regulated Tariff).

[83] PER 2005 (C-0075/R-0019), Section 3.1.1.

[84] PER 2005 (C-0075/R-0019), Section 4.2 [as per the Respondent's translation on p. 115 of the PDF; not included in the Claimant's translation].

[85] PER 2005 (C-0075/R-0019), Section 4.2 [as per the Respondent's translation on p. 115 of the PDF; not included in the Claimant's translation].

financed and refers in multiple instances to "*project finance*" as one of the financing alternatives available to investors.[86]

### 6.     December 2005 Supreme Court Judgment

164     On 15 December 2005, the Spanish Supreme Court decided on an appeal brought by an association of renewable energy producers against RD 436/2004.[87] The association essentially argued that RD 436/2004 brought about adverse changes (as compared to RD 2818/1998) that affected existing installations. The Spanish Supreme Court dismissed the appeal and noted in particular that

> [g]iven the normative rank of this Royal Decree [RD 2818/1998], nothing prevents another norm of the same hierarchical rank from modifying it.[88]

165     Moreover, the Spanish Supreme Court found that:

> There is no legal obstacle that exists to prevent the Government, in the exercise of the regulatory powers and of the broad entitlements it has in a strongly regulated issue such as electricity, from modifying a specific system of remuneration remaining within the framework established by [Law 54/1997].[89]

### 7.     RDL 7/2006

166     On 23 June 2006, the Respondent passed RDL 7/2006. Among others, RDL 7/2006 provided that until a new remuneration regime was put in place, future revisions of the TMR would not affect the remuneration for renewable energy technologies including CSP and wind power.[90] In other words, the remuneration level was temporarily frozen. The background to this change was that the TMR-linkage introduced by RD 436/2004 had resulted in very significant increases of the remuneration paid by the Respondent to renewable energy producers.[91]

### 8.     October 2006 Supreme Court Judgment

167     On 25 October 2006, the Spanish Supreme Court issued a judgment on a challenge against a RD that is not at issue in this arbitration. According to the plaintiff in that case, that RD changed the system for calculating premiums under RD 436/2004. The Supreme Court dismissed the appeal and found as follows:

---

[86] For wind and CSP technologies, see PER 2005, Section 4.5 [as per the Respondent's translation on p. 126, 135 of the PDF; not included in the Claimant's translation].

[87] As a matter of course, the Tribunal assumes that this decision, as well as all other decisions of the Spanish Supreme Court referred to in this Award, were made public on or shortly after the date of the decision.

[88] Spanish Supreme Court, Judgment of 15 December 2005, Case 73/2004 (R-0137), 7th legal ground [as per the English translation in *BayWa v. Spain*, ¶107].

[89] Ibid., 8th legal ground [the Tribunal has completed the Respondent's English translation of the relevant sentence in R-0137 with the translation to be found in CMoM, ¶270].

[90] RDL 7/2006 (C-0076/R-0087), Transitional Provision Two.

[91] CMoM, ¶¶233-237; RoM, ¶107.

> Until it is replaced by another, [Article 30 of Law 54/1997] allows the respective companies to expect that the fixing of the premiums can be included as a factor relevant to their <u>obtaining 'reasonable rates of return with reference the cost of money in the capital market'</u> […]. However the payment regime under examination <u>does not guarantee to special regime electricity producers that a certain level of profits or revenues will be unchanged</u> relative to those obtained in previous years, <u>or that the formulas for fixing the premiums will stay unchanged</u>. [...]

> Companies that freely decide to enter a market such as electricity generation under the special regime, knowing that is largely dependent on the setting of economic incentives by public authorities, are or should be aware that they may be modified within legal guidelines, by those same authorities. One of the 'regulatory risks' to which they submit and which they must take into account, is precisely the variation of parameters for premiums or incentives, something which the [Law 54/1997] limits, as previously discussed, but does not preclude.[92] (emphasis added)

**9.    RD 661/2007 and March 2007 Supreme Court Judgment**

168    The initial draft of what would become RD 661/2007 was released on 28 November 2006. The press release accompanying the draft stated:

> As far as profitability is concerned, the new regulation guarantees a return of 7% for wind […] installations opting for the regulated tariff, and a return of between 5% and 9% if they participate in the electric energy generation market.

> In the case of technologies requiring a boost because of their limited development, such as […] solar thermal, profitability is increased to 8% for the regulated tariff option and between 7 and 11% when participating in the market.[93]

169    On 14 February 2007, the CNE issued a report on this draft. It noted that feed-in remuneration is an essential regulatory instrument to reach the renewable energy targets set by the government. It also pointed out the importance of legal stability for investors and recommended that any future revisions to the remunerative regime follow the example of Article 40(3) RD 436/2004 and not affect existing installations.[94] At the same time, the CNE noted:

> As shown both in the scientific doctrine case law […] the principles of legal certainty and protection of legitimate expectations cannot be […] used as instruments to petrify current Law at any moment. […] it does not mean that legislation is resistant or immune to reform. […] Thus the principles only require that regulatory innovation–especially if sudden, unpredictable or unexpected–be carried out with certain guarantees and caution (sufficient transition periods for adaption and, where applicable, compensatory measures) that cushion, moderate and minimise as far as possible the defrauding of expectations generated by the previous regulations.[95]

170    On 20 March 2007, the Spanish Supreme Court issued a judgment concerning an amendment to RD 436/2004 with regard to the methodology for updating premiums.[96] The plaintiff claimed, among others, that the amendment reduced by 22.6% the premium value

---

[92] Spanish Supreme Court, Judgment of 25 October 2006, Case 12/2005 (R-0138), 3rd legal ground.
[93] Ministry of Energy, Press Release of 28 November 2006 (C-0081), p. 2.
[94] CNE, Report 3/2007 of 14 February 2007 (C-0073/R-0128), p. 10-13, 19f.
[95] Ibid., p. 18 [not included in the English translation provided by the Claimant].
[96] Spanish Supreme Court, Judgment of 20 March 2007, Case 11/2005 (R-0139).

in force the previous year, undermining legitimate expectations in view of the fact that they had invested in reliance of legal conditions remaining stable. The Supreme Court rejected the appeal, quoting extensively from its 25 October 2006 judgment.

171    On 21 March 2007, the Ministry of Energy prepared a report on the proposed new regulation. According to the report, which the Claimant argues was an internal document only released "*now*"[97]:

> The regulated tariff has been calculated in order to ensure a return of between 7% and 8% depending on the technology. Bonuses have been calculated following the same criteria as in Royal Decree 436/2004, that is, the <u>bonus is calculated as the difference between the regulated tariff and the average market price set for these technologies</u>. […]
>
> **3.2.2. Solar Thermoelectic Sector**
>
> […]
>
> The regulated tariff value proposed provides an 8 % return (IRR in local currency, with own capital, after tax and after 25 years).
>
> For the market option, a bonus is proposed that ensures an IRR per project of 9.5 % for the standard case after 25 years, with a 7.6 % minimum and 11% maximum in the limits of the band.[98] (bold original, underline added)

172    On 29 March 2007, the Respondent's Chief State Attorney issued a report on the draft of RD 661/2007, noting inter alia that:

> To argue for a subjective right to the premium in the future on the same terms currently established by RD 436/2002 [sic] would be to claim a subjective right to an incentive based merely on the fact that it had been offered in previous years, irrespective of any change to the legal framework. The only thing that the Government is under obligation to do is to establish a reasonable return.[99]

173    On 25 May 2007, the Respondent enacted RD 661/2007, which replaced RD 436/2004 (subject to an optional transitory period, see ¶178 *infra*). RD 661/2007 is the RD under which the CSP Plants were constructed, commissioned and started operating.[100]

174    The preamble of RD 661/2007 states as follows:

> The economic framework established in the present Royal Decree develops the principles provided in Law 54/1997 […], guaranteeing the owners of facilities under the special regime a

---

[97] RoM, ¶587.
[98] Ministry of Energy, Report of 21 March 2007 (R-0081), Sections 3.2.1- 3.2.3.
[99] Chief State Attorney, Report of 29 March 2007 (C-0775), p. 39.
[100] MoM, ¶¶ 253, 278; RoM, fn. 261; Commission Certificate of Morón, 31 May 2012 (C-0097); Commissioning Certificate of Olivenza, 31 August 2012 (C-0098). While RDL 1/2012, which suppressed the feed-in mechanism of RD 661/2007, had entered into force before the CSP Plants were commissioned and started operating, it did not apply to the CSP Plants as they had already been registered in the Remuneration Pre-Allocation Register before RDL 1/2012 entered into force, see MoM, ¶558.

<u>reasonable return on their investments</u>, and the consumers of electricity an assignment of the costs attributable to the electricity system which is also reasonable […].”[101] (emphasis added)

175    RD 661/2007 amended the remuneration regime applicable to Special Regime facilities as follows:

(i)    Instead of receiving a Regulated Tariff, producers could still sell the energy on the market for the Pool Price and receive from the Respondent a premium, but no longer an additional incentive for participating in the free market (“**Pool Price Plus Premium**” option). Both the Regulated Tariff and the premium were set in numerical terms (euros per kWh), i.e. disassociated from the TMR.[102]

(ii)    In relation to the Pool Price Plus Premium option, RD 661/2007 introduced cap and floor limits to the remuneration payable per KWh.[103]

(iii)    After a certain number of years of operation, renewable energy producers were set to receive lower levels of Regulated Tariff or premium, respectively, until the end of their lifetime.[104]

(iv)    RD 661/2007 maintained the reactive energy supplement/penalty[105] and the right to sell the full net amount of electricity.[106]

(v)    The values of the Regulated Tariff, premiums, cap and floor limits were to be updated on a quarterly basis as a function of certain fuel price indices and the Spanish consumer price index (“**CPI**”) for the same period.[107]

176    In addition, Article 44(3) RD 661/2007, the meaning of which is heavily disputed between the Parties, provided as follows:

During 2010, in view of the results of the monitoring reports on the degree of compliance with the [PER 2005], and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan for the period 2011-2020, there will be a revision of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree, considering the costs associated with each of these technologies, the degree of participation of the Special Regime in covering the demand and its impact upon the technical and economic management of the system, always guaranteeing reasonable rates of return with reference to the cost of money in the capital markets. Thereafter, every four years, a new revision shall be performed, maintaining the same criteria as previously.

---

[101] RD 661/2007 (C-0064/R-0101), Preamble [as per the Respondent's translation on p. 2 of the PDF; the Claimant's translation is identical in substance].
[102] RD 661/2007 (C-0064/R-0101), Preamble and Article 44.
[103] RD 661/2007 (C-0064/R-0101), Article 27(2).
[104] For wind energy producers, this reduction applied after the first 20 years of operation, while for CSP producers it applied after the first 25 years, see RD 661/2007 (C-0064/R-0101), Article 36.
[105] RD 661/2007 (C-0064/R-0101), Article 29 and Annex V.
[106] RD 661/2007 (C-0064/R-0101), Article 17(b).
[107] RD 661/2007 (C-0064/R-0101), Article 44(1). While MoM, ¶¶1215f. refers to *annual* updates, this is not reflected in the wording of the provision referred to.

> The reviews of the regulated tariff and the cap and floor limits indicated in this section [apartado] shall not affect facilities for which the commission certificate had been granted prior to 1 January of the second year following the year in which the revision had been performed.[108]

177    Moreover, the use of Back-up Fuel by CSP plants remained subject to the same rules as under RD 436/2004.[109]

178    Finally, RD 661/2007 included a transitional provision which granted renewable energy facilities commissioned before 1 January 2008 the possibility to (1) switch to the remuneration regime of RD 661/2007 as of the date of its entry into force; or (2) apply the Regulated Tariff of RD 436/2004 for the remainder of the installation's lifetime, or (3) receive the Pool Price plus premium and incentive under RD 436/2004 until 31 December 2012,[110] after which the remunerative scheme under RD 661/2007 would apply.[111] The Wind Farms chose option (3).[112]

179    On 25 May 2007, i.e. the day on which RD 661/2007 was enacted, the Respondent's government issued a press release which stated, inter alia:

> **The Government assigns priority to profitability and stability in the new Royal Decree on renewable energy and cogeneration.**
>
> […]
>
> The purpose of this Royal Decree is to improve the remuneration of those less mature technologies, such as […] thermosolar, so as to be able to meet the objectives of the [PER 2005] […].
>
> […] The government's commitment to [renewable] energy technologies has been the reason why in the new regulation stability in time is sought allowing business owners to plan in the medium and long term, as well as a sufficient and reasonable return which, like the stability, makes the investment and engagement in this activity attractive. […]
>
> In 2010 the tariffs and premiums established in the proposal will be reviewed in the light of the aims established in the [PER 2005] and the Energy Saving and Efficiency Strategy […], and in accordance with the new targets to be included in the next Renewable Energies Plan for the 2011-2020 period.
>
> Any revisions of tariffs to be carried out in the future shall not affect the facilities already in operation. This guarantee provides legal certainty for the producer, providing stability for the sector and promoting its development.
>
> […]

---

[108] RD 661/2007 (C-0064/R-0101), Article 44(3) [as per the Claimant's translation; while the more appropriate translation of the term "apartado" in the second sub-paragraph seems to be "paragraph" (as in the Respondent's translation), the Tribunal considers that nothing turns on the different translations].

[109] RD 661/2007 (C-0064/R-0101), Article 2(1)(b), sub-group b.1.2.

[110] Although without TMR revisions, which were eliminated permanently by RDL 7/2006.

[111] RD 661/2007 (C-0064/R-0101), First Transitional Provision.

[112] MoM, ¶254(ii); CWS-DG, ¶42.

The new regulation guarantees an average return of 7% for wind […] installations opting to cede their production to distributors, and a return of between 5% and 9% if they participate in the electricity market.

For other technologies which require a boost due to their limited development, as with […] thermoelectric solar power, the profitability increases to 8% with the transfer of production to distributors and between 7% and 11% if they participate in the market.

[…]

Thus, increases in the regulated tariff compared with that envisaged in Royal Decree 436/2004 are 12% for wind farms […], 17% for thermosolar installations […].[113] (bold original)

## 10.   October 2007 Supreme Court Judgment

180   On 9 October 2007, the Spanish Supreme Court issued a decision on an amendment to RD 436/2004 by a subsequent RD. Drawing upon its October 2006 and March 2007 judgments, and following the approach taken in those earlier judgments, the court held that renewable energy producers do not have an intangible right but merely an expectation to be paid the premium.[114]

## 11.   RDL 6/2009

181   RDL 6/2009 of 30 April 2009 adopted new measures for the energy sector. Its preamble reads, in relevant part, as follows:

The growing tariff deficit [...] is provoking serious problems that, in the context of the current international financial crisis, is seriously affecting the system and not only putting the financial situation of the companies in the electric power sector at risk, but also the sustainability of the system itself. This imbalance is unsustainable and entails dire consequences, being that it is detrimental to the security and capacity of financing the investments that are necessary to supply electricity at the levels of quality and security demanded by the Spanish people.[115]

182   RDL 6/2009 introduced the so-called "**Remuneration Pre-Allocation Register**" to control and eventually limit the growth of renewable energy capacity in Spain.[116] In order to be entitled to the economic regime established in RD 661/2007, facilities were required to get registered in the Remuneration Pre-Allocation Register and, within 36 months of the notification of such registration, to become registered in the RAIPRE and to start selling energy.[117] Registration in the Remuneration Pre-Allocation Register was only effected if the facility concerned met a number of requirements.[118] Also, registration was only possible as long as the target capacity for the technology in question had not yet been exceeded based on facilities already registered in the Remuneration Pre-Allocation

---

[113] Ministry of Energy, Press Release of 25 May 2007 (C-0082), p. 1-3.
[114] Spanish Supreme Court, Judgment of 9 October 2007, Case 13/2006 (R-0140), 5th legal ground.
[115] RDL 6/2009 (C-0067/R-0088), Preamble [as per the Claimant's translation on p. 1 of the PDF; the Respondent's translation is identical in substance].
[116] RDL 6/2009 (C-0067/R-0088), Preamble and Article 4(1).
[117] RDL 6/2009 (C-0067/R-0088), Articles 4(2) and (8).
[118] RDL 6/2009 (C-0067/R-0088), Article 4(3).

Register.[119] The CSP Plants were registered in the Remuneration Pre-Allocation Register on 11 December 2009.[120]

183  Moreover, RDL 6/2009 provided for a transitional regime in relation to facilities that met the requirements for registration in the Remuneration Pre-Allocation Register already at the time of entry into force of RDL 6/2009. If such facilities applied to be registered in the Remuneration Pre-Allocation Register within 30 days of entry into force of RDL 6/2009, they would be registered irrespective of whether the relevant target capacity had already been exceeded.[121] However, if the relevant capacity target was exceeded, the Respondent was given the power to impose annual restrictions on the entry into operation of pre-registered installations if the economic or technical sustainability of the SES so required.[122] This power was exercised through the Council of Minister's Resolution of 13 November 2009, referred to in ¶184 *infra*.

## 12.    Council of Ministers Resolution of 13 November 2009

184  On 13 November 2009, the Council of Ministers issued a resolution concerning renewable energy facilities subject to RDL 6/2009. In view of the applications to the Remuneration Pre-Allocation Register exceeding the previously set capacities for CSP plants and wind, the Council of Ministers decided to accept additional capacity based on two technical reports, which concluded that this was technically and economically feasible, although new capacity should be limited to certain amounts given the difficulties involved in balancing generation and demand.[123] However, in order not to compromise the technical and economic security of the electrical system, the entry into operation of CSP plants and wind farms was staggered.[124] That said, according to the resolution, overall benefits of additional renewable installations "*greatly exceed the costs and justify the support for renewable energy of the regulatory framework*".[125]

## 13.    December 2009 Supreme Court Judgments

185  On 3 December 2009, the Spanish Supreme Court issued a decision on a challenge against RD 661/2007. Among others, the plaintiffs in that case contended that RD 661/2007 breached their legitimate expectations under Spanish law by disregarding the prohibition against retroactivity set out in Article 40(3) RD 436/2004. The Supreme Court dismissed the complaint and held that such "*setting in stone or freezing of the remuneration system*" did not follow from Law 54/1997, which affords the Government "*a degree of discretion*

---

[119] RDL 6/2009 (C-0067/R-0088), Article 4(6).
[120] Resolution of pre-registration for Morón (C-0117); Resolution of pre-registration for Olivenza (C-0118).
[121] RDL 6/2009 (C-0067/R-0088), Fourth Transitional Provision (a further requirement was the provision of a financial guarantee within 30 additional days).
[122] RDL 6/2009 (C-0067/R-0088), Fifth Transitional Provision (1).
[123] Council of Ministers, Resolution of 13 November 2009 (C-0113/R-0116). See also Red Eléctrica de España, Report on the Medium-term Integration of Renewable Generation 2009-2014 (R-0456).
[124] Council of Ministers, Resolution of 13 November 2009 (C-0113/R-0116), p. 3.
[125] Ibid., p. 2 [as per the Claimant's translation; the Respondent's translation is identical in substance].

*to determine the energy yields offered*".[126] In dismissing the claim, the Supreme Court quoted from, and relied upon the approach taken by, its December 2005 judgment.

186     On 9 December 2009, the Supreme Court issued another decision on a challenge against essentially the same amendment at issue in its October 2007 judgment. The Supreme Court dismissed the challenge and noted:

> [...] [the plaintiff] does not pay enough attention to the case law of this Chamber referred to with regard to the principles of legitimate expectation and non-retroactivity applied to the successive incentives' regimes for electricity generation. This involves the considerations set out in our decision dated October 25, 2006 and repeated in that issued on March 20, 2007, inter alia, about the legal situation of the owners of electrical energy production installations under a special scheme to whom it is not possible to acknowledge for the future an 'unmodifiable right' to the maintenance unchanged of the remuneration framework approved by the holder of the regulatory authority provided that the stipulations of the Law on the Electricity Sector are respected in terms of the reasonable return on investments.[127]

## 14.     The 2010 Agreements with the Wind and CSP Sectors and RD 1614/2010

187     From late April to early July 2010, officials from the Ministry of Energy discussed various aspects of a proposed regulation with representatives of trade associations from the renewable energy sector, including the wind energy association Asociación Empresarial Eólica ("**AEE**") and Protermosolar, the latter representing the thermosolar industry. In particular, those discussions related to the limitation of hours subject to feed-in remuneration, premium values, transitional periods and the scope of future revisions.[128]

188     On 2 July 2010, the Secretary of Energy sent by email to AEE the "*latest version*" of a document entitled "*Agreement with the Wind Sector*" ("**2010 Wind Agreement**"), which read as follows:

> The [Ministry of Energy] has reached an agreement with the wind sector whereby it undertakes to promote the following actions:
>
> 1. Temporary and extraordinary 35% reduction of the reference premium currently in force for wind installations subjected to Royal Decree 661/2007, applicable from the entry into force of the new Royal Decree and until 12/31/2012, notwithstanding the annual updates of the reference premium in accordance with Royal Decree 661/2007. The regime established in First Transitional Provision remain unchanged until 12/31/2012 and thereafter shall be subject to the provisions of Royal Decree 661/2007, with annual updates.
>
> 2. Amendment of Art. 44.3 of Royal Decree 661/2007 stating that future revisions of the premiums should not affect existing facilities, in precisely the same manner as currently established for regulated tariffs and upper and lower limits, nor those installations, upon approval of the revision, that were already registered into the Remuneration Pre-allocation Register established by Royal Decree-Law 6/2009, of April 30.

---

[126] Spanish Supreme Court, Judgment of 3 December 2009, Case 151/2007 (R-0141), 4th legal ground.
[127] Spanish Supreme Court, Judgment of 9 December 2009, Case 152/2007 (R-0002 bis), 6th legal ground.
[128] MoM, ¶¶326-356.

3. For those years in which the average production values of the sector as a whole exceed the provisions of PER2005-2010 (2,350 hrs), the hours of each plant exceeding 2,589 hrs (2,345 +10%) shall be remunerated at the pool price.

[…]

7. In order to maintain sustained growth in the industry and meet the 2020 targets for wind energy, in determining the new remuneration framework applicable from 2013, the Government will ensure reasonable rates of return benchmarked against the cost of money in the capital market.

The legislative text resulting from this agreement shall be disclosed to the industry prior to the processing thereof.[129]

189    Likewise on 2 July 2010, Protermosolar sent by email to the Director General for Energy Policy and Mining the "*final version*" of a document entitled "*Agreement with the Thermosolar Sector*" ("**2010 CSP Agreement**" and, together with the 2010 Wind Agreement, the "**2010 Agreements**"), which reads as follows:

The [Ministry of Energy] has reached an agreement with the thermosolar sector whereby they undertake to promote the following actions:

1. Temporary and exceptional suppression of the market + premium option for one year for all of the plants that are listed in the pre-registry, as of the entry into force of the Royal Decree or, for those plants that shall enter into operation at a later date, during their first year of operation.

[…]

2. Solid commitment to delay the entry into operation of several of the listed plants, as per the attached list.

3. Amendment of Article 44.3 of Royal Decree 661/2007, establishing that the future revisions of premiums shall not affect existing facilities, in exactly the same way as the provisions currently in place for regulated tariffs, and the upper and lower limits, nor those that at the time of approving the review would be already listed in the Remuneration Pre-allocation Registry, created by Royal Decree-Law 6/2009, of April 30, nor those that were definitively registered at the Register of Production Facilities under the Special Regime (REPE as per its acronym in Spanish) before May 6, 2009.

4. The number of equivalent operational hours at nominal, annual capacity, with a right to the remuneration currently foreseen in Royal Decree 661/2007, during the operation of the facility, shall under no circumstances be lower than: […]

This number of hours shall not [be] subject to future revision for facilities listed at the Remuneration Pre-allocation Registry or within the Register of Production Facilities under the Special Regime before May 6. Operating hours that exceed the aforesaid limits shall be remunerated at market price.

[…]

---

[129] C-0255.

5. The terms of this Agreement, as far as legally relevant, shall be reflected in the resolutions pertaining to each facility.

[…]

The legal instrument embodying this agreement shall be shared with the industry before the approval process thereof is commenced."[130]

190    By return email of 2 July 2010, the Director General for Energy Policy and Mining replied that "*I have already seen it with the Secretary of State and it has our ok*".[131]

191    On 2 July 2010 the Respondent issued a press release announcing that "*agreements*" had been found between the Ministry of Energy and the wind and thermosolar sectors, and summarizing the main contents of the 2010 Agreements.[132] Similar statements were published on 2 July 2010 by Protermosolar and on 9 July 2010 by AEE.[133]

192    On 15 July 2010, a first draft of what became RD 1614/2010 was disclosed to AEE and Protermosolar.[134] Both AEE and Protermosolar suggested specific changes to this draft by communications sent on 20 and 21 July, respectively.[135]

193    A new draft followed on 30 July 2010, which was circulated for observations along with a first explanatory report of the same date.[136]

194    On 30 August 2010, AEE filed formal observations on this new draft before the CNE. Inter alia, they stated:

The proposed modification of the remuneration regime of the reactive energy, if approved, would have a level of retroactivity such that, according to the Jurisprudence of the Constitutional Court, it may be considered of a 'minimum degree' as it only has an impact on the economic effects that in a future would be produced although the basic situation or relation has arisen in accordance with the previous one. It is true that the Supreme Court has declared, in relation to this type of retroactive modification, that it is not an 'unchangeable right' that the economic regime remains unaltered [...] thus recognizing a relatively broad margin to the 'ius variandi' of the Administration in a regulated sector involving general interests. Meanwhile, [...] the jurisprudence has established limits [...] with regard to the retroactive modification of this remuneration framework, in particular 'that the requirements of the Law on the Electrical Sector are observed with regard to the reasonable return of investments' […]

AEE maintains in view of the above that any revision of the remuneration regime established in Royal Decree 661/2007 must, necessarily guarantee the reasonable return of the investments and

---

[130] C-0249.
[131] C-0251. On 8 July, the Director General for Energy Policy and Mining sent to Protermosolar another document identical to the one sent to the 2010 CSP Agreement, but this time with the Ministry of Energy's logo on top of the document, see C-0252.
[132] Ministry of Energy, Press Release of 2 July 2010 (C-0247).
[133] Protermosolar, Press Release of 2 July 2010 (C-0256); article from AEE's Bulletin of 9 July 2010 (C-0257).
[134] C-0284, C-0285.
[135] C-0286, C-0289.
[136] C-0290, C-0292.

moreover meet the criteria established in this Royal Decree (which have not been modified) and to those higher principles of legal certainty and proportionality.[137]

195    On 4 November 2010, the Ministry of Energy issued a regulatory impact report on the draft of RD 1614/2010. It stated, in relevant part:

[The fact that installed power objectives for CSP and wind technologies as set out in the PER 2005 have been reached or exceeded] has also caused problems that need to be addressed before they pose an irreversible threat to the economic and technical sustainability of the system. […]

This Royal Decree provides a series of austerity measures to contribute to transferring to society the gain from the proper evolution of these technologies in terms of competitiveness in relative costs, reducing the deficit of the power system, while safeguarding the legal security of investments and the principle of reasonable profitability. […]

The remuneration values of Royal Decree 661/2007 were calculated in order to obtain reasonable profitability rates […]

Subsequently, during actual system operation, it was shown that […] the remuneration obtained exceeds that which is considered reasonable.

[…] as compensation for the reduction in remuneration for the first year [related to CSP facilities], the wording of Article 44 of Royal Decree 661/2007 is amended, thereby guaranteeing the installations in operation, and those pre-allocated, that the value of the regulated and maximum tariffs, as well as the value of the bonus, will stay the same over time. […]

[…] as compensation for the reduction in remuneration for the given period [related to wind farms], the wording of Article 44 of Royal Decree 661/2007 is amended, thereby guaranteeing the installations in operation, and those pre-allocated, that the value of the regulated and maximum tariffs, as well as the value of the bonus, will stay the same over time.[138]

196    On 3 December 2010, the Respondent's Council of Ministers announced the approval of RD 1614/2010 through a press release that reads as follows in relevant part:

"The new regulations, which were agreed with both sectors last July, have the main objectives of obtaining savings to benefit consumers and to make the objectives of promotion of renewable energies compatible with those of limiting electricity production costs to guarantee the sustainability of the electricity system.

The regulation also involves reinforcement of the visibility and stability of the regulation of these technologies in the future, and guarantees the present premiums and tariffs of Royal Decree 661/2007 as of 2013 for facilities in operation and for those included on the pre-register.[139]

197    The Respondent subsequently promulgated RD 1614/2010 on 8 December 2010. According to its Preamble,

---

[137] AAE, Observations before the CNE of 30 August 2010 (R-0166), p. 6f. of the PDF (footnotes omitted).
[138] Ministry of Energy, Report of 4 November 2010 (R-0082t), p. 3- 6.
[139] Council of Ministers, Press Release of 3 December 2010 (C-0315).

the support system […] must be adapted, safeguarding the legal security of the investments and the principle of reasonable return […].[140]

198    RD 1614/2010 introduced a limit to the hours of annual operation for which CSP plants and wind farms could obtain remuneration under the Special Regime.[141] It was provided that such limit "*shall not be revisable during their operational life*" for all facilities that were registered in RAIPRE, or were pre-registered in the Remuneration Pre-allocation Register and managed to obtain RAIPRE registration within 36 months of their pre-registration.[142]

199    In addition, the Regulated Tariff was made compulsory for CSP plants during their first year of operation (or, for CSP plants already in operation, the first year after entry into force of RD 1614/2010), i.e. CSP plants could not opt for the Pool Price Plus Premium option for that year.[143]

200    Moreover, all wind farms that had opted, under the First Transitory Provision of RD 661/2007, to remain under the Pool Price regime of RD 436/2004 (as did the Wind Farms)[144], would be subject to the following remuneration regime as from 1 January 2013: In principle, the Special Regime tariffs and premiums under RD 661/2007 would apply, but instead of the higher values for 2013 that would otherwise have applied, the remuneration would be based on the values determined for 2010.[145] Those values would be updated according to the coefficients that would have been applicable to them under Article 44(1) RD 661/2007.[146]

201    Furthermore, Articles 4 and 5(3) RD 1614/2010 provided as follows:

> For thermosolar technology facilities under [RD 661/2007], the revisions of tariffs, premiums and lower and upper limits, to which Article 44.3 of said Royal Decree refers, shall not affect those facilities finally registered in [RAIPRE] as of May, 7 2009, nor to those facilities pre-registered on the remuneration pre-allocation Register […] and that complied with the obligation [to obtain final RAIPRE registration within 36 months of notification of the pre-registration]."[147]

> Without prejudice to that set forth in this royal decree, for wind power technology facilities governed under [RD 661/2007], the reviews of the tariffs, bonuses and lower and upper limits referred to in Article 44.3 of the aforementioned royal decree will not affect the facilities finally registered in [RAIPRE] as of May 7, 2009, or those which had been registered in the

---

[140] RD 1615/2010 (C-0066/R-0105), Preamble [as per the Claimant's translation on p. 1 of the PDF; the Respondent's translation is identical in substance].
[141] RD 1614/2010 (C-0066/R-0105), Article 2. For the CSP Plants, the applicable limit was 2,855 hours/year. For the Wind Farms, the applicable limit was 2,589 hours/year, provided that in the respective calendar year the average annual operating hours of all onshore wind farms exceeds 2,350 hours (failing which no limit on the operating hours would apply).
[142] RD 1614/2010 (C-0066/R-0105), Article 2(3) [as per the Claimant's translation; the Respondent's translation is identical in substance].
[143] RD 1614/2010 (C-0066/R-0105), Article 3.
[144] See ¶178 *supra*.
[145] Those values were determined by MO ITC/3519/2009 of 28 December 2009 (C-0084).
[146] RD 1614/2010 (C-0066/R-0105), Article 5(2).
[147] RD 1614/2010 (C-0066/R-0105), Article 4.

Remuneration Pre-Allocation Register [...] and fulfil the obligation [to obtain final RAIPRE registration within 36 months of notification of the pre-registration].[148]

## 15.    Waiver Letters and Waiver Acceptance Resolutions

202    On 21 October 2010, i.e. still before RD 1614/2010 was adopted, the secretary to the Director General for Energy Policy and Mining sent an email to Protermosolar as follows:

> As indicated by Mr. Antonio Hernández, General Director for Energy Policy and Mining, I hereby attach the waiver acceptance resolution forms and notice of remuneration conditions to be passed, for each one of the facilities, on request of their owners.[149]

203    Attached to said email were draft templates for letters to be sent by the Ministry of Energy to owners of CSP plants once the owners had sent letters to the Ministry of Energy waiving their right to enter into operation before a certain date ("**Waiver Letters**").

204    Further exchanges and a meeting between the Ministry of Energy and Protermosolar on the text of the two documents followed.[150] On 23 November 2010, Protermosolar circulated amongst its members

> the text that we have agreed with the Ministry in relation to the fulfilment of the undertaking by each plant to notify of the new start date for delivery with premium or equivalent premium rights, as was agreed on July 2 and was kept by the Ministry in the text sent to the Council of State.[151]

205    In late November and early December 2010, the Ministry of Energy sent to all CSP producers the respective (customized) Waiver Letters to be signed by them, and informed Protermosolar that RD 1614/2010 would not be approved before all CSP producers had sent the signed Waiver Letters to the Ministry.[152] The CSP SPVs sent their Waiver Letters on 30 November.[153] On 28 December 2010, the Ministry of Energy sent resolutions ("**Waiver Acceptance Resolutions**") to the CSP SPVs, accepting their waivers and stating, in addition, as follows:

> Communicates that, at present, under the provisions of paragraph 1 of the fifth transitional provision of Royal Decree-Law 6/2009, of April 30, the remuneration applicable to the facility is made up of the tariffs, premiums, upper and lower limits and supplements established by RD 661/2007, of May 25, and updated annually by Order of the [Ministry of Energy], with the current values from January 1, 2011 being as follows: [...][154]

---

[148] RD 1614/2010 (C-0066/R-0105), Article 5(3) [as per the Claimant's translation; the Respondent's translation is identical in substance].
[149] C-0337.
[150] Cf. MoM, ¶¶518-521; CWS-LC, ¶104.
[151] C-0351.
[152] CWS-LC, ¶105.
[153] C-0331; C-0333.
[154] C-0332; C-0334.

206    In this arbitration, the legal regime as described in this section D. was labelled "*Regulatory Framework No. 1*" by the Claimant, and is referred to hereinafter as "**RF1**".

## E.    The Disputed Measures

### 1.    Regional Act 1/2012[155]

207    On 28 February 2012, the Respondent's autonomous community Castile and León adopted Regional Act 1/2012 ("**Regional Act 1/2012**"), entering into force on 1 March 2012.[156]

208    This legislation introduced a measure referred to as a "*tax on the environmental effects caused by […] wind farms*" ("**TEE**").[157] The "*taxable event*" is the "*generation of visual and environmental impacts by wind farms*".[158] The number of turbines existing at the relevant wind park forms the "*taxable base*"[159] and the amount payable is to be calculated for each turbine separately based on its power.[160] The operator and, if not identical, the owner of the relevant installation are jointly liable for payment of the TEE.[161] The revenue from the TEE will be used for the "*financing of the region's expenditure programmes on industrial energy efficiency*".[162]

### 2.    Regional Act 9/2012

209    On 21 December 2012, Castile and León passed Regional Act 9/2012 ("**Regional Act 9/2012**"), which created a regional fund to finance a regional surcharge to the electricity tolls of Law 54/1997,[163] and provided that the revenue collected through the TEE was allocated to the said fund.[164]

### 3.    Law 15/2012

210    On 27 December 2012, the Respondent adopted Law 15/2012, which introduced two notable changes to the regulatory framework.

211    First, Law 15/2012 restricted the use of Back-up Fuel as follows:

---

[155] Later repealed and replaced with a restated text by Regional Law Decree 1/2013, see MoM, ¶652.

[156] Castile and León Act 1/2012 on Tax, Administrative and Financial Measures, of 28 February (C-0375/R-0032).

[157] Regional Act 1/2012 (C-0375/R-0032), Article 19(1) [here and in the subsequent two footnotes: as per the Claimant's translation; the Respondent's translation is identical in substance].

[158] Regional Act 1/2012 (C-0375/R-0032), Article 20(1)(b).

[159] Regional Act 1/2012 (C-0375/R-0032), Article 23(3).

[160] Regional Act 1/2012 (C-0375/R-0032), Article 24(3).

[161] Regional Act 1/2012 (C-0375/R-0032), Article 21(1) and (2).

[162] Regional Act 1/2012 (R-0032), Article 19(3) [C-0375 incorporates the changes subsequently introduced by Regional Act 9/2012, which altered the wording of Article 19(3) of Regional Act 1/2012].

[163] Said surcharge was introduced, on a national level, by RDL 20/2012 (C-0395/R-0092), Article 38, which modified Law 54/1997 (C-0060/R-0003), Article 17(4).

[164] Castile and León Act 9/2012, of 21 December, on Tax and Administrative Measures (C-0394/R-0046), Second Additional Provision, Fifth Final Provision.

The electric energy attributable to the use of fuel in a generation facility that uses one of the non-consumable renewable energies as its primary energy shall not be object of the feed-in remuneration regime […].

For these purposes, by order of the [Ministry of Energy], the methodology for the calculation of the electric power that can be attributed to the fuels used shall be published.[165]

212    Until MO IET/1882/2014 set out the methodology referenced in the above quote (see section 11. *infra*), the Respondent continued paying feed-in remuneration for energy produced through Back-up Fuel as per the previous regulation, subject however to later settlement if overpayments had occurred.[166]

213    Secondly, Law 15/2012 introduced a 7% "*tax on the value of electric power generation*"[167] (known by the Spanish acronym "**TVPEE**"), which applied to both conventional and renewable sources. The preamble states that this measure aims at addressing the tariff imbalance and environmental concerns.[168] Moreover, Law 15/2012 provides that an amount equal the estimated TVPEE revenue shall be allocated to finance the costs of the SES.[169]

## 4.    RDL 2/2013

214    On 1 February 2013, RDL 2/2013 was promulgated, effective as of 1 January 2013. It introduced two notable changes to the regulatory framework.

215    First, it effectively abolished the Pool Price Plus Premium option[170] by changing the premium to 0 EUR/kWh[171] and by providing that facilities choosing the Pool Price Plus Premium option beyond 2 February 2013 could not subsequently choose the Regulated Tariff.[172]

216    Secondly, RDL 2/2013 altered the mechanism for updating tariffs, premiums and remaining elements of remuneration. While the update was previously linked to the CPI, the Respondent substituted a different index, the "*Consumer Price Index at a constant tax rate*", which, among others, excluded energy products.[173]

---

[165] Act 15/2012 (C-0372/R-0030), Final Provision One, point two [as per the Claimant's translation; not included in the Respondent's translation].
[166] See MoM, ¶¶874, 888.
[167] Act 15/2012 (C-0372/R-0030), Article 1 of Act 15/2012 [as per the Claimant's translation; the Respondent's translation is identical in substance].
[168] Act 15/2012 (C-0372/R-0030), sections I. and II. of the Preamble.
[169] Act 15/2012 (C-0372/R-0030), Second Additional Provision (a).
[170] The Parties agree on this assessment, see MoM, ¶639; cf. also CMoM, ¶¶538f.
[171] RDL 2/2013 (C-0373/R-0093), Article 2.
[172] RDL 2/2013 (C-0373/R-0093), Article 3.
[173] RDL 2/2013 (C-0373/R-0093), Article 1 [as per the Claimant's translation; the Respondent's translation is identical in substance].

## 5.    MO IET/221/2013

217    On 14 February 2013, MO IET/221/2013 entered into force and set new values, applicable as of 1 January 2013, for the Regulated Tariff in respect of both wind farms and CSP plants. This entailed a reduction of the Regulated Tariff compared to the levels applicable in 2012.[174]

218    The amendments to RF1 as described in sections 1. to 5. created a modified regulatory framework that the Claimant labelled "*Regulatory Framework No. 2*". It is referred to hereinafter as "**RF2**".

## 6.    RDL 9/2013

219    On 12 July 2013, the Respondent adopted RDL 9/2013, which came into force on 14 July 2013. It amended Article 34 Law 54/1997, i.e. the provision that had created the Special Regime, and repealed RD 661/2007 altogether.[175] In particular, the amendment to Article 34(3) Law 54/1997 set the groundwork for a new remunerative regime for renewable energy producers by providing for:

> specific remuneration composed by a term per unit of installed capacity which covers, where applicable, the investment costs for a standard facility that cannot be recovered through the sale of energy and a term to the operation which covers, if applicable, the difference between the operating costs and the revenues from this standard facility participating in the market.
>
> To calculate said specific remuneration for a standard facility throughout its regulatory useful life and based on the activity performed by an efficient and well-managed company, the following will be taken into account:
>
>    a)    The standard revenues from the sale of energy generated valued at the production market price.
>
>    b)    The standard operating costs.
>
>    c)    The standard value of the initial investment.
>
> […]
>
> This remuneration regime will not exceed the minimum level necessary to cover the costs which allow the facilities to compete on equal footing with the other technologies on the market and which allow a reasonable profitability to be obtained with reference to the standard facility applicable in each case. […]
>
> This reasonable profitability will be based on the average yield in the secondary market of ten-year government bonds applying the appropriate spread, before taxes.[176]

---

[174] See MoM, ¶¶241, 646; Appendix 4 to MO IET/3586/2011 (C-0089); Appendix 3 to MO IET/221/2013 (C-0374).

[175] RDL 9/2013 (C-0398/R-0094), Article 1 (Second) and Sole Repealing Provision (2)(a).

[176] Law 54/1997, Article 30(4), as revised by RDL 9/2013 (C-0398/R-0094), Article 1 (Second) [as per the Claimant's translation; the Respondent's translation is identical in substance].

220    Moreover, in relation to facilities which, upon entry into force of RDL 9/2013, were entitled to remuneration under the Special Regime, RDL 9/2013 provided that:

> a profitability before taxes is established based on the average yield over the last ten years in the secondary market of ten-year government bonds, increased by 300 basis points, all of the foregoing without prejudice to the review envisaged in [Article 30(4) Law 54/1997].[177]

221    In addition, RDL 9/2013 abolished the supplement for reactive energy but maintained the related penalty.[178]

222    Furthermore, RDL 9/2013 provided that the government would approve a RD "*regulating the legal and economic regime*" for renewable energy production facilities, which would "*adapt to the criteria envisaged in*" the revised Article 30(4) Law 54/1997.[179] Pending such RD, remuneration would be paid to Special Regime facilities "*as a payment on account*" pursuant to the previous economic regime, subject to "*regularization*" in six settlements once the new regime entered into force.[180]

223    As a consequence, from July 2013 to May 2014, renewable energy producers were paid on an interim basis in accordance with the previous economic regime, because it took until June 2014 for RD 413/2014 and MO IET/1045/2014 to set out the details of the new economic regime.

224    Finally, a so-called "*Register of the specific remuneration scheme*" (known by the Spanish acronym "**RRRE**") was established and registration of the respective facility in the RRRE was made a pre-condition to receiving feed-in remuneration.[181]

## 7.    Law 24/2013

225    On 26 December 2013, the Respondent adopted Law 24/2013, which superseded Law 54/1997 and restated the principles of remuneration that had been set out in RDL 9/2013 already, including the rate of profitability for the first regulatory period.[182]

---

[177] RDL 9/2013 (C-0398/R-0094), First Additional Provision [as per the Claimant's translation; the Respondent's translation is identical in substance].

[178] Cf. RDL 9/2013 (C-0398/R-0094), Third Transitory Provision (1) *in fine*. See MoM, ¶¶681f.

[179] RDL 9/2013 (C-0398/R-0094), Final Provision Two [as per the Claimant's translation; the Respondent's translation is identical in substance].

[180] RDL 9/2013 (C-0398/R-0094), Third Transitory Provision (2) and section II of the Preamble [as per the Claimant's translation; the Respondent's translation is identical in substance].

[181] RDL 9/2013 (C-0398/R-0094), Article 1(4) [as per the Respondent's translation; the Claimant's translation is identical in substance].

[182] Law 24/2013 (C-0378/R-0076), Article 14(7) in conjunction with Tenth Additional Provision (2). The interim "payment on account" was likewise confirmed, see Law 24/2013 (C-0378/R-0076), Sixth Transitory Provision; see also MoM, ¶¶753-763.

226   In addition, Law 24/2013 required renewable energy producers to finance a tariff imbalance up to a limit of 2% for a given financial year (and 5% in terms of accumulated imbalance).[183]

## 8.    RD 413/2014

227   On 16 July 2013, the Respondent submitted a first draft of RD 413/2014 to the CNE for "*urgent mandatory reporting*".[184] Following a meeting on 4 September 2013, the CNE issued a report criticizing a number of aspects of the draft, and stating that the short time frame did not allow for an effective participation of the CNE and other relevant agencies in the law-making process.[185] In the last week of November 2013, the Respondent terminated the procedure before the CNE and, on 26 November 2013, submitted a new draft of RD 413/2014 to the newly created CNMC, which was seen to be closer to the government's position.[186]

228   On 6 June 2014, the Respondent adopted RD 413/2014, which entered into force on 11 June 2014 and set out in more detail the economic regime as introduced by RDL 9/2013 and restated by Law 24/2013.

229   Specifically, RD 413/2014 introduced the remuneration parameters "*return on investment*" ("**RInv**")[187] and "*return on operation*" ("**ROp**")[188] along with the respective formulas for their calculation. RInv is a fixed remuneration per unit of installed power, while the ROp is a fixed remuneration per unit of energy sold. Taken together, RInv and ROp form the so-called "**Specific Remuneration**" that Special Regime facilities are entitled to, in addition to the Pool Price.

230   In addition, RD 413/2014 introduced the concept of a so-called "**Regulatory Lifespan**", which differs in length depending on the type of facility concerned, and after the expiry of which period no Specific Remuneration will be paid to the relevant facility.[189] However, payment of RInv may cease even before the end of the Regulatory Lifespan if the investment costs for the respective standard facility have already been recovered earlier.[190]

231   RD 413/2014 also introduced three new thresholds for annual operating hours: First, the so-called "**Maximum Operating Hours**", above which no ROp would be paid.[191] Secondly, facilities were required each year to reach the so-called "**Operating Threshold**",

---

[183] Law 24/2013 (C-0378/R-0076), Article 19(2) and (3).

[184] Letter from the Ministry of Energy to the CNE of 16 July 2013 (C-0411).

[185] CNE, Report 18/2013 of 4 September 2013 (C-0415).

[186] See Reuters, Spain delays the decree on renewable to get legally armed, 25 November 2013 (C-0414); see also MoM, ¶724.

[187] RD 413/2014 (C-0399/R-0110), Articles 11(6)(a) and 16 [here and for the subsequent footnote: as per the Claimant's translation; the Respondent's translation is identical in substance].

[188] RD 413/2014 (C-0399/R-0110), Articles 11(6)(b) and 17.

[189] RD 413/2014 (C-0399/R-0110), Article 27(1).

[190] Cf. RD 413/2014 (C-0399/R-0110), Second Additional Provisions (5).

[191] RD 413/2014 (C-0399/R-0110), Articles 13(2)(g) and 17(2).

failing which no Specific Remuneration would be paid at all for the relevant year.[192] Thirdly, if a facility exceeded the Operating Threshold but remained below the "*minimum equivalent operating hours*" ("**Minimum Operating Hours**"), the Specific Remuneration would be reduced proportionally for that year.[193]

232    Moreover, RD 413/2014 provided that if the use of Back-up Fuel exceeds 12% of the overall energy generation of a given year, no Specific Remuneration will be paid at all for the relevant year. If this threshold is crossed twice, the facilities' registration in the RRE will be cancelled and a fine may be imposed.[194]

233    Finally, RD 413/2014 provided that those facilities that had been receiving feed-in remuneration until the entry into force of RDL 9/2013 would automatically be registered in the RRRE on the date set forth in a MO yet to be adopted (which was eventually promulgated a year later, see section 10. *infra*).[195]

## 9.    MO IET/1045/2014

234    On 23 July 2013, the Respondent launched a tender process seeking external advice mainly in the form of reports assessing and establishing the investment and operation costs standards of facilities operating under the Special Regime. On 20 September 2013, the Minister of Energy confirmed that Boston Consulting Group ("**BCG**") and Roland Berger were the winners of the tender process and would issue their reports (the "**Consultant Reports**") by the end of November 2013.[196]

235    By a letter dated 31 January 2014, the first draft of MO IET/1045/2014 was released and submitted to the CNMC.[197] The Respondent refused to meet requests from members of parliament that the Consultant Reports be made public. As it turned out later, the Consult Reports did not yet exist at that time.

236    On 3 and 4 February 2014, respectively, during a meeting of joint committees of IDAE and BCG on the one hand, and IDAE and Roland Berger on the other hand, IDAE received from both companies "*the first draft of the final document*".[198] Subsequently, IDAE communicated to Roland Berger (by letter of 24 February 2014)[199] and BCG (by letter of 21 March 2014)[200] that it did not accept the submitted drafts as final reports because they did not comply with the contractual requirements, and requested certain changes to be made and additional information on underlying data to be provided. By a letter of 6 March

---

[192] RD 413/2014 (C-0399/R-0110), Article 21(1) *in fine* and (4)(c).
[193] RD 413/2014 (C-0399/R-0110), Article 21(4)(b) [as per the Claimant's translation; the Respondent's translation is identical in substance].
[194] RD 413/2014 (C-0399/R-0110), Article 33(4).
[195] RD 413/2014 (C-0399/R-0110), First Transitional Provision (1).
[196] Council of Ministers, Press Release of 20 September 2013 (C-0425).
[197] Letter from the Ministry of Energy to the CNMC of 31 January 2014 (C-0430).
[198] Minutes of the first meeting of the BCG/IDAE Joint Committee of 3 February 2014 (C-0728); Minutes of the first meeting of the Roland Berger/IDAE Joint Committee of 4 February 2014 (C-0729).
[199] IDAE, Comments on the Report of Roland Berger, 24 February 2014 (C-0746).
[200] IDAE, Comments on the Draft by BCG, 21 March 2014 (C-0745).

2014, Roland Berger largely agreed to take IDAE's comments into account in the final report, provided that IDAE furnished its updated financial models to Roland Berger.[201] By a letter of 9 April 2014, BCG responded to IDAE's requests and accepted some, but not all of them.[202]

237     On 16 June 2014, the Respondent promulgated MO IET/1045/2014,[203] which entered into force on 21 June 2014 and defined different standard facilities, for each of which it set the relevant values for calculating the applicable remuneration under RD 413/2014. In particular, this includes RInv, ROp, the Regulatory Lifespan, the Maximum Operating Hours, the Operating Threshold and the Minimum Operating Hours. For the CSP Plants, the Regulatory Lifespan was set at 25 years, with the Maximum Operating Hours being 2,040 per year. For the Wind Farms, the Regulatory Lifespan was set at 20 years, and the ROp was set at 0.

238     In Appendix II to MO IET/1045/2014, the rate of reasonable profitability was set at 7.398% pre-tax, being 300 basis points above the average yield in the secondary market for ten-year state bonds.[204]

239     Between 9 July 2014 and 5 August 2014, IDAE and Roland Berger exchanged several letters on additional amendments requested by IDAE to Roland Berger's Consultant Report.[205] On 30 September[206] and 31 October[207] 2014, IDAE received revised versions of Roland Berger's Consultant Report, the latter of which was eventually accepted by IDAE on 11 December 2014 as the final report.[208] By contrast, while BCG submitted two further versions of its Consultant Report on 28 June 2014 and 30 July 2014 following requests for amendments by IDAE,[209] IDAE did not accept any of them as the final report, and notified BCG of the termination of their contract on 26 February 2015.[210]

**10.    MO IET/1168/2014**

240     MO IET/1168/2014, adopted on 3 July 2014, provided that facilities formerly entitled to feed-in remuneration would automatically be registered in the RRRE as of 9 July 2014.[211]

---

[201] Letter from Roland Berger to IDAE of 6 March 2014 (C-0748).
[202] Letter from BCG to IDAE of 9 April 2014 (C-0731).
[203] C-0388/R-0115.
[204] Appendix III to MO IET/1045/2014 (C-0388/R-0115), Section 1.3.
[205] Letter from IDAE to Roland Berger of 6 July 2014 (C-0752); Letter from Roland Berger to IDAE of 23 July 2014 (C-0753); Letter from IDAE to Roland Berger of 5 August 2015 (C-0756).
[206] Roland Berger, Consultant Report of 30 September 2014 (C-0757).
[207] Roland Berger, Consultant Report of 31 October 2014 (C-0435).
[208] IDAE, Approval Certificate (C-0436).
[209] BCG, Consultant Report of 28 June 2014 (C-0749); BCG, Consultant Report of 30 July 2014 (C-0576).
[210] Letter from IDAE to BCG of 26 February 2015 (C-0579).
[211] MO IET/1168/2014 (C-0402), One.

11.    **MO IET/1882/2014**

241    On 14 October 2014, the Respondent promulgated MO IET/1882/2014, which introduced a formula for computing the amount of electricity produced attributable to the use of Back-up Fuel.[212] It also determined the amount of energy production attributable to the use of Back-up Fuel that was considered necessary for technical reasons and would therefore benefit from Specific Remuneration.[213] Moreover, MO IET/1882/2014 provided that its methodology applied as of 1 January 2013 and that any Specific Remuneration paid after that date for energy attributable to the use of Back-up Fuel needed to be repaid to the extent that it exceeded the remuneration owed under the new methodology.[214]

242    The amendments to RF2 described in sections 6. to 11. was labelled "*Regulatory Framework No. 3*" by the Claimant, and is referred to hereinafter as "**RF3**".

F.    **The Spanish Electricity System (SES) and the Financial and Economic Crisis**

243    The SES is operated as a closed economic structure. Its income originates exclusively from consumers, who pay not only the market price of the energy consumed but also tolls and charges that are meant to cover the costs of those aspects of the SES that are still regulated, including notably the subsidies paid to producers of renewable energy.[215] When the income of the SES is insufficient to cover its costs, a so-called "**Tariff Deficit**" arises.[216]

244    Each year from 2000 to 2013, the SES produced a Tariff Deficit, before first seeing a surplus in 2014. The following chart indicates the yearly deficit/surplus and the accumulated deficit by the end of 2014[217]:



---

[212] MO IET/1882/2014 (C-0403), Article 4(1).
[213] MO IET/1882/2014 (C-0403), Article 4(1).
[214] MO IET/1882/2014 (C-0403), First Transitional Provision.
[215] MoM, ¶¶599-607; CMoM, ¶¶62-69.
[216] CMoM, ¶84.
[217] Chart from Accuracy I, ¶A.9 (Figure 6.g).

245    As the income of the SES is directly linked to the Spanish energy demand, which in turn is dependent on the strength of the economy, it is important to note that the global financial crisis, which started in 2007, entailed a severe economic crisis in Spain from 2008 to 2014. In particular, after slowing down its growth in 2008, the Spanish GDP decreased in 2009, remained stable in 2010 and then decreased again in 2011, 2012 and 2013. At the same time, from 2007 to 2013, the unemployment rate increased from 8.3% in 2007 to 26.1% in 2013.[218]

246    In the context of this financial and economic crisis, the Spanish energy demand evolved as follows:[219]



247    Due to the merely slight increase in energy consumption in 2008 and the decrease in the years thereafter, the demand fell increasingly below the forecast of the Spanish regulator that underlay the Respondent's Renewable Energy Plans.[220] This gap between the forecast and the actual evolvement of energy demand in Spain is depicted in the following chart[221]:

---

[218] See RjoM, ¶118; Accuracy I, ¶A12 (Table 6.a) and Accuracy II, ¶180 (Table 8). The existence of the crisis is also acknowledged by the Claimant, see, e.g., BRR I, ¶138.
[219] Chart from Red Electrica de España (Spanish Electricity Grid), The Spanish Electricity System 2015 (R-0344), p. 16 [p. 1 of the PDF in the partial English translation].
[220] See CMoM, ¶¶126f.
[221] Chart from Accuracy I, ¶A.8 (Figure 6.f).



248     At the same time, between 2007 and 2014, the amount paid by an average Spanish household for its electricity bill, including taxes, increased by approximately 50%.[222] Likewise, even though the Parties disagree on the reasons, it is undisputed that between 2007 and 2014, Spanish household electricity prices increased much more than the EU average:[223]



249     In a report of 7 March 2012, the CNE opined in view of the accumulated Tariff Deficit that

---

[222] From EUR 412.60 to EUR 616.20, see CMoM,¶73.
[223] Chart from BRR II,¶118 (Figure 11).

the current situation is unsustainable. The introduction of regulatory measures […] is called for with immediate effect in the short term, in order to eliminate the deficit of the system […].[224]

250    On 20 July 2012, in the framework of the EU providing financial assistance to the Respondent to overcome the economic crisis, the Respondent committed to

address the electricity tariff deficit in a comprehensive way.[225]

251    It appears to be undisputed between the Parties that the Disputed Measures have helped reduce the accumulated Tariff Deficit, and are a main reason why the SES appears to converge towards financial sustainability, as reflected also in the assessment of the Disputed Measures by leading rating agencies in 2014, 2015 and 2016.[226]

**G.    The State Aid Decision of the European Commission**

252    On 10 November 2017, the EC issued the EC State Aid Decision on the compliance of RF3 with the EU's rules on State aid ("**EU State Aid Rules**").[227] The EC State Aid Decision reads, in relevant part, as follows:

(157) The investors argue, both before investor-State arbitration tribunals and in their submissions to the Commission, that by modifying the support scheme with regard to existing installations, Spain has violated the general principles of Union law of legal certainty and legitimate expectations.

(158) In the very specific situation of the present case, where a Member State grants Staid aid to investors, without respecting the notification and stand-still obligation of Article 108(3) TFEU, legitimate expectations with regards to those State aid payments are excluded. That is because according to the case-law of the Court of Justice, a recipient of State aid cannot, in principle, have legitimate expectations in the lawfulness of aid that has not been notified to the Commission. [footnote omitted]

[…]

(164) In any event, there is also on substance no violation of the [ECT's] fair and equitable treatment provisions. As explained above [in paragraphs 157 and 158], in the specific situation of the present case Spain has not violated the principles of legal certainty and legitimate expectations under Union law. In an intra-EU situation, Union law is part of the applicable law, as it constitutes international law applicable between the parties to the dispute. As a result, based on the principle of interpretation in conformity, the principle of fair and equitable treatment cannot have a broader scope than the Union law notions of legal certainty and legitimate expectations in the context of a State aid scheme. In an extra-EU situation, the fair and equitable treatment provision of the ECT is respected since no investor could have, as a matter of fact, a legitimate expectation stemming from illegal State aid. This has been expressly recognised by Arbitration Tribunals. [footnote omitted] It is in any event settled case-law [footnote omitted]

---

[224] CNE, Report on Economic Sustainability of SES of 7 March 2012 (R-0131), p. 16 of the PDF [as per the Respondent's translation on R-PHB, p. 51, fn. 203].
[225] Memorandum of Understanding on Financial-Sector Policy Conditionality of 20 July 2012 (RL-0042), ¶31.
[226] Cf. R-PHB, ¶189; Accuracy II, ¶¶256-258, referring to statements from Fitch and Moody's. See also Fitch, Limted Risk of Energy Reforms Reversal in Spain of February 2016 (R-0378).
[227] State aid decision SA.40348 of 10 November 2017 (RL-0116).

that a measure that does not violate domestic provisions on legitimate expectation generally does not violate the fair and equitable treatment provision.

(165) The Commission recalls that any compensation which an Arbitral Tribunal were to grant to an investor on the basis that Spain has modified the *premium* economic scheme by the notified scheme […] would be notifiable State aid pursuant to Article 108(3) TFEU and be subject to the standstill obligation.

(166) Finally, the Commission recalls that this Decision is part of Union law, and as such also binding on Arbitral Tribunals, where they apply Union law. The exclusive forum for challenging its validity are the European Courts.

## IV. THE PARTIES' REQUESTS FOR RELIEF

253    The Claimant's request for relief, as submitted at the hearing, is as follows:[228]

"i. DECLARING that the Arbitral Tribunal has jurisdiction to hear all claims submitted by RENERGY under the Energy Charter Treaty and, consequently, rejecting each of the preliminary objections that the Respondent raised against the jurisdiction of the Arbitral Tribunal.

ii. DECLARING that the Respondent's actions and omissions with respect to the Claimant's Investment amount to breaches of the Respondent's obligations under Part III of the Energy Charter Treaty, as well as under the applicable rules and principles of international law.

iii. ORDERING the Respondent to pay to RENERGY compensation in the amount of EUR 151[229] million.

iv. ORDERING Respondent to pay the entire costs of the arbitration and all legal costs and other expenses incurred by RENERGY.

v. ORDERING Respondent to pay to RENERGY *pre* and *post* award interest accrued on all amounts claimed, compounded, until full payment thereof, at the rates specified by RENERGY.

vi. DECLARING that the Arbitral Tribunal's Award is made net of all taxes and/or withholdings, and ORDERING Spain to indemnify Claimants [sic] for any tax liability or withholding that may be imposed in relation to the compensation awarded in the Tribunal's Award.

vii. ORDERING any such further relief as the Arbitral Tribunal may deem appropriate."

254    The above request is identical in substance to the request contained in the Claimant's Reply on the Merits.[230] While the latter contained also a request for a declaration that the Respondent may not impose any tax on the Claimant arising from the award, the Tribunal considers that the substance of this request did no go beyond the (maintained) request for a declaration that any award be made net of taxes.

---

[228] See the Claimant's powerpoint presentation "Claimant's Opening Statement", as presented at the Hearing ("**C-OS**"), slides 288f. (italics original).
[229] As becomes clear from C-PHB, ¶232, this includes EUR 10 million as pre-award interest up to November 2018.
[230] RoM, ¶1542.

255    Similarly, while in its post-hearing brief the Claimant re-stated the above request for relief with partially different wording and without requesting a declaration as to the net nature of any award or an order for indemnification for any tax liability, the Tribunal does not consider that this was intended to withdraw these previous requests. Instead, the post-hearing brief expressly requests "*an Award as indicating* [sic] *in the previous submissions by the Claimant*", followed by a footnote referring to the request for relief submitted in the Claimant's opening statement at the hearing.[231] Therefore, the Tribunal finds that the foregoing requests regarding taxes have been maintained by the Claimant.

256    The Respondent, in turn, requests the Tribunal to:[232]

> "a) Declare that it lacks jurisdiction to hear the Claimant's claims.
>
> b) Subsidiarily, dismiss all the Claimant´s claims regarding the merits of the case, as the Kingdom of Spain has not in any way failed to comply with the ECT;
>
> c) Subsidiarily, dismiss all the Claimant´s claims for compensation as it is not entitled to compensation; and
>
> d) Order that the Claimant pays all costs and expenses arising from this arbitration, including administrative expenses of the ICSID and the fees of the Arbitrators, as well as the fees of the legal representation of the Kingdom of Spain, its experts and advisers, and any other costs or expenses that may have incurred, all of which include a reasonable interest rate from the date these costs are incurred until the date of their actual payment."

## V.    JURISDICTION

257    The Tribunal will deal in turn with each of the six jurisdictional objections maintained by the Respondent, as amended and re-labelled by the Respondent during the arbitration.

## A.    Objection A

## 1.    The *Achmea* and *Komstroy* Judgments

258    The Respondent's Objection A, which is hereinafter also referred to as the "**Intra-EU Objection**", relies heavily on the *Achmea* Judgment.[233] The Tribunal has found the following parts of the *Achmea* Judgment relevant for its analysis:

> "31 By its first and second questions, which should be taken together, the referring court essentially asks whether Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.

---

[231] C-PHB, ¶232.
[232] R-PHB, ¶218. These requests are identical in substance to the ones in CMoM, ¶1273 and RjoM, ¶1757.
[233] *Achmea* Judgment (CL-0278/RL-0135).

32 In order to answer those questions, it should be recalled that, according to settled case-law of the Court, an international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the Court. That principle is enshrined in particular in Article 344 TFEU, under which the Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties [reference omitted].

33 Also according to settled case-law of the Court, the autonomy of EU law with respect both to the law of the Member States and to international law is justified by the essential characteristics of the EU and its law, relating in particular to the constitutional structure of the EU and the very nature of that law. EU law is characterised by the fact that it stems from an independent source of law, the Treaties, by its primacy over the laws of the Member States, and by the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves. Those characteristics have given rise to a structured network of principles, rules and mutually interdependent legal relations binding the EU and its Member States reciprocally and binding its Member States to each other [reference omitted].

34 EU law is thus based on the fundamental premiss that each Member State shares with all the other Member States, and recognises that they share with it, a set of common values on which the EU is founded, as stated in Article 2 TEU. That premiss implies and justifies the existence of mutual trust between the Member States that those values will be recognised, and therefore that the law of the EU that implements them will be respected. It is precisely in that context that the Member States are obliged, by reason inter alia of the principle of sincere cooperation set out in the first subparagraph of Article 4(3) TEU, to ensure in their respective territories the application of and respect for EU law, and to take for those purposes any appropriate measure, whether general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the EU [reference omitted].

35 In order to ensure that the specific characteristics and the autonomy of the EU legal order are preserved, the Treaties have established a judicial system intended to ensure consistency and uniformity in the interpretation of EU law [reference omitted].

36 In that context, in accordance with Article 19 TEU, it is for the national courts and tribunals and the Court of Justice to ensure the full application of EU law in all Member States and to ensure judicial protection of the rights of individuals under that law [references omitted].

37 In particular, the judicial system as thus conceived has as its keystone the preliminary ruling procedure provided for in Article 267 TFEU, which, by setting up a dialogue between one court and another, specifically between the Court of Justice and the courts and tribunals of the Member States, has the object of securing uniform interpretation of EU law, thereby serving to ensure its consistency, its full effect and its autonomy as well as, ultimately, the particular nature of the law established by the Treaties [reference omitted].

38 The first and second questions referred for a preliminary ruling must be answered in the light of those considerations.

39 It must be ascertained, first, whether the disputes which the arbitral tribunal mentioned in Article 8 of the BIT is called on to resolve are liable to relate to the interpretation or application of EU law.

40 Even if, as Achmea in particular contends, that tribunal, despite the very broad wording of Article 8(1) of the BIT, is called on to rule only on possible infringements of the BIT, the fact remains that in order to do so it must, in accordance with Article 8(6) of the BIT, take account in particular of the law in force of the contracting party concerned and other relevant agreements between the contracting parties.

41 Given the nature and characteristics of EU law mentioned in paragraph 33 above, that law must be regarded both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States.

42 It follows that on that twofold basis the arbitral tribunal referred to in Article 8 of the BIT may be called on to interpret or indeed to apply EU law, particularly the provisions concerning the fundamental freedoms, including freedom of establishment and free movement of capital.

43 It must therefore be ascertained, secondly, whether an arbitral tribunal such as that referred to in Article 8 of the BIT is situated within the judicial system of the EU, and in particular whether it can be regarded as a court or tribunal of a Member State within the meaning of Article 267 TFEU. The consequence of a tribunal set up by Member States being situated within the EU judicial system is that its decisions are subject to mechanisms capable of ensuring the full effectiveness of the rules of the EU [reference omitted].

44 In the case in which judgment was given on 12 June 2014, *Ascendi Beiras Litoral e Alta, Auto Estradas das Beiras Litoral e Alta* (C-377/13, EU:C:2014:1754), the Court derived the status of 'court or tribunal of a Member State' of the tribunal in question from the fact that the tribunal as a whole was part of the system of judicial resolution of tax disputes provided for by the Portuguese constitution itself [reference omitted].

45 In the case in the main proceedings, the arbitral tribunal is not part of the judicial system of the Netherlands or Slovakia. Indeed, it is precisely the exceptional nature of the tribunal's jurisdiction compared with that of the courts of those two Member States that is one of the principal reasons for the existence of Article 8 of the BIT.

46 That characteristic of the arbitral tribunal at issue in the main proceedings means that it cannot in any event be classified as a court or tribunal 'of a Member State' within the meaning of Article 267 TFEU.

47 The Court has indeed held that there is no good reason why a court common to a number of Member States, such as the Benelux Court of Justice, should not be able to submit questions to the Court for a preliminary ruling in the same way as the courts or tribunals of any one of the Member States [references omitted].

48 However, the arbitral tribunal at issue in the main proceedings is not such a court common to a number of Member States, comparable to the Benelux Court of Justice. Whereas the Benelux Court has the task of ensuring that the legal rules common to the three Benelux States are applied uniformly, and the procedure before it is a step in the proceedings before the national courts leading to definitive interpretations of common Benelux legal rules, the arbitral tribunal at issue in the main proceedings does not have any such links with the judicial systems of the Member States [reference omitted].

49 It follows that a tribunal such as that referred to in Article 8 of the BIT cannot be regarded as a 'court or tribunal of a Member State' within the meaning of Article 267 TFEU, and is not therefore entitled to make a reference to the Court for a preliminary ruling.

50 In those circumstances, it remains to be ascertained, thirdly, whether an arbitral award made by such a tribunal is, in accordance with Article 19 TEU in particular, subject to review by a court of a Member State, ensuring that the questions of EU law which the tribunal may have to address can be submitted to the Court by means of a reference for a preliminary ruling.

51 It should be noted that under Article 8(7) of the BIT the decision of the arbitral tribunal provided for in that article is final. Moreover, pursuant to Article 8(5) of the BIT, the arbitral tribunal is to determine its own procedure applying the UNCITRAL arbitration rules and, in

particular, is itself to choose its seat and consequently the law applicable to the procedure governing judicial review of the validity of the award by which it puts an end to the dispute before it.

52 In the present case, the arbitral tribunal applied to by Achmea chose to sit in Frankfurt am Main, which made German law applicable to the procedure governing judicial review of the validity of the arbitral award made by the tribunal on 7 December 2012. It was thus that choice which enabled the Slovak Republic, as a party to the dispute, to seek judicial review of the arbitral award, in accordance with German law, by bringing proceedings to that end before the competent German court.

53 However, such judicial review can be exercised by that court only to the extent that national law permits. Moreover, Paragraph 1059(2) of the Code of Civil Procedure provides only for limited review, concerning in particular the validity of the arbitration agreement under the applicable law and the consistency with public policy of the recognition or enforcement of the arbitral award.

54 It is true that, in relation to commercial arbitration, the Court has held that the requirements of efficient arbitration proceedings justify the review of arbitral awards by the courts of the Member States being limited in scope, provided that the fundamental provisions of EU law can be examined in the course of that review and, if necessary, be the subject of a reference to the Court for a preliminary ruling [references omitted].

55 However, arbitration proceedings such as those referred to in Article 8 of the BIT are different from commercial arbitration proceedings. While the latter originate in the freely expressed wishes of the parties, the former derive from a treaty by which Member States agree to remove from the jurisdiction of their own courts, and hence from the system of judicial remedies which the second subparagraph of Article 19(1) TEU requires them to establish in the fields covered by EU law [reference omitted], disputes which may concern the application or interpretation of EU law. In those circumstances, the considerations set out in the preceding paragraph relating to commercial arbitration cannot be applied to arbitration proceedings such as those referred to in Article 8 of the BIT.

56 Consequently, having regard to all the characteristics of the arbitral tribunal mentioned in Article 8 of the BIT and set out in paragraphs 39 to 55 above, it must be considered that, by concluding the BIT, the Member States parties to it established a mechanism for settling disputes between an investor and a Member State which could prevent those disputes from being resolved in a manner that ensures the full effectiveness of EU law, even though they might concern the interpretation or application of that law.

57 It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law. The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected [reference omitted].

58 In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU is provided for by an agreement which was concluded not by the EU but by Member States. Article 8 of the BIT is such as to call into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of the law established by the Treaties, ensured by the

54

preliminary ruling procedure provided for in Article 267 TFEU, and is not therefore compatible with the principle of sincere cooperation referred to in paragraph 34 above.

59 In those circumstances, Article 8 of the BIT has an adverse effect on the autonomy of EU law.

60 Consequently, the answer to Questions 1 and 2 is that Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.

[…]

62 […]

On those grounds, the Court (Grand Chamber) hereby rules:

Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept."

259    Moreover, the Tribunal has found the following paragraphs of the *Komstroy* Judgment relevant to its analysis:[234]

"47 It is in the light of the foregoing considerations that the question whether a dispute between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State may be subject to arbitration proceedings under Article 26(2)(c) ECT must be examined.

48 To that end, in the first place, it should be noted that, in accordance with Article 26(6) ECT, the arbitral tribunal provided for in paragraph 4 of that article is to rule on the issues in dispute in accordance with the ECT and with the applicable rules and principles of international law.

49 As stated in paragraph 23 of this judgment, the ECT itself is an act of EU law.

50 It follows that an arbitral tribunal such as that referred to in Article 26(6) ECT is required to interpret, and even apply, EU law.

51 It must therefore be ascertained, in the second place, whether such an arbitral tribunal is situated within the judicial system of the European Union, and in particular whether it can be regarded as a court or tribunal of a Member State within the meaning of Article 267 TFEU. The consequence of a tribunal set up by Member States being situated within the EU judicial system is that its decisions are subject to mechanisms capable of ensuring the full effectiveness of the rules of the European Union (judgment of 6 March 2018, Achmea, C-284/16, EU:C:2018:158, paragraph 43 and the case-law cited).

---

[234] *Komstroy* Judgment (RL-0173).

52 In the precisely same way as the arbitral tribunal at issue in the case giving rise to the judgment of 6 March 2018, Achmea (C-284/16, EU:C:2018:158, paragraph 45), an ad hoc arbitral tribunal, such as that referred to in Article 26(6) ECT, does not constitute a component of the judicial system of a Member State, in this case the French Republic. Indeed it is precisely the exceptional nature of that court's jurisdiction, by comparison with that of the courts of the contracting parties to the ECT, which is one of the main reasons for the existence of Article 26(2)(c) and (4) of that treaty. That is all the more so given that, if the arbitral tribunal concerned were one of the courts of a Contracting Party to that treaty, it would be included amongst the courts referred to in Article 26(2)(a) ECT and thus Article 26(2)(c) ECT would lose any effectiveness.

53 That characteristic of such an arbitral tribunal means that it cannot, in any event, be classified as a court or tribunal 'of a Member State' within the meaning of Article 267 TFEU, and is not therefore entitled to make a reference to the Court for a preliminary ruling (see, by analogy, judgment of 6 March 2018, Achmea, C-284/16, EU:C:2018:158, paragraphs 46 and 49).

54 In those circumstances, it remains to be ascertained, in the third place, whether an arbitral award made by such a tribunal is, in accordance with Article 19 TEU in particular, subject to review by a court of a Member State and whether that review is capable of ensuring full compliance with EU law guaranteeing that questions of EU law which the tribunal may have to address can, if necessary, be submitted to the Court by means of a reference for a preliminary ruling.

55 To that end, it should be noted that, under Article 26(8) ECT, arbitral awards are final and binding on the parties to the dispute concerned. In addition, by application of Article 26(4) ECT, a dispute, such as that at issue in the main proceedings, may be brought before an ad hoc arbitration tribunal on the basis of the Uncitral arbitration rules, with that arbitral tribunal determining its own procedural rules in accordance with those arbitration rules.

56 In the present case, as has been recalled in paragraph 32 of the present judgment, the parties to the dispute at issue in the main proceedings chose, in accordance with Article 26(4)(b) ECT, to submit that dispute to an ad hoc arbitration tribunal, established on the basis of the Uncitral arbitration rules, and thus accepted, in accordance with those arbitration rules, that the seat of the arbitration tribunal should be established in Paris, which made French law applicable to the proceedings before the referring court, whose purpose was the judicial review of the arbitration award made by that tribunal.

57 However, such judicial review can be carried out by the referring court only in so far as the domestic law of its Member State so permits. Article 1520 of the Code of Civil Procedure provides only for limited review concerning, in particular, the jurisdiction of the arbitral tribunal.

58 It is true that, in relation to commercial arbitration, the Court has held that the requirements of efficient arbitration proceedings justify the review of arbitral awards by the courts of the Member States being limited in scope, provided that the fundamental provisions of EU law can be examined in the course of that review and they can, if necessary, be the subject of a reference to the Court for a preliminary ruling (judgment of 6 March 2018, Achmea, C-284/16, EU:C:2018:158, paragraph 54 and the case-law cited).

59 However, arbitration proceedings such as those referred to in Article 26 ECT are different from commercial arbitration proceedings. While the latter originate in the freely expressed wishes of the parties concerned, the former derives from a treaty whereby, in accordance with Article 26(3)(a) ECT, Member States agree to remove from the jurisdiction of their own courts and, hence, from the system of judicial remedies which the second subparagraph of Article 19(1) TEU requires them to establish in the fields covered by EU law (see, to that effect, judgment of 27 February 2018, Associação Sindical dos Juízes Portugueses, C-64/16, EU:C:2018:117, paragraph 34), disputes which may concern the application or interpretation of that law. In those

56

circumstances, the considerations set out in the preceding paragraph relating to commercial arbitration do not apply to arbitration proceedings such as those referred to in Article 26(2)(c) ECT (see, to that effect, judgment of 6 March 2018, Achmea, C-284/16, EU:C:2018:158, paragraph 55).

60 Having regard to all the characteristics of the arbitral tribunal set out in paragraphs 48 to 59 of the present judgment, it must be considered that, if the provisions of Article 26 ECT allowing such a tribunal to be entrusted with the resolution of a dispute were to apply as between an investor of one Member State and another Member State, it would mean that, by concluding the ECT, the European Union and the Member States which are parties to it established a mechanism for settling such a dispute that could exclude the possibility that that dispute, notwithstanding the fact that it concerns the interpretation or application of EU law, would be resolved in a manner that guarantees the full effectiveness of that law (see, by analogy, judgment of 6 March 2018, Achmea, C-284/16, EU:C:2018:158, paragraph 56).

61 It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the EU institutions, including the Court of Justice of the European Union, is not in principle incompatible with EU law. The competence of the European Union in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the European Union and its legal order is respected (judgment of 6 March 2018, Achmea, C-284/16, EU:C:2018:158, paragraph 57 and the case-law cited).

62 However, the exercise of the European Union's competence in international matters cannot extend to permitting, in an international agreement, a provision according to which a dispute between an investor of one Member State and another Member State concerning EU law may be removed from the judicial system of the European Union such that the full effectiveness of that law is not guaranteed.

63 Such a possibility would, as the Court held in the case giving rise to the judgment of 6 March 2018, Achmea (C-284/16, EU:C:2018:158, paragraph 58) and as the Advocate General observed in essence in point 83 of his Opinion, call into question the preservation of the autonomy and of the particular nature of the law established by the Treaties, ensured in particular by the preliminary ruling procedure provided for in Article 267 TFEU.

64 It should be noted in that regard that, despite the multilateral nature of the international agreement of which it forms part, a provision such as Article 26 ECT is intended, in reality, to govern bilateral relations between two of the Contracting Parties, in an analogous way to the provision of the bilateral investment treaty at issue in the case giving rise to the judgment of 6 March 2018, Achmea (C-284/16, EU:C:2018:158, paragraph 58).

65 It follows that, although the ECT may require Member States to comply with the arbitral mechanisms for which it provides in their relations with investors from third States who are also Contracting Parties to that treaty as regards investments made by the latter in those Member States, preservation of the autonomy and of the particular nature of EU law precludes the same obligations under the ECT from being imposed on Member States as between themselves.

66 In the light of the foregoing, it must be concluded that Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State."

## 2.    The Respondent's Principal Arguments

### a.    EU Member States as the Same Contracting Party vis-à-vis Each Other

260    According to the Respondent, Article 26(1) ECT deals with disputes arising between a contracting party to the ECT ("**Contracting Party**") and an Investor of another Contracting Party concerning Investments of the latter in the Area of the former. The Respondent argues that in light of the object and purpose of the ECT, and the legal framework and cooperation it establishes, in particular its Part III, it is evident that the EU Member States have fully transferred the intra-EU competences dealt with and applied in the ECT to the EU, which is also a Contracting Party to the ECT. As a consequence, EU Member States are not "*another Contracting Party*" and another "*Area*" to each other under the ECT and EU Member States could not have agreed on, and could not be bound by, something the necessary competence for which they had already transferred to the EU. Within the EU, the ECT and the EU share the same purpose, and the EU is the competent Contracting Party to the ECT for such matters.[235] According to the Respondent, it would have been nonsensical for EU Member States to enter into an agreement to cover an area between them which had already been comprehensively, and better, covered for years by EU law – however, in the Respondent's view, this is what it would mean to interpret the ECT as applicable intra-EU.[236]

261    According to the Respondent, Article 1(3) ECT (as well as Articles 1(2) ECT and 36(7) ECT) have expressly contemplated the transfer of competence to "*Regional Economic Integration Organisations*" ("**REIO**s") as it has taken place from EU Member States to the EU in matters covered by the ECT.[237] Quoting *Electrabel v. Hungary*, the Respondent submits that

> the possible interference with a foreign investment through the implementation by an EU Member State of a legally binding decision of the European Commission was and remains inherent in the framework of the ECT itself.[238]

262    Therefore, according to the Respondent, intra-EU disputes are excluded from the scope of the ECT.[239]

---

[235] Hearing Transcript ("**HT**"), Day 1, 133:21-135:13; the Respondent's powerpoint presentation "Jurisdictional Objections Raised by the Kingdom of Spain", as presented at the Hearing ("**R-OS (Jurisdiction)**"), slides 4-7; RoPO, ¶¶63-72; RC on EC's Comments on *Achmea* Judgment, ¶¶2-4; MoPO, ¶¶236-240, 251, 267.

[236] MoPO, ¶¶269-272; RC on *Komstroy*, ¶¶11, 31.

[237] HT, Day 1, 135:14-136:7; R-OS (Jurisdiction), slide 7; RC on EC's Comments on *Achmea* Judgment, ¶¶19, 30; RoPO, ¶¶66-70; MoPO, ¶¶254-258; RC on *Komstroy*, ¶¶11, 31.

[238] R-OS (Jurisdiction), slide 7, quoting *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 (CL-0002/CL-0046/RL-0060) ("*Electrabel v. Hungary I*"), ¶4.142.

[239] HT, Day 1, 133:21-142:5; R-OS (Jurisdiction), slides 4-7; RoPO, ¶¶63-72; RC on EC's Comments on *Achmea* Judgment, ¶¶2-4; MoPO, ¶¶236-240, 251.

b.      **Applicability of EU Law**

263    The Respondent submits that, as confirmed by the *Komstroy* Judgment, Article 26(6) ECT requires that (i) the dispute be settled in accordance with the ECT and other principles and rules of international law, that (ii) EU law is international law and that, thus, (iii) the Tribunal must apply EU law.[240] The Respondent adds that EU law must also be taken into account as a relevant rule of international law applicable in the relations between the Parties in the sense of Article 31(3)(c) of the Vienna Convention on the Law of Treaties ("**VCLT**").[241] In addition, according to the Respondent, the primacy of EU law also makes it the applicable law to resolve the present dispute.[242]

264    The Respondent adds that, in its view, EU law is also applicable in the Tribunal's *ex officio* analysis of its jurisdiction.[243]

c.      **Primacy of EU Law**

265    According to the Respondent, EU law must be applied as interpreted by the CJEU,[244] and any potential conflict arising between the ECT and EU law must thus be resolved in favour of EU law by the principle of autonomy and primacy of EU law (see below),[245] which is expressly recognised by Article 25 ECT[246] and also forms part of customary international law and the Treaty of Lisbon.[247]

266    The Respondent argues that the Tribunal should interpret the ECT as an act of the EU[248] and, thus, in harmony with EU law.[249] In its submissions on the *Komstroy* Judgment, the Respondent adds that according to the judgment, the ECT, as an act of the EU, forms part of EU law.[250] Therefore, according to the Respondent, with the CJEU being the supreme interpreter of EU law, its interpretation of the ECT is binding on the Tribunal.[251]

267    The Respondent submits that the primacy of the EU law was known to the Contracting Parties that were also EU Member States when they entered into the ECT, such as the Respondent and Luxembourg. These States thus knew that EU law had primacy over the

---

[240] RC on EC's Comments on *Achmea* Judgment, ¶¶10-17; RC on *BayWa*, ¶¶39-51, 71-78; RC on Declarations of EU Member States, ¶13; R-OS (Jurisdiction), slide 8; HT, Day 1, 136:14-137:10; RoPO, ¶¶27-29, 75-76; MoPO, ¶286; RC on *Komstroy*, ¶¶11, 27, 29-32, 39-41.

[241] RC on Declarations of EU Member States, ¶13, referring to Vienna Convention on the Law of Treaties, signed at Vienna on 23 May 1969 (CL-0024/RL-0041).

[242] RoPO, ¶35.

[243] RC on Declarations of EU Member States, ¶13; HT, Day 1, 136:8-136:25.

[244] RC on Declarations of EU Member States, ¶13.

[245] RC on *BayWa*, ¶52-78; RC on *Komstroy*, ¶¶33-38.

[246] RoPO, ¶¶24-35, 75-76; RC on EC's Comments on *Achmea* Judgment, ¶15; RC on *BayWa*, ¶¶39-78; RC on Declarations of EU Member States, ¶13; MoPO, ¶257.

[247] RC on *Komstroy*, ¶¶35-37, 46.

[248] RC on EC's Comments on *Achmea* Judgment, ¶28.

[249] RC on Declarations of EU Member States, ¶14; R-OS (Jurisdiction), slide 8; HT, Day 1, 137:11-137:17; MoPO, ¶268; RC on *Komstroy*, ¶30.

[250] RC on *Komstroy*, ¶¶11, 39-41.

[251] Ibid., ¶¶39-41.

ECT when entering into the ECT, and their whole participation in the ECT must be seen in that light.[252]

### d.    Inapplicability of Article 26 ECT to Intra-EU Cases

268    According to the Respondent, Articles 267 and 344 of the Treaty on the Functioning of the European Union[253] ("**TFEU**") prescribe that EU law cannot be subject to any dispute resolution outside the EU judicial system.[254] In the view of the Respondent, this was confirmed in the *Achmea* and *Komstroy* Judgments.[255]

269    The Respondent submits that, with that in mind, the EU and the EU Member States, as Contracting Parties to the ECT, could never have intended to adopt rules incompatible with their obligations under the the TFEU and the Treaty on European Union[256] ("**TEU**", together with the TFEU the "**EU Treaties**"). As such, Article 26 ECT was never, and could never have been, meant by the EU Member States as an intra-EU arbitration clause. The Respondent adds that this interpretation is also confirmed by the 22 Member States Declaration (see section i. *infra*).[257]

270    The Respondent submits that, in addition, the dispute at hand concerns essential elements of EU law (EU State Aid Rules and competition law as well as all four fundamental freedoms), and that a decision on such topics falls within the sole competence of the CJEU, not an ICSID tribunal which is not part of the EU hierarchy.[258]

### e.    Primacy of EU Law as a Conflict Rule and *Lex Posterior* to Article 26 ECT

271    According to the Respondent, if the Tribunal nevertheless deemed that a conflict existed between the provisions of the ECT and EU law, such a conflict would have to be resolved by public international law. The Respondent submits that as a result of a public international law analysis, the Tribunal would have to give precedence to the specific rules for the resolution of conflicts which are provided by EU law.[259] In the view of the Respondent, the principle of primacy of EU law is not only an interpretative criterion, but a special conflict rule, which takes precedence over the general rules of conflict as reflected in Article 30(3) to (5) VCLT.[260]

272    The Respondent further submits that the principle of primacy of EU law also constitutes a *lex posterior* to the ECT because it was codified in the Treaty of Lisbon, after the

---

[252] RC on *BayWa* ¶¶79-83; RC on *Komstroy*, ¶¶36f.
[253] Treaty on the Functioning of the European Union, originally signed at Rome on 23 March 1957.
[254] RoPO, ¶57; MoPO, ¶261.
[255] R-OS (Jurisdiction), slides 15-17; RC on *Komstroy*, ¶¶14-20, 27-41.
[256] Treaty on European Union, originally signed at Maastricht on 7 February 1992.
[257] RC on Declarations of EU Member States, ¶14.
[258] RoPO, ¶34; RC on EC's Comments on *Achmea* Judgment, ¶¶16, 18; R-OS (Jurisdiction), slides 10-12, 19; HT, Day 1, 138:3-139:25; RC on *Komstroy*, ¶¶31f., 40.
[259] RC on Declarations of EU Member States, ¶¶19-23.
[260] Ibid., ¶¶19-23; RC on *Komstroy*, ¶46.

conclusion of the ECT.[261] According to the Respondent, the EU Treaties do not only share, but also exceed the object and purpose of the ECT, and as such are later treaties on the same subject-matter in the sense of Articles 30 and 59 VCLT.[262]

273    In reference to Article 16 ECT, and regarding the question of which regime is more favourable to investors, the Respondent submits that Article 26 ECT does not establish an order of preference between the different dispute settlement mechanisms it provides for, i.e. the Article does not prefer the dispute resolution by national courts over arbitration and vice versa. Therefore, according to the Respondent, Article 26 ECT does not establish that arbitration would be more favourable to an investor than dispute settlement by a national court.[263]

**f.    The *Achmea* Judgment**

274    Turning to the *Achmea* Judgment, the Respondent submits that in that judgment the CJEU does not limit itself to BITs.[264]

275    The Respondent further notes that in the *Achmea* Judgment the CJEU established two conditions that would necessitate the invalidation of an intra-EU arbitration clause. Specifically, an invalidation is necessary (i) in case the dispute that a tribunal is called to resolve relates to the interpretation or application of EU law and (ii) in case the CJEU is impeded from exercising its powers, e.g. through the preliminary ruling procedure. Since, according to the Respondent, both conditions are met, i.e. EU law must be applied and is relevant (see ¶270 *infra*), and the CJEU cannot be seized of the matter, it must follow that the *Achmea* Judgment applies to the arbitration clause in this case and that said clause must therefore be invalidated.[265]

276    The Respondent recalls that EU law must be applied as interpreted by the CJEU.[266]

**g.    The *Komstroy* Judgment**

277    Turning to the *Komstroy* Judgment, the Respondent submits that the CJEU declared that intra-EU investment arbitration under the ECT is not possible and confirmed the Respondent's earlier arguments in this case and its earlier interpretation of the *Achmea* Judgment.[267]

---

[261] RC on Declarations of EU Member States, ¶¶24f.; RC on *Komstroy*, ¶¶36f., 46.
[262] RoPO, ¶¶43-54; RC on *Komstroy*, ¶46.
[263] RoPO, ¶¶73f., 83f.
[264] Respondent's Comments on the Decision on Jurisdiction, Liability and Partial Decision on Quantum *Cube Infrastructure Fund SICAV and Others v. Kingdom of Spain* (ICSID ARB 15/20) of 17 May 2019, ¶14(i).
[265] HT, Day 1, 140:17-141:21; R-OS (Jurisdiction), slides 18-21; RC on EC's Comments on *Achmea* Judgment, ¶24.
[266] RC on Declarations of EU Member States, ¶13.
[267] RC on *Komstroy*, ¶9.

278    In the view of the Respondent, the *Komstroy* Judgment underlines that with the Treaty of Lisbon, the EU acquired exclusive competences in the field of foreign direct investment.[268]

279    The Respondent submits that when dealing with intra-EU investment arbitration, the *Komstroy* Judgment exactly follows the reasoning of the *Achmea* Judgment, as the Respondent had outlined it before (see above). The Respondent points out that the judgment concludes that intra-EU investment arbitration is prohibited and not compatible with the EU Treaties – independent of whether the bilateral obligation to arbitrate exists within a BIT, or between two parties to a multilateral agreement, such as the ECT.[269]

280    According to the Respondent, in the *Komstroy* Judgment, the CJEU recalled that because the ECT is an act adopted by the EU institutions, its provisions are part of the EU's legal framework, and therefore, the CJEU is competent to decide preliminary questions on its interpretation.[270] However, the Respondent argues that if the ECT thus forms part of EU law and EU law is to be exclusively interpreted by the CJEU, which, in the *Komstroy* Judgment, decided that intra-EU investment arbitration under the ECT is not possible, then the Tribunal lacks jurisdiction.[271] According to the Respondent, a citizen of an EU Member State cannot rely on an arbitration agreement and an offer to arbitrate on which its Member State, as a consequence of a judgment of its highest court, the CJEU, could not rely anymore.[272]

### h.    Lack of a Disconnection Clause

281    The Respondent submits that the lack of an explicit disconnection clause in the ECT is irrelevant because EU law takes primacy in any case.[273] According to the Respondent, this conclusion is supported by the views of the EC, as expressed, for example, in its comments on the necessity for a disconnection clause in the Convention on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters of 21 December 2007 (the "**Lugano Convention**").[274] It is further supported by many international treaties from which intra-EU relations are "disconnected" even though no disconnection clause has been included in them.[275]

### i.    The EU Member States Declarations

282    According to the Respondent, the 22 Member States Declaration establishes that arbitrations under the ECT between an investor from an EU Member State and another EU Member State are incompatible with EU law.[276] The Respondent regards the 22 Member States Declaration as a demonstration of the will of "*the States that signed the ECT*" as to

---

[268] RC on *Komstroy*, ¶11.
[269] RC on *Komstroy*, ¶¶13-20.
[270] RC on *Komstroy*, ¶11.
[271] RC on *Komstroy*, ¶¶39-41, 42-48.
[272] RC on *Komstroy*, ¶43.
[273] RoPO, ¶77; RC on *Komstroy*, ¶35.
[274] RC on *BayWa*, ¶¶54-70; RoPO, ¶85f.
[275] RC on *BayWa*, ¶¶54-70; RoPO, ¶¶85f.; RC on *Komstroy*, ¶45.
[276] RC on Declarations of EU Member States, ¶¶4, 10-12.

how Article 26 ECT should be interpreted in relation to EU law,[277] and a reflection of a subsequent agreement between the parties regarding the authentic interpretation of the treaty in the sense of Article 31(3)(a) VCLT.[278] According to the Respondent, the 22 Member States Declaration, in any case, represents subsequent practice in the sense of Article 31(3)(b) VCLT.[279]

283    The Respondent adds that the Five Member States Declaration is silent on the applicability of the *Achmea* Judgment on cases under the ECT because, instead of arguing a point, it only expresses a preference to await a judgment of the CJEU on the subject. This in turn shows, according to the Respondent, that in the view of those five EU Member States, the CJEU is the supreme interpreter on the issue of applicability of EU law to the ECT.[280] In the view of the Respondent, the Five Member States Declaration does not jeopardise the interpretation of the 22 Member States Declaration as a reflection of a subsequent agreement regarding the interpretation of a treaty, because Article 31(3)(a) VCLT (i) contemplates that such an agreement is not made between all parties to a treaty, and (ii) has, in the past, been interpreted in a very "*non-formalistic*" way.[281]

284    The Respondent argues that it is the common ground of all three EU Member States Declarations that they acknowledge the principle of autonomy and primacy of EU law, and acknowledge that EU law offers a comprehensive and effective legal framework to intra-EU investors.[282]

## 3.    The Claimant's Principal Arguments

### a.    Intra-EU Effect of the ECT

285    According to the Claimant, Article 26 ECT has intra-EU effect according to the plain meaning of the Article (read in conjunction with Article 1 ECT)[283] and as supported by case law.[284] In particular, the Claimant argues that the term "*Area*" in Article 26 ECT cannot form a hurdle to jurisdiction in this case as it can only refer to the territory of the respective EU Member State in question, not to the territory of the entire EU.[285] The

---

[277] Ibid., ¶12.
[278] Ibid., ¶15.
[279] Ibid., ¶17.
[280] RC on Declarations of EU Member States, ¶¶4, 26-29.
[281] RC on Declarations of EU Member States, ¶¶16, 27-29.
[282] RC on Declarations of EU Member States, ¶¶5-8.
[283] C-OS, slide 249; CMoJ, ¶¶115, 123-129, 155-160.
[284] CMoJ, ¶¶115, 155-171, referring in particular to *CSP Equity Investment v. Spain*, SCC Arbitration 2013/094, Award on Jurisdiction, 13 May 2016 (CL-0204), ¶¶126, 135-176; *PV Investors v. Spain I*, ¶¶174-207; *Charanne v. Spain*, ¶¶424-450*; Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain,* SCC Arbitration V 2013/153, Award, 12 July 2016 (RL-0095/CL-0206) ("***Isolux v. Spain***"), ¶¶621-660; *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016 (CL-0205) ("***RREEF v. Spain I***"), ¶¶71-90; *Electrabel v. Hungary I*, ¶¶4.146f.*; Eastern Sugar B.V. v. Czech Republic*, SCC No. 008/2004, Partial Award, 27 March 2007 (CL-0005) ("***Eastern Sugar v. Czech Republic***"), ¶¶159f., 165; *Eureko B.V. v. Slovak Republic*, PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, 26 October 2010 (CL-0007/RL-0087), ¶¶245f., 274.
[285] CC on EC's Comments on *Achmea* Judgment, ¶¶55-59; RoJ, ¶21; CMoJ, ¶¶126-129.

Claimant adds that the Respondent's reading of Article 26 ECT would have required a disconnection clause in the ECT.[286]

286    The Claimant points out that the *travaux préparatoires* of the ECT confirm the applicability of the ECT to intra-EU disputes.[287] The Claimant submits that during the negotiation of the ECT a disconnection clause was suggested by the EU, but not accepted by the other signatory States, as was highlighted also in *Blusun vs. Italy*.[288] The Claimant notes that eventually a very specific exception with respect to the Svalbard Treaty[289] was negotiated into the ECT, while no exception with regard to intra-EU relations was included in its final text. According to the Claimant, the fact that a minor exception was included, but a major exception, such as the intra-EU exception, was rejected and did not make it into the final version of the Treaty, also stands in the way of implying the intra-EU exception into the terms of the ECT.[290] In that regard, the Claimant argues that contrary to how the Respondent relies on and interprets the Lugano Convention, that convention further illustrates that the EU consistently followed the practice of introducing disconnection clauses when it considered that intra-EU relations should be governed by EU law rather than the respective international treaty.[291] Moreover, in the Claimant's view, the EC had endorsed the application of the ECT to intra-EU disputes in its statements in the case *Electrabel v. Hungary*.[292]

287    According to the Claimant, the ECT is a mixed agreement which needed to be signed by the EU and the EU Member States because of their shared competence in energy matters (Article 4(2)(i) TFEU).[293] The Claimant argues, however, that this circumstance has no effect on the possibility of intra-EU disputes under the ECT.[294] Nor, according to the Claimant, does the definition of REIO in Article 1(3) ECT or the granting of voting rights to the EU under Article 36(7) ECT have any such effect.[295]

**b.    Validity and Binding Effect of the ECT between Luxembourg and Spain**

288    The Claimant submits that Luxembourg and the Respondent had the competence to enter into the ECT and to allow the settlement of intra-EU disputes under it.[296] The Claimant points out that (i) the ECT has not been amended, that (ii) even if attempts to that effect

---

[286] CMoJ, ¶138; RoJ; ¶¶30, 71-77.

[287] CMoJ, ¶¶138-148, 199; RoJ, ¶25.

[288] CC on *BayWa*, ¶7; CC on EC's Comments on *Achmea* Judgment, ¶¶40, 67, referring to *Blusun S.A. et al. v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016 (CL-0277/RL-0115) ("***Blusun v. Italy***"), ¶¶280, 282f.; C-OS, slide 273.

[289] Treaty recognising the sovereignty of Norway over the Archipelago of Spitsbergen, signed at Paris on 9 February 1920.

[290] RoJ, ¶72.

[291] RoJ, ¶76.

[292] CMoJ, ¶¶182-191; RoJ, ¶¶23-24.

[293] CC on EC's Comments on *Achmea* Judgment, ¶60. According to the Claimant, the division of competences in energy questions has been unaltered since 1957, CMoJ, ¶195.

[294] CC on EC's Comments on *Achmea* Judgment, ¶¶60, 69; RoJ, ¶22.

[295] CC on EC's Comments on *Achmea* Judgment, ¶61.

[296] RoJ, ¶22.

had been made, the amendment procedure set out in Articles 40, 42, 34(3) and 36 ECT has not been followed, nor begun, and that (iii) the ECT has not been suspended in the sense of Article 58 VCLT.[297]

### c.    Inapplicability of EU Law to a Decision on Jurisdiction

289    According to the Claimant, EU law is, as confirmed by case law, irrelevant for the question of jurisdiction in this case, because that question is exclusively governed by Articles 25 and 26 of the ICSID Convention together with Article 26(1) to (5) of the ECT.[298]

290    The Claimant furthermore argues that because EU law is not applicable between all Contracting Parties to the ECT, it can also not be applicable in an ECT case between EU Member States.[299] In the view of the Claimant, the interpretation of the ECT should be coherent between all its Contracting Parties, including the Contracting Parties that are not EU Member States, and that requirement of coherence prohibits the application of EU law between only some Contracting Parties.[300]

291    The Claimant submits that the current case is not an EU State aid case and that the applicable law to resolve the merits of the dispute is the ECT.[301] However, the Claimant adds that, even if the question whether or not the incentives that Spain granted to renewable companies were compliant with the EU State Aid Rules, the fundamental freedoms, or competition law of the EU did play a role in the merits of this dispute, those questions would have nothing to do with the Tribunal's determination of its jurisdiction.[302]

### d.    Irrelevance of the Primacy of EU Law

292    The Claimant submits that the Respondent only relies on the primacy of EU law to avoid the analysis of the jurisdictional provisions of the ECT.[303] However, according to the Claimant, that attempt must fail as EU law has no primacy over the ECT and as the ECT, together with the ICSID Convention, form the Tribunal's sole "*Constitution*" as outlined, for example, in the *RREEF v. Spain* case.[304] If the European Commission is the guardian of the EU Treaties, the Claimant submits, then "*this Arbitral Tribunal is the guardian of*

---

[297] CC on EC's Comments on *Achmea* Judgment, ¶¶41-51.
[298] Ibid., ¶¶13, 53f., 68. According to the Claimant, Article 26(6) is a conflict of laws rule, not a rule on competence, and cannot be applied in order to determine the Tribunal's competence – hence the Claimant's limitation to Article 26(1) to (5) ECT, see HT, Day 1, 114:2-114:21.
[299] CC on *BayWa*, ¶9.
[300] Ibid., ¶6; CC on *Komstroy*, ¶28.
[301] C-OS, slides 249, 269f.; CC on EC's Comments on *Achmea* Judgment, ¶52; RoJ, ¶¶38-47; CC on *Komstroy*, ¶27.
[302] C-OS, slide 249; HT, Day 1, 119:1-119:21; RoJ, ¶¶38-47.
[303] RoJ, ¶¶27-37.
[304] HT, Day 1 113:19-114:1, 114:22-114:24; C-OS, slides 250, 253-255, 273; CC on EC's Comments on *Achmea* Judgment, ¶¶10-13, 53f.; RoJ, ¶28f.

*the ECT and the ICSID Convention*".[305] EU law, according to the Claimant, cannot and does not modify the ECT provisions.[306]

293    The Claimant further argues that in particular ICSID Tribunals constituted under the ECT are not within the European Legal Order as they only rely on the ICSID Convention and the ECT and, according to Article 52 of the ICSID Convention, their awards could also not be annulled for being contrary to the EU legal order.[307]

### e.    Resolution of a Conflict of Laws

294    Based on the above, the Claimant's main position is that there is no inconsistency, incompatibility, or conflict between the ECT and the EU Treaties.[308] Investor-State arbitration in intra-EU disputes under the ECT, according to the Claimant, does not contravene EU law.[309]

295    However, even if there were any such conflict, the Claimant argues that, as case law shows, neither Article 344 TFEU, nor the *Achmea* Judgment (see below), can be invoked to justify the Intra-EU Objection.[310]

296    The Claimant argues that, equally, Article 25 ECT, on which the Respondent relies to establish supremacy of EU law, merely avoids extension of preferential treatment granted by EU law to third parties, and is thus neither a conflict rule nor does it establish supremacy of EU law over the provisions of the ECT.[311]

297    The Claimant submits that the applicable conflict rule is Article 16 ECT, which provides that in the case of a conflict, the more favourable rule for the investor prevails.[312] As EU law does not provide an investor with the right to file a claim before an independent tribunal outside the forum state, according to the Claimant, the ECT offers the more favourable rule for the investor, and thus prevails.[313]

298    As regards potential arguments of *lex posterior* or an implied termination by a later treaty, the Claimant submits that the EU Treaties and the ECT do not have the same subject-matter.[314]

---

[305] HT, Day 1, 120:2-120:4.
[306] CC on *BayWa*, ¶4.
[307] C-OS, slide 286.
[308] E.g. CMoJ, ¶153.
[309] CMoJ, ¶¶202-206.
[310] RoJ, ¶70; CMoJ, ¶¶133-137.
[311] RoJ, ¶30; CMoJ, ¶¶130f.
[312] As, according to the Claimant, confirmed by *RREEF v. Spain I*, see RoJ, ¶¶31-33; C-OS, slides 273, 275; CC on EC's Comments on *Achmea* Judgment, ¶¶62-65, 70; CMoJ, ¶¶130f.
[313] RoJ, ¶¶33, 68f.; C-OS, slide 273; CC on EC's Comments on *Achmea* Judgment, ¶65.
[314] RoJ, ¶67.

299    As regards Article 31(3)(c) VCLT, the Claimant submits that it is merely "*a tool of interpretation not explicitly vested with the power to modify*".[315]

## f.    Irrelevance of the *Achmea* Judgment

300    The Claimant argues that the *Achmea* Judgment is irrelevant in the present case for various reasons.

301    First, according to the Claimant, the *Achmea* Judgment is irrelevant because it relates only to bilateral investment treaties and is silent on multilateral treaties such as the ECT and the ICSID Convention.[316] In particular, the Claimant stresses that the BIT with which the *Achmea* Judgment dealt required the application of internal law to the merits of a case, not just the application of international law, as is the case with the ECT.[317]

302    Secondly, according to the Claimant, even if the *Achmea* Judgment expressly referred to multilateral treaties such as the ECT and the ICSID Convention, which it did not, the Judgment cannot supersede, or alter, the EU's and the EU Member States' international obligations under Articles 25 and 53-55 of the ICSID Convention.[318] The Claimant adds that, given also Article 216 TFEU, the EU and its institutions, including the CJEU, must abide by the international obligations of the EU and thus no interpretation of EU law could allow the EU to breach the ECT.[319]

303    Thirdly, the Claimant notes that the *Achmea* Judgment expressly recognizes the EU's power to conclude international agreements that provide for a court responsible for the interpretation of such treaties.[320] In that regard, the Claimant underlines that in the case at hand, there is no risk that the autonomy of EU law would be undermined, in particular, because no EU law act applies directly to the merits of the case, and no conflict between the ECT and EU law exists (as confirmed by other tribunals).[321]

304    Fourthly, the Claimant argues that, as the Tribunal is seised in an international law context, for the Tribunal the *Achmea* Judgment is but an internal court decision of a Contracting Party to the ECT.[322] The Claimant recalls that Article 27 VCLT prevents all States from successfully invoking internal law and interpretations thereof to justify a breach of an international obligation.[323]

---

[315] CC on EC's Comments on *Achmea* Judgment, ¶52, fn. 27, quoting *Simma/Kill*, Harmonizing investment protection and international Human Rights: first steps towards a methodology, in: International Investment Law for the 21st Century (2009) (C-0824), 694f.

[316] CC on EC's Comments on *Achmea* Judgment, ¶16; C-OS, slides 259, 271, 281; HT, Day 1, 115:18-116:21.

[317] C-OS, slides 260-262; HT, Day 1, 116:11-116:21.

[318] CC on EC's Comments on *Achmea* Judgment, ¶17.

[319] Ibid., ¶¶31f.

[320] CC on EC's Comments on *Achmea* Judgment, ¶¶18-22; C-OS, slides 264-268.

[321] CC on EC's Comments on *Achmea* Judgment, ¶¶20f.

[322] CC on *BayWa*, ¶8; CC on EC's Comments on *Achmea* Judgment, ¶¶28-35; C-OS, slide 273; HT, Day 1, 120:18-120:21.

[323] CC on *BayWa*, ¶8; pre *Achmea* Judgment argument in RoJ, ¶¶34-36.

305    Fifthly, the Claimant submits that the EU, itself or through its courts, cannot unilaterally amend the ECT, as this would violate the ECT's provisions on amendments.[324] The Claimant notes that the *Achmea* Judgment does not comply with any of the requirements of Art. 58 VCLT for the suspension of a treaty and that suspension would also not be the effect intended by the CJEU for its judgments.[325]

306    Sixthly, the Claimant submits that the *Achmea* Judgment cannot retroactively invalidate the Respondent's unconditional consent to arbitration given long before the date of the *Achmea* Judgment.[326]

307    The Claimant concludes that the *Achmea* Judgement "*does not reach*" the ECT, does not bind an ICSID tribunal constituted under the ECT, does not invalidate ECT provisions, and could not retroactively invalidate the Respondent's consent to arbitration.[327]

## g.    Case Law before and after the *Achmea* Judgment

308    According to the Claimant, already in 2018, close to twenty arbitral awards had unanimously confirmed their jurisdiction in intra-EU cases under Article 26 ECT, and the rejection of the Intra-EU Objection forms one of the rare cases of uniform *jurisprudence constante* in investment arbitration.[328]

## h.    Irrelevance of the *Komstroy* Judgment

309    The Claimant submits that the *Komstroy* Judgment is as irrelevant to the present case as the *Achmea* Judgment, not least, because its dispositive part, i.e. the part of the judgment that is binding on the court that posed the preliminary questions, only deals with the definition of "*Investment*" under the ECT.[329] According to the Claimant, the CJEU's considerations on Article 26 of the ECT in the *Komstroy* Judgment are *obiter dicta*. They may require future action of EU Member States, but do not require any action by investors or tribunals in ongoing arbitrations under the ECT, which is a treaty that has neither been amended nor, in view of Articles 27, 42, 46, and 47 ECT, properly been denounced by the EU and its Member States, including the Respondent.[330]

310    The *Komstroy* Judgment is further irrelevant, the Claimant argues, because, while the CJEU adopts an approach based on EU law, restricted to EU law, and limited to the perspective of one of the many Contracting Parties to the ECT, the Tribunal must apply the provisions of the ECT and the ICSID Convention. Unlike the CJEU, as an internal judge of a Contracting Party to the ECT, an ECT tribunal is the competent authority to develop

---

[324] CC on EC's Comments on *Achmea* Judgment, ¶¶41-51.
[325] Ibid., ¶¶46-51.
[326] C-OS, slide 272; CC on EC's Comments on *Achmea* Judgment, ¶33.
[327] CC on ECT Decisions, ¶2; C-OS, slides 271-273.
[328] HT, Day 1, 114:13-114:18; C-OS, slides 250-252; RoJ ¶¶48-70; CMoJ, ¶¶149-171.
[329] CC on *Komstroy*, ¶¶2f., 20-22.
[330] Ibid., ¶¶3, 5, 8, 12-15, 20-22.

an authoritative interpretation of the ECT.[331] The Claimant repeats that it is evident that under the provisions of the ECT and the ICSID Convention the Tribunal has jurisdiction.[332]

311    The Claimant adds that much like the *Achmea* Judgment, the *Komstroy* Judgment can in any case not retroactively invalidate the Respondent's unconditional consent to arbitration given long before the date of the *Achmea* and *Komstroy* Judgments.[333]

312    Furthermore, the Claimant points out that, while the CJEU appears to have deemed the seat of an arbitration very relevant for its *Achmea* and *Komstroy* Judgments (Frankfurt and Paris, respectively, in those cases), the present arbitration is not seated in the EU.[334] According to the Claimant, the closed system of ICSID arbitration and enforcement prevents the creation of a link to the EU and EU law in the present case. The Claimant submits that the ICSID system is specifically designed to be isolated from the effects of local interpretations.[335]

313    Finally, the Claimant questions the correctness of the CJEU's analysis in the *Komstroy* Judgment, in view of the case law of ECT tribunals and given that, in its references to the applicable law, the arbitration agreement that was relevant for the *Achmea* Judgment differs considerably from Article 26(6) ECT.[336]

### i.    The EU Member States Declarations

314    According to the Claimant, the EU Member States Declarations are of a political nature and show strong differences of opinion within the EU about the applicability of the *Achmea* judgment to the ECT.[337] The Claimant underlines that the Respondent and Luxembourg signed different declarations.[338]

315    The Claimant argues that the 22 Member States Declaration cannot modify the content and scope of the ECT, because in order to do so, the mechanisms set out in the ECT itself and in general international law would have to be followed.[339] In that regard, the Claimant notes that Article 46 ECT expressly prohibits reservations to the ECT, and that the amendment procedure set out in Article 42 ECT has not been commenced.[340] The Claimant further argues that the 22 Member States Declaration does not constitute an agreement on the interpretation of the ECT within the meaning of Article 31(3)(a) VCLT, nor subsequent practice regarding its interpretation in the sense of Article 31(3)(b).[341]

---

[331] Ibid., ¶¶4, 7-15.
[332] Ibid., ¶6.
[333] Ibid., ¶¶16-18.
[334] Ibid., ¶¶30-34.
[335] Ibid., ¶¶32, 30-34.
[336] Ibid., ¶¶23-26.
[337] CC on Declarations of EU Member States, ¶¶2-4.
[338] Ibid., ¶4.
[339] Ibid., ¶¶5-9.
[340] Ibid., ¶6.
[341] Ibid., ¶¶7-9.

316     Finally, the Claimant submits that, even if the 22 Member States Declaration did amend the ECT in any way, this would come too late for this arbitration, as according to Article 25(1) ICSID Convention, Spain cannot unilaterally withdraw its consent to arbitration after it has given its consent, as it did, at the time of the Request on 22 July 2014.[342]

**j.      Propriety of Issuing an Award**

317     The Claimant submits that the Tribunal should assert its jurisdiction in order "*not to violate fundamental rights of the investors*" because if eventually the CJEU or a national court would rule in favour of compatibility of the ECT with intra-EU arbitration, but the Tribunal would have declined jurisdiction, irreparable harm to the Claimant would have been caused and its right to an effective remedy and fair trial would have been violated. The Claimant notes that under Article 52 ICSID Convention, an ICSID award cannot be annulled for being contrary to the EU legal order.[343]

**4.      The European Commission's Submission**

318     The EC submits that pursuant to Article 31(3)(c) VCLT and in line with, e.g., *Electrabel v. Hungary* and *Charanne v. Spain* (but contra *RREEF v. Spain*), the Tribunal should interpret Article 26 ECT in conformity with international law rules, among which EU law.[344] The EC further submits that it cannot be assumed lightly that the Respondent entered into the ECT with the intention to accept obligations that are contrary to EU law.[345] The EC submits that, therefore, also in light of the *Achmea* Judgment, the Tribunal must conclude that intra-EU disputes are not covered by the consent to arbitrate under Article 26 ECT.[346]

319     According to the EC, this interpretation is confirmed by the wording of the ECT, in particular by the provisions that envisage and deal with REIOs, such as Articles 1(2), 1(3), 1(10) and 36(7) ECT, and according to which, in the EC's view, the territories of all EU Member States that are Contracting Parties to the ECT fall under one and the same "*Area*" in the sense of the ECT.[347] According to the EC, this interpretation is further confirmed by the practice of the EU Member States never to enter into *inter se* obligations in the framework of multilateral treaties.[348] The EC submits that the EU had negotiated the ECT and that individual EU Member States had only become Contracting Parties to the ECT because at the time of the conclusion of the ECT it was considered that EU Member States would retain some competences relevant for the ECT. The EC adds that said competences were, however, not retained and that it was never assumed that such competences would regard the protection of investments.[349] According to the EC, the ECT is an external, not

---

[342] Ibid., ¶¶10-14.
[343] C-OS, slide 286.
[344] EC's Second Amicus Curiae Brief, ¶¶46-56.
[345] Ibid., ¶51.
[346] Ibid., ¶53.
[347] Ibid., ¶¶58-74; EC's First Amicus Curiae Brief, ¶¶15-31.
[348] EC's Second Amicus Curiae Brief, ¶¶78-80; EC's First Amicus Curiae Brief, ¶37.
[349] EC's Second Amicus Curiae Brief, ¶89; see also EC's First Amicus Curiae Brief, ¶¶65-68.

an internal, energy policy project of the EU, not envisaged for EU-internal policy or disputes and as such it falls under the exclusive external competence of the EU.[350] The EC recalls its position that under EU law the Claimant enjoys "*complete, strong and effective protection of their investment*".[351] According to the EC, the general principle of EU law of mutual trust requires EU Member States to accord trust to their respective legal systems and judicial institutions.[352]

320    The EC argues that the lack of a disconnection clause is of no consequence for the interpretation of Article 26 in the case of intra-EU disputes, in particular also because the EU itself is a Contracting Party to the ECT.[353]

321    The EC submits that the ECT forms part of EU law because the EU is a Contracting Party to it.[354] The EC cites the principle set out in the CJEU's judgment in the *Western Sahara* case that provisions of international agreements entered into by the EU need to be in full compliance with EU law.[355] The EC submits that, as it also follows from the *Achmea* Judgment, intra-EU investment arbitration is precluded by the principle of autonomy of EU law (Articles 19, 267 and 344 TFEU).[356]

322    The EC further submits that if the Tribunal deems it impossible to interpret Article 26 ECT as excluding intra-EU investment disputes, the Tribunal would need to conduct a conflict of laws analysis with the result that Article 26 ECT must not be applied in such disputes.[357] According to the EC, the Tribunal could come to that result either based on (i) the primacy of EU law and an *a contrario* reading of Article 351(1) TFEU or (ii) by considering the suppression of *inter se* obligations of EU Member States under the ECT as an amendment to a treaty by a later treaty only between certain parties thereto in the sense of Article 41(1)(b) VCLT, or by treating said suppression as *lex posterior* in the sense of Article 30(4)(a) of the Vienna Convention.[358] According to the EC, Article 16 ECT does not change that result because it is a rule of interpretation, not of conflict. Furthermore, even if it were a conflict rule, it would have been superseded by the later special conflict rule of "*primacy*" and Article 351 TFEU *a contrario.* In any case, according to the EC, it is in the EU Member States' sovereign freedom to undo Article 16 ECT.[359]

323    Finally, the EC submits that if the Tribunal has any doubts about those arguments, then it should refer its questions to the CJEU by using a *juge d'appui*.[360]

---

[350] EC's Second Amicus Curiae Brief, ¶¶81-88; EC's First Amicus Curiae Brief, ¶¶40-51, 68-69.
[351] EC Submission on State Aid, p. 2; EC's First Amicus Curiae Brief, ¶¶70-79.
[352] EC's First Amicus Curiae Brief, ¶80.
[353] EC's Second Amicus Curiae Brief, ¶¶2, 91-105; EC's First Amicus Curiae Brief, ¶¶52-57.
[354] EC's Second Amicus Curiae Brief, ¶28; EC's First Amicus Curiae Brief, ¶¶33f.
[355] EC's Second Amicus Curiae Brief, ¶29.
[356] EC's Second Amicus Curiae Brief, ¶30; EC's First Amicus Curiae Brief, ¶¶98-117.
[357] EC's Second Amicus Curiae Brief, ¶¶107-122.
[358] EC's Second Amicus Curiae Brief, ¶¶111-122; EC's First Amicus Curiae Brief, ¶¶124-137.
[359] EC's Second Amicus Curiae Brief, ¶¶123-126.
[360] EC's Second Amicus Curiae Brief, ¶¶9, 127-134.

324    The EC further warns that if the Tribunal granted the Claimant a compensation, such an award would effectively amount to an authorisation by the Tribunal of potentially unlawful Spanish State aid to the Claimant. Doing so would ignore the EC's exclusive competence under EU law to authorise State aid.[361]

## 5.    The Tribunal's Analysis

325    The Tribunal notes that the Intra-EU Objection in its current form in essence consists of the following two-step argument:

> (i)    first, the Tribunal must apply EU law, and,

> (ii)    secondly, the consequence of applying EU law is that Article 26 ECT does not apply in this dispute and did not apply at the time of the Request.

326    The Tribunal will deal with both parts of the argument in turn.

327    The Tribunal will then deal with the Respondent's other line of argument on the Intra-EU Objection, which the Respondent had emphasized more strongly before the *Achmea* Judgment was rendered. In that line of argument, the Respondent had submitted that

> (i)    the Respondent's and Luxembourg's competences to deal with the issues regulated under the ECT between each other have been fully absorbed in the single membership of the EU in the ECT, and that,

> (ii)    as such, an arbitration between the Respondent and an investor from Luxembourg is not, and cannot have been agreed to be, an arbitration between different Contracting Parties in different "*Areas*" in the sense of the ECT.

328    Finally, the Tribunal will analyse whether, in light of potential issues with the enforcement of an award, considerations of propriety and the Tribunal's judicial function have, or should have, an impact on its jurisdiction.

## a.    Applicability of EU Law and Consequences Thereof

## i.    Applicability of EU Law

### *(1)    Possibility to Apply EU Law*

329    As stated above, the Tribunal must first clarify whether (and, if so, to what extent), from the perspective of an investment tribunal established on the basis of the ECT, EU law forms part of the law to be applied by the tribunal.

330    The relevant parts of Article 26 ECT state in this regard:

---

[361] EC's Second Amicus Curiae Brief, ¶¶135-141.

"(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;

(b) in accordance with any applicable, previously agreed dispute settlement procedure; or

(c) in accordance with the following paragraphs of this Article.

(3) (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

[…]

(6) A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

331    As regards the question of what is the law applicable to decisions on jurisdiction and, consequently, whether, from the perspective of an investment tribunal established on the basis of the ECT, EU law forms part of the applicable law, two interpretations of Article 26 ECT have been put forward.

332    The first approach, which is supported by the Respondent, relies on Article 26(6) ECT, according to which a tribunal "*shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law*". In case Article 26(6) ECT applies to questions of jurisdiction, such rules and principles of international law would also include EU law, including judgments of the CJEU,[362] inasmuch as it is based on international treaties concluded between the EU Member States, i.e. the TEU as well as the TFEU.[363] In this regard, it deserves mention that the *Achmea* Judgment expressly characterizes EU law as "*deriving from an international agreement between the Member States*"[364] and that in the *Komstroy* Judgment, the CJEU concludes that because "*the ECT*

---

[362] See *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* issue, 31 August 2018 (CL-0283) ("**Vattenfall v. Germany**"), ¶148.

[363] See *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015 (RL-0062) ("**Electrabel v. Hungary II**"), ¶¶4.120, 4.195; *RREEF v. Spain I*, ¶73; *Vattenfall v. Germany*, ¶146. See, however, *Eiser Infrastructure Limited and Energia Solar Luxembourg S.À.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017 (CL-0276/RL-0114) ("**Eiser v. Spain**"), ¶198; *Greentech Energy Systems A/S et al. v. Italy*, SCC Arbitration V (2015/095), Award, 23 December 2018 ("**Greentech v. Italy**"), ¶397 ("'principles of international law' […] must in this context refer to public international law, not EU law").

[364] *Achmea* Judgment, ¶41 (CL-0278): "Given the nature and characteristics of EU law […], that law must be regarded both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States."

*itself is an act of EU law*", "*an arbitral tribunal such as that referred to in Article 26(6) ECT is required to interpret, and even apply, EU law.*"[365]

333    The opposite view insists that, with respect to applicable law, a distinction must be made between decisions on jurisdiction and decisions on the merits of a dispute. Accordingly, the reference in Article 26(6) ECT to "*the issues in dispute*" only covers the decision on the merits whereas the law applicable to decisions on jurisdiction is to be derived from Article 26 ECT as a whole. Pursuant to Article 26(2)(c) ECT, dispute resolution by means of investment arbitration is to be conducted "*in accordance with the following paragraphs of this Article*", notably paragraphs (4) and (5) in case of submission of the dispute to ICSID.

334    In the context of the interpretation of the ICSID Convention, a similar controversy exists in relation to Articles 25 and 42 of the Convention. According to Article 42(1) ICSID Convention, "[t]*he Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable.*" Some arbitral tribunals have relied on this provision in deciding questions of jurisdiction and have thus also applied other "*rules of international law*".[366] Other tribunals have rejected this approach and stated that the reference to "*decid*[ing] *a dispute*" in Article 42(1) ICSID Convention only covers the decision on the merits, whereas questions of jurisdiction are to be decided exclusively

---

[365] *Komstroy* Judgment, ¶¶49f.
[366] See the references in *Schreuer*, The ICSID Convention: A Commentary, 2nd ed., 2009, Article 42, ¶8, fn. 11.

on the basis of Article 25 ICSID Convention as well as of the treaty provisions containing the offer to consent to arbitration.[367] The second view appears to be the prevailing one.[368]

335    The views on this issue adopted by arbitral tribunals deciding on ECT-based intra-EU claims have been inconsistent. On the one hand, the *Vattenfall v. Germany* tribunal confirmed the view that "*the law applicable to the assessment of its jurisdiction is the ECT, in particular Article 26 thereof, in conjunction with Article 25 of the ICSID Convention*".[369] On the other hand, other tribunals have not taken issue with applying Article 26(6) ECT in regard to jurisdictional objections.[370]

---

[367] *Ceskoslovenska Obchodni Banka v. Slovak Republic*, ICSID Case No. ARB/97/4, Decision on Jurisdiction, 24 May 1999, ¶35; *Enron Corporation and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/03, Decision on Jurisdiction, 14 January 2004 (CL-0189), ¶38; *Noble Energy, Inc. and Machalapower Cia. Ltda. v. Republic of Ecuador*, ICSID Case No. ARB/05/12, Decision on Jurisdiction, 5 March 2008 (CL-0091), ¶¶56f.; *CMS Gas Transmission Company v. Republic of Argentina*, ICSID Case No. ARB/01/8, Decision on Jurisdiction, 17 July 2003 (CL-0185), ¶¶42, 88; *Siemens A.G. v. Argentine Republic*, ICSID Case No. ARB/02/08, Decision on Jurisdiction, 3 August 2004 (CL-0186), ¶¶29-31; *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Decision on Jurisdiction, 8 December 2003, ¶¶48-50; *Camuzzi International S.A. v. Argentine Republic*, ICSID Case No. ARB/03/2, Decision on Objections to Jurisdiction, 11 May 2005, ¶¶15-17, 57; *AES Corporation v. Argentine Republic*, ICSID Case No. ARB/02/17, Decision on Jurisdiction, 26 April 2005, ¶¶34-39; *Vladimir Berschader, Moïse Berschader v. Russian Federation*, SCC Case No. 080/2004, Award, 21 April 2006, ¶¶93-97; *Jan de Nul N.V., Dredging Intl. N.V. v. Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Decision on Jurisdiction, 16 June 2006, ¶¶65-68; *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010 (RL-0091) ("**Burlington v. Ecuador**"), ¶¶101-103; *Railroad Development Corporation v. Republic of Guatemala*, ICSID Case No. ARB/07/23, Second Decision on Objections to Jurisdiction, 18 May 2010, ¶111; *Mobil Corporation et al. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Jurisdiction, 10 June 2010, ¶¶71-85 (CL-0160); *Alpha Projekholding GmbH v. Ukraine*, ICSID Case No. ARB/07/16, Award, 8 November 2010, ¶¶225-227; *CEMEX Caracas Investments B.V. and CEMEX Caracas II Investments B.V. v. Bolivarian Republic of Venezuela*, Decision on Jurisdiction, 30 December 2010, ¶¶67-139; *Duke Energy International Peru Investments No. 1, Limited v. Republic of Peru*, ICSID Case No. ARB/03/28, Decision of the Ad Hoc Commitee, 1 March 2011, ¶¶125-144; *Alps Finance and Trade AG v. Slovak Republic*, UNCITRAL, Award, 5 March 2011, ¶¶193-199; *M. Meerapfel Söhne AG v. Central African Republic*, ICSID Case No. ARB/07/10, Award, 12 May 2011, ¶¶139-147; *Abaclat et al. v. Argentina*, ICSID Case No. ARB/07/05, Decision on Jurisdiction and Admissibility, 4 August 2011, ¶430; *Quiborax S.A. et al. v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Decision on Jurisdiction, 27 September 2012, ¶¶47-52; *Electrabel v. Hungary I*, ¶4.17; *Teinver S.A. et al. v. Argentine Republic*, ICSID Case No. ARB/09/1, Decision on Jurisdiction, 21 December 2012, ¶¶227-228; *Ambiente Ufficio S.P.A. and others v. Argentine Republic*, ICSID Case No. ARB/08/9, Decision on Jurisdiction and Admissibility, 8 February 2013 (CL-0159), ¶¶134, 153, 233-246, 257, 514f.; *Burimi SRL and Eagle Games SH.A v. Republic of Albania*, ICSID Case No. ARB/11/18, Award, 29 May 2013, ¶¶92f.; *Philip Morris Brands Sàrl et al. v. Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Decision on Jurisdiction, 2 July 2013, ¶30; *KT Asia Investment Group B.V. v. Republic of Kazakhstan*, ICSID Case No. ARB/09/8, Award, 17 October 2013 (CL-0285) ("**KT Asia v. Kazakhstan**"), ¶85; *Churchill Mining PLC and Planet Mining Pty Ltd v. Republic of Indonesia*, ICSID Case No. ARB/12/14 and ARB/12/40, Decision on Jurisdiction, 24 February 2014, ¶86. See also *Vattenfall v. Germany*, ¶¶109, 118f.

[368] See *Schreuer*, The ICSID Convention: A Commentary, 2nd ed., 2009, Article 42, ¶¶3ff., notably ¶7.

[369] *Vattenfall v. Germany*, ¶166 (see also the analysis in ibid., ¶¶113-121); see also *Eiser v. Spain*, ¶¶198f.; *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. Spain*, SCC Arbitration (2015/063), Final Arbitral Award, 15 February 2018 (CL-0279) ("**Novenergia v. Spain**"), ¶¶459, 461; see further *Foresight/Greentech v. Spain*, ¶218: "[…] Article 26(6) ECT applies to the merits of the case and not to jurisdiction. The Tribunal must determine its jurisdiction exclusively in accordance with the jurisdictional requirements of the ECT."

[370] See *Blusun v. Italy*, ¶278; *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018 (CL-0281) ("**Antin v. Spain**"), ¶¶223f.; see also implicitly *Greentech v. Italy*, ¶397; *Eskosol v. Italy*, ¶173.

336    In the Tribunal's view, much is to be said in favour of reading "*issues in dispute*" in Article 26(6) ECT only as issues concerning alleged breaches of the protections of Part III ("*Investment Promotion and Protection*"), as does the tribunal in *Vattenfall v. Germany*.[371] However, the Intra-EU Objection itself shows that jurisdiction can also be an issue in dispute, and it is indeed when the conditions and criteria for jurisdiction have to be tested, and met, that a tribunal may have to look further than just the instrument under which it is constituted, and that it may require the guidance of a provision on the law to be applied.

337    Nevertheless, the debate is of limited relevance here, and the issue does not need to be decided by the Tribunal, since both arguments miss the point.

338    This is because, first, no matter how one interprets Article 26(6) ECT, an analysis of its own jurisdiction by a tribunal impanelled under the ECT would never take place in a vacuum but rather in the international law setting into which the ECT was embedded from its creation onwards. Hence, if a rule of international law existed that was relevant and applicable, even though it was not mentioned in the ECT, it would likely be, and would likely have to be, applied notwithstanding the respective interpretation of Article 26(6) ECT (this idea is also expressed in Articles 31(2)(b) and 31(3)(c) VCLT, see below). Similarly, if there were a successive, valid and binding, formal treaty that abolished parts of the ECT, the Tribunal could not pretend that such a treaty did not exist.

339    Secondly, in the Tribunal's view, Article 26(6) ECT is the wrong point of entry for an argument of incompatibility. Article 26(6) ECT, as most governing law provisions, is not a conflict rule (contrary to what the Claimant submits). The Article embodies a hierarchy which starts, logically, with "*this Treaty*", i.e. the ECT. The applicable rules and principles of international law are then mentioned to allow a tribunal to supplement the Treaty where necessary, not to contradict it. Thus, where the ECT is clear, Article 26(6) ECT does not open a door to introduce a contradictory meaning through applicable rules and principles of international law.

340    In addition, there exists a clear conflict rule in Article 16 ECT that shields the relevant Parts III and V of the ECT from a conflict and would also stand in the way of interpreting "*applicable rules and principles*" in a way that would render the clear text of the ECT inapplicable (see below), especially when such allegedly "*applicable rules and principles*" lack clarity and specificity.

341    In principle, Article 26(6) ECT may thus allow the Tribunal to apply rules of EU law in this dispute where it deems it necessary, potentially even in its decision on jurisdiction. In practice, however, no such application has been found to be necessary and the Tribunal will elaborate on that conclusion below.

342    However, prior to that, the Tribunal wishes to take the opportunity of its analysis of Article 26(6) ECT to also refute the argument that because (principles of) EU law may play a role in the analysis of the merits of this case and because the merits of the case (or indeed the Tribunal's Award in this case) might affect matters of EU law within the exclusive

---

[371] *Vattenfall v. Germany*, ¶¶113-121.

jurisdiction of the CJEU or the EC, this Tribunal should decline jurisdiction. In the Tribunal's view, this argument fails. First, the Tribunal is not convinced that its decision on the merits will have to touch upon such matters, not least because as an ECT tribunal, the Tribunal will focus on violations of the ECT. Secondly, as shown above, Article 26(6) ECT explicitly allows, or even mandates, the Tribunal not to desist from taking into consideration other applicable rules of international law where it deems it necessary.

*(2)    No Need to Apply EU Law*

343    The Tribunal has seen no need to also resort to EU law in the determination of its jurisdiction for two reasons:

(i)    First, on the basis of its text alone, the regime of Article 26 ECT and Article 25 ICSID Convention, i.e. the arbitration clause underlying this arbitration, is clear, specific, and self-sufficient.

(ii)    Secondly, the conditions for jurisdiction included in those two Articles have been met as set out in the Claimant's Memorial on the Merits: There is a dispute between the Parties. The Respondent is a Contracting Party to the ECT in the sense of Article 1(2) ECT. The Claimant is a national of another Contracting Party to the ECT. The Claimant is an Investor in the sense of Article 1(7) ECT. The investments of the Claimant are, in their entirety or in part, Investments in the sense of Article 1(6) ECT and the dispute relates to them. The investments lie in the Area of the Respondent in the sense of Article 1(10) ECT. The Claimant alleges violations by the Respondent of Part III of the ECT. The Claimant has made an attempt for amicable settlement and more than three months have elapsed between this attempt and the Request. There is no evidence that the dispute was submitted to the courts of the Respondent or that any other applicable, previously agreed dispute settlement procedure was applied, and, finally, the Claimant has provided ICSID with its written consent to arbitration.[372]

344    In addition, no other reasons were presented, or are imaginable, that could raise suspicion in the mind of the Tribunal that the regime of Article 26 ECT and Article 25 ICSID Convention was insufficient, invalid, or in any need of supplementation at any relevant point in time.

345    In that regard, the Tribunal notes that no subsequent agreement exists regarding the interpretation of Article 26 ECT that would cast Article 26 ECT's clarity, sufficiency, or validity into doubt, nor does any subsequent practice to that effect exist.

346    The Tribunal furthermore notes that, as the Claimant rightly points out, the Respondent and Luxembourg had the competence to enter into the ECT in its current form and neither State has made any reservations to the ECT, nor could they have. Contrary to some arguments of the Respondent, Articles 26 ECT and 25 ICSID Convention have neither been suspended, in the sense of Article 58 VCLT, nor amended within the framework and in

---

[372] See MoM, ¶¶1041-1089.

accordance with the procedures set out in the ECT, nor by any other procedure either between the Respondent and Luxembourg or between all, or at least some, of the parties to both Treaties.

347    In that regard, the Tribunal, finally, also notes that the political declarations on the interpretation of the *Achmea* Judgment that Luxembourg and the Respondent have signed, differed as to the effect they attach to the *Achmea* Judgment *vis-à-vis* intra-EU investment arbitration under the ECT, with Luxembourg declining to express a view regarding the compatibility of the intra-EU application of the ECT with EU law.[373]

348    With a view to the arguments of amendment, suspension, or regarding the alleged effects of the EU Member States Declarations, the Tribunal further adds and recalls that even if suspension or amendment was the argued effect of either the EU Member States Declarations or the *Achmea* and *Komstroy* Judgments, any such effect would come too late in this case to affect or invalidate the consent perfected by the Parties at the relevant time, i.e. the date of the Request.

349    Therefore, the Tribunal, when analysing and determining its jurisdiction, does not see a reason to doubt the validity, clarity, and sufficiency of Articles 26 ECT and 25 ICSID Convention and thus does not see a reason to look further than the unambiguous arbitration clause under which it is constituted.

350    The Tribunal therefore finds that, while it may apply EU law where it deems it applicable and necessary, as outlined above, the application and analysis of EU law is not required for the Tribunal's determination of its jurisdiction in the case before it. The Respondent's main argument on the Intra-EU Objection thus fails on its basic premise: i.e. that the Tribunal must apply EU law when determining its jurisdiction.

351    Nevertheless, for completeness' sake, the Tribunal will now turn to the second prong of the Respondent's argument and consider what the Tribunal would have to do if it had to consider and apply EU law also in its decision on its jurisdiction.

## ii.    Consequences of Applying EU Law

352    To that end, the Tribunal finds it helpful to, first, take this opportunity to explain its understanding of EU law as expressed in the *Achmea* and *Komstroy* Judgments, followed, secondly, by an analysis of whether there are any relevant points of contact between the EU legal order and the ECT legal order, and, finally, by a discussion of how the Tribunal would deal with a conflict between applicable rules of both orders if such a conflict arose.

353    It is not for this Tribunal to determine with certainty what the CJEU meant where its findings are not entirely clear, or to seek to determine the EU-internal consequences of the

---

[373] See the 22 Member States Declaration (C-0851) and the Five Member States Declaration (C-0852), p. 3. The Tribunal is of course aware that, in view of the content of the Five Member States Declaration, this sub-argument has become less relevant after the *Komstroy* Judgment, i.e. after the CJEU has expressed a clearer position on its view of intra-EU investment arbitration under the ECT.

CJEU's findings. Nevertheless, the Tribunal in the course of these proceedings had to establish its reading of the *Achmea* Judgment in order to properly resolve the Intra-EU Objection.

354    In doing so, the Tribunal came to the following conclusion:

355    Given that, under the ECT, EU Member States undertake to accept the jurisdiction of an arbitral tribunal in the case of claims by individuals from other EU Member States, and given that that arbitral tribunal

    (i)    is not a court in the sense of the EU Treaties,

    (ii)    cannot request a preliminary ruling from the CJEU and

    (iii)    its decisions are removed from review by national courts of the EU,

the Tribunal found it appropriate to base its analysis on the assumption that the *Achmea* Judgment means that, from an EU-internal point of view, the arbitration clause of the ECT is incompatible with the "*principle of sincere cooperation*" embodied in Article 4(3) TEU,[374] and, as a consequence, Articles 267 and 344 TFEU "*preclude*" the clause. In the Tribunal's view, the *Komstroy* Judgment, which appears to structure its argument exactly along these lines, confirms this interpretation.

356    In the Tribunal's view, the *Achmea* and *Komstroy* Judgments thus mean that from an internal EU law perspective, EU Member States should not have entered into the ECT in its current form and may even mean that EU Member States should try to amend their obligations thereunder (an interpretation of the necessary process that also finds an expression in the existence and content of the EU Member States Declarations). However, it is doubtful to this Tribunal whether, in such a scenario, the *Achmea* or *Komstroy* Judgment, from an internal EU law perspective, could mean that the obligations of EU Member States under the ECT are void, invalidated, or could not have been validly entered into, as the Respondent seems to argue. It is furthermore uncertain whether the CJEU assumes that its judgments do have, or could have, such an effect.[375]

357    Therefore, it is not apparent whether EU law, as interpreted by the *Achmea* and *Komstroy* Judgments, from an EU-internal point of view, has the legal consequences for an ECT Tribunal that the Respondent attributes to it.

---

[374] *Achmea* Judgment, ¶58 in conjunction with ¶34.

[375] Interestingly, the EC has summarised the situation for arbitration clauses in intra-EU bilateral investment treaties as follows: "However, those provisions in bilateral investment treaties are not part of Union law. Hence the Court of Justice lacks the power to annul them. National courts and tribunals have to leave those provisions unapplied (general principle of primacy of Union law). They remain nevertheless, formally part of the national legal order and the international legal order. Member States, as a matter of Union law, have an obligation to immediately terminate them, in order to ensure legal certainty." EC's Second Amicus Curiae Brief, ¶27; see also EC's First Amicus Curiae Brief, ¶¶68f., 81-84, 96-117, where the EC seems to argue mostly in terms of a potential violation of EU law by an intra-EU offer to arbitrate under the ECT rather than in terms of inapplicability.

358     In any case, even assuming that those judgments, from an EU-law perspective, did purport to directly void or rewrite a clause in an international agreement of one of its Member States, the question that is relevant for this Tribunal is not one of EU-internal law. The question that is relevant for this Tribunal is whether, from the viewpoint of the ECT, i.e. the perspective that matters to this Tribunal, in a decision on jurisdiction under the ECT, there are points of contact with EU law through which the EU-internal reading of the law and the ECT could become relevant to this ECT Tribunal.

359     The Tribunal has found no such points of contact relevant to its decision on jurisdiction. The ECT, which prohibits reservations and provides for a closed system of withdrawal and amendments (see above) is, as a matter of principle, ignorant of, and unaffected by, judgments and evolving legal interpretations in another legal order such as the EU, as well as in national legal orders, no matter how forcefully those orders argue their applicability. Furthermore, any potential breach of internal or EU law committed by entering into the ECT could not have been sufficiently evident at the time of the conclusion of the ECT to call into question the EU Member States' consent to Article 26 ECT in its current form or to be relevant in any other form, not least in light of the ECT's *travaux préparatoires* and the lack of a disconnection clause in the ECT (see below).[376]

360     Therefore, from the perspective of international law, the *Achmea* and *Komstroy* Judgments cannot mean that the obligations of EU Member States under the ECT are void, invalidated, or could not have been validly entered into, even if performing them would violate EU law. In addition, from that same perspective, a judgment of the CJEU cannot direct a tribunal impanelled under the ECT to "*leave unapplied*" the arbitration clause under which it is constituted.

361     In light of the above, from the perspective of this Tribunal, independent of whatever the CJEU intended to cover with the *Achmea* and *Komstroy* Judgments, there can thus be no direct conflict of laws (i.e. a situation in which the Tribunal has to choose between two contradicting applicable rules) between EU law and the ECT as regards Article 26 ECT, unless the Tribunal were to apply EU law to its decision on jurisdiction and considered itself subject to EU law. However, as the Tribunal has determined above, it will not and does not have to apply EU law to that decision and it is not subject to EU law.

362     Nevertheless, for completeness' sake, the Tribunal will now entertain the hypothetical scenario of how to resolve a conflict of applicable provisions of the ECT and EU law in case there was a conflict. The Tribunal's findings on this hypothetical scenario reflect the view of the majority, with Arbitrator Sands not finding it necessary to address the hypothetical.

### iii.     Resolution of a Conflict of Laws

363     In the hypothetical case of a conflict between provisions of the ECT and EU law relevant to this Tribunal and this case, the Tribunal could either seek to interpret one treaty in

---

[376] See also the argument on the EC's submission in the *Electrabel v. Hungary* case, CMoJ, ¶¶181ff.

harmony with the provisions of the other, as is demanded by the Respondent and supported by the submissions of the EC and the *Komstroy* Judgment, or, if that was impossible, the Tribunal would have to identify and apply the applicable conflict rule.

364    The Tribunal will therefore turn to these two options now, starting with the possibility of harmonious interpretation.

*(1)    Harmonious Interpretation*

365    Unlike the Respondent, the EC, and the CJEU, the Tribunal is not convinced that an alleged conflict between EU law and Article 26 ECT can be resolved by harmonious interpretation. In the view of the Tribunal, Article 26 ECT is too clear and self-sufficient in its meaning to require, or even allow for, further non-textual interpretation. The position of EU law on the other hand, while having become substantially clearer due to the *Komstroy* Judgment, can still not be determined exactly and is subject to ongoing developments.

366    It is generally accepted that the ECT, and notably its Article 26, must be interpreted in accordance with Articles 31 to 33 VCLT.[377] The general rule of interpretation in Article 31(1) VCLT is that "[a] *treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms in their context and in the light of its object and purpose*".

367    Throughout the proceedings, the Claimant has consistently opposed the argument that the proper and harmonious interpretation of Article 26 ECT (together with other provisions of the ECT or stand-alone) would lead to the exclusion of intra-EU claims from ECT dispute settlement, since plainly no such restriction exists in the language of the ECT. In a similar vein, numerous arbitral tribunals have unanimously stated that such a carve-out or disconnection clause with regard to intra-EU claims could not be implicit, but would have to be express and clear.[378]

368    The Tribunal endorses this position. Prior to the conclusion of the ECT, the EU had been aware of, and had actually used express disconnection clauses as a means to ensure that provisions of a mixed agreement would not apply between EU Member States.[379] Furthermore, as opposed to the intra-EU scenario on which the ECT is silent, the ECT explicitly limits its application in certain specific situations, notably with respect to the Svalbard Treaty[380] as well as in Article 28 ECT. Moreover, the EU had proposed the

---

[377] See *Antin v. Spain*, ¶206; *Vattenfall v. Germany*, ¶¶125, 166; *Foresight/Greentech v. Spain*, ¶201.

[378] See *Charanne v. Spain*, ¶437; *RREEF v. Spain I*, ¶¶84f.; *Eiser v. Spain*, ¶¶186, 189; *Novenergia v. Spain*, ¶454; *Antin v. Spain*, ¶215; *Vattenfall v. Germany*, ¶¶202, 207; *Greentech v. Italy*, ¶¶338, 342.

[379] See *Vattenfall v. Germany*, ¶203, referring to Article 27(2) of the 1988 Joint Council of Europe/OECD Convention on Mutual Assistance in Tax Matters.

[380] See Decision 1 with respect to the ECT (Annex 2 to the Final Act of the European Energy Charter Conference): "Decision with respect to the Treaty as a whole: In the event of a conflict between the treaty concerning Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, the treaty concerning Spitsbergen shall prevail to the extent of the conflict, without prejudice to the positions of the Contracting Parties in respect of the Svalbard Treaty. In the event of such conflict or a dispute as to whether there is such conflict or as to its extent, Article

insertion of a disconnection clause during the negotiations of the ECT, but the clause was ultimately dropped from the draft treaty.[381]

369    In addition, the Tribunal is not convinced that Article 31(3)(c) VCLT – according to which "*any relevant rules of international law applicable in the relations between the parties*" shall be taken into account, together with the context – can be relied upon to "*carve out*" intra-EU claims from the scope of Article 26 ECT, as suggested by the Respondent as well as the EC. Article 31(3)(c) VCLT is not to be applied in isolation, but as an integral part of the general rule of interpretation enshrined in Article 31(1) VCLT. The Tribunal agrees that the role of this provision in the exercise of treaty interpretation cannot be to introduce external elements into a treaty with the effect of rewriting the treaty altogether.[382]

370    As has been shown before, neither the ordinary meaning of the terms used by the ECT, nor the systematic analysis of its provisions, offer a basis for the Tribunal to conclude that the ECT is to be construed as removing intra-EU claims from ECT dispute settlement. Assigning to Article 31(3)(c) VCLT the role of completely reversing this assessment in the name of "*harmonious*" treaty interpretation or "*systemic integration*" would put too much burden on this provision which calls on the Tribunal to "*take into account*" relevant provisions of international law together with the other factors referred to in Article 31(1) VCLT, and not to substitute the former for the latter.

371    Moreover, inasmuch as the Respondent contends that the 22 Member States Declaration reflects a subsequent agreement regarding the interpretation of the ECT within the meaning of Article 31(3)(a) VCLT and, subsidiarily, that it constitutes, for the purposes of Article 31(3)(b) VCLT, subsequent practice in the application of the ECT establishing agreement of the Parties regarding its interpretation, the Tribunal has similar reservations, not least in view of the fact that the Respondent and Luxembourg have signed different declarations (see above). To be sure, the 22 Member States Declaration as well as the two further declarations were adopted by the remaining EU Member States, may have some interpretative value, especially after the *Komstroy* Judgment, which appears to have significantly reduced the differences between the Five Member States Declaration and the 22 Member States Declaration. Yet, being non-binding instruments and not reflecting a consensus of all EU Member States – let alone, and more importantly, all ECT Contracting Parties – the EU Member States Declarations cannot change the clear terms of the ECT or guide the Tribunal in seeking a harmonious interpretation.

372    Finally, while having entertained the possibility of a harmonious interpretation for the sake of argument, the Tribunal expresses its serious doubts that even if it came to a situation where a harmonious interpretation might be an option, the Tribunal, as a Tribunal under the ECT, would be obliged to seek an interpretation of the ECT harmonious with EU law and not, if at all, the other way round. This, not least, in light of the ECT's Article 16,

---

16 and Part V of the Energy Charter Treaty shall not apply." See *PV Investors v. Spain I*, ¶183; *Eiser v. Spain*, ¶187; *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 (CL-0280) ("***Masdar v. Spain***"), ¶311; *Vattenfall v. Germany*, ¶204; *Greentech v. Italy*, ¶343.

[381] See *Vattenfall v. Germany*, ¶205.
[382] See ibid., ¶154; *Eskosol v. Italy*, ¶126.

which expressly prohibits interpretations that would deviate from, or undermine, certain core provisions and protections of the ECT, including the right to dispute resolution (as discussed below).

373    The Tribunal therefore concludes that, if there were a conflict between EU law and provisions of the ECT, in particular its Article 26 ECT, a harmonious interpretation, even if allowed and desirable, would not function and thus could not be applied.

*(2)    Potential Conflict Rules*

374    The Tribunal will now turn to the identification and application of potential conflict rules. It will start with Article 16 ECT, which it deems the relevant and applicable norm, and will then deal with, and dismiss, other potential norms on which the Respondent has sought to rely.

*(a)    Article 16 ECT*

375    Article 16 ECT, titled "*Relation to Other Agreements*", prescribes that if two Contracting Parties to the ECT have entered into a prior, or enter into a subsequent, international agreement that concerns the subject matter of Part III ECT ("*Investment Promotion and Protection*") or Part V ECT ("*Dispute Settlement*"), "*nothing*" in the terms of the other agreement "*shall be construed to derogate from any provision of Part III or V of* [the ECT] *or from any right to dispute resolution with respect thereto under* [the ECT]*, where any such provision is more favourable to the Investor or Investment.*"

376    In view of its terms, e.g. the reference to "*construe*", Article 16 ECT may at first sight appear to represent a rule of interpretation rather than a conflict rule. The Claimant, and also many arbitral tribunals,[383] however, have considered Article 16 ECT to work as a conflict rule governing a situation where provisions of two treaties are not compatible with each other. After careful analysis, the present Tribunal shares this view. The Tribunal is of the opinion that Article 16 ECT's clear wording in absolute terms (e.g. using terms such as "*nothing*") shows that it was intended as an insurmountable protection of certain core principles and rights within the ECT in case of a conflict with any other agreement.

377    Article 16 ECT's protections apply in this case if

    (i)    the EU Treaties are prior or subsequent international agreements that "*concern*" Part III ECT or Part V ECT,

    (ii)    provisions of the EU Treaties (as interpreted by the *Achmea* and *Komstroy* Judgment) aim to derogate from provisions of Part III of V of the ECT, or from any right to dispute resolution, and

---

[383] See *Vattenfall v. Germany*, ¶¶217, 223, 229; *Greentech v. Italy*, ¶341.

(iii) the provisions which might otherwise be subject to derogation are more favourable to the Investor or the Investment than those in the derogating treaty.

378 Regarding the first and second condition, the Tribunal notes that it would seem that the EU Treaties, in the interpretation given to them by the Respondent and the *Komstroy* Judgment, "*concern*" the subject matter of Part III and in any case Part V of the ECT. It would further seem that, according to that interpretation, the EU Treaties in fact aim to derogate from at least Part V of the ECT, in particular from Article 26 ECT, and the right to dispute resolution contained therein. The above-mentioned first and second condition are therefore met.

379 The Tribunal furthermore notes that, based on its wording, Article 16 ECT operates irrespectively of the question of timing, as it applies to both prior and subsequent international agreements relating to Part III ("*Investment Promotion and Protection*") or Part V ("*Dispute Settlement*") of the ECT. Accordingly, the issue of whether the ECT is the earlier or the later legal instrument *vis-à-vis* the EU Treaties, which is of relevance with respect to Article 30 VCLT (see below), does not affect the application of the *lex specialis* of Article 16 ECT.

380 In light of the above, the effect of Article 16 ECT essentially depends on the fulfilment of the third condition, i.e. whether the substantive and procedural guarantees of either Part III/V ECT or of EU law are more favourable to EU investors and investments. The Parties have taken conflicting positions on this question: On the one hand, the Respondent argues that EU law creates a more comprehensive and better system of intra-EU protection of investments than the ECT. On the other hand, the Claimant contends that as EU law does not provide an investor with the right to file a claim before an independent tribunal outside the forum state, the ECT offers the more favourable rule for the investor.

381 Arbitral practice on the subject[384] has affirmed that Article 26 ECT is at least in some aspects more favourable to investors and investments than EU law, thus preventing a reading of Article 16 ECT that would restrict EU investors' rights to dispute resolution under the ECT.[385] In particular, the *Masdar v. Spain* tribunal has found that

> "Article 16 ECT affords precedence to the more favourable investor-protection provisions of Article 26 ECT of which Claimant has availed itself over any conflicting provision of the EU treaties. They are more favourable, not least, because they obviate the need to bring the claim in the Spanish courts and Respondent cannot derogate from Article 26, pursuant to which it has given unconditional consent to arbitration."[386]

---

[384] See *Plama Consortium Ltd. v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction, 8 February 2005 (CL-0179/RL-0025), ¶141; *Eiser v. Spain*, ¶202; *Masdar v. Spain*, ¶332; *Vattenfall v. Germany*, ¶194; *Greentech v. Italy*, ¶¶340f.

[385] See *RREEF v. Spain I*, ¶¶75, 87; *Vattenfall v. Germany*, ¶196: "[…] Article 16 [ECT] confirms beyond doubt that Respondent's proposed reading of the provisions of the ECT is untenable. In light of this provision it is not possible to 'read into' Article 26 [ECT] an interpretation whereby certain investors would be deprived of their right to dispute resolution, whether against an EU Member State or otherwise."; see further ibid., ¶229: "[…] Article 16 [ECT] poses an insurmountable obstacle to Respondent's argument that EU law prevails over the ECT".

[386] *Masdar v. Spain*, ¶332 (footnote omitted).

382     The Tribunal embraces this statement and thus concludes that at least some of the provisions of Part III and Part V of the ECT are more favourable to investors and investments with respect to ECT intra-EU claims. As a consequence, from the perspective of the ECT which the Tribunal must primarily apply, the provisions of the ECT, notably its Article 26, prevail over those of EU law. That this potential collision of norms may have to be handled differently from the point of view of EU law, does not change this assessment.

383     If the Tribunal thus had to resolve a conflict of laws regarding its jurisdiction, Article 16 ECT would decide that conflict in favour of Article 26 ECT. In light thereof, the Respondent's main argument regarding its Intra-EU Objection, even if it reached the stage of a conflict of laws analysis, would have to fail.

384     Having so concluded, the Tribunal will now turn to alternative arguments raised by the Respondent as to how EU law could prevail over the provisions of the ECT.

    *(b)     Article 30 and 59 VCLT*

385     According to the Respondent, the EU Treaties, in the form of the Treaty of Lisbon, which is of a later date than the date of conclusion of the ECT, not only share but also exceed the object and purpose of the ECT and as such are later treaties on the same subject-matter in the sense of Articles 30 and 59 VCLT. That means, according to the Respondent, that they supersede the ECT as *leges posteriores* in the sense of Article 30 VCLT or even have the character of an implied termination or suspension by conclusion of a later treaty in the sense of Article 59 VCLT.

    *(i)     Article 30 VCLT*

386     The first provision for the Tribunal to consider in this regard is Article 30 VCLT which deals with the "Application of successive treaties relating to the same subject-matter" and to which the Parties have also referred in their submissions.

387     According to Article 30(3) VCLT, in case of successive treaties relating to the same subject-matter, "[w]*hen all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty*". Pursuant to Article 30(4) VCLT, the rule that the later treaty prevails (*lex posterior derogat legi priori*) also governs situations where the parties to the earlier and later treaties do not coincide, but its effect is then limited to the States which are parties to both treaties. This is the relevant scenario in the present context, as the relationship of the ECT on the one hand and the EU Treaties on the other is under scrutiny.

388     However, in order for Article 30 VCLT to apply, the treaties in question must regulate the "*same subject-matter*". As far as the ECT and the EU Treaties are concerned, according to numerous arbitral tribunals, this requirement is not met.[387]

389     In addition, with respect to the concept of "*successive treaties*", there are different views as to whether the ECT or the EU Treaties qualify as the earlier or later treaties within the meaning of Article 30 VCLT. The ECT was adopted in 1994 and entered into force in 1998. While it is true that Articles 267 and 344 TFEU, which are the critical provisions of EU law from the point of view of the *Achmea* and the *Komstroy* Judgment, form part of the TFEU which was introduced by the 2007 Treaty of Lisbon (which entered into force in 2009), these provisions have existed in substantively similar form since the 1957 Treaty of Rome establishing the European Economic Community (Articles 177 and 219 EEC Treaty), in force since 1 January 1958.[388]

390     The Tribunal need not take a stand on these questions. The VCLT, which embodies general rules on treaty interpretation in its Article 30(2), specifically makes way for special agreements, *i.e. leges speciales*, to deviate from the general norms set out therein. According to Article 30(2) VCLT, "[w]*hen a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail*".

391     As highlighted and discussed above, Article 16 ECT is *lex specialis vis-à-vis* Article 30 VCLT. Therefore, even if the EU Treaties and the ECT were "*successive treaties relating to the same subject-matter*", an issue which, in light of the above, does not need to be decided by the Tribunal, the Tribunal would still never reach Article 30(3) VCLT in its analysis.

392     Therefore, the Tribunal finds that even if the EU Treaties were *leges posteriores* to the ECT, and even if they prohibited intra-EU investor-State arbitration, Article 16 ECT, as *lex specialis*, would trump the considerations of posteriority. Thus, absent any explicit amendments thereto, in determining the jurisdiction of this Tribunal, the relevant provisions of the ECT prevail over any of the implied or explicit provisions of the EU Treaties.

       *(ii)    Article 59 VCLT*

393     The second provision to consider for the Tribunal in this regard is Article 59 VCLT which deals with the "*termination or suspension of a treaty implied by conclusion of a later treaty*".

---

[387] See *Eastern Sugar v. Czech Republic*, ¶¶159-166; *Electrabel v. Hungary II*, ¶4.176; *Vattenfall v. Germany*, ¶¶194, 214; *Greentech v. Italy*, ¶346. See, however, Study Group of the ILC, Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law, UN Doc. A/CN.4/L.682, 13 April 2006, ¶¶22f., challenging an overly strict interpretation of the "same subject-matter" requirement.
[388] See *Vattenfall v. Germany*, ¶218.

86

394     The Tribunal can be quick in dismissing any arguments based on this Article. Even independent of the above analysis of the role of Article 16 ECT and Article 30 VCLT, the Tribunal cannot help but notice that no proper argument has been made, among other things, why (i) the Tribunal should apply Article 59 VCLT by analogy even though not all Contracting Parties to the ECT are EU Member States, and (ii) why it should do so only with a view to Article 26 ECT, and only with a view to certain Contracting Parties among each other, even though the Article seems to deal with termination or suspension of treaties as a whole. It has also not been presented as probable, let alone been established as fact, that the relevant Contracting Parties to the ECT indeed intend, or intended at any point in time, to terminate or suspend the ECT in part or in full, and intended that such a termination or suspension should not take place through the proper channels set out in the ECT itself.

395     Therefore, the Tribunal is not convinced that Article 59 VCLT has any bearing on the situation at hand, nor that it would have the effect that the Respondent seems to imply and hope it to have.

(c)     *Primacy of EU Law*

396     The Tribunal then turns to the Respondent's main "conflict of laws" argument.

397     According to the Respondent, the principle of primacy of EU law is not only an interpretative criterion, but also a special conflict rule, which takes precedence over the general rules of conflict as reflected in Article 30(3) to (5) VCLT. In addition, according to the Respondent, the principle of primacy of EU law is also *lex posterior* to the ECT because it was codified in the Treaty of Lisbon, after the conclusion of the ECT.

398     The Tribunal cannot follow this argument for several reasons. Even independent of an answer to the question whether the principle of primacy of EU law is *lex posterior* to the ECT even though it existed before the ECT (with the Respondent itself relating it back to the *Van Gend and Loos* Judgment),[389] the Tribunal is not necessarily convinced, and did not hear sufficient argument to the effect, that the principle was ever intended to have a reach, or could have a reach, broader than the resolution of conflicts between EU law and the law of EU Member States. Indeed, the Tribunal cannot help but note that the very declaration, which according to the Respondent has codified the principle of supremacy, states:

"17. Declaration concerning primacy

The Conference recalls that, in accordance with well settled case law of the Court of Justice of the European Union, the Treaties and the law adopted by the Union on the basis of the Treaties

---

[389] E.g. RC on *BayWa*, ¶67; CJEU, Judgment of 5 February 1963 in *Van Gend & Loos v. Nederlandse administratie der belastingen*, Case C-26/62 (RL-0161).

have primacy over the law of Member States, under the conditions laid down by the said case law."[390]

399    The text of this "*codifying*" declaration is thus focussed on establishing supremacy of EU law over the law of EU Member States. This is a far cry from establishing supremacy over the obligations in another treaty belonging to another international legal order. This holds true with special force in view of the fact that the EU itself is a party to the ECT and that both the Respondent and the European Commission took the view that, from an internal EU perspective, the ECT forms part of EU law – in other words, on the Respondent's own case, as supported by the European Commission, any collision between the EU Treaties and the ECT would be a conflict between different instruments of EU law, not between EU law and the law of EU Member States. The Tribunal is thus not convinced that the principle of primacy is the kind of conflict rule that the Respondent has argued it to be.

400    In that regard, the Tribunal notes, that contrary to what the Respondent has argued, Article 25 ECT does not express any form of primacy of EU law within the ECT. Article 25 ECT is a standard provision that allows for two-speed integration by exempting "*Economic Integration Agreements*" from most-favoured-nation obligations. It has nothing to do with the alleged primacy of EU law and nothing to do with Article 26 ECT.

401    Regarding the applicability of the principle of primacy, the Tribunal is furthermore not convinced of any arguments that the ECT forms part of EU law because the EU is a Contracting Party to it, to the extent that this argument is intended to mean that the simple fact of the EU being a Contracting Party to the ECT would import the ECT into the hierarchy of EU law on a level below the EU Treaties. As a matter of course, once the EU entered into the ECT, its obligations thereunder are obligations of the EU and to that extent form part of EU law. However, the Tribunal notes that this view is just the EU-internal view on its ECT obligations. From an international law perspective, i.e. the perspective of the ECT, with its Contracting Parties from all over the world, the EU status as Contracting Party does nothing to the position of the ECT in the hierarchy of norms between different international treaties and regimes.

402    That being said, even if the principle of primacy were the rule of conflict that the Respondent desired it to be, and even if it was *lex posterior*, for this Tribunal impanelled under the ECT it would still stand in competition with the very clear and specific terms of the ECT conflict rule of Article 16 ECT, as discussed above. In that competition between different treaties and international legal orders, this Tribunal, being an ECT Tribunal, would then have to give precedence to Article 16 ECT, which in its clear terms protects certain provisions and principles of the ECT even from later treaties. This would ever so much more have to be the conclusion because while, on the one hand, Article 16 ECT embodies a clear and specific, written, agreement on this particular subject, the principle of supremacy, on the other hand, could at best be considered a vague catch-all provision,

---

[390] 12008E/AFI/DCL/17, Declaration concerning primacy, in Consolidated version of the Treaty on the Functioning of the European Union - DECLARATIONS annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon, signed on 13 December 2007 - A. DECLARATIONS CONCERNING PROVISIONS OF THE TREATIES - 17. Declaration concerning primacy; Official Journal 115, 09/05/2008 P. 0344 – 0344.

which would have to be interpreted as having been implied (rather than expressly agreed) into the ECT by only some of the Contracting Parties.

403     Therefore, the Tribunal sees no reason why the principle of primacy under EU law should change its conclusion regarding the meaning of Article 16 ECT as it has stated it above.

**b.      The Respondent and Luxembourg as "other Contracting Parties" vis-à-vis Each Other**

404     The Tribunal then turns to a line of argument regarding the Intra-EU Objection on which the Respondent had placed more emphasis before the *Achmea* Judgment was rendered.

405     According to the Respondent, within the EU, the objects and subjects that the ECT deals with and aims to achieve fall under the sole competence of the EU. The EU Member States had transferred those competences to the EU already before entering into the ECT. According to the Respondent, that has two consequences:

    (i)     First, for ECT-related issues and conflicts within the EU, all EU Member States must be deemed to be one Contracting Party consisting of one single "*Area*" as reflected in the status of the EU as Contracting Party, and the many Articles of the ECT that contain provisions for REIOs.

    (ii)    Secondly, the EU Member States could not have agreed to intra-EU dispute resolution under the ECT because at the time of the conclusion of the ECT they did not have the competence to commit to such dispute resolution as that competence had already been transferred to the EU.

406     The Tribunal cannot follow either prong of this argument.

407     As regards the first prong, the Tribunal notes that it is correct that the ECT does provide for the membership of international organisations and the text of the ECT is structured in that way. However, nothing in Articles 26(1), 1(2), 1(3), 1(10), or 36(7) ECT can lead the Tribunal to interpret these provisions in a way other than following the clear meaning of their text: these Articles, in short, show that a REIO can be a Contracting Party to the ECT. If there is a conflict between an Investor and a Contracting Party that is a REIO, the Area in the sense of Article 26(1) ECT is the totality of the Areas of the member states of that REIO, and if there is a conflict between an Investor and a State that is a Contracting Party, as is the case here, the Area in the sense of Article 26(1) ECT is the Area of that State. This part of the Respondent's argument thus fails.

408     As regards the second prong of the argument, the Tribunal finds it equally unconvincing. Without needing to delve too deeply into the matter, the basic premise of the argument, i.e. that EU Member States had transferred all intra-EU competence on matters of energy as regulated in the ECT to the EU seems doubtful to the Tribunal, not least in light of the wording of Article 4(2)(i) TFEU, as the Claimant rightly points out.

409   The Tribunal has furthermore not heard any convincing argument on the question of how, even if the two States had already transferred their competences on energy policy and dispute resolution, as the Respondent argues, this circumstance would lead to anything but an internal conflict of obligations under different treaties as discussed and resolved above.

410   Finally, the Respondent's argument cannot succeed in light of the *travaux préparatoires* of the ECT and, in particular, the EU's failed attempt to include a disconnection clause into the ECT – an aspect of the case which has been discussed in detail by the Parties and above in this Award. The EU had deemed a disconnection clause necessary to avoid an intra-EU effect of (certain parts of) the ECT, but such a clause was not included into the final draft of the ECT.

411   Therefore, the Respondent's other line of argument on the Intra-EU Objection must equally fail.

**c.    Propriety of Issuing an Award**

412   The Claimant has also submitted that pending further decisions of the CJEU on the exact meaning of the *Achmea* Judgment and further political developments, the Tribunal should assert its jurisdiction in order "*not to violate fundamental rights of the investors*", and in order not to deny it the right to an effective remedy. In addition, the Claimant has pointed out that any award by this Tribunal as an award of an ICSID Tribunal would not be subject to annulment for violation of the EU legal order.

413   The Tribunal notes that while neither the ICSID Convention nor the ECT contain a rule analogous to Article 42 of the ICC Rules[391], according to which arbitral tribunals "*shall make every effort to make sure that the award is enforceable at law*", the question may be asked in the present context whether serious problems to be expected in the enforceability of the award rendered should prompt an arbitral tribunal to refrain from exercising its jurisdiction in order to preserve the integrity of the arbitral function.[392]

414   In this regard, the Tribunal notes the argument of the *Micula v. Romania* tribunal which found that

> "it is not desirable to embark on predictions as to the possible conduct of various persons and authorities after the Award has been rendered, especially but not exclusively when it comes to enforcement matters. It is thus inappropriate for the Tribunal to base its decisions in this case on matters of EU law that may come to apply after the Award has been rendered. It will thus not address the Parties' and the Commission's arguments on enforceability of the Award […]. That being said, he Tribunal notes that Articles 53 and 54 of the ICSID Convention […] apply in any event to this Award."[393]

---

[391] ICC Rules of Arbitration of 1 March 2017.

[392] See also *Vattenfall v. Germany*, ¶230.

[393] *Ioan Micula et al. v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013 (CL-0111/RL-0111) ("***Micula v. Romania***"), ¶¶340-341.

415    This was confirmed by the *Eskosol v. Italy* tribunal which found:

> "[T]he Tribunal rejects Italy's contention that any award it may render (in either Party's favour) necessarily would be unenforceable. [...] In these circumstances, a tribunal finding that it has jurisdiction under the ICSID Convention and the ECT should not decline to exercise that jurisdiction, simply because there are certain scenarios under which one or the other Party might face challenges in enforcement in certain jurisdictions, based on their national laws and/or their other treaty obligations. The Tribunal has a duty to exercise the jurisdiction it has found to exist, and will proceed to do so with respect to the issues remaining in this case."[394]

416    The Tribunal agrees. While it may be expected that questions of enforceability will arise before EU Member States' domestic courts, and while the answers to such questions by EU domestic courts could appear uncertain in light of the above, the Tribunal feels duty-bound to issue an Award on the merits, to the extent that it has jurisdiction on the claims submitted to it. In the view of the Tribunal, Articles 53 and 54 ICSID Convention deal with post-award issues conclusively and sufficiently safeguard the enforceability of an award.

417    Accordingly, the Tribunal sees no reason to refrain from exercising its jurisdiction.

### d.    Conclusion

418    For the foregoing reasons, the Tribunal rejects the Respondent's Intra-EU Objection.

## B.    Objection B

### 1.    The Respondent's Principal Arguments

419    The Respondent's jurisdictional objection B has undergone some permutations. The Respondent's Reply on Preliminary Objections ("**RoPO**"), of 24 February 2017, partly withdraws Preliminary Objection A in the Respondent's Memorial on Preliminary Objections ("**MoPO**"), but re-establishes parts of Preliminary Objections A and E as Preliminary Objection B.[395] In its revised form, Preliminary Objection B addresses the Tribunal's power to hear the Claimant's claim in relation to certain assets, namely "*returns*", "*rights conferred by law or contract*", and "*interests*". According to the Respondent, the only damage that the Claimant can claim is the loss of value of its indirect participation in the capital of the SPVs caused by the Disputed Measures. This would not include a percentage of the future dividends allegedly lost, since there exists a group of companies between the Claimant and the SPVs which would affect the flow-through of the yields produced by these plants.[396]

420    For the Respondent, the Claimant's investment consisted exclusively of the indirect interest in the capital and subordinated loans of the holding companies of the Wind Farms and CSP Plants.[397] The Respondent submits that the Claimant neither owned nor directly or

---

[394] *Eskosol v. Italy*, ¶235; see also *Vattenfall v. Germany*, ¶230.
[395] RoPO, ¶8.
[396] Ibid., ¶¶7-9.
[397] Ibid., ¶¶89, 108.

indirectly controlled the Wind Farms or CSP Plants, their returns, their rights or their contracts. The Claimant merely owned equity stakes in the SPVs, which in turn own the plants, their returns and other rights. Therefore, the Claimant cannot directly claim the damage suffered by the SPVs.[398]

421    The Respondent relies on *ST-AD v. Bulgaria*,[399] *Poštová banka v. Hellenic Republic*,[400] *RREEF v. Spain*, and *Nykomb v. Latvia*[401] for the proposition that an investor has no enforceable right over the assets of a company in which it owns shares, and that a tribunal's jurisdiction extends only to the loss of value of the shares or participation in the capital.[402]

422    The Respondent also relies on Article 25 ICSID Convention, which provides for jurisdiction over legal disputes "*arising directly out of an investment*". Therefore, jurisdiction would be restricted to matters that directly affect the Claimant's investment, that is, its indirect participation in the capital and in the loans of the SPVs.[403]

423    The Respondent submits that Article 25(2)(b) ICSID Convention and Article 26(7) ECT provide a separate remedy that allows companies controlled by the foreign shareholder to claim their own damages directly. In the Respondent's view, this would derive from the principle of non-recognition of the *locus standi* of the shareholder to claim for losses of the company, which is also established in customary international law and in advanced national systems of mercantile law.[404]

424    The Respondent stresses that the exact delimitation of the investment will directly impact upon the umbrella clause under ECT Article 10(1) *in fine*, upon the question of expropriation, and upon the calculation of damages.[405]

425    At the Hearing, the Respondent pointed out that, with its percentage of indirect participation in the SPVs never exceeding 50%, the Claimant neither owned nor directly or indirectly controlled the plants, their returns, or their contracts.[406]

## 2.    The Claimant's Principal Arguments

426    The Claimant maintains that its investment includes not just its shareholding and subordinated debt interests, but also other interests, such as returns, in the SPVs. In accordance with the definition of "*Investment*" in Article 1 ECT, Claimant's investment

---

[398] Ibid., ¶¶90-94.

[399] *ST-AD (Germany) v. Republic of Bulgaria,* PCA Case No. 2011-06, Award on Jurisdiction, 18 July 2013 (RL-0023) ("**ST-AD v. Bulgaria**"), ¶¶278, 292.

[400] *Poštová banka, a.s. and Istrokapital SE v. Hellenic Republic* ("**Poštová banka v. Hellenic Republic**"), ICSID Case No. ARB/13/8, Award, 9 April 2015 (RL-0008), ¶245.

[401] *Nykomb Synergetics Technology Holding AB v. Republic of Latvia*, SCC Case No. 118/2001, Arbitral Award, 16 December 2003 (CL-0064/RL-0088) ("**Nykomb v. Latvia**"), p. 39.

[402] RoPO, ¶¶95-101.

[403] Ibid., ¶102.

[404] Ibid., ¶¶103-106.

[405] Ibid., ¶107.

[406] R-OS (Jurisdiction), slides 23f.

included "*the plants*", "*interests*", "*rights and contracts*" and "*returns*". The Claimant points out that the CSP Plants and Wind Farms are the essential assets of the SPVs. Returns are covered by the definition of "*Investment*" in ECT Article 1(6)(e) and 1(9). Rights and contracts are also covered by ECT Articles 1(6) and 10(1), last sentence.[407] In support, the Claimant relies on *Isolux v. Spain*.[408]

427    The Claimant dismisses the case authorities upon which the Respondent relies: *ST-AD v. Bulgaria* and *Postová Banka v. Hellenic Republic* are not ECT cases but were decided under differently worded BITs. *Nykomb v. Latvia* and *RREEF v. Spain* do not support Respondent's position.[409] The Claimant points out that *RREEF v. Spain* actually supports its position.[410]

428    The Claimant confirms that it is entitled to claim for the entire damage suffered by the SPVs that own and operate the CSP Plants and the Wind Farms.[411]

429    At the Hearing, the Claimant relied on the Awards in *Antin v. Spain*, *RREEF v. Spain*, and *Eiser v. Spain*. The Claimant maintained that it had an interest in the plants, in their expected returns and in the rights conferred by law upon the plants. Therefore, it can claim for its share in the decrease in value resulting from Spain's measures affecting said interests. The Claimant pointed out that this "*jurisdictional objection*" is moot since both Experts calculated damages based on the Claimant's stake in the CSP Plants and the Wind Farms.[412]

## 3.    The Tribunal's Analysis

430    The Parties are agreed that shareholders have standing, in principle, to pursue claims arising from adverse action against the company in which they hold shares. Where they disagree is the nature of the shareholders' rights. The Respondent insists that a shareholder is limited to the diminution of share value. The Claimant argues that shareholders can claim also for damage suffered by the company.

431    The Tribunal must proceed from the wording of the ECT. Its definition of the term "*Investment*" in Article 1(6) starts with a general reference to "*every kind of asset, owned or controlled directly or indirectly by an Investor*". Therefore, indirect ownership of assets is no obstacle to a claim. The most obvious form of indirect ownership is through shareholding in a company that owns the assets directly.

432    Article 1(6) ECT offers a non-exhaustive list of assets that the investor may own or control directly or indirectly. Apart from shareholding (Article 1(6)(b)), these assets include

---

[407] RjoJ, ¶¶85-90.
[408] *Isolux v. Spain*, ¶692.
[409] RjoJ, ¶¶92-96.
[410] Ibid., ¶¶97-99.
[411] Ibid., ¶102.
[412] C-OS, slides 246f.

> "(a) tangible and intangible, and movable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;"

433    This would cover the CSP Plants and the Wind Farms and rights derived from them. These rights may be owned or controlled directly or indirectly, i.e. through shareholding.

434    In addition, the ECT's definition includes

> "(c) claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment;
>
> […]
>
> (e) Returns;
>
> (f) any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector."

435    This would cover the "*returns*", "*rights conferred by law or contract*", and "*interests*" that are contested between the Parties. These assets, too, may be owned or controlled directly or indirectly, i.e. through shareholding.

436    In addition to its definition of "*Investment*", the ECT contains an explicit provision on reflective losses, albeit restricted to expropriation. Its Article 13(3) provides:

> "For the avoidance of doubt, Expropriation shall include situations where a Contracting Party expropriates the assets of a company or enterprise in its Area in which an Investor of any other Contracting Party has an Investment, including through the ownership of shares."

437    Therefore, under the ECT, at least as far as an expropriation is concerned, a shareholder may pursue claims arising from damage it suffers it as a consequence of damage inflicted upon a company in which it owns shares.

438    It follows that an analysis of the ECT's text militates in favour of a shareholder's right to pursue claims for reflective losses.

439    Tribunal practice beyond the ECT offers a mixed picture. Some tribunals have expressed the view that the rights of indirect investors do not go beyond what could be derived from their shareholding.[413] In *Poštová banka v. Hellenic Republic*, the Tribunal said:

> "a shareholder of a company incorporated in the host State may assert claims based on measures taken against such company's assets that impair the value of the claimant's shares. However,

---

[413] *BG Group Plc. v. Republic of Argentina*, UNCITRAL, Final Award, 24 December 2007 (CL-0090/RL-0053) ("*BG v. Argentina*"), ¶¶214-217; *El Paso Energy International Company v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011 (CL-0020) ("*El Paso v. Argentina*"), ¶¶177-214; *ST-AD v. Bulgaria*, ¶¶268-285; *Enkev Beheer B.V. v. Republic of Poland*, PCA Case No. 2013-01, First Partial Award, 29 April 2014, ¶¶310, 313; *Casinos Austria International GmbH and Casinos Austria Aktiengesellschaft v. Argentine Republic*, ICSID Case No. ARB/14/32, Decision on Jurisdiction, 29 June 2018 ("*Casinos Austria v. Argentina*"), ¶¶184f.

> such claimant has no standing to pursue claims directly over the assets of the local company, as it has no legal right to such assets."[414]

440    Other tribunals have held that shareholders may claim also for adverse action affecting the company's economic position.[415] In *Continental Casualty v. Argentina*, the Tribunal relied on a definition of "*investment*" in the Argentina-US BIT that included "*a company or shares of stock or other interests in a company or interests in the assets thereof.*" The Tribunal summarized these rights in the following terms:

> the treaty protection is not limited to the free enjoyment of the shares, that is the exercise of the rights inherent to the position as a shareholder, specifically a controlling or sole shareholder. It also extends to the standards of protection spelled out in the BIT with regard to the operation of the local company that represents the investment.[416]

441    Similarly, in *Arif v. Moldova* the Tribunal said:

> "the Tribunal finds that shareholder protection is not restricted to ownership in the shares, it extends to the assets of the company."[417]

442    In the present case, the Tribunal does not need to take a definitive position on the nature and extent of shareholder rights in general. The Respondent does not contest the Claimant's *ius standi* in its capacity as shareholder, in principle. The difference between the Parties on this point concerns not the existence of shareholder rights, but their nature and extent. It is, therefore, not a matter of jurisdiction, but a question of how the claims are to be characterized and computed. This is a matter the Tribunal addresses below in its decision on quantum.

443    The Respondent relies on Article 25 ICSID Convention, which provides for the jurisdiction of a tribunal over a "*legal dispute arising directly out of an investment*". This requirement of directness refers to the relationship of the dispute to the investment. It does not refer to the character of the investment and does not exclude disputes that arise out of investments that were made, or are held, indirectly.[418]

444    Respondent's reliance on Article 25(2)(b) ICSID Convention and on Article 26(7) ECT does not further its argument. These provisions foresee that the parties may agree to give standing to a locally registered company because of foreign control. This mechanism does not derive from the principle of non-recognition of *locus standi* of the shareholder, as

---

[414] *Poštová banka v. Hellenic Republic*, Award, 9 April 2015, ¶245.

[415] *Telefónica S.A. v. Argentine Republic*, ICSID Case No. ARB/03/20, Decision on Jurisdiction, 25 May 2006, ¶¶76, 81; *RosInvestCo UK Ltd. v. Russian Federation*, SCC Arbitration V (079/2005), Final Award, 12 September 2010 (CL-0224) ("***RosInvest v. Russia***"), ¶608; *Bernhard von Pezold and Others v. Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Award, 28 July 2015 (CL-0266) ("***Pezold v. Zimbabwe***"), ¶¶323, 326; *Mera Investment Fund Limited v. Republic of Serbia*, ICSID Case No. ARB/17/2, Decision on Jurisdiction, 30 November 2018 ("***Mera v. Serbia***"), ¶¶135, 230.

[416] *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, Decision on Jurisdiction, 22 February 2006, ¶79 ("***Continental Casualty v. Argentina I***").

[417] *Mr. Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013 (CL-0290), ¶380.

[418] *Casinos Austria v. Argentina*, ¶194.

suggested by the Respondent. Rather, it is designed to overcome the negative nationality requirement that would otherwise exclude a locally registered company from access to ICSID arbitration.

445    It follows that Jurisdictional Objection B must be dismissed.

## C.    Objection C

### 1.    The Respondent's Principal Arguments

446    Insofar as the Claimant's claims under Article 10(1) ECT relate to the TVPEE and TEE, the Respondent objects to the Tribunal's jurisdiction arguing that its consent to arbitration pursuant to Article 26 ECT is limited to alleged breaches of an obligation under Part III of the ECT.[419] The Respondent notes that according to Article 21(1) ECT, Article 10(1) ECT does not create any obligations with respect to taxation measures (subject to certain exceptions not applicable here).[420] The Respondent contends that both the TVPEE and TEE are in fact taxation measures and are therefore not encompassed by the Respondent's consent to arbitration.[421]

447    In characterizing the TVPEE and TEE as taxation measures, the Respondent relies on Article 21(7) ECT, which defines taxation measures as including "*any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof*".

448    The Respondent argues that the TVPEE forms part of the domestic law of the Respondent, i.e. the "*Contracting Party*",[422] while the TEE forms part of the domestic law of a "*political subdivision*" of Respondent, namely its autonomous community of Castile and León.[423]

449    As to the other requirement mentioned in Article 21(7) ECT, i.e. whether the TVPEE and the TEE are "*relating to taxes*", the Respondent submits that this question is governed by Spanish law, mainly because Article 21(7)(a)(i) ECT refers to the domestic law of the Contracting Party.[424] As to the TVPEE's character as a tax under Spanish law, the Respondent invokes Article 1 Law 15/2012, which explicitly characterizes the TVPEE as a "*tax of direct […] nature*".[425] In addition, the Respondent refers to MO HAP/703/2013, which introduced a tax form to be used for the self-assessment of the TVPEE. Moreover, the Respondent asserts that the Spanish Constitutional Court ratified the taxation nature of the TVPEE and that the Spanish High Court approved the legality of the aforementioned MO.[426] With respect to the TEE, the Respondent refers to Article 50 of Royal Decree

---

[419] MoPO, ¶¶390-396.
[420] Ibid., ¶¶397-408.
[421] Ibid., ¶¶409-448.
[422] Ibid., ¶¶412-414.
[423] Ibid., ¶¶427-440.
[424] RjoJ, ¶¶120-125.
[425] Act 15/2012 (C-372/R-0030), Article 1.
[426] MoPO, ¶¶415-425.

1/2013 of Castile and León, which explicitly denotes the TEE as a "*tax*".[427] In addition, the Respondent submits that the taxation nature was confirmed by the Superior Court of Justice of Castile and León when it ruled that Order HAC/184/2012 introducing the applicable tax form was legal.[428]

450    The Respondent further submits that even if the legal nature of the TVPEE and the TEE were governed by international law, they would still qualify as taxes. In this regard, the Respondent refers in particular to *EnCana v. Ecuador*, whereby a tax is introduced by law and creates a liability for classes of persons to pay money to the State for public purposes.[429] The Respondent contends that the TVPEE and the TEE meet these criteria. In particular, the Respondent submits that the public purpose is to create income to be included in the general budget of the Spanish State or of Castile and León, respectively.[430] Moreover, the Respondent asserts that the EC confirmed the tax nature of the TVPEE,[431] while the Court of Justice of the European Union confirmed that a measure materially identical to the TEE (imposed in another autonomous community of the Respondent) constituted a direct tax.[432]

451    In addition, the Respondent submits that its position on the taxation nature of the TVPEE was shared by the tribunal in *Isolux v. Spain*.[433]

452    The Respondent opposes the Claimant's view that one must further assess whether the TVPEE and TEE are *bona fide* taxation measures. The Respondent argues that such a test was only applied in *Yukos v. Russia*, which award however was quashed and, in any event, was based on extraordinary circumstances not present in the instant case, namely actions taken under the guise of taxation to destroy a company or eliminate a political opponent.[434] Moreover, the Respondent submits that the Claimant's assessment of the economic effects of the TVPEE and the TEE is irrelevant, given that in *EnCana v. Ecuador* it was held that what counts is the legal operation, not the economic effect of the measures in question.[435] In addition, the Respondent contends that both the TVPEE and the TEE are *bona fide* taxation measures anyway.[436] In particular, the fact that an amount equivalent to that levied through the TVPEE is used to finance the costs of the SES does not call into question that the TVPEE is levied to finance public expenses, given the public interest in a sustainable

---

[427] Regional Legislative-Decree 1/2013, of 12 September 2013, approving the Restated Text of Tax Provisions of Castile and León (C-0376/R-0031), Article 50(1) and (3).

[428] Ibid., ¶¶445-448; RoJ, ¶¶178-181.

[429] RoJ, ¶¶143-145, referring to *EnCana Corporation v. Republic of Ecuador*, LCIA Case No. UN 3481, Award, 3 February 2006 (RL-0050) ("***Encana v. Ecuador***"), ¶142; *Duke Energy Electroquil Partners & Electroquil S.A. v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008 (CL-0113/RL-0090) ("***Duke Energy v. Ecuador***"), ¶174; *Burlington v. Ecuador*, ¶¶ 164f.

[430] RoJ, ¶¶150-162, 186-191.

[431] Ibid., ¶¶163-171.

[432] R-PHB, ¶¶46f.

[433] RoJ, ¶¶264-269, referring to *Isolux v. Spain*, ¶¶739-741.

[434] RoJ, ¶202, referring to *Yukos Universal Limited (Isle of Man) v. Russian Federation*, PCA Case No. AA 227, Final Award, 18 July 2014 (CL-0140/RL-0092) ("***Yukos v. Russia*** (**Final Award**)"), ¶1407.

[435] RoJ, ¶203, referring to *EnCana v. Ecuador*, ¶142.

[436] RoJ, ¶¶206-263.

electricity system.[437] Furthermore, the Respondent maintains that the TVPEE does not discriminate against renewable energy producers: First, it applies to renewable and conventional energy producers alike.[438] Secondly, while only conventional energy producers are able to pass the TVPEE on to consumers, the TVPEE is one of the costs that are remunerated to renewable producers through the Specific Remuneration, thus neutralizing the economic effect of this tax,[439] in addition to its being tax-deductible for the purposes of Spanish corporate tax.[440]

453     Furthermore, the Respondent argues that the Claimant cannot invoke most favoured nation ("**MFN**") treatment via the clawback provision of Article 21(3) ECT. The Respondent refers to the Energy Charter Secretariat's "*Reader's Guide*" to the ECT ("**ECT Reader's Guide**")[441], according to twhich the clawback is limited to indirect taxes, and asserts that neither the TVPEE nor the TEE are indirect taxes. Instead, the Respondent contends that the TVPEE is a tax on income, noting in particular that under the definition of Article 21(7)(b) ECT, it is irrelevant whether it is the gross or net income that is being taxed.[442] As to the TEE, the Respondent asserts that it is a tax on capital because the taxable event is the ownership of a wind turbine and, thus, the ownership of capital.[443]

454     Finally, the Respondent submits that even if Article 21(3) ECT were applicable, this would still not afford MFN treatment to Claimant in respect of the TVPEE and the TEE. In the Respondent's view, this follows from Article 21(3)(a) ECT, which excludes MFN treatment related to any obligations "*with respect to advantages accorded by a Contracting Party pursuant to the tax provisions of any [...] agreement [...] described in subparagraph (7)(a)(ii)*". In turn, Article 21(7)(a)(ii) ECT refers to any international agreement to which Respondent is bound. The Respondent contends that the BITs that the Claimant seeks to invoke through the MFN clause are international agreements within the meaning of Article 21(7)(a)(ii) ECT and, therefore, fall under the exclusion of Article 21(3)(a) ECT.

## 2.     The Claimant's Principal Arguments

455     The Claimant argues that the TVPEE and TEE are not in fact *bona fide* taxation measures, but rather a cut on remuneration introduced under the guise of taxation, and therefore do not fall within the scope of the taxation carve-out provided for in Article 21(1) ECT.

456     Specifically, the Claimant submits that according to Spanish general taxation legislation, a tax aims at yielding revenue to finance public expenses, and is levied on transactions, acts

---

[437] Ibid., ¶239.
[438] Ibid., ¶¶208-220.
[439] Ibid., ¶¶228-233, referring in particular to section III of the Explanatory Memorandum to MO IET/1045/2014 (R-0115) ("other costs [...] are taken into account including [...] the [TVPEE]").
[440] RoJ, ¶234.
[441] Energy Charter Secretariat, The Energy Charter Treaty: A Reader's Guide, June 2002 (CL-0025/RL-0067).
[442] RoJ, ¶¶281-283.
[443] Ibid., ¶¶284-286.

or events that evidence taxpayers' economic capacity.[444] According to Claimant, neither of these two essential features of a tax is present for the TVPEE or the TEE.

457    As to the TVPEE, the Claimant asserts that the purpose of this measure is not to finance public expenses, but to impose on producers of electricity the obligation to reduce the tariff imbalance in the SES, which is to be distinguished from the State itself.[445] Moreover, the Claimant argues that the TVPEE does not charge economic capacity, but rather the amount of electricity produced, without any regard to profits or losses stemming from this activity.[446] In addition, the Claimant contends that the TVPEE does not serve the environmental purpose for which it was allegedly introduced, inter alia because it charges all electricity producers in the same way, irrespective of the impact that each technology has on the environment; instead, according to Claimant, contemporary statements by the Minister of Energy confirm that the TVPEE has the same effect as a retroactive cut in the remuneration that renewable energy producers were previously entitled to.[447] Moreover, the Claimant asserts that the TVPEE discriminates against renewable energy producers because, contrary to producers of conventional energy, they cannot pass this extra cost on to consumers because of the mandatory Regulated Tariff applicable as of 1 January 2013; according to the Claimant, the Respondent has failed to demonstrate that the TVPEE is compensated for as part of the Specific Remuneration, in particular because the remuneration is calculated not based on the actual costs of each facility, but rather based on hypothetical costs of standard facilities.[448]

458    Also, the Claimant argues that contrary to the Respondent's suggestion, neither the EC nor the Spanish Constitutional Court ratified the nature of the TVPEE as a tax.[449] In particular, the Spanish Constitutional Court merely rejected a constitutional challenge against the TVPEE based on narrow grounds invoked by the applicant in that case, while at the same time the Spanish Constitutional Court did in fact raise doubts as to the compatibility of the TVPEE with the Spanish Constitution on other grounds, namely that the TVPEE is levied on gross revenues and that it is disconnected from its alleged environmental purpose.[450]

459    With respect to the TEE, the Claimant argues that its purpose is likewise not of an environmental nature, as claimed by the government of Castile and León. Rather, it is meant to provide further income to the SES, meaning that also the TEE does not finance public expenses.[451] The Claimant contends that the TEE is thus nothing but a retroactive cut in the remuneration to wind farms.[452]

460    Moreover, the Claimant submits that even if the TVPEE and TEE were *bona fide* taxation measures, the Tribunal would still have jurisdiction over them because they would fall

---

[444] MoM, ¶589.
[445] Ibid., ¶¶591-611.
[446] Ibid., ¶¶612-616.
[447] Ibid., ¶¶617-621; CMoJ, ¶¶301-310.
[448] MoM, ¶¶625-630.
[449] RjoJ, ¶117.
[450] Ibid., ¶118.
[451] MoM, ¶¶664-679; CMoJ, ¶¶313-316.
[452] MoM, ¶681.

under the clawback provided for in Article 21(3) ECT, which obliges the Respondent to afford MFN treatment under Article 10(7) ECT in relation to taxes *"other than those on income or on capital"*. Via certain BITs to which the Respondent is a party, the MFN treatment allows the Claimant to invoke, in respect of the TVPEE and TEE, the very standards that it relies on under Article 10(1) ECT.[453]

461    Contrary to the Respondent's argument, the Claimant contends that for the purposes of Article 21(3) ECT, the distinction between direct or indirect taxes is irrelevant, and that the ECT Reader's Guide does not exclude direct taxes from falling under Article 21(3) ECT.[454]

462    The Claimant submits that the TVPEE is not a tax on income because it is levied on gross revenues, while according to the OECD taxes on income are charged on net income.[455] Per the Claimant, this position of the OECD is highly relevant because the definition in Article 21(7)(b) ECT mirrors the definition of *"taxes on income and on capital"* in the OECD Model Tax Convention.[456] Moreover, the Claimant notes that the Respondent's double taxation treaties cover taxes levied on gross revenues only in case of entities without a taxable presence in Spain, while the TVPEE is levied on gross revenues of entities that do have a taxable presence in Spain.[457]

463    Likewise, the Claimant asserts that the TEE is not a tax on capital because it is levied on the mere ownership of a wind farm and is calculated based on the installed capacity, regardless to the owner's capital, income, or the market value of the wind farm.[458] Furthermore, according to the Claimant, the TEE is different from any of the examples of taxes on income or capital that are mentioned in Article 21(7)(b) ECT.[459]

464    Moreover, the Claimant opposes the Respondent's argument that Article 21(7)(a)(ii) ECT results in the inapplicability of the clawback provision of Article 21(3) ECT. The Claimant contends that Article 21(7)(a)(ii) ECT excludes MFN treatment only for *"tax provisions"* in international treaties. However, none of the BITs relied on by Claimant includes any such tax provisions.[460]

465    Finally, the Claimant submits that *Isolux v. Spain* does not support the Respondent's position. First, *Isolux v. Spain* accepted that Article 21(1) ECT applies only to *bona fide* taxation measures and that this requires, in particular, that the purpose is to raise revenue

---

[453] CMoJ, ¶¶329-330; RoM, ¶¶1146, 1220, 1394, 1413; RjoJ, ¶151.

[454] RjoJ, ¶¶139f.

[455] CMoJ, ¶¶321-325, referring to OECD, Factbook 2014: Economic, Environmental and Social Statistics 6 May 2014 (CL-0225), Section Government – Taxes – Total tax revenue – Definition ("Taxes on incomes and profits cover taxes levied on the net income or profits (gross income minus allowable tax reliefs) of individuals and enterprices. [...]").

[456] RjoJ, ¶137, referring to the OECD 1992 Model Tax Convention on Income and on Capital of 1 September 1992 (CL-0226), Article 2(2) ("There shall be regarded as taxes on income and on capital all taxes imposed on total income, on total capital, or on elements of income or of capital, including taxes on gains from the alienation of movable or immovable property, taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation").

[457] C-PHB, ¶¶34-36.

[458] CMoJ, ¶327; RjoJ, ¶¶142-145.

[459] C-PHB, ¶40.

[460] RjoJ, ¶¶146-150.

for the State. Contrary to the claimant in *Isolux v. Spain*, the Claimant asserts that it has established that the TVPEE does not pursue the objective of raising revenue for public purposes. Secondly, as the claimant in that case did not invoke MFN treatment via Article 21(3) ECT, *Isolux v. Spain* did not make any finding in this regard.[461]

### 3.   The Tribunal's Analysis

466   Article 21 ECT reads, in relevant part, as follows:

> "(1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. […]
>
> […]
>
> (3) Article 10(2) and (7) shall apply to Taxation Measures of the Contracting Parties other than those on income or on capital, except that such provisions shall not apply to:
>
> > (a) impose most favoured nation obligations with respect to advantages accorded by a Contracting Party pursuant to the tax provisions of any convention, agreement or arrangement described in subparagraph (7)(a)(ii) […]
>
> […]
>
> (5) (a) Article 13 shall apply to taxes. […]
>
> […]
>
> (7) For the purposes of this Article:
>
> > (a) The term "Taxation Measure" includes:
> >
> > > (i) any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof […]; and
> > >
> > > (ii) any provision relating to taxes of […] any other international agreement or arrangement by which the Contracting Party is bound.
> >
> > (b) There shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation."

467   As a preliminary matter, the Tribunal notes that the Respondent's Objection C is limited to the Claimant's assertion of a breach of Article 10(1) ECT, while it does not apply to the alleged breach of Article 13 ECT.[462] This is consistent with Article 21(5) ECT, which makes clear that Article 13 ECT does apply to taxation measures.

468   Accordingly, it is for the Tribunal to determine whether the tax carve-out in Article 21(1) ECT deprives the Tribunal of jurisdiction over the asserted breach of Article 10(1) ECT as regards the TVPEE and TEE. This presupposes that (i) the TVPEE and TEE are "*Taxation Measures*" within the meaning of Article 21(1) ECT, (ii) neither of the two measures is removed from the scope of the tax carve-out based on an abuse of rights and (iii) the claw-

---

[461] RjoJ, ¶¶127-132.
[462] In respect of Article 13 ECT, Respondent merely raised an objection to admissibility in its Objection D, see section D. *infra*.

back of Article 21(3) ECT does not, in conjunction with Article 10(7) ECT and other Spanish BITs, bring the TVPEE and TEE back under protections in those BITs that are corresponding to Article 10(1) ECT. Each of these three requirements will be dealt with in turn in subsections a. to c. *infra*.

### a.    TVPEE and TEE as "Taxation Measures"

469    The definition of the term "*Taxation Measures*" in Article 21(7)(a)(i) ECT has two elements. First, the measure in question must be a provision of the domestic law of the Contracting Party or a political subdivision thereof. Secondly, such provision must relate to taxes.

470    The Tribunal has no doubt that the first element of the definition is met for both the TVPEE and the TEE. The legislation introducing the TVPEE (Articles 1-11 of Law 15/2012) consist of provisions of the domestic law of the Respondent, i.e. the Contracting Party. Similarly, the legislation introducing the TEE (Articles 19-25 of Regional Act 1/2012) consist of provisions of the domestic law of Castile and León, which is a political subdivision of the Respondent. While the Claimant raises doubts as to the constitutionality of the TVPEE, it does not specifically argue that the relevant provisions of domestic law are a legal nullity. Even if such argument had been made, the Tribunal does not see itself in a position to make such finding based on the record before it.[463] In particular, the Tribunal notes that the Spanish Constitutional Court rejected a constitutional challenge against the TVPEE.[464] While it is true that in a subsequent judgment, the Court "*raise*[d] *the question of unconstitutionality*",[465] this question was left undecided. Such *obiter dictum* is not sufficient for the Tribunal to be satisfied that the TVPEE does in fact violate the Spanish Constitution. Much less is it sufficient for the Tribunal to find that the relevant provision of domestic law is null and void (so that the TVPEE is no longer based on a provision of domestic law), given that laws passed by Spanish parliament are valid, from a Spanish law perspective, unless and until declared unconstitutional by the Spanish Constitutional Court,[466] which has not happened.

471    With respect to the second element of the definition in Article 21(7)(a)(i) ECT, the Parties disagree as to how the Tribunal should ascertain whether the provisions of domestic law introducing the TVPEE and the TEE are related to taxes. The Tribunal finds that it can

---

[463] This finding is in line with *9REN Holding S.À.R.L. v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019 (CL-0303) ("*9REN v. Spain*"), ¶198; *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability, and certain Issues of Quantum, 30 December 2019 (CL-0310/RL-0125) ("*RWE Innogy v. Spain*"), ¶385.

[464] Spanish Constitutional Court, Judgment of 6 November 2014, Case 1780/2013 (R-0043).

[465] See Spanish Constitutional Court, Judgment of 14 June 2016, Case 2554/2014 (C-0602), p. 5 of the PDF; Spanish Constitutional Court, Judgment of 14 June 2016, Case 2955/2014 (C-0602), p. 6 of the PDF.

[466] See Organic Law 6/1985 on the Judiciary (R-0066), Article 5(2).

leave this question undecided because both the TVPEE and the TEE qualify as taxes under any of the standards advanced by the Parties.[467]

472    From the perspective of Spanish law, the Tribunal finds that the TVPEE and the TEE do have all necessary characteristics of a tax.

473    First, the legislation introducing these measures explicitly refers to them as taxes and provides for tax forms to be filled out in relation thereto. In and of itself, this is a strong indication that the TVPEE and TEE are in fact taxes under Spanish law – irrespective of the fact that framing a measure as a tax under domestic law could be an abuse of rights under international law, which is a different question and will be dealt with in section b. *infra*.

474    Secondly, the Spanish Constitutional Court dismissed a constitutional challenge against the TVPEE, while the Spanish High Court approved the legality of the Ministerial Order introducing the respective tax form and the Superior Court of Justice of Castile and León dismissed a challenge against a tax form relating to the TEE. In doing so, none of these Spanish courts raised any doubts as to the tax nature of the TVPEE or TEE, respectively. Quite the contrary, considering that the Spanish Constitutional Court specifically referred to the TVPEE as a "*tax*".[468]

475    Thirdly, as per both Parties' submission on Spanish general taxation legislation, a tax in Spain is characterized by two elements, namely aiming at yielding revenue to finance public expenses and being levied on transactions, acts or events that evidence taxpayers' economic capacity. Contrary to Claimant's position, the Tribunal has no doubt that these two elements are in fact met in case of the TVPEE and TEE.[469] Both measures clearly aim at yielding revenue to finance public expenses, irrespective of whether these expenses are incurred by the SES or in the protection of the environment. Also, as they are tied to the amount of electricity transmitted into the grid (TVPEE) or to the capacity to produce energy (TEE), both measures undoubtedly are levied as a function of the economic capacity

---

[467] The taxation nature of the TVPEE has been confirmed also in *Isolux v. Spain*, ¶722; *Eiser v. Spain*, ¶266; *Novenergia v. Spain*, ¶519; *Foresight/Greentech v. Spain*, ¶¶256, 258; REEFF, ¶185; *NextEra v. Spain*, ¶372; *9REN v. Spain*, ¶198; *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Award, 31 July 2019 (CL-0305) ("*SolEs v. Spain*"), ¶272; *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Award, 6 September 2019 (CL-0307) ("*Operafund v. Spain*"), ¶404; *BayWa v. Spain*, ¶297; *InfraRed Environmental Infrastructure GP Limited et al. v. Kingdom of Spain*, ICSID Case No. ARB/14/12, Award, 2 August 2019 (CL-0306/RL-0165) ("*InfraRed v. Spain*"), ¶301; *RWE Innogy v. Spain*, ¶¶385f.; *Stadtwerke München GmbH et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019 (CL-0308/RL-0128) ("*Stadtwerke München v. Spain*"), ¶171.

[468] See Spanish Constitutional Court, Judgment of 6 November 2014, Case 1780/2013 (R-0043), ¶3, in particular the penultimate paragraph thereof; see also Spanish Constitutional Court, Judgment of 14 June 2016, Case 2554/2014 (C-0602), ¶5.4; Spanish Constitutional Court, Judgment of 14 June 2016, Case 2955/2014 (C-0602), ¶5.4; see also *BayWa v. Spain*, ¶301.

[469] Same view *Operafund v. Spain*, ¶404.

of energy producers.[470] After all, the more electricity is or can (due to capacity) be sold, the more income is or can be generated.

476    If one instead treats the question of whether the TVPEE and TEE are taxes as a question of international law, the Tribunal comes to the same result. In this regard, the Tribunal endorses the test developed in *EnCana v. Ecuador* and employed by numerous other tribunals, i.e. whether the measure at stake is imposed by law and creates a liability for classes of persons to pay money to the State for public purposes.[471] There is no doubt in the Tribunal's mind that all requirements of this test are met. First, as per above, both the TVPEE and the TEE were imposed by law. Secondly, they create a liability for all energy producers (i.e. a class of persons) to pay money to the State (the Respondent or its subdivision Castile and León). Thirdly, this is done for a public purpose (whether it be the protection of the environment or the financing of the electricity deficit, see on this issue ¶481 *infra*).

**b.    Abuse of rights**

477    The Tribunal agrees with *Antin v. Spain* that

> if a measure bears the hallmarks of a tax under the applicable domestic law and under the general approach taken by international law, it is very likely that the measure will be excluded by operation of ECT Article 21. However, in exceptional circumstances a measure that bears such hallmarks could not benefit from the taxation exclusion if a claimant is able to demonstrate a lack of good faith on the part of the respondent.[472]

478    In other words, the tax carve-out of Article 21(1) ECT applies only to *bona fide* taxation measures[473] and therefore does not apply if the respondent State commits an abuse of rights by framing the measure at stake as a tax.[474]

479    However, in line with well-settled jurisprudence on this issue, the Tribunal finds that there is a presumption that the TVPEE or TEE were enacted as *bona fide* taxation measures and that it is for the Claimant to disprove this presumption.[475] In the words of *Isolux v. Spain*, this requires the Claimant to establish that the TVPEE and TEE were "*not enacted with the purpose of raising revenue for the State but with a different purpose*".[476] This is a very high

---

[470] The Tribunal notes that in relation to the TVPEE, also the Spanish Constitutional Court explicitly found that the taxable amount is the "*economic value*" of the energy produced, see its Judgment of 14 June 2016, Case 2554/2014 (C-0602), ¶5.3.

[471] *EnCana v. Ecuador*, ¶142. Followed, e.g., by *NextEra v. Spain*, ¶372; *Operafund v. Spain*, ¶404; *BayWa v. Spain*, ¶299; see also *Eiser v. Spain*, ¶266; *9REN v. Spain*, ¶195; *Stadtwerke München v. Spain*, ¶166.

[472] *Antin v. Spain*, ¶314.

[473] As per *Yukos v. Russia* (Final Award), ¶1407; *Isolux v. Spain*, ¶729; *Novenergia v. Spain*, ¶¶520f.; *Antin v. Spain*, ¶314; left open in *Eiser v. Spain*, ¶269; *Foresight/Greentech v. Spain*, ¶259; *RWE Innogy v. Spain*, ¶¶388f. (indicating doubts); apparently contra *Stadtwerke München v. Spain*, ¶170 *in fine*, but see also ¶174.

[474] *Watkins v. Spain*, ¶269, referring to *RosInvest v. Russia*, ¶628.

[475] *Isolux v. Spain*, ¶734; *Novenergia v. Spain*, ¶521; *RREEF v. Spain I*, ¶186; *InfraRed v. Spain*, ¶302; *Watkins v. Spain*, ¶270; see also *Antin v. Spain*, ¶¶315, 317.

[476] *Isolux v. Spain*, ¶734 [as per the Claimant's translation; the Respondent's translation is identical in substance].

bar.[477] It requires the Claimant to prove "*extraordinary*"[478] or "*exceptional*"[479] circumstances that evidence an "*extreme purpose*"[480] or "*egregious abuse of tax power*"[481], such as a pattern of behaviour aimed at destroying the investor[482] or at least the investment. This very stringent requirement is due to the fact that States have a wide latitude in imposing and enforcing taxation laws, and that it is not for the Tribunal to substitute the Respondent's policy choices with its own political propositions on how to micromanage the Respondent's tax policy.[483]

480   For the following reasons, and on the basis of the evidence before it, the Tribunal finds that the Claimant did not succeed in crossing this high evidentiary threshold.[484]

481   First, while the Tribunal agrees with the Claimant that there are some question marks as to whether the stated objective of the TVPEE and the TEE, namely to protect the environment, could in fact be achieved by these taxes given the way they are designed,[485] this does not of itself suffice to constitute an abuse of rights. As a starting point, the Tribunal does not find it impossible that an indirect environmental purpose can in fact be attained, in particular because the amounts raised via the TVPEE and the TEE[486] help covering the costs of the SES, of which subsidies to renewable energy producers form a significant part.[487] Moreover, even if the TVPEE and TEE did not serve any environmental purpose and their real objective was the one asserted by the Claimant, namely to finance the Tariff Deficit, this would not help the Claimant's case. After all, financing the SES is undoubtedly a public purpose, which is therefore open to tax financing, without this evidencing any *mala fide* intentions on the part of Respondent.[488] Also, the Tribunal notes that the TVPEE and TEE flow directly to the State treasury before an equivalent amount is appropriated by the State budget to a specific purpose (be it financing the SES or addressing

---

[477] *Novenergia v. Spain*, ¶522; *Masdar v. Spain*, ¶291; *Antin v. Spain*, ¶317; *SolEs v. Spain*, ¶273; *Watkins v. Spain*, ¶270.

[478] *SolEs v. Spain*, ¶273.

[479] *Antin v. Spain*, ¶314.

[480] *Isolux v. Spain*, ¶739.

[481] *Watkins v. Spain*, ¶272.

[482] *Eiser v. Spain*, ¶270; *BayWa v. Spain*, ¶305.

[483] See *RosInvest v. Russia*, ¶574; *RREEF v. Spain I*, ¶190; *Cube v. Spain I*, ¶231; *9REN v. Spain*, ¶203; see also *Stadtwerke München v. Spain*, ¶169.

[484] Rulings to the same effect were made in all other cases on the record in which a *mala fide* argument was mounted against the TVPEE: *Isolux v. Spain*, ¶¶735-739; *Eiser v. Spain*, ¶¶269-271; *Antin v. Spain*, ¶¶317-322; *RREEF v. Spain I*, ¶188; *Cube v. Spain I*, ¶¶224-228; *SolEs v. Spain*, ¶¶274-276; *Cavalum v. Spain*, ¶¶393-395; *FREIF v. Spain*, ¶¶373-378; *Masdar v. Spain*, ¶291; *Novenergia v. Spain*, ¶524; *Foresight/Greentech v. Spain*, ¶259; *BayWa v. Spain*, ¶305f.; *InfraRed v. Spain*, ¶300; *RWE Innogy v. Spain*, ¶393.

[485] See *Isolux v. Spain*, ¶739; *BayWa v. Spain*, ¶305; *Masdar v. Spain*, ¶291.

[486] While, initially, the TEE was meant to finance energy efficiency programs (and, thus, more directly served an environmental purpose), it was later allocated to a fund to finance a regional surcharge to the electricity tolls of Law 54/1997, see ¶¶208 and 209 *supra*.

[487] As noted also by *9REN v. Spain*, ¶202.

[488] *Isolux v. Spain*, ¶740; *Masdar v. Spain*, ¶293; *Cube v. Spain I*, ¶231; *9REN v. Spain*, ¶203; *BayWa v. Spain*, ¶306; *InfraRed v. Spain*, ¶305; *Stadtwerke München v. Spain*, ¶174; *Watkins v. Spain*, ¶273.

adverse environmental effects). Contrary to what the Claimant seems to suggest,[489] the Tribunal agrees with *9REN v. Spain* that this is

> the normal function of a budget, and there is nothing inherently improper or unusual in making a budget appropriation in support of the electricity system.[490]

482    Secondly, it is irrelevant whether the same economic effect could have been achieved by a cut on remuneration.[491] As per *Encana v. Ecuador*, an economic analysis of a measure should not displace a finding that a measure is a tax as a matter of law.[492] Moreover, even if the TVPEE and TEE have the commercial effect of reducing the Claimant's revenue, that is the effect of virtually any tax and cannot be a proper factual basis for the inference that the Respondent acted *mala fide*.[493]

483    Thirdly, for the same reason, the Tribunal does not consider that *mala fides* is evidenced by the Minister of Energy openly acknowledging this fact, i.e. that the commercial effect of the TVPEE is functionally equivalent to a tariff cut.[494] Also, should the Claimant's suggestion be that the Respondent was aware that a tariff cut would not have been permissible under the ECT, and chose for this reason to achieve the same result by introducing the TVPEE,[495] the Minister of Energy's statements do not lend any support to such theory. To begin with, the Minister of Energy making such statements in public is hardly consistent with there being a motive to dissimulate.[496] In addition, such theory presupposes that RF1 could not be altered, that the Respondent so knew and that it therefore knowingly framed a tariff cut as a tax in order to circumvent Article 10(1) ECT. In this regard, the Tribunal notes and agrees with *Masdar v. Spain* that:

> that proposition itself presupposes that the dispute between the Parties as to the nature of the commitments made by Respondent is not a good faith dispute and that Respondent's conduct is tainted with bad faith. That is not a leap that the Tribunal is prepared to make.[497]

484    Fourthly, neither the TVPEE nor the TEE aim specifically at the Claimant or even at foreign investors in general.[498] Also, contrary to the Claimant's assertion, the TVPEE does not seem to discriminate against renewable energy producers because it is levied also on conventional producers. While renewable energy producers may not be able to pass on the tax to consumers since the Pool Price Plus Premium option was abolished, the Tribunal accepts that TVPEE is an operating cost taken into account in the Specific Remuneration[499]

---

[489] CMoJ, ¶313; RjoJ, ¶¶116, 125.

[490] *9REN v. Spain*, ¶202.

[491] Same view *NextEra v. Spain*, ¶372; see also *9REN v. Spain*, ¶203.

[492] *EnCana v. Ecuador*, ¶142. Followed inter alia by *Foresight/Greentech v. Spain*, ¶258; *BayWa v. Spain*, ¶299; *InfraRed v. Spain*, ¶306.

[493] Same view *Cube v. Spain I*, ¶244; *9REN v. Spain*, ¶204.

[494] See also *Eiser v. Spain*, ¶269; *Antin v. Spain*, ¶319.

[495] Cf. CMoJ, ¶¶297, 311; RjoJ, ¶115.

[496] *RWE Innogy v. Spain*, ¶392.

[497] *Masdar v. Spain*, ¶292; see also *9REN v. Spain*, ¶205; *RWE Innogy v. Spain*, ¶392; *Eiser v. Spain*, ¶269; *Cube v. Spain I*, ¶227.

[498] Same view for the TVPEE: *Stadtwerke München v. Spain*, ¶174.

[499] As seems to be acknowledged also in Brattle's Memorandum of 5 August 2020, ¶39.

and a deductible expense for corporate tax purposes. This suggests that the impact of the TVPEE is either neutralized entirely or, in case of discrepancies between Respondent's operating assumptions for standard facilities and the operation of actual facilities,[500] at least significantly diminished.[501] Even if the TVPEE or TEE had a greater effect on renewable energy producers, this would not change their character as a *bona fide* tax because, as held in *Cube v. Spain*, there is

> no reason why producers of renewable energy should not be treated as a distinct class for the purposes of taxation, just as they were treated as members of a distinct class for the purposes of the Special Regime and its attendant benefits.[502]

485    Finally, the Tribunal wishes to emphasize that the TVPEE and TEE are not in any way comparable to the extreme cases that the tribunals in *Yukos v. Russia* or *RosInvest v. Russia* found they were faced with, namely State measures aimed at destroying investments or investors under the guise of taxation.[503]

### c.    Claw-back of Article 21(3) ECT

486    Given that the TVPEE and TEE therefore fall under the tax carve-out of Article 21(1) ECT, the Tribunal could assume jurisdiction over these measures (other than in relation to Article 13 ECT) only if the claw-back of Article 21(3) ECT applied and referred the Tribunal, via the MFN treatment of Article 10(7), to other investment treaties through which Spain accorded protection to foreign investors also in respect of taxation measures.

487    To begin with, the Tribunal agrees with the Claimant that the BIT provisions it relies on do not fall under the exclusionary provision of Article 21(3)(a) ECT because, contrary to the Respondent's argument, those BIT provisions are not "*tax provisions*" as required by Article 21(3)(a) ECT. Rather, they are provisions that guarantee fair and equitable treatment, respect of obligations entered into by Spain (umbrella clauses), full protection and security as well as non-impairment.[504]

488    However, the plain wording of Article 21(3) ECT makes clear that the claw-back requires that the TVPEE and TEE are taxes "*other than* […] *on income or on capital*". As it is the Claimant who seeks to invoke Article 21(3) ECT, the burden is on the Claimant to establish that this requirement is met. On the basis of the evidence before it, the Tribunal is not satisfied that the Claimant has discharged this burden.

---

[500] Cf. BRR II, ¶¶263-265; see, however, also Brattle's Memorandum dated 5 August 2020, ¶39 ("The Remuneration under the New Regulatory Regime included explicit compensation for the 7% TVPEE, which effectively 'Neutralized' the impact of the 7% TVPEE.")

[501] See MO IET/1045/2014 (C-0388/R-0115), Section III of the Preamble; Corporation Tax Act 27/2014 of 27 November 2014 (R-0421), Art. 15; Directorate-General for Taxation, Response of 23 December 2014 to Binding Tax Consultation V3371-14 (R-0401). The TVPEE was found to be neutralized in *Eiser v. Spain*, ¶272; *Operafund v. Spain*, ¶404; see also *InfraRed v. Spain*, ¶307; *RWE Innogy v. Spain*, ¶391.

[502] *Cube v. Spain I*, ¶230; see also ibid., ¶225.

[503] Same view in relation to the TVPEE: *Masdar v. Spain*, ¶285; *Antin v. Spain*, ¶322; *BayWa v. Spain*, ¶305.

[504] See the references to those BIT provisions in RoM, ¶¶1146, 1220, 1394, 1413.

489   In relation to the TVPEE, the Claimant argues that it is not a tax on income because it is levied on gross revenue rather than on profit. The Tribunal is not convinced by this argument. Pursuant to the definition in Article 21(7)(b) ECT:

> There shall be regarded as taxes on income or on capital all taxes imposed on <u>total</u> income, on total capital or on elements of income or of capital, including taxes on gains from alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation." (emphasis added)

490   Based on this definition, the Tribunal agrees with *NextEra v. Spain* that "[t]*here is no basis for assuming that the reference to income in Article 21(3) of the ECT was a reference to net income*".[505] Instead, the Tribunal has no hesitation in finding that the TVPEE is a tax on (total) income.[506]

491   Contrary to the Claimant's view, this is not changed by the fact that the OECD Model Tax Convention of 1992 contains a definition of "*taxes on income and on capital*" that is similar to Article 21(7)(b) ECT, and that the OECD Factbook of 2014 describes taxes on income as being levied on net income.[507] First, Article 21(7)(b) ECT is even broader than the OECD Model Tax Convention because it covers also "*substantially similar taxes*". Secondly, the Tribunal is not convinced that the OECD Factbook purports to give a general and exhaustive definition of "*taxes on income*"; instead, the sentence referred to by the Claimant merely seems to explain which types of taxes the OECD Factbook included in a statistic provided therein. Thirdly, while it may well be true that taxes on income are typically levied on net income, this does not mean that taxes levied on gross income are not taxes on income; in fact, the Tribunal finds it difficult to see any other category of taxes into which taxes on gross income could otherwise fall.

492   The Tribunal also fails to see how this analysis could be changed by the fact that the Respondent's double taxation treaties cover taxes levied on gross revenues only with respect to entities without a taxable presence in Spain (while the TVPEE applies only to entities with a taxable presence in Spain). If at all, this disproves the Claimant's argument that taxes on income are always levied on net income.

493   Finally, the Tribunal also agrees with *9REN v. Spain* that:

> there is nothing objectionable to a tax on revenue rather than profit. Multinational corporations can structure themselves to allocate profits to different jurisdictions to suit their corporate purposes, which may not align with the legitimate interest of the host country.[508]

494   Turning to the TEE, the Tribunal finds that it is a tax on capital because, as noted by the Respondent, the taxable event is ownership of capital, namely of a wind turbine. While the Claimant correctly points out that the tax base is the relevant facility's capacity rather than

---

[505] *NextEra v. Spain*, ¶383.
[506] Same view *NextEra v. Spain*, ¶383; *Operafund v. Spain*, ¶¶404, 413; *BayWa v. Spain*, ¶308; *InfraRed v. Spain*, ¶318.
[507] Same view *InfraRed v. Spain*, ¶315.
[508] *9REN v. Spain*, ¶201.

the amount invested into, the market value of, or the revenue generated by the relevant facility, the Tribunal does not find that this calls into question the TEE's nature as a tax on capital. Given the wide latitude of States to design their tax laws, the Tribunal finds nothing objectionable to the Respondent using a facility's capacity as a proxy for the value of the taxpayer's capital. After all, the capacity of a wind turbine determines the amount of energy it can produce, which in turn reflects its ability to generate revenue and, thus, directly impacts its market value. While other factors such as location or technical design of the turbine etc. will also play a role for the market value, the Tribunal does not consider that the Respondent deciding not to take such other factors into account for the tax base makes the TEE a tax other than on capital.

495    Consequently, the Tribunal finds that the claw-back of Article 21(3) ECT does not apply and that, therefore, the Tribunal has no jurisdiction over alleged breaches of the ECT (other than its Article 13) to the extent they rest on the TVPEE and TEE. It follows that the Tribunal upholds Objection C. As a result thereof, when referring on the merits to the Disputed Measures in the context of Article 10(1) ECT, this reference excludes the TVPEE and the TEE.

## D.    Objection D

496    In its Memorial on Preliminary Objections, the Respondent raised as "Objection G" the objection that the claim brought under Article 13 ECT against the TVPEE and TEE was inadmissible because the time limit provided for in Article 21(5)(b) ECT had not yet expired. Although the Respondent re-named this objection "Objection D" in its Reply on Preliminary Objections, it stated at the same time that this claim "*has become admissible*" due to the time limit having expired in the meantime.[509] Therefore, the Tribunal finds that the Respondent has effectively abandoned this objection and that it is thus not necessary for the Tribunal to make any ruling on it.

## E.    Objection E

## 1.    The Respondent's Principal Arguments

497    In the Respondent's view, the Tribunal does not have jurisdiction over the Claimant's claim for a tax gross-up, which is based on the Claimant's assertion that any amount awarded to the Claimant by this Tribunal would allegedly attract taxes in Luxembourg.

498    The Respondent submits that Article 21(1) ECT establishes a "*Tax Gross-Up carve-out*" by providing that the ECT does not create any rights or obligations with respect to taxation measures of the Contracting Parties. As Luxembourg is a Contracting Party, the Respondent argues that the ECT creates no obligation of the Respondent to compensate the Claimant for losses it may incur as a result of Luxembourg taxes.[510]

---

[509] RoPO, ¶11; see also ibid., ¶¶295-300.
[510] MoPO, ¶¶476-480; RoPO, ¶¶310-313.

499    In addition, the Respondent contends that holding it liable for taxation measures of Luxembourg would be contrary to Article 2 of the International Law Commission's Articles on Responsibility of States (the "**ILC Articles**"[511]), which requires conduct attributable to the State that is to be held liable.[512] In support of this argument, the Respondent refers to *Rusoro v. Venezuela*, which found as follows:

> In its Memorial and Reply, Rusoro sought indemnity in respect of any double taxation of the Award that may rise in Canada (or elsewhere), to the extent this liability would not have arisen had Venezuela observed its international commitments under the Treaty. This claim seems to have been abandoned in Rusoro's Post Hearing Brief. In any case, the claim lacks merit. Any tax liability arising under Canadian tax laws (or from any other fiscal regime, other than the Venezuelan), does not qualify as consequential loss arising from Venezuela's breach of the Treaty and does not engage Venezuela's liability.[513]

500    Finally, the Respondent invokes the "Monetary Gold" principle recognised by the International Court of Justice. In the Respondent's view, this principle should lead the Tribunal not to assume jurisdiction over the tax gross-up claim for two reasons. First, the Tribunal would otherwise need to pronounce itself on the authority of Luxembourg to subject the arbitral award to taxation, without taking into account that pursuant to Article 21(1) ECT, Luxembourg did not give its consent to arbitrate tax-related matters under the ECT. Secondly, Luxembourg was not invited to participate in this proceeding to defend its tax authority.[514]

## 2.    The Claimant's Principal Arguments

501    The Claimant argues that the Respondent should be estopped from raising this objection because it failed to raise it in at least one other ICSID case where a tax gross-up was requested.[515]

502    Moreover, the Claimant asserts that its claim for tax gross-up is not aimed at challenging any taxation measure, but rather intends to give effect to the principle of full reparation enshrined in international law. According to the Claimant, this principle is not affected by the tax carve-out in Article 21(1) ECT.[516]

---

[511] Annex to General Assembly resolution 56/83 of 12 December 2001, corrected by document A/56/49(Vol. I) / Corr.4 (CL-0027).

[512] MoPO, ¶481; RoPO, ¶¶318f.

[513] *Rusoro Mining Limited v. Venezuela*, ICSID Case No. ARB(AF)/12/5, Award, 22 August 2016 (CL-0258/RL-0094) ("***Rusoro v. Venezuela***"), ¶854 (footnote omitted), referred to in RoPO, ¶320.

[514] RoPO, ¶¶315-317, referring to *Chevron Corporation, Texaco Petroleum Company v. Republic of Ecuador*, PCA Case No. 2009-23, Third Interim Award on Jurisdiction and Admissibility, 27 February 2012 (RL-0093), ¶¶4.59-4.70.

[515] Claimant's Observations to Respondent's Request for Bifurcation, ¶278, referring to *InfraRed v. Spain*.

[516] CMoJ, ¶336; RjoJ, ¶153.

503    In addition, the Claimant submits that several arbitral tribunals, in particular *Siemens v. Argentina* and *Venezuela Holdings v. Venezuela*, have issued awards in which the amount of damages is calculated net of taxes.[517]

504    Furthermore, the Claimant contends that the "Monetary Gold" principle does not apply because the Tribunal would merely need to pronounce itself on whether any potential taxes that an award could attract in Luxembourg need to be borne by the Respondent, as opposed to the Claimant. As the Claimant would never have to face such taxes had it not been for the Respondent's wrongful acts, it is fair that the Respondent is the one who bears those expenses.[518]

505    Finally, the Claimant argues that the Respondent is confusing the concepts of an internationally wrongful act and its consequences. It is the wrongful act (the Disputed Measures), not its consequences (hypothetical taxes imposed in Luxembourg), that must be attributable to a State to hold it liable under international law. In accordance with the principle of full reparation, the consequences of the wrongful act must be fully compensated by the State to which the act is attributable.

**3.    The Tribunal's Analysis**

506    In the Tribunal's view, by stating that the ECT does not, in principle, create any rights or obligations in respect of taxation measures, Article 21(1) ECT merely provides that, subject to certain exceptions not relevant here, an investor cannot claim a breach of the ECT in relation to taxation measures.

507    Based on this understanding, the Tribunal finds that Claimant's claim for a tax gross-up does not fall within the scope of this tax carve-out in Article 21(1) ECT. This is because the claim for tax gross-up is not in fact based on the assertion that a Contracting Party's tax laws violate the ECT. Rather, the claim rests on the allegation that the Disputed Measures are in breach of the ECT. Except for the TVPEE and TEE, none of the Disputed Measures are taxation measures. Luxembourg's tax laws enter the picture solely on the level of quantum, namely as a fact that, according to Claimant, has an impact on the amount that needs to be awarded to it so that it is fully compensated for Respondent's alleged breaches of the ECT.[519]

508    For the same reason, ILC Article 2 does not prevent the Tribunal from assuming jurisdiction over the tax gross-up claim. Apart from it being doubtful whether this argument goes to the Tribunal's jurisdiction rather than the merits, it is the alleged wrongful act (i.e. the Disputed Measures) that must be attributable to the State to be held liable. Whether or

---

[517] RjoJ, ¶154, referring to *Siemens A.G. v. Argentine Republic*, ICSID Case No. ARB/02/8, Award, 6 February 2007 (CL-0138) ("***Siemens v. Argentina***"), ¶403; *Venezuela Holdings B.V. et al. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Award, 9 October 2014 (CL-0275/RL-0061) ("***Venezuela Holdings v. Venezuela***"), ¶389.
[518] RjoJ, ¶155.
[519] To same effect *PV Investors v. Spain II*, ¶860; *Operafund v. Spain*, ¶705.

not taxes levied by the investor's home State qualify as consequential losses is a matter of quantum and will be addressed in that context.[520]

509    Likewise, the Tribunal is not persuaded by the Respondent's argument that the "Monetary Gold" principle should lead it to deny jurisdiction over the tax gross-up claim. Contrary to the Respondent's suggestion, deciding on this claim will not require the Tribunal to pronounce itself on the legality or propriety of Luxembourg's taxation measures that may apply to any amount awarded by the Tribunal. Therefore, the Tribunal also fails to see why Luxembourg, which will not be affected by the Tribunal's award, should have been invited to submit its position in this regard.

510    Consequently, the Tribunal finds that neither Article 21(1) nor any other provision of the ECT or any principle of international law prevent the Tribunal from assuming jurisdiction over the Claimant's claim for tax gross-up.

## F.    Objection F[521]

### 1.    The Respondent's Principal Arguments

511    The Respondent argues that the Claimant does not have an investment for purposes of Article 1(6) ECT or Article 25 ICSID Convention. Under both treaties, according to the Respondent, the investment would have to be an investment in the "*objective or ordinary sense*".[522]

512    In the Respondent's view, under the ECT the existence of an investment in an objective sense would require the contribution of economic resources and the assumption of a risk. The essence of the ordinary meaning of "*investment*" involves an active behaviour, i.e. an action that consists of making a cash contribution with a view to obtaining a profit.[523] If the Claimant has not made economic contributions and has not assumed the risks inherent to the investment, it has not made an investment in an objective sense according to the Respondent.[524]

513    The Respondent points out that, for purposes of Article 25 of the ICSID Convention, an investment includes four elements, namely, a substantial contribution of funds, a certain duration, the assumption of risk and a contribution to the host State's development.[525]

---

[520] See section VIII.C.5 *infra*.
[521] This objection was initially named "Objection A" by the Respondent. However, it was later withdrawn (subsequent to which the Respondent re-labelled the old "Objection C" into "Objection A") and was finally revived, without any denomination, in reply to Procedural Order No. 13. For ease of reference, the Tribunal refers to this objection as "Objection F".
[522] MoPO, ¶¶22, 119, 205.
[523] Ibid., ¶126.
[524] Ibid., ¶136.
[525] Ibid., ¶¶137f.

514    According to the Respondent, this means that for an investment to exist, both the ECT and the ICSID Convention require at least a contribution of funds, a certain duration and the assumption of a risk.[526]

515    It is the Respondent's position that the Claimant has not made any investment under either treaty because it has not contributed any funds or assumed the risks inherent to an investment. Rather, the contribution of funds and the assumption of risk are attributable exclusively to Mr. Gómez, who decided to transfer his assets to a shell company in Luxembourg, namely the Claimant.[527]

516    In addition, the Respondent states that the Claimant's alleged investment must be restricted to its indirect stake in the capital of and the loans to the SPVs. It does not extend to the profitability or other assets of these Plants.[528]

517    Moreover, the Respondent posits that the Claimant does not indirectly own stakes in the capital or in the participating credit of the Wind Farms and CSP Plants because Article 1(6) ECT requires that assets be owned or controlled directly or indirectly by "*an Investor*". By using the singular for "*Investor*", the ECT indicates that there can only be one investor that indirectly owns the investment. Only the final element in the chain of ownership counts. The Claimant is a mere link in the chain of ownership which binds the assets to their final and true owner, Mr. Gómez. Therefore, the Claimant does not indirectly own the assets in question.[529]

518    Similarly, the Respondent contends that the only person who controls the alleged investment is Mr. Gómez, while the Claimant does not exercise *de facto* or *de jure* control.[530]

519    Furthermore, the Respondent claims that the Claimant is not an "*Investor*" under the terms of the ECT. Article 1(7)(a)(ii) speaks of "*a company or other organisation*". Under the definition in the dictionary of the Royal Academy of Spanish language, under EU law as well as under Luxembourg law, a company would be an organization that provides goods or services. An entity that merely holds shares in other companies is not a company.[531] This interpretation is supported by Article 17 ECT, denying the advantages of the ECT in the absence of substantial business activities. Article 17 does not use the term "*company or other organisation*" but the expression "*legal entity*". The Claimant does not have any material or human resources of its own, is not engaged in any economic activity and lacks a physical presence. Therefore, it is not a company or other organization in the sense of Article 1(7)(a)(ii) ECT and, consequently, is not an "*Investor*" for purposes of Article 1(7) ECT.[532]

---

[526] Ibid., ¶139.
[527] Ibid., ¶¶139-143.
[528] Ibid., ¶¶144-150.
[529] Ibid., ¶¶151-166.
[530] Ibid., ¶¶167-171.
[531] Ibid., ¶¶176-191.
[532] Ibid., ¶¶192-204.

520    For the Respondent it follows that the Claimant does not have an "*Investment*" under the ECT because it has not engaged in any investment activity in an objective or ordinary sense, it does not own or control, directly or indirectly, the assets, nor is it an "*Investor*" under Article 1(7).[533]

521    In its Reply on Preliminary Objections, the Respondent made the following statement:

> in view of the documentation in the proceeding and the disparity of arbitration criteria as regards the concept of investment, in this Reply on Jurisdiction the Kingdom of Spain partially withdraws from Preliminary Objection A of the Memorial on Preliminary Objections regarding the lack of investment. […] Preliminary Objection A of the Memorial of Preliminary Objections remains, however, in respect of the determination of the assets comprising the investment of the Claimant.[534]

522    The Respondent merged what remained of Objection A with Objection E, renumbered as Objection B (dealt with in section B. *supra*).

523    After the Hearing, in Procedural Order No. 13 of 19 December 2018, the Tribunal directed the following question No. 3 to the Parties:

> What precisely were the transactions whereby Renergy acquired the investments under dispute? Who owned or controlled the seller and the purchaser? What is the relevance, if any, of the Award in *KT Asia v. Kazakhstan* (17 October 2013), especially paragraphs 199-206, to this case?" (italics original)

524    The Respondent's Answer to the Tribunal's Post-Hearing Question No. 3[535] revives aspects of its original Preliminary Objection A. The Respondent points out that the Tribunal must verify its jurisdiction *ex officio* and that the burden to prove jurisdiction lies on the Claimant.[536]

525    The Respondent insists that the Claimant must establish that it has made an investment protected under the ECT and the ICSID Convention. It insists on an objective definition of investment which comprises a contribution of resources, duration and risk.[537]

526    In the Respondent's view, the Claimant has not made any contribution or allocation of resources. Mr. Gómez and not the Claimant is the real investor, the latter being a mere shell company without any kind of activity.[538]

527    The Wind Farms were commissioned and became operational in 2004 and 2007. At that time, the Claimant did not exist. It was only subsequently that the ultimate ownership of the Wind Farms was assigned to the Claimant. Mr. Gómez incorporated the Claimant on

---

[533] Ibid., ¶205.
[534] RoPO, ¶8.
[535] R-PHB, ¶¶50-84.
[536] Ibid., ¶¶50f.
[537] Ibid., ¶¶52f.
[538] Ibid., ¶¶54f.

5 November 2007 for the purpose of transferring the ownership of the investments. Mr. Gómez owns 100% of its share capital.[539]

528    The Respondent points out that the Claimant is a mere shell company without tangible or intangible assets except for the financial assets in the Spanish subsidiaries. It lacks ordinary revenue due to sales or revenues and has no employees. There is no evidence of payment by the Claimant for the acquisition of the corporate shares and loans.[540]

529    The Respondent presents a similar analysis of the Claimant's acquisition of the CSP investment. There is no evidence that the Claimant invested any amount for the acquisition of the stakes or loans. The alleged investment was a mere transfer of assets without any contribution of funds made by the Claimant. Mr. Gómez is not only the ultimate owner but also the party that has contributed the funds. In all relevant share transfers he represented both Parties.[541]

530    The Respondent relies on *KT Asia v. Kazakhstan*, where the Tribunal found that in the absence of a payment the investor had made no contribution with respect to its alleged investment. It would follow that the investment of the Claimant is in reality the investment of Mr. Gómez, who decided to transfer his assets to a shell company. Various transactions were made for the purchase, sale and assignment of assets with investees of Mr. Gómez without the Claimant ever having to make an effective contribution of funds. The Claimant's funds stem from Mr. Gómez, who funds the group companies by means of participating loans. The loans acquired by the Claimant were assigned by Mr. Gómez or other group companies.[542]

531    It follows for the Respondent that the Claimant has not made an investment and that the Tribunal lacks jurisdiction *ratione materiae* to hear the present dispute.[543]

## 2.    The Claimant's Principal Arguments

532    The Claimant points out that the Respondent conflates two separate issues: jurisdiction *ratione materiae* and jurisdiction *ratione personae*. It proceeds to address these two issues separately.[544]

533    The Claimant rejects the notion of an investment in the "*ordinary and objective sense*" and dismisses the need to look at the "*final link of the chain of ownership*". These concepts have no place in Article 1(6) ECT and Article 25(1) ICSID Convention.[545]

534    The Claimant sets out in some detail that it made and continues to hold an investment in the renewable sector in Spain by indirectly holding shares. With regard to the Wind

---

[539] Ibid., ¶¶59-65.
[540] Ibid., ¶¶66-72.
[541] Ibid., ¶¶73-80.
[542] Ibid., ¶¶81-83.
[543] Ibid., ¶84.
[544] CMoJ, ¶¶7f.
[545] Ibid., ¶¶9f.

subsector it indirectly owns the Wind Farms. With regard to the CSP subsector it indirectly owns the CSP Plants.[546]

535    The Claimant points out that it made and continues to hold an investment under Article 1(6) ECT by holding "*shares, stock, or other forms of equity participation in a company or business enterprise*". Article 1(6) makes no mention of an investment in "*an objective and ordinary sense*" nor does it require the assumption of risk or the contribution of monetary funds or resources. The only requirement is that the investment be owned or controlled by the investor. Therefore, the Wind Farms and the CSP Plants qualify as an investment protected by the ECT.[547]

536    Relying on previous cases that address the interpretation of Article 1(6) ECT,[548] the Claimant states that the Respondent's construction of the term "*Investment*" under the ECT amounts to an inadmissible attempt to add requirements that are not present in Article 1(6).[549]

537    The Claimant rejects the Respondent's assertion that under Article 1(6) ECT only the ultimate owner can claim indirect ownership of an investment. The consequence of this theory would be that investments held by companies would never be protected by the ECT because the ultimate owners of the investment are the shareholders. The ECT does not restrict protection to the beneficial or ultimate owner.[550]

538    In addition, it is the Claimant's position that it also made and continues to hold an investment under Article 25(1) ICSID Convention. It rejects the Respondent's attempt to present the criteria for the existence of an investment listed in *Salini v. Morocco*[551] as mandatory legal requirements. These criteria, the Claimant argues, are merely typical features or characteristics. In any case, the Claimant's investment clearly meets the *Salini* test. It involves a contribution, which need not be made in the form of money, and involves substantial risk.[552]

539    The Claimant also refutes the Respondent's allegation that, as a shell company without any business activity, it does not qualify as an investor. Article 1(7) ECT only requires incorporation under the laws of a Contracting Party. It is impermissible to read additional requirements into the ECT's text. Therefore, the allegation of a shell company is irrelevant

---

[546] Ibid., ¶¶11-14.
[547] Ibid., ¶¶15-28.
[548] *RREEF v. Spain I*, ¶¶149, 157f.; *Isolux v. Spain*, ¶¶689f.; *Yukos Universal Limited (Isle of Man) v. Russian Federation*, PCA Case No. AA 227, Interim Award on Jurisdiction and Admissibility, 30 November 2009 (CL-0042) ("*Yukos v. Russia* (**Interim Award**)"), ¶432; *Hulley Enterprises Limited v. Russian Federation*, PCA Case No. AA 226, Interim Award on Jurisdiction and Admissibility, 30 November 2009 (CL-0043), ¶431.
[549] CMoJ, ¶¶29-33.
[550] Ibid., ¶¶34-41.
[551] *Salini Costruttori S.P.A. and Italstrade S.P.A. v. Kingdom of Morocco*, ICSID Case No. ARB/00/4, Decision on Jurisdiction, 23 July 2001 ("*Salini v. Morocco*"), ¶52.
[552] CMoJ, ¶¶42-55.

and, moreover, factually wrong. The Claimant is incorporated in Luxembourg and hence qualifies as an investor under Article 1(7) ECT.[553]

540    Article 17(1) ECT, providing for a denial of benefits where an investor is owned or controlled by a non-ECT national, presupposes protection unless the host State exercises its right under this clause. If Respondent's reading of Article 1(7) were correct, Article 17(1) would be pointless.[554]

541    The Claimant also points out that it was incorporated in Luxembourg and had invested in Spain well before the Disputed Measures were enacted or were even foreseeable. The incorporation of the Claimant had nothing to do with an alleged strategy to submit the present dispute to arbitration under the ECT. Therefore, no abuse of law can be asserted in this case since the restructuring was a *bona fide* economic investment.[555]

542    The Claimant's Answer to the Tribunal's Questions in Procedural Order No. 13, submitted on the same date as Respondent's Answer,[556] points out that an investor may acquire the ownership and control of an investment through a variety of means. The Claimant lists its indirect shareholding interest in the SPVs. This indirect ownership of shares and subordinated loans matches the criteria for an investment in the ECT as well as the ICSID Convention.[557] In the Claimant's words:

> As far as Article 1(6) of the ECT is concerned, the Claimant's investments fall within the concept of '*every kind of asset (...) owned or controlled (...) indirectly*' as a form of '*shares, stock, or other forms of equity participation in a company or business enterprise*' with the economic goal to develop an '*Economic Activity in the Energy Sector*'. Likewise, they comply with the wide concept of '*investment*' set out in Article 25(1) of the ICSID Convention.[558]

543    Any other criterion, such as the origin of the Claimant's funds, would be irrelevant.[559]

544    The Claimant contests the applicability of the *Salini* criteria. At the same time, it asserts that these would be met in any case: the Claimant has made substantial contributions by way of share purchases, contributions in kind, equity and loans. Renergy acquired its indirect investment in the Wind Farms and the CSP Plants as a result of these. The renewable projects were long-standing. The Claimant assumed significant risk. And it made an unquestionable contribution to the host State's development.[560]

545    For the Claimant it follows that there is no doubt that it made an investment both under the terms of Article 1(6) ECT and Article 25(1) ICSID Convention.[561]

---

[553] Ibid., ¶¶56-76.
[554] Ibid., ¶62.
[555] Ibid., ¶¶77-84.
[556] C-PHB, ¶¶44-63.
[557] Ibid., ¶¶46-48.
[558] Ibid., fn. 55 (italics original).
[559] Ibid., ¶48.
[560] Ibid., ¶¶49-53, 62.
[561] Ibid., ¶54.

546    The Claimant offers detailed tables tracing the acquisition of the Wind Farms and CSP Plants. These demonstrate that the Claimant acquired the ownership of its investment in the Wind Farms and CSP Plants through a repositioning of assets among companies of the same group.[562]

547    The Claimant finds the Award in *KT Asia v. Kazakhstan* irrelevant for the present arbitration. The differences between the two cases stem from the fraudulent context surrounding the investment in *KT Asia v. Kazakhstan*, from the fact that the activities of the investors were different and from the inappropriately strict application of the *Salini* test in *KT Asia v. Kazakhstan*.[563]

## 3.    The Tribunal's Analysis

548    The Parties agree that both the ECT and the ICSID Convention require the existence of an investment. The criteria for the existence of an investment under these two documents are not necessarily identical and must be examined separately.

549    <u>The ECT</u>, in its definition of the term "*Investment*" in Article 1(6), states in relevant part:

> (6) 'Investment' means every kind of asset, owned or controlled directly or indirectly by an Investor and includes:
>
> […]
>
> (b) a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;

550    This definition squarely covers the Claimant's assets in the renewable sector.

551    Article 1(6) ECT requires that these assets be "*owned or controlled directly or indirectly by an Investor*". It is undisputed that the Claimant indirectly owns shares of the SPVs that own the Wind Farms and the CSP Plants.

552    The ECT, in its definition if the term "*Investor*" in Article 1(7), states in relevant part:

> "(7) 'Investor' means:
>
> (a) with respect to a Contracting Party:
>
> […]
>
> (ii) a company or other organization organized in accordance with the law applicable in that Contracting Party;*"*

553    It is undisputed that the Claimant is organized in accordance with the law of Luxembourg, a Contracting Party of the ECT. It follows that the assets in question meet the requirements

---

[562] Ibid., ¶¶58f.
[563] Ibid., ¶¶60-63.

of the ECT for the existence of an investment owned or controlled directly or indirectly by an investor.

554    The Respondent's call for additional requirements finds no support in the text of the ECT. Article 1(6) leaves no room for an "*objective definition of investment*" as suggested by the Respondent. Article 1(6) is inclusive speaking of "*every kind of asset*" without limitation.

555    Also, the argument that the Claimant is not the real investor in an economic sense and does not truly control the investment is to no avail. Under Article 1(6) ECT, the only required relationship between investor and investment is ownership or control. There is no need for the investor to have played an active role in the making of the investment. Nor is there a need for the investor to be the ultimate owner or controller.

556    The Respondent's complaint about the Claimant being a "*shell company*" does not affect the Tribunal's jurisdiction. Article 1(7)(a)(ii) ECT uses organization under the law of a Contracting Party as the only criterion for the existence of a corporate investor. Unlike other treaties that require a "*real economic activity*" in the home State, the ECT does not exclude "*shell companies*" whose only function is to hold the shares of other companies.

557    In *RREEF v. Spain* the tribunal rejected a similarly worded objection in the following terms:

> The term '*shell company*' is often used as a short-hand reference to a commercial entity that has little or no activity apart from owning or controlling directly or indirectly assets. Unless there is a reason under the relevant municipal law or investment treaty to conclude otherwise, there is no basis under international law to accord such a commercial entity any less entitlement to the protections afforded under an investment treaty than any other commercial entity. There are examples of investment treaties that include within the definition of investor only commercial entities that can demonstrate certain characteristics or activities. There is no such limitation in the ECT or the ICSID Convention. It would not be proper to read such an artificial limitation into the plain meaning of the ECT, the ICSID Convention or into international law generally.[564]

558    The Tribunal's task is to apply the ECT, not to rewrite it. In the words of the *Yukos* tribunal:

> The Tribunal cannot in effect impose upon the parties a definition of 'Investment' other than that which the parties to the ECT, including Respondent, have agreed.[565]

559    The Parties disagree on the appropriate test for the determination of an investment under the ICSID Convention. Article 25(1) ICSID Convention requires the existence of an "*investment*" but does not does not offer a definition.

560    In *Salini v. Morocco*, the tribunal said:

> The doctrine generally considers that investment infers: contributions, a certain duration of performance of the contract and a participation in the risks of the transaction [reference omitted].

---

[564] *RREEF v. Spain I*, ¶145 (footnote omitted, italics original).
[565] *Yukos v. Russia* (Interim Award), ¶432.

In reading the Convention's preamble, one may add the contribution to the economic development of the host State of the investment as an additional condition.[566]

561    Numerous tribunals have since grappled with a definition or description of the term "*investment*" in Article 25(1) ICSID Convention, often with the help of these so-called *Salini* criteria.[567] The Parties disagree on the legal nature of the *Salini* test. The Respondent sees it as a list of jurisdictional requirements whereas the Claimant regards it as merely descriptive of typical characteristics.

562    The Tribunal agrees with the position that the *Salini* criteria should not be seen as distinct jurisdictional requirements each of which must be met separately to establish jurisdiction but rather as a descriptive list of typical features of an investment. This does not make these criteria legally irrelevant. An economic operation that meets them enjoys the presumption that it is an investment for purposes of the ICSID Convention.

563    In the present case the Tribunal need not enter into a deeper debate about the nature of the *Salini* test for two reasons.

564    First, the assets under dispute clearly meet the *Salini* criteria. The Wind Farms and the CSP Plants as well as Claimant's indirect shareholding and loan participation in them are contributions to Spain's economy. These investments are designed for a period of at least 25 years and involve substantial risk as evidenced by the present dispute. Moreover, they have the potential to contribute to Spain's economic and social development.

565    Secondly, the Respondent's argument based upon the *Salini* test does not address the question whether there has been a contribution but rather who made the contribution. In other words, the Respondent's complaint is not about the existence of an investment but about the role of the Claimant in its acquisition. The *Salini* test, however, relates to the existence of an investment and not to the role of the investor. The test offered by the *Salini* criteria is not helpful for determining whether the Claimant is the right claimant in the present case.

566    The Respondent's discussion of the Claimant's role in the investment raises three questions:

    (i)    Is mere ownership of the investment sufficient to satisfy the role of an investor or is there a need for an active role in the making of the investment?

    (ii)    Is the origin of funds used for the acquisition of assets relevant for the existence of an investment?

---

[566] *Salini v. Morocco*, ¶52.
[567] See, e.g., *Deutsche Bank AG v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/09/2, Award, 31 October 2012, ¶¶293–307; *Flughafen Zürich A.G. and Gestión e Ingenería IDC S.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/19, Award, 18 November 2014, ¶¶244–258; *Casinos Austria v. Argentina*, ¶¶187–193.

(iii) Did the establishment of the Claimant in Luxembourg involve improper forum shopping?

567    As to the first of these three questions, the Respondent's complaint about the absence of an active role in the investment by the Claimant has not led to a discussion of the relevant authorities by either Party.

568    Some tribunals have indeed required that, in order to be recognized as an investor, a claimant must have played an active role in the making of the investment. In some of these cases, the argument that an active role is required was based on wording like "*investment made*", "*investment by*" or "*investments of*" an investor in the relevant treaties.[568] To the extent that the reasoning is based on the specific wording of other treaties, it is not relevant to the present case, which is based on the ECT. As discussed above, Article 1(6) ECT provides that the investment must be owned or controlled by the investor, but contains no indication that the investor must have played an active role in its making.

569    In other cases, tribunals indicated that an investor had to be more than the formal owner of the investment and had to be engaged with the allocation of resources in order to enjoy protection.[569]

570    In *KT Asia* v. *Kazakhstan*, relied upon by the Respondent, the claimant had received shares for no consideration to hold them for a few weeks pending their sale. The transaction had consisted of a transfer of shares in a Kazakh bank between two foreign companies that belonged to the same individual. The Tribunal denied that the operation involved an internal group restructuring since there had been no corporate group as understood in corporate and tax law. A corporate group operates as a single economic entity with a common objective and group management. Instead, there was an aggregation of assets in the form of a large number of companies the purpose of which was to conceal the common ownership by the controlling individual from the Kazakh authorities. Since KT Asia had made no contribution, it had not demonstrated the existence of an investment under Article 25(1) ICSID Convention and under the BIT.[570] The Tribunal found confirmation in the fact that the transaction was not meant to have a longer term duration than a few weeks.[571]

571    In a larger number of cases, tribunals have rejected the suggestion that the current owner of assets must have made an active contribution to qualify as an investor. In several cases tribunals have held that the acquisition of the assets was sufficient.[572] In *Levy v. Peru* a

---

[568] *Standard Chartered Bank v. United Republic of Tanzania*, ICSID Case No. ARB/10/12, Award, 2 November 2012, ¶¶206-232.

[569] *Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Award, 5 June 2012 (RL-0005), ¶¶408-467; *OI European Group B.V.* v. *Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Award, 10 March 2015, ¶246; *Vestey Group Ltd* v. *Bolivarian Republic of Venezuela*, ICSID Case No. ARB/06/4, Award, 15 April 2016 (RL-0106) ("*Vestey v. Venezuela*"), ¶192.

[570] *KT Asia v. Kazakhstan*, ¶¶188-206.

[571] Ibid., ¶¶207-216.

[572] *Veteran Petroleum Limited (Cyprus) v. Russian Federation*, PCA Case No. AA 228, Interim Award on Jurisdiction and Admissibility, 30 November 2009 (CL-0044), ¶477; *Pezold v. Zimbabwe*, ¶¶312f.; *Orascom TMT Investments S.à*

father had transferred shares to his daughter free of charge. Peru argued that the resulting share ownership did not amount to an investment. The Tribunal disagreed:

> It is clear that the Claimant acquired her rights and shares free of charge. However, this does not mean that the persons from whom she acquired these shares and rights did not previously make very considerable investments of which ownership was transmitted to the Claimant by perfectly legitimate legal instruments.[573]

572    In a similar way, tribunals have recognized assets acquired through corporate restructuring as valid investments and the current holders of these assets as investors. In *Gold Reserve v. Venezuela*, Article I(g) of the Canada-Venezuela BIT spoke of "*any enterprise* [...] *who makes the investment in the territory of Venezuela*". The question was whether assets acquired as a consequence of corporate restructuring constituted an "*investment*". Venezuela argued that the claimant cannot be said to have made the investment since the investment already existed before the claimant's incorporation in Canada.[574] The Tribunal rejected Venezuela's argument that the claimant had not "*made*" the investment[575] and said:

> there is no support in previous cases for contentions pertaining to a lack of investment as a result of (1) the parent company entering the structure after the concession had been granted; (2) the parent company being inserted as a result of an internal corporate restructure; or (3) the new parent company being incorporated in a jurisdiction with a BIT which has previously not been relevant. Therefore, provided that the corporate restructure or investment transfer is not made for improper purposes (for example, to gain treaty protection after the dispute had arisen), then the fact that it occurred after the concession had been granted does not affect jurisdiction.[576]

573    In *MNSS B.V. and Recupero Credito Acciaio N.V.* v. *Montenegro* the question was whether the assignee of a loan could be regarded as an investor. The respondent disputed that the second claimant (RCA) had made an investment because it merely passively owned a loan. Several provisions of the Netherlands-Yugoslavia BIT referred to an investment "*made*".[577] The Tribunal said:

> "The fact that RCA was not an active investor because of the activity connotation of the expression 'making an investment,' as argued by the Respondent, does not mean that an investor, once a loan is made or equity in a company is acquired, needs to make further investments or be particularly active in the management of the investment."[578]

---

*r.l.* v. *People's Democratic Republic of Algeria*, ICSID Case No. ARB/12/35, Award, 31 May 2017, ¶384; *Mera v. Serbia*, ¶¶98-110.

[573] *Renée Rose Levy de Levi v. Republic of Peru*, ICSID Case No. ARB/10/17, Award, 26 February 2014 (CL-0130) ("***Levy de Levi v. Peru***"), ¶148 (bold removed).

[574] *Gold Reserve Inc.* v. *Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014 (CL-0110) ("***Gold Reserve v. Venezuela***"), ¶260.

[575] Ibid., ¶¶256-272.

[576] Ibid., ¶270.

[577] *MNSS B.V. and Recupero Credito Acciaio N.V.* v. *Montenegro*, ICSID Case No. ARB(AF)/12/8, Award, 4 May 2016 (RL-0100), ¶126.

[578] Ibid., ¶204.

574    In *KIM v. Uzbekistan*, the Kazakhstan-Uzbekistan BIT referred to "*property rights invested by the investors*" (Article 1(2)) and to "*investments made by him or her*" (Article 10). The Tribunal rejected a distinction between active and passive investors and said:

> the BIT in this case does not contain a distinction between active and passive investors requiring the former.[579]

575    These cases demonstrate that much of the discussion surrounding the need for an active role of an investor in the making of the investment is based on specific wording in applicable treaties. The ECT's reference to assets "*owned or controlled*" does not lend itself to a restrictive interpretation in this regard.

576    There is also little support for the idea that an active role of the current holder of an investment is inherent in the concept of "*investment*" in Article 25(1) of the ICSID Convention. The majority of the authorities addressing this issue conclude that ownership or control of an investment will suffice even without specific wording to this effect. It follows that, both under the ECT and under the ICSID Convention, an active contribution by the current owner of the assets is not required to fulfil the requirement for an investment. This result is in line with the exigencies of contemporary investment law. It enables the protection of shareholding, an accepted form of investment. It prevents an existing investment from losing that quality if transferred to another person whether through corporate restructuring or otherwise.

577    With respect of the second question formulated in ¶566 *supra*, the Respondent complains that Claimant did not invest any of its own assets. Rather, the acquisition of the shares was entirely funded by Mr. Gómez.

578    Tribunals have held in numerous cases that the origin of the funds invested was not relevant to the existence of an investment. Most often this argument was used to question the international nature of the investment. For instance, in *Tokios Tokelės v. Ukraine*, the Respondent argued that there was no protected investment, since the capital invested did not originate outside the Ukraine. The Tribunal noted that neither the ICSID Convention nor the Ukraine-Lithuania BIT contained a requirement that capital used by an investor should originate in its State of nationality or indeed originate outside the host State.[580] The Tribunal said:

> "The origin of the capital used to acquire these assets is not relevant to the question of jurisdiction under the Convention."[581]

579    In *Eiser v. Spain*, the Respondent contended that the funds invested did not come from the investor. The Tribunal found the origin of invested capital irrelevant:

---

[579] *Vladislav Kim and others v. Republic of Uzbekistan*, ICSID Case No. ARB/13/6, Decision on Jurisdiction, 8 March 2017, ¶312.

[580] *Tokios Tokelės v. Ukraine*, ICSID Case No. ARB/02/18, Decision on Jurisdiction, 29 April 2004 (CL-0163), ¶¶74-82.

[581] Ibid., ¶81.

> Respondent urged that the funds invested were not the Claimants' own, and were derived from the limited partners in EGIF. However, the origins of capital invested by an Investor in an Investment are not relevant for purposes of jurisdiction.[582]

580    In *Gavrilović* v. *Croatia*, the respondent contested the existence of an investment since the claimant had not used his own funds to make the investment. The Tribunal rejected this argument:

> the source of the funds that Mr Gavrilović used to purchase the Five Companies is not relevant to whether Mr Gavrilović is an investor who made an investment. There is no requirement under the BIT, the ICSID Convention, international law, or otherwise that a prospective investor must use his or her personal funds in order to be found to have made a contribution that qualifies as an investment.[583]

581    It follows from the above authorities that, unless specifically provided, the origin of the funds expended for the acquisition of an investment is irrelevant for purposes of determining whether a tribunal has jurisdiction. Whether the investment is made from the investor's own capital or capital put at the investor's disposal, whether it is made from imported funds or from funds raised locally, makes no difference. For purposes of the ECT and the ICSID Convention, an investment is a foreign investment if it is owned or controlled by a foreign investor.

582    Regarding the third question identified in ¶566 *supra*, the Claimant points out that its incorporation in Luxembourg and investment in Spain did not involve impermissible forum shopping or other abuse of right.

583    The standard for impermissible nationality planning or treaty shopping has been succinctly summarized by the Tribunal in *Levy and Gremcitel v. Peru* in the following terms:

> 184. In the Tribunal's view, it is now well-established, and rightly so, that an organization or reorganization of a corporate structure designed to obtain investment treaty benefits is not illegitimate *per se*, including where this is done with a view to shielding the investment from possible future disputes with the host state. […]

> 185. However, a restructuring carried out with the intention to invoke the treaty's protections at a time when the dispute is foreseeable may constitute an abuse of process depending on the circumstances. In this respect, the Tribunal agrees with the test suggested in *Pac Rim* whereby 'a specific future dispute' must be 'foresee[able] […] as a very high probability and not merely as a possible controversy'. In the Tribunal's view, this test strikes a fair balance between the need to safeguard an investor's right to invoke a BIT's protection in the context of a legitimate corporate restructuring and the need to deny protection to abusive conduct.[584]

584    The Tribunal notes that the Claimant was incorporated in Luxembourg on 5 November 2007. It acquired its indirect shareholding in the Wind Farms in 2007 and 2009 with subsequent capital increases in 2010 and 2011. Claimant acquired its indirect shareholding

---

[582] *Eiser v. Spain*, ¶228 (footnote omitted).
[583] *Georg Gavrilović and Gavrilović d.o.o.* v. *Republic of Croatia*, ICSID Case No. ARB/12/39, Award, 26 July 2018, ¶216; see also ibid., ¶209.
[584] *Renée Rose Levy and Gremcitel S.A. v. Republic of Peru*, ICSID Case No. ARB/11/17, Award, 9 January 2015, ¶¶184f. (footnote omitted).

in the CSP Plants between 2007 and 2011 with subsequent capital increases in 2009 to 2013. The first measures taken by Respondent that are the object of the present dispute were enacted in late 2012 followed by further measures in the course of 2013 and 2014.

585     The sequence of events in the present case would make implausible any suggestion that the Claimant was established and acquired its investment with a view to enable it to bring the present dispute to arbitration under the ECT. The Tribunal cannot identify any impermissible forum shopping or abuse of right.

586     It follows that this final objection to the Tribunal's jurisdiction must likewise be rejected.

## VI.   APPLICABLE LAW

587     The Respondent argues that in addition to the provisions of the ECT itself, EU law applies as international law pursuant to Article 26(6) ECT.[585] By contrast, the Claimant submits that EU law does not apply as it is to be regarded as internal law of the Respondent.[586]

588     The Tribunal finds that it does not fall to be decided whether EU law forms part of the law applicable to the merits. The only rules of EU law that the Respondent seeks to apply in this case are the EU State Aid Rules, specifically Article 108(3) TFEU.[587] Indeed, the Tribunal agrees that these are the only rules of EU law that could potentially be relevant to the merits of this case. However, even if one accepted that, in principle, EU law were applicable to the merits of this dispute pursuant to Article 26(6) ECT, the Tribunal finds that in accordance with Article 16(2) ECT, the EU State Aid Rules could not be applied in any case.

589     Pursuant to the conflict of laws rule in Article 16(2) ECT, applicable rules and principles of international law shall not operate to derogate from any provision of Part III of the ECT, where such ECT provision is more favourable to the investor or the investment. Neither Party asserts that the EU State Aid Rules are more favourable to the investor or the investment than Part III of the ECT, and the Tribunal agrees they are not. To the contrary, the Respondent invokes the EU State Aid Rules precisely for the very purpose of preventing the Claimant from enjoying protection under Part III of the ECT.[588] The

---

[585] RjoM, ¶395. In RC on *BayWa*, ¶¶39-84, the Respondent also relied on Article 38 of the Statute of the International Court of Justice.

[586] See C-OS, slides 248, 259-261; the Respondent does not seem to dispute that EU law forms part of its internal law, but rather argues that it is, at the same time, international law (and a relevant fact), due to the "*triple nature*" of EU law, see the Respondent's powerpoint presentation "Respondent's Opening Statements Grounds on the Merits", as presented at the Hearing ("**R-OS (Merits)**"), slide 4, referring to *Electrabel v. Hungary I*, ¶¶4.117f.

[587] Other aspects of EU law are invoked by the Respondent only as factual backdrop, in particular Directive 2001/77/EC, on the promotion of electricity produced from renewable energy sources in the internal electricity market (RL-0018); Directive 2003/54/EC, on common rules for the internal electricity market (RL-0019); Directive 2009/28/EC, on the promotion of the use of energy from renewable sources (RL-0046).

[588] If it were not entitled to such protection even under the ECT alone, the question of whether the less favourable EU State Aid Rules apply would of course be moot.

Tribunal finds that Article 16(2) ECT is an insurmountable obstacle to this suggested application of the EU State Aid Rules.[589]

590    As there are no other rules of EU law whose application would appear to have, or is suggested by the Parties to have, any relevance to the outcome of this case on the merits, the Tribunal does not need to take a position on the general applicability of EU law pursuant to Article 26(6) ECT.

591    In addition, and for the avoidance of doubt, the Tribunal notes that it has no hesitation in finding that EU law can and must be taken into account as a relevant fact.[590] After all, it is undisputed that EU law is an integral part of the Respondent's internal legal system within which the Claimant invested. As such, it is just as (potentially) relevant as any and all other circumstances shaping the environment in which the investment was made. Neither Party argues, nor does the Tribunal find that, it would make any material difference in this case if, in addition to considering EU law as a fact, EU law also formed part of the applicable law.

## VII. RESPONSIBILITY

### A.    Fair and Equitable Treatment

### 1.    Applicable Standard

### a.    The Claimant's Principal Arguments

592    The Claimant submits that the guarantee of fair and equitable treatment ("**FET**") provided for in Article 10(1) ECT is the "*Grundnorm*" of the protection of foreign investments, which is autonomous from and goes beyond the minimum standard of treatment of customary international law ("**MST**").[591] In particular, according to the Claimant, the FET standard encompasses the protection of legitimate expectations and an obligation of the State to act transparently, to accord due process and to refrain from arbitrary actions.[592]

---

[589] To similar effect *Vattenfall v. Germany*, ¶229 (in the context of the *Achmea* argument). See also *BayWa v. Spain*, ¶280; *RREEF v. Spain II*, ¶210.

[590] Same approach in *AES Summit Generation Limited and AES-Tisza Erömü Kft v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010 (CL-0003/CL-0127/RL-0056) ("*AES v. Hungary*"), ¶7.5.3; *Electrabel v. Hungary I*, ¶4.127; *Cube v. Spain I*, ¶160; *FREIF v. Spain*, ¶¶526, 532; see also *Micula v. Romania*, ¶328.

[591] MoM, ¶1310, referring inter alia to *Suez, Sociedad General de Aguas de Barcelona S.A., and InterAgua Servicios Integrales del Agua S.A. v. Argentine Republic*, ICSID Case No. ARB/03/17, Decision on Liability, 30 July 2010 (CL-0100) ("*Suez v. Argentina*"), ¶181; *Plama Consortium Ltd. v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008 (CL-0026/RL-0054) ("*Plama v. Bulgaria*"), ¶163; *Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Award, 22 June 2010 (CL-0101) ("*Liman v. Kazakhstan*"), ¶263.

[592] MoM, ¶¶1316f., 1320, 1402; RoM, ¶1319, referring inter alia to *Electrabel v. Hungary I*, ¶¶7.74f.; *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan*, SCC Case No. V (064/2008), Partial Award on Jurisdiction and Liability, 2 September 2009 (CL-0037) ("*Al-Bahloul v. Tajikistan*"), ¶183; *Gold Reserve v. Venezuela*, ¶570.

The Claimant further asserts that the "*stable* […] *conditions*" required by Article 10(1) of the ECT form part of the FET standard.[593]

593    With respect to the Respondent's argument that FET is essentially limited to the guarantees of non-discrimination and MST, the Claimant contends that this position lacks any support in the ECT, in case-law and in scholarly writing.[594] In addition, the Claimant argues that such interpretation would render the FET standard superfluous, given that non-discrimination and MST are already expressly guaranteed by the third and fourth sentence of Article 10(1) ECT, which is further strengthened by Articles 10(3) and 10(7) ECT in respect of national treatment and MFN treatment.[595]

## b.    The Respondent's Principal Arguments

594    Based mainly on the reference in Title I of the European Energy Charter[596] to the "*principle of non-discrimination*" and the ECT's objective to achieve a free energy market between Western Europe and former Soviet Republics, the Respondent argues that the main thrust of the FET standard is to protect investors against discrimination based on their nationality.[597] The Respondent claims that this is supported also by the ECT Reader's Guide.[598]

595    However, according to the Respondent, the ECT does not fully achieve this non-discrimination objective, due to the States' reluctance to limit their regulatory powers. In particular, the Respondent submits that in respect of the process of the making of the investment, the ECT merely contains a "*best efforts*" commitment to accord to investors of other Contracting States the better of national treatment or MFN treatment, as per Articles 10(2) and 10(3) ECT. The Respondent asserts that the FET standard, in particular the second sentence of Article 10(1) ECT, form part of this mere "*soft law*" that applies in the stage of the making of the investment.[599] After the making of the investment, in the Respondent's view, the protection is limited to national treatment, with international law setting the minimum standard, as is reflected in the third sentence of Article 10(1) ECT as well as in Article 10(7) ECT.[600]

596    In addition, the Respondent invokes Article 10(8) ECT, pursuant to which the modalities of applying Article 10(7) ECT to "*programmes under which a Contracting Party provides grants or other financial assistance*" are left for a supplementary treaty. The Respondent asserts that 85.8% of the remuneration received by renewable energy producers in Spain consist of subsidies, and that the exception provided for in Article 10(8) ECT therefore applies to the present case. Given that the supplementary treaty referred to in Article 10(8)

---

[593] MoM, ¶1313, referring to *Plama v. Bulgaria*, ¶173.
[594] RoM, ¶¶912f., 916f., 928-930.
[595] RoM, ¶¶914f., 921-924.
[596] Which the Respondent argues is relevant because Article 2 of the ECT refers to it, see RjoM, ¶¶1064f.
[597] CMoM, ¶¶608-702.
[598] CMoM, ¶¶722-724; RjoM, ¶1068.
[599] RjoM, ¶¶1076f.
[600] CMoM, ¶¶704-709.

ECT has not been signed thus far, the Respondent contends that there is not yet any obligation for Contracting States to accord national treatment to foreign investors in relation to subsidies.[601]

### c.    The Tribunal's Analysis

597    Article 10(1) ECT provides, in relevant part, as follows:

> Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations.

598    As accepted by both Parties,[602] the interpretation of Article 10(1) ECT is governed by the VCLT, in particular the general rule of interpretation codified in Article 31(1) thereof, pursuant to which

> A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

599    First of all, based on these principles of interpretation, the Tribunal dismisses the Respondent's argument that the FET standard applies only to the process of the "*Making of the Investment*", whereas allegedly it does not apply thereafter. In the Tribunal's view, this argument is irreconcilable with the ordinary meaning of the term "*at all times*" in the second sentence of Article 10(1) ECT,[603] which the Tribunal finds is the main provision from which the ECT's FET standard derives.[604]

600    Contrary to the Respondent's contention, nothing else follows from the context. To begin with, while it is true that the term "[s]*uch conditions*" at the beginning of the second sentence of Article 10(1) ECT ties back to the first sentence, the Tribunal is not convinced that the first sentence, as claimed by the Respondent, applies only to the establishing of the investment, but not to subsequent stages.[605] The Tribunal notes that the first sentence does not use the defined term "*Make Investments*", which indeed refers to the "*establishing* [of] *new Investments*" (Article 1(8) ECT), but rather uses the uncapitalized und thus undefined term "*make*"; there is no indication that this was an accident, much less since Article 10(2) ECT does use the defined term "*Making of Investments*". In addition, even if one considered that the non-capitalization of the term "*make*" in the first sentence of Article

---

[601] CMoM, ¶¶710-712.
[602] MoM, ¶1312; RjoM, ¶1061.
[603] Same view *RWE Innogy v. Spain*, ¶428.
[604] See also *Blusun v. Italy*, ¶319(3); *RWE Innogy v. Spain*, ¶429.
[605] Different view *RWE Innogy v. Spain*, ¶426. The tribunal in *Blusun v. Italy*, ¶319(2) at least expanded the scope to subsequent "extensions of the investment as well as changes of form".

10(1) ECT were a clerical mistake, the second sentence with its clear wording "*at all times*" would anyway extend the protection to all stages of the investment.[606]

601    Equally, the Tribunal fails to see how the object and purpose of the ECT could modify the ordinary meaning to be given to the term "*at all times*". Even if one accepted the Respondent's case that the object and purpose of the ECT is merely to prevent discrimination on the basis of nationality, this would be no reason to limit the temporal scope of the FET standard to the "*Making of the Investment*".

602    Secondly, the Tribunal does not accept the Respondent's submission that the FET standard is mere "*soft law*". The second sentence of Article 10(1) ECT – as, in fact, all sentences of this provision – is clearly cast in mandatory terms ("*shall*") and, thus, is not merely hortatory in nature.[607]

603    Thirdly, the Tribunal does not endorse the Respondent's argument that the ECT's FET standard is limited to national treatment, MFN treatment and/or MST. The Tribunal agrees in this respect with *Infrared v. Spain*:

> The clear language of Article 10(1) ECT belies such an interpretation. So too does what might fairly be called a *jurisprudence constante* that is based on the understanding shared by the Tribunal to the effect that the FET obligation is a distinct standard linked (among others) to the legitimate expectations of investors as assessed on the facts of each case.[608]

604    In particular, the ordinary meaning of "*fair and equitable treatment*" and "*stable, equitable, favourable and transparent conditions*" does not imply any limitation to national treatment, MFN treatment or MST. Quite the contrary: The context, namely the separate protection against non-discrimination in the third sentence of Article 10(1) ECT, the guarantee of MST in the fourth sentence of Article 10(1) ECT, and the guarantee of national treatment and MFN treatment in Article 10(3) and (7) ECT strongly support the conclusion that the FET standard must go beyond those protections. For the same reason, the Respondent's argument based on Article 10(8) ECT does not help the Respondent's case because said Article refers to the modalities of national treatment and MFN treatment only, not to FET.

605    Fourthly, in respect of the legal standard to apply when determining whether the FET standard is violated, the Tribunal agrees with *RWE Innogy v. Spain* that

> reference to dictionary definitions scarcely helps it in interpreting the formula *'fair and equitable.'* The terms *'fair'* and *'equitable'* are not in any event particularly difficult to understand as a matter of ordinary meaning: the difficulty, as is very well-known, is how and where to draw the line between what is fair / unfair, equitable / inequitable, in particular in the context of a State's adoption of regulations of general application.[609]

---

[606] *Plama v. Bulgaria*, ¶172; to similar effect *RWE Innogy v. Spain*, ¶429.

[607] *Blusun v. Italy*, ¶319(1); *Antin v. Spain*, ¶501; *RWE Innogy v. Spain*, ¶426.

[608] *InfraRed v. Spain*, ¶365 (italics original); same view *Liman v. Kazakhstan*, ¶263; *Antin v. Spain*, ¶530; *RREEF v. Spain II*, ¶258; *Operafund v. Spain*, ¶425.

[609] *RWE Innogy v. Spain*, ¶440; see also *Saluka Investments BV (The Netherlands) v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006 (CL-0121) ("**Saluka v. Czech Republic**"), ¶297; *Micula v. Romania*, ¶504.

606     Similarly, the Tribunal does not find it necessary to revisit the long line of case-law in which investment tribunals have offered definitions of the FET standard.[610] For the purposes of deciding the present case, it suffices to say that the Tribunal endorses, at least as a matter of principle, the well-established line of jurisprudence under which the ECT's FET standard offers protection, inter alia, against a violation of legitimate expectations, lack of transparency, lack of due process, and arbitrariness.[611]

607     The Tribunal does not need to take a position on whether the foregoing protections are independent (sub-)standards or whether they merely describe types of conduct that typically conflict with fairness and equity and are, therefore, likely to violate the FET standard. As the Parties pleaded separately on those protections, the Tribunal will deal with them separately below.[612] However, the Tribunal (by majority, with Arbitrator Sands dissenting) wishes to highlight already at this point that based on the facts of this case, the Tribunal does not find that the aspects of transparency, due process or arbitrariness provide any additional protection to the Claimant as compared to the protection of its legitimate expectations.

608     As mentioned above, the difficulty lies not in the abstract definition of what is fair and equitable, but rather in determining whether a State's conduct in an individual case falls afoul of the FET standard. As a matter of course, this question cannot be answered in the abstract, but only with due regard to all relevant circumstances surrounding such conduct.[613] Moreover, there can be no doubt that answering this question requires a balancing exercise, as follows not only from the very concepts of fairness and equity themselves but also from the object and purpose of the ECT.[614] Specifically, in cases such as the present one, where the propriety of legislative change lies at the heart of the dispute, the Tribunal must balance the host State's undisputed right to regulate with legitimate interests of an investor who committed resources on the basis of the earlier legal regime.[615]

609     In the framework of this balancing exercise, the Tribunal (by majority, with Arbitrator Sands dissenting) considers that it must also take into account the particular importance attached by the ECT to the concept of stability.[616] This emphasis on stability follows from

---

[610] To same effect *RREEF v. Spain II*, ¶260; *BayWa v. Spain*, ¶457, the latter with many references to arbitral case-law.
[611] See, in particular, *Electrabel v. Hungary I*, ¶7.74. See also, e.g., *PV Investors v. Spain II*, ¶565; *RREEF v. Spain II*, ¶260; *Operafund v. Spain*, ¶524. Outside the ECT context, see, in particular, *Micula v. Romania*, ¶¶522, 528f., 533.
[612] Similarly, as the Parties' pleadings treated the standards of most constant protection and security and non-imparment as separate from the FET standard, the Tribunal's analysis follows this structure, without this being a statement on whether those standards are part and parcel of the FET standard.
[613] See, e.g., *Mondev International Limited v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002, ¶118; *Waste Management, Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004 (CL-0055) ("**Waste Management v. Mexico**"), ¶99; *Micula v. Romania*, ¶505.
[614] See, in particular, *Silver Ridge Power BV v. Italian Republic*, ICSID Case No. ARB/15/37, Award, 26 February 2021, ¶¶396-400, ¶¶411-418; *RWE Innogy v. Spain*, ¶¶432-451; outside the ECT context also *Saluka v. Czech Republic*, ¶¶300-306.
[615] *Blusun v. Italy*, ¶393(4) and (5); see also *Antaris GmbH and Dr Michael Göde v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018 (CL-0286) ("**Antaris v. Czech Republic**"), ¶360(8) and (9); *Antin v. Spain*, ¶¶531f.; *Novenergia v. Spain*, ¶694.
[616] See also *Plama v. Bulgaria*, ¶173; *Electrabel v. Hungary I*, ¶7.73; *Eiser v. Spain*, ¶¶379f.; *Antin v. Spain*, ¶533.

the ordinary meaning of the term "*stable* […] *conditions*" in the first sentence of Article 10(1) ECT, in light also of the stated objective of long-term cooperation in Article 2 ECT, which in turn suggests that the ECT is conceived as enhancing the stability required for such cooperation.[617] Further confirmation derives from the objectives and principles of the European Energy Charter, as referred to in Article 2 ECT, whereby cooperation in the energy field entails and signatories "*will* […] *provide for a stable* […] *legal framework*".[618]

610     However, once again, the Tribunal (by majority, with Arbitrator Sands dissenting) does not find it necessary to take a position on whether the guarantee of "*stable* […] *conditions*" constitutes a separate standard or is an element to be taken into account in the framework of the FET standard. The Tribunal does not believe that the different approaches would result in different outcomes.[619] Therefore, the Tribunal (by majority, with Arbitrator Sands dissenting) finds it most appropriate to treat the guarantee of "*stable* […] *conditions*" in its analysis as it was presented by the Claimant, namely as an aspect of the FET standard.[620]

## 2.     Violation of Legitimate Expectations

## a.     Applicable Test

611     It is widely recognized in arbitral jurisprudence that a core element of the FET standard in Article 10(1) ECT is the protection of the investor's legitimate expectations.[621] The test applied by tribunals to determine whether a State thwarted legitimate expectations varies. However, to the Tribunal, this seems to be more a result of different terminology than of any disagreement on substance. Indeed, the Tribunal considers that the findings of many other tribunals[622] are consistent with an approach that raises the following questions, which the Tribunal considers to be pertinent in this case:

> (i)     Did the host State act in a way that, at the time the investment was made, gave rise to legitimate expectations on the part of investors?

---

[617] *Eiser v. Spain*, ¶378; *Antin v. Spain*, ¶¶520, 533.

[618] European Energy Charter (RL-0040), Title I.2 and Title 4.

[619] In other words, if the Tribunal were to treat the requirement of "stable […] conditions" as independent from the FET standard (or at least from the protection of legitimate expectations), the Tribunal would find (by majority, with Arbitrator Sands dissenting) that the Respondent failed to provide stable conditions, for the reasons set out in section VII.A.2.d.iii below.

[620] Cf. PHB-C, ¶¶116f.

[621] *Electrabel v. Hungary I*, ¶7.75; *Charanne v. Spain*, ¶486; *RREEF v. Spain II*, ¶260; *Foresight/Greentech v. Spain*, ¶260; *Novenergia v. Spain*, ¶648; *NextEra v. Spain*, ¶582; cf. also *Isolux v. Spain*, ¶777; more reserved: *Cube v. Spain I*, ¶¶386f. See also MoM, ¶1320; RjoM, ¶1126.

[622] See, e.g., *Antaris v. Czech Republic*, ¶360(3); *Micula v. Romania*, ¶¶667-669, 672; *Charanne v. Spain*, ¶486; *Isolux v. Spain*, ¶775; *Antin v. Spain*, ¶538; *Cube v. Spain I*, ¶388; *Foresight/Greentech v. Spain*, ¶353; *Operafund v. Spain*, ¶481; outside the ECT also e.g. *Duke Energy v. Ecuador*, ¶340; *International Thunderbird Gaming Corporation v. United Mexican States*, UNCITRAL, Award, 26 January 2006, ¶147 (and Separate Opinion of Thomas Wälde, 1 December 2005, ¶1 (RL-0105)); *Mobil Investments Canada Inc. and Murphy Oil Corporation v. Canada*, ICSID Case No. ARB(AF)/07/04, Decision on Liability and on Principles of Quantum, 22 May 2012 (CL-0289) ("***Mobil v. Canada***"), ¶154; *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Arbitration Case No. ARB/05/8, Award, 11 September 2007 (RL-0051) ("***Parkerings v. Lithuania***"), ¶¶330f.

      (ii)   Did the investor in question place reliance on those expectations when making its investment?

      (iii)  Did the host State frustrate those expectations with its subsequent behaviour?

612    It appears that this approach is also accepted by both Parties.[623] Likewise, it appears undisputed, and the Tribunal finds, that it is the Claimant who bears the burden of proving that all elements of the test are met.[624] In the following subsections b. to d., the Tribunal will analyse in turn whether the Claimant met its burden of proof.

## b.    Legitimate Expectations Created by the Respondent

## i.    The Claimant's Principal Arguments

613    The Claimant submits that legitimate expectations are created when a State's conduct is such that an investor may reasonably rely on that conduct as being consistent.[625] According to the Claimant, legitimate expectations may be engendered through commitments, promises or assurances attributable to competent organs or representatives of the host State, irrespective of whether they were explicit, implicit, general or specific.[626] However, the Claimant acknowledges that the form, content, clarity and specificity of the commitments, promises or assurances determine the degree to which the host State is limited in its subsequent behaviour.[627] That said, the Claimant avers that specific representations are not indispensable for a legitimate expectations claim.[628] At the same time, however, the Claimant seems to acknowledge that in the absence of any clear and specific representations, laws may be changed to the detriment of existing investments.[629]

614    The Claimant argues that legitimate expectations can also be engendered by domestic legislation.[630] In particular, the Claimant contends that the existence and maintenance of a stable and consistent regulatory framework is directly linked to investors' legitimate expectations, meaning that investors are entitled to expect that the regulatory framework

---

[623] The Claimant effectively applied this approach in its submissions, see MoM, headings of sections X.2.2, X.2.3, X.2.4; C-PHB, ¶¶135, 151 (in ¶136, the Claimant only takes issue with a further-reaching finding by the *Mobil v. Canada* tribunal, which Claimant argues cannot apply in an ECT context). The Respondent, in R-PHB, ¶139, relies on *Antaris v. Czech Republic*, ¶360(3), which follows an approach that is identical in substance; in RjoM, ¶1129, the Respondent further relies on *Invesmart, B.V. v. Czech Republic*, UNCITRAL, Award, 26 June 2009 (RL-0101) ("***Invesmart v. Czech Republic***"), ¶¶250-258, which also applies a similar approach.

[624] *Electrabel v. Hungary II*, ¶154; invoked by the Respondent in CMoM, ¶739, and not commented on by the Claimant in its RoM. Followed also by *Watkins v. Spain*, ¶516.

[625] MoM, ¶1322, relying on *Gold Reserve v. Venezuela*, ¶570.

[626] MoM, ¶1322, relying on *Micula v. Romania*, ¶¶669, 671.

[627] MoM, ¶1331, referring to *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Liability, 27 December 2010 (CL-0115) ("***Total v. Argentina***"), ¶121; *El Paso v. Argentina*, ¶364, 375.

[628] C-PHN, ¶122, referring to *Electrabel v. Hungary I*, ¶7.78 as recited also in *Antaris v. Czech Republic*, ¶360(5).

[629] C-PHB, ¶¶141f.

[630] MoM, ¶¶1322f., relying in particular on *LG&E Energy Corp. et. al. v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006 (CL-0082) ("***LG&E v. Argentina***"), ¶175.

will remain stable and consistent.[631] In the Claimant's view, this is true all the more in the context of the ECT, given the explicit reference to "*stable* [...] *conditions*" in Article 10(1) ECT.[632]

615    Equally as a result of this express requirement of stability, the Claimant submits that one cannot adopt under the ECT the view taken by other tribunals based on certain BITs, namely that host States are not required to elevate the interests of the investors above other considerations. In the Claimant's view, the first sentence of Article 10(1) ECT does give prevalence to investors' interests over other competing interests.[633] In addition, the Claimant submits that the right to regulate is not unfettered, and Article 10(1) ECT prohibits drastic or abrupt revisions of the legal regime upon which the investment depended.[634]

616    As to the relevant point in time for assessing the creation of legitimate expectations, the Claimant argues that while legitimate expectations must rest on the conditions as they exist at the time of the investment, investments are often a process rather than instantaneous acts.[635] With respect to the Wind Farms, the Claimant's position is that the investment spanned from 6 November 2007 (when the Claimant acquired shares in Condeu) through 22 December 2011 (when the Claimant increased its interest in Dagosa).[636] Regarding the CSP Plants, the Claimant submits that the investment covered the period from 21 November 2007 (when the Claimant acquired a shareholding interest in Iberéolica Solar) until 26 May 2011 (when the Claimant acquired additional shares in Iberéolica Solar).[637]

617    The Claimant asserts that the Respondent had created the legitimate expectation on the part of the Claimant that RF1 "*would remain stable and consistent over time*".[638] While the Claimant avers that it does not claim petrification of RF1 but rather the absence of any "*abrupt change*",[639] its position is not entirely consistent because elsewhere the Claimant

---

[631] MoM, ¶¶942f., 1324-1326, 1332, relying inter alia on *Duke Energy v. Ecuador*, ¶340; *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Tikaret Limited Sirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007 (CL-0114) ("*PSEG Global v. Turkey*"), ¶¶250, 254; *Charanne v. Spain*, ¶484.

[632] MoM, ¶¶1313, 1326; referring also to *Plama v. Bulgaria*, ¶173.

[633] C-PHB, ¶¶124-128; see also ¶¶181-188.

[634] C-PHB, ¶191, referring to *Eiser v. Spain*, ¶¶363, 387.

[635] C-PHB, ¶65, relying on *Saluka v. Czech Republic*, ¶329; *Azurix Corp.* v. *Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006 (CL-0128) ("*Azurix v. Argentina*"), ¶372; *Siemens v. Argentina*, ¶299; *Duke Energy v. Ecuador*, ¶¶340, 347, 365, 366; *AES v. Hungary*, ¶¶9.3.8-9.3.12; *Schreuer/Kriebaum*, At What Time Must Legitimate Expectations Exist? (CL-0288), p. 4.

[636] C-PHB, ¶¶67, 74f.

[637] Ibid., ¶¶76.

[638] MoM, ¶1334.

[639] RoM, ¶1223; to same effect ibid., ¶1272(vii); see also RoM, ¶¶931, 934, and Mr. Gómez' testimony at the hearing, where he acknowledged that "we knew that [Spain] could change the projects", but that these were "small changes or adjustments, [...] non-material changes, [...] and we were not worried" (HT, Day 2, 39:20-29:22).

133

argues that "*any*" changes to RF1 would breach the ECT, and its primary damage calculation is based on a counterfactual in which RF1 remains completely unchanged.[640]

618     In particular, the Claimant contends that the Respondent has created this legitimate expectation of stability through the following measures:

(i)     The PER 2000 and the PER 2005 proved the Respondent's commitment to further develop renewable energies in Spain, even more so because each of them had been issued by one of the two major Spanish political parties, who were aligned on this policy objective.[641]

(ii)     RD 661/2007, together with the corresponding press release of 25 May 2007, contained specific commitments guaranteeing the stability of the remuneration scheme, in particular by way Article 44(3) of RD 661/2007.[642]

(iii)     Article 4(3) and the 4th/5th Transitory Provisions of RDL 6/2009 guaranteed to the CSP Plants that they would receive the remuneration foreseen by RD 661/2007, because they were pre-registered on the Remuneration Pre-Allocation Register and, within 36 months thereof, entered into operation and were finally registered on the RAIPRE.[643]

(iv)     The Resolution of the Council of Ministers of 13 November 2009 (together with the corresponding press release of the same day) admitted further CSP capacity to the Special Regime and highlighted the necessity of providing certainty to promoters of renewable energies, constituting a further guarantee regarding the stability of the system.[644]

(v)     The registration of the Wind Farms and CSP Plants in RAIPRE triggered a specific right to receive the remuneration foreseen in RD 661/2007, based on Article 14 of RD 661/2007 and as confirmed by resolutions that were sent by the Respondent to the CSP SPVs and Wind SPVs confirming their registration.[645]

(vi)     The 2010 Agreemens, together with the corresponding press release of 2 July 2010, guaranteed the stability of the economic regime in exchange for certain sacrifices made by the CSP SPVs and Wind SPVs.[646]

---

[640] RoM, ¶1272(ii): "The Respondent was well aware in 2010 that any change of Regulatory Framework No. 1 that was not agreed upon with the CSP and Wind subsectors would be contrary to the ECT"; see also MoM, ¶1366; CWS-DG, ¶64.

[641] MoM, ¶¶1371f., 1374-1376.

[642] MoM, ¶¶237f., 268, 1336-1342; RoM, ¶¶128-131.

[643] MoM, ¶¶281-316, 1343-1346; see also RoM, ¶¶190-193.

[644] MoM, ¶¶1347-1350.

[645] MoM, ¶280; RoM, ¶¶182-189, 1256-1258, referring in particular to the Dissenting Opinion of G.S. Tawil in *Charanne v. Spain* (CL-0191), ¶¶9-11.

[646] MoM, ¶¶370-376, 399-408, 421-426, 1351-1354.

(vii) RD 1614/2010 (together with the corresponding press release of 3 December 2010) transformed the 2010 Agreements into Spanish law and, thus, guaranteed the existing economic regime for the CSP Plants and Wind Farms. Specifically, the Claimant refers to Articles 4 and 5(3) of RD 1614/2010.[647]

(viii) The Waiver Acceptance Resolutions concerning the CSP Plants, which guaranteed that the economic regime for the CSP Plants would be maintained for the remainder of their operational life.[648]

619   Contrary to the Respondent's argument that the remuneration levels were always subject to an overriding principle of "*reasonable return*", the Claimant submits that the foregoing measures created the legitimate expectation of receiving the specific revenues set out in RD 661/2007, as amended by RD 1614/20010, and that the Claimant never understood that is was guaranteed only a "*reasonable return*".[649] In particular, the Claimant dismisses the Respondent's suggestion that such a concept of "*reasonable return*" had a dynamic character, arguing that the costs for constructing the CSP Plants and Wind Farms are sunk and do not change even if the same installation can be built for a lesser amount of money at a later point in time.[650]

620   In response to the Respondent's allegation that the Claimant could not legitimately expect any feed-in tariff for the CSP Plants because their installed capacity exceed 50 MW, the Claimant submits that the Respondent's attempt to equate the term "*installed capacity*" with gross production is unsustainable. While RF1 did not define the term "*installed capacity*", the Claimant asserts that such term is commonly used in the industry to refer to the capacity that a plant is able to deliver to the grid (net production), which is lower than the capacity of its generator (gross production) due to the internal consumption and losses of power within the plant and along the transmission line. The Claimant alleges that both CSP Plants are designed and operated to deliver no more than a net production of 50 MW to the grid, and have never collected feed-in remuneration above the 50 MW limitation. In addition, the Claimant notes that the nameplates of the generators in both CSP Plants, which nameplates were installed by the supplier of the generators, prove that the installed capacity does not exceed 50 MW. In addition, the Claimant argues that because feed-in remuneration under RF1 was applicable solely to net production,[651] the term "*installed capacity*" could not have referred to anything else. Moreover, the Claimant contends that the Respondent's regional authorities interpreted "*installed capacity*" as referring to net production because, otherwise, they would not have granted the relevant administrative authorizations and registered the CSP Plants with the Special Regime. Similarly, even though the Ministry of Energy was aware that the CSP Plants had a gross capacity of 55 MW, the CSP Plants were nonetheless registered in the Remuneration Pre-Allocation Registry and RAIPRE. Therefore, the Claimant submits that the Respondent is estopped from claiming that the CSP Plants did not qualify for the Special Regime based on their

---

[647] MoM, ¶¶1355-1359.
[648] MoM, ¶¶1360-1364.
[649] RoM, ¶¶153f., 156, 563; see also MoM, ¶¶764f.
[650] RoM, ¶¶179, 1272(iv); see also ibid., ¶¶578-584.
[651] This is acknowledged also by the Respondent, see CMoM, ¶115.

installed capacity. Furthermore, the Claimant asserts that this arbitration is not the proper forum for the Respondent to dispute the CSP Plants' compliance with the Special Regime requirements, given that the necessary commissioning certificates and the admission of the CSP Plants to the Remuneration Pre-Allocation Registry and RAIPRE are valid administrative acts under Spanish law, which presuppose that the CSP Plants comply with the maximum power limit. Those administrative acts could only be rendered ineffective by the same administrative bodies that issued them or by Spanish administrative courts.[652]

621    Finally, with respect to the Respondent's State aid argument, the Claimant invokes several arbitral awards pursuant to which the Respondent's failure to notify RF1 as State aid did not preclude legitimate expectations of investors.[653] The Claimant submits that when it invested, neither the Claimant nor any other investors nor any lawyers, bankers or engineers considered that RF1 could be unlawful under EU law, in particular in view of the CJEU's judgment in *PreussenElektra*.[654] The Claimant points out that not even the Respondent itself nor the EC considered RF1 to constitute Staid aid, as evidenced by the fact that the Respondent never notified RF1 to the EC and that the EC, while fully aware of RF1, never initiated a procedure on its own motion, as it could have.[655] The Claimant notes that the EC State Aid Decision in fact stated that it was not relevant to assess whether RF1 would have been compatible with RF1.[656] The Claimant adds that the EC has not created a right for the Respondent, much less an obligation, to procure the reimbursement of amounts of State aid already paid, as it could have.[657] Also, the Claimant alleges that EU law does not limit the subsidies that the CSP Plants and Wind Farms could lawfully receive to what is granted by the Disputed Measures.[658] Moreover, the Claimant argues that it is entitled to rely on the applicable 10-year limitation period for recovering any unlawful State aid, which would have expired in 2017, i.e. 10 years after adoption of RD 661/2007.[659]

## ii.    The Respondent's Principal Arguments

622    The Respondent argues that in accordance with arbitral jurisprudence, the application of the FET standard allows for a balancing exercise by the host State, and the host State is not

---

[652] MoM, ¶133; RoM, ¶¶355-393, relying in respect of the last point on *ECE Projektmanagement International GmbH and Kommanditgesellschaft PANTA Achtundsechzigste Grundstücksgesellschaft mbH & Co v. Czech Republic*, PCA Case No. 2010-05, Award, 19 September 2013 (CL-0214), ¶4.764. The Claimant also relies on the expert testimony of Mr. Jose Mesa-Díaz, who opines that from an engineering standpoint, the term "installed capacity" is somewhat ambiguous but must be understood as net energy delivered at the interconnection point with the grid, see ATA CSP Capacity Report, ¶42; see also, e.g., HT, Day 3, 127:15-128:20.

[653] CC on *BayWa*, ¶38, referring to *9REN v. Spain*, ¶¶166-169, fn. 117; *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Award, 15 July 2019 (C-0304) ("**Cube v. Spain II**"), ¶¶306f., 309; *InfraRed v. Spain*, ¶¶443f.; *Foresight/Greentech v. Spain*, ¶381; *Operafund v. Spain*, ¶487; *SolEs v. Spain*, ¶442.

[654] CC on *BayWa*, ¶¶27-36, referring to CJEU, Judgment of 13 March 2001 in *PreussenElektra AG v Schleswag AG*, C-379/98, ¶¶59-61.

[655] Ibid., ¶¶11f. See also C-OS, slide 198.

[656] CC on *BayWa*, ¶14.

[657] Ibid., ¶¶15f.

[658] Ibid., ¶16, referring to *BayWa v. Spain*, ¶569(h).

[659] CC on *BayWa*, ¶¶19-22.

required to elevate the interests of foreign investors above all other considerations in every circumstance.[660]

623    The Respondent further submits that the ECT is not an insurance policy against the risk of changes to the regulatory framework, and does not require host States to freeze their legal systems for the investor's benefit, irrespective of Article 10(1) FET referring to "*stable* […] *conditions*".[661] Instead, the Respondent contends that for an expectation of petrification to be legitimate, the host State needs to have made a specific commitment to the investor according to which the legal regime in force will remain unchanged.[662] The Respondent argues that the legal regime itself cannot constitute such specific commitment.[663]

624    In addition, the Respondent points out that in order to be protected under the FET standard, expectations must be reasonable and objective under the existing regulatory framework, and thus take into account the knowledge that the investor had or should have had about the regulatory framework when making the investment. Accordingly, the Respondent argues that there is an "*inexcusable obligation*" for every investor to perform a diligent analysis and to know the regulatory framework affecting the investment, including the relevant jurisprudence of domestic courts, in particular in a highly regulated sector.[664]

625    With respect to the Wind Farms, the Respondent contends that the relevant point in time for assessing the Claimant's legitimate expectations was 2003, when Mr. Gómez paid for the construction of the Wind Farms. By contrast, according to the Respondent, the acquisition of Condeu by the Claimant in November 2007 was merely a re-shuffling of assets that were all wholly owned by Mr. Gómez. In the alternative, the Respondent argues that the latest point in time for assessing legitimate expectations in respect of the Wind Farms is November 2007. In relation to the CSP Plants, the Respondent submits that the relevant point in time is November 2007.[665]

626    In the Respondent's view, the Claimant could not legitimately expect that the remuneration regime would remain unchanged because the Respondent did not make any specific commitment to this effect, in particular not in any of the legal instruments or public statements invoked by the Claimant in this regard.[666]

---

[660] CMoM, ¶740, referring to *Electrabel v. Hungary II*, ¶165.

[661] CMoM, ¶¶756, 813-817, referring in particular to *AES v. Hungary*, ¶¶9.3.29f.

[662] CMoM, ¶756; RjoM, ¶1126, referring inter alia to *Plama v. Bulgaria*, ¶219; *Charanne v. Spain*, ¶499; *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009 (RL-0055) ("***EDF v. Romania***"), ¶217; *Electrabel v. Hungary II*, ¶¶155, 157, 162.

[663] RjoM, ¶1257; R-PHB, ¶¶119-122, referring inter alia to *Plama v. Bulgaria*, ¶219 and *AES v. Hungary*, ¶9.3.29.

[664] CMoM, ¶¶745-753; RjoM, ¶1126, referring inter alia to *Electrabel v. Hungary II*, ¶7.78; *Parkerings v. Lithuania*, ¶333; *Saluka v. Czech Republic*, ¶304; *Charanne v. Spain*, ¶¶495, 505; *Isolux v. Spain*, ¶781.

[665] CMoM, ¶745; R-PHB, ¶¶89-98. In R-PHB, ¶¶99-111, the Respondent confirmed that it did not consider the time of the EPM, O&M and financing contracts to be relevant for Claimant's legitimate expectations, contrary to what it had argued in RjoM, ¶1214 and at the Hearing, see R-OS (Merits), slide 26.

[666] CMoM, ¶¶757(8), 765-785, referring also to *Charanne v. Spain*, ¶¶499-505 in relation to RD 661/2007; see also R-PHB, ¶¶123-135.

627    Specifically, with respect to RD 661/2007, the Respondent argues that Article 44(3) thereof did not prevent the Respondent from adopting revisions that were necessary to safeguard the sustainability of the SES or to avoid situations of over-remuneration; instead, the scope of application of Article 44(3) was limited to the regular, quadrennial revisions of the Regulated Tariff and the upper and lower limits as foreseen in Article 44.[667] As regards the registration in RAIPRE, the Respondent submits that this merely determined the applicability of RD 661/2007, but did not guarantee that the tariffs provided for therein would remain the same.[668] With respect to the Resolution of the Council of Ministers of 13 November 2009, the Respondent argues that this Resolution and the underlying reports in fact emphasized the need to safeguard the sustainability of the SES.[669] Regarding the 2010 Agreements, the Respondent contends that the involvement of the CSP and wind sectors did not amount to any agreement in the legal sense of the term, but rather formed part of a consultation procedure that is a mandatory part of the Spanish legislative process.[670] As to the Waiver Acceptance Resolutions, the Respondent claims, inter alia, that as per the plain wording of those documents, they merely communicated the remuneration that was applicable "*at present*" to the CSP Plants and Wind Farms, thus not excluding any subsequent changes.[671]

628    In addition, the Respondent contends that any investor who analysed the regulatory framework applicable at the time the Claimant invested should have known that if there was a situation affecting the sustainability of the SES, changes could and would be made to the regulatory regime, provided that the principle of reasonable return for investors would be maintained. In particular, according to the Respondent, this follows from the normative hierarchy within the Spanish legal system, from the fact that the subsidies under the Special Regime were subordinate to the economic sustainability of the SES, and that the cornerstone of the Special Regime has always been the guarantee of a reasonable return, which has a dynamic character.[672]

629    The Respondent submits that it was also clear from the judgments issued by the Spanish Supreme Court prior to the Claimant's investment in 2007 (and thereafter) that the remunerative regime for renewable energy production could be changed; the Respondent asserts that the Claimant was aware of those judgments.[673] The Respondent adds that not only other investors such as the Claimant's partner in Ibereólica Solar but also the most relevant interest groups for the wind and CSP sectors were perfectly aware of this possibility of legislative changes; in fact, Protermosolar even proposed (unsuccessfully) to include an additional provision into the draft of RD 1614/2010 to the effect that the Respondent would accept liability if the economic regime were modified to the detriment

---

[667] CMoM, ¶¶281-284, 765-769; RjoM, ¶¶584-616. According to the Respondent, the same applies to Article 4 of RD 1614/2010, see CMoM, ¶¶378-386, 777-785; RjoM, ¶¶617-630.
[668] CMoM, ¶¶306-308, 770-774, referring also to *Charanne v. Spain*, ¶¶509-511; RjoM, ¶¶676-691, 1157-1165. A similar argument is made in respect of the Remuneration Pre-Allocation Register, see R-PHB, ¶129.
[669] RjoM, ¶¶1172-1176.
[670] CMoM, ¶¶351-356; RjoM, ¶¶1181-1191.
[671] CMoM, ¶¶423-427; see also RjoM, ¶¶631-675, 1192f.
[672] CMoM, ¶¶757-759; see also RjoM, ¶¶238-284, 302-325, 404-433, 706-709, 808-880, 1133, 1204-1207.
[673] CMoM, ¶¶160-190, referring also to *Charanne v. Spain*, ¶¶507f.; RjoM, ¶¶202-207.

of the owner of a facility.[674] In addition, the Respondent highlights the CNE's report of 14 February 2007, which acknowledged that the protection of legitimate expectations cannot petrify the legal framework, even for existing installations.[675]

630    Furthermore, the Respondent submits that the energy sector is of a strategic nature and involves a high degree of regulation and important public interests. In the Respondent's view, no diligent investor could have expected the existence of stabilization commitments in regulations which, by nature, are changing norms.[676]

631    In addition, the Respondent asserts that in respect of the CSP Plants at least, the Claimant could not have held any legitimate expectations as to benefitting from the Special Regime, given that one requirement of the Special Regime is that the installed capacity does not exceed 50 MW. In the Respondent's view, the term "*installed capacity*" refers to the CSP Plants' nominal power, which undisputedly exceeds 50 MW. The Respondent submits that it is not estopped from raising this argument because the checks performed by public authorities on the CSP Plants were limited to verifying the documentation provided and visiting the plants, whereas no measurement or inspection were carried out.[677]

632    Finally, the Respondent argues, and is supported in this regard by the EC,[678] that no investor could have held any legitimate expectations as to receiving any remuneration under RF1 because RF1 constituted illegal State aid, given the Respondent's failure to notify RF1 to the EC in accordance with Article 108(3) TFEU.[679] The EC submits that this notification requirement is a fundamental principle of EU law, the violation of which entails the illegality of any State aid granted without the EC's authorization.[680] Moreover, the EC asserts that there is longstanding case-law of the CJEU according to which, save in exceptional circumstances, undertakings cannot legitimately expect that any State aid granted to them is lawful unless it has been granted in compliance with the procedure laid down in the TFEU.[681] The EC further alleges that arbitral jurisprudence confirms that assurances *contra legem* cannot create legitimate expectations.[682] In addition, the EC claims that in accordance with settled arbitral case-law, a measure that does not violate

---

[674] CMoM, ¶¶344, 358, 769, 779, 781; RjoM, ¶¶212-230, 740-749.

[675] RjoM, ¶753.

[676] CMoM, ¶762; R-PHB, ¶149.

[677] CMoM, ¶757(9) in conjunction with ¶¶103-120; RjoM, ¶¶1035-1054, 1248f. The Respondent also relies on the expert testimony of Mr. Jesús Casanova Kindelán of the Universidad Politécnica of Madrid, who opines that the "installed capacity" equals the nominal capacity of the CSP Plants' turbo generators (55 MW each), see Casanova Report, ¶¶62f.; see also, e.g., HT, Day 3, 127:2-127:13.

[678] The Tribunal finds that it need not decide on the Claimant's objection to the admissibility of the EC Submission on State Aid, given that the Tribunal does not follow the position taken in that submission.

[679] RC on *BayWa*, ¶¶39-84, 98-101; EC Submission on State Aid, p. 1f., 5; cf. also R-PHB, ¶¶136, 150.

[680] EC Submission on State Aid, p. 5f.

[681] EC Submission on State Aid, p. 2, 6, referring to CJEU, Judgment of 20 September 1990 in *Commission v. Germany*, Case C-5/89, EU:C:1990:320, ¶14; CJEU, Judgment of 20 March 1997 in *Land Rheinland-Pfalz v. Alcan Deutschland*, Case C.24/95, EU:C:1997:163, ¶25. See also RC on *BayWa*, ¶¶39-84, 97.

[682] EC Submission on State Aid, p. 4f., referring to *PSEG Global v. Turkey*, ¶¶241-243; *Venezuela Holdings v. Venezuela*, ¶256. See also RC on *BayWa*, ¶¶102f., referring to *EnCana v. Ecuador*, ¶184; *Plama v. Bulgaria*, ¶¶138f.

domestic provisions on legitimate expectations also does not violate the FET standard.[683] Likewise, the EC argues that diligent investors in the EU must be familiar with the EU State Aid Rules, including the fact that EU Member States have no say in deciding whether State aid is compatible with EU law, thus rendering any promises or assurances by an EU Member State about State aid matters incapable of creating any legitimate expectation.[684]

633    The EC asserts that the findings from the EC State Aid Decision are binding on the Tribunal when assessing a violation of the substantive protections standards of the ECT.[685] These findings notably include, according to the EC, that investors could not have held any legitimate expectations, neither under the TFEU nor under the ECT, with respect to RF1, given the Respondent's failure to notify it to the EC.[686]

634    In addition, the EC submits that Article 1(3) ECT recognizes that Contracting Parties who are members of a REIO, such as EU Member States, were signing onto the ECT only in respect of matters for which they retained competence. The EC argues that the EU Member States transferred certain competences to the EU and that, therefore, Contracting Parties to the ECT knew from the beginning that an investor in an EU Member State could acquire legitimate expectations only if it complied with EU law.[687]

635    Moreover, the EC submits that any arbitral award rendered by this Tribunal would need to be notified to the EC so that it can assess the compatibility of the State aid granted by the award with the EU internal market.[688]

### iii.    The Tribunal's Analysis

636    The Tribunal finds it useful to first set out its view on how to assess the existence of legitimate expectations before determining which legitimate expectations, if any, the Respondent created with respect to RF1, i.e. the legal regime under which the Claimant invested.

#### (1)    Standard for Assessing Legitimate Expectations

637    There is broad consensus in arbitral jurisprudence, to which the Tribunal subscribes, that the existence of a legitimate expectation (or expectations) is to be assessed as at the time

---

[683] EC Submission on State Aid, ¶164, referring to *EDF v. Romania*, ¶¶279-283; *Al-Bahloul v. Tajikistan*, ¶¶221-225; *ADF Group Inc. v. United States of America*, ICSID Case No. ARB(AF)/00/1, Award, 9 January 2003, ¶189.

[684] EC Submission on State Aid, p. 5, referring to the CJEU, Judgment of 20 September 2011 in *Regione Autonoma della Sardegna v. Commission*, joined Cases T-394/08, T-408/08, T-453/08 and T-454/08, EU:T:2011:493, ¶281.

[685] EC Submission on State Aid, p. 2-4, referring to CJEU, Judgment of 6 October 1970 in *Franz Grad v. Finanzamt Traunstein*, Case 9/70, EU:C:1970:78, ¶¶5-10; CJEU, Judgment of 13 March 2007 in *Unibet (London) v. Justitiekanslern*, Case C-432/05, EU:C:2007:163, ¶38; *Electrabel v. Hungary I*, ¶¶6.70-6.93; *JSW Solar and Wirtgen v. Czech Republic*, PCA Case No. 2014-03, Final Award, 11 October 2017 (RL-0118) ("***Wirtgen v. Czech Republic***"), ¶¶371, 373, 406 (including fn. 250). To same effect EC State Aid Decision, ¶166.

[686] EC Submission on State Aid, p. 2f., 6, referring to the EC State Aid Decision, ¶¶158, 164 (RL-0116).

[687] EC Submission on State Aid, p. 4.

[688] Ibid., p. 6; also the EC State Aid Decision, ¶165.

when the investment was made.[689] If an investment is made in multiple parts on different dates, the legitimate expectations need to be assessed at each of those dates separately.[690]

638    Moreover, the Tribunal shares the well-established view that the assessment of legitimate expectations must be an objective one. This has two dimensions. First, it is irrelevant which intentions the State pursued when carrying out the actions that objectively gave rise to certain legitimate expectations, in particular whether the State subjectively sought to commit itself to anything by virtue of those actions.[691] Secondly, it is not the subjective belief of the investor in question that counts.[692] Rather, legitimate expectations are those that a prudent investor would have held.[693] Accordingly, in principle, the assessment of legitimate expectations must be made based on the information that a prudent investor would have held at the time the investment was made, without appraising the investor's expectations with the benefit of hindsight.[694] However, if the individual investor in question was privy to additional information not available to others, this personal information will likewise be taken into account.[695]

639    In addition, the Tribunal finds that, in principle, there is no *numerus clausus* as to the forms of State actions that can give rise to legitimate expectations. Accordingly, such expectations can be engendered by any (explicit or implicit) statements or conduct.[696] In particular, therefore, legitimate expectations do not necessarily require specific representations by the host State.[697] However, in the absence of any clear indication to the contrary, no State can reasonably be taken to have entered into an investment treaty with the intention of generally committing to freezing its laws,[698] or for the investment treaty to serve as a permanent "*insurance policy*" to the benefit of foreign investors against any

---

[689] *AES v. Hungary*, ¶¶9.3.8-9.3.12; outside the ECT also *LG&E v. Argentina*, ¶130; *Enron Corporation and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/03, Award, 22 May 2007 (CL-0084/RL-0085) ("***Enron v. Argentina***"), ¶262; *BG vs. Argentina*, ¶298; *National Grid P.L.C. v. Argentine Republic*, UNCITRAL, Award, 3 November 2008 (CL-0147/RL-0110) ("***National Grid v. Argentina***"), ¶173.

[690] See *Schreuer/Kriebaum*, At What Time Must Legitimate Expectations Exist? (CL-0288), p. 7f., with multiple references to pertinent jurisprudence.

[691] *Micula v. Romania*, ¶669; *Novenergia v. Spain*, ¶652.

[692] *Charanne v. Spain*, ¶495; *Isolux v. Spain*, ¶777; *Antin v. Spain*, ¶536; *Foresight/Greentech v. Spain*, ¶354; *RREEF v. Spain II*, ¶261; outside ECT also *Suez v. Argentina*, ¶209; *El Paso v. Argentina*, ¶¶356, 358, 364; *Invesmart v. Czech Republic*, ¶250; *Saluka v. Czech Republic*, ¶304.

[693] *Electrabel v. Hungary I*, ¶7.75; *Charanne v. Spain*, ¶495; *Isolux v. Spain*, ¶777; *Novenergia v. Spain*, ¶648; *Foresight/Greentech v. Spain*, ¶354; *RREEF v. Spain II*, ¶¶261, 380, 393; outside ECT also *Suez v. Argentina*, ¶209; *El Paso v. Argentina*, ¶¶356, 364; *Invesmart v. Czech Republic*, ¶250.

[694] *Antin v. Spain*, ¶537.

[695] *Electrabel v. Hungary I*, ¶7.78; *Isolux v. Spain*, ¶781; *Antin v. Spain*, ¶537; in essence also *RREEF v. Spain II*, ¶398; *Cube v. Spain I*, ¶393.

[696] *Micula v. Romania*, ¶669; *Novenergia v. Spain*, ¶¶650f.; *Antaris v. Czech Republic*, ¶360(3); outside the ECT also *Parkerings v. Lituania*, ¶331.

[697] *Electrabel v. Hungary I*, ¶7.78 (referring to multiple decisions outside the ECT); *Novenergia v. Spain*, ¶650; *Antaris v. Czech Republic*, ¶360(5); outside the ECT also *Parkerings v. Lithuania*, ¶331.

[698] *Micula v. Romania*, ¶673; see also *SolEs v. Spain*, ¶318; outside the ECT also *Saluka v. Czech Republic*, ¶673; *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, 5 September 2008 (CL-0077) ("***Continental Casualty v. Argentina II***"), ¶258.

change of the regulatory framework.[699] As a consequence, as seems to be accepted by both Parties,[700] for an investor to legitimately hold the very particular expectation that the regulatory framework in force at the time of investment will remain unchanged, the State needs to have made a specific commitment to that effect.[701]

640     This leads to the question as to which type of State conduct may qualify as a specific commitment in the foregoing sense. Stabilization clauses in a contractual agreement between the investor and the host State certainly could amount to a specific commitment, depending on the particular provision,[702] but in this case there is no such clause. By contrast, it is often said that arbitral jurisprudence is incoherent when it comes to the question of whether general legislation could engender a legitimate expectation that the regulatory framework will remain unchanged. According to *Masdar v. Spain*, one school of thought considers that this is possible, while another school of thought requires something more than general legislative statements.[703] However, upon review of the decisions referred to in *Masdar v. Spain* in support of this categorization, as well as of other decisions in which tribunals accepted that general legislation could engender legitimate expectations, it seems to the Tribunal that the difference between these schools of thought is quite limited:

> (i)     The decisions cited by *Masdar v. Spain* in support of the first school of thought (general laws may qualify as specific commitments) did not in fact accept as legitimate the expectation that the laws would not change *at all*, but merely the expectation that such changes would not exceed a certain margin.[704] Exceptions are the decisions in *Operafund v. Spain* and *9REN v. Spain*, both issued after *Masdar v. Spain*, which qualified a legislative provision as a specific commitment

---

[699] *Antaris v. Czech Republic*, ¶360(10), referring to the non-ECT cases of *EDF v. Romania*, ¶219; *Philip Morris Brands Sàrl et al. v. Oriental Republic of Uruguay*, ICSID Case No. ARB/10/7, Award, 8 July 2016 (CL-0293) ("**Philip Morris v. Uruguay**"), ¶42.

[700] C-PHB, ¶¶141f.; CMoM, ¶756; RjoM, ¶1126.

[701] *Antaris v. Czech Republic*, ¶360(10); *Charanne v. Spain*, ¶499; *Electrabel v. Hungary I*, ¶7.77; *Blusun v. Italy*, ¶372; *EDF v. Romania*, ¶217; *Plama v. Bulgaria*, ¶219; *AES v. Hungary*, ¶¶9.3.31, 9.3.34; *InfraRed v. Spain*, ¶366; *RWE Innogy v. Spain*, ¶¶448, 451; outside the ECT also *Philip Morris v. Uruguay*, ¶426; *El Paso v. Argentina*, ¶372; *Parkerings v. Lithuania*, ¶332. By contrast, *Stadtwerke München v. Spain*, ¶264 apparently considers it possible that an expectation of immutability of the legislative framework could be legitimate even in the absence of any specific commitment, depending on the legislation and the facts surrounding the making of the investment.

[702] *Micula v. Romania*, ¶529; *Antaris v. Czech Republic*, ¶360(7); *Stadtwerke München v. Spain*, ¶264; cf. also *AES v. Hungary*, ¶9.3.25. Outside the ECT see *Parkerings v. Lithuania*, ¶¶332, 336; *Philip Morris v. Uruguay*, ¶¶423, 481.

[703] See *Masdar v. Spain*, ¶¶490-495, 504-510; this analysis seems to be shared by *RWE Innogy v. Spain*, ¶453.

[704] *Antin v. Spain*, ¶532; *Novenergia v. Spain*, ¶¶654, 665-667, 681; *Cube v. Spain I*, ¶¶388, 411f.; *Antaris v. Czech Republic*, ¶360(4), (6) and (7); the latter recited by *BayWa v. Spain*, ¶459; outside the ECT also *El Paso v. Argentina*, ¶¶377, 394; *CMS Gas Transmission Company v. Republic of Argentina*, ICSID Case No. ARB/01/8, Award, 12 May 2005 (CL-0070) ("**CMS v. Argentina**"), ¶277; see also UNCTAD, Fair and Equitable Treatment, 2012 (CL-0123), p. 69 ("Where a government extends these types of [specific] commitments to investors, this significantly curbs and restricts it powers to change the rules").

that prevented the host State from making *any* changes to the detriment of the investor.[705]

(ii) Conversely, those decisions cited by *Masdar v. Spain* in support of the second school of thought (general laws do not qualify as specific commitments) merely ruled that one cannot legitimately expect, based on general laws, that there would be no legislative change *at all*.[706] They do not rule out, however, that general legislation engenders more limited expectations of stability.

641   Hence, with the exception of *Operafund v. Spain* and *9REN v. Spain*, the prevailing view seems to be that general legislation cannot engender legitimate expectations in the sense that no legislative changes could be made *at all* (hereinafter "**Absolute Stability**"[707]). Indeed, the Tribunal finds this convincing because "*a stabilisation commitment made in a law is just as much subject to change as all the other dispositions of the law in question*"[708] – as opposed to a stabilization clause in a contract with the investor, which the State could not change unilaterally, i.e. without the investor agreeing.

642   However, the Tribunal (by majority, with Arbitrator Sands dissenting) agrees with the now well-established arbitral case-law that even in the absence of any specific commitment, Article 10(1) ECT does protect investors against legislative changes that exceed a (wide) acceptable margin, i.e. general legislation creates the legitimate expectation that it will not be subjected to any such changes (hereinafter "**Relative Stability**"[709]).[710] Depending on the language used by the relevant tribunal, this excludes changes that are unreasonable,[711] unjustified,[712] unfair,[713] inconsistent,[714] disproportionate,[715] contrary to public interest,[716]

---

[705] *Operafund v. Spain*, ¶¶481, 485; *9REN v. Spain*, ¶¶257, 264-269; while a specific commitment was found to exist also in *InfraRed v. Spain*, ¶¶406, 410, 449, this was based not only on legislative provisions and was seen to be limited to some elements of the legislation, i.e. it did not amount to a petrification of the regulatory framework in general.

[706]*Charanne v. Spain*, ¶¶492f., 498f., 514; outside ECT: *Continental Casualty v. Argentina II*, ¶261(ii). Arguably also *RWE Innogy v. Spain*, ¶¶461f., 538, which was rendered after *Masdar v. Spain*.

[707] Labelled "expectation of stability" in *InfraRed v. Spain*, ¶¶366f.

[708] *Masdar v. Spain*, ¶504, ascribing this argument to its second school of thought; see also the Dissenting Opinion of Philippe Sands in *Operafund v. Spain*, ¶19.

[709] Labelled "expectation of consistency" in *InfraRed v. Spain*, ¶¶368f.

[710] *AES v. Hungary*, ¶9.3.73; *Antaris v. Czech Republic*, ¶360(7); outside the ECT also *El Paso v. Argentina*, ¶402; *Philip Morris vs Uruguay*, ¶433. Apparently, the majority of the tribunal in *Stadtwerke München v. Spain* does not share this view as it merely assessed whether there were any commitments engendering an expectation of immutability of the legislative framework (see ibid., ¶¶264, 268-308); only the Dissenting Opinion of Kaj Hobér, ¶¶9-14 (CL-0308) analysed whether legitimate expectations were violated based on "fundamental and radical" changes.

[711] *Charanne v. Spain*, ¶515; *Masdar v. Spain*, ¶484; *RWE Innogy v. Spain*, ¶451; *Watkins v. Spain*, ¶521; *PV Investors v. Spain II*, ¶847; this approach is criticized in *Blusun v. Italy*, ¶318. Same approach outside the ECT in *Parkerings vs. Lithuania*, ¶331, which adds "unfairly" and "inequitably" as further alternatives.

[712] *Masdar v. Spain*, ¶484.

[713] *Electrabel v. Hungary I*, 7.77; *RWE Innogy v. Spain*, ¶462; *Watkins v. Spain*, ¶521; outside the ECT also *Parkerings vs. Lithuania*, ¶331. Some of those decisions add "inequitable" as a further alternative.

[714] *Electrabel v. Hungary II*, 7.77.

[715] *Charanne v. Spain*, ¶515; *Blusun v. Italy*, ¶¶319, 372; *BayWa v. Spain*, ¶478; *RWE Innogy v. Spain*, ¶550; *PV Investors v. Spain II*, ¶847.

[716] *Charanne v. Spain*, ¶515; criticized in *Blusun v. Italy*, ¶318.

fundamental[717] and/or radical,[718] subversive,[719] total,[720] unpredictable,[721] or changes that suddenly and unexpectedly remove the essential features of the previous regulatory framework.[722] Despite the different language employed, the cases in which those terms were used do not appear to reveal any significant difference as to the standard applied. In particular, notwithstanding the varying terminology in this regard, all awards on record dealing with RF2 found that it did not exceed the acceptable margin of change.[723] Likewise, the majority of them of them found that at least the core measures that formed part of RF3 did violate legitimate expectations[724] or, depending on the theoretical basis pursued, a free-standing obligation of States under Article 10(1) ECT to provide stable conditions for foreign investment.[725]

643    It will now be for the Tribunal to determine, based on the foregoing principles, which objectively legitimate expectations, if any, the Claimant could have held at the times it invested. This first requires the Tribunal to deal with the Respondent's threshold arguments that there could have been no legitimate expectations in respect to RF1 at all, given the EU State Aid Rules (see section (2) *infra*), and that in any case no legitimate expectations could

---

[717] *Eiser v. Spain*, ¶363; *Novenergia v. Spain*, ¶654; *Foresight/Greentech v. Spain*, ¶¶359, 365; *Cube v. Spain I*, ¶440; *InfraRed v. Spain*, ¶368; *Watkins v. Spain*, ¶¶492, 521.

[718] *Novenergia v. Spain*, ¶656; *Foresight/Greentech v. Spain*, ¶359; *RREEF v. Spain II*, ¶315; *Cube v. Spain I*, ¶440; *Antin v. Spain*, ¶532; *InfraRed v. Spain*, ¶368; *Watkins v. Spain*, ¶¶492, 521.

[719] *Blusun v. Italy*, ¶363; *RWE Innogy v. Spain*, ¶451.

[720] *RWE Innogy v. Spain*, ¶451; following the non-ECT case of *El Paso v. Argentina*, ¶517.

[721] *Electrabel v. Hungary II*, 7.77.

[722] *Charanne v. Spain*, ¶517; similarly *Antin v. Spain*, ¶532 ("stripped of its essential features"); *Novenergia v. Spain*, ¶656 ("radically altered the essential characteristics") and *Micula v. Romania*, ¶684 ("stripped [the previous legal framework] of most of its practical content and reduced almost to nothing its advantages").

[723] While *9REN v. Spain*, ¶309 in conjunction with ¶299, *Operafund v. Spain*, ¶490, *Masdar v. Spain*, ¶522 in conjunction with ¶464f., and arguably also *InfraRed v. Spain*, ¶¶451-455, found that measures forming part of RF2 constituted a breach, they did so on the basis of their finding there was a specific commitment of Absolute Stability. In other words, they did not make a finding on whether those legislative measures exceeded legitimate expectations of Relative Stability. *BayWa v. Spain* did not make any finding on RF2 because it was not challenged by the claimant in that case, see ibid., ¶590(e). *RWE Innogy v. Spain* did not expressly say which pieces of legislation it deemed to violate legitimate expectations, but the effects it took issue with (lower IRR and claw-back) were all introduced by RF3.

[724] *Novenergia v. Spain*, ¶697; *Foresight/Greentech v. Spain*, ¶398; *RREEF v. Spain II*, ¶589; *Cube v. Spain I*, ¶428; *NextEra v. Spain*, ¶601; *SolEs v. Spain*, ¶462; *Watkins v. Spain*, ¶570; in relation to some of the facilities in question also *RWE Innogy v. Spain*, ¶¶598-600, and *PV Investors v. Spain II*, ¶847; same result, but based on findings that there were specific commitments of Absolute Stability, also *9REN v. Spain*, ¶309 in conjunction with ¶299, *Operafund v. Spain*, ¶490, *Masdar v. Spain*, ¶522 in conjunction with ¶464f., and *InfraRed v. Spain*, ¶¶451-455; left open in *Cavalum v. Spain*, ¶642 (because it was not yet clear whether the facilities in question obtained a reasonable return under RF3). To different effect *BayWa v. Spain*, ¶¶467-515, 590; *Eurus v. Spain*, ¶¶335-369; *FREIF v. Spain*, ¶¶561-570; however, those three latter tribunals likewise did not seem to apply a substantially different standard, but merely found that, on the facts before them, the IRR granted by RF3 to the facilities in question was still reasonable. Similarly, while *Isolux v. Spain*, ¶¶773-815, likewise denied a violation of legitimate expectations, it did accept that legislative change that was not "foreseeable" could violate legitimate expectations (ibid., ¶715), and merely denied such unforeseeability in the case before it, mainly due to the late investment date. Finally, while *Stadtwerke München v. Spain*, ¶¶263-308, also denied any violation of legitimate expectations, the tribunal in that case does not seem to have analysed the notion of Relative Stability.

[725] In particular *Eiser v. Spain*, ¶382 (noting, however, in ¶370, that the principle is the same independent of whether one views reasonable expectations as the theoretical basis); *Antin v. Spain*, ¶¶516-532.

have existed regarding the CSP Plants because their installed capacity allegedly exceeded 50 MW (see section (3) *infra*). Subsequently, the Tribunal will assess whether any of the Respondent's actions invoked by the Claimant engendered a legitimate expectation of Absolute Stability, as asserted by the Claimant in at least some of its submissions, or whether the expectation that the Claimant could have legitimately held was more limited, as argued by the Respondent (see section (4) *infra*).

*(2)    The State Aid Argument*

644    As a starting point, the Tribunal finds that it does not need to decide whether payment by the Respondent of any amount under this award would qualify as State aid. The Tribunal acknowledges that, if this were the case, such payment would be illegal under the EU State Aid Rules unless and until the EC authorizes such State aid. However, this would merely be an obstacle to the enforcement of the award (within the EU) and should not, in and of itself, prevent the Tribunal from awarding damages to the Claimant in the first place.[726] This holds true even more because the Tribunal is in no position to find whether the EC would grant its authorization, i.e. whether any such obstacle to enforcement would be permanent.

645    Accordingly, the only issue for the Tribunal to decide is whether the Respondent's failure to notify RF1 to the EC as State aid renders any expectations of investors with respect to RF1 illegitimate.

646    In the Tribunal's view, there is force to the argument that RF1 constitutes State aid.[727] This holds true in particular if one deems binding, or at least affords deference to, the EC's assessment in this respect, given that the EC qualified RF1 as State aid in its submissions in this arbitration and, arguably, also in an *obiter dictum* in the EC State Aid Decision.[728] Also, the Tribunal finds that if RF1 was in fact State aid, it seems difficult to avoid the conclusion that RF1 was unlawful under EU law for not having been notified to the EC, in violation of Article 108(3) TFEU. However, the Tribunal considers that it does not need to take a position on either of these questions because even if RF1 was unlawful under Article 108(3) TFEU, the Tribunal finds that this would not preclude investors from having had legitimate expectations with respect to RF1, for the reasons set out in the following.

647    This finding of the Tribunal, together the underlying reasons set out in the remainder of this section (2), reflect the view of the majority, with Arbitrator Sands dissenting.

648    First, the Tribunal does not agree with the argument that the Tribunal is bound to a ruling in the EC State Aid Decision whereby no legitimate expectations protected by Article 10(1)

---

[726] Same view *BayWa v. Spain*, ¶568; *Eurus v. Spain*, ¶422; see also *Vattenfall v. Germany*, ¶230 (in the context of the *Achmea* objection).

[727] Same view *BayWa v. Spain*, ¶¶565, 590(g); contra *9REN v. Spain*, ¶166.

[728] EC State Aid Decision, ¶158, which states that "In the very specific situation of the present case, […] a Member State grants State aid to investors, without respecting the notification and stand-still obligation of Article 108(3) TFEU, legitimate expectations with regard to those State aid payments are excluded". Even though the Respondent failed to (timely) notify not only RF1 but also RF3, meaning that the quoted text could also refer to RF3, the context suggests that the EC alluded to RF1, and implied its nature as State aid.

ECT could have existed in relation to RF1. To begin with, the Tribunal is not convinced that the EC State Aid Decision did in fact make a ruling on this issue. The subject-matter of the EC State Aid Decision was whether RF3 should receive the EC's authorization under the EU State Aid Rules.[729] Therefore, even though the relevant paragraphs of the EC State Aid Decision indeed seem to refer to RF1 rather than RF3,[730] this can only be an *obiter dictum* rather than a ruling – even more so as the EC State Aid Decision primarily took the position that the ECT is not even applicable in an intra-EU context.[731] Even if the EC's remarks on RF1 were not just *an obiter dictum*, the Tribunal is unable to accept the proposition that any such ruling made by the EC on the interpretation and application of Article 10(1) ECT would be binding on the Tribunal.[732] The Tribunal must decide this case based on the applicable law as determined by Articles 26(6) and 16(2) ECT. The applicable law, however, does not contain any rule that would bind the Tribunal to any finding of the EC as to whether investors under RF1 could have held legitimate expectations for the purpose of Article 10(1) ECT. In particular, no such binding effect can be derived from EU law. Even assuming *arguendo* that, in principle, EU law forms part of the applicable law, Article 16(2) ECT would preclude the application of any rule of EU law pursuant to which the Tribunal is bound to the EC's alleged ruling. After all, binding the Tribunal to such alleged ruling would be more unfavourable to investors than Part III of the ECT itself, pursuant to which legitimate expectations did in fact exist in relation to RF1 (see section (4) *infra*). The Tribunal also notes that while the arbitral awards invoked by the EC did take into account findings made in EC decisions, those awards did not concern, much less make any ruling on, the issue at stake here, namely whether the EC can bind a tribunal constituted under the ECT when it comes to matters of interpretation and application of the ECT itself.[733]

649    Secondly, it is a general principle of public international law, to which the Tribunal fully subscribes, that a host State may not rely on its internal law as a ground for non-fulfilment of its international obligations.[734] As both the Respondent and the EC acknowledge, EU law forms part of the Respondent's legal system. Hence, from the perspective of the ECT, the EU State Aid Rules must be considered (at least: also) as internal law of the Respondent.[735]

650    Thirdly, the Tribunal is unconvinced by the EC's proposition[736] that there is longstanding arbitral jurisprudence to the effect that an investor cannot have any legitimate expectation of treatment that is unlawful under the laws of the host State, or based on assurances that were made *contra legem*. In the Tribunal's view, all of the decisions invoked for this proposition actually say something else, namely that an investor cannot expect protection of an investment that is itself illegal, or that was made through illegal means (in particular

---

[729] Cf. EC State Aid Decision, ¶1 and the "Conclusion" on p. 33.
[730] EC State Aid Decision, ¶¶158, 164; see also fn. 728 *supra*.
[731] EC State Aid Decision, ¶163.
[732] To same effect *FREIF v. Spain*, ¶529.
[733] *Electrabel v. Hungary I*, ¶¶6.70-6.93; *Wirtgen v. Czech Republic*, ¶¶371, 373, 406 (including fn. 250).
[734] See, e.g., *BayWa v. Spain*, ¶569(a); *AES v. Hungary*, ¶7.6.6.
[735] To similar effect *BayWa v. Spain*, ¶249.
[736] Apparently shared by *BayWa v. Spain*, ¶569(a).

involving corruption). The Respondent does not assert, and the Tribunal is not aware of any indication whatsoever, that the Claimant's investment was itself illegal or involved illegal practices. Instead, the question before this Tribunal is quite different, namely whether an investor can legitimately expect to continue receiving subsidies if these subsidies are unlawful under the laws of the host State.

651    Fourthly, irrespective of the fact that neither the Respondent nor the EC submitted any pertinent jurisprudence on this point, the Tribunal does find it reasonable to assume that, in principle, an investor cannot legitimately expect to receive subsidies that are illegal under the laws of the host State, at least if a diligent investor would have been aware of such illegality. However, the Tribunal also finds that investors should not be held to a higher standard than the host State itself.[737] In this respect, the Tribunal notes the following facts, which the Tribunal deems highly relevant:

(i)    At the time the Claimant invested, the Respondent itself apparently considered that RF1 did not constitute State aid, and that it was therefore not illegal to implement RF1 without seeking the EC's authorization. In fact, the Respondent submits that only through a CJEU decision in 2014 did it become aware that it needed to notify RF3 as State aid.[738]

(ii)    The EC, being the guardian of the TFEU and being obliged to "*keep under constant review all systems of aid existing in* [EU Member States]" (Article 108(1) TFEU), was fully aware of RF1 and never took any steps despite the Respondent's failure to notify it.[739]

(iii)    There is no showing that RF1 did not comply with the substantive requirements of Article 107 TFEU. Indeed, it actually appears quite likely that those requirements are met, i.e. that RF1 would have been authorized by the EC had the Respondent notified it.[740]

(iv)    The EC authorized RF3 in spite of its "*lamenting*" that it was notified too late, and without even requiring that beneficiaries pay interest for the time between the granting and the authorization of the State aid, as it could have.[741]

(v)    The two foregoing points suggest that had the Respondent complied with its duty to notify RF1, even after the Claimant had invested, it could reasonably be expected that the Claimant could have kept any subsidies granted under RF1. In other words, even if one considered that the Claimant could not legitimately expect RF1 to be legal under EU law pending authorization by the EC, it is

---

[737] In this sense *Micula v. Romania*, ¶706. See also C-OS, slides 198, 200.
[738] CMoM, ¶¶656f., referring to CJEU, Order of 22 October 2014 in *Elcogás SA v. Administración del Estado and Iberdrola SA*, Case C-275/13 (R-0024).
[739] Cf. *BayWa v. Spain*, ¶569(d) and (h).
[740] Cf. *BayWa v. Spain*, ¶¶563f. The Tribunal also notes that according to EC Communication, The support of electricity from renewable energy sources (COM(2005) 627, ¶3.5, approximately 60 support schemes for renewable energy were approved by the EC from 2001 to 2004, see CC on *BayWa*, ¶29.
[741] Cf. *BayWa v. Spain*, ¶558.

reasonable to say that the Claimant could have legitimately expected that (i) the Respondent would meet its EU law obligation to notify RF1, (ii) the EC would authorize RF1 and (iii) the Claimant would subsequently be entitled to keep all benefits under RF1.

(vi) While in hindsight it may seem "*surprising*" that the Claimant was not concerned about the fact that RF1 had not been notified to the EC as State aid,[742] it appears that at the time the Claimant invested, no one in Spain (including the Respondent itself and the EC) held any such concerns.

652    Lastly, it is striking that while the Respondent has now taken the stance, albeit very late in this arbitration, that RF1 was in fact State aid that needed to be notified to the EC, the Respondent appears not to have made such notification until this very day. The Tribunal has great difficulty with the Respondent's argument that its own continued failure to notify RF1, which the Respondent itself acknowledges is illegal, should go to the detriment of the Claimant.

653    For the above reasons, the Tribunal finds that the Respondent's failure to notify RF1 to the EC does not automatically precludes the Claimant from holding legitimate expectations with respect to RF1.[743] At most, one might say, in the words of the tribunal in *BayWa v. Spain*, that

> "[b]y about 2010, if not earlier, the Special Regime subsidies were at least arguably state aid and notifiable as such to the EC: the subsidies were not notified, and were unenforceable as such pending EC approval following notification, which never happened. This gave them underlined added vulnerability."[744] (emphasis added)

*(3)    The 50MW Argument*

654    As a matter of principle, the Tribunal agrees with the Respondent's view that if the CSP Plants did not meet the legal requirements for entering the Special Regime created by RF1, the Claimant could not legitimately expect to receive any feed-in remuneration that is limited to Special Regime facilities.

655    The Tribunal notes that the Parties disagree on whether the CSP Plants met the applicable legal requirement of an "*installed capacity*" not exceeding 50 MW. There seems to be no dispute on the technical facts: the CSP Plants' nominal capacity of the generator (gross production) exceeds 50 MW, while the power that the CSP Plants are designed and operated to deliver to the grid (net production) does not. Accordingly, the Parties' dispute is confined to the question of which of the two numbers matters. In other words, the Parties disagree on the interpretation of the relevant Spanish legislation, namely how to interpret the notion of "*installed capacity*" mentioned therein.

---

[742] *BayWa v. Spain*, ¶569(c).

[743] To same effect *Antin v. Spain*, ¶658; *Foresight/Greentech v. Spain*, ¶381; *9REN v. Spain*, ¶166; *SolEs v. Spain*, ¶442; *InfraRed v. Spain*, ¶¶443f.; *PV Investors v. Spain II*, ¶¶635, 637; *Cavalum v. Spain*, ¶611.

[744] *BayWa v. Spain*, ¶590(g).

656    The Tribunal's findings on the Respondent's 50 MW argument reflect the view of the majority, with Arbitrator Sands dissenting.

657    The Tribunal agrees with the Claimant's view that this investment arbitration is not the proper forum for deciding this question of domestic law. This holds true in particular as the Respondent has not disputed that the commissioning certificates and admittance of the CSP Plants to RAIPRE are valid administrative acts under Spanish law unless and until they are annulled by the competent Spanish authorities, which has not happened. Therefore, in the eyes of the Tribunal, the CSP Plants qualify for the Special Regime and the corresponding feed-in remuneration simply because valid administrative decisions issued by the Respondent itself say so.

658    The Tribunal wishes to add that if those administrative decisions are voidable under Spanish law, the Respondent would have had ample time to initiate the necessary steps. The fact that, based on the record, it has not done so, sheds further doubt on the Respondent's interpretation of the term "*installed capacity*",[745] without the Tribunal needing to take any definitive position in this regard.

659    Consequently, the Tribunal dismisses the Respondent's argument that the Claimant could not have held any legitimate expectations in respect of its investment in the CSP Plants, due to their installed capacity.[746]

*(4)    Nature of Legitimate Expectations Created*

660    As mentioned above, legitimate expectations must be assessed as at the point(s) in time when the investment is made. The Parties' positions on the relevant point(s) in time have changed over the course of the arbitration.[747] Given that the investment consists of indirect shareholding by the Claimant in the SPVs, the Tribunal considers that the Claimant's investment occurred when that shareholding was acquired, including as part of subsequent capital increases.[748] Therefore, with respect to the Wind Farms, the Tribunal finds that the relevant points in time are 6 November 2007 (acquisition of shares in Condeu), 19 September 2009 (acquisition of shares in Dagosa) and 20 December 2011 (capital increase in Dagosa). As regards the CSP Plants, the relevant points in time are 21 November 2007 (acquisition of shares in Ibereólica Solar), 17 September 2008 (capital

---

[745] As does the fact, acknowledged by both Parties' technical experts, that the vast majority of CSP plants accepted to the Special Regime as at the time the ATA CSP Capacity Report was prepared (namely at least 40 out of 44 CSP plants) had a generator with a nominal power of 55 MW, i.e. the same as the CSP Plants, see HT, Day 3, 134:1-135:21.
[746] To same effect *Eiser v. Spain*, ¶¶339-345; *InfraRed v. Spain*, ¶¶338-340.
[747] Claimant: 2007 (MoM, ¶120; RoM, ¶¶502, 1229); November 2007 (RoM, ¶¶963, 97); various points in time or the entire period (not clear which of the two) "between" November 2007 and December 2011 for the Wind Farms and "between" November 2007 and May 2011 for the CSP Plants (C-PHB, ¶¶67-75, ¶¶76-99); Respondent: Wind Farms in 2007 (RjoM, ¶1214); Wind Farms in 2003 (R-PHB, ¶89); CSP Plants in 2010 and 2011 (CMoM, ¶807; RjoM, ¶1214); CSP Plants in 2007, July 2010 and May 2011 (R-OS (Merits), slide 26); CSP Plants in November 2007 and potentially on other dates (unclear, R-PHB, ¶¶90-98).
[748] See for this principle *AES v. Hungary*, ¶9.3.14; *Isolux v. Spain*, ¶783; *Novenergia v. Spain*, ¶539.

increase in Ibereólica Solar) and 26 May 2011 (acquisition of additional shares in Ibereólica Solar).

661    Contrary to the argument advanced by the Claimant,[749] the Tribunal finds that no further investments were made when the CSP SPVs entered into EPC, O&M and financing agreements. The Claimant was not a party to any of those agreements.[750] They may or may not have represented investments by the CSP SPVs, but those are legal entities that are separate from the Claimant and the Tribunal finds no basis for piercing the corporate veil. For the same reason, capital increases in which Dagosa participated[751] cannot be qualified as investments of the Claimant, irrespective of the fact that it is a fully-owned subsidiary of the Claimant.

662    The Tribunal will now examine, in turn, the "*commitments, promises and assurances*" invoked by the Claimant, to determine whether any of them gave rise to a legitimate expectation of Absolute Stability and, if not, what other expectation could have been legitimately held by the Claimant.

(a)    *RD 661/2007 and the Press Release Accompanying It*

663    Insofar as the Claimant refers generally to the economic rights granted to investors under RD 661/2007, the Tribunal finds that the Claimant confuses the promise of a certain remuneration with the promise that this remuneration will remain unchanged. The fact that a piece of legislation grants certain rights to investors does not in and of itself constitute a commitment, much less a specific one, that this legislation will not be changed in the future. If a piece of legislation is at all capable of engendering the legitimate expectation that it will not itself be changed by subsequent legislation of the same or higher level of hierarchy (which is doubtful, see ¶641 *supra*), such piece of legislation would at least need to contain a provision specifically stating so. However, no such provision exists in RD 661/2007.

664    In particular, Article 44(3) RD 661/2007 merely provides that facilities that commenced operations before or shortly after a quadrennial revision are exempted from such revision.[752] By contrast, Article 44(3) RD 661/2007 does not purport to protect investors against a revision of RD 661/2007 itself, and neither does Law 54/1997 contain any provision to this effect. Moreover, Article 44(3) RD 661/2007 does not even cover

---

[749] C-PHB, ¶¶91f., 96, 101-110.
[750] The Tribunal notes that, initially, the Claimant may have acted as a guarantor with respect to some of the financing agreements (see C-PHB, ¶156; also, elswhere the Claimant labels the financing agreements as "non-recourse", see C-PHB, ¶17), even though it is unclear from the Claimant's submissions if the Claimant itself or one of its subsidiaries was the guarantor. However, in any case, the Claimant acknowledges that once the registration in RAIPRE had taken place, no recourse was possible anymore (C-PHB, ¶156). Hence, even if the Claimant initially acted as guarantor and even if this qualified as an investment, such investment ceased to exist at the latest on 19 December 2012, when Olivenza was registered in RAIPRE as the last of the facilities at stake in this arbitration (see MoM, ¶¶253, 278; RoM, fn. 261). This was before RF3 was adopted. In addition, the Claimant has not claimed that it incurred any damage in relation to this alleged investment.
[751] C-PHB, ¶43.
[752] See also *Stadtwerke München v. Spain*, ¶283.

revisions of the premiums[753] – which is highly relevant because the Wind Farms always operated under the Pool Price Plus Premium option and the Claimant asserts that the CSP Plants would have chosen to do so had RF1 not been abrogated before they got to choose between its two remuneration options.[754]

665     In addition to the plain wording of Article 44(3) RD 661/2007, it is important to note that at the time the Claimant invested, the Spanish legislator had already introduced multiple amendments to RD 436/2004. The Spanish Supreme Court had repeatedly dismissed challenges against those amendments despite the existence of Article 40(3) RD 436/2004, which is largely[755] identical to Article 44(3) of RD 661/2007. Diligent investors must be taken to be aware of important judgments of the host State's highest courts.[756] This holds true in particular in the present case where the relevant judgments were expressly referred to in reports by the CNE and the Respondent's Chief State Attorney on a draft of RD 661/2007,[757] i.e. precisely the piece of legislation that the Claimant argues could not be changed. Therefore, also in view of the Spanish Supreme Court's jurisprudence, it was not legitimate for the Claimant to expect on any of the investment dates that pursuant to Article 44(3) RD 661/2007, the remuneration values set by RD 661/2007 could not be changed to the detriment of existing facilities.[758]

666     This analysis is not changed by the press release accompanying RD 661/2007. While emphasizing that by virtue of RD 661/2007, "*stability in time is sought allowing business owners to plan in the medium and long term*", this is a fairly general statement that does not come close to a specific commitment that the remuneration values would never change. Also, while stating that any revisions of the tariffs would not affect facilities in operation, this is clearly a reference to Article 44(3) of RD 661/2007 and does not purport to go beyond the commitment that this provision itself makes. In particular, the press release likewise distinguishes between tariffs and premiums, and does not state that revisions of premiums would not apply to existing facilities.[759]

667     In summary, therefore, neither RD 661/2007 nor the press release accompanying it were specific commitments that the remunerative regime of RD 661/2007 would remain unchanged.

---

[753] See also by *RWE Innogy v. Spain*, ¶545.

[754] MoM, ¶¶190, 278; CWS-JMR, ¶47.

[755] The main difference being that due to the different components of the remunerative regime, RD 661/2007 is different in relation to the remuneration values covered by the protection that is offered by this provision. In view of this, the Tribunal is not convinced by the Claimant's argument that the Spanish Supreme Court's jurisprudence was irrelevant simply because, at the time, it only concerned Article 40(3) RD 436/2004 rather than Article 44(3) RD 661/2007 (or because the cases decided concerned other renewable energy technologies than wind or CSP).

[756] *Isolux v. Spain*, ¶794; *SolEs v. Spain*, ¶429; *RWE Innogy v. Spain*, ¶518.

[757] See ¶¶169, 172 *supra*.

[758] Same view *Antin v. Spain*, ¶¶553, 555; *NextEra v. Spain*, ¶584; *Stadtwerke München v. Spain*, ¶282; *BayWa v. Spain*, ¶466; *RWE Innogy v. Spain*, ¶¶538, 542f.; contra *Operafund v. Spain*, ¶485; *9REN v. Spain*, ¶¶264-269; *InfraRed v. Spain*, ¶¶418-420.

[759] See ¶179 *supra*.

<em>(b)    The Respondent's Advertising of Its Regulatory Framework to Foreign Investors</em>

668    The Claimant refers to multiple presentations that Spain made on the attractiveness of its remuneration regime. In particular, the Claimant invokes a presentation on photovoltaic investments labelled "*The Sun can be yours*" dated 24 May 2005,[760] a presentation named "*Opportunities in Renewable Energy in Spain*" dated 15 November 2007[761] and a presentation titled "*Business Opportunities in Spain*" dated 27 April 2009[762] (the latter two of which also dealt with CSP).

669    However, the Claimant explicitly stated that it did not invoke those presentations in the context of the alleged violation of legitimate expectations, but rather as unilateral undertakings under the umbrella clause.[763] Moreover, as pointed out by the Respondent, the Claimant neither specifically asserted nor provided any evidence that it was aware of and relied on any statements contained in those presentations when it made its investments.[764] In addition, the presentation of 15 May 2005 pre-dated RD 661/2007, while the other two above-mentioned presentations post-dated some of the Claimant's investments. Finally, those marketing documents are fairly vague as to what precisely is meant with the stability advertised therein, which in any case excludes qualifying them as specific commitments.[765]

670    In summary, Spain's efforts in marketing RF1 were neither claimed by the Claimant nor did they in fact engender a legitimate expectation of Absolute Stability.

<em>(c)    Registration in RAIPRE and the Remuneration Pre-Allocation Registry</em>

671    RD 661/2007 merely provides that registration in RAIPRE is a requirement for being subject to the regulatory regime in place at the time.[766] As the Tribunal has already found that RD 661/2007 itself did not engender the legitimate expectation that it would not be changed, fulfilling a requirement to become subject to RD 661/2007 cannot have generated such expectation either.[767] In addition, the CSP Plants obtained final registration in RAIPRE only on 31 May and 19 December 2012, respectively, i.e. after the Claimant's last CSP-related investment on 26 May 2011. Therefore, such registration cannot possibly

---

[760] IDAE, The Sun Can be Yours, 24 May 2005 (C-0079), referred to in MoM, ¶201; RoM, ¶339.

[761] Invest in Spain, Opportunities in Renewable Energy in Spain, 15 November 2007 (C-0678), referred to in RoM, ¶¶333f.; see also Invest in Spain, Opportunities in Renewable Energy in Spain, November 2008 (C-0608).

[762] Invest in Spain, Opportunities in Renewable Energy in Spain, 27 April 2009 (C-0681), referred to in RoM, ¶335; see also also Invest in Spain, Opportunities in Renewable Energy in Spain, 26 March 2009 (C-0682).

[763] RoM, ¶1184(iv); see also ibid., ¶1178.

[764] RjoM, ¶693.

[765] See also *Stadtwerke München v. Spain*, ¶¶286f.

[766] See RD 661/2007 (C-0064/R-0101), Article 14.

[767] Same view *Charanne v. Spain*, ¶¶509f.; *RREEF v. Spain II*, ¶¶339f.; *Stadtwerke München v. Spain*, ¶306; *RWE Innogy v. Spain*, ¶544; see also *Cube v. Spain I*, ¶453 (in the context of the umbrella clause); different view *Masdar v. Spain*, ¶¶512-521 (in part, however, because of a reading of the Waiver Acceptance Resolutions that this Tribunal is unable to share, see ¶¶676-678 *infra*); *Antin v. Spain*, ¶552.

152

have created any legitimate expectations on the part of the Claimant at the time of its investment.

672    With respect to the CSP Plants' registration in the Remuneration Pre-Allocation Registry, the situation is essentially the same. RDL 6/2009 made the registration in that registry a requirement for new facilities coming under the scope of RD 661/2007. It did not, however, say anything about whether RD 661/2007 could be changed to the detriment of plants admitted to that registry.[768] Indeed, it would be quite peculiar if the remuneration offered by RD 661/2007 could be changed to the detriment of facilities registered in RAIPRE and already in operation, but not for facilities that are merely pre-registered.

   (d)    *Resolution of the Council of Ministers of 13 November 2009*

673    With the Resolution of its Council of Ministers of 13 November 2009, the Respondent accepted new CSP and wind capacity to the Special Regime, but staggered the entry into operation in order to safeguard the technical and economic sustainability of the electricity system. While the Claimant argues this amounted to "*a further guarantee* […] *regarding the future stability of the regulatory framework*" because it declared that the CSP Plants' production was acceptable for the power management system, there can be no doubt that admitting new facilities into the Special Regime does not by itself constitute any specific commitment of Absolute Stability of the remunerative regime in force at the time.

   (e)    *RD 1614/2010, the 2010 Wind/CSP Agreements and Accompanying Press Releases*

674    Based on the record, the Tribunal is of the impression that the communications between Protermosolar and AEE on the one side and the Respondent on the other side did in fact go beyond the type of consultation process that would normally form part of the Spanish legislation process. However, this intensified exchange does not necessarily render the results of these communications specific commitments by the Respondent vis-à-vis the Claimant.[769]

675    In any case, neither the 2010 Agreements nor RD 1614/2010 contained any language through which Spain specifically committed not to implement any further changes to the remunerative regime, even for existing facilities. In particular, while those documents provided for an expansion of the scope of Article 44(3) RD 661/2007 (notably by including premiums), this protection remained limited to the quadrennial revisions provided for in that same Article.[770] Moreover, analogous to the above findings on RD 661/2007 (see ¶665 *supra*), the constant jurisprudence of the Spanish Supreme Court left no room for investors to legitimately expect that the remuneration provided for by RD 1614/2010 could not be changed at all. Indeed, the observations filed by AEE on the draft of RD 1614/2010 (see

---

[768] Same view *Stadtwerke München v. Spain*, ¶300.
[769] See also *Stadtwerke München v. Spain*, ¶290.
[770] Contra *InfraRed v. Spain*, ¶¶418, 421-426.

¶194 *supra*) show that this concept was well-understood by the renewable energy sector at the time.

*(f)    The Waiver Letters and Waiver Acceptance Resolutions*

676    Even though the exchange of Waiver Letters and Waiver Acceptance Resolutions was part of the course of action agreed between Protermosolar and the Respondent in the lead-up to RD 1614/2010, the Tribunal does not find that this gave rise to a contract, as argued by the Claimant.[771]

677    Irrespective of their legal nature, the Waiver Acceptance Resolutions do not contain any language that could be understood as a specific commitment of Absolute Stability. Instead, the Waiver Acceptance Resolutions merely state that

at present […] the remuneration applicable to the facility is made up of the tariffs, premiums, upper and lower limits and supplements established by RD 661/2007 […] and updated annually […], with the current values from January 1, 2011 being as follows: […][772] (emphasis added).

678    This is not a specific commitment of Absolute Stability.[773] In fact, given the express qualification "*at present*" and "*current*", the Tribunal finds it difficult to discern any commitment of any sort in this statement.

*(g)    Conclusion on Legitimate Expectations Created*

679    It follows from the above that the Claimant has failed to prove any specific commitment of Absolute Stability. In other words, the Claimant could not legitimately expect that the Respondent would not make any changes at all to RF1.

680    However, even in the absence of such a specific commitment, the Tribunal finds that it was still legitimate to expect Relative Stability of RF1, i.e. that any changes to RF1 would not exceed an acceptable margin (see ¶642 *supra*). This finding of the Tribunal and the remainder of this section (g) reflect the view of the majority, with Arbitrator Sands dissenting.

681    In order to make the acceptable margin and thus the content of the legitimate expectation of Relative Stability more intelligible, the Tribunal finds it useful to resort to the following criteria, all of which find some support, albeit to different degree, in arbitral jurisprudence referenced by the Parties, and on all of which the Parties have made submissions:

(i)    Magnitude of the change: The more fundamental the changes to the legislation are, i.e. the more the essential the elements of the previous regime are that are

---

[771] See in more detail ¶979 *infra*.
[772] C-0332; C-0334.
[773] Same view *NextEra v. Spain*, ¶586; *Stadtwerke München v. Spain*, ¶296; arguably also *RREEF v. Spain II*, ¶¶321 in conjunction with 167; contra *Masdar v. Spain*, ¶¶519-521; *InfraRed v. Spain*, ¶¶429-435.

being removed, the more likely such changes are to exceed the acceptable margin.[774]

(ii) <u>Economic impact</u>: The more damaging the legislative changes are to the investor, the more likely they are to exceed the acceptable margin.[775]

(iii) <u>Abruptness of the change</u>: The more time a host State gives to the investor to adjust to the new regulatory regime, i.e. through timely announcing the change and/or implementing a transitional period during which the new regime does not yet (fully) apply, the more likely it is that Relative Stability is respected; contrariwise, if the regime change even features elements of retroactivity, or at least retrospectivity, this makes the legislative changes more likely to violate legitimate expectations.[776]

(iv) <u>Change of external circumstances</u>: The more the legislative changes were triggered by a change of external circumstances, i.e. circumstances largely beyond the control of the host State, as opposed to a mere change of internal policy, the more likely such legislative changes are to remain within the acceptable margin of change.[777]

(v) <u>Public interests involved</u>: The more important the public interests involved are, which often coincides with a high level of regulation, the more a diligent investor could have expected change. This is because, as rightly noted by the Respondent:

> [t]he host State is not required to elevate the interests of the investor above all other considerations, and the application of the FET standard allows for a balancing or weighing exercise by the State and the determination of a breach of the FET standard must be made in the light of the high measure of deference which international law generally extends to the right of national authorities to regulate matters within their own borders.[778]

(vi) <u>Prior legislative practice</u>: The more the measures in dispute depart from the host State's previously established practice in respect of legislative changes, in particular in the same field, the less could a diligent investor have expected those measures and the more likely they are to violate Relative Stability. Of course, this cannot mean that a host State can escape responsibility under the FET standard altogether if only its past behaviour was sufficiently reckless; however, if diligent investors are aware of a history of legislative changes in the relevant field, investment therein involves a certain assumption of risk by the investor, which is

---

[774] Cf. the awards that assessed whether essential features of the previous legislative framework were removed, see fn. 722 *supra*.

[775] Cf. for instance *RWE Innogy v. Spain*, ¶550; *BayWa v. Spain*, ¶497; *InfraRed v. Spain*, ¶454.

[776] Cf. awards that referred to "sudden" changes (*Charanne v. Spain*, ¶517) or considered elements of retroactivity/retrospectivity relevant, e.g. *Isolux v. Spain*, ¶814; *Foresight/Greentech v. Spain*, ¶395; *RREEF v. Spain II*, ¶328; *RWE Innogy v. Spain*, ¶617; *BayWa v. Spain*, ¶496; *Eurus v. Spain*, ¶355.

[777] Cf. *Stadtwerke München v. Spain*, ¶264.

[778] *Antaris v. Czech Republic*, ¶360(9), referring to non-ECT cases including *Saluka v. Czech Republic*, ¶¶305f.

relevant to the determination of whether legislative changes introduced after the investment exceed the acceptable margin.[779]

(vii) <u>Stability assurances</u>: Even if a host State's assurances as to the stability of the regulatory framework do not qualify as specific commitments giving rise to a legitimate expectation of Absolute Stability, the degree to which such assurances were made is still relevant for the question of whether subsequent changes to the regulatory framework exceeded the acceptable margin.[780]

682　The Tribunal will henceforth use the term "radical" to denote changes that exceed the acceptable margin of change, as outlined above, and thus violate the notion of Relative Stability.[781]

683　The Tribunal will return to the above criteria when assessing whether the Claimant's legitimate expectation of Relative Stability was frustrated, i.e. whether the Disputed Measures exceeded the acceptable margin (see section d. *infra*). Already at this point, however, the Tribunal is in a position to find that for the legitimate expectations held by the Claimant, it does not make any material difference which of the six investment dates one looks at.

684　In particular, no relevant changes occurred between the first three investment dates (6 November 2007, 21 November 2007 and 17 September 2008) that could have changed the Claimant's legitimate expectations.[782]

685　Before the next investment, which was made on 19 September 2009, the main relevant changes were the growth of the Tariff Deficit coupled with the enactment of RDL 6/2009, which prepared the ground for staggering additional renewables capacity coming into operation so as to limit further costs to the electricity system. The Tribunal finds that, on the one hand, the growing Tariff Deficit, being significantly influenced by the global financial and economic crisis,[783] was an external change of circumstance that made legislative change more likely. Similarly, the adoption of RDL 6/2009 provided another

---

[779] Cf. *RWE Innogy v. Spain*, ¶539.

[780] Treated as a matter of degree also in *Operafund v. Spain*, ¶481; arguably to the same effect *Electrabel v. Hungary I*, ¶7.78; *NextEra v. Spain*, ¶591.

[781] To the Tribunal, this terminology has the benefit of not being limited to the magnitude of the change (as opposed to "fundamental"; "removal of essential elements"), the time element (as opposed to "sudden"), the State's prior or other behaviour (as opposed to "inconsistent") or the public interests involved (as opposed to "contrary to the public interest"). Also, compared to the terms "unfair", "unjust", "disproportionate", the term "radical" makes even clearer that the changes must be of a very significant magnitude, about which there seems no disagreement in arbitral jurisprudence on Relative Stability.

[782] While IDAE, Opportunities in Renewable Energy in Spain, 15 November 2007 (C-0678), which claims on slide 4 that the premium system of RD 661/2007 was "guaranteed", post-dates only the first investment date, this a fairly general marketing document that does not specify the scope of the "guarantee" (which could, e.g., refer to the protection from revisions as per Art. 44(3)). In addition, it is unclear to whom the presentation was held and, thus, whether the Claimant or a diligent investor would even have been aware of it. In any case, the Claimant did not specifically rely on it with respect to its legitimate expectations.

[783] See on this assessment ¶¶895-897 *infra*.

example of Spain amending the regulatory framework to the detriment of investors,[784] going to the criterion of the host State's previous legal practice. On the other hand, however, by introducing the Remuneration Pre-Allocation Registry through RDL 6/2009, the Respondent did imply a certain assurance that those facilities that did manage to get registered in time (and get registered in RAIPRE within the applicable deadline) would gain some additional protection, as opposed to non-registered facilities. Balancing these factors, the Tribunal finds that on 19 September 2009, the margin of acceptable change was not significantly different than on the previous investment dates.

686    Before the next (and last) investment dates, i.e. 26 May 2011 and 20 December 2011, the main relevant changes were the continued growth of the Tariff Deficit, the December 2009 judgments of the Spanish Supreme Court as well as the 2010 Agreements and the enactment of RD 1614/2010. On the one hand, both the Supreme Court judgments[785] and RD 1614/2010 showed to investors that the Respondent could (under Spanish law) and would in fact enact amendments to RD 661/2007 that were detrimental to investors,[786] even in relation to facilities that were already in operation or at least pre-registered. Also, RD 1614/2010 was additional proof of the Respondent's determination to gain control over the tariff deficit, as was clear at the time from its preamble, the related press release and the underlying explanatory report.[787] On the other hand, the 2010 Agreements could be seen to mark the beginning of a legislative practice that Spain would not introduce such cuts for existing facilities without first seeking an understanding with the affected sectors, a practice which Spain did not follow in relation to the Disputed Measures (it being noted, however, that RD 1565/2010 had evidenced shortly before the 2010 Agreements that in case no such understanding was reached, the Respondent was willing to enact detrimental changes anyway). Also, by RD 1614/2010 shielding existing facilities against certain revisions of the economic regime in a stronger fashion than RD 661/2007 (mainly by including premiums into the protective provision), the Respondent can be seen to have somewhat reinforced its assurances of stability. Balancing the foregoing observations, it does not seem to the Tribunal that from the perspective of 26 May and 20 December 2011, the assessment of whether the Disputed Measures brought about a radical change should be materially different from the assessment made with respect to the earlier investments.

687    Accordingly, in its further analysis, the Tribunal will focus on the investments made on 6 November 2007, 21 November 2007 and 17 September 2008, which in the Tribunal's assessment marked the Claimant's main investments decisions anyway.

---

[784] See also *InfraRed v. Spain*, ¶¶407f. Even though the Council of Ministers' Resolution of 13 November 2009 (C-0113) concluded that additional renewable energy production capacity could be admitted to the system without compromising its economic sustainability, the Claimant itself acknowledged that this Resolution only allowed a reduced number of CSP plants to operate (RoM, ¶1430). Also, RD 6/2009 showed to investors that Spain was increasingly concerned by the growth of the tariff deficit and was willing to take measures it considered necessary to reduce it.

[785] See also *RWE Innogy v. Spain*, ¶¶520-523.

[786] See also *InfraRed v. Spain*, ¶407.

[787] See ¶¶195, 197 *supra*.

### c.     Reliance by the Claimant

### i.     The Claimant's Principal Arguments

688     The Claimant acknowledges that the investor in question needs to have relied on the expectation created by the host State. However, the Claimant points out that it is not necessary for the entire investment to have been based solely on such expectation. Instead, it is sufficient that the expectation was a determining factor in the decision to invest, or in the manner or magnitude of the investment.[788] Moreover, the Claimant submits that in accordance with case-law and doctrine, the standard is an objective one, whereas an investor's subjective beliefs are not decisive.[789] Therefore, in order to prove reliance, the Claimant submits that it does not have to prove its own subjective perceptions, but only the contents of the regulatory framework and the other representations made by the host State that were calculated to induce the investment. If the investor then actually invests, there is a fair inference that the investor was induced to invest by the State's conduct.[790]

689     With respect to due diligence, the Claimant argues that when the regulations are perfectly clear in offering certain protections to investors, the investors can legitimately expect such protections without the issue of diligence being relevant.[791] In the Claimant's view, diligence of the investor might be relevant only if the regulatory framework offered no guarantees to induce investment, was unstable or unclear, or the investment climate was risky – none of which was the case when the Claimant invested. In addition, even in such case, Article 10(1) ECT does not require, nor define, any specific standard of diligence, which depend on the facts of the case.[792] In particular, according to the Claimant, commissioning a legal opinion is not a precondition to establishing legitimate expectations.[793]

690     In support of its assertion that when making its investment, it relied on this legitimate expectation created by Spain, the Claimant submits that the Special Regime was adopted with the specific intention to attract investment and that the Claimant invested with the specific purpose of benefitting from this regime. In the Claimant's view, the Respondent's regulations and representations, followed by the Claimant's investment, are evidence of the Claimant's reliance.[794] In addition, the Claimant refers to the witness statement of Mr. Gómez, according to whom the Claimant would not have invested were it not for its reliance on a stable feed-in remuneration for the entire lifetime of the plants.[795]

---

[788] MoM, ¶1329; relying on *Micula v. Romania*, ¶672.
[789] C-PHB, ¶¶137-139.
[790] Ibid., ¶¶145-148, 152.
[791] C- Ibid., ¶165, referring to the Dissenting Opinion of Gary Born in *Wirtgen v. Czech Republic*, ¶98.
[792] C-PHB, ¶166.
[793] C-PHB, ¶167, referring to *Isolux v. Spain*, ¶781, whereby an investor is not required to conduct "an extensive legal investigation".
[794] C-PHB, ¶154.
[795] MoM, ¶¶1368, 1380, referring to CWS-DG, ¶¶39, 64f., 71.

691    The Claimant alleges that its conclusion at the time as to the stability of the regulatory framework was supported by the legal services of Ibereólica and Ibereólica Solar as well as by their auditors.[796] In addition, the Claimant contends that all Wind Farms and CSP Plants were supported by technical and legal due diligence reports.[797] Moreover, Mr. Gómez testified at the hearing that he received verbal advice on many occasions, inter alia by the law firm representing the Claimant in this arbitration, about the legal framework for renewable energy projects in Spain, and that none of the lawyers he spoke to ever raised any concerns as to the stability of the remuneration regime.[798] The Claimant adds that, in any case, as per *Novenergia v. Spain*, RF1 "*was so adamantly clear that its understanding by common readers did not require a particularly sophisticated analysis*", and no due diligence carried out between 2007 and 2011 would have ever forecasted a full replacement of a remuneration model with a new and unprecedented one.[799]

692    The Claimant submits that in addition to itself and any other reasonable investor, reliance was placed on the stability of RF1 also by many sophisticated banks, financial entities and their legal advisers. According to the Claimant, this reliance is evidenced by the fact that investors entered into major long-term project finance schemes for financing the construction and commissioning of almost all renewable energy projects that were developed in Spain, including the CSP Plants and Wind Farms. Similarly, banks and financial institutions were willing to enter into interest rate swaps with the Claimant (and many other investors), which they would not have done had the feed-in remuneration not been guaranteed to pertain in time.[800] Relying on *Masdar v. Spain* and *Antin v. Spain*, the Claimant argues that this reliance by banks on stable revenue streams, in turn, is further proof for the legitimacy of the Claimant's expectation, even if the bank's underlying due diligence was not made available to the Claimant.[801]

## ii.    The Respondent's Principal Arguments

693    According to the Respondent, the guiding thread of all legislative changes before and after the Claimant's investment was to guarantee the sustainability of the SES and to avoid situations of over-remuneration, always maintaining the principle of reasonable return. As Mr. Gómez had witnessed all those regulatory changes since 2000, the Respondent claims he could not have been ignorant of the fact that there was no guarantee that any specific remuneration regime would remain unchanged. In particular, the Respondent claims that RD 661/2007 itself, on which the Claimant seeks to base its expectation of petrification, effected a change in the previous remuneration regime, despite the fact that RD 436/2004 had contained an article that was very similar to Article 44(3) RD 661/2007.[802]

[796] CWS-G, ¶64.
[797] C-PHB, ¶¶170-174.
[798] HT, Day 2, 39:2-39:13; 40:5-40:8; 46:22-47:5.
[799] C-PHB, ¶¶168f., referring to *Novenergia v. Spain*, ¶679.
[800] MoM, ¶¶543-548; see also BRR II, ¶37; C-PHB, ¶¶156-159, highlighting also that final registration in RAIPRE excluded recourse by the banks against the sponsors of the CSP Plants and Wind Farms, including the Claimant.
[801] C-PHB, ¶¶177f., referring to *Masdar v. Spain*, ¶497; *Antin v. Spain*, ¶384.
[802] CMoM, ¶¶803-805; see also RjoM, ¶¶193-200; R-PHB, ¶148.

694    The Respondent asserts that neither Mr. Gómez nor the Claimant nor the SPVs did in fact have the expectation that the remunerative regime of RD 661/2007 could not be altered. In the Respondent's view, this is confirmed inter alia by the financing agreements for the CSP Plants, which make express reference to a "*recalculation of the base case in the event of unfavourable regime change*",[803] as well as by the annual accounts of the CSP Plants, which acknowledged a regulatory risk, in particular in the form of variations in the premiums paid.[804]

695    In addition, the Respondent points out that there is no documentary evidence suggesting that, at the time of the investment, the Claimant was aware of any of the press releases, public statements, presentations or roadshows invoked by it. In fact, most of them had been produced by the Respondent in the document production phase of this arbitration. Similarly, the Respondent notes that there is not a single contemporaneous document showing that the Claimant relied on the foregoing statements, the 2010 Agreements or the Waiver Acceptance Resolutions.[805]

696    Furthermore, the Respondent argues that the Claimant's alleged expectations are not supported by any legal due diligence undertaken before the investment was made. To the contrary, during the document production phase, the Claimant either submitted that the due diligence reports requested by the Respondent did not exist, or failed to produce them. In the Respondent's view, the Claimant cannot rely on any due diligence performed not by itself, but by the banks, especially when the relevant due diligence reports were not made available to the Claimant. Moreover, the Respondent submits that while the due diligence supposedly conducted by the law firm representing the Claimant in this arbitration was not provided in this arbitration, an interview of December 2010 with a partner from the same firm, which was published by a photovoltaic association, included the statement that "*No Royal decree is free from being amended according to the regulatory risk theory, even retroactively*".[806]

### iii.    The Tribunal's Analysis

697    The Tribunal's findings on the issue of reliance reflect the view of the majority, with Arbitrator Sands dissenting.

698    In principle, as acknowledged by both Parties, it is well-established in arbitral jurisprudence that an investor can only base its claim on those representations of the host State upon which the investor relied when making its investment (which needs to be

---

[803] CMoM, ¶809, referring to BQR 72, BQR 73 and C-0492 to C-0497. In addition, RjoM, ¶¶1231-1235 refers to the construction and O&M contracts, which likewise include clauses dealing with regulatory change.
[804] RjoM, ¶¶1229f.; R-PHB, ¶¶170-173.
[805] R-PHB, ¶163.
[806] Quote from Suelo Solar, Interview with Mr. Juan Carlos Hernanz, 22 December 2010 (R-0443); RjoM, ¶¶1217f., 1224; R-PHB, ¶¶165f., 175f. See also R-OS (Merits), slides 49f.

established by the investor).[807] However, the Tribunal finds that this element of reliance is less relevant when the only legitimate expectation in question is Relative Stability, as is the case here. First, as discussed above,[808] the expectation of Relative Stability is legitimate even in the absence of any specific representations made by the State. In the absence of such representations, there is no action of the host State, except for the adoption of the regulatory framework in question, that could serve as point of reference, or object, of the investor's reliance. Secondly, if the viability of an investment depends on a certain regulatory framework, it stands to reason that in normal circumstances, the investment will not be made in the first place unless the investor relies on the absence of any radical changes to that regulatory framework to the investor's detriment. In other words, the Tribunal finds that the making of the investment itself usually implies reliance on the Relative Stability of the regulatory framework upon which the investment depends.[809]

699     It appears that the tribunal in *Charanne v. Spain* came to the same conclusion, given its general finding – not based on any specific showing of actual reliance by the investor before it – that

> an investor has a legitimate expectation that, when modifying the regulation under which it made the investment, the State will not act unreasonably, contrary to the public interest or in a disproportionate manner[810] (emphasis added)

700     The Tribunal finds additional, albeit implicit support for this approach in many other arbitral awards. Indeed, in almost all awards on record related to the Relative Stability of a host State's regulatory framework,[811] reliance by the investor was either not addressed at all[812] or only in the abstract, i.e. without assessing whether the individual investor did in fact rely on Relative Stability (as opposed to the question as to whether a reasonable

---

[807] See e.g. *Técnicas Medioambientales Tecmed S.A. v. The United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003 (CL-0061) ("***Tecmed v. Mexico***"), ¶154; *Duke Energy v. Ecuador*, ¶340; *Waste Management v. Mexico*, ¶98; *CME Czech Republic B.V. v. Czech Republic*, UNCITRAL, Partial Award, 13 September 2001 (CL-0041) ("***CME v. Czech Republic***"), ¶611; *Enron v. Argentina*, ¶262 with further references; cf. also UNCTAD, Fair and Equitable Treatment, 2012 (CL-0123), p. 70.

[808] See ¶642 *supra*.

[809] The Tribunal notes that this essentially resembles the Claimant's argument that there is a fair inference that the legal framework induced the investor to invest, even though that argument seemed to have been more far-reaching as it was not clearly limited to the narrower notion of Relative Stability.

[810] *Charanne v. Spain*, ¶514; similarly general statements can be found in *Novenergia v. Spain*, ¶654; *Foresight/Greentech v. Spain*, ¶359.

[811] This excludes *Operafund v. Spain* and *9REN v. Spain*, as both of them found a specific commitment of Absolute Stability in Article 44(3) RD 661/2007, see ¶640 *supra*. While *Masdar v. Spain* and *InfraRed v. Spain* (albeit limited to some elements of the legislation, ¶¶406, 449) likewise eventually found a specific commitment, they did first discuss Relative Stability.

[812] See in particular *Charanne v. Spain*, *Isolux v. Spain*, *Eiser v. Spain* (even though mentioning in ¶119 as part of the factual background certain facts that could be seen to establish reliance), *Antin v. Spain*, *Foresight/Greentech v. Spain*; the requirement of reliance was neither clearly stated nor applied also in *Novenergia v. Spain, Masdar v. Spain, NextEra v. Spain* and *BayWa v. Spain* (which only refers multiple times generally to "reliance interests of participants", e.g. in ¶463, but not to a requirement for the individual investor to show reliance). *InfraRed v. Spain* is particularly noteworthy because in the context of Relative Stability, the tribunal requires reliance only on the regulatory framework under which the investment is made, rather than on its stability (¶368), while in the context of a specific commitment of Absolute Stability, the tribunal seems to require the investor to establish reliance on this Absolute Stability (¶453).

investor was entitled to rely thereon).[813] Were it not for an underlying assumption that the Relative Stability of the host State's legal framework is generally relied on by investors, it would be difficult to explain why reliance did not play any role in all those awards revolving around Relative Stability, despite reliance being generally accepted as a prerequisite for a legitimate expectations claim.

701    In line with the foregoing, the Tribunal finds that the burden for establishing reliance on Relative Stability is a low one. In essence, the investor will need to establish that

(i)    at the time of investing, the investor was aware of at least the essential elements of the relevant framework[814] and

(ii)    the (degree of) profitability of the investment depended materially on that regulatory framework.

702    If the investor establishes both of the above, its claim that it relied on the Relative Stability of the regulatory framework in question when making the investment will generally be credible absent any special circumstances indicating otherwise.

703    With respect to point (i) above, the Claimant states that it was "*very much aware of RD 661/2007, [RDL] 6/2009 and RD 1614/2010 when it decided to invest*".[815] The Respondent, in turn, submits that "[Mr. Gomez] *was a witness to all of those regulatory changes from the time he began to invest in wind farms in the year 2000. Therefore, the Claimant, entirely owned and administered by* [Mr. Gomez]*, could not ignore the guiding thread of these regulatory modifications.*"[816] Similarly, in numerous instances, the Respondent refers to elements of RF1 that, according to the Respondent, the Claimant was well aware of.[817] On this basis, the Tribunal has no doubt that the Claimant was in fact aware, when it invested, of at least the essential elements of RF1. This is also corroborated by the witness testimony of Mr. Gómez.[818]

704    As to point (ii) above, the Tribunal notes that electricity market prices are not high enough to justify, by themselves, investment in renewable energy projects, including CSP and wind technologies.[819] In fact, this is the very reason why RF1 offered (and RF3 still offers) feed-in remuneration to renewable energy producers in an effort to create a level playing field

---

[813] *RREEF v. Spain II*, ¶388; *Cube v. Spain I*, ¶388; *Operafund v. Spain*, ¶481 (criticized in the Dissenting Opinion of Philippe Sands, ¶¶35-37); *SolEs v. Spain,* ¶¶315, 318; *Plama v. Bulgaria*, ¶176. An exception is *RWE Innogy v. Spain*, ¶¶494, 497, 504-506, where the tribunal did make a finding whereby the investor placed reliance on the stability of RF1, but even in that case only on a general level rather than in respect of specific provisions.
[814] Cf. also *Eiser v. Spain*, ¶119: "contemporaneous documents show that [the investor was] keenly aware of the features of the RD 661/2007 regime"; UNCTAD, Fair and Equitable Treatment, 2012, p. 68 (letter b), 71f. (CL-0123).
[815] RoM, ¶1277.
[816] RjoM, ¶91.
[817] See, e.g., CMoM, ¶¶11, 15, 16-19, 386, 1060; RjoM, ¶¶134, 412, 477, 538, 601, 758, 789.
[818] CWS-DG, ¶¶31, 39, 71f.; HT, Day 2, 16:24-17:4, 45:20-45:23.
[819] BRR I, ¶9.

as compared to conventional energy production.[820] Specifically in relation to the Wind Farms and CSP Plants, the Tribunal accepts that in 2014, feed-in remuneration made up 9-28% of the Wind Farms' overall income,[821] while for the CSP Plants, feed-in remuneration made up 82-83% of their overall income in 2015.[822] The Tribunal notes that these numbers from 2014/2015 reflect the situation under RF3, which is less generous than RF1 in terms of feed-in remuneration payable to the Wind Farms and CSP Plants. Accordingly, it is safe to assume that under RF1, feed-in remuneration accounted for an even higher share of their overall remuneration. In any case, the Tribunal has no difficulty to find that the profitability of the Claimant's investment in the Wind Farms and CSP Plants depended materially on RF1.

705    Consequently, the Tribunal accepts that the Claimant relied on the stability of RF1 when making the investment. Although it is not entirely clear from the Claimant's submissions whether it claims to have relied at the time on an expectation of Absolute or Relative Stability,[823] the Tribunal does not find this distinction decisive in the context of reliance. An expectation of Absolute Stability, while not legitimate in the circumstances of the present case, necessarily encompasses the less far-reaching expectation of Relative Stability, on which the Claimant could legitimately rely.

706    Moreover, the Tribunal finds that the Claimant's reliance on the Relative Stability of RF1 is not called into question by the Respondent's argument that the Claimant failed to engage, before making the investment, in any meaningful legal due diligence as to the stability of the regulatory framework under which it invested.

707    The Tribunal agrees with the Respondent that, based on the record, the Claimant's legal due diligence in preparation of its investment was very limited, to say the least. However, the Tribunal does not consider that a lack of legal due diligence is an indication of the Claimant not having relied on the expectation of Relative Stability. Rather, if at all, a lack of legal due diligence could raise the question of whether such reliance was misplaced, i.e. whether the expectation relied upon was not legitimate. In this regard, however, the Tribunal wishes to stress that legislative change only violates the notion of Relative Stability if it exceeds the margin of change that a diligent investor – who, by definition, conducted sufficient due diligence – could have foreseen. Accordingly, legal due diligence on the part of the investor would not lead the investor to expect anything else than Relative Stability. In other words, even if one considered that the ECT imposed a duty of a formal

---

[820] See CMoM, ¶¶99 (third bullet-point), 1059; RjoM, ¶252. See also Law 24/2013 (C-0378/R-0076), Article 14(7): "[…] The remuneration regime will not exceed the minimum level necessary to cover costs that allow facilities that produce electricity from renewable energy sources […] to compete on a level playing field with all other technologies in the market and enable them to achieve a reasonable return […]", referred to in MoM, ¶770.

[821] Padornelo: 9%; Hedroso: 11%; Lubian: 28%, see RjoM, ¶816; RWS-CMR2, ¶171; the accuracy of these numbers was not disputed by the Claimant, which referred to RjoM, ¶816 in C-OS, slide 176.

[822] Olivenza: 82%; Morón: 83%, see RjoM, ¶816; RWS-CMR2, ¶166; the Claimant reproduced these numbers in C-OS, slide 176, without denying their accuracy.

[823] See ¶617 *supra*.

due diligence on investors[824] and even if the Claimant breached such duty, there would be no causal link between this breach and the legitimacy of the expectation of Relative Stability. Under these circumstances, the Tribunal finds that any lack of due diligence is not an obstacle to the Claimant relying on the Relative Stability of the regulatory framework under which it invested.[825]

708    This being so, the Tribunal does not find it necessary to make a finding on whether the Claimant's legal due diligence did in fact meet the standards required of a diligent investor. Irrespective of whether this was the case, the Claimant placed reliance on the legitimate expectation of Relative Stability.

**d.     Frustration of Legitimate Expectations by the Respondent**

**i.     The Claimant's Principal Arguments**

709    According to the Claimant, the Respondent violated the Claimant's legitimate expectations by adopting the Disputed Measures, which first dismantled RF1 (through RF2) and then replaced it with a completely different, internationally unprecedented and unreasonable new regime (RF3). To the Claimant, this constitutes a radical change of policy that no reasonable businessperson could have foreseen.[826] The Claimant avers that the remunerative regime of RF3 applies retroactively back to the date on which the CSP Plants and Wind Farms started producing energy, given that past gains are taken into account when determining the remuneration to be paid under RF3. In the Claimant's view, this "*mid-stream switch in the regulatory paradigm*" thwarts, in and of itself, the Claimant's legitimate expectations, and also renders the new remunerative system inefficient.[827] In addition, the Claimant submits that the level of remuneration offered by RF3, i.e. a pre-tax IRR of 7.398%, is not only unreasonably low but also hypothetical, given that the true remuneration is lower due to unrealistic assumptions in the calculations underlying this purported IRR.[828] Moreover, the Claimant asserts that it is unreasonable and unprecedented to tie the feed-in remuneration to Spanish bond rates instead of to the cost of capital.[829]

710    The Claimant argues that this drastic change of the rules occurred only shortly after the CSP Plants had started producing energy and had begun to benefit from the remuneration as foreseen by RF1, and before the Wind Farms had even started receiving such

---

[824] In this sense arguably *Masdar v. Spain*, ¶494 (but only "if general legislation is to be the source of the investor's legitimate expectations") and *Operafund v. Spain*, ¶486; less clear *Charanne v. Spain*, ¶505 (stating that the claimant "should have" conducted due diligence, but not saying this is a requirement for protection, and subsequently assessing only what would have been objectively foreseeable). By contrast, a requirement of "formal" or "extensive" due diligence, respectively, is expressly denied in *SolES v. Spain*, ¶331 and *Isolux v. Spain*, ¶781; similarly *Cube v. Spain I*, ¶¶393, 396; essentially also *RWE Innogy v. Spain*, ¶¶513f.

[825] To similar effect the Dissenting Opinion of Gary Born in *Wirtgen v. Czech Republic*, ¶¶98f.; cf. also *SolES v. Spain*, ¶331; *InfraRed v. Spain*, ¶¶362f.; *Charanne v. Spain*, ¶¶505, 507, 511.

[826] MoM, ¶¶1380, 1391; C-PHB, ¶¶144, 207.

[827] MoM, ¶¶786-791, 1387-1390; RoM, ¶549.

[828] MoM, ¶¶778-782, 1385, 1389; RoM, ¶¶674-689.

[829] RoM, ¶1455(iii).

remuneration.[830] In the Claimant's view, this resembles the facts of multiple other arbitrations in which investors complied with all regulatory requirements but were suddenly deprived of their rights precisely when they were scheduled to start benefitting from their investment.[831]

711   The Claimant adds that even if one followed the Respondent's argument according to which the only legitimate expectation that an investor could have had was to receive a "*reasonable return*", such return was quantified by the Respondent itself as a post-tax IRR of up to 11% for the CSP Plants and up to 9% for the Wind Farms,[832] based on the applicable levels of remuneration at the time the Claimant invested.[833] In the Claimant's view, there was no justifiable reason for the Respondent to subsequently pursue a different understanding of what level of return could be considered reasonable.[834]

## ii.    The Respondent's Principal Arguments

712   The Respondent submits that it has not violated any legitimate expectation of the Claimant and that there was no radical change in its legislation.[835] Specifically, it asserts that the essential characteristics of the regulatory framework under which the Claimant invested have been maintained, in particular the priority of access, the basic structure of the compensation model (market price plus subsidy), the methodology for determining the feed-in tariffs (by reference to efficient standard facilities) and the principle of a dynamic reasonable return.[836] Moreover, the Respondent contends that the return offered under RF3 is objectively reasonable, irrespective of whether one compares it to the cost of capital, the profitability in other regulated sectors in Spain or the proposal made in 2009 by the association of renewable energy producers "Asociación de Productores de Energías Renovables" ("**APPA**") and Greenpeace, who were advised by the law firm representing the Claimant in this arbitration.[837] In addition, the Respondent asserts that contrary to the Claimant's argument, the investment costs contemplated in RF3 are in fact realistic, as proven by the fact that they correspond to the projected investment costs for the CSP Plants.[838]

713   Furthermore, the Respondent asserts that contrary to the Claimant's argument, the Disputed Measures are not retroactive in nature, neither within the meaning of international law nor

---

[830] The transitional period of RD 661/20007, which the Wind Farms had opted to be subject to and which allowed them to continue receiving remuneration as provided for under RD 436/2004, expired on the same day that RDL 2/2013 came into force retroactively.

[831] MoM, ¶¶1381-1384, referring to *Metalclad Corporation v. United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2020 (CL-0065) ("***Metalclad v. Mexico***"); *Tecmed v. Mexico*; *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004 (CL-0106); *Gold Reserve v. Venezuela*.

[832] Note, however, that in C-OS, slide 231, the numbers referred to in this context were 9.5% and 7%, respectively.

[833] RoM, ¶¶157-171, 585-589.

[834] RoM, ¶174.

[835] CMoM, ¶810; RjoM, ¶1280.

[836] CMoM, ¶¶812, 818-821; RjoM, ¶¶808-880, 1278; R-PHB, ¶¶181-189.

[837] RjoM, ¶¶815, 982-989, 1278.

[838] Ibid., ¶¶1246f.

under Spanish domestic law. According to the Respondent, this follows in particular from the fact that the Claimant never had any acquired or vested rights to future compensation, *sine die*, through a fixed level of feed-in remuneration. The fact alone that the Disputed Measures affect also existing installations does not make those measures retroactive, in the Respondent's view. The Respondent acknowledges that RF3 takes into account the remuneration already received by the relevant facility from the beginning of its operation. However, the Respondent claims that this merely concerns the calculation of the facility's future remuneration, meaning that past payments are respected even if they exceeded a reasonable return.[839]

714   Finally, the Respondent objects to the Claimant's alternative argument that it was at least entitled to rely on the IRRs underlying RF1, submitting that the Claimant has failed to establish that this return was guaranteed to remain the same over time.[840]

### iii.   The Tribunal's Analysis

715   The Tribunal's findings on the issue of whether the Respondent frustrated the Claimant's legitimate expectations reflect the view of the majority, with Arbitrator Sands dissenting.

716   In order to determine whether the Disputed Measures violated the Claimant's legitimate expectation of Relative Stability, the Tribunal finds it appropriate to make a global assessment of the criteria identified in ¶681 *supra*. Accordingly, the Tribunal will first analyse each of these criteria in turn (see subsections (1) to (7) *infra*) and then decide whether, taking the results of the analyses together, the Respondent violated the expectation of Relative Stability (see subsection (8) *infra*).

#### (1)   Magnitude of the Change

717   The Parties' views differ greatly as to how similar or dissimilar RF1 and RF3 are. While the Respondent claims that the Disputed Measures were merely an "*evolution of the regulatory system*"[841] that maintained the essential characteristics of RF1, the Claimant asserts they resulted in "*a complete overhaul*" of RF1 that constituted "'*a mid-stream switch' of the regulatory paradigm*".[842]

718   In determining the true magnitude of the change brought about by the Disputed Measures, the Tribunal finds it useful to look at each of the main components of the changes from RF1 to RF3 in turn (see subsections (a) to (h) *infra*), before assessing their overall magnitude (see subsection (i) *infra*). As a preliminary remark, the Tribunal wishes to highlight that the magnitude of the change will be determined solely based on those elements of the Disputed Measures for which the Claimant was able to establish that they

---

[839]  Ibid., ¶¶710-738, 1284-1288, relying on *Nations Energy Inc. et al v. Republic of Panama*, ICSID Case No. ARB/06/19, Award, 24 November 2010 (RL-0057), ¶¶642, 644, 646; *Charanne v. Spain*, ¶¶546, 548; *Isolux v. Spain*, ¶814; Spanish Supreme Court, Judgment of 1 June 2016, Case 649/2014 (R-0254), p. 14f.

[840]  RjoM, ¶1274.

[841]  CMoM, ¶678.

[842]  RoM, ¶521.

adversely effected the Wind Farms or CSP Plants. This is because the analysis is not an abstract exercise but is rather meant to inform the Tribunal whether a breach of the FET standard occurred specifically in relation to the Claimant's investment.

*(a)    Level of Remuneration Deemed Reasonable by the Respondent*

719    The Tribunal agrees, in principle, with the Respondent's position that the guiding principle for the remuneration under RF1 was the objective of achieving a reasonable rate of return on the part of investors. While the Claimant essentially alleges that this principle of reasonable return was made up by the Respondent *ad hoc* for the purposes of avoiding liability in investment arbitrations such as the present one,[843] the Tribunal finds this characterization irreconcilable both with the wording of the relevant pieces of legislation and with contemporaneous authoritative statements thereon. In particular, Article 30(4) of Law 54/1997 expressly provided that the objective of premiums to the market price was to "*achieve reasonable rates of profitability*".[844] Moreover, the preamble of RD 661/2007 made clear that RD 661/2007 was meant to pursue this very objective, by stating that it "*develops the principles provided in Law 54/1997* […] *guaranteeing* […] *a reasonable return*".[845] The Spanish Supreme Court, in turn, ruled on 25 October 2006 that Law 54/1997 and the implementing Royal Decree that set the remuneration values[846] guaranteed a reasonable return, but not specific levels of remuneration.[847] Similarly, on 29 March 2007, the Respondent's Chief State Attorney opined that the "*only thing that the Government is under obligation to do is to establish a reasonable rate of return*".[848] In respect of the renewable energy sector itself, the observations filed by AEE on the draft of RD 1614/2010 (see ¶194 *supra*) likewise show that the jurisprudence of the Spanish Supreme Court was well understood. In particular in view of that clear jurisprudence, the Tribunal is also unable to follow the Claimant's argument that the principle of reasonable return as laid down in Article 30(4) of Law 54/1997 was merely a "*directive to the regulator*" [849] while investors were entitled to rely on the remuneration values set in the relevant Royal Decree.

720    That said, at least from the perspective of the ECT's FET standard, the Tribunal shares the Claimant's view that such guiding principle of a reasonable return cannot serve as a *carte blanche* that would allow the Respondent to change the remuneration at its will in relation to investments that were made in reliance of the previous regime. The Tribunal accepts, as claimed by the Respondent, that the principle may have a dynamic character in the sense that what is reasonable depends on the circumstances, which may change over time. However, this does not mean that there are no limits to the Respondent re-defining its

---

[843] See RjoM, ¶¶100-102, 139-145.
[844] See ¶145 *supra*.
[845] See ¶174 *supra*.
[846] At that time, RD 436/2004.
[847] See ¶167 *supra*.
[848] See ¶172 *supra*.
[849] RoM, ¶142.

understanding of what is a reasonable return. Instead, also in this regard, the Respondent is bound by the legitimate expection of Relative Stability.

721    It is undisputed that between RF1 and RF3, the Respondent changed its view as to which level of return is reasonable. In order to determine the extent of this change, the Tribunal will first identify the positions taken by the Respondent under each regulatory framework (see subsection (i) *infra*), then convert the post-tax IRR underlying RF1 into pre-tax numbers (see subsection (ii) *infra*) and finally compare the latter to the pre-tax IRR targeted by RF3 (see subsection (iii) *infra*).

   *(i)    Positions Taken by the Respondent under RF1 and RF3*

722    The Tribunal finds that under RF1, the IRR that the Respondent sought to achieve (hereinafter the "**RF1 Reference IRR**") was 7% for the Wind Farms and 8% for the CSP Plants, both post-tax and excluding financing. Besides other documents, these numbers were expressly mentioned in the press release accompanying RD 661/2007 as the rates of return that the Regulated Tariff sought to achieve for the respective technology.

723    The Tribunal is well aware that for the Pool Price Plus Premium option, the same document indicated a range of 5-9% for the Wind Farms and 7-11% for the CSP Plants, based on which the Claimant argues that the Respondent is estopped from invoking in this arbitration a RF1 Reference IRR of less than 11% for the CSP Plants and less than 9% for the Wind Farms.[850] The Tribunal also notes that the Wind Farms indeed always operated under the Pool Price Plus Premium option (for as long as it existed), and the Tribunal finds it likely that the CSP Plants would likewise have chosen to do so, in line with industry practice.[851] However, the IRR underlying the Pool Price Plus Premium option depends on the uncertain development of market prices, which is why it was expressed as a range in the documents underlying/accompanying RD 661/2007. For this reason alone, it does not seem appropriate to simply use the upper end of the range, as the Claimant suggests. In addition, the methodology behind the setting of the premiums was intended to achieve the same IRR in the Pool Price Plus Premium option as in the Regulated Tariff.[852] Therefore, the Tribunal finds it preferable to use the IRRs underlying the Regulated Tariff for the purposes of comparing RF1 with RF3.[853]

724    RF3, in turn, introduced a target IRR of 7.398% pre-tax (hereinafter the "**RF3 Target IRR**").

---

[850] RoM, ¶171.
[851] MoM, ¶¶190, 278; CWS-JMR, ¶47; RWS-CMR, ¶40 (98.4% of installed wind capacity in 2008 opted for Pool Price Plus Premium).
[852] RjoM, ¶¶801, referring to Economic Report on the draft of RD 436/2004 (R-0260), p. 7, 10; see also CNE, Report on Economic Sustainability of SES of 7 March 2012 (R-0131), p. 31 of the PDF.
[853] The Tribunal notes also that the base case of the Wind Farms' and CSP Plants' financing agreements was in fact the Regulated Tariff, see CMoM, ¶539. The Claimant asserts the Regulated Tariff was chosen because it was a conservative case, but that it did not reflect Renergy's true expectations, see RoM, ¶460.

*(ii)    Conversion of RF1 Reference IRR into Pre-tax Numbers*

725    In order to be able to compare the RF1 Reference IRR to the RF3 Target IRR, it is necessary to either convert the latter into post-tax numbers or the former into pre-tax numbers. The Tribunal finds it more appropriate to compare pre-tax numbers. In particular, this eliminates the risk that any changes in Spanish tax laws between 2007 (when RF1 was promulgated) and 2014 (when RF3 was completed) could influence the comparison between the IRRs that the Respondent sought to achieve with these two regulatory frameworks. While neither party made any submissions on any amendments to Spanish tax laws beyond the TVPEE and TEE, this does not necessarily mean that no such amendments were made for a period of seven years. As no taxation measures (beyond the TVPEE and TEE) were challenged by the Claimant, and as any such measures would risk falling outside the Tribunal's jurisdiction due to Article 21(1) ECT, it would seem inappropriate for them to influence the present analysis.[854]

726    In order to be able to convert the post-tax RF1 Reference IRR into pre-tax numbers, it is necessary to determine the effective tax rate governing this conversion. In its second regulatory expert report, Brattle used effective tax rates of 17.3% for the CSP Plants and 13.2% for the Wind Farms.[855] Accuracy adopted these rates in at least some of its calculations.[856] However, subsequent submissions of Brattle shed doubt on whether these effective tax rates were in fact correct, at least in respect of the Wind Farms.[857] Therefore, the Tribunal requested the Experts to confirm the correct effective tax rates for both the CSP Plants and the Wind Farms.

727    The Experts, however, were unable to agree on effective tax rates because they took different views on the correct approach to depreciation. Brattle's position is that the effective tax rate should be calculated on the basis of straight-line depreciation of the fixed assets. By contrast, Accuracy's view is that the effective tax rate should be calculated based on accelerated depreciation. These different views entail significant differences in the tax rates calculated by the Experts.[858]

728    In support of its approach, Brattle argues that it would be consistent for the Tribunal to use the depreciation methodology employed by the Respondent when it set the feed-in remuneration values in the first place. Brattle claims that the Respondent has consistently assumed straight-line depreciation. In this respect, Brattle refers to the PER 2005, which stated that

---

[854] Also, it is not entirely clear to the Tribunal whether the effective tax rates submitted by the Experts included the effects of the TVPEE and TEE; if they did, this would mean that the post-tax IRRs under RF3 calculated based on those tax rates would be lower than they should be for the purposes of the Tribunal's analysis, given the Tribunal's lack of jurisdiction over the TVPEE and TEE. This provides another reason for looking at pre-tax numbers.
[855] See BRR II, fn. 265, 267.
[856] See Accuracy II, ¶145.
[857] Cf. the Experts' Joint Memorandum of 9 November 2020, ¶15. While Brattle calculates effective tax rates under RF1 of 21.5% for the CSP Plants and 24.1% for the Wind Farms, Accuracy calculates 14.0% and 14.1%, respectively.
[858] See the Experts' Joint Memorandum of 16 December 2020, p. 2 (Table 1).

the generation costs study is carried out considering an investment financed with 100% equity, <u>without aids or deductions</u> […]. The useful life period is 25 years, as is the depreciation period.[859] (emphasis added by Brattle)

729    While agreeing with Accuracy that accelerated depreciation is an advantageous tax option in Spain and that it is economically reasonable to assume that investors would have decided to use this benefit, Brattle argues that the Respondent decided to disregard the options of debt financing and accelerated depreciation when setting the feed-in remuneration of RF1. Therefore, according to Brattle, the Respondent created the opportunity for investors to earn more than the RF1 Reference IRR if investors managed to finance their projects with debt and/or to secure the ability to accelerate depreciation. Brattle submits that the Claimant managed to do both and that it is reasonable for it to retain the efficiency benefits so created. Brattle contends that otherwise, i.e. if one applied accelerated depreciation as suggested by Accuracy, one would appropriate the tax benefits that investors expected to retain under RF1.[860]

730    Accuracy, in turn, points out that in line with accelerated depreciation being the preferred choice for investors, the Experts agreed on using that approach when calculating damages in the Joint Model.[861] Accuracy argues that if the idea is to compare the two regulatory frameworks with each other and/or to compare a given regulatory framework with the actual and but-for scenarios deriving from the Joint Model, such comparison is only meaningful if the same depreciation method is used throughout.[862]

731    Moreover, Accuracy contends that the Respondent did not in fact consistently disregard the possibility of accelerated depreciation when devising the regulatory framework for renewables. In particular, according to Accuracy, the PER 2005 referenced by Brattle does not in fact mention any specific depreciation method, but merely the depreciation period.[863]

732    In any case, Accuracy argues that for determining the *effective* tax rate in each regulatory framework, it is irrelevant whether the Respondent contemplated straight-line depreciation when it set the feed-in remuneration of RF1. In this context, Accuracy also rejects Brattle's analogy to the Respondent having disregarded the benefits of external financing in determining target returns. According to Accuracy, while external financing is an individual choice that may increase the equity returns but involves additional risks (namely losing the entire investment if cash-flows are not sufficient to service the debt), accelerated depreciation is a feature of Spanish tax legislation that comes without any risk to the investor, meaning that it is not a matter of an efficient choice to beat one or the other regulatory framework.[864]

---

[859] Ibid., ¶¶6f., referring to PER 2005 (C-0075/R-0019), p. 109 [as translated into English by Brattle].
[860] Experts' Joint Memorandum of 16 December 2020, ¶¶9f.
[861] Ibid., ¶14.
[862] Ibid., ¶15.
[863] Ibid., ¶18.
[864] Ibid., ¶¶15-17.

733    On balance, the Tribunal finds Accuracy's positions more convincing for the following reasons.

734    First, it has not been established that the RF1 Reference IRRs were in fact based on straight-line depreciation. As correctly noted by Accuracy, the quote from the PER 2005 invoked by Brattle does not in fact say anything about which depreciation method the Respondent contemplated.[865] In addition, it is unclear whether the remuneration assumptions underlying RF1 were fully identical to those developed in the PER 2005 – the latter was issued almost two years before the enactment of RD 661/2007 and was vaguer regarding the IRRs the Respondent sought to achieve compared to subsequent legislative material related to RD 661/2007.[866]

735    Secondly, the Experts agree that in order to allow for any meaningful comparison, one must be consistent on the depreciation method used. Brattle has not disputed that the Joint Model contemplates accelerated depreciation, as did Brattle's own damage calculations. Therefore, if one seeks (as the Tribunal does[867]) to compare the IRRs targeted by RF1/RF3 with the actual and but-for IRRs of the Claimant's facilities as calculated in the Joint Model or by Brattle, such comparison is only meaningful if one assumes accelerated depreciation also when converting the IRRs underlying RF1 and RF3 from post-tax to pre-tax or vice-versa.

736    Thirdly, the Tribunal asked the Experts for the effective tax rate for a specific purpose, namely to ascertain the economic impact that the Disputed Measures had *on the Claimant's individual facilities*. Brattle has confirmed that the Claimant's facilities do use accelerated depreciation. Nonetheless applying straight-line depreciation would create a risk of distorting the effect of the Disputes Measures with theoretical tax effects that are not relevant to the facilities in question and, therefore, to the purpose of the Tribunal's analysis.

737    Finally, the effective tax rates initially used by Brattle in its second regulatory expert report (and adopted by Accuracy in its second expert report) are much closer to those now calculated by Accuracy than to those now calculated by Brattle. The significant differences between Brattle's initial calculations and its new ones, in particular for the Wind Farms, shed additional doubt on the reasonability of Brattle's latest position on the depreciation method.

---

[865] For the sake of completeness, it does not seem as if the additional references that Brattle sought to introduce in the Experts' Joint Memorandum of 16 December 2020 would have helped the Claimant's case: One reference concerns isolated tables from the 1989 (sic!) Renewable Energy Plan, which do not seem capable of enlightening the Tribunal on Spain's considerations behind RF1 almost 20 years later. The other reference is to certain financial models underlying the PER 2005 that were disclosed by Spain in other arbitrations, which models Brattle claims were based on straight-line depreciation; even if this was true, the Tribunal is unable to consider this in the present arbitration, where those models are not part of the record.

[866] While the PER 2005 referred to an IRR of "around 7%", the press releases accompanying the first draft and final versions of RD 661/2007 indicated 7% for wind farms and 8% for CSP plants under the Regulated Tariff, and 5-9% respectively 7-11% under the Pool Price Plus Premium option.

[867] See ¶857 *infra*.

738    Therefore, any conversion between post-tax and pre-tax numbers in the analysis below is based on the effective tax rates submitted by Accuracy.

*(iii)   Comparison between RF1 and RF3*

739    Using the effective tax rates submitted by Accuracy, the RF1 Reference IRR is 8.1% pre-tax for the Wind Farms and 9.3% pre-tax for the CSP Plants.[868] Accordingly, RF1 and RF3 compare as follows:

|  | **Wind Farms** | **CSP Plants** |
|---|---|---|
| **RF1 Reference IRR** | 8.1% | 9.3% |
| **RF3 Target IRR** | 7.398% => 8.7% lower than RF1 | 7.398% => 20.5% lower than RF1 |

*\*In this table and all following tables comparing IRRs or cash-flows, red colour denotes numbers that are lower than the relevant benchmark (here: the RF1 Reference IRR), while green colour denotes numbers that exceed the relevant benchmark.*

740    The Tribunal finds that already this nominal reduction of the IRR that the Respondent seeks to achieve is significant.[869] The Tribunal is of course aware that RF1 provided for a rate of return that is reasonable with reference to "*the cost of money on the capital markets*".[870] Hence, if the cost of capital decreased, it might be said that a corresponding change of the reasonable rate of return would be in line with what a reasonable investor had to expect under RF1. However, based on the 10-year average of Spanish 10-year bonds, which the Respondent itself uses in RF3 as a proxy for the cost of money in the capital market,[871] it seems that the cost of money was roughly the same at the time the Claimant invested and when the Disputed Measures were enacted.[872] Therefore, the Tribunal finds that the change in the Respondent's assessment of what is a reasonable rate of return cannot be explained by a corresponding fall in the cost of money in the capital market.

741    In addition, there seems to be some truth to the Claimant's assertion that the RF3 Target IRR is more difficult for real-life facilities to achieve than was the RF1 Reference IRR. In this regard, the Tribunal finds it useful to look at how the Wind Farms' and CSP Plants' IRRs in the actual scenario perform against the the RF3 Target IRR, compared to how their

---

[868] See the Experts' Joint Memorandum of 16 December 2020, ¶4 (Table 2).

[869] For completeness, the Tribunal notes that had it compared post-tax numbers (excluding financing), RF3 would offer an IRR of 6.049% for the Wind Farms and 6.225% for the CSP Plants, which is 13.6% respectively 22.2% lower than RF1. The Tribunal does not consider that using these numbers would materially change the analysis.

[870] Law 54/1997 (C-0060/R-0003), Article 30(4) [as per the Claimant's translation; the Respondent's translation is identical in substance); to same effect RD 661/2007 (C-0064/R-0101), Article 44(3).

[871] RDL 9/2013 (C-0398/R-0094), First Additional Provision.

[872] See R-PHB, ¶210. Cf. also C-PHB, ¶212, which however provides numbers only up until July 2013.

IRRs in the but-for scenario (in which RF1 remains unchanged) perform against the RF1 Reference IRR[873]:

| | Hedroso (wind) | Padornelo (wind) | Lubián (wind) | Olivenza (CSP) | Morón (CSP) |
|---|---|---|---|---|---|
| **RF1 Reference IRR** | 8.1% | 8.1% | 8.1% | 9.3% | 9.3% |
| **But-for IRR** | 9.45% => 16.7% above reference | 11.06% => 36.5% above reference | 10.69% => 24.2% above reference | 8.38% => 9.9% below reference | 8.49% => 8.7% below reference |
| **RF3 Target IRR** | 7.398% | 7.398% | 7.398% | 7.398% | 7.398% |
| **Actual IRR** | 4.64% => 37.3% below target | 6.42% => 13.2% below target | 6.14% => 17.0% below target | 5.37% => 27.4% below target | 5.12% => 30.8% below target |

742    Accordingly, while under RF1 the Wind Farms could be expected to outperform the RF1 Reference IRR, the very same facilities can now be expected to stay significantly below the RF3 Target IRR. Similarly, while already under RF1 the CSP Plants could be expected to remain below the RF1 Reference IRR, the shortfall between their forecast actual IRRs and the RF3 Target IRR is much bigger. Even though the Tribunal cannot rule out that, as alleged by the Respondent, certain inefficiencies at the Claimant's facilities have an adverse effect on their IRRs, such inefficiencies do not explain why under RF3 all facilities compare much less favourably to the relevant benchmark than they did under RF1. Therefore, the above analysis appears to confirm that the RF3 Target IRR is more difficult to achieve for real-life facilities such as the Wind Farms and CSP Plants than was the case with the RF1 Reference IRR.

743    The lowering of the IRR that the Respondent sought to achieve, combined with the apparently more demanding assumptions that need to be met by real-life facilities in order to reach the target, leads the Tribunal to conclude that the Respondent's understanding of which level of feed-in remuneration was reasonable changed significantly between RF1 and RF3.

---

[873] For the assumptions underlying these forecasts, see in detail section (2)(a) *infra*.

(b)    *New Remunerative System and the Incentives It Creates for Producers*

744    A first change to the remuneration system was implemented by RF2, with RDL 2/2013 effectively abolishing the Pool Price Plus Premium Option. However, the Tribunal notes that this change merely concerned a period of little more than half a year, until RDL 9/2013 introduced RF3. In addition, the Pool Price Plus Premium option had anyway been meant to achieve the same average rate of return as the Regulated Tariff.[874] Therefore, the Tribunal finds that the magnitude of this particular change of the remunerative system was quite limited.

745    As to RF3, the Tribunal is not convinced by the Claimant's argument that it is unreasonable and unprecedented to tie the feed-in remuneration to Spanish bond rates instead of to the cost of capital. First, the Tribunal notes that both Parties considered those very bond rates to be a suitable proxy for the "*cost of money on the capital markets*" as referred to by RF1, i.e. the regulatory framework under which the Claimant invested.[875] On this basis alone, the Tribunal is unable to accept the Claimant's argument that RF3 using the same proxy is unreasonable or unprecedented. Secondly, even if it was true that no other State tied feed-in remuneration to bond rates of that State, this would not by itself be sufficient to establish that bond rates are an unreasonable benchmark. Thirdly, the fact that the draft bill published by APPA and Greenpeace in 2009 likewise tied the feed-in remuneration to Spanish bond rates is a further indication that such approach is neither unprecedented nor unreasonable *per se*.

746    Equally, the Tribunal is unable to accept the Claimant's allegation that RF3 introduced a new methodology for calculating tariffs by looking at the characteristics of pre-defined standard facilities rather than taking into account the characteristics of the individual facility in question. To the Tribunal, it is clear that this methodology of setting remuneration values based on standard facilities was a guiding thread throughout the different stages of RF1.[876] First, already in the PER 2000 and the PER 2005, which are referred to in Law 54/1997 and the implementing RDs,[877] the calculation model was based on standard projects that were defined according to technical economic parameters.[878] Secondly, based on the economic report that accompanied the draft of RD 436/2004, the same methodology was pursued in this precursor regulation to RD 661/2007.[879] Thirdly, the Ministry of Energy's report on the draft of RD 661/2007 expressly states that categories, groups and sub-groups have been changed so as to ensure a reasonable return

---

[874] See ¶723 *supra*.
[875] See C-PHB, ¶211; R-PHB, ¶209.
[876] See also RWS-CMR2, ¶¶20f.
[877] Law 54/1997 (C-0060/R-0003), Sixteenth Transitory Provision, Twenty-fifth Additional Provision; RD 436/2004 (C-0063/R-0099), Article 40(1); RD 661/2007 (C-0064/R-0101), Preamble.
[878] See PER 2000 (C-0065/R-0118), Sections 2, 2.1; PER 2005 (C-0075/R-0019), Section 4.5. See also the witness testimonies of Mr. Ceña (HT, Day 2, 100:6-100:12) and Mr. Montoya (HT, Day 2, 183:6-183:16; 203:9-204:5; RWS-CMR, ¶21f.).
[879] Economic Report on the draft of RD 436/2004 (R-0260), p. 3-5.

"*for each standard project*".[880] Fourthly, RD 661/2007 itself refers to such standard projects, in particular in Article 44(4), which concerns the quarterly update of the main remuneration values, and authorizes the CNE for this purpose to

> establish the definition of the technologies and <u>standard facilities</u> […] and to gather information on the investments, costs, revenues, and other parameters of the various multiple current facilities that make up the <u>standard technologies</u>.[881] (emphasis added)

747     Fifthly, the Tribunal finds the Claimant's assertion difficult to square with Articles 35-43 of RD 661/2007, which provide for different remuneration values for numerous groups and sub-groups of facilities.

748     However, despite the fact that the methodology for calculating the remuneration values thus remained materially the same, the Tribunal shares the Claimant's view that there was still a significant change in the remunerative system. This is because, under RF1, the feed-in remuneration was exclusively a function of the amount of energy produced. This, in turn, incentivized maximum production up until the cap of annual operating hours.[882] By contrast, under RF3, the feed-in remuneration for the Wind Farms is limited to RInv, which depends solely on the installed capacity and is, thus, independent of the amount of energy actually produced.[883] Accordingly, the Tribunal accepts the Claimant's argument that contrary to RF1, the feed-in remuneration offered by RF3 provides the Wind Farms with no incentive at all (in addition to the pool price[884]) to maximize production. While the CSP Plants receive also ROp, i.e. the second component of the feed-in remuneration under RF3, which is a function of the energy produced, the Respondent has not disputed that this makes up only a small part of the total feed-in remuneration received.[885] The larger part is therefore likewise paid through RInv. Accordingly, the CSP Plants at least have a reduced

---

[880] Ministry of Energy, Report of 21 March 2007 (R-0081), section 2.1. While the Tribunal is aware that the Claimant asserts this Report was an internal document disclosed only in this arbitration, the Tribunal does not find the public or not nature of this document relevant to the question of whether the methodology changed between RF1 and RF3. Also, the Tribunal notes that the Claimant itself relied on the same document in RoM, ¶1448. In any case, the Tribunal does not find this document decisive, given the other evidence for the methodology used in RF1.

[881] RD 661/2007 (C-0064/R-0101), Article 44(4) [as per the Claimant's translation; the Respondent's translation is identical in substance].

[882] As provided for in RD 1614/2010 (C-0066/R-0105), Article 2(3) and (4).

[883] See MoM, ¶802; BRR I, ¶176; BRR II, ¶186.

[884] The Experts agree that the pool price can be expected to exceed the Wind Farm's operating costs, see the Experts' Joint Memorandum of 21 May 2021, ¶6(c). Accordingly, even without any feed-in remuneration for the energy delivered to the grid, there is an incentive to keep operating the Wind Farms.

[885] See MoM, ¶801; see also BRR II, ¶186.

incentive to produce more than the Minimum Operating Hours,[886] or to continue operating after 25 years.[887]

749    The problem with the above-described change in the remuneration system and in the associated economic incentives is that the initial investment costs for constructing CSP plants or Wind farms, which are sunken costs, make up the largest portion of the overall investment in such facilities.[888] Accordingly, if an investor decided to invest more into the construction of its facilities in order to maximize production, e.g. by choosing more efficient and durable components, this may well have been an efficient investment decision under RF1 (given its focus on energy produced). However, the same choice can be rendered inefficient by RF3 (given its focus on the installed capacity), without the investor being able to react to this change of the remunerative system.

750    Especially for the Claimant's Wind Farms, this seems confirmed by the numbers provided in ¶741 *supra*: The facilities were efficient by the Respondent's own standards at the time because they could be expected to beat the RF1 Reference IRR; with the adoption of RF3, however, they became inefficient by the Respondent's standards because they can now be expected to fall short of the (even lower) RF3 Target IRR.[889]

751    In light of the above, the Tribunal considers that as far as the system of remuneration as such is concerned, there was indeed a paradigm shift, at least for facilities that were constructed before RF3 was adopted (as is the case of the Claimant's facilities).

  *(c)    Introduction of Regulatory Lifespan*

752    While RF1 reduced the remuneration values for the Wind Farms as of year 20, and for the CSP Plants as of year 25, both the Wind Farms and the CSP Plants would continue to receive feed-in remuneration based on these reduced values for the remainder of their lifetime. By contrast, RF3 provides that no feed-in remuneration at all is paid after the end

---

[886] Above this limit, while the CSP Plants continue to receive ROp, this merely serves to cover the shortfall between expected pool prices and standard operating costs, not to generate profit (see ¶¶758, 797 infra). That said, if the *actual* pool prices are higher than the sum of the CSP Plant's *actual* operating costs and ROp, there would still be an incentive to maximize production (up to the Maximum Operating Hours, beyond which no ROp is paid). In this regard, the Tribunal notes that in 2014, both CSP Plants did produce significantly more than the Minimum Operating Hours, see BQR-109 and BQR-110 (even if one looks only at solar production, i.e. disregards the use of Back-up Fuel, as the Claimant asserts that the CSP Plants had contracts requiring the continued purchase of natural gas up until 2014, see Brattle's Memorandum of 22 September 2020, ¶15). This seems to indicate that there was still some economic benefit in maximizing production beyond the Minimum Operating Hours that year.

[887] Because no ROp is paid after 25 hours (see section (c) *infra*) and the forecast pool prices will not be sufficient to cover operating costs, see the Experts' Joint Memorandum of 4 June 2021, ¶8.

[888] See BRR I, ¶40; Accuracy I, ¶¶112, 526, 531.

[889] As to the CSP Plants, while it can be expected that they would have fallen short of the RF1 Reference IRR, this does not necessarily mean that they were inefficient in the sense of the investment not being viable economically; it merely means that they were less efficient than the standard facilities underlying the Respondent's calculations. That said, under RF3, this shortfall became much bigger.

of the Regulatory Lifespan, which is defined as 20 years for the Wind Farms and 25 years for the CSP Plants.[890]

753     In theory, this is a change that does not seem insignificant. The Tribunal finds, however, that the Claimant has failed to establish that, in reality, this change has any adverse effect on the Wind Farms or CSP Plants.

754     In respect of the CSP Plants, the Tribunal's assumption[891] is that their lifetime is anyway limited to 25 years. This deprives the cut of feed-in remuneration after this point in time of any practical effect.

755     As regards the Wind Farms, the Tribunal's assumption is that they would operate 25 years.[892] Accordingly, by eliminating feed-in remuneration after 20 years, RF3 deprives the Wind Farms of five years of feed-in remuneration. That said, the Tribunal notes that the Wind Farms do not receive any ROp payments anyway. Consequently, they are only deprived of five years of RInv payments. However, based on the record, the Tribunal is not convinced that this results in any harm to the Claimant. It is undisputed that RInv is meant to cover the initial investment costs of a standard facility, to the extent they will not be offset through operating income, and is paid by means of annual instalments that stretch until the end of the Regulatory Lifespan (unless, taking into account payments received under RF1, the Wind Farms reach the target IRR before that point in time).[893] To the Tribunal, it seems to follow from this logic that if the Regulatory Lifespan were prolonged, the overall amount in RInv payments would not change. Instead, payment of this same overall amount would be stretched over a longer period of time.[894] Therefore, if RF3 had determined the regulatory useful life of the Wind Farms to be 25 years, it appears that it would have taken the Wind Farms five more years to receive the same amount. Given the need to discount future cash-flow, this would seem to rather have an adverse effect on the investment, as compared to the actual Regulatory Lifespan of 20 years.

756     In view of the foregoing, the Tribunal finds that the Claimant, being the party bearing the burden of proof, has failed to establish that the introduction of a Regulatory Lifespan was a change that adversely affected its investment.

---

[890] See ¶¶230, 237 *supra*.
[891] See ¶808 *infra*.
[892] See ¶815 *infra*.
[893] See RD 413/2014 (C-0399/R-0110), Articles 11(6)(a), 16 and Second Additional Provision (5); MoM, ¶¶795f., 824f., 827f.; CMoM, ¶¶573f., 584, 588, 592.
[894] The Tribunal also notes that the formula for calculating RInv in RD 413/2014 (C-0399/R-0110), Article 16(2) is a function of the residual Regulatory Lifespan of the facility in question.

(d)    *Cap on Annual Operating Hours Qualifying for Feed-in Remuneration*

757    Already under RF1, there had been a cap on annual operating hours qualifying for feed-in remuneration.[895] RF3 reduced this cap to 0 for the Wind Farms (from 2,589) and to 2,040 for the CSP Plants (from 2,855).[896]

758    Regarding the Wind Farms, the Tribunal does not find this reduction to add anything to the considerations set out above on the change of the remuneration system. This is because the setting of the cap on annual operating hours to 0 is merely the technical tool through which RF3 avoids the payment of any ROp to the Wind Farms. The ROp serves the sole purpose of covering any shortfall between the operating costs and the pool price, while the RInv is meant to cover investment costs and allow for a reasonable rate of return. As neither party has challenged the assumption underlying RF3 that the relevant standard facilities' operating costs are exceeded by the pool price,[897] the suppression of any ROp for those installations is inherent to the logic of the new remuneration system. Therefore, the Tribunal finds that the reduction of the cap on annual hours does not constitute a further restriction on the Wind Farms (in addition to the change of the remunerative system) that would need to be considered when determining the magnitude of the legislative change.

759    The situations is different for the CSP Plants, given that they do receive ROp. However, the Tribunal finds that in the absence of any provision to the contrary, the previous cap, as fixed by RF1, must be taken to have contemplated that CSP plants could produce up to 15%[898] of their total energy production through Back-up Fuel.[899] By contrast, it is the Claimant's own position that the new cap on annual operating hours does not contemplate any use of Back-up Fuel at all.[900] Thus, to appreciate the 'net' reduction of the cap on annual operating hours, the Tribunal finds it appropriate to eliminate the effect of the new rule on Back-up Fuel (which is discussed separately below) by deducting from the old cap on annual operating hours the 15% of Back-up Fuel included therein. This adjusted old cap is approximately 2,427 hours.[901] Consequently, the new cap of 2,040 hours reflects a

---

[895] RD 1614/2010 (C-0066/R-0105), Article 2(3) and (4).

[896] See ¶237 *supra*.

[897] Indeed, the Expers agree that the Wind Farms(forecast) operating costs are lower than (forecast) pool prices, see the Experts' Joint Memorandum of 21 May 2021, ¶6(c).

[898] In the Pool Price Plus Premium scenario. While the Tribunal's analysis of the remunerative system rests on the Regulated Tariff scenario, this does not change the fact that the cap of 2,855 annual operating hours, which applied to both tariff options alike, contemplated up to 15% of LNG energy production.

[899] As acknowledged by Brattle in its Memorandum of 22 September 2020, ¶18. In respect of RF3, Accuracy is likewise of the view that due to the lack of any explanation to the contrary, the cap must be understood to include energy produced through the burning of LNG, see its Memorandum of 21 September 2020, ¶24.

[900] Brattle's Memorandum of 5 August 2020, ¶63. The Tribunal notes that this assertion does not seem to be accurate, given that RF3 does allow for Back-up Fuel in an amount of up to 15,000 thermal MWh. However, the Claimant's assertion is more detrimental to its own case as regards the effect of the reduction of the cap on annual operating hours. Therefore, the Tribunal finds it appropriate to work off the Claimant's assertion in this regard, given that the Claimant bears the burden of proof for the alleged violation of its legitimate expectations.

[901] 2,855 operating hours x 0.85% = 2,426.75 operating hours.

decrease of the cap by approximately 16% if one eliminates the effect of the new rule on Back-up Fuel.[902]

760    That said, the Tribunal is not convinced that this nominal reduction of the cap has any practical adverse impact on the CSP Plants. This is because the CSP Plants' forecast production (without Back-up Fuel) does not exceed the new cap on operating hours, irrespective of whether one looks at the Claimant's own contemporaneous forecast,[903] the Claimant's calculation of a hypothetical bank case without Back-up Fuel[904] or, as the Tribunal finds most appropriate, an average of the bank case and the Claimant's contemporaneous forecast.[905] In fact, the Claimant's own experts have acknowledged that

> [t]he Disputed Measures have […] a limited and measurable effect on their production. The key effect on production involves the elimination of support for electricity produced using natural gas […]. The New Regulatory Regime did not affect the extent of production that came solely from solar energy.[906] (emphasis added)

761    Accordingly, the Tribunal is not convinced that the reduction of the cap on operating hours, while not insignificant in the abstract, has any concrete adverse effect on the CSP Plants.

*(e)    Reduction of CSP Plants' Maximum Energy Production through Back-up Fuel Qualifying for Feed-in Remuneration*

762    Under RF1, the maximum amount of energy produced through Back-up Fuel that would qualify for feed-in remuneration was 12 or 15% of the CSP Plants' total energy production

---

[902] 2,040 operating hours / 2,427 operating hours = 84.05%.The Tribunal notes for completeness that if one acted on the assumption that the new cap on annual operating hours included the amount of Back-up Fuel allowed by RF3, one would need to add roughly 4,200 MWh (corresponding to 15,000 thermal MWh according to the conversion ratio indicated in Brattle's Memorandum of 22 September 2020, fn. 27), i.e. 84 operating hours (4,200 MWh / 50 MW), to the operating hours as calculated in the previous footnote, yielding an adjusted old cap of 2,510.75. Accordingly, the new cap would reflect of a decrease by approximately 19% (2,040 operating hours / 2,510.75 operating hours = 81.25%).

[903] According to Brattle's Memorandum of 22 September 2020, ¶¶14f., the forecast from 2015 is the one relied on by Brattle in its calculations for the period after January 2013 in the actual scenario. That forecast indicated net annual power generation (without Back-up Fuel) of 99,442 MWh for Morón and 101,993 MHw for Olivenza (see the excel sheet "BQR-59 Renergy CSP – Economic and Operating data", tab "Key Asssumtions", line 22, columns F and G). This corresponds to 1,988.84 and 2,039.86 annual operating hours, respectively, for these 50 MW plants.

[904] Net annual power generation of 80,358 MWh for Morón and 84,696 MWh for Olivenza (see Accuracy's Memorandum of 21 September 2020, ¶22 (Table 4)), corresponding to 1,607.16 and 1,693.92 annual operating hours, respectively. For completeness, the Respondent's calculation for the bank case without gas is 102,960 MWh for Morón and 101,552 MWh for Olivenza (see ibid.). This corresponds to 2,059.2 and 2,031.04 annual operating hours, respectively. While Morón would therefore slightly exceed the cap of 2,040 under the Respondent's calculation for the bank case, the Tribunal does not consider this decisive. Apart from the marginal effect that the cap would have in this case (curtailing 19.2 or less than 1% of Morón's operating hours), the Tribunal considers it more appropriate to build an average between the Claimant's contemporaneous forecast and the Respondent's calculation of the bank case, see ¶¶822-828 *infra*. This average is below the cap of 2,040, see the next footnote.

[905] See ¶822 *infra*. Based on the Claimant's calculation for the bank case, the averages are 89,900 MWh for Morón and 93,345 MWh for Olivenza, corresponding to 1,798.00 and 1,866.90 annual operating hours, respectively. Based on the Respondent's calculation for the bank case, the averages are 101,201 MWh for Morón and 101,773 for Olivenza, corresponding to 2,024.02 and 2,035.42 annual operating hours, respectively.

[906] BQR II, ¶58.

179

(depending on whether the Regulated Tariff or the Pool Price Plus Premium applied). RF3 reduced this maximum amount to 15,000 thermal MWh, which equals approximately 4% of the energy produced by a 50 MW plant such as the CSP Plants.[907] According to the Claimant, this change alone was so damaging to the CSP Plants that it would have justified an FET claim in and of itself.[908]

763    The Tribunal notes that, already under RF1, the use of Back-up Fuel was explicitly limited to necessary technical purposes, specifically the "*maintenance of the temperature of the heat transmitter fluid compensating for an absence of solar irradiation that may affect the planned supply of energy*", with 12/15% being the absolute limit for such use.[909] Therefore, in the Tribunal's view, one cannot say that RF1 provided an unqualified right to receive feed-in remuneration for 12 or 15% production through Back-up Fuel in any case, i.e. irrespective of whether the Back-up Fuel was used for necessary technical purposes. Instead, the cap of 12/15% was relevant only if the prescribed technical purpose required using a higher amount of Back-up Fuel. The Tribunal is not convinced that this is generally the case. In fact, already in 2012, the CNE estimated that a mere 5% of a CSP plant's overall energy production is sufficient for technical purposes.[910] Also, the Claimant, being the party bearing the burden of proving a violation of its legitimate expectations, never asserted that the amount of Back-up Fuel still qualifying for feed-in remuneration under RF3 is insufficient for technical purposes.[911] Instead, the Claimant simply argued that it was entitled to use and receive feed-in remuneration for Back-up Fuel up to 12/15% of the total energy production, which the Tribunal finds is an inaccurate description of what RF1 provided.

764    Therefore, the Tribunal does not find it established that the mere reduction of the maximum amount of Back-up Fuel qualifying for feed-in remuneration adversely effected the average CSP plant (or the CSP Plants). Instead, based on the record, the Tribunal agrees with the Respondent that RF3 merely adapted the estimate of the amount of Back-up Fuel needed to fulfil the purposes to which the use of fuel had been restricted already by RF1.[912] This

---

[907] 15,000 thermal MWh = approximately 4,200 electrical MWh (see fn. 902 *supra*). Dividing this by the overall energy produced by a 50MW plant within the maximum of 2,040 operating hours (102,000 MWh) yields approximately 4.12%.

[908] MoM, ¶571.

[909] See RD 661/2007 (C-0064/R-0101), Article 2(1)(b), sub-group b.1.2 [as per the Claimant's translation; the Respondent's translation is identical in substance]. MO IET/1882/2014 (C-0403), Articles 3(2)(a), 4(1) speaks of "[t]echnically indispensable uses".

[910] See RjoM, ¶781.

[911] To the contrary, according to Brattle's Memorandum of 22 September 2020, fn. 27, the CSP Plants used only about 6,000 thermal MWh of Back-up Fuel in 2015 "for internal heating and other minor purposes", which the Tribunal understands to be the "[t]echnically indispensable uses" referred to in MO IET/1882/2014 (C-0403), Articles 3(2)(a), 4(1). 6,000 thermal MWh is roughly 40% of the maximum energy production through Back-up Fuel qualifying for feed-in remuneration under RF3. It respresents approximately 1.6 respectively 1.7% of each CSP Plant's overall energy consumption in that year.

[912] See RjoM, ¶¶781, 786. As per RWS-CMR2, ¶154, when the cap was initialy set at 12/15%, there was still very limited experience as to how much Back-up Fuel was necessary for technical purposes, given that there was only one CSP plant in operation in Spain at the time, without production records being available.

may also explain why the Claimant's partner in the CSP Plants, Aprovechamientos Energéticos S.L., opined that this particular change of the regulatory framework

> involved mere progressive adjustments and adaptations of the same remunerative regime to the reality of the sector.[913]

(f)    *Substitution of Index For Inflation Updates to Remuneration Values*

765    RF1 had provided that the main remuneration values were to be updated quarterly as a function of the CPI.[914] RF3 substituted the CPI with a different index, the "*Consumer Price Index at a constant tax rate*", which excluded unprocessed foods and energy products. While the Respondent claims that this did not harm producers because the new index was higher than the CPI "*in certain periods in 2013, 2014 and 2015*"[915], the Claimant asserts that the new index was used only for 7 months in 2013 (until RD 661/2007 was repealed), during which period it was much lower than the CPI (0.47% compared to 3.48%).[916] Although the Claimant did not proffer any evidence for this specific assertion, the Respondent did not dispute it, either.

766    That said, the Tribunal does not find the Claimant's assertion conclusive in terms of evidencing any harm to investors. First, the updates were to be made quarterly, meaning that the important question is how the new index compared to the CPI at the precise points in time when the update was due. The Claimant has not made any submissions in this regard. Accordingly, the Tribunal is not prepared to accept that the substitution of the CPI with another entailed any adverse effect on investors. Secondly, even if at the relevant points in time the difference between the two indices was in fact approximately 3 percentage points, this would still only have quite a limited impact on the investment, given the short period during which this change applied. Thirdly, the Tribunal does not find it established, based on the record, that the new index was, by its nature, less appropriate to be used as a benchmark for inflation updates than the CPI.[917]

(g)    *Periodic Review*

767    RF1 foresaw quadrennial reviews of the main remuneration values, with new values however not applying to facilities coming into operation before 1 January of the second year following the relevant review.[918] RF3 subjects all remuneration parameters except for the Regulatory Lifespan and the value of the investment, but including the RF3 Target IRR, to a revision every three or six years (depending on the parameter). Existing facilities are not exempted from any such revision. In fact, if the RF3 Target IRR is changed, past

---

[913] Aprovechamientos Energéticos JG, S.L., Statement of Claim before the Spanish Supreme Court of 4 April 2016, Case 185/2016 (R-0230), p. 3 of the PDF.
[914] RD 661/2007 (C-0064/R-0101), Article 44(1) and First Additional Provision.
[915] CMoM, ¶530; however, the chart included by the Respondent only shows 2014 and the first half of 2015.
[916] RoM, ¶468.
[917] Noting in particular the Respondent's explanations in CMoM, ¶¶531f., which the Tribunal finds were not successfully refuted by the Claimant.
[918] RD 661/2007 (C-0064/R-0101), Article 44(3); RD 1614/2010 (C-0066/R-0105), Article 4.

181

payments already received by a producer under RF3 would be taken into account to determine the payments yet to be made.[919]

768    The Tribunal finds that, conceptually, this is not an insignificant change, in particular with respect to installations that were already operating before the revision takes place. That said, it is not the review mechanism as such that would affect the remuneration payable to the installations, but rather any subsequent action of the Respondent that makes use of the mechanism, in which case it would be open to the Claimant to challenge such subsequent action.[920] The review mechanism as such may, of course, be seen as an element increasing the general regulatory risk, and thus making the financing of investments more difficult or costly.[921] However, based on the record, the Tribunal is not convinced that had the Respondent enacted RF3 without this particular change on the review mechanism, this would significantly change the overall risk assessment of investors and financial institutions. In particular, even if such review mechanism had not been introduced, previous reforms as well as the enactment of RF3 itself would have made diligent investors and banks aware that the Respondent might anyway reduce the applicable remuneration through repealing the regulatory framework as such rather than using a review mechanism provided for in the existing regulatory framework.

       *(h)    Other Changes*

769    While there were other changes to the feed-in regime, the Tribunal does not find it established that any of them had any adverse effect on the CSP Plants or Wind Farms.

770    First, as regards the introduction of the Operating Threshold[922] and Minimum Operating Hours[923], below which a facility would receive no or only reduced feed-in remuneration,[924] the Tribunal notes that all of the Claimant's facilities easily surpassed both of these thresholds in the past, and can be assumed to continue to do so for the remainder of their lifetime, based on any of the production forecasts.[925] Accordingly, the Tribunal does not find it established that this change had any practical effect on the Claimant's facilities.

771    Secondly, while the Claimant asserts that RF3 entailed a restriction of priority access/despatch to the grid, as had been guaranteed by RF1, this was disputed by the Respondent and the Tribunal does not consider that the Claimant met its burden of proof

---

[919] See MoM, ¶¶807ff.
[920] The Tribunal is aware that RDL 17/2019 (C-0855), Sole Article (1) represents such subsequent action as it provides for a reduction of the RF3 Target IRR to 7.09% for the six-year regulatory period beginning on 1 January 2020 (subject to the exception provided for in Third Final Provision Bis (1)). However, the Claimant has not challenged this piece of legislation in this arbitration and has instead submitted that "[i]n this arbitration, it is not necessary to recalculate damages because the valuation date is June 2014, see CC on ECT Decisions, ¶48.
[921] To this effect MoM, ¶811.
[922] MO IET/1045/2014 set these values to 714 annual operating hours for the CSP Plants and 629 for the Wind Farms, see MoM, ¶848.
[923] MO IET/1045/2014 set these values to 1,224 annual operating hours for the CSP Plants and 1,048 for the Wind Farms, see MoM, ¶848.
[924] See RD 413/2014 (C-0399/R-0110), Article 21(4)(b) and (c).
[925] See fn. 903-905 *supra*.

in this regard. Indeed, to the Tribunal, both Article 26(2) Law 24/2013[926] and Article 6(2) RD 413/2014[927] still provide for priority access/despatch, and the Tribunal finds no indication in the record that the Respondent has failed to respect this priority in practice.

772    Thirdly, even though it is undisputed that RF3 eliminated the supplement for reactive energy (while keeping the related penalty),[928] it has remained unclear what the magnitude of this change or its impact on producers is. In fact, it has remained unclear whether the Claimant's facilities would have qualified at all to receive the supplement, had it continued to exist. On this basis, the Tribunal is not in a position to consider the elimination of the supplement a material change of the legislation.

773    Fourthly, the Claimant referred to a new obligation introduced by RF3 for producers to finance a Tariff Deficit of up to 2%. However, the Tribunal notes that producers are entitled to recover such contribution with interest.[929] Taking this into account, it has remained unclear which adverse impact, if any, this particular change has on the Claimant.

774    Consequently, the Tribunal finds that none of these four changes can be considered to constitute a material change to RF1 that adversely affected the Claimant.

    (i)    Conclusion

775    Based on the above analysis, the Tribunal concludes that the Disputed Measures brought about two fundamental changes to RF1 that the Claimant established were detrimental to its investment. First, the Respondent materially changed its understanding of which IRR was reasonable. Secondly, the Respondent switched the remunerative paradigm by transforming a system in which investors were incentivized to maximize production to a system in which the production level was much less important.

776    By contrast, the Tribunal finds that the other changes, while numerous, were much less significant in nature (or are consumed by the two before-mentioned changes) and that the Claimant did not succeed in establishing that, in reality, any of them had any adverse effect on the CSP Plants or Wind Farms.

    (2)    Economic Impact on the Claimant's Facilities

777    In assessing whether the Disputed Measures were a radical departure from RF1 that violated the Claimant's legitimate expectation of Relative Stability, the Tribunal finds it crucial to ascertain the economic impact that the Disputed Measures had on the Claimant's facilities. Inevitably, this analysis creates a certain overlap between responsibility and

---

[926] C-0378/R-0076.
[927] C-0399/R-0110.
[928] RDL 9/2013 (C-0398/R-0094), Third Transitional Provision (1) *in fine*; RD 413/2014 (C-0399/R-0110), Article 7(e)(i) in conjunction with Annex III.
[929] Law 24/2013 (C-0378/R-0076), Article 19(2) and (3).

quantum. However, in line with findings of other tribunals faced with similar claims against the Respondent, the Tribunal does not find this overlap to be problematic.[930]

778    That said, before analysing the economic impact of the Disputed Measures, the Tribunal will first explain the assumptions underlying its economic analysis, given that the Parties' own assumptions differed significantly from each other in numerous respects.

(a)    *Assumptions Underlying the Economic Analysis*

(i)    *Valuation Method*

779    The Parties disagree on the methodology by which the economic impact of the Disputed Measures should be determined.

780    The Claimant submits that one should apply the discounted cash-flow ("**DCF**") methodology. The Claimant asserts that this is the standard approach in financial valuation used in the normal course not only by the Claimant before undertaking its investment, but also by sponsors, accountants, lenders and even the Respondent itself.[931] In addition, the Claimant alleges that the DCF method has come to dominate specifically the analyses of investments in power stations.[932] Finally, the Claimant submits that the historic performance of the Claimant's facilities represents a sufficient basis for the required forecast of cash-flows.[933]

781    The Respondent, in turn, argues that an asset-based valuation ("**ABV**") is preferable in the present case. The Respondent alleges that based on arbitral jurisprudence, an ABV is more appropriate than a DCF calculation when the history of operations for the facility in question is too short to allow for a projection of future earning, as is the case for the Wind Farms and CSP Plants.[934] Conversely, the Respondent claims that performing a DCF calculation in this case is subjective and speculative, thus allowing for windfall profits.[935] In particular, the Respondent argues that a DCF approach assumes a petrification of remuneration values over many years, which the Respondent deems inappropriate and incompatible with a regulated market, in line with jurisprudence of the Spanish Supreme

---

[930] See *RREEF v. Spain II*, ¶472; *PV Investors v. Spain II*, ¶¶647f. Even less so because, as will become clear in the section on quantum, the damages that the Claimant is entitled to are not identical to the economic difference between RF1 and RF3.

[931] RoM, ¶1470; BQR I, ¶45; BQR II, ¶¶67-73.

[932] BQR I, ¶¶44, 46.

[933] BQR II, ¶¶59-62.

[934] CMoM, ¶1213; RjoM, ¶1677, referring to *Tenaris S.A et. al. v. Venezuela*, ICSID Case No. ARB/11/26, Award, 29 January 2016 (RL-0108), ¶¶525-527; Accuracy I, ¶¶512-516. The Respondent also relies heavily in this regard on *Sergey Ripinsky/Kevin Williams*, Damages in International Investment Law, British Institute of International and Comparative Law (BIICL), 2008 (RL-0074), p. 227, who refer inter alia to the awards in *Biloune and Marine Drive Complex Ltd. v. Ghana*, UNCITRAL, Award on Damages and Costs, 30 July 1990, 95 ILR 211, 228-29; *Metalclad v. Mexico*, ¶122; *Wena Hotels Ltd. v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000, ¶125.

[935] CMoM, ¶¶1199-1231; Accuracy I, ¶¶112f.; Accuracy II, ¶¶16, 28, 121-124.

Court.[936] Also, the Respondent claims that the CSP Plants are among the pioneers for the technology used on a non-experimental scale, and that the Wind Farms' technology was likewise immature when they were built in 2003, creating a high technological risk that makes it very difficult to project the expenses for operation and maintenance of the facilities.[937]

782     In line with the approach taken by many other tribunals in respect of similar claims against the Respondent,[938] the Tribunal considers that the DCF method is more appropriate to assess the economic impact that the Disputed Measures had on the Claimant compared to the situation under RF1. The Tribunal accepts the Claimant's argument that this is the standard methodology used not only prior to making investments, but also to quantify damages resulting from a breach of international law,[939] and the Tribunal does not share the Respondent's view that the present case should form an exception.

783     In particular, the Tribunal finds this suggestion by the Respondent difficult to reconcile with the fact that the DCF method or at least forecasts of cash-flows were used by the Respondent itself in the context of RF1.[940] This implies that at the time of the investment, the Respondent did not consider this approach inappropriate to determine the economic effect of the feed-in regime.

784     Moreover, the Tribunal finds Brattle's explanation convincing according to which power stations "*have a relatively simple business, producing electricity, whose demand and long-run value can be analyzed and modeled in detail based on readily available data*", and that their costs and production levels are relatively easy to predict.[941]

785     As to the predictability of production levels, the Tribunal finds this particularly plausible given the priority of access/dispatch to the grid, which makes it very unlikely that a falling electricity demand would have any impact on the production levels of the CSP Plants or Wind Farms, thus making their revenue less vulnerable to market fluctuations than that of other businesses. While the Tribunal agrees with the Respondent that the operating history of the CSP Plants is relatively short as at the valuation date (21 June 2014, see section (ii) *infra*), the Tribunal does not find this to be a sufficient reason to discard the DCF method in relation to the CSP Plants. First, the Tribunal accepts Brattle's submission that even

---

[936] CMoM, ¶1205; RjoM, ¶¶1665-1668, referring to Spanish Supreme Court, Judgment of 24 September 2012, Case 60/2011 (R-0147), 6th legal ground.

[937] Accuracy I, ¶¶508-511.

[938] See also *Eiser v. Spain*, ¶465, *Novenergia v. Spain*, ¶820; *Masdar v. Spain*, ¶575; *Antin v. Spain*, ¶691; *Foresight/Greentech v. Spain*, ¶506; *Cube v. Spain I*, ¶478; *9REN v. Spain*, ¶407; *SolEs v. Spain*, ¶488; *Operafund v. Spain*, ¶621.

[939] In addition to the awards mentioned in the previous footnote, see, e.g., *Anatolie Stati et al. v. Republic of Kazakhstan*, SCC Case No. V (116/2010), Award, 19 December 2013 (CL-0030) ("**Stati v. Kazakhstan**"), ¶1617; *ADC Affiliate Limited and ADC & ADMC Management Limited v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006 (CL-0117) ("**ADC v. Hungary**"), ¶¶501-504; *Occidental Petroleum Corporation et al. v. Ecuador*, ICSID Case No. ARB/06/11, Award, 15 October 2012 (CL-0146), ¶708; *CMS v. Argentina*, ¶416; *Enron v. Argentina*, ¶¶385f.; *National Grid v. Argentina*, ¶275.

[940] See the references in BQR II, ¶¶71f.

[941] BQR I, ¶46.

without any operating history, the production level of CSP Plants can still be forecast relatively well based on technical design parameters.[942] If this were different, the Tribunal would find it difficult to explain why banks were willing to lend very significant amounts of money based on project finance arrangements that inherently depend on the predictability of cash-flows. Also, the Respondent has not disputed that the EPC contracts for the CSP Plants guaranteed a certain level of production[943] and it seems unlikely that such guarantee would be given if production levels were as difficult to predict as the Respondent asserts. Secondly, as will become clear below, the Tribunal has opted for a rather conservative forecast to the production level of CSP Plants so as to address the concern arising from the limited track record of those facilities.

786    Regarding the Claimant's argument that the DCF method assumes a freezing of the feed-in remuneration over long periods of time, the Tribunal considers that the discounting of future cash-flows and the taking into account of regulatory risk sufficiently reflect that there is a level of uncertainty about future remuneration levels, which increases over time.

787    Furthermore, the Tribunal is not convinced that the DCF method is improper due to the allegedly immature (at the time) technologies used by the Wind Farms and CSP Plants. Even if the technologies had been immature and even if this resulted in predictions of O&M costs being difficult, this does not undermine the present DCF analysis because the Tribunal has modelled these costs not according to any hypothetical assumptions but rather according to the actual costs contractually agreed to be paid by the CSP SPVs and Wind SPVs in the future to their respective operators (see ¶836 *infra*).

788    Finally, while the Tribunal agrees with the Respondent that there is of course a certain level of subjectivity and speculation inherent to any DCF calculation, the Tribunal notes that the ABV proposed by the Respondent is likewise based on numerous assumptions that are, to some extent, necessarily subjective and speculative.[944] In fact, the same is likely to be true for any valuation method.[945] Accordingly, the Tribunal considers that the existence of elements of subjectivity and speculation do not discredit the DCF method as such, but rather call for a very careful approach to the underlying assumptions in order to minimize the risk of what the Respondent calls a "*Cinderella effect*".[946] Indeed, as will become clear in the next sections, the Tribunal has taken quite a conservative approach in this regard, addressing in many cases the criticism raised by the Respondent in respect of the assumptions underlying the Claimant's DCF model.

---

[942] BQR I, ¶46.
[943] BQR II, ¶52.
[944] Cf. Accuracy II, ¶¶137-145, 147, 149.
[945] See *Sergey Ripinsky/Kevin Williams*, Damages in International Investment Law, British Institute of International and Comparative Law (BIICL), 2008 (RL-0074), p. 227: "Valuation experts note that there is uncertainty assiciated with valuation and that it is unrealistic to expect or demand absolute certainty. Moreover, valuation is rarely a fully objective exercise [...]."
[946] Accuracy I, ¶¶403, 409; Accuracy II, ¶78.

*(ii)    Valuation Date*

789    The Claimant submits that the valuation date should be 21 June 2014, which is the date on which MO IET/1045/2014 came into force, setting for the first time the specific remuneration values applicable under RF3.[947] The Respondent argues that the valuation date should be 28 February 2012 for the Wind Farms[948] and 31 December 2012 for the CSP Plants,[949] each being the day before the first Disputed Measure affecting the respective technology came into force (Regional Act 1/2012 and Law 15/2012, respectively).

790    The Tribunal agrees with the Claimant that the appropriate valuation date is 21 June 2014. Only on that date it became clear what the remuneration under RF3 was. If one chose earlier valuation dates such as those proposed by the Respondent, one would either need to ascertain what remuneration, based on the information available on those dates, could be expected to be offered by RF3 once it was completed (which would be unnecessarily speculative), or one would need to use the benefit of hindsight (which is generally inconsistent with applying the DCF approach as of the valuation date). The Tribunal finds additional comfort in the fact that most other tribunals faced with comparable claims against the Respondent likewise chose a valuation date in June 2014.[950]

*(iii)    Inflation*

791    It is the Claimant's view that inflation should be forecast by reference to the traded prices of Spanish inflation swaps.[951] By contrast, the Respondent appears to assume 2% inflation in the but-for scenario and 1.5% inflation in the actual scenario.[952]

792    The Tribunal finds the Claimant's approach reasonable. By contrast, the Respondent has failed to explain how it calculated its inflation rates, and why they should be different in the two scenarios. Therefore, the Tribunal finds that inflation shall be forecast by reference to trades prices of Spanish inflation swaps. The Experts agree that this yields an inflation rate of approximately 2.27%.[953]

---

[947] BQR I, ¶53.

[948] Accuracy I, ¶813.

[949] According to Accuracy I, Appendix 1, ¶A.69, where the CAPM is calculated for that date. While in Accuracy I, ¶707, Accuracy seems to say the relevant date is 27 December 2012, claiming this coincides with "time zero of the regulatory service life of the CSP Plants", this is difficult to reconcile with the fact that Morón entered into operation on 25 October 2012 and Olivenza on 1 February 2013.

[950] Cf. *Eiser v. Spain*, ¶458; *Masdar v. Spain*, ¶¶603, 605; *Antin v. Spain*, ¶583; *Foresight/Greentech v. Spain*, ¶536; *Cube v. Spain I*, ¶477; *9REN v. Spain*, ¶406; *SolEs v. Spain*, ¶527; *Operafund v. Spain*, ¶683; *InfraRed v. Spain*, ¶576; *Watkins v. Spain*, ¶680; *PV Investors v. Spain II*, ¶723 (albeit based on an agreement between the parties). Later dates were applied in *Novenergia v. Spain*, ¶768 (15 September 2016) and *NextEra v. Spain*, ¶652 (30 June 2016). Only *RREEF v. Spain II*, ¶¶575, 586 seems to have applied an earlier date (June 2013).

[951] BQR I, ¶¶17, 69.

[952] This is not clear from Accuracy's expert reports; rather, these numbers are derived from Brattle's analysis of Accuracy's model, see BQR II, ¶¶120, 124.

[953] Brattle's Memorandum of 5 August 2020, ¶21; Accuracy's Memorandum of 5 August 2020, ¶29.

*(iv)    Feed-in Remuneration in the Actual Scenario*

793    In view of RD 413/2014 contemplating an update of remuneration values in 2019 and every three years thereafter, the Claimant's own economic model assumes that the Respondent will continue to apply a spread of 3 percentage points above the Spanish 10-year bond yield, and forecasts the likely evolution of that bond yield based on June 2014 bond market conditions and according to the Spanish "*yield curve*" as indicated by bonds with different maturities.[954] The Respondent's own economic model, in turn, apparently assumes that the RF3 Target IRR will remain the same[955] and that the bond yield will be unchanged from 2017 onwards.[956]

794    In the Tribunal's view, on the valuation date, there was no sufficiently reliable indication as to how the Respondent may adjust the spread in the periodical reviews foreseen by RF3. Likewise, the Tribunal is not fully convinced by the bond yield forecast suggested by the Claimant. Instead, the Tribunal considers it preferable to assume that RInv and ROp will remain the same as on the valuation date for the entire lifetime of the Claimant's facilities. However, as agreed by both Experts, it seems appropriate to index ROp (but not RInv) to inflation.[957]

795    That said, the Experts disagree on the applicable inflation rate. Brattle argues that an inflation rate of 1% should apply because this is the rate actually used by the Respondent to forecast operating costs of the standard plants in June 2014, which in turn was the basis on which Spain set the ROp that applied on the valuation date.[958] By contrast, Accuracy submits that there is no reason not to apply the general inflation rate forecast of 2.27% to the ROp.

796    The Tribunal finds Accuracy's position more convincing. Brattle's proposal ignores the periodic review mechanism provided for in RF3. Because of this mechanism, it was clear from the beginning that whatever inflation rate the Respondent may have used in June 2014 to forecast the operating costs in order to derive the ROp, this did not mean that the same inflation rate would be used throughout the following revisions. Indeed, Brattle itself acknowledged that Spain has in fact "*used the three-year updates to adjust for the difference between Spain's forecasts of pool prices and inflation, and the outturn*" (emphasis added).[959] While this is hindsight knowledge, it merely confirms what was to be expected in any case: the Respondent's initial assumption in June 2014, namely 1% inflation on the operating costs, was not cast in stone for the remainder of the lifetime of the Wind Farms and CSP Plants, but would rather be revised triennially in view of actual inflation rates.

---

[954] BQR I, ¶¶71-73.
[955] Accuracy I, ¶702, making reference to the "subsidy scheme currently in force".
[956] Accuracy I, ¶729.
[957] See Brattle's letter of 29 June 2020, p. 2, and Accuracy's letter of 6 July 2020, p. 1.
[958] Brattle's Memorandum of 5 August 2020, ¶22.
[959] Brattle's Memorandum of 5 August 2020, ¶26.

797     In addition, the Tribunal recalls that the ROp is meant to cover the shortfall between expected revenues from electricity sales to the pool and forecast annual operating costs of the relevant standard facility. Given this objective, the Tribunal had indicated to the Experts subsequent to Procedural Order No. 14 that "*an appropriate approach may be to forecast the* [ROp] *in a way that ensures that the formula (pool price +* [ROp]*) - operating costs constantly yields the same result from the valuation date onwards*".[960] The Tribunal maintains this view and considers that only Accuracy's position on the inflation rate is commensurate with the said approach, given that the in the Tribunal's economic model, the pool price is likewise subject to the general inflation rate of 2.27%.[961]

   *(v)     Feed-in Remuneration in the But-for Scenario*

798     As to the feed-in remuneration payable in the but-for scenario, the Claimant's own model assumes that RF1 continues to apply,[962] with at least the CSP Plants opting for Pool Price Plus Premium; it is not quite clear to the Tribunal whether the same is assumed for Wind Farms[963] or whether they are assumed to opt for the Regulated Tariff[964]. Moreover, the Claimant assumes that the premiums will remain at 2013 levels, indexed for inflation thereafter.[965]

799     While the Respondent's primary position is that RF1 did not guarantee any specific remuneration but rather was subject to the principle of a dynamic reasonable return, the Respondent does, in its subsidiary damage calculation, assume that RF1 would have applied, at least for the CSP Plants.[966] However, contrary to the Claimant, the Respondent applies the Regulated Tariff as used in the financial models, updated each year based on the CPI.[967] For the Wind Farms, it seems that based on an EU law argument, the Respondent is assuming payment of subsidies only up to the point of the investment having been recovered, which it claims was almost the case in June 2014.[968]

800     As a matter of principle, in the framework of the present analysis, which seeks to determine the economic impact of the Disputed Measures, the Tribunal agrees with the Claimant that the CSP Plants' and Wind Farms' performance under RF3 is to be compared with RF1 as it existed, rather than 'correcting' it based on EU law. This holds true in particular as the

---

[960] E-Mail to the Parties of 14 July 2020.
[961] Brattle's Memorandum of 5 August 2020, ¶28, disagrees with this assessment, but it does so by mixing the operating costs of standard installations (which are indexed at 2.27%) with those of the actual plants (which are indexed according to what is agreed in the O&M contracts, as per Procedural Order No. 14). The formula mentioned by the Tribunal as part of its preliminary view relates to standard installations because the ROp was meant to cover a standard installation's (not: the actual installation's) shortfall between pool prices and operating costs.
[962] BQR I, ¶29 (in conjunction with ¶8).
[963] Cf. BQR I, ¶¶65, 70.
[964] Cf. BQR II, ¶44(b).
[965] BQR II, ¶44(d).
[966] Accuracy I, ¶714.
[967] Accuracy I, ¶716 (stating it has no explanation why different rates were applied for both plants).
[968] Accuracy I, ¶¶811, 418. According to Brattle's analysis of Accuracy's position, Accuracy assumes payment of a "liquidation dividend" in February 2012, which would result in an 7.7% after-tax return for the Wind Plants, equalling their past profitability rate, see BQR II, ¶¶163-166.

Tribunal is not in a position to judge whether, and to what extent, subsidies under RF1 exceeded the amount that was still acceptable under EU law.

801   That said, contrary to the Claimant's position (at least on the CSP Plants), the Tribunal prefers to rely in its analysis on the Regulated Tariff. While the Tribunal acknowledges that the Wind Farms had always operated under the Pool Price Plus Premium Option and that the CSP Plants were likely to make the same choice before that option was eliminated, the Tribunal notes that the dependency of the overall remuneration on the evolvement of the pool price makes this option more difficult to predict, rendering a DCF calculation on that basis more speculative. This impression seems confirmed by the fact that by using the Pool Price Plus Premium option, the Claimant's own economic model seems to have benefitted the CSP Plants by EUR 11 million as compared to the Regulated Tariff.[969] As the Pool Price Plus Premium Option was meant to yield the same IRR as the Regulated Tariff,[970] the Tribunal finds it likely that the Respondent would have adjusted the premiums so as to largely synchronize the two tariff options over time.[971] This makes the Tribunal doubt the appropriateness of forecasting remuneration that is significantly above the Regulated Tariff.

802   In addition, the Tribunal notes that the bank case at the time of the investment was based on the Regulated Tariff. While the Tribunal appreciates that the bank case may be more conservative than the investor's own expectations, this is in line with the Tribunal's preference for a rather conservative approach to the DCF analysis.[972]

   *(vi)   Pool Prices*

803   The pool price underlying the Claimant's economic model is EUR 48/MWh in 2015/16 (consistent with Bloomberg's forward prices in June 2014 for deliveries in 2015 and 2016), with annual increases thereafter in line with forecasted inflation.[973] For the CSP Plants, the Claimant added a premium of 2.07 (as per MO IET/1045/2014) in the actual scenario because they produce electricity during the day when pool prices tend to be highest.[974] For the Wind Farms, a discount of 11.11% is applied (as per MO IET/1045/2014) in the actual scenario because they do not tend to produce at peak periods.

804   The Respondent's economic analysis, by contrast, relies on the pool prices given by MO IET/1045/2014 for the period from 2014 to 2017, and applies EUR 53.08/MWh from 2017 onwards.[975]

---

[969] See Accuracy's presentation "Quantum", slide 14.
[970] See ¶171 *supra*.
[971] In fact, in CNE, Report on Economic Sustainability of SES of 7 March 2012 (R-0131), p. 31 of the PDF, the CNE recommended reducing the premium for solar thermoelectric energy production precisely in order to harmonize it with the Regulated Tariff; see the Respondent's powerpoint presentation "Fundamental Fact Issues of the Arbitration", as presented at the Hearing ("**R-OS (Facts)**"), slide 102.
[972] See ¶788 *supra*.
[973] BQR I, ¶¶17, 67.
[974] BQR I, ¶68.
[975] Accuracy I, ¶¶729, 814.

805    As the market prices indicated in MO IET/1045/2014 were merely assumptions made by the Respondent when it adopted that MO, the Tribunal prefers to begin with the actual price on the valuation date and use that price for the remainder of 2014. For 2015 and 2016, the Tribunal finds the Claimant's approach convincing, i.e. to use the forward prices for these two years as at the valuation date (EUR 48/MWh). Thereafter, this price shall be indexed for inflation, at the general inflation rate mentioned above. Moreover, in the actual scenario, the Tribunal agrees with the Claimant that it is appropriate to apply a premium of 2.07% to the CSP Plants and a discount of 11.11% to the Wind Farms, in accordance with MO IET/1024/2014.

### (vii)   Projected Lifetime of the Claimant's Facilities

806    According to the Claimant, both the CSP Plants[976] and the Wind Farms[977] can be expected to operate for 35 years. Regarding the CSP Plants, the Claimant argues, in particular, that the reasonableness of such lifetime expectancy is confirmed by the track record of similar plants, statements by public and scientific organisations, as well as the ATA Wind Lifetime Report. The Claimant asserts that the (shorter) lifetime indicated in the CSP SPV's financial statements is irrelevant because these statements are concerned with depreciation life rather than actual useful life.[978] In relation to the Wind Farms, while the Claimant acknowledges that extending their lifetime beyond 25 years requires some action (constant recondition of components, replacement of minor components), the Claimant contends that the investment involved is minor.[979] Moreover, the Claimant argues that RD 661/2007 itself acknowledged lifetimes of more than 25 years by providing for payment of feed-in remuneration thereafter.

807    By contrast, the Respondent asserts that the CSP Plants' lifetime expectancy is 25 years[980] while the Wind Farms' is 20 years.[981] As to the CSP Plants, the Respondent points out that the CSP SPV's financial statements assumed 25 years in 2013/14 (in earlier years, it was 20 or 30 years)[982] and that the bank model contemplated 21 years.[983] Moreover, the Respondent refers to the Servert Report, which concludes that the expected lifetime of the CSP Plants is 20-25 years, in the best case.[984] With respect to the Wind Farms, the Respondent invokes the Wind SPV's financial statements, which assumed 12.5 years between 2007 and 2011, in line with the bank case.[985] The Respondent notes that this was changed to 20 years as of the 2013 financial statements, which the Respondent asserts is consistent with MO IET/1045/2014, the PER 2005 and the technical study underlying the 2011-2020 Renewable Energy Plan. The Respondent also refers to statements by the

---

[976] See BQR I, ¶75; C-OS, slides 216f.
[977] See, e.g., C-OS, slides 216, 218.
[978] BQR II, ¶¶131f.
[979] ATA Wind Lifetime Report, ¶¶30, 35.
[980] Accuracy I, ¶711 (however, Accuracy does not explain why it does not assume 21 years, despite claiming that it oriented itself at the financing base cases, see e.g. ibid., ¶¶710, 713).
[981] Accuracy II, ¶225.
[982] Accuracy I, ¶634.
[983] Accuracy I, ¶636 (however, Accuracy does not give any reference to documents on the record).
[984] Servert Opinion, p. 49.
[985] Accuracy I, ¶639.

European Wind Energy Association and the publication "*Renewables First*", both of which indicate a useful lifetime of 20-25 years.[986]

808    As regards the CSP Plants, the Tribunal finds that 25 years, as contended by the Respondent, is a realistic lifetime expectancy, in particular in view of the Tribunal's conviction that a conservative approach to the DCF analysis is appropriate.[987] The Parties' respective technical experts, Mr. Mesa-Díaz of ATA and Dr. Servert, agreed that CSP plants in Spain are designed for a useful life of 25 years.[988] Equally, they agreed that some of the main components of the CSP Plants were designed for a lifetime of 20-25 years.[989] While both technical experts likewise agreed that depending on the circumstances it can be possible to operate CSP plants beyond the useful life for which they were designed, the Tribunal does not find it established that in the case of the CSP Plants, this is to be expected with a sufficient degree of certainty.

809    First, both Parties' technical experts agree that the design, equipment, quality of construction and the operation and maintenance practice are crucial factors in assessing the expected lifetime of a CSP Plant.[990] Surprisingly, however, the experts confirmed at the Hearing that neither of them had even been provided with the annex to the EPC contract that would have allowed them to study the design of the CSP Plants in detail.[991] Similarly, it appears that there are concerns or at least uncertainties regarding the quality of the construction as well as operation and maintenance of the CSP Plants.[992] Moreover, Mr. Mesa-Díaz acknowledged at the hearing that the equipment for which he assessed the useful life was not the equipment used specifically at the CSP Plants, but rather equipment used in CSP plants in general in Spain,[993] whereas Dr. Servert confirmed that the analysis conducted in the Servert Report was based on the components of the CSP Plants.[994] On the basis of the foregoing alone, the Tribunal does not hesitate to find that the Claimant has failed to establish that the CSP Plants can be expected to operate for more than 25 years.[995]

810    Secondly, for multiple reasons, the Tribunal is not convinced that the example of the SEGS plants in California would show that the CSP Plants can be expected to operate for more than 25 years. To begin with, the Claimant has not established that the SEGS plants are sufficiently comparable to the CSP Plants in terms of design, equipment, quality of construction and the operation and maintenance practice. In fact, as mentioned above, the technical experts were not even able to ascertain with certainty all relevant aspects of the

---

[986] Accuracy II, Appendix 10, ¶¶370-373.
[987] See ¶788 *supra*.
[988] HT, Day 3, 183:1-183:14 and 184:13-184:15.
[989] ATA CSP Lifetime Report, ¶¶26f. (noting that the technical lifetime in practice can still exceed 25 years); Servert Report, p. 20, 27-41 (noting that, in some instances, the Claimant did not provide sufficient information about the precise equipment used at the CSP Plants).
[990] Servert Report, p. 9; HT, Day 3, 180:8-180:22.
[991] HT, Day 3, 206:22-207:11.
[992] See, in particular, Servert Report, p. 42-47; HT, Day 3, 209:3-210:19, 211:4-212:2, 212:13-213:11, 214:13-215:5, 224:14-22.
[993] HT, Day 3, 217:18-217:21; see also 218:8-218:11.
[994] HT, Day 3, 218:12-218:20.
[995] C-OS, slide 216.

design, construction and operation and maintenance of the CSP Plants themselves. In addition, the Tribunal considers it established based on the Servert Report that significant[996] additional investments were required between years 17-23 of operation in order to enable the SEGS plants to continue operating after year 25.[997] In view of the above, the Tribunal is not prepared to conclude from the experience with the SEGS plants that the CSP Plants can be expected to operate for more than 25 years.

811    Thirdly, to the extent that the Claimant seeks to rely on the example of another CSP plant, the DEWA project in Dubai, it seems that, unlike the CSP plants in Spain, the DEWA project was in fact designed to last for 35 years, which however entails higher capital expenditures than those made for the CSP Plants.[998] For this reason alone, the Tribunal does not consider it established that the DEWA project is comparable to the CSP Plants. In any case, as the DEWA project was completed only in 2018,[999] nobody knows at this time whether it will in fact reach more than 25 years of operational life.

812    Fourthly, even if the Tribunal were prepared to accept that, in principle, additional investments in the CSP Plants would allow them to operate for more than 25 years, it would have been for the Claimant to establish the magnitude of such investment so that the Tribunal could assess the likelihood of such investment being made (and, if it could be expected to be made, take such investment into account in assessing the future cash-flows of the CSP Plants). The Tribunal considers that the Claimant has failed to do so. While, at the Hearing, Mr. Mesa-Díaz provided an estimate of the requirement additional investment (25% of the initial investment),[1000] the ATA CSP Lifetime Report does not provide any numbers or sources that would have allowed the Tribunal to assess the accuracy of that estimate. In addition, the estimate was disputed by Dr. Servert at the hearing (who estimated 75-80% of the initial investment).[1001]

813    Fifthly, the Tribunal finds that the studies referred to in the ATA CSP Lifetime Report equally do not allow for the conclusion that the CSP Plants will operate for more than 25 years. To begin with, the Tribunal notes that the ranges of forecasted lifetimes indicated in three of the seven studies actually include a lifetime of 25 years.[1002] Therefore, those three studies do not call into question the Respondent's assertion that the CSP Plants have a lifetime of no more than 25 years. In addition, the Tribunal shares Dr. Servert's concerns as to the informative value of those studies in relation to the CSP Plants.[1003] In particular, the factual basis of the lifetime estimates made in those studies seems rather opaque, taking

---

[996] While the technical experts disagreed on the extent of the additional investments made at the SEGS plants to prolong their useful life, they did agree that the investment was at least USD 100 million, see HT, Day 3, 192:25-193:20.
[997] Servert Report, p. 10f.
[998] HT, Day 3, 186:2-186:15, 186:24-188:13.
[999] HT, Day 3, 182:1.
[1000] See HT, Day 3, 195:17-196:15.
[1001] See HT, Day 3, 196:16-198:5.
[1002] This applies to the studies of ESTELA (20-40 years), Greenpeace (25-30 years) and the World Bank ("at least" 25 years), as referred to in the ATA CSP Lifetime Report, ¶20. The Tribunal also notes that *Rainer Kistner/Henry Price*, Financing Solar Thermal Power Plants (C-0845) indicates a lifetime of 25-30 years.
[1003] Servert Report, p. 12-15.

into account also that at the time those studies were issued, the only real experience with CSP projects was the SEGS project.

814　On balance, therefore, the Tribunal does not find it established that the CSP Plants can be expected to operate for more than 25 years. Contrary to the Claimant's view, the Tribunal does not consider this finding to be contradicted by the fact that RD 661/2007 provided for feed-in remuneration also after 25 years of operation. This merely implies that RD 661/2007 saw the possibility of renewable energy projects operating for more than 25 years, which is a different question than whether the CSP Plants in particular can be expected to operate for more than 25 years. The Tribunal also notes that its finding on the lifetime of the CSP Plants is in line with other tribunals' findings on CSP plants in Spain.[1004]

815　With respect to the Wind Farms, the Tribunal notes that the Respondent did not submit any expert report. At the same time, however, the Tribunal considers that the ATA Wind Lifetime Report does not engage in any technical analysis of the Wind Farms specifically.[1005] Instead, it contains general statements on what is technically possible and what life expectancy some other wind farms have.[1006] Indeed, the only specific documents in relation to the Wind Farms analysed in the ATA Wind Lifetime Report are the O&M contracts,[1007] based on which it was assumed that the Wind Farms "*underwent and will continue to undergo adequate and standard maintenance during their lifetime*"[1008] and that "*life extension plans are a suitable option*"[1009] for the Wind Farms. Notably, the specific construction contracts were not taken into account, as acknowledged by Mr. Fernández García at the Hearing. However, he also stated that he was aware of the general design because the Wind Farms were built by the manufacturer itself, who were "*using obviously the design strictures of their own equipment*".[1010] Moreover, Mr. Fernández García testified at the hearing that there are wind farms in Spain that have been operating for 25-28 years even though they are using older technology than the Wind Farms.[1011]

816　The Tribunal further notes that the ATA Wind Lifetime Report acknowledges that without life extension programs, most wind farms have a life expectancy of 20-30 years.[1012] While ATA claimed that the costs of such programs are "*relatively low*" compared to the initial investment,[1013] no specific numbers were provided.[1014] Accordingly, the Tribunal is not in

---

[1004] *Eiser v. Spain*, ¶451; *Masdar v. Spain*, ¶618; *Antin*, ¶714; *RREEF v. Spain II*, ¶549; *InfraRed v. Spain*, ¶¶567-573.
[1005] See, notably, ATA Wind Lifetime Report, ¶3: "ATA has been asked to analyse the technical lifetime of a standard Wind Farm based on the generic characteristics that this sort of facilities comprise […]." (emphasis added); ATA Wind Lifetime Report, ¶6: "ATA prepared the current Expert Report on the basis of the assumption of an onshore Wind Farm in the range 20 -50 MW connected to the grid." (emphasis added).
[1006] ATA Wind Lifetime Report, ¶¶19-31.
[1007] ATA Wind Lifetime Report, ¶¶13-16.
[1008] ATA Wind Lifetime Report, ¶7; see also ¶17.
[1009] ATA Wind Lifetime Report, ¶32.
[1010] HT, Day 3, 235:19-236:1.
[1011] HT, Day 3, 247:16-247:18, 250:17-250:19, 251:20-251:20.
[1012] See the table at ATA Wind Lifetime Report, ¶21.
[1013] ATA Wind Lifetime Report, ¶¶30, 35.
[1014] This is noted also in Accuracy II, Appendix 10, ¶371.

a position to assess the likelihood of such investment being made – or to take such investment into account as additional costs in a forecast of cash-flows, if the Tribunal were prepared to assume a life expectancy exceeding 25 years. Therefore, the Tribunal prefers not to take the possibility of life extension programs into account.

817     Based on the foregoing, the Tribunal finds it appropriate to assume a lifetime of 25 years. This reflects, in particular, the undisputed fact that wind farms with older technology have been operating in Spain for 25-28 years and that studies indicate a general life-time expectancy of wind farms of 20-30 years (without extension programs). Moreover, the Tribunal notes that a life expectancy of 25 years is in line with the findings of other tribunals on wind farms in Spain.[1015]

        *(viii) Production Levels*

818     The Claimant based its economic model on "*historical performance and contemporaneous forecasts prepared by Renergy*".[1016] Specifically, in relation to the Wind Farms, the Claimant's annual forecast for 2015 onwards is approximately 64.9 GWh for Hedroso, 77.3 GWh for Padornelo and 107.5 GWh for Lubián.[1017] For the CSP Plants, the contemporaneous forecast anticipates annual production of approximately 133.1 GWh per year for Olivenza and 134.6 GWh per year for Morón.[1018] However, as those forecasts would cause the CSP Plants to exceed the Maximum Operating Hours under RF3 (2,040 hours = 102GWh for a 50MW plant), the Claimant appears to assume in the actual scenario that the CSP Plants will produce 102 GWh annually, seemingly with a slight degradation each year.[1019]

819     The basis of the Respondent's forecast differs depending on the scenario. In the but-for scenario, the Respondent relies on the bank models, at least as far as the CSP Plants are concerned. This means 117GWh per year for Morón and 115.4GWh per year for Olivenza, but degrading 0.1% per year starting from year 11 of regulatory service life.[1020] While the Respondent's position is not as clear with respect to the Wind Farms, the Respondent likewise seems to have used the bank models for the but-for scenario (which are higher than the Claimant's forecast).[1021] In the actual scenario, the Respondent assumes production based on the reference production of a standard installation as per as per Annex III of IET/1045/2014 MO, which includes annual degradation from 2014 onwards of 0.2% for the CSP Plants and 0.5% for the Wind Farms.[1022]

---

[1015] *Watkins v. Spain*, ¶¶707f.; *BayWa v. Spain,* ¶484; *Eurus v. Spain*, ¶344.
[1016] BQR I, ¶17.
[1017] See BQR-59 ("Wind_Cost data Renergy Wind V3.xls"); tab N2 of Oct_2018_updates_Lapuerta-Caldwell Rebuttal Workpapers, table N2; cf. also BQR II, ¶66 (Figure 1).
[1018] Cf. BQR I, Annex A, ¶204 (Table 22).
[1019] See BQR I, ¶62 (Figure 2).
[1020] Accuracy I, ¶715.
[1021] Cf. BQR II, ¶63 (including fn. 47).
[1022] See Accuracy I, ¶728; Accuracy II, ¶225.

820    For the Wind Farms, given that on the valuation date they had already been in operation for up to ten years,[1023] the Tribunal finds that, in principle, the most objective approach is to use the average historical annual production from before the valuation date as a forecast for future years.[1024] However, for Hedroso and Lubián, this approach would yield lower production levels than either of the Parties' own forecasts for the actual scenario (which are also very similar to each other).[1025] The Tribunal does not find it appropriate to substitute its own forecast for the Parties' forecasts to the extent that both of them are aligned. Therefore, in relation to Hedroso and Lubián, the present analysis uses the average between the actual scenario forecasts submitted by the Parties. For consistency, the Tribunal will use the same approach also for Padornelo, despite the fact that in that case, the historic average was slightly above the Respondent's forecast.

821    The Tribunal further finds that its above-described forecast for the Wind Farms shall apply not only in the actual scenario but also in the but-for scenario. Contrary to the Respondent's approach, the Tribunal fails to see why the Wind Farms' production should differ from one scenario to the other.

822    As to the CSP Plants, given their shorter history of operations, the Tribunal considers that the most appropriate approach is to rely on contemporaneous forecasts around the valuation date. Two types of forecasts exist: the Claimant's own forecasts[1026] and the bank case. These forecasts differ significantly from each other and it is difficult for the Tribunal to tell which of the two is more realistic. While the Tribunal accepts that the bank case may have erred on the lower side in order to ensure that cash-flows are sufficient to service the debt, the Tribunal considers that the Claimant's own forecasts may have been too optimistic. In particular, the Tribunal notes that in 2013 and 2014, actual solar production[1027] at Olivenza was 20% respectively 19% below the Claimant's long-run production expectations, and actual solar production at Morón fell 21% respectively 8% short of those expectations.[1028] While Brattle suggests that "[m]*etereological conditions may explain some of the variation*,[1029] it is unclear which portion of the variation this concers and what the reasons were behind the remainder of the variation. In addition, the Claimants have not established that in future years the relevant metereological conditions can be expected to be significantly better than in 2013 and 2014. On balance, therefore, the Tribunal finds it appropriate to use the average of the Claimant's contemporaneous forecasts and the bank case.

823    In principle, this applies to both the but-for scenario and the actual scenario. However, in the actual scenario, the forecast needs to reflect that RF3 introduced a new rule on the use

---

[1023] Hedroso, Padornelo and Lubián started operating in 2004, see BQR-105 and also RWS-CMR2, ¶130 (Table 14).
[1024] See Annex 1 to Procedural Order No. 14.
[1025] See Joint Memorandum of 9 November 2020, ¶22 (Figure 3).
[1026] One forecast from 2011, based on RF1 and including gas (BQR I, Annex A, ¶¶203-205), and a second forecast from 2015, based on RF3 and excluding gas (see BQR-59 "Renergy CSP – Economic and Operating data", tab "Key Asssumtions", line 22, columns F and G). See also Accuracy's Response of 21 September 2020, ¶18 and Brattle's Comments of 6 October 2020, ¶2.
[1027] I.e. excluding energy production through the use of Back-up Fuel.
[1028] See BQR I, Annex A, ¶204 (Table 22).
[1029] BQR I, Annex A, ¶205.

of Back-up Fuel. While the Claimant's forecast from 2015 does take this into account, the only bank case available contemplates that the CSP Plants would produce 12% of their overall energy through the burning of Back-up Fuel, i.e. the absolute maximum allowed under RF1 in the Regulated Tariff option. This assumption underlying the bank case is not compatible with the actual scenario, in which RF3 provides for a much lower absolute limit for the use of Back-up Fuel. In other words, as agreed by the Experts, the bank case needs to be adjusted to fit the actual scenario, before an average can be built with the Claimant's contemporaneous forecast from 2015. However, the Experts disagree on what the appropriate adjustment to the bank case is.

824    Brattle's solution is to look into the Claimant's own contemporaneous forecasts from 2011 (which assumed 15% production with Back-up Fuel) and 2015 (which assumes no use of Back-up Fuel at all) to derive a ratio between production with and without Back-up Fuel. This ratio is then applied to the bank case (after adjusting the ratio to 12% Back-up Fuel, as is underlying the bank case). Accuracy, instead, simply deducts 12% from the bank case.

825    Brattle's approach results in a lower overall production in the actual scenario (and, thus, a greater economic impact of the Disputed Measures) than Accuracy's approach. According to Brattle, the reason behind this is that the Claimant's contemporaneous forecasts considered that burning Back-up Fuel not only generated energy directly, but also created efficiencies that indirectly benefitted solar power production. In particular, as is undisputed between the Parties, burning Back-up Fuel helps maintaining a certain temperature of the heat transfer fluid during spells of low solar radiation, which in turn allows CSP plants to instantly start producing solar energy at normal levels once there is again sufficient solar radiation.[1030] Due to these efficiencies, the comparison between the Claimant's contemporaneous forecasts from 2011 and 2015 implies that 15% Back-up Fuel use translates into 22% additional energy production.[1031]

826    As a matter of principle, Brattle's position seems to make more sense because both Parties agree that burning Back-up Fuel can increase the efficiency of solar energy production. However, the problem is that neither the Claimant's contemporaneous forecasts nor Brattle provide any verifiable details as to (the magnitude of) such efficiencies.

827    As mentioned, on Brattle's case, 15% Back-up Fuel use translates into 22% additional energy production. This number seems quite high, at least without any further information beyond the mere comparison between the production forecasts from 2011 and 2015. As the Tribunal has the impression that the Claimant's initial forecast from 2011 may have been a bit too optimistic, the Tribunal is not convinced that the entire difference between the 2011 and 2015 forecasts is due to the reduction in Back-up Fuel use, as opposed to other factors that may have been considered when the 2015 forecast was made. While it appears likely that use of Back-up Fuel does have a positive effect on the solar production capacity, it is not possible for the Tribunal to quantify this effect given that no relevant information was provided beyond the Claimant's own forecasts. As the Claimant bears the burden of

---

[1030] See also RD 661/2007 (C-0064/R-0101), Article 2.
[1031] Brattle's Memorandum of 5 August 2020, ¶34.

197

proving its damage, the Tribunal finds that this lack of information must go to the detriment of the Claimant.

828    Therefore, the Tribunal assumes that in the actual scenario, the production will be the average between the Claimant's contemporaneous forecast from 2015 and 88% of the production forecast from the bank case. As this average is below the Maximum Operation Hours for both Olivenza and Morón,[1032] no further adjustment is necessary.

   *(ix)    Use of Back-up Fuel*

829    In the Claimant's economic model, the but-for scenario contemplates that 15% of the respective CSP Plant's total energy production is generated through the burning of Back-up Fuel.[1033] By contrast, in its actual scenario, the Claimant assumes that no Back-up Fuel will be used at all for production of energy after December 2014, which the Claimant asserts is consistent with the actual behaviour of the CSP Plants and with their actual revised operating plans.[1034]

830    The Respondent's but-for scenario, in turn, is based on the use of Back-up Fuel contemplated in the bank case, which the Tribunal takes to be 12% of the overall energy production.[1035] In the actual scenario, the Respondent assumes use of Back-up Fuel based on what it claims are the Claimant's own operating assumptions.[1036]

831    As mentioned above, the Tribunal is not convinced that RF1 granted producers an unconditional right to feed-in remuneration for electricity generated through the burning of Back-up Fuel, i.e. irrespective of whether the use of LNG was necessary for technical purposes.[1037] Accordingly, on its own motion, the Tribunal would not have necessarily assumed that the CSP Plants would burn the maximum amount of 12% (under the Regulated Tariff) in the but-for scenario. However, as the Respondent itself took this position and the Claimant assumed an even higher use of 15% (due to its assumption that the Pool Price Plus Premium option applied), the Tribunal does not find it appropriate to substitute its view for the Parties' joint view that the LNG use is no less than 12% of the total energy produced. Accordingly, the Tribunal assumes that in the but-for scenario, the CSP Plants generate 12% of their overall energy production through the burning of LNG.

832    In respect of the actual scenario, the Tribunal finds that in order to be consistent, one should also assume that the CSP Plants would burn the maximum amount of Back-up Fuel that still qualifies for feed-in remuneration, namely 15,000 thermal MWh.

---

[1032] The averages are 101,201 MWh for Morón and 101,773 for Olivenza, see Accuracy's Response of 21 September 2020, ¶22. This corresponds to 2,024.02 and 2,035.42 annual operating hours, respectively.
[1033] BQR I, ¶80.
[1034] BQR I, ¶¶30, 60, 80.
[1035] Accuracy I, ¶¶710, 718 together with Accuracy's Response of 21 September 2020, ¶14 (Table 1).
[1036] Accuracy I, ¶730, referring to BQR-59.
[1037] See ¶763 *supra*.

*(x)    Back-up Fuel Prices*

833    The Claimant's economic model forecasts Back-up Fuel prices to increase at the inflation rate.[1038] It is not quite clear which assumption is underlying the Respondent's model in this regard. The Tribunal finds the Claimant's approach reasonable and has therefore adopted it for the present analysis.

*(xi)    O&M Costs*

834    In the Claimant's economic model, the costs for operating and maintaining the Claimant's facilities are projected by reference to their O&M contracts, not forecasting the payment of any bonuses or penalties thereunder. [1039] In the but-for-scenario, an increase is made to reflect use of Back-up Fuel at the maximum allowed under RF1.[1040]

835    In the but-for scenario, the Respondent has taken essentially the same position for the CSP Plants,[1041] whereas its position on the Wind Farms is unclear. In the actual scenario, the Respondent instead relies for the CSP Plants on data provided by Brattle,[1042] while for the Wind Farms it uses an estimate that is based on the historic average for 2009-2011, indexed for inflation thereafter.[1043]

836    The Tribunal finds the Claimant's position more reasonable as there is no indication on record that the O&M contracts may be amended concerning payments to be made for operating and maintaining the Claimant's facilities. Also, the Tribunal agrees that in the but-for scenario, an adjustment needs to be made to reflect the additional use of Back-up Fuel.

*(xii)    Discount Rate (Not Including Regulatory Risk)*

837    The Tribunal finds the Claimant's view convincing that it is preferable to address regulatory risk by adjusting cash-flows appropriately, instead of modifying the discount rate.[1044] The Respondent has likewise computed discount rates not reflecting regulatory risk.[1045] Accordingly, regulatory risk will be dealt with separately in section (xiii) *infra*.

838    According to the Claimant, the discount rate should be 4.8%. The Claimant calculated this rate based on the Capital Asset Pricing Model ("**CAPM**") and the following parameters:

---

[1038] BQR I, ¶81.

[1039] BQR I, ¶¶17, 7, 829.

[1040] BQR I, ¶33.

[1041] Accuracy I, ¶719 relies on the bank case, which is however in line with the O&M contracts.

[1042] Accuracy I, ¶731.

[1043] Accuracy I, ¶814.

[1044] According to BQR I, ¶92, this is "recommended practice" reflected also in *Brealey/Myers/Stewart/Allen*, Principles of Corporate Finance, 10th ed., 2011, p. 21-23, 168-170 (BQR-2).

[1045] See Accuracy I, ¶¶319, 749.

    (i)   <u>Risk-free rate</u>: 2.09% (20-year Euribor swap rate on 21 June 2014)[1046]

    (ii)   <u>Beta</u>: 0.5, based on how a sample of 17 renewables firms (14 from Europe) with publicly traded stock performed in comparison to the FTSE All-Europe stock index[1047]

    (iii)   <u>Market risk premium</u>: 5.5%, based on a study by the London Business School that compared historical performance of stocks to short-term government bonds[1048]

839    The Respondent, in turn, calculated a discount rate of 4.0% for the CSP Plants, likewise applying the CAPM methodology and using the following parameters:

    (i)   <u>Risk-free rate</u>: 2.16% (20-year Euribor swap rate on 31 December 2012, i.e. the Respondent's valuation date for the CSP Plants)[1049]

    (ii)   <u>Beta</u>: 0.41% (same methodology as the Claimant, but with a different selection of 20 listed companies in the renewables sector)[1050]

    (iii)   <u>Market risk premium</u>: 4.5%, based on a different figure from the same study as invoked by the Claimant[1051]

840    For the Wind Farms, the Respondent calculated a discount rate of 4.3% based on the following CAPM parameters:[1052]

    (i)   <u>Risk-free rate</u>: 2.6% (20-year Euribor swap rate on 28 February 2012, i.e. the Respondent's valuation date for the Wind Farms)

    (ii)   <u>Beta</u>: 0.37%[1053]

    (iii)   <u>Market risk premium</u>: 4.5%, as for the CSP Plants

841    The Tribunal agrees with the Experts that it is appropriate to determine the discount rate based on the CAPM methodology. As to the risk-free rate, the Experts agree on the appropriate proxy, namely the 20-year Euribor swap rate, and merely disagree on the valuation date. Given the Tribunal's finding that the valuation date is 21 June 2014 and in view of the fact that the Respondent has not disputed that on that date, the 20-year Euribor swap rate was 2.09%, this is the risk-free rate that the Tribunal chooses to apply. Regarding the beta, the Tribunal does not see itself in a position to determine whose Expert's list of

---

[1046] BQR I, ¶98. The Claimant does not use Spanish or even German bond rates because they reflect certain default risks, which the Claimant considers as part of its analysis of Spanish regulatory risk, outside the discount rate.
[1047] BQR I, ¶¶101-106.
[1048] BQR I, ¶107.
[1049] Accuracy I, ¶739.
[1050] Accuracy I, ¶741.
[1051] Accuracy I, ¶745.
[1052] Accuracy I, Appendix 10, ¶A65.
[1053] Accuracy does not explain the difference compared to the beta it determined for the CSP Plants, but the Tribunal assumes that this may be due to the different valuation date used by the Respondent for the CSP Plants.

comparable companies is more appropriate. To the Tribunal, both of them appear equally sustainable. Therefore, the Tribunal finds it appropriate to take the average between the Expert's betas.[1054] As the Respondent has calculated a beta of 0.4% for the Tribunal's valuation date of 21 June 2014,[1055] the average with the Claimant's beta is 0.45%. Finally, as to the market risk premium, the Tribunal finds 4.5% appropriate because the study on market risk that both Experts rely on gives that number.[1056] Applying the CAPM formula,[1057] this yields a discount rate of 4.115%.

*(xiii)  Regulatory Risk*

842    The Claimant calculates regulatory risk based on the assumption that Spanish Tariff Deficit securities have a rating of BBB+ in the actual scenario (consistent with Spanish government bonds) and A+ in the but-for-scenario (consistent with rating agencies allowing for an uplift of up to three notches above the relevant sovereign).[1058] According to the Claimant, these ratings translated (on 21 June 2014) into an annual chance of default of 3.4% in the actual scenario and 2% in the but-for-scenario.[1059] The recovery rate assumed by the Claimant in its calculations is 60% in case of default.[1060] As a result, in the Claimant's model, if one translates regulatory risk into a premium to be added to the discount rate, the regulatory risk premium in the actual scenario is 0.1 percentage points for Hedroso, Padornelo and Lubián I, 0.5 percentage points for Lubián II, and 1.6 percentage points for the CSP Plants. In the but-for scenario, the Claimant calculates a regulatory risk premium of 0.5 percentage points for Lubián I and II, 0.6 percentage points for Hedroso and Padornelo, and 1 percentage points for the CSP Plants.[1061] In other words, the Claimant's position is that regulatory risk *increased* in the actual scenario by 0.6 percentage points for the CSP Plants, while for the Wind Farms it stayed the same (Lubián II, being the newest) or decreased by 0.4/0.5 percentage points because they are older and receive less remuneration under RF3 than newer installations (thus reducing risk exposure).[1062]

843    By contrast, the Respondent asserts that as a result of the Disputed Measures, the regulatory risk *decreased* for all of the Claimant's facilities by 1.7 percentage points. In the Respondent's view, before the Disputed Measures were taken, rating agencies had downgraded Tariff Deficit securities precisely because of the high deficit and the uncertainty about the measures that Spain was going to take to address the situation.[1063] The Respondent notes that once the last Disputed Measures were adopted, the rating rose

---

[1054] Same approach taken in *RREEF v. Spain II*, ¶585.
[1055] Accuracy I, Appendix 9, ¶368.
[1056] BQR-9, p. 2, 9, 18 (Table 2); Brattle seems to have used instead the 5.5% equity return mentioned in ibid., p. 2, 18 (Table 1).
[1057] Risk-free rate + beta*market risk premium.
[1058] BQR I, ¶119.
[1059] BQR I, ¶126.
[1060] BQR I, ¶125.
[1061] See the "asset yields" in BQR I, ¶135 (Table 12), from which one needs to deduct the Claimant's discount rate of 4.8% in order to identify the regulatory risk premium for each facility.
[1062] BQR I, ¶135.
[1063] Accuracy I, Appendix 13, ¶¶615-626.

again and one of the securities even regained by 2015 a three-notch difference as compared to Spanish bonds.[1064] The Respondent assumes that the tariff deficit securities rating will rise to AA in the actual scenario (noting that at the time this submission was made, the rating was already between A and A+), while in the but-for scenario it would have further deteriorated to at least BBB-.[1065] Translating these assumptions into a premium to the discount rate, the Respondent calculates a regulatory risk premium of 2.2 percentage points in the but-for scenario and 0.5 percentage points in the actual scenario. [1066]

844    The Tribunal finds this question of the appropriate regulatory risk premium particularly difficult to answer.[1067] On the one hand, the Tribunal notes that after constantly falling in the years before the Disputed Measures were adopted, the rating of the Tariff Deficit securities did in fact recover thereafter. The Tribunal agrees with the Respondent that this seems to indicate a decrease in regulatory risk. On the other hand, the Tribunal finds that there is some force to the Claimant's argument that in the but-for scenario, one cannot assume that the Respondent would not have taken any alternative measures in order to decrease the Tariff Deficit, such as imposing higher access tolls and/or increasing energy prices. In view of the foregoing, the Tribunal finds it appropriate to adopt the Claimant's assumptions for the actual scenario, but to use the same regulatory risk also in the but-for scenario because the Parties' position on how those ratings and yields would have evolved but for the Disputes Measures appear equally persuasive (and speculative).

*(xiv)  Taxes*

845    In respect of tax liabilities from before the valuation date, the Claimant has based them in the actual scenario on the asset values actually reported for accounting purposes, while in the but-for scenario they are based on the depreciation and amortization the SPVs would have reported in the absence of the asset write-downs that occurred in 2013 in response to the Disputed Measures.[1068] This position, which has not been contested by the Respondent, seems reasonable to the Tribunal. Consequently, it is adopted for the present analysis.

846    In addition, the TEE and TVPEE shall apply not only in the actual scenario, but also in the but-for scenario, given that the Tribunal lacks jurisdiction over the Claimant's claim as far as these taxation measures are concerned. Eliminating those measures from the but-for scenario would imply a finding that they breached the ECT, which finding the Tribunal cannot make without having jurisdiction.

---

[1064] Accuracy I, Appendix 13, ¶¶627f.; see also Accuracy II, ¶¶256-258.
[1065] Accuracy I, Appendix 13, ¶¶A81f.
[1066] Accuracy I, ¶¶749, 813 and Appendix 13, ¶¶A83f.
[1067] The Tribunal notes that the jurisprudence in similar cases involving the Respondent is not unanimous on this point. An increase of regulatory risk was accepted in *Masdar v. Spain*, ¶¶640f.; *Novenergia v. Spain*, ¶832 (criticized by *RREEF v. Spain II*, ¶¶582ff.); *Foresight/Greentech v. Spain*, ¶¶525f.; *Antin v. Spain*, ¶721; *SolEs v. Spain*, ¶532. By contrast, *Cube v. Spain I*, ¶¶510-512 found (for hydro plants) that the Disputed Measures "offered the prospect of a more stable regime for electricity pricing and, in consequence, less pressure to amend the regime further". Similarly, *9REN v. Spain*, ¶421h ruled that on the valuation date "there was a risk that Spain would not perform as promised and that […] Spain's tariff reductions would not be considered violations of the ECT."
[1068] BQR I, ¶34.

847    However, Brattle argues that even if the Tribunal considers the TVPEE to be outside its jurisdiction, the Tribunal would still need to decide on the time period during which the TVPEE should apply in the but-for scenario, for two reasons. First, Brattle asserts that the Respondent neutralized the effects of the TVPEE under RF3. Secondly, Brattle alleges that the TVPEE was suspended in 2018-2019. In Brattle's view, if the Tribunal considers on the level of liability that the TVPEE had only a small or no effect because RF3 effectively neutralized it (so that the TVPEE was "*temporary*" in Brattle's terminology, i.e. until RF3 came into force), the consistent position on damages would be to likewise consider the TVPEE temporary. Alternatively, Brattle finds it likewise possible to consider the TVPEE permanent on both levels.[1069]

848    Accuracy argues that if the Tribunal decides that is has no jurisdiction over the TVPEE, the but-for scenario should include the TVPEE permanently because the but-for scenario should reflect the regulatory framework in force before/without the breach.[1070]

849    The Tribunal agrees with Accuracy's position. In the present context, the but-for scenario is designed to determine the economic impact of the Disputes Measures as a criterion for assessing a potential breach of the ECT. Therefore, the Tribunal must construct the but-for scenario by removing from the actual scenario any and all Disputed Measures for which it is at least possible that the Tribunal may find a breach of the ECT. No such possibility exists for measures over which the Tribunal lacks jurisdiction. Accordingly, the TVPEE must form part of the but-for world. This cannot change based on legislation that is subsequent to the valuation date, forms part of the Disputed Measures and is thus to be ignored in the but-for world. Also, there is no issue of consistency between responsibility and damages because any damage that may have resulted from the TVPEE cannot influence the Tribunal's decision given that it has concluded that it does not have jurisdiction.

    *(xv)    Summary*

850    In summary, while the Tribunal agrees with the Claimant in particular on the valuation method and the valuation date, the Tribunal prefers to make more conservative assumptions on multiple parameters, especially on the feed-in remuneration in the but-for scenario, the projected lifetime of the Claimant's facilities and their production levels. Similarly, the Tribunal's position on the discount rate and the regulatory risk strikes a balance between the Parties' positions.

851    The above assumptions have been communicated to the Parties by way of Procedural Order No. 14 and subsequent instructions, based on which the Parties have agreed on the Joint Model. The following analysis relies mainly on the numbers indicated in the Joint

---

[1069] Brattle's Memorandum of 5 August 2020, ¶¶39-45.
[1070] Accuracy's Memorandum of 5 August 2020, ¶¶46-48.

Model.[1071] In some cases, however, the Tribunal will look, in addition, at the numbers asserted by the Parties based on their respective own models.

    *(b)    Analysis of the Economic Impact*

852    The Claimant asserts that as a result of the Disputed Measures, "*the vast majority of renewable producers went bankrupt*".[1072] However, it does not offer much evidence for this assertion. The most relevant[1073] piece of evidence on record is an evaluation by Brattle of data from the Spanish National Statistical Institute. According to this evaluation, after the announcement of the first Disputed Measures, the number of insolvencies of energy firms increased by 161% compared to 2012, with a further increase by 28% in 2014.[1074] However, the raw data underlying this evaluation was not submitted and it is unclear to what extent those insolvencies related to renewables and, more specifically, to the wind and CSP sectors. As Brattle itself acknowledges that an earlier spike in the number of insolvencies (in 2011) mainly related to photovoltaic installations, it cannot be presumed without further information that the insolvencies in 2013/2014 related to wind or CSP installations.

853    That said, Ibereólica Solar was in fact declared insolvent under Spanish law and the Claimant asserts that the insolvency proceedings would "*surely*" end up with Ibereólica Solar being wound up.[1075] However, the Respondent disputes that this insolvency was a result of the Disputed Measures. Instead, the Respondent claims that documents from the insolvency proceedings show that the reasons for insolvency were (i) RDL 1/2012, which caused Ibereólica Solar to abandon six other CSP projects not at issue in this arbitration, exposing it to damages claims filed by contractual partners, (ii) the general economic crisis and (iii) a higher level of third-party financing than other companies in the sector.[1076] The first point was disputed by Mr. Gómez during his witness testimony,[1077] but at the same

---

[1071] For some of the issues that are disputed between the Experts, the Joint Model allows the Tribunal to select different options in multiple toggles. In accordance with the Tribunal's findings above, the Tribunal has selected the "Primary But For (¶2.b)" as the "Active But-for Scenario", "YES" for the toggles "7% Tax in But For" and "Regulated Tariff (FIT) only", "NO" for the toggle "7% tax Temporary/Neutralized (YES) or Permanent (NO)", "Accuracy" for the toggles "Actual scenario production" and "Standard Installation's OPEX indexation", "Pre-tax" for the toggle "Tax Treatment" and "Plant" for the toggle "Plant or Standard Inst.?".

[1072] RoM, ¶1455(iii), second bullet-point.

[1073] Other documents on the record are mostly news articles and statements from sector associations that, however, pre-date RD 413/2014 and MO IET/1045/2014 and merely voice the expectation that the anticipated changes would create the risk of insolvency (BRR-96; BRR-97; BRR-98; BRR-99; BRR-100; BRR-101).

[1074] BRR I, ¶174; see BRR II, Appendix A for an update including 2015 (which likewise does not reveal the number of insolvencies in renewables/wind/CSP), which seems inconclusive because in Q1-Q3 the number of insolvencies is not much higher and partially even lower than in 2011, while in Q4 there is a spike. The press report submitted as BRR-153 essentially contains the same information as presented by Brattle.

[1075] RoM, ¶¶895-900.

[1076] RjoM, ¶¶1605-1618.

[1077] HT, Day 2, 11:3-11:10 (saying that the costs of the abandoned CSP projects "are part of it, but they are not the cause of the insolvency").

time he acknowledged that unlike the SPVs that operated the abandoned CSP projects, the CSP SPVs were able to avoid insolvency and were sold to a third party.[1078]

854    Based on the Parties' submissions and the available documents from the insolvency proceedings, the Tribunal does not find it established that Iberéolica Solar's insolvency was caused solely or primarily by the Disputed Measures (or that the Disputed Measures bankrupted a significant number of companies in the Wind and CSP sectors). However, the Tribunal does not consider that in order to establish a breach of Article 10(1) FET, the Claimant would need to show that the Disputed Measures had this effect. Therefore, the Tribunal now turns to the extent of the Disputed Measures' economic impact below the threshold of bankruptcy. The Tribunal will first analyse the impact on the IRRs of the Claimant's facilities (see subsection (i) *infra*). This will be followed by an analysis of the impact on cash-flows (see subsection (ii) *infra*). Finally, the Tribunal will measure the IRRs achieved by the Claimant's facilities against the cost of capital (see subsection (iii) *infra*).

   *(i)    Impact on IRRs*

855    The Tribunal finds it appropriate to begin with a comparison between the IRRs that the Claimant's facilities can be expected to achieve in the actual scenario with those in the but-for. Based on the Joint Model, this comparison looks as follows (pre-tax):

|  | **Hedroso** (wind) | **Padornelo** (wind) | **Lubián** (wind) | **Olivenza** (CSP) | **Morón** (CSP) |
|---|---|---|---|---|---|
| **But-for** | 9.45% | 11.06% | 10.69% | 8.38% | 8.49% |
| **Actual** | 4.64% = 50.9% lower than but-for | 6.42% = 42.0% lower than but-for | 6.14% = 42.6% lower than but-for | 5.37% = 35.9% lower than but-for | 5.12% = 39.7% lower than but-for |

856    Accordingly, based on the Joint Model, all of the Claimant's facilities saw a very significant drop in their IRRs as a result of the Disputed Measures. This observation would not change if one looked instead at the Claimant's economic model.[1079] Also, the assessment is not called into question by the Respondent's calculations as the Respondent did not provide but-for IRRs based on its own economic assumptions.

---

[1078] HT, Day 2, 14:2-14:14.
[1079] Based on Brattles' numbers, the IRR dropped between 30.2% and 52.4% depending on the facility, see CER-005, Table 4 (Updated).

857    In addition to the comparison of actual and but-for IRRs, the Tribunal finds it useful to compare the actual IRRs of the Claimant's facilities with the RF1 Reference IRR. Even though, given the absence of any specific commitment of Absolute Stability, the Claimant could not legitimately expect that no changes at all would be made to RF1, the Tribunal still considers the RF1 Reference IRR to be an important guiding figure that realistically influenced any diligent investors' legitimate expectation of Relative Stability. The actual IRRs of the Claimant's facilities compare as follows to the RF1 Reference IRR:

| | Hedroso (wind) | Padornelo (wind) | Lubián (wind) | Olivenza (CSP) | Morón (CSP) |
|---|---|---|---|---|---|
| **Reference IRR of RF1** | 8.1% | 8.1% | 8.1% | 9.3% | 9.3% |
| **Joint Model Actual Scenario** | 4.64% <br><br> = 42.7% lower than reference | 6.42% <br><br> = 20.7% lower than reference | 6.14% <br><br> = 24.2% lower than reference | 5.37% <br><br> = 42.3% lower than reference | 5.12% <br><br> = 44.9% lower than reference |
| **Brattle[1080] Actual Scenario** | 5.5% <br><br> = 32.1% lower than reference | 7.8% <br><br> = 3.7% lower than reference | 7.4% <br><br> = 8.6% lower than reference | n/a[1081] | |
| **Accuracy [1082] Actual Scenario** | 8.5% <br><br> = 4.9% higher than reference | 11.2% <br><br> = 38.3% higher than reference | 8.5% <br><br> = 4.9% higher than reference | 7.0% <br><br> = 24.7% lower than reference | 7.2% <br><br> = 22.6% lower than reference |

858    With respect to the CSP Plants, it follows from the above comparison that based not only on the Joint Model, but also the Respondent's own numbers, the actual IRRs are significantly below the relevant RF1 Reference IRR. That said, the Tribunal notes that based on the Joint Model, the CSP Plants' but-for IRRs (Olivenza: 8.38%; Morón: 8.49%)

---

[1080] Wind Farms' pre-tax IRRs as per Joint Memorandum of 9 November 2020, ¶17 (Table 2).

[1081] Brattle did not calculate the CSP Plants' pre-tax IRRs. However, it is clear that Brattle assumes lower pre-tax IRRs than those calculated by Accuracy, cf. Brattle's presentation "Changes to the Regulation of Wind and CSP Installations in Spain", slide 13.

[1082] Accuracy II, ¶53 (Figure 4), ¶55 (Figure 5). For the CSP Plants, Accuracy applied certain "corrections" for alleged inefficiencies, namely the investment costs (which were higher than initially projected and than foreseen in MO IET 1045/2014) and the investment period (which was 4 years instead of 18-24 months as foreseen in the PER 2005), see Accuracy's presentation "Quantum", slides 6f.; Accuracy II, ¶¶34-41.

likewise fall short of the RF1 Reference IRR (by 9.9% or 8.7%, respectively).[1083] Therefore, even if RF1 had remained in place, the CSP Plants could not have been expected to achieve the RF1 Reference IRR. Consequently, one cannot say that the entire shortfall between the CSP Plants' actual IRRs and the RF1 Reference IRR is due to the Disputed Measures. However, even deducting the aforementioned shortfall that would have existed had RF1 remained in force, the additional shortfall inflicted by the Disputed Measures still exceeds 30 percentage points, as per the Joint Model, which the Tribunal finds to be a very significant impact.

859    As to the Wind Farms, both the Joint Model and the Claimant's own model indicate that the actual IRRs are lower than the RF1 Reference IRR. The Tribunal does not consider the Respondent's numbers, which are not based on a true DCF calculation,[1084] to cast doubt on this result of the analysis. The Tribunal notes that in relation to Padornelo and Lubián, the Claimant's own numbers suggest a shortfall that is much smaller than for the CSP Plants[1085] and that could, at least in the case of Padornelo, be considered negligible. However, the Tribunal also notes that this does not detract from the fact that, equally based on the Claimant's own model, the change from RF1 to RF3 was very significant: it appears that only because Padornelo and Lubián could be expected to beat the RF1 Reference IRR by a very big margin in the but-for scenario, the Disputed Measures brought them merely slightly below that benchmark in the actual scenario.[1086]

860    In summary, therefore, the analysis shows that as a result of the Disputed Measures, all of the Claimant's facilities have seen a very significant decrease in their IRRs. This has caused the Wind Farms to fall below the RF1 Reference IRR, while the CSP Plants' pre-existing shortfall compared to the RF1 Reference IRR has increased significantly.

*(ii)    Impact on Cash-flows*

861    As is undisputed between the Parties, it is common practice for renewable energy projects to rely heavily on project financing.[1087] The logic behind project financing relies on the assumption that the asset itself will generate steady and predictable streams of revenue to

---

[1083] See the table in ¶741 *supra*.

[1084] Instead of assuming that RF1 remains in place and produces respective cash-flows for the lifetime of the plants, Accuracy allocated to the Wind Farms such revenue that would yield an IRR that Accuracy deems reasonable (Accuracy I, ¶¶808, 811; Accuracy II, ¶199), namely 9.5% on equity. This reflects the CAPM calculated by Accuracy for 2003, which they consider to be the time of the "real" investment in the Wind Farms, because at that time Condeu (fully owned by Mr. Gómez and later acquired by the Claimant) acquired indirect stakes in the Wind Farms, cf. Accuracy I, ¶¶124, 203; Accuracy II, ¶¶107, 199, 201, 205.

[1085] As noted in fn. 1081 *supra*, while Brattle did not calculate the CSP Plants' pre-tax IRRs, it is clear that Brattle assumes lower pre-tax IRRs than those calculated by Accuracy.

[1086] While the Claimant did not provide pre-tax IRRs for the Wind Farms in the but-for scenario, the Tribunal estimates them to be 10.0% for Hedroso, 12.0% for Padornelo and 11.6% for Lubián, based on the post-tax IRRs (including financing) calculated by the Claimant (CER-005, Table 4 (Updated)) and the effective tax rates underlying the Joint Model for a conversion of the Wind Farms' post-tax IRRs (including financing) into pre-tax IRRs. Accordingly, had RF1 remained in place, Padornelo and Lubián could have been expected to beat the RF1 Reference IRR by more than 40% based on the Claimant's numbers.

[1087] MoM, ¶¶543-547; the Respondent acknowledged this already in its PER 2005, Section 4.5.

service the debt.[1088] Accordingly, the cash-flows generated by renewables projects are of essential importance for the repayment of their loans.[1089] Therefore, in order to assess the economic impact of the Disputed Measures, the Tribunal finds that it must look not only at the IRR (even though important given the fundamental role it played for the Respondent in devising the remunerative regimes) but also at how the cash-flows of CSP Plants and Wind Farms were affected.[1090]

862    Based on the Joint Model, the cash-flows in the but-for and actual scenarios compare as follows (in million EUR):

|  | **Hedroso** (wind) | **Padornelo** (wind) | **Lubián I** (wind) | **Lubián II** (wind) | **Olivenza** (CSP) | **Morón** (CSP) |
|---|---|---|---|---|---|---|
| **But-for** | 30 | 31 | 38 | 17 | 347 | 372 |
| **Actual** | 10 | 10 | 16 | 14 | 253 | 257 |
| Δ | 20 = -66.7% | 21 = -67.7% | 22 = -57.9% | 3 = -17.6% | 94 = -27.1% | 115 = -30,9% |

863    Accordingly, the Tribunal finds that while the effect on cash-flows varies considerably between the different facilities, all of them saw a very significant fall in their cash-flows at project-level. At the level of the Claimant's shareholding, these losses add up to approximately EUR 55.4 million.[1091] While this is significantly less than the EUR 141 asserted by the Claimant, it is still a very significant amount that is also much higher than on the Respondent's case, which is that either the Claimant suffered no damages at all (ABV calculation) or, at most, EUR 7.4 million (subsidiary DCF calculation).

864    For comparison, based on the Claimant's DCF model, the cash-flows in the actual and but-for scenarios compare as follows (in million EUR):[1092]

---

[1088] BRR, ¶61.
[1089] MoM, ¶319.
[1090] Cf. also *RWE Innogy v. Spain*, ¶599(a).
[1091] See Joint Model, cell Q57 (using the configuration described in fn. 1071 *supra*).
[1092] See BQR I, ¶131 (Table 11).

|  | Hedroso (wind) | Padornelo (wind) | Lubián I (wind) | Lubián II (wind) | Olivenza (CSP) | Morón (CSP) |
|---|---|---|---|---|---|---|
| **But-for** | 40 | 48 | 52 | 22 | 497 | 510 |
| **Actual** | 11 | 15 | 19 | 14 | 235 | 239 |
| Δ | -29 = - 72.5% | -33 = -68.75% | -33 = -63.46% | -8 = -36.36% | -262 = -52.72% | -271 = -53.14% |

865    While the Respondent's primary damage calculation rest on the ABV methodology, it provided a subsidiary DCF calculation based on which the cash-flows under the actual and but-for scenarios compare as follows[1093]:

|  | Hedroso (wind) | Padornelo (wind) | Lubián (wind) | Olivenza (CSP) | Morón (CSP) |
|---|---|---|---|---|---|
| **But-for** | 21.9 | 21.3 | 35.5 | 379.6 | 382.4 |
| **Actual** | 17.7 | 20.6 | 38.5 | 308.3 | 318.6 |
| Δ | -4.2 = -19.18% | -0.7 = -3.29% | +3.0 = +8,45% | -71.3 = -18.78% | -63,8 = -16.68% |

866    Accordingly, both Parties calculate significant cash-flow reductions for Hedroso, Olivenza and Morón. This further confirms the Tribunal's findings based on the Joint Model. While the Claimant alleges significant reductions also for Padornela and Lubián, as does the Joint Model, the Respondent asserts that Padornelo lost relatively little cash-flow while Lubián's cash-flow even increased as a result of the Disputed Measures. However, as mentioned before, the Respondent subsidiary DCF calculation is not in fact based on the cash-flows that an unchanged RF1 would have yielded.[1094] Therefore, the Tribunal does not consider that the Respondent's model calls into question the findings made on the basis of the Joint Model.

*(iii)    Comparison with Cost of Capital*

867    While the previous two sections sought to determine the economic impact of the Disputed Measures by comparing RF1 and RF3, the present section aims at ascertaining how

---

[1093] Accuracy I, ¶¶752 (CSP), 817 (Wind); Accuracy II, ¶231 (Wind).
[1094] See fn. 1084 *supra*.

reasonable the return offered by RF3 is compared to the risks undertaken by the Claimant, as reflected in the cost of capital.[1095] In other words, while the previous analyses sought to ascertain how much was 'taken away' from the Claimant as a result of the Disputed Measures, the following comparison with the cost of capital seeks to determine whether what is still left (i.e. the remuneration under RF3) is reasonable in the sense of maintaining the efficiency of the investment – irrespective of whether the previous regulatory regime offered even higher returns.

868    The Respondent has submitted,[1096] and the Tribunal in principle agrees, that the CAPM is an appropriate benchmark for this analysis. While the CAPM disregards external financing, so did the Respondent when devising the remunerative regime for both RF1 and RF3.[1097]

869    However, for the present purposes,[1098] the Tribunal finds it appropriate to take regulatory risk into account when determining the applicable CAPM. This is because an investment will only be made if the expected IRR is high enough to compensate the investor for *all* risks involved in the project, i.e. including any regulatory risk.[1099] Therefore, if the CAPM is to serve as an indicator of the reasonableness of the IRR offered by RF3, regulatory risk must be included in the calculation of the CAPM. Accordingly, the Tribunal must add to the discount rate of 4.115%, as calculated in the framework of the DCF analysis,[1100] a regulatory risk premium. As the analysis concerns the actual scenario, for which the Tribunal accepts the Claimant's position that tariff deficit securities have a rating of BBB+,[1101] the Tribunal must determine how this rating translates into a regulatory risk premium to be added to the discount rate. The Tribunal finds it appropriate to rely in this regard on the "*Rating-based Default Spread*" study of Professor Aswath Damodaran

---

[1095] The Tribunal notes that such comparison with the cost of capital was relied on also by the tribunal in *RREEF v. Spain II*, ¶574, to determine whether RF3 grants a reasonable rate of return; to similar effect, albeit in the context of quantum, *NextEra v. Spain*, ¶662-666; *Cavalum v. Spain*, ¶687.

[1096] Accuracy II, Figures 4, 5 (while Accuracy uses the term "*WACC*", i.e. the abbreviation of Weighted Average Cost of Capital, which unlike the CAPM takes into account external financing, the number they refer to is derived from a CAPM calculation, as is clear from Accuracy II, ¶52 (fn. 21), ¶54, (fn. 22), in conjunction with Accuracy I, Annexes 10, 11). The Tribunal notes that in BQR II, ¶12, Brattle merely takes issue with a comparison between the IRR and the WACC because the former is an equity return while the latter includes debt; this seems to imply that, as a matter of principle, comparing the IRR with the CAPM is acceptable to Brattle, as well.

[1097] The Tribunal notes that the tribunals in *RREEF v. Spain II*, ¶577, and arguably also in *NextEra v. Spain*, ¶611, compared IRRs to the WACC instead of the CAPM. In the present case, neither party made submissions on the precise debt ratio or the cost of debt in relation to the CSP Plants or Wind Farms. Thus, the Tribunal is not in a position to determine whether a comparison taking into account the effects of external financing would have yielded a different result.

[1098] Contrary to the CAPM calculation used to determine the discount rate in the framework of the DCF analysis. In that context, regulatory risk was treated separately and to avoid double-counting, it could not then again be included in the CAPM calculation.

[1099] See the statement to this effect of Brattle's Mr. Lapuerta at the hearing, see HT, Day 4, 17:2-11; see also Accuracy I, ¶¶319, 325. While Mr. Lapuerta referred also to other types of risks that he felt were missing in the comparison between IRRs and CAPMs (construction risk, technological risk and illiquidity risk), the Tribunal is not in a position to quantify those risks in the form of premiums to be added to CAPMs. However, whatever those premiums may be, they would in any case have increased the CAPM, which in turn would only have lent further support to the conclusions drawn below.

[1100] See ¶841 *supra*.

[1101] See ¶842 *supra*.

referred to by Accuracy for the same purpose.[1102] The Tribunal is aware that this study is based on public information related to generic investments for the country in question and therefore does not take into account the specific elements of the Claimant's investment.[1103] Nonetheless, the Tribunal is satisfied that its approach is sufficiently accurate for the present analysis, which is not concerned with quantifying precise damages but rather appreciating the magnitude of the economic effect of the Disputed Measures. Based on the said study, the rating of BBB+ translates into a regulatory risk premium of 2.2 percentage points that must be added to the CAPM. As the Tribunal assumes a CAPM excluding regulatory risk of 4.115%, this yields a CAPM including regulatory risk of 6.315%.[1104]

870    The Tribunal notes that other tribunals have considered that the appropriate benchmark for the reasonableness of the return is the cost of capital *plus a premium*.[1105] However, as the CAPM used by the Tribunal already includes regulatory risk and as no specific additional premium is obvious from the Parties' submissions, the Tribunal does not consider it appropriate to add any further premium for the purposes of the present analysis.[1106]

871    On this basis, the CAPM compares as follows to the RF3 Target IRR[1107]:

|  | **Wind Farms** | **CSP Plants** |
|---|---|---|
| **CAPM** | 6.315% | 6.315% |
| **RF3 Target IRR** | 6.049% = -4.2% | 6.225% = -1.4% |

872    When looking instead at the real-life IRRs of the Claimant's facilities as projected by the Joint Model in the actual scenario, the comparison looks as follows:

---

[1102] See Accuracy II, ¶A.83. The Tribunal does not consider it possible to rely instead on the regulatory risk premiums calculated by Brattle (see ¶842 *supra*). Those premiums reflect asset yields that were derived from the cash-flows projected by Brattle (taking into account regulatory risk) (see BQR I, ¶¶132-136). As Brattle's cash-flow projections are based on a number of assumptions that are not shared by the Tribunal (see section VII.A.2.d.iii(2)(a) *supra*), the Tribunal presumes that the regulatory risk premiums implicit in Brattle's model are different from those implicit in the Joint Model relied upon by the Tribunal.

[1103] See Accuracy II, ¶A.85.

[1104] The Tribunal is aware that there are different approaches to incorporating country risk (of which regulatory risk forms part) into the CAPM. However, as both Parties have taken the approach of simply adding the applicable regulatory risk premium to their CAPM (rather than, e.g., first multiplying the regulatory risk premium with beta), the Tribunal finds it appropriate to follow this approach.

[1105] One percentage point in *RREEF v. Spain II*, ¶588; two percentage points in *NextEra v. Spain*, ¶666.

[1106] The Tribunal notes that contrary to what seems to have been before the tribunals in *RREEF v. Spain II*, ¶588 and *NextEra v. Spain*, ¶662, there is no submission before this Tribunal as to any intentions of the regulator, at the time of the investment, to offer investors a specific premium to the cost of capital.

[1107] CAPMs are, by definition, post-tax and excluding financing. Consistent with the finding in ¶738 *supra*, the RF3 Target IRRs have thus been converted into post-tax numbers (excluding financing) by using Accuracy's conversion rate, see Joint Memorandum of 16 December 2020, ¶4 (Table 2).

|  | Hedroso (wind) | Padorneloo (wind) | Lubián (wind) | Olivenza (CSP) | Morón (CSP) |
|---|---|---|---|---|---|
| CAPM | 6.315% | 6.315% | 6.315% | 6.315% | 6.315% |
| Actual IRR | 3.15% = -50.1% | 3.75% = -40.6% | 4.37% = -30.8% | 4.71% = -25.4% | 4.51% = -28.6% |

873    In addition, it is noteworthy that in the but-for scenario, the projected IRRs of the Claimant' facilities, as per the Joint Model, compare as follows to the CAPM[1108]:

|  | Hedroso (wind) | Padornelo (wind) | Lubián (wind) | Olivenza (CSP) | Morón (CSP) |
|---|---|---|---|---|---|
| CAPM | 6.315% | 6.315% | 6.315% | 6.315% | 6.315% |
| But-for IRR | 7.53% = +19.2% | 8.41% = +33.2% | 8.59% = +36.0% | 7.37% = +16.7% | 7.51% = +18.9% |

874    Accordingly, while the but-for IRRs are above the cost of capital, the RF3 Target IRRs are lower and the actual IRRs very much lower than the cost of capital for all of the Claimant's facilities.

875    In the Tribunal's view, this shows that when the Claimant made its investment, it was an efficient investment decision because the Claimant's facilities could be expected to achieve IRRs well in excess of the cost of capital. By contrast, once the Disputed Measures were enacted, none of the Claimant's facilities could anymore be expected to exceed the cost of capital, neither based on the RF3 Target IRR nor – much less – based on actual IRRs. In other words, the Tribunal finds that this analysis confirms the above general observation that the change of the remuneration system introduced by the Disputed Measures rendered previously efficient investments inefficient.

    *(iv)    Summary*

876    Irrespective of whether one looks at IRRs or cash-flows, it is obvious to the Tribunal that from an economic perspective, the Disputed Measures had a very significant adverse impact on all of the Claimant's facilities. This is true in particular for the Wind Farms, whose IRRs under RF1 could be expected to comfortably outperform the RF1 Reference IRR. By contrast, under RF3, the IRRs dropped so much that they now remain significantly

---

[1108] As the Tribunal assumes that regulatory risk is the same in the but-for scenario as in the actual scenario (see ¶844 above), the regulatory risk premium and, thus, the CAPM remains the same.

below even the lower RF3 Target IRR. In addition, on average, their cash-flows decreased by more than 50%. While the CSP Plants were anyway set to fall short of the RF1 Reference IRR, the Tribunal does not consider that this can detract from the fact that they were likewise severely affected by RF3. Their IRRs dropped by percentages that are not much lower than for at least two of the Wind Farms. This has caused the CSP Plant's IRRs to fall significantly below the RF3 Target IRR, which they would have remained well above of with the remuneration scheme of RF1. Also, on average, their cash-flows decreased by almost 30%.

877    In addition, even if one disregarded the fact that the remuneration under RF3 is significantly lower than under RF1, and instead merely looked at RF3 in isolation, the rates of return offered by RF3 to any of the Claimant's facilities are lower than the cost of capital (including regulatory risk) as at the valuation date.[1109] Accordingly, the Tribunal concludes that on the valuation date, no investor would have invested in the CSP Plants and Wind Farms in view of the Disputed Measures. This, in turn, implies that the rate of return offered by RF3 is not reasonable for pre-existing facilities such as the CSP Plants and Wind Farms.

878    In making this finding, the Tribunal has taken into account that at the time the Claimant's investment was made, the IRRs that the Claimant's facilities could be expected to achieve under RF1 exceeded both the cost of capital and the RF1 Reference IRR by significant margins. For this reason, the Tribunal is not convinced by the Respondent's assertion that the low actual IRRs under RF3 are mainly due to inefficiencies at the Claimant's facilities, as opposed to them being a result of the Disputed Measures.

879    The Tribunal does not find the foregoing to be called into question by the fact, invoked by the Respondent, that in 2009, APPA and Greenpeace published a draft bill for the promotion of renewable energies in which they proposed a target rate of return equivalent to the average yield of 10-year Spanish government bonds, plus a spread of 300 basis points.[1110] First, while at first sight this target rate of return is identical to the RF3 Target IRR, the Tribunal notes that it is unclear whether the rate of return proposed by APPA and Greenpeace is pre-tax (as in RF3[1111]) or post-tax (which would be in line with RF1, i.e. the regime in place at the time the proposal was made, where the RF1 Reference IRR was always post-tax and excluding financing). If it was meant to be a post-tax rate of return, it would in fact be significantly higher than the RF3 Target IRR. Secondly, the Respondent does not claim and the Tribunal has no reason to believe that the rate of return proposed by APPA and Greenpeace was intended to apply to pre-existing facilities, much less retrospectively by taking into account remuneration paid under previous regimes.[1112] Therefore, the Tribunal finds that the APPA/Greenpeace proposal does not support the

---

[1109] This does not even take into account that further risk premiums may have to be added to the CAPM in order to make it fully comparable to the IRRs, see fn. 1099 *supra*.

[1110] See R-0187.

[1111] See RDL 2/2013 (C-0373/R-0093), First Additional Provision: "profitability before taxes"; Law 24/2013 (C-0378/R-0076), Tenth Additional Provision (2): "profitability […] before tax".

[1112] To the contrary, the last sentence of Article 27(1) of the draft bill reads: "In any case, it is not permitted for modifications made to support schemes to be extended to facilities or uses that were enjoying the benefits of previous support schemes, which shall be retained unless an express replacement request is submitted by the respective beneficiary" (R-0187); see RoM, ¶1408(i).

Respondent's position that the remunerative regime of RF3 was reasonable for facilities such as the Wind Farms and CSP Plants.

880    Similarly, while according to the EC State Aid Decision the RF3 Target IRR "*appear*[s] t*o be in line with the rates of return of renewable energy* […] *projects recently approved with the Commission*" in France, Italy, Estonia and Latvia,[1113] this does not mean that in those four countries similar rates of return were applied (much less retrospectively) to facilities that were built and started operating under a more favourable previous remunerative regime. Indeed, the Respondent has not submitted that this is what happened in those four countries. In addition, even if that were the case, it would not necessarily follow that the RF3 Target IRR is reasonable.

*(3)    Abruptness of the Change*

881    The Respondent claims that it announced by late 2011 the changes that would be brought about by the Disputed Measures.[1114] Also, it asserts that none of the changes are retroactive in nature.[1115]

882    The Claimant submits that the details of the new regulatory regime were not even clear in July 2013 when RDL 9/2013 repealed RF1, given that it took the Respondent another year to approve RD 413/2013, MO IET/1045/2014 and MO IET/1882/2014.[1116] Furthermore, the Claimant argues that RF3 was retroactive in two ways. First, payments of feed-in remuneration made to a facility under RF1 were deducted from the payments to which the facility was entitled under RF3.[1117] Secondly, RDL 2/2013, which suppressed the Pool Price Plus Premium option and indexed the remuneration parameters to a new index instead of the CPI, was adopted on 1 February 2013, but with an effective date of 1 January 2013.[1118] Lastly, the Claimant highlights the lack of any transitional regime that could have allowed existing facilities to adapt to RF2/3.[1119]

883    Based on the record, the Tribunal agrees with the Claimant that the Respondent did not sufficiently warn renewable energy producers before RDL 2/2013 suppressed the Pool Price Plus Premium option and RDL 9/2013 replaced RF1 with the principles of RF3. The Tribunal is not convinced that any of the public statements it was referred to by the Respondent, most of which also post-date the Claimant's investment, show otherwise.[1120]

884    To begin with, the parliamentary speech of soon-to-become Prime Minister Mariano Rajoy held on 19 December 2011[1121] merely constituted a general political statement about the

---

[1113] EC State Aid Decision, ¶120 (with fn. 57), referred to in R-OS (Facts), slide 159.
[1114] CMoM, ¶¶470-495.
[1115] CMoM, ¶¶846-858; RjoM, ¶¶710-738.
[1116] RoM, ¶504.
[1117] RoM, ¶¶549-553.
[1118] MoM, ¶635.
[1119] RoM, ¶111(ii).
[1120] To same effect *SolEs v. Spain*, ¶439.
[1121] Transcript of the Speech of (then) Prime Minister Mariano Rajoy to the Spanish Congress of 19 December 2011 (R-0192); referred to in CMoM, ¶474.

need for reform to address the Tariff Deficit. However, it was completely unclear which direction such reform could take – in particular, how severe it was going to be and which stakeholders were going to be affected in what way.

885    Similarly, it is true that a press release by the CNE on 28 December 2011 stressed "*the need to immediately implement, amongst other measures, proposals for the regulation of activities, aimed at getting rid of the system's structural deficit*".[1122] However, this press release then goes on to suggest certain measures that could be taken, with none of them being a general reduction of the feed-in remuneration paid to renewable energy producers, much less to existing installations.[1123]

886    A first hint at the magnitude of possible changes was a report issued by CNE on 7 March 2012, which stated that "[d]*ue to the high cost of the remuneration of the special regime equivalent premium, the difficulty of its funding by access tariffs (taking into account the current economic imbalance in the electricity system) as well as the necessary review of efficiency incentives in the current regulation, the current regulation must be reviewed*", and proposed a number of significant changes.[1124] However, the Ministry of Energy – which would be in charge of implementing such changes – distanced itself from the report the day after it received it.[1125] In addition, the measures proposed in the CNE report were not as far-reaching for renewable producers[1126] as the Disputed Measures.

887    Other statements referred to by the Respondent[1127] remained too vague for them to have served as a sufficient warning of the legislative changes about to be implemented some months later. Moreover, in January, March and July 2012, the Respondent adopted legislative measures that did not affect renewable energy facilities or at least not those registered in the Remuneration Pre-Allocation Registry or in RAIPRE,[1128] which may well have reinforced the impression of investors that the Tariff Deficit would be addressed without changing the economic regime in place for registered renewables facilities.

888    Accordingly, based on the record, it appears that the enactment of RDL 2/2013 and RDL 9/2013 came quite suddenly indeed. This impression is only reinforced by the CNE criticizing the legislator for having submitted to it the first draft of RDL 9/2019 at such short notice that it "*does not allow to guarantee an effective participation of the different agents affected*".[1129]

889    In addition, the Tribunal considers that there is indeed an element of retrospectivity that is imminent to RF3 because if a facility has already received payments under the previous

---

[1122] CNE, Press Release of 28 December 2011 (R-0170), page 1 of the PDF; referred to in CMoM, ¶475.

[1123] See CNE, Press Release of 28 December 2011 (R-0170).

[1124] CNE, Report on Economic Sustainability of SES of 7 March 2012 (R-0131), p. 100 of the PDF; referred to in CMoM, ¶483.

[1125] Ministry of Energy, Press Release of 9 March (C-0709).

[1126] In particular, a proposed tax on the sale of petrol and gas would arguably have effected producers of renewable energy less than producers of conventional energy.

[1127] CMoM, ¶¶471-473, 477f., 485-493; RoM, ¶¶502-509.

[1128] CMoM, ¶493; RoM, ¶510.

[1129] CNE, Report 18/2013 of 4 September 2013 (C-0415), p. 1 of the PDF.

regulatory framework, such payments will be deducted from the overall remuneration that the facility would otherwise receive under RF3.[1130] This clawback essentially put producers in the same position as if RD 661/2007 had never existed[1131] – unless, of course, the facility in question had already achieved before the adoption of RF3 an IRR that was higher than the RF3 Target IRR, because in that case the producer would at least be able to keep what could be considered an "overpayment" in the eyes of RF3. That said, none of the Claimant's facilities fall into this latter category.[1132]

890    Moreover, the Tribunal finds that RDL 2/2013 had retroactive effect because it took effect on 1 January 2013 even though it was adopted only one month later, on 1 February 2013.[1133]

891    Finally, it is true that RDL 9/2013 repealed RD 661/2007 with immediate effect, without providing for a true transitional period in which existing facilities could adapt to the new situation. While RDL 9/2013 provided that producers would temporarily continue to receive remuneration as per the values of the previous regime, this was subject to a final settlement once the remuneration values of RF3 were set. In other words, in the end producers would not receive more than what was owed to them under RF3, as of the coming into force of RDL 9/2013.

892    In summary, therefore, the Tribunal considers that the Respondent replaced the remunerative regime of RD 661/2007, as amended by RD 1614/2010, very abruptly indeed: without sufficient prior warning, without a true transitional regime and with elements of retroactivity or at least retrospectivity.

### (4)    Change of External Circumstances

893    Consistent with contemporaneous statements it made after RD 1614/2010 had been adopted (i.e. after RF1 had been completed),[1134] the Respondent submits that the Disputed Measures are justified because of the soaring Tariff Deficit, the rise of energy prices for consumers and the existence of over-remuneration in the renewables sector.[1135]

894    The Claimant, by contrast, argues that the Tariff Deficit cannot justify the Disputed Measures, mainly for two reasons. First, the Claimant asserts that the Respondent itself created the Tariff Deficit by refusing, for political reasons, to fix network access tolls at a level that reflected the true cost of electricity.[1136] Secondly, in 2007, when according to the

---

[1130] To same or similar effect *Foresight/Greentech v. Spain*, ¶395; *RREEF v. Spain II*, ¶328, *BayWa v. Spain*, ¶¶488, 496; *Watkins v. Spain*, ¶601; *RWE Innogy v. Spain*, ¶617; *PV Investors v. Spain II*, ¶¶812f.; *Eurus v. Spain*, ¶¶347-355; *Cavalum v. Spain*, ¶637; different view *Isolux v. Spain*, ¶814.

[1131] This view is shared by the three Justices who dissented on the Spanish Supreme Court's Judgment of 1 June 2016, Case 650/2014 (C-0711), on the legality of RD 413/2014, see p. 25f. of the PDF.

[1132] Cf. the actual IRRs reported in the Joint Model.

[1133] RDL 2/2013 (C-0373/R-0093), Article 1 and Final Provision Four.

[1134] See, in particular, the transcript of the speech of (then) Minister of Energy Miguel Sebastián to the Spanish Congress of 26 January 2011 (R-0227); Ministry of Energy, Press Release 27 January 2012 (R-0172).

[1135] CMoM, ¶¶729, 906, 929-937, 1107.

[1136] RoM, ¶¶830-844.

Claimant the Tariff Deficit was huge already, the Respondent took the conscious policy decision of giving priority to the development of renewable energy, by choosing to implement a highly attractive remunerative regime by virtue of RD 661/2007.[1137]

895   The Tribunal considers that the Claimant's arguments overlook the fact that at the end of 2007, a very significant part of the accumulated Tariff Deficit (almost 40% thereof) was due to a very high deficit in 2005, whereas in 2006 and 2007 the annual deficits decreased significantly and steadily.[1138] Accordingly, the Tribunal is not convinced that, at the time, the Tariff Deficit appeared to be structural. Only after RD 661/2007 was adopted, due to the global financial crisis that began in the end of 2007, and the ensuing severe economic crisis in Spain, the demand in energy in Spain increased much less than expected in 2008 and decreased in 2009, for the very first time for 25 years, instead of further increasing as had been projected.[1139] At the time, the wind power association AEE acknowledged an "*exceptional fall in the demand for electricity*".[1140] After a slight recovery in 2010, the decline in energy demand continued from 2011 to 2013.[1141] Even though the energy prices for consumers increased by more than 60% between 2007 and 2012,[1142] the Tariff Deficit still increased by 365% during the same time period.[1143]

896   The Tribunal has no hesitation to find that the global financial crisis, which led to a severe economic crisis in Spain (and elsewhere in Europe) that, in turn, exacerbated the Tariff Deficit dramatically, was in fact an extraordinary change of external circumstances that post-dated RD 661/2007 and that was an important reason behind the adoption of the Disputed Measures.[1144] While it may well be that the Respondent's past policy to keep network access tolls were also a significant factor contributing to the size of the Tariff Deficit, it would not be appropriate to negate the great impact that the very exceptional economic surroundings between 2008 and 2014 had on the Tariff Deficit, irrespective of the Respondent's policy on network access tolls. Although it is true that a significant Tariff Deficit existed already when the Respondent decided to offer investors an attractive remunerative regime through RD 661/2007, this policy decision did not prevent the Respondent from changing course once it faced the very exceptional economic circumstances that occurred thereafter.[1145]

---

[1137] RoM, ¶¶88 (with fn. 110), 1430.

[1138] See the chart in CMoM, ¶85. In 2007, the annual deficit was down to approximately 37% of the annual deficit in 2005.

[1139] See the charts in CMoM, ¶¶71, 445 and the Transcript of the speech of (then) Minister of Energy Miguel Sebastián to the Spanish Congress of 26 January 2011 (R-0227).

[1140] AAE, Observations before the CNE of 30 August 2010 (R-0166), p. 2 of the PDF.

[1141] See the charts in CMoM, ¶¶71, 445.

[1142] See the table in CMoM, ¶73 (according to which the average electricity bill per consumer increased from 412.6 EUR in 2007 to 669.7 EUR in 2012).

[1143] See the chart in CMoM, ¶85.

[1144] See in this regard also the preamble of RDL 6/2009 (¶181 *supra*); UNEP, Global Trands in Sustainable Energy Investment 2010 (RL-0079), p. 14 [second paragraph in the blue box].

[1145] See also *RWE Innogy v. Spain*, ¶559.

897    Therefore, the Tribunal finds that at least one of the triggers for the Disputed Measures was a significant change of external circumstances.

*(5)    Public Interests Involved*

898    The Tribunal has no hesitation to find that the reliability a State's electricity system is of vital public interest. This was also expressly reflected in the Preamble of Law 54/1997[1146] and it cannot therefore have come as a surprise to any diligent investor that the Respondent attached great importance to this policy objective. Equally, the Tribunal has no doubt that before the Disputed Measures were taken, the Tariff Deficit in Spain had begun to pose a serious risk to the economic sustainability of the SES. In fact, this does not seem to be in dispute between the Parties. Given that the Disputed Measures (just like previous measures, such as RD 1614/2010[1147]) were clearly aimed at reducing the Tariff Deficit, as was acknowledged by both Parties in this arbitration,[1148] they objectively pursued an important public interest.

899    While the Claimant may be correct that there would have been different ways in which the Respondent could have tackled the Tariff Deficit, e.g. through network access tolls or by levying a CO2 tax,[1149] it is not for the Tribunal to pass judgment on what would have been the best policy decision for the Respondent to take.[1150] Rather, in the present context, it suffices to note that cutting costs of the system by reducing the remuneration payable to renewable (and other) energy producers is not *per se* an unsuitable means to pursue the important public interest of tackling the Tariff Deficit and thereby safeguarding the economic sustainability of the electricity system.[1151]

900    At the same time, the Tribunal notes that increasing the use of green energy is likewise of vital public interest, given in particular the positive impact on the environment. Indeed, the Respondent itself committed to pursuing this interest many times, not least in the Preamble of Law 54/1997,[1152] and is also under an obligation to do so under EU law, in particular pursuant to EU Directive 2009/28/EC.[1153] As it seems difficult to deny that, at least in the short term, the Disputed Measures make investments in green energy projects in Spain less attractive to investors,[1154] the Disputes Measures could be seen to run counter to the public interest in saving the environment.[1155]

---

[1146] The Preamble of Law 54/1997 (C-0060/R-0003) reads: "The supply of electric power is essential for the functioning of our society." [as per the Claimant's translation; the Respondent's translation is identical in substance].

[1147] See Ministry of Energy, Press Release of 2 July 2010 (C-0247); see also AEE, Press Release of 9 December 2010 (C-0263).

[1148] RoM, ¶¶789-793; CMoM, ¶¶832 f., 923, 1107.

[1149] RoM, ¶¶848-855.

[1150] Same view *BayWa v. Spain*, ¶480; see also *RWE Innogy v. Spain*, ¶553.

[1151] To same effect *RWE Innogy v. Spain*, ¶559.

[1152] Law 54/1997 (C-0060/R-0003), Sixteenth Transitional Provision.

[1153] As highlighted by both Parties, see RoM, ¶¶44-60; RjoM, ¶¶494f.

[1154] While the Respondent submits that RF3 is still attracting significant investment, it does not seem to dispute that the economic regime of RF3 is less attractive to investors than the one of RF1.

[1155] Cf. C-PHB, ¶¶200f.

901    However, balancing competing public interests is one of the core responsibilities and prerogatives of a State. The Tribunal does not find it appropriate to second-guess the Respondent's assessment at the time that, at least for the time being, it was more important to bring the Tariff Deficit under control than to keep incentives for investment in green energy at the same level as before. This policy choice is not manifestly unreasonable, in particular as an economically unsustainable electricity system is also likely to deter future investment into green energy projects. Therefore, the Tribunal will defer to the Respondent's policy choice of according priority to the reduction of the Tariff Deficit. Based thereon, the Tribunal finds that the Disputed Measures do pursue the overriding public interest of ensuring the sustainability of the SES.

### (6)    Prior[1156] Legislative Practice

902    The Claimant asserts that any changes to the regulatory framework introduced before its investment continuously improved the attractiveness to investors,[1157] never affected existing facilities[1158] and, in addition, even made sure that transitional regimes allowed investors to adopt to the new regulatory framework.[1159] By contrast, the Respondent claims that the guiding thread of all legislative changes has always been to protect the sustainability of the SES and to prevent overcompensation.[1160] Also, the Respondent submits that even before the Disputed Measures were adopted, many legislative measures were criticized by the renewable sector as retroactively affecting facilities already in operation.[1161]

903    To begin with, the Tribunal notes that prior to the Disputed Measures, the Respondent amended the regulatory framework for renewable energy production multiple times within a relatively short period of time. Specifically, even if one counts only the main legislative measures, the Respondent enacted five comprehensive pieces of legislation between 1997 and 2007, i.e. on average one every other year.[1162] Hence, the Tribunal considers that the Respondent's legislative practice in this field of law was characterized by constant change.[1163]

---

[1156] In CC on ECT Decisions, ¶¶47-54, the Claimant also invokes RDL 17/2019, i.e. legislation *subsequent* to the Disputed Measures, arguing in particular that it confirms that RF3 does not provide legal stability and is arbitrary. The Tribunal does not share the Claimant's view that RDL 17/2019 is relevant to the assessment of whether the Disputed Measures are in breach of the ECT (see also fn. 920 *supra*). If at all, RDL 17/2009 may itself amount to a breach of the ECT, which however is not a question that is before this Tribunal.

[1157] MoM, ¶¶8, 10, 250.

[1158] MoM, ¶¶11, 27, 476.

[1159] RoM, ¶111(ii).

[1160] CMoM, ¶803.

[1161] RjoM, ¶740.

[1162] Law 54/1997, RD 2818/1998, RD 436/2004, RDL 7/2006 and RD 661/2007. Further measures would e.g. include Law 17/2007 (C-0760) and numerous Ministerial Orders. This high frequency of changes was criticized e.g. by APPA in its presentation New Special Regime Decree, 19 April 2004 (R-0290), slide 14.

[1163] To same effect *Isolux v. Spain*, ¶788.

904    Contrary to the Claimant's allegation, the Tribunal finds that such change was not always to the benefit of investors.[1164] This holds true in particularly in the case of RDL 7/2006, which froze tariffs by de-linking them from the TMR, which link had led to high returns previously.[1165] Also, while RD 661/2007 may have brought about certain improvements to renewables investors, it did result in lower tariffs to wind farms at least in the first seven months after it entered into force,[1166] and apparently also in 2008, 2011 and 2012.[1167] In addition, the fact that practically all wind farms in Spain opted to remain under RD 436/2004 during a transitional period until 31 December 2012, despite the tariffs and premiums under RD 436/2004 remaining frozen to the values of 2007,[1168] likewise indicates that, at the time, RD 661/2007 was not considered by the wind sector to clearly result in higher remuneration.[1169] Moreover, the Tribunal notes that the PER 2005, to which RD 661/2007 makes express reference, concluded that in order to achieve the renewable energy targets for 2010, no change was required to the remuneration regime as regards CSP and wind energy.[1170] This likewise suggests that it is not entirely accurate when the Claimant characterizes RD 661/2007 as aiming mainly at benefitting investors, in particular in the fields of CSP and wind energy.

905    Accordingly, the Respondent implementing further changes in 2013 and 2014 that adversely affected investors and even existing installations was not *per se* out of line with the legislative behaviour that the Respondent had displayed before the Claimant's investment on 6 November 2007, even though the magnitude of the changes was different.

906    Furthermore, it is undisputed that prior to the Disputed Measures, the Respondent refrained from setting out a specific rate of return (much less specific remuneration values) on the level of a Law. Instead, Law 54/1997 merely provided for the requirement of a "*reasonable rate of profitability*" while leaving the development of the remuneration scheme achieving this objective to implementing RDs and MOs. It seems that market actors were aware that this provided less security for investors as opposed to a Law setting out the rate of return (which could only be changed by parliament).[1171] That said, prior to the Disputed Measures, there was in fact a common thread in the IRR underlying both the PER 2000[1172] and the PER 2005,[1173] which made reference to 7% post-tax and pre-financing,[1174] as did

---

[1164] Same view *BayWa v. Spain*, ¶471.

[1165] See the criticism by APPA in its publication Review of the Economic Regime Renewable Energy of November 2006 (R-0224), p. 4f. of the PDF. See also *RWE Innogy v. Spain*, ¶539.

[1166] See AEE, Press Release of 10 January 2008 (R-0163).

[1167] RWS-CMR2, ¶42.

[1168] RjoM, ¶¶195, 469; RWS-CMR2, ¶42.

[1169] The Claimant argues the Wind SPVs opted to remain under RD 436/2004 for stability reasons because they and their lenders preferred to maintain a remuneration scheme that had already been tested (MoM, ¶261; RjoM, ¶111(ii)). However, if RD 661/2007 was such a clear improvement as argued by Claimant, this explanation does not seem entirely credible.

[1170] See ¶162 *supra*.

[1171] See *Miguel Mendonça/David Jacobs/Benjamin Sovacool*, Powering the Green Economy Manual, 2010 (RL-0078), p. 57; see also Article 23 of the Draft Energy Bill prepared by APPA/Greenpeace in 2009 (R-0187).

[1172] PER 2000 (C-0065/R-0118), Section 2.1.

[1173] PER 2005 (C-0075/R-0119), Section 4.2.

[1174] Diligent investors can be taken to be aware of these plans; in fact, they were invoked by Renergy itself in the context of its reliance, see MoM, ¶1372.

the press releases accompanying the draft and final versions of RD 661/2007 for the regulated tariff for wind power facilities (while for CSP the rate indicated was 8%).[1175] Thus, with the exception of the lower end of the IRR spectrum for wind facilities under the Pool Price Plus Premium Option of RD 661/2007 (5%), the lowest pre-financing and post-tax IRR mentioned was always 7% post-tax. The Disputed Measures setting the post-tax target IRR to 6.049% for the Wind Farms and 6.225% for the CSP Plants[1176] does therefore mark a departure from an established legislative practice as it existed prior to Claimant's investment on 6 November 2007.

907    With respect to the Claimant's assertion that legislation adopted prior to the Disputed Measures had never had any retroactive effect on existing facilities, the Tribunal is not satisfied that this is accurate. In particular, such assertion is contradicted by the understanding of renewable energy associations at the time, who criticized RD 436/2004,[1177] RDL 7/2006[1178] and RD 661/2007[1179] for what they considered to be retroactive changes to the previous regulatory frameworks affecting facilities in operation.[1180]

908    As to the Claimant's argument on the Respondent's past practice of implementing transitional regimes, the Tribunal notes that the Respondent introduced three successive remunerative regimes after the enactment of Law 54/1997: first RD 2818/1998, then RD 436/2004 and finally RD 661/2007 (the latter eventually amended by RD 1614/2010). The transitions from one regime to the other were indeed always facilitated by transitional periods during which existing facilities would stay (or at least could opt to stay) under the previous regime for a certain period of time.[1181] By contrast, the Respondent did not include such transitional regime when introducing RF3.[1182] In this regard, therefore, the Respondent did in fact act out of line with its prior legislative behaviour in the same field.

   *(7)    Stability Assurances*

909    As set out in ¶¶663-679 *supra*, the Respondent's statements and actions invoked by the Claimant do not rise to the level of specific commitments that could have created a legitimate expectation of Absolute Stability, i.e. that RF1 would remain unchanged.

---

[1175] Ministry of Energy, Press Release of 28 November 2006 (C-0081), p. 2; Ministry of Energy, Press Release of 25 May 2007 (C-0082), p. 2.

[1176] See ¶871 *supra*.

[1177] APPA, New Special Regime Decree, 19 April 2004 (R-0290), p. 13.

[1178] APPA, Review of the Economic Regime Renewable Energy, November 2006 (R-0224), p. 4 of the PDF.

[1179] APPA, Submission to the Council of State on RD 661/2007, 3 April 2007 (R-0293); AEE, Press Release of 9 May 2007 (R-0354).

[1180] See also *BayWa v. Spain*, ¶472, which notes that not all decrees previous to RD 661/2007 grandfathered existing plants.

[1181] RD 2818/1998 (C-0061), First Transitional Provision [not contained in the partial English translations provided by the Parties]; RD 436/2004 (C-0063/R-0099), Second Transitional Provision; RD 661/2007 (C-0064/R-0101), First Transitional Provision. See also ¶¶159, 178 *supra*.

[1182] See also ¶891 *supra*.

However, by repeatedly making legislative[1183] and other public statements[1184] that underlined the Respondent's awareness of the importance of regulatory stability, the Respondent did reinforce the legitimate expectation of Relative Stability. By doing so, the Tribunal finds that the Respondent somewhat narrowed the margin of changes that are acceptable under the FET standard,[1185] as compared to a case in which a host State merely enacts a support scheme for renewables without giving any of the (albeit soft) assurances of stability that the Respondent gave.

*(8)    Conclusion*

910    In summary, the above analysis has shown that the Disputed Measures

(i)    fundamentally changed essential elements of RF1 by (i) materially altering the Respondent's understanding of what was an appropriate return on investments in wind farms and CSP plants, and (ii) replacing the previous system of remuneration with a substantially different one that places much less importance on the amount of energy produced,

(ii)    had a severe adverse economic impact on the Claimant's facilities, both in terms of cash-flows and IRRs, and resulted in a rate of return that is insufficient in comparison with the Claimant's cost of capital,

(iii)    were adopted without any transitional period (contrary to previous legislation in the field) and contained elements of retroactivity (RDL 2/2013 taking effect one month prior to its adoption) and retrospectivity (effective claw-back of remuneration paid under RF1),

(iv)    were triggered, inter alia, by the global financial crisis and the ensuing economic crisis in Spain, which had an unforeseeable adverse effect on the energy demand in Spain, and thus significantly exacerbated the Tariff Deficit,

(v)    pursued an important public interest, namely safeguarding the sustainability of the SES and

(vi)    were not *per se* inconsistent with the Respondent's legislative behaviour before the Claimant's investment, namely to frequently change the regulatory framework for renewable energy production, also for existing facilities and sometimes to the detriment of investors; however, the magnitude of the adverse change was different and the RF3 Target IRR did depart from what had been a relatively stable understanding by the Respondent as to what was a reasonable rate of return.

---

[1183] In particular in the form of RD 661/2007 (C-0064/R-0101), Article 44(3).
[1184] See, e.g., Ministry of Energy, Press Release of 25 May 2007 (C-0082), whereby "stability in time" was sought so that entrepreneurs could "plan in the medium and long term", highlighting also the provision of "legal certainty for the producer".
[1185] Same view *RWE Innogy v. Spain*, ¶571.

911    In addition, the above analysis has shown that while the Respondent made no commitment of Absolute Stability, it repeatedly made statements underlining the importance of regulatory stability, thus somewhat narrowing the acceptable margin of change under the notion of Relative Stability.

912    Putting these results of the analysis together, the Tribunal's view is that a diligent investor in wind and CSP projects would, at the time the Claimant invested, have expected that in case of a global and severe economic crisis and a steep incline of the Tariff Deficit, the Respondent would adopt measures to safeguard the sustainability of the SES. A diligent investor would also have expected that those measures might adversely affect even existing wind and CSP projects, as had previous reforms in Spain. The Tribunal finds, however, that no diligent investor would have expected measures with such far-reaching effects on investments as the Disputed Measures. Specifically, no investor could have anticipated that the Respondent would change the level of remuneration and the entire remunerative system as dramatically and as abruptly as it did, resulting in an adverse impact on the Claimant's investment that, taking into account all circumstances, the Tribunal considers to be dispropriate even in the face of the economic crisis prevailing at the time. Therefore, the Tribunal finds that the Disputed Measures were a radical departure from RF1 and thus violated the ECT's FET standard by thwarting the Claimant's legitimate expectation of Relative Stability.

913    However, in line with the above analysis, the Tribunal exempts from this finding notably the following measures, which the Tribunal considers were not radical but rather remained within the acceptable margin of change:

(i)    RDL 2/2013, which replaced the inflation index and effectively abolished the Pool Price Plus Premium option. However, the Tribunal finds that its retroactive application, as of 1 January 2013 instead of 1 February 2013, was in breach of the FET standard;

(ii)    the introduction of a Regulatory Lifespan of 20 years for the Wind Farms and 25 years for the CSP Plants;

(iii)    the introduction of a cap of 2,040 annual operating hours for the CSP Plants;[1186]

(iv)    the reduction of the cap on energy produced through Back-up Fuel that would qualify for feed-in remuneration, to 15,000 thermal MWh;

(v)    the abolishment of the supplement for reactive energy;

(vi)    the introduction of the Operating Threshold and Minimum Operating Hours; and

---

[1186] In relation to the Wind Farms, the reduction of the cap to 0 is inherent to the logic of the new remuneration system (see ¶758 *supra*), which forms part of the measures that breach the FET standard.

(vii) the obligation for producers to contribute to the financing of a tariff deficit of up to 2%, which contribution is subject to recovery with interest.

914    Moreover, as the Claimant has not established that the Disputed Measures changed the rules on priority access/despatch for renewable energy producers, there is no basis for the Tribunal to find any breach in this regard. Similarly, in respect of the quadrennial review under RF3, the Tribunal finds that this mechanism as such does not constitute a breach of the FET standard. While reviews conducted under this mechanism may result in such breach, the Claimant has not challenged any such review in this arbitration and the Tribunal does not, therefore, need to make any finding in this regard.[1187]

### 3.    Lack of Transparency and Due Process

### a.    The Claimant's Principal Arguments

915    Relying in particular on the wording "*transparent conditions for Investors*" in Article 10(1) ECT and on *Electrabel v. Hungary*,[1188] the Claimant submits that the FET standard required the Respondent to clarify which rights investors had and to inform them about any intended changes in its policies and regulations that had the potential of significantly affecting investments.[1189] Moreover, the Claimant argues that the FET standard includes a guarantee of due process, which may be violated not only by the host State's courts but also by executive and legislative decision-making that is lacking procedural fairness.[1190] The Claimant points out that ILC Article 2 provides that an internationally wrongful act can be committed by omission, so that a lack of transparency or due process constitutes a breach of the ECT.[1191]

916    According to the Claimant, the Respondent failed to meet the requirements of transparency and due process when it adopted the Disputed Measures. The Claimant contends that the CSP Plants and Wind Farms suffered from a "*roller-coaster*" of legislative changes that created a situation of "*absolute uncertainty*" as to their rights.[1192]

917    In particular, the Claimant highlights that the Respondent passed RDL 2/2013 and MO IET/221/2013 only to abrogate them – together with the entire RF1 – just a few months later through RDL 9/2013. In addition, the Claimant submits that it took another year before it was clear what the new regulatory framework was going to be, both in terms of the economic regime and the procedure for becoming registered in the RRRE. Moreover, the Claimant contends that the law-making process during that year was highly irregular, featuring (i) a complete withdrawal of the initial draft of RD 413/2014 after it had received severe criticism by the CNE, (ii) the submission of a slightly revised draft to the newly created CNMC, which was widely known to be closer to the Respondent's position, and

---

[1187] Cf. also fn. 920 *supra*.
[1188] *Electrabel v. Hungary I*, ¶7.79.
[1189] MoM, ¶¶1402-1405.
[1190] Ibid., ¶¶1407f.
[1191] Ibid., ¶¶1406, 1410.
[1192] Ibid., ¶1411.

(iii) the Respondent's behaviour in respect of the Consultant Reports, which came to be known as the "*report scandal*" in the industry.[1193]

918    In addition, the Claimant contends that while Law 15/2012 stripped the CSP Plants as of 1 January 2013 of feed-in remuneration for electricity generated with Back-up Fuel, the methodology that it referred to for establishing the effective amount of electricity attributable to the use of Back-up Fuel was not enacted until 14 October 2014 (in MO IET/1882/2014). According to the Claimant, this left the CSP Plants in complete uncertainty for almost two years as to how much Back-up Fuel they were entitled to use and required them to subsequently reimburse some of the feed-in remuneration received.[1194]

919    Furthermore, the Claimant asserts that its rights are not even clear under RF3 because of its being subject to revisions every 3 or 6 years.[1195]

**b.    The Respondent's Principal Arguments**

920    The Respondent denies the alleged "*vices or errors*" in its law-making and maintains that it acted transparently, at the very least under the lenient standard developed in *AES v. Hungary*.[1196]

921    In particular, the Respondent submits that the need for a reform of RF1 had been known since at least 2009, based on the explanatory memorandums of RDL 6/2009, RD 1614/2010 and RDL 14/2010. Moreover, the Respondent refers to multiple public announcements that were made by the Respondent between December 2011 and September 2012.[1197]

922    In addition, the Respondent contends that the delays in adopting RD 413/2014 were simply due to the volume of observations received, meaning that they were actually a consequence of transparency and of the participation of the affected sectors. With respect to the time that it took to promulgate MO IET 1045/2014, the Respondent points out the complexity of this piece of legislation, which comprises 1,761 pages and covers 1,967 different installation types.[1198]

923    Moreover, the Respondent argues that during the law-making process for RD 413/2014 and MO IET/1045/2014, all interested parties were timely informed and had the right to access the relevant information, as required by Spanish legislation. The Respondent notes in particular that Protermosolar, AEE and APPA participated actively in the process. In the Respondent's view, this disproves the Claimant's assertion that its facilities were operating in a regulatory limbo for almost two years.[1199]

---

[1193] Ibid., ¶¶1413-1432; RoM, ¶¶1366-1372.
[1194] Ibid., ¶¶1433-1440.
[1195] Ibid., ¶1442.
[1196] CMoM, ¶¶823-827, referring to *AES v. Hungary*, ¶9.3.73.
[1197] CMoM, ¶¶829-834.
[1198] Ibid., ¶¶835-838.
[1199] Ibid., ¶¶841-845.

924    The Respondent further contends that the contract with BCG was terminated due to failures in the contract execution and that the Respondent never received their Consultant Report. With respect to Roland Berger, the Respondent asserts that their Consultant Report was received after the passing of both RD 413/2014 and MO IET/1045/2014 and merely served as a technical support to IDAE, which had also carried out an analysis on its own. Therefore, the Respondent argues that the Consultant Reports not being public prior to the enactment of the foregoing pieces of legislation does not constitute a lack of transparency because these reports were not determinative for the law-making.[1200]

925    Finally, the Respondent submits that contrary to the Claimant's argument, the periodic reviews every three and six years grant additional security and predictability to investors because they are aimed at ensuring a reasonable rate of return.[1201]

## c.    The Tribunal's Analysis

926    The Tribunal agrees with the approach taken by other tribunals insofar as they considered the aspects of transparency and due process relevant to deciding whether an investor was accorded FET within the meaning of Article 10(1) ECT.[1202] With respect to transparency, this finds explicit support in the wording of Article 10(1) ECT, which requires the host State to provide "*transparent conditions*" to investors.

927    However, on the basis of the evidence before it, the Tribunal finds that the Claimant has been unable to establish that a breach of the Article 10(1) ECT occurred on the basis of a lack of transparency and due process.

928    The Tribunal notes that law-making processes and styles differ significantly not only between different States but also over time within the same State. Also, the legislative process lies at the core of a State's sovereignty. For these reasons, it is not inappropriate for a tribunal to apply its own views of what constitutes legislative 'best practices' as a standard to determine whether a State's law-making process was sufficiently transparent and in line with due process in order not to breach Article 10(1) ECT. Instead, States must be accorded a significant margin of appreciation in this regard and tribunals must limit themselves to safeguarding the most fundamental notions of transparency and due process. The Tribunal finds that this level of judicial scrutiny is consistent with the approach taken in *AES v. Hungary*, where the tribunal found that the acceptable margin of law-making processes included also practices that were sub-optimal.[1203] Applying this standard to the present case, the Tribunal does not find it established that the Respondent violated such fundamental notions of transparency and due process.

---

[1200] Ibid., ¶¶859-862.
[1201] Ibid., ¶¶864-867.
[1202] See *Electrabel v. Hungary I*, ¶7.79; *Charanne v. Spain*, ¶477; *Isolux v. Spain*, ¶¶764-766; *Eiser v. Spain*, ¶379; *Novenergia v. Spain*, ¶646; *Foresight/Greentech v. Spain*, ¶361. While most of those decisions clarify that the aspect of transparency is not a standalone obligation, nothing turns on this question in the present case, as mentioned in ¶607 *supra*.
[1203] *AES v. Hungary*, ¶9.3.73.

929    The Tribunal agrees with the Claimant that certain aspects of the law-making process were far from ideal. In particular, there was a significant time of uncertainty after RDL 9/2013 abrogated the previous regulatory framework without spelling out the economic details of the new system (providing instead for temporary application of the old economic regime, subject to potential reimbursement of overpayments once the new regulatory regime was devised). However, the Tribunal also considers that the Respondent's explanation for the delay in implementing the new regulatory regime justifies at least significant parts of that delay. Moreover, given the soaring Tariff Deficit at the time, there is at least a reasonable explanation for the Respondent's decision not to wait with the abrogation of the old system until all details of the new system were ready, but rather to enact right away the ground rules of the new system (in the form of RDL 9/2013) and announce that the details would follow in later pieces of legislation.[1204] In light thereof, while certainly not ideal, the Tribunal does not consider that the Respondent's course of action constituted a breach of Article 10(1) ECT for lack of transparency or due process.

930    The same is true for the "*report scandal*" referred to by the Claimant. The Tribunal does share the Claimant's concerns regarding the Respondent's explanations as to why reports of BCG and Roland Berger were not published before the enactment of RD 413/2014 and MO IET/1045/2014. However, the Tribunal does not consider that Article 10(1) ECT necessarily requires States to make public all internal documents on which they relied in drafting their legislation. Publishing any and all expert reports based on which the economic parameters of RF3 were set would certainly have been preferable in this case, not least to further the public confidence in the law-making process. However, the Tribunal is not convinced that the Respondent's failure to be more transparent in this regard is sufficient, in and of itself, to constitute a breach of Article 10(1) ECT.

931    Similarly, as regards the periodic revisions of RF3 that may take place every 3 or 6 years (depending on the parameters to be revised), the Tribunal agrees with the Claimant that this does introduce an element of uncertainty that goes beyond the periodic review mechanism contained in RF1. However, it is also true that the legislator must be able to react to changes of circumstances, in particular in a heavily regulated and subsidized environment such as the energy sector. Moreover, Law 24/2013 does guarantee a reasonable rate of profitability.[1205] While this guarantee is not spelled out in numeric terms (beyond the first regulatory period[1206]) and is therefore open to interpretation, it does limit the Respondent's ability to use the periodic reviews for changes that adversely affect producers of renewable energy. Accordingly, producers of renewable energy could challenge periodic reviews on that basis. Therefore, once again, while the Tribunal has sympathy for the Claimant's concerns, it does not find it established that there is a lack of transparency or due process that reaches the level of breaching Article 10(1) ECT.

932    Finally, and in any case, even if a breach of Article 10(1) ECT had occurred for lack of transparency or due process, the Claimant has failed to establish on the basis of evidence

---

[1204] For this reason, the Tribunal is unable to share the Claimant's view that there was no "urgency" (being a requirement under Spanish law for using the form of a Royal-Decree Law), as argued in MoM, ¶1417; RoM, ¶¶1379f.
[1205] Law 24/2013 (C-0378/R-0076), Article 14(4).
[1206] Law 24/2013 (C-0378/R-0076), Tenth Additional Provision (2).

that it suffered any damage as a result of this particular alleged breach. Indeed, the Claimant has not established that there is any specific damage that would not have arisen had the Respondent enacted the very same RF3 but through a law-making process that met the highest possible standards in terms of transparency and due process.[1207] For this reason alone, the Tribunal cannot entertain the Claimant's claim insofar as it rests on the allegation that the Respondent's law-making was not sufficiently transparent and did not respect due process.

## 4.    Arbitrariness

### a.    The Claimant's Principal Arguments

933    The Claimant submits that according to arbitral jurisprudence, in particular *Electrabel v. Hungary*, the FET guarantee of Article 10(1) ECT encompasses also the prohibition of arbitrariness.[1208] According to the Claimant, the consecutive changes to the regulatory framework applicable to the CSP Plants and Wind Farms have produced a completely new system, which represents a radical departure from the RF1 and which is totally unprecedented and unique when compared to other models existing in the EU and beyond.[1209] The Claimant contends that these changes were unforeseeable and made the Respondent dramatically less attractive for investors.[1210]

### b.    The Respondent's Principal Arguments

934    The Respondent argues that arbitrariness is not an independent standard, but is instead included in the third sentence of Article 10(1) ECT.[1211] In any case, the Respondent submits that it pursued a rational policy in the public interest, and therefore did not act arbitrarily under the standard of arbitrariness developed in *Electrabel v. Hungary*.[1212]

### c.    The Tribunal's Analysis

935    Relying on *Charanne v. Spain*, the Claimant itself has noted the connection between the protection of legitimate expectations and the question as to whether a State acted arbitrarily.[1213] Indeed, much of the case-law relied on by the Claimant to support its claim of arbitrariness was in fact related to the protection of legitimate expectations.[1214] Also, the main thrust of the Claimant's arbitrariness argument is that the legislative change were radical and unforeseeable for investors.

---

[1207] The Claimant merely asserts that "[d]ue to the overflow of changes and regulatory uncertainty, the Claimant suffered substantial damages" (RoM, ¶1385), without however particularizing this alleged damage.

[1208] RoM, ¶1319; see also further references in ibid., ¶1317.

[1209] Ibid., ¶1336, see also ibid., ¶¶1327-1335.

[1210] Ibid., ¶¶1344-1349.

[1211] Ibid., ¶1116; see also RjoM, fn. 893.

[1212] RjoM, ¶¶1358-1366, referring to *Electrabel v. Hungary II*, ¶179.

[1213] RoM, ¶1320, referring to *Charanne v. Spain*, ¶¶514, 517.

[1214] RoM, ¶¶1324f., referring to *BG v. Argentina*, ¶307, *ADC v. Hungary*, ¶423, *CMS v. Argentina*, ¶277; *Total v. Argentina*, ¶309.g.

936    Against this background, the Tribunal finds that the Claimant's claim of arbitrariness does not add anything of substance to its claim that its legitimate expectations were violated by the Respondent. This is unsurprising because legitimate expectations do not encompass arbitrary behaviour on the part of the host State. Similarly, the Tribunal finds that the Claimant's claim of arbitrariness is difficult to distinguish from its claim that its investment was impaired by unreasonable measures on the part of the Respondent.

937    Therefore, the Tribunal considers that the Claimant's arguments as to alleged arbitrariness are subsumed in the Tribunal's analysis on whether the Respondent violated legitimate expectations (see section 2. above) or the guarantee of non-impairment (see section C. below).

## B.    Most Constant Protection and Security

## 1.    The Claimant's Principal Arguments

938    The Claimant submits that pursuant to arbitral jurisprudence, the ECT's guarantee of "*most constant protection and security*" ("**MCPS**") is equivalent to the standard of full protection and security as is commonly used in international investment treaties.[1215] According to the Claimant, several arbitral tribunals have found this guarantee to require a host State not only to secure the physical protection of the investors, but also to provide a secure legal environment.[1216] Specifically, the Claimant argues that based on *CSOB v. Slovakia*, a host State violates its obligation to provide full protection and security if it fails to live up to commitments, assurances or promises that it made to the investor.[1217]

939    Moreover, relying on the MFN clause in Article 10(7) ECT, the Claimant invokes a number of BITs entered into by the Respondent for the purposes of obtaining full protection and security. The Claimant submits that if the Tribunal finds that the ECT's MCPS does not encompass legal security, the Respondent would need to grant legal security at least under Article 10(7) ECT in conjunction with those BITs.[1218]

940    The Claimant asserts that the Respondent violated the MCPS standard by failing to provide a secure and stable investment environment, instead implementing a series of legislative changes that resulted in a regulatory limbo for significant periods of time and eliminated paramount economic rights of the investors – all this despite numerous commitments, assurances and promises through which the Respondent had guaranteed that the regulatory framework for the Claimant's facilities would remain stable and consistent over time.[1219]

---

[1215] MoM, ¶¶1452f., referring to *Electrabel v. Hungary I*, ¶7.80; *AES v. Hungary*, ¶13.3.5; *Plama v. Bulgaria*, ¶181.
[1216] MoM, ¶1454, referring to *CME v. Czech Republic*, ¶613; *Azurix* v. *Argentina*, ¶408; *Biwater Gauff (Tanzania) Ltd. v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008 (CL-0129), ¶729; *Levy de Levi v. Peru*, ¶406.
[1217] MoM, ¶1455, referring to *Ceskoslovenska Obchodni Banka v. Slovak Republic*, ICSID Case No. ARB/97/4, Award, 29 December 2004 (CL-0131), ¶161.
[1218] RoM, ¶1394.
[1219] MoM, ¶¶1456-1461; RoM, ¶¶1395-1400.

941    The Claimant adds that even if one followed the test proposed by the Respondent, i.e. that measures do not violate the guarantee of MCPS if they are reasonable in the circumstances and are taken to a achieve a rational public policy goal, the Respondent would still have breached the MCPS standard because the Disputed Measures fail to meet this test.[1220]

## 2.    The Respondent's Principal Arguments

942    The Respondent submits that the Claimant's arguments on this claim do not add anything to its legitimate expectations case. Moreover, the Respondent claims that the MCPS standard guarantees protection against third parties and has its origin in avoiding physical attacks against investors. In addition, according to the Respondent, arbitral jurisprudence and scholarly writing shows that the MCPS standard is not violated if a State exercises its right to legislate, provided that it acts reasonably in the circumstances and with a view to achieving objectively rational public policy goals.[1221] Furthermore, the Respondent highlights that the tribunal in *Isolux v. Spain* found that the MCPS standard "*cannot intervene to protect the investor against modifications of the legal framework in cases that do not justify such protection as a result of the obligation to ensure the FET*".[1222] The Respondent argues that the MCPS standard does not guarantee stable legal conditions, or else it would be superfluous besides the FET standard and the guarantee of non-impairment.[1223]

943    The Respondent contends that the Disputed Measures did not violate the MCPS standard because they were a reasonable response to the social and economic circumstances, given that they aimed at rebalancing the Tariff Deficit, stopping the rise of consumer electricity tariffs and maintaining reasonable rates of return for producers of renewable energy. In this regard, the Respondent also emphasizes that the RF3 Target IRR coincides which what APPA had suggested in 2009.[1224]

## 3.    The Tribunal's Analysis

944    The Tribunal concurs with the view taken by the tribunals in *AES v. Hungary*, *Electrabel v. Hungary* and *Isolux v. Spain* that the MCPS standard in Article 10(1) ECT requires the host State to use due diligence and take reasonable steps to protect investors against harmful acts by third parties.[1225] The Tribunal further finds that at its core, at least, this guarantee is concerned with the investor's physical security. It is undisputed that the Respondent did not breach the MCPS standard in this regard.

---

[1220] RoM, ¶¶1402-1409.
[1221] CMoM, ¶¶890-898, referring in particular to *AES v. Hungary*, ¶13.3.2.; RjoM, ¶¶1384f., referring to *Electrabel v. Hungary I*, ¶7.83, which in turn concurs with *El Paso v. Argentina*, ¶¶522f.
[1222] RjoM, ¶1382, quoting from *Isolux v. Spain*, ¶817 [as per the Respondent's translation; the Claimant's translation is identical in substance].
[1223] RjoM, ¶¶1381, 1383.
[1224] CMoM, ¶¶899f.
[1225] *AES v. Hungary*, ¶13.3.2.; *Electrabel v. Hungary I*, ¶7.83; *Isolux v. Spain*, ¶817.

945    The Tribunal does not rule out that (but does not need to decide whether) under certain circumstances, the MCPS standard may require protection also against other forms of harassment, be it at the hands of State organs or private persons. In any case, the Tribunal does not consider that MCPS offers any additional protection against legislative change in addition to the protection afforded by the FET standard, in particular the protection of the investor's legitimate expectations. The Tribunal finds this approach to be supported by *AES v. Hungary* and *Isolux v. Spain*.[1226] Moreover, while some tribunals seem to have considered that actions other than failure to protect the investor's physical integrity could violate the comparable standard of full protection and security under other investment treaties, it seems that those tribunals routinely reached the same result as under the FET standard.[1227] This confirms the Tribunal's view that, in case of the ECT, MCPS does not provide additional protection against legislative change as compared to FET.

946    This being so, and given that the Claimant's MCPS claim relies on the very same acts of the Respondent as the FET claim, the Tribunal does not find it necessary to analyse whether the guarantee of MCPS was breached by way of an unstable legal environment created by the Respondent. Even if MCPS covers such actions of the host State, the Tribunal's conclusion could not be any different than its conclusions on the Claimant' FET claim.

## C.    Non-impairment

### 1.    The Claimant's Principal Arguments

947    The Claimant submits that Article 10(1) ECT is breached if the host State impairs investments by measures that are either unreasonable or discriminatory, i.e. it is not necessary that the host State's actions meet both of these criteria cumulatively.[1228] In the Claimant's view, at least for the discrimination criterion, the burden of proof is on the Respondent, i.e. the Respondent must prove that no discrimination took place.[1229]

948    Relying on *BG v. Argentina*, the Claimant argues that a measure fails to meet the standard of reasonableness not only if it is unreasonable from an objective viewpoint, but also if it fails to live up to the subjective expectation of the parties involved in the dispute, in particular if the host State withdraws assurances given to investors to induce them to invest.[1230] According to the Claimant, the Disputed Measures were subjectively unreasonable[1231] because they thwarted the Claimant's legitimate expectation that the regulatory framework would remain stable and consistent over time, given the commitments, promises and assurances made by the Respondent. In particular, the Claimant argues that the Respondent changed the focus of the remuneration parameters

---

[1226] See the references in fn. 1225 *supra*.
[1227] See *Azurix v. Argentina*, ¶¶406f. with further references.
[1228] MoM, ¶1463, referring to *Waguih Elie George Siag and Clorinda Vecchi v. The Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009 (CL-0132), ¶457.
[1229] RoM, ¶1428, referring to *Nykomb v. Latvia*, p. 34.
[1230] MoM, ¶1465, referring to *BG v. Argentina*, ¶344.
[1231] The Claimant also argues that the TVPEE was objectively unreasonable, see MoM, ¶¶1476-1481; RoM, ¶¶1415-1419; however, as explained above in section C., the Tribunal does not have jurisdiction over this part of the claim.

(from production to power capacity) and fixed a target rate of return without regard to the Claimant's earlier investment decision, its financial base case and the rate of return considered back then, in specific reliance of RF1.[1232] The Claimant asserts that the Respondent cannot use the Tariff Deficit as a justification as it was created by the Respondent itself.[1233] Moreover, the Claimant denies the Respondent's contention that the reasonableness of RF3 is shown by a renewable energy boom in Spain since 2015. According to the Claimant, the investments referred to by the Respondent are actually divestments because aggrieved investors left the country and sold their assets at prices close to zero. Also, the fact that new projects may be planned under RF3 does not mean that RF3 is reasonable for projects that were financed and realized under RF1.[1234]

949    As to the discriminatory nature of a measure, the Claimant submits that in accordance with arbitral case law, a measure is discriminatory if (i) the group of investors that must be taken into account for the purposes of comparison is in similar circumstances to those of the investor in question, (ii) a different treatment has been given to the investor in question by the host State than to the group of comparable investors, and (iii) such a different treatment is not reasonably justified.[1235] The Claimant asserts that its CSP Plants were discriminated against compared to other renewable energies because Law 15/2012 suppressed the right to receive feed-in remuneration for the production of energy attributable to Back-up Fuel. In the Claimant's view, there was no reasonable justification for this discrimination given that the CSP Plants were technically designed to use Back-up Fuel and had the right to benefit from the specific guarantees set out in the 2010 CSP Agreement and the Waiver Acceptance Resolutions. Moreover, the Claimant alleges that the Respondent unfairly delayed the approval of MO IET/1882/2014 and thereby forced the CSP Plants to produce energy without knowing how much energy produced with Back-up Fuel would be accepted as being used for essential technical purposes and, thus, remunerated on top of pool prices.[1236]

950    The Claimant asserts that even if one applied the legal tests suggested by the Respondent to determine whether the Disputed Measures were unreasonable or discriminatory, the result would be the same. In particular, the Claimant argues that the RF3 Target IRR is unreasonable, that the Disputed Measures were not suitable to avoid increases in consumer tariffs, and that there was no justification for discriminating against the CSP and wind subsectors when trying to reduce the Tariff Deficit.[1237] Moreover, the Claimant asserts that the Disputed Measures were not a logical response to the tariff deficit, in particular because

---

[1232] MoM, ¶¶1469-1475.
[1233] RoM, ¶¶1430f.
[1234] RoM, ¶¶1435-1437.
[1235] MoM, ¶1466, referring to *LG&E v. Argentina*, ¶146; *Occidental Exploration and Production Company v. Republic of Ecuador*, LCIA Case No. UN 3467, Final Award, 1 July 2004 (CL-0071), ¶177; *Saluka v. Czech Republic*, ¶313; *BG v. Argentina*, ¶356.
[1236] MoM, ¶¶1490f. The Claimant also asserts discrimination of the CSP Plants and Wind Farms through the TVPEE and the TEE, see MoM, ¶¶1482-1488; RoM, ¶¶1420-1427; however, as explained above in section C., the Tribunal does not have jurisdiction over this part of the claim.
[1237] RoM, ¶1444.

other avenues than cutting the remuneration of renewable energies were available to but not taken by the Respondent.[1238]

951    Finally, the Claimant contends that as per arbitral jurisprudence, legislative change reducing the income received for energy production qualifies as an impairment for the purposes of Article 10(1) ECT.[1239] The Claimant argues that contrary to the Respondent's view, the decision in *Isolux v. Spain*, in which the tribunal found that there was no impairment because there was no negative impact on the investment, is of little relevance because the facts and circumstances were different.[1240]

## 2.    The Respondent's Principal Arguments

952    Relying on *Electrabel v. Hungary*, the Respondent submits that the burden is on the Claimant to prove impairment by unreasonable or discriminatory measures.[1241]

953    The Respondent argues that this standard of protection is related to the FET standard and that the test established in *AES v. Hungary* serves to determine whether a State's measures are reasonable.[1242] According to the Respondent, the same facts that allow for the conclusion that the Disputed Measures did not breach the FET standard also show that the Disputed Measures cannot be considered unreasonable or discriminatory.[1243] In particular, the Respondent refers to the socioeconomic circumstances that urgently required legislative change in 2013.[1244] The Respondent asserts that the Disputed Measures aimed at protecting consumers and the sustainability of the SES while avoiding over-remuneration, all of which the tribunal in *AES v. Hungary* (and the Ad Hoc Committee in the same case) considered to be perfectly valid and rational policy objectives.[1245] The Respondent further argues that there was an appropriate correlation between these objectives and the Disputed Measures as they involved all members of the SES and also taxpayers, and because the RF3 Target IRR is reasonable and coincides with what APPA had expressly proposed in 2009.[1246] Moreover, the Respondent alleges that RF3 has been positively received by the EC, the International Monetary Fund, the International Energy Agency and domestic and international investors, resulting in a renewable energies boom in 2015 with more than 5 billion euros in investment.[1247]

---

[1238] Ibid., ¶1445.
[1239] MoM, ¶1467, referring to *AES v. Hungary*, ¶¶10.3.37f.
[1240] RoM, ¶1412.
[1241] CMoM, ¶904, referring to *Electrabel v. Hungary II*, ¶154.
[1242] CMoM, ¶¶905, 921.
[1243] Ibid., ¶¶905, 923f.
[1244] CMoM, ¶¶906-909; RjoM, ¶¶1335-1340, 1359-1363.
[1245] CMoM, ¶¶925-928, referring to *AES v. Hungary*, ¶¶10.3.31, 10.3.34; *AES Summit Generation Limited and AES-Tisza Erömü Kft v. Republic of Hungary*, ICSID Case No. ARB/07/22, Decision of the Ad Hoc Committee on the Application for Annulment, 29 June 2012 (RL-0058), ¶78. The Respondent also refers to *Electrabel v. Hungary II*, ¶179; *Charanne v. Spain*, ¶510; *Isolux v. Spain*, ¶¶822-825.
[1246] CMoM, ¶¶931-936; RjoM, ¶¶1367-1378.
[1247] CMoM, ¶¶910-912; see also RjoM, ¶¶1341, 1344f.

954    The Respondent argues that the Claimant's reliance on *BG v. Argentina* is misplaced because in that case, the host State contractually agreed not to modify certain licenses granted without the consent of the licensor.[1248]

955    With respect to discrimination, the Respondent argues that the applicable test is the one set out in *EDF v. Romania*, i.e. whether the measure in question (i) inflicts damage on the investor without serving any apparent legitimate purpose, (ii) is not based on legal standards but on discretion, prejudice or personal preference, (iii) is taken for reasons that are different from those put forward or (iv) is taken in wilful disregard of due process and proper procedure.[1249] The Respondent submits that none of these criteria is met as the Disputed Measures serve to rebalance the then unsustainable electricity system (as explained in the legislative materials), preserve the principle of reasonable return, apply to any domestic or international investors alike, and have been adopted pursuant to the legally established procedures and following extensive consultation with interested parties.[1250]

956    In addition, the Respondent denies that the Disputed Measures were discriminatory even if one applied the test suggested by the Claimant. First, the Respondent asserts that when comparing different subsectors in the renewable energy sector, one cannot look in isolation at the measures adopted in 2013 because with respect to the wind and photovoltaic sectors, measures reducing their remuneration had already been passed in 2007 and 2010. Secondly, the Respondent argues that the Claimant failed to establish that there was any different treatment, given that the Disputed Measures affected all producers of renewable energy without distinction. Thirdly, the Respondent contends that the Tariff Deficit and over-remuneration of renewable energy producers justified the measures taken.[1251]

## 3.    The Tribunal's Analysis

957    The Tribunal agrees with the Claimant that the non-impairment standard of Article 10(1) ECT is breached if the Disputed Measures are either unreasonable or discriminatory and result in an impairment of the investment.

958    With respect to the burden of proof, the Tribunal agrees with the Respondent that it is for the Claimant to establish such breach. This applies also to the assertion of discriminatory measures. In this regard, the Tribunal is unable to follow the approach apparently taken in *Nykomb v. Latvia*, as relied on by the Claimant, whereby the host State bears the burden of proving that no discrimination took place. Apart from the fact that the proof of a negative is a difficult concept, the Tribunal sees no reason to depart from the generally accepted rule under international law that each party bears the burden of proving the requirements of its claim (or defence).[1252] This does not exclude, of course, that if the investor established that

---

[1248] CMoM, ¶¶903, 913, referring to *BG v. Argentina*, ¶¶47-50, 344.
[1249] CMoM, ¶918, referring to *EDF v. Romania*, ¶303.
[1250] CMoM, ¶919; RjoM, 1353.
[1251] CMoM, ¶914.
[1252] See, e.g., *Marvin Feldman v. Mexico*, ICSID Case No. ARB(AF)/99/1, Award, 16 December 2002 (RL-0048), ¶177; *Hussein Nuaman Soufraki v. United Arab Emirates*, ICSID Case No. ARB/02/7, Award, 7 July 2004 (CL-

it was treated differently from comparable investors and if there is no justification apparent for such discrimination from the investor's pleadings, it will be for the host State to submit in defence any facts that may justify the different treatment.

959    Turning first to the Claimant's allegation that the Disputed Measures are unreasonable, the Tribunal notes that apart from the TVPEE and the TEE, over both of which the Tribunal does not have jurisdiction, the Claimant asserts only subjective unreasonableness. The Tribunal further notes that according to the Claimant, this subjective unreasonableness stems from a frustration of its legitimate expectation that the regulatory framework would remain stable and consistent. In other words, this part of the Claimant's non-impairment claim is identical in substance with the Claimant's legitimate expectations case. Therefore, the Tribunal considers that this aspect of the non-impairment claim is subsumed in the analysis in section VII.A.2 above, and does not require additional analysis here.

960    With respect to the question as to whether the Disputed Measures are discriminatory, the Tribunal notes that beyond the TVPEE and the TEE, the Claimant asserts discrimination solely in respect of those Disputed Measures that concerned the CSP Plants' right to receive feed-in remuneration for energy produced through the burning of Back-up Fuel. While the Tribunal endorses the three-prong test submitted by the Claimant to determine whether a measure is discriminatory in the sense of the non-impairment standard in Article 10(1) ECT, the Tribunal does not accept the Claimant's application of this test to the facts of this case.

961    First, the Tribunal finds it difficult to accept the Claimant's assertion that it was treated differently from comparable investors. Contrary to the Claimant, the Tribunal doubts that the CSP projects are comparable to other renewable energy projects when it comes to evaluating the Respondent's decision to reduce the maximum amount of Back-up Fuel for which CSP plants could receive feed-in remuneration. After all, the need to burn Back-up Fuel for technical purposes is a special characteristic of CSP facilities that differentiate them from other renewable technologies. The Claimant has not referred the Tribunal to any other types of renewable energy technologies that likewise burn Back-up Fuel for technical purposes and that were treated differently from the CSP Plants when it came to the Disputed Measures' impact on the feed-in remuneration receivable for Back-up Fuel.

962    Secondly, and in any event, even if one were to compare CSP plants to other renewables that do not even use Back-up Fuel, the Tribunal finds that the Respondent provided a reasonable justification for the change brought about by RF2. As already explained above,[1253] the CSP Plants never had any right, i.e. not even under RF1, to receive feed-in remuneration for non-technical use of Back-up Fuel. The Respondent has submitted and the Claimant has not disputed that experience showed that the 12 or 15% caps applicable under RF1 went far beyond the amount of Back-up Fuel actually needed for technical purposes. Also, the Claimant has not claimed that the amount of Back-up Fuel that benefits from feed-in remuneration under RF3 is lower than what is required for technical purposes.

---

0210/RL-0089), ¶58; *Saipem S.p.A. v. People's Republic of Bangladesh*, ICSID Case No. ARB/05/07, Decision on Jurisdiction and Recommendation on Provisional Measures, 21 March 2007 (CL-0213/RL-0113), ¶83.
[1253] See ¶¶763f. *supra*.

Therefore, even if one considered that the CSP plants were treated differently from other renewables because only CSP plants were subject to this particular legislative change, the Tribunal finds this different treatment to be justified: only for CSP plants, the previous maximum amount of Back-up Fuel went beyond what was needed for technical purposes. Therefore, it was reasonable to make this adjustment for CSP Plants alone.

963    Thirdly, for essentially the same reason, the Tribunal finds that the Claimant's investment was not impaired by the alleged discrimination. As mentioned, both under RF1 and RF3, the Respondent is entitled to feed-in remuneration only in respect of Back-up Fuel used for technical purposes, and there is no showing that the reduced maximum amount of Back-up Fuel in RF3 is insufficient and therefore undermines the exercise of this right.

964    For these reasons, the Tribunal does not find the Disputed Measures to discriminate against the Claimant. To the extent that subjective unreasonableness is asserted based on the violation of legitimate expectations, the Tribunal refers to its findings in relation to the FET standard.

## D.    Umbrella Clause

## 1.    The Claimant's Principal Arguments

965    Relying on arbitral jurisprudence and doctrine both in an ECT context and beyond, the Claimant argues that the umbrella clause in the fourth sentence of Article 10(1) ECT refers to obligations of any nature, including contractual and statutory.[1254] Moreover, based in particular on the findings of the International Court of Justice, respectively its predecessor, in the *Nuclear Tests* and *Mavrommatis* cases, the Claimant submits that official statements made by State agents may create obligations within the meaning of the ECT's umbrella clause.[1255]

966    As regards contractual obligations, the Claimant relies on *Amto v. Ukraine* to argue that the ECT's umbrella clause covers also obligations entered into by the host State vis-à-vis subsidiary companies of the investors established in the host State.[1256] The Claimant asserts that the Waiver Letters and Waiver Acceptance Resolutions fulfilled all requirements of a "*declaratory contract*" under Spanish law, by which the Respondent entered into a binding commitment towards the CSP SPVs not to change the remuneration offered by RF1. In this regard, the Claimant also submits that had the Waiver Acceptance Resolutions been mere

---

[1254] MoM, ¶¶1227, 1240-1242; RoM, ¶¶1131-1134, 1151-1165; referring inter alia to *Plama v. Bulgaria*, ¶186; *Al-Bahloul v. Tajikistan*, ¶257; *Khan Resources Inc. et al. v. Government of Mongolia and MonAtom LLC*, PCA Case No. 2011-09, Decision on Jurisdiction, 25 July 2012 (CL-0088), ¶438; outside the ECT e.g. *Eureko v. Poland*, Partial Award, 19 August 2005 (CL-0032), ¶244.
[1255] MoM, ¶¶1237f., 1253f.; RoM, ¶¶1148f., 1167, referring to the ICJ, Judgments of 20 December 1974 in *Nuclear Tests (Australia v. France)* (CL-0035), ¶¶43, 46, and *Nuclear Tests (New Zealand v. France)* (CL-0036), ¶¶46, 49; ICJ, Judgment of 30 August 1924 in *The Mavrommatis Palestine Concessions*, P.C.I.J. Series A, No. 5 (CL-0244), p. 37f.
[1256] MoM, ¶1280, referring to *Limited Liability Company Amto v. Ukraine*, SCC Arbitration No. 080/2005, Award, 26 March 2008 (CL-0096), ¶110. In MoM, ¶1281f., the Claimant also relies on the ECT Reader's Guide and arbitral jurisprudence on umbrella clauses in other investment treaties. See also RoM, ¶¶1201-1206.

administrative acts, as claimed by the Respondent, it could not be explained why the Respondent and Protermosolar had exchanged drafts of the Waiver Letters and Waiver Acceptance Resolutions and agreed in the CSP Agreement that these documents would be exchanged between the Respondent and individual CSP plants.[1257]

967    Regarding statutory obligations falling under the umbrella clause in this case, the Claimant relies in particular on *LG&E v. Argentina*[1258] and contends that Law 54/1997, RD 2818/1998, RD 436/2004, RD 661/2007 and RD 1614/2010 (in combination also with administrative acts such as the registration of the Claimant's facilities in RAIPRE) contained unilateral commitments addressed to the renewably energy sector for the purposes of attracting investments therein. In particular, the Claimant highlights the rights granted to the Wind Farms and CSP Plants under RD 661/2007, as well as Articles 4 and 5 of RD 1614/2010, which according to the Claimant protected existing facilities against changes of the remunerative regime.[1259]

968    With respect to official statements made by the Respondent, the Claimant invokes the official press releases accompanying RD 661/2007, the 2010 Agreements and RD 1614/2010, as well as certain public statements made by the Respondent's Minister of Energy, Minister of Industry and Minister of Foreign Affairs. The Claimant asserts that all of the foregoing reflected the idea that RF1 was endorsed by the Respondent and would not be changed for qualifying CSP plants and wind farms.[1260]

969    The Claimant asserts that by adopting the Disputed Measures, the Respondent failed to meet the aforementioned obligations to keep RF1 intact and, therefore, breached the umbrella clause.[1261] In addition, via the MFN clause included in Article 10(7) ECT, the Claimant also relies on umbrella clauses contained in BITs entered into by the Respondent, claiming that those clauses too were breached by the Disputed Measures.[1262]

## 2.    The Respondent's Principal Arguments

970    The Respondent submits that in view of the wording "*entered into*" in the ECT's umbrella clause, it only applies to contractual obligations assumed by the host State with respect to a specific investor or specific investment. According to the Respondent, this is confirmed by arbitral jurisprudence, doctrine and the ECT Reader's Guide.[1263] In addition, the Respondent claims that none of the case-law and scholarly writing invoked by the Claimant support its theory that laws of general application such as RF1, related press releases or

---

[1257] MoM, ¶¶1287-1302; RoM, ¶¶1187-1200.
[1258] MoM, ¶¶1247f., referring to *LG&E v. Argentina*, ¶¶172, 174f.
[1259] MoM, ¶¶1256-1260; RoM, ¶¶1171-1175, 1182.
[1260] MoM, ¶¶1261-1263; RoM, ¶¶1176-1179, 1183f.
[1261] RoM, ¶¶1207-1212.
[1262] Ibid., ¶1146.
[1263] CMoM, ¶¶942-954; RjoM, ¶¶1391-1395, referring inter alia to *Isolux v. Spain*, ¶¶768-771; *Noble Ventures, Inc. v. Romania*, ICSID Case No. ARB/01/11, Award, 12 October 2005 (RL-0049), ¶51; *Thomas W. Wälde*, The "Umbrella" Clause in Investment Arbitration: A Comment on Original Intentions and Recent Cases, 6 J. World Investment & Trade 183 (2005) (RL-0070), p. 226; ECT Reader's Guide, p. 26.

other public statements by officials of the host State fall under the ECT's umbrella clause.[1264]

971    In addition, referring to its submissions on the Claimant's legitimate expectation claim, the Respondent argues that none of the legislative provisions or public statements invoked by the Claimant contained any specific commitments not to change RF1.[1265] Moreover, the Respondent asserts that the Claimant failed to establish that it relied on any such public statements when making the investment.[1266] Also, with respect to the 2010 Agreements, the Respondent notes that AEE and Protermosolar, as alleged parties to the 2010 CSP Agreement, never invoked any "*agreement*" on petrifying a specific remuneration regime, and neither did the Claimant prior to this arbitration.[1267]

972    Similarly, as to the Waiver Letters and Waiver Acceptance Resolutions, the Respondent disputes that they created a declaratory contract, and asserts that the Claimant's argument in this regard is a mere invention for this arbitration. The Respondent submits that neither the Claimant nor its subsidiaries nor Mr. Gómez ever invoked such a contract prior to this arbitration. The Respondent adds that Protermosolar as well as the Claimant's partner in Ibereólica Solar, Aprovechamientos Energéticos (in its claim against the Disputed Measures before the Spanish Supreme Court) never argued the existence of any declaratory contract either. The Respondent submits that the Waiver Acceptance Resolutions are administrative acts and that their non-contractual nature is clear already from their title, which speaks of a "*Resolution*" and a "*Communication*", and from their text, which reads "*It is hereby decided that* […]". The Respondent argues that the notice of the right to appeal further confirms the legal nature as administrative act. Moreover, the Respondent notes that none of the three elements required under Spanish law for a contract (consent, object and cause) is present in the exchange of the Waiver Letters and the Waiver Acceptance Resolutions. In any case, the Respondent highlights that in respect of the remuneration values, the Waiver Acceptance Resolutions merely communicated the remuneration applicable at the time, without making any statement that could be read as a commitment not to change the remuneration in the future. According to the Respondent, this mere communication of remuneration values was not even an administrative act in the legal sense and therefore lacked any binding force under Spanish law, in accordance with Spanish jurisprudence and doctrine. Finally, the Respondent submits that even if any obligations falling under the umbrella clause had existed in respect of RF1, such obligations would have been exclusively between the Respondent and the CSP SPVs, rather than the Claimant.[1268] In support of its arguments, the Respondent submitted a legal opinion by two professors for Spanish administrative and civil law, who opined that the Waiver Letters and Waiver Acceptance Resolutions are not contracts under Spanish law.[1269]

---

[1264] CMoM, ¶¶957-998; RjoM, ¶¶1397-1426.
[1265] CMoM, ¶¶1002-1115; RjoM, ¶¶1431-1442.
[1266] CMoM, ¶¶1016f.; RjoM, ¶1444.
[1267] CMoM, ¶¶357-359, 781f., 790.
[1268] Ibid., ¶¶402-440, 798-800, 1019-1053; RjoM, ¶¶1443-1452.
[1269] See the Santos Vaquer Opinion.

### 3.    The Tribunal's Analysis

973    The fourth sentence of Article 10(1) ECT provides as follows:

> Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.

974    The Tribunal notes that the above wording is very wide. In particular, the term "*any obligations*" does not suggest any limitation as to the source of such obligation. While the Tribunal accepts that the term "*entered into*" would usually be used more in the context of bilateral or multilateral instruments, the Tribunal is not convinced that this wording precludes, in and of itself, that commitments may be "*entered into*" unilaterally by a host State, at least in case of unilateral commitments made specifically vis-à-vis individual investors.[1270]

975    That said, the Tribunal does not find it necessary to make a definitive finding on this issue because, in any case, the Tribunal does not find it established that any of the legislation, documents or statements invoked by the Claimant created any obligations falling under the ECT's umbrella clause.

976    In relation to RF1 itself as well as related press releases and certain presentations, the Tribunal has already found in the context of the Claimant's legitimate expectation claim that none of them could be understood as a specific commitment not to change RF1 or the tariff levels applicable at the time the Claimant invested.[1271]

977    Moreover, the Tribunal does not consider that the 2010 Agreements gave rise to any contractual obligations of the Respondent, be it vis-à-vis the Claimant or any of its subsidiaries through which the investment was made.[1272] First, the Tribunal notes that neither the Claimant nor the SPVs were parties to the 2010 Agreements (for the avoidance of doubt, the Claimant has not established that AEE or Protermosolar had any authority to act on behalf of the Claimant or any of the SPVs). Secondly, the Tribunal finds that the 2010 Agreements cannot be isolated from their context, which was a consultation of the industries affected by the intended amendments to the regulatory framework. In the Tribunal's view, the outcome of those consultations, as reflected in the 2010 Agreements, was not contractual in nature. Rather, the Tribunal considers that the 2010 Agreements were political documents. The Tribunal is not convinced that the intention was for them to create any legally binding and enforceable obligations of the Respondent vis-à-vis the trade associations with whom the 2010 Agreements were concluded.

978    Equally, the Tribunal finds that no such commitments were made in any of the other public statements that the Claimant invokes in the context of its umbrella clause claim. This holds true in particular for statements allegedly made by officials of the Respondent at the inauguration of the Wind Farms (by the then Minister of Industry), at roadshows (by the

---

[1270] Cf. *Novenergia v. Spain*, ¶715; *BayWa v. Spain*, ¶442.
[1271] See ¶¶662-678 *supra*.
[1272] Same view regarding the 2010 Wind Agreement *BayWa v. Spain*, ¶452; *FREIF v. Spain*, ¶¶596f.

then Minister of Energy) or "*ribbon-cutting ceremonies*" for other renewable energy projects (by the then Ministers of Foreign Affairs and Energy).[1273] Except for one quote from the then Minister of Energy that does not in fact include any statements on RF1 or its stability,[1274] the Claimant did not explain which statements specifically it considers to have created obligations within the meaning of the umbrella clause. Having nonetheless carefully reviewed all of the documents referred to by the Claimant in this regard,[1275] the Tribunal finds that some of them do not even contain any statements on RF1 at all. To the extent that RF1 is referred or at least alluded to, there are no statements on the stability or future evolution of the regulatory framework, much less statements that could be regarded as creating an obligation in the sense of the ECT's umbrella clause. Similarly, the mere fact that the then Minister of Energy and the then Secretary of State for Energy "*visited USA in 2009 for the purposes of attracting investors*"[1276] or that the then King of Spain attended an inauguration ceremony[1277] is not a sufficient basis for creating legally binding obligations protected by the ECT's umbrella clause.

979   Finally, with respect to the Waiver Acceptance Resolutions, the Tribunal has already found that based on their plain language, they merely confirmed the remuneration levels applicable at the time the Waiver Acceptance Resolutions were issued, without making any statements on the stability of such remuneration levels. For this reason alone, these documents could not give rise to an obligation not to change RF1. In addition, the Tribunal does not find it established that, under Spanish law, the Waiver Letters and Waiver Acceptance Resolutions created a contract, as asserted by the Claimant. The Tribunal finds the arguments of the Respondent in this regard convincing, which were supported by the legal opinion of the Respondent's legal experts. The Tribunal notes that the Claimant, who bears the burden of proof in this regard, did not proffer any expert evidence to support its contrary position.

980   Accordingly, the Tribunal dismisses the Claimant's claim under the fourth sentence of Article 10(1) ECT. The Tribunal notes that to its knowledge, no tribunal thus far has found any of the Disputed Measures to be in breach the ECT's umbrella clause.[1278]

---

[1273] MoM, ¶1262.

[1274] Reproduced in MoM, ¶1262 *in fine*, taken from Diario de Sevilla, Gemasolar ya da luz a la noche, 5 October 2011 (C-0515).

[1275] El Adelantado de Segovia, Montilla inaugura un complejo Eólico con 3 parques y 92 aerogeneradores, 9 July 2015 (C-0052); Houston Chronicle, Q&A: Official details Spain's big green-energy push, 7 November 2009 (C-0511); Spanish Institute for Foreign Trade, Agenda for the Meeting Actividades del Plan Made in/ Made by Spain, 24 October 2009 (C-0512); Spain's Royal House, Inauguration of Gemasolar CSP Plant, 4 October 2011 (C-0513); Torresol Energy, Inauguration of Gemasolar CSP Plant, 4 October 2011 (C-0514).

[1276] RoM, ¶1184(ii).

[1277] RoM, ¶1184(iii).

[1278] To the contrary, such claims were expressly dismissed in *Isolux v. Spain*, ¶¶767-772; *Novenergia v. Spain*, ¶715; *Foresight/Greentech v. Spain*, ¶413; *BayWa v. Spain*, ¶455; *Cavalum v. Spain*, ¶641; *RWE Innogy v. Spain*, ¶680; arguably also *9REN v. Spain*, ¶¶345f.; while the tribunal in *Operafund v. Spain*, ¶569 left the umbrella clause claim undecided, it explicitly stated its agreement with the approach taken in *Isolux v. Spain* and *Novenergia v. Spain*; similarly *InfraRed v. Spain*, ¶478.

### E.    Unlawful Expropriation

### 1.    The Claimant's Principal Arguments

981    The Claimant argues that RF2 and RF3 amount to an indirect expropriation of its investment under Article 13 ECT.[1279] According to the Claimant, the market value of its investment has decreased by 94% on average, diminishing its value to nearly zero. The Claimant contends that it is unable to manage the investment and is unable to obtain any profit from it. Therefore, the Claimant claims that it has been deprived of all significant economic value of its investment.[1280]

982    The Claimant further contends that, in terms of Article 13 ECT, the expropriation was unlawful because it has not been compensated and was not carried out under due process of law.[1281]

983    It is the Claimant's position that RF2 and RF3 amounted to a creeping indirect *de facto* expropriation. The Claimant acknowledges that it retained its property in the shares that constitute its investment. However, the value of its indirect stakes in the companies owning the CSP Plants and Wind Farms has been destroyed, creating a situation tantamount to an expropriation.[1282]

984    The Claimant recognizes that severity, or the extent of the economic impact, is the decisive criterion for the existence of a measure tantamount to an expropriation. This requirement of a 'substantial deprivation' manifests itself in the neutralization of all significant economic value of the investment and in the destruction of the ability to manage the investment.[1283] The value loss in equity and shareholder loans interests of 90% qualifies as a permanent 'substantial deprivation' for the purposes of the determination of an indirect expropriation under Article 13(1) ECT.[1284] Moreover, the refinancing process of the companies prevents the distribution of any dividends.[1285]

985    The Claimant argues that the Tribunal should consider the Respondent's adverse measures in aggregate as a composite act.[1286] The Claimant complains that, as a consequence of Respondent's measures, the management of the investment has become almost impossible since it has to concentrate its efforts on "*pure survival activity*" dealing with the lenders to avoid default and with urgent efforts to avoid the collapse of the affected companies.[1287] In

---

[1279] MoM, ¶¶1122-1218
[1280] Ibid., ¶¶48, 920, 924.
[1281] Ibid., ¶¶1128-1131, 1211.
[1282] Ibid., ¶¶1134-1163, 1217; RoM, ¶¶907, 1039.
[1283] MoM, ¶1178.
[1284] MoM, ¶¶1209, 1214; RoM, ¶¶873-876, 906, 1041-1043, 1073, 1080, 1113, 1116.
[1285] RoM, ¶¶877-894, 1072.
[1286] MoM, ¶¶1183-1187, 1213.
[1287] Ibid., ¶¶1188-1206; RoM, ¶¶902, 904, 1071, 1074, 1081, 1086, 1113, 1120-1121.

addition, Ibereólica Solar's management has been curtailed by an "*insolvency manager*".[1288]

986  The Claimant points out that it has made an investment that is capable of being expropriated. Its investment consists of shares and returns. These are capable of being expropriated. Its indirectly expropriated investments are share capital and subordinated debt.[1289]

987  The Claimant denies that Spain has merely taken regulatory government measures that would rule out a compensable expropriation. The Disputed Measures are discriminatory towards the renewables sector, inflict disproportionate damage upon CSP and wind farms and did not comply with due process of law.[1290]

## 2.    The Respondent's Principal Arguments

988  The Respondent denies the existence of an indirect expropriation. The rights alleged by the Claimant do not constitute property that would be subject to expropriation. The Claimants did not own possible future returns resulting from hoped for subsidies. The premiums on tariffs were mere expectations that were not part of the investor's patrimony. The Claimant did not have a title or acquired right to these benefits.[1291] Nor did the Claimant have a right to administer and manage the CSP Plants and Wind Farms.[1292] The Claimant's investment consists of shares and credits/loans. Therefore, the Claimant had, at most, the expectation of receiving dividends and of supervising the management. It is the Respondent's position that neither the shares nor the subordinated debt has been expropriated. Nor have the invoked powers of administration and enjoyment been expropriated.[1293]

989  In addition, the Respondent points out that the Disputed Measures were regulatory measures taken in the State's normal exercise of its "*police powers*" and were hence not subject to compensation. The contested measures are proportionate and in the public interest. The public interest pursued was to prevent the collapse of the SES. In the Respondent's view, the measures adopted by Spain were regulatory and non-discriminatory, performed *bona fide*, with the purpose to protect public interests in a proportional way and taken in compliance with due process.[1294]

990  The Respondent denies the existence of a substantial deprivation. An indirect expropriation would be absent when investors have maintained control over the whole investment. Adverse effects would not be enough. A substantial deprivation requires loss of control over the investment or the elimination of its economic value. The Claimant's facilities were still in operation and under the control and management of their owners receiving a

---

[1288] RoM, ¶¶895-900, 903.
[1289] Ibid., ¶¶1033-1044,
[1290] Ibid., ¶¶1045-1068.
[1291] CMoM, ¶¶1074-1096.
[1292] RjoM, ¶¶1461, 1480,
[1293] RjoM, ¶¶1470, 1478-1500.
[1294] CMoM, ¶¶1097-1116; RjoM, ¶¶36, 50, 1470, 1501-1535, 1626.

reasonable return.[1295] The Claimant continues to maintain control and ownership of the shares and subordinated debt.[1296] The fact that the Claimant had to focus its efforts on dealing with lenders and restructuring shows that it still exercises managerial control over the companies.[1297]

991    In the Respondent's view, any substantial deprivation would stop the operation or would imply a taking of control or permanently destroy the investment's value. The regulatory measures taken by the Respondent are neither permanent nor irreversible. Moreover, the measures did not amount to a transfer of assets to the Respondent or to a private entity.[1298] Therefore, there is neither a substantial deprivation nor an interference with the possibility of management nor are the measures non-modifiable.[1299]

## 3.    The Tribunal's Analysis

992    Both Parties rely on Article 13 of the Energy Charter Treaty which provides:

> ARTICLE 13
>
> EXPROPRIATION
>
> (1) Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as 'Expropriation') except where such Expropriation is:
>
> (a) for a purpose which is in the public interest;
>
> (b) not discriminatory;
>
> (c) carried out under due process of law; and
>
> (d) accompanied by the payment of prompt, adequate and effective compensation.
>
> Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the 'Valuation Date').
>
> Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on the basis of the market rate of exchange existing for that currency on the Valuation Date. Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment.
>
> (2) The Investor affected shall have a right to prompt review, under the law of the Contracting Party making the Expropriation, by a judicial or other competent and independent authority of

---

[1295] CMoM, ¶¶1129, 1148, 1157; RjoM, ¶¶1471, 1536-1575, 1630.
[1296] RjoM, ¶1628
[1297] CMoM, ¶¶1113-1137.
[1298] Ibid., ¶¶1138-1151.
[1299] Ibid., ¶¶1162, 1183; RjoM, ¶¶1463f.

that Contracting Party, of its case, of the valuation of its Investment, and of the payment of compensation, in accordance with the principles set out in paragraph (1).

(3) For the avoidance of doubt, Expropriation shall include situations where a Contracting Party expropriates the assets of a company or enterprise in its Area in which an Investor of any other Contracting Party has an Investment, including through the ownership of shares.

993    The Parties agree that the Claimant's investment consists of shares and loans. The Parties also agree that the test for an indirect expropriation is the existence of a substantial deprivation.

994    The criterion of substantial deprivation addresses the intensity or severity of the economic impact of the disputed measures. This severity may manifest itself in a loss of control over the investment or a substantial, i.e. total or near total, loss of its value. In this way, an indirect expropriation may occur even though formal ownership has not been affected.

995    In *Metalclad v. Mexico*, the tribunal, applying Article 1110 of the NAFTA, described an indirect expropriation as follows:

> 103. Thus, expropriation under NAFTA includes not only open, deliberate and acknowledged takings of property, such as outright seizure or formal or obligatory transfer of title in favour of the host State, but also covert or incidental interference with the use of property which has the effect of depriving the owner, in whole or in significant part, of the use or reasonably-to-be-expected economic benefit of property even if not necessarily to the obvious benefit of the host State.[1300]

996    In *Tecmed* v. *Mexico* the tribunal described the intensity of the interference in terms of a 'radical deprivation':

> it must be first determined if the Claimant, due to the Resolution, was radically deprived of the economical use and enjoyment of its investments, as if the rights related thereto – such as the income or benefits related to the Landfill or to its exploitation – had ceased to exist. In other words, if due to the actions of the Respondent, the assets involved have lost their value or economic use for their holder and the extent of the loss.[1301]

997    In *Starrett Housing* v. *Iran*, the Iran-United States Claims Tribunal described an indirect expropriation in the following terms:

> it is recognized in international law that measures taken by a State can interfere with property rights to such an extent that these rights are rendered so useless that they must be deemed to have been expropriated, even though the State does not purport to have expropriated them and the legal title to the property formally remains with the original owner.[1302]

---

[1300] *Metalclad v. Mexico*, ¶103.
[1301] *Tecmed v. Mexico*, ¶115.
[1302] *Starrett Housing Corp. v. Government of the Islamic Republic of Iran*, (1983) 4 Iran-USCTR 122, p. 154.

998    In that case, as well as in other cases decided by the Iran-United States Claims Tribunal,[1303] the appointment of managers by the government and the actions of these managers were seen as amounting to an indirect expropriation.

999    In *CMS* v. *Argentina*, the tribunal found that the essential issue was "*to establish whether the enjoyment of the property has been effectively neutralized.*"[1304] The tribunal found that this was not the case since:

> the investor is in control of the investment; the Government does not manage the day-to-day operations of the company; and the investor has full ownership and control of the investment.[1305]

1000    As far as loss of value is concerned, tribunals have found that only a total or near total and permanent deprivation amounted to an indirect expropriation. In *AES v. Hungary*, the tribunal said:

> It is evident that many state's acts or measures can affect investments and a modification to an existing law or regulation is probably one of the most common of such acts or measures. Nevertheless, a state's act that has a negative effect on an investment cannot automatically be considered an expropriation. For an expropriation to occur, it is necessary for the investor to be deprived, in whole or significant part, of the property in or effective control of its investment: or for its investment to be deprived, in whole or significant part, of its value.[1306]

1001    The tribunal in *Venezuela Holdings v. Venezuela* went one step further and required a total loss of value:

> The Tribunal considers that, under international law, a measure which does not have all the features of a formal expropriation may be equivalent to an expropriation if it gives rise to an effective deprivation of the investment as a whole. Such a deprivation requires either a total loss of the investment's value or a total loss of control by the investor of its investment, both of a permanent nature.[1307]

1002    In the present case, the Claimant confirms that it retained ownership in the shares that constituted the investment. Its inability to manage the investment is said to derive from the need to give an inordinate amount of attention to "*survival activity*". However, as the Respondent points out correctly, the plants were still in operation and under the control and management of their original owners. The Claimant continued to maintain control and ownership of the shares and subordinated debt.

1003    Accuracy's second expert report calculates an actual project return for the CSP plants of 7.1% pre-tax, which is higher than the cost of capital. The same Report calculates an average project return of 10.4% for the wind farms, which is also higher than the cost of capital. Therefore, on the Respondent's case, the CSP Plants and the Wind Farms were

---

[1303] *SEDCO Inc. v. National Iranian Oil Company*, (1985) 9 Iran-USCTR 248, p. 278; *ITT Industries, Inc. v. The Islamic Republic of Iran et al*. (1983) 2 Iran-USCTR 348, p. 351f.; *Tippetts, Abbett, McCarthy, Stratton v. TAMS-AFFA Consulting Engineers of Iran* (1984), 6 Iran-USCTR 219, p. 225f.
[1304] *CMS v. Argentina*, ¶262.
[1305] Ibid., ¶263.
[1306] *AES v. Hungary*, ¶14.3.1.
[1307] *Venezuela Holdings v. Venezuela*, ¶286.

obtaining a reasonable return.[1308] Brattle's first regulatory expert report shows a substantially reduced cash flow available for distribution to equity investors as a consequence of the disputed measures. It does, however, indicate that even under RF3 there was still space for some revenue for the shareholders.[1309] This conclusion is reinforced by the Joint Model.

1004    Under these circumstances, the Tribunal finds that the element of substantial deprivation is missing. The Disputed Measures had a negative economic effect upon the Claimant's investment but that is not sufficient for a finding of indirect expropriation. There was no substantial or radical deprivation or effective neutralization of the investment. The losses suffered by Claimant are more appropriately analysed under the rubric of FET. They do not, however, lend themselves to a finding of indirect expropriation.

1005    Since the Tribunal holds that there is no indirect expropriation, it need not enter into the discussion between the Parties on whether the measures met the requirements for a lawful expropriation. Nor does it need to address the question whether the allegedly expropriatory measures were justified as legitimate regulation.

1006    Decisions in other cases dealing with Spain's measures in the renewables sector confirm the conclusion reached by this Tribunal. In the majority of cases, a claim of expropriation was either not raised or dropped.[1310] In *Charanne v. Spain*, the claimants contended that RD 1565/2010 and RDL 14/2010 amounted to an expropriation. The tribunal rejected this argument and said:

> 461. The Arbitral Tribunal agrees with many arbitral tribunals which have considered that the indirect expropriation standard under international law entails a substantial impact on the investor's property rights. Such impact can occur in the event of an effective deprivation of all or part of the assets subject to the investment, or in the event of a loss of value that could be equivalent to a deprivation of the investment due to its magnitude.
>
> 462. Notwithstanding the foregoing, it is undisputed that the Claimants still own their shares in T-Solar. There have neither been any allegations that their rights as T-Solar's shareholders have been limited or affected in any way by the measures disputed in this arbitration. Finally, is also undisputed that the company Grupo T-Solar is still operating and producing profits, and it has not been submitted that the company has been deprived of all or part of its assets, although the disputed measures could have affected the company's profitability.[1311]

1007    In *Isolux v. Spain*, the claimant argued that the measures adopted by Spain had the effect of an expropriation because they resulted in the investment's substantial deprivation.[1312] The tribunal rejected this argument and said:

> the position adopted […] by various international arbitral tribunals in this regard, is very clear and demonstrates the common conviction that the unlawful direct or indirect expropriation may

---

[1308] Accuracy II, ¶¶47-55, 81-83.
[1309] BRR I, ¶¶161-165, 210-211. See also BRR II, ¶7 i).
[1310] See, e.g., *Masdar v. Spain*, ¶72.
[1311] *Charanne v. Spain*, ¶¶461-462 (footnotes omitted) [as per the Claimant's translation; the Respondent's translation is identical in substance].
[1312] *Isolux v. Spain*, ¶826.

affect both the investment and its control, and the affect must be substantial. That is to say, the impact to the rights or goods of the investor of the measures, must be of such magnitude that its investment loses all or a significant part of its value, which amounts to a deprivation of its property.[1313]

1008    In *Novenergia* v. *Spain*, the claimant contended that Spain's measures in eliminating the Special Regime and the imposition of a tax on renewable energy producers, had an effect tantamount to the expropriation of its investment.[1314] The tribunal rejected the expropriation claim and said:

> Although the said acts had the effect of seriously affecting the Claimant's investment and of entitling the Claimant to proper compensation, they have nevertheless left unaffected the Claimant's proprietary rights. [...] the Claimant is still the 'untouched' owner of its plants and is still the holder (direct or indirect) of the companies' shares and relevant capital. While the value of these assets diminished as an effect of the state measures which proved to be incompatible with the FET obligation, the assets as such were not expropriated nor affected by measures having an effect equivalent to an expropriation.[1315]

1009    In *Foresight/Greentech v. Spain*, the claimants argued that 83% of the value of their equity investment in the companies that owned the PV facilities had been destroyed as a result of the disputed measures. This, they contended, amounted to a substantial deprivation and thus constituted an expropriation of their investment.[1316] The tribunal rejected the claim based on expropriation and said:

> The Majority of the Tribunal accepts that the Claimants have suffered serious financial losses as a result of the disputed measures. But this is not enough to sustain an expropriation claim. [...] In the Tribunal's view, the disputed measures did not substantially deprive the Claimants' of the value, use or enjoyment of their investment. Accordingly, the Claimants' claim under Article 13 ECT is dismissed.[1317]

1010    In *9REN v. Spain*, the claimant argued that Spain, by way of RF3, had substantially interfered with the claimant's right to receive the full value of the RD 661/2007 and RD 1578/2008 tariffs and had, therefore, expropriated the claimant's investments.[1318] The tribunal denied the existence of an expropriation:

> While regulatory modifications between 2010 and 2014 significantly reduced the share value, the reduction in value is better analyzed in terms of a violation of the Claimant's legitimate expectation. [...] [Spain] has reduced the value of the Claimant's shares, but the income stream still represents a return in the order of 7.9% [...] In the circumstances, the Tribunal rejects the Claimant's allegation that its investment was expropriated.[1319]

---

[1313] Ibid., ¶839.
[1314] *Novenergia v. Spain*, ¶720.
[1315] Ibid., ¶¶761-762.
[1316] *Foresight/Greentech v. Spain*, ¶428.
[1317] Ibid., ¶¶430f.
[1318] *9REN v. Spain*, ¶¶354-356.
[1319] Ibid., ¶¶370-372.

### F.  Conclusion on Responsibility

1011    In summary, the Tribunal finds (by majority, with Arbitrator Sands dissenting) that the Respondent breached the FET standard in Article 10(1) ECT by violating the Claimant's legitimate expectation of Relative Stability. In relation to the other breaches of the ECT alleged by the Claimant, they were either not established or do not add anything to the breach of the FET standard.

## VIII.  DAMAGES

### A.  The Claimant's Principal Arguments

1012    The Claimant submits that while the ECT provides, in Article 13(1), the standard of compensation for a lawful expropriation, it does not provide a standard of compensation for any of the breaches of the ECT asserted by the Claimant. Therefore, the Claimant argues that based on customary international law, as reflected in ILC Articles 1, 31 and 36 as well as the *Chorzów Factory Case*[1320], the Respondent is obliged to repair in full any damages arising from the breach of the ECT, namely the adoption of the Disputed Measures.[1321] The Claimant asserts that full reparation means putting the Claimant in the same pecuniary position as it would be in but for the Respondent's breach of the ECT, and that the amount of compensation is best evaluated by comparing the income streams in the actual scenario with those in a but-for scenario in which the breach had not been committed.[1322]

1013    The Claimant contends that the total amount of compensation consists of historical damages, present damages, pre- and post-award interest and any gross-up needed as a result of the award attracting any taxes.[1323]

1014    As to historical damages, the Claimant submits that they account for the impact of the Respondent's breach from 28 February 2012 (i.e. the entry into force of Regional Act 1/2012, being the first measure challenged by the Claimant) until 21 June 2014 (i.e. the valuation date asserted by the Claimant). According to the Claimant, the historical damages amount to approximately EUR 12 million.[1324]

1015    Regarding present damages, the Claimant asserts that they account for the reduction in the fair market value of its financial interest in the CSP Plant and Wind Farms as of 21 June 2014, due to the Disputed Measures. The Claimant quantifies its present damages based on a DCF analysis of the actual and but-for scenarios, relying on Brattle's assumptions as indicated in section VII.A.2.d.iii(2)(a) *supra*. After estimating the value of the SPVs (taking into account the net present value of the side-effects of external financing) and subtracting the market value of the project finance debt from the asset value of

---

[1320] Permanent Court of International Justice, Judgment on the merits of 13 September 1928 in the *Chorzów Factory Case* (Germany *v.* Poland), PCIJ Series A, No. 17 (CL-0143), ¶125.

[1321] MoM, ¶¶1500-1502.

[1322] MoM, ¶¶1511-1515, 1561, referring inter alia to *Stati v. Kazakhstan*, ¶1527.

[1323] MoM, ¶1523; BQR I, ¶¶11-16, 23f.

[1324] MoM, ¶¶1525-1528, as updated in BQR II, ¶28.

shareholders' loans and common equity, an illiquidity discount is applied to reflect the lack of marketability of the investment interests compared to publicly traded shares. As a result of the foregoing, the Claimant calculates present damages of EUR 129 million, resulting in a total of EUR 141 million including the historical damages.[1325]

1016    The Claimant objects to the Respondent's assertion that the foregoing DCF analysis is speculative and unsuitable for assessing damages in the present case. In particular, the Claimant dismisses the Respondent's criticism that Brattle's but-for scenario is overvalued. As regards the Respondent's comparison of the IRR allegedly implicit in Brattle's valuation with the discount rate used by Brattle, the Claimant contends that this inappropriately compares equity returns with a weighted average cost of capital, which includes external financing. In addition, the Claimant asserts that large parts of the difference between the implicit IRR and the originally expected IRR is due to the general decline in Spanish interest rates since the investment. With respect to the Respondent's comparison between Brattle's valuation and the book value of the investment, the Claimant asserts that the market-to-book premium is reasonable and consistent with evidence on market transactions involving CSP and wind assets.[1326]

1017    As to the Respondent's own (subsidiary) DCF calculation, the Claimant argues that the assumptions underlying the calculation are unrealistic and that, in respect of the Wind Farms, the Respondent committed a calculation error and anyway fails to perform a true DCF analysis, with the but-for scenario instead being a backward-looking assessment of the plant's past profitability.[1327]

1018    Subsidiarily, the Claimant submits that even if all that was guaranteed under RF1 had been a reasonable return that the Respondent could change from time to time, the Respondent would still be liable for damages based on the IRRs underlying RF1, namely 9.5% post-tax for the CSP Plants and 7% post-tax for the Wind Farms. The Claimant asserts that this subsidiary damage calculation yields a total of EUR 118 million in principal damages.[1328]

1019    With respect to pre-and post-award interest, the Claimant argues that this is expressly foreseen by Article 26(8) ECT and ILC Article 38. As to pre-award interest, the Claimant submits that its main function is to safeguard the principle of full reparation, and that it should be calculated from June 2014 to the date of the award, at the prevailing Spanish 10-year bond rates in each month, compounded monthly. The Claimant considers the 10-year bond rate to be an appropriate proxy for a commercial borrowing rate, and notes that it has been lower than the actual borrowing costs of the CSP SPVs and Wind SPVs. Regarding post-award interest, the Claimant submits that it is widely recognized that a defaulting respondent defaulting on an award should be penalized by an interest rate that is no longer limited to the concrete damage suffered by the injured party, but is instead higher to incentivize prompt compliance with the award. According to the Claimant, it is appropriate

---

[1325] MoM, ¶¶1529-1536, as updated in BQR II, ¶28.
[1326] RoM, ¶¶1466-1474, ¶1477-1479; BQR II, ¶12f.
[1327] RoM, ¶¶1492-1513; BQR II, ¶¶116-175.
[1328] RoM, ¶¶1536-1539; BQR II, ¶¶203-210.

and in line with Spanish domestic law[1329] to add a "*moratorium differential*" of two percentage points to the pre-award interest, compounded monthly.[1330]

1020    Finally, as regards a tax gross-up, the Claimant submits that this is necessary to achieve full compensation because such taxes are an unavoidable consequence of the Respondent's breach.[1331] The Claimant requests that the amount to be awarded by the Tribunal be calculated and expressed in the Award according to the formula A/(1-T), where A would be the damages to be awarded to the Claimant and T would be the accumulate of any tax, withholding or equivalent concept eventually applicable to the payment of damages in any relevant jurisdiction.[1332] The Claimant disagrees with the Respondent's assertion that a favourable award would not be taxable in Luxembourg, given that such award would be made in favour of the Claimant, not any of its Spanish subsidiaries, thus rendering the EU's participation exemption inapplicable. In addition, the Claimant contends that its damages calculation is post-tax, meaning that if no tax gross-up were awarded, there would be an effective double-taxation on the Claimant, once based on the Spanish taxation considered in the damages assessment and once for the Luxembourg taxes that an award would attract.

## B.    The Respondent's Principal Arguments

1021    The Respondent submits that the Claimant has failed to meet its burden of proof as its damage calculation is entirely speculative and ignores the basic concepts of regulatory life and a reasonable return on the investment made. In particular, the Respondent argues that in a regulated sector, it is unrealistic to assume that the but-for and actual scenarios will be maintained over decades, irrespective of whether the return achieved is reasonable.[1333]

1022    Moreover, the Respondent contends that the DCF method is inappropriate in this case, for the reasons mentioned already in ¶781 *supra*, and that the ABV method is to be preferred.[1334]

1023    The Respondent asserts that the amount sought by the Claimant confirms the validity of the above arguments. In particular, the Respondent submits that the value of the plants computed by Brattle in the but-for scenario (EUR 1,169 million) is 84% higher than their book value, which according to the Respondent constitutes the closest approximation to

---

[1329] The Claimant refers to the Spanish Civil Procedure Act (C-0527), Article 576, which imposes a "moratorium differential" of two percentage points to the base rate for general statutory interest.
[1330] MoM, ¶¶1538-1550; RoM, ¶¶1514-1525, referring also to *Valeri Belokon v. Kyrgyz Republic*, UNCITRAL, Award, 24 October 2014 (CL-0265), ¶325; *Pezold v. Zimbabwe*, ¶934; *Gold Reserve v. Venezuela*, ¶856.
[1331] In support of its position, the Claimant refers to United Nations Compensation Commission Governing Council, *Saudi Arabian Texaco v. Iraq*, Report and Recommendations made by the Panel of Commissioners concerning the Second Instalment of "E1" Claims, S/AC.26/1999/10, 24 June 1999 (CL-0267); European Court of Human Rights, Judgment of 20 December 2016 in *Sociedad Anónima del Ucieza v. Spain*, Application no. 38963/08 (CL-0268), ¶29.
[1332] MoM, ¶¶1551, 1554. The Tribunal notes that this "request" of a specific formula was not included in any of the requests for relief submitted by the Claimant in this arbitration.
[1333] CMoM, ¶¶1199-1206; RjoM, ¶¶1663-1671, referring in particular to *Gemplus S.A. et al. v. United Mexican States and Talsud S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/04/3 & ARB(AF)/04/4, Award, 16 June 2010 (RL-0107), ¶¶12-56; Spanish Supreme Court, Judgment of 24 September 2012, Case 60/2011 (R-0147), 6th legal ground.
[1334] CMoM, ¶¶1207-1220; RoM, ¶¶1676-1682.

the market value. Similarly, the Respondent contends that the IRR implicit in the but-for value computed by Brattle is 33.8% on average for the CSP Plants and 23.1% on average for the Wind Farms, which the Respondent claims is disproportionate and also much higher than the discount rate used by Brattle itself to determine the equity value at the valuation date (4.8% and 4.4%, respectively). The Respondent argues that there is no rational justification for Brattle's but-for value, especially considering that this is not a monopolized market, that the valuation date is close to the date of the construction of the plants, and that this is a capital-intensive sector in which intangible values or know-how are irrelevant to the valuation. As to the Claimant's argument that the fall of interest rates explains much of the but-for valuation, the Respondent submits that this is further confirmation of the speculative nature of the DCF method, and of the fact that the return on investment must be dynamic in order to avoid excessive fluctuations in investment value.[1335]

1024    The Respondent further argues that the reality checks conducted by Brattle are flawed. In particular, the few transactions used by Brattle as a reference do not meet the minimum requirements for comparability. In addition, a more plausible reality check based on the ratings of the main rating agencies and the information provided by two "*YieldCos*" confirms that the Disputed Measures were positive and reduced regulatory risk.[1336]

1025    In addition, the Respondent claims that even if one uses the DCF method but on the basis of more realistic assumptions (Accuracy's assumptions as mentioned in section VII.A.2.d.iii(2)(a) *supra*), the Claimant either suffered no damage at all or much lower damage than asserted. As to the Claimant's investment in the CSP Plants, the Respondent contends that it is actually worth significantly more in the actual scenario than in the but-for scenario, i.e. no damage was suffered, because the CSP Plants had an installed capacity exceeding 50 MW. Even if applying the remuneration values of RF1 for CSP Plants not exceeding such installed capacity, the Respondent avers that the Claimant's damage would only be EUR 5.9 million, being 92% lower than the damage calculated by the Claimant.[1337] Regarding the Wind Farms, the Respondent submits that any damage would be "*proportionally negligible*", given that a realistic DCF analysis yields a difference of only 1.7 million between RF1 and RF2/RF3, for all Wind Farms combined. In addition, the Respondent points out that the Wind Farms have been practically amortised and that the pool prices exceed the operating costs. Therefore, the Claimant cannot expect to continue receiving any subsidies, even in the but-for scenario.[1338]

1026    With respect to interest, the Respondent argues that if any damages were to be awarded, pre-award interest should not accrue at the rate of 10-year bonds but rather bonds reflecting the duration between the valuation date and the date of the award, which the Respondent estimates to be approximately 2-3 years. As to post-award interest, the Respondent submits that adding any differential to the pre-award rate would run counter to the principle of full reparation. Specifically, the Respondent refers to Commentary (4) on ILC Article 36,

---

[1335] CMoM, ¶¶1221-1231, as updated in RoM, ¶¶1683-1691.
[1336] RjoM, ¶¶1673-1676.
[1337] CMoM, ¶¶1236-1246, as updated in RjoM, ¶¶1693-1697.
[1338] CMoM, ¶¶1247-1253, as updated in RjoM, ¶¶1705-1709.

whereby compensation "*is not concerned to punish the responsible State, nor does compensation have an expressive or exemplary character*".[1339] In addition, the Respondent argues that the Claimant's reference to the Spanish Civil Procedure Act is misplaced in an international law context, and is anyway incorrect as a matter of Spanish law because in cases of default by the Spanish administration, Articles 17 and 24 of the General Budgetary Act provide for simple (not compound) interest at the "*fixed legal interest*" rate, and only after a grace period of three months.[1340]

1027    As regards any tax-gross up, the Respondent mainly[1341] submits that any payment obligation under the arbitral award would not be subject to any taxes in Luxembourg, because any such payment would fall under the participation exemption of the EU's Parent-Subsidiary Directive.[1342] In this context, the Respondent also relies on *Venezuela Holdings v. Venezuela*, which dismissed a claim for compensation related to foreign taxation on the basis that such claim was "*speculative and uncertain*", and notes that the Claimant has not supplied any information, let alone evidence, on the alleged possibility of taxation in Luxembourg, such as the legal basis, the taxable event or the tax rate.[1343]

## C.    The Tribunal's Analysis

1028    The Tribunal's findings on damages reflect the view of the majority, with Arbitrator Sands dissenting.

1029    The Tribunal agrees with the Claimant, and the Respondent has not disputed, that due to the lack of specific provisions in the ECT on the standard of compensation (except in case of lawful expropriations), this question is governed by customary international law. The Tribunal further agrees that based on ILC Article 36(1) and *Chorzów Factory*, the applicable principle is that of full reparation, wiping out the consequences of the illegal act.

1030    The Tribunal does not agree with the Claimant, however, that this approach entails constructing a but-for scenario in which RF1 would have remained unchanged. As per the Tribunal's findings on responsibility, the Respondent breached the FET standard by exceeding the acceptable margin of legislative change, thus violating the Claimant's legitimate expectation of Relative Stability. The illegality of the Disputed Measures under the ECT is therefore limited to that portion which exceeds the acceptable margin. If the

---

[1339] Quoted per "Draft articles on Responsibility of States for Internationally Wrongful Acts, with commentaries, 2001" (RL-0032), submitted by the International Law Commission to the United Nations General Assembly as part of the Official Records of the General Assembly, Fifty-sixth Session, Supplement No. 10 and corrigendum (A/56/10 and Corr.1).

[1340] CMoM, ¶¶1254-1258; ¶¶1716-1725, referring also to *Micula v. Romania*, ¶1269; *Vestey v. Venezuela*, fn. 122.

[1341] The Respondent partially repeated the arguments made in the context of its jurisdictional Objection E. Those arguments were already dealt with in section V.E.3 *supra*.

[1342] Council Directive 2011/96/EU of 30 November 2011 on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States (RL-0084).

[1343] CMoM, ¶¶1259-1270; RjoM, ¶¶1729-1753, referring to *Venezuela Holdings v. Venezuela*, ¶388; *Rusoro v. Venezuela*, ¶854; *Abengoa S.A. and Cofides S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/09/2, Arbitration Award, 18 April 2013 (RL-0112), ¶¶775-777.

but-for scenario assumed a petrification of RF1, the Respondent would be liable for damages also to the extent that the Disputed Measures were still within the acceptable margin. Such damages calculation would be neither appropriate nor in line with the principle of full reparation, which merely calls for undoing any damage flowing from illegality.

1031    The Tribunal is of course aware of the difficulties in attempting to precisely demarcate the outer boundary of the acceptable margin of change. However, the Tribunal does not find these difficulties to be categorically different from those inherent to any assessment of damages in complex cases such as the present one. As aptly described in *Eiser v. Spain*, "*in a case of such scope and complexity damages cannot be determined with mechanical precision*".[1344] That said, the Tribunal is confident that its assessment of damages, as set out below, does justice to both Parties, taking into account both the Claimant's burden to prove its damage and the fact that due to its violation of the legitimate expectation of Relative Stability, it was the Respondent that created the need for the Tribunal to decide how much of the impact inflicted on the Claimant by the Disputed Measures still falls within the acceptable margin of change.

1032    As already explained in section VII.A.2.d.iii(2) above, the Tribunal agrees with the Claimant that the DCF methodology is an appropriate means of determining the Claimant's damages in this case. In addition, as a matter of principle, the Tribunal sees no reason to depart on the level of quantum from the assumptions underlying its DCF analysis in the framework of its findings on responsibility (see again section VII.A.2.d.iii(2) above). However, as regards the construction of the but-for scenario, it is necessary to make some changes compared to the initial but-for scenario used in the context of responsibility (which assumed that RF1 would remain unchanged), in order to reflect the foregoing finding that the Respondent shall be liable only for the damage caused by the portion of the Disputed Measures that exceeded the acceptable margin.

1033    On this basis, the Tribunal finds it appropriate to first construct an alternative but-for scenario that is described in subsection 1. *infra*. After that, the Tribunal will make a finding on the illiquidity discount to be applied in order to determine the Claimant's damage (see subsection 2. *infra*) before calculating the principal damages to which the Claimant is entitled (see subsection 3. *infra*). Finally, the Tribunal will make findings on the Claimant's requests for interest (see subsection 4. *infra*) and a tax-gross up (see subsection 5. *infra*).

---

[1344] *Eiser v. Spain*, ¶473; followed by *PV Investors v. Spain II*, ¶643.

1.      **Construction of the Alternative But-for Scenario**

1034   Based on the corresponding findings on responsibility,[1345] and largely[1346] in accordance with Procedural Order No. 14, the Tribunal finds that it is appropriate to make the following adjustments to the 'initial' but-for scenario (as used in the context of responsibility, i.e. RF1 remaining unchanged) in order to derive the 'alternative' but-for scenario based on which quantum is to be determined.

1035   First, contrary to the initial but-for scenario, the alternative but-for scenario shall include RDL 2/2013, which shall however enter into force only on 1 February 2013 (i.e. not with retroactive effect as of 1 January 2013, as in the actual scenario), with the assumption being that the Claimant's facilities chose the Regulated Tariff as of that date. The Experts disagreed on how to implement this adjustment in the Joint Model, with Brattle suggesting that the Regulated Tariff could apply either permanently or only temporarily until July 2013 (when, in the actual scenario, RDL 2/2013 was replaced by RF3), while Accuracy agues that RDL 2/2013 must apply permanently. This disagreement is based on the same arguments as the Expert's disagreement on whether the TVPEE shall apply permanently or until the measure was replaced in the actual scenario (see ¶¶847-849 *supra*). For similar reasons as in that context, the Tribunal finds that in the alternative but-for scenario, RDL 2/2013 shall apply permanently. In particular, the alternative but-for scenario is meant to isolate the damage inflicted on the Claimant by those Disputed Measures that exceeded the acceptable margin of change. Due to this logic, the alternative but-for scenario must include all Disputed Measures that remained within the acceptable margin of change, which includes RDL 2/2013. If the alternative but-for scenario included RDL 2/2013 only up until the point in time when it was replaced, in the actual scenario, by another Disputed Measure, this would mix the but-for world with the actual world. This, in turn, would render it impossible for the Tribunal to isolate the damage inflicted by the Disputed Measures that went beyond the acceptable margin of change.

1036   Secondly, as of 14 July 2013, i.e. the day on which RDL 9/2013 came into force, both the supplement and the penalty for reactive energy shall be eliminated. While RDL 9/2013 eliminated only the supplement, the Tribunal would not find it appropriate if damages were reduced by the corresponding penalty (that RDL 9/2013 maintained). Even though it has remained unclear, based on the Parties' submissions, if any such penalty could be expected to apply, the Tribunal eliminates the penalty from the alternative but-for scenario to be on the safe side.

---

[1345] See ¶913 *supra*. The Tribunal does not find it necessary to address in the alternative but-for scenario the Operating Threshold or Minimum Operating (because all of the Claimant's facilities will exceed these thresholds under any of the available forecasts) or the obligation to contribute to the financing of the tariff deficit up to 2% (because no such payments are foreseen in the actual scenario either).

[1346] The only differences are in accordance with the Tribunal's instructions to the Experts of 19 April 2021, respectively the Expert's agreement that the IRR cap shall apply as of July 2013 instead of the valuation date (see the Expert's Joint Memorandum of 4 June 2021, ¶7).

1037   Thirdly, as of 21 June 2014, i.e. the day on which MO IET/1045/2014 entered into force, the CSP Plants and Wind Farms shall be subject to a limitation whereby they will not receive any feed-in remuneration after 25 or 20 years of operation, respectively.

1038   Fourthly, as of 2014, the CSP Plants shall receive feed-in remuneration only for up to 2,040 hours of annual operation. The Experts disagreed on how to implement this adjustment in the Joint Model. Brattle submitted that this cap can apply only to solar production, while Accuracy argued that it must apply to the overall production including through the burning of Back-up Fuel. The Tribunal shares Accuracy's view on this point. The rationale behind this adjustment to the 'initial' but-for scenario is to include the very cap introduced by RF3, which the Tribunal found not to be in breach of the ECT. RF3, in turn, limits feed-in remuneration to 2,040 hours of annual operation without distinguishing between different sources of energy. This implies that it is an overall cap that includes also the energy produced through Back-up Fuel. This is also consistent with the fact that the previous cap introduced by RF2 applied also to production through Back-up Fuel, as acknowledged by Brattle.[1347] In the Tribunal's view, there is no indication that RF3 sought to depart from that approach taken in RF2. While Brattle argues that such departure derives from the fact that RF3 eliminated the use of Back-up Fuel, this assertion is factually incorrect because RF3 merely reduced the cap on such use.

1039   Fifthly, as of 15 October 2014, i.e. the day on which MO IET/1882/2014 entered into force, an annual cap of 15,000 thermal MWh shall apply to the payment of feed-in remuneration for energy produced at the CSP Plants through the burning of LNG.

1040   Sixthly and finally, as of July 2013,[1348] the Wind Farms and the CSP Plants shall be subject to a prospective IRR cap of 7% respectively 8% post-tax (excluding financing). This reflects the Tribunal's view that while the RF1 Reference IRRs did not represent a guaranteed level of remuneration, diligent investors could not expect to receive, for the entire lifetime of their plants, subsidies that lifted their IRRs above those RF1 Reference IRRs. In other words, in the circumstances prevailing at the time the Disputed Measures were taken, the Respondent could have reduced the feed-in remuneration at least to the extent that it previously allowed the Claimant's facilities to achieve IRRs beyond the RF1 Reference IRRs. Accordingly, the Tribunal finds it appropriate to implement a respective cap in its alternative but-for scenario.

## 2.   Illiquidity Discount

1041   The Experts agree,[1349] as does the Tribunal, that it is appropriate to apply an illiquidity discount to account for the lack of marketability of the Claimant's investment. However, the Experts disagree on what this discount should be. Brattle computed 25% in the actual scenario (assuming it would take 12 months to find a buyer for the Claimant's shareholding in the Wind Farms and CSP Plants) and 12% in the but-for scenario (3 months to find a

---

[1347] See Brattle's Memorandum of 22 September 2020, ¶18.
[1348] The Tribunal had initially instructed the Experts to apply this cap as of the valuation date. However, as both Experts agreed that July 2013 would be more appropriate, the Tribunal has deferred to their joint view.
[1349] See BQR I, ¶181; Accuracy I, ¶644.

buyer).[1350] Accuracy, by contrast, calculated 16.7% in the actual scenario (assuming 3 months to find a buyer) and 35% in the but-for scenario (12 months to find a buyer).[1351]

1042    The Tribunal notes that the different correlation between each Expert's illiquidity discount and the corresponding period for finding a buyer is explained by the fact that Accuracy looked at market liquidity in 2012 while Brattle looked at 2014, as per their respective valuation dates. The Tribunal further notes that the illiquidity discount is closely related to regulatory risk,[1352] which explains why Brattle assumes a decrease in the illiquidity discount from the actual scenario to the but-for scenario, while Accuracy takes the opposite view.

1043    In light of the Tribunal's above findings on the valuation date and on regulatory risk,[1353] the Tribunal finds it most appropriate to apply Brattle's liquidity discount, as calculated for the actual scenario, to both the actual and the but-for scenario.

## 3.    Principal Damages

1044    The Tribunal's assumptions for the DCF analysis, including the above-described adjustments to the but-for scenario and the foregoing finding on the applicable illiquidity discount, are reflected in the Joint Model prepared by the Experts based on the Tribunal's instructions.[1354] Pursuant to the Joint Model, the discounted cash-flows of the Claimant's Facilities compare as follows between the actual scenario and the alternative but-for scenario:

---

[1350] BQR I, ¶¶187f.
[1351] Accuracy I, ¶649.
[1352] See BQR I, ¶189; BQR II, ¶15; Accuracy I, ¶646; Accuracy II, ¶¶187f.
[1353] See ¶¶790, 844 *supra*.
[1354] Selecting the "Alternative But For (¶2.b)" as the "Active But-for Scenario"; "YES" for the toggles "7% Tax in But For", "Elimination of RE supplement in But For", "Remuneration for 25 years of operation only", "Regulated Tariff (FIT) only", "Cap in hours" and "Limit of NG use in BF (15k)"; "NO" for the toggle "7% tax Temporary/ Neutralized (YES) or Permanent (NO)", "Temporary (YES) or Permanent (NO) Regulated Tariff only" and "Cap applies only to solar production (YES) or to both solar and gas (NO)"; "Accuracy" for the toggles "Actual scenario production" and "Standard Installation's OPEX indexation", "Post-Tax, Excl. Financing" for the toggle "Tax Treatment", "Plant" for the toggle "Plant or Standard Inst.?" and "YES, 2013 onwards" for the toggle "IRR Cap".

| | Jun-14 APV | | |
|---|---|---|---|
| | Actual (¶2.a.ii) | But For | Impact |
| Olivenza | 252.500.094 | 293.497.821 | 40.997.726 |
| Morón | 256.971.869 | 296.444.407 | 39.472.539 |
| CSP Plants | 509.471.963 | 589.942.228 | 80.470.265 |
| Hedroso | 10.297.850 | 25.503.762 | 15.205.912 |
| Padornelo | 10.393.859 | 26.614.953 | 16.221.094 |
| Lubián I | 15.663.940 | 34.051.058 | 18.387.118 |
| Lubián II | 13.674.034 | 14.705.123 | 1.031.088 |
| Wind Plants | 50.029.683 | 100.874.896 | 50.845.213 |
| Total | 559.501.646 | 690.817.124 | 131.315.478 |

1045   According to the Joint Model, this translates into the following impact on the Claimants' discounted equity cash-flows:

| | | Claimants' Equity | | | |
|---|---|---|---|---|---|
| | | | Jun-14 PV | | |
| | Pre Jun-14 Impact | Actual (¶2.a.iv) | But For | Post Jun-14 Impact | Impact at Jun-14 |
| Olivenza | 1.705.491 | 7.017.780 | 11.419.752 | 4.401.972 | 6.107.462 |
| Morón | 926.013 | 8.426.666 | 11.840.624 | 3.413.957 | 4.339.971 |
| CSP Plants | 2.631.504 | 15.444.447 | 23.260.375 | 7.815.929 | 10.447.433 |
| Hedroso | 1.457.453 | 0 | 4.594.851 | 4.594.851 | 6.052.304 |
| Padornelo | 2.007.811 | 0 | 4.858.884 | 4.858.884 | 6.866.695 |
| Lubián I | 1.661.483 | 386.587 | 7.281.757 | 6.895.169 | 8.556.653 |
| Lubián II | 586.498 | 2.985.697 | 3.372.355 | 386.658 | 973.156 |
| Wind Plants | 5.713.245 | 3.372.284 | 20.107.847 | 16.735.562 | 22.448.807 |
| Total | 8.344.749 | 18.816.731 | 43.368.222 | 24.551.491 | 32.896.240 |

1046   Consequently, the Joint Model computes the overall damage suffered by the Claimant, as at the valuation date, to amount to EUR 32,896,240. The Tribunal has no indication that this computation agreed by the Experts could be mathematically incorrect or otherwise not aligned with the Tribunal's DCF modelling assumptions. Therefore, the Tribunal finds that the Respondent is entitled to this amount in principal damages.

#### 4.      Interest

1047    The Tribunal has no hesitation in finding, and the Respondent does not seem to dispute, that the principle of full reparation entitles the Claimant to payment of interest.

1048    As to the pre-award interest rate, the Tribunal agrees with the Claimant that Spanish 10-year bonds are an appropriate benchmark. First, even if one followed the Respondent's argument that the bond duration should mirror the time between the valuation date and the award date, this would make 10-years bonds a better approximation than the 2-3 year bonds suggested by the Respondent. Secondly, the Respondent itself refers in RF3 to 10-year bonds as a proxy for the cost of money on the capital market.

1049    With respect to the post-award interest rate, the Parties have referred the Tribunal to arbitral jurisprudence supporting their respective views on whether a differential should be applied on pre-award interest so as to incentivize compliance with the arbitral award. The Tribunal is more convinced by the line of jurisprudence rejecting such differential. In particular, as reflected in ILC Article 38(1), interest is meant to uphold the principle of full reparation as provided for in ILC Article 36. This principle, as confirmed by paragraph 4 of the ILC commentary on Article 36, "*is not concerned to punish the responsible State, nor does compensation have an expressive or exemplary character*".[1355] The Tribunal is not convinced that this rationale applies only to pre-award interest, but not to post-award interest, as argued by the Claimant. Therefore, the Tribunal finds that the same interest rate shall apply pre- and post-award.

1050    As regards compound interest, the Respondent did not address the Claimant's request that interest be compounded monthly.[1356] Considering this lack of opposition, and noting that many tribunals faced with similar claims against the Respondent have accepted monthly compound interest,[1357] the Tribunal is satisfied that interest shall be compounded monthly.

#### 5.      Tax Gross-up

1051    As a starting point, the Tribunal notes that none of the precedents invoked by the Claimant in support of its position dealt with the question of whether a host State that is found to have violated an investment treaty must compensate the investor for taxes that the award

---

[1355] Quoted per "Draft articles on Responsibility of States for Internationally Wrongful Acts, with commentaries, 2001" (RL-0032), submitted by the International Law Commission to the United Nations General Assembly as part of the Official Records of the General Assembly, Fifty-sixth Session, Supplement No. 10 and corrigendum (A/56/10 and Corr.1).

[1356] The only mention of compound interest in the Respondent's memorials relates to the Spanish General Budgetary Act, which the Respondent argues provides for "*simple (not compound) interest*" (RjoM, ¶1720). However, the Respondent itself submits that the interest rate cannot be derived from domestic law, see RjoM, ¶1719.

[1357] *Eiser v. Spain*, ¶478; *Masdar v. Spain*, ¶665, *Novenergia v. Spain*, ¶847; *Antin v. Spain*, ¶734; *Foresight/Greentech v. Spain*, ¶¶545f.; *NextEra v. Spain*, ¶676; *Watkins v. Spain*, ¶¶748f.; compound interest, but with different compounding periods, was also accepted by *SolEs v. Spain*, ¶559 (quarterly); *Cube v. Spain II*, ¶¶28f.; *PV Investors v. Spain II*, ¶854f. (both semi-annually); *InfraRed v. Spain*, ¶5 of the operative part; *9REN v. Spain*, ¶429 (both annually). Cf. also *Operafund v. Spain*, ¶¶721f. (pre-award interest not compounded, post-award interest compounded monthly).

may attract in its home State. Indeed, the Tribunal finds it doubtful whether any such taxation would qualify as a consequential loss arising from the Disputed Measures, and notes there are multiple arbitral awards denying or at least questioning such causal link.[1358]

1052    However, the Tribunal does not need to decide this question because it finds that, in any case, the Claimant has failed to substantiate, let alone prove, its assertion that an award in this matter may be subject to taxes in Luxembourg.[1359] The Claimant has not identified any legal basis for such taxes, has not specified the alleged tax rate, and has not convincingly rebutted the Respondent's argument on the EU's participation exemption. Thus, the Tribunal is not satisfied that the present award may be subject to Luxembourg taxes, much less that such taxes would exceed the taxes that the Claimant would have had to pay on corresponding dividends it would have received from its investment but for the Disputed Measures.

1053    Similarly, while the Claimant seems to have upheld its request that any award be expressed net of Spanish taxes, the Claimant has not made any specific submissions in support of this request. In particular, the Claimant has not substantiated which Spanish taxes, if any, this award may attract, and how this would compare to potential Spanish taxation of any amounts the Claimant would have received but for the Disputed Measures.

1054    Therefore, the Claimant's claim for a tax gross-up is dismissed. The Tribunal notes that, based on the jurisprudence on record, the same position was taken by all tribunals faced with similar claims against the Respondent, to the extent a tax gross-up was requested in those cases.[1360]

---

[1358] *Rusoro v. Venezuela*, ¶854; *PV Investors v. Spain II*, ¶863; *BayWa v. Spain*, ¶621; cf. also *SolEs v. Spain*, ¶550, albeit not in relation to taxation of the award.

[1359] This further distinguishes the present case from the recomendations by the United Nations Compensation Commission Governing Council in *Saudi Arabian Texaco v. Iraq* (CL-0267), as invoked by the Claimant (see fn. 1331 *supra*). In that case, the Commission emphasized at ¶454 that Saudi Arabian Texaco had produced evidence suggesting that Saudi Arabia would view any award on the relevant claim as taxable income.

[1360] *Eiser v. Spain*, ¶456; *Masdar v. Spain*, ¶660; *Antin v. Spain*, ¶673; *BayWa v. Spain*, ¶627; *InfraRed v. Spain*, ¶598; *Operafund v. Spain*, ¶704; *PV Investors v. Spain II*, ¶856; *Watkins v. Spain*, ¶759.

## IX.    COSTS

### A.    The Claimant's Submission on Costs

1055    The Claimant submits that it has incurred the following costs in connection with this arbitration:[1361]

| | |
|---|---|
| Attorneys' Fees | |
| Cuatrecasas | EUR 3,185,636.25[1362] |
| Allen & Overy LLP | EUR 96,332.95 |
| Fees and expenses of expert witnesses | EUR 976,848.31 |
| Translation, courier, photocopies and other expenses | EUR 121,083.82 |
| Advances and other payments to ICSID | USD 875,000.00 |
| **Total** | **EUR 4,379,901.33 and USD 875,000.00** |

1056    The Claimant accepts that there exists a wide consensus that, under Article 61(2) ICSID Convention and ICSID Arbitration Rule 28, the Tribunal enjoys "*a degree of discretion*" to decide the allocation of costs. However, the Claimant argues that the ICSID Convention's *travaux préparatoires*, the practice of ICSID tribunals, the practice followed by other arbitration regimes as well as commentary provide guidance for the exercise of such discretion.[1363] In this regard, the Claimant highlights the principles of 'costs follow the event' and that a party that is responsible for a particular part of the proceedings should bear the resulting costs.[1364]

1057    The Claimant submits that in accordance with the 'costs follow the event' rule, if the Respondent is found liable under the ECT, the Claimant is entitled to recover from the Respondent the reasonable costs arising from this arbitration.[1365]

1058    Moreover, based on the second principle mentioned in ¶1056 *supra*, the Claimant contends that, in any case, if the Respondent's intra-EU objection is dismissed, the Respondent should bear the costs resulting from the EC's applications for leave to intervene as an

---

[1361] Claimant's Submission on Costs of 24 November 2021 ("**C-SoC**"), ¶¶7-11.
[1362] Out of which, according to the Claimant, EUR 76,006.25 correspond to work resulting from the EC's interventions, and EUR 113,152.00 correspond to work related to the Respondent's request for bifurcation.
[1363] C-SoC, ¶15.
[1364] Ibid., ¶16.
[1365] Ibid., ¶¶18-25.

amicus curiae. The Claimant alleges that those costs are inextricably linked to that objection. The Claimant stresses that the intra-EU objection was raised despite the fact that such objection had been rejected already by a "*jurisprudence constante et cohérente*", and that the Respondent and the EC followed a coordinated strategy that caused the Claimant an unfair prejudice.[1366]

1059    Based on the same principle, the Claimant argues that it should be entitled to recover, in any case, the costs resulting from the Respondent's request for bifurcation. In the Claimant's view, all of the Respondent's preliminary objections (on which the request for bifurcation was based) were frivolous and/or inextricably linked to the merits.[1367]

1060    Finally, the Claimant avers that the costs incurred by it are reasonable. In particular, the Claimant claims that the number of hours devoted by the legal team is appropriate considering all circumstances and the complexity of the case, as are the hourly rates charged. Moreover, the Claimant asserts that the assessment of reasonability of the costs is not to be judged against the Respondent's legal costs.[1368]

## B.    The Respondent's Submission on Costs

1061    The Respondent submits that it has incurred the following costs in connection with this arbitration:[1369]

| | |
|---|---|
| Legal Fees | EUR 1,410,000 |
| Fees and expenses of expert witnesses | EUR 477,995.45 |
| Translation, courier, photocopies and other expenses | EUR 90,589.12 |
| Advances and other payments to ICSID | EUR 783,747.83 |
| **Total** | **EUR 2,762,332.40** |

1062    The Respondent argues that ICSID tribunals enjoy wide and unfettered discretion to allocate costs pursuant to Article 61(2) ICSID Convention and ICSID Arbitration Rule 28, and highlights that the ECT likewise is silent on the issue of how the costs of dispute resolution are to be allocated.[1370] According to the Respondent, ICSID tribunals typically allocate costs between the Parties based on a number of factors including, without

---

[1366] Ibid., ¶¶26-30.
[1367] Ibid., ¶¶31-33.
[1368] Ibid., ¶¶36-49, referring for the latter aspect inter alia to *Isolux v. Spain*, ¶863.
[1369] Respondent's Submission on Costs of 3 December 2021 ("**R-SoC**"), ¶¶9-16.
[1370] Ibid., ¶2.

limitation, the extent to which a party has succeeded on its various claims and arguments.[1371]

1063    The Respondent contends that if it ultimately prevails in this arbitration, it is entitled to a reimbursement of its costs on a full indemnity basis. In the alternative, the Respondent submits that it should never be ordered to bear the Claimant's costs, even if the Tribunal were to uphold the Claimant's claim, since the case involved a number of challenging procedural and legal issues that were addressed by the Respondent with professional and effective advocacy.

## C.    The Tribunal's Decision on Costs

1064    Article 61(2) ICSID Convention provides:

> In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.

1065    As expressly acknowledged by both Parties, the Tribunal therefore has discretion to allocate the arbitration costs (i.e. the fees and expenses of the Tribunal and ICSID's charges) as well as the expenses incurred by the Parties in connection with the arbitration.

1066    In the circumstances of this case, the Tribunal does not find it appropriate to apply a strict form of 'costs follow the event' as advocated by the Claimant, i.e. to hold that the Respondent shall bear most or all of the arbitraton costs because it was found to have breached the ECT. Instead, the Tribual wishes to reflect in the apportionement of costs that both Parties have prevailed on significant aspects of the case, each of which has contributed to the costs of this arbitration.

1067    On jurisdiction, the Respondent prevailed with its objections in relation to the TVPEE and TEE, while the Claimant prevailed on the request for bifurcation and all of the Respondent's other (and time-consuming) jurisdictional objections, including in particular the intra-EU objection. Similarly, both Parties prevailed partially on responsibility. The Respondent successfully defended itself in particular against the claims for unlawful expropriation and breach of the umbrella clause. By contrast, the Claimant ultimately prevailed with its legitimate expectations claim; however, the scope of the legitimate expectations accepted by the Tribunal is narrower than asserted by the Claimant. Moreover, the Respondent prevailed to a large extent on quantum as the Claimant is awarded only about 16% of the principal damages requested.[1372] That said, the Respondent did breach the ECT and therefore gave the Claimant reasonable cause to initiate arbitral proceedings.

---

[1371] Ibid., ¶4.
[1372] Taking into account that the Claimant initially quantified its request for a tax-gross up, which was dismissed in its entirety, at EUR 60 million. Disregarding the tax-gross up, the success rate would be approximately 23%.

This leads the Tribunal not to overestimate the importance of the rather low percentages by which the Claimant prevailed on quantum.

1068    On balance, taking all of the foregoing into account, the Tribunal finds it appropriate that each of the Parties bears half of the arbitration costs and that each Party bears its own expenses incurred in relation to the arbitration.

1069    As to the arbitration costs, ICSID has set the costs as follows in accordance with Article 59 ICSID Convention:

| Arbitrators' fees and expenses | |
|---|---|
| Judge Bruno Simma | USD 596,961.32 |
| Professor Christoph Schreuer | USD 276,698.63 |
| Professor Philippe Sands QC | USD 158,123.24 |
| Mr. Heiner Kahlert's fees and expenses | USD 216,148.55 |
| ICSID's administrative fees | USD 306,000.00 |
| Direct expenses (estimated) | USD 247,933.70 |
| **Total** | **USD 1,801,865.44** |

1070    The above costs have been paid out of the advances made by the Parties as follows: The Claimants have paid USD 943,176.68 and the Respondent has paid USD 924,617.00.

1071    Accordingly, neither party is entitled to any reimbursement of arbitration costs by the other Party. Instead, the remaining balance of the advances will be reimbursed to the Parties in proportion to the payments that each has advanced to ICSID.

## X.   OPERATIVE PART

1072   For the reasons provided in the body of this Award, the Tribunal rules as follows:

1. The Tribunal has jurisdiction over the claims submitted by the Claimant, except for the claims related to the TVPEE and TEE under Article 10(1) ECT.

2. The Respondent has breached its obligations under Article 10(1) ECT to provide fair and equitable treatment to the Claimant (this ruling is made by majority, with Arbitrator Sands dissenting).

3. The Respondent is ordered to pay damages to the Claimant in the amount of EUR 32,896,240.00, together with interest at the Spanish 10-year bond yield rate, compounded monthly, from 21 June 2014 until the date of payment (this ruling is made by majority, with Arbitrator Sands dissenting).

4. The Claimant and the Respondent shall each bear 50% of the arbitration costs.

5. The Claimant and the Respondent shall each bear their own expenses.

6. Any claim, request or defence of the Parties that has not been expressly accepted in this Section X, is hereby dismissed.

_____

Professor Christoph Schreuer
Arbitrator
Date:

_____

Professor Philippe Sands QC
Arbitrator
Date: 22 April 2022
(with Dissenting Opinion on
Liability and Quantum)

_____

Judge Bruno Simma
President of the Tribunal
Date:

Professor Christoph Schreuer
Arbitrator
Date: 26 April 2022

Professor Philippe Sands QC
Arbitrator
Date:
(with Dissenting Opinion on
Liability and Quantum)

Judge Bruno Simma
President of the Tribunal
Date:

_____

Professor Christoph Schreuer
Arbitrator
Date:

_____

Professor Philippe Sands QC
Arbitrator
Date:
(with Dissenting Opinion on
Liability and Quantum)

_____

Judge Bruno Simma
President of the Tribunal
Date: 29 April 2022