# EXHIBIT 34

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**HYDRO ENERGY 1 S.À R.L. AND HYDROXANA SWEDEN AB**

Claimants

and

**KINGDOM OF SPAIN**

Respondent

**ICSID Case No. ARB/15/42**

---

# DECISION ON JURISDICTION, LIABILITY AND DIRECTIONS ON QUANTUM

---

***Members of the Tribunal***
Lord Collins of Mapesbury, LL.D., F.B.A., President
Professor Rolf Knieper, Arbitrator
Mr Peter Rees, QC, Arbitrator

***Secretary of the Tribunal***
Ms Ana Constanza Conover Blancas

*Date of dispatch to the Parties*: 9 March 2020

**REPRESENTATION OF THE PARTIES**

*Representing Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB*:

Dr Gaëtan Verhoosel
Ms Carmen Martínez López
Mr Manish Aggarwal
Mr Maanas Jain

Three Crowns LLP
New Fetter Place
8-10 New Fetter Lane
London EC4A 1AZ
United Kingdom

Ms Inés Vázquez García
Gómez-Acebo & Pombo
Paseo de la Castellana
Madrid, 216 – 28046
Spain

Mr Simon Maynard
Ms Maria Juliana Muci

*Representing the Kingdom of Spain*:

Mr José Manuel Gutiérrez Delgado
Mr Javier Castro López
Mr Pablo Elena Abad
Mr Antolín Fernández Antuña
Mr Roberto Fernández Castilla
Ms María del Socorro Garrido Moreno
Mr Rafael Gil Nievas
Ms Elena Oñoro Sainz
Mr Juan Rodríguez de la Rúa Puig
Mr Mariano Rojo Pérez
Mr Diego Santacruz Descartin
Mr Javier Torres Gella
Mr Alberto Torró Molés
Mr Francisco de la Torre Díaz
Mr Luis Vacas Chalfoun

Abogacía General del Estado
Ministry of Justice of the Government of Spain
Dpto. Arbitrajes Internacionales
c/Marqués de la Ensenada, 14-16, 2ª planta
28004, Madrid
Spain

TABLE OF CONTENTS

I.    **INTRODUCTION AND PARTIES** .......................................................................... 1

II.   **PROCEDURAL HISTORY** ................................................................................. 2

III.  **FACTUAL BACKGROUND** ............................................................................. 13

      A.   The Claimants ................................................................................................ 13

           (1)  Xana Portfolio ........................................................................................ 13

           (2)  Ondina Portfolio ..................................................................................... 14

      B.   The Position when the Claimants Acquired the Plants in 2011 ..................... 14

      C.   Supreme Court Decisions Prior to the Claimants' Investment ...................... 34

      D.   The Disputed Measures .................................................................................. 38

IV.   **THE PARTIES' REQUESTS FOR RELIEF** ................................................... 49

V.    **SUMMARY OF THE PARTIES' CLAIMS ON JURISDICTION** ............... 51

      A.   First Objection: Lack of Jurisdiction over an Intra-EU Dispute ................... 52

           (1)  The Respondent's Position ..................................................................... 52

           (2)  The Claimants' Position .......................................................................... 60

      B.   Second Objection: Lack of Jurisdiction in View of the Taxation Carve-out in
           Articles 21 and 10(7) of the ECT .................................................................. 69

           (1)  The Respondent's Position ..................................................................... 69

                a. Applicability of the taxation carve-out set out in Article 21 of the ECT
                   with regard to breaches concerning Article 10(1) of the ECT ............. 69

                b. Inapplicability of the MFN clause set out in Article 10(7) of the ECT,
                   in accordance with Article 21(3) of the ECT ..................................... 74

           (2)  The Claimants' Position .......................................................................... 76

                a. Inapplicability of the taxation carve-out set out in Article 21 of the ECT
                   with regard to breaches concerning Article 10(1) of the ECT ............. 76

                b. Applicability of the MFN clause set out in Article 10(7) of the ECT, in
                   accordance with Article 21(3) of the ECT ........................................ 79

VI.   **SUMMARY OF THE PARTIES' CLAIMS ON LIABILITY** ........................ 82

      A.   Alleged Unlawful Expropriation in Breach of Article 13 of the ECT ........... 83

           (1)  Introduction ............................................................................................ 83

           (2)  The Applicable Legal Standard .............................................................. 84

a. The Claimants' Position ................................................................ 84

b. The Respondent's Position ........................................................... 85

(3) The Claim ................................................................................................ 86

a. The Claimants' Position ................................................................ 86

b. The Respondent's Position ........................................................... 89

B. Alleged Breach of the Fair and Equitable Treatment Obligation of Article 10(1)
of the ECT ......................................................................................................... 92

(1) Introduction ............................................................................................. 92

(2) The Applicable Legal Standard ............................................................... 93

a. The Claimants' Position ................................................................ 93

b. The Respondent's Position ........................................................... 96

(3) The Claim ................................................................................................ 98

a. The Claimants' Position ................................................................ 98

b. The Respondent's Position ......................................................... 109

C. Alleged Breach of the Obligation not to Impair by Unreasonable or Discriminatory
Measures the Management, Maintenance, Use, Enjoyment or Disposal of
Claimants' Investments under Article 10(1) of the ECT ............................... 119

(1) Introduction ........................................................................................... 119

(2) The Applicable Legal Standard ............................................................. 120

a. The Claimants' Position .............................................................. 120

b. The Respondent's Position ......................................................... 121

(3) The Claim .............................................................................................. 121

a. The Claimants' Position .............................................................. 121

b. The Respondent's Position ......................................................... 121

D. Alleged Breach of Most Constant Protection and Security Standard under
Article 10(1) of the ECT ................................................................................. 122

(1) Introduction ........................................................................................... 122

(2) The Applicable Legal Standard ............................................................. 123

a. The Claimants' Position .............................................................. 123

b. The Respondent's Position ......................................................... 124

(3) The Claim .............................................................................................. 125

a. The Claimants' Position .............................................................. 125

b. The Respondent's Position ......................................................... 125

VII.  **THE TRIBUNAL'S ANALYSIS** ................................................................. 126

   A.  Small-hydro ........................................................................................... 126

   B.  The Investments .................................................................................... 128

   C.  The Overall Nature of the Case ............................................................ 129

   D.  Jurisdiction ........................................................................................... 131

      (1)  The EU Issue .................................................................................. 131

         a. Introduction .............................................................................. 131

         b. The Starting Point ..................................................................... 132

         c. The Nationality Point ................................................................ 134

         d. The Regional Economic Integration Organization (REIO) Point and the "Area" Point ..................................................................... 135

         e. The *Achmea* ruling Point .......................................................... 137

         f. The *Achmea* ruling .................................................................. 140

         g. Conclusions .............................................................................. 146

      (2)  Jurisdiction: The Taxation Issue ................................................... 154

         a. The Legislation ......................................................................... 154

         b. The Parties' Position in Summary ............................................. 154

         c. The Tax Carve-Out .................................................................... 155

         d. Are the TVPEE and the Water Levy "Taxation Measures"? ...... 156

   E.  The Expropriation Claim ...................................................................... 161

      (1)  Article 13(1) of the ECT .............................................................. 161

      (2)  The Tribunal's Conclusion ........................................................... 165

   F.  Article 10(1) of the ECT: Principles .................................................... 166

      (1)  General Considerations ................................................................. 167

         a. Interpretation ............................................................................ 167

         b. The Article 10(1) Obligations ................................................... 168

         c. Proportionality .......................................................................... 176

         d. Due Process .............................................................................. 177

         e. Non-Discrimination ................................................................... 177

         f. Retroactivity ............................................................................. 177

         g. Legitimate Expectations ........................................................... 178

         h. Commitments ............................................................................ 181

         i. Authority .................................................................................. 183

         j. Due Diligence ........................................................................... 183

(2) Whether There was a Legislative Commitment in RD 661/2007 on which the Claimants were Entitled to Rely; the Relevance of the Decisions of the Spanish Supreme Court; the Claimants' Legal Advice; and the 2010 Changes ................................................................................ 184

    a. The Claimants' Position ............................................................. 184

    b. The Respondent's Position ......................................................... 186

    c. The Tribunal's View ................................................................... 188

    d. The Tribunal's Conclusion ......................................................... 194

(3) Whether There Were other Reasons to Justify a Legitimate Expectation that There Would be no Change to the RD 661/2007 Regime in Relation to Small-Hydro, Including Specific Commitments ........................... 195

    a. The Claimants' Evidence on Due Diligence and their Internal Documents ................................................................... 195

    b. IDAE and Mr Tapia ................................................................... 199

    c. Other Alleged Assurances .......................................................... 206

    d. Banks' Willingness to Lend ....................................................... 208

(4) Overall Conclusions ........................................................................ 209

VIII. **DAMAGES** ...................................................................................... 219

  A. The Parties' Positions ............................................................................ 219

    (1) The Claimants' Approach to Compensation ....................................... 219

    (2) The Respondent's Approach to Compensation .................................... 221

  B. The Tribunal's Analysis ......................................................................... 223

    (1) Aggregation or Individual Plant ........................................................ 223

    (2) Reasonable Rate of Return ............................................................... 225

        a. Pre-tax or Post-tax ..................................................................... 225

        b. Reasonable Rate of Return Calculation ...................................... 226

        c. Calculation of the IRR of the Individual Plants ......................... 230

        d. Next Steps .................................................................................. 234

IX. **DECISION** ........................................................................................ 236

**TABLE OF SELECTED ABBREVIATIONS**

| | |
|---|---|
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings, in force as of 10 April 2006 |
| C-[#] | Claimants' exhibit |
| CL-[#] | Claimants' legal authority |
| Cl. Mem. or Claimants' Memorial | Claimants' Memorial, dated 4 November 2016 |
| Cl. PHB | Claimants' Post Hearing Brief, dated 31 May 2018 |
| Cl. Rej. or Claimants' Rejoinder | Claimants' Rejoinder on Jurisdictional Objections, dated 12 March 2018 |
| Cl. Reply or Claimants' Reply | Claimants' Reply on Merits and Counter-Memorial on Jurisdictional Objections, dated 9 October 2017 |
| Cl. St. Costs | Claimants' Statement of Costs, dated 18 April 2019 |
| Claimants | Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB |
| ECT | Energy Charter Treaty |
| First Compass Lexecon Report | Expert Report of Compax Lexecon – *Valuation of Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB's Investments in Spain*, prepared by Pablo T. Spiller and Santiago Dellepiane Avellaneda, dated 4 November 2016 |
| First Econ One Report | Expert Report of Econ One Research, Inc. prepared by Daniel Flores, dated 24 February 2017 |
| First KPMG Report | Expert Report of KPMG – *Regulatory Expert Witness Report: Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v Kingdom of Spain (ICSID Case No. ARB/15/42)*, prepared by Carlos Solé Martín, dated 4 November 2016 |
| First López Statement | Witness Statement of Carmen López, dated 20 February 2017 |
| First Margarit Statement | Witness Statement of Jaume Margarit, dated 3 November 2016 |
| First Quiroga Statement | Witness Statement of Luis Quiroga, dated 4 November 2016 |

| | |
|---|---|
| Hearing | Hearing on jurisdiction, merits and quantum held in Paris, France, from 2 to 5 April 2018 |
| Hydro Energy | Hydro Energy 1 S.à r.l. |
| Hydroxana | Hydroxana Sweden AB |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| Megawatt | MW |
| R-[#] | Respondent's exhibit |
| RD | Royal Decree |
| RD-L | Royal Decree-Law |
| Request for Arbitration | Request for Arbitration, dated 5 October 2015 |
| Resp. C-Mem. or Respondent's Counter-Memorial | Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction, dated 24 February 2017 |
| Resp. PHB | Respondent's Post Hearing Brief, dated 31 May 2018 |
| Resp. Rej. or Respondent's Rejoinder | Respondent's Rejoinder on the Merits and Reply on Jurisdiction, dated 19 February 2018 |
| Resp. St. Costs | Respondent's Statement of Costs, dated 18 April 2019 |
| Respondent or Spain | Kingdom of Spain |
| Rev. Tr. Day [#] (ENG/SPA), [page:line] ([Speaker(s)]) | Transcript of the Hearing (as revised by the Parties on 27 April 2018) |
| RL-[#] | Respondent's legal authority |
| Second Compass Lexecon Report | Second Expert Report of Compax Lexecon – *Supplemental Report: Valuation of Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB's Investments in Spain*, prepared by Pablo T. Spiller and Santiago Dellepiane Avellaneda, dated 9 October 2017 |

Second Econ One Report          Second Expert Report of Econ One Research, Inc. prepared by Daniel Flores, dated 19 February 2018

Second KPMG Report          Second Expert Report of KPMG – *Rebuttal Expert Witness Report: Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v Kingdom of Spain (ICSID Case No. ARB/15/42)*, prepared by Carlos Solé Martín, dated 9 October 2017

Second López Statement          Second Witness Statement of Carmen López, dated 16 February 2018

Second Margarit Statement          Second Witness Statement of Jaume Margarit, dated 3 November 2016

Second Quiroga Statement          Second Witness Statement of Luis Quiroga, dated 16 June 2017

Third Quiroga Statement          Third Witness Statement of Luis Quiroga, dated 9 October 2017

Tribunal          Arbitral tribunal constituted on 3 May 2016 in ICSID Case No. ARB/15/42

## I.   INTRODUCTION AND PARTIES

1.   This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Energy Charter Treaty, which entered into force on 16 April 1998 with respect to the Grand Duchy of Luxembourg, the Kingdom of Sweden and the Kingdom of Spain (the "**ECT**"), and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**").

2.   The claimants are Hydro Energy 1 S.à r.l. ("**Hydro Energy**"), a private limited company (*société à responsabilité limitée*) incorporated under the laws of Luxembourg, and Hydroxana Sweden AB ("**Hydroxana**"), a private limited liability company (*Aktiebolag*) incorporated under the laws of Sweden (together, the "**Claimants**").

3.   The respondent is the Kingdom of Spain ("**Spain**" or the "**Respondent**").

4.   The Claimants and the Respondent are collectively referred to as the "**Parties**". The Parties' representatives and their addresses are listed above on page (i).

5.   This dispute relates to measures implemented by the Respondent that modified the regulatory and economic regime applicable to producers of hydropower generation energy, which allegedly negatively impacted the Claimants' investment (equity and debt interests) in various Spanish companies that own and operate thirty-three hydropower generation plants in Spain with a total installed production capacity of 106.788 megawatts ("**MW**").

6.   The Claimants allege that Spain has breached its obligations under Article 13 of the ECT by means of the indirect expropriation of their investment. They also submit that the Respondent has failed to comply with the following obligations under Article 10(1) of the ECT: *(a)* to accord fair and equitable treatment ("**FET**"), *(b)* not to impair by unreasonable or discriminatory measures the management, maintenance, use, enjoyment or disposal of the Claimants' investment, and *(c)* to accord the most constant protection and security ("**MCPS**"). The Claimants seek compensation for damage caused as a result of the Respondent's violations of the ECT amounting to EUR 132.1 million.

1

II.    **PROCEDURAL HISTORY**

7.    On 13 October 2015, ICSID received a request for arbitration dated 5 October 2015 from the Claimants against Spain, accompanied by exhibits C-0001 to C-0016 (the "**Request for Arbitration**").

8.    On 19 October 2015, the Secretary-General of ICSID registered the Request for Arbitration in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration.  In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

9.    In accordance with Article 37(2)(a) of the ICSID Convention, the Parties agreed to constitute the Tribunal as follows: three arbitrators, one to be appointed by each Party, and the third, presiding arbitrator, to be appointed by agreement of the Parties.  Pursuant to the Parties' agreed method of constitution, failing an agreement of the Parties on the presiding arbitrator, she or he would be appointed by the Secretary-General of ICSID following a blind 'strike-and-rank' procedure, without limitation to the ICSID Panel of Arbitrators. Under this procedure, each Party struck candidates from a list of names and ranked the remaining ones by order of preference.  The nominated candidate was the one, out of those not struck-out by either Party, who obtained the lowest score adding both parties' points.

10.    The Tribunal is composed of Lord Collins of Mapesbury, a national of the United Kingdom, President, appointed by agreement of the Parties; Mr Peter Rees, a national of the United Kingdom, appointed by the Claimants; and Professor Rolf Knieper, a national of Germany, appointed by the Respondent.

11.    On 3 May 2016, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Mr Gonzalo Flores, ICSID Team

Leader/Legal Counsel, was designated to serve as Secretary of the Tribunal, assisted by Ms Ana Constanza Conover Blancas, ICSID Legal Counsel.

12. On 22 June 2016, Ms Conover was designated to serve as Secretary of the Tribunal, replacing Mr Flores.

13. In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 27 June 2016, by telephone conference.

14. Following the first session, on 12 July 2016, the Tribunal issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters and the decision of the Tribunal on disputed issues. Procedural Order No. 1 provided, *inter alia*, that the applicable Arbitration Rules were those in effect from 10 April 2006, that the procedural languages were English and Spanish, and that the place of proceeding was Washington, DC. Procedural Order No. 1 also set out the procedural calendar for this arbitration.

15. In accordance with Procedural Order No. 1, on 4 November 2016, the Claimants filed a Memorial on the Merits (the "**Claimants' Memorial**"); accompanied by exhibits C-0017 to C-0128; legal authorities CL-0001 to CL-0091; two witness statements, by Mr Luis Quiroga and Mr Jaume Margarit; and two expert reports, one by Mr Carlos Solé of KPMG Asesores S.L. ("**KPMG**") and the other by Professor Pablo Spiller and Mr Santiago Dellepiane Avellaneda of Compass Lexecon.

16. On 24 February 2017, the Respondent filed a Counter-Memorial on the Merits and a Memorial on Jurisdiction (the "**Respondent's Counter-Memorial**"); accompanied by exhibits R-0001 to R-0238; legal authorities RL-0001 to RL-0067; a witness statement of Ms Carmen López (or "**Ms López**"); and an expert report of Dr Daniel Flores of Econ One Research, Inc.

17. On 30 March 2017, with the purpose of reducing the volume of hard copies in the proceeding, the Parties proposed amendments to Procedural Order No. 1 for the Tribunal's consideration. On 3 April 2017, the Tribunal issued Procedural Order No. 2, concerning the submission of hard copies in the proceeding.

3

18.    On 4 May 2017, following exchanges between the Parties, the Parties filed a request for the Tribunal to decide on production of documents in a Redfern Schedule format. On 16 May 2017, the Tribunal issued Procedural Order No. 3, concerning the production of documents. Regarding documents 1 to 7 of the Respondent's document production requests, the determination of these requests was adjourned, and the Tribunal directed the Claimants to file a statement from a responsible officer stating whether such documents existed.

19.    On 19 June 2017, pursuant to the Tribunal's Procedural Order No. 3, the Claimants submitted a Second Witness Statement of Mr Luis Quiroga dated 16 June 2017.

20.    On 7 July 2017, in view of the evidence adduced by Mr Quiroga in his Second Witness Statement, the Tribunal made no order on items 1 to 7 of the Respondent's document production requests of 4 May 2017.

21.    On 24 August 2017, the Tribunal proposed amendments to Procedural Order No. 1 concerning the filing of hard copies of pleadings and supporting documents and invited the Parties to submit any comments concerning the proposal by 31 August 2017. On 5 September 2017, having received the Parties' observations on the proposed modifications to Procedural Order No. 1, the Tribunal issued Procedural Order No. 4, concerning the number of copies and method of filing of the Parties' presentations.

22.    On 9 October 2017, the Claimants filed a Reply on the Merits and a Counter-Memorial on Jurisdiction (the "**Claimants' Reply**"); accompanied by exhibits C-0129 to C-0185 and a consolidated index of Claimants' factual exhibits; legal authorities CL-0092 to CL-0134 and a consolidated index of the Claimants' legal authorities; a Third Witness Statement of Mr Luis Quiroga; a Second Expert Report of Mr Carlos Solé of KPMG, and a Second Expert Report of Professor Pablo Spiller and Mr Santiago Dellepiane Avellaneda of Compass Lexecon.

23.    On 19 February 2018, the Respondent filed a Rejoinder on the Merits and Reply on Jurisdiction (the "**Respondents' Rejoinder**"); accompanied by exhibits R-0239 to R-0378 and a consolidated list of the Respondent's factual exhibits; legal authorities RL-0068 to

RL-0104 and a consolidated list of the Respondent's legal authorities; a Second Witness Statement of Ms Carmen López; and a Second Expert Report of Dr Daniel Flores of Econ One Research, Inc.

24.     On 28 February 2018, the Parties notified the Tribunal of the witnesses and experts to be cross-examined at the oral hearing.

25.     On 9 March 2018, following a pre-hearing organizational meeting held between the Tribunal and the Parties by telephone conference on 6 March 2018, the Tribunal issued Procedural Order No. 5 on procedural matters pertaining to the organization of the hearing.

26.     On 12 March 2018, the Claimants filed a Rejoinder on Jurisdictional Objections (the "**Claimants' Rejoinder**"), accompanied by exhibit C-0186 with a consolidated list of factual exhibits; and legal authorities CL-0135 to CL-0145 with a consolidated list of legal authorities.

27.     On 15 March 2018, the Respondent requested to submit corrected versions of its Rejoinder on the Merits, a corrected consolidated list of legal authorities, and revised translations of certain documents.  Absent any objections from the Claimants, the Tribunal authorized the Respondent to file such documents into the record of the case.

28.     On 16 March 2018, the Respondent filed a request for the Tribunal to decide on the admissibility of new documents.  On 23 March 2018, the Claimants filed observations on the Respondent's request of 16 March 2018.

29.     On 23 March 2018, the Claimants informed the Tribunal and the Respondent of the inability of one of their fact witnesses, Mr Jaume Margarit, to attend the hearing.  The Claimants requested that Mr Margarit be excused from participation in the hearing under Procedural Order No.1 and Article 4.7 of the IBA Rules on the Taking of Evidence.

30.     On 23 March 2018, following instructions from the Tribunal, the Parties submitted a joint expert memorandum on regulatory issues prepared by the Claimants' expert, Mr Carlos Solé of KPMG and the Respondent's expert, Dr Daniel Flores of Econ One Research, Inc.

31.   On 26 March 2018, the Tribunal decided on the Respondent's request of 16 March 2018 to incorporate new documents into the record of the case.

32.   By communications of 27 and 28 March 2018, the Parties exchanged views on the consequences that Mr Margarit's absence at the hearing should have with respect to his written evidence.

33.   On 28 March 2018, following authorization from the Tribunal, the Respondent submitted legal authorities RL-0105 to RL-0109.

34.   On 28 March 2018, the Tribunal informed the Parties of its decision not to remove the witness statement of Mr Jaume Margarit from the record in view of all the circumstances and indicated that the Tribunal would give it such weight as it considered appropriate, *inter alia*, in the light of all the evidence and submissions.

35.   On 28 March 2018, following instructions from the Tribunal, the Parties submitted a joint expert memorandum on quantum issues prepared by the Claimants' experts, Messrs. Spiller and Dellepiane of Compass Lexecon, and the Respondent's expert, Dr Daniel Flores of Econ One Research, Inc.

36.   A hearing on jurisdiction, merits and quantum was held in Paris, France from 2 to 5 April 2018 (the "**Hearing**"). The following persons were present throughout the Hearing:

*Tribunal*:

| | |
|---|---|
| Lord Collins of Mapesbury | President |
| Professor Rolf Knieper | Arbitrator |
| Mr Peter Rees | Arbitrator |

*ICSID Secretariat*:

| | |
|---|---|
| Ms Ana C. Conover Blancas | Secretary of the Tribunal |

*For the Claimants*:

| | |
|---|---|
| Dr Gaëtan Verhoosel | Three Crowns LLP |
| Ms Carmen Martínez López | Three Crowns LLP |

6

| | |
|---|---|
| Mr Manish Aggarwal | Three Crowns LLP |
| Mr Simon Maynard | Three Crowns LLP |
| Mr Maanas Jain | Three Crowns LLP |
| Ms Holly Pelham-Stewart | Three Crowns LLP |
| Ms Inés Vázquez García | Gómez-Acebo & Pombo Abogados, S. L. P. |
| Mr Luigi Pettinicchio | |
| Ms Emma Tinker | |
| Mr Olivier Delpon de Vaux | |
| Mr Rafael Cruz | |
| Ms Rebeca Quiroga | |
| Mr Luis Quiroga | |
| Mr Carlos Solé | KPMG |
| Ms Marta Serrano | KPMG |
| Mr Samuel Vázquez | KPMG |
| Dr Pablo Spiller | Compass Lexecon |
| Mr Santiago Dellepiane | Compass Lexecon |
| Mr Julian Delamer | Compass Lexecon |
| Mr Jack Ghaleb | Compass Lexecon |

*For the Respondent*:

| | |
|---|---|
| Mr Javier Torres Gella | Abogacía General del Estado |
| Mr José Manuel Gutiérrez Delgado | Abogacía General del Estado |
| Mr Antolín Fernández Antuña | Abogacía General del Estado |
| Mr Javier Castro López | Abogacía General del Estado |
| Mr Roberto Fernández Castilla | Abogacía General del Estado |
| Mr Juan Rodríguez de la Rúa Puig | Abogacía General del Estado |
| Mr Antonio García García | IDAE |
| Ms Carmen López Ocón | IDAE |
| Dr Daniel Flores | Econ One Research, Inc. |
| Mr Jordan Heim | Econ One Research, Inc. |
| Ms Bridget Richardson | Econ One Research, Inc. |

*Court Reporters*:

| | |
|---|---|
| Mr Trevor McGowan | |
| Elizabeth Cicoria | DR-Esteno |
| Luciana Sosa | DR- Esteno |

*Interpreters*:

| | |
|---|---|
| Mr Jesús Getan Bornn | |
| Ms Roxana Dazin | |
| Ms Anna-Sophia Chapman | |

37.    The following persons were examined during the Hearing:

*On behalf of the Claimants*:

Fact Witness
Mr Luis Quiroga

Expert Witnesses
Mr Carlos Solé
Mr Pablo Spiller
Mr Santiago Dellepiane

*On behalf of the Respondent*:

Fact Witness
Ms Carmen López Ocón

Expert Witness
Dr Daniel Flores

38.    Having discussed Mr Margarit's absence at the Hearing with the Parties and following the Claimants' withdrawal of Mr Margarit's evidence on 4 April 2018, the Tribunal indicated on 5 April 2018 that it would not rely on references to Mr Margarit's evidence in the Parties' written pleadings[1] or in the oral submissions or in the oral evidence.  In addition, the Tribunal allowed the Respondent to file a short note on the passages from Mr Margarit's evidence of which the Tribunal should not take notice.  The Respondent submitted this note to the Tribunal on 25 April 2018.

39.    On 27 April 2018, the Parties submitted agreed corrections to the hearing transcripts.

40.    On 23 May 2018, the Claimants filed a request for the Tribunal to decide on the admissibility of a new document.  Absent objections from the Respondent, the Tribunal admitted the requested document into the record.

---

[1] This Decision contains citations of the pleadings of the parties where reference is made to Mr Margarit's evidence among others. The Tribunal confirms that it has not relied on Mr Margarit's evidence.

8

41.     On 31 May 2018, the Parties filed simultaneous post-hearing briefs; the Claimants' post hearing brief was accompanied by legal authority CL-0146 with a consolidated list of legal authorities.

42.     On 25 June 2018, the Claimants filed a request for the Tribunal to decide on the admissibility of a new document, together with a written submission commenting on the relevance of such document.  On 26 June 2018, the Tribunal informed the Parties that, unless the Respondent objected, the Claimants would be authorized to submit the requested document together with a written submission by 12 July 2018, and the Respondent would be authorized to respond to the Claimants' submission within 14 days of its receipt.  Absent objections from the Respondent, on 12 July 2018, the Claimants submitted the document as legal authority CL-0147 together with a written submission.  On 1 August 2018, the Tribunal took note that no response had been submitted by the Respondent to the Claimants' submission of 12 July 2018.

43.     On 5 September 2018, the Claimants filed a request for the Tribunal to decide on the admissibility of a new document, together with a written submission commenting on the relevance of such document.  On 6 September 2018, the Tribunal informed the Parties that, unless the Respondent objected within seven days, the Claimants would be authorized to submit the requested document, and the Parties would be invited to agree on a timetable for the submission of observations regarding the relevance of such document.

44.     On 11 September 2018, the Respondent informed the Tribunal that it had no objection to the introduction of the requested document into the record and filed a request for the Tribunal to decide on the admissibility of a new document.  On 13 September 2018, the Tribunal informed the Parties that, unless the Claimants objected within seven days, the Respondent's request would be granted.  On 17 September 2018, the Claimants notified the Tribunal that they had no objection to the introduction of the document requested by the Respondent subject to an opportunity to file a written submission commenting on the relevance of such document.

45.     On 17 September 2018, the Tribunal authorized the Parties to introduce into the record the documents requested on 5 and 11 September 2018, together with a written submission commenting on their relevance. On 5 October 2018, the Parties filed their respective submissions. The Claimants' written submission was accompanied by legal authority CL-0148 and the Respondent's submission was accompanied by legal authority RL-0110 with a consolidated list of legal authorities.

46.     On 16 October 2018, the European Commission filed an "Application for Leave to Intervene as a Non-Disputing Party" pursuant to ICSID Arbitration Rule 37(2), with accompanying documentation. ICSID transmitted a copy of the application to the Tribunal on the same date. On 17 October 2018, ICSID transmitted a copy of the application to the Parties and the Tribunal invited the Parties to provide observations on the application. On 7 November 2018, the Parties submitted their respective observations on the application.

47.     By letter of 19 November 2018, the Tribunal decided on the European Commission's application of 16 October 2018. The Tribunal considered that the requirements of ICSID Arbitration Rule 37(2) were satisfied in this case, and that it would be assisted by receiving a written submission from the European Commission. The Tribunal allowed the European Commission to intervene only in writing, without access to the record of the case and subject to conditions, including that the submission be no longer than twenty pages, and that the European Commission should not append copies of documents or authorities to its submission. The Tribunal did not consider it necessary to require the European Commission to provide an undertaking on costs as a condition for its intervention and therefore rejected the Claimants' request in this regard.

48.     On 3 December 2018, the European Commission filed a written submission under ICSID Arbitration Rule 37(2) which exceeded the twenty-page limit imposed by the Tribunal. Following instructions from the Tribunal, on 4 December 2018, the Secretary of the Tribunal transmitted a copy of the European Commission's written submission to the Parties and the Tribunal, and informed the Parties that, rather than requiring the European Commission to re-submit its intervention submission, the Tribunal directed that the Parties' observations could be up to a similar length.

49.    On 18 December 2018, each Party filed observations on the European Commission's submission pursuant to ICSID Arbitration Rule 37(2) ("**Comments on EC Submission**"). The Claimants' observations were accompanied by legal authority CL-0149.

50.    On 28 January 2019, the Respondent filed a request for the Tribunal to decide on the admissibility of a new document, together with a written submission commenting on the relevance of such document.  On 4 February 2019, the Claimants filed observations on the Respondent's request.  On 5 February 2019, the Tribunal granted the Respondent's request of 28 January 2019.

51.    On 12 February 2019, following authorization from the Tribunal, the Respondent submitted new legal authorities RL-0111, RL-0112 and RL-0113 with a consolidated list of legal authorities and its observations on those documents.  On 19 February 2019, the Claimants submitted their observations on the three new documents and on the Respondent's written submission of 12 February 2019.

52.    On 14 March 2019, the Respondent filed a request for the Tribunal to decide on the admissibility of a new document, together with a written submission commenting on the relevance of such document.  On 16 March 2019, the Tribunal informed the Parties that, subject to any objection from the Claimants by 22 March 2019, the Respondent's request would be granted.

53.    On 18 March 2019, the Claimants submitted objections to the Respondent's request of 14 March 2019.  On 19 March 2019, having considered the Parties' observations, the Tribunal granted the Respondent's request of 14 March 2019.

54.    On 1 and 2 April 2019, the Respondent filed the new document into the record as legal authorities RL-0114 and RL-0115, together with a consolidated list of legal authorities and its observations on the relevance of such document.  On 12 April 2019, the Claimants filed a reply to the Respondent's observations of 1 April 2019.

55.    On 17 and 18 April 2019, the Respondent and the Claimants, respectively, submitted their statements of costs. The Claimants' submission was accompanied by two documents labelled as CL-0150 and CL-0151. On 20 April 2019, the Tribunal received the Respondent's statement of costs, admitted the Claimants' statement of costs and its two accompanying documents into the record, and allowed the Respondent to reply to the Claimants' statement of costs. On 10 May 2019, the Respondent submitted its comments on the Claimants' submission on costs of 18 April 2019.

56.    On 4 December 2019, the Respondent filed a request for the Tribunal to decide on the admissibility of two new documents. On 6 December 2019, the Claimants submitted objections to the Respondent's request of 4 December 2019. On 9 December 2019, having considered the Parties' observations, the Tribunal authorized the Respondent to introduce the two new legal authorities into the record of the case.

57.    On 20 December 2019, the Respondent proposed the disqualification of Mr. Peter Rees, in accordance with Article 57 of the ICSID Convention and ICSID Arbitration Rule 9 (the "**Disqualification Proposal**"). On the same date, the Centre informed the Parties that the proceeding had been suspended until the other Members of the Tribunal, Lord Collins and Professor Knieper (the "**Unchallenged Arbitrators**") ruled on the proposal, in accordance with Article 58 of the ICSID Convention and ICSID Arbitration Rule 9.

58.    On 13 January 2020, the Respondent filed a Supplementation on the Disqualification Proposal of Mr. Peter Rees. On 14 January 2020, the Claimants filed observations in response to the Respondent's Disqualification Proposal. On 20 January 2020, Mr Rees furnished his explanations on the Disqualification Proposal as envisaged by ICSID Arbitration Rule 9(3). Both Parties were allowed to submit additional observations on the Disqualification Proposal by 27 January 2020. No additional observations were received from either Party by that date.

59.    On 17 February 2020, the Claimants requested leave to introduce a new document into the record. The request was rejected by the Unchallenged Arbitrators on the same date.

60.     On 17 February 2020, having received observations from both Parties and Mr Rees, the Unchallenged Arbitrators rejected the Disqualification Proposal. The proceeding was resumed on the same date, pursuant to ICSID Arbitration Rule 9(6).

III.   **FACTUAL BACKGROUND**

A.  **The Claimants**

61.     The Claimants are part of the HgCapital LLP group ("**HgCapital**"), a private equity enterprise.

62.     The Claimants' small-hydro investments consist of two portfolios:

(1)     The Xana Portfolio, consisting of 14 plants with a total installed capacity of approximately 53.675 MW, which the Claimants acquired in May 2011; and

(2)     The Ondina Portfolio, consisting of 19 plants with a total installed capacity of approximately 53.113 MW, which the Claimants acquired in December 2011.

63.     In 2009 and 2010 HgCapital had invested in photovoltaic ("**PV**") plants in Spain.[2]

(1) **Xana Portfolio**

64.     The Claimants paid EUR 26.3 million for a 100% equity interest in Hidro Xana S.L.U. ("**Hidro Xana**").  As part of this transaction, a shareholder loan from Naturener Hidro S.L.U. (the company that subsequent to its acquisition by Rinlantium changed its name to Hidro Xana S.L.U) to Grupo Naturener S.A. (i.e. the sellers of Hidro Xana) in the amount of EUR 23.9 million was re-assigned from Grupo Naturener S.A. to Rinlantium S.L. (a wholly-owned subsidiary of Hydroxana).

65.     The bank debt held by Hidrodata S.A. ("**Hidrodata**") was refinanced in September 2015.

66.     The bank debt held by Hidro Xana was refinanced in March 2017.

---

[2] "HgCapital makes three fresh renewable investments", Real Deals, 1 February 2010 (R-0356).

67.     The Xana Portfolio comprises 14 hydropower plants located in Galicia, Extremadura, Castilla y León and Castilla La Mancha.  Thirteen of the plants have an installed capacity of less than 10 MW, while the remaining one has an installed capacity of 17.474 MW.

(2) **Ondina Portfolio**

68.     The Claimants paid EUR 46.0 million for a 100% equity interest in Hidrodata.  As part of the Claimants' acquisition of Hidrodata, Hydroxana made a debt investment in Hidrodata of EUR 7.8 million in the form of a mezzanine loan in January 2012.  The mezzanine loan was transferred from Hydroxana to Hydro Energy, i.e. within the Claimants, on 30 December 2012.

69.     The Ondina Portfolio consists of 19 hydropower plants located in Catalonia (where the majority are located) and Aragon.  Eighteen of the plants have an installed capacity of less than 10 MW, while the remaining one has an installed capacity of 13.5 MW.

B.  **The Position when the Claimants Acquired the Plants in 2011**

70.     This section will consider the Spanish regulatory framework against the background of European Union ("**EU**") policy.  Spanish legislation for this purpose consists of Laws (or Acts) approved by the legislature; Royal-Decree Laws ("**RD-L**") which are enacted by the executive, but subject to legislative approval; and Royal Decrees ("**RD**"), which implement RD-Ls.

71.     It is important to emphasise at this stage that an RD-L is enacted by the executive, and is subject to the Law or Act under which it is promulgated.  This is accepted by the Claimants as a matter of Spanish law.[3]

72.     In the 1992 United Nations Framework Convention on Climate Change industrialised States (including Spain) committed to a reduction in greenhouse gases and to allocate resources to deal with climate change.

---

[3] Cl. Reply, fn 270.

73.  **Energy Act 40/1994**[4] and **RD 2366/1994**:[5] Act 82/1980, on Energy Conservation,[6] promoted the adoption of renewable energies, among them hydroelectric power, establishing a legal framework for the construction, expansion, or adaptation of small hydroelectric power plants. RD 1217/1981[7] dealt with the promotion of hydroelectric production in small power plants. Facilities commissioned after 1981 were to be remunerated on the basis of a regulated payment per unit of energy produced. [8]

74.  Under the Energy Act 40/1994 and RD 2366/1994 small-hydro facilities were automatically incorporated into the economic regime of RD 2366/1994,[9] with the aim of establishing an economic regime that contemplated the "*necessary balance between adequate profitability of the project and a cost for the electrical system that would not involve increased tariffs*."[10] The Ordinary Regime was applicable to conventional generation facilities (i.e. non-renewable sources such as coal-fired plants), and it required producers to sell their electricity output in the wholesale electricity market at the pool price (i.e. the market price). Qualifying renewable energy producers, whose installed capacity was below a certain threshold, became subject to the "Special Regime" and its more favourable feed-in remuneration regime. Small-hydro facilities under the RD 1217/1981 regime were automatically incorporated into the economic regime of RD 2366/1994, which required renewable producers to register their installations in a new *Registro Administrativo de Instalaciones de Producción en Régimen Especial* ("**RAIPRE**"), after establishing that the facility complied with certain administrative requirements.

---

[4] Act 40/1994, on Planning the National Electricity System, 30 December 1994 (C-0023 and R-0037) ("**Energy Act 40/1994**").

[5] Royal Decree 2366/1994, on the generation of electricity by hydroelectric, cogeneration and other facilities supplied by renewable energy sources, 9 December 1994 (C-0024 and R-0055) ("**RD 2366/1994**").

[6] Act 82/1980, of 30 December, on Energy Conservation (R-0190); Cl. Mem., ¶ 30; Resp. C-Mem., ¶ 390.

[7] Royal Decree 1217/1981, for the promotion of hydroelectric production in small power plants, 10 April 1981 (R-0196) ("**RD 1217/1981**").

[8] First KPMG Report, ¶ 88(i).

[9] RD 2366/1994. *See* Cl. Mem., ¶¶ 30-33; Resp. C-Mem., ¶¶ 342, 393.

[10] RD 2366/1994 (R-0055t), preamble (emphasis added).

75. **Electricity Act 54/1997**:[11] The Electricity Act 54/1997 liberalised the Spanish electricity sector and set out the general principles and objectives for its implementation.  It provided that by 2010 the contribution of renewable sources of energy to Spain's gross energy consumption should reach 12%.  Qualifying electricity generators using renewable sources of energy as primary energy, and with an installed capacity of less than 50 MW, became subject to a "Special Regime" (Article 27).  The Special Regime generators were entitled to receive the market price of electricity plus a supplementary premium (the amount of which was to be fixed in statutory terms by governmental regulations).  Ordinary Regime traditional generation plants received remuneration from the wholesale price of electricity. The overall object was to secure the supply of energy at low cost for consumers.

76. Electricity Act 54/1997 gave small-hydro plants commissioned before RD 1217/1981 the possibility of joining the incentive scheme for the rest of their operational life, so that small-hydro facilities with more than 20 years of operation (previously excluded from the Special Regime established in 1994) were entitled to the same feed-in remuneration as new facilities.

77. Article 30(4) of the Electricity Act 54/1997 provided:

> The determination of premiums will take account of the voltage level of the delivery of energy to the network, the effective contribution to the improvement of the environment, the primary energy savings and energy efficiency, the production of economically justifiable useful heat and the investment costs incurred, in order to achieve *reasonable profitability rates* with reference to the cost of the money on the capital markets.[12]

78. All energy producers were required to be registered in the RAIPRE.

79. The Electricity Act 54/1997 was implemented by a series of Royal Decrees, following Spain's signature in April 1998 of the Kyoto Protocol to the United Nations Framework

---

[11] Act 54/1997, on the Electric Power Sector, 27 December 1997 (C-0025 and R-0059) ("**Electricity Act 54/1997**"). *See* Cl. Mem., ¶¶ 34-39; Resp. C-Mem., ¶ 318 *et seq*.
[12] Electricity Act 54/1997, Article 30(4) (emphasis added).

Convention on Climate Change, which required the contracting parties to reduce greenhouse gas emissions and set binding emission targets to achieve reduction.[13]

80.     **RD 2818/1998**:[14] RD 2818/1998 implemented the Special Regime, and provided that Special Regime generators who had been duly registered in the RAIPRE were entitled to remuneration consisting of the market price plus a premium. RD 2818/1998 classified the qualifying Special Regime renewable generators into categories and groups according to, *inter alia*, the generation technologies used. It classified small-hydro generation installations into *(1)* group b.4, comprising hydropower installations whose installed capacity was not higher than 10 MW; and *(2)* group b.5, comprising hydropower installations whose installed capacity was higher than 10 MW but less than 50 MW. Group b.4 installations were entitled to a premium of 5.45 pesetas/kWh (a FiP) or in the event the facilities chose not to apply the premium, to a regulated tariff of 11.20 pesetas/kWh (a FiT). The premium for group b.5 installations was calculated by applying a specific formula to the premium payable to group b.4 based on the relevant facility's installed capacity.

81.     Installations which had been registered in the RAIPRE before the entry into force of the Electricity Act 54/1997 could choose between remuneration based on: *(a)* RD 2818/1998; or *(b)* RD 2366/1994, until 1 June 2007.

82.     The premiums set out in RD 2818/1998 were subject to revision every four years, based on the evolution of the price of electricity on the market, the participation of Special Regime facilities in coverage of demand, and their impact on the technical management of the electricity system (Article 32). According to the Claimants,[15] this involved a lack of predictability and stability regarding the applicable premiums and made investment under the RD 2818/1998 regime less attractive for private investors, and Spain realised that it needed to revise its legal and economic framework to provide more stable, sufficient, and

---

[13] Cl. Mem., ¶ 40; Resp. C-Mem., ¶ 307.

[14] Royal Decree 2818/1998, on electricity production by facilities using renewable sources of energy, waste and cogeneration, 23 December 1998 (C-0026 and R-0067) ("**RD 2818/1998**"); Cl. Mem., ¶¶ 40-46; Resp. C-Mem., ¶¶ 395-408.

[15] Cl. Mem., ¶¶ 46, 50.

17

predictable economic incentives to attract private capital into renewable projects, including increasing the role of project finance debt.

83.    **The Development Plan for Renewable Energies 2000-2010** ("**1999 PER**"):[16] The 1999 PER was prepared by the *Instituto para la Diversificación y Ahorro de la Energía* ("**IDAE**") and approved by the Council of Ministers in December 1999. It set the targets for implementation of renewable energies for a baseline scenario of an annual increase in electricity demand at 2%. The plan recognised that small-hydro was among the technologies which had reached "very high levels of maturity."[17]

84.    The 1999 PER determined standard facilities, different benchmarks were established for each (cost of investment, operating cost, useful life of the plant, production hours subject to a premium, market price), which would allow each plant, within a certain period of time (useful life), to reach a reasonable rate of return according to the cost of money on the capital markets. The return of the standard projects was estimated at "7% with own resources, before financing and after tax."[18]

85.    **EU Directive 2001/77/EC**:[19] In 2001, the EU adopted Directive 2001/77/EC on the Promotion of Electricity Produced from Renewable Energy Sources in the Internal Electricity Market, in order to comply with the Kyoto Protocol.[20]

86.    The Directive recited that the need for support schemes in favour of renewable energy sources was recognised in the Community guidelines for State aid for environmental protection.[21] The Directive obliged all EU Member States to "take appropriate steps to encourage greater consumption of electricity produced from renewable energy sources" in

---

[16] Plan for the Promotion of Renewable Energies for the period 2000-2010 (C-0160 and R-0090); Resp. C-Mem., ¶ 414 *et seq*; Rejoinder, ¶¶ 392-395.

[17] First Econ One Report, ¶ 123 (emphasis omitted), citing KPMG Exhibit 17, p 167.

[18] Resp. C-Mem., ¶¶ 421, 478 (citing Plan for the Promotion of Renewable Energies 2000-2010 (R-0090), p 182).

[19] Directive 2001/77/EC of the European Parliament and of the Council, on the promotion of electricity produced from renewable energy sources in the internal electricity market, 27 September 2001 (C-0028 and RL-0015) ("**EU Directive 2001/77/EC**"); Cl. Mem., ¶¶ 47-49.

[20] EU Directive 2001/77/EC entered into force in 2005 for the EU and Spain.

[21] EU Directive 2001/77/EC, recital (12).

order to "meet Kyoto targets more quickly", and required "all Member States … to set national indicative targets for the consumption of electricity produced from renewable sources", and to report regularly to the EU on their progress in meeting those targets.[22]  Spain's indicative target was to draw 29.4% of its electricity from renewable sources by 2010. The Directive required Spain to enact implementing legislation by 27 October 2003.[23]

87.    **RD 436/2004**:[24] RD 436/2004 was enacted to implement the 1999 PER and replace RD 2818/1998.  The Economic Report on RD 436/2004 prepared by the Ministry of Energy stated:

> Parameter A [Production cost: the investment, operating and maintenance costs for each technology] has a significant weighting in establishing the amount of the regulated tariff for sale to distributors.  This way, *any plant in Spain in the special regime, provided it is equal to or better than the standard (the standardised plant) for its group, will obtain reasonable return.*
>
> …
>
> … it is assumed, in all cases, that 100% of the funding will come from equity.  The leverage and percentage between equity and other sources of funding are independent decisions in each project and for each promoter that, when made wisely, should provide better ratios than those estimated in this report.[25]

88.    RD 436/2004 repealed RD 2818/1998, and adapted the feed-in system to the new average or reference electricity tariff (*tarifa eléctrica media o de referencia* or "**TMR**")[26] methodology.  Its preamble stated:

---

[22] EU Directive 2001/77/EC, Article 3(1), recitals (1) and (5).

[23] EU Directive 2001/77/EC, Article 9 and Annex.

[24] Royal Decree 436/2004 establishing the methodology for the updating and systematisation of the legal economic regime for electric energy production, 12 March 2004 (C-0029 and R-0069) ("**RD 436/2004**"); Cl. Mem., ¶ 50 *et seq*.; Resp. C-Mem., ¶ 424 *et seq*.

[25] Economic Report of Royal Decree 436/2004 (R-0052), pp 4-5 (emphasis added).

[26] On 1 January 2003, Spain put into effect a new formula to calculate the average or reference electricity tariff (*Tarifa Eléctrica Media* or TMR), one of the inputs to determine the remuneration of renewable energy installations. The TMR would be set by the Government annually and published in advance based on estimated costs needed to remunerate projected electricity supply and consumer demand.

> The goal is to continue down the path begun by Royal Decree 2818/1998 … with the added benefit of being able to simultaneously take advantage of the stability brought to the system as a whole by Royal Decree 1432/2002 … to provide those who have decided or decide in the near future to make a commitment to the special regime of a long-lasting, objective and transparent regulatory framework.
>
> …
>
> Whatever remuneration mechanism is chosen, the Royal Decree *guarantees the owners of the facilities under the special regime a reasonable remuneration for their investments and it guarantees electricity consumers a reasonable allocation of the costs attributable to the electric system ...*[27]

89.     RD 436/2004 gave qualifying renewable energy producers the right to choose, on an annual basis, between: *(a)* a fixed tariff, calculated as a specific percentage of the TMR, defined as a single flat rate and, where applicable, a supplement for reactive energy ("regulated tariff option"); and *(b)* the pool price plus a premium and an incentive for participating in the market, and, where applicable, a supplement for reactive energy ("pool price plus premium option").  Premium, incentive and supplement were all calculated by reference to the TMR as a fixed percentage.

90.     RD 436/2004[28] maintained RD 2818/1998's classification of hydropower installations into category "b", and further into group "b.4" (hydropower installations whose installed capacity was no more than 10 MW) and group "b.5" (hydropower installations whose installed capacity was higher than 10 MW but less than 50 MW) in Article 2.  It also provided for tariffs, premiums and incentives, calculated as percentages of the TMR, for the operational lifespan of such installations (Article 36).

91.     Pursuant to the transitional provisions of RD 436/2004, existing Special Regime installations which were previously under RD 2818/1998 could choose: *(a)* to benefit from the economic regime established in RD 436/2004 from the date RD 436/2004 entered into force (28 March 2004); or *(b)* to continue to be subject to RD 2818/1998's remuneration

---

[27] RD 436/2004, Summary (emphasis added).

[28] RD 2351/2004 and RD 2392/2004 increased the 10 MW threshold to 15 MW, *see* Cl. Reply, fn 430.

regime until 31 December 2006, and thereafter migrate to the RD 436/2004 regime automatically from 1 January 2007 (later extended to 31 May 2007).[29]

92.    Article 40(1) of RD 436/2004 contemplated revisions to the regulated tariff, premiums and incentives stipulated therein, every four years starting from 2006, based on the costs associated with each of the renewable technologies, their degree of participation in the Special Regime in demand coverage and their impact on the technical and economic management of the system.

93.    Article 40 provided:

> **Article 40. Revision of tariffs, premiums, incentives and supplements for new installations.**
>
> 1    In 2006, in view of the findings of the monitoring reports on the degree of compliance with the Renewable Energies Promotion Plan, the tariffs, premiums, incentives and supplements defined in this Royal Decree will undergo revision, taking into account the costs associated with each one of these technologies, their degree of participation in the special regime in demand coverage and their impact on the technical and economic management of the system. Every four years, beginning in 2006, a new revision shall take place.[30]
>
> ....
>
> 3    The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the facilities that commence operations subsequent to the date of the

---

[29] This transitional period was finally extended, by RD 1634/2006, until 31 May 2007 (the day before the entry into force of RD 661/2007). The Claimants' small-hydro installations in the Xana Portfolio chose option (a) (i.e. benefit from RD 436/2004 and its "pool price plus incentive and premium" option from 28 March 2004), while small-hydro installations in the Ondina Portfolio chose option (b) (i.e. continue to be subject to RD 2818/1998's remuneration regime until 31 May 2007, and migrating to the RD 436/2004 regime automatically from 1 June 2007). *See* First KPMG Report, ¶ 88 (iii)(b).

[30] The Respondent's translation is: "During 2006, in view of the findings of the monitoring reports on the degree of performance of the renewable energies promotion Plan, the tariffs, premiums, incentives and supplements defined in this Royal Decree shall undergo revision. This shall bear in mind the costs associated with each one of these technologies, their degree of participation in the special regime in demand coverage and their impact on the technical and economic management of the system. Every four years, starting from 2006, a new revision shall take place." RD 436/2004 (R-0069t), Article 40(1).

21

entry into force referred to in the section above and shall not be effective retroactively on any previous tariffs and premiums.[31]

94.   RD 436/2004 was an improvement to the incentive scheme under RD 2818/1998, but Spain became dissatisfied with RD 436/2004's progress in attracting investment to the Spanish renewable industry.  Since the feed-in scheme under RD 436/2004 was based on the TMR, which changed on a yearly basis, there were inevitably fluctuations in the tariffs, premiums and incentives that investors would receive. The Claimants submit that "[t]hese fluctuations meant a lack of predictability, as it was difficult for investors to foresee what actual income might be consistently received over the long term.  This lack of predictability and stability made investment under [RD 436/2004] more risky and … less attractive to lenders than it might otherwise have been".[32]

95.   **2005-2010 Renewable Energy Promotion Plan** ("**2005-2010 PER**"):[33] The 2005-2010 PER was prepared by IDAE and approved by the Council of Ministers in August 2005. The aim of the 2005-2010 PER was to provide recommendations which would assist in further increasing investment in renewable energy in Spain as RD 436/2004 had not resulted in the expected increase in installed renewable capacity. [34]

96.   Spain concluded that it would need to attract investments amounting to approximately EUR 24 billion into the Spanish renewable energy sector to achieve its policy targets.  The Plan recognised the fundamental importance of ensuring that renewable projects be both attractive to investors and palatable to lending institutions (i.e. capable of supporting project finance): "… it is essential to place the various technologies in a position to be of financial performance, thereby making them attractive to investors, as well as to facilitate access to bank financing."[35]

---

[31] RD 436/2004 (C-0029t), Article 40.

[32] Cl. Mem., ¶ 60.

[33] Plan for Renewable Energies in Spain 2005-2010 (C-0019 and R-0092).  *See also* IDAE's and Ministry's Summary of the Renewable Energy Plan (PER) 2005-2010 (C-0009) ("**2005-2010 PER Summary**").

[34] Cl. Mem., ¶ 62.

[35] 2005-2010 PER, p 276.

97.   In relation to hydropower generation, the 2005-2010 PER Summary stated that "[h]ydroelectricity is one of Spain's main sources of electricity" and that, "[g]iven the level of resources available, it has a long history in Spain, and as a result the sector is mature and consolidated" and noted that small-scale (i.e. less than 10 MW) hydropower generation was "advancing more slowly than envisaged", and recommended the further development of the hydropower sector.  It recommended installation of additional generation capacity of: *(a)* 450 MW of small-scale (i.e. less than 10 MW) hydropower capacity, to reach a total of 2,199 MW of installed capacity by 2010; and *(b)* 360 MW of other hydropower capacity (between 10 to 50 MW), to reach a total of 3,257 MW of installed capacity by 2010.[36]

98.   The 2005-2010 PER Summary also said:

> In order to bring the targets set out here to fruition, a detailed evaluation has been made of the investment envisaged over the period as a whole, the nature of this investment and the public aid necessary to meet the targets.  This analysis, based on the specific features of each technology, such as its degree of maturity and contribution to the overall target, rests on a balance between all the factors, such that a return is achieved from on public and private investments, and the necessary resources are mobilised to ensure the envisaged investments are made.[37]

99.   The 2005-2010 PER established the following conception of return of standard projects: "*Return on Project Type*: calculated on the basis of maintaining an Internal Rate of Return (IRR), measured in legal tender and for each standard project, around 7%, on equity (before any financing) and after taxes."[38]

100.  **RD-L 7/2006**:[39] RD-L 7/2006 adopted urgent measures for the energy sector.  It suspended the remuneration's revisions for renewable energy technologies until a new remuneration scheme dissociated from the TMR was developed.  According to the Respondent,[40] the

---

[36] 2005-2010 PER Summary, pp 20-21, 23.

[37] 2005-2010 PER Summary, p 56 (emphasis omitted).

[38] 2005-2010 PER, p 274.

[39] Royal Decree Law 7/2006, adopting urgent measures in the energy sector, 23 June 2006 (C-0027 and R-0056) ("**RD-L 7/2006**").

[40] Resp. C-Mem., ¶¶ 464-465; Rejoinder, ¶ 256.

reason for RD-L 7/2006 was that the majority of the facilities opted for remuneration according to the market price plus the premium, thereby earning much higher remuneration than had been forecast by the regulator. According to the Claimants this only had the intention of temporarily freezing the feed-in remuneration paid to renewable energy facilities under RD 436/2004 until Spain could de-couple them from the TMR.[41]

101.   In February 2007 the Spanish *Comisión Nacional de Energía* ("**CNE**") reported that a majority of its Board considered that the need to make what became RD 661/2007 retroactive had not been sufficiently justified, and emphasised that RD 436/2004 had "a very significant quality, which is regulatory stability."[42]

102.   **RD 661/2007**:[43] The objective of RD 661/2007 was to create enhanced incentives. It stated in its preamble:

> The creation of the special regime electricity generation was an important milestone in our country's energy policy. The targets for the promotion of renewable energies and combined heat and power, are collected in 2005-2010 Renewable Energies Plan and the Strategy of Energy Saving and Efficiency in Spain (E4), respectively. In view thereof it is found that although experienced by all the special arrangements for electricity generation has been remarkable growth in certain technologies, the objectives are still far from being achieved.
>
> …
>
> … the activity of electricity production in the special regime is characterized by the possibility that its remuneration is supplemented by charging a premium on the terms established by regulation, the determination of which takes into account factors such as the voltage level of the power delivery grid, contribution to the improvement of the environment, the primary energy savings, energy efficiency and investment costs that are incurred.

---

[41] Cl. Reply, ¶ 219.

[42] CNE Report 3/2007 on the Royal Decree proposal that regulates the activity of energy production under the Special Regime and that of certain similar technological installations under the Ordinary Regime (C-0074) ("**CNE Report 3/2007**"), p 11.

[43] Royal Decree 661/2007, regulating the activity of electricity production under the Special Regime, 25 May 2007 (C-0033 and R-0071) ("**RD 661/2007**"); Cl. Mem., ¶¶ 68-72, 74, 81-83, 85; Resp. C-Mem., ¶¶ 487-532.

A change to the economic and legal framework governing the special regime in force to date is necessary for several reasons: Firstly, the growth experienced by the special regime in recent years, coupled with the experience gained during the implementation of Royal Decrees 2818/1998, of December 23, and 436/2004, of March 12, has revealed the need to regulate certain technical aspects in order to contribute to the growth of these technologies, safeguarding security in the electrical system and ensuring quality in the delivery of the same, and also to minimize restrictions on the production of said generation. The economic regime established by Royal Decree 436/2004, of March 12, owing to the changes experienced by market prices, which in recent times have been more greatly affected by certain variables not considered in the above remuneration scheme of the special regime, makes modification of the remuneration scheme necessary, separating it from the Average or Benchmark Electricity Tariff, used to date. Finally, the regulatory changes resulting from European legislation, as well as the Royal Decree-Act 7/2006, of June 23, must be included, by means of which urgent measures were adopted in the energy sector, introducing significant changes regarding the legal regime of the combined heat and power activity.

The present Royal Decree replaces Royal Decree 436/2004, of March 12, which defined the methodology for updating and the systematization of the legal and economic framework for electricity production activity under the special regime, while maintaining the basic structure of the regulations therein.

The economic framework established in this Royal Decree implements the principles contained in Act 54/1997, of November 27, on the Electricity Sector, *guaranteeing owners of facilities in the special regime a reasonable return for their investment and the consumers of electricity an allocation of the costs attributable to the electrical system that is also reasonable*, while participation is encouraged in the market, since it is considered that under this framework, government intervention on the pricing of electricity will be reduced, as well as better more efficient and allocation of costs arising from the system, especially with regard to the handling of deviations and additional services. (Emphasis added)

103.  RD 661/2007 implemented a remuneration regime pursuant to which a qualifying Special Regime generator could choose between selling its electricity output at either: *(a)* a fixed regulated tariff (in euro cents per kWh) at the same rate for all scheduling periods (i.e. a FiT option) (Article 24(1)(a)); or *(b)* the pool price *plus* a fixed premium payment (in euro cents per kWh) over and above the pool price (i.e. a FiP option) (Article 24(1)(b)).

The generators could choose between these two options – the "regulated tariff" or the "pool price plus premium" on an annual basis (Article 24(4)). The Special Regime producers were entitled to obtain the regulated tariff or the pool price plus premium for all of their electricity output (measured in kWh), without any limit on production.

104. By contrast with RD 436/2004, the fixed regulated tariff and premium under RD 661/2007 were not calculated by reference to annual TMR values. It disassociated subsidies from the TMR and updated them annually based on an adjusted CPI.

105. In relation to the "pool price plus premium" option, RD 661/2007 introduced a cap and floor mechanism, by establishing upper and lower limit values for the sum of the hourly market price plus a "reference" premium, so that the actual premium for each hour could be limited by reference to those values. Pursuant to this mechanism, when the hourly pool prices were excessively low, installations were guaranteed a minimum level of remuneration (the lower limit or "floor"). When the pool prices reached, or exceeded, the defined upper limit or "cap", the actual hourly premium payable was zero (thereby imposing no extra burden on the electricity system) (explanatory preamble).

106. Hydropower installations had the right to receive the feed-in remuneration for their operational life, either at the regulated tariff or the pool price plus premium – at a particular rate during its first 25 years of operation, after which the feed-in remuneration would continue for the lifetime of the installation, but at a lower rate.

107. RD 661/2007 also provided for an inflation adjustment mechanism pursuant to which the values of the regulated tariff, premium, and lower and upper limits provided for in RD 661/2007 were to be updated on a yearly basis to reflect increases in the Spanish CPI (Article 44(1)). For the installations in category "b" (including hydropower installations in groups b.4 and b.5), this was to be done by reference to the increase in the CPI, less 25 basis points up to 31 December 2012 and 50 basis points thereafter (Article 44(1)).

108.    Pursuant to its First Transitional Provision, Special Regime installations previously subject to the incentive scheme set out in RD 436/2004 and which entered into commercial operations before 1 January 2008 were granted the right to choose between: *(1)* benefiting from the remuneration regime in RD 661/2007 from the date it entered into force (1 June 2007); or *(2)* applying the prior remuneration regime of RD 436/2004, subject to certain conditions and in some cases during a transitional period.  Under choice (2), there were two further options:  *(i)* if the RD 436/2004 option chosen was "regulated tariff", then the regulated tariff regime of RD 436/2004 would apply for the remainder of the installation's lifetime; or *(ii)* if the installation chose the "market price plus premium and incentive" option, the economic regime for that option would apply until 31 December 2012, after which (from 1 January 2013) the feed-in remuneration scheme under RD 661/2007 (with a right to choose annually between the regulated tariff and the pool price plus premium options) was to apply.

109.    The Claimants say that most of the Claimants' hydropower installations chose option (2)(ii) under the RD 436/2004 regime (except two installations in the Xana Portfolio which chose option (1), to benefit from the RD 661/2007 feed-in remuneration regime from the date RD 661/2007 entered into force).  Those installations which chose option (2)(ii) were remunerated under the "market price plus premium and incentive" of RD 436/2004 until 31 December 2012, and from 1 January 2013, were expected to start receiving the feed-in remuneration of RD 661/2007 (i.e. either the "regulated tariff" or the "pool price plus premium").

110.    Article 44(3) contemplated a review of the tariffs, premiums and lower and upper limits every four years, starting from 2010, to determine whether those incentives still reflected a particular technology's costs, market participation and a reasonable return for the investor.  It provided (according to the Claimants' translation[44]):

---

[44] RD 661/2007 (C-0033t).  The Respondent's translation (R-0071t) is: "3. During the year 2010, on sight of the results of the monitoring reports on the degree of fulfilment of the Renewable Energies Plan (PER) 2005-2010, and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan 2011-2020, there shall be a review of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree with regard to the costs associated with each of these technologies,

3. During 2010, in view of the results of the monitoring reports on the degree of compliance with the 2005-2010 Renewable Energies Plan (PER), and of the Energy Efficiency and Savings Strategy in Spain (E4), together with such new targets as may be included in the subsequent Renewable Energies Plan for the period 2011-2020, there will be a revision of the tariffs, premiums, supplements and lower and upper limits defined in this Royal Decree, considering the costs associated with each of these technologies, the degree of participation of the Special Regime in covering the demand and its impact upon the technical and economic management of the system, always guaranteeing reasonable rates of return with reference to the cost of money in the capital markets. Thereafter, every four years, a new revision shall be performed, maintaining the same criteria as previously.

The revisions of the regulated tariff and the upper and lower limits indicated in this section shall not affect facilities for which the commissioning certificate had been granted prior to January 1 of the second year following the year in which the revision had been performed.

111. **RD 1578/2008**:[45] RD 1578/2008 put in place a new remuneration regime applicable to PV facilities that were not registered by the deadline for RD 661/2007. RD 1578/2008 offered lower tariffs than RD 661/2007. It also provided that the tariffs fixed each quarter would remain in force for "a maximum period of twenty-five years" (Article 11(5)) and would be updated as "provided for in Article 44.1 of Royal Decree 661/2007" (Article 12).

112. **RD-L 6/2009**:[46] RD-L 6/2009 amended the Electricity Act 54/1997. Its preamble stated that *(a)* the growing tariff deficit was causing serious problems which, in the context of the current international financial crisis, was having a deep effect on the system and

---

the degree of participation of the special regime in covering the demand and its impact upon the technical and economic management of the system, and a reasonable rate of profitability shall always be guaranteed with reference to the cost of money in the capital markets. Subsequently a further review shall be performed every four years, maintaining the same criteria as previously.

The revisions to the regulated tariff and the upper and lower limits indicated in this paragraph shall not affect facilities for which the deed of commissioning shall have been granted prior to 1 January of the second year following the year in which the revision shall have been performed."

[45] Royal Decree 1578/2008, on the payment for the electric production activity from solar photovoltaic technology for facilities built after the deadline until which the remuneration under Royal Decree 661, of 25 May, was maintained for said technology, 26 September 2008 (C-0154 and R-0072) ("**RD 1578/2008**").

[46] Royal Decree-Law 6/2009, which adopts certain measures in the energetic sector and passes the discount tariff, 30 April 2009 (C-0144 and R-0057) ("**RD-L 6/2009**"); Resp. C-Mem., ¶¶ 570-584; Cl. Reply, ¶¶ 226-230.

jeopardising not only the financial situation of electricity sector companies but the very sustainability of the system itself; *(b)* the imbalance was unsustainable; *(c)* the trend of these technologies might put at risk the sustainability of the system in the short term, both from the economic point of view and its impact on the electricity tariff, as well as from the technical point of view, compromising the economic feasibility of the installations already finished, whose working depended on the suitable balance between manageable and non-manageable generation; and *(d)* it had become necessary to adopt an urgent measure to guarantee the necessary legal security for those who have made investments, and to lay the foundation to establish new economic schemes which afforded fulfilment of the intended objectives: the fulfilment of some power targets by technology at a reasonable cost to the consumer and their technological evolution which allowed a gradual reduction of their costs and therefore of their competition with the conventional technologies.

113.    RD-L 6/2009 was aimed at eliminating the tariff deficit by 1 January 2013.  It provided that enrolment (which was subject to conditions) on a "pre-assignment of payment register" established by the Decree-Law would be necessary to obtain the right to take advantage of the Special Regime under RD 661/2007.  It also allowed Spain to introduce restrictions on the number of registered installations which could begin operating if renewable energy targets were exceeded (Article 4(2)).

114.    **EU Directive 2009/28/EC**:[47] The Directive on the promotion of the use of energy from renewable sources repealed Directive 2001/77/EC and increased the EU's community-wide target for total energy from renewable sources from 12% by 2010 to 20% by 2020, and a minimum target of 10% for each Member State.  Member States were required to adopt a National Action Plan for the implementation of the Directive and its targets.

---

[47] Directive 2009/28/EC of the European Parliament and of the Council, on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC, 23 April 2009 (C-0102 and RL-0017) ("**EU Directive 2009/28/EC**").

115.   **2010 Renewable Energy Promotion Plan**, **30 June 2010** ("**2011-2020 PER**"):[48] The 2011-2020 PER stated that the then-existing remuneration framework for renewable energies was "stable, predictable, flexible, controllable and secure for developers and the electricity system";[49] electrical energy production under the special procedure was founded on three basic principles, namely "legal certainty, feasibility and regulatory stability";[50] and any present or future economic remuneration system to support the generation of electricity from renewable sources would be based on those principles.  It also stressed that the system was intended to guarantee a reasonable return (emphasis added):

> **Royal Decree 661/2007** of 26 May 2007 regulating electrical energy production under the special regime, implements the Electricity Sector Act Law 54/1997 and defines the legal and economic regime for electrical energy and cogeneration plants and plants that use renewable energies and waste as raw material, with the overarching objective of establishing *a stable and predictable system that guarantees a reasonable return* on electrical energy production under the special regime.[51]
>
> …
>
> The economic framework, currently implemented by **Royal Decree 661/2007** of 25 May 2007 regulating electrical energy production under the Special Regime, and Order ITC/3519/2009 of 28 December 2009 reviewing access fees as from 01 January 2010 along with the tariffs and premiums corresponding to special regime installations, provide for electricity generation remuneration levels *that afford a reasonable return on investment*.  In determining those levels, account is taken of the specific technical and economic aspects of each technology, installed capacity and the date operation commenced, in all cases using criteria of system economic sustainability and efficiency.[52]
>
> …
>
> **Royal Decree 661/2007** *provides for reviews of remuneration* amounts every four years, which may be modified on the basis of

---

[48] Spain's National Renewable Energy Action Plan 2011-2020, 30 June 2010 (C-0012 and R-0093).  *See* Cl. Mem., ¶ 86; Resp. C-Mem., ¶ 597 *et seq.*

[49] 2011-2020 PER, p 49.

[50] 2011-2020 PER, p 118.

[51] 2011-2020 PER, p 106.

[52] 2011-2020 PER, p 112.

technological developments within the sectors, market behaviour, degree of compliance with renewable energy targets, percentage of demand covered by special regime facilities and their effect on the technical and economic management of the system, *while always guaranteeing reasonable rates of return*.  In any event, these reviews take account of cost trends associated with each technology with three objectives in mind: to see that renewable technologies become as competitive as possible with Ordinary Regime generation, to foster a technological development balance and to see that the remunerative scheme moves in the direction of minimising socio-economic and environmental costs.[53]

…

Technical parameters and investment costs incurred will be considered in determining remuneration *with a view to providing a reasonable rate of return referenced to the cost of money on the capital market in accordance with the provisions of the Electricity Sector Act*.

Also, effective administrative supervision is required to assure that gains from the development of these technologies in terms of relative cost competitiveness are passed on to society, thus *minimising the speculative risks posed in the past by excessive rates of return*, which not only hurts consumers but is also damaging to the industry in general in terms of the perception people have of it. Therefore, it will be necessary to devise sufficiently flexible and transparent systems that permit the issue and reception of economic and market signals so as to minimise the risks associated with investment and its remuneration and those caused by fluctuations in the energy markets.[54]

116. From 2010 there was a fall in electricity demand, which increased the tariff deficit.  As the International Energy Agency said later:

The tariff deficit, which had been accumulating since 2001, began to spiral out of control after 2005.  From 2005 to 2013, the costs in the electricity system grew by 221% while revenues increased by only 100%.  Subsidies for renewable electricity are the single largest cost element. By 2012, the accumulated debt in the system had reached more than EUR 20 billion and was set to expand by billions every year unless action was taken. In 2012, the government temporarily eliminated subsidies for new installations. It also

---

[53] 2011-2020 PER, p 115.
[54] 2011-2020 PER, p 118.

reduced remuneration for transmission and distribution network activities, increased access tariffs, and introduced a 7% tax on electricity generation (22% for hydropower). Nevertheless, the deficit grew to EUR 26 billion by the end of 2012.[55]

117.    **RD 1565/2010**:[56] RD 1565/2010 capped the quantity of electricity produced by PV plants (*inter alia*) which was eligible to receive incentive tariffs and eliminated the tariffs after 25 years of operation, which was later extended to 28 years and then to 30 years (by RD-L 14/2010 and Act 2/2011).  RD 1565/2010 also imposed a reduction in the tariff rate available to certain facilities enrolling in the RD 1578/2008 regime.

118.    **RD 1614/2010**:[57] RD 1614/2010 affected only wind and concentrating solar power ("**CSP**") facilities.  Its preamble stated that the legal regime must be adapted, safeguarding the legal security of investments and "the principle of reasonable return", to maintain a necessary and sufficient support which was coherent with market conditions and strategic energy objectives on energy to contribute to the transfer to society of the benefits from the suitable evolution of these technologies.

119.    RD 1614/2010 reduced premium values under RD 661/2007, although it provided for a transitional period according to which qualifying installations could remain under the prior regulatory regime until the end of 2012.  It also limited the number of hours of operation amenable to premium if certain caps were surpassed.

120.    **RD-L 14/2010**:[58] RD-L 14/2010 introduced urgent measures to correct the tariff deficit.  The preamble stated:

> Since the adoption of [RD-L 6/2009], there have been a series of supervening circumstances that have had a direct impact on the

---

[55] Energy Policies of IEA Countries - Spain 2015 Review, Executive summary and key recommendations, published by the International Energy Agency (R-0182), p 10.

[56] Royal Decree 1565/2010, which regulates and modifies certain aspects of the electricity production activities in the Special Regime, 19 November 2010 (R-0074) ("**RD 1565/2010**"); Resp. C-Mem., ¶¶ 606-611.

[57] Royal Decree 1614/2010, regulating and modifying certain aspects related to electric energy production using thermoelectric solar and wind power technologies, 7 December 2010 (R-0075) ("**RD 1614/2010**"); Resp. C-Mem., ¶¶ 612-627.

[58] Royal Decree-Law 14/2010, establishing urgent measures for the correction of the tariff deficit in the electricity sector (C-0064 and R-0058) ("**RD-L 14/2010**").  *See* Cl. Mem., ¶ 108; Resp. C-Mem., ¶¶ 628-638; Cl. Reply, ¶¶ 232-236.

anticipated tariff deficit in the electricity system and it has been
determined that the capped ex ante deficit limits, as established in
the aforementioned Twenty-First Additional Provision, have been
largely overcome.  The impact of the global crisis, which traverses
the Spanish economy, has led to a significant decline in the demand
for electric energy, however, supply has been impacted by aspects
such as the evolution of the price of fuels on the international
markets during the current year, 2010 and the favourable climatic
conditions that have led to increased electric energy production from
renewable sources.  The current economic situation has not had
symmetrical consequences in all electric power sectors: while the
ordinary regime (traditional electric power plants) have seen a
reduction in their operating hours and income, due to the decline in
wholesale market prices, however, producers under the special
regime are found to be in a different circumstance, as this specific
regime ensures the sale of generated electricity at preferential rates
within the system.

121.   The preamble also stated that it was enacted "in consideration of the rate of growth of
photovoltaic installations" and that the PV sector was a major contributor to the regulated
costs of the electricity system as a consequence of the objectives being exceeded.
It imposed a temporary three-year cap on the number of operating hours during which
PV installations were entitled to the RD 661/2007 tariff, in exchange for a three-year
extension of the 25-year tariff term (which was later extended by a further two years by
Act 2/2011).  It also imposed an access fee (of EUR 0.50/MWh) on all producers (including
small-hydro installations) for access to transmission and distribution networks.

122.   **Act 2/2011 on Sustainable Economy**:[59] Act 2/2011 (March 2011) outlined the need to
undertake a reform in energy regulation in general and the incentives for the Special
Regime in particular. Section 78(1) set a minimum national goal of 20% for the
participation of renewable energies in gross energy consumption for the year 2020; and the
target was to be attained with an energy quota from renewable energies in all kinds of
transmission by 2020 that was equivalent to at least 10% of the final energy consumption
in the transmission sector.

---

[59] Act 2/2011, of March 4, on Sustainable Economy (C-0114 and R-0045).  *See* Resp. C-Mem., ¶¶ 639-643.

C. **Supreme Court Decisions Prior to the Claimants' Investment**[60]

123.    **15 December 2005**:[61] The Supreme Court, in a challenge against RD 436/2004, said that: "No legal obstacle exists for the Government, in the exercise of the regulatory power and the large authorisations which it has in a heavily regulated field such as electricity, to modify a particular compensation system ...".

124.    **25 October 2006**:[62] The Supreme Court, in a challenge against RD 2351/2004, ruled:

> the owners of electrical energy production facilities under the special regime do not have an "unmodifiable right" to maintain unchanged the way in which the collection of premiums is governed. This regime actually attempts to promote the use of renewable energies by means of an incentive mechanism which, like any of this kind, is not guaranteed to be retained without amendments in the future … In the same way that, according to factors of economic policy ... the premiums and incentives for the production of electric energy under the special scheme can increase from one year to the next, they can also decrease when those same considerations make it advisable. As long as, we repeat, the variations are kept within the legal limits that govern this mode of promotion, the mere fact that the updating or financial significance of the premium may increase or decrease does not constitute, by itself, reason for nullity, nor does it affect the legitimate expectations of the recipients."[63]

125.    The Supreme Court also said:

> legal certainty is not incompatible with the regulatory changes from the perspective of the validity of the latter … The same consideration applies to the principle of legitimate expectations ... The appellants argue that their investments in the activity of production of electrical energy under the special regime were made at a given time "trusting that the Administration will not change the legal conditions that were decisive for … them to decide to build the

---

[60] Resp. C-Mem., ¶¶ 364-384, 409, 500, 901-902; Cl. Reply, ¶ 242 *et seq*; Rejoinder, ¶ 437 *et seq*; Cl. PHB, ¶¶ 5, 9, 61-69; Resp. PHB, ¶¶ 24101, 108, 164-165, 181-183. The Respondent also relies on judgments post-dating the investment, but these are not considered at this stage. *See* below, ¶ 132.

[61] Ruling from the Third Chamber of the Supreme Court, 15 December 2005 (R-0117) (as cited in Resp. C-Mem., fn 198).

[62] Ruling from the Third Chamber of the Supreme Court, 25 October 2006, appeal 12/2005, reference El Derecho EDJ 2006/282164 (R-0118) ("**Ruling from the Third Chamber of the Supreme Court dated 25 October 2006**").

[63] Ruling from the Third Chamber of the Supreme Court, 25 October 2006 (as cited in Resp. C-Mem., ¶ 365 and fn 200) (emphasis omitted).

facility," a premise from which they infer that the reduction of premiums subsequent to RD 2351/2004 regarding those established in RD 435/2004 would be contrary to that principle. Such reasoning, based on an incentive mechanism as that of the premiums in question, cannot be shared …

Until it is replaced by another one, the aforementioned Act (Article 30 of Electricity Sector Act) enables the corresponding companies to pursue premiums that include, as a relevant factor, the achievement of "reasonable rate of return with reference to the cost of money on the capital market" or, to once again use the words of the preamble to RD 436/2004, "fair remuneration for their investments". The remuneration regime which we examine does not guarantee, on the contrary, holders of facilities under special regime the inviolability of a certain level of returns or income in relation to those obtained in past years, nor the indefinite permanence of formulas used for fixing premiums.[64]

126.    **20 March 2007**[65] (a decision on amendments to RD 2818/1998) and **9 October 2007**[66] (a challenge to RD 1454/2005): the Supreme Court confirmed that there is no vested right to receive a specific subsidy in the future.

127.    **3 December 2009**[67] and **9 December 2009**:[68] These were challenges to the replacement of RD 436/2004 by RD 661/2007. In the former decision the Supreme Court stated:

the prescriptive content of Act 54/1997 ... does not envisage the petrifaction or freezing of the remunerative regime of owners of electricity facilities under the special regime, nor any recognition of the right of producers under the special regime to the unmodifiability of that regime, given that the Government, as intended by the legislator, possesses a discretion power to determine the energy remunerations that are offered ... taking into account, in the exercise of its regulatory powers the evident and essential

---

[64] Ruling from the Third Chamber of the Supreme Court, 25 October 2006 (as cited in Resp. C-Mem., fn 201 and ¶ 409) (emphasis omitted).

[65] Ruling from the Third Chamber of the Supreme Court, 20 March 2007, rec. 11/2005 EDJ 2007/18059 (R-0119) ("**Ruling from the Third Chamber of the Supreme Court dated 20 March 2007**").

[66] Ruling from the Third Chamber of the Supreme Court, 9 October 2007, rec. 13/2006 EDJ 2007/175313 (R-0120) ("**Ruling from the Third Chamber of the Supreme Court dated 9 October 2007**").

[67] Ruling from the Third Chamber of the Supreme Court, 3 December 2009, Appeal 151/2007 EDJ 2009/307349 (R-0121) ("**Ruling from the Third Chamber of the Supreme Court dated 3 December 2009**").

[68] Ruling from the Third Chamber of the Supreme Court, 9 December 2009, rec. 152/2007, reference El Derecho EDJ 2009/307357 (R-0122) ("**Ruling from the Third Chamber of the Supreme Court dated 9 December 2009**").

general interests implied in the proper functioning of the system of production and distribution of electricity, and, in particular, the rights of users.[69]

128.    There was no breach of the principle of legal certainty because:

it is not deduced that said regulation [RD 661/2007] does not respond to the demands of the principle of legal certainty, which does not include any right to freezing of the existent legal order …

[T]here are no grounds for challenging Transitory provision one, section 4 of the RD contested, of infringing the principle of legitimate expectations, given that the mercantile companies appealing, as companies that operate in the electricity production business … do not have a right for the remunerative regime of the electricity sector to remain unaltered. ... as we upheld in the Judgement of this Chamber of Contentious-Administrative Matters of the Supreme Court of 15 December 2005, "there is no legal obstacle to prevent the Government, in the exercise of regulatory powers and broad entitlements that it has in such a strongly regulated matter as electricity, from modifying a specific system of remuneration providing that this remains within the framework established through the Electricity Sector Act".[70]

129.    In relation to legitimate expectation, the Court said: "The principle of legitimate expectations does not guarantee the perpetuation of the existing situation; which can be modified at the discretion of the institutions and public authorities to impose new regulations taking into account the needs of the general interest."[71]

130.    In the second decision, 9 December 2009, on two challenges against RD 661/2007, the Court said:

… [The Claimant] does not pay sufficient attention to the case-law of this Chamber issued specifically in relation to the principles of legitimate expectations and non-retroactivity applied to successive incentives regimes for electricity generation. These are the

---

[69] Ruling from the Third Chamber of the Supreme Court, 3 December 2009 (as cited in Resp. C-Mem., ¶ 371, emphasis omitted).

[70] Ruling from the Third Chamber of the Supreme Court dated 3 December 2009 (as cited in Resp. C-Mem., ¶¶ 373, 500, emphasis omitted).

[71] Ruling from the Third Chamber of the Supreme Court dated 3 December 2009 (as cited in Resp. C-Mem., ¶ 374, emphasis omitted).

considerations expressed in our Ruling of 25 October 2006 and reiterated in that of 20 March 2007, *inter alia*, on the legal status of the owners of facilities producing electricity under the special regime, for whom it is not possible to recognise pro futuro an 'unalterable right' to the maintenance of the remuneration framework approved by the holder of regulatory power, provided that the prescriptions of the LSE regarding the reasonable rate of return of the investments are respected.[72]

131.   The Court also said:

Any companies that freely choose to enter a market such as the special regime electricity production market, knowing in advance that it is largely dependent upon economic incentives established by public authorities, are or must be aware that these may be modified, within legal guidelines, by these authorities.  One of the "regulatory risks" to which they are subject, which they must necessarily take into account, is precisely the variation of the parameters of the premiums or incentives, which the Electricity Sector Act – in the sense above – tempers but does not exclude …

It should be noted that the establishment of the economic regime for facilities operating under the special electricity production regime, proposed by RD 661/2007, of 25 March, cannot be described as arbitrary, since it is conditional upon the objective of ensuring reasonable rate of return throughout the useful life of these facilities, so that the Government, pursuant to Article 15.2 of Act 54/1997, of 27 November, of the Electricity Sector, is authorised to approve the methodology for calculating and updating the remuneration of said activity with objective, transparent and non-discriminatory objectives …[73]

132.   **Later decisions**: There are judgments rendered after the Claimants' investment in the same sense. They cannot affect the Claimants' expectations, but they confirm the earlier decisions of which the Claimants and their advisers were, or should have been, aware.[74]

---

[72] Ruling from the Third Chamber of the Supreme Court dated 9 December 2009 (as cited in Resp. C-Mem., ¶ 375, emphasis omitted).

[73] Ruling from the Third Chamber of the Supreme Court dated 9 December 2009 and Ruling from the Third Chamber of the Supreme Court dated 3 December 2009 (as cited in Resp. C-Mem., fn 208 and ¶ 902, emphasis omitted).

[74] Ruling from the Third Chamber of the Supreme Court (RJ/2013/5644) appeal 252/2012, 25 June 2013 (R-0131); Ruling from the Third Chamber of the Supreme Court appeal 118/2013, reference CENDOJ: 28079130032015100072, 16 March 2015 (R-0133); Ruling from the Supreme Court appeal 133/2013. CENDOJ: 28079130032015100087, 26 March 2015 (R-0134); Ruling 63/2016 of the Supreme Court handed down in cassation

D. **The Disputed Measures**

133.    On 7 March 2012, the CNE issued Report 2/2012 recommending measures to address the
tariff deficit.[75] It said:

> The Spanish electrical system has recorded a structural deficit in the
> revenues from regulated activities (tariff deficit) for a decade, due
> to the fact that the costs that have been recognised for the various
> regulated activities and costs have been (and continue to be) higher
> than the revenues obtained from the regulated prices paid by
> consumers.
>
> … the current situation is unsustainable. The introduction of
> regulatory measures, as requested by the document of the SEE, is
> called for with immediate effect in the short term, in order to
> eliminate the deficit of the system, mitigate the cost of funding the
> yet unsecuritised debt and clearly define the access costs that will be
> assumed by electricity consumers, in order to determine their access
> tariffs in a satisfactory and stable manner.[76]

134.    On 20 July 2012 Spain and the EU signed a Memorandum of Understanding, in which
Spain committed to "address the electricity tariff deficit in a comprehensive way."[77]

135.    **RD-L 1/2012**:[78] RD-L 1/2012 eliminated feed-in remuneration under RD 661/2007 for
new plants, and suspended new RAIPRE registrations.[79] Facilities which, at the time of the
entry into force of RD-L 1/2012, had been finally registered in the RAIPRE were excluded
from its scope of application.  The preamble restated the efforts made by RD-L 6/2009 and

---

appeal 627/2012, 21 January 2016 (R-0135).  *See also* Ruling 28/2015 of the Plenary Session of the Constitutional
Court, constitutional appeal number 6412-2013, 19 February 2015 (R-0132); Ruling from the Constitutional Court
passed in unconstitutionality appeal no. 5347/2013, 17 December 2015 (R-0136), Ruling from the Constitutional
Court passed in unconstitutionality appeal no. 5852-2013, 18 February 2016 (R-0137), and Ruling from the
Constitutional Court passed in unconstitutionality appeal no. 6031-2013, 18 February 2016 (R-0138).

[75] Report by the National Energy Commission (CNE): Introduction and executive summary, Part I: Measures to
guarantee the financial-economic sustainability of the electricity sector, National Energy Commission (R-0105)
("**CNE Report Part I**"); Resp. C-Mem., ¶ 779 *et seq*.

[76] CNE Report Part I, sections I.1 and I.5.

[77] Memorandum of Understanding signed with the European Union on 20 July 2012: "VI. Public Finances,
Macroeconomic Imbalances and Financial Sector Reform" (RL-0067), p 15.

[78] Royal Decree-Law 1/2012, proceeding to the suspension of the remuneration pre-assignment procedures and the
elimination of the economic incentives for new electric energy production plants using cogeneration, renewable
energy sources and waste, 27 January 2002 (R-0060); Resp. C-Mem., ¶¶ 776-777.

[79] Cl. Reply, ¶ 206.

RD-L 14/2010 to address the tariff deficit, and stated that *(a)* the measures adopted so far had not been sufficient, and the final purpose of eliminating the tariff deficit as from 2013 was still in jeopardy; *(b)* it was therefore considered appropriate to withdraw the economic incentives for certain special regime facilities and for certain ordinary regime facilities using similar technologies, as well as to suspend the remuneration pre-allocation procedures established for them, in order to address the problem of the electricity sector high tariff deficit in a more favourable environment; *(c)* by adopting this measure, the Government had chosen to limit its scope to special regime facilities not yet registered, except where such condition was due to the Administration's failure to comply with the relevant time limit for making a decision; and *(d)* it had been decided to limit the scope of the measure in order to prevent it from affecting investments already made with regard to ordinary regime facilities, not subject to the pre-allocation scheme.

136.    **Act 15/2012**:[80] Act 15/2012 (27 December 2012) on tax measures for energy sustainability introduced a 7% tax on all revenue received from the generation of electricity ("**TVPEE**"), whether from conventional or renewable sources.  The preamble stated that this measure was introduced to address tariff imbalance and to meet environmental concerns: "The purpose of this act is to harmonize our fiscal system with more efficient and environmentally-respectful use and sustainability, which are the values that have inspired this fiscal reform, and as such, in line with the basic principles that govern the fiscal, energy, and of course environmental policy of the European Union."

137.    By Article 1: "The tax on the value of electric power generation is a tax of direct and real nature that charges the performance of activities of production and incorporation of electric power into the electrical system, measured in power plant busbars, through each one of the facilities indicated in Article 4 of this Act."

138.    By Article 4(1): "The taxable event is the production and incorporation into the electrical system of electrical power measured at the busbars…"

---

[80] Act 15/2012 on fiscal measures for the energetic sustainability, 27 December 2012 (C-0068 and R-0003) ("**Act 15/2012**").  *See also* Cl. Mem., ¶¶ 117-126; Resp. C-Mem., ¶¶ 103-121.

139. Act 15/2012 provided that an amount equal to that collected through the TVPEE would be allocated to finance the costs of the Electricity System (Second Additional Provision). It also created three additional taxes, which are not in issue: *(i)* a tax on production of spent nuclear fuel and radioactive waste, *(ii)* a tax on storage of spent nuclear fuel and radioactive waste, and *(iii)* a levy on use of continental waters for electricity production.

140. Act 15/2012 inserted a new provision, Article 112 bis, in RD-L 1/2001 (the Spanish Water Act), imposing a new levy on hydropower concessionaires (i.e. hydropower producers) for using the inland public hydraulic domain to produce electricity (the "**Water Levy**"). The rate applicable to small-hydro facilities with an installed capacity equal to or less than 50 MW (which includes all hydropower installations in which the Claimants hold investments) was 2.2% of the economic value of all hydroelectricity produced using the public hydraulic domain in each annual period.

141. **Act 17/2012**:[81] Act 17/2012 on the general state budget supplemented Act 15/2012 and earmarked an amount equivalent to the tax collected under Act 15/2012 to fund the costs of the electricity system related to promotion of renewable energy.

142. **RD-L 2/2013** and **MO IET/221/2013** implementing RD-L 2/2013:[82] The preamble of RD-L 2/2013 recognised "the dual objective of guaranteeing reasonable profitability for these facilities and, at the same time, avoid their over-remuneration" and said:

> The information provided by [CNE] indicates new variations in the estimates for costs and revenues for 2012 and 2013 year end due to various factors which, in the current economic environment, would make it practically impossible to cover them with a charge to the electricity tariffs and to the categories envisaged in the General State Budgets.
>
> These variations are due in large part to a significant rise in the cost of the special regime due to the operating hours increasing more than anticipated and due to an increase in the remuneration values due to

---

[81] Act 17/2012 on the General State Budget for 2013: Fifth additional provision (R-0023 and R-0258) ("**Act 17/2012**").

[82] Royal Decree-Law 2/2013, on urgent measures on the electric system and the financial sector, 1 February 2013 (C-0075 and R-0063) ("**RD-L 2/2013**"); Ministerial Order IET/221/2013, 14 February 2013 (C-0076) ("**MO IET/221/2013**"); Cl. Mem., ¶¶ 127-134; Resp. C-Mem., ¶¶ 828-840.

their indexation to the Brent price, and a decrease in revenues from tolls due to the sharp drop in demand this year.

The alternative proposed would be a new increase in the access tolls which pay electricity consumers. This measure would directly affect household economies and the competitiveness of companies which are both in a delicate situation due to the current economic situation.

Faced with this scenario, in order to mitigate the situation, the government has contemplated adopting certain urgent cost reduction measures which prevent putting new strain on consumers, allowing them, through consumption and investment, to also collaborate in the economy's recovery.

143.    RD-L 2/2013 effectively eliminated the premium under the "pool price plus premium" option under RD 661/2007 and replaced the CPI-linked updating index in RD 661/2007 with a lower index: *(1)* it ascribed a new value" of "zero" per kWh to the reference premiums (and caps and floors) applicable to Special Regime installations (including small-hydro) under RD 661/2007; *(2)* if a Special Regime facility opted to sell electricity under the "pool price" option (without premium), it would no longer be entitled to choose the regulated tariff option during the remainder of its operational life; and *(3)* with effect from 1 January 2013, it replaced the CPI used for making the annual updates in RD 661/2007 with a "CPI at constant tax rates and excluding unprocessed foods and energy products", the effect of which was that any annual updates to the feed-in remuneration would no longer reflect any variations in the tax rates or inflation in relation to the prices of unprocessed foods and energy products.

144.    On 14 February 2013, Spain implemented several of these changes through the approval of Order 221/2013,[83] which dealt with the access tolls, tariffs and premiums for Special Regime facilities.

145.    **RD-L 9/2013**:[84] RD-L 9/2013, effective as of 14 July 2013, repealed RD 661/2007.  It eliminated the regime of fixed tariffs and premiums both for new and existing installations,

---

[83] MO IET/221/2013.

[84] Royal Decree-Law 9/2013, adopting urgent measures to ensure the financial sustainability of the electric system, 12 July 2013 (C-0107 and R-0064) ("**RD-L 9/2013**").

and substituted a system providing for "specific remuneration" based on "standard" costs per unit of installed power, plus standard amounts for operating costs.

146.    The preamble stated:

> … for a decade the Spanish electric system has been generating a tariff deficit which, over time, has become structural due to the fact that the real costs associated with the regulated activities and the functioning of the electric sector are higher than the revenues from the tariffs set by the state and which consumers pay.
>
> Between 2004 and 2012 the electric system's revenues from tolls on consumers increased 122%, while the increase in the system's regulated costs in the aforementioned period was 197%. Of the costs which have contributed to the largest extent to said increase, the special regime premiums and the annuities of accumulated deficits stand out as costs which have multiplied by six and by nine respectively over the aforementioned period.
>
> According to the most recent data available from the Spanish National Commission for Energy [CNE] the cumulative debt balance amounted to €26,062.51 million at May 10, 2013. As a supplement to the calculation of the electric system's debt, the CNE points out that from 2003 and until May 10, 2013, the amount to be paid to finance the electric system's deficit through the annuities included in the access tolls on consumers, at updated prices for each year, amounts to €11,823 million.
>
> These figures show the unsustainable nature of the electric sector's deficit and the need to adopt urgent measures effective immediately which bring this situation to an end.[85]

147.    Article 1 substituted a new Article 30(4) in the Electricity Act 54/1997:

> In addition and under the terms which are determined in a regulatory manner by royal decree of the Council of Ministers, the remuneration for the sale of energy generated valued at market price, the facilities may receive a specific remuneration composed by a term per unit of installed capacity which covers, where applicable, the investment costs for a standard facility that cannot be recovered through the sale of energy and a term to the operation which covers, if applicable, the difference between the operating

---

[85] RD-L 9/2013 (C-0107t), preamble.

costs and the revenues from this standard facility participating in the market.

To calculate said specific remuneration for a standard facility throughout its regulatory useful life and based on the activity performed by an efficient and well-managed company, the following will be taken into account:

a) The standard revenues from the sale of energy generated valued at the production market price.

b) The standard operating costs.

c) The standard value of the initial investment.

For these purposes, under no circumstances will costs or investments which are determined by regulations or administrative actions which are not applicable throughout Spain be taken into account. Similarly, only the costs and investments which correspond exclusively to the activity of producing electric energy will be taken into account.

…

This remuneration regime will not exceed the minimum level necessary to cover the costs which allow the facilities to compete on equal footing with the other technologies on the market and which allow a reasonable profitability to be obtained with reference to the standard facility applicable in each case. Notwithstanding the foregoing, the remuneration regime may exceptionally also include an investment and execution incentive within a specific period when the facility represents a significant reduction of costs in island and nonmainland systems.

This reasonable profitability will be based on the average yield in the secondary market of ten-year government bonds applying the appropriate spread, before taxes.

The parameters of the remuneration regime may be reviewed every six years.[86]

---

[86] RD-L 9/2013 (C-0107t), Article 1.

43

148.    The reasonable profitability provision was as follows:

> **First additional provision. Reasonable profitability of the production facilities with the right to a premium economic regime.**
>
> Pursuant to that envisaged in the second-to-last paragraph of article 30.4 of Electricity Act 1997, for facilities which, upon the entry into force of this royal decree-law, had the right to a premium economic regime, a profitability before taxes is established based on the average yield over the last ten years in the secondary market of ten-year government bonds, increased by 300 basis points, all of the foregoing without prejudice to the review envisaged in the last paragraph of said article.

149.    Details were left to be determined by implementing decrees.

150.    **Act 24/2013**:[87] Act 24/2013, December 2013, superseded the Electricity Act 54/1997.  It removed the distinction between Ordinary and Special Regimes under RD 661/2007. According to the preamble:

> … a crucial factor in this reform has been the accumulation of annual imbalances between revenues and costs for the electric system over the last decade, resulting in a structural deficit.
>
> This imbalance is due to excessive growth in certain costs as a result of energy policy decisions, with no guarantee of revenues for the system. This situation has been exacerbated by the absence of growth in demand for electricity, due for the most part to the economic crisis.
>
> ... Such is this imbalance that the electric system as a whole has debts of more than twenty-six thousand million euros, a structural deficit of ten thousand million euros a year, and a failure to correct the imbalance has resulted in the prospect of the electric system going bankrupt.
>
> Act 54/1997, of November 27, has proven insufficient to ensure the financial equilibrium of the system due, among other reasons, to the fact that the system for the remuneration of regulated activities has not had the flexibility required to adapt to important changes in the electric system or changes in the economy.

---

[87] Act 24/2013, on the Electric Power Sector, 26 December 2013 (C-0085 and R-0047) ("**Act 24/2013**").

Thus, the experience of the last decade has revealed that the economic and financial instability of the electric system the result of the tariff deficit has made it impossible to guarantee the stable regulatory framework needed for the correct development of a highly investment-intensive activity such as electricity production.

Thus, the economic unsustainability of the electric system, together with the constant evolution of the sector over the last sixteen years, has forced the legislature to adapt Act 54/1997, of November 27, on the Electric Power Sector on a number of occasions, often via the approval of urgent measures by Royal Decree-Law. At present, there is a degree of normative dispersion that is undesirable in such an important sector of the economy.

…

In short, constant rule changes have significantly distorted the normal operation of the electric system, a distortion that must be corrected via action by the legislature that provides the regulatory stability required for electricity production. This regulatory security, together with the need to undertake the reforms required in order to ensure the sustainability of the system in the long-term and to resolve the aforementioned problems in the operation of the system, warrant approval for a reform of the sector as a whole, based on a new regime of revenue and expenditure for the electric system designed to return to the system a financial sustainability it lost long ago, and which it has not been possible to restore to date via the adoption of partial measures.

…

The remuneration regime for renewable energies, cogeneration, and recycling waste will be based on the necessary participation of these facilities in the market, with market revenue to be topped up with a specific level of regulated remuneration that allows these technologies to compete on a level playing field with all other technologies on the market. This specific additional remuneration will be sufficient to cover costs that, unlike conventional technologies, these technologies cannot recover from the market, and will enable them to achieve a reasonable return by reference to the standard facility applicable in each case.[88]

151.    The object of the new regime of revenue and expenditure for the electric system was (Article 1(1)): "to establish regulations for the electric power sector, in order to guarantee

---

[88] Act. 24/2013 (C-0085t), preamble.

electricity supplies and adapt them to the needs of consumers in terms of security, quality, efficiency, objectivity, and transparency, at the lowest possible minimum cost."

152. Act 24/2013 eliminated the distinction between the Ordinary and Special Regimes, on the basis that renewables producers were on the same footing as conventional power generators, except as expressly provided.  It provided for a special payment remuneration scheme subject to revision every six years, with the base line predictions reviewed every three years.

153. Pending implementing regulations (RD on renewable production, subsequently RD 413/2014; and Ministerial Order on remuneration parameters, subsequently MO IET/1045/2014[89]) were to apply from their date of enactment to 14 July 2013.

154. **RD 413/2014**:[90] RD 413/2014 established the new regime, and MO IET/1045/2014 gave details of the new compensation formulas. Together, RD-L 9/2013, Law 24/2013, RD 413/2014, and MO IET/1045/2014 comprised the "**New Regime**".

155. RD 413/2014 stated in Article 1 that its purpose was "to provide a legal and economic framework for the electricity generation activity from renewable energy sources …"  It was to apply "to facilities from renewable energy sources which [did] not reach the minimum level to cover those costs that allow[ed] them to compete on equal terms with the other technologies in the market obtaining a reasonable profitability in the standard facility applicable in each case" (Article 11(2)).

156. To determine the specific remuneration scheme applicable in each case, every facility depending on its features was to have an assigned standard facility, and the remuneration for each facility was to be obtained from the remuneration parameters for the standard facility and the features of the actual facility (Article 11(4), (5)).  By Article 19, reasonable profitability for the standard facility was to be calculated as the average yield of ten-year

---

[89] Ministerial Order IET/1045/2014, approving the remuneration parameters for standard plants applicable to certain facilities which produce power from renewable sources of energy, cogeneration and waste, 16 June 2014 (C-0079 (corrected C-0080 and C-0081) and R-0086) ("**MO IET/1045/2014**").

[90] Royal Decree 413/2014, regulating the activity of power production from renewable sources of energy, cogeneration and waste, 6 June 2014 (C-0078 and R-0080) ("**RD 413/2014**").

Spanish bonds in the secondary market during the 24 months prior to May of the year before the regulatory period increased by one differential.  It was to be based on a standard installation with an operational life of 25 years.

157.   Tariff payments received prior to the inception of the New Regime were to be counted towards the total remuneration which an installation might receive over its deemed operational life, to determine whether the plant had received a reasonable return.  If the installation surpassed the "reasonable return" (7.398%), it would not receive further subsidies.

158.   **MO IET/1045/2014**:[91]  This Ministerial Order (consisting of some 1760 pages) also referred in its preamble to a remuneration model which "ensur[es] the facilities' reasonable profitability."  It set the remuneration parameters for "standard" facilities, including the estimated "standard costs" applied under the new regulatory regime, and the criteria for "standard installations" for different types of renewable.  Under Annex III of the Order, the target rate of return for renewable energy producers is set at 7.398% pre-tax.  This value will apply until 31 December 2019 (until the end of the first regulatory period running from 12 July 2013), and is then subject to discretionary reviews for subsequent regulatory periods.[92]  Order 1045 limits payment of the specific remuneration for small-hydro installations to the regulatory useful life of a hydropower plant, which has been set at 25 years, after which projects will receive no specific remuneration.

159.   **MO IET/1168/2014**:[93]  MO IET/1168/2014, 3 July 2014 determined the automatic registration date for certain facilities on the Specific Remuneration Regime Registry regulated in Title V of RD 413/2014.

---

[91] MO IET/1045/2014.

[92] MO IET/1045/2014, Appendix III, ¶ 1.3 (300 basis points above the average yield of 4.398% on Spanish ten-year government bonds).

[93] Ministerial Order IET/1168/2014, that determines de date of automatic registration of certain facilities on the specific remuneration regime register regulated in Title V of Royal Decree 413/2014, of 6 June, regulating the activity of power production from renewable sources of energy, cogeneration and waste, 3 July 2013 (C-0082).

160.   **MO IET/1344/2015**:[94] MO IET/1344/2015 modified MO IET/1045/2014 to reduce the period of regulatory useful life of certain hydropower facilities.

161.   **RD 198/2015**:[95] RD 198/2015, 23 March 2015 further developed Article 112 bis of the Spanish Water Act, and limited the scope of application of the Water Levy to hydropower plants located in inter-regional river basins.  As with the TVPEE, the Water Levy is applied on the gross value (i.e. the total amount in euros) to be received by the hydropower producer, and was aimed at increasing the electricity system's revenues at the expense of hydroelectric producers.  It also has a disproportionate impact on hydropower plants.

162.   The overall effect was to eliminate the Special Regime generators' entitlement to the regulated tariff.  The only option now available to renewable energy generators is to sell their entire electricity output at market prices, with the possibility "under exceptional circumstances"[96] of receiving from the State an additional specific remuneration, which may include one or both of the following elements: *(1)* a "remuneration to investment" (investment incentive) (RIN), per MW of installed capacity, seeking, in theory, to cover the hypothetical investment costs of a "standard facility" that cannot be met by market prices; and *(2)* a "remuneration to operation" (operating incentive) (ROP), per MWh of electricity produced, seeking to cover the hypothetical operating costs of a "standard facility" (a hypothetical efficient plant) which cannot be met by market prices. *(1)* is calculated on the basis of standard historical values of the operation and performance of a "standard facility" throughout its regulatory lifespan, so that it theoretically reaches a target return; and *(2)* is only received by facilities which have not exceeded a certain number of years of operation (25 years, in the case of small-hydro). Remuneration parameters (including the rate of return) may be revised every three or six years, including for existing

---

[94] Ministerial Order IET/1344/2015, approving the standard facilities and the corresponding remuneration parameters applicable to certain facilities of power production from renewable sources of energy, cogeneration and waste, 2 July 2015 (C-0083) ("**MO IET 1344/2015**").

[95] Royal Decree 198/2015, implementing Article 112 bis of the Consolidated Text of the Water Act, whereby the levy applicable for utilization of continental waters to generate electric power in EU areas is governed, 23 March 2015 (R-0224) ("**RD 198/2015**"); Cl. Mem., ¶¶ 125-126.

[96] Act 24/2013, Article 14(7).

facilities.  The use of CPI as an index to inflation is abandoned.  There are no transitional provisions (no grandfathering for existing facilities).[97]

163.    If the return before July 2013 exceeded the target return, the installation will not be entitled to the regulated revenue even though the scheme did not then exist, as if the scheme had then been in existence.  If the installation passed the "reasonable return" test (7.398%) it will not receive further subsidies.[98]

## IV.    THE PARTIES' REQUESTS FOR RELIEF

164.    In their Rejoinder, the Claimants request that the Tribunal issue an Award:

    a.    DECLARING that the Tribunal has jurisdiction over Claimants' claims in the present arbitration;

    b.    DECLARING that Spain has breached its obligations under Articles 10 and 13 of the ECT;

    c.    ORDERING that Spain:

        (a)    compensate Claimants in full for all losses suffered as a result of Spain's breaches of the ECT, and in particular:

            1)    damages for the lost income to Claimants as a result of Spain's wrongful measures between 1 January 2013 and the date of the Tribunal's Award, in an amount determined as at the date of the Tribunal's Award;

            2)    damages in an amount equal to the diminution in the fair market value of Claimants' debt and equity investments, determined as at the date of the Tribunal's Award;

        (b)    pay, on a full indemnity basis, all of the costs and expenses of these arbitration proceedings, including, without limitation, the fees and expenses: (1) of the members of the Tribunal; (2) of ICSID; (3) relating to Claimants' legal representation (including attorney fees and disbursements); and (4) of any experts or consultants appointed by Claimants (or the Tribunal);

---

[97] First KPMG Report, ¶ 99 *et seq*; Second KPMG Report, ¶ 88 *et seq*.

[98] Second KPMG Report, ¶ 90.

(c) pay post-award interest on sums awarded pursuant to (b)(i) and b(ii) above, at a rate equal to the cost of equity for a hydro plant portfolio in Spain as at the date of the Tribunal's Award plus an additional 2%, compounded annually, from the date of the award until full payment thereof; and

d. DECLARING the Tribunal's Award is made net of all Spanish taxes, and that Spain may not impose any tax on Claimants arising from the Tribunal's Award;

e. DECLARING that Spain indemnify Claimants for the amount of any additional tax liability in Luxembourg and/or Sweden in relation to the compensation awarded in the Tribunal's Award that is attributable to Spain's breaches; and

f. ORDERING any such other and further relief that the Tribunal may deem appropriate in the circumstances.[99]

165. In its Rejoinder, the Respondent requests the Tribunal to:

a) declare its lack of jurisdiction to hear the claims of the Claimant[s], or if applicable their inadmissibility, in accordance with what is set forth in Section III of the present Memorial, referring to Jurisdictional Objections; and

b) Subsidiarily, in the event that the Arbitral Tribunal decides that it has jurisdiction to hear this dispute, to dismiss all the Claimants' claims regarding the Merits, as the Kingdom of Spain has not breached the ECT in any way, pursuant to Sections IV and V herein, referring to the Facts and the Merits, respectively;

c) Secondarily, to dismiss all the Claimant[s'] claims for damages as the [Claimants have] no right to compensation, in accordance with Section V herein; and

d) Order the Claimant[s] to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees, and the fees of the legal representatives of the Kingdom of Spain, their experts and advisers, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred until the date of their actual payment.[100]

---

[99] Cl. Rej., ¶ 76 (internal citations omitted).

[100] Resp. Rej., ¶ 1284.

## V.     SUMMARY OF THE PARTIES' CLAIMS ON JURISDICTION

166.    The Respondent has raised two objections to jurisdiction in this case.

167.    *First*, the Respondent submits that the Claimants are not "investors of *another* Contracting Party" as required under Article 26 of the ECT because the Claimants are incorporated in EU Member States and the Respondent is also an EU Member State.  Given that Spain has not consented to the arbitration of disputes involving an EU Member State and nationals of other EU Member States ("**intra-EU disputes**"), the Claimants cannot be considered as protected investors and the Tribunal therefore lacks jurisdiction *ratione personae*.[101]

168.    *Second*, concerning the TVPEE and the Water Levy, the Respondent argues that the Tribunal lacks jurisdiction to consider *(a)* breaches of Article 10(1) of the ECT because of the taxation carve-out in Article 21 of the ECT; and *(b)* breaches of other standards of protection, given the inapplicability of the Most Favored Nation ("**MFN**") treatment standard of Article 10(7) of the ECT in this case.[102]  The Respondent acknowledges that the Tribunal has jurisdiction to hear an alleged violation of Article 13 of the ECT in relation to the TVPEE and the Water Levy.[103]

169.    The Claimants request the Tribunal to dismiss the Respondent's jurisdictional objections.  *First*, they submit that the Tribunal has jurisdiction *ratione personae* under the ECT.[104]  *Second*, the Claimants argue that the Tribunal has jurisdiction to hear claims concerning the TVPEE and the Water Levy because *(a)* as non-genuine *bona fide* measures, they do not fall within the tax carve-out of Article 21 of the ECT; and *(b)* even if they were considered genuine *bona fide* taxes, they would be taxes for which Spain must comply with its MFN obligation of Article 10(7) of the ECT.[105]

---

[101] *See* Resp. C-Mem., ¶¶ 5, 47-250; Resp. Rej., ¶¶ 5, 76-122.

[102] *See* Resp. C-Mem., ¶¶ 6, 99-102; Resp. Rej., ¶¶ 6-8, 124-223.

[103] Resp. C-Mem., ¶¶ 142-144.

[104] *See* Cl. Reply, ¶¶ 376-402; Cl. Rej., ¶¶ 3-30.

[105] *See* Cl. Reply, ¶¶ 403-432; Cl. Rej., ¶¶ 32-75.

A. **First Objection: Lack of Jurisdiction over an Intra-EU Dispute**

170.   The Respondent's jurisdictional objection concerning the alleged inapplicability of Article 26 of the ECT to intra-EU disputes was first raised in its Counter-Memorial and in its Rejoinder.[106]   On 6 March 2018, the Court of Justice of the European Union ("**CJEU**") rendered a ruling in the *Achmea* case.[107]   At the Hearing, the Respondent focused its jurisdictional arguments on the *Achmea* ruling.[108]   The Claimants did not address the Respondent's jurisdictional objections at the Hearing and referred the Tribunal to their written submissions in this regard.[109]   The Parties subsequently submitted post-hearing briefs and additional submissions which included their positions on this objection.   A brief summary of the Parties' positions regarding the "intra-EU" objection is provided below.

(1) **The Respondent's Position**

171.   The Respondent objects to the Tribunal's jurisdiction *ratione personae* arguing that the Claimants are not "investors of *another* Contracting Party" as required under Article 26 of the ECT because they are incorporated in Luxembourg and Sweden which are EU Member States and the Respondent is also an EU Member State; besides, Luxembourg, Sweden and Spain were members of the EU at the time they entered into the ECT.[110]   In the Respondent's view, the ECT does not apply to disputes relating to "intra-EU" investments.[111]

172.   In its Counter-Memorial, the Respondent raised three main arguments in support of this objection: *(a)* the EU system confers particular protection upon the EU-national investor, which is of preferential application over the provisions of the ECT;[112] *(b)* the prevalence

---

[106] *See*, e.g. Resp. C-Mem., ¶¶ 47-54, 98; Resp. Rej., ¶ 5.

[107] *Slowakische Republik v Achmea BV*, Case C-284/16, Ruling of the Court of Justice of the European Union (Grand Chamber), 6 March 2018 (RL-0105) ("*Achmea*" or "*Achmea* **ruling**").

[108] Tr. Day 1, (Torres Gella) 172:22-23 *et seq.*

[109] Tr. Day 1, (Verhoosel) 11: 2-11:9.

[110] Resp. C-Mem., ¶¶ 47-49, 98; Resp. Rej., ¶¶ 76-77, 122.  *See also* Resp. Comments on EC Submission, ¶¶ 33, 37.

[111] Resp. C-Mem., ¶¶ 47, 98.

[112] Resp. C-Mem., ¶¶ 55-63.

of EU law among EU Member States is reflected in the literal interpretation, context and purpose of the ECT;[113] and *(c)* commentators also support the Respondent's position.[114]

173. **First**, the Respondent submits that the ECT is not applicable in this case because the EU system confers particular and preferential protection upon the EU-national investors within the framework of the Internal Market in Electricity of the EU.[115] According to the Respondent, the Claimants' investments were made within the EU's integral system for intra-EU investments, which guarantees promotion and protection of those investments through its institutional and judicial framework.[116]

174. To decide this arbitration, the Respondent claims that the Tribunal would have to deliver an opinion on the rights of intra-EU investors as regards Spain and the Internal Market in Electricity, which would interfere with the competence of the EU judicial system.[117] The Respondent argues that the EU investor protection system prevails over any other national or international law to regulate intra-EU investments, and therefore this system is "of preferential application over the provisions of the ECT" in this case.[118] The Respondent argues that prior arbitral tribunals have agreed that in case of conflict between the ECT and EU law, the latter shall prevail over the former.[119]

175. **Second**, the Respondent argues that the prevalence of EU law among EU Member States is supported by the text, context and purpose of the ECT.[120]

---

[113] Resp. C-Mem., ¶¶ 64-86.

[114] Resp. C-Mem., ¶¶ 87-97.

[115] Resp. C-Mem., ¶¶ 51, 55.

[116] Resp. C-Mem., ¶¶ 55-61.

[117] Resp. C-Mem., ¶¶ 53, 75.

[118] Resp. C-Mem., ¶ 55.  *See also id.*, ¶¶ 51, 63-64; Resp. Rej., ¶ 82.

[119] Resp. C-Mem., ¶ 73; Resp. Rej., ¶¶ 88-89 (citing *Electrabel S.A. v Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 (RL-0002) ("***Electrabel v Hungary* Decision**"), and *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016) (RL-0075) ("***Blusun v Italy***")).

[120] Resp. C-Mem., ¶¶ 64-86.  *See also* Resp. Rej., ¶ 97.

176.    Concerning the text of the ECT, the Respondent draws attention, *inter alia*, to: *(a)* Article 1(2), which includes Regional Economic Integration Organisations ("**REIO**") such as the EU under the definition of the "Contracting Parties" and Article 1(3), which recognizes the binding nature of competences conferred to the EU by its member states;[121] *(b)* Article 16 establishing the rules of compatibility between the ECT and other treaties, including EU treaties, which prevail over the ECT in intra-EU relations;[122] *(c)* Article 25 which prevents the applicability of the EU's system of preferential treatment to other ECT Contracting Parties that are not EU Member States via the MFN clause;[123] *(d)* Article 36(7), which provides REIOs with votes equivalent to the number of its member states which are Contracting Parties to the ECT when voting on matters over which it has competence;[124] and *(e)* Article 26(6) that requires disputes to be resolved "in accordance with this Treaty and applicable rules and principles of International law" and means that the Tribunal must interpret the dispute settlement provision of Article 26 of the ECT in accordance with EU law, which is applicable international law.[125]

177.    Pursuant to Article 26(6) of the ECT, the Respondent submits that the Tribunal should consider Article 344 of the Treaty on the Functioning of the European Union ("**TFEU**"), the application of which prevents Spain from submitting any matters relating to the EU's Internal Market in Electricity (such as this dispute) to any dispute settlement method other than the EU judicial system.[126]

178.    Regarding the context of the ECT, the Respondent mentions that at the time the ECT was signed, the Member States of the then European Community were unable to contract obligations between them as regards the Internal Market (as it is an area in which they had

---

[121] Resp. C-Mem., ¶¶ 65-67.

[122] Resp. C-Mem., ¶ 69.

[123] Resp. C-Mem., ¶ 70.

[124] Resp. C-Mem., ¶ 71.

[125] Resp. C-Mem., ¶¶ 72-73, 92.  *See also* Resp. Rej., ¶¶ 98, 882-884; Respondent's Comments on the Declaration of the Representatives of the Governments of the Member States of 15 January 2019, on the Legal Consequences of the Judgement of the Court of Justice in *Achmea* and on Investment Protection in the European Union, 12 February 2019 ("**Resp. Comments on EU Members Declarations**"), ¶ 15.

[126] Resp. C-Mem., ¶¶ 73-74, 91.

transferred their sovereignty to the then European Community) and for this reason the EU is a Contracting Party to the ECT.  Therefore, Article 26 of the ECT does not generate obligations between the EU Member States.[127]

179.    According to the Respondent, the object and purpose of the ECT confirms its intra-EU dispute objection because admitting intra-EU disputes within the scope of the ECT's application would mean that the EU and its Member States promoted the ECT to cover intra-EU investments which had been already regulated by EU law in a superior manner.[128] The Respondent contends that such interpretation and application would take away competencies from the CJEU and lead to mistrust of the EU's protection system.[129]

180.    ***Third***, the Respondent claims that its position with regard to the exclusion of intra-EU disputes from the ECT dispute settlement mechanism is also endorsed by doctrine.[130]

181.    In its Rejoinder, the Respondent introduced two further arguments in support of its "intra-EU" objection: ***(i)*** under the "principle of primacy" of EU law in intra-EU relations, it is EU law and not the ECT which must be applied to resolve this dispute;[131] and ***(ii)*** the Tribunal lacks jurisdiction under the ICSID Convention in view of the Claimants' dual nationality.[132]

182.    ***First***, the Respondent argues that pursuant to the principle of primacy established by the ECJ in the ruling in 1964 in *Costa v ENEL*, EU law applies to intra-EU relations in preference to any other law, "displacing any other national or international provision".[133] According    to    the    Respondent,    the    principle    of    primacy    implies    that    the

---

[127] Resp. C-Mem., ¶ 80.

[128] Resp. C-Mem., ¶¶ 83-85.  *See also* Resp. Rej., ¶¶ 109-112.

[129] Resp. C-Mem., ¶ 83.

[130] Resp. C-Mem., ¶¶ 87-90 (citing Bruno Poulain, *Développements récents du droit communautaire des investissements internationaux*, Revue Générale de Droit International Public, C XIII/2009, 4 (RL-0060), p 881; and Jan Kleinheisterkamp, *Investment protection and EU Law: the intra- and extra- EU dimension of the Energy Charter Treaty*, Journal of International Economic Act 15(1), Oxford University Press 2012 (RL-0064), pp 101, 103 and 108).

[131] Resp. Rej., ¶¶ 80-92.

[132] Resp. Rej., ¶¶ 115-121.

[133] Resp. Rej., ¶ 82.  *See also id*., ¶¶ 80-81 (citing *Flaiminio Costa v ENEL*, Judgement of the European Court of Justice, Case 6/64, 15 July 1964 (RL-0081) ("***Costa v ENEL***")).

obligations of EU Member States *vis-à-vis* international treaties are subsidiary to their obligations to the EU.[134] Therefore, for the ECT to be interpreted in conformity with EU law, the principle of primacy prevents the ECT from incorporating an offer to arbitrate intra-EU disputes.[135]

183.    Among other arguments, the Respondent submits that: *(a)* Articles 25 and 26 of the ECT recognise the primacy of EU law in the context of intra-EU relations (to the extent that Article 25 refers to "preferential treatment" applicable between the parties to an economic integration agreement and Article 26 requires the application of EU law to the dispute as it forms part of the rules and principles of international law applicable to the Parties' dispute under Article 26(6));[136] and *(b)* EU law, not the ECT, should apply because this dispute affects essential elements of EU law such as State aid.[137]

184.    In relation to its argument about the principle of primacy of EU law, the Respondent submits that EU law constitutes part of public international law and thus "applicable rules and principles of international law" under Article 26(6) of the ECT.[138]  Also, it considers that "the ECT is part of Union law".  Thus, an arbitral tribunal must necessarily take into account EU law in its jurisdictional review.[139]

185.    *Second*, the Respondent argues that the Tribunal lacks jurisdiction under Article 25 of the ICSID Convention because the Claimants hold dual Luxembourg-European and Swedish-European nationality.  According to the Respondent: *(a)* Article 20 of the TFEU establishes that all citizens of an EU Member State simultaneously hold European nationality; *(b)* the EU and the Member States made an express declaration regarding Article 25 of the ECT to clarify that that legal persons incorporated in accordance with the legislation of any Member State should be treated in the same way as natural persons who are nationals of the Member States; and *(c)* Article 25(2)(a) of the ICSID Convention precludes natural

---

[134] *See* Resp. Comments on EC Submission, ¶¶ 2, 7-14.

[135] *See* Resp. Comments on EU Members Declarations, ¶ 16.

[136] Resp. Rej., ¶¶ 83-84, 87-88.

[137] Resp. Rej., ¶ 92.

[138] Resp. Comments on EC Submission, ¶ 13.

[139] Resp. Comments on EC Submission, ¶¶ 20, 43-44.

persons with dual nationality from filing an arbitration claim.[140] Therefore, the Respondent argues that because the Claimants hold "dual nationality", they do not meet the jurisdictional requirement of Article 25(2)(a) of the ICSID Convention.[141]

186.    At the Hearing and during the post-hearing submissions, the Respondent focused its jurisdictional arguments on the *Achmea* ruling.[142]   The Respondent submits that this ruling applies in the context of the ECT and confirms the Respondent's intra-EU objection in this case.[143]

187.    The Respondent refers to paragraph 60 of the *Achmea* ruling which reads as follows:

> Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States … under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[144]

188.    Concerning the relevance of this decision the Respondent mentions, *inter alia*, the following: *(i)* the findings of the ruling are not a novelty but reflect consolidated case law that dates back to 1991;[145] *(ii)* the ruling's scope of application is not limited to BITs but it extends to any international treaty, including the ECT;[146] *(iii)* the ruling is applicable in this case because it concerns an intra-EU dispute in which the Tribunal is obliged to apply EU law;[147] and *(iv)* given that the Tribunal does not form part of the EU judicial system

---

[140] Resp. Rej., ¶ 116.

[141] Resp. Rej., ¶¶ 115-121.

[142] Tr. Day 1, 172:22 *et seq.*; Resp. PHB, ¶¶ 34-52; Respondent's Comments on *Vattenfall* Decision and the EC Communication, 5 October 2018 ("**Resp. Comments on *Vattenfall* Decision**"); Resp. Comments on EC Submission, ¶¶ 19-30; and Resp. Comments on EU Members Declarations.

[143] *See*, e.g. Resp. PHB, ¶ 34; Resp. Comments on EC Submission, ¶¶ 19-30.

[144] Resp. PHB, ¶ 35 (citing *Achmea*).

[145] Tr. Day 1, 185:16-186:15; Resp. PHB, ¶ 36.

[146] Tr. Day 1, 174:1 *et seq.*; Resp. PHB, ¶¶ 38, 40, 51-52.

[147] Resp. PHB, ¶ 47.

and therefore cannot make a question for a preliminary ruling to the CJEU under Article 267 of the TFEU, the Tribunal lacks jurisdiction over this intra-EU dispute.[148]

189.  ***First***, the Respondent claims that the CJEU applied a consolidated case law referring to multilateral treaties that dates back to 1991.  According to this case law, the Respondent notes that the *Achmea* ruling endorses the following principles: ***(a)*** pursuant to Article 344 of the TFEU, an international agreement "cannot affect the allocation of powers fixed by the Treaties in the EU legal system"; ***(b)*** EU law has primacy over the laws of the Member States; ***(c)*** pursuant to Article 19 of TFEU, it falls on the national courts and the CJEU to "ensure the full application of EU law" in order to maintain consistency and uniformity in the interpretation of EU law; ***(d)*** the preliminary ruling system established in Article 267 of the TFEU aims to secure the uniform interpretation of EU law and ensure its consistency; and ***(e)*** EU law is both part of the law of each EU Member State and also derives from an international agreement between the Member States.[149]

190.  According to the Respondent, the CJEU concluded that these principles were not fulfilled in *Achmea* because: ***(a)*** the investment arbitration tribunal established may be called upon to interpret or apply EU law as international applicable law or national law; ***(b)*** the tribunal was not part of the EU judicial system; ***(c)*** the tribunal did not meet the classification of a court of a Member State under the Article 267 of the TFEU and therefore could not make reference to the CJEU for a preliminary ruling; ***(d)*** the tribunal's decision was final and judicial review by national courts was limited; ***(e)*** the dispute involved investment arbitration and commercial arbitration case law could not be applied; and ***(f)*** the States involved established a dispute resolution method that could prevent the disputes from being resolved ensuring the full effectiveness of EU law, even though the dispute may concern application or interpretation of EU law.[150]

---

[148] Resp. PHB, ¶¶ 48-49.  *See also* Tr. Day 1, 180:21-181:2.

[149] Resp. PHB, ¶ 36.

[150] Resp. PHB, ¶ 37.

191.   The Respondent argues that the above-mentioned principles and conclusions should apply to the disputes under the ECT involving interpretation or application of EU law.[151]

192.   **Second**, the Respondent contends that the *Achmea* ruling refers to any "international agreement", including the ECT, and therefore it does not limit its effects to BITs.[152] In this regard, the Respondent submits that the grounds of the *Achmea* ruling are not formalistic (i.e. based on the bilateral nature of the treaty at issue), but substantive because they refer to the nature and characteristics of the arbitral jurisdiction faced with EU law.[153]

193.   **Third**, relying on the above observations, the Respondent concludes that the reasoning in *Achmea* is applicable in the present case because the Tribunal may be called upon to interpret and apply EU law given that "the core of the dispute affects [a] key institution of EU Law, such as State Aid, which was created by EU Law to ensure the efficiency of the internal market of the EU."[154]

194.   **Fourth**, because the Tribunal does not form part of the EU judicial system and cannot request a preliminary ruling to the CJEU under Article 267 of the TFEU, the Respondent concludes that this Tribunal lacks jurisdiction to hear the present dispute.[155]

195.   In addition, the Respondent disputes the Claimants' reliance on prior tribunals constituted under the ECT which upheld their jurisdiction despite an intra-EU objection. For instance, the Respondent argues that the *Masdar v Spain* award is inconsistent with paragraphs 31 to 57 of the *Achmea* ruling which refer to both bilateral and multilateral treaties;[156] and that the reasoning in *Vattenfall v Germany*[157] was inadequate as the tribunal started its analysis

---

[151] Resp. PHB, ¶ 38.

[152] Resp. PHB, ¶ 38; Resp. Comments on EC Submission, ¶¶ 25, 29.

[153] Tr. Day 1, 175:2-175:7; Resp. PHB, ¶ 40.

[154] Resp. PHB, ¶ 47.  *See also id.*, ¶¶ 41-46.

[155] Resp. PHB, ¶¶ 48-49.

[156] Resp. PHB, ¶¶ 50-52 (referring to *Masdar Solar & Wind Cooperatief U.A. v Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018 (CL-0146) ("*Masdar v Spain*")).

[157] Referring to *Vattenfall AB, Vattenfall GmbH, Vattenfall Europe Nuclear GmbH, Kernkraftwerk Krümel GmbH & Co. oHG, Kernkraftwerk Brunsbüttel GmbH & Co. oHG v Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018 (CL-0148) ("*Vattenfall v Germany*" or "*Vattenfall Decision*"). *See* Resp. Comments on *Vattenfall* Decision.

from flawed premises under international law and did not actually address the relevance of *Achmea*.

196.    Finally, with regard to the declarations made by EU Members States on 15 and 16 January 2019 regarding the *Achmea* ruling, the Respondent considers, *inter alia*, that the declaration adopted by the majority of Member States "confirms that Article 26 of the ECT cannot be considered a valid consent to arbitration in the case of intra-EU disputes for it would be incompatible with the autonomy and primacy of EU law."[158]

### (2) **The Claimants' Position**

197.    The Claimants submit that they meet the jurisdictional requirements of Article 26 of the ECT and Article 25 of the ICSID Convention.[159]  They request the Tribunal to dismiss the Respondent's "intra-EU" jurisdictional objection, which has been rejected by numerous Tribunals.[160]

198.    In their Memorial, the Claimants set forth the jurisdictional bases for their claims under the ECT and the ICSID Convention. Concerning the ECT, the Claimants submit that: *(a)* Spain is a "Contracting Party" to the ECT, as the ECT entered into force with respect to Spain on 16 April 1998;[161] *(b)* each of the Claimants is an "investor of another Contracting Party", as they are companies incorporated under the laws of Luxembourg (Hydro Energy) and Sweden (Hydroxana), States for which the ECT entered into force on 16 April 1998;[162] *(c)* the dispute relates to an "investment" in the area of Spain, as the Claimants hold shareholding and debt interests in Spanish companies that own and operate hydropower generation installations, as well as interests in those installations, claims to

---

[158] Resp. Comments on EU Members Declarations, ¶ 26.

[159] *See* Cl. Mem., ¶¶ 185-212.

[160] *See* Cl. Reply, ¶ 377; Cl. Rej., ¶¶ 3-5; and Claimants' letter concerning the *Vattenfall* Decision and the Communication of 19 July 2018 from the Commission to the European Parliament and the Council on the "Protection of intra-EU investment", 5 October 2018 ("**Cl. Comments on *Vattenfall* Decision**"), ¶ 31.

[161] Cl. Mem., ¶¶ 185-186.

[162] Cl. Mem., ¶¶ 187-188.

money, and rights conferred by law (including those conferred by RD 661);[163] *(d)* the Parties have consented to the arbitration of this dispute under the ECT, as Spain has given its "unconditional consent to the submission of a dispute to international arbitration" pursuant to Article 26(3) of the ECT and the Claimants have consented in writing to this arbitration by filing their Request for Arbitration pursuant to Article 26(4) of the ECT;[164] and *(e)* the Claimants sought to resolve the dispute by negotiation before commencing arbitration, consistent with Article 26(1) of the ECT.[165]

199. The Claimants further argue that the jurisdictional requirements of Article 25 of the ICSID Convention have been met in this case, as they submit a legal dispute between a Contracting State and nationals of other Contracting States arising out of their investments in the hydropower generation sector in Spain, which they and Spain have consented in writing to submit to the Centre.[166]

200. In their Reply, the Claimants address the "intra-EU" objection raised by the Respondent in its Counter-Memorial and request the Tribunal to find that it has jurisdiction *ratione personae* under the ECT on the basis that: *(i)* the argument that the ECT is incompatible with EU law is irrelevant because the Claimants do not base their claims on breaches of EU law and, in any event, non-EU courts and tribunals are not precluded from applying or interpreting EU law;[167] *(ii)* nothing in the text, context or purpose of the ECT suggests the exclusion of intra-EU disputes;[168] and *(iii)* the commentators cited by the Respondent are of no assistance to its position.[169]

---

[163] Cl. Mem., ¶¶ 189-192.
[164] Cl. Mem., ¶¶ 193-195.
[165] Cl. Mem., ¶¶ 199-201.
[166] Cl. Mem., ¶¶ 203-212.
[167] Cl. Reply, ¶¶ 378-382.
[168] Cl. Reply, ¶¶ 383-400.
[169] Cl. Reply, ¶ 401.

201.  ***First***, the Claimants submit that the Respondent's argument of incompatibility between EU law and the ECT is misguided because it is based on the wrong assumption that the Claimants' claims are based on breaches of EU law.[170]  The Claimants submit that their claims in this case concern their rights under the ECT, not their rights in the EU's Internal Market in Electricity.  The Tribunal is therefore not required to analyse the Claimants' rights under the EU's integral system and, accordingly, the matter does not hinder the competence of the EU.[171]

202.  The Claimants rely on the findings of prior tribunals to assert that, notwithstanding the "intra-EU" nature of a dispute, tribunals constituted pursuant to the ECT or intra-EU BITs have jurisdiction over investment-treaty claims because "such claims are not based on a breach of EU Law but rather on a violation of the investment treaty in question."[172]  Hence, the Claimants argue that the question of incompatibility of the ECT with EU law is not relevant in this case because there is no such conflict presented.[173]  In other words, "the ECT (not EU law) is the applicable law to determining the Tribunal's jurisdiction."[174]

203.  The Claimants further contend that the Respondent's argument is irrelevant since the application of EU law by an arbitral tribunal does not jeopardise the uniform application of EU law.  In this regard, the Claimants refer to the findings of a prior tribunal in support that non-EU courts and tribunals are not precluded from applying or interpreting EU law.[175]

204.  ***Second***, the Claimants dismiss the Respondent's interpretation of the ECT provisions and submit that nothing in the text, context or purpose of the ECT suggests the exclusion of intra-EU disputes.[176]

---

[170] Cl. Reply, ¶ 379.

[171] Cl. Reply, ¶¶ 378-382.

[172] Cl. Reply, ¶ 380 (emphasis omitted).  *See also id.*, ¶ 381.

[173] Cl. Reply, ¶ 378.  *See also* Cl. PHB, ¶ 215.

[174] Cl. Comments on EC Submission, ¶ 14.

[175] Cl. Reply, ¶ 382 (citing *Isolux Infrastructure Netherlands, B.V. v Kingdom of Spain*, SCC Case No. V2013/153, Award, 12 July 2016 (CL-0108/CL-108t, RL-0069 and RL-0071) ("***Isolux v Spain***"), ¶ 654).

[176] Cl. Reply, ¶¶ 383-400.

205.    Regarding the text of the ECT, the Claimants argue that: *(a)* Article 1(3) of the ECT does not imply any limitation on the consent to arbitration of Contracting Parties to the ECT which belong to the same REIO;[177] *(b)* Article 16 provides that the provisions of another agreement cannot derogate from the provisions of the ECT where a provision of the ECT is more favourable to the investor;[178] *(c)* Article 25 does not preclude REIO members to agree to other obligations under a different treaty regime, in this case the ECT;[179] *(d)* the voting provision under Article 36(7) has no bearing on Spain's argument regarding an alleged allocation of competences at the time of the ECT's conclusion;[180] and *(e)* Article 26 does not exclude intra-EU disputes.

206.    With respect to Article 26, the Claimants argue that nothing in its text or context, nor in the object of the ECT provides any basis for an exclusion of intra-EU ECT disputes.[181] For instance, the Claimants contend that the ECT does not contain any disconnection clause in respect of intra-EU disputes and if the ECT Contracting Parties wished to exclude intra-EU disputes from the treaty's scope, they would have included such clause.[182] In addition, the Claimants argue that the fact that the EU was an initial party to the ECT (together with its Member States, including Spain) reinforces their argument as it implies that the EU and its Member States, at the time of the ECT's ratification, "had both the competence and the intention to enter into and create obligations between themselves".[183]

207.    The Claimants also dismiss the Respondent's reliance on Article 344 of the TFEU. They note that Article 344 of the TFEU concerns inter-State disputes concerning the EU founding treaties (which are not at issue in this case), not disputes between a Contracting Party and an Investor of another Contracting Party.[184] In other words, "there

---

[177] Cl. Reply, ¶¶ 395-399.
[178] Cl. Reply, ¶ 400(a).
[179] Cl. Reply, ¶ 400(b).
[180] Cl. Reply, ¶ 400(c).
[181] Cl. Reply, ¶¶ 384-386. *See also* Cl. Comments on EC Submission, ¶¶ 11-13.
[182] Cl. Reply, ¶ 386.
[183] Cl. Reply, ¶ 387.
[184] Cl. Reply, ¶¶ 389-390.

is no conflict between the ECT and EU law in this regard, because Articles 267 and 344 TFEU do not concern the same subject matter as Part III or Part V of the ECT".[185]

208.    The Claimants also distinguish arbitral decisions relied on by the Respondent; for instance, they state that the tribunal in *Electrabel v Hungary* concluded that there was "no material inconsistency between the ECT and EU law" and that EU law was not an obstacle to its jurisdiction.[186]   Instead, they point to the decisions of other tribunals which have shared the Claimants' interpretation.[187]

209.    ***Third***, the Claimants submit that the commentators cited by the Respondent are of no assistance to its position.[188]

210.    In their Rejoinder, the Claimants further claim that: ***(i)*** Spain's reliance on the primacy of EU law is misguided;[189] and ***(ii)*** the Claimants are not 'dual' corporate nationals nor precluded from bringing a claim under Article 25(2)(a) of the ICSID Convention.[190]

211.    ***First***, the Claimants argue that the Respondent's reference to the *Costa v ENEL* judgment is inapposite because that case concerned a finding that a subsequent, unilateral measure by an EU Member State could not conflict with existing EU relations.  As such, that case is irrelevant in this context because it concerned only the national law of a Member State (not international treaties, such as the ECT), and because the ECT (unlike the measure at issue in that case) is not a unilateral act but an international treaty.[191]

---

[185] Cl. Comments on EC Submission, ¶ 28.

[186] Cl. Reply, ¶ 391.

[187] Cl. Comments on EC Submission, ¶ 28 (citing *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l., v Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016 (CL-0112) ("***RREEF v Spain* Decision on Jurisdiction**"), ¶ 79; and *Vattenfall* Decision, ¶ 212).

[188] Cl. Reply, ¶¶ 401-402.

[189] Cl. Rej., ¶¶ 8-23.

[190] Cl. Rej., ¶¶ 24-30.

[191] Cl. Rej., ¶¶ 9-10.  *See also* Cl. Comments on EC Submission, ¶¶ 30-31.

212.    The Claimants also reject the Respondent's argument that the ECT itself expressly recognises the primacy of EU law in the context of intra-EU relations.  In their view, this argument is at odds with several provisions of the ECT, particularly Article 16(2).[192] According to this provision, if a Contracting Party to the ECT has entered into an agreement prior to the ECT concerning the same subject matter, the provisions of the prior agreement cannot derogate from the provisions of the ECT where a provision of the ECT is more favorable to the investor.[193]  Given that the EU treaties do not contain substantive or procedural protections equivalent to Articles 10(1), 13 and 26 of the ECT, the provisions of the ECT (which are more favorable to the investor in accordance with Article 16(2)) should prevail.[194]

213.    In addition, the Claimants submit that the Respondent's argument that EU law, not the ECT, should apply because this dispute affects essential elements of EU law should be rejected, *inter alia*, as the Claimants' claims only concern their rights under the ECT and not any issues of State aid.[195]

214.    Moreover, the Claimants refer to the findings of the *Eiser v Spain* tribunal which dismissed Spain's argument that Article 26(6) of the ECT precludes the jurisdiction of an ECT tribunal because it would imply introducing "a major, if unwritten, exception into the coverage of the ECT on the back of a somewhat intricate argument regarding choice of law" and disagreed "that the drafters of the ECT either intended or accomplished this result".[196]

---

[192] Cl. Rej., ¶¶ 10-16.

[193] Cl. Rej., ¶ 12; Cl. Reply, ¶ 400.

[194] *See* Cl. Rej., ¶ 14.

[195] Cl. Rej., ¶¶ 17-19.  *See also* Cl. Comments on EC Submission, ¶¶ 43-45.

[196] Cl. Rej., ¶ 20 (citing *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à.r.l. v Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017 (CL-0092 and RL-0073) ("***Eiser v Spain***"), ¶¶ 197-199).

215.    **Second**, the Claimants reject the Respondent's argument that the Claimants are "dual" corporate nationals of both their home EU Member States as well as of the EU, in contravention of Article 25(2)(a) of the ICSID Convention.[197]

216.    The Claimants submit that the Respondent's argument is wrong as a matter of fact because the concept of "EU nationality" does not exist.  While Article 20 of the TFEU establishes citizenship of the EU, it does not establish EU nationality and instead acknowledges that nationality and citizenship are different concepts.  In fact, the EU is composed of citizens who by definition do not share the same nationality.[198]

217.    The Claimants argue that the Respondent's submission is also wrong as a matter of law because the Claimants are not natural persons but companies, and as such they qualify as "juridical persons" for purposes of Article 25(2)(b) of the ICSID Convention which does not contain any stipulation against dual corporate nationality.[199]

218.    In its post-hearing submissions, the Claimants submit that the *Achmea* ruling is not applicable to the context of the ECT.[200]

219.    The Claimants argue that the *Achmea* ruling does not apply to the ECT.[201]  The Claimants dispute the Respondent's reliance on the ruling for two main reasons: *(i)* the CJEU stated in clear terms that its ruling in *Achmea* does not apply to the ECT, and Spain has acknowledged this;[202] and *(ii)* an ECT tribunal is obliged to uphold its "constitutional" instrument, namely the ECT.[203]

---

[197] Cl. Rej., ¶ 24.

[198] Cl. Rej., ¶¶ 26-29.

[199] Cl. Rej., ¶ 25.

[200] Cl. PHB, ¶ 206.

[201] *See* Cl. PHB, ¶¶ 207-209.

[202] Cl. PHB, ¶¶ 202-212.

[203] Cl. PHB, ¶¶ 213-217.  *See also* Cl. Comments on EC Submission, ¶ 29.

220.  ***First***, the Claimants submit that prior to the *Achmea* ruling, the Respondent acknowledged that such ruling would have no bearing on the present case under the ECT.[204]  In addition, the Claimants highlight that the *Achmea* case concerned a BIT dispute and the CJEU stated expressly that the ruling had no bearing on a treaty such as the ECT.[205]  The Claimants cite in this regard paragraphs 57 through 58 of the *Achmea* ruling which read:

> It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law. The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected…
>
> In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU is provided for by an agreement which was concluded not by the EU but by Member States.[206]

221.  The Claimants draw support for their argument from the award in *Masdar v Spain*, the first investment treaty tribunal to decide on the implications of the *Achmea* ruling, and the tribunal's decision in the *Vattenfall v Germany* case.[207]  For instance, the Claimants state that the tribunal in *Masdar v Spain* affirmed that the *Achmea* ruling cannot be applied to multilateral treaties including the ECT and "pertains only to BITs concluded between

---

[204] Cl. PHB, ¶ 206 (citing Resp. Rej., ¶¶ 79, 96).

[205] Cl. PHB, ¶¶ 202, 207.  *See also* Cl. Comments on EC Submission, ¶¶ 16, 25; Claimants' letter concerning the Declarations of the Representatives of the Governments of the Member States of 15 and 16 January 2019, and the Declaration of the Representative of the Government of Hungary of 16 January 2019 regarding the Judgment of the Court of Justice of the European Union in *Achmea*, 19 February 2019 ("**Cl. Comments on EU Members Declarations**"), ¶ 3.

[206] Cl. PHB, ¶ 207 (quoting *Achmea*, ¶¶ 57-58, emphasis omitted).

[207] Cl. PHB, ¶¶ 208-211; Cl. Comments on EC Submission, ¶¶ 20-22; Cl. Comments on *Vattenfall* Decision; Cl. Comments on EU Members Declarations, ¶ 3.

EU Member States".[208]  The Claimants agree with this reasoning and add that the tribunal in that case noted that the wording of the question submitted to the CJEU for a preliminary ruling specifically refers to "bilateral investment protection agreement between Member States of the European Union".[209]

222.    The Claimants further disagree with the Respondent's argument that, prior to *Achmea*, the incompatibility of arbitration provisions in multilateral agreements to which the EU is a signatory with EU law had been already established.[210]  In the Claimants' view, the CJEU took into account relevant and recent authorities in reaching its conclusions at paragraphs 57 and 58 quoted above.[211]

223.    ***Second***, the Claimants maintain that in the event of contradiction between the ECT and EU law, the Tribunal has to "uphold the application of its 'constitutional' instrument – the ECT – on which its jurisdiction is founded".[212]  For the Claimants, this argument is also supported by Article 16 of the ECT, which provides that the ECT prevails over any other norm.[213]  It is the Claimants' submission, therefore, that EU law does not prevail over the ECT nor can it trump public international law.[214]

224.    Finally, with regard to the declarations made by EU Members States on 15 and 16 January 2019 regarding the *Achmea* ruling, the Claimants consider that the political nature of such declarations "cannot have any *legal* bearing on the ECT or in relation to arbitration being heard thereunder".[215]

---

[208] Cl. PHB, ¶ 209 (quoting *Masdar v Spain*, ¶ 680 (internal quotation marks omitted).  *See also* Cl. Comments on EC Submission, ¶ 18.

[209] Cl. PHB, fn 37 (quoting *Masdar v Spain*, ¶ 680).

[210] Cl. PHB, ¶ 212.

[211] Cl. PHB, ¶ 212.

[212] Cl. PHB, ¶ 215 (citing *RREEF v Spain* Decision on Jurisdiction, ¶ 75).

[213] Cl. PHB, ¶ 216.  *See also* Cl. Comments on EC Submission, ¶¶ 32, 39.

[214] Cl. PHB, ¶¶ 214, 216.

[215] Cl. Comments on EU Members Declarations, ¶ 3 (emphasis in the original).

225.   For the reasons above, the Claimants argue that the Tribunal has jurisdiction to hear this dispute.

B.  **Second Objection: Lack of Jurisdiction in View of the Taxation Carve-out in Articles 21 and 10(7) of the ECT**

(1)  **The Respondent's Position**

226.   The Respondent submits that the Tribunal lacks jurisdiction over the Claimants' claims relating to the alleged violation of the Respondent's obligations under the ECT arising out of measures introduced by Act 15/2012, namely the TVPEE and the Water Levy.[216]

227.   In particular, the Respondent objects to the Tribunal's jurisdiction to hear: *(i)* breaches of Article 10(1) of the ECT given the taxation carve-out in Article 21 of the ECT; and *(ii)* breaches of other standards of protection (FET, MCPS, and non-impairment standards), in view of the inapplicability of the MFN treatment standard of Article 10(7) of the ECT that the Claimants seek to import to this case.[217]

a.  **Applicability of the taxation carve-out set out in Article 21 of the ECT with regard to breaches concerning Article 10(1) of the ECT**

228.   The Respondent argues that: *(a)* Article 10(1) of the ECT does not generate obligations regarding taxation measures in this case;[218] *(b)* the TVPEE and the Water Levy are taxation measures for purposes of the ECT;[219] *(c)* it is not appropriate to conduct an additional analysis on the good faith of the TVPEE and the Water Levy;[220] and *(d)* even if such additional analysis was undertaken, in any case the TVPEE and the Water Levy are *bona fide* taxation measures.[221]

---

[216] Resp. C-Mem., ¶¶ 6, 99, 103, 120-121; Resp. Rej., ¶¶ 6-8, 124.

[217] *See* Resp. C-Mem., ¶¶ 6, 99-102; Resp. Rej., ¶¶ 6-8, 124-223.

[218] Resp. C-Mem., ¶¶ 129-144.

[219] Resp. C-Mem., ¶¶ 145-242.

[220] Resp. C-Mem., ¶¶ 243-248; Resp. Rej., ¶ 132.

[221] Resp. Rej., ¶¶ 131-195, 221(iv).

229.    ***First***, the Respondent contends that it has not given consent to submit claims concerning the TVPEE and the Water Levy to arbitration because: ***(a)*** Article 26 of the ECT only concerns claims relating to breaches of obligations under Part III of the ECT; and ***(b)*** pursuant to Article 21 of the ECT, Article 10 of the ECT does not generate any obligations with respect to taxation measures of the Contracting Parties, although it is located in Part III of the ECT.[222]  Article 21(1) of the ECT reads as follows:

> Article 21. Taxation
>
> 1. Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties.  In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.[223]

230.    The Respondent explains that "if no obligation derived from Part III of the ECT exists, there cannot be an alleged breach of it and thus, there is no consent of the Contracting Party to resort to arbitration".[224]  The Respondent notes that although Article 21 of the ECT contains a general exclusion of taxation measures from the scope of ECT's application with a few stipulated exceptions, none of those exceptions refers to Article 10(1) of the ECT.[225]  Accordingly, the Respondent argues, Article 10(1) of the ECT does not impose any obligations with respect to taxation measures in this case.[226]

231.    ***Second***, the Respondent argues that the TVPEE and the Water Levy are taxation measures within the meaning of Article 21(7)(a) of the ECT, which includes "any provision relating to taxes of the domestic law of the Contracting Party".[227]  The Respondent first contends that both domestic law and international law are possible applicable laws in determining

---

[222] Resp. C-Mem., ¶¶ 124-128; Resp. Rej., ¶¶ 124-125.

[223] Resp. C-Mem., ¶ 129 (emphasis in the original, citing Energy Charter Treaty (CL-0036 and RL-0006), Article 21(1)).

[224] Resp. C-Mem., ¶ 126.

[225] Resp. C-Mem., ¶¶ 129-136.

[226] Resp. C-Mem., ¶¶ 137, 140; Resp. Rej., ¶¶ 129-130.

[227] Resp. C-Mem., ¶¶ 145-146, 158; Resp. Rej., ¶ 125.

whether a measure relates to taxes, and further argues that the measures at issue are taxation measures under either interpretation.[228]

232.    Under domestic law, the Respondent notes that the Spanish Constitutional Court has ratified the TVPEE as a tax.[229] The Respondent also cites Article 1 of Act 15/2012, which defines the TVPEE as a direct tax levied on the performance of the "activities of production and incorporation into the electricity system of electric energy" in the Spanish electrical system.[230] The Respondent mentions that the TVPEE has a defined taxable base, a tax rate and a tax period, and that its payment is made through a tax form.[231] The Respondent further submits that the TVPEE is a deductible from corporate tax, which is confirmed by the General Directorate of Taxation.[232] With respect to the Water Levy, the Respondent argues that Article 29 of Act 15/2012 confirms the taxation nature of the measure, as set out in Article 2 of Act 58/2003 on General Taxation.[233] The Respondent notes that the Water Levy, as in the case of the TVPEE, has a defined taxable base, a taxable period and a tax rate, that it is paid through a levy form, and it is a deductible from corporate tax.[234]

233.    Under international law, the Respondent argues that the TVPEE and the Water Levy are taxes according to the concept of tax adopted by prior arbitral tribunals.[235] Specifically, the Respondent contends that the concept of tax developed by different tribunals has defining characteristics, all of which are met with respect to both measures because: *(a)* the measures are established by law (Act 15/2012); *(b)* the measures impose obligations on a class of people (the TVPEE is applied to anyone that produces and incorporates electrical energy into the Spanish electricity system, and the Water Levy is levied on water concessionaires for the use and exploitation of continental waters for the production of

---

[228] Resp. C-Mem., ¶¶ 147, 157-159, 163-164, 216-217; Resp. Rej., ¶ 131.

[229] Resp. C-Mem., ¶¶ 165, 175-178.

[230] Resp. C-Mem., ¶ 166 (citing Act 15/2012 of 27 December, regarding fiscal measures for energy sustainability (R-0003), Article 1).

[231] Resp. C-Mem., ¶¶ 168-169.

[232] Resp. C-Mem., ¶¶ 172-174.

[233] Resp. C-Mem., ¶ 219-220.

[234] Resp. C-Mem., ¶¶ 221-223.

[235] Resp. C-Mem., ¶¶ 179-180.

electric energy); and *(c)* such obligations involve paying money to the State for public purposes.[236]  The Respondent further submits that, with respect to the TVPEE, the European Commission has confirmed the taxation nature of the measure and its conformity with EU law.[237]

234.  Furthermore, the Respondent submits that both the TVPEE and the Water Levy were measures introduced by Act 15/2012, which is a part of the domestic law of Spain, a Contracting Party to the ECT.[238]  The Respondent notes that Act 15/2012 was passed by the Parliament in accordance with relevant legislative procedure and its Constitution.[239]

235.  ***Third***, the Respondent submits that, in determining whether the TVPEE and the Water Levy are taxation measures, additional good faith or economic effects analysis is not appropriate.[240]  The Respondent argues that the Claimants' reference to the *Yukos v Russia* award is inapposite as the analysis used in that case is not applicable to this dispute.[241]  The Respondent also highlights that the tribunal in the case of *EnCana v Ecuador* found that the question of whether something is a taxation measure is primarily a question of its "legal operation, not its economic effect".[242]

236.  ***Finally***, the Respondent contends that, in any event, the TVPEE and the Water Levy are *bona fide* taxation measures.[243]

237.  The Respondent submits that the TVPEE is a *bona fide* taxation measure on the basis that: *(a)* it is not discriminatory in terms of its application and repercussion as it covers both renewable and conventional energy producers, granting the same treatment to all

---

[236] Resp. C-Mem., ¶¶ 181-195, 225-242.

[237] Resp. C-Mem., ¶¶ 180, 204-212.

[238] Resp. C-Mem., ¶ 160.

[239] Resp. C-Mem., ¶¶ 160-162.

[240] Resp. C-Mem., ¶¶ 243-248; Resp. Rej., ¶ 132.

[241] Resp. C-Mem., ¶ 246 (citing *Yukos Universal Limited (Isle of Man) v Russian Federation*, PCA Case No. 2005-4/AA 227, Final Award, 18 July 2014 (CL-0001 and RL-0004) ("***Yukos v Russia***"), ¶ 1407).

[242] Resp. C-Mem., ¶ 247 (citing *EnCana Corporation v Republic of Ecuador*, LCIA Case No. UN 3481, Award, 3 February 2006 (RL-0027) ("***EnCana v Ecuador***"), ¶ 142 (internal quotation marks omitted)).

[243] Resp. Rej., ¶¶ 132-195, 221(iv).

taxpayers;[244] *(b)* its general application is linked to the environmental nature of the tax;[245] and *(c)* if conventional producers passed on the cost of the TVPEE to the market price of electricity, renewable energy producers would also benefit, as they would also obtain that increased market price.[246]

238.    The Respondent argues that the Water Levy is a *bona fide* taxation measure on the basis that: *(a)* its establishment is a legitimate exercise of the State legislator without discriminatory effect;[247] and *(b)* if hydroelectric power producers who are not part of the special regime passed on the cost of the Water Levy to the market price of electricity, other hydroelectric power producers would also benefit, as they would also obtain that increased market price.[248]

239.    The Respondent further argues that both measures were adopted for the legitimate public purpose of raising income for Spain.[249]  The Respondent also points out that the tribunals in *Isolux v Spain* and *Eiser v Spain* upheld objections to jurisdiction over claims of alleged breaches of Article 10(1) of the ECT with respect to the TVPEE.  While the Respondent acknowledges that the tribunals in these cases considered only the TVPEE, it argues that the reasoning in these awards can be extended to the Water Levy because Claimants' arguments are similar with respect to both measures.[250]

240.    In light of the above, the Respondent concludes that the Tribunal lacks jurisdiction to hear claims concerning the alleged violation of Article 10(1) of the ECT as a result of the TVPEE and Water Levy enacted under Act 15/2012.[251]

---

[244] Resp. Rej., ¶¶ 136-156.
[245] Resp. Rej., ¶¶ 143, 145.
[246] Resp. Rej., ¶¶ 157-160.
[247] Resp. Rej., ¶¶ 170-176.
[248] Resp. Rej., ¶¶ 177-179.
[249] Resp. Rej., ¶¶ 162-167, 180-189.
[250] Resp. Rej., ¶¶ 190-195.
[251] Resp. C-Mem., ¶¶ 249-250.

**b. Inapplicability of the MFN clause set out in Article 10(7) of the ECT, in accordance with Article 21(3) of the ECT**

241.    The Respondent rejects the Claimants' subsidiary argument set out in their Reply that, if the Tribunal considered that the TVPEE and the Water Levy are *bona fide* taxation measures (thus excluded from protection under Article 10(1) of the ECT), the Claimants may invoke breaches of substantive standards of protection contained in other international treaties with regard to these measures, by means of the MFN clause set out in Article 10(7) of the ECT.[252]

242.    The Respondent contends that the Claimants' arguments should be dismissed because: *(a)* the MFN clause set out in Article 10(7) of the ECT does not apply to taxes on income or on capital, only to indirect taxes; *(b)* the disputed measures are direct taxes and therefore fall outside the scope of the MFN clause; and *(c)* in any event, Article 21(3)(a) of the ECT prohibits applying the MFN clause of Article 10(7) as the Claimants intend.[253]

243.    *First*, Article 10(7) of the ECT contains an MFN clause by which ECT Contracting Parties shall accord to investments in their territories "treatment no less favourable than that which it accords to Investments of its own Investors or of the Investors of any other Contracting Party or any third state".[254]  In turn, Article 21(3) of the ECT provides that Article 10(7) "shall apply to Taxation Measures of the Contracting Parties <u>other than those on income or on capital</u>".[255]  The Respondent relies on a document from the ECT Secretariat to assert that the exclusion of taxation measures on income or capital "<u>remains, in general, applicable with regard to **indirect taxes**</u>".[256]  The Respondent therefore concludes that the

---

[252] Resp. Rej., ¶¶ 196-220, 221(vi).

[253] Resp. Rej., ¶¶ 199-220.

[254] Energy Charter Treaty (CL-0036 and RL-0006), Article 10(7).

[255] Energy Charter Treaty (CL-0036 and RL-0006), Article 21(3) (emphasis added).

[256] Resp. Rej., ¶ 201 (emphasis in the original, citing The Energy Charter Treaty Secretariat, "The ECT: A Reader's Guide" (RL-0053), p 39).

MFN clause in Article 10(7) may only apply to indirect taxes (i.e. those which can be legally passed on to another person).[257]

244.  **Second**, according to the Respondent, both the TVPEE and the Water Levy are direct taxes, levied "on income or on capital" for the purposes of the ECT and therefore, Article 10(7) is not applicable to these measures.[258]  The Respondent rejects the Claimants' argument that the measures are not taxes on income because they are levied on gross income and not on net income.[259]  For the Respondent, a tax on income under the ECT does not require it to be a tax on net income.[260]  The Respondent argues that the Claimants have acknowledged that the measures are taxes on income because, *inter alia*, they stated in their Reply that the measures are levied on gross revenues.[261]

245.  **Finally**, the Respondent contends that, in any case, Article 21(3)(a) of the ECT prevents the application of the MFN clause as it provides that:

> 3. **Article 10[7]** … **shall not apply to**:
>
> a) **Impose most favoured nation obligations** with respect to advantages accorded by a Contracting Party pursuant to the tax provisions of any convention, agreement o arrangement described in subparagraph (7)(a)(ii)[.][262]

246.  The Respondent relies on Article 21(7)(a)(ii) of the ECT, which refers to "international agreement or arrangement by which the Contracting Party is bound", and argue that the BITs invoked by the Claimants are encompassed by this provision.[263]

---

[257] Resp. Rej., ¶¶ 202-204.

[258] *See* Resp. Rej., ¶ 221(vi).

[259] Resp. Rej., ¶¶ 211, 215.

[260] Resp. Rej., ¶ 215.

[261] Resp. Rej., ¶¶ 211-212.

[262] Resp. Rej., ¶ 217 (emphasis in the original, citing Energy Charter Treaty (CL-0036 and RL-0006), Article 21(3)(a)).

[263] Resp. Rej., ¶¶ 217-220.

247.    Therefore, the Respondent concludes that Article 10(7) of the ECT cannot be applied so as to impose MFN obligations, as intended by the Claimants.[264]

### (2) **The Claimants' Position**

248.    The Claimants submit that the Tribunal has jurisdiction over breaches of the Respondent's obligations under the ECT arising out of the TVPEE and the Water Levy.[265]

249.    The Claimants request the Tribunal to dismiss the Respondent's objection given that: *(i)* the TVPEE and the Water Levy do not fall within the taxation carve-out at Article 21 of the ECT because they are not *bona fide* taxation measures;[266] and *(ii)* alternatively, the Claimants may invoke breaches of standards of protection (FET, MCPS, and the non-impairment obligation) found in a number of BITs entered into by Spain with third countries, in view of the MFN clause of Article 10(7) of the ECT.[267]

### a.  **Inapplicability of the taxation carve-out set out in Article 21 of the ECT with regard to breaches concerning Article 10(1) of the ECT**

250.    There is no dispute between the Parties that the TVPEE and the Water Levy are taxes imposed by Spanish domestic law and therefore constitute taxation measures as defined in Article 21(7)(a) of the ECT.[268]  The Claimants argue, however, that *(a)* the taxation carve-out set out in Article 21(1) of the ECT only applies to *bona fide* taxation measures; *(b)* neither the TVPEE nor the Water Levy are *bona fide* taxation measures; and *(c)* accordingly, the Tribunal has jurisdiction to hear claims concerning these measures.[269]

251.    *First*, the Claimants submit that Article 21(1) of the ECT carves out only genuine *bona fide* taxation measures from the scope of protection of Part III of the ECT.  They refer in this regard to the definition of *bona fide* taxes found in the *Yukos v Russia* award (i.e. "those

---

[264] Resp. Rej., ¶ 220.
[265] Cl. Mem., ¶¶ 196-198; Cl. Reply, ¶¶ 403-432; Cl. Rej., ¶¶ 31-75.
[266] Cl. Mem., ¶ 197; Cl. Reply, ¶¶ 403, 405-421; Cl. Rej., ¶¶ 32-49.
[267] Cl. Reply, ¶¶ 422-432; Cl. Rej., ¶¶ 50-75.
[268] Cl. Mem., fn 275.
[269] Cl. Mem., ¶¶ 196-197; Cl. Reply, ¶¶ 403, 405-421.

'that are motivated by the purpose of raising general revenue for the State'"), which excludes actions carried out under the guise of taxation that in reality aim to achieve an unrelated purpose.[270]

252.  The Claimants dismiss the Respondent's criticisms to the *Yukos v Russia* award and note that the key finding of that tribunal, which is fully applicable in this case, is that the ECT's taxation carve-out can only apply to *bona fide* measures.[271]

253.  **Second**, the Claimants maintain that the TVPEE and the Water Levy are not *bona fide* taxes for the purpose of Article 21 of the ECT, but "disguised, discriminatory tariff cuts, introduced for the specific purpose of addressing Spain's self-inflicted tariff deficit".[272]

254.  Among other arguments, the Claimants contend that the TVPEE and the Water Levy are not *bona fide* taxation measures because they: *(a)* did not tax the value of electricity as purported, but instead reduced the value of the feed-in remuneration granted to the Claimants in a manner that was not tied to income, operating costs or profitability;[273] *(b)* had a disproportionate and discriminatory impact on different electricity producers (i.e. renewable energy producers and conventional power producers) and therefore they were not taxes of general application;[274] *(c)* did not raise any general revenue for the State (as the amounts collected must be used to finance the costs of the electricity system);[275] and *(d)* did not serve the purported purpose of raising general revenues for the State nor did they serve any environmental aim.[276]

255.  Concerning the TVPEE, the Claimants further argue that: *(a)* before the New Regime applied, the effect of this measure on the Claimants' hydro installations was discriminatory because the installations only received the RD 661/2007 regulated tariff (i.e. a fixed

---

[270] Cl. Reply, ¶ 405; Cl. Rej., ¶ 34.

[271] Cl. Reply, ¶ 414; Cl. Rej., ¶ 34.

[272] Cl. Reply, ¶ 403(a); Cl. Rej., ¶ 32(a).

[273] Cl. Reply, ¶ 406; Cl. Rej., ¶ 34.

[274] Cl. Reply, ¶ 407; Cl. Rej., ¶¶ 34, 36-37.

[275] Cl. Reply, ¶ 408; Cl. Rej., ¶¶ 34, 42-43.

[276] Cl. Reply, ¶¶ 409-410; Cl. Rej., ¶¶ 34, 39-41.

payment per k Wh, detached from the market price) and after the New Regime generators may not be able to recover the 7% levy if their production is below the standard operating hours set by the Respondent;[277] *(b)* the Respondent's reference to a judgment of its Constitutional Court upholding the taxation nature of the TVPEE is irrelevant as the question before the Tribunal is not whether the TVPEE was contrary to Spanish law but whether it is a *bona fide* taxation measure under international law;[278] *(c)* by passing on to producers costs over which they have no control (i.e. electricity generation), the TVPEE fails to comply with its alleged environmental purpose;[279] and *(d)* the Respondent's reliance on the findings of the *Isolux v Spain* and the *Eiser v Spain* tribunals do not assist its position because in *Isolux v Spain* the tribunal agreed that only *bona fide* taxation measures can benefit from the tax carve-out in Article 21(1) of the ECT, and in *Eiser v Spain* the claimants accepted and the tribunal thus assumed without analysis that the TVPEE had all the characteristics of a legitimate tax.[280]

256.    With regard to the Water Levy, the Claimants further argue that: *(a)* it did not raise general revenue for the State because, unlike all other fees collected under the Water Law concerning the use of public waters, only 2% of the revenue collected by the Water Levy is remitted to the relevant "Watershed agency" while the remaining 98% is allocated to cover the costs of the Spanish electricity system;[281] and *(b)* the Respondent's argument that the pass-through of the Water Levy to the market price by big hydro-producers will also benefit the Claimants' hydro installations is misguided because before the New Regime entered into force the Claimants' facilities only received the RD 661/2007 regulated tariff which was detached from the market price, and after the New Regime entered into force the Water Levy can only be passed on to consumers by a small subsector of renewable producers with a limited impact on the market price.[282]

---

[277] Cl. Rej., ¶ 37.

[278] Cl. Rej., ¶ 38.

[279] Cl. Rej., ¶¶ 40-41.

[280] Cl. Rej., ¶¶ 44-46.

[281] Cl. Rej., ¶ 48.

[282] Cl. Rej., ¶ 49.

257.    Moreover, according to the Claimants, the Respondent's reliance on domesic and international law to categorize the TVPEE and the Water Levy as taxation measures is not sufficient.[283]  The Claimants argue that: *(a)* investment treaty tribunals have confirmed that domestic law is not determinative in classifying a purported taxation measure; and *(b)* the defining characteristics of a tax under international law suggested by the Respondent are inadequate because they ignore the *bona fide* criterion established by the *Yukos v Russia* tribunal and in any case the measures fail to serve a legitimate "public purpose", and thus they do not meet the test proposed by the Respondent.[284]

258.    *Third*, in view of the above, the Claimants conclude that the Tribunal has jurisdiction to hear breaches of the Respondent's obligations under the ECT concerning the TVPEE and the Water Levy.

### b.  Applicability of the MFN clause set out in Article 10(7) of the ECT, in accordance with Article 21(3) of the ECT

259.    The Claimants submit that, if the TVPEE and the Water Levy were considered *bona fide* taxes for the purposes of Article 21 of the ECT, *(a)* they should be considered as taxes "other than those on income or on capital" within the meaning of Article 21(3) of the ECT; and accordingly *(b)* the Respondent must comply with its MFN obligation set forth in Article 10(7) of the ECT.[285]

260.    *First*, the Claimants note that Article 21(3) of the ECT introduces an exception to the tax carve-out at Article 21(1) of the ECT for taxes other than those on income or capital.[286] Article 21(7)(b) of the ECT, in turn, defines taxes on income and capital as those "imposed on total income, on total capital or on elements of income or of capital".[287]

---

[283] Cl. Reply, ¶¶ 415-418.

[284] Cl. Reply, ¶¶ 416-420.

[285] Cl. Reply, ¶¶ 403(b), 422-432; Cl. Rej., ¶¶ 32(b), 50.

[286] Cl. Reply, ¶¶ 423-424.

[287] Cl. Reply, ¶ 425 (citing Energy Charter Treaty (CL-0036 and RL-0006), Article 21(7)(b)).

261.   In support of their argument that the measures are not a tax on income or capital, the Claimants note that: *(a)* the TVPEE and the Water Levy are imposed on gross revenues;[288] and *(b)* the ordinary meaning of the term "taxes on income" refers to taxes on net income (not on gross revenues).[289]   The Claimants argue that the definition of "taxes on income" in the OECD Model Tax Convention, which mirrors the definition under the Article 21(7)(b) of the ECT, does not include charges on "gross revenues".[290]   According to the Claimants, their argument is also confirmed by Article 2 of the OECD Model Tax Convention and commentators' interpretations which refer to net amounts, not gross amounts.[291]

262.   The Claimants reject the Respondent's argument that to benefit from the exception at Article 21(3) of the ECT, a taxation measure must not only be a tax "other than those on income and capital" but must also be an "indirect" tax.   The Claimants maintain that the only criterion for the application of Article 21(3) of the ECT is that the taxes are not "on income and capital".[292]   Among other arguments, the Claimants submit that there is no textual basis for the Respondent's assertion as Article 21(7)(b) of the ECT says nothing about indirect taxes.[293]   Also, they argue that the Respondent misquoted the excerpt from the ECT Secretariat on which it allegedly bases its position.[294]   Therefore, whether the TVPEE and the Water Levy are direct or indirect taxes is irrelevant.[295]

263.   Contrary to the Respondent's submission, the Claimants highlight that there is nothing contradictory in their submissions as they have "nowhere characterized either the TVPEE or Water Levy as direct or indirect taxes".[296]   The Claimants refer to specific passages of

---

[288] Cl. Reply, ¶ 426; Cl. Rej., ¶ 56.
[289] Cl. Reply, ¶¶ 426-428.
[290] Cl. Reply, ¶ 427.
[291] Cl. Reply, ¶¶ 428-430.
[292] Cl. Rej., ¶¶ 51-60.
[293] Cl. Rej., ¶¶ 53, 57.
[294] Cl. Rej., ¶¶ 58-59.
[295] Cl. Rej., ¶ 60.
[296] Cl. Rej., ¶ 62.

their prior pleadings and contend that the Respondent has partially quoted them to misrepresent their position.[297]

264. **Second**, the Claimants argue that, because the TVPEE and the Water Levy are taxes "other than those on income and capital", the Respondent is obliged under Article 10(7) of the ECT to accord the Claimants the same treatment with respect to these measures as it accords to other foreign investors under relevant BITs.[298]

265. The Claimants reject the Respondent's argument that, because Article 21(7)(a)(ii) of the ECT –concerning the definition of the term "Taxation Measure" for the purpose of Article 21– refers to "any provision relating to taxes … of any other international agreement or arrangement by which the Contracting Party is bound", then the BITs entered into by Spain from which the Claimants seek to import other investment protections are international agreements by which Spain is bound, and the FET, MCPS and non-impairment obligations of those BITs are "tax provisions".[299]

266. The Claimants argue that the FET, MCPS and non-impairment provisions invoked do not relate to taxes and it would be untenable to consider them as "taxation measures" for the purposes of the ECT.  These provisions concern substantive standards of treatment that the Respondent must afford, as host State, to investments by investors of the home State, under the relevant BITs.  In the Claimants' view, the fact that in certain circumstances these provisions may be applied in respect of taxation measures adopted by the host State "cannot transform them into provisions that relate to taxes.  To put it another way, the use to which the provisions may be put cannot define their nature".[300]

267. Lastly, the Claimants maintain that, in any event, the Tribunal has jurisdiction to decide on the Claimants' claim that the TVPEE and the Water Levy form part of a series of measures constituting a creeping expropriation of their investments in breach of Article 13 of the

---

[297] Cl. Rej., ¶¶ 64-68.
[298] Cl. Reply, ¶ 431.
[299] Cl. Rej., ¶¶ 73-75.
[300] Cl. Rej., ¶ 75 (emphasis omitted).

ECT. This is so because Article 21(5)(a) of the ECT provides that Article 13 on expropriation shall apply to taxes, and Spain explicitly states that it does not assert a jurisdictional objection against this claim.[301]

## VI.    SUMMARY OF THE PARTIES' CLAIMS ON LIABILITY

268.    The Claimants submit that the Respondent has breached its obligations under the Articles 13 and 10(1) of the ECT, based on four main claims.

269.    *First*, the Claimants claim that the Respondent violated Article 13 of the ECT by subjecting the Claimants' investments to measures having an effect that is equivalent to expropriation.[302]  The Claimants further allege that these measures did not abide by the ECT requirements of lawful expropriation.[303] The Respondent maintains that the Claimants' investments have not been expropriated and that the challenged measures are regulatory acts that do not generate an obligation to compensate.[304]

270.    *Second*, the Claimants assert that the Respondent breached the FET standard under Article 10(1) of the ECT.  Specifically, the Claimants argue that the Respondent frustrated the Claimants' legitimate expectations; failed to provide a stable legal and business framework for the Claimants' investments; failed to act in a transparent manner and respect the Claimants' due process rights; and acted in a manner that was arbitrary, unreasonable, disproportionate, and discriminatory.[305]  The Respondent claims that it did not violate the Claimants' legitimate expectations; provided a stable legal and business framework for the Claimants' investments; acted in a transparent manner without infringing upon the Claimants' due process rights; and that the measures adopted were reasonable, proportionate, and non-discriminatory.[306]

---

[301] Cl. Mem., ¶ 198; Cl. Reply, ¶ 404; Cl. Rej., fn 1.

[302] Cl. Mem., ¶ 225; Cl. Reply, ¶¶ 34, 65.

[303] Cl. Mem., ¶ 227; Cl. Reply, ¶¶ 22, 68-69.

[304] Resp. C-Mem., ¶¶ 1216, 1235-1237, 1243; Resp. Rej., ¶¶ 1086, 1122.

[305] *See* Cl. Mem., ¶¶ 237-309; Cl. Reply, ¶¶ 22, 70, 103-223, 225-304.

[306] *See* Resp. C-Mem., ¶¶ 1065, 1089, 1100, 1117, 1127, 1145, 1154, 1170, 1215; Resp. Rej., ¶¶ 16, 51-53.

271.  **Third**, the Claimants argue that the Respondent has impaired, by unreasonable and discriminatory measures, the management, use and enjoyment of the Claimants' investments in violation of Article 10(1) of the ECT.[307]  The Respondent claims that the measures were reasonable and non-discriminatory, ensuring a "reasonable rate of return" for the Claimants' investments.[308]

272.  **Finally**, the Claimants submit that the Respondent breached the standard of MCPS as a result of dismantling the legal framework on which the Claimants' investments relied.[309]  The Respondent argues that the measures at issue were reasonable and in accordance with the given circumstances, and therefore, it has provided full protection and security to the Claimants' investments.[310]

A.  **Alleged Unlawful Expropriation in Breach of Article 13 of the ECT**

(1) **Introduction**

273.  The Claimants assert that the Respondent indirectly expropriated the value of Claimants' equity and debt investments through measures that did not meet the requirements provided under Article 13(1) of the ECT.[311]

274.  The Respondent argues that it has not expropriated the Claimants' investments either directly or indirectly.[312]  The Respondent also asserts that the disputed measures are regulatory acts that do not generate the obligation to compensate because they were reasonable and proportional.[313]

---

[307] Cl. Mem., ¶¶ 313-316; Cl. Reply, ¶¶ 22, 305-310.

[308] Resp. C-Mem., ¶¶ 1185-1189; Resp. Rej., ¶¶ 108, 1026, 1038.

[309] Cl. Mem., ¶¶ 310-312; Cl. Reply, ¶¶ 22, 311-314.

[310] Resp. C-Mem., ¶¶ 1263, 1274-1277; Resp. Rej., ¶ 1078.

[311] Cl. Mem., ¶¶ 215, 225; Cl. Reply, ¶ 34.

[312] Resp. C-Mem., ¶ 1235; *see* Resp. Rej., ¶¶ 1085-1088.

[313] Resp. C-Mem., ¶¶ 1237, 1239-1243.

(2) **The Applicable Legal Standard**

275.    The text of Article 13 of the ECT is as follows:

### ARTICLE 13
### EXPROPRIATION

(1) Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:

(a) for a purpose which is in the public interest;

(b) not discriminatory;

(c) carried out under due process of law; and

(d) accompanied by the payment of prompt, adequate and effective compensation. …[314]

a.    **The Claimants' Position**

276.    The Claimants submit that the protection in Article 13(1) of the ECT extends to indirect expropriation, which results from "measures having effect equivalent to … expropriation".[315]  The Claimants state that indirect expropriation may take the form of "creeping expropriation", that is "a series of acts and/or omissions over time that cumulatively result in expropriation even if each individual measure would not constitute an expropriation standing alone".[316]

277.    The Claimants argue that the "equivalent effect" or "actual effect" of the measures on the investments is the touchstone in all cases of indirect expropriation, not whether the State intended an expropriation.[317]

---

[314] Energy Charter Treaty (CL-0036 and RL-0006), Article 13.

[315] Cl. Mem., ¶ 216 and Cl. Reply, ¶¶ 33, 61(internal quotation marks omitted).

[316] Cl. Mem., ¶ 217 (internal footnotes omitted).

[317] Cl. Mem., ¶¶ 218-219; Cl. Reply, ¶ 61.

278.    The Claimants submit that an essential factor for finding that an expropriation has occurred is whether there has been a substantial deprivation of the value or economic benefits of the investment, "irrespective of whether ownership, control or management rights are also directly affected".[318]

279.    The Claimants further rely on arbitral precedents to assert that States may carry out indirect expropriations through regulatory measures.[319]

280.    In addition, the Claimants argue that a State has an obligation to compensate investors for the destruction of their investments in case of expropriation, irrespective of whether such destruction was due to the State's *bona fide* exercise of its police powers.[320]  In any event, the purpose of a State measure does not affect the State's obligation to compensate the expropriated investor.[321]

281.    With respect to the lawfulness of an expropriation, the Claimants assert that failure to comply with any of the subparagraphs (a) through (d) of Article 13 of the ECT entails a breach of the provision.[322]

b.    **The Respondent's Position**

282.    The Respondent asserts that the definition of expropriation requires the existence of an "asset".[323]  The Respondent further argues that this definition requires the Claimants to prove that it has ownership over the allegedly expropriated asset and that there is a causal relationship between the measures and their effect on the ownership of said asset.[324]

---

[318] Cl. Reply, ¶ 65 (internal footnotes omitted).  *See also id*., ¶¶ 62-64; Cl. Mem., ¶¶ 219-220.

[319] Cl. Mem., ¶ 221; Cl. Reply, ¶ 45.

[320] Cl. Mem., ¶¶ 222-224 (referring to *Azurix Corp v Argentine Republic*, ICSID Case No. ARB/01/12, Award, 23 June 2006 (CL-0025) ("***Azurix v Argentina***"), ¶¶ 310-311; Cl. Reply, ¶ 44.

[321] Cl. Reply, ¶¶ 46-54.

[322] Cl. Mem., ¶ 227 and footnote 309 (citing, *inter alia*, *Crystallex International Corporation v Bolivarian Republic of* Venezuela, ICSID Case No. ARB(AF)/11/2, Award, 4 April 2016 (CL-0011) ("***Crystallex v Venezuela***"), ¶ 716); Cl. Reply, ¶ 68.

[323] Resp. C-Mem., ¶ 1218.

[324] Resp. C-Mem., ¶ 1218; Resp. Rej., ¶ 1082.

283. Regarding indirect expropriation, the Respondent refers to the findings of prior arbitral tribunals to assert that, for governmental measures to be equivalent to expropriation, such measures must prevent the investor from continuing to operate its investment or from using it, or otherwise entail a substantial, radical, severe and devastating deprivation of the investment.[325]

284. Concerning the lawfulness of an expropriation, the Respondent argues that tribunals have considered whether the contested measures are reasonable or in proportion with the intended objective or public interest sought.[326]

### (3) The Claim

#### a. The Claimants' Position

285. The Claimants submit that the Respondent breached its obligation under the ECT by subjecting the Claimants' investments to measures having effect equivalent to expropriation, and that such measures were unlawful.[327]  Each of these main arguments is summarized below.

#### (i) Indirect Expropriation

286. The Claimants argue that the Respondent's measures had an effect that was "equivalent to expropriation" on their investments.  The Claimants assert that Spain substantially deprived them of the value and economic benefits of their equity and debt investments through a series of wrongful measures, thus resulting in an indirect, creeping expropriation.[328]  The Claimants submit three main arguments in this regard.

---

[325] Resp. C-Mem., ¶¶ 1245-1250 (citing, *inter alia*, *Electrabel v Hungary* Decision, ¶¶ 6.53-6.62, 6.63; and *AES Summit Generation Ltd and AES-Tisza Erömü Kft v Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010 (RL-0039) ("***AES v Hungary***"), ¶¶ 14.3.1-14.3.4).

[326] Resp. C-Mem., ¶ 1240.

[327] Cl. Mem., ¶¶ 225, 227; Cl. Reply, ¶¶ 34, 65, 68-69.

[328] Cl. Mem., ¶¶ 215, 225; *see* Cl. Reply, ¶¶ 34, 39, 66-67, 404.

287.   *First*, the Claimants state that their investments in Spain are protected investments within the meaning of the ECT and capable of being expropriated.  The Claimants argue that the Respondent miscategorised the Claimants' future lost income as the Claimants' investment.[329]  The Claimants emphasize that their investments are the equity and debt interests in Spanish companies, and consequently, such shareholding and debt investments are protected "investments" under Article 1(6) the ECT.[330]

288.   The Claimants also reject the Respondent's reliance in the case *Nations Energy v Panama*, which the Respondent cited to argue that measures that only apply to the future without affecting any acquired rights cannot amount to expropriation.[331]  The Claimants emphasize that the facts in the present case are different.[332]  Specifically, the Claimants argue that in this case the Respondent conferred vested rights to the Claimants by providing express guarantees that the feed-in remuneration regime would last for "the full operating lifetime of qualifying facilities" and that any adverse future changes would not apply to installations already in existence.[333]

289.   *Second*, the Claimants dispute the Respondent's justification that the challenged measures are regulatory acts not subject to compensation.  The Claimants submit that the nature and purpose of the Respondent's measures are relevant to their legality (per the wording of Article 13(1) of the ECT), but do not affect their characterisation as expropriation or excuse compensation.[334]  The Claimants further argue that, in any event, the Respondent has not shown that the measures were taken for a *bona fide* public purpose nor that the regulations were reasonable or proportional.[335]

---

[329] Cl. Reply, ¶ 39.

[330] Cl. Reply, ¶¶ 37, 39.

[331] Cl. Reply, ¶ 41 (referring to *Nations Energy Inc. and others v Republic of Panama*, ICSID Case No. ARB/06/19, Award, 24 November 2010 (RL-0040) ("***Nations Energy v Panama***"), ¶ 646).

[332] Cl. Reply, ¶ 41.

[333] Cl. Reply, ¶ 41.

[334] Cl. Reply, ¶¶ 42-58.

[335] Cl. Mem., ¶¶ 230-232; Cl. Reply, ¶¶ 55-58.

290.   **Finally**, the Claimants contend that the Respondent's measures deprived the value and economic benefits of their investments in a manner that is equivalent to expropriation.[336] The Claimants mention that the market prices in the small-hydro sector are insufficient to service the installations' project financing debt obligations and to generate a return on the Claimants' equity and debt investments. Therefore, "[t]he economic benefits of these investments have … disappeared, and those investments have thus been rendered essentially worthless".[337]

291.   As evidence of the deprivation of value and benefit on their investments, the Claimants mention, *inter alia*, that the measures have reduced the fair market value of their equity investments from EUR 130.2 million (in the but-for scenario) to EUR 19 million (in the actual scenario), and the value of their debt investments from EUR 9.4 million (in the but-for scenario) to EUR 1.8 million (in the actual scenario).[338]

(ii) Unlawfulness of the Measures

292.   The Claimants argue that the Respondent violated each of the four cumulative requirements for a lawful expropriation under Article 13 of the ECT.[339]

293.   The Claimants first claim that the measures at issue did not serve any legitimate public purpose.  Among other arguments, the Claimants submit that: the tariff deficit that Spain allegedly aimed at reducing was a consequence of its own actions; there is no reasonable or proportional relationship between the State measures concerning the small-hydro sector and Spain's aim of reducing the tariff deficit given that the feed-in remuneration to small-hydro contributed the lowest amount towards the electricity system's regulated costs; Spain failed to adopt other less restrictive means to fulfil its stated objective of reducing the tariff deficit; and, in any event, a State has no right to expropriate only for financial purposes.[340]

---

[336] Cl. Reply, ¶¶ 59-67.

[337] Cl. Reply, ¶ 66.

[338] Cl. Reply, ¶ 67.

[339] Cl. Mem., ¶ 227; Cl. Reply, ¶¶ 68-69.

[340] Cl. Mem., ¶¶ 228-232; Cl. Reply, ¶ 55.

294.    The Claimants then submit that the measures at issue were also discriminatory;[341] not carried out under due process of law;[342] and not accompanied by any prompt, adequate and effective compensation (instead, the regulatory changes "were purposefully designed to create the appearance of providing a 'reasonable return' and thus deny the existence of a damage or the need to compensate the Claimants").[343]

295.    Based on the above, the Claimants conclude that the Respondent has unlawfully expropriated their investment, and therefore, breached Article 13 of the ECT.[344]

### b.  The Respondent's Position

296.    The Respondent submits that there has been neither direct nor indirect expropriation.[345] The Respondent further claims that the measures cannot be considered expropriatory as they are reasonable and lawful.[346] Each of these arguments is summarized below.

### (i)  Lack of Direct or Indirect Expropriation

297.    The Respondent first considers that future returns, or loss of future income or revenues, are not an asset subject to expropriation under the ECT, Spanish law or otherwise under international law.[347] In particular, the Respondent notes that both Spanish law and international law require the rights to be vested or acquired in order for their deprivation to be compensable.[348] The Respondent contends that the facts of this case only establish the Claimants' acquired right to the remuneration under RD 661/2007 with respect to the energy already sold, but not to future returns.[349] The Respondent, citing *Nations Energy v*

---

[341] *See*, e.g. Cl. Mem., ¶ 233 and Cl. Reply, ¶ 68.

[342] *See*, e.g. Cl. Mem., ¶ 234 and Cl. Reply, ¶ 68.

[343] Cl. Mem., ¶ 235 and footnote 325; Cl. Reply, ¶ 68.

[344] Cl. Mem., ¶ 236; Cl. Reply, ¶ 69.

[345] Resp. C-Mem., ¶ 1235; Resp. Rej., ¶¶ 1080, 1088.

[346] *See* Resp. C-Mem., ¶¶ 1240-1243; Resp. Rej., ¶¶ 1137-1148.

[347] Resp. C-Mem., ¶¶ 1221-1231 (citing, e.g. UNCTAD, Series on Issues in International Investment Agreements, Expropriation, United Nations Series, New York and Geneva, 2012 (RL-0030), p 22; Iñigo Iruretagoinea Agirrezabalaga, "Arbitration in cases of expropriation of foreign investments", Bosch, 2010 (RL-0050), p 291). *See also* Resp. C-Mem., ¶¶ 1236, 1253.

[348] Resp. C-Mem., ¶¶ 1225-1227.

[349] Resp. C-Mem., ¶ 1228.

*Panama* as an illustrative case, further argues that measures that do not affect acquired rights (as in this case, which concerns future returns) cannot be considered equivalent to expropriation.[350]

298.  Furthermore, the Respondent emphasizes that the Tribunal is required to refer to domestic legislation, in this case Spanish law, in determining which rights are subject to expropriation.[351]  The Respondent claims that based on Royal Legislative Decree 1/2010 concerning Spanish corporations law, and Supreme Court case law, the Claimants' ownership of shares grant them, at most, the expectation to receive dividends and to oversee the management of the administrative body, but under no circumstance a right to receive dividends nor a right to the direct management of the plants in which they hold shares.[352]

299.  Therefore, the Respondent concludes that the Claimants' investment is not an asset subject to expropriation since the shares and subordinated debt held in the Xana Plants and in the Ondina Plants do not imply the right to manage such companies or the right to receive dividends, as protected under Article 13(1) of the ECT.[353]

300.  The Respondent further contends that the challenged measures do not constitute an indirect expropriation because: *(a)* the Claimants continue to control their shares in the plants; *(b)* the plants continue to operate; and *(c)* the Claimants continue to obtain a reasonable rate of return from the plants.[354]  In short, the Respondent argues that neither the Respondent has prevented the Claimants from continuing with the operations of their plants, nor the effects of the challenged measures on the Claimants' investments meet the required threshold for "substantial deprivation" to be considered expropriatory.[355]

---

[350] Resp. C-Mem., ¶¶ 1227, 1229 (citing *Nations Energy v Panama*, ¶¶ 635-648).

[351] Resp. C-Mem., ¶¶ 1224-1225; Resp. Rej., ¶ 1107.

[352] Resp. C-Mem., ¶ 1225; Resp. Rej., ¶¶ 1084-1085, 1103-1119.

[353] Resp. Rej., ¶¶ 1103, 1113, 1116-1117.

[354] Resp. C-Mem., ¶ 1251; Resp. Rej., ¶ 1087.

[355] Resp. C-Mem., ¶¶ 1232, 1250-1252, 1255; Resp. Rej., ¶ 1095.

(ii) Lawfulness of the Measures

301.   The Respondent claims that the measures adopted are "non-discriminatory regulatory adaptations that were enacted in good faith for the purpose of protecting public interest in a proportionate manner to the objective they were intended to achieve and in compliance with due process".[356]

302.   Accordingly, the Respondent asserts that the challenged measures are regulatory acts that do not generate the obligation to compensate.[357]  Specifically, the Respondent argues that the challenged measures consist of macroeconomic control measures which were adopted to serve a public purpose, including resolving the tariff deficit.[358]  Furthermore, the Respondent argues that the measures were reasonable as the Claimants can recover the costs associated with their investments as well as a "reasonable rate of return".[359]  The Respondent also argues that the measures were applied to all operators in the Spanish energy system, and therefore, they are not discriminatory.[360]

303.   In its Rejoinder, the Respondent maintains that the Claimants failed to meet their burden of proof in showing that the measures at issue were not in the public interest.[361] The Respondent argues that the disputed measures have been accepted as necessary and reasonable macroeconomic control measures, and consequently, admissible as a public interest policy.[362] The admissibility of reforms arising from a rational policy, the Respondent argues, has been supported by several prior tribunals.[363]

---

[356] Resp. C-Mem., ¶ 1243, Resp. Rej., ¶¶ 1086-1095.  *See also* Resp. C-Mem., ¶ 1254.

[357] Resp. C-Mem., ¶¶ 1237-1238; Resp. Rej., ¶¶ 1122-1123.

[358] Resp. C-Mem., ¶ 1241; Resp. Rej., ¶¶ 912, 1134.

[359] Resp. C-Mem., ¶¶ 1239, 1241.

[360] Resp. C-Mem., ¶ 1242; Resp. Rej., ¶¶ 1131-1133.

[361] Resp. Rej., ¶¶ 1127, 1136.

[362] *See* Resp. C-Mem., ¶¶ 974-225; Resp. Rej., ¶ 1128.

[363] Resp. Rej., ¶¶ 1027-1030 (citing *Electrabel S.A. v Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015 (RL-0048) ("***Electrabel v Hungary* Award**"), ¶ 179; *Charanne v Kingdom of Spain*, Final Award, 21 January 2016 (RL-0049) ("***Charanne v Spain***"), ¶ 536).

304.    Moreover, the Respondent reiterates that the disputed measures are proportionate,[364] compliant with due process requirements (e.g. without any irregularities in the legislative process),[365] and highlight that the competent Spanish tax authorities have confirmed that the TVPEE and the Water Levy do not amount to an expropriation.[366]

305.    Based on the above, the Respondent concludes that it has not unlawfully expropriated the Claimants' investment, and therefore, has not breached Article 13 of the ECT.[367]

### B.  Alleged Breach of the Fair and Equitable Treatment Obligation of Article 10(1) of the ECT

#### (1) Introduction

306.    The Claimants submit that the measures at issue violate the Respondent's obligations under the FET standard of the ECT. As part of their analysis, the Claimants argue that the Respondent's treatment of the Claimants' investments: *(a)* failed to provide stability to the Claimants' investments; *(b)* failed to protect the Claimants' legitimate expectations; *(c)* was not transparent and failed to respect the Claimants' due process rights; and *(d)* was unreasonable, disproportionate, arbitrary, and discriminatory.[368]

307.    The Respondent argues that it has complied with the FET standard of the ECT. Specifically, the Respondent submits that: *(a)* it respected its duty to provide stable and transparent conditions; [369] *(b)* it did not violate the Claimants' expectations; *(c)* the measures were carried out in a transparent manner and following due process; and *(d)* its treatment of the Claimants' investments was reasonable, proportional, non-arbitrary, and non-discriminatory. [370]

---

[364] Resp. Rej., ¶¶ 1137-1138.

[365] Resp. Rej., ¶ 1141.

[366] Resp. Rej., ¶¶ 1143-1148.

[367] Resp. C-Mem., ¶ 1256.

[368] *See* Cl. Mem., ¶¶ 240-241; Cl. Reply, ¶¶ 73-138.

[369] Resp. Rej., ¶ 1038.

[370] *See* Resp. C-Mem., ¶¶ 1042-1043; Resp. Rej., ¶ 1038.

(2) **The Applicable Legal Standard**

308.    Article 10(1) of the ECT requires Contracting Parties to "encourage and create stable, equitable, favourable and transparent conditions for Investors[, including] a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment".[371]

309.    Both Parties agree that the FET standard must be considered in the light of the object and purpose of the ECT.[372]  The Parties also agree that the FET standard of the ECT includes the duty to provide stable conditions for foreign investors,[373] to refrain from acting in a disproportionate manner,[374] to respect investors' legitimate expectations at the time of their investment,[375] to act transparently and in accordance with due process,[376] and to refrain from acting unreasonably or discriminatorily.[377]

a.    **The Claimants' Position**

310.    The Claimants agree with the Respondent that the protection standards of the ECT, including FET, must be analysed in accordance with the objective of the ECT.  However, they reject the Respondent's argument that the ECT's objective is to ensure national treatment or non-discrimination.[378]  Instead, the Claimants maintain that:

> the fundamental objectives of the ECT are to require the Contracting States to maintain a stable and transparent legal and regulatory framework for energy sector investments, and to provide substantive protections (which include, but are not limited to, national treatment) and the procedural mechanism of investor-State dispute settlement, with a view to reducing political and regulatory risks and thus facilitate investments in the energy sector.[379]

---

[371] Energy Charter Treaty, Article 10 (CL-0036 and RL-0006).

[372] Cl. Mem., ¶ 238, Resp. C-Mem., ¶¶ 1046, 1197; Cl. Reply, ¶ 71.

[373] Cl. Mem., ¶ 240, 242-244; Resp. C-Mem., ¶ 1102; Cl. Reply, ¶¶ 71, 75; Resp. Rej., ¶ 922.

[374] Cl. Mem., ¶ 240, 268; Resp. C-Mem., ¶ 1196; Cl. Reply, ¶ 71; Resp. Rej., ¶ 922.

[375] Cl. Mem., ¶ 240, 242; Resp. C-Mem., ¶ 1053; Cl. Reply, ¶ 71; Resp. Rej., ¶¶ 923, 937.

[376] Cl. Mem., ¶ 240; Resp. C-Mem., ¶¶ 1122, 1160-1164; Cl. Reply, ¶ 71; Resp. Rej., ¶ 918.

[377] Cl. Mem., ¶¶ 240, 299-300; Resp. C-Mem., ¶ 1175; Cl. Reply, ¶ 71; Resp. Rej., ¶¶ 921, 1018.

[378] Cl. Reply, ¶ 23.

[379] Cl. Reply, ¶ 29.

311.   The Claimants argue that FET is an autonomous legal standard of protection, which is higher than the customary international law minimum standard for the treatment of aliens.[380]

312.   The Claimants submit that under the ECT, the Respondent has an obligation: *(a)* to respect investors' legitimate expectations and to provide a stable legal and business framework for their investments; *(b)* to act in a transparent manner and in accordance with due process; and *(c)* to refrain from acting disproportionately, arbitrarily, unreasonably or discriminatorily.[381]

313.   *First*, the Claimants argue that the provision of a stable legal and business environment is encompassed in the protection of investors' legitimate and reasonable expectations, such protection being a core element of the FET standard.[382]   The Claimants note that this is of particular importance in the energy sector because of the heavy reliance investors have on a stable legal and business environment when committing a substantial amount of capital for generating long-term returns.[383]   The Claimants further argue that this reliance can be derived from laws and regulations, as well as other indirect undertakings of a host State.[384]

314.   *Second*, the Claimants note that the FET standard requires a State to act in a manner that is transparent and in accordance with investors' due process rights.[385]   The Claimants submit that transparency requires the absence of administrative ambiguity or opacity, which is closely related to respecting "procedural propriety and due process".[386]   The Claimants also highlight the investors' right to receive information and be heard on important decisions, in a fair and prior hearing.[387]

---

[380] Cl. Mem., ¶ 239.

[381] Cl. Mem., ¶ 240; Cl. Reply, ¶ 71.

[382] Cl. Mem., ¶¶ 242-245; Cl. Reply, ¶ 73.

[383] Cl. Mem., ¶ 245.

[384] Cl. Mem., ¶ 246; Cl. Reply, ¶ 171.

[385] Cl. Mem., ¶¶ 284, 291.

[386] Cl. Mem., ¶¶ 287-288.

[387] Cl. Mem., ¶ 290.

315.    **Third**, the Claimants argue that the FET standard encompasses a protection against disproportionate, arbitrary, unreasonable or discriminatory measures.[388]

316.    Concerning the proportionality principle, the Claimants argue that it applies equally to administrative acts and to the enactment of legislation.[389]  The Claimants refer to a four-stage test adopted by the *Occidental v Ecuador* tribunal for assessing the proportionality of a State measure, as follows:

> (a) the legitimacy of the State's aim; (b) whether the measure adopted by the State was suitable and/or reasonably connected to the objective it pursued; (c) whether the measure adopted by the State was necessary (i.e., was it the least restrictive measure available to achieve the State's aim); and (d) whether the effects of the measure were disproportionate or excessive in relation to the interests involved, i.e., whether the benefit of realising the State's aim exceeded the harm to the relevant rights of investors.[390]

317.    The Claimants add that these four elements are cumulative and the State's failure to comply with any of them will result in breach of the FET standard.[391]

318.    To determine whether measures are arbitrary, the Claimants refer to a fourfold classification developed by Professor Schreuer, on whether the measures at issue: *(a)* inflict damage upon investors without serving any apparent legitimate purpose; *(b)* are based on "discretion, prejudice or personal preference" instead of acceptable legal standards; *(c)* are adopted for reasons other than those put forward by the State; and *(d)* are taken in wilful disregard of due process and proper procedure.[392]  In their Reply, the Claimants dismiss the Respondent's assertion that protection against arbitrariness is not a part of the FET standard

---

[388] Cl. Mem., ¶¶ 268, 299, 303, 306.

[389] Cl. Mem., ¶ 270.

[390] Cl. Mem., ¶ 272 (internal foonotes omitted, citing *Occidental Petroleum Corporation and Occidental Exploration and Production Company v Republic of Ecuador*, ICSID Case No. ARB/06/11, Award, 5 October 2012 (C-0019) ("***Occidental v Ecuador***"), ¶¶ 416, 428-436, 450, 452).  *See also* Cl. Reply, ¶ 141.

[391] Cl. Reply, ¶ 142.

[392] *See* Cl. Mem., ¶ 300.

and submit there is a "well-settled jurisprudence finding States to be in breach of the FET standard where they act in an arbitrary manner".[393]

319.    In determining the reasonableness of the measures at issue, the Claimants submit that it must be shown that the measures were taken in pursuance of a rational policy goal and were tailored to achieve that goal.[394]

320.    Finally, the Claimants consider that unjustifiable or arbitrary regulatory distinctions made without justification between things that are alike (e.g. between similarly situated groups of people or categories), may amount to discriminatory treatment proscribed by the ECT.[395]

### b.  The Respondent's Position

321.    The Respondent considers that the protection standards of the ECT, including FET, must be analysed in accordance with the objective of the ECT, which is to ensure the principle of national treatment or non-discrimination.[396]  In this regard, the ECT does not limit nor prevents the adoption of macroeconomic control measures on grounds of general interest.[397] In its Rejoinder, the Respondent also maintains that a number of precedents have allowed reasonable and proportionate regulatory changes on the grounds of public policy.[398]  Accordingly, the protection afforded to investors under the FET standard is not absolute, nor can it amount to an "insurance policy" in favour of the investor in a strategic and highly regulated sector such as the energy sector.[399]

322.    The Respondent agrees with the Claimants that in examining the FET standard, tribunals must assess the legitimate expectations that an investor had at the time of its investment.[400] The Respondent maintains that the standard of providing stable conditions under the ECT

---

[393] Cl. Reply, ¶ 303.

[394] Cl. Mem., ¶¶ 303-304.

[395] Cl. Mem., ¶¶ 307-308.

[396] Resp. C-Mem., ¶¶ 1008, 1014, 1018, 1033; Resp. Rej., ¶¶ 46, 902, 1017, 1022.

[397] Resp. C-Mem., ¶¶ 1032, 1036-1039, 1093; Resp. Rej., ¶¶ 46, 903, 910, 972, 977.

[398] Resp. Rej., ¶¶ 927-929.

[399] Resp. C-Mem., ¶¶ 1033, 1046, 1066, 1091; Resp. Rej., ¶¶ 45, 910, 913, 938.

[400] *See*, e.g. Cl. Reply, ¶ 171 and Resp. C-Mem., ¶ 1053.

does not extend to providing a "predictable" regulatory framework, since the wording of Article 10(1) of the ECT does not contain such term. Moreover, the Respondent argues that the ECT does not guarantee the predictability of the regulatory framework of the Contracting States unless there is a specific commitment by the State in this regard.[401]

323. The Respondent submits that investors' expectations must be reasonable and objective in relation to the existing regulatory framework, and therefore, tribunals must assess whether investors knew and understood the framework applicable to their investments, as well as the risk associated with it.[402]

324. With respect to the duty to provide stable conditions, the Respondent rejects the Claimants' interpretation of "retroactivity", and submits that retroactive measures must affect acquired rights in accordance with international and national precedents.[403]

325. Regarding the interpretation of the principle of transparency under the ECT, the Respondent refers to the tribunals' decisions in the cases of *Tecmed v Mexico*, *Electrabel v Hungary*, and *Plama v Bulgaria*.[404] Concerning due process, the Respondent refers to the interpretation of this concept by a number of arbitral tribunals.[405]

326. In assessing compliance with the FET standard, the Respondent notes that the prohibition of arbitrary measures is not an independent standard but is encompassed within the ECT protection against impairment of investments by unreasonable or discriminatory measures.[406] The Respondent submits that an analysis of whether the measures in dispute

---

[401] Resp. C-Mem., ¶¶ 1028, 1066, 1121-1122; Resp. Rej., ¶¶ 906-909, 938(a), 972.

[402] Resp. C-Mem., ¶¶ 1053-1054. *See also id.*, ¶¶ 1055-1057, 1061; Resp. Rej., ¶¶ 938-941.

[403] Resp. C-Mem., ¶¶ 1102-1117. *See also* Resp. Rej., ¶¶ 1003-1009.

[404] Resp. C-Mem., ¶ 1160 (citing *Técnicas Medioambientales Tecmed S.A. v The United Mexican* States, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003 (CL-0009) ("***Tecmed v Mexico***"); *Electrabel v Hungary* Decision; and Plama *Consortium Limited v the Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008 (RL-0034) ("***Plama v Bulgaria***")).

[405] Resp. C-Mem., ¶ 1163 (citing, *inter alia, Saluka Investments B.V. v Czech Republic* (UNCITRAL), Partial Award, 17 March 2006 (CL-0028) ("***Saluka v Czech Republic***"); *The Interoceanic Railway of Mexico (Acapulco to Veracruz) (Limited), and The Mexican Eastern Railway Company (Limited), and The Mexican Southern Railway (Limited) v United Mexican States*, Decision No 53; Claim Nos 79 and 85, 28 AJIL 167, 18 June 1931 (CL-0055); and *International Thunderbird Gaming Corporation v United Mexican States* (UNCITRAL), Award, 26 January 2006 (CL-0056)).

[406] Resp. C-Mem., ¶¶ 1171-1172.

are discriminatory or unreasonable under an analysis of the FET standard is only necessary when there has been an impairment of the investment.[407]

### (3) **The Claim**

#### a. **The Claimants' Position**

327.    The Claimants argue that the Respondent's treatment of their investments is in breach of the FET standard because the Respondent: *(i)* failed to provide a stable legal and business framework for their investment; *(ii)* frustrated the Claimants' legitimate expectations; *(iii)* failed to act in a transparent manner and to respect the Claimants' due process rights; and *(iv)* acted in a manner that was arbitrary, unreasonable, disproportionate, and discriminatory.

### (i) Respondent Failed to Provide a Stable Legal and Business Framework for Claimants' Investments

328.    The Claimants maintain that the Respondent failed to provide a stable legal and economic framework for their investments because it overhauled the RD 661/2007 feed-in remuneration regime that was in place at the time of their investments, thus dismantling the legal framework upon which Claimants' investments were premised.[408]  The Claimants refer, *inter alia*, to the tribunal's decision in *Eiser v Spain* to illustrate that the drastic and abrupt change to the RD 661/2007 regime amounts to a violation of the FET standard.[409]

329.    In particular, the Claimants identify six main changes between the RD 661/2007 feed-in remuneration regime and the New Regime through which the value of their investments was allegedly eviscerated.[410]

330.    ***First***, the RD 661/2007 regime was based on maximization of production while the New Regime establishes a completely new remuneration framework applicable to existing

---

[407] Resp. C-Mem., ¶¶ 1167-1170.

[408] Cl. Mem., ¶¶ 261-262; Cl. Reply, ¶¶ 3, 73, 76-77, 134.

[409] Cl. Reply, ¶¶ 1-2, 4.

[410] Cl. Reply, ¶¶ 3, 77.

installations that is not production-oriented.[411]  For instance, through the enactment of RD-2/2013 the Respondent eliminated the premium under the "pool price plus premium" option that was afforded by RD 661/2007 and replaced the Consumer Price Index ("**CPI**")-linked updating index in RD 661/2007 with a lower index, resulting in lower revenue growth.[412]

331.  ***Second***, the RD 661/2007 regime was not subject to any cap on renewable installations' feed-in remuneration or investors' level of profitability (by reference to an alleged principle of "reasonable rate of return" or otherwise) while the New Regime subjects existing installations to a cap by reference to a "target rate of return" on assumed costs.[413]  The Claimants argue, *inter alia*, that the "target rate of return" is retroactive and backward looking in the calculation of the return.[414]

332.  ***Third***, the RD 661/2007 regime entitled the Claimants' hydropower installations to feed-in remuneration for their entire operational lifetimes while the New Regime limits payment of the new feed-in incentive to 25 years from the deemed dates of installations' commissioning without regard to their actual remaining useful life.[415]  The Claimants note that this 25-year period has either already expired or will come to an end shortly for most of the Claimants' plants.[416]

333.  ***Fourth***, the RD 661/2007 regime was based on kWh of electricity produced by each individual plant and thus driven by actual plant-specific variables as determined by the investor, while the New Regime sets arbitrary and unreasonable new remuneration parameters derived from hypothetical standard installations as set by Spain.[417]  This change drastically reduced the level of feed-in remuneration enjoyed by existing

---

[411] Cl. Reply, ¶¶ 80-88.

[412] Cl. Mem., ¶¶ 263-265; Cl. Reply, ¶ 86.

[413] Cl. Reply, ¶¶ 89-114.

[414] Cl. Reply, ¶ 113.

[415] Cl. Reply, ¶¶ 115-118.

[416] Cl. Reply, ¶ 117.

[417] Cl. Reply, ¶¶ 119-125.

installations.[418]  As a result of the Respondent's measures, the Claimants submit that their plants are now only entitled to market price for their electricity.[419]

334.    ***Fifth***, the RD 661/2007 regime contained express commitments that adverse future changes to the statutorily applicable feed-in remuneration would not affect existing installations, while the New Regime enables Spain to unilaterally vary the *ex-post* target return and update the new remuneration parameters for both existing and new installations in regulatory periods with limited scrutiny.[420]

335.    ***Finally***, the RD 661/2007 regime was based on, and driven by, Spain's desire to increase its installed capacity base for different technologies to meet its renewable energy targets by assigning specific Government targets to each technology, while the New Regime abandons these targets and seeks to reduce the remuneration to renewables.[421]

(ii) Respondent Frustrated Claimants' Legitimate Expectations

336.    The Claimants argue that the Respondent made a number of representations to foreign investors with the specific aim of inducing investment in the small-hydro sector.[422]  In particular, the Claimants submit that, at the time of their investments, they had legitimate expectations that: the small-hydro plants they had acquired would be entitled to benefit from the RD 661/2007 feed-in remuneration regime during their entire operational lives in amounts pre-established in RD 661/2007, that any changes to that remuneration regime would be unlikely and that, in any event, such changes would not adversely impact existing small-hydro facilities nor would they fundamentally alter the essential characteristics of the regulatory framework on the basis of which they invested.[423]

---

[418] Cl. Reply, ¶ 123.
[419] Cl. Reply, ¶ 112.
[420] Cl. Reply, ¶¶ 126-130.
[421] Cl. Reply, ¶¶ 131-133.
[422] Cl. Mem., ¶ 250.
[423] Cl. Reply, ¶ 169.

337.    The Claimants claim that their expectations were legitimate based on the express guarantees set out in RD 661/2007 and representations attributable to the Respondent (e.g. through a press release issued by the Ministry of Energy, a statement issued by the Council of Ministers, and presentations for investors given by personnel of the CNE and *InvestinSpain*), which induced the Claimants' investment by guaranteeing that facilities registered by the legal deadline would not be subject to retroactive changes to the feed-in tariff.[424]  In this case, all 33 of the hydropower plants in which the Claimants invested were registered before the legal deadline and hence were eligible for and relied upon the guaranteed feed-in tariff ("**FiT**") under RD 661/2007.[425]

338.    The Claimants also submit that their expectations were legitimate, as they were the result of the Claimants' due diligence prior to making their investment.[426]  The results of the due diligence showed, *inter alia*, the following: *(a)* that for over 30 years the Respondent had consistently updated and improved the regulatory regime of the small-hydro sector without adverse, retroactive regulatory changes; *(b)* that small-hydro was the safest and most "bankable" from among other renewable energy sectors in Spain (e.g. due to its negligible contribution to the regulated costs of the Spanish electricity system and since several small-hydro assets in Spain were owned by semi-public entities and large Spanish utilities); *(c)* IDAE was looking to expand its portfolio of small-hydro assets; *(d)* according to IDAE representatives, the small-hydro sector was sheltered from any future adverse regulatory changes; *(e)* major utilities and foreign infrastructure funds had demonstrated acquisitiveness in the Spanish small-hydro sector; and *(f)* lenders continued to fund small-hydro projects.[427]

339.    The Claimants, relying on *Masdar v Spain,* dismiss the Respondent's allegation that there was any Supreme Court case law that could have constituted a warning to the Claimants of the possibility of regulatory changes.[428]  The Claimants submit that *(a)* the first group of

---

[424] Cl. Mem., ¶¶ 79, 251-254, 266; Cl. Reply, ¶¶ 169-170; Tr. Day 1, 33:8-36:20.

[425] Cl. Mem., ¶ 254; Cl. Reply, ¶ 202.

[426] Cl. Mem., ¶ 255; Cl. Reply, ¶¶ 8, 171.

[427] Cl. Mem., ¶¶ 256-260; Cl. Reply, ¶¶ 6, 8, 169, 236; Cl. PHB, ¶ 52.

[428] Cl. PHB, ¶ 63 (citing *Masdar v Spain*, ¶ 496(iii)).

case law upon which the Respondent relies did not concern the regime established under RD 661/2007;[429] *(b)* the second group of case law from December 2009 do not support the Respondent's contention that the government had unlimited authority to make sweeping changes to the regulatory framework for the small-hydro sector;[430] and *(c)* the third group of case law are post-investment judgments that could not have put the Claimants on notice – at the time of their investment – about Spain's upcoming regulatory changes, nor could they have an effect on the legitimacy of their expectations.[431]

340.    The Claimants submit that, because Spain is unable to engage with this record, the Respondent has mischaracterized the regulatory regime applicable at the time of the Claimants' investments.[432]    The Claimants argue that, contrary to the Respondent's assertions: *(a)* renewable electricity generation was not a regulated activity under the Electricity Act 54/1997;[433] *(b)* there was no overriding principle of "economic sustainability" or "financial self-sufficiency" within Spanish regulation at the time of the Claimants' investments;[434] *(c)* Article 44(3) of RD 661/2007 contained an unambiguous and unequivocal guarantee of non-retroactivity to specific facilities –i.e. those that were commissioned by a particular date;[435] and *(d)* under the regulatory regime existing at the time of the Claimants' investments, brownfield projects had the same rights and received the same feed-in remuneration as greenfield projects.[436]

341.    In response to the Respondent's contention that the Claimants were or should have been aware of surrounding circumstances and relevant regulations, the Claimants assert that the facts, laws and case law invoked by the Respondent do not undermine the Claimants' legitimate expectations.[437]  Specifically, the Claimants argue that the Respondent is

---

[429] Cl. Reply, ¶ 244; Tr. Day 1, 100:9-102:8; Cl. PHB, ¶ 65.

[430] Cl. Reply, ¶ 243; Tr. Day 1, 102:9-108:24; Cl. PHB, ¶ 66.

[431] Cl. Reply, ¶ 242; Tr. Day 1, 109:6-109:17; Cl. PHB, ¶ 69.

[432] Cl. Reply, ¶¶ 11, 14, 173.

[433] Cl. Reply, ¶¶ 175-179.

[434] Cl. Reply, ¶¶ 12, 1180-187.

[435] Cl. Reply, ¶¶ 7, 189-203.

[436] Cl. Reply, ¶¶ 204-210.

[437] Cl. Reply, ¶¶ 211-223, 225-255.

estopped from relying on the tariff deficit which pre-existed the commitments it made under RD 661/2007, and in any case, the Claimants could not have expected, at the time of their investments, that the tariff deficit could affect their feed-in remuneration to the small-hydro sector, which accounted for only a fraction of the regulated costs to the Spanish electricity system.[438]

342. The Claimants submit that they were not on notice of potential adverse changes despite the evolution of the regulatory framework.[439] On the contrary, RD 661/2007 provided guarantees against adverse, retroactive regulatory changes and provided investors with greater predictability.[440] Even the regulatory changes introduced by Spain in 2010 to the PV sector are said to reinforce this conclusion precisely because they were PV-specific, since the PV sector was a major contributor to the regulated costs of the electricity system (while small-hydro's contribution was negligible).[441]

343. Accordingly, the Claimants argue that the measures introduced by Spain in 2010 were not comparable to the 2013 measures as they had a limited impact on the PV sector and were not relevant to the small-hydro sector.[442]

344. In addition, the Claimants dismiss case law cited by the Respondent, noting that the vast majority of those cases were issued after the Claimants' investments in 2011 and involve facts distinguishable from the present case.[443] Similarly, with respect to the Respondent's reliance on decisions by the *Charanne v Spain* and *Isolux v Spain* tribunals, the Claimants argue that those cases are not relevant as they involved a different renewable energy sector (PV, as opposed to small-hydro) and concerned different facts.[444] Moreover, neither media

---

[438] Cl. Reply, ¶¶ 13, 213-215.

[439] Cl. Reply, ¶¶ 216-217. *See also id.*, ¶¶ 219-223, 225-240.

[440] Cl. Reply, ¶¶ 216-217.

[441] *See*, e.g. Cl. Reply, ¶ 10.

[442] *See*, e.g. Cl. Mem., ¶ 108; Cl. Reply, ¶¶ 10, 231-236.

[443] Cl. Reply, ¶¶ 241-250.

[444] Cl. Reply, ¶¶ 272-286.

reports nor the Claimants' transaction documents demonstrate knowledge of future changes to the RD 661/2007 regime.[445]

345.　The Claimants further argue that, at the time of their investments in 2011, the Respondent had expressly indicated that existing investments made under RD 661/2007 would not be affected by any adverse future changes, and that this understanding was confirmed by government institutions such as IDAE, financial institutions, and other market participants.[446]

346.　With regard to supporting documents that the Respondent introduced on the record in its rejoinder to allege that other market participants were aware that Spain could revoke RD 661/2007, the Claimants argue that: *(a)* the Respondent quoted the documents misleadingly and selectively; *(b)* none of the documents concerned the small-hydro sector; *(c)* a number of the documents introduced were post-investment; and *(d)* none of the documents could have put an investor on notice of the possibility of revocation of RD 661/2007.[447]

347.　Finally, the Claimants highlight that their position "is not (and has never been) that they expected that Spain would 'petrify' its regulatory framework … Claimants' case is that Spain cannot modify its laws in a manner that is inconsistent with its specific promises and representations, and resulting legitimate expectations, as to how it would modify its laws in the future *with respect to existing investments*".[448]

348.　Based on the above, the Claimants conclude that the Respondent's disputed measures frustrated the Claimants' legitimate expectations at the time of their investments by repealing the RD 661/2007 regime in its entirety, in breach of the FET standard.[449]

---

[445] Cl. Reply, ¶¶ 251-253

[446] Cl. Mem., ¶ 249. *See also* Cl. Reply, ¶¶ 256-265.

[447] Tr. Day 1, 90:20-99:10; Cl. PHB, ¶¶ 75-76.

[448] Cl. Reply, ¶¶ 17, 199 (emphasis in the original).

[449] Cl. Reply, ¶¶ 270, 286.

> (iii) Respondent Failed to Act in a Transparent Manner and to Respect Claimants' Due Process Rights

349.    The Claimants argue that the Respondent failed to act in a transparent manner and to respect the Claimants' due process rights.[450]  The Claimants arguments in support of this assertion include the following:

350.    **_First_**, the disputed measures were contrary to the Respondent's Renewable Plans of 2005-2010 and 2011-2020 which noted that the small-hydro sector required further development.[451]

351.    **_Second_**, the ability of affected parties to participate in the design of the new regulatory framework was very limited.[452]  The Claimants submit that the Respondent failed to give them "meaningful opportunity" to participate in adopting the disputed measures or disclose reports the remuneration parameters were allegedly based on.[453] According to the Claimants, they became aware of RD-L 9/2013 only a day before the measure was adopted, which limited the Claimants' ability to intervene in the design of the new regulatory framework.[454]

352.    **_Third_**, during the eleven months following the enactment of RD-L 9/2013, the Respondent failed to provide any information as to which remuneration any qualifying plant would be entitled to. Therefore, the Claimants argue that the Respondent failed to provide predictability and legal certainty to the Claimants' investment.[455]  Moreover, even after the enactment of the implementing measures of June 2014, the Respondent failed to define the precise economic regime that was to apply to qualifying installations.[456]

---

[450] Cl. Mem., ¶ 292; Cl. Reply, ¶ 297.

[451] Cl. Mem., ¶ 293.

[452] Cl. Mem., ¶ 294.

[453] Cl. Mem., ¶ 294; Cl. Reply, ¶ 296(b).

[454] Cl. Reply, ¶ 296(b).

[455] Cl. Mem., ¶ 295; Cl. Reply, ¶ 289.

[456] Cl. Mem., ¶ 296.

353.     ***Fourth***, the current regime provides no certainty regarding the applicable remuneration parameters since all but two of them can be changed by the Government through regulatory periods of six years (which are in turn divided into two periods of three years each).[457]

354.     ***Finally***, according to the Claimants, the Respondent also failed to disclose the technical reports on which the remuneration parameters were allegedly based, despite multiple requests.[458]  The Claimants argue that the Respondent's subsequent explanations with respect to these reports corroborate Claimants' arguments because they reflect arbitrariness of the methodology used and raise doubts as to what extent the Respondent relied on the findings of the report.[459]

(iv) Respondent's actions were arbitrary, unreasonable, disproportionate, and discriminatory

355.     The Claimants submit that the Respondent also violated the FET standard because the measures at issue were *(i)* arbitrary or *(ii)* unreasonable, *(iii)* disproportionate, and *(iv)* discriminatory.

356.     ***First***, concerning the arbitrariness of the Respondent's measures, the Claimants argue that the sudden and retroactive change in the Respondent's policy with regard to the small-hydro sector, as well as the constant changes to the regulatory framework applicable to the Claimants' investments, were arbitrary.[460]

357.     In addition, the Claimants consider that the New Regime is itself arbitrary, *inter alia*, because: it limits payment of the specific remuneration to a maximum period of 25 years of operation, far shorter than the operational life of hydro plants and the length of hydro-energy concessions; the new remuneration parameters do not reflect the circumstances of actual renewable facilities but are instead based on "standard" hypothetical categories of installations unilaterally defined by Spain; the Respondent has imposed a cap for all

---

[457] Cl. Mem., ¶ 297; Cl. Reply, ¶ 295.

[458] Cl. Mem., ¶ 298; Cl. Reply, ¶¶ 291-292.

[459] Cl. Mem., ¶ 298; Cl. Reply, ¶¶ 293-294.

[460] Cl. Mem., ¶ 301.

renewable technologies to ensure that the specific remuneration does not go beyond an arbitrarily defined "*ex post* target return" of 7.398% pre-tax; and it allows the Respondent to unilaterally modify at regular intervals the ex-post target return and the new remuneration parameters for both existing and new facilities.[461]

358.    **Second**, with respect to the alleged unreasonable nature of the measure, the Claimants apply Professor Christoph Schreuer's fourfold test and maintain that the Respondent's actions were arbitrary because they: *(a)* lacked a legitimate purpose; *(b)* were not based on acceptable legal standards; *(c)* were taken for reasons different from purported reasons; and *(d)* wilfully disregarded due process and proper procedure.[462]

359.    In addition, the Respondent's measures do not satisfy the reasonableness test because they were not taken to pursue a rational policy goal nor were they tailored to achieve such goal. The Claimants highlight that the measures were enacted to cure the result of the Respondent's own "regulatory malfeasance".[463]  The Claimants argue that the application of the 7% TVPEE and the Water Levy were unreasonable since the TVPEE was ineffective to meet its alleged environmental purpose and the Water Levy imposed a tax that was already paid by the Claimants in existing hydraulic concession royalties.[464]  Moreover, the Claimants rely on *BG v Argentina* to assert that a unilateral withdrawal of undertakings given by States in good faith to investors is by definition unreasonable.  Accordingly, the Respondent's unlawful modification of its regulatory regime was "patently unreasonable".[465]

360.    **Third**, the Claimants argue that the Respondent's measures against the small-hydro sector were disproportionate and in breach of the FET standard because: *(a)* they did not pursue a legitimate aim nor were they reasonably connected to the Respondent's stated

---

[461] Cl. Mem., ¶ 302; Cl. Reply, ¶¶ 3(d), 121, 126-130; Cl. PHB, ¶¶ 105-109.

[462] Cl. Mem., ¶ 300.

[463] Cl. Mem., ¶ 305.

[464] Cl. Mem., ¶ 305.

[465] Cl. Mem., ¶ 305 (citing *BG Group Plc. v Republic of Argentina* (UNCITRAL), Final Award, 24 December 2007 (CL-0066) ("***BG v Argentina***"), ¶¶ 343 and 346); *see also* Cl. Reply, ¶ 302.

objective;[466] **(b)** the Respondent failed to consider available, less restrictive, alternative measures for reducing the tariff deficit, for instance by disregarding a National Energy Commission's Report which contained 24 alternative measures;[467] and **(c)** the harm inflicted on the small-hydro sector by the disputed measures far exceeds the purported benefit of the Respondent's objective to reduce the tariff deficit. For instance, under the current regime 85% of the small-hydro facilities no longer receive any remuneration above the market price and the share of savings extracted from the small-hydro sector was about four times higher than the share of its contribution to the costs of the Special Regime, while the feed-in remuneration to small-hydro accounted for only a fraction of the regulated costs to the Spanish electricity system.[468]

361.   The Claimants add that the Respondent has not provided any evidentiary support for its assertion that the disputed measures were proportionate.[469] In fact, contrary to the Respondent's assertion, neither Spanish court decisions nor international institutions or the markets have endorsed the proportionality of the Respondent's disputed measures.[470] For instance, with regard to an alleged "renewable boom" in the market, the Claimants submit that the vast majority of transactions from 2013 onwards consist of distressed sales at prices materially below the original value of the investment.[471]

362.   In addition, the Claimants submit that the regime in which they invested never gave rise to any concerns of State aid (e.g. there is no finding by any EU institution that the RD 661/2007 feed-in remuneration regime constituted incompatible EU state aid law), and therefore the Respondent errs in arguing that an investor should have known that the Special Regime could constitute illegal State aid and therefore would have to be repealed.[472]

---

[466] Cl. Mem., ¶¶ 276, 279; Cl. Reply, ¶¶ 143-152.
[467] Cl. Mem., ¶¶ 280-281; Cl. Reply, ¶¶ 13, 153-157.
[468] Cl. Mem., ¶ 283; Cl. Reply, ¶¶ 5, 158 and fn 259.
[469] Cl. Reply, ¶ 140.
[470] Cl. Reply, ¶¶ 159-168.
[471] Cl. Reply, ¶ 167.
[472] Cl. PHB, ¶¶ 70-74. *See also* Cl. Reply, ¶¶ 266-268.

363.  **Finally**, the Claimants argue that the Respondent's treatment of other conventional power and renewable energy producers reflects the Respondent's discriminatory treatment against the Claimants' investments.[473]  In their Reply, for example, the Claimants maintain that the small-hydro facilities experienced a 92.6% cut in the revenues, which is almost six times the average cut of 17.85% across all other technologies in the Special Regime.[474]  In addition, the Claimants note that the Water Levy only applied to hydropower producers and not to other renewable energy and conventional power producers.[475]  Moreover, the TVPEE was discriminatory since renewable energy producers were unable to pass through the additional costs imposed by this tax to consumers while conventional power producers could.[476]

364.  Based on the above, the Claimants conclude that the Respondent breached the FET clause of the ECT.

b.  **The Respondent's Position**

365.  The Respondent submits that it complies with the FET standard of the ECT for the following reasons: *(i)* the Respondent did not violate the Claimants' expectations and respected the duty to create stable conditions set forth in the ECT; *(ii)* the Respondent acted in a transparent manner without infringing upon the Claimants' due process rights; and *(iii)* the measures adopted by the Respondent were reasonable, proportionate, non-arbitrary, and non-discriminatory.  Each of these arguments is analysed below.

(i)  Respondent did not Breach Claimants' Legitimate Expectations nor its Duty to Create Stable and Equitable Business Framework

366.  The Respondent submits that it did not breach the FET standard because it did not violate the Claimants' legitimate expectations, and it respected the duty to create stable conditions set forth in the ECT.

---

[473] Cl. Mem., ¶ 309; Cl. Reply, ¶¶ 298, 300.
[474] Cl. Reply, ¶ 300(a).
[475] Cl. Reply, ¶ 300(b).
[476] Cl. Mem., ¶ 309; Cl. Reply, ¶ 158(c).

367.    The Respondent rejects that the Claimants had legitimate expectations because there is no evidence that the Claimants performed an exhaustive analysis of the applicable legal framework.[477]  For instance, the Claimants failed to establish that they had examined Spanish case law regarding the rights of renewable energy investor in Spain, prior to making their investments.[478]  The Claimants' lack of due diligence means that their intended expectations cannot be deemed to be real and objective.[479]

368.    Moreover, even if a due diligence had been performed by the Claimants, the Respondent argues that it has not breached the FET standard because: *(a)* there were no specific commitments in the Spanish regulatory framework on the future immutability of the framework of RD 661/2007 in favour of renewable energy facilities;[480] *(b)* the Claimants' expectations are not reasonable in light of the regulatory framework actually in place in Spain, nor can they have arisen out of alleged statements of Spain aimed at attracting investment;[481] *(c)* the Respondent has respected the duty to create stable conditions set forth in the ECT; [482] and *(d)* no retroactive measures in breach of the ECT have been adopted.[483]

369.    *First*, the Respondent maintains that RD 661/2007 does not provide any guarantee or commitment to freeze the Respondent's framework in favour of the Claimants or their investment.[484]  The Respondent argues that the regulatory framework only guaranteed a reasonable rate of return, which is a "level playing field" with ordinary power plants.[485] The Respondent draws attention to multiple case law that examined the Spanish regulatory framework, which, contrary to the Claimants' assertions, denied that RD

---

[477] Resp. C-Mem., ¶¶ 1053-1065.

[478] Resp. C-Mem., ¶¶ 1063-1064.

[479] Resp. C-Mem., ¶ 1065.  *See also id*., ¶¶ 1059-1060, 1064, 1079.

[480] Resp. C-Mem., ¶¶ 1068-1072.

[481] Resp. C-Mem., ¶¶ 1073-1089.

[482] Resp. C-Mem., ¶¶ 1090-1101.

[483] Resp. C-Mem., ¶¶ 1102-1117.

[484] Resp. C-Mem., ¶ 1068; Resp. Rej., ¶ 960.

[485] Resp. C-Mem., ¶ 1068.

661/2007 granted investors reasonable expectations that the regulatory framework would remain unchanged.[486]

370.    **Second**, the Respondent argues that the Claimants' expectations are not objective nor reasonable with respect to the regulatory framework in place and all relevant circumstances.[487]  The Respondent asserts that the Claimants knew or should have known essential principles of Spain's regulatory framework, including, *inter alia*, the following: that subsidies to the special regime are a cost of the Spanish electricity system; the principle of a reasonable rate of return within the framework of a sustainable Spanish electricity system; that the subsidies were determined according to the evolution of the demand and other basic economic data; and that the successive regulatory changes adopted by the Respondent were motivated by the need to correct situations of over-remuneration and guarantee the sustainability of the system.[488]

371.    Also, the Respondent claims that the Claimants could not have been unaware of the limits to subsidies for renewable energies derived from EU law and therefore the Claimants could not have expectations that they had acquired a right to receive public subsidies.[489]

372.    Moreover, the Respondent submits that the Claimants' argument is based on insufficient evidence.  The Respondent rejects the Claimants' reliance on alleged statements of Spain aimed at attracting investment, including presentations made by CNE workers (which were in Spanish and not targeted at foreign investors), a presentation by InvestSpain (an advertising brochure uncapable of creating objective expectations for diligent investors), informal conversations with IDAE employees, and a press release announcing the future publication of RD 661/2007.[490]

---

[486] Resp. C-Mem., ¶ 1069 (citing *Charanne v Spain*, ¶¶ 504, 508); Resp. Rej., ¶¶ 964-969.

[487] Resp. C-Mem., ¶¶ 1074-1075, 1083, 1085; Resp. Rej., ¶¶ 939, 950-952.

[488] Resp. C-Mem., ¶ 1075-1078.  *See also id.*, ¶ 1083.

[489] Resp. Rej., ¶¶ 946-948.

[490] Resp. C-Mem., ¶¶ 1073, 1086-1089; Resp. Rej., ¶¶ 933, 961-962.

373.    The Respondent points to other public statements and behaviours made during the time of the Claimants' investments that provided warnings for possible changes to the regulatory frame in cases of over-remuneration or possible unsustainability of the market.[491] In addition, the Respondent notes that the Claimants' expectations were not shared by other relevant investors, which evidences that the Claimants' assertion is based on the Claimants' own subjective expectations.[492]  The Respondent considers that the Claimants were aware or should have been aware of these circumstances.[493]

374.    The Respondent further claims that in Spain, courts control the regulatory power and the legality of an administrative action; therefore, an investor's due diligence process should not neglect the importance of Supreme Court case law.[494]  With regard to the Claimants' argument that Supreme Court judgments could not have affected their expectations, the Respondent submits that the Claimants attempt to mischaracterise the role of jurisprudence in the Spanish framework when, in fact, the Spanish Supreme Court had ruled that regulatory changes were permissible provided that the Government respected the principle of a reasonable rate of return.[495]

375.    The Respondent dismisses the Claimants' reliance on *Masdar v Spain* to establish that there was no Supreme Court case law that could have put them on notice of the possibility of regulatory changes and argues that contrary to what the *Masdar v Spain* tribunal found, three Supreme Court judgments of December 2009 examined RD 661/2007.[496]

376.    ***Third***, the Respondent submits that it has respected the duty to create stable conditions reflected in the ECT.[497]  The Respondent claims that it maintained the essential nature of the regulatory framework in which the Claimants made their investments by ensuring that

---

[491] Resp. Rej., ¶¶ 933, 949-952, 1011.
[492] Resp. Rej., ¶¶ 943, 954-959.
[493] Resp. Rej., ¶¶ 940-941, 959.
[494] *See*, e.g. Resp. C-Mem., ¶¶ 261-262, 361-362, 1060-1061; Resp. Rej., ¶ 429.
[495] *See*, e.g. Resp. C-Mem., ¶¶ 367, 371, 376, 377, 540; Resp. Rej., ¶ 426.
[496] Resp. PHB, ¶¶ 181-183.
[497] Resp. C-Mem., ¶¶ 1090-1101.

the Claimants were able to obtain a reasonable rate of return and recover investment and operating costs.[498]

377.   The Respondent submits that the obligation to create "stable conditions" set forth in ECT Article 10(1) of the ECT has been respected, *inter alia*, since the contested measures: *(a)* maintained the subsidies for renewables as a cost of the Spanish electricity system tied to their sustainability; *(b)* maintained the priority of access and dispatch; *(c)* maintained the principle that the remuneration of the special regime consists of a subsidy which allows investors to receive a reasonable rate of return; *(d)* maintained the methodology whereby subsidies are determined; and *(e)* resolved a situation of imbalance which jeopardized the economic sustainability of the Spanish energy system.[499]  The Respondent notes that these essential elements were recognized by the *Charanne v Spain* award.[500]  In this regard, the Respondent rejects the Claimants' reliance in the *Eiser v Spain* award, since such award does not discuss the essential elements established in the *Charanne v Spain* case; instead, it ignores them and incorrectly assumes that regulators should adjust the regulatory framework to the subjective behavior of investors.[501]

378.   The Respondent rejects the Claimants' references to other "essential elements" of the Spanish regulatory framework because such elements have not been recognized in any award and they did not exist during the Claimants' investment; therefore, they are not admissible.[502] For instance, to claim that the RD 661/2007 regime was based on maximization of production is incorrect since the Claimants invested at a time (2011) when they knew that the Government had limited the subsidized hours to other renewable energy sectors.  The Claimants could also not reasonably have expected unlimited profits based on EU regulations of State aid. Also, regarding the Claimants' argument that the RD 661/2007 regime was based on Spain's desire to increase its renewable energy capacity, the Claimants should have known that the objectives were defined in periodic

---

[498] Resp. C-Mem., ¶¶ 1097-1098.

[499] Resp. C-Mem., ¶ 1100; Resp. Rej., ¶¶ 984, 986, 1002.

[500] *See* Resp. Rej., ¶¶ 982-983, 1002.

[501] Resp. Rej., ¶¶ 994-1001.

[502] Resp. Rej., ¶¶ 988-990.

plans and that the objectives changed in each plan. The Claimants could therefore not have ignored that there had been modifications over time for renewable energies technologies.[503]

379.    **Fourth**, the Respondent asserts that the disputed measures are not retroactive under international law in that they only applied to "future events" and did not affect acquired rights.[504] The Respondent also notes that its Supreme Court and the Council of State have confirmed the non-retroactive nature of the modifications, given that they apply to the future without affecting acquired rights.[505]

380.    Moreover, the Respondent highlights that some of the Claimants' plants were built decades prior to the enactment of RD 661/2007 and hence they could never have expected the petrification of a future remuneration framework when they were built.[506]

381.    In its Rejoinder, the Respondent claims, as further evidence of the Claimants' lack of legitimate expectations, that they made investments in the Spanish PV sector in 2009,[507] that the Claimants' parent company filed a claim against Spain prior to its investments in 2011 for breach of the ECT arising out of 2010 measures in relation to facilities registered with the RAIPRE,[508] and that internal documents and contracts of the Claimants and their related enterprises show that they were aware of the regulatory risks and warnings of the Spanish Government.[509]

382.    The Respondent further submits that the Claimants failed to seek the necessary due diligence that any diligent investor would have sought after the measures of 2010.[510] In view of this lack of due diligence, the alleged infringement of the Claimants' legitimate expectations must be rejected.[511] Even if the Claimants had performed a due diligence, the

---

[503] Resp. Rej., ¶¶ 989-990.

[504] Resp. C-Mem., ¶ 1108. *See also id.*, ¶¶ 1102-1117; Resp. Rej., ¶¶ 1004-1005, 1007, 1009.

[505] Resp. C-Mem., ¶¶ 114-1115.

[506] Resp. Rej., ¶ 926.

[507] Resp. Rej., ¶ 934.

[508] Resp. Rej., ¶¶ 12(d), 635, 935, 963.

[509] Resp. Rej., ¶¶ 626, 663-693, 933, 944; Resp. PHB, ¶¶ 147-149.

[510] Resp. C-Mem., ¶¶ 681 734, 1059-1060, 1065; Resp. Rej., ¶ 10; Resp. PHB, ¶¶ 150-169.

[511] Resp. C-Mem., ¶ 1065.

Respondent submits that the contested measures did not breach the objective legitimate expectations of the Claimants since *(a)* there was no specific commitment in the Spanish regulatory framework on the future immutability of the framework of RD 661/2007 in favor of renewable energy facilities; *(b)* the Claimants' expectations are not reasonable and justified in relation to the contested measures; *(c)* Spain respected the duty to create stable conditions set forth in the ECT; and *(d)* no retroactive measures in breach of the ECT have been adopted.[512]

383.    In its Rejoinder, the Respondent submits that due diligence reports submitted by the Claimants only show that they were warned about possible changes in the tariffs of RD 661/2007.[513]

> (ii) Respondent acted in a Transparent Manner without Infringing upon the Claimants' Due Process Rights

384.    The Respondent denies lack of transparency with respect to both the publication of the disputed measures and the procedure followed for the adoption of the measures.[514] In particular, the Respondent submits the following:

> Spain has been transparent, since, in any case: (i) it has justified and publicised the need for the reforms; (ii) it has followed the legally established procedures, without any unjustified delays; (iii) it has guaranteed participation in the regulatory process by the holders of legitimate rights; (iv) it has not incurred in retroactivity contrary to the legal framework; (v) it has not hidden any information that would affect the drafting of the reforms; and (vi) it has approved a regulatory system that is predictable and dynamic.[515]

385.    *First*, the Respondent argues that the justification for reforming the electrical sector was shared publicly over time, in a clear and foreseeable manner, accompanied by relevant legislative changes such as the Electricity Sector Act in 2011.[516]

---

[512] Resp. C-Mem., ¶¶ 1066-1117.

[513] Resp. Rej., ¶¶ 651-662.

[514] Resp. C-Mem., ¶¶ 1118-1119; Resp. Rej., ¶¶ 1012-1013.

[515] Resp. C-Mem., ¶ 1127. *See also id.*, ¶ 1165.

[516] Resp. C-Mem., ¶¶ 1127, 1129-1132.

386.  **Second**, with respect to the transitional period of eleven months that was taken to approve MO IET/1045/2014, the Respondent highlights that the sector was "well aware" of the drafts in the preparation of RD 432/2014 and of MO IET/1045/2014 because hearings were provided for all stakeholders and there were multiple pleadings by interested parties including renewable energy producers and associations from the sector.[517]  The Respondent argues that these parties participated actively and were "clearly aware of the reduced margins for the final wording of the remuneration parameters".[518]  The Respondent also notes that contrary to what the Claimants assert, the delay of eleven months was a consequence of the time spent in reviewing the volume of observations received, and therefore is justified.[519]

387.  **Third**, the Respondent rejects the Claimants' assertion that the Respondent limited the Claimants' ability to intervene in the framing of the new legal regime and argues that interested parties were granted participation in multiple occasions, and that the measures were preceded by a broad debate with the renewable energy sector.[520]

388.  **Fourth**, the Respondent argues that it has not violated the duty of transparency because the disputed measures are not retroactive.[521]

389.  **Fifth**, the Respondent acknowledges that the report issued by Roldan Berger was received after the approval of both RD 413/2014 and MO IET/1045/2014.[522]  The Respondent explains that the report was only a "technical support" for IDAE in the preparation of the analysis of the costs of the plants, and therefore, was not determinant for drafting the order.[523]  Consequently, the Respondent argues that the report does not affect the transparency analysis under the ECT.[524]

---

[517] Resp. C-Mem., ¶¶ 1139, 1143-1144; Resp. Rej., ¶ 1015.
[518] Resp. C-Mem., ¶ 1144.
[519] Resp. C-Mem., ¶¶ 1135-1136.  *See also id.*, ¶ 1137.
[520] Resp. C-Mem., ¶¶ 1141-1142; Resp. Rej., ¶ 1013(a).
[521] Resp. C-Mem., ¶ 1149.
[522] Resp. C-Mem., ¶ 1152.
[523] Resp. C-Mem., ¶¶ 1152-1153.
[524] Resp. C-Mem., ¶ 1153.

390.    **Sixth**, the Respondent submits that the regulatory periods of three or six years established by the new legal regime are predictable and constitute an element of security for investors. Therefore, these periods provide stability for the value of the investment.[525]

391.    Given that Spain publicised the disputed measures well in advance of their enactment, allowed public participation and developed the reforms in accordance with the applicable legal provisions, the Respondent asserts that it has complied with its obligation of acting in a transparent manner, and respected due process.[526]

(iii)    The measures adopted by Respondent were reasonable, proportionate, non-arbitrary and non-discriminatory

392.    The Respondent alleges that the measures at issue were *(i)* reasonable, *(ii)* proportional, *(iii)* non-arbitrary, and *(iv)* non-discriminatory.

393.    **First**, regarding the reasonability of the measures, the Respondent mentions that: the Spanish energy system faced unsustainable economic circumstances in 2012;[527] the remuneration method challenged by the Claimants was expressly proposed by the renewable energy sector in 2009;[528] the contested measures have been accepted by domestic and foreign investors as reasonable and attractive (in fact, there was a "boom in renewable energy" in 2015);[529] and the Claimants' plants will receive a total after-tax return of 17.2%, which is reasonable and proportionate.[530]

394.    In addition, the Respondent argues that the measures are reasonable and compliant with the FET standard because they were *(a)* based on a rational policy, and *(b)* reasonable in relation to the policy.[531] The Respondent maintains that the contested measures were based on a rational policy to control the tariff deficit and protect consumers, and constitute an

---

[525] Resp. C-Mem., ¶¶ 1155-1158.

[526] *See* Resp. C-Mem., ¶¶ 1162, 1164-1165; Resp. Rej., ¶ 1013.

[527] Resp. C-Mem., ¶¶ 1176-1178.

[528] Resp. C-Mem., ¶¶ 1179-1182.

[529] Resp. C-Mem., ¶¶ 1183-1184.

[530] Resp. Rej., ¶¶ 1033, 1035.

[531] Resp. C-Mem., ¶¶ 1201-1215; Resp. Rej., ¶¶ 1026, 1038.

admissible public policy interest according to relevant precedents.[532]   Moreover, the measures were reasonable because they affected all interested parties and there is an appropriate correlation between the objective of the public policy (to deal with the tariff deficit) and the measures adopted to reach this objective (by allowing investors to receive a reasonable rate of return).[533]

395.   ***Second***, in addressing the Claimants' assertion that the measures at issue were disproportionate, the Respondent dismisses the *Occidental v Ecuador* case cited by the Claimants as irrelevant, on the basis that the case did not interpret the ECT.[534]   The Respondent further argues that, in any case, the Claimants' arguments based on the criteria set forth in *Occidental v Ecuador* are unfounded.[535]   Among other reasons, the Respondent submits that the Claimants relied on proposed alternatives without examining their feasibility, and therefore, have not demonstrated that the disputed measures were more restrictive than other alternatives for achieving its aim.[536]   The Respondent adds that the proportionality of the measures at issue has been confirmed by the European Commission, domestic State bodies including the Spanish Constitutional Court, and other international organizations such as the International Monetary Fund.[537]

396.   ***Third***, regarding the prohibition of "arbitrariness", the Respondent submits that this is not an independent standard of protection under Article 10(1) of the ECT and Spain discusses it within the above-mentioned standards of reasonableness and proportionality.[538]

397.   ***Fourth***, the Respondent argues that the disputed measures are not discriminatory. The Respondent rejects the Claimants' argument that regulatory distinctions made without justification between things that are like may amount to discriminatory treatment.   Among other reasons, the Respondent submits that the Claimants fail to show to what degree the

---

[532] Resp. C-Mem., ¶¶ 1202-1208; Resp. Rej., ¶¶ 1027-1031.

[533] Resp. C-Mem., ¶¶ 1209-1214; Resp. Rej., ¶ 1032.

[534] Resp. Rej., ¶ 1040 (citing Cl. Reply, ¶¶ 141-168).

[535] Resp. Rej., ¶¶ 1041, 1054.

[536] Resp. Rej., ¶¶ 1046-1049.

[537] Resp. Rej., ¶¶ 1045, 1051-1053.

[538] Resp. C-Mem., ¶ 1172. *See also id.*, ¶¶ 1173-1175.

different energy sub-sectors may be treated as a valid reference group; and do not demonstrate in what way they have been discriminated in comparison to other investors in the hydraulic sector when all renewable energy producers were affected by the reforms.[539]

398.    The Respondent also claims that the disputed measures are not discriminatory based on Dr Schreuer's fourfold test that was adopted by the *EDF v Romania* tribunal.[540]  According to the Respondent, in addition to serving a legitimate purpose, the measures were implemented in accordance with the relevant laws in place and Spanish Supreme Court case law, adopted for the same reasons announced by the President of the Government in 2011 (i.e. adopted for the same reasons put forward by the decision maker), and adopted in full compliance with due process and following the proper legal procedures.[541]

399.    In conclusion, the Respondent argues that the measures were based on a rational policy and were carried out in a reasonable, proportional, and non-discriminatory manner.  Hence, it has complied with the FET standard under the ECT.[542]

### C.    **Alleged Breach of the Obligation not to Impair by Unreasonable or Discriminatory Measures the Management, Maintenance, Use, Enjoyment or Disposal of Claimants' Investments under Article 10(1) of the ECT**

#### (1) **Introduction**

400.    The Claimants submit that the Respondent's measures were both unreasonable and discriminatory.[543] The Claimants allege that the disputed measures impaired the Claimants' investments by eviscerating the value and economic benefits of the Claimants' investments.[544]

---

[539] Resp. C-Mem., ¶¶ 1192-1195.

[540] Resp. C-Mem., ¶¶ 1198-1200 (citing *EDF (Services) Limited v Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009 (RL-0035) ("***EDF v Romania***"), ¶ 303); Resp. Rej., ¶¶ 1018, 1023.

[541] Resp. C-Mem., ¶ 1199.

[542] *See* Resp. Rej., ¶ 1038.

[543] Cl. Mem., ¶ 315 (referring to Sections IV.B.6 and IV.B.7 of Claimants' Memorial); Cl. Reply, ¶ 306.

[544] Cl. Mem., ¶ 316; Cl. Reply, ¶ 308.

401.    The Respondent maintains that its measures were reasonable and non-discriminatory.[545] The Respondent also contends that the Claimants' investments suffered no impairment because the Claimants' Internal Rate of Return ("**IRR**") came to 16.4%, surpassing a "reasonable rate of return".[546]

### (2) The Applicable Legal Standard

402.    Article 10(1) of the ECT provides that "no Contracting Party shall in any way impair by unreasonable or discriminatory measures [the] management, maintenance, use, enjoyment or disposal [of Investments of Investors of other Contracting Parties]".[547]

403.    Both Parties seem to agree that Article 10(1) of the ECT prohibits impairment measures that are either unreasonable or discriminatory.[548]

### a. The Claimants' Position

404.    The Claimants submit that in meeting the standard of reasonableness, as examined in the context of the FET standard, the Respondent must show that the measures at issue were taken in pursuance of a rational policy goal and that they were appropriately tailored to achieve the goal.[549] The Claimants note that the analysis for reasonable and non-discriminatory treatment under the FET standard is also applicable here.[550]

405.    With respect to 'impairment', the Claimants submit that the concept must be determined by assessing the objective impact that the measures at issue had on the investments.[551] The Claimants further argue that the concept cannot be measured by the Respondent's subjective notion of a "reasonable rate of return".[552]

---

[545] *See* Resp. C-Mem., ¶¶ 1170, 1185-1188.

[546] Resp. C-Mem., ¶¶ 1185-1186.

[547] Energy Charter Treaty, Article 10(1).

[548] Cl. Mem., ¶ 313; Resp. C-Mem., ¶¶ 1167, 1197; Cl. Reply, ¶ 305.

[549] Cl. Mem., ¶ 314; *see also* Cl. Mem., ¶¶ 303-305.

[550] Cl. Mem., ¶ 315; Cl. Reply, ¶ 310.

[551] Cl. Reply, ¶ 308.

[552] Cl. Reply, ¶ 308.

### b. The Respondent's Position

406. The Respondent agrees that a violation of Article 10(1) of the ECT requires either unreasonable or discriminatory measures, without any need for both to be present.[553]

407. The Respondent submits that the infringement of the non-impairment standard of Article 10(1) of the ECT requires the existence of an impairment.[554]

### (3) The Claim

### a. The Claimants' Position

408. The Claimants submit that the Respondent violated the standard of non-impairment under the ECT because the Respondent's measures were both unreasonable and discriminatory for the same reasons set out under their FET standard analysis.[555]

409. In arguing that the contested measures inflicted impairment on the Claimants' investments, the Claimants argue that the measures have "wiped out the entirety of the value of Claimants' investments".[556]  In their Reply, the Claimants maintain that the Claimants' investments lost the value and economic benefits, which amount to an impairment.[557] Furthermore, the Claimants assert that the IRR analysis relied on by the Respondent is "fundamentally flawed".[558]

### b. The Respondent's Position

410. The Respondent contends that the Claimants did not suffer any impairment because, according to Econ One's analysis, the Claimants' IRR came to 16.4%, which surpasses Spain's supposed reasonable rate of return.[559]

---

[553] Resp. C-Mem., ¶ 1167.

[554] Resp. C-Mem., ¶¶ 1169, 1175.

[555] Cl. Mem., ¶ 315; Cl. Reply, ¶ 306.  *See also* Cl. Mem., ¶¶ 303-305, 306-309 (arguing that the measures were both unreasonable and discriminatory under the FET standard).

[556] Cl. Mem., ¶ 316.

[557] Cl. Reply, ¶ 308.

[558] Cl. Reply, ¶ 309.

[559] Resp. C-Mem., ¶¶ 1185-1186.

411.    Moreover, in the Respondent's view, the standard of non-impairment under the ECT has been respected since the disputed measures are reasonable and proportional.[560]

412.    For instance, the Respondent notes that the disputed measures were a reaction to the unsustainable economic circumstances of the Spanish energy system and were in fact proposed by the renewable sector.[561] Moreover, the current regulatory regime has attracted more than EUR 5,000 million in investments and this reflects the measures' proportionality and reasonableness.[562]

413.    In addition, the Respondent argues that the Claimants have not shown, *inter alia*, that they were treated differently than other similarly situated investors, if there were any, and maintains that the measures affected all renewable energy producers.[563]

414.    The Respondent further argues that the measures pass other tests referring to the ECT's objectives, including those applied in *EDF v Romania* and *AES v Hungary*, and therefore are not discriminatory or unreasonable.[564]

D.    **Alleged Breach of Most Constant Protection and Security Standard under Article 10(1) of the ECT**

(1) **Introduction**

415.    The Claimants argue that the Respondent breached the MCPS standard for reasons considered under their analysis pertaining to the FET standard.[565] Specifically, the

---

[560] Resp. C-Mem., ¶¶ 1170, 1175.

[561] Resp. C-Mem., ¶¶ 1176-1182.

[562] Resp. C-Mem., ¶¶ 1183-1184.

[563] Resp. C-Mem., ¶¶ 1192-1194.

[564] Resp. C-Mem., ¶¶ 1189, 1196-1215; Resp. Rej., ¶¶ 1018-1019, 1058-1061 (citing *EDF v Romania* and *AES v Hungary*).

[565] Cl. Mem., ¶¶ 310-312. *See also* Cl. Reply, ¶¶ 311-314 and ¶¶ 73, 77, 134, 173, 286 (arguing that the Respondent failed to provide a stable and equitable legal and economic framework for Claimants' investments and frustrated their legitimate expectations, in breach of the FET standard).

Claimants claim that the Respondent breached this obligation by dismantling the legal framework on which the Claimants' investments relied.[566]

416.   The Respondent distinguishes the MCPS standard from the FET standard and considers that the Claimants have not accredited any fact that could lead to a breach of this obligation, since they merely rely on the same facts used to address an alleged breach of the FET standard.[567]  In any event, the Respondent affirms that it has provided full protection and security to the Claimants' investments.[568]

## (2) **The Applicable Legal Standard**

417.   Article 10(1) of the ECT provides that investments shall "enjoy the most constant protection and security".

### a.  **The Claimants' Position**

418.   The Claimants argue that the MCPS standard requires a State to take all necessary measures to protect and ensure the legal security of the investments made by protected investors in the form of certainty of norms and foreseeability of application.[569]

419.   Contrary to the Respondent's suggestion, the Claimants argue, with reference to the findings of the *Biwater v Tanzania* and the *AES v Hungary* tribunals, that the MCPS standard is not limited to protection against acts by a third party and extends to actions by organs and representatives of the State.[570]

420.   The Claimants argue that even if this ECT standard was not deemed to encompass the full protection and security standard commonly incorporated in investment treaties, the Respondent would still be required to provide this treatment by the operation of the MFN

---

[566] Cl. Mem., ¶ 312.

[567] Resp. C-Mem., ¶¶ 1259-1260, 1263-1264.

[568] Resp. C-Mem., ¶ 1277.

[569] Cl. Reply, ¶¶ 312, 314.  *See also* Cl. Mem., ¶ 311.

[570] Cl. Reply, ¶ 313 (citing *Biwater Gauff (Tanzania) Limited v United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008 (CL-0006) ("***Biwater v Tanzania***"), ¶ 730 and *AES v Hungary*, ¶ 13.3.2).

clause in Article 10(7) of the ECT.[571]  The Claimants do not seem to have made further references to this argument in their Reply, at the Hearing, nor in their post-hearing submissions.

### b.  The Respondent's Position

421.    The Respondent maintains that the concept of the MCPS is different than the FET standard.[572] Given that the guarantee of providing stable, transparent or reasonable conditions to the investor already fall within the FET standard, such guarantee cannot also constitute a part of the MCPS standard in the ECT.[573]  In any event, the Respondent maintains that the FET standard does not grant investors a right to "the petrification or freezing of Government legislation".[574]

422.    The Respondent cites *AES v Hungary* and Professors Dolzer and Schreuer, emphasizing that the MCPS standard does not provide protection against a State's right to legislate or regulate in a reasonable manner and in accordance with the circumstances.[575] It also refers to the *Electrabel v Hungary* case in support that States have a legitimate right to regulate in the public interest and therefore a host State is not required to "elevate unconditionally the interests of the foreign investor above all other considerations".[576]

423.    According to the Respondent, the MCPS standard refers to the guarantee that a State will use "due diligence" to protect investors against injuries caused by third parties or to provide remedies when such injuries occur.[577]

---

[571] Cl. Mem., fn 445.

[572] Resp. C-Mem., ¶¶ 1258-1259, 1264; Resp. Rej., ¶¶ 1066-1068.

[573] Resp. C-Mem., ¶ 1259; Resp. Rej., ¶¶ 1070-1071.

[574] Resp. C-Mem., ¶ 1267; *see also* Resp. Rej., ¶ 1074.

[575] Resp. C-Mem., ¶¶ 1269-1270 (citing *AES v Hungary*, ¶ 13.3.2); Resp. Rej., ¶ 1075 (citing Dolzer and Schreuer "Principles of International Investment Law", 2012 (RL-0031), p 162).

[576] Resp. C-Mem., ¶ 1272 (citing *Electrabel v Hungary* Award, ¶¶ 165-166); Resp. Rej., ¶¶ 973, 1057.

[577] Resp. C-Mem., ¶¶ 1261-1262; Resp. Rej., ¶ 1073.

424.    Finally, the Respondent rejects that the MCPS standard may be applied as a consequence of the MFN clause of Article 10(7) of the ECT in this case.[578]

### (3) **The Claim**

#### a.   **The Claimants' Position**

425.    The Claimants claim that the Respondent breached its obligation under the MCPS standard because it failed to ensure legal certainty of the investments by dismantling the legal framework on which the Claimants' investments were relied upon.[579]

426.    In the Claimants' words, "Spain … violated its obligations to ensure that the agreed and approved security and protection of the Claimants' investments was not withdrawn or devalued either by the amendment of its laws or by the actions of its executive bodies".[580]

427.    The Claimants argue that the Respondent modified its laws in a manner that was not consistent with the commitment it guaranteed to the Claimants' investments.[581]  In support of their argument, the Claimants rely on the reasons considered under the FET standard, as summarized above.[582]

#### b.   **The Respondent's Position**

428.    The Respondent submits that it has not breached the MCPS standard.[583]  The Respondent argues that the Claimants have failed to establish facts suggesting that the Respondent has failed to practice due diligence in preventing injuries to their investments.[584]

---

[578] Resp. C-Mem., ¶¶ 1278-1282.

[579] Cl. Mem., ¶ 312.

[580] Cl. Mem., ¶ 312.

[581] *See* Cl. Mem., ¶ 312.

[582] Cl. Mem., ¶¶ 310-312; Cl. Reply, ¶¶ 199-200, 314.

[583] Resp. C-Mem., ¶¶ 1263, 1277; Resp. Rej., ¶ 1078.

[584] Resp. C-Mem., ¶¶ 1261-1263; Resp. Rej., ¶ 1074.

429.    Also, the Respondent claims that, based on the elements required by doctrine and case law, it has respected the MCPS standard because the measures were proportionate and reasonable in accordance with the circumstances.[585] Among other reasons, the Respondent submits that the Claimants' investments received the most constant protection and security in light of: *(a)* the factual background, including the tariff deficit and the need to halt rising tariffs for consumers; *(b)* the State's right to regulate in the public interest; and *(c)* the adoption of reasonable measures in accordance with the existing economic circumstances which have respected the essential elements of the regulatory framework in which the Claimants invested, including the maintenance of a reasonable rate of return for renewable energy producers to achieve the stabilisation of the tariff deficit.[586]

430.    Finally, the Respondent rejects that the MCPS standard may be applied in this case by means of the MFN clause of the ECT because the Claimants have not made any reference to the treaties signed by Spain on which they base themselves to assert that other foreign investors have received better treatment (i.e. MCPS) under treaties other than the ECT, and because in any case the Claimants only refer to the same arguments concerning an alleged breach of the FET standard.[587]

431.    Based on the above, the Respondent submits that there has not been an infringement of the MCPS standard.

## VII.    THE TRIBUNAL'S ANALYSIS

### A.    Small-hydro

432.    The Claimants say that these are the main characteristics of small-hydro.[588] "Small-hydro" facilities are hydropower installations with an installed capacity of up to 50 MW. Under Spanish law, hydropower generators must obtain from the State: *(a)* administrative concessions for the private use of water; *(b)* administrative authorisations for the

---

[585] Resp. C-Mem., ¶ 1266. *See also id.*, ¶ 1268.
[586] Resp. C-Mem., ¶¶ 1274-1277; Resp. Rej., ¶ 1077.
[587] Resp. C-Mem., ¶¶ 1278-1282.
[588] E.g. Cl. Mem., ¶¶ 13, 16, 18.

construction and operation of the relevant plant; *(c)* approval of the project execution plan; and *(d)* approval of the final construction works, and the obtaining of the commissioning certificate.  They are particularly efficient in terms of the environment and energy cost. The technology is versatile (i.e. it can be used under a wide variety of water flow levels and head heights), and is compatible with other economic uses, such as water for agricultural irrigation or human consumption.

433.  Small-hydro facilities have a long asset life, with many facilities operating more than 50 years when properly maintained.  The small-hydro sector makes significant economic and social contributions in the form of concession payments to hydrographic confederations and water agencies, and public entities.  The sector helps to create local jobs and infrastructure in the rural areas where such facilities are most commonly built, because these facilities have maintenance requirements that exceed those of other renewable assets such as wind or solar PV installations.  There was a broad consensus across the political spectrum on the merits of small-hydro and on the need to increase its installed base, in particular to meet Spain's renewable energy targets under both international environmental protection conventions and EU directives.  The contribution of the small-hydro incentives regime to the electricity system's regulated costs has, in any event, been very limited.  The small-hydro incentives under RD 661/2007 accounted for only 1.1% of the system's regulated costs in 2013; and small-hydro was the technology which contributed the least to the regulated costs of the system between 2008 and 2013.

434.  At the time of the Claimants' investments, the majority of small-hydro assets in Spain (i.e. approximately 58% of the installed base) was owned by large Spanish utilities, semi-public entities such as farmers' cooperatives and municipalities, and the Spanish State, through the IDAE.

B.  **The Investments**[589]

435.  Each of the Claimants' plants was certified as meeting the criteria necessary to qualify for the RD 661/2007 regime by the relevant Spanish authorities (including through registration in the RAIPRE).

436.  Each of the hydropower plants had been commissioned, and was in full operation, when the Claimants invested in them.  There is some disagreement as to when the plants were "commissioned",[590] but it appears that the Xana plants were put into operation between 1990 and 2004, without any expansion of the installed capacity after that date; and the Ondina plants were put into operation between 1906 and 1986, and most of their installed capacity has been operational since 1950.[591]

437.  According to the Respondent, since all the hydraulic plants that the Claimants purchased were already in operation at the time of their acquisition (some ever since the beginning of the 20th century), and did not carry out any expansion of their installed capacity, the Claimants did not contribute to achieving any installed power objective;[592] and their acquisition reflects a purely financial investment scheme, and was not made with the aim of increasing the installed capacity of the plants.[593]  In both cases the object was to make acquisitions in special situations (in the case of Xana "the distressed nature of the sellers") and to sell them ultimately to utilities.

438.  The Claimants say that their initial objective was to purchase one or two of the larger portfolios of existing small-hydro plants, and subsequently acquire other smaller portfolios and new projects for construction.  Once they had acquired those assets, they intended to use their expertise to improve operational performance (typically through capital expenditure investments), maximize electricity production and reduce operating costs, and

---

[589] Cl. Mem., ¶ 89 *et seq*; Resp. C-Mem., ¶ 694.

[590] *See* Joint Compass Lexecon-Econ One Memorandum, 28 March 2018, ¶ 11.

[591] First Econ One Report, ¶¶ 39, 73-75.

[592] Resp. C-Mem., ¶ 697 *et seq*.

[593] First Econ One Report, ¶ 130.

pay out dividends from operating cash flows. Ultimately they intended to sell the "de-risked" assets at a profit, to passive long-term institutional investors.[594]

439. The Tribunal is satisfied that the Claimants made relevant investments, and that the circumstances in which they were made, and their ultimate purpose, has no bearing on the issues in this arbitration.

### C. The Overall Nature of the Case

440. Although the Claimants' overall case has many strands, their case on FET and legitimate expectations has two main elements.

441. The first[595] is that the rights granted by RD 661/2007 amounted to a commitment (or, as it is sometimes put, a guarantee[596]) that small-hydro plants *(a)* could sell all of their electricity output; *(b)* at either a regulated tariff or a premium on the market price; *(c)* for pre-established amounts revised yearly for inflation; *(d)* for the plants' entire operational lifetime; and *(e)* free from any future downward reviews or alterations to the specified feed-in remuneration rates or term. Connected with that way of putting the case is the contention that in other respects the Spanish State gave assurances or made representations to the same or similar effect.[597]

442. The Claimants say[598] that this is not a case of investors seeking to rely on "general statements in treaties or legislation which, because of their nature of general regulations, can evolve".[599] Rather it is a case of Spain granting specific rights to specific small-hydro

---

[594] First Quiroga Statement, ¶ 61; Third Quiroga Statement, ¶ 43.

[595] Cl. Mem., ¶¶ 3-4, 107; Cl. Reply, e.g. ¶¶ 3, 7, 16, 77, 101-103, 105-106, 130, 151, 170, 188, 192, 214, 245, 255, 314, 329, 411.

[596] E.g. Cl. Mem., ¶¶ 79, 119, 179, 253-254, 266; Cl. Reply, ¶¶ 7, 14, 16, 40, 107-108, 169, 192-193, 198, 217, 245, 255, 406.

[597] E.g. Cl. Mem., ¶ 7; Cl. Reply, ¶¶ 16, 170, 255, 259.

[598] Cl. Reply, ¶ 198, citing *Ioan Micula, Viorel Micula and others v Republic of Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013 (CL-0048) ("***Micula v Romania***").

[599] Cl. Reply, ¶ 198, citing *El Paso Energy International Company v Argentine Republic*, ICSID Case No. ARB/03/15, Award, 31 October 2011 (CL-0073) ("***El Paso v Argentina***"), ¶¶ 375-376.

plants in order to induce private investment, and then substantially altering and revoking those rights after the investments had been made.

443.    The second, and more general way of putting their case, is that the FET standard, irrespective of any commitments, assurances, or representations, protects the legitimate expectations of investors regarding the key terms of their investment and the stability of the host state's legal and business framework upon which an investor reasonably relied in making its investment.[600]

444.    The Respondent's overall case[601] is that in line with the business associations in the renewable energy sector, the main companies that operated in the Spanish renewable energy sector accepted that *(i)* regulatory measures affecting plants in operation were possible, *(ii)* these measures could reduce the remuneration granted by previous regulations, *(iii)* these measures may be based on guaranteeing the economic sustainability of the Spanish electricity system and correcting situations of over-remuneration, and *(iv)* the limit to the new regulatory measures lies in the fact that they must provide the plants with a reasonable rate of return.  The ECT does not oblige States to maintain a regulatory framework that is stable and predictable for all investments and during its entire validity. Article 10(1) of the ECT alludes to "stable conditions", not to a "predictable framework". In no case is the power of the States to modify the regulatory framework to maintain an efficient energy market nullified or limited.

445.    The Claimants objectively could not be unaware of the purpose of the subsidies for renewable energies (reaching a *level playing field*) and the limits derived from EU legislation on State aid to avoid market distortion, such as the energy market.  These limits prevent the Claimants from having expectations that they had acquired a *right* to receive public subsidies.  Neither the Claimants nor their parent companies could have been unaware of these regulations or have expected the subsidies to remain unchanged for 25 or 30 years even if they distort the energy market.

---

[600] E.g. Cl. Mem., ¶¶ 242-243.

[601] E.g. Resp. Rej., ¶ 508 *et seq*.

D. **Jurisdiction**

(1) **The EU Issue**

a. **Introduction**

446.   The first Claimant is incorporated under the laws of Luxembourg, and the second Claimant is incorporated under the laws of Sweden. Luxembourg was an original member of the European Economic Community ("**EEC**"). Spain joined the European Community on 1 January 1986. Sweden joined the EU on 1 January 1995. Luxembourg and Sweden ratified the ECT in February 1997 and November 1997 respectively. Spain ratified the ECT in December 1997. The ECT entered into force on 16 April 1998.

447.   The relevant European treaty provisions at the time the ECT entered into force were those of the Treaty establishing the European Community ("**TEC**"), but there is no material difference between the versions of the relevant articles since their inception in the EEC Treaty and their present iteration in the TFEU.

448.   The arguments of the Parties have been summarised above and it is only necessary at this stage to emphasise these points.

449.   The Respondent's arguments can largely be allocated between two main arguments.

450.   The first main point is that, on the proper interpretation of the principal provisions of the ECT, the Tribunal has no jurisdiction. The second main point, with some overlap with the first point, is that intra-EU disputes are outside the competence of the Tribunal.

451.   Within the first point may be included the arguments that (*1*) the Tribunal lacks jurisdiction under Article 25 of the ICSID Convention because the Claimants hold dual Luxembourg-European and Swedish-European nationality; and (*2*) that Article 26 ECT does not generate obligations between the EU Member States, because the Member States of the then European Community were unable to contract obligations between them as regards the Internal Market (as it is an area in which they had transferred their sovereignty to the then European Community) and for this reason the EU is a Contracting Party to the ECT.

452.   Within the second main point, that intra-EU disputes are outside the competence of the Tribunal, are the arguments that *(1)* the *Achmea* ruling applies to multilateral treaties such as the ECT; *(2)* EU law is international law; *(3)* EU law is paramount and displaces any other national or international provision; *(4)* EU law (such as the law relating to issues in the arbitration) applies to claims in the arbitration; and *(5)* the Tribunal would be interfering with the EU judicial system.

453.   The European Commission's *amicus curiae* submission dated 3 December 2018 supports the Respondent's position, and in particular refers to *(1)* Commission Decision SA.40348 of 10 November 2017 that the contested measures did not violate the investment protection provisions of the ECT and that Article 26 ECT does not apply intra-EU; and *(2)* the Commission communication "Protection of Intra-EU Investment" of 19 July 2018 to the same effect.

454.   The Commission accepts that the Tribunal is competent to rule on its jurisdiction and applicable law under the ICSID Convention, but says that if the offer in the ECT by the Respondent to accept arbitration was inapplicable as a result of the principle in the *Achmea* ruling, then there would be no consent to arbitration.  EU law has a special conflict of laws rule, namely the primacy of EU law.[602]  The Commission also observes that the Treaty of Lisbon post-dated the ECT, and re-stated the provisions on which the *Achmea* ruling relied in holding that the investor-State dispute resolution provisions in the BIT were incompatible with EU law.  Accordingly, the effect of the Vienna Convention on the Law of Treaties ("**VCLT**"), Article 30, is that Articles 267 and 344 TFEU take precedence over Article 26 ECT.

### b.  The Starting Point

455.   The obvious starting point is the express wording of the jurisdiction and choice of law provisions.

---

[602] *Costa v ENEL*; and TFEU (RL-0001), Declaration 17 annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon, 13 December 2007.

456. **Energy Charter Treaty**: The effect of Article 26(1)-(3) is that where there arise "Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former" which cannot be settled amicably, then the Investor party may submit it to a form of dispute resolution including ICSID arbitration "if the Contracting Party of the Investor and the Contracting Party to the dispute are both parties to the ICSID Convention" and in such a case "each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration … in accordance with the provisions of this Article" (Article 26(3)(a)), and the Tribunal "shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law" (Article 26(6)).

457. By Article 1(2) "Contracting Party" means a state or Regional Economic Integration Organization which has consented to be bound by the ECT and for which the ECT is in force, and by Article 1(3) "Regional Economic Integration Organization" means an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters. By Article 38: "This Treaty shall be open for signature at Lisbon from 17 December 1994 to 16 June 1995 by the states and Regional Economic Integration Organizations which have signed the Charter." The EU is a Regional Economic Integration Organization, and is a party to the ECT.

458. Article 16 provides:

> Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III ["Investment Promotion and Protection", which includes Articles 10 and 13] or V ["Dispute Settlement", which includes Article 26] of this Treaty,
>
> (1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and
>
> (2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or

133

from any right to dispute resolution with respect thereto under this Treaty,

where any such provision is more favourable to the Investor or Investment.

459.  **ICSID Convention**: By Article 25(1): "The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre.  When the parties have given their consent, no party may withdraw its consent unilaterally."

460.  By Article 41(1): "The Tribunal shall be the judge of its own competence."

461.  By Article 42(1): "The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties.  In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable."  As indicated above, Article 26(6) ECT contains a separate choice of law provision.

462.  The combined effect of these provisions on the face of their wording is that the Tribunal has jurisdiction where the investor is a national of a Contracting State and the respondent State is a Contracting State.

### c.  The Nationality Point

463.  The Respondent says that the Tribunal lacks jurisdiction under Article 25 of the ICSID Convention because *(1)* the Claimants hold dual Luxembourg-European and Swedish-European nationality; *(2)* Article 20 TFEU establishes that all citizens of an EU Member State simultaneously hold European nationality; *(3)* the EU and the Member States made an express declaration regarding Article 25 ECT to clarify that legal persons incorporated in accordance with the legislation of any Member State should be treated in the same way as natural persons who are nationals of the Member States; *(4)* Article 25(2)(a) of the ICSID Convention precludes natural persons with dual nationality from filing an arbitration

claim; and *(5)* accordingly, because the Claimants hold dual nationality, they do not meet the jurisdictional requirement of Article 25(2)(a) of the ICSID Convention.

464.    The Tribunal rejects this argument.  Article 20 TFEU establishes a separate category of EU citizenship for nationals of EU Member States.  It does not create dual nationality, and Article 25(2)(a) of the ICSID Convention does not apply to corporations and is not engaged by the declaration that legal persons incorporated in accordance with the legislation of any Member State should be treated in the same way as natural persons who are nationals of the Member States for the purposes of Article 25 ECT.

### d.  The Regional Economic Integration Organization (REIO) Point and the "Area" Point

465.    These points are linked, although the REIO point arises also as a subset of the intra-EU argument, but it is convenient to deal with them together.  The Respondent says that: *(1)* the ECT acknowledges the special nature of the EU as an international organisation constituted by States to which they have transferred competence over certain matters in an irrevocable and binding way;[603] and *(2)* when the ECT was signed, the Member States of the then European Community were unable to contract obligations between them as regards the Internal Market as it is an area in which they had transferred their sovereignty to the then European Community.  For that reason, the EU is a Contracting Party, the relevant Area is that of the EU and not of an EU Member State and accordingly Article 26 ECT does not generate any obligations between the Member States.[604]

466.    The provisions of the ECT on which reliance has been placed are as follows:

467.    By Article 1:

> …
>
> (2) "Contracting Party" means a state or Regional Economic Integration Organization which has consented to be bound by [the ECT] and for which the Treaty is in force.

---

[603] Resp. C-Mem., ¶ 67.
[604] Resp. C-Mem., ¶ 80.

(3) "Regional Economic Integration Organization" means an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters.

…

(10) "Area" means with respect to a state that is a Contracting Party:

  (a) the territory under its sovereignty, it being understood that territory includes land, internal waters and the territorial sea; …

…

With respect to a Regional Economic Integration Organization which is a Contracting Party, Area means the Areas of the member states of such Organization, under the provisions contained in the agreement establishing that Organization.

468.   By Article 25:

(1) The provisions of this Treaty shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement (hereinafter referred to as "EIA") to extend, by means of most favoured nation treatment, to another Contracting Party which is not a party to that EIA, any preferential treatment applicable between the parties to that EIA as a result of their being parties thereto.

(2) For the purposes of paragraph (1), "EIA" means an agreement substantially liberalizing, inter alia, trade and investment, by providing for the absence or elimination of substantially all discrimination between or among parties thereto through the elimination of existing discriminatory measures and/or the prohibition of new or more discriminatory measures, either at the entry into force of that agreement or on the basis of a reasonable time frame.

469.   By Article 36(7):

A Regional Economic Integration Organization shall, when voting, have a number of votes equal to the number of its member states which are Contracting Parties to this Treaty; provided that such an Organization shall not exercise its right to vote if its member states exercise theirs, and vice versa.

470.    The Tribunal considers that these provisions do not assist the Respondent in its objections to jurisdiction.  Article 26(1) plainly means that the "[i]nvestment … in the Area of the former", i.e. the Contracting Party, is an investment in the national territory of the respondent State. The fact that the EU is also a Contracting Party and a "Regional Economic International Organization" does not mean in the context of Article 26(1) that the Area is the territory of the EU as a whole, which would simply make no sense.  Nor can it in itself bar the Tribunal's jurisdiction; nor can the Tribunal's jurisdiction be removed by the fact that the ECT recognises that competence may be transferred to such an Organization, or the fact that in certain circumstances the Organization may vote instead of the Member States.  Article 25 does not prevent REIO members from agreeing to other obligations under a different treaty regime, such as the ECT.

471.    Nor is there anything express or implied in these provisions which could amount to a "disconnection clause", i.e. a provision that disapplies certain provisions of a treaty in mutual relations between certain parties.

### e.   The *Achmea* ruling Point

#### (i)   TFEU

472.    The principally relevant provisions of EU law are as follows:

> **(1)  Article 267 of the TFEU (formerly, with immaterial differences, Article 177 EEC Treaty and Article 234 TEC)**
>
> The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:
>
> (a) the interpretation of the Treaties;
>
> …
>
> Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon.

Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.

….

**(2) Article 344 TFEU (formerly, with immaterial differences, Article 219 EEC Treaty and Article 292 TEC)**

Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.

**(3) Article 351 TFEU (formerly, with immaterial differences, Article 234 EEC Treaty and Article 307 TEC)**

The rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties.

To the extent that such agreements are not compatible with the Treaties, the Member State or States concerned shall take all appropriate steps to eliminate the incompatibilities established. Member States shall, where necessary, assist each other to this end and shall, where appropriate, adopt a common attitude.

In applying the agreements referred to in the first paragraph, Member States shall take into account the fact that the advantages accorded under the Treaties by each Member State form an integral part of the establishment of the Union and are thereby inseparably linked with the creation of common institutions, the conferring of powers upon them and the granting of the same advantages by all the other Member States.

(ii) ECT

473.    On this aspect the principally relevant provisions of the ECT are mentioned at paragraph 456 *et seq.* above.

(iii) The Vienna Convention on the Law of Treaties

474.  Both Parties[605] have relied on the VCLT, although several parties to the ECT are not, or (like the EU) cannot be, parties to the VCLT, but the provisions relied on by them codify customary international law relating to the interpretation of treaties. The VCLT provides in Article 30 (which is headed "Application of successive treaties relating to the same subject-matter"):

> 1. Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States parties to successive treaties relating to the same subject-matter shall be determined in accordance with the following paragraphs.
>
> …
>
> 3. When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation …, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.
>
> 4. When the parties to the later treaty do not include all the parties to the earlier one:
>
> (a) As between States Parties to both treaties the same rule applies as in paragraph 3;
>
> (b) As between a State party to both treaties and a State party to only one of the treaties, the treaty to which both States are parties governs their mutual rights and obligations.
>
> …

475.  By Article 31 ("General rule of interpretation"):

> 1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.
>
> 2. The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

---

[605] E.g. Cl. Comments on EC Submission, 18 December 2018, ¶ 39; Resp. Observations on EU Declarations, 12 February 2019, ¶ 17.

*(a)* Any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;

*(b)* Any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3. There shall be taken into account, together with the context:

*(a)* Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

*(b)* Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

*(c)* Any relevant rules of international law applicable in the relations between the parties.

…

## f.    The *Achmea* ruling

476.    The underlying arbitration in the *Achmea* ruling was an UNCITRAL arbitration (with the PCA as Registry), with a seat in Germany, brought under the Netherlands-Czechoslovakia BIT by a Dutch investor against Slovakia.  The tribunal awarded damages against Slovakia, which sought, in the German courts, to have the award set aside on the ground (*inter alia*) that the award was contrary to public policy because the tribunal was unable to make a reference to the CJEU on questions of EU law which it had failed to take into account.

477.    So far as material, the questions referred by the Bundesgerichtshof ("**BGH**", Federal Court of Justice of Germany) were:

(1) Does Article 344 TFEU preclude the application of a provision in a bilateral investment protection agreement between Member States of the European Union (a so-called intra-EU BIT) under which an investor of a Contracting State, in the event of a dispute concerning investments in the other Contracting State, may bring proceedings against the latter State before an arbitral tribunal where the investment protection agreement was concluded before one of the Contracting States acceded to the European Union but the arbitral proceedings are not to be brought until after that date?

> If Question (1) is to be answered in the negative:
>
> (2) Does Article 267 TFEU preclude the application of such a provision? ….[606]

478.    The opinion of M. Wathelet, Advocate General, was that Articles 267 TFEU and 344 TFEU were to be interpreted as not precluding the application of an investor-State dispute settlement mechanism established by means of a bilateral investment agreement concluded before the accession of one of the Contracting States to the European Union and providing that an investor from one Contracting State might, in the case of a dispute relating to investments in the other Contracting State, bring proceedings against the latter State before an arbitral tribunal.

479.    In the course of his opinion he said:

> Furthermore, all the Member States and the Union have ratified the Energy Charter Treaty, signed at Lisbon on 19 December 1994. That multilateral treaty on investment in the field of energy operates even between Member States, since it was concluded not as an agreement between the Union and its Member States, of the one part, and third countries, of the other part, but as an ordinary multilateral treaty in which all the Contracting Parties participate on an equal footing.  In that sense, the material provisions for the protection of investments provided for in that Treaty and the [investor-State dispute settlement] mechanism also operate between Member States.  I note that if no EU institution and no Member State sought an opinion from the Court on the compatibility of that treaty with the EU and FEU Treaties, that is because none of them had the slightest suspicion that it might be incompatible.[607]

480.    The answer by the CJEU, however, was that Articles 267 and 344 TFEU were to be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one Member State might, in the event of a dispute concerning investments in the other Member State,

---

[606] *Achmea*, ¶ 23.

[607] Case C-0284/16 *Slovak Republic v Achmea BV*, Opinion of Advocate General Wathelet (CL-0117) ("**Wathelet *Achmea* Opinion**"), ¶ 43 (internal footnotes omitted).

bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.

481.   The crucial steps in the legal reasoning were:

(1)   An international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the court (at paragraph 32).

(2)   That principle is enshrined in particular in Article 344 TFEU, under which the Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties: Opinion 2/13 (European Convention on Human Rights) (at paragraph 32).

(3)   The autonomy of EU law with respect both to the law of the member States and to international law is justified by the essential characteristics of the EU and its law, relating in particular to the constitutional structure of the EU and the very nature of that law (at paragraph 33).

(4)   EU law is characterised by the fact that it stems from an independent source of law, the Treaties, by its primacy over the laws of the Member States, and by the direct effect of provisions which are applicable to their nationals and to the Member States themselves (at paragraph 33).

(5)   Those characteristics have given rise to a structured network of principles, rules and mutually interdependent legal relations binding the EU and its Member States reciprocally and binding its Member States to each other: Opinion 2/13, paragraphs 165-167 (at paragraph 33).

(6)   The Member States are obliged, by reason, *inter alia*, of the principle of sincere co-operation, to ensure the application of and respect for EU law, and to take for those purposes any appropriate measure to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the EU: Opinion 2/13, paragraphs 168 and 173 (at paragraph 34).

(7)     In order to ensure that the specific characteristics and the autonomy of the EU legal order, it is for the national courts and tribunals and the CJEU to ensure the full application of EU law in all Member States and to ensure judicial protection of the rights of individuals under that law (at paragraphs 35 and 36).

(8)     The EU judicial system has as its keystone the preliminary ruling procedure provided for in Article 267 TFEU, which has the object of securing uniform interpretation of EU law, thereby serving to ensure its consistency, its full effect and its autonomy as well as the particular nature of the law established by the Treaties: Opinion 2/13, paragraph 176 (at paragraph 37).

482.    The application of those principles involved the following steps:

(1)     Under the terms of the BIT, Article 8(6), the arbitral tribunal was called on to rule on possible infringements of the BIT, but in order to do so it was obliged to take account in particular of the law in force of the Contracting Party concerned and other relevant agreements between the Contracting Parties, and might therefore be called on to interpret or indeed to apply EU law, particularly the provisions concerning the fundamental freedoms, including freedom of establishment and free movement of capital (at paragraphs 39-42).

(2)     The arbitral tribunal was not part of the judicial system of the Netherlands or Slovakia, and it was the exceptional nature of the tribunal's jurisdiction compared with that of the courts of the two Member States that was one of the principal reasons for the existence of Article 8 of the BIT (at paragraphs 43-45).

(3)     Consequently, it could not be classified as a court or tribunal "of a member state" within the meaning of Article 267 TFEU (at paragraphs 46, 49).

(4)     Under Article 8(7) of the BIT the decision of the arbitral tribunal was final, and, pursuant to Article 8(5) of the BIT, the arbitral tribunal was to determine its own procedure applying the UNCITRAL arbitration rules and was itself to choose its seat and consequently the law applicable to the procedure governing judicial review of the validity of the award (at paragraph 51).

(5)    Because the arbitral tribunal chose to sit in Frankfurt am Main, German law was applicable to the procedure governing judicial review of the validity of the arbitral award, but the review was a limited review, concerning in particular the validity of the arbitration agreement under the applicable law and the consistency with public policy of the recognition or enforcement of the arbitral award (at paragraphs 52-53).

(6)    By contrast with commercial arbitration, where the requirements of efficient arbitration proceedings justify limited review of arbitral awards by the courts of the Member States, provided that the fundamental provisions of EU law can be examined in the course of that review and, if necessary, be the subject of a reference for a preliminary ruling (*Eco Swiss China Time Ltd v Benetton International NV* (Case C-126/97) [1999] ECR I-3055, paragraphs 35, 36 and 40 and *Mostaza Claro v Centro Móvil Milenium SL* (Case C-168/05) [2006] ECR I-10421, paragraphs 34–39), arbitration proceedings under Article 8 of the BIT derive from a treaty by which Member States agree to remove from the jurisdiction of their own courts, and hence from the system of judicial remedies in the fields covered by EU law (*Associação Sindical dos Juízes Portugueses v Tribunal de Contas* (Case C-64/16) [2018], paragraph 34), disputes which may concern the application or interpretation of EU law (at paragraphs 54-55).

(7)    By concluding the BIT, the Member States established a mechanism for settling disputes between an investor and a Member State which could prevent those disputes from being resolved in a manner that ensured the full effectiveness of EU law, even though they might concern the interpretation or application of that law (at paragraph 56).

(8)    In a passage on multilateral treaties the CJEU said (at paragraphs 57-58):

> It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law. The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or

designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected (see, to that effect, Opinion 1/91 (EEA Agreement-I) of 14 December 1991, EU:C:1991:490, paragraphs 40 and 70; Opinion 1/09 (Agreement creating a unified patent litigation system) of 8 March 2011, EU:C:2011:123, paragraphs 74 and 76; and Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, EU:C:2014:2454, paragraphs 182 and 183).

In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU is provided for by an agreement which was concluded not by the EU but by Member States. Article 8 of the BIT is such as to call into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of the law established by the Treaties, ensured by the preliminary ruling procedure provided for in Article 267 TFEU, and is not therefore compatible with the principle of sincere cooperation …[608]

483.    The operative part of the ruling was:

Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[609]

484.    On 15 and 16 January 2019, the 28 EU Member States issued declarations on the legal consequences of the *Achmea* ruling. Twenty-two of the Member States (including Spain) expressed the view that the ruling applied also to international agreements concluded by the EU, including the ECT, which were an integral part of the EU legal order and must

---

[608] *Achmea*, ¶¶ 57-58.

[609] *Achmea*, ¶ 62.

therefore be compatible with the Treaties.  Accordingly, if Article 26(3) were interpreted as containing an arbitration clause applicable between Member States, "that clause would be incompatible with the Treaties and thus would have to be disapplied."[610]

485.    Five other Member States (including Luxembourg and Sweden) issued a declaration, which did not express a view on the effect of the *Achmea* ruling on multilateral treaties such as the ECT.  They said:

> The Achmea case concerns the interpretation of EU law in relation to an investor-state arbitration clause in a bilateral investment treaty between Member States.  The Member States note that the *Achmea* judgment is silent on the investor-state arbitration clause in the Energy Charter Treaty. A number of international arbitration tribunals post the *Achmea* judgment have concluded that the Energy Charter Treaty contains an investor-State arbitration clause applicable between EU Member States. This interpretation is currently contested before a national court in a Member State.[611] Against this background, the Member States underline the importance of allowing for due process and consider that it would be inappropriate, in the absence of a specific judgment on this matter, to express views as regards the compatibility with Union law of the intra EU application of the Energy Charter Treaty.[612]

### g.  Conclusions

486.    On this aspect of the objections to jurisdiction, a preliminary point arises as whether the *Achmea* ruling has any application to multilateral treaties such as the ECT, to which both Member States and the EU itself are members.

487.    The *Achmea* ruling concerned BITs, but, as indicated above, M. Wathelet expressed the view in the course of his opinion that the investor-State provisions in the ECT operated as

---

[610] Declaration of the Representatives of the Governments of the Member States, of 15 January 2019 on the legal consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union (RL-0111), p 2.

[611] This is a reference to *Novenergia II v Spain* in the Svea Court of Appeal. Hungary issued a separate declaration noting that the *Achmea* ruling concerned only intra-EU BITs, and omitting any reference to the Swedish proceedings.

[612] Declaration of the Representatives of the Governments of the Member States of 16 January 2019, on the Enforcement of the Judgement of the Court of Justice in *Achmea* and on Investment Protection in the European Union (RL-0112), p 3.

between Member States because it was concluded not as an agreement between the EU and its Member States, of the one part, and third countries, of the other part, but as an ordinary multilateral treaty in which all the Contracting Parties participate on an equal footing.[613] But his overall view that there was no incompatibility between dispute resolution provisions in BITs and EU law was not accepted by the CJEU, and therefore only limited weight can be given to his view on the ECT.

488.    It is therefore necessary to turn to the ruling of the CJEU. The relevant paragraphs have been quoted above.

489.    What is being said there is that the EU has competence in the field of international relations to enter into an international agreement providing for the establishment of a court created or designated by such agreements as regards the interpretation and application of their provisions and whose decisions are binding on the institutions, including the CJEU. This is not in principle incompatible with EU law, provided that the autonomy of the EU and its legal order is respected.

490.    There are two reasons for supposing that the CJEU did not express the view that investor-State dispute resolution procedures in a multilateral agreement such as the ECT were outside the scope of its intra-EU ruling. The first is that the following paragraph suggests, by its reference to the BIT being concluded "not by the EU but by Member States",[614] that it was mainly directing itself to agreements with third States. The second reason is the citation of previous rulings, two of which concerned treaties concluded by the European Community or the European Union with third states: Opinion 1/91 (EEA Agreement - I) EU:C:1991:490, paragraphs 40 and 70; and Opinion 2/13 (Accession of the EU to the ECHR), EU:C:2014:2454, paragraphs 182 and 183). The third ruling, Opinion 1/09 EU:C:2011:123, concerned the draft Agreement creating a unified patent litigation system, to which the Member States were parties, and concerned the draft agreement on the European and Community Patents Court ("**EPC**").

---

[613] Wathelet *Achmea* Opinion, ¶ 43.

[614] *Achmea*, ¶ 58.

491.   In Opinion 1/09 the CJEU ruled that although the CJEU had no jurisdiction to rule on direct actions between individuals in the field of patents (since that jurisdiction was held by the courts of the Member States), the Member States could not confer the jurisdiction to resolve such disputes on a court created by an international agreement which would deprive courts of their task, as courts within the EU legal order, to implement EU law and, thereby, of the power or obligation in Article 267 TFEU to refer questions for a preliminary ruling in the field concerned.

492.   The essence of these decisions is contained in Opinion 2/13, paragraphs 182-184:

> The Court of Justice has admittedly already stated in that regard that an international agreement providing for the creation of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not, in principle, incompatible with EU law; that is particularly the case where, as in this instance, the conclusion of such an agreement is provided for by the Treaties themselves. The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions (see Opinions 1/91, EU:C:1991:490, paragraphs 40 and 70, and 1/09, EU:C:2011:123, paragraph 74).

> Nevertheless, the Court of Justice has also declared that an international agreement may affect its own powers only if the indispensable conditions for safeguarding the essential character of those powers are satisfied and, consequently, there is no adverse effect on the autonomy of the EU legal order (see Opinions 1/00, EU:C:2002:231, paragraphs 21, 23 and 26, and 1/09, EU:C:2011:123, paragraph 76; see also, to that effect, judgment in *Kadi and Al Barakaat International Foundation v Council and Commission*, EU:C:2008:461, paragraph 282).

> In particular, any action by the bodies given decision-making powers by the ECHR, as provided for in the agreement envisaged, must not have the effect of binding the EU and its institutions, in the exercise of their internal powers, to a particular interpretation of the

rules of EU law (see Opinions 1/91, EU:C:1991:490, paragraphs 30 to 35, and 1/00, EU:C:2002:231, paragraph 13).[615]

493.    The Tribunal will therefore (and in respectful disagreement with the tribunal in *Masdar v Spain*[616]) assume that there is at least the possibility, and perhaps the probability, particularly as a result of the citation of Ruling 1/09 on the EPC, and the use of the term "international agreement" in the *dispositif* (by contrast with the term "bilateral investment protection agreement" in the reference by the BGH) that if the compatibility of the ECT with the TFEU arose before the CJEU, it would apply the *Achmea* ruling to the dispute resolution mechanism under the ECT.

494.    It is also necessary to mention three fundamental points about EU law.  First, it has been established for more than 50 years that, from the viewpoint of EU law, that European Union "constitutes a new legal order of international law for the benefit of which the states have limited their sovereign rights, albeit within limited fields, and the subjects of which comprise not only Member States but also their nationals."[617]  In *Electrabel v Hungary*, it was said that EU law is international law because it is rooted in international treaties as legal instruments under public international law; and EU law as a whole is part of the international legal order, without any material distinction between the EU Treaties and the "*droit dérivé*", with the result that all EU legal rules are part of a regional system of international law and therefore have an international legal character (citing *Van Gend den Loos*).[618]  Like the tribunal in *Vattenfall v Germany*, this Tribunal considers that this formula can be accepted on the basis that "the corpus of EU law derives from treaties that are themselves a part of, and governed by, international law, and contains other rules that are applicable on the plane of international law, while also containing rules that operate only within the internal legal order of the EU and, at least arguably, are not a part of

---

[615] Opinion 2/13 of the Court (Full Court) of 18 December 2014, pursuant to Article 218(11) TFEU (Accession of the EU to the ECHR) (RL-0109), ¶¶ 182-184.

[616] *Masdar v* Spain, ¶ 682.

[617] *NV Algemene Transport- en Expeditie Onderneming van Gend & Loos v Netherlands Inland Revenue Administration* (Case 26/62), Judgement of the Court, 5 February 1963, p 12. (cited in part in the *Electrabel v Hungary* Award, ¶ 4.122).

[618] *Electrabel v Hungary* Award, ¶ 4.119 *et seq*.

international law …"[619]  The tribunal in *Vattenfall v Germany* went on to say that since the CJEU was empowered by the EU treaties to give preliminary rulings on the interpretation of EU law, including the treaties, the *Achmea* ruling's "interpretation of the EU Treaties likewise [constituted] a part of the relevant international law".[620]

495.    But in the view of this Tribunal, the point that EU (or most of it) is international law, or that the rulings of the CJEU are part of international law is not in any sense conclusive. The question still remains as to whether EU law and the rulings of the CJEU are part of the applicable international law.

496.    The second point is that it has also been established for more than 50 years that it is a fundamental principle of EU law that the EU has created its own legal system, which is an integral part of the legal system of Member States and which their courts are bound to apply.[621]

497.    The third point is that the system of references under what is now Article 267 TFEU is designed to ensure the proper application and uniform interpretation of EU law in all the Member States between national courts, in their capacity as courts responsible for the application of EU law, and the CJEU.

498.    Although phrased in terms of interpretation of two provisions of the TFEU, it is hard to read the *Achmea* ruling as a normal case of treaty interpretation, since Article 267 is simply the latest iteration (originally in Article 177 of the EEC Treaty) of the power (and in some cases the duty) of national courts to make references to the Court of Justice, and Article 344 (originally Article 219 of the EEC Treaty) simply prevents Member States from submitting disputes concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties.

499.    The residual remedy for a national of an EU Contracting State who wishes to complain of a breach by another EU Contracting State of the relevant provisions of the ECT is to

---

[619] *Vattenfall* Decision, ¶ 146.
[620] *Vattenfall* Decision, ¶ 148.
[621] *See Costa v ENEL*, p 593.

commence an ICSID arbitration against that State. The only time at which national courts will normally be engaged in this process is at the time of enforcement. It is impossible to see how, on the face of Articles 267 and 344 TFEU, and in accordance with normal rules of treaty interpretation, the effect of Article 26(3) ECT is to prevent national courts from making references to the CJEU or to allow Member States to submit disputes concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the EU Treaties.

500.    The *Achmea* ruling is a decision on the constitutional order of the EU in support of the policy of European integration, rather than an orthodox application of the rules of treaty interpretation. As such the ruling of the CJEU is entitled to the greatest respect from an international arbitral tribunal. But such a tribunal is not in any sense bound by the ruling. Nor, consequently, can the Tribunal find that, on any normal basis of interpretation under customary international law codified in the VCLT, the dispute resolution provisions of the ECT are incompatible with Articles 267 and 344 TFEU.

501.    The *Achmea* ruling says that the agreement to arbitrate is precluded (paragraph 60 and the *dispositif*), not that it is void, or incompatible with the TEC/TFEU, and consequently the ruling leaves open the question of the effect of preclusion, and in particular whether its effect is that any such provision ceased to have effect, or whether Member States should modify or abrogate the BITs between them.

502.    The Tribunal therefore comes to these conclusions:[622]

    (1)    The Tribunal is "the judge of its own competence": ICSID Convention, Article 41(1).

    (2)    The question of jurisdiction must be distinguished from the question of applicable law, or choice of law. As indicated above, Article 42(1) provides that the "Tribunal

---

[622] The results in other ECT cases have been in the same sense: *Masdar v Spain*; *Eiser v Spain*; *Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar B.V. (formerly Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.) v Kingdom of* Spain, ICSID Case No. ARB/13/31, Award, 15 June 2018 (CL-0147); *Vattenfall* Decision; *RREEF v Spain* Decision on Jurisdiction.

shall decide a dispute in accordance with such rules of law as may be agreed by the parties."

(3)     In the present case Article 26(6) ECT provides that the "tribunal established ... shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

(4)     The issues in dispute are those concerning alleged breaches of obligations under the ECT relating to investments: Article 26(1) ECT.  Accordingly, Article 42(1) of the ICSID Convention and Article 26(6) of the ECT do not determine jurisdiction, and are not relevant for present purposes.

(5)     By virtue of Article 25(1) of the ICSID Convention jurisdiction exists where *(1)* there is a legal dispute which *(2)* arises directly out of an investment, *(3)* between a Contracting State and a national of another Contracting State, and *(4)* which the parties to the dispute consent in writing to submit to the Centre.

(6)     By virtue of Article 26(1)-(3) of the ECT: *(1)* where there arise disputes between a Contracting Party and an investor of another Contracting Party relating to an investment of the latter in the area of the former, *(2)* which cannot be settled amicably, *(3)* the investor party may submit it to ICSID arbitration, *(4)* if the Contracting Party of the investor and the Contracting Party to the dispute are both parties to the ICSID Convention.

(7)     There is plainly a dispute between the Claimants and the Respondent which arises out of an investment in Spain, and the Contracting Parties of the investors, Luxembourg and Sweden, are parties to the ECT and to the ICSID Convention, as is the Respondent.

(8)     Accordingly the Respondent has given "its unconditional consent to the submission of [the] dispute to international arbitration" (Article 26(3)(a) of the ECT), and the Claimants have taken advantage of that consent.

(9)     For the reasons given above there is nothing in the combination of the ECT and EU law which could give rise to an implication of a "disconnection" clause.

(10)   The EU itself is a separate party to the ECT.

(11)   There is no conflict between Article 26(1)-(3) of the ECT and Articles 267 and 344 of the TFEU such as to bring the principles codified in Article 30 VCLT into play.

(12)   It is therefore not necessary to decide whether the effect of Article 16 of the ECT is that, even if there were an inconsistency between Articles 267 and 344 of the TFEU (and their predecessors) and the ECT, there would be no derogation from the dispute resolution provisions in Part V of the ECT.

(13)   There is nothing in the *Achmea* ruling which could deprive a Tribunal so constituted of jurisdiction.  Neither it, nor the decisions which it cites on multilateral agreements, suggest that Member States had no *capacity* to enter into agreements such as the ECT.

(14)   The fact that the Tribunal, as a creature of international law, and not national law, cannot make a reference to the CJEU, does not deprive it of jurisdiction under international law.  Nor can the plain meaning of the jurisdictional provisions of the ECT and the ICSID Convention be affected by the CJEU's interpretation of Articles 267 and 344 of the TFEU.

(15)   The declaration of the majority of the Member States of January 2019 is a political declaration without legal force and does not affect the jurisdiction of the Tribunal; and in particular, as a declaration by only some of the parties to the ECT it cannot, for the purposes of the rules codified in Article 31 of the VCLT, be regarded as a subsequent agreement between the parties regarding its interpretation or application, or as practice establishing agreement.

(16)   The fact that EU law is international law for at least some purposes does not affect the conclusion that, on the plain meaning of the ECT and the ICSID Convention, the Tribunal has jurisdiction.  It is true that EU law is international law because it is rooted in international treaties, but it does not follow that all of EU law is international law for all purposes, or that it will necessarily be the applicable law in all circumstances.

(17)  The fact that EU law has primacy under the principle in *Costa v ENEL* does not affect the position.  The principle is concerned with primacy over national law and not international law, whether customary law or treaty law.  As the Opinion of the Council Legal Service, quoted in the Declaration on which the Commission relies, put it: "… the law stemming from the Treaty, an independent source of law, could not, because of its special and original nature, be overridden by domestic legal provisions, however framed, without being deprived of its character as Community law and without the legal basis of the Community itself being called into question."[623]

(18)  It follows that the Tribunal has jurisdiction over the dispute.

### (2)  Jurisdiction: The Taxation Issue

#### a.  The Legislation

503.  As noted at paragraph 136 *et seq.* above, Act 15/2012[624] introduced a 7% tax on all revenue received from the generation of electricity, whether from conventional or renewable sources (the TVPEE), and a new provision imposing a new royalty (the Water Levy) on hydropower concessionaires (i.e. hydropower producers) for using the inland public hydraulic domain to produce electricity.

504.  Of the 33 hydroelectric plants that are the subject of this arbitration, because of the territorial limitation, the following 16 are affected by the Water Levy: 11 plants of the Xana Portfolio: Villar del Rey, Peña Corada, La Confianza, Alange, Quebradas, Tedelche, Vicarias, Canal de Almazán, Jerte, Ferreras and Porma; and 5 plants of the Ondina Portfolio: Castillonroy, Ponts, San Lorenzo, La Pobla (3 and 4) and Molinos.

#### b.  The Parties' Position in Summary

505.  The arguments have been set out above.  In summary, the Claimants' case is that the TVPEE and the Water Levy were unreasonable and discriminatory, represented a back-

---

[623] *Costa v ENEL*, p 594.
[624] Act 15/2012; Cl. Mem., ¶¶ 117-126; Resp. C-Mem., ¶¶ 103-113, 115-118.

door tariff cut to the RD 661/2007 regime, and were part of the New Regime in breach of Article 10(1) of the ECT.  In answer to the Respondent's jurisdictional objection based on the tax carve-out in ECT, Article 21, the Claimants say that they were not *bona fide* taxes, and that, even if they were *bona fide*, the effect of Article 21(5)(a) is that under Article 13, for expropriation, taxes are not excluded (which is common ground) and that the effect of Article 21(3) is that, as taxes which are "other than those on income and capital", they remain subject to the MFN clause in ECT, Article 10(7).

### c. The Tax Carve-Out

506. ECT, Article 21 provides:

> (1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties.  In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.
>
> …
>
> (3) Article 10(2) and (7) shall apply to Taxation Measures of the Contracting Parties other than those on income or on capital, except that such provisions shall not apply to:
>
> > (a) impose most favoured nation obligations with respect to advantages accorded by a Contracting Party pursuant to the tax provisions of any convention, agreement or arrangement described in subparagraph (7)(a)(ii) or resulting from membership of any Regional Economic Integration Organization; …
>
> > …
>
> (5) (a) Article 13 shall apply to taxes.
>
> …
>
> (7) For the purposes of this Article:
>
> > (a) The term "Taxation Measure" includes:

(i) any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and

(ii) any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.

(b) There shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation.

…

(d) For the avoidance of doubt, the terms "tax provisions" and "taxes" do not include customs duties.

507.    Article 21(3) refers to Article 10(2) and Article 10(7).  Article 10(2), together with Article 10(3), imposes an obligation on Contracting Parties to endeavour to accord to investors of other Contracting Parties treatment which is no less favourable than that which they accord to their own investors or to investors of any other Contracting Party or any third state, whichever is the most favourable.

508.    Article 10(7) provides:

Each Contracting Party shall accord to Investments in its Area of Investors of other Contracting Parties, and their related activities including management, maintenance, use, enjoyment or disposal, treatment no less favourable than that which it accords to Investments of its own Investors or of the Investors of any other Contracting Party or any third state and their related activities including management, maintenance, use, enjoyment or disposal, whichever is the most favourable.

### d.  Are the TVPEE and the Water Levy "Taxation Measures"?

509.    Article 21 does not contain a comprehensive definition of "Taxation Measures", although Article 21(7)(a) does indicate that they include any provision relating to taxes of the

domestic law of the Contracting Party or of a political subdivision or local authority; and any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.  Article 21(7) gives a (probably non-exhaustive) list of measures to be regarded as taxes on income or capital for the purposes of (*inter alia*) Article 21(3),and excludes customs duties.

510.    Article 21 of the ECT as a whole must be interpreted in accordance with the principles of customary international law codified in the VCLT, in particular the general rule of treaty interpretation in Article 31, which provides that "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

511.    In order to ascertain whether a measure qualifies as a taxation measure under Article 21 it is first necessary to consider the characterisation of the measure in the State's domestic law.  In order for Article 21 to apply, the domestic law of the host State must characterise the measure as a tax in nature and substance.  That is clear from several references in Article 21 to taxation measures of the Contracting Parties (e.g. Article 21(1), (3)) or "taxes of the domestic law of the Contracting Party" (Article 21(7)(a)(i)).

512.    But simply describing a measure as a tax is not sufficient.  Article 21(7) provides that the term "Taxation Measure" includes "any provision relating to taxes of the domestic law of the Contracting Party."  But even if a measure is characterised as a tax by national law, the characterisation by domestic law is not conclusive for the purposes of international law.  In the view of the Tribunal, to qualify as a taxation measure, the measure must be both a tax under national law and also under the ECT.  In the absence of a comprehensive definition in the ECT, resort must be had to international arbitral decisions.

513.    There is no doubt that the measures are regarded as taxation measures under Spanish law.  Act 15/2012 described itself as relating to "fiscal measures" and Act 17/2012 on the Budget for 2013 provided that the taxes raised under Act 15/2012 should be assigned to finance the costs of the promotion of renewable energy in the electricity system under the

Electricity Act 54/1997.[625]  In deciding that the legislation on TVPEE was justified by an extraordinary and urgent need to make cost adjustments in the electricity sector and was compliant with the Spanish Constitution, the Constitutional Court proceeded on the basis that it was a tax in its decision of 6 November 2014,[626] as did several decisions of the Spanish High Court in June 2014.[627]

514.    International arbitral practice indicates that for the purpose of the interpretation of the carve-out taxation in investment treaties, the following factors are relevant: *(1)* that it is imposed by law and is part of a regime for the imposition of a tax; and *(2)* that it imposes a liability on classes of persons to pay money to the State for public purposes.[628]

515.    In view of what is said above, there is no doubt that on its face the TVPEE and Water Levy were imposed by law and were part of the taxation regime in Spain, and imposed a liability on classes of persons to pay them for public purposes.

516.    Nevertheless, even if a measure is *prima facie* a taxation measure, it may be outside the carve-out if it is called a taxation measure but is imposed in bad faith for other reasons.  In such a case a tribunal would look beyond the form of the measure and consider the reality.

517.    In *Yukos v Russia*[629] the tribunal said:

> …the Tribunal finds that, in any event, the carve-out of Article 21(1) can apply only to *bona fide* taxation actions, *i.e.*, actions that are motivated by the purpose of raising general revenue for the State. By contrast, actions that are taken only under the guise of taxation, but in reality aim to achieve an entirely unrelated purpose (such as the destruction of a company or the elimination of a political

---

[625] Act 17/2012, Article 5.

[626] Ruling 183/2014, issued by the Constitutional Court Plenary in unconstitutionality appeal number 1780-2013 filed by the Cabinet of the Andalusian Regional Government with regard to Articles 4, 5 and 8 of Act No. 15/2012 (and other regulations), 6 November 2014 (R-0018).

[627] Ruling from the Spanish High Court, dismissing administrative appeal 297/2013, 2 June 2014 (R-0009); Ruling from the Spanish High Court, dismissing administrative appeal 298/2013, 2 June 2014 (R-0010); Ruling from the Spanish High Court, dismissing administrative appeal 296/2013, 30 June 2014 (R-0011).

[628] *EnCana v Ecuador*, ¶ 174; *Burlington Resources Inv. v Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010 (RL-0036), ¶¶ 164 and 165.

[629] *Yukos v Russia*, ¶¶ 1407, 1433, 1437-1438.

opponent) cannot qualify for exemption from the protection standards of the ECT under the taxation carve-out in Article 21(1).

…

To find otherwise would mean that the mere labelling of a measure as "taxation" would be sufficient to bring such measure within the ambit of Article 21(1) of the ECT, and produce a loophole in the protective scope of the ECT. Since the claw-back in Article 21(5) of the ECT relates only to expropriations under Article 13 of the ECT, a State could, simply by labelling a measure as "taxation", effectively avoid the control of that measure under the ECT's other protection standards. It would seem difficult to reconcile such an interpretation with the purpose of Part III of the ECT.

…

Thus, the *RosInvestCo* tribunal concluded that:

> [I]t is generally accepted that the mere fact that measures by a host state are taken in the form of application and enforcement of its tax law, does not prevent a tribunal from examining whether this conduct of the host state must be considered, under the applicable BIT or other international treaties on investment protection, as an abuse of tax law to in fact enact an expropriation.[630]

Similarly, the *Quasar* tribunal opined that:

> It is no answer for a state to say that its courts have used the word "taxation" ... in describing judgments by which they effect the dispossession of foreign investors. If that were enough, investment protection through international law would likely become an illusion, as states would quickly learn to avoid responsibility by dressing up all adverse measures, perhaps expropriation first of all, as taxation. When agreeing to the jurisdiction of international tribunals, states perforce accept that those jurisdictions will exercise their judgment, and not be stumped by the use of labels.[631]

---

[630] *Yukos v Russia*, citing *RosInvestCo UK Ltd. v Russian Federation*, SCC Case No. 079/2005, Final Award, 12 September 2010, ¶ 628.

[631] *Yukos v Russia*, citing *Quasar de Valors SICAV S.A. et al. (Formerly Renta 4 S.V.S.A et al.) v Russian Federation*, SCC Case No. 24/2007, Award, 20 July 2012, ¶ 179.

518.    But it is for a claimant to meet what must be the heavy burden of showing bad faith. It would be a serious matter for a tribunal to find that the exercise of the sovereign power to tax was exercised in bad faith. The Claimants say that the measures were taxation measures "in name only"[632] because they were thinly disguised retroactive cuts to the RD 661/2007 regime and because the revenues were to be spent on financing the electricity system. But there is no evidential basis put forward to show that the TVPEE and the Water Levy had any illegitimate ulterior purpose. Consequently, it does not require any elaboration for the Tribunal to conclude that the Claimants have not established that the Respondent used the taxation power for an ulterior purpose. The stated, and actual, purpose was to raise revenue for the electricity system and create a balanced budget. A tax does not cease to be a tax because there is a mandatory allocation of revenues received from the taxation measure.

519.    The final question is whether the effect of Article 21(3) is to allow the application of Article 10(7), the MFN clause. Article 21(3) provides that Article 10(7) (and also the national treatment provision in Article 10(2)) shall apply to taxation measures, but not to taxation measures on "income or on capital." Article 21(7)(b) provides: "There shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital."

520.    The Claimants' argument is that the essence of this definition is that taxes on income or capital are those imposed on "total income" or "total capital" or on "elements of" either income or capital. The TVPEE and the Water Levy are not imposed on either total income or total capital, or elements of capital, but on gross revenues; and they rely on the OECD Model Tax Convention, and commentaries on it, to suggest that the ECT should likewise be interpreted to use income in the sense of gross revenues minus deductible expenses.[633]

521.    The Tribunal is satisfied that this argument fails. First, there is nothing in Article 21(3) or Article 21(7)(b) to suggest that the exclusion is limited to taxes on net income. Second, Article 27(1)(b) refers also to "total income … or … elements of income" which suggests

---

[632] Rev. Tr. Day 1 (ENG), 61:1 (Ms Martínez López).

[633] Cl. Reply, ¶ 426 *et seq*.

that it extends beyond net income.  Third, although it is of course by no means conclusive, the Energy Charter Secretariat takes the view that the purpose of the provision is to exclude indirect taxes, which plainly the TVPEE and Water Levy are not.[634]

522.    Consequently, the Tribunal has no jurisdiction to consider the Claimants' claims in relation to the TVPEE and Water Levy, other than expropriation claims under ECT, Article 13, and only then under the conditions in ECT, Article 21(5).

### E.  The Expropriation Claim

#### (1) Article 13(1) of the ECT

523.    By Article 13(1) of the ECT:

> Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:
>
> (a) for a purpose which is in the public interest;
>
> (b) not discriminatory;
>
> (c) carried out under due process of law; and
>
> (d) accompanied by the payment of prompt, adequate and effective compensation.
>
> Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment…

524.    By Article 1(6):

> "Investment" means every kind of asset, owned or controlled directly or indirectly by an Investor and includes:

---

[634] The Energy Charter Treaty. A Reader's Guide (RL-0053), p 39.

(a) tangible and intangible, and movable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;

(b) a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;

(c) claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment;

(d) Intellectual Property;

(e) Returns;

(f) any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.

A change in the form in which assets are invested does not affect their character as investments and the term "Investment" includes all investments, whether existing at or made after the later of the date of entry into force of this Treaty for the Contracting Party of the Investor making the investment and that for the Contracting Party in the Area of which the investment is made (hereinafter referred to as the "Effective Date") provided that the Treaty shall only apply to matters affecting such investments after the Effective Date.

…

525.  The Claimants' case is that the disputed measures amount to indirect and/or creeping expropriation.

526.  They also claim that the TVPEE and the Water Levy form part of a series of measures constituting a creeping expropriation of the Claimants' investments in breach of Article 13 ECT for this purpose.[635]  It is common ground that there is no jurisdictional issue concerning this claim because the effect of Article 21(5)(a) is that the tax carve-out provisions of Article 21 do not apply to expropriation claims even if they are *bona fide* taxation measures.[636]  The Claimants say that the procedural provisions of Article 21(5)(b)

---

[635] Cl. Mem., ¶ 198; Cl. Reply, ¶ 404.
[636] *Yukos v Russia*, ¶ 1434.

requiring referral to the competent tax authority whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory do not apply, according to the Claimants, because *(a)* they are not *bona fide* taxation measures; and *(b)* in any event, form only a part of a series of Spain's measures leading to a creeping expropriation of Claimants' investments (i.e. it is not the Claimants' position that these two measures by themselves result in an expropriation). But without prejudice to the Claimants' position that such a referral is not required, the Claimants have made such a referral to the Competent Tax Authority in Spain.[637]

527.    There is no substantial dispute concerning the basic principles underlying Article 13(1).

528.    First, for a taking to be lawful, each of the conditions of *(a)* public purpose; *(b)* non-discrimination; *(c)* due process of law; and *(d)* compensation must be satisfied.[638]

529.    Second, it applies expressly to indirect expropriation by virtue of the reference to "measures having an effect equivalent to … expropriation", and indirect expropriation may take the form of "creeping expropriation", i.e. a "specific form of expropriation that results from a series of measures taken over time that cumulatively have an expropriatory effect, rather than from a single measure or group of measures that occur at one time."[639]

530.    Third, indirect expropriation has been described in a number of different ways, but all with essentially the same effect, namely that the contested measures:

(1)    Irreversibly and permanently deprive the owner of property of the effective use of the asset, even where legal ownership is not affected, and the form of the deprivation measure is less important than its actual effects;[640] or

---

[637] Letter from Hydroxana Sweden AB and Hydro Energy 1 S.à r.l to the Spanish Dirección General de Tributos of 30 September 2016 (C-0106).

[638] E.g. *Crystallex v Venezuela*, ¶ 711; *Saluka v Czech Republic*, ¶¶ 245 and 266.

[639] *Crystallex v Venezuela*, ¶¶ 666 and 667. *See also* e.g. *Compañia del Desarrollo de Santa Elena S.A. v Republic of Costa Rica*, ICSID Case No. ARB/96/1, Final Award, 17 February 2000 (CL-0012) ("***Santa Elena v Costa Rica***"), ¶ 76.

[640] *Tecmed v Mexico*, ¶ 116.

(2)     Effectively neutralize the benefit of the property of the foreign owner[641]; or

(3)     Radically deprive the investors of the economic use and enjoyment of their rights and have the effect of putting an end to the investment[642] or effectively freeze or blight the possibility for the owner reasonably to exploit the economic potential of the property[643]; or

(4)     Consist of a "substantial, radical, severe, devastating or fundamental deprivation of its rights or the virtual annihilation, effective neutralisation or factual destruction of its investment, its value or enjoyment."[644]

531.    Fourth, expropriation, direct or indirect, entails "substantial deprivation", i.e. the loss of all significant economic value,[645] where the loss of value is such that it could be considered equivalent to a deprivation of property,[646] or the loss of all attributes of ownership.[647]

532.    Fifth, consequently a loss of some of the anticipated returns on investments in shares may not, depending on the facts, be an expropriation,[648] and a mere loss in value of an investment, as distinct from interference with the control or use of the property, is not an indirect expropriation[649] unless the loss of value is such that it could be considered equivalent to a deprivation of the investment.[650]    It follows that suggestions[651] that a

---

[641] *CME Czech Republic B.V. (Netherlands) v Czech Republic* (UNCITRAL), Partial Award, 13 September 2001 (CL-0008), ¶ 604.

[642] *Compañiá de Aguas del Aconquija S.A. and Vivendi Universal S.A. v Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007 (CL-0021) ("***Vivendi v Argentina***"), ¶¶ 7.5.11 and 7.5.24.

[643] *Santa Elena v Costa Rica*, ¶ 76.

[644] *Electrabel v Hungary* Decision, ¶ 6.62.

[645] *Electrabel v Hungary* Decision, ¶ 6.53; *Blusun v Italv*, ¶ 398; *Philip Morris Brands SÀRL, Philip Morris Products S.A. and Abal Hermanos S.A., v Republic of Uruguay*, ICSID Case No. ARB/10/7, Final Award, 8 July 2016 (RL-0086) ("***Philip Morris v Uruguay***"), ¶ 192.

[646] *Charanne v Spain*, ¶ 461.

[647] *Santa Elena v Costa Rica*, ¶ 76; applied in *Mamidoil Jetoil Greek Petroleum Products Societe Anonyme SA v Republic of Albania*, ICSID Case No. ARB/11/24, Award, 30 March 2015 (RL-0046) ("***Mamidoil v Albania***"), ¶ 566.

[648] E.g. *Charanne v Spain*, ¶¶ 458-459.

[649] *El Paso v Argentina*, ¶¶ 255-256; *Mamidoil v Albania*, ¶ 572.

[650] *Charanne v Spain*, ¶ 465.

[651] E.g. *Biwater v Tanzania*, ¶ 452; *AES v Hungary*, ¶ 14.3.1; *Alpha Projektholding GmbH v Ukraine*, ICSID Case No. ARB/07/16, Award of 8 November 2010 (CL-0022), ¶ 408; *Quiborax SA, Non Metallic Minerals SA and Allan Fosk Kaplún v Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Award, 16 September 2015 (CL-0075), ¶ 238.

significant or substantial depreciation in value of the asset amounts to indirect expropriation may go too far, or must be read in a particular factual context, and that the true test is whether the measures involve a "substantially complete deprivation of the economic use and enjoyment of the rights to the investment, or of identifiable, distinct parts thereof (i.e., approaching total impairment) …"[652]

533.    Sixth, regulatory measures can constitute indirect expropriation.[653] This is so where the negative economic impact of such actions on the financial position of the investor is sufficient to neutralize in full the value, or economic or commercial use of its investment without the receipt of any compensation.[654]

534.    Seventh, a State is not required to compensate an investment for any loss sustained by the imposition of a non-discriminatory, regulatory measure designed and applied to protect legitimate public welfare objectives.[655]

(2) **The Tribunal's Conclusion**

535.    What the Claimants say is that Spain has effected an indirect, creeping expropriation of their investments. They say:[656] *(1)* Spain's measures have wiped out completely the fair market value of the Claimants' equity investments as of 30 September 2016, and the value of their debt investments was reduced by around 85.3% as of the same date; *(2)* market prices received by the small-hydro installations for their electricity are insufficient for the installations to service project financing debt obligations and to generate a return on the Claimants' equity and debt investments; *(3)* the economic benefits of these investments have therefore disappeared, and those investments have thus been rendered essentially worthless; *(4)* Spain's measures have reduced the fair market value of the Claimants' equity investments to EUR 19 million, and the value of their debt investments to

---

[652] *Plama v Bulgaria*, ¶ 193.

[653] *ADC Affiliate Limited and ADC & AMC Management Limited v Republic of Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006 (CL-0023), ¶ 423; *Azurix v Argentina*, ¶ 310.

[654] *Tecmed v Mexico*, ¶¶ 121-122.

[655] *Bear Creek Mining Corporation v Republic of Peru*, ICSID Case No. ARB/14/2, Award, 30 November 2017 (RL-0087), ¶ 471 (quoting with approval a statement by the Canadian Government).

[656] Cl. Mem., ¶ 225; Cl. Reply, ¶¶ 66-67; First Compass Lexecon Report, ¶ 58.

EUR 1.8 million;[657] *(5)* the Claimants have also been deprived of EUR 13.3 million in historical cash flows from 1 January 2013; and *(6)* the Claimants have been permanently deprived of the fundamental investment rights that enabled them to expect a reasonable economic benefit from their investment.

536.    As the above account of the relevant principles establishes, regulatory measures can amount to indirect expropriation, but if they are to amount to indirect expropriation there must be substantial deprivation, i.e. the loss of all significant economic value through the loss of at least one of the constitutive attributes of ownership, such that the loss of value is such that it could be considered equivalent to a deprivation of property, and the loss of attributes of ownership. A mere loss in value of an investment, unless the loss of value is such that it could be considered equivalent to a deprivation of the investment, is not sufficient.

537.    The Spanish measures were not intended to expropriate the Claimants' assets nor did they have that effect. The Claimants have not sought to establish that they were deprived of their investment, because they are not in a position to do so. They still hold the shares in the companies and the plants are still operating, albeit that there may have been a substantial reduction in their value.

538.    In these circumstances the Tribunal rejects the expropriation claim.

F.  **Article 10(1) of the ECT: Principles**

539.    By Article 10(1) of the ECT:

> Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management,

---

[657] Second Compass Lexecon Report, ¶ 4.

maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.

(1) **General Considerations**

a. **Interpretation**

540.    As indicated above, the ECT standards are to be interpreted in accordance with the principles of customary international law codified in the VCLT, including its reference in Article 31(3)(c) to general international law,[658] and against the background of the purposes of the ECT.

541.    Under the heading "Purpose of the Treaty" Article 2 of the ECT provides: "This Treaty establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter."

542.    The Concluding Document of the Hague Conference on the European Energy Charter of 17 December 1991 recognised in its preamble "State sovereignty and sovereign rights over energy resources" and "the role of entrepreneurs, operating within a transparent and equitable legal framework, in promoting co-operation under the Charter." Under the heading "Promotion and protection of investments" the Charter provided:[659]

> In order to promote the international flow of investments, the signatories will at national level provide for a stable, transparent legal framework for foreign investments, in conformity with the relevant international laws and rules on investment and trade.
>
> They affirm that it is important for the signatory States to negotiate and ratify legally binding agreements on promotion and protection

---

[658] *Philip Morris v Uruguay*, ¶ 317.

[659] Concluding Document of the Hague Conference on the European Energy Charter of 17 December 1991 (CL-0093), Title II (4).

167

of investments which ensure a high level of legal security and enable the use of investment risk guarantee schemes.[660]

543.    Consequently, the Tribunal approaches the ECT with due regard to its purpose of establishing a legal framework in order to promote long-term cooperation,[661] but also balancing State sovereignty and the State's responsibility to create an adapted and evolutionary framework for the development of economic activities and the necessity to protect foreign investment and its continuing flow.[662]

### b.  The Article 10(1) Obligations

544.    Article 10(1) contains, so far as is relevant, the following principal obligations on the Contracting Parties: *(1)* to encourage and create stable, equitable, favourable and transparent conditions for investors, including a commitment to accord fair and equitable treatment; *(2)* to afford "the most constant protection and security" to investments; and *(3)* not to impair by unreasonable or discriminatory measures the maintenance, use, or enjoyment of investments.  Other obligations in Article 10(1) such as the obligation to afford at least the treatment standards required by international law, and to observe any obligations entered into with an investor (the umbrella clause), have not played any significant role in this arbitration.

545.    Comprehensive analysis of the various obligations in Article 10(1) and their interaction with each other is not necessary since the Parties have in these proceedings concentrated on the core (and overlapping) obligations of *(1)* fair and equitable treatment, including aspects of stability and transparency, and the implied or inherent obligation of respect for legitimate expectations; *(2)* constant protection and security; and *(3)* impairment by unreasonable or discriminatory treatment.

---

[660] The Energy Charter Secretariat, *The Energy Charter Treaty and Related Documents* (2004) (CL-0036 (excerpts) and RL-0077), p 133.  *See also Energy Charter Secretariat, The Energy Charter Treaty: A Reader's Guide* (RL-0053), pp 19-20.

[661] *Eiser v Spain*, ¶ 378.

[662] *Plama v Bulgaria*, ¶ 167 (citing *El Paso v Argentina*, Decision on Jurisdiction, 27 April 2006, ¶ 70, a BIT case).

546.    It is apparent from the many awards in relation to the ECT and BITs that these obligations overlap to a very great degree, and it is not necessary to undertake a minute examination of the differences between them.

(i) The obligation to "create stable, equitable, favourable and transparent conditions"

547.    On the face of Article 10(1) there is a separate obligation to "create stable, equitable, favourable and transparent conditions", which includes a "commitment to accord at all times … fair and equitable treatment."

548.    It is, however, clear that even without an express obligation to create stable, equitable and transparent conditions, that such an obligation would be included in the fair and equitable treatment standard (FET), and that, no doubt, was what the tribunal in *Plama v Bulgaria*[663] meant when it said that "stable and equitable conditions are clearly part of the fair and equitable treatment standard under the ECT."

549.    But some tribunals have taken this (wrongly in the view of this Tribunal) to mean "that the stability and transparency obligation is simply an illustration of the obligation to respect the investor's legitimate expectations through the FET standard, rather than a separate or independent obligation."[664]    But nothing turns on the point in this arbitration because it is clear that stability and transparency are also part of the FET standard itself.

(ii) "… commitment to accord at all times … fair and equitable treatment"

550.    There are many awards which emphasise that protection of legitimate expectations is the dominant element,[665] or the most important element,[666] of the FET standard.    But before

---

[663] *Plama v Bulgaria*, ¶ 173.  *See also Eiser v Spain*, ¶¶ 381-382.

[664] *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v Kingdom of* Spain, SCC Case No. 2015/063, Final Award, 15 February 2018 (CL-0138), ¶ 646; and in the same sense *Isolux v Spain*, ¶¶ 764-766.

[665] *See Enron Corporation and Ponderosa Assets, L.P v Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007 (CL-0046), ¶¶ 264-266; *LG&E Energy Corp., LG&E Capital Corp., and LG&E International, Inc. v Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006 (CL-0034) ("**LG&E v Argentina**"), ¶¶ 130 and 133; *Saluka v Czech Republic*, ¶¶ 301−302.

[666] *Electrabel v Hungary* Decision, ¶ 7.75.

the principles relating to legitimate expectation are set out, it is necessary to say something about the State's other obligations involved in FET, or connected by the ECT with it.

551.    These elements are stability and transparency, the obligation to provide most constant protection and security, reasonableness and non-discrimination, due process and non-retroactivity.

### (iii) Stability and transparency

552.    As indicated above, stability and transparency are included in the express obligation in Article 10(1) for the State to "create stable … and transparent conditions" and are also implicit in the obligation to accord FET, and stability is also part of the legitimate expectation of the investor.

### (iv) Meaning of stability

553.    Stability is linked to the investor's legitimate expectations that the legal framework will not be arbitrarily changed and that commitments will be observed.  But it does not mean that an investor is protected from any change. The obligation has a relatively high threshold, and the emphasis is on the subversion of the legal regime.[667]

554.    The tribunal in *Frontier v Czech Republic* said:

> Stability means that the investor's legitimate expectations based on this legal framework and on any undertakings and representations made explicitly or implicitly by the host state will be protected.  The investor may rely on that legal framework as well as on representations and undertakings made by the host state including those in legislation, treaties, decrees, licenses, and contracts. Consequently, an arbitrary reversal of such undertakings will constitute a violation of fair and equitable treatment.  While the host state is entitled to determine its legal and economic order, the investor also has a legitimate expectation in the system's stability to facilitate rational planning and decision making.[668]

---

[667] *Blusun v Italy*, ¶ 363.

[668] *Frontier Petroleum Services Ltd. v The Czech Republic* (UNCITRAL), Final Award, 12 November 2010 (CL 0047) ("**Frontier v Czech Republic**"), ¶ 285.

555.  But there are limits to the use of the concept of stability.  The duty to provide stable conditions does not mean that a State does not maintain its legitimate right to regulate.[669] In *AES v Hungary* the tribunal said:

> The stable conditions that the ECT mentions relate to the framework within which the investment takes place.  Nevertheless, it is not a stability clause.  A legal framework is by definition subject to change as it adapts to new circumstances day by day and a state has the sovereign right to exercise its powers which include legislative acts.
>
> Therefore, to determine the scope of the stable conditions that a state has to encourage and create is a complex task given that it will always depend on the specific circumstances that surrounds [sic] the investor's decision to invest and the measures taken by the state in the public interest.[670]

556.  The State's right to regulate and its limits will be developed below.

### (v)  Transparency

557.  Transparency is plainly linked with stability.  Transparency will enable the investor to be shielded from arbitrary change and from the frustration of legitimate expectations.

558.  In the context of the ECT, in *Electrabel v Hungary* the tribunal said:

> Article 10(1) ECT not only speaks of fair and equitable treatment and equitable and stable conditions, it also refers to "favourable and transparent conditions."  The reference to transparency can be read to indicate an obligation to be forthcoming with information about intended changes in policy and regulations that may significantly affect investments, so that the investor can adequately plan its investment and, if needed, engage the host State in dialogue about protecting its legitimate expectations…[671]

---

[669] *Plama v Bulgaria*, ¶ 177.

[670] *AES v Hungary*, ¶¶ 9.3.29 and 9.3.30.

[671] *Electrabel v Hungary* Decision, ¶ 7.79.  *See also Tecmed v Mexico*, ¶ 154; *Plama v Bulgaria*, ¶ 178; *Micula v Romania*, ¶ 530; *Frontier v Czech Republic*, ¶ 285.

(vi) "… shall also enjoy the most constant protection and security..."

559.     Article 10(1) of the ECT provides that investments shall "enjoy the most constant protection and security". This provision is similar to, and perhaps stronger than, the commonly used language in investment treaties that obliges host States to provide "full protection and security" to investments, but there is no reason to suppose that they will lead to a different result in practice in any case.[672]

560.     There are two views of the "protection and security" obligation, whether or not it is characterised as "constant" or "full".

561.     The first view is that it is simply reflective of the traditional duty of the State in public international law to protect property of aliens from interference by third parties or (sometimes) State actors.[673]  This view is exemplified by *Electrabel v Hungary*, in which the tribunal said[674] (approving the award in the *El Paso v Argentina* case[675]):

> … The second part of Article 10(1) ECT requires Hungary to ensure that all covered investments "shall also enjoy the most constant protection and security".  The FET standard and this FPS standard are two distinct standards of protection under the ECT, dealing with two different types of protection for foreign investors.
>
> …
>
> In the Tribunal's view, given that there are two distinct standards under the ECT, they must have, by application of the legal principle of "effet utile", a different scope and role.  The Tribunal generally concurs with the description given by the *El Paso* award of the scope of an FPS standard, as follows:
>
>> *"The case-law and commentators generally agree that this standard imposes an obligation of vigilance and due diligence upon the government. … The minimum standard of vigilance and care set by international law comprises a duty of prevention and a duty of repression.  A well-established*

---

[672] E.g. *Asian Agricultural Products Ltd. v Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Award, 27 June 1990 (CL-0069) ("***Asian Agricultural Products v Sri Lanka***"), ¶ 47.

[673] E.g. *Elettronica Sicula S.pA. (ELSI), USA v Italy* (Judgment) [1989] ICJ Reports 15, (CL-0068), ¶ 111; *Asian Agricultural Products v Sri Lanka*, ¶ 72 *et seq.*

[674] *Electrabel v Hungary* Award, ¶¶ 7.80, 7.83.

[675] *El Paso v Argentina*, ¶¶ 522-523.

> *aspect of the international standard of treatment is that States must use "due diligence" to prevent wrongful injuries to the person or property of aliens caused by third parties within their territory, and, if they did not succeed, exercise at least "due diligence" to punish such injuries. If a State fails to exercise due diligence to prevent or punish such injuries, it is responsible for this omission and is liable for the ensuing damage. It should be emphasised that the obligation to show "due diligence" does not mean that the State has to prevent each and every injury.*"

562.    In *Saluka v Czech Republic* the tribunal said that "… the standard obliges the host State to adopt all reasonable measures to protect assets and property from threats or attacks which may target particularly foreigners or certain groups of foreigners. The practice of arbitral tribunals seems to indicate, however, that the 'full security and protection' clause is not meant to cover just any kind of impairment of an investor's investment, but to protect more specifically the physical integrity of an investment against interference by use of force."[676]

563.    The other view is that the duty to afford full or most constant protection and security also extends to a duty to provide a legal framework which provides legal security. In *Siemens v Argentina*, the tribunal defined legal security as "the quality of the legal system which implies certainty in its norms and, consequently, their foreseeable application"[677] and in *Vivendi v Argentina* the tribunal said that it:

> should be interpreted to apply to reach any act or measure which deprives an investor's investment of protection and full security, providing, in accordance with the Treaty's specific wording, the act or measure also constitutes unfair and inequitable treatment. Such actions or measures need not threaten physical possession or the legally protected terms of operation of the investment.[678]

564.    This approach is exemplified by the award in *AES v Hungary*, in which the tribunal said:

> In the Tribunal's view, the duty to provide most constant protection and security to investments is a state's obligation to take reasonable steps to protect its investors (or to enable its investors to protect

---

[676] *Saluka v Czech Republic*, ¶ 484 (footnotes omitted).

[677] *Siemens A.G. v Argentine Republic*, ICSID Case No. ARB/02/8, Award, 17 January 2007 (CL 0015) ("**Siemens v Argentina**"), ¶ 303.

[678] *Vivendi v Argentina*, ¶ 7.4.15.

themselves) against harassment by third parties and/or state actors. But the standard is certainly not one of strict liability. And while it can, in appropriate circumstances, extend beyond a protection of physical security, it certainly does not protect against a state's right (as was the case here) to legislate or regulate in a manner which may negatively affect a claimant's investment, provided that the state acts reasonably in the circumstances and with a view to achieving objectively rational public policy goals.[679]

565.    On this view the full or most constant protection and security standard encompasses a "guarantee of stability in a secure environment, both physical, commercial and legal"[680] or "stability afforded by a secure investment environment."[681] But as the tribunal in *Plama v Bulgaria* recognised, to include protection concerning legal security under this head means that "the standard becomes closely connected with the notion of fair and equitable treatment."[682] Consequently, when the tribunal in *Azurix v Argentina* found that a failure to provide a secure investment environment was a failure to afford fair and equitable treatment, it "finds that the Respondent also breached the standard of full protection and security."[683]

566.    In the present case, there is no allegation of failure to provide constant protection and security in the traditional sense of protection against third parties, and since in the wider sense it adds little or nothing to the FET standard, it is not necessary to say more than on the normal reading of the expression, against the background of customary international law and the practice of modern tribunals, the former view is correct and that it connotes an obligation which is distinct from FET.

---

[679] *AES v Hungary*, ¶ 13.3.2.

[680] *Biwater v Tanzania*, ¶ 729.

[681] *Azurix v Argentina*, ¶ 408.

[682] *Plama v Bulgaria*, ¶ 180; *see also Spyridon Roussalis v Romania*, ICSID Case No. ARB/06/1, Award, 7 December 2011 (CL 0038), ¶ 321.

[683] *Azurix v Argentina*, ¶ 408.

(vii) "shall [not] in any way impair by unreasonable or discriminatory measures"

567.  The obligation not to impair investments by unreasonable or discriminatory measures appears as a free-standing obligation, but there is no doubt that the FET standard contains the same obligation.

568.  Regulatory measures must be proportionate, non-arbitrary, and non-discriminatory.[684] Consequently, in the absence of a specific commitment, the State has no obligation to grant subsidies such as feed-in tariffs, or to maintain them unchanged once granted.  But if they are lawfully granted, and if it becomes necessary to modify them, this should be done in a manner which is not disproportionate to the aim of the legislative amendment, and should have due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime.[685]

569.  Reasonableness means that "the State's conduct bears a reasonable relationship to some rational policy."[686] But that alone is not sufficient. In *Micula v Romania* the tribunal said:

> … for a state's conduct to be reasonable, it is not sufficient that it be related to a rational policy; it is also necessary that, in the implementation of that policy, the state's acts have been appropriately tailored to the pursuit of that rational policy with due regard for the consequences imposed on investors.[687]

[684] *See*, e.g. *Tecmed v Mexico*, ¶ 122; *MTD Equity Sdn. Bhd. and MTD Chile S.A. v Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004 (CL-0050), ¶ 109; *Occidental v Ecuador*, ¶ 404; *Waste Management Inc. v United Mexican States (No.2)*, ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004 (CL-0059), ¶ 98; *S.D. Myers, Inc. v Government of Canada* (UNCITRAL), First Partial Award, 13 November 2000 (CL-0060) ("***S.D. Myers v Canada***"), ¶ 263; *CMS Gas Transmission Company v Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005 (CL-0020) ("***CMS v Argentina***"), ¶ 290.

[685] *Blusun v Italy*, ¶¶ 319, 372.

[686] *Saluka v Czech Republic*, ¶ 179.

[687] *Micula v Romania*, ¶ 525.

570.    But the criterion of "unreasonableness" is not to be used as an open-ended mandate to second-guess the host State's policies.[688]

571.    In *EDF v Romania*,[689] the tribunal adopted Dr Schreuer's criteria in the context of "unreasonable or discriminatory measures": *(a)* a measure that inflicts damage on the investor without serving any apparent legitimate purpose; *(b)* a measure that is not based on legal standards but on discretion, prejudice or personal preference; *(c)* a measure taken for reasons that are different from those put forward by the decision maker; and *(d)* a measure taken in wilful disregard of due process and proper procedure.

572.    In *AES v Hungary* the tribunal said:

> There are two elements that require to be analyzed to determine whether a state's act was unreasonable: the existence of a rational policy; and the reasonableness of the act of the state in relation to the policy.
>
> A rational policy is taken by a state following a logical (good sense) explanation and with the aim of addressing a public interest matter.
>
> Nevertheless, a rational policy is not enough to justify all the measures taken by a state in its name. A challenged measure must also be reasonable. That is, there needs to be an appropriate correlation between the state's public policy objective and the measure adopted to achieve it. This has to do with the nature of the measure and the way it is implemented.[690]

### c.    Proportionality

573.    The requirement of proportionality is part of the reasonableness standard and of the fair and equitable treatment standard.[691]

574.    A measure must be suitable to achieve a legitimate policy objective, necessary for that objective, and not excessive considering the relative weight of each interest involved, and

---

[688] *Blusun v Italy*, ¶ 318.

[689] *EDF v Romania*, ¶ 303.

[690] *AES v Hungary*, ¶¶ 10.3.7 to 10.3.9.

[691] *Occidental v Ecuador*, fn 7 and ¶ 404.

a balancing or weighing exercise so as to ensure that the effects of the intended measure remain proportionate with regard to the affected rights and interests.[692]

### d. Due Process

575. "Procedural propriety and due process" are part of the FET standard, both in relation to judicial and administrative action. But they are intimately linked with transparency in the sense that in the legislative process, as distinct from the juridical process, where they play a much greater role, they are relevant mainly to the Claimants' complaint[693] that in breach of the Respondent's obligation to act transparently, and in accordance with due process,[694] the disputed measures were enacted using Spain's emergency Royal Decree law process, thereby restricting consultation and input from affected parties such as the Claimants.

576. The Respondent does not deny that due process is required. It says that all the measures were published and hearings were held about them.[695]

### e. Non-Discrimination

577. "Non-discrimination" requires a rational justification of any differential treatment. For a measure to be discriminatory two similar situations are objectively treated differently, without objective justification. [696]

### f. Retroactivity

578. There is no general principle which prohibits the retroactivity of legislation, but it may, depending on the context, be relevant to unreasonableness, breach of legitimate expectation or destruction of acquired rights.

---

[692] *Electrabel v Hungary* Award, ¶¶ 179-180; also *Tecmed v Mexico*, ¶ 122.

[693] *See* Cl. Mem., ¶ 294.

[694] *See* e.g. *Rumeli Telekom A.S and Telsim Mobil Telekomikasyon Hizmetleri A.S. v Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008 (CL-0039), ¶ 609; *Frontier v Czech Republic*, ¶ 328; *Saluka v Czech Republic*, ¶ 308.

[695] Resp. C-Mem., ¶¶ 1163-1164.

[696] *Saluka v Czech Republic*, ¶ 460; *Plama v Bulgaria*, ¶ 183.

### g. Legitimate Expectations

#### (i) The Relevant Time

579.  An investor's legitimate expectations must be assessed as at the time of the investment.[697]

#### (ii) Legitimate Expectation and the Right to Regulate

580.  In this context, legitimate expectation means a legally protected expectation. It is not synonymous with a reasonable business judgment.  It is in the nature of businesses to take decisions or risks on the basis of the facts known to them and their reasonable predictions about the future.  Not every such decision is legally protected.

581.  A very extensive review of arbitral practice enables the following propositions (some of which overlap with each other) to be extracted from the many awards cited to this Tribunal.

582.  First, the State's sovereign right to regulate has been affirmed in many awards, and the State is entitled to a "high measure of deference,"[698] and the requirements of legitimate expectations and legal stability as manifestations of the FET standard do not affect the State's rights to exercise its sovereign authority to legislate and to adapt its legal system to changing circumstances.[699]

583.  Second, the idea that legitimate expectations, and therefore FET, imply the stability of the legal and business framework does not mean the virtual freezing of the legal regulation of economic activities.[700]  There has to be a weighing of an investor's expectations and the State's regulatory interests.[701]

---

[697] E.g. *Tecmed v Mexico*, ¶ 154; *CMS v Argentina*, ¶ 275; *Saluka v Czech Republic*, ¶ 302; *LG&E v Argentina*, ¶ 130; *Bayindir Insaat Turizm Ticaret Ve Sanayi AS v Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Award, 27 August 2009 (CL-0018), ¶ 190; *Mr. Jürgen Wirtgen and others v Czech Republic*, PCA Case No. 2014-03, Award, 11 October 2017 (RL-0094), ¶ 407.

[698] *S.D. Myers v Canada*, ¶ 263; applied in *Joseph Charles Lemire v Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010 (RL-0085), ¶ 505; *Saluka v Czech Republic*, ¶ 305; *Total S.A. v Argentine Republic*, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010 (CL 0045) ("***Total v Argentina***"), ¶ 115.

[699] *Philip Morris v Uruguay*, ¶ 422.

[700] *EDF v Romania*, ¶ 217.

[701] *Saluka v Czech Republic*, ¶ 306.

584.    Third, in the absence of specific promises or representations by the State to the investor, the investor may not rely on an investment treaty as a kind of insurance policy against the risk of any changes in the host State's legal and economic framework.[702]

585.    Fourth, it has been said that it is inconceivable a State would make a general commitment never to change its legislation whatever the circumstances, and it would be unreasonable for an investor to rely on such a freeze,[703] in particular where times and needs change, or where crisis arises.

586.    Fifth, general laws are not promises, and the risk of change is for entrepreneurs to assess and assume.[704]

587.    Sixth, economic, social, environmental and legal circumstances and problems are by their nature evolutionary, dynamic and bound to constant change, and it is indispensable for successful public infrastructure and public services to be adaptable to change in evolving circumstances.[705]

588.    Seventh, consequently, the FET standard preserves the regulatory authority of the host State to make and change its laws and regulations to adapt to changing needs, including fiscal needs, subject to respect for specific commitments made.[706]

589.    Eighth, the expression "margin of appreciation" can be used to convey the point that the State's right to regulate is subject to a wide latitude, subject to its compliance with its duties under the ECT and customary international law. As the tribunal in *Electrabel v Hungary* said:

> Regulatory pricing (by operation of law) was and remains an important measure available to State regulators in liberalised markets for electricity. It is, even at best, a difficult discretionary exercise involving many complex factors. In short, Hungary would

---

[702] *EDF v Romania*, ¶ 217.

[703] *El Paso v Argentina*, ¶ 374.

[704] *Blusun v Italy*, ¶¶ 367, 373.

[705] *Mamidoil v Albania*, ¶ 617. E.g. *EDF v Romania*, ¶ 217; *Eiser v Spain*, ¶ 362.

[706] *Blusun v Italy*, ¶ 319.

enjoy a reasonable margin of appreciation in taking such measures before being held to account under the ECT's standards of protection.[707]

590.    Ninth, consequently changes to general legislation (at least in the absence of a stabilization clause) are not prevented by the FET standard if they do not exceed the acceptable margin of change in the exercise of the host State's normal regulatory power in pursuance of a public interest.  In *Philip Morris v Uruguay* the tribunal said:

> It is common ground in the decisions of more recent investment tribunals that the requirements of legitimate expectations and legal stability as manifestations of the FET standard do not affect the State's rights to exercise its sovereign authority to legislate and to adapt its legal system to changing circumstances.

> On this basis, changes to general legislation (at least in the absence of a stabilization clause) are not prevented by the fair and equitable treatment standard if they do not exceed the exercise of the host State's normal regulatory power in the pursuance of a public interest and do not modify the regulatory framework relied upon by the investor at the time of its investment "outside of the acceptable margin of change.[708]

(iii)    Basic principles and the importance of commitments by the State

591.    Most of these principles appear from the award in *Micula v Romania*:

> …the fair and equitable treatment standard does not give a right to regulatory stability *per se*.  The state has a right to regulate, and investors must expect that the legislation will change, absent a stabilization clause or other specific assurance giving rise to a legitimate expectation of stability.

> …

> The Parties agree that, in order to establish a breach of the fair and equitable treatment obligation based on an allegation that Romania undermined the Claimants' legitimate expectations, the Claimants must establish that (a) Romania made a promise or assurance, (b) the

---

[707] *Electrabel v Hungary* Decision, ¶ 8.35; also *Philip Morris v Uruguay*, ¶ 399; *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018 (RL-0114) ("**RREEF v Spain Decision on Responsibility**"), ¶¶ 242-243.

[708] *Philip Morris v Uruguay*, ¶¶ 422-423, 426-427.

Claimants relied on that promise or assurance as a matter of fact, and (c) such reliance (and expectation) was reasonable. This test is consistent with the elements considered by other international tribunals.

…

This promise, assurance or representation may have been issued generally or specifically, but it must have created a specific and reasonable expectation in the investor. That is not to say that a subjective expectation will suffice; that subjective expectation must also have been objectively reasonable. As stated by the *Saluka* tribunal, "the scope of the Treaty's protection of foreign investment against unfair and inequitable treatment cannot exclusively be determined by foreign investors' subjective motivations and considerations. Their expectations, in order for them to be protected, must rise to the level of legitimacy and reasonableness in light of the circumstances."

The Claimants must also have relied on that expectation when they made their investments. However, it is not necessary for the entire investment to have been predicated solely on such expectation. Businessmen do not invest on the basis of one single consideration, no matter how important. In the Tribunal's view, that expectation must be a determining factor in an investor's decision to invest, or in the manner or magnitude of its investments.

When the alleged legitimate expectation is one of regulatory stability, the reasonableness of the expectation must take into account the underlying presumption that, absent an assurance to the contrary, a state cannot be expected to freeze its laws and regulations...[709]

### h. Commitments

592.    The same or similar points are made in many other awards, often subject to the same important proviso that a change in the law may be a breach of an investor's legitimate expectation if a specific commitment has been made not to change the regulatory framework.

---

[709] *Micula v Romania*, ¶¶ 666, 668, 671-673. *See also Electrabel v Hungary* Decision, ¶ 7.77.

593.    In the context of the ECT, in *Plama v Bulgaria*[710] the tribunal made it clear that the ECT did not protect investors against any and all changes in the host country's laws. Under the FET standard the investor was only protected if (at least) reasonable and justifiable expectations were created in that regard by the State's promises or other representations to the investor to freeze its legislation on environmental law.

594.    Usually general texts cannot contain such commitments, as there is no guarantee that they will not be modified in due course. In *Blusun v Italy* the tribunal said:

> … a representation as to future conduct of the state could be made in the form of a law, sufficiently clearly expressed. But there is still a clear distinction between a law, i.e. a norm of greater or lesser generality creating rights and obligations while it remains in force, and a promise or contractual commitment. There is a further distinction between contractual commitments and expectations underlying a given relationship: however legitimate, the latter are more matters to be taken into account in applying other norms than they are norms in their own right. International law does not make binding that which was not binding in the first place, nor render perpetual what was temporary only.[711]

595.    In *Philip Morris v Uruguay* the tribunal said:

> It clearly emerges from the analysis of the FET standard by investment tribunals that legitimate expectations depend on specific undertakings and representations made by the host State to induce investors to make an investment. Provisions of general legislation applicable to a plurality of persons or of category of persons, do not create legitimate expectations that there will be no change in the law.[712]

596.    But it has been said[713] that legitimate expectations may be engendered by the legal framework at the time of the investment, especially if there has been "a reiteration of the same type of commitment in different types of general statements,"[714] but this may

---

[710] *Plama v Bulgaria,* ¶ 219.

[711] *Blusun v Italy*, ¶ 371.

[712] *Philip Morris v Uruguay*, ¶ 426.

[713] *See* the discussion in *Masdar v Spain*, ¶ 490 *et seq*.

[714] *El Paso v Argentina*, ¶ 377.

properly be regarded as an aspect of stability rather than as an example of a specific commitment.

### i. Authority

597.    If the assurance is given informally by a State official, it is necessary to see if statements have the necessary clarity, and to ensure that the person making the representation has the appropriate authority to give undertakings binding on the State.[715]

598.    Normally an entity of the State not vested with actual decision-making authority cannot be taken to bind the entity which by law possesses the actual authority.[716]

### j. Due Diligence

599.    Fairness and consistency must be assessed against the background of information that the investor knew and should reasonably have known at the time of the investment and of the conduct of the host State.[717]

600.    Consequently, given the State's regulatory powers, in order to rely on legitimate expectations, the investor should inquire in advance regarding the prospects of a change in the regulatory framework in light of the then prevailing or reasonably to be expected changes in the economic and social conditions of the host State.[718]

601.    It follows that it is therefore important to assess the investor's due diligence exercise when it made the investment, and in particular whether, for example, *(1)* the investor investigated or took advice on the host State's applicable law;[719] and *(2)* whether it took care that any official statements on which it relied could reasonably be attributed to the State.[720]

---

[715] *Blusun v Italy*, ¶ 371; *RREEF v Spain* Decision on Responsibility, ¶ 320.

[716] *Invesmart, B.V. v Czech Republic* (UNCITRAL), Award, 26 June 2009 (RL-0019) ("***Invesmart v Czech Republic***"), ¶ 258.

[717] *Electrabel v Hungary* Decision, ¶ 7.78; *RREEF v Spain* Decision on Responsibility, ¶ 397.

[718] *Philip Morris v Uruguay*, ¶ 427.

[719] *Total v Argentina*, ¶ 124.

[720] *Invesmart v Czech Republic*, ¶ 258.

(2) **Whether There was a Legislative Commitment in RD 661/2007 on which the Claimants were Entitled to Rely; the Relevance of the Decisions of the Spanish Supreme Court; the Claimants' Legal Advice; and the 2010 Changes**

602.　At the risk of over-simplification, the Claimants say that: RD 661/2007 amounted to a specific legislative commitment that any changes to the regime would not affect existing installations; they were entitled to rely on that commitment at the time of their investment; and there was nothing in the decisions of the Spanish Supreme Court which would have put them on notice that RD 661/2007, Article 44(3) could be rendered inoperative.[721]

603.　It should be emphasised that the Claimants also say that, even if there was no such general commitment, there was nevertheless a commitment, and therefore a legitimate expectation, that any such change would not affect small-hydro.

604.　It is important at the outset to emphasise that this is not purely a matter of Spanish law. Whether there was a commitment which could give rise to a legitimate expectation is in the first instance a question of international law.　But in considering whether there was such a commitment and whether it was reasonable to rely on it, it is necessary to look at it in the context of Spanish law, and the advice which an investor took or should have taken on the nature of the commitment if any.

a.　**The Claimants' Position**

605.　To recapitulate what has been said above,[722] the case put in the Claimants' Memorial was that the rights granted by RD 661/2007 amounted to a commitment (or, as it is sometimes said, a guarantee[723]) that small-hydro plants *(a)* could sell all of their electricity output; *(b)* at either a regulated tariff or a premium on the market price; *(c)* for pre-established amounts revised yearly for inflation; *(d)* for the plants' entire operational lifetime; and *(e)* free from any future downward reviews or alterations to the specified feed-in

---

[721] E.g. Cl. Reply, ¶ 189 *et seq.*

[722] *See* ¶ 441 above.

[723] E.g. Cl. Mem., ¶¶ 79, 119, 179, 253-254, 266; Cl. Reply, ¶¶ 7, 14, 16, 40, 107-108, 169, 192-193, 198, 217, 245, 255, 406.

remuneration rates or term. The Claimants say that Article 44(3) made it clear that any revisions stemming from these reviews would not apply to existing installations.[724] Article 44(3) expressly stipulated that revisions of the feed-in remuneration in RD 661/2007 would occur every four years, beginning in 2010. However, by contrast with the Article 44(1) inflation-based update which was to apply to all facilities regardless of their commissioning date, Article 44(3) expressly stipulated that the envisaged revisions would not apply to existing plants or plants then under development that were commissioned by January of the second year following the revision. A revision conducted in 2010 could not affect existing installations or any installations that were commissioned by January 2012. If Article 44(3) had intended to preserve the scope for Spain to make other "unplanned revisions" to the feed-in remuneration for existing facilities regardless of their commissioning date, it would have said so expressly (as in Article 44(1)).

606. The Claimants also rely on a press release from the Ministry of Energy of 25 May 2007 issued on enactment of RD 661/2007, which stated: "Any revisions of tariffs to be carried out in the future shall not affect the facilities already in operation. This guarantee provides legal certainty for the producer, providing stability for the sector and promoting its development."[725]

607. The express guarantees contained in RD 661/2007, combined with numerous unequivocal statements made by Spain's representatives (including IDAE) and the special features of the small-hydro sector, were reasonably understood by the Claimants as guaranteeing their small-hydro installations the RD 661/2007 feed-in remuneration for their electricity during their entire operational lives, without downward revisions in respect of *existing* facilities. There was no Supreme Court case law that could have constituted a warning to the Claimants of the possibility of regulatory changes. The first group of cases upon which

---

[724] Cl. Reply, ¶¶ 193 and 196. The Claimants rely on a press release from the Ministry of Energy, the Official Press Release of the Ministry of Energy of 25 May 2007, regarding the enactment of RD 661/2007 (C-0034) ("**RD 661/2007 Press Release**"), p 1. A CNE presentation talked of regulatory stability and non-retroactivity: CNE Vice-President's Presentation "Renewable Energies Legal and Normative Framework" of 29 October 2008 (C-0108), slides 25 and 27. InvestinSpain presentation said that subsequent revisions of the tariff will not affect installations already commissioned: InvestinSpain Presentation "Legal Framework for Renewable Energies in Spain", November 2009 (C-0110), slide 4.

[725] RD 661/2007 Press Release, p 2.

the Respondent relies did not concern the regime established under RD 661/2007; the December 2009 judgments considered the replacement of RD 436/2004 by RD 661/2007, which afforded greater certainty to renewable installations and led to a significant increase in renewable investments, and do not support the Respondent's contention that the government had unlimited authority to make sweeping changes to the regulatory framework for the small-hydro sector; the other group involved claims which were based on RD 2366/1994 or RD 2818/1998 and did not concern RD 661/2007. In any event, even if a reasonable investor in the small-hydro sector could have considered the pre-RD 661/2007 judgments to be relevant, these judgments would not have enabled the investor to foresee that Spain could abandon its commitments under RD 661/2007 altogether (notwithstanding the express guarantees in RD 661/2007) and that its prospective investments in the small-hydro sector would be subject to a total and drastic overhaul of the regulatory framework such as that subsequent imposed by Spain.

### b. The Respondent's Position

608. The Respondent says that the second paragraph of Article 44(3) applies only to the revisions to be made in 2010 and every 4 years.[726] The Article does not refer to "any" revisions of the regulated tariff and the upper and lower limits. That Article limited its scope exclusively to the revisions provided in "this section" (*este apartado*).[727] This paragraph of Article 44(3) only makes reference to the revisions which necessarily must be performed "in 2010" and to the revisions which must necessarily be made every "four years," and provides that there will be mandatory revisions to take advantage of the reductions in the costs inherent to renewable energy technologies. But it does not exclude other unplanned revisions such as *(i)* those arising from the adoption of macro-economic control measures, or *(ii)* to avoid over-remuneration or unreasonable rate of return, or *(iii)* to guarantee the economic sustainability of the Spanish electricity system.

---

[726] Resp. C-Mem., ¶¶ 526-545.

[727] For discussion of the translation *see* Rev. Tr. Day 1 (ENG), 29:22-31:25 (multiple speakers); Rev. Tr. Day 1 (ENG), 213:23-214:25 (Mr Castro López).

609.    No investor conducting a diligent and exhaustive analysis of the regulatory framework could deduce that Article 44(3) is a stabilisation clause with regard to opting between the tariff and a premium, or updates based on the CPI.  Article 44(3) only refers to the revisions "of the regulated tariff and of the upper and lower limits".  Article 44(3) does not refer to the update of the CPI; or to the possibility of introducing tax or other measures that will directly or indirectly impact the return of the plants.  No investor could claim that there is a regulatory provision that would prevent the adoption of measures to ensure the economic sustainability of the Spanish electricity system.  If such a regulatory provision existed, it would be contrary to the basic principle on which the Electricity Act 54/1997 rests, namely the sustainability of the Spanish electricity system.

610.    The Respondent's position[728] is: *(1)* the Spanish Supreme Court had clearly ruled since 2005 that what the Spanish legal framework guaranteed to the owners of facilities under the Special Regime was a reasonable return on the project and not a given level of profits or income nor the indefinite permanence of the formulas used to set the subsidies; and the renewable energy sector was aware of that Supreme Court case law: not only the *Asociación de Empresas de Energías Renovables* (APPA, the main renewable energy association, with close ties with the Claimants) but also the Claimants themselves;[729] and *(2)* renewable energy investors and their advisers knew in May 2011 that: *(a)* previous tariff changes had been made in 2006 and 2007, notwithstanding Article 40(3) of RD 436/2004; *(b)* changes to RD 661/2007 would be possible if it was necessary due to economic reasons, as happened in 2010; and *(c)* the Supreme Court case law allowed those changes.[730]

---

[728] As summarised in Resp. PHB, ¶ 24 *et seq.*

[729] Rev. Tr. Day 2 (ENG), 117:14-117:24 (Mr Quiroga).

[730] *See* Resp. PHB, ¶ 101.

### c. The Tribunal's View

#### (i) Legal due diligence

611. HgCapital and the financial institutions involved had access to advice from three eminent law firms.

612. HgCapital were advised by the international law firm, Allen & Overy, but, according to Mr Quiroga:

> Allen & Overy did not produce any regulatory and/or legal due diligence reports prior to Claimants' investments, and its involvement was limited to drafting and advising on relevant transactional documents, and conducting negotiations in relation to the same on behalf of Claimants.[731]

613. In June 2011 the eminent Spanish law firm Garrigues was asked to give a due diligence report to banks[732] in connection with the purchase of the Xana plants. Their review did not include the question of regulatory risk:

> … it is expressly stated on the record that it has been confined solely and exclusively to the areas of Commercial Law and Administrative Law … and … verification of the existence of administrative and environmental permits necessary for the operation of hydroelectric power stations … and the verification and analysis of administrative sanctioning procedures and judicial proceedings in relation to them…[733]

614. The Respondent also relied on two documents relating to another eminent Spanish law firm, Cuatrecasas Gonçalves Pereira, which had advised HgCapital. The first was a Legal Due Diligence Report given to HgCapital in 2009 in connection with its acquisition of PV plants, in which it pointed out that the Lease Agreements contained termination clauses in the event of (*inter alia*) "lack of viability of the project due to a change in the economic regime" of RD 661/2007.[734] The second was a report of an interview with Juan Carlos

---

[731] Second Quiroga Statement, ¶ 3(c)(ii).

[732] On which the Claimants could rely: Letter from Garrigues to HG Plenium Partners of 8 September 2011 (C-0179).

[733] Garrigues Report, "Legal Administrative Audit of the Hidrodata Group", 16 June 2011 (C-0180), p 4.

[734] Cuatrecasas Legal Due Diligence Report Solar Photovoltaic Project Tina, 24 November 2009 (R-0364), p 34.

Hernandez, a partner of the firm, in which he said that "no Royal decree is free from being amended according to the regulatory risk theory."[735]

615.    Mr Quiroga's written evidence was that due diligence focused among other areas on the right of the plants to receive the FiT under RD 661/2007; and that their assessment of regulatory risk was based (*inter alia*) on "exchanges with Spanish legal advisers specialised in public and corporate law relating to the energy sector."[736]  In evidence at the Hearing, Mr Quiroga said: *(a)* in 2010 he "was aware about some of the discussions around the applicability of the Supreme Court decisions" to RD 661/2007;[737] *(b)* Cuatrecasas did not warn him about the possible modification of RD 661/2007 and the relevance of the Supreme Court decisions;[738] and *(c)* there was no need to ask Garrigues about regulatory risk because the Claimants and the lenders had no reason to doubt the stability of the regulatory framework.[739]

616.    The striking result is that the Claimants never sought, nor received, advice on regulatory risk from the three eminent firms who advised the Claimants or the banks in relation to their acquisitions.

617.    The reason must have been that all parties were aware that there was a regulatory risk and that the Supreme Court had held previous changes to be valid. Although it is unnecessary to make a finding, it is hard to resist the conclusion that the Claimants deliberately avoided being advised that regulatory changes could be made. In themselves the financing documents are neutral on the question of the expectation of change.  Consequently, the share purchase and option agreements[740] provided that loss of or change in the tariff under

---

[735] Suelo Solar Interview with collaborating lawyers (cuatrecasas and PROMEIN) of the Photovoltaic Legal Platform, 22 December 2010 (R-0305).

[736] Third Quiroga Statement, ¶ 9(a) and (b).

[737] Rev. Tr. Day 2 (ENG), 142:7-142:10 (Mr Quiroga).

[738] Rev. Tr. Day 2 (ENG), 144:21-145:6 (Mr Quiroga).

[739] Rev. Tr. Day 2 (ENG), 146:20-147:13 (Mr Quiroga).

[740] Deed of Sale and Purchase Agreement between Sínia Renovables S.C.R. de regimen simplificado S.A. and Hydro Energía Ondina S.L. on the shares of Hidrodata, S.A., 30 December 2012 (C-0057); Deed of Sale and Purchase Agreement between Invercartera Energía, S.L. and Hydro Energia Ondina, S.L. on the shares of Hidrodata, S.A., 29 December 2011 (C-0044), Put Option Sale and Purchase Agreement between Hydro Energía Ondina S.L. and Sinia Renovables Sociedad de Capital Riesgo de Régimen Simplificado, S.A. on the shares of Hidrodata, S.A., 29 December

the Special Regime would not be a ground for termination, or for damages, whereas in the financing agreements such a change might amount a material adverse change justifying a requirement for early repayment.[741] None of these documents shows any actual expectation of change.

618.    The Claimants must also be taken to have been aware through their legal advisers *(a)* of the hierarchical superiority of Electricity Act 54/1997 which guaranteed reasonable profitability with reference to the capital market which in turn was echoed and specified by Decrees such as in Article 44(3) of RD 661/2007 and *(b)* that Article 44(3) of RD 661/2007 was not of a general character but concerned only the revision of specific premiums contained in "this section" ("*apartado*").[742]

(ii) The 2010 PV changes

619.    In addition, the Respondent relied on the fact that not only did HgCapital know about the 2010 changes, but also, as an investor in PV, it was actively challenging the changes relating to PV in arbitration proceedings, which it had not disclosed to this Tribunal.

620.    The changes made by RD 1565/2010 and RD-L 14/2010 have been set out above in section III.  RD 1565/2010 capped the quantity of electricity produced by PV plants (*inter alia*) which was eligible to receive incentive tariffs and eliminated the tariffs after 25 years of operation, which was later extended to 28 years and then to 30 years; and imposed a reduction in the tariff rate available to certain facilities enrolling in the RD 1578/2008 regime.  RD-L 14/2010 also imposed an access fee (of EUR 0.50/MWh) on all producers (including small-hydro installations) for access to transmission and distribution networks.

---

2011 (C-0050); Put Option Sale and Purchase Agreement between Hydro Energía Ondina S.L. and Copcisa Eléctrica S.L.U. on the shares of Hidrodata, S.A., 29 December 2011 (C-0052).

[741] Financing contract between Banco Santander, S.A., Caixa D'Estalvis I Pensions de Barcelona and Naturener Hidro, S.L.U., 22 January 2009 (CLEX-0048), p 66; Senior Loan Agreement between Banco Sabadell, S.A., Bankia, S.A. and Hidrodata, S.A., Vall Fosca Hidráulica, S.L., Copcisa Eléctrica S.L. Unipersonal, Sinia Renovables, Sociedad de Capital Riesgo de Régimen Simplificado, S.A. and Invercartera Energía S.L., 30 June 2011 (C-0045), pp 88-90.

[742] The discussion of the translation of "*apartado*" is in Rev. Tr. Day 1 (ENG), 29:22-31:25 (multiple speakers) and Rev. Tr. Day 1 (ENG), 213:23-214:25 (Mr Castro López).

621.    The Claimants say that they took comfort from Spain's 2010 measures, which focused on those technologies for which the government targets had been exceeded, namely PV, CSP and wind; those measures only had a financial impact on PV, although temporary (a cap on hours during 2011-2013) and with partial compensation (higher FiT extended for five years after year 25); the hours caps imposed on CSP and wind, which were agreed with those sectors, had no actual financial impact and these technologies received reinforced assurances of regulatory stability; and these were presented as a "one-off" which were not going to recur.[743]  The reason given by Spain for RD 1565/2010 and RD-L 14/2010 was that the feed-in remuneration for the PV sector was, as a result of exceeding government-set targets, a major contributor to the regulated costs of the electricity system and to the tariff deficit.  The volume of PV installations registered under RD 661/2007 within the one-year deadline stipulated in Article 22 of RD 661/2007 had greatly exceeded government targets for that period.  As a result, the PV sector accounted for the largest portion of the feed-in payments: 37% in 2010 and 34% in 2011.  By contrast, the total installed capacity of the small-hydro sector was well below the targets set out in the Renewable Plan 2005-2010 and RD 661/2007, and the feed-in remuneration for the small-hydro sector made the lowest contribution towards the "extra costs" imposed by the RD 661/2007 regime on the Spanish electricity system: between 1% and 4% between 2008 and 2013.[744]

622.    Spain's PV-specific regulatory changes therefore clearly indicated its intention to reduce feed-in remuneration for only those technologies (such as PV) that it considered to be significant contributors to that deficit, and not without introducing compensatory measures (e.g. the extension of the tariff term under RD-L 14/2010).  It also indicated that Spain would not enact any adverse retroactive measures against those renewable technologies (such as small-hydro) that were below Government-set targets and which made immaterial contributions to the regulated costs of the electricity system.

623.    Mr Quiroga's evidence was that RD 1565/2010 and RD-L 14/2010 showed the Claimants the conditions under which Spain might consider it necessary to make change to the

---

[743] Rev. Tr. Day 2 (ENG), 168:22-169:5 (Mr Quiroga); and Rev. Tr. Day 3 (ENG), 9:4-9:23 (Mr Solé).
[744] First KPMG Report, ¶ 148; First Quiroga Statement, ¶ 35(a).

RD 661/2007 regime, namely, where a technology had substantially exceeded its installed capacity target and was making a meaningful contribution to the regulated costs of the electricity system.[745]  The PV-specific measures of RD-L 14/2010 were justified on the grounds that the PV sector was a major contributor to the regulated costs of the electricity system as a consequence of said objectives being exceeded, but in small-hydro it would be very unlikely that those conditions would apply, because the objectives were far from being achieved and the sites were scarce, and in any event the total share of the cost that could be attributed to small-hydro was insignificant, and so it would be irrational to seek any savings from the small-hydro sector, because the total contribution was negligible.[746]  As a result of the benefits of small-hydro facilities, including the fact it is the most environmentally friendly technology and has a number of positive economic and social externalities, there was broad consensus across the political spectrum on the merits of small-hydro and on the need to increase its installed base, in particular to meet Spain's renewable energy targets under both international environmental protection conventions and EU directives.

624.  During the validation debate of RD-L 14/2010, the Minister of Industry, Tourism and Commerce, Mr Sebastián Gascón, said:

> … since 2009 the Government has been working for the adoption of a set of measures whose common denominator is the regulated cost rationalisation and reduction of the tariff deficit....
>
> … But the measures of 2009 and 2010 were not sufficient**.**  The imbalances were highlighted as a consequence of the appearance of a series of adverse circumstances, in some cases exceptional, two of which I would like to mention here.  On the one hand, the growth beyond that expected of some of the regulated costs during 2010, in particular of the special regime premiums, and, on the other hand, the evolution of the demand for electricity, which in 2009 decreased by 4.7 percent … These reductions in the demand for electricity reduce the income from the system and mean that the fixed costs must be paid by fewer consumers of electricity, thereby increasing the cost per user.  These two circumstances have increased the tariff deficit and mean that the measures adopted to date to guarantee the

---

[745] Rev. Tr. Day 2 (ENG), 162:20-165:25 (Mr Quiroga).

[746] Rev. Tr. Day 2 (ENG), 165:1-169:5 (Mr Quiroga).

> progressive reduction of the tariff deficit in a balanced manner among all the agents in the sector have been inadequate. Therefore, the need to urgently adopt new cost saving measures and new revenue generation measures for the system to prevent the destabilisation of our electrical system or excessive electricity tariff increases.[747]

625.   Mr Quiroga had read the speech as part of HgCapital's due diligence, and accepted in evidence that, although Mr Sebastián Gascón made specific reference to solar and wind power, he did not mention, or exclude, small-hydro.[748]

626.   In answer to the point made in the Counter-Memorial[749] that RD-L 14/2010 was not solely focused on the PV sector, and also imposed an access fee (of EUR 0.50/MWh) on all producers (including the Claimants' small-hydro installations) for access to transmission and distribution networks, the Claimants say that this short-term measure was introduced provisionally to comply with EU Regulation 838/2010 on laying down guidelines relating to the inter-transmission system operator compensation mechanism and a common regulatory approach to transmission charging, establishing that "the value of the annual average transmission charges paid by producers shall be within a range of 0 to 0.5 EUR/MWh".[750]   To put the EUR 0.50/MWh in perspective, the RD 661/2007 FiT for small-hydro plants under 10 MW in 2011 was EUR 84.237/MWh.  Even assuming that a reasonable investor viewed this access fee as equivalent to a reduction of the RD 661/2007 tariffs, this constituted a reduction of only 0.59% for small-hydro.  No reasonable investor would have concluded in 2011 that such a de minimis access fee on all producers was a precursor to the wholesale abrogation of the RD 661/2007 framework and its replacement with a dynamic return- and capacity incentive-based New Regime that would practically destroy the value of the Claimants' investments in the small-hydro sector.  Mr Solé and

---

[747] Daily Record of Proceedings of the Spanish Congress of Deputies. Recognition of Royal Decree-Act 14/2010 (R-0227), p 47.

[748] Rev. Tr. Day 2 (ENG), 126:11-130:10 (Mr Quiroga).

[749] Resp. C-Mem., ¶¶ 629-633.

[750] Cl. Reply, fn 400.

Mr Quiroga confirmed that the access toll applicable to small-hydro introduced by RD-L 14/2010 had only a *de minimis* effect on small-hydro.[751]

### d.  The Tribunal's Conclusion

627.  HgCapital invested in the PV sector in 2009 and 2010.  At the time HgCapital said that

> … "the regulatory framework and capacity targets for renewables in Spain provide an attractive environment for investors looking for stability with moderate returns".
>
> … "In addition to the photovoltaic sector, we believe there are interesting opportunities in the wind, solar thermal and mini-hydraulic sectors[.]"[752]

628.  Following the 2010 changes, in November 2011 HgCapital (or group members), and other PV investors, commenced arbitral proceedings under the ECT against Spain: *PV Investors v Spain.*[753]  The Respondent criticised the Claimants for not revealing the existence of these proceedings to this Tribunal.  It might have been appropriate for the Claimants to have disclosed the existence of the proceedings, but there has been no prejudice to the Respondent from the failure to do so.

629.  But the 2010 changes are, in the view of the Tribunal, another reason for concluding that the Claimants must have known that the RD 661/2007 was not immune from change as long as it remained within the framework established in the Electricity Act 54/1997.  In the view of the Tribunal, the 2010 changes show that the Claimants must have been aware that there could be changes to the regime, and that there might be further changes, but they do not show anything about the anticipated scale of the changes, or their lawfulness, or whether further changes might apply to small-hydro.

---

[751] Rev. Tr. Day 2 (ENG), 123:10-123:15 (Mr Quiroga); Rev. Tr. Day 3 (ENG), 72:8-17 (Mr Solé).

[752] Hg Capital acquires solar parks from Naturener and Gestamp, 2 February 2010 (R-0354) (quoting Mr Murley and Mr Quiroga).

[753] *PV Investors v Kingdom of Spain* (UNCITRAL), PCA Case No. 2012-14, Notice of arbitration of Hg Capital among other claimants, 16 November 2011 (R-0359); Allen & Overy web page: "Investors demand compensation or repeal for retroactive Spanish PV tariff", 11 March 2011 (R-0256).

630.   The Tribunal therefore accepts the Respondent's submission that HgCapital could not have been unaware of the fact that RD 661/2007 might be amended beyond the compulsory revisions every four years under Article 44(3), since they had already experienced a revision after three years which, in addition, HgCapital had claimed to be a breach of the duties established under the ECT; and the Claimants invested after the 2010 changes, in May and December 2011, with the knowledge and conviction that RD 661/2007 could be amended without Article 44(3) representing a commitment to the contrary.

(3)   **Whether There Were other Reasons to Justify a Legitimate Expectation that There Would be no Change to the RD 661/2007 Regime in Relation to Small-Hydro, Including Specific Commitments**

a.   **The Claimants' Evidence on Due Diligence and their Internal Documents**

631.   The Claimants' evidence was given by Mr Quiroga, which was: *(1)* in 2011 HgCapital concluded that small-hydro was widely considered to be "safest and most 'bankable' renewable asset class from the regulatory point of view in Spain;" *(2)* "any changes to the regulatory regime for small-hydro would be extremely unlikely, and, even in that extremely unlikely case, they would not impact existing investments, as Spain had guaranteed in RD 661;"[754] *(3)* small-hydro made the smallest contribution (less than 5%) towards the extra costs imposed by the RD 661/2007 regime on the Spanish electricity system and therefore had a limited impact on Spain's tariff deficit; *(4)* small-hydro made a significant economic and social contribution; *(5)* small-hydro was one of the most underdeveloped renewable energy technologies relative to Government targets;[755] *(6)* there was a broad political consensus (in both the ruling socialist party (PSOE) and the main opposition party (Partido Popular[756]) that small-hydro should be developed further, and small-hydro was not subject to the same political criticism that the PV sector had received; *(7)* the majority of small-hydro assets in Spain (approximately 58% of the installed base) were owned by, *inter alia*, large Spanish utilities (such as Endesa, Iberdola, and Acciona), and semi-public

---

[754] First Quiroga Statement, ¶ 34.
[755] Relying on 2011-2020 PER.
[756] With whom the Claimants said they consulted: Rev. Tr. Day 2 (ENG), 168:8-168:17 (Mr Quiroga).

entities such as farmers' cooperatives and municipalities; *(8)* those stakeholders had political access and accordingly a good insight into the regulatory environment, and shared the same view as the Claimants in relation to the stability of the feed-in remuneration regime for the small-hydro sector; *(9)* by investing in small-hydro, the Claimants would see their interests aligned with those of domestic Spanish companies and semi-public bodies; *(10)* small-hydro plants also constituted the majority of the State-owned advisory body, IDAE's own portfolio of renewable assets, and therefore any adverse changes to the feed-in remuneration for the small-hydro sector would have hurt the IDAE materially; *(11)* discussions with the AAPA did not reveal any concerns about the regulatory stability of the small-hydro sector; and *(12)* financial institutions and investors showed confidence in the regulatory stability of the small-hydro sector, as did market analysts such as Pöyry.[757]

632.    The Claimants produced a number of internal presentations for internal investment committees, at least some of which were prepared by Mr Quiroga.  HgCapital's Country Profile for Spain, February 2009,[758] (which did not deal with small-hydro) noted under "Renewable Power Resources/Hydro": "Limited potential for growth, dwindling water resource" (page 3); under "Stated Objectives/Other": "Limited growth potential for hydro" (page 4); and under "Risks": "Regulatory uncertainty around tariff levels as capacity nears targets (wind, CSP)" (page 8).

633.    In connection with the plan to acquire small-hydro interests in 2011, the internal HgCapital presentations for approval of the projects indicate a view that *(1)* acquisitions in Spain were possible "due to the distressed nature of the sellers"; *(2)* hydro assets in Spain were a "defensive play in view of regulatory uncertainty"; *(3)* the goal was to acquire "good resource and equipment plants from distressed sellers"; *(4)* there would be "attractive returns due to particular financial stress of vendors"; and *(5)* "[t]he purchase price for the portfolio [was] unusually low due to the distressed nature of the sellers." [759]

---

[757] First Quiroga Statement, ¶¶ 34-35, 42(d), 54-56; Third Quiroga Statement, ¶¶ 16-18, 21, 35-39; Rev. Tr. Day 2 (ENG), 168:8-172:4 (Mr Quiroga).

[758] HgCapital Country Profiles Spain, 20 February 2009 (R-0379), pp 3, 4, and 8.

[759] HgCapital IN Note, "RPP2: Spanish Hydro Platform: Project Xana", 9 May 2011 (C-0065) ("**HgCapital IN Note 'RPP2: Spanish Hydro Platform: Project Xana'**"), p 4; HgCapital BRN Note, "RPP2 Sirocco" of May 2011

634.  In particular one of the "Key Potential Issues" identified in the February 2011 BRN Note[760] was whether "the next government [was] likely to completely overhaul the Spanish electricity system," and under "Political/Regulatory due Diligence": "Political agenda regarding new electricity market reform if any" (page 5).  The May 2011 IN Note[761] said that "Hydro assets in Spain are the best regulatory risk adjusted asset class in Spain" and stated: "Regulatory: Is the asset class protected from potential tariff changes?" (pages 4-5).  Under "Due Diligence Status" it was said (page 7):

> Mini-hydro considered protected from regulatory changes as:
>
> − Lowest cost renewable producer (net of concession fees, feed-in tariff below wind)
>
> − Small portion of the special regime cost (less than 3%)
>
> − Majority owned by utilities and local administrations (58% of installed base)
>
> − Both the current government and the conservative opposition favour growth in small hydro over other renewable energy technologies
>
> − Local governments benefit from concession payments by small-hydro installations (€10/MWh or ca. 12% of revenues in the case of Xana)

635.  In March 2011, the HgCapital presentation said in relation to PV and RD 661/2007:[762] "Material retroactive changes have materialized, due to lack of support by interest groups (utilities) and contagion from debt markets" and in relation to CSP: "Further retroactive changes possible if macroeconomic situation worsens," but in relation to small-hydro: "Material retroactive changes extremely unlikely" and "Reprice equity to compensate for macro risk perception" (page 3, emphasis in the original) and "Dispatchability, long asset life, low regulatory risk, low technological risk make the asset class highly attractive to industrial and financial buyers" (page 7).  Under the heading "Regulation" the presentation

---

(C-0111), p 3; HgCapital BRN Note, "RPP2: Spanish Hydro", February 2011 (C-0066) ("**HgCapital BRN Note 'RPP2: Spanish Hydro'**"), pp 3-4.

[760] HgCapital BRN Note 'RPP2: Spanish Hydro', p 3.

[761] HgCapital IN Note 'RPP2: Spanish Hydro Platform: Project Xana', pp 4-5.

[762] HgCapital Spain Country Plan: Update, March 2011 (R-0370).

says: "Although regulatory instability will continue in Spain for as long as there is a tariff deficit it is clear to everyone that wind is very safe and we do not expect material retroactive changes" (page 9).

636.    In May 2011 it was being said that: "Hydro assets in Spain are the best regulatory risk adjusted asset class in Spain" (page 4), and repeated "Key Potential Issues": "Regulatory: Is the asset class protected from potential tariff changes?" (page 5).[763] In the same month a presentation repeated the question whether "the next government [was] likely to completely overhaul the Spanish electricity system."[764] In July 2011 a presentation repeated in relation to small-hydro: "Material retroactive changes extremely unlikely" and "Reprice equity to compensate for macro risk perception" (page 2, emphasis in the original).[765]

637.    The Respondent places reliance on a statement from July 2011: "**2012-2013**: … Prepare for exit **2014** Exit!",[766] and suggests that this demonstrates that the Claimants did not trust that the tariffs would be maintained for 10, 15 or 25 years. But the Tribunal does not place any weight on this point, since frequently the object of private equity enterprises is to sell in the long or short term. Nor does the Tribunal derive any assistance from references to regulatory risk in HgCapital's annual accounts.

638.    The view of the Tribunal of Mr Quiroga's evidence and of HgCapital's internal documents is that they show the Claimants making business assessments of the potential investment and the regulatory risk in the light of available sources and knowledge. Their assessment was that the regulatory risk for small-hydro was lower than for other renewables. They support neither side's case. They do not suggest that there was no risk, nor do they suggest that the Claimants considered that there was a real risk of significant change.

---

[763] HgCapital IN Note 'RPP2: Spanish Hydro Platform: Project Xana', p 5.
[764] HgCapital: RPP2: Sirocco, BRN Note, May 2011 (C-0111), p 3.
[765] HgCapital: Spain Country Plan Update, July 2011 (R-0371) ("**HgCapital Spain Country Plan July 2011**"), p 2.
[766] HgCapital Spain Country Plan July 2011, page. 5.

### b.  IDAE and Mr Tapia

639.    This aspect of the case became increasingly more important as it progressed.  The IDAE is a State-owned advisory body that reports to the Spanish Ministry of Industry, Energy and Tourism (the "**Ministry**").

640.    At the relevant time in 2011 Mr Isidoro Tapia was the Secretary-General of IDAE, and Mr Quiroga had one or more meetings with Mr Tapia.  In their Memorial, the Claimants say that as part of their due diligence they observed that government institutions such as IDAE shared the Claimants' assessment that small-hydro would be protected from adverse change, and the Claimants noted: "A confirmation by IDAE that the small-hydro sector would be sheltered from any adverse regulatory changes and was considered a 'safe haven' for investors."[767] In the Reply, the statements by Mr Tapia were said to be "representations."[768] In the Claimants' Post-hearing Brief, they became "a specific assurance in respect of the stability of the RD 661 regime from a representative of the State, Mr Tapia."[769]

641.    There is no dispute between the Parties about the nature of IDAE.  The Claimants accept[770] that the basic function of IDAE is to advise the Spanish Government on policy in relation to energy efficiency and the renewable energy sector and to invest Government money in these sectors, and that IDAE had no specific jurisdiction to regulate the Special Regime. According to the Respondent,[771] IDAE's duties are limited to providing technical advice to the Ministry and to implementing the government's policy on energy efficiency, diversification of energy sources and promotion of renewable energies.  IDAE can perform technical assistance, service engineering, consultancy, project management or implementation, advisory activities, etc. being authorised to directly or indirectly invest

---

[767] Cl. Mem., ¶ 113(a).

[768] Cl. Reply, ¶¶ 170, 258.

[769] Cl. PHB, fn 6.

[770] Cl. Reply, ¶ 259.

[771] Second López Statement, ¶ 162 *et seq*.

in projects of energy interest through participation in already established or newly created companies.

642.    Prior to his appointment at IDAE, Mr Tapia had worked as an adviser to the Secretary of State for Energy, where he was part of the government team which worked on the 2010 changes affecting PV plants.  In December 2010 he notified the Claimants that he was entering a new stage as Secretary-General of IDAE, and a meeting was arranged between him and Mr Quiroga on 30 March 2011.[772]

643.    The Tribunal considers that it is probable that there were several meetings at the offices of IDAE with Mr Tapia, and that at least in one of them Ms López, who was IDAE's head of the Hydroelectric, Sea Energy and Geothermal Department, was present.

(i)    The Claimants' account

644.    Mr Quiroga's evidence[773] was that in the course of 2011, he met Mr Tapia on numerous occasions.  HgCapital had first met Mr Tapia in 2010, in the course of meetings between the Spanish Government and international investors, during which he defended the changes to the PV sector as being necessary due to the government target for PV having been exceeded by a multiple; the high cost of PV technology; and the temporary nature of the changes and partial compensation provided.  In 2011, they heard that Mr Tapia had been appointed to a senior position within the IDAE.  They understood that in his capacity as the Secretary-General of IDAE, Mr Tapia had direct and frequent interaction with the Ministry and that his position generally reflected that of the Ministry.

645.    When they were considering investing in the Spanish small-hydro sector they contacted him in order to assess the Government's outlook for this sector.  They had meetings, which were formal in nature, and were conducted at the offices of IDAE (both in Mr Tapia's private office and in one of the larger meeting rooms at IDAE's premises) in the presence of Mr Tapia and other IDAE officials, including Ms López.

---

[772] Quiroga Calendar Entry of 30 March 2011 (C-0120) (calendar note and chain of emails arranging meeting).

[773] First Quiroga Statement, ¶ 38 *et seq*; Third Quiroga Statement, ¶ 29 *et seq*.

646.  Mr Tapia emphasised that investments in the small-hydro sector remained an area of focus for IDAE, as that sector was sheltered from any adverse regulatory changes and was considered a "safe haven", because *(1)* the level of investment in the small-hydro sector was clearly below government targets, and therefore more investment in the sector was needed; *(2)* by comparison with other renewable technologies such as PV, the small-hydro sector's feed-in remuneration made the lowest contribution to the Spanish tariff deficit, and there was no need for government policies seeking to reduce costs to target this sector; *(3)* IDAE assumed regulatory stability in small-hydro, and IDAE, in making its own investments in small-hydro assets, had based its Discounted Cash Flow ("**DCF**") analysis on an FiT tariff remuneration regime that was locked-in for the entire operational life of the assets; and *(4)* small-hydro plants constituted an important component of IDAE's own portfolio of renewable assets and any adverse changes to the feed-in remuneration for small-hydro would have hurt IDAE materially.

647.  They also had a meeting with Ms López, which Mr Tapia arranged in September 2011, to discuss the possibility of acquiring IDAE's minority stake in Hidroastur S.A. ("**Hidroastur**"), a Spanish Company with a portfolio of small-hydro plants, but IDAE said that it was reluctant to sell its stake as it had no intention of exiting the small-hydro sector and in fact would rather expand its own small-hydro plant portfolio.  The Claimants say that this decision by IDAE confirms the Claimants' contention that IDAE thought that any future changes would not affect small-hydro.

(ii) The Respondent's account

648.  The Respondent[774] accepts that there was at least one meeting with Mr Tapia, but no evidence is provided that Mr Tapia stated at any time that the small-hydro sector would be sheltered from any adverse regulatory changes.

649.  The meetings held between Mr Quiroga and Mr Tapia did not take place in the course of exercising any authority legally attributed to IDAE, nor are they reflected in documents through public tender procedures, meeting minutes, etc.  The contact between Mr Quiroga

---

[774] Resp. C-Mem., ¶ 683 *et seq*; Resp. Rej., ¶ 616 *et seq*; Resp. PHB, ¶¶ 83 and 119 *et seq*.

and Mr Tapia was strictly informal in nature, and the correspondence shows that the meeting was based on a previous personal relationship between Mr Quiroga and Mr Tapia, rather than being an institutional contact between HgCapital and IDAE.

650. The Claimants had already attempted to invest in the mini-hydraulic sector some months prior to their discussions with IDAE.[775] If the Claimants had already attempted to invest in the mini-hydraulic sector prior to their conversations with IDAE, without success, the purpose of their subsequent conversations must have been to seek a new investment opportunity, not to gain certainty as to the immutability of the remuneration system.

651. Ms López's evidence was that Mr Tapia could not have promised the Claimants the maintenance of the regulatory framework for hydro plants, because the issues related to the regulatory framework of this technology were discussed with her. He had no authority to promise or commit to maintaining the current regulations for certain facilities, since IDAE has no powers in legislative matters, which were exclusive to the Ministry. She was present at a meeting with Mr Quiroga and Mr Tapia, but IDAE never promised *(i)* that the tariffs were going to remain unchanged for operating plants, or *(ii)* that hydroelectric technology would be treated differently to other renewable technologies, or *(iii)* that this sector would be considered a "safe haven" for investors. She said:

> What I told you before – and I believe I've already answered the question – is that considering IDAE's remit – because we were in constant contact with the sector, and there were many warnings. The sector was aware that changes were in the offing, and such changes could never have left the mini-hydro technology. Changes have always affected all technologies. So there was an expectation that changes were to be made[.][776]

652. Ms López attended one of the meetings referred to by the Claimants and she confirmed that no explanation was given that would allow the conclusion that the small-hydro sector would not be affected by regulatory changes. When the Claimants went through

---

[775] First Quiroga Statement, ¶¶ 11, 45; HgCapital BRN Note 'RPP2: Spanish Hydro', p 4.
[776] Rev. Tr. Day 2 (ENG), 206:5-206:12 (Ms López).

Mr Quiroga's statement with Ms López and, in particular, the fact that the mini-hydraulic sector was to be regarded as a "safe haven", Ms López said:

> But my opinion, which I can give you and I can repeat again, because I've been talking about this paragraph right from the very beginning of this cross-examination, is that I would find that rather astonishing, that such a commitment could ever have been proffered, could ever have been made.

> And these are the very words that I can read here in the witness testimony: "safe haven", these words are very odd. I've been working here in this sector for 22 years. "Safe haven" in this area? It's impossible.[777]

653.    The meetings were held because the Claimants were interested in acquiring the shares that IDAE had in a small-hydro company, Hidroastur.  IDAE refused to sell those shares.[778]

654.    There is a contradiction by the Claimants in saying that they attended a meeting with the double purpose of proposing the acquisition of some shares of Hidroastur and, at the same time, obtain confirmation that there would be no regulatory changes in the sector in which the investor has already decided to invest.

655.    The alleged content of the meeting between Mr Quiroga and IDAE employees would constitute, at best, an analysis of the *probability* or likelihood of a regulatory change from an opportunity perspective.  However, it does not constitute an analysis about the legal *possibility* of introducing regulatory changes within the Spanish regulatory framework.

656.    The Claimants say in response that Ms López's evidence is unreliable, and that she expressed a definitive view on what was said at Mr Quiroga's meetings with Mr Tapia, even though she was only present at one of them[779] but in cross-examination, she conceded that she was not aware of what happened at the meetings which she did not attend.[780] But she agreed with most of the statements on which Mr Tapia, according to Mr Quiroga,

---

[777] Rev. Tr. Day 2 (ENG), 195:19-196:3 (Ms López).

[778] Rev. Tr. Day 2 (ENG), 230:2-8 (Ms López).

[779] Second López Statement, ¶¶ 169-170.

[780] Rev. Tr. Day 2 (ENG), 183:5-184:16 (Ms López).

based his assessment.[781] She accepted that the 2011-2020 PER, which was issued in November 2011 and reflected the views of the administration as of that date, did not anticipate any change to the remuneration model for any technology, let alone small-hydro.[782]

657.    The meeting which Ms López did attend concerned a potential sale of certain small-hydro assets held by IDAE. But IDAE decided not to sell, which begs the question, why would IDAE have decided not to sell, if, as Ms López contended, it knew of the regulatory changes to come?

(iii) The Tribunal's view of the evidence

658.    Mr Tapia did not give evidence in this arbitration. He now works for the European Investment Bank. According to Mr Quiroga,[783] Mr Tapia originally agreed to give evidence for the Claimants, but his employers refused permission, and he told Mr Quiroga that when the Respondent's lawyers approached him, he confirmed the Claimants' version of the conversations. Considering all the evidence in the round, the Tribunal considers that it is probable that Mr Tapia gave the impression at meetings with Mr Quiroga that in his view there would be no substantial regulatory changes to the regime in so far as it applied to small-hydro.

659.    The Claimants' case on this aspect has varied. At the conclusion of the Hearing their position was that they were not saying their case was that Mr Tapia made a specific commitment: "It's not about a promise"[784] but rather "… Mr Tapia's opinion was very important" to Mr Quiroga.[785] But, as noted above, in its post-hearing brief, the Claimants said that: "Furthermore, Claimants … received a specific assurance in respect of the stability of the [RD 661/2007] regime from a representative of the State, Mr Tapia."[786]

---

[781] *See*, e.g. Rev. Tr. Day 2 (ENG), 197:11-198:22 (Ms López).

[782] Rev. Tr. Day 2 (ENG), 211:11-211:17 (Ms López).

[783] Rev. Tr. Day 2 (ENG), 108:13-109:7 (Mr Quiroga).

[784] Rev. Tr. Day 4 (ENG), 154:14-155:19 (Ms Martínez López).

[785] Rev. Tr. Day 4 (ENG), 154:14-154:16 (Ms Martínez López).

[786] Cl. PHB, fn 6.

660.    But in the view of the Tribunal, what Mr Tapia is claimed to have said cannot be regarded as a commitment or assurance on behalf of the Spanish State.

661.    The Claimants say[787] that *(1)* in his capacity as the Secretary-General of IDAE, Mr Tapia had direct and frequent interaction with the Ministry, and prior to his appointment at IDAE, Mr Tapia had worked as an adviser to the Secretary of State for Energy and therefore benefited from direct access to senior Ministry officials thanks to his recent work there; *(2)* the Claimants understood that Mr Tapia's position generally reflected that of the Ministry, and as such, IDAE (and those leading it such as Mr Tapia) were uniquely well-placed to opine on the stability of the RD 661/2007 feed-in regime and its representations demonstrated that the Government entities shared the same expectations regarding the continuing application of the RD 661/2007 regime to the small-hydro sector; and *(3)* it was therefore reasonable for the Claimants to take their representations into account when making the decision to invest.

662.    The Claimants accept[788] that IDAE had no specific jurisdiction to regulate the Special Regime, and that the purpose of the Claimants' meetings with IDAE was not to seek guarantees regarding the stability of the RD 661/2007 remuneration regime.  They argue that that does not negate the legitimacy of the Claimants' expectations based on the IDAE's representations, relying on *Micula v Romania*: "The crucial point is whether the state, through statements or conduct, has contributed to the creation of a reasonable expectation, in this case, a representation of regulatory stability.  It is irrelevant whether the state in fact wished to commit itself; it is sufficient that it acted in a manner that would reasonably be understood to create such an appearance."[789]

663.    The Tribunal, however, accepts the Respondent's argument[790] that any rational investor was aware that the activity of the IDAE was merely technical and advisory, and that it had

---

[787] Cl. Reply, ¶ 259.
[788] Cl. Reply, ¶ 259.
[789] *Micula v Romania*, ¶ 669
[790] Resp. Rej., ¶ 621.

no authority to regulate the Special Regime, and that Mr Tapia could not have had authority to make commitments or give assurances on behalf of the Respondent.

664.   Nor can the Claimants derive much from the fact that IDAE retained small-hydro plants, and would not sell its shares in small-hydro investments, including its 20% minority stake in Hidroastur.

665.   The Tribunal accepts that IDAE's decisions are not based on profitability criteria. Ms López said:

> IDAE's role is to promote … ferment renewable energies.  One of the actions taken by IDAE to promote renewable energies is to invest in projects or in companies.  But that's just one line of action; it's not, by far, the only line of action.  IDAE also cooperates with the PERs and develops renewable energy projects; cooperate in various measures, in referencing statistics and renewables, publications on renewables.  We have so many different lines of action, the overriding purpose of which is obviously to promote renewable energies.
>
> Now, obviously our business is not commercial. It's not commercial.  We're a public entity. And so our purpose is to promote stations – PV, wind, what have you – to develop this sector, so that they reach a level of competitiveness with the conventional producers.  That has been our purpose.[791]

666.   Consequently, the Claimants were of course entitled to take account of Mr Tapia's view in making their business decisions, but the Tribunal does not regard those views as a commitment of the Spanish State.

### c.   Other Alleged Assurances

667.   The Claimants also rely[792] on:

(1)    A press release issued on 25 May 2007,[793] the day on which RD 661/2007 was approved by Spain's Council of Ministers, stating that the aim of the legislation was

---

[791] Rev. Tr. Day 2 (ENG), 234:15-235:6 (Ms. Lopez).

[792] Cl. Mem., ¶¶ 79-80; Cl. Reply, ¶ 107, fn 167.

[793] RD 661/2007 Press Release, p 1.

to establish a stable system of incentives guaranteeing an attractive return, with any revisions of tariffs to be carried out in the future not to affect the facilities already in operation: "This guarantee provides legal certainty to generators, granting stability to the sector and encouraging its development;"

(2)     The report issued by the CNE prior to the enactment of RD 661/2007 (CNE Report 3/2007), which emphasised the importance of achieving "sufficient legal certainty to eliminate, in so far as possible, uncertainty and regulatory risk" in order to achieve sufficient levels of investment pursuant to RD 661/2007;[794]

(3)     Presentations by CNE to potential investors to induce them into investing in the renewables sector in which they referred to the non-retroactive nature of the RD 661/2007;[795]

(4)     Presentations by InvestinSpain, the State-owned entity responsible for encouraging foreign investment in Spain, for investors (together with the Ministry) highlighting the guaranteed revenues available under the RD 661/2007 regime, and emphasising that these incentives were shielded from any future changes.[796]

668.    The Respondent says that the press release was issued by a Press Office of a Ministry (not by the Government) and does not guarantee the tariffs of RD 661/2007 for plants in operation; and there is no suggestion that the Claimants ever took it into account.[797] The Powerpoint presentations by CNE staff (which were in Spanish and not targeted at foreign investors) are irrelevant since CNE's duties do not include organising promotional campaigns for foreign investors. They were neither part of an advertising campaign organised by the CNE to attract foreign investors, nor could they create in the Respondent any objective expectation.[798] As regards the InvestinSpain presentation the Claimants have

---

[794] CNE Report 3/2007, p 19; Cl. Mem., ¶ 80; Cl. Reply, ¶ 107, fn 167.

[795] Cl. Mem., ¶ 253; CNE Vice-President's Presentation "Renewable Energies Legal and Normative Framework", 29 October 2008 (C-0108); CNE Vice-President's Presentation "Renewable Energy Regulation in Spain", February 2010 (C-0109).

[796] Cl. Mem., ¶ 253; Cl. Reply, ¶ 247.

[797] Resp. Rej., ¶ 961.

[798] Resp. C-Mem., ¶¶ 665-678; Resp. Rej., ¶¶ 605-609.

not shown that they ever had knowledge of it, but in any event it could not reasonably create a real and objective expectation that the framework of RD 661/2007 was going to remain unchanged.[799]

669.    For those reasons, in the view of the Tribunal, these are not matters which could have given rise to any expectations in 2011 when the Claimants made their investments.

### d.    Banks' Willingness to Lend

670.    The Claimants say that lenders were willing to provide long-term project financing for small-hydro assets on the basis of Spain's feed-in remuneration regime.[800]  At the time of the Claimants' acquisition, both the Xana and Ondina Portfolios had project finance in place.[801]  The Ondina Portfolio was refinanced in the summer of 2011, immediately prior to the Claimants' acquisition.  In this refinancing, two of Spain's largest banks, Bankia and Banco Sabadell provided EUR 146 million of project finance and mezzanine debt to the Ondina Portfolio.  The existence of this project financing was an important part of the Claimants' due diligence work.  The refinancing agreement itself indicated that the loan presupposed regulatory stability, as can be inferred from the "banking case" (i.e. the financial projections used to calculate the terms of the loan) which showed stable future revenues implying a price per unit of electricity generated consistent with the FiT under RD 661/2007.  As part of their strategy to merge the Xana and Ondina Portfolios, the Claimants sought interest from Spanish lenders such as Santander, Caixa Bank and international banks (such as Natixis) to refinance those portfolios.  The fact that all these lenders, who were familiar with the renewable energy sector in Spain and who do not take on the risk of regulatory instability, were willing to provide long-term project financing for small-hydro assets on the basis of Spain's feed-in remuneration regime further reinforced the Claimants' expectations as to the regulatory stability of the sector.[802]

---

[799] Resp. C-Mem., ¶¶ 679-682; Resp. Rej., ¶¶ 610-615.
[800] First Quiroga Statement, ¶ 55.
[801] First Quiroga Statement, ¶ 52.
[802] First Quiroga Statement, ¶¶ 54-55.

671.    In the view of the Tribunal, the most that this shows is that, like the Claimants, financial institutions were not anticipating major changes.

672.    Overall the matters relied on by the Claimants were facts that an investor would have taken into account in a risk assessment process, but they did not engender a legally enforceable expectation that there would be no change.  In particular, the special characteristics of small-hydro were plainly capable of being weighed in the balance in taking business decisions and business risks, but those characteristics did not make them immune from change or subject to special considerations for FET purposes.

### (4) Overall Conclusions

673.    The Tribunal has concluded that the Claimants did not receive any specific commitments or assurances in the legislation or otherwise that there would be no changes in the RD 661/2007 regime, and that, on the contrary, the Claimants must have known that change was legally and politically possible, even though they took the commercial view that there was a low regulatory risk, especially for small-hydro.

674.    The Tribunal will not repeat its factual findings, but it emphasises that when the Claimants made their small-hydro investments, they or their bankers had been advised by two eminent Spanish law firms (Garrigues and Cuatrecasas) and one eminent English firm practising in Spain (Allen & Overy), none of whom was apparently asked to advise on regulatory risk or on the powers of the Spanish legislature or executive to change the regulatory system. None of them could have been unaware of the relevant decisions of the Spanish Supreme Court (and indeed Mr Quiroga himself was aware of them in general terms). In addition, not only had the 2010 changes been made when the Claimants made their small-hydro investments, but HgCapital was itself challenging the 2010 changes under the ECT in UNCITRAL arbitral proceedings.

675.    But it does not follow that the Respondent was free to make radical changes to the regime without incurring liability under Article 10(1) ECT, nor that the Claimants had no legitimate expectations protected by the ECT and international law.

209

676.    The Tribunal has already pointed out:

(1)    On the face of Article 10(1) there is a separate obligation to "create stable, equitable … conditions", which includes a "commitment to accord at all times … fair and equitable treatment" and that irrespective of whether there is an express obligation to create stable and equitable conditions, that such an obligation would be included in the FET standard.

(2)    Stability is linked to the investor's legitimate expectations that the legal framework will not be arbitrarily changed and that commitments will be observed.

(3)    But it does not mean that an investor is protected from any change.  The State has a legitimate right to regulate, and the obligation has a relatively high threshold.

(4)    Regulatory measures must be proportionate, and the State should have due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime.

(5)    The criterion of "unreasonableness" is not to be used as an open-ended mandate to second-guess the host State's policies.

(6)    A measure must be suitable to achieve a legitimate policy objective, necessary for that objective, and not excessive considering the relative weight of each interest involved, and a balancing or weighing exercise so as to ensure that the effects of the intended measure remain proportionate with regard to the affected rights and interests.

(7)    There is no general principle which prohibits the retroactivity of legislation, but it may, depending on the context, be relevant to unreasonableness, breach of legitimate expectation or destruction of acquired rights.

(8)    The State's sovereign right to regulate has been affirmed in many awards, and the State is entitled to a high measure of deference, and the requirements of legitimate expectations and legal stability as manifestations of the FET standard do not affect the State's rights to exercise its sovereign authority to legislate and to adapt its legal system to changing circumstances.

(9)  The idea that legitimate expectations, and therefore FET, imply the stability of the legal and business framework does not mean the virtual freezing of the legal regulation of economic activities, and there has to be a weighing of an investor's expectations and the State's regulatory interests.

(10)  Economic, social, environmental and legal circumstances and problems are by their nature evolutionary, dynamic and bound to constant change, and it is indispensable for successful public infrastructure and public services to be adaptable to change in evolving circumstances.

(11)  Consequently, changes to general legislation (at least in the absence of a stabilization clause) are not prevented by the FET standard if they do not exceed the acceptable margin of change in the exercise of the host State's normal regulatory power in pursuance of a public interest.

677.  The Special Regime under RD 661/2007 gave registered installations the right to fixed feed-in remuneration for the entire electricity output, with no cap on profitability, for their operational lifetime, and free from downward reviews.

678.  The overall effect of the 2012/2014 measures (which on 12 July 2013 the Government described as a "structural reform" to correct the tariff deficit)[803] was to eliminate the Special Regime generators' entitlement to the regulated tariff.

679.  As outlined in the account of the legislation above, the only option available to renewable energy generators was to sell their entire electricity output at market prices, with the possibility "in exceptional circumstances"[804] of receiving from the State an additional specific remuneration, which might include one or both of the following elements: *(1)* a "remuneration to investment" (investment incentive) (RIN), per MW of installed capacity, to cover the hypothetical investment costs of a "standard installation" that cannot be met by market prices; and *(2)* a "remuneration to operation" (operating incentive) (ROP), per

---

[803] Official transcript of the press conference given on 12 July 2013 by the Vice-President and spokesperson of the Spanish Government and by the Minister of Industry, Energy and Tourism, after the meeting of the Spanish Cabinet (C-0077).

[804] Act 24/2013, Article 14(7).

MWh of electricity produced, seeking to cover the hypothetical operating costs of a "standard facility" (a hypothetical efficient plant) which cannot be met by market prices. *(1)* is calculated on the basis of standard historical values of the operation and performance of a "standard facility" throughout its regulatory lifespan, so that it theoretically reaches a target return; and *(2)* is only received by facilities which have not exceeded a certain number of years of operation (25 years, in the case of small-hydro).

680.    Remuneration parameters (including the rate of return) may be revised every three or six years, including for existing facilities.  The use of CPI as an index to inflation is abandoned. There are no transitional provisions (no grandfathering for existing facilities).[805]

681.    The Tribunal accepts that the main changes were these:

(1)    The RD 661/2007 regime was based on maximisation of production while the New Regime establishes a new remuneration framework applicable to existing installations which is not production-oriented: through RD-2/2013 the Respondent eliminated the premium under the "pool price plus premium" option under RD 661/2007 and replaced the CPI-linked updating index in RD 661/2007 with a lower index.

(2)    The RD 661/2007 regime was not subject to any cap on renewable installations' feed-in remuneration or investors' level of profitability, whereas the New Regime subjects existing installations to a cap by reference to a "target rate of return" on assumed costs.  The "target rate of return" *(a)* applies to both new and existing facilities; and *(b)* takes into account the renewable energy installations' past earnings under the RD 661/2007 feed-in remuneration regime in order to reduce its specific remuneration under the New Regime.

(3)    Under the New Regime, the new remuneration is calculated so as to theoretically ensure the target return for standard facilities over their entire regulatory lifespan.  If the return obtained by a facility prior to July 2013 exceeds the new *ex post* target

---

[805] In the New Regime, the new remuneration is calculated so as to theoretically ensure the target return for standard facilities over their entire regulatory life.  First KPMG Report, ¶ 99 *et seq*; Second KPMG Report, ¶ 88 *et seq*.

return, the facility will no longer be entitled to regulated revenue under the New Regime, irrespective of whether or not it has reached the end of its regulatory life.[806]

(4)    The RD 661/2007 regime entitled small-hydro plants to feed-in remuneration for their entire operational lifetimes while the New Regime limits payment of the new feed-in incentive to 25 years from the deemed dates of installations' commissioning without regard to their actual remaining useful life.

(5)    The RD 661/2007 regime was based on kWh of electricity produced by each individual plant and thus driven by actual plant-specific variables as determined by the investor, while the New Regime sets new remuneration parameters derived from hypothetical standard installations as set by Spain.

(6)    The New Regime enables Spain to unilaterally vary the *ex-post* target return and update the new remuneration parameters for both existing and new installations in regulatory periods with limited scrutiny.

682.    Even though, as indicated at paragraph 566 above, there is no allegation in this case of failure to provide constant protection and security in the traditional sense of protection against third parties, on the basis of the evidence before it, the Tribunal finds that there was no breach of the separate constant protection and security/non-impairment obligations. But, although the Claimants recognised and accepted some risk of change, the overall effect is to amount to such a radical change in the renewables regime as to breach the FET obligation of stability (or the legitimate expectation of stability) of the overall legal framework, by dismantling the entire legal framework going back in different forms to 1998.

683.    The change was unprecedented internationally, as the CNE recognised.[807] The CNE Report of 7 March 2012 proposed alternative measures, which were not adopted, including *(a)* elimination from system regulated costs of certain items that are not strictly driven by

---

[806] Second KPMG Report, ¶¶ 89-91 and 95.

[807] CNE Report 18/2013 on the Royal Decree Proposal regulating the electricity energy production activity from renewable energy, cogeneration and waste, 4 September 2013 (C-0087), p 6.

the activity of electricity supply; and *(b)* partial funding of Special Regime incentives by sectors responsible for the consumption of fossil fuels, or alternatively by the State Budget.[808]

684.    But breach of the obligation of stability would, in the present context, not give rise to any damage unless the regulatory measures caused damage, for example as a result of impermissible retroactivity or disappointing the Claimants' legitimate expectations.

685.    It is important to signal at this stage the close connection in this type of case between the issues of liability and the issues of damages.

686.    The Parties accept, as they must, the principle in the *Chorzów Factory* case:

> The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that reparation must, as far as possible, wipe out all the consequences of the illegal act and *reestablish the situation which would, in all probability, have existed if that act had not been committed.* Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it – such are the principles which should serve to determine the amount of compensation due for an act contrary to international law.[809]

687.    But the words in italics above are crucial. In the case of a subsidy regime, an investor claimant is not automatically entitled to the difference between the subsidies before the unlawful act (but for) and those after it (actual) in a case where the respondent State could have enacted, and would have enacted, measures which would have reduced the subsidies in the same or similar ways.

---

[808] CNE Report on the Spanish Electricity Sector. Introduction and Executive Summary, 7 March 2012 (C-0146); First KPMG Report, ¶¶ 153-161.

[809] *Case Concerning the Factory at Chorzów* (Germany v Poland) (Merits), PCIJ Series A No 17 (1928) (CL-0076) ("***Chorzów Factory***"), p 47 (emphasis added). *See* Cl. Mem., ¶ 327 *et seq.* and Resp. Rej., ¶ 1204.

688.    This indicates that the Tribunal has to assess what would have happened if the disputed measures had not been enacted, and the answer must be that Spain would have enacted some measures to deal with the tariff deficit.

689.    This is in line with what the tribunal in *RREEF v Spain* said of tribunals which had found liability, that they had:

> … considered that, since the Respondent had been found in breach of Article 10 of the ECT, it was obliged to make full reparation for the losses suffered; this has been the position taken by the *Eiser* and *Novenergia* tribunals.  This last position would be illogical in the present case since the Tribunal accepted that the Claimants were not immune from reasonable changes in the regime applicable to its investment; therefore, it is only to the extent that the modifications would have exceeded the limits of what is reasonable that compensation would be due and should be calculated.[810]

690.    The questions which then arise are these: what is the essence of the previous regime which was abandoned and to what legitimate expectations did it give rise?  In the view of the Tribunal, the essence of the regime was that it was intended to promote, and ensure the continuance of, renewables having a reasonable rate of return for their future lifetime balanced against the cost to the consumer.  This is a recurring theme from 1997 until, and including, the disputed measures:

(1)    Article 30(4) of the Electricity Act 54/1997 provided that the object of the determination of premiums was to achieve reasonable profitability rates with reference to the cost of the money on the capital markets.

(2)    The Economic Report on RD 436/2004 prepared by the Ministry of Energy emphasised that any plant in Spain in the special regime, provided it is equal or better than the standard (the standardized plant) for its group, would obtain a reasonable return.

(3)    RD 436/2004's preamble stated that it guaranteed the owners of the facilities under the special regime a reasonable remuneration for their investments.

---

[810] *RREEF v Spain* Decision on Responsibility, ¶ 515.  *See also id*., ¶ 523.

(4) RD 661/2007's preamble said that the economic framework established by it implemented the principles contained in the Electricity Act 54/1997 guaranteeing owners of facilities in the special regime a reasonable return for their investment and the consumers of electricity an allocation of the costs attributable to the electrical system that was also reasonable, and Article 44(3) contemplated a review from 2010 to determine whether the incentives still reflected (inter alia) a reasonable return for the investor.

(5) The 2011-2020 PER also stressed that the system under RD 661/2007 was intended to guarantee a reasonable return.

(6) The decisions of the Supreme Court of 25 October 2006 and 9 December 2009 referred to the reasonable return in the Special Regime system.

(7) RD-L 2/2013, RD-L 9/2013, Act 24/2013, and Order 1045 all purported to apply notions of reasonable profitability or reasonable rates of return.

691. This puts into context what is called in some of the renewables cases[811] (although not in the present case) the "claw-back" of past remuneration. It arises because the remuneration from 2013 onwards is determined by subtracting all (theoretical) historical profits achieved by a power plant since its inception.[812] The new regulated, specific remuneration is calculated so as to theoretically ensure the target return for standard facilities over their entire regulatory lifespan. All income, both past and future, must be estimated and considered. Consequently, if the return obtained by a facility prior to July 2013 exceeds the new *ex post* target return, the facility will no longer be entitled to regulated revenue under the New Regime, irrespective of whether or not the facility has reached the end of its regulatory life.[813]

692. The Respondent's position is that there is no issue of retroactivity because there is no question of reimbursement of excessive returns. What is involved is establishing a

---

[811] *Masdar v Spain*, ¶ 466.
[812] First Compass Lexecon Report, ¶ 57(b), fn 44, citing RD 413/2014, Annex XIII, ¶ 2.a, and MO IET 1344/2015, Final Provision One.
[813] Second KPMG Report, ¶ 90.

reasonable rate of return for the useful life of the facility, which makes it possible to take into consideration the remuneration already received from the facility's commissioning date, for the purpose of calculating the future subsidies to be received.[814]

693.    In *RREEF v Spain* the tribunal decided that such retroactive application required "appropriate compensation" for the damage that breach caused to the Claimants,[815] and other tribunals have taken a similar view.[816]  But in *Isolux v Spain* the tribunal took the view that the fact that the new remuneration system took existing and past parameters into consideration was not objectionable, since it applied to existing installations, but projected all of its effects to the future.[817]

694.    In the view of this Tribunal, it would be objectionable and contrary to FET for past remuneration to be taken into account when determining a reasonable rate of return for the future.  It is not necessary to resort to the concepts of acquired rights to conclude that removing subsidies for the future on the basis that reasonable returns have been made in the past may involve (as it would in the present case) unfair and inequitable treatment in breach of the FET standard.

695.    The Tribunal agrees with the analysis in *RREEF v Spain*[818] that (*1*) the Claimants had a legitimate expectation of receiving a reasonable return for their investment through special means such as the FiT, designed to attract investments in a sector which was unattractive at market prices; (*2*) the Claimants could legitimately expect a return for their investment at a reasonable rate significantly above a mere absence of financial loss, taking into account the cost of money on capital markets for such investments as well as other objectives; (*3*) the Claimants were entitled to expect that the Respondent would not significantly modify the legal framework applicable to the investors as provided for in Spanish law when the investments were made, but not necessarily for their operational lifetimes; and (*4*) the

---

[814] Resp. Rej., ¶¶ 820-821.

[815] *RREEF v Spain* Decision on Responsibility, ¶ 330.

[816] *See*, e.g. *Masdar v Spain*, ¶ 651.

[817] *Isolux v Spain*, ¶ 814.

[818] *RREEF v Spain* Decision on Responsibility, ¶¶ 328, 390 *et seq.*

Claimants had, when they made their investments, a legitimate expectation of a reasonable return on their investments, and that any modifications would be reasonable and equitable.

696.    This Tribunal agrees with *RREEF v Spain* that it is not possible to say whether there has been a breach until it has been decided that the projected rate of return is not reasonable:

> … the Claimants had, when they made their investments, a legitimate expectation to get a reasonable return on their investments. Such expectation did not include a guarantee to have the legal regime in place unchanged until the end of the operation of the plants, but it did include to have any modifications reasonable and equitable. Whether such a legitimate expectation was violated can only be assessed by way of a global view of the situation that resulted from the modifications introduced by the Respondent after the date of the investment. It is only in case the answer to this question is in the affirmative that compensation is due to the Claimants under this head of claim.[819]

697.    The real question which will determine whether the Claimants are entitled to compensation is whether the remuneration of the facilities going forward (without reference to past remuneration) accords with a reasonable rate of return.

698.    The way in which this was approached in *RREEF v Spain* is apparent from the following passages*:*

> As recalled above, the Respondent has decided, in its own words, to take into account "the remuneration already received from the beginning of the operation of the facility, for the purpose of calculating the future subsidies to receive […]." The Tribunal has already concluded that such a means of calculation was in contradiction with the principle of nonretroactivity and entailed a right to compensation for the Claimants.
>
> …
>
> Since the Tribunal has determined that the only legitimate expectation of which the Claimants could prevail themselves was that of a "reasonable return", it is appropriate to compare both regimes depending on the IRR that the Claimants can get under each of them. As the *Novenergia* Tribunal put it, "the internal rates of return is a relevant measurement for what the Claimant was

---

[819] *RREEF v Spain* Decision on Responsibility, ¶ 399.

218

> expecting to get from its investment in the Kingdom of Spain at the time of making the investment."
>
> …
>
> As a result, the Tribunal considers that, while entitled to compensation for unreasonable return on their investments – if established –, the Claimants cannot claim full compensation for the total decrease in their profits as a result of the adoption of the new regime by the Respondent; they can only get compensation to the extent that such decrease is below the threshold of a reasonable return.[820]

699.  However, in this case, neither the Claimants nor the Respondent adopted this approach. Each approached the question of compensation very differently, as will appear from the next section of this Decision.


## VIII.  DAMAGES

### A.  The Parties' Positions

#### (1)  The Claimants' Approach to Compensation

700.  The Claimants say that the New Regime is backward-looking in the calculation of the return and note that, once an installation is judged to have recovered its investment (while achieving the ex post target rate), it is no longer entitled to any specific remuneration. Based on the application of this methodology, from the next regulatory period commencing 1 January 2020, the Claimants assert that only 8 of their small-hydro plants are likely to receive any specific remuneration.[821]

701.  The Claimants' approach to the calculation of resulting compensation is that they are entitled to receive the diminution in the fair market value of their equity and debt investments plus additional amounts to compensate for losses they said they would suffer.[822]

---

[820] *RREEF v Spain* Decision on Responsibility, ¶¶ 481, 521 and 523 (internal footnotes omitted).
[821] Cl. Mem., ¶ 164 (and also Cl. Reply, ¶ 113).
[822] Cl. Mem., ¶ 319.

702.    The Claimants rely on the *Chorzów Factory* case and say that where, as here, restitution is impracticable, they are entitled to monetary compensation that will wipe out the consequences of the Respondent's unlawful acts and place the Claimants in the same pecuniary position in which they would have been if the Respondents had not breached the ECT. They say this should be achieved by assessing the "fair market value" of the affected investment, supplemented, as necessary, by any profits already lost by the valuation date, as well as any additional losses resulting from that conduct.[823]

703.    The diminution of value was calculated by the Claimants' experts, Compass Lexecon, using a DCF model of Free Cash Flows to Equity ("**FCFE**"). The calculation was made on the basis of historical cash flow losses from 1 January 2013 (the date when Act 15/2012 came into effect) to a "date of valuation," which is stated to be the date of the award, plus losses in fair market value of the Claimants' equity and debt investments as of the "date of valuation" plus the loss in the fair market value of the Claimants' debt investments as at the "date of valuation."[824]

704.    The Claimants maintain that the DCF methodology is typically applied by international tribunals, in particular where the business in question is a going concern and had a sufficient record of operations. They also submit that it is settled law that in the case of unlawful conduct by the State an investor is entitled to choose between a valuation as of the expropriation date and as of the date of the award, whichever is higher.[825]

705.    The Claimants note that Compass Lexecon estimate the total damages as of 31 August 2017 to be EUR 132.1 million and at the date of breach to be EUR 108.1 million. The Claimants submit they are entitled to the higher figure.[826]

---

[823] Cl. Mem., ¶¶ 329-331.

[824] Cl. Mem., ¶¶ 320-321.

[825] Cl. Mem., ¶¶ 332-336 and Cl. Reply, ¶¶ 325-330.

[826] Cl. Mem., ¶ 337 and Cl. Reply, ¶ 319 and fn 558.

706. The Claimants' experts did not produce a damages assessment based on a reasonable return,[827] although they did carry out what the Claimants refer to as "a reasonability check … by calculating operational equity IRRs for both the Xana and Ondina portfolios."[828] The Claimants say this shows equity IRRs in the actual case of 2.8% and 0.5% for the Ondina and Xana portfolios respectively.[829]

### (2) **The Respondent's Approach to Compensation**

707. The Respondent's experts did not produce a valuation of the losses suffered by the Claimants on their debt and equity investments.[830]

708. The Respondent considers that such an approach fails to take into account the concept of regulatory entire lifespan and omits the joint consideration of cash flows, past and future, in order to guarantee a reasonable rate of return on the investments that were made.[831] It submits that arbitration doctrine and case-law tend towards verifying that investors get their investments back plus a reasonable rate of return on the costs of those investments and that the DCF approach has been rejected on numerous occasions and can lead to the overvaluation of financial impacts based on future events.[832]

709. The Respondent states that its experts, Econ One, have calculated the economic impact of the measures on the plants and have concluded that the measures have had a positive impact on them.[833]

710. This conclusion is based on the approach that, in view of the age of the hydroelectric plants (the Xana plants have been in operation for more than 20 years and some of the Ondina plants for more than 90 years) they should be considered as having been fully amortised. In consequence, Econ One consider that they are projected to generate substantial positive

---

[827] Rev. Tr. Day 3 (ENG), 155:18-156:4 (Professor Spiller).

[828] Cl. PBH, ¶ 160.

[829] Cl. PBH, ¶ 160 and Second Compass Lexecon Report, ¶¶ 23-25 and Table V.

[830] Rev. Tr. Day 4 (ENG), 67:2-67:10 (Dr Flores).

[831] Resp. C-Mem., ¶ 1292.

[832] Resp. C-Mem., ¶¶ 1298-1311 and Resp. Rej., ¶¶ 1163-1172.

[833] Resp. C-Mem., ¶¶ 1312-1314.

cash flows from operations, such that the Xana plants will operate at a margin of about 30% and the Ondina plants at a margin of about 55%.[834]

711.    The Respondent notes that Econ One calculates the IRR on the plants to be 17.1%.[835]

712.    Econ One say that they consider it is most appropriate to calculate an "exit IRR" (17.1%), which assumes the Claimants sell the plants rather than a "holding IRR" (16.4%), which assumes the Claimants retain the plants. Having said that, they note that neither calculation changes their conclusion that the IRR is well in excess of the reasonable rate of return on the plants.[836]

713.    The Respondent submits that the Claimants' claim is based on a simplistic comparison of scenarios, real and counterfactual, and assumes that the real scenario is going to be maintained during the next decades, ignoring that the guiding principle of the system is constituted by reasonable guaranteed return.[837]

714.    Further, the Respondent says that the Claimants' "but-for" scenario does not admit the State's right to regulate or the possibility of regulatory changes and it is, therefore, a fictitious, broadly overestimated, scenario. It submits that the damages calculated by Compass Lexecon should, at any rate, be reduced in line with the actual regulatory risk existing prior to the measures; otherwise, it would deny the State's right to regulate or the possibility of regulatory changes.[838]

715.    The Respondent also takes issue with the Claimants' contention that an investor is entitled to choose between a valuation as of the expropriation date and as of the date of the award. The Respondent refers to Article 13(1) of the ECT which states:

---

[834] Resp. C-Mem., ¶¶ 1315-1320.

[835] Resp. Rej., ¶¶ 1173-1179.

[836] Resp. Rej., ¶ 1177 and Second Econ One Report, ¶¶ 33-35.

[837] Resp. Rej., ¶ 1157.

[838] Resp. Rej., ¶¶ 1180-1183.

> Such compensation shall amount to the fair market value of the investment expropriated at the time immediately before the expropriation or impending expropriation became known in such a way as to affect the value of the investment (hereinafter referred to as the "valuation date").

716. The Respondent submits that this demonstrates that the only valuation date considered in the ECT is the date of the measure which is challenged under the ECT, and that this date is the only one which guarantees compliance with the principles of full reparation and causality.[839]

### B. **The Tribunal's Analysis**

#### (1) **Aggregation or Individual Plant**

717. As will be apparent from the conclusion reached by the Tribunal, what determines whether the Claimants are entitled to compensation is whether the remuneration of the facilities going forward from the date of the New Regime (without reference to past remuneration) accords with a reasonable rate of return. Accordingly, the Tribunal does not consider the DCF approach adopted by the Claimants to be the correct way to calculate any compensation which may be payable.

718.  The approach taken by the Respondent accords more closely with the manner in which the Tribunal considers any compensation payable should be calculated, in that it seeks to establish an IRR. However, that IRR is not calculated on the correct basis in that it takes into account the remuneration already received from the beginning of the operation of the plants for the purpose of calculating the future subsidies. This was an approach with which the *RREEF v Spain* tribunal disagreed and which this Tribunal also considers to be incorrect.

719. Further, the Respondent aggregates the IRR of the individual plants, and then of the two portfolios, to produce a final IRR.

---

[839] Resp. Rej., ¶¶ 1206-1220.

720.   Econ One say that:

> To determine whether the Measures had a negative economic impact, it is more accurate to calculate the IRR of the combined Hydro Plants. This allows us to determine the average return of all the plants by mitigating the individual effects of outlier plants that might be performing above or below average for reasons unrelated to the Special Regime.
>
> This can be illustrated with the Hydro Plants. The combined IRR of the Hydro Plants is 17.2%. If we separate the two portfolios, the IRRs of the Xana and Ondina Hydro Plants are 6.6% and 22.0%, respectively. Given that both portfolios operate under the same Special Regime, the fact that one has a lower IRR is a clear indication that specific Xana Hydro Plants are performing below average for reasons unrelated to the Special Regime…
>
> The calculation of the combined IRR of the Hydro Plants allows us to mitigate these plant-specific effects.[840]

721.   The Tribunal considers there is a fundamental inconsistency with arguing that a reasonable rate of return should be calculated on an individual plant basis but then aggregating the individual plants to iron out inconsistencies.

722.   If, as the New Regime contemplates, a reasonable rate of return is to be calculated on the basis of a theoretical individual standard facility or plant, then the IRR of the individual real facilities/plants should be used as the comparator. If the IRR of a particular facility/plant is above the calculated standard reasonable rate of return it should not attract compensation, if it is below, it should.

723.   If a portfolio comprised just three small-hydro plants and two had extremely low IRRs, and one had a higher IRR, well above the rate of return fixed by the regulator, with the consequence being that, overall, the portfolio was below that rate of return, would the regulator, with equanimity, subsidise all three plants? Clearly not.

---

[840] Second Econ One Report, ¶¶ 167-169 (internal footnotes omitted).

724.  The clear rationale behind the legislation is to consider what constitutes a reasonable rate of return on a plant by plant basis and the Tribunal finds there is no justification for an aggregation approach. The fact that a plant happens to be in a portfolio owned by a particular investor should not impact whether that plant is considered to make a reasonable rate of return. Each plant should be considered on its own, as would have to be the case if each were individually owned by different investors.

725.  The Tribunal also notes that in *RREEF v Spain*, the Respondent adopted an individual project approach:

> Both the Claimants and the Respondent agree that the reasonable return targeted by the Spanish law is a project IRR. The Tribunal see[s] no reason to decide otherwise.[841]

726.  Having concluded that the reasonable rate of return should be considered on an individual plant basis it is then necessary to consider firstly, what constitutes a reasonable rate of return, secondly how the IRR of the individual plants should be calculated, and thirdly whether each of those plants are achieving a rate of return above or below that which has been calculated to be reasonable.

### (2) Reasonable Rate of Return

#### a. Pre-tax or Post-tax

727.  The New Regime altered a variable system of target returns for various renewables to a target of 7.398% for all renewables. The first question, therefore, is does that constitute a reasonable rate of return for small-hydro facilities?

728.  This question, and this approach, is consistent with the approach taken by the *RREEF v Spain* tribunal which was not willing simply to accept that the target set by the New Regime constituted a reasonable rate of return.[842]

---

[841] *RREEF v Spain* Decision on Responsibility, ¶ 545.

[842] *RREEF v Spain* Decision on Responsibility, ¶¶ 574-575.

729.    The *RREEF v Spain* tribunal noted that the rate of return fixed by the regulator at 7.398% is a pre-tax rate of return and commented:

> To assess the reasonability of these returns, the Tribunal has to calculate post-tax figures. The Tribunal considers that taxes are costs impacting the return of the Claimants' investments. …
>
> The Parties disagree on the targeted post-tax project under the new regime. The Claimants consider that 7.398% IRR pre-tax is equivalent to an average 5.8% IRR post-tax for CSP plants; for its part, the Respondent denies these rates but without giving its own numbers.[843]

730.    In this case, the Claimants assert that 7.398% pre-tax is equivalent to a post-tax reasonable rate return of 5.549%;[844] the Respondent asserts the equivalent post-tax figure is 7%.[845] It is not clear to the Tribunal what taxes have been included by the respective experts in their calculations, so the Tribunal is not in a position to decide whether the post-tax equivalent of the pre-tax figure of 7.398% is 5.5%, 7% or another figure.

731.    In any event, the Tribunal agrees with the tribunal in *RREEF v Spain* that taxes are costs impacting the return of the Claimants' investments and, in consequence, the measure of what constitutes a reasonable rate of return should be considered on a post-tax basis. Thus, rather than simply accepting that the post-tax equivalent of 7.398% pre-tax is a reasonable rate of return, it is necessary to calculate, on an appropriate basis, what does constitute a reasonable rate of return in the small-hydro market in Spain.

### b.  Reasonable Rate of Return Calculation

732.    In *RREEF v Spain*, the tribunal found that the reasonable post-tax rate of return was WACC (as calculated by the tribunal) plus 1% and found the Respondent to be in breach of its obligations to ensure a reasonable rate of return insofar as the return per plant, in that case, was lower than the figure it calculated.[846]

---

[843] *RREEF v Spain* Decision on Responsibility, ¶¶ 571-572.

[844] First Compass Lexecon Report, ¶ 56.

[845] Second Econ One Report, ¶ 314.

[846] *RREEF v Spain* Decision on Responsibility, ¶¶ 586 to 589 and 600(3).

226

733.    In *RREEF v Spain* the tribunal considered a WACC calculation was required because the legislation mandated the calculation must be made by reference to the cost of money, and both sides had proceeded on that basis:

> According to Act 54/1997, the reasonable return should be assessed "with reference to the cost of money in the capital market". The Tribunal understands this reference to the cost of money in the capital market as a guideline to assess the reasonableness of the return generated by the plants. Under this cost of money, a project is likely to be seen as being not profitable, and no investor would likely invest in it. A reasonable return has therefore to be superior to this cost of money. To calculate this cost of money, both Parties calculated the WACC, which "reflects the cost of raising funds from shareholders and lenders for a typical company operating in a given industry".[847]

734.    The tribunal in *RREEF v Spain* calculated WACC as at June 2013 (which it determined to be the correct date):

> … taking into consideration the Spanish 10 years bond as the risk-free rate that is 4.398%, a market risk premium of 5.5%, a beta of 0.455%, a ratio debt/equity of 60/40 and a cost of debt of 3.43% in 2013 (as calculated by the Respondent and taking into consideration that both Parties use the 30% corporate tax rates). The WACC calculated by the Tribunal on this basis is 5.86%.[848]

735.    The *RREEF v Spain* tribunal then added 1% to this figure on the basis that the claimants in that case:

> … had legitimate expectations that the return on their investment would be above the mere level of the WACC since the Respondent attracted investments in the renewable energy sector by raising hope of above-average profits.[849]

---

[847] *RREEF v Spain* Decision on Responsibility, ¶ 574 (internal footnote omitted).

[848] *RREEF v Spain* Decision on Responsibility, ¶ 586.

[849] *RREEF v Spain* Decision on Responsibility, ¶ 587.

736.    The *RREEF v Spain* tribunal thus found:

> Consequently, the Respondent must be held responsible for a breach of its obligation to [e]nsure a reasonable return to the Claimants investment and it must pay to them a compensation amounting to the difference between their actual return and the reasonable rate of return as calculated above by the Tribunal: 6.86%.[850]

737.    This approach seems consistent with what Compass Lexecon say in their Second Report:

> Furthermore, it is not uncommon for regulators to provide rates of return above the WACC to achieve desired objectives. For example:
>
>   a. In Spain, the regulator used a premium over the WACC in setting tariffs so as to promote speedy deployment of renewables, and in particular in those technologies where deployment was below government targets, such as small-hydro.
>
>   b. In other regulated energy sectors in Spain, such as gas storage, the regulator has set returns to at least the WACC + 300 basis points.
>
>   c. In at least 12 European jurisdictions, regulators provide premiums over the cost of capital for energy network utilities.[851]

738.    In this case, the Claimants' DCF analysis involves a Cost of Equity calculation made at differing dates (8 July 2015 and 30 September 2016) to account for the cost of raising equity for a hydro plant portfolio in Spain, and the Claimants' experts Compass Lexecon conclude that the average pre-tax WACC for renewable energy investments from 1989-2016 was 13.76%.

739.    The Respondent does not produce a WACC calculation and its experts simply raise criticisms of the calculations made by Compass Lexecon.

---

[850] *RREEF v Spain* Decision on Responsibility, ¶ 589.
[851] Second Compass Lexecon Report, ¶ 124 (internal footnotes omitted).

740.  When it comes to calculating what constitutes a reasonable rate of return, the Tribunal sees no reason to depart from the principles adopted by the *RREEF v Spain* tribunal, namely taking the appropriate post-tax WACC calculation and adding 1%. In doing so the Tribunal notes that the Respondent's experts, Econ One accept the principle that a benchmark for a reasonable rate of return needs to include an uplift on risk free investments.[852]

741.  As for the constituent parts of the WACC calculation, the Tribunal agrees with the *RREEF v Spain* tribunal that the appropriate date is the date of the relevant legislation, namely June 2013.

742.  The Tribunal also considers that, for the same reasons as the *RREEF v Spain* tribunal, the average yield on Spanish 10 year bonds should be taken as the risk-free rate, namely 4.398%.[853]

743.  As for the other components of the calculation, namely market risk premium, applicable beta, appropriate debt/equity ratio and cost of debt in 2013, the Tribunal does not have sufficient material from the experts to be able to come to firm conclusions at this stage. The Claimants use a market risk premium and beta in their cost of equity calculations[854] but the CAPM approach used by Compass Lexecon is criticised in general terms by Econ One and it is not clear to the Tribunal, in consequence, whether there is any measure of agreement between the Parties as to appropriate figures for these two elements of the calculation, not least because Econ One consider that an illiquidity discount should be included and Compass Lexecon disagree.[855]

---

[852] First Econ One Report at ¶ 299 "One benchmark for the reasonable rate of return is the average yield of government bonds in Spain, German, and United Kingdom, plus 3 percentage points."

[853] *RREEF v Spain* Decision on Responsibility, ¶ 580: "Concerning an investment in Spain, the Tribunal is more convinced by the Claimants approach to use the average yield on ten-year Spanish government bonds as the relevant free-risk rate. All the more so that RD-L 9/2013 itself provides that '[s]uch reasonable return will be based on, before taxes, the average returns in the secondary market of the State's ten-year bonds plus the adequate differential'."

[854] First Compass Lexecon Report, ¶¶ 126-132.

[855] Second Compass Lexecon Report, ¶¶ 66-74.

744.    The Tribunal agrees with *RREEF v Spain* in principle where the tribunal stated:

> Both Parties have calculated a post-tax WACC for renewable energy companies. They differ significantly in their results. The Respondent calculates a WACC of 4.9% while the Claimants' calculation comes to about 8.148%. This difference lies mainly in the fact that the Claimants have only calculated a cost of equity, using Capital Asset Pricing Model (CAPM), while the Respondent calculated both a cost of equity and a cost of debts, taking into consideration the common financial structure of the projects.
>
> The Tribunal agrees with the Respondent['s] approach. Considering that the reasonable return provided by the Respondent is allocated to the project, it seems logical to take into consideration the financial structure of the whole project. The return obtained by the projects will be used to remunerate both equity and debt. The Tribunal follows the Respondent calculation on this point and accepts the following financial structure: debt 60% / equity 40%. Consequently, it will be necessary to leverage the beta, that is the "company's systematic risk", in the calculation of the cost of equity, as does the Respondent.[856]

745.    Further, there is the question as to what taxes to include, and at what rates. Although there has been some discussion of this by the experts, there is no detailed explanation as to the approach taken by each, at least so far as the Tribunal has been able to discern, no doubt as a result of the different approach each side has taken.

746.    In consequence, unlike the *RREEF v Spain* tribunal, this Tribunal is unable, at this stage, to state categorically what constitutes a reasonable post-tax rate of return for small-hydro assets save to express the expectation that it is likely to be somewhere in the region of 5.5% to 7%. More assistance is, therefore, needed from the experts.

### c. Calculation of the IRR of the Individual Plants

747.    Just as the reasonable rate of return should be calculated on a post-tax basis, so should the IRR of the individual plants.

---

[856] *RREEF v Spain* Decision on Responsibility, ¶¶ 576 and 577.

748. As to what taxes should be included in the calculation, again the Tribunal adopts the *RREEF v Spain* approach:

> Therefore, taxes must be taken into consideration for the global assessment of the reasonable return to which the Claimants are entitled and the IRR should be evaluated post-tax. This applies in particular to the 7% levy. The Tribunal recognizes that Article 21(1) of the ECT is a carve-out from the Tribunal's jurisdiction and, therefore, it does not take a decision over the legality of the levy. But this does not change the fact that the levy has an impact on the return. In this respect, the Tribunal recalls that it has decided that the 7% levy has to be taken into account in this calculation.[857]

749. Another basic question to be considered in calculating the IRR of the individual plants is whether the IRR is to be calculated on an exit basis or on an operational/holding basis.

750. Econ One calculate an exit IRR although they say "In any case, the difference between the exit IRR and the holding IRR is not significant enough to affect either Compass Lexecon's conclusions or our own. We conducted a sensitivity analysis which shows a holding IRR of 16.4%, that is, similar to the exit IRR of 17.2%. Both the exit IRR and the holding IRR are above all benchmarks presented in our Reports. Thus, the distinction between holding and exit IRRs is irrelevant in this case".[858]

751. Compass Lexecon criticise Econ One's exit analysis and say "the Operational IRR is consistent with the benchmark return, and furthermore relies on fewer assumptions (namely, there is no need for a discount rate or to speculate on an exit date), it is more objective and, therefore, it is better suited for Econ One's analysis".[859]

752. As the name suggests, an operational IRR represents the return from operating the plants until the end of their useful life (with no assumed exit sale). In *RREEF v Spain* the tribunal noted that the lifetime of plants has a major impact on holding IRR calculations and, after determining the lifetime of the CSP plants to be 25 years, was happy to conclude that the

---

[857] *RREEF v Spain* Decision on Responsibility, ¶ 571.
[858] Second Econ One Report, ¶ 186.
[859] Second Compass Lexecon Report, ¶ 119.

distinction made between the exit IRR and the holding IRR did not have a major impact on the calculation in that case. The tribunal did, however say:

> As the IRR determined to be applicable in this case by the Tribunal is the project IRR, it is assumed that the profitability will be calculated during the whole life of the investment, that is the lifetime of the plant.[860]

753.    Ministerial Order MO IET/1045/2014 limits payment of the specific remuneration for small-hydro installations to the regulatory useful life of a hydropower plant, which has been set at 25 years, after which projects will receive no specific remuneration. A "useful life" of 25 years is clearly inappropriate when considering the actual lifetime of small-hydro plants and the concessions to produce electricity which have been granted to them. The Tribunal considers the actual lifetime should be used when calculating the operational IRR of the individual plants in the Xana and Ondina portfolios.

754.    Effectively, the lifetime of the small-hydro plants will be determined by the end date of the concessions granted to the individual plants and the Tribunal considers this to be the most appropriate way of fixing the lifetime of the plants. In paragraphs 35 and 39 of their First Report Compass Lexecon set out tables which show the end of concession dates for the individual plants comprising the Xana and Ondina portfolios respectively. The latest date in the Xana portfolio is 2063 and in the Ondina portfolios, 2061.

755.    The Tribunal is not aware that any doubt has been cast on these tables and considers that the dates in those tables should be the ones used to represent the lifetimes of the individual plants when calculating their operational IRRs.

756.    Each set of experts in *RREEF v Spain* had provided pre-tax IRRs for each of the plants in question. The calculations differed but as the 3 solar plants averaged out at approximately 7% and the 3 wind plants at 13% (with the lowest individual calculation being 12.6%), the tribunal was able to conclude that post-tax IRRs of the individual wind plants would be in

---

[860] *RREEF v Spain* Decision on Responsibility, ¶ 548 (internal footnote omitted).

excess of its calculated post-tax reasonable rate of return of 6.86% and found that Spain was not in breach of its obligations in respect of the wind plants.[861]

757.  As for the solar plants, although the parties' experts disagreed as to the post-tax IRRs for the individual plants, all the calculations for all the individual plants came in below the post-tax reasonable rate of return of 6.86%.[862]

758.  Having reached that conclusion, the tribunal then told the parties and their experts to go away and to reach an agreement with respect to each of the solar plants on the amount of compensation to be paid by the Respondent to the Claimants in respect of its breaches of its obligations.[863]

759.  In this case, the Tribunal notes that Compass Lexecon have stated that:

> The 15.3% post-tax exit IRR Econ One computes is for the Xana and Ondina Portfolios combined. We have disaggregated Econ One's figures for each Portfolio separately, finding that there is a large discrepancy between the two Portfolios: the post-tax exit IRRs are 4.5% for the Xana Portfolio and 22.2% for the Ondina Portfolio under the Measures. Such a discrepancy stems from the flawed implementation of the Ondina Portfolio IRR, due to two main reasons:
>
> a.  First, 87% of the Ondina Portfolio's capacity was already online by 1930. The capital expenditure figures Econ One uses are based on accounting values from the financial statements for years 1999 onwards, while these plants were built over half a century before. These accounting values therefore most likely do not represent the true cost of building the plants, given the distortions created by, among other things, inflation, depreciation and maintenance CAPEX.
>
> b.  Second, if the project IRR is to be computed for the life of the plants, the cash flows since the plants came online in the early 1900s should also be taken into account.[864]

---

[861] *RREEF v Spain* Decision on Responsibility, ¶¶ 568 and 569.

[862] *RREEF v Spain* Decision on Responsibility, ¶ 572.

[863] *RREEF v Spain* Decision on Responsibility, ¶ 600(5).

[864] Second Compass Lexecon Report, ¶ 114.

760.    If the disaggregation performed by Compass Lexecon is correct, it seems more than likely that some compensation is due to the Claimants in respect of some of the plants in the Xana portfolio, even if none is due in respect of Ondina. It is, of course, possible that a few Ondina plants may be below the properly calculated reasonable rate of return and compensation may be payable in respect of those individual plants also, depending on the validity of the criticisms made of Econ One's approach to calculating the operational IRRs of the individual plants.

### d.  Next Steps

761.    As stated above, unlike the *RREEF v Spain* tribunal, on the basis of the information available from the experts to date in this case, this Tribunal is unable, at this stage, to state categorically what constitutes a reasonable post-tax rate of return for small-hydro assets, and is unable to be certain which, if any, of the individual plants in the Xana and Ondina portfolios have a post-tax holding IRR below such level of reasonable post-tax rate of return and, therefore, in respect of which the Claimants are entitled to compensation.

762.    Accordingly, in order to make any finding as to any compensation that may be due to the Claimants, the Tribunal needs to have:

   (1)    an agreed post-tax reasonable rate of return calculated using the WACC as at June 2013; and

   (2)    agreed post-tax holding IRRs for the individual plants in the Ondina and Xana portfolios.

763.    Insofar as agreement is not possible between the Parties on either or both of the above, the Tribunal will require submissions, on those two matters and, on the basis of their respective submissions what, if any, compensation each side considers appropriate for those plants which have a post-tax IRR below the post-tax reasonable rate of return.

764.    With regard to calculation of the post-tax reasonable rate of return, the Tribunal has provided some principles which the Parties should follow, namely the calculation date of June 2013, that the calculation should be post-tax, that the risk-free rate should be the Spanish 10 year bond rate of 4.398%[865] and that a reasonable rate of return will be 1% above whatever the result of the WACC calculation turns out to be.

765.    The Tribunal is, equally, conscious that there are some components of this calculation upon which it cannot give guidance as they have not been discussed in detail between the experts, namely the market risk premium, the beta, the debt/equity ratio and the correct approach to tax (save that the 7% levy and the Water Levy should be taken into account in the calculation).

766.    The Tribunal therefore invites the Parties to attempt to reach agreement on the two matters above and, insofar as the holding IRR of any of the individual small-hydro plants falls below the calculated and agreed reasonable rate of return to agree the compensation due to the Claimants amounting to the difference between the actual rate of return of the small-hydro plant in question and the reasonable rate of return.

767.    The Parties are therefore directed to agree within 42 days (or such longer period as may be agreed by the Parties or directed by the Tribunal) following the notification of this decision on a reasonable timetable for reaching agreement on what constitutes a reasonable rate of return for small-hydro projects in Spain, what are the individual holding IRRs of the plants in the Xana and Ondina portfolios and, in consequence, what, if any, compensation is payable to the Claimants.

768.    In the absence of agreement on a timetable within the period set out above, the Tribunal will, following consultation with the Parties, set a timetable for submissions from the Parties on whatever the Parties have failed to agree.

769.    Costs are reserved.

---

[865] In doing so the Tribunal notes that this removes the need for any country risk premium to be used.

IX.    **DECISION**

770.    For the reasons set out above:

(1)    the Tribunal declares that it has jurisdiction over the Claimants' claims in the present arbitration;

(2)    the Tribunal dismisses the Claimants' claim under ECT, Article 13(1);

(3)    the Tribunal declares that the Respondent might (or would) be in breach of ECT, Article 10(1), if and to the extent that the remuneration of each of the plants in the Ondina and Xana portfolios failed to accord with a reasonable post-tax rate of return in the small-hydro market in Spain on the basis of WACC plus 1%, with the risk-free rate being the Spanish 10 year bond rate of 4.398%;

(4)    the Tribunal accordingly directs the Parties to endeavour to agree on the bases in Section VIII B hereof (i) an agreed post-tax reasonable rate of return calculated using the WACC as at June 2013; and (ii) agreed post-tax holding IRRs for each of the plants;

(5)    the Tribunal directs the Parties to report to the Tribunal within **60** days hereof whether agreement has been reached, and if not, on the principal areas of disagreement;

(6)    the Tribunal will give such further directions as may be necessary;

(7)    the Tribunal reserves all consequential matters, including interest (if any) and costs, to a further Decision or final Award.

_____
Professor Rolf Knieper
Arbitrator

Date:    **FEB 2 1 2020**


_____
Mr Peter Rees, QC
Arbitrator

Date:    **FEB 2 5 2020**


_____
Lord Collins of Mapesbury, LL.D., F.B.A.
President of the Tribunal

Date:    **FEB 2 4 2020**

237