# EXHIBIT 37

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**THEODOROS ADAMAKOPOULOS AND OTHERS**

Claimants

and

**REPUBLIC OF CYPRUS**

Respondent

**ICSID Case No. ARB/15/49**

---

DECISION ON JURISDICTION

---

***Members of the Tribunal***
Professor Donald M. McRae, President of the Tribunal
Mr. Alejandro Escobar, Arbitrator
Professor Marcelo G. Kohen, Arbitrator

***Secretary of the Tribunal***
Ms. Martina Polasek

*Date of dispatch to the Parties:* February 7, 2020

<h2 align="center">REPRESENTATION OF THE PARTIES</h2>

*Representing Theodoros Adamakopoulos and others*:

Mr. Jay Eisenhofer
Mr. Olav Haazen
Ms. Caitlin Moyna
Ms. Alice Cho Lee
Grant & Eisenhofer P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
United States of America

and

Mr. Stephen Fietta
Mr. Ashique Rahman
Ms. Oonagh Sands
Fietta
1 Fitzroy Square
W1T 5HE London, United Kingdom

and

Mr. Geoffrey Jarvis and Mr. Stuart Berman
Kessler Topaz Meltzer & Check LLP
280 King of Prussia Road
Radnor, PA 19087
United States of America

and

Ms. Emily Christiansen
Kessler Topaz Meltzer & Check LLP
280 King of Prussia Road
Radnor, PA 19087
United States of America

and

Ms. Chrysthia Papacleovoulou
City Forum, Suite 201
11 Florinus Street
1065 Nicosia, Republic of Cyprus

and

Mr. John Kyriakopoulos
Kyros Law
Omirou 50, TK 10672
Athens, Hellenic Republic

*Representing the Republic of Cyprus*:

Mr. Mark H. O'Donoghue
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, NY 10178
United States of America

and

Mr. Justin M. Jacinto
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
United States of America

and

Mr. Peter M. Wolrich
Curtis, Mallet-Prevost, Colt & Mosle LLP
6 Avenue Velasquez
75008 Paris, French Republic

and

Ms. Luciana Ricart
Mr. William Hampson
Ms. Sena Tsikata
Curtis, Mallet-Prevost, Colt & Mosle LLP
99 Gresham Street
ECV2 7NG London, United Kingdom

and

Mr. Costas Clerides,
Attorney General of the Republic of Cyprus
Mrs. Elena Zachariadou
Mrs. Mary-Ann Stavrinides
Mrs. Despina Kyprianou
Office of the Attorney General
1 Apelli Str.
1403 Nicosia, Republic of Cyprus

TABLE OF CONTENTS

I.    INTRODUCTION AND PARTIES ............................................................................... 1

II.   PROCEDURAL HISTORY ......................................................................................... 2

III.  THE RESPONDENT'S POSITION .......................................................................... 10

      (1)   Claimants' claims should be dismissed as EU Law superseded the intra-EU BITs
            rendering them inoperative upon Cyprus' accession to the EU................................. 11

            (a)  The CJEU has established that Articles 267 and 344 TFEU preclude the dispute
                 resolution clauses of intra-EU BITs ........................................................ 11

            (b)  Conflict of Treaties ................................................................................. 12

            (c)  Incompatibility between EU Treaties and Intra-EU BITs ............................... 14

      (2)   Claimants have initiated a mass claims proceeding which is outside this Tribunal's
            jurisdiction and is inadmissible .................................................................... 16

      (3)   Respondent has not consented to the consolidation of claims brought under multiple
            BITs ........................................................................................................ 19

      (4)   The Cyprus-Greece BIT does not cover indirect investments or indirect investors ... 20

      (5)   Claimants' assets do not all qualify as investments under the ICSID Convention and
            the BITs .................................................................................................. 21

      (6)   Claimants that did not comply with the access requirements of the BITs must be
            excluded ................................................................................................... 22

      (7)   Nationals of Greece or Luxembourg are not entitled to bring claims for investments
            that belong to non-covered investors ........................................................... 23

      (8)   Greek legal entities controlled by Cypriot nationals are not entitled to bring claims. 24

      (9)   The Cyprus-Greece BIT's fork-in-the-road clause precludes Claimants that brought
            the dispute to the Cypriot courts from resorting to arbitration ............................ 24

IV.   THE CLAIMANTS' POSITION .............................................................................. 25

      (1)   The Intra-EU Law Objection: the BITs are in full force and effect and their arbitration
            provisions constitute valid bases for this Tribunal's jurisdiction ........................... 26

            (a)  International law, not EU Law, governs this Tribunal's jurisdiction..................... 26

            (b)  The BITs remain in full force ...................................................................... 27

      (2)   Claimants' multi-party claims are admissible and do not preclude jurisdiction......... 30

      (3)   There has been no consolidation of claims under multiple BITs............................. 33

      (4)   This Tribunal has jurisdiction over "indirect" investments ................................... 34

      (5)   All Claimants made qualifying investments in Cyprus ........................................ 35

(6)  The notice provisions of the BITs offer no basis for the Tribunal to decline to exercise its jurisdiction...................................................................................................... 37

(7)  Claimants are pursuing claims only on behalf of Greek or Luxembourg citizens...... 38

(8)  Legal entities that are incorporated and have their seat in Greece are eligible to bring claims, regardless of the nationality of their shareholders.......................................... 38

(9)  Claimants do not violate the fork-in-the-road provision............................................. 39

V.    THE EUROPEAN COMMISSION'S POSITION ....................................................................40

VI.   THE TRIBUNAL'S ANALYSIS ..........................................................................................43

(1)  The Intra-EU BIT Objection ..................................................................................... 43

     (a)  The Respondent's argument on the basis of EU law ........................................ 43

     (b)  The Conflict of Treaties .................................................................................. 47

(2)  The Objection to Jurisdiction and Admissibility due to a Mass Claims Proceeding.. 54

     (a)  Jurisdiction....................................................................................................... 55

     (b)  Admissibility.................................................................................................... 64

     (c)  Certainty of the claimant pool......................................................................... 75

     (d)  Bifurcation....................................................................................................... 75

     (e)  Security for Costs............................................................................................. 76

(3)  The Objection to Jurisdiction due to lack of consent to the consolidation of claims . 76

(4)  The Objection to Jurisdiction with respect to indirectly held investments................ 78

(5)  The Objection to Jurisdiction over certain claims due to the absence of a qualifying investment .................................................................................................................. 84

     (a)  The Life Insurance Contracts........................................................................... 86

     (b)  The UK-Issued Bonds...................................................................................... 88

(6)  The Objection to Jurisdiction due to non-compliance with the notice provisions under the BITs...................................................................................................................... 89

(7)  The Objection to Jurisdiction over certain claims due to lack of qualification as an investor under the BITs............................................................................................... 94

(8)  The Objection to Jurisdiction over certain claims due to control of legal entities by Cypriot nationals........................................................................................................ 96

(9)  The Objection to Jurisdiction due to the fork-in-the-road clauses............................ 97

(10) Claimants Nos. 626 and 627 ..................................................................................... 99

VII.  COSTS ................................................................................................................................ 99

VIII. DECISION ........................................................................................................................ 100

iii

TABLE OF ABBREVIATIONS

| | |
|---|---|
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| C-[#] | Claimants' Exhibit |
| Cl. C-Mem. Jur. | Claimants' Counter-Memorial on Jurisdiction originally dated June 1, 2018 and modified on June 6, 2018 |
| Cl. Mem. Merits | Claimants' Memorial on the Merits dated December 15, 2015 |
| Cl. Rej. Jur. | Claimants' Rejoinder on Jurisdiction dated September 7, 2018 |
| CL-[#] | Claimants' Legal Authority |
| Cyprus-BLEU BIT | Agreement between the Republic of Cyprus and the Belgo-Luxemburg Economic Union on the Reciprocal Promotion and Protection of Investment, which entered into force on June 5, 1999 |
| Cyprus-Greece BIT | The Agreement between the Government of the Hellenic Republic and the Government of the Republic of Cyprus for the Reciprocal Encouragement and Protection of Investments, which entered into force on February 26, 1993 |
| Hearing | Hearing on Jurisdiction held from May 17, 2019 through May 18, 2019 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated March 18, 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| R-[#] | Respondent's Exhibit |
| Resp. Mem. Jur. | Respondent's Memorial on Jurisdiction dated March 16, 2018 |

| Resp. Rep. Jur. | Respondent's Reply on Jurisdiction dated July 27, 2018 |
|---|---|
| RL-[#] | Respondent's Legal Authority |
| Tr. Day [#] [page] | Transcript of the Hearing |
| Tribunal | Arbitral tribunal constituted on September 28, 2016 and reconstituted on November 9, 2018 after the passing away of arbitrator Francisco Orrego Vicuña |

## I.    INTRODUCTION AND PARTIES

1.    This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") on the basis of the Agreement between the Government of the Hellenic Republic and the Government of the Republic of Cyprus for the Reciprocal Encouragement and Protection of Investments (the "Cyprus-Greece BIT")[1], which entered into force on February 26, 1993, the Belgium-Luxembourg Economic Union-Cyprus BIT, which entered into force on June 5, 1999 (the "Cyprus-BLEU BIT")[2], and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on October 14, 1966 (the "ICSID Convention") for the original Contracting States. The ICSID Convention entered into force for Cyprus on December 25, 1966; for Greece on May 21, 1969; and for Luxembourg on August 29, 1970.

2.    As of the date of the hearing on jurisdiction, the claimants were 951 natural persons and seven companies (together, the "Claimants").[3] With the exception of one company incorporated in Luxembourg, the remaining Claimants are Greek nationals.[4]

3.    The respondent is the Republic of Cyprus ("Cyprus" or the "Respondent").

4.    The Claimants and the Respondent are collectively referred to as the "Parties." The Parties' representatives as of the date of this Decision and their addresses are listed above.

---

[1] C-0001 to the Amended Request for Arbitration. The Respondent does not agree with the translation of Article 9 in C-0001 and has submitted its own version as R-0002. *See* Tr., Day 2, pp. 324-325.

[2] C-0016 to the Amended Request for Arbitration/ CL-0012.

[3] The number of Claimants has changed since the filing of the request for arbitration. According to the Claimants (Claimants' Opening Submission, p. 6), 12 Claimants passed away and were succeeded as parties by their estates, consisting of family members. Also, four Claimants were omitted by error from the original list (Nos. 413, 626 and 627), three Claimants had duplicate entries (Nos. 75, 456 and 481), one Claimant was inadvertently listed as two with separate names (Claimant No. 160, Katafigiotis, Patroklos-Ioannis) and one Claimant was originally listed but later not included (Claimant No. 514, Konstantinou Andreas). The number of Claimants provided by the Claimants at the Hearing – 969 -- does not correspond to Annex A (revised, version 2) of their Rejoinder on Jurisdiction, on which the information was based. Annex A (revised, version 2) lists 958 Claimants, including two whose claims were withdrawn (*see infra* fn. 4). The final number of Claimants excluding the two whose claims were withdrawn is thus 956. The full list of Claimants is appended to this Decision as Annex I.

[4] As noted later in this Decision, the claims of two of the Claimants, CNP Asfalistiki Ltd. (Claimant No. 2) and Vasiliu, Athanasios (Claimant No. 417) have been withdrawn because they did not meet the nationality requirements (*see infra* paras. 323, 326-328).

5.    The Claimants are holders of certain financial instruments and bank deposits in Laiki Bank and Bank of Cyprus. In 2012-2013, the two banks incurred losses from their exposure to the Greek economic crisis. In March 2013, faced with an economic emergency, Cyprus reached an agreement with the EC, the ECB and the IMF (the "Troika") for the adoption of an adjustment plan which led to the merger of Laiki Bank with the Bank of Cyprus and a bail-in of shareholders, bondholders and deposit holders of the Bank of Cyprus. The Claimants allege that the adoption of the so-called Plan B by the Government of Cyprus has resulted in a violation of its obligations towards their investments under the Cyprus-Greece BIT and the Cyprus-BLEU BIT.

## II.    PROCEDURAL HISTORY

6.    On September 25, 2015, ICSID received a request for arbitration of the same date from Theodoros Adamakopoulos and 676 other requesting parties against Cyprus.

7.    On November 18, 2015, ICSID received an amended request for arbitration withdrawing some of the requesting parties that had dual Greek and Cypriot nationalities and adding other requesting parties (the "Request"). The requesting parties were 947 Greek natural persons, six companies incorporated in Greece, and one company incorporated in Luxembourg.[5]

8.    On December 17, 2015, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

9.    On March 4, 2016, the Claimants requested that the Tribunal be constituted in accordance with Article 37(2)(b) of the ICSID Convention. Accordingly, by letter of March 7, 2016, ICSID informed the Parties that the Tribunal would consist of three arbitrators, one

---

[5] A list of the Claimants was attached to the registration papers and published on ICSID's website.

arbitrator appointed by each party and the third, who shall be the President of the Tribunal, appointed by agreement of the Parties.

10. On March 19, 2016, following appointment by the Claimants, Francisco Orrego Vicuña, a national of Chile, accepted his appointment as arbitrator.

11. On April 3, 2016, following appointment by the Respondent, Marcelo G. Kohen, a national of Argentina, accepted his appointment as arbitrator.

12. By letter of August 26, 2016, the Claimants informed ICSID that the Parties were unable to reach agreement on the President of the Tribunal and requested that the Chairman of the ICSID Administrative Council (the "Chairman") appoint the President of the Tribunal in this case, pursuant to Article 38 of the ICSID Convention and ICSID Arbitration Rule 4.

13. Following an unsuccessful ballot process, ICSID informed the Parties, by letter of September 21, 2016, of its intention to propose the appointment of Prof. Donald M. McRae, a national of Canada and New Zealand, as the President of the Tribunal. Having received no objection from the Parties, the Chairman proceeded with the appointment of Prof. McRae.

14. On September 28, 2016, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings (the "Arbitration Rules"), the Acting Secretary-General notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Ms. Martina Polasek was designated to serve as Secretary of the Tribunal.

15. In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on November 30, 2016 by teleconference.

16. Following the first session, on December 6, 2016, the Tribunal issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters and the Tribunal's decisions. Procedural Order No. 1 provided, *inter alia*, that the applicable arbitration rules are those in force as of April 10, 2006, that the procedural language of the arbitration is

English, and that the place of proceedings is Washington, DC. Procedural Order No. 1 also set out the agreed procedural schedule for submissions concerning the Respondent's request for bifurcation of proceedings.

17. In accordance with Procedural Order No. 1, the Respondent submitted its Notification of Jurisdictional Objections and Request for Bifurcation and Document Production on December 9, 2016 (accompanied by Annexes I and II, Exhibit R-0001 and Legal Authorities RL-0001 through RL-0014).

18. On January 12, 2017, the Claimants submitted their Response to the Respondent's Notification of Jurisdictional Objections and Request for Bifurcation and Document Production (accompanied by Annexes A and B and Legal Authorities CL-0001 through CL-0011).

19. A second session concerning bifurcation and other procedural matters was held in London on January 24, 2017.

20. On February 13, 2017, the Tribunal issued Procedural Order No. 2. In accordance with Article 41(2) of the ICSID Convention and Arbitration Rule 41(4), the Tribunal, *inter alia*; (i) directed the Claimants to file their Memorial on the Merits in accordance with the schedule in Annex 1; (ii) decided to bifurcate the proceedings after the filing of the Claimants' Memorial; and (iii) directed the Parties to file their written pleadings on jurisdiction and admissibility in accordance with the schedule in Annex 1.

21. On September 27, 2017, the Claimants requested a modification of the Tribunal's Procedural Order No. 1, paragraph 16.1, seeking to file their Memorial on the Merits without quantification of their moral damages. Following the Parties' submissions on this request, in Procedural Order No. 3 dated October 19, 2017, the Tribunal confirmed its Procedural Orders Nos. 1 and 2 and directed the Claimants to file a Memorial on Merits including all damages.

22. In accordance with Procedural Order No. 2, the Claimants filed their Memorial on the Merits ("Cl. Mem. Merits") on December 15, 2017.[6]

23. On January 30, 2018, the Respondent requested that the Tribunal direct the Claimants to provide certain spreadsheets used in one of the expert reports, to understand the expert's methodology and the manner in which damages were calculated. Following the Parties' submissions on this matter, in Procedural Order No. 4 dated February 9, 2018, the Tribunal ordered the Claimants to produce to the Respondent certain material relied on in the relevant expert report.

24. On March 16, 2018, the Respondent filed its Memorial on Jurisdiction ("Resp. Mem. Jur.").[7]

25. On June 1, 2018, the Claimants filed their Counter-Memorial on Jurisdiction, a modified version of which was filed on June 6, 2018 ("Cl. C-Mem. Jur.").[8]

26. On July 27, 2018, the Respondent filed its Reply on Jurisdiction ("Resp. Rep. Jur.").[9]

27. On September 7, 2018, the Claimants filed their Rejoinder on Jurisdiction ("Cl. Rej. Jur.").[10]

---

[6] Cl. Mem. Merits was accompanied by Annex A, Witness Statement of Irene Karamanou, Witness Statement of Vassos Shiarly, Witness Statement of Evdokimos Xenophontos, Witness Statement of Vasiliki Aidini, Witness Statement of Georgios Androulakis, Witness Statement of Lemonia Balaoura and Konstantinos Panagiotopoulos, Witness Statement of Filothei Dede, Witness Statement of Elissavet Georgiadis, Witness Statement of Dimitrios Giouroukos, Witness Statement of Ioannis Kloukinas, Witness Statement of Athanasios Konstantinou, Witness Statement of Grigorios Kopsidas, Witness Statement of Aikaterini Kouki, Witness Statement of Asterios Koukos, Witness Statement of Olga-Vithleem Michailidi, Witness Statement of Ioannis Stefanis, Witness Statement of Vivian Terlegas, Witness Statement of Dimitrios Theodorou, Witness Statement of Ioannis Vamvakaris and Maria Sinoyli, Expert Opinion of Emilios Avgouleas, Expert Opinion of George Z. Georgiou, Expert Opinion of Alecos Markides, Expert Opinion of Costas Xiouros, Exhibits C-0001 through C-0195, and Legal Authorities CL-0012 through CL-0145.

[7] Resp. Mem. Jur. was accompanied by Exhibits R-0002 through R-0218 and Legal Authorities RL-0015 through RL-0140.

[8] Cl. C-Mem. Jur. was accompanied by Revised Annex A, Witness Statement of Athanasia and Michail Nikolopoulos, Witness Statement of Vivian Terlegas, Exhibits C-0196 through C-0211 and Legal Authorities CL-0146 through CL-0231.

[9] Resp. Rep. Jur. was accompanied by Exhibits R-0219 through R-0226 and Legal Authorities RL-0141 through RL-0184.

[10] Cl. Rej. Jur. was accompanied by Witness Statement of Ioannis Leontiadis, Witness Statement of Eirini Grigoropoulou,   Annex A (Revised, version 2), Exhibits listed in the Index of Claimants' Database Exhibits, Exhibits C-0212 through C-0214 and Legal Authorities CL-0232 through CL-0273.

28. On September 13, 2018, the European Commission (the "Commission" or "EC") filed an application for leave to intervene as a non-disputing party in the proceedings, pursuant to Rule 37(2) of the Arbitration Rules (the "EC Application"). The Commission sought leave to file a written submission regarding the Tribunal's jurisdiction under the Greek-Cyprus BIT and the judgment of the Court of Justice of the European Union in *Slowakische Republik v. Achmea BV*, Case C-284/16, EU:C:2018:158 ("*Achmea*" or "*Achmea* Ruling")[11], and regarding the effect of any eventual award compensating the Claimants under EU State aid rules.

29. On September 13, 2018, ICSID transmitted the EC Application to the Tribunal and, on September 14, to the Parties, inviting them to file their comments by September 19, 2018, and any reply comments by September 21, 2018.

30. On September 17, 2018, the Claimants sought an extension of the time to respond to the EC Application until October 3, 2018, with replies due on October 10, 2018. The Tribunal granted the request on September 19, 2018. On the same date, shortly before the Tribunal's communication extending the time limit for observations, the Respondent filed its comments on the EC Application.

31. The Respondent urged the Tribunal to grant the EC Application. It suggested that the Commission be allowed to file its written submission before the hearing on jurisdiction and that it could attend the hearing and answer any questions from the Tribunal at the hearing. Alternatively, the Commission could make a written submission on the implications of *Achmea* after the hearing on jurisdiction and the parties could file written responses.

32. On September 21, 2018, due to health reasons of one of the arbitrators, the hearing on jurisdiction scheduled on October 18 and 19, 2018 was postponed. Subsequently, on September 27, 2018, the Claimants requested a further extension of time to comment on

---

[11] RL-0015, Judgement of the Court of Justice of the European Union, delivered on March 6, 2018, *Achmea*, C-284/16, EU:C:2018:158.

the EC Application. The Respondent did not object and the Tribunal therefore approved the extension until October 24, 2018, and October 31, 2018 for the Parties' replies.

33. On October 2, 2018, ICSID informed the Parties of the passing away of Professor Francisco Orrego Vicuña. In accordance with Arbitration Rule 10(2), the proceeding was suspended until the vacancy was filled.

34. By letter of November 7, 2018, the Claimants notified ICSID that they appointed Mr. Alejandro Escobar, a national of Chile and the United States, as arbitrator pursuant to Arbitration Rule 11(1).

35. On November 9, 2018, ICSID informed the Parties that Mr. Alejandro Escobar had accepted his appointment and the vacancy on the Tribunal had been filled.  In accordance with Arbitration Rule 12, the proceeding resumed on the same date.

36. By letter of November 12, 2018, the Tribunal invited the Claimants to file their observations on the EC Application by December 14, 2018 and the Parties to file their simultaneous responses by December 21, 2018.

37. On December 14, 2018, the Claimants filed their observations. They did not object to the Commission's intervention with regard to the question whether the intra-EU BITs at issue in this case are contrary to EU law, so long as such intervention did not disrupt the proceeding or unduly burden or unfairly prejudice the Claimants. However, they opposed the intervention with regard to the issue of provision of State aid (the legal consequences of any compensation awarded to the Claimants). The Claimants found the issue of State aid irrelevant "because it is based on the EC's apparent misconception that the Claimants include Laiki Bank shareholders." They were of the view that the request to intervene on this point did not meet the requirements of Arbitration Rule 37.

38. On December 21, 2018, the Respondent filed a response. The Respondent agreed that the Commission's submission should be concerned with addressing the intra-EU BIT jurisdictional question at this stage of the proceeding, rather than with questions of substance.

39. On December 21, 2018, the Claimants informed the Tribunal that they had sufficiently stated their position regarding the EC Application and would not submit a further response.

40. In Procedural Order No. 5 dated January 9, 2019, the Tribunal granted leave to the EC to file a written submission regarding the intra-EU BIT jurisdictional issue, excepting certain arguments of substance concerning State aid with regard to the legal consequences of any eventual award compensating the Claimants. The written submission was to be limited to 20 pages and was to be filed within 15 days after receipt by the EC of the Parties' main pleadings relating to the intra-EU jurisdictional issue (without any supporting documents).

41. After consultation with the parties, by letter of January 18, 2019, the Tribunal confirmed that the Hearing on Jurisdiction (the "Hearing") would be held in Washington, DC on May 17 and 18, 2019, with May 19 in reserve.

42. In accordance with Procedural Order No. 5, the Commission filed an *amicus curiae* brief on February 13, 2019 (accompanied by Annexes EC-1 through EC-29).

43. On February 28, 2019, each party filed observations on the non-disputing party's written submission.[12]

44. On March 7, 2019, each party filed a response to the other party's observations on the non-disputing party's written submission.[13]

45. On April 12, 2019, the Tribunal held a pre-hearing organizational meeting with the Parties by telephone conference.

46. On April 17, 2019, the Tribunal issued Procedural Order No. 6 concerning the organization of the Hearing.

---

[12] Claimants' observations were accompanied by Legal Authorities CL-0274 through CL-0285. The Respondent's observations were accompanied by Legal Authorities RL-0185 through RL-0204.
[13] Respondent's response was accompanied by Legal Authority RL-0205.

47. The Hearing was held in Washington DC on May 17 and 18, 2019. The following persons were present:

Tribunal:

| | |
|---|---|
| Professor Donald M. McRae | President |
| Mr. Alejandro Escobar | Arbitrator |
| Professor Marcelo G. Kohen | Arbitrator |

ICSID Secretariat:

| | |
|---|---|
| Ms. Martina Polasek | Secretary of the Tribunal |

For the Claimants:

| | |
|---|---|
| Mr. Stephen Fietta | Fietta LLP |
| Mr. Ashique Rahman | Fietta LLP |
| Ms. Oonagh Sands | Fietta LLP |
| Mr. Olav Haazen | Grant & Eisenhofer P.A. |
| Ms. Caitlin Moyna | Grant & Eisenhofer P.A. |
| Ms. Alice Cho Lee | Grant & Eisenhofer P.A. |
| Mr. George Martsekis | Grant & Eisenhofer P.A. |
| Mr. Toby Saviano | Grant & Eisenhofer P.A. |
| Ms. Stephanie Johnson | Grant & Eisenhofer P.A. |
| Mr. Geoffrey Jarvis | Kessler Topaz Meltzer & Check, LLP |
| Mr. Ioannis Kyriakopoulos | Kyros Law Offices |
| Ms. Maria Skiadioti | Kyros Law Offices |
| Mr. Panagiotis Terlegkas | Claimant |
| Ms. Vasiliki Terlegka | Claimant |
| Mr. Georgios Androulakis | Claimant |
| Mrs. Ioanna Giannakopoulou | Wife of Mr. Georgios Androulakis |
| Mr. Evangelos Kopsidas | Claimant |
| Mr. Tommy Dimopoulos | Nephew of Mr. Evangelos Kopsidas |
| Mr. John Kontrafouris | Claimant |
| Ms. Stella Kontrafouris | Wife of Mr. Kontrafouris |

For the Respondent:

| | |
|---|---|
| Mr. Mark H. O'Donoghue | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Mr. Peter M. Wolrich | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Mr. Justin M. Jacinto | Curtis, Mallet-Prevost, Colt & Mosle LLP |

| | |
|---|---|
| Mr. Guillermo A. Ulke | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Ms. Luciana Ricart | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Mr. William Hampson | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Ms. Sena Tsikata | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Mr. Odysseas E. Stergianopoulos | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Ms. Madeline Murphy | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Ms. Bailey Ellicott | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Mr. Marvin Alexis | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Mr. Joshua R. Krichman | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Ms. Elena Zachariadou | Law Office of the Republic of Cyprus |
| Ms. Mary-Ann Stavrinides | Law Office of the Republic of Cyprus |
| Ms. Avgi Chrysostomou | Ministry of Finance of the Republic of Cyprus |
| Mr. Michalis C. Stylianou | Central Bank of Cyprus |
| Mr. Maria S. Kettirou | Central Bank of Cyprus |

Court Reporter:

| | |
|---|---|
| Ms. Michelle Kirkpatrick | B&B Reporters |

48. The Parties filed joint errata to the Hearing transcript (Tr.) on June 18, 2019 and their submissions on costs on June 20, 2019.

## III.  THE RESPONDENT'S POSITION

49. The Respondent has made several arguments to the effect that the Tribunal does not have jurisdiction to hear the Claimants' claims. The Respondent's main jurisdictional objections are: (1) there is no consent to arbitration because EU law prevails over the BITs and rendered them inoperative as of the date of Cyprus' accession to the EU; (2) multi-party claims are inadmissible absent consent of the respondent; (3) consolidation of claims is not permissible; (4) the Claimants' claims are indirect and do not qualify as investments within the scope of the BIT; (5) the Claimants' investments are not qualifying investments under the BIT and the ICSID Convention; (6) the Claimants did not comply with the notice provisions under the BIT; (7) the Claimants made claims on behalf of investors not covered by the BIT; (8) Greek legal entities controlled by Cypriot nationals are not covered investors under the BIT and the ICSID Convention; and (9) the BIT's fork-in-the-road clause precludes Claimants from resorting to arbitration.

**(1) Claimants' claims should be dismissed as EU Law superseded the intra-EU BITs rendering them inoperative upon Cyprus' accession to the EU**

50.  The Respondent submits that the arbitration clauses in Article 9 of the Cyprus-Greece BIT and Article 10 of the Cyprus-BLEU BIT and all claims that the Claimants assert through these provisions are incompatible with EU law in four respects. First, they are incompatible with Articles 267 and 344 of the Treaty on the Functioning of the European Union (the "**TFEU**"), as decided by the Court of Justice of the European Union (the "CJEU") in *Achmea.* Second, the arbitration clauses in the BITs are terminated as a result of the application of Articles 59 and 30(3) of the VCLT. Third, the intra-EU BITs overlap and are incompatible with the EU Treaties. Fourth, the adjudication of the claims violates the exclusive competence of the EU institutional bodies to supervise the capital transfer and EU Bank Recovery and Resolution Directive ("**BRRD**").

51.  According to the Respondent, because EU law supersedes intra-EU BITs, the Contracting Parties' offer to consent to ICSID arbitration in the BIT became inapplicable when the Republic of Cyprus acceded to the European Union on May 1, 2004. Therefore, the Respondent concludes that this Tribunal and ICSID do not have jurisdiction over the dispute.

    *(a) The CJEU has established that Articles 267 and 344 TFEU preclude the dispute resolution clauses of intra-EU BITs*

52.  The Respondent urges this Tribunal to follow the *Achmea* Ruling which held that:

> Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring

proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.[14]

53. According to the Respondent, the CJEU has thus established that Articles 267 and 344 of the TFEU preclude the operability of dispute resolution clauses providing for investor-state arbitration in intra-EU BITs.[15] The EU Treaty provisions cited provide that the CJEU has the final and authoritative word on the meaning of whether there is incompatibility between the BITs and EU Treaties. Additionally, the preliminary reference procedure under Article 267 of the TFEU allows the CJEU to answer the questions referred but does not provide the CJEU with jurisdiction to apply EU law to the case itself. As a result, questions of EU law that tribunals may have to address are not guaranteed to be heard by the CJEU. This ultimately threatens the uniform and effective interpretation and application of EU law in violation of the principle of sincere cooperation under Article 4(3) of the TEU and Article 344 of the TFEU.

54. According to the Respondent, the January 2019 Declarations of EU Member States affirm the overall importance of the *Achmea* Ruling as an "authoritative determination of the ineffectiveness of intra-EU BITs as a matter of international law."[16] The Declarations are subsequent agreements on the interpretation and application of the EU Treaties and intra-EU BITs under Article 31(3)(a) VCLT and a form of authentic interpretation and application of treaties under international law. [17] The Joint Information Note issued by the Hellenic Republic and Cyprus is a further step implementing the consequences of *Achmea* pursuant to the Declarations.[18] No further formality was necessary in this respect as subsequent agreements can take a variety of forms and can be both formal and informal.

    *(b) Conflict of Treaties*

55. The Respondent submits that intra-EU BITs have been superseded through the application of international law rules on resolving treaty conflicts. The Respondent argues that EU

---

[14] *Achmea* Ruling, para. 31.
[15] Resp. Mem. Jur., para. 301.
[16] Tr. Day 1, p. 42. *See* Annex EC-02.
[17] Tr. Day 1, p. 43.
[18] Tr. Day 1, p. 44. *See* RL-0206.

law prevails over conflicting provisions of the BIT pursuant to several conflict rules: (i) Articles 59 and 30(3) of the VCLT; and (ii) Article 351 of the TFEU relating to pre-existing treaties.

56.     The Respondent argues that upon application of Articles 59 and 30 of the VCLT, it must be ascertained whether: (i) the successive treaties relate to the same subject matter; and (ii) whether there is incompatibility under the subjective or objective test.[19] Article 59(1) of the VCLT will then operate to terminate the earlier treaty. On the first step, the Respondent argues that the successive treaties govern the same subject matter. On the second step, the Respondent argues that the objective test – whether "the provisions of the later treaty are so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time"[20] – is satisfied.[21] Specifically, the incompatibility between the treaties demonstrates that parties intended for EU Treaties to govern intra-EU investments, and that Cyprus and Greece have confirmed that intra-EU investment protection is governed by the EU Treaties, especially relating to dispute resolution.[22]

57.     The Respondent further argues that pre-existing treaties between Member States cannot prevail over EU law as evinced by the limited grandfathering provision in Article 351 of the TFEU.[23] Specifically, Article 351 TFEU enables continued validity of those treaties which were concluded between a Member State and a non-Member State prior to the Member State's accession to the EU.[24] However, upon the Respondent's accession to the EU, the intra-EU BITs were transformed… into an international treaty between two EU Member States, rendering them ineligible for the grandfathering protection in Article 351

---

[19] Resp. Mem. Jur., paras. 306-308.

[20] VCLT, Art 59(1)(b), CL-0051.

[21] Resp. Mem. Jur., p. 159, footnote 570.

[22] *Ibid*.

[23] Resp. Mem. Jur., paras. 309-310; Resp. Rep. Jur., paras. 84-86.

[24] TFEU, Art. 351, RL-0020 ("The rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties. To the extent that such agreements are not compatible with the Treaties, the Member State or States concerned shall take all appropriate steps to eliminate the incompatibilities established. Member States shall, where necessary, assist each other to this end and shall, where appropriate, adopt a common attitude.").

TFEU."[25] The Respondent relies on the *Electrabel v. Hungary* award, which reasoned that the pre-existing inconsistent treaty rights of EU Member States are precluded, and that if the ECT and EU law remained incompatible "EU law would prevail over the ECT's substantive protections..."[26]

*(c) Incompatibility between EU Treaties and Intra-EU BITs*

58. According to the Respondent, the intra-EU BITs overlap with EU Law and are incompatible with the EU Treaties. The Respondent submits that incompatibility is due to (i) the intra-EU BITs' investment protection provisions being replaced by the EU Treaties; (ii) the discriminatory treatment of nationals of different EU Member States resulting from the intra-EU BITs and (iii) the incompatibility of the intra-EU BITs' arbitration clause with the EU's institutional and judicial framework. The Respondent argues that the Claimants' case demonstrates this incompatibility.

59. The Respondent primarily argues that upon Member States' accession to the EU, investments subject to the host State's laws transform into intra-EU investments regulated by EU law.[27] Thus, the EU Treaties replace the intra-EU BITs' investment protection provisions, through the application of Articles 59 and 30 of the VCLT.

60. The second reason for incompatibility as argued by the Respondent is that the intra-EU BITs result in discriminatory treatment of nationals of different EU Member States. The Respondent argues that the intra-EU BIT provisions violate the TFEU's prohibition against discrimination on the basis of nationality, including substantive rights and the right to arbitrate, as it grants selective benefits to investors under these treaties.[28] The Respondent contends that jurisprudential discussions on this issue are inadequate, and

---

[25] Resp. Mem. Jur., para. 309.
[26] *Electrabel S.A. v. Hungary (ICSID Case No. ARB/07/19)*, Award, November 25, 2015, para. 4.189, CL-0085 ("*Electrabel v. Hungary*" or "*Electrabel*").
[27] Resp. Mem. Jur., para. 316.
[28] Resp. Mem. Jur., paras. 330-331.

refers to the  pronouncements made by EU Member States that intra-EU BITs contravene the non-discrimination principle.[29]

61.  The third reason for incompatibility is that the arbitration clause in the intra-EU BIT is incompatible with the EU's institutional and judicial framework. The Respondent relies on the *Achmea* Ruling which reasoned that Articles 267 and 344 of the TFEU preclude the dispute resolution clauses of intra-EU BITs because the clauses permit dispute resolution outside the EU system and thus undermine the autonomy of EU law, contrary to the foundation principles of the European Union.[30]

62.  According to the Respondent, the Claimants' case demonstrates this incompatibility.  The TFEU contains detailed provisions which pertain to capital transfer restriction, "with direct effect"[31] and are inconsistent with the terms of the Cyprus-Greece BIT and Article 5 of the Cyprus-BLEU BIT. This is because Chapter 4 of the TFEU establishes a general ban on transfer restrictions and pursuant to Article 344 of the TFEU, the interpretation or application of such provisions is subject to the EU courts' exclusive jurisdiction.[32] Accordingly, for the purposes of Article 59 of the VCLT, the TFEU constitutes a successive treaty to the BITs relating to the same subject matter (transfer restrictions). The Respondent submits that the alternative condition in Article 59(1)(b) of the VCLT is satisfied; a clear incompatibility is evinced between the two treaties as "the BITs exclude transfer restrictions without specifying that States may adopt restrictions in certain circumstances…"[33]

63.  Additionally, the Respondent submits that the Claimants' claims conflict with the EU Bank Recovery and Resolution Directive (BRRD), which is EU law. The Claimants' reliance on intra-EU BITs to challenge the resolution measures' validity reaffirms the incompatibility between the BITs and the EU Treaties.[34] The BRRD is deemed to be a

---

[29] Resp. Mem. Jur., paras. 332-337.
[30] Resp. Mem. Jur., paras. 338-341; *Achmea* Ruling, paras. 32, 55, 58-60.
[31] *Skatteverket v. A*, Judgment, December 18, 2007, ECLI:EU:C:2007:804, para. 21, RL-0060.
[32] TFEU, Art. 344, RL-0020: "Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein."
[33] Resp. Mem. Jur., paras. 351-352.
[34] Resp. Mem. Jur., paras. 353-358; Resp. Rep. Jur., paras. 127-130.

collective EU effort where the resolution, regulatory powers and bail-in powers fall within the purview of the EU law and institutions.

### (2) Claimants have initiated a mass claims proceeding which is outside this Tribunal's jurisdiction and is inadmissible

64. The Respondent argues that it did not consent to an arbitration brought by a group of investors under the ICSID Convention or the BITs. The Respondent notes that these treaties use singular terms of "national" [35] and "investor" in the consent provisions[36] and thus, the provisions do not extend to a group of investors. This is further supported by other provisions, such as Article 27(1) of the ICSID Convention which uses "one of its nationals", rather than "national", indicating that consent was not intended to extend to arbitration brought by groups of investors. According to the Respondent, these terms should not be given an expansive interpretation[37] and extending singular treaty terms to include the plural is not supported by other provisions of the Treaties, the *travaux preparatoires,* the Treaties' context and purpose, or jurisprudence.[38]

65. The Respondent critiques the *Abaclat* majority's reasoning on how multiple claimants should be treated, and pointed out that it sidestepped the main objection and incorrectly found that jurisdiction *ratione materiae* over the subject matter could extend to jurisdiction over a collective mass claim.[39] The Respondent also critiques the *Ambiente* majority ruling as erroneous, as that tribunal did not distinguish between multi-party proceedings and proceedings where consolidations or multi-party proceedings were agreed to.[40] The Respondent argues that this proceeding involves a very large group of investors who are not homogenous, and thus, jurisdiction does not exist.

---

[35] ICSID Convention, Art. 25(1).
[36] Cyprus-Greece BIT, Art. 9, R-0002; Cyprus-BLEU BIT, Art. 10(1), C-0016: Resp. Mem. Jur., paras. 365-369; Resp. Rep. Jur., paras. 142-145.
[37] Resp. Mem. Jur., paras. 366-369.
[38] Resp. Mem. Jur., paras. 366-369; Resp. Rep. Jur., paras. 143-144.
[39] Resp. Mem. Jur., para. 380; *Abaclat and others v. Argentine Republic (ICSID Case No. ARB/07/5)*, Decision on Jurisdiction and Admissibility, August 4, 2011, para. 490, RL-0001 ("*Abaclat*").
[40] Resp. Rep. Jur., para. 147; *Ambiente Ufficio S.p.A. and others v. Argentine Republic (ICSID Case No. ARB/08/9)*, Decision on Jurisdiction and Admissibility, February 8, 2013, RL-0002 ("*Ambiente*").

66.  The Respondent submits that the ICSID Convention and the BITs provide only for arbitration between two "parties" and the Claimants are not a single party.[41] The Claimants are also not related but rather independent entities with distinct rights and interests, different types of assets acquired at different times, and have experienced different effects from the disputed measures.[42]

67.  The Respondent submits that there would be problems of enforceability when dealing with an award on costs against multiple claimants.[43] If an award is enforced on a joint and several basis, there might be issues of inequality in how much is actually to be paid by each Claimant vis-à-vis the amount that each Claimant claims for. The alternative, a pro rata basis, would reaffirm the Respondent's argument that the Claimants are not a single party. Further, there are procedural problems with multiple Claimants. For example, they might have inconsistent positions on annulment requests.[44]

68.  The Respondent submits that the Claimants' claims do not constitute a single dispute for the purposes of the ICSID Convention and the BITs. The phrasing of the consent provisions in the ICSID Convention and the BITs suggest that only a single dispute can be brought to arbitration.[45] This is supported by *Alemanni*, which concluded that treaty clauses in the ICSID Convention and the BITs "provide a mechanism for the settlement of individual disputes; they do not (absent either special agreement to that effect or joinder) provide a mechanism for the joint settlement of a collection of separate disputes."[46] On the present facts, the Respondent argues that the Claimants' claims cannot constitute a 'single dispute'. This is because the Claimants are bringing claims under two BITs, the claims concern two banks that were subject to differential treatment by the Respondent's policies, the Claimants' claims involve different assets that were subject to

---

[41] Resp. Mem. Jur., paras. 384-385.
[42] Resp. Mem. Jur., para. 386; Cyprus-Greece BIT, Art 9, C-0001/R-0002; Cyprus-BLEU BIT, Art. 10, C-0016.
[43] Resp. Mem. Jur., para. 390.
[44] Resp. Mem. Jur., paras. 395-396.
[45] Resp. Mem. Jur., paras. 402-404.
[46] *Giovanni Alemanni and others v. Argentine Republic (ICSID Case No. ARB/07/8)*, Decision on Jurisdiction and Admissibility, November 17, 2014, para. 292, RL-0003 ("*Alemanni*").

different treatment by the Respondent's alleged conduct, and all Claimants' claims are based on specific facts.[47]

69. According to the Respondent, the Claimants' claims are not homogeneous and fall outside of the ICSID Convention and this Tribunal's jurisdiction. The Respondent critiques the test by the majority in *Abaclat* that jurisdiction will exist where the claimants complain of "the same illegality which the Respondent is said to have committed against them all", where they "have made identical prayers of relief", and "claim that the factual background on the basis of which the Claimants seek to establish their claim is virtually the same for all Claimants."[48] However, even if adopted, the Respondent argues that the Claimants do not satisfy this test. This is because the Claimants have brought claims under two different BITs, the claims are based on events leading to breaches that are different for each Claimant, and not all Claimants were affected in the same way by the State's alleged conduct.

70. Finally, the Claimants' claims are unmanageable due to their numerosity and diversity, and do not allow this ICSID arbitration to be conducted in a manner consistent with the ICSID Convention, Rules, and Respondent's due process rights.[49] The Claimants' claims touch on distinct issues and a unique factual pattern that requires individualized attention of each claim.[50]

71. There would be significant time, cost, and a "burdensome" prolonging of proceedings to address each individual's claims and determine damages.[51] The Respondent submits that it would require 60 weeks of hearing time to address each individual claim raised.[52] The Respondent also suggests that the Claimants' claims would become unmanageable in the event of a division between the Claimants which stopped them from acting as a single party. For example, in the event that an award on the merits was issued in favor of the Claimants, only those of them who perceive the award to be beneficial would want to keep

---

[47] Resp. Mem. Jur., paras. 411-426.
[48] *Abaclat*, paras. 539-543; *Ambiente*, para. 161; *See however*, Resp. Mem. Jur., paras. 427-429.
[49] Resp. Rep. Jur., para. 195.
[50] Resp. Mem. Jur., para. 433; Resp. Rep. Jur., para. 196.
[51] Resp. Mem. Jur., paras. 434-436; Resp. Rep. Jur., paras. 196-199; Tr., Day 1, pp. 123-124.
[52] Tr., Day 1, p. 122.

it and the others would want to seek an annulment and might file multiple annulment applications.[53]

### (3) Respondent has not consented to the consolidation of claims brought under multiple BITs

72.    The Respondent submits that the Claimants cannot unilaterally consolidate the claims brought under the Cyprus-Greece BIT and the Cyprus BLEU BIT without the Respondent's consent. Without such consent, the Respondent argues that consolidation is invalid and results in a defective procedure.[54] Absent consent, claims under each BIT must be submitted to separate arbitrations. According to the Respondent, the unilateral consolidation of the claims resulted in an "improper departure from a fundamental rule of procedure" as the Parties departed from the nationality requirement in each BIT.[55] The Respondent asserts that the consolidation has compromised the constitution of the Tribunal because it has restricted the possibility to appoint nationals of both Luxembourg and Greece to the Tribunal. If the BITs were dealt with separately, this would not have occurred.[56]

73.    The Respondent relies on the London Commercial Court case of *A v. B*[57] which overturned an LCIA award as claims under two contracts to a single arbitration were submitted without the consent by all parties.[58] The Court found that arbitrations commenced under two different arbitration agreements are separate and distinct, and cannot be unilaterally consolidated.

74.    Therefore, the Respondent argues that the Claimants' unilateral consolidation is invalid and leads to a defective procedure.

---

[53] Tr., Day 1, p. 84.
[54] Resp. Mem. Jur., paras. 460-464.
[55] Resp. Mem. Jur., para. 462.
[56] *Ibid.*
[57] *A v. B* [2017] EWHC 3417 (Comm), RL-0072.
[58] Resp. Mem. Jur. at paras. 463-464; *See also A v. B* [2017] EWHC 3417 (Comm), para. 19, RL-0072.

19

### (4) The Cyprus-Greece BIT does not cover indirect investments or indirect investors

75. The Respondent submits that the Claimants' claims based on "indirect investments" should be dismissed as the Cyprus-Greece BIT does not protect indirect investments. The BIT includes a limited definition of investment that does not expressly provide for the protection of indirect investments, whereas other BITs concluded by Cyprus and Greece do.[59] Some of the Claimants base their claims on "assets held by Cypriot entities which they claim to own" or "assets held by legal entities of other States which they claim to own or are associated with in some other manner", neither of which fall within the BIT's limited definition.[60] In the absence of express terms including indirect investments in BITs, they cannot be presumed to be covered, especially as the Contracting Parties have concluded other BITs expressly covering indirect investments.[61] To take such an approach would contravene the *verba aliquid operari debent* principle as it would render the express references to indirect investments in treaties otiose.[62]

76. The Respondent relies on the *Poštová banka*[63] award where the Cyprus-Greece BIT was also at issue, to argue that the Cyprus-Greece BIT does not entitle shareholders of an entity to treat the latter's investment as the shareholder's own.

77. The Respondent thus submits that 30 Claimants holding indirect investments should have their claims dismissed for lack of jurisdiction. These claims, according to the Respondent, involve assets held by legal entities registered in offshore jurisdictions and the Claimants do not satisfy the nationality requirements under the BITs.[64]

---

[59] Resp. Mem. Jur., paras. 453-459; Resp. Rep. Jur., paras. 204-208.
[60] Resp. Mem. Jur., para. 452.
[61] Resp. Mem. Jur., para. 454.
[62] *Ibid.*
[63] *Poštová banka, a.s. and ISTROKAPITAL SE v. Hellenic Republic (ICSID Case No. ARB/13/8)*, Award, April 9, 2015, paras. 229-231, RL-0029 ("*Poštová banka*").
[64] In a series of Claimant-specific objections, the Respondent contends that some assets are held by a company, "shares of which are owned by other intermediary companies or individuals, who in turn hold these shares as trustees for the named Claimants in their capacity as beneficial owners." *See* Resp. Rep. Jur., para. 211. For other Claimants; assets are owned by intermediary companies in which Claimants only have a minority shareholding; and/or the Claimant in at least one claim has a limited connection to the company; and Claimant No. 221 does not appear to be the actual owner of the asset. *See* Resp. Rep. Jur., paras. 211-212, 217, 220. Moreover, for other claims, some Claimants are at best "beneficial owners of indirect investment vehicles or intermediary companies," Resp. Rep. Jur., paras. 213-216.

**(5) Claimants' assets do not all qualify as investments under the ICSID Convention and the BITs**

78. The Respondent argues the Claimants' investments do not qualify as such under both the ICSID Convention (as applied through the "*Salini*" test[65]) and the BITs. It argues that even if the Claimants' holdings satisfy the requirements of each BIT as they constitute assets, bonds, and claims to money, they are still not investments as they do not fulfill the qualities inherent to an investment; namely, contribution of assets or money, a certain duration, and risk.[66]

79. For example, the Claimants' assets of (i) life insurance contracts associated with Laiki bonds and (ii) bonds issued by the U.K. entity, Egnatia Finance PLC, do not qualify as investments.

80. The life insurance contracts in this case cannot be considered investments as the contractual relationship was between an individual Claimant and a Greek insurance providing company, CNP Zois S.A. Further, even if these contracts were deemed investments, they would be investments in Greece, not in Cyprus as Greek law governed the contractual obligations, the contracts were procured in Greece, and disputes arising out of the contracts were subject to Greek courts.[67] Since the individual Claimants do not have an ownership interest in the contracts, as they do not own any Laiki bonds, the contracts fall outside of the BIT protection.[68]

81. In any event, CNP Zois S.A., the Greek life insurance provider company, is a separate Claimant in this proceeding and "appears to be claiming with respect to the same losses on the Laiki bond with ISIN No. XS0468634539 that are claimed by the holders of the Life Insurance Contracts."[69] As such, double-recovery should not be allowed. In any event, the Claimants' proposed "stream-of-commerce" test is irrelevant. Instead, if there

---

[65] Resp. Mem. Jur., para. 483; *Salini Costruttori S.p.A. and Italstrade S.p.A. v. Kingdom of Morocco (ICSID Case No. ARB/00/4)*, Decision on Jurisdiction, July 16, 2001, RL-0114 ("*Salini*").
[66] Resp. Mem. Jur., para. 485.
[67] Resp. Mem. Jur., paras. 489-490.
[68] Resp. Rep. Jur., paras. 261-264; Resp. Mem. Jur., para. 491, relying on *Burimi SRL and Eagle Games SH.A v. Republic of Albania (ICSID Case No. ARB/11/18)*, Award, May 29, 2013, paras. 145-146, RL-0182.
[69] Resp. Mem. Jur., para. 491.

is no legal connection to the Respondent state, "factual economic connections between a claimant's financial interests and actions by that State do not satisfy the requirement that investments be made in its territory."[70]

82. For the bonds with ISIN Nos. XS0427466817 and XS0449357754, the Respondent submits that these bonds were issued in the United Kingdom by a British company, Egnatia Finance PLC, not by Laiki.[71] As Egnatia Finance PLC is an entity incorporated in England and Wales under English law, the bonds were issued in the United Kingdom, and any disputes arising are subject to English courts; as such, the bonds cannot be considered to be an investment in Cyprus.

83. Finally, the Respondent argues that some Claimants may not have qualifying investments under the ICSID Convention and the relevant BITs as the deposits were held for a short term and were not long-term investments in Cyprus.[72]

### (6) Claimants that did not comply with the access requirements of the BITs must be excluded

84. According to the Respondent, only 21 Claimants complied with the mandatory notice and waiting periods in the relevant BITs and thus, the other Claimants should be dismissed from this proceeding.[73]

85. The Respondent argues that the six-month waiting period under Article 10(2) of the Cyprus-BLEU BIT[74] was not satisfied and that the Tribunal is therefore deprived of jurisdiction, as held by various tribunals.[75] According to the Respondent, the notice of dispute under the Cyprus-BLEU BIT was sent on 11 June 2015, and the Request for Arbitration which added the Luxembourg Claimant was filed on 18 November 2015, less

---

[70] Resp. Rep. Jur., para. 267.
[71] Resp. Mem. Jur., para. 492; Resp. Rep. Jur., paras. 268-269.
[72] Resp. Mem. Jur., para. 494.
[73] Resp. Mem. Jur., paras. 465-476.
[74] "In the absence of an amicable settlement by direct agreement between the parties to the dispute or by conciliation through diplomatic channels within six months from the receipt of the notification, the dispute shall be submitted to international arbitration…", C-0016.
[75] Resp. Mem. Jur., paras. 466-467.

than six months after the former was transmitted.[76] Accordingly, the Luxembourg Claimant failed to observe the waiting period required under the BIT.

86.  The Claimants submitted dispute notifications for 21 Claimants, which shows that "they understood that the waiting and cooling-off periods in the BITs were mandatory" and cannot be ignored.[77] This is consistent with the "the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose."[78]

87.  Since some Claimants listed in the Request for Arbitration were not identified in the Notice of Dispute, these Claimants must be excluded from this Tribunal's jurisdiction.[79] Not doing so, according to the Respondent, is contrary to the purpose of a proper notice of claim and the need for the State's consent to arbitration.[80]

   **(7) Nationals of Greece or Luxembourg are not entitled to bring claims for investments that belong to non-covered investors**

88.  The Respondent argues that the Tribunal lacks jurisdiction to hear claims of Claimants that are not nationals of Greece or Luxembourg. At least two Claimants did not appear to satisfy these requirements. While Claimant No. 221 is designated as Mr. Ioannis Leontiadis, the Respondent contends that the actual Claimant is a Liberian company, Seaworthy Bay Inc., with an ambiguous shareholdership and with Mr. Leontiadis being a mere director.[81] In any event, Mr. Leontiadis was only authorized to bring a claim on behalf of the Corporation relating to the Corporation's losses before the notice of dispute was sent and thus, at the material time, there was no established investment.[82] Further, according to the Respondent, the Claimants have not submitted any proof that Mr. Leontiadis was the holder of the bearer share certificate at the material time when the claim was initiated against the Respondent, or when the investments held by Seaworthy Bay Inc. were allegedly affected. Even if Mr. Leontiadis is considered to be the owner of

---

[76] Resp. Mem. Jur., para. 465.
[77] Resp. Rep. Jur., para. 234.
[78] VCLT, Art. 31(1), CL-0051; Resp. Rep. Jur., para. 235.
[79] Resp. Mem. Jur., paras. 469-476.
[80] Resp. Mem. Jur., paras. 472-475.
[81] Resp. Mem. Jur., para. 496; CD 221.1, Ioannis Leontiadis (Seaworthy Bay Inc.), Corporate Documents; CD 221.1, Ioannis Leontiadis (Seaworthy Bay Inc.), Proof of Nationality; CD 221.1, Ioannis Leontiadis (Seaworthy Bay Inc.).
[82] Resp. Mem. Jur., para. 496.

Seaworthy Bay Inc., the bonds are held by another U.K. entity and Mr. Leontiadis is at best an owner of indirect investments.[83]

89. The Respondent argues that Claimant No. 2, CNP Asfalistiki Ltd, also does not appear to be a Greek national, and that the Claimants have not tendered sufficient proof to establish that the nationality requirement has been satisfied.[84] In any event, the CNP Asfalistiki Ltd structure appears to be organized under the Cypriot laws.[85] The claims of Claimant No. 2 have been withdrawn but CNP Asfalistiki Ltd continues to be a Claimant.[86]

**(8) Greek legal entities controlled by Cypriot nationals are not entitled to bring claims**

90. The Respondent submits that this Tribunal lacks jurisdiction over the claims of Claimants No. 1 (CNP Asfalistikes Praktoriakes Ergasies S.A.) and No. 3 (CNP Zois S.A.) as they are Greek legal entities controlled by Cypriot nationals and thus, precluded from bringing their claims under the ICSID Convention and/or the Cyprus-Greece BIT.

91. The Respondent observes that Claimant No. 1 and Claimant No. 3 are wholly-owned by a Cypriot company and thus are nationals of Cyprus that cannot bring a dispute under Article 25(1) of the ICSID Convention. Doing so would go against the provision of "dispute settlement between States and foreign investors" as held by academics and various tribunals.[87]

**(9) The Cyprus-Greece BIT's fork-in-the-road clause precludes Claimants that brought the dispute to the Cypriot courts from resorting to arbitration**

92. The Respondent contends that Claimant No. 37 should not be permitted to resort to arbitration as the dispute has been submitted to Cypriot courts and is thereby precluded under Article 9(2) of the Cyprus-Greece BIT. The Respondent relies on the "Fundamental

---

[83] Resp. Rep. Jur., paras. 272-274.
[84] Resp. Mem. Jur., para. 497.
[85] *Ibid*. Tr., Day 1, p. 296.
[86] Cl. C-Mem. Jur., para 244; Cl. C-Mem. Jur., para. 244, footnote 207; Tr. Day 1, p. 294; Resp. Rep. Jur., para. 270; Tr. Day 2, p. 438.
[87] Resp. Mem. Jur., paras. 500-504.

Basis" test, set forward by the tribunal in *Pantechniki v. Albania* and subsequent tribunals[88], to ascertain whether the fork-in-the-road provision applies to Claimant No. 37.[89]

93. On the present facts, the Respondent notes that approximately 1,800 civil actions were brought before the Cypriot district courts against the Banks and Cypriot authorities relating to the deposits, and/or BOC/Laiki bonds. According to the Respondent, the claims brought by the Claimants in this proceeding relating to the alleged violation of BITs "would have the same 'fundamental basis' as the claim being made in the Cypriot courts by the Claimant as they "pursue ultimately the same purposes"[90] which is the recovery of money deposited or held in bonds.[91]

## IV.    THE CLAIMANTS' POSITION

94. The Claimants respond as follows to the Respondent's jurisdictional objections: (1) the BITs' arbitration provisions constitute valid bases for this Tribunal's jurisdiction as international law governs this Tribunal's jurisdiction and the BITs have not been terminated; (2) there has been no consolidation of claims under multiple BITs; (3) the multi-party claims are admissible and do not preclude this Tribunal's jurisdiction; (4) this

---

[88] *Pantechniki S.A. Contractors & Engineers (Greece) v. Republic of Albania*, ICSID Case No. ARB/07/21, Award, dated July 30, 2009, paras 61-62, CL-0111("*Pantechniki*"):

> [T]he relevant test is the one expressed by the America-Venezuela Mixed Commission in the Woodruff case (1903): whether or not "the fundamental basis of a claim" sought to be brought before the international forum is autonomous of claims to be heard elsewhere. . ... The key is to assess whether the same dispute has been submitted to both national and international fora.
> …
> The same facts can give rise to different legal claims. The similarity of prayers for relief does not necessarily bespeak an identity of causes of action. What I believe to be necessary is to determine whether claimed entitlements have the same normative source. But even this abstract statement may hardly be said to trace a bright line that would permit rapid decision. The frontiers between claimed entitlement are not always distinct. Each situation must be regarded with discernment.

*See also H&H Enterprises Investments, Inc. v. Arab Republic of Egypt (ICSID Case No. ARB/09/15)*, Excerpts of the Award, May 6, 2014, RL-0139; *Supervision y Control S.A. v. Republic of Costa Rica (ICSID Case No. ARB/12/4)*, Award, January 18, 2017 ("*Supervision*"), paras. 315, 318 and 330, RL-0138.
[89] Resp. Mem. Jur., para. 508.
[90] *Supervision*, para. 318.
[91] Resp. Mem. Jur., para. 516.

Tribunal has jurisdiction over "indirect" investments; (5) all Claimants made covered investments in Cyprus and satisfied the requirements of the Convention and the BITs; (6) the notice provisions of the BITs offer no basis for the tribunal to decline to exercise its jurisdiction; (7) all Claimants made qualifying investments in Cyprus; (8) legal entities that are incorporated and have their seat in Greece are eligible to bring claims, regardless of the nationality of their shareholders; and (9) the Claimants have not violated the fork-in-the-road provision.

**(1) The Intra-EU Law Objection: the BITs are in full force and effect and their arbitration provisions constitute valid bases for this Tribunal's jurisdiction**

95.   The Claimants refute the Respondent's arguments on the intra-EU law objection on the following grounds.

*(a) International law, not EU Law, governs this Tribunal's jurisdiction*

96.   This Tribunal's jurisdiction is derived from international law, not EU Law. The Claimants submit that the *Achmea* Ruling is not binding upon this Tribunal, relying on awards such as *Marfin*.[92] The application of the *Achmea* Ruling is limited as the CJEU only pronounced itself on whether investor-state arbitration under the BIT in that particular case was precluded by EU law. No findings were made regarding the general compatibility of intra-EU BITs with EU law and whether all intra-EU BITs are superseded by EU law.[93]

97.   The Claimants submit that there is no general conflict rule or clause establishing the supremacy of EU law. Even if there were, it would not be applicable here as the jurisdiction of the Tribunal is governed by the ICSID Convention and the BIT. Further, upon applying international law, there is no requirement of deference to EU law or the CJEU's case law, and Articles 267 and 344 of the TFEU and the CJEU's decisions do not bind this Tribunal.[94] This Tribunal's jurisdiction is derived from international law, and

---

[92] *Marfin Investment Group Holdings S.A., Alexandros Bakatselos and others v. Republic of Cyprus (ICSID Case No. ARB/13/27)*, Award, July 26, 2018, CL-0264 ("*Marfin*" or "*Marfin v. Cyprus*").
[93] Cl. Rej. Jur., paras. 62-63.
[94] Cl. C-Mem. Jur., para. 52.

specifically the arbitration agreements in the Cyprus-Greece and Cyprus-BLEU BITs.[95] Thus, EU law is irrelevant to jurisdiction.

98.  The Claimants submit that the *Achmea* Ruling did not terminate any BITs or make them inoperative.[96] *Achmea* merely held that the BIT in that case was "not compatible" with EU law, not that termination of the BIT is required upon mention of incompatibility.[97] Even if *Achmea* was construed as effectuating the termination of the BIT at hand, the decision is to be confined to its facts and the present proceedings can be distinguished from *Achmea*.[98] The *Achmea* Ruling has limited precedential effect as it is not an exposition of law applicable broadly to all types of intra-EU BITs.[99]

### (b) The BITs remain in full force

99.  First, the Claimants submit that the relevant BITs in this case remain in full force as they have not been terminated in accordance with their terms.[100] No notice of termination or any steps towards termination were taken by the Respondent.[101] However, even if the Respondent did terminate the BITs, the sunset clauses provide for a continued protection period for another 10 years, and thus, the BITs still remain in force at present.[102]

100. Second, the Claimants submit that the Joint Information Note of 2019 reaffirms their stance that the BITs are still in force. According to the Claimants, the January 2019 Declaration only seeks to commit Member States to make "best efforts" to terminate the intra-EU BITs by "no later than 6 December this year". [103] The Claimants also submit that

---

[95] Cl. C-Mem. Jur., para. 53.
[96] Cl. Rej. Jur., para. 63.
[97] Cl. C-Mem. Jur., para.70.
[98] Cl. C-Mem. Jur., paras. 71-73.
[99] Cl. C-Mem. Jur., paras. 74.
[100] Cl. C-Mem. Jur., paras. 64.
[101] Cl. C-Mem. Jur., paras. 65-68.
[102] Cyprus-BLEU BIT, Art. 13(1) provides: "This Agreement shall enter into force one month after the date of exchange of the instruments of ratification by the Contracting Parties. The Agreement shall remain in force for a period of ten years. Unless notice of termination is given by either Contracting Party at least six months before the expiry of its period of validity, this Agreement shall be tacitly extended for a further period of t[e]n years . . ."; Cyprus-Greece BIT, Art. 12(1)-(2) provides: "1. This agreement shall enter into force one month after the exchange of the instruments of ratification. It shall remain in force for a period of ten years. 2. Unless notice of termination has been given by either Contracting Party at least six months before the date of its expiration, this Agreement shall be thereafter tacitly renewed for ten-year periods."), C-0001; *See also* Cyprus-BLEU BIT, Art. 13(2); Cyprus-Greece BIT, Art 12(2).
[103] Tr., Day 1, pp. 247-249.

the Respondent has failed to provide any evidence that the BITs were superseded as a result of Cyprus' accession to the EU.

101. Third, the Claimants submit that the CJEU did not terminate any BITs through the *Achmea* Ruling as the CJEU only held that the BIT on the factual matrix in that case was "not compatible" with EU law.[104] Even if the *Achmea* Ruling is relied on for the incompatibility finding, the Tribunal should limit the CJEU's findings to the facts of that case and should not extend it to other intra-EU BITs.[105]

102. Fourth, the Claimants argue that the BITs have not been terminated pursuant to the Vienna Convention. In furtherance of this argument, the Claimants advance that Articles 59 and 30 of the VCLT are inapplicable as: (i) the EU Treaties do not have the same subject matter as the BITs; (ii) the Contracting Parties did not intend for the EU Treaties to supersede their BITs; and (iii) the BITs and EU Treaties are not incompatible. Accordingly, the Claimants argue that the BITs have not been terminated and remain in force.

103. As to the same subject matter, the Claimants dispute the legal standard for what constitutes the "same subject matter", arguing that it is a high threshold and that the "topic or substance" "must relate to the same legal relationship."[106] The Claimants rely on a string of investment treaty jurisprudence which has held that EU Treaties and investment treaties do not relate to the same subject-matter, including the *Marfin* award.[107] Further, the EU Treaties do not cover the full scope of the substantive protections in the intra-EU BITs,[108] *e.g.* with regard to fair and equitable treatment and expropriation.[109] Any alleged overlap between the capital transfer provisions in the BITs and EU law is irrelevant as no such capital transfer claim has been made.[110]

---

[104] Cl. C-Mem. Jur., paras. 69-70.
[105] Cl. C-Mem. Jur., paras. 71-73.
[106] *Eureko B.V. v. The Slovak Republic, UNCITRAL, PCA Case No. 2008-13*, Award on Jurisdiction, October 26, 2010, paras. 258-259, RL-0026.
[107] Cl. C-Mem. Jur., para. 83, footnote 54; *See also* para. 84; Cl. Rej. Jur., para. 71, footnote 29, paras. 74-82.
[108] Cl. C-Mem. Jur., para. 84.
[109] Cl. Rej. Jur., paras. 75-77.
[110] Cl. C-Mem. Jur., para. 85.

104. The Claimants argue that the Contracting Parties to the BITs did not intend for the EU Treaties to supersede their BITs. The Respondent has not discharged its burden of proof in this respect. A series of awards demonstrates the contrary.[111] Even if Parties to this proceeding have evinced their interpretation of how similar subject-matters are to be approached, Article 8 of the Cyprus-BLEU BIT and Article 10 of the Cyprus-Greece BIT evinces that subsequent treaty provisions would coexist, and not supersede, earlier treaties.[112] The Respondent's actions indicate that they themselves intended to give full effect to the existing BITs and did not consider them superseded.[113]

105. Finally, the Claimants submit that the BITs are not so incompatible with the EU Treaties such that they cannot be applied in full under Articles 59(1)(b) and Article 30(3) of the VCLT, even if the "same subject matter" exists. The Claimants dispute the standard required under Article 59 of the VCLT, pointing out that "it must be *impossible* to reconcile two treaties in their application."[114] The *Electrabel* award does not support the Respondent's position, as it affirmed that the substantive protections in Part III of the ECT and the TFEU are different, with the result that the treaties do not share the same subject-matter.[115]

106. Relying of Article 8 of the Cyprus-BLEU BIT and Article 10 of the Cyprus-Greece BIT, the Claimants contend that the BITs themselves provide for conflict resolution mechanisms, where the provision most favourable to foreign investors prevail. The Claimants argue that the protection of EU Member State investors under the BITs is not irreconcilable with the non-discrimination principle in Article 18 of the TFEU, as remedies such as granting others a similarly favorable position, or the ability for states to claim their rights akin to those protected under BITs, are available.[116] Further, the BITs' arbitration provisions are also not irreconcilable with the exclusive jurisdiction over the

---

[111] Cl. C-Mem. Jur., paras. 88-90.
[112] Cl. C-Mem. Jur., paras. 93-94.
[113] Cl. C-Mem. Jur., paras. 95-96.
[114] Cl. C-Mem. Jur., paras. 97-98.
[115] Cl. Rej. Jur., para. 109. *Electrabel*, paras. 4.175-4.176, CL-0085.
[116] Cl. C-Mem. Jur., para. 99.

EU provided for in Articles 267 and 344 of the TFEU as this Tribunal need not pronounce on any EU law issue in order to make a decision on the BIT violations.[117]

107. Finally, the Claimants also dispute the Respondent's characterization of the BIT violations involving legislative acts and regulatory measures made relating to the "Troika" and Eurogroup's bail-in conditions, and the purported conflict with the TFEU's capital transfer provisions. The Claimants contest the relevance of the Troika to the EU law objections, whether the bail-in conditions were attributable to the Troika, and the timing of the BRRD in order to rebut the relevance of the capital transfer provisions.[118]

108. Even if EU law is to be interpreted and applied in this proceeding, the Claimants argue that that does not render the treaties irreconcilable as a matter of international law. This is because this Tribunal is not bound by the "autonomy of the EU legal system" or the reasoning on Article 344 as pronounced in *Achmea*.[119]

109. The Claimants maintain that no arbitral tribunal applying public international law rules has found that there is incompatibility between intra-EU BITs and the EU Treaties within the confines of Articles 59 and 30 of the VCLT.[120] Hence, the Claimants submit that the BITs and EU Treaties are not incapable of simultaneous application.

110. Even if Article 351 TFEU were to apply to intra-EU BITs, it would – at most – trigger a requirement that EU Member States terminate the BITs to "eliminate the incompatibilities" between the BITs and EU Law.[121]

**(2) Claimants' multi-party claims are admissible and do not preclude jurisdiction**

111. The Claimants submitted at the Hearing that there are 969 Claimants with 617 separate claims.[122] The change in the number of claimants during the proceeding is due to their

---

[117] Cl. C-Mem. Jur., para.100.
[118] Cl. C-Mem. Jur., paras. 101-104.
[119] Cl. C-Mem. Jur., paras. 105-107. *PL Holdings S.à.r.l. v. Republic of Poland, SCC Arbitration No. V 2014/163, Partial Award*, June 24, 2017, CL-0113.
[120] Cl. Rej. Jur., paras. 108-111; *See also* Cl. C-Mem. Jur., paras. 108-112.
[121] Cl. Rej. Jur., para. 117.
[122] Tr., Day 1, p. 178. The correct number of Claimants according to Claimants' Annex A (revised, version 2) is 956, *see supra* para. 2.

aging population, which has resulted in the passing away of 11 claimants since the registration of case.[123]

112. The Claimants maintain that that the ICSID Convention and the BITs do not require a respondent to separately and expressly consent to a multi-party proceeding.

113. The Claimants mainly rely on the *Alemanni* and *Ambiente* awards which do not preclude a plurality of claimants.[124] They agree with the jurisdictional test in *Alemanni* and *Funnekotter*: jurisdiction will exist where the claimants have (i) proper nationality under the treaty; (ii) the subject-matter arises "directly out of an investment by the claimants in the territory of the Respondent" and (iii) claims were brought for conduct that occurred after the relevant BIT came into force.[125]

114. Relying on a series of ICSID awards, the Claimants contend that no tribunal has required a separate and express consent by the Respondent State to commence an arbitration instituted by multiple claimants.[126] The *Abaclat* award should be followed on how consent to multi-party proceeding with multiple claims should be treated.[127] In any event, the Respondent has, in fact, consented to this multi-party proceeding as (i) the BITs can be interpreted to protect mass investments, such as bonds and deposits; (ii) the Respondent decided to fuel its economic development through its banking sector to attract investments, which inevitably involved smaller investments from numerous foreigners; (iii) the Respondent decided not to include a minimum claim threshold in the BITs; and (iv) the Respondent consented to multi-party proceeding in the same Cyprus-Greece BIT that was in issue in *Marfin v. Cyprus*.[128]

---

[123] Annex A (revised, version 2) to Cl. Rej. Jur. indicates that there are 11 deacesed claimants, not 12 as stated by the Claimants at the Hearing; Tr, Day 1, p. 179.[124] Cl. C-Mem. Jur., paras. 117-120. *See also Alemanni* and *Ambiente*.
[124] Cl. C-Mem. Jur., paras. 117-120. *See also Alemanni* and *Ambiente*.
[125] *See also* Cl. C-Mem. Jur., paras. 127-128; *Bernardus Henricus Funnekotter and others v. Republic of Zimbabwe (ICSID Case No. ARB/05/6)*, Award, April 22, 2009, para. 95, CL-0182 ("*Funnekotter*").
[126] Cl. C-Mem. Jur., paras. 123-127.
[127] Cl. Rej. Jur., paras. 135-138.
[128] Cl. Rej. Jur. at paras. 140-147.

115. Permitting this proceeding as a single dispute would also be consistent with the object and purpose of the ICSID Convention to provide a basis for investors to enforce their rights.[129] Neither the ICSID Convention nor the BITs limit arbitration to two-party disputes.[130]

116. The Claimants submit that their claims are admissible if they are "sufficiently homogenous"[131], or if "the necessary link among them exists in terms of the treaty claim they jointly submit in the present arbitration,"[132] as decided in *Abaclat* and *Ambiente*. In this case, the Claimants' claims are sufficiently linked and homogeneous:[133] (i) the relief sought is similar as all Claimants seek full reparation from the Respondent; (ii) the losses suffered by Claimants are all sufficiently similar as all individuals lost investments that were placed in bonds or deposits at the Cypriot banks; (iii) the claims are based on the Respondent's conduct pertaining to the 2013 bail-in measures which affected Laiki and the Bank of Cyprus; and (iv) all of the claims are based on the same BIT provisions (in both BITs relied upon) – protection against uncompensated expropriation and the right to fair and equitable treatment.[134]

117. The claims also constitute a 'single dispute' under the *Alemanni* decision, as supported by their factual similarity. As held in *Abaclat*, "the specific circumstances surrounding individual purchases by Claimants of security entitlements are irrelevant."[135] Even if the difference of investment target made any difference, there can be groupings made of the claimants either by the Bank they invested in (Bank of Cyprus or Laiki), the amount of damages they claim (52% claim EUR100,000 and above) or the date they made their investment (97.6% made their investment prior to November 29, 2012).[136]

118. The Claimants submit that this multi-party proceeding is manageable and can be conducted in a manner consistent with the ICSID Convention and the Arbitration Rules. According to the Claimants, if the arbitration was limited to a single dispute between two

---

[129] Cl. C-Mem. Jur., paras. 129-132.
[130] Cl. C-Mem. Jur., paras. 133-135.
[131] *Abaclat*, para. 540.
[132] *Ambiente*, para. 161.
[133] Cl. C-Mem. Jur., paras. 136-151.
[134] Cl. C-Mem. Jur., paras. 138-150.
[135] *Abaclat*, para. 542.
[136] Cl. Rej. Jur., para. 132.

parties, it would lead to absurd consequences.[137] It would in fact "equal a denial of justice," as held in *Abaclat*.[138] Moreover, individual proceedings would be hugely inefficient, cost-prohibitive and unmanageable within the ICSID system.[139] It is more efficient for the Claimants to proceed together. For example, with regard to document production, it would avoid several hundred-fold identical productions by the Respondent, which would need to be repeated in each individual proceeding.[140] As regards a potential award of costs in favor of the Respondent, the Claimants state that the Respondent's prospect of recovering costs from the Claimants would be higher, and the costs of the proceeding would be lower.

### (3) There has been no consolidation of claims under multiple BITs

119. The Claimants argue that this proceeding is not a consolidation of separate proceedings but instead a single multiparty proceeding. This characterization is supported by the *Ambiente* decision which distinguished between a single multiparty proceeding and a consolidation of separate proceedings.[141] The tribunal in that case stated:

> Having concluded that the present dispute constitutes a multi-party proceeding, a further conceptual clarification is in place: A multi-party proceeding can be the result of the initial submission of a certain number of separate individual arbitrations which are subsequently consolidated and joined with each other. There can be no doubt that such an ex post joinder or consolidation of proceedings is subject to a specific consent of the Parties. . . .

> The present dispute is not a case of consolidation of proceedings, however, but the original submission of a claim by a plurality of Claimants in one single ICSID proceeding. This appears to be conceded by the Respondent itself when it states in relation to the *Abaclat* case – which is analogous in this regard to the present dispute – that there "the claims were not filed on a separate basis and later aggregated, but were filed on an aggregate basis from the beginning, and may not be treated as individual claims.[142]

---

[137] Cl. C-Mem. Jur., para. 121.
[138] Cl. Rej. Jur., para. 183.
[139] Cl. Rej Jur., para. 126.
[140] Cl. Rej. Jur., para. 185.
[141] Cl. Rej. Jur., para. 210.
[142] *Ambiente*, paras. 123-124.

120. The Claimants rely on a series of other ICSID decisions to argue that a single multi-party claim does not require "specific or additional consent."[143] Moreover, it is common for multiple claimants to initiate one arbitration under multiple BITs under the ICSID regime.[144] The *A v. B* case relied on by the Respondent is irrelevant as it is not an ICSID case.

**(4) This Tribunal has jurisdiction over "indirect" investments**

121. The Claimants submit that sufficient information has been provided as to their qualifying "indirect" investments, and that these are protected also under the Cyprus-Greece BIT. The broad construction of Article 1.1 of that BIT[145] extends to "indirect" investments.[146] Not only is this interpretation supported by the plain meaning of Article 1.1, but it also comports with the object and purpose of the Cyprus-Greece BIT.[147]

122. The Claimants argue that the *Poštová* award is an outlier and erroneous[148] and further critique the *Berschader* award, pointing instead to other lines of investor-state jurisprudence which extend the scope of investment to indirect investments even if not expressly stipulated in the definition.[149] Even if *Poštová* is followed, the present facts are

---

[143] Cl. Rej. Jur., para. 211; See *Flughafen Zürich A.G. and Gestión e Ingeniería IDC S.A. v. Bolivarian Republic of Venezuela (ICSID Case No. ARB/10/19)*, Award, November 18, 2014, paras. 399-400, CL-0256 ("In reality, there is no consolidation of any kind; what has been produced is a joint claim brought by two Claimants, who had constituted a Consortium in Venezuela, and who claim that the same set of facts, attributable to Venezuela, has caused damage to their investment. The two Claimants agreed to act jointly in this arbitration . . . The consolidation in international arbitration consists of unifying in a single arbitration two or more proceedings initiated separately. In this arbitration from the beginning there was only one dispute that two Claimants filed against one Respondent - we are facing a multiplicity of plaintiffs, not a consolidation of proceedings.").

[144] Cl. Rej. Jur., para. 212.

[145] "'Investment' means every kind of asset and in particular, though not exclusively, includes [etc.]", C-0001.

[146] Cl. C-Mem. Jur., para. 173.

[147] Cl. C-Mem. Jur., paras. 175-179, 183.

[148] Cl. C-Mem. Jur., paras. 185-196.

[149] Cl. C-Mem. Jur., paras. 175-178; Cl. Rej. Jur., para. 193; *See Tza Yap Shum v. Republic of Peru (ICSID Case No. ARB/07/6)*, Decision on Jurisdiction (Spanish), June 19, 2009, para. 101, CL-0229. *Ioannis Kardassopoulos v. Georgia (ICSID Case No. ARB/05/18)* ("*Kardassopoulos*") was equally clear on this point. After noting the lack of express wording on whether an indirectly held asset was an "investment," it quoted the tribunal in *Siemens* and held that: "the indirect ownership of shares by Claimant constitutes an 'investment' under the BIT and the ECT." *See Kardassopoulos*, Decision on Jurisdiction, July 6, 2007, para. 124, CL-0201.

distinguished on the basis that "the Greek Claimants who own indirect investments in Cyprus clearly had a right to the assets held by their investment vehicles."[150]

123. Further, the Claimants argue that there is no basis to the Respondent's specific allegations with regard to a small number of Claimants who hold "indirect" investments. Mr. Leontiadis owned Seaworthy Bay Inc. well before the dispute arose.[151] Mr. Melas also owned his Cypriot and Liberian holding companies before the dispute arose.[152] With regard to Mr. Kopsidas and Mr. Sarioglou, their investments are protected under the Cyprus-Greece BIT even though they were owned through "beneficial interests" in intermediary companies.[153] Jurisdiction is not precluded when claimants who are shareholders own investments through a corporate chain, including multiple intermediary companies, even when the companies are incorporated in third states.[154] Finally, there is no distinction between investments acquired through a majority or minority interest in a holding vehicle. Therefore, the investments owned by Messrs. Konstantinou and Chrissovelonis, who own minority shares in companies registered in Cyprus, which in turn hold assets in Bank of Cyprus and Laiki, are also covered by the Cyprus-Greece BIT.[155]

### (5) All Claimants made qualifying investments in Cyprus

124. The Claimants argue that all bonds and deposit accounts that the Respondent expropriated are covered investments under both the ICSID Convention and the BITs.

125. The bonds and deposits fall within the definitional scope of 'investment' expressly listed within the relevant BITs.[156] The Claimants argue that the *Salini* test is not relevant in this case and that the Tribunal should primarily look to the BITs scope.[157] However, even if

---

[150] Cl. Rej. Jur., para. 198.
[151] Cl. Rej. Jur., para. 202.
[152] Cl. Rej. Jur., para. 203.
[153] Cl. Rej. Jur., para. 204, referring to *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador (ICSID Case No. ARB/06/11)*, Decision on Annulment, November 2, 2015, para. 259, CL-0269.
[154] Cl. Rej. Jur., paras. 206-209, referring to *Yury Bogdanov v. Moldova, SCC Arbitration No. V114/2009*, Final Arbitral Award, March 30, 2010, para. 67, CL-0231.
[155] Cl. Rej. Jur., para. 208.
[156] Cl. C-Mem. Jur., paras. 224-225.
[157] Cl. C-Mem. Jur., para. 226.

the *Salini* factors were to apply, the Claimants argue that the test would have been satisfied. In applying the test, the Tribunal should assess the factors holistically, as opposed to cumulatively. With regard to: (i) substantial commitment: the Claimants' bond value and deposits were of substantial value, ranging from €100,000 to €50 million[158]; (ii) duration: while duration is one factor that is to be considered holistically, the investments individually do amount to a significant duration as the bonds issued under Laiki's Programme had ten year terms, and other Claimants held deposits for a significant period of time; (iii) regularity of profit or return: the Claimants' investments were for the purpose of deriving a profit or return on the investment to contribute to the Cyprus banking and financial sector; (iv) assumption of risk: the Claimants' investments had significant operational risk due to the bank's ability to pay interest; (v) contribution to development of Cyprus: assuming that this element is a relevant factor in the *Salini* test, the Claimants advance that their investments were part of Cyprus' policy to attract investments to boost its position as an international center of finance.[159]

126. The Claimants argue that the investments, including those comprising of life insurance contracts and bonds with ISIN Nos. XS0427466817 and XS0449357754, were made in Cyprus. This was the location where the benefits flowed, which is the relevant factor pursuant to the *Ambiente* award.[160] Specifically, *Ambiente* held that "in order to identify in which State's territory an investment was made, one has to determine the first State which benefits from this investment."

127. The Claimants submit that the bonds underlying the Life Insurance Contracts are covered investments as the indirect claims for the losses flowing from the Laiki bonds fall under the BITs' broad definition of "investment."[161] Additionally, the bonds underlying the life insurance contract holders' investments have a territorial nexus with Cyprus and the associated losses were a result of the bail-in, further connecting the investments to Cyprus.[162]

---

[158] Cl. C-Mem. Jur., para. 228; Cl. Mem. Merits, para. 208.
[159] Cl. C-Mem. Jur., paras. 227-234.
[160] Cl. C-Mem. Jur., para. 237; *Ambiente*, para. 499; *See also* CL-0053.
[161] Cl. C-Mem. Jur., para. 239.
[162] Cl. C-Mem. Jur., para. 240.

128. Further, the bonds with ISIN Nos. XS0427466817 and XS0449357754 were investments in Cyprus. Even though the bonds were issued by an English company, governed by English law and were subject to the purview of English courts, a Cypriot company and in turn the Cypriot banking and financial sector was the beneficiary of the investment, and the purchasers of the bonds were cognizant of the transaction and risks associated with the investment.[163]

**(6) The notice provisions of the BITs offer no basis for the Tribunal to decline to exercise its jurisdiction**

129. The Claimants submit that the notice provisions in the applicable BITs were complied with through the multiple notices sent to the Respondent over a 16-month period detailing the proposed claims.[164] No response was received by the Respondent. As such, the Claimants cited the futility exception in reserving their right to submit the dispute to international arbitration prior to the expiry of the cooling-off period.[165] Further, the Claimants contend the legal basis of the Respondent's argument that any claimants that were not identified six months in advance of the filing of arbitration proceedings do not have jurisdiction.[166]

130. Additionally, the Claimants contend that notice/resolution provisions are non-jurisdictional in nature, relying on a series of arbitral awards such as *Biwater v. Tanzania*, *Bayindir v. Pakistan*, and *Société Générale v. Pakistan*.[167] Further, relying on a series of arbitral awards and academic commentaries, the Claimants argue that if settlement is

---

[163] Cl. C-Mem. Jur., paras. 241-243.
[164] Cl. C-Mem. Jur., paras. 194-198.
[165] Cl. C-Mem. Jur., para. 198 (citing Letter from S. Fietta and G. Jarvis to H.E. President N. Anastasiades et al., October 20, 2015, p. 2, C-0127); Cl. Rej. Jur. paras. 219, 224.
[166] Cl. Rej. Jur., para. 220.
[167] Cl. C-Mem. Jur., paras. 204-206; Cl. Rej. Jur., para. 221; *See Biwater Gauff (Tanzania) Ltd. v. Tanzania (ICSID Case No. ARB/05/22)*, Award, July 24, 2008, CL-0066; *Bayindir Insaat Turzim Ticaret Ve Sanayi A.S. v. Pakistan (ICSID Case No. ARB/03/29)*, Decision on Jurisdiction, November 14, 2005, CL-0063; *Société Générale de Surveillance S.A. v. Pakistan (ICSID Case No. ARB/01/13)*, Decision on Objections to Jurisdiction, , August 6, 2003, CL-0226.

deemed to be futile, failure to comply with the notice/resolution provision does not impede jurisdiction.[168]

**(7) Claimants are pursuing claims only on behalf of Greek or Luxembourg citizens**

131. The Claimants submit that Claimant No. 221, Mr. Leontiadis, is a proper Claimant in this proceeding. The Claimants argue that Mr. Leontiadis is the bearer of the sole share certificate in the amount of all 500 shares issued to him on November 4, 1991 till date.[169]

132. Further, Mr. Leontiadis' claim did not create any prejudice to the Respondent as his designation as a potential Claimant was sent to the Respondent in July 2014 and Mr. Leontiadis was granted sufficient corporate authorization which was effective upon the commencement of proceedings.[170]

**(8) Legal entities that are incorporated and have their seat in Greece are eligible to bring claims, regardless of the nationality of their shareholders**

133. The Claimants argue that the Respondent is factually and legally incorrect in asserting that the Tribunal lacks jurisdiction over Claimant No. 1, CNP Asfalistikes or Asfalistikes, and Claimant No. 3, CNP Zois or Zois (collectively "CNP Greece Entities").

134. There are insufficient facts to prove that the CNP Greece Entities are controlled by a Cypriot entity. While the Claimants acknowledge that a Cypriot entity holds the shares of the CNP Greece Entities which are also registered with the Greek Government, the CNP Greece Entities are in fact controlled by a French entity and not a Cypriot entity.[171]

135. The place of incorporation is determinative of corporate nationality under Article 25(2)(b) of the ICSID Convention.[172] Thus, CNP Greece Entities are proper Claimants in this proceeding, as they are incorporated in Greece. The Tribunal should not pierce the

---

[168] Cl. C-Mem. Jur., paras. 207-210; Cl. Rej. Jur., para. 222.
[169] CD-221.1, pp. 1-6 (Seaworthy Bay Inc. Certificate of Incorporation); CD-221.1, p. 7 (copy of bearer share certificate); Witness Statement of Ioannis Leontiadis, para. 4; Cl. C-Mem. Jur., paras. 245-246; Cl. Rej. Jur., para. 260.
[170] Cl. C-Mem. Jur., para. 247.
[171] Cl. C-Mem. Jur., para. 249.
[172] Cl. C-Mem. Jur., paras. 250-255.

corporate veil of the CNP Greece Entities, but rather follow the majority award in *Tokios Tokeles*, which relied on the BIT's definition of "investor" to determine whether a controlling entity is indicative of the claimant's nationality.[173]

**(9) Claimants do not violate the fork-in-the-road provision**

136. The Claimants agree that Article 9(2) of the Cyprus-Greece BIT is a fork-in-the-road provision but dispute the applicable test for the preclusion of claims and the basis upon which it is triggered. The Claimants submit that the prevailing test is the "Triple Identity" test, as established by a series of arbitral tribunals.[174] Under this test, a claim is precluded under the provision if: (i) the dispute is between the same parties, (ii) the same object is at stake and (iii) the dispute arises under the same claim.[175] The Claimants also submit that the purpose of the fork-in-the-road clause is to "prevent parallel proceedings concerning the same investment dispute from being conducted in different fora"[176] as opposed to limiting all claims.[177]

137. While the Claimants dispute the applicability of the "Fundamental Basis" test proposed by the Respondent, even if the test were to apply a claim is not precluded simply because of the similarity of facts or prayers of relief underlying the action.[178]

138. Finally, the Claimants also submit that any information related to commenced or ongoing proceedings before Cyprus courts would be publicly available for the Respondent's perusal.[179] In any event, the Claimants argue that the Respondent cannot shift its burden of proof onto the Claimants and the document requests that the Respondent has made are irrelevant.[180]

---

[173] Cl. C-Mem. Jur., paras. 259, 262-263. *Tokios Tokeles v. Ukraine (ICSID Case No. ARB/02/18),* Award, July 26, 2007, RL-0132.
[174] Cl. C-Mem. Jur., paras. 264-265.
[175] *Toto Costruzioni Generali S.p.A. v. Lebanese Republic (ICSID Case No. ARB/07/12)*, Decision on Jurisdiction, September 11, 2009, para. 211, CL-0137.
[176] *Pantechniki,* para. 62.
[177] Cl. C-Mem. Jur., para. 267.
[178] Cl. C-Mem. Jur., para. 270.
[179] Cl. Rej. Jur., para. 267.
[180] Cl. Rej. Jur., para. 269.

## V.    THE EUROPEAN COMMISSION'S POSITION

139. The Commission focused its non-disputing party submission on the relevance of the *Achmea* Ruling; the law applicable to the decision on jurisdiction; the primacy of EU law as a special applicable conflict rule and; in the alternative, the application of the conflict rules in the VCLT. Its submission corresponds in large part to the Respondent's jurisdictional objection on the intra-EU law objection. The EC's overarching position is that this Tribunal lacks jurisdiction to hear the case, because there is a lack of consent or, at the very least, no valid consent to arbitration.

140. The EC's position is that the *Achmea* Ruling is applicable to and binding on all intra-EU BITs, regardless of whether the case is an ICSID Convention case or whether the BIT provides for a sunset or grandfathering clause.[181] The EC reaffirmed the *Achmea* Ruling as standing for the proposition that investor-state arbitration clauses in intra—EU BITs are inapplicable and any tribunal established on the basis of those clauses would lack jurisdiction.[182] Further, the EC highlights the CJEU's declaration that EU law precludes a dispute settlement mechanism for it falls outside Article 19 TEU.[183] Furthermore, the EC contends that, as an inevitable result of this Tribunal interpreting the BITs which include a choice of law clause, this Tribunal will have to apply and interpret EU law.[184]

141. The EC also contends that the judgment in *Achmea* applies *ex tunc*, and that the conflict between the BITs and EU law existed since May 1, 2004, *i.e.* the date of the Respondent's accession to the EU.[185] As such, consent to arbitrate was lacking *ab initio*, and the mere filing of the request for arbitration did not constitute a valid offer for arbitration from the Respondent.[186]

142. Furthermore, the EC argued that the sunset, or grandfathering, clauses in the BITs are not triggered because they would only regulate the legal consequence of unilateral termination of the BIT by one contracting party, whereas the Treaty of Accession of Cyprus to the EU

---

[181] EC Application, paras. 5-8.
[182] EC Application, para. 8; *See also* the Commission Communication of July 19, 2018, p.3.
[183] EC Application, para. 8.
[184] EC Application, para. 9.
[185] EC Application, para. 12.
[186] EC Application, paras. 12-13.

was a plurilateral international agreement; accordingly, the consensual agreement between the same parties on new rules is not within the purview of the sunset clause.[187] Additionally, even if the sunset clause were to be triggered, it would be inapplicable as it constitutes a breach of EU Law.

143. If the above reasons are not accepted by the Tribunal, the EC argues that the Tribunal still has to decline jurisdiction as the BITs have been terminated, pursuant to Articles 30(3) and 59 of the VCLT.[188] The EC contends that the conditions for the application of Article 59 VCLT are satisfied and that the Tribunal should conclude that the BITs have been implicitly terminated after the Respondent acceded to the EU on 1 May 2004. As such, this Tribunal has no jurisdiction as there was no valid offer to arbitrate.[189]

144. The EC also argues that the Parties to the BITs intended that investment protection be governed by EU Law as per Article 59(1)(a) of the VCLT. This is on the basis that EU law applies wholly from a new Member State's accession to the EU such that EU law takes primacy and the protection of intra-EU investments would be governed as such.[190]

145. Additionally, the EC submits that the EU law provisions are so incompatible with the BIT provisions such that they are incapable of being applied simultaneously, on grounds of inequality between EU Member States and discrimination.[191]

146. Further, the EC argues that the test for deciding whether two treaties relate to the same subject matter is met in the present case as both the intra-EU BIT and EU law govern the EU Member State's treatment of the investment.[192]

147. There is no need to respect the formal requirements pursuant to Articles 65 *et seq.* VCLT, as Article 59 VCLT dealing with implied termination has been satisfied.[193] If the Tribunal

---

[187] EC Application, paras. 14.
[188] EC Application, paras. 16-17.
[189] EC Application, paras. 16-17.
[190] EC Application, paras. 19-20.
[191] EC Application, paras. 21.
[192] EC Application, paras. 23-26.
[193] EC Application, para. 27.

were to disagree that the BITs have been terminated pursuant to Article 59 VCLT, EU law prevails under all conflict rules over the BITs.[194]

148. First, the law applicable to the decision on jurisdiction is the law of the host State, Cypriot law, which includes EU law, making EU law have precedence over the BITs.[195] The EC cites a string of case law and arbitral awards in support of this approach.[196] Second, in applying the domestic law of Cyprus, the EC argues that there is no consent provided as there is no valid offer for arbitration, that being the legal consequence of the conflict between the BIT and the EU law. Third, the EC construes the primacy of EU law on the basis of Declaration 17 to the Treaty of Lisbon and Article 351(1) of the TFEU as a relevant conflict rule of international law.[197] In support of this argument, the EC relies on jurisprudence such as *Electrabel v Hungary* and academic opinions.[198] Further, the EC contends that the BITs' offer for arbitration and the application of the sunset clauses are precluded by EU Law.[199] Fourth, an application of Article 30 VCLT results in the conclusion that EU law prevails over the arbitration clause in the BITs.[200] The BIT, and the EU Treaties and the Accession Treaty are successive treaties between the same Contracting Parties and relating to the same subject matter under Article 30(3) of the VCLT. According to the EU, International Law Commission confirms that if two treaties collide, they necessarily relate to the "*same subject matter*".[201] This is determined by whether the fulfilment of an obligation under one treaty affects the fulfilment of an obligation under another treaty.

---

[194] EC Application, para. 28.
[195] EC Application, paras. 29-34.
[196] *See* e.g. *Zhinvali v Georgia (ICSID Case No. ARB/00/1),* Award, January 24, 2003, paras. 296-301, quote at para. 297 at the end, attached as Annex EC-17; German Federal Supreme Court, Decision of October 31, 2018, reference 1 ZB 2/15, ECLI:DE:BGH:2018:311018BIZ2.15.0, attached as Annex EC-04, paras. 15-18; *JSW v Czech Republic (PCA Case No. 2014-03),* Final Award, dated October 11, 2017, paras. 170-178, attached as Annex EC-18; *Pantechniki*, para. 62.
[197] EC Application, paras. 37-40.
[198] EC Application, paras. 41-42.
[199] EC Application, paras. 44-45.
[200] EC Application, paras. 47-53.
[201] EC Application, para. 49.

149. Finally, the EC submits that any award in favour of the Claimants would face annulment and could not be enforced pursuant to its Communication "Protection of intra-EU investment."[202]

## VI.    THE TRIBUNAL'S ANALYSIS

### (1) The Intra-EU BIT Objection

150. The Respondent argues that the Tribunal has no jurisdiction in a dispute arising under a BIT between two EU member states on three broad grounds:

    i.    The CJEU has ruled that Article 267 and 344 of the TFEU preclude a provision in a bilateral investment treaty between two EU states allowing for claims to be brought by the nationals of a member state against another member state.

    ii.    In accordance with Articles 59 and 30 of the VCLT, the later treaty, the TFEU, takes priority over the earlier BITs, including the Cyprus-Greece BIT and the Cyprus-BLEU BIT.

    iii.    BITs between two EU states are incompatible with the EU Treaties.

151. Although expressed in terms of three separate heads, the Respondent's arguments essentially fall into two categories – arguments relating to the effect of EU law on the jurisdiction of the Tribunal and arguments relating to the application of principles of international law on the jurisdiction of the Tribunal. The question is whether on either basis the Respondent's claim that the Tribunal has no jurisdiction can be upheld.

*(a) The Respondent's argument on the basis of EU law*

152. The Respondent argues that under EU law a provision in a bilateral investment treaty between two EU member states allowing the investors of one state to sue the other state can have no validity. EU law in this regard, it says, is set out in the decision of the CJEU in *Achmea* where the Court ruled that:

---

[202] EC Application, paras. 54-55.

> Articles 267 and 344 TFEU must be interpreted as precluding a provision
> in an international agreement concluded between Member States, such as
> Article 8 of the Agreement on encouragement and reciprocal protection of
> investments between the Kingdom of the Netherlands and the Czech and
> Slovak Federative Republic, under which an investor from one of those
> Member States may, in the event of a dispute concerning investments in the
> other Member State, bring proceedings against the latter Member State
> before an arbitral tribunal whose jurisdiction that Member State has
> undertaken to accept.[203]

153. The core of the reasoning of the CJEU is that since an arbitral tribunal would have the power to engage in interpretations of EU law, but is not a domestic court or tribunal of an EU member state and thus cannot request preliminary opinions on EU law from the CJEU, the existence of such a tribunal is inconsistent with Article 344 of the TFEU which grants the CJEU the sole authority to interpret EU law. The Respondent argues that the conclusion reached by the CJEU is the same as would be reached by the application of principles of international law relating to successive treaties, and claims that the Declarations of the EU member states[204] and the Joint Information Note[205] issued by the Hellenic Republic and Cyprus in January 2019 constitute subsequent practice of the parties relevant to the interpretation of the BITs.

154. The Respondent also relies on a broader argument about the incompatibility of an investment agreement between EU member states and the regime set up under the EU Treaties. The investment protection provisions of a BIT, it argues, have been replaced by provisions on investment in EU law.[206] More specifically, if an EU member state grants rights to the nationals of another EU member state without granting such a right to the nationals of all EU member states this is a violation of the principle of non-discrimination that lies at the heart of a customs union such as the EU.

155. The Claimants respond by arguing that while the CJEU has the authority to determine what is applicable under EU law, the jurisdiction of this Tribunal is not derived from EU

---

[203] *Achmea* Ruling, para. 31.
[204] See Annex EC-02.
[205] See RL-0206.
[206] Resp. Mem. Jur., para. 316.

law but from international law. The effect of the CJEU decision in *Achmea* was not to terminate the BITs applicable in this case, which remain fully in force until terminated by the Contracting Parties. Nor, the Claimants argue, did the subsequent Declarations and Joint Information Note operate to terminate the BITs.[207]

156. The Tribunal notes that the law to be applied in determining its jurisdiction is that derived from the BITs and Article 25 of the ICSID Convention, under which the Tribunal is established. There are two bases under which EU law becomes potentially relevant. First, under the terms of the Cyprus-BLEU BIT the Tribunal is to decide on the basis of, inter alia, national law including the conflict of laws rules of the state in which the investment was made. The national law of EU member states will incorporate provisions of EU law. Second, EU law is international law and thus can be applied by the Tribunal as part of its mandate to apply the principles of international law in resolving this dispute.

157. With respect to the first basis for considering EU law, the Tribunal does not see the fact that the domestic law of the parties may be based on EU law to be relevant to the determination of its jurisdiction. The jurisdiction of a tribunal established under international agreements has to be determined by international law and although the domestic law of the parties may be relevant for determining certain matters, such as whether a claimant is in fact a national of one of the parties to the BIT, it is not a basis for determining whether a tribunal has jurisdiction over the dispute. As the tribunal in *CSOB v. Slovakia*[208] pointed out,

> The question whether the parties have effectively expressed their consent to ICSID jurisdiction is not be be answered by reference to national law. It is governed by international law as set out in Article 25(1) of the ICSID Convention.

158. Indeed, it would undermine the whole purpose of establishing an international investment regime if ultimately jurisdiction could be defeated by provisions of the domestic law of one or both of the parties. In any event, the parties in the present case did not contend that

---

[207] *Supra*, paras 99-100.
[208] *Československa obchodní banka, a.s. v. Slovak Republic (ICSID Case No. ARB/97/4)*, Decision on Jurisdiction, May 24, 1999 ("*CSOB v. Slovakia*"), para. 35.

jurisdiction should be determined on the basis of the domestic law of the parties to the BITs.

159. More relevant is to consider EU law as international law. As the Respondent points out, EU law is derived from the EU Treaties and thus EU law is international law. The proposition is unassailable; the question is, what follows from it? The Respondent would have the Tribunal treat the ruling in *Achmea* as a determination of the international law position of the rights and obligations of EU member states. Thus, a determination by the appropriate EU organ, the CJEU, that Articles 276 and 344 TFEU preclude the possibility of EU members states permitting the nationals of one EU member state to sue another EU state, is a determination of the international law relations of the two EU member states. On this basis the relevant rules of international law for EU member states are rules of EU law and under EU law the Claimants' state could not grant its nationals the right to sue and the Respondent could not consent to being sued. Thus, this Tribunal has no jurisdiction.

160. The Tribunal accepts that EU law, in particular the rules set out in the relevant EU Treaties as interpreted by the relevant EU organs, is international law binding on EU member states. Thus, those rules of law, like any other rules of international law, can be invoked in this dispute. And any decision of the CJEU as the interpreter of those rules, on the scope, interpretation and application of those rules is equally relevant. However, that does not end the matter. The problem in this case is that there is another competing set of rules, also rules of international law, established in this case by bilateral agreement – the rules of the BITs – and by the ICSID Convention.

161. The issue, then, is which has primacy, the EU rules which purport to prevent any claim being brought by the Claimants, as nationals of an EU member state, against the Respondent, another EU member state, or the BIT rules that permit such a claim to be brought? The argument of the Respondent is that EU law must be given priority, but for this Tribunal, which must apply principles of international law, the answer that EU law must govern is not self-evident. The issue is in many respects a classic question of

international treaty law – when two treaties between the same parties conflict, which governs? The Tribunal will address this question shortly.

162. In short, the Tribunal cannot accept that EU law must necessarily override other principles of international law applicable between the parties. That may be true within the regime of EU law, and the Tribunal does not question that the decision of the CJEU in *Achmea* is a valid interpretation of EU law. If this Tribunal were constituted under EU law, then presumably it would be obliged to apply the *Achmea* decision and decline jurisdiction. But, the CJEU in *Achmea* did not purport to apply principles of international law in deciding that Article 267 and 34 TFEU overrode the provisions of the BIT; it explicitly decided the matter on the basis of EU law. Thus, this Tribunal has to decide whether as a matter of international law the rules emanating from the EU Treaties constitute the applicable law to resolve the question of jurisdiction or whether the law of the BITs as agreed by the parties to those BITs is the applicable law. Under any way of looking at the matter, the question is one of a conflict of treaties.

### *(b) The Conflict of Treaties*

163. The Respondent also invokes the rules of international law governing conflicts between treaties to the question of this Tribunal's jurisdiction, arguing that even by application of those rules, Articles 59 and 30(3) of the VCLT, EU law would take priority in determining jurisdiction.[209]

164. VCLT Article 59(1) provides:

> A treaty shall be considered as terminated if all the parties to it conclude a later treaty relating to the same subject matter and: (a) it appears from the later treaty or is otherwise established that the parties intended that the matter should be governed by that treaty; or (b) the provisions of the later treaty are so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time.

165. Article 30(3) provides:

---

[209] Resp. Mem. Jur., paras. 306-308.

When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.

166. The Respondent argues that it was the intention of EU member states that the subsequent EU treaty, the TFEU, would replace the earlier BITs and thus the first head of Article 59 is complied with. The Respondent also argues that the relevant provisions of the EU Treaties are incompatible with the provisions of the BITs and thus the later treaties must prevail in accordance with the second head of Article 59. The Respondent further argues that even if the matter were dealt with by Article 30(3) the provisions of the BITs are not compatible with those of the EU Treaties.

167. The Claimants argue that EU law cannot be given priority over the BITs on the basis of Articles 59 and 30(3) of the VCLT. The BITs and the EU Treaties do not have the same subject matter, the Claimants argue, and that this conclusion has been reached consistently by investment tribunals.[210] The Claimants further argue that in any event, it was not the intention of the EU member states that the EU Treaties would supersede investment agreements. Nor, the Claimants argue, are BITs incompatible with the EU Treaties in that they are not incapable of being applied at the same time. Moreover, the relevant provisions of EU law, Articles 267 and 344 TFEU, are not even applicable to the present case since they are concerned with disputes over the interpretation and application of EU Treaties, something that is not in issue in this case.

168. The Tribunal is of the view that Articles 59 and 30(3) of the VCLT are potentially applicable to the question of the Tribunal's jurisdiction. BITs deal with investment and dispute settlement. The EU Treaties also deal with investment and dispute settlement. Thus, at a certain, general, level the treaties deal with the same subject matter. But at a more specific level they deal with different subject matters. BITs deal with general obligations on states relating to foreign investment within the countries of the contracting parties but they also provide a mechanism for nationals of one party to bring a claim against another party, something that is not provided for in the EU Treaties. Under the EU

---

[210] *See supra*, para. 106.

regime claimants are left in the hands of domestic courts only, something that BITs do not provide for. In fact, BITs provide specifically for an alternative to determination by national courts. In that respect, the EU Treaties and the BITs do not deal with the same subject matter.

169. In its Report on Fragmentation,[211] the ILC Study Group described the fulfilment of the test of "the same subject matter" as follows:

> [T]he test of whether two treaties deal with the "same subject matter" is resolved through the assessment of whether the fulfilment of the obligation under one treaty affects the fulfilment of the obligation of another. This "affecting" might then take place either as strictly preventing the fulfilment of the other obligation or undermining its object and purpose in one or another way.

170. The test posited is whether the fulfilment of the obligation under one treaty prevents the fulfilment of the obligation under the other treaty or undermines its object and purpose. Applying this test, the Tribunal has difficulty in seeing the BITs and the EU Treaties as being of the same subject-matter. The existence of a procedure allowing the nationals of one state to bring a claim against another state under a BIT does not prevent the EU Treaties from operating. The fact that both have provisions relating to obligations on states in respect of foreign investors does not mean that the functioning of one prevents the functioning of the other. They can both operate side by side. The object and purpose of neither treaty regime is undermined by the fact the two operate in parallel.

171. In this regard, the arguments of the Respondent can also be seen in broad and narrow terms. The broad argument is that since the intention of the EU is to have exclusive jurisdiction over investment matters affecting its members, the existence of BITs regulating investment undermine that objective. The argument is put in the form by both the Respondent and the EU in its non-disputing party brief that while investment agreements involve discrimination, non-discrimination is a basic principle of an economic union such as the EU. However, these objections strike the Tribunal as much too broad.

---

[211] International Law Commission, Report of the Study Group, Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law, UN Doc. No. A/CN.4/L.682, dated April 13, 2006, RL-0027.

Certainly, it is the objective of a customs union to regulate matters that are within the scope of the union on a common basis and to avoid discrimination. But the fact that some matters are so regulated while others are not, does not prevent the fulfilment of obligations under the customs union or undermine its object and purpose. Of course, if the EU Treaties had provided for a parallel investor-state arbitration process, then the conflict would have been manifest and the two treaty regimes incapable of operating together. But that is not the case here.

172. Equally, the narrower view of the conflict does not, in the view of the Tribunal, turn the treaties into treaties of the same subject matter or make them incompatible. The objection that the CJEU found in the *Achmea* case was that an arbitral tribunal may be involved in the interpretation or application of EU law. But, as pointed out earlier, that is not so here. The mandate of the arbitral tribunal under the BITs is to apply the provisions of the BITs and of the ICSID Convention and this means primarily principles of international law. Where a tribunal refers to national law, then to the extent that national law is based on EU law this might be an indirect reference to EU law. But the fact that a tribunal might refer to national law to determine whether a claimant is a national of that state could hardly be seen as an action that would prevent the fulfilment of the EU Treaties or undermine their object and purpose. This limited potential for investment tribunals to look at EU law may have been sufficient for the purposes of EU law to say that arbitration under a BIT was precluded, and the CJEU so decided in *Achmea*. But Article 59 and 30 set a different standard. They require that the treaties be treaties with the same subject matter and such a standard is not met in this case.

173. In the same vein, the Respondent's claim that there is a potential inconsistency between the BITs and EU Treaties in respect of capital transfers, something that is not in issue in this case, can hardly be a matter that undermines the object and purpose of the EU Treaties. The rules on the conflict of treaties were meant to deal with incompatibility not with potential minor inconsistencies.

174. Moreover, to the extent that the Tribunal would have to decide whether the "bail-in" measures have resulted in a violation of the provisions of the BIT, it is not involved in the

50

interpretation or application of EU law. The fact that, as alleged by the Respondent, the bail in measures were "policy measures established by the EU Bank Recovery Resolution Directive"[212] does not mean that the Tribunal would be interpreting or applying EU law. The bail-in measures are facts for this Tribunal which has to ask whether there has been a violation of the relevant BIT provisions. The Tribunal would not necessarily be interpreting or applying EU law and thus there is no incompatibility between the BITs and the EU Treaties.

175. However, even if one were to assume that the BITs and the EU Treaties were in fact treaties of the same subject matter to bring the treaties within the scope of Articles 59 and 30, there are further hurdles to overcome in respect of both those provisions. The Tribunal will deal first with Article 59 and then with Article 30(3).

176. Article 59 sets out two circumstances where a subsequent treaty can have the effect of terminating an earlier treaty: where the parties intended that the later treaty would govern and where the terms of the later treaty are so far incompatible with those of the earlier treaty that the two treaties are not capable of being applied at the same time.

177. The Respondent argues that the EU member states intended the TFEU to replace BITs, but it offers no evidence of this other than an implication from the wording of the TFEU, which makes no reference to BITs, and its object and purpose.[213] The Claimants, by contrast refer to the actual practice of the EU member states, in particular Cyprus, which has maintained that the BITs have been treaties in force since the signing of the TFEU and has referred to the BITs as an inducement to investors to invest in Cyprus.[214]

178. The Tribunal is unable to conclude that there is evidence of any intention on the part of the Respondent, or EU states more generally, at the time of the negotiation of the TFEU, or immediately subsequently, that the TFEU was to replace BITs and in particular the BITs that are the subject of this case. Indeed, the Respondent quotes from a statement by the European Commission in 2015 that "Intra-EU BITs are agreements that exist between

---

[212] Resp. Mem. Jur., para. 353.
[213] Resp. Mem. Jur., para. 310.
[214] Cl. C-Mem. Jur., paras 88-96.

EU Member States". Although the EC said that such agreements should not be necessary in light of the provisions on investment in the EU Treaties, it did not say that such agreements are no longer of any effect. Although the EU has now taken the position that these agreements should no longer be in effect, that cannot retroactively produce the intention that is required by Article 59.

179. The Respondent argues that the Declarations and Information Note of the EU member states following *Achmea* are evidence of a subsequent interpretation of the BITs which shows that Cyprus has withdrawn its consent to investor-state arbitration. But, that interpretation does not accord with the terms of the Declarations themselves which establish the understanding of the Contracting Parties with regard to their obligations under EU law and require member states to advise investment tribunals of the *Achmea* decision and its consequences for them and encourages states to terminate their BITs. Setting out the obligations of states under EU law does not constitute a subsequent interpretation of their BITs and a withdrawal of consent to arbitrate. Furthermore, encouraging states to terminate their BITs is inconsistent with the view that states no longer have obligations under those treaties. A similar point can be made with respect to the Information Note which states that the arbitration clauses in the BITs are no longer applicable because they are "contrary to European law".

180. The second alternative under Article 59 is that "the provisions of the later treaty are so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time". As pointed out earlier, there is no barrier to the BITs and the EU Treaties being applied at the same time. Tribunals established under the BITs are engaged in the interpretation of the provisions of the BITs and in the application of international law. They are not concerned with the interpretation and application of EU Treaties and could only do so indirectly when referring to the national law of a party. Investment tribunals are concerned with claims by investors under the terms of investment treaties. The CJEU is concerned with the application of EU law. These bodies deal with different things and thus there is no basis for concluding that the terms of the EU Treaties "are so far incompatible" with the terms of the BITs that the two treaties are not capable of being applied at the same time.

181. The Tribunal is aware that the consequence of *Achmea* is that successful claimants under an intra-EU investor-state arbitration may be unable to enforce any award within the EU. However, enforcement of awards under the ICSID Convention is not limited to the courts of the host state or to courts of EU member states.

182. In light of the above, the Tribunal concludes that the provisions of Article 59 have not been met and the BITs have not been terminated as a result of the conclusion of the relevant EU Treaties.

183. The Tribunal turns to VCLT Article 30(3) which operates in the event that a treaty is not terminated in accordance with Article 59. Under Article 30(3) such a treaty "applies only to the extent that its provisions are compatible with those of the later treaty". The question, then, is whether the terms of the BITs are compatible with the terms of the later TFEU. Applying EU law, the CJEU concluded that resort to arbitration under a BIT was precluded by TFEU Articles 267 and 344. As a matter of EU law, therefore, the provisions were not compatible. Does the same conclusion apply when the relationship of the BITs with the EU Treaties in considered by operation of Article 30(3)?

184. Earlier the Tribunal pointed out that the BITs and the EU Treaties could not be regarded as incompatible for the purposes of Article 59(1)(b). The wording of Article 30(3) is slightly different in that it refers to the treaties as being "compatible" rather than being "so far incompatible", which suggests a different threshold than in the case of Article 59(1)(b).

185. Yet, the Tribunal does not consider that this difference, if any, has any impact on the facts of this case. The suggested incompatibility is in relation to the exclusive authority of the CJEU under the EU Treaties and the potential for investment tribunals to engage in the interpretation and application of EU law. But, as pointed out already, this is a limited possible incompatibility. And, in fact, investment tribunals would not be interpreting and applying EU law as such. They would be interpreting or applying the domestic law of a party that was founded on EU law. Moreover, in practice there is no real incompatibility. Investment tribunals deal with disputes relating to the obligations set out in a BIT and such substantive obligations are interpreted and applied on the basis of the principles of

international law, not the domestic law of a party. Investment tribunals have no mandate to decide on the rights of the parties under EU law. Investment tribunals and EU courts function independently of each other and each can operate without interfering with the jurisdiction of other.

186. On this basis, the Tribunal concludes that the terms of Article 30(3) are not met and thus there is no basis in that provision for denying this Tribunal jurisdiction.

187. Accordingly, in light of the reasons set forth above, the Tribunal rejects the objection of the Respondent that it has no jurisdiction because this is a dispute between two EU member states.

**(2) The Objection to Jurisdiction and Admissibility due to a Mass Claims Proceeding**

188. In the view of the Respondent, the present claim is a "mass claim" and the Tribunal lacks jurisdiction to hear it. Furthermore, it argues, the claim is in any event inadmissible. Cyprus claims that it has never given its consent to a "mass claim", and that such claims are not provided for under the ICSID Convention or the relevant BITs. It also argues that the claims in this case do not meet the "homogeneity" test set out in ICSID decisions on this issue and the management of such a mass claim would infringe on the Respondent's due process rights.[215]

189. As a preliminary matter, the Tribunal notes that the issue of mass claims has been the subject of detailed discussion in three cases known as the Argentine Bondholder Cases: *Abaclat*,[216] *Ambiente*[217] and *Alemanni*.[218] The Tribunal will refer to these cases but will not repeat the extensive analyses undertaken there. The Tribunal also notes that the number of claimants in the present case, some 956, is well in excess of those in other "mass claim" cases with the exception of *Abaclat*. In some sense, then, this case is quite unique. The Tribunal further observes that none of the other "mass claims" cases

---

[215] *See supra*, paras. 64-69.
[216] *See supra*, n. 39.
[217] *See supra*, n. 40.
[218] *See supra*, n. 46.

proceeded to a final resolution. Thus, the complexities of a mass claim case and the various solutions proposed for it have not been tested in practice.

190. There is also a question of terminology. Some tribunals have doubted whether the term "mass claims" is appropriate, and the Claimants in this case prefer to use the term "multi-party proceeding".[219] The claim here is a "mass claim" in the sense that it is a claim brought by a large number of claimants within the scope of a single case against the Respondent. But this does not imply that it is a representative claim, a class action, or a consolidation of claims, or that it is anything other than what it is – a substantial number of individuals bringing their claims against the Republic of Cyprus within a single case against the Republic.

191. In short, the Tribunal does not see that any consequence flows from the use of the term "mass claims" to describe this case and that the questions of jurisdiction and admissibility are to be decided on the basis of the substantive nature of the claims that are brought and their relevant elements and not on the basis of terminology. Hence, it simply uses the term "mass claims" as a convenient shorthand expression.[220]

### (a) Jurisdiction

192. The other "mass claims" tribunals have differed over whether the issues raised by such claims go to jurisdiction or to admissibility and the *Alemanni* tribunal took the view that the distinction was of no particular importance for the disposition of the issues before it.[221] This Tribunal is aware of these differences in view over the relationship between jurisdiction and admissibility but it does not find it necessary to take a position on this matter in order to reach its decision. The Tribunal will deal with the objections made by the Respondent in terms of their relevance to both jurisdiction and admissibility.

---

[219] Tr., Day 1, pp. 204-205.
[220] The tribunals in the Argentine Bondholder Cases will also be referred to as the "mass claims" tribunals.
[221] *Alemanni v. Argentina*, para. 257.

193. The Respondent contends that it has never consented to having a mass claim brought against it and that neither the provisions of the ICSID Convention nor the provisions of the Cyprus-Greece or the Cyprus-BLEU BIT permit the bringing of mass claims.[222]

194. In the view of the Tribunal, these two issues are linked. Undeniably, the jurisdiction of the Tribunal is dependent on the consent of both parties to this arbitration and the scope of the consent of Cyprus depends precisely on the terms of the BITs that provide for investor-state arbitration as well as the relevant provisions of ICSID.

195. The relevant provision of the Cyprus-Greece BIT, Article 9, defines the matters that may be submitted to arbitration in the following way:

> Any dispute between either Contracting Party and an investor of the other Contracting Party concerning an investment, expropriation or nationalization of an investment…

196. In similar terms the Cyprus-BLEU BIT defines the matters that may be submitted to arbitration as:

> Any investment dispute between an investor of one Contracting Party and another Contracting Party…

197. The Respondent seeks to rely on the fact that both treaties use the term "an investor". In its view this indicates an intention that only a single investor can submit a claim under the relevant BIT.[223] To the Respondent, this use of the singular in key provisions relating to consent shows that mass or multiple claims fall outside the scope of these articles and hence the scope of Cyprus' consent to them. The Claimants, by contrast, point out the occasions when the plural "investors" or "disputes" are also used elsewhere in the BITs thus negating any intention to limit disputes to individual claims against a Contracting Party.[224]

---

[222] Resp. Mem. Jur., paras. 366-369.
[223] *Ibid.*
[224] Cl. C-Mem. Jur., para. 120.

198. The Tribunal does not consider these arguments relying on the use of the singular or the plural to be conclusive. Apart from the fact that, as the *Alemanni* tribunal pointed out,[225] in interpretation the use of the singular often implies the plural and vice versa, the treaties refer to "any dispute" and "any investment dispute" clearly indicating that more than one dispute may be brought against a Contracting Party. But, on the question whether these disputes have to be brought individually or may be brought together in a mass or multi-party proceeding, the treaties are simply silent.

199. The Respondent also claims that "mass claims" are outside the scope of the ICSID Convention and hence it has not consented to such claims. The relevant provision of the Convention, Article 25(1), defines the jurisdiction of the Centre as extending to:

> any legal dispute arising directly out of an investment between a Contracting State… and an investor of another Contracting State which the parties to the dispute consent in writing to submit to the Centre.

200. The Respondent focuses on the singular "dispute"[226] and the Claimants on the reference to "the parties to the dispute".[227] But, for the reasons given in respect of the jurisdictional provisions of the BITs, the Tribunal finds none of this determinative. Again, the Convention is essentially silent on the issue in question. While it does not expressly provide for individual claims to be brought on a multi-party basis, neither does it preclude such claims from being so brought. Thus, if such claims are to be rejected on the basis of jurisdiction, something other than the wording of the jurisdictional provisions of the BITs and the ICSID Convention must be sought.

201. Nor does the Tribunal find convincing the argument that a separate consent to mass claims would be required over and above the consent given by a state to the jurisdiction of an investment tribunal when it became party to the BIT. The notion of double or dual consent finds no basis in the relevant BITs. And the silence in the BITs about such double consent cannot be a basis for implying such a requirement. The Tribunal deals with the question

---

[225] *Alemanni,* para. 265.
[226] Resp. Mem. Jur., paras. 401-405.
[227] Cl. C-Mem. Jur., para. 201.

of whether the Respondent has consented to a consolidation of claims later in this Decision, *infra*, paragraphs 267-272.

202. In concluding that it had jurisdiction over the mass claim before it, the majority in *Abaclat* proceeded largely on the basis of an act of faith:

> Assuming that the Tribunal has jurisdiction over the claims of several Claimants, it is difficult to see how such a Tribunal could lose such jurisdiction when the number of Claimants outgrows a certain threshold.[228]

Although this is hardly a satisfactory basis on which to rest jurisdiction, it is grounded on an important point. A claim can only proceed if a tribunal has jurisdiction over a claimant. Thus, in multi-party proceedings a tribunal must have jurisdiction over each of the individual claimants.

203. The *Ambiente* tribunal had a different basis for concluding whether it had jurisdiction. After reviewing the case law it concluded: "multi-party arbitration is a generally accepted practice in ICSID arbitration".[229] That practice, however, with the exception of *Abaclat*, did not include cases with the magnitude of the number of claimants that exist in the present case. In *Abaclat*, the dissenting arbitrator's view was that the magnitude of the numbers of claimants turned a mass claim into something fundamentally different from the usual claim brought before ICSID.[230]

204. The *Alemanni* tribunal concluded that the question of jurisdiction depended on whether what was brought before it was a "dispute" within the meaning of Article 8 of the Italy-Argentina BIT, which provided for dispute resolution with respect to

> Any dispute relating to investments that arises between an investor from one of the Contracting Parties and the other Party...[231]

The *Alemanni* tribunal concluded that it was unable to determine the actual rights of each party, and whether the actual effects of Argentina's conduct on those rights were

---

[228] *Ambiente v. Argentina*, para. 490.
[229] *Abaclat v. Argentina*, para. 141.
[230] *See* dissenting opinion by arbitrator Georges Abi-Saab, para. 177.
[231] *See supra*, n. 46, para. 281.

sufficiently similar to constitute a single dispute, because these questions were closely intertwined with the substance of the dispute between the parties. Thus, it decided to defer a decision on whether it had jurisdiction until the merits phase, thus joining jurisdiction to the merits.[232]

205. The Tribunal agrees with the *Alemanni* tribunal that the issue of whether there is jurisdiction over a mass claim is not resolved simply by concluding that there is jurisdiction over the individual claims. The question is whether those individual claims can be put together as a single "mass claim".  Nor does the Tribunal accept that on the basis of claims involving a relatively small number of claimants it is possible to conclude that jurisdiction over a mass claim of 956 claimants is generally accepted in ICSID arbitration. In that respect, the Tribunal agrees with the *Alemanni* tribunal that there must be "a dispute" within the meaning of the relevant BITs and not just a myriad of separate disputes. Unfortunately, since the *Alemanni* case proceeded no further it provides no guidance on whether on the facts of that case the requirement of a "dispute" would have been met.

206. The present case differs from the *Alemanni* case in that, acting in accordance with the requirements of Procedural Order No. 2, the Claimants have submitted a Memorial on the Merits, so that the nature and extent of the claims are known. Thus, it is possible at this stage to determine the rights asserted by each claimant and indeed the Respondent has challenged certain individual claimants and classes of claimant and disputed whether what is being submitted is in fact a dispute that is common to all the parties. Thus, the Tribunal has before it the information that will, in principle, allow it to determine whether the actual effects of Cyprus' measures on the Claimants are sufficiently similar to constitute a single dispute.

207. The claims that have been put forward in this case are claims of bondholders and holders of deposits all with respect to the Laiki Bank and the Bank of Cyprus. The Respondent has raised questions about whether some of the Claimants are in fact bondholders,[233]

---

[232] *Ibid,* para. 293.
[233] *See supra*, para. 80.

whether they are in fact Greek nationals[234] and whether what they have qualifies as an investment.[235] These matters will be dealt with later in this Decision. The present analysis deals with only those claimants that have been properly determined as being bondholders of the Laiki Bank and the Bank of Cyprus and those who hold deposits in those banks.

208. In the view of the Tribunal, the actual rights of the Claimants are in this regard clear. They either held bonds in these banks or had deposits over the amount of $100,000. The argument of the Claimants is that the effect of the "bail-in" was that bondholders either had their bonds converted into Bank of Cyprus equity thus becoming valueless or, in the case of Laiki Bank, bonds were rendered worthless through the "resolution" measures for that bank. Deposit holders in both banks with assets exceeding $100,000, it is claimed, received a "haircut" reducing their deposits to $100,000.

209. The question, following the approach of *Alemanni*, is whether the claims can be regarded as a single dispute. In arguing against the notion of a single dispute in this case, the Respondent points to the different BITs, the different banks, the different types of assets (bonds and deposits) and the different times at which the assets were acquired resulting in different expectations that might be held and different damages claimed.[236] The Claimants by contrast focus on the similarity in the relevant provisions of the two BITs on the basis of which liability is asserted, the similarity in the conduct that gave rise to the breaches and the similarity in the damages claimed for loss of the bonds and loss of the value of deposits.[237]

210. In the view of the Tribunal there is "substantial unity"[238] or similarity in the claims that are being made and the breaches alleged. The claims arise out of the actions by the Republic of Cyprus in respect of the Laiki Bank and the Bank of Cyprus in 2013 as a consequence of the economic crisis Cyprus faced in the early 2000s. The Claimants were deposit holders or bondholders in one or both of these banks. With respect to the bondholders, it is claimed, the actions taken by Cyprus had the same effect – the bonds

---

[234] *See supra*, paras. 88-89.
[235] *See supra*, paras. 75-82.
[236] Resp. Mem. Jur., paras. 410-426.
[237] Cl. C-Mem. Jur., paras. 138-151.
[238] *Alemanni*, para. 287.

were made worthless either by being transferred into equity in the case of Bank of Cyprus bonds or through the demise of the Laiki Bank. In the case of deposit holders in both banks, they were all subject to the same "haircut". Uninsured deposits, that is those over $100,000, were "bailed-in". In short, all of the claims are about the measures that were taken against the two banks, which in key respects are identical measures.

211. The alleged liability of the Respondent in this case does not differ in respect of individual claimants. As pointed out earlier, the claims in this case fall into four categories and the actions giving rise to liability are identical within each category although there are some differences between categories. The Claimants' case is that the implementation of Plan B was discriminatory in respect of all foreign deposit holders or bondholders.[239] It is not a claim about some of the Claimants; it was about the treatment of foreigners and all Claimants fall into that class. Equally, the claim that the implementation of Plan B was arbitrary is also a claim on behalf of all Claimants.[240]

212. In respect of expropriation, the Claimants argue that the result of the implementation of Plan B was that the property of all Claimants was expropriated by the same actions of the government of Cyprus directed against both banks.[241] They also argue that measures taken against the Bank of Cyprus increased the losses to the Bank of Cyprus bondholders and deposit holders, which requires a determination of liability affecting the claimants in two of the four major categories.[242] While some measures may have affected classes of claimants differently – in some cases moral damages are claimed – the Tribunal does not have to make individual determinations of liability for each claimant.

213. Taking this into account, the Tribunal does not see the fact that two BITs have been invoked to be a barrier to the present case being considered as a single dispute. Invoking the provisions of two BITs is not uncommon in investment disputes and in this case the claims under both BITs are, in the words of the *Alemanni* tribunal, "in all essential respects"[243] the same, and the claimants are relying on provisions of those agreements that

---

[239] Cl. Mem. Merits, para. 224.
[240] Cl. Mem. Merits, para. 237.
[241] Cl. C-Mem. Jur., para. 147.
[242] Cl. C-Mem. Jur., para. 26.
[243] *Alemanni*, para. 292

are also essentially the same. Nor does the Tribunal consider that the fact there are two banks involved prevents this case from being considered a dispute within the meaning of the Cyprus-Greece and the Cyprus-BLEU BITs. The commonality of the dispute in this case is derived from the fact that the allegations with respect to the actions of Cyprus are "so similar in their essence"[244] in respect of both banks and the standard for determining liability is essentially the same under both BITs. On that basis the claims can be considered together as a single dispute.

214. The real source of concern in this case, leading to doubts about its characterization as a single dispute, is the number of claimants. If there were a small number of claimants, say six, bringing claims as bondholders or depositors arising out of Cyprus's measures affecting the Laiki Bank and the Bank of Cyprus, it is difficult to see how a tribunal would decline jurisdiction even though three claimants were proceeding under one BIT and three claimants under the other. This suggests that the real issue here is not jurisdiction, but rather the Respondent's arguments about the manageability within the ICSID framework of a mass claim with 956 Claimants, a matter that will be dealt with under admissibility below.

215. The Tribunal has considered whether it would be more appropriate to accept jurisdiction in respect of only one of the four categories of claims, for example the claim of bondholders in Laiki Bank, and leave the other categories of claimants, deposit holders in Laiki Bank, bondholders in the Bank of Cypress, deposit holders in the Bank of Cyprus, to pursue three separate claims. But that would involve four cases based on the same measures taken by the Government of Cyprus and the same alleged breaches of the BITs giving rise to the same liability. Certainly, there would be a reduction in the number of claimants in each case, but otherwise it is difficult to see what the gains of such an approach would be. Moreover, apart from the inefficiency in litigation that such a result would impose, it would create a greater burden on the Government of Cyprus than a single claim dealing with the same measures and the same alleged breaches. The Tribunal saw no justification for this.

---

[244] *Alemanni*, para. 288.

216. The Respondent raises other concerns about this case, in particular the differences in the damages claimed by the various Claimants.[245] In the view of the Tribunal, these differences do not affect the question of jurisdiction. At a broader level the relief claimed is similar; there is a claim for a declaration and a claim for damages with the damages for each Claimant particularized on a spreadsheet.[246] The Respondent claims that assessing all of the damages claims will overly burden the process and make the consideration of the claims unmanageable. The Tribunal will review these matters under the rubric of the admissibility of the claim; the Respondent's objection does not go to the question whether the Tribunal has jurisdiction.

217. The Respondent argues that the claims in this case do not meet the homogeneity test articulated in *Abaclat* and *Ambiente*. Those cases suggested that for a tribunal to have jurisdiction over a mass claim, the claims would have to be: brought under the same BIT, based on the same allegation of illegality, have the same prayer for relief and based on the same factual background.[247] The Tribunal has some reservations about the articulation of the test in terms of homogeneity. As the dissenting arbitrator in *Abaclat* pointed out: "homogeneity is in the eyes of the beholder. One can always reach a sufficient level of homogeneity, i.e. common denominators, by climbing up the ladder of abstraction and/or by weeding out all the specificities of the claims that appear inconvenient."[248]

218. While the factors identified in *Abaclat* and *Ambiente* may be useful to consider in deciding whether a mass claim constitutes a dispute, they are not decisive. As the Tribunal has pointed out, what is critical in this case is that the claims are identical or essentially the same. Although the claims are brought under two BITs, they invoke almost identical and broad expressions of consent by Cyprus in each BIT (extending in each case to "*any dispute*"); they are based on the same substantive allegations of illegality in respect of provisions in the two BITs that are substantially the same, the relief claimed is a common declaration of liability, and the claims relate to the same factual background – the treatment accorded by the Government of Cyprus to bondholders and deposit holders in

---

[245] Resp. Mem. Jur., para. 433.
[246] Cl. Mem. Merits, para. 434.
[247] Resp. Mem. Jur., paras. 428-430.
[248] *Abaclat v. Argentina, dissenting opinion of arbitrator Georges Abi-Saab*, para. 142.

the Laiki Bank and the Bank of Cyprus. Where the claims differ is in their quantification of loss in respect of each claimant. Thus, the Tribunal does not consider that jurisdiction can be denied on the basis of a "homogeneity" test.

219. The Tribunal concludes, therefore, that the claims before it constitute a "dispute" within the meaning of Article 9 of the Cyprus-Greece BIT and Article 10 of the Cyprus-BLEU BIT. That dispute is made up of claims of bondholders and deposit holders in the Laiki Bank and the Bank of Cyprus, all based on the same actions allegedly attributable to the government of Cyprus. The claims are linked in a single dispute in that they are all claiming essentially the same treaty breach under the two BITs, they complain about the same illegality, they have essentially identical prayers for relief, and they base themselves on the same factual background to establish their claims. The difference in the amount of damages claimed by each claimant is not relevant to the question of jurisdiction.

220. In light of the above, the Tribunal concludes that it has jurisdiction.

221. This is not to say that each and every Claimant is automatically covered by this conclusion. The Respondent has challenged individually some of the Claimants and those challenges will be dealt with below, (paras. 323-340) following treatment of the question of admissibility.

   *(b) Admissibility*

222. The Respondent argues that a mass claim of this nature is inadmissible because the ICSID system does not accommodate such claims – the "manageability" issue. According to the Respondent, a mass claim "creates intractable procedural problems".[249] These include the awarding of costs against such multiple claimants, the potential for changes in counsel or the formation of independent groups within the claimants, the situation where some claimants prevail and others do not and the impact of this on attempts to set aside an award through annulment.[250]  The Respondent anticipates that such a mass claim would involve extensive discovery proceedings, lengthy hearings amounting to as much as 60 weeks to

---

[249]  Resp. Mem. Jur., para. 432.
[250]  Resp. Mem. Jur., paras. 390-400.

examine all claimants, and that there would be problems in making individual determinations of damages.[251]

223. The Claimants argue that such procedural concerns should be dismissed as they were "by the tribunals in *Abaclat*, *Ambiente* and *Alemanni*".[252] They point out that they have provided all the information necessary for the Tribunal to make decisions on jurisdiction, merits and damages for each of the Claimants and that it is premature to make judgments about the time that will be taken in a merits phase, which in any event is not relevant to admissibility. Equally, the Claimants argue, the question of allocation of costs is not relevant to the question of admissibility. The Claimants consider that the existing rules of procedure are adequate to deal with the issues raised by the Respondent and refer to the fact that the *Abaclat* tribunal was willing to create its own special rules of procedure to deal with the mass claims there.[253]

224. In the view of the Tribunal, an assessment of whether the mass claim in this case poses insurmountable problems for the management of the case involves (1) balancing the rights of the Claimants to have their claims heard, (2) the capacity of the ICSID framework to manage the claim process, and (3) the due process rights of the Respondent.

225. With respect to the rights of the Claimants to have their claims heard, the Tribunal observes that while investors who meet the requirements of the relevant BIT have a right to bring a claim in accordance with the BIT, there is no necessary corollary right to have claims bundled together and brought as a mass claim. Whether such a mass claim is admissible depends precisely on whether such a claim is compatible with the terms of the BIT and manageable under the selected dispute resolution process, that is to say ICSID.

226. As the Claimants pointed out, the tribunals in *Abaclat*, *Ambiente*, and *Alemanni*, all took the view that such claims were manageable. However, in neither the *Ambiente* nor the *Alemanni* case were the numbers of claimants of a scale similar to this case. As pointed out earlier, the alleged problems with a mass claim in this case derive from the number of

---

[251] *Ibid*, para. 436.
[252] Cl. C-Mem. Jur., para. 155.
[253] Cl. C-Mem. Jur., para. 158.

claimants involved. Although the numbers in *Abaclat* (60,000 claimants) are again of a different scale from those in the present case, *Abaclat* is perhaps a better decision to consider in deciding how a mass claim could be handled.

227. The *Abaclat* majority took the view that it had the authority, deriving from Article 44 of the ICSID Convention and Rule 19 of the ICSID Arbitration Rules, to modify the "normal procedures" for considering claims in order to accommodate the mass claim in that case. It said that it would not be in a position to consider "all elements and related documents in the same way as if there were only a handful of Claimants".[254] It saw the need for a simplified examination process, which could have an impact on the depth of examination and the number of evidentiary documents to be examined, and a selection process that might involve samples of documents instead of a "serial examination of each document."[255]

228. The diminution of rights in this process was seen by the tribunal to be that the claimants would not be able to have each case determined individually but rather they would have to be done collectively and the respondent would not be able to bring arguments in depth relating to the situation of each individual claimant. However, the tribunal justified this diminution of rights on the basis that the alternative of each claimant bringing an individual claim would be prohibitive for many individual claimants and constitute in effect a denial of justice.[256] The tribunal utilized the same argument to justify diminishing the respondent's "defense rights". The procedure to be adopted for this mass claim was, in the view of the tribunal, better for the respondent than having to defend against 60,000 individual claims.[257]

229. The actual process set out by the *Abaclat* tribunal in subsequent procedural orders involved consideration of the merits in two main phases, Phase 2 and Phase 3, with Phase 2 divided into three sub-phases. The first part of Phase 2 involved the tribunal in identifying the issues on the merits on the basis of the submissions of the parties and the

---

[254] *Abaclat v. Argentina*, para. 531.
[255] *Ibid.*
[256] *Abaclat v. Argentina*, para. 537.
[257] *Abaclat v. Argentina*, para. 545.

second phase involved verification of the data provided by the claimants on each individual claim, dealing with such matters as "nationality and domiciliation requirements, and that they have made relevant investments".[258] The verification process was to be conducted by experts appointed by the tribunal.

230. Ultimately the case was withdrawn by agreement of the parties and thus the full efficacy of the procedure adopted by the tribunal was never tested.

231. The Tribunal will now consider the particular procedural needs of the present case, whether those needs would require an adjusted or new procedure and if so whether the model established by the *Abaclat* tribunal would meet those needs, and finally whether making whatever procedural adjustments are required falls within the authority of the Tribunal.

232. The concerns of the Respondent about a mass claims process fall into two categories; first, the conduct of the proceedings, and, second, the post-Award phase.

233. In respect of the conduct of the proceedings, the Respondent focuses on the length and complexity of a discovery process involving this many Claimants. It claims a right to an oral hearing in which claims could be addressed individually, involving perhaps the calling of each Claimant.[259] The Claimants doubt that the hearing would take the time estimated by the Respondent but in any event argue that it is premature to estimate a timetable for the merits phase.[260] Relying on the fact that the *Abaclat* tribunal was able to devise a procedure for the analysis of thousands of claims, the Claimants argue that it should be possible for the Tribunal to do so for thousands fewer claims in this case.[261]

234. In respect of the post-Award phase, the Respondent argues that costs in a mass claims award against almost 1000 individual claimants would be almost impossible, and financially prohibitive, to collect. It also argues that difficulties would exist on annulment

---

[258] *Abaclat and others v. Argentine Republic (ICSID Case No. ARB/07/5)*, Procedural Order No. 12, July 7, 2012, para. S(i).
[259] Resp. Mem. Jur., para. 436.
[260] Cl. C-Mem. Jur., para. 157.
[261] *Ibid,* para. 158.

should some of the Claimants wish to have an award annulled and others to uphold it.[262] The Claimants consider that the question of costs is irrelevant to admissibility and reject the view that potential conflict between Claimants following the award should be taken into account.[263]

235. The Tribunal is of the view that in principle what happens in the post-Award phase does not go to the question of admissibility. How annulment procedures might work should not be a matter that concerns this Tribunal in deciding on the admissibility of the claim. The fact that some claimants may wish to pursue annulment, but others would not, is not a basis for finding that the case should not go ahead at this stage. The question of costs may be different and the Respondent has raised legitimate concerns about recovery of costs in the context of almost 1000 claimants.[264] Yet, the fact that there may be difficulty in recovery of costs should not be a basis for finding that a claim is not admissible. However, if this proceeding were to go ahead, consideration would have to be given to whether in these rather unusual circumstances the Respondent is entitled to security for its costs.

236. The central question for the Tribunal is whether this mass claim can be handled within the ICSID rules and procedures or whether some different procedure would have to be devised. As a preliminary matter the Tribunal will address the question whether it has the authority to establish a new procedural framework, going beyond what is provided for in ICSID. If it cannot, then the question will be whether the Tribunal can manage the claim within the existing ICSID framework.

237. The *Abaclat* tribunal derived its authority to establish a process that went beyond the process provided by ICSID from Article 44 of the ICSID Convention and Rule 19 of the ICSID Arbitration Rules.

238. Article 44 provides:

> Any arbitration proceeding shall be conducted in accordance with the provisions of this Section and, except as the parties otherwise agree, in

---

[262] Resp. Mem. Jur., para. 395.
[263] Cl. C-Mem. Jur., para. 159.
[264] Resp. Mem. Jur., para. 390.

accordance with the Arbitration Rules in effect on the date on which the parties consented to arbitration. If any question of procedure arises which is not covered by this Section or the Arbitration Rules or any rules agreed by the parties, the Tribunal shall decide the question.

239. Rule 19 provides:

The Tribunal shall make the orders required for the conduct of the proceeding.

240. In short, the *Abaclat* tribunal decided that the power to decide, "any question of procedure that arises which is not covered by this Section or the Arbitration Rules or any rules agreed by the parties" provided it with authority to establish new procedures and that Rule 19 provided a mandate to implement these new procedures.[265]

241. As pointed out above, in doing so the *Abaclat* tribunal recognized that the result was that the rights normally held by the parties arbitrating under ICSID were being diminished. The claimants would not be able to have each case determined individually but rather they would be dealt with collectively and the respondent would not be able to bring arguments in depth relating to the situation of each individual claimant. While the claimants were not unhappy with this result, the respondent objected to it. The solution was not one agreed to by the parties.

242. The *Abaclat* tribunal's view was that the approach was necessary in order to avoid a denial of justice to the claimants. The denial of justice, it considered, was requiring each claimant to bring its own claim individually. The Tribunal is not convinced by such reasoning. A denial of justice occurs where a claimant has been denied a right. But, the question there was whether the claimant had a right. What the *Abaclat* tribunal did was to assume a right to a mass claim against which the denial of justice was measured – in effect the reasoning is circular. Denial of a forum could only be a denial of justice if there was a right to the forum in the first place.

---

[265] *Abaclat v. Argentina*, para. 597.

243. Moreover, as the dissenting arbitrator in *Abaclat,* said, it is odd to speak under international law of the absence of a competent forum being a denial of justice, because international law has never had an organized system of courts and tribunals before which all litigation can be brought.[266]

244. The *Abaclat* tribunal also considered that establishing a new procedure was better for the respondent than having 60,000 claims brought against it. But that was not the true comparator, because it is not clear that in the absence of a mass claim all of the claimants would have proceeded individually. It is difficult to see, therefore, that this circumstance justifies a tribunal in establishing a new procedure.

245. The *Abaclat* tribunal's decision to establish its own procedure has also been doubted by Judge Crawford who saw it as an unwarranted extension of the power in Article 44, arguing:

> The development of procedural rules for dealing with mass claims does not constitute merely filling a gap in the ICSID framework, but rather involves developing an entire framework for a new form of proceeding.[267]

The present Tribunal agrees. Article 44 permits a tribunal to deal with a question of procedure that arises when applying the existing procedural framework and the question is not answered by the existing rules. It does not provide a mandate for a tribunal to invent its own procedural framework.

246. In light of the above, the Tribunal concludes that there is no mandate provided for in ICSID for the Tribunal to devise a new procedural framework, outside the existing ICSID framework, to deal with this case.

247. The question, then, is whether this case can be managed within the existing ICSID framework. In other words, can the claim be managed in a way that will preserve the procedural rights of both parties? This will involve allowing each claimant in the mass

---

[266] *Abaclat v. Argentina*, Dissenting Opinion by Georges Abi-Saab on Jurisdiction and Admissibility, August 4, 2011, para. 257.
[267] RL-0091, James Crawford, State Responsibility: The General Part (Cambridge University Press 2013) (excerpt).

claim to have its case properly heard and will ensure that the respondent will be able to defend itself against the claims in the same manner it would if these were separate claims. This would include the ability to examine the case of each claimant.

248. The Tribunal has already noted that the concerns raised by the Respondent relating to the potential annulment of any award are not relevant to admissibility, and it has also noted that consideration would have to be given to an order of security for costs if the mass claim were to go ahead. The Tribunal also considers that the consequences of changes in counsel during the course of the proceeding do not pose an unusual problem. Changes of counsel occur from time to time during arbitrations and the matter can be managed pursuant to the Tribunal's power under Article 44 and Rule 19. The Respondent also refers to the possibility that the Claimants will in the course of the proceedings form separate groups with separate counsel demanding a change in the process.[268] This can be avoided by the Tribunal fixing the pool of Claimants at the outset. The Tribunal can also deal with unforeseen developments in the course of the proceedings under its power to manage the proceedings.

249. With regard to the remaining objections of the Respondent relating to the manageability of the process, the Tribunal observes that these concerns are primarily about the time this process will take – a lengthy document production process, a lengthy hearing, more time needed to prepare submissions and the time necessary to make individual determinations of damages.[269] The Tribunal is not convinced that the fact that an arbitral process will take a long period of time is automatically a reason for finding a claim inadmissible. The real question is whether a process that goes on for a considerable period of time can be completed without infringing the rights of either party to the dispute.

250. The Tribunal considers that it can only answer this question by looking at each stage of the process to determine whether it can be conducted in a manner that preserves the rights of the parties.

---

[268] Resp. Mem. Jur., para. 437.
[269] *Ibid*, para. 435.

251. **Verification of claims.** The Respondent has had the claims before it since at least the filing of the Memorial on the Merits and has made objections to some of those claims. The objections that have been made will be dealt with later in this Decision. Accordingly, the Tribunal does not consider that any time for a further verification of claims, if necessary, will pose a burden and complicate the management of the process.

252. **Document Discovery.** The Tribunal recognizes that document discovery can be lengthy in any ICSID arbitration. Each party has the right to request documents that it considers necessary for the prosecution of its case. No prior limitation can be placed on what may be requested by a party, and if production were to be refused by the other party it would be for the Tribunal to rule on the matter. Undoubtedly the number of claimants in a case can have an impact on the time that document production will take. However, in the present case, the fact that the claims are limited to actions in respect of two banks and in respect of two classes of claimants – bondholders and depositors, the commonality amongst all of the claims in respect of the actions in respect of those banks will inevitably limit the scope of the documents that can be requested. This could potentially limit the requests by both parties although undoubtedly document production will impose a greater burden on the Respondent than on the Claimants. Furthermore, bifurcation of the liability and damages phases in this arbitration, discussed below, will make document production in each phase more manageable, again a circumstance that is not uncommon in investment arbitration.

253. The Tribunal is not convinced that a document production process in respect of liability issues that might exceed the length of processes taken in other cases would necessarily infringe on the due process rights of either party. At the liability phase the issues are common to all claimants or to groups of claimants and so it is difficult to see how an examination of each individual claim would be relevant. Moreover, both parties have an interest in making the process move forward efficiently and the Tribunal can monitor the process to ensure that repetitive production requests that would constitute an abuse of the process are not being made. Accordingly, the Tribunal does not consider that the potential length of a document production process in respect of liability would make the

proceedings in this case unmanageable. As pointed out below, the Tribunal also considers a damages phase would also be manageable.

254. **Length of Submissions.** The Tribunal notes the Respondent's concern about the length of the submissions that would be necessary to enable it to respond to each claim individually in its Counter Memorial on the Merits and Rejoinder).[270] Once again the Tribunal considers that a counter memorial restricted to liability, and not dealing with damages issues, will not have to focus on individual claims. In a bifurcated process liability would have to be established before there would be a damages phase in which there would be an assessment of loss on individual claimant basis. Thus, the submissions at that stage would be more contained than the Respondent contemplates.

255. **Length of Hearings.** The Respondent has argued that the hearings could take up to 60 weeks if the Respondent was to take only a few hours to address each claim.[271] While it is true that such a period would be an extensive addition to the time a case might be expected to take, the Tribunal does not see such a consequence as inevitable. As the Tribunal has pointed out the claims can be considered in four categories: claims by Bank of Cyprus bondholders; claims by Laiki Bank bondholders; claims by Bank of Cyprus depositors; claims by Laiki Bank depositors.

256. Since the alleged breach in respect of each category of claimants is the same, (together with an additional claim of breach with respect to bondholders and deposit holders in Bank of Cyprus) then the need to repeat the basic claims in respect of each claimant within each category, either when seeking to establish or in seeking to deny liability, seems unnecessary, and it is not clear why a party would want to take the time to do this. Further, the power of the Tribunal under Article 44 and Rule 19 would enable it to ensure that unnecessary repetition that was not relevant to the basic question of liability was avoided. The Respondent's argument that the claims are different because the Claimants purchased their assets at different times and under different circumstances and would thus have different expectations[272] is not relevant in determining liability in this case where the

---

[270] Resp. Mem. Jur., para. 439.
[271] *Ibid*, para. 436.
[272] Resp. Mem. Jur., para. 418.

claims are not founded on the basis of legitimate expectations.[273] The time and circumstances of the purchase of an asset might be relevant to the assessment of damages, but that does not make it relevant to the determination of liability.

257. **Quantification of damages.** The Tribunal recognizes that the question of the separate consideration of individual claims would arise in the context of determining damages should the Tribunal decide that the Respondent was liable and thus would involve further document production during the damages phase, although more limited because of the document production in the liability phase. At the present stage, however, it is not possible to determine the scope of the need for individual examination of claimants. If the proceedings were to be bifurcated between a liability phase and a damages phase, the question of the examination of individual claims would be postponed until there was a decision on liability. Of course, if the Tribunal were to decide that liability had not been established, then there would be no need for any such examination. But there are other possibilities. The Tribunal might find liability in a way that requires only a limited examination of individual claims or it might find that some categories of claims are to be excluded altogether. Indeed, the need for and purpose of any individual assessment of damages could only be determined in the light of a decision of the Tribunal on liability.

258. Given these considerations, the Tribunal is of the view that it would be premature to undertake an examination of individual claims before a damages phase was reached. As a result, the consideration of individual claims for the purposes of assessing damages should be postponed until a separate damages phase of the proceedings. In short, since the potential for a lengthy process for the examination of individual claims is only conjectural at this stage, the Tribunal does not find this a basis for concluding that the proceedings are unmanageable and that the mass claim should be found inadmissible.

259. In light of the above, the Tribunal concludes that the claims before it are admissible as a mass claim, subject to the fulfilment of certain other conditions that are discussed below.

---

[273] Cl. C-Mem. Jur., para. 153.

*(c) Certainty of the claimant pool*

260. It would be unreasonable for the Respondent and create uncertainty for the Tribunal if individual claimants were entitled to exit from the mass claim at will. The Respondent could be faced with an ever-decreasing class of claimants, which could create uncertainty and raise questions such as, against whom can any award be enforced and how are costs to be recovered? Accordingly, the pool of claimants has to be fixed. The relevant time for fixing the claimant pool is May 17, 2019, the date when the claimant list was clarified to the Tribunal. All 956 Claimants within the pool at that date will receive the benefit of any award in their favour and will be responsible for any costs ordered by the Tribunal. No Claimant may withdraw from the case without the consent of the Respondent.

261. This result follows from Article 25(1) of the Convention under which once consent is given no party can withdraw it unilaterally. In accordance with Arbitration Rule 44, if the Respondent objects to the discontinuance of a claim, then the proceedings continue. In the event of a claimant dying before the award, other tribunals have left the question of succession to the applicable national law of the deceased claimant.[274]

*(d) Bifurcation*

262. In order to ensure the manageability of the proceedings, there is a strong argument for the case to be bifurcated between a liability phase and a damages phase. Accordingly, the Tribunal invites submissions from the Parties on bifurcation within 30 days of this Decision.

263. The Tribunal recognizes that the Claimants have already made arguments on damages, but if the proceedings were to be bifurcated, the Respondent need not respond to these arguments until the damages phase. Thus, under a bifurcated process the next round of pleadings – Counter Memorial, Reply and Rejoinder – would deal only with questions of liability. A subsequent damages phase, if necessary, would commence with the Claimants updating their Memorial on the Merits as it relates to damages followed by a Counter Memorial, Reply and Rejoinder all relating to damages. The timetable for the filing of the

---

[274] *E.g. Marfin v. Cyprus, see supra* fn. 92, para. 1415.

pleadings on liability would be a matter to be determined by the Tribunal after consultation with the parties.

*(e) Security for Costs*

264. Earlier the Tribunal indicated that if this case were to go forward consideration would have to be given to granting security for costs. The right of tribunals to grant security for costs has been widely recognized, and it has been included specifically in ICSID's proposed amendments to its Arbitration Rules. Its application, however, has been exceedingly limited. Generally, it is considered that security for costs should be awarded only in exceptional cases where a Respondent faces having to defend a claim against a claimant whose past actions or current financial position show that there is a real likelihood that it will not pay costs awarded against it.

265. There is no evidence of this kind in respect of the Claimants. What the Respondent has demonstrated, however, is the difficulty of pursuing claims against 956 claimants to recover costs, when the cost of doing so could well exceed the amount of the costs awarded. The Tribunal recognizes that this is a unique consequence of a mass claim and creates a burden that respondents in cases involving much smaller numbers of claimants do not face. Accordingly, the Tribunal considers that it would be a reasonable protection of the Respondent's interests to make an order for security of costs and condition the continuance of this case on the provision of that security.

266. Accordingly, the Tribunal invites the Respondent to make an application for security for costs within 30 days of this Decision and the Claimants to provide comments on that application within 15 days after receipt of an application by the Respondent. If the proceedings were to be bifurcated the request for security for costs would be made initially for the liability phase.

**(3) The Objection to Jurisdiction due to lack of consent to the consolidation of claims**

267. The Respondent argues that the Claimants have unilaterally consolidated their claims under the Cyprus-Greece BIT and the Cyprus-BLEU BIT without the Respondent's

consent, which it says is invalid and results in a defective procedure.[275] Absent consent, the Respondent argues, the claims under each BIT must be submitted to separate arbitrations. The Respondent relies on the London Commercial Court case of *A v. B*[276] which overturned an LCIA award as claims under two contracts to a single arbitration were submitted without the consent by all parties.[277] The Respondent argues further that unilateral consolidation violates "a fundamental rule of procedure" because it restricts the possibility to appoint nationals of both Luxembourg and Greece to the Tribunal and therefore the constitution of the Tribunal has been compromised.[278]

268. The Claimants argue that this proceeding is not a consolidation of separate proceedings but instead a single proceeding with a plurality of claimants,[279] as upheld in the *Ambiente* jurisdictional decision.[280] The Claimants argue further that several ICSID decisions hold that the initiation of a single proceeding by multiple claimants does not require "specific or additional consent."[281] The Claimants add that it is common for multiple claimants to initiate one arbitration under multiple BITs under the ICSID Convention.[282] They submit that the *A v. B* case is not an ICSID case and is therefore irrelevant.

269. The Tribunal agrees with the finding in the *Ambiente* decision that there is no consolidation where, as in this case, a plurality of claimants agree to proceed jointly in one proceeding. Instead, the Claimants are pursuing this arbitration procedure as a single claimant party. No additional issue of consent arises from this circumstance.

270. In the Tribunal's view, no additional consent on the part of the Respondent is required for Claimants to proceed jointly on the basis both of the Cyprus-Greece BIT and the Cyprus-BLEU BIT. Neither of these BITs nor the ICSID Convention contain language requiring such additional consent. The case of *A v. B* before the London Commercial Court is not

---

[275] Resp. Mem. Jur., paras. 460-464.
[276] *A v. B* [2017] EWHC 3417 (Comm), RL-0072.
[277] Resp. Mem. Jur. at paras. 463-464; *See also A v. B* [2017] EWHC 3417 (Comm), para. 19, RL-0072.
[278] Resp. Mem. Jur., para. 462.
[279] Cl. Rej. Jur., para. 210.
[280] *Ambiente*, paras. 123-124.
[281] Cl. Rej. Jur., para. 211; See *Flughafen Zürich A.G. and Gestión e Ingeniería IDC S.A. v. Bolivarian Republic of Venezuela (ICSID Case No. ARB/10/19)*, Award, November 18, 2014, paras. 399-400, CL-0256.
[282] Cl. Rej. Jur., para. 212.

apposite, as it concerns arbitrations arising out of separate contracts (each of which would apply to persons bound by privity) rather than under separate BITs (each of which apply to an undetermined group of investors). Moreover, the arbitrations at issue in that case were not, and could not have been, conducted under the ICSID Convention.

271. The Respondent is correct in asserting that when, as in this case, claimants of different nationalities proceed jointly in an arbitration proceeding under the ICSID Convention, each of the Parties is limited from appointing an arbitrator of the same nationality as that of any of the disputing parties. The Tribunal disagrees, however, that this somehow "compromises" the constitution of the Tribunal or that it affects this Tribunal's jurisdiction. Under Article 39 of the ICSID Convention, the Parties may agree to appoint each individual member of the Tribunal, in which case the nationality restriction does not apply. In any event, the restriction applies in equal measure to both the Claimants and the Respondent. There is no evidence that the Respondent has attempted to seek agreement with the Claimants under Article 39 of the Convention.

272. The Tribunal thus dismisses the Respondent's objection based on consolidation of claims.

### (4) The Objection to Jurisdiction with respect to indirectly held investments

273. The Respondent argues that certain claims based on indirectly held investments should be dismissed because the Cyprus-Greece BIT does not expressly provide for the protection of indirect investments.[283] The Respondent argues that Claimants may not establish jurisdiction by asserting ownership of, or other interests in, entities established in Cyprus or third states which in turn hold assets in Cyprus.[284] The Respondent notes that each of the Contracting Parties has concluded BITs with other states expressly covering indirect investments.[285] To read the same provision into the Cyprus-Greece BIT would undermine and render otiose the express references to indirect investments in those other treaties.[286] The Respondent further relies on the *Poštová banka*[287] award to argue that the Cyprus-

---

[283] Resp. Mem. Jur., paras. 453-459; Resp. Rep. Jur., paras. 204-208.
[284] Resp. Mem. Jur., para. 452.
[285] Resp. Mem. Jur., para. 454.
[286] *Ibid*.
[287] *Poštová banka, a.s. and ISTROKAPITAL SE v. Hellenic Republic (ICSID Case No. ARB/13/8)*, Award, April 9, 2015, paras. 229-231, RL-0029 ("*Poštová banka*").

Greece BIT, under which it was rendered, does not entitle shareholders of an entity to treat the latter's investment as the shareholder's own.

274. The Claimants argue that the broad terms of Article 1.1 of that BIT[288] extends to "indirect" investments,[289] an interpretation which comports with the object and purpose of the Cyprus-Greece BIT.[290] The Claimants emphasize the lines of investor-state jurisprudence which extend the scope of investment to indirect investments even if not expressly stipulated in the definition.[291] They argue that the *Poštová* award was incorrectly decided,[292] and that it can be distinguished from this case based on the structure and character of the relevant investments.[293] In addition to addressing certain factual points, the Claimants argue that indirect holdings of investments in Cyprus are protected under the Cyprus-Greece BIT even if they are held through a "beneficial interest" in intermediary companies[294] or consist of a minority interest in such companies.[295]

275. The Tribunal must begin its analysis on the basis of the text of the Cyprus-Greece BIT. Article 1.1 of the Cyprus-Greece BIT contains a broad definition of "[i]nvestment", but its core definition of this term is that "'[i]nvestment' means every kind of asset". This provision is silent on the question of the manner (including the degree of remoteness, if any) in which a qualifying investment may be held by a qualifying investor. The only reference in the Cyprus-Greece BIT to this question seems to appear in the language found in Article 2 (and repeated in other provisions of the BIT and its preamble) that refers to "investments *by* investors of the other Contracting Party" (emphasis added). This minimal formulation may allow for a broad construction but does not exhaust the analysis.

---

[288] "'Investment' means every kind of asset and in particular, though not exclusively, includes [etc.]", C-0001.
[289] Cl. C-Mem. Jur., para. 173.
[290] Cl. C-Mem. Jur., paras. 175-179, 183.
[291] Cl. C-Mem. Jur., paras. 175-178; Cl. Rej. Jur., para. 193; *See Tza Yap Shum v. Republic of Peru (ICSID Case No. ARB/07/6)*, Decision on Jurisdiction (Spanish), June 19, 2009, para. 101, CL-0229; and *Ioannis Kardassopoulos v. Georgia (ICSID Case No. ARB/05/18)* ("*Kardassopoulos*"), Decision on Jurisdiction, July 6, 2007, para. 124, CL-0201.
[292] Cl. C-Mem. Jur., paras. 185-196.
[293] Cl. Rej. Jur., para. 198.
[294] Cl. Rej. Jur., para. 204, referring to *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador (ICSID Case No. ARB/06/11)*, Decision on Annulment, November 2, 2015, para. 259, CL-0269.
[295] Cl. Rej. Jur., para. 208.

276. The Respondent argues that, because both the Respondent and Greece agreed in express terms in other BITs (for example, in Article 3.1 of the Cyprus-BLEU BIT and Article 1 of the Greece-Morocco BIT[296]) to the protection of indirectly held investments, the absence of such terms in the Cyprus-Greece BIT shows that the Contracting Parties to this BIT did not intend to embrace indirect investments within its scope.  To accept the Claimants' interpretation of the Cyprus-Greece BIT, says the Respondent, would render the express language in other BITs "superfluous," contrary to principles of treaty interpretation.[297] The Tribunal does not find the Respondent's argument convincing.  It is undisputed that the Cyprus-Greece BIT should be interpreted in good faith in accordance with the ordinary meaning of its terms in their context and in the light of its object and purpose.[298] In this respect, none of the other BITs entered into by Cyprus or Greece is an agreement between Cyprus and Greece that was made in connection with the Cyprus-Greece BIT, or that relates to the interpretation or application of the Cyprus-Greece BIT, or that applies to Cyprus-Greece relations.[299] Those other BITs can therefore at most have a remote bearing on the interpretation of the Cyprus-Greece BIT.

277. The entire text of the Cyprus-Greece BIT is of greater relevance to the interpretation of each of its terms. Article 7 of the Cyprus-Greece BIT provides that it shall apply to pre-existing investments "provided that such investments are still under the ownership, full or partial, of the interested investors". This provision does not specify whether the subsisting "ownership" of an investment must be held by an investor directly. The additional qualification that ownership must belong to an "interested investor", however, would suggest that ownership need not be direct.

278. In addition to the ordinary meaning of its terms in their context, the Tribunal must interpret the Cyprus-Greece BIT in the light of its object and purpose. The Contracting Parties expressed their common aspirations in the preamble of the Cyprus-Greece BIT as follows:

[296] R-0212.
[297] Resp. Mem. Jur., para. 454.
[298] *See*, Vienna Convention on the Law of Treaties, Article 31(1), CL-0051; R-207.
[299] Vienna Convention on the Law of Treaties, Article 31(2) and (3), CL-0051.

"DESIRING to strengthen their economic cooperation to the mutual benefit of both countries on a long term basis,

HAVING, as their objective, to create favourable conditions for investments by investors of either Contracting Party in the territory of the other Contracting Party,

RECOGNISING that the promotion and protection of investments, on the basis of the present Agreement, will stimulate the initiative in this field."

279. The aim of long-term economic cooperation for mutual benefit and the objective of favorable conditions for investments are in the Tribunal's view compatible with the protection of indirect investment. The Tribunal does not see any limitation in or deriving from the Cyprus-Greece BIT to the manner in which qualifying Greek investors may hold or own investments in Cyprus. Taken together, therefore, the Tribunal finds that the broad terms used in the provisions of the Cyprus-Greece BIT ("investments by investors"), in view of the BITs reference in its Article 7 to "interested" investors, and in the light of its object and purpose to foster long-term economic cooperation for the mutual benefit of the Contracting States, support the conclusion that the Cyprus-Greece BIT applies to indirect investments by Greek nationals in the territory of Cyprus.

280. The Tribunal must consider whether its reading of the Cyprus-Greece BIT is consistent with a good faith understanding of the terms of the BIT. The Tribunal takes account in this respect of the *Poštová* award, on which the Respondent relies, which declined jurisdiction on the basis of the Cyprus-Greece BIT, where one of the claimants claimed to have an investment held by a Slovakian bank. While the *Poštová* award concluded that the investor in question did not have a protected investment in Cyprus, the award does not contain an analysis of the Cyprus-Greece BIT in the terms carried out above by this Tribunal and is thus of limited guidance. The *Poštová* award does contain reasoning based on several arbitral decisions applying other BITs.[300] Those other decisions, cited in the *Poštová* award, similarly do not reveal any analysis of the issues discussed above in this decision. The absence of such analysis is striking given the fact that at least one of the

---

[300] *Poštová banka*, paras. 230-244, RL-0029.

BITs on which certain of those decisions are made (viz., *El Paso v. Argentina* and *CMS v. Argentina*, both under the Argentina-United States BIT), expressly provides for the protection of investments held "directly or indirectly" by qualifying investors.[301]

281. The above suggests that the issue addressed by the *Poštová* award is not identical to the issue raised by the Respondent in this proceeding. This is confirmed by examining the award in *BG Group v. Argentina*,[302] under the Argentina-United Kingdom BIT. Despite the fact that the Argentina-United Kingdom BIT does not contain an express provision covering indirectly held investments, the *BG* tribunal upheld its jurisdiction over BG Group's "indirect participation in the Argentine companies" MetroGAS and GASA.[303] The BG tribunal did not recognize, however, BG Group's standing to claim for amounts due under MetroGAS's license because BG Group did not establish that those losses flowed to the value of its shares.[304]

282. The issue in the *BG* case (as well as in related decisions including the *Poštová* award) is therefore not one of indirect holding of investments but one of standing to claim for obligations due to an enterprise in which the investor holds an interest as a shareholder. The proposition articulated by the *Poštová* award is that standing requires a showing that loss is sustained by the shareholder as well as by the enterprise. In this case, the Claimants assert that each of them has sustained loss as a result of the Respondent's measures. As a result, neither the *Poštová* award nor the decisions on which it relies provide guidance to this Tribunal for analyzing whether it has jurisdiction under the Cyprus-Greece BIT.

283. The Tribunal must consider, in addition, whether its reading of the Cyprus-Greece BIT is contrary to any particular established principle of interpretation that would negate its analysis under the customary rule set out in Article 31 of the Vienna Convention. The Respondent has invoked the principle *verba aliquid operari debent*. The Tribunal does not see how that principle is material to its reading of the Cyprus-Greece BIT.  The

---

[301] *El Paso Energy International Company v. Argentina (ICSID Case No. ARB/03/15)*, Award, October 31, 2011, para. 143, CL-0084.; *CMS Gas Transmission Company v. Argentina (ICSID Case No. ARB/01/8)*, Award, May 15, 2005, para. 4, CL-0075.
[302] *BG Group plc v Argentine Republic*, RL-0096.
[303] *BG Group plc v Argentine Republic*, paras. 112, 138, 216, RL-0096.
[304] *BG Group plc v Argentine Republic*, paras. 214-215, RL-0096.

meaning and effect of the provisions of BITs entered into by Cyprus or Greece with third parties are not affected by the interpretation of the Cyprus-Greece BIT. The fact that certain stipulations are made expressly in certain of those treaties but only tacitly in the Cyprus-Greece BIT does not imply contradiction nor does it render the express provisions superfluous or meaningless.  Each treaty must be interpreted on its own terms.

284. The above conclusion, therefore, is sufficient for the Tribunal to find that investments in Cyprus held by Greek nationals through wholly owned or controlled intermediary entities come within the scope of the Cyprus-Greece BIT. The Respondent, however, raises two additional issues under this objection.

285. The first additional issue is whether a "beneficial interest" of a Greek national in an intermediary company which owns an investment in Cyprus is sufficient to bring that investment within the scope of the Cyprus-Greece BIT. In the Tribunal's view, it is. Beneficial ownership is a form of legal interest widely recognized by the principal legal systems of the world and by international law.[305] For the purpose of establishing the Tribunal's jurisdiction, it is sufficient for the relevant Claimant or Claimants to assert and provide *prima facie* evidence of such a beneficial interest.

286. The second additional issue raised by the Respondent under this objection is whether a minority shareholding held by a Greek national in an intermediary company, which owns an investment in Cyprus, is sufficient to bring that investment within the scope of the Cyprus-Greece BIT.

287. The Tribunal is bound to mention that Article 7 of the Cyprus-Greece BIT provides that it shall apply to investments "under the ownership, full or partial, of" qualifying investors. This provision applies to investment pre-dating the entry into force of the BIT. The BIT is silent on whether it applies to investments made after its entry into force which are under the "full or partial" ownership of qualifying investors. In the Tribunal's view, Article 2 of the Cyprus-Greece BIT ("investments by investors") must be read in the context of, and consistently with, Article 7 of the BIT. Moreover, it would be manifestly

---

[305] *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador (ICSID Case No. ARB/06/11)*, Award, October 5, 2012, footnote 77, CL-0110.

unreasonable to conclude that the BIT does *not* apply to investments in Cyprus under the partial ownership of Greek investors only when they are made after the entry into force of the Cyprus-Greece BIT.

288. The Tribunal has found that the ownership of an investment under the Cyprus-Greece BIT may be direct or indirect. Article 7 of the Cyprus-Greece BIT adds that such ownership may also be full or partial. A minority shareholding by a Greek national in an entity that holds an investment in Cyprus would satisfy the requirement of a partial, indirect ownership of a qualifying investment and therefore come within the scope of protection of the BIT. This conclusion is moreover supported by the line of arbitral decisions cited by the Claimants.

289. Finally, the Respondent raises under this objection certain factual issues concerning the alleged insufficiency of information that would allow the Tribunal to conclude that certain Claimants do in fact hold investments in Cyprus indirectly. The Tribunal, however, need not reach a final conclusion on those factual issues for the purpose of its jurisdiction. Given that the Respondent argues that the Claimants have not met their burden of evidence to establish jurisdiction, this is the extent of the Tribunal's finding. In other words, the Claimants have provided sufficient information for the purpose of establishing this Tribunal's jurisdiction, without prejudice to the Respondent's right to rebut that evidence in the liability phase of these proceedings.

290. Accordingly, the Tribunal dismisses the Respondent's objection based on the indirect holding of investments.

### (5) The Objection to Jurisdiction over certain claims due to the absence of a qualifying investment

291. The Respondent objects that the Claimants' investments do not qualify as such under both the ICSID Convention and the BITs. The Respondent first makes the general contention that, even if the Claimants' holdings satisfy the literal descriptions of each BIT as they constitute assets, bonds, and claims to money, they nevertheless do not fulfill the qualities inherent to an investment (namely, contribution of assets or money, a certain duration, and

risk) and therefore fall outside the scope of the BITs and of the ICSID Convention.[306] The Respondent argues further that some Claimants may not have qualifying investments because they held deposits only for a short period and not as long-term investments in Cyprus.[307] The Tribunal shall first consider this general dimension of the Respondent's objection before turning to certain specific issues.

292. The Claimants argue that all bonds and deposit accounts for which they claim are covered investments under both the ICSID Convention and the BITs. The bonds and deposits fall within the definitions of 'investment' within the relevant BITs.[308] The Claimants argue that the *Salini* test is not relevant in this case and that the Tribunal should primarily look to the terms of the BITs.[309] The Claimants argue that, even if the *Salini* factors were to apply, the test would be satisfied with respect to each component factor,[310] which should be assessed holistically rather than cumulatively.[311]

293. The Tribunal is of the view that the bonds and deposits for which the Claimants claim are investments for the purpose of the BIT and the ICSID Convention. Bonds and deposits are in turn a form of tradeable "asset" as expressly provided by the BITs. Assuming, without deciding the question, that the BIT's definition of "investment" does not control the meaning of "investment" under the ICSID Convention, the Tribunal finds that the purchase of bonds and the making of bank deposits is comprised by the ordinary meaning of the term "investment" as this term is used in the ICSID Convention. The Oxford English Dictionary includes among the six definitions of "investment" in "[s]enses relating to the investing of money or capital", the following: "The use of money or capital to purchase an asset or assets (such as property, stocks, bonds, etc.), in the expectation of earning income or profit over time."[312]

---

[306] Resp. Mem. Jur., paras. 483-485.
[307] Resp. Mem. Jur., para. 494.
[308] Cl. C-Mem. Jur., paras. 224-225.
[309] Cl. C-Mem. Jur., para. 226.
[310] E.g., with respect to a substantial commitment of money, Cl. C-Mem. Jur., para. 228; Cl. Mem. Merits, para. 208.
[311] Cl. C-Mem. Jur., paras. 227-234.
[312] Oxford English Dictionary, "investment, n.", viewed online, January 15, 2020, at https://www.oed.com/view/Entry/99052?redirectedFrom=investment#eid.

294. As regards the so-called *Salini* test, the Tribunal notes that this test is a doctrinal and jurisprudential formulation. The Tribunal can only view the *Salini* test as subordinated to the applicable rules and principles of treaty interpretation, in particular the requirement to have regard of the ordinary meaning of the term "investment". The contours of this meaning, even with the aid of the *Salini* test, are broad. The Tribunal therefore agrees that the *Salini* test should be applied holistically, in accordance with the international law rules and principles of treaty interpretation, and not cumulatively. The Tribunal is greatly aided in this task by the discussion in the ICSID arbitral decisions that have dealt with disputes concerning bonds and bank deposits, including the decision in *Fedax*,[313] *Abaclat*,[314] *Alemanni*[315] and *Ambiente Ufficio*,[316] which have reached conclusions consistent with the Tribunal's finding in this case.

295. With respect to bonds that were held by certain Claimants only for a short period, the Tribunal finds that this circumstance does not change their character as investments on the facts on the record. The relevant Claimants are entitled to the presumption that their acquisition of these bonds was for an indefinite period (subject to the applicable date of maturity) and with the expectation of a financial gain.

296. The Tribunal therefore rejects the Respondent's general objection based on the lack of a qualifying investment. It will now consider the Respondent's specific arguments under this objection.

297. The Respondent argues that the Claimants' assets consisting in (a) life insurance contracts associated with Laiki bonds and (b) bonds issued by the U.K. entity, Egnatia Finance PLC, do not qualify as investments.

*(a) The Life Insurance Contracts*

298. The Respondent argues that certain life insurance contracts do not qualify as investments as the contractual relationship in each case was between an individual Claimant and a

---

[313] *Fedax N.V. v. The Republic of Venezuela (ICSID Case No. ARB/96/3)*, Decision of the Tribunal on Objections to Jurisdiction, July 11, 1997, CL-0088.
[314] *See supra*, n. 39.
[315] *See supra*, n. 46.
[316] *See supra*, n. 40.

Greek insurance company, CNP Zois S.A. Even if these contracts were deemed investments, they would be investments in Greece, not in Cyprus. They are governed by Greek law, they were procured in Greece, and disputes arising out of the contracts were subject to Greek courts.[317] The individual Claimants do not own any Laiki bonds and the contracts thus fall outside of the Cyprus-Greece BIT.[318] Mere "factual economic connections" with Cyprus are not sufficient to establish an investment in Cyprus.[319] In any event, the Greek life insurance company CNP Zois S.A. is a separate Claimant in this proceeding and "appears to be claiming with respect to the same losses on the Laiki bond with ISIN No. XS0468634539 that are claimed by the holders of the Life Insurance Contracts." [320] Double recovery should not be allowed.

299. The Claimants argue that the investments, including those comprising of life insurance contracts, were made in Cyprus. This was the location where the benefits flowed, which is the relevant factor pursuant to the *Ambiente* award.[321] The Claimants submit that the relevant covered investments are the bonds underlying the Life Insurance Contracts in which the Greek holders of insurance contract hold an indirect interest, as evidenced by the losses flowing from the measures affecting Laiki bank and the bonds.[322]

300. The Tribunal agrees that the bonds underlying the Life Insurance Contracts have a territorial nexus with Cyprus. The question, however, is whether these bonds have a qualifying nexus with the holders of the Life Insurance Contracts. That nexus is not one of ownership, but is instead of a contractual character. The Claimants assert that the policyholders' pooled premiums were used to purchase the bonds from Laiki bank. This circumstance indicates that the contracts prompted the purchase of the bonds for the benefit of the policyholders. Such a transaction in the view of the Tribunal involves the creation of a beneficial interest in the bonds which amounts to an indirect investment by

---

[317] Resp. Mem. Jur., paras. 489-490.
[318] Resp. Rep. Jur., paras. 261-264; Resp. Mem. Jur., para. 491, relying on *Burimi SRL and Eagle Games SH.A v. Republic of Albania (ICSID Case No. ARB/11/18)*, Award, May 29, 2013, paras. 145-146, RL-0182.
[319] Resp. Rep. Jur., para. 267.
[320] Resp. Mem. Jur., para. 491.
[321] Cl. C-Mem. Jur., para. 237; *Ambiente*, para. 499 (*Ambiente* held that "in order to identify in which State's territory an investment was made, one has to determine the first State which benefits from this investment."); *See also* CL-0053.
[322] Cl. C-Mem. Jur., paras. 239-240.

the policyholders in the bonds. The bonds' nexus with Cyprus is, in turn, sufficient to amount to an investment covered by the Cyprus-Greece BIT.

301. The Claimants nevertheless take the position that this investment does not exclude the claim in this case by CNP Zois S.A. with respect to the same bonds. The Tribunal agrees with the Respondent that double recovery is not allowed in this circumstance. This, however, is an issue for the merits or damages phase of this proceeding and does not affect the Tribunal's jurisdiction with respect to each of these Claimants.

### (b) The UK-Issued Bonds

302. The Respondent submits that the bonds with ISIN Nos. XS0427466817 and XS0449357754 were issued in the United Kingdom by a British company, Egnatia Finance PLC, not by Laiki.[323] As Egnatia Finance PLC is an entity incorporated in England and Wales under English law, the bonds were issued in the United Kingdom, and any disputes arising are subject to English courts. The bonds therefore cannot be considered to be an investment in Cyprus.

303. The Claimants argue that the bonds with ISIN Nos. XS0427466817 and XS0449357754 were investments in Cyprus. Even though the bonds were issued by an English company, governed by English law and were subject to the purview of English courts, a Cypriot company and in turn the Cypriot banking and financial sector was the beneficiary of the investment, and the purchasers of the bonds were cognizant of the transaction and risks associated with the investment.[324]

304. The Tribunal finds that these bonds were guaranteed by Laiki bank. The Claimants assert that "as of December 2009, Laiki ultimately became the guarantor of the notes in question and the capital raised by the notes was deposited into Laiki."[325] The Tribunal finds that the bonds therefore amount to investments in Cyprus for the purpose of the Cyprus-Greece BIT.

---

[323] Resp. Mem. Jur., para. 492; Resp. Rep. Jur., paras. 268-269.
[324] Cl. C-Mem. Jur., paras. 241-243.
[325] Cl. C-Mem. Jur., para. 242.

**(6) The Objection to Jurisdiction due to non-compliance with the notice provisions under the BITs**

305. According to the Respondent, only 21 Claimants complied with the mandatory notice and waiting periods in the relevant BITs. The other Claimants should be dismissed from this proceeding.[326] The notice of dispute under the Cyprus-BLEU BIT was sent on June 11, 2015, while the Request for Arbitration which added the Luxembourg Claimant was filed on November 18, 2015, less than six months after the notice.[327] Accordingly, the Respondent argues that the Luxembourg Claimant failed to observe the waiting period required under the Cyprus-BLEU BIT[328] and the Tribunal is deprived of jurisdiction.[329] Taking jurisdiction over these Claimants, according to the Respondent, is contrary to the purpose of a proper notice of claim and the need for the State's consent to arbitration.[330]

306. The Claimants submit that the notice provisions in the applicable BITs were complied with through the multiple notices sent to the Respondent over a 16-month period detailing the proposed claims.[331] No response was received by the Respondent. The Claimants cited the futility exception in reserving their right to submit the dispute to international arbitration prior to the expiry of the cooling-off period.[332] Further, the Claimants reject the Respondent's argument that any claimants that were not identified six months in advance of the filing of arbitration proceedings are outside the Tribunal's jurisdiction.[333]

307. Additionally, the Claimants contend that notice provisions are non-jurisdictional in nature, relying on a series of arbitral awards such as *Biwater v. Tanzania*, *Bayindir v. Pakistan*, and *Société Générale v. Pakistan*.[334] Further, relying on a series of arbitral awards and

---

[326] Resp. Mem. Jur., paras. 465-476.

[327] Resp. Mem. Jur., para. 465.

[328] "In the absence of an amicable settlement by direct agreement between the parties to the dispute or by conciliation through diplomatic channels within six months from the receipt of the notification, the dispute shall be submitted to international arbitration…", C-0016.

[329] Resp. Mem. Jur., paras. 466-467.

[330] Resp. Mem. Jur., paras. 472-475.

[331] Cl. C-Mem. Jur., paras. 194-198.

[332] Cl. C-Mem. Jur., para. 198 (citing Letter from S. Fietta and G. Jarvis to H.E. President N. Anastasiades et al., October 20, 2015, p. 2, C-0127); Cl. Rej. Jur. paras. 219, 224.

[333] Cl. Rej. Jur., para. 220.

[334] Cl. C-Mem. Jur., paras. 204-206; Cl. Rej. Jur., para. 221; *See Biwater Gauff (Tanzania) Ltd. v. Tanzania (ICSID Case No. ARB/05/22)*, Award, July 24, 2008, CL-0066; *Bayindir Insaat Turzim Ticaret Ve Sanayi A.S. v. Pakistan (ICSID Case No. ARB/03/29)*, Decision on Jurisdiction, November 14, 2005, CL-0063; *Société Générale de*

academic commentaries, the Claimants argue that if settlement is deemed to be futile, failure to comply with the notice provision does not impede jurisdiction.[335]

308. The Tribunal notes that the Respondent's objection does not affect all Claimants. The Respondent acknowledges that 21 Claimants did comply with the six-month notice period under the Cyprus-Greece BIT. In the Tribunal's view, the issues concerning non-compliance with the relevant notice periods are twofold. First, aside from the 21 Claimants whom the Respondent admits have complied with the notice period under the Cyprus-Greece BIT, is jurisdiction excluded over the remaining Claimants who seek to claim under the Cyprus-Greece BIT? Second, is jurisdiction excluded in this case over Global Equity Investments S.A. (*i.e.*, the Luxembourg Claimant) due to its alleged non-compliance with the notice period under the Cyprus-BLEU BIT?

309. The first question above requires the Tribunal to examine whether the remaining Greek Claimants have complied with Article 9 of the Cyprus-Greece BIT and, if not, what are the consequences of such non-compliance. The remaining Greek Claimants have each submitted claims arising out of the same dispute of which the initial 21 Claimants gave notice under the Cyprus-Greece BIT. The initial notice of dispute, dated July 11, 2014, advised the Respondent that other similarly situated Claimants may join the claim. By a letter of August 12, 2015 (*i.e.*, more than a year later), the Claimants notified the Respondent that a further 303 Claimants had joined the claim. The Respondent has not denied the Claimants' assertion that it did not at any time attempt to engage in discussions for an amicable settlement of the dispute prior to the registration of the Request for Arbitration (nor, apparently, at any point after registration of the Request).

310. The Tribunal observes that arbitration decisions do not reveal uniformity either with respect to the factual allegations concerning non-compliance with notice requirements under BITs or with respect to the remedies, if any, that arbitral tribunals have ordered with respect to non-compliance.

---

*Surveillance S.A. v. Pakistan (ICSID Case No. ARB/01/13)*, Decision on Objections to Jurisdiction, August 06, 2003, CL-0226.
[335] Cl. C-Mem. Jur., paras. 207-210; Cl. Rej. Jur., para. 222.

311. The distinctive facts of this case are that 21 Claimants complied with the notice period with respect to a dispute arising from certain measures affecting holders of bonds and deposits in Laiki bank and the Bank of Cyprus and alleged to breach the Cyprus-Greece BIT. That dispute could not be settled within the prescribed six-month notice period. The 21 Claimants commenced arbitration proceedings under the ICSID Convention as a single claimant party. An additional 303 Claimants gave notice on August 12, 2015 with respect to the same measures alleged to amount to the same breaches of the Cyprus-Greece BIT. These additional Claimants did not commence a separate proceeding but instead joined the initial 21 Claimants as a single claimant party in the Request for Arbitration dated November 18, 2015. An additional 631 Claimants joined the initial 21 Claimants in the Request for Arbitration, also with respect to the same measures alleged to amount to the same breaches of the Cyprus-Greece BIT.[336]

312. The Tribunal must determine whether all or part of the remaining Claimants have complied with the access requirements of Article 9 of the Cyprus-Greece BIT, as that provision is understood in accordance with the rules of international law governing the interpretation of treaties.[337] The Tribunal holds that all remaining Claimants have so complied, for the reasons set out in the following paragraphs.

313. Article 9(1) of the Cyprus-Greece BIT speaks of a dispute with "an investor". Article 9(2) of the Cyprus-Greece BIT provides that after the six-month notice period "the investor concerned may submit the dispute" to arbitration under the ICSID Convention. As the Tribunal has discussed above in a different context, these terms should not be understood rigidly as referring exclusively to a single investor. It is more reasonable, instead, to understand these terms as embracing multiple investors.

314. The purpose of the notice period is to allow the dispute, as provided by Article 9(1) of the Cyprus-Greece BIT, to "be settled, to the extent possible, by the interested parties in an amicable way". Article 9(2) of the Cyprus-Greece BIT allows "the investor concerned" to

---

[336] Annex I of the Amended Request for Arbitration lists 955 Claimants.
[337] VCLT, Art. 31(1), CL-0051; *see* Resp. Rep. Jur., para. 235.

submit the dispute to arbitration under the ICSID Convention if the dispute "cannot be settled within six months from the date either party requested amicable settlement".

315. It follows from the ordinary meaning of these terms that they do *not* require "the investor concerned" to request amicable settlement of the dispute as a condition for it to commence arbitration under the BIT. The condition expressed in Article 9(2) of the Cyprus-Greece BIT is that the dispute "cannot be settled within six months from the date *either party* requested amicable settlement" (emphasis added). Article 9(1) of the BIT refers to the "interested parties" in the context of investor-state disputes under the BIT. These provisions suggest that the purpose of the notice requirement under the BIT is to trigger an opportunity for the settlement of the dispute before the commencement of arbitration proceedings. The notice requirement is not cast in terms of a narrow or rigid access requirement to investor-state arbitration under the BIT.

316. It is clear in this case that it has been impossible for the Parties to settle the dispute within six months from the date that the claimant party first requested an amicable settlement of the dispute. Does the Cyprus-Greece BIT require that there be no additional investors added to the claimant party at least six months prior to the commencement of investor-state arbitration? Its terms do not say so.

317. The Respondent argues that it is entitled to the opportunity under the Cyprus-Greece BIT to assess, and seek a settlement with, each individual Claimant within the six-month notice period. The Tribunal notes once more that the Cyprus-Greece BIT does not use these exact terms. The Cyprus-Greece BIT requires that the disputing parties have the opportunity to settle the dispute during a six-month period between a request for settlement and the commencement of arbitration. The Parties in this case had that opportunity. The Greek investors who were added as Claimants beginning in August 2015 chose to form part of the effort to settle the same dispute. Given the time elapsed from the first notification, any attempt to settle that dispute with the latter, additional Claimants required the Respondent to settle the dispute with the initial 21 Claimants. The Respondent, however, made no attempt to do either.

318. The Tribunal concludes that the terms of Article 9 of the Cyprus-Greece BIT allow an eligible investor "involved" in a dispute to commence arbitration against a Contracting Party to the BIT if the dispute cannot be settled within six months from the date a party in the dispute (whether a claimant or the prospective respondent) has requested settlement. The terms of Article 9 of the Cyprus-Greece BIT do not always require, however, that each investor "involved" in a dispute provide a six-month notice to the prospective respondent Contracting Party. In circumstances where the prospective respondent has had a full opportunity to seek a settlement of the dispute with the prospective claimant over the prescribed six-month period, it is consistent with the terms of Article 9 of the Cyprus-Greece BIT in their context and in the light of its object and purpose for additional investors "involved" in the same dispute to be added as claimants for commencing an ICSID Convention arbitration. All Greek Claimants have therefore complied with the access requirements of Article 9 of the Cyprus-Greece BIT.

319. The Tribunal is not required to rule on whether a similarly situated investor may commence an arbitration proceeding relying on a request for settlement made by an investor who is a party to a separate, pending arbitration proceeding, arguing that the dispute could not be settled within the prescribed six-month period. It would seem, however, that once an investor or group of investors commence an arbitration proceeding in reliance on a request for settlement, that request has achieved and perhaps exhausted its purpose and, arguably, could not be relied upon to commence an additional proceeding.

320. The second question above requires the Tribunal to examine whether the Luxembourg Claimant has complied with Article 10 of the Cyprus-BLEU BIT. Under Article 10(1) of this BIT, "the first party to take action" is required to notify the dispute in writing to the other party. Under Article 10(1) of the Cyprus-BLEU BIT, absent an amicable settlement of the dispute "within six months from the receipt of the notification, the dispute shall be submitted to international arbitration, any other legal remedy being excluded."

321. In this case, the Luxembourg Claimant notified the dispute to Cyprus on June 11, 2015. The Respondent argues that, because the Claimants filed their amended Request for Arbitration (which included the Luxembourg Claimant) on November 18, 2015, less than

six months from June 11, 2015, the Luxembourg Claimant did not comply with Article 10 of the Cyprus-BLEU BIT. However, the submission of a dispute to ICSID Convention arbitration is not accomplished solely by the filing of a Request for Arbitration, but requires the registration of the Request by the ICSID Secretary-General.[338] In this case, the ICSID Secretary-General registered the Request on December 17, 2015, more than six months after the notice of dispute by the Luxembourg Claimant. The requirements of Article 10 of the Cyprus-BLEU BIT are therefore met.

322. Accordingly, the Tribunal dismisses the Respondent's objections based on non-compliance with the access requirements under the Cyprus-Greece BIT and the Cyprus-BLEU BIT.

**(7) The Objection to Jurisdiction over certain claims due to lack of qualification as an investor under the BITs**

323. The Respondent submits that at least three Claimants appear not to be nationals of either Greece or Luxembourg:

- Claimant No. 221 is designated as Mr. Ioannis Leontiadis, but the Respondent contends that the actual Claimant is a Liberian company, Seaworthy Bay Inc., which authorized its director Mr. Leontiadis to claim on its behalf. The Respondent says there is no indication Mr. Leontiadis is even a shareholder of Seaworthy Bay Inc.[339] In addition, this company authorized Mr. Leontiadis to bring a claim on its behalf only after the initial notice of dispute and thus the claim is an abusive attempt to create jurisdiction over a pre-existing dispute.[340] Even if Mr. Leontiadis is considered to be the owner of Seaworthy Bay Inc., the bonds are held by another U.K. entity and Mr. Leontiadis is at best an owner of indirect investments.[341]

---

[338] For the relevance of the date of the registration of a Request for Arbitration to ICSID jurisdiction, *see El Paso Energy International Company v. Argentina (ICSID Case No. ARB/03/15)*, Decision on Jurisdiction, April 27, 2006, para. 136, CL-0254.
[339] Resp. Mem. Jur., para. 496; CD 221.1, Ioannis Leontiadis (Seaworthy Bay Inc.), Corporate Documents; CD 221.1, Ioannis Leontiadis (Seaworthy Bay Inc.), Proof of Nationality; CD 221.1, Ioannis Leontiadis (Seaworthy Bay Inc.).
[340] Resp. Mem. Jur., para. 496.
[341] Resp. Rep. Jur., paras. 272-274.

- Claimant No. 2, CNP Asfalistiki Ltd, does not appear to be a Greek national, and the Claimants have not tendered sufficient proof to establish that the nationality requirement has been satisfied.[342] In any event, the CNP Asfalistiki Ltd structure appears to be organized under Cypriot laws.[343] The claims of Claimant No. 2 have been withdrawn but CNP Asfalistiki Ltd continues to be a Claimant.

- Claimant No. 417, Athanasios Vasileiou, is not a Greek national.

324. The Claimants submit that Claimant No. 221, Mr. Leontiadis, is a proper Claimant as he is the bearer of the sole share certificate of Seaworthy Bay Inc., in the amount of all 500 shares, issued to him on 4 November 1991 and which is effective to date.[344] Further, Mr. Leontiadis' designation as a potential Claimant was sent to the Respondent in July 2014 and Mr. Leontiadis was granted sufficient corporate authorization which was effective upon the commencement of proceedings.[345]

325. The Tribunal finds that Mr. Leontiadis has asserted *prima facie* grounds for jurisdiction over his claims against the Respondent, which include his possession of the sole share certificate of Seaworthy Bay Inc. These grounds are rebuttable during the liability or damages phase of the proceeding.

326. The Tribunal notes that Claimants No. 2 (CNP Asfalistiki Ltd) and 417 (Athanasios Vasileiou) have requested discontinuance of their claims pursuant to ICSID Arbitration Rule 44.[346] These Claimants have conceded that they were not nationals of Greece or Luxembourg at the relevant time, and that the Tribunal therefore has no jurisdiction over their claims.

---

[342] Resp. Mem. Jur., para. 497.
[343] *Ibid*. Tr., Day 1, p. 296.
[344] CD-221.1, pp. 1-6 (Seaworthy Bay Inc. Certificate of Incorporation); CD-221.1, p. 7 (copy of bearer share certificate); Witness Statement of Ioannis Leontiadis, para. 4; Cl. C-Mem. Jur., paras. 245-246; Cl. Rej. Jur., para. 260.
[345] Cl. C-Mem. Jur., para. 247.
[346] Cl. C-Mem. Jur., para 244; Cl. Rej. Jur., para. 275(4); Tr. Day 1, p. 294; Cl. Opening Submission – Hearing on Jur., p. 4.

327. The Respondent acknowledged the request for discontinuance with regard to Claimants No. 2 and No. 417,[347] but contends that these Claimants should remain parties and be subject to an award of costs in an award on jurisdiction.[348]

328. As Claimants No. 2 and No. 417 do not have the required nationalities, they do not meet the jurisdictional requirements and the Tribunal must dismiss jurisdiction vis-à-vis these Claimants, except with regard to any potential costs award against them. They are therefore excluded from any future involvement in this case but remain liable for costs in respect of the jurisdictional phase.

**(8) The Objection to Jurisdiction over certain claims due to control of legal entities by Cypriot nationals**

329. The Respondent submits that this Tribunal lacks jurisdiction over the claims of Claimants No. 1 (CNP Asfalistikes Praktoriakes Ergasies S.A.) and No. 3 (CNP Zois S.A.) as they are Greek legal entities wholly-owned and controlled by Cypriot nationals and therefore precluded from bringing their claims under the ICSID Convention and/or the Cyprus-Greece BIT. Doing so would go against the provision of "dispute settlement between States and foreign investors" as held by academics and various tribunals.[349]

330. The Claimants argue that the Respondent is factually and legally incorrect in asserting that the Tribunal lacks jurisdiction over Claimant No. 1, CNP Asfalistikes or Asfalistikes, and Claimant No. 3, CNP Zois or Zois (collectively the "CNP Greece Entities"): The CNP Greece Entities are in fact controlled by a French entity and not a Cypriot entity.[350] The place of incorporation determines corporate nationality under Article 25(2)(b) of the ICSID Convention.[351] Thus, the CNP Greece Entities are proper Claimants in this proceeding. The Tribunal should not pierce the corporate veil of the CNP Greece Entities, but instead rely on the BIT's definition of "investor".[352]

---

[347] Resp. Rep. Jur., para. 270.
[348] Tr. Day 2, pp. 438-439.
[349] Resp. Mem. Jur., paras. 500-504.
[350] Cl. C-Mem. Jur., para. 249.
[351] Cl. C-Mem. Jur., paras. 250-255.
[352] Cl. C-Mem. Jur., paras. 259, 262-263. *Tokios Tokeles v. Ukraine (ICSID Case No. ARB/02/18),* Award, July 26, 2007, RL-0132.

331. The Tribunal observes that the term "investor" is defined in Article 1(3)(b) of the Cyprus-Greece BIT, with respect to legal persons, on the basis of the laws in accordance with which such legal persons are constituted and the place of their seat. The BIT does not define the nationality of investors who are legal persons on the basis of their control.

332. Article 25(2)(b) of the ICSID Convention allows parties to agree to treat a legal person as a national of another Contracting State "due to foreign control". It is a permissive provision whose purpose is to expand the scope of ICSID jurisdiction, not to restrict it. Indeed, if control of a legal person were an independent basis for its nationality under Article 25(2) of the ICSID Convention, there would be no need for permissive language in the Convention for the parties' agreement on such nationality "due to foreign control".

333. Accordingly, the Tribunal dismisses the Respondent's objections based on the control of Claimant No. 1 and Claimant No. 3.

**(9)  The Objection to Jurisdiction due to the fork-in-the-road clauses**

334. The Respondent contends that Claimant No. 37 should be excluded because it submitted the dispute to Cypriot courts and jurisdiction is thereby precluded under Article 9(2) of the Cyprus-Greece BIT. The Respondent relies on the "Fundamental Basis" test as articulated by the tribunal in *Pantechniki v. Albania* and subsequent tribunals.[353] According to the Respondent, the claims in this proceeding alleging violation of the BITs

---

[353] *Pantechniki S.A. Contractors & Engineers (Greece) v. Republic of Albania*, ICSID Case No. ARB/07/21, Award, dated July 30, 2009, paras 61-62, CL-0111 ("*Pantechniki*"):

> [T]he relevant test is the one expressed by the America-Venezuela Mixed Commission in the Woodruff case (1903): whether or not "the fundamental basis of a claim" sought to be brought before the international forum is autonomous of claims to be heard elsewhere. . .. The key is to assess whether the same dispute has been submitted to both national and international fora.
> …
> The same facts can give rise to different legal claims. The similarity of prayers for relief does not necessarily bespeak an identity of causes of action. What I believe to be necessary is to determine whether claimed entitlements have the same normative source. But even this abstract statement may hardly be said to trace a bright line that would permit rapid decision. The frontiers between claimed entitlement are not always distinct. Each situation must be regarded with discernment.

*See also H&H Enterprises Investments, Inc. v. Arab Republic of Egypt (ICSID Case No. ARB/09/15)*, Excerpts of the Award, May 6, 2014, RL-0139; *Supervision y Control S.A. v. Republic of Costa Rica (ICSID Case No. ARB/12/4)*, Award, January 18, 2017 ("*Supervision*"), paras. 315, 318 and 330, RL-0138.

have the same "fundamental basis" as the claim being made in the Cypriot courts by Claimant No. 37 as they "pursue ultimately the same purposes",[354] which is the recovery of money deposited or held in bonds.[355]

335. The Claimants agree that Article 9(2) of the Cyprus-Greece BIT is a fork-in-the-road provision but dispute the applicable test. The Claimants submit that the prevailing test is the "Triple Identity" test.[356] Under this test, a claim is precluded under the provision if: (i) the dispute is between the same parties, (ii) it has the same object and (iii) the dispute arises under the same legal ground.[357] The Claimants submit that the purpose of the fork-in-the-road clause is to "prevent parallel proceedings concerning the same investment dispute from being conducted in different fora"[358] as opposed to limiting all claims.[359] Even if the "Fundamental Basis" test were to apply, the Claimants argue that a claim is not precluded simply because of the similarity of facts or prayers of relief.[360]

336. The Tribunal notes that Claimants No. 37 (Theodosios Arvanitopoulus and Chariklia Arvanitopoulos) have withdrawn their case before the Supreme Court of Cyprus[361] and that these Claimants are therefore in the same position as Claimant No. 335 (Alexandra Samouil), whose claim was also withdrawn. A further Claimant No. 35 (Dionysios Argyros), also filed a complaint before the Supreme Court of Cyprus but the Court dismissed his suit, ruling that it did not have jurisdiction.[362]

337. The Tribunal notes that the Respondent withdrew the objection based on the fork-in-the-road clause vis-à-vis Claimants Nos. 35 and 335 in its Reply on Jurisdiction.[363] The Claimants subsequently informed the Tribunal and the Respondent in the Rejoinder on Jurisdiction that Claimants No. 37 had also withdrawn their claim before the Supreme

---

[354] *Supervision*, para. 318.
[355] Resp. Mem. Jur., para. 516.
[356] Cl. C-Mem. Jur., paras. 264-265.
[357] *Toto Costruzioni Generali S.p.A. v. Lebanese Republic (ICSID Case No. ARB/07/12)*, Decision on Jurisdiction, September 11, 2009, para. 211, CL-0137.
[358] *Pantechniki*, para. 62.
[359] Cl. C-Mem. Jur., para. 267.
[360] Cl. C-Mem. Jur., para. 270.
[361] Cl. Rej. Jur., para. 273.
[362] Cl. C-Mem. Jur., para 275; Cl. Rej. Jur. para. 270.
[363] Resp. Rep. Jur., para. 287; Tr. Day 1, p. 307.

Court of Cyprus.[364] As Claimants No. 37 are essentially in the same position as Claimants Nos. 35 and 335, and the Respondent did not maintain its objection during the Hearing on Jurisdiction, the Tribunal assumes that the objection is moot.

**(10)    Claimants Nos. 626 and 627**

338. The Respondent argues that this Tribunal has no jurisdiction over Claimants No. 626 (Ioannis Chrissovelonis) and No. 627 (Simon Simoudis and Angeliki Simoudis) as they were not listed in the Request for Arbitration and were added to the case after the registration of the Request.[365] The Respondent also objects to jurisdiction over these Claimants because they hold indirect investments.[366]

339. The Claimants contend that, in the course of preparing their Document Database, they discovered that the claims initially brought by Claimant No. 312 in fact belong to Claimants No. 294, 626, and 627.[367] They argue that they did not add new claims and simply seek to correct the list of Claimants in Annex A of their Rejoinder on Jurisdiction in accordance with Rule 25 of the ICSID Arbitration Rules.[368]

340. The Tribunal notes that the Claimants corrected the error vis-à-vis these Claimants in a timely manner and therefore dismisses the objection that they are new Claimants with new claims.[369]

# VII.    COSTS

341. The Tribunal defers the issue of costs until its Award.

---

[364] Cl. Rej. Jur., para. 273. The Claimants have also noted that Claimant No. 515 had initiated court proceedings in Cyprus but that the claim was dismissed for lack of jurisdiction, Cl. Rej. Jur., para. 270.
[365] Resp. Mem. Jur., footnote 794.
[366] Resp. Rep. Jur., paras. 217, 220-221.
[367] Cl. Mem. Merits, footnote 324.
[368] Cl. C-Mem. Jur., paras. 216-219.
[369] The Tribunal notes that one of the persons listed as Claimants No. 413 in Claimants' Annex A (revised, version 2), (Maria Vrysagoti) was also omitted in the Request for Arbitration, but a copy of a retainer agreement dated March 18, 2015 was later provided. See CD-413.1 – CD-413.4.

## VIII.   DECISION

342. **The Tribunal, by majority,[370] decides as follows:**

i.   The Tribunal has jurisdiction in this case and the Claimants' mass claim is admissible.

ii.   The Parties are invited to make submissions on whether the proceedings should be bifurcated into a liability phase and a damages phase within 30 days of this Decision.

iii.   The Respondent is invited to make an application for security for costs within 30 days of this Decision. If an application is made, the Claimants shall file a response within 15 days after receipt of the application.

iv.   The Claimants consist of all 956 Claimants on May 17, 2019, the date of the commencement of the hearing on jurisdiction, listed in Annex I to this Decision. No Claimant shall be entitled to withdraw from the case without the consent of the Respondent.

v.   The Tribunal will establish the timetable for subsequent pleadings after consultation with the Parties following the decision by the Tribunal on bifurcation and, if an application is made, on security for costs.

vi.   The Tribunal reserves its decision on costs, including with regard to Claimants No. 2 and No. 417.

---

[370] This Decision is taken by majority with a Statement of Dissent by Arbitrator Marcelo Kohen. The other members of the Tribunal wish to state that they have considered the Dissent and that it presents a well-reasoned analysis which leads to a view contrary to the one they have reached. While they agree with a number of points made in the Statement, their analysis, which leads to a different conclusion for the reasons expressed above, remains unchanged.

[signed]                                             [signed]

_____                    _____
Mr. Alejandro Escobar                          Professor Marcelo G. Kohen
Arbitrator                                            Arbitrator
                                                   Subject to the attached Statement of Dissent

Date: 31 January 2020                          Date: 3 February 2020




[signed]

_____
Professor Donald M. McRae
President of the Tribunal

Date: 30 January 2020

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**THEODOROS ADAMAKOPOULOS AND OTHERS**

Claimants

and

**REPUBLIC OF CYPRUS**

Respondent

**ICSID Case No. ARB/15/49**

---

**STATEMENT OF DISSENT OF PROFESSOR MARCELO G. KOHEN**

---

1.  To my great regret, the Tribunal was unable to issue a unanimous Decision on Jurisdiction since I felt obliged to vote against the Decision. The present Statement of Dissent (the "Statement") explains the reasons why I strongly believe that the Tribunal lacks jurisdiction by virtue of the first objection raised by the Respondent. Indeed, the possibility to set up arbitration as emerging from the two invoked BITs is incompatible with the later conventional engagements adopted by the same parties to these BITs at the time of the accession of Cyprus to the European Union on 1 May 2004.

2.  This Statement focuses on the first objection to jurisdiction concerning the intra-EU BITs. Since I consider that the Tribunal does not have jurisdiction on this basis, I will only briefly refer to the other objections that were also dismissed by the majority. The Statement is divided into seven sections: A. The applicable law by the Tribunal; B. The basis for the Decision on Jurisdiction, in turn divided into three sub-sections: (a) Article 59 of the Vienna Convention on the Law of Treaties ("VCLT"); (b) Article 30 of the VCLT; (c) Article 351(1) of the Treaty on the Functioning of the European Union ("TFEU"); C. The subject-matter of the BITs and the EU Treaties; D. The incompatibility of the BITs with EU treaties; E. The authentic interpretation by the Contracting Parties to the BITs of the relationship BITs-EU Treaties; F. The precedence of EU Treaties over the BITs; and G. Brief comments on the Decision with regard to the other objections. It finishes with some concluding remarks.

**A.  The Applicable Law by the Tribunal**

3.  At the outset, it is important to clarify what the applicable law of the Tribunal is. According to the relevant rules, it is both International Law and the National Law of Cyprus.[1] EU Law is part of *both*. The foundations of EU Law are international treaties and all other EU rules and institutions derive from them. National Law of EU Member

---

[1] This is explicitly mentioned in Article 10(5) of the Cyprus-BLEU BIT, CL-012: "The arbitral tribunal shall decide on the basis of: The national law, including the rules relating to conflicts of law, of the Contracting Party involved in the dispute in whose territory the investment has been made; The provisions of this Agreement; The terms of the specific agreement which may have been entered into regarding the investment; The principles of international law." The Cyprus-Greece BIT, CL-013, does not contain any rule as to the applicable law by the Tribunal. Consequently, Article 42 of the ICSID Convention is applicable, which states that, in the absence of the agreement of the parties, the applicable law is "the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable".

States must be consistent with EU Law and in case of contradiction, EU Law prevails. These are well known principles that require no further elaboration. That International Law and Cypriot National Law (both including EU Law) are the applicable laws to the merits of the case - if the case arrives at the merits stage - is also without a doubt. The question here is the applicable law to decide the matter of jurisdiction. I consider that the majority of the Tribunal has largely disregarded the role of EU Treaties in that matter while alleging at the same time that it applies international law.

4.  The first question to be clarified is the status of the two BITs. No ground for invalidity has been invoked and there is none. It is also clear that the Contracting Parties have not formally terminated them. Nevertheless, this is not the end of the analysis. The question remains whether the later accession of Cyprus to the EU Treaties implied the tacit termination of the BITs or whether the offer to arbitrate contained in the BITs is no longer operational after that accession because of its incompatibility with the EU Treaties.

5.   It would be a simplistic analysis to state that since Article 10 of the Cyprus-BLEU BIT and Article 9 of the Cyprus-Greece BIT confers jurisdiction on the Tribunal, the matter is settled since the EU Treaties do not apply to jurisdiction. It is clear that the only source of jurisdiction for the Tribunal would be the BITs, and neither EU Law nor the National Law of Cyprus would govern the matter. The question, however, is whether the BITs can be invoked in the context of the case at issue here, on the basis of the role of other international applicable rules governing conflict of treaties. The Respondent and the EC have contended that the BITs cannot be invoked because of the conflict between the BITs and the EU Treaties, the incompatibility of the former with the latter and the prevalence of the latter. In order to address this issue, it is necessary to apply the rules of international law that govern conflict of rules in general as well as the particular rules of conflict of treaties, as set out in the VCLT.[2] In turn, in order to apply these rules, it is necessary to interpret and, if necessary, to take into account the rules of the EU Treaties. The relevant question is whether the EU Treaties that are *lex posterior*

---

[2] The date of the entry into force of the VCLT for the Contracting Parties to the treaties concerned are the following: Belgium: 1 October 1992, Cyprus: 27 January 1980, Greece: 27 January 1980 and Luxembourg: 23 June 2003. The VCLT is applicable to the Cyprus-Greece BIT. It can be considered to be also applicable to the Cyprus-BLEU BIT, since it was concluded by Belgium on behalf of Luxembourg. It is not disputed that the VCLT applies to either BIT. Even if it were considered not to be applicable to Luxembourg since this State became a party to the VCLT after the conclusion of the Cyprus-BLEU BIT, the relevant provisions of the VCLT can be considered as reflecting general international law.

3

have superseded the BITs and/or render the offer to arbitrate contained in them ineffective.

6. The question is not whether the judgment of the CJEU in the *Achmea* case[3] is binding on the Tribunal. Neither *Achmea* nor any other decision by any other Court or tribunal is binding on this Tribunal. However, this does not mean that the CJEU judgment is devoid of any bearing on the present case. This is an authoritative interpretation of EU Treaties and of their impact on other rules of international law, *i.e.* the BITs concluded by EU Member States at a time one of the parties to those treaties was not a member of the EU. It is a short view approach to contend that since the CJEU decided on the basis of EU Law, then its decision has a limited scope for the question at issue here, which is placed on a broader scenario of international law. The CJEU analysed the question of the compatibility of prior conventional engagements of EU Member States with EU Treaties and came to the conclusion that they are not.

**B.  The Basis for the Decision on Jurisdiction**

7. In order to determine whether the Cyprus-Greece and Cyprus-BLEU BITs can be invoked as a basis for jurisdiction of the Tribunal or, on the contrary, have been terminated or their relevant articles became inapplicable after 1 May 2004, different avenues are open from a perspective of international law. As mentioned, there is no ground for invalidity of the BITs. Termination of the BITs is another possibility. In the instant case, since there has been no formal termination, the only possibility still open is a tacit termination in the sense of Article 59 of the VCLT. Even if the BITs are still in force, there is another possibility to be examined: the question of whether Articles 9 of the Cyprus-Greece BIT and 10 of the Cyprus-BLEU BIT can be invoked. Three different provisions stemming from applicable conventional law were advanced by the Respondent and the EC in order to challenge jurisdiction in this regard: Articles 59 and 30 of the VCLT and Article 351 of the TFEU. I will analyse these sequentially and

---

[3] Judgement of the Court of Justice of the European Union, delivered on March 6, 2018, *Slowakische Republik v. Achmea BV*, Case C-284/16, EU:C:2018:158, RL-0015.

4

subsequently examine the question of the (in)compatibility of the BITs with EU Treaties based on my conclusions with regard to the three provisions.

**(a) Article 59 of the VCLT**

8.  Article 59(1) of the VCLT refers to the possibility of an implied termination of treaties by the conclusion of a subsequent one. It reads as follows:

> A treaty shall be considered as terminated if all the parties to it conclude a later treaty relating to the same subject matter and: (a) it appears from the later treaty or is otherwise established that the parties intended that the matter should be governed by that treaty; or (b) the provisions of the later treaty are so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time.

9.  The Respondent mentioned that the procedure set out by Article 65 and following of the VCLT is not necessary in the case of an implicit termination governed by Article 59.[4] Indeed, a careful comparison of this article with the others of the same section dealing with termination of treaties or suspension of their application may confirm this conclusion. While the other articles mention that such termination or suspension "may be invoked", Article 59 states that a treaty "shall be considered as terminated" if the conditions set out in the article are met.

10. If Article 59 of the VCLT is applied, then the two hypotheses mentioned in its paragraph (1) should be examined. I will not proceed with this analysis for the following reasons. The position of the Parties to the BITs, particularly that of the Respondent, as well as that of the EC, has not been entirely consistent. The BITs continue to be on the list of treaties for which Cyprus is a party,[5] the possibility of unilateral termination contained in Article 13(1) and 12(1), respectively, of the Cyprus-BLEU and Cyprus-Greece BITs has not been employed, the EC has urged Member States to terminate their intra-EU BITs, and negotiations are currently in course.[6] All these facts render the applicability of Article 59 of the VCLT difficult in the instant case. Even if a formal termination

---

[4] Resp. Rep. Jur., para. 104.
[5] Tr. Day 1, p. 259; Tr. Day 2, p. 524.
[6] Declaration of the Representatives of the Government of the Member States of 15 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, p. 4, Annex EC-02; Declaration of the Representatives of the Governments of the Member States, of 16 January 2019 on the Enforcement of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union, p. 4, Annex EC-03.

could be explained as a manner to put an end to the existing legal ambiguity, particularly in view of the decisions of other investment arbitral tribunals considering the BITs as a valid basis for their jurisdiction in intra-EU cases, it is evident that a treaty that has implicitly been terminated needs no further termination. For this reason, I consider that Article 59 of the VCLT cannot form the basis for a decision to dismiss jurisdiction in this case. I concur with the majority on this point, however through a different path.

**(b) Article 30 of the VCLT**

11. Article 30 of the VCLT refers to the relationship between two successive treaties between the same parties relating to the same subject-matter. The relevant paragraphs read as follows:

> 2. When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.
>
> 3. When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the latter treaty.
>
> 4. When the parties to the later treaty do not include all the parties to the earlier one:
>
> (a) as between States parties to both treaties the same rule applies as in paragraph 3;
>
> (b) as between a State party to both treaties and a State party to only one of the treaties, the treaty to which both States are parties governs their mutual rights and obligations.

12. The situation in this case corresponds to that envisaged in paragraph (4): the later treaties are the EU Treaties[7] and the earlier ones are the Cyprus-BLEU and Cyprus-

---

[7] The Treaty of Nice was in force at the time of the accession of Cyprus in 2004, amending the Treaty of the European Union (Maastricht) and the treaties establishing the European Communities. For commodity, I will refer to the text of the current TFEU only.

Greece BITs. By virtue of paragraph (4), the rule of paragraph (3) applies here. The question is twofold: (i) whether the EU Treaties and the BITs relate to the same subject-matter and; (ii) whether the provisions of Article 9 of the Cyprus-BLEU BIT and Article 10 of the Cyprus-Greece BIT are compatible with the EU Treaties. Before analyzing these two aspects of the question, it is also necessary to refer to an explicit rule of compatibility of prior treaties contained in the later applicable one, here the TFEU. Indeed, as discussed below, the same two aspects need to be addressed with regard to Article 351 of the TFEU.

**(c)  Article 351 of the TFEU**

13. Article 351 of the TFEU is the same as Article 307 of the Treaty Establishing the European Community. It reads as follows:

> The rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties.

> To the extent that such agreements are not compatible with the Treaties, the Member State or States concerned shall take all appropriate steps to eliminate the incompatibilities established. Member States shall, where necessary, assist each other to this end and shall, where appropriate, adopt a common attitude.

> In applying the agreements referred to in the first paragraph, Member States shall take into account the fact that the advantages accorded under the Treaties by each Member State form an integral part of the establishment of the Union and are thereby inseparably linked with the creation of common institutions, the conferring of powers upon them and the granting of the same advantages by all the other Member States.

14. At the outset, it is important to read this Article in light of Article 30 of the VCLT. The method followed in both is comparable: the first paragraph of Article 351 enounces the possibility to apply rules of treaties concluded before the EC/EU membership of the State concerned on the assumption that they are compatible with the EU Treaties. The

7

second paragraph of Article 351 refers to the possibility of incompatibility of prior treaties with EU Treaties, in line with paragraph 3 of Article 30 of the VCLT. The logical assumption is that if incompatibility exists, it is because the subject-matter is also regulated by the EU Treaties. There cannot be incompatibility for matters not falling within the realm of the EU.[8]

15. The first paragraph of Article 351 has been interpreted as not being applicable between two States that have become EU members. The reason is that the text refers to treaties concluded "between one or more Member States on the one hand" and "one or more third countries on the other".[9] According to this view, this would not be the case because the BITs are treaties between two EU Member States. Even if the text is not a model of clarity, this interpretation is incorrect and indeed leads to an absurd result.

16. The two BITs at stake here were concluded before the accession of Cyprus to the EU in May 2004. Consequently, these are treaties concluded between one or more Member States (Belgium and Luxembourg, Greece) and a third country (Cyprus) at the time of the conclusion of the BITs. Article 351 refers to treaties concluded before the accession of Member States and consequently this would refer to the treaties concluded by Cyprus before 1 May 2004 but not those concluded by BLEU or Greece, because in their case the BITs were concluded after their EU membership. To strictly interpret the provision like this would imply that the TFEU has regulated incompatibilities between treaties concluded between Member States with third countries but did not regulate incompatibilities of treaties concluded between Member States themselves prior to the accession of one or more of them to the EU. This is a manifestly absurd and unreasonable result: it would mean that the Member States should have to avoid incompatibilities of treaties with third States while leaving unregulated incompatibility of treaties between themselves.

17. Indeed, the question of bilateral treaties concluded between EU Member States before their admission to the EU (or the admission of one of them) has been addressed by the

---

[8] See further below, Section D.
[9] TFEU, Article 351(1), RL-0020.

8

Luxembourg Court well before *Achmea* and with the same result: EU Law prevails over incompatible rules of pre-accession EU Member States treaties.[10]

18. The second paragraph of Article 351 commands Member States to "take all appropriate steps to eliminate the incompatibilities established". Claimants understand this obligation as, at the most, triggering a requirement that EU Member States terminate the BITs in order to "eliminate the incompatibilities" between the BITs and EU Law.[11] This is just one possibility among others that Member States may decide. Another possibility is to negotiate the modification of the incompatible provisions. Yet another is to consider the treaty terminated by virtue of Article 59 of the VCLT or to consider the incompatible clauses not applicable as foreseen in Article 30 of the VCLT. This array of possibilities in accordance with international law is open to Member States and it is for them in the context of their autonomy of will to decide which are the "appropriate steps" they wish to adopt. There is no obligation to follow one rather than another.

19. The third paragraph of Article 351 is also important and has not been taken into account in the Decision. It assists the Member States and their co-contracting parties to interpret the extent of the compatibilities with EU Treaties. Indeed, it delineates the framework beyond which there is incompatibility. It recalls that:

> the advantages accorded under the Treaties by each Member State form an integral part of the establishment of the Union and are thereby inseparably linked with the creation of common institutions, the conferring of powers upon them and the granting of the same advantages by all the other Member States.[12]

20. In other words, the advantages of Member States granted by the EU Treaties, the creation of common institutions (including the CJEU and the whole judicial system of

---

[10] *Conegate Limited v. HM Customs & Excise*, Case C-121/85, Judgment, 11 March 1986, ECLI:EU:C:1986:114, para. 25, RL-0036; *Ministère public v. Deserbais*, Case C-286/86, Judgment, 22 September 1988, ECLI:EU:C:1988:434, paras. 17-18, RL-0037; *Annunziata Matteucci v. Communauté Française de Belgium and Commissariat Général aux Relations Internationales de la Communauté Française of Belgium,* Case C-235/87, Judgment, 27 Sept. 1988, ECLI:EU:C:1988:460, para. 22, RL-0032; *Exportur SA v. LOR SA and Confiserie du Tech*, Case C-3/91, Judgment, 10 November 1992, ECLI:EU:C:1992:420, para. 8, RL-0038; *Commission v. Italy*, Case 10/61, Judgment, 27 February 1962, ECLI:EU:C:1962:2, RL-0039.
[11] Cl. Rej. Jur., para. 117.
[12] TFEU, Art. 351(3), RL-0020.

the EU), the respect of their powers and the fact that all members enjoy the same advantages constitute a whole that must be respected in their mutual relations and in the relations with third parties. No matter what the correct interpretation of the first paragraph of Article 351 is, the third paragraph offers clear guidance as to the manner in which treaties concluded between Member States must be interpreted, in light of the EU Treaties and in order to determine whether they are compatible. The arbitration clauses of the two BITs must pass this test in order to remain applicable.

21. Since Article 351 of the TFEU is the explicit provision of the later treaty dealing with conflict of rules with prior treaties, it becomes a relevant rule in order to determine the relationship between the BITs and the EU Treaties. I consider that this provision backs the application of Article 30 of the VCLT and does not introduce any specific rule deviating from the general one established by the latter. It simply specifies the content of the "compatibility test" and renders explicit the solution that in case of incompatibility of prior treaties with EU Treaties, the latter prevail.

22. Consequently, the two following sections will analyse the two first elements that are necessary to decide whether the provisions of Article 9 and 10 of the Cyprus-BLEU and Cyprus-Greece BITs are applicable to this case: whether the treaties concerned deal with the same subject-matter and whether or not they are compatible.

## C. The BITs and the EU Treaties are dealing with the same subject-matter

23. The Decision rightly mentions the Report on Fragmentation of the ILC Study Group describing the manner in which the test of "the same subject matter" must be followed:

> [T]he test of whether two treaties deal with the "same subject matter" is resolved through the assessment of whether the fulfilment of the obligation under one treaty affects the fulfilment of the obligation of another. This "affecting" might then take place either as strictly preventing the fulfilment of the other obligation or undermining its object and purpose in one or another way.[13]

---

[13] International Law Commission, Report of the Study Group, Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law, UN Doc. No. A/CN.4/L.682, 13 April 2006, RL-0027.

24. The majority recognizes that both BITs and EU Treaties deal with investment and that "at a certain, general, level the treaties deal with the same subject matter".[14] Indeed, the fact that one treaty has a wider scope than another treaty but deals with matters covered by the latter, does not mean that they have different "subject matters". My colleagues consider, however, that "at a more specific level they deal with a different subject matter".[15] For them, the crucial point is that BITs "provide a mechanism for nationals of one party to bring a claim against another party, something that is not provided for in the EU treaties".[16] Before demonstrating that this is not correct, I consider necessary to show that on substantial issues relating to the treatment to be granted to investment, both the BITs and EU Treaties deal with the same subject. The next section, analyzing the incompatibilities of the BITs with EU Treaties, will complete the analysis by demonstrating that the fulfilment of the obligations of the BITs both affects the obligations of EU Member States under the EU Treaties and indeed undermines their object and purpose.

25. What is considered free movement of capital within the EU is larger than what is considered as investment in the BITs.[17] The Contracting Parties of the two BITs, and consequently their investors, since the time of the accession of Cyprus to the EU, enjoy all the privileges of the single European market. This includes the four fundamental freedoms, i.e. free movements of persons, goods, capital and to establish and provide services. The Charter of Fundamental Rights of the European Union, which according to Article 6 of the TFEU has the same legal value as the EU Treaties, specifically mentions the freedom to conduct a business, the right to property, equality before the law and non-discrimination, among others. Article 18 of the TFEU explicitly contains a rule of non-discrimination. Proportionality, legal certainty and even the controversial doctrine of legitimate expectations are recognized as general principles of EU Law and applied by the European judiciary.[18] The right of property recognized within the EU

---

[14] Decision, para. 168.

[15] *Ibid.*

[16] *Ibid.*

[17] *See* Council Directive 88/361/EEC of 24 June 1988 for the implementation of Article 67 of the Treaty Establishing the European Economic Community. For case law, *see Commission v. Kingdom of the Netherlands,* Joined Cases C-282/04 to C-283/04, Judgment, 28 September 2006, [2006] ECR I-9141; *Commission v. Italian Republic,* Case C-174/04, Judgment, 2 June 2005, [2005] ECR 1-4933.

[18] *Pfleger,* C-390/12, EU:C:2014:281, paras. 30 to 37; ECJ, 30 April 2019, *Italy v. Conseil,* case C-611/17, paras. 97-116; ECJ (GC), 3 December 2019, *Czech Republic v. Parliament and Conseil,* case C-482/17, paras. 141, 153

11

Law includes the protection envisaged in BITs concerning the deprivation and limitation of ownership. Free transfers, as protected by BITs, are equally covered by the four fundamental freedoms, particularly the free movement of capitals.

26. The breaches alleged by the Claimants are based on what they consider discriminatory and arbitrary measures leading to their alleged expropriation, having suffered an alleged unfair and unequitable treatment.[19] All these allegations find resonance under both the BITs and the EU Law.

27. On the basis of the above, it can be considered without any doubt that the "fair and equitable treatment" that investors enjoy by virtue of the BITs is then also applicable by virtue of the EU treaties. Even more, one can also mention that EU investors enjoy within the EU more substantial rights and privileges than non-EU investors, even with regard to those non-EU investors having the benefit of the protection of BITs.[20] Indeed, it is a banality to state that EU-investors enjoy more privileges for conducting their businesses in the EU than non-EU investors. No distinction exists between Nationals of a Member State and Nationals of other EU Member States. In fact, "the need for international protection" for the latter does not exist for the EU-investors as they are already enjoying it by virtue of international treaties and international institutions - including a permanent judicial Court - and mechanisms, including a judicial system binding on all EU Member States.

28. Analysing the same question, and in order to justify the position that BITs and EU Treaties do not deal with same subject-matters, some prior decisions have argued that the protection granted by BITs is higher than that of EU Treaties.[21] I have not been convinced by this *petitio principii*. Rather, the two BITs themselves explicitly demonstrate the opposite. This is crystal clear in the key Article 3 of both BITs, dealing with the "protection of investments", which is the clause defining the scope of that protection, as mentioned immediately below.

---

and 157. The principle of the respect of legitimate expectations has been recognized as early as in 1993: *Driessen and Others v. Minister van Verkeer en Waterstaat*, Joined cases C-13/92, C-14/92, C-15/92 and C-16/92, para. 35.
[19] Cl. Mem. Merits, paras 223-349.
[20] See below, paragraph 78.
[21] For example: *Jürgen Wirtgen, Stefan Wirtgen, Gisela Wirtgen and JSW Solar (zwei) GmbH & Co. KG v. Czech Republic (PCA Case No. 2014-03)*, Final Award, 11 October 2017, para. 253, Annex EC-018.

29. Article 3(3) of the Cyprus-BLEU BIT provides that "[t]he treatment and protection referred to in paragraphs 1 and 2 shall at least be equal to those enjoyed by investors of a third State and shall in no case be less favourable than those recognized under international law." Article 3(4) immediately put the following limit:

> However, such treatment and protection shall not cover the privileges granted by one Contracting Party to the investors of a third State pursuant to its participation in or association with a free trade zone, a customs union, a common market or any other form of regional economic organization.

30. A similar clause is found in the Cyprus-Greece BIT.[22] In other words, prior to the accession of Cyprus to the EU on 1 May 2004, Belgian, Luxembourgian, Greek and Cypriot investors could not enjoy the privileges of EU investors in EU Member States in their activities in the other Contracting Parties of the two BITs. Now it is the case: they enjoy them after the accession of Cyprus to the EU in May 2004.

31. For the purposes of this concrete analysis, the crucial point, however, is that considering the protection in one case being better than in another rather shows that the subject-matters are the same. It is elementary that something cannot be better than something else if they are substantially different. One cannot compare apples with pears, even though both are fruits.

32. The argument for the alleged higher protection to investors through BITs than from EU Treaties is that the former contains an arbitration clause. It is surprising, and even regrettable, to read in another award that "[f]rom the point of view of the promotion and protection of investments, the arbitration clause is in practice the most essential provision of Bilateral Investment Treaties".[23] If this were true, then the applicable law becomes secondary. If one follows this view expressed by international arbitrators, what is essential for the protection of foreign investments is the fact of having international arbitrators interpreting and applying the law, no matter what the law establishes.

---

[22] Cyprus-Greece BIT, Art. 3(3): "This treatment is not extended to privileges or advantages granted by Contractual parties to third party investors: a) Due to their participation or link to a customs or economical union, common market, free trade zone or any other similar organization."
[23] *Eastern Sugar B.V. (Netherlands) v. The Czech Republic*, SCC Case No. 088/2004, Partial Award, 27 March 2007, para. 164, RL-0053.

33. Unfortunately, the Decision follows a similar path, even if it does not go so far as that quoted above, in order to conclude that BITs and EU Treaties do not address the same subject-matter. It asserts that "[u]nder the EU regime claimants are left in the hands of domestic courts only, something that BITs do not provide for. In fact, BITs provide specifically for an alternative to determination by national courts. In that respect, the EU Treaties and the BITs do not deal with the same subject matter".[24] Following this conclusion, the Decision goes further and concludes that

> The existence of a procedure allowing the nationals of one state to bring a claim against another state under a BIT does not prevent the EU Treaties from operating. The fact that both have provisions relating to obligations on states in respect of foreign investors does not mean that the functioning of one prevents the functioning of the other. They can both operate side by side. The object and purpose of neither treaty regime is undermined by the fact both operate in parallel.[25]

34. In fact, these assertions are not correct. The subject-matter includes dispute settlement in both, as recognized by the Decision.[26] Furthermore, both the BITs and EU Treaties allow EU investors to have recourse not only to an international adjudicative system, but even to reach international tribunals or courts. It is true that in the EU Judicial System domestic courts and tribunals play a primary role. However, this role is neither exclusive nor even decisive. The last word in the interpretation of EU treaties lies in a permanent international Court: the CJEU. Domestic judges must trigger a preliminary ruling of the CJEU if there is a question concerning the interpretation of an EU Treaty.[27] Furthermore, Article 267 of the TFEU explicitly states that if that such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the CJEU. In both cases, national courts and tribunals must follow the decision of the CJEU. Moreover, this is not the only case in which this standing international Court may act in the context of an investment within the EU, as explained immediately below.

---

[24] Decision, para. 168.
[25] Decision, para. 170.
[26] Decision, para. 168.
[27] TFEU, Article 267, RL-0020.

35. In accordance with the principle of state responsibility for violation of EU Law, an investor can activate a mechanism to establish state responsibility for violation of EU Law. This is the so-called *Francovich* principle, by virtue of which the Court of Luxembourg established that EU Member States could be liable to pay compensation to individuals who suffered a loss because a Member State failed to apply EU Law. The court in *Francovich* summarized the situation in the following clear manner:

> 31 It should be borne in mind at the outset that the EEC Treaty has created its own legal system, which is integrated into the legal systems of the Member States and which their courts are bound to apply. The subjects of that legal system are not only the Member States but also their nationals. Just as it imposes burdens on individuals, Community law is also intended to give rise to rights which become part of their legal patrimony. Those rights arise not only where they are expressly granted by the Treaty but also by virtue of obligations which the Treaty imposes in a clearly defined manner both on individuals and on the Member States and the Community institutions (see the judgments in Case 26/62 *Van Gend en Loos* [1963] ECR 1 and Case 6/64 *Costa v ENEL* [1964] ECR 585).

> 32 Furthermore, it has been consistently held that the national courts whose task it is to apply the provisions of Community law in areas within their jurisdiction must ensure that those rules take full effect and must protect the rights which they confer on individuals (see in particular the judgments in Case 106/77 *Amministrazione delle Finanze dello Stato v Simmenthal* [1978] ECR 629, paragraph 16, and Case C-213/89 *Factortame* [1990] ECR I-2433, paragraph 19).

> 33 The full effectiveness of Community rules would be impaired and the protection of the rights which they grant would be weakened if individuals were unable to obtain redress when their rights are infringed by a breach of Community law for which a Member State can be held responsible.

> 34 The possibility of obtaining redress from the Member State is particularly indispensable where, as in this case, the full effectiveness of Community rules is subject to prior action on the part of the State and where, consequently, in the absence of such action, individuals cannot enforce before the national courts the rights conferred upon them by Community law.

> 35 It follows that the principle whereby a State must be liable for loss and damage caused to individuals as a result of breaches of Community

15

law for which the State can be held responsible is inherent in the system of the Treaty.[28]

36. In addition, it is possible to report the possible Member State violation to the EU Commission, which, by virtue of Articles 258 to 260 TFEU, can bring the matter to the CJEU against the Member State in question. Member States are responsible for the actions of their judiciary.

37. It is important to compare the object and purpose of BITs with the establishment of a Common Market by the EU Treaties. The preambles of the BITs explain their object and purpose. The Cyprus-BLEU BIT states that the Governments desire "to strengthen their economic cooperation by creating favourable conditions for investments by nationals of one Contracting Party in the territory of the other Contracting Party". For its part, the Cyprus-Greece BIT affirms "[t]he enhancement of cooperation between both countries in order to foster mutually beneficial investments, between investors who wish to invest to the other contractual party territory and vice versa".

38. By becoming Members of the EU and its treaties, these same States have allowed their investors to be subject to the same rules in the whole area of the common market and customs union, and national laws cannot override EU Law in this regard. Indeed, one could even consider that the object and purpose of these BITs became obsolete after the accession of Cyprus to the EU Treaties. When these BITs were encouraged to be concluded, it was with the purpose of preparing the accession of the new Member States to the EU.[29]

39. The next section demonstrates the incompatibility of the BITs with the EU Treaties. Consequently, the provisions allowing nationals of one State to bring a claim against another State under a BIT prevent the EU Treaties from operating in the manner these

---

[28] *Andrea Francovich and Others v. Italy*, Joined Cases C-6/90 and C-9/90, Judgment, 19 November 1991, ECLI:EU:C:1991:428, paras. 31-35, RL-0051.

[29] This is what is mentioned by the Opinion of Advocate General Wathelet in the *Achmea* case, although reaching the, in my view wrong, conclusion, that, because of this, BITs and EU Law are not incompatible: "For a very long time, the argument of the EU institutions, including the Commission, was that, far from being incompatible with EU law, BITs were instruments necessary to prepare for the accession to the Union of the countries of Central and Eastern Europe.", para. 40, CL-0224. As a matter of course, while both treaty regimes cover the same rights and allow international protection, there is no incompatibility in this sense.

treaties were envisaged. In other words, both dispute settlement mechanisms cannot work together, as the CJEU concluded and as will be seen below.

### D. The BITs are incompatible with EU Treaties

40. The Decision has not gone as far as a recent award that considered that there is a "presumption of non-conflict" and applied such presumption to the relationship between intra EU-BITs and the EU Treaties.[30] Such a presumption does not appear either in the VCLT or in customary law. Rather, the mere presence of Article 30 of the VCLT shows that there is no presumption and that there is a need to envisage the possibility of conflict of rules and to regulate it. This is quite normal. States have concluded thousands of treaties over the years (or even centuries), the vast majority of them not providing for a time limit of their existence. Many of them even remain forgotten although they are formally in force.

41. Even assuming that such invented doctrinal presumption of non-conflict exists, it would not be applicable to this case. One thing is imaging that two States having concluded a bilateral treaty will take care while concluding a later one not to adopt contradictory rules, yet another quite different thing is to become member of a developed multilateral integration system (and consequently becoming party to its treaties). There is no need of any stretch of imagination to realize that with this accession not few, but *many*, conventional provisions as well as national legislation, may become incompatible with EU treaties.

42. The Parties and the Tribunal have largely addressed the impact of the *Achmea* Judgment. The Decision focuses its analysis on Articles 267 and 344 of the TFEU as the ground for precluding the operability of dispute resolution clauses in intra-EU BITs. The CJEU's reasoning is that allowing investment treaty arbitral tribunals to deal with matters that require the application of EU Law ultimately threatens the uniform and effective interpretation and application of EU law in violation of the principle of sincere cooperation under Article 4(3) of the TEU and Article 344 of the TFEU. Indeed, the

---

[30] *Magyar Farming Company Ltd, Kintyre Kift, and Inicia Zrt v. Hungary (ICSID Case No. ARB/17/27)*, Award, 13 November 2019, para. 240.

role of the CJEU as emerging from the TFEU would be undermined if the arbitration clauses of prior BITs remained applicable.

43. The exclusive jurisdiction of the CJEU to render a final interpretation of EU Treaties is not a novelty of *Achmea*. In *MOX Plant*, the Court asserted that international agreements cannot affect the exclusive jurisdiction of the Court under Article 344 of the TFEU.[31] Equally, in *ECHR II*, the Court stated that its exclusive jurisdiction is in itself an essential characteristic of EU Law that precludes "any prior or subsequent external control".[32] One of the points to be dealt with in the instant case, if it reaches the merits, is the alleged exclusive competence of the EU institutional bodies to supervise the capital transfer and the EU Bank Recovery and Resolution Directive. Indeed, EU Law and EU action is omnipresent in this case. This would necessarily require examining EU Law, contrary to what the Decision states, contending that these are mere "facts".[33] EU Law, as mentioned above, is part of both national and international law applicable to the "facts" of the case by virtue of the BITs.

44. The question here is not that no other Court or tribunal but EU judicial bodies can examine EU Law. As a matter of course, WTO panels and the Appellate Body have examined EU Law and ITLOS could have done the same if the case concerning *Conservation and Sustainable Exploitation of Swordfish Stocks (Chile/European Union)* was not discontinued.[34] The same may apply in other circumstances, including the application of BITs concluded by a EU Member State with a non-Member State. Last year, the CJEU affirmed the compatibility with the principle of autonomy of EU Law of the Investment Court System provided for by the Comprehensive Economic and Trade Agreement between the EU and Canada ("CETA").[35] The question here is indeed the settlement of *intra-EU disputes within the EU*.

45. The Decision does not cite the importance of Article 18 of the TFEU, which declares the principle of non-discrimination. The fact that the CJEU did not consider necessary to analyse this Article in *Achmea* (which was the third question put to it) because it

---

[31] *Commission of the European Communities v. Ireland*, Case C-459/03, Judgment, 30 May 2006, ECR-I4635 para. 132.
[32] Opinion 2/13, *ECHR II*, 18 December 2014, EU:C:2014:2454, paras. 201 and 210.
[33] Decision, para. 174.
[34] *Conservation and Sustainable Exploitation of Swordfish Stocks (Chile/European Union), Order of 16 December 2009, ITLOS Reports 2008-2010*, p. 13.
[35] Opinion 1/17 of the Court (full Court), 30 April 2019, ECLI:EU:C:2019:341.

reached the conclusion that Articles 267 and 344 of the TFEU preclude an investor of a Member State from bringing a claim against another Member State on the basis of an arbitration clause of a BIT (answering the first and second question put to it) does not prevent this Tribunal from examining it.

46. One of the bases for economic integration is the right of equal treatment of EU citizens in the enjoyment of the EU freedoms. Article 18 of Part Two of the TFEU, under the heading "Non-Discrimination and Citizenship of the Union", establishes the principle of non-discrimination and prohibits discrimination on the basis of nationality. National rules, no matter whether they have not yet been abrogated, cannot be validly opposed to this fundamental provision of EU Law.[36] Collectively granting the right of citizens and corporations of some of the EU Member States to resort to international arbitration while not to citizens and corporations of other EU Member States through BITs constitutes an elementary infringement of Article 18. This ground would be largely enough to dispose of the arbitration clauses contained in BITs concluded between EU members with States that also became EU members later. In my view, together with the respect for the exclusive EU judicial system, this is a major incompatibility between the BITs and EU Treaties.

47. This incompatibility could not be solved by a kind of MFNC to be applied by extension to all EU citizens and corporations for a number of reasons I do not consider necessary to explain here. I will content myself to say that such a "solution" would be tantamount to destroying the EU judicial system established by the EU Treaties.

48. Taking into account the incompatibility of the BITs arbitration clauses with the EU Treaties, this conflict of rules must be settled in one manner or another. One of the purposes of the rules governing conflict of rules is to avoid the unfortunate result of having the same conduct being considered illegal by virtue of one rule, and legal for the other at the same time. The same unfortunate result occurs when the same situation can be examined by two different adjudicative bodies at the same time. In this particular

---

[36] As stated by the Court in *Collins*, the right to equal treatment laid down in Article 18 of the TFEU is conferred directly by EU law. That right may, therefore, be relied upon before a national court as the basis for a request that it disapply the discriminatory provisions of national law (*Collins v. Imtrat Handelsgesellschaft mbH,* Joined Cases C-92/ 92 and C-326/92, Judgment, 20 October 1993, ECLI:EU:C:1993:847, para. 34).

case, the EU Treaties prevail by virtue of the rules embodied in Article 30 of the VCLT and in Article 351 of the TFEU, as will be elaborated further.

49. Ancillary, it must be mentioned that as a result of the EU membership of Cyprus, not only Article 9 of the Cyprus-Greece BIT and Article 10 of the Cyprus-BLEU BIT became inapplicable. Other articles of both BITs followed the same sort. As seen above, Article 3(4) of the BITs lost its sense since now all Contracting Parties are members of the EU. Article 6 of the Cyprus-BLEU BIT relating to exchange rates of transfers also became inapplicable after the Euro became the same currency of the Parties to the BIT. The remaining articles are a mere juxtaposition of similar rules also found in EU Law.

50. The Claimants have invoked that between the *lex posterior* and the *lex specialis*, the latter prevails.[37] According to them, the BITs are *lex specialis*.[38] The question here is that the BITs and EU Law are both "special", at the procedural level (arbitral tribunal or EU judicial system) and at the substantial level (discrimination, fair and equitable treatment, expropriation, etc). The *lex specialis* rule does not provide a solution to this conflict. The pretence that since this is an arbitral tribunal constituted on the basis of the BITs, the applicable *lex specialis* is that of the BITs is also a manner to beg the crucial question, avoiding the resolution of the conflict of applicable rules. Perhaps this explains the insistence on the argument that the CJEU is only "concerned with the application of EU Law",[39] and that the Tribunal applies the BITs only.

51. According to the Claimants, Article 8 of the Cyprus-BLEU BIT and Article 10 of the Cyprus-Greece BIT demonstrate that BITs can coexist with EU Treaties and indeed are complementary.[40] According to these articles, the investors of the other Contracting Party can avail themselves of the provisions of national legislation or international treaties that are the most favourable to them in an issue relating to investment. In my view, these articles do not cover the arbitration clauses contained in Article 10 of the Cyprus-BLEU and Article 8 of the Cyprus-Greece BIT. Even if they were covered, the question would remain what of the two international adjudicative mechanisms is most favourable. It is not for the Claimants themselves to decide. To put the question is to show its inadequacy. Is one or the other more favourable because the chances of success

---

[37] Tr. Day 1, p. 257.
[38] *Ibid*; Tr. Day 2, p. 508.
[39] Decision, para. 180.
[40] Cl. C-Mem. Jur., paras. 93-94; Tr. Day 1, p. 257.

are higher in one rather than in the other? Is it because the procedure is shorter in one than in the other? Or because the national judges are directly excluded in one and they participate in the other? Or is it because the chances to obtain recognition and enforcement are higher in one case than in the other? I wonder whether EU investors within the EU could validly enjoy all the privileges of their European capacity within the EU system while at the same time exclude one fundamental element of the Union: its judicial system. Indeed, there is no need to answer any of these questions. Since the arbitration clauses are incompatible with the edifice constructed by the EU Treaties, Article 10 of the Cyprus-Greece BIT and Article 8 of the Cyprus-BLEU BIT are no longer applicable.

### E. The Award Disregards the Authentic Interpretation Made by the Contracting Parties

52. The majority of the Tribunal presented the content of the Declarations of the EU Member States of January 2019 and the Joint Information Note Cyprus/Greece in an incomplete manner. The Decision merely states that the Declarations "establish the understanding of the Contracting Parties with regard to their obligations under EU law and require member states to advise investment tribunals of the *Achmea* decision and its consequences for them and encourages states to terminate their BITs".[41] It goes on contending that "[s]etting out the obligations of states under EU law does not constitute a subsequent interpretation of their BITs and a withdrawal of consent to arbitrate. Furthermore, encouraging states to terminate their BITs is inconsistent with the view that states no longer have obligations under those treaties".[42] However, the second paragraph of the 15 January 2019 Declaration (signed *inter alia* by Cyprus and Greece) states that "Union law takes precedence over bilateral investment treaties concluded between Member States. As a consequence, all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are

---

[41] Decision, para. 179.
[42] *Ibid.*

contrary to Union law and thus inapplicable." A footnote to this paragraph even refers to the VCLT.[43]

53. The Decision does not discuss the Joint Information Note of the Hellenic Republic and the Republic of Cyprus regarding their 1992 BIT either. The Respondent considered this Joint Information Note as well as the January 2019 Declarations as falling within Article 31(2)(a) or Article (3)(a) of the VCLT as subsequent agreements, either forming part of the context or to be taken into account together with the context as subsequent agreements in the sense of the VCLT.[44] The Joint Information made clear that the Parties to it consider its BIT as being incompatible with the European Union Law and consequently inapplicable. As a result, the two Contracting Parties to the 1992 BIT consider that this Tribunal lacks jurisdiction. The Cyprus-Greece Joint Information Note specifically refers to Article 31(2) and Article 31(3) of the VCLT.[45] I consider that the Tribunal cannot ignore this authentic interpretation made by both Contracting Parties to their BIT.

54. With regard to the Cyprus-BLEU BIT and its compatibility with EU Treaties, the Declaration of the Representatives of the EU Member States of 16 January 2019, which included Luxembourg, can also be considered as the expression of their interpretation. It also states that, "according to the case law of the CJEU, the provisions of a bilateral agreement between Member States containing an investment-State arbitration clause such as the one described in the *Achmea* judgment are contrary to Union law and thus inapplicable".[46]

55. It is unfortunate that the majority of this Tribunal has not given these authentic interpretations the importance that they deserve. In order to be considered agreements, there is no need of any specific form. There is no doubt that these instruments are the expression of the common will and understanding of the Parties to the BITs. There is

---

[43] Declaration of the Representatives of the Government of the Member States of 15 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, p. 1, Annex EC-02.
[44] Decision, para. 54.
[45] Joint Information Note of the Hellenic Republic and the Republic of Cyprus regarding the Agreement between the Government of the Hellenic Republic and the Government of the Republic of Cyprus for the Reciprocal Encouragement and Protection of Investments of March 30, 1999, dated 8 May 2019, p. 1, RL-0206.
[46] Declaration of the Representatives of the Governments of the Member States, of 16 January 2019, on the enforcement of the judgment of the Court of Justice in *Achmea* and on investment protection in the European Union, p. 1, Annex EC-03.

also no doubt that an interpretation does not infringe on any prohibition of retroactivity, if any. By definition, interpretation is the operation of clarifying the content and scope of a given provision or instrument and this ascertainment of the content applies to that provision or instrument since its existence. Another thing would be to modify or to terminate the provision or instrument at stake. As mentioned earlier, the BITs were not formally terminated and the question here is not about modification but of compatibility with an ulterior treaty.

56. Nevertheless, the crucial point here is not to exclusively focus on the interpretation of one article of the BITs or another of the EU Treaties. Indeed, the point is not to interpret the arbitration clauses: they clearly provide the possibility of arbitration. What the Parties to the BITs and the EU Treaties have done is an *interpretation of the relationship of both conventional arrangements*. Put differently, they have interpreted Article 30 of the VCLT and Article 351 of the TFEU and applied it to the relationship between the BITs and the EU Treaties. It is this conventional whole, including the arbitration clauses in the context of the EU Treaties to which the Parties became bound afterwards, that has been interpreted, not individual provisions of a treaty. This is how the Contracting Parties came to the conclusion of the incompatibility invoked in their common understanding.

57. The Contracting Parties to the two BITs consider that the arbitration clauses contained in them are inoperative. As the CJEU is the judicial authority vested by these same Contracting Parties in the EU Treaties with the capacity of stating the correct interpretation of EU Treaties in an authoritative manner, the Contracting Parties to the BITs are bound to follow that interpretation. All this cannot be disregarded lightly.

58. The Contracting Parties' interpretation can be regarded as made in good faith and in line with consistent practice and case law on the prevalence of EU Treaties over national laws and international agreements dealing with EU matters. Article 31 of the VCLT gives weight to the subsequent interpretation of the parties to treaties. The interpretation should at least be "taken into account".[47] The Decision has given no weight to it. It did not take it "into account". Instead, the Decision tells the Contracting Parties to the

---

[47] VCLT, Art. 31(3), CL-0051.

Treaties on the basis of which the Tribunal was established that they misinterpreted their own Treaties.

59. It has been argued by other tribunals that since BITs are international treaties conferring rights to private parties, the authentic interpretation by the parties would be limited by the general principles *res inter alios acta, aliis nec nocet nec prodest* and of legal certainty.[48] At the outset, these are not treaties conferring rights on a third State or on human beings in general. BITs are treaties based on an inter-State relationship, on mutuality and equality of obligations. The rights conferred on private parties are exclusively based on their nationality, *i.e.* those of the Contracting Parties. As investors, they do not have "inherent rights". This Tribunal is not a human rights body and we are not dealing with human rights treaties. Investors' rights are exclusively based on the will of the Parties of having a mutual exchange of investor protection. If the Contracting Parties interpret their BITs in one manner or another, this interpretation applies to the investors of both Parties. The so-called "sunset provision" does not have any bearing on the interpretation of the compatibility of intra EU-BITs with EU Treaties. It simply preserves investors' rights for a given period of time after the denunciation of a BIT by one of the Contracting Parties. The Tribunal is analyzing a completely different situation at this jurisdictional phase. "*res inter alios acta*" does not play any role here.

60. The so-called principle of legal certainty does not change the present perception of things. If there is a problem of interpretation, it is necessarily because the matter is not clear enough. If the Claimants made a given interpretation of the BITs and the impact of the EU Treaties on them after the accession of Cyprus to the EU, it may be that this interpretation was wrong. Certainly, the situation would be different for Claimants having made their investments before or after the EU accession of Cyprus with regard to acts accomplished by Cyprus before or after 1 May 2004. However, the question here is that the interpretation of the prevalence of EU Treaties over bilateral treaties dealing with matters covered by EU Law has been consistent since the early times of the existence of the European communities. Furthermore, there is no evidence that the Claimants were motivated by the existence of the BITs when they made their alleged investments in Cyprus.

---

[48] *Magyar Farming Company Ltd, Kintyre Kift, and Inicia Zrt v. Hungary* (*ICSID Case No. ARB/17/27*), Award, 13 November 2019, para. 222.

**F.  EU Treaties take precedence over incompatible BITs**

61. Having examined the same subject-matter of BITs and EU Treaties and determined the incompatibility of the application of the arbitration clauses of the former with the whole EU legal system and having taken into account the authentic interpretation of the conventional relations entered into by the Contracting Parties, this section further determines which of the two systems must prevail. As will be seen, the natural response that emerges from what has been analysed above is that the EU Treaties prevail.

62. I entirely agree with the ILC Study Group Report on Fragmentation which stated already in 2006 (that is to say, at a time when the questions raised by the intra-EU investment disputes and arbitration were not envisaged by investment arbitral tribunals in the manner as is the case today) that:

> Agreements establishing international organizations often contain a conflict clause. The best known example is Article 103 the United Nations Charter (…). Likewise, article 307 (previously art. 234) of the Treaty establishing the European Community (EC Treaty) [today Article 351 of the TFEU] sets up a conflict rule for agreements between member States and third parties. The EC Treaty takes absolute precedence over agreements that Member States have concluded between each other.[49]

63.  The position by the CJEU in *Achmea* with regard to the prevalence of EU treaties over prior ones concluded by Member States before their accession to the EU does not come as a surprise. It is coherent with the position that the Court has taken for a long time. Thus, as early as in 1962, the Court held:

> in matters governed by the EEC Treaty, that Treaty takes precedence over agreements concluded between Member States before its entry into force, including agreements made within the framework of GATT.[50]

---

[49] International Law Commission, Report of the Study Group, Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law, UN Doc. No. A/CN.4/L.682, 13 April 2006, para. 283, RL-0027.
[50] *Commission v. Italy,* Case 10/61, Judgment, 27 February 1962, ECLI:EU:C:1962:2, para. II B 5, RL-0039.

25

64. In this context, it is useful to pay attention to the manner in which Germany explained why it referred a dispute with Italy, another member of the EU, to the ICJ. Germany considered necessary to explain why the matter could have not been submitted to the CJEC under the title "*No jurisdiction of the Court of Justice of the European Communities*" in the following manner:

> The present dispute is not covered by any of the jurisdictional clauses of the Treaty of Nice (Art. 227 EC). Although disturbances of the proper functioning of the internal market under the Treaty of Nice — and later of the Treaty of Lisbon — may result from the contested practice of the Italian courts, it has no direct link with the operation of the European market régime. The general relationship between the European nations continues to be governed by general international law. Every member State of the European Community/European Union is obligated to respect the general rules of international law vis-à-vis the other members unless specific derogations from the régime have been stipulated. In respect of the dispute in the instant case, however, no such derogation has been agreed upon. Jurisdictional immunity belongs to the core elements of the relationship between sovereign States. Outside the specific framework established by the treaties on European integration, the 27 European nations concerned continue to live with one another under the régime of general international law. It should be added, in this connection, that the special framework of judicial co-operation that enables individuals to obtain the execution of judgments rendered in one member State of the European Union in other member States of the Union does not comprise legal actions claiming compensation for loss or damage suffered as a consequence of acts of warfare.[51]

65. It is clear for Germany that Member States can only resort to international courts and tribunals on matters not covered by EU Treaties and hence, covered by general international law. It would be strange to imagine that what States prohibit among themselves on matters governed by EU Law, they do not prohibit their citizens. Furthermore, there is no doubt that the issues at stake in the instant case involve the application of EU Law.

66. Finally, the EU has been coherent in this interpretation of the incompatibility of intra-EU BITs with EU Treaties. It adopted a Regulation establishing a framework for

---

[51] *Jurisdictional Immunities of the State (Germany v. Italy), Application Instituting Proceedings,* International Court of Justice, 22 December 2008, para. 6.

managing financial responsibility linked to investor-state dispute settlement tribunals established by international agreements to which the European Union is party[52] and another one establishing transitional arrangements for bilateral investment agreements between Member States and third countries.[53] As a matter of course, there is no Regulation with regard to investment agreements between Member States.

67. No EU investor (and jurist as well, even those not specialized in the field) can ignore the fundamental basis by which this highly developed economic integration legal system operates. The fundamental characteristics of the EU legal system have been extensively addressed by the Luxembourg Court for decades, well before the problem of the BITs concluded by States that later became EU Members arose. That EU Law has direct effect[54] and primacy over national law[55] has been enunciated in historic well-known judgments. In *EP v Council and Commission (Bangladesh)*, the Court also asserted that exclusive EU competence bars the Member States from exercising their own retained competences *inter-se*, outside the Treaty structures.[56]

68. Indeed, that EU Treaties take precedence over prior treaties concluded between Member States in matters governed by the EU, as is the case here, is not a surprise nor an invention of the CJEU in *Achmea*. Other tribunals have quoted a case in which it was affirmed that the current Article 351 of the TFEU is not applicable to treaties concluded between Member States, but neglected another fundamental paragraph of the same ruling, according to which:

> the Court has consistently held (see in particular the judgment of 27 February 1962 in Case 10/61 Commission v Italy [1962] ECR 1) that, in matters governed by the EEC Treaty, that Treaty takes precedence over agreements concluded between Member States before its entry into force.[57]

---

[52] Regulation (EU) No. 912/ 2014, [2014] OJ L257/ 121.
[53] Regulation (EU) No. 1219/ 2012, [2012] OJ L351/ 40.
[54] *NV Algemene Transport- en Expeditie Onderneming van Gend & Loos v. Netherlands Inland Revenue Administration,* Case 26/62, Judgment, 5 February 1963, EU:C:1963:1, RL-0041.
[55] *Flaminio Costa v. E.N.E.L,* Case 6/64, Judgment, 15 July 1964, EU:C:1964:66, RL-0042.
[56] *EP v. Council and Commission (Bangladesh)* Joined Cases C- 181/ 91 & C- 248/ 91, Judgment, 30 June 1993, ECLI:EU:C:1993:271.
[57] *Annunziata Matteucci v. Communauté Française of Belgium and Commissariat Général aux Relations Internationales of the Communauté Française of Belgium,* Case C-235/87, Judgment, 27 Sept. 1988, ECLI:EU:C:1988:460, para. 22, RL-0032.

69. As the Court also recalled, Member States are under a duty of solidarity as a result of "the equilibrium between advantages and obligations" flowing from their adherence to the Union.[58] In my view, this extends to all EU investors: they cannot rely on EU advantages while ignoring the entire EU system.

70. For all the above reasons, I consider that the Tribunal lacks jurisdiction. The majority decided otherwise and continued the analysis -and rejected- all the other jurisdictional objections. I will content myself to brief remarks about them, since I consider that the Decision should have stopped at the first jurisdictional objection and decided accordingly.

## G.  Brief Remarks on the Decision on the Other Jurisdictional Objections

71. A first issue to be addressed is whether the claims fall under the definition of "investment" found in the BITs and the ICSID Convention. I have my doubts about whether the claims fall within this concept, particularly whether they pass the so-called *Salini* test.[59] I do not share the manner in which the majority dismissed this objection.[60] In particular, the majority decided that the question of the life insurance contracts and the situation of Mr. Leontiadis must be addressed at the merits stage.[61] I believe this is a matter of jurisdiction.

72. On mass claims, while I have my concern about their compatibility with the whole system, I share some of the majority's theoretical analysis. I also commend the manner in which the Decision solves some intrinsic problems of mass claims in a practical manner, such as the certainty of the Claimants' pool, potential bifurcation between a liability phase and a damages phase and an order of security for costs. Nevertheless, at the end of the day, it is the Claimants' choice that is imposed on the Respondent to have the case organised in the manner they wish. This raises considerations as to whether the principle of equality of the Parties can be respected. More concretely, I have serious doubts about the homogeneity of the claims. The Decision recognizes the existence of

---

[58] *Commission v. Italy*, Case 39/ 72, Judgment, 7 February 1973, EU:C:1973:13, para 24.
[59] *Salini Costruttori S.p.A. and Italstrade S.p.A. v. Kingdom of Morocco* (*ICSID Case No. ARB/00/4*), Decision on Jurisdiction, 16 July 2001, RL-0114.
[60] Decision, paras. 291-296.
[61] Decision, paras. 301 and 325.

four different categories of claims. The fact that all these claims share a number of common elements is not enough to accept the possibility of imposing a collective unified case against the Respondent. Having the same nationality (or two, as is the case here), invoking investments that were allegedly affected by the same governmental measures and claiming the same kind of reparation is not enough. Otherwise, many cases having substantially different elements may be presented as one. It seems to me that the situation of the Bank of Cyprus and that of Laiki are different and cannot be treated as being the same. Similarly, the moment in which the alleged investments were made appears to be different in time and whether they were made before or after the contested measures has an impact that casts doubt on their homogeneity.

73. I strongly disagree with the analysis (or rather, the lack of it) of the objection regarding indirect investments, which concern 30 Claimants. The majority seems to consider that the definition of investment in Article 1.1. of the Cyprus-Greece BIT as to include "any asset" means that no matter the remoteness in the manner an "investor" possesses this asset, it will be covered by that definition.[62] The Decision bases its reasoning on the broad terms "investments by investors" in that BIT[63] and in its object and purpose to "strengthen their economic cooperation to the mutual benefit of bout countries on a long term basis".[64] This is an extremely extensive interpretation. I wonder what is more remote, the alleged indirect "investments" or the causal explanation given in the Decision to justify their inclusion. The same applies for its rejection of the opposite interpretation given to the same Cyprus-Greece BIT made by the *Poštová* award.[65]

74. In particular, no analysis is made of the reference in Article 2 of the Cyprus-Greece BIT to investments "made" by investors of the other party, not simply "held" (if they are), or to the concrete cases advanced by the Respondent. It is contradictory to contend that the protection of indirect investments on one hand because a Greek citizen has made an "investment" in a Cypriot or third country company, and to ignore the fact that some Greek companies acting as claimants are allegedly controlled by Cypriot nationals.[66]

---

[62] Decision, para. 275.
[63] *Ibid.*
[64] Decision, para. 278.
[65] Decision, paras. 280-281.
[66] Decision, para. 329.

75. I also find the analysis of the alleged lack of compliance by all but 21 Claimants with the mandatory notice and waiting period of Article 9 of the Cyprus-Greece BIT rather short. The majority contends that since 21 Claimants satisfied these requirements and in this case all Claimants constitute one single Party, there is no need for the other Claimants to give the mandatory notice and to respect the waiting period.[67] This reasoning furnishes indeed a tool for future investors who are willing to bypass a formal requirement of a BIT: it is enough that another investor has fulfilled the relevant provision, the others may simply adhere to it. I also wonder whether this analysis is not in contradiction with the analysis of mass claims advanced earlier in the Decision.

## H.  Concluding Remarks

76. Even though I find the Decision extremely unbalanced on the whole, this Statement has focused on the intra-EU BITs jurisdictional objection, which in my view is dispositive at the outset. I am aware that a number of investment tribunals have decided this matter in the same manner as the majority. In order to achieve the goal of attributing themselves jurisdiction, the majority has adopted an extremely narrow interpretation of "the same subject matter" that would create incommensurable treaty chaos in international relations (as it is actually being created at the European level) if it were generally applied in other fields. There is an unlimited number of treaties concluded during centuries that have never been explicitly terminated. They may easily contain many clauses that are incompatible with ulterior treaties, no matter whether the treaties in their entirety address the "same subject-matter".

77. There are BITs that were concluded between an EU Member State and a State that later became an EU Member. There are BITs that were concluded by two States before later both becoming EU Members. Significantly, there are no BITs that were concluded between two States after their EU membership. The explanation is very simple: BITs are inconceivable between EU Member States. The same investors' rights can be found in both. Arbitration to settle disputes between EU investors and EU Member States is

---

[67] Decision, paras. 308-318.

not possible. Disputing parties have at their disposal the exclusive EU judicial system set out in the EU Treaties.

78. As mentioned above, EU investors enjoy more rights within the EU by virtue of EU Treaties than non-EU investors. Indeed, the BITs at issue in this case explicitly recognize this in their key Article 3, which is the clause defining the scope of investor protection, and exclude the privileges accorded to investors by virtue of the adherence to common markets or custom unions, as seen also above. These very same articles also became inoperative after the accession of Cyprus to the EU.

79. It is important to keep in mind the overall picture of the treatment of investors and their protection by the law. National investors do not enjoy the possibility of resorting to international arbitration against their own countries. They have at their disposal the local remedies. EU investors are part of the most developed international system of economic integration which includes a judicial system, having at its top an international Court. It is quite normal that they have at their disposal this international mechanism within the EU. They are not subject to an exclusive national (foreign) judicial system but to an international (regional) one to which they are not "foreigners" (Non-EU) but part of it as EU citizens or corporations in a single economic area. EU investors enjoy all the benefits of this sophisticated "supra-national" system. It is normal that they have to follow the procedures of this system as well.

80. It is not in the interest of investment arbitration to extend jurisdiction where there is none and where there is not even any political or moral reason to do so. This policy only serves to discredit the system of international investment arbitration. The current practice at different levels, including treaties, looking for alternative ISDS systems should provoke a reflection in this regard.

81. My task as an international arbitrator is to decide such disputes that are submitted to the Tribunal to which I am a member in accordance with the relevant applicable law. Consent to arbitration deserves particular attention because the general rule is the absence of it. I am not a member of a standing Court, but a member of an *ad hoc* arbitral tribunal. Extreme care is needed when deciding about one's own jurisdiction, that is to say, whether one will continue to work on the case concerned or not.

82. As an international arbitrator, I also owe due respect to the existence of other international Courts and tribunals, "bearing in mind considerations of mutual respect and comity which should prevail between judicial institutions".[68] I do not wish to associate myself with the contribution to a chaotic situation at the international adjudicative level and hence append this Statement of Dissent.


[signed]
Professor Marcelo Kohen

3 February 2020
_____

---

[68] The *MOX Plant Case (Ireland v. United Kingdom)*, Order N° 3, 24 June 2003, para. 28, Annex EC-05.

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|:---:|:---:|:---|
| 1 | 1 | CNP Asfalistikes Praktoriakes Ergasies S.A. |
| 2 | | [NO JURISDICTION] CNP Asfalistiki Ltd. |
| 3 | 2 | CNP Zois S.A. |
| 4 | 3 | Domissima S.A. |
| 5 | 4 | Eltek S.A. |
| 6 | 5 | Vinez S.A. |
| 7 | 6 | Adamakopoulos, Theodoros |
| 8 | 7 | Adamantidou, Ilektra |
| 9 | 8 | Aidini, Vasiliki |
| 10 | 9 | Aidenli, Kleoniki |
| 10 | 10 | Aidenli, Asimina |
| 11 | 11 | Aivaliotis, Ignatios |
| 12 | 12 | Akka, Rodama |
| 13 | 13 | Alampanou, Anna |
| 14 | 14 | Alexandris, Vasileios |
| 15 | 15 | Alexopoulos, Georgios |
| 15 | 16 | Alexopoulou, Fereniki |
| 15 | 17 | Alexopoulos, Angelos |
| 15 | 18 | Alexopoulos, Eleftherios |
| 16 | 19 | Amanatidis, Ioannis |
| 17 | 20 | Amoiridis, Savvas |
| 17 | 21 | Amoiridou, Zoi |
| 18 | 22 | Ampatzi, Lida |
| 18 | 23 | Argyrakis, Dimitrios |
| 19 | 24 | Anagnostopoulos, Ioannis |
| 20 | 25 | Anastasaki, Maria Eleni |
| 20 | 26 | Liakopoulos, Panagiotis |
| 21 | 27 | Anastasiadou, Eirini |
| 22 | 28 | Anastasiadis, Michail |
| 23 | 29 | Anastasiou, Theodoros |
| 23 | 30 | Anastasiou, Zoi |
| 23 | 31 | Anastasiou, Anestis |
| 23 | 32 | Anastasiou, Ioulia |
| 24 | 33 | Andreadis,Ioannis |
| 24 | 34 | Andreadou, Olga |
| 25 | 35 | Andrianopoulos, Theodoros |
| 25 | 36 | Andrianopoulou, Konstantina |
| 26 | 37 | Andrikopoulos, Panagiotis |
| 26 | 38 | Andrikopoulou, Bernantet Mari |
| 26 | 39 | Andrikopoulou, Aikaterini |
| 27 | 40 | Androulakis, Georgios |
| 28 | 41 | Angelopoulou, Paschalia |
| 29 | 42 | Anthopoulos, Stefanos |
| 30 | 43 | Antonelos, Stavros |
| 30 | 44 | Antonelos, Spyridon |
| 30 | 45 | Antonelou, Eleni |
| 31 | 46 | Antonopoulos, Dimitrios |

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| Deceased | | Antonopoulos, Konstantinos |
| 32 | 47 | Apostolakos, Spyridon |
| 33 | 48 | Arampatzis, Ioannis |
| 33 | 49 | Neofotistou, Evrydiki |
| 34 | 50 | Aravidis, Panagiotis |
| 35 | 51 | Argyros, Dionysios |
| 36 | 52 | Arkadianos, Ioannis |
| 37 | 53 | Arvanitopoulos, Theodosios |
| 37 | 54 | Arvanitopoulou, Chariklia |
| 38 | 55 | Asvestis, Charalampos |
| 39 | 56 | Athanasiou, Antonios |
| 40 | 57 | Athanasoglou, Vasiliki |
| 41 | 58 | Athanasopoulos, Petros |
| 41 | 59 | Athanasopoulou, Vasiliki |
| 41 | 60 | Athanasopoulos, Nikolaos |
| 42 | 61 | Athanassiou, Panagiotis |
| 42 | 62 | Athanassiou, Ifigenia |
| 42 | 63 | Athanassiou, Lambros |
| 42 | 64 | Athanassiou, Ioannis |
| 43 | 65 | Bakas, Georgios |
| 44 | 66 | Vamvakidou, Andromachi |
| 45 | 67 | Batagiannis, Aristeidis |
| 45 | 68 | Tzamara, Paraskevi |
| 46 | 69 | Bavarezos, Konstantinos |
| 46 | 70 | Antypa, Konstantina |
| 47 | 71 | Benardos, Andreas |
| 48 | 72 | Biskos, Vasilis |
| 49 | 73 | Biskou, Olga |
| 50 | 74 | Bitzilekis, Theodoros |
| 51 | 75 | Bontzios, Georgios |
| 51 | 76 | Bontzios, Ioannis |
| 51 | 77 | Bontzios, Spyridon |
| 51 | 78 | Garmpidou, Asimina |
| 52 | 79 | Boukoura, Panagiota |
| 52 | 80 | Boukoura, Alexandra |
| 53 | 81 | Bourlatsenko, Angelos |
| 53 | 82 | Chardaloumpa, Eirini |
| 54 | 83 | Bouros, Evangelos |
| 54 | 84 | Bouros, Charilaos |
| 55 | 85 | Boursianis, Achilleas |
| 56 | 86 | Bozini, Anastasia |
| 56 | 87 | Bozini, Parthenopi |
| 56 | 88 | Bozinis, Charalampos |
| 57 | 89 | Bres, Sotirios |
| 58 | 90 | Chalkias, Konstantinos |
| 58 | 91 | Telli, Aikaterini |
| 59 | 92 | Chalkis, Dimitrios |

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 59 | 93 | Christonasi, Lamprini |
| 60 | 94 | Charamantidis, Nikolaos |
| 61 | 95 | Charitos, Christos |
| 61 | 96 | Charitou, Antonia |
| 62 | 97 | Charitos, Georgios |
| 63 | 98 | Chatziangelidou, Paraskevi |
| 63 | 99 | Chatziangelidis, Charalampos |
| 63 | 100 | Chatziangelidou, Georgia |
| 63 | 101 | Chatziangelidou, Kalliopi |
| 64 | 102 | Chatzinikolaou, Ioannis |
| 64 | 103 | Chatzinikolaou, Nikolaos |
| 64 | 104 | Chatzinikolaou, Georgios |
| 64 | 105 | Chatzinikolaou, Anastasia |
| 65 | 106 | Chatzis, Ioannis |
| 65 | 107 | Chatzi, Petroula |
| 66 | 108 | Chatzistamoulos, Ioannis |
| 67 | 109 | Chioti, Adamantia |
| 68 | 110 | Chitos, Vasileios |
| 69 | 111 | Chloros, Ioannis |
| 69 | 112 | Chlorou, Anthi |
| 69 | 113 | Chlorou, Evangelia |
| 70 | 114 | Choremis, Georgios |
| 71 | 115 | Chrysostomou, Vasiliki |
| 72 | 116 | Christofi, Athina |
| 73 | 117 | Christou, Sotirios |
| 74 | 118 | Chrysochoidou, Despoina |
| 75 | | [DELETED AS DUPLICATE OF CLAIMANT #444] |
| 76 | 119 | Kopsidas, Evangelos |
| 77 | 120 | Costis, Ioannis |
| 78 | 121 | Dandreas, Evangelos |
| 79 | 122 | Daniilidis, Lazaros |
| 80 | 123 | Dede, Filothei |
| 81 | 124 | Diamantopoulou, Effrosyni |
| 82 | 125 | Dilmperi, Paraskevi |
| 82 | 126 | Dilmperis, Ioannis |
| 83 | 127 | Dimitreli,Eleni |
| 84 | 128 | Dimitrelis, Dimitrios |
| 85 | 129 | Dimitriadis, Thomas |
| 86 | 130 | Dimitriadou, Maria |
| 87 | 131 | Doikos, Pavlos |
| 87 | 132 | Magklara, Eleni |
| 88 | 133 | Dotsis, Alexandros |
| 88 | 134 | Dotsi, Olympia |
| 88 | 135 | Dotsi, Alexia |
| 88 | 136 | Dotsis, Georgios |
| 89 | 137 | Douka, Pinelopi |
| 89 | 138 | Doukas, Aristeidis |

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 89 | 139 | Douka, Nikoleta |
| 90 | 140 | Doumpas, Athanasios |
| 91 | 141 | Dovletoglou, Efstratios |
| 92 | 142 | Drakontaeidis, Evangelos |
| Deceased | | Dritsa, Evangelia |
| Deceased | | Skouloudi, Stamatina |
| 93 | 143 | Dritsa, Evgenia |
| 93 | 144 | Skouloudi, Evangelia |
| 93 | 145 | Skouloudis, Nikolaos |
| 94 | 146 | Efthymiou, Konstantinos |
| 95 | 147 | Emmanouilidou, Despoina |
| 96 | 148 | Evert, Alexandra |
| 97 | 149 | Exarchopoulou, Chrysoula |
| 97 | 150 | Katramados, Michail |
| 98 | 151 | Fanourakis, Emmanouil |
| 99 | 152 | Filippakis, Ioannis |
| 100 | 153 | Fotiadis, Asterios |
| 101 | 154 | Galazios, Christos |
| 102 | 155 | Galeridis, Konstantinos |
| 103 | 156 | Gavriil, Theodoros |
| 104 | 157 | Georgiadi, Elissavet |
| 105 | 158 | Georgiadis, Ioannis |
| 106 | 159 | Gerakopoulos, Nikiforos |
| 107 | | [INTENTIONALLY LEFT BLANK] |
| 108 | 160 | Giannakis, Athanasios |
| 109 | 161 | Giarmadouros, Dimitrios |
| 109 | 162 | Plakoyianni, Stavroula |
| 110 | 163 | Giouroukos, Dimitrios |
| 110 | 164 | Giouroukou, Chariklia |
| 111 | 165 | Gkertsi, Iordana |
| 111 | 166 | Gkertsis, Petros |
| 112 | 167 | Gkanapi, Ioanna |
| 112 | 168 | Gkanapis, Eleftherios |
| 113 | 169 | Gkologkina, Athina |
| 113 | 170 | Liaros, Achillefs |
| 113 | 171 | Liaros, Alexandros |
| 114 | 172 | Gkoni, Stamatia |
| 115 | 173 | Gkougkoulidis, Panagiotis |
| 116 | 174 | Gkoumopoulos, Georgios |
| 116 | 175 | Barmpouni, Panagiota |
| 117 | 176 | Gonidis, Alexandros |
| 118 | 177 | Goudelis, Aristogenis |
| 119 | 178 | Grouspas, Athanasios |
| 119 | 179 | Grouspa, Niovi |
| 119 | 180 | Grouspa, Eleni |
| 120 | 181 | Halikiopoulos, Nikolaos |
| 121 | 182 | Halkiadakis, Konstantinos |

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 122 | | [INTENTIONALLY LEFT BLANK] |
| 123 | 183 | Vasileiou, Ilias |
| 124 | 184 | Iliadis, Georgios |
| 125 | 185 | Iliadis, Michail |
| 125 | 186 | Iliadou, Aikaterini |
| 126 | 187 | Ioannidou, Maria |
| 127 | 188 | Ioannidou, Virginia |
| 128 | 189 | Kafantaris, Themistoklis |
| 129 | 190 | Kafritsas, Ilias |
| 129 | 191 | Gkotsi, Konstantina |
| 130 | 192 | Kaikis, Konstantinos |
| 130 | 193 | Fraraki, Argyro |
| 131 | 194 | Kakkos, Kyriakos |
| 132 | 195 | Kalamaraki, Marianthi |
| 133 | 196 | Kalfas, Ioannis |
| 134 | 197 | Kalokyris, Evangelos |
| 135 | 198 | Kalpidis, Lazaros |
| 136 | 199 | Kampakos, Christos |
| 137 | 200 | Kantis, Michail |
| 138 | 201 | Kapoulitsas, Georgios |
| 139 | 202 | Kappos, Pantelis |
| 140 | 203 | Kapranas, Konstantinos |
| 141 | 204 | Karagianni, Magdalini |
| 142 | 205 | Karagianni, Thelma-Kyriafina |
| 143 | 206 | Karagiannis, Georgios |
| 143 | 207 | Karagiannis, Eleftherios |
| 143 | 208 | Karagiannis, Konstantinos |
| 144 | 209 | Karakosta, Kalliopi |
| 145 | 210 | Karamani, Zoi |
| 146 | 211 | Karameros, Anastasios |
| 147 | 212 | Karampelas, Andreas |
| 148 | 213 | Karanikas, Asterios |
| 149 | 214 | Karanikolas, Ioakeim |
| 150 | 215 | Karantanas, Konstantinos |
| 150 | 216 | Karadimou, Stavros |
| 151 | 217 | Kardari, Kalliopi |
| 151 | 218 | Alamanos, Ioannis |
| 152 | 219 | Kargiotis, Dimitrios |
| 153 | 220 | Karkanis, Filippos |
| 153 | 221 | Seferidou, Despoina |
| 154 | 222 | Karra, Angeliki |
| 155 | 223 | Karytsioti, Elvira |
| 156 | 224 | Kasemian, Gkarampet |
| 156 | 225 | Kasemian, Alin-Kochar |
| 156 | 226 | Kasemian, Louiza |
| 156 | 227 | Kasemian, Ermina |
| 157 | 228 | Kasiotakis, Emmanouil |

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 158 | 229 | Kassios, Alexandros |
| 158 | 230 | Kassios, Charalampos |
| 159 | 231 | Kastrisios, Christos |
| 160 | 232 | Katafygiotis, Sokratis |
| 160 | 233 | Katafygiotou, Eleni |
| 160 | 234 | Katafygiotou, Amalia |
| 160 | 235 | Katafygiotis, Patroklos-Ioannis |
| 161 | 236 | Katakis, Fotios |
| 162 | 237 | Katechaki, Eirini |
| 163 | 238 | Katevenis, Emmanouil |
| 164 | 239 | Katoglou, Eirini |
| 164 | 240 | Diavatidis, Stamatios |
| 165 | 241 | Katsidis, Georgios |
| 166 | 242 | Katsieris, Avgerinos |
| 167 | 243 | Katsoulas, Antonios |
| 168 | 244 | Katsoulis, Georgios |
| 169 | 245 | Kavoura, Athanasia |
| 169 | 246 | Tsapekos, Menelaos Alexandros |
| 169 | 247 | Tsapekou, Zoi |
| 170 | 248 | Kazanis, Dimitrios |
| 171 | 249 | Kiousis, Angelos |
| 172 | 250 | Kitis, Stavros |
| 173 | 251 | Klepkos, Sotirios |
| 174 | 252 | Klimos, Markos |
| 175 | 253 | Klouras, Nikolaos |
| 175 | 254 | Kloura, Panagiota |
| 176 | 255 | Koilaridis, Kimon |
| Deceased |  | Kokkinopoulos, Dimitrios |
| 177 | 256 | Kokkinopoulou, Eleni |
| 177 | 257 | Kokkinopoulos, Ioannis |
| 177 | 258 | Kokkinopoulou, Evgenia; |
| 177 | 259 | Kokkinopoulos, Alexandros |
| 178 | 260 | Kokkinos, Filis-Filippos |
| 179 | 261 | Kollias, Georgios |
| 180 | 262 | Kolokythas, Konstantinos |
| 180 | 263 | Marini, Petroula |
| 180 | 264 | Kolokytha, Christiana |
| 181 | 265 | Moraitou, Vasiliki |
| 182 | 266 | Komiotis, Charalambos |
| 183 | 267 | Komninos, Georgios |
| 184 | 268 | Konidari, Aristea |
| 185 | 269 | Konstantakou, Triantafyli |
| 186 | 270 | Konstantinidis, Georgios |
| 186 | 271 | Konstantanidi, Niki |
| 187 | 272 | Konstantinidis, Georgios |
| 188 | 273 | Isaak, Konstantinos |
| 189 | 274 | Konstantinou, Athanasios |

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 190 | 275 | Kordopatis, Georgios |
| 190 | 276 | Kolia, Sevasti |
| 191 | 277 | Korkidis, Vasileios |
| 192 | 278 | Adam, Kosmas |
| 193 | 279 | Kostarellos, Vasileios |
| 194 | 280 | Kostopoulos, Alexandros |
| 195 | 281 | Kotoula, Domna |
| 195 | 282 | Kotoula, Athina |
| 195 | 283 | Kotoula, Christina |
| 195 | 284 | Kotoulas, Kyriakos |
| 196 | 285 | Kotsi, Vasiliki |
| 197 | 286 | Kotsis, Konstantinos |
| 198 | 287 | Koudounis, Panagiotis |
| 198 | 288 | Papaioannou, Niki |
| 199 | 289 | Kouki, Aikaterini-Mavra |
| 199 | 290 | Koukis, Panagis |
| 200 | 291 | Koukos, Asterios |
| 201 | 292 | Koumnas, Michail |
| 202 | 293 | Kouri, Maria |
| 202 | 294 | Kouris, Spyridon |
| 202 | 295 | Kouris, Angelos |
| 203 | 296 | Kouros, Ioannis |
| 204 | 297 | Kouros, Panteleimon |
| 205 | 298 | Kousidis, Ioannis |
| 205 | 299 | Fardella, Evanthia |
| 206 | 300 | Koutoupis, Andreas |
| 207 | 301 | Kouvousi, Angeliki |
| 207 | 302 | Kouvousi, Maria |
| 207 | 303 | Maragkidou, Sofia |
| 208 | 304 | Kouvousis, Nikolaos |
| 209 | 305 | Krasopoulos, Konstantinos |
| 209 | 306 | Krasopoulos, Athanasios Christos |
| 210 | | [INTENTIONALLY LEFT BLANK] |
| 211 | 307 | Kyrgias, Michail |
| 211 | 308 | Kyrgia, Sofia |
| 211 | 309 | Kyrgias, Georgios |
| 212 | 310 | Kyriakopoulos, Ioannis |
| 212 | 311 | Kyriakopoulos, Alexandros |
| 212 | 312 | Kyriakopoulos, Filippos |
| 212 | 313 | Kyriakopoulou, Evdoxia |
| 213 | 314 | Andreou, Kyriakos |
| 214 | 315 | Kyrillidou, Elpis |
| 215 | 316 | Lagos, Nikolaos |
| 215 | 317 | Lagou, Margeto |
| 216 | 318 | Laimos, Georgios |
| 217 | 319 | Lamprakis, Georgios |
| 217 | 320 | Spanou, Sofia |

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 218 | 321 | Laoulakos, Dionysios |
| 219 | 322 | Lazopoulos, Charalampos |
| 219 | 323 | Bourotzoglou, Eleni |
| 219 | 324 | Lazopoulou, Sofia |
| 219 | 325 | Lazopoulos, Georgios |
| 220 | 326 | Lemonis, Panagiotis |
| 220 | 327 | Mavrou, Angeliki |
| 221 | 328 | Leontiadis, Ioannis |
| 222 | 329 | Liolios, Antonios |
| 222 | 330 | Konstantinidi, Georgia |
| 223 | 331 | Loukoutou, Sotiria |
| 224 | 332 | Louvros, Spyridon |
| 224 | 333 | Louvrou, Eleni |
| 225 | 334 | Magkatsas, Konstantinos |
| 226 | 335 | Makri, Stamatina |
| 226 | 336 | Makri, Ourania |
| 227 | 337 | Makrygiannakis, Antonios |
| 228 | 338 | Maletskos, Nikolaos |
| 229 | 339 | Maliaris, Konstantinos |
| 229 | 340 | Balta, Dimitra |
| 230 | 341 | Malliari, Ioulia |
| 230 | 342 | Georgopoulos, Dimitrios |
| 231 | 343 | Maltaki, Kyriakoula |
| 232 | 344 | Manousos, Michail |
| 233 | 345 | Mantas, Ioannis |
| 234 | 346 | Mantas, Konstantinos |
| 235 | 347 | Margetis, Andreas |
| 235 | 348 | Margeti, Eirini |
| 235 | 349 | Margeti, Flora |
| 236 | 350 | Markoulis, Ioannis |
| 237 | 351 | Mathioudakis, Emmanouil |
| 238 | 352 | Matselos, Pantelis |
| 239 | 353 | Mattes, Michail |
| 239 | 354 | Matte, Olga |
| 239 | 355 | Matte, Vasiliki |
| 240 | 356 | Mavrakis, Andreas |
| 241 | 357 | Mavridis, Athanasios |
| 241 | 358 | Mavridou, Stavroula |
| 241 | 359 | Mavridou, Zoi |
| 241 | 360 | Mavridis, Georgios |
| 242 | 361 | Mavridis, Ioannis |
| 243 | 362 | Mavroudis, Grigorios |
| 244 | 363 | Meletis, Gerasimos |
| 244 | 364 | Meleti, Theognosia |
| 245 | 365 | Micha, Eleni |
| 246 | 366 | Michailidis, Michael |
| 246 | 367 | Michailidi, Olga-Vithleem |

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 246 | 368 | Michailidis, Filippos |
| 247 | 369 | Michalitsis, Georgios |
| 247 | 370 | Michalitsi, Eleni |
| 247 | 371 | Michalitsi, Vasiliki |
| 247 | 372 | Michalitsis, Sotirios |
| 248 | 373 | Mikes, Christos |
| 249 | 374 | Misokarakis, Michail |
| 250 | 375 | Mitta, Martha |
| 251 | 376 | Mizi, Athanasia |
| 251 | 377 | Mizis, Kyriakos |
| 252 | 378 | Moldovanidou, Kalliopi |
| 253 | 379 | Moniakis, Nikolaos |
| 253 | 380 | Moniaki, Maria |
| 254 | 381 | Moschopoulos, Theodoros |
| 255 | 382 | Moudios, Ilias |
| 255 | 383 | Moudiou, Foteini |
| 255 | 384 | Moudiou, Chrysanthi |
| 255 | 385 | Moudiou, Panagiota |
| 256 | 386 | Mourikis, Anestis |
| 257 | 387 | Mousatos, Georgios |
| 258 | 388 | Moustakatou, Konstantina |
| 259 | 389 | Moutzalia, Olga |
| 259 | 390 | Sachinidi, Kalliopi |
| 260 | 391 | Mylonas, Thalis |
| 260 | 392 | Mylona, Aikaterini-Nina |
| 261 | 393 | Nakopoulos, Dimitrios |
| 261 | 394 | Panteli, Maria |
| 262 | 395 | Navrozidis, Dionysios |
| 263 | 396 | Niarchou, Konstantina |
| 264 | 397 | Nikolaou, Dimitrios |
| 265 | 398 | Nikolaidis, Anastasios |
| 266 | 399 | Nikolaou, Aikaterini |
| 267 | 400 | Nikolopoulou, Athanasia |
| 267 | 401 | Nikolopoulos, Michail |
| 268 | 402 | Nikoloudaki, Anna |
| 269 | 403 | Nonas, Evangelos |
| 270 | 404 | Nterkrikorian, Grigorios |
| 271 | 405 | Oikonomou, Moschoula Stavroula |
| 271 | 406 | Gikas, Georgios |
| 271 | 407 | Gkikas, Panagiotis |
| 272 | 408 | Okantaridis, Vasileios-Andronikos |
| 273 | | [INTENTIONALLY LEFT BLANK] |
| 274 | 409 | Palaiokrassas, Leonardos |
| 274 | 410 | Palaiokrassa, Klairi-Georgia |
| 275 | 411 | Panagiotopoulos, Georgios |
| 276 | 412 | Panagiotopoulos, Konstantinos |
| 276 | 413 | Balaoura, Lemonia |

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 277 | 414 | Pantazis, Evangelos |
| 277 | 415 | Pantazi, Paraskevi |
| 277 | 416 | Pantazis, Sotirios |
| 277 | 417 | Pantazis, Epameinondas |
| 278 | 418 | Pantazopoulou, Evangelia |
| 279 | 419 | Panteli, Eleni |
| 280 | 420 | Papadopoulos, Alekos |
| 281 | 421 | Papadopoulos, Antonios |
| 282 | 422 | Papadopoulos, Epameinondas |
| 282 | 423 | Asimakou, Christofili |
| 283 | 424 | Papadopoulos, Georgios |
| 284 | 425 | Papadopoulou, Anthi |
| 285 | 426 | Papadopoulou, Athina |
| 285 | 427 | Papadopoulos, Ioannis |
| 286 | 428 | Papadopoulos, Sofoklis |
| 287 | 429 | Papageorgiou, Ioannis |
| 288 | 430 | Papaioannou, Ioannis |
| 289 | 431 | Papakyriakou, Dimitrios |
| 290 | 432 | Papakonstantinou, Eleni |
| 291 | 433 | Papakonstantinou, Stefanos |
| 292 | 434 | Papalexandris, Athanasios |
| 292 | 435 | Papalexandri, Nansi |
| 292 | 436 | Papalexandris, Georgios |
| 293 | 437 | Papamatthaiakis, Michail |
| 294 | 438 | Papanastasiou, Alexandra |
| 294 | 439 | Karydis, Dimitrios |
| 294 | 440 | Karydis, Marios Alexandros |
| 295 | 441 | Papandreou, Antonios |
| 295 | 442 | Kousoula, Sofia |
| 296 | 443 | Papandreou, Xenofon |
| 297 | | [INTENTIONALLY LEFT BLANK] |
| 298 | 444 | Paparis, Georgios |
| 299 | 445 | Papastathi, Kalliopi |
| 299 | 446 | Moraiti, Alexandra |
| 299 | 447 | Moraitis, Michail |
| 300 | 448 | Papagianni, Ioanna |
| 301 | 449 | Parasoglou, Efthymios |
| 302 | 450 | Parathyras, Charalampos |
| 303 | 451 | Partheni, Orsalia |
| 303 | 452 | Askiti, Chrysanthi |
| 304 | 453 | Patilas, Stefanos |
| 304 | 454 | Patilas, Dimitrios |
| 304 | 455 | Tamvaki, Lida |
| 305 | 456 | Patitakis, Nikolaos |
| 306 | 457 | Patsopoulos, Ioannis |
| 306 | 458 | Papakosta, Betina Ntaiana |
| 306 | 459 | Patsopoulos, Ilias |

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 307 | 460 | Pavlidou, Anneta |
| 308 | 461 | Pentefountis, Petros |
| 309 | 462 | Peristeris, Andreas |
| 310 | 463 | Peros, Vasileios |
| 311 | 464 | Perris, Spyridon |
| 311 | 465 | Perris, Eftychios |
| 312 | 466 | Pervanoglou, Dimitrios |
| 312 | 467 | Katsari, Vasiliki |
| Deceased | | Petridis, Athanasios |
| 313 | 468 | Petridou, Vasiliki |
| 313 | 469 | Petridis, Efthymios |
| 314 | 470 | Petritsopoulos, Theodoros |
| 314 | 471 | Dimitropoulou, Georgia |
| 314 | 472 | Petritsopoulos, Stefanos |
| 314 | 473 | Dimitropoulos, Fotios |
| 315 | 474 | Petroulakis, Ioannis |
| 316 | 475 | Petsas, Ioannis |
| 317 | 476 | Petsas, Nikolaos |
| 318 | 477 | Pitsios, Panagiotis |
| 318 | 478 | Papadopoulou, Paraskevi |
| 319 | 479 | Politou, Maria |
| 319 | 480 | Loukrezis, Dimitrios |
| 319 | 481 | Loukrezi, Eirini |
| 320 | 482 | Polyzos, Periklis |
| 321 | 483 | Pournaras, Lampros |
| 322 | 484 | Printezis, Iosif |
| 323 | 485 | Psaroudaki, Angeliki |
| 324 | 486 | Pseftonga,Evangelia |
| 324 | 487 | Frydas, Themistoklis |
| 325 | 488 | Psyntridis, Ioannis |
| 326 | 489 | Psomadopoulos, Sokratis |
| 327 | 490 | Ravani, Elena |
| Deceased | | Rodopoulos, Alexandros Christos |
| 328 | 491 | Petrova, Iryna |
| 329 | 492 | Roupakioti, Maria |
| 329 | 493 | Baltas, Konstantinos |
| 330 | 494 | Roupakiotis, Christos |
| 330 | 495 | Roupakioti, Despoina |
| 331 | 496 | Ryding, Joann Dorothy |
| 332 | 497 | Sachinidis, Konstantinos |
| 332 | 498 | Sachinidis, Emmanouil-Evangelos |
| 333 | 499 | Saias, Avraam |
| 334 | 500 | Saklampanaki, Pandora |
| 335 | 501 | Samouil, Alexandra |
| 336 | 502 | Saoulidis, Georgios |
| 337 | 503 | Sardis, Georgios |
| 338 | 504 | Sarioglou, Iordanis |

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 339 | 505 | Sarri, Christina |
| 339 | 506 | Sarri, Asimina |
| 339 | 507 | Sarri, Maria |
| 340 | 508 | Sdrali, Eleni |
| 341 | 509 | Seitanidou, Maria |
| 342 | 510 | Sfakianakis, Georgios |
| 342 | 511 | Zisiadou, Olga |
| 343 | 512 | Siachamis, Charalampos |
| 344 | 513 | Siakkas, Dimitrios |
| 344 | 514 | Kapetanopoulou, Soultana |
| 345 | 515 | Sidiropoulos, Dimosthenis |
| 346 | 516 | Simiriotis, Dimitrios |
| 346 | 517 | Gianniri, Kyriaki |
| 347 | 518 | Simitsoglou, Stavros |
| 347 | 519 | Simitsoglou, Nikolaos |
| 347 | 520 | Simitsoglou, Evangelia |
| 348 | 521 | Simitzis, Petros |
| 348 | 522 | Kosma, Anna |
| 349 | 523 | Sioutis, Dionysios |
| 349 | 524 | Ntouni, Christina |
| 350 | 525 | Sioutis, Pavlos |
| 350 | 526 | Sioutis, Ioannis |
| 350 | 527 | Sioutis, Ilias |
| 351 | 528 | Skandali, Panagoula |
| 351 | 529 | Favvatas, Argyrios |
| 352 | 530 | Skarla, Konstantina |
| 353 | 531 | Sklavaki, Maria |
| 354 | 532 | Skodras, Dimitrios |
| 354 | 533 | Skodra, Kyriakoula |
| 354 | 534 | Skodra, Thaleia |
| 354 | 535 | Skodras, Grigorios |
| 355 | 536 | Skotidas, Athanasios |
| 356 | 537 | Sotiropoulos, Konstantinos |
| 356 | 538 | Kolivira, Eirini |
| 357 | 539 | Soukeras, Dimitrios |
| 357 | 540 | Louka, Anastasia |
| 357 | 541 | Soukeras, Ioannis |
| 358 | 542 | Sourdis, Athanasios |
| 359 | 543 | Spatalas, Anastasios |
| 360 | 544 | Spiliopoulos, Georgios |
| 360 | 545 | Kyritsi, Christina |
| 361 | 546 | Spyridonidis, Dimitrios |
| 362 | 547 | Spyropoulos, Periklis |
| 362 | 548 | Spyropoulou, Antigoni-Christina |
| 362 | 549 | Oraiopoulos, Nikolaos-Panagiotis |
| 362 | 550 | Oraiopoulou, Eleni |
| 362 | 551 | Oraiopoulos, Dimitrios |

# ANNEX I

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 363 | 552 | Ioannidis, Stamatios |
| 364 | 553 | Statiris, Charalampos |
| 364 | 554 | Statiris, Spyridon |
| 365 | 555 | Stavreas, Vasileios |
| 366 | 556 | Stavropoulos, Panagiotis |
| 367 | 557 | Stefanis, Ioannis |
| 368 | 558 | Stefanis, Vasileios |
| 369 | 559 | Strintzi, Eftychia |
| 370 | 560 | Strintzi, Marietina |
| 371 | 561 | Stroumpis, Pantelis |
| 372 | 562 | Giannouladis, Stylianos |
| 373 | 563 | Stylidis, Stellios |
| 374 | 564 | Svanas, Apostolos |
| 375 | 565 | Sygkounas, Evangelos |
| 376 | 566 | Sygkounas, Konstantinos |
| 377 | 567 | Syrantonis, Prokopios |
| 378 | 568 | Targontsidis, Athansios |
| 378 | 569 | Targontsidou, Despoina |
| 379 | 570 | Tatakis, Avgoustis |
| 380 | 571 | Terzi, Evangelia |
| 381 | 572 | Theocharis, Vasileios |
| 382 | 573 | Theodoratou, Maria |
| 382 | 574 | Theodoratos, Panagis |
| 382 | 575 | Theodoratou, Thaleia |
| 382 | 576 | Theodoratou, Antzela-Mavra |
| 383 | 577 | Theodoridis, Dimitrios |
| 384 | 578 | Theodoropoulos, Antonios |
| 385 | 579 | Theodosopoulos, Georgios |
| 386 | | [INTENTIONALLY LEFT BLANK] |
| 387 | 580 | Tolias, Dimitrios |
| 388 | 581 | Tomou, Eftychia |
| 389 | 582 | Topouzoglou, Mardarios |
| 389 | 583 | Topouzoglou, Angeliki |
| 389 | 584 | Topouzoglou, Aikaterini |
| 389 | 585 | Topouzoglou, Zoi |
| 390 | 586 | Trempela Lauzanne Fauquembergue, Kalliopi |
| 391 | 587 | Triantafyllidis, Nikolaos |
| 392 | 588 | Trichakis, Efstathios |
| 393 | 589 | Trigatzis, Dimitrios |
| 393 | 590 | Trigatzis,  George-William |
| 393 | 591 | Trigatzis, Michael-Alexander |
| 394 | 592 | Tripou, Eirini |
| 394 | 593 | Tripou, Kalliopi-Maria |
| 394 | 594 | Tripos, Nikolaos-Stamatios |
| 395 | 595 | Tsakiris, Konstantinos |
| 396 | 596 | Tsakonas, Apostolos |
| 397 | 597 | Tsangari, Despoina |

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 398 | 598 | Tsatsoulis, Pavlos |
| 398 | 599 | Tsatsouli, Paraskevi |
| 399 | 600 | Tsifountoudis, Sotirios |
| 400 | 601 | Tsirigkakis, Efstathios |
| 400 | 602 | Athanasiadou, Eleni |
| 401 | 603 | Tsokanos, Dimitrios |
| 401 | 604 | Tsokanou, Georgia |
| 401 | 605 | Tsokanou, Zoi |
| 401 | 606 | Tsokanos, Nikolaos |
| 401 | 607 | Tsokanos, Vasileios |
| 402 | 608 | Tsolakis, Eleftherios |
| 403 | 609 | Tsompas, Thomas |
| 404 | 610 | Tzaneti, Aikaterini |
| 405 | 611 | Tzermiadianos, Angelos |
| 406 | 612 | Tzikou, Magdalini |
| 407 | 613 | Vaitis, Michail |
| 408 | 614 | Vaitsidou, Ioanna |
| 409 | 615 | Vakasis, Antonios |
| 410 | 616 | Vamvakaris, Ioannis |
| 411 | 617 | Vamvakopoulou, Adamantia |
| 411 | 618 | Vamvakopoulou, Maria |
| 412 | 619 | Varagki, Vertha-Michaela |
| 413 | 620 | Varkas, Antonios |
| 413 | 621 | Vrysagoti, Maria |
| 414 | 622 | Vasikostas, Dimitrios |
| 415 | 623 | Vasileiadis, Christos |
| 416 | 624 | Vasileiadis, Emmanouil |
| 416 | 625 | Stergiou, Stamatina |
| 417 | | [NO JURISDICTION] Vasileiou, Athanasios |
| 418 | 626 | Ventouratou, Eleni |
| 419 | 627 | Vergidou, Aliki |
| 420 | 628 | Vlachogiannis, Efthymios |
| 420 | 629 | Vlachogiannis, Konstantinos |
| 421 | 630 | Vlachos, Leonidas |
| 422 | 631 | Vlachos, Stamatios |
| 422 | 632 | Vlachou, Eleni |
| 422 | 633 | Vlachou, Sofia |
| 422 | 634 | Vlachou, Stamatia |
| 423 | 635 | Xanthopoulos, Damianos |
| 423 | 636 | Xanthopoulos, Androniki |
| 423 | 637 | Xanthopoulou, Sofia |
| 424 | 638 | Xofylli, Sofia |
| 424 | 639 | Xofylli, Anthoula |
| 424 | 640 | Xofyllis, Athanasios |
| 424 | 641 | Xofylli, Maroula |
| 425 | 642 | Yokas, Thomas |
| 425 | 643 | Gyioka, Elisavet |



**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 425 | 644 | Yoka, Charikleia |
| 425 | 645 | Yoka, Iolandi |
| 426 | 646 | Zacharias, Petros |
| 427 | 647 | Zacharioudakis, Stavros |
| 428 | 648 | Zalimi, Vasiliki |
| 429 | 649 | Zervas, Galinos |
| 430 | 650 | Zervas, Grigorios |
| 431 | 651 | Zympirikaki, Evanthia |
| Deceased | | Zisis, Nikolaos |
| 432 | 652 | Portari, Eleni |
| 432 | 653 | Zisis, Alexandros |
| 432 | 654 | Syribeys, Floredia Lauren (nee Zisi) |
| 432 | 655 | Trovato, Ageliki Kelly (nee Zisi) |
| 433 | 656 | Zografou, Eleftheria |
| 434 | 657 | Zografou, Marika |
| 434 | 658 | Zografos, Miltiadis |
| 434 | 659 | Zografou, Ilektra |
| 434 | 660 | Zografou, Aspasia |
| 435 | 661 | Global Equity Investments S.A. |
| 436 | 662 | Adamopoulos, Vasileios |
| 437 | 663 | Adosoglou, Rodoniki |
| 438 | 664 | Agtzoglou, Neofytos |
| 439 | 665 | Androni, Christina |
| 439 | 666 | Andronis, Athanasios |
| 439 | 667 | Petropoulou, Vasiliki |
| 440 | 668 | Antonaropoulos, Angelos |
| 441 | 669 | Antonopoulos, Andreas |
| 442 | 670 | Argyropoulou, Vasiliki |
| 442 | 671 | Argyropoulos, John Christos |
| 443 | 672 | Armaou, Stamatina |
| 443 | 673 | Armaou, Vasileios-Stavros |
| 444 | 674 | Athanasiou, Konstantinos |
| 445 | 675 | Avramea, Afroditi |
| 446 | 676 | Babataka, Vasiliki |
| 447 | 677 | Bakiris, Georgios |
| 448 | 678 | Beis, Konstantinos |
| 449 | 679 | Bourmpoulis, Spyridon |
| 449 | 680 | Bourmpoulis, Ioannis |
| 450 | 681 | Bozatzidis, Christodoulos |
| 450 | 682 | Bozatzidis, Dimitrios |
| 451 | 683 | Bredimas, Antonios |
| 452 | 684 | Charitakis, Ioannis |
| 453 | 685 | Chatzipani, Athina |
| 454 | 686 | Chatzisavvas, Anastasios |
| 455 | 687 | Chatzopoulos, Efstathios |
| 456 | | [DELETED AS DUPLICATE OF CLAIMANT #67] |
| 457 | 688 | Christianou, Eleni |

# ANNEX I

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 458 | 689 | Christianou, Eirini |
| 459 | 690 | Chrysostomakis, Chrystostomos |
| 460 | 691 | Komninos, Nikolaos-Alexandros |
| 461 | 692 | Damigos, Athanasios |
| 461 | 693 | Pavlou, Ioanna |
| 462 | 694 | Damigos, Ioannis |
| 462 | 695 | Miller, Elisabeth |
| 462 | 696 | Damigou, Evangelia |
| 462 | 697 | Damigou, Vasiliki |
| 463 | 698 | Damigos, Stylianos |
| 464 | 699 | Dervisis, Nikolaos |
| 464 | 700 | Dervisi, Sofia |
| 464 | 701 | Papadopoulou, Afroditi |
| 465 | 702 | Digka, Fani |
| 466 | 703 | Doumanidis, Stavros |
| 467 | 704 | Doumanidou, Eleni |
| 468 | 705 | Doumas, Efkleidis |
| 469 | 706 | Doumpa, Aikaterini |
| 470 | 707 | Economou, Georgios |
| 471 | 708 | Eleftheriadis, Dimosthenis |
| 472 | 709 | Emmanouilidis, Xenofon |
| 472 | 710 | Emmanouilidou, Xeni |
| 472 | 711 | Emmanouilidou, Marianna |
| 473 | 712 | Eryfiadou, Grammatiki |
| 473 | 713 | Erfyiadou, Anastasia |
| 473 | 714 | Erfyiadou, Olga |
| 474 | 715 | Fais, Sam |
| 474 | 716 | Tsalta, Styliani |
| 475 | 717 | Fragkou, Aikaterini |
| 476 | 718 | Gantzias, Alexandros |
| 477 | 719 | Georgaroudakis, Stylianos |
| 478 | 720 | Georgopoulos, Nikolaos |
| 478 | 721 | Theodosiadou, Afroditi |
| 479 | 722 | Giakoumetti, Sofia |
| Deceased | | Giannoudis, Eleftherios |
| 480 | 723 | Alexandra Sfakianou |
| 480 | 724 | Chrysoula Giannoudi |
| 480 | 725 | Alexandros Giannoudis |
| 481 | | [DELETED AS DUPLICATE OF CLAIMANT #372] |
| 482 | 726 | Giourtsoglou, Evangelos |
| 483 | 727 | Gkliatis, Antonios |
| 484 | 728 | Goneos, Ioannis |
| 484 | 729 | Georgiou, Theodora |
| 485 | 730 | Gousgounis, Periklis |
| 486 | 731 | Grigoropoulou, Eirini |
| 487 | 732 | Grillias, Panagiotis |
| 488 | 733 | Chalvatzis, Ioannis |

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 488 | 734 | Bizopoulos, Charalambos |
| 488 | 735 | Chalvatzi, Athina-Maria |
| 488 | 736 | Emmanouilidou, Marianna |
| 489 | 737 | Ioannidis, Georgios |
| 490 | 738 | Kadi, Styliani |
| 490 | 739 | Kadis, Nikolaos |
| 490 | 740 | Kadis, Modestos |
| 491 | 741 | Kakouris, Ilias |
| 492 | 742 | Kalampakas, Antonios |
| 493 | 743 | Kalisperis, Nikolaos |
| 494 | 744 | Kalles, Odysseas |
| 494 | 745 | Vrysi, Sofia |
| 495 | 746 | Kalokairinou, Eleni |
| 496 | 747 | Kanavakis, Emmanouil |
| 497 | 748 | Kapaktsoglou, Pavlos |
| 498 | 749 | Kapetanakis, Dimitrios |
| 498 | 750 | Kafounis, Stavros |
| 498 | 751 | Kafounis, Ioannis |
| 499 | 752 | Kapouranis, Vasileios |
| 500 | 753 | Kapralos, Panagiotis |
| 501 | 754 | Karageorgos, Konstantinos |
| 502 | 755 | Karagiannis, Miltiadis |
| 503 | 756 | Karagiannis, Nikolaos |
| 503 | 757 | Karagianni, Aikaterini |
| 503 | 758 | Karagianni, Evangelia |
| 504 | 759 | Karvounaki, Marina |
| 504 | 760 | Karvounakis, Dimitrios |
| 504 | 761 | Karvounakis, Konstantinos |
| 504 | 762 | Karvounaki, Eleftheria |
| 505 | 763 | Katsarou, Aristea |
| Deceased | | Katsianis, Ioannis |
| 506 | 764 | Katsiani, Eirini-Aliki |
| 507 | 765 | Kikiras, Dimitrios |
| 507 | 766 | Kikira, Maria |
| 507 | 767 | Nikoletos, Stefanos |
| 507 | 768 | Nikoletou, Despoina |
| 508 | 769 | Kiliaridis, Stavros |
| 509 | 770 | Kladis, Dionysios |
| 509 | 771 | Kladis, Dimitrios |
| 510 | 772 | Kloukinas, Ioannis |
| 511 | 773 | Koithas, Nikolaos |
| 512 | 774 | Komninos, Dimitrios |
| 512 | 775 | Komninos, Konstantinos |
| 512 | 776 | Komninou, Myrsini |
| 512 | 777 | Komninos, Efstratios |
| 513 | 778 | Konstantinidis, Fotios |
| 514 | 779 | Konstantinou, Ioannis |

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 515 | 780 | Konstantinou, Konstantina |
| 516 | 781 | Kontrafouris, Ioannis |
| 516 | 782 | Kontou, Georgia |
| 516 | 783 | Malliaris, Georgios |
| 518 | 784 | Kopsidas, Grigorios |
| 518 | 785 | Kopsida, Chrysoula |
| 519 | 786 | Kotrokois, Gerasimos |
| 520 | 787 | Kotzamanis, Ioannis |
| 520 | 788 | Kotzamani, Olga Stella |
| 521 | 789 | Koufopoulou, Eleni |
| 522 | 790 | Kountouri, Maria |
| 523 | 791 | Kourtopoulos, Ioannis |
| 523 | 792 | Kourtopoulou, Aspasia |
| 523 | 793 | Kourtopoulou, Vasiliki |
| 523 | 794 | Kourtopoulou, Antonia |
| 524 | 795 | Kritikos, Asterios |
| 524 | 796 | Kritikos, Emmanouil |
| 525 | 797 | Kritsepis, Kyriakos |
| 526 | 798 | Kyraleos, Athanasios |
| 527 | 799 | Laliotis, Xenofon |
| 528 | 800 | Lekkakis, Pavlos |
| 529 | 801 | Leventi, Athina |
| 529 | 802 | Papavasileiou, Vasileios |
| 530 | 803 | Liakopoulos, Athanasios |
| 531 | 804 | Liakopoulos, Athanasios |
| 531 | 805 | Liakopoulou, Eleni |
| 531 | 806 | Liakopoulou, Stefania |
| 531 | 807 | Liakopoulos, Georgios |
| 532 | 808 | Liaskos, Athanasios |
| 532 | 809 | Liaskou, Aikaterini |
| 533 | 810 | Linopoulos, Georgios |
| 534 | 811 | Livas, Alexandros |
| 535 | 812 | Liverakos, Konstantinos |
| 536 | 813 | Lykissas, Marios |
| 536 | 814 | Andrioti, Maria |
| 537 | 815 | Lymperatos, Grigorios |
| 537 | 816 | Maniati, Maria |
| 538 | 817 | Lymperopoulos, Dimitrios |
| 539 | 818 | Lyraki, Kalliopi |
| 540 | 819 | Lyraki, Maria |
| 541 | 820 | Mammeas, Ilias |
| 542 | 821 | Manassakis, Ioannis |
| 542 | 822 | Manassaki, Aikaterini |
| 542 | 823 | Manassakis, Emmanouil |
| 542 | 824 | Manassaki, Evangelia |
| 542 | 825 | Manassaki, Efthymia |
| 543 | 826 | Markopoulos, Konstantinos |

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 544 | 827 | Masoura, Paraskevi |
| 544 | 828 | Masoura, Eleni |
| 544 | 829 | Masoura, Lida |
| 544 | 830 | Masoura, Markella |
| 545 | | [INTENTIONALLY LEFT BLANK] |
| 546 | 831 | Megalogiannis, Panagiotis |
| 546 | 832 | Theodorakopoulou, Angeliki |
| 547 | 833 | Melas, Panagiotis |
| 548 | 834 | Michalopoulou, Foteini |
| 549 | 835 | Misdrachis, Alvertos |
| 549 | 836 | Misdrachis, Chaim |
| 549 | 837 | Misdrachi, Ines |
| 550 | 838 | Mitsiolidis, Konstantinos |
| 550 | 839 | Mitsiolidou, Vasiliki |
| 550 | 840 | Mitsiolidou, Olga |
| 551 | 841 | Moraitakis, Theofanis |
| 552 | 842 | Motakis, Iakovos |
| 553 | 843 | Nalmpantis, Dimitrios |
| 554 | 844 | Nestoridis, Iordanis |
| 554 | 845 | Moiropoulou, Anastasia |
| 555 | 846 | Nezi, Alki-Alkioni |
| 556 | 847 | Nezi, Eirini |
| 557 | 848 | Niarchos, Georgios |
| 558 | 849 | Nikas, Efthymios |
| 559 | 850 | Nikolaou, Nikolaos |
| 559 | 851 | Sakellariou, Apostolia-Violetta |
| 560 | 852 | Ntoanidis, Ioannis |
| 561 | 853 | Ntsounos, Christos |
| 561 | 854 | Ntsounou, Kyriaki |
| 562 | 855 | Oikonomopoulos, Ioannis |
| 562 | 856 | Touralia, Athina |
| 563 | 857 | Palikaronas, Athanasios |
| 563 | 858 | Palikarona, Panagiota |
| 563 | 859 | Palikaronas, Ilias |
| 564 | 860 | Panagiotakis, Nikolaos |
| 565 | 861 | Panagiotoglou, Anastasios |
| 566 | 862 | Panagiotopoulos, Ioannis |
| 567 | 863 | Panagopoulos, Panagiotis |
| 568 | 864 | Pandi, Sofia |
| 569 | 865 | Pandis, Evangelos |
| 570 | 866 | Pantselis, Theodoros |
| 570 | 867 | Lalou, Panagiota |
| 571 | 868 | Papacharalampous, Kassiani |
| 571 | 869 | Papacharalampous, Mavretta |
| 572 | 870 | Papadopoulou, Eirini |
| 573 | 871 | Papamichail, Ioannis |
| 574 | 872 | Paparrigopoulos, Filippos |

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 574 | 873 | Paparrigopoulou, Venetia |
| 575 | 874 | Papavasileiou, Maria |
| 575 | 875 | Papavasileiou, Vasileios |
| Deceased | | Paraskevaidis, Nikolaos |
| 576 | 876 | Georgiou, Aikaterini |
| 577 | 877 | Paraskevas, Georgios |
| 578 | 878 | Parlas, Solon |
| 579 | 879 | Paspatis, Nikolaos |
| 580 | 880 | Pavlakis, Konstantinos |
| 581 | 881 | Pentsa, Despoina |
| 582 | 882 | Pentsas, Vasileios |
| 583 | 883 | Pepe, Dionysia |
| 584 | 884 | Petridis, Konstantinos |
| 585 | 885 | Pistiolas, Georgios |
| 586 | 886 | Pitarakis, Alfredos |
| 587 | 887 | Pliatsios, Georgios |
| 587 | 888 | Pliatsios, Dimitrios |
| 587 | 889 | Pliatsiou, Souzana |
| 587 | 890 | Pliatsiou, Aikaterini |
| 588 | 891 | Pouplis, Georgios |
| 588 | 892 | Poupli, Maria |
| 588 | 893 | Poupli, Margarita |
| 588 | 894 | Poupli, Maria |
| 589 | 895 | Psaroudaki, Aikaterini |
| 589 | 896 | Valasiadis, Michail |
| 590 | 897 | Rapsanioti, Aikaterini |
| 590 | 898 | Rapsaniotis, Georgios |
| 590 | 899 | Nikolitsa, Maria |
| 591 | 900 | Rapti, Aristoula |
| 592 | 901 | Ravani, Sofia |
| 593 | 902 | Rekatsinas, Epaminondas |
| 594 | 903 | Reppas, Evangelos |
| 594 | 904 | Nikolaidou, Eleni |
| 594 | 905 | Reppa, Niki |
| 594 | 906 | Reppa, Anna |
| 595 | 907 | Roumelis, Georgios |
| 596 | 908 | Sapounas, Ioannis |
| 597 | 909 | Sarantou, Nikolaos |
| 597 | 910 | Alamanidou, Maria |
| 598 | 911 | Saringalas, Evangelos |
| 599 | 912 | Skiadopoulos, Spyridon |
| 599 | 913 | Vlachopoulou, Eleni |
| 599 | 914 | Skiadopoulou, Sofia |
| 599 | 915 | Skiadopoulos, Alexis |
| 600 | 916 | Stamatopoulos, Ioannis |
| 600 | 917 | Stamatopoulou, Anna |
| 601 | 918 | Stamos, Athanasios |

**ANNEX I**

| Claimant # (Annex A) | Claimant Count | Rejoinder - Name (Family name, Given Name) |
|---|---|---|
| 602 | 919 | Terlegas, Panagiotis |
| 602 | 920 | Terlega, Vasiliki |
| 603 | 921 | Theodoridis, Georgios |
| 604 | 922 | Theodorou, Dimitrios |
| 605 | 923 | Toptsas, Charalampos |
| 606 | 924 | Trigkazi, Maria |
| 607 | 925 | Tsakiridis, Gabriel |
| 608 | 926 | Tsifoutis, Theodoros |
| 609 | 927 | Tsilvelis, Achillefs |
| 610 | 928 | Tsipitsi, Efthalia |
| 610 | 929 | Tsipitsis, Diogenis |
| 611 | 930 | Tsirivakos, Ilias |
| 612 | 931 | Tsitsikas, Andreas |
| 612 | 932 | Papanikita, Maria |
| 612 | 933 | Papanikitas, Georgios |
| Deceased | | Valmas, Georgios |
| 613 | 934 | Christos Valmas |
| 613 | 935 | Maria-Nefeli Valma |
| 614 | 936 | Vardoulakis, Konstantinos |
| 615 | 937 | Veros, Konstantinos |
| 616 | 938 | Vitsas, Vasileios |
| 617 | 939 | Vlachos, Naoum |
| 618 | 940 | Vournas, Ioannis |
| 618 | 941 | Kallimorou, Andriana |
| 618 | 942 | Vournas, Alexandros-Vasileios |
| 618 | 943 | Vourna, Christina |
| 619 | 944 | Vousvounis, Alexandros |
| 619 | 945 | Vousvouni, Vasiliki-Chrysiis |
| 620 | 946 | Zacharopoulos, Alexandros |
| 621 | 947 | Zacharopoulos, Konstantinos |
| 622 | 948 | Zamparas, Dimitrios |
| 623 | 949 | Ziagkos, Dimitrios |
| 624 | 950 | Zikopoulos, Konstantinos |
| 624 | 951 | Gkanti, Sofia |
| 625 | 952 | Ziras, Konstantinos |
| 625 | 953 | Apalla, Maria |
| 626 | 954 | Chrissovelonis, Ioannis |
| 627 | 955 | Simoudis, Simon |
| 627 | 956 | Simoudis, Angeliki |